Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

Patrick J. Nash, Jr., P.C. (*pro hac vice* pending)
Ross M. Kwasteniet, P.C. (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Proposed Counsel to the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DEBTORS' MOTION SEEKING**
**ENTRY OF INTERIM AND FINAL ORDERS**
**(I) AUTHORIZING THE DEBTORS TO PAY PREPETITION**
**CLAIMS OF CERTAIN CRITICAL VENDORS, FOREIGN VENDORS,**
**503(B)(9) CLAIMANTS, AND LIEN CLAIMANTS, (II) GRANTING**
**ADMINISTRATIVE EXPENSE PRIORITY TO ALL UNDISPUTED OBLIGATIONS ON**
**ACCOUNT OF OUTSTANDING ORDERS, AND (III) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>")

respectfully state the following in support of this motion (this "<u>Motion</u>"):

<u>**Relief Requested**</u>

1.     The Debtors seek entry of interim and final orders, substantially in the forms

attached hereto as **<u>Exhibit A</u>** and **<u>Exhibit B</u>** (respectively, the "<u>Interim Order</u>" and "<u>Final Order</u>"):

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

(a) authorizing, but not directing, the Debtors to pay, in the ordinary course of business, prepetition amounts owing on account of:  (i) critical vendor claims[2] (the "Critical Vendor Claims"), in an amount not to exceed $3.23 million; (ii) foreign vendor claims (the "Foreign Vendor Claims"), in an amount not to exceed $753,422; (iii) claims related to distribution vendors, construction vendors, and other lien claimants (the "Lien Claims"), in an amount not to exceed $1.28 million; and (iv) claims of 503(b)(9) claimants (the "503(b)(9) Claims" and, together with the Critical Vendor Claims, Foreign Vendor Claims, and Lien Claims, the "Trade Claims," and the holders of Trade Claims, collectively, the "Vendors"), in an amount not to exceed $1.26 million; and (b) granting related relief.  In addition, the Debtors request that the Court (as defined herein) schedule a final hearing in approximately 21 days after the commencement of these chapter 11 cases, or as soon thereafter as is convenient for the Court, to consider approval of this Motion on a final basis.  The Debtors do not seek to accelerate payment of amounts that would not otherwise come due in the interim period.

## Jurisdiction and Venue

2.    The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York, entered February 1, 2012.  The Debtors confirm their consent to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[2]    A "claim" means any claim as defined in section 101(5) of the Bankruptcy Code.

4.     The statutory bases for the relief requested herein are sections 105(a), 363, 503, 1107(a), and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 9013-1 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules").

**Background**

5.     The Debtors, together with their non-Debtor affiliates (collectively, "Celsius"), are one of the largest and most sophisticated cryptocurrency based finance platforms in the world and provide financial services to institutional, corporate, and retail clients across more than 100 countries.  Celsius was created in 2017 to be one of the first cryptocurrency platforms to which users could transfer their crypto assets and (a) earn rewards on crypto assets and/or (b) take loans using those transferred crypto assets as collateral.  Headquartered in Hoboken, New Jersey, Celsius employs a global workforce of approximately 670 employees and has more than 1.7 million registered users and approximately 300,000 active users with account balances greater than $100.

6.     On July 13, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description of the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, in Support of Chapter 11 Petitions and First Day Motions* (the "Mashinsky Declaration") and the *Declaration of Robert Campagna, Managing Director of Alvarez & Marsal North America, LLC, in Support of Chapter 11 Petitions and First Day Motions* (the "Campagna Declaration"), both filed contemporaneously with this Motion and incorporated by reference herein.[3]  As described in more detail in the Mashinsky Declaration, the

---

[3]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Mashinsky Declaration or the Campagna Declaration (together, the "First Day Declarations"), as applicable.

Debtors commenced these chapter 11 cases to provide Celsius an opportunity to stabilize its business and consummate a comprehensive restructuring transaction that maximizes value for stakeholders.

7.     The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrent with the filing of this Motion, the Debtors have also filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no official committees have been appointed or designated.

### The Debtors' Business Obligations and the Trade Claims

8.     In the ordinary course of business, the Debtors engage a number of providers for many of the critical services and materials the Debtors require to run their operations and service their business.  Of particular importance are Vendors who are irreplaceable due to geography, specialized equipment providers, and technical service providers with expertise specific to the Debtors' operations, equipment, and technological infrastructure.  The Debtors rely on Vendors to provide a range of goods and services including transaction processing, coin mining technology and infrastructure, compliance, data and coin storage, user interface technology, data security, hosting, cloud storage, project management, and construction and related services, among others.

9.     As part of their crypto mining enterprise—one of the largest in the country—the Debtors own 80,850 rigs, 43,632 of which are in operation and generated a total of 3,114 Bitcoin in 2021.  To increase their ability to mine Bitcoin, the Debtors decided to build a proprietary crypto mining center in Texas (the "Mining Center").  Following months of preparation, construction began in earnest in June 2022.  In connection with the construction of the Mining Center, the Debtors engaged Vendors to procure and provide goods and services.  Currently, the Debtors are

in the process of expanding their mining enterprise and expect to operate up to 122,722 rigs and project to generate approximately 10,000 Bitcoin by the end of 2022. When completed in the coming weeks, the new Mining Center will consist of 4 sites, which will host over a quarter of the Debtors' mining rigs. Accordingly, the Mining Center is an essential driver of growth in the Debtors' business and will allow the Debtors to expand and more profitably mine Bitcoin.

10. In the 6 months prior to the Petition Date, the Debtors' average monthly payments to Vendors, excluding those Vendors providing goods and services for the mining enterprise and the construction of the Mining Center, totaled approximately $5.22 million per month. In June 2022, when construction of the Mining Center began, the Debtors' payments to Vendors, including those Vendors providing goods and services for the construction of the Mining Center, totaled approximately $15.25 million. The Debtors estimate that, as of the Petition Date, they owe approximately $6.52 million on account of undisputed Trade Claims to Vendors, including Vendors associated with the Mining Center. The Debtors estimate that approximately $3.76 million of that amount will come due within the next three weeks (the "Interim Period"). Thus, despite the increased amount of Trade Claims incurred due to the Mining Center in recent months, the relief requested in this Motion is on par with the Debtors' overall Vendor spend.

11. The following table summarizes the Trade Claims associated with each category of Vendor that are estimated to be outstanding as of the Petition Date:

| Category | Description of Claims | Estimated Amount Due Within Interim Period | Estimated Total Amount Outstanding as of the Petition Date |
|---|---|---|---|
| Critical Vendor Claims | Claims of certain trade creditors that are essential to maintaining the going-concern value of the Debtors' enterprise. | $1.51 million | $3.23 million |
| Foreign Vendor Claims | Claims of foreign vendors located across Cyprus and Israel who supply products and services that are crucial to the Debtors' ongoing operations. | $351,597 | $753,422 |

| Category | Description of Claims | Estimated Amount Due Within Interim Period | Estimated Total Amount Outstanding as of the Petition Date |
|---|---|---|---|
| 503(b)(9) Claims | Claims entitled to statutory priority section 503(b)(9) of the Bankruptcy Code. | $944,531 | $1.26 million |
| Lien Claims | Claims of third parties who may assert various statutory liens, including mechanics' liens, shipping liens, and warehouse liens. | $956,250 | $1.28 million |
| | **Total Trade Claims** | **$3.76 million** | **$6.52 million** |

## I.      The Critical and Foreign Vendors.

### A.      Critical Vendors.

12.      After an extensive review and analysis of the Debtors' Vendors, the Debtors and their advisors identified the Vendors that supply products and services (collectively, the "Critical Vendors") vital to the Debtors' financial and trading operations and mining enterprises.  The Debtors rely on the Critical Vendors to operate their business, and depend on the Critical Vendors' timely provision of specialized services to provide top-quality services to their customer base.

