Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (*pro hac vice* pending)
Ross M. Kwasteniet, P.C. (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Proposed Counsel to the Debtors and*
*Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DEBTORS' MOTION SEEKING ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) CONTINUE TO OPERATE THEIR CASH MANAGEMENT SYSTEM, (B) HONOR CERTAIN PREPETITION OBLIGATIONS RELATED THERETO, (C) MAINTAIN EXISTING BUSINESS FORMS, AND (D) CONTINUE TO PERFORM INTERCOMPANY TRANSACTIONS, (II) GRANTING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS TO POSTPETITION INTERCOMPANY BALANCES, AND (III) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state the following in support of this motion (this "Motion"):

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

**Relief Requested**

1.        The Debtors seek entry of interim and final orders, substantially in the forms

attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and "Final Order"):

(a) authorizing, but not directing, the Debtors to (i) continue to operate their Cash Management

System (as defined herein), (ii) honor certain prepetition obligations related thereto, (iii) maintain

existing Business Forms (as defined herein) in the ordinary course of business, and (iv) continue

to perform Intercompany Transactions (as defined herein) consistent with historical practice;

(b) granting superpriority administrative expense status to postpetition intercompany balances; and

(c) granting related relief.  In addition, the Debtors request that the Court (as defined herein)

schedule a final hearing in approximately 21 days after the commencement of these chapter 11

cases, or as soon thereafter as is convenient for the Court, to consider approval of this Motion on

a final basis.

**Jurisdiction and Venue**

2.        The United States Bankruptcy Court for the Southern District of New York

(the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the

*Amended Standing Order of Reference* from the United States District Court for the Southern

District of New York, entered February 1, 2012.  The Debtors confirm their consent to the Court

entering a final order in connection with this Motion to the extent that it is later determined that

the Court, absent consent of the parties, cannot enter final orders or judgments in connection

herewith consistent with Article III of the United States Constitution.

3.        Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.        The statutory bases for the relief requested herein are sections 105, 345, 363, 364,

and 503 of title 11 of the United States Code (the "Bankruptcy Code"), rules 6003 and 6004 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 9013-1(a) of the Local

Bankruptcy Rules for the Southern District of New York (the "Local Rules").

**Background**

5.      The Debtors, together with their non-Debtor affiliates (collectively, "Celsius"), are

one of the largest and most sophisticated cryptocurrency based finance platforms in the world and

provide financial services to institutional, corporate, and retail clients across more than

100 countries.  Celsius was created in 2017 to be one of the first cryptocurrency platforms to which

users could transfer their crypto assets and (a) earn rewards on crypto assets and/or (b) take loans

using those transferred crypto assets as collateral.  Headquartered in Hoboken, New Jersey, Celsius

employs a global workforce of approximately 670 employees and has more than 1.7 million

registered users and approximately 300,000 active users with account balances greater than $100.

6.      On July 13, 2022 (the "Petition Date"), each of the Debtors filed a voluntary

petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description of the facts

and circumstances of these chapter 11 cases is set forth in the *Declaration of Alex Mashinsky,*

*Chief Executive Officer of Celsius Network LLC, in Support of Chapter 11 Petitions and First Day*

*Motions* (the "Mashinsky Declaration") and the *Declaration of Robert Campagna, Managing*

*Director of Alvarez & Marsal North America, LLC, in Support of Chapter 11 Petitions and First*

*Day Motions* (the "Campagna Declaration"), both filed contemporaneously with this Motion and

incorporated by reference herein.[2]  As described in more detail in the Mashinsky Declaration, the

Debtors commenced these chapter 11 cases to provide Celsius an opportunity to stabilize its

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the
Mashinsky Declaration or the Campagna Declaration (together, the "First Day Declarations"), as applicable.

business and consummate a comprehensive restructuring transaction that maximizes value for stakeholders.

7.       The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrent with the filing of this Motion, the Debtors have also filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no official committees have been appointed or designated.

## The Cash Management System

### I.       Overview.

8.       In the ordinary course of business, the Debtors maintain a complex cash and cryptocurrency management system (the "Cash Management System") comparable to the systems used by similarly situated companies to manage the cash and digital assets on their platform in a cost-effective and efficient manner.  The Debtors' Cash Management System is critical to the Debtors' business, as it streamlines the Debtors' ability to collect, transfer, and disburse cash and cryptocurrency generated from their operations and to facilitate cash and digital asset monitoring, forecasting, and reporting.

9.       The Debtors' treasury department maintains daily oversight over the Cash Management System and implements cash management controls for accepting, processing, and releasing funds, including in connection with Intercompany Transactions (as defined herein).  The Debtors' accounting department regularly reconciles the Debtors' books and records to ensure that all transfers are accounted for properly.

10.      As part of the Debtors' Cash Management System, the Debtors maintain a cryptocurrency management system that allows the Debtors to pool assets for use in asset

deployment strategies, facilitate the trading of various cryptocurrency, and store digital currencies on the Debtors' platform or on third party platforms.

11.     As described more fully herein, the Cash Management System is an essential component of the Debtors' business.  Any interruption of the Cash Management System would have an immediate and significant adverse effect on the Debtors' operations and ability to preserve assets to the detriment of their estates and stakeholders.  Accordingly, to minimize the disruption caused by these chapter 11 cases, the Debtors seek authority to continue to use their existing Cash Management System in the ordinary course of business on a postpetition basis in a manner consistent with past practice, and to pay any prepetition fees related to the Cash Management System.

**II.     The Bank Accounts and Flow of Funds**.

12.     As of the Petition Date, the Debtors' Cash Management System, a schematic of which is attached as Exhibit 1 to **Exhibit A** and **Exhibit B** hereto (the "Schematic"), is comprised of 14 bank accounts (each, a "Bank Account" and, collectively, the "Bank Accounts") and certain cryptocurrency workspaces, vaults, and "wallets."[3]  Of those Bank Accounts, 11 are maintained at Signature Bank.[4]  The remaining three Bank Accounts are brokerage accounts which are maintained at Oppenheimer & Co. Inc., Signature Securities Group Corporation, and ED&F Man Capital Markets, Inc. (together, with Signature Bank, the "Cash Management Banks").  The Bank

---

[3]   The descriptions of the cryptocurrency workspaces, vaults, and "wallets" are included herein to provide the Court with a complete picture of the Debtors' Cash Management System.

[4]   On June 13, 2022, the Debtors received an account closure notice from Silvergate Bank with respect to the Debtors' Bank Accounts ending in 9165 and 9173.  Following receipt of this notice, the Debtors transferred the funds held in those accounts to the Treasury Account (as defined herein).

Accounts are identified on Exhibit 2 annexed to **Exhibit A** and **Exhibit B** attached hereto, subject to the Debtors' rights to open and close certain accounts in their discretion.[5]

13.    The Debtors maintain a treasury account which serves as the Debtors' primary concentration account (the "Treasury Account"). The vast majority of the Debtors' inflows are received directly into the Treasury Account by way of transfers from the Signature Bank SIGNET platform. Generally, funds are then transferred from the Treasury Account to the other Bank Accounts in the Cash Management System and used to support the Debtors' business operations.

14.    As of the Petition Date, the Debtors have approximately $130 million of cash on hand.

15.    The Bank Accounts and Cash Management System are described further in the following table:

| Bank Accounts | Descriptions of Accounts |
|---|---|
| **Treasury Account**<br><br>*Signature Bank account ending in 2589* | The Treasury Account (2589) maintained by Debtor Celsius Network Limited serves as the Debtors' primary concentration account. The Treasury Account is funded by the monetization of the Debtors' cryptocurrency assets, interest payments on account of retail and institutional loans, and certain proceeds from cryptocurrency derivatives. Historically, the Treasury Account was also funded by Series B financing and investments from Caisse de dépôt et placement du Québec and WestCap.<br><br>The Treasury Account in turn funds, either directly or indirectly through the Primary Operating Accounts (as defined herein), the operating, capital, and general administrative expenses of certain Debtors and non-Debtor affiliates. Such expenses include payroll, accounts payable, and tax obligations.<br><br>A sub-account linked to the Treasury Account allows the Debtors to convert fiat currency into cryptocurrency using the Signature Bank SIGNET platform. |
| **Primary Operating Accounts** | The Debtors maintain five primary operating accounts (individually, the "U.S. Operating Account", the "UK Operating Account",  the "Vendor Operating |

---

[5]    The Debtors are in the process of opening a new bank account at Signature Bank to fund adequate assurance payments for their utility providers pursuant to the *Debtors' Motion Seeking Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief*, filed contemporaneously herewith. If the new bank account is opened prior to the entry of the Final Order, the Debtors will file a revised Exhibit 2 to the Final Order.

