WILLIAM K. HARRINGTON
United States Trustee
U.S. Department of Justice
Office of the United States Trustee
201 Varick Street, Room 1006
New York, NY 10014
Tel. (212) 510-0500
By:    Shara Cornell
      Mark Bruh
      Brian Masumoto

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- x

| | | |
|---|---|---|
| *In re* | : | Chapter 11 |
| | : | |
| CELSIUS NETWORK LLC., *et al.*,[1] | : | Case No. 22-10964 (MG) |
| | : | |
| Debtors. | : | (Jointly Administered) |

------------------------------------------------- X

## MOTION OF THE UNITED STATES TRUSTEE FOR ENTRY OF AN ORDER DIRECTING THE APPOINTMENT OF AN EXAMINER

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

# TABLE OF CONTENTS

TABLE OF CONTENTS ………………………………………………… i

TABLE OF AUTHORITIES ………………………………………….. ii

I.  PRELIMINARY STATEMENT ………………………………………... 1

II.  BACKGROUND ………………………………………………….... 4

    A.  The Bankruptcy Filing ……………………………………….... 4

    B.  The Debtors' Business Model and Corporate Structure ………………… 6

    C.  Committee Requests ………………………………………….... 10

    D.  Prepetition Litigation ………………………………………….... 11

    E.  State Investigation, Enforcement, and Advisory Actions ……………… 12

    F.  Known Prepetition Conduct of the Debtors ……………………………. 14

    G.  Customer Mistrust ……………………………………………....…. 16

III.  GROUNDS/BASIS FOR RELIEF ………………………………….... 17

    A.  The Appointment of an Examiner Would Be in the Best Interests of the Debtors' Estate and Their Creditors and Equity Security Holders. ……. 17

        1.  There are Credible Allegations of Incompetence or Gross Mismanagement, Including the Offering of Unregistered Securities, Which Warrant the Appointment of an Examiner to Investigate. ……………………………………………… 19

        2.  There are Significant Transparency Issues…………………… 20

        3.  Widespread Mistrust in the Debtors. …………………………22

    B.  The Debtors Exceed the Unsecured Debt Limit in § 1104(c)(2). ……….24

# TABLE OF AUTHORITIES

**Statutes and Rules**

11 U.S.C. § 1104(c) …………………………………………….. *passim*

11 U.S.C. § 1104(c)(1) …………………………………………. 17

11 U.S.C. § 1104(c)(2) …………………………………………. 17, 24-25

**Case Law**

*First Am. Health Care of Georgia, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 208 B.R. 992 (Bankr. S.D. Ga. 1996) …………………………... 18

*In re Euro-American Lodging Corp.*, 365 B.R. 421 (Bankr. S.D.N.Y. 2007) …………………………………………………………… 22

*In re JNL Funding Corp.*, No. 10-73724, 2010 WL 3448221 (Bankr. E.D.N.Y. Aug. 26, 2010) …………………………………………. 18

*In re Loral Space & Communications Ltd.,* No. 04 Civ. 8645RPP, 2004 WL 2979785 (S.D.N.Y. Dec. 23, 2004) ………………………………… 24

*In re McCorhill Publ., Inc.*, 73 B.R. 1013 (Bankr. S.D.N.Y. 1987) ………… 22

*In re Michigan BioDiesel, LLC*, 466 B.R. 413 (Bankr. W.D. Mich. 2011) 18

*In re PRS Insurance Group*, 274 B.R. 381 (Bankr. D. Del. 2001) ……….. 19

*In re UAL Corp.,* 307 B.R. 80 (Bankr. N.D. Ill. 2004) …………………… 24, 25

*In re Vascular Access Centers, L.P.*, 611 B.R. 742 (Bankr. E.D. Pa. 2020) 19

*Manufacturers and Traders Trust Co. v. Morningstar Marketplace, Ltd. (In re Morningstar Marketplace, Ltd.)*, 544 B.R. 297 (Bankr. M.D. Pa. 2016) …………………………………………………………… 22

*Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498 (6th Cir. 1990) …………………………………………………….. 24

*Oklahoma Refining Co. v. Blaik (In re Oklahoma Refining Co.)*, 838 F.2d 1133 (10th Cir. 1988) …………………………………………………... 19

WILLIAM K. HARRINGTON
United States Trustee
U.S. Department of Justice
Office of the United States Trustee
201 Varick Street, Room 1006
New York, NY 10014
Tel. (212) 510-0500
By:    Shara Cornell
       Mark Bruh
       Brian Masumoto

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- x
*In re*                        :    Chapter 11
                            :
CELSIUS NETWORK LLC., *et al.*,[1]   :    Case No. 22-10964 (MG)
                            :
                 Debtors.   :    (Jointly Administered)
------------------------------------------------- X

### MOTION OF THE UNITED STATES TRUSTEE FOR ENTRY OF
### AN ORDER DIRECTING THE APPOINTMENT OF AN EXAMINER

    William K. Harrington, United States Trustee for Region 2 (the "United States

Trustee"), through his counsel, files this Motion (the "Motion") for the entry of an order

directing the appointment of an examiner pursuant to 11 U.S.C. § 1104(c). In support

thereof, the United States Trustee respectfully represents as follows:

### I.   PRELIMINARY STATEMENT

    As acknowledged by the Debtors and all parties in interest, these cases are unique.

