Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 22-10964-mg

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    CELSIUS NETWORK LLC,

8

9         Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12              United States Bankruptcy Court

13              One Bowling Green

14              New York, NY  10004

15

16              August 16, 2022

17              2:04 PM

18

19

20

21   B E F O R E :

22   HON MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  JONATHAN

Page 2

1   HEARING re Hearing Using Zoom for Government RE: Motion (I)

2   Authorizing the Debtors To (A) Continue to Operate Their

3   Cash Management System, (B) Honor Certain Prepetition

4   Obligations Related Thereto, (C) Maintain Existing Business

5   Forms, and (D) Continue to Perform Intercompany

6   Transactions, (II) Granting Superpriority Administrative

7   Expense Status to Postpetition Intercompany Balances, and

8   (III) Granting Related Relief. (Doc## 56, 40, 21, 192, 357,

9   401, 448)

10

11  HEARING re Hearing Using Zoom for Government RE: Debtor's

12  Motion Seeking Entry of an Order (I) Permitting the Sale of

13  the Debtors Mined Bitcoin in the Ordinary Course and (II)

14  Granting Related Relief. (Doc## 187, 192, 357, 371, 372,

15  400, 428, 448, 453)

16

17  HEARING re Hearing Using Zoom for Government RE: Debtor's

18  Motion to Approve Procedures for De Minimis Asset

19  Transactions. (Doc## 189, 192, 357, 400, 409, 429, 448)

20

21  HEARING re Hearing Using Zoom for Government RE: Debtor's

22  Motion for Entry of an Order (I) Authorizing and Approving

23  Procedures to Reject, Assume, or Assume and Assign

24  Executory Contracts and Unexpired Leases and (II) Granting

25  Related Relief. (Doc## 185, 192, 357, 402, 448, 468, 471)

Page 3

1   HEARING re Hearing Using Zoom for Government RE: Motion (I)

2   Authorizing the Debtors to (a) Pay Prepetition Employee

3   Wages, Salaries, Other Compensation, and Reimbursable

4   Expenses and (b) Continue Employee Benefits Programs and

5   (II) Granting Related Relief (Doc## 61, 19, 192, 357, 402,

6   409, 413, 448).

7

8   HEARING re Hearing Using Zoom for Government RE: Motion (I)

9   Authorizing the Debtors to Pay Prepetition Claims of Certain

10   Critical Vendors, Foreign Vendors, 503(B)(9) Claimants,

11   and Lien Claimants, (II) Granting Administrative Expense

12   Priority to All Undisputed Obligations on Account of

13   Outstanding Orders, and (III) Granting Related Relief.

14   (Doc## 80, 20, 37, 192, 357, 402, 448, 469, 471)

15

16   HEARING re Hearing Using Zoom for Government RE: Motion (I)

17   Establishing Certain Notice, Case Management, and

18   Administrative Procedures and (II) Granting Related Relief

19   (Doc## 63, 15, 192, 470, 471).

20

21

22

23

24

25

```
                                                    Page 4
 1    HEARING re Hearing Using Zoom for Government RE: Motion (I)

 2    Authorizing the Debtors to (A) Pay their Obligations Under

 3    Prepetition Insurance Policies, (B) Continue to Pay Certain

 4    Brokerage Fees, (C) Renew, Supplement, Modify, or Purchase

 5    Insurance Coverage, and (D) Maintain their Surety Bond

 6    Program and (II) Granting Related Relief (Doc## 59,

 7    16, 192, 467, 471).

 8

 9    HEARING re Final Hearing Using Zoom for Government RE:

10    Motion (I) Approving Notification and Hearing Procedures for

11    Certain Transfers of and Declarations of Worthlessness with

12    Respect to Common Stock and Preferred Stock and (II)

13    Granting Related Relief (Doc## 58, 39, 5, 192, 409, 463,

14    471).

15

16    HEARING re Hearing Using Zoom for Government RE: Motion (I)

17    Authorizing the Payment of Certain Taxes and Fees and (II)

18    Granting Related Relief (Doc## 62, 17, 192, 466, 471).

19

20    HEARING re Hearing Using Zoom for Government. RE: Motion

21    Seeking Entry of an Order (I) Approving the Debtors'

22    Proposed Adequate Assurance of Payment for Future Utility

23    Services, (Prohibiting Utility Providers from Altering,

24    Refusing, or Discontinuing Services, etc. (Doc. ##3, 357,

25    409).
```

Page 5

1    HEARING re Hearing Using Zoom for Government RE: Debtor's

2    Motion for Entry of an Order (I) Establishing Procedures for

3    Interim Compensation and Reimbursement of Expenses for

4    Retained Professionals and (II) Granting Related Relief.

5    (Doc## 186, 192, 357, 465, 471)

6

7    HEARING re Hearing Using Zoom for Government RE: Debtors'

8    Motion Authorizing the Retention and Compensation of

9    Professionals Utilized in the Ordinary Course of Business

10   filed by Joshua Sussberg on behalf of Celsius Network LLC.

11   (Doc # 190, 357, 464, 471)

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

```
1    A P P E A R A N C E S :

2

3    KIRKLAND & ELLIS LLP

4         Attorneys for the Debtor

5         601 Lexington Avenue

6         New York, NY 10022

7

8    BY:  JOSHUA SUSSBERG

9

10   KIRKLAND & ELLIS LLP

11        Attorneys for the Debtor

12        300 North LaSalle

13        Chicago, IL 60654

14

15   BY:  ROSS KWASTENIET

16

17   WHITE & CASE LLP

18        proposed counsel to the Committee

19        111 South Wacker Drive, Suite 5100

20        Chicago, IL 60606

21

22   BY:  GREGORY F. PESCE

23

24

25
```

Page 7

1    TOGUT, SEGAL & SEGAL LLP

2         Attorneys for Ad Hoc Group of Custodial Account Holders

3         One Penn Plaza, Suite 3335

4         New York, NY 10119

5

6    BY:  KYLE J. ORTIZ

7

8    Troutman Pepper Hamilton Sanders LLP

9         Attorneys for Ad Hoc Group of Withhold Account Holders

10        4000 Town Center, Suite 1800

11        Southfield, MI 48075

12

13   BY:  DEBORAH KOVSKY

14

15   UNITED STATES DEPARTMENT OF JUSTICE

16        Attorneys for the U.S. Trustee

17        201 Varick Street, Suite 1006

18        New York, NY 10014

19

20   BY:  SHARA CORNELL

21

22   ALSO PRESENT TELEPHONICALLY:

23   OLUMIDE ADIGBOLUJA

24   YAFEU AKWETEE

25   EMMANUEL I. ALBINO

Page 8

1   YELENA ALEYNIK

2   NELLY CESSISKA ALMEIDA

3   BJRN ANDERSEN

4   JULIEN ARSENAULT

5   JOSEPH MICHAEL AVINO

6   BRIAN BUCHANAN

7   ERIC BAEHR

8   KALPAK BARDE

9   BRIAN BARNES

10  DAVID BARSE

11  MANUEL BASILE

12  MICHAEL BASINGER

13  MARI BATILANDO

14  JASON D BEAIRD

15  CHRIS BECIN

16  MARK BEISSWANGER

17  HUGH BELLAMY

18  JAMES M. BENEDICK

19  BRENTON BENNETT

20  JARNO ERIK BERG

21  QUENTIN BICHON

22  CHERYL BIERBAUM

23  BRIANNA B BILTER

24  JASON B. BINFORD

25  SOMA BISWAS

Page 9

1    DAVID R. BOLT

2    RICHARD D. BOND

3    SHIREEN BOONE

4    DUSTIN C. BOROFF

5    JOSEPH BOTROS

6    OCTAVE J. BOURGEOIS

7    JEFFREY BRADIAN

8    STEPHEN BRALVER

9    KYLE BRAY

10   OLGA BRODSKAYA

11   JOHAN BRONGE

12   SEQUOIA BROWN

13   WILLIAM EDWARD BROWN

14   TODD BUCHMAN

15   JUAN CRUZ CACERES

16   RAMSEY CASTANEDA

17   AMY CASTOR

18   CAROLYN CHAMBERLAYNE

19   EDWARD CHAMPIGNY

20   ERIC CHAN

21   WILL CHANDLER

22   RICKIE CHANG

23   DANIEL CHIU

24   ELLE CHOI

25   VINCENT CHUNGWING CHOW

Page 10

1   JOE CHUNG

2   GEOFFREY CIRKEL

3   MARTIN CIZEK

4   DAVID ALLAN CLARK

5   DAKEN COLEMAN

6   AARON COLODNY

7   JOSEPH COLVIN

8   PAUL COMBE

9   KIMBERLY N. COOK

10  MIA E. COOPER

11  CARL COTE

12  CAMERON R. CREWS

13  COLIN CROSSMAN

14  OONA CRUSELL

15  BENJAMIN CULVER

16  ALISTAIR CUMMINGS

17  PAUL CUPP

18  KENNETH E. DARSCHEWSKI

19  RYAN DAVIES

20  STEFFAN DAVIES

21  JIMMY DE LA PAZ

22  SALVATORE DE MARIA

23  THOMAS NICHOLAS DEMOS

24  ZARYN DENTZEL

25  DAVID J. DERAN

1    LINDSEY DERENCE

2    STEVEN L. DEYO

3    JASON DIBATTISTA

4    JORIS DIRICKX

5    JOHN R. DODD

6    MARILOU DOTSON

7    STEPHEN N. DREIKOSEN

8    WESLEY DRIVER

9    SUMIT DUA

10   JANELL ECKHARDT

11   BENJAMIN R. EADES

12   DANIEL EGGERMANN

13   GEORGE T. ELKINDS

14   ANDREAS EMINIDIS

15   JAMES ENGEL

16   JEFFREY T. FENTER

17   LISA FAUCHER

18   ADAM M. FEINTISCH

19   NOAH FENNELL

20   ALEXANDER FERNANDEZ

21   MANUELA FERRARIO

22   MICHAEL FERTIK

23   SCOTT FLAHERTY

24   FORREST LEIGH FORMSMA

25   JARED FRANK

1   DEBORAH FRANKEL

2   DOV FRANKEL

3   OLIVER FRIEDBERG

4   LARRY FULTON

5   EBBA GEBISA

6   UTSAV GHOSH

7   ALEX GIANNETTO

8   BRADLEY GIARDIELLO

9   JEFFREY R. GLEIT

10   ANDREW K. GLENN

11   GRZEGORZ PAWE GLONEK

12   JACOB K. GOEREE

13   ANDREW GOLDSTEIN

14   RYAN GOLDSTEIN

15   JOO GONALVES

16   PEDRO GONALVES

17   RAMON GONZALES

18   TODD GORDON

19   UDAY GORREPATI

20   ANNALEE GOULD

21   CURTIS GREEN

22   SEAN GUERRI

23   JANO GULJA

24   JIANWEI HU

25   STEVEN HAEHNICHEN

1   FRODE HAGEN

2   JESS HALL

3   THOMAS HALL

4   OMAR HAMOUDA

5   TAYLOR HARRISON

6   JOSEPH HARVEY

7   MARIA HELIOTI

8   TAYLER HENDRICKSON

9   RICHARD HENDRY

10   JULIE HENRY

11   MEVIN HERMANS

12   SAMUEL P. HERSHEY

13   JEREMY HILL

14   CANDACE L. HILLARD

15   RICARDO HIRALDO

16   HUONG HO

17   DAVID HOLLERITH

18   PATRICK HOLOHAN

19   KYLE HOLZHAUER

20   KRISZTIAN HORVATH

21   BENEDICT Y. HUI

22   MEHDAD HUSSAIN

23   JASON IOVINE

24   ROBERTO JACOBS

25   ANDRE JACOBS

1   KRAIG JAKOBSEN

2   STIG JELLESTAD

3   DAVID JESSOP

4   NICOLE JEW

5   TIMOTHY JOHNSON

6   LEAH JONAS

7   ASIA JONES

8   BRIAN JONES

9   LEIF N. JONES

10   MARIO JOSE

11   MATTHEW T. JOYCE

12   GREG KACZKOWSKI

13   CHEREE KAHRS

14   COLTON KAISER

15   JESS KAPLAN

16   JARED KASNER

17   KONSTANTINOS KATRAOURAS

18   AISLINN KEELY

19   TRAVIS KEENEY

20   MIKAELA KENSINGTON

21   OLGA KHARIF

22   PAUL KING

23   ONDREJ KLUBAL

24   DIETRICH KNAUTH

25   CHRISTOPH KNEDEL

1    JEREMY FRANCIS KOO

2    RIKI KOULY

3    DEBORAH KOVSKY-APAP

4    ALEXANDER KRAVETS

5    ADAM P. KRYSKOW

6    SIMON LECLERCQ

7    MICHAEL LEON

8    OLEKSANDR LEONENKO

9    ISAAC R. LLEWELLYN

10   JOSEPH LALIA

11   GREG P. LAMPHEAR

12   LUIS LANDAS

13   HANNAH LANG

14   JOSEPH LANGENBRUNNER

15   JEAN-PHILIPPE LATREILLE

16   TYLER NATHANIEL LAYNE

17   JEREMIAH PAUL LEDWIDGE

18   MIKE LEGGE

19   JOSEPH LEHRFELD

20   MARK S. LEONARD

21   JOHN LIND

22   ANDREAS LINDERMEIER

23   JESSICA LJUSTINA

24   GINA LOCKWOOD

25   PATRICK LONEY

Page 16

1  EDMUNDO LOPEZ

2  THOMAS LORD

3  DAVID LOS ARCOS CARCAMO

4  PATRICK LOVE

5  MARY LUKOWSKI

6  JESSE LUND

7  EDWARD LUO

8  SERBAN LUPU

9  LAURA LY

10  BECKY MADSEN

11  DAVE MALHORTA

12  MEAGAN MALONEY

13  THIRU MANICKAM

14  KEVIN M. MANUS

15  MATTHEW W. MARCUS

16  DANIEL J. MAREE

17  GINA MARTINY

18  EMILY MASON

19  KYLE MASON

20  AKIKO MATSUDA

21  ANDREW MATTHEWS

22  JAMES ALEXANDER GEORGE MATTHEWS

23  DAVID MAYO

24  HUGH R. MCCULLOUGH

25  OLWENT MCNEILL

1    ERIC MENDELSON

2    BRIAN MENDIETA

3    KEVIN MEYER

4    VALERIE MICKLE

5    RICHARD MINOTT

6    TIMON MITRAKAS

7    HUGH MITTON

8    MARY MONROY

9    MICHAEL MOWRY

10   THOMAS MURPHY

11   BRIAN MURRAY

12   ANTONIO MUSUMECI

13   KEN NA

14   VIK NAGPAL

15   JASON GRIFFIN NEW

16   MAN NGUYEN

17   PAUL NIEHE

18   DANIEL NIGGEMANN

19   TONY NIKSICH

20   DERRICK NNAJI

21   JEFFERSON NUNN

22   DAVID P. O'BRIEN

23   LAURIE-ANN O'CONNOR

24   TYLER OKADA

25   WARREN K. OLSEN

Page 18

1    RICHARD E. OSWALD

2    PAUL M. PAGE

3    MICHAEL A. PAINTER

4    HSIN-CHIEH PAN

5    LEAH PANTALONE

6    JORDYN PAPERNY

7    SEAN PARAHUS

8    BRENNERO PARDO

9    MICHAEL J. PARISI

10   MILIN PATEL

11   MIREN PATEL

12   SIDDHARTH PATEL

13   JOSEPH T. PATTISALL

14   PETER PATZAK

15   JOHN D. PENN

16   THOMAS PERRIN

17   KHAI PHAM

18   RICHARD R. PILLIPS

19   AARON PICHT

20   GREGORY G. PLOTKO

21   HANS POLZMACHER

22   RICKY POON

23   DAVID PORTER

24   DONALD POYNTER

25   CHRISTOPHER A. PROVOST

1    MILES PYWELL

2    LI QIU

3    NAZNEN RAHMAN

4    RAFAEL RAJ

5    RICHARD CARLOS RAMIREZ

6    ANDREW RASMUSSEN

7    RICARTO RATINHO

8    TIMOTHY REILLY

9    RICHARD RHINE

10   ANUBHAV RICHARDS

11   PETER RIFKIND

12   AARON RILEY

13   GRAY RITCHEY

14   BRYCE ROBERTS

15   DAVE ROBICHAUX

16   SHAYA ROCHESTER

17   JONATHAN RODRIGUEZ

18   ROBERTO ROJAS

19   DEREK ROONEY

20   KATHARINE M. ROONEY

21   JASON ROSELL

22   CLAUDIO ROSSI

23   ANDREW RUDOLPH

24   KARL RUPILIUS

25   KEVIN RUTKOWSKI

Page 20

```
 1   JEFFREY S. SABIN

 2   RON SABO

 3   DANA SACCHETTI

 4   KAMBIZ SAFAIE

 5   SAM SAFERSTEIN

 6   CAROLINE SALLS

 7   ROBERT SANDOVAL

 8   NAIDU A. SANDRANA

 9   MIKE SANTOS

10   NICOLA SARTORI VOMIERO

11   SANDEEP S. SASTRY

12   RAJIV MANGUBAT SAWHNEY

13   SCOTT SCHMEIZER

14   SHAI SCHMIDT

15   MARC N. SCHWARZ

16   JAN SDERSTRM

17   JOSEPH SEATON

18   RAFFAELE SENESE

19   FRANCO SERRATORE

20   DAVID SHIM

21   MATTAN SHRAGER

22   KADHIM SHUBBER

23   JOHN J. SIKORA

24   CRISTIANO SILVA

25   MATTHEW W. SILVERMAN
```

