TOGUT, SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Kyle J. Ortiz
Bryan M. Kotliar

*Counsel to the Ad Hoc Group of
Custodial Account Holders*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, et al. | Case No.:  22-10964 (MG) |
| Debtors.[1] | (Jointly Administered) |
| AD HOC GROUP OF CUSTODIAL ACCOUNT HOLDERS, <br><br> Plaintiff, <br> v. <br><br> CELSIUS NETWORK LLC; CELSIUS KEYFI LLC; CELSIUS LENDING LLC; CELSIUS MINING LLC; CELSIUS NETWORK INC.; CELSIUS NETWORK LIMITED; CELSIUS NETWORKS LENDING LLC; and CELSIUS US HOLDING LLC. <br><br> Defendants. | Adv. Pro. No. 22-_____ (MG) |

## COMPLAINT FOR DECLARATORY JUDGMENT

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

The Ad Hoc Group of Custodial Account Holders (the "Ad Hoc Group" or the "Plaintiff"), by and through its attorneys, brings this complaint (the "Complaint") against the debtors and debtors in possession (collectively, the "Debtors" or the "Defendants") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), and allege and state:

## SUMMARY OF ACTION[2]

1.      "Custody" wallets, a common feature in the cryptocurrency industry, allow users to safely store their digital assets online while retaining title to such assets— as opposed to offline in cold storage where they could be subject to loss.  In April 2022, the Debtors created a self-titled "Custody Service" where users entrusted their cryptocurrency to the Debtors in a "Custody Wallet" but retained title to such assets, unlike certain of the Debtors' other programs.  Also unlike certain of the Debtors' other programs, the Custody Assets would not generate interest or earn rewards.  The Custody Service was created following adverse actions taken against the Debtors by state securities regulators that jeopardized the Debtors' ability to continue to operate their business.

2.      In June 2022, the Debtors froze all withdrawals of cryptocurrency from their platform.  Since that date and since the Petition Date, the Debtors have not honored any withdrawals from any programs, including Custody Service, even though the Custody Assets—by the plain language of the Debtors' Terms of Use—provide that title to Custody Assets always remains with the user.

---

[2]    Capitalized terms used but not otherwise defined in this Summary of Action have the meanings ascribed to such terms below.  References to "Docket No. __" refer to documents filed on the main docket for the jointly administered Chapter 11 Cases under case number 21-10964 (MG).

3.      The Court made clear at various hearings that if Custody Assets are not property of the estate, such assets should be returned to users.  Following discussions with the Debtors and their advisors and the Creditors' Committee and its advisors, Plaintiff has been unable to obtain return of its Custody Assets, and the Debtors have not lifted the freeze with respect to Plaintiff's Custody accounts.  Upon information and belief, the Debtors have the identical type of (although, consistent with the Terms of Use, not the exact same) cryptocurrency in their possession, segregated from the Debtors' other business lines relating to what was transferred by customers to the Custody Wallet.  Thus, the Debtors have the ability to honor withdrawals of Custody Assets, but nevertheless, have refused to do so for months.

4.      The Debtors' continued refusal to honor withdrawals of all Custody Assets has created tremendous hardship on their users as set forth in hundreds of letters filed on the docket and in statements made by users at hearings in the Chapter 11 Cases.  As it is not the Debtors' property, the Debtors should not continue to hold Custody Assets during the Chapter 11 Cases and cannot use them to pay the Debtors' creditors' claims.

5.      Therefore, Plaintiff files this Complaint for a declaratory judgment that the Custody Assets are not property of the estate under section 541 of the Bankruptcy Code.

## THE PARTIES

6.      The Plaintiff is the Ad Hoc Group of Custodial Account Holders, which is comprised of a group of account holders represented by Togut, Segal & Segal LLP (the "Togut Firm") in connection with the Celsius Custody Service (as described

below).[3]  As of the filling of this Complaint, the Ad Hoc Group of Custodial Account

Holders is comprised of individual holders of 64 accounts that collectively held

cryptocurrency in the Custody Service valued at more than approximately $22.5 million

as of the Petition Date (as defined below).

7.      The Defendants are the Debtors in the above-captioned Chapter 11 Cases.

The Debtors' names and addresses are set forth in their voluntary petitions filed with

this Court.  The corporate organization of the Debtors, as well as their jurisdictions of

formation, are set forth in Exhibit A to the *Declaration of Alex Mashinsky, Chief Executive*

*Officer of Celsius Network LLC, In Support of Chapter 11 Petitions and First Day Motions*,

filed on July 14, 2022 [Docket No. 23] (the "First Day Declaration").

### JURISDICTION AND VENUE

8.      This adversary proceeding arises in and relates to the Chapter 11 Cases

pending before the U.S. Bankruptcy Court for the Southern District of New York

(the "Court") under chapter 11 of title 11 of the United States Bankruptcy Code

(the "Bankruptcy Code").

