**Hearing Date:  October 6, 2022, at 10:00 a.m. (prevailing Eastern Time)**
**Objection Deadline:  September 29, 2022, at 4:00 p.m. (prevailing Eastern Time)**

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Proposed Counsel to the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) |
| | ) Case No. 22-10964 (MG) |
| Debtors. | ) |
| | ) (Jointly Administered) |
| | ) |

## NOTICE OF HEARING ON DEBTORS' MOTION
## SEEKING ENTRY OF AN ORDER (I) AUTHORIZING
## THE DEBTORS TO REOPEN WITHDRAWALS FOR CERTAIN
## CUSTOMERS WITH RESPECT TO CERTAIN ASSETS HELD IN THE CUSTODY
## PROGRAM AND WITHHOLD ACCOUNTS AND (II) GRANTING RELATED RELIEF

**PLEASE TAKE NOTICE** that a hearing on the *Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to Reopen Withdrawals for Certain Customers With Respect to Certain Assets Held in the Custody Program and Withhold Accounts and (II) Granting Related Relief* (the "Motion") will be held on **October 6, 2022, at 10:00 a.m., prevailing Eastern Time** (the "Hearing").  In accordance with General Order M-543 dated March 20, 2020, the Hearing will be conducted remotely using Zoom for Government.  Parties wishing to appear at the Hearing,

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

whether making a "live" or "listen only" appearance before the Court, need to make an electronic appearance through the Court's website at https://ecf.nysb.uscourts.gov/cgi-bin/nysbAppearances.pl.

   **PLEASE TAKE FURTHER NOTICE** that any responses or objections to the relief requested in the Motion shall:  (a) be in writing; (b) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York; (c) be filed electronically with the Court on the docket of *In re Celsius Network LLC*, No. 22-10964 (MG) by registered users of the Court's electronic filing system and in accordance with all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York (which are available on the Court's website at http://www.nysb.uscourts.gov); and (d) be served so as to be actually received by **September 29, 2022, at 4:00 p.m., prevailing Eastern Time**, by (i) the entities on the Master Service List available on the case website of the above-captioned debtors and debtors in possession (the "Debtors") at https://cases.stretto.com/celsius and (ii) any person or entity with a particularized interest in the subject matter of the Motion.

   **PLEASE TAKE FURTHER NOTICE** that only those responses or objections that are timely filed, served, and received will be considered at the Hearing.  Failure to file a timely objection may result in entry of a final order granting the Motion as requested by the Debtors.

   **PLEASE TAKE FURTHER NOTICE** that copies of the Motion and other pleadings filed in these chapter 11 cases may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/celsius.  You may also obtain copies of the Motion and other pleadings

filed in these chapter 11 cases by visiting the Court's website at http://www.nysb.uscourts.gov in

accordance with the procedures and fees set forth therein.

<table>
<tr><td>New York, New York<br>Dated: September 1, 2022</td><td>/s/ Joshua A. Sussberg</td></tr>
</table>

New York, New York
Dated: September 1, 2022

*/s/ Joshua A. Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          jsussberg@kirkland.com

    - and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          patrick.nash@kirkland.com
                ross.kwasteniet@kirkland.com

*Proposed Counsel to the Debtors and*
*Debtors in Possession*

Hearing Date:  **October 6, 2022 at 10:00 a.m. (prevailing Eastern Time)**
Objection Deadline:  **September 29, 2022 at 4:00 p.m. (prevailing Eastern Time)**

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Proposed Counsel to the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

**DEBTORS' MOTION SEEKING**
**ENTRY OF AN ORDER (I) AUTHORIZING**
**THE DEBTORS TO REOPEN WITHDRAWALS FOR CERTAIN**
**CUSTOMERS WITH RESPECT TO CERTAIN ASSETS HELD IN THE CUSTODY**
**PROGRAM AND WITHHOLD ACCOUNTS AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state the following in support of this motion (this "Motion"):

**Preliminary Statement**[2]

1.      The Debtors' principal goal in these chapter 11 cases is to maximize the value of

their estates and distribute that value to their customers as quickly and fairly as possible.

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

[2]      Capitalized terms used but not defined in this section shall have the meanings ascribed to such terms elsewhere
(Continued)

Accordingly, since the Petition Date, the Debtors and their advisors have been analyzing whether the cryptocurrency assets that were transferred to the Debtors' platform by customers are property of the Debtors' estates, or property of the Debtors' customers.

2.       At the same time, the Debtors and their advisors have also been evaluating whether the Debtors have any colorable causes of action with respect to these cryptocurrency assets. The Debtors do not believe that it would be appropriate to turn over property to certain customers at this time if the Debtors have potential causes of action with respect to that property (*e.g.*, avoidance actions).[3]  Turnover of property under such circumstances would not only be inefficient but could also imperil the Debtors' ability to realize the value of those causes of action for the benefit of the Debtors' customer community.  Allowing customers to withdraw property that could be subject to later avoidance actions would be akin to choosing to drain a sink full of water, and then trying to collect the water after it had drained through the pipes—incredibly wasteful and inefficient if your goal is to maximize water for later allocation and distribution.

