# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
BRADLEY CONDIT,                                          :
                                                         :
                              Plaintiff,                 :        Case No. 22-cv-5452(CS)
                                                         :
                v.                                       :        **COMPLAINT**
                                                         :
CELSIUS NETWORK LLC and YARON SHALEM,                    :        **<u>Jury Trial Demanded</u>**
in his individual and professional capacities.           :
                                                         :
                              Defendants.                :
------------------------------------------------------------------x

Plaintiff Bradley Condit, by his attorneys, Parker Pohl LLP, as and for his Complaint against Defendants Celsius Network LLC ("<u>Celsius</u>") and Yaron Shalem, alleges as follows:

## <u>INTRODUCTION</u>

1.     Celsius Network LLC ("<u>Celsius</u>" or "<u>Company</u>") is a fintech startup founded in 2017 with the goal of "disrupting the financial industry" with an innovative cryptocurrency platform. (*See* https://celsius.network/careers)  Celsius is an "industry leader" with a "mission towards economic freedom for everyone." It invites job applicants to join in its venture, stating: "The revolution has started. Join us." (*See id.*)

2.     In 2020, Bradley Condit did just that. He was significantly older than most Celsius employees and had decades of accounting and finance experience. In October 2020, Condit was hired to be Celsius's Controller on a contract basis, and he became the Company's full-time Controller on January 1, 2021.

3.     Condit was hired by Harumi Urata-Thompson and Daniel Leon, before Yaron Shalem joined Celsius in or around April 2021. To induce him to take the job at a substantially below-market salary, management told him, repeatedly, that he and other executives would be granted valuable equity and become "rich" as soon as the Company took off.

4.      Condit excelled as Controller from the start, never received a negative review, and was well-liked by his team.

5.      He also had a history of cancer – a result of his work as a First Responder at Ground Zero when the Twin Towers collapsed on 9/11. Although he survived cancer, the experience left him with continuing neuropathy and weakened his immune system.

6.      These disabling conditions put Condit at a significant disadvantage when, during his short tenure at Celsius, he had the misfortune of contracting not only COVID-19, but also Lyme disease and Ehrlichiosis. Those illnesses led to life-threatening medical issues and a hospitalization a few months into his employment.

7.      Celsius learned of Condit's health issues and, instead of reacting with sympathy, it (and in particular Shalem) decided to get rid of Condit. Indeed, shortly after learning of Condit's disabling health conditions, and as a result of them, Celsius began to phase him out by trying to fire him without basis, drastically decreasing his responsibilities, and beginning the process of replacing him with a new Controller.

8.      That plan came to fruition on September 27, 2021, when Celsius fired Condit without warning. Remarkably, during his termination meeting, Celsius's Director of Finance Yaniv Tsur told Condit that Shalem – who had been aiming to replace Condit since Shalem joined Celsius in March 2021 – had made the decision to terminate Condit within weeks of Condit informing Celsius of his June 2021 hospitalization and debilitating illness.

9.      Celsius also told Condit his termination was due to a company restructuring and the elimination of his position. But that was clearly a pretext: shortly after firing Condit, Celsius advertised a job opening *for Condit's exact same position*.

10. Put simply, Celsius was motivated by the very things that the anti-discrimination laws are meant to stamp out: an employee's disabilities and the perception that an employee's health problems somehow made him less capable than others, despite the fact that no one had ever complained about his performance. Rather than work with Condit to address his health challenges, as legally obligated to, Celsius simply discarded him.

11. Indeed, Celsius diminished his responsibilities and ultimately fired Condit as a direct result of his disclosure of severe health problems. As this Complaint sets forth, the circumstances surrounding his reduction in responsibilities and ultimate termination are a textbook case of disability discrimination under the New York State Human Rights Law ("NYSHRL") and the Americans with Disabilities Act ("ADA").

12. As a 9/11 First Responder, a cancer survivor, and an excellent, well-liked employee with no performance issues, Condit deserved better.

