

The New York Times
620 8TH AVENUE · NEW YORK, NY 10018

# PROOF OF PUBLICATION

Sep-06, 20 22

I, Edgar Noblesala, in my capacity as a Principal Clerk of the Publisher of The New York Times, a daily newspaper of general circulation printed and published in the City, County and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of The New York Times on the following date or dates, to wit on

Sep 6, 2022, NYT & Natl, pg B3

Sworn to me this 6th day
of September, 2022

_____
Notary Public

Ellen Herb
Notary Public, State of New York
No. 01HE6163785
Qualified in New York County
Commission Expires April 2, 2023

---

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:                                        ) Chapter 11
CELSIUS NETWORK LLC, et al.,[1]   ) Case No. 22-10964 (MG)
                              Debtors.   ) (Jointly Administered)

**NOTICE OF AUCTION FOR THE POTENTIAL SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF ANY AND ALL CLAIMS, INTERESTS, AND ENCUMBRANCES**

PLEASE TAKE NOTICE that the above-captioned debtors and debtors in possession (collectively, the "Debtors") are soliciting offers for the purchase of certain of the Debtors' assets and assumption of certain liabilities of the Debtors consistent with the bidding procedures (the "Bidding Procedures") approved by the United States Bankruptcy Court for the Southern District of New York (the "Court") by entry of an order on September 1, 2022 [Docket No. 687] (the "Bidding Procedures Order"). All interested bidders should carefully read the Bidding Procedures and Bidding Procedures Order. To the extent that there are any inconsistencies between this notice and the Bidding Procedures Order, the Bidding Procedures or the Bidding Procedures Order, as applicable, shall govern in all respects.

Copies of the Bidding Procedures Order or other documents related thereto are available upon request to Stretto, Inc. by calling (855) 423-1530 (Domestic) or (949) 669-5873 (International) or visiting the Debtors' restructuring website at (https://cases.stretto.com/celsius).

PLEASE TAKE FURTHER NOTICE that any person or entity interested in purchasing the GK8 Assets may submit a non-binding Indication of Interest to the Debtors any time prior to the Final Bid Deadline.

PLEASE TAKE FURTHER NOTICE that the Final Bid Deadline is **September 21, 2022, at 4:00 p.m. (prevailing Eastern Time)**, and that any person or entity who wishes to participate in the Auction must comply with the participation requirements, bid requirements, and other requirements set forth in the Bidding Procedures.

PLEASE TAKE FURTHER NOTICE that the Debtors may conduct the Auction, at which time they will consider proposals submitted to the Debtors and their professionals, by and pursuant to the Bidding Procedures as set forth in the Bidding Procedures Order, on **September 23, 2022, at 10:00 a.m. (prevailing Eastern Time)**, via remote video.

PLEASE TAKE FURTHER NOTICE that the Debtors expect to seek approval of the Sale (if any) at the Sale Hearing, which is presently scheduled to commence on **October 6, 2022, at 10:00 a.m. (prevailing Eastern Time)**, before the Honorable Martin Glenn, United States Bankruptcy Court for the Southern District of New York.

PLEASE TAKE FURTHER NOTICE that, except as otherwise set forth in the Bidding Procedures Order with respect to objections to proposed cure amounts or the assumption and assignment of Assigned Contracts, objections, if any, to a proposed Sale **must**: (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules and the Local Rules; (c) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (d) be filed with the Court by **September 29, 2022, at 4:00 p.m.** (prevailing Eastern Time).

**CONSEQUENCES OF FAILING TO TIMELY MAKE AN OBJECTION**

ANY PARTY OR ENTITY WHO FAILS TO TIMELY MAKE AN OBJECTION TO A SALE ON OR BEFORE THE SALE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO SUCH SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE SELLING DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, EXCEPT AS SET FORTH IN THE APPLICABLE PURCHASE AGREEMENT(S).

