**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) ) ) ) ) ) ) | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | | Case No. 22-10964 (MG) |
| Debtors. | | (Jointly Administered) |

## ORDER (I) AUTHORIZING THE EMPLOYMENT AND RETENTION OF CENTERVIEW PARTNERS LLC AS INVESTMENT BANKER FOR THE DEBTORS EFFECTIVE AS OF JULY 13, 2022, (II) APPROVING THE TERMS OF THE CENTERVIEW AGREEMENT, (III) WAIVING CERTAIN REPORTING REQUIREMENTS PURSUANT TO LOCAL RULE 2016-2, AND (IV) GRANTING RELATED RELIEF

Upon the application (the "Application," ECF Doc. # 362)[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"): (a) authorizing the employment and retention of Centerview Partners LLC ("Centerview") to serve as the Debtors' investment banker as of July 13, 2022 in accordance with the terms and conditions set forth in that certain engagement letter between Centerview and certain of the Debtors, dated as of August 2, 2022 (the "Engagement Letter"), a copy of which is attached as **Exhibit 1** to this Order, pursuant to sections 327(a) and 328(a) of the Bankruptcy Code; (b) approving the provisions of the Engagement Letter, including the compensation arrangements (as modified by this Order) and indemnification and reimbursement provisions set forth therein; (c) modifying

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Application or the Engagement Letter, as applicable.

certain timekeeping requirements of Bankruptcy Rule 2016(a), Local Rule 2016-1, the Court

Guidelines, the U.S. Trustee Guidelines, and any other applicable procedures and orders of the

Court in connection with Centerview's engagement; and (d) granting such other relief as is just

and proper, all as more fully set forth in the Application; and upon the Puntus Declaration and the

*First Supplemental Declaration of Marc Puntus in Support of the Debtors' Application for Entry*

*of an Order (I) Authorizing the Employment and Retention of Centerview Partners LLC as*

*Investment Banker for the Debtors Effective as of July 13, 2022, (II) Approving the Terms of the*

*Centerview Agreement, (III) Waiving Certain Reporting Requirements Pursuant to Local Rule*

*2016-2, and (IV) Granting Related Relief* (ECF Doc. # 784) (the "Supplemental Declaration");

and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the

*Amended Standing Order of Reference* from the United States District Court for the Southern

District of New York, entered February 1, 2012; and this Court having the power to enter a final

order consistent with Article III of the United States Constitution; and this Court having found that

venue of these cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this

Court having found that the relief requested in the Application is in the best interests of the

Debtors' estates, their creditors, and other parties-in-interest; and this Court having found that the

Debtors' notice of the Application and opportunity for a hearing thereon were appropriate under

the circumstances and no other notice need be provided; and this Court having reviewed the

Application and having heard the statements in support of the relief requested therein at a hearing

before this Court (the "Hearing"); and this Court having determined that the legal and factual bases

set forth in the Application and at the Hearing establish just cause for the relief granted herein; and

after due deliberation and sufficient cause appearing therefore, it is HEREBY ORDERED THAT:

1.      The Application is granted as set forth in this Order, and the provisions set forth in the Engagement Letter (and all attachments thereto) are hereby approved, to the extent provided herein and except as otherwise expressly modified herein to the contrary.

2.      In accordance with sections 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016, and Local Rules 2014-1 and 2016-1, the Debtors, solely as debtors in possession, are authorized to employ and retain Centerview as their investment banker in these chapter 11 cases in accordance with the terms and conditions set forth in the Engagement Letter, incorporated herein by reference and as modified herein, to pay fees and reimburse expenses, and to provide indemnification, contribution, and/or reimbursement to Centerview on the terms and at the times specified in the Engagement Letter as modified herein, effective as of the Petition Date.

3.      The Engagement Letter, including, without limitation, the Indemnification Agreement, is incorporated herein by reference and approved in all respects except as otherwise set forth herein.

4.      Centerview shall be compensated for fees and reimbursed for reasonable and documented out-of-pocket expenses by the Debtors in accordance with the terms of the Engagement Letter, as modified herein, and all fees and out-of-pocket expense reimbursements to be paid to Centerview, including without limitation the Monthly Advisory Fees, the Restructuring Fee, the Sale Transaction Fees, and the Financing Fee, shall be subject to section 328(a) of the Bankruptcy Code, except as set forth herein.  Notwithstanding the Fee and Expense Structure set forth in the Application and/or Engagement Letter, Centerview shall be compensated as follows:

       (a)      **Monthly Advisory Fee**.  A monthly financial advisory fee of $250,000 (the "Monthly Advisory Fee"), the first of which shall be due and paid by the Debtors upon execution of the Engagement Letter and thereafter on each monthly anniversary thereof during the term of Centerview's engagement.  Upon entry of this Order, the Monthly Advisory Fee shall be adjusted downwards from $250,000 to $200,000 going forward. After receipt of six months of Monthly Advisory Fees, 50% of the amount of any

subsequent Monthly Advisory Fees paid to Centerview will be credited (but only once) against any Restructuring Fee.

(b)    **Restructuring Fee**.    If at any time during the term of Centerview's engagement or within the twelve full months following the termination of this engagement (including the term of this engagement, the "Fee Period"), (1) the Debtors consummate any Restructuring[3] or (2) the Debtors enter into an agreement in principle, definitive agreement or Plan to effect a Restructuring, and at any time (including following the expiration of the Fee Period), such Restructuring is consummated, Centerview shall be entitled to receive a restructuring fee (a "Restructuring Fee"), contingent upon the consummation of a Restructuring and payable at the closing thereof equal to $12,000,000.

(c)    **Sale Fees**.    If at any time during the Fee Period, whether in connection with the consummation of a Restructuring or otherwise, (1) the Debtors consummate any of (A) a sale of all or substantially all of the assets or equity interests of GK8 Ltd. and its subsidiaries (the "GK8 Sale"), (B) a sale of all or substantially all of the assets or equity interests of Celsius Mining LLC and Celsius Mining Ltd. (the "Mining Sale"), or (C) a sale of the Debtors' platform and related assets (the "Platform Sale" and together with the GK8 Sale and the Mining Sale, a "Sale Transaction"), or (2) the Debtors enter into an agreement in principle or definitive agreement to effect a Sale Transaction, and at any time during the Fee Period such Sale Transaction is consummated, the Debtors shall pay Centerview a fee (a "Sale Transaction Fee") equal to (A) 2.50% of the Aggregate Consideration[4] of a GK8

---

[3]    The term "Restructuring" has the meaning ascribed to it in the Engagement Letter, and this definition shall also include any transactions included in subsection (i) of the definition of "Transaction" in the Perella Weinberg Partners LP Engagement Letter, dated August 24, 2022, [Docket No. 606, Exhibit C].

