

1  UNITED STATES BANKRUPTCY COURT

2  SOUTHERN DISTRICT OF NEW YORK

3  Case No. 22-10964-mg

4  - - - - - - - - - - - - - - - - - - - - - - - - - - x

5  In the Matter of:

6

7  CELSIUS NETWORK LLC,

8

9        Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12              United States Bankruptcy Court

13              One Bowling Green

14              New York, NY  10004

15

16              September 14, 2022

17              2:05 PM

18

19

20

21  B E F O R E :

22  HON MARTIN GLENN

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO:  F. FERGUSON

1    Hearing Using Zoom for Government RE: Motion to Appoint

2    Examiner. (Doc## 546, 588, 723, 730, 731, 732, 734, 735,

3    746, 752, 755, 757, 758, 764, 779, 792, 793, 798, 799, 801)

4

5    Hearing Using Zoom for government re: Debtors' Ex Parte

6    Motion Pursuant to Section 107 of the Bankruptcy Code

7    Seeking Entry of an Order (I) Authorizing the Debtors to

8    Redact Certain Personally Identifiable Information from the

9    Creditor Matrix, Schedules and Statements, and Related

10   Documents and (II) Granting Related Relief filed by Joshua

11   Sussberg on behalf of Celsius Network LLC. (Doc # 344, 364,

12   389, 399, 600, 607, 633, 638, 642, 643)

13

14   Hearing Using Zoom for Government re: The Official Committee

15   Of Unsecured Creditor's Motion for Entry of An Order

16   Clarifying the Requirement to Provide Access to Confidential

17   or Privileged Information and Approving a Protocol Regarding

18   Creditor Requests for Information. (Doc# 432, 608, 617)

19

20   Hearing Using Zoom for Government RE: Official Committee of

21   Unsecured Creditors' Application to Retain White & Case LLP

22   as Counsel effective as of July 29, 2022. (Doc # 603, 814,

23   815)

24

25

Page 3

1    Hearing Using Zoom for Government RE: Application to Employ

2    Centerview Partners LLC as Investment Bankers filed by

3    Joshua Sussberg on behalf of Celsius Network LLC. (Doc #

4    362, 364, 374, 389, 601, 635)

5

6    Hearing Using Zoom for Government RE: The Official Committee

7    of Unsecured Creditors' Ex Parte Motion Seeking Entry of an

8    Order (I) Authorizing the Committee to File Under Seal

9    Certain Confidential Commercial Information Related to the

10   Application to Retain and Employ White & Case LLP as Counsel

11   to the Committee and (II) Granting Related Relief filed by

12   Gregory F Pesce on behalf of The Official Committee of

13   Unsecured Creditors. (Doc # 602)

14

15   Hearing Using Zoom for Government RE: Motion Authorizing the

16   Debtors to Prepare a Consolidated List of Creditors in Lieu

17   of Submitting A Separate Mailing Matrix for Each Debtor,

18   (II) Authorizing the Debtors to File A Consolidated List of

19   the Debtors Fifty Largest Unsecured Creditors, (III)

20   Authorizing the Debtors to Redact Certain Personally

21   Identifiable Information, (IV) Approving the Form and Manner

22   of Notifying Creditors of Commencement, and (V) Granting

23   Related Relief. (Doc ## 18, 55, 357, 445, 626, 643)

24

25

1   Hearing Using Zoom for Government RE: Debtors Motion for

2   Entry of an Order (I) Authorizing Debtors to Serve Parties

3   by E-Mail and (II) Granting Related Relief. (Doc# 640, 702,

4   802)

5

6   Hearing Using Zoom for Government RE: Debtors Motion

7   Pursuant to Section 107 of the Bankruptcy Code Seeking Entry

8   of an Order (I) Authorizing the Debtors to (A) Redact

9   Individual Names, and (B) Implement an Anonymized

10  Identification Process, and (II) Granting Related Relief.

11  (Doc# 639, 702, 806)

12

13  Hearing Using Zoom for Government, Only if There are

14  Objection(s), to the Notice of Presentment of Agreed

15  Reporting Framework Stipulation (ECF Doc. No. 669).

16

17  Hearing Using Zoom for Government RE: The Official Committee

18  of Unsecured Creditors' Application for Entry of an Order

19  Authorizing the Employment and Retention of Kroll

20  Restructuring Administration LLC as Noticing and Information

21  Agent of the Committee Effective as of August 5, 2022. (Doc

22  #433, 443, 617)

23

24  Hearing Using Zoom for Government RE: Kirkland Retention

25  Application. (ECF Doc. # 360, 754, 756, 759, 800, 808)

1   Hearing Using Zoom for Government RE: Debtors' Application

2   to Employ and Retain Alvarez & Marsal North America, LLC as

3   Financial Advisor to the Debtors and Debtors in Possession

4   Effective as of July 13, 2022 (ECF Doc. # 410, 601, 666,

5   667, 765, 805)

6

7   Hearing Using Zoom for Government RE: Stretto Retention

8   Application (ECF Doc. # 361, 809)

9

10   Hearing Using Zoom for Government RE: Latham and Watkins

11   Retention Application (ECF Doc. # 363, 440, 601, 647, 807)

12

13   Hearing Using Zoom for Government RE: Akin Gump Retention

14   Application (ECF Doc. # 392, 810)

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

```
 1    A P P E A R A N C E S :

 2

 3    KIRKLAND & ELLIS LLP

 4         Attorneys for Debtors

 5         300 North Salle

 6         Chicago, IL 60654

 7

 8    BY:  ROSS KWASTENIET

 9         CHRIS KOENIG

10         JUDSON BROWN

11         ELIZABETH JONES

12         DAN LATONA

13         JOSHUA SUSSBERG

14         PATRICK NASH

15

16    WHITE & CASE LLP

17         Attorneys for the Official Committee of Unsecured

18         Creditors

19         555 South Flower Street, Suite 2700

20         Los Angeles, CA 90071

21

22    BY:  SAM HERSHEY

23         GREGORY PESCE

24         DAVID TURETSKY

25         KEITH WOFFORD
```

Page 7

1   TEXAS OFFICE OF ATTORNEY GENERAL

2        Attorney for Texas State Securities Board

3        PO Box 12548

4        Austin, TX 78711-2548

5

6   BY:  LAYLA MILLIGAN

7

8   MCCARTER ENGLISH, LLP

9        Attorney for Zaryn Dentzel

10        245 Park Avenue

11        New York, NY 10167

12

13   BY:  DAVID ADLER

14

15   UNITED STATES DEPARTMENT OF JUSTICE

16        Attorneys for the U.S. Trustee

17        201 Varick Street, Suite 1006, 10th Floor

18        New York, NY 10014

19

20   BY:  SHARA CLAIRE CORNELL

21        BRIAN MASUMOTO

22        LINDA RIFKIN

23        MARK BRUH

24

25

Page 8

1    MILBANK

2        Attorney for The Series B Shareholders

3        1850 K St NW

4        Washington, DC 20006

5

6    BY:  DENNIS DUNNE

7

8    TOGUT, SEGAL & SEGAL

9        Attorneys for Ad Hoc Group of Custodial Account Holders

10        One Pennsylvania Plaza Suite 3335

11        New York, NY 10119

12

13    BY:  KYLE ORTIZ

14        BRYAN KOTLIAR

15

16    ALVAREZ AND MARSAL

17        Attorneys for Debtors

18        540 W Madison

19        Chicago, IL 60654

20

21    BY:  HOLDEN BIXLER

22

23

24

25

```
 1   LATHAM & WATKINS

 2        Attorneys for Debtors

 3        330 North Wabash Avenue, Ste 2800

 4        Chicago, IL 60611

 5

 6   BY:  CAROLINE RECKLER

 7        JOHN SIKORA,

 8

 9   ALSO APPEARING:

10   FREDERICK BRUCE PURDY - Pro Se Creditor

11   LILLIAN YIELDING (ANN) - Pro Se Creditor

12   MAX GALKA, WITNESS CEO of Elementus

13   DANIEL FRISHBERG, Pro Se Creditor

14   IMMANUEL HERRMANN, Pro Se Creditor

15

16

17

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2              CLERK:  All right, starting the recording for

3    September 14, 2022, at 2:00 p.m.  It's for Celsius Network

4    LLC, Case Number 22-10964.  Starting to admit participants.

5    All right.

6              All right, I believe Kirkland's going to be

7    joining.

8              WOMAN 1:  Yes, Kirkland is here.

9              CLERK:  Yes, okay.  If you could, just tell me

10   which participants are going to have a speaking line from --

11   is this the Chicago office?

12             WOMAN 1:  Yes.

13             CLERK:  Okay, so if you could, just tell me the

14   participants from the Chicago office that are going to be

15   speaking this afternoon.

16             WOMAN 1:  Sure.  This afternoon, it will be Ross

17   Kwasteniet and Chris Koenig.

18             CLERK:  Okay, great.

19             WOMAN 1:  And then, we also have a listen-only

20   line under the name Susan Golden.

21             CLERK:  Okay, so she's listening.  All right,

22   perfect.  I just need to know the live participants so that

23   they can -- they can speak on the record.  And then, from I

24   think the other Kirkland & Ellis line is --

25             WOMAN 1:  Yeah, that's the Susan Golden line.  We

1    will rename that.

2             CLERK:  Okay, great.  And then, Judson Brown,

3    Elizabeth Jones, Dan Latona, Joshua Sussberg, and Patrick

4    Nash.  Who is -- who is appearing in person, and who is -- I

5    mean, who is speaking, and who is listening?

6             MAN 2:  I believe it's going to be Elizabeth Jones

7    and Patrick Nash who will be speaking, and others --

8    everybody else will be listening.

9             CLERK:  Okay.  Do you know who's speaking first?

10            MAN 2:  I think that we're going to start with Pat

11   Nash today.

12            CLERK:  Okay, great.  All right, thank you.  So,

13   does anyone have to -- well, I guess I'll wait until Susan

14   and -- well, not -- wait until the other parties join.  And

15   then, if they have to unmute -- we could test if they can

16   mute and unmute.  That's all.

17            MAN 2:  Okay, great.  And can I ask, is our volume

18   okay?  Are you able to hear me okay?

19            CLERK:  Yes, I can.

20            MAN 2:  Okay, thank you.

21            CLERK:  All right.  Thank you.  All right, as

22   parties join, if you could mute your line, that would be

23   most appreciated.

24            All right, just waiting for some parties to

25   connect.

1          All right, Mr. Hershey, are you -- if you could

2    just unmute and give your appearance for the record, please.

3          MR. HERSHEY:  Yeah, hi.  Sam Hershey from White &

4    Case on behalf of the official committee of unsecured

5    creditors.

6          CLERK:  All right.  And is there any of your

7    specific co-counsel that's going to be also speaking on the

8    record this afternoon?

9          MR. HERSHEY:  Yeah, I have several co-counsel who

10   will be joining.  I'm happy to give you their names now, or

11   they can speak for themselves when they join, whatever you

12   prefer.

13         CLERK:  Okay.  You could give the -- you just have

14   to tell me the parties that are speaking, and also if you

15   could specify who's going to be speaking first on behalf of

16   the committee.

17         MR. HERSHEY:  So, my understanding is that Gregory

18   Pesce will speak first.

19         CLERK:  Okay.

20         MR. HERSHEY:  But I know that also, my partners

21   David Turetsky and Keith Wofford will be speaking as well.

22         CLERK:  Okay, I do see David, so I'm admitting him

23   now.  And let me look for Keith.  I see Keith as well, so

24   I'm admitting him as well.

25         MR. HERSHEY:  Do you see Greg?

1          CLERK:  I do not see him yet.

2          MR. HERSHEY:  Okay.

3          CLERK:  I don't know if you want to reach out to

4     him.

5          MR. HERSHEY:  I'll reach out to him.  Also, we

6     have a couple witnesses, I think, potentially speaking

7     today, one of whom is Max Galka, who we set up with a live

8     line.

9          CLERK:  Yes, I did get Max Galka.  Is there anyone

10    else that is going to be testifying this afternoon, to your

11    knowledge?

12         MR. HERSHEY:  Not to my knowledge, though I see

13    that Keith is -- Mr. Wofford is now on, and Mr. Turetsky I

14    think is now on.  They may be aware of other witnesses, but

15    I am only aware of Keith.

16         CLERK:  Okay.

17         MR. HERSHEY:  Actually, about Max.  Excuse me.

18         CLERK:  All right, thank you.  Good afternoon,

19    Keith.  If you could, just give your appearance for the

20    record, please.

21         MR. WOFFORD:  Yes, hello.  Good afternoon.  Keith

22    Wofford from White & Case for the official committee.

23         CLERK:  Thank you.  And David, if you could unmute

24    and give your appearance as well.  I don't know if he hears

25    me.  David Turetsky?  All right, perhaps I could come back

1   to him.

2          Keith, do you happen to know, besides Maxwell

3   Galka, if anyone else is going to be appearing as a witness

4   this afternoon?

5          MR. WOFFORD:  I do not believe there will be any

6   other witnesses.

7          CLERK:  Okay, thank you.  I appreciate that.  All

8   right, so we'll come back.  If someone could reach out to

9   David and just make sure that he is able to mute and unmute,

10   in case he needs to speak on the record, that would be most

11   appreciated.

12          MR. HERSHEY:  Yeah, I'll reach out to Greg and

13   David.

14          CLERK:  Thank you.

15          Okay, it doesn't look like we have anyone on from

16   the US Trustee's office yet.

17          All right, it looks like she's still joining.  All

18   right.  David?  If you could unmute and just give your

19   appearance, just to make sure you can mute and unmute if you

20   need to speak.

21          MR. TURETSKY:  Sure, it's David Turetsky of White

22   & Case on behalf of the committee.

23          CLERK:  Thank you very much.

24          MR. TURETSKY:  Thank you.

25          CLERK:  All right.

1            All right, for the parties that have joined, if

2     you are speaking this afternoon, please unmute one at a time

3     and give your appearance for the record.

4            Okay, Max, if you could unmute and just give your

5     appearance, Max Galka.  Sorry, I can't hear you.

6            MR. GALKA:  Yes, hello.

7            CLERK:  Hi.  Oh, yes, Max, if you could just state

8     your appearance for the record.

9            MR. GALKA:  I'm sorry, state what?

10           CLERK:  Your appearance for the record, just your

11    first and your last name, how you're involved in the case.

12           MR. GALKA:  Sure.  My name is Max Galka.  I am the

13    CEO of Elementus, and we are working on behalf of the

14    unsecured creditors committee regarding crypto on-chain

15    analysis.

16           CLERK:  Okay, thank you.  And I was told that it's

17    possible you may testify this afternoon?

18           MR. GALKA:  Mm hmm.

19           CLERK:  Okay.  If you do, please make sure you

20    have your video on, and then someone will administer the

21    oath to you.

22           MR. GALKA:  Okay.

23           CLERK:  All right, thank you.

24           MR. GALKA:  Great.

25           CLERK:  You can mute your line.  Okay, great.

1            Yes, Susan?  Yes, Susan, you had your hand up?

2            Okay, Mr. Herrmann, are you -- Immanuel, are you

3    making an appearance this afternoon?

4            MR. HERRMANN:  Yes.  Immanuel Herrmann, pro se

5    creditor.

6            CLERK:  Okay.  Thank you so much.

7            WOMAN 2:  Susan is here.

8            CLERK:  All right, there are some -- still some

9    parties that are joining.

10            MR. HERSHEY:  Yeah, I'm just raising my hand to

11    let you know that Greg Pesce told me he's in the waiting

12    room, just so you are aware.

13            CLERK:  Thank you.  Appreciate that.  Okay, he is

14    joining.

15            MR. PESCE:  Hi, it's Greg Pesce, White & Case,

16    joining the test on behalf of the official creditors

17    committee.  Good afternoon.

18            CLERK:  Thank you very much.  Good afternoon.

19    Your appearance is noted.

20            MR. PESCE:  Thank you.

21            CLERK:  All right, for any of the parties --

22    actually, parties are still connecting to audio.

23            Okay, for the parties that have joined, is there

24    -- if anyone's speaking on the record, please unmute one at

25    a time and give your appearance.

1          MR. KOENIG:  Good morning, again.  It's the

2     Kirkland Chicago office.  This is Chris Koenig.  We have

3     some colleagues in New York, Patrick Nash and Elizabeth

4     Jones.  I think they're still in the waiting room.  They'll

5     be appearing as well.  We just wanted to note that they

6     weren't able to get in quite yet.

7          CLERK:  Okay, I'm looking for Elizabeth.  I don't

8     see her in the waiting room, so you might want to check

9     with --

10          MR. KOENIG:  Yeah, we'll give them a ring and come

11     back to you.  Thank you.

12          CLERK:  Thank you.

13          All right, the parties that have joined, if you

14     could please unmute one at a time and give your name if you

15     are speaking this afternoon, all right?

16          MAN 3:  Are you going to call us, or should we

17     announce -- self-announce?

18          CLERK:  If you have not given your appearance yet,

19     please self-announce one at a time.

20          All right, if -- for the parties that have joined,

21     if you are speaking this afternoon and want -- please give

22     your appearance on the record.  Please unmute one at a time

23     and give your appearance.

24          Again, the parties that are joining, please unmute

25     one at a time if you are speaking this afternoon, and please

1    give your appearance for the record.

2          Yes, Daniel?

3          MR. FRISHBERG:  Daniel Frishberg appearing.  I'm

4    objecting to several motions.

5          CLERK:  Okay, thank you.

6          All right, Kyle Mason, are you going to be

7    speaking this afternoon?  Actually, I'm sorry, I have you as

8    listen-only.  My apologies.

9          Do you know if any other counsel from Weil is

10   going to be speaking this afternoon?

11          Okay, Elizabeth is -- Helen Jones is joining.

12          Yes, Chase, if you could unmute.

13          MR. MARSH:  Yes, hi.  Good morning.  This is Chase

14   Marsh.  I'm a creditor, and I left a message with the clerk

15   yesterday.  One letter that I had filed with the Court on

16   the docket was referenced in today's agenda, and I was just

17   curious if I'm being required or asked to speak on that, or

18   if that's just for reference only.

19          CLERK:  I am actually not sure as to that.

20          MR. MARSH:  Okay.

21          CLERK:  But you could definitely bring it up when

22   the motion is called by the judge and once the judge allows

23   parties to speak one at a time.

24          MR. MARSH:  Okay.  Thank you very much.

25          CLERK:  All right, thank you.

1          All right, are there any parties that have joined

2     that have not given their appearance this afternoon and are

3     speaking?  I see, Elizabeth, that you have joined.

4          MS. JONES:  Yes.  Hi.  Elizabeth Jones of Kirkland

5     & Ellis, proposed counsel to the Debtors.

6          CLERK:  Okay, thank you.  And you're -- actually,

7     Mr. Nash is speaking first.  Is that right?

8          MS. JONES:  Yes.  Mr. Nash will be joining me here

9     as well.

10          CLERK:  Okay.  Thank you.

11          All right, for the parties that have joined, if

12     there is anyone that has been admitted and is speaking on

13     the record this afternoon and has not given their

14     appearance, please unmute.  You could raise your hand,

15     unmute, and just state your appearance for the record.

16          MR. ADLER:  Yes, it's David Adler on behalf of

17     certain Celsius borrowers, and I'll be speaking today.

18          CLERK:  Thank you, David.

19          Yes, good afternoon.  If everyone is speaking this

20     afternoon and has not given their appearance, please do so.

21     Please raise your hands one at a time, and I will take your

22     appearances.

23          Shara, if you could unmute and give your

24     appearance, please?

25          MS. CORNELL:  Hi.  Shara Cornell with the Office

Page 20

1     of the United States Trustee.

2               CLERK:  Thank you.

3               MS. CORNELL:  I'm having trouble with my video, as

4     per usual.  I may have to re-log back in.

5               CLERK:  Oh, that's fine.  I just have a quick

6     question.  Are Brian Masumoto, Linda Rifkin, or Mark Bruh,

7     are any of the above going to be joining as well?

8               MS. CORNELL:  You know what?  I think they may all

9     -- they may all be joining this afternoon.

10              CLERK:  Okay.  All right, thank you.

11              MS. CORNELL:  Thank you.

12              MS. JONES:  Deanna, this is Elizabeth Jones again,

13    from Kirkland & Ellis.  I just wanted to let you know we're

14    setting up a conference room in New York that Mr. Nash and I

15    will be speaking from.  That was the one that was just

16    subsequently added.

17              CLERK:  Oh, perfect.  All right, thank you.

18              MS. JONES:  Of course.

19              CLERK:  All right, if there's any participants

20    that are speaking this afternoon that have not given their

21    appearance, please raise your hands, and then unmute one at

22    a time to give your appearance.  Yes, Deb?

23              MS. KOVSKY:  Hi.  It's Deb Kovsky for the ad hoc

24    group of withhold accountholders.

25              CLERK:  Thank you very much.

1              All right, so I see someone in the waiting room

2      that's the exhibit technician.  Is that for Kirkland?  Does

3      anyone know?

4              MAN 4:  -- from Kirkland.  I don't believe that

5      the exhibit tech is a Kirkland line.  Not sure who they're

6      affiliated with, but nobody we're expecting.

7              CLERK:  Thank you.  All right, the party that

8      joined as exhibit technician, can you specify who you're

9      with, which firm?  If you do not unmute and give your

10     appearance, I will be forced to put you back in the waiting

11     room.

12             All right, HY conference room 37D, can someone

13     identify that party?

14             All right, for the parties that have joined, if

15     you could unmute one at a time, if you have not given your

16     appearance yet, and state your appearance for the record.

17     Yes?

18             MS. JONES:  Deanna, can you hear me?  We just

19     added a new room, and we're not sure how the volume is

20     working.

21             CLERK:  It's perfect.

22             MS. JONES:  Okay.  Thank you very much.

23             CLERK:  All right.  You're welcome.

24             MR. PURDY:  Hello?

25             CLERK:  Yes, who is speaking?

1              MR. PURDY:  Oh, gosh, I'm just supposed to be in

2      the waiting room.  I'm a creditor.

3              CLERK:  And your name, sir?

4              MR. PURDY:  Frederick Bruce Purdy.

5              CLERK:  Well, you've been admitted.  Are you

6      speaking this afternoon?

7              MR. PURDY:  No, I wasn't intending to.  I'm just

8      listening.

9              CLERK:  Okay, that's fine.  You can mute your

10     line.

11             MR. PURDY:  Oh, okay.  Mute, there we go.  Oops.

12             CLERK:  I got it for you.

13             All right, for the parties that have joined, if

14     you have not given your appearance this afternoon and you

15     are speaking on the record, speaking not listening, please

16     unmute one at a time and give your appearance, please.

17             All right, Brian, can you hear me?

18             MR. MASUMOTO:  Yes, I can hear you.  This is Brian

19     Masumoto.

20             CLERK:  Oh, okay, so Brian Masumoto is appearing

21     on behalf of the US Trustee.  Are you speaking this

22     afternoon, or just listening?

23             MR. MASUMOTO:  I'm listening.

24             CLERK:  Okay, great.  Thank you.

25             All right, for the parties that have joined, if

1    you are speaking this afternoon, unmute your line one at a

2    time and give your appearance for the record.

3            MS. YEILDING:  Hi, my name is Ann Yeilding, and I

4    was hoping to speak briefly today.  I'm a creditor.

5            CLERK:  Okay, Ann, your appearance is noted.  Are

6    you speaking regarding any specific motion?

7            MS. YEILDING:  The examiner appointment motion.

8            CLERK:  Okay.

9            MS. YEILDING:  You know, I don't know what I'm

10   doing here.  I'm making it up as I go along, but that's the

11   issue I am interested in.

12           CLERK:  All right, so the judge will ask parties

13   one at a time if they have anything in reference to that

14   motion, so you can just wait for that cue.  And of course,

15   if you're going to be speaking, please, everyone raise their

16   hands, and the judge will take the raised hands in turn.

17           MS. YEILDING:  Okay.  Thank you for your patience.

18           CLERK:  You're welcome.  I am going to mute your

19   line for now.

20           MS. YEILDING:  Okay.

21           MS. CORNELL:  Deanna, this is Shara Cornell.  Can

22   you see my video now, please?

23           CLERK:  Yes, I can.

24           MS. CORNELL:  Excellent.  Thank you for your

25   patience.

