**Hearing Date and Time: October 6, 2022, at 10:00 a.m. EDT**
**Objection Deadline: September 29, 2022, at 4:00 p.m. EDT**

Dennis F. Dunne
Nelly Almeida
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Tel: (212) 530-5000
Fax: (212) 660-5219

Joshua M. Mester (admitted *pro hac vice*)
**JONES DAY**
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071
Tel: (213) 489-3939
Fax: (213) 243-2539

*Counsel to CDP Investissements Inc.*

Andrew M. Leblanc
Melanie Westover Yanez
**MILBANK LLP**
1850 K Street, NW, Suite 1100
Washington, DC 20006
Tel: (202) 835-7500
Fax: (202) 263-7586

*Counsel to Community First Partners, LLC,*
*Celsius SPV Investors, LP, and Celsius*
*New SPV Investors, LP*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### NOTICE OF MOTION OF
### COMMUNITY FIRST PARTNERS, LLC, CELSIUS SPV
### INVESTORS, LP, CELSIUS NEW SPV INVESTORS, LP, AND
### CDP INVESTISSEMENTS INC. FOR ENTRY OF AN ORDER DIRECTING
### THE APPOINTMENT OF AN OFFICIAL PREFERRED EQUITY COMMITTEE

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

PLEASE TAKE NOTICE that a hearing on the *Motion of Community First Partners, LLC, Celsius SPV Investors, LP, Celsius New SPV Investors, LP, and CDP Investissements Inc. for Entry of an Order Directing the Appointment of an Official Preferred Equity Committee* (the "Motion") will be held on **October 6, 2022, at 10:00 a.m.** (prevailing Eastern Time) (the "Hearing").

PLEASE TAKE FURTHER NOTICE that in accordance with General Order M-543 dated March 20, 2020, the Hearing will be conducted remotely using Zoom for Government. Parties wishing to appear at the Hearing, whether making a "live" or "listen only" appearance before the Court, need to make an electronic appearance through the Court's website at https://ecf.nysb.uscourts.gov/cgi-bin/nysbAppearances.pl.

PLEASE TAKE FURTHER NOTICE that any responses or objections to the relief requested in the Motion shall: (i) be in writing; (ii) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York; (iii) be filed electronically with the Court on the docket of *In re Celsius Network LLC*, No. 22-10964 (MG) by registered users of the Court's electronic filing system and in accordance with all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York (which are available on the Court's website at http://www.nysb.uscourts.gov); and (iv) be served so as to be actually received by **September 29, 2022, at 4:00 p.m.** (prevailing Eastern Time), by (a) the undersigned counsel, (b) the entities on the Master Service List available on the case website of the above-captioned debtors at https://cases.stretto.com/celsius, and (c) any person or entity with a particularized interest in the subject matter of the Motion.

**PLEASE TAKE FURTHER NOTICE** that only those responses or objections that are timely filed, served, and received will be considered at the Hearing.  Failure to file a timely objection may result in entry of a final order granting the Motion as requested by the Requesting Equity Holders (as defined in the Motion).

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion and other pleadings filed in these chapter 11 cases may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/celsius.  You may also obtain copies of the Motion and other pleadings filed in these chapter 11 cases by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

Dated: September 22, 2022
        New York, New York

/s/ Dennis F. Dunne
Dennis F. Dunne
Nelly Almeida
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Tel: (212) 530-5000
Fax: (212) 660-5219
Email: ddunne@milbank.com
        nalmeida@milbank.com

- and -

Andrew M. Leblanc
Melanie Westover Yanez
**MILBANK LLP**
1850 K Street, NW, Suite 1100
Washington, DC 20006
Tel:  (202) 835-7500
Fax: (202) 263-7586
Email: aleblanc@milbank.com
        mwyanez@milbank.com

*Counsel to Community First Partners, LLC,*
*Celsius SPV Investors, LP, and Celsius*
*New SPV Investors, LP*

/s/ Joshua M. Mester
Joshua M. Mester
**JONES DAY**
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071
Tel: (213) 489-3939
Fax: (213) 243-2539
Email: jmester@jonesday.com

*Counsel to CDP Investissements Inc.*

**Hearing Date and Time: October 6, 2022, at 10:00 a.m. EDT**
**Objection Deadline: September 29, 2022, at 4:00 p.m. EDT**

Dennis F. Dunne
Nelly Almeida
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Tel: (212) 530-5000
Fax: (212) 660-5219

Joshua M. Mester (admitted *pro hac vice*)
**JONES DAY**
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071
Tel: (213) 489-3939
Fax: (213) 243-2539

Andrew M. Leblanc
Melanie Westover Yanez
**MILBANK LLP**
1850 K Street, NW, Suite 1100
Washington, DC 20006
Tel: (202) 835-7500
Fax: (202) 263-7586

*Counsel to CDP Investissements Inc.*

*Counsel to Community First Partners, LLC,*
*Celsius SPV Investors, LP, and Celsius*
*New SPV Investors, LP*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**MOTION OF COMMUNITY FIRST PARTNERS, LLC, CELSIUS**
**SPV INVESTORS, LP, CELSIUS NEW SPV INVESTORS, LP, AND**
**CDP INVESTISSEMENTS INC. FOR ENTRY OF AN ORDER DIRECTING**
**THE APPOINTMENT OF AN OFFICIAL PREFERRED EQUITY COMMITTEE**

Community First Partners, LLC, Celsius SPV Investors, LP, Celsius New SPV

Investors, LP, and CDP Investissements Inc. (collectively, the "Requesting Equity Holders"), as

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

beneficial holders, or investment advisors or managers of beneficial holders, of Series B
Preferred Shares issued by Celsius Network Limited ("CNL" and, together with its affiliated
debtors and debtors in possession, the "Debtors" and, the Debtors and their non-Debtor affiliates,
collectively, the "Celsius Entities"), by and through their undersigned counsel, hereby submit
this motion (the "Motion") for entry of an order appointing an official committee of the holders
of CNL's preferred equity securities (an "Official Preferred Equity Committee") in these cases
and, in support of the requested relief, state as follows:

## Preliminary Statement

1.      The immediate appointment of an Official Preferred Equity Committee is
necessary to ensure adequate representation of the interests of CNL's preferred equity holders
(the "Equity Holders") in these cases.  The Debtors have repeatedly acknowledged that certain
fundamental issues exist that need to be addressed in the short term, including, for example,
which Debtors are liable with respect to customer claims, the appropriate allocation of any asset
sale proceeds, and whether the claims of the Debtors' customers must be determined in United
States dollars as of the Petition Date.  The resolution of these issues is necessary to advance any
restructuring negotiations.  Indeed, the Debtors and the Official Committee of Unsecured
Creditors (the "UCC") have acknowledged as much, and they appear to be well on their way to
resolving these key issues.[2]  The problem, however, is that the resolution of these critical issues
directly affects the recoveries of the Equity Holders.  And as the Debtors have made clear from
the outset of these cases, they have partnered with the UCC in resolving these issues and are not

---

[2]     _See, e.g._, 8/16/22 Hr'g Tr. at 38:12-14; 9/1/22 Hr'g Tr. at 48:17-20, 55:12-15; 9/14/22 Hr'g Tr. at 36:7-15.
Copies of the relevant portions of the foregoing transcripts are attached hereto as **Exhibits B**, **C**, and **D**,
respectively.  Indeed, concerns have already been raised regarding the use of proceeds from the sale of the
equity interests in non-Debtor GK8 Ltd. ("GK8") and of certain purportedly "_de minimis_" assets (discussed
below).

taking an adverse position.  The Equity Holders urgently require their own fiduciary – with the access, standing, and resources equal to those enjoyed by the UCC – to represent their interests.

2.        The need for a fiduciary to pursue the Equity Holders' interests is particularly critical when one considers the practical realities of these cases:  there are only two groups of real economic stakeholders – the retail customers and the Equity Holders.  The interests of the customers are being vigorously pursued by the UCC, which is concededly a committee of customers.  8/16/22 Hr'g Tr. at 28:24-29:1.  Not only is the UCC laser focused on maximizing value for the customers, without regard for the Equity Holders, but the Debtors also have made it abundantly clear that the UCC is their partner, and these cases are "*all* about the customer."  *Id.* at 42:8-10, 29:20-22 (emphasis added).[3]  Thus, there is no stakeholder presently at the table advocating for the interests of the Equity Holders.

3.        The lack of adequate representation of the Equity Holders' interests is particularly glaring in light of the corporate separateness of the customer-facing entities from the Non-Customer Facing Entities (as defined below), whose value flows to CNL.  Indeed, the Celsius Entities are, essentially, a conglomerate of three business lines conducted by separate and distinct legal entities, including, without limitation:  (i) the storage business, which is conducted by GK8, whose equity the Debtors are seeking to sell;[4] (ii) the mining operations, which are

---

[3]    *See also* 7/18/22 Hr'g Tr. (a copy of the relevant portions of which is attached hereto as **Exhibit E**) at 14:1-3, 30:25-31:1 ("Our goal is to maximize the value of Celsius' assets for the benefit of our customers" who "are our primary creditors."); *id.* at 36:25-37:2 (describing the mining business to be a "very valuable source of recovery for our stakeholders, our customers"); 8/16/22 Hr'g Tr. at 28:2-4 (explaining that management was instructed to "focus on the task at hand; and that's getting our customers their crypto back"); *id.* at 35:3-5 ("[W]e are contemplating [putting] all the value associated with the rising crypto over the last several weeks directly back into our customers' pockets."); *Notice of Filing of Second Day Hearing Presentation* [Dkt. No. 462] (the "Second Day Hr'g Presentation") at 12 ("Celsius is working tirelessly to identify the means that will provide the greatest possible recovery to its customers through the restructuring.").

[4]    *See Order (I) Approving Bidding Procedures for the Potential Sale of Certain of the Debtors' Assets, (II) Scheduling Certain Dates with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving Contract Assumption and Assignment Procedures, and (V) Granting Related Relief* [Dkt No. 687] (the "Bidding Procedures Order"); 7/18/22 Hr'g Tr. at 32:15-33:5; *Declaration of Alex Mashinsky, Chief*

conducted by Debtor Celsius Mining LLC (a subsidiary of CNL) and its non-Debtor subsidiary, Celsius Mining IL Ltd. (collectively, the "Mining Entities" and, together with CNL and GK8, the "Non-Customer Facing Entities")[5]; and (iii) the retail customer-facing business, which is conducted primarily through Celsius Network LLC and is thus separate from the Non-Customer Facing Entities.[6]

4.    The Debtors and the UCC have acknowledged that each of the Debtors is a separate legal entity and recognized the importance of maintaining that corporate separateness and not inappropriately diverting value from one estate for the benefit of another.[7]   And, as further described below, there is meaningful value in the Non-Customer Facing Entities (collectively, the "Excluded Assets"), including value from (i) mining equipment, mined bitcoin, and other assets utilized by the Mining Entities; (ii) CNL's loan portfolio that is expected to be paid over time and other investments;[8] and (iii) the equity in GK8, a wholly-owned subsidiary of CNL purchased for $115 million with funds invested by certain of the Equity Holders.  This value, the Requesting Equity Holders believe, should largely inure to the benefit of the Equity Holders, given that the Non-Customer Facing Entities have no third-party funded debt, and the

---

*Executive Officer of Celsius Network LLC, in Support of Chapter 11 Petitions and First Day Motions* [Dkt. No. 23] (the "Mashinsky Declaration") ¶¶ 85-86.

[5]    7/18/22 Hr'g Tr. at 32:6-13; Mashinsky Declaration ¶¶ 65-68.

[6]    7/18/22 Hr'g Tr. at 31:1-36:22 (describing different business lines); Mashinsky Declaration ¶ 42.

[7]    *See* Cash Management Motion [Dkt. No. 21] ¶ 54 (recognizing a need to "ensure that each individual Debtor will not, at the expense of its creditors, fund the operations of another entity"); *The Official Committee of Unsecured Creditors' Limited Objection to the Debtors' Cash Management Motion* [Dkt. No. 401] (the "UCC Cash Management Objection") ¶ 9 ("[W]hile the Debtors' estates are jointly administered for procedural purposes, the estates are not substantively consolidated.  As such, the account holders and general unsecured creditors of each Debtor estate are legally entitled to assurance that the particular value upon which they rely is not improperly diverted.").

[8]    *See, e.g.*, Mashinsky Declaration ¶ 66 ("To expand [Celsius Mining LLC]'s operations, and thus generate a greater yield, effective as of November 1, 2020, and through 2021, CNL entered into an intercompany revolver facility with [Celsius Mining LLC] for up to $750 million. The loan is a long-term investment in [Celsius Mining LLC] that is expected to generate significant yield for the Company.").  As of May 31, 2022, the outstanding loan balance owed to CNL was approximately $576 million. *Id.* ¶ 68.

retail customers are not customers of, and do not have claims against, any of the Non-Customer Facing Entities.

5.      The Debtors and the UCC have already acknowledged that (i) the issue of which Debtors and/or non-Debtor affiliates are liable on the customer claims is central to these cases and will determine, among other things, the extent of the recovery available for the Equity Holders[9] and (ii) they – currently, the only two case fiduciaries – are working together to advance the interests of the customers.[10]   The UCC has already acknowledged both that it will assert that customers have claims against every Celsius Entity and that the Equity Holders will contest such assertion. *See, e.g.*, 9/1/22 Hr'g Tr. at 48:23-25 ("In our view, as has been said in these other hearings, the account holders have claims []at every entity . . . ."); UCC Cash Management Objection ¶ 2 ("[W]hile the Debtors have acknowledged that account holders may have claims against multiple Debtor entities, the Court has not yet adjudicated the matter, and the Committee expects that the preferred equity of [CNL] will contest the matter.").  Thus, while in many cases a creditors' committee's goal of maximizing value may naturally be aligned with the interests of equity holders, that is not the case here, where maximizing value for the customers necessarily means advocating that they have claims against the Non-Customer Facing Entities, which is a directly adverse position to the Equity Holders.

6.      Another significant issue in these cases is the question of whether customer claims have to be "dollarized," *i.e.*, determined to be claims against an estate in a fixed amount of United States dollars, as of the Petition Date, as required by the Bankruptcy Code.  The

---

[9]    9/1/22 Hr'g Tr. at 49:22-24, 53:19-54:13.

[10]   *Id.* at 55:12-13 (Debtors explaining that they and the UCC have had numerous in-person meetings and "countless video and telephonic conferences"); *id.* at 33:13-22 (outlining the Debtors' collaboration with UCC); 8/16/22 Hr'g Tr. at 29:19-22 (Debtors stating that the "customer committee is our partner here, and we intend to work very closely with them from day one to the end"); *see also id.* at 48:17-20; 9/14/22 Hr'g Tr. at 36:7-15.

Debtors have stated that they have no intention of "dollarizing" claims and that they intend to return cryptocurrency assets, rather than "fiat currency" (*i.e.*, United States dollars), to their customers.[11]  While the type of consideration distributed under a plan of reorganization is certainly open to negotiation, the size of the claim that any particular creditor has against an estate is governed by Section 502(b) of the Bankruptcy Code.  Though the UCC has not yet taken a position on this issue – and may have a conflict in doing so given that its constituency holds different types of cryptocurrency and may have strongly different views – the Debtors have been clear that they are not intending to follow the mandate of Section 502(b).  An estate fiduciary is needed to take the other side of this dispute before a plan of reorganization is proposed that violates the Bankruptcy Code.

7.     With respect to these and other issues, the Debtors cannot be relied on to adequately represent the Equity Holders' interests.  Because the Debtors require the support and confidence of their customers if they are to continue as a going concern, management is understandably focused on protecting the customers' interests and the Debtors' reputation.[12]  Indeed, the Debtors' senior management is likely incentivized to pursue a particular case outcome that provides value to the holders of CEL tokens,[13] rather than the Equity Holders, because certain members of senior management (and their family members) hold millions of CEL tokens.

8.     The Debtors have even conceded that they have taken a unique approach *vis-à-vis* the UCC in these cases.  8/16/22 Hr'g Tr. at 29:18-22.  Apparently, the Debtors have decided

---

[11]   *Infra* n.32.

[12]   *Supra* n.3.

[13]   The CEL token is cryptocurrency issued by the Debtors and paid or distributed to customers as a reward for depositing cryptocurrency on the Earn platform.

that they do not represent the interests of any stakeholder in these cases other than the customers, who are already adequately represented by the UCC.[14]  Thus, the Debtors are actively working with the UCC, whose interests are at odds with those of the Equity Holders, to resolve key issues that will shape the outcome of these cases – without any fiduciary acting for the Equity Holders to provide a much-needed counterbalance.  In the Debtors' own words "[w]here customer claims sit and at what legal entities" is an "important issue, maybe even the most important issue[] that has to be decided in the case" and it is "coming down the pipe soon."  9/1/22 Hr'g Tr. at 53:20-21, 54:2-11.  It follows that an Official Preferred Equity Committee should be appointed now – and not after the fact – or these cases will be inappropriately and inequitably skewed in favor of the customers to the detriment of the Equity Holders.

9.    One only need to look at the Debtors' actions and statements to date to realize that these cases are rapidly progressing in a way that will be prejudicial to the Equity Holders if they don't have adequate representation soon.  For example:

   a.    The Debtors and the UCC have already reached agreement with respect to key issues that impact the Equity Holders and are in ongoing discussion regarding how "to potentially reorganize the business" and the Debtors' business plan, which will necessarily dictate the terms of any restructuring.[15]

   b.    In violation of Section 502(b) of the Bankruptcy Code, the Debtors have indicated that they do not plan to "dollarize" claims as of the Petition Date and intend to provide in-kind recovery to customers based on customer coin counts, at the expense of the Equity Holders.[16]  Thus, the Debtors appear to be well on the way to formulating an unconfirmable plan.

---

[14]   *See, e.g.*, Second Day Hr'g Presentation at 9 (summarizing the progress in these cases since filing, noting that (i) with respect to "engagement with stakeholders," the "Debtors have engaged with creditors directly, as well as counsel to the [UCC]" and (ii) the "Debtors and their advisors are advancing their thinking on the key legal issues in these chapter 11 cases and engaging with the [UCC]'s counsel").

[15]   9/1/22 Hr'g Tr. at 33:13-22; 8/16/22 Hr'g Tr. at 30:3-13.

[16]   *Infra* n.32.

    c.    The Debtors have obtained relief with respect to anticipated sales of significant assets that raises serious concerns regarding how the sale proceeds will be used.  For example, the Debtors intend to sell mined bitcoin,[17] the equity interests in GK8,[18] and certain *de minimis* assets," which, according to "some intelligence" received by the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"), are "equities and stocks" that are not actually *de minimis*.[19]

    d.    The Debtors have also (i) given the UCC robust consent and/or consultation rights over, among other things, the budget for intercompany transactions, cryptocurrency transfers, and asset sales over $300,000,[20] and (ii) agreed to an extensive reporting protocol that is "above and beyond the reporting that the [B]ankruptcy [C]ode requires."[21]  While the Requesting Equity Holders have received certain documents, they do not have the same access to this voluminous information on a timely basis.

10.    In light of the foregoing, it is critical that the Equity Holders have an Official Preferred Equity Committee to adequately represent their unique interests as early as possible. Not after significant time and estate resources have been unnecessarily expended on a restructuring that disregards fundamental bankruptcy principles.  And certainly not after significant value from the Non-Customer Facing Entities is improperly diverted to fund

---

[17]  *Order (I) Permitting the Sale of the Debtors' Mined Bitcoin in the Ordinary Course and (II) Granting Related Relief* [Dkt. No. 514].

[18]  *See* Bidding Procedures Order.  The Bidding Procedures Order reserves all parties' rights with respect to the use of proceeds, which further highlights the imminency of this issue.

[19]  *Order Approving Procedures for De Minimis Asset Sales* [Dkt. No. 692] (the "De Minimis Asset Sales Order"); 8/16/22 Hr'g Tr. at 95:13-17.  Even the Court "had no inkling that the Debtor was proposing to sell millions of dollars of equity or notes, investments, in other crypto businesses." *Id.* at 97:4-6 (J. Glenn).

[20]  *See e.g., Second Interim Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Granting Superpriority Administrative Expense Status to Postpetition Intercompany Balances, and (III) Granting Related Relief* [Dkt. No. 513] ¶ ¶ 3, 5; De Minimis Asset Sales Order ¶ 18.

[21]  *Stipulation and Agreed Order Regarding Framework for the Distribution of the Debtors' Reporting Information to the Committee* [Dkt. No. 668] (the "Stipulation and Order").  Pursuant to the Stipulation and Order, the Debtors have already produced thousands of pages of documents to the UCC.  9/1/22 Hr'g Tr. at 56:6-20.

operations of entities that are separate and distinct from these entities, at the expense of the Equity Holders.

11.     Any suggestion that an Equity Holder, acting on its own, without the benefit of the status and trappings of an official committee, can adequately represent the Equity Holders' interests ignores the practical realities of the chapter 11 process in general and the proceedings in these cases to date, in particular.  Without official representation (*i.e.*, a fiduciary looking out for all Equity Holders' interests), the Equity Holders will be left without effective and timely access to management and other sources for diligence and thus severely limited in any meaningful participation in these cases.  This will result in an inequitable and unbalanced process that is inherently contrary to the policies behind chapter 11 of the Bankruptcy Code.  Indeed, a lack of transparency from the Debtors and the UCC has already presented a challenge for the Requesting Equity Holders and has been remarked on by the U.S. Trustee.[22]

12.     Importantly, there is no reason to believe that the appointment of an Official Preferred Equity Committee would cause any delays in these cases.  To the contrary, the appointment of an Official Preferred Equity Committee at this juncture will prevent unnecessary cost and delay in the future, as such a committee will provide a unified voice to the Equity Holders that will obviate the necessity for the Debtors to deal with multiple objections and requests for information.  The Requesting Equity Holders have no intention to prevent the Debtors from continuing their fast-paced reorganization efforts.[23]  They simply ask to have an equal seat at the table while key negotiations are happening, particularly in light of the fact that

---

[22]    *Infra* n.39.

[23]    Indeed, as detailed below, Milbank LLP ("Milbank"), on behalf of some of the Requesting Equity Holders, sought the appointment of an Official Preferred Equity Committee from the U.S. Trustee on July 19, 2022, only six days after the commencement of these cases.

the Equity Holders have a substantial likelihood of meaningful recovery in these cases, the value

of which is at risk because of steps being taken by the Debtors and the UCC.

13.     Accordingly, and as explained in more detail below, the Court should order the

immediate appointment of an Official Preferred Equity Committee to adequately represent the

unique interests of the Equity Holders.

## Relief Requested

14.     By this Motion, the Requesting Equity Holders seek, pursuant to section

1102(a)(2) of title 11 of the Bankruptcy Code, entry of an order, substantially in the form

attached hereto as **Exhibit A**, directing the appointment of an Official Preferred Equity

Committee.

## Jurisdiction and Venue

15.     This Court has jurisdiction to consider the relief sought herein pursuant to 28

U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States

District Court for the Southern District of New York, dated January 31, 2012.  The Requesting

Equity Holders consent to the entry of a final order by the Court in connection with this Motion

to the extent that it is later determined that the Court, absent consent of the parties, cannot enter

final orders or judgments in connection herewith consistent with Article III of the United States

Constitution.

16.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

17.     The bases for the relief requested are section 1102(a) of the Bankruptcy Code,

rule 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the

applicable rules of the Local Bankruptcy Rules for the Southern District of New York (the

"Local Rules").

