Rebecca Gallagher
*Pro se creditor*
September 26 2022

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CELSIUS NETWORK LLC, *et al*, [1] | ) | Case No. 22-10964 (MG) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered.) |
|  | ) |  |

**Objection to docket #832, the debtor's motion permitting the sale of stable coins**

My name is Rebecca Gallagher and I am a Celsius Network LLC Earn Customer who was "grandfathered in" to the Earn product on April 15, 2022.

I would humbly request that customer stable coins absolutely not be used to provide liquidity for day to day running operations. These are our coins—our property—and should be held in reserve to be distributed back to all customers fairly when the time comes. If granted, the motion sets the stage to have this court rule that depositors' coins are not their property.

Although the most recently updated TOS would like to transfer ownership of our coins to Celsius, they surely remain ours. The TOS are quite clearly waived given all the many statements Alex Mashinsky made in the weekly AMAs referring to them repeatedly as our coins. This is corroborated by the fact that they were used as collateral for loans, and that 1099s were issued on them for customers to pay their taxes. Celsius' TOS included no clause that prevented oral modification of their contract with depositors. Furthermore if, as Celsius claims, title to the coins now belongs to them, then Celsius would thereby also be saying that they operate as a Bank. This would put them afoul of the law as they do not hold the necessary licenses to be a Bank.

There are many legal arguments that customer coins are customer property under Federal and State laws, including New York law. (Exhibit A) Fact-finding on this issue is currently ongoing and must be completed and ruled on before any assets are sold, or released to any sub-group of customers so that no one group is hurt.

I would humbly request that instead of selling stable coins, the CEL treasury, which is the property of Celsius and a reserve asset, be used. This is the stated purpose of the treasury, as per Alex Mashinsky, should there be a bank run. (Exhibit B) It could be slowly and carefully liquidated to provide for day-to-day operations, so as not to crash the market.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

No more than $10,000-50,000 daily is the amount recommended by a trading expert. Also, Bitcoin from the mining operation **can** continue to be sold, as has already been agreed to by the Court. DIP financing, however, would be totally unacceptable.

I would ask this Court, the UST, and the UCC to carefully consider if there is a viable reorganized company that can emerge under current management. Every day Alex remains in charge we are wasting precious customer dollars and depositers' life savings on overhead and legal fees. It is time for Alex Mashinsky to step-down. Time to move swiftly to a distribution of all customer crypto funds that remain and a crypto solution to fill the hole from a trustworthy source. Enough is enough.

I strongly object to any payout of funds to one entity, such as Custody and Withhold, ahead of the rest of us, and until we have a clear ruling that Earn coins are our property. Anyone who was non-accredited should have been placed in Custody at the time of its creation, or more importantly, should never have been in the Earn product to begin with. Many of us are not able to bear the financial loss from the high-risk practices Celsius exposed us to without our knowledge or consent.

The intent of regulators forcing Celsius to introduce Custody was clearly to protect US unaccredited investors from financial harm. So why should Celsius be allowed to sell stable coins belonging to Earn customers, who were not qualified to deposit their funds into this product, but not coins belonging to Custody and Withhold customers, some of whom are millionaires and accredited investors? Is it just because those people can afford a lawyer?

Granting permission for these coins to be sold plays into the position that Celsius is attempting to take regarding the TOS that our coins are their property, and that is unacceptable. This is the key issue in the case with far-reaching repercussions. I personally sold my house and put the proceeds, my life savings, and my last year's salary into Celsius so that I could live off the yield in retirement, which is only 6 months away. There is no way I would have knowingly given away title to all that I own. No one would. That is simply preposterous. I watched the weekly AMAs, believed the many false statements and misrepresentations and, acting in good faith, thought I was investing in a safe, low risk product similar to a Bank. I am now financially destitute, face a very grim future and am too old to recover. I need my coins back.

Let us get this key issue of who owns the earn coins on the table and resolved. Let us not waste precious court time discussing such things as *de minimis* sales, which have no bearing on the grand scheme of things for thousands of depositors who have been separated from their funds and are now struggling to make ends meet. Let us not go along with a sneakily set precedent that will be used down the road to deprive customers of what is rightfully theirs.

For the foregoing reasons, I ask that you deny the motion in docket number 832, the Debtor's motion to sell stable coins.

