Cameron Crews
*Pro se creditor*
camcrews@proton.me

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
|  | ) |  |
| In re: | ) | Chapter 11 |
|  | ) |  |
| Celsius Network LLC, et al.,[1] | ) | Case No. 22-10964 (MG) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**OMNIBUS OBJECTION TO THE DEBTORS' MOTION SEEKING ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO REOPEN WITHDRAWALS FOR CERTAIN CUSTOMERS WITH RESPECT TO CERTAIN ASSETS HELD IN THE CUSTODY PROGRAM AND WITHHOLD ACCOUNTS AND (II) GRANTING RELATED RELIEF DOCKET #670, TO THE AD HOC GROUP OF CUSTODIAL ACCOUNT HOLDERS' ADVERSARY CASE #22-01142 COMPLAINT FOR DECLARATORY JUDGMENT DOCKET #662, AND TO THE AD HOC GROUP OF WITHHOLD ACCOUNT HOLDERS' MOTION FOR RELIEF FROM THE AUTOMATIC STAY DOCKET #737.**

I, Cameron Crews, respectfully file this objection to docket numbers 670, 662, and 737 due to (1) a lack of substantiation that Earn and Custody accounts were properly segregated; (2) the revelation that customer withdrawals were funded by new customer deposits; (3) a lack of explanation for the source of yield payments to Earn accounts; (4) a lack of explanation as to why Earn accounts did not convert to Custody during the Celsius "Pause"; (5) a preponderance of evidence supporting that the title of Earn accounts rightfully belongs to depositors.

The Examiner, not yet appointed, has been tasked with investigating related matters:

    i.   An examination of the Debtors' cryptocurrency holdings, including a

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

    determination as to where the Debtors' cryptocurrency holdings were stored prepetition and are stored postpetition and whether different types of accounts are commingled.

  ii. An examination as to why there was a change in account offerings beginning in April 2022 from the Earn Program to the Custody Service for some customers while others were placed in a "Withhold Account."

I ask this court to delay decisions on motions which may materially affect customer recoveries until the Examiner is able to investigate the aforementioned scope, so it can be conclusively determined what customer assets *are* and *are not* property of the estate.

**Background**

The two main services the Debtors offered to depositors were the ability to (1) earn a return on their crypto assets, and (2) take out loans using those assets as collateral. For the vast majority of the Debtors' existence as a going concern, each customer had a consolidated account that earned varied rates of interest for each crypto asset held, with the exception of funds actively being used as loan collateral.

The concept of supposedly segregated Earn and Custody accounts was introduced to the Celsius platform on April 15, 2022. This change came on the heels of a $100M fine that the Security and Exchange Commission (SEC) levied on BlockFi in February 2022 for lack of regulatory compliance of its own similar crypto lending platform.

The new Earn accounts functioned identically to the previous consolidated accounts, while funds in Custody did not earn a return. Celsius grandfathered existing customers into the Earn program, whereas only non-US or accredited investors were permitted to add funds to Earn after April 15, 2022.

To withdraw from the Celsius platform, depositors would first have to transfer their funds into Custody status. As such, the primary use of Custody was as a precursor to withdrawing funds from the platform and as the initial home for new deposits. Custody was introduced to protect Celsius from US regulators, rather than in response to market demand of its customers.

**1. Custody and Earn funds were not properly segregated**

The Debtors have not substantiated that funds designated as Earn and Custody accounts were properly recorded in auditable blockchain transactions[2]. To the extent customer funds of separate account categories were commingled, customers shared common risks resulting from the Debtors' handling of their funds. Therefore, despite the Debtors' supposedly separate classifications of customer accounts, creditor groups with commingled funds should be entitled to common recoveries.

Celsius CSO Shiran Kleiderman's testimony to the existence of a Custody "workspace" in Fireblocks[3] is not sufficient to show that user funds were appropriately segregated within this workspace. To the contrary, evidence suggests customer funds were mishandled and the Debtors lacked the automated processes necessary to manage large volumes of cryptocurrency reliably.

