```
                                                          Page 1
 1   UNITED STATES BANKRUPTCY COURT

 2   SOUTHERN DISTRICT OF NEW YORK

 3   Case No. 22-10964-mg

 4   Adv. Case No. 22-01142-mg

 5   - - - - - - - - - - - - - - - - - - - - - - - - - - x

 6   In the Matter of:

 7

 8   CELSIUS NETWORK, LLC,

 9

10          Debtor.

11   - - - - - - - - - - - - - - - - - - - - - - - - - - x

12   AD HOC GROUP OF CUSTODIAL ACCOUNT HOLDERS,

13                 Plaintiff,

14          v.

15   CELSIUS NETWORK, LLC, et al,

16                 Defendants.

17   - - - - - - - - - - - - - - - - - - - - - - - - - - x

18                 United States Bankruptcy Court

19                 One Bowling Green

20                 New York, NY   10004

21

22                 October 7, 2022

23                 10:03 A.M.

24

25
```

Page 2

1    B E F O R E :

2    HON MARTIN GLENN

3    U.S.  BANKRUPTCY  JUDGE

4

5    ECRO:   KS

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1    HEARING re 22-01142-mg Ad Hoc Group of Custodial Account

2    Holders v. Celsius Network LLC et al Pre-trial Conference

3    Using Zoom for Government. (Doc ## 1 to 4, 6, 7, 8)

4

5    HEARING re Hearing Using Zoom for Government RE: Ad Hoc

6    Group of Withhold Account Holders Motion for Relief from The

7    Automatic Stay. (Doc# 737, 745, 857, 914, 937, 951, 954,

8    984)

9

10   HEARING re Hearing Using Zoom for Government RE: Debtor's

11   Motion Seeking Entry of an Order (I) Authorizing the Debtors

12   to Reopen Withdrawals for Certain Customers with Respect to

13   Certain Assets Held in the Custody Program and Withhold

14   Accounts and (II) Granting Related Relief. (Doc# 670, 725,

15   753, 857, 914, 933, 937, 951, 984)

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

```
                                                      Page 4
 1    A P P E A R A N C E S :

 2

 3    KIRKLAND ELLIS

 4         Attorneys for Celsius Network, LLC

 5         300 N LaSalle

 6         Chicago, IL 60654

 7

 8    BY:   CHRIS KOENIG (TELEPHONICALLY)

 9         ROSS M. KWASTENIET (TELEPHONICALLY)

10

11    WHITE CASE LLP

12         Attorneys for the Official Committee of Unsecured

13         Creditors

14         1221 Avenue of the Americas

15         New York, NY 10020

16

17    BY:   SAMUEL P. HERSHEY (TELEPHONICALLY)

18         GREGORY F. PESCE (TELEPHONICALLY)

19         DAVID TURETSKY (TELEPHONICALLY)

20

21

22

23

24

25
```

```
                                                        Page 5

1    NICOLE BARSTOW

2         Pro Se Creditor

3         49 Day Street

4         Norwalk, CT 06854

5

6    BY:  NICOLE BARSTOW (TELEPHONICALLY)

7

8    TROUTMAN PEPPER HAMILTON SANDERS, LLP

9         Attorneys for the Ad Hoc Group of Withhold Account

10        Holders

11        4000 Town Center, Suite 1800

12        Southfield, MI 48075

13

14   BY:  DEBORAH KOVSKY-APAP (TELEPHONICALLY)

15

16   CAMERON R. CREWS

17        Pro Se Creditor

18        92 Hudson Street, Apt. 1

19        Hoboken, NJ 07030

20

21   BY:  CAMERON R. CREWS (TELEPHONICALLY)

22

23

24

25
```

Page 6

1   UNITED STATES DEPARTMENT OF JUSTICE

2        Attorneys for the U.S. Trustee

3        201 Varick Street

4        New York, NY 10014

5

6   BY:  SHARA CLAIRE CORNELL (TELEPHONICALLY)

7        MARK BRUH (TELEPHONICALLY)

8        BRIAN S. MASUMOTO (TELEPHONICALLY)

9

10  JENNER BLOCK

11       Attorneys for the Examiner

12       353 N. Clark Street

13       Chicago, IL 60654

14

15  BY:  VINCENT LAZAR (TELEPHONICALLY)

16       SHOBA PILLAR (TELEPHONICALLY)

17

18  IMMANUEL HERMANN

19       Pro se Creditor

20       8201 Schrider Street, Apt. 6

21       Silver Spring, MD 20910

22

23  BY:  IMMANUEL HERMANN (TELEPHONICALLY)

24

25

```
                                                            Page 7

  1   MILBANK

  2        Attorneys for Series B Preferred Shareholders

  3        55 Hudson Yards

  4        New York, NY 10001

  5

  6   BY:  NELLY ALMEIDA (TELEPHONICALLY)

  7

  8   TOGUT SEGAL SEGAL, LLP

  9        Attorneys for Ad Hoc Group of Custodial Account Holders

 10        One Penn Plaza, Suite 3335

 11        New York, NY 10119

 12

 13   BY:  KYLE J. ORTIZ (TELEPHONICALLY)

 14        BRYAN KOTLIAR (TELEPHONICALLY)

 15

 16   FISHER BROYLES, LLP

 17        Attorneys for Vincent Theodore Goetten

 18        445 Park Avenue, 9th Floor

 19        New York, NY 10022

 20

 21   BY:  HOLLACE T. COHEN (TELEPHONICALLY)

 22

 23   ALSO PRESENT:

 24   DAVID J. ADLER

 25   KATHERINE M. AIZPURU
```

Page 8

1    EMMANUEL ALBINO

2    JOEL ANTHONY

3    RICHARD ARCHER

4    SAMUEL D. ARGIER

5    JULIEN ARSENAULT

6    RAMZI AUDEH

7    JESUS AYALA, JR.

8    NEGISA BALLUKU

9    BRIAN BARNES

10   NICOLE BARSTOW

11   MALCOLM M. BATES

12   ROBERT BEAULAC

13   CHRIS BECIN

14   BEN R BEN EADES

15   AARON BENNETT

16   JARNO BERG

17   FRANK BERTRAMS

18   CHERYL BIERBAUM

19   BRIANNA B. BILTER

20   EDWARD G. BIRCH

21   SOMA BISWAS

22   REED BOERBOOM

23   JARED C. BORRIELLO

24   JOSEPH BOTROS

25   HENRY BOUCHOT

Page 9

1   OCTAVE J. BOURGEOIS

2   JEFFREY BRADIAN

3   PHILIP BRENDEL

4   HEINZ BRENIG

5   NURALDEEN BRIFKANI

6   ADAM BRISTOW

7   JOHAN BRONGE

8   JOSEPH BROWN

9   VERA BROWN

10   AMY CASTOR

11   CAROLYN CHAMBERLAYNE

12   EDWARD CHAMPIGNY

13   ERIC CHAN

14   RICKIE CHANG

15   IMRAN CHAUDHRY

16   ESME CHIN

17   EDMOND CHIU

18   ROB CHRISTIANSEN

19   JEFFREY CHUBAK

20   MAYO CID

21   GEOFFREY CIRKEL

22   BERNIE CLICK

23   ROBERT J COMINOS

24   HOLLACE T. COHEN

25   MICHAEL CONLON

Page 10

1   LAFAYETTE COOK

2   KAREN CORDRY

3   CARL COTE

4   SCOTT CRAIG

5   OONA CRUSELL

6   PAUL CUPP

7   RANIERO D'AVERSA

8   ZURY DABBAH

9   DAVID DALHART

10  JOSH DAUM

11  STEFFAN DAVIES

12  SALVATORE DE MARIA

13  GEAN CARLOS DE OLIVEIRA BRINKER

14  STEPHEN DREIKOSEN

15  ZARYN A DENTZEL

16  ROMA N. DESAI

17  TRISTAN DIAZ

18  ANDREW G. DIETDERICH

19  JOSEPH DIEUJUSTE

20  JON DIMETROS

21  STEVEN DIODONET

22  DANIEL J. DION

23  DREW DUFFY

24  DENNIS DUNNE

25  JOHN P. DZARAN

Page 11

1    JANELL ECKHARDT

2    JANINE EDGERTON-AVIN

3    DANIEL EGGERMANN

4    SIMON ELIMELECH

5    JAMES ENGEL

6    DAVID AVERY FAHEY

7    LISA FAUCHER

8    DEREK FEAGIN

9    DAVID FEINMAN

10   ALEXANDER FERNANDEZ

11   MARCIA G. FLECK

12   WILSON FORERO

13   FORREST L. FORMSMA

14   WILLIAM FOSTER

15   LARRY FULTON

16   REBECCA GALLAGHER

17   CHRISTOPHER GASTELU

18   UTSAV GHOSH

19   BRADLEY GIARDIELLO

20   RYAN GILLIGAN

21   BRIAN D. GLUECKSTEIN

22   RYAN GOLDSTEIN

23   BRUNO GOMES

24   RAMON GONZALES

25   TODD GORDON

Page 12

1    UDAY GORREPATI

2    THOMAS HALL

3    PHILIP HARDING

4    TAYLOR HARRISON

5    PHILIPPE HEGI

6    JULIE HENRY

7    JEREMY HILL

8    JESSICA HO

9    SASHA HODDER

10   KYLE HOLZHAUER

11   ROBERT HONEYWELL

12   VICKY HUANG

13   ANDREW HUGGETT

14   MITCHELL HURLEY

15   MAX JACKSON

16   ROBERTO JACOBS

17   KRAIG JAKOBSEN

18   ALI JAMSHID FAR

19   JANKO JANKOVIC

20   HECTOR JARRET

21   AROON JHAMB

22   RAUL JIMENEZ

23   LEIGH JOHANNSEN

24   KATHERINE JOHNSON

25   GREG KACZKOWSKI

Page 13

1    CHEREE KAHRS

2    DAN KAPLAN

3    LORETA KASH

4    AISLINN KEELY

5    JOHN R. KEMENOSH

6    MIKAELA KENSINGTON

7    FARSHID KHALILI

8    FABIAN MATHIAS KHNLEIN

9    CRYSTAL KIM

10   RON KIRBY

11   CHRIS KOENIG

12   JEREMY FRANCIS KOO

13   MARY KORDOMENOS

14   TOMAS KSTER

15   KAY KUEHNE

16   MEI PO PO KWOK

17   CHRISTOPHER LACKEY

18   SMILE LASISI

19   JEAN-PHILIPPE LATREILLE

20   ANDREW LEBLANC

21   JOE LEHRFELD

22   KAREN LEUNG

23   RYAN WYMN LEWIS DAVIES

24   SETH H. LIEBERMAN

25   CHEYENNE LIGON

Page 14

```
 1   DAVID LITTLE

 2   JESSICA LJUSTINA

 3   ISAAC R. LLEWELLYN

 4   GINA LOCKWOOD

 5   PATRICK LONEY

 6   EDMUNDO LOPEZ

 7   RUBAN LOPEZ

 8   DAVID LOS ARCOS CARCAMO

 9   JESSE LUND

10   JOHN LY

11   LAURA LY

12   DAVE MALHOTRA

13   KEVIN M. MANUS

14   KEVIN MARCELISSEN

15   DANIEL J. MAREE

16   JEREMY MARONPOT

17   CHASE MARSH

18   KYLE MASON

19   DIANE MATTHEWS

20   JAMES MCNAMARA

21   MATTHEW MEEHAN

22   ARJUN MEHRA

23   ERIK MENDELSON

24   TOM MERCURI

25   JOSHUA MESTER
```

Page 15

```
 1   CJ MILLER
 2   LAYLA MILLIGAN
 3   RICHARD CHESTER MINOTT
 4   TIMON MITRAKAS
 5   CHRISTOPHER L MOBLEY
 6   ERIC MOORMAN
 7   MICHAEL D. MORRIS
 8   MICHAEL MOWRY
 9   ERIC NEMETH
10   NANCY NGUYEN
11   PAUL NIEHE
12   ANASTASIA NORTON
13   JOSHUA K. NWOSU
14   LAURIE-ANN O'CONNOR
15   PAUL O'CONNELL
16   SHANE C. OWENS
17   CHRISTOPHER PAGNANELLI
18   HSIN-CHIEH PAN
19   JORDYN PAPERNY
20   MILIN PATEL
21   SAMIR PATEL
22   ARIE PELED
23   MONICA A. PERRIGINO
24   KHAI PHAM
25   RICHARD PHILLIPS
```

