Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) ) Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) ) Case No. 22-10964 (MG) |
| Debtors. | ) ) (Jointly Administered) |

**DEBTORS' OBJECTION TO MOTION**
**FOR ENTRY OF AN ORDER DIRECTING THE**
**APPOINTMENT OF AN OFFICIAL PREFERRED EQUITY COMMITTEE**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

## TABLE OF CONTENTS

**Page**

Preliminary Statement................................................................................................ 1

Background ................................................................................................................ 3

Objection.................................................................................................................... 7

I.      The Requesting Equity Holders' Interests Are Adequately Represented. .................. 9

II.     The Requesting Equity Holders Have Failed to Demonstrate They Are
        Entitled to a Substantial Likelihood of Recovery. ........................................ 13

III.    The Equity Committee Motion Is Not Timely.................................................. 17

IV.     The Other Factors Do Not Demonstrate that an Equity Committee Is
        Necessary. ..................................................................................................... 19

Conclusion .................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Alpha Nat. Res., Inc.*,
No. 15-33896 ................................................................................................10

*In re Ampex Corp.*,
No. 08-11094 (AJG), 2008 WL 2051128 (Bankr. S.D.N.Y. May 14, 2008) ..........................9

*In re Dana Corp.*,
344 B.R. 36 (Bankr. S.D.N.Y. 2006) ..................................................................8, 19

*In re Eastman Kodak Co.*,
2012 WL 2501071 ........................................................................................ *passim*

*In re Edison Bros. Stores, Inc.*,
No. 95-1354, 1996 WL 534853 (D. Del. Sept. 17, 1996)............................................8, 10, 15

*In re Emons Industries, Inc.*,
50 B.R. 692, 694 (Bankr. S.D.N.Y. 1985) ...............................................................15

*In re Nat'l R.V. Holdings, Inc.*,
390 B.R. 690 (Bankr. C.D. Cal. 2008)...................................................................9

*In re Oneida Ltd.*,
No. 06-10489 (ALG), 2006 WL 1288576 (Bankr. S.D.N.Y. May 4, 2006)............................10

*In re Spansion, Inc.*,
421 B.R. 151 (Bankr. D. Del. 2009) ...............................................................8, 12, 20

*In re SunEdison Inc.*,
556 B.R. 94 (Bankr. S.D.N.Y. 2016)............................................................... *passim*

*In re Williams Comm'n Grp., Inc.*,
281 B.R. 216 (Bankr. S.D.N.Y. 2002)............................................................. *passim*

**Statutes and Rules**

11 U.S.C. § 503(b)(3)(D)..................................................................................16

11 U.S.C. § 1102(a)(2).................................................................................1, 7, 8

11 U.S.C. § 1107(a) .......................................................................................4

11 U.S.C. § 1108 .................................................................................................................. 4

Fed. R. Bankr. P. 1015(b) ................................................................................................... 4

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file

this objection (this "Objection") in response to the *Motion of Community First Partners, LLC,*

*Celsius SPV Investors, LP, Celsius New SPV Investors, LP, and CDP Investissements Inc. for*

*Entry of an Order Directing the Appointment of an Official Preferred Equity Committee*

[Docket No. 880] (the "Equity Committee Motion")[2] filed by Community First Partners, LLC,

Celsius SPV Investors, LP, Celsius New SPV Investors, LP (the "Series B Holders"), and

CDP Investissements Inc. (together with the Series B Holders, the "Requesting Equity Holders")

requesting that the United States Bankruptcy Court for the Southern District of New York

(the "Court") appoint an official committee of equity holders (an "Equity Committee") pursuant

to section 1102(a)(2) of title 11 of the United States Code (the "Bankruptcy Code").  In support of

this Objection, the Debtors state as follows.

## Preliminary Statement[3]

1.      An Equity Committee is neither necessary nor beneficial to these chapter 11 cases.

Appointing an Equity Committee is the exception, not the rule, and the Requesting Equity Holders

have failed to satisfy their high burden that the Debtors' estates should bear the costs of an Equity

Committee.

2.      The Requesting Equity Holders—which represent approximately 19% of the equity

in Celsius Network Limited ("Celsius Network")—ask the Court to appoint an Equity Committee

to ensure that they have the "access, standing, and resources equal" to that of the official committee

---

2    Andersen Invest Luxembourg S.A. SPF filed the *Joinder of Andersen Invest Luxembourg SA SPF to the Motion of Community First Partners, LLC, Celsius SPV Investors LP, Celsius New SPV Investors LP and CDP Investissements Inc for Entry of Order Directing the Appointment of an Official Preferred Equity Committee* [Docket No. 924] joining the Equity Committee Motion.

3    Capitalized terms that are used but not defined herein have the meanings given to such terms in the Equity Committee Motion, or elsewhere in the Objection, as applicable.

of unsecured creditors (the "Committee").  The Requesting Equity Holders, however, are already adequately represented, and appointing an Equity Committee funded out of the Debtors' estates is not appropriate at this point.  Indeed, appointing an Equity Committee, prior to any indication that equity has a substantial likelihood of recovery in these chapter 11 cases, would run counter to bedrock priority principles of the Bankruptcy Code to elevate the self-interests of institutional equity investors over the interests of all other stakeholders in the Debtors' estates.

3.     The Requesting Equity Holders argue that an Equity Committee must be immediately appointed to ensure that equity holders can respond to issues that may "need to be addressed in the short term" because such issues "directly affect[ ] the recoveries of the [e]quity [h]olders."  In making such demand, the Requesting Equity Holders suggest that as stakeholders in these chapter 11 cases, they are similarly situated to unsecured creditors.  This is simply not the case.  The Bankruptcy Code prioritizes the treatment of creditor claims above those of equity holders.  It is only in exceptional cases that the Bankruptcy Code permits the use of estate resources to pay for an official committee of equity holders.  These are not such exceptional cases, and it is inappropriate for estate resources to be used to advance the interests of institutional investors who are already represented by sophisticated counsel in these chapter 11 cases, and who are already advancing the interests of equity holders in these chapter 11 cases.

4.     Negotiations regarding the Debtors' restructuring have been, and will continue to be, extraordinarily complicated and the Requesting Equity Holders already have a seat at the table in these negotiations.  Adding an Equity Committee paid for by the Debtors' estates and who would have nothing to lose in pursuing claims and positions at considerable estate expense would undoubtedly prove detrimental to the Debtors' reorganization efforts.  There is simply no need for another estate-funded group with another set of professionals.  Counsel for the Requesting Equity

2

Holders is actively participating in these chapter 11 cases on behalf of the Requesting Equity Holders by providing comments on various court orders (which were incorporated by the Debtors), participating in hearings, and filing objections to various pleadings.  In other words, as the Requesting Equity Holders have already demonstrated, failing to appoint an official equity committee in these chapter 11 cases will not silence the Requesting Equity Holders.  Rather, the Requesting Equity Holders will remain able to participate in these chapter 11 cases as they see fit and as they have already done.

