WILLIAM K. HARRINGTON
United States Trustee
U.S. Department of Justice
Office of the United States Trustee
201 Varick Street, Room 1006
New York, NY 10014
Tel. (212) 510-0500

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| *In re* | : | Chapter 11 |
| | : | |
| CELSIUS NETWORK LLC., *et al.*,[1] | : | Case No. 22-10964 (MG) |
| | : | |
| Debtors. | : | (Jointly Administered) |

**OBJECTION OF THE UNITED STATES TRUSTEE TO DEBTORS' MOTION SEEKING ENTRY OF AN ORDER (I) APPROVING THE BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (II) SCHEDULING CERTAIN DATES WITH RESPECT THERETO, (III) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (IV) APPROVING CONTRACT ASSUMPTION AND ASSIGNMENT PROCEDURES, AND (V) GRANTING RELATED RELIEF**

William K. Harrington, the United States Trustee for Region 2 (the "United States Trustee"), through his counsel, files this Objection (the "Objection") to the Motion of Celsius Network LLC, *et al.* (the "Debtors") Seeking Entry of an Order (I) Approving the Bidding Procedures in Connection With the Sale of Substantially All of the Debtors' Assets, (II) Scheduling Certain Dates With Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving Contract Assumption and Assignment Procedures, and (V) Granting

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

1

Related Relief (the "Motion") [ECF Doc. No. 929]. In support thereof, the United States Trustee respectfully represents as follows:

## INTRODUCTION

The Motion seeks an order approving bidding procedures to be followed by the sale(s) of substantially all of the Debtors' assets. This Motion should be denied for three reasons.

First, bidding procedures should not be approved until and unless it is known what specific assets are to be sold. The Motion divides the Debtors' assets into two groups: (i) Retail Platform Assets and (ii) the Remaining Assets. However, it is not clear if the Retail Platform Assets includes the Debtors' mining business. According to various pleadings filed by the Debtors, it is the mining business which gives the Debtors the best chance for financial success in the future. If this business is sold, what is the impact upon the Debtors' financial future? Also unknown are the circumstances under which the Debtors' loan portfolio is to be sold. If these customer accounts are sold, how are these accounts to be treated by a potential purchaser? While the Debtors have suggested that its users will receive an in-kind distribution, will a potential purchaser be required to do the same?

Second, there appears to be no justification to holding the sale of the Debtors' assets outside the ordinary course of business, in advance of a plan, and in advance of the filing of a report by the Examiner. That the Debtors have located interested potential bidders is not a basis for conducting auctions of its assets under a "melting ice cube" type of time limitations. While the United States Trustee is sympathetic to the plight of customers who want financial renumeration as soon as possible, the Examiner has been directed to examine the Debtors' cryptocurrency holdings – which are – at least in part – the very same assets that comprise the Retail Platform Assets that the Debtors propose to sell. Surely, it makes sense to wait until the

Examiner's Report is filed before any sale is held in order to understand exactly what assets are available for sale or distribution to creditors.

Third, a privacy ombudsman should be appointed. The Debtors propose to sell customer accounts. As the Court is aware, customers of these Debtors have significant concerns regarding transparency and irregularities. Any sale of their accounts should be under the watchful eye of a privacy ombudsman.

For these reasons, the United States Trustee objects to the relief sought in the Motion.

## BACKGROUND

### A. General Background

1. On July 13, 2022 (the "Petition Date"), Celsius Network LLC, Celsius KeyFi LLC, Celsius Lending LLC, Celsius Mining LLC, Celsius Network Inc., Celsius Network Limited, Celsius Networks Lending LLC, and Celsius US Holding LLC (collectively, the "Debtors") each commenced a voluntary case under Chapter 11 of the Bankruptcy Code. *See* Voluntary Petitions, SDNY Case No. 22-10964(MG), ECF Doc. No. 1. On July 19, 2022, the Court entered an Order directing that these cases be jointly administered. ECF Doc. No. 53.

