**WHITE & CASE LLP**
David M. Turetsky
Keith H. Wofford
Samuel P. Hershey
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: david.turetsky@whitecase.com
  kwofford@whitecase.com
  sam.hershey@whitecase.com

**WHITE & CASE LLP**
Aaron E. Colodny (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone: (213) 620-7700
Facsimile: (213) 452-2329
Email: aaron.colodny@whitecase.com

– and –

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
Email: mandolina@whitecase.com
  gregory.pesce@whitecase.com

*Counsel to the Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |
| | **Re. Docket No. 880 & 924** |

# THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OBJECTION TO THE MOTION OF COMMUNITY FIRST PARTNERS, LLC, CELSIUS SPV INVESTORS, LP, CELSIUS NEW SPV INVESTORS, LP, AND CDP INVESTISSEMENTS INC. FOR ENTRY OF AN ORDER DIRECTING THE APPOINTMENT OF AN OFFICIAL PREFERRED EQUITY COMMITTEE

---

[1] The Debtors in these chapter 11 cases and the last four digits of their federal tax identification number are as follows: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

**Table of Contents**

|  |  | **Page** |
|---|---|---|
| Preliminary Statement | | 1 |
| Background | | 3 |
| I. | The Chapter 11 Cases | 3 |
| II. | Request to U.S. Trustee for Appointment of an Official Preferred Equity Committee | 3 |
| Objection | | 4 |
| I. | The Motion Fails to Establish that an Official Preferred Equity Committee Is Necessary for the Preferred Equity Holders to Be Adequately Represented. | 4 |
| | A. Preferred Equity Holder Interests Are Already Adequately Represented by the Requesting Equity Holders. | 5 |
| | B. The Interests of Preferred Equity Holders Are Adequately Represented by the Special Committee and the Debtors' Management Team. | 7 |
| | C. Certain Key Interests of Preferred Equity Holders Are Aligned with the Committee's Interests. | 10 |
| | D. The Requesting Equity Holders Fail to Identify Any Issues an Official Preferred Equity Committee Is Uniquely Situated to Address. | 11 |
| II. | The Motion Fails to Establish a Substantial Likelihood of a Meaningful Distribution to Preferred Equity Holders. | 12 |
| III. | Other Factors Weigh Against Appointing an Official Preferred Equity Committee. | 14 |
| Conclusion | | 15 |

**Table of Authorities**

**Page(s)**

**CASES**

*Commodity Futures Trading Comm'n v. Weintraub*,
  471 U.S. 343 (1985) ..................................................................................................... 7

*In re Beker Indus. Corp.*,
  55 B.R. 945 (Bankr. S.D.N.Y. 1985) ........................................................................... 14

*In re Eastman Kodak Co.*,
  No. 12-10202 (ALG), 2012 WL 2501071 (Bankr. S.D.N.Y. June 28, 2012) .................. passim

*In re Oneida Ltd.*,
  No. 06-10489 (ALG), 2006 WL 1288576 (Bankr. S.D.N.Y. May 4, 2006) ..................... 8, 9

*In re Revlon, Inc.*,
  Case No. 22-10760 (DSJ) ............................................................................................. 7

*In re Saxon Indus., Inc.*,
  39 B.R. 945 (Bankr. S.D.N.Y. 1984) ........................................................................... 14

*In re Spansion*,
  421 B.R. 151 (Bankr. D. Del. 2009) ...................................................................... 5, 6, 13

*In re SunEdison, Inc.*,
  556 B.R. 94 (Bankr. S.D.N.Y. 2016) ...................................................................... passim

*In re Williams Commc'ns Grp.*,
  281 B.R. 216 (Bankr. S.D.N.Y. 2002) .................................................................... passim

*Matter of Kalvar Microfilm, Inc.*,
  195 B.R. 599 (Bankr. D. Del. 1996) .............................................................................. 6

*Victor v. Edison Bros. Stores (In re Edison Bros. Stores, Inc.)*,
  No. 95-1354 (PJW), 1996 WL 534853 (D. Del. Sept. 17, 1996) ..................................... 8

