**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| In re: <br><br> CELSIUS NETWORK LLC, et al.,[1] <br><br> Debtor. | Chapter 11 <br><br> Case No. 22-10964 (MG) <br> Jointly Administered |
|---|---|

**DECLARATION OF JEFF PRATT IN SUPPORT OF CORE SCIENTIFIC, INC.'S OPPOSITION TO DEBTORS' MOTION TO ENFORCE THE AUTOMATIC STAY AND FOR CIVIL CONTEMPT**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

I, Jeff Pratt, declare:

1.  I am the Senior Vice President, Partnerships, of Core Scientific, Inc. ("Core"). I submit this Declaration in support of Core's Opposition to Celsius Mining LLC's ("Celsius") Motion to Enforce the Automatic Stay and for Civil Contempt and Core's Motions for Affirmative Relief.

2.  My responsibilities as Senior Vice President, Partnerships include managing client relationships, developing new business, overseeing sales deals, and purchasing mining hardware. With respect to Celsius, one of Core's top five accounts, I managed the relationship with Core's sales team, growing the Celsius fleet hosted at Core. In this capacity, I was in regular contact with Celsius.

3.  As Senior Vice President, Partnerships, I am familiar with Core's contracts with Celsius and the relationship between them from the time periods before and after the Debtors' chapter 11 filings on July 13, 2022 (the "Petition Date"). The facts set forth in this declaration are based on my personal knowledge and experience, and my review of relevant documents and Core's books and records that are maintained and used in the ordinary course of Core's business.

**I.    THE MASTER SERVICES AGREEMENT**

4.  On December 18, 2020, Core and Celsius entered into a Master Services Agreement whereby Core agreed to provide Celsius certain services in connection with hosting its digital-asset-mining machines. MSA (Ex. A), § 1(a). Core and Celsius supplemented the agreement with several "Orders" that incorporate the MSA and specify, among other things, the quantity of digital-asset-mining machines that Core will host for Celsius. On September 20, 2021, Order #10—the order most relevant here—commenced. Order #10 (Ex. B).

5. Digital asset mining is the process of securing new digital cryptocurrency "coins" (like Bitcoin, Ethereum, Litecoin, Zcash, etc.) by continuously running digital-asset mining machines (also called "rigs," "miners," or "units") to crack a cryptocurrency code, which is rewarded with a cryptocurrency coin. These machines process data extremely quickly, consume a large amount of power, and need to operate in a data center designed to maximize performance and machine longevity. Core currently has eight data-center facilities, where it hosts machines that are mining for cryptocurrency, and is in the process of building out certain of these facilities to further expand Core's hosting availability.

6. The MSA that Core and Celsius executed is a standard agreement that Core used with all of its customers. At a high level, the way it works is that a customer either buys machines from Core that Core then "deploys" or a customer delivers machines to Core for deployment. Order #10 is the first order where Celsius purchased its own data-mining machines and delivered them to Core for deployment. In all previous orders, Celsius purchased machines directly through Core. Once Core receives the machines, it goes through several steps before the machines are online at the hosting facility and considered fully "deployed." To deploy the data-mining machines, in addition to identifying an adequate site and securing industrial-scale power, Core must, among other things: provide installation racks; make power and network connections; and ensure adequate airflow and cooling systems to dissipate the large amount of heat these machines generate.

7. As a general rule, Core deploys machines received from customers, like Celsius, as soon as practicable and in accordance with our guiding "first in time" principle, which dictates that machines are deployed in chronological order based on when they are received from the customer or purchased by Core, who also hosts its own machines for cryptocurrency mining. This is all

consistent with the MSA, which states in § 2(b) that Core has "the right to review and sole right to approve any delivery, installation (including without limitation, the location and position of Client Equipment at the Company Facility)…." Core has always followed this "first in time" principle, which Celsius—as a long-standing customer that has over 26,655 miners deployed across Core's data-center facilities—is familiar with.