13.      To support the Debtors' mining and financial and trading operations, the Critical Vendors provide mission-critical goods and services related to their core financial services.  For example, a number of the Critical Vendors provide essential goods and services related to the completion of the Mining Center.  Once completed, the Mining Center is expected to be a critical source of value, and any delays would negatively impact the Debtors' ability to operate as well as the Debtors' long-term growth and revenue strategy.  Other Critical Vendors form the backbone of the Debtors' platform, products, and services.  Such Critical Vendors include Vendors who provide software, IT, and security services, which are essential to ensuring that the Debtors' platform and products and services are secure.  Any attempt to replace these Critical Vendors would be highly disruptive to the Mining Center construction process and general operations, particularly during the Debtors' transition into chapter 11.

14.     The Debtors' trade relationships with their Critical Vendors generally are not governed by long-term contracts, and the Debtors believe those trade relationships may materially deteriorate, causing disruption to the Debtors' operations if the Debtors are unable to pay these Critical Vendor Claims.[4]  Accordingly, the Debtors believe payment of the Critical Vendor Claims is essential to avoid costly disturbances to the Debtors' business during these chapter 11 cases at this critical juncture.

15.     As of the Petition Date, the Debtors believe they owe Critical Vendors $3.23 million, which is approximately 20 percent of the Debtors' total outstanding accounts payable.

**B.     Foreign Vendors**.

16.     As a result of the global nature of their operations, a critical component of the Debtors' operations involve transactions with foreign vendors (collectively, the "Foreign Vendors").  In the ordinary course of business, the Debtors incur obligations (the "Foreign Vendor Claims") to numerous suppliers of goods or services (the "Foreign Vendors") whose assets are located exclusively outside the United States.

17.     Maintaining existing relationships with the Foreign Vendors is critical to continuing to operate the Debtors' business in the ordinary course.  Replacing these Foreign Vendors would be time-consuming, impracticable, and cost prohibitive.  Foreign Vendors often have skeptical reactions to the United States bankruptcy process because many of them are

---

[4]     In several cases, the Debtors' contracts with certain of the Vendors provide only a framework for the issuance of purchase orders that are limited in scope to particular projects or orders.  Thus, the Debtors' postpetition ability to use the contracts to compel the Vendors to continue to provide goods and services may be limited.  In addition, certain Vendors that are party to long-term written supply contracts may cease performance under such contracts postpetition, notwithstanding the application of the automatic stay, causing irreversible harm to the Debtors' business.  The Debtors seek authority to pay such Vendors as necessary, in their business judgment, to ensure continued performance.

unfamiliar with the chapter 11 process. Short of severing their contractual relations with the Debtors, nonpayment of prepetition claims may cause the Foreign Vendors to take other precipitous actions, including delaying shipments or initiating a lawsuit in a foreign court to obtain a judgment against the Debtors to collect prepetition amounts owed to them. Although the automatic stay applies to protect the Debtors' assets where they are located in the world, the Foreign Vendors may erroneously believe that they are not subject to the automatic stay of section 362 of the Bankruptcy Code. Moreover, attempting to enforce the Bankruptcy Code in foreign countries will be uneconomical.

18.     As of the Petition Date, the Debtors estimate that there is approximately $753,422 outstanding in Foreign Vendor Claims, approximately $351,597 of which will become due and owing within 21 days of the Petition Date.

19.     In light of the above, the Debtors seek entry of the Interim Order and Final Order granting them authority to make payments, in their sole discretion and business judgment, on account of the Critical Vendor Claims and the Foreign Vendor Claims in an amount not to exceed an aggregate amount of $1.86 million on an interim basis and $3.98 million on a final basis, which amounts represent the Debtors' best estimate as to what amounts must be paid to the Critical Vendors and the Foreign Vendors to continue an uninterrupted supply of critical goods and services. The Debtors further request that the Court grant the Debtors the authority to allocate the foregoing amounts at their discretion, without prejudice to seek additional relief, and subject to an agreement (within the Debtors' discretion) to receive terms consistent with trade terms (including credit limits, discounts, pricing, timing of payments, availability, and other terms) consistent with the parties' ordinary course practice or as otherwise agreed by the Debtors in their reasonable

business judgment (the "<u>Customary Trade Terms</u>") from the Critical Vendors and the Foreign

Vendors.

### C.    Process for Identifying Critical Vendors.

20.    Recognizing that payment of all prepetition claims of third-party vendors outside

of the Debtor's chapter 11 plan would be extraordinary relief, the Debtors, with the assistance of

their advisors, spent significant time reviewing and analyzing their books and records, consulting

operations management and purchasing personnel, reviewing contracts, supply agreements and

purchase orders incorporated thereunder, and analyzing applicable laws, regulations, and historical

practice to identify the limited number of vendors that are critical to the operation of the Debtors'

business—the loss of which could materially harm their business or reduce its enterprise value.  In

this process, the Debtors considered a variety of factors, including:

- whether a vendor provides goods or services that are essential to maintaining employee health and safety;

- whether certain specifications or contract requirements prevent, directly or indirectly, the Debtors from obtaining goods or services from alternative sources;

- whether a vendor is a sole-source, limited-source, or high-volume supplier of goods or services critical to the Debtors' business operations;

- whether an agreement exists by which the Debtors could compel a vendor to continue performing on prepetition terms;

- whether alternative vendors are available that can provide requisite volumes of similar goods or services on equal (or better) terms and, if so, whether the Debtors would be able to continue operating while transitioning business thereto;

- the degree to which replacement costs (including, pricing, transition expenses, professional fees, and lost sales or future revenue) exceed the amount of a vendor's prepetition claim;

- whether the Debtors' inability to pay all or part of the vendor's prepetition claim could trigger financial distress for the applicable vendor;

- the likelihood that a temporary break in the vendor's relationship with the Debtors could be remedied through use of the tools available in these chapter 11 cases;

- whether failure to pay all or part of a particular vendor's claim could cause the vendor to hold goods owned by the Debtors, or refuse to ship inventory or to provide critical services on a postpetition basis;

- the location and nationality of the vendor; and

- whether failure to pay a particular vendor could result in contraction of trade terms as a matter of applicable non-bankruptcy law or regulation.

21.     In addition to these factors, the Debtors and their advisors examined the health of each Vendor relationship, the Vendor's familiarity with the chapter 11 process, and the extent to which each Vendor's prepetition claims could be satisfied elsewhere in the chapter 11 process.

## II.     503(b)(9) Claims.

22.     The Debtors may have received goods worth millions of dollars from various vendors within the 20-day period immediately preceding the Petition Date (collectively, the "503(b)(9) Claimants"), thereby giving rise to prepetition claims to the 503(b)(9) Claimants (the "503(b)(9) Claims").  The Debtors receive large volumes of construction materials from their vendors on a rolling basis to satisfy their current building demands related to the Mining Center.