| Bank Accounts | Descriptions of Accounts |
|---|---|
| | Account", the "Mining Operating Account", and the "Legacy Operating Account", collectively, the "Primary Operating Accounts"). |
| Signature Bank account ending in 8569 | The U.S. Operating Account (8569) is maintained by Debtor Celsius Network LLC and is funded by the Treasury Account.  The U.S. Operating Account in turn makes disbursements to fund general operating expenses of certain Debtors and non-Debtor affiliates located in the United States.  A sub-account linked to the U.S. Operating Account is also maintained by the Debtors on Signature Bank's blockchain platform to transfer cash, from time to time, to Celsius' retail and institutional customers during off-banking hours. |
| Signature Bank account ending in 0999 | The UK Operating Account (0999) is maintained by Debtor Celsius Network Limited and is also funded by the Treasury Account.  The UK Operating Account in turn funds the general operating expenses of certain Debtors and non-Debtor affiliates. |
| Signature Bank account ending in 9778 | The Vendor Operating Account (9778) is maintained by Debtor Celsius Network Limited and is also funded by the Treasury Account.  The Vendor Operating Account in turn funds vendor-related obligations incurred by a certain non-Debtor affiliate. |
| Signature Bank account ending in 4445 | The Mining Operating Account (4445) is maintained by Debtor Celsius Mining LLC and is also funded by the Treasury Account.  The Mining Operating Account in turn funds the general operating expenses with respect to mining operations. |
| Signature Bank account ending in 2597 | The Legacy Operating Account (2597) is maintained by Debtor Celsius Network Inc. and is also funded by the Treasury Account.  The Legacy Operating Account in turn funds certain invoices relating to legacy D&O insurance policies, lease obligations with respect to Celsius' office located in Tampa Bay, Florida, and certain prepetition professional fees owed to third party accounting services providers. |
| **Lending Accounts** | The Debtors maintain two lending accounts with respect to their retail business (collectively, the "Retail Lending Accounts") and one lending account with respect to their institutional business (the "Institutional Lending Account", together with the Retail Lending Accounts, the "Lending Accounts"). |
| Signature Bank account ending in 5677 | Historically, the Retail Lending Account (5677) maintained by Celsius Networks Lending LLC was the primary lending account for Celsius' retail business.  This account receives interest payments, from time to time, on account of loans issued by Celsius to its retail customers, but no longer funds loans and, thus, is largely inactive.[6] |
| Signature Bank account ending in 6687 | The Retail Lending Account (6687) maintained by Celsius Lending LLC is funded by principal and interest payments made on account of loans issued to retail customers.  Historically, the account in turn funded new loans to Celsius' |

---

[6]    As discussed further herein, Celsius does not charge late fees on its interest payments and, thus, it is not uncommon for retail loans to be repaid in their entirety (including monthly accrued interest) on the maturity date. Thus, this account is rarely used in connection with retail lending in comparison to the Retail Lending Account (6687).

| Bank Accounts | Descriptions of Accounts |
|---|---|
| | retail customers. To the extent this account holds funds in excess of the amounts required to service Celsius' retail lending business, such funds are typically transferred to the Treasury Account.[7] |
| **Collateral Accounts**<br><br>*Signature Bank account ending in 9786*<br><br>*Signature Bank account ending in 2073* | The Debtors maintain two collateral accounts at Signature Bank (collectively, the "Collateral Accounts"). One account holds funds that secure the Debtors' lease obligations with respect to Celsius' office located in Las Vegas, Nevada, account ending in (9786). The second account holds funds that secured the Debtors' lease obligations with respect to Celsius' office located in Hoboken, New Jersey, account ending in (2073). |
| **Brokerage Accounts**<br><br>*SSG account ending in 0783*<br><br>*EDF account ending in 1000*<br><br><br>*Oppenheimer account ending in 9697* | Debtor Celsius Network Limited maintains three brokerage accounts (the "SSG Account", the "ED&F Account", and the "Oppenheimer Account", collectively, the "Brokerage Accounts").<br><br>The SSG Account (0783) is maintained at Signature Securities Group Corporation and funds the Debtors' investments in certain cryptocurrency investment trusts. The ED&F Account (1000) is maintained at ED&F Man Capital Markets, Inc. and funds the Debtors' investments in gold futures, among other things. The Debtors are not making active investments in either the SSG Account or the ED&F Account as of the Pause Date. As such, the balances in these accounts primarily accrued prior to the Pause Date and the Debtors do not expect these amounts to increase during these chapter 11 cases.<br><br>The Oppenheimer Account (9697) is maintained at Oppenheimer & Co. Inc. Historically, the Oppenheimer Account was used to fund the Debtors' investments in certain money market funds. Prior to the Petition Date, all funds held in the Oppenheimer Account were transferred to the Treasury Account. As such, the Oppenheimer Account now maintains a zero balance. |
| **OTC Account**<br><br>*Signature Bank account ending in 0344* | The Debtors maintain an account to fund purchases and sales of cryptocurrency on over-the-counter exchanges (the "OTC Account"). This account ensures that Celsius maintains adequate reserves of various fiat currencies to satisfy customer withdrawals. The Debtors are not currently engaging in any over-the-counter transactions, and, thus, the OTC Account is largely inactive. The balance in the OTC Account primarily accrued prior to the Pause Date. |

## III.    **Financial Transactions**.

16.    Celsius historically offered retail customers a variety of services through an account

on the Celsius platform (each, a "Celsius Account"), whereby customers could earn rewards on

---

[7]    As discussed further in the Mashinsky Declaration, the Debtors' paused their retail lending operations on June 12, 2022 (the "Pause Date"). Thus, the funds in the Retail Lending Account are associated with loans that were instituted prior to such date.

cryptocurrency transferred to Celsius, buy cryptocurrency, swap different types of cryptocurrency, and take out loans from Celsius.  These services include the Earn program and custody accounts, all as further explained in the Mashinksy Declaration.

17.    Once a customer created a Celsius Account, they either had to (a) transfer cryptocurrency from their own external "wallet" to one of Celsius' "wallets" depending on the type of service they sought to utilize or (b) use fiat currency to purchase cryptocurrency for use on Celsius' platform.

18.    Depending on the type of service a customer used, cash and/or cryptocurrency moved in and out of the Debtors' Cash Management System as described below.

**A.    Cash Transactions**.

19.    ***Buy***.  Celsius provided retail customers with the ability to purchase cryptocurrency with fiat currency.[8]  Using the Celsius mobile application, customers could purchase certain cryptocurrencies using fiat currency through one of three of Celsius' third-party providers, Simplex, Gem, and Circle.  When a customer used Celsius' platform to purchase cryptocurrency, it redirected customers to the appropriate third party's platform to conduct the transaction. Once there, the customer was able to exchange fiat currency for cryptocurrency, with the cryptocurrency being directly transferred to the customer's Celsius Account.[9]  Thus, the customers' cash never permeated the Debtors' Cash Management System.

20.    ***Institutional and Retail Lending***.  Celsius also provided users with the ability to borrow cash or cryptocurrency in return for posting cryptocurrency as collateral.  The Debtors

---

[8]    "Fiat currency" means government-issued currency that is not backed by a physical commodity such as gold, but rather by the government that issued it.

[9]    The cryptocurrency is not transferred to the customer's external "wallet," but rather one of Celsius' "deposit wallets" and is ready for use on Celsius' platform at the direction of the customer.

reconciled the balances of outstanding retail and institutional loans at the end of each month based on the value of the collateral on the date of reconciliation.

21.    Retail borrowers could have entered into loan agreements through their Celsius Account.  When a retail borrower executed a loan agreement on Celsius' platform, the loan was first reviewed and verified by Celsius' lending team.  Once approved, cryptocurrency designated as collateral was locked in the user's Celsius Account, which meant the user could neither withdraw the asset nor transfer it into Celsius' Earn program (or other Celsius service).  If a user was seeking to borrow cash from Celsius, once the collateral was locked, the cash was wired from the Retail Lending Account to the user's personal bank account.  If the user chose to borrow stablecoin, stablecoin was transferred to the user's Celsius Account, which the user could then withdraw.  For cash loans, Celsius kept track on a daily ledger the amount of cash requested by retail borrowers in the aggregate, and then provided that ledger to Signature Bank at the end of each day.

22.    Retail loans were balloon loans with monthly interest fees that could have been repaid in either cash or stablecoin.  Although interest was required to be paid monthly, Celsius did not charge late fees and, thus, it was not uncommon for retail loans to be repaid in their entirety (including monthly accrued interest) on the maturity date.  When a user repaid its retail loan in cash, that amount was deposited back into the Retail Lending Account.  When a user repaid its retail loan in stablecoin, that stablecoin was transferred into one of Celsius' "wallets" for use on the Celsius platform.  While Celsius is continuing to receive loan repayments from users with respect to retail loans, it is no longer providing users with new retail loans.

23.    Institutional borrowers, on the other hand, could choose to borrow cash or various types of cryptocurrencies, such as Bitcoin and Ether, in addition to stablecoins.  Unlike retail loans,

the terms and conditions of institutional loans were based on master loan agreements ("MLAs") and term sheets that set forth the detailed terms of any specific transaction memorialized in "hard copy" loan agreements. Once Celsius and the institutional lender agreed on the terms of the loan, the institutional lender was required to post its collateral before receiving its loan proceeds. Using an electronic code provided by Celsius, the borrower transferred its collateral to one of Celsius' institutional vaults named for the loan counterparty sitting in one of Celsius' institutional lending workspaces. This system provided Celsius with an easy way to account for the amount of collateral that entered into its platform and which party transferred such collateral.