The Debtors operate a crypto asset-based finance platform that provides financial

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax
identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC
(8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554);
Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor
Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11
cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

services to institutional, corporate, and retail clients across more than 100 countries. The market for cryptocurrency is relatively new, purposefully opaque, and, at best, loosely regulated. It also lacks transparency, which has resulted in widespread confusion among the Debtors' customers and other parties in interest, requiring the immediate appointment of an examiner under section 1104(c)(1). This lack of visibility didn't start with the bankruptcy filing; it has been ongoing and is evidenced by the sudden changes in types of customer accounts and extensive customer confusion about the status of individual assets. There is no real understanding among customers, parties in interest, and the public as to the type or actual value of crypto held by the Debtors or where it is held. An independent examiner is necessary here to investigate and report in a clear and understandable way on the Debtors' business model, their operations, their investments, their lending transactions, and the nature of the customer accounts to ensure public confidence in the integrity of the bankruptcy system and to neutralize the inherent distrust creditors and parties in interest have in the Debtors.[2]

There are also numerous questions in this case as to the Debtors' management and their role in creating the Debtors' current illiquidity (*i.e.,* the prepetition failure of the Debtors and their affiliates to adequately collateralize their loans on an institutional level and the Debtors' repayment of hundreds of millions of dollars in loans during the ninety days prepetition) that require investigation by an impartial third party. Moreover, the allegations found in the prepetition complaints and regulatory actions against the Debtors are severe, including allegations of offering of unregistered securities, the failure to

---

[2] An unprecedented number of letters have been filed on the electronic docket in this case by affected customers. *See* Cornell Decl., ¶ 3.

2

obtain proper licenses, and the failure to hedge against market volatility. If these allegations are true, they could expose further irregularities. An examiner would be able to look into these and other issues to determine if there are any claims or causes of actions that the Unsecured Creditors Committee (the "Committee") can pursue.

The Debtors' professionals acknowledge many of these facts and circumstances and have provided information requested by the United States Trustee. Irrespective of such cooperation, however, the divergent interests of the various estates, the extreme financial irregularities that have taken place, and the extensive mistrust of the Debtors' customers, all make the appointment of an independent and disinterested examiner in the best interests of creditors, equity security holders, and the bankruptcy estates. Moreover, while it is helpful that the Committee has been formed and has already begun the difficult work of advancing the collective interest of the Debtors' creditors, the Committee, as a party in interest, is not neutral and not tasked with providing a public report of its findings for the benefit of all parties in interest and the public. Given the unique nature of these cases, a public report which provides transparency as to the Debtors' business model and operations, their investments, their lending transactions, and the nature of customer accounts is essential.

Based on the limited facts provided, the Debtors' capital structure includes unsecured debt in excess of the $5 million threshold of Bankruptcy Code section 1104(c)(2). Thus, the appointment of an examiner is not only necessary and in the best interest of creditors and parties in interest, but it is also mandatory. Accordingly, an examiner should be appointed to provide the Court, the United States Trustee, creditors,

and other parties in interest with transparency and clarity as to the business structure, practices, and liquidity of the above-captioned Debtors. For these reasons and as discussed below, the United States Trustee respectfully urges the Court to direct the United States Trustee to appoint an Examiner, pursuant to section 1104(d) of the Bankruptcy Code.

## II.    **BACKGROUND**

### A.    **The Bankruptcy Filing**

1.      On July 13, 2022 (the "Petition Date"), Celsius Network LLC, Celsius KeyFi LLC, Celsius Lending LLC, Celsius Mining LLC, Celsius Network Inc., Celsius Network Limited, Celsius Networks Lending LLC, and Celsius US Holding LLC (collectively, the "Debtors") each commenced a voluntary case under Chapter 11 of the Bankruptcy Code. *See* Voluntary Petitions, SDNY Case No. 22-10964(MG), ECF Doc. No. 1; *see also* Declaration of Shara Claire Cornell ("Cornell Decl."), attached hereto and made a part hereof, ¶ 1.

2.      The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107 and 1008 of the bankruptcy Code. Cornell Decl., ¶ 1. On July 19, 2022, the Court entered an Order directing that these cases be jointly administered. ECF Doc. No. 53.

3.      A first day hearing was held on July 18, 2022 granting certain interim relief. *See* Transcript dated July 18, 2022, attached hereto as Exhibit A.

4.      An Official Committee of Unsecured Creditors was appointed on July 27, 2022. ECF Doc. No. 241.

5.       On July 14, 2022, the Debtors filed their Motion Seeking Entry of Interim and Final Orders (I) Authorizing the payment of Certain Taxes and (II) Granting Related Relief (the "Tax Motion"). ECF Doc. No. 17. The Tax Motion identified that the Debtors had not paid Sales, Use, and VAT Taxes since 2020 and were liable for an estimated $20.2 million. Tax Motion, ¶ 14. The Tax Motion also identified that the Debtors were liable for Customs and Import Duties for an estimated $1.5 million. *Id*., ¶ 15. No trust fund or escrow accounts have been identified as earmarked for the payment of these taxes. Cornell Decl., ¶ 5.