Page 21

1   ROHAN SINGH

2   MATTHEW SMART

3   CHRISTOPHER SMITH

4   JOSE SMOGLE

5   ERIC SOPRACASA

6   EVANGELOS STEFANOU

7   JASON STONE

8   PAUL D. STORVICK

9   STEVE STOYKA

10  MCKENZIE STRATIGOPOULOS

11  STEVE STRIKER

12  KEITH SUCKNO

13  JOHN SULLIVAN

14  VINCE SULLIVAN

15  SINDHU SUNDAR

16  NIKHIL SURI

17  ADAM SWINGLE

18  BRYAN M. SWINK

19  KEYAN TAJI

20  JUSTIN TELLES

21  NATASHA A. TESESE

22  MICHAEL ALEXANDER THOMPSON

23  KRISTOF THYS

24  TIM TILLER

25  PAWEL M. TOMCZYK

Page 22

```
 1   NICHOLAS TOWERS

 2   ANHMINH TRAN

 3   KHOI TRAN-QUANG

 4   JOSEPH TROVATO

 5   ELVIN R. TURNER JR.

 6   VICTOR UBIERNA DE LAS HERAS

 7   VISHWAS VADNERKAR

 8   RENAUD VALKENBERG

 9   ALLAN ALBERT VAN DER MEER

10   RICK VAN DIJK

11   JONATHAN VAN GROUW

12   JEREMIAH VANDERMARK

13   JADE VARGAS

14   DAN VELLON

15   LUIGI VERBIST

16   ALAN VETRE

17   VINCENZO D. VIOLI

18   SIEU VONG

19   THOMAS VYHONSKY

20   CHAD WILSON

21   STEPHEN WUNDKE

22   MAARTEN WAGENAAR

23   PAUL V. WAIS

24   AL WAL

25   KEVIN WALDRON
```

1    BENJAMIN WALKER

2    CHRISTOPHER D. WALRON

3    EVANS WANG

4    NATALIE WELSH

5    MARSHALL WEST

6    LISA WEST

7    JAMES WESTON

8    HIRAM WILLIAMSON

9    CHAD R. WILSON

10   MEGAN WILSON

11   CARA M. WINTERS

12   JAN WODNICKI

13   JULIE WOLF

14   BENNY WONG

15   DEANGELO WOOLEY

16   ELIE JONATHAN WORENKLEIN

17   CHRISTOPHER WRIGHT

18   MARK WYLIE

19   SEAN XUE

20   MELANIE YANEZ

21   LILIAN YEILDING

22   SIMON YEOMAN-TAYLOR

23   TAK YEUNG

24   MICHAEL YODLER

25   AUDREY ZAEBST

1    GREGORY ALAN ZELL

2    ERIC W. ZITZOW

3    EVAN J. ZUCKER

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2            THE COURT:  We have a lot of people who have

3     appeared this afternoon.  We are going to proceed through.

4     We're using for the most part the Amended Agenda for Second

5     Day Hearing that was filed by Debtor's counsel, Kirkland &

6     Ellis.

7            In addition to that -- and I believe I have agreed

8     that they can start with an initial presentation -- last

9     night, they filed notice of filing of Second Day Hearing

10    Presentation.  It's ECF Docket 462.  So anybody with access

11    to the electronic case filing system can actually see the

12    presentation.

13            After the Debtor's counsel makes its presentation,

14    I am going to give the Committee of Unsecured Creditors

15    counsel an opportunity to make some preliminary remarks.

16            I also may have some additional preliminary

17    remarks.  I'll save them until after both the Debtor's

18    counsel and the Committee's counsel have had an opportunity

19    to speak.

20            So let me make one other point.  There are a lot

21    of people not represented by counsel who are appearing

22    today.  Some with listen-only lines, and some with an

23    opportunity to speak.  If you're not represented by counsel,

24    at the appropriate time if you wish to speak, you'll see at

25    the bottom of your screen over to the right a raise hand

Page 26

1    icon.  If you click on that, my courtroom deputy will be

2    able to identify you as someone who wants to speak.

3           So it's very important -- and I'm sure all of you

4    will agree -- that this hearing proceed in an orderly

5    fashion.  I want to give everyone an opportunity to speak.

6    But I reserve the right to cut you off.  It's important that

7    your comments be appropriate to the issue that the Court is

8    discussing at that time.

9           I know this case has generated a great deal of

10   interest, and I think it's very important that all

11   creditors, whether they're represented by counsel or not,

12   have an opportunity to make their views known.  I will say

13   that for those of you who have access to the docket, you can

14   see that many of the letters and communications that have

15   been addressed to the Court have been filed on the case

16   docket so that everyone associated with the case can see the

17   issues that people are raising.  And I may make some

18   comments a little bit later.  I won't go through all of

19   those.  But I think some of those communications that have

20   been filed by individual creditors (indiscernible) have

21   raised important issues that will have to be addressed at

22   some point in this case.

23          So I just want you to know if you've been filing

24   letters, if you've been sending letters to the Court, they

25   are filed in the public docket.  The Court and its staff has

Page 27

1    an opportunity to see it, as do the other parties.  So your

2    thoughts are important to the court.  I just want to make

3    that clear.

4            So, Mr. Sussberg, are you going to begin?

5            MS. SUSSBERG:  I am, Your Honor.  Good afternoon.

6    Joshua Sussberg from Kirkland & Ellis on behalf of Celsius.

7    It's a pleasure to be before Your Honor today.

8            We are going to do a short presentation and

9    appreciate the Court indulging us, because I think it's

10   important to help set the stage.

11           As Your Honor commented, this case has drawn a lot

12   of interest.  And we've been fortunate to be involved in

13   many different types of cases, but I don't think any of us

14   can remember a case that generated this much interest, both

15   from the customer community and the media.  And I think as a

16   result, it's really important for us to level set and talk

17   about what's happened and where we're going.

18           Before I do, one quick comment for everybody.

19   Customers, Your Honor, and all those listening.  The media

20   coverage on this case and many of the individuals at the

21   company has been relentless, much of which is inaccurate.

22   And it would be impossible to respond to every single false

23   allegation, at the same time trying to restructure this

24   business.

25           So we at Kirkland, Latham & Watkins

1    (indiscernible) have instructed the management team to take

2    the repeated punches, not respond, and instead focus on the

3    task at hand; and that's getting our customers their crypto

4    back.  But no one should assume that silence is in any way

5    acquiescence.

6            So with that backdrop, Your Honor, I would like if

7    the Court could share the system with Ms. Jones.

8            CLERK:  Ms. Jones is a co-host.  She can share the

9    screen.

10            MS. SUSSBERG:  Excellent.

11            THE COURT:  Let me just say.  As I said already, a

12    copy of this presentation is filed on the docket.  So if

13    you're interested in obtaining a copy of it, you can do so

14    by accessing the docket.  And it's ECF Docket 462.  You'll

15    find it.  Go ahead, Mr. Sussberg.

16            MS. SUSSBERG:  Yes, Your Honor.  I'm going to

17    cover, as noted on Slide 2, five topics.  One, the committee

18    formation; two, progress since filing; three, a crypto

19    market update; four, customer correspondence; and five, the

20    path forward.

21            On Slide 3, Your Honor, as has noted and as

22    everyone is aware, the Committee was appointed on July 27th

23    and it consists of seven members.  And each of those members

24    are customers.  And so while it's called an official

25    committee of creditors, it's really an official committee of

1    customers.  Of the identified parties on the slide, two are

2    institutional investors.  The remaining are retail

3    investors.

4              As you'll see on the right-hand of the page, the

5    Committee has proposed to retain (indiscernible) at White

6    and Case, led by Mr. Pesch; at M3 Partners, led by Mr.

7    Meghji; at Perella Weinberg, led by Kevin Cofsky; and at

8    Elementus, which is the UCC's crypto forensic specialist.

9    And that engagement is being led by Mr. Galka.

10             I also wanted to note -- and I'm sure Mr. Pesch

11   will comment during the course of his presentation -- that

12   the Committee has established an information website.  I'm

13   sure they will make that known and send that out to

14   customers.  It's actually available at Kroll.  And there's a

15   specific name that we'll get out to everybody where people

16   can get information and hopefully have many of their

17   questions answered.

18             On Slide 4, Your Honor, just wanted to note we've

19   taken a very different approach in this case vis-à-vis the

20   Committee, because this case is all about the customer.  And

21   the customer committee is our partner here, and we intend to

22   work very closely with them from day one to the end.  And I

23   think and I hope that Mr. Pesce would agree that we and our

24   advisor team have been an open book.  And thus far, it has

25   been an incredibly collaborative exercise, including, and

Page 30

1    I'm pleased to report, resolution of all the objections that

2    were filed by the Committee.

3              We also had an opportunity to have an initial

4    meeting with committee members and its advisors together

5    with the company's advisors on August 11th.  And we've

6    already scheduled a subsequent meeting with the committee

7    members, advisors, and our management team to discuss our

8    business plan and the path forward on August 23rd.  And

9    that's a business plan that I will cover, Your Honor,

10   briefly in a few moments.  But it has been underway and

11   subject to intense discussion and review, and we are pleased

12   to have an opportunity to try to build consensus and

13   alignment around that next week with the Committee.

14             I also want to note at Docket 447 we filed a

15   budget and coin report.  And this is in collaboration with

16   the Creditor's Committee and the United States Trustee in an

17   effort to have transparency.  And as Your Honor can imagine,

18   we've been dealing with diligence requests from both the

19   Committee and the U.S. Trustee and other parties.  We are

20   doing everything in our power to respond in kind through

21   dozens of phone calls and thousands of pages of discovery.

22             On Slide 5, Your Honor, I want to cover a couple

23   topics so that the Court and our community understand what

24   we're focused on.

25             The company is looking at multiple DIP financing

Page 31

1    proposals in various shapes and sizes.  And we are working

2    closely with Centerview and Perella to figure out the best

3    way to address the company's liquidity shortfall -- sorry,

4    Your Honor.  It's projected in October.  And that's

5    reflected in our recently-filed budget.  So in order to

6    avoid a negative liquidity balance, which would be

7    detrimental to everybody in this case -- and I don't think

8    anyone would challenge that -- we're now figuring out and

9    thinking through ways in which we can get additional capital

10   to facilitate the restructuring.

11          THE COURT:  Ms. Sussberg, you may have seen today

12   in the ABI News today, which is emailed out every day, one

13   of the articles is Crypto-lender Celsius on Pace to Run Out

14   of Cash by October.  It obviously picked up on your budget

15   and coin report and includes some of the information from

16   it.

17          MR. SUSSBERG:  Yes.  It just goes to the point

18   that there are no secrets and this is covered everywhere.

19   But we, Your Honor, are very, very focused on making sure

20   that we have liquidity.  And I am pleased to report that we

21   have multiple offers outstanding with several more likely

22   coming in.  And this will be a function of working with the

23   Committee and coordinating with them to figure out the best

24   way to finance the resolution of this case.

25          In addition, Your Honor, as far as engagement with

Page 32

1    stakeholders -- because I've already talked about the go-

2    forward plan in our August 23rd meeting -- there were two ad

3    hoc groups that have filed.  First is the Ad Hoc Group of

4    Custodial Account Holders.  And as Your Honor will recall,

5    these are the non-accredited U.S. users post April 2022.

6    There are no rewards in those accounts.  It's approximately

7    $180 million.  And they're represented by the Togut firm.

8              In addition, there's an Ad Hoc Group of Withhold

9    Account Holders.  We know some of the assets, possibly all

10   of these assets are for people who were not eligible for

11   custody accounts or earn accounts and in which states where

12   we were not licensed.  And the total amount in the withhold

13   accounts is approximately $14.5 million.  That ad hoc

14   committee is represented by Troutman Pepper.  And we are

15   very focused on coming to a conclusion with the Committee

16   that would potentially result in us being able to get that

17   capital back to those (indiscernible).

18             Moving to Slide 6, Your Honor.  And this is

19   important.  And it goes directly to the many customer

20   letters that articulate both derivative and direct potential

21   claims and causes of action.  And Your Honor mentioned that.

22   And I will cover in a moment that we try to read every one

23   of these letters and we take the accusations therein, as the

24   Court does, very seriously.  And if there is a there, we are

25   going to find out and an investigation is being conducted.

Page 33

1          Before the Chapter 11 filing, a special committee

2    was created.  That special committee includes two members;

3    David Barse and Alan Carr.  Now, Mr. Barse and Carr are

4    highly regarded restructuring experts with sterling

5    reputations.  And I can pledge to this Court and everyone

6    involved that both Mr. Barse and Mr. Carr are 100 percent

7    focused and completely locked in.  And it's important for

8    everyone to understand exactly what they are focused on.

9    And so I want to go over the bullets on this slide fairly

10   carefully.

11         The special committee was delegated full authority

12   to direct the company's restructuring, including all aspects

13   of these cases.  So Mr. Barse and Mr. Carr are in charge and

14   driving the car.  They were delegated full authority to

15   investigate allegations of misconduct involving the company

16   or its employees and to take remedial action in connection

17   with that investigation.  And that investigation is ongoing.

18   In fact, in July the special committee tasked Celsius'

19   outside counsel with conducting that investigation and

20   coordinating with the advisors to the Official Committee on

21   that investigation.

22         While findings or actions by the Special Committee

23   may be disclosed in due course through the Chapter 11 cases,

24   Celsius does not intend to comment on specific allegations

25   or to comment or provide interim updates regarding the

Page 34

1    Special Committee's investigations work at this time.  And

2    this really, Your Honor, is similar to the point I made

3    (indiscernible).  and as badly as we feel for so many of

4    these employees that are taking a beating in the public, we

5    have counseled everyone that we can't do this on an

6    incremental basis.  We need to do our work, and in turn we

7    will be able to respond.

8              Finally, Your Honor, Celsius has continued to work

9    cooperatively with U.S. and foreign regulators since the

10   filing to respond to information requests and inquires made

11   as part of a number of non-public law enforcement

12   investigations.  And just so that there's no confusion,

13   speculation, or surprise, the (indiscernible) investigating

14   multiple U.S. State and Federal as well as foreign

15   regulators and their primary focus is on compliance with

16   state and federal securities laws, although the company has

17   had dialogue with other agencies.  For example, state

18   lending and money transmitter authorities.

19             Moving to Slide 7, Your Honor.  There is so much

20   misinformation out there regarding the rebound in crypto and

21   who gets the value associated with the rebound.  As you can

22   see on this slide, crypto, at least the two major coins, BIT

23   and ETH, have recovered significantly since the petition

24   date.  Twenty-five percent increase for Bitcoin, 82 percent

25   increase for ETH.  And I want to be crystal clear -- and I

Page 35

1    know Mr. Nash was at the first-day hearing, but there

2    continues to be confusion and doubt.  The business plan and

3    transitions we are contemplating (indiscernible) all the

4    value associated with the rising crypto over the last

5    several weeks directly back in our customers' pockets.  The

6    company is not seeking to dollarize claims on the petition

7    date and give people back a recovery in fiat.  That's just

8    not what we are going to do.

9              And if we can get alignment with the Committee and

10   other stakeholders quickly on a business plan, I am hopeful

11   that we can avoid expensive and unnecessary litigation that

12   will only benefit professionals to the detriment of our

13   stakeholders.