9.      The Court has jurisdiction over this adversary proceeding pursuant to

28 U.S.C. §§ 157 and 1334.  The adversary proceeding is a core proceeding pursuant to

28 U.S.C. §§ 157(b)(2)(A), (G) and (O).

10.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

11.     The statutory predicates for the relief requested herein are sections 105(a)

---

[3]     The members of the Ad Hoc Group of Custodial Account Holders are set forth in statements ("Rule
2019 Statements") filed by the Togut Firm from time to time pursuant to Rule 2019 of the Federal
Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  For the latest Rule 2019 Statement, *see
Verified Statement Pursuant to Bankruptcy Rule 2019*, filed on August 19, 2022 [Docket No. 547].
Additional members continue to join the Ad Hoc Group of Custodial Account Holders on an ongoing
basis, and the Togut Firm will file additional 2019 Statements as necessary to comply with
Bankruptcy Rule 2019.

and 541 of the Bankruptcy Code and Bankruptcy Rules 7001(1) and 7001(9).

**BACKGROUND AND FACTS**

**I.    Overview of Celsius**

12.    The Debtors refer to themselves as "one of the largest and most sophisticated . . . finance platforms in the world" and a provider of "financial services to institutional, corporate, and retail clients across more than 100 countries."[4]

13.    The Debtors were created "with a basic business model whereby users could transfer their crypto assets to Celsius and benefit from the opportunity to borrow fiat, or other digital assets, against those assets or earn rewards on those assets at more favorable rates than traditional banks or cryptocurrency platforms that merely store crypto assets."[5]

14.    The Debtors' business segments relating to the foregoing description are referred to as the Earn Program and the Borrow Program (each as defined below).  *See* Part I.A and I.B below.  A "small percentage of digital assets" transferred to the Debtors came from the "no yield 'Custody Service,' which has different terms of use . . . ."[6]  *See* Part II.C below.

**A.    Earn Program**

15.    Through the Debtors' "Earn" program ("Earn" or the "Earn Program"), users who transfer certain cryptocurrency to the Debtors receive "rewards" in the form of payment-in-kind interest or CEL Tokens (the Debtors' own cryptocurrency) on their

---

[4]    *See* First Day Decl. ¶ 1.

[5]    *See id.* ¶ 4.

[6]    *See id.* ¶ 1.

assets.[7]  According to the Debtors, as of the Petition Date, there were more than 600,000

Earn users, who had transferred approximately $2 billion in digital assets to the

Debtors, in the aggregate, with a market value of approximately $4.2 billion (as of July

10, 2022).[8]

16.     The Earn Program is governed by a "terms of use that form[s] the basis of

the contract between Celsius and its users . . . ."[9]  Upon information and belief,

acceptance of the Terms of Use is done as part of the account creation or "onboarding"

process, and users cannot create an account without accepting the Terms of Use.  The

Terms of Use are governed by New York law.[10]

17.     The Terms of Use applicable to the Earn program refer to earning a

"financing fee" from the Debtors—referred to as "Rewards"—in the form of "Digital

Assets (either in-kind, i.e., in the same Digital Asset you transfer, or in CEL Tokens,

where permitted)."[11]  Users earned this "financing fee" on the "loan of Eligible Digital

---

[7]   *See id.* ¶ 47.

[8]   *See id.* ¶ 49.

[9]   *See id.* ¶ 5.  All references herein to "Terms of Use" are to the latest version from April 14, 2022, a
copy of which is attached hereto as **Exhibit A** and was attached as Exhibit A-8 to the *Declaration of
Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, Providing Terms of Use Dating Back to
February 18, 2018*, filed on August 8, 2022 [Docket No. 393] (the "TOU Declaration").  In addition, as
explained below, the April 14, 2022 version of the Terms of Use was the only Terms of Use ever
applicable to the Custody Service (as defined below), as the Custody Service was created on April 15,
2022.

[10]   *See* Terms of Use § 33.

[11]   *See* Terms of Use § 4(D).  "Digital Asset" means "a digital representation of value in which encryption
techniques are used to regulate the generation of digital units and verify the transfer of assets,
operating independently from a central bank."