3.       Following their analysis, the Debtors have identified significant cryptocurrency assets that they do not believe are property of their estates, and as to which the Debtors do not believe that they have any colorable causes of action under applicable law.  Accordingly, the Debtors believe it is fair and appropriate to permit customers to withdraw those cryptocurrency assets at this time.  By this Motion, the Debtors seek authority to permit certain customers to withdraw their cryptocurrency from the Custody Program and Withhold Accounts—in accordance with procedures and other conditions set forth in this Motion.

---

in the Motion.

[3]    To be clear, the Debtors are continuing to evaluate the viability of these potential avoidance actions and have not yet determined whether to bring any avoidance actions.  If the Debtors determine to pursue these avoidance actions, they would do so in order to maximize the value of the estates and ensure a fair distribution of property to all customers.

4.      More specifically, and as discussed further herein, the Debtors believe, following analysis by their advisors and with input from certain of their key stakeholders, that the cryptocurrency assets in the Custody Program and Withhold Accounts likely do not constitute property of their estates.  The Debtors have also determined that many of the transfers made to the Custody Program and Withhold Accounts were made from the Earn Program or the Borrow Program in the 90 days before the Petition Date (respectively, the "Transferred Custody Assets" and the "Transferred Withhold Assets" and, together, the "Transferred Assets").  The Debtors believe that assets in the Earn Program and the Borrow Program *are* likely property of their estates, and that the transfer of such assets to Custody Program or the Withhold Accounts would have been a transfer of the Debtors' property to customers on account of such customers' claims against the Debtors.  Accordingly, the Debtors' estates may have colorable preference claims to unwind many of these transfers.   Any such preference claims, if successful, would permit the Debtors to distribute the proceeds thereof more fairly to *all* creditors.  However, section 547(c)(9) of the Bankruptcy Code prohibits a debtor from seeking to avoid a potential preferential transfer to a particular transferee if the "aggregate value of all property" at issue is less than $7,575 (the "Statutory Cap").[4]  Accordingly, the Debtors do not believe that they could succeed on a preference action where a particular customer transferred less than the Statutory Cap (in the aggregate).  For that reason, the Debtors believe it is appropriate to permit customers to withdraw the Transferred Custody Assets and the Transferred Withhold Assets to the extent that a customer transferred less than the Statutory Cap from the Earn Program or the Borrow Program.

---

[4]    The statutory minimum has increased since the latest Bankruptcy Code amendments and is currently $7,575 as of April 1, 2022.  *See April 1 Increase of Federal Bankruptcy Exemptions, Other Dollar Amounts*, National Consumer Law Center, Inc., March 22, 2022.

5.      Additionally, there are certain assets in the Custody Program and Withhold Accounts that were never in the Earn Program or the Borrow Program; the customers transferred cryptocurrency assets into the Custody Program or Withhold Account from an external wallet but never transferred such property to or from the Earn Program or the Borrow Program.  Accordingly, the Debtors believe that such transferred assets were never property of the Debtors (unless a customer also had an outstanding loan in the Borrow Program, as described further below), and could not be subject to a preference action (the "Pure Custody Assets," and, together with the Transferred Custody Assets, the "Custody Assets," and the "Pure Withhold Assets" and, together with the Transferred Withhold Assets, the "Withhold Assets").  Given that the Pure Custody Assets and Pure Withhold Assets could not be subject to a preference action, the Debtors likewise believe it is appropriate to permit the applicable customers to withdraw such assets in accordance with procedures and other conditions set forth in this Motion.

6.      There are important exclusions from the relief requested in this Motion (collectively, the "Excluded Assets").  *First*, at this time, the Debtors are not seeking to release any Custody Assets or Withhold Assets to any current or former employees or insiders, or affiliates of any current or former employees or insiders.  *Second*, if a customer has an outstanding loan with the Debtors under the Borrow Program, certain amounts in the applicable customer's Custody Program or Withhold Account serve as collateral for such loan, pursuant to the Loan Terms of Use, which is therefore property of the estate that could be set off by the Debtors pursuant to the Latest Terms of Use, Loan Terms of Use, and applicable law.  Accordingly, no account held by a customer with an outstanding loan will be unfrozen pursuant to this Motion.[5]

---

[5]    This second exclusion pertains to approximately (i) 88 users that hold Pure Custody Assets with an aggregate value of approximately $884,570 and (ii) 1,656 users that hold Transferred Custody Assets with an aggregate value of approximately $2.49 million (each, as of on or around August 30, 2022).

7.      The Debtors recognize that the relief sought in this Motion may not be supported by every customer or stakeholder, and that it may not go as far as some Custody Program customers and Withhold Account holders may wish. This Motion is a first step toward, and not the last word on, efforts to return assets to customers where possible without jeopardizing the Debtors' efforts to maximize value and distribute that value to all customers as fairly as possible. By tailoring the relief requested to the Pure Custody Assets and Pure Withhold Assets, and any customer's Transferred Assets that are below the Statutory Cap, the Debtors believe they have struck the right balance, at this time, between these competing goals.

8.      To be clear, the Debtors are ***not*** proposing that they be permitted to continue to possess the Transferred Assets above the Statutory Cap indefinitely. To the contrary, the Debtors are continuing their analysis of whether there are potential causes of action with respect to the Transferred Assets above the Statutory Cap, and the Proposed Order sets a status conference for the next omnibus hearing for the Debtors to update the Court and all parties in interest on the Debtors' analysis and proposed timeline for resolution of such assets.