13. In addition to the loss of multiple categories of income, including the equity he was repeatedly promised by Celsius, Condit has suffered severe emotional distress as a result of Defendants' discriminatory conduct and his termination.

14. By this action, Condit seeks to remedy the injustice caused by Defendants' discriminatory actions and recover the monetary and non-monetary losses he has suffered as a result of his unlawful termination.

**ADMINISTRATIVE PREREQUISITES**

15. Plaintiff timely pursued all applicable administrative remedies. On or about March 1, 2022, Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission (Charge No. 520-2022-05370C) against the Defendants herein.

16.     The EEOC issued Plaintiff a right to sue letter dated June 7, 2022.  This action is

commenced within within 90 days of Plaintiff's receipt of the right to sue letter.  A copy of the

letter is attached.

## PARTIES

17.     Plaintiff is a 62-year-old cancer survivor, with a long, successful career in

accounting and finance. Plaintiff is a resident of Armonk, New York.

18.     Defendant Celsius is a financial technology platform that serves as a cryptocurrency

bank. Celsius is located in New York, New York at 43 W 23rd Street, New York, NY 10010. Upon

information and belief, Celsius has over 100 employees.

19.     Defendant Yaron Shalem was the Chief Financial Officer at Celsius between March

and December 2021 until his arrest in Israel for alleged money laundering, fraud, embezzlement

and sexual assault. Upon information and belief, Shalem resides in Israel.

## JURISDICTION AND VENUE

20.     The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343

and has supplemental jurisdiction over the state law claims that are alleged pursuant to 28 US.C.

§ 1367, et. seq.

21.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1)-(2). A substantial

part of the events or omissions giving rise to Plaintiff's claims occurred within this District.  In

addition, venue is proper under 42 U.S.C. § 2000e-5(f)(3), because the unlawful employment

practice complained of herein occurred within the geographic jurisdiction of the Southern District

of New York.

## FACTS

### Condit's Background: From 9/11 Responder to Successful Finance Career

22.    Immediately after the planes hit on September 11, 2001, Condit, having been trained in advanced first aid, ran from his place of work on the 11th Floor of the Travelers Building in lower Manhattan and provided first aid and assistance to numerous victims on the perimeter of the North Tower and 7 World Trade Center. Condit arrived on the scene before the NYPD, FDNY and EMTs.

23.    Before and after 9/11, Condit had a highly successful, 40-year career in accounting and finance. In particular, he developed recognized expertise in financial controllership, treasury management, risk management, investment management, regulatory compliance and Basel I, II and III. His career has included high-level positions, including Chief Advisor CCAR at Societe Generale, Global Treasurer at Cantor Fitzgerald, Treasury Controller at Safra Group, Controller and Head of Decision Support at First Union National Bank (Wells Fargo), and Senior Investment Manager at Summit Bancorporation.

24.    Condit also has over 15 years of consulting experience with clients including Merrill Lynch, RBS, J.P. Morgan Chase, Citibank, Deutsche Bank, Citizens Bank, State Street Bank and Trust, Satander Bank and TIAA/CREF.

25.    Condit holds a B.S. Cum Laude in Finance/Economics and an M.B.A. in Finance/Investments with Distinction from Fairleigh Dickenson University. He also holds a graduate degree from the Stonier Graduate School of Banking at the University of Delaware and is completing his doctorate (ABD) in international finance from Pace University. He has the prestigious designation of Chartered Financial Analyst.

26.    Like many other 9/11 heroes, Condit eventually paid a steep price for his exposure to the pervasive toxins at Ground Zero. In 2015, he was diagnosed with colon cancer.

27.    Condit underwent seven (7) surgeries and six (6) months of chemotherapy and ultimately beat the cancer. However, as a result of his struggle with cancer, he suffers from severe neuropathy to this day with limited use of his hands, arms, legs and feet. Like most cancer survivors, he also has a severely suppressed immune system.