**NO SUCCESSOR OR TRANSFEREE LIABILITY**

The Sale Order (if any) is expected to provide, among other things, that the Successful Bidder from the Sale will have no responsibility for, and the assets will be sold free and clear of, any successor liability, including the following:

To the greatest extent allowable by applicable law, the Successful Bidder shall not be deemed, as a result of any action taken in connection with the Stalking Horse Agreement (in the case where a Stalking Horse Bidder is the Successful Bidder) or a separate purchase agreement entered into with the Successful Bidder (if a Stalking Horse Bidder is not the Successful Bidder), the consummation of the Sale, or the transfer or operation of the assets, to: (a) be a legal successor, or otherwise be deemed a successor to the Debtors (other than with respect to any obligations as an assignee under the Assigned Contracts arising after the Effective Date); (b) have, de facto or otherwise, merged with or into the Debtors; or (c) be an alter ego or mere continuation or substantial continuation of the Debtors, in the case of each of (a), (b), and (c), including, without limitation, within the meaning of any foreign, federal, state or local revenue law, pension law, the Employee Retirement Income Security Act, the Consolidated Omnibus Budget Reconciliation Act, the WARN Act (29 U.S.C. §§ 2101 et seq.), the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964 (as amended), the Age Discrimination and Employment Act of 1967 (as amended), the Federal Rehabilitation Act of 1973 (as amended), the National Labor Relations Act (29 U.S.C. § 151, et seq.), environmental liabilities, debts, claims or obligations, any liabilities, debts or obligations of or required to be paid by the Debtors for any taxes of any kind for any period, labor, employment, or other law, rule or regulation (including without limitation filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine. All rights of any party to set off any claims, debts or obligations owed by or to the Successful Bidder in connection with the assets shall be extinguished on the Effective Date pursuant to the Sale Order. Other than as expressly set forth in the Stalking Horse Agreement (or another Successful Bidder's purchase agreement, as applicable) with respect to Assumed Liabilities, the Successful Bidder shall not have any responsibility for (a) any liability or other obligation of the Debtors or related to the assets or (b) any claims (as such term is defined by section 101(5) of the Bankruptcy Code) against the Debtors or any of their predecessors or affiliates. To the greatest extent allowed by applicable law, the Successful Bidder shall have no liability whatsoever to the Debtors' (or their predecessors' or affiliates') respective businesses or operations or any of the Debtors' (or their predecessors' or affiliates') obligations based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor or transferee liability, de facto merger or substantial continuity, labor and employment or products liability, whether known or unknown as of the Effective Date, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the assets prior to the Effective Date. For the avoidance of doubt, the Successful Bidder shall assume all liabilities of GK8, whether or not such liabilities are directly or indirectly related to any of the Debtors. The Stalking Horse Bidder would not have entered into the Stalking Horse Agreement but for the foregoing protections against potential claims based upon "successor liability" theories.

PLEASE TAKE FURTHER NOTICE that the Debtors reserve the right, in their reasonable business judgment and subject to the exercise of their fiduciary duties, and in consultation with the Consultation Parties, to modify the Bidding Procedures and/or to terminate discussions with any Potential Bidders at any time, to the extent not materially inconsistent with the Bidding Procedures.

PLEASE TAKE FURTHER NOTICE that copies of the Bidding Procedures Motion, Bidding Procedures, and Bidding Procedures Order, as well as all related exhibits, are available: (a) free of charge upon request to Stretto, Inc. (the notice and claims agent retained in these chapter 11 cases) by calling (855) 423-1530 (Domestic) or (949) 669-5873 (International); (b) by visiting the Debtors' restructuring website at (https://cases.stretto.com/Celsius); or (c) for a fee via PACER by visiting (https://www.deb.uscourts.gov/).