[4]    The term "Aggregate Consideration" shall mean the total amount of cash and the fair market value (on the date of payment and as determined by the Company and Centerview in good faith) of all securities and other property paid or payable, directly or indirectly, by the acquiring party (the "Acquiror") to the acquired party or the seller of the acquired business (in either case, the "Acquired"), or to the Acquired's contract parties, claim holders, security holders and employees, or by the Acquired to the Acquired's contract parties, claim holders, security holders and employees, in connection with a Sale Transaction or a transaction related thereto (including, without limitation, amounts paid by the Acquiror (i) pursuant to covenants not to compete, employment contracts, employee benefit plans or other similar arrangements and (ii) to holders of any warrants, stock purchase rights, convertible securities or similar rights of the Acquired and to holders of any options or stock appreciation rights issued by the Acquired, whether or not vested). Aggregate Consideration shall also include the value of any liabilities (including obligations relating to any capitalized leases and the principal amount of any indebtedness for borrowed money) (x) existing on the Acquired's balance sheet at the time of a Sale Transaction or repaid or retired in anticipation of a Sale Transaction (if such Sale Transaction takes the form of a merger or sale or exchange of stock) or (y) assumed directly or indirectly by the Acquiror in connection with a Sale Transaction (if such Sale Transaction takes the form of a sale or exchange of assets). Aggregate Consideration shall also include (i) the net value (on the closing date of the Sale Transaction and as determined by the Company and Centerview in good faith), if positive, of any current assets not sold to the Acquiror. If a Sale Transaction takes the form of a recapitalization of the Company (including, without limitation, through an extraordinary dividend or other distribution, a spin-off, split-off or similar transaction), Aggregate Consideration shall also include the fair market value ( on the closing date of the Sale Transaction and as determined by the Company and Centerview in good faith) of (i) the equity securities of the Company retained by the Company's security holders and/or creditors following the consummation of such transaction and (ii) any cash, securities (including securities of subsidiaries) or other consideration received by the Company's security holders and/or creditors in exchange for

Sale, (B) 1.25% of the Aggregate Consideration of a Mining Sale, and (C) 1.50% of the Aggregate Consideration of a Platform Sale. Such Sale Transaction Fee shall be contingent upon the consummation of a Sale Transaction and payable at the closing thereof. Every dollar of Sale Transaction Fees (in the aggregate) that are received in excess of $7,500,000 shall be 50% credited (but only once) against any Restructuring Fee. For the avoidance of doubt, Aggregate Consideration does not include, and Centerview shall not be paid any Sale Transaction Fees on account of, the sale of any cryptocurrency or coin assets (including, but not limited, the transfer of customer coin to a buyer) or any sale of alternative investments related to minority investments (either in stock, preferred equity, convertible equity, or other instruments) in other businesses.

(d)      **Financing Fee**.  If at any time during the Fee Period, (1) the Debtors consummate any Financing or (2) the Debtors receive and accept written commitments for one or more Financings (the execution by a potential financing source and the Debtors of a commitment letter or securities purchase agreement or other definitive documentation shall be deemed to be the receipt and acceptance of such written commitment), and at any time (including following the expiration of the Fee Period) any such Financing is consummated, the Debtors will pay to Centerview the following (each a "Financing Fee"):

1. 1.00% of the aggregate amount of financing commitments of any indebtedness issued that is secured by a first lien, including debtor-in-possession financing (such fee, a "DIP Fee");

2. 3.00% of the aggregate amount of financing commitments of any indebtedness issued that (x) is secured by a second or junior lien, (y) is unsecured and/or (z) is subordinated; and

3. 4.00% of the aggregate amount of financing commitments of any equity or equity-linked securities or obligations issued.

Any DIP Fee shall be 50% credited (but only once) against any Restructuring Fee. For the avoidance of doubt, Centerview may receive a Financing Fee or a Sale Transaction Fee for a particular single transaction or series of transactions, but not both.

---

or in respect of securities of and/or claims against the Company in connection with such transaction (all such cash, securities and/or claims against other consideration received by such security holders and/or creditors being deemed to have been paid to such security holders and/or creditors in such transaction). If a Sale Transaction takes the form of a joint venture, partnership or other entity, Aggregate Consideration shall mean the fair market value (equity plus debt) of the joint venture, partnership or similar entity on the date of formation of such entity. In the event that any part of the consideration in connection with any Sale Transaction will be payable (whether in one payment or a series of two or more payments) at any time following the consummation thereof, the term Aggregate Consideration shall include the present value of such future payment or payments, as determined by the Company and Centerview in good faith, except that amounts (if any) held in escrow shall be deemed to have been paid at closing. As used in this Order, the terms "payment," "paid" or "payable" shall be deemed to include, as applicable, the issuance or delivery of securities or other property other than cash.

5.      Notwithstanding anything to the contrary contained herein or in the Application and/or Engagement Letter, Centerview shall file interim and final fee applications for allowance of compensation and reimbursement of reasonable and documented out-of-pocket expenses pursuant to sections 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Court Guidelines, the U.S. Trustee Guidelines, and any other procedures or orders of the Court; *provided, however*, the U.S. Trustee retains all rights to respond or object to Centerview's interim and final applications for compensation (including, without limitation, the Monthly Advisory Fees, the Sale Transaction Fees, the Restructuring Fee, and the Financing Fee) and reimbursement of out-of-pocket expenses pursuant to section 330 of the Bankruptcy Code, and the Court retains jurisdiction to consider the U.S. Trustee's response or objection to Centerview's interim and final fee applications pursuant to section 330 of the Bankruptcy Code; *provided, further*, that "reasonableness" for this purpose shall be evaluated by comparing (among other things) the fees payable in these chapter 11 cases to fees paid to comparable investment banking firms with similar experience and reputation offering comparable services in other chapter 11 cases and shall not be evaluated primarily on an hourly or length-of-case based criteria.

6.      Centerview is authorized to apply the Retainer to any unbilled or otherwise remaining expenses that Centerview becomes aware of during its ordinary course billing review and reconciliation.  Centerview shall apply any remaining amounts of the Retainer as a credit towards postpetition fees and expenses after such postpetition fees and expenses are approved pursuant to the first order of the Court awarding fees and expenses to Centerview.

7.      Notwithstanding anything to the contrary in the Application and/or the Engagement Letter, Centerview's restructuring professionals, with the exception of clerical and administrative staff, shall be required only to keep summary time records of the services they have performed in

one-half hour increments. Centerview's professionals shall not be required to keep time records on a project category basis, and Centerview shall not be required to provide or conform to any schedule of hourly rates.