```
 1               CLERK:  You're welcome.

 2               All right, for the parties that have joined, if

 3     you are speaking this afternoon, please raise your hands.  I

 4     will ask you to unmute and give your appearance if you have

 5     not already done so.

 6               Again, for the parties that have joined, if anyone

 7     is speaking on the record this afternoon, please raise your

 8     hands, and I will unmute you one at a time and ask you to

 9     give your appearance.  Judson Brown?

10               MR. BROWN:  Yes, this is Judson Brown from

11     Kirkland & Ellis.  I likely will not be speaking today, but

12     out of an abundance of caution, I may be speaking today --

13               CLERK:  Okay.

14               MR. BROWN:  -- so wanted to enter my appearance.

15               CLERK:  Understood.  Thank you.

16               MR. BROWN:  Thank you.

17               CLERK:  Yes, Mitch Hurley?

18               MR. HURLEY:  Hi, good afternoon, Mitch Hurley with

19     Akin Gump Strauss Hauer & Feld.  I similarly -- I think it's

20     pretty unlikely that I'm going to need to speak, but since

21     our retention application is up, it's at least conceivable,

22     so I'm going to enter my appearance as well.

23               CLERK:  Okay, thank you, Mitch.  Is Dean Chapman

24     also going to be joining?

25               MR. HURLEY:  Dean will not be joining.
```

1          CLERK:  Okay, thank you.

2          MR. HURLEY:  Thank you.

3          CLERK:  All right.  From the US -- Mr. Mark Bruh?

4          MR. BRUH:  Yeah, I can --

5          CLERK:  Hi.

6          MR. BRUH:  Hi.  How are you?

7          CLERK:  Hi.  How are you?  Are you speaking this

8   afternoon, Mark?

9          MR. BRUH:  I don't plan to.  I know Ms. Cornell

10  will be doing the presentation.  I don't know if she's

11  logged on yet, but --

12          CLERK:  Yes, she has.

13          MR. BRUH:  -- I'll note my appearance, though.

14  Thank you.

15          CLERK:  Thank you.

16          Layla Milligan, are you going to be speaking this

17  afternoon?

18          MS. MILLIGAN:  Good afternoon.  I think I will

19  speak.  We filed a joinder to one of the matters.  Can you

20  hear me okay?

21          CLERK:  Yes, I can.  Thank you.  If you could just

22  state your full appearance, who you represent.

23          MS. MILLIGAN:  Yes.  I'm Layla Milligan.  I'm with

24  the Texas Office of the Attorney General, and I am here

25  representing the Texas State Securities Board.

1          CLERK:  Thank you very much.

2          MS. MILLIGAN:  Thank you.

3          CLERK:  All right, Karen, I'll be back in a

4     moment.

5          WOMAN 2:  Okay.

6          CLERK:  All right, we are going to get started in

7     a few minutes.  There are certain parties that have not

8     joined, and I just want to see if anyone from these specific

9     parties are going -- are on the line and have not given

10    their appearance.

11         I don't have anyone from Milbank on behalf of

12    Series B shareholders, to my knowledge.  But if you have

13    joined, please unmute and give your appearance at this time.

14         MR. DUNNE:  Yes, hi.  Can you hear me?  It's

15    Dennis Dunne from Milbank on behalf of the Series B.

16         CLERK:  Okay, thank you.  Is anyone else from

17    Milbank going to be joining with a speaking role?

18         MR. DUNNE:  No, just me.

19         CLERK:  Okay, great.  Thank you.  All right.  Is

20    there anyone on from Togut?

21         MR. ORTIZ:  Good afternoon, Ms. Anderson.  Kyle

22    Ortiz is on, as well as my colleague, Bryan Kotliar.

23         CLERK:  Okay, so who's going to be speaking first?

24         MR. ORTIZ:  I will be, Kyle Ortiz.

25         CLERK:  Okay.  Thank you.

1          MR. ORTIZ:  Thanks.

2          CLERK:  All right.  Is there anyone from the State

3    of Wisconsin Department of Financial Institutions?  Okay.

4          Do we have anyone from Alvarez and Marsal?

5          MR. BIXLER:  Yes, Holden Bixler with Alvarez and

6    Marsal.

7          CLERK:  Okay, thank you.  Is Robert Campagna also

8    joining?

9          MR. BIXLER:  I do not believe that Robert Campagna

10   is joining.

11         CLERK:  Okay, thank you.  All right, is there

12   anyone from Sullivan & Cromwell?  I'll take that as a no.

13         All right, is there anyone from Broad Reach

14   Consulting, LLC?  All right.

15         Has Howard Seife joined from Norton Rose, the firm

16   of Norton Rose?  Okay.

17         Do we have counsel from Latham & Watkins?

18         MS. RECKLER:  Yes, good afternoon, Your Honor.

19   This is Caroline Reckler.  My partner, John Sikora, who is

20   the declarant for our retention application, will be joining

21   and will be the primary speaker.

22         CLERK:  Okay.  All right, thank you.  All right,

23   we'll look out for -- and Paul Silverstein?  Is Paul

24   Silverstein on the line?  All right.

25         Are there any additional participants?  This is

1     the last call.  If you're going to be speaking on the record

2     this afternoon and you have not given your appearances,

3     whether -- but you want to speak this afternoon and you have

4     not given an appearance, you can raise your hands one at a

5     time and please give your appearance on the record.  This

6     includes everyone that's appeared at the -- that has joined

7     the hearing.  Is there anyone that has not given their

8     appearance that is going to be speaking this afternoon?

9              I have a few brief announcements before we get

10    started.  Please take note of the following:  All persons

11    are strictly prohibited from making any recording or

12    reproduction of court proceedings, whether by video or

13    audio, screenshots, or otherwise.  Violation of this may

14    result in sanctions.

15             All right, a few more announcements.

16             If a party is speaking, every time that they

17    speak, they have to unmute their line and state their name

18    each time they speak on the court record.  As I previously

19    said, audio and video recording and everything else made in

20    the previous statement is prohibited.

21             Judge, would you like to begin, or would you like

22    to wait?

23             THE COURT:  No, we can begin.  Thank you very

24    much, Deana, and good afternoon to everyone.  We are here in

25    Celsius, 22-10964.

1          Once again, we have a long agenda, which was filed

2     on the docket, and we'll go through the order of the agenda.

3     For the many pro se parties who have appeared today, as in

4     past hearings, if you will use the raised hand function at

5     the bottom of your screen, I will give you an opportunity to

6     speak if you are intending to speak about one of the pending

7     motions, so that's how we'll proceed.

8          MR. NASH:  Good afternoon, Judge.  Pat Nash from

9     Kirkland & Ellis for the Debtors.

10         THE COURT:  Good afternoon, Mr. Nash.

11         MR. NASH:  Your Honor, before diving right into

12    the agenda and handing the first matter over to Miss Cornell

13    and Mr. Pesce in the first instance, one scheduling item,

14    Judge.

15         When we were last in front of you, you had asked

16    the Debtors to confer with the two ad hoc groups, the

17    custody group and the withhold group, regarding scheduling

18    matters with respect to their issues and certain pleadings

19    that they had filed.  And we would propose, Your Honor, to

20    address that at the conclusion of the hearing at the end of

21    the agenda.

22         THE COURT:  All right.  That's fine, Mr. Nash.

23    And I have some questions and some comments on that subject

24    as well.  We'll put that at the end of the agenda.

25         MR. NASH:  Terrific, Your Honor.  And with that, I

1    turn it over to Miss Cornell and/or Mr. Pesce -- Miss Corner

2    and Mr. Pesce.  Thank you, Judge.

3           MR. PESCE:  Your Honor, it's Gregory Pesce, White

4    & Case, proposed counsel to the committee.  Prior to the

5    hearing, Miss Cornell and I spoke and then I spoke with

6    Kirkland & Ellis.  And if it would please the Court, I am

7    prepared to discuss the agreed form of order that the

8    creditors' committee filed on behalf of ourselves and the

9    U.S. Trustee at Docket 752 with respect to the examiner

10   motion and provide some context and overview of that before

11   allowing the other parties to speak.

12          But again, if Your Honor has a different order in

13   which we should proceed, just let us know.

14          THE COURT:  No.  Let me just state for the record,

15   the United States Trustee made a motion for the entry of an

16   order directing the appointment of an examiner.  The motion

17   was filed as ECF Docket No. 546.  There have been a series

18   of responses.  I won't go through each of them.  But some of

19   them filed by -- the committee filed and various other

20   organized groups did.

21          In addition, the Court received and has reviewed

22   some individual creditor filings.  Immanuel Herrmann, for

23   example, has two filings: one at ECF 755 and the other at

24   779.  There have been joinders in the motion for the

25   appointment of the examiner by a group of states, a large

1    group of states, and there actually is an additional filing

2    by Mr. Herrmann, which is ECF Docket No. 780.

3           So the Court has reviewed all of those pleadings.

4    I haven't given the number of each, but I reviewed all of

5    them that relate to the issue of the appointment of an

6    examiner.

7           Mr. Pesce, go ahead.

8           MR. PESCE:  Thank you, Your Honor.  Again, for the

9    record, Gregory Pesce, White & Case, on behalf of the

10   Official Creditors' Committee.

11          Since the filing of the examiner motion in mid-

12   August, as Your Honor can imagine, it has been a source of

13   incredible focus and attention for the Debtors, the

14   committee, I imagine the U.S. Trustee, and many, many of the

15   1.7 million users that used Celsius prior to the petition

16   date.

17          Prior to filing that, this wasn't a surprise for

18   the committee in two respects.  First, as we greatly

19   appreciate, the U.S. Trustee did confer with us several

20   times about it and sought our input, and the committee is

21   also just not ignorant of the unprecedented facts and

22   circumstances of these cases.

23          As I mentioned, it's 1.7 million people can't

24   access their cryptocurrency.  There's over $6 billion of

25   liabilities, hundreds of letters have been filed with the

1    Court.  This is a focus point of regulatory and media

2    scrutiny.  The sheer number of investigations allege

3    significant potential acts of civil regulatory potential

4    criminal misconduct.

5         And there are significant questions among the

6    customer base about whether customers or account holders

7    have claims that one entity or at other entities, such as

8    the mining entity, which Your Honor has heard so much about

9    since the beginning of the case.

10        These are critical questions for which

11   transparency is absolutely imperative.  The committee

12   strongly supports transparency in this case.  We've taken a

13   lot of steps that we've talked about before, to ensure

14   transparency.  Yet, the original scope, as we shouldn't be

15   surprised we laid out in our pleading, it was concerning for

16   the committee.  The committee had been formed just two and a

17   half weeks earlier.  We were already looking into nearly all

18   of those matters.  There was a risk of duplication.

19        Liquidity was a significant issue.  You might have

20   heard from Mr. Sussberg a few weeks ago that there was

21   originally a thought to be a need for a DIP loan at the end

22   of September.  Luckily, that has come to pass and there is

23   liquidity now, it looks like, through the end of the year,

24   but that liquidity forecast is still tight.  And this case

25   just simply cannot sustain tens of millions of dollars of

1    professional fees, nor could this case tolerate a standstill

2    while an examiner did a wide-ranging investigation of

3    certain matters because that would mean months or longer

4    before customers could get some type of liquidity through

5    crypto or otherwise.

6           Those risks were -- or those issues were real for

7    the committee, yet the committee also recognized that this

8    is, simply put, a special and a unique case and there are

9    truly compelling circumstances here.

10          Following the September 1st hearing, Mr.

11   Harrington, Miss Riffkin, Miss Cornell, Mr. Bruno, and

12   others, Mr. Masumoto, made themselves available extensively

13   to the committee's professionals and we began to have an

14   extensive good-faith dialogue on the scope of the examiner

15   motion in light of all the circumstances of the case.

16          As a result of those discussions, the original

17   proposed scope that's been narrowed so that it effectively

18   will cover four basic topics: where were and were are the

19   coins held and where they comingled; what is the nature of

20   the utility payments, which are significant, and has come up

21   in prior hearings for the mining business; what are the

22   procedures for the Debtors paying sales, use, and back

23   taxes, an issue that came up at the 341 meeting in

24   particular; and as will be addressed at the end of this

25   hearing, how the so-called custody and withhold programs

1    came about just 89 days prior to the petition date.

2           The UCC supported that scope.  We supported the

3    60-day period that there is for a report.  And while there

4    isn't an examiner yet, obviously, we expect to have dialogue

5    with the United States Trustee on that matter, and we will

6    also have dialogue, if Your Honor appoints -- orders the

7    appointment of an examiner, on their budgets to make sure

8    that the budget, the work plan, et cetera is commensurate

9    with the tailored scope of this.

10          For the committee -- and this is what I really

11   want my constituency to hear -- this struck the right

12   balance.  In the month and a half since the committee has

13   been out there, the circumstances of this case, while still

14   very significant and raising important questions, have

15   changed in some important respects.

16          As I mentioned, the investigation, we've made

17   significant progress with the Debtors.  They've agreed in

18   writing to cooperate with that investigation.  Mr. Mashinsky

19   has his own counsel.  They've likewise agreed to produce

20   information and documents.  We've received over 16,000

21   documents, 63,000 pages, and importantly, we're starting to

22   get information from Mr. Mashinsky about a number of topics,

23   including his withdrawals from the platform.  That

24   investigation will continue, but it is in a more advanced

25   state than it was earlier.

1            Second, the case has changed in terms of an issue

2    which you might hear more about called coin security.  We

3    had concerns at the outset of the case, the U.S. Trustee had

4    concerns at the outset of the case about how many coins

5    there were, where they were held.  At the committee's

6    insistence and the U.S. Trustee's insistence, the Debtor his

7    now producing a coin report.  That report is obviously not

8    perfect, it's a work in process, but it's better than what

9    was there in mid-July when the case filed.

10            At the same time as we were discussing this with

11   the U.S. Trustee, we had begun having extensive dialogue

12   with the Debtors regarding cash management.  We wanted to

13   make sure that their cash was secure, but more importantly,

14   we wanted to make sure their coins were secure from external

15   threats like hackers, and we wanted to make sure that the

16   coins were being protected and eventually would be used in

17   accordance with appropriate internal protocols.

18            Those discussions were very advanced, and we were

19   speaking with the U.S. Trustee and are now pleased today, as

20   you might have seen on the docket last night, to see there

21   is an agreed stipulation with the committee about how to

22   enhance the security of the coins that's going to be up on

23   October 6th, but another important piece.

24            Finally -- or rather, next, in terms of our

25   discussions with the Trustee.  By the time we've been having

1   those discussions, we had made progress with the Debtors

2   regarding what is really a fundamental issue, which is where

3   the customers have claims.  Do they only have claims at the

4   customer-facing entity or do they have claims in terms of

5   service, we think suggests against all of the entities,

6   including the mining entity.

7           Those productive discussions, I'm happy to say,

8   earlier today resulted in the Debtors confirming to me that

9   they will be scheduling customer claims at every entity when

10   the schedules are filed later this week.  Obviously, people

11   might disagree with that, they might object, but the

12   committee, based on those discussions and particularly now

13   that they've resulted in that agreement to schedule the

14   claims, has provided the committee and customers greater

15   comfort here.

16           And then finally, you know, I won't belabor the

17   point -- we mentioned it at the prior hearing -- the end

18   game for this case is still unknown, but the parameters for

19   how that end game will be reached are becoming clearer.

20           The Debtors, this has been widely reported, met

21   with the UCC.  They presented a concept.  The UCC does not

22   support that concept; we don't support any end game here.

23   But more importantly, the Debtors have committed to running

24   a process to market check what is out there and whatever the

25   management team might ultimately produce.  We're working

1    with the Debtors on those marketing procedures.  We hope to

2    see the Debtor file them soon.  We want to open a full

3    transparent process so we can see what the market provides,

4    and we can let the community respond and Your Honor can

5    eventually make a determination about whatever that results

6    in.

7              So in light of the changed circumstances here, in

8    light of what we were doing, and in light of the

9    developments here, the committee thought it was appropriate

10   to reach common ground with the Trustee.  These cases are

11   already beset by huge costs.  There's already innuendo and

12   gossip and commentary about who's doing what for whom.  We

13   didn't think it was appropriate to have a long hearing about

14   these issues when, really, we're all talking about the same

15   thing, which is transparency.  We think that scope if

16   appropriate.

17             You know, as Your Honor has seen from the

18   pleadings, certain people take issue.  There is a concern

19   that the scope should be restored to its broader gambit.

20   Regulators seek to have it cover what individual state

21   regulations might provide.  Some parties are seeking a

22   trustee or a CRO to be appointed.

23             And then finally, there's been a lot of conjecture

24   about the conflicts of the different professionals that are

25   raised in the case.  I'm sure that'll be more fully covered.

1    Each of these -- those will all be fully covered at the

2    retention portion of the hearing.  But, you know, I do want

3    the other people here to say their piece about this, but as

4    we can talk about more later on in the hearing, we don't

5    think any of these hold water.

6            The committee is already investigating the things

7    that were struck.  The regulators have the ability and the

8    mandate under their state laws to look into matters.  The

9    committee has made itself available to the regulators.  In

10   fact, tomorrow, we're going to be joining a call with at

11   least the Texas State Attorney General and some other state

12   regulatory agencies to share the status of our investigation

13   so that we're all working for a common purpose, sharing

14   information where possible so there isn't duplication or

15   extra cost.  We want to get the facts, we want to get the

16   facts out, and we want to make sure we're not hoarding them.

17           And then, you know, in terms of the suggestion for

18   a Trustee.  As we said in our filing here, that requires

19   notice and a hearing.  There's a significant record that