## Background

### I.    These Chapter 11 Cases

18.    On July 13, 2022 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

19.    A detailed description of the relevant facts and circumstances is set forth in the Mashinsky Declaration and the *Declaration of Robert Campagna, Managing Director of Alvarez & Marsal North America, LLC, in Support of Chapter 11 Petitions and First Day Motions* [Dkt. No. 22] (collectively, the "First Day Declarations").[24]

20.    The first-day hearing was held on July 18, 2022.  On July 27, 2022, the U.S. Trustee appointed the UCC, which is comprised of seven customers.  *Notice of Appointment of Official Committee of Unsecured Creditors* [Dkt. No 241].  On August 18, 2022, the U.S. Trustee filed the *Motion of the United States Trustee for Entry of an Order Directing the Appointment of an Examiner* [Dkt. No. 546] (the "Examiner Motion"), citing to a lack of transparency in these cases.  On September 14, 2022, the Court entered an *Order Directing the Appointment of an Examiner Pursuant to Section 1104(c) of the Bankruptcy Code* [Dkt. No. 820] (the "Examiner Order"), which directed the appointment of an examiner on a limited scope.[25]

---

[24]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the First Day Declarations, as applicable.

[25]    The scope of the examiner's investigation consists of an examination of (i) the Debtors' cryptocurrency holdings, (ii) the change in account offerings from the Earn Program to the Custody Service, (iii) the Debtors' procedures for paying, and the extent of their compliance with non-bankruptcy laws relating to, sales, use, and value-added taxes, and (iv) the utility obligations of the Debtors' mining business. *See* Examiner Order ¶ 3. This scope may be expanded by order of the Court. *Id.* ¶ 13.

21.     At a hearing on September 1, 2022, the Debtors noted that they had engaged in meaningful discussions with the UCC regarding a business plan and a potential restructuring and that both parties agreed to a comprehensive diligence reporting framework.  9/1/22 Hr'g Tr. at 33:12-22; Stipulation and Order.  Pursuant to the Stipulation and Order, the Debtors are required to produce documents to the UCC on a rolling basis and give the UCC full access to the Debtors' management and advisors.

## II.     The Requesting Equity Holders' Prior Requests to Form an Official Preferred Equity Committee

22.     On July 19, 2022, promptly after the Petition Date, Milbank (on behalf of certain Requesting Equity Holders) submitted a letter to the U.S. Trustee requesting the appointment of an Official Preferred Equity Committee, a copy of which is attached hereto as **Exhibit F**.  On July 22, 2022, Jones Day (on behalf of the other Requesting Equity Holder) submitted a letter to the U.S. Trustee requesting the same, a copy of which is attached hereto as **Exhibit G**.

23.     On July 28, 2022, after the Debtors filed three motions seeking to sell certain assets,[26] Milbank wrote a supplemental letter to the U.S. Trustee, a copy of which is attached hereto as **Exhibit H**, highlighting the imminent need for an Official Preferred Equity Committee.

24.     Following discussions with the U.S. Trustee in which it was disclosed that the Debtors and the UCC provided responses to the U.S. Trustee with respect to the above requests, Milbank requested copies of these responses from the Debtors' and the UCC.  Only the Debtors

---

[26]   On July 25, 2022, the Debtors filed the (i) *Debtors' Motion Seeking Entry of an Order (I) Permitting the Sale of the Debtors' Mined Bitcoin in the Ordinary Course and (II) Granting Related Relief* [Dkt. No. 187]; (ii) *Debtors' Motion Seeking Entry of an Order (I) Approving Bidding Procedures for the Potential Sale of Certain of the Debtors' Assets, (II) Scheduling Certain Dates with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving Contract Assumption and Assignment Procedures, and (V) Granting Related Relief* [Dkt. No. 188]; and (iii) *Debtors' Motion to Approve Procedures for De Minimis Asset Transactions* [Dkt. No. 189].

agreed to provide their response.[27]  On August 10, 2022, Milbank received a copy of the

Debtors' response from Kirkland & Ellis LLP, which is attached hereto as **Exhibit I** (the

"Debtors' Letter").  On August 15, 2022, Milbank responded to certain assertions contained in

the Debtors' Letter, and a copy of this response is attached hereto as **Exhibit J**.

25.    The U.S. Trustee has not yet responded to the Requesting Equity Holders'

requests to appoint an Official Preferred Equity Committee.  Nevertheless, because the

Requesting Equity Holders believe that time is of the essence, counsel for the Requesting Equity

Holders informed the U.S. Trustee of their intent to file this Motion today, and now respectfully

submit this Motion.

### Basis for Relief

26.    Section 1102(a) of the Bankruptcy Code permits the court, on request of a party in

interest, to order the appointment of an official committee of equity security holders "if

necessary to assure adequate representation of . . . equity security holders."  11 § U.S.C. 1102(a).

The Court's determination of the need for an Official Preferred Equity Committee should be

conducted *de novo*.  *In re Enron Corp.*, 279 B.R. 671, 684 (Bankr. S.D.N.Y. 2002) ("Therefore,

this Court must necessarily conduct an independent review of whether there is adequate

representation by an existing committee by the mandate of 11 U.S.C. § 1102(a)(2).").

27.    The term "adequate representation" is not defined in the Bankruptcy Code;

instead, bankruptcy courts have absolute discretion in determining whether an official equity

committee is warranted under the specific facts and circumstances of each case.  *In re Eastman*

*Kodak Co.*, No. 01-16034, 2012 WL 2501071, at *1 (Bankr. S.D.N.Y. June 28, 2012) (citing *In*

*re Spansion, Inc.*, 421 B.R. 151, 156 (Bankr. D. Del. 2009); *In re Beker Indus. Corp.*, 55 B.R.

---

[27]    Notwithstanding, the Requesting Equity Holders' request, the UCC has not shared a copy of its response.

945, 948 (Bankr. S.D.N.Y. 1985)).  To determine whether there is "adequate representation,"
courts generally consider:  (i) whether equity holders are adequately represented by stakeholders
already at the table; (ii) the complexity of the case; (iii) whether the debtors are hopelessly
insolvent; (iv) the delay that would result from the appointment of an official equity committee
and the timing of the request therefor relative to the status of the case; and (v) whether the costs
associated with such committee significantly outweigh the need for adequate representation of
equity holders.  *See, e.g.*, *In re Williams Commc'ns Grp., Inc.*, 281 B.R. 216, 220 (Bankr.
S.D.N.Y. 2002).  No one factor is dispositive, and the weight attributed to each factor depends
upon the facts and circumstances of each case.  *In re Kalvar Microfilm, Inc.*, 195 B.R. 599, 600–
01 (Bankr. D. Del. 1996).

28.     For the reasons set forth below, these factors favor the appointment of an Official
Preferred Equity Committee here, and therefore, the Court should grant the relief requested in
this Motion.

## I.     The Interests of the Equity Holders Are Not Adequately Represented.

29.     As explained above, because of the Debtors' unique capital and organizational
structure, there are only two sets of stakeholders in these cases:  (i) the customers, who are
represented by the UCC, and (ii) the Equity Holders.  But only the interests of the customers are
adequately represented, as there is no fiduciary advocating for the interests of the Equity
Holders.  The Requesting Equity Holders recognize that, generally, a creditors' committee
advances the interests of all stakeholders when seeking to maximize the overall value of the
bankruptcy estate; however, the special circumstances of these cases are such that the interests of
customers and those of the Equity Holders are uniquely adverse, and both the UCC and the
Debtors have made it clear that they intend to do whatever it takes to advance the customers'

interests.[28]  While it is appropriate for the UCC to do so, it is equally appropriate to appoint an

Official Preferred Equity Committee to ensure that the Equity Holders are on equal footing with

the other major stakeholder group in these cases, particularly where the Debtors have abandoned

any pretext of acting in the interests of the Equity Holders.

30.      Because the Debtors are made up of several business lines conducted by separate

and distinct legal entities (and their respective non-Debtor subsidiaries), the retail customers only

have claims against the customer-facing entities – which are entirely separate from the Non-

Customer Facing Entities that drive value to the Equity Holders.  Thus, maximizing value for the

customers, as the UCC intends to do, requires, in part, proving that customers have claims

against those Non-Customer Facing Entities, a legal theory with which the Requesting Equity

Holders strongly disagree (and which the Debtors are willing to entertain).[29]  As such, the

interests of the customers (and thus the UCC) and those of the Equity Holders are diametrically

opposed on a number of important issues.[30]  *See e.g.*, *In re Pilgrim's Pride Corp.*, 407 B.R. 211,

217 n.17 (Bankr. N.D. Tex. 2009) (appointing equity committee and noting that although

"shareholders and unsecured creditors often have common interests . . . when it comes to

---

[28]   *See* 8/16/22 Hr'g Tr. at 36:14-16 ("We and the [UCC] are focused on getting as much crypto and as much dollars back to customers as we possibly can."); *id.* at 42:4-19 (UCC stating that "[f]irst and foremost, the [UCC] wants to make accountholders the focus of these cases" and "[t]o that end, the [UCC] is laser-focused on maximizing the value that will be available for those accountholders"); *id.* at 45:20-22 (UCC stating that they are "the only party that's accountable only to the customers"); *see also The Official Committee of Unsecured Creditors' Statement Regarding These Chapter 11 Cases* [Dkt. No. 390] at 5, 7 (stating that "[t]he [UCC] intends to . . . put the interests' of the Debtors account holders and unsecured creditors first" and "[t]he [UCC] will explore strategic options to reorganize or sell the business (or portions thereof) to maximize value for account holders and unsecured creditors").

[29]   9/14/22 Hr'g Tr. at 36:7-15 (UCC stating that the Debtors "confirm[ed] . . . that they will be scheduling customer claims at every entity when the schedules are filed"); 9/1/22 Hr'g Tr. at 48:23-25.

[30]   Moreover, due to the ongoing investigations and uncertainty regarding the Debtors' go-forward business operations, there may be additional issues on which the Equity Holders and customers will naturally be opposed.

valuation and determination of future capital structure for plan purposes, their agendas are likely to be very much at odds").

31.    Additionally, unlike other cases where a debtor's management may be incentivized to represent the equity holders' interests, the Debtors here have openly and repeatedly acknowledged that they intend to work hand in hand with the UCC to maximize value for the customers, without any regard of the Equity Holders' interests.[31]  Accordingly, while it is appropriate for the Debtors to strive to maximize value for customers, especially because customer support will be crucial for the success of the reorganized Debtors' business, it would be "unrealistic" and unjust to rely on "the usual presumption that the Board will pay due . . . regard to the interests of shareholders." *In re Oneida Ltd.*, No. 06-10489 (ALG), 2006 Bankr. LEXIS 780 at *7 (Bankr. S.D.N.Y. May 4, 2006).  This is true even though certain of the Debtors' insiders and employees own CNL's stock and stock options that are junior to the preferred securities held by the Equity Holders.  The court in *Pilgrim's Pride Corp.*, 407 B.R. at 218-19, noted that, even though the debtor's management owe fiduciary duties to the shareholders, "the reorganization process is not so simple that that [those duties] ensure[] shareholders are adequately represented ***by even equity-owning management***" (emphasis added).

32.    Indeed, due to the peculiar dynamics of these cases, the Debtors have made clear that they intend to advance the customers' interests at the expense of the Equity Holders (even, potentially, in contravention of the Bankruptcy Code).  For example, the Debtors have already decided, with the tacit approval of the UCC, not to "dollarize" claims as of the Petition Date, which could directly and negatively impact the Equity Holders' recovery and violate section

---

[31]    *Supra* n.2, 10; 8/16/22 Hr'g Tr. at 29:19-22 (Debtors stating that the "customer committee is our partner here, and we intend to work very closely with them from day one to the end"); 9/1/22 Hr'g Tr at 33:13-22.

502(b) of the Bankruptcy Code.[32]  Thus, without an Official Preferred Equity Committee, there is no estate fiduciary at the table to advocate for the Equity Holders' interests when negotiations are taking place with respect to key legal issues that will necessarily impact their recoveries.

33.    Indeed, there is no doubt that such issues are meaningful and that they will be front and center in these cases.  Both the Debtors and the UCC have unequivocally acknowledged two important facts:  (i) the Debtors are separate, distinct entities and should be treated as such for all purposes,[33] and (ii) the issue of which Debtor or its non-Debtor affiliates is liable on the customers' claims will be hotly contested.[34]  Moreover, these issues have already been joined in the context of the Mined Bitcoin Motion, the Bidding Procedures Motion, and the De Minimis Asset Sales Motion.[35]  While some issues raised by these motions have been resolved on an interim basis, the allocation of the sales proceeds – a substantial concern in these cases – is yet to be resolved.

34.    While these critical issues are being negotiated in an effort to obviate potential litigation with the UCC, the Equity Holders do not have the benefit of the same information sharing afforded to the UCC and the customers, and, more importantly, an equal opportunity to advocate for themselves during such negotiations.  For example, prior to the hearing on September 14, 2022, unbeknownst to the Requesting Equity Holders, the Debtors agreed with the UCC that customers will have claims at every Debtor entity, which is one of the most

---

[32]  *See* 8/16/22 Hr'g Tr. at 35:5-7 ("The company is not seeking to dollarize claims on the petition date and give people back a recovery in fiat."); *id.* at 42:11-16 ("[The UCC is] pleased that the company is not focused on dollarization of claims . . . an in-kind recovery is absolutely critical.").

[33]  *Supra* n.4-6.

[34]  *See, e.g.*, 9/1/22 Hr'g Tr. at 53:20-21, 54:2-11; Debtors' Letter (**Exhibit I**) at 5; UCC Cash Management Objection ¶ 2.

[35]  *Supra* n.26.

fundamental issues in these cases.[36]  The Requesting Holders were left out of those discussions and not consulted prior to the hearing.

35.     The Requesting Equity Holders recognize that the Debtors and the UCC may be legitimately concerned about confidentiality; however, it seems clear that, without an Official Preferred Equity Committee, the Equity Holders will continue to be excluded from timely access to information that may be crucial in any plan negotiations.  For instance, the reporting protocol agreed to by the Debtors and the UCC is, in the Debtors' own words, "above and beyond the reporting that the [B]ankruptcy [C]ode requires" (9/1/22 Hr'g Tr. at 56:6-8), and, indeed, the Debtors are providing the UCC on a regular basis with reports regarding intercompany transfers and balances, cash flows, cryptocurrency assets, mining operations, and numerous other matters relating to the Debtors' business operations.[37]  Meanwhile, some requests of the Requesting Equity Holders for the factual information and/or legal theories underpinning the Debtors' and the UCC's apparent positions with respect to the customers' potential recourse against the Non-Customer Facing Entities have been ignored or delayed.[38]

36.     Indeed, the U.S. Trustee has taken issue with the lack of transparency in these cases, which has already led to the appointment of an examiner.[39]  While such appointment is not

---

[36]    9/14/22 Hr'g Tr. at 36:1-15 (UCC stating that "productive discussions . . . resulted in the Debtors confirming to [the UCC] that they will be scheduling customer claims at every entity").

[37]    *Supra* n.21.

[38]    As described above, the UCC has not even responded to the Requesting Equity Holders' requests for a copy of its letter to the U.S. Trustee regarding the request to appoint an Official Preferred Equity Committee.

[39]    *See, e.g.*, 7/18/22 Hr'g Tr. at 49:1-12, 74:21-75:2 (expressing concern "with overall visibility with respect to what the assets are, what the business structure is, and how some of that information was relayed in the 1007 statement" and emphasizing "the need for transparency"); *id.* at 90:20-22, 92:6-7 (remarking that the information sharing has "been very slow" and that it is "curious" why information was just getting to the U.S. Trustee "within the hour before this hearing" although it was available to the Debtors over a week prior); 8/16/22 Hr'g Tr. at 84:16-21, 86:8-9, 95:3-4 (expressing overall concern with transparency and noting that, in the context of the Mined Bitcoin Motion, "[w]e still do not know what expenses are being paid or what bitcoin is being sold[] . . . [a]nd it is premature to approve anything until we have transparency into the bitcoin mining and the cost for running it").  *See* Examiner Motion at 23 (describing the "Significant Transparency Issues").

directly relevant to the Court's consideration of this Motion, it should be noted that the

appointment of an examiner does not preclude the appointment of an Official Preferred Equity

Committee.[40]  That is because the two fulfill very different functions in a case: an examiner is a

*neutral*, investigative party while an official equity committee is an *advocate* for the interests of

equity holders.

37.    Finally, despite the Debtors' allegations to the contrary in their correspondence to

the U.S. Trustee, the Equity Holders cannot adequately represent their interests without an

Official Preferred Equity Committee.  The fact that the Requesting Equity Holders (or any other

Equity Holder) retained counsel (as every party in interest has the right to do) and appeared

through such counsel at the initial stages of these cases is of no moment.  Absent official

committee status, such counsel will have neither a seat at the negotiation table nor equal, timely

access to the necessary diligence materials.  Thus, mere legal representation, no matter how

competent, will not be "adequate" within the contemplation of section 1102 of the Bankruptcy

Code.  *See, e.g.*, *Oneida Ltd.*, No. 06-10489 (ALG) (Bankr. S.D.N.Y. May 18, 2006) (appointing

equity committee despite the fact that counsel for an *ad hoc* group of equity holders made

appearances at several hearings before the appointment); *In re Brietburn Energy Partners LP*,

No. 16-11390 (SMB) (Bankr. S.D.N.Y. Nov. 15, 2016) (same); *In re Delphi Corp.*, No. 05-

44481 (RDD), Hr'g Tr. at 152:25-153:3, 183:24-25 (Bankr. S.D.N.Y. Mar. 22, 2006) [Dkt. No.

3704] (appointing equity committee despite debtors' argument that the requesting shareholders

---

[40]    *See, e.g.*, *In re A.H. Robins Co.*, 880 F.2d 769, 771 (4th Cir. 1989) (appointing both an official equity committee and an examiner); *In re Wash. Mut., Inc.*, 442 B.R. 314, 325 (Bankr. D. Del. 2011) (same); *Official Comm. of Equity Sec. Holders of Mirantenron Corp. v. Wilson Law Firm, P.C.* (*In re Mirant Corp.*), 334 B.R. 787, 790-91 (Bankr. N.D. Tex. 2005) (same); *In re Southmark Corp.*, 113 B.R. 280, 280 (Bankr. N.D. Tex. 1990) (same); *In re Pub. Serv. Co.*, 99 B.R. 177, 179, 183-84 (Bankr. D.N.H. 1989) (same).  Indeed, the Bankruptcy Code provides that *any* official committee, including a committee of equity holders, may "request the appointment of a trustee or examiner under section 1104." 11 U.S.C. §1103(c)(4) (emphasis added).

were sophisticated and could function as an informal committee). Moreover, the Requesting
Equity Holders' counsel does not and cannot represent all Equity Holders. On information and
belief, there are dozens of Equity Holders besides the Requesting Equity Holders and many of
them are not U.S. entities or individuals and are unlikely to be familiar with the U.S. bankruptcy
process.

38.    In light of the foregoing, there is no basis to conclude that, without an Official
Preferred Equity Committee, the Equity Holders' interests are or will be adequately represented
in these cases, including during crucial plan negotiations that are already underway. And that is
the precise situation that Congress intended to prevent by enacting section 1102 of the
Bankruptcy Code – "to counteract the natural tendency of a debtor in distress to pacify . . .
creditors with whom the debtor would expect to do business at the expense of . . . investors."
*See* S. Rep. No. 95-989, at 10 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787  (noting that it is
"essential for [investors] to have legislative assurance that their interests will be protected").

39.    Accordingly, an Official Preferred Equity Committee is not just warranted in
these circumstances – it is absolutely necessary to advance the interests of the Equity Holders.

## II.    These Chapter 11 Cases Are Complex.

40.    There is no dispute that these cases are sufficiently complex to justify the
appointment of an Official Preferred Equity Committee.[41]  The Celsius Entities market
themselves as "one of the largest and most sophisticated cryptocurrency based finance platforms
in the world."[42]  The Debtors do more than just "merely store crypto assets;" among other things,
they also allow users to earn rewards on those assets and/or take loans using such assets as

---

[41]    *See* Debtors' Letter (**Exhibit I**) at 6 (acknowledging the complexity of these cases).

[42]    Mashinsky Declaration ¶ 1.

collateral.[43]  Besides the novelty and complexity of the Debtors' businesses, as discussed above,

the Celsius Entities are comprised of 23 distinct legal entities located in at least five countries

and serving customers in more than 100 countries.  Finally, unlike most cases, these cases have

seen substantial direct participation by customers, including the filing of over 300 customer

letters in just the first two months of these cases.

### III.    CNL Is Not Hopelessly Insolvent; Equity Has a Stake Worth Protecting.

41.    "[G]enerally no equity committee should be appointed when it appears that a

debtor is hopelessly insolvent because neither the debtor nor the creditors should have to bear the

expense of negotiating over the terms of what is in essence a gift."  *In re Wang Lab'ys, Inc.*, 149

B.R. 1, 3 (Bankr. D. Mass. 1992).  Thus, the determination of whether the debtor is "hopelessly

insolvent" is "a major factor" in the determination the Court needs to make.  *Williams Commc'ns*

*Grp., Inc.*, 281 B.R. at 220.

42.    No party has asserted that the Debtors are hopelessly insolvent.  In fact, the

Requesting Equity Holders believe that a meaningful recovery for the Equity Holders is very

likely, if not certain.  First, as described above, there are valuable Excluded Assets owned by the

Non-Customer Facing Entities, and because the customers do not have claims against the Non-

Customer Facing Entities and these entities have very little debt, the value of the Excluded

Assets inures largely to the Equity Holders.  Moreover, based on the Debtors' own Budget and

Coin Report, if the provisions of the Bankruptcy Code, including section 502(b), are complied

with, there can be a meaningful recovery for the Equity Holders depending on how certain legal

disputes are resolved.

---

[43]    *Id.* ¶¶ 1, 4.

43.     Although the Debtors have represented that their aggregate current liabilities are $1.19 billion greater than their aggregate current assets, this consolidated information does not allow the Court or the Requesting Equity Holders to determine the solvency (or lack thereof) of any individual Debtor.  Given the need to separate the assets and liabilities of distinct corporate legal entities, this consolidated information is not particularly meaningful.  In any event, a balance sheet is not the "exclusive[] indicator of insolvency" and more than "a simple reference to the balance sheet" is required."  *Id*.  Apart from the above incomplete balance sheet information, at worst, the Debtors have asserted that (i) whether customers have claims against all Celsius entities is an undecided issue, and (ii) to the extent it is established that customers have claims against CNL, such claims "may very well exceed CNL's current assets."  *See* Debtors' Letter (**Exhibit I**) at 5.  This doubly conditional statement is very far from an assertion that CNL is "hopelessly insolvent."

44.     Moreover, there is reason to believe that there is meaningful value in CNL that should be available to the Equity Holders.  The Debtors have acknowledged that the customer-facing business was migrated away from CNL in August 2021.  7/18/22 Hr'g Tr. at 31:4-8.  The Requesting Equity Holders do not believe that CNL has issued any guarantees to support the activities of its customer-facing subsidiaries.  Thus, the Debtors' customers have no grounds for asserting claims against CNL or the other Non-Customer Facing Entities.  Furthermore, as discussed above, the value of the Excluded Assets – such as the valuable bitcoin mining equipment and the other assets used by the Mining Entities, an institutional loan portfolio, and the cold storage business of GK8 – should remain with the Non-Customer Facing Entities and – ultimately – CNL.[44]

---

[44]  *See e.g.*, Mashinsky Declaration ¶ 66 (noting that Celsius expects that Mining's operations will generate sufficient assets to bring in revenue).