Thanking you for your consideration, Your Honor.

Respectfully submitted by

s/ Rebecca Gallagher
Rebecca Gallagher
*Pro se creditor and US Non-Accredited Earn Customer*

Dated: September 26, 2022
Signed: Bedford, England

**Exhibit A**

# Whose Crypto Is It, Anyway?

**08.03.22**

On July 18, the maxim "not your keys, not your coin" took on a whole new meaning for customers of the bankrupt cryptocurrency exchange Celsius Network LLC, which had filed Chapter 11 in the Bankruptcy Court for the Southern District of New York. At the first day hearing, attorneys explained the debtor's view that cryptocurrency deposited on the exchange belonged to Celsius, not the depositors. They cited the terms of use for Celsius' "Earn Rewards" program (Earn Program) where retail customers could place cryptocurrency into interest-bearing accounts, which Celsius then pooled to fund its lending, trading, and other operations. Under Celsius' terms of use, "all rights and title" to coins in the Earn Program are transferred to Celsius, and Celsius is free to use, sell, pledge, and rehypothecate those coins.

In other words, according to Celsius' attorneys, coins in the Earn Program are property of the bankruptcy estate,[1] and depositors who thought they were still the owners of those coins are merely general unsecured creditors. The extent to which this came as a shock to depositors is reflected in the dozens of outraged and incredulous letters that have been filed on the docket in Celsius' bankruptcy case.

**Coins in the Custody Program**

Notably, a very small subset of coins on the Celsius platform in the "Custody" service (about 4% of the total coins on the exchange, worth about $180 million at filing) may be subject to different treatment in the bankruptcy case. A little history is needed for context: As explained in detail here, in 2021, Celsius became the subject of several cease-and-desist actions by state regulators, each of which asserted that Celsius was illegally offering unregistered securities through its Earn Program. After initial resistance, in April 2022, Celsius unveiled the new Custody Program where depositors could store digital assets but would not earn rewards or financial compensation. New transfers made by nonaccredited investors in the United States on or after April 15 would automatically go into Custody. (Coins deposited by nonaccredited U.S. investors prior to April 15 were grandfathered in to the Earn Program and could remain there until moved by the depositors.)

The terms of use for the Custody service provide that title to coins deposited there remain with the customer, and do *not* give Celsius the right to use, sell, pledge, and rehypothecate those coins. The terms of use are not perfect (or perfectly clear) and do not necessarily spell out a slam dunk case for Custody account holders. For example, they provide Celsius with a right to set off mutual debts against coins in Custody, which is more consistent with a creditor relationship, and warns that Custody depositors may be treated as unsecured creditors in a bankruptcy. But the language is, at a minimum, more depositor-favorable than the terms of use for the Earn Program.

The status of coins in the Custody account is likely to come to a head in fairly short order, as hundreds of Custody depositors have organized themselves into an ad hoc committee and retained counsel to pursue this issue. If they are successful in obtaining a judgment that their coins are not

© 2022 Troutman Pepper Hamilton Sanders LLP                                                                                                                                1

property of the bankruptcy estate, they will be well-positioned to demand immediate return of those coins.[2]

**Coins in the Earn Program**

So where does this leave depositors in the Earn Program — particularly nonaccredited investors who arguably should never have had access to unregistered securities in the first place? Should they resign themselves to treatment as general unsecured creditors who must wait months or years for a distribution that is likely to be in fiat currency and (even worse) based on the depressed value of their crypto assets on the bankruptcy petition date?

Not necessarily.

For one thing, the Earn Program's terms of use are somewhat ambiguous: While they speak in terms of a transfer of title and ownership to Celsius, they also expressly state that depositors are merely entering into "open-ended loans" of their digital assets to Celsius. A loan generally does not effectuate a change of ownership. If I make an open-ended loan of my car to my teenager, she may use the car to do any number of things, but she does not thereby acquire title to it. Or, in a more closely analogous situation, I might enter into a hypothecation agreement for a margin account that allows my broker to lend out my shares to short sellers, but that doesn't make him the owner of the shares. Earn Program depositors may be able to make similar arguments with respect to the status of their coins in Celsius' hands.