My investigation shows that customer deposits on the Ethereum blockchain were routinely sent to the Celsius Network LLC (CNL) workspace rather than the Custody workspace[4], a violation of the regulatory requirement to segregate Custody assets. Regardless of whether the Celsius website represented to customers that their funds were held in Custody,

---

[2] A "blockchain" is a public database consisting of a sequence of blocks, where each block contains a group of transactions and a hash value that vouches for the authenticity of itself and all prior blocks. While the identity of wallet owners involved in blockchain transactions is unknown without supplemental real-world knowledge of participants, such transactions can be confirmed to exist by sharing of a wallet address or a transaction hash, which acts like a digital receipt.
[3] Docket 813
[4] Exhibit A, my investigation identifies CNL and Custody wallets by cross referencing Docket 813 with the expanded coin report filed as Docket 811, then traces the flow of deposits and withdrawals through them

customer deposits regularly first passed into the CNL wallet that only Earn accounts should have interacted with. This handling of deposits on the blockchain was consistent both before and after the 4/15/22 activation of segregated Earn and Custody accounts[5].



Such examples of apparent failure to adhere to the proper flow of customer funds are perhaps to be expected when considering the recent revelation that Celsius lacked automated processes to assist in compliance. Despite the Debtors' opening day attestation of being a "sophisticated" operation, Celsius reportedly managed its customers' assets valued at billions of dollars using just a simple Excel spreadsheet[6].

> "Celsius… never had sophisticated software to properly manage and track its assets, according to sources familiar with the company. These sources… said **the data was being tracked manually,** on a simple Excel spreadsheet."
> CNBC Investigations, 9/23/22 "Celsius has a Hail Mary Bankruptcy Plan"
> by Paige Tortorelli and Kate Rooney
> https://cnb.cx/3DQe9u6

While Alex Mashinsky's first day declaration acknowledged that "all user assets are comingled [sic],[7]" the Debtors were still obligated to segregate assets across different account categories to manage the supposedly different risk profiles of Earn and Custody. Put simply,

---

[5] Exhibit A, #3
[6] CNBC article "Celius has a Hail Mary Bankruptcy Plan" 9/23/22
[7] Docket #23, Item #58

funds all parties agree were titled to depositors should have been held separately from funds the Debtors believed they held title to.

As Earn and Custody accounts were both unknowingly exposed to the same risks of the Debtors' activities, they should be treated similarly in the recovery process ordered by the Court.

**2. Customer withdrawals were funded by new customer deposits**

My investigation indicates customer withdrawals were substantially funded by new customer deposits[8] during the period between March and June when the Debtors' net outflow of accounts was negative[9].



Above: The orange lines predominantly indicate USDC deposits into the CNL workspace's Wallet #5 between April 22, 2022 and April 25, 2022. This Wallet #5 then sent $9.4M USDC to Wallet 0xD86C, which funded Celsius customer withdrawals.
https://explorer.bitquery.io/ethereum/address/0xd86C6ae32199d1C14e573F3BD9987DCc1b4Fec49/graph?from=2022-04-22&till=2022-04-25

The Debtors were almost certainly insolvent during this period, when considering Ethan McLaughlin's filing[10] which shows over $1B in negative equity by May 13, 2022.  Only after the

---

[8] Exhibit A, #8
[9] Docket #23, Mashinsky first day declaration, item #41
[10] Docket #730-1, item #4

Debtors filed for bankruptcy protection did it emerge in their coin reports that $3B of customer deposits were missing[11]. Tellingly, when asked by one of his equity investors whether he knew about this hole in a 9/22/22 Twitter Spaces call, Alex Mashinsky declined to answer[12].

Those who withdrew from the Celsius platform during this period disproportionately benefited over those left behind. The Debtors hid the fact they had lost a portion of withdrawing customers' assets and made them whole using new deposits from other customers, at least in part. The Court should consider these inequitable circumstances when making a determination on the appropriateness of clawbacks, to better distribute the impact of the Debtors' malfeasance.

Note that clawbacks do have significant disadvantages of drawing more victims into the Debtors' mess and of suffering from unequal enforcement. It may be more expeditious to instead, when calculating creditor claims, proportionately deduct any already successful withdrawals made by customers from any of their remaining claims.

**3. The source of steady yield credited to Earn accounts remains unexplained**

Validating the source of yield payments on Celsius is crucial before creditor recoveries are authorized. The Debtors boasted of paying out +$1B in rewards[13] while leaving an even larger hole in their balance sheet, which calls into question the legitimacy of these rewards payments.