Page 16

1   BRYAN POMRANKY

2   LUKE PORCARI

3   LAWRENCE PORTER

4   DONALD POYNTER

5   RYAN PRAMER

6   LALANA PUNDISTO

7   PAUL J. PURCELL

8   TOMASZ PYTEL

9   SILVESTRE RAMOS

10   RICARDO R. RAT

11   TIMOTHY REILLY

12   SPENCER M. REITZ

13   CURTIS RESTA

14   ANUBHAV RICHARDS

15   AARON RILEY

16   CHRISTOPHER D. ROBINSON

17   RICHARD KRIS ROBISON

18   JONATHAN RODRIGUEZ

19   ROBERTO ROJAS

20   JOE L. ROSA

21   GABRIEL ROUEN

22   ANDREW RUDOLPH

23   NICHOLAS SABATINO

24   KAMBIZ SAFAIE

25   JEDIDIAH SALYARDS

Page 17

1   ARACELI SANCHEZ

2   DANA SANDEFUR

3   KRISZTIAN SANDOR

4   NAIDU A. SANDRANA

5   ALEX SHLIVKO

6   SHAI SCHMIDT

7   DAVID SCHNEIDER

8   DESIREE SCHOEN

9   NOAH M. SCHOTTENSTEIN

10  WILLIAM D. SCHROEDER

11  KADHIM SHUBBER

12  MARC SCHWARZ

13  DAVID SENES

14  LUPU SERBAN

15  ALI SIADATI

16  KENG HOCK SIAH

17  LUIS SILVA

18  MATTHEW W. SILVERMAN

19  ERIC SIPPER

20  DON SMITH

21  PAUL STAPLETON

22  COURTNEY STEADMAN

23  JASON STONE

24  PAUL STORVICK

25  AUSTIN STRATTON

Page 18

1    ANDREA STRIANESE

2    KEITH SUCKNO

3    ADAM SWINGLE

4    KEYAN TAJI

5    KAI TANG

6    MICHAEL TARSI

7    ELIZABETH THYS

8    ANHMINH TRAN

9    ELVIN TURNER

10   VICTOR UBIERNA DE LAS HERAS

11   TONY VEJSELI

12   FEMKE VESSIES

13   ERIC VOIGTSBERGER

14   CHRISTOPHER WALTON

15   ED WALTON

16   REBECCA WHITE

17   CARL N. WEDOFF

18   MORGAN WILLIS

19   JASON S. WISEMAN

20   IAN WITTKOPP

21   BENNY WONG

22   RICKY WOODARD

23   FENGLIANG WU

24   ANDRE WYSS

25   MELANIE YANEZ

Page 19

1    WAJOHN YAO

2    MER FARUK YAZ

3    NATHAN YEARY

4    ANNE YEILDING

5    TAK YEUNG

6    KAILA ZAHARIS

7    JEFFREY ZATS

8    DREW ZERDECKI

9    TANZILA ZOMO

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 20

1                    P R O C E E D I N G S

2              CLERK:  Starting the recording for October 7, 2022

3      at 10 a.m.  Calling Celsius Network LLC, Case Number 22-

4      10964, and Ad Hoc Group of Custodial Account Holders v.

5      Celsius Network LLC, Case Number 22-1142.

6              Are the main participants from Kirkland's -- good

7      morning, Chris.

8              MR. KOENIG:  Good morning.  Can you hear me?

9              CLERK:  Yes, I can.  If you can just give your

10     appearance for the record, please.

11             MR. KOENIG:  Good morning.  It's Chris Koenig from

12     Kirkland & Ellis on behalf of the Debtors.

13             CLERK:  Okay, and I'm admitting Ross as well.

14             MR. KOENIG:  Great.  Thank you.  I'm trying to get

15     my video to work, to confirm that that works.

16             CLERK:  Understood.  Ross, if you could unmute and

17     give your appearance, please?

18             MR. KWASTENIET:  Yes, good morning.  It's Ross

19     Kwasteniet from Kirkland & Ellis.

20             CLERK:  Thank you.  All right, you could just

21     check back with me with the video, Chris.

22             MR. KOENIG:  Will do.  Thank you.

23             CLERK:  Okay.

24             MR. KOENIG:  Are you able to see me and hear me

25     okay?

Page 21

```
 1                CLERK:  Yes.  Now I can see both of you.

 2                MR. KOENIG:  Wonderful.  Good morning.

 3                MR. KWASTENIET:  Okay, great.

 4                CLERK:  Good morning.  Thank you.

 5                MR. KOENIG:  Thank you.  I'm going to turn off

 6  video and put myself on mute but we'll be here as needed.

 7                CLERK:  Okay, thanks.  Sounds good.

 8                MR. KOENIG:  Thank you.

 9                CLERK:  Good morning, Mr. Hershey.

10                MR. HERSHEY:  Hi.  How are you?

11                CLERK:  Good.  Could you mute and just -- while

12  you're unmuted, could you please just give your appearance

13  for the record?

14                MR. HERSHEY:  Sure.  Sam Hershey from White & Case

15  on behalf of the Official Committee of Unsecured Creditors.

16                CLERK:  Okay, great.  And is --

17                MR. HERSHEY:  Can you hear me okay?

18                CLERK:  I can hear you.  I can't see your video

19  but I can hear you.

20                MR. HERSHEY:  Great.  Thank you.

21                CLERK:  Is Gregory Pesce or David Turetsky -- are

22  either of them going to be joining as well?

23                MR. HERSHEY:  Yes, they both will be joining.  I

24  think they were in the waiting room.  So, I don't know if

25  they're still there but I can ping them.  They will be
```

Page 22

```
 1    joining.
 2             CLERK:  Okay, I don't see either of them in there
 3    unless someone else --
 4             MR. HERSHEY:  I'll email them.
 5             CLERK:  Okay.  All right, thank you.  Deborah, are
 6    you going to be speaking this morning?
 7             MS. FRANKEL:  Deborah Frankel.
 8             CLERK:  Back to you...  Good morning.  Could the
 9    parties that have joined, if you're speaking on the record
10    and have not given your appearance yet, please do so.
11    Again, for the participants that have joined, if you are
12    speaking on the record this morning and have not given your
13    appearance, please do so.
14             MS. BARSTOW:  Hi, I'm Nicole Barstow.
15             CLERK:  Okay, Nicole.  And if you could specify
16    how you're -- if you're a creditor, or if you're with a
17    firm, if you're pro se -- could you just specify that,
18    please?
19             MS. BARSTOW:  Yes, pro se creditor with an earn
20    account until (indiscernible).
21             CLERK:  Thank you.  And you're speaking this
22    morning?
23             MS. BARSTOW:  Yes, I'd like to speak.  I have a
24    motion in in regards to requesting for USDC -- the USD coins
25    to be considered secured creditors instead of unsecured
```

Page 23

1  creditors due to the fact that it's backed by collateral.

2         CLERK:  You don't have to go into a big

3  explanation.  That's fine.  So, the judge will give

4  participants -- ask participants in turn if anyone wants to

5  speak on the record.  So, you can just listen for that cue.

6         MS. BARSTOW:  Okay.  Thank you.

7         CLERK:  You're welcome.  All right, please pause

8  recording.

9         Good morning, Deborah Kovsky.  Are you going to be

10  speaking this morning on the record from Troutman?

11         MS. KOVSKY-APAP:  Yes, I expect so.

12         CLERK:  All right.  If you could just give your

13  appearance, please.

14         MS. KOVSKY-APAP:  Sure.  Deborah Kovsky-Apap from

15  Troutman Pepper on behalf of the Ad Hoc Group of Withhold

16  Account Holders.

17         CLERK:  Thank you.  Is there anyone else that has

18  been admitted this morning that will be speaking on the

19  record and has not given their appearance?  Thank you.

20         Again, for those that have joined, is there anyone

21  that has not given their appearance that will be speaking on

22  the record?  All right, Kevin, you can pause the recording.

23         Yes, Cam Crews?

24         MR. CREWS:  Yes.  I'm a pro se creditor and plan

25  to speak on Objection Filing 914 if on topic for today.

```
 1              CLERK:  Okay, thank you for noting your

 2   appearance.  Anyone else that's going to be speaking on the

 3   record this morning that has not given an appearance yet?

 4   All right, you can pause the recording again.

 5              Hi, Gregory Pesce, if you could unmute and give

 6   your appearance, please.

 7              MR. PESCE:  Yes.  Hi.  Gregory Pesce, White &

 8   Case, on behalf of the Creditors Committee.  My colleague,

 9   Mr. Hershey, who I believe is on already, will be taking the

10   lead for the Committee today.  Thank you.

11              CLERK:  Thank you.  And we're still waiting for

12   David Turetsky, correct?

13              MR. PESCE:  I think that's correct.

14              CLERK:  I don't see him in the waiting room yet.

15   Okay, so we'll look out for him.  All right, are there any

16   participants that are speaking on the record that have not

17   given your appearance yet?  All right, I'm admitting Mr.

18   Turetsky.  Good morning, David Turetsky.  If you could

19   unmute your line?  There we go.  Hi, good morning, David, if

20   you could unmute and give your appearance for the record?

21              MR. TURETSKY:  Good morning.  It's David Turetsky

22   of White & Case on behalf of the Creditors Committee.

23              CLERK:  Thank you.

24              MR. TURETSKY:  Thank you.

25              CLERK:  All right, please pause the recording.
```

Page 25

1    Good morning, Shara.  If you could unmute and give your

2    appearance for the record, please.

3              MS. CORNELL:  Good morning.  Shara Cornell from

4    the Office of the United States Trustee.

5              CLERK:  All right, thank you.  Are Mark Bruh or

6    Brian Masumoto going to be joining as well?

7              MS. CORNELL:  You know what?  I think so.

8              CLERK:  Okay, all right, thank you.

9              MS. CORNELL:  Thank you.

10             CLERK:  Again, for any participants that have

11   joined who have not given their appearance yet and they're

12   speaking, please give your appearance.  Good morning,

13   Vincent, if you can unmute and give your appearance, please.

14             MR. LAZAR:  Good morning.  Vincent Lazar on behalf

15   of the Trustee -- or excuse me, Examiner, not Trustee.

16             CLERK:  Good morning, Vincent.  Is Shoba also -- I

17   think she joined as well.  Is she -- Shoba, are you speaking

18   this morning?  I don't know if she can hear me.  Vincent, is

19   Shoba speaking this morning?

20             MR. LAZAR:  She will be on speaking mode if the

21   judge wants to hear from her.

22             CLERK:  Okay.  Her appearance is noted.  All

23   right, please pause the recording.

24             For the participants who have joined, if anyone is

25   speaking on the record and has not given their appearance

Page 26

1    yet, please -- please unmute and give your appearance.

2              MR. HERMAN:  Emanuel Herman, pro se Celsius

3    creditor.

4              CLERK:  Thank you.  Nelly Almeida, are you going

5    to be speaking this morning?  All right, again, for any

6    participants that have joined, if you're speaking this

7    morning and have not given your appearance, please unmute

8    one at a time and give your appearance for the record.

9              WOMAN 1:  (indiscernible) LLP on behalf of several

10   holders of the Series D Preferred shareholders.

11             CLERK:  Okay, thank you.  And are you going to be

12   the only party that's speaking from your firm?

13             WOMAN 1:  If we do speak, yes, Your Honor.

14             CLERK:  Okay, thank you for your appearance.  All

15   right, is there anyone else that has joined that has not

16   given their appearance yet and will be speaking on the

17   record this morning?  Good morning, Brian.  Can you hear me?

18             MR. MASUMOTO:  Yes, Brian Masumoto from the Office

19   of the United States Trustee.

20             CLERK:  All right, thank you.  All right, Mark

21   Bruh, if you could unmute and give your appearance, please.

22             MR. BRUH:  Yes.  Mark Bruh for the United States

23   Trustee.  I know Ms. Cornell is going to be at this hearing

24   so I don't know if I'll be speaking at all.

25             CLERK:  Okay, thank you.  Ms. Cornell and Mr.

Page 27

1   Masumoto both gave their appearance.  All right, David

2   Adler, are you going to be speaking this morning?

3            MR. ADLER:  Good morning.  I am not.  I do not

4   intend to be speaking.

5            CLERK:  Okay, thank you.  Kyle Ortiz, are you

6   going to be speaking this morning?

7            MR. ORTIZ:  Good morning.  Yes, I will, on behalf

8   of the Ad Hoc Group of Custodial Account Holders.

9            CLERK:  Okay.  Are the other two parties, Jared

10   and Brian, are they speaking as well?