5.      Moreover, deciding whether an Equity Committee should be appointed now is premature while the import and the impact of issues such as, "which Debtors are liable with respect to customer claims" or "whether the claims of the Debtors' customers must be determined in United States dollars as of the Petition Date" remain unresolved.  The Debtors understand that these novel legal questions will be integral to confirming a chapter 11 plan and emerging from bankruptcy, and intend to push resolutions of those issues forward, but until these issues are resolved by the Court, it is pure speculation as to whether the equity holders will receive a recovery.  Furthermore, once these issues are properly before the Court, there is nothing preventing the Requesting Equity Holders from actively participating in their resolution and advocating for their preferred outcome as they have done throughout these chapter 11 cases.

6.      In sum, the Requesting Equity Holders have not demonstrated that the extraordinary remedy of appointing an official equity committee is necessary and the Equity Committee Motion should be denied.

**Background**

7.      The Debtors, together with their non-Debtor affiliates (collectively, "Celsius"), are one of the largest and most sophisticated cryptocurrency based finance platforms in the world and provide financial services to institutional, corporate, and retail clients across more than

3

100 countries. Celsius was created in 2017 to be one of the first cryptocurrency platforms to which users could transfer their crypto assets and (a) earn rewards on crypto assets and/or (b) take loans using those transferred crypto assets as collateral. Headquartered in Hoboken, New Jersey, Celsius has more than 1.7 million registered users and approximately 300,000 active users with account balances greater than $100.

8.    On July 13, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors commenced these chapter 11 cases to provide Celsius an opportunity to stabilize its business and consummate a comprehensive restructuring transaction that maximizes value for stakeholders.

9.    The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. These chapter 11 cases have been consolidated for procedural purposes only and are jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket No. 53]. On July 27, 2022, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the Committee [Docket No. 241]. On September 29, 2022, the Court entered an order approving the appointment of an examiner (the "Examiner") [Docket No. 923].

10.    The Debtors have made significant progress in these chapter 11 cases with respect to protecting their estates, stabilizing and streamlining operations, and charting a path towards a successful resolution of these chapter 11 cases—all while adapting the legal framework of chapter 11 protection to an emerging and innovative industry. To date, the Debtors have worked with the Committee, the U.S. Trustee, the Examiner, the Requesting Equity Holders, two ad hoc groups of customers, and countless other stakeholders to seek consensus on key matters and advance these chapter 11 cases.

11.    Importantly, the Requesting Equity Holders are active participants in these chapter 11 cases. Counsel for the Series B Holders participated in the first day hearing to make the equity holders' views known on matters important to equity holders. *See* July 18, 2022 Tr. 80:7-83:10, attached hereto as **Exhibit A**. Counsel for the Series B Holders also participated in the September 14, 2022 hearing. *See* Sept. 14, 2022 Hr'g Tr. 44:21-45:21, 45:24-46:1 attached hereto as **Exhibit B**. On August 2, 2022, CDP Investissements Inc. filed a *Declaration of Status as a Substantial Shareholder* [Docket No. 336] and on August 8, 2022, the Series B Holders filed a *Declaration of Status as a Substantial Shareholder* [Docket No. 444], signaling their appearances in these chapter 11 cases.

12.    On September 7, 2022, the Series B Holders filed the *Series B Holders' Limited Objection to Motion of the United States Trustee for Entry of an Order Directing the Appointment of an Examiner* [Docket No. 734]. The Debtors engaged with the Requesting Equity Holders and included their comments on the relief granted by the:

- *Order (I) Permitting Sale of the Debtors' Mined Bitcoin in the Ordinary Course and (II) Granting Related Relief* [Docket No. 514] (the "Mined Bitcoin Order");

- *Order Approving Procedures for De Minimis Asset Sales* [Docket No. 692] (the "De Minimis Sale Order");

- *Order (I) Approving Bidding Procedures for the Potential Sale of Certain of the Debtors' Assets, (II) Scheduling Certain Dates with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving Contract Assumption and Assignment Procedures, and (V) Granting Related Relief* [Docket No. 687] (the "GK8 Bidding Procedures Order"); and

- *Interim Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Granting Superpriority Administrative Expense Status to Postpetition Intercompany Balances, and (III) Granting Related Relief* [Docket No. 56] (the "First Interim Cash Management Order");

- *Second Interim Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related*

*Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Granting Superpriority Administrative Expense Status to Postpetition Intercompany Balances, and (III) Granting Related Relief* [Docket No. 513] (the "Second Interim Cash Management Order"); and

- *Third Interim Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Granting Superpriority Administrative Expense Status to Postpetition Intercompany Balances, and (III) Granting Related Relief* [Docket No. 699] (the "Third Interim Cash Management Order" and together with the First Interim Cash Management Order and the Second Interim Cash Management Order, the "Interim Cash Management Orders").

As a part of these conversations, the Debtors agreed to broad reservations of rights for stakeholders to protect all stakeholders' rights, including the rights of the Requesting Equity Holders.

13. On July 19, 2022, and July 28, 2022, the U.S. Trustee received letters from Milbank LLP requesting the appointment of an Equity Committee and on July 22, 2022, the U.S. Trustee received a letter from Jones Day LLP requesting the appointment of an Equity Committee (together, the "Letters") *See* Equity Committee Mot., Exhibits F–H. The Committee responded to the Letters on August 10, 2022. *See Statement of the United States Trustee to Motion of Community First Partners, LLC, Celsius SPV Investors, LP, Celsius New SPV Investors, LP, and CDP Investissements Inc. for Entry of an Order Directing the Appointment of an Official Preferred Equity Committee* [Docket No. 948]. The Debtors also responded to the Letters on August 10, 2022. *See* Equity Committee Mot., Exhibit I. The Requesting Equity Holders replied to the Debtors' response on August 15, 2022. *See id.,* Exhibit J. The Requesting Equity Holders filed the Equity Committee Motion on September 22, 2022.