2. An Official Committee of Unsecured Creditors was appointed on July 27, 2022. ECF Doc. No. 241.

3. On September 22, 2022, First Partners, LLC, Celsius SPV Investors, LP, Celsius New SPV Investors, LP, and CDP Investissements Inc. (collectively, the "Equity Holders") filed for a Motion for Entry of an Order Directing the Appointment of an Official Preferred Equity Committee (the "Equity Committee Motion"). ECF Doc. No. 880.

### B. The Motion

4. On September 29, 2022, the Debtors filed the Motion seeking *inter alia* the authority to sell all or some of the Debtors' unidentified assets. The Motion divides the Debtors' assets into retail platform assets ("Retail Platform Assets") and all other remaining assets (the "Remaining Assets") (together, the "Sale Assets"). No stalking horse bidder has been selected for either type of asset. Motion at ¶ 6(c). A final bid deadline for the Retail Platform Assets is set for November 15, 2022 with a sale hearing date of November 28, 2022. Motion at ¶ 6(b). A final bid deadline for the Remaining Assets is set for December 5, 2022 with a sale hearing date of December 20, 2022. Motion at ¶ 6(d).

5. The Motion states that "the Debtors, with input from the Committee and its professionals, determined that the best way to maximize value for account holders is to conduct a robust, transparent process to solicit proposals from potentially interested parties for their retail platform, including the Debtors' account holders, loan portfolio, and related technology, custody and swap services, and staking and mining operations." Motion at ¶ 1.

6. The Retail Platform Assets allegedly include "any cryptocurrencies or digital assets held by the Debtors to the extent that they comprise property of the estate as such term is defined under section 541 of the Bankruptcy Code." Motion at ¶ 14. Notably absent from the Motion is any schedule of such cryptocurrencies or digital assets with an identification as to type, quantity, value, or location. The Motion also does not explicitly state whether the Debtors' loan portfolios will be included in any sale, and if sold, on what terms. Instead, the Debtors assert, without explanation that "the Debtors and their creditors can be assured that, taking into account the financial condition of the market and the economy, the consideration obtained will be fair and reasonable and at or above market." Motion at ¶ 31.

7. The proposed sales of the Sale Assets are to be conducted privately, only allowing "representatives of each of the Qualified Bidders (including any Stalking Horse Bidders), the Debtors and their respective advisors, the Committee and their respective advisors, and any other creditor party who makes a written request upon the Debtors to attend an Auction." Motion at ¶ 18(ii)(d). The United States Trustee and the Examiner are just two notable excluded parties from attending the auction.

8. The Motion further seeks a sale "free and clear" under Section 363(f) of the Bankruptcy Code, if (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. Motion at ¶ 38. The Motion does not state under which of the five enumerated subsections of Section 363(f) that the Debtors have satisfied, nor does the Motion identify what liens, security interests, pledges, charges, defects, or similar encumbrances apply to its alleged assets. *See* Motion at ¶ 40.

9. In connection with the sales proposed in the Motion, the Debtors seek a waiver of the 14-day stay provided in Bankruptcy Rule 600(h). Motion at ¶ 25(a). Without explanation or detail, the Debtors state that "In light of the current circumstances and financial condition of the Debtors, the Debtors believe that, to maximize value and maximize distributions to holders of claims through receipt of the proceeds of the sale, any transaction related to the Assets should be consummated as soon as reasonably practicable." Motion at ¶ 50.

10. The Motion further seeks to limit successor liability. Motion at ¶ 25(b); Motion at p. 80 of 87.

5

11. To date, no disclosure statement or plan of reorganization has been filed.

C. **The Examiner**

12. On August 18, 2022, the United States Trustee filed its Motion to Appoint an Examiner (the "Examiner Motion"), which detailed the lack of transparency into the Debtors' cryptocurrency holdings, business model for storing, using, or selling such cryptocurrency, and the employment of different types of accounts, including the custody and withhold accounts. ECF Doc. No. 546.