**STATUTES**

11 U.S.C. § 502(a) ............................................................................................................. 10

11 U.S.C. § 503(b) ............................................................................................................. 15

11 U.S.C. § 1102(a)(2) ......................................................................................................... 1

11 U.S.C. § 1107(a) ............................................................................................................. 3

11 U.S.C. § 1108 ................................................................................................................3

## OTHER AUTHORITIES

*Celsius Network Announces an Investment Led by WestCap and CDPQ at a Valuation More Than US $3 Billion*, PR NEWSWIRE (Oct. 12, 2021, 8:00 ET) ..................................................5

Edward L. Rothberg & Deirdre Carey Brown, *Official Equity Committees in Chapter 11 Cases*, 36 AM. BANKR. INST. J. 22, 22 (Nov. 2017) ........................................................................5

S. Rep. No. 95-989 (1978) *reprinted in* 1978 U.S.C.C.A.N. 5787 ................................................5

*Schedule A/B for Celsius Network LLC* at 34 ...........................................................................13

The Official Committee of Unsecured Creditors (the "**Committee**") appointed in the cases of the above-captioned debtors and debtors-in-possession (collectively the "**Debtors**") states as follows in support of this objection to the *Motion of Community First Partners, LLC, Celsius SPV Investors, LP, Celsius New SPV Investors, LP, and CDP Investissements Inc. for Entry of an Order Directing the Appointment of an Official Preferred Equity Committee* [Docket No. 880] (the "**Motion**") and joinder of Andersen Invest Luxembourg S.A. SPF ("**Andersen**") [Docket No. 924], seeking entry of an order directing appointment of an official committee of preferred equity security holders (an "**Official Preferred Equity Committee**"):[1]

### Preliminary Statement

1. Through the Motion, the movants—which hold 87% of the Series B preferred equity interests, collectively manage hundreds of billions of dollars, and are already represented by two large, global law firms—request that the Court mandate the appointment of an Official Preferred Equity Committee. This unprecedented request lacks any basis in the law or the facts and circumstances of these cases, and, if granted, would subsidize private equity fund managers at the expense of the Debtors' account holders. The Court should deny the Motion.

2. Section 1102(a)(2) of the Bankruptcy Code permits the court to "order the appointment of additional committees of creditors or equity security holders *if necessary to assure adequate representation* of creditors or equity security holders." 11 U.S.C. § 1102(a)(2) (emphasis added). The appointment of an official equity committee is the rare exception and is extraordinary relief. *See In re SunEdison, Inc.*, 556 B.R. 94, 103 (Bankr. S.D.N.Y. 2016) ("The

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Motion.

1

appointment of official equity committees should be the rare exception.") (citing *In re Williams Commc'ns Grp.*, 281 B.R. 216, 223 (Bankr. S.D.N.Y. 2002)).

3. To meet its burden, a movant must establish both that there is a substantial likelihood that equity holders will receive a meaningful distribution in the case under a strict application of the absolute priority rule *and* that equity holders are unable to represent their interests in the bankruptcy case without an official committee. *Williams*, 281 B.R. at 223. "The second factor is critical because, in most cases, even those equity holders who do expect a distribution in the case can adequately represent their interests without an official committee." *Id.*

4. Here, the movants cannot meet their heavy burden. The interests of preferred equity holders are more than adequately represented in these chapter 11 cases. The movants hold 87% of the Series B preferred equity interests and are already active parties in these cases. Moreover, the movants are sophisticated entities that collectively manage hundreds of billions of dollars and have retained highly regarded, global law firms to represent their interests in these cases, including in connection with the U.S. Trustee's request to appoint an examiner and the Debtors' request to sell certain assets. The interests of preferred equity holders are also adequately represented by several other parties in the chapter 11 cases, such as the Special Committee of the Board (the "**Special Committee**") of Celsius Network Limited ("**CNL**"), which has a fiduciary duty to maximize value for all stakeholders, including preferred equity holders. Moreover, one of the two members of the Special Committee was designated by affiliates of significant preferred equity holder WestCap Management LLC ("**WestCap**"). And, even if the interests of preferred equity holders were not adequately represented—which, to be clear, is far from the case here—there is no prospect that preferred equity holders will receive a distribution in light of the Debtors' undisputed insolvency.