8. Another provision of the MSA that is particularly important to Core and included in all of Core's service agreements with its customers provides that Core has the "sole and absolute discretion" to charge for "any increases, changes in . . . tariffs." MSA (Ex. A), § 4(f) (defining "Increased Costs."). This provision is essential because it allows Core to pass through increased power costs—which fall within the definition of tariffs—and requires that the customer (here, Celsius) "pay all Increased Costs." *See id*. Because power costs are a key component in the profitability of cryptocurrency mining and can vary widely, the ability to pass through increases in power costs to customers is an absolute cornerstone of Core's business model, without which Core would be exposed to energy spikes and a level of volatility that does not make any business sense to assume. Core never agreed to undertake the risk of spikes in energy prices with Celsius or any other of its customers.

9. The MSA also provides that Core's liability to Celsius for "all claims arising from or related to the subject matter of this agreement . . . will not exceed an amount equal to one (1) months fee." MSA (Ex. A), § 5(d). This provision is important from Core's business perspective because it provides Core with the safety-net option of effectively buying its way out of a failed business relationship. Core insists on including this safety-net provision in all of its agreements.

10. The relevant Order that I understand is most at issue in this matter is Order #10. When Core and Celsius executed Order #10, Core had extremely limited hosting availability and

was in the process of building additional data-center facilities. Core also had purchased thousands of its own machines that it had yet to deploy. Core communicated these points to Celsius, who therefore knew that Core had very limited hosting availability and thousands of its own machines in the queue to deploy first. In this context, and after discussions and negotiations with Celsius, Core agreed to "notify [Celsius] as soon as practicable of additional hosting availability, if any, and provide [Celsius] up to 10 additional MW per month at a hosting services rate of $0.0625 per KWh. Additional hosting availability if available will be the subject of a separate order and provided to Client on a priority basis, subject to Client acceptance." Order #10 (Ex. B) at p. 4-5; Am. to Order #10 (Ex. C). After Order #10 was executed, Core had no additional hosting availability.

11. Additional hosting availability aside, my understanding is that Celsius was planning to phase-out Core and host machines at its own data-center facilities, believing that it would be more lucrative. I first learned about this plan at a lunch with Celsius's Chief Operating Officer Patrick Holert in July 2021. A few months later, in November 2021, Celsius General Counsel Ron Deutsch confirmed that Celsius intended to shift to a self-hosting business model that excluded Core.

## II. DEPLOYMENT

12. Celsius contends that Core failed to deploy its machines. This is incorrect. As of today, Core has deployed *all* machines that Celsius has delivered.

13. The way delivery works under Order #10 is that Celsius should deliver machines to Core by the target "Deployment Month" listed in Order #10:

| Deployment Month | Quantity & Type of Unit (the "Units") | Assumed power consumption per Unit (KWh): |
|---|---|---|
| SEP 2021 | 2,250 - M30S+ or Equivalent | 3.57 |
| MAR 2022 | 3,530 - M30S+ or Equivalent | 3.57 |
| APR 2022 | 4,710 - M30S+ or Equivalent | 3.57 |
| MAY 2022 | 2,350 - M30S+ or Equivalent | 3.57 |
| JUNE 2022 | 2,350 - M30S+ or Equivalent | 3.57 |
| JUL 2022 | 2,350 - M30S+ or Equivalent | 3.57 |
| AUG 2022 | 2,350 - M30S+ or Equivalent | 3.57 |
| SEP 2022 | 2,350 - M30S+ or Equivalent | 3.57 |
| OCT 2022 | 2,350 - M30S+ or Equivalent | 3.57 |
| NOV 2022 | 2,350 - M30S+ or Equivalent | 3.57 |
| DEC 2022 | 2,350 - M30S+ or Equivalent | 3.57 |

14.     The dates set forth above are target dates for when Celsius was expected to deliver machines to Core for deployment. *See* MSA § 2(b). As of today, Celsius has delivered only the first three tranches of machines set forth in the chart above.

15.     The way payment works under Order #10 is that Celsius must pay certain prepayments set forth in Order #10 in full prior to deployment by Core. Specifically, Celsius owed 35% of the prepayment for all units on September 20, 2021; another 35% six months before deployment; and the final 30% one month before deployment. Core must receive payment in full before deployment. After deployment, Celsius pays a hosting services rate in an amount set forth in the Order that may be adjusted in Core's "sole and absolute discretion" pursuant to Section 4(f) of the MSA. Aside from prepayments, Core receives from Celsius only the hosting services rate and does not share in any upside on the coins that Celsius mines.