23.     The vast majority of the 503(b)(9) Claimants are also Critical Vendors.  The Debtors' relationships with these vendors, and with many of the other 503(b)(9) Claimants, are not governed by long-term contracts.  Rather, the Debtors obtain goods from such claimants on an order-by-order basis.  As a result, 503(b)(9) Claimants may refuse to supply new orders if the Debtors do not pay the 503(b)(9) Claims.  Such refusal would significantly delay the completion of the Mining Center, negatively impacting the timely deployment of the Debtors' rigs, which will constitute the Mining Center's primary source of revenue.

24.     The Debtors also believe that certain 503(b)(9) Claimants could demand payment in cash on delivery—further exacerbating the Debtors' liquidity.  The Debtors believe that, as of the Petition Date, they owe approximately $1.26 million on account of goods delivered within the

20 days immediately preceding the Petition Date, approximately $944,531 of which may become due within the first 21 days of these chapter 11 cases, and the value of which may be entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

25.    Accordingly, by this Motion, the Debtors seek authority, but not direction, to pay outstanding prepetition obligations on account of the 503(b)(9) Claims, up to $1.26 million in the aggregate, but only as such amounts come due in the ordinary course of business or as may be necessary to secure a Vendor's agreement to continue business with the Debtors on Customary Trade Terms, and to continue to pay the 503(b)(9) Claims as they come due in the ordinary course of business.

III.    **Outstanding Orders**.

26.    Additionally, in the ordinary course of business, the Debtors may have ordered goods prior to the Petition Date which will not be delivered until after the Petition Date (the "Outstanding Orders").  In the mistaken belief that they would be general unsecured creditors of the Debtors' estates with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition—potentially disrupting the Debtors' ongoing business operations and requiring the Debtors to expend substantial time and effort in issuing such substitute orders.  As set forth in greater detail below, because the Outstanding Orders are administrative expenses of the Debtors' estates, the Debtors are requesting that the Court confirm the administrative expense priority under section 503(b) of the Bankruptcy Code to all undisputed obligations of the Debtors arising from the postpetition acceptance of goods subject to Outstanding Orders and authorize the Debtors to pay amounts due on account of Outstanding Orders in the

ordinary course of business and subject to the limitations set forth in the Interim Order and Final

Order.

**IV.     Lien Claims**.

27.     The Debtors routinely transact business with a number of third parties who may

assert various statutory liens (the "Lien Claimants"), including mechanics' liens, against the

Debtors and their property if the Debtors fail to pay for the services rendered.  The Lien Claimants

primarily consist of: (a) vendors who provide shipping, storage, and related services for the

Debtors' mining operations (collectively, the "Distribution Vendors"); and (b) Vendors providing

construction services (collectively, the "Construction Vendors").

28.     The Distribution Vendors, which include shippers and warehouses, transport, store,

and otherwise facilitate the movement of the Debtors' mining rigs to the hosting sites.  The

Distribution Vendors include shippers and warehouses.  The Construction Vendors are engaged in

the construction of the Debtors' Mining Center, including the installation and repair of certain

equipment, the provision of power services and infrastructure, and the maintenance and general

construction of the Mining Center.  The Construction Vendors are generally hired and paid on a

project-by-project basis.

29.     To the extent any Lien Claimant has perfected a lien on any of the Debtors' property

or their customers' property or, in the Debtors' estimation, could assert and perfect a lien on any

such property, it is imperative that the Debtors be authorized to pay such Lien Claimants,

regardless of whether their claims arose prior to or after the Petition Date.  Such payment will

secure the release of any such lien and the Debtors' continued uninterrupted access to the goods

and services provided by the Lien Claimants.  Further, if amounts owed to the Lien Claimants are

not paid, certain of the Lien Claimants may be able to assert and perfect mechanics' or other liens

against certain of the Debtors' goods or property, notwithstanding the automatic stay imposed by section 362 of the Bankruptcy Code.

30.    Moreover, the value of the assets in the possession of the Lien Claimants generally exceeds the value of their respective prepetition claims. The refusal of Lien Claimants to deliver or return the Debtors' goods as a result of not being paid would severely disrupt the Debtors' operations and could potentially cost the Debtors a substantial amount of revenue. The Debtors' ability to maintain access to materials, goods, equipment, and services is critical to the timely completion and continued viability of the Debtors' Mining Center.

31.    As of the Petition Date, the Debtors owe Lien Claimants an aggregate amount of approximately $1.28 million on account of Lien Claims, approximately $956,250 of which will come due within the first 21 days of these chapter 11 cases. For the avoidance of doubt, the Debtors seek authority to pay only those amounts that they determine, in their sole discretion, are necessary or appropriate to obtain release of critical or valuable goods and materials and induce the Lien Claimants to continue performing and otherwise supporting the Debtors' Mining Center construction project on a postpetition basis. The Debtors intend to pay prepetition Lien Claims only where they believe, in their business judgment, that the benefit to their estates from making such payments will exceed the costs that their estates would incur by bringing an action to compel the turnover of such goods and the delay associated with such actions.

## Customary Trade Terms

32.    Subject to the Court's approval, the Debtors intend to pay Trade Claims only to the extent necessary to preserve their business. The Debtors have designated a core group of executives, advisors, and employees who have experience in the Debtors' business and in the Debtors' value-preserving process to review, assess, and potentially recommend any payment on account of these claims. In return for paying these claims, the Debtors will use commercially

13

reasonable efforts to condition payment of Critical Vendor Claims, Foreign Vendor Claims, 503(b)(9) Claims, and Lien Claims upon each claimant's agreement to continue supplying goods and services to the Debtors in accordance with the Customary Trade Terms.

33.    In particular, the Debtors will condition the payment of Critical Vendor Claims upon each such party's agreement to continue supplying goods or services on Customary Trade Terms by executing a trade agreement substantially in the form attached as **Exhibit C** (each, a "Trade Agreement").  Each such Trade Agreement, once agreed to and accepted by a party, shall be a legally binding contractual arrangement between the parties governing the commercial trade relationship as provided herein.

34.    In addition, the Debtors request that if any party accepts payment pursuant to the relief requested by this Motion and thereafter does not continue to provide goods or services on Customary Trade Terms, as applicable, then:  (a) such payment may be deemed to be an improper postpetition transfer on account of a prepetition claim, and therefore, immediately recoverable by the Debtors in cash upon written request; (b) upon recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment had not been made; and (c) if there exists an outstanding postpetition balance due from the Debtors to such party, the Debtors may elect to recharacterize and apply any payment made pursuant to the relief requested by this Motion to such outstanding postpetition balance and such supplier or vendor will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

**Basis for Relief**

I.      **The Court Should Grant the Relief Requested in this Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code.**

35.      Courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate.  *See, e.g.*, *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (authorizing debtor to pay prepetition wages); *Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (Bankr. S.D.N.Y. 1983) (authorizing the payment of prepetition claims to suppliers); *see also In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).  In so doing, these courts acknowledge that several legal theories rooted in sections 105(a) and 363(b) of the Bankruptcy Code support the payment of prepetition claims as provided herein.

36.      Pursuant to section 363(b) of the Bankruptcy Code, courts may authorize payment of prepetition obligations where a sound business purpose exists for doing so.  *See In re Ionosphere Clubs*, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification).  *See also In re James A. Phillips*, 29 B.R. at 397 (relying upon section 363 as a basis to allow a contractor to pay the prepetition claims of suppliers who were potential lien claimants).  Indeed, courts have recognized that there are instances when a debtor's fiduciary duty can "only be fulfilled by the preplan satisfaction of a prepetition claim."  *See, e.g.*, *In re CoServ*, 273 B.R. 497.