24.     Once the collateral was received, Celsius then funded the institutional user's bank account or Celsius Account, as applicable, using the Signature Bank SIGNET platform, wire transfers, or one of its many cryptocurrency platforms, as applicable. Institutional loans funded in cash were paid from the Institutional Lending Account. Institutional loans could also be repaid in either cash or cryptocurrency with cash and/or cryptocurrency coming back into the Cash Management System. Institutional loans repaid in cash were deposited in the Institutional Lending Account. Similar to its retail loans, Celsius is continuing to receive loan repayments from users with respect to institutional loans, but is no longer proving users with new institutional loans.

**B.     Cryptocurrency Transactions**.

25.     *Cryptocurrency Transfers*. Alternatively, customers could have chosen to transfer cryptocurrency into their Celsius Account by initiating a transfer of cryptocurrency assets from their external wallet to the Celsius platform. Once on Celsius' platform, the cryptocurrency could have been used in a variety of ways.

26.     *Swap*. On the Celsius platform, users could "swap," "trade," or "convert" eligible digital assets for another type of eligible digital asset without paying a fee or spread. Currency

that was "swapped" remained on the Celsius platform until withdrawn by a user.  As of June 12, 2022, this feature is no longer offered.

27.    ***Institutional and Retail Lending***.  As previously discussed, Celsius previously provided users with the ability to borrow cryptocurrency in return for posting cryptocurrency as collateral.

28.    ***Custody***.  In April 2022, Celsius began providing custodial services to its customers, including U.S. non-accredited investors.  For these users, "Custody" served as the centerpiece of their cryptocurrency management by providing a secure way to navigate across all of Celsius' products.  Customer assets were held in "commingled" wallets in the name of Celsius Network LLC, with other custody customers' assets and did not earn rewards.  Coins held in "Custody" were not and are not transferred, sold, loaned, or otherwise rehypothecated by Celsius without instructions from the customer.  Pursuant to the "Terms of Use," Celsius was, however, entitled to set-off any obligations owed by a customer to Celsius against the customers' assets held in "Custody."[10]  Because all customer assets were comingled, "Custody" users were not entitled to the return of their specific digital assets, but rather the return of the same type of digital asset.

## IV.    Recent Transactions.

29.    Given the risks associated with asset deployment and the current volatility of the cryptocurrency market, Celsius decided to "unwind" many of its decentralized finance ("DeFi") loans and cease its asset deployment activities.  Prior to the Petition Date, on June 27, 2022, Celsius had approximately $648 million in DeFi borrows collateralized by approximately $1.61 billion in digital assets based on a market valuation as of June 27, 2022.  To date, Celsius has closed or

---

10    *See* paragraph 9, Celsius' *Terms of Use*, as of April 14, 2022.

unwound nearly all of its outstanding DeFi and other counterparty loans to bring its collateral back under Celsius' control.

V.      **Compliance with the Bankruptcy Code and Guidelines**.

A.      **Cause Exists to Waive Certain Deposit Requirements Under the U.S. Trustee Guidelines and Section 345 of the Bankruptcy Code**.

30.      Signature Bank is designated as an authorized depository in the Southern District of New York by the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"), pursuant to the *Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees* (the "U.S. Trustee Guidelines"). Signature Bank is party to a uniform depository agreement with the U.S. Trustee, and therefore, the Debtors believe that the Bank Accounts at this institution will be collateralized in a manner consistent with the requirements of section 345 of the Bankruptcy Code.

31.      The Debtors' Brokerage Accounts are not maintained at authorized depositories. However, the banks at which the Brokerage Accounts are maintained are trustworthy, well-capitalized, and financially stable institutions with strong reputations. The Debtors believe that they can maintain the Brokerage Accounts without jeopardizing any parties in interest and that any funds deposited in any of the Brokerage Accounts are secure. Requiring the Debtors to transfer the Brokerage Accounts to a designated authorized depository or to post a bond would place a needless administrative burden on the Debtors and likely impose unnecessary costs on the Debtors' estates.

32.      In addition, the Debtors hold cryptocurrency assets through third party custodians in the ordinary course of business. Requiring the Debtors to collateralize their digital asset holdings, including cryptocurrency, would be prohibitively expensive (if possible at all). Further, requiring the Debtors to liquidate their digital assets and transfer the resulting cash to an authorized

13

depository would be value destructive to the debtors and their stakeholders.  In the event that any of the Bank Accounts cease to comply with, or do not comply with, the requirements of section 345(b) of the Bankruptcy Code during the chapter 11 cases, the Debtors request that the Court provide the Debtors with 45 days without prejudice to seeking an additional extension from the entry of the Interim Order, to either (a) bring the Bank Accounts into compliance with section 345(b) of the Bankruptcy Code or (b) to seek appropriate relief from the Court.

**B.      Compliance with U.S. Trustee Guidelines as to Business Forms**.

33.      As part of the Cash Management System, the Debtors utilize a number of preprinted business forms (the "Business Forms") in the ordinary course of their business, including, but not limited to, letterhead, purchase orders, invoices, and checks.  The U.S. Trustee Guidelines require that the Cash Management Banks print "Debtor in Possession" and the bankruptcy case number on checks issued after the Petition Date.  To minimize expenses to their estates and avoid confusion on the part of employees, customers, vendors, and suppliers during the pendency of these chapter 11 cases, the Debtors request that the Court authorize their continued use of all Business Forms in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession.  The Debtors submit that once they have exhausted their existing stock of Business Forms, they shall ensure that any new Business Forms are clearly labeled "Debtor in Possession," and with respect to any Business Forms that exist or are generated electronically, the Debtors shall ensure that such electronic Business Forms are clearly labeled "Debtor in Possession."

**VI.      Bank Fees**.

34.      In the ordinary course of business, the Debtors incur periodic service charges and other fees in connection with maintaining the Cash Management System (collectively, the "Bank Fees").  The Debtors incur a *de minimis* amount in Bank Fees each month

14

under the Cash Management System. As of the Petition Date, the Debtors estimate that no prepetition amounts remain outstanding on account of Bank Fees. However, out of an abundance of caution, and to maintain the integrity of their Cash Management System, the Debtors request authority to pay any prepetition Bank Fees for prepetition transactions that are charged postpetition and to continue to pay the Bank Fees in the ordinary course of business on a postpetition basis.

## VII.    Intercompany Transactions.

35.    As explained above, the Debtors operate as a global enterprise, and thus, routinely engage in intercompany financial transactions (the "Intercompany Transactions") with other Debtors and non-Debtor affiliates, resulting in intercompany receivables and payables. In the ordinary course of business, the Debtors make Intercompany Transactions to either (a) reimburse certain Debtors or non-Debtor affiliates for various expenditures associated with their business or (b) fund certain Debtors' or non-Debtor affiliates' accounts in anticipation of such expenditures as needed. As discussed above, the Treasury Account is the Debtors' primary operating account where substantially all of the Debtors' cash is directly or indirectly wired or transferred throughout the Cash Management System.

36.    For example, the Debtors make certain payments from the Treasury Account directly to employees and vendors on behalf of their international non-Debtor affiliate, Celsius Services CY Ltd ("Celsius Cyprus"). This international non-Debtor affiliate primarily provides service support to Celsius' customers. Historically, the Debtors remitted approximately $300,000 per month on behalf of Celsius Cyprus to cover certain operational costs, including employee payroll. The customer service support functions provided by Celsius Cyprus are crucial to the Debtors' overall global business operations. In addition to the direct disbursements related to the Celsius Cyprus operations, the Debtors also periodically provide transfers to their international non-Debtor affiliates, Celsius Network IL Ltd., Celsius Mining IL Ltd, and Celsius Network

15

Europe d.o.o. Beograd.  Historically, the Debtors have remitted approximately $2.5 million per month to cover certain operational and administrative expenses.

37.    The Debtors track all fund transfers through their accounting system and can ascertain, trace, and account for all Intercompany Transactions.  If the Intercompany Transactions were to be discontinued, the Cash Management System and the Debtors' operations would be disrupted unnecessarily to the detriment of the Debtors, their creditors, and other stakeholders.[11]

### Basis for Relief

**I.    Maintaining the Existing Cash Management System Is Essential to Maximizing the Value of the Debtors' Estates**.

38.    The U.S. Trustee Guidelines require debtors in possession to, among other things: (a) close all existing bank accounts and open new debtor-in-possession bank accounts; (b) establish one debtor-in-possession account for all estate monies required for the payment of taxes, including payroll taxes; (c) physically set aside all monies required by law to be withheld from employees or collected from others for taxes; (d) open a new set of books and records as of the commencement date of the case; (e) use new business forms indicating the debtor-in-possession status of the chapter 11 debtor; and (f) make all disbursements of estate funds by check with a notation representing the reason for the disbursement.  *See* U.S. Trustee Guidelines.  These requirements are designed to provide a clear line of demarcation between prepetition and postpetition transactions and operations and to prevent inadvertent payment of prepetition claims.  Considering, however, the complex Cash Management System that the Debtors have in place for the transfer and distribution of funds, which ties into the Debtors existing

---

[11]    This Motion provides an overview of the Debtors' typical Intercompany Transactions.  The relief requested herein is applicable with respect to all Intercompany Transactions and is not limited to those Intercompany Transactions described in this Motion.  To the extent that there are any outstanding prepetition obligations related to Intercompany Transactions not described herein, the Debtors, out of an abundance of caution, seek authority to honor such obligations.

corporate accounting and cash forecasting reporting, enforcement of this provision of the U.S. Trustee Guidelines during these chapter 11 cases would disrupt the Debtors' ability to efficiently administer these chapter 11 cases.