6.       Also on July 14, 2022, the Debtors filed their Motion Seeking Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief (the "Utility Motion"). ECF Doc. No. 3. The Utility Motion states that the majority of the Debtors' utilities are paid through its leases. Utility Motion, ¶ 10. The Utility Motion is silent as to how many leases the Debtors have or their monthly costs. Cornell Decl., ¶ 6.

7.       On July 25, 2022, the Debtors filed their Motion for an Order to Approve Bidding Procedures ("Bid Procedures") for the sale of its equity interests in GK8, a non-debtor affiliate. ECF Doc. No. 188.

8.       Also on July 25, 2022, the Debtors filed their Motion to Approve Procedures for De Minimis Asset Transactions ("De Minimis Motion") whereby the

Debtors would be authorized to complete allegedly ordinary course transactions up to a $5 million cap. ECF Doc. No. 189.

9.      Also on July 25, 2022, the Debtors filed their Motion Seeking Entry of an Order (I) Permitting the Sale of the Debtors' Mined Bitcoin in the Ordinary Course and (II) Granting Related Relief (the "Bitcoin Motion") where the Debtors argued, *inter alia*, for the authority to sell, pledge, transfer, assign, or otherwise monetize the Bitcoin generated from their mining activity. ECF Doc. No. 187. The Bitcoin Motion is silent as to the use of the proceeds of any sold bitcoin, how much bitcoin the Debtors currently hold, or why the Debtors are unable to use any of its liquid reserves instead of actively selling bitcoin. Cornell Decl., ¶ 7.

### B. **The Debtors' Business Model and Corporate Structure**

10.      The Declaration of Alex Mashinsky, Chief Executive Officer of the Celsius Network LLC, in Support of Chapter 11 Petitions and First Day Motions (the "Mashinsky Decl.") (ECF Doc. No. 23) stated that the Debtors and non-debtor affiliates (collectively, "Celsius") were created in 2017 by founders Alex Mashinsky, S. Daniel Leon, and Nuke Goldstein.

11.      The Debtors are a crypto asset based finance platform that provides financial services to institutional, corporate, and retail clients across more than 100 countries. See Mashinsky Decl., ¶ 1. The platform allowed users to transfer their crypto assets and (a) earn rewards on such crypto assets and/or (b) borrow money using those transferred crypto assets as collateral. *Id.*

6

12.    The terms of use that form the basis of the contract between Celsius and its users explicitly state that in exchange for the opportunity to earn rewards on assets, users transfer "all right and title" of their crypto assets to Celsius including "ownership rights" and the right to "pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use" any amount of such crypto, whether "separately or together with other property", "for any period of time," and "without retaining in Celsius's possession and/or control a like amount of [crypto] or any other monies or assets, and to use or invest such [crypto] in Celsius's full discretion."[3] A version of this statement has been in every version of Celsius's "Terms of Use" since 2018. And since 2019, the Company has been clear that it might "experience cyber-attacks, extreme market conditions, or other operational or technical difficulties which could result in immediate halt of transactions either temporarily or permanently. (footnotes omitted)." Mashinsky Decl., ¶ 5.

13.    The Celsius platform was launched in 2018, and by March 2021 Celsius had allegedly surpassed $10 billion in digital assets and 200 employees. In December 2021, Celsius announced the first closing of its Series B equity funding for 600 million at an implied enterprise value of approximately $3 billion. Mashinsky Decl., ¶¶ 7 and 40.

14.    By July 2022, Celsius had approximately 1.7 million registered users and approximately 300,000 active users with account balances of more than $100 and approximately $6.0 billion in assets and was preparing to go forward with an initial public offering of Debtor Celsius Mining LLC ("Mining"). Mashinsky Decl., ¶ 9.

---

[3] On August 1, 2022, this Court entered an Order directing the Debtors to file its terms of use on or before August 8, 2022. ECF Doc. No. 301.

15.     Celsius Network Inc. (the ultimate parent of the Debtors) disclosed unaudited liabilities of $5.5 billion and assets of $4.31 billion as of July 13, 2022. Mashinsky Decl., ¶ 16.

16.     The Celsius business model is centered on deploying digital assets to generate income for Celsius and its operations and growth.  Some of Celsius's crypto is tied up in long term and illiquid crypto deployment activities; some of Celsius's crypto assets have been loaned to third parties; and some of Celsius's crypto assets have been pledged in support of borrowings or sold to generate cash used to acquire Bitcoin mining equipment and the GK8 storage business. Because of the variety of asset deployment strategies that the Company engaged in, including the terms and length of time those strategies "lock" the assets, and due to the drop in value of digital assets, Celsius was unable both to meet user withdrawals and to provide additional collateral to support its obligations. Mashinsky Decl., ¶ 13.

17.     Extreme market volatility in early 2022, including the implosion of Terra LUNA ("Luna") and its TerraUSD stablecoin ("USTD") as well as the failure of several crypto funds/exchanges, accelerated the onset of a "crypto winter" and an industry-wide sell-off in 2022.  Mashinsky Decl., ¶¶ 11-2.

18.     As a result of the volatility, Celsius suffered a rapid "run on the bank" that prompted Celsius to pause all withdrawals, swaps, and transfers on its platform on June 12, 2022.  Mashinsky Decl., ¶ 14.