14             On Slide 8, Your Honor, I think this is important

15   and Your Honor focused on it.  This is actually outdated

16   because I believe another 37 letters have been filed

17   overnight and during the course of the day.  I have them

18   printed on a daily basis because I want all the customers to

19   understand that the team here at Kirkland is reading those

20   letters and understanding and trying to get to the bottom of

21   everything that was articulated in those letters.

22             And I just really want to let people know that we

23   empathize, we hurt, and we see the pain that so many people

24   are articulating.  And it's frankly demoralizing.

25             Just a reminder for Your Honor, Celsius has 1.7

Page 36

1    million registered accounts and over 300,000 customers with

2    account balances over $100.  So while we have approximately

3    300 letters on the docket, and I am sure more will come as

4    many did today, I just wanted to set the landscape for the

5    customer community and those that have voiced their concerns

6    already.

7            And as far as those concerns are concerned, I

8    think what we did is break down a couple of themes that

9    we've seen in these letters and hopefully can try to provide

10   people with a little bit of understanding as to what we are

11   going to do and how we are going to do it.

12           Many customers have suggested that all of their

13   money or all of those -- all of their crypto is lost.  And

14   that is not the case.  We and the Committee are focused on

15   getting as much crypto and as much dollars back to customers

16   as we possibly can.  There are many letters that talk about

17   treatment of creditors and whether certain creditors in

18   various accounts should be treated differently or treated

19   similarly.  This is an issue we are looking at very

20   carefully with the Creditor's Committee and we intend to

21   treat similarly-situated customers exactly the same as we

22   are required to under the bankruptcy code.

23           There are lots of comments about Celsius profiting

24   from the restructuring.  That is not true.  It's not the

25   case.  The crypto rebound that you saw on the prior page, it

Page 37

1    is our thesis and the company's business plan that that

2    rebound and that value goes to our stakeholders, not to

3    Celsius.  And employees and insiders, everybody at the

4    company, they are going to be treated just like every other

5    customer.  And many of our employees have crypto on the

6    exchange and in the wallet, and they are going to get the

7    same treatment.

8              There's a lot of questions about the time that

9    this restructuring is going to take to resolve.  Some people

10   suggesting years.  We will not let this last four years.  We

11   are going to move with all deliberate speed.  And I am going

12   to speak to our timeline momentarily.  And even more

13   important, with our liquidity position, as Your Honor noted,

14   we need to get alignment quickly with our key stakeholders

15   to get capital into this business to facilitate an expedited

16   process.  No one is going to (indiscernible) this company

17   for a long period of time and wait for years for this case

18   to be resolved.

19             Finally, Your Honor, there are many concerns of

20   customers.  But again, one theme that we gleaned was

21   customers are concerned about missed deadlines for filing of

22   claims.  There have been no such missed deadlines.  Just so

23   customers appreciate and understand, as I know the Court

24   does, Celsius will be filing schedules and statements later

25   this month.  Once those schedules and statements are filed,

Page 38

1    we will set a date by which all customers will be required

2    to file claims.  That will be on notice to the world and to

3    each of our customers and everyone will have an opportunity

4    to file a claim.  And just as we have been over the last

5    several weeks, to the extent any customers have questions,

6    we are available 24/7 and we'll answer them and look forward

7    to doing so.

8              Finally, Your Honor, our case timeline.  And I

9    just think it's important to keep in mind that our cash

10   balance, as we've talked about, dips negative in October.

11   And so the key in this first box is where all the action is.

12   And we need to reach alignment with the UCC on how we intend

13   to fund these cases and whether or not the business plan is

14   supportable because time is of the essence.  With no

15   liquidity as soon as October, this alignment in the next

16   several weeks is key to all our customers because it will

17   allow us to maximize value.  And once we reach that

18   alignment, which I am actually confident we will, we will of

19   course adhere to the statutory requirements and applicable

20   noticing rules as it relates to a disclosure statement and

21   plan.  But everyone should appreciate that moving with all

22   deliberate speed is mission-critical.  It just has to be

23   that way, and that's how we intend to move forward.

24             So, Your Honor, I really appreciate the time and

25   you indulging us.  Unless you have any questions for me, I

1     think I will cede the podium to Mr. Pesch.

2              THE COURT:  Thank you very much, Mr. Sussberg.

3              Mr. Pesch?

4              MR. PESCE:  Thank you, Your Honor.  Gregory Pesce,

5     White and Case.  Do you hear me all right?

6              THE COURT:  Yes, I can.  But let's take down the

7     share screen.  Go ahead, Mr. Pesce.

8              MR. PESCE:  Sure.  Thank you, Your Honor.  For the

9     record, Gregory Pesce, White and Case, proposed counsel to

10    the Official Committee of Unsecured Creditors.  We

11    appreciate the opportunity before we turn to the rest of the

12    hearing, which I am pleased to hear or pleased to report is

13    fully uncontested as between the Debtors and the Committee.

14    The Committee would like to provide some context about what

15    these cases are and what they are about and what they are

16    not about.

17             Quite naturally, there's been a lot of discussion

18    about Alex Mashinsky, the founder, about the mining

19    business, about what Celsius aspired to be, and many other

20    topics here.  These are topics that are important and they

21    are areas of focus that the Committee will focus the

22    appropriate attention on in due course.

23             At the same time, it's absolutely critical to

24    recognize that the events of the last several months have

25    harmed Celsius' accountholders and unsecured creditors in

1    unprecedented and horrible ways.

2            Therefore, from the Committee's perspective, the

3    purposes of these cases is to maximize value for Celsius so

4    it's accountholders can be made whole preferably with an in-

5    kind recovery of coins, and then move on with their lives.

6            So at the outset of this case, the U.S. Trustee

7    had a difficult task of forming a Committee that would serve

8    the interest of accountholders.  The Celsius community, as

9    Mr. Sussberg noted, totals over $1.7 million individuals and

10   over $300,000 have over $100 in cryptocurrency or other

11   digital assets on the platform as of the filing date.

12           From that $1.7 million, apparently thousands

13   sought to serve on the Committee, which in all of the

14   professionals' experience here that I've spoken to is an

15   unprecedented statistic.

16           Ultimately, the U.S. Trustee selected 7

17   individuals to serve on that committee on July 27th.  The

18   Committee's members bring a breadth and depth of experience

19   and perspectives here that is unheard of in many cases in

20   terms of their professional backgrounds, where they're from,

21   and what they do with their day-to-day lives.  The

22   composition of the Committee though makes it singularly-

23   equipped to represent the fiduciary duties of all

24   accountholders regardless of whether they are in the custody

25   program, the earn program, whether they're in Bitcoin,

Page 41

1   Ethereum, or some other token or coin that's hosted on the

2   platform.

3           As Mr. Sussberg noted, the Committee has gotten to

4   work hiring its advisor roster.  I'm sure in the coming

5   weeks and months, the Court will hear from other partners at

6   my firm, White and Case, Mr. Meghji's team at M3, Mr.

7   Cofsky's team at Perella Weinberg, and Elementus, which is a

8   cutting-edge, boutique blockchain consultancy that we've

9   engaged to help us with the important task of tracking the

10  movements of cryptocurrency on the blockchain so we can find

11  out where the coins went and when and find out if there is a

12  way to bring them back to Celsius.

13          Let me talk for a moment just about our initial

14  priorities here.  For the last three weeks, the committee

15  members and their advisors have been inundated with

16  thousands of emails, phone calls, text messages, Reddit

17  posts, tweets, and other communications regarding Celsius

18  and the pause that preceded the petition date that affected

19  account holders' lives.

20          In an effort to speak directly to our constituency

21  and to put Celsius on notice about what accountholders do as

22  the priorities for this bankruptcy, on August 8th, the

23  Committee filed a mission statement with the Court.  We

24  thought this was important so that everyone would see where

25  we stand and what we plan to focus on in this case.  For

Page 42

1    today we want to highlight for the Court and for our

2    constituency just a few things that we view -- that the

3    Committee views as imperative to drive the process forward.

4         First and foremost, the Committee wants to make

5    accountholders the focus of these cases.  We appreciate

6    hearing from Mr. Sussberg the focus that Celsius plans to

7    have on accountholders, and we'll keep them honest in that

8    regard.  To that end, the Committee is laser-focused on

9    maximizing the value that will be available for those

10   accountholders at the end of this case.

11        We are pleased to hear that the company is not

12   focused on dollarization of claims, as I mentioned.  From

13   what we've heard on holders directly by phone, email, social

14   media, et cetera, and reading the letters, the hundreds of

15   letters on the docket, receiving an in-kind recover is

16   absolutely critical.  And that is something that the

17   Committee is focused on working on in this case.

18        As to the form of the ultimate restructuring here

19   that will maximize value for accountholders, these are early

20   days and the Debtors are apparently focused on a standalone

21   reorganization being an option here.

22        The Committee though at this point does not have

23   its hands tied to any particular outcome.  And until

24   accountholders receive a full recovery, from the Committee's

25   perspective, all options, be it a sale or sales, or

Page 43

1    reorganization of some or all of the business, or a

2    combination, needs to be on the table.

3          Second, the ability to pursue a value-maximizing

4    restructuring will depend on cold, hard cash.  And that's

5    ironic given that this is a business that is in the bitcoin

6    and the cryptocurrency industry.  But cash is king in

7    Chapter 11, and the Committee is laser-focused on ensuring

8    that the company has liquidity to pursue -- to identify,

9    pursue, and consummate a restructuring alternative.

10          A few days ago at the Committee's request, the

11    Debtors published a Forecast and Coin Report that

12    demonstrates the news that you mentioned a few moments ago,

13    Your Honor, about how the Debtors are poised to run out of

14    cash by the middle of October.

15          There's little question though that these cases

16    are going to take more than two months to complete.  There's

17    frankly too much at stake to short-arm this process.

18          The Committee, therefore, plans to scrutinize the

19    Debtor's headcount and its expenditures to free up cash

20    where available, and it's for that reason why we were

21    supportive of the mined bitcoin motion that's going to be

22    presented to Your Honor today.  We think it's important to

23    have the resources to find the best option available for

24    accountholders.

25          At the same time, we are cognizant that the cash

Page 44

 1   on hand and cost savings might not be sufficient, and

 2   external financing might be necessary.  The Committee is

 3   rolling up its sleeves and figuring out what is the best

 4   possible way to finance this case.  Is it a DIP, is it some

 5   other form of financing, and which assets or which parts of

 6   the business provide the credit support for that type of

 7   external financing.  But we want the accountholders to hear

 8   this loud and clear; we don't take it lightly how expensive

 9   bankruptcy financing can be.  We don't take it lightly how

10   expensive the professionals can be.  The Committee therefore

11   is laser-focused on making sure that we can cut costs where

12   we can and obtain the cheapest available financing out

13   there.

14              Let me talk next just about the other key priority

15   that we have, which is something Mr. Sussberg also touched

16   on, which is the investigation.  The Committee has already

17   begun an investigation of Celsius.  This is a wide-ranging

18   endeavor.  It covers its founders, its management, its

19   directors, its funding parties, and all commercial and other

20   counterparties that have touched Celsius.  We will leave no

21   stone unturned in this effort.  We are gearing up to go

22   across the globe, across the country, across the blockchain

23   to find claims and causes of action and recovery on those to

24   make sure that if the coins in-house today are not

25   sufficient to provide a full recovery, there will be other

Page 45

1   forms through a litigation recovery that will be able to do

2   so.

3           This is not a trivial task, especially if the

4   company pursues a reorganization.  Celsius depends on

5   customer confidence.  Customers are not going to entrust

6   their coins to Celsius if they are not confident that those

7   coins will be held securely and with due care.  And the news

8   stories today that were discussed a few moments ago, without

9   getting into the specifics or the truth of any of those

10  matters raise important questions that any customer would

11  have to consider before putting their coins with reorganized

12  Celsius.

13          And this is going to be also important if there

14  isn't a reorganization.  As I mentioned, the litigation

15  recoveries here could form a significant portion of what

16  accountholders get at the end of this case.

17          We understand that the Debtors have started their

18  own investigation.  The Committee respectfully believes that

19  it is the only part that is capable to conduct this

20  investigation.  It's the only party that's accountable only

21  to the customers that are having their ox gored in this case

22  and it is the new party on the scene that is going to bring

23  a fresh perspective and a fresh set of eyes to all that

24  happened before the commencement of these bankruptcy cases.

25          That said, we look forward to working with the

Page 46

1   debtors in this regard.  We've had some preliminary

2   conversations I am pleased to report and understand there is

3   much alignment and expected to be much alignment in terms of

4   what they provide to us and the information they provide.

5          So I'm sure the Court will be hearing more from us

6   on this investigation in the coming weeks and months here.

7          THE COURT:  I have a couple of questions.

8          MR. PESCE:  Yes, sir.

9          THE COURT:  I don't expect answers today.

10         MR. PESCE:  Yes, sir.

11         THE COURT:  Since the Debtor business model was so

12  heavily dependent on the so-called earn accounts and given

13  the number of securities regulator investigations as to

14  whether the Debtors were engaged in the sale of unregistered

15  securities, I have a question whether -- what's the business

16  model going forward?

17         MR. PESCE:  You know, that is the $64,000 question

18  that we are all confronting right now.  And while on one

19  hand the Committee is focused on getting coins back into the

20  hands of the accountholders, on the other hand we want to

21  make sure that this doesn't presage another similar episode

22  for reorganized Celsius or whoever buys the assets.  We

23  think that finding the right solution from a securities and

24  regulatory standpoint is absolutely paramount here.  And

25  this is something that we are focusing a great amount of

1    time on.  I am pleased to report that we've had preliminary

2    conversations with several regulatory bodies who will be

3    before your court probably today and in the future, and we

4    look forward to further dialogue there.  Because I think

5    they share our goal as well, which is making sure that the

6    accountholders that were caught in the middle here don't

7    have that experience again.  They get their coins back, and

8    they have it with a safe, prudent, compliant organization on

9    the back end of this bankruptcy.

10            THE COURT:  The other question -- and I guess when

11   the Debtors take up their mining motion -- maybe I

12   misunderstood the numbers.  But it looked to me that the

13   mining business is projected to be cashflow negative for

14   some period of time.  Maybe I misunderstood the numbers on

15   the charts that I saw.  But I will certainly -- they are

16   looking to make a substantial investment in new rigs to

17   increase its mining business.  And I'm going to want to hear

18   from the Debtors about -- I mean, they get to exercise

19   business judgement.  But on the other hand, I want to be

20   comfortable that it appears to be an appropriate business

21   judgement.  We'll save that until we get to the mining

22   motion.

23            MR. PESCE:  We agree and echo all those questions

24   and have been asking the Debtor in the same regard about

25   those.

1          THE COURT:  Okay.  What I would like to hear from

2     now -- at the start I was told there were two ad hoc

3     committees.  I see Mr. Ortiz at the top of my screen

4     representing the custody holders.  And I do want to hear

5     from Mr. Ortiz and counsel for the second ad hoc committee

6     as well.  Mr. Ortiz?

7          MR. ORTIZ:  Good afternoon, Your Honor.  Kyle

8     Ortiz with Togut, Segal and Segal on behalf of the Ad Hoc

9     Group of Custodial Account Holders.  I should be less than a

10    minute, Your Honor.

11         I just quickly wanted to let Your Honor know that

12    we are here and representing these uniquely-situated

13    interests, that we've had productive conversations with the

14    debtors, and we are hopeful that our presence in this case,

15    Your Honor, will amount to little more than a brief and non-

16    controversial cameo because the custodial accounts can

17    ultimately be unfrozen sooner rather than later.

18         We understand, as Mr. Sussberg noted, that the

19    Debtors and the Committee are doing their proper diligence

20    on these matters, and want to preserve estate and court

21    resources and give them the appropriate space to do that,

22    Your Honor, and hopefully come to a happy, consensual

23    resolution without us needing to force the issue, although

24    of course we won't hesitate to do that if it comes to that,

25    Your Honor, in the relatively near term.

1          So that's all I have for now, Your Honor, unless

2     you have questions.  But we are hopeful you won't have to

3     hear much from us during this case, but wanted to let you

4     know that we are here and that there is a considerable

5     element of the custodial account holders that have organized

6     and are active.