Assets you have transferred to Celsius in connection with the Earn Service . . . ."[12]

18.    The Terms of Use applicable to the Earn Program (a) "explicitly state that in exchange for the opportunity to earn rewards on assets, ***users transfer 'all right and title' of their crypto assets to Celsius including 'ownership rights'***" and (b) provide that the transfer of all right and title to cryptocurrency transferred to the Debtors under the Earn Program is in "***consideration***" for the rewards payable thereunder.[13]

19.    More specifically, the Terms of Use provide:

- "If our Earn Service is available to you, upon your election, ***you will lend your Eligible Digital Assets to Celsius and grant Celsius all rights and title to such Digital Assets***, for Celsius to use in its sole discretion while using the Earn Service."[14]

- "Once such Eligible Digital Assets are received by Celsius into your Earn balance, ***they shall be Celsius' property, in every sense and for all purposes*** . . . ."[15]

- "In consideration for the Rewards payable to you on the Eligible Digital Assets using the Earn Service . . . and the use of our Services, ***you grant Celsius***, subject to applicable law and ***for the duration of the period during which you elect to utilize the Eligible Digital Assets in the Earn Service*** (if available to you) and thus loan such Eligible Digital Assets to us through your Celsius Account . . . ***all right and title to such Eligible Digital Assets, including ownership rights***, and the right, without further notice to you, to hold such Digital Assets in Celsius' own Virtual Wallet or elsewhere, ***and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital***

---

[12]    *See id.* " Eligible Digital Asset" is defined as "the types of Digital Assets we may choose to designate for inclusion under one or more of the Services from time to time, which are subject to change and/or limitation in our sole discretion, based on business, regulatory and/or other considerations."

[13]    *See* First Day Decl. ¶ 4 (citing Terms of Use § 14); *id.* ¶ 47 ("In the Earn program, users transfer their digital assets on to the Celsius platform and all rights and title to such digital assets are transferred to Celsius."); *see also* Terms of Use § 13 ("In consideration for the Rewards payable to you on the Eligible Digital Assets using the Earn Service . . . .").

[14]    *See* Terms of Use § 4(D).

[15]    *See id.*

> ***Assets, separately or together with other property, with all
> attendant rights of ownership***, and for any period of time, and
> without retaining in Celsius' possession and/or control a like
> amount of Digital Assets or any other monies or assets, and to use
> or invest such Digital Assets in Celsius' full discretion."[16]

- With respect to cryptocurrency used by the Debtors pursuant to the
  Earn Program and the Borrow Program (as described below), users
  "acknowledge[d] that . . . [they] will not be able to exercise rights of
  ownership . . . ."[17]

20.    Pursuant to the Terms of Use, for cryptocurrency transferred to the

Debtors under the Earn Program, the Debtors are permitted to "***pledge, re-pledge,***

***hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such***

***Digital Assets***, separately or together with other property . . . for any period of time,

and without retaining in Celsius' possession and/or control a like amount of Digital

Assets or any other monies or assets, and to use or invest such Digital Assets in Celsius'

full discretion."[18]  The Debtors used cryptocurrency transferred pursuant to the Earn

Program to "generate a yield for Celsius."[19]

21.    Repayments under the Earn Program were to be in-kind (*i.e.*, the same

type of cryptocurrency transferred by the user) but not the "actual same" assets

originally transferred by the user.[20]

---

[16]    *See* Terms of Use § 13

[17]    *See id.*

[18]    *See id.* (emphasis added).

[19]    *See* First Day Decl. ¶ 47 ("[A]ny repayment shall be in-kind (i.e., in the same type of Eligible Digital
Assets loaned by you, but not the actual same Digital Assets originally transferred by you).").

[20]    *See* Terms of Use § 11.

22.    To withdraw cryptocurrency from the Earn Program, customers had a "call option on all loans made to Celsius to demand immediate, complete or partial repayment of any loan at any time."[21]  To make a withdrawal request, users were required to "provide the details of the Virtual Wallet to which you wish to receive your repayment of Digital Assets.[22]  Withdrawals could be effectuated by a "transfer to a Custody Wallet, if available to you" or "a complete or partial withdrawal of Eligible Digital Assets at any time," which, in either case, would "terminate in whole or in part your loan to Celsius . . . ."[23]  The Debtors initiate the withdrawal process "immediately following a withdrawal request when possible; however, [the Debtors] make take up to three (3) days after you submit your withdrawal request to process the withdrawal."[24]

23.    As explained in greater detail below, as of April 2022, the Earn Program was only offered to U.S. accredited investors and users outside of the United States.[25]

**B.    Borrow Program**

24.    The Debtors also provide "borrowing services to institutional and retail parties."[26]  The Debtors' retail lending (referred to herein as the "Borrow Program") is

---

[21]    *See* Terms of Use § 11 ("Withdrawals").

[22]    *See id.*  The Terms of Use define "Virtual Wallet" or "Virtual Wallet Address" as "an on-Blockchain virtual address in which Digital Assets can be held and transferred."

[23]    *See id.*

[24]    *See id.*

[25]    *See* First Day Decl. ¶ 49.

[26]    First Day Decl. ¶ 53.  While the Debtors have both retail and institutional lending, only the retail lending services are relevant to this Complaint as institutional borrowings "are based on master loan agreements and term sheets that set forth the detailed terms of any specific transaction."  *Id.* ¶ 56.