9.      Before filing this Motion, the Debtors have engaged in extensive and productive discussions with the Creditors' Committee, the Ad Hoc Group of Custodial Account Holders,[6] and the Ad Hoc Group of Withhold Account Holders on the matters relevant to the Motion.[7] The Debtors understand that while the Creditors' Committee plans to further review the requested relief and requires certain information prior to making a determination on whether to fully support approval of this Motion, the Creditors' Committee is generally supportive of releasing the relevant

---

[6]   *See Notice of Appearance and Request for Service of Papers* [Docket No. 330]; *Verified Statement Pursuant to Bankruptcy Rule 2019* [Docket No. 547].

[7]   *See Notice of Appearance and Demand for Service of Papers* [Docket No. 427] (purporting to represent an ad hoc group of holders of withhold accounts).

cryptocurrency assets. In particular, the Debtors have been informed by the Creditors' Committee's advisors that the Creditors' Committee will need to assess the procedures and other conditions set forth in this Motion to limit release of any cryptocurrency assets to any current or former employees or insiders (or affiliates of any current or former employees or insiders). The Debtors also understand that the ad hoc groups similarly plan to further review the requested relief and are generally supportive of the relief requested herein; however the ad hoc groups believe the relief requested should apply to all Custody Assets and Withhold Assets.[8]

## **Relief Requested**

10.     The Debtors seek entry of an order attached hereto as **Exhibit A** (the "Proposed Order"), authorizing the Debtors to reopen withdrawals for certain customers (such customers, the "Eligible Customers") with respect to the Pure Custody Assets, Pure Withhold Assets, and Transferred Assets below the Statutory Cap (together, the "Withdrawable Assets"), and granting related relief.[9] Additionally, the Proposed Order contemplates that a further status conference will be held at the omnibus hearing after the hearing on this Motion (currently scheduled for November 1, 2022 at 10:00 a.m. (prevailing Eastern Time)). For the avoidance of doubt, the relief sought by this Motion does not extend to the Excluded Assets.

## **Jurisdiction and Venue**

11.     The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern

---

[8]    The Debtors are in process analyzing the mechanics of how they could reopen withdrawals solely for Withdrawable Assets in an efficient manner.

[9]    As reflected in the Proposed Order, the Debtors believe that, upon reopening withdrawals, digital assets should be withdrawn net of any "gas" or transaction fees required to effectuate the withdrawal or transfer of such assets to customers.

6

District of New York, entered February 1, 2012.  The Debtors confirm their consent to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

12.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

13.    The statutory bases for the relief requested herein are sections 105(a) and 541 of title 11 of the United States Code (the "Bankruptcy Code") and rule 9013-1(a) of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules").

### Background

14.    The Debtors, together with their non-Debtor affiliates (collectively, "Celsius"), are one of the largest and most sophisticated cryptocurrency based finance platforms in the world and provide financial services to institutional, corporate, and retail clients across more than 100 countries.  Celsius was created in 2017 to be one of the first cryptocurrency platforms to which users could transfer their crypto assets and (a) earn rewards on crypto assets and/or (b) take loans using those transferred crypto assets as collateral.  Headquartered in Hoboken, New Jersey, Celsius has more than 1.7 million registered users and approximately 300,000 active users with account balances greater than $100.

15.    On July 13, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description of the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 23] (the "Mashinsky Declaration") and the *Declaration of Robert Campagna, Managing Director of Alvarez & Marsal North America, LLC, in Support of*

*Chapter 11 Petitions and First Day Motions* [Docket No. 22] (the "Campagna Declaration").[10] As described in more detail in the Mashinsky Declaration, the Debtors commenced these chapter 11 cases to provide Celsius an opportunity to stabilize its business and consummate a comprehensive restructuring transaction that maximizes value for stakeholders.

16.     The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  These chapter 11 cases have been consolidated for procedural purposes only and are jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket No. 53].  On July 27, 2022, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed an official committee of unsecured creditors [Docket No. 241] (the "Creditors' Committee").  On August 18, 2022, the U.S. Trustee filed a motion seeking the appointment of an examiner in these chapter 11 cases, which is currently set for hearing on September 14, 2022.  *See* Docket No. 546.

## Factual Background

17.     On April 15, 2022, 89 days prior to the Petition Date, the Debtors began providing a custody service to certain users located in the United States (the "Custody Program").[11]  For eligible users, the Custody Program serves as the central hub of their digital asset account at Celsius, enabling the user to move their digital assets from Celsius' "Custody Wallet" to other service offerings.[12]  For example, an eligible customer (*i.e.*, a customer that is an accredited

---

[10]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Mashinsky Declaration or the Campagna Declaration (together, the "First Day Declarations"), as applicable.

[11]   *See Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, Providing Terms of Use Dating Back to February 18, 2018* [Docket No. 393] (the "Terms of Use Declaration").  The current controlling terms of use, which went into effect on April 14, 2022, (the "Latest Terms of Use") are attached as Exhibit A-8 to the Terms of Use Declaration.