28.    In March 2020, Condit suffered a major heart attack also related to his 9/11 exposures, which required surgery and the placement of a stent in his heart. This major health event – termed a Widow Maker Heart Attack – compounded his already compromised immune system.

29.    Researchers have found that 9/11 first responders are at greater risk for cardiovascular and other health problems. One study discovered that firefighters who arrived immediately at the scene on the day of the attacks, as Condit did, have a 44% higher risk of cardiovascular troubles than those who arrived later.

**Condit's Hiring and Excellent Performance at Celsius**

30.    Condit began working at Celsius as an independent contractor on October 3, 2020. He was hired by Daniel Leon, Celsius's Co-Founder and Chief Strategy Officer, and Harumi Urata-Thompson, who was at the time Celsius's Chief Investment Officer.

31.    In recognition of his capabilities, Celsius made Condit its full-time Controller three months later on January 1, 2021.

32.    During interviews for his position, Celsius repeatedly told Condit that employees at his level would be granted substantial, valuable equity in the Company. In reliance on these

promises, Condit agreed to become Celsius's Comptroller at a well-below-market salary for someone with his experience and credentials.

33.      After Condit started the job, Celsius continued to promise that he would receive equity that would "make [him] rich."

34.      Condit's responsibilities as Controller included planning, directing and coordinating all operational accounting functions; managing the accumulation and consolidation of financial data; coordinating and preparing financial statements; coordinating external auditors; managing the budget; managing books reflecting blockchain activities; assessing accounting operations, internal controls, software and databases; and overseeing regulatory reporting.

35.      At 62 years of age, Condit was the oldest employee at Celsius.

36.      Condit's first few months at Celsius went smoothly. He was well-liked by his team and received positive feedback.

37.      In fact, during his entire tenure at Celsius, Condit never received a single complaint about his performance or a negative review.

**Condit Contracts COVID-19 and Informs Celsius of His Underlying Health Conditions**

38.      On January 6, 2021, Condit contracted COVID-19 while at cardiac rehab. Condit suffered serious symptoms, for which he received a monoclonal-antibody infusion on January 15, 2021. Initially, he was able to keep working from home despite the severity of his sickness.

39.      However, in February 2021, he began suffering debilitating symptoms. While he did not know it at the time, he later was diagnosed with Lyme disease and Ehrlichiosis. These illnesses caused recurring fever, fatigue, shortness of breath, nausea, weakness and blurred vision.

40.      In or around February and March 2021, Condit informed Trunshedda Ramos, Celsius's Chief Human Resources Officer, about his health challenges and his underlying disabling

medical condition. He also told Ramos that he was seeking medical treatment for his as-yet undiagnosed symptoms.

41.     Despite the severity of his COVID and the effects of his Ehrlichiosis and Lyme disease, Condit continued his excellent performance as Celsius's Controller. However, since January 6, 2021 to the present, Condit has suffered from "long Covid," and is currently participating in a clinical study into the effects of long Covid.

**Yaron Shalem Becomes Celsius's CFO and Begins Targeting Condit**

42.     In March 2021, Shalem became Celsius's CFO and Condit's supervisor. Celsius hired Shalem as CFO despite warnings directly to Alex Mashinsky (Celsius's co-founder and CEO) that Shalem was being sued in Israel for fraud and embezzlement, which meant that criminal charges were likely to follow.[1]

43.     Although Shalem was Condit's supervisor, Shalem barely spoke to Condit about his job and did not engage in any review of Condit's performance.

44.     Nevertheless, just after Condit had disclosed his disability to HR, Shalem wasted no time targeting Condit.

45.     For example, in or around April 2021, barely a month after Condit revealed his disabling health problems, Shalem approached Condit's direct reports to ask if there was a basis to "get rid of" him. Condit's reports responded that Condit was doing an excellent job and that there was no basis to fire him.

46.     When that approach failed, Shalem directed Eran Levi, Celsius's Controller over European divisions, to decrease Condit's responsibilities and cut him off from his direct reports.