New York, New York, Dated: September 1, 2022

/s/ *Joshua A. Sussberg*, **KIRKLAND & ELLIS LLP, KIRKLAND & ELLIS INTERNATIONAL LLP**, Joshua A. Sussberg, P.C., 601 Lexington Avenue, New York, New York 10022, Telephone: (212) 446-4800, Facsimile: (212) 446-4900, Email: jsussberg@kirkland.com -and- Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*), Ross M. Kwasteniet, P.C. (admitted *pro hac vice*), 300 North LaSalle Street, Chicago, Illinois 60654, Telephone: (312) 862-2000, Facsimile: (312) 862-2200, Email: patrick.nash@kirkland.com, ross.kwasteniet@kirkland.com, *Proposed Counsel to the Debtors and Debtors in Possession*

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1239); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures Order or the Bidding Procedures, as applicable.

# White House Reveals $50 Billion Blueprint To Bolster Chip Makers

FROM FIRST BUSINESS PAGE

The fund, which was approved by Congress in July, was created to encourage U.S. production of strategically important semiconductors and spur research and development into the next generation of chip technologies. The Biden administration says the investments will lessen dependence on a foreign supply chain that has become an urgent threat to the country's national security.

"This is a once-in-a-lifetime opportunity, a once-in-a-generation opportunity, to secure our national security and revitalize American manufacturing and revitalize American innovation and research and development," Ms. Raimondo said. "So, although we're working with urgency, we have to get it right, and that's why we are laying out the strategy now."

Trade experts have called the fund the most significant investment in industrial policy that the United States has made in at least 50 years.

It will come at a pivotal moment for the semiconductor industry.

Tensions between the United States and China are rising over Taiwan, the self-governing island that is the source of more than two-thirds of the most advanced semiconductors. Shortages of semiconductors have also helped to fuel inflation globally, by increasing delivery times and prices for electronics, appliances and cars.

Semiconductors are crucial components in mobile phones, pacemakers and coffee makers, and they are also the key to advanced technologies like quantum computing, artificial intelligence and unmanned drones.

With elections fast approaching, the Biden administration is under pressure to demonstrate that it can use this funding wisely and lure manufacturing investments back to the United States. The Commerce Department is responsible for choosing which companies receive the money and monitoring their investments.

In its strategy paper, the Commerce Department said that the United States remained the global leader in chip design, but that it had lost its leading edge in producing the world's most advanced semiconductors. In the last few years, China has accounted for a substantial portion of newly built manufacturing, the paper said.

The high cost of building the kind of complex facilities that manufacture semiconductors, called fabs, has pushed companies to separate their facilities for designing chips from those that manufacture them. While many leading companies, like Qualcomm, Nvidia and Apple, design chips in the United States, they contract out their fabrication to foundries based in Asia, particularly in Taiwan. The system creates a risky source of dependence for the chips industry, the White House says.

The department said the funding aims to help offset the higher costs of building and operating facilities in the United States compared with other countries, and to encourage companies to build the larger type of fabs in the United States that are now more common in Asia. Domestic and foreign companies can apply for the funds, as long as they invest in projects in the United States.

To receive the money, companies will need to demonstrate the long-term economic viability of their project, as well as "spillover benefits" for the communities they operate in, like investments in infrastructure and work force development, or their ability to attract suppliers and customers, the department said.

Projects that involve economically disadvantaged individuals and businesses owned by minorities, veterans or women, or that are based in rural areas, will be prioritized, the department said. So will projects that help make the current supply chain more secure, for example by providing another production location for advanced chips that are currently manufactured in Taiwan. Companies are encouraged to demonstrate that they can obtain other sources of funding, including private capital and state and local investment.



Making chips in Jiangsu, China. The country accounts for much of newly built manufacturing, a U.S. report said.
AGENCE FRANCE-PRESSE — GETTY IMAGES

The Commerce Department is setting up two new offices housed under the National Institute of Standards and Technology to implement the programs.

One of the department's biggest challenges will be ensuring that the government funds add to, rather than displace, money that chip making companies were already planning to invest. Companies including Global Foundries, Micron, Qualcomm and Intel have announced plans to make major investments in U.S. facilities that may qualify for government funding.