8.      In the event that Centerview seeks reimbursement from the Debtors for attorneys' fees and expenses pursuant to the Application and/or the Engagement Letter, the invoices and supporting time records for the attorneys' fees and expenses shall be included in Centerview's own applications, both interim and final, and such invoices and time records shall be subject to the approval of the Court pursuant to section 330 and 331 of the Bankruptcy Code without regard to whether such attorneys have been retained under section 327 of the Bankruptcy Code, and without regard to whether such attorneys' services satisfy section 330(a)(3)(C) of the Bankruptcy Code. Attorneys' fees and/or expenses reimbursed under the Engagement Letter shall be limited to those expended in representing Centerview in retention and fee application matters. For the avoidance of doubt, the preceding sentence does not apply to, and in no way limits, the provisions with respect to reimbursement of attorneys' fees and/or expenses set forth in <u>Annex A</u> to the Engagement Letter with respect to indemnification.

9.      The indemnification, exculpation, contribution, and reimbursement provisions included in <u>Annex A</u> to the Engagement Letter are approved, subject during the pendency of these chapter 11 cases to the following modifications:

> a.      All requests by Centerview Persons for payment of indemnity pursuant to the Engagement Letter shall be made by means of an application (interim or final as the case may be) and shall be subject to review by the Court to ensure that payment of such indemnity conforms to the terms of the Engagement Letter and is reasonable based upon the circumstances of the litigation or settlement in respect of which indemnity is sought, provided, however, the Debtors shall have no obligation to indemnify, or provide contribution or reimbursement to, a Centerview Person to the extent that a court determines by final order that any loss, claim, damage, demand, liability (joint or several) or action or proceeding resulted from such Centerview Person's own bad-faith, self-

7

dealing, breach of fiduciary duty (if any), gross negligence or willful misconduct;

b.  In the event that Centerview seeks reimbursement from the Debtors for reasonable attorneys' fees in connection with a request by Centerview for payment of indemnity pursuant to the Engagement Letter, as modified by this Order, the invoices and supporting time records from such attorneys shall be included in Centerview's own application (both interim and final) and such invoices and time records shall be subject to the Court Guidelines and the U.S. Trustee Guidelines and the approval of the Court under the standards of sections 330 and 331 of the Bankruptcy Code without regard to whether such attorney has been retained under section 327 of the Bankruptcy Code and without regard to whether such attorneys' services satisfy section 330(a)(3)(C) of the Bankruptcy Code;

c.  Centerview shall not be entitled to reimbursement by the Debtors for any fees, disbursements and other charges of Centerview's counsel other than those incurred in connection with a request of Centerview for payment of indemnity, retention of Centerview and preparation of fee applications; and

d.  In no event shall a Centerview Person be indemnified if the Debtor(s) or representatives of the estates assert a claim for, and a court determines by final order that such claim arose out of, such Centerview Person's own bad-faith, self-dealing, breach of fiduciary duty (if any), gross negligence, or willful misconduct.

e.  Any limitation of liability pursuant to the terms and conditions set forth in the Application, the Engagement Letter, or the Indemnification Agreement thereto, shall not apply with respect to any losses, claims, damages or liabilities arising out of Centerview's engagement that resulted from the breach of contract, gross negligence, willful misconduct, or bad faith of an Indemnified Person.

10.    Centerview shall use its reasonable efforts to avoid any duplication of services provided by any of the Debtors' other retained professionals in these chapter 11 cases.

11.    Notwithstanding anything to the contrary in the Application and/or Engagement Letter, to the extent that Centerview uses the services of independent contractors or employees of foreign affiliates or subsidiaries (collectively, the "Contractors") in these cases, Centerview (i) shall pass-through the cost of such Contractors to the Debtors at the same rate that Centerview pays the Contractors; (ii) shall seek reimbursement for actual out-of-pocket expenses only; and

(iii) shall ensure that the Contractors are subject to the same conflict checks and disclosures as required of Centerview by Bankruptcy Rule 2014.

12.    Centerview shall apply any remaining amounts of its prepetition retainer as a credit toward postpetition fees and expenses, after such postpetition fees and expenses are approved pursuant to the first order of the Court awarding fees and expenses to Centerview.

13.    Such services other than set forth in the Application that the Debtors may request that Centerview provide during the course of these chapter 11 cases, and as agreed to by Centerview, shall be subject to separate application and order of this Court.

14.    Centerview has a continuing duty to review whether any new material facts or relationships bearing on the matters described herein arise during the pendency of these chapter 11 cases.  If such material facts or relationships are discovered or otherwise arise, Centerview will use reasonable efforts to provide the Court with a supplemental declaration disclosing such new material facts or relationships.

15.    To the extent that the Court does not grant certain of the relief requested in the *Debtors'* Ex Parte *Motion Pursuant to Section 107 of the Bankruptcy Code Seeking Entry of an Order (I) Authorizing the Debtors to Redact Certain Personally Identifiable Information from the Creditor Matrix, Schedules and Statements, and Related Documents and (II) Granting Related Relief* (ECF Doc. # 344) or other motion seeking to authorize the sealing of information, the Debtors shall file, as soon as reasonably practicable thereafter, unredacted versions of any declaration or other supplemental disclosure to the extent necessary to comply with such rulings by the Court.

16.    The Debtors and Centerview are authorized and empowered to take all actions necessary to implement the relief granted in and pursuant to this Order.

17.     Notice of the Application as provided therein shall be deemed good and sufficient notice of such Application and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

18.     The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

19.     Notwithstanding any provision to the contrary in the Application or the Engagement Letter, the Court shall retain jurisdiction to hear and to determine all matters arising from or related to implementation, interpretation, or enforcement of this Order and Centerview's retention.

20.     To the extent that there is any inconsistency between the Engagement Letter, the Application, the Puntus Declaration, the Supplemental Declaration, and this Order, the provisions of this Order shall apply.


**IT IS SO ORDERED.**

Dated: September 16, 2022
          New York, New York


                                   _____/s/ Martin Glenn_____
                                        MARTIN GLENN
                              Chief United States Bankruptcy Judge

## <u>Exhibit 1</u>

**Engagement Letter**

Centerview Partners LLC
31 West 52nd Street
New York, NY 10019

August 2, 2022

CONFIDENTIAL
Celsius Network LLC
121 River Street, PH05
Hoboken, NJ 07030
Attention: Chris Ferraro

Dear Mr. Ferraro:

This letter (the "Agreement") confirms the terms under which Celsius Network LLC and certain of its affiliates (collectively, the "Company") have engaged Centerview Partners LLC ("Centerview") as its financial advisor and investment banker with respect to a possible Restructuring, Financing and/or Sale (each as defined below) and with respect to such other financial matters as to which the Company and Centerview may agree in writing during the term of this engagement. For purposes hereof, the term "Company" also includes any entity that the Company may form or invest in to consummate a Restructuring, Financing and/or Sale, and shall also include any successor to or assignee of all or a portion of the assets and/or businesses of the Company, whether pursuant to a Plan (as defined below) or otherwise. If appropriate in connection with performing its services for the Company hereunder, Centerview may utilize the services of one or more of its affiliates, in which case references herein to Centerview shall include, as applicable, such affiliates. The terms of this Agreement shall apply to all services provided by Centerview to the Company in connection with the matters contemplated herein, including those provided prior to the date of this Agreement.