20   would be needed.  That record isn't here today.  And as we

21   alluded to in our filing that a Trustee is really a

22   significant step in these cases.  It would signal a

23   liquidation, which is something we don't think is necessary

24   under the right circumstances here and would provide the

25   wrong incentives for parties in this case.

1          So with that, we hope this context is helpful to

2     the Court and to our constituency.  I see hundreds of people

3     are listening in.  We think the scope is appropriate and we

4     support the Court entering that agreed order, which I should

5     note the Debtors also subsequently agreed to, so it is

6     agreed to by the Trustee, the UCC, and the Debtor in the

7     case.

8          So with that, I'll pause.  I'm happy to take other

9     questions or defer to Miss Cornell if she has any feedback

10    as well.

11         THE COURT:  Let me hear from Miss Cornell, and

12    then I may have some comments I may want to make.

13         MS. CORNELL:  Good morning, Your Honor.  Shara

14    Cornell with the Office of the United States Trustee.

15         I just want to point out as a preliminary matter

16    that no one is currently questioning whether a third-party

17    neutral should be appointed in this case.  The need for

18    extraordinary transparency is unquestioned by all the

19    parties.

20         I think that the order that we've proposed speaks

21    for itself.  The examiner has to be independent.  He's not

22    going to be consulting or reporting with the committee or

23    the Debtors.  Obviously, an examiner that is appointed will

24    cooperate to the extent of the order, but I just want to

25    make it clear for the record that the examiner is an

Page 40

1    independent party.

2            There have been some questions about the costs of

3    an examiner, and I think that those are a red herring in a

4    case like this, which just calls for such extraordinary

5    transparency.  The examiner will come before the Court with

6    a work plan and a budget, which will be built into the

7    order, and it will be handled by the examiner who's going to

8    do the work, and I think it would be premature to talk about

9    a budget since we haven't even appointed anyone yet.

10           And I think that for the Court's information and

11   maybe for the other parties just to give a little bit of

12   color about the diligence that the United States Trustee's

13   Office has been doing so far.  We already have close to 40

14   self-nominated parties to serve as examiner, and pursuant to

15   1104(d), we will request recommendations from the parties by

16   noon on Friday for further recommendations.

17           And we're hopeful that the interviews of these

18   potential candidates will occur next week, but we do have a

19   lot of folks to interview and it takes time and we'll move

20   expeditiously, but there are a lot of candidates.  And we

21   just wanted to make sure that the Court and the parties were

22   aware of all of this as we move forward this morning.

23           THE COURT:  Thank you, Miss Cornell.

24           MS. CORNELL:  Thank you.

25           THE COURT:  Let me give an opportunity to anyone

Page 41

1    else who filed any response with respect to the examiner

2    motion.  I've identified some.  In addition to the various

3    state regulators who have filed, there were individuals as

4    well.  I think I pointed out that Mr. Immanuel Herrmann had

5    three separate filings.  I wanted to give Mr. Herrmann a

6    chance to speak if he wishes to do so.

7             MR. HERRMANN:  Yes, hello.  Thank you, Your Honor.

8    So first, I just want to thank Shara Cornell and the U.S.

9    Trustee's office for all of their diligence on behalf of

10   depositors.

11            Your Honor, we're here today because customers

12   were lied to and misled and now trust in the Celsius brand

13   and management team is gone.  Perhaps you have seen the

14   leaked internal Celsius conversations in "The New York

15   Times" this morning.

16            Celsius has one thing in common with Pepsi and

17   Delta Airlines:  It is a customer-facing company, a brand.

18   But that is where the similarities end.  Unlike Pepsi and

19   Delta Airlines, or Celsius Energy Drink for that matter,

20   which actually exists as an energy drink with no relation to

21   Celsius, the crypto bank, Celsius Network, LLC is a

22   financial services company billed as essentially a

23   depository institution (sound glitch).  It was described to

24   depositors as "safer than a bank," and we were told that

25   there could never be a "run on the bank."

1          Cryptocurrency was invented on the premise that

2     you don't need to trust any centralized platform or

3     institution to hold your keys.  You can hold them yourself.

4     But when customers don't want to or can't hold their own

5     keys, they turn to centralized institutions like Celsius,

6     and when they do, trust and transparency is paramount, just

7     like it is with any financial institution.

8          The idea that somehow depositors are going to

9     trust Celsius after dissipating over $2 billion in our

10    crypto clients and after they had, I will add, a "don't

11    trust, verify" logo plastered all over their website that

12    implied you could verify, similar to what they're talking

13    about doing going forward, which by the way, they've removed

14    in the run up to the bankruptcy when they did numerous

15    website edits.  After calling the coins our coins pre-

16    bankruptcy, after calling our deposits "deposits", borrowing

17    "borrowing", and all of that, frankly, it just is absurd.

18          So the fact is, Your Honor, the Celsius brand and

19    the trust behind it, in my view, is gone.  And I say this

20    not just as a customer, though admittedly, I'm extremely

21    disappointed because I believed Alex Mashinsky, I trusted

22    what people from the company said, and I was misled, but I

23    also say this in the context of the larger brand and the

24    management.  I just do not believe that this brand or this

25    management team has value any longer.

1          But as Mr. Nash said in his first day

2    presentation, all is not lost.  I believe the business does

3    have value.  I believe it can survive under new management

4    as a going concern.  Celsius has valuable assets, it has a

5    valuable team, and I believe that under entirely new

6    management, there can still be a future for the company,

7    even in spite of the, I would say, Ponzi-like promotion of

8    it, the fact that they were likely insolvent since 2021,

9    except for the sell token, and even though as the CFO

10   admitted at the 341 meeting, withdrawals exceeded deposits

11   apart from the money they lost in their reckless

12   speculation.

13          In spite of all that, I still believe that there

14   is a real business under the hood here.  You know, I think

15   also that, you know, Alex is a great salesman, but he just

16   has shown himself to be a poor businessman, and what we need

17   now is somebody who's a good businessperson, who can run a

18   viable business.  This is an unusual case where there's both

19   fraud that has to be addressed and a real business that

20   needs to be saved.  I think that's pretty unusual, so, you

21   know, let's do both.  That's my pitch.  Let's bring in

22   competent management before it's too late, and let's also do

23   the investigations that we need.

24          I believe that there is already more than ample

25   information in the court record to appoint a chief

1     restructuring officer with the powers of a trustee, and

2     that's what I'm urging you and the Court to do.  But I

3     understand that I'm just one depositor and if Your Honor is

4     not quite ready to appoint a trustee, then if you're

5     amenable, I can prepare a draft order directing Celsius to

6     build a polling feature so that the Court, the UCC, and

7     other parties in interest can gauge customer sentiment and

8     find out where customers stand on this and other important

9     matters.

10            I believe in this case gauging where customers

11    stand on issue such as this is critical because, again, this

12    is a financial services business where trust is paramount

13    and where to have a future, it would need the trust of the

14    customer base.

15            THE COURT:  All right.  Thank you, Mr. Herrmann.

16    Let me call on some more people and (indiscernible) as well.

17    Thank you very much for participating.

18            MR. HERRMANN:  Sure.

19            THE COURT:  Mr. Dunn, you need to unmute.  Go

20    ahead.

21            MR. DUNNE:  Good afternoon, Your Honor.  For the

22    record, Dennis Dunne from Milbank, LLP on behalf of the

23    Series B Preferred, and I'll be brief.

24            I just want to raise two things, one of which is

25    that as Your Honor has seen and read, we filed a limited

1    objection because we thought the initially proposed

2    parameters were overbroad and would lead to a very expensive

3    examiner's report, but the subsequent limited scope agreed

4    to by the Debtors, the UCC, and the U.S. Trustee addresses

5    our concern.  So as a result, we're not prosecuting the

6    objection today, Your Honor.

7              One last note, which is in the nature of an

8    audible, Your Honor, is I have to respond to something Mr.

9    Pesce said during his remarks, that the customer claims will

10   be scheduled at every entity.  That's the first we're

11   hearing of it, and we don't know of any kind of convincing

12   evidence to support it.  We haven't seen a balance sheet or

13   financial statement showing that individual claims at each

14   entity.  And to our knowledge, there's no guarantee of the

15   customer debt that was signed by every entity.  We

16   understood that there were some guaranties that were drafted

17   for certain, but not all of the entities with respect to the

18   customer claims, but even those were never executed.

19             So it's a long way of saying we don't know the

20   basis for the Debtors' conclusion.  Not an issue for today,

21   of course, Your Honor, and we'll review the schedules.

22             THE COURT:  I have enough on the table today, Mr.

23   Dunne, let's deal with the issues for today.

24             MR. DUNNE:  Right.  And so, we'll review that and

25   talk to the Debtors about their foundation for that, and if

1    there's a disagreement, we'll bring it to the Court.

2              THE COURT:  Thank you very much, Mr. Dunne.  If

3    you'd lower your hand when you finish, that would be

4    appreciated.

5              MR. DUNNE:  Thank you.

6              THE COURT:  All right.  Mr. Frishberg.

7              MR. FRISHBERG:  Thank you, Your Honor.  Can you

8    hear me?

9              THE COURT:  Yes, I can.  Go ahead.

10             MR. FRISHBERG:  Perfect.  Thank you, Your Honor.

11   One of the main points that I would like to make is

12   effectively Celsius, as Mr. Herrmann had said, does have a

13   viable business model, but as he said, the current

14   management, it's not sustainable.  They're spending enormous

15   amounts of money, over $50 million a month I believe, and

16   it's just unsustainable.  They're not having any revenue

17   generation and it needs to be changed.

18             Quite simply, as he put it, the brand has become

19   toxic because Mr. Mashinsky, he took all the trust that was

20   given to him and effectively threw it out the window.  It's

21   not helping that his wife, Miss Mashinsky, released a t-

22   shirt saying, "bankrupt yourself," on it and then told

23   people who complained about it being insensitive to, and I

24   quote, "get over it," which I think actually damages the

25   potential recovery.

1          THE COURT:  Mr. Frishberg, let me ask if you

2    would, if you would keep your remarks directed to the motion

3    that's before --

4          MR. FRISHBERG:  Yes, sorry.  A trustee should and

5    can be appointed because according to 11 U.S.C. 1104(a)(1),

6    a trustee can be appointed when cause exists and causes

7    consists of fraud, dishonesty, incompetence, or gross

8    mismanagement, which all have occurred here.  I mean, some

9    of it's still ongoing.

10          And I believe that a chief restructuring officer

11    is in the best interest of the creditors because it will

12    allow both the chief restructuring officer trustee to

13    restore liquidity while investigating claims such as an

14    examiner would be.  It would significantly decrease the cash

15    burn, I believe, once we get a potential of crypto executive

16    or somebody to start addressing the ongoing issues of the

17    extremely high spending and lack of income.

18          As Mr. Herrmann has said, more transparency would

19    be necessary.  I don't think anyone would agree that Celsius

20    should be liquidated, but some people may want it.  But I

21    think everyone has stated that it should be saved, but I

22    just don't think it's viable in its current form.  And

23    according to the case Silverman, the Court is required to

24    appoint a Chapter 11 trustee once a finding of cause has

25    been made.

1            THE COURT:  Thank you very much, Mr. Frishberg.

2    Let me point out and I think this was already emphasized by

3    Mr. Frishberg, there has been no motion filed for the

4    appointment of a Chapter 11 trustee.  What the Court has

5    before it is the motion for the appointment of an examiner.

6    Under Section 1104(c), if the Court does not order the

7    appointment of a trustee under the section, then at any time

8    before the confirmation of a plan on the request of a party

9    in interest or the United States Trustee and after noticing

10   a hearing, the Court shall order the appointment of an

11   examiner to conduct such an investigation of the Debtor as

12   is appropriate, including an investigation of any

13   allegations of fraud, dishonesty, incompetence, misconduct,

14   mismanagement, or irregularity in the management of the

15   affairs of the Debtor of or by current or former management

16   of the Debtor.  It goes on from there.  I'll stop there.

17            But Miss Milligan, do you want to be heard?

18            MS. MILLIGAN:  Yes, Your Honor, thank you.  Layla

19   Milligan with the Texas Attorney General's Office, appearing

20   on behalf of the Texas State Securities Board.  Thank you

21   for allowing me to speak today.

22            First, I would like to thank Mr. Pesce and the

23   committee counsel and the U.S. Trustee and all of the

24   parties that have worked to reach a consensus regarding this

25   motion to appoint an examiner.  We did file a joinder at

1    Docket No. 732 and have reviewed the agreed order that was

2    proposed and filed at Docket No. 752.

3             We had initially some concerns regarding the scope

4    but had communications with the committee and continue those

5    discussions.  I would further note that the proposed order

6    provides for the allowance of parties in interest to seek

7    permission to expand the scope as becomes necessary in the

8    course of the examination and allows for the examiner to

9    cooperate and coordinate with state regulatory bodies, which

10   we think is appropriate and is appreciated.

11            So we do not oppose the entry of the proposed

12   agreed order and, again, appreciate the efforts to get to

13   this point.

14            THE COURT:  Thank you very much, Miss Milligan.

15            MS. MILLIGAN:  Thank you, Your Honor.

16            THE COURT:  Mr. Adler.

17            MR. ADLER:  Good afternoon, Your Honor.  David

18   Adler from McCarter & English on behalf of certain Celsius

19   borrowers.

20            As we indicated in our pleadings, this motion or

21   this response is filed by four borrowers, all of whom posted

22   collateral at Celsius and took a loan against it; that is

23   the people that I am filing this objection on behalf of.

24            I understand, Your Honor, that what you stated

25   earlier, which is there is no motion in front of you to

1    appoint a Chapter 11 trustee.  Obviously, our concerns

2    initially were the fact that an examiner would take time,

3    cost a lot of money, and would be left at the end of that

4    examination process with who would be bringing those claims,

5    and we still have that issue, I believe, floating around in

6    this case.

7              So yesterday, we filed a partial joinder; it's

8    Docket No. 799.  We joined in Mr. Herrmann's pleading

9    partially, but we felt that the scope of the examination

10   should include the tether issue and whether the $750 million

11   intercompany revolver shifted or could shift recoveries from

12   deposits to preferred shareholders.  And the concern that we

13   have is that committee counsel would not be able to

14   investigate that issue given its prior representation of the

15   preferred shareholders.

16             So while we're not objecting to White & Case and

17   we think they've done a very good job thus far, we do have

18   concerns about when we get to the end of this process who

19   will be bringing these claims for fraud.

20             As we also stated in the joinder -- and I think

21   this is really sort of the fundamental question here -- is,

22   if you look at the July 29th coin report, it indicates that

23   there are 6.673 billion in crypto deposits made by customers

24   and there's only 3.828 billion in crypto assets available at

25   Celsius, which is another way of saying the Debtors are

1   short 2.845 billion in coin.  And so, we would ask that the

2   examiner investigate where, when, and how the Debtors

3   dissipated the 2.845 billion in crypto, which is reflected

4   on the July 29th report.

5           I think that's sort of the fundamental question

6   here that everyone is asking is where did the crypto go?

7   How was it used?  And, you know, I tried to sort of distill

8   two of Mr. Herrmann's points to get to that sort of global

9   question of what happened to the funds.

10          I don't know if Your Honor has any questions for

11  me on what we've asked for.  But if you don't, Your Honor,

12  I'm completed.

13          THE COURT:  Thank you, Mr. Adler.  So I've

14  reviewed the proposed order with the changes that have been

15  made and there is one addition that the Court will make to

16  the order.  A new Paragraph 16 will read as follows:

17          "Once the examiner is appointed, the examiner and

18  the examiner's professionals shall consult with the

19  committee, the Debtors, and the United States Trustee and

20  review the pro se filings related to the motion to consider

21  whether any revisions to the scope are appropriate.  Any

22  proposed revisions to the scope should be included in an

23  application to the Court to amend this order."  That's the

24  change.

25          In Paragraph 3 of the proposed order, it sets

1    forth the scope in five subparagraphs.  Once the examiner --

2    once he or she is appointed and they consult with the major

3    constituencies, it may well be that the examiner believes

4    there should be some change in the terms of this order, the

5    scope.  And obviously there's going to be a work statement

6    that's done and obviously budgets.

7              But until -- and I certainly, you know, observe

8    and respect the work that the committee and the U.S. Trustee

9    and others have done to date, I thought that some of the

10   issues raised in the pro se filings that I read raised very

11   good questions and I want to be sure that those questions

12   are appropriately reviewed.  The question may be whether the

13   committee should do that or whether the examiner should do

14   that.

15             So the form of the order that was submitted, I

16   find acceptable with the change that I've added this new

17   Paragraph 16.  The Paragraph 17, which gets renumbered but

18   was in the original as submitted is, "The Court shall retain

19   jurisdiction with respect to all matters arising from or

20   related to the implementation of this order."

21             So with the change that I've described that order

22   will be entered.  And it's obviously up to the U.S. Trustee

23   -- I'm sure that you'll consult with other parties in

24   interest and select an appropriate person as the examiner.

25             All right, let's move on in the agenda then.