45.    Thus, CNL appears to be solvent or – at worst – its solvency is a contested issue, and it "would be unduly prejudicial to all parties to make a preliminary determination [of such contested issue] for purposes of this [M]otion." *Oneida Ltd.*, No. 06-10489 (ALG) (Bankr. S.D.N.Y. Apr. 5, 2006) [Dkt. No. 209].  Indeed, where hopeless insolvency is difficult to establish, equity holders should be given "the benefit of the doubt." *Delphi Corp.*, No. 05-44481 (RDD), Hr'g Tr. at 166:24-167:3 (Bankr. S.D.N.Y. Mar. 22, 2006) [Dkt. No. 3704] (concluding that the court should "give the benefit of the doubts" to the shareholders where a motion for the appointment of an equity committee is filed "early in the case"); *see also Wang Lab'ys, Inc.*, 149 B.R. at 3 (appointing an official equity committee where the debtor "remained in operation at present, albeit at a loss," and there was conflicting evidence as to whether the debtor was insolvent); *Pilgrims Pride Corp.*, 407 B.R. at 217, n.15 (stating that "[m]uch of the authority suggests—and the court agrees" that appointment of an equity committee should not disfavor equity holders when there is a doubt as to the debtor's insolvency) (internal citations omitted).

46.    And any value, either held directly by CNL or that flows to CNL from the other Non-Customer Facing Entities, once the Non-Customer Facing Entities' own obligations (believed to be insignificant) are paid down, should go to satisfy the preferred Equity Holders' liquidation preferences, and any excess should go to the common shareholders.

## IV.    The Request for an Official Preferred Equity Committee Is Timely.

47.    This Motion is unquestionably timely.  An Official Preferred Equity Committee can "most effectively exercise its responsibilities at the beginning of a reorganization, prior to the formulation of a plan." *In re Johns-Manville Corp.*, 68 B.R. 155, 161 (S.D.N.Y. 1986). Milbank's first request (on behalf of certain of the Requesting Equity Holders) for the appointment of an Official Preferred Equity Committee that was made just six days after the Petition Date, and Jones Day's request (on behalf of the other Requesting Equity Holder) came

just three days later.  And the Requesting Equity Holders have diligently pursued the appointment since that time.  Even now, these cases are only two months old.  Thus, an Official Preferred Equity Committee will still be in the position to "exercise its responsibilities . . . most effectively."  *Id.*

48.    Perhaps because the Debtors recognize that the legal standard for the appointment of an Official Preferred Equity Committee is satisfied here, they have suggested that the issue of such an appointment should be left for a later date – possibly until after the Debtors and the UCC have decided the key issues in these cases.[45]  Indeed, the Debtors have been clear that they intend to move with all "deliberate speed," and the Debtors and UCC are "well underway" to resolving many important issues, including determining how to "reorganize the business" and "fund these cases" and finalizing a business plan – which will necessarily dictate the contours of the Debtors' restructuring, and other issues that will profoundly impact the Equity Holders' recoveries.[46]  It is thus imperative that the Equity Holders have the benefit of an Official Preferred Equity Committee now, including full and timely access to diligence and participation in analyses and negotiations that will determine their recoveries in these cases.  It is evident that these cases are rapidly progressing and, without the immediate appointment of an Official Preferred Equity Committee, the outcome will be skewed in a way that is greatly prejudicial to the Equity Holders.  For example:

    a.    There are extensive, ongoing discussions between the Debtors and the
          UCC regarding a potential restructuring, in which the Equity Holders
          are not involved.

---

[45]  *See* Debtors' Letter (**Exhibit I**) at 2, 5-6 (stating that an Official Preferred Equity Committee "is neither necessary nor beneficial at this stage of these chapter 11 cases" and that such appointment is premature, suggesting that such appointment may be appropriate only after the Requesting Equity Holders "are successful in demonstrating that substantial value exists purely for the benefit of CNL's Equity Holders").

[46]  9/1/22 Hr'g Tr. at 33:13-22; 8/16/22 Hr'g Tr. at 38:12-22, 55:6-8 (stating that the Debtors intend to come before the Court "in the near future" with respect to "issues that [they] are very deep in terms of analyzing").

b. In fact, the Debtors appear to be well on the way to formulating an unconfirmable plan, as they have indicated that they do not plan to "dollarize" claims as of the Petition Date and, instead, intend to provide in-kind recovery to customers, at the expense of the Equity Holders and in violation of section 502(b) of the Bankruptcy Code.

c. The Debtors are in the process of selling (or intend to sell) mined bitcoin, the equity interests in GK8, and certain "*de minimis* assets," which apparently include "equities and stocks" that are not actually *de minimis*.

d. The Debtors have given the UCC extensive consent and/or consultation rights over, among other things, the budget for intercompany transactions, cryptocurrency transfers, and sales of assets having value over $300,000 and have agreed to an atypically expansive reporting protocol. The Equity Holders do not have the same access to information or diligence on a timely basis and have not been given any similar consultation rights.

49. Therefore, without an Official Preferred Equity Committee, the Equity Holders will not be able to adequately protect their interests, while appointing such a committee at a later stage in these cases may prove to be too late. *See Pilgrim's Pride Corp.*, 407 B.R. at 219-20 (noting that because the debtors were finalizing their business plan, "establishment of an advocate for shareholders is urgent" and "[d]enying equity owners the means to analyze and critique Debtors' projections in their business plan is likely to hinder if not hopelessly cripple any later effort to show that Debtors' value is sufficient to justify equity participation"). Excluding the Equity Holders from the information flow, negotiations, and decision-making is patently inappropriate under the unique circumstances of these cases, and the Debtors' efforts to silence adversarial viewpoints should not be condoned. *See, e.g.*, *Delphi Corp.*, No. 05-44481 (RDD), Hr'g Tr. at 171:1-5, 175:10-13 (Bankr. S.D.N.Y. Mar. 22, 2006) [Dkt. No. 3704] (acknowledging the importance of "having an equity committee with counsel in the near future to deal at least with . . . transformational issues on behalf of the shareholders" and noting that "where there truly are extremely difficult negotiations that the debtors must go through[,] . . . I

believe that it is important for the debtors to be fortified in those negotiations by the views of key constituencies").

## V.    The Critical Need for an Official Preferred Equity Committee Outweighs Potential Costs.

50.    The costs associated with having an official equity committee in a chapter 11 case only become a factor when they *significantly* outweigh the benefit of affording adequate representation to the equity holders. *See Beker Indus. Corp.*, 55 B.R. at 949; *Wang Labs., Inc.*, 149 B.R. at 3-4. Thus, the court must "employ a balancing test to weigh the cost of an equity committee versus the 'concern for adequate representation.'" *Williams Commc'ns Grp., Inc.*, 281 B.R. at 220.

51.    The Requesting Equity Holders appreciate the concerns regarding the additional expense associated with appointing an Official Preferred Equity Committee. As the parties first in line to the residual value of CNLs' estate, the Requesting Equity Holders are laser focused on costs. Indeed, the Requesting Equity Holders to date have only filed one limited objection in these cases, and that objection was to the Examiner Motion and sought to limit the scope and cost of any examination. *See Series B Holders' Limited Objection to the Motion of the United States Trustee for Entry of an Order Directing the Appointment of an Examiner* [Dkt. 734].

52.    In any case, "[c]ost alone cannot, and should not, deprive . . . security holders of representation." *In re McLean Indus.*, 70 B.R. 852, 860 (Bankr. S.D.N.Y. 1987); *see also Enron Corp.*, 279 B.R. at 694 ("Added cost alone does not justify the denial of appointment of an additional committee where it is warranted."). The benefits of official committee representation of the Equity Holders' interests in these cases far outweigh any potential costs. Because the Equity Holders' interests are sharply delineated, the Official Preferred Equity Committee would not duplicate the efforts of the other parties, including that of an examiner.

## **No Prior Request**

53.    No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of page intentionally left blank]*

## Conclusion

54.    For the foregoing reasons, the facts of these cases do not simply satisfy the

standard for the appointment of an Official Preferred Equity Committee – they cry out for it.

Therefore, the Requesting Equity Holders submit that the Court should immediately direct the

appointment of an Official Preferred Equity Committee in these cases.

WHEREFORE, the Requesting Equity Holders respectfully request that the Court enter an

order, substantially in the form attached hereto as **Exhibit A**, directing the appointment of an

Official Preferred Equity Committee.

Dated: September 22, 2022
     New York, New York

*/s/ Dennis F. Dunne*
Dennis F. Dunne
Nelly Almeida
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Tel:  (212) 530-5000
Fax: (212) 660-5219
Email: ddunne@milbank.com
     nalmeida@milbank.com

- and -

Andrew M. Leblanc
Melanie Westover Yanez
**MILBANK LLP**
1850 K Street, NW, Suite 1100
Washington, DC 20006
Tel:  (202) 835-7500
Fax: (202) 263-7586
Email: aleblanc@milbank.com
     mwyanez@milbank.com

*Counsel to Community First Partners, LLC,*
*Celsius SPV Investors, LP, and Celsius*
*New SPV Investors, LP*

Respectfully submitted,

*/s/ Joshua M. Mester*
Joshua M. Mester
**JONES DAY**
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071
Tel:  (213) 489-3939
Fax: (213) 243-2539
Email: jmester@jonesday.com

*Counsel to CDP Investissements Inc.*

**<u>Exhibit A</u>**

Proposed Order

Dennis F. Dunne
Nelly Almeida
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Tel: (212) 530-5000
Fax: (212) 660-5219

Andrew M. Leblanc
Melanie Westover Yanez
**MILBANK LLP**
1850 K Street, NW, Suite 1100
Washington, DC 20006
Tel: (202) 835-7500
Fax: (202) 263-7586

*Counsel to Community First Partners, LLC,*
*Celsius SPV Investors, LP, and Celsius*
*New SPV Investors, LP*

Joshua M. Mester (admitted *pro hac vice*)
**JONES DAY**
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071
Tel: (213) 489-3939
Fax: (213) 243-2539

*Counsel to CDP Investissements Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

**ORDER DIRECTING THE APPOINTMENT**
**OF AN OFFICIAL PREFERRED EQUITY COMMITTEE**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

Upon the motion (the "Motion")[2] of the Requesting Equity Holders for entry of an order appointing an official committee of the holders of CNL's preferred equity securities (an "Official Preferred Equity Committee"), as more fully set forth in the Motion; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York, dated January 31, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is appropriate pursuant to section 1102(a)(2) of the Bankruptcy Code; and it appearing that notice of the Motion has been given as set forth in the Motion and that such notice is adequate under the circumstances and no other or further notice need be given; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefore, it is **HEREBY ORDERED THAT**:

1.      The Motion is granted as set forth herein (the "Order").

2.      All objections that have not been withdrawn, waived, or otherwise resolved, if any, are hereby denied or overruled on the merits with prejudice.  All withdrawn objections are deemed withdrawn with prejudice.

---

[2]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

3.      The U.S. Trustee is directed to appoint an Official Preferred Equity Committee in these chapter 11 cases as expeditiously as possible.

4.      This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.


Dated: _____, 2022
          New York, New York

                                        _____
                                        MARTIN GLENN
                                        CHIEF UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit B</u>**

Excerpts from August 16, 2022, Hearing Transcript

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 22-10964-mg

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   CELSIUS NETWORK LLC,

8

9         Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                United States Bankruptcy Court

13                One Bowling Green

14                New York, NY  10004

15

16                August 16, 2022

17                2:04 PM

18

19

20

21   B E F O R E :

22   HON MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  JONATHAN

Page 2

1   HEARING re Hearing Using Zoom for Government RE: Motion (I)

2   Authorizing the Debtors To (A) Continue to Operate Their

3   Cash Management System, (B) Honor Certain Prepetition

4   Obligations Related Thereto, (C) Maintain Existing Business

5   Forms, and (D) Continue to Perform Intercompany

6   Transactions, (II) Granting Superpriority Administrative

7   Expense Status to Postpetition Intercompany Balances, and

8   (III) Granting Related Relief. (Doc## 56, 40, 21, 192, 357,

9   401, 448)

10

11   HEARING re Hearing Using Zoom for Government RE: Debtor's

12   Motion Seeking Entry of an Order (I) Permitting the Sale of

13   the Debtors Mined Bitcoin in the Ordinary Course and (II)

14   Granting Related Relief. (Doc## 187, 192, 357, 371, 372,

15   400, 428, 448, 453)

16

17   HEARING re Hearing Using Zoom for Government RE: Debtor's

18   Motion to Approve Procedures for De Minimis Asset

19   Transactions. (Doc## 189, 192, 357, 400, 409, 429, 448)

20

21   HEARING re Hearing Using Zoom for Government RE: Debtor's

22   Motion for Entry of an Order (I) Authorizing and Approving

23   Procedures to Reject, Assume, or Assume and Assign

24   Executory Contracts and Unexpired Leases and (II) Granting

25   Related Relief. (Doc## 185, 192, 357, 402, 448, 468, 471)

Page 3

1    HEARING re Hearing Using Zoom for Government RE: Motion (I)

2    Authorizing the Debtors to (a) Pay Prepetition Employee

3    Wages, Salaries, Other Compensation, and Reimbursable

4    Expenses and (b) Continue Employee Benefits Programs and

5    (II) Granting Related Relief (Doc## 61, 19, 192, 357, 402,

6    409, 413, 448).

7

8    HEARING re Hearing Using Zoom for Government RE: Motion (I)

9    Authorizing the Debtors to Pay Prepetition Claims of Certain

10   Critical Vendors, Foreign Vendors, 503(B)(9) Claimants,

11   and Lien Claimants, (II) Granting Administrative Expense

12   Priority to All Undisputed Obligations on Account of

13   Outstanding Orders, and (III) Granting Related Relief.

14   (Doc## 80, 20, 37, 192, 357, 402, 448, 469, 471)

15

16   HEARING re Hearing Using Zoom for Government RE: Motion (I)

17   Establishing Certain Notice, Case Management, and

18   Administrative Procedures and (II) Granting Related Relief

19   (Doc## 63, 15, 192, 470, 471).

20

21

22

23

24

25

Page 4

1   HEARING re Hearing Using Zoom for Government RE: Motion (I)

2   Authorizing the Debtors to (A) Pay their Obligations Under

3   Prepetition Insurance Policies, (B) Continue to Pay Certain

4   Brokerage Fees, (C) Renew, Supplement, Modify, or Purchase

5   Insurance Coverage, and (D) Maintain their Surety Bond

6   Program and (II) Granting Related Relief (Doc## 59,

7   16, 192, 467, 471).

8

9   HEARING re Final Hearing Using Zoom for Government RE:

10  Motion (I) Approving Notification and Hearing Procedures for

11  Certain Transfers of and Declarations of Worthlessness with

12  Respect to Common Stock and Preferred Stock and (II)

13  Granting Related Relief (Doc## 58, 39, 5, 192, 409, 463,

14  471).

15

16  HEARING re Hearing Using Zoom for Government RE: Motion (I)

17  Authorizing the Payment of Certain Taxes and Fees and (II)

18  Granting Related Relief (Doc## 62, 17, 192, 466, 471).

19

20  HEARING re Hearing Using Zoom for Government. RE: Motion

21  Seeking Entry of an Order (I) Approving the Debtors'

22  Proposed Adequate Assurance of Payment for Future Utility

23  Services, (Prohibiting Utility Providers from Altering,

24  Refusing, or Discontinuing Services, etc. (Doc. ##3, 357,

25  409).

Page 5

1    HEARING re Hearing Using Zoom for Government RE: Debtor's

2    Motion for Entry of an Order (I) Establishing Procedures for

3    Interim Compensation and Reimbursement of Expenses for

4    Retained Professionals and (II) Granting Related Relief.

5    (Doc## 186, 192, 357, 465, 471)

6

7    HEARING re Hearing Using Zoom for Government RE: Debtors'

8    Motion Authorizing the Retention and Compensation of

9    Professionals Utilized in the Ordinary Course of Business

10   filed by Joshua Sussberg on behalf of Celsius Network LLC.

11   (Doc # 190, 357, 464, 471)

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

Page 6

1    A P P E A R A N C E S :

2

3    KIRKLAND & ELLIS LLP

4         Attorneys for the Debtor

5         601 Lexington Avenue

6         New York, NY 10022

7

8    BY:  JOSHUA SUSSBERG

9

10   KIRKLAND & ELLIS LLP

11        Attorneys for the Debtor

12        300 North LaSalle

13        Chicago, IL 60654

14

15   BY:  ROSS KWASTENIET

16

17   WHITE & CASE LLP

18        proposed counsel to the Committee

19        111 South Wacker Drive, Suite 5100

20        Chicago, IL 60606

21

22   BY:  GREGORY F. PESCE

23

24

25

1    TOGUT, SEGAL & SEGAL LLP

2         Attorneys for Ad Hoc Group of Custodial Account Holders

3         One Penn Plaza, Suite 3335

4         New York, NY 10119

5

6    BY:  KYLE J. ORTIZ

7

8    Troutman Pepper Hamilton Sanders LLP

9         Attorneys for Ad Hoc Group of Withhold Account Holders

10        4000 Town Center, Suite 1800

11        Southfield, MI 48075

12

13   BY:  DEBORAH KOVSKY

14

15   UNITED STATES DEPARTMENT OF JUSTICE

16        Attorneys for the U.S. Trustee

17        201 Varick Street, Suite 1006

18        New York, NY 10014

19

20   BY:  SHARA CORNELL

21

22   ALSO PRESENT TELEPHONICALLY:

23   OLUMIDE ADIGBOLUJA

24   YAFEU AKWETEE

25   EMMANUEL I. ALBINO

1                   P R O C E E D I N G S

2           THE COURT:  We have a lot of people who have

3    appeared this afternoon.  We are going to proceed through.

4    We're using for the most part the Amended Agenda for Second

5    Day Hearing that was filed by Debtor's counsel, Kirkland &

6    Ellis.

7           In addition to that -- and I believe I have agreed

8    that they can start with an initial presentation -- last

9    night, they filed notice of filing of Second Day Hearing

10   Presentation.  It's ECF Docket 462.  So anybody with access

11   to the electronic case filing system can actually see the

12   presentation.

13          After the Debtor's counsel makes its presentation,

14   I am going to give the Committee of Unsecured Creditors

15   counsel an opportunity to make some preliminary remarks.

16          I also may have some additional preliminary

17   remarks.  I'll save them until after both the Debtor's

18   counsel and the Committee's counsel have had an opportunity

19   to speak.

20          So let me make one other point.  There are a lot

21   of people not represented by counsel who are appearing

22   today.  Some with listen-only lines, and some with an

23   opportunity to speak.  If you're not represented by counsel,

24   at the appropriate time if you wish to speak, you'll see at

25   the bottom of your screen over to the right a raise hand

1  (indiscernible) have instructed the management team to take

2  the repeated punches, not respond, and instead focus on the

3  task at hand; and that's getting our customers their crypto

4  back.  But no one should assume that silence is in any way

5  acquiescence.

6          So with that backdrop, Your Honor, I would like if

7  the Court could share the system with Ms. Jones.

8          CLERK:  Ms. Jones is a co-host.  She can share the

9  screen.

10          MS. SUSSBERG:  Excellent.

11          THE COURT:  Let me just say.  As I said already, a

12  copy of this presentation is filed on the docket.  So if

13  you're interested in obtaining a copy of it, you can do so

14  by accessing the docket.  And it's ECF Docket 462.  You'll

15  find it.  Go ahead, Mr. Sussberg.

16          MS. SUSSBERG:  Yes, Your Honor.  I'm going to

17  cover, as noted on Slide 2, five topics.  One, the committee

18  formation; two, progress since filing; three, a crypto

19  market update; four, customer correspondence; and five, the

20  path forward.

21          On Slide 3, Your Honor, as has noted and as

22  everyone is aware, the Committee was appointed on July 27th

23  and it consists of seven members.  And each of those members

24  are customers.  And so while it's called an official

25  committee of creditors, it's really an official committee of

1    customers.  Of the identified parties on the slide, two are

2    institutional investors.  The remaining are retail

3    investors.

4            As you'll see on the right-hand of the page, the

5    Committee has proposed to retain (indiscernible) at White

6    and Case, led by Mr. Pesch; at M3 Partners, led by Mr.

7    Meghji; at Perella Weinberg, led by Kevin Cofsky; and at

8    Elementus, which is the UCC's crypto forensic specialist.

9    And that engagement is being led by Mr. Galka.

10           I also wanted to note -- and I'm sure Mr. Pesch

11   will comment during the course of his presentation -- that

12   the Committee has established an information website.  I'm

13   sure they will make that known and send that out to

14   customers.  It's actually available at Kroll.  And there's a

15   specific name that we'll get out to everybody where people

16   can get information and hopefully have many of their

17   questions answered.

18           On Slide 4, Your Honor, just wanted to note we've

19   taken a very different approach in this case vis-à-vis the

20   Committee, because this case is all about the customer.  And

21   the customer committee is our partner here, and we intend to

22   work very closely with them from day one to the end.  And I

23   think and I hope that Mr. Pesce would agree that we and our

24   advisor team have been an open book.  And thus far, it has

25   been an incredibly collaborative exercise, including, and

Page 30

1    I'm pleased to report, resolution of all the objections that

2    were filed by the Committee.

3              We also had an opportunity to have an initial

4    meeting with committee members and its advisors together

5    with the company's advisors on August 11th.  And we've

6    already scheduled a subsequent meeting with the committee

7    members, advisors, and our management team to discuss our

8    business plan and the path forward on August 23rd.  And

9    that's a business plan that I will cover, Your Honor,

10   briefly in a few moments.  But it has been underway and

11   subject to intense discussion and review, and we are pleased

12   to have an opportunity to try to build consensus and

13   alignment around that next week with the Committee.

14             I also want to note at Docket 447 we filed a

15   budget and coin report.  And this is in collaboration with

16   the Creditor's Committee and the United States Trustee in an

17   effort to have transparency.  And as Your Honor can imagine,

18   we've been dealing with diligence requests from both the

19   Committee and the U.S. Trustee and other parties.  We are

20   doing everything in our power to respond in kind through

21   dozens of phone calls and thousands of pages of discovery.

22             On Slide 5, Your Honor, I want to cover a couple

23   topics so that the Court and our community understand what

24   we're focused on.

25             The company is looking at multiple DIP financing

Page 35

1    know Mr. Nash was at the first-day hearing, but there

2    continues to be confusion and doubt.  The business plan and

3    transitions we are contemplating (indiscernible) all the

4    value associated with the rising crypto over the last

5    several weeks directly back in our customers' pockets.  The

6    company is not seeking to dollarize claims on the petition

7    date and give people back a recovery in fiat.  That's just

8    not what we are going to do.

9             And if we can get alignment with the Committee and

10   other stakeholders quickly on a business plan, I am hopeful

11   that we can avoid expensive and unnecessary litigation that

12   will only benefit professionals to the detriment of our

13   stakeholders.

14            On Slide 8, Your Honor, I think this is important

15   and Your Honor focused on it.  This is actually outdated

16   because I believe another 37 letters have been filed

17   overnight and during the course of the day.  I have them

18   printed on a daily basis because I want all the customers to

19   understand that the team here at Kirkland is reading those

20   letters and understanding and trying to get to the bottom of

21   everything that was articulated in those letters.

22            And I just really want to let people know that we

23   empathize, we hurt, and we see the pain that so many people

24   are articulating.  And it's frankly demoralizing.

25            Just a reminder for Your Honor, Celsius has 1.7

Page 36

1    million registered accounts and over 300,000 customers with

2    account balances over $100.  So while we have approximately

3    300 letters on the docket, and I am sure more will come as

4    many did today, I just wanted to set the landscape for the

5    customer community and those that have voiced their concerns

6    already.

7            And as far as those concerns are concerned, I

8    think what we did is break down a couple of themes that

9    we've seen in these letters and hopefully can try to provide

10   people with a little bit of understanding as to what we are

11   going to do and how we are going to do it.

12           Many customers have suggested that all of their

13   money or all of those -- all of their crypto is lost.  And

14   that is not the case.  We and the Committee are focused on

15   getting as much crypto and as much dollars back to customers

16   as we possibly can.  There are many letters that talk about

17   treatment of creditors and whether certain creditors in

18   various accounts should be treated differently or treated

19   similarly.  This is an issue we are looking at very

20   carefully with the Creditor's Committee and we intend to

21   treat similarly-situated customers exactly the same as we

22   are required to under the bankruptcy code.