In the same vein, New York law looks to the substance of a relationship; the words used to characterize it are not dispositive. Celsius expressly disavowed any fiduciary obligations to depositors in the terms of use, which would tend to preclude a finding that it held depositors' coins as an agent or custodian. However, "where a writing erects the essential structure of an agency relationship, even an explicit disclaimer cannot undo it."[3] As New York's highest court has recognized, the existence of fiduciary obligations "is not dependent solely upon an agreement or contractual relation between the fiduciary and the beneficiary but results from the relation."[4] In other words, just because Celsius claimed it wasn't acting as an agent or custodian for Earn Program depositors doesn't let it off the hook. A factual record must be developed to determine the true relationship between Celsius and the Earn Program depositors.

Alternatively, Earn Program depositors could seek to rescind their transfers of coins to Celsius, based on either securities law considerations applicable to nonaccredited investors or on a theory of fraudulent inducement. (A cursory search of YouTube reveals numerous examples of statements made by Celsius executives that appear to be inconsistent with Celsius' terms of use.)

Earn Program depositors could also argue that the terms of use were orally modified by public pronouncements by Celsius executives, indicating that they would continue to own and control their coins. The terms of use, somewhat surprisingly, contain no integration clause or prohibition of oral modification; thus, under New York law, a colorable argument may be made that the terms were orally modified to keep title to the coins with the depositors.[5]

**Conclusion**

While Custody account holders are likely in a stronger position to exclude their coins from property of the estate, Earn Program depositors may also have viable arguments to retain ownership of their crypto assets, although further factual development and legal analysis would be required.

© 2022 Troutman Pepper Hamilton Sanders LLP                                                                                    2

[1] The filing of a bankruptcy petition creates an "estate," consisting of all legal or equitable interests of the debtor in property as of the commencement of the case. *See* 11 U.S.C. § 541.

[2] Of course, many of them will likely face preference lawsuits down the road. Under 11 U.S.C. § 547, the debtor-in-possession can claw back payments made to creditors on account of antecedent debt within 90 days before the bankruptcy filing. If coins in the Earn Program are deemed to be property of the estate, or loans from depositors to Celsius, then the transfer of coins to Custody would be payment of debts owed to creditors. It's no coincidence that Celsius filed for bankruptcy on the 89th day after the Custody accounts were created — the company and its very competent bankruptcy counsel were making sure that any coins transferred from the Earn Program to Custody would fall within the preference period.

[3] *Veleron Holding, B.V. v. Stanley*, 117 F. Supp. 3d 404, 452 (S.D.N.Y. 2015).

[4] *EBC I, Inc. v. Goldman, Sachs & Co.,* 832 N.E.2d 26 (N.Y.2005).

[5] *See, e.g., Merrill Lynch Realty Assocs., Inc. v. Burr*, 140 A.D.2d 589, 593, 528 N.Y.S.2d 857, 860 (1988) (explaining that New York's General Obligations law does not "bar enforcement of a subsequent oral agreement to modify or cancel a contract where . . . the contract does not contain an express prohibition against oral modification").

## Authors

Deborah Kovsky-Apap

Ethan G. Ostroff

Keith J. Barnett

James W. Stevens

## Related Practices and Industries

Finance

Financial Restructuring + Insolvency

## Exhibit B

Celsius Ask Me Anything, Friday, October 23, 2020, 1:22:06
https://www.facebook.com/CelsiusNetwork/videos/celsius-ama-ask-mashinsky-anything-friday-october-23/824831858266094/

Host: Uh, question from Jonathan here. Would Celsius survive a run on all of the company's holdings? Like if everyone withdrew, would Celsius be alright?

Alex Mashinsky: Yeah, so the answer is yes. And I do this every AMA. We have plenty more assets … than all of our deposits put together. Meaning, tomorrow, if everybody said: Alex, enough of this B.S., we wanna withdraw all of our coins, we can give all of the coins to all of our depositors and we have plenty left over. Like, $10s of millions of dollars left over, plus another $400 million worth of CEL token that Celsius owns. Remember, Celsius is the largest holder of CEL token. It's sitting on a treasure trove, right, which is like that safety-belt that we created around all the depositors. So, so, yes, we have, if that happens, we are allowed to call back all of our loans with our users, both institutional and retail… So Talla's not gonna be happy, but, she's gonna have to go to all these customers to say, please return the loan, unfortunately too many people want their money back and we have to shut it down. So, uh, we do not do fractional reserves like the banks do.