In May of 2022, the Debtors faced a precipitous decline in assets under management (AUM) due to both a decrease in digital asset prices and depositors pulling their funds off the Celsius platform. To whatever extent the Debtors' purported revenue was real, this revenue must

---

[11] Docket #447, page 6. Note, $3.2b customer deposits are missing when subtracting out the Debtors' CEL balance
[12] https://youtu.be/6c4SYdx6aNo?t=5m Simon Dixon asks Alex Mashinsky about the hole at 5 minutes
[13] https://bit.ly/3DTEWWt Alex Mashinsky on London Real 4/8/22

have declined during the erosion of their UAM from $25B in October 11, 2021[14] to less than $4B on June 12, 2022 when customer deposits were paused.

The Debtors have repeatedly claimed their depositors collectively earn a share of 80% of the company's revenue. These yield payments were credited every Monday to depositors.



How could the Debtors simultaneously share 80% of their revenue and also pay out the same high yields even as this revenue declined? Quite simply, they could not. But rather than reduce rates, they decided to keep up appearances.

This meant they would have to make up the difference through some combination of drawing down on deposits/cash reserves, taking out business loans, or convincing as many customers as possible to accept CEL token for their yield[15] instead of an asset whose market value Celsius did not substantially influence. When asked about the source of yield in interviews months before bankruptcy, the Debtors' CEO offered vague assurances that begin to look like confessions, when considered in hindsight.

> "If we paid a billion dollars, that means we made more than a billion dollars… **[we] don't take investors' money or somebody else's money and subsidize our payouts**. The yield we pay out has been earned. So you can extrapolate from there what are the revenues of Celsius Network."
> Alex Mashinsky 4/8/22 in interview on London Real "The fees that you never see"
> https://bit.ly/3DTEWWt

---

[14] https://www.youtube.com/watch?v=IRmdexz7cG0 Alex Mashinsky interview with Paul Barron on 10/11/21.
[15] The "earn in CEL" option was only available to non-US and accredited investors

To the extent the Debtors paid out withdrawals and yield using new deposits, Celsius met the technical definition of a Ponzi scheme. Jennifer Rood's filing on behalf of Vermont's Department of Financial Regulation, noted that CFO Chris Ferraro admitted "the company had never earned enough revenue to support the yields being paid to investors"[16] from which she prudently concluded "at least at some points in time, yields to existing investors were probably being paid with the assets of new investors."

This has since been further corroborated at the Debtors' all-hands meeting on September 8, 2022, wherein its CEO Alex Mashinsky confirmed the Celsius Earn product operated at a loss.

> "A lot of these smaller accounts, we probably lost money on them because they were just not using loans or not using some of the services where we had income."
> Alex Mashinsky 9/8/22 in company all-hands meeting leaked to creditor Tiffany Fong
> https://bit.ly/3qRueIc (53 minutes, 42 seconds in)

Since Earn customers comprised a significant majority of Celsius's users, paying out Earn returns at a loss raises serious questions about the source of these returns. I respectfully ask the Court and Examiner to resolve such questions prior to disbursing depositor funds, to allow for a more equitable outcome for all creditors.

**4. Earn accounts should have converted to Custody after the 6/12/22 pause**

Inexplicably, each of the five Mondays from June 13th through the bankruptcy filing on July 13th, Earn customers continued to receive notice of weekly yield accruing to their accounts. The continuation of rewards even after the platform had paused further calls into question the legitimacy of Earn reward payouts.

---

[16] Vermont filing, item #12 of Docket #730

Surely the correct thing to do for an insolvent company facing an existential crisis would have been to suspend rewards for depositors.  However, had Earn accounts stopped being credited with yield, they would have become *de facto* Custody accounts.  This would have further undermined the Debtors' claim to legal title over deposits designated as Earn assets. Thus it was to the Debtors' strategic advantage to continue to credit rewards despite being incapable of fulfilling them.

Because the Pause should have resulted in suspension of yield payments, Earn accounts should have been converted to Custody.  As a result, accounts classified as Earn or Custody should receive the same treatment in the bankruptcy proceedings.



**5. Debtors should address flaws to their claim of legal title to deposits**

The Debtors' attempt to assert ownership over Earn accounts suffers from insurmountable flaws including the (a) lack of establishment that customers gave positive assent to ToS changes, (b) observation that surrender of title made no sense for depositors, (c) lack of proper banking license necessary to take ownership of customer funds, (d) oral modification of

the contract including, but not limited to, repeated assertions that crypto assets were property of their customers, (i.e. "your coins," "deposit," "withdraw," etc.) with no talk of customers "transferring title" of their assets.