11           MR. ORTIZ:  They most likely won't but they are --

12   I do see at least Jared on.  It's kind of hard to find

13   everybody in this...

14           CLERK:  I understand.  Yeah, Jared has joined.

15           MR. ORTIZ:  Yeah, and Brian should be joining

16   shortly, but I don't -- most likely it'll just be me unless

17   something goes sideways.

18           CLERK:  Okay.  Thank you, Kyle.

19           MR. ORTIZ:  Thanks.

20           CLERK:  All right, counsel for the Texas State

21   Securities Board, are you going to be speaking this morning?

22           MS. DESAI:  No, I will not.  I'm just monitoring.

23           CLERK:  Okay, thank you.  Okay, I'm going to go

24   through a list of different participants that have not

25   joined to see if parties have given their appearances.  Is

1    there anyone from Sullivan Cromwell on the phone that will

2    be speaking this morning?  Okay.  Anyone from DLA Piper?

3    Okay.  Anyone from the Federal Trade Commission?

4              MS. JOHNSON:  Yes, good morning.  Katherine

5    Johnson is here.  We're not going to be making an

6    appearance; we're just monitoring.

7              CLERK:  Okay.  All right, thank you.  All right,

8    anyone from FisherBroyles on the phone or joining by video?

9    All right, participants that have joined, if anyone has not

10   given their appearance and plans to speak on the record,

11   please unmute your line and give your appearance at this

12   time.

13             MR. KOTLIAR:  Good morning, Deana, this is Bryan

14   Kotliar of Togut, Segal & Segal, on behalf of the Ad Hoc

15   Group of Custodial Account Holders.

16             CLERK:  Okay, thank you, Brian.  All right, is

17   there anyone from Akin Gump this morning that will be

18   speaking on the record?  That is a no.  All right, for the

19   participants that have joined and have not given their

20   appearance and are speaking on the record, please unmute

21   your line one at a time and give your appearance, please.

22   All right, Kevin, please pause the recording.

23             Anyone that has not given their appearance and is

24   speaking on the record, please unmute your line and give

25   your appearance, please.

Page 29

1           MS. COHEN:  If I may speak -- my name is Hollace

2     Cohen.  I'm with FisherBroyles.  My client is Vincent

3     Goetten.

4           CLERK:  Okay, thank you very much.

5           MS. COHEN:  Thank you.  All right, Dan Kaplan, are

6     you speaking this morning?  All right, again, Dan Kaplan,

7     are you speaking on the record this morning?  I'll take that

8     as a no.  All right, anyone else that has joined that has

9     not given their appearance and will be speaking on the

10    record this morning?

11          All right, are we waiting on anyone, to anyone's

12    knowledge?

13          MR. KOENIG:  Deana, not from the Debtors.  I

14    believe all the parties for the scheduling conference here

15    this morning are -- are on the line.

16          CLERK:  Okay, thank you.  All right, Judge, would

17    you like me to proceed with the announcements and -- to

18    start the hearing?

19          THE COURT:  Yes, please go ahead, Deana.  Thank

20    you.

21          CLERK:  All right.  If everyone could please take

22    -- pay attention to the following announcements:  All

23    persons are strictly prohibited from making any recording or

24    reproduction of court proceedings, whether by video, audio,

25    screenshots or otherwise.  Violation of this may result in

Page 30

1   sanctions.  Also, if everyone could please -- each time they

2   speak, please identify yourself for the court record.

3   Judge, would you like to begin?

4           THE COURT:  Yes, I would.  Thank you.  Good

5   morning, everybody.  This is Judge Glenn.  We're on the

6   record in Celsius in the main case, 22-10964 and the

7   adversary proceeding, Ad Hoc Group of Custodial Account

8   Holders v. Celsius Network LLC et al., 22-01142.  An agenda

9   has been filed in both the main case and in the adversary

10  proceeding.  The Court received and viewed the letter dated

11  October 6th regarding the proposed -- the Debtor, the

12  Committee and the Ad Hoc Groups with the proposed joint

13  stipulation.  So, I have those in front of me.  Who's going

14  to begin for the Debtor?

15          MR. KOENIG:  Good morning, Your Honor.  It's Chris

16  Koenig from Kirkland & Ellis that's counsel to the Debtors.

17  Can you hear me okay?

18          THE COURT:  Yes, I can.

19          MR. KOENIG:  Wonderful.  Your Honor, as you

20  mentioned, we're here this morning on just one matter, the

21  status conference related to certain custody and withhold

22  issues.  I'll get to those in a moment.  Our next omnibus

23  hearing is on October 20th.  The Debtors will provide Your

24  Honor and the other parties with a more robust status update

25  at that point, but we just wanted to provide one quick

Page 31

1    update for the Court.

2          Your Honor, as you probably saw in the press,

3    we've had a change at the top of our management team.  Alex

4    Mashinsky, Celsius' former CEO, has voluntarily stepped

5    aside and the Special Committee of Celsius' board of

6    directors has appointed Mr. Chris Ferraro, who is the

7    company's chief financial officer, to also serve as Celsius'

8    interim chief executive officer and chief restructuring

9    officer.

10          Mr. Ferraro is likely listening to the proceedings

11    this morning.  I expect that you will be a participant at

12    future evidentiary hearings in court in the future.  We just

13    wanted to confirm for the Court and the other parties in

14    interest, the Debtors have had a very smooth transition to

15    operate under Mr. Ferraro's leadership.  The employees and

16    the company's management are engaged with and reporting to

17    him, the business is operating as usual, given the

18    restrictions that are in place as a result of these Chapter

19    11 cases.

20          Mr. Ferraro is also the signatory on the Debtor's

21    schedules of assets and liabilities and statements of

22    financial affairs, which were filed late in the evening on

23    Wednesday, October 5th.  That's just one --

24          THE COURT:  I've only had the briefest opportunity

25    to begin to look at the schedules.  I noted that they were

Page 32

1    filed.  I do plan to spend more time reviewing them but I

2    still -- for now, let me just say I noted that they were

3    filed.

4            MR. KOENIG:  Thank you, Your Honor.  With that

5    brief update out of the way, I'd propose to turn to the

6    scheduling order that was proposed for these matters.

7            THE COURT:  Let me ask a very pointed question and

8    I'm sure it's something that the examiner -- the Committee,

9    the ad hoc committees and perhaps others are interested in -

10   - and I've certainly read but don't fully understand

11   everything about withdrawals of assets by insiders of the

12   company.  Let me just describe it that way.  Did Mr. Ferraro

13   -- is it miss or missus?

14           MR. KOENIG:  It's Mr. Ferraro, Your Honor.  Yes,

15   Mr. Chris Ferraro.

16           THE COURT:  Okay.  Did he withdraw assets from the

17   Debtor for insiders -- in accounts more than 90 days -- let

18   me just right now ask the question with respect to the 90

19   days before the filing of the bankruptcy proceeding.

20           MR. KOENIG:  With respect to Mr. Ferraro, Your

21   Honor?

22           THE COURT:  With respect to him.

23           MR. KOENIG:  No, Your Honor, I don't believe so.

24   I mean, he, of course, drew a salary in his role as chief

25   financial officer, but as far as withdrawing assets from the

Page 33

1   platform, I don't believe so.

2           THE COURT:  Okay.  Others may look longer than

3   that 90-day period but that's my question for now.

4           MR. KOENIG:  Understood.

5           THE COURT:  All right, let's proceed with the --

6   you know, the path forward.  Let me describe it that way.

7   And, as I say, I've read the letter and I've read the

8   proposed stipulation.  I understand that there is one issue

9   as to which of the parties could not agree whether, you

10  know, they should be included in the briefing and whatever

11  discovery is done.  And so I do want to hear specifically

12  about that issue.

13          MR. KOENIG:  Very good, Your Honor.  I'll keep my

14  overview remarks brief and then I'll get right into the

15  issue.  But just to provide an update -- following the last

16  hearing, the parties met and conferred regarding a schedule.

17  I'm pleased to report that, of course, we -- we filed what

18  we filed last night.  That includes an agreement on

19  everything except for this one issue about the ordinary

20  course of business defense.

21          The purpose of the schedule is to streamline these

22  issues to provide information to the Debtors and other

23  parties in interest about these potential preference claims

24  that the Debtor's estates hold.  We have agreed -- in Phase

25  II, the parties have agreed to brief the ordinary business

Page 34

1   terms defense and the defense under Section 546(e) of the

2   Bankruptcy Code.  We have not agreed, as Your Honor

3   mentioned, about the ordinary course of business defense.

4           From the Debtor's perspective, it is perfectly

5   reasonable and appropriate to include that defense as well.

6   The entire purpose of this streamlined briefing schedule is

7   to make sure that the Debtors and the other parties in

8   interest have the benefit of some bellwether rulings from

9   the Court with respect to certain would-be defendants of

10  preference claims.  The purpose of that is to make sure that

11  all parties have the benefit of understanding, you know,

12  which way the wind is likely to blow with respect to certain

13  transfers.

14          Of course, all rights are reserved as to any

15  particular preference claim but we're doing this briefing

16  schedule in order to avoid the Debtors from having to bring

17  formal preference claims and bog down the process.  We're

18  trying to do this on an expedited basis, given the

19  exigencies of these cases.

20          So, from the Debtor's perspective, the ordinary

21  course of business defense is similar to 546(e) and the

22  ordinary business terms defense in that it cuts across

23  Defendants.  And it'd be very helpful to the Debtors, Your

24  Honor, to have the benefit of some bellwether rulings from

25  Your Honor as part of these proceedings.

Page 35

1          THE COURT:  One question I had is does that issue

2    need to be resolved today or can it await the Phase I

3    rulings?

4          MR. KOENIG:  Your Honor, I mean, we would prefer

5    for it to be resolved today, but if it were to be resolved

6    in connection with the Phase I rulings and before Phase II

7    kicked off, you know, there would be no objection from the

8    Debtors.

9          THE COURT:  Let me ask another question.  For

10   purposes of Phase I, will the presumption of the Debtor's

11   insolvency in the 90 days before the filing -- will not be

12   challenged?  In other words, no evidence will be offered and

13   the Court will not be asked to -- asked to decide whether

14   the Debtor was insolvent?  As I understand it, the bulk of

15   the transfers into custody accounts happened 89 days or so

16   before the bankruptcy filing.  And, of course, there's a

17   presumption under the statute of insolvency, but that

18   presumption can be overcome.  And have the parties discussed

19   that issue?  And, if concluded, I know that in Paragraph 9

20   of the stipulation, it says that during Phase 1, the parties

21   agree that all inferences regarding the existence, validity

22   and merit of preference and other claims against the custody

23   and withholding claimants will be drawn in favor of the

24   Debtor's estates.

25          And I took that to mean that in Phase I there will

Page 36

1   be no challenge as to whether or not the Debtor was

2   insolvent at the time of the transfers.

3          MR. KOENIG:  Your Honor, again, Chris Koenig.  We

4   -- from the Debtor's perspective that's certainly correct.

5   We don't anticipate there to be any evidence or for anybody

6   to be challenging that issue.  Specifically during Phase I,

7   I think the parties are agreed that the Debtor's estates are

8   presumed to have prima facie preference claims.  Of course,

9   all rights being reserved with respect to any individual

10  preference claim.  That's just for purpose of the briefing

11  of the issues in Phase I, but I'll let the other parties

12  speak for themselves.

13         THE COURT:  Sure.  Let me raise one other issue

14  before I hear from the other parties.  Paragraph 15 of the

15  stipulation provides, in part, 15(c), any ruling in

16  connection with a Phase I issue, including in connection

17  with the Debtor's custody and withhold motion or the

18  preference defense motion, shall be immediately appealable

19  and the parties waive any objection to such appeal being

20  taken immediately.

21         The problem with that is that's not my issue.

22  Under 28 USC 158(a)(3), it provides that for interlocutory

23  orders an appeal (indiscernible) with leave of court from

24  the -- from other interlocutory orders.  And -- but it's the

25  District Court that has to grant leave, not this court.  I

Page 37

1    can't -- so, I can't approve a stipulation that says it's

2    immediately appealable.

3              MR. KOENIG:  Understood, Your Honor.  And the

4    intent of the language -- the parties agreed not to oppose

5    any such relief.  Of course, the decision rests with the

6    District Court.  We're happy to adjust the language in 15(c)

7    to make that more clear that it's really an agreement

8    between the parties that -- if a party, you know, sought an

9    interlocutory appeal, the other parties wouldn't oppose it.