14. The U.S. Trustee—which has the discretion to appoint an Equity Committee—did not make a determination on whether an Equity Committee should be appointed in these chapter 11 cases after reviewing the Letters and the Committee's and the Debtors' responses. *See* [Docket No. 948]. Now, in response to the Equity Committee Motion, the U.S. Trustee has again decided

to "not take a position with respect to the Equity Committee Motion," and has requested that the Court grant relief as it "deem[s] just and proper." *Id.*

15.     On October 5, 2022, the Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs (the "Schedules") [Docket No. 974].  The Debtors scheduled Celsius account-holder claims at each Debtor entity. *Id.*  The Debtors explained in their Global Notes to the Schedules (the "Global Notes") that this issue has been disputed by the Series B Holders and the Debtors and will be resolved by the Court.  *See Global Notes and Statement of Limitations, Methodology and Disclaimers Regarding the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs* [Docket No. 974] ("The Debtors understand that certain parties in interest, including certain holders of the Series B Preferred Shares issued by Celsius Network Limited, intend to argue that account holders have claims solely against Celsius Network LLC.  The Debtors expect that this legal issue will be resolved by the Court in the near term, either through a to-be-commenced adversary proceeding, a claims objection, or other litigation.").

## Objection

16.     Section 1102(a)(2) of the Bankruptcy Code provides that "[o]n request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure adequate representation of creditors or of equity security holders." 11 U.S.C. § 1102(a)(2).  The standard is high given that the Bankruptcy Code requires that the equity committee be necessary and the burden "is far more onerous than if the statute merely provided that a committee be useful or appropriate."  *In re SunEdison Inc.*, 556 B.R. 94, 103 (Bankr. S.D.N.Y. 2016) (quoting *In re Eastman Kodak Co.,* 2012 WL 2501071, at \*2).  Although courts apply varying definitions of "necessary," they uniformly agree that an appointment of an official equity committee "constitutes extraordinary relief and is the exception

rather than the rule in chapter 11 cases." *Id.*; *see In re Spansion, Inc.*, 421 B.R. 151, 156 (Bankr. D. Del. 2009) (quoting *In re Dana Corp.*, 344 B.R. 36, 38 (Bankr. S.D.N.Y. 2006))*; In re Williams Comm'n Grp., Inc.*, 281 B.R. 216, 223 (Bankr. S.D.N.Y. 2002) (same); 7 Collier on Bankruptcy, ¶ 1102.03[1][b][2] (Richard Levin & Henry J. Sommer eds., 16th ed.) ("Appointment of committees of equity security holders is the exception rather than the rule in chapter 11 cases.").

17.     The Requesting Equity Holders bear the burden to demonstrate that an Equity Committee is necessary for equity holders to be adequately represented.  *See SunEdison*, 556 B.R. at 103.  The Southern District of New York has emphasized that this standard "is not whether the shareholders are 'exclusively' represented, but whether they are 'adequately' represented." *Williams*, 281 B.R. at 223 (quoting *In re Edison Bros. Stores, Inc.*, No. 95-1354, 1996 WL 534853, at *4 (D. Del. Sept. 17, 1996)); *see also Edison Bros.*, 1996 WL 534853, at *4 ("While appellants may be correct in their observation that management cannot exclusively advocate for the interests of the shareholders, the statutory focus of § 1102(a)(2) is not whether shareholders are 'exclusively' represented, but whether they are 'adequately' represented."). Adequate representation is a case-by-case determination dependent upon a number of factors, including:  "the number of shareholders; the complexity of the case; the likely cost of an additional committee to the estate; whether equity is adequately represented by stakeholders already at the table; the timing of the motion relative to the status of the chapter 11 case; and whether there appears to be a substantial likelihood that equity will receive a meaningful distribution in the case." *Eastman Kodak*, 2012 WL 2501071, at *1.

18.     Among these factors, the two key considerations are whether "(i) there is a substantial likelihood that [equity holders] will receive a meaningful distribution in the case under a strict application of the absolute priority rule, and (ii) [equity holders] are unable to represent

8

their interests in the bankruptcy case without an official committee." *SunEdison*, 556 B.R. at 103

(quoting *In re Williams*, 281 B.R. at 223); *In re Ampex Corp.*, No. 08-11094 (AJG), 2008 WL

2051128, at *1 (Bankr. S.D.N.Y. May 14, 2008); *see also In re Nat'l R.V. Holdings, Inc.*, 390

B.R. 690, 696 (Bankr. C.D. Cal. 2008) ("The principal issue on any motion for the appointment of

an equity security holders[] committee is whether the debtor is solvent or it appears likely that

there will be a substantial return for equity.").

## I.    The Requesting Equity Holders' Interests Are Adequately Represented.

19.    As an initial matter, the Requesting Equity Holders misconstrue and misapply the

standard for appointment of an Equity Committee.  The Requesting Equity Holders allege that they

are not adequately represented in these chapter 11 cases because:  (a) the Committee's

representation of creditor interests is "diametrically opposed" to equity holder interests;

(b) without an "estate fiduciary at the table to advocate for the Equity Holders' interests" their

recoveries will be impaired in these chapter 11 cases; and (c) retaining counsel and participating

in these chapter 11 cases does not amount to "adequate representation."  In sum, the Requesting

Equity Holders argue that because their interests in these chapter 11 cases are not exclusively and

equally represented by a fiduciary paid for by the Debtors' estates, they are not adequately

represented in these chapter 11 cases.  Exclusive representation is not the standard; it is only

necessary that equity holders are adequately represented.  *See Williams*, 281 B.R. at 223.

20.    The moving party bears the burden of proof that an equity committee is necessary

for equity holders to be adequately represented.  *See SunEdison*, 556 B.R. at 103.  The Requesting

Equity Holders fail to meet this high burden.

21.    ***First***, the Requesting Equity Holders are not entitled to a "fiduciary" to advocate

for their interests.  A separate committee to represent their "exclusive" interests is not the standard

for appointment of an Equity Committee nor is it warranted in these chapter 11 cases.  As debtors

in possession, the Debtors have the fiduciary duty to maximize the value of their estate for all stakeholders. *See Eastman Kodak*, 2012 WL 2501071, at *2 ("All the other constituencies in the case have the same goals as a shareholders[] committee—to maximize the value of the estate."). The Requesting Equity Holders' contention that they should be on "equal footing" with other stakeholders is blatantly incorrect when creditor claims are statutorily paid ahead of equity claims. Equity Committee Mot. ¶ 29; *see also SunEdison*, 556 B.R. at 106 ("Debt is senior to equity.")

22.     The Requesting Equity Holders rely heavily on *In re Oneida Ltd.*, No. 06-10489 (ALG), 2006 WL 1288576, at *3 (Bankr. S.D.N.Y. May 4, 2006) to suggest that an equity committee is warranted. Equity Committee Mot. ¶¶ 31, 37, 45. The *Oneida* court appointed an equity committee to avoid the appearance of impropriety when the "usual checks and balances" were absent because the unsecured creditors committee was ineffective and the Board of Directors was controlled by a group of creditors who received the residual equity. *Oneida*, 2006 WL 1288576, at *3. Unlike in *Oneida*, the Special Committee is rigorously working to uphold its fiduciary obligation to maximize the value of the Debtors' estate for all stakeholders.