13. On September 14, 2022, the Court entered the Order Directing the Appointment of an Examiner (the "Examiner Order"). ECF Doc. No. 820. The Examiner Order stated, in relevant part, that the scope of the Examiner (the "Examiner Scope") *shall* consist of:

(i) An examination of the Debtors' cryptocurrency holdings, including a determination as to where the Debtors' cryptocurrency holdings were stored prepetition and are stored postpetition and whether different types of accounts are commingled.

(ii) An examination as to why there was a change in account offerings beginning in April 2022 from the Earn Program to the Custody Service for some customers while others were placed in a "Withhold Account."

Examiner Order at ¶ 3(i) and (ii) (emphasis added).

14. On September 29, 2022, the United States Trustee appointed Shoba Pillay as examiner (the "Examiner"). ECF Doc. No. 920 (the "Examiner Appointment").

15. Also on September 29, 2022, the Court entered the Order Approving the Appointment of the Examiner. ECF Doc. No. 923.

16. The Examiner Order further provided that the Examiner shall provide a work plan (the "Work Plan") and budget within seven days of the Examiner Appointment. Examiner Order at ¶ 7.

6

17. The Examiner Order further provided that the Examiner shall prepare and file a report (the "Examiner's Report") within sixty (60) days following the filing of the Work Plan. Examiner Order at ¶ 8.

**ARGUMENT**

A. **The Bid Procedures Fail to Provide Requisite Details for a Section 363 Sale and Lack Justification for the Proposed Timeline**

18. A bankruptcy court has the authority to approve proposed sales outside of the ordinary course of business under § 363(b) of the Code upon appropriate notice and hearing; however, the burden is on the *debtor* to establish that the transaction is "fair and equitable," supported by sound business justification, and in the best interests of the estate. *See In re Phoenix Steel Corp.*, 82 B.R. 334 (Bankr. D. Del. 1987); *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983). Bankruptcy sales under Section 363 must be scrutinized closely by the Court in cases where all, or substantially all, of the assets of a Chapter 11 debtor are being liquidated due to the dangers associated with providing "the functional equivalent of an order confirming a conventional chapter 11 reorganization plan" without the protections inherent in the confirmation process. *Western Auto Supply Co. v. Savage Arms, Inc. (In re Savage Indus., Inc.)*, 43 F.3d 714, 720 n.9 (1st Cir. 1994) (special bankruptcy scrutiny warranted in liquidations under Chapter 11).

19. Courts have refused to approve Section 363 sales where the predominant business justification for the sale is the appeasement of a major creditor and no distribution to unsecured creditors is likely to be produced from the sale. *See Lionel Corp*, 722 F.2d 1063; *see, e.g., In re Encor Healthcare Assocs.*, 312 B.R. 52 (Bankr. E.D. Pa. 2004) (refusing to approve sale at issue in Chapter 11 *sua sponte* since sale would benefit only the secured creditor); *In re Fremont*

*Battery Co.,* 73 B.R. 277, 279 (Bankr. N.D. Ohio 1987) (proposed sale of substantially all assets to satisfy claim of a single creditor not approved under § 363(b)).

20. First, the Motion is confusing as to what the Debtors are intending to sell. The Motion states that the Debtors wish to sell *all* its assets, defined as "properties, goodwill, and rights relating to their businesses." Motion at ¶ 3. The introduction suggests that this includes the "retail platform, *including* the Debtors' account holders, loan portfolio, and related technology, custody and swap services, and staking and mining operations." However, the definition for Retail Platform Assets is only "any cryptocurrencies or digital assets held by the Debtors to the extent that they comprise property of the estate as such term is defined under section 541 of the Bankruptcy Code." Motion at ¶ 14. The use of the term "Retail" is misleading because it does not seem to be applicable to the mining operation but the introduction to the Motion suggests that the sale includes mining operations. The Debtors have suggested at various times in these bankruptcy proceedings that the Debtors believe that the mining business will financially support these restructuring proceedings. The Debtors should clearly state their intentions with respect to the mining business and attendant assets.