5. Ultimately, the costs of representing the interests of preferred equity holders should not be borne by the Debtors' individual account holders, many of whom have lost access to their retirement accounts, life savings, college funds, and other personal savings as a result of these bankruptcy cases. The Court should deny the Motion.

## Background

### I. The Chapter 11 Cases

6. On July 13, 2022 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief in this Court under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code. On July 27, 2022, the U.S. Trustee appointed the Committee. *See* Docket No. 241. The Committee is comprised of seven members, each of whom holds cryptocurrency (or digital) assets through the Celsius platform. On September 14, 2022, the Court appointed an examiner in these chapter 11 cases. *See* Docket No. 820.

7. Certain information regarding the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 23] (the "**Mashinsky Declaration**") and the *Declaration of Robert Campagna, Managing Director of Alvarez & Marsal North America, LLC, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 22].

### II. Request to U.S. Trustee for Appointment of an Official Preferred Equity Committee

8. On July 19, 2022, Milbank LLP ("**Milbank**"), on behalf of Community First Partners, LLC, Celsius SPV Investors, LP, and Celsius New SPV Investors, LP (collectively, the "**Milbank Equity Holders**"), submitted a letter to the U.S. Trustee seeking the appointment of an Official Preferred Equity Committee. On July 22, 2022, Jones Day LLP ("**Jones Day**"), on behalf of CDP Investissements Inc. ("**CDP**" and, together with the Milbank Equity Holders,

3

the "**Requesting Equity Holders**"), submitted a letter to the U.S. Trustee requesting the same. On July 28, 2022, Milbank submitted a supplemental letter to the U.S. Trustee.

9.   At the invitation of the U.S. Trustee, the Debtors and the Committee each advised the U.S. Trustee of their opposition to the formation of an Official Preferred Equity Committee. A copy of the Committee's letter is attached hereto as **Exhibit A**. On September 22, 2022, the Requesting Equity Holders filed the Motion. On September 29, 2022, Andersen joined the Motion. On October 3, 2022, the U.S. Trustee filed a statement [Docket No. 948] stating that it takes no position with respect to the Motion.

**Objection**

**I.    The Motion Fails to Establish that an Official Preferred Equity Committee Is Necessary for the Preferred Equity Holders to Be Adequately Represented.**

10.   The Requesting Equity Holders must establish that an Official Preferred Equity Committee is "necessary" to adequately represent preferred equity holders' interests. *See In re SunEdison, Inc.*, 556 B.R. 94, 103 (Bankr. S.D.N.Y. 2016). That question, in turn, requires the movant to demonstrate not merely "whether the shareholders are 'exclusively' represented, but whether they are 'adequately' represented." *In re Williams Commc'ns Grp.*, 281 B.R. 216, 223 (Bankr. S.D.N.Y. 2002) (internal citation omitted).

11.   Preferred equity holder interests are either directly represented by, or economically aligned with, three separate, adequately represented, constituencies.

4

### A. Preferred Equity Holder Interests Are Already Adequately Represented by the Requesting Equity Holders.

12. The Requesting Equity Holders hold 87% of CNL's Series B preferred equity interests.[2] They are large, sophisticated financial investors that have the resources to represent their interests in these cases. *See Celsius Network Announces an Investment Led by WestCap and CDPQ at a Valuation More Than US $3 Billion*, PR NEWSWIRE (Oct. 12, 2021, 8:00 ET), https://www.prnewswire.com/news-releases/celsius-network-announces-an-investment-led-by-westcap-and-cdpq-at-a-valuation-more-than-us-3-billion-301397834.html/ (listing WestCap as having over USD 5 billion of assets under management and CDP as having net assets of approximately CAD 390 billion as of June 30, 2021).