16.     Once Celsius delivers machines to Core, Core then deploys them. As noted above, although Core seeks to deploy the machines as soon as practicable after they are delivered, there is no requirement in the agreement governing Core's deployment of the machines. And as Celsius knew when entering into Order #10, Core needed to build new data-center facilities to house machines, including the Celsius machines set forth in Order #10.

17. Because construction timelines are subject to external variables, Celsius also knew that Core's timeline for deployment could vary. Indeed, Core communicated to Celsius the possibility of delay in deploying machines when the parties executed Order #10.

18. After the parties executed Order #10, Core continued communicating with Celsius about external factors affecting the deployment schedule, including those closely tied to the Covid-19 pandemic. Attached as **Exhibit D** is a true and correct copy of an email thread dated January 3, 2022, where I update Celsius on external factors affecting deployment, including a grounded cargo fleet, surging cases of Covid-19, non-existent commercial flights to/from Asia, and customs overload.

19. Despite this knowledge, Celsius now complains that Core did not deploy the machines quickly enough. But the fact is that Celsius was not entitled to any specific deployment timeline and, in any event, all delays were justifiable and not within Core's control:

*First Tranche of Machines*

20. Under Order #10, Celsius was targeting to deliver the first tranche of machines in September 2021. But Celsius did not begin rolling deliveries of these machines until late November 2021, around Thanksgiving. Once the machines were delivered, Core faced significant hurdles in preparing them for deployment at our data-center facility in Grand Forks, North Dakota.

21. The first challenge that Core faced was that Celsius had delivered several types of machines that Core had never installed before. This caused us to lose about two weeks on the front end as our engineers had to learn how to deploy these new machines, obtain the proper equipment needed to deploy them, and input them into our system, which is a tedious and time-consuming task. To accomplish this, we needed Celsius to provide specific information for each machine: the miner type/firmware, processing speed, power consumption, fan speed/airflow, and pool

-7-

configuration. Without this information, Core could not energize the machines. Attached as **Exhibit E** is a true and correct copy of an email thread dated November 23, 2021, between Core and Celsius where Mitch Livingston and myself seek information from Celsius needed to deploy the first tranche of machines and explain to Celsius why preparing this first tranche of machines for installation is time consuming.

22. Core diligently pressed through these changes and deployed machines, on a rolling basis, as they became available. These rolling deployments began in early December 2021, only a few weeks after Celsius first delivered the machines.

23. Unfortunately, due to supply chain delays in sourcing materials like power distribution units (PDUs), dampers, and switchgears, we did not yet have sufficient availability at the new facility to deploy all Celsius machines that were ready for deployment. *See, e.g.*, **Exhibit F** (June 22, 2021 emails documenting delay in delivering switchgears); **Exhibit G** (July 23, 2021 email concerning delivery delays of PDUs); **Exhibit H** (September 14, 2021 email reporting damper shortage); **Exhibit I** (November 10, 2021 email concerning delivery delays of PDUs). Although these material delays predated Celsius's delivery of machines, they had a cascade effect on the deployment timeline because construction is a sequential process. In other words, if Core experiences a month-long delay in obtaining the materials necessary to ready its facilities for rig deployment, that delay in turn prevents it from beginning other preparatory steps and sets back the entire timeline.

24. Then, around December 15, 2021, before deployment was complete, a Covid-19 outbreak left the facility without its crew of electricians, who are essential to deployment. Once the electrician team returned to work, a severe winter storm shuttered the entire facility for a week. As a result, Core could not resume deploying any machines until January 1, 2022.

25. Once deployment resumed on a rolling basis, delays in receiving a certificate of occupancy for one of the new-construction buildings—there are currently two buildings at the Grand Forks facility and we deployed Celsius machines across both—limited availability and slowed the rate of deployment. Once the building was ready to go online around the middle of January 2022, we immediately began deploying Celsius machines.

26. Because of these external circumstances, which were entirely outside Core's control, the Celsius machines could not be fully deployed until late January 2022.