37.      In addition, courts may authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code.  Section 105(a) of the Bankruptcy Code codifies the Court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Under section 105(a) of the Bankruptcy Code, courts may authorize preplan payments of prepetition

obligations when essential to the continued operation of a debtor's business. *See, e.g.*, *In re C.A.F. Bindery, Inc.*, 199 B.R. 828, 835 (Bankr. S.D.N.Y. 1996); *see also In re Fin. News Network Inc.*, 134 B.R. 732, 735–36 (Bankr. S.D.N.Y. 1991) (holding that the "doctrine of necessity" stands for the principle that a bankruptcy court may allow preplan payments of prepetition obligations where such payments are critical to the debtor's reorganization). Specifically, the Court may use its power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity"). *See e.g.*, *In re Ionosphere Clubs*, 98 B.R. at 176.

38.    Moreover, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, debtors in possession are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." *In re CoServ*, 273 B.R. at 497. Implicit in the fiduciary duties of any debtor in possession is the obligation to "protect and preserve the estate, including an operating business's going-concern value." *Id.* Some courts have noted that there are instances in which a debtor can fulfill this fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." *Id.* The court in *CoServ* specifically noted the pre-plan satisfaction of prepetition claims would be a valid exercise of the debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate . . . " *Id.*

39.    The relief requested herein is appropriate and warranted under the circumstances. The authority to satisfy the Trade Claims in the initial days of these cases without disrupting the Debtors' operations will maintain the integrity of the Debtors' employee base and supply chain, facilitate the Debtors' accounts receivable collection, and allow the Debtors to smoothly transition into and efficiently administer these chapter 11 cases. Failure to pay the Trade Claims could potentially destroy value that would otherwise inure to the benefit of the Debtors' estates.

40.    The resulting harm to the Debtors' estates far outweighs the costs associated with

paying the Debtors' prepetition obligations to the Critical Vendors and Lien Claimants.  Thus, the

Debtors' other creditors will be no worse off, and likely fare better, if the Debtors are empowered

to negotiate such payments to achieve a smooth transition into chapter 11 with minimal

disruptions.  As such, the Debtors believe the relief sought in this Motion will not burden the

Debtors but will help maximize the value of their estates.  Accordingly, for the reasons set forth

herein, it is appropriate for the Court to authorize the Debtors to satisfy the Critical Vendor Claims

and Lien Claims.

41.    Where, as here, debtors have shown that the payment of prepetition claims is critical

to maximize the value of their estates, courts in this district and other jurisdictions have routinely

authorized payments to critical vendors, 503(b)(9) claimants, lien claimants, and similar vendors

on account of prepetition claims.  *See, e.g.*, *In re GTT Communications, Inc.*, No. 21-11880 (MEW)

(Bankr. S.D.N.Y. Nov. 30, 2021) (authorizing the payment of prepetition trade claims of suppliers,

foreign vendors, lien claimants, and other operational partners); *In re Frontier Communications

Corp.*, No. 20-22476 (RDD) (Bankr. S.D.N.Y. June 19, 2020) (authorizing the payment of

prepetition claims of critical vendors, lien claimants, and section 503(b)(9) claimants on the basis

that they could cease to provide specialized goods and services necessary to maintain the smooth

operation of the debtors' business otherwise); *In re Barneys New York, Inc.*, No. 19-36300 (CGM)

(Bankr. S.D.N.Y. Sept. 5, 2019) (authorizing the payment of prepetition claims of critical vendors,

foreign vendors, lien claimants, and section 503(b)(9) claimants on the basis that they could cease

to provide specialized goods and services necessary to maintain the smooth operation of the

debtors' business otherwise); *In re Hollander Sleep Products, LLC*, No. 19-11068 (MEW)

(Bankr. S.D.N.Y. July 2, 2019) (same); *In re Windstream Holdings, Inc.*, No. 19-22312

(RDD) (Bankr. S.D.N.Y. Apr. 22, 2019) (authorizing the payment of prepetition claims of critical

vendors, lien claimants, and section 503(b)(9) claimants on the same basis); *In re Aegean Marine*

*Petrol. Network Inc.*, No. 18-13374 (MEW) (Bankr. S.D.N.Y. Dec. 6, 2018) (authorizing the

payment of prepetition claims of foreign claimants, lien claimants, 503(b)(9) claimants, and HSE

and other claimants on the same basis).[5]

## II.    The Court Should Authorize the Payment of Critical Vendor Claims and Foreign Vendor Claims.

42.    Allowing the Debtors to pay the Critical Vendor Claims and Foreign Vendor

Claims is especially appropriate where, as here, doing so is consistent with the "two recognized

policies" of chapter 11 of the Bankruptcy Code—preserving going concern value and maximizing

the value of property available to satisfy creditors. *See Bank of Am. Nat'l Trust Savs. Ass'n v. 203*

*N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999). Indeed, reflecting the recognition that payment

of prepetition claims of certain essential suppliers and vendors is, in fact, both critical to a debtor's

ability to preserve any value and maximize creditor recovery, courts in this district regularly grant

relief consistent with that which the Debtors are seeking in this Motion.

43.    Additionally, if the Debtors do not pay certain of the Foreign Vendor Claims,

certain Foreign Vendors may simply refuse to do business with the Debtors unless and until they

receive payment on account of their prepetition claims. The Foreign Vendors may take other

precipitous action against the Debtors under based on the incorrect believe they are not bound by

the automatic stay. As a result, the Debtors would be unable to procure products and services,

potentially causing the Debtors to fail or delay providing products to their customers. Courts in

this jurisdiction routinely grant authorization for debtors to pay claims owing to foreign entities

---

[5]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

against which the automatic stay cannot be enforced readily in the United States and as to which it would be unduly time-consuming and expensive to seek enforcement of an order of the bankruptcy court in the creditor's home country.  *See, e.g.*, *In re Philippine Airlines, Inc.*, No. 21-11569 (SCC) (Bankr. S.D.N.Y. Sept. 30, 2021) (authorizing the payment of prepetition obligations owed to foreign critical vendors); *In re Avianca Holdings S.A.*, No. 20-11133 (MG) (Bankr. S.D.N.Y. Jan. 27, 2021) (same); *In re LATAM Airlines Group S.A.*, No. 20-11254 (JLG) (Bankr. S.D.N.Y. July 7, 2020) (same); *In re Frontier Communications Corp.*, No. 20-22476 (RDD) (Bankr. S.D.N.Y. June 19, 2020) (same); *In re Barneys New York, Inc.*, No. 19-36300 (CGM) (Bankr. S.D.N.Y. Sept. 5, 2019) (authorizing the payment of prepetition claims of foreign vendors).[6]

44.     The Debtors depend on the goods and the provision of services by the Critical Vendors and Foreign Vendors.  Ensuring these Critical Vendors and Foreign Vendors continue to deliver goods and materials and provide services is therefore vital to the ability of the Debtors to maximize the value of their ongoing projects.  Based on these circumstances, the Debtors submit that the relief requested herein represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is therefore justified under sections 105(a) and 363(b) of the Bankruptcy Code.

**III.    The Court Should Authorize the Payment of Claims Entitled to Priority Pursuant to Section 503(b)(9) of the Bankruptcy Code**.