39.     Continuation of the Cash Management System is nevertheless permitted pursuant to section 363(c)(1) of the Bankruptcy Code, which authorizes the debtor in possession to "use property of the estate in the ordinary course without notice or a hearing." 11 U.S.C. § 363(c)(1). *See, e.g.*, *Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997) ("Section 363(c)(1) of the Bankruptcy Code authorizes a debtor-in-possession to enter into transactions involving property of the estate within the ordinary course of business without notice or a hearing."); *In re Enron Corp.*, No. 01-16034 (AJG), 2003 WL 1562202, at *15 (Bankr. S.D.N.Y. Mar. 21, 2003) (same). Included within the purview of section 363(c) of the Bankruptcy Code is a debtor's ability to continue the "routine transactions" necessitated by a debtor's cash management system. *In re Frigitemp Corp.*, 34 B.R. 1000, 1010 (S.D.N.Y. 1983), aff'd, 753 F.2d 230 (2d Cir. 1985); *see also Amdura Nat'l Distrib. Co. v. Amdura Corp. (In re Amdura Corp.)*, 75 F.3d 1447, 1453 (10th Cir. 1996).

40.     Bankruptcy courts routinely treat requests for authority to continue utilizing existing cash management systems as a relatively "simple matter." *See In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987). Additionally, courts have noted that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash." *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992), *aff'd in part and rev'd in part*, 997 F.2d 1039 (3d Cir. 1993). As a result, courts have concluded that the requirement to maintain all accounts separately "would be a huge administrative

17

burden and economically inefficient." *Id.* at 1061; *see also In re Southmark Corp.*, 49 F.3d 1111, 1114 (5th Cir. 1995) (noting that maintaining an existing cash management system allows debtors "to administer more efficiently and effectively its financial operations and assets").

41.     Here, the Debtors respectfully request that the Court allow them to continue operating each of the Bank Accounts identified on Exhibit 2 annexed to **Exhibit A** and **Exhibit B** attached.  The Bank Accounts will be maintained in the ordinary course as they were before the Petition Date and are necessary to conduct the Debtors' routine prepetition transactions.  As noted in the cases above, maintaining the Cash Management System and Bank Accounts allows efficient utilization of the Debtors' cash resources and will enable the Debtors' business to continue certain operations.  Additionally, the Debtors request authority to continue to maintain and manage their cryptocurrency assets in their reasonable discretion.

## II.     Maintaining the Existing Cash Management System Will Not Harm Parties in Interest.

42.     The Debtors' continued use of their Cash Management System will facilitate the Debtors' transition into chapter 11 by, among other things, avoiding administrative inefficiencies, expenses, and distraction associated with disrupting this system and minimizing delays in the payment of postpetition obligations.  The Debtors respectfully submit that parties in interest will not be harmed by the Debtors' maintenance of their existing Cash Management System, including maintenance of the Bank Accounts and continuance of the Intercompany Transactions, because the Debtors have developed and implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred before the Petition Date. Specifically, with the assistance of their advisors, the Debtors have implemented internal control procedures that prohibit payments on account of prepetition debts without the prior approval of

the Debtors' accounting department.  In light of such protective measures, the Debtors submit that maintaining the Cash Management System is in the best interests of their estates and creditors.

**III.    Authorizing the Debtors to Continue Using Debit, Wire, Credit Card, and ACH Transfers Is Warranted**.

43.    The Debtors request that the Court grant further relief from the U.S. Trustee Guidelines to the extent such guidelines require the Debtors to make all disbursements by check. The U.S. Trustee Guidelines require that all receipts and all disbursements of estate funds must be made by check with a notation representing the reason for the disbursement.  The Debtors conduct a large number of transactions on a daily basis through ACH transfers and other similar methods. If the Debtors' ability to conduct transactions by debit, wire, ACH transfer, or other similar methods is impaired, the Debtors' day-to-day activities may be unnecessarily disrupted, and the estates will incur additional costs.  Therefore, the Debtors submit that authorizing the continuation of using debit, wire, and ACH transfers is warranted.

**IV.    Authorizing the Cash Management Banks to Continue to Maintain, Service, and Administer the Bank Accounts in the Ordinary Course of Business is Warranted**.

44.    The Debtors respectfully request that the Court authorize the Banks to continue to maintain, service, and administer the Bank Accounts, without interruption and in the ordinary course.  In this regard, the Debtors request that, with the exception of the item described in paragraph 45 below, the Banks be authorized to (a) receive, process, honor, and pay any and all checks, ACH transfers, and other instructions and drafts payable through, drawn, or directed on such Bank Accounts after the Petition Date by holders, makers, or other parties entitled to issue instructions with respect thereto; (b) accept and honor all representations from the Debtors as to which checks, drafts, wires, or ACH transfers should be honored or dishonored consistent with any order of the Court and governing law, whether such checks, drafts, wires, or ACH transfers are dated before or subsequent to the Petition Date; and (c) continue to charge the Debtors the

19

Bank Fees and charge-back returned items to the Bank Accounts, whether such items are dated before, on, or subsequent to the Petition Date, in the ordinary course.

45.     The Debtors also request that, except for those transactions noted in paragraph 44 above, to the extent a Bank honors a prepetition check or other item drawn on any account either: (a) at the direction of the Debtors; (b) in a good-faith belief that the Court has authorized such prepetition check or item to be honored; or (c) as a result of an innocent mistake made despite implementation of customary item handling procedures, such Bank will not be deemed to be liable to the Debtors or to the estates on account of such prepetition check or other item honored postpetition. This is reasonable and appropriate because the Banks are not in a position to independently verify or audit whether a particular item may be paid in accordance with a Court order or otherwise. The Debtors also request that the Court authorize the Debtors to pay any prepetition Bank Fees for prepetition transactions that are charged postpetition.

46.     Courts in this district have regularly waived certain U.S. Trustee Guidelines and allowed the continued use of cash management systems and prepetition bank accounts employed in the ordinary course of a debtor's prepetition business. *See, e.g., In re Voyager*, No. 22-10943 (MEW) (Bankr. S.D.N.Y. July 6, 2022) (authorizing debtors to continue to operate their cash management system on an interim basis); *In re Pareteum Corp.*, No. 22-10615 (LGB) (Bankr. S.D.N.Y. June 8, 2022) (authorizing debtors to continue to operate their cash management system on a final basis); *In re Grupo Posadas S.A.B. de C.V.*, No. 21-11831 (SHL) (Bankr. S.D.N.Y. Dec. 9, 2021) (same); *In re GBG USA Inc.*, No. 21-11369 (MEW) (Bankr. S.D.N.Y. Sept. 1, 2021) (same); *In re Lakeland Tours*, LLC, 20-11647 (JLG) (Bankr. S.D.N.Y. Aug 6, 2020) (same).[12]

---

[12]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

## V.    The Court Should Authorize Payment of Fees and Prepetition Obligations Related to the Bank Accounts.

47.     Courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value. *See*, *e.g.*, *In re Just for Feet, Inc.*, 242 B.R. 821, 825–26 (D. Del. 1999); *see also In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175–76 (Bankr. S.D.N.Y. 1989); *Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (S.D.N.Y. 1983).  In so doing, these courts acknowledge that several legal theories rooted in sections 105(a) and 363(b) of the Bankruptcy Code support the payment of prepetition claims.

48.     Section 363(b) of the Bankruptcy Code permits a bankruptcy court, after notice and a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  "In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions."  *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) (collecting cases); *see also Armstrong World*, 29 B.R. at 397 (relying on section 363 to allow contractor to pay prepetition claims of suppliers who were potential lien claimants because the payments were necessary for general contractors to release funds owed to debtors); *In re Ionosphere Clubs*, 98 B.R. at 175 (finding that a sound business justification existed to justify payment of certain prepetition wages); *In re Phx. Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (requiring the debtor to show a "good business reason" for a proposed transaction under section 363(b)).

21

49.    Courts also authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code.  Section 105(a) of the Bankruptcy Code codifies a bankruptcy court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Under section 105(a), courts may authorize pre-plan payments of prepetition obligations when essential to the continued operation of a debtor's business.  *See In re Just for Feet*, 242 B.R. at 825−26. Specifically, a court may use its power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity").  *See*, *e.g.*, *In re Ionosphere Clubs*, 98 B.R. at 176; *In re Lehigh & New England Ry Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (stating that courts may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *see also In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191−92 (Bankr. D. Del. 1994) (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to the continued operation of the business).  A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."  *In re Ionosphere Clubs*, 98 B.R. at 175–76 (citing *Miltenberger v. Logansport, C. & S.W. Ry. Co.*, 106 U.S. 286 (1882)). Indeed, at least one court has recognized that there are instances when a debtor's fiduciary duty can "only be fulfilled by the preplan satisfaction of a prepetition claim."  *In re CoServ*, 273 B.R. at 497.