19.     As of April 2022, the Earn program is only offered to international-based users and U.S. accredited users.  U.S. non-accredited users who had a balance in their

8

Earn account prior to April 15, 2022, are allowed to keep such balances in the Earn program and have continued to earn rewards thereon. As of the Petition Date, there were over 600,000 Earn users, who had transferred approximately 2 billion in digital assets, in the aggregate, with a market value of approximately $4.2 billion as of July 10, 2022, to Celsius. As of the Petition Date, Celsius no longer offers rewards on digital assets transferred to Celsius through the Earn program. Mashinsky Decl., ¶ 49.

20.    In April 2022, the Company began providing a new type of service marketed to its users located in the U.S. called the Celsius Custody Service. For eligible users, "Custody Service" serves as the central hub of their digital asset account at Celsius, enabling the user to navigate from Celsius's "Custody Wallet" to various Celsius products (based on the availability of those products in the user's jurisdiction).[4] For example, an eligible customer could elect to transfer their crypto assets from the "Custody Service" program to the Earn program to earn rewards. For clarity, crypto assets held solely in "Custody Service" do not earn rewards from the Earn program as crypto assets held in custody shall "at all times remain with the [user]" and "Celsius will not transfer, sell, loan or otherwise rehypothecate" digital assets in custody unless "specifically instructed by [users], except as required by valid court order, competent regulatory agency, government agency or applicable law." Pursuant to the "Terms of Use," the Company is, however, entitled to set-off any obligations owed by a user to the Company against the user's assets held in custody. Because all user assets are

---

[4] Certain Custody Service account holders have retained the Togut, Segal & Segal LLP firm to represent as an Ad Hoc Group of Custodial Account Holders in these Bankruptcy Cases. *See Notice of* Appearance, ECF Doc. No. 330.

comingled, custody users are not entitled to the return of their specific digital assets, but rather the return of the same type of digital asset (footnotes omitted). Mashinsky Decl., ¶ 58.

21.     Even though Custody Services were only created in April 2022, as of July 10, 2022, the Debtors had $180 million held in its Custody accounts. Mashinsky Decl., ¶ 16, 59.

22.     The Mashinsky Declaration is silent as to "Withhold" Accounts.[5] Cornell Decl., ¶ 4.

### C. Committee Requests

23.     The United States Trustee has received two separate requests for the appointment of formal equity committees that, *inter alia*, allege that their respective constituencies are not adequately represented in this bankruptcy case, not withstanding the appointment of the Committee. Cornell Decl., ¶ 11.

24.     Upon information, at least two other ad hoc committees have been formed. On August 2, 2022, a notice of appearance and request for service was filed on behalf of an Ad Hoc Group of Custodial Account Holders. ECF Doc. No. 330. On August 11, 2022, a notice of appearance and demand for notices was filed on behalf of an Ad Hoc Group of Withhold Account Holders. ECF Doc. No. 427.

---

[5] There are allegations regarding these types of accounts in multiple letters filed on the Court's electronic docket. *See, e.g.*, ECF Doc. No 162 ("It appears that the Debtor has failed to disclose to the court that there is a fourth account type--the "Withhold" account"). The allegations include that in states that prohibited "Custody" accounts, customer assets were instead held in accounts the Debtors labeled as "Withhold" accounts. *Id*. Troutman Pepper Hamilton Sanders LLP has filed a Notice of Appearance as counsel for an Ad Hoc Group of Withhold Account Holders. ECF Doc. No. 427.

### D. **Prepetition Litigation**

25.     On July 7, 2022, KeyFi, Inc. ("KeyFi") filed a complaint in the Supreme

Court of the State of New York, County of New York against CNL and Celsius KeyFi

LLC (the "KeyFi Complaint") alleging five different causes of action asserting

breach of contract, negligent misrepresentation, and fraud claims and demanding an

accounting. Cornell Decl., ¶ 8.

26.     The KeyFi Complaint also specifically alleged that in order to address a

liquidity crisis precipitated by customer withdrawals, Celsius offered double-digit interest

rates in order to lure new depositors, whose funds were used to repay depositors and

creditors, thereby becoming a Ponzi scheme.  KeyFi Complaint, ¶ 87.

27.     The KeyFi Complaint was filed in response to an ongoing dispute with

KeyFi and its chief executive officer.  Mashinsky Decl., ¶ 129.

28.     On July 13, 2022 a Class Action Complaint was filed in the United States

District Court for the District of New Jersey against Celsius Network, LLC, Celsius

Lending, LLC, Celsius KeyFi LLC, Alexander Mashinsky, Shomi "Daniel" Leon, David

Barse, and Alan Jeffrey Carr (the "Class Action Lawsuit").  The Class Action Lawsuit

alleged that the common legal factual questions include, but are not limited to:

a.     whether the Celsius Financial Products are securities under the Securities
       Act;

b.     whether the sale of Celsius Financial Products violates the registration of
       the Securities Act;

c.     whether certain Debtors (and management) improperly and misleadingly
       marketed Celsius Financial Products;

11

     d.     whether certain Debtors' (and management's) conduct violates the state consumer protection statutes asserted herein;

     e.     whether Debtors (and management) conspired to artificially inflate the price of the Celsius Financial Products and then sell their Celsius Financial Products to unsuspecting investors;

     f.     whether Debtors (and management) have been unjustly and wrongfully enriched as a result of their conduct;

     g.     whether the proceeds obtained as a result of the sale of Celsius Financial Products rightfully belongs to class members; and

     h.     whether Management breached the implied covenant of good faith and fair dealing.