7          THE COURT:  I guess what I would say is without

8     prejudicing the issues, the issues with respect to the

9     custodial accounts, is the property in those accounts

10    property of the estate.  If not, I expect that it will be

11    returned.  As I understand it, there was $180 million

12    approximately in the custodial accounts.  So it's a

13    substantial amount of money.  Quite a few of the letters

14    that have been docketed are from custodial account holders.

15    So I am going to want -- I am going to want a sooner rather

16    than later resolution.  But I also have some questions about

17    the custodial accounts.

18          As I understand it, it wasn't until April 2022

19    that Celsius set up the custodial accounts.  So it's quite

20    recent.  And while I guess it was something like 58,000

21    account holders with custodial accounts, I am certainly

22    going to want to know whether there are insiders and

23    employees with custodial accounts and whether any of them

24    were able to transfer assets, crypto assets from other

25    Celsius accounts into the custodial accounts and what did

Page 50

1    they know at the time they made the transfer.  Were they

2    contemplating that business was trending negative and the

3    best way for them individually to protect the value of their

4    accounts was to transfer assets into custodial accounts?  I

5    won't go further with it than that for now.

6           But I guess the thing that caught my attention the

7    most was if I'm reading the papers correctly, it wasn't

8    until April 2022 when Celsius set up the custodial accounts.

9    And I understand that the earn accounts, the terms of use

10   provide that you transfer all right, title, and interest to

11   Celsius when you deposit your crypto assets.  We'll see h ow

12   that unfolds in the case.  There's certainly been a lot of

13   letters that dealt with that issue.  But I certainly would

14   like to see the issue about the custodial accountholders

15   resolved sooner rather than later.

16          I think at the first day hearing, Debtor's counsel

17   made some comment about possibly initiating an adversary

18   proceeding for a declaratory judgement.  I am not

19   foreclosing that, but it may be more expeditious if

20   necessary if it can't be resolved consensually for a lift

21   stay motion on the grounds that this is not property of the

22   estate.  So I would like to see an expeditious resolution of

23   the issue of custodial accounts, but I also want to be

24   satisfied that this wasn't a vehicle for insiders to protect

25   their assets while customers at large could not.  Let me

Page 51

1    stop there.

2              MR. SUSSBERG:  All noted and understood, Your

3    Honor.

4              THE COURT:  Just a second, Mr. Sussberg.  Let me

5    give the other -- as I understand it, the other group of

6    account holders, the Ad Hoc Group of Withheld Accounts,

7    Troutman Pepper represents them.  Do they want to say

8    anything at this point?

9              MS. KOVSKY:  Yes, Your Honor.  Good afternoon.

10   This is Deb Kovsky at Troutman Pepper for the Ad Hoc Group

11   of Withhold Account Holders.  And I will echo what Mr. Ortiz

12   said.  We hope we will be little more than a blip in this

13   case.  We are a much smaller group, as Mr. Sussberg alluded.

14   There is only about $14.5 million worth of crypto assets in

15   the withhold accounts.  And these were effectively accounts

16   that were created almost by default in those states where

17   the Debtor wasn't licensed so that there couldn't be a

18   custody account.  And this is where coins essentially

19   landed, whether intentionally or inadvertently, when

20   individual depositors tried to withdraw them from the

21   Celsius platform altogether.

22              To the best of our knowledge and understanding,

23   there are no terms and conditions that govern these

24   accounts.  They don't appear to be part of the Debtor's

25   balance sheet.  They really even -- they're not really in

Page 52

1    the Celsius ecosystem and we believe that a prompt

2    resolution along the lines that Your Honor suggested would

3    be appropriate for this very small group of sort of outlier

4    depositors.

5              THE COURT:  All right.  Thank you very much, Ms.

6    Kovsky.

7              All right, who wants to move forward for the

8    Debtors?

9              MR. KWASTENIET:  Good afternoon, Your Honor.  Ross

10   Kwasteniet from Kirkland in the Chicago office.  Can you

11   hear me okay?

12             THE COURT:  Yes, I can.

13             MR. KWASTENIET:  Great.  Your Honor, I did want to

14   just circle back very briefly before we proceed with the

15   agenda if that's all right with Your Honor, with just a few

16   more comments about the custody and the withheld accounts.

17             So it is our understanding that in anticipation of

18   some of the very regulatory concerns that Your Honor noted

19   earlier with respect to the earn account and whether it was

20   securities, there is a notable settlement in the crypto

21   industry not involving Celsius, but involving a competitor

22   of Celsius where they had a similar earn product.  And they

23   agreed in an agreement with the SEC to limit that product to

24   U.S. accredited investors.  So any U.S. not accredited

25   investor would not be eligible to receive that earn or sort

Page 53

1     of the interest rate or the earn component.

2              And in anticipation of the SEC taking a similar

3     position -- and we were in -- I don't know if they were

4     preliminary or advanced.  I don't know the exact status of

5     the conversations.  But we were in conversations with the

6     SEC about this issue.  And the company preemptively decided

7     in April to not allow U.S. unaccredited investors to open

8     new accounts in the earn program.  And we put them in the

9     custody program and we also amended the terms of use in

10    connection with that to provide the customers who went into

11    the custody program, title to their crypto stayed with them.

12    So that's very different than the terms of use that applied

13    to the earn program.  And we further provided that Celsius

14    could not use, sell, pledge, hypothecate, rehypothecate, the

15    custody assets without the customers' consent.  And in fact,

16    we held those assets to the side.  We effectively created a

17    matched quote.  For every deposit that came in that we

18    determined was not eligible and should be a custody deposit,

19    we maintain those crypto assets.

20             And so the company is in discussions with the

21    Committee about honoring the terms of use, because that

22    really is the backbone of the agreement between the parties.

23    And assuming we can get buy-in, I would expect that we would

24    be filing a motion in the near-term, or you may see a lift

25    stay motion for the return of those assets.

1          One of the reasons that I had entered an order

2     requiring the Debtors to file each version of its terms of

3     use since 2018 was really precisely for that point; to trace

4     through what if any changes were made over time.  The most

5     recent terms of use had all sorts of qualifiers, making

6     clear that the Debtor was not making -- was not saying how

7     this issue would ultimately be resolve, let me put it that

8     way.  But that was one of the things that triggered my

9     interest in seeing all of the versions of the terms of use.

10    Little did I know that there were going to be more than

11    1,100 pages of them --

12          MR. KWASTENIET:  Little did we know, Your Honor.

13    It ended up being a pretty significant project for a lot of

14    people who worked 24 hours a day through the weekend to get

15    that done.

16          THE COURT:  I thought I was being generous in

17    giving about a week for them to get them.

18          MR. KWASTENIET:  I had urgent requests to ask you

19    for more time on that, Your Honor.  But I am happy to say we

20    did get it done.  And it's an important document and we do

21    think it is -- you know, a lot of people have recognized

22    there's novel legal issues.  You know, what is crypto?

23    We're not a registered securities broker, we're not a

24    licensed commodity broker.  It doesn't fall neatly into --

25    we're not a licensed bank.  What are we?  Well, at the

Page 55

1   foundation, the nature of the relationship is governed by

2   the terms of use.  And there will be a lot more to come on

3   that about how customers accept that and click on that and

4   click -- the validity of clickwrap agreements under New York

5   law, which have been recognized and have stood up.  So those

6   are the kind of issues that we are very deep in terms of

7   analyzing, and we plan to come before you in the near

8   future.  Because, to Your Honor's point, if we are holding

9   on to something that is not an estate asset, we would like

10   to get it back to the customers ASAP and well in advance of

11   a plan.  So that is something that is high on our list, and

12   I think you'll be seeing more on that topic in the near

13   future.

14          And the same with the withheld account.  It's

15   similar but slightly different.  These are assets that were

16   initially just not eligible to be put in any Celsius

17   service.  So we sort of held them on the side for people to

18   pick up.  And then they got caught up and we filed.  And so

19   now we need a court order to return those.  But they are

20   assets that were effectively ineligible.  It may have been

21   possible, Your Honor, and we are looking into it, for people

22   who were in the earn program to transfer into the custody

23   program or transfer into the withhold program.  So we are

24   looking into that and it's one of the things the Committee

25   has asked us about, and that's one of the things we'll have

Page 56

1    to bottom out.  But suffice it to say the analysis on that

2    is well underway and it's one of our top priorities.

3               THE COURT:  Thank you.

4               MR. KWASTENIET:  All right, Your Honor.  Unless

5    you have any further questions, I am happy to jump into the

6    agenda for today, which at the outset I would just like to

7    echo Mr. Sussberg's thanks for all the many parties,

8    including the U.S. Trustee, the UCC's advisors, our ad hoc

9    equity holders, and also many others for collaborating with

10   us to get us to a point where I believe that we are

11   presenting a more or less fully consensual set of orders

12   today.  Obviously if people have issues or comments or

13   tweaks, they'll speak for themselves.  So I am certainly not

14   prejudging anybody's opportunity.  But as I stand here

15   today, my understanding is that we have made changes to the

16   orders that address all the objections and concerns that

17   were raised.

18               And so with Your Honor's permission, I will jump

19   into Agenda Item 1, which is the Debtor's --

20               THE COURT:  Let me just say that obviously the

21   principal parties that have been engaged in resolving issues

22   about the second day motions have been the Debtors, the

23   Committee, the U.S. Trustee.  If there are individual

24   creditors who wish to be heard by the Court, please use the

25   raise hand function and I will recognize you.  I just ask

Page 57

1    that any comments you make -- and I certainly will be happy

2    to hear from you -- ought to be pertinent to the specific

3    motions that are being heard.

4           Before you begin, Andre, I see your raised hand.

5    We haven't even started on the agenda of the motions, but

6    let me hear from your briefly.  Go ahead.  Unmute and go

7    ahead and speak.  You need to unmute.  Go ahead.

8           MR. JACOBS:  Thank you for the opportunity and

9    thank you for allowing us to participate.  I am obviously a

10   foreign investor in Celsius with international accounts

11   across the world.  I am a resident in South Africa and I am

12   very concerned about the fact that it might be prejudicial

13   to us not being able to appear physically as we would like

14   to have done.  But we are concerned as a whole group of

15   investors in Celsius and other parts of the world that our

16   needs and our interests will also be looked after.  And

17   that's my only comment.

18          THE COURT:  Let me say, Andre, that at the present

19   time, we are only appearing remotely on Zoom For Government.

20   It may well be that we will return to the courtroom, but to

21   the fullest extent that it's possible, I will arrange for

22   the hearings to be what we refer to as hybrid hearings so

23   that lawyers and others appearing in my courtroom can do so

24   but people such as yourself in South Africa or wherever in

25   the world will have an opportunity to appear and see exactly

Page 58

1       what's happening and an opportunity to address the court.

2                So at this stage, everybody is appearing remotely.

3       And hopefully depending on the COVID-19 pandemic, we will,

4       beginning to do in other matters, return to the courtroom,

5       but doing so with hybrid hearings.

6                Before we get into the agenda, there's one other

7       hand raised.  I will give -- oh, there are two now.  But

8       Mario Foti, I will give you a chance.  And then Colin

9       Crossman.  But then we're going to move on with the agenda.

10               First, Mario Foti, if you would unmute and I will

11      give you chance to speak.  Go ahead, Mr. Foti, you've

12      unmuted.  Mr. Foti, your line has been unmuted.  So if you

13      want to address the Court, please go ahead.  All right.  For

14      whatever reason, Mr. Foti has not addressed the Court even

15      though his line is unmuted.

16               Colin Crossman, if you would unmute your line, I

17      will give you a chance to speak.

18               MR. CROSSMAN:  Thank you, Your Honor.  This is

19      Colin Crossman.  I currently do not represent anyone.

20      However, I did want to put down a marker that members of

21      Celsius who have outstanding loans with collateral are

22      working to form an ad hoc committee as well.  So I wanted to

23      make you aware of that fact so that when we do file

24      something, you see it coming.  Thank you.

25               THE COURT:  Thank you very much, Mr. Crossman.

Page 59

1    Another person, Mike.  Don't have a last name.  If you would

2    unmute.  Go ahead.  You can speak.

3              MIKE:  Judge, thank you so much for your time.  My

4    question is also along the lines of loans.

5              One of the things that's been unclear to us as

6    loan holders is the collateral that's held with Celsius, is

7    that part of the custodial group or some other

8    classification?

9              THE COURT:  It's a fair question, and I'm sure

10   that will be addressed.  I am sure that Mr. Ortiz on behalf

11   of the Ad Hoc Custodial Group can try and address it.  The

12   UCC's counsel, and perhaps the Debtor as well.  But I

13   understand from a lot of the letters that I've received, a

14   lot of those letters have been written by people who had

15   loans with crypto assets as collateral, and that has been a

16   major concern of many people.  In some of the letters that

17   I've reviewed, that specifically is the major issue that

18   people have raised.  So that's not on the agenda for today

19   for any of the motions that are before us.  But that

20   certainly is I think an important issue that's going to have

21   to be addressed.

22             Ramsey G., if you want to unmute and briefly make

23   your comments, go ahead.

24             MR. CASTANEDA:  Hello, Judge.  Thank you for your

25   time.  I appreciate it.  Something I wanted to address was -

Page 60

1  - you guys were just addressing it, but the custody

2  accounts.  Pretty much in the terms of service, it says that

3  the title of the assets in the custodial accounts stay with

4  the customer and they do not transfer to Celsius.  So what

5  I'm failing to understand is why is the four percent of

6  funds that Celsius has for custodial accounts not being able

7  to be withdrawn?

8         THE COURT:  It may be four percent, but it's $180

9  million.  By my take, that's a lot of money.  And I think

10  that is an issue that Mr. Ortiz on behalf of the counsel for

11  the Ad Hoc Group of Custody Holders is going to be front and

12  center for them.  It is certainly an issue I am very aware

13  of and focused on.  And hopefully it will be able to be

14  resolved one way or another fairly quickly.  Thank you very

15  much.

16         MR. CASTANEDA:  I just had one more question or

17  one more thing I wanted to address.

18         THE COURT:  Go ahead.

19         MR. CASTANEDA:  So for the mining operation, I am

20  actually a miner myself.  It's pretty hard to be profitable

21  in this market --

22         THE COURT:  Ramsey, when we get to the mining

23  motion -- I've already raised the issue for committee's

24  counsel.  And certainly the Debtor will have to address it.

25  Because of the mining motion, whether -- because it looked

Page 61

1    to me that that was -- for the near future at least was

2    going to be cashflow negative.  So it's certainly an issue

3    that I've focused on as well.  But let's move on.

4              MR. CASTANEDA:  Okay.

5              THE COURT:  Mr. Bralver, go ahead.  If you'd like

6    to unmute and speak, go ahead.

7              MR. BRALVER:  Hello, Your Honor.  My name is

8    Stephen Bralver.  Forgive me.  I'm kind of nervous because I

9    feel as though my family's security is really based on this

10   question I'm about to ask you.

11             I am unrepresented by any counsel simply because I

12   can't afford it.  I just wanted to know if you have read my

13   letter that I wrote to you.  I believe it was around 142.

14             I feel very misled by this company, who

15   continually told us that they had enough money in case there

16   was a run on the bank and they were more than liquid.  I

17   have less than $500 in my checking account right now, and I

18   can't afford to keep a roof over my family's head and put

19   food on the table for them.  I was using Celsius as

20   basically a checking and savings account.  And this was

21   money that I rely on.  And week in and week out Mr.

22   Mashinsky said we are more than secure.  And now my money is

23   frozen and I don't know how I'm going to be able to take

24   care of my family.

25             I never was an investor in this company, and I

Page 62

1    wasn't even an investor in crypto.  The majority of my money

2    was U.S. Dollar that was just sitting there, collecting

3    interest to keep up with inflation.  And I am asking if

4    there is some way that you could please release my funds.

5    If not all of them, a good part of them so I can continue to

6    pay for the necessary expenses just so I can provide for my

7    family.

8              THE COURT:  Mr. Bralver, the issues you are

9    raising about alleged representations that Mr. Mashinsky

10   made has figured pretty heavily.  If you've been following

11   the letters that appear on the docket, you're not alone in

12   raising those same issues, assurances that the Debtor would

13   have sufficient funding.

14             So I think that the Committee, which says it is

15   undertaking an investigation, I'm sure that is something

16   that the Committee will be examining.  At this stage, there

17   really is not something for the Court to deal with other

18   than to say that the concerns you are raising, many people

19   have raised.  And it would typically be the unsecured

20   creditors' committee in a case like this that would be

21   focusing on the issue.