"generally conducted through [Debtor] Celsius Lending LLC . . . ."[27]  Borrowers in certain jurisdictions are able to "choose from different loan products based upon loan to value . . . ratios of posted collateral . . . with applicable interest rates being higher for higher LTV loans."[28]  Retail loans are only granted in fiat or stablecoins.[29]

25.    The same contract that governs the Earn Program—the Terms of Use— applies to the Borrow Program.[30]  However, for retail borrowers that participate in the Borrow Program, there is a separate "Celsius Loan Terms and Conditions" provided by Debtor Celsius Network Limited which borrowers were required to agree to in connection with the closing of their loan application.[31]

26.    Similar to the Earn Program, the Debtors hold title to digital assets transferred by borrowers in the Borrow Program as collateral and is permitted to rehypothecate such collateral."[32]  Also "[s]imilar to Earn, title to any digital assets

---

[27]    *Id.* ¶ 54.

[28]    *Id.*

[29]    *Id.*

[30]    *See* Terms of Use § 13("In consideration . . . for us entering into any Loan Agreement, and the use of our Services, you grant Celsius, subject to applicable law and for the duration of the period during which you elect to utilize Eligible Digital Assets . . . as collateral under the Borrow Service (if available to you), all right and title to such Eligible Digital Assets, including ownership rights, and the right, without further notice to you, to hold such Digital Assets in Celsius' own Virtual Wallet or elsewhere, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets in Celsius' full discretion.").

[31]    TOU Declaration ¶ 15 ("The user-borrower's loan was governed by the version of the Celsius Loan Terms and Conditions agreed to at the conclusion of the application process for the subject loan.").

[32]    *Id.* ¶ 53; *see also id.* ¶ 54 ("Similar to Earn, title to any digital assets posted with [Celsius Lending LLC] for retail loans is transferred to Celsius and Celsius is entitled to rehypothecate such assets.").

posted with [Celsius Lending LLC] for retail loans is transferred to Celsius and Celsius is entitled to rehypothecate such assets."[33]  Upon information and belief, similar to how the Debtors generated a yield by using cryptocurrency transferred to them under the Earn Program, by using cryptocurrency transferred to the Debtors under the Borrow Program as collateral, the Debtors were able to offer favorable terms to retail borrowers.

27.    According to the Debtors, as of the Petition Date, the Debtors had approximately 23,000 outstanding loans to retail borrowers in the aggregate amount of approximately $411 million backed by collateral with a market value of approximately $765.5 million in digital assets.[34]

### C.    Custody Service

28.    A "small percentage of digital assets transferred to [the Debtors] came in [to the Debtors] through no yield 'Custody Service."  Custody Service "serves as the central hub of [eligible users'] digital asset account at Celsius, enabling the user to navigate from Celsius' 'Custody Wallet' to various Celsius products (based on the availability of those products in the user's jurisdiction."[35]  Unlike the Earn program, "crypto assets held solely in 'Custody Service' do not earn rewards from the Earn program."[36]

29.    According to the Debtors, as of the Petition Date, approximately 58,000 users were utilizing the Custody service, with cryptocurrency transferred into the

---

[33]    *Id.*

[34]    First Day Decl. ¶ 55.

[35]    *Id.* ¶ 58.

[36]    *Id.* ¶ 58; *see also* Terms of Use § 1 ("**DIGITAL ASSETS HELD IN A CUSTODY WALLET WILL NOT EARN REWARDS THROUGH CELSIUS' EARN SERVICE . . . .**") (emphasis in original).

Custody Service (the "Custody Assets") worth a market value of approximately $180 million (as of July 10, 2022) were held by the Debtors.[37]

(1)    Creation of the Custody Service

30.    In April 2022, the Debtors announced changes to "the way our Earn product will function for users in the United States" and began providing a new product called the "Celsius Custody Service," which went into effect on April 15, 2022.[38]

31.    The Custody Service arose "as a result of [the Debtors'] continued work with regulators around the world and will provide a path forward for our users in the United States to continue holding coins and earning rewards with Celsius."[39]  Upon information and belief the reference to "continued work with regulators" relates to certain cease and desist orders and similar enforcement actions taken by several states' securities regulators that sought to ban the Debtors' offering of the Earn program in their states because of their position that the Earn program constituted the offer and sale of unregistered securities.

32.    For example, on September 17, 2021, the New Jersey Bureau of Securities (the "NJ Securities Bureau") entered a *Summary Cease and Desist Order* (the "NJ Order") against the Debtors (a) finding that the Debtors had offered and sold unregistered securities in violation of various New Jersey state securities statutes and (b) prohibiting the Debtors from (i) "offering for sale any security, including any Earn Rewards product to or from New Jersey unless the security is registered with the NJ Securities

---

[37]    *See* First Day Decl. ¶ 59.

[38]    https://support.celsius.network/hc/en-us/articles/4838161060381-Custody-FAQ (last visited August 23, 2022) (the "Celsius Custody FAQ").