[12]   *See* Latest Terms of Use at 11.

investor, qualified institutional buyer, or non-U.S. person) could transfer cryptocurrency from the Custody Program to the "Earn" program (the "Earn Program") in order to earn certain rewards or the "Borrow" program (the "Borrow Program") pursuant to which users could take out a loan from Celsius.[13]  However, unlike the Earn Program or the Borrow Program, cryptocurrency assets held in the Custody Program remain the property of the user under the Latest Terms of Use, and do not earn rewards.[14]  As stated in the Latest Terms of Use, ownership in cryptocurrency assets held in the Custody Program shall "at all times remain with the [user]" and "Celsius will not transfer, sell, loan or otherwise rehypothecate" digital assets in custody unless "specifically instructed by [users], except as required by valid court order, competent regulatory agency, government agency or applicable law."[15]

18.    When the Debtors began offering the Custody Program, the Debtors could not lawfully offer the Custody Program in nine states (the "Prohibited States").  Due to the nature of cryptocurrency transfers on the blockchain, the assets from individuals who attempted to transfer cryptocurrency to the Debtors' Custody Program (either from an external platform or from another of the Debtors' services, such as the Earn Program), but were unable to do so because they were residents of a Prohibited State, were impossible to halt.  Similarly, when a customer paid off a loan through the Borrow Program, the cryptocurrency tied to the loan was transferred to the Custody Program for all customers except residents of a Prohibited State.  These circumstances led the

---

[13]   *See id.* at 13.

[14]   *See id.* at 4.B.

[15]   *See id.*  The Custody Program was first implemented under the Latest Terms of Use.

Debtors to use the alternate "Withhold" accounts (the "Withhold Accounts") to store the Withhold Assets.[16]

19.    As of the date hereof, approximately 58,300 users hold Custody Assets (the "Custody Customers") that are worth approximately $210.02 million in the aggregate (as of August 29, 2022).  Of the Custody Customers, approximately 15,680 hold Pure Custody Assets that are worth, in the aggregate, approximately $43.87 million (as of on or about August 27, 2022) and 22,580 hold Transferred Custody Assets (that the aggregate value of the transfers at the time of transfers was less than the Statutory Cap) that are worth, in the aggregate, approximately $11.25 million (valued as of August 31, 2022).

20.    In addition, as of the date hereof, approximately 5,000 users hold Withhold Assets (the "Withhold Customers") that are worth approximately $15.33 million (as of August 29, 2022). Of the Withhold Customers, approximately 470 hold Pure Withhold Assets that are worth, in the aggregate, approximately $702,360 (valued as of August 31, 2022) and 3,180 hold Transferred Withhold Assets (that the aggregate value of the transfers at the time of transfers was less than the Statutory Cap) that are worth, in the aggregate, approximately $1.04 million (valued as of August 31, 2022).

## Basis for Relief

I.    **The Debtors Should Be Authorized to Reopen Withdrawals for Certain Customers With Respect to the Withdrawable Assets**.

21.    The Debtors submit that the Pure Custody Assets and Pure Withhold Assets do not constitute property of their bankruptcy estates and, accordingly, customers should be permitted to withdraw such property, as described herein.  Under the Latest Terms of Use, ownership of the

---

[16]    The Latest Terms of Use do not explicitly address the Withhold Accounts.

Custody Assets remained with the customers.  The Debtors did not intend to accept the Pure Withhold Assets in the first instance because the Debtors did not have a service to offer for those assets, yet were unable to bar such transfers.  The Debtors also submit that customers should be allowed to withdraw the Transferred Custody Assets and the Transferred Withhold Assets below the Statutory Cap:  it is the Debtors' position that such property is not property of the estate, and the Debtors do not believe there is any viable preference claim with respect to such assets. However, to the extent a customer holds a loan under the Borrow Program, the Loan Terms of Use provide that certain assets held in other programs on account of such customer are pledged as collateral of the Debtors, and could be subject to the Debtors' right to setoff.

22.     For Transferred Custody Assets and the Transferred Withhold Assets, to the extent such transfers were under the Statutory Cap, even if the *prima facie* elements of a preference claim are met, no such claim is viable because of the Statutory Cap.  For Transferred Custody Assets and the Transferred Withhold Assets, to the extent such transfers were above the Statutory Cap, the Debtors are continuing to analyze the facts and law with respect to such potential preference claims, and the Debtors do not seek relief to permit customers to withdraw such assets at this time.

A.     **The Withdrawable Assets Do Not Constitute Property of the Estate**.

23.     The Debtors continue to evaluate whether their bankruptcy estates have any colorable claims, including preference actions under section 547 of the Bankruptcy Code, in connection with reopening withdrawals of the Withdrawable Assets to customers.  The Debtors believe that, even if a *prima facie* case exists for a preference action on transfers from the Earn Program or the Borrow Program to the Custody Program or Withhold Accounts, in each case, that

occurred within the 90 days before the Petition Date, any such claim is statutorily barred to the extent such transfer was, in the aggregate, below the Statutory Cap.