---

[1]     Sure enough, in November 2021, Shalem was arrested in Israel on suspicion of money laundering, fraud, and sexual assault. Click here for the public report.

For example, Levi blocked Condit's participation in monthly close processes and removed the financial controls Condit had previously exercised and which fell squarely within his duties as Controller. There was no legitimate, non-discriminatory business reason for Shalem, via Levi, to decrease Condit's responsibilities – he was beginning the process of getting rid of Condit as a result of his disabilities and Celsius's perception that he was disabled.No one with a supervisory role at Celsius objected to or tried to stop Shalem and Levi from decreasing Condit's responsibilities in this manner, and there was no attempt by anyone at Celsius to remediate the situation.

### Celsius Posts Condit's Controller Job on Its Website

47.     Sometime in May 2021, Condit discovered to his shock that Celsius was posting his Controller job on its website as a position the Company was seeking to fill.

48.     When Condit confronted Shalem about why he was trying to fill Condit's position, Shalem said Celsius was just trying to provide Condit with "extra support." The explanation was demonstrably false: the job posting advertised Condit's Controller position, not a support position. Shalem's purported explanation was nothing more than a pretext for his illegal, discriminatory efforts to get rid of Condit.

### Celsius Refuses Condit's Requests for Accommodation Due to Illness

49.     Later in May 2021, Condit developed a high fever of 103.8 degrees as a result of his still-undiagnosed Lyme disease and Ehrlichiosis and asked if he could be excused from an upcoming meeting.

50.     After several emails to Shalem requesting that he be excused as an accommodation for his illness, to which Shalem did not even respond, Levi told Condit that he had to attend the

meeting. Shalem, and Celsius, knew that Condit was experiencing dangerous fever symptoms and nonetheless declined his request to accommodate his illness.

51.     Celsius's failure to accommodate Condit's minimal request was another indication of Celsius's total disregard of his health problems and its efforts to make his job intolerable. It was also part and parcel of Celsius's retaliatory actions against Condit, *i.e.,* the further reduction of his responsibilities and his ultimate firing.

**Condit Is Hospitalized and Again Informs Celsius of His Disabling Health Conditions**

52.     In June 2021, Condit was hospitalized with a high fever, and doctors diagnosed him with Lyme disease and Ehrlichiosis. Because of his compromised immune system and the time it took to diagnose the conditions, Condit also developed sepsis, and kidney and liver failure, which required him to receive two simultaneous intravenous antibiotics for five days. In fact, as medical records corroborate, he was near death. Condit now has Stage 2 kidney disease.

53.     While Condit was still in the hospital, his wife informed Celsius, via email to Ramos, of his serious disabling illness.

54.     Thankfully, after five days in the hospital (and three days of missed work), Condit recovered and was able to return to work.

55.     When he returned to work, Condit informed Ramos via email (copying Shalem) that doctors predicted his full recovery would take approximately three months. Unfortunately, informing Celsius of his health condition – and, in particular, the length of time he would need to heal – led only to further discrimination.

**Celsius Further Reduces Condit's Responsibilities and Effectively Replaces Him**

56.     Upon Condit's return from the hospital, Celsius and Shalem continued discriminating against him by further reducing and/or eliminating his responsibilities, including his responsibility to account for investments and his role dealing with outside auditors.

57.     Then, in July 2021 – within approximately five months of Condit first informing Celsius of his disabilities and within just a month of his hospitalization – Shalem told Condit that Shalem had decided that Darren Yarwood, would "function" as Controller, but that Condit would "technically" still be Controller.

58.     Shalem's nonsensical move made clear he had taken Condit's job away from him.

**Shalem Denies Condit Vacation That Had Been Previously Approved**

59.     In early July 2021, Shalem approved Condit's email request for a family vacation from August 2-6. Per company policy, and based on Shalem's approval as his supervisor, Condit then submitted the request in the Celsius HR system, which required final "sign off" from Shalem in the HR system.