The chips bill specifies that companies that accept funding cannot make new, high-tech investments in China or other "countries of concern" for at least a decade, unless they are producing lower-tech "legacy chips"

destined to serve only the local market.

The Commerce Department said it would review and audit companies that receive the funding, and claw back funds from any company that violates its rules. The guidelines also forbid recipients from engaging in stock buybacks, so that taxpayer money doesn't end up being used to reward a company's investors.

"We're going to run a serious, competitive, transparent process," Ms. Raimondo said. "We are negotiating for every nickel of taxpayer money."

In addition to the new prohibitions on investing in chip manufacturing facilities in China, officials in the Biden administration have agreed that the White House should take executive action to scrutinize outbound investment

## Countering China, and reducing dependence on Taiwan.

in other industries as well, Ms. Raimondo said in the interview.

But she said that the administration was still working through the details of how to implement such a policy.

Earlier versions of the chips bill also proposed setting up a broader system to review investments that U.S. companies make abroad to prevent certain strategic technologies from being shared with U.S. adversaries. That provision, which would have applied to cutting edge technologies beyond the chips sector, was ultimately stripped out of the bill, but officials in the Biden administration have been considering an executive order that would establish a similar review process.

The United States has a review system for investments that foreign companies make in the United States, but not vice versa.

Meanwhile, the Biden administration has taken steps to restrict the types of advanced semiconductors and equipment that can be exported out of the United States.

In statements last week, Nvidia and Advanced Micro Devices, both based in the Silicon Valley, said they had been notified by the U.S. government that exports to China and Russia of certain high-end chips they produce for use in supercomputers and artificial intelligence were now restricted. These chips help power the kind of supercomputers that can be used in weapons development and intelligence gathering, including large-scale surveillance.

Ms. Raimondo declined to discuss the export controls in detail but said the department was "constantly evaluating" its efforts, including how best to work with allies to deny China the equipment, software and tooling the country uses to enhance its semiconductor industry.

---

# Trying to Sell That Peloton Bike You Bought During the Pandemic? So Is Peloton.

FROM FIRST BUSINESS PAGE

far.

Peloton has offered a cautionary tale about quickly changing consumer habits. At the height of the pandemic, its business soared as gyms shuttered and Covid restrictions kept people at home. But many who bought Peloton bikes at their peak popularity are now returning to gyms and busy schedules, and some are regretting what might be their most expensive pandemic-era purchase. Sites like Facebook, Craigslist and eBay are flooded with posts offering used Peloton bikes, shoes and weights.

At the same time that many consumers are trying to sell used equipment, Peloton is looking to sell used inventory as well. In August, Peloton ran a 10-day test of its certified pre-owned bike program, which allowed consumers to buy secondhand bikes through the company. On a call with analysts last week, Barry McCarthy, Peloton's chief executive, said the program was a top priority for the business.

The focus on resale comes as Peloton's sales continue to plummet. Last week, the company reported a $1.2 billion quarterly loss. It has lost money for six straight quarters. Mr. McCarthy, who stepped into his role in February, is working to cut costs and earn a profit. In recent months, the company has slashed jobs and closed stores. Mr. McCarthy has said reaching "value-minded" consumers, including by reselling used bikes, will be key for the company's growth.

But it's competing with a crowded third-party market. Christine Bass, an avid Peloton rider and a moderator of the Facebook group "Peloton Buy Sell Trade," which has more than 200,000 members, has seen an increase in posts selling bikes this summer and noticed that posts selling bikes for $600 or $700 often get a lot of interest. Ms. Bass said that earlier in the pandemic, when customers faced long delivery delays for new Peloton bikes, people were listing used bikes on Facebook for thousands of dollars — sometimes at higher prices than new ones.

Now she sees people post: "I'm using it as a clothes hanger. Need it gone now!"

On eBay, sales of Peloton bikes increased 80 percent between July 2020 and July 2022, according to a spokeswoman for the site.