As used herein, the term "Restructuring" shall mean any recapitalization or restructuring (including, without limitation, through any exchange, conversion, cancellation, forgiveness, structured resolution or settlement, retirement refinancing, purchase or repurchase and/or a material modification or amendment to the terms, conditions or covenants thereof) of the Company's preferred equity and/or debt securities and/or bank or other credit facilities and/or all other indebtedness, obligations or liabilities (including, without limitation, partnership interests, lease obligations, trade credit facilities, customer-related obligations and/or contract, tort and contingent obligations), including pursuant to a repurchase or an exchange transaction, a Plan (as defined below) or a solicitation of consents, waivers, acceptances or authorizations.

*1*

As used herein, the term "Financing" shall mean a public or private issuance, sale or placement of equity, equity-linked or debt securities, instruments or obligations of the Company with one or
more lenders and/or investors (each such lender or investor, an "Investor"), or any loan, rights
offering or other financing, including any "debtor in possession financing" or "exit financing" in
connection with a case under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101
et. seq. (the "Bankruptcy Code").

For purposes of this Agreement, the term "Sale" shall mean any transaction or series of related transactions involving an acquisition, merger, consolidation, or any other business combination pursuant to which all or substantially all of the business, equity or assets of the Company are, directly or indirectly, sold, purchased or combined with another entity or company.

1.     Centerview, as financial advisor and investment banker to the Company, will perform the following financial advisory and investment banking services:

     a.     <u>General Financial Advisory and Investment Banking Services</u>.  To the extent requested by the Company, Centerview shall:

        i.     familiarize ourselves with the business, operations, properties, financial condition and prospects of the Company;

        ii.     review the Company's financial condition and outlook;

        iii.     advise and assist the Company in the development of financial data and presentations, including financial projections, to the Company's Board of Directors, various equity holders, creditors and other parties;

        iv.     evaluate the Company's debt capacity and capital structures alternatives;

        v.     participate in negotiations among the Company and related equity holders, creditors, suppliers, lessors and other interested parties with respect to any of the transactions contemplated by this Agreement;

        vi.     advise and assist the Company in evaluating a range of strategic alternatives and advise and assist in formulating alternative plans for the Company in connection with any transaction contemplated by this Agreement; and

        vii.     perform such other financial advisory services as may be specifically agreed upon in writing by the Company and Centerview.

b.   <u>Restructuring Services</u>.  To the extent requested by the Company, Centerview shall:

    i.   analyze various Restructuring scenarios and the potential impact of these scenarios on the value of the Company; and the recoveries of those stakeholders impacted by the Restructuring;

    ii.   advise and assist the Company in structuring, negotiating, implementing and otherwise responding to the financial aspects of a Restructuring;

    iii.   provide financial and valuation advice and assistance to the Company in developing and seeking approval of a plan of reorganization under chapter 11 of the Bankruptcy Code to effectuate a Restructuring (as the same may be modified from time to time, a "<u>Plan</u>");

    iv.   provide financial advice and assistance to the Company in structuring any new securities or debt instruments to be issued pursuant to the Restructuring;

    v.   advise and assist the Company in connection with and/or participate in negotiations with entities or groups affected by the Restructuring; and

    vi.   if requested by the Company, participate in hearings before the bankruptcy court with respect to the matters upon which Centerview has provided advice, including, as relevant, coordinating with the Company's counsel with respect to expert reports or testimony in connection therewith.

c.   <u>Financing Services</u>.  To the extent requested by the Company, Centerview shall:

    i.   provide financial advice and assistance to the Company in structuring and effecting a Financing, identifying potential Investors and, at the Company's request, contacting such Investors; and

    ii.   assist in the arranging of a Financing, the due diligence process and negotiating the terms of any proposed Financing.

It is understood and agreed that nothing contained herein shall constitute an expressed or implied commitment by Centerview to underwrite, place or purchase any securities, in a financing or otherwise, which commitment shall only be set forth in a separate underwriting, placement agency or other appropriate agreement relating to a Financing.

d.   <u>Sale Services</u>.  To the extent requested by the Company, Centerview shall:

      i.     provide financial advice and assistance to the Company in connection with a Sale, identifying potential acquirors and, at the Company's request, contacting such potential acquirors;

      ii.    assist the Company in connection with any due diligence process in connection with any potential Sale; and

      iii.   assist the Company in connection with and/or participate in negotiations with potential acquirors.

In rendering its services to the Company hereunder, Centerview is not assuming any responsibility for the Company's underlying business decision to pursue any business strategy or to effect any Restructuring, Financing, and/or Sale. The Company agrees that Centerview shall not have any obligation or responsibility to provide accounting, audit, "crisis management," or business consultant services for the Company, and shall have no responsibility for designing or implementing operating, organizational, administrative, cash management or liquidity improvements, or to provide any fairness or valuation opinions. The Company acknowledges that Centerview is not providing any advice on tax, legal, regulatory or accounting matters, and the Company agrees that it will seek and rely on the advice of its own professional advisors for such matters, and will make an independent decision with respect to the matters that are the subject of this engagement based on such advice.

In order to coordinate effectively the Company's and Centerview's activities to effect a Restructuring, Financing and/or Sale, the Company will use commercially reasonable efforts to promptly inform Centerview of any discussions, negotiations or inquiries regarding a possible Restructuring, Financing and/or Sale (including any such discussions, negotiations or inquiries that have occurred in the six month period prior to the date of this Agreement).

The Company shall use commercially reasonable efforts to make available to Centerview all information in its possession concerning the business, assets, operations, financial condition and prospects of the Company that Centerview reasonably requests in connection with the services to be performed for the Company hereunder, and shall provide Centerview with reasonable access to the Company's officers, directors, employees, independent accountants, and counsel, and other advisors, agents and other representatives of the Company as Centerview deems appropriate in its reasonable discretion. To the best of the Company's knowledge, all information furnished by or on its behalf to Centerview pertaining to the Company, when delivered, will be accurate and complete in all material respects. In addition, the Company agrees that it will use commercially reasonable efforts to promptly notify Centerview of any material event or change in the business affairs, condition (financial or otherwise) of the Company that occurs during the term of our engagement hereunder, or if it learns of any material inaccuracy or misstatement in, or material omission from, any information theretofore delivered to Centerview. The Company understands and agrees that, in performing our services hereunder, Centerview (a) will be using and relying on publicly available information and on materials, data and other information furnished to Centerview by the Company and other parties, (b) is entitled to assume and rely upon the accuracy and completeness of such publicly available information and the other information

*4*

so furnished without having independently verified the same, and (c) does not assume any responsibility for the accuracy or completeness of such information. Centerview will not conduct an independent evaluation or appraisal of the assets or liabilities (including any contingent, derivative or off-balance sheet assets or liabilities) of the Company, or advise or opine on any solvency or viability issues, nor will it make an inspection of the properties or assets of the Company. With respect to any forecasts or projections that may be furnished to Centerview or discussed with the Company, Centerview will assume that they have been reasonably prepared on bases reflecting the best then currently available estimates and judgments of the management of the Company as to the matters covered thereby. In connection with the services described above, Centerview acknowledges and agrees that it will transmit any memorandum prepared by the Company describing the Company and its assets, properties or businesses in connection with a Sale or a Financing to potential parties to a Sale or Financing only with the express prior written consent of the Company and subject to the terms of any confidentiality agreements entered into between the Company and such potential parties to a Sale or Financing. The Company will be solely responsible for the contents of this memorandum.