```
1    Thank you very much to everybody who's spoken on this

2    important issue.

3              Next on the agenda is the sealing motion and the

4    Debtors' ex parte motion, pursuant to Section 107 of the

5    Bankruptcy Code, was filed as Docket No. 344.  It has many

6    permutations here.  It comes up with respect to retention

7    applications and other matters as to which sealing is

8    sought.

9              At the last hearing, I encouraged the committee,

10   the U.S. Trustee, and the Debtor to confer.  I raised at

11   that hearing the issue of possible redaction of physical

12   addresses, email addresses, phone numbers of individual

13   creditors, and the possible impoundment of those lists.  But

14   I had serious reservations, which I continue to have, with

15   respect to not disclosing the names of creditors, not

16   disclosing creditors outside the U.S.

17             So I do want to hear -- and I've seen the

18   additional filings that have been made.  There obviously has

19   not been an agreement reached among the parties.  The U.S.

20   Trustee, as I understand it, continues to object to the

21   motions to seal and I do want to hear argument about the

22   sealing now.

23             MR. NASH:  Your Honor, with your permission, I

24   will hand the podium over to my colleague, Miss Elizabeth

25   Jones, to handle this matter.
```

1            THE COURT:  Thank you.

2            MS. JONES:  Thank you, Your Honor.  Elizabeth

3    Jones of Kirkland & Ellis on behalf of the Debtors.

4            Your Honor, yes, that's correct, we did confer

5    with all the parties.  Before getting into that, if it's

6    okay with you, I would just like to move our additional

7    declaration into evidence at the start.

8            THE COURT:  Please, go ahead.

9            MS. JONES:  Thank you.  Your Honor, in addition to

10   the declaration that we filed in connection with Docket No.

11   344, we filed a supplemental declaration of Mr. Holden

12   Bixler of Alvarez and Marsal of North American as Exhibit A

13   to Docket No. 782.  At this time, we propose to move his

14   declaration into evidence in lieu of live testimony.  And

15   we're currently not aware of any intent to cross-examine or

16   to object to his declaration, although he is here in case

17   that comes up.

18            So with that, Your Honor, we'd like to submit the

19   declaration of Mr. Bixler attached as Exhibit A to Docket

20   No. 782 into the record.

21            THE COURT:  Is there any objections to the Court

22   admitting in evidence for purposes of this hearing the

23   Bixler declaration, ECF Docket No. 782, Exhibit A?

24            MS. CORNELL:  Yes, Your Honor.  This is Shara

25   Cornell on behalf of the Office of the United States

1    Trustee.  I have an objection to the admission.

2              THE COURT:  And what is your objection?

3              MS. CORNELL:  There's no evidentiary basis for

4    this declaration.  The basis that's been provided by the

5    Debtors is arguably hearsay, if not all hearsay, and I think

6    that if the Debtors would like to have that information on

7    the record that they would need to put him on the stand.

8              THE COURT:  All right.  Any other objections?  All

9    right.  The Court is going to overrule the objection and

10   admit the Bixler declaration, Exhibit A to ECF 782 into

11   evidence and give it only so much weight as the Court

12   believes it deserves.

13             (HOLDEN BIXLER DECLARATION ADMITTED INTO EVIDENCE)

14             MS. JONES:  Understood.  Thank you, Your Honor.

15   There is one more declaration as well that the committee has

16   proposed, which goes to one of your questions about the

17   names.  You know, I'd defer to you if you would like the

18   committee to move that declaration into evidence at the

19   start and address those concerns as well or if you would

20   prefer to do that at a later time.

21             THE COURT:  We can get the evidence that's being

22   offered in support of sealing.  If the committee wants to

23   offer it, go ahead.

24             MR. HERSHEY:  Thank you, Your Honor.  Good

25   afternoon.  Sam Hershey from White & Case on behalf of the

1    Official Committee of Unsecured Creditors.

2              Your Honor, I am joined in the virtual courtroom

3    today by Mr. Maxwell Galka.  Mr. Galka submitted a

4    declaration in support of the Debtors' motions and the

5    committee's joinder to those motions.  That declaration is

6    at Exhibit A to Docket No. 785, and I would like at this

7    time to move Mr. Galka's declaration into evidence.

8              THE COURT:  All right.  Any objections?

9              MS. CORNELL:  Yes, Your Honor.  This is Shara

10   Cornell with the Office of the United States Trustee again.

11             The issue with this proffer is similar to the one

12   advanced by counsel for the Debtor.  In particular in this

13   case, I don't understand the purpose this witness serves for

14   relevance.  The witness is not an expert or a fact witness,

15   then why is he testifying or offering any information.  I

16   just don't understand what relevance this has in this court

17   if he isn't a fact or an expert witness, then what is.

18             THE COURT:  The objection is overruled.  The Galka

19   declaration is admitted into evidence for as much weight as

20   its entitled to.

21             (MAXWELL GALKA DECLARATION ADMITTED INTO EVIDENCE)

22             MS. CORNELL:  Thank you, Your Honor.

23             THE COURT:  Let's hear the argument in support of

24   the sealing.

25             MS. JONES:  Thank you, Your Honor.  With respect

1    to your earlier questions, we did meet and confer with the

2    committee and with the two ad hoc groups and the U.S.

3    Trustee.

4            We understand your argument and your concerns --

5    sorry, not your argument -- your concern, Your Honor, with

6    the names of certain creditors.  And we did go back and

7    really look at, especially with respect to the GDPR, what we

8    may or may not be able to do there.  But at this time, Your

9    Honor, given that --

10           THE COURT:  You'll deal with what I tell you you

11   have to do.

12           MS. JONES:  Exactly, Your Honor.  That was our

13   point, is that we felt that it was important for us to

14   preserve our request on the record, but that, of course,

15   whatever you ultimately rule, we will abide be and we have

16   no issue with that.  It was just on our basis, Your Honor,

17   we felt that it was important for us to preserve that

18   request.

19           THE COURT:  Let me ask you some questions, Miss

20   Jones.  No one's addressed these issues in any of the papers

21   that have been filed.

22           Bankruptcy Rule 3003(b)(1) provides that the

23   schedule of liabilities filed pursuant to Section 521(1) of

24   the code shall constitute prima facie evidence of the

25   validity and amount of the claims of creditors, unless they

1    are scheduled as disputed, contingent, or unliquidated.

2    I'll stop my reading there.

3            But I'm going to move on to 3004(c)(2), who must

4    file.  Any creditor or equity security holder whose claim or

5    interest is not scheduled or scheduled as disputed

6    contingent or unliquidated shall file a proof of claim or

7    interest within the time prescribed by (c)(3) of the rule.

8    I'll stop reading there.

9            So, you know, Mr. Pesce started by saying there

10   are 1.7 million people who can't access their crypto assets.

11   The Mashinsky first day declaration described over 50,000 --

12   no, over 200,000, excuse me, Celsius customers with active

13   accounts with over $100 in the account.

14           The claims allowance process in bankruptcy was

15   designed and works best when creditors file schedules

16   identifying their creditors by name and the claim amount,

17   which the Debtors also seek to seal.  This is important

18   because creditors can look at the schedules and see whether

19   their claim has been listed -- whether it's undisputed

20   claim, in which case, they don't have to file a proof of

21   claim.

22           Do you expect 1.7 million people to file proofs of

23   claim because they don't know whether they have a disputed

24   claim?

25           MS. JONES:  No, Your Honor, and I'm happy to walk

1    you through the process that we proposed specifically with

2    that, and I know this gets to one of the other later

3    redaction requested with the anonymized number.

4            But with respect to that process -- and this,

5    again, is in connection with the email noticing -- is that

6    we will send individual emails and notifications to every

7    1.7 account user, both to their web account and their email,

8    that informs them of the amount that their claim has been

9    scheduled and provides them with that number so that they

10   can go on to Stretto's website and crosscheck that number on

11   their own and confirm.

12           In addition, we're going to be setting a --

13           THE COURT:  How do they go on Stretto's website

14   and confirm it if it's under seal?

15           MS. JONES:  So this is why we would propose to

16   file these schedules with the anonymized number in lieu of

17   the names.  That would be essentially the sealed version, is

18   that it would use account number -- well, it'd be a number

19   that we've given, so 123456, in connection with the balance.

20   They can check and confer to see both if that number matches

21   what it currently says in their Celsius account, as well as

22   the email they received, as well as if that matches the

23   schedules and statement.

24           In addition, we'll be setting up a process that

25   any individual creditor can email Stretto and say this is my

Page 60

1     email, can you please confirm what my account has been

2     scheduled at.

3            And so, we have a couple of different process.

4     Both will proactively reach out through email and app

5     notification, but also provide a way for those individual

6     customers to reach out and say, I've looked, I can't find my

7     number, or I never received an email that had a number I

8     need to confirm, and if I haven't been scheduled or don't

9     have it, I'm going to file a proof of claim.

10            THE COURT:  Where in your papers do you explain

11     what you just did now?

12            MS. JONES:  When we filed our request for

13     anonymized process, we hadn't yet detailed that.  We

14     intended to lay that all out in our bar date motion as well

15     to explain how parties would go about filing and submitting

16     their proofs of claim and crosschecking with schedules and

17     statements.

18            THE COURT:  You haven't filed anything that told

19     me what you just said to everybody who's listening; is that

20     correct?

21            MS. JONES:  That's correct, Your Honor, and we

22     would be happy to file a supplemental pleading and

23     declaration today if that would be helpful.

24            THE COURT:  So part of the purpose of having

25     public schedules is that not just each individual creditor,

1    but creditors in general and the public have complete --

2    that there's complete transparency so that others can review

3    those schedules.

4          I said at the last hearing, while I haven't yet

5    ruled, I don't have a particular problem about sealing

6    physical residence addresses, email addresses, telephone

7    numbers of individual creditors.  Bankruptcy Code Section

8    10141(a) in defining personally identifiable information

9    includes that.  It doesn't include names as well.  But most

10   of your papers have focused on the issue of customer lists.

11   What I'm focused on is creditor lists.  In many cases,

12   customer lists and creditor lists are different.

13         It seems to me that -- and this your papers didn't

14   really address -- is the importance of transparency of who

15   the creditors are, how much their claims are.

16         MS. JONES:  Yes, Your Honor.  It's correct that in

17   most cases, customers and the creditors are different, which

18   makes this a little unique is that almost all of the

19   Debtors' creditors are their customers, which in this

20   circumstance, we do believe that there is a very, very

21   severe and real security risk to disclosing names and

22   account balances; that, while it is not a perfect solution

23   or ideal, we do think that that overrides the need to let

24   other individuals cross-reference the names and accounts for

25   holdings.

1          We understand again that there is a need for

2     transparency here, but we are very concerned that these

3     individual will be targeted both with physical and online

4     violence.  And in this circumstance, we felt that the

5     balance of the harms weighed in favor of providing a way for

6     individuals to confirm and check their own amounts.

7          THE COURT:  But why do you think this issue, the

8     issue of physical safety, there are lots of big cases, there

9     are lots of claims filed, creditors are identified.  How do

10    I draw the line, how does any bankruptcy judge draw the

11    line?  You're trying to rewrite the code to allow for

12    schedules to be anonymized, to omit claim amounts.  You want

13    to rewrite the code.

14          If I approve it here, the next case, I'm sure they

15    will be seeking to do the same thing.  It totally turns

16    upside down what has been a very public and transparent

17    claims allowance process.

18          MS. JONES:  Respectfully, Your Honor, I don't

19    think we're -- we are not trying to redact account balances

20    themselves, so we do believe that those numbers should be

21    put out there.  And we don't feel here as though we're

22    trying to rewrite the code, but rather to work within the

23    provisions that we can seek the right to redact information

24    where public undue risk of identify theft and other harm.

25          THE COURT:  How does putting someone's name out

1    there create an undue risk of identify theft?  Every case I

2    have includes lots of schedules, individuals' businesses,

3    and no one has made the argument that by putting their names

4    on a schedule, you create a risk of identity theft.

5             What evidence do you have to support that

6    argument?

7             MS. JONES:  Sure, Your Honor.  It's more the names

8    in connection with the account balances and it's not just an

9    individual name alone.  And the reason why here is that

10   these account balances are not a -- it's a little bit unique

11   here in that these accounts represent an asset that is

12   easily hacked and broken into and it's not necessarily a

13   claim of the --

14            THE COURT:  How does an account balance make an

15   account easily hacked?

16            MS. JONES:  I'm sorry, Your Honor.  You cut out

17   part of the question.

18            THE COURT:  How does an account balance listed in

19   the schedule make an account easily hacked?

20            MS. JONES:  An account balance in connection with

21   a name provides the roadmap for hackers to locate those

22   individuals and essentially -- I mean, there are -- we have

23   provided -- I understand the evidence point.  We provided

24   examples of individuals being held at gunpoint until they've

25   provided a passcode to their assets.

 1             And so, there is a different risk here associated

 2    with providing an account balance that signals that there is

 3    thousands or millions of dollars' worth of assets held by an

 4    individual that could indicate to other hackers and other

 5    individuals that these account balances are similar to what

 6    are held on other accounts or that there might be

 7    cryptocurrency held in cold storage or that this individual

 8    has assets in their home that they can then be essentially

 9    physically harmed until the release access to get those

10    assets, which is different than if you are alleging that the

11    debtor owes you money for failing to adhere to some sort of

12    contract or other agreement.  This is a physical asset that

13    could be broken into.

14             THE COURT:  It's not a physical asset; that's

15    number one.  And I don't see how this differs from any other

16    case where creditors are required to have their names

17    identified, to have their claim -- the amount that the

18    Debtor schedules as their claim.

19             Why is it any different from the opioid cases or

20    any of the mass tort cases in bankruptcy?  And I haven't

21    seen where courts have permitted redacting of schedules of

22    claimants in those cases.

23             MS. JONES:  We understand, Your Honor.  Our

24    position, as set forth in --

25             THE COURT:  In any of the mass tort cases, have

1    courts permitted the sealing of schedules that list the

2    claimants and amounts of claims?

3              MS. JONES:  Your Honor, I'm not aware of that, but

4    I do know in many of the mass tort cases, the amounts are

5    not scheduled because they're usually contingent and the

6    liabilities --

7              THE COURT:  They're unliquidated.  They're usually

8    unliquidated.

9              MS. JONES:  Correct, and there is usually a --

10   many of those cases do have a confidential claims process to

11   that those claims are not publicly filed on the docket and

12   that individuals can submit their information with the

13   assurance that that will not be made publicly available.  So

14   there is that process that takes place and that coupled with

15   not listing a dollar amount next to what their claims are is

16   a little bit different from this circumstance.

17             Because we do know the cryptocurrency holdings, we

18   can't put that as an unliquidated and give people the same

19   protection there.  But that does provide a protection in

20   many of the mass tort cases that is essentially what we're

21   trying to do here and allow people to have that privacy

22   while still participating in the bankruptcy process.

23             THE COURT:  Anything else you want to say?

24             MS. JONES:  No, Your Honor, unless you have any

25   further questions.

1          THE COURT:  Let me ask you, sealing issues also

2     arise with respect to retention applications.  Are you going

3     to address that or is someone else going to do it?

4          MS. JONES:  I'm happy to address that, Your Honor.

5     With respect, we're still on the position that if it is

6     under the GDPR, the name should be redacted; that's our

7     request.  We are prepared to file unredacted -- it's only

8     names of individuals with respect to GDPR that we're

9     currently requesting with our schedules and statements, but

10    we are prepared to file unredacted if that how the Court

11    prefers it to be done.

12         THE COURT:  All right.  Anybody else who wants to

13    speak in favor of sealing?  Mr. Wofford, are you going to

14    speak in favor?

15         MR. WOFFORD:  Yes, Your Honor.  Thank you very

16    much.

17         First of all, Your Honor, look, we recognize that

18    this is a departure from the traditional rule and the

19    general rule in American courts of transparency and openness

20    in public filings, but to respond directly to some of the

21    questions that you raised with Ms. Jones as to the

22    committee's position.

23         Look, as the statute notes, the discretion of the

24    Court to seal portions of the filings has to do not just

25    with respect to identity theft, but also other unlawful

1    injury to the account holders or to their property, not just

2    physical violence, but also to their property.  So certainly

3    there's a legal ability of the Court to do so if the Court

4    is convinced, which in fairness, it's clear that you're not

5    yet.

6              In that regard, I would call your attention, Your

7    Honor, to Mr. Galka's testimony and particularly the fact

8    that Mr. Galka is here and available to answer your

9    questions.  Mr. Galka has worked with and currently works

10   with law enforcement agencies on these sorts of matters and

11   his affidavit details the methods and the means by which

12   malice actors try to invade customer property and

13   potentially persons to get to their crypto.

14             Now, before you either take or do not take the

15   opportunity to ask Mr. Galka questions, I do want to respond

16   to one question you did ask, which is why is this different

17   from other cases.

18             And, Your Honor, this is different because of the

19   nature of cryptocurrency, and it's a little bit of a

20   conflict or an oxymoron or a tension; it's an intangible

21   bearer asset.  You know, it's not like a bank account where

22   there are checks and protections and an institution that

23   protects your property.  Here, if someone has the keys or

24   can get those keys, they have the ability within minutes to

25   drain someone's account.  And this, again, is detailed in

1    Mr. Galka's affidavit and declaration.

2            I think at this point, because we do feel that --

3    and this is a very serious matter, Your Honor.  We obviously

4    do believe in transparency, but we do believe that this

5    increases the risk to tens, if not hundreds, of thousands of

6    account holders.  So if you can indulge me, Your Honor, if

7    the Court has questions about how this can actually happen

8    or if you believe that the potential harms raised by the

9    broad disclosures without any redactions required by the

10   code, then I would encourage you to ask Mr. Galka those

11   questions because he does have first-hand experience in the

12   sorts of things to which our customers will be subjected.

13           THE COURT:  I read his declaration.  I don't need

14   to do more (sound drops).

15           MR. WOFFORD:  Fair enough.  Fair enough.  Then let

16   me just conclude with argument, Your Honor, as to what

17   should be redacted versus not.  We welcome the Court's

18   suggestion that it would consider redacting names and

19   addresses and email addresses.  But the names themselves --

20           THE COURT:  I didn't say names.

21           MR. WOFFORD:  I'm sorry, forgive me.  Email

22   addresses and phone numbers and physical addresses.  But I

23   was going on and the reason I made the mental slip there,

24   Your Honor, was I wanted to address the name issue because

25   we dealt with it in our papers and in Mr. Galka's argument.

1        We admit that the names are not exactly the same