23           There are lots of comments about Celsius profiting

24   from the restructuring.  That is not true.  It's not the

25   case.  The crypto rebound that you saw on the prior page, it

Page 38

1    we will set a date by which all customers will be required

2    to file claims.  That will be on notice to the world and to

3    each of our customers and everyone will have an opportunity

4    to file a claim.  And just as we have been over the last

5    several weeks, to the extent any customers have questions,

6    we are available 24/7 and we'll answer them and look forward

7    to doing so.

8              Finally, Your Honor, our case timeline.  And I

9    just think it's important to keep in mind that our cash

10   balance, as we've talked about, dips negative in October.

11   And so the key in this first box is where all the action is.

12   And we need to reach alignment with the UCC on how we intend

13   to fund these cases and whether or not the business plan is

14   supportable because time is of the essence.  With no

15   liquidity as soon as October, this alignment in the next

16   several weeks is key to all our customers because it will

17   allow us to maximize value.  And once we reach that

18   alignment, which I am actually confident we will, we will of

19   course adhere to the statutory requirements and applicable

20   noticing rules as it relates to a disclosure statement and

21   plan.  But everyone should appreciate that moving with all

22   deliberate speed is mission-critical.  It just has to be

23   that way, and that's how we intend to move forward.

24             So, Your Honor, I really appreciate the time and

25   you indulging us.  Unless you have any questions for me, I

Page 42

1    today we want to highlight for the Court and for our

2    constituency just a few things that we view -- that the

3    Committee views as imperative to drive the process forward.

4              First and foremost, the Committee wants to make

5    accountholders the focus of these cases.  We appreciate

6    hearing from Mr. Sussberg the focus that Celsius plans to

7    have on accountholders, and we'll keep them honest in that

8    regard.  To that end, the Committee is laser-focused on

9    maximizing the value that will be available for those

10   accountholders at the end of this case.

11             We are pleased to hear that the company is not

12   focused on dollarization of claims, as I mentioned.  From

13   what we've heard on holders directly by phone, email, social

14   media, et cetera, and reading the letters, the hundreds of

15   letters on the docket, receiving an in-kind recover is

16   absolutely critical.  And that is something that the

17   Committee is focused on working on in this case.

18             As to the form of the ultimate restructuring here

19   that will maximize value for accountholders, these are early

20   days and the Debtors are apparently focused on a standalone

21   reorganization being an option here.

22             The Committee though at this point does not have

23   its hands tied to any particular outcome.  And until

24   accountholders receive a full recovery, from the Committee's

25   perspective, all options, be it a sale or sales, or

1    forms through a litigation recovery that will be able to do

2    so.

3              This is not a trivial task, especially if the

4    company pursues a reorganization.  Celsius depends on

5    customer confidence.  Customers are not going to entrust

6    their coins to Celsius if they are not confident that those

7    coins will be held securely and with due care.  And the news

8    stories today that were discussed a few moments ago, without

9    getting into the specifics or the truth of any of those

10   matters raise important questions that any customer would

11   have to consider before putting their coins with reorganized

12   Celsius.

13             And this is going to be also important if there

14   isn't a reorganization.  As I mentioned, the litigation

15   recoveries here could form a significant portion of what

16   accountholders get at the end of this case.

17             We understand that the Debtors have started their

18   own investigation.  The Committee respectfully believes that

19   it is the only part that is capable to conduct this

20   investigation.  It's the only party that's accountable only

21   to the customers that are having their ox gored in this case

22   and it is the new party on the scene that is going to bring

23   a fresh perspective and a fresh set of eyes to all that

24   happened before the commencement of these bankruptcy cases.

25             That said, we look forward to working with the

1            THE COURT:  Okay.  What I would like to hear from

2    now -- at the start I was told there were two ad hoc

3    committees.  I see Mr. Ortiz at the top of my screen

4    representing the custody holders.  And I do want to hear

5    from Mr. Ortiz and counsel for the second ad hoc committee

6    as well.  Mr. Ortiz?

7            MR. ORTIZ:  Good afternoon, Your Honor.  Kyle

8    Ortiz with Togut, Segal and Segal on behalf of the Ad Hoc

9    Group of Custodial Account Holders.  I should be less than a

10   minute, Your Honor.

11           I just quickly wanted to let Your Honor know that

12   we are here and representing these uniquely-situated

13   interests, that we've had productive conversations with the

14   debtors, and we are hopeful that our presence in this case,

15   Your Honor, will amount to little more than a brief and non-

16   controversial cameo because the custodial accounts can

17   ultimately be unfrozen sooner rather than later.

18           We understand, as Mr. Sussberg noted, that the

19   Debtors and the Committee are doing their proper diligence

20   on these matters, and want to preserve estate and court

21   resources and give them the appropriate space to do that,

22   Your Honor, and hopefully come to a happy, consensual

23   resolution without us needing to force the issue, although

24   of course we won't hesitate to do that if it comes to that,

25   Your Honor, in the relatively near term.

1    foundation, the nature of the relationship is governed by

2    the terms of use.  And there will be a lot more to come on

3    that about how customers accept that and click on that and

4    click -- the validity of clickwrap agreements under New York

5    law, which have been recognized and have stood up.  So those

6    are the kind of issues that we are very deep in terms of

7    analyzing, and we plan to come before you in the near

8    future.  Because, to Your Honor's point, if we are holding

9    on to something that is not an estate asset, we would like

10   to get it back to the customers ASAP and well in advance of

11   a plan.  So that is something that is high on our list, and

12   I think you'll be seeing more on that topic in the near

13   future.

14            And the same with the withheld account.  It's

15   similar but slightly different.  These are assets that were

16   initially just not eligible to be put in any Celsius

17   service.  So we sort of held them on the side for people to

18   pick up.  And then they got caught up and we filed.  And so

19   now we need a court order to return those.  But they are

20   assets that were effectively ineligible.  It may have been

21   possible, Your Honor, and we are looking into it, for people

22   who were in the earn program to transfer into the custody

23   program or transfer into the withhold program.  So we are

24   looking into that and it's one of the things the Committee

25   has asked us about, and that's one of the things we'll have

Page 84

1   references to investment hypothecation pledging.

2           MAN 1:  Hold for (indiscernible).

3           MS. MILLIGAN:  It's cash only, and it is specific

4   as to how the Debtors would use those funds, and provides

5   oversight by the Committee and the US Trustee, that we agree

6   are appropriate.

7           So, in light of the changes that have been made to

8   that order, that we have seen on the Docket, we believe our

9   concerns have been addressed.

10          THE COURT:  Thank you very much, Ms. Milligan.

11  Ms. Cornell, do you want to --?

12          MS. CORNELL:  Thank you, Your Honor, this is Shara

13  Cornell on behalf of the Office of the United States Trustee

14  again.

15          While we appreciate the Debtor's efforts, since

16  our objection was filed, our office is still not in

17  agreement on this motion.  As of today, we still do not know

18  what expenses are being paid or what bitcoin is being sold.

19  And we believe it's premature to approve anything until we

20  have transparency into the bitcoin mining and the cost for

21  running it.

22          We need more information so we can make a reasoned

23  determination.  We don't have an opinion one way or another

24  yet, because we don't have that information yet.  And it's -

25  -

Page 86

```
 1    Texas security regulators have raised, to assure that

 2    they're not resuming other investment activities, that the

 3    bitcoin would be sold only for cash.  So, you seem to be

 4    challenging their business judgment as to pursuing this

 5    business of mining and sale of bitcoin; whether it's bitcoin

 6    coming from inventory or newly mined bitcoin.

 7              MS. CORNELL:  You know, we're not -- that's not

 8    our intention.  And I think our objection shows what we're

 9    really concerned with in this case is transparency.  And we

10    don't have that type of visibility in some mining

11    operations.  For example, we have no understanding, at this

12    point in time, what the Debtor's utility-related costs are

13    for running these mining rigs.  We're just looking for some

14    more information.  And in that same vein, at this point in

15    time, our office is seriously considering the appointment of

16    an examiner to address these rampant transparency issues,

17    with this motion and with others.

18              The Debtor mentioned that they will eventually

19    file or provide a detailed mining plan.  Then maybe what we

20    need to do is put this motion on hold until we have more

21    information, so that all the parties can better understand

22    what the Debtor's intentions are, and what the Debtor's

23    business goals can actually accomplish with the use of this

24    motion.

25              THE COURT:  Thank you, Ms. Cornell.  Does anybody
```

Page 95

1  that creates more questions and more confusion amongst, I

2  think, anybody that had that information.  And it goes back

3  to what I was discussing earlier.  There's a lack of

4  transparency here.

5          The motion -- and we mention it in our objection -

6  - makes it sound as though the Debtor is selling office

7  furniture or similar --

8          THE COURT:  I didn't understand that they were

9  selling office furniture --

10         MS. CORNELL:  Or similar hard-type assets that

11 they no longer need.  And one of our questions in our

12 objection had to do whether or not that might be mining

13 equipment.  Well, we were informed that it was not, in fact,

14 mining equipment.  But what they're actually looking to sell

15 are equities and stocks.  And that, in our opinion, is not a

16 de minimis asset, that should be sold through a de minimis

17 asset motion.

18         First, it wasn't clearly, it wasn't made clear in

19 the motion at all, that those were the assets that were

20 being sought to be sold.  And those types of assets should

21 be made clear and they should be pursuant to a sale motion.

22         THE COURT:  Well, what stock are they talking --

23 did you find out what stock they're talking about?

24         MS. CORNELL:  No.  We received some intelligence

25 about the extent of the equities.  But the book value of the

1              THE COURT:  Let me tell you what I'm going to do.

2       I'm not resolving this motion today.  You need to confer

3       further with the US Trustee and the Committee.  I'm

4       concerned -- certainly, I had no inkling that the Debtor was

5       proposing to sell millions of dollars of equity or notes,

6       investments, in other crypto businesses.  Those are not what

7       I would ordinarily consider to be de minimis assets.  So, I

8       want some better definition.

9              And to the extent that you can't resolve as to

10      what assets can be sold, then it absolutely has to be on

11      notice.  So, the notice has to provide clear notice of what

12      it is the Debtor is proposing to sell, and the US Trustee

13      and the Committee, or anybody else if they wish, can file

14      objections and I'll hear them if you can't resolve them.

15      But I'm concerned by the issues that Ms. Cornell has raised.

16      So, I'm not resolving this motion until you try and work it

17      out further with the US Trustee.

18              MS. HOCKBERGER:  Understood, Your Honor.  Thank

19      you.

20              THE COURT:  Thank you.

21              MS. HOCKBERGER:  So, if it' all right with Your

22      Honor, I'd like to skip the next item on the agenda, the

23      wages motion, and turn to the assumption of rejection

24      procedures motion.

25              THE COURT:  Sure.  I think that was uncontested,

Page 118

1                   C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    *[signature]*

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  August 18, 2022

## **Exhibit C**

Excerpts from September 1, 2022, Hearing Transcript

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 22-10964-mg

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    CELSIUS NETWORK LLC,

8

9          Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                United States Bankruptcy Court

13                One Bowling Green

14                New York, NY  10004

15

16                September 1, 2022

17                10:13 AM

18

19

20

21   B E F O R E :

22   HON MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO: F. FERGUSON

Page 2

1    HEARING re Hearing Using Zoom for government re: Debtors' Ex

2    Parte Motion Pursuant to Section 107 of the Bankruptcy

3    Code Seeking Entry of an Order (1) Authorizing the Debtors

4    to Redact Certain Personally Identifiable Information

5    from the Creditor Matrix, Schedules and Statements, and

6    Related Documents and (II) Granting Related Relief

7    filed by Joshua Sussberg on behalf of Celsius Network LLC.

8    (Doc ## 344, 364, 389, 399, 600, 607, 633, 638, 642, 643)

9

10   HEARING re Hearing Using Zoom for Government RE: Motion to

11   (A) Continue to Operate Their Cash Management System,

12   (B) Honor Certain Prepetition Obligations Related Thereto,

13   (C) Maintain Existing Business Forms, and (D) Continue to

14   Perform Intercompany Transactions, (II) Granting

15   Superpriority Administrative Expense Status to

16   Postpetition Intercompany Balances, and (IIT) Granting

17   Related Relief (Doc## 56, 401, 448, 479, 513, 592, 626,

18   643)

19

20   HEARING re Hearing Using Zoom for Government RE: Debtor's

21   Motion Seeking Entry of (I) an Order (A) Approving Bidding

22   Procedures for the Potential Sale of Certain of the Debtors

23   Assets, (B) Scheduling Certain Dates with Respect

24   Thereto, (C) Approving the Form and Manner of Notice

25   Thereof, (D) Approving Bid Protections, (E) Approving

Page 3

1    Contract Assumption and Assignment Procedures, (II) an Order

2    Authorizing the Debtors to Enter into A

3    Definitive Purchase Agreement, and (IID) Granting Related

4    Relief. (Doc## 188, 192, 357, 409, 430, 445, 626)

5

6    HEARING re Hearing Using Zoom for Government RE: Motion for

7    Relief for aN Exemption From the Automatic Stay.

8    (Document No. 342, 590, 597, 609, 610, 618, 620, 625, 626,

9    655)

10

11   HEARING re Hearing Using Zoom for Government RE: Debtor's

12   Motion to Approve Procedures for De Minimis Asset

13   Transactions (Doc ## 189, 400, 402, 429, 448, 499, 626)

14

15   HEARING re Hearing Using Zoom for Government RE: Motion (I)

16   Authorizing the Debtors to (a) Pay Prepetition Employee

17   Wages, Salaries, Other Compensation, and Reimbursable

18   Expenses and (b) Continue Employce Benefits

19   Programs and (11) Granting Related Relief (Doc## 61, 19,

20   192, 357, 402, 409, 413, 448, 518, 613. 626, 636, 643).

21

22   HEARING re Hearing Using Zoom for Government RE: Application

23   to Employ Akin Gump Strauss Hauer & Feld LLP as Special

24   Litigation Counsel filed by Joshua Sussberg on behalf of

25   Celsius Network LLC. (Doc # 392, 601, 626, 649, 656)

Page 4

1    HEARING re Hearing Using Zoom for Government RE: Debtors'

2    Application for Entry of an Order Authorizing the Retention

3    and Employment of Kirkland & Ellis LLP and Kirkland & Ellis

4    International LLP as Attorneys for the Debtors and Debtors

5    in Possession Effective as of July 13, 2022. (Doc # 360,

6    364, 374, 389, 561, 601, 626, 628, 629, 637, 638, 643)

7

8    HEARING re Hearing Using Zoom for Government RE: Application

9    to Employ Latham & Watkins LLP as Special Counsel

10   filed by Joshua Sussberg on behalf of Celsius Network LLC.

11   (Doc ## 363, 364, 374, 389, 440, 601, 626, 643, 645, 647)

12

13   HEARING re Hearing Using Zoom for Government RE: Application

14   to Employ Stretto. Inc. as Administrative Advisor to the

15   Debtors and Debtors in Possession Effective as of July 13,

16   2022. (Doc ### 361, 364, 374, 389, 601, 626, 643)

17

18   HEARING re Hearing Using Zoom for Government RE: Application

19   to Employ Alvarez & Marsal North America, LLC as

20   Financial Advisor filed by Joshua Sussberg on behalf of

21   Celsius Network LLC. (Doc ## 410, 601, 643}

22

23   HEARING re Hearing Using Zoom for Government RE: Debtors' Ex

24   Parte Motion Seeking Entry of an Order (1) Authorizing

25   the Debtors to File Under Seal the Names of Certain

Page 5

1    Confidential Parties in Interest Related to the Debtors'

2    Potential Sale of Certain Assets and (II) Granting Related

3    Relief Notice of Hearing of Debtors Ex Parte Motion

4    Seeking Entry of an Order (1) Authorizing the Debtors to

5    File Under Seal the Names of Certain Confidential

6    Parties in Interest Related to the Debtors Potential Sale of

7    Certain Assets and (II) Granting Related Relief. (Doc#

8    457, 380, 626, 643)

9

10   HEARING re Hearing Using Zoom for Government re: Second

11   Motion to Extend Deadline to File Schedules or Provide

12   Required Information. (Doc# 431, 626, 57, 643)

13

14   HEARING re Hearing Using Zoom for Government RE: Motion

15   Authorizing the Debtors to Prepare a Consolidated List of

16   Creditors in Lieu of Submitting A Separate Mailing Matrix

17   for Each Debtor, (ID Authorizing the Debtors to File

18   A Consolidated List of the Debtors Fifty Largest Unsecured

19   Creditors, (II Authorizing the Debtors to Redact

20   Certain Personally Identifiable Information, (IV) Approving

21   the Form and Manner of Notifying Creditors of

22   Commencement, and (V) Granting Related Relief. (Doc ## 18,

23   55, 357, 445, 626, 643)

24

25

1    HEARING re Doc# 676 Amended Notice of Agenda Amended Agenda

2    for Hearing to Be Held September 1, 2022, at 10:00

3    A.M. (Prevailing Eastern Time)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

Page 7

```
 1    A P P E A R A N C E S :

 2

 3    KIRKLAND & ELLIS LLP

 4         Attorneys for the Debtor

 5         1301 Pennsylvania Avenue NW

 6         Washington, DC 20004

 7

 8    BY:  JUDSON BROWN

 9

10    KIRKLAND & ELLIS LLP

11         Attorneys for the Debtor

12         300 N. LaSalle

13         Chicago, IL 60654

14

15    BY:  ROSS KWASTENIET

16         HEIDI HOCKBERGER

17

18    KIRKLAND & ELLIS LLP

19         Attorneys for the Debtor

20         601 Lexington Avenue

21         New York, NY 10022

22

23    BY:  SIMON BRIEFEL

24

25
```

Page 8

1    WHITE & CASE LLP

2         Attorneys for the Official Committee of Unsecured

3         Creditors

4         111 South Wacker Drive, Suite 5100

5         Chicago, IL 60606

6

7    BY:  GREGORY F. PESCE

8

9    WHITE & CASE LLP

10        Attorneys for the Official Committee of Unsecured

11        Creditors

12        200 South Biscayne Blvd., Suite 4900

13        Miami, FL 33131

14

15   BY:  TRUDY SMITH

16

17   WHITE CASE LLP

18        Attorneys for the Official Committee of Unsecured

19        Creditors

20        555 South Flower Street, Suite 2700

21        Los Angeles, CA 90071

22

23   BY:  AARON COLODNY

24

25

1      TROUTMAN PEPPER HAMILTON SANDERS LLP

2           Attorneys for Ad Hoc Group of Withhold Account Holders

3           4000 Town Center, Suite 1800

4           Southfield, MI 48075

5

6      BY:  DEBORAH KOVSKY-APAP

7

8      DANIEL A. FRISHBERG, Pro Se Movant

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  P R O C E E D I N G S

2                  CLERK:  All right.  Starting the recording for

3       September 1, 2022 at 10 a.m., calling Celsius Network, Case

4       Number 22-10964.  Is there counsel for Kirkland on the line?

5       All right.  Any counsel from Kirkland?

6                  MR. PESCE:  I see at least Judson Brown from K and

7       E is on the line.

8                  CLERK:  Right.

9                  MR. BROWN:  Hey, Greg.  This is Judson Brown from

10      K and E.  I'm here.  But it doesn't look like my bankruptcy

11      colleagues have joined yet.  I'm sure they will be joining

12      soon.

13                 CLERK:  All right.  Do you happen to know if

14      they're going to do like a conference room or if people are

15      joining individually?

16                 MR. BROWN:  My understanding is they're joining by

17      conference room, one in Chicago and then a separate one in

18      New York.

19                 CLERK:  Okay, that's helpful.  And it's just

20      yourself that's going to be joining, that joined separately?

21                 MR. BROWN:  I think so, but I can't guarantee it.

22      I'm in a different office and I think that I am the only one

23      outside of Chicago and New York but I can't promise.

24                 CLERK:  I understand.  All right, thank you.

25                 MR. BROWN:  Sure.

1            So Your Honor with respect to the 341 meeting that

2     was held the morning of August 19, the Debtor's CEO, Alex

3     Mashinsky was sworn in as was the Debtor's CFO, Chris

4     Ferraro.  And both of those gentlemen remained on the line

5     for what ended up being a little over three hours and there

6     were a few technical difficulties where we had to pause and

7     sort of reconnect and clear background noise on the line.

8     But Mr. Ferraro ended up testifying under oath and responded

9     to questions from the U.S. Trustee's Office, the Creditors

10    Committee and many dozen individual creditors and was under

11    oath and testified for, according to my records, a little

12    over three hours on that date.

13           Your Honor, also on August the 23rd, the Debtors

14    met in person with the United -- with the Creditors

15    Committee and their advisers and certain of the principals

16    of the Creditors Committee.  And the main topic of that

17    meeting was really the path forward for these Chapter 11

18    cases, including ideas for how to potentially reorganize the

19    business, all with, of course, the overriding objective of

20    returning as much value and as much cryptocurrency to

21    holders as soon as possible in a manner that would be as

22    fair as possible.

23           Your Honor, since that meeting on August the 23rd,

24    the UCC advisors and the Debtor's advisors have engaged in

25    what I'll call deeper dive diligence related to securities,

1    last hearing, I would like to try and get these issues

2    resolved.  Assets that should go back to  customers should

3    go back, if possible, sooner rather than later.  But there

4    are a myriad of issues that are being raised about this and

5    it may be hard for the Court to deal with it in the context

6    of a long agenda with many other items on it.

7          So why don't let's leave it at that for now?  I

8    understand your position.  Ms. Kovsky, and, you know, all of

9    these issues will get their full airing by the Court.

10          Mr. Pesce, do you want to address just on the

11    custody issue?  I'll give you a chance for any other

12    remarks, but I want to sort of close off and give Mr. Herman

13    a chance as well to address the custody account issues and

14    I'll give you a chance to address anything else you want.

15          MR. PESCE:  Yes, Your Honor.  Gregory Pesce, White

16    and Case for the proposed counsel to the Committee.  I'll

17    just speak very, very quickly on the custody issue.  You

18    know in the two weeks since the last hearing, we appreciate

19    the Debtors engaging with us on how they were going to

20    approach this and having extensive dialogue with that.  At

21    this point, the Committee is not taking an official position

22    on the matter, but we will note that this is -- we do

23    believe this is a good first step.  In our view, as has been

24    said in these other hearings, the account holders have

25    claims that every entity, So we don't think this is going to

Page 49

1    affect overall account holder recoveries.  It's going to

2    provide near term liquidity.  It's intended to cover coins

3    that don't have a preference exposure.  There isn't a whole

4    preference morass that we need to deal with.  And it does so

5    in a way that lets us preserve these potential causes of

6    action.

7            Just to put it on the Court's radar though and for

8    the benefit of our constituency, I know there's so many

9    people listening in today, our work isn't done yet.  Like I

10   said, we just saw the motion yesterday.  We need to study

11   it.  We need to make sure that insiders like Mr. Mashinsky,

12   his wife and others don't benefit from this based on how

13   they have their wallet set up.  I also want to make it clear

14   the Committee has not made a determination about whether it

15   would support pursuing preference actions, if there are any.

16   That's a topic that remains for another day.  We also need

17   to make sure that there's no double dipping based on the

18   statutory cap based on how you mix and match individual

19   accounts.  And then finally, going back to my original

20   point, you know, our general desire to have account holders

21   get liquidity, get their coins back, and how this motion

22   fits in there is part of a broader conversation that's been

23   happening in this case where the account holders have their

24   claims.  We've been very heartened to hear the Debtor's

25   statements about how account holders have claims at every

1    news about Celsius emerged, customers with sophistication

2    and resources were able to withdraw enormous sums in the

3    days, weeks and months leading up to the pause while the

4    company was insolvent.  Whereas, those who believed the

5    statements of company leadership such as Alex Mashinsky and

6    his statements were left holding the bag.  So yeah, that's

7    basically our position is we should have either been in

8    custody or, you know, we shouldn't have been there at all.