**a. A lack of establishment that customers gave positive assent to ToS changes**

Preserving customer ownership of digital assets was the customary practice at Celsius for most of its existence. As of September 30, 2020, the Debtors' original terms of service required its customers to affirm ownership of digital assets deposited on the platform:

> "You hereby represent and warrant to us… that any Digital Asset used by you in connection with your Celsius Wallet **is owned by you**"[17]

The Debtor, however, made a radical change to their terms of service in July of 2021, wherein a single line within the 11,749 word document now stipulated "all rights and title" of deposited funds earning a return transferred to the Debtor.

> "…you will lend your Eligible Digital Assets to Celsius and **grant Celsius all rights and title** to such Digital Assets, for Celsius to use in its sole discretion while using the Earn Service."

Furthermore, this updated terms of service lacked the customary "terms updated on" clause that informed customers the terms had been updated. This clause was previously included on the 2/16/18, 6/15/20, and 9/30/20 versions that each affirmed the customer retained title to their coins upon deposit.

---

[17] ToS 9/30/20 – 7/21 Reads as Follows (emphasis added):
<<8. Ownership of Digital Assets
You hereby represent and warrant to us at all times during which you hold Digital Assets in your Celsius Wallet that any Digital Asset used by you in connection with your Celsius Wallet **is owned by you** or that you are validly authorized to carry out transactions using such Digital Assets, and that all transactions initiated with your Celsius Wallet are for your own Celsius Wallet and not on behalf of any other person or entity. You further represent and warrant that all such Digital Assets are free from any claims, indebtedness, liens, or third-party interests.>>

Such a major change to the July 2021 version without the **informed** positive assent of Celsius customers qualifies as a deceptive business practice, forbidden by Section 5 of the Federal Trade Commission Act[18]. New York's General Business Law Section 349 bars deceptive business practices upon grounds established by the FTCA.

Before any funds are released, the Examiner should investigate how the Debtors ensured their customers (1) were made aware of the substance of this change to the ToS; (2) positively assented to the new terms; and (3) can validate record of their assent with a digital signature.

**b. Transfer of title made no sense for depositors**

Maintaining ownership of digital assets is foundational to crypto platforms. This allows customers to benefit from either earning a return or taking out a loan on their crypto assets without triggering a taxable event.

If title to a digital asset transferred from the customer to the Debtors upon deposit, this would qualify as a disposal event under Internal Revenue Service (IRS) publication 544. The implication of this would be that customers unwittingly owe gains on any crypto deposited into Celsius if above their cost basis. This is a consequence that not only did the Debtors not disclose, but they also affirmed their customers deferred taxable events through use of Celsius.

> "You should be borrowing fiat or dollars against your Bitcoin and spending those dollars. That's what rich people do, they borrow against their real estate, they borrow against their stocks and bonds. And they allow them to continue to appreciate and, in turn, basically **they defer their taxes on all their capital gains**."
>> Alex Mashinsky 11/17/21, extolling the Celsius loan product on Kitco News
>> "Peter Schiff & Alex Mashinsky debate Bitcoin: Gold 2.0 or fool's gold?"
>> https://bit.ly/3qKUjJ2 (49 minutes, 46 seconds in)

---

[18] https://www.federalreserve.gov/boarddocs/supmanual/cch/ftca.pdf
An act or practice is deceptive where • a representation, omission, or practice misleads or is likely to mislead the consumer; • a consumer's interpretation of the representation, omission, or practice is considered reasonable under the circumstances; and • the misleading representation, omission, or practice is material.

The Debtors will have to explain how simultaneously they were able to take possession of depositor funds and avoid this transfer of title from triggering a taxable event for depositors. The consequence of a taxable event upon depositing funds would undermine the purpose of using the Celsius platform for many of its customers.

According to *Veleron Holding, B.V. v. Stanley*, 117 F. Supp. 3d 404, 452 (S.D.N.Y. 2015) "where a writing erects the essential structure of an agency relationship, even an explicit disclaimer cannot undo it." This is such a situation. Celsius was clear with customers and the IRS from the inception of this product that coins were property of customers. Their marketing, behavior, and oral representations to customers all affirmed this, and they reported Earn rewards as interest payments on customers' 1099 forms. This behavior with customers and IRS did not change in 2022 from prior years even when they surreptitiously changed their terms in July of 2021. Now, they want to claim ownership of our assets in bankruptcy, with intent to hold our funds hostage as unwilling venture capital for their rebirth.