10   But, of course, it's within the District Court's discretion

11   on that issue.

12             THE COURT:  I think you need to modify that

13   language.  I mean, I can't approve a stipulation that says

14   something's immediately appealable when it's not my call.

15             MR. KOENIG:  Understood, Your Honor.  We're happy

16   to do so.

17             THE COURT:  All right.  Let me hear -- let me hear

18   from Mr. Ortiz first, and then I'll hear from Ms. Kovsky and

19   I'll let anybody else who wants to be heard speak as well.

20             MR. ORTIZ:  Good morning, Your Honor.  Kyle Ortiz

21   of Togut Segal & Segal on behalf of the Ad Hoc Group of

22   Custodial Account Holders.  Thank you for your time this

23   morning, Your Honor.  I think apologies on behalf of all the

24   parties for, you know, getting you something last night for

25   a hearing this morning.  But there was a fair amount of work

Page 38

1    to get here.  I won't pretend like we love this schedule.

2    Of course, as you, I'm sure, are fully aware, we'd like to -

3    -

4               THE COURT:  I commend you in that but that's, you

5    know -- it's important that we move this forward.

6               MR. ORTIZ:  Right.  And that was ultimately what

7    got us there was -- you know, at some point we just need to

8    be moving things forward.  You know, we've had papers

9    drafted for some time and we're looking forward to the

10   opportunity to put them in front of your court and hopefully

11   resolve things in Phase I.  But the question is if we don't

12   resolve things in Phase I and we get to Phase II, and we

13   want to talk about the preference defenses, does ordinary

14   course of business need to be there?

15              And, in our view, it's not -- the reason that we

16   don't think it's useful is because it doesn't really, in our

17   view, tell Your Honor anything.  I think we're ultimately

18   trying to answer two questions through this whole process:

19   One, whether or not it's property of the estate.  And if

20   it's not property of the estate, what does that mean?  And

21   if there are defenses to preferences, if preferences apply,

22   we need ones that are actually applicable to everybody.  And

23   the safe harbor and ordinary business terms, in our view,

24   does apply to absolutely everybody who's equally situated.

25              Ordinary course of business is very fact-specific,

Page 39

1   and it's going to be not something that you can take even

2   from a sampling that the parties have talked about and

3   ultimately say, okay, this applies to 58,000 people.  And

4   it's kind of an expensive exercise and, you know, there

5   seems to be a desire for a fair amount of discovery into

6   these bellwether plaintiffs -- sorry, Defendants -- and it

7   doesn't seem like it's really progressing anything in the

8   case.  Whereas if we ultimately prevail on business terms of

9   safe harbor, that -- it should apply to all 58,000 potential

10  preference Defendants.

11          Whereas ordinary course of business, you could

12  have someone who every Monday for years and years, you know,

13  took out the exact same amount from earn, and you have

14  everybody else who, on a given day, decided to withdraw

15  everything they had in earn.  And they're just -- you're not

16  going to be able, I don't think, to really learn anything

17  about what should we do with this entire pot of money by

18  going down that kind of expensive and time-consuming rabbit

19  hole, Your Honor?

20          THE COURT:  My concern, Mr. Ortiz, is if that

21  issue is not resolved, at least as to bellwether

22  accountholders, where does that leave your clients if the

23  Debtor continues to insist that it's not -- the ordinary

24  course defense doesn't apply?

25          MR. ORTIZ:  That's a great question, Your Honor.

Page 40

1    So, really, to be honest, the way we look at this is, you

2    know, if we prevail in Phase I, that's easy.  If we get to

3    Phase II and these broad defenses that apply to everybody

4    don't get us there and there isn't -- and Your Honor decides

5    that, you know, you don't think that those defenses apply,

6    we're probably in a spot where we need to wait.  We need to

7    see where this case is going.

8            Because you can't -- and if you've determined, in

9    Phase I, that they -- notwithstanding that you've determined

10   that it is not property of the estate but because of these

11   they can hold onto it, and we don't prevail on these

12   particular defenses, I don't really think it tells us much

13   to go down the ordinary course of business.  Because I think

14   we just, quite frankly, have to wait because there's the

15   question of will the Debtors ever really want to bring

16   preference actions?  And I think we're at a stage in the

17   case where we have no idea.

18           So, again, it doesn't really tell us a lot.  And I

19   think we would have to say, you know, we're really happy

20   that we have a ruling that it's not property of the estate

21   and we're going to have to wait if Your Honor is determined

22   that that's -- you know, the next step isn't that it's

23   released at that point and see where the case goes.  So,

24   that's another reason I don't think it's terribly helpful to

25   take the time and energy and pick a couple bellwethers and

Page 41

1    bother those people with discovery -- to go down that path.

2            THE COURT:  Ms. Kovsky?

3            MS. KOVSKY-APAP:  Good morning, Your Honor.  Deb

4    Kovsky, Troutman Pepper, for the Ad Hoc Group of Withhold

5    Account Holders.  I agree with and echo everything that Mr.

6    Ortiz just said.  I represent a group of 11 withhold account

7    holders.  We could choose bellwethers whose fact patterns

8    don't fit any of them, don't fit some of them.  And so we

9    could go through this entire exercise and at the end of the

10   day, my clients are still left in a position where well, we

11   just don't know.

12           To us, it makes the most sense to look at defenses

13   that are broadly applicable, that are going to apply to

14   every member of our group and perhaps to every member of the

15   withhold -- you know, every withhold account holder across

16   the board.  Otherwise there's just -- there's not a lot of

17   value.  I understand the Debtor wants guidance and wants

18   some bellwethers and have some idea as to what preference

19   claims might be viable, but there's just -- there's too many

20   potential fact patterns to make this a worthwhile exercise.

21           If Your Honor saw the SOFAs that were just filed,

22   over 14,000 pages of transactions.  How we're going to --

23           THE COURT:  Yeah, I didn't read 15,000 pages,

24   okay?

25           MS. KOVSKY-APAP:  But -- I did not either.  I did

Page 42

1   look at the page count and realized that there are just far

2   too many potential fact patterns here to make a fact-

3   specific defendant-specific defense a viable exercise.

4           THE COURT:  Okay, who else wants to be heard on

5   this issue of what should be included in Phase II?

6           CLERK:  Judge, Mr. Hershey has his hand up.

7           THE COURT:  Oh, okay.  Well, go ahead, Mr.

8   Hershey.  Yeah, there you are.  Okay.

9           MR. HERSHEY:  Thank you, Your Honor.  Your Honor,

10  I have some broader comments on the schedule that, if Your

11  Honor prefers, I'll wait to give until we resolve this issue

12  on the ordinary course defense.  It's up to you.

13          THE COURT:  No -- go ahead.

14          MR. HERSHEY:  Okay, thank you, Your Honor.

15          THE COURT:  I kind of have the feeling that you've

16  all sent yourselves and me on a death march here, but go

17  ahead, Mr. Hershey.

18          MR. HERSHEY:  Certainly not my intention, Your

19  Honor.  Just for the record, Sam Hershey from White & Case,

20  on behalf of the Official Committee of Unsecured Creditors.

21  Your Honor, in negotiating the schedule for the custody and

22  withhold disputes, the Committee had four goals in mind:

23  First, the Committee wanted to find a way to tee these

24  issues up as quickly as we responsibly could so that, to the

25  extent the Court determines that the custody and withhold

Page 43

1   coins are not estate property and there is no other basis

2   for the estate to retain them or postpone distributions,

3   those coins can be returned to the accountholder with all

4   deliberate speed.

5          Second, the Committee wanted to ensure that this

6   process, which aims to determine the rights of custody and

7   withhold accountholders does not in any way prejudice the

8   rights of any other types of accountholders or the Debtor's

9   estates.

10          Third, the Committee sought to include a mechanism

11   resolving key issues relevant to potential preference claims

12   against custody and withhold accounts.  And I'll return to

13   this when I discuss the ordinary course of business defense

14   that is under discussion.

15          And four, the Committee wanted to ensure that it

16   would receive all discovery necessary for it to form a

17   position on these issues before it was asked to litigate

18   them.

19          The Committee is pleased to report that each of

20   these goals has been met.  The schedule that the parties

21   have negotiated moves quickly resulting in a hearing on the

22   Debtor's motion and certain threshold legal issues regarding

23   ownership as early as next month.  The schedule also

24   reflects the robust reservation of rights for all parties

25   and for the estates.  It makes clear that no other

Page 44

1    accountholder's rights, including the rights of earn and

2    borrow accountholders, are being adjudicated or prejudiced

3    in any way by this proceeding.

4          The schedule includes a potential second phase

5    that will allow the parties to litigate the key issues

6    relevant to preference claims against the custody and

7    withhold accounts, including any defenses the accountholders

8    may have under Section 546(e) and 547.  And the schedule

9    provides for discovery regarding all material issues

10   relevant to this dispute, including the history of the

11   custody and withhold accounts, the mechanics of those

12   accounts and the nature of the current assets held in those

13   accounts.  Importantly, this information will be contained

14   in a sworn declaration to be filed on the docket in this

15   case where all accountholders will be able to read it.

16         Now, briefly, Your Honor, on the ordinary course

17   of business defense I think that there are two issues.  The

18   first is the bellwethers themselves.  We should, in the

19   interest of efficiency, fully and finally adjudicate all

20   relevant defenses as to those individuals.  Mr. Ortiz says

21   we shouldn't bother those people with discovery.  They

22   sought relief.  They chose to file an adversary proceeding

23   and a motion.  There is no basis for requiring debtors and

24   the estates to litigate this in phases rather than getting

25   it done all at once because those individuals have sought to

Page 45

1    have this resolved.

2            The second issue, Your Honor -- and I agree with

3    Mr. Koenig -- the Committee's view is that the whole point

4    of litigating bellwether cases is to identify likely common

5    facts and defenses that'll enable the parties and the Court

6    to gain a better understanding of the broader conference

7    litigations that will potentially follow.  Mr. Ortiz seeks

8    to make the perfect the enemy of the good by arguing that

9    ordinary course defenses are fact-specific.  That may be

10   true but there will almost certainly be overwhelming factual

11   overlap between the bellwethers and many other customers and

12   we should therefore hear these issues while we can to allow

13   us to chart a path forward.

14           For these reasons, Your Honor, the Committee

15   supports the schedule that the parties have negotiated and

16   asks the Court to enter an order adopting it and include in

17   that order a requirement that the bellwethers litigate the

18   ordinary course defense.  Thank you, Your Honor.

19           THE COURT:  Thank you, Mr. Hershey.  Anyone else

20   want to be heard right now.  Go ahead, Ms. Cornell.

21           MS. CORNELL:  Thank you, Your Honor.  Shara

22   Cornell on behalf of the United States Trustee.  I also had

23   some general remarks if Your Honor --

24           THE COURT:  Yeah, go ahead.

25           MS. CORNELL:  (indiscernible) -- at this point.

Page 46

1    Thank you very much.  I'd like to note that the stipulation

2    was filed late last night, and we certainly didn't have time

3    to respond.  And we were not even aware that such a

4    stipulation was forthcoming -- even though we did file a

5    limited objection at Docket Number 933 on the basis that we

6    have a court-appointed examiner with a court-mandated scope,

7    a scope which was consented to by both the Committee and the

8    Debtors.  The stipulation raises some concerns about a

9    potential duplication over what is to be investigated by the

10   examiner.

11          It's interesting that the Committee counsel just

12   used the term overwhelming factual overlap because I think

13   that is the case also with the examiner in this case.  We

14   don't want to duplicate resources.  We appointed an examiner

15   and we want the examiner to do the investigation --

16          THE COURT:  I wish that process -- I wish you had

17   selected sooner, but --

18          MS. CORNELL:  I think that --

19          THE COURT:  I kept checking the docket every day

20   looking, has the U.S. Trustee selected an examiner yet?

21          MS. CORNELL:  And I apologize for that, Your

22   Honor.  We had -- as we previously reported, there was an

23   overwhelming response to the examiner role.  But we did

24   appoint an examiner, and it seems like a duplication of

25   efforts to have estate fiduciaries performing similar

Page 47

1    functions.

2            And, as noted by the examiner motion and the

3    examiner order, both the Debtors and the committees, they

4    have a stake in identifying what the return is here; not

5    whether it's the correct thing to do.  The examiner is a

6    neutral third party who's best-suited to examine a debtor's

7    assets, and particularly the extent of and potential impact

8    of the debtor's management and comingling of its assets.