23.     Furthermore, in addition to the Special Committee, other existing constituencies, including the Board of Directors, the Committee, and the Requesting Equity Holders themselves (acting as an ad hoc committee) more than adequately represent shareholders' interests in "maximiz[ing] the value of the estate." *See, e.g.*, *In re Alpha Nat. Res., Inc.*, No. 15-33896, Dec. 17, 2015 Hr'g Tr. 61:6–10 (noting that equity may be "properly represented, adequately represented by the board of directors, by management that serve at the pleasure of the board, and by [] other constituencies . . . ."); *Edison Bros.*, 1996 WL 534853, at *4 (affirming the bankruptcy court's order denying a motion to appoint an official equity committee and noting that shareholders failed to establish that the debtors' management was incapable of honoring their fiduciary duties);

*Eastman Kodak*, 2012 WL 2501071, at *2 ("It is recognized that the debtor in possession in a chapter 11 case has fiduciary duties to the creditors; however, as the Supreme Court has stated, '[T]he insolvency of a company does not absolve the board of its fiduciary duty to the shareholders.'").

24.    ***Second***, contrary to the Requesting Equity Holders assertions, the Debtors have not yet decided "key issues" central to the chapter 11 cases behind closed doors resulting in prejudice to the Requesting Equity Holders.  The Requesting Equity Holders reference the Debtors' general statements on the record as evidence that certain "key issues" were definitively resolved with the Committee and that equity holders somehow missed the opportunity to participate in the resolution of such issues.  Yet they fail to point to any actual evidence of this—because the Debtors have run and open and fair process.  In the Global Notes, the Debtors specifically reserve determination of these key issues for the Court.  Prior to the filing the Schedules and the Global Notes, the Special Committee and the Debtors' legal counsel met by videoconference with counsel to the Requesting Equity Holders to hear the Requesting Equity Holders' position on this issue.

25.    Whether claims should be dollarized, as well as many of the other unresolved legal questions raised by the Requesting Equity Holders as evidence that an Equity Committee is warranted, are questions that the Debtors intend to bring before the Court in the near term and at that time, the Requesting Equity Holders will be able to advocate for their interests—as they have been since the start of these chapter 11 cases.

26.    ***Third***, the Requesting Equity Holders' existing representation through independent counsel is adequate to represent their interests in these chapter 11 cases.  Celsius' equity is held by fewer than 40 equity holders, and the Requesting Equity Holders, sophisticated institutional investors, have collectively invested at least $400 million in the past year.  They are more than

capable of funding their own advisors to represent their own interests. The Requesting Equity

Holders claim there are "dozens" of other equity holders that are incapable of participating in the

bankruptcy process who require an Equity Committee yet only one other institutional equity holder

has joined the request for an Equity Committee. Equity Committee Mot. ¶ 37. In cases such as

these where *pro se* participation is robust, there is no such *pro se* participation by unrepresented

equity holders. Rather, and quite ironically, the only equity holders that assert they are not

adequately represented are those that have been adequately represented by counsel since the outset

of these chapter 11 cases.

27.     Moreover, as detailed above, the Requesting Equity Holders are well organized,

well represented by counsel, and have made appearances at hearings, filed objections and

declarations, and frequently communicated with the U.S. Trustee and the Debtors since the

Petition Date. Courts have routinely held that equity holders are adequately represented through

unofficial, ad hoc committees, such as the one the Requesting Equity Holders have currently

established. *Eastman Kodak*, 2012 WL 2501071, at *2-3 (denying the appointment of an official

committee of equity security holders where shareholders' interests were adequately represented

by other constituencies, including an equity owning board of directors, a "well-organized" ad hoc

committee, and an unsecured creditors committee); *Spansion*, 421 B.R. at 163 ("[The]

Ad Hoc Equity Committee is well organized, well represented by counsel, and adequate to the task

of representing its interests without 'official' status.").

28.     There is simply no indication on the record that the Requesting Equity Holders were

or are now unable to represent their interests without an Equity Committee. At this stage in the

chapter 11 cases, there is no reason to add yet another set of professionals, paid by the estate, to

advocate for equity holders whose interests are already being advanced by a well-organized group of equity holders represented by sophisticated and engaged counsel.

## II.    The Requesting Equity Holders Have Failed to Demonstrate They Are Entitled to a Substantial Likelihood of Recovery.

29.    The Requesting Equity Holders have failed to establish that they have a substantial likelihood of recovery in these chapter 11 cases. The Requesting Equity Holders' arguments that certain of the Debtors "appear" to be solvent or that solvency is at least a "contested issue" do not pass muster. The fact that equity holders *may* be entitled to recovery depending on the outcome of certain disputes in these chapter 11 cases is insufficient to satisfy the Requesting Equity Holders' high burden that an Equity Committee should be appointed at this time.

30.    Although no party has asserted that the Debtors are hopelessly insolvent, as detailed in the Debtors' latest monthly operating report, the Debtors' current liabilities are approximately $329 million greater than their current assets. *See Chapter 11 Monthly Operating Report for Case Number 22-10971 for the Month Ending: 08/31/2022* [Docket No. 873]. Moreover, the burden does not rest with the Debtors to prove they are insolvent for this Court to decline to appoint an Equity Committee, rather the burden rests with the Requesting Equity Holders to prove the Debtors are solvent before an Equity Committee should be appointed. Given that the Requesting Equity Holders have provided no definitive documentation showing the Debtors' solvency, or that customers are not entitled to the benefit of the value of all of the Debtors' estates, they have not satisfied their burden of proof that an Equity Committee is necessary.

31.    Furthermore, the Requesting Equity Holders have failed to show the required substantial likelihood of recovery. A "substantial likelihood" of "meaningful distribution under a strict application of the absolute priority rule" is a prerequisite to appointment of an official committee of equity holders. *Williams*, 281 B.R. at 223. The Requesting Equity Holders attempt

to demonstrate that they stand to receive a "substantial likelihood" of recovery by arguing that the Court should separate the different lines of business that the Debtors engage in and silo recovery for Celsius' account holders into entities that have limited assets, which would permit the equity holders to recover from the profitable segments of the Debtors. Equity Committee Mot. ¶¶ 3–4, 10, 30, 33, 42–44, 46. This theory—that the Debtors' customers cannot assert claims against Debtor Celsius Mining LLC, non-Debtor Celsius Mining IL Ltd., non-Debtor GK8 Ltd. (collectively, the "Celsius Network Limited Subsidiaries")—is currently an open question. Moreover, this argument directly contradicts the plain reading of the current terms of use, dated April 14, 2022, (the "Terms of Use").