21. The catchall sale for what the Debtors have deemed the "Remaining Assets" is similarly confusing. For example, it is entirely unclear which sale includes the Debtors' mining business. The Motion should not only communicate clearly to any potential purchaser what assets are included in each sale but should also make clear to account holders which sale impacts their holdings. To that end, there have been several representations by the Debtors that some type of payment in kind would be made to creditors, but it is unclear from the Motion whether that expectation has either been communicated to potential purchasers or if potential purchasers are required to honor that representation.

22. The Debtors propose a fast timeline to market its assets and consummate the proposed sale of the Sale Assets. In fact, at this juncture, the Debtors do not even have a stalking horse bidder. Part of the rationale for a stalking horse bidder is to avoid initial low bids and to compensate a bidder for its due diligence (which presumably reduces the due diligence needed by other bidders). Anointing a stalking horse bidder after bids defeats its purpose. Additionally, breakup fees and expense reimbursements may chill bidding and it is important for other potential bidders to know if there is a stalking horse bidder so as to bid appropriately. If the stalking horse bidder is selected after bids are received, the other bids may become moot.

23. Moreover, the Amended Guidelines for Assets Sales specify various stalking horse bidder protections, none of which are included except for the bidding increments. *See* Amended Guidelines for the Conduct of Asset Sales for the Southern District of New York (March 16, 2013). Since there is no set group(s) of assets being identified, the $500,000 bid increment may not be appropriate depending on the asset group.

24. Furthermore, there has been no explanation as to the intersection of these proposed sales and the Debtors' secured liabilities. The lack of explanation and transparency also make it near impossible to evaluate if any sale could be contemplated pursuant to Section 363(f) of the Bankruptcy Code, especially considering the broad request for successor liability found in the Motion. As a result, the proposed timeline denies parties in interest a meaningful opportunity to effectively participate in the proposed sale process. These issues are magnified by the Debtors attempt to conduct the auction privately without the United States Trustee or the Examiner. Motion at ¶ 18(ii)(d).

25. The Motion also seeks prohibitions against any successor liability and provides for injunctions against any purchasers based upon acts prior to the purchases.

26. Finally, the Retail Platform Assets, as broadly defined by the Motion allegedly include: "any cryptocurrencies or digital assets held by the Debtors (to the extent that they comprise property of the estate as such term is defined under section 541 of the Bankruptcy Code." Motion at ¶ 14. This is exactly what the Examiner, whose scope was not only Court ordered but consented to by both the Debtors and the Official Committee, is tasked with investigating. The Examiner Order provides that the Examiner's Scope "*shall* consist of [a]n examination of the Debtors' cryptocurrency holdings, including a determination as to where the Debtors' cryptocurrency holdings were stored prepetition and are stored postpetition . . ." Examiner Order at ¶ 3(i). The Examiner Report should be filed in advance of any sale in order to understand what assets are available for sale or distribution to creditors.

27. Simply put, the Debtors have not provided the proper justification in the Motion to support this timeline for the bidding process. Any proposed sale prior to the completion of the Examiner's investigation and publication of the Examiner Report should be denied.

### B. The Motion Does Not Adequately Address Consumer Privacy Concerns

    **a. Under Sections 363(b)(1) and 332 of the Bankruptcy Code, a Consumer Privacy Ombudsman is Required.**

28. The Debtors propose to sell substantially all of their assets, which will likely include the sale of its customer database, its credit records of customers, other books and records, and other personally identifiable information of its customers, or make such information available to potential bidders in this bid process. As a result, a consumer privacy ombudsman must be appointed to protect the information.