13. WestCap and CDP are far from the "small and scattered" retail investors with no means to engage advisors or coordinate across vast distances that official equity committees are intended to represent.[3] Rather, the Requesting Equity Holders are capable—as they have already demonstrated—of representing their interests in these cases.[4] It would be unprecedented to appoint an Official Preferred Equity Committee in these circumstances, and for good reason. *See In re Spansion*, 421 B.R. 151, 163-64 (Bankr. D. Del. 2009) (denying a motion to appoint an equity committee and concluding that equity security holders were adequately represented without the

---

[2] Mot., Ex. F (stating that the Milbank Equity Holders "own approximately 65% of the Series B Preferred Shares issued by Celsius Network Limited"); Mot., Ex. G (stating that "CDP holds more than 22% of the Class B Preferred Shares that CNL issued").

[3] S. Rep. No. 95-989, at 10 (1978) *reprinted in* 1978 U.S.C.C.A.N. 5787, 5795 (stating that the Bankruptcy Reform Act of 1978 "is designed to counteract the natural tendency of a debtor in distress to pacify large creditors, with whom the debtor would expect to do business, at the expense of small and scattered investors"); *see also* 7 COLLIER ON BANKR. P. 1102.03 (16th 2022) (noting that the appointment of an official equity committee is "generally only appropriate in chapter 11 cases involving corporations with publicly traded stock"); Edward L. Rothberg & Deirdre Carey Brown, *Official Equity Committees in Chapter 11 Cases*, 36 AM. BANKR. INST. J. 22, 22 (Nov. 2017) (stating that official equity committees "certainly are not necessary in most nonpublic . . . chapter 11 cases" but may be necessary in "large public cases" as "a shareholder who owns a small percentage of stock in a large publicly held company can hardly afford to retain counsel who can competently contest a plan").

[4] *See Series B Holders' Limited Objection to Motion of the United States Trustee for Entry of an Order Directing the Appointment of an Examiner* [Docket No. 734].

5

need for an official committee, reasoning that the ad hoc committee of equity security holders was "well organized, well represented by counsel, and adequate to the task of representing its interests without 'official' status"); *Matter of Kalvar Microfilm, Inc.*, 195 B.R. 599, 601 (Bankr. D. Del. 1996) (denying motion to appoint equity committee where movant held over 30% of the preferred equity and could represent its own interests). As in the *Kodak* case, "given the quality of the legal talent" hired by the Requesting Equity Holders, there is "no reason to conclude" that shareholder interests "cannot be represented ably through an unofficial, or *ad hoc*, committee." *In re Eastman Kodak Co.*, No. 12-10202 (ALG), 2012 WL 2501071, at *3 (Bankr. S.D.N.Y. June 28, 2012).

14. Moreover, the Requesting Equity Holders have already demonstrated their ability to advocate for their own interests without the title of an official committee and the burden such committee would have on the estate's resources. *Spansion*, 421 B.R. at 163; *Williams*, 281 B.R. at 224. As in *Spansion*, the Requesting Equity Holders are "well organized, well represented by counsel, and adequate to the task of representing [their] interests without 'official' status." 421 B.R. at 163. The Requesting Equity Holders have made numerous appearances in these cases to date, including filing an objection to the motion of the U.S. Trustee for the appointment of an examiner [Docket No. 734] as well as negotiating first day relief and engaging with the Committee and the Debtors with respect to the procedures for certain asset sales.

15. Finally, the Requesting Equity Holders assert that Milbank and Jones Day cannot represent all preferred equity holders given there are "dozens" of other equity holders besides the Requesting Equity Holders. Mot. ¶ 37. The Requesting Equity Holders—who hold 87% of the CNL Series B preferred stock—would be the overwhelming beneficiaries of an equity committee. Even if the remaining 13% of the preferred equity was widely held, that fact would not outweigh the grossly disproportionate benefits to the well-counseled and well-heeled investors.