*Second Tranche of Machines*

27. After the issues with the various machines provided by Celsius in connection with the first tranche, Celsius decided to deliver different machines with lower power for the second tranche, which Celsius was targeted to deliver in March 2022. Celsius did not deliver the machines until late March 2022. Even though the Deployment Schedule for the March 2022 tranche listed only 3,530 machines, Core agreed to house additional machines from Celsius so that Celsius would be able to obtain the same amount of overall power (3.57 KWh) as set forth in the Schedule. Thus, the second tranche actually consisted of 3,780 machines, which meant that Celsius's machines took up more space at our facility than as set forth in the contract. Core agreed to accommodate Celsius once again in connection with the third tranche, with Celsius delivering 4,860 machines as compared to 4,710 in Order #10.

28. The machines for the second tranche were slotted to be deployed at Core's new data-center facility in Denton, Texas. Deployment was delayed for two primary reasons. First, Core faced an unexpectedly prolonged timeline in securing building permits from the City of Denton, which further delayed the facility's opening. Attached as **Exhibit J** is a true and correct copy of an email thread with the City of Denton between December 20, 2021 – January 28, 2022

regarding building permits for the Denton data-center facility. Generally, securing building permits from the city is routine and takes only a week or so, but here, we had to work diligently with the City of Denton for thirty-nine days before the permits finally issued in January 28, 2022. Because any delays to the project timeline have a cascading effect, as discussed above, this contributed to deployment delays overall. Second, supply-chain disruptions and shortages caused by the Covid-19 pandemic that affected steel, network equipment, and electrical equipment pushed the construction timeline, which in turn delayed deployment of the machines. Due to these compounding delays, the Celsius machines were not deployed until July 2022.

29. Mr. Lawlor states in paragraph 14 of his declaration that, "after the March rigs were deployed—between July 21, 2022, and September 16, 2022—Core Scientific had the March rigs online for a total of approximately eight days." Mr. Lawlor omits the reason why, which Celsius was fully aware of at the time: the forty transformers at Core's facility failed and were deemed a life-safety risk, and we could not use the facility until they were replaced. Attached as **Exhibit K** is a true and correct copy of a letter dated August 18, 2022, from a consulting engineer stating that a manufacturing defect is causing transformer failures and recommending that Core replace those affected transformers. This caused a 78-day delay that impacted all machines hosted at the Denton facility. Once the transformers were replaced, the facility was back online by September 16, 2022.

*Third Tranche of Machines*

30. Under Order #10, Celsius was targeting to deliver the third tranche of machines in April 2022. Celsius did not deliver these units until June 2022.

31. Once received, Core worked to deploy these machines at its Cottonwood, Texas facility, aiming for a July 22, 2022 deployment date. Deployment was delayed, however, because on March 25, 2022, the Electrical Reliability Council of Texas implemented a state-wide

regulatory change that prevented Texas-New Mexico Power ("TNMP") from supplying the amount of power that Core had already contracted with TNMP to receive. *See* **Exhibit L** (ERCOT Notice dated March 25, 2022, re: "Interim Large Load Interconnection Process"); **Exhibit M** (August 2021 energy contracts executed between Core and TNMP to secure energy for the Cottonwood and Cedarvale data-center facilities). This regulatory shift left Core unable to fully energize either of its brand-new Texas facilities for about six-months, impacting our power capacity and profitability overall.

32. We therefore worked urgently and persistently to have power implemented at our Texas data-center facilities. Carol Haines, Core Senior Vice President of Power and Sustainability, had at least weekly conversations with ERCOT, advocating for the immediate release of full power to our facilities. Attached as **Exhibit N** are true and correct copies of email threads between Core and the power company regarding power at Core's Texas facilities.

33. Finally, after our diligent efforts, on September 28, 2022, TNMP provided energy to the Cottonwood facility, albeit with a fraction (approximately 20%) of the power that we anticipated. Once the facility received power, we diligently prepared to deploy the machines that had been in line for deployment at the Cottonwood facility, including the Celsius machines. On October 6, 2022, about a week after Cottonwood received power, all machines at the facility, including the Celsius machines, were powered on.