45.     Section 503(b)(9) of the Bankruptcy Code provides administrative priority for "the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such

---

[6]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

debtor's business." 11 U.S.C. § 503(b)(9). The 503(b)(9) Claims must be paid in full for the Debtors to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(A). Consequently, payment of such claims now only provides such parties with what they would be entitled to receive under a chapter 11 plan. Moreover, the timing of such payments lies squarely within the Court's discretion. *See In re Photo Promotion Assocs., Inc.*, 881 F.2d 6, 8-9 (2d Cir. 1989) ("Foremost, of course, is the broad discretion a bankruptcy judge has in applying . . . 503(b)"); *In re Glob. Home Prods., LLC*, No. 06-10340 (KG), 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006) (agreeing with parties that "the timing of the payment of that administrative expense claim is left to the discretion of the Court"); 4 Collier on Bankruptcy ¶ 503.16[3] (Richard Levin & Henry J. Sommer eds., 16th ed.) ("[P]rior to confirmation bankruptcy courts have discretion to determine when section 503(b)(9) claims should be paid."). The Debtors' ongoing ability to obtain goods as provided herein is key to their survival and necessary to preserve the value of their estates. Absent payment of the 503(b)(9) Claims at the outset of these chapter 11 cases—which merely accelerates the timing of payment and not the ultimate treatment of such claims—the Debtors could be denied access to the goods necessary to maintain the Debtors' operations and maximize the value of the Debtors' estates.

46.     Moreover, the Bankruptcy Code does not prohibit a debtor from paying such claims prior to confirmation. As administrative claims incurred in the ordinary course of business, the Debtors believe they may pay such claims in accordance with their business judgment pursuant to section 363(c)(1) of the Bankruptcy Code. *See, e.g.*, *In re Dana Corp.*, 358 B.R. 567, 580 (Bankr. S.D.N.Y. 2006) ("The Bankruptcy Code is designed to allow a debtor-in-possession the flexibility to engage in ordinary transactions without unneeded oversight by creditors or the court, while at the same time giving creditors an opportunity to contest those transactions that are not

ordinary. This balance between allowing businesses to continue their daily operations . . . and protecting creditors from squandering the estate's assets . . . is reflected in section 363(c)(1) of the Bankruptcy Code."); *In re James A. Phillips, Inc.*, 29 B.R. 391, 395 n.2 (S.D.N.Y. 1983) ("Insofar as transactions are actually in the ordinary course, they are authorized automatically by § 363(c)(1) and § 1107(a), and do not require Bankruptcy Court approval."); Transcript of Hearing held on October 31, 2006 at 49, *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC) (Bankr. D. Del. Nov. 6, 2006) ("THE COURT: I think arguably the debtor could pay its 503(b)(9) claimants without court approval."). Again, the timing of such payments lies squarely within the Court's discretion. *See In re Glob. Home Prods., LLC*, No. 06-10340 (KG), 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006).

47. For these reasons, courts in this district have regularly authorized the payment of claims arising under section 503(b)(9) of the Bankruptcy Code in the ordinary course of business. *See, e.g.*, *In re Frontier Communications Corp.*, No. 20-22476 (RDD) (Bankr. S.D.N.Y. June 19, 2020) (authorizing the payment of prepetition claims of section 503(b)(9) claimants on the basis that they could cease to provide specialized goods and services necessary to maintain the smooth operation of the debtors' business otherwise); *In re Barneys New York, Inc.*, No. 19-36300 (CGM) (Bankr. S.D.N.Y. Sept. 5, 2019) (same); *In re Hollander Sleep Products, LLC*, No. 19-11068 (MEW) (Bankr. S.D.N.Y. July 2, 2019) (same); *In re Windstream Holdings, Inc.*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. Apr. 22, 2019) (same); *In re Aegean Marine Petrol. Network Inc.*, No. 18-13374 (MEW) (Bankr. S.D.N.Y. Dec. 6, 2018) (same).[7] Accordingly, for the reasons set

---

[7] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

forth herein, the Debtors submit that it is appropriate for the Court to authorize the Debtors to
satisfy the 503(b)(9) Claims.

## IV.    The Court Should Confirm that Outstanding Orders Are Administrative Expense Priority Claims and that Payment of Such Claims Is Authorized.

48.    Pursuant to section 503(b)(1) of the Bankruptcy Code, obligations that arise in
connection with the postpetition delivery of goods and services, including goods ordered
prepetition, are administrative expense priority claims because they benefit the estate postpetition.
*See* 11 U.S.C. § 503(b)(1)(A) (providing that the "actual [and] necessary costs and expenses of
preserving the estate" are administrative expenses); *see also In re John Clay & Co.*, 43 B.R. 797,
809–10 (Bankr. D. Utah 1984) (holding that goods ordered prepetition but delivered postpetition
are entitled to administrative priority).  Thus, granting the relief sought herein with respect to the
Outstanding Orders will not afford such claimants any greater priority than they otherwise would
have if the relief requested herein were not granted and will not prejudice any other party in
interest.

49.    Absent such relief, however, the Debtors may be required to expend substantial
time and effort reissuing the Outstanding Orders to provide certain suppliers with assurance of
such administrative priority.  The attendant disruption and delay to the continuous and timely flow
of critical materials and other goods to the Debtors would force the Debtors to potentially halt
operations and production, disrupt the Debtors' business, and lead to a loss of revenue, all to the
detriment of the Debtors and their creditors.

50.    Indeed, courts in this jurisdiction routinely grant the type of relief requested herein.
*See, e.g.*, *In re GTT Communications, Inc.*, No. 21-11880 (MEW) (Bankr. S.D.N.Y. Nov. 30, 2021)
(holding that goods ordered prepetition but delivered postpetition are entitled to administrative
priority); *In re Jason Industries, Inc.*, No. 20-22766 (RDD) (Bankr. S.D.N.Y. July 27, 2020);

(MEW) (Bankr. S.D.N.Y. July 2, 2019) (same); *In re Windstream Holdings, Inc.*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. Apr. 22, 2019) (same); *In re Aegean Marine Petrol. Network Inc.*, No. 18-13374 (MEW) (Bankr. S.D.N.Y. Dec. 6, 2018) (same).  Accordingly, the Debtors submit that the Court should confirm the administrative expense priority status of the Outstanding Orders and should authorize the Debtors to pay the Outstanding Orders in the ordinary course of business.

## V.    The Court Should Authorize the Payment of Lien Claims.

51.    Certain Lien Claimants may be entitled under applicable nonbankruptcy law to assert certain possessory liens on the Debtors' goods or equipment in their possession (notwithstanding the automatic stay under section 362 of the Bankruptcy Code) in an attempt to secure payment of their prepetition claim.  Under section 362(b)(3) of the Bankruptcy Code, the act of perfecting such liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay.  11 U.S.C. § 362(b)(3).  As a result, the Debtors anticipate that certain Lien Claimants may assert or perfect liens, refuse to turn over goods in their possession, or stop performing their ongoing obligations.  Even absent a valid lien, to the extent that certain Lien Claimants have possession of the Debtors' inventory, mere possession or retention would disrupt the Debtors' operations.

52.    Additionally, pursuant to section 363(e) of the Bankruptcy Code, the Lien Claimants may be entitled to adequate protection of a valid possessory lien to the extent that the Debtors use or sell the estate property against which a Lien Claim is asserted.  Given that the value of such property will generally far exceed the value of the related Lien Claim, creditors will not be harmed—and, in fact, will be benefited—by the satisfaction of certain amounts owed to the Lien Claimants.  Those payments will facilitate the use and/or sale of estate property against which liens may otherwise be asserted, helping to preserve the going concern value of the Debtors' business and enabling the Debtors to smoothly transition into chapter 11.