50.    These standards are satisfied here because the payment of fees, including Bank Fees, and related prepetition obligations are necessary to maintain the Cash Management System and avoid any disruption in the administration of the Bank Accounts.  The Debtors request

authority to continue to pay the Bank Fees, including any prepetition Bank Fees, in the ordinary course of business, in light of the material benefit of maintaining the Cash Management System. The relief requested represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is therefore justified under sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 6003.

**VI.    The Court Should Authorize the Debtors to Continue Using Their Existing Business Forms**.

51.     To avoid disruption of the Cash Management System and the incurrence of unnecessary expenses, the Debtors request that they be authorized to continue to use their existing Business Forms (including, without limitation, letterhead, checks, and other Business Forms) substantially in the form existing immediately before the Petition Date, without reference to their status as debtors in possession.  The Debtors submit that parties-in-interest will not be prejudiced if the Debtors are authorized to continue to use their Business Forms substantially in the forms existing immediately before the Petition Date.  Such parties will undoubtedly be aware of the Debtors' status as debtors in possession and, thus, changing Business Forms is unnecessary and would be unduly burdensome.  The Debtors further submit that once they have exhausted their existing stock of Business Forms, they shall ensure that any new Business Forms are clearly labeled "Debtor-In-Possession."  With respect to any Business Forms that exist or are generated electronically, the Debtors shall ensure that such electronic Business Forms are clearly labeled "Debtor-In-Possession."

52.     In other chapter 11 cases, courts in this district have allowed debtors to use their prepetition business forms without the "debtor in possession" label.  *See, e.g., In re Voyager*, No. 22-10943 (MEW) (Bankr. S.D.N.Y. July 6, 2022) (authorizing use of existing business forms on an interim basis); *In re Pareteum Corp.*, No. 22-10615 (LGB) (Bankr. S.D.N.Y. June 8, 2022)

(authorizing use of existing business forms on a final basis); *In re Grupo Posadas S.A.B. de C.V.*, No. 21-11831 (SHL) (Bankr. S.D.N.Y. Dec. 9, 2021) (same); *In re GBG USA Inc.*, No. 21-11369 (MEW) (Bankr. S.D.N.Y. Sept. 1, 2021) (same); *In re Lakeland Tours*, LLC, 20-11647 (JLG) (Bankr. S.D.N.Y. Aug 6, 2020) (same); *In re Jason Indus., Inc.*, No. 20-22766 (RDD) (Bankr. S.D.N.Y. July 27, 2020) (same).

**VII.    The Court Should Authorize the Debtors to Continue Conducting Intercompany Transactions in the Ordinary Course of Business and Grant Superpriority Administrative Expense Status to Postpetition Intercompany Balances Among the Debtors**.

53.    The Debtors' funds move through the Cash Management System as described above.  At any given time, there may be intercompany balances (the "Intercompany Balances") owed by one Debtor to another Debtor, or a Debtor to a non-Debtor affiliate (or vice versa). Intercompany Transactions are made between and among the Debtors and their non-Debtor affiliates in the ordinary course as part of the Cash Management System.  The Debtors track all fund transfers in their accounting system and can ascertain, trace, and account for all Intercompany Transactions previously described.  The Debtors, moreover, will continue to maintain records of such Intercompany Transactions.  If the Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls could be disrupted to the Debtors' and the estates' detriment.  In addition, a number of critical services, including centralized management services and cash management services, currently provided to Debtor entities on an intercompany basis would be interrupted.  Accordingly, the Debtors respectfully submit that the continued performance of the Intercompany Transactions is in the best interest of the Debtors' estates and their creditors and, therefore, the Debtors should be permitted to continue such performance.

54.    Because certain of the Intercompany Transactions represent extensions of intercompany credit made in the ordinary course of business that are an essential component of the Cash Management System, the Debtors respectfully request the authority to continue conducting Intercompany Transactions postpetition in the ordinary course of business without need for further Court order.  To ensure each individual Debtor will not, at the expense of its creditors, fund the operations of another entity, the Debtors further request that pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, all postpetition transfers and payments on account of an Intercompany Transaction be accorded superpriority administrative expense status. This relief will ensure that each entity receiving payments from a Debtor will continue to bear ultimate repayment responsibility for such ordinary course transactions, thereby reducing the risk that these transactions would jeopardize the recoveries available to each Debtor's respective creditors.

55.    Similar relief has been granted in other similarly situated chapter 11 cases in this district.  *See, e.g., In re Voyager*, No. 22-10943 (MEW) (Bankr. S.D.N.Y. July 6, 2022) (allowing intercompany transactions to continue on an interim basis); *In re Pareteum Corp.*, No. 22-10615 (LGB) (Bankr. S.D.N.Y. June 8, 2022) (allowing intercompany transactions to continue on a final basis); *In re Grupo Posadas S.A.B. de C.V.*, No. 21-11831 (SHL) (Bankr. S.D.N.Y. Dec. 9, 2021) (same); *In re GBG USA Inc.*, No. 21-11369 (MEW) (Bankr. S.D.N.Y. Sept. 1, 2021) (same); *In re Lakeland Tours*, LLC, 20-11647 (JLG) (Bankr. S.D.N.Y. Aug 6, 2020) (same); *In re Jason Indus., Inc.*, No. 20-22766 (RDD) (Bankr. S.D.N.Y. July 27, 2020) (same).

**VIII.    Cause Exists for Waiving the U.S. Trustee Guidelines Regarding Authorized Depositories on an Interim and Final Basis**.

56.    To the extent the Cash Management System does not strictly comply with section 345 of the Bankruptcy Code, the Debtors further seek a waiver of the deposit and investment requirements set forth therein.

57.    Section 345(a) of the Bankruptcy Code governs a debtor's cash deposits during a chapter 11 case and authorizes deposit or investment of money of estates, such as cash, as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment."  For deposits that are not "insured or guaranteed by the United States or by a department, agency or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) of the Bankruptcy Code provides that the estate must require from the entity with which the money is deposited or invested a bond in favor of the United States secured by the undertaking of a corporate security, "unless the court for cause orders otherwise."  Additionally, under the U.S. Trustee Guidelines, debtors in possession must, among other things, close prepetition bank accounts and open new "debtor in possession" operating, payroll, and tax accounts at one or more approved depositories.

58.    Courts may waive compliance with section 345 of the Bankruptcy Code and the U.S. Trustee Guidelines for "cause."  In evaluating whether "cause" exists, courts have considered a number of factors such as:

> (1)    the sophistication of the debtor's business;
>
> (2)    the size of the debtor's business operations;
>
> (3)    the amount of the investments involved;
>
> (4)    the bank ratings (Moody's and Standard & Poor) of the financial institutions where the debtor in possession funds are held;
>
> (5)    the complexity of the case;

26

(6)     the safeguards in place within the debtor's own business for ensuring the safety of the funds;

(7)     the debtor's ability to reorganize in the face of a failure of one or more of the financial institutions;

(8)     the benefit to the debtor;

(9)     the harm, if any, to the debtor;

(10)    the harm, if any, to the estate; and

(11)    the reasonableness of the debtor's request for relief from section 345(b) requirements in light of the overall circumstances of the case.

*See In re Serv. Merch. Co., Inc.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999).

59.     Because the Bank Accounts are vital to the Cash Management System, requiring the Debtors to transfer funds to other banks would be unduly burdensome to the Debtors' operations and potentially cause severe tax consequences to the detriment of the Debtors' estates. The Debtors believe that the Bank Accounts provide protections that are comparable to those contemplated by section 345 of the Bankruptcy Code. Therefore, the Debtors submit that cause exists to waive the U.S. Trustee Guidelines and allow the Debtors to continue to maintain the Bank Accounts in the ordinary course of business.

60.     Additionally, the Debtors hold cryptocurrency assets through third-party custodians in the ordinary course of business. Requiring the Debtors to collateralize their digital asset holdings, including cryptocurrency, would be prohibitively expensive (if possible at all). Further, requiring the Debtors to liquidate their digital assets and transfer the resulting cash to an authorized depository would be extremely value destructive to the detriment of the Debtors and their stakeholders.

61.     To allay the concerns addressed by section 345(b) of the Bankruptcy Code, the Debtors will engage with the U.S. Trustee in good faith discussion to determine potential modifications to the Debtors' Cash Management System.