Class Action Lawsuit, Exhibit B.

29.     The Class Action Lawsuit was not described in the Mashinsky

Declaration. Cornell Decl., ¶ 4.

### E.  <u>State Investigation, Enforcement, and Advisory Actions</u>

30.     At least six state regulators also have investigated the operations of

Celsius, including whether Celsius was offering unregistered securities through its

interest bearing Earn accounts. Cornell Decl., ¶ 12. The six states—Washington, New

Jersey, Alabama, Texas, Kentucky, and Vermont—have taken the following actions:

- On September 16, 2019, a consent order was entered into between the State of Washington Department of Financial Institutions Division of Consumer Services and Celsius Network Inc. prohibiting Celsius Network Inc. from holding itself out being able to or providing money services to Washington state consumers until such time as Celsius Network Inc. obtains a license in accordance with the Uniform Money Services Act. It was further agreed that Celsius Network shall cease and desist from making, facilitating, or assisting in making or financing any loans to Washington State residents until such time as Celsius Network obtains a license in accordance with the Consumer Loan Act.

- On September 1, 2021, the New Jersey Bureau of Securities issued a Cease and Desist Order against Celsius Network LLC from (1) offering for sale any security to or from New Jersey without first registering the security or qualifying for an exemption, (2) accepting any additional assets into an existing Earn account, and (3) violating any securities law.

- On September 16, 2021, the Alabama Securities Commission issued an Order to Show Cause Why the Alabama Securities Commission Should Not Order Respondents to Cease and Desist from Further Offers or Sales of Securities in Alabama.

- On September 17, 2021, the Texas State Securities Board, issued a Notice of Hearing scheduled for February 14, 2022, for the purpose of determining whether to issue a proposal for decision for the entry of a Cease and Desist against Celsius Network, LLC, and Celsius Lending, LLC.

- On September 23, 2021, the Department of Financial Institutions for the State of Kentucky issued an Emergency Order to Cease and Desist against Celsius Network LLC prohibiting it from soliciting or selling any security in Kentucky unless that security is registered with the Department and from any and all activity which would violate the Securities Act of Kentucky.

- On July 7, 2022, the Vermont Department of Financial Regulation issued an *Investor Alert: Celsius Network* (Celsius Network LLC and its affiliates) warning, in part, that:

> The Department believes Celsius is deeply insolvent and lacks the assets and liquidity to honor its obligations to account holders and other creditors. Celsius deployed customer assets in a variety of risky and illiquid investments, trading, and lending activities. Celsius compounded these risks by using customer assets as collateral for additional borrowing to pursue leveraged investment strategies. Additionally, some of the assets held by Celsius are illiquid, meaning they may be difficult to sell, and a sale may result in financial losses. The company's assets and investments are probably inadequate to cover its outstanding obligations.

- On August 8, 2022, a Desist and Refrain Order was issued by the State of California Business, Consumer Services and Housing Agency Department of Financial Protection and Innovation ordering Celsius Network Inc., Celsius Network Limited, Celsius US Holding LLC,

13

Celsius Network LLC, and any of their subsidiaries, and Alexander
Mashinsky (collectively, "California Defendants"), to desist and
refrain from further offers and sale of securities unless such sales are
qualified under California law or an exemption applies. Furthermore,
the California Defendants were ordered to desist and refrain from
offering securities in California by means of untrue statements of
material fact or omissions of material facts necessary to make the
statements made, in the light of the circumstances under which the
statements were made, not misleading in violation of Corporations
Code section 24501.

Cornell Decl., ¶ 12.

31.    The Mashinsky Declaration is silent as to any regulatory issue or action.

Cornell Decl., ¶ 4.

**F.    Known Prepetition Conduct of the Debtors**

32.    The Debtors admit that "despite the Company's directive to engage in
only market neutral exchange deployments, certain asset deployment decisions were
made in the midst of its unexpected asset growth that in hindsight proved
problematic. Although the Company took the necessary steps to "unwind" these
deployments, unfortunately, the damage was done." Mashinsky Decl., ¶ 92.

33.    The Debtors purchased GK8 in the Fall of 2021. Mashinsky Decl., ¶¶ 8,
85. The Company intended to use the acquisition of GK8 to enhance the Company's
ability to provide consumers with custody services by April 2022. *Id.*

34.    Celsius Network entered into an intercompany loan with Mining for $750
million effective as of November 1, 2022. Mashinsky Declaration, ¶ 66. As of May 31,
2022, the outstanding loan balance owed to Celsius Network is approximately $576
million. Mashinsky Declaration, ¶ 68. The Mashinsky Declaration categorizes this as a
revolver but does not identify if the revolver borrower function is still active or if by the

terms of the agreement the loan is only in repayment mode. Cornell Decl., ¶ 4. No terms

of the agreement are provided in the Mashinsky Declaration. *Id*.