22             You can certainly reach out to counsel for the

23   Unsecured Creditors' Committee if you have specific

24   questions that you wanted to raise.  But I am happy to have

25   you appear.  Okay?

1          MR. BRALVER:  Thank you.  One thing really quick

2     if you don't mind.

3          THE COURT:  Go ahead.

4          MR. BRALVER:  I just wanted to say I was never an

5     investor in Celsius.  Mashinsky said we are better than

6     banks, we're safer than banks, and they're just holding our

7     money.  And now that (indiscernible) happened, they've taken

8     our money.  And I feel as though I am a victim.  And I feel

9     what they've done is crooked.  And I need to take care of my

10    family.  And I was misled.  And I hope that you can

11    understand where I'm coming from.  I have less than $500 in

12    my checking account and $50,000 in Celsius.

13          THE COURT:  Mr. Bralver, there is nothing before

14    the Court other than for me hearing your concern, hearing --

15    having the Creditors' Committee specifically be able to hear

16    your concern, I assure you that your letter and all the

17    other letters that have been filed have been looked at by

18    the Court, have been looked at by counsel of the Creditors'

19    Committee.  Mr. Sussberg indicated that he and his

20    colleagues have looked at them as well.  So it's not going

21    unnoticed.  All right?

22          (indiscernible), if you want to unmute and give

23    your comments, I will give you this one last chance.

24          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.  Can

25    you hear me?

1              THE COURT:  Yes.  Go ahead.

2              UNIDENTIFIED SPEAKER:  Thank you, sir.  Just an

3     unsecured creditor representing myself.

4              So I just had one quick question.  When Celsius

5     switched to accredited-investor-only status to be eligible

6     for earn accounts back in April, did the SEC give specific

7     permission for Celsius to grandfather all non-accredited

8     investors?  And if that has been touched on, I apologize.

9              THE COURT:  It hasn't been touched on, but it is

10    not something I can answer.  I think the issue -- I raised

11    questions about their business model in light of the issues

12    that have been raised by various securities regulators.  The

13    Texas securities regulator has appeared today and has filed

14    objections to at least one of the motions and then filed a

15    supplement that was joined -- their objection was joined in

16    by many other state securities regulators.  I think at the

17    first day hearing, counsel to the Debtor disclosed that this

18    has been a subject raised by the securities and exchange

19    commission as well.  I don't have any answers for you.  I am

20    sure it is on the radar screen of a lot of the lawyers and

21    people involved in the case.

22             UNIDENTIFIED SPEAKER:  Okay.

23             THE COURT:  Mr. Trovato?

24             MR. TROVATO:  Hello, Your Honor.  I am here with

25    my girlfriend, who seems to be in a very unique situation.

Page 65

1    She had an earn account on Celsius prior to the recent

2    change in terms and conditions, these most recent terms and

3    conditions where the accredited investor aspect was

4    established.  She is not an accredited investor.  She has

5    never accepted the terms and conditions, and in fact

6    followed a prompt on the app to decline the terms and

7    conditions and close the account.  She was also added to a

8    list of others in this situation and she was then prompted

9    to send a video of her intent to decline and close the

10   account and provided a crypto address to receive her coins.

11   Once Celsius filed for Chapter 11, she received an email

12   saying they would be unable to withdraw her funds.  And I

13   believe that her crypto should not belong in the general

14   earn accounts and should be considered an outliner and

15   possibly a withhold account or a custody account.  And any

16   rewards that were earned during this period of time can be

17   returned to Celsius if need be.  And we have not had any

18   clarity on this issue from Celsius.

19           THE COURT:  All right.  I'm sure that it's an

20   issue that the Creditors' Committee will want to explore.

21   It's not an issue that can be resolved today.

22           Mr. (indiscernible)?  I'm sorry if I am

23   mispronouncing your name.  If you want to unmute and speak,

24   go ahead.

25           UNIDENTIFIED SPEAKER:  That was a pretty good

Page 66

1    pronunciation of the last name there.

2              So I don't want to beat the dead horse here

3    because I know a lot of these questions have touched on the

4    custody issue.  I think there is one other smaller group of

5    users that had pending withdrawal transactions prior to the

6    formal pausing of withdraws on June 12th.  So these are

7    people that chose to withdraw on June 11th or June 12th

8    before roughly ten p.m.  We were told by Celsius that these

9    transactions had been initiated and were processing, and

10   then they were kind of unilaterally cancelled after the

11   fact.

12             So while we do have the custody ad hoc group

13   advocating for us, I don't know if anybody is specifically

14   advocating for users that had already processed these

15   withdrawals and how that might be addressed.

16             THE COURT:  All right.  What I would urge you to

17   do is communicate with counsel to the Creditors' Committee

18   and the Ad Hoc Committee.  And this issue may well come up

19   in the case in another time.  It's not on the agenda for

20   today.  I appreciate you raising the issue.  I understand

21   it's a valid concern.  Okay?

22             UNIDENTIFIED SPEAKER:  Thank you for your time.

23             THE COURT:  Matthew Marcus, if you want to unmute

24   and speak, go ahead.

25             MR. MARCUS:  Thank you, Your Honor.  Unrepresented

Page 67

1    creditor here as well.  Not to belabor this point either,

2    but I wanted to speak about the earned service specifically.

3    In correspondence with Celsius, it seems as though they are

4    operating this service specially as though it's business as

5    usual.  They are requiring us to continue to service the

6    loan with interest payments that can only be made via U.S.

7    wire when not letting us know if the collateral is even

8    there in the background.  And furthermore, they are not

9    giving any information as to what happens to these loans

10   upon maturity date.  If the interest payments are not made,

11   is the loan closed and the collateral capped?  I feel -- I

12   don't know if this is possible, but is it possible that the

13   Court could issue an order that they no longer continue this

14   service as though it's business as usual?  Because it's

15   really not.  Thank you.

16          THE COURT:  Mr. Marcus, the issue that you raise

17   has been raised by other creditors as well.  There were

18   filed letters on the docket.  I have in front of me -- I

19   won't mention the name of the author, but ECF Docket 478,

20   which is an August 5th, 2022 letter, four pages, raises a

21   number of issues.  That's among them.  So I think the

22   Creditors' Committee and the Debtor are certainly aware of

23   the issue you are raising.  I've seen in many of the letters

24   that have been filed similar concerns expressed where people

25   had loans and what happened after the petition date.  Could

Page 68

1    they get their -- satisfy the loan, get their collateral

2    released.  So I think everybody is aware of that issue.

3    That's all I can really say for today.  There's no

4    (indiscernible).

5              MR. KWASTENIET:  Your Honor, if I may.  Ross

6    Kwasteniet again.  I could give a brief update on this.

7              THE COURT:  Please go ahead.

8              MR. KWASTENIET:  We are well aware of the issues

9    around the loan portfolio and we have approximately 23,000

10   customers who took out loans against their Celsius

11   positions.  We call those the retail borrowers.  And they

12   were owed -- or they owed the company a little over $400

13   million in aggregate as of the filing date.  Prepetition --

14             THE COURT:  What was the value of their collateral

15   at the date when the loans outstanding were $400 million?  I

16   mean, I think that's what's really on the mind of a lot of

17   the creditors, where they had collateral far in excess of

18   the amount of the outstanding loans.  They couldn't satisfy

19   the loan and get their collateral back.

20             MR. KWASTENIET:  Understood, Your Honor.  And the

21   collateral as I understand it generally came in through the

22   earn or the borrow program.  If it came in through the earn

23   program and then was used as collateral for a loan, it was

24   no longer eligible to earn rewards while it was sort of set

25   aside as collateral.

1           These loans typically as I understand it were

2    well-collateralized or covered.  You know, 50 percent or so

3    as a surplus cushion.  But what the company has done is

4    we've frozen these accounts so we are no longer demanding

5    margin call.  We thought that that was an appropriate change

6    to make given that customers can't withdraw coins from the

7    plan, so we're no longer demanding that they put new coins

8    onto the platform to protect those loans.  And we've also

9    suspended any liquidation of those positions.  So it used to

10   be that when -- if a margin call was made and not honored,

11   then before the collateral dissipated too far, the company

12   would close the loan and offset, if you will, against the

13   collateral that was posted.

14           So we do have a few gating items.  And we've

15   started conversations with the Committee.  Those include is

16   the collateral truly collateral.  If it came in through the

17   earn program under terms of use that said that those assets

18   became Celsius assets, then is it really truly collateral?

19   The other question is do they have a valid contractual right

20   of setoff that survives a 553 scrutiny.  And that is also

21   something that we are analyzing.  And we have not come to a

22   firm position yet.  It's going to be an important issue for

23   the Committee to weigh in on.

24           And I will note, Your Honor, I believe that

25   several of the committee members themselves have taken

1   loans.  So there are people on the Committee with an active

2   interest in this question.  It is important, and we are

3   focused on it, but we don't have a management-endorsed,

4   board-approved proposed resolution on this.  But it is

5   something we are working on.

6           THE COURT:  All right.  And I appreciate that.

7   And I know that's not an issue for today's agenda.  I wanted

8   to give people an opportunity to express their views.

9           I am going to call on one last -- I see two people

10  with a hand raised.  But the last one I'm going to call on

11  is Joseph Trovato.  And then we are going to move to the

12  agenda.

13          Mr. Trovato, if you want to unmute and --

14          MR. TROVATO:  Actually, I already spoke.  My hand

15  was up by accident and I did not notice.  I apologize for

16  that.

17          THE COURT:  Okay.  Someone -- Mr. Cam or Ms. Cam,

18  your hand is raised.  You can be the last one I'm going to

19  allow to speak.

20          UNIDENTIFIED SPEAKER:  Wonderful.  Thank you,

21  Judge.  Can you hear me?

22          THE COURT:  Yes.  Go ahead.

23          UNIDENTIFIED SPEAKER:  Great.  Yeah.  I just

24  wanted to address Attorney Sussberg's comment about

25  transparency that Celsius has demonstrated.  They have

Page 71

1    disclosed their balance sheets.  But just as a snapshot,

2    they've paid out about $1.2 billion in depositor awards and

3    they have a hole in their balance sheet that exceeds those

4    payouts.  So it seems likely that they are either very bad

5    at earning a return or that there could be some sort of

6    fraud that's occurred here.  So it could be very helpful if

7    they release profit and loss statements that we can actually

8    analyze their ability to earn money.  Otherwise, we're going

9    to just keep this suspected Ponzi scheme going and further

10    harm those of us that are impacted.

11            THE COURT:  Let me address your point.  The

12    Creditors' Committee, which has White and Case as its

13    counsel and a number of financial advisors and other

14    advisors, I am sure they are going to be doing exactly what

15    you are asking, that they're going to be scrutinizing.

16    Because their mission in life is the protection of the

17    creditors.  And I am sure they will be diligent about

18    pursuing it.

19            So let's now move to the agenda of the motions

20    that are pending before the Court.  Okay?  let's go.

21            MR. KWASTENIET:  Thank you, Your Honor.  Starting

22    with at the top with Agenda Item 1.  Again, thanks to a lot

23    of hard work and cooperation from all the stakeholders, I

24    believe I am going to be proposing a consensual cash

25    collateral order.

Page 72

1          I will note that this is a -- we've styled it as a

2    second interim order for a few reasons.  One, we still have

3    not come to ground with the U.S. Trustee's office on a final

4    345 waiver.  That is a topic we're going to be in ongoing

5    discussions with.  We have agreed that the waiver period

6    runs through 55 days after the petition date subject to

7    further agreement between us and the U.S. Trustee or a

8    further request by the company to extend.  But those

9    discussions are ongoing and therefore we thought not

10   appropriate to seek final order today.

11          And the other item, Your Honor, is that we are,

12   frankly, still working with the Committee on the form of and

13   substance of reporting obligations going forward.  Your

14   Honor has noted that we filed a budget and coin report.  We

15   thought that that was important.  We filed that at Docket

16   447 in order to give the community more information.  This

17   is not a case -- in a lot of cases where there is DIP

18   financing or where there is a use of cash collateral, all

19   parties will see a budget and there will be a little bit

20   more information out there in terms of required DIP or cash

21   collateral disclosures, we realized there was a deficit

22   here.  We also realized that people were very, very focused

23   on what crypto assets we held and some detail around them.

24   And so that was the genesis that we discussed with the U.S.

25   Trustee and the Committee as an initial way -- I'm sure not

```
 1    the only way or the final way, but an initial way of us

 2    getting some important information out to the broader

 3    community.  And between now and our next hearing, which is

 4    10:00 a.m. September 1st, Your Honor, where we hope to

 5    present a final cash collateral order, we will continue to

 6    work with the parties to refine the form and substance of

 7    disclosures.  And that was one of the main issues that we're

 8    still collaborating with them on, Your Honor.

 9              But with Your Honor's permission, I would turn to

10    something that we filed just this morning.  It's Docket 479.

11    That includes a clean and a redline to the first interim

12    order showing the various changes that we've agreed to with

13    the Office of the U.S. Trustee and the Committee and certain

14    others.  And I can highlight those changes and then would

15    welcome anybody else's comments.  But I believe that this

16    reflects an agreed form of order.  And again, a form of

17    order that carries us a few more weeks and everybody

18    reserves rights on it with respect to the final order.

19              THE COURT:  Let me hear briefly from the Committee

20    and then from the U.S. Trustee.  I may have a couple of

21    questions as well.  Anybody from the U.S. Trustee?

22              MR. PESCE:  It's Gregory Pesce at White and Case.

23    Would you like us to go first or the Trustee?

24              THE COURT:  Go ahead, Mr. Pesce.  You're speaking,

25    so go ahead.
```

Page 74

1              MR. PESCE:  So we were going to speak about this

2    order just generally just to give a few high-level points

3    about how we approach all of these.  And then my partner,

4    Mr. Wofford, was going to say something when the mined coin

5    motion comes up.  I don't think it's necessary for us to

6    speak about everyone, but first, we appreciate working with

7    the Debtor to resolve all of these comments consensually in

8    approaching -- and since we've had so many people dial in

9    and we're getting so many questions, I just want to make a

10   few points about how we approach this.  Because we have

11   received a lot of questions from the community about why

12   we're standing down so to speak on our objections here.

13             The Committee received a great deal of benefits by

14   resolving these objections.  We've been promised now to

15   receive a significant amount of information and reporting

16   that will let us get visibility into how the business

17   operated, which is one of our key concerns.

18             Second, we are getting in certain ways consent

19   rights which will let us control how certain expenditures

20   are made, which is important for us so that we have some

21   control over sensitive pieces of the business.

22             And finally, at least with respect to the cash

23   management order, there is now a budgeting and a forecasting

24   process.  We expect that that process will get further

25   refined and the budget will get further refined as we

1    approach September 1st.

2             So these concepts sort of carried across all of

3    the orders in terms of (indiscernible) and preserving the

4    status quo.  So in light of all the questions we received

5    from the community, we wanted to put that on the record.

6    And then we are happy to address other specific questions as

7    we go on.  But those are kind of meta points that go across

8    all of them.  Thank you, Your Honor.

9             THE COURT:  Thank you, Mr. Pesce.

10            Ms. Cornell or Mr. Masumoto, do you want to

11   briefly address the cash management?

12            MS. CORNELL:  Thank you, Your Honor.  This is

13   Shara Cornell on behalf of the Office of the United States

14   Trustee.

15            First, Your Honor, since this is the first time I

16   am speaking today, I just wanted to draw Your Honor's

17   attention to Docket Entry 459 that we filed yesterday with

18   instructions for the 341 meeting for any interested party.

19            THE COURT:  Thank you.

20            MS. CORNELL:  You're welcome.  Counsel for the

21   Debtor is correct.  We did reach an agreement for this

22   bridge order until the next hearing.  We are hoping that in

23   this interim time period we receive additional information

24   regarding the Debtor's cash accounts and the budget, the

25   same -- in the same vein that the Creditors' Committee just

Page 76

1    mentioned.  But for the time being, this bridge order is

2    consensual.  Thank you.

3              THE COURT:  All right.  Let me raise a couple of

4    questions.  And this really has to do with intercompany

5    transfers to non-debtors.  And Mr. Kwasteniet, maybe you

6    could just briefly explain to me how that is being

7    monitored, what information is being provided to the

8    Committee and to the U.S. Trustee with respect to transfers

9    to non-debtors.