[39]    *Id.*

Bureau" and (ii) "accepting any additional assets into an existing Earn Rewards

account." By its terms, the NJ Order became effective on November 1, 2021; however,

upon information and belief, the effective date was delayed following discussions

between the Debtors and the NJ Securities Bureau.

33.    Substantially similar orders were entered on August 8, September 16 and

23, 2021, in California, Alabama and Kentucky, respectively.[40]

34.    On September 17, 2021, the Texas state securities board issued a notice of

hearing for February 14, 2022, to consider whether Celsius violated Texas securities

laws and seek the entry of a cease and desist order.[41]

35.    On October 18, 2021, the New York Attorney General announced an order

(the "NY Order") (which was made available to the public only in redacted form)

demanding that any unlawful selling or offering for sale of securities and/or

commodities within or from the state of New York that are not registered by N.Y. Gen.

Bus. Law § 352 cease.[42] Upon information and belief, the Debtors denied receiving the

NY Order, but acknowledged the New York Attorney General requested information

on or around October 18, 2021.

---

[40]    *See* Cal. Dept. Fin. Protection and Innovation, *Desist and Refrain Order* at 5:10-15 ("[Debtors] are
ordered to desist and refrain from further offers and sale of securities in California, including but not
limited to the Earn Rewards accounts, unless such sale has been qualified under" California securities
laws.); Ala. Sec. Comm., Admin. Order No. SC-2021-0012 ¶ 10 (ordering Debtors to show cause why
they "should not be ordered to cease and desist from any further violations of the Alabama Securities
Act" because "the Earn Rewards product is not currently registered with the Commission"); Ken.
Dep't Fin. Inst., Admin. Order 2021-AH-00024, at 9 (ordering Debtors to cease and desist from
"soliciting or selling any security in Kentucky unless that security is registered with the
Department").

[41]    *See* Tex. State Sec. Bd., SOAH Docket No. 312-220160 ¶ 46 ("At the hearing, the Enforcement Division
will present testimony and other admissible evidence in support of its prayer for relief for a proposal
for decision for the entry of a [cease and desist order] against [r]espondents.").

[42]    *See* Office of the Attorney General of New York, Press Release (Oct. 18, 2021).

(2)    Implementation of the Custody Service

36.    After creation of the Custody Service, the Earn Program was only available to accredited investors in the United States and users located abroad.[43]

37.    For U.S.-based non-accredited investors in states where the Custody Service was available, (a) any new cryptocurrency transferred to the Debtors went into the Custody account, and (b) any existing cryptocurrency in the Earn program would continue to remain in the Earn account and earn rewards as they did before.[44]  Non-accredited investors could not transfer cryptocurrency from their Custody account into their Earn account, and no new cryptocurrency could be transferred into their Earn account unless the user became an accredited investor.[45]

38.    For U.S.-based accredited investors, such users would continue to earn rewards through their Earn account as they did before.[46]  Similar to their non-accredited counterparts, U.S. based accredited investors would also have their accounts divided between the Custody Service and the Earn Program, however, accredited investors could transfer new cryptocurrency to their Earn account if they wish.[47]

---

[43]  *See* Celsius Custody FAQ.  There was no change to services offered by the Debtors outside of the United States.  *Id; see also* Terms of Use § 1.

[44]  *See* Celsius FAQ.  Upon information and belief, in states where the Custody Service was not available, the Debtors held any cryptocurrency transferred in these states after April 15, 2022 was held by the Debtors in "withhold" accounts.

[45]  *See* Celsius Custody FAQ; *see also* Terms of Use §§ 1, 4(D).

[46]  *See* Celsius Custody FAQ; *see also* Terms of Use §§ 1, 4(D).

[47]  *See* Celsius Custody FAQ.

(3)    <u>Terms of the Celsius Custody Service</u>

39.    A cryptocurrency wallet is usually a storage system identified by a "public key" stores a user's public and private keys to their cryptocurrency and typically provides a user-friendly interface to manage crypto balances.  The public key is like a bank account number, while the private key—a 12-to-24-word phrase—is like the bank account password.

40.    Private keys can either be stored offline (referred to as "cold storage") or in an online wallet.  Offline cold storage is typically through a physical storage medium like a hard drive or USB-drive, or other similar device where the user uploads their private keys onto the device.  Because the only way to access the cryptocurrency in cold storage is through physical possession of the device (as well as typically additional security measures like a password to use the device), cold storage offers some benefits over online storage, such as less risk of hacking.  However, a cold storage device could be misplaced or destroyed, in which case the cryptocurrency would be lost unless the user has backed up or otherwise saved somewhere safe their private keys.[48]  Even still, the device and its backup could both be lost at the same time—such as in a house fire, for example—again, resulting in total loss of the cryptocurrency.[49]  Online wallets, on the other hand, have certain benefits over cold storage, such as typically a user-friendly interface for transferring or using cryptocurrency, and reduced risk of the physical loss

---

[48]    As long as a user has their private keys, the user can upload their cryptocurrency to any online or offline wallet.