24.     Section 541 of the Bankruptcy Code generally provides that all property in which a debtor has a legal or equitable interest, including any interest in property that a debtor acquires postpetition, becomes property of the estate upon the commencement of a chapter 11 case. 11 U.S.C. § 541(a)(1), (a)(7).  Importantly, section 541 of the Bankruptcy Code does not by itself create new legal or equitable interests in property; instead, "[p]roperty interests are created and defined by state law." *Butner v. United States*, 440 U.S. 48, 54-55 (1979) (noting that "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law").  Indeed, Congress was clear that section 541(a)(1) of the Bankruptcy Code "is not intended to expand the debtor's rights against others more than they existed at the commencement of the case." H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 367-68 (1977); *see also Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984) (holding that the "rights a debtor has in property at the commencement of the case continue in bankruptcy—no more, no less").  Thus, if a debtor holds no legal or equitable interest in property as of the commencement of the case, such property does not become property of the debtor's estate under section 541 and the debtor is prohibited from distributing such property to its creditors. *See Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 135-36 (1962) ("The Bankruptcy Act simply does not authorize a [debtor] to distribute other people's property among a bankrupt's creditors . . . [S]uch property rights existing before bankruptcy in persons other than the bankrupt must be recognized and respected in bankruptcy.").

25.     The Debtors recognize that the treatment of cryptocurrencies as a general matter is not well-trod in bankruptcy courts, property law, or contract law.[17]  Thus, the Debtors believe the

---

[17]     *See, e.g.*, Adam J. Levitin, *Not Your Keys, Not Your Coins:  Unpriced Credit Risk in Cryptocurrency*, 101 Tex.
(Continued)

Court should first examine the Debtors' and customers' intent in connection with these assets, as reflected in the Latest Terms of Use and Loan Terms of Use.[18]

### B.    The Withdrawable Assets Are Property of the Customers.

26.    Cryptocurrency is a new asset class, and existing regulatory and legal frameworks have not yet determined how to think about ownership of crypto assets.  The law is unsettled on whether cryptocurrency assets are akin to, and should be regulated as, securities, commodities, currency, bank deposits, or some other type of asset class.[19]  In fact, in July 2022, the sponsors of the Uniform Commercial Code proposed amendments that address these issues, but such amendments have not yet been adopted by any state legislatures.[20]  In some contexts, cryptocurrency assets may operate similarly to a security, in others they may resemble a commodity, and in others they may serve the purpose of a currency—and many users of cryptocurrency assets believe this flexibility is a feature, not a bug.  There may be arguments that ownership of cryptocurrency assets should be treated differently based on these different regimes, but these arguments remain unresolved by courts and legislative bodies in the United States.

27.    In many ways, how to think about ownership of cryptocurrency assets is a novel issue, but our legal system is well-equipped to answer these types of questions of property

---

L. Rev. (forthcoming, 2022).

[18]    The Latest Terms of Use do not explicitly address the Withhold Accounts because such accounts were created after the Latest Terms of Use went into effect.

[19]    *See id.*

[20]    In July 2022, the Joint Committee of the American Law Institute and the Uniform Laws Commission—the sponsors of the Uniform Commercial Code—approved wide-ranging amendments to the Uniform Commercial Code to provide workable rules for emerging technologies, such as cryptocurrency.  Unif. Comm. Code & Emerging Techs. (Unif. L. Comm'n & Am. L. Inst. 2022), available at https://www.uniformlaws.org/HigherLogic /System/DownloadDocumentFile.ashx?DocumentFileKey=67fe571b-e8ad-caf8-4530-d8b59bdca805&force Dialog=1.  This update provides evidence for a recognition that cryptocurrency was not previously governed by the Uniform Commercial Code.

ownership. Absent a contrary legal or regulatory framework (such as the recording system governing the transfers of real property), courts look to the intent of the parties as evidenced in a written agreement. *See Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010) (holding that, as a general matter with respect to contracts, the intent of the parties controls); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985) (same); *The Elgee Cotton Cases*, 89 U.S. 180, 186 (1874) (applying intent of parties doctrine to question of transfer of title). Here, the parties entered into a contractual arrangement governed by clear terms of use and under which the parties have a consistent course of dealing, so those terms govern the parties' relative rights. Under New York law, which governs the Latest Terms of Use, contracts are interpreted and enforced in accordance with their plain meaning and clear and unambiguous terms.[21] The ultimate objective in interpreting an agreement is to determine "the intention of the parties as derived from the language employed."[22] Here, the ownership and title to the Custody Assets should be determined by the parties' respective contractual rights, as articulated in the Latest Terms of Use, which are clear and provide ample evidence that the parties' intent was that the title and ownership of Custody Assets remain with the customers, and that title and ownership of assets in the Earn Program and the Borrow Program are held by the Debtors.

28. As an initial matter, the Latest Terms of Use expressly provide that title and ownership of Custody Assets remain with customers at all times. "Title to any [each customer's] Eligible Digital Assets in a Custody Wallet shall at all times remain with [the customer] and not transfer to Celsius. Celsius will not transfer, sell, loan or otherwise rehypothecate Eligible Digital

---

[21] *See, e.g.*, *In re Condado Plaza Acquisition LLC*, 620 B.R. 820, 831 (Bankr. S.D.N.Y. 2020); *see* Latest Terms of Use, at § 33 (providing that New York law governs).

[22] *In re Lehman Bros. Holdings Inc.*, 439 B.R. 811, 825 (Bankr. S.D.N.Y. 2010) (quoting *Tom Doherty Assocs. Inc. v. Saban Entm't Inc.*, 869 F. Supp. 1130, 1137 (S.D.N.Y. 1994)).