60.     As Condit's vacation approached, Shalem still had not formally approved the vacation in the HR system. Condit sent several emails to Shalem reminding him to approve the request, to no avail. However, Shalem did reply to one of the emails by saying "I will take care of this; it's approved."

61.     Based on Shalem's informal email approvals, Condit left for his family vacation to Rhode Island on Saturday July 31. The next day, Condit received an email from Shalem with the subject line "Vacation Request Denied." The body of Shalem's message asked Condit who was covering for him when he was on vacation, despite the fact that the week before Condit had informed Shalem that his Assistant Controller and Senior Accountant were covering for him and

were fully briefed on what needed to be done while Condit was away. Condit had also made clear to Shalem that he would be available if needed while on vacation. Thus, Shalem's question about coverage was a façade designed to falsely suggest that Condit was neglecting his duties.

62.     Condit responded immediately with an email to Shalem and the entire Celsius accounting department saying that he would leave his family vacation in Rhode Island and return to work. Only after this reply to the entire department did Shalem respond to say that Condit could stay on vacation and actually claimed that he had had hit the "wrong button" on the vacation request. Shalem's purported denial of Condit's vacation request, *after approving the request and after Condit had already left for his approved vacation*, was yet another act of hostility by Shalem toward Condit based on his disability.

## Celsius Wrongfully Withdraws Condit's CEL Tokens

63.     On or about August 18, 2021, Celsius withdrew 2,727.60 CEL tokens from Condit's Celsius account with a value of approximately $16,938.40 at the time.

64.     However, Celsius had previously withdrawn *those same CEL tokens* from Condit's account on or about Mary 28, 2021.

65.     Celsius's withdrawal of the CEL tokens on August 18 was duplicative of the previous withdrawal, and Celsius was not entitled to withdraw the CEL tokens again.

66.     Celsius's improper withdrawal was yet another instance of discrimination and retaliation against Condit.

## Celsius Fires Condit Based on a Decision Made Just After Condit's Hospitalization

67.     Celsius's discriminatory pattern of reducing Condit's responsibilities, advertising his job, and effectively replacing him (all while he indisputably had no performance issues whatsoever) culminated in Celsius firing him on September 27, 2021.

68.     That day, Condit attended a meeting with Yaniv Tsur, Celsius's Director of Finance, where Tsur told him that: (a) Condit's Controller position was being eliminated; (b) Shalem had made the decision to fire Condit; and (c) the decision had been made in July 2021, *just after Condit's disabling hospitalization in June.*

## After Telling Condit His Job Had Been Eliminated, Celsius Advertises for His Replacement

69.     Incredibly, even though Celsius had told Condit he was being fired because his position was being eliminated, Celsius posted job openings for that very same position shortly after firing Condit.

70.     The postings described the same responsibilities as Condit's position, including all of the duties described herein.

71.     Indeed, Celsius's claim that Condit's position had been eliminated was false and plainly a pretext for discrimination.

72.     Celsius later claimed that it had transformed Condit's Controller position into multiple positions as part of a business restructuring. But Condit was never offered any of these purported positions, despite being fully qualified for all of them.

73.     Celsius ultimately hired a Controller to replace Condit.

74.     Celsius replaced Condit with Liran Shaulov, who, upon information and belief, has at most four years of experience in finance and accounting.

## Celsius Grants Equity to Condit's Peers

75.     Upon information and belief, within days after Celsius fired Condit and in keeping with the timeline Alex Mashinsky had promised to Condit and other senior employees, the Company granted Condit's peers shares of equity in the Company.

13

76.     Of course, Condit had been promised that same equity grant, *repeatedly*, by Celsius and he had agreed to become Celsius's Controller at a below-market salary in reliance on those promises.

77.     Instead of fulfilling those promises, Celsius fired Condit in violation of the NYSHRL and the ADA, thereby causing him to lose out on valuable compensation.