Peloton has been exploring a resale program for some time. John Foley, its former chief executive and a founder of the company, said on a call with analysts in September 2020 that Peloton was planning to offer a certified pre-owned option in the future. The company moved forward with plans to buy back customers' bikes, offering them a $700 credit toward a Bike+, which is an upgraded bike with additional features, as well as other incentives, like free pickup and a yoga set. Then in November that year, Mr. Foley told analysts that the company did not have enough inventory to move for-

## A cautionary tale about fast-changing consumer habits.

ward with a certified pre-owned bike program at that time. He said fewer people than expected had sold back their bikes.

Peloton paused the trade-in program this past June.

"It's in Peloton's interest to try to control the secondary market," said Sucharita Kodali, an analyst at Forrester. By buying back equipment, Peloton takes used bikes away from the peer-to-peer market. Then the company can decide when and where to resell them, all while building a direct relationship with new customers and understanding who is buying their merchandise, she said.

When Peloton sells a bike, even a lower-priced used one, it is not just selling a piece of equipment. It is also gaining a potential customer for its all-access workout program, which costs $44 per month. Peloton's subscriptions grew 27 percent over the past year, to about three million. (That number is roughly flat from the previous quarter.) A spokesman

for Peloton said that the certified pre-owned program was meant to reach customers with both its equipment and its software.

Subscribers are paying Peloton the same recurring fee, Ms. Kodali said, whether they are riding a new model or a used one. "That fee is very lucrative because it's very scalable," she said. Mr. McCarthy said last week that he considered Peloton's content, which includes instructor-led classes and scenic rides, the company's "singularly unique competitive advantage."

Peloton faces some challenges specific to its business, but it's not the only company struggling to adapt to shifting consumer habits. Companies like Target and Walmart have seen profits drop this year, and many companies are stuck with excess merchandise not just because of inflation but also because consumers are focusing more on "going-out categories," as Brian Cornell, Target's chief executive, said in May.

In spite of Peloton's runaway success in 2020, the pandemic was bad for the company, said Simeon Siegel, a retail analyst at BMO Capital Markets. "If not for the pandemic, Peloton would have been a steady grower that would have not sought to conquer the world," he said.

A spokesman for Peloton said the company, having completed its 10-day trial run of the certified pre-owned bike program, aimed to expand the program across the country. In the meantime, many customers will continue to turn to third-party sites to offload their bikes.

Not everyone has a tough time selling Peloton equipment: Last month Kaylee Caspers, 22, was able to find a buyer for her used Bike+ in Fargo, N.D., within a few days on Facebook. She attributed the quick sale to the apparent scarcity of exercise bikes in her area. When she was looking for a Peloton in 2020, there was "absolutely nothing in the area," she said, adding, "It's definitely not like New York or L.A."

But many are having to eat a large part of the cost of their pandemic purchase. In the New York area last month, Olivia Hilton, 27, was able to make a sale after lowering her price to $1,200 from $1,500 in a Facebook post.

Ms. Hilton, a nurse living on Long Island, bought a Bike+ and accessories in 2020 using a health care worker discount. "I spent three grand on this bike that collected dust," she said.

"I felt a little bit guilty about selling the bike," she said. But she would tell others in her situation: "You tried. Move on. Get the thing out of your house if you don't want it anymore."

---

[Legal notices at the bottom of the page, including UCC Public Sale Notice for Jones Lang LaSalle on behalf of Motcomb Estates Ltd.; Notice of Deadlines for Filing of Proofs of Claim in the United States Bankruptcy Court for the District of Delaware, In re: First Guaranty Mortgage Corporation, et al., Case No. 22-10584 (CTG); and United States Bankruptcy Court Southern District of New York, In re: Celsius Network LLC, et al., Chapter 11, Case No. 22-10964 (MG), Notice of Auction for the Potential Sale of Certain of the Debtors' Assets Free and Clear of Any and All Claims, Interests, and Encumbrances.]