2.      As compensation for our services rendered under this Agreement, the Company agrees to pay Centerview in cash, by wire transfer of immediately available funds when due, the following fees:

   a.      A monthly financial advisory fee of $250,000 (the "Monthly Advisory Fee"), the first of which shall be due and paid by the Company upon execution of this Agreement and thereafter on each monthly anniversary thereof during the term of this engagement. After receipt of aggregate Monthly Advisory Fees of $3,000,000, 50% of the amount of any subsequent Monthly Advisory Fees paid to Centerview will be credited (but only once) against any Transaction Fee payable to Centerview pursuant to subparagraph 2(b) hereof.

   b.      If at any time during the term of this engagement or within the twelve full months following the termination of this engagement (including the term of this engagement, the "Fee Period"), (1) the Company consummates any Restructuring or Sale or (2) the Company enters into an agreement in principle, definitive agreement or Plan to effect a Restructuring or Sale, and at any time (including following the expiration of the Fee Period), such Restructuring or Sale is consummated, Centerview shall be entitled to receive a transaction fee (a "Transaction Fee"), contingent upon the consummation of a Restructuring or Sale and payable at the closing thereof equal to $12,000,000

   c.      If at any time during the Fee Period, whether in connection with the consummation of a Restructuring or otherwise, (1) the Company consummates any sale transaction not covered by the definition of Sale (a "Minority Sale"), or (2) the Company enters into an agreement in principle or definitive agreement to effect a Minority Sale, and at any time during the Fee Period such Minority Sale is consummated, the Company shall pay Centerview a fee (a "Minority Sale Transaction Fee") equal to 2.50% of the

Aggregate Consideration (as defined below).    Such Minority Sale Transaction Fee shall be contingent upon the consummation of a Minority Sale and payable at the closing thereof.  Any fee paid under this section 2(c) shall be 50% credited (but only once) against any fees payable under 2(b).

For purposes of this Agreement, the term "Aggregate Consideration" shall mean the total amount of cash and the fair market value (on the date of payment and as determined by the Company and Centerview in good faith) of all securities and other property paid or payable, directly or indirectly, by the acquiring party (the "Acquiror") to the acquired party or the seller of the acquired business (in either case, the "Acquired"), or to the Acquired's contract parties, claim holders, security holders and employees, or by the Acquired to the Acquired's contract parties, claim holders, security holders and employees, in connection with a Minority Sale or a transaction related thereto (including, without limitation, amounts paid by the Acquiror (i) pursuant to covenants not to compete, employment contracts, employee benefit plans or other similar arrangements and (ii) to holders of any warrants, stock purchase rights, convertible securities or similar rights of the Acquired and to holders of any options or stock appreciation rights issued by the Acquired, whether or not vested).  Aggregate Consideration shall also include the value of any liabilities (including obligations relating to any capitalized leases and the principal amount of any indebtedness for borrowed money) (x) existing on the Acquired's balance sheet at the time of a Minority Sale or repaid or retired in anticipation of a Minority Sale (if such Minority Sale takes the form of a merger or sale or exchange of stock) or (y) assumed directly or indirectly by the Acquiror in connection with a Minority Sale (if such Minority Sale takes the form of a sale or exchange of assets). Aggregate Consideration shall also include (i) the net value (on the closing date of the Minority Sale and as determined by the Company and Centerview in good faith), if positive, of any current assets not sold to the Acquiror.  If a Minority Sale takes the form of a recapitalization of the Company (including, without limitation, through an extraordinary dividend or other distribution, a spin-off, split-off or similar transaction), Aggregate Consideration shall also include the fair market value (on the closing date of the Minority Sale and as determined by the Company and Centerview in good faith) of (i) the equity securities of the Company retained by the Company's security holders and/or creditors following the consummation of such transaction and (ii) any cash, securities (including securities of subsidiaries) or other consideration received by the Company's security holders and/or creditors in exchange for or in respect of securities of and/or claims against the Company in connection with such transaction (all such cash, securities and/or claims against other consideration received by such security holders and/or creditors being deemed to have been paid to such security holders and/or creditors in such transaction).  If a Minority Sale takes the form of a joint venture, partnership or other entity, Aggregate Consideration shall mean the fair market value (equity plus debt) of the joint venture, partnership or similar entity on the date of formation of such entity. In the event that any part of the consideration in connection with any Minority Sale will be payable (whether in one payment or a series of two or more payments) at any time following the consummation thereof, the term Aggregate Consideration shall include the present value of such future payment or payments, as determined by the Company and Centerview in good faith, except that amounts (if any) held in escrow shall be deemed to have been paid at closing. As used in this Agreement, the terms "payment," "paid" or "payable" shall be deemed to include, as applicable, the issuance or delivery of securities or other property other than cash.

d.    If at any time during the Fee Period, (1) the Company consummates any Financing or (2) the Company receives and accepts written commitments for one or more Financings (the execution by a potential financing source and the Company of a commitment letter or securities purchase agreement or other definitive documentation shall be deemed to be the receipt and acceptance of such written commitment), and at any time (including following the expiration of the Fee Period) any such Financing is consummated, the Company will pay to Centerview the following (each a "Financing Fee"):

i.     1.00% of the aggregate amount of financing commitments of any indebtedness issued that is secured by a first lien, including debtor-in possession financing;

ii.    3.00% of the aggregate amount of financing commitments of any indebtedness issued that (x) is secured by a second or junior lien, (y) is unsecured and/or (z) is subordinated; and

iii.   4.00% of the aggregate amount of financing commitments of any equity or equity-linked securities or obligations issued.

In the event that the Company requests that Centerview contact potential investors in connection with a Financing that involves the sale or issuance of securities, upon Centerview's request, the Company and Centerview shall enter into an amendment to this Agreement having such representations and warranties and additional terms as are customary in such transactions.