2    and that the names are a greater tension with the rules set

3    forth in the code.  But the fact of the matter, Your Honor,

4    is that the name is not just like a name in a phonebook

5    standing alone.  It is the name in combination with the

6    knowledge that these folks are cryptocurrency holders; that

7    means they are likely to have other cryptocurrency accounts.

8    They may have offline wallets.  They may have crypto on

9    other platforms.  And even in the case of the statements of

10   90-day transfers, we will be identifying people who were

11   sent crypto by the Debtors in the runup to the case.  So

12   we're directly identifying those holders as people who could

13   be targeted by what we know are groups who are trying to do

14   it.

15        And so, Your Honor, you asked why there is an

16   undue risk of injury to persons of their property based on

17   unlawful activity.  It is clear to us, Your Honor, that

18   these disclosures would enhance that.  To the extent we can

19   get some redactions but not all, that is good, but we don't

20   think it does enough.

21        And, frankly, Your Honor, we ask your indulgence

22   in this matter because it is so serious.  And, look,

23   everyone's been subject to harassment technologically.  We

24   feel that if the Court is made comfortable with respect to

25   the Debtors' process of anonymous identification -- that if

Page 70

1    the Court's comfortable with that process, that the motion

2    should be granted with respect to the motion to redact

3    names, as well as the motion to redact PII.

4              Thank you, Your Honor.

5              THE COURT:  Thank you.  Miss Kovsky.

6              MS. KOVSKY:  Thank you, Your Honor.  Deb Kovsky

7    for the ad hoc group of withhold account holders.

8              At the last hearing, you had asked me what the

9    withhold account group's position was on the redaction of

10   names, and I had said that we'd basically given up on that

11   point at least for the members of our group since we did

12   file a 2019 motion.

13             However, I do want to point out that that was a

14   choice that was made by the members of my group and it's a

15   choice that's not being made by tens or hundreds of

16   thousands or millions of other account holders who did not

17   anticipate having their personal information publicly

18   displayed.

19             I also want to echo what Mr. Wofford was just

20   saying about the 90-day withdrawals, and that's something

21   that we had not spoken about at the last hearing, but it is

22   something that we addressed in our joinder that we filed.

23             If the Court requires the identification by name

24   and amount, all of the crypto that was taken off of the

25   platform in the 90 days prior to the petition date, that is

1     drawing a roadmap for thieves and other wrongdoers to

2     basically target those people.  And Your Honor had said,

3     well, these are not physical assets.  The reality is many,

4     many people who have taken cryptocurrency off of online

5     exchanges have put them into physical hard wallets.  It's

6     basically, like, the size of a USB drive that is sitting in

7     their desk drawer at home, so these are --

8               THE COURT:  You're telling me it may be plausible,

9     but it's entirely speculation unsupported by evidence.

10              MS. KOVSKY:  Well, Your Honor, the case law does

11    indicate that a risk doesn't have to have actually happened

12    in order for it to be taken into account by the Court

13    because you're, by definition, talking about future events

14    that haven't happened yet.  And, in fact, if we look at some

15    of the past history that have been reported in the news --

16    and I think these were referenced in the Debtors' papers --

17    there have actually been home invasions of, you know,

18    exactly the type that we're trying to prevent with respect

19    to the customers in this case.

20              So while we -- you know, we don't take a position

21    on the identification of the names in the schedules -- you

22    know, certainly with respect to our group we've already

23    identified everyone by name -- but we would encourage the

24    Court to take very seriously the risks faced by individuals

25    who have taken crypto off the platform.  And if there is a

1    way to extend some protection to them, we believe that it's

2    appropriate.  And, you know, it goes without saying that, of

3    course, we support the redaction of the email addresses and

4    home addresses.

5              THE COURT:  Let me say first, Miss Herrmann -- I'm

6    sorry, Miss Kovsky.  I do take risk to physical safety very

7    seriously.  I don't mean to underestimate that at all.  But

8    I also take seriously the requirements of the Bankruptcy

9    Code and the openness and transparency of bankruptcy

10   proceedings.  I understand it's a balance but let me leave

11   it at that.

12             Mr. Herrmann.

13             MR. HERRMANN:  Yes, Your Honor.  I just wanted to

14   echo what Mr. Wofford and Miss Kovsky said.  I agree

15   completely with everything they said.  And then also I just

16   wanted to ask your indulgence that nothing be filed in the

17   Court record that contains my home address as a pro se

18   filer.

19             THE COURT:  Look, I've already -- I haven't ruled,

20   but I've made it pretty clear that with respect to physical

21   home addresses, email addresses, personal telephone numbers,

22   I don't have a problem about that being redacted.

23             MR. HERRMANN:  Yes, thank you, Your Honor.  I'm

24   actually speaking about my personal pro se filings, that if

25   there was any kind of service of your order or something.

1          THE COURT:  Mr. Herrmann, your pro se filings get

2     filed on the docket.  I don't remember whether -- your name

3     is certainly there.  I don't remember --

4          MR. HERRMANN:  I didn't provide my address, so I

5     just wanted to make sure.

6          THE COURT:  I haven't raised -- you know, no one's

7     raised an issue about that.

8          MR. HERRMANN:  Okay.

9          THE COURT:  You've appeared before, and you appear

10    today.  I'm happy to hear pro ses have a chance to speak and

11    express their views and I hope to continue to do that in

12    this and future hearings.  But I think it's a different

13    issue than what the purposes of schedules are in a

14    bankruptcy case.  Let me leave it at that.

15          All right.  Miss Cornell.

16          MS. CORNELL:  Thank you, Your Honor.  Shara

17    Cornell of the United States Trustee again.

18          I think the bottom line is that the evidence

19    presented does not establish that there's a threat, let

20    alone credible threats, or harm in this case.  Over 250

21    creditors have already filed claims with names and

22    addresses.  Over 350 letters have been filed on the docket

23    with names.  Appearances in this court case and at the 341

24    meetings have names.  We have ad hoc committees identifying

25    their members in the 2019 statements.

1              And there has been no showing, thus far, by any

2     part that any of the individuals that have self-identified

3     have been the target of any of the acts the committee or the

4     Debtors argue is imminent upon disclosure.

5              I'm sympathetic to the concerns expressed, but

6     there's simply no evidence presented by any party that these

7     are concrete and discernible threats that upon disclosure

8     will occur to creditors.  Other than to Alex Mashinsky, who

9     already has a security detail and whose address is not

10    disclosed, there have been no actual reported threats, just

11    speculation.

12             As we have told the Debtors on numerous occasions,

13    all threats of physical harm in this bankruptcy case should

14    be forwarded to my office for review -- we take those types

15    of threats very seriously -- and, to date, we have not

16    received any such threats.

17             The Debtors already spend money to protect

18    Mashinsky.  I do not think that the attachments related to -

19    - I'll just leave it at that.  I don't think that that's an

20    issue in this case, and I think that it was meant for a

21    distraction.

22             And specifically with respect to the retention

23    applications, all parties in interest need to be evaluated.

24    If you don't think the conflict is one that needs to be

25    addressed, the whole process of retention involves a check

1    for conflicts, which the parties are ignoring.  How do you

2    get around the issue; how do you cure it if you don't even

3    know who's involved?  We need to know who is being conflict

4    checked.  The parties need to disclose that information to

5    the public.

6            And even assuming, you know, arguendo that the

7    evidence attached to the supplemental briefings did show

8    some type of credible threat, which they do not, the Debtors

9    and the committee have only attempted to show threats

10    against specific individuals who we aren't even sure are

11    actually creditors.  We haven't seen anything against the

12    creditor body as a whole.  There has absolutely been no

13    authentication about who is making threats, who is allegedly

14    being threatened.

15            Again, we don't even know if the people that are

16    posting on Reddit are actually creditors in this case.

17    Moreover, the posts that were attached don't even all

18    support the Debtor and the committee's position.  There are

19    -- in the attachments alone, there are at least two threads

20    that support the United States Trustee's position that

21    transparency and disclosure should be followed in this case.

22            And I'm happy to point Your Honor to those

23    examples if it would be helpful, but there is correlation

24    with the customers in this case.  And even posting an

25    article from several years ago, it also has no correlation.

1    Randomly throwing out these happenstances does not create a

2    connection to this specific case.  And just as we saw at the

3    last hearing, there is just simply no evidence -- there's no

4    evidence.

5            And I'd also like to just briefly touch, Your

6    Honor, on the European issues that I don't think that the

7    Debtors have equally expanded upon since our last hearing.

8    There are exceptions to the GDPR rule out there that I don't

9    believe the Debtors have explored or have provided to the

10   Court.  I think that there should be more of an explanation

11   to this Court as to why those exceptions have not been

12   explored or even identified.  And if not, in any event, to

13   the extent U.S. bankruptcy law and the GDPR conflict, the

14   application of U.S. law should prevail.

15           The Debtors are a U.K. company.  They chose to

16   file in the United States of America for bankruptcy.  They

17   chose that knowing the law in the United States.  They have

18   consciously subjected themselves to American bankruptcy law

19   over European insolvency law and that Debtors have simply

20   not addressed why a court order or a U.S. statute does not

21   apply, and I think that also should be addressed.

22           And I would like to note, you know, before I hand

23   it over, Your Honor.  We did meet and confer with both the

24   Debtors and the committee after the last hearing, and both

25   parties were unwilling to budge in their position.  So I

1    just want to put that out there that we heard Your Honor at

2    the last hearing and there was no movement on behalf of the

3    committee and the Debtors.

4            THE COURT:  Let me, just so I understand, what is

5    the U.S. Trustee's position with respect to redaction to

6    remove -- for individuals, not businesses -- to remove

7    physical addresses, email addresses, telephone numbers, to

8    remove that.

9            MS. CORNELL:  Your Honor, I have heard your

10   concerns.  The United States Trustee's Office has heard your

11   concerns, both at last hearing and at this hearing with

12   respect to the addresses and email addresses, and at this

13   time, I take no position with respect to those.  I do

14   believe that the names must be disclosed, especially with

15   respect to the retention applications.

16           THE COURT:  All right.  Thank you, Miss Cornell.

17           MS. CORNELL:  Thank you.  Does anyone wish to

18   address the issue of the retention applications?  I'm going

19   to take the whole thing under submission.  This has gone on

20   and I wish you were all able to have reached agreement.  You

21   couldn't.  I will resolve these issues in an opinion.

22   Hopefully, it'll be sooner than later, but this is

23   important.  I'm sensitive to the security and personal

24   safety issues.

25           You know, the Debtor has frankly changed its tune.

1    Its original pitch was 90 percent based on confidential

2    commercial information.  I've stopped hearing about that and

3    now all I'm hearing about is 107(c) physical safety.  Well,

4    let me leave it at that.

5         I want to hear -- I see hands raised, but what I

6    want to hear are from any of the professionals who wish to

7    speak in support of redaction of names in retention

8    applications.  Is there anybody who wants to be heard on

9    that?

10         MS. JONES:  Your Honor, Elizabeth Jones from

11    Kirkland & Ellis on behalf of the Debtors.  If I just may

12    note, we do have a process in place there that if parties

13    would like to see the schedules, all they have to do is ask.

14    We have that in our proposed order and, yes, we understand

15    that that is slightly different.

16         THE COURT:  Miss Jones, maybe you misunderstood my

17    question.  What's the basis for sealing names from retention

18    applications?  Those are voluntary applications and

19    professionals who wish to be retained.  The rules require

20    disclosure of all of those contacts and relationships.

21    They're used for the purpose of evaluating conflicts.

22         I've commented on this before in an opinion in

23    Motors Liquidation.  It dealt not with the professionals,

24    but it deals with the parties themselves, where I declined

25    to allow them to redact names of their shareholders and

1    interest holders because it's important for the public to be

2    able to see what the Court is considering when it decides

3    whether or not to approve a retention or not.

4            Do you have any arguments why retention

5    applications professionals should be permitted to redact

6    names from those?

7            MS. JONES:  Understood, Your Honor.  We have

8    nothing further than what we've put in our papers.

9            THE COURT:  All right.  Any other professionals

10   who want to be heard?

11           MR. PESCE:  Your Honor, it's Gregory Pesce, White

12   & Case, proposed counsel to the committee.  I'm going to

13   handle the White & Case retention in a moment and can speak

14   to this.  We have no objection to the customer names being

15   unsealed in our retention application.  We were effectively

16   filing suit since the Debtors filed theirs first and had

17   sought to seal the customer names.  We will immediately re-

18   file them if you require us to do so.

19           There's a separate sealing issue that's going to

20   be heard on October 6th, which is there's one potentially

21   interested party that was listed in our retention

22   application and that was sealed to sort of protect the

23   process that -- seal their name as the Debtors were sort of

24   running that process; that's up on October 6th as well.

25           And, I believe Miss Cornell plans to deal with the

Page 80

1  other retention issues then, but no objection on the

2  customers from the committee for White & Case's retention.

3        THE COURT:  All right.  I'm going to take this

4  issue under submission.  I had -- we dealt with this at the

5  last hearing.  I raised some suggestions.  There were no

6  takers.  I will deal with all of these in an opinion in due

7  course.

8        All right.  Let's go on to the next item on the

9  agenda.

10        MS. JONES:  Understood.  Thank you, Your Honor.

11  If I may, can I move forward to the uncontested matters

12  before passing the podium over for the retention

13  applications?

14        THE COURT:  Sure.

15        MS. JONES:  The first matter then will be item 11

16  on the agenda which, Your Honor, this was a reporting

17  stipulation framework that we filed at docket number 668.

18  It was on presentment.  The objection deadline passed on the

19  7th.  There was no objection and so we planned to submit a

20  proposed order to chambers, but we had it listed on the

21  agenda since presentment time was for today's hearing in

22  case I have an objection.

23        THE COURT:  Does anybody else want to be heard?

24  All right.  It's granted.

25        MS. JONES:  Thank you, Your Honor.  Then the next

1    item on the agenda is item number 12 which is an email

2    service motion was filed at docket number 640.  Pursuant to

3    that motion, the Debtors are seeking to serve individuals

4    both by email and on the Celsius web app as well as first-

5    class mail in circumstances where we have both.  Certain

6    circumstances we only have their email.

7            THE COURT:  Let me stop you there.  I've reviewed

8    this carefully.  It's approved.

9            MS. JONES:  Thank you, Your Honor.  The next item,

10   I believe, Your Honor, that -- the account redaction motion,

11   although uncontested but correct if I'm wrong that that will

12   also be addressed under your submission?

13           THE COURT:  It will.

14           MS. JONES:  Thank you, Your Honor.  And then I

15   assume, Your Honor, item number 14 which is the creditor

16   matrix motion also deals with certain redaction that, once

17   we have your ruling, we will submit a revised proposed order

18   in line with that?

19           THE COURT:  Yes.

20           MS. JONES:  Okay.  Thank you, Your Honor.  So --

21           THE COURT:  It's 15 not 14 but that's --

22           MS. JONES:  Yes.  Item number 14, thank you, Your

23   Honor.  So with that, Your Honor, I know there's item number

24   15 which is information protocol motion but that is the

25   committee's motion and so at this point, I propose to the

1    pass the podium back to my colleague Mr. Kwasteniet who'll

2    be dealing with our retention applications.

3              THE COURT:  Okay.  Go ahead.

4              MS. JONES:  Thank you, Your Honor.

5              MR. KWASTENIET:  Good afternoon, Your Honor.  Ross

6    Kwasteniet from Kirkland & Ellis proposed counsel for the

7    Debtors.

8              If it please Your Honor, Mr. Pesce has a

9    scheduling challenger this afternoon and requested that the

10   committee go first with respect to their retention

11   applications.  So if Your Honor's all right with taking

12   those out of order, we're certainly fine with having the

13   committee go first so that Mr. Pesce can be released to his

14   next engagement.

15             THE COURT:  Sure.  Mr. Pesce, go ahead.

16             MR. PESCE:  Thank you, Mr. Kwasteniet and thank

17   you, Your Honor for accommodating me.  I greatly appreciate

18   it.

19             The next matter up is the White and Case retention

20   application.  Consistent with our practice when we represent

21   Debtors and Creditors, we ran an exhaustive search and

22   whenever there was a judgment call, we bordered on over

23   disclosure rather than under disclosure.  Following the

24   filing of that application, we had dialog with the United

25   States Trustee's Office.  As a result of that dialog, we

1    filed a supplemental disclosure affidavit from myself and

2    I'm here if you have any questions about that.  We also

3    filed an updated order to clarify how, among other things,

4    fees and expenses will be dealt with in our retention.

5              As far as I'm aware, there is no formal objection

6    to our retention -- you know, it's -- as came up earlier in

7    the hearing, obviously, some parties and interests have

8    raised questions regarding other matters that my firm has

9    been involved with.  Just to set the record, you know, we

10   have over 2500 attorneys in 40 different countries all over

11   the world.  Like any law firm, they sometimes represent

12   other people, become involved in bankruptcy cases.  Apropos

13   to my other comments, we try to border on over inclusion, in

14   doing so, some of the parties have raised issues about those

15   other representations.

16             I'm happy to go through the ones that I'm aware of

17   that came up or any other topics, but in short, we believe,

18   particularly in light of the subsequent disclosures that we

19   made with the United States Trustee's agreement and they're

20   not objecting, that we meet the standards for retention.

21             We're obviously going to continue to update our

22   disclosures during the pendency of the case, and unless Your

23   Honor has any questions, we would ask that you grant our

24   retention application.

25             THE COURT:  Mr. Phillips, do you want to be heard

1    on the White & Case retention application?

2             MR. PHILLIPS:  Yes, I do, Your Honor.  Richard

3    Phillips, unsecured creditor appearing pro se.

4             THE COURT:  Go ahead.

5             MR. PHILLIPS:  I want to thank Your Honor for

6    letting me speak and I apologize for not filing a timely

7    objection.  I was under the impression that the U.S. Trustee

8    would be doing so as opposed to just filing a revised

9    proposed order.

10             I'd ask the Court to -- for a continuance to the

11    10-1 hearing so that I may be given leave to actually file a

12    timely objection addressing my particular concerns.  I do

13    think that Mr. Pesce's revised declaration continues to

14    suffer from lack of transparency.  I'm glad these -- you

15    know, providing unredacted information on the creditors.  I

16    don't believe he provided -- (indiscernible) provide

17    unredacted information as to the identity of the consortium

18    clients.

19             Also I think it's very important to understand

20    which attorneys in this massive firm are actually conflicted

21    out of this representation and on the other side of the

22    Chinese wall.  The WestCap matter in particular is very

23    complex and I don't think we know the rights and privileges

24    of the Series B preferred enough to fully evaluate total