9    We should have been asked to withdraw.

10         THE COURT:  All right, thank you, Mr. Herman.  If

11   you could lower your hand now because you had your chance.

12   Your hand is still raised.

13         MR. HERMAN:  All right.  Thank you.

14         THE COURT:  Mr. Kwasteniet, do you want to

15   continue with your motion?  I think we've heard what we're

16   going to hear about this issue of the custody accounts.

17         MR. KWASTENIET:  I do, Your Honor.  I just have

18   two very quick points.  One perhaps to head off the need for

19   Mr. LeBlanc to make a comment.  First of all, the Debtors

20   have not made any final conclusion as to where all the

21   customer claims sit and at what legal entities.  We have

22   described in various letters to the U.S. Trustee in response

23   to a request for the appointment of a formal equity

24   committee that customers can certainly read the terms of use

25   as having claims against every entity.  We understand from

1    Mr. LeBlanc's group that they have arguments against that.

2    It's going to be an important issue, maybe one of the most

3    important issues that has to be decided in the case, and I

4    didn't want to leave it just unsaid and uncorrected that we

5    that we formed a formal definitive view on that topic.  It's

6    something that we're still analyzing and discussing with our

7    board and, you know, we'll be making a decision on and

8    taking a position on in due course, but I didn't want to be

9    saddled with a position that I'm not authorized to make or

10   advocate as we sit here today.  It's an important issue and

11   one that's coming down the pipe soon, but I think the

12   description as to the Debtor's position at least was

13   premature, and I wanted to correct that.

14          Your Honor with respect to the concerns raised by

15   Mr. Emmanuel, I understand what he's saying, and in many

16   ways, I'm not surprised that to the extent that there may be

17   an avenue for withdrawal for custody program holders that a

18   lot of people are going to be figuring out, and I assume

19   that Mr. Emmanuel's group is not going to be the last,

20   right, seeking to shoehorn themselves into a group that is,

21   you know, perhaps receiving or the ability to withdraw

22   crypto off the platform.  These are issues that we're aware

23   of and that we're going to look into.  We don't have a

24   position today.  And to be clear, his group, folks, folks

25   who were grandfathered in and who did not make a move into

1     custody, you know, by the relevant date, they're not subject

2     to this motion, but that's not to say that they've been

3     forgotten or will be ignored.  We read every letter that's

4     filed.  We're aware of positions, you know, taken by Mr.

5     Herman and others, you know, sort of similarly situated to

6     him.  But again, that's not an issue for today.

7              Your Honor, the next topic I wanted to move to

8     briefly because we do have an agenda, and so I'll try to

9     speed up my remarks here, is just engagement with the

10    Creditors Committee and with creditors more generally.  Your

11    Honor, we've had multiple in-person meetings with the UCC.

12    We've done countless video and telephonic conferences with

13    the Committee advisors and their members.  We've granted

14    full access to the management team and to the company's

15    advisors.  The U.S. -- the UCC has submitted over 250 unique

16    diligence requests.  We believe we've fully responded to

17    more than 160 of them and we're in the process of responding

18    to everything else in connection with this.  We have

19    disclosed thousands of pages of documents and we've, I think

20    in a relatively unique step, we've given the Committee's

21    crypto advisors electronic access to certain wallets at the

22    company that will allow them to research and analyze

23    historical transaction data.  So there's been a great deal

24    of open and transparency with respect to the sharing of

25    information.

1       To formalize that, the Debtors have entered into

2   and filed on the docket a stipulation to facilitate and

3   effectively streamline Rule 2004 discovery requests by the

4   UCC including the company agreeing to accept process in

5   committing to produce documents on a rolling basis.  We have

6   also negotiated a bespoke reporting protocol that is going

7   to be applied going forward where even though above and

8   beyond the reporting that the bankruptcy code requires in

9   admission of the fact that we have unique issues related not

10  just to cryptocurrency but how our business is structured,

11  that enhanced reporting is appropriate and will be

12  forthcoming and we've agreed to sort of terms and parameters

13  with the Creditors Committee.

14       Finally, Your Honor, we've engaged in extensive

15  discussions with the Creditors Committee and their advisors

16  including a lengthy call yesterday regarding crypto security

17  and the Debtor's processes and protocols.  And in response

18  to conversations with the UCC's advisors and some questions

19  they have raised, we've already made meaningful adjustments

20  or enhancements to the way that the company stores its

21  crypto.  And we're open to further and ongoing changes and I

22  expect, Your Honor, that the issue of crypto security, this

23  is a preliminary conversation we've had with the Office of

24  the United States Trustee, may well culminate in the filing

25  of a declaration that details how it is that we are storing

Page 130

1                    C E R T I F I C A T I O N

2

3       I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

6

7

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19   Veritext Legal Solutions

20   330 Old Country Road

21   Suite 300

22   Mineola, NY 11501

23

24   Date:  September 6, 2022

25

## **Exhibit D**

Excerpts from September 14, 2022, Hearing Transcript



Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 22-10964-mg

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    CELSIUS NETWORK LLC,

8

9          Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                    United States Bankruptcy Court

13                    One Bowling Green

14                    New York, NY  10004

15

16                    September 14, 2022

17                    2:05 PM

18

19

20

21   B E F O R E :

22   HON MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  F. FERGUSON

Page 2

1    Hearing Using Zoom for Government RE: Motion to Appoint

2    Examiner. (Doc## 546, 588, 723, 730, 731, 732, 734, 735,

3    746, 752, 755, 757, 758, 764, 779, 792, 793, 798, 799, 801)

4

5    Hearing Using Zoom for government re: Debtors' Ex Parte

6    Motion Pursuant to Section 107 of the Bankruptcy Code

7    Seeking Entry of an Order (I) Authorizing the Debtors to

8    Redact Certain Personally Identifiable Information from the

9    Creditor Matrix, Schedules and Statements, and Related

10   Documents and (II) Granting Related Relief filed by Joshua

11   Sussberg on behalf of Celsius Network LLC. (Doc # 344, 364,

12   389, 399, 600, 607, 633, 638, 642, 643)

13

14   Hearing Using Zoom for Government re: The Official Committee

15   Of Unsecured Creditor's Motion for Entry of An Order

16   Clarifying the Requirement to Provide Access to Confidential

17   or Privileged Information and Approving a Protocol Regarding

18   Creditor Requests for Information. (Doc# 432, 608, 617)

19

20   Hearing Using Zoom for Government RE: Official Committee of

21   Unsecured Creditors' Application to Retain White & Case LLP

22   as Counsel effective as of July 29, 2022. (Doc # 603, 814,

23   815)

24

25

Page 3

1   Hearing Using Zoom for Government RE: Application to Employ

2   Centerview Partners LLC as Investment Bankers filed by

3   Joshua Sussberg on behalf of Celsius Network LLC. (Doc #

4   362, 364, 374, 389, 601, 635)

5

6   Hearing Using Zoom for Government RE: The Official Committee

7   of Unsecured Creditors' Ex Parte Motion Seeking Entry of an

8   Order (I) Authorizing the Committee to File Under Seal

9   Certain Confidential Commercial Information Related to the

10  Application to Retain and Employ White & Case LLP as Counsel

11  to the Committee and (II) Granting Related Relief filed by

12  Gregory F Pesce on behalf of The Official Committee of

13  Unsecured Creditors. (Doc # 602)

14

15  Hearing Using Zoom for Government RE: Motion Authorizing the

16  Debtors to Prepare a Consolidated List of Creditors in Lieu

17  of Submitting A Separate Mailing Matrix for Each Debtor,

18  (II) Authorizing the Debtors to File A Consolidated List of

19  the Debtors Fifty Largest Unsecured Creditors, (III)

20  Authorizing the Debtors to Redact Certain Personally

21  Identifiable Information, (IV) Approving the Form and Manner

22  of Notifying Creditors of Commencement, and (V) Granting

23  Related Relief. (Doc ## 18, 55, 357, 445, 626, 643)

24

25

Page 4

1    Hearing Using Zoom for Government RE: Debtors Motion for

2    Entry of an Order (I) Authorizing Debtors to Serve Parties

3    by E-Mail and (II) Granting Related Relief. (Doc# 640, 702,

4    802)

5

6    Hearing Using Zoom for Government RE: Debtors Motion

7    Pursuant to Section 107 of the Bankruptcy Code Seeking Entry

8    of an Order (I) Authorizing the Debtors to (A) Redact

9    Individual Names, and (B) Implement an Anonymized

10   Identification Process, and (II) Granting Related Relief.

11   (Doc# 639, 702, 806)

12

13   Hearing Using Zoom for Government, Only if There are

14   Objection(s), to the Notice of Presentment of Agreed

15   Reporting Framework Stipulation (ECF Doc. No. 669).

16

17   Hearing Using Zoom for Government RE: The Official Committee

18   of Unsecured Creditors' Application for Entry of an Order

19   Authorizing the Employment and Retention of Kroll

20   Restructuring Administration LLC as Noticing and Information

21   Agent of the Committee Effective as of August 5, 2022. (Doc

22   #433, 443, 617)

23

24   Hearing Using Zoom for Government RE: Kirkland Retention

25   Application. (ECF Doc. # 360, 754, 756, 759, 800, 808)

Page 5

1   Hearing Using Zoom for Government RE: Debtors' Application

2   to Employ and Retain Alvarez & Marsal North America, LLC as

3   Financial Advisor to the Debtors and Debtors in Possession

4   Effective as of July 13, 2022 (ECF Doc. # 410, 601, 666,

5   667, 765, 805)

6

7   Hearing Using Zoom for Government RE: Stretto Retention

8   Application (ECF Doc. # 361, 809)

9

10  Hearing Using Zoom for Government RE: Latham and Watkins

11  Retention Application (ECF Doc. # 363, 440, 601, 647, 807)

12

13  Hearing Using Zoom for Government RE: Akin Gump Retention

14  Application (ECF Doc. # 392, 810)

15

16

17

18

19

20

21

22

23

24

25  Transcribed by:  Sonya Ledanski Hyde

Page 6

1    A P P E A R A N C E S :

2

3    KIRKLAND & ELLIS LLP

4          Attorneys for Debtors

5          300 North Salle

6          Chicago, IL 60654

7

8    BY:  ROSS KWASTENIET

9          CHRIS KOENIG

10         JUDSON BROWN

11         ELIZABETH JONES

12         DAN LATONA

13         JOSHUA SUSSBERG

14         PATRICK NASH

15

16   WHITE & CASE LLP

17         Attorneys for the Official Committee of Unsecured

18         Creditors

19         555 South Flower Street, Suite 2700

20         Los Angeles, CA 90071

21

22   BY:  SAM HERSHEY

23         GREGORY PESCE

24         DAVID TURETSKY

25         KEITH WOFFORD

Page 7

1   TEXAS OFFICE OF ATTORNEY GENERAL

2        Attorney for Texas State Securities Board

3        PO Box 12548

4        Austin, TX 78711-2548

5

6   BY:  LAYLA MILLIGAN

7

8   MCCARTER ENGLISH, LLP

9        Attorney for Zaryn Dentzel

10        245 Park Avenue

11        New York, NY 10167

12

13   BY:  DAVID ADLER

14

15   UNITED STATES DEPARTMENT OF JUSTICE

16        Attorneys for the U.S. Trustee

17        201 Varick Street, Suite 1006, 10th Floor

18        New York, NY 10014

19

20   BY:  SHARA CLAIRE CORNELL

21        BRIAN MASUMOTO

22        LINDA RIFKIN

23        MARK BRUH

24

25

Page 8

1    MILBANK

2        Attorney for The Series B Shareholders

3        1850 K St NW

4        Washington, DC 20006

5

6    BY:  DENNIS DUNNE

7

8    TOGUT, SEGAL & SEGAL

9        Attorneys for Ad Hoc Group of Custodial Account Holders

10        One Pennsylvania Plaza Suite 3335

11        New York, NY 10119

12

13    BY:  KYLE ORTIZ

14        BRYAN KOTLIAR

15

16    ALVAREZ AND MARSAL

17        Attorneys for Debtors

18        540 W Madison

19        Chicago, IL 60654

20

21    BY:  HOLDEN BIXLER

22

23

24

25

Page 9

1   LATHAM & WATKINS

2        Attorneys for Debtors

3        330 North Wabash Avenue, Ste 2800

4        Chicago, IL 60611

5

6   BY:  CAROLINE RECKLER

7        JOHN SIKORA,

8

9   ALSO APPEARING:

10  FREDERICK BRUCE PURDY - Pro Se Creditor

11  LILLIAN YIELDING (ANN) - Pro Se Creditor

12  MAX GALKA, WITNESS CEO of Elementus

13  DANIEL FRISHBERG, Pro Se Creditor

14  IMMANUEL HERRMANN, Pro Se Creditor

15

16

17

18

19

20

21

22

23

24

25

1                     P R O C E E D I N G S

2              CLERK:  All right, starting the recording for

3     September 14, 2022, at 2:00 p.m.  It's for Celsius Network

4     LLC, Case Number 22-10964.  Starting to admit participants.

5     All right.

6              All right, I believe Kirkland's going to be

7     joining.

8              WOMAN 1:  Yes, Kirkland is here.

9              CLERK:  Yes, okay.  If you could, just tell me

10    which participants are going to have a speaking line from --

11    is this the Chicago office?

12             WOMAN 1:  Yes.

13             CLERK:  Okay, so if you could, just tell me the

14    participants from the Chicago office that are going to be

15    speaking this afternoon.

16             WOMAN 1:  Sure.  This afternoon, it will be Ross

17    Kwasteniet and Chris Koenig.

18             CLERK:  Okay, great.

19             WOMAN 1:  And then, we also have a listen-only

20    line under the name Susan Golden.

21             CLERK:  Okay, so she's listening.  All right,

22    perfect.  I just need to know the live participants so that

23    they can -- they can speak on the record.  And then, from I

24    think the other Kirkland & Ellis line is --

25             WOMAN 1:  Yeah, that's the Susan Golden line.  We

Page 36

1    those discussions, we had made progress with the Debtors

2    regarding what is really a fundamental issue, which is where

3    the customers have claims.  Do they only have claims at the

4    customer-facing entity or do they have claims in terms of

5    service, we think suggests against all of the entities,

6    including the mining entity.

7              Those productive discussions, I'm happy to say,

8    earlier today resulted in the Debtors confirming to me that

9    they will be scheduling customer claims at every entity when

10   the schedules are filed later this week.  Obviously, people

11   might disagree with that, they might object, but the

12   committee, based on those discussions and particularly now

13   that they've resulted in that agreement to schedule the

14   claims, has provided the committee and customers greater

15   comfort here.

16             And then finally, you know, I won't belabor the

17   point -- we mentioned it at the prior hearing -- the end

18   game for this case is still unknown, but the parameters for

19   how that end game will be reached are becoming clearer.

20             The Debtors, this has been widely reported, met

21   with the UCC.  They presented a concept.  The UCC does not

22   support that concept; we don't support any end game here.

23   But more importantly, the Debtors have committed to running

24   a process to market check what is out there and whatever the

25   management team might ultimately produce.  We're working

Page 133

1                   C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

6   *Sonya M. Ledanski Hyde*

7

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  September 16, 2022

**Exhibit E**

Excerpts from July 18, 2022, Hearing Transcript

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 22-10964-mg

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    CELSIUS NETWORK LLC,

8

9          Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                    United States Bankruptcy Court

13                    One Bowling Green

14                    New York, NY  10004

15

16                    July 18, 2022

17                    2:00 PM

18

19

20

21   B E F O R E :

22   HON MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  MARIA

Page 2

1  HEARING re First Day Hearings

2

3  HEARING re Debtors' Amended Motion Seeking Entry of an Order

4  (I) Directing Joint Administration of the Chapter 11 Cases

5  and (Il) Granting Related Relief (Doc #7)

6

7  HEARING re Debtors' Application Seeking Entry of an Order

8  (I) Authorizing and Approving the Appointment of Stretto,

9  Inc. as Claims and Noticing Agent and (Il) Granting Related

10  Relief (Doc #4)

11

12  HEARING re Debtors' Motion Seeking Entry of Interim and

13  Final Orders (I) Authorizing the Debtors to (a) Continue to

14  Operate Their Cash Management System, (b) Honor Certain

15  Prepetition Obligations Related Thereto, (c) Maintain

16  Existing Business Forms, and (d) Continue to Perform

17  Intercompany Transactions, (II) Granting Superpriority

18  Administrative Expense Status to Postpetition Intercompany

19  Balances, and (Ill) Granting Related Relief (Doc #21)

20

21  HEARING re Debtors' Motion Seeking Entry of Interim and

22  Final Orders (I) Authorizing the Debtors to (a) Pay

23  Prepetition Employee Wages, Salaries, Other Compensation,

24  and Reimbursable Expenses and (b) Continue Employee Benefits

25  Programs and (Il) Granting Related Relief (Doc #19)

```
                                                    Page 3

1     HEARING re Debtors' Motion Seeking Entry

2     of Interim and Final Orders (I) Authorizing the Debtors to

3     Pay Prepetition Claims of Certain Critical Vendors, Foreign

4     Vendors, 503(B)(9) Claimants, and Lien Claimants, (Il)

5     Granting Administrative Expense Priority to All Undisputed

6     Obligations on Account of Outstanding Orders, and (III)

7     Granting Related Relief (Doc #20)

8

9     HEARING re Debtors' Motion Seeking Entry of Interim and

10    Final Orders (I) Establishing Certain Notice, Case

11    Management, and Administrative Procedures and (Il) Granting

12    Related Relief (Doc #15)

13

14    HEARING re Debtors' Motion Seeking Entry of an Order (I)

15    Authorizing the Debtors to Prepare a Consolidated List of

16    Creditors in Lieu of Submitting A Separate Mailing Matrix

17    for Each Debtor, (II) Authorizing the Debtors to File A

18    Consolidated List of the Debtors Fifty Largest Unsecured

19    Creditors, (III) Authorizing the Debtors to Redact Certain

20    Personally Identifiable Information, (IV) Approving the Form

21    and Manner of Notifying Creditors of Commencement, and (V)

22    Granting Related Relief (Doc #18)

23

24

25
```

Page 4

1    HEARING re Debtors' Motion Seeking Entry of an Order (I)

2    Extending Time to File Schedules of Assets and Liabilities,

3    Schedules of Current Income and Expenditures, Schedules of

4    Executory Contracts and Unexpired Leases, and Statement of

5    Financial Affairs, (Il) Extending Time to File Rule 2015.3

6    Financial Reports and (Ill) Granting Related Relief (Doc #8)

7

8    HEARING re Debtors' Motion Seeking Entry of Interim and

9    Final Orders (I) Authorizing the Debtors to (a) Pay their

10   Obligations Under Prepetition Insurance Policies, (b)

11   Continue to Pay Certain Brokerage Fees, (c) Renew,

12   Supplement, Modify, or Purchase Insurance Coverage, and (d)

13   Maintain their Surety Bond Program and (Il) Granting Related

14   Relief (Doc #16)

15

16   HEARING re Debtors' Motion Seeking Entry of Interim and

17   Final Orders (I) Authorizing the Payment of Certain Taxes

18   and Fees and (Il) Granting Related Relief (Doc #17)

19

20   HEARING re Debtors' Motion Seeking Entry of Interim and

21   Final Orders (I) Approving Notification and Hearing

22   Procedures for Certain Transfers of Declarations of

23   Worthlessness with Respect to Common Stock and Preferred

24   Stock and (Il) Granting Related Relief (Doc #5)

25

Page 5

1   HEARING re Debtors' Motion Seeking Entry of an Order (I)

2   Restating and Enforcing the Worldwide Automatic Stay,

3   Anti-Discrimination Provisions, and Ipso Facto Protections

4   of the Bankruptcy Code, (II) Approving the Form and Manner

5   of Notice, and (III) Granting Related Relief (Doc #6)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

Page 6

1     A P P E A R A N C E S :

2

3     KIRKLAND & ELLIS

4          Attorneys for Debtor

5          601 Lexington Avenue

6          New York, NY 10022

7

8     BY:  PAT NASH (TELEPHONICALLY)

9          ROSS KWASTENIET (TELEPHONICALLY)

10         ALISON WIRTZ (TELEPHONICALLY)

11         SIMON BRIEFEL (TELEPHONICALLY)

12         JOSHUA SUSSBERG (TELEPHONICALLY)

13

14    MILBANK LLP

15         Attorneys for Series B Preferred Equity Shareholders

16         55 Hudson Yards

17         New York, NY 10001

18

19    BY:  DENNIS JOHN (TELEPHONICALLY)

20

21

22

23

24

25

1    UNITED STATES DEPARTMENT OF JUSTICE

2         Attorneys for The United States Trustee

3         201 Varick Street

4         New York, NY 10014

5

6    BY:  SHARA CORNELL (TELEPHONICALLY)

7

8    ALSO APPEARING TELEPHONICALLY:

9         DENNIS F. DUNNE, Representing Community First Partners

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 8

1                   P R O C E E D I N G S

2              CLERK:  Good afternoon.  This is Greg White, the

3     Courtroom Deputy.  This hearing is in Case Number 22-1094,

4     Celsius Network LLC.  It's 2:00 PM on July 18th.  At this

5     time, I'd like to take appearances from anyone who plans on

6     speaking during the hearing, please.

7              MR. NASH:  Good afternoon.  Pat Nash, from

8     Kirkland & Ellis, proposed counsel to Celsius Network LLC

9     and it's seven affiliated Debtors.

10             CLERK:  Thank you.

11             MR. JOHN:  Good afternoon.  It's Dennis John, from

12    Milbank LLP, on behalf of several holders of the Debtors'

13    Series B Preferred Equity Shares.

14             CLERK:  Thank you.

15             MR. NASH:  This is Pat Nash again, from Kirkland &

16    Ellis.  I'd also like to make appearances for my partner,

17    Mr. Ross Kwasteniet; a colleague of mine, Ms. Alison Wirtz;

18    and a third colleague of mine, Mr. Simon Briefel, each of

19    whom will be addressing the Court, with the Court's

20    permission, during the course of the hearing today.

21             CLERK:  Okay, thank you.

22             MR. SUSSBERG:  Your Honor, it's Joshua Sussberg,

23    from Kirkland & Ellis.  I am not planning to appear today,

24    just participate with my partners and colleagues.  Thank

25    you.

Page 14

1    not lost.  We intend for this to be a reorganization.  Our

2    goal is to maximize the value of Celsius' assets for the

3    benefit of our customers.

4            More than any place I can remember, Judge, we look

5    forward to the UST appointing an official Committee of

6    Unsecured Creditors.  We expect that this committee will be

7    essentially, if not literally, a customer committee.  We

8    have very little unsecured trade debt.  We know that it will

9    be incumbent upon us to work expeditiously on the path

10   forward with this committee.  A reorganization plan for

11   Celsius is not going to succeed without the buy-in of our

12   stakeholders and our community.

13           At a very high level, Judge, what does this plan

14   look like?  And this isn't to preordain anything, but we do

15   have a lot of folks listening and paying attention, and

16   they're very interested in what our general game plan is.

17           THE COURT:  Mr. --

18           MR. NASH:  At a high level --

19           THE COURT:  Before you go on, Mr. Nash, then

20   everyone can understand this, there are now two people in my

21   courtroom observing the hearing.  But my Zoom screen shows

22   that there are 197 participants who have signed in for the

23   hearing at this point.  So, obviously, this is a matter

24   that's had very broad attention and concern.  And I'll let

25   you go on in a second.