Earn customers may have constructive trust claims under New York law, which may mean our assets are recoverable using the "lowest intermediate balance rule," contingent upon the Examiner's findings. I therefore ask that this court defer related decisions until these investigations are complete so that coins that may belong to us are not disposed of by the estate.

### c. A lack of proper banking license for Debtors to take possession of customer assets

The Debtors should establish that they possess an appropriate banking license that would permit them to claim title of customer's deposits.

**d. Repeated assertions that crypto assets remained in the possession of their customers**

The Debtors made repeated assertions to customers throughout their time as a going concern that reaffirmed deposits on their platform belonged to their customers.  To supplement the points on this matter raised by Rebecca Gallagher's objection in Docket 901, a small sampling of attestations of depositor ownership are presented as exhibits B-E.  Customers materially relied upon this continuous, repeated language affirming customer ownership of deposits.  Such actions of the Debtors, both before and after the "title" clause was inserted into their terms in July of 2021, should constitute a modification of contract.

**WHEREFORE**, this *pro se* creditor respectfully requests the Court seek to DEFER ruling on the foregoing motions and Adversary Proceeding.

I ask that the Examiner and the Unsecured Creditors' Committee (UCC) adequately resolve the aforementioned concerns about title of customer assets across all categories before any customer withdrawals begin. I will note that scopes i and ii of the Examiner order are relevant here, along with possible adversary proceedings or lift-stay motions that may be filed by Earn or Loans depositors. Only when ownership across all products is clear and definitely ruled upon by this court would it be appropriate to consider motions to authorize withdrawals for certain customers from the estate.

Dated: September 28, 2022                         /s/ Cameron Crews
                                                  Cameron Crews
                                                  *pro se creditor*

Exhibit A) Examination of Celsius deposits and withdrawals

This examination focuses on the Ethereum network because, in addition to ETH, Celsius supports several ERC20 tokens such as USDC, wBTC, and CEL which use the Ethereum network, making it the most convenient to analyze.

1) Firstly, to inform our investigation we identify Celsius wallets with the workspace labels divulged in docket #812 by using the expanded coin report in docket #811.

**Custody Wallet 0xC131**
The coin report indicates that the Custody workspace has $36.1M worth of USDC stablecoin as of 9/2/22. This matches Celsius wallet 0xC131 which holds the same amount of USDC. We can therefore conclude this is the primary active wallet within the Custody workspace.[19]

https://etherscan.io/address/0xc131701ea649afc0bfcc085dc13304dc0153dc2e

**CNL Wallet 0x4F67, AKA Wallet #5**
The coin report identifies $11.6M worth of Ethereum held within the Celsius Network LLC (CNL) workspace as of 9/2/22. At a $1,577 market price for ETH, this suggests the workspace holds approximately 7,355 ETH. Celsius wallet 0x4F67 holds 6,861 ETH, which is a balance above all but two disclosed workspaces: Custody and CNL.

0x4F67 also holds 8.6M CEL while Custody only had 1.8M CEL ($2.7M CEL / $1.48 per CEL on 9/2/22). Because the 0x4F67 wallet balance exceeds the Custody workspace balance, we know this wallet cannot be Custody. CNL is the only remaining possibility, and as it safely falls within the CNL workspace balance of 259M CEL ($384M CEL / $1.48 per CEL on 9/2/22), we therefore conclude 0x4F67 is a major wallet within the CNL Workspace.
https://etherscan.io/address/0x4f6742badb049791cd9a37ea913f2bac38d01279

**Flow of Deposits**
2) When a customer deposits an Ethereum token with Celsius, the funds appear to be sent initially to a personalized deposit address for the customer, and then are immediately sent to a wallet within the CNL workspace.



This pattern was initially observed when examining a creditor's deposit on 4/6/22, two weeks before the creation of supposedly segregated Earn and Custody accounts on 4/15/22.

---

[19] The pseudonymous blockchain investigator DirtyBubbleMedia also concluded 0xC131 is the Celsius Custody wallet: https://twitter.com/MikeBurgersburg/status/1570068050895945728

3) The same deposit pattern continued even after Earn and Custody accounts were introduced.