9            Additionally, there are some concerns about the --

10           THE COURT:  Let me stop you for a second.  The

11   Committee -- certainly it's an issue for the Committee

12   whether assets should be returned to custody and withhold

13   accountholders.  I think I made this point at a prior

14   hearing.  Every dollar that gets paid back -- every dollar -

15   - whatever the asset is that gets transferred back to

16   custody and withhold accountholders is that much less

17   available for pro rata distributions to creditors.

18           MS. CORNELL:  Mm hmm.

19           THE COURT:  With all due respect, I don't believe

20   -- this is an issue where the Committee's interest is direct

21   and their faith -- what the examiner does is important, and

22   I do want that input, but this is an issue -- while I hope

23   to have all the parties in interest avoid duplication of

24   effort, the Committee's investigation, the examiner's

25   investigation -- but this is an issue that directly impacts

Page 48

1   unsecured creditors.  And so I don't think that the

2   Committee -- you know, they shouldn't have to defer to what

3   the examiner concludes.  I hope they'll coordinate what's

4   done but on this issue, I hope that the examiner does a very

5   robust, thorough, prompt investigation, but on an issue that

6   directly impacts the potential recovery to unsecured

7   creditors, I don't think the Committee is just beholden to

8   have to wait to see what the examiner does.  So, on that --

9   to that extent -- I interrupted you because on that I don't

10  agree with you.

11          MS. CORNELL:  Understandably, Your Honor.  Thank

12  you.  You know what?  I think that's a good segue.  You

13  know, I'd like to note that the examiner is present and this

14  is her first opportunity to address the Court.  And if the

15  Court deems it appropriate, I would appreciate it if the

16  Court were to give her a few minutes to introduce herself.

17  And if she has any views or opinions, it might be

18  appropriate, given that the filing took place last night and

19  may have an impact on her investigation.

20          THE COURT:  That's fine.  And I also note that Mr.

21  Lazar has made an appearance.  I assume he's counsel to the

22  examiner.  But I would like to hear from the examiner.

23          MS. PILLAY:  Thank you, Your Honor.  Shoba Pillay,

24  the examiner, with counsel Vincent Lazar from Jenner Block

25  is also present, as you note.  I appreciate the opportunity

Page 49

1    to address the Court today.  I appreciate the opportunity to

2    engage in this investigation.  I do have concerns in light

3    of a lot of what Ms. Cornell has identified as the

4    duplication of the investigation.  We are working closely

5    with the Debtor committee and ad hoc committees, and anyone

6    else who is interested in talking to us -- we've taken the

7    opportunity to speak to already in the last week.

8            The concern I have is, I think -- I understand the

9    Court's goal in moving forward on these open issues, and I

10   understand the Committee does have a critical interest in

11   identifying which asset should stay with the estate and may

12   not be appropriate for the estate.  However, it is directly

13   coextensive with the examiner's mandate.  So, the question

14   that I have is in light of the stipulated order, if Your

15   Honor does deem it appropriate to move forward with it, if

16   it would be appropriate for a date certain within that

17   timeframe, within Phase I, for the examiner to issue an

18   interim report based on whatever investigation we're able to

19   complete to that date in order to be able to provide some

20   insight from the independent perspective.

21           In other words, we are working closely with all

22   the parties in order to get the materials but I think

23   because the purpose of the examiner in this matter is to

24   identify and, to some level, look under the hood, if you

25   will, in light of some of the transparency concerns

Page 50

1   articulated by the Trustee -- in my mind, it would be useful

2   for the Court and the parties to have perspective as the

3   examiner's position before --

4          THE COURT:  I agree.  But the question is one of

5   timing.

6          MS. PILLAY:  Certainly, Your Honor.  I think based

7   upon --

8          THE COURT:  (indiscernible) I'm not faulting you

9   in the least.  You were recently appointed.  The issue of

10  whether property in the custody accounts or the withheld

11  property is property of the estate was identified as an

12  issue, you know, pretty much right at the outset of the

13  case.  And to the extent that the property doesn't belong to

14  the Debtor, it's not an estate asset, the property of

15  accountholders is being held up.

16         There is this problem identified early also that

17  transfers -- the bulk of the transfers were within 90 days

18  of bankruptcy, raising the preference issue, which is a

19  giant complication.  But do you -- I want this all to move

20  forward.  I think that I would very much value your

21  independent assessment of this issue.  The question is one

22  of time.  I think clearly you have to prioritize the issues

23  you're going to deal with.

24         I do come back to the point that the Committee --

25  this is a value issue for the Committee.  Every -- whether

Page 51

1   it's cryptocurrency or dollars, I'll talk about dollars --

2   every dollar out is a dollar less that's available for

3   distribution to the general bulk of unsecured creditors.

4   And so it has to happen quickly.  Do you have an estimate of

5   how much time you want to be able to investigate this set of

6   issues?

7           MS. PILLAY:  Your Honor, we are still assessing

8   the collection of materials but I think in light of the

9   stipulated order, to the extent Your Honor enters that, we

10  would suggest at least for an interim report on this issue,

11  to file something about 14 days after the first Phase I

12  briefing.  So, that would be, I guess, 28 days from if the

13  order is entered today based on the current stipulated

14  order.  In order to give -- so, it would be sort of inside

15  or interim to the briefing schedule proposed by the parties.

16          THE COURT:  Let me ask, did you or Mr. Lazar speak

17  with the other counsel involved in this to see whether --

18  what their view is about fitting your interim report on the

19  schedule you proposed into this overall schedule?

20          MS. PILLAY:  We did not, Your Honor, in part

21  because I think this was filed last night and we were making

22  an assessment of how to best address it in a --

23          THE COURT:  I don't fault you at all for that.  I

24  mean...

25          MS. PILLAY:  And, Your Honor, the idea here is not

Page 52

1    to be obstructive to the process.  I take your point.  It's

2    to provide the parties with as much perspective as possible.

3              THE COURT:  I'll tell you; I want your interim

4    report on this issue because you don't represent any

5    particular stakeholder in this.  The Committee does.  The

6    Debtor, I'm not quite sure where they -- where to align them

7    on this issue.  I absolutely want your interim report.  So,

8    just repeat for me -- I know you said interim report 14 days

9    after the Phase I briefing.  When would that be?  Because I

10   know what's going to happen.  You're going to file an

11   interim report and other parties are going to want to start

12   taking potshots at you one way or the other.  So, what --

13   just --

14             MS. PILLAY:  The original declarations are, I

15   think, due to be filed 14 days from the entry of this order.

16   And the parties are to file their opening briefs ten

17   calendar days after that.  So, it would be 14 days after the

18   opening briefs, I think would be the appropriate timeline.

19             THE COURT:  I guess I should ask this -- the

20   Debtor Committee and the Ad Hoc Committees whether they

21   expected to take depositions of the declarants and when that

22   would take place.

23             MR. KOENIG:  Your Honor, in the -- again, Chris

24   Koenig for the Debtors.  The stipulation provides that there

25   won't be depositions of the declarant in Phase I.  So,

Page 53

1    that's a non -- a nonissue for purposes of Phase I.

2             THE COURT:  Well, what do I do, Mr. Koenig, when

3    you've all agreed there won't be any depositions and, you

4    know, there's a violent reaction by the other parties about

5    well, that's not true.  I guess we'll have an eventual

6    hearing but -- so, everyone's agreed that declarations will

7    be filed and you'll do it the old-fashioned way, cross-

8    examination at a hearing to the extent anybody disputes the

9    facts.  That's what everybody's agreed --

10            MR. KOENIG:  That's the agreement by the parties,

11   Your Honor.  And, also, all parties are reserving rights

12   that other facts are relevant to Phase I issues.  So, if at

13   the Phase I hearing the examiner has identified additional

14   facts or the other parties believe that there are additional

15   facts outside the scope of the declarations that are

16   relevant to Phase I issues, which, to be clear, the Debtor's

17   position is that it's purely legal -- those matters can be

18   determined on a legal basis only.  That there's an

19   unambiguous agreement between the parties.  So, parole

20   evidence isn't relevant as a matter of law.  But to the

21   extent parties believe that there are additional facts, they

22   can argue that at the Phase I hearing and, you know, Your

23   Honor would make a ruling at that time.

24            What we were trying to do is to streamline Phase I

25   so that we could get in front of Your Honor on these issues

Page 54

1    and try to argue, you know, the legal issues first.  And to

2    the extent other facts become relevant and Your Honor

3    believes the facts are relevant, perhaps -- you know,

4    because Your Honor finds that the language is not -- or that

5    the language is ambiguous, then we will have to -- we will

6    have to deal with that at the appropriate time.

7            THE COURT:  Do you -- I know we're doing this all

8    on the fly.  So, you've heard from Ms. Pillay about her

9    suggestion that she does an interim report 14 days after the

10   Phase I briefing.  What's your position on that?

11           MR. KOENIG:  Oh, look, I'd like to -- Your Honor,

12   I'd like to have the opportunity to speak to the other

13   parties but I imagine we will be able to adjust schedule

14   accordingly.  I think that an interim report is appropriate

15   and we can build it into the schedule.  I think that the

16   parties would likely -- at least speaking for the Debtors --

17   we would like our responsive briefs to have the benefit of

18   the interim report.  That's the purpose of filing the

19   interim report.  But from the Debtor's perspective, we would

20   have no objection to sort of slotting Ms. Pillay's interim

21   report in between the opening briefs and the responsive

22   briefs.  But, of course, I defer to the other parties as

23   well.

24           THE COURT:  So, on this let me hear from Mr.

25   Hershey next, and then I'll hear from Mr. Ortiz and Ms.

Page 55

1   Kovsky on this issue -- slotting in the examiner's interim

2   report.

3           MR. HERSHEY:  Thank you, Your Honor.  Just for the

4   record, Sam Hershey from White & Case for the Committee.  A

5   few very quick points, Your Honor.  First of all, I have to

6   respond to what Mr. Koenig just said about the parties

7   agreeing not to depose the Debtor's declarant.  The schedule

8   actually provides, in Paragraph 2, that the Debtor's

9   agreement to provide a declaration is not an agreement that

10  they will produce the declarant for a deposition.  It does

11  not say that we've agreed necessarily that we will not seek

12  a deposition.  And actually all the parties' rights with

13  regard to seeking further discovery are preserved.  I just

14  wanted to note that for the record.  That's the first thing.

15          The second thing is -- I agree with Mr. Koenig

16  that I'd like an opportunity to speak with the parties.  I

17  don't think I can adjust the schedule on the fly, but I do

18  think we will be able to reach a schedule that works for

19  everyone.  It certainly is our intention to make the

20  schedule work for all parties and we'll work -- continue to

21  work in good faith to do that.

22          The last thing I want to say, just because I think

23  it's important, is the order appointing the examiner

24  specifically says in Paragraph 5 -- this is Docket Number

25  820 -- that nothing herein shall preclude the Debtors or the

Page 56

1    Committee from concluding its -- oh, sorry -- from

2    conducting its own investigation regarding the Debtors,

3    including whether the estate has claims or causes of action

4    against any person or entity.  And that clearly describes

5    this proceeding that we're discussing right now.

6              So, I just want to make clear there is no conflict

7    here.  The Committee did retain the right, through the

8    appointment of the examiner, to continue to do this

9    investigation.  As Your Honor observed, it's important to

10   the Committee's role in this case and I just wanted to put

11   that on the record.

12             THE COURT:  You know, and I don't know whether

13   I've said this before or not but it should be obvious, when

14   I get fee applications, I'm going to look at whether or not

15   there was, in my view, unnecessary or unreasonable

16   duplication of effort.  So, I'll just leave it at that.  I

17   mean, s I've said, Mr. Hershey, I think to the fullest

18   extent possible, duplication should be avoided.  But an

19   issue that, as I've expressed already, is an essential issue

20   for the Committee.  I mean, every dollar that goes out is a

21   dollar less available for pro rata distributions.

22             So, I don't -- you know, I want the examiner's

23   interim report on this.  I'm not shutting the Committee down

24   as to what they do, but there are likely to be other matters

25   that come up in this case where coordination and the

Page 57

1    avoidance of unnecessary duplication is going to be

2    important.  Let me just stop with that, okay?

3              MR. HERSHEY:  Thank you, Your Honor.  The

4    Committee, of course, is also committed not to wasting

5    estate resources in duplication and we'll work with the

6    examiner to avoid that happening in all cases.