32.    The plain language of the Terms of Use provides that customers may assert claims against the Debtor and its non-Debtor Affiliates. Under the Terms of Use, customers contract with Celsius Network LLC "and its Affiliates."[4] Notably, the Requesting Equity Holders did not attempt to advance an alternative interpretation of the Terms of Use or even refer to the Terms of Use at all in the Equity Committee Motion.

33.    Furthermore, both retail and institutional customers contracted directly with Celsius Network until August 2021 when Celsius transferred many of its customer-facing operations to Celsius Network LLC. Borrowing and lending with institutional customers remain at Celsius Network. Thus, many historical and current customer claims will likely be asserted against Celsius Network. As Celsius Network is the direct or indirect parent of the Celsius Network Limited

---

[4]    *See Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, Providing Terms of Use Dating Back to February 18, 2018* [Docket No. 393] (the "Terms of Use Declaration"), Exhibit A-8. "Affiliate" is defined as "an entity that owns or controls, is owned or controlled by, or is or under common control or ownership with a party, where control is defined as the direct or indirect power to direct or cause the direction of the management and policies of such party, whether through ownership of voting securities, by contract, or otherwise." *Id.* This definition has been used since the second version of the Terms of Use, in effect as of March 5, 2020. *See* Terms of Use Declaration, Exhibit A-2.

14

Subsidiaries, value that flows from those entities up to Celsius Network will be first available to customers with claims sitting at that entity, which may very well exceed Celsius Network's current assets.

34.    Thus, unless and until the issue of whether customers have claims against all Celsius entities is decided, it is premature to appoint an Equity Committee based on the Requesting Equity Holders' allegations that customers do not have claims against the Celsius Network Limited Subsidiaries and "other subsidiaries" or that customers are not entitled to the value generated by Celsius Network's "institutional loan portfolio."    Equity Committee Mot. ¶ 44; *see generally* Global Notes [Docket No. 974] ("The Debtors understand that certain parties in interest, including certain holders of the Series B Preferred Shares issued by Celsius Network Limited, intend to argue that account holders have claims solely against Celsius Network LLC.  The Debtors expect that this legal issue will be resolved by the Court in the near term, either through a to-be-commenced adversary proceeding, a claims objection, or other litigation.").

35.    It is inappropriate for the Debtors' estates to bear the cost of advancing the Requesting Equity Holders' contingent legal theories or for the Debtors' estates to write equity a blank check to advance the Requesting Equity Holders' arguments regardless of the outcome.  *See SunEdison*, 556 B.R. at 105 ("[T]he law does not require the creditors of an insolvent estate to bear this additional financial burden because the shareholders cannot."); *id*. at 107 ("The appointment of an Equity Committee . . . will not create value where it does not exist."); *Williams*, 281 B.R. at 220 ("When a debtor appears to be hopelessly insolvent, an equity committee is not generally warranted 'because neither the debtor nor the creditors should have to bear the expense of negotiating over the terms of what is in essence a gift.'") (quoting *In re Emons Industries*, *Inc.*, 50 B.R. 692, 694 (Bankr. S.D.N.Y. 1985)); *Edison Bros.*, 1996 WL 534853, at *2, (affirming

bankruptcy court order denying motion for equity committee even when bankruptcy court found

that debtor was not hopelessly insolvent); *Eastman Kodak*, 2012 WL 2501071, at *3 ("Nothing

could be more harmful to [debtor's] restructuring efforts than a hearing at which it would be

required to adduce evidence of its insolvency at a time when its efforts should be focused on

maximizing the value of its enterprise for all stakeholders.")

36.     Finally, in the event the Requesting Equity Holders successfully demonstrate that

substantial value exists for the benefit of equity holders, there are other avenues by which they

may seek a recovery of the expenses associated with making such demonstration.  For example,

they may seek to recover their costs for "substantial contribution" under section 503(b) of the

Bankruptcy Code or to renew a request for appointment of an official equity committee.  *See*

11 U.S.C. § 503(b)(3)(D) (authorizing allowance of administrative expenses for the "actual,

necessary expenses" incurred by "an equity security holder[] . . . in making a substantial

contribution" in a chapter 11 case); *Eastman Kodak Co.*, 2012 WL 2501071, at *4 ("If future

developments change any of these conclusions, the Shareholders may renew their motion for an

official committee at that time, but at this point their motion must be denied.").

37.     By contrast, there will be no remedy for the Debtors' estates if the ultimate

resolution of these "key issues" is that creditor claims sit at all entities and equity holders are not

entitled to a recovery.  In such a circumstance, the appointment of an Equity Committee will

directly reduce creditor recoveries.  *See SunEdison*, 556 B.R. at 102 ("Payments to professionals

generally reduce the amount available for distribution.  If the debtor is solvent, those payments

tend to lessen the distribution to shareholders, but if the debtor is insolvent, the creditors ultimately

pay the fees.").

### III.    The Equity Committee Motion Is Not Timely.

38.    The Equity Committee Motion is not timely when, as stated above, the Requesting Equity Holders are adequately represented and equity recovery is contingent on the outcome of outstanding legal questions.  The Requesting Equity Holders argue that an Equity Committee is needed now so that they have the benefit of participating in certain discussions with the Debtors and the Committee as well as the same access to information as the Committee.  It is unclear, however, why the Requesting Equity Holders believe that an Equity Committee is better suited than their own counsel to advocate for their positions in these discussions or request access to information.

39.    Counsel to the Requesting Equity Holders is more than capable of adequately representing the interests of the Requesting Equity Holders in these chapter 11 cases.  In fact, since the outset of these chapter 11 cases, counsel to the Requesting Equity Holders has asked to participate in plan discussions, among other things, and the Debtors have honored many, if not all, of such requests.  In addition, the Debtors have openly engaged with the Requesting Equity Holders and incorporated their comments and responses into final orders, particularly with respect to the Interim Cash Management Orders, the Mined Bitcoin Order, the De Minimis Sale Order, the GK8 Bidding Procedures Order, and the Third Interim Cash Management Order.  *See* July 18, 2022, H'rg Tr. 80:8-9, 82:17-22, attached hereto as **Exhibit A** ("Dennis Dunne from Milbank on behalf of several of the Series B Preferred holders . . . with respect to the relief today, and particularly cash management, we commend the Debtors for spending a lot of time with us to kind of go through our concerns and obviating the need for an objection with the language changes that the Court has heard about and we support the entry of the relief today."); Aug. 16, 2022, H'rg Tr. 56:6-12, attached hereto as **Exhibit C** ("I would just like to echo . . . thanks for our ad hoc equity holders . . . for collaborating with us to get us to a point where I believe that we are presenting a

more or less fully consensual set of orders today."); Sept. 1, 2022 H'rg Tr. 106:6-11, attached

hereto as **Exhibit D** ("[W]e had extensive discussion[s] with counsel for the Committee as well as

counsel to certain shareholders of the Debtors represented by Jones Day and Milbank to resolve

their comments. And so I'm happy to report that I believe the order is now presented on an

uncontested basis.").