29. 11 U.S.C. § 363(b)(1) provides:

> (b)(1) The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate, except that if the debtor in connection with offering a product or a service discloses to

an individual a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtor and if such policy is in effect on the date of the commencement of the case, then the trustee may not sell or lease personally identifiable information to any person unless --

> (A) such sale or lease is consistent with such policy; or
>
> (B) after appointment of a consumer privacy ombudsman in accordance with section 332, and after notice and a hearing, the court approves such sale or such lease --
>
>> (i) giving due consideration to the facts, circumstances, and conditions of such sale or such lease; and
>>
>> (ii) finding that no showing was made that such sale or such lease would violate applicable nonbankruptcy law.

30. The Debtors' privacy policy is posted on its website. *See* celsius.network/privacy-policy which states in relevant part:

> We may share information, including Personal information, in the event of a corporate transaction (e.g., sale of a substantial part of our business, merger, consolidation or asset sale of an asset or transfer in the operation thereof) of the Company. In the event of the above, the acquiring company or transferee will assume the rights and obligations as described in this Privacy Policy.

31. The relevant part of the privacy policy allows the sale of personally identifiable information upon a sale of the business or asset or a transfer in the operation thereof. Any such sale is contingent upon the acquiring company or transferee assuming the right and obligations described by Celsius' privacy policy.

32. It is unclear from the Motion whether the Debtors are selling customer lists and/or selling their loans, and on what terms. With respect to customer lists, if the Debtors intend to market and sell the assets together with the personally identifiable information of its customers (or assets containing personally identifiable information) pursuant to 11 U.S.C. §§ 363(b)(1)(B) and 332(a), a consumer privacy ombudsman must be appointed.

11

### b. The Motion Does not Address Bankruptcy Code Section 363(o).

33.     An additional consumer protection issue exists. The Proposed Sale Orders provide for sales free and clear of all interests of any person, contain prohibitions against any successor liability, and provide for injunctions against any actions against the purchasers based upon acts prior to the purchase. While successor liability may be an equitable issue for determination by the Court in the absence of legislative direction, *see, e.g. Chicago Truck Drivers, Helpers & Warehouse Workers Union Pension Fund v. Tasemkin, Inc*., 59 F.3d 48, 49 (7th Cir. 1995), Section 363(o) of the Bankruptcy Code provides unambiguous direction:

> Notwithstanding subsection (f), if a person purchases any interest in a consumer credit transaction that is subject to the Truth in Lending Act or any interest in a consumer credit contract...and if any such interest is purchased through a sale under this section, then such person shall remain subject to all claims and defenses that are related to such consumer credit transaction or such consumer credit contract, to the same extent as such person would be subject to such claims and defenses of the consumer had no such interest been purchased at a sale not under this section.

11 U.S.C. § 363(o).

34.     If the Debtors are selling its loan portfolios, either under the Retail Platform Assets or the catchall Remaining Assets, the Debtors must provide additional information regarding what is being sold and on what terms. Paragraph 1 of the Motion clearly states that their retail platform includes, "account holders, *loan portfolio*, and related technology, custody and swap services, and staking and mining operations." Motion at ¶ 1 (emphasis added). Accordingly, if an underlying contract is to be modified by a purchaser, that needs to be disclosed. Moreover, any sale must be subject to Section 363(o).

35.     The United States Trustee reserves any and all rights, remedies and obligations to, *inter alia*, complement, supplement, augment, alter and/or modify this Objection and to conduct any and all discovery as may be deemed necessary or as may be required and to assert such other

grounds as may become apparent upon further factual discovery, assert further and additional objections at any hearing on the Motion, and to take whatever other actions are deemed necessary, justifiable, and appropriate.

## CONCLUSION

WHEREFORE, the Motion should be denied.

Dated: New York, New York
October 13, 2022

                    WILLIAM K. HARRINGTON
                    UNITED STATES TRUSTEE

By:   */s/ Shara Cornell*
      Shara Cornell, Esq.
      Brian Masumoto, Esq.
      Mark Bruh, Esq.
      Trial Attorneys
      201 Varick Street, Suite 1006
      New York, New York 10014
      Tel. No. (212) 510-0500
      Fax No. (212) 668-2255