6

*See SunEdison*, 556 B.R. at 103 (denying appointment of equity committee "[n]otwithstanding the admitted complexities of the Debtors' cases and the number of outstanding common shares and holders of record"); *Williams*, 281 B.R. at 223 ("[W]hile there is a large number of shareholders, not every case with such a large number will require an official equity committee. Indeed, if Congress' intent was otherwise, it would have mandated the appointment of equity committees instead of leaving it within the discretion of the UST and the Court."). The fact that minority shareholders are not formally represented by the majority shareholders in a chapter 11 case does not change the fact that the interests of minority shareholders and majority shareholders are broadly aligned. For example, another judge in this district recently declined to appoint an equity committee of minority shareholders, finding that their interests were adequately represented by, among other constituents, the Debtors' controlling shareholder. *See In re Revlon, Inc.*, Case No. 22-10760 (DSJ), Hr'g Tr. at 85:21 86:3 (Aug. 24, 2022) [Docket No. 540] (denying appointment of equity committee despite minority shareholders "express[ing] concern that Revlon's majority shareholders may have conflicts that will cause them not to vigorously challenge [certain] transactions or financings or advance the estate's interests" with respect to certain issues).

### B. The Interests of Preferred Equity Holders Are Adequately Represented by the Special Committee and the Debtors' Management Team.

16. The interests of preferred equity holders are also already represented by the Special Committee and the Debtors' management team, each of which has fiduciary duties to maximize value for the benefit of the Debtors' estates as a whole, including creditors and equity holders alike. *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985) (noting that "the fiduciary duty of the trustee runs to shareholders as well as to creditors . . . if a debtor remains in possession" and that the "debtor's directors bear essentially the same fiduciary

7

obligation to creditors and shareholders as would the trustee for a debtor out of possession") (internal citation omitted).

17. The usual presumption is that a board will represent the interests of shareholders. The existence of a functioning board of directors—as exists here—"supports the inference that equity's interests will be adequately represented notwithstanding the absence of an official equity committee." *Eastman Kodak Co.*, 2012 WL 2501071 at *2. The Requesting Equity Holders, accordingly, must show with evidence (not just speculation) that there is a conflict that prevents the Special Committee from discharging its fiduciary duties. *See Victor v. Edison Bros. Stores (In re Edison Bros. Stores, Inc.)*, No. 95-1354 (PJW), 1996 WL 534853, at *5 (D. Del. Sept. 17, 1996) (observing that equity holders seeking to form an equity committee had not provided any evidence that management was conflicted and "incapable of adequately representing non-insider shareholders").

18. The Requesting Equity Holders have failed to meet this burden. They have offered no reason to diverge from the "usual presumption" that "the Board will pay due (perhaps special) regard to the interests of shareholders." *In re Oneida Ltd.*, No. 06-10489 (ALG), 2006 WL 1288576 at *2 (Bankr. S.D.N.Y. May 4, 2006). Indeed, one of the two members of the Special Committee, Alan J. Carr, was **selected by an affiliate of WestCap**.[5] Nor is it inappropriate or surprising that the Debtors have taken steps to advance the interests of account holders, which constitute the largest constituency in these chapter 11 cases. Celsius is a customer-facing business, whose "goal since inception has been to take care of its global community." Mashinsky Decl. ¶ 134. As the Requesting Equity Holders acknowledge, "customer support will be crucial for the success of the reorganized Debtors' business." Mot. ¶ 31. Put another way, Celsius' asset

---

[5] *See* Notice to Celsius Network Limited, dated June 23, 2022, attached to the Colodny Declaration as **Exhibit 1**.

deployment is dependent on users entrusting their crypto assets to Celsius. It makes perfect sense for the Debtors to actively engage with the Committee to develop a viable exit from chapter 11 that will result in maximum recoveries to its customers.

19. The Requesting Equity Holders seek to rely on *Oneida* for the proposition that it would be "unrealistic and unjust to rely on the usual presumption" that the Special Committee will "pay due . . . regard to the interests of shareholders." Mot. ¶ 31; *In re Oneida Ltd.*, No. 06-10489 (ALG), 2006 WL 1288576 (Bankr. S.D.N.Y. May 4, 2006). But the "unusual (perhaps unique) circumstances" of *Oneida* have no bearing here. *Id.* at *2. In *Oneida*, the debtors' board was controlled by the debtors' secured lenders, who appointed six of the nine directors. The company and those same lenders had proposed a plan that paid unsecured creditors in full while wiping out equity. The court found that "under the unusual (perhaps unique) circumstances of this case," the "usual presumption that the Board will pay due" regard to shareholder interests was unrealistic, because the debtors were controlled by their lenders. *Id.* at *2. Here, none of the Debtors' customers appointed any member of the Special Committee—WestCap did. Further, in *Oneida*, the court noted that, because unsecured creditors were being paid in full under the terms of the prepackaged plan, there was no official committee of unsecured creditors, and therefore "the usual checks and balances [were] not present." *Id.* at *3. Here, the Committee has been appointed and has every incentive to maximize the value of the Debtors' estates.