\* \* \* \* \*

34. Mr. Lawlor's declaration states that Celsius delivered machines to Core but that Core just did not deploy them for several months. Celsius knows that this is not the case. Deployment is a standing topic at Core's weekly meeting with Celsius. And throughout the deployment process, Core regularly discussed in detail with Celsius the schedule and delays, which

were caused by external factors, as described above. *See e.g.*, **Exhibit O** (May 24, 2022 email thread between me, Mr. Holert, and Celsius Chief Executive Officer Amir Ayalon scheduling time to discuss deployment schedule); **Exhibit P** (August 10, 2022 email thread between me, Mr. Holert, Mr. Ayalon, Core Chief Executive Officer Mike Levitt, and Core Executive Vice President of Client Services, Russell Cann scheduling time to discuss deployment schedule); **Exhibit Q** (non-exhaustive compilation of invitations confirming discussions with Celsius regarding deployment schedule).

35. As of today, Core has deployed all of the machines that Celsius has delivered. This amounts to 26,655 Celsius machines deployed in total, including the 10,885 machines deployed under Order #10.

## III. ADDITIONAL HOSTING AVAILABILITY

36. When Core and Celsius entered into Order #10, Core had very little hosting availability to offer Celsius. Celsius was aware of this but decided to enter into the Order anyway, fully understanding that Core was in a power-capacity deficit and early in the process of constructing new data-center facilities. Core also told Celsius that over 100,000 machines that Core had just purchased had to be deployed *before* Core would have any additional hosting availability to offer Celsius beyond the number of units set forth in Order #10. Attached as **Exhibits R-U** are true and correct copies of the contracts documenting Core's purchase of 108,900 machines between March and May 2021, before we executed Order #10.

37. Against this backdrop, when executing Order #10, Celsius also wanted to add a clause that it would be entitled to priority over *any* additional hosting availability. Core, however, did not want to promise Celsius priority over an unlimited amount of availability. We both compromised, agreeing to add a "Notification of Hosting Availability" provision to the MSA,

-12-

providing that "Company will notify Client as soon as practicable of additional hosting availability, if any, and provide Client up to 10 additional MW per month at a hosting services rate of $0.0625 per KWh. Additional hosting availability if available will be the subject of a separate order and provided to Client on a priority basis, subject to Client acceptance." Order #10 (Ex. B) at 4-5.

38. Celsius now claims that Core violated Order #10 by failing to notify Celsius of additional hosting availability. Celsius Mot. ¶ 19. But that is not correct: since the commencement of Order #10 on September 20, 2021, Core has not had any additional hosting availability.

39. This lack of additional hosting availability is demonstrated by the fact that Core has still yet to deploy at least 14,513 of the 108,900 machines that Core purchased before Order #10 commenced. Until these machines are deployed, Core will not have any additional hosting availability.

40. Celsius argues that Core must have failed to offer it additional hosting availability because we expanded our fleet by at least 18,000 machines between December 2021 and April 2022. But the fact that Core expanded its fleet has nothing to do with whether Core has additional hosting availability.

41. For example, what Celsius claims was fleet expansion is in fact a fleet swap that Core agreed to with its largest client, Argo Blockchain. Core and Argo agreed to exchange Argo's mining fleet—which is hosted at Core—for some data-mining machines that Core previously ordered but never deployed. Attached as **Exhibit V** is a true and correct copy of an email dated August 1, 2022, confirming the Argo fleet swap. This swap had no impact on hosting availability across Core's data-center facilities.

42. Core's fleet also expanded due to a decision to test the usability of "antboxes," which are portable containers used to host data-mining machines. After a brief testing period, Core has decided that these antboxes are not suitable hosting options and is working to decommission them across the board. This likewise had no impact on hosting availability across Core's data-center facilities.

43. Finally, in late July 2022 (after the Petition Date), Core executed a hosting agreement with a major existing client, Bitmain, from which Core purchases machines. In exchange for significant funding and a substantial credit on machines, Core agreed, among other things, to deploy a limited set of Bitmain machines in place of machines that Core had purchased for itself before executing Order #10. Other Bitmain machines will be housed in new "exclusive-use" facilities constructed for Bitmain machines only and run by Bitmain technicians. This is a novel hosting model that Core has not previously used.