53.     For these reasons, courts in this jurisdiction have authorized the payment of prepetition lien claims under similar circumstances in recent chapter 11 cases.  *See, e.g.*, *In re Philippine Airlines, Inc.*, No. 21-11569 (authorizing the payment of prepetition claims of lien claimants); *In re Garrett Motion Inc.*, No. 20-12212 (MEW) (Bankr. Oct. 20, 2020) (same); *In re Frontier Comms. Corp.*, No. 20-22476 (RDD) (Bankr. S.D.N.Y. June 19, 2020) (same); *In re Barneys New York, Inc.*, No. 19-36300 (CGM) (Bankr. S.D.N.Y. Sept. 5, 2019) (same); *In re Hollander Sleep Products, LLC*, No. 19-11068 (MEW) (Bankr. S.D.N.Y. July 2, 2019) (same). Accordingly, for the reasons set forth herein, the Debtors submit that it is appropriate for the Court to authorize the Debtors to satisfy the Lien Claims.

### Processing of Checks and Electronic Fund Transfers Should Be Authorized

54.     The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course of business.   In addition, under the Debtors' existing cash management system, which is described in further detail in a separate motion, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the relief requested herein.  Accordingly, the Debtors believe that checks or wire transfer requests that are not related to authorized payments will not be honored inadvertently.  Therefore, the Debtors respectfully request that the Court authorize and direct all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

### The Requirements of Bankruptcy Rule 6003 Are Satisfied

55.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." As set forth in this Motion, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested

could hinder the Debtors operations and cause irreparable harm.  Furthermore, the failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support the relief requested herein.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

56.    To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Reservation of Rights

57.    Nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or should be construed as (a) an admission as to the validity of any particular claim against the Debtors, (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds, (c) a promise or requirement to pay any particular claim, (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion, (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law, or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be

construed as an admission as to the validity of any particular claim or a waiver of the Debtors'
rights to subsequently dispute such claim.

## **Motion Practice**

58.     This Motion includes citations to the applicable rules and statutory authorities upon
which the relief requested herein is predicated and a discussion of their application to this Motion.
Accordingly, the Debtors submit that this Motion satisfies Local Rule 9013-1(a).

## **Notice**

59.     The Debtors will provide notice of this Motion to the following parties or their
respective counsel:  (a) the United States Trustee for the Southern District of New York; (b) the
holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) the
United States Attorney's Office for the Southern District of New York; (d) the Internal Revenue
Service; (e) the offices of the attorneys general in the states in which the Debtors operate; (f) the
Vendors; (g) the Securities and Exchange Commission; and (h) any party that has requested notice
pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief
requested, no other or further notice need be given.

## **No Prior Request**

60.     No prior request for the relief sought in this Motion has been made to this or any
other court.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order and

Final Order granting the relief requested herein and such other relief as the Court deems

appropriate under the circumstances.

New York, New York
Dated: July 14, 2022

*/s/ Joshua Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900
Email:            jsussberg@kirkland.com

 - and -

Patrick J. Nash, Jr., P.C. (*pro hac vice* pending)
Ross M. Kwasteniet, P.C. (*pro hac vice* pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200
Email:            patrick.nash@kirkland.com
                  ross.kwasteniet@kirkland.com

*Proposed Counsel to the Debtors and*
*Debtors in Possession*

## Exhibit A

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**INTERIM ORDER**
**(I) AUTHORIZING THE**
**DEBTORS TO PAY PREPETITION CLAIMS OF**
**CERTAIN CRITICAL VENDORS, FOREIGN VENDORS,**
**503(B)(9) CLAIMANTS, AND LIEN CLAIMANTS, (II) GRANTING**
**ADMINISTRATIVE EXPENSE PRIORITY TO ALL UNDISPUTED OBLIGATIONS ON**
**ACCOUNT OF OUTSTANDING ORDERS, AND (III) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an interim order (this "Interim Order"):  (a) authorizing, but not directing, the Debtors to pay, in the ordinary course of business, prepetition amounts owing on account of: (i) Critical Vendor Claims; (ii) claims of Foreign Vendor Claims; (iii) Lien Claims; (iv) 503(b)(9) Claims; (b) granting related relief; and (c) scheduling a final hearing to consider approval of the Motion on a final basis, all as more fully set forth in the Motion; and upon the First Day Declarations; and this Court having jurisdiction over this matter pursuant to  28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York, entered February 1, 2012; and this Court having the power

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

to enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted on an interim basis as set forth herein.

2.      The final hearing (the "Final Hearing") on the Motion shall be held on _____, 2022, at__:__ _.m., prevailing Eastern Time.  Any objections or responses to entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Eastern Time, on _____, 2022, and shall be served on:  (a)  the Debtors, Celsius Network LLC, 121 River Street, PH05, Hoboken, New Jersey 07030, Attn: Ron Deutsch; (b) proposed counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua A. Sussberg, P.C., and 300 North LaSalle, Chicago, Illinois 60654, Patrick J. Nash, Jr., P.C., and Ross M. Kwasteniet, P.C.; (c) the Office of the United States Trustee, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, New York 10014, Attn: Shara Cornell, Mark Bruh, and Brian S. Masumoto; and (d) counsel to any statutory committee appointed in these chapter 11 cases.

3.     The Debtors are authorized, in their sole discretion, to continue their prepetition business operations, policies, and programs and pay any accrued but unpaid prepetition Trade Claims, on a postpetition basis in the ordinary course of business on Customary Trade Terms or as may be necessary to secure a Vendor's agreement to continue business with the Debtors on Customary Trade Terms, up to the amount set forth for each category of Trade Claims set forth in the Motion.

4.     The form of Trade Agreement, substantially in the form attached to the Motion as Exhibit C, is approved in its entirety.  The Debtors are authorized to enter into any such Trade Agreements.  The Debtors shall condition payment of Critical Vendor Claims upon the execution of a Trade Agreement.

5.     Notwithstanding paragraph 4 of this Interim Order, the Debtors may (a) in their reasonable business judgement, negotiate, amend, or modify the form of Trade Agreement, and (b) decline to condition payment of Critical Vendor Claims upon the execution of a Trade Agreement.

6.     Regardless of whether a Trade Agreement has been executed, if any party accepts payment hereunder and does not continue supplying goods or services to the Debtors in accordance with trade terms at least as favorable to the Debtors as the Customary Trade Terms then, subject to the entry of a final order on the Motion from this Court: (a) any payment on account of a prepetition claim received by such party shall be deemed, in the Debtors' sole discretion, an improper postpetition transfer and, therefore, recoverable by the Debtors in cash upon written request by the Debtors; (b) upon recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment had not been made; and (c) if there exists an outstanding postpetition balance due from the Debtors to such party, the Debtors may elect to recharacterize and apply any

payment made pursuant to the relief requested by the Motion to such outstanding postpetition balance and such supplier or vendor will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

7.      The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with the relief granted herein.

8.      Notwithstanding the relief granted in this Interim Order and any actions taken pursuant to such relief, nothing in this Interim Order shall be deemed:  (a) an admission as to the validity of any prepetition claim against a Debtor entity; (b) a waiver of the Debtors' right to dispute any prepetition claim on any grounds; (c) a promise or requirement to pay any prepetition claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Interim Order or the Motion; (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights or the rights of any other person under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens. Any payment made pursuant to this Interim Order is not intended and should not be construed as an admission as the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

9.      The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized and directed to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Interim Order.