62.     Courts in this district have granted relief similar to that requested herein in other complex chapter 11 cases. *See, e.g., In re Voyager*, No. 22-10943 (MEW) (Bankr. S.D.N.Y. July 6, 2022) (waiving U.S. Trustee Guidelines regarding approved depositories on an interim basis); *In re Pareteum Corp.*, No. 22-10615 (LGB) (Bankr. S.D.N.Y. June 8, 2022) (waiving U.S. Trustee Guidelines regarding approved depositories on a final basis); *In re Grupo Posadas S.A.B. de C.V.*, No. 21-11831 (SHL) (Bankr. S.D.N.Y. Dec. 9, 2021) (same); *In re GBG USA Inc.*, No. 21-11369 (MEW) (Bankr. S.D.N.Y. Sept. 1, 2021) (same); *In re Lakeland Tours*, LLC, 20-11647 (JLG) (Bankr. S.D.N.Y. Aug 6, 2020) (same).

## The Requirements of Bankruptcy Rule 6003(b) Are Satisfied

63.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." As set forth in this Motion, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors efforts and cause irreparable harm.  Furthermore, the failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support the relief requested herein.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

64.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notices of the relief requested herein satisfies Bankruptcy Rule 6004(a)

and that the Debtors have established cause to exclude such relief from the 14 day stay period under Bankruptcy Rule 6004(h).

## Reservation of Rights

65.     Nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or should be construed as (a) an admission as to the validity of any particular claim against the Debtors, (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds, (c) a promise or requirement to pay any particular claim, (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion, (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law, or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## Motion Practice

66.     This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Motion. Accordingly, the Debtors submit that this Motion satisfies Local Rule 9013-1(a).

## Notice

67.     The Debtors will provide notice of this Motion to the following parties or their respective counsel:  (a) the U.S. Trustee; (b) the holders of the 50 largest unsecured claims against

the Debtors (on a consolidated basis); (c) the United States Attorney's Office for the Southern District of New York; (d) the Internal Revenue Service; (e) the offices of the attorneys general in the states in which the Debtors operate; (f) the Securities and Exchange Commission; (g) the Cash Management Banks; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

68.    No prior request for the relief sought in this Motion has been made to this or any other court.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order and

Final Order granting the relief requested herein and such other relief as the Court deems

appropriate under the circumstances.

New York, New York
Dated: July 14, 2022

*/s/ Joshua A. Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          jsussberg@kirkland.com

 - and -

Patrick J. Nash, Jr., P.C. (*pro hac vice* pending)
Ross M. Kwasteniet, P.C. (*pro hac vice* pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          patrick.nash@kirkland.com
                ross.kwasteniet@kirkland.com

*Proposed Counsel to the Debtors and*
*Debtors in Possession*

**<u>Exhibit A</u>**

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

|  |  |
|---|---|
| In re: | ) |
| | ) |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) |
| | ) |
| Debtors. | ) |
| | ) |

| |
|---|
| Chapter 11 |
| |
| Case No. 22-10964 (___) |
| |
| (Joint Administration Requested) |

_____

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS
TO (A) CONTINUE TO OPERATE THEIR CASH MANAGEMENT
SYSTEM, (B) HONOR CERTAIN PREPETITION OBLIGATIONS RELATED
THERETO, (C) MAINTAIN EXISTING BUSINESS FORMS, AND (D) CONTINUE TO
PERFORM  INTERCOMPANY TRANSACTIONS, (II) GRANTING SUPERPRIORITY
ADMINISTRATIVE EXPENSE STATUS TO POSTPETITION INTERCOMPANY
BALANCES, AND (III) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession

(collectively, the "Debtors") for entry of an interim order (this "Interim Order"), (a) authorizing,

but not directing, the Debtors to (i) continue to operate their cash and cryptocurrency management

system (the "Cash Management System"), (ii) honor certain prepetition obligations related thereto,

(iii) maintain existing Business Forms in the ordinary course of business, and (iv) continue to

perform Intercompany Transactions consistent with historical practice, (b) granting superpriority

administrative expense status to postpetition intercompany balances, (c) granting related relief,

and (d) scheduling a final hearing to consider approval of the Motion on a final basis, all as more

fully set forth in the Motion; and upon the First Day Declarations; and this Court having

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York, entered February 1, 2012; and that this Court having the power to enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefore, it is HEREBY ORDERED THAT:

1.      The Motion is granted on an interim basis as set forth herein.

2.      The final hearing (the "Final Hearing") on the Motion shall be held on _____, 2022, at__:__ _.m., prevailing Eastern Time.  Any objections or responses to entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Eastern Time, on _____, 2022, and shall be served on:  (a)  the Debtors, Celsius Network LLC, 121 River Street, PH05, Hoboken, New Jersey 07030, Attn: Ron Deutsch; (b) proposed counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua A. Sussberg, P.C., and 300 North LaSalle, Chicago, Illinois 60654, Patrick J. Nash, Jr., P.C. and Ross M. Kwasteniet, P.C.; (c) the Office of The United States Trustee, U.S. Federal Office Building, 201 Varick Street, Suite

2

1006, New York, New York 10014, Attn. Shara Cornell, Mark Bruh, and Brian S. Masumoto; and (d) counsel to any statutory committee appointed in these chapter 11 cases.

3.    The Debtors are authorized, on an interim basis and in their sole discretion, to: (a) continue operating the Cash Management System, substantially as illustrated on **Exhibit 1** attached hereto; (b) honor their prepetition obligations related thereto; and (c) continue to perform Intercompany Transactions consistent with historical practice.

4.    The Debtors are authorized, on an interim basis and in their sole discretion, to: (a) continue to use, with the same account numbers, the Bank Accounts in existence as of the Petition Date, including those Bank Accounts identified on **Exhibit 2** attached hereto; (b) treat the Bank Accounts for all purposes as accounts of the Debtors as debtors in possession; (c) deposit funds in and withdraw funds from the Bank Accounts by all usual means, including checks, wire transfers, and other debits; (d) pay all prepetition Bank Fees; and (e) pay any ordinary course Bank Fees incurred in connection with the Bank Accounts, irrespective of whether such fees arose prior to the Petition Date, and to otherwise perform their obligations under the documents governing the Bank Accounts.

5.    The Debtors are authorized to continue to maintain and manage their cryptocurrency assets in their reasonable discretion.

6.    The Debtors are authorized, but not directed, to continue using, in their present form, the Business Forms, as well as checks and other documents related to the Bank Accounts existing immediately before the Petition Date, without reference to the Debtors' status as debtors in possession; *provided* that once the Debtors have exhausted their existing stock of Business Forms, the Debtors shall ensure that any new Business Forms are clearly labeled "Debtor-In-Possession"; *provided*, *further*, with respect to any Business Forms that exist or are

3

generated electronically, to the extent reasonably practicable, the Debtors shall ensure that such electronic Business Forms are clearly labeled "Debtor-In-Possession."

7.    The Cash Management Banks at which the Bank Accounts are maintained are authorized to continue to maintain, service, and administer the Bank Accounts as accounts of the Debtors as debtors in possession without interruption and in the ordinary course, and to receive, process, honor, and pay, to the extent of available funds, any and all checks, drafts, wires, and ACH transfers issued and drawn on the Bank Accounts after the Petition Date by the holders or makers thereof, as the case may be.

8.    All Cash Management Banks provided with notice of this Interim Order maintaining any of the Bank Accounts shall not honor or pay any bank payments drawn on the listed Bank Accounts, or otherwise issued before the Petition Date, absent further direction from the Debtors.

9.    The Debtors will maintain records in the ordinary course reflecting transfers of cash, if any, including Intercompany Transactions, so as to permit all such transactions to be ascertainable.

10.    In the course of providing cash management services to the Debtors, the Cash Management Banks at which the Bank Accounts are maintained are authorized, without further order of the Court, to deduct the applicable fees and expenses associated with the nature of the deposit and cash management services rendered to the Debtors, whether arising prepetition or postpetition, from the appropriate accounts of the Debtors, and further, to charge back to, and take and apply reserves from, the appropriate accounts of the Debtors any amounts resulting from returned checks or other returned items, including returned items that result from ACH transactions, wire transfers, merchant services transactions or other electronic transfers of any

4

kind, regardless of whether such items were deposited or transferred prepetition or postpetition and regardless of whether the returned items relate to prepetition or postpetition items or transfers.

11.    Each Bank is authorized to debit the Bank Accounts in the ordinary course of business without the need for further order of the Court for: (a) all checks drawn on the Bank Accounts which are cashed at such Cash Management Bank's counters or exchanged for cashier's checks by the payees thereof prior to the Petition Date; (b) all checks or other items deposited in one of the Bank Accounts with such Cash Management Bank prior to the Petition Date which have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent the Debtors were responsible for such items prior to the Petition Date; (c) all undisputed prepetition amounts outstanding as of the date hereof, if any, owed to any Cash Management Bank as service charges for the maintenance of the Cash Management System; and (d) all reversals, returns, refunds, and chargebacks of checks, deposited items, and other debits credited to Debtor's account after the Petition Date, regardless of the reason such item is returned or reversed (including, without limitation, for insufficient funds or a consumer's statutory right to reverse a charge).

12.    Each of the Cash Management Banks may rely on the representations of the Debtors with respect to whether any check or other payment order drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to this or any other order of the Court, and such Cash Management Bank shall not have any liability to any party for relying on such representations by the Debtors as provided for herein.