35.    The Debtor took out a third-party loan from October 2019 to February

2021 that is characterized by the Debtor as a "collateralized term loan[]." Mashinsky

Decl., ¶ 94. Neither the lender, the amount of the loan, nor the type of collateral are

identified. Cornell Decl., ¶ 4. Whether this lender is a non-debtor affiliate, insider, or

otherwise related entity is not found in the Mashinsky Declaration. Cornell Decl., ¶ 4. In

July 2021, about two and a half years after taking out the loan, Celsius learned that this

lender could not return its collateral, which resulted in "Celsius having an approximately

$509 million uncollateralized claim against this party after it setoff its own loan

obligations to the lender." Mashinsky Decl., ¶ 94. As a result, this unidentified lender has

been making payments to the Debtors to repay the lost collateral. *Id*. The aggregate

principal owed to the Company stands at approximately $439 million, consisting of $361

million in USD and 3,765 BTC, the latter worth approximately $78 million. *Id*. No

description of the types of claims the Debtors may have against this lender are made in

the Mashinsky Declaration, nor is there an explanation for why legal recourse was not

sought. Cornell Decl., ¶ 4. There is also no description of any investigation by the

Debtors into its legal recourse. *Id*..

36.    Prior to the Petition Date, on June 27, 2022, the Company had

approximately $648 million in loans collateralized by approximately $1.61 billion in

digital assets based on a market valuation of June 27, 2022. However, as of the Petition

Date, the Debtors had substantially repaid all of these loans, and the collateral was returned. Mashinsky Decl., ¶ 71.

37.     In May and June 2022, Celsius stopped providing Tether, issuer of the stablecoin USDT, additional collateral and agreed to a liquidation of its loan. Tether issued a margin call (exact date not provided) to Celsius with regard to an outstanding $841 million USDT loan. Celsius agreed to a liquidation and settlement of its loan with Tether, which resulted in a loss of approximately $97 million to the Debtors. Mashinsky Decl., ¶ 123.

38.     The Debtors have roughly 50% of its mining rigs in operation; it owns 80,850 but only 43,632 are currently mining. Mashinsky Decl., ¶ 67. It is unclear if un-operational rigs are offline because the equipment is obsolete or for another reason. Cornell Decl., ¶ 4.

### G.  Customer Mistrust

39.     Customers of the Debtors have evidenced a high level of mistrust in the Debtors and Debtors' current management. On a regular basis, customers of Celsius file grievance letters on the Court docket. Cornell Decl., ¶ 3.  These allegations include (i) that the Debtors ran a Ponzi scheme where the yield was coming from new investors and not from the charged interests on loans; (ii) that employees withdrew their own funds in advance of the account freezing, thereby causing additional market volatility; and (iii) that current management made regular public announcements to customers assuring them of the safety of their crypto assets through regular AMAs (Ask Me Anything) when management was aware of the danger surrounding investments. Cornell Decl., ¶ 3.

16

## III.    GROUNDS/BASIS FOR RELIEF

40.    Creditors, as well as investors, require an independent, conflict-free, experienced party investigating the financial affairs of these Debtors, free from the constraints of current management, to serve as a clear, easily understood, and trusted source of information.

41.    Under 11 U.S.C. § 1104(c), this Court must direct the appointment of an examiner:

> to conduct such an investigation of [the Debtors] as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of [the Debtors] of or by current or former management of [the Debtors], if
>
> (1)    such appointment is in the interests of creditors, any equity security holders, and other interests of the estate; or
>
> (2)    [the Debtors'] fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

42.    As discussed below, this Court should direct the appointment of an examiner under either or both sections 1104(c)(1) and 1104(c)(2).

### A.    The Appointment of an Examiner Would Be in the Best Interests of the Debtors' Estate and Their Creditors and Equity Security Holders.

43.    An order directing the appointment of an examiner would be in the best interests of the Debtors' estates, their creditors, and equity security holders. An investigation by an independent examiner—who would present his or her findings in an understandable way—is essential to provide the Court, the United States Trustee, creditors, and other parties in interest with transparency and clarity as to the business

17

structure, practices, and liquidity of the Debtors. The Debtors' financial affairs and

business operations need to be reviewed and "untangled" by a disinterested person that is

removed from the competing interests of the complicated and numerous constituencies in

this case.  This is all the more important where the sums at stake are enormous as is the

distrust felt by those who dealt with the Debtors.

44.    Examiners have been held to be particularly appropriate when the subject

matter of the investigation involves a complex area of law that may be beyond the

bankruptcy court's expertise. *See In re Michigan BioDiesel, LLC*, 466 B.R. 413, 421

(Bankr. W.D. Mich. 2011) (appointing examiner and noting that the court would

"appreciate an examiner's independent advice on these complex issues of federal tax and

energy policy"). Given that cryptocurrency is an entirely new medium of exchange

created in the last decade or so and that it is neither widely used nor widely understood

(compared to traditional fiat currencies issued and regulated by central governments), this

case fits that novel and complex profile that would benefit from an examiner. Likewise,

examiners are appropriate where the investigation pertains to alleged improprieties by the

debtor itself or its managers or affiliates. *See In re JNL Funding Corp.*, No. 10-73724,

2010 WL 3448221, at *3 (Bankr. E.D.N.Y. Aug. 26, 2010); *see also First Am. Health*

*Care of Georgia, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 208 B.R. 992, 994–95

(Bankr. S.D. Ga. 1996) (finding that where there was a "fog of uncertainty" regarding the

debtor's independence, the debtor's credibility would be "well served by the involvement

of an examiner.").