10             MR. KWASTENIET:  Yes, Your Honor, absolutely.  And

11   there are some important restrictions in that regard.  First

12   and foremost, there remains a flat prohibition on the

13   intercompany transfer of cryptocurrency assets from debtors

14   to non-debtors.  There was a discussion, and I suspect there

15   will be discussions around whether it may be appropriate at

16   some point in time to transfer crypto to a non-debtor

17   affiliate that we refer to as GK8, which we believe is the

18   leading storage platform.  But obviously the Committee has a

19   lot of work to do, including with their experts at

20   Elementus, to evaluate that and get (indiscernible).  The

21   crypto is staying in the same places it's been staying since

22   our last hearing.  And there will be no transfers of crypto

23   from debtors to non-debtors.

24             There will be -- I believe this order permits up

25   to $245,000 in cash being transferred from Debtors to non-

Page 77

1    debtors to support critical business functions where we

2    have, you know, some back office and other services that are

3    rendered by affiliates outside the U.S., primarily in

4    Cypress.  Your Honor, we did have this concept also in the

5    first day order.  I believe the amount was in the $300,000

6    range.  So because we are extending for several more weeks,

7    this is an incremental $245,000 to continue to fund.  But

8    that's a cap and we can't go beyond that.  And we've also

9    committed to do monthly reporting to the U.S. Trustee and to

10   the Committee summarizing all intercompany transactions.

11   Because we recognize that there may yet be issues in the

12   case as to who has claims against what particular debtors,

13   and so we are also proposing and committing to track and

14   trace and to afford super priority administrative status to

15   intercompany transfers.  And these are all things that we

16   can revisit down the road to the extent it becomes relevant

17   that one group has claims here, another group has claims

18   there.  We are tracking and tracing and reporting on

19   everything related to intercompany, Your Honor.

20             THE COURT:  All right.  Let me make one other

21   brief comment.  To the extent that the Debtor and the

22   Committee have agreed on certain consent rights for the

23   Committee, I will approve the order that includes that.  But

24   no one should think that my approval will carry forward in

25   all instances of consent rights.

1        I would call to your attention the decision in In

2   re UNR Industries Inc., 30 B.R. 609 (Bankr. 1983).

3   Specifically if you look at Pages -- at Page 612.  I think

4   the consent -- I think the consensual agreement on consent

5   rights can be constructive and helpful.  But that is not

6   necessarily the uniform law with respect to whether or not

7   it's an appropriate restriction on a Debtor's business

8   judgment.  So I will approve it here, but one shouldn't

9   think that that automatically means that any time consent

10  rights are at issue, that that will be the Court's ruling.

11       So this is approved on an interim basis, second

12  interim basis.

13       MR. KWASTENIET:  Thank you very much, Your Honor.

14  That brings me to the next item, which is the Bitcoin Sale

15  Motion.

16       Your Honor, we received a number of different

17  objections to this motion, and we've receive official

18  signoff on the revised proposed form of order from a few.

19  And I believe that we have addressed the concerns through

20  revisions to the order.  But obviously the parties are

21  present and can speak for themselves.

22       But Your Honor, basically pursuant to this motion,

23  the Debtors seek the authority to sell bitcoin that's

24  generated by the mining debtor to sell it for cash in arm's

25  length third party transactions and to use the cash proceeds

Page 79

1    of those sales to fund the expenses of the mining debtor.  I

2    will say at the outset, Your Honor, you astutely note that

3    the mining debtor is cashflow negative in the near-term.

4    And I will represent to Your Honor that that is because the

5    mining debtor is in the process of building out and

6    finishing its business.  It's finishing construction of its

7    own housing facilities in Texas and it's facilitating taking

8    delivery of equipment and making deposits for power

9    contracts.  So we are still in the capital-intensive part of

10   the business.  And also, importantly, we don't yet have all

11   of the rigs, the mining rigs.  These are essentially

12   computers that are used to do the bitcoin mining and

13   verification transactions.  We don't have all of those

14   deployed yet.

15           And so, we're getting the business stood up.  We

16   still have a lot of capital expenditure.  But there is a

17   plan that once the capital expenditures are done, the mining

18   rigs are all operational, that the company becomes very

19   accretive.

20           And Your Honor, I would also note that, you know,

21   with in the last, you know, six to eight months, when market

22   conditions were very different, admittedly, the company was

23   preparing and planning for, and it even drafted an S1, to

24   IPO the mining business.  And the bankers were talking

25   about, you know, potentially multibillion dollar valuations

Page 80

1    for this business.  And so it's -- timing is everything and

2    we missed it on that one, Your Honor.  But that said, you

3    know, essentially, where we are, our perspective is, having

4    committed so much already, in the development of the mining

5    business, and starting construction and ordering the rigs,

6    that it makes sense to go the last mine.  We're essentially

7    on the -- we're inside the 10-yard line, if you will, Your

8    Honor, in terms of completing this business.  And if we

9    don't complete the business --

10            AUTOMATED VOICE:  Join the meeting.

11            MR. KWASTENIET:  -- we think we risk destroying a

12   lot of value.  So, it just -- we're sort of pot committed,

13   if you're a poker player.  It just makes sense to see this

14   through and complete it.  Even though we are, like capital

15   users, in the next few months, until things turn around.

16            And one of the reporting obligations, Your Honor,

17   that we've agreed to, with the Committee, and we'll share

18   with the US Trustee, is a more detailed mining-specific

19   business plan, so that people can understand, you know, what

20   that looks like and when it's going to turn around; what are

21   the variables that go into the profitability; its power

22   price, and it's the price of bitcoin.  Not surprisingly,

23   those are two of the biggest drivers of whether this

24   business is successful.  But we believe it is a core asset

25   and we've had a number of conversations with the US Trustee

Page 81

1      and the Committee.  And this is one of those things, you

2      know, that between now and our next hearing, I think we're

3      going to be providing a lot more diligence and information.

4      And it's also something that, if people think is

5      inappropriate, or shouldn't be included in a budget, it's

6      something that people will have the opportunity to revisit

7      with us and with Your Honor as needed.

8              THE COURT:  Let me ask you this:  The proposal for

9      selling mined bitcoin for cash, is that a change from the

10     company's business model previously?

11             MR. KWASTENIET:  Your Honor, as I understand it,

12     in the leadup to the petition date, the mining business

13     really kicked off last year, and generated a little over

14     3,000 bitcoin.  As I understand it, substantially all of

15     those were sold to raise cash to use in its business.

16     Because when you're buying computer rigs and signing power

17     contracts and you're constructing buildings, you've got a

18     company that has a lot of cash-based expenditures.  The

19     employees get paid in cash, you know, your vendors.

20             And so, and similarly this year, Your Honor, in

21     the leadup to the filing, the company had generated a few

22     thousand more bitcoin.  And my understanding is,

23     substantially, all of those were sold for cash, and the cash

24     proceed were plowed back into the business.  And that's

25     exactly what we're proposing to do.  We've got a number of

Page 82

1    objections, Your Honor, and I just want to be very clear

2    about this.  We got objections that we shouldn't be able to

3    use the bitcoin that we mined, to resume speculative

4    trading, investment activity, loaning it, pledging it, you

5    know, etc.  All we are proposing to do is, arm's length,

6    third-party sales.

7            Now, we do have to, for the time being, until we

8    can set up our own mining trading account, we have to send

9    it up to the parent --

10           AUTOMATED VOICE:  Join the meeting.

11           MR. KWASTENIET:  -- (indiscernible) who has the

12   trading business.  They will trade it, and then send the

13   cash proceeds back down.  And we've agreed, in the proposed

14   form of order, super priority claims and obligations to

15   returns, and deemed held in trust, to make sure that there's

16   not any value leakage in that transfer.

17           But Your Honor, the company has told me that this

18   is entirely consistent with what they did with substantially

19   all the bitcoin that they mined before the petition date.

20           THE COURT:  Ms. Milligan, do you want to be heard?

21           MS. MILLIGAN:  Yes, Your Honor.  Can you hear me?

22           THE COURT:  Yes, I can.

23           MS. MILLIGAN:  Good afternoon, Your Honor, Layla

24   Milligan, with the Texas Attorney General's Office,

25   appearing on behalf of the State, Texas State Securities

Page 83

1    Board.  Thank you, Your Honor, for allowing me to appear

2    before you today.

3            The Securities Board did file an objection to the

4    Debtor's motion, at Docket number 371, in a supplemental

5    exhibit at Docket number 453.

6            Our concerns with the motion and the proposed

7    order, at the time that we filed our objection, were largely

8    with the ambiguity of the pleading and the order, in that it

9    appeared that the Debtor was seeking to, or seeking

10   permission to begin investing in hypothecating, and pledging

11   the bitcoin as it did prepetition, which was of great

12   concern to the Texas Securities Board, as well as the

13   Securities --

14           THE COURT:  You've got lots of (indiscernible)

15   securities regulators to sign on in your supplement.

16           MS. MILLIGAN:  Yes, Your Honor.  There was grave

17   concern in the Debtor beginning its investment processes

18   again, as it did prepetition.  In the interim, we've had

19   multiple conversations with the counsel for Debtor, counsel

20   for the Committee, the US Trustee.  And we greatly

21   appreciate your willingness to share information.  And we

22   did see that a revised order was filed, I believe, at Docket

23   number 474.  And that order does --

24           AUTOMATED VOICE:  Join the meeting.

25           MS. MILLIGAN:  -- lay out that -- it removes the

Page 84

1      references to investment hypothecation pledging.

2              MAN 1:  Hold for (indiscernible).

3              MS. MILLIGAN:  It's cash only, and it is specific

4      as to how the Debtors would use those funds, and provides

5      oversight by the Committee and the US Trustee, that we agree

6      are appropriate.

7              So, in light of the changes that have been made to

8      that order, that we have seen on the Docket, we believe our

9      concerns have been addressed.

10             THE COURT:  Thank you very much, Ms. Milligan.

11     Ms. Cornell, do you want to --?

12             MS. CORNELL:  Thank you, Your Honor, this is Shara

13     Cornell on behalf of the Office of the United States Trustee

14     again.

15             While we appreciate the Debtor's efforts, since

16     our objection was filed, our office is still not in

17     agreement on this motion.  As of today, we still do not know

18     what expenses are being paid or what bitcoin is being sold.

19     And we believe it's premature to approve anything until we

20     have transparency into the bitcoin mining and the cost for

21     running it.

22             We need more information so we can make a reasoned

23     determination.  We don't have an opinion one way or another

24     yet, because we don't have that information yet.  And it's -

25     -

1          THE COURT:  (indiscernible) ask you this.  This

2     concerns the sale of bitcoin.  They have (indiscernible)

3     inventory and they're going to be creating additional

4     bitcoin through the mining operation.  If they're selling

5     bitcoin for cash, does it matter whether it's bitcoin that's

6     in inventory already or newly mined?  Isn't it fungible?

7          MS. CORNELL:  In theory, yes.  But the use of the

8     proceeds to fund the bitcoin mining, which is what the

9     Debtors intents are, requires more information.  We know

10    what the Debtors expect to generate, but we have no idea how

11    much it's going to cost to generate any of that.  And at

12    this --

13         THE COURT:  Part of my concern about it, it

14    appeared to me that this business was going to be, of

15    mining, was going to be cashflow negative for some period of

16    time in the future, but …  Are you challenging the Debtor's

17    business judgment to pursue the mining business?  Because

18    that's what it sounds like.

19         MS. CORNELL:  No, Your Honor.

20         THE COURT:  They've made a business judgment that

21    despite the short-term cashflow negative nature of the

22    business, that longer term, this is important to their

23    business operations.  And they make the business judgment,

24    that this is how they want to proceed.  They've addressed

25    the concerns that the US Trustee has raised, and that the

Page 86

1    Texas security regulators have raised, to assure that

2    they're not resuming other investment activities, that the

3    bitcoin would be sold only for cash.  So, you seem to be

4    challenging their business judgment as to pursuing this

5    business of mining and sale of bitcoin; whether it's bitcoin

6    coming from inventory or newly mined bitcoin.

7              MS. CORNELL:  You know, we're not -- that's not

8    our intention.  And I think our objection shows what we're

9    really concerned with in this case is transparency.  And we

10   don't have that type of visibility in some mining

11   operations.  For example, we have no understanding, at this

12   point in time, what the Debtor's utility-related costs are

13   for running these mining rigs.  We're just looking for some

14   more information.  And in that same vein, at this point in

15   time, our office is seriously considering the appointment of

16   an examiner to address these rampant transparency issues,

17   with this motion and with others.

18              The Debtor mentioned that they will eventually

19   file or provide a detailed mining plan.  Then maybe what we

20   need to do is put this motion on hold until we have more

21   information, so that all the parties can better understand

22   what the Debtor's intentions are, and what the Debtor's

23   business goals can actually accomplish with the use of this

24   motion.

25              THE COURT:  Thank you, Ms. Cornell.  Does anybody

1    else --

2              MR. WOFFORD:  Your Honor --

3              THE COURT:  No, stop.  Does anybody else wish to

4    be heard in opposition to the motion.

5              MR. WOFFORD:  Your Honor, not in opposition, but

6    merely from the Committee, when you are ready.

7              THE COURT:  Go ahead, please, go ahead.

8              MR. WOFFORD:  Your Honor, Keith Wofford from White

9    & Case on behalf of the Committee.

10             The Committee has not made an ultimate

11   determination or, frankly, any determination on the ultimate

12   viability of the mining business.  It is a focus of our

13   broader continuing investigation, and we have substantial

14   diligence requests, as the Debtor's counsel noted, with

15   respect to, particularly, some of the issues which have been

16   raised:  the incremental capital expense being undertaken in

17   Texas; the additional miners being purchased.

18             But the fact of the matter, you know, is that,

19   regardless of the outcome of that inquiry, with respect to

20   which the Committee's mind remains completely open, there is

21   a 41,000 mining rig operation currently installed and in

22   progress, that has expenses.

23             THE COURT:  But not all of those rigs are

24   operational, as I understand it.

25             MR. WOFFORD:  The 41,000, Your Honor, I believe

Page 88

1    are.  But then they have an incremental 40,000 that are not.

2    But in any event, Your Honor, you rightly note that there

3    are questions to be answered, and the Committee had the same

4    concerns that were expressed about the relatively ambiguous

5    term, 'monetization,' that appeared in the original order.

6    And through the means that have been described already, Your

7    Honor, and I won't rehash them, we feel we've adequately

8    addressed them, at least in terms of preserving the status

9    quo, while allowing the incremental liquidity to be made

10   available; rather than minding -- effectively, putting out

11   cash expenses, and remaining (indiscernible) bitcoin and,

12   effectively, speculating in bitcoin, with respect to funding

13   the cost of the mining operation.

14         THE COURT:  Thank you, Mr. Wofford.  Ramsey G.,

15   I'll give you a brief chance to address it.  You've got your

16   hand raised.

17         MR. CASTANEDA:  Hey, can you hear me?

18         THE COURT:  Yes, I can.  Go ahead.

19         MR. CASTANEDA:  So, I wanted to address -- I mean,

20   also as well, you guys's concerns about the mining business.

21   It doesn't, to me, it doesn't make sense to keep expanding,

22   to keep adding more rigs, and then to liquidate the bitcoin

23   into cash to fund the business.  It doesn't seem like it's

24   in the interest of creditors, because this seems like a

25   stretch, to be able to get back -- what is it, billions of

1    dollars, to the customers, for this, for just doing this

2    mining business.

3             You know, we didn't sign up to be part of a mining

4    business.  You know what I mean?  We signed up to be part of

5    a exchange.  And this kind of deviates completely away from

6    the point of what we were trying to do.

7             But as a fellow miner, I just don't see it being

8    very profitable in the long run, and being able to make

9    creditors whole, or even, you know, a fraction of that.

10            THE COURT:  All right, thank you.  Mr. Kwasteniet,

11   do you want to briefly reply?

12            MR. KWASTENIET:  I do, briefly, Your Honor.

13            THE COURT:  You just need to identify yourself

14   each time you speak to the record.

15            MR. KWASTENIET:  Yes, thank you.  Ross Kwasteniet

16   from Kirkland & Ellis on behalf of the Debtors.  Again, Your

17   Honor, we believe, whether people agree with it or don't

18   agree with it, it was our business judgment, at a point in

19   time when we had significantly more assets under management,

20   to make a, what we thought, was a diversifying investment in

21   a mining business.  Given the drop in crypto, the run on the

22   bank, the mining business looks like an outsized part of our

23   portfolio, but it was a much smaller part back when we

24   entered into it.