[49]    A cold storage device is the proverbial equivalent of putting money underneath one's mattress.  However, cold storage is risky and subject to total loss if the user misplaces the private keys.  In a famous example, one user discarded a device holding eight thousand bitcoins in 2013, which was worth more than $500 million when the price of bitcoin peaked in October 2021.  *See* D.T. Max, *Half a Billion Bitcoin, Lost in the Dump*, The New Yorker, Dec. 6, 2021.

of the keys which are now stored with a third party.

41.     Many cryptocurrency businesses such as cryptocurrency exchanges offer different types of online wallets as "custodial wallets."[50]  Custodial wallets have certain benefits, such as less user responsibility regarding private key management.  When a user outsources a custody wallet to a business, the user is outsourcing their private keys in that institution.  The individual user is not responsible for protecting the private key to the wallet and therefore "places trust in the business keeping the private key safe."[51]

42.     Online custody wallets are similar to online bank accounts, but with a few key differences—custody wallets are not backed by government deposit schemes, like FDIC insurance, only hold crypto (not fiat) currency, and importantly, the user retains title to its funds at all times.[52]

43.     The Debtors' Custody Service, like other custody wallets available in the industry, allows users to "store Eligible Digital Assets in a Custody Wallet accessible through you Celsius Account."[53]  For both accredited and non-accredited U.S.-based investors, cryptocurrency transferred to Celsius after April 15, 2022 would first be

---

[50]    *See* https://www.coindesk.com/learn/custodial-wallets-vs-non-custodial-crypto-wallets/ (last visited Aug. 23, 2022).

[51]    *See id.*

[52]    *See* Terms of Use § 4(B), 10.

[53]    *See* Terms of Use § 4(B).  The Terms of Use define "<u>Custody Wallet</u>" as "a Virtual Wallet where all Eligible Digital Assets held therein are custodial assets maintained either by us or by a third party institution or other entity selected by Celsius (a "**Third Party Custodian**")." *Id.* § 2 (emphasis in original).

stored in a Custody Wallet; accredited investors had the option of transferring the cryptocurrency thereafter from the Custody Wallet into the Earn program.[54]

44.     Unlike the Earn Program, title to cryptocurrency "held in custody shall 'at all times remain with the [user]' and 'Celsius will not transfer, sell, loan or otherwise rehypothecate' digital assets in custody unless 'specifically instructed by [users], except as required by valid court order, competent regulatory agency, government agency or applicable law."[55]

45.     Specifically, the Terms of Use provided:

- "Title to any of your Eligible Digital Assets in a Custody Wallet shall at all times remain with you and not transfer to Celsius."[56]

- "Celsius will not transfer, sell, loan or otherwise rehypothecate Eligible Digital Assets held in a Custody Wallet unless specifically instructed by you, except as required by valid court order, competent regulatory agency, government agency or applicable law."[57]

- "As title owner of assets, you bear all risk of loss. Celsius shall have no liability for any Digital Asset price fluctuations or any or all loss of Digital Assets."[58]

- "When you use the Custody Service, you understand and agree that Celsius may act as the custodian or we may use a Third Party Custodian to provide the Custody Service."[59]

- "By using the Custody Service, you understand and agree to appoint Celsius or a Third Party Custodian selected by Celsius as your agent

---

[54]   *See* Terms of Use §§ 1, 4(D).

[55]   *See* First Day Decl. ¶ 58 (citing Terms of Use § 4(B)).

[56]   Terms of Use § 4(B).

[57]   *Id.*

[58]   *Id.*

[59]   *Id.*

to store and secure Eligible Digital Assets in a Custody Wallet, and perform other duties customarily performed by a custodian."[60]

46.    The Terms of Use purportedly disclaimed any "fiduciary relationship" between the Debtors and Custody users and provided that neither the Debtors nor any Third Party Custodian had any fiduciary duty to customers.[61]  The Terms of Use also stated that in the event of an insolvency proceeding by the Debtors, the treatment of Custody Assets was uncertain.[62]

47.    Similar to withdrawals from the Earn Program, a Custody user could initiate a withdrawal request with the Debtors, which could require up to three (3) days for processing.[63]  The Terms of Use provide that the Debtors are not obligated to return the exact same digital assets transferred to a Custody Wallet but will return digital assets of the identical type reflected in a user's Custody account at the time the user requests a return.[64]  The Terms of Use provided that the Debtors' "retain[ed] the right to set-off any Eligible Digital Assets in a Custody Wallet against any obligations you may have to us."[65]

---

[60]    *Id.*

[61]    *See id.*

[62]    *See id.*

[63]    *See* Terms of Use § 11.