Assets held in a Custody Wallet."[23]    Accordingly, the parties' intent with respect to the Custody

Assets was to **not** pass any degree of ownership to Celsius, meaning such assets (once in the

Custody Program) cannot be property of the estate, subject to the one exception when a customer

also has an outstanding loan under the Borrow Program.[24]    The Loan Terms of Use, to which all

customers in the Borrow Program must agree, include provisions that provide the Debtors with

certain setoff rights not only with respect to the customers' direct collateral in the Borrow Program,

but also with respect to certain assets held in the customer's Celsius Account (which, for the

avoidance of doubt, approximates customer assets held in the Custody Program or Withhold

Account).[25]

29.    Consistent with this understanding, in connection with Custody Assets, the terms

outline a relationship where, inter alia, Celsius was proscribed from using the Custody Assets for

its own benefit,[26] Celsius was acting merely as an agent of customers,[27] Celsius was merely

holding the Custody Assets on the customers' behalf,[28] and an economic relationship between the

customers and Celsius as to Custody Assets simply was not created[29].    Last, the Debtors' course

of dealings under the Latest Terms of Use included the use and maintenance of a matched book

---

[23]  Latest Terms of Use, at § 4.B.

[24]  *See infra* par.36-38.  *See also* Mashinsky Declaration ¶ 58.

[25]  *See infra* par. 36-38.  *See also* Mashinsky Declaration ¶ 58.

[26]  *See* Latest Terms of Use, at § 4.B (prohibiting Celsius from transferring, selling, loaning, or otherwise hypothecating Custody Assets absent an instruction to do so by customers or other limited circumstances not applicable here).

[27]  *See id.* (providing that Celsius was acting as an agent to "store and secure" Custody Assets and would "perform other duties customarily performed by a custodian" in connection therewith).

[28]  *See id.* at § 2 (describing the Custody Assets as being "held in custody on the User's behalf").

[29]  *See id.* at § 4.B (stating that customers would bear all economic risk of loss, including price fluctuation, rather than providing that both parties are tied together economically or that Celsius would provide, interest, rewards, or other consideration on account of holding Custody Assets).

system as to Custody Assets. The balance of Custody Assets are held in Custody-specific wallets and workspaces within the Debtors' internal architecture.

30.    With respect to the Withhold Assets, the Debtors have never claimed or acquired an equitable interest in the cryptocurrency stored in Withhold Accounts. Thus, Custody Assets and Withhold Assets are held by the Debtors on behalf of customers and are not property of the Debtors' estates. Such assets are owned in the first instance by the respective customers.

31.    Accordingly, the Debtors respectfully request that the Court authorize the Debtors to reopen withdrawals for customers as to such assets to the extent they are not subject to any avoidance action, as described below. Specifically, and as set forth more fully below and reflected in the Proposed Order, the Debtors submit that customers should be permitted to withdraw (a) the Pure Custody Assets and Pure Withhold Assets, which do not include a transfer that could be subject to an avoidance action, and (b) the Transferred Custody Assets and Transferred Withhold Assets to the extent below the Statutory Cap.

## II.    Transferred Custody Assets and Transferred Withhold Assets That Fall Below the Statutory Cap Are Not Subject to a Colorable Preference Action.

32.    Section 547(b) of the Bankruptcy Code provides that a transfer of an interest of the debtor in property may be avoided if it was made: (a) for the benefit of a creditor; (b) on account of an antecedent debt owed by the debtor; (c) while the debtor was insolvent; (d) within 90 days before the petition date; and (e) to enable such creditor to receive preferential treatment relative to what the creditor would receive if the bankruptcy case were a chapter 7 liquidation.[30]

33.    The Debtors are reviewing the extent to which a *prima facie* case exists for a preference action, with respect to transfers from the Earn Program or the Borrow Program to the

---

[30]    11 U.S.C. § 547(b)(1)-(5).

Custody Program or Withhold Accounts, all of which occurred within the 90 days before the Petition Date.  The preference elements may be satisfied with respect to the assets transferred from the Earn or Borrow Programs to the Custody Program or Withhold Accounts.  Among other things, each transfer was made to or for the benefit of a creditor on account of an antecedent debt (*i.e.*, extinguishing the Debtors' contractual obligations to return the cryptocurrency to the customers pursuant to the Latest Terms of Use).[31]  Pursuant to section 547(f) of the Bankruptcy Code, the Debtors are presumed to be insolvent in the 90 days before the Petition Date.[32]  Finally, in a hypothetical chapter 7 context, had these digital assets not been transferred from the Earn or Borrow Programs to the Custody Program or Withhold Accounts, the relevant creditors would have received their pro rata share of distributions of estate property, along with similarly situated creditors, which would be less than a full recovery on their claims.[33]  However, because such transfers occurred, the return of Transferred Custody and Transferred Withhold Assets would constitute an in-kind and full recovery to such customers.

34.    However, section 547(c)(9) of the Bankruptcy Code expressly exempts transfers that, in the aggregate, total less than the Statutory Cap.  11 U.S.C. § 547(c)(9).  The vast majority of transfers of Transferred Custody and Transferred Withhold Assets fall below the Statutory Cap and could likely not be successfully challenged as preferential.  Thus, to the extent the transfers of Transferred Custody and Transferred Withhold Assets, at the time of each such transfer, had an

---

[31]    *See In re ContinuityX, Inc.*, 569 B.R. 29, 34 (Bankr. S.D.N.Y. 2017) ("Debt is considered an 'antecedent debt' . . . if it was incurred prior to the challenged transfer").