78.     Moreover, Celsius had granted Condit valuable CEL tokens as part of his compensation. Celsius took back those CEL tokens after wrongfully terminating Condit, thereby also depriving him of valuable compensation.

79.     In addition, Celsius CEL tokens have plummeted in value since Condit's termination. But for Celsius's discriminatory and retaliatory termination, Condit could have realized significant value from the CEL tokens he was granted and from the CEL tokens he should have been granted, but that Celsius either wrongfully took from him or did not allow to vest as they would have.

## FIRST CAUSE OF ACTION
### (Disability Discrimination under ADA – Hostile Work Environment, Discriminatory Termination, Regarded As Disabled, and Failure to Provide a Reasonable Accommodation) (Against Both Defendants)

80.     Plaintiff realleges each of the foregoing allegations as if fully set forth herein.

81.     Defendants were Plaintiff's employer under the ADA.

82.     The term disability under the ADA is defined to include "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12101(1).

83.     Major life activities include standing, lifting, bending, speaking, and working.  *Id.* § 12101(2)(A).

14

84.    Plaintiff suffers from a physical or mental impairment of the body, including, without limitation, the disabling effects of cancer, Lyme disease, and Ehrlichiosis.

85.    Plaintiff's physical or mental impairment, including without limitation, the disabling effects of cancer, Lyme disease, and Ehrlichiosis, substantially limits Plaintiff's major life activities.

86.    Plaintiff has a record of a physical and mental impairment within the meaning of the ADA.

87.    Defendants regarded Plaintiff as having an impairment within the meaning of the ADA.

88.    Plaintiff was, at all relevant times, a person with a "disability" within the meaning of the ADA.

89.    Defendants had notice of Plaintiff's disabilities.

90.    Plaintiff was qualified to perform the essential functions of his job, with reasonable accommodations, including but not limited to, time off to care for his serious medical conditions. Therefore, Plaintiff was, at all relevant times, a "qualified individual with a disability" within the meaning of the ADA.

91.    The ADA requires an employer to engage in a good faith interactive process to provide a reasonable accommodation to a qualified individual with a disability.

92.    Plaintiffs, due to his disability, was entitled to receive a reasonable accommodation.

93.    Defendants failed and refused to engage in the good faith interactive process required under the ADA to identify what reasonable accommodations were appropriate to provide Plaintiff, and Defendants failed and refused to make a reasonable accommodation for Plaintiff's disabilities.

94.    Defendants discriminated against Plaintiff in the terms and conditions of his employment based on his disability by failing to provide him with a reasonable accommodation.

95.    As a result of his disability, Defendants subjected Plaintiff to a hostile work environment that was permeated with discriminatory intimidation and ridicule that altered the conditions of his employment and created an abusive working environment.

96.    Defendants discriminated against Plaintiff because of his disability in violation of the ADA by, without limitation, (a) reducing his responsibilities and effectively replacing him as Controller, and (b) ultimately firing Plaintiff under the pretext of restructuring.

97.    Defendant Shalem instigated, caused, participated in, and accomplished some or all of the discriminatory acts that form the basis for Plaintiff's claims. Defendant Celsius encouraged, approved, acquiesced and/or condoned (through active support and/or calculated inaction) those acts.

98.    Therefore, Celsius is liable for its own acts as an employer and is also (or alternatively) vicariously liable for the acts of Shalem.

99.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the ADA, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of monetary damages and other relief, including but not limited to compensatory damages, his CEL tokens, and the equity Celsius promised him and to which he is entitled.

100.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the ADA, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which he is entitled to an award of monetary damages and other relief in an amount to be determined at trial.

101.    Plaintiff suffered, and continues to suffer, the impact of Defendants' discriminatory actions at his residence and home office in Armonk, New York, which is where he performed almost all of his work when he was employed by Celsius.