It is understood and agreed that if the proceeds of any such Financing are to be funded in more than one stage, Centerview shall be paid its applicable compensation hereunder upon the closing date of each stage even if one or more of such stages is consummated after the expiration of the Fee Period, so long as one or more of such stages is consummated during the Fee Period. For the avoidance of doubt, if the Company consummates a financing that falls into two or more of the categories in this subparagraph 2(d), the higher fee shall be payable.

Notwithstanding anything in this subparagraph 2(d) to the contrary, a Financing Fee earned in connection with a debtor-in-possession Financing shall be due upon the Company's receipt and acceptance of written commitments for a debtor-in-possession financing (it being understood and agreed that the execution by a potential financing source and the Company of a commitment letter or securities purchase agreement or other definitive documentation shall be deemed to be the receipt and acceptance of such written commitment).

The Company acknowledges and agrees that Centerview's restructuring expertise as well as its capital markets/financing knowledge and mergers and acquisitions capabilities, some or all of which may be required by the Company during the term of Centerview's engagement hereunder, were important factors in determining the amount of the various fees set forth herein, and that the ultimate benefit to the Company of Centerview's services hereunder

could not be measured merely by reference to the number of hours to be expended by Centerview's professionals in the performance of such services. The Company also acknowledges and agrees that the various fees set forth herein have been agreed upon by the parties in anticipation that a substantial commitment of professional time and effort will be required of Centerview and its professionals hereunder over the life of the engagement, and in light of the fact that such commitment may foreclose other opportunities for Centerview and that the actual time and commitment required by Centerview and its professionals to perform its services hereunder may vary substantially from week to week or month to month, creating "peak load" issues for the firm. In addition, given numerous issues which Centerview may be required to address in the performance of its services hereunder, Centerview's commitment to the variable level of time and effort necessary to address all such issues as they arise, and the market prices for Centerview's services for engagements of this nature in an out-of-court context, each party hereto agrees that the fee and expense arrangements hereunder are reasonable under all applicable legal standards.

The Company and Centerview acknowledge and agree that more than one fee may become payable to Centerview under subparagraphs 2(b), 2(c) and/or 2(d) hereof in connection with any single transaction or a series of transactions. It is understood and agreed that if more than one fee becomes so payable to Centerview in connection with a series of independent transactions, each such fee shall be paid to Centerview, subject to applicable credits as provided in this paragraph 2.

3.    In addition to the fees payable by the Company to Centerview hereunder, the Company shall, whether or not any Restructuring, Financing and/or Sale shall be proposed or consummated, reimburse Centerview on a periodic basis for its travel and other reasonable out-of-pocket expenses (including all fees, disbursements and other charges of counsel to be retained by Centerview, and of other consultants and advisors retained by Centerview with the Company's consent), incurred in connection with, or arising out of Centerview's activities under or contemplated by this engagement. The Company shall also reimburse Centerview, at such times as Centerview shall request, for any sales, use or similar taxes (including additions to such taxes, if any) arising in connection with any matter referred to in, or contemplated by, this engagement. Such reimbursements shall be made promptly upon submission by Centerview of statements for such expenses. It is understood and agreed that nothing contained herein shall be deemed to limit in any manner the indemnification, expense reimbursement and other obligations of the Company contained in the Indemnification Agreement attached hereto as Annex A.

4.    The Company and Centerview have entered into a separate letter agreement, dated the date hereof and attached hereto as Annex A (the "Indemnification Agreement"), providing for indemnification by the Company of Centerview and certain related persons. Such Indemnification Agreement is an integral part of this Agreement and the terms thereof are incorporated by reference herein. As stated therein, the Indemnification Agreement shall survive any termination or completion of Centerview's engagement hereunder.

5.     The Company agrees that neither Centerview nor any of its affiliates, their respective members, directors, officers, employees and controlling persons, and each of their respective successors and assigns (collectively, the "Centerview Persons" and each individually, a "Centerview Person") shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Company or any person asserting claims on behalf of or in right of the Company for or in connection with this engagement or any transactions or conduct in connection herewith, except to the extent that any losses, claims, damages or liabilities incurred by the Company are finally judicially determined to have resulted directly from the bad faith, willful misconduct or gross negligence of such Centerview Person.

6.     This Agreement and Centerview's engagement hereunder may be terminated by the Company or Centerview at any time upon 15 days' prior written notice thereof to the other party; provided, however, that (A) termination of Centerview's engagement hereunder shall not affect the Company's continuing obligations under the Indemnification Agreement, and its continuing obligations and agreements under paragraphs 5 and 7 hereof, (B) notwithstanding any such termination, Centerview shall be entitled to the full fees in the amounts and at the times provided for in paragraph 2 hereof and (C) termination of Centerview's engagement hereunder shall not affect the Company's obligation to reimburse the expenses accrued prior to such termination to the extent provided in paragraph 3 hereof.

7.     Centerview has been retained under this Agreement as an independent contractor with duties owed solely to the Company, and the Company acknowledges that Centerview is not acting as an agent of the Company or in a fiduciary capacity, whether pursuant to contract or otherwise, with respect to the Company or its stockholders, employees, creditors or any other third party. The advice (oral or written) rendered by Centerview pursuant to this Agreement is intended solely for the benefit and use of the Company in considering the matters to which this Agreement relates, and the Company agrees that such advice may not be relied upon by any other person, used for any other purpose or reproduced, disseminated, quoted or referred to at any time, in any manner or for any purpose, nor shall any public references to Centerview be made by the Company, without the prior written consent of Centerview. Centerview is not assuming any duties or obligations other than those expressly set forth in this Agreement.

8.     The Company agrees that, Centerview shall have the right to place advertisements in financial and other newspapers and journals and in marketing materials at its own expense describing its services to the Company hereunder.

9.     In the event that the Company becomes a debtor under the Bankruptcy Code, the Company shall use commercially reasonable efforts to promptly apply to the bankruptcy court having jurisdiction over the chapter 11 case or cases (the "Bankruptcy Court") for the approval pursuant to sections 327(a) and 328(a) of the Bankruptcy Code of this Agreement and Centerview's retention by the Company under the terms of this Agreement, and subject to the standard of review provided for in Section 328(a) of the Bankruptcy Code, and not subject to any other standard