25    conflicts there.

1          What Mr. Pesce's firm (indiscernible) case may

2    actually be a witness in these proceedings because they

3    oversaw the due diligence to that matter and may have

4    exposure due to -- I don't know what Mr. Dunn's going to do

5    on behalf of WestCap in terms of pursuing their claims.

6    Potentially, there are claims that WestCap could pursue that

7    would impact the recovery of the unsecured creditors given

8    the complex nature of the investment and the complex

9    structure of the corporate entities involved here.

10          So I think that there needs to be more full

11    disclosure of the WestCap matter and also of the consortium

12    before the conflicts can be fully evaluated in this case.  I

13    would ask for a continuance.

14          THE COURT:  Thank you, Mr. Phillips.  Mr. Pesce,

15    can you briefly describe what ethical screens you've created

16    within the firm?

17          MR. PESCE:  I can, Your Honor.  As part of our

18    dialog with the United States Trustee's Office, we were

19    asked to provide a list of all of the timekeepers at White &

20    Case that worked on the diligence project for WestCap during

21    the other engagement.  We provided that list and have

22    confirmed that none of the timekeepers on that list are

23    providing advice to the committee in connection with the

24    committee engagement, and as I mentioned, there's an ethical

25    screen there.  We're following all of the protocols there.

1           I should note that our screens are not

2      speculative.  We recently defended them earlier this week.

3      It was a -- our screening process in another matter was

4      actually upheld by the third circuit so we take these very

5      seriously.  We provided the information and we do not view -

6      - this is an issue since they're not going to providing work

7      and we conversely are not going to be receiving any of the

8      information with that other team in their matter.  May have

9      received -- and the files are sealed -- the computer systems

10     can't -- the computer systems won't let me or Mr. Turetsky

11     or Mr. Wofford access their files and them vice versa.

12           So -- and again, there's no ongoing representation

13     of WestCap today.  It's a former representation, former

14     clients of the firm.  So in light of that, we do not believe

15     that that is a conflict that would prevent us from

16     representing the committee vigorously here in this case.

17           THE COURT:  Okay.  Ms. Cornell?

18           MS. CORNELL:  Thank you, Your Honor.  Shara

19     Cornell with the Office of the United States Trustee.

20     Committee counsel's correct.  We have been working quite

21     diligently to work through all of these issues.  Understand

22     there are some.  Our office does have the consortium names.

23     We also did discuss with committee counsel the possibility

24     of obtaining conflicts counsel if it becomes necessary in

25     this case.  We discussed that at length with Mr. Pesce and

1    he was understandable of that possibility.

2              I believe there's also a waiver in this case that

3    had been executed. I'm not sure if the parties had discussed

4    that but we were given all of that information that were

5    then provided with the supplements from committee counsel.

6              THE COURT:  Mr. Pesce, can you just address the

7    waiver?  I don't remember seeing that.

8              MR. PESCE:  Sure.  My initial declaration, we

9    stated that as part of the WestCap engagement, they had

10   provided, you know, an advance written waiver as part of the

11   retention process and we believed it was enforceable and we

12   disclosed that in the original declaration and I believe we

13   also referenced it by reference in the second declaration as

14   well.

15             THE COURT:  Does anybody else wish to be heard who

16   I haven't heard so far?  All right.  Mr. Phillips' request

17   for an adjournment is denied.  The White & Case retention is

18   approved.

19             MR. PESCE:  Thank you, Your Honor.  I greatly

20   appreciate it and with the Court's permission, if I may be

21   excused.  My partners, Mr. Turetsky and Mr. Wofford, will be

22   continuing the hearing on behalf of the creditors committee

23   today.

24             THE COURT:  Thank you.

25             MR. PESCE:  Thank you, Your Honor.  Thank you, Ms.

1    Cornell.

2              THE COURT:  All right.  Let's go back to --

3              MR. WOFFORD:  Keith Wofford --

4              MR. KWASTENIET:  Yes, Your Honor.  Ross Kwasteniet

5    from Kirkland.  We can probably resume back with the

6    original order of the agenda unless Mr. Wofford or Mr.

7    Turetsky, there's any need to continue with the committee

8    applications at this point.  I'm happy to go either way.

9              THE COURT:  We're happy for you to proceed.

10             MR. KWASTENIET:  Very good, Your Honor.  Up next

11   is -- again, Ross Kwasteniet from Kirkland & Ellis, proposed

12   counsel to the Debtors for the record.

13             The next item on the agenda is number 3.  It's the

14   Kirkland & Ellis retention application.   Your Honor, we did

15   receive an objection from the United States Trustee's

16   Office.  We dealt with it in the context of the sealing

17   motion.  In addition to that objection with respect to

18   sealing which I think enough has been said on, the U.S.

19   Trustee's Office also had some comments which we

20   accommodated, both through a supplemental declaration from

21   my colleague Mr. Nash as well as revisions to the proposed

22   form of order.

23             Your Honor, just very briefly, I believe last

24   night, we filed at docket number 808 a proposed form of

25   order that included not only the revisions agreed to with

1    Ms. Cornell's office but also a new paragraph that said that

2    the Debtors will comply with however Your Honor rules with

3    respect to the sealing question with respect to the

4    individual names.  Your Honor, I will submit that that it is

5    a -- that same paragraph which we negotiated with the U.S.

6    Trustee's Office and I believe Ms. Cornell has signed off on

7    but she can tell me -- tell us -- if that's wrong, has been

8    replicated into each of the Debtors' proposed orders as well

9    as I believe in the committee's proposed orders, Your Honor.

10            So we are all agreeing that however Your Honor

11    decides and if names need to be fully disclosed, we are

12    prepared to do that, and of course we will commit to all

13    ongoing searches.  We have an extremely robust search

14    process.

15            Your Honor, that leaves us with several pro se

16    objections to Kirkland's retention.  Right off the bat, Your

17    Honor, I'll note that the standard which Your Honor has

18    elucidated in several published opinions is that a retained

19    professional under 327(a) must not hold or represent an

20    interest adverse to the estate.  Here, I don't believe there

21    is any allegation that Kirkland holds an adverse interest

22    against the estate, but several pro se objectors have raised

23    arguments that they believe that Kirkland may represent

24    adverse interests.  And in particular, Your Honor, they seem

25    to have focused on our -- the fact that Kirkland is also

1    representing Voyager.

2           And with respect to that, Your Honor, I want to

3    note just a few things.  In Mr. Nash's original declaration,

4    he made clear that Kirkland would not be representing

5    Celsius in matters adverse to Voyager or Voyager in matters

6    adverse to Celsius.  That representation was bolstered in

7    his supplemental declaration.

8           Your Honor, I would also note that both Celsius

9    and Voyager have conflicts counsel to handle any issues that

10   may arise between the parties.  Several of the pro se

11   litigants point to the fact that both Voyager and Celsius

12   are creditors, Voyager much more so to larger claim amounts

13   in the Three Arrows case, but Celsius also with a not

14   insignificant claim there.

15          With respect to that, Your Honor, again, both

16   firms have conflicts counsel.  Both Debtors have conflicts

17   counsel who would deal with issues in the Voyager case and

18   any dispute that may arise.  But we believe that right now

19   and likely forever, the interests of Voyager and Celsius are

20   fully aligned.  There's a winddown liquidation proceeding

21   and we expect that the creditors in that proceeding are

22   going to be treated equally so this is not a situation of a

23   race to the courthouse or we do a better job representing

24   one versus another and one creditor gets a better recovery,

25   and in fact, we're not representing Celsius or Voyager in

1      respect to pursuing claims in the Three Arrow case, in any

2      event.

3              Finally, Your Honor, I would note that while

4      Voyager is listed as a creditor in the Celsius case -- we've

5      disclosed that in our declaration -- it is a relatively

6      small creditor and it is one of hundreds of thousands of

7      similarly situated creditors so this is not a situation like

8      others that have come before you, Your Honor, where you've

9      had an issue with whether conflicts counsel was appropriate.

10     Here, Voyager is far from the main issue in the case.

11     They're similarly situated to hundreds of thousands of

12     others, and again, Kirkland -- the Celsius Debtors have

13     conflicts counsel who are more than able to step in and

14     address any conflicts that may arise with respect to the

15     Voyager case.

16             So, Your Honor, the Debtors respectfully submit

17     that the challenges raised or issues raised by the pro se

18     Plaintiffs are not a reason to question whether Kirkland is

19     disinterested and whether we satisfy the standards of

20     327(a), Your Honor.

21             THE COURT:  I just comment on that in the Project

22     Orange case that you're probably referring to.  I sustained

23     the U.S. Trustee's objection to the retention of the

24     Debtor's lead bankruptcy counsel because the largest

25     creditor in that case was also a client of the firm and I

1   concluded that it would be impossible to confirm a plan

2   without resolving the issue with that creditor, and I found

3   that conflicts counsel was not sufficient in those

4   circumstances, but let me hear from Ms. Cornell.

5           MS. CORNELL:  Thank you, Your Honor.  Shara

6   Cornell on behalf of the Office of the United States

7   Trustee.  Mr. Kwasteniet is correct.  We've discussed this

8   at length with Kirkland & Ellis and their relationship

9   between the two Debtors.  We have been discussing this with

10  them since before the case was even filed, and at this time,

11  we're satisfied with the representation -- of their

12  representation of their representation of both parties.

13  Voyager in this case is not even in the top 50 creditors.  I

14  don't believe it's anywhere close, and I do not believe that

15  there is conflict at this time.

16          THE COURT:  And as I already commented in that

17  Project Orange case, it was  your office, Ms. Cornell -- it

18  was before you were in that office -- that objected to the

19  retention of the Debtor's principal counsel so I certainly

20  know that your office reviews these issues very carefully.

21  This is a very different situation than Project Orange.

22          As I said, Project Orange -- the Debtor's proposed

23  counsel also represented the largest creditor in the case in

24  another matter, but, nevertheless.  I think it's a very

25  different situation.

1           MS. CORNELL:  Yes, Your Honor.

2           THE COURT:  Does anybody else wish to be heard

3    with respect to the retention of Kirkland & Ellis?  Mr.

4    Herrmann.

5           MR. HERRMANN:  Yes, thank you, Your Honor.  So one

6    thing I wanted to note for you is that I actually filed a

7    supplemental response at 11:38 a.m. yesterday, but

8    unfortunately --

9           THE COURT:  I've read every one of your pieces of

10   paper, Mr. Herrmann.

11          MR. HERRMANN:  Oh, awesome.  Okay.  So anyway, I

12   just wanted to say --

13          THE COURT:  I don't mean that I -- I take everyone

14   of them serious because I think you've raised some very

15   important issues.  So let me --

16          MR. HERRMANN:  Thank you so much, Your Honor.  I

17   appreciate it.  So actually, I -- if Ms. Cornell thinks that

18   the Three Arrows thing is fine then that's fine with me.  I

19   did raise two other points that I wanted to briefly bring

20   up.

21          One is just that, you know, Kirkland, whether they

22   represent shareholders and management, I had suggested that

23   they clarify that they've not represented them since they

24   were first engaged and will not represent them during the

25   remainder of the case.  And then also I just wanted to

1   clarify also about non-Debtor affiliates and using Debtor

2   affiliate dollars to pay for representation of non-Debtor

3   affiliates or other representation averse to the Debtor's

4   estate.

5          If they're spending estate resources to keep

6   entities out of the estate --

7          THE COURT:  I don't your point.  I understand the

8   issue about the non-Debtors and where -- how the money's

9   flowing, but I don't follow what, in terms of the

10  representation of Kirkland & Ellis --

11         MR. HERRMANN:  Oh, I'm wondering if Kirkland is

12  essentially using money from, say, Celsius Network, LLC, to

13  pay for representation of companies that aren't even part of

14  -- like I'm wondering who decides what becomes a Debtor --

15  you know, basically, what becomes a Debtor affiliate and

16  what becomes a non-Debtor affiliate and then who's paying

17  for the legal fees for the non-Debtor affiliates to make

18  these determinations.

19         THE COURT:  Let me ask.  Mr. Kwasteniet, are you

20  representing any of the non-Debtors -- non-Debtor

21  affiliates?

22         MR. HERRMANN:  Sorry.  I didn't --

23         MR. KWASTENIET:  Your Honor, I want to double

24  check our engagement letter.  I believe that our engagement

25  is for the parent and its affiliates.  I'd like to double

1    check whether that includes non-Debtors, but it was an

2    important point to note, Your Honor, is that we do have a

3    business unit in Israel.  We have referred to it as the GK8

4    business.  It is a material asset of these cases and I've

5    been on calls as recently as yesterday about how most

6    efficiently to monetize that asset.  At some point in time,

7    Your Honor, it may be that in connection with the sale

8    process, those entities actually become Chapter 11 Debtors

9    but certainly as part of our role as the company's

10   restructuring counsel, we are mindful and paying some

11   attention to those non-Debtor entities.

12           But, again, Your Honor, those are assets of the

13   estate and so it's appropriate for the Debtors to, you know,

14   be paying fees as necessary to maintain and maximize the

15   value of those estates.  I'd also submit that that's not an

16   unusual fact pattern in these Chapter 11 cases.  But if Your

17   Honor would like an answer to the specific question as to

18   whether the non-Debtors are included in the engagement

19   letter, we can look that up pretty quickly.  I can let you

20   know.

21           THE COURT:  Please do that.  Okay.  Mr. Herrmann,

22   anything else you want to say?

23           MR. HERRMANN:  No.  I think that essentially

24   covers it.  You know, it was a limited objection.  My most

25   recent supplemental response kept it as a limited objection

Page 96

1    so I just wanted to get these things covered.  You know I

2    did say that -- you know, I would support -- I mean, if they

3    can sign a supplemental statement that they're not going to

4    represent shareholders and management, I think that would be

5    good, but honestly, I leave that to you, Your Honor.  I'm

6    just a pro se creditor so (indiscernible).  But I put that

7    in my document and that's pretty much all I've got.

8              THE COURT:  Thank you very much.

9              MR. KWASTENIET:  Your Honor, I forgot -- I

10   neglected --

11             THE COURT:  Go ahead, Mr. Kwasteniet.  Go ahead.

12             MR. KWASTENIET:  Your Honor, I neglected to

13   address Mr. Emmanuel's first point.  Our engagement letter

14   is clear that we represent the company not individual

15   officers and directors.  We have not, we will not, we do not

16   represent the individual officers and to the extent -- I'll

17   double check our prior affidavits to the extent that wasn't

18   made clear.  I think it is clear in the engagement letter.

19   It's a fundamental term of our engagement, you know, the

20   scope of who we're representing, but I'd make that

21   representation on the record.

22             THE COURT:  Thank you.  All right.  Mr. Frishberg.

23             MR. FRISHBERG:  Thank you, Your Honor.  I just

24   wanted to say -- some of the points I was going to make Mr.

25   Herrmann made, but like all of Kirkland & Ellis's lawyers,

1    Mr. Sussberg who represents currently both Voyager and

2    Celsius but it's more related to how he potentially may

3    represent the shareholders and he's a -- Mr. Sussberg is an

4    ethical and honest lawyer, but no lawyer can fully represent

5    two potentially conflicting parties which is why I think

6    that there are at least a so-called fire wall or attorney's

7    wall should be erected between the two -- between Kirkland &

8    Ellis.

9         THE COURT:  Mr. Frishberg, what's fairly typical

10   in cases like this is that conflicts counsel is retained and

11   I think in so far as Voyager and Celsius (indiscernible)

12   involved, you know, Kirkland can't represent both of them at

13   the same time on a particular issue.  That's one of the

14   reasons you have conflicts counsel, and those have been

15   retained.

16        MR. FRISHBERG:  I think that in order to avoid

17   conflicts of interest, Kirkland & Ellis should be ordered to

18   issue a sworn statement confirming that they have never

19   given legal advice to Mr. Mashinsky, Mr. Leon, and any other

20   Celsius employees in their personal roles.  And Kirkland &

21   Ellis and/or the Debtors should disclose the identity of the

22   lawyer or lawyers who drafted the declarations

23   (indiscernible) for Mr. Leon and Mr. Mashinsky since those

24   declarations at least to me look like they were written by

25   an attorney.

1          THE COURT:  Mr. Frishberg, they filed declarations

2     on behalf of the Debtor.  In every case, it's typical to

3     have the CEO assign the first day declaration -- the 1007

4     declaration.  So there's nothing --

5          MR. FRISHBERG:   (indiscernible) how is a tax

6     benefit to --

7          THE COURT:  Stop.

8          MR. FRISHBERG:  Yes, Your Honor.

9          THE COURT:  I read that declaration very

10    carefully.  I've had lots of questions along the way.  It is

11    very common in representing a corporate debtor to engage

12    with its officers and directors, obtain information from

13    them, use it in connection with the case, prepare

14    declarations, but that is not a representation of the

15    individuals.  We've had the very explicit statement that

16    Kirkland is not representing Mr. Mashinsky individually or

17    the other individuals.  All right.  Anybody else who wants

18    to be heard with respect to the Kirkland retention

19    application?

20          All right.  Again, subject to my ruling on the

21    sealing issues, it's approved.

22          MR. KWASTENIET:  Thank you, Your Honor.  The next

23    item on the agenda, Your Honor, is the Debtor's proposed

24    retention of Akin Gump Hauer & Feld as special litigation

25    counsel and also conflicts counsel.

1          Your Honor, we did file a proposed form of order.

2     Similarly, to the other Debtor's professionals, Akin worked

3     with the Office of the United States Trustee with respect to

4     supplemental declaration and certain modifications to their

5     order, and we did file just yesterday a form of order at

6     docket number 810 that included that same paragraph I

7     referenced with respect to the Kirkland order that says that

8     they will comply with Your Honor's ruling with respect to

9     sealing and will update -- the Debtors will update and file

10    unredacted schedules if that's what Your Honor requires.

11         I don't believe that there are any pending

12    objections to the Akin retention.

13         THE COURT:  Ms. Cornell?

14         MS. CORNELL:  Thank you, Your Honor.  Shara

15    Cornell on behalf of the Office of the United States

16    Trustee.  We worked quite closely with counsel at Akin to

17    resolve our outstanding issues in this case and as Mr.

18    Kwasteniet said, in addition to the additional supplement

19    that was filed, there were several changes made to the order

20    that are now satisfactory to the United States Trustee's

21    Office.

22         THE COURT:  All right.  Does anybody else wish to

23    be heard?  All right.  That retention is approved as well.

24         MR. KWASTENIET:  Thank you, Your Honor.  Next on

25    the agenda is the Debtor's motion to retain Latham & Watkins

1      as counsel.  Latham has been doing regulatory work for the

2      company and has been interfacing with various state

3      regulators and federal regulators, and given their body of

4      knowledge and what I can represent have been extensive

5      efforts directed by our special committee that Latham and

6      Kirkland coordinate with each other but not overlap with

7      each other, Latham does have a unique and distinct role

8      here.  And similar to the other retention applications,

9      Latham has also worked with the Office of the United States

10     Trustee, has filed a supplemental declaration and a revised

11     form of order, the latest of which, Your Honor, was filed at

12     docket number 807 and again, includes the language that they

13     will comply with Your Honor's ruing with respect to sealing.

14            THE COURT:  Ms. Cornell.

15            MS. CORNELL:  Shara Cornell on behalf of the

16     Office of the United States Trustee.  That's correct, Your

17     Honor, and just for the comfort of all of those listening, I

18     just want to remind everybody that our offices worked with

19     counsel for the Debtors and all of the proposed

20     professionals to discuss overlapping duties in this case and