Page 30

1    and I do think they probably can get into that with a little

2    more granularity in connection with the cash management

3    motion.  I think Mr. Kwasteniet, frankly, can get into that

4    with a little more granularity than I can right here at this

5    moment.

6             THE COURT:  Go ahead.

7             MR. NASH:  So, Your Honor, to sum it up in terms

8    of, you know, the status of the operations, it's not

9    business as usual, no new deployment.  We've been focused on

10   harvesting and safeguarding our assets and we've been doing

11   that because it's very important.  Had we not been doing

12   that we might render some of these interesting legal issues

13   moot.  You know, are folks entitled to their coin back in

14   kind?  That would end up being an academic legal exercise if

15   we, over the course of the case through what otherwise might

16   be considered ordinary course activities, you know, we lost

17   all or a meaningful portion of our coin.

18            So the coin that we have today, we intend to keep.

19   And I said now, probably more than once, ultimately

20   distribute in connection with a plan of reorganization.

21            Now, Judge, I'm turning to page 7.  For the

22   benefit of folks on the phone, a bit of a business overview

23   and a corporate structure overview.  From the outset here,

24   Judge, just to make sure that nobody listening misses it, we

25   have no long-term or funded debt.  So, our customers are our

Page 31

1    primary creditors.  And when you look at this structure

2    chart, Judge, and you look at who the Debtors are, the lead

3    debtor, kind of down, towards the bottom in the middle,

4    Celsius Network LLC; since August 21, since August 19,

5    pardon me, 2021, that entity has been the primary customer

6    facing, you know, the retail business.  That is the entity

7    that the retail customers do business with, Judge; Celsius

8    Network LLC.

9            Right below that, Celsius Lending LLC, that is the

10   entity that conducts the retail lending business.  If you go

11   up the chain, Judge, you've got an intermediate holding

12   company, but you get up to Celsius Network Limited, UK,

13   which owns 100 percent of the deposit business, 100 percent

14   of the mining business, which is over on the right, and 100

15   percent of the non-debtor business, GK8, which I'll talk

16   about in a second.

17           So, Celsius Network Limited UK is the entity out

18   of which the company has historically conducted, and up

19   until the petition date, its institutional borrowing and

20   lending business.  Up until August of 2021, Judge, Celsius

21   Network Limited UK was the customer-facing party for the

22   retail depositors.  So, up until about 11 months ago, if you

23   were opening a -- if you were a retail customer and you

24   wanted to open an account, you interfaced with Celsius

25   Network Limited UK.  In August of last year, Celsius Network

Page 32

1    Limited UK, transferred the existing customer accounts down

2    to Celsius Network LLC.  And from that point forward, any

3    new accounts were open by Celsius Network LLC.  And so, you

4    know, that history and that transaction may or may not end

5    up being relevant in these cases.

6            Celsius Network Limited, UK, as I said, Judge,

7    owns 100 percent of Celsius Mining.  And I talk about that a

8    little bit later in the presentation.  Celsius Mining is a

9    bitcoin mining business, currently operational.  Celsius

10   Mining was established and developed through financing from

11   Celsius Network Limited UK.  And as of the petition date,

12   Celsius Mining owes approximately $576 million to Celsius

13   Network Limited UK.

14           Celsius Network Limited UK, Judge, also, again,

15   owns 100 percent of the deposit business.  And it also owns,

16   over here on the left, non-Debtor, the Celsius Network

17   Limited Israel, and its subsidiaries, who we refer to as

18   GK8.

19           In October of 2021, Celsius acquired GK8 for

20   approximately $115 million.  GK8 is a market-leading cold

21   storage platform for crypto assets.  The company is

22   currently engaged in an out-of-court market process, with

23   respect to GK8.  And to the extent that, you know, that

24   process goes well and we receive a bid that we like, we

25   would envision it being sold, and proceeds being available

Page 33

1   to be dividended up to Celsius Network Limited UK, and

2   addressed in connection with a plan at Celsius Network

3   Limited UK.  And if we don't get a bid that we like, we

4   would intend to fold that business into our operations and

5   include it in our reorganization.  So, that's the --

6           THE COURT:  When we get to first day motions, cash

7   management, intercompany transactions, you know, the

8   organizational chart, corporate structure that we're looking

9   at now, has Debtor entities shown in red, and non-Debtor

10  entities shown in blue.  One of the things that you're

11  asking, to enable to make critical vendor payments, relates

12  to the efforts by Celsius mining to build out its

13  operations.  And you're going to have to explain, you or one

14  of your colleagues, is going to have to explain to me

15  further the flow of funds -- what is going, what is proposed

16  to go to non-Debtors, what goes to Debtors.  I mean, Celsius

17  Mining, there's a Debtor and there's a non-Debtor shown in

18  that same -- the Debtor owns a non-Debtor.  So, we have to

19  talk about where the funds are going.  But I'll wait until

20  you get to it.  Since you were on this organizational chart,

21  I wanted to be sure that I understood the flow of funds

22  going forward, to make the relief you're asking for.

23          MR. NASH:  We'll take that up in connection with

24  the specific motion, Judge.  You know, Celsius Mining is a

25  Debtor.  It started the case with its own cash on the

Page 34

1    balance sheet and it needs relief to use that cash to make

2    critical vendor payments.  But in any event, you know, we'll

3    deal with that in connection with that motion.

4          Your Honor, I'm now, I'm speaking off of page 8.

5    Celsius has approximately 1.7 million registered users.

6    That's not how many active and open accounts we have.  We

7    have approximately 300,000, a little more than 300,000

8    active users with account balances of more than $100.  So,

9    we've got 300,000 with more than $100.  We've got probably a

10   couple of hundred thousand more than that, Judge, who have

11   accounts with balances less than $100,000.  And these

12   customers are spread out, literally, all over the world,

13   100-plus countries.

14         I'm turning to page 9, Judge, going through the

15   key business segments.  Our retail business, we had the Earn

16   program.  This is by far and away where most of our crypto

17   assets are held, in what was the most popular product for

18   the customers.  The terms of use of the Earn program

19   provided a title to coins as transfer to Celsius.  And

20   Celsius is entitled to use, sell, pledge and rehypothecate

21   those coins.

22         It was Celsius' ability to do those things that

23   allowed it to generate yield and, correspondingly, pay

24   yield, or what we call rewards, to our retail customers.

25         The Borrow program.  This is the folks, charge

Page 35

1    retail customers who took out loans, and posted collateral,

2    and could conventionalize this for Your Honor.  A moment

3    ago, I talked about having, you know, 300,000 with more than

4    $100 in the account, and as many as 200,000 more with any

5    amount of money in the account.

6            As of the petition date, of those hundreds of

7    thousands of retail customers, there were approximately

8    23,000 loans with an open balance of approximately $411

9    million.  So, retail customers, approximately 23,000 of

10   them, maybe you have one customer who's got more than one

11   loan, I don't know.  But a small subset of the many hundreds

12   of thousands of retail customers who took out loans, and in

13   the aggregate, owe $411 million to Celsius.  And in

14   connection with taking those loans out, collateral with a

15   market value of $765 million is posted on the Celsius

16   platform.

17           THE COURT:  Valued as of when?  When was -- that

18   765 million collateral, valued as of when?

19           MR. NASH:  The petition date, Judge.  Sorry I

20   missed your question.

21           Talking off of page 10 now, Judge, key business

22   segments, the institutional and the mining business.

23   Institutional lending and borrowing program, as I mentioned

24   a minute or two ago, that's conducted out of Celsius Network

25   Limited UK.  It is a bespoke lending and borrowing business

Page 36

1    or platform with institutional clients such as hedge funds

2    and market makers.  Depending on the creditworthiness of the

3    counterparty, loans to institutional investors may be

4    secured, partially secured or unsecured.  As of July 11,

5    2022, Judge, we had 47 institutional borrowers who, in the

6    aggregate owed 93 million, approximately, to Celsius; that

7    had posted coin collateral with a market value as of that

8    July 11 date, of approximately $98.5 million.

9            Another important business, Your Honor, the mining

10   business.  Mining is a Debtor.  Celsius, through its Debtor

11   subsidiary, Celsius Mining LLC, operates one of the largest

12   bitcoin mining enterprises in the United States.  Celsius

13   operates over 43,000 mining rigs currently, with plans to

14   operate approximately 112,000 mining rings some time in Q2

15   of 2023.

16           And a few more stats, Judge, that I think are

17   interesting:  In the seven days leading up to the petition

18   date, Celsius mining mined approximately $14.2 bitcoin per

19   day.  The operation mined approximately 3,114 bitcoins in

20   2011.  And we expect, if everything goes well, in 2022, to

21   mine approximately 10,100 bitcoin.

22           And, again, if everything goes well, in 2023, we

23   hope and expect to be in the position to mine approximately

24   15,000 bitcoin a day.  And so, Judge, this mining business,

25   which is wholly owned by a Debtor is, we think, a potential

1   very valuable source of recovery for our stakeholders, for

2   our customers.  It gives us the ability to literally mine

3   bitcoin; which could be relevant in terms of a repayment in

4   kind or, to the extent that we can, repayment in kind type

5   plan.  And so, the mining business, Your Honor, we think is

6   interesting and in a world where the crypto market rebounds,

7   we think it has the potential to be quite valuable.

8           And I should say, it makes money today, Judge,

9   even at these prices.  So, to the extent the market

10  improves, it becomes that much more valuable.

11          Page 11, Judge, I have a slide here that talks

12  about things we used to do historically from a deployment

13  point of view.  We're not doing any of these things during

14  the case.  And if we ever do, we'll come back to you for

15  approval.  So, unless Your Honor has any questions, you

16  know, maybe I'll just move on.

17          Now, going to page 13, Judge, assets by program,

18  asset breakdown.  So, this is a useful slide, Your Honor,

19  when you think about what we were talking about before when

20  you were asking about the custody accounts.

21          In terms of our cryptocurrency assets, 77 percent

22  of those are held through the Earn program; approximately 4

23  percent of those are held through the Custody program.

24  Approximately 15 percent of those were provided in

25  connection with collateral for a loan.  And approximately 4

1    case.  And that is with overall visibility with respect to

2    what the assets are, what the business structure is, and how

3    some of that information was relayed in the 1007 statement.

4           I'm happy to give examples to Your Honor now, or

5    with respect to individual motions.  But that's something

6    that we're going to be looking at very closely now and

7    throughout this case.

8           THE COURT:  If you have comments that are more

9    general than the specific motions, why don't you go ahead

10   and make them now.

11          MS. CORNELL:  So, with respect to visibility and

12   the need for transparency, specifically, the 1007 failed to

13   give information about the regulatory actions that Your

14   Honor mentioned earlier; both state regulatory action, cease

15   and desist letters.  And we currently are not aware of, but

16   there may be foreign regulatory actions out there.  They're

17   a little bit harder for us to find, but I think that

18   information needs to be shared with the group.

19          I think a lot of the reasons that the Debtor was

20   holding back on some of this information, and looking for

21   more confidentiality provisions, is a fear of the market.

22   But I think that what the Debtors and this Court need to

23   need to be are of is that, while that may be a concern in a

24   lot of other cases, most of this information is already out

25   there.  And the Internet is a savvy place, particularly with

Page 74

1    that and we will --

2              THE COURT:  Clean and redline.

3              MR. KWASTENIET:  Great.  We will copy Ms. Cornell

4    on that also and --

5              THE COURT:  I think you know, but the email

6    address -- chambers' email address is

7    MG.chambers@NYSB.USCourts.gov.

8              MR. KWASTENIET:  I think that Ms. Golden may have

9    that on her speed dial, Your Honor, but yes.  Thank you.

10   Your Honor, that --

11             MR. DUNNE:  May I be heard --

12             MR. KWASTENIET:  -- that's --

13             MR. DUNNE:  -- in connection with cash management?

14             MS. CORNELL:  And me as well, Your Honor.

15             THE COURT:  First Ms. Cornell then Mr. Dunne, if

16   you want to address this, I'm absolutely going to give you a

17   chance to talk about it.  Go ahead --

18             MS. CORNELL:  Thank you.  I just wanted to discuss

19   a few overarching issues with respect to cash management and

20   they -- possibly how they relate to some of the other

21   motions.  And it goes back to that issue of transparency I

22   mentioned earlier and some of the information missing from

23   the 1007 and maybe from the motion itself.

24             We need more information from the Debtors about

25   the transfer of their crypto assets and -- or transferring

1    to cash between Debtors and non-debtor affiliates.  The

2    business practice really needs more information about, as

3    you mentioned earlier, about the how, but we also really

4    need to know about the why.  Why are they transferring the

5    assets regularly between different Debtor and non-debtor

6    entities and how much and what is the benefit to the company

7    in the past and now going forward in light of the change in

8    market?

9              And we worked diligently with Debtors' counsel to

10   limit a lot of this language, but there are still some

11   concerns about these intercompany transfers and how much

12   information we're getting and the speed in which we're

13   getting it.  As the Debtor indicated earlier, we asked them

14   to change some of the language about the loans.  We are

15   concerned about non-debtor entities and their ability to

16   repay any loans made by the Debtor now or in the future and

17   that's something that we're going to be considering

18   particularly because we don't have a great handle on the

19   Debtors' practices, both historically and going forward with

20   respect to its crypto assets and how they're being

21   transferred.

22             THE COURT:  I -- and I just -- let me, that was

23   one of my major concerns when I worked on this over the

24   weekend as well, and one of the questions I have, and I

25   don't know whether this is something you've addressed with

1   beyond in making themselves available as we went through

2   turns of these motions and orders.  And I understand it's,

3   you know, been a process to get all of the information over,

4   but we really appreciate them making themselves available

5   and we look forward to continuing the dialogue as we share

6   information on the vendors and vendor payments going

7   forward.

8               THE COURT:  If I understand correctly, it's $3.76

9   million on an interim basis for the next 21 days?

10              MS. WIRTZ:  That is correct, Your Honor.

11              THE COURT:  And what's the total that you would be

12   seeking?

13              MS. WIRTZ:  On a final basis, we are seeking 6.52

14   million.

15              THE COURT:  Okay.  Ms. Cornell, do you want to be

16   heard?

17              MS. CORNELL:  Yes, Your Honor.  Shara Cornell at

18   the Office of the United States Trustee.

19              I just wanted to highlight a few issues for the

20   Court with the critical vendors motion in this case.  We've

21   been very slow to get information and $3.7 million is a lot

22   of money and it's a lot of money for payments at the

23   discretion of the Debtor and it's a lot of money to be spent

24   on an industry where we're not sure where the future

25   benefits lie.

Page 92

1       with the information you're asking for.

2                   MS. CORNELL:    Sure.  So the Debtor, as I

3       understand it, is working -- is trying to work diligently to

4       get us the information; however, it's been very slow.  And

5       it's been slow even though the Debtor has known how much

6       money it's needed since the filing of this motion, which is

7       curious to me that we just got the list just within the hour

8       before this hearing, but they knew they needed $3.7 million

9       over a week ago, and I'd like to see that information come

10      more quickly.

11                  And I also think it's really important that we

12      know for which entity these different payments are going

13      because they all seem to do different things and I don't

14      have a good grasp on what those different things are, other

15      than the fact that there's one mining company that I don't

16      believe is currently operable but has cost the Debtor a

17      considerate amount of money and I'm not clear if

18      construction may or may not be the best avenue for the

19      Debtor at this time.  Why not just consider liquidating its

20      assets and move on?  We don't know.

21                  MS. WIRTZ:  If I may address some of those points.

22      So as was discussed previously in Mr. Nash's presentation,

23      we believe that the mining segment is a unique segment that

24      offers value to the enterprise going forward, and we have

25      worked to provide additional detail on that.

Page 121

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

6

7

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  July 20, 2022

**Exhibit F**

Milbank's Letter to U.S. Trustee, dated July 19, 2022



**DENNIS F. DUNNE**

*Partner*

55 Hudson Yards | New York, NY 10001
T: 212.530.5770
ddunne@milbank.com | milbank.com

July 19, 2022

**VIA ELECTRONIC MAIL**

Attn: Shara Cornell
Office of the United States Trustee
U.S. Federal Office Building
201 Varick Street, Suite 1006
New York, NY 10014
shara.cornell@usdoj.gov

Re: *In re Celsius Network LLC, et al.*, Case No. 22-10964 (MG)
  <u>Request for Appointment of Official Committee of Equity Security Holders</u>

Dear Ms. Cornell:

  We represent Community First Partners, LLC, Celsius SPV Investors, LP, and Celsius New SPV Investors, LP (referred to collectively herein as the "<u>Series B Holders</u>") in the above-referenced chapter 11 cases (the "<u>Cases</u>") of Celsius Network LLC and its affiliated debtor entities (together, "<u>Celsius</u>" or the "<u>Debtors</u>")[1] pending before the United States Bankruptcy Court for the Southern District of New York.  The Series B Holders own approximately 65% of the Series B Preferred Shares issued by Celsius Network Limited ("<u>CNL</u>") and approximately 14% of all equity issued by CNL; CNL directly or indirectly owns each Debtor and non-Debtor entity other than Celsius Network Inc. and Celsius Networks Lending LLC.[2]  More broadly, the

---

[1] The Debtors in these Cases are Celsius Network LLC, Celsius KeyFi LLC, Celsius Lending LLC, Celsius Mining LLC, Celsius Network Inc., Celsius Network Limited, Celsius Networks Lending LLC, and Celsius US Holding LLC.

[2] The common stock and stock options of Celsius Network Inc. are owned by Celsius's founders, Alex Mashinsky and Daniel Leon, as well as certain other employees.  *See Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, in Support of Chapter 11 Petitions and First Day*

MILBANK LLP

NEW YORK | LOS ANGELES | WASHINGTON, D.C. | SÃO PAULO | FRANKFURT
LONDON | MUNICH | BEIJING | HONG KONG | SEOUL | SINGAPORE | TOKYO

July 19, 2022                                                                                              Page 2

Series B Holders understand that the Debtors' equity security holders include at least 35 non-insider shareholders who directly or indirectly hold in the aggregate more than 30% of all of the Debtors' ordinary and preferred shares.  As a large, complex, and novel bankruptcy proceeding, it is essential that these equity security holders are properly represented in these Cases.

As set forth in greater detail below, we write to (a) respectfully request the appointment of an official committee of equity security holders (an "Equity Committee") in these Cases, and (b) indicate the Series B Holders' interest in serving on such an Equity Committee.

**Legal Standard**

Section 1102(a) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), provides that the United States Trustee may appoint a statutory committee of equity security holders where appropriate.  *See* 11 U.S.C. § 1102(a)(1).  Moreover, the Bankruptcy Code provides that the appointment of a statutory committee of equity security holders may be appropriate where it is "necessary to assure adequate representation of . . . equity security holders."  11 U.S.C. § 1102(a)(2).  Factors generally considered in an "adequate representation" analysis include the complexity of the case, whether the costs associated with the committee significantly outweigh the need for adequate representation, the delay that would result from appointment and the timing of the request relative to the status of the case, and the likelihood of whether the debtors are insolvent.  *See In re Williams Commc'ns Group, Inc.*, 281 B.R. 216, 220 (Bankr. S.D.N.Y. 2002) (applying factors)*; Albero v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 68 B.R. 155, 159 (S.D.N.Y. 1986) (same); *In re Eastman Kodak Co.*, No. 12-10202 ALG, 2012 WL 2501071, at *1 (Bankr. S.D.N.Y. June 28, 2012) (same); *see also In re Pilgrim's Pride Corp.*, 407 B.R. 211, 217 (Bankr. N.D. Tex. 2009) (granting motion for order directing the appointment of an official equity committee); *Matter of Kalvar Microfilm, Inc.*, 195 B.R. 599 (Bankr. D. Del. 1996).

**Equity Security Holders Are Not Adequately Represented In These Cases**

These Cases are undoubtedly complex; the digital asset, cryptocurrency, and decentralized finance markets are new, dynamic, and complicated.  These Cases involve Debtors with new-age, highly complex operating businesses and with an intricate organizational structure, featuring distinct legal entities that are based or operate in at least five different countries including the U.S., the U.K., Israel, Serbia, and Cyprus.  The Debtors serve clients in more than 100 countries and filed eight separate petitions, through which they have indicated more than $4.3 billion in assets and non-user liabilities totaling approximately $780 million.  The Debtors also have numerous shareholders; the Series B Holders understand that as of July 13, 2022, the Debtors' shares of common or preferred stock were held by at least 35 non-insider shareholders.

---

*Motions* [Dkt. No. 23] at ¶ 88.  Celsius Network Inc. owns 100% of the equity in Celsius Networks Lending LLC.  *Id.* at ¶ 87.

These Cases are also particularly novel; they represent among the first in what is likely to be an influx of bankruptcies filed by companies engaged in the new and emerging digital asset, cryptocurrency, and decentralized finance markets.  And such companies, like Celsius, are themselves unique: Celsius has obtained the majority of its funding through the issuance not of debt, but of preferred equity.  Moreover, the Series B Holders understand that at least three meaningful assets sit at entities within the Debtors' organizational structure that are wholly separate and apart from the Debtors' retail customer-facing entities; and as such, the value from these assets should be available only for the benefit of the Debtors' equity security holders.  Specifically, *first*, the Series B Holders understand that CNL is the indirect owner of the Debtors' valuable bitcoin mining equipment and other assets utilized by Debtor Celsius Mining LLC and non-Debtor Celsius Mining IL Ltd. (the "Mining Entities"), wholly-owned subsidiaries of CNL.  The Series B Holders understand that the Mining Entities are unaffected by retail customer claims.  *Second*, the Series B Holders understand that CNL itself has a set of assets consisting of an institutional loan portfolio that will be paid over time as those loans amortize and mature.  *Third*, the Series B Holders understand that CNL is the indirect owner of GK8 Ltd. ("GK8"), a wholly-owned subsidiary and self-custody technology platform incorporated in Israel, which was acquired in October 2021 for approximately $115 million.  The Series B Holders further believe GK8 was purchased entirely with funds invested in CNL by the Series B Holders, and understand that GK8 has not been integrated into the Debtors' retail customer-facing entities.

Because of this structure and the organizational locations of these significant assets, the value from the assets should be available only for the benefit of the Debtors' equity security holders.  The Debtors' equity security holders thus have unique, material interests in these Cases.  Moreover, for these reasons (among others), while an official committee of unsecured creditors may, in a non-digital asset or cryptocurrency case, advance the interests of equity security holders through its representation of unsecured parties and its overarching goal of maximizing the value of the bankruptcy estate, the same is not the case here where many of the Debtors' valuable assets are subject *only* to claims of equity security holders and not retail customers or other unsecured creditors.  The interests of creditors are simply not aligned with equity security holders' interests in these Cases, and in fact such interests may be at odds with each other.

No other party to these Cases adequately represents the interests of the Debtors' equity security holders; neither an official committee of unsecured creditors nor current management, which has separate interests in protecting customers and the Debtors' industry reputation, has any incentive to represent the interests of shareholders.  *See In re Williams*, 281 B.R. at 222-23 (creditors' committees and equity security holders do not always have "sufficiently aligned or parallel interests"); *In re Pilgrim's Pride Corp.*, 407 B.R. at 218-19 (noting that the "dynamics of chapter 11" are such that debtors and their management are unable to advocate effectively for equity recoveries).  Without an Equity Committee, there can be no meaningful representation of the interests of equity security holders in these Cases.

July 19, 2022                                                                                                    Page 4

Moreover, any costs associated with the appointment of an Equity Committee in these Cases will not outweigh (much less significantly outweigh) the need for adequate representation. Given the nature of the Debtors' cryptocurrency businesses and their unique organizational structure, it is both appropriate and necessary for the estate to incur the reasonable expenses associated with an Equity Committee to ensure that the interests of equity security holders are not improperly wiped out by the Debtors. Without an Equity Committee, equity security holders will not benefit from organized information flow, negotiations, and decision-making. And the timing of this request is unquestionably appropriate. These Cases are only six days old. Appointment of an Equity Committee now will cause no delay in the proceedings. *See In re Williams*, 281 B.R. at 216; *Johns-Manville*, 68 B.R. at 163 (declining to appoint equity committee where "reorganization is in its final stages, and approaching confirmation").