Above: Deposits flowing into the Celsius Wallet #5 on 4/16/22
https://explorer.bitquery.io/ethereum/address/0x4f6742badb049791cd9a37ea913f2bac38d01279/graph?from=2022-04-16&till=2022-04-16

4) Looking at individual transactions with the flood of incoming funds entering the CNL Wallet on April 16th, 2022, one finds confirmation that they represent incoming deposits:

One customer deposited 1.5 ETH worth over $4,500 at the time from their account at Crypto.com:
https://etherscan.io/txs?a=0x31d6c057b5c45de2b93d6e117a892b71a54ed2c6

Another customer deposited $150,000 in USDC stablecoin from competitor Nexo after having previously made over $416,000 in USDC deposits:
https://etherscan.io/address/0x60122c8487c94eef88b13554e66ea4738e1d4623#tokentxns

5) These transactions continued to flow through the CNL workspace's Wallet #5 rather than be placed in custody.  Wallet #5 did send along 2k ETH of its ~42k ETH balance to Custody, which indicates deposits improperly filtered through the CNL workspace on their way to Custody.



https://explorer.bitquery.io/ethereum/address/0xc131701ea649afc0bfcc085dc13304dc0153dc2e?from=2022-04-16&till=2022-04-22

6) In reply to a thread started by DirtyBubbleMedia's Twitter account[20] soliciting Celsius withdrawal addresses for examination, one customer provided address 0x6727727AA0500C08ebD5f60Cd75421eafb5472Ff as the source of their DAI withdrawal. Examination of this address shows that the funds were sourced through 0x4f67, the CNL Wallet #5.



Above: DAI withdrawals flowing from Wallet #5 to intermediary wallet 0x6727 before reaching the customer's wallet in May 2021.
https://explorer.bitquery.io/ethereum/address/0xa0fc5a1227c164e076ae84ddafa333dadae9a923/graph?from=2021-05-06&till=2021-05-20

7) This same pattern continued a year later after the Earn and Custody distinction was introduced.



Above: USDC withdrawals funded by $9.4M from Wallet #5 (orange arrow) sent to intermediary wallet 0xD86C before being disbursed (4/22/22-4/25/22).
https://explorer.bitquery.io/ethereum/address/0xd86C6ae32199d1C14e573F3BD9987DCc1b4Fec49/graph?from=2022-04-22&till=2022-04-25

---

[20] https://twitter.com/MikeBurgersburg/status/1570850602548334592

8) Worse still, expanding the inbound transaction view shows Wallet #5 being funded by new deposits.



Above: Expanding the inbound depth of the previous exhibit reveals Wallet #5 was funded by new deposits sent to 0xD86C for withdrawals.
https://explorer.bitquery.io/ethereum/address/0xd86C6ae32199d1C14e573F3BD9987DCc1b4Fec49/graph?from=2022-04-22&till=2022-04-25

9) One of the transactions sending UDSC into Wallet #5 comes from an apparent personalized deposit address for a customer who sent 99,766 USDC from exchange Bitfinex. Based upon this flow of funds, we can say this customer's deposits were used to fund Celsius withdrawals.

https://etherscan.io/address/0x03dda849a412a55cff7b51d4406f6d45f7a8cf86#tokentxns

**Conclusion**
For both withdrawals and deposits, the CNL wallet was the source and destination of funds rather than a Custody wallet. This violates regulatory requirements that customer funds be stored in Custody, which are not resolved by the subsequent transfer of funds from CNL to Custody. We also uncovered evidence that new deposits to Celsius were used to fund customer withdrawals.

Exhibit B) June 8th, 2020 "Earn interest on **your** crypto"



# Earn, Borrow & Pay on the Blockchain

Celsius Network lets you earn interest on your crypto and instantly borrow against it. No fees ever.

GET THE APP

Exhibit C) May 5, 2020 "Have **your** crypto and earn it, too"

# Have your crypto and earn it, too



Earn up to 10% interest on deposits.

\* Earn in CEL
\* The "Buy Crypto" buttons are provided by third parties, and your use of their service may be governed by their own terms and conditions of use and privacy policies. Not available in all areas.

Exhibit D) July 2nd, 2021 "**Your** crypto made you $157.32 in yield this week."



Exhibit E) May 8th, 2022 "Access **your** coins whenever, keep them safe forever"