7              THE COURT:  Okay.  Let me hear from Mr. Ortiz.

8              MR. ORTIZ:  Good morning again, Your Honor.  Kyle

9    Ortiz of Togut Segal & Segal on behalf of the Ad Hoc Group

10   of Custodial Account Holders.  I'll note at the outset we're

11   very happy that Ms. Pillay is here and we're -- you know,

12   excited to see what she's going to do, and we're glad that

13   the examiner is on the scene.

14             But I don't necessarily think -- and look, we're

15   very happy to have her have a preliminary report on this

16   issue, but I would note when we're talking about --

17             THE COURT:  You described it as an interim report.

18   Let's call it the interim report.

19             MR. ORTIZ:  Interim report.  But I would note, you

20   know, when I look at that same order that Mr. Hershey was

21   just speaking to in Paragraph 3-2 and the scope, it's an

22   examination as to why there was a change in account

23   offerings beginning in April of '22 from the earn program to

24   the custody service for some customers while others were

25   placed in withhold accounts.  And I don't necessarily think

Page 58

1   that there's complete overlap there -- because really that

2   seems to be a question of why did you create these programs,

3   which gets into an investigation of, you know, some of the

4   securities law issues and state investigations that were

5   going on.  Whereas the question that we're trying to solve

6   with this scheduling order is -- the program was created;

7   why it was created is one issue, but it was created and it

8   was on contractual terms between these parties.  And what do

9   those mean for who owns these assets?

10          And, you know, my biggest concern with where

11  things are going with this, including the examiner and

12  waiting for things, is, again, the same concern I had with

13  this whole scheduling order is -- we continue to get

14  stretched out.  And, again, I think her input will be

15  helpful but I don't necessarily think that these issues are

16  actually the same issues.

17          THE COURT:  Let me ask you this -- first, with

18  respect to the scope of the examiner's investigation.  I

19  added a paragraph to the order and so the specific scope

20  that's defined in that order is not necessarily the last

21  word.  Let me -- I won't go further than that.

22          MR. ORTIZ:  I appreciate that, Your Honor.

23          THE COURT:  There've been lots of pleadings,

24  writings, letters filed by pro se creditors who raised a lot

25  of serious issues that aren't necessarily within the precise

Page 59

1    scope of what the Debtor, the Committee and the U.S. Trustee

2    set forth as the scope of the investigation.  And that was

3    one of the reasons I added a paragraph to the order.  It

4    gives Ms. Pillay an opportunity to confer with the parties

5    but also it's not necessary to come back to the Court and

6    say I think it's important to include, within the scope of

7    the examiner's investigation, the following.

8            But I guess the -- the question I have for you,

9    Mr. Ortiz, is how the -- Ms. Pillay's request to be able to

10   do -- to slot into the schedule an interim report 14 days

11   after the Phase I briefing.  You know, this is a whole

12   expedited schedule.  Lots of work for everybody to do.  But

13   it didn't strike me that that's going to upset this overall

14   schedule of moving forward.  I'd like your reaction on that.

15           MR. ORTIZ:  Yes, Your Honor.  I think -- as long

16   as it's not upsetting the schedule, again, I actually think,

17   you know, her input's going to be useful.  She has resources

18   and more of a mandate than we probably do, so it'll be

19   helpful to have --

20           THE COURT:  Her work's coming out of -- her work

21   is coming out of the estate's nickel and not -- you know,

22   which isn't --

23           MR. ORTIZ:  Right.  Exactly.  So, I think it'll be

24   helpful.  Our concern was just, you know, additional delay.

25   And if it slots in in a way that works, we're going to be

Page 60

1    more than happy to have her participating.

2          THE COURT:  I suspect that Ms. Pillay and her

3    counsel will be happy to hear from you about things you

4    think she should include in her focus for this interim

5    report, because you think that'll help you?

6          MR. ORTIZ:  Yeah, I would note Ms. Pillay and her

7    counsel reached out to us shortly they appointed us -- they

8    did to many -- and I've been looking for input, and they've

9    been doing the right things so far.  So, we're very happy,

10   again, to have her on the scene.

11         If I may, Your Honor, I wanted to make just one

12   really brief, maybe 15-second response to something that Mr.

13   Hershey said about the ordinary course?

14         THE COURT:  Go ahead.

15         MR. ORTIZ:  So, when he was talking about maybe

16   it'd be helpful to -- there's a lot of common facts and to

17   have a few buckets.  Even if we ultimately determined, based

18   on some bellwethers, that you had common -- you know, five

19   sets of common facts, you still have 58,000 people and you

20   can't say, well, you kind of fit into this because that's

21   not really due process for those 58,000 other people.  So, I

22   just wanted to note that and I won't belabor it any further,

23   Your Honor.

24         THE COURT:  Okay.  Ms. Kovsky?

25         MS. KOVSKY-APAP:  Thank you, Your Honor.  Deb

```
                                                      Page 61
 1   Kovsky, Troutman Pepper, for the Ad Hoc Group of Withhold

 2   Account Holders.  I do share Mr. Ortiz's concern about not

 3   stretching the schedule but I don't think that slotting an

 4   interim report in and adjusting our response briefs by a few

 5   days is going to have a material impact on the overall

 6   schedule.

 7           Also, the withhold account holders are situated a

 8   little bit differently from the custody account holders, and

 9   I do think that Ms. Pillay's investigation into why withhold

10   accounts were created in certain states is directly relevant

11   to what we're doing.  There are nine states that the Debtors

12   have referred to as the prohibited states, where they were

13   not permitted to custody coins on behalf of customers, where

14   they're still holding coins on behalf of customers.  And we

15   think that Ms. Pillay's investigation in that regard is

16   absolutely critical to what we're doing here.  So, we

17   absolutely welcome her interim report and would be very much

18   in favor of finding a way to slot that in.

19           THE COURT:  All right, thank you.  Okay.  Mr.

20   Herman?  You've been waiting patiently.

21           MR. HERMAN:  Thank you, Your Honor.  Emanuel

22   Herman, pro se, Celsius LLC creditor and the admin of the

23   Worldwide Earn Customer Group, which has 2,850 members

24   representing hundreds of millions of dollars in assets.  I

25   wanted to clarify for this Court and the parties here that
```

Page 62

1    our group has switched from non-accredited earn to a space

2    for all earn customers worldwide.

3         I apologize for sending my most recent filing last

4    night in advance of this hearing.  I do think it raises some

5    important questions around insider withdrawals, and it took

6    me to the very last minute to find that information and get

7    it to this Court.  I also apologize that I made some

8    typographical errors in my declaration and I'll be filing an

9    amended version soon.  But I did want to get it into your

10   hands before this hearing.  So, I do have a few comments

11   relevant to this hearing and then I have some questions I

12   hope we can go back and forth on.  If anything's irrelevant,

13   please feel free to interrupt me or, you know...

14        So, first, I want to welcome Ms. Pillay to this

15   case.  I want to second what the U.S. Trustee's Office,

16   Shara Cornell said and what Ms. Pillay said.  As an earn

17   customer and a leader of that group, the largest customer

18   group that Celsius has, I believe it would be best to have

19   at least the examiner's interim report in hand before these

20   cases move forward.  Earn customers are the ones who will

21   get less of a distribution if these claims prevail.

22        I also agree with Deb Kovsky from the Withhold

23   Group as well that Ms. Pillay's investigation of why this

24   happened is critical to what I am planning to do as well.

25   So, I just wanted to get that out of the way.  I'll keep my

Page 63

1    statements as brief as I can, and then I do have a few

2    questions.

3              So, first, I want to commend Kirkland and the

4    Debtors for whatever role they may have played behind the

5    scenes to facilitate the departure of Alex Mashinsky to step

6    down.  I'd encourage them to continue working with Mr.

7    Mashinsky to encourage him to stop pushing plans outside the

8    process.

9              We're here today because a small group of

10   customers has decided to litigate against the rest of us to

11   get all of their coins back.  I think they have a pretty

12   good case -- that their coins are not property of the

13   estate, and I think earn customers, such as myself, also

14   have a pretty good case -- our coins are not property of the

15   estate, as I outlined in my objection and in my supplemental

16   filing and declaration from last night, which will be

17   docketed soon.

18             Since it seems that we are moving to litigation, I

19   have decided to file my own adversary proceeding with both

20   contract and constructive trust claims.  I would like to

21   cooperate with the parties and this Court to minimize the

22   burden on the Court and the other parties.  I would like to

23   ask for the same relief as the Ad Hoc Committee's, including

24   procedural relief and the acceptance of electronic service

25   for me and any other pro se parties who may file adversary

Page 64

1   proceedings.  Would that be acceptable to the parties or to

2   you, Your Honor?

3          THE COURT:  I'm not going to -- I'm not going to

4   answer the question on the fly, Mr. Herman.

5          MR. HERMAN:  That's totally fine.  I'm happy to

6   send a motion or something, if that's what you would prefer.

7   Okay, so now I have some questions.  Please feel free to not

8   answer or whatever -- whatever you --

9          THE COURT:  I usually don't have to answer

10  questions but go ahead, Mr. Herman.

11          MR. HERMAN:  Okay.  I guess one question is just

12  is there a deadline by which I need to file a lift stay or

13  adversary proceeding or that the Court would prefer that I

14  file to sort of make it easier to get along with all of

15  these other cases?

16          THE COURT:  You know, again, that's -- there's no

17  statute of limitations on you at this stage, but there are a

18  lot of moving parts to this case.  I think from -- I'm

19  making no rulings at this stage but the earn account

20  holders, by virtue of the Debtor's terms of service, are in

21  a far different position than the issues about the custody

22  account holders and the withhold account holders.

23          MR. HERMAN:  Understood.

24          THE COURT:  There already is one written opinion

25  that I have on the -- I think Fishberg's motion to lift the

Page 65

1    stay.  And I don't have my opinion in front of me, but it

2    certainly addressed some of -- I think some of the issues

3    that you're raising now.  I think that the...

4              CLERK:  Judge?  It seems like he froze.

5              MR. HERMAN:  It seems it, yeah.

6              CLERK:  All right.  Hold on...

7              THE COURT:  -- in one way or the other about any

8    of that.  It's just that I think it -- certainly I

9    recognized from the start that the earn accountholders were

10   differently situated from the issues for the custody

11   accountholders or the withhold accountholders.  I'm

12   determined -- I made this clear really from the very

13   beginning of this case -- to try and resolve this is-it-

14   property-of-the-estate issue.  And that's why we're heading

15   down this road and I'm appreciative that the -- the main

16   parties who've teed up this issue have come to an agreement

17   on a path forward and I'm trying to honor -- honor that.

18              So, I can't -- without seeing your papers, Mr.

19   Herman, it's very hard for me to assess where that comes

20   out, whether the Committee has objections to it, whether the

21   Debtor has objections to it, etc.  So, I don't know.  I --

22   the one thing I'll tell you, Mr. Herman.  Everything you

23   have filed in this case, I have read it and considered it.

24   If you file motions, I will -- will get it on the agenda

25   for, you know, one of the omnibus hearings and -- as with

Page 66

1    everything I do, I try to give fair consideration and follow

2    the law.  So, I can't -- without seeing what it is -- your,

3    your request for relief and what you're filing, I can't

4    really react to it now.

5              I'd just say, you know, there are lots of

6    aggrieved parties here and it's a real concern to me.  But

7    that doesn't necessarily translate into the relief that you

8    may seek.  So, let me just stop with that.  I'll have to see

9    what you file.

10             MR. HERMAN:  Thank you, Your Honor.  I have only

11   two more short questions and then I'd like to let other

12   parties go.  So, one question is just if I can file on

13   behalf of similarly situated earn customers worldwide and

14   those who've paid off loans or if I would just be filing for

15   myself?

16             THE COURT:  I think the issue of representing

17   others is something I don't think you're in a position to

18   do.  So, I think you can file for yourself but, you know,

19   unless something is certified as a class action -- I did not

20   ask Mr. Ortiz or Ms. Kovsky the issue about standing of ad

21   hoc committees but maybe I'll briefly touch on that.  But I

22   think the way the stipulation's been drafted deals with some

23   of the concerns I had there.  But I don't want to tell you

24   you're on your own but -- you know...  You can file for

25   yourself.  I'm very mindful that arguments you make may

Page 67

1    apply to a much broader swath of people.  I'm mindful of

2    that when I rule on things.  When I denied Mr. Fishberg's

3    motion to lift the stay, I was fully cognizant of -- that he

4    was not alone in expressing the positions that he expressed

5    and I just followed the law with respect to it.  So, I don't

6    know that I could say more than that.