40.     With respect to certain other pleadings that the Requesting Equity Holders allege

they were not fairly afforded an opportunity to engage on, such as the Debtors' stipulation

regarding reporting information with the Committee, such stipulation was filed on the docket and

noticed for presentment prior to entry. *See Notice of Presentment of Joint Stipulation and Agreed*

*Order Between the Debtors and the Committee with Respect to Cryptocurrency Security*

[Docket No. 813]. If the Requesting Equity Holders wanted to join the stipulation, or a part of it,

all they needed to do was reach out to the Debtors and the Committee, or otherwise seek to be

heard on the issue. The Requesting Equity Holders, however, did not take either of these actions.

Thus, their failure to take affirmative action in these chapter 11 cases does not amount to the

Debtors excluding them from a seat at the table.

41.     The Debtors will continue to engage with the Requesting Equity Holders on the

resolution of the key issues they raise in the Equity Committee Motion. In the next week, the

Debtors intend to propose a briefing schedule on these key issues (among other legal issues) to

their core constituents, including the Committee, the Requesting Equity Holders, and the two ad

hoc groups, to move these chapter 11 cases forward. If the Requesting Equity Holders are

successful in demonstrating either the Debtors' solvency and/or there is a substantial likelihood of

recovery for equity, then it may be timely to seek the appointment of an Equity Committee.

IV.    **The Other Factors Do Not Demonstrate that an Equity Committee Is Necessary.**

42.    The Requesting Equity Holders also argue that an Equity Committee is necessary because (a) these chapter 11 cases are complex and (b) the benefits of an Equity Committee outweigh the costs given the "needs" of the Requesting Equity Holders to be adequately represented. With respect to the first point, mere complexity cannot necessitate appointment of an equity committee, otherwise every complex chapter 11 case would have an equity committee. In fact, the complexity of this case and its numerous stakeholders demonstrate exactly why an equity committee is not warranted when there are, as stated above, Debtor-funded constituencies exploring the same questions as the Requesting Equity Holders.

43.    With respect to the second point, the costs to the Debtors' estates associated with appointing an Equity Committee far outweigh any benefit to the equity holders. The Debtors should not, and are not required to, fund the advancement of contingent legal theories upon which equity could recover at the expense of customers. In these chapter 11 cases, this Court has clearly indicated that it will not permit parties to duplicate efforts when the result would lead to decreased customer recoveries. *See* Oct. 7, 2022 Hr'g Tr. 56:13-18, attached hereto as **Exhibit E** ("[I]t should be obvious, when I get fee applications, I'm going to look at whether or not there was, in my view, unnecessary or unreasonable duplication of effort. . . . I think to the fullest extent possible, duplication should be avoided."). The Debtors' estates are already funding the costs of the Committee and the Examiner which, as stated above, are tasked with investigating many of the same issues the Requesting Equity Holders deem necessary for the appointment of an Equity Committee. "The additional cost to be incurred by the Debtors' estates cannot be justified." *Dana Corp.*, 344 B.R. at 40 (concluding that an official committee was not appropriate because that the high cost of legal and professional fees in a large chapter 11 case and the possibility of duplicative efforts).

44.     Thus, where the Requesting Equity Holders are "well organized, well represented by counsel, and adequate to the task of representing its interests without 'official' status," and these cases already have an active Committee and an Examiner, it is unreasonable for the estates to expend additional resources for an equity committee whose efforts would be duplicative and whose interests are already protected by a variety of estate fiduciaries and sophisticated parties with aligned interests.  *Spansion*, 421 B.R. at 163 (finding that, "[e]ven if [the Court] were to conclude on this record that neither the Debtors, its management, nor the Creditors' Committee [were] adequately representing the interest of the equity security holders," appointment of an official equity committee in place of such "well organized ad hoc group" would be unwarranted).  This is especially true when the Examiner's task of investigating the Debtors' cryptocurrency holdings and storage of these assets encompasses the Requesting Equity Holders' concerns regarding where customer claims should be filed.  Equity Committee Mot. ¶¶ 5, 8.

## Conclusion

45.     For the reasons set forth above, the Debtors respectfully request that the Court deny the Equity Committee Motion.

*[Remainder of page intentionally left blank]*

20

New York, New York
Dated:  October 13, 2022

/s/ Joshua A. Sussberg

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:             jsussberg@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:             patrick.nash@kirkland.com
                       ross.kwasteniet@kirkland.com
                       chris.koenig@kirkland.com
                       dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

## Exhibit A

**Excerpt from *In re Celsius* Hearing Transcript - July 18, 2022**

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 22-10964-mg

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    CELSIUS NETWORK LLC,

8

9         Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                   United States Bankruptcy Court

13                   One Bowling Green

14                   New York, NY  10004

15

16                   July 18, 2022

17                   2:00 PM

18

19

20

21   B E F O R E :

22   HON MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  MARIA

Page 80

1   be downside.

2           MS. CORNELL:  Thank you.

3           THE COURT:  All right.  Any other issue for now,

4   Ms. Cornell.

5           MS. CORNELL:  No, Your Honor.  Thank you.

6           THE COURT:  Mr. Dunne, you wanted to be heard.

7           MR. DUNNE:  Thank you, Your Honor.  Good

8   afternoon.  And for the record, Dennis Dunne from Milbank on

9   behalf of several of the Series B Preferred holders.

10          I just wanted to focus the Court on some of the

11  perspectives that the Series B Preferred had because they

12  kind of all landed on this cash management order and a lot

13  of our comments with respect to tracking intercompany

14  transfers as loans having maximum transparency I think are

15  comments and language fixes kind of overlapped with and

16  dovetailed with the U.S. Trustee's.

17          But with the Court's indulgence, to just give you

18  a sense of how the preferred sees these issues, as well as

19  the case.  In the fall of last year, the Debtors closed on

20  their largest capital raise by far.  The Series A came in

21  before, but it was about 30 million.  The Series B is nearly

22  $700 million of investments, and it all came in at the U.K.

23  parent, Celsius Network, Ltd.

24          One point related to that is given the total

25  enterprise value at that time -- and we all wish it was true

Page 81

1    today -- that was not a controlled transaction, so that the

2    founders still retained control then and they do now, and

3    they own the common stock and the common corporate

4    governance rights there.