20. Finally, the Debtors' recent actions demonstrate that they are treating account holders even-handedly. For example, the Debtors state in the Global Notes to each of their Schedules of Assets and Liabilities and Statements of Financial Affairs that, despite scheduling account holder claims against each entity, "it is not the intent of the Debtors to create any presumption that account holders have claims against each Debtor entity" and that "no creditor or

9

other party should rely on the fact that account holder claims are scheduled at each Debtor entity as dispositive as to this legal issue." *E.g.*, [Docket No. 974] (the "**Global Notes**") ¶ 2. That the Committee disagrees with the Debtors on this issue further emphasizes that the Debtors are not unduly favoring account holders.

### C. Certain Key Interests of Preferred Equity Holders Are Aligned with the Committee's Interests.

21. The Committee's duty to maximize the value of the Debtors' estates will "inhere to the benefit of shareholders." *See Eastman Kodak*, 2012 WL 2501071 at *3; *see also SunEdison*, 566 B.R. at 103; *Williams*, 281 B.R. at 221-22. The Committee has taken significant strides towards a value-maximizing restructuring that will inure to the benefit all stakeholders, including preferred equity holders. This alignment of interests is evident from actions taken or supported by the Committee, such as the Committee's efforts to effectuate executive leadership changes, its investigation of potential claims and causes of action (the proceeds of which will increase the amount of value available to distribute to stakeholders), and its collaboration with the Debtors regarding the ongoing marketing process.

22. The Requesting Equity Holders assert that the interests of customers and equity holders are "uniquely adverse" due to the Committee's view that customers hold claims against every Debtor entity. *See* Mot. ¶¶ 29-30. As an initial matter, this Motion is not the appropriate forum to address the merits of this issue, nor is an inevitable disagreement among stakeholders a basis for forming another statutory committee, the fees and expenses of which would come at the expense of the other stakeholders. Nonetheless, every party in interest has standing to object to claims filed or scheduled against the Debtors in these chapter 11 cases. *See* 11 U.S.C. § 502(a) (providing that a proof of claim is deemed allowed "unless a party in interest" objects). The

10

Requesting Equity Holders are free to do so. An Official Preferred Equity Committee is not necessary to that litigation.

### D. The Requesting Equity Holders Fail to Identify Any Issues an Official Preferred Equity Committee Is Uniquely Situated to Address.

23. The Requesting Equity Holders assert that an Official Preferred Equity Committee is necessary to represent their interests with respect to two issues in these chapter 11 cases: (i) which Debtors are liable with respect to customer claims; and (ii) whether customer claims must be determined in U.S. dollars as of the Petition Date. *See* Mot. ¶¶ 1-6. Specifically, as further detailed below, the Requesting Equity Holders contend that certain of CNL's non-retail customer facing assets should inure solely to the benefit of the Requesting Equity Holders and that the customers do not have claims against these entities. *See id.* at ¶¶ 3-5. Accordingly, the Requesting Equity Holders assert that a fiduciary is needed to dispute the scheduling of such claims against all Debtor entities. Additionally, the Requesting Equity Holders argue that an Official Preferred Equity Committee is necessary given the Debtors' intention to provide in-kind recovery to customers under a chapter 11 plan rather than "dollarize" customer claims as of the Petition Date. *See id.* at ¶¶ 9, 32.