### IV.    POWER COST PASS-THROUGHS

44. Section 4(f) of the MSA gives Core the right to pass through increases in tariffs to its customers. In the data-mining industry, the term "tariffs" includes the rates charged by utility companies. These rates are impacted by several different factors, including the cost of fuel. A document prepared by the Tennessee Valley Authority ("TVA")—one of the utility companies that provides power to certain of Core's data-center facilities—demonstrates this point, stating that base power rates are subject to a "Fuel Cost Adjustment" that impacts monthly fuel costs. Attached as **Exhibit W** is a true and correct copy of the TVA's "Large Direct Service Manufacturing Power Rates." Consistent with this, the invoices that Core receives from the TVA are broken down to include line items for fuel and other adjustments that impact monthly power costs. Attached as

**Exhibit X** is a true and correct copy of an October 3, 2022 power invoice for one of Core's data-center facilities.

45. Mr. Lawlor implies that the power costs that Core passed through to Celsius are not "tariffs" within the meaning of Section 4(f) of the MSA. Lawlor Decl. ¶¶ 25-26. Mr. Lawlor also suggests that Celsius enjoys a fixed power rate free from fuel-cost volatility. *Id.* Celsius knows that neither is true. Not only are these positions contrary to the industry standard and utility documents themselves, but Core's business communications with the Celsius team make clear that Celsius very well knew that power costs are tariffs that Core can pass through to Celsius.

46. For example, as a general matter, Core is in frequent communications with its customers regarding power prices and the monthly power-cost rate. Power prices are a central topic of conversation because operating the data-mining machines consumes such a tremendous amount of power that high power prices can undercut profitability. If Celsius were entitled to a fixed power rate, as Mr. Lawlor suggests, Celsius would have no reason to care about the monthly power-cost rate.

47. Additionally, prior to filing for bankruptcy, Celsius paid power cost pass-throughs to Core, with Mr. Holert, acknowledging in writing that the costs "make sense." Attached as **Exhibit Y** is a true and correct copy of an email dated November 20, 2021 from Mr. Holert to myself and Core's Accounting Manager, Monica Xia. This all directly undermines Mr. Lawlor's statement that Celsius's contract with Core is a fixed-fee contract or that the power cost pass-through charges "suddenly [arose] after the Petition Date." Lawlor Decl. ¶ 25. They did not.

48. Finally, Core charges the power cost pass-through to all of its customers. This makes clear that Core did not single out Celsius and that its decision to invoice its customers when

-15-

power costs are high has nothing to do with Celsius's decision to file for bankruptcy; it is Core's standard business practice.

## V. CORE DID NOT THREATEN CELSIUS POSTPETITION

49. Celsius claims that, during an August 22, 2022 telephone call, I threatened to withhold deploying new data-mining machines until Celsius made its outstanding *prepetition* payments. *See* Celsius Mot. at ¶¶ 25, 46. This is false. In response to Celsius requesting that Core consider deploying new data-mining machines beyond those that Celsius had paid for prepetition, I told Celsius that Core would not deploy any new data-mining machines until Celsius paid its outstanding balance on amounts that have accrued *postpetition*.

50. Celsius appears to be attempting to renegotiate the MSA and extract postpetition benefits from Core that we are not obligated to provide. It would not make any business sense for Core to voluntarily deploy new Celsius data-mining machines when we are currently losing approximately $53,226 per day, or around $1.65 million a month to cover the postpetition power cost pass-through amounts that Celsius refuses to pay. With these losses continuing to accumulate daily, Core cannot afford to keep funding Celsius's operations.

## VI. POSTPETITION RELATIONSHIP

51. After the Petition Date, Core continued business with Celsius in the ordinary course. This has benefitted Celsius's estate, as Celsius is generating revenue from data mining through the machines hosted at Core's data-center facilities. Despite reaping this benefit, Celsius has refused to pay the power cost pass-through amounts that have accrued postpetition. Because Celsius has not paid these outstanding amounts, Core is currently covering these costs to keep the Celsius machines running (and profitable for Celsius). This is tying up Core's working capital and preventing us from using that capital to create the infrastructure that we need to host more

machines, including our own machines. Covering these costs for Celsius thus poses a serious threat to Core's own financial stability.

52. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on October 19, 2022, at Bellevue, Washington.

*/s/ Jeff Pratt*
Jeff Pratt