10.      Any Critical Vendor that accepts payment from the Debtors on account of all or a portion of a Critical Vendor Claim pursuant to this Interim Order shall be deemed to (a) agree to the terms and provisions of this Interim Order, and (b) have waived, to the extent so paid, any and all prepetition claims, of any type, kind, or priority, against the Debtors, their assets, and properties.

11.      The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

12.      Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

13.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

14.      The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Interim Order in accordance with the Motion (including, without limitation, making copies of this Interim Order, the Motion, and any materials or other information related thereto available in any local language in a jurisdiction in which the Debtors or their affiliates operate).

15.     This Court retains exclusive jurisdiction with respect to all matters arising from or

related to the implementation, interpretation, and enforcement of this Interim Order.

New York, New York
Dated: _____, 2022

_____
THE HONORABLE [●]
UNITED STATES BANKRUPTCY JUDGE

**Exhibit B**

**Proposed Final Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**FINAL ORDER**
**(I) AUTHORIZING THE**
**DEBTORS TO PAY PREPETITION CLAIMS**
**OF CERTAIN CRITICAL VENDORS, FOREIGN VENDORS,**
**503(B)(9) CLAIMANTS, AND LIEN CLAIMANTS, (II) GRANTING**
**ADMINISTRATIVE EXPENSE PRIORITY TO ALL UNDISPUTED OBLIGATIONS ON**
**ACCOUNT OF OUTSTANDING ORDERS, AND (III) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of a final order (this "Final Order"):  (a) authorizing, but not directing, the Debtors to pay, in the ordinary course of business, prepetition amounts owing on account of:  (i) Critical Vendor Claims;  (ii) Foreign Vendor Claims;  (iii) Lien Claims;  and (iv) 503(b)(9) Claims;  and (b) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declarations; and this Court having jurisdiction over this matter pursuant to  28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York, entered February 1, 2012; and this Court having the power to enter a final order consistent with Article III of the United States Constitution;

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT.

1.      The Motion is granted on a final basis as set forth herein.

2.      The Debtors are authorized, in their sole discretion, to continue their prepetition business operations, policies, and programs and pay any accrued but unpaid prepetition Trade Claims, on a postpetition basis in the ordinary course of business on Customary Trade Terms or as may be necessary to secure a Vendor's agreement to continue business with the Debtors on Customary Trade Terms, up to the amount set forth for each category of Trade Claims set forth in the Motion.

3.      The form of Trade Agreement, substantially in the form attached to the Motion as Exhibit C, is approved in its entirety.  The Debtors are authorized to enter into any such Trade Agreements.  The Debtors shall condition payment of Critical Vendor Claims upon the execution of a Trade Agreement.

4.      Notwithstanding paragraph 3 of this Final Order, the Debtors may (a) in their reasonable business judgment, negotiate, amend, or modify the form of Trade Agreement, and

(b) decline to condition payment of Critical Vendor Claims upon the execution of a Trade Agreement.

5.        Regardless of whether a Trade Agreement has been executed, if any party accepts payment hereunder and does not continue supplying goods or services to the Debtors in accordance with trade terms at least as favorable to the Debtors as the Customary Trade Terms then, subject to the entry of a final order on the Motion from this Court: (a) any payment on account of a prepetition claim received by such party shall be deemed, in the Debtors' sole discretion, an improper postpetition transfer and, therefore, recoverable by the Debtors in cash upon written request by the Debtors; (b) upon recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment had not been made; and (c) if there exists an outstanding postpetition balance due from the Debtors to such party, the Debtors may elect to recharacterize and apply any payment made pursuant to the relief requested by the Motion to such outstanding postpetition balance and such supplier or vendor will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

6.        The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with the relief granted herein.

7.        Notwithstanding the relief granted in this Final Order and any actions taken pursuant to such relief, nothing in this Final Order shall be deemed:  (a) an admission as to the validity of any prepetition claim against a Debtor entity; (b) a waiver of the Debtors' right to dispute any prepetition claim on any grounds; (c) a promise or requirement to pay any prepetition

claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Final Order or the Motion; (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights or the rights of any other person under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection, or seek avoidance of, all such liens. Any payment made pursuant to this Final Order is not intended and should not be construed as an admission as the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

8. The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Final Order.

9. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

10. Any Critical Vendor that accepts payment from the Debtors on account of all or a portion of a Critical Vendor Claim pursuant to this Final Order shall be deemed to (a) agree to the terms and provisions of this Final Order, and (b) have waived, to the extent so paid, any and all prepetition claims, of any type, kind, or priority, against the Debtors, their assets, and properties.

11.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final

Order are immediately effective and enforceable upon its entry.

12.     The Debtors and their affiliates are authorized to take all actions necessary to

effectuate the relief granted in this Interim Order in accordance with the Motion (including,

without limitation, making copies of this Interim Order, the Motion, and any materials or other

information related thereto available in any local language in a jurisdiction in which the Debtors

or their affiliates operate).

13.     This Court retains exclusive jurisdiction with respect to all matters arising from or

related to the implementation, interpretation, and enforcement of this Final Order.

New York, New York
Dated: _____, 2022

_____
THE HONORABLE [●]
UNITED STATES BANKRUPTCY JUDGE

## **Exhibit C**

**Trade Agreement**

### Trade Agreement

[COMPANY ENTITY] (the "Company"), on the one hand, and the supplier identified in the signature block below (the "Supplier"), on the other hand, hereby enter into the following trade agreement (this "Trade Agreement") dated as of the date in the Supplier's signature block below.

### Recitals

WHEREAS on July 13, 2022 (the "Petition Date"), the Company and its affiliates (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Court").

WHEREAS on [●], 2022, the Court entered its *Interim Order (I) Authorizing the Debtors to Pay Prepetition Claims of Critical Vendors, Foreign Vendors, 503(b)(9) Claimants, and Lien Claimants, and (II) Granting Related Relief* (the "Critical Vendors Order") [Docket No. [●]] authorizing the Debtors, under certain conditions, to pay the prepetition claims of certain suppliers, including Supplier, subject to the terms and conditions set forth therein.[1]

WHEREAS prior to the Petition Date, Supplier delivered goods or services to the Company, and the Company paid Supplier for such goods or services, according to Customary Trade Terms (as defined herein).

WHEREAS the Company and Supplier (each a "Party," and collectively, the "Parties") agree to the following terms as a condition of payment on account of certain prepetition claims Supplier may hold against the Company.

### Agreement

1.     Recitals.  The foregoing recitals are incorporated herein by reference as if set forth at length herein.

2.     Supplier Payment.  Supplier represents and agrees that, after due investigation, the sum of all amounts currently due and owing by the Company to Supplier is $[●] (the "Agreed Supplier Claim").  Following execution of this Trade Agreement, the Company shall, in full and final satisfaction of the Agreed Supplier Claim, pay Supplier $[●] on account of its prepetition claim (the "Supplier Payment") (without interest, penalties, or other charges), as such invoices become due and payable.

3.     Agreement to Supply.

a.     Supplier shall supply goods to and/or perform services for the Company, and the Company shall accept and pay for goods and/or service from Supplier, for the duration of the Debtors' chapter 11 cases based on the following "Customary Trade Terms": trade terms

---

[1]     Capitalized terms used but not defined herein shall have the meanings set forth in the Critical Vendors Order.