13.    Those agreements existing between the Debtors and the Cash Management Banks shall continue to govern the postpetition cash management relationship between the Debtors and the Cash Management Banks, subject to applicable bankruptcy or other law, all of the provisions

5

of such agreements, including the termination, fee provisions, rights, benefits, offset rights and remedies afforded under such agreements shall remain in full force and effect absent further order of the Court or, with respect to any such agreement with any Cash Management Bank (including, for the avoidance of doubt, any rights of a Bank to use funds from the Bank Accounts to remedy any overdraft of another Bank Account to the extent permitted under the applicable deposit agreement), unless the Debtors and such Bank agree otherwise, and any other legal rights and remedies afforded to the Cash Management Banks under applicable law shall be preserved, subject to applicable bankruptcy law.

14.     The requirement to establish separate bank accounts for cash collateral and/or tax payments is hereby waived.

15.     Notwithstanding anything to the contrary set forth herein, the Debtors are authorized, but not directed, to continue Intercompany Transactions arising from or related to the operation of their business in the ordinary course; *provided* that each Debtor shall (a) continue to pay its own obligations consistent with such Debtor's past practice with respect to Intercompany Transactions and related obligations, and in no event shall any of the Debtors pay for the prepetition or postpetition obligations incurred or owed by any of the other Debtors in a manner inconsistent with past practices and (b) beginning on the Petition Date, maintain (i) current records of intercompany balances; (ii) a Debtor by Debtor summary on a monthly basis of any postpetition Intercompany Transactions involving the transfer of cash for the preceding month (to be available on the 21st day of the following month); and (iii) reasonable access to the Debtors' advisors with respect to such records.

16.     All postpetition transfers and payments from the Debtors to another Debtor under any postpetition Intercompany Transactions authorized hereunder are hereby accorded superpriority administrative expense status under section 503(b) of the Bankruptcy Code.

17.     Notwithstanding the Debtors' use of a consolidated Cash Management System, the Debtors shall calculate quarterly fees (to be paid in U.S. dollars) under 28 U.S.C. § 1930(a)(6) based on the disbursements of each Debtor, regardless of which entity pays those disbursements.

18.     Those certain existing deposit and service agreements between the Debtors and the Cash Management Banks shall continue to govern the postpetition cash management relationship between the Debtor and the Cash Management Banks, and that all of the provisions of such agreements, including, without limitation, the termination, chargeback, and fee provisions, shall remain in full force and effect.

19.     The Debtors and the Cash Management Banks may, without further order of the Court, agree to and implement changes to the Cash Management System and procedures in the ordinary course of business, including, without limitation, the opening and closing of bank accounts; *provided* that in the event the Debtors open a new bank account they shall open one at an authorized depository; *provided, further*, that the Debtors shall give notice of the opening of any new bank accounts or closing of any Bank Account to the U.S. Trustee within five (5) business days.

20.     The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with any Bank Fees.

21.    Notwithstanding the relief granted in this Interim Order and any actions taken pursuant to such relief, nothing in this Interim Order shall be deemed: (a) an admission as to the validity of any particular claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Interim Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens.  Any payment made pursuant to this Interim Order is not intended and should not be construed as an admission as the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

22.    The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized and directed to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Interim Order.

23.    Nothing in this Interim Order shall modify or impair the ability of any party in interest to contest how the Debtors account, including, without limitation, the validity or amount set forth in such accounting for any Intercompany Transaction or Intercompany Balance.  The rights of all parties in interest with the respect thereto are fully preserved.

24.     To the extent any of the Debtors' Bank Accounts, Brokerage Accounts, and investment accounts are not in compliance with section 345(b) of the Bankruptcy Code or any of the U.S. Trustee's requirements or guidelines, the Debtors shall have until a date that is 45 days from the Petition Date, without prejudice to seeking an additional extension, to come into compliance with section 345(b) of the Bankruptcy Code and any of the U.S. Trustee's requirements or guidelines; *provided* that nothing herein shall prevent the Debtors or the U.S. Trustee from seeking further relief from the Court to the extent that an agreement cannot be reached.  The Debtors may obtain a further extension of the 45-day period referenced above by written stipulation with the U.S. Trustee and filing such stipulation on the Court's docket without the need for further Court order.

25.     As soon as practicable after entry of this Interim Order, the Debtors shall serve a copy of this Interim Order on the Cash Management Banks.

26.     The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

27.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

28.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

29.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Interim Order in accordance with the Motion.

30.     This Court retains exclusive jurisdiction with respect to all matters arising from or

related to the implementation, interpretation, and enforcement of this Interim Order.

New York, New York
Dated: _____, 2022

_____
THE HONORABLE [●]
UNITED STATES BANKRUPTCY JUDGE

**Exhibit 1**

**Cash Management System Schematic**

# Cash Schematic (excludes brokerage accounts)



* Account operates with sub-account that has access to a blockchain based digital payments platform. Platform allows company and customers to transact in off-banking hours by sending/receiving tokenized USD. Treasury funds the sub-account ahead of disbursements and manually sweeps funds into fiat parent account after receipts.

## Exhibit 2

**Bank Accounts**

| No. | Entity | Bank | Location | Description | Account No. |
|---|---|---|---|---|---|
| 1. | Celsius Network Limited | Signature Bank | New York | OTC | xxx0344 |
| 2. | Celsius Network Limited | Signature Bank | New York | Operating | xxx0999 |
| 3. | Celsius Network Limited | Signature Bank | New York | Treasury | xxx2589 |
| 4. | Celsius Mining LLC | Signature Bank | New York | Operating | xxx4445 |
| 5. | Celsius Networks Lending LLC | Signature Bank | New York | Lending | xxx5677 |
| 6. | Celsius Lending LLC | Signature Bank | New York | Lending | xxx6687 |
| 7. | Celsius Network LLC | Signature Bank | New York | Operating | xxx8569 |
| 8. | Celsius Network Limited | Signature Bank | New York | Operating | xxx9778 |
| 9. | Celsius Network LLC | Signature Bank | New York | Collateral | xxx2073 |
| 10. | Celsius Network Limited | Signature Bank | New York | Collateral | xxx9786 |
| 11. | Celsius Network Limited | Oppenheimer & Co. Inc. | New York | Brokerage | xxx9697 |
| 12. | Celsius Network Limited | ED&F Man Capital Markets, Inc. | Illinois | Brokerage | xxx1000 |
| 13. | Celsius Network Limited | Signature Securities Group Corporation | New York | Brokerage | xxx0783 |
| 14. | Celsius Network Inc. | Signature Bank | New York | Operating | xxx2597 |

**<u>Exhibit B</u>**

**Proposed Final Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## FINAL ORDER (I) AUTHORIZING THE DEBTORS TO (A) CONTINUE TO OPERATE THEIR CASH MANAGEMENT SYSTEM, (B) HONOR CERTAIN PREPETITION OBLIGATIONS RELATED THERETO, (C) MAINTAIN EXISTING BUSINESS FORMS, AND (D) CONTINUE TO PERFORM INTERCOMPANY TRANSACTIONS, (II) GRANTING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS TO POSTPETITION INTERCOMPANY BALANCES, AND (III) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of a final order (this "Final Order"), (a) authorizing, but not directing, the Debtors to (i) continue to operate their cash and cryptocurrency management system (the "Cash Management System"), (ii) honor certain prepetition obligations related thereto, (iii) maintain existing Business Forms in the ordinary course of business, and (iv) continue to perform Intercompany Transactions consistent with historical practice, (b) granting superpriority administrative expense status to postpetition intercompany balances, and (c) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declarations; and this Court having jurisdiction over this matter pursuant to  28 U.S.C. §§ 157 and 1334 and the *Amended Standing*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

*Order* of Reference from the United States District Court for the Southern District of New York, entered February 1, 2012; and that this Court having the power to enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing, if any, before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.       The Motion is granted on a final basis as set forth herein.

2.       The Debtors are authorized, in their sole discretion, to:  (a) continue operating the Cash Management System, substantially as illustrated on **Exhibit 1** attached hereto; (b) honor their prepetition obligations related thereto; and (c) continue to perform Intercompany Transactions consistent with historical practice.

3.       The Debtors are further authorized, in their sole discretion, to:  (a) continue to use, with the same account numbers, the Bank Accounts in existence as of the Petition Date, including those Bank Accounts identified on **Exhibit 2** attached hereto; (b) treat the Bank Accounts for all purposes as accounts of the Debtors as debtors in possession; (c) deposit funds in and withdraw funds from the Bank Accounts by all usual means, including checks, wire transfers, and other

debits; (d) pay all prepetition Bank Fees; and (e) pay any ordinary course Bank Fees incurred in connection with the Bank Accounts, irrespective of whether such fees arose prior to the Petition Date, and to otherwise perform their obligations under the documents governing the Bank Accounts.

4.      The Debtors are authorized to continue to maintain and manage their cryptocurrency assets in their reasonable discretion.

5.      The Debtors are authorized, but not directed, to continue using, in their present form, the Business Forms, as well as checks and other documents related to the Bank Accounts existing immediately before the Petition Date, without reference to the Debtors' status as debtors in possession; *provided* that once the Debtors have exhausted their existing stock of Business Forms, the Debtors shall ensure that any new Business Forms are clearly labeled "Debtor-In-Possession"; *provided*, *further*, with respect to any Business Forms that exist or are generated electronically, to the extent reasonably practicable, the Debtors shall ensure that such electronic Business Forms are clearly labeled "Debtor-In-Possession."

6.      The Cash Management Banks at which the Bank Accounts are maintained are authorized to continue to maintain, service, and administer the Bank Accounts as accounts of the Debtors as debtors in possession without interruption and in the ordinary course, and to receive, process, honor, and pay, to the extent of available funds, any and all checks, drafts, wires, and ACH transfers issued and drawn on the Bank Accounts after the Petition Date by the holders or makers thereof, as the case may be.

7.      All Cash Management Banks provided with notice of this Final Order maintaining any of the Bank Accounts shall not honor or pay any bank payments drawn on the listed Bank Accounts, or otherwise issued before the Petition Date, absent further direction from the Debtors.

8.      The Debtors will maintain records in the ordinary course reflecting transfers of cash, if any, including Intercompany Transactions, so as to permit all such transactions to be ascertainable.

9.      In the course of providing cash management services to the Debtors, the Cash Management Banks at which the Bank Accounts are maintained are authorized, without further order of the Court, to deduct the applicable fees and expenses associated with the nature of the deposit and cash management services rendered to the Debtors, whether arising prepetition or postpetition, from the appropriate accounts of the Debtors, and further, to charge back to, and take and apply reserves from, the appropriate accounts of the Debtors any amounts resulting from returned checks or other returned items, including returned items that result from ACH transactions, wire transfers, merchant services transactions or other electronic transfers of any kind, regardless of whether such items were deposited or transferred prepetition or postpetition and regardless of whether the returned items relate to prepetition or postpetition items or transfers.

10.     Each Cash Management Bank is authorized to debit the Debtors' accounts in the ordinary course of business without the need for further order of the Court for: (a) all checks drawn on the Debtors' accounts which are cashed at such Cash Management Bank's counters or exchanged for cashier's checks by the payees thereof prior to the Petition Date; (b) all checks or other items deposited in one of the Debtors' accounts with such Bank prior to the Petition Date which have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent the Debtors were responsible for such items prior to the Petition Date; (c) all undisputed prepetition amounts outstanding as of the date hereof, if any, owed to any Cash Management Bank as service charges for the maintenance of the Cash Management System; and (d) all reversals, returns, refunds, and chargebacks of checks, deposited items, and

4

other debits credited to Debtor's account after the Petition Date, regardless of the reason such item is returned or reversed (including, without limitation, for insufficient funds or a consumer's statutory right to reverse a charge).

11.     Each of the Cash Management Banks may rely on the representations of the Debtors with respect to whether any check or other payment order drawn or issued by the Debtors prior to the Petition Date and should be honored pursuant to this or any other order of the Court, and such Cash Management Bank shall not have any liability to any party for relying on such representations by the Debtors as provided for herein.

12.     Those agreements existing between the Debtors and the Cash Management Banks shall continue to govern the postpetition cash management relationship between the Debtors and Cash Management Banks, subject to applicable bankruptcy or other law, all of the provisions of such agreements, including the termination, fee provisions, rights, benefits, offset rights and remedies afforded under such agreements shall remain in full force and effect absent further order of the Court or, with respect to any such agreement with any Cash Management Bank (including, for the avoidance of doubt, any rights of a Bank to use funds from the Bank Accounts to remedy any overdraft of another Bank Account to the extent permitted under the applicable deposit agreement), unless the Debtors and such Cash Management Bank agree otherwise, and any other legal rights and remedies afforded to the Cash Management Banks under applicable law shall be preserved, subject to applicable bankruptcy law.

13.     The requirement to establish separate bank accounts for cash collateral and/or tax payments is hereby waived.

14.     Notwithstanding anything to the contrary set forth herein, the Debtors are authorized, but not directed, to continue Intercompany Transactions arising from or related to the

operation of their business in the ordinary course; *provided* that each Debtor shall (a) continue to pay its own obligations consistent with such Debtor's past practice with respect to Intercompany Transactions and related obligations, and in no event shall any of the Debtors pay for the prepetition or postpetition obligations incurred or owed by any of the other Debtors in a manner inconsistent with past practices; and (b) beginning on the Petition Date, maintain (i) current records of intercompany balances; (ii) a Debtor by Debtor summary on a monthly basis of any postpetition Intercompany Transactions involving the transfer of cash for the preceding month (to be available on the 21st day of the following month); and (iii) reasonable access to the Debtors' advisors with respect to such records.

15.    All postpetition transfers and payments from the Debtors to another Debtor under any postpetition Intercompany Transactions authorized hereunder are hereby accorded superpriority administrative expense status under section 503(b) of the Bankruptcy Code.

16.    Notwithstanding the Debtors use of a consolidated Cash Management System, the Debtors shall calculate quarterly fees (to be paid in U.S. dollars) under 28 U.S.C. § 1930(a)(6) based on the disbursements of each Debtor, regardless of which entity pays those disbursements.

17.    Those certain existing deposit and service agreements between the Debtors and the Cash Management Banks shall continue to govern the postpetition cash management relationship between the Debtors and the Cash Management Banks, and that all of the provisions of such agreements, including, without limitation, the termination, chargeback, and fee provisions, shall remain in full force and effect.

18.    The Debtors and the Cash Management Banks may, without further order of the Court, agree to and implement changes to the Cash Management System and procedures in the ordinary course of business, including, without limitation, the opening and closing of bank

accounts; *provided* that in the event the Debtors open a new bank account they shall open one at an authorized depository; *provided, further*, that the Debtors shall give notice of the opening of any new bank accounts or closing of any Bank Account to the U.S. Trustee within five (5) business days.

19.     The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with any Bank Fees.

20.     Notwithstanding the relief granted in this Final Order and any actions taken pursuant to such relief, nothing in this Final Order shall be deemed: (a) an admission as to the validity of any particular claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Final Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens.  Any payment made pursuant to this Final Order is not intended and should not be construed as an admission as the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

21.     The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized

and directed to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Final Order.

22.    Nothing in this Final Order shall modify or impair the ability of any party in interest to contest how the Debtors account, including, without limitation, the validity or amount set forth in such accounting for any Intercompany Transaction or Intercompany Balance.  The rights of all parties in interest with the respect thereto are fully preserved.

23.    Section 345 of the Bankruptcy Code and any provision of the U.S. Trustee Guidelines requiring that the Bank Accounts be U.S. Trustee authorized depositories is waived with respect to the Bank Accounts, Brokerage Accounts, and investment accounts existing as of the Petition Date.

24.    As soon as practicable after entry of this Final Order, the Debtors shall serve a copy of this Final Order on the Cash Management Banks.

25.    Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

26.    Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order are immediately effective and enforceable upon its entry.

27.    The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Final Order in accordance with the Motion.

28.     This Court retains exclusive jurisdiction with respect to all matters arising from or

related to the implementation, interpretation, and enforcement of this Final Order.

New York, New York
Dated: _____, 2022

_____
THE HONORABLE [●]
UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit 1</u>**

**Cash Management System Schematic**

# Cash Schematic (excludes brokerage accounts)

* Account operates with sub-account that has access to a blockchain based digital payments platform. Platform allows company and customers to transact in off-banking hours by sending/receiving tokenized USD. Treasury funds the sub-account ahead of disbursements and manually sweeps funds into fiat parent account after receipts.



## Exhibit 2

**Bank Accounts**

| No. | Entity | Bank | Location | Description | Account No. |
|---|---|---|---|---|---|
| 1. | Celsius Network Limited | Signature Bank | New York | OTC | xxx0344 |
| 2. | Celsius Network Limited | Signature Bank | New York | Operating | xxx0999 |
| 3. | Celsius Network Limited | Signature Bank | New York | Treasury | xxx2589 |
| 4. | Celsius Mining LLC | Signature Bank | New York | Operating | xxx4445 |
| 5. | Celsius Networks Lending LLC | Signature Bank | New York | Lending | xxx5677 |
| 6. | Celsius Lending LLC | Signature Bank | New York | Lending | xxx6687 |
| 7. | Celsius Network LLC | Signature Bank | New York | Operating | xxx8569 |
| 8. | Celsius Network Limited | Signature Bank | New York | Operating | xxx9778 |
| 9. | Celsius Network LLC | Signature Bank | New York | Collateral | xxx2073 |
| 10. | Celsius Network Limited | Signature Bank | New York | Collateral | xxx9786 |
| 11. | Celsius Network Limited | Oppenheimer & Co. Inc. | New York | Brokerage | xxx9697 |
| 12. | Celsius Network Limited | ED&F Man Capital Markets, Inc. | Illinois | Brokerage | xxx1000 |
| 13. | Celsius Network Limited | Signature Securities Group Corporation | New York | Brokerage | xxx0783 |
| 14. | Celsius Network Inc. | Signature Bank | New York | Operating | xxx2597 |