**1.    There are Credible Allegations of Incompetence or Gross Mismanagement, Including the Offering of Unregistered Securities, Which Warrant the Appointment of an Examiner to Investigate.**

45.    The offering of unregistered securities, failing to obtain proper licenses, failing to hedge against market volatility, and engaging in risky investments bear the hallmarks of "incompetence" or "gross mismanagement" warranting appointment of a neutral third party as a chapter 11 examiner. *See, e.g., In re Vascular Access Centers, L.P.*, 611 B.R. 742, 764 (Bankr. E.D. Pa. 2020) ("Accordingly, courts have found cause present pursuant to § 1104(a)(1) in circumstances demonstrating conflicts of interest; misuse of assets and funds; inadequate recordkeeping and reporting; failure to file required documents; lack of adequate disclosure; lack of appropriate cost controls; transgressions related to taxes; failure to make required payments; lack of credibility and creditor confidence; and breaches of fiduciary duties."); *Oklahoma Refining Co. v. Blaik (In re Oklahoma Refining Co.)*, 838 F.2d 1133, 1136 (10th Cir. 1988) ("There are many cases holding that a history of transactions with companies affiliated with the debtor company is sufficient cause for the appointment of a trustee where the best interests of the creditors require"); *see also In re PRS Insurance Group*, 274 B.R. 381, 387 (Bankr. D. Del. 2001) (evidence of diversion of assets, or the absence of accurate financial records, constitutes "incompetence or gross mismanagement"). At least six state regulators—Washington, New Jersey, Alabama, Texas, Kentucky, and Vermont—have investigated the operations of the Debtors and found preliminary evidence that it was offering unregistered securities through its interest bearing Earn accounts. A neutral third party is necessary to explain the potential ramifications to parties in interest.

19

46.     The Debtors admit that "despite the Company's directive to engage in only market neutral exchange deployments, certain asset deployment decisions were made in the midst of its unexpected asset growth that in hindsight proved problematic. Although the Company took the necessary steps to 'unwind' these deployments, unfortunately, the damage was done." Mashinsky Decl., ¶ 92. The extent of these missteps and the impact on these bankruptcy cases may be the basis for significant causes of action belonging to the bankruptcy estate and demonstrate that appointment of an examiner is in the best interests of the Debtors' estate and its stakeholders. Because the Debtors' assets may include claims and causes of action against a range of entities and persons, including current management, current management cannot be expected to exercise their fiduciary duty to the Debtors' creditors and "investors" to investigate and prosecute claims against themselves. An impartial third party is therefore crucial to a full and fair investigation.

## 2.  **There are Significant Transparency Issues.**

47.     The lack of transparency in this bankruptcy case along with the lack of visibility into the Debtors' prepetition business operations require a neutral third party to investigate and present to the Court, the United States Trustee, and all interested parties a report that the Debtors' customers can understand. The Debtors have not provided adequate information regarding their liquidity position, their business model, the flow of traditional cash funds, or the value of their crypto assets. An examiner is necessary to explain the gaping holes in Debtors' business model and balance sheet in order for all parties in interest to evaluate any proposed restructuring or sale.

48.    The addition of social media in this case has amplified the Debtors'

transparency issues because there is a lot of information on the internet, but it is not

vetted or explained, thereby leaving hundreds of thousands of customers to form their

own conclusions based on the missing facts in this case coupled with the information

passed around as truth on the internet. The result has been confusion and anxiety. An

examiner can fix this.

49.    Interested parties need visibility by a third party neutral who is

unbeholden to any constituency on at least the following known missing information:

    i.    How much crypto is held and where and how is it stored? Are different types of accounts comingled together?

    ii.    There is no transparency regarding the change in April 2022 from the Earn Program to the Custody Service for some customers while others were placed in a "Withhold Account." Who holds what account and why is particularly confusing for customers who had their accounts unilaterally changed by the Debtors prepetition. This information is important if assets were comingled among the different types of accounts.

    iii.    Who is the undisclosed third party loan party and what steps did the Debtors take to neutralize their lost collateral?

    iv.    Why was $648 million repaid and collateral returned prepetition? What were the terms of these loans? Who was a cosigner?

    v.    There needs to be more information regarding the $750 million intercompany revolver, including, the origins of the loan, terms of this loan, and the uses of the loan proceeds.

    vi.    Why did Celsius liquidate its Tether loan at a $97 million loss within 90 days of the Petition Date?

    vii.    There are no details regarding the GK8 acquisition to understand the proposed sale of only the equity interests less than a year later.

    viii.    There is no information as to why Sales, Use, and VAT taxes have not been paid or if the money to pay these taxes is currently held in escrow.

    ix.    There is no visibility into the Debtors' mining business and what equipment exists and what equipment is operational, valuable, or in transit.

21

    x.   There is no information regarding the costs of the ongoing mining operations. The Debtors state that utilities are paid directly through their leases, but have not provided copies of their leases or how much monthly rents are. The cost of mining is incredibly important to this case as the Debtors suggest that mining and then selling new bitcoin will help fund these bankruptcy cases.

### 3. <u>Widespread Mistrust in the Debtors.</u>

50.    The lack of transparency has created an incredible atmosphere of mistrust of the Debtors and their management. The "appointment [of a trustee] is in the interests of creditors" under 11 U.S.C. § 1104(a)(2), as their hopes for a recovery on account of their claims are tied to the impartial investigation and prosecution of claims and causes of action. *See Manufacturers and Traders Trust Co. v. Morningstar Marketplace, Ltd. (In re Morningstar Marketplace, Ltd.)*, 544 B.R. 297, 305 (Bankr. M.D. Pa. 2016) ("A court is more likely to appoint a trustee under § 1104(a)(2) when reorganization is not possible, and a Debtor's principal may be motivated to protect his own interests rather than the interests of creditors. When coupled with a lack of confidence in management, and the benefits of appointing a trustee outweigh the cost, courts often find the argument for appointment of a trustee to be compelling.") (internal citation omitted); *In re Euro-American Lodging Corp.*, 365 B.R. 421, 427-28 (Bankr. S.D.N.Y. 2007) ("Where a chapter 11 debtor and its managers … suffer from material conflicts of interest, an independent trustee should be appointed"); *In re McCorhill Publ., Inc.*, 73 B.R. 1013, 1017 (Bankr. S.D.N.Y. 1987) (where there are questionable inter-company financial transfers and the principals of the debtor occupy conflicting positions in the transferee companies, appointment of a trustee is warranted in the best interests of all creditors and all parties in interest to investigate the financial affairs of the debtor).

51.      In this case, letters are filed on the docket on a regular basis that detail the distrust between customers and the Debtors and Debtors' management. While the allegations may not be aligned, the overall message is clear—the creditors feel misled by the Debtors and current management.

52.      An examiner is better positioned to conduct an investigation in this bankruptcy case than a committee because an examiner is a disinterested person who, akin to a trustee, represents the interests of the entire estate—not just a subset of unsecured creditors, equity holders, or some other constituency. The Committee has its own mission with a clear constituency and is by definition not an independent third party, whereas an examiner has no constituency and is truly independent. An examiner can work cooperatively with the Committee as the Committee does its examination on behalf of its own constituents.

53.      Moreover, an appropriately tailored independent examination likewise will provide creditors and other parties in interest with important missing information in a timely, cost-effective manner. An examiner would not interfere in the Committee's efforts, nor would there be a duplication of work.[6] Indeed, an examiner will maximize value by having the estate pay once for an examination by a party other than the Debtors, rather than for multiple, duplicative examinations by committees, creditors, and other parties in interest. In fact, there is no better way to support the Committee here than to have a third party that is trusted by all parties in interest to vet all of the necessary

---

[6] The United States Trustee, pursuant to its statutory duties, will review all fee applications filed in this case.

information so that the Committee can focus on its own obligations in representing its own unsecured creditor constituency.

54.    Accordingly, a neutral examiner should be appointed to provide the much-needed visibility into the Debtors, their business model, and their balance sheet and to also bridge the gap between the creditors and the Debtors by fostering trust in the information provided for a successful reorganization.

### B.    The Debtors Exceed the Unsecured Debt Limit in § 1104(c)(2).

55.    The Court should direct the appointment of an examiner because Debtors have both the type and amount of unsecured debts that that make the appointment mandatory under section 1104(c)(2).

56.    The Mashinsky Declaration describes the Debtors' capital structure as including funded unsecured debt in excess of the $5 million threshold of section 1104(c)(2). Accordingly, the appointment of an examiner to investigate and report on the affairs of the Debtors is mandatory. *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500-01 (6th Cir. 1990) ("[Section 1104(c)(2)] plainly means that the bankruptcy court 'shall' order the appointment of an examiner when the total fixed, liquidated, unsecured debt exceeds $5 million if the United States Trustee requests one."); *In re Loral Space & Communications Ltd.,* No. 04 Civ. 8645RPP, 2004 WL 2979785, at *4, 5 (S.D.N.Y. Dec. 23, 2004) (reversing Bankruptcy Court's decision denying appointment of examiner where $5 million debt threshold under section 1104(c)(2) was met and parties seeking appointment had standing to do so); *In re UAL Corp.,* 307 B.R. 80, 83-86 (Bankr. N.D. Ill. 2004) ("best reading of the statute" is that

24

appointment of an examiner is mandatory if the requirements of section 1104(c)(2) are satisfied).

57.     Although a court has authority under section 1104(c)(2) to specify  the appropriate scope of an examination, the "as is appropriate" language in that statutory subsection does not confer discretion to decide whether an examiner should be appointed as a threshold matter once it is clear that the statute's monetary threshold is met. *See In re Loral*, 2004 WL 2979785, at \*5 ("[i]t is [the bankruptcy court's] duty to fashion the role of an examiner to avoid substantial interference with the ongoing bankruptcy proceedings."); *In re UAL Corp.,* 307 B.R. at 85, n.2 (construing the "as is appropriate" language in section 1104(c)(2) to vest discretion in the bankruptcy court nullifies its mandate).

WHEREFORE the United States Trustee requests that this Court enter an order directing the appointment of an examiner.

Dated:  New York, New York
           August 18, 2022

Respectfully submitted,

WILLIAM K. HARRINGTON
UNITED STATES TRUSTEE, Region 2

By:     */s/ Shara Cornell*
        Shara Cornell, Esq.
        Mark Bruh, Esq.
        Brian Masumoto, Esq.
        Trial Attorneys
        201 Varick Street, Room 1006
        New York, New York 10014
        Tel. (212) 510-0500