25            Again, from our perspective, we would be burning

Page 90

1    the value of our investment effectively, were we to stop

2    now, while we're like mid construction on a facility in

3    Texas, and we're mid taking delivery of the final rigs.  And

4    so, we completely accept that parties will need to evaluate

5    what's the best long-term, you know, use of this asset.

6              Again, not long ago, we were talking to bankers

7    about an IPO at a multibillion-dollar valuation, and it was

8    looking like a genius operation, and could, in fact, be a

9    crown jewel.  And could, in fact, once we get to the break-

10   even and generative phase of the business, after we pay the

11   startup costs, we think that this could be an asset that

12   provides material coin into the system, that helps make up

13   for the shortfall; all topics that we want to discuss to

14   discuss with the creditors.  And all we're talking about

15   right now is the limited authority to continue to do what we

16   did prepetition, which is to sell the bitcoin that we

17   generate, to fund the expenses.  And we will be providing

18   more detailed financial information and budgeting and

19   forecasting, to the Committee, to the US Trustee.

20             And I do submit, Your Honor, that the US Trustee

21   is effectively, you know, calling into question our business

22   judgment.  Which, I suppose, if we're doing something that

23   is so manifestly wasteful, you know, that may be a

24   perspective.  But the Committee, who is the economic party

25   and interest here, does not have -- they're reserving

1    rights, but they're not opposing this motion.  And I think

2    that they understand that, our rationale for wanting to

3    continue.

4              THE COURT:  I've heard enough on this.  So,

5    pending before the Court is the Celsius motion for the Court

6    to approve, on a post-petition basis, in the ordinary course

7    of business, the sale, the mining and sale of bitcoin.  The

8    motion was filed as ECF Docket number 187.  A revised order

9    has been submitted.  I think that there has been important

10   negotiation with the Committee.

11             Ms. Cornell, on behalf of the US Trustee, has

12   certainly expressed the concerns that the US Trustee has

13   about this.  Ramsey G. has likewise expressed his concern.

14             At bottom, I think this is a business judgment

15   decision.  It may turn out to be very wrong.  But we will

16   see.

17             AUTOMATED VOICE:  Join the meeting.

18             THE COURT:  And I'm going to go ahead and grant

19   the motion on an interim -- well, grant the motion as

20   revised.  I need to mute for a second.

21             (PAUSE)

22             THE COURT:  So, that motion is granted and the

23   order will be in.  All right, let's go onto the next.

24             MR. KWASTENIET:  Thank you, Your Honor.  I'm going

25   to cede the podium to my colleague, Ms. Heide Hockberger,

1    who is going to take up the next item on the agenda.

2            MS. HOCKBERGER:  Good afternoon, Your Honor, Heide

3    of Kirkland & Ellis on behalf of the Debtors.

4            The next item on the agenda is the Debtors de

5    minimis asset sales procedures motion, which is filed at

6    Docket number 189.  This motion requests approval for

7    procedures for the Debtors to sell or abandon certain de

8    minimis assets without the need for a separate motion and

9    court approval.  The purpose of this motion is to allow the

10   Debtors to officially monetize de minimis assets to bring

11   more cash into the system, similar to the takeaway motion,

12   and use that cash for their general operating expenses.

13           The US Trustee and the Unsecured Creditors

14   Committee filed objections requesting certain revisions to

15   the proposed order, and certain shareholders of Celsius

16   Network Limited provided information comments as well.

17           So, following lengthy discussions with these

18   parties, we believe we resolved all objections via the

19   revised order that we filed at Docket number 499.

20           I apologize that these discussions took so long

21   that we filed the revised order right before the hearing.

22   So, I expect that Your Honor has not --

23           THE COURT:  I guarantee you I have not looked at

24   the revised order.

25           MS. HOCKBERGER:  I'm happy to summarize those

Page 93

1    changes or walk through the redline, whatever Your Honor

2    approves.

3              THE COURT:  Let me raise -- let me put my issue.

4    I don't know whether this was an issue with any of the

5    objectors.  But I have approved similar orders before, never

6    with a $1 million floor, before anybody can object or slow

7    down or prevent a sale.  That's a lot of money.  I don't

8    know whether there's been any change on that score.

9              I've, you know, what I've done in the past is,

10   included it in a very short objection, you know, notice and

11   objection procedure.  And if you don't receive any

12   objections, fine, you go ahead and sell.  But if you receive

13   an objection, you can't go ahead and sell it without

14   approval of the Court.  But that $1 million, that's a lot of

15   money.

16             MS. HOCKBERGER:  Understood, Your Honor.  And that

17   was one of the objections that various parties raised.  And

18   we've reduced that floor to $300,000.  So, instead of a, for

19   this kind of two-tier -- with $1 million, then $5 million,

20   and ow it's $300,000 and $4 million; so, under $300,000 both

21   sales.  We provide notice to the various notice parties, as

22   specified in the revised order.  And then parties, both

23   parties have an opportunity to raise any objections, and

24   then we can resolve those or bring them to Your Honor.

25             And then, between $300,000 and $4 million, those

1    sales require filing and notice on the docket that gives

2    parties the opportunity to object.  And then, if there's no

3    objection, we can continue monetizing that, proceeding that

4    sale.  But if there are any objections that would, again, be

5    either resolved or brought before Your Honor.

6            THE COURT:  All right.  Anything else you want to

7    add before I turn to the Committee and the US Trustee?

8            MS. HOCKBERGER:  Just, happy to answer any

9    questions or walk through any other of the changes,

10   summarize --

11           THE COURT:  Well, I raised what my concern was.

12           MS. HOCKBERGER:  Got it.

13           THE COURT:  And so, let me turn to the Committee.

14           MS. HOCKBERGER:  Sure.

15           MR. PESCE:  We have no objection to -- I'm sorry,

16   Gregory Pesce, White & Case, for the record.  We have no

17   objection to the approval of the motion as modified, and we

18   thank the Debtor working with us to resolve our issues.

19           THE COURT:  Thank you, Mr. Pesce.  Ms. Cornell?

20           MS. CORNELL:  Thank you again, Your Honor.  Shara

21   Cornell on behalf of the Office of the United States

22   Trustee.

23           This order does not address our concerns, Your

24   Honor.  Since we filed our objection, we have received

25   additional information regarding the de minimis asset motion

Page 95

1    that creates more questions and more confusion amongst, I

2    think, anybody that had that information.  And it goes back

3    to what I was discussing earlier.  There's a lack of

4    transparency here.

5            The motion -- and we mention it in our objection -

6    - makes it sound as though the Debtor is selling office

7    furniture or similar --

8            THE COURT:  I didn't understand that they were

9    selling office furniture --

10           MS. CORNELL:  Or similar hard-type assets that

11   they no longer need.  And one of our questions in our

12   objection had to do whether or not that might be mining

13   equipment.  Well, we were informed that it was not, in fact,

14   mining equipment.  But what they're actually looking to sell

15   are equities and stocks.  And that, in our opinion, is not a

16   de minimis asset, that should be sold through a de minimis

17   asset motion.

18           First, it wasn't clearly, it wasn't made clear in

19   the motion at all, that those were the assets that were

20   being sought to be sold.  And those types of assets should

21   be made clear and they should be pursuant to a sale motion.

22           THE COURT:  Well, what stock are they talking --

23   did you find out what stock they're talking about?

24           MS. CORNELL:  No.  We received some intelligence

25   about the extent of the equities.  But the book value of the

Page 96

1    equities that they provided, just to my office -- I'm not

2    sure what else was provided to other parties, is not a de

3    minimis asset.  You know, we're talking millions of dollars'

4    worth of assets here.

5              THE COURT:  Also, if the threshold is set lower,

6    they have to provide notice.  And you have an opportunity to

7    object.

8              MS. CORNELL:  No, and I understand that, Your

9    Honor.  I just don't think that what they're actually

10   seeking to be sold was described in the motion.  We saw

11   itemized up to $210 million, in our, you know, information

12   received from the Debtors, and that just was not in the

13   motion whatsoever.  And I don't believe that there's been

14   transparency into what the Debtor's true intentions are with

15   respect to what they're deeming to be de minimis assets.

16             THE COURT:  Ms. Hockberger, can you address the

17   issue of what assets the Debtor was thinking about selling?

18             MS. HOCKBERGER:  Yes, Your Honor, absolutely.  So,

19   it's -- that's correct, it's equity interest in certain

20   other kind of strategic investments, other crypto-related

21   companies.  Some if it is notes or bonds that the company

22   holds that are issued by other, generally, crypto companies.

23             And Ms. Cornell, if you're able to send us what

24   your further questions are, we'd appreciate that, and we can

25   get you that information.

1              THE COURT:  Let me tell you what I'm going to do.

2      I'm not resolving this motion today.  You need to confer

3      further with the US Trustee and the Committee.  I'm

4      concerned -- certainly, I had no inkling that the Debtor was

5      proposing to sell millions of dollars of equity or notes,

6      investments, in other crypto businesses.  Those are not what

7      I would ordinarily consider to be de minimis assets.  So, I

8      want some better definition.

9              And to the extent that you can't resolve as to

10     what assets can be sold, then it absolutely has to be on

11     notice.  So, the notice has to provide clear notice of what

12     it is the Debtor is proposing to sell, and the US Trustee

13     and the Committee, or anybody else if they wish, can file

14     objections and I'll hear them if you can't resolve them.

15     But I'm concerned by the issues that Ms. Cornell has raised.

16     So, I'm not resolving this motion until you try and work it

17     out further with the US Trustee.

18             MS. HOCKBERGER:  Understood, Your Honor.  Thank

19     you.

20             THE COURT:  Thank you.

21             MS. HOCKBERGER:  So, if it' all right with Your

22     Honor, I'd like to skip the next item on the agenda, the

23     wages motion, and turn to the assumption of rejection

24     procedures motion.

25             THE COURT:  Sure.  I think that was uncontested,

1    wasn't it?

2              MS. HOCKBERGER:  That's right.

3              THE COURT:  Does anybody else want to be heard on

4    the Assumption Rejection Motion?  I've reviewed them all and

5    I just -- there were no objections to this.  Let me see

6    whether anybody else wants to be heard.

7              CLERK:  Someone's raising their hand, judge.

8              THE COURT:  Mr. Bralver excuse me, Mr. Bralver.  I

9    can't her you, you must be muted.  You're muted, Mr.

10   Bralver.  You're still muted.

11             MR. BRALVER:  Can you hear me now?

12             THE COURT:  Now I can hear you.  Go ahead.

13             MR. BRALVER:  Very good.  Your Honor, I want to

14   ask you one question.  Is CEO, in the shareholders and the

15   stakeholders, the people who are at the top, like Mashinksy

16   and Goldstein, are they still getting paid while we have our

17   accounts frozen?  And can I make a request that their

18   payment be stopped.

19             THE COURT:  Mr. Bralver, we're on to specific

20   motions.  I'm not getting diverted from it.  If you have any

21   objections to this specific motion, I'll give you an

22   opportunity.

23             MR. BRALVER:  My objection is that --

24             THE COURT:  Mr. Bralver?

25             MR. BRALVER:  Yes?

1           THE COURT:  I only want to hear specific

2     objections to the specific motion that we're discussing now.

3     Do you have objections to the specific motion that we're

4     discussing now?  Do you have objections to that specific

5     motion?

6           MR. BRALVER:  I regress.  I will regretfully stand

7     back.  Sorry, Your Honor, my respect to you.

8           THE COURT:  All right.  Anybody else wish to be

9     heard?  All right, the Assumption Rejection Motion, which is

10    filed as ECF Docket number 185, is granted.

11          MS. HOCKBERGER:  Thank you, Your Honor.  Next item

12    on the agenda is the Debtor's Case Management Procedures

13    Motion, filed at Docket number 15.  Again, there were no

14    objections filed to this motion.  So, unless Your Honor has

15    any questions.

16          THE COURT:  Does anybody wish to be heard with

17    respect to the Case Management Motion?  Let me just make a

18    comment generally.  In other cases, in an early stage in the

19    case, I've approved similar case management motions.  But a

20    case develops, it may be that amendments or changes are

21    needed.  So, the fact that I'm prepared to approve this

22    motion, does not prevent me or parties raising an issue,

23    whether any of the case management procedure (indiscernible)

24    should be altered.  Does anybody wish to be heard?  There

25    were no objections as to this one.  Does anybody wish to be

Page 100

1    heard on this motion?  All right, it's granted a well.

2            MS. HOCKBERGER:  Thank you, Your Honor.  The next

3    item on the agenda is the Debtor's Ordinary Course

4    Professionals Motion, filed at Docket number 190.  We filed

5    a revised order last night, and no objections were filed.

6    I'm happy to be answer any questions.

7            THE COURT:  Ms. Cornell, your office, from time to

8    time, this is something they look at carefully.  Are you

9    satisfied with this motion and the order?

10           MS. CORNELL:  I'm sorry, Your Honor.  Can you

11   repeat that?  My internet cut out.  I apologize.

12           THE COURT:  That's okay.  My question was, your

13   office often looks very closely at ordinary course

14   professional motions.  And I just wanted to be sure that you

15   and your colleagues were satisfied with this proposed order.

16           MS. CORNELL:  Yes, Your Honor.  We discussed at

17   length with counsel for the Debtors.  Thank you.

18           THE COURT:  Does the Committee want to be heard on

19   this too?

20           MR. PESCE:  Gregory Pesce for White & Case for the

21   Committee.  No, Your Honor.  We don't have any comment on

22   this one.  We support it.

23           THE COURT:  It's granted.  Thank you very much.

24           MS. HOCKBERGER:  Thank you, Your Honor.  The next

25   item on the agenda is the Debtor's Interim Compensation

Page 101

1     Procedures Motion, filed at Docket number 186.  We also

2     filed a revised order for this one, and there were no

3     objections filed.

4              THE COURT:  Does anybody wish to be heard with

5     respect to the Interim Compensation Motion, which is ECF

6     186?  All right, the motion is granted.

7              MS. HOCKBERGER:  Thank you, Your Honor.  Now for

8     the balance of the agenda, I'd like to turn the podium to my

9     colleague Alison Wirtz.

10             MS. WIRTZ:  Good afternoon, Your Honor.  For the

11    record, Alison Wirtz from Kirkland & Ellis, proposed counsel

12    for the Debtors.  As Ms. Hockberger mentioned, I'll be

13    taking us through the remaining items on the agenda.  And

14    we'll start slightly out of order, with item number 4, the

15    Wages Motion.

16             The Wages Motion was filed at Docket number 19,

17    and the interim order was entered at Docket number 61.  As

18    stated at the first day hearing, we did not seek to pay non-

19    insider severance, non-insider ad hoc bonuses or continue

20    the equity incentive plan on an interim basis.  But we

21    initially sought relief to do so on a final basis.

22             In their response to this request, the US Trustee

23    and the Committee both filed objections highlighting these

24    three programs.  These are located at Docket number 413 and

25    402, respectively.

Page 102

```
1              Following further discussions with both parties,
2    the Debtors provided additional diligence, and after
3    negotiation, agreed not to continue the ad hoc bonus program
4    or the equity incentive program.  The Debtors also agreed to
5    pay prepetition severance allegations, only out to the
6    statutory cap that's set for in 507(A)(4) of the Bankruptcy
7    Code.
8              Given additional discussions with the US Trustee
9    as early as last night, we propose to adjourn the narrow
10   issue of prepetition severance to the September 1 hearing.
11   And proposed to move forward with the rest of the relief
12   we're seeking on a final basis today.  Accordingly -- you
13   know, in sum, we believe this is the most efficient
14   resolution for the narrow outstanding issues related to the
15   prepetition severance.  And we plan to file additional
16   evidentiary support for doing so.
17             In the meantime, though, we filed a revised
18   proposed order at Docket number 473, and we did so early
19   this morning, Your Honor.  So, I would be happy to walk
20   through any of the changes that we made.  Otherwise, I will
21   let the other parties speak at the time.
22             THE COURT:  Let me hear -- the Committee filed an
23   objection, which is at ECF 402.  Let me hear from the
24   Committee first.
25             MR. PESCE:  Sure.  Gregory Pesce for White & Case
```

1    on behalf of the Committee.

2              We did file an objection to this particular

3    motion.  Our concern was largely focused on the bonus

4    programs, the cash bonus program, and then the stock bonus

5    program.  Those were both removed.  And in terms of

6    severance, we had some additional diligence information that

7    we've requested.  My understanding -- we've reached an

8    accommodation on making sure severance payments don't exceed

9    the stator cap, which was sort of sleeves off our vest,

10   because that would mean our constituency couldn't get a

11   recovery anyway until those were paid.

12             Our understanding is it says no payments over the

13   cap.  And then, a to the remainder, that's being deferred to

14   September 1, with the United States Trustee.  But, as

15   presented today, on the other points, we support approval of

16   this motion.

17             THE COURT:  Thank you, Mr. Pesce.  Ms. Cornell?

18             MS. CORNELL:  Shara Cornell on behalf of the

19   Office of the United States Trustee.  That is correct, Your

20   Honor.  And we appreciate the Debtor's willingness to sever

21   those remaining issues, that we can move forward.  Thank

22   you.

23             THE COURT:  All right, the motion is granted with

24   the changes that have been (indiscernible).

25             MS. WIRTZ:  Thank you, Your Honor.  And with that,

Page 104

1    I'll take us through the remaining items on the agenda, all

2    of which are uncontested.  So, I will try and move quickly.

3            The next item up on the agenda is Item number 4 of

4    the uncontested motions, the Critical Vendors Motion; which

5    was originally filed at Docket number 20, and --

6            THE COURT:  Actually, Item number 5 on the agenda,

7    on the revised agenda.

8            MS. WIRTZ:  Yes.  Apologies.

9            THE COURT:  Go ahead.

10           MS. WIRTZ:  So, by this motion, we're seeking a

11   total of $6.52 million in aggregate on a final basis.

12   Following the appointment of the Committee, we've worked

13   with the advisors to provide additional diligence and bring

14   them up to speed on the various vendors.

15           AUTOMATED VOICE:  Join the meeting.

16           MS. WIRTZ:  We also have provided significant

17   diligence to the US Trustee as well.  And going forward, we

18   plan to engage with both parties and have taken their input

19   on a revised proposed order; which was filed at Docket

20   number 469.

21           As such, happy to walk through any of the

22   particular changes that were made to the order.  Otherwise,

23   we respectfully request that the Court enter the order.

24           THE COURT:  All right, let me turn to Mr. Pesce

25   first.  The Committee filed a limited objection.

Page 105

1              MR. PESCE:  Likewise with our other resolutions

2      here, we appreciate the Debtor working it out with us.  We

3      would request that the Court approve the motion today.

4              THE COURT:  All right.  Does anybody else want to

5      be heard on this?  No one else filed any objections.  All

6      right, it's granted.

7              MS. WIRTZ:  Thank you, Your Honor.  I will next

8      take us to the Insurance Motion, which was filed at Docket

9      number 16, and the interim insurance order that was filed at

10     Docket number 59.  We're seeking entry of a final order

11     requesting authority to pay any and all obligations that may

12     arise under the Debtor's insurance policies and surety bond

13     program in the ordinary course.

14              Unless Your Honor has any questions, or would like

15     me to walk through any of the changes on the order, we would

16     respectfully request entry of this final insurance order.

17              THE COURT:  All right.  No responses were filed on

18     this.  Is there anybody wants to be heard?  All right, it's

19     granted.

20              MS. WIRTZ:  Thank you, Your Honor.  The next item

21     on the agenda is the NOL Motion, which was filed at Docket

22     number 5, and an interim order was filed at Docket number

23     58.  We filed a revised proposed final order at Docket

24     number 463.  Following the first day hearing, we had

25     received some comments from the Committee, as well as the US

Page 106

1    Trustee, regarding a final NOL order, and have worked

2    through those comments.

3           So, unless Your Honor has any questions, or would

4    like me to walk through the changes to the order, we would

5    respectfully request entry of the final NOL order?

6           THE COURT:  Does anybody else which to be heard?

7    It's granted.

8           MS. WIRTZ:  Thank you, Your Honor.  The next item

9    on the agenda is the Taxes Motion, which was filed at Docket

10   number 17.  The taxes interim order was filed at Docket

11   number 62.  Again, we received some informal comments from

12   the Committee and the IRS, and were able to incorporate

13   language into the revised proposed order that we filed at

14   Docket number 466.  Unless Your Honor has any questions, we

15   respectfully request entry of this order.

16          THE COURT:  Does anybody else wish to be heard?

17   It's granted as well.

18          MS. WIRTZ:  Thank you, Your Honor.  And finally,

19   the last item on the agenda is the Utilities Motion, which

20   was filed at Docket number 3.  By this motion, we're seeking

21   authority to provide adequate assurance to certain utility

22   provides and segregate, deposit approximately $20,508 into

23   an account for the benefit of the utility providers.  This

24   also sets forth certain procedures for providing adequate

25   assurance.

1          Following the appointment of the committee, we

2    discussed and negotiated certain additional language in this

3    order as well.  And unless Your Honor has any questions, we

4    would respectfully request entry of this order.

5          THE COURT:  Does anybody else wish to be heard?

6          MS. CORNELL:  Your Honor, Shara Cornell on behalf

7    of the Office of the United States Trustee, if I may.

8          THE COURT:  Please.

9          MS. CORNELL:  Thank you, Your Honor.  We don't

10   have an objection to the motion itself.  But I wanted to

11   note some confusion for the record.

12         We still have questions regarding the Debtor's

13   determination of what is a utility.  It's our understanding

14   that it costs millions to run a mining rig.  And so, there's

15   a lot of questions about how those types of utilities are

16   being paid.  The motion itself only references $15,000 in

17   utilities.  And obviously --

18         THE COURT:  I must say, I was surprised by the

19   amount of electricity that has to be used to run the mining

20   operation.

21         MS. CORNELL:  So, there's a lot of questions about

22   that.  We think … we were told there's some type of third-

23   party payment, but we don't have full visibility into what

24   that program is or what those costs are.

25         THE COURT:  Your Honor, the one thing I could tell

Page 108

1   you, Ms. Cornell, is I've had utilities scream bloody murder

2   when they thought they haven't been getting enough.  And if

3   they were served with notice -- and they have filed anything

4   -- but I'll ask Ms. Wirtz if she could briefly address this

5   issue.

6           MS. CORNELL:  Thank you.

7           THE COURT:  They've got to be spending a lot of

8   money on electricity.

9           MS. WIRTZ:  Certainly, Your Honor, happy to

10  discuss this further.  So, as Ms. Cornell noted, seeking to

11  provide adequate assurance to the list of utilities that the

12  Debtors are in direct privity of contract with.  And these

13  tend to be more of the telecommunications side of the house.

14  In terms of the Debtor's regular way office space, many of

15  the utilities are provided for in the overall lease that the

16  Debtor signed.  So, the obligation to pay electricity, to

17  run the lights in, for instance Las Vegas or Hoboken --

18          THE COURT:  I don't think Ms. Cornell was

19  concerned about turning the lights on in the office.

20          MS. WIRTZ:  Okay.  Understand.  Moving on, so,

21  currently, and as has been previewed, we are in the process

22  of finalizing construction of the mining center.  The

23  Debtors have entered into a contract with Constellation

24  Energy, to provide electricity for the mining center.  And

25  we have listed them as a utility provider on the utilities

Page 109

1   schedule.

2          They have not, historically, provided a great deal

3   of utility expense, so we didn't have a ton of information

4   available at the time of the filing to put, you know, a

5   particular adequate assurance deposit down.  However, we do

6   have the procedures, and to the extent that they reach out

7   to us, we will continue to negotiate that.

8          In respect of the other current mining, operation

9   of the mining rig, we have engaged with a number of third-

10  party host providers, including EZ Blockchain,

11  (indiscernible) and Core Scientific.  And under these

12  contracts with these counterparties, there is a provision

13  for electrical --

14          AUTOMATED VOICE:  Join the meeting.

15          MS. WIRTZ:  -- (indiscernible) into the overall

16  contract.  And so, these contracts are typically prepaid

17  monthly.  And then, to the extent that the forecasted

18  electricity usage goes over or under, based on, you know,

19  the price and the amount of use throughout the month, then

20  there's a provision in the contract that allows for the

21  Debtors to either receive a slight credit, or to pay a

22  little bit more at the end of the month.  But these

23  relationships are contractual with these third-party hosting

24  providers, not direct utilities.  And so, we didn't feel it

25  appropriate to list any sort of third-party provider on the

Page 110

1    schedule of utilities, since we don't feel that those types

2    of entities should be given -- are what Congress was

3    intending when they drafted Section 366 of the Bankruptcy

4    Code.

5              THE COURT:  Well, we'll see (indiscernible) come

6    in screaming.  The motion is granted.

7              MS. WIRTZ:  Excellent.  Thank you, Your Honor.

8    And with that, that concludes our agenda for the day.

9    Again, we would like to thank you, your staff and everyone

10   else for the time.  We look forward to seeing you all again

11   for the September 1 hearing, and look forward to further

12   engagement with the US Trustee, the Committee, and all

13   stakeholders.

14             THE COURT:  Thank you very much.

15             MS. WIRTZ:  And I was going to say, Mr. Sussberg,

16   from our New York office, is standing up, so I'll cede the

17   virtual podium back to him.

18             THE COURT:  Go ahead, Mr. Sussberg.

19             MR. SUSSBERG:  I got nothing.  All set, Your

20   Honor.  Thank you for the time today.  Appreciate it.

21             THE COURT:  One Ryan Reck, who's raised his hand.

22   I will briefly recognize him.

23             MR. RECK:  Thank you, Your Honor.  My name is Ryan

24   Reck.  I am an investor, or depositor, with Celsius Network,

25   and I do have my funds in the Earn Account.  I have one

1    question and I have one comment.

2            My question is, when Celsius filed for chapter 11,

3    is their debt locked in USD terms, including the prices of

4    the assets when they filed for chapter 11?

5            THE COURT:  I'm not sure I completely understand.

6    I mean, they have to file schedules with their assets and

7    liabilities and --

8            MR. RECK:  Yes.  Are those debts locked in?

9            THE COURT:  I don't know what you mean about

10   locked in.  But Mr. Sussberg, maybe you can tell me, how are

11   assets and liabilities valued, really, the assets, valued

12   for the schedule, purposes of schedules.  I guess you

13   haven't filed your schedules yet.

14           MR. SUSSBERG:  Yeah, we haven't filed the

15   schedules yet, and I think Mr. Reck is hitting on an

16   important question, that there are lots of perspectives on

17   around the table.  What I would suggest is, we're working on

18   our schedules and statements.  I think that will provide a

19   lot of information for folks, including the Committee

20   Trustee and all our relevant stakeholders.  And as we get

21   those on file, people will digest them and then it will

22   center around conversations about claims, when they're

23   calculated, and who's the beneficiary.  So, more to come on

24   that.

25           THE COURT:  All right, thank you.

1          MR. RECK:  Okay, thank you.  And I do have one

2     comment, if you don't mind.

3          THE COURT:  Please.

4          MR. RECK:  So, my comment is, looking at Celsius

5     Network's balance sheet from the date of filing, obviously,

6     my previous question couldn't be answered exactly.  But that

7     was on July 13.  They had liabilities of approximately 5.5

8     billion.  And due to the crypto market rebound, it appears

9     that their current assets sit at approximately 4.8 billion.

10    And it's actually more if we include the company's own sell

11    token, which I'm kind of not including right now.

12          But with this said, I'd like the Court Trustee and

13    Committee to consider, or at least look into, a chapter 11

14    liquidation, in USD, for three reasons.  First reason is

15    Celsius Network does not have the necessary income to run

16    business operations normally without acquiring additional

17    debt.  I believe that Celsius Network needs to acquire

18    additional debt to run their general business operations.

19    This is, in fact, the telltale that they're using customers'

20    funds to pay out their interest rewards and, hence, running

21    an alleged Ponzi scheme.

22          I completely understand now that their customers

23    were financing their business operations instead of the

24    profitability of Celsius Network, allowing them to secure

25    their own financing and grow their business naturally.

```
 1              The second reason is the majority of creditors

 2    want to be reimbursed in kind crypto, which I completely

 3    understand; meaning that if they loaned bitcoin or Ethereum

 4    to Celsius, that they would be reimbursed bitcoin or

 5    Ethereum or other tokens, back.  My issue with this one, is

 6    that there are gas fees involved in paying back creditors in

 7    kind, and believe the expense of doing this will also

 8    minimize the recovery and the request -- the recovery.  And

 9    I request the Committee to use their resources to calculate

10    and submit the gas fees with any plans proposed.

11              And my final reason -- go ahead, sorry sir.

12              THE COURT:  Please, go ahead.

13              MR. RECK:  Okay.  And my final reason is, the

14    majority of customers, I believe, will withdraw their funds

15    when withdrawals are restored.  Considering the bulk of

16    their customers will withdraw, and the negative cash flow

17    business model that they're proposing at the moment, it's

18    hard to understand how Celsius Network will survive and

19    thrive.

20              Thank you, Your Honor for your time, and all

21    parties listening.

22              THE COURT:  Thank you, Mr. Reck.  Mr. Bralver,

23    I'll very briefly recognize you.

24              MR. BRALVER:  Your Honor, apologies for speaking

25    at the wrong time earlier.  I am sorry.  I am not a lawyer.
```

Page 114

1    And I chimed in at the wrong moment.  What I was trying to

2    ask was; recently, I read that the board holders are still

3    getting paid and they're getting paid exorbitant amounts of

4    money, while us accountholders have our moneys frozen.  And

5    I wanted to bring that to your attention and ask if that's

6    fair, and also if that is in the best interests of

7    everybody, while you're trying to solve how to save this

8    business and get everybody repaid?  I believe Mr. Mashinsky

9    and his board members were getting paid $4 million alone in

10   the week after the freeze happened in July.  I have nothing

11   else to say, but I wanted to ask if you were aware of that,

12   and what would be the appropriate action if they are still

13   getting paid.  Thank you.

14            THE COURT:  Mr. Bralver, I'm sure the Committee is

15   looking at issues such as that, but there's nothing on the

16   agenda today for me to deal with.  Mr. Lin, do you wish to

17   be heard?

18            MR. LIN:  Yes, thank you, Your Honor.  I'll try to

19   make this really quick.  It's a question aimed at attorney

20   Pesce's earlier statements and the Creditor Committee's plan

21   to track down and return crypto.  My concern is that

22   unaccredited earn depositors who chose to withdraw during

23   the 90 days preceding filing, could face potential claw

24   backs, either via USD value or any kind of crypto.  I'm

25   talking about non-insiders, non-institutional depositors.

Page 115

1   So, I'd like to know if this is a direction that the UCC is

2   taking.

3           THE COURT:  I think, if I could, Mr. Lin, you

4   ought to communicate directly with the UCC rather than

5   during a hearing.  Okay?  I'm not -- you certainly can raise

6   the issue, but that, you've got to raise it with the

7   Committee.  Okay?

8           MR. LIN:  Okay, thank you.

9           THE COURT:  Your hand is still raised, you've

10  already spoken.  I don't know whether you -- is there

11  something else you wanted to say?

12          MR. LIN:  No, that was it, thank you.

13          THE COURT:  Okay, all right.  Okay, Mr. Sussberg,

14  anything else for today?  You're muted.

15          MR. SUSSBERG:  No, Your Honor.  We are all set.

16  Really appreciate the Court's time.  Thank you.

17          THE COURT:  We'll see you on September 1.

18          MR. SUSSBERG:  Yes, sir.

19          THE COURT:  Okay.  We are adjourned.  Thank you

20  very much, everybody.

21

22

23          (Whereupon these proceedings were concluded at

24  4:16 PM)

25

Page 116

1                          I N D E X

2

3                             RULINGS

4                                        Page        Line

5

6     Consensual Cash Collateral Order Granted    77          24

7     Bitcoin Sale Motion

8

9     Motion as Revised Granted                   91          20

10

11    Assumption Rejection Motion Granted         99          11

12

13    Case Management Motion Granted              100         2

14

15    Ordinary Course Motion Granted              100         24

16

17    Interim Compensation Motion Granted         101         7

18

19    Wages Motion Granted                        103         24

20

21    Critical Vendors Motion Granted             105         7

22

23    Insurance Motion Granted                    105         20

24

25    NOL Motion Granted                          106         8

1                          I N D E X

2

3                            RULINGS

4                                               Page      Line

5

6   Taxes Motion Granted                         106        18

7

8   Utilities Motion Granted                     110         7

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 118

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    *(signature)*

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  August 18, 2022