[64]    *See* Terms of Use § 4(B) ("Celsius is under no obligation to return the actual Eligible Digital Assets initially transferred by you to a Custody Wallet, but will return Eligible Digital Assets of the identical type reflected in your Celsius Account at the time you request such a return.").

[65]    *See id.*; *see also id.* § 9 ("We may also take or set off from any Digital Assets in your Celsius Account, including any of your Digital Assets using the Custody Service (*i.e.*, in a Custody Wallet), or deduct from any obligations Celsius may have to you, any direct, indirect, and acquired Obligations that you owe us or our Affiliates").  The Terms of Use define "Obligations" as "debts, amounts owed, or liabilities incurred to us or any of our Affiliates by you or any of your Authorized Representatives, if any . . . ." *Id.* § 9.

(3)     Custody Service Practices[66]

48.     The Terms of Use provided that "Eligible Digital Assets may be comingled with the Eligible Digital Assets of other Users."[67]  Upon information and belief, the Debtors comingled the Custody Assets of all users with the Custody Assets of all users, but those digital assets were not comingled with Celsius' other programs.[68]

49.     Upon information and belief, the Debtors did not permit the use of Custody Assets to serve as collateral under the Borrow Program, and Custody Assets that were designated by a user for use as collateral were transferred from the Custody Service into the Borrow Program.

50.     Upon information and belief, the Debtors created and received transferred cryptocurrency in an individualized intake or bridge wallet that is tied to that particular customer's account (a "Bridge Wallet").  Customer transfers are initially received into a Bridge Wallet (regardless of whether the account is new or established), and each customer account has a Bridge Wallet for each type of cryptocurrency transferred. From the Bridge Wallet, digital assets are transferred to the Debtors' main

---

[66]  Certain of the information contained in this Part I.C.3 was obtained from a letter sent by counsel for the Debtors to counsel for the official committee of unsecured creditors.

[67]  *See* Terms of Use § 4(B); *see also* First Day Decl. ¶ 58 ("Because all user assets are comingled, custody users are not entitled to the return of their specific digital assets, but rather the return of the same type of digital asset.").

[68]  This is corroborated by statements by the Debtors' counsel at various hearings in the Chapter 11 Cases.  *See e.g.*, Tr. of Hr'g, July 18, 2022 ("First Day Hearing Transcript") at 20:13-16 ("The crypto, Your Honor, that we hold pursuant to the custody arrangement is isolated and comingled.  But all of those proceeds are sitting in a specific and identifiable account.  And we are going to keep it that way . . . And, you know, what I can assure the Court and assure any of our customers who are party to a custodial arrangement, that crypto is sitting in an account and it is available, to the extent Your Honor were to rule that that is their property.").

aggregator/omnibus wallets that correspond to that type of cryptocurrency (each, an "<u>Aggregator Wallet</u>").

51.     Upon information and belief, from the Aggregator Wallets, the Debtors transferred cryptocurrency to either (a) in the case of the Custody Service, to separate custody wallets (each a "<u>Custody Wallet</u>") distinct from the Aggregator Wallets, and (b) in the case of Earn and other programs, the cryptocurrency may be moved to various destinations for the Debtors' business needs, including to be deployed to generate a yield for the Debtors.[69]  The exact cryptocurrency asset deposited in a Custody Wallet was not earmarked as an asset held in a Custody Wallet, but rather a like asset (*i.e.,* same amount of the same cryptocurrency) was earmarked as an asset held in a Custody Wallet.

52.     Upon information and belief, the Debtors maintained a matched book of customer deposits in the Custody Wallets and earmarked Custody Assets to remain in the omnibus wallet.  The earmarking is done through a manual process.  The Debtors periodically rebalanced the Custody Wallets to ensure that at all times the Debtors collectively hold assets equal to or in excess of the balance of each type of cryptocurrency deposited by users of the Custody Service (on an aggregated basis) as reflected in the Debtors' internal ledger.[70]

53.     Upon information and belief, the Debtors did not hypothecate, rehypothecate, transfer, or otherwise use any cryptocurrency earmarked as being held

---

[69]   Like the Bridge Wallets and Aggregator Wallets, Custody Wallets are also maintained by type of cryptocurrency.

[70]   To this point, in the First Day Declaration, the Debtors stated $180 million in assets relating to the Custody program and $180 million in liabilities.  *See* First Day Decl. ¶ 16.  Upon information and belief, the Custody Wallets were sightly overfunded as of the Petition Date, and so these figures may be restated or corrected by the Debtors.

under the Custody Service.  In June 2022, the Debtors discovered a mismatch between

the Custody Wallets and the Custody Service balances and the discrepancy in the

Custody balances was fixed to match the Custody Wallets.  As such, on the Petition

Date, the Custody Wallet was overfunded.

## II.    The Debtors Freeze Withdrawals of Custody Assets

54.    On June 12, 2022 (the "Pause Date"), without any prior notice, the Debtors

decided to pause all withdrawals, swaps, and transfers on its platform (the "Pause").[71]

The Pause followed statements by the Debtors and their executives, including their

Chief Executive Officer and founder Alex Mashinsky, that withdrawals were continuing

even though customers were complaining that they were unable to obtain return of

their cryptocurrency from the Debtors.[72]

55.    Since the Pause Date, withdrawals of Custody Assets have been frozen,

and users have been unable to obtain the return of their Custody Assets.  Without

access to their Custody Assets, many Custody users have experienced tremendous

personal hardship.[73]

---

[71]    First Day Decl. ¶ 14.

[72]    For example, on June 7, 2022, the Debtors posted to their website an article titled "Damn the
Torpedoes, Full Speed Ahead" touting, among other things, "**Celsius continues to process
withdrawals without delay**.  We have not had any issues meeting withdrawal requests" and
"**Celsius has the reserves (and more than enough ETH) to meet obligations**." (emphasis in original).
*See* https://celsiusnetwork.medium.com/damn-the-torpedoes-full-speed-ahead-4123847832af.  As
another example, on June 11, 2022, just one day before the Pause, Alex Mashinsky asked a venture
capitalist publicly on the social media platform Twitter, "Mike do you even know one person who
has a problem withdrawing from Celsius?  Why spread FUD [fear, doubt, and uncertainty] and
misinformation."  *See* https://qz.com/2177014/why-celsius-network-froze-withdrawals/ (citing
https://twitter.com/Mashinsky/status/1535767334668861440).

[73]    To date, hundreds of letters have been filed on the docket of the Chapter 11 Cases by customers,
many of which include and relate to the Debtors' failure to honor withdrawals from the Custody
Service.

56.     On July 13, 2022 (the "Petition Date"), each of the Debtors filed voluntary petitions for chapter 11 protection with this Court.  At the first day hearing on July 18, 2022, counsel for the Debtors stated that legal treatment of the Custody Assets would likely need to be determined by the Court.[74]

57.     Since its creation on or about August 1, 2022, the Ad Hoc Group of Custodial Account Holders and its counsel have been working with the Debtors and their advisors and the official committee of unsecured creditors (the "Creditors' Committee") and its advisors regarding the lifting of the Pause and the allowance for continued withdrawals of Custody Assets in accordance with the Terms of Use.  While those discussions have been ongoing, the Debtors have not committed to lifting the Pause to permit all Custody users to withdraw their Custody Assets.

58.     As such, Plaintiff has filed this lawsuit for the declaratory relief set forth herein requesting that the Court find that Custody Assets are not property of the Debtors' estates under section 541 of the Bankruptcy Code.

## FIRST CLAIM FOR RELIEF
### (Declaratory Judgment Pursuant to Bankruptcy Rule 7001(9) That Certain Property is Not Property of the Estate)

59.     Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

60.     The Debtors do not have title or ownership of the Custody Assets.  By the plain language of the Terms of Use, title to Custody Assets at all times remained with Custody users and did not transfer to the Debtors, and the Debtors agreed not to "transfer, sell, loan or otherwise rehypothecate" Custody Assets held in a Custody

---

[74]  *See* First Day Hearing Transcript at 20:13-20 ("And to the -- we think, Your Honor, that it is a legal question as to whether or not it is, you know, truly a custodial account, truly in trust, or despite that having been people's intentions, is that the legal effect?").

Wallet."

61.    While Custody Assets are in the Debtors' possession, the Debtors agreed to act as "agent" and "custodian" with respect to Custody Assets and to store and secure Custody Assets in a Custody Wallet, and perform other duties customarily performed by a custodian.

62.    Based upon the foregoing, Plaintiff is entitled to a declaratory judgment that digital assets transferred into the Custody service are property of the Custody users and not property of the estate pursuant to section 541 of the Bankruptcy Code.  The Debtors should be required to permit withdrawals of Custody Assets in accordance with the Terms of Use.

## **PRAYER FOR RELIEF**

WHEREFORE, the Debtors respectfully request as follows:

(i)    the grant of relief as set forth in the final paragraph of the Claim for Relief;

(ii)    the grant such other and further relief as this Court deems just and proper under the circumstances.

DATED:    August 31, 2022
New York, NY

> AD HOC GROUP OF CUSTODIAL
> ACCOUNT HOLDERS
> By its Counsel,
> TOGUT, SEGAL & SEGAL LLP
> By:
>
> */s/Kyle J. Ortiz*
> KYLE J. ORTIZ
> BRYAN M. KOTLIAR
> One Penn Plaza, Suite 3335
> New York, New York 10119
> (212) 594-5000
> kortiz@teamtogut.com
> bkotliar@teamtogut.com