[32]    *See* 11 U.S.C. § 547(f); *In re Roblin Indus.*, 78 F.3d 30, 34 (Bankr. S.D.N.Y. 1996).

[33]    *See In re Teligent, Inc.*, 380 B.R. 324, 339 (Bankr. S.D.N.Y. 2008) ("As a practical matter, this element is satisfied whenever the plaintiff shows that the creditor would receive less than 100% in a hypothetical chapter 7 distribution.").

aggregate value of less than the Statutory Cap, such transfers are exempt from the preference statute by definition and, accordingly, customers should be permitted to withdraw these assets.

35.     Approval of the requested relief is justified because the Debtors are maintaining their ability to effectively pursue preference actions where colorable claims exist, while permitting customers to withdraw assets that are not property of the estate.   Accordingly, the Debtors respectfully submit that honoring the Latest Terms of Use is proper and, accordingly request to reopen withdrawals for certain customers with respect to (i) property that is not property of the estate (and not subject to an avoidance action in the first instance), *i.e.*, Pure Custody and Pure Withhold Assets, as well as (ii) property that is not subject to a viable preference action, *i.e.*, Transferred Custody and Transferred Withhold Assets but only to the extent such transfers fall below the Statutory Cap as set forth in section 547(c)(9) of the Bankruptcy Code.

### III.     The Debtors Do Not Seek, At This Time, to Reopen Withdrawals With Respect to the Withdrawable Assets Where the Debtors May Have a Contractual Right of Setoff.

36.     As stated above, one of the Debtors' principal goals in the chapter 11 cases is to return value to customers.  However, that goal is not unqualified.  Rather, it must be balanced along with the Debtors' duty to maximize the value of their estates for the benefit of all creditors and their obligation to provide for distributions to stakeholders that fairly reflect such holders' legal entitlements.  For all Withdrawable Assets, the Debtors need to consider the extent to which they may hold a right to setoff against obligations owed to customers, including the customers' obligation to repay loans under the Borrow Program.  Accordingly, the Proposed Order carves out from the relief the reopening of withdrawals for any customer with any outstanding loans under the Borrow Program.

37.     To enter into the Borrow Program, customers had to agree to the Loan Terms of Use, which provide for a right to setoff even as to certain Custody Assets, as set forth below:

18

If you fail to make any repayment of principal when due, in addition to any rights Celsius may have in connection with a Default Event, Celsius shall be entitled, and you hereby authorize Celsius, to: (a) deduct from your Celsius account any Eligible Stablecoins to recover your repayment obligation in full or in part; and/or (b) Liquidate the Collateral to recover your repayment obligation in full or in part, in accordance with the terms of Section 15 below.[34]

38.     In light of the Debtors' ongoing efforts to evaluate their setoff rights under the Latest Terms of Use, the Loan Terms of Use, and applicable law, for purposes of this Motion, the Debtors, at this time, are seeking limited relief, and the Debtors are not seeking to reopen withdrawals for Withdrawable Assets to the extent such assets are linked to a customer with an outstanding loan.  Rather, the Debtors are preserving material available assets pending ongoing analysis of the amounts outstanding under the Borrow Program.

## **Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

39.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## **Reservation of Rights**

40.     Nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or should be construed as (a) an admission as to the validity of any particular claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds, including with respect to what constitutes property of the estate; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order

---

[34] *See* Terms of Use Declaration, at <u>Exhibit B-9</u> attached thereto (the "<u>Loan Terms of Use</u>"), at "Repayment," 3. *See also* Mashinsky Declaration ¶ 58.

granting the relief requested by this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law including with respect to any avoidance actions; (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens; or (h) a waiver of, or concession or admission relating to, any cause of action or right of the Debtors.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## Motion Practice

41.     This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Motion. Accordingly, the Debtors submit that this Motion satisfies Local Rule 9013-1(a).

## Notice

42.     The Debtors will provide notice of this Motion to the following parties or their respective counsel:  (a) the U.S. Trustee; (b) counsel to the Creditors' Committee; (c) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (d) the United States Attorney's Office for the Southern District of New York; (e) the Internal Revenue Service; (f) the offices of the attorneys general in the states in which the Debtors operate; (g) the Securities and Exchange Commission; (h) Eligible Customers; and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **No Prior Request**

43.    No prior request for the relief sought in this Motion has been made to this or any other Court.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Order,

granting the relief requested herein and such other relief as the Court deems appropriate under the

circumstances.

New York, New York
Dated: September 1, 2022

*/s/ Joshua A. Sussberg*
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:            jsussberg@kirkland.com

 - and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:            patrick.nash@kirkland.com
                     ross.kwasteniet@kirkland.com

*Proposed Counsel to the Debtors and*
*Debtors in Possession*

**<u>Exhibit A</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**ORDER (I) AUTHORIZING THE DEBTORS**
**TO REOPEN WITHDRAWALS FOR CERTAIN CUSTOMERS**
**WITH RESPECT TO CERTAIN ASSETS HELD IN THE CUSTODY**
**PROGRAM AND WITHHOLD ACCOUNTS AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"), authorizing the Debtors to reopen withdrawals for certain customers with respect to certain assets held in the Custody Program and in Withhold Accounts, and granting related relief, all as more fully set forth in the Motion; and upon the First Day Declarations; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York, entered February 1, 2012; and this Court having the power to enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of these cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

Court having found that the Debtors' notice of the Motion and the Order and opportunity for a hearing thereon were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefore, it is

HEREBY ORDERED THAT:

1.      The Motion is granted on a final basis as set forth herein.

2.      The Debtors are authorized, in consultation with the Creditors' Committee's advisors, to permit customers to withdraw the following digital assets held on behalf of a customer—other than any current or former employees or insiders[3] or, with respect to any of the foregoing, any affiliate[4] thereof—in the Custody Program and/or Withhold Accounts subject to the terms of this Order, assets that were:

     a.  only ever in the Custody Program (the "Pure Custody Assets");

     b.  only ever in a Withhold Account (the "Pure Withhold Assets");

     c.  transferred in the 90 days before the Petition Date from the Earn Program or the Borrow Program into the Custody Program and, at the time of such transfer(s), the aggregate value of such transfer(s) was less than $7,575 (valued as of the time of such transfer) (the "Transferred Custody Assets"); and

     d.  transferred in the 90 days before the Petition Date from the Earn Program or Borrow Program into a Withhold Account and, at the time of such transfer(s), the aggregate value of such transfer(s) was less than $7,575 (valued as of the time of such transfer) (the "Transferred Withhold Assets"),

---

[3]     As such term is defined in section 101(31) of the Bankruptcy Code.

[4]     As such term is defined in section 101(2) of the Bankruptcy Code; *provided* that any entity that would fall within the definition of affiliate if such entity was a debtor in a case under the Bankruptcy Code shall also be an "affiliate" for purposes of this Order.

*provided*, that the Debtors are not authorized absent further order of the Court after notice and a hearing to transfer any cryptocurrency assets to any current or former employee or insider (or any affiliate of any current or former employee or insider); *provided further*, that no digital assets shall be permitted to be withdrawn unless and until a detailed schedule(s) (each such schedule, a "Distribution Schedule") with each affected account is (i) agreed with the Creditors' Committee or (ii) approved by a further order of the Court.

3.      Cryptocurrency assets shall be permitted to be withdrawn by customers in accordance with the Distribution Schedule(s), net of any gas fees or transaction costs in order to effectuate the withdrawal or transfer of digital assets to customers.

4.      In the event the Debtors reopen withdrawals in accordance with this Order, (a) the Debtors shall file a notice listing the affected customers and detailing how affected customers may effectuate withdrawals on the docket in these chapter 11 cases and (b) the Debtors shall not permit customers to transfer assets between programs of the Debtors.

5.      Notwithstanding anything in this Order to the contrary, this Order does not authorize the Debtors to permit withdrawals of any cryptocurrency (a) other than cryptocurrency held in the Custody Program and/or Withhold Accounts, (b) by any employee or insider or former employee or insider of the Debtors or any non-Debtor affiliate, or (c) to any customer with an outstanding loan owed to the Debtors through the Debtors' Borrow Program.

6.      For the avoidance of any doubt, customer withdrawals permitted pursuant to this Order will be in cryptocurrency, not in fiat currency.

7.      The omnibus hearing currently set for November 1, 2022, at 10:00 a.m. (prevailing Eastern Time) shall include a status conference on the matters relevant to the implementation of this Order and the status of the Debtors' analysis of Custody Assets and Withhold Assets that are

not subject to this Order.

8.    Notwithstanding anything to the contrary in the Motion, this Order, or any findings announced at the Hearing, nothing in the Motion, this Order, or announced at the Hearing constitutes a finding under the federal securities laws as to whether crypto tokens or transactions involving crypto tokens are securities, and the right of the United States Securities and Exchange Commission to challenge transactions involving crypto tokens on any basis are expressly reserved.

9.    Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed:  (a) an admission as to the validity of any particular claim against the Debtors; (b) a waiver of the rights of any Debtor or the Creditors' Committee to dispute any particular claim on any grounds, including with respect to what constitutes property of the estate, any avoidance actions, and any right to setoff; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the rights of any Debtor or the Creditors' Committee under the Bankruptcy Code or any other applicable law including with respect to any avoidance actions and any right to setoff; (g) a concession by the Debtors or the Creditors' Committee that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens; or (h) a waiver of, or concession or admission relating to, any cause of action or right of the Debtors.  Without limiting the generality of the foregoing, any payment made pursuant to this Order is not intended and should not be construed as an admission regarding the validity of any particular claim or a waiver or prejudice of the Debtors' rights (or the rights of any successor to

the Debtors or of any entity that has or acquires standing to assert rights on behalf of the Debtors or their estates) to subsequently dispute such claim or pursue such rights.

10.     Notice of the Motion satisfies the requirements of Bankruptcy Rule 6004(a).

11.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

12.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

13.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

New York, New York
Dated: _____, 2022

THE HONORABLE MARTIN GLENN
CHIEF UNITED STATES BANKRUPTCY JUDGE