**SECOND CAUSE OF ACTION**
**(Disability Discrimination under NYSHRL – Hostile Work Environment,**
**Discriminatory Termination, and Failure to Provide a Reasonable Accommodation)**
**(Against Both Defendants)**

102.    Plaintiff realleges each of the foregoing allegations as if fully set forth herein.

103.    Defendants are employers subject to the NYSHRL.

104.    At all times relevant to the allegations against him, Defendant Shalem was Condit's supervisor, was an executive officer of Celsius, and had an ownership interest in Celsius. At all times relevant to the allegations against him, Shalem had substantial authority and responsibility to make decisions regarding the terms of employment at Celsius, including but not limited to changing or reducing an employee's responsibilities, replacing an employee, and/or terminating an employee.

105.    N.Y. Executive Law § 296(1) makes it unlawful:

> [f]or an employer . . . because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

106.    Plaintiff suffers from a physical or medical impairment resulting from anatomical, physiological, genetic, or neurological conditions which prevented the exercise of a normal bodily function and/or is demonstrable by medically accepted clinical or laboratory diagnostic techniques, and Plaintiff has a record of such impairment.

17

107. Plaintiff suffers from, without limitation, the disabling effects of cancer, Lyme disease, and Ehrlichiosis.

108. Defendants had notice of Plaintiff's disabilities.

109. Plaintiff was qualified to perform the essential functions of his job, with reasonable accommodations, including but not limited to, time off to care for his serious medical conditions.

110. Defendants failed and refused to engage in the good faith interactive process required under the NYSHRL to identify what reasonable accommodations were appropriate to provide Plaintiff, and Defendants failed and refused to make a reasonable accommodation for Plaintiff's disabilities.

111. Defendants discriminated against Plaintiff based on his disability by failing to provide him with a reasonable accommodation.

112. As a result of his disability, Defendants subjected Plaintiff to a hostile work environment that was permeated with discriminatory intimidation and ridicule that altered the conditions of his employment and created an abusive working environment.

113. Defendants discriminated against Plaintiff because of his disability in violation of the NYSHRL by, without limitation, (a) reducing his responsibilities and effectively replacing him as Controller, and (b) ultimately firing Plaintiff under the pretext of restructuring.

114. Defendant Shalem instigated, caused, participated in, and accomplished some or all of the discriminatory acts that form the basis for Plaintiff's claims. Defendant Celsius encouraged, approved, acquiesced and/or condoned (through active support and/or calculated inaction) those acts.

115. Therefore, Celsius is liable for its own acts as an employer and is also (or alternatively) vicariously liable for the acts of Shalem.

116.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of monetary damages and other relief, including but not limited compensatory damages, his CEL tokens, and the equity Celsius promised him and to which he is entitled.

117.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which he is entitled to an award of monetary damages and other relief in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
### (Disability Discrimination under NYSHRL – Regarded As Disabled)
### (Against Both Defendants)

118.     Plaintiff realleges each of the foregoing allegations as if fully set forth herein.

119.     The term disability under the NYSHRL is defined to include "a condition regarded by others as such an impairment."

120.     Plaintiff suffers from a physical or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function and/or is demonstrable by medically accepted clinical or laboratory diagnostic techniques, and Plaintiff has a record of such impairment. Put simply, Plaintiff's impairments are demonstrable by medically accepted techniques.

121.     Defendants regarded Plaintiff's serious health problems as compromising his ability to perform his job, preventing him from being a productive employee, and/or posing a risk of increased costs or inconvenience for Defendants.

122.     Defendants discriminated against Plaintiff, based on having regarded him as disabled, by (a) changing the terms of his employment by reducing his responsibilities and effectively replacing him as Controller, and (b) ultimately terminating Plaintiff under the pretext of restructuring.

123.     As described in the Facts section of this Complaint, Defendant Shalem instigated a significant portion of the discriminatory conduct referenced in the preceding paragraph. Indeed, Shalem instigated, caused, participated in, and accomplished some or all of the discriminatory acts that form the basis for Plaintiff's claims. Defendant Celsius encouraged, approved, acquiesced and/or condoned (through active support and/or calculated inaction) those acts.

124.     Therefore, Celsius is liable for its own acts as an employer and is also (or alternatively) vicariously liable for the acts of Shalem.

125.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of monetary damages and other relief, including but not limited compensatory damages, his CEL tokens, and the equity Celsius promised him and to which he is entitled.

126.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which he is entitled to an award of monetary damages and other relief.

127.     Plaintiff suffered, and continues to suffer, the impact of Defendants' discriminatory actions at his residence and home office in Armonk, New York, which is where he performed almost all of his work when he was employed by Celsius.

## FOURTH CAUSE OF ACTION
### (Aiding and Abetting Disability Discrimination under NYSHRL)
### (Against Defendant Shalem)

128.     Plaintiff realleges each of the foregoing allegations as if fully set forth herein.

129.     As described in the Facts section of this Complaint, Defendant Shalem instigated a significant portion of the discriminatory conduct referenced above. His acts were performed with intent to discriminate against Condit for his disability or perceived disability, an intent he shared with Celsius.

130.     Shalem's discriminatory acts assisted and were in concert with those of Celsius and other supervisory employees at Celsius, including Eran Levi and Yaniv Tsur.

131.     Shalem's personal participation in the discriminatory conduct therefore constituted aiding and abetting of Celsius's NYSHRL violations, pursuant to N.Y. Exec. Law § 296(6), which provides: "It shall be unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under [the NYSHRL], or to attempt to do so."

**WHEREFORE,** Plaintiff requests that the Court grant judgment in his favor and against Defendants, providing for the following relief:

a.     An award of damages against Defendants, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, loss of past and future income, wages, compensation, seniority, and other benefits of employment;

b.     An award of damages against Defendants, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for his severe emotional distress;

c. An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff, including, but not limited to, loss of income, reputational harm and harm to professional reputation, in an amount to be determined at trial, plus prejudgment interest;

d. An award of punitive damages, in an amount to be determined at trial;

e. An award of any applicable penalties and/or liquidated damages in an amount to be determined at trial;

f. An award of attorneys' fees and costs that Plaintiff has incurred in this action, to the fullest extent permitted by law; and

g. Such other and further relief as the Court may deem just and proper.

Dated: New York, New York     **PARKER POHL LLP**
   June 28, 2022

By: _____
    M. Todd Parker
    Hyatt M. Howard
    Wendy W. Tannenbaum

    99 Park Avenue, Suite 1510
    New York, New York 10016
    (212) 202-8886
    (646) 924-3100 (fax)

    *Attorneys for Plaintiff Bradley Condit*

# EXHIBIT A

EEOC Form 161-B (01/2022)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

To:  **Bradley Condit**
     **c/o Parker Pohl LLP 99 Parker Avenue, Suite 1510**
     **New York, NY 10016**

From:  **New York District Office**
       **33 Whitehall St, 5th Floor**
       **New York, NY 10004**

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **520-2022-05370** | **Michael Woo,** **Investigator** | **929-506-5348** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

> Less than 180 days have elapsed since the filing date. I certify that the Commission's processing of this charge will not be completed within 180 days from the filing date.

> The EEOC is terminating its processing of this charge.

*Equal Pay Act (EPA): You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.*

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Digitally Signed By:Judy Keenan
06/07/2022

**Judy Keenan**
**District Director**

Enclosures(s)

cc:  **Todd H Girshon**
     **Todd.Girshon@jacksonlewis.com**

     **Todd Parker**
     **Parker Pohl LLP**
     **todd.parker@parkerpohl.com**

Enclosure with EEOC
Form 161-B (01/2022)

# INFORMATION RELATED TO FILING SUIT
# UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS** -- **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of **the date you *receive*** this Notice. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed*** to you (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS** -- **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – not 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION** -- **Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE** -- **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months** of this Notice. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*