*9*

of review under section 330 of the Bankruptcy Code or any other standard of review, and shall use commercially reasonable efforts to obtain Bankruptcy Court authorization thereof. The Company will use commercially reasonable efforts to supply Centerview with a draft of such application and any proposed order authorizing Centerview's retention that is proposed to be submitted to the Bankruptcy Court sufficiently in advance of the filing of such application or the submission of such order, as the case may be, to enable Centerview to review and comment thereon. Centerview shall have no obligation to provide any services under this Agreement in the event that the Company becomes a debtor under the Bankruptcy Code unless and until Centerview's retention under the terms of this Agreement is approved under Sections 327(a) and 328(a) of the Bankruptcy Code by a final order of the Bankruptcy Court no longer subject to appeal, rehearing, reconsideration or petition for certiorari, and which order is acceptable to Centerview in all respects. Centerview acknowledges that in the event that the Bankruptcy Court approves its retention by the Company pursuant to the application process described in this paragraph 9, payment of Centerview's fees and expenses shall be subject to (i) jurisdiction and approval of the Bankruptcy Court under Sections 327(a) and 328(a) of the Bankruptcy Code and any order approving Centerview's retention, (ii) any applicable fee and expense guidelines and/or orders and (iii) any requirements governing interest and final fee applications. Centerview shall have no obligation to keep time records except as it does so in its normal practice and will have no obligation to provide services under this Agreement if it will be required to vary its normal time-keeping practices. In the event that the Company becomes a debtor under the Bankruptcy Code and Centerview's engagement hereunder is approved by the Bankruptcy Court, the Company shall pay all fees and expenses of Centerview hereunder as promptly as reasonably practicable in accordance with the terms hereof and any orders of the Bankruptcy Court. In so agreeing to seek Centerview's retention under section 328(a) of the Bankruptcy Code, the Company acknowledges that it believes that Centerview's experience and expertise, its knowledge of the industry in which the Company operates and the capital markets and its other capabilities will inure to the benefit of the Company, that the value to the Company of Centerview's services hereunder derives in substantial part from that expertise and experience and that, accordingly, the structure and amount of the fees payable to Centerview hereunder are reasonable regardless of the number of hours to be expended by Centerview's professionals in performance of the services to be provided hereunder. Prior to commencing a chapter 11 case, the Company shall pay all undisputed amounts theretofore due and payable to Centerview in cash.

The Company agrees that Centerview's post-petition compensation as set forth herein and payments made pursuant to the expense reimbursements and indemnification provisions of this Agreement (including, without limitation, Annex A hereto) shall be entitled to priority as expenses of administration under sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code, and shall be entitled to the benefits of any "carve-outs" for professional fees and expenses in effect pursuant to one or more financing orders entered by the Bankruptcy Court. The Company also agrees to assist Centerview in preparing, filing and serving all required fee statements, interim fee applications, and final fee application. The Company agrees

to support Centerview's fee applications during any Bankruptcy Court hearing on such fee applications, so long as the fees and expenses sought by Centerview therein are consistent with this Agreement.

10. This Agreement shall be deemed made in New York. This Agreement and all controversies arising from or relating to performance hereunder shall be governed by, and construed in accordance with, the laws of the State of New York applicable to agreements made and to be performed entirely in such State, without giving effect to such State's rules concerning conflicts of laws that might provide for any other choice of law. The Company and Centerview agree that any action or proceeding based hereon, or arising out of Centerview's engagement hereunder, shall be brought and maintained in the courts of the State of New York located in the City and County of New York or in the United States District Court for the Southern District of New York; provided that, if has commenced a chapter 11 case, all legal proceedings relating to this Agreement shall be brought in the Bankruptcy Court. The Company and Centerview each hereby irrevocably submit to the jurisdiction of the courts of the State of New York located in the City and County of New York or in the United States District Court for the Southern District of New York, or, if a chapter 11 case is commenced by the Company, the Bankruptcy Court, for the purpose of any such action or proceeding as set forth above. Each of the Company and Centerview hereby irrevocably waive, to the fullest extent permitted by law, any objection which it may have or hereafter may have to the laying of venue of any such action or proceeding brought in any such court referred to above and any claim that any such action or proceeding has been brought in an inconvenient forum and agree not to plead or claim the same. THE COMPANY (FOR ITSELF, ANYONE CLAIMING THROUGH IT OR IN ITS NAME, AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ON BEHALF OF ITS EQUITY HOLDERS) AND CENTERVIEW EACH HEREBY IRREVOCABLY WAIVE ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY CLAIM BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

11. This Agreement may be executed in counterparts, each of which together shall be considered a single document. This Agreement may not be assigned by either party (except by Centerview to an affiliate) without the prior written consent of the other. This Agreement shall be binding upon Centerview and the Company and their respective successors and permitted assigns (including, in the case of the Company, any successor to all or a portion of the assets and/or the businesses of the Company under a Plan). This Agreement is not intended to confer any rights upon any shareholder, creditor, owner or partner of the Company, or any other person or entity not a party hereto, other than the Indemnified Persons referenced in the Indemnification Agreement attached hereto as Annex A and the Centerview Persons referenced in paragraph 5 hereof. This Agreement and the Indemnification Agreement constitute the entire agreement of the parties with respect to the subject matter hereof, and may not be amended or otherwise modified or its provisions waived except by a writing executed by Centerview and the Company.

*11*

12.    This Agreement supersedes in its entirety all prior agreements between Centerview and the Company related to the above referenced matter, including that certain agreement dated June 19, 2022.  The parties acknowledge that they intend for this agreement to be effective as of June 19, 2022.

13.    Centerview is engaged directly and through its affiliates and related parties in a number of investment banking, financial advisory and merchant banking activities. The Company acknowledges and agrees that in performing its services for the Company hereunder, Centerview shall have no duty to disclose to the Company, or to use for the benefit of the Company, any proprietary or non public information obtained by Centerview or its affiliates or related parties in the course of providing services to any other entity or person, engaging in any transaction (including as principal) or otherwise conducting its business.

We are pleased to accept this engagement and look forward to working with the Company.  Please confirm that the foregoing is in accordance with our mutual understanding by signing and returning to Centerview this letter and the Indemnification Agreement attached hereto as Annex A, which shall thereupon constitute binding agreements between Centerview and the Company.

Very truly yours,

CENTERVIEW PARTNERS LLC

By:

Name: Marc Puntus
Title: Partner

Accepted and Agreed to:

CELSIUS NETWORK LLC

By: _____

    Name: Chris Ferraro
    Title: Chief Financial Officer

Annex A

August 2, 2022

Centerview Partners LLC
31 West 52nd Street
New York, NY 10019

Ladies and Gentlemen:

In connection with the engagement (the "Engagement") of Centerview Partners LLC ("Centerview") and Celsius Network LLC and certain of its affiliates (collectively, the "Company") to render financial advisory services to the Company pursuant to a letter agreement dated the date hereof to be entered into between the Company and Centerview (the "Engagement Agreement"), the Company hereby agrees as follows:

1.  Except as provided in paragraph 3 hereof, the Company agrees to indemnify and hold harmless the Centerview Persons (as defined below) from and against any and all losses, claims, damages, demands and liabilities, joint or several, or actions or proceedings in respect thereof, brought by or against any person, including, without limitation, by the Company against any Centerview Person and vice versa (collectively, "Losses"), which are related to or arise out of the Engagement Agreement, the Engagement or any matter or transaction contemplated thereby. As used in this letter agreement, the term "Centerview Persons" shall mean Centerview and each of its affiliates, Centerview's and such affiliates' respective members, directors, officers, employees and controlling persons, and each of their respective successors and assigns.

2.  The Company agrees to reimburse Centerview and each other Centerview Person promptly upon request for all costs and expenses (including fees, disbursements and other charges of legal counsel), as they are incurred in connection with investigating, preparing for, pursuing, defending against or providing evidence in, any pending or threatened action, claim, suit, investigation or other proceeding brought by or against any person, including, without limitation, by the Company against any Centerview Person and vice versa, in any jurisdiction related to or arising out of the Engagement Agreement, the Engagement or any matter or transaction contemplated thereby (whether or not Centerview or any other Centerview Person is a named party or witness, and whether or not any liability to any person results therefrom), including, without limitation, in connection with enforcing the terms hereof.

3.  Notwithstanding the foregoing, the Company shall have no obligation to indemnify and hold harmless any Centerview Person under this letter agreement in respect of any Losses to the extent that such Losses are finally judicially determined to have resulted directly from the bad faith, willful misconduct or gross negligence of such Centerview Person.

*1*

4.  The Company agrees that it will not, without Centerview's prior written consent, settle, compromise, consent to the entry of any judgment in or otherwise seek to terminate any pending or threatened action, claim, suit, investigation or proceeding in respect of which indemnification or contribution may be sought hereunder (whether or not Centerview or any other Centerview Person is an actual or potential party thereto) unless such settlement, compromise, consent or termination includes an unconditional release of each Centerview Person from all liability arising out of such action, claim, suit, investigation or proceeding and does not impose any monetary or financial obligation on any Centerview Person or contain any admission of culpability or liability on the part of any Centerview Person. No Centerview Person seeking indemnification, reimbursement or contribution under this letter agreement will, without the Company's prior written consent (which consent shall not be unreasonably withheld or delayed), settle, compromise, consent to the entry of any judgment in or otherwise seek to terminate any action, claim, suit, investigation or proceeding referred to herein.

5.  If the foregoing indemnification provided for herein is determined to be unavailable to a Centerview Person for any reason or is insufficient to hold it harmless in respect of any Losses referred to herein, then, in lieu of indemnifying such Centerview Person hereunder, the Company shall contribute to the amount paid or payable by such Centerview Person as a result of such Losses (and expenses related thereto) (i) in such proportion as is appropriate to reflect the relative benefits to the Company, on the one hand, and to Centerview, on the other hand, with respect to the Engagement or (ii) if the allocation provided by clause (i) of this paragraph is not available, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) but also the relative fault of each of the Company, together with its officers, directors, employees, stockholders, affiliates and other advisors, on the one hand, and Centerview, on the other hand, and any other relevant and equitable considerations; provided, however, that except with respect to any Losses that are finally judicially determined to have resulted from the bad faith, willful misconduct or gross negligence of any Centerview Person, in no event shall the aggregate contribution of the Centerview Persons to the amounts so paid or payable exceed the aggregate amount of all fees actually received by Centerview from the Company in connection with the Engagement (excluding any amounts received by Centerview as reimbursement of expenses pursuant to the Engagement Agreement). For purposes of this letter agreement, the relative benefit to the Company and Centerview of the Engagement shall be deemed to be in the same proportion as (a) the total value paid or contemplated to be paid or received or contemplated to be received by the Company in the transaction or transactions that are the subject of the Engagement, whether or not such transaction is proposed or completed, bears to (b) the fees paid or to be paid to Centerview under the Engagement Agreement.

6.  This letter agreement shall be deemed made in New York. This letter agreement and all controversies arising from or relating to performance hereunder shall be governed by, and construed in accordance with, the laws of the State of New York applicable to agreements made and to be performed entirely in such State, without giving effect to such State's rules concerning conflicts of laws that might provide for any other choice of law. Each of the Company and Centerview agrees that any action or proceeding based on, arising out of or resulting from any matter referred to in this letter agreement, shall be brought and

*2*

maintained exclusively in the courts of the State of New York located in the City and
County of New York or in the United States District Court for the Southern District of New
York; provided that, if the Company has commenced a chapter 11 case, all legal
proceedings relating to this letter agreement shall be brought in the bankruptcy court
overseeing such proceedings. The Company and Centerview each hereby irrevocably
submits to the jurisdiction of the courts of the State of New York located in the City and
County of New York or in the United States District Court for the Southern District of New
York, or, if a chapter 11 cases is commenced by the Company, the relevant bankruptcy
court, for the purpose of any such action or proceeding as set forth above, and irrevocably
agrees to be bound by any judgment rendered thereby in connection with such action or
proceeding. Each of the Company and Centerview hereby irrevocably waives, to the fullest
extent permitted by law, any objection which it may have or hereafter may have to the
laying of venue of any such action or proceeding brought in any such court referred to
above and any claim that any such action or proceeding has been brought in an
inconvenient forum, and agree not to plead or claim the same. ANY RIGHTS OF TRIAL
BY JURY WITH RESPECT TO ANY CLAIM, COUNTERCLAIM OR ACTION
ARISING OUT OF THIS LETTER AGREEMENT ARE HEREBY WAIVED.

7.  The indemnity, contribution, reimbursement and other obligations of the Company
hereunder shall be in addition to any liability that the Company may have, at common law
or otherwise, and shall be binding on its successors and permitted assigns. The obligations
of the Company hereunder cannot be assigned without the prior written consent of
Centerview.

8.  Prior to or at the time a public announcement is made concerning the Company entering
into any agreement or arrangement with respect to, or effecting, any merger, statutory
exchange or other business combination or proposed sale or exchange, dividend or other
distribution or liquidation of all or a significant portion of its assets in one or a series of
transactions or any significant recapitalization or reclassification of its outstanding
securities that does not directly or indirectly provide for the assumption of the obligations
of the Company set forth herein, the Company will notify Centerview in writing thereof
and, if requested by Centerview, shall use commercially reasonable efforts to arrange in
connection therewith alternative means of providing for the obligations of the Company
set forth herein.

9.  The terms of this letter agreement shall apply to all services provided by Centerview to the
Company in connection with the matters contemplated by the Engagement, including those
provided prior to the date of this letter agreement. This letter agreement supersedes the
prior letter agreement dated June 17, 2022. The parties acknowledge that they intend for
this letter agreement to be effective as of June 17, 2022. The provisions of this letter
agreement shall apply to any subsequent amendment to or modification of the Engagement
Agreement, and shall survive the termination of the Engagement Agreement or completion
of any transaction contemplated by the Engagement Agreement. The provisions of
paragraph 11 of the Engagement Agreement are incorporated by reference into this letter
agreement.

*3*

Very truly yours

CELSIUS NETWORK LLC

By:    _____

Chris Ferraro
Chief Financial Officer

Accepted:

CENTERVIEW PARTNERS LLC

By: _____
        Marc Puntus
        Partner