21     that there will be an effort of all of the professionals to

22     not duplicate work and that we will be looking for that in

23     the future in there are any issues.  So I just want to make

24     sure that that's out there and everybody understands that.

25     Thank you.

1          THE COURT:  Thank you, Ms. Cornell.  All right.

2     It's approved.

3          MR. KWASTENIET:  Thank you, Your Honor.  Up next

4     is the Debtor's proposed retention of Stretto.  Again,

5     similarly, Your Honor, we have filed a revised proposed form

6     of order at docket number 809 that's similarly includes a

7     commitment on the part of Stretto to file unredacted

8     schedules consistent with Your Honor's order.

9          THE COURT:  Ms. Cornell.

10          MS. CORNELL:  Shara Cornell on behalf of the

11     Office of the United States Trustee.  No objection.

12          MS. CORNELL:  Shara Cornell, on behalf of the

13     office of the United States Trustee.  No objection.

14          THE COURT:  All right.  And I was -- we don't have

15     an (indiscernible) issue with respect to the Stretta

16     retention?

17          MS. CORNELL:  Not in this case, Your Honor.

18          THE COURT:  It's approved.

19          MR. KWASTENIET:  Thank you, Your Honor.  I believe

20     the last of the Debtors' -- or second to the last of the

21     Debtors' retention applications is Docket Number 7, the

22     motion to retain Alvarez and Marsal.  Your Honor, similar to

23     the other advisors, A&M and worked out a revised form of

24     order, which was filed at Docket Number 805, also including

25     the commitment to file unredacted schedules, consistent with

1    any ruling Your Honor makes.

2              THE COURT:  Ms. Cornell?

3              MS. CORNELL:  Shara Cornell, on behalf of the

4    office of the United States Trustee.  That's correct.  No

5    objection at this time.  Thank you.

6              THE COURT:  All right.  It's approved as well.

7              MR. KWASTENIET:  Thank you, Your Honor.  The

8    Debtors' last retention application is for their investment

9    banker, Centerview Partners.  In addition to the informal

10   comments United States Trustee's office, which has been

11   resolved, as I understand, Centerview also received from

12   informal comments from the Creditors' Committee that dealt

13   primarily with the amount of the monthly fee and how certain

14   other fees in the engagement letter worked.

15              Your Honor, the Debtors filed a revised proposed

16   form of order at Docket Number 803 that reflects the

17   agreement between Ms. Cornell's office and also the

18   Committee with regard to certain revisions to the monthly

19   fee and some of the transaction-related fees, Your Honor.

20              THE COURT:  Ms. Cornell?

21              MS. CORNELL:  That's correct, Your Honor.

22              THE COURT:  All right.  It's approved as well.

23              MR. KWASTENIET:  Thank you, Your Honor.  I believe

24   that brings us to the end of the Debtors' agenda, and I

25   would turn it back over to counsel for the Committee for the

1    balance of the Committee's agenda.

2           Following that, Your Honor, just wanted to remind

3    everybody that we did note that we'd like to have a

4    discussion about scheduling with respect to the pleadings

5    that are on file with respect to custody and the withhold

6    issues.  And I would turn it to my calling, Mr. Koenig, at

7    the end of the discussion on the Committee's retention

8    applications.

9           THE COURT:  Thank you.  Okay.

10          MR. KWASTENIET:  Thank you, Your Honor.

11          MR. TURETSKY:  Good afternoon, Your Honor.  David

12   Turetsky, of White & Case, on behalf of the Committee.  Your

13   Honor, before I get into the first retention application,

14   which was the Kroll retention application, I did want to say

15   that similar to Ms. Cornell, the Committee did review all of

16   the retention applications and worked with the Debtors where

17   reseller issues, in particular on Centerview.  And Your

18   Honor has already approved that, but I did want to provide

19   reassurance to our constituency that that was the case.

20          Your Honor, the first retention application for

21   the Committee is the Kroll retention application.  That was

22   filed at Docket Number 433 with appended exhibits at 443.

23   We filed a certificate of no objection with a proposed

24   order.  This is to retain Kroll's information agent as well

25   as noticing agent to the Committee.  We believe that that

1    relief is critical to the Committee's efforts to engage with

2    its constituency.  We believe it's standard.  And we would

3    ask that Your Honor enter the order.

4              THE COURT:  Ms. Cornell?

5              MS. CORNELL:  That's correct, Your Honor.  No

6    objection at this time.  Thank you.

7              THE COURT:  All right.  The Kroll retention

8    application is approved.

9              MR. TURETSKY:  Thank you, Your Honor.  The next

10   matter for the Committee is an information protocols motion.

11   It relates to the relief that we just sought and obtained on

12   Kroll.  It's a motion to establish information protocols, as

13   well as information platforms, with which the Committee can

14   communicate with its constituency.

15             I'd note that I believe that the relief is pretty

16   standard, with one exception.  It does request information

17   platforms that use -- that make greater use of social media

18   than is sometimes seen.  With that said, we think that given

19   the context of this case, it's appropriate to do so.

20             We did receive a response from Creditor Rights

21   Coalition, which was supportive of the relief that we

22   sought.  However, they did ask that we provide for

23   additional language in the proposed order indicating that

24   among the information that the Committee could provide to

25   its constituents on one of the information platforms, which

1    includes a website, is recommendations with respect to a

2    plan after approval of the disclosure statement.  We thought

3    that made sense.  We did so.

4           We also conferred with Ms. Cornell and made

5    certain revisions to the proposed order.  And we'd ask that

6    Your Honor, unless there are any questions, enter the

7    proposed order.

8           THE COURT:  Mr. Turetsky, it may have been there.

9    It's been hard for me to keep up with the docket.  I think I

10   asked at a prior hearing to see the bylaws that the

11   Committee adopted.  Have those been posted?

12          MR. TURETSKY:  They have.  I believe they were

13   posted during the last hearing.  I can double check if you

14   would like, but I believe they've been posted.

15          THE COURT:  If you could have one of your

16   colleagues just let me know the ECF docket number.  It's

17   been hard to keep up with all of the filings.  I did want to

18   review that.

19          MR. TURETSKY:  Absolutely, Your Honor.  Thank you.

20          THE COURT:  Does anybody wish to be heard with

21   respect to the information protocol motion?

22          MS. CORNELL:  Your Honor, this is Shara Cornell,

23   with the office of the United States Trustee.  I just wanted

24   to echo Mr. Turetsky's comments.  We did work closely with

25   the Committee on this motion, and I know that Mr. Turetsky

1    said that this is a common motion.  It actually contains a

2    little uncommon relief that I would just like to bring to

3    Your Honor's attention, and if Your Honor has any questions

4    about some of the changes to the order that Committee

5    counsel and the United States Trustee came to.

6         For example, the specific social media platforms

7    that were proposed in the original order have now been

8    limited to only those expressed in the order.  We have also

9    required that the Committee post its official handles or

10   names for those platforms, so that participants will be

11   aware of who they are communicating with.

12        We have also made certain requests that should be

13   noted on the record, I think.  The author of these

14   communications is going to be -- and Mr. Turetsky can

15   correct me if I'm explaining it wrong -- but the author of

16   these communications is going to be Kroll.  However, Kroll

17   will be getting its information from counsel for the

18   Committee and the Committee itself.  And I think that

19   perhaps counsel for the Committee can explain that a little

20   bit on the record for its constituency, so that the

21   constituency understands who will be communicating with them

22   on these platforms.

23        MR. TURETSKY:  That's right, Your Honor.  Dave

24   Turetsky again for the Committee.  While in point of fact,

25   Kroll is maintaining these information platforms, postings

1    will come from the Committee, as advised by its advisors,

2    and so the information that is being provided on these

3    platforms will not be Kroll's information, but rather

4    postings from the Committee itself.  And obviously, there

5    will be more traditional postings that relate to, you know,

6    key events of the case, where key documents can be found,

7    that type of thing.

8              I do acknowledge, and I thought I had

9    acknowledged, that the information platforms make greater

10   use of social media, but Ms. Cornell has elaborated on that,

11   and I would agree with that elaboration.

12             In addition to that, we are specifying in the

13   order that the information that is being provided does not

14   constitute legal advice.  And I think that that's important

15   as well because we don't want to give the impression that

16   we're doing anything other than informing our constituents.

17   We are not giving them legal advice.  Obviously, to the

18   extent that individual creditors have individual issues, we

19   do have FAQs.  But they should consult their own counsel to

20   address those issues as a legal matter.

21             THE COURT:  Does anybody else wish to be heard

22   with respect to the information protocol motion?  All right.

23   The motion is granted.

24             MR. KOENIG:  Good afternoon, Your Honor.  Chris

25   Koenig, from Kirkland and Ellis, as counsel to the Debtors.

1    I'm here to address the custody and withhold scheduling

2    matters that Your Honor raised at the last hearing.

3           So, at the last hearing you directed the parties

4    to meet and confer about whether we could have a separate

5    hearing date, separate from the omnibus hearings, at which

6    the custody and withhold issues can be heard separate from

7    all the other items that are on agendas for omnibus hearings

8    in these cases.  We have met and conferred.

9           There are three matters that are currently pending

10   with respect to custody and withhold.  First, there's the

11   Debtors' motion to allow customer withdrawals from certain

12   accounts.  Then the Ad Hoc Group of withhold customers filed

13   a motion to lift the automatic stay.  And of course, the Ad

14   Hoc Group of custody customers filed an adversary

15   proceeding, and there is a pretrial conference, a status

16   conference, in that matter scheduled as well.

17          All of those matters are currently scheduled for

18   the October 6th omnibus hearing at 10:00 AM.  We've met and

19   conferred with the other parties.  We would propose to have

20   that heard on October 7th.

21          Your Honor, I recognize that that's a Friday and

22   that's an unusual scheduling request for your chambers.

23   Just wanted to note some of the scheduling difficulties that

24   week.  Earlier in that week, there's Jewish holidays on

25   Tuesday and Wednesday, and then of course we have the

1    omnibus hearing on Thursday.

2              And given when the lift stay motion was filed

3    pursuant to Section 362(e) of the Bankruptcy Code, there has

4    to be a hearing on that matter within 30 days.  The last day

5    of that 30-day period is the 7th, which is how we arrived at

6    the 7th.  So, that is what the parties would like to do with

7    respect to scheduling.

8              There's another matter that I'll turn to in a

9    moment, about the letter that Mr. Ortiz filed.  But before

10   turning to that I just wanted to address the scheduling

11   matter with Your Honor.

12             THE COURT:  So, we could do a Zoom hearing on

13   Friday, October 7th.  I'm able to do that.  I'm away later

14   in the day, but I could do that in the morning.

15             MS. CORNELL:  Your Honor, this is Shara Cornell

16   with the office of the United States Trustee.  I just wanted

17   to let Your Honor that we were currently in discussion with

18   the Debtors for scheduling the continued 341 meeting for

19   October 7th in the morning.  I just wanted to put -- we can

20   pick a different date if that's the only date available for

21   Your Honor.  But I just wanted to make sure that you are

22   aware that.  Thank you.

23             THE COURT:  Thank you, Ms. Cornell.  The Jewish

24   holiday of Yom Kippur is Tuesday night and Wednesday.

25   That's clearly out.  The 6th, we have the hearing.  And I'm

Page 110

1    willing to do this on Friday morning, the 7th.  I don't know

2    how long people anticipate that hearing will last.  I'm away

3    all of the following week, I should make clear.  So, I can

4    do that hearing on the 7th.

5            I guess I'd like a better definition of what it is

6    I'm hearing at that time.

7            MR. KOENIG:  Certainly, Your Honor.  So, it would

8    be the Debtors' motion to reopen the -- to allow customers

9    to withdraw from certain customer accounts.  Ms. Kovsky

10   filed a lift stay motion and then there's a status

11   conference in the adversary, and that's, I think, the matter

12   that we should discuss more substantively.  Mr. Ortiz filed

13   a letter.  And so, I'll turn the virtual lectern over to him

14   to discuss that matter.

15           THE COURT:  Okay.  Go ahead, Mr. Ortiz.

16           MR. ORTIZ:  Good afternoon, Your Honor.  Kyle

17   Ortiz, with Togut, Segal & Segal, on behalf of the Ad Hoc

18   Group of Custodial Account Holders.

19           We agree that the 7th is a good day, Your Honor.

20   But I think the difference that we have with the Debtor is I

21   think they want to have that be a status conference on our

22   adversary proceeding.  And consistent with the letter that

23   we file that Docket 3 asking under Local Rule 7056-1 for a

24   premotion conference, our view is that we can have the

25   actual summary judgment motion that day --

1          THE COURT:  You can't.  And I'll explain why.  But

2     go ahead.

3          MR. ORTIZ:  I mean, Your Honor, I don't want to

4     belabor a point that you've kind of already said we can't.

5     I think the main point from our perspective is, you know, to

6     the extent that we still need to have a premotion conference

7     to put on a summary judgment motion ahead of that status

8     conference, I do think we would want that heard, you know,

9     at least pretty quickly after the 7th.  And obviously, those

10    are things we can deal with on the 7th.

11         But we do think that the relief that we're asking

12    for is in many senses the exact same relief that the Debtors

13    are seeking, with the difference of, you know, who can be

14    released at what time.

15         THE COURT:  Let me ask -- let me put some

16    questions to both sides.  First -- and let me make clear, I

17    want to try and resolve the custody and withhold issues as

18    soon as reasonably possible.  And I'm not trying to throw

19    any monkey wrenches into the efforts to do that.

20         Mr. Ortiz, do you have case authority that an ad

21    hoc committee has standing to file this adversary proceeding

22    for a declaratory judgment and get the result that it's

23    asking for?

24         MR. ORTIZ:  Well, the Ad Hoc Group represents

25    parties in interest in this case, 26 --

1            THE COURT:   (Indiscernible)

2            MR. ORTIZ:   I don't, offhand at this very moment,

3    Your Honor.

4            THE COURT:   If the plaintiffs in that adversary

5    proceeding were the named Ad Hoc Group -- you refer in the

6    complaint to your 2019 statement, I appreciate.  And it may

7    be that the group has increased in number.

8            Again, I'm not trying to throw a monkey wrench

9    into your efforts.  I genuinely don't know the answer to

10   whether an ad hoc group has standing to raise the issues

11   that you have.  I think that the account holders could.  But

12   for the hearing on the 7th, if you want to brief in advance

13   -- I don't want the brief the day before -- a brief

14   addressing whether an ad hoc committee has the standing to

15   bring the adversary proceeding seeking, I would like to see

16   it.

17           If you conclude that they don't and you're going

18   to amend the complaint to name individually named

19   plaintiffs, fine.  I'm sure that you can stipulate to an

20   agreement to amend the complaint and do that.

21           So, I just want to be sure that if I rule in your

22   favor that it's enforceable.  And I just generally don't

23   know the answer.  I looked quickly this morning and couldn't

24   find anything on it.  So, I don't know.  You may be able to

25   put your finger on authority that does it.

1          Then let me raise this question.  When I say that

2    I'm not prepared to hear your summary judgment

3    (indiscernible), I understand the issues that were raised at

4    the last conference.  Eighty-nine days before the filing of

5    a bankruptcy petition, the Debtor transferred property from

6    earn accounts into custody accounts.  And it's going to

7    raise the preference issue.

8          I don't know...  Well, has the Debtor filed a

9    responsive pleading yet to the Ad Hoc Committee's complaint?

10         MR. KOENIG:  Your Honor, again, it's Chris Koenig,

11   for the Debtors.  The summons that was issued -- the

12   deadline has not yet passed, Your Honor.  We have not filed

13   one yet.  The deadline is on October the 3rd, and that's

14   (indiscernible) Your Honor.

15         THE COURT:  Okay.  So, one question I have -- and

16   Mr. Ortiz said, well, there's no preference action against

17   anybody; return everybody's money and then, you know, then

18   somebody could chase 50,000 people in all parts of the world

19   to see whether you could recover preferences.

20         It hypothetically seemed to me that the Debtor

21   could file a counterclaim, a declaratory relief

22   counterclaim, for a determination that transfers 89 days

23   before the petition date are avoidable preferences.

24         I want to be able to resolve these issues, Mr.

25   Ortiz, sooner rather than later.  And I think the response

Page 114

1    you gave me at the last hearing about a respectable position

2    for you was, no, they haven't recovered avoidable damage,

3    sued to recover preferences.  They haven't filed suit.  They

4    haven't recovered on it.  And so, give everybody their money

5    back.  I don't -- you know, were it only so easy.

6            So, I think the Debtor has to seriously -- you

7    know, it may not want -- I can understand at this early

8    stage of the case -- to be suing every transferee who

9    received a transfer into a custody account 89 days --  Mr.

10   Ortiz's group -- I don't know.  What are you up to?  What's

11   your head count now for your Ad Hoc Committee, Mr. Ortiz?

12            MR. ORTIZ:  Your Honor, I believe we're at around

13   70 that held, as of the petition date, $26 million-or-so in

14   custody.  And my understanding from the Debtor is that

15   market has moved that number up.  But I think just making it

16   simple for the Court throughout, we'll always stick with the

17   petition date number, which is around $26 million for the

18   group that we currently have.

19            THE COURT:  No, I -- you know...  I don't want to

20   put your clients, Mr. Ortiz -- you represent the Ad Hoc

21   Committee -- but the members of the Committee and the

22   position they're suddenly going to find themselves as

23   defendants in preference avoidance action, but the issue of

24   their getting their assets back is, in my view, inextricably

25   tied to what their avoidable preference is.  And it may be

1    that some of your 26 are in different situations.  Some may

2    have some defenses that others don't have.  I don't know.

3           But I think that you and Mr. Koenig should talk

4    about whether -- can you agree to how this will be

5    structured, so the Court will deal with the issues of both

6    the (indiscernible) -- you know, yes, the terms of use that

7    all right, title and interest is in the account holder for

8    the custody accounts.  And I'm not sure the Debtor was

9    contesting that part.  It was the fact that they had done a

10   transfer 89 days before the bankruptcy.

11          And so, I think when we meet on the 7th, hopefully

12   you will have agreed on a game plan for how to structure

13   this and move forward.  It may be -- if you believe of your

14   26-or-so clients, there are different defenses that may be

15   available to some and not others.  I want trans -- look, if

16   you want to get this resolved, I'm not going to hear a

17   summary judgment motion until I think it's right to do that.

18          There hasn't been any discovery.  If there has to

19   be discovery on defenses, for example, you ought to

20   voluntarily talk with the Committee and the Debtors'

21   counsel.  I left the Committee out until now, but the

22   Committee's got a big stake in this.  You know, if $200

23   million gets to custody account holders, it's that much less

24   available for pro rata distributions to all of the unsecured

25   creditors.

1          So, the Committee has a stake in this, so I think

2     -- I don't know whether, Mr. Hershey, you're appearing with

3     your hand up on the screen -- to talk about these issues.  I

4     think that you need to confer not only with the Debtors'

5     counsel but the Committee's counsel and see if you can come

6     up with an agreed game plan.  And I'll try and cooperate to

7     get this all done sooner rather than later.

8          And what I'm telling you now is why you're not

9     going to have a summary judgment hearing on October 7th.

10          MR. ORTIZ:  Right.  Understood, Your Honor.  Kyle

11     Ortiz for the Ad Hoc Group again.  If it's all right with

12     Your Honor, I'd like to spend 30 seconds responding to some

13     of that.

14          THE COURT:  Sure.  Go ahead.

15          MR. ORTIZ:  I think one of the things that we

16     wanted to make clear is that we weren't necessarily trying

17     to get to the preference action yet.  I think there is a

18     kind of threshold issue where there is agreement and the

19     summary judgment was actually focused on just the plain and

20     simple answer of who actually the property is owned by,

21     whether or not it's property of the estate, which in our

22     view, the Debtors have largely conceded.  Obviously, that's

23     -- the ultimate decision on that is Your Honors and not

24     theirs.

25          But, you know, there's that threshold question,

1    which we wanted to try to get to summary judgment.  And then

2    there is the final follow-up question of what does that mean

3    with regards to when and how people can get assets back.

4    And I think that's when the potential preference comes in,

5    and I think, you know, that gets interesting because there's

6    -- you know, an examiner was appointed today, there's

7    questions of fraud, there's been things today said where

8    there's no clear end game.

9              So, it's not really clear that the Debtors will

10   ever bring preferences.  They may or they may not.  I think

11   we want to try to work together to get to the bottom of that

12   sooner rather than later, as Your Honor has said.  I think

13   sooner rather than later are quotes of yours at every

14   hearing we've had to date.

15             But you know -- and we have been working with the

16   Committee and we have been working with the Debtors, but I

17   think there's two steps here.  And we were trying, to the

18   extent that we could get agreement on really just that one

19   threshold question, and then from there --

20             THE COURT:  I don't hear summary judgment motions

21   until the responsive pleadings have been filed.  That hasn't

22   happened.  That --

23             MR. ORTIZ:  No, I understand, Your Honor.  And

24   we're not trying -- I heard you loud and clear and the 7th

25   is the 7th, and that's on a pretrial conference.  But I

1   think what we're trying to say is that I do think there is

2   hopefully a path forward to at least kind of getting

3   agreement on some of the key facts.  And you know,

4   obviously, we're not going down the summary judgment route,

5   but the stipulated facts were all, you know, things from

6   their own pleadings, and I think we can get there.

7               And there's the secondary question, and with that

8   secondary question, when we get to it, I do think under

9   541(a)(3) it's not property of the estate until it's

10  recovered.  And there has to be -- there is some burden on

11  the Debtor who's holding someone else's property, if that's

12  where we land --

13              THE COURT:   (Indiscernible)

14              MR. ORTIZ:   -- to demonstrate why they can hold on

15  to that and --

16              THE COURT:   You're not -- your client's not

17  getting the money back until I decide whether they are

18  avoidable preferences.  It's simple as that.  You may not

19  like that answer, but that's the answer.  Okay?  Because

20  whether it's a creditors' committee or a post-confirmation

21  trustee trying to chase 50,000 people who got money back and

22  they're scattered all around the world, that's not going to

23  happen.  Okay?

24              You need to work with the Committee and the

25  Debtors' counsel to come up with an agreed path.  If you can

1    -- hopefully, you'll be able to, with respect to the issue

2    of whose property is it once it's in a custody account,

3    hopefully you're going to be able to stipulate as to most if

4    not all of the facts.  Okay?

5            So, summary judgment will certainly be facilitated

6    -- summary judgment motion would be facilitated to the

7    extent that you can have a stipulation of facts.  Ms.

8    Kovsky, this may go for the withhold account holders as

9    well.

10           So, you know, you all need to get together and

11   figure out a path forward that will allow the Court to

12   resolve these issues expeditiously.  Some of your concerns,

13   hopefully, Mr. Ortiz, you'll be able to resolve through

14   stipulations.  And where there are disputed issues of facts,

15   fine.  You know, we'll try them, and I'll resolve them.

16           But, you know, you have filed an adversary

17   proceeding against the estate.  I have this question about

18   the standing.  It wouldn't be an issue if your individual

19   clients were named.  Once you've done that, under Katchen v.

20   Landy, the estate can file its counterclaim against all of

21   them.  It would arise out of the same facts, and I believe I

22   would have the authority to resolve those issues together.

23   That's what I want to try and do.

24           It may well be that your clients have very good

25   defenses to possible preference actions.  I thought it was

1    remarkable that 89 days before the filing of the petition,

2    they returned custody -- they returned assets into the

3    custody accounts.  If it had been 91 days, you'd be in a

4    different position than 89 days.

5              Ms. Kovsky, do you want to be heard?

6              MS. KOVSKY:  Thank you, Your Honor.  We're

7    positioned a little bit different procedurally from Mr.

8    Ortiz's client group, because we filed a motion for stay

9    relief.  Our view was, there really isn't that preliminary

10    issue to be decided.

11              It didn't seem like there was a case or

12    controversy when the Debtors saying these coins are not

13    property of the estate and we're saying the coins are not

14    property of the estate, and the real question is the

15    preference issue that Your Honor has decided.  We felt that

16    it would be appropriate to take up Your Honor on your prior

17    suggestion of, well, somebody ought to just file a motion

18    for stay relief, which is what we did.

19              Given your direction that we should be conferring

20    with the Debtor about a game plan on how to structure this

21    and how to get that preference question resolved, we're also

22    -- we have a constraint of timing to have the motion for

23    stay relief heard within 30 days.  So, if Your Honor has any

24    guidance on what --

25              THE COURT:  I'll start the hearing and then tell

1    you we have to adjourn it, which I can do.

2            MS. KOVSKY:  Fair enough, Your Honor.

3            THE COURT:  Here's what.  We're not going to let

4    that 30-day issue stand -- if you insist on going forward in

5    30 days, I'll deal with it, you know.  What I want you to do

6    is talk with Mr. Ortiz, and if Mr. Hershey is the one who's

7    handling from the Committee standpoint, I'm happy to try and

8    get this all resolved as quickly as possible.

9            If your issues -- and you did it in the form of a

10   lift stay motion.  That's fine.  Maybe your issues can be

11   separated out.  I'm not sure.  But either come back to me

12   with a plan you're agreed on or let me know what the

13   disagreement is.  We can have a separate -- you know, I

14   mean, October 6th is not all that far off -- October 7th.

15   We'll get this worked out.  I want to try and resolve your

16   clients' issues, Mr. Ortiz's clients' issues as soon as

17   possible.

18           The one thing I don't want, if none of this is

19   property of the estate and if the estate doesn't have good

20   preference claims to claw it back, I want the money to go

21   back to the people it belongs to.  And I want that to happen

22   sooner rather than later.  But at this stage, I don't quite

23   know enough about everything to be able to provide the

24   answer.

25           Mr. Hershey, do you want to be heard?

1          MR. HERSHEY:  Yes, Your Honor.  Thank you very

2     much.  Again, for the record, Sam Hershey, from White &

3     Case, on behalf of the Official Committee of Unsecured

4     Creditors.

5          Your Honor, I had fairly lengthy remarks written

6     out that I'm streamlining substantially because I think Your

7     Honor has hit the main points that we agree with.  We agree

8     that there needs to be discovery on these issues.  We need

9     to understand whether these coins are held the way the

10    Debtors say they are held in segregated individual accounts.

11    We need to know where they were before they were in those

12    accounts.  We need to know how the coins have moved through

13    the Debtors' systems.  And so, there are matters, factual

14    matters, that we will need to drill down on.

15          I want to note for Your Honor -- and I appreciate

16    Your Honor noting the important role the Committee as a

17    fiduciary representative for all account holders appraised

18    in these matters.  For that reason, we've asked for and

19    received consent from the Ad Hoc Custody Group and the

20    Debtors to intervene in the pending adversary proceeding.

21    And we will be filing an unopposed motion to intervene

22    shortly so that we can play the role that I believe we need

23    to play on these issues.

24          And Your Honor, I guess the only thing I'll say

25    is, just for the record, we just are reserving rights in

1    terms of the position we ultimately take on the relief

2    sought by the various Ad Hoc groups and by the Debtors until

3    we've been able to take the discovery we believe needs to be

4    taken and formulate a position on the issues that have been

5    raised, such as preference issue that Your Honor mentioned,

6    which we believe are complex issues.  And while we certainly

7    want to facilitate the expeditious distribution to creditors

8    of assets that belong to creditors, we need to take the time

9    necessary to do this properly, and not risk having certain

10   account holders collect ahead of others, simply because they

11   moved first.

12           THE COURT:  Okay.  Mr. Hershey, if you have an

13   agreement with Mr. Ortiz and with the Debtor to permit the

14   Committee to intervene in the adversary proceeding that's

15   been filed, file the stipulation as soon as possible and

16   I'll approve it.  And then you can go ahead and take...  I

17   would think that most of your discovery requests, you ought

18   to be able to propound without even formal discovery.  And

19   if you need to take formal discovery, as soon as you're a

20   party, go ahead and use the discovery rules and do it.

21           I'm not going to slow it down for particularly

22   lengthy discovery.  Yes, I agree you need to have the facts.

23   You need to get the facts quickly.  Okay?

24           MR. HERSHEY:  Agree completely, Your Honor.  Thank

25   you very much.

Page 124

1          THE COURT:  All right.

2          MR. KOENIG:  Your Honor, Chris Koenig, for the

3     Debtors.  May I be heard again?

4          THE COURT:  Yes, please.  Go ahead.

5          MR. KOENIG:  Your Honor, just briefly, just wanted

6     to make clear.  For the Debtors, this is a top priority.  As

7     we explained at the last omnibus hearing, we take very

8     seriously that we want to return property to customers where

9     appropriate.  But of course, we don't want valuable estate

10    assets to go out the door if we are going to later have to

11    bring avoidance actions to claw that property back into the

12    estate.

13          What we're trying to do is to, you know, walk a

14    fine line, take this in stages.  The motion that we filed is

15    stage one.  We continue our analysis in our discussions with

16    the other parties, and we have some ideas on how to

17    streamline the process forward.  We look forward to working

18    with the other parties following this hearing on how we can

19    try to expeditiously resolve this issue.

20          Of course, we'll continue to work with the

21    Committee and the other parties to provide whatever factual

22    information they need ahead of October 7th or otherwise.

23    But just to be clear, you know, we take this very seriously.

24    We believe that customers should receive their property

25    back, but at the same time, we have to balance it against,

1    you know, the need to maximize the value of the estate for

2    all of the Debtors' customers.

3              Just to be clear, you know, and it's not for

4    today, you know, as we said at the last hearing, the 89 days

5    was a pure happenstance.  And again, just to be clear, the

6    transactions in the custody didn't all happen on the 89th

7    day.  You know, they happened over time on a rolling basis.

8    Again, not for today, but I just wanted the record to be

9    clear so that our silence wasn't interpreted in any other

10    way.

11              THE COURT:  You know, Baldwin United filed its

12    Chapter -- an involuntary Baldwin-United Chapter 11 was

13    filed, I think, 89 days before the preference period would

14    have expired.  And the timing was completely appropriate.

15    So, I'm not suggesting -- anyway, it is what it is.  Okay.

16    I just --

17              MR. KOENIG:  Thank you, Your Honor.  We just

18    wanted the record to be clear.  And of course, the facts

19    will bear that out.  But we just wanted to make sure that

20    the record was clear about our position.

21              THE COURT:  Let's see if you'll agree on the path

22    forward.  Mr. Ortiz?

23              MR. ORTIZ:  Thank you, Your Honor.  I'll be really

24    brief.  I just want to know -- you know, I appreciate Mr.

25    Koenig's comments.  I will note they're the same ones we

1    heard at the last few hearings.

2            And you know, Mr. Hershey has mentioned discovery.

3    I believe, you know, we've been told that they have issues

4    that they're looking into, which of course isn't really from

5    the custody account holders; it's from the Debtors.  And our

6    understanding is those conversations have been going on for

7    quite some time.

8            So, we appreciate that Your Honor has continued to

9    move these matters forward and will continue to speak to

10   everyone.  But, you know, we're hopeful that that really is

11   on a, you know, as expedited track as is appropriate for all

12   the parties.  Thank you, Your Honor.

13           THE COURT:  You know, Mr. Ortiz, if you have a

14   suggested path forward that you want to put down on paper,

15   share it with the Debtor and the Committee and the withhold

16   account holders.  And you can all do the same thing.  You

17   can exchange proposals how to move forward.  If you do that

18   and you have some roadblocks and you want to have a separate

19   conference with the Court to talk about it, we can do that

20   as well.  It doesn't have to be one of the omnibus hearings

21   to do that.  I'm happy to do that.  I would like to move

22   this forward.  To the extent that the Debtor should return

23   property that belongs to account holders, it should happen

24   sooner rather than later.  Okay.

25           MR. ORTIZ:  Thank you.

1            THE COURT:  There is another hand raised on the

2      screen from a Ms. Neuman, who looks rather young in the

3      picture, but perhaps there's someone perhaps not as cute

4      who's behind the picture who wants to be heard.  I guess

5      not.  I don't know if it's a Ms. or a Mr. Cruz whose hand is

6      raised.

7            MR. CRUZ:  Hi, Judge.  Yeah, I just wanted to

8      remark on the coin report filings.  It is helpful to have

9      more details than the latest one that was dated September

10     2nd.  However, it was formatted very differently from the

11     one from July 29th.  And it would be very helpful if we had

12     consistency in the formats across dates so we can see the

13     changing positions.  The latest was lacking in the market

14     price of each coin and the quantity.

15           So, in a sense, it's obfuscating what's happening

16     with these coins.  And it was filed late last night or early

17     this morning.  It appeared that we have decreased our

18     position of bit coin -- I'm speaking, I guess, the royal we

19     here -- but 114 down in bitcoin if you net -- wrap bitcoin

20     and bitcoin together, about $700,000 worth of ETH is also

21     disposed of.  And I think about $135,000 worth of

22     stablecoin.  And it would be impossible to tell that by just

23     looking at the filings.

24           So, it would be helpful to have the same format so

25     we can actually see what's happening with these coins,

1   because it's essentially sands in the hourglass that are

2   ticking down.  And it feels like it might have been a way of

3   hiding what's going on versus what we keep hearing about,

4   transparency being of paramount importance.  So, it would

5   just be helpful for K&E and Celsius to just try to be

6   consistent with the formats you're providing across states

7   so we can actually see what's going on.  Thank you, Judge.

8            THE COURT:  Thank you, Mr. Cruz.  Anybody else

9   want to be heard?  Mr. Turetsky?

10           MR. TURETSKY:  Good afternoon, Your Honor.  David

11  Turetsky, of White & Case, for the Committee.  Earlier in

12  the hearing, you did ask about the filing of the bylaws, and

13  I did want to give you a docket number.

14           THE COURT:  Okay.

15           MR. TURETSKY:  They were filed that Docket Number

16  682 under a notice of filing of bylaws.

17           THE COURT:  Thank you very much.

18           MR. TURETSKY:  Thank you.

19           THE COURT:  All right.  Anybody else want to be

20  heard before we adjourn?

21           MR. ORTIZ:  Your Honor -- oh, I'm sorry.

22           MR. KOENIG:  Your Honor, the only thing I would

23  say on the 341 meeting is, you know --

24           THE COURT:  Who's that speaking?  One at a time.

25  Go ahead.  Mr. Ortiz, did you want to say something?

1            MR. KOENIG:  Thanks (indiscernible) --

2            MR. ORTIZ:  Yeah, I'm sorry, Your Honor.

3            MR. KOENIG:  I'm sorry.

4            MR. ORTIZ:  I just thought it would be --

5            MR. KOENIG:  Chris Koenig from Kirkland & Ellis

6     again.  I'm sorry.

7            THE COURT:  Go ahead.

8            MR. ORTIZ:  Sorry.

9            MR. KOENIG:  After you.

10           MR. ORTIZ:  I just thought I would note just be --

11    for purposes of efficiency and clarity, you know, we had

12    asked in the letter for a pretrial motion.  I think we can

13    basically count this hearing is that.  So, there isn't any

14    need for the Court to reply or for that separate hearing to

15    happen.  Just wanted to kind of clean up the record amount.

16           THE COURT:  Thank you.  Let me just say, if you

17    all confer and can come up with a plan and you do that

18    before October 6th, share it with me in writing before, and

19    we can try and put firm dates down.  Okay?  So, yes, we're

20    going to have October 7th as a conference, but I encourage

21    you all to try and get something done before then.  And then

22    if there are things that need some tweaks, we can deal with

23    that.  Okay?  All right.

24           MR. KOENIG:  Thank you, Your Honor.  Chris Koenig,

25    for the Debtors.  Just a couple of sort of housekeeping

1   matters.  On the 341 meeting, of course the Debtors would

2   like to continue to have that meeting at the pleasure of the

3   United States Trustee.  We're, of course, able to divide and

4   conquer over here.  From the Debtors' perspective we can

5   have, you know, the hearing on the one hand and a 341

6   meeting on the other hand.  We have enough folks to divide

7   and conquer.  I don't know if the United States Trustee is

8   able to do that or not.  We can obviously continue that with

9   her offline.

10          As far as the scheduling on October 7th, will Your

11   Honor be entering a scheduling order, or would like the

12   Debtors to follow notice?  We're happy to --

13          THE COURT:  Why don't you file a notice.  Why

14   don't you file the notice for 10:00 AM on the 7th and be

15   specific about what you heard.  Okay?  All right.

16          MR. KOENIG:  Very good.  We'll file something in

17   the main case and also in the adversary proceeding.  Thank

18   you.

19          THE COURT:  Thank you. Mr. Mendelson?

20          MR. MENDELSON:  Hi, Your Honor.  Eric Mendelson.

21   I'm a custody account holder as well as an EARN holder.  And

22   I was late to this hearing, so I do apologize.  I'm not sure

23   if this was addressed earlier.

24          I am concerned that the $180 million or $210

25   million, or whatever that evolving number is of custody

1    accounts, is being held by Celsius, which is far from a

2    trustworthy company.  And I believe that the Court should

3    make a determination that these custody assets are held by a

4    true custodian, and outside of the reach of Celsius, while

5    Mr. Ortiz works this through the process to have these

6    custody funds released to us.

7             I'm just concerned that security breaches could

8    happen, any number of things could happen.  Alex's cold

9    storage wallet could fall in the ocean, and then our $180

10   million of crypto currency is lost, and there's no recourse

11   for us.

12            So, I just want to make the Court aware of my

13   concerns, as well as other custody account holders concerns,

14   and probably EARN holders accounts concerns that Celsius is

15   in control of our cryptocurrency, when it should be held by

16   a proper custodian at this time.

17            THE COURT:  Thank you, Mr. Mendelson.  Ms. Kovsky?

18            MS. KOVSKY:  Just logistically, Your Honor -- I'm

19   sorry.  Deb Kovsky, for the withhold account holders.  Would

20   you like us to renotice the stay relief motion, or can we

21   rely on the Debtors' notice of the hearing for the 7th?

22            THE COURT:  You can rely -- Mr. Koenig, include

23   that in the notice, okay, so that they don't have to file --

24            MR. KOENIG:  Of course.  We were planning to do

25   so, Your Honor.

1              THE COURT:  All right.

2              MS. KOVSKY:  Thank you, Your Honor.

3              THE COURT:  Again, Ms. Kovsky, the same thing.  If

4    you come -- you know, if you can reach an agreement on a

5    plan forward, let me know sooner rather than later, okay?

6              MS. KOVSKY:  Will do, Your Honor.

7              THE COURT:  All right.  All right.  We are

8    adjourned.  Thank you very much, everybody.

9

10             (Whereupon these proceedings were concluded at

11   4:32 PM)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 133

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  September 16, 2022