These Cases are also not cases where the debtors are "hopelessly insolvent" and where equity security holders consequently have no real economic interest at stake. For the reasons discussed above, the Series B Holders understand that numerous meaningful and valuable assets sit at entities separate and apart from the Debtors' retail customer-facing entities. Because of this organizational structure, value unquestionably exists that will inure to the benefit of equity security holders in these Cases. Moreover, the Series B Holders understand that no meaningful debt exists at parent-level entities Celsius Network Inc. and CNL—the entity at which non-insider equity sits—such that any value that flows to the parent entities should inure to the benefit of non-insider equity security holders, regardless of the Debtors' retail customer-facing entities. Further, on information and belief, the Series B Holders understand that, other than institutional lending in connection with decentralized finance transactions, there exists *no* funded third-party indebtedness anywhere in the organizational structure, and only ordinary trade creditors and intercompany debts sit at the entities above the Debtors' retail customer-facing entities, including CNL. Finally, the Series B Holders do not believe there exist any guarantees issued by CNL to support the retail customer activity at the subsidiaries that face those retail customers. As such, any value that flows to CNL should be available to satisfy preferred equity security holders' liquidation preferences, and any excess value should benefit equity security holders.

The facts of these Cases do not simply satisfy the applicable standard for the appointment of an Equity Committee; they cry out for it. The Series B Holders submit that, for all the reasons set forth above and based upon the pertinent facts and circumstances known at this time, an official committee of equity security holders should be appointed in these cases.

**Willingness to Serve**

The Series B Holders are ready, willing, and able to serve on the Equity Committee. The Series B Holders also understand that other equity security holders have an interest in serving on the Equity Committee. The Series B Holders are willing to comply with applicable requirements for service on the Equity Committee, and are prepared to dedicate the time and resources

July 19, 2022                                                                                      Page 5

required to ensure that the Equity Committee can carry out its mandate to protect shareholder value.

Respectfully,


*/s/ Dennis F. Dunne*
Dennis F. Dunne
Milbank LLP
*Counsel to Community First Partners, LLC, Celsius SPV Investors, LP, and Celsius New SPV Investors, LP*

**<u>Exhibit G</u>**

Jones Day's Letter to U.S. Trustee, dated July 22, 2022

# JONES DAY

555 SOUTH FLOWER STREET • FIFTIETH FLOOR • LOS ANGELES, CALIFORNIA 90071.2452

TELEPHONE: +1.213.489.3939 • JONESDAY.COM

Direct Number: 2132432508
JMESTER@JONESDAY.COM

July 22, 2022

**VIA ELECTRONIC MAIL**

Attention:  Shara Cornell, Esq.
Office of the United States Trustee
U.S. Federal Office Building
201 Varick Street, Suite 1006
New York, NY 10014
shara.cornell@usdoj.gov

Re:    *In re Celsius Network, LLC, et al. - Case No. 22-10964 (MG)*

Dear Ms. Cornell:

We represent CDP Investissements Inc. ("CDP") in connection with the chapter 11 cases (the "Cases") commenced by Celsius Network LLC and certain of its affiliates (collectively, the "Debtors") in the United States Bankruptcy Court for the Southern District of New York.  CDP is a significant holder of Series B Preferred Shares issued by debtor Celsius Network Limited ("CNL").

CNL's capital structure is comprised of Ordinary Shares, Ordinary B Shares, Class A Preferred Shares, Class A1 Preferred Shares, and Class B Preferred Shares and does not include any funded debt.  *See Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Netowrk LLC, In Support of Chapter 11 Petitions and First Day Motions* (ECF No. 23)(the "Mashinsky Declaration").  CDP holds more than 22% of the Class B Preferred Shares that CNL issued and more than 4.5% of the total equity issued by CNL.

We write on behalf of CDP to respectfully request that the Office of the United States Trustee (the "U.S. Trustee") appoint of an official committee of holders of CNL's Series B Preferred Shares, Series A Preferred Shares, and Series A1 Preferred Shares (collectively, the "Preferred Shareholders")[1] in the Cases.

The U.S. Trustee is empowered to appoint an official committee of equity security holders.  *See* 11 U.S.C. §1102(a)(1).  Equity committees are also appointed to ensure that equityholders have adequate representation in bankruptcy cases.  *Id.* at §1102(a)(2).  We understand that the U.S. Trustee and Bankruptcy Courts evaluating the appointment of equity committees have historically considered several factors in determining whether to appoint an

---

[1]  We note that in large measure, the holders of the Ordinary Shares and Ordinary B Shares are insiders of the Debtors.

AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRISBANE • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS • DETROIT
DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • LONDON • LOS ANGELES • MADRID • MELBOURNE
MEXICO CITY • MIAMI • MILAN • MINNEAPOLIS • MUNICH • NEW YORK • PARIS • PERTH • PITTSBURGH • SAN DIEGO • SAN FRANCISCO
SÃO PAULO • SAUDI ARABIA • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

JONES DAY

Office of the United States Trustee
July 22, 2022
Page 2

equity committee, including, the complexity of the cases, the need for adequate representation, whether the costs of a committee will outweigh the need for adequate representation, the timing of the request, and whether the debtors are solvent. *See In re Williams Commc'ns Group, Inc.*, 281 B.R. 216, 220 (Bankr. S.D.N.Y. 2002) (applying factors)*; Albero v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 68 B.R. 155, 159 (S.D.N.Y. 1986) (same); *In re Eastman Kodak Co.*, No. 12-10202 ALG, 2012 WL 2501071, at *1 (Bankr. S.D.N.Y. June 28, 2012) (same). As discussed below, when applied to these Cases, these factors strongly support the appointment of an official committee of Preferred Shareholders.

The Debtors' Cases present one of the first restructurings involving the novel, complex, and growing cryptocurrency industry. The Debtors' business has hundreds of thousands of active users, provides financial services across more than 100 countries, and involves billions in multiple types of crytopcurrency and investments. *See, Mashinsky Declaration.* The Debtors' corporate structure is also complex. CNL has 23 direct and indirect subsidiaries. *Id.* While it is not a publicly traded company, CNL does have a substantial number of Preferred Shareholders. Thus, these are large complicated cases for many Preferred Shareholders to navigate effectively.

While the Cases are large, novel, and complex, CNL is not hopelessly insolvent. In fact, it is likely just the opposite. Like many complicated businesses, the Debtors hold different lines of businesses and assets through separate and distinct corporate entities. For instance, less than a year ago, CNL acquired the GK8 business for approximately $115 million, which is contained in non-debtor entities that are direct and indirect subsidiaries of CNL. *Id.* In addition, CNL's debtor-subsidiary Celsius Mining LLC operates a distinct data-mining business with substantial value that is not a part of the Debtors' retail customer facing activities. Other subsidiaries of CNL that are not involved in customer activities may have additional assets. CNL is the ultimate beneficiary of these businesses and their value. CNL does not have any funded debt obligations and the Debtors have not disclosed any substantial guarantees by CNL of liabilities of any affiliates. *Id.* at ¶89. Given the substantial value in these separate subsidiaries and the lack of apparent undisputed claims against CNL, it is likely that CNL is solvent. Thus, the Preferred Shareholders have significant economic interests in CNL that must be protected.

These interests, however, cannot be adequately protected without an official committee of Preferred Shareholders. Neither the Debtors nor the Official Committee of Unsecured Creditors will sufficiently advocate for the Preferred Shareholders' interests. Given the Debtors' corporate structure and separate business assets, creditors' interests in maximizing value may actually conflict with the interests of CNL's equity holders to the extent that creditors look to these separate entities for compensation. Moreover, the Debtors' current management may be focused on elements of these cases other than preserving value for Preferred Shareholders. No fiduciary in these Cases is incentivized or charged with protecting the interests of the Preferred Shareholders.

JONES DAY

Office of the United States Trustee
July 22, 2022
Page 3

And the costs incurred by an official committee of Preferred Shareholders are outweighed by the needs of and benefits to the Preferred Shareholders.  As noted above, the values at issue in the Cases are substantial.  The Preferred Shareholders made significant investments into CNL in the not-to-distant past.  The reasonable expenses incurred by an official committee to preserve the value of those investments pale in comparison to the amounts at stake in these Cases.

Now is the time for the appointment of an official committee of Preferred Shareholders. The Debtors have just concluded their first day hearing.  It is critical to provide adequate representation for Preferred Shareholders at this early stage so that they can effectively participate in the Cases prior to the Debtors' formulation of a plan or implement any sale or investment process.  If anything, formation of an official committee of Preferred Shareholders now will avoid delay in the Cases and offers the best path forward for the Debtors to emerge from Chapter 11 expeditiously.

CDP takes the request for an official committee of Preferred Shareholders seriously. Accordingly, CDP is pleased to advise the U.S. Trustee that it is willing to serve on such an official committee if the U.S. Trustee were to appoint one.  CDP will dedicate the time and resources necessary in carrying out this important role.

Thank you for your consideration of this request.  We would be happy to discuss this request with you at your convenience.

Sincerely,

*/s/ Joshua M. Mester*

Joshua M. Mester

## **Exhibit H**

Milbank's Supplemental Letter, dated July 28, 2022



**DENNIS F. DUNNE**
*Partner*
55 Hudson Yards  |  New York, NY 10001
T: 212.530.5770
ddunne@milbank.com  |  milbank.com

July 28, 2022

**VIA ELECTRONIC MAIL**

Attn: Shara Cornell
Office of the United States Trustee
U.S. Federal Office Building
201 Varick Street, Suite 1006
New York, NY 10014
shara.cornell@usdoj.gov

Re:    *In re Celsius Network LLC, et al.*, Case No. 22-10964 (MG)
       Request for Appointment of Official Committee of Equity Security Holders

Dear Ms. Cornell:

We write to supplement our letter dated July 19, 2022 (the "July 19 Letter," attached hereto as **Exhibit A**), submitted on behalf of Community First Partners, LLC, Celsius SPV Investors, LP, and Celsius New SPV Investors, LP (referred to collectively as the "Series B Holders") in the above-referenced chapter 11 cases of Celsius Network LLC and its affiliated Debtors[1] pending before the United States Bankruptcy Court for the Southern District of New York (the "Court").

As detailed in the July 19 Letter, the Series B Holders have respectfully requested the appointment of an Equity Committee in these Cases.  The Series B Holders own approximately 65% of the Series B Preferred Shares issued by Celsius Network Limited ("CNL") and approximately 14% of all equity issued by CNL; CNL directly or indirectly owns each Debtor and non-Debtor entity other than Celsius Network Inc. and Celsius Networks Lending LLC.

---

[1] All capitalized terms used but not defined herein have the meanings ascribed to such terms in the July 19 Letter.

MILBANK LLP

NEW YORK | LOS ANGELES | WASHINGTON, D.C. | SÃO PAULO | FRANKFURT
LONDON | MUNICH | BEIJING | HONG KONG | SEOUL | SINGAPORE | TOKYO

Recent newly-filed motions by the Debtors on July 25, 2022 (the "New Second Day Pleadings") make even more clear the need for equity security holders to be properly represented in these Cases, and that no other party to these Cases adequately represent their interests.  In relevant part, pursuant to the New Second Day Pleadings, the Debtors seek:

- authority to reject, assume, or assume and assign executory contracts and unexpired leases of the Debtors (many of which are, directly or indirectly, ***wholly-owned by CNL***), and to remove or abandon those Debtors' personal property[2];

- authority to continue one of Celsius' primary operations: the sale and monetization of Bitcoin generated from mining activities performed by Debtor Celsius Mining LLC[3]—an entity that (i) utilizes valuable Bitcoin mining equipment and other assets, (ii) is indirectly ***wholly-owned by CNL***, (iii) is ***unaffected by retail customer claims***, and (iv) is in the process of repaying a $750 million intercompany loan to CNL[4];

- approval of bidding procedures and authorizing the Debtors to enter into a definitive purchase agreement in connection with a potential sale of the equity interests in non-Debtor GK8 Ltd.[5]—an entity that has ***not been integrated into***

---

[2] *See Debtors' Motion for Entry of an Order (I) Authorizing and Approving Procedures to Reject, Assume, or Assume and Assign Executory Contracts and Unexpired Leases and (II) Granting Related Relief* [Dkt. No. 185].

[3] *See Debtors' Motion Seeking Entry of an Order (I) Permitting the Sale of the Debtors' Mined Bitcoin in the Ordinary Course and (II) Granting Related Relief* [Dkt. No. 187].

[4] *See id.* at ¶ 10 ("In the ordinary course of its business and on market terms, Celsius monetized the Bitcoin generated by the mining activity of Celsius Mining LLC to not only cover expenses . . . at Celsius Mining LLC but also to distribute funds to Debtor Celsius Network Limited to repay a certain intercompany loan, as further described in the Mashinsky Declaration."); *see also Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, in Support of Chapter 11 Petitions and First Day Motions* [Dkt. No. 23] (the "Mashinsky Declaration") at ¶ 66 ("To expand [Celsius Mining LLC]'s operations, and thus generate a greater yield, effective as of November 1, 2020, and through 2021, CNL entered into an intercompany revolver facility with [Celsius Mining LLC] for up to $750 million. The loan is a long-term investment in [Celsius Mining LLC] that is expected to generate significant yield for the Company."). According to the Mashinsky Declaration, as of May 31, 2022, the outstanding loan balance owed to CNL was approximately $576 million. *Id.* at ¶ 68.  The Series B Holders understand, however, that an additional $70 million or more was subsequently drawn to fund capital expenditures at Celsius Mining LLC.

[5] *See Debtors' Motion Seeking Entry of (I) an Order (A) Approving Bidding Procedures for the Potential Sale of Certain of the Debtors' Assets, (B) Scheduling Certain Dates with Respect Thereto, (C) Approving the Form and Manner of Notice Thereof, (D) Approving Bid Protections, (E) Approving Contract Assumption and Assignment Procedures, (II) an Order Authorizing the Debtors to Enter into a Definitive Purchase Agreement, and (III) Granting Related Relief* [Dkt. No. 188].

July 28, 2022                                                                 Page 3

> *the Debtors' retail customer-facing entities*, and which interests are ***wholly-owned by CNL***; and

- approval of procedures to authorize the use, sale, swap, or transfer of certain assets of the Debtors—many of which are indirectly ***owned by CNL***—without further order of the Court or notice to any party, below set transaction value thresholds.[6]

    As detailed in the July 19 Letter and as noted above, meaningful assets sit at entities within the Debtors' organizational structure that are wholly separate and apart from the Debtors' retail customer-facing entities and that have no known claims; as such, the value from these assets should be available only for the benefit of the Debtors' equity security holders, and not retail customers or other unsecured creditors.  Equity security holders in these Cases thus have unique, material interests, including as concerns the relief sought pursuant to the New Second Day Pleadings—relief which may be considered by the Court in under two weeks.  Without an Equity Committee—and without an Equity Committee *now*, ahead of a hearing on the New Second Day Pleadings—there can be no meaningful representation of the interests of equity security holders in these Cases.

    The Series B Holders submit that, for all the reasons set forth above and in the July 19 Letter, an Equity Committee should be appointed now, in the early stage of these Cases.  We remain available to discuss the foregoing.


                                                    Respectfully,


                                                    */s/ Dennis F. Dunne*
                                                    Dennis F. Dunne
                                                    Milbank LLP
                                                    *Counsel to Community First Partners,*
                                                    *LLC, Celsius SPV Investors, LP, and*
                                                    *Celsius New SPV Investors, LP*

---

[6] *See Debtors' Motion to Approve Procedures for De Minimis Asset Transactions* [Dkt. No. 189].

## **<u>Exhibit I</u>**

Debtors' Letter to U.S. Trustee, dated August 10, 2022

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

<table>
<tr>
<td>Ross M. Kwasteniet<br>To Call Writer Directly:<br>+1 312 862 2069<br>ross.kwasteniet@kirkland.com</td>
<td>300 North LaSalle<br>Chicago, IL 60654<br>United States<br><br>+1 312 862 2000<br><br>www.kirkland.com</td>
<td>Facsimile:<br>+1 312 862 2200</td>
</tr>
</table>

August 10, 2022

**Via E-mail**

William K. Harrington, U.S. Trustee (Region 2)
Linda A. Riffkin, Assistant U. S. Trustee, S.D.N.Y.
Shara C. Cornell, Trial Attorney, S.D.N.Y.
Office of the United States Trustee
201 Varick Street, Suite 1006
New York, NY 10014
Shara.Cornell@usdoj.gov

>      Re:    In re Celsius Network, LLC, et al., Chapter 11 Case No. 22-10964 (Bankr.
>      S.D.N.Y.) (MG)

Dear Mr. Harrington, Ms. Riffkin, and Ms. Cornell:

Kirkland & Ellis LLP represents Celsius Network LLC and its affiliated debtors and debtors in possession (collectively, the "Debtors" and together with their non-Debtor affiliates, "Celsius") in the above-referenced chapter 11 cases. Per your request, I write to respond to (a) the July 19, 2022 and July 28, 2022 letters of Mr. Dennis F. Dunne, Esq. requesting the appointment of an Official Committee of Equity Security Holders Pursuant to Section 1102 of the Bankruptcy Code (the "Equity Request") and (b) the July 22, 2022 letter from Mr. Joshua M. Mester, Esq. requesting the appointment of an official committee of holders of CNL's Series B Preferred Shares, Series A Preferred Shares, and Series A1 Preferred Shares pursuant to Section 1102 of the Bankruptcy Code (the "Preferred Request" and together with the Equity Request, the "Equity Committee Requests").

Pursuant to the Equity Committee Requests, Community First Partners, LLC, Celsius SPV Investors, LP, Celsius New SPV Investors, LP, and CDP Investissements Inc. (collectively, the "Series B Holders")[1] are seeking the appointment of an official committees of equity holders

---

[1]    Pursuant to the Equity Request, Community First Partners, LLC, Celsius SPV Investors, LP, and Celsius New SPV Investors, LP own approximately 65% of the Series B Preferred Shares issued by Debtor Celsius Network Limited ("CNL") and approximately 14% of all equity issued by CNL. Pursuant to the Preferred Request, CDP Investissements Inc. owns approximately 22% of the Series B Preferred Shares issued by CNL and more than

# KIRKLAND & ELLIS LLP

William K. Harrington
Linda A. Riffkin
Shara C. Cornell
August 10, 2022
Page 2

(an "Equity Committee") pursuant to section 1102(a)(2) of title 11 of the United States Code (the "Bankruptcy Code").

The Debtors respectfully request that the U.S. Trustee exercise his discretion and decline to appoint an Equity Committee in these chapter 11 cases.

An Equity Committee is neither necessary nor beneficial at this stage of these chapter 11 cases because the Series B Holders have failed to demonstrate that equity holders would be prejudiced if an Equity Committee is not appointed. The Series B Holders are deep-pocketed institutional investors who have been actively represented in these chapter 11 cases and they can well afford to continue to fund their own advisors. Moreover, despite the assertions that equity holders have the first right to various discrete pools of value in the Debtors' estates, these assertions are far from certain, and, in fact, the Debtors' customers have credible arguments that the customers have a first claim to all value in the Debtors' estates.

The appointment of an Equity Committee is the exception, not the rule, in chapter 11 cases, and here, the Series B Holders have failed to meet the high burden of proof that such committee is "'necessary' to adequately represent equity's interests."[2] In fact, it would do meaningful harm and counter important statutory principles to elevate the self-interests of four institutional equity investors who hold approximately 19% of the equity in CNL over the interests of these estates, and saddle the Debtors' estates with the costs of paying for an Equity Committee's advisors at this early states of these chapter 11 cases when the right of equity holders to receive any recovery is far from established.

## I.    APPLICABLE LEGAL STANDARD

Section 1102(a)(2) of the Bankruptcy Code provides that "[o]n request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders if *necessary* to assure adequate representation of creditors or of equity security holders." 11 U.S.C. § 1102(a)(2) (emphasis added). The standard is high given that the Bankruptcy Code requires that the equity committee is *necessary* and "is far more onerous than if the statute merely provided that a committee be useful or appropriate." *In re Eastman Kodak Co.*, 2012 WL 2501071, at *2 (Bankr. S.D.N.Y. June 28, 2012). While courts apply varying

---

4.5% of the total equity issued by CNL. Thus, collectively, the Series B Holders own approximately 19% of the equity issued by CNL.

[2]    *In re SunEdison, Inc.*, 556 B.R. 94, 103 (Bankr. S.D.N.Y. 2016).

# KIRKLAND & ELLIS LLP

William K. Harrington
Linda A. Riffkin
Shara C. Cornell
August 10, 2022
Page 3

definitions of "necessary," they uniformly agree that an appointment of an equity committee "constitutes extraordinary relief and is the exception rather than the rule in chapter 11 cases." *Id.*

The moving party bears the burden of proof that an equity committee is necessary for equity holders to be adequately represented. *See In re SunEdison, Inc.*, 556 B.R. at 103. Courts routinely emphasize that this standard "is not whether the shareholders are 'exclusively' represented, but whether they are 'adequately' represented." *In re Williams Comm'n Grp., Inc.*, 281 B.R. 216, 223 (Bankr. S.D.N.Y. 2002) (quoting *In re Edison Bros. Stores, Inc.*, 1996 WL 534853, at *4 (D. Del. 1996)); *see also In re Edison Bros. Stores, Inc.*, 1996 WL 534853, at *4 ("While appellants may be correct in their observation that management cannot exclusively advocate for the interests of the shareholders, the statutory focus of § 1102(a)(2) is not whether shareholders are 'exclusively' represented, but whether they are 'adequately' represented."). Adequate representation is a case-by-case determination dependent on a number of factors, including: "the number of shareholders; the complexity of the case; the likely cost of an additional committee to the estate; whether equity is adequately represented by stakeholders already at the table; the timing of the motion relative to the status of the chapter 11 case; and whether there appears to be a substantial likelihood that equity will receive a meaningful distribution in the case." *In re Eastman Kodak Co.*, 2012 WL 2501071, at *1.

Among these factors, the two key considerations are whether (i) "'there is a substantial likelihood that [equity holders] will receive a meaningful distribution in the case under a strict application of the absolute priority rule," and (ii) equity holders "are unable to represent their interests in the bankruptcy case without an official committee." *In re SunEdison, Inc.*, 556 B.R. at 103 (quoting *In re Williams Comm'n Grp., Inc.*, 281 B.R. at 223).

## A.    The Requesting Shareholders Interests Are Adequately Represented.

Here, the Series B Holders cannot meet their burden of showing that their interests will not be adequately represented absent the appointment of an Equity Committee. The Series B Holders make cursory arguments as to why they are not adequately represented. Namely, they argue that neither the Committee nor current management can adequately represent their interests because they have "separate interests in protecting customers and the Debtors' industry reputation,"[3] and "creditors' interests in maximizing value may actually conflict with the

---

[3]    *See* Equity Request, July 19, 2022, at 3.

## KIRKLAND & ELLIS LLP

William K. Harrington
Linda A. Riffkin
Shara C. Cornell
August 10, 2022
Page 4

interests of CNL's equity holders . . . [and] current management may be focused on elements of these cases other than preserving value" for the Series B Holders.[4]

Once again, the Series B Holders misconstrue the applicable legal standard. The standard is not whether equity holders are "exclusively" represented, but whether they are adequately represented.[5] Celsius is not a publicly company widely held by many individual equity holders. Rather, Celsius' equity is held by less than 40 equity holders, and the Series B Holders have collectively invested at least $400 million in the past nine months and as such they are more than capable of funding their own advisors.

Courts have routinely held that equity holders are adequately represented through unofficial, ad hoc committees, such as the one the Series B Holders have currently established.[6] The Series B Holders are more than adequately represented in this case and have already engaged with the Debtors on multiple occasions. The Debtors' estates should not bear the cost associated with an Equity Committee when, as is the case here, the Debtors' liabilities far outweigh their assets.

The Debtors are duty-bound to maximize the value of their estate for **all** stakeholders, and here, the Debtors, have determined the best way to achieve that goal is through these chapter 11 cases so that they may build consensus among all stakeholders and, ultimately, fund recoveries through a chapter 11 plan.

**B.    The Requesting Shareholders Have Failed To Show A Substantial Likelihood Of Recovery.**

In addition, the Series B Holders fall short of demonstrating that there is a substantial likelihood of recovery for equity. Their arguments that certain value of the Debtors' estates should be "carved-out" based on allegations that customers do not have a right to that value and

---

[4]    *See* Preferred Request, at 2.

[5]    *See In re Williams Comm'n Grp., Inc.*, 281 B.R. at 223.

[6]    *See In re Eastman Kodak Co.*, 2012 WL 2501071, at *3 ("Finally, given the quality of the legal talent hired by the Shareholders, there is no reason to conclude that the Shareholders cannot be represented ably through an unofficial, or *ad hoc*, committee. As the Court said in *Spansion* in denying a motion to appoint an equity committee, 'the Ad Hoc Equity Committee is well organized, well represented by counsel, and adequate to the task of representing the interests without 'official' status.'") (citations omitted).

# KIRKLAND & ELLIS LLP

William K. Harrington
Linda A. Riffkin
Shara C. Cornell
August 10, 2022
Page 5

that equity alone is entitled to a recovery on certain assets are far from clear for the following reasons.

*First*, the Series B Holders' overall argument that customers cannot assert their claims against certain Debtor and non-Debtor affiliates is an undetermined question that the Debtors, and likely the recently appointed committee of unsecured creditors (the "Committee"), are still analyzing.[7]  As an initial matter, until August 2021, retail and institutional customers contracted directly with CNL.  In August 2021, in response to increased regulations in the U.K. regarding cryptocurrency trading, Celsius transferred many of its customer-facing operations to Celsius Network LLC ("LLC").  Borrowing and lending with institutional customers remain at CNL. Thus, many historical and current customer claims will likely be asserted against CNL.  As CNL is the direct or indirect parent of many Debtor and non-Debtor entities, value that flows from those entities up to CNL will first be available to customers with claims sitting at that entity, which may very well exceed CNL's current assets.

Moreover, based on the Debtors' initial analysis, they believe that customers may assert claims against all Debtor and non-Debtor entities in the Debtors' capital structure given the language in Celsius' current terms of use, dated April 14, 2022, (the "TOU").  In the TOU, customers contract with LLC "and its Affiliates."[8]  Thus, whether customers have claims against all Celsius entities is an undecided issue in these chapter 11 cases and it is premature to appoint an Equity Committee based on the Series B Holders allegations that customers do not have claims against Debtor Celsius Mining LLC, non-Debtor Celsius Mining IL Ltd., non-Debtor GK8 Ltd., and "other subsidiaries"[9] or that customers are not entitled to the value generated by CNL's "institutional loan portfolio."[10]

---

[7]     *See* Equity Request, July 19, 2022, at 3; Preferred Request, at 2.

[8]     *See Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, Providing Term of Use Dating Back to February 18, 2018* [Docket No. 393] (the "TOU Declaration"), Exhibit A-8.  "Affiliate" is defined as "an entity that owns or controls, is owned or controlled by, or is or under common control or ownership with a party, where control is defined as the direct or indirect power to direct or cause the direction of the management and policies of such party, whether through ownership of voting securities, by contract, or otherwise." *Id.*  This definition has been used since the second version of the TOU, in effect as of March 5, 2020. *See* TOU Declaration, Exhibit A-2.

[9]     *See* Equity Request, July 19, 2022, at 3; Preferred Request, at 2.

[10]    *See* Equity Request, July 19, 2022, at 3.

# KIRKLAND & ELLIS LLP

William K. Harrington
Linda A. Riffkin
Shara C. Cornell
August 10, 2022
Page 6

*Second*, Celsius' current liabilities are approximately $1.19 billion greater than its current assets.[11]    And given that the Series B Holders have provided no definitive documentation showing the Debtors' solvency, or that customers are not entitled to the benefit of the value of certain of Celsius' assets, they have failed to meet their burden of proof that an Equity Committee is *necessary* at this time in these chapter 11 cases.

The Series B Holders have made it clear that they will dispute that customer claims may be asserted against all Celsius entities.  This will likely remain true regardless of whether an Equity Committee is appointed.  If the Series B Holders are successful in demonstrating that substantial value exists purely for the benefit of CNL's equity holders, such as themselves, then they may seek to appoint an Equity Committee at that time.  Furthermore, the Series B Holders are not financially disadvantaged by making those arguments without a formal Equity Committee as such holders may seek to recover their costs and expenses pursuant to section 503(b)(3)(D) of the Bankruptcy Code in the event their arguments are successful.

To appoint an Equity Committee at this time, however, would force the Debtors' estates to bear the cost of an undecided, disputed issue that would risk diverting a substantial recovery away from the Debtors' creditors.[12]

For all of these reasons, the Series B Holders have failed to sustain their burden that CNL is solvent and that "'there is a substantial likelihood that they will receive a meaningful distribution in the case'" at this early stage in these chapter 11 cases.[13]

## C.    Additional Factors.

The Series B Holders also argue that an Equity Committee is necessary because (a) these chapter 11 cases are complex and (b) the benefits of an Equity Committee outweigh the costs given the "needs" of the Series B Holders to be adequately represented.  To the Series B Holders' first point, the complexity of these chapter 11 cases is precisely why appointing an Equity Committee at this stage will do more harm than good for all stakeholders.  Signaling to creditors from the outset that equity holders are entitled to recoveries that customers are not

---

[11]    *See* Mashinsky Declaration ¶ 16.

[12]    *In re Eastman Kodak Co.*, 2012 WL 2501071, at *3 ("If the Shareholders make a substantial contribution to Kodak's reorganization, they can obtain compensation for their fees under Bankruptcy Code § 503(b)(3)(D). On the other hand, the estate will not be forced to fund a constituency that appears to be out of the money.").

[13]    *In re SunEdison, Inc.*, 556 B.R. at 103 (quoting *In re Williams Comm'n Grp., Inc.*, 281 B.R. at 223).

# KIRKLAND & ELLIS LLP

William K. Harrington
Linda A. Riffkin
Shara C. Cornell
August 10, 2022
Page 7

would create massive discord among the Debtors' stakeholders and undermine the Debtors' attempts to build consensus while moving towards confirmation of a chapter 11 plan.

With respect to the Series B Holders' second point, the benefits of an Equity Committee, at the request of approximately 19% of CNL's equity holders who are already adequately represented by two firms, do not outweigh the costs to the Debtors for all the reasons set forth herein.

## V. CONCLUSION

The Series B Holders seek "an extraordinary remedy" that is not supported by the facts of this case.[14]  The appointment of an Equity Committee does not make practical sense in the context of these chapter 11 cases where there is no certainty that the Debtors' creditors are not entitled to all of the Debtors' value, let alone that the Debtors' customers will be repaid in full. The Series B Holders must meet a high legal burden for their relief to be granted, and their arguments do not meet that burden.  They have not (and cannot) show that they are not adequately represented, and similarly they have not shown a substantial likelihood of recovery.

For these reasons, appointment of an Equity Committee here is not necessary, and accordingly, the Debtors respectfully request that the U.S. Trustee exercise his discretion and decline to appoint an Equity Committee in these chapter 11 cases.

Sincerely,

/s/ Ross M. Kwasteniet
Ross M. Kwasteniet

---

[14]    *See In re New Century TRS Holdings, Inc.*, 2013 WL 5377962, at *3 (Bankr. D. Del. Sept. 26, 2013).

## **Exhibit J**

Milbank's Response Letter, dated August 15, 2022



**DENNIS F. DUNNE**
*Partner*
55 Hudson Yards  |  New York, NY 10001
T: 212.530.5770
ddunne@milbank.com  |  milbank.com

August 15, 2022

**VIA ELECTRONIC MAIL**

Attn: Shara Cornell
Office of the United States Trustee
U.S. Federal Office Building
201 Varick Street, Suite 1006
New York, NY 10014
shara.cornell@usdoj.gov

> Re:    *In re Celsius Network LLC, et al.*, Case No. 22-10964 (MG)
>        Request for Appointment of Official Committee of Equity Security Holders

Dear Ms. Cornell:

We write again, on behalf of Community First Partners, LLC, Celsius SPV Investors, LP, and Celsius New SPV Investors, LP (referred to collectively herein as the "Series B Holders"),[1] concerning the appointment of an equity committee (an "Equity Committee") in the above-referenced chapter 11 cases (the "Cases") and to respond directly to the Debtors' August 10, 2022 letter (the "Debtors' Letter," attached hereto as **Exhibit A**) to your office concerning the same.[2]  As detailed in our letters dated July 19, 2022 (the "July 19 Letter," attached hereto as **Exhibit B**) and July 28, 2022 (the "July 28 Letter," attached hereto as **Exhibit C**), the Series B Holders have respectfully requested the appointment of an Equity Committee.

---

[1] The Series B Holders are, in turn, fund managers protecting the investments of their own clients, including pensioners.  The Series B Holders own approximately 65% of the Series B Preferred Shares issued by Celsius Network Limited ("CNL") and approximately 14% of all equity issued by CNL; CNL directly or indirectly owns each Debtor and non-Debtor entity other than Celsius Network Inc. and Celsius Networks Lending LLC.

[2] We have twice requested that counsel to the Official Committee of Unsecured Creditors in these Cases (the "UCC") provide us a copy of the letter the UCC sent to your office concerning the appointment of an Equity Committee, but counsel to the UCC has not responded.

MILBANK LLP

NEW YORK | LOS ANGELES | WASHINGTON, D.C. | SÃO PAULO | FRANKFURT
LONDON | MUNICH | BEIJING | HONG KONG | SEOUL | SINGAPORE | TOKYO

August 15, 2022                                                                                              Page 2

At the outset, we note that both the Debtors and the UCC have unequivocally acknowledged two important facts in these Cases: *first*, that the Debtor entities are separate, distinct entities and should be treated as such;[3] and *second*, that which claims can be asserted at which entities will be an issue that is hotly contested.[4]  The Debtors have further acknowledged that the customer-facing business was transferred from CNL nearly a year before the Debtors filed for chapter 11 protection (the "Petition Date"),[5] and that the only entity with which retail customers do business is Celsius Network LLC.[6]

Section 1102(a)(1) of the Bankruptcy Code provides that the United States Trustee may appoint a statutory committee of equity security holders where "appropriate."  *See* 11 U.S.C. § 1102(a)(1).  These important acknowledged facts, coupled with the Debtors' Letter, reveal why the appointment of an Equity Committee is not only appropriate, but critical in these Cases.

## I.      An Equity Committee Should be Appointed Now

Perhaps because they recognize that the legal standard set forth in the Bankruptcy Code is unquestionably satisfied, the Debtors argue that the time is not right to appoint an Equity Committee.  We strongly disagree.  The Debtors effectively suggest that the Equity Committee issue should be put off while the Debtors and the customer fiduciary, the UCC, resolve critical issues in the Cases.  Indeed, the Debtors suggest that the United States Trustee should wait and see whether the Series B Holders, on their own, can prove the absence of claims at CNL and only then decide to appoint an Equity Committee, all while making plain that the central issue to these Cases—where customer claims can be asserted—already has been joined.

The Debtors explain that "whether customers have claims against all Celsius entities is an *undecided*" and "*disputed*" issue in these Cases, and that whether customers can assert their claims against certain Debtor and non-Debtor affiliates is "an undetermined question that *the Debtors, **and . . . the recently appointed [UCC]** . . . are still analyzing.*"  Debtors' Letter at 5, 6

---

[3] *See Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, in Support of Chapter 11 Petitions and First Day Motions* [Dkt. No. 23] (the "Mashinsky Declaration") at Ex. A (setting forth the Debtors' corporate structure); *The Official Committee of Unsecured Creditors' Limited Objection to the Debtors' Cash Management Motion* [Dkt. No. 401] (the "UCC Cash Management Objection") at ¶ 9 ("[W]hile the Debtors' estates are jointly administered for procedural purposes, the estates are not substantively consolidated. As such, the account holders and general unsecured creditors of each Debtor estate are legally entitled to assurance that the particular value upon which they rely is not improperly diverted.").

[4] *See* Debtors' Letter at 5 ("[W]hether customers have claims against all Celsius entities is an undecided issue in these chapter 11 cases . . . ."); UCC Cash Management Objection at ¶ 2 ("[W]hile the Debtors have acknowledged that account holders may have claims against multiple Debtor entities, the Court has not yet adjudicated the matter, and the Committee expects that the preferred equity of [CNL] will contest the matter.").

[5] *See* Debtors' Letter at 5.

[6] *See* Transcript from July 18, 2022 Hearing (the "First Day Hr'g Tr.") at 31:1-8.

August 15, 2022                                                                              Page 3

(emphases added).  Thus, the Debtors' position is that the Debtors and the UCC, and their respective advisors, shall work together with unfettered access to diligence to reach conclusions on this issue while the Series B Holders must prove that customer claims do ***not*** exist at CNL or at the various mining entities ***before*** they can be afforded the protections provided by an appointed committee.  In other words, the equity security holders must win the fight with one hand tied behind their back to establish they are worthy of recognition.  This is nonsensical; equity security holders have no such burden.

The Debtors ignore that an Equity Committee will represent the interests of, and owe duties to, *all* equity security holders in these Cases—not solely the holders who penned letters to the United States Trustee.[7]  Excluding the dozens of equity security holders—who the Series B Holders maintain are the proper recipients of value from certain meaningful assets held by entities completely separate from the Debtors' customer-facing entities and that have no known claims—from the organized and complete information flow, negotiations, and decision-making of official committee status is patently inappropriate, and indeed will improperly wipe out the interests of equity security holders in these Cases.  The Debtors' efforts to quiet or diminish adversarial viewpoints from the process of determining a key issue in these Cases should not be condoned.  Instead, the Debtors, customers, ***and*** equity security holders should all have equally situated fiduciaries with equal access and capabilities in determining this key issue beginning now, at the early stages of these Cases.

Already, many of the Series B Holders' requests to the Debtors' advisors for facts and evidence underpinning the Debtors' and/or the UCC's theories as to how customer claims might potentially exist at CNL have gone unanswered.  The Series B Holders are thus effectively in the dark.  The Debtors' Letter, however, makes clear that the Debtors ***and the UCC*** are now in the process of analyzing the question; it follows that an Equity Committee should be appointed ***now***, to allow equity security holders to equally and fairly participate in the analysis.

## II.      Equity Security Holders Are Not Adequately Represented

Where the United States Trustee declines to appoint an official equity committee, a party in interest may request the court to order such appointment if necessary to assure adequate representation of equity security holders.  *See* 11 U.S.C. § 1102(a)(2).  As described in the July 19 Letter, factors generally considered in an "adequate representation" analysis include the complexity of the case, whether the costs associated with the committee significantly outweigh the need for adequate representation, the delay that would result from appointment and the

---

[7] The Debtors argue, inexplicably, that appointing an Equity Committee would "elevate the self-interests of four institutional equity investors who hold approximately 19% of the equity in CNL over the interests of these estates[.]"  Debtors' Letter at 2.  This is misleading in two manners.  First, the Series B Holders seek appointment of an Equity Committee to represent the interests of ***all equity security holders*** in these Cases.  Second, appointment of an Equity Committee would not elevate the interests of equity security holders *over* the interests of the Debtors; it would merely place the Debtors' equity security holders on equal footing with the Debtors' customers.

timing of the request relative to the status of the case, and the likelihood that the debtors are hopelessly insolvent.  *See In re Williams Commc'ns Group, Inc.*, 281 B.R. 216, 220 (Bankr. S.D.N.Y. 2002) (applying factors).  Each of these factors strongly favors appointment of an Equity Committee in these Cases for the reasons described in the July 19 Letter.  *See generally* July 19 Letter at 2-4.  The Debtors' Letter does not contest that these Cases are complex, nor does it argue that the Debtors are hopelessly insolvent.  Indeed, according to the Debtors' filings, given where assets are currently valued and assuming liabilities are measured as of the Petition Date, the Debtors are solvent today.

What is more, the Debtors' Letter suggests postponing appointment of an Equity Committee until a later time, which ignores that the resolution of vital issues in these Cases, including where customer claims can be asserted, are likely to be litigated in the short term and the prejudice that would result from such a possible later appointment.  Moreover, unlike most debtors that come through the bankruptcy system, these Debtors raised capital through preferred equity, rather than debt, to fund their growth.  As such, there are no ad hoc groups of funded debt holders and the Series B Holders represent the senior-most security at CNL—inflating the need for adequate representation of this key constituency.

The Debtors argue cursorily that equity security holders in these Cases are already adequately represented.  But the Debtors misconstrue the legal standard, noting that courts have "routinely held that equity holders are adequately represented through unofficial, ad hoc committees[.]"  Debtors' Letter at 4.  Equity security holders in these Cases have *not* established any ad hoc committee; the Series B Holders retained their own counsel at these initial stages of the Cases, as is every party's right, in part in an effort to seek appointment of an Equity Committee.  But we do not and cannot, absent an Equity Committee, represent all of the Debtors' equity security holders, which the Series B Holders understand include more than 35 non-insider shareholders who directly or indirectly hold in the aggregate more than 30% of all of the Debtors' shares.[8]  Numerous of these equity security holders have *no* representation in these Cases—many are not U.S. entities, are entirely unfamiliar with the procedures of the Bankruptcy Code, and lack resources to ensure proper representation—and thus will not be adequately represented absent an Equity Committee.  Moreover, the arguments raised in the Debtors' Letter, coupled with the failure of the UCC to respond to the Series B Holders' requests for a copy of the UCC's letter concerning appointment of an Equity Committee, make patently clear that no other stakeholder in these Cases is even purporting to represent the interests of equity security holders.  The Debtors' current management and the UCC both have shown an overwhelming interest in protecting customers and have no incentive to represent the interests of shareholders. *See In re Williams*, 281 B.R. at 222-23 (creditors' committees and equity security holders do not always have "sufficiently aligned or parallel interests"); *In re Pilgrim's Pride Corp.*, 407 B.R.

---

[8] Because the Debtors' common stock and stock options are owned by the company's founders, *see* Mashinsky Declaration at ¶ 88, the Equity Committee would be comprised of, and would represent the interests of, the company's ***preferred*** equity security holders—whose interests are separate and distinct from those of the company's management.

211, 218-19 (Bankr. N.D. Tex. 2009) (noting that the "dynamics of chapter 11" are such that debtors and their management are unable to advocate effectively for equity recoveries).

### III.    Equity Security Holders Have a Substantial Likelihood of Meaningful Recovery

The Debtors' Letter argues that the Series B Holders must also demonstrate a substantial likelihood of recovery. *See* Debtors' Letter at 4. While any single factor in the adequate representation analysis is not dispositive, based on all information available to and known by the Series B Holders, along with the dearth of any information regarding customer claims being properly asserted against CNL or the mining entities, the Series B Holders **have** demonstrated a certainty of recovery for equity under the facts of these Cases. At least three meaningful assets sit at entities within the Debtors' organizational structure that are ***wholly separate and apart from the Debtors' customer-facing entities***; and as such, the value from these assets should be available only for the benefit of the Debtors' equity security holders. The Debtors' Letter does not dispute this fact,[9] but instead contends that the facts may change and other creditors may be able to bring claims against CNL that they do not have today, to take the value that belongs to the Series B Holders. Neither the Debtors' Letter nor any pleadings filed by the UCC to date establish that customers have any claims at CNL or the mining entities—those only raise arguments that such customers may make. Absent any such claims, there is no dispute that equity security holders will recover in these Cases.

As described in our July 19 Letter: (i) CNL is the indirect owner of the Debtors' valuable bitcoin mining equipment and other assets utilized by Debtor Celsius Mining LLC, a wholly-owned subsidiary of CNL, which is unaffected by customer claims; (ii) CNL has a loan portfolio that will be paid over time; and (iii) CNL is the indirect owner of GK8 Ltd. ("GK8"), a wholly-owned subsidiary purchased with funds invested in CNL by the Series B Holders, and which has not been integrated into the Debtors' retail customer-facing entities. Although we do not believe it is directly relevant, the evidence also demonstrates that the Series B funding was directly used to create the value of those assets. Publicly available information makes clear that the Series B Holders' investment into CNL pre-dated the Debtors' acquisition of GK8 by mere weeks: on October 12, 2021, Celsius announced the initial $400 million investment led by the Series B Holders into CNL[10]—in fact, $150 million of Series B was funded in September 2021; just a few weeks later, Celsius acquired GK8 for $115 million.[11] The Debtors' First Day Hearing Presentation further makes clear that Celsius' acquisition of Series B funding was tied to its acquisition of GK8. *See* Dkt. No. 45 at 17. Publicly available sources also demonstrate that the

---

[9] The Debtors have in these Cases unequivocally stated that CNL "owns 100 percent of the mining business . . . and 100 percent of the non-debtor business, GK8 [Ltd.]," and that the only entity with which retail customers do business is Celsius Network LLC. *See* First Day Hr'g Tr. at 31:1-8, 31:10-16.

[10] *See* https://www.prnewswire.com/news-releases/celsius-network-announces-an-investment-led-by-westcap-and-cdpq-at-a-valuation-more-than-us-3-billion-301397834.html.

[11] *See* https://www.gk8.io/gk8-joins-forces-with-celsius-to-supercharge-its-growth-while-retaining-independence/.

August 15, 2022                                                                 Page 6

second and final round of funding from the Series B Holders, which closed in December 2021, was used in part to fund Celsius' bitcoin mining capabilities.[12]  Indeed, the Series B Holders understood that their investment was to fund the acquisition of GK8 and the Debtors' bitcoin mining operations, as did their advisors.

The Debtors maintain that the Series B Holders' assertions are "far from certain" and that the UCC may have "credible arguments" to the contrary, *see* Debtors' Letter at 2, all the while arguing that the Series B Holders *must* demonstrate a substantial likelihood of recovery **ahead** of appointment of an Equity Committee.  This defies logic.  Whether customer claims can be properly asserted against CNL dictates the recovery owed to equity security holders; but the Series B Holders can only definitively prove the *lack* of customer claims at CNL (much the same as the Debtors and the UCC can only prove the **presence** of customer claims at CNL) after an Equity Committee has been appointed, thus granting equity security holders (and their advisors) equal footing with customers (and their advisors) to access information, decipher the company's complex intercompany finances, and conduct forensic accounting and other diligence. Appointment of an Equity Committee at this time is necessary to ensure that the process is not skewed for the benefit of the company's customers.

**IV.    Conclusion**

The Series B Holders submit that, for all the reasons set forth above and in the July 19 Letter and the July 28 Letter, an Equity Committee should be appointed now, in the early stage of these Cases, to adequately represent the important and unique interests of equity security holders.  We remain available to discuss the foregoing.

Respectfully,

*/s/ Dennis F. Dunne*
Dennis F. Dunne
Milbank LLP
*Counsel to Community First Partners,*
*LLC, Celsius SPV Investors, LP, and*
*Celsius New SPV Investors, LP*

---

[12] *See* https://blockworks.co/celsius-expands-its-series-b-from-400m-to-oversubscribed-750m/ ("Celsius will use the funds to further improve . . . its commitment to sustainable Bitcoin mining, the company said.").