7              MR. HERMAN:  Okay.  And my last question actually

8    -- I'm just wondering if Kirkland has had a chance to review

9    in my filing my requests for information from the Debtor,

10   because I'd be willing to work with them on discovery so

11   that I can report back on where we can find common ground in

12   advance of the October 20th hearing.  So then hopefully I

13   don't have to ask for an order on --

14             THE COURT:  Let me ask --

15             MR. HERMAN:  -- discovery.

16             THE COURT:  Can someone who's appearing for the

17   Debtor identify with whom Mr. Herman should speak to try and

18   resolve any discovery issues?  To get it on the record now,

19   so he knows specifically with whom he should speak.

20             MR. KOENIG:  Thank you, Your Honor.  Chris Koenig

21   for the Debtors.  If Mr. Herman would reach out to me in the

22   first instance, we can direct him to the appropriate folks.

23   My email address is in the signature block of all of the

24   Debtor's filings.

25             THE COURT:  Okay.  And I'm sure you will try and

Page 68

1    promptly respond to Mr. Herman so he can -- he knows with

2    whom to engage, okay?

3           MR. KOENIG:  Of course, Your Honor.  Of course,

4    Your Honor.  And just very briefly, Your Honor.  You were

5    speaking to Mr. Herman earlier.  You mentioned your ruling

6    on Mr. Fishberg and your video and audio froze for about 30

7    seconds.  So, I apologize to make you go back but I just

8    wanted to make sure that all the parties understood what you

9    were trying to say there.

10          THE COURT:  What I said was -- and I think I had

11   the name right -- Mr. Fishberg filed a motion to lift the

12   stay.  He wanted to proceed with his State court action

13   against Celsius.  He is or was, as I recall it, an earn

14   accountholder.  And I denied his motion to lift the stay.

15   It's in a written opinion on the record.  And so that was

16   really what I was pointing out.

17          So, you know, the earn -- I guess the point that I

18   was trying to make is the earn accountholders are in a

19   different position than the arguments made by the custody

20   and withhold accountholders.  Celsius' terms of use provide

21   that when somebody deposits crypto assets, they transfer all

22   right, title and interest to the debtor.  Whether there's

23   some argument that that shouldn't be enforced or it's

24   ambiguous for some reason, I'm not -- I'm not getting into

25   for now.  I'm not making any ruling about any of that.  I'm

Page 69

1    just -- I was just pointing out that I think that earn

2    accountholders are in a different position than the

3    arguments made by the custody and withhold accountholders.

4              And I really do appreciate your pointing out to me

5    if my connection froze up, but that's it.

6              MR. KOENIG:  Thank you, Your Honor.  Just in

7    response to what Mr. Herman said -- so, we certainly agree

8    that -- what we've tried to do is to deal with custody and

9    withhold on an expedited basis.  The earn issues will be

10   addressed at the appropriate time.  The Debtors have filed a

11   motion for permission to sell stable coin.  That -- that

12   motion has been adjourned to November 1st.  But I think that

13   many of the issues that Mr. Herman is discussing is likely

14   to come up as part of the Debtor's presentation in support

15   of that motion.  So, I just want to point Mr. Herman to

16   that.  That these issues of the custody and withhold

17   accountholders, on the one hand, will be addressed in this

18   schedule, but the earn accountholders, it is not that the

19   Debtors are delaying those matters either.  There are

20   already matters that are likely to come before the Court

21   with respect to earn accountholders, and the Debtors intend

22   to move forward on those issues as well.

23             MR. HERMAN:  Okay, but I -- but I -- sorry, go

24   ahead.

25             THE COURT:  Just a minute, Mr. Herman.  Mr.

Page 70

1   Koenig, one -- and I understand that the stable coin sale

2   motion is not on for today.  But let me ask you just a

3   couple of questions.  And, again, the schedules, I didn't

4   have a chance to read through all of them.

5           What's the total value -- approximate value,

6   because I know it's a moving -- less a moving target with

7   stable coin than with others -- what's the approximate value

8   of the stable coin that the Debtor is holding?

9           MR. KOENIG:  It's tens of millions of dollars,

10  Your Honor.  I don't have the figure in front of me but I'd

11  estimate it around $50 million, you know, give or take.

12          THE COURT:  I thought that the motion put a higher

13  value.  Again, I don't --

14          MR. KOENIG:  Perhaps --

15          THE COURT:  I thought it was like a $77 million --

16          MR. KOENIG:  It's certainly referenced in the

17  motion, Your Honor.  I just don't have the figure in front

18  of me.

19          THE COURT:  Look, I have to say that when I saw

20  that motion -- and, again, it's not for today and I'm not

21  ruling on it -- one of my concerns was, with caveats, your

22  colleagues said that they hoped that the case would result

23  in a plan for in-kind distributions.  But if the stable coin

24  is sold, there's not going to be an in-kind distribution of

25  stable coin from those who actually deposited with it.  So,

Page 71

1    that was an initial reaction I had.  Did -- that doesn't go

2    to the legal issues of are the stable coin property of the

3    estate, and whether the Debtor can, should, must at the

4    present time sell it.  You've now made a motion for approval

5    of bidding procedures, whether the case has taken a

6    different turn as a result of that, whether -- and I

7    understand that motion, again, not on for today, reflected

8    consultations and a parrot agreement with the Committee

9    about a path forward.

10            So, you know, this -- the ground has shifted in

11   this case from the time you filed it until today, and I'm

12   fully aware of that.  I'll deal with the stable coin motion.

13   The U.S. Trustee had an objection.  I think the Texas

14   security regulator had an objection to it.  We'll -- we'll

15   see where we are.  That's not on the agenda for today.

16            MR. KOENIG:  Thank you, Your Honor.  Just for the

17   record -- I'm sorry to interrupt you.  The motion reflects

18   as $23 million of stable coin as of the date of the motion,

19   just for the record.

20            THE COURT:  All right, okay.  Thank you very much

21   for correcting me.  Mr. Herman?

22            MR. HERMAN:  Oh, I'm sorry, Your Honor.

23            THE COURT:  I paused too long.  Mr. Herman,

24   communicate with Mr. Koenig.  He'll promptly identify with

25   whom you should speak on your discovery issues, okay?

Page 72

1             MR. HERMAN:  Thank you, Your Honor.  I just wanted

2    to make one other quick comment, which is that I agree that

3    our claims are different, particularly with constructive

4    trust.  I did want to note that under 541(d), for people who

5    borrowed -- who took out loans, there may be actual contract

6    claims, which was outlined in my filing, which may be

7    similar to the -- to Deb's group of -- Ms. Kovsky's group of

8    withhold accountholders and that we may have actually signed

9    contracts where a plain reading of the contract says that

10   the coins are our property.

11            Of course I haven't filed anything, of course, so

12   I'm just noting that for information of the parties --

13            THE COURT:  Well, let me stop you there.  Well,

14   okay, all right.

15            MS. COHEN:  Your Honor, this is Hollace Cohen.  Do

16   you hear me?

17            THE COURT:  Yes, go ahead.

18            MS. COHEN:  Apropos the comments that were just

19   made by Mr. Herman --

20            THE COURT:  Remind me who your client -- remind me

21   who your client is.

22            MS. COHEN:  My client is Vincent Goetten.  And he

23   is a borrower who paid off his loan.  In fact, tried to do

24   it just before the pause.  And he was told that he would get

25   his bitcoin that he pledged put into a custodial account.

Page 73

1   It then occurred to the Debtor seven days after the loan was

2   repaid that, in fact, he was from a prohibited state.  And

3   so they put his bitcoin into an earn account.  So there --

4   we are very much of the view that our client is entitled to

5   be treated just as a custodial account would be.  And we're

6   kind of surprised that the Debtor did not consider putting

7   his bitcoin into a withhold account.

8          But the bottom line is there are very different

9   types of earn accounts, and these are certainly, you know,

10  important issues that have yet to be addressed.

11         THE COURT:  A lot -- there are a lot of important

12  issues, Ms. Cohen, that haven't been addressed and are going

13  to take time to address.  If you want to file a motion, file

14  a motion and I'll deal with it.

15         MS. COHEN:  Okay.  I just wanted to bring it to

16  your attention.

17         THE COURT:  Thank you.  All right, I don't want to

18  -- who hasn't spoken yet?  I'm trying to see -- are there

19  hands -- whether there are hands raised or not.

20         MR. ORTIZ:  Your Honor, I just know -- my hand's

21  only raised to address your standing question, if you want

22  us to.  Otherwise, I --

23         THE COURT:  Yeah, go ahead.

24         MR. ORTIZ:  Sure.  So, at the last hearing you

25  asked us to address whether or not we had standing as an ad

Page 74

1   hoc group to bring the complaint.  There's really two places

2   that we look.  It's Rule 2019 and Rule 7017.  I'll start

3   with 2019.  And just note that I don't think there's any

4   question that our 70 clients all have standing and that 2019

5   doesn't allow you to have a single counsel.  Whether that

6   counsel is an entity and bring an adversary complaint is a

7   different question.  I think when I read the rules, the

8   answer is yes but I will admit to you that I don't have a,

9   you know, solid case to say that.

10          So, we've also looked at Bankruptcy Rule 7017,

11   which incorporates Federal Rule 17(a)(3), which allows a

12   party to ratify.  And there's even Second Circuit case law

13   from just last year in Fund Liquidating Holding LLC v. Bank

14   of America Corp, which is at 991 F3d. 370, where at 386, the

15   Court holds that Article III is satisfied as long as a party

16   with standing to prosecute the specific claim in question

17   exists at the time the pleading is filed, which I think we

18   clearly have here.  If that party, the real party interest

19   is not named in the complaint, then it must ratify, join or

20   be substituted into the action within a reasonable time.

21          I think the reasonable time here, we've actually

22   built that reasonable time into the scheduling order.  So,

23   it's two days after the ruling on Phase I.  And one of the

24   reasons that it's two days after the ruling on Phase I is if

25   Phase I is successful, we don't really need to go forward

Page 75

1    with our complaint because, in our view, the Debtors ask for

2    very much the same relief in the first instance of whether

3    or not it's property of the estate.  There are questions

4    that come from that but that was all our complaint asked for

5    was that initial ruling.

6                So, if we get to that point and we need to ratify,

7    we will have our clients ratify the complaint, consistent

8    with Rule 17(a)(3), Your Honor.

9                THE COURT:  Give me a second.

10               MR. ORTIZ:  Of course, Your Honor.

11               THE COURT:  More than a second.  I'm searching for

12   something.  How are the bellwether clients going to be

13   identified?

14               MR. ORTIZ:  That is -- my understanding is that

15   each group, and the committee, and the Debtors kind of

16   identify folks.  Again, I don't necessarily think if we

17   limit this to ordinary business terms, and safe harbor, they

18   even need bellwethers.  I think you really only need

19   bellwethers if you get into ordinary course of business.

20               THE COURT:  Let me stop you there, because I've

21   decided that ordinary course of business should be included.

22               MR. ORTIZ:  Okay.

23               THE COURT:  It's still a (indiscernible) issue but

24   it's -- I do believe it should be included.  And that's, you

25   know … and that will require, if we get to phase two, it

Page 76

1  will require selection of the bellwether parties.  Have you

2  discussed how that's to be done?  Is that done in

3  consultation between the parties to these disputes?

4            MR. ORTIZ:  Yes, Your Honor.  Of course, I'll let

5  the other parties speak as well.  But the concept is, we

6  would all agree that there's a number, and that we all get

7  to choose a certain amount within that number of the

8  bellwethers.

9            THE COURT:  Like, I mean … from the bank -- you

10  know, I inherited Motors Liquidation GM from Judge Gerber

11  when he retired, and they were overlapping issues with what

12  went on in the District Court, which is just about at an

13  end.  But you know, the selection of bellwether parties can

14  be very important, because you try and get a range of people

15  who, when you resolve their disputes, it pretty well has

16  everything else fall in line with it.  So, I do think that's

17  important.  We'll see where we get to after phase one.  But

18  I do think -- I would include the bracketed language, in

19  paragraph 10, of phase two, is the language where there was

20  no agreement; the ordinary course of business defense, under

21  547(C)(2)(a) of the Bankruptcy Code.  So, I would approve a

22  stipulation with that included.

23            I think the thing -- let me get the last few

24  parties, Mr. Ortiz.  Mr. Nunn, go ahead.

25            MR. NUNN:  Your Honor, thank you for allowing me

1   to speak today.  I really just have, just one question, that

2   I think a lot of people have been asking to us unsecured

3   creditors.  In light of the recent news, Mashinsky and

4   others, have withdrew tens of millions of dollars, prior to

5   the bankruptcy filing, and prior to their departure from the

6   company.  Why isn't there a clawback order to get that money

7   back, especially considering that Mashinsky wanted to sell,

8   you know, $50 million worth of our own assets to fund

9   ongoing operations; which we still don't have

10  (indiscernible) into.  Why is it $15 million a month, or

11  whatever it is?  It's a lot of money that just keeps going

12  out the door.  So, that's my question.  Thank you.

13        THE COURT:  I have a feeling that's something the

14  examiner will be looking at, Mr. Nunn.  So, I rule on

15  disputes that are brought to me in the form of motions,

16  pleadings, things of that nature.  You're raising very good

17  questions.  It, frankly, was one of the things that led me

18  to ask the question at the outset, as to whether Chris

19  Ferraro had withdrawn funds from the Debtor within the 90

20  days.  For insiders, the lookback period is a year, but for

21  this purpose today, I just limited it to the 90-day issue.

22  But you're raising very good questions.

23        Ms. Barstow?

24        MS. BARSTOW:  Yes, hello.  I'm just, I put in a

25  motion for the USBC earn customers be considered secured

Page 78

1    creditors.  I'm just wondering, is that going to be heard

2    today, or will you be scheduling a time for that to be

3    heard?

4              THE COURT:  It's not today.  It'll get put on the,

5    you know, on the agenda for an upcoming hearing; I don't

6    know which one.

7              MR. KOENIG:  Your Honor, it's Chris Koenig for the

8    Debtors.  That's scheduled for November 1.  It was

9    rescheduled.  There was a notice that we filed a few days

10   ago.  It was included as an adjourned matter.  It will be

11   part of the agenda for November 1, and we'll be sure to

12   include it in the agenda that we filed for that hearing.

13             THE COURT:  Well, there's your answer, Mr.

14   Barstow, okay.

15             MS. BARSTOW:  Okay, thank you.

16             MR. KOENIG:  You're welcome.

17             THE COURT:  It won't get lost in the shuffle,

18   okay.

19             MS. BARSTOW:  Okay.

20             THE COURT:  Mr. Crews?

21             MR. CREWS:  Thank you, Your Honor.  It's Cam

22   Crews, pro se Creditor.  I had filed an omnibus objection,

23   filing 914, which may have been obviated by this filing, the

24   988 plan.  But my filing did include an Exhibit A, which

25   addresses some of the issues between custody and earn; which

Page 79

1    I think are important in terms of identifying substantive

2    issues.  So, I wanted to just see whether it would be

3    appropriate to outline that briefly, or know when best to

4    bring that your attention.

5              THE COURT:  I'll give you a chance to just briefly

6    -- I apologize, but I haven't read your filing.  So, go

7    ahead.  And I will, but go ahead.

8              MR. CREWS:  So, I think the most important aspect

9    of it is what I included in Exhibit A, which is a blockchain

10   investigation that I performed myself, which attempted to

11   resolve the expanded coin report, filing 811, which the

12   testimony of the chief security officer, 812.  So, I was

13   able to identify the custody wallet; is, essentially, all

14   the funds are held within a single wallet within the custody

15   workspace.  And also, a major wallet within the retail earn

16   space.  And my investigation showed two main things, which I

17   am hoping the examiner will also be able to look at.  Funds

18   that are going into Celsius wallets would always go into the

19   retail workspace first.  So, there was a custody workspace,

20   but they would only be sent there later, from time to time.

21             And there was an admission from the head of

22   technology founder today, that all transfers between custody

23   and earn occur off-chain; which means that the underlying

24   assets were not transferred within the regular course of

25   business.  So, that's just something that I think is very

Page 80

1    important to the issues between earn and custody, be

2    different, and as well, would affect the loans accounts.

3         Another major finding is that people that were

4    depositing and were induced to deposit due to referral to

5    bonuses, that they were offered, which the Debtor had no

6    ability to fulfill, based on their solvency.  These deposits

7    were going directly out the door as withdrawals, in the same

8    day.  And I included a diagram showing millions of dollars

9    in stable coin going into Celsius wallets, making one hop,

10   and then being distributed to customers leaving; who were

11   being made whole because they were also taking their

12   earnings with them, if they had any.

13        So, essentially, it's raising major issues about

14   the behavior of the Debtor in their final days, and just

15   showing the flow of funds.  The filing also points out

16   questions of ownership with regard to the terms of service,

17   which were changed in July 2021; where, previously, the

18   terms of service asked everybody who was using the service

19   to affirm that you hereby represent and warrant to us, that

20   any digital asset used by you in connection with your

21   Celsius wallet, is owned by you.  This is something you had

22   to have agreed to do prior to July 2001.

23        Subsequent to that, they released a change and

24   said, you transfer all rights and title of digital assets to

25   Celsius.  But they removed the date changed from that

Page 81

1    agreement.  And I would argue they did not collect, posit a

2    cent from their customers; that this change had been made.

3            And there are substantial issues with what they've

4    changed here, because the next question would be, with

5    regards to tax liabilities, if you've transferred title,

6    that would be a disposal event under the IRS tax code.  But

7    they would present your tax forms as if you owe all taxes of

8    the customer.

9            They've also presented that using Celsius is a way

10   to defer your tax responsibilities.  So, essentially, they

11   were caught between two ways.  Like, how can they claim

12   title, while allowing you to defer your taxes.  So, that's

13   something that the Debtor really should address.  It would

14   really -- nobody would want to use their service if they're

15   going to incur these tax liabilities by transferring title

16   of their clients.  It would completely undermine the purpose

17   of using their service.

18           And there's also Exhibits B through E, show screen

19   shots of their website that constantly refer to, you're able

20   to access your coins at any time, keep them safe with

21   Celsius.  They're always using the term, 'your coins.'  And

22   those terminologies did not change at all after the 2001

23   change.

24           So, I think it's just really important to identify

25   what I would classify as deceptive trade practice.  And I

Page 82

```
1    think there could be very constructive arguments that kind

2    of outline that.  That's the brief summary.

3              THE COURT:  What is the ECF Docket number of your

4    filing?

5              MR. CREWS:  It's 914, Your Honor.

6              THE COURT:  Thank you very much.  And I will make

7    a point of going over it.  I apologize, I did not read it

8    before this hearing.

9              MR. CREWS:  Wonderful.  Thank you so much.

10             THE COURT:  Okay.  All right.  Anybody else who

11   has not been heard yet wish to speak?  Ms. Barstow, I've

12   heard from you already.  You need to put your hand down.

13   Thank you.

14             All right, here's where I want to leave it for

15   today.  I agree that Ms. Pillay, should be put into the

16   schedule to file an interim report within 14 days after the

17   initial briefing.  Here's what I would ask for, because the

18   stipulation needs to be revised.  Already, I pointed out,

19   right at the start, that paragraph 15, with respect to

20   rights to appeal, that's not me -- and I can't approve a

21   stipulation that says it's immediately appealable.  So, we

22   talked about that earlier, so that needs to be changed.

23             But I believe -- so, in terms of the unresolved,

24   previously unresolved issue in paragraph 10, I agree with

25   the Debtor that ordinary course of business defense under
```

Page 83

1    547(C)(2)(a) needs to be added to the stipulation.

2              You know, the other comment I would make --

3    obviously, we'll have to see how -- what happens with phase

4    one; phase two may or may not be important after that.  Let

5    me see … Mr. Koenig, under this schedule, you all wanted a

6    trial in November.  Is that correct?

7              MR. KOENIG:  That's right, Your Honor.  There's a

8    bracketed date on page 8 for the hearing on the phase one

9    issues and the Debtor's motion.  We were targeting November.

10   Obviously, we'll have to adjust the schedule based on

11   slotting in Ms. Pillay's interim report.

12             THE COURT:  Right.  Let me just flip down my

13   calendar.

14             MAN 1:  It's our Thanksgiving present for you,

15   Your Honor.

16             MR. KOENIG:  Your Honor, I'm just sort of counting

17   out days, assuming the order was entered today.  The

18   declaration would be filed on October 21; opening briefs

19   would be due ten days after that, which I believe would be

20   the 1st of November.  And I believe Ms. Pillay suggested

21   that 14 days after that date would be the appropriate date

22   for the interim report, so just counting out, that's

23   November 15.  We would need to figure out how to slot in the

24   responsive briefs from the parties, to deal with, you know,

25   making sure that everybody has an opportunity to read Ms.

Page 84

1    Pillay's interim report.

2          You know, perhaps ten days after that would be

3    appropriate; although, of course, we have the Thanksgiving

4    holiday in that period.  So, looking at a calendar, I

5    suspect that that hearing will be in late November or early

6    December, just sort of counting out the days on my calendar

7    live at the hearing.

8          THE COURT:  All right, let me …

9          MR. KOENIG:  And by all means, if I miscounted

10   days somewhere, one of the other parties should interrupt me

11   and …  And we do already have an omnibus hearing on November

12   30, but I suspect that Your Honor would prefer to keep this

13   separate from the omnibus dates, as we've been trying to do

14   on custody and withhold issues, generally.  But I should

15   inquire as to what Your Honor would prefer.

16         THE COURT:  Well, I just, I believe it is going to

17   be necessary to move the November 30 omnibus hearing day.

18   Just give me a second.  I've got to look at two different

19   calendars -- or three different calendars -- on that issue.

20         All right.  We're going to move the omnibus

21   hearing date to December 5th at two o'clock.  And we're

22   going to tentatively schedule the hearing on Phase I for

23   Wednesday, December 7, and Thursday, December 8.  At this

24   date, I don't know whether those two days are going to be

25   enough, but that's what I'm blocking out for now.

Page 85

 1              MR. KOENIG:  Wonderful.  Thank you, Your Honor.

 2              THE COURT:  Okay.  Deanna, you -- my courtroom

 3    deputy is listening to all of this, and so she will make

 4    those notes so we're -- just so we're clear again, I'm

 5    moving the omnibus hearing -- Celsius omnibus hearing date

 6    of November 30, Wednesday, November 30,

 7              MR. KOENIG:  To December 5th at 10:00 A.M.?

 8              THE COURT:  No, December 5th at 2:00 p.m. because

 9    I have --

10              MAN:  Oh, I'm sorry.  Thank you, Your Honor.

11              THE COURT:  -- a hearing at 9:00 a.m. that day.

12              MR. KOENIG:  Okay.  And the Debtors will file a

13    notice on the docket of that adjournment.

14              THE COURT:  Correct.

15              MR. KOENIG:  Okay.

16              CLERK:  And sorry, judge, for the Phase I on

17    December 7th and 8th, did you want to start at 9:00 a.m.

18    both days?

19              THE COURT:  We'll start at 9:00 a.m. days, Deanna.

20    Thank you.

21              CLERK:  Thank you.

22              THE COURT:  You know, we'll -- let me pick another

23    date here, hold on.  Tuesday, November 22 at 10:00 a.m.

24    we're going to have a case management conference with -- it

25    will be in both the main case and the ad hoc adversary,

Page 86

1   specifically focused on the hearing scheduled for December.

2   So -- I'm not quite sure how to describe it in the agenda,

3   but let's do the -- on the -- Tuesday the 22nd at 10:00 a.m.

4           MR. KOENIG:  Thank you, Your Honor.  We'll reflect

5   that in the revised stipulation of status conference

6   perhaps, on the 22nd at 10:00 a.m.

7           THE COURT:  That's fine.  And, you know, if there

8   are issues that arise between -- that somebody believes you

9   need the assistance of the Court, you'll get hearings.  You

10  call -- you know, you try and agree if there are

11  disagreements.  Call Deanna.  You'll get a hearing date.

12  I'll give expedited conference dates as necessary.  I want

13  to keep this moving along.  Okay?

14          MR. KOENIG:  Thank you, Your Honor.  So we will go

15  back with the other parties, revise the stipulation in

16  accordance with your rulings today, and we'll file a revised

17  stipulation and scheduling order as soon as possible,

18  hopefully this afternoon.

19          THE COURT:  Okay.  Thank you very much, Mr.

20  Koenig.

21          MR. KOENIG:  Thank you, Your Honor.

22          THE COURT:  All right.  Thank you very much,

23  everybody.  We are adjourned.

24          (Whereupon these proceedings were concluded at

25  11:28 a.m.)

Page 87

1                      C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    *[signature: Sonya M. Ledanski Hyde]*

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  October 10, 2022