5         We understand that the money that was raised last

6    fall was used principally to fund the buildout of the mining

7    rigs and the data mining business, as well as the purchase

8    of a GK entity.  That's important because, as Your Honor saw

9    from Mr. Nash's presentation, the corporate chart -- and

10   this is where it's a little different than Voyager, right.

11   Voyager doesn't have the additional business lines that

12   Celsius has.  This looks a bit like a conglomerate that owns

13   and manages, you know, several different business lines in

14   different legal entities.

15        And as you've heard, you know, the U.S. customers

16   are in the U.S. Delaware, LLCs.  The U.K. parent owns that

17   entity but has separate silos as well where the mining rig

18   flows up into the U.K. parent, as well as the GK8 entity.

19   We were very focused on making sure that that separateness

20   was tracked and maintained, both in the cash management

21   order and elsewhere, so that we could all figure out later.

22   I mean, you know, I can talk about the key legal issues on

23   Page 3, but that's all for a future date and let's see what,

24   you know, the committee has to say about them.

25        I think the role today is to make sure that we

Page 82

1    don't inadvertently change the realities that existed on the

2    petition date by, you know, post-petition actions or failure

3    to account properly.

4              Your Honor, this is a different case than I've

5    been involved, frankly, in the sense that the absence of,

6    you know, bank debt, the absence of bondholder debt, no debt

7    for borrowed money at all means that I think we, the

8    preferred equity, are going to play a larger role than you

9    might see other preferred equity holders play in cases where

10   that debt existed.

11             And I say that because, as Your Honor knows, it's

12   the ad hoc committees of bank or bond debt that often raises

13   and joins issues with the Court.  And here on top of that

14   where you have significant value flowing directly up into

15   the U.K. parent, we expect to play an important and active

16   role in these cases.

17             But with respect to the relief today, and

18   particularly cash management, we commend the Debtors for

19   spending a lot of time with us to kind of go through our

20   concerns and obviating the need for an objection with the

21   language changes that the Court has heard about and we

22   support the entry of the relief today.

23             I guess more broadly, we remain optimistic about

24   the prospects of a reorganization for certain aspects of the

25   Debtors' business and believe with sufficient time and

1    stability stakeholders should receive substantial

2    distributions.  The Debtors' decision to file when they did,

3    you know, fixes that liability but also, hopefully, has

4    mitigated the noise around that's been endemic I think since

5    the pause on June 12th.

6            And we hope that provides a breathing spell where

7    the parties can get together and have a pathway for the

8    company to maximize value for all stakeholders and we look

9    forward to being actively involved in negotiations on,

10   hopefully, a consensual plan.

11           Thank you, Your Honor.

12           THE COURT:  If I shorten what you've said, you

13   support the cash management order with the changes that have

14   been proposed today.

15           MR. DUNNE:  Your Honor, as always, cuts through

16   it.  Yes, that's precisely.

17           THE COURT:  All right.  Is there anybody else who

18   wishes to be heard with respect to the cash management

19   motion?  All right.

20           Subject to seeing the final form of the order,

21   which hopefully will work out with Ms. Cornell and Mr.

22   Dunne, who have, you know, a dog in this hunt, so see if you

23   can get the final language worked out and submit it to

24   chambers, okay?  And indicate in the cover email that you'll

25   copy them on that the form of the order is acceptable to

1                  C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7    *[signature: Sonya M. Ledanski Hyde]*

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  July 20, 2022

## Exhibit B

**Excerpt from *In re Celsius* Hearing Transcript - September 14, 2022**



Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 22-10964-mg

4    - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    CELSIUS NETWORK LLC,

8

9          Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                  United States Bankruptcy Court

13                  One Bowling Green

14                  New York, NY  10004

15

16                  September 14, 2022

17                  2:05 PM

18

19

20

21   B E F O R E :

22   HON MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  F. FERGUSON

Page 44

1    restructuring officer with the powers of a trustee, and

2    that's what I'm urging you and the Court to do.  But I

3    understand that I'm just one depositor and if Your Honor is

4    not quite ready to appoint a trustee, then if you're

5    amenable, I can prepare a draft order directing Celsius to

6    build a polling feature so that the Court, the UCC, and

7    other parties in interest can gauge customer sentiment and

8    find out where customers stand on this and other important

9    matters.

10           I believe in this case gauging where customers

11   stand on issue such as this is critical because, again, this

12   is a financial services business where trust is paramount

13   and where to have a future, it would need the trust of the

14   customer base.

15           THE COURT:  All right.  Thank you, Mr. Herrmann.

16   Let me call on some more people and (indiscernible) as well.

17   Thank you very much for participating.

18           MR. HERRMANN:  Sure.

19           THE COURT:  Mr. Dunn, you need to unmute.  Go

20   ahead.

21           MR. DUNNE:  Good afternoon, Your Honor.  For the

22   record, Dennis Dunne from Milbank, LLP on behalf of the

23   Series B Preferred, and I'll be brief.

24           I just want to raise two things, one of which is

25   that as Your Honor has seen and read, we filed a limited

Page 45

1    objection because we thought the initially proposed

2    parameters were overbroad and would lead to a very expensive

3    examiner's report, but the subsequent limited scope agreed

4    to by the Debtors, the UCC, and the U.S. Trustee addresses

5    our concern.  So as a result, we're not prosecuting the

6    objection today, Your Honor.

7            One last note, which is in the nature of an

8    audible, Your Honor, is I have to respond to something Mr.

9    Pesce said during his remarks, that the customer claims will

10   be scheduled at every entity.  That's the first we're

11   hearing of it, and we don't know of any kind of convincing

12   evidence to support it.  We haven't seen a balance sheet or

13   financial statement showing that individual claims at each

14   entity.  And to our knowledge, there's no guarantee of the

15   customer debt that was signed by every entity.  We

16   understood that there were some guaranties that were drafted

17   for certain, but not all of the entities with respect to the

18   customer claims, but even those were never executed.

19           So it's a long way of saying we don't know the

20   basis for the Debtors' conclusion.  Not an issue for today,

21   of course, Your Honor, and we'll review the schedules.

22           THE COURT:  I have enough on the table today, Mr.

23   Dunne, let's deal with the issues for today.

24           MR. DUNNE:  Right.  And so, we'll review that and

25   talk to the Debtors about their foundation for that, and if

1     there's a disagreement, we'll bring it to the Court.

2              THE COURT:  Thank you very much, Mr. Dunne.  If

3     you'd lower your hand when you finish, that would be

4     appreciated.

5              MR. DUNNE:  Thank you.

6              THE COURT:  All right.  Mr. Frishberg.

7              MR. FRISHBERG:  Thank you, Your Honor.  Can you

8     hear me?

9              THE COURT:  Yes, I can.  Go ahead.

10             MR. FRISHBERG:  Perfect.  Thank you, Your Honor.

11    One of the main points that I would like to make is

12    effectively Celsius, as Mr. Herrmann had said, does have a

13    viable business model, but as he said, the current

14    management, it's not sustainable.  They're spending enormous

15    amounts of money, over $50 million a month I believe, and

16    it's just unsustainable.  They're not having any revenue

17    generation and it needs to be changed.

18             Quite simply, as he put it, the brand has become

19    toxic because Mr. Mashinsky, he took all the trust that was

20    given to him and effectively threw it out the window.  It's

21    not helping that his wife, Miss Mashinsky, released a t-

22    shirt saying, "bankrupt yourself," on it and then told

23    people who complained about it being insensitive to, and I

24    quote, "get over it," which I think actually damages the

25    potential recovery.

Page 133

1              C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    *[signature: Sonya M. Ledanski Hyde]*

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  September 16, 2022

## **Exhibit C**

**Excerpt from *In re Celsius* Hearing Transcript - August 16, 2022**

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 22-10964-mg

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    CELSIUS NETWORK LLC,

8

9            Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                   United States Bankruptcy Court

13                   One Bowling Green

14                   New York, NY   10004

15

16                   August 16, 2022

17                   2:04 PM

18

19

20

21   B E F O R E :

22   HON MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:   JONATHAN

1   to bottom out.  But suffice it to say the analysis on that

2   is well underway and it's one of our top priorities.

3           THE COURT:  Thank you.

4           MR. KWASTENIET:  All right, Your Honor.  Unless

5   you have any further questions, I am happy to jump into the

6   agenda for today, which at the outset I would just like to

7   echo Mr. Sussberg's thanks for all the many parties,

8   including the U.S. Trustee, the UCC's advisors, our ad hoc

9   equity holders, and also many others for collaborating with

10  us to get us to a point where I believe that we are

11  presenting a more or less fully consensual set of orders

12  today.  Obviously if people have issues or comments or

13  tweaks, they'll speak for themselves.  So I am certainly not

14  prejudging anybody's opportunity.  But as I stand here

15  today, my understanding is that we have made changes to the

16  orders that address all the objections and concerns that

17  were raised.

18           And so with Your Honor's permission, I will jump

19  into Agenda Item 1, which is the Debtor's --

20           THE COURT:  Let me just say that obviously the

21  principal parties that have been engaged in resolving issues

22  about the second day motions have been the Debtors, the

23  Committee, the U.S. Trustee.  If there are individual

24  creditors who wish to be heard by the Court, please use the

25  raise hand function and I will recognize you.  I just ask

Page 118

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  August 18, 2022

**Exhibit D**

**Excerpt from *In re Celsius* Hearing Transcript - September 1, 2022**



Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 22-10964-mg

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    CELSIUS NETWORK LLC,

8

9            Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                   United States Bankruptcy Court

13                   One Bowling Green

14                   New York, NY  10004

15

16                   September 1, 2022

17                   10:13 AM

18

19

20

21   B E F O R E :

22   HON MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO: F. FERGUSON

1      auction if one is necessary.  And the third one is October

2      6th as the date for the sale hearing.

3              The motion was initially scheduled for the second

4      day hearing, which was on August 16th, but we had decided to

5      adjourn it light of comments and objections that we had

6      received from parties.  Since that time, we had extensive

7      discussions with counsel for the Committee as well as

8      counsel to certain shareholders of the Debtors represented

9      by Jones Day and Milbank to resolve their comments.  And so

10     I'm happy to report that I believe the order is now

11     presented on an uncontested basis.  We filed a revised order

12     last night at Docket Number 665 which reflects that

13     resolution, but I will point out for Your Honor that we

14     filed a revised order during this hearing and apologies --

15              THE COURT:  That one I didn't see.

16              MR. BRIEFEL:  Say again?

17              THE COURT:  That one I didn't see.

18              MR. BRIEFEL:  Okay, exactly.  So that was an order

19     that we wanted to get on file just to run a last minute

20     change that was signed off by parties with whom we've had

21     discussions and that's a change to the assumption and

22     assigning procedures simply to make clear that we would like

23     authority for the bidding -- excuse me for the assumption

24     procedures to allow us to assume a signed contract to a

25     purchaser that as long as this is allowed under the

Page 130

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19    Veritext Legal Solutions

20    330 Old Country Road

21    Suite 300

22    Mineola, NY 11501

23

24    Date:  September 6, 2022

25

**<u>Exhibit E</u>**

**Excerpt from *In re Celsius* Hearing Transcript - October 7, 2022**

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 22-10964-mg

4    Adv. Case No. 22-01142-mg

5    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

6    In the Matter of:

7

8    CELSIUS NETWORK, LLC,

9

10            Debtor.

11   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12   AD HOC GROUP OF CUSTODIAL ACCOUNT HOLDERS,

13              Plaintiff,

14          v.

15   CELSIUS NETWORK, LLC, et al,

16              Defendants.

17   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

18              United States Bankruptcy Court

19              One Bowling Green

20              New York, NY  10004

21

22              October 7, 2022

23              10:03 A.M.

24

25

Page 56

1    Committee from concluding its -- oh, sorry -- from

2    conducting its own investigation regarding the Debtors,

3    including whether the estate has claims or causes of action

4    against any person or entity.  And that clearly describes

5    this proceeding that we're discussing right now.

6             So, I just want to make clear there is no conflict

7    here.  The Committee did retain the right, through the

8    appointment of the examiner, to continue to do this

9    investigation.  As Your Honor observed, it's important to

10   the Committee's role in this case and I just wanted to put

11   that on the record.

12            THE COURT:  You know, and I don't know whether

13   I've said this before or not but it should be obvious, when

14   I get fee applications, I'm going to look at whether or not

15   there was, in my view, unnecessary or unreasonable

16   duplication of effort.  So, I'll just leave it at that.  I

17   mean, s I've said, Mr. Hershey, I think to the fullest

18   extent possible, duplication should be avoided.  But an

19   issue that, as I've expressed already, is an essential issue

20   for the Committee.  I mean, every dollar that goes out is a

21   dollar less available for pro rata distributions.

22            So, I don't -- you know, I want the examiner's

23   interim report on this.  I'm not shutting the Committee down

24   as to what they do, but there are likely to be other matters

25   that come up in this case where coordination and the

1                   C E R T I F I C A T I O N

2

3       I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

6

7

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  October 10, 2022