24. An Official Preferred Equity Committee, however, is not necessary to litigate these issues. Even absent the appointment of an Official Preferred Equity Committee, the Requesting Equity Holders are free to object to claims scheduled by the Debtors. Indeed, at the hearing on September 14, 2022, the Milbank Equity Holders indicated that Milbank would "bring" any disagreement with respect to the foundation for scheduling customer claims at every Debtor entity with the Court. Hr'g Tr. at 45:9-46:1 (Sept. 14, 2022) [Docket No. 849]. The Global Notes acknowledge that statement, and explicitly state that the Debtors "expect that this legal issue will be resolved by the Court in the near term, either through a to-be-commenced adversary proceeding,

11

a claims objection, or other litigation." Global Notes ¶ 2. Nor is an Official Preferred Equity Committee necessary to counterbalance the Debtors' and Committee's exploration of whether account holders may receive cryptocurrency or tokens under a plan of reorganization. The Bankruptcy Code provides debtors broad latitude to restructure their claims. Distributing cryptocurrency or tokens to account holders is not inconsistent with the Bankruptcy Code, which permits a debtor to issue securities or other instruments (which may include cryptocurrency or tokens) to holders of claims under a confirmed plan of reorganization. In short, the Requesting Equity Holders have failed to point to any issue that an Official Preferred Equity Committee would be uniquely or singularly suited to address in these cases.

## II. The Motion Fails to Establish a Substantial Likelihood of a Meaningful Distribution to Preferred Equity Holders.

25.     The second requirement for the appointment of an Official Preferred Equity Committee is a "substantial likelihood" that equity holders in these chapter 11 cases will receive a "meaningful distribution." *Williams*, 281 B.R. at 223; *Eastman Kodak*, 2012 WL 2501071, at *1. The Requesting Equity Holders have not met, and cannot meet, this burden.

26.     The Requesting Equity Holders do not even attempt to argue that they will receive a distribution. Rather, they claim that "[n]o party has asserted that the Debtors are hopelessly insolvent." Mot. ¶ 42 (citing *Williams*, 281 B.R. at 220). That is simply wrong: the Debtor's CFO testified under oath that the Debtors are insolvent by $1.2 billion—and potentially much more.[6] But even if the Requesting Equity Holders' statement was correct, it would still be irrelevant, as that is not the standard. An official equity committee "should not be appointed unless equity holders establish that they will receive a meaningful distribution in the case under a strict

---

[6]  *See* Section 341(a) Meeting Tr. at 68:14-25.

application of the absolute priority rule." *Williams*, 281 B.R. at 220, 223. The Requesting Equity Holders cannot meet their burden of "establishing that they will receive a meaningful distribution" simply by (wrongly) claiming that other parties have not asserted insolvency. Courts strictly enforce this standard, and for good reason: if there is not a substantial likelihood of a meaningful recovery for equity holders, the appointment of an official equity committee creates an unreasonable risk that the estates would "bear the expense of negotiating with an Equity Committee over what appears to be a gift." *SunEdison*, 556 B.R. at 102–03 (citing cases); *see also Spansion*, 421 B.R. at 156 (explaining that "if equity holders have no reasonable prospect of receiving a meaningful distribution, an equity committee could serve no legitimate role in negotiating a plan").

27. In any event, the record to date demonstrates that preferred equity holders are out-of-the-money. The Debtors' account holders have claims against each Debtor entity (including CNL, which issued preferred equity interests) under the Terms of Use, which explicitly memorialize an agreement between the account holders, on the one hand, and Celsius Network LLC and its "Affiliates," on the other hand. *See* Docket No. 670. The Terms of Use consistently describe the account holders' relationship with "Celsius," which is broadly defined in a manner that includes all "Affiliates" of Celsius Network LLC. Accordingly, based on the Terms of Use, account holders have claims against every Debtor and non-Debtor entity in the Debtors' corporate structure, including CNL. The Requesting Equity Holders have not demonstrated any reason for the Court to look any further than the four corners of the Terms of Use. Moreover, there is an over $9 billion intercompany obligation owed by CNL to Celsius Network LLC. *See Schedule A/B for Celsius Network LLC* at 34. Even if account holders do not have a claim against each Debtor

13

entity, that intercompany obligation comes ahead of the preferred equity and redistributes any value that flows to CNL to Celsius Network LLC and the account holders.

### III. Other Factors Weigh Against Appointing an Official Preferred Equity Committee.

28. The other factors that are often considered by courts do not overcome the Requesting Equity Holders' failure to demonstrate the two requirements for an official committee. *See Eastman Kodak*, 2012 WL 2501071 at *1; *Williams*, 281 B.R. at 220.

29. Although these cases present complex issues, that is true in all large chapter 11 cases and does not justify the appointment of an Official Preferred Equity Committee. *E.g.*, *SunEdison*, 556 B.R. at 103 (denying a motion to appoint an equity committee notwithstanding the admitted complexities of the debtors' cases); *Eastman Kodak*, 2012 WL 2501071, at *4 (denying motion to appoint equity committee even though the debtor's chapter 11 cases were large and complex).

30. The costs of the appointment of an Official Preferred Equity Committee also speak to why it is not appropriate here. *See Williams*, 281 B.R. at 220 (quoting *In re Saxon Indus., Inc.*, 39 B.R. 945, 947 (Bankr. S.D.N.Y. 1984)) ("The appointment of an equity committee raises cost concerns since such appointments are closely followed by applications to retain attorneys and accountants."). As a result of the Debtors' actions and the filing of these chapter 11 cases, the Debtors' customers have been unable to access digital assets held with the Debtors and face significant—and, in some cases, devastating—losses. The Debtors' customers and unsecured creditors should not face the prospect of still greater diminution in recoveries as a result of the Debtors' assets being misallocated to fund an unnecessary Official Preferred Equity Committee. *See In re Beker Indus. Corp.*, 55 B.R. 945, 949 (Bankr. S.D.N.Y. 1985) (finding that, even if the requirements for appointment are met, additional committees should not be appointed if "the cost

14

of the additional committee sought significantly outweighs the concern for adequate representation").

31. Finally, denial of the Motion would not preclude the Court from later granting similar relief. Indeed, courts in this district have denied motions to appoint official equity committees while leaving open the possibility that an ad hoc equity committee could be awarded fees as an administrative expense under section 503(b) of the Bankruptcy Code. *E.g.*, *SunEdison*, 556 B.R. at 103 (noting that "in most cases, even those equity holders who do expect a distribution in the case can adequately represent their interest without an official committee and can seek compensation if they make a substantial contribution in the case"). The Requesting Equity Holders assert that they have a claim to the value to be distributed to customers under a potential chapter 11 plan. At this time, however, the Requesting Equity Holders have not established that claim. Rather, as was the case in *Kodak*, "there is no reason to conclude" that the Requesting Equity Holders are not perfectly capable of representing their own interests, and if the Requesting Equity Holders demonstrate that they will receive a distribution in these cases, "they can obtain compensation for their fees." *Eastman Kodak*, 2012 WL 2501071 at *3. Denial of the Motion will not prejudice the Requesting Equity Holders from seeking to assert a substantial contribution claim (which would of course require the Requesting Equity Holders to demonstrate that payment of such expenses would truly be borne by preferred equity holders, not creditors) and will allow the estate to save resources. In contrast, granting the Motion at this juncture would prematurely dictate the resolution of that matter at this stage in the cases.

## Conclusion

WHEREFORE, for the reasons set forth herein, the Committee respectfully requests that the Court deny the Motion and grant such other relief as is just and proper under the circumstances.

Dated: October 13, 2022
      Chicago, Illinois

Respectfully submitted,

/s/ *Gregory F. Pesce*
**WHITE & CASE LLP**
David M. Turetsky
Keith H. Wofford
Samuel P. Hershey
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: david.turetsky@whitecase.com
      kwofford@whitecase.com
      sam.hershey@whitecase.com

– and –

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
Email: mandolina@whitecase.com
      gregory.pesce@whitecase.com

– and –

**WHITE & CASE LLP**
Aaron E. Colodny (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone: (213) 620-7700
Facsimile: (213) 452-2329
Email: aaron.colodny@whitecase.com

*Counsel to the Official Committee of Unsecured Creditors*