(including practices and programs, credit limits, pricing, cash discounts, timing of payments, allowances, product mix, availability, and other programs) that are at least as favorable to the Company as those in place in the 120 days prior to the Petition Date or are otherwise acceptable to the Company in light of customary industry practices.

b.    Supplier shall continue to honor any existing allowances, credits, contractual obligations, or balances that were accrued as of the Petition Date and shall apply all such allowances, credits, or balances towards future orders in the ordinary course of business.

c.    Supplier shall continue to supply goods and/or perform services in the ordinary course and shall fill orders for goods requested by the Company in the ordinary course of business pursuant to the Customary Trade Terms.

d.    The Customary Trade Terms may not be modified, adjusted, or reduced in a manner adverse to the Company except as agreed to in writing by the Parties.

4.    <u>Other Matters</u>.

a.    Supplier agrees that it shall not require a lump-sum payment upon the effective date of a plan in the Company's chapter 11 case on account of any outstanding administrative claims Supplier may assert arising from the delivery of postpetition goods or services, to the extent that payment of such claims is not yet due.  Supplier agrees that such claims will be paid in the ordinary course of business after confirmation of a plan pursuant to the Customary Trade Terms then in effect.  The Supplier Payment will be made concurrently with payment of other outstanding administrative claims as provided in a confirmed plan.

b.    Supplier will not separately seek payment from the Company on account of any prepetition claim (including, without limitation, any reclamation claim or claim pursuant to section 503(b)(9) of the Bankruptcy Code) outside the terms of this Trade Agreement or a plan confirmed in the Company's chapter 11 case.

c.    Supplier will not file or otherwise assert against the Company, its assets, or any other person or entity or any of their respective assets or property (real or personal) any lien, regardless of the statute or other legal authority upon which the lien is asserted, related in any way to any remaining prepetition amounts allegedly owed to Supplier by the Company arising from prepetition agreements or transactions.  Furthermore, if Supplier has taken steps to file or assert such a lien prior to entering into this Trade Agreement, Supplier will promptly take all necessary actions to remove such liens.

d.    The Debtors and their successors and assigns agree to waive any claim or cause of action against Supplier and its successors and assigns regarding any payments received by Supplier and any of its affiliates and subsidiaries from the Debtors during the ninety-day period before the Petition Date; *provided* that such claim or cause of action shall be automatically reinstated upon the occurrence of Supplier Breach (as defined herein) by Supplier and its successors and assigns.

5.      Supplier Breach.

e.      In the event that Supplier fails to satisfy its undisputed obligations arising under this Trade Agreement (a "Supplier Breach"), upon written notice to Supplier, Supplier shall promptly pay to the Company immediately available funds in an amount equal to, at the election of the Company, the Supplier Payment or any portion of the Supplier Payment which cannot be recovered by the Company from the post-petition receivables then owing to Supplier from the Company.

f.      In the event that the Company recovers the Supplier Payment pursuant to Section 5(a) hereof or otherwise, the full Agreed Supplier Claim shall be reinstated as if the Supplier Payment had not been made.

g.      Supplier agrees and acknowledges that irreparable damage would occur in the event of a Supplier Breach and remedies at law would not be adequate to compensate the Company.  Accordingly, Supplier agrees that the Company shall have the right, in addition to any other rights and remedies existing in its favor, to an injunction or injunctions to prevent breaches of the provisions of this Trade Agreement and to enforce its rights and obligations hereunder not only by an action or actions for damages but also by an action or actions for specific performance, injunctive relief, and/or other equitable relief.  The right to equitable relief, including specific performance or injunctive relief, shall exist notwithstanding, and shall not be limited by, any other provision of this Trade Agreement.  Supplier hereby waives any defense that a remedy at law is adequate and any requirement to post bond or other security in connection with actions instituted for injunctive relief, specific performance, or other equitable remedies.

6.      Notice.

If to Supplier, then to the person and address identified in the signature block hereto.

If to Company:

Celsius Network LLC
121 River Street, PH05
Hoboken, New Jersey 07030
Attention:  Ron Deutsch
Title:  General Counsel
E-mail address:  ron.deutsch@celsius.network

and

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attn:  Tricia Schwallier Collins and Alison J. Wirtz

and

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York
Attn: Elizabeth H. Jones

7.      <u>Representations and Acknowledgements</u>.  The Parties agree, acknowledge, and represent that:

h.      the Parties have reviewed the terms and provisions of the Critical Vendors Order and this Trade Agreement and consent to be bound by such terms and that this Trade Agreement is expressly subject to the procedures approved pursuant to the Critical Vendors Order;

i.      any payments made on account of the Agreed Supplier Claim shall be subject to the terms and conditions of the Critical Vendors Order;

j.      if Supplier refuses to supply goods or services to the Company as provided herein or otherwise fails to perform any of its obligations hereunder, the Company may exercise all rights and remedies available under the Critical Vendors Order, the Bankruptcy Code, or applicable law; and

k.      in the event of disagreement between the Parties regarding whether a breach has occurred, either Party may apply to the Court for a determination of their relative rights, in which event, no action may be taken by either Party, including, but not limited to, the discontinuing of shipment of goods from Supplier to the Company, until a ruling of the Court is obtained.

8.      <u>Confidentiality</u>.  In addition to any other obligations of confidentiality between Supplier and Company, Supplier agrees to hold in confidence and not disclose to any party:  (a) this Trade Agreement; (b) any and all payments made by the Company pursuant to this Trade Agreement; (c) the terms of payment set forth herein; and (d) the Customary Trade Terms (collectively, the "<u>Confidential Information</u>"); *provided* that, if any party seeks to compel Supplier's disclosure of any or all of the Confidential Information, through judicial action or otherwise, or Supplier intends to disclose any or all of the Confidential Information, Supplier shall immediately provide the Company with prompt written notice so that the Company may seek an injunction, protective order, or any other available remedy to prevent such disclosure; *provided*, *further*, that, if such remedy is not obtained, Supplier shall furnish only such information as Supplier is legally required to provide.

9.      <u>Miscellaneous</u>.

l.      The Parties hereby represent and warrant that:  (i) they have full authority to execute this Trade Agreement on behalf of the respective Parties; (ii) the respective Parties have full knowledge of, and have consented to, this Trade Agreement; and (iii) they are fully authorized to bind that Party to all of the terms and conditions of this Trade Agreement.

m.      This Trade Agreement sets forth the entire understanding of the Parties regarding the subject matter hereof and supersedes all prior oral or written agreements between them.  This Trade Agreement may not be changed, modified, amended, or supplemented, except in a writing signed by both Parties.  Moreover, Supplier agrees to vote all claims now or hereafter

4

beneficially owned by Supplier in favor of, and not take any direct or indirect action to oppose or impede confirmation of, any chapter 11 plan on a timely basis in accordance with the applicable procedures set forth in any related disclosure statement and accompanying solicitation materials, and timely return a duly-executed ballot to the Debtors in connection therewith, if such chapter 11 plan provides for a treatment of any Agreed Supplier Claim that is materially consistent with this Agreement.

n.      Signatures by facsimile or electronic signatures shall count as original signatures for all purposes.

o.      This Trade Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.

p.      The Parties hereby submit to the exclusive jurisdiction of the Court to resolve any dispute with respect to or arising from this Trade Agreement.

q.      This Trade Agreement shall be deemed to have been drafted jointly by the Parties, and any uncertainty or omission shall not be construed as an attribution of drafting by any Party.

[Signature Page Follows]

AGREED AND ACCEPTED AS OF THE DATE SET FORTH ABOVE:

**[COMPANY ENTITY]**                              [●]


By: _____                     By: _____
Title:                                          Title:
Address: 121 River Street, PH05                 Address:
Hoboken, New Jersey 07030                       Date:
Date: