# Transmission/Substation Facility Extension Agreement

This Agreement is made between C o r e  S c i e n t i f i c ,  I n c . , hereinafter called "Customer" and T e x a s  N e w  M e x i c o  P o w e r C o m p a n y , hereinafter called "Company" for the extension of Company Delivery System transmission/substation facilities, as hereinafter described. As used herein, the term "extension" shall mean the construction of new facilities or modification of existing  facilities.

Customer has requested that Company construct the following Company-owned Delivery System facilities: A new service terminal to be constructed at Cedarvale Substation and operated at a nominal 138,000 volts or higher. The service terminal is to consist of poles, conductors, breakers, switches and associated protection and metering equipment and communication devices and a single line terminal position for the Customer's transmission line, ("Company Facilities") to serve the following Customer-Owned Facilities located at 31°30'44.30"N, 103°27'13.78"W ,("Customer Facilities"): A substation operated at a nominal 138,000 volts or higher. Customer substation will consist of multiple transformers rated at approximately 250MVA each with primary and secondary circuit breakers and relays compatible with TNMP's relays and protective schemes at Company service meter station.

## ARTICLE I - PAYMENT BY CUSTOMER

1.  As payment for Customer's portion of the cost of the extension of the Company Facilities in accordance with this Agreement, Customer will pay to Company the amount(s) shown below, such payment(s) to be and remain the property of the Company.

    Customer will not be required to pay an upfront contribution in aid of construction as set forth on Exhibit A.

2.  If the Customer Facilities have not achieved the level of operation specified below by the date specified below, then Custom er shall pay to Company those costs as described below to  compensate Company for costs it has incurred asso ciated with the Company Facilities. The following will also address any security required associated with such payment obligation.

    At the end of thirty-six (36) monthly billing cycles following the date the Company Facilities are completed, if the actual revenue is below the Minimum Facilities Revenue, Customer shall pay to TNMP an amount equal to the Minimum Facilities Revenue less the Actual Revenue, grossed up for federal, state and local taxes. In addition, Customer shall deliver to TNMP a surety bond or irrevocable letter of credit, issued by a surety company or banking institution authorized to do business in the State of Texas and reasonably a cceptable to TNMP, on or before the Effective Date of thi s Agreement. The surety bond or irrevocable letter of credit shall have a face value equal to the Minimum Facilities Revenue and a 40-month term from the date the Company Facilities are completed. The surety bond or irrevocable letter of credit shall secure all duties and obligations of customer hereunder and ensure same are done and performed at the time and in the manner specified in this Agreement.

    Company shall provide an accounting of the Minimum Facilities Revenue balance to Customer  no more frequently than annually upon request from Customer.

3.  Upon termination pursuant to the provisions of Article III, Paragraph 2 below, Customer shall pay to Company all of: (a) the costs that Company has incurred prior to the date of termination for engineering, procuring equipment and materials, construction, and any other costs related to the Company Facilities; (b) the costs that Company has committed to incur prior to the date of te rmination that it is unable to avoid using commercially reasonable  steps; and (c) such costs incurred by Company after the date of termination to return the Delivery System to a condition consistent with Company's construction standards and Company's Tariff for Retail Delivery Service.    Any cost obligations incurred by Customer under this paragraph will be reduced by any payments made by Customer under Paragraph 1 above.  The provisions of this paragraph shall survive termination of this Agreement.

4.  In calculating the costs Company has incurred (or committed to be  incurred), such costs shall include the normal loadings Company applies to construction projects of this nature and shall be increased by an adder to cover the effects of a Customer payment on the Company's tax liability and shall include an amount to reco ver franchise fees where applicable.

## ARTICLE II - TITLE AND OWNERSHIP

Company at all times shall have title to and complete ownership and control over the Company Facilities extended under this A greement.

## ARTICLE III - TERM AND TERMINATION

1.  This Agreement becomes effecti ve on the date of execution by both parties and may be executed in two or more counterparts, each of which is deemed an original, but all constitute one and the same instrument.

2.  Customer may terminate this Agreement at any time  prior to completion of the Company Facilities by providing Company with seven (7) days advanced written notice.

## ARTICLE IV - GENERAL CONDITIONS

1.  Customer understands that, as a result of the installation provided for in this Agreement, the Delivery of Electric Power and Energy by Company to the specified location will be provided in accordance with Transmission Service Rate Schedule, which may from time to time be amended or succeeded.

2.  This Agreement supersedes all previous agreements or representations, either written or oral, between Company and Customer made with respect to the matters herein contained, and when duly executed constitutes the agreement between the parties hereto and is not binding upon Company unless and until signed by  one of its duly authorized representatives.

3.  The services covered by this Agreement will be provided by Company, and accepted by Customer, in accordance with applicable Public Utility Commission of Texas ("PUCT") Substantive Rules and Company's Tariff for Retail Delivery Service (including the Service Regulations contained therein), as it may from time to time be fixed and approved by the PUCT ("Company's Retail Delivery Tariff"). Company's Retail Delivery Tariff is part of this Agreement to the same extent as if fully set out herein. Unless otherwise expressly stated in this Agreement, the terms used herein have the meanings ascribed thereto in Company's Retail Delivery Ta riff.

4.  This Agreement may be amended only upon mutual agreement of the parties, which amendment will not be effective until reduced to writing and executed by the parties.  Changes to applicable PUCT Substantive Rules and Company's Retail Delivery Tariff are applicable to this Agreement upon their effective date and do not  require an amendment of this Agreement.

5.  The failure of a party to this Agreement to insist, on any occasion, upon strict performance of any provision of this Agreement will not be considered to waive the obligations, rights, or duties imposed upon the  parties.

6.  Customer may not assign the Agreement without Compan y's prior written consent.

7.  This Agreement was executed in the State of Texas and must in all respects be governed by, interpreted, construed, and enforced in accordance with the laws thereof.  This Agreement is subject to all valid, applicable federal, state, and local laws, ordinances, and rules and regulations of duly constituted regulatory authorities having jurisdiction.

## ARTICLE V - OTHER SPECIAL CONDITIONS

1.  TNMP shall use reasonable efforts to cons truct the TNMP Facilities by a target completion date of 12 m onths from the effective date of this agreement.
2.  A Facility Schedule outlining TNMP and Customer facility responsibilities and including a  one-line diagram of the TNMP and Customer-Owned Facilities is attached as Exhibit B.
3.  Customer agrees to maintain a Power Factor of ninety -five percent (95%) lagging or greater as measured at the TNMP  service tap station meter. If Customer does not maintain a Power Factor of ninety-five percent (95%), and Customer does not correct its Power Factor within 30 days of receipt of notice from TNMP, Company may install equipment on the Delivery System necessary to correct the Customer Power Factor . In the event TNMP installs such e quipment, Customer shall reimburse TNMP for all reasonable costs and expenses related to the procurement and installation of such equipment within thirty (30) days after rec eipt of TNMP's invoice therefor.
4.  The Customer shall design, install, cons truct, operate and maintain the Customer Facilities and its other electrical equipment in compliance with the TNMP Tariff and Applicable Legal and Electrical Requirements.
5.  This Agreement does not provide for interconnection of generation to TNMP's system or inter connection for any purpose other than for TNMP to provide retail delivery service.
6.  Subject to any necessary ERCOT approval, each Party shall provide necessary equipment outages to allow the other Party to perform periodic testing, maintenance, repair or  replacement of its facilities.  Such outages shall be scheduled at mutually agreeable times, unless conditions exist which a Party believes, in accordance with Good  Utility Practice, may endanger person or property.
7.  Customer understands and agrees that ce rtain contingencies could affect delivery service to the  CSI POD due to the system curtailment plans of the TNMP 138kV transmission loop system serving the area and therefore delivery service to the  CSI POD may be interrupted.
8.  Customer's full connected future load is estimated to be  700 MVA by 2026 and will coordinate load additions in excess with Company.
9.  TNMP requires a detailed load ramp schedule to ensure the necessary shunt capacitance is available in the timeframe Customer requires load support. The cost to serve and security required will be revised upon determination of the final load ramp timi ng and shunt capacitor bank need.
   .

ACCEPTED BY COMPANY:                          ACCEPTED BY CUSTOMER:

_Keith Nix_                                   _Weston Adams_
Signature                                     Signature

Keith Nix                                     Weston Adams
Name                                          Name

Vice President                                CCO
Title                                         Title

8/20/2021                                     8/19/2021
Date Signed                                   Date Signed

# Exhibit A

## Contribution in Aid of Construction

| | |
|---|---|
| Cost to Serve CSI Substation from Cedarvale Substation | |
| 138kV Service Station | |
| Engineering | $350,000.00 |
| Procurement | $2,000,000.00 |
| Construction | $1,900,000.00 |
| **Total Estimated Costs** | **$4,250,000.00** |
| | |
| **Less: Minimum Facilities Revenue** | **$4,250,000.00** |
| | |
| Balance of Estimated Costs | $0.00 |
| Gross-up for Federal Tax | $0.00 |
| State Tax | $0.00 |
| Local Tax | $0.00 |
| | |
| **Total Upfront Contribution** | **$0.00** |

## Revenue Credit Calculation

Transmission Customer Addition:CSI Substation fed from Cedarvale Substation

| Customer | Load (KVA) | In-Service | Monthly | Annual Revenue | Method |
|---|---|---|---|---|---|
| CSI | 50,000 | 1/1/2021 - 12/31/2021 | $207,623 | $2,491,473 | NCP |
| CSI | 100,000 | 1/1/2022 - 12/31/2022 | $414,055 | $4,968,664 | 4CP |
| CSI | 150,000 | 1/1/2023 - 12/31/2023 | $620,488 | $7,445,856 | 4CP |
| | | | Composite Total | $14,905,993 | |

| | Applied to Credit |
|---|---|
| Customer Charge | $31.96 |
| Meter Charge (per meter) | $1,158.21 |
| Transmission System Charge (per KVA)(TCRF) | $0.000000 |
| Distribution System Charge (per KVA) | $0.00 |
| TCRF (Per 4CP KVA) | $4.128652 |
| CTC Charge | $0.0000000 |
| SBF Charge | $0.0000000 |
| RCE#3 | $0.0000000 |
| HCRF | $0.0000000 |
| Rates effective as of September 1, 2021 | |

DocuSign Envelope ID: A524A4B8-E27E-45B4-A9EE-607E09AD4543

# Exhibit B

# Facility Schedule

1. **Name:** CSI POD

2. **Point of Interconnection Location:**
   TNMP Cedarvale Substation, located at 3165 FM 516 N, Barstow, TX 79719 At approximately
   31°30'49.98"N, 103°27'8.22"W. The detailed location will be at the Company property line
   where the Customer can acquire transmission line easement.

3. **Delivery Voltage:** 138kV Nominal

4. **Metering (Voltage, Location, Other):**
   Metering is accomplished by using 138kV potential and current metering accuracy instrument
   transformers located at Company's Cedarvale substation. Metering equipment will provide for
   one retail transmission point of delivery.

5. **One line diagram attached:** YES

6. **Customer Facilities Furnished by Customer:**
   i.   Customer will provide all necessary facilities on the load side of the TNMP Metering
        Station, consisting of a transmission line and substation operated at a nominal 138,000
        volts or higher.
   ii.  Customer substation will consist of multiple transformers rated at approximately 250
        MVA each with primary and secondary circuit breakers and relays compatible with
        Company's relays and protective schemes at Company service station

7. **Company Facilities Furnished by TNMP:**
   Company will install and construct a metered line terminal at its Worsham substation consisting
   of a line terminal structure, breaker, relays, switches, metering instrument transformers and
   metering, control and communications cabinet at its Substation substation. In addition,
   Company will construct a portion of the service line to the boundary of TNMP fee owned
   property.

8. **Company One Line**



9. **Customer One Line**



# Transmission/Substation Facility Extension Agreement

This Agreement is made between Core Scientific, Inc., hereinafter called "Customer" and Texas New Mexico Power Company, hereinafter called "Company" for the extension of Company Delivery System transmission/substation facilities, as hereinafter described. As used herein, the term "extension" shall mean the construction of new facilities or modification of existing facilities.

Customer has requested that Company construct the following Company-owned Delivery System facilities: A new service terminal to be constructed at Cottonwood Substation and operated at a nominal 138,000 volts or higher. The service terminal is to consist of poles, conductors, breakers, switches and associated protection and metering equipment and communication devices and a single line terminal position for the Customer's transmission line, ("Company Facilities") to serve the following Customer-Owned Facilities located at 31°30'44.30"N, 103°27'13.78"W ("Customer Facilities"): A substation operated at a nominal 138,000 volts or higher. Customer substation will consist of multiple transformers rated at approximately 150MVA each with primary and secondary circuit breakers and relays compatible with TNMP's relays and protective schemes at Company service meter station.

## ARTICLE I - PAYMENT BY CUSTOMER

1.  As payment for Customer's portion of the cost of the extension of the Company Facilities in accordance with this Agreement, Customer will pay to Company the amount(s) shown below, such payment(s) to be and remain the property of the Company.

    Customer will not be required to pay an upfront contribution in aid of construction as set forth on Exhibit A.

2.  If the Customer Facilities have not achieved the level of operation specified below by the date specified below, then Customer shall pay to Company those costs as described below to compensate Company for costs it has incurred associated with the Company Facilities. The following will also address any security required associated with such payment obligation.

    At the end of thirty-six (36) monthly billing cycles following the date the Company Facilities are completed, if the actual revenue is below the Minimum Facilities Revenue, Customer shall pay to TNMP an amount equal to the Minimum Facilities Revenue less the Actual Revenue, grossed up for federal, state and local taxes. In addition, Customer shall deliver to TNMP a surety bond or irrevocable letter of credit, issued by a surety company or banking institution authorized to do business in the State of Texas and reasonably acceptable to TNMP, on or before the Effective Date of this Agreement. The surety bond or irrevocable letter of credit shall have a face value equal to the Minimum Facilities Revenue and a 40-month term from the date the Company Facilities are completed. The surety bond or irrevocable letter of credit shall secure all duties and obligations of customer hereunder and ensure same are done and performed at the time and in the manner specified in this Agreement.

    Company shall provide an accounting of the Minimum Facilities Revenue balance to Customer no more frequently than annually upon request from Customer.

3.  Upon termination pursuant to the provisions of Article III, Paragraph 2 below, Customer shall pay to Company all of: (a) the costs that Company has incurred prior to the date of termination for engineering, procuring equipment and materials, construction, and any other costs related to the Company Facilities; (b) the costs that Company has committed to incur prior to the date of termination that it is unable to avoid using commercially reasonable steps; and (c) such costs incurred by Company after the date of termination to return the Delivery System to a condition consistent with Company's construction standards and Company's Tariff for Retail Delivery Service. Any cost obligations incurred by Customer under this paragraph will be reduced by any payments made by Customer under Paragraph 1 above. The provisions of this paragraph shall survive termination of this Agreement.

4.  In calculating the costs Company has incurred (or committed to be incurred), such costs shall include the normal loadings Company applies to construction projects of this nature and shall be increased by an adder to cover the effects of a Customer payment on the Company's tax liability and shall include an amount to recover franchise fees where applicable.

## ARTICLE II - TITLE AND OWNERSHIP

Company at all times shall have title to and complete ownership and control over the Company Facilities extended under this Agreement.

## ARTICLE III - TERM AND TERMINATION

1.  This Agreement becomes effective on the date of execution by both parties and may be executed in two or more counterparts, each of which is deemed an original, but all constitute one and the same instrument.

2.  Customer may terminate this Agreement at any time prior to completion of the Company Facilities by providing Company with seven (7) days advanced written notice.

## ARTICLE IV - GENERAL CONDITIONS

1.  Customer understands that, as a result of the installation provided for in this Agreement, the Delivery of Electric Power and Energy by Company to the specified location will be provided in accordance with Transmission Service Rate Schedule, which may from time to time be amended or succeeded.

2.  This Agreement supersedes all previous agreements or representations, either written or oral, between Company and Customer made with respect to the matters herein contained, and when duly executed constitutes the agreement between the parties hereto and is not binding upon Company unless and until signed by one of its duly authorized representatives.

3. The services covered by this Agreement will be provided by Company, and accepted by Customer, in accordance with applicable Public Utility Commission of Texas ("PUCT") Substantive Rules and Company's Tariff for Retail Delivery Service (including the Service Regulations contained therein), as it may from time to time be fixed and approved by the PUCT ("Company's Retail Delivery Tariff"). Company's Retail Delivery Tariff is part of this Agreement to the same extent as if fully set out herein. Unless otherwise expressly stated in this Agreement, the terms used herein have the meanings ascribed thereto in Company's Retail Delivery Ta riff.

4. This Agreement may be amended only upon mutual agreement of the parties, which amendment will not be effective until reduced to writing and executed by the parties. Changes to applicable PUCT Substantive Rules and Company's Retail Delivery Tariff are applicable to this Agreement upon their effective date and do not require an amendment of this Agreement.

5. The failure of a party to this Agreement to insist, on any occasion, upon strict performance of any provision of this Agreement will not be considered to waive the obligations, rights, or duties imposed upon the parties.

6. Customer may not assign the Agreement without Compan y's prior written consent.

7. This Agreement was executed in the State of Texas and must in all respects be governed by, interpreted, construed, and enforced in accordance with the laws thereof. This Agreement is subject to all valid, applicable federal, state, and local laws, ordinances, and rules and regulations of duly constituted regulatory authorities having jurisdiction.

## ARTICLE V - OTHER SPECIAL CONDITIONS

1. TNMP shall use reasonable efforts to cons truct the TNMP Facilities by a target completion date of 12 m onths from the effective date of this agreement.

2. A Facility Schedule outlining TNMP and Customer facility responsibilities and including a one-line diagram of the TNMP and Customer-Owned Facilities is attached as Exhibit B.

3. Customer agrees to maintain a Power Factor of ninety -five percent (95%) lagging or greater as measured at the TNMP service tap station meter. If Customer does not maintain a Power Factor of ninety-five percent (95%), and Customer does not correct its Power Factor within 30 days of receipt of notice from TNMP, Company may install equipment on the Delivery System necessary to correct the Customer Power Factor. In the event TNMP installs such e quipment, Customer shall reimburse TNMP for all reasonable costs and expenses related to the procurement and installation of such equipment within thirty (30) days after rec eipt of TNMP's invoice therefor.

4. The Customer shall design, install, cons truct, operate and maintain the Customer Facilities and its other electrical equipment in compliance with the TNMP Tariff and Applicable Legal and Electrical Requirements.

5. This Agreement does not provide for interconnection of generation to TNMP's system or inter connection for any purpose other than for TNMP to provide retail delivery service.

6. Subject to any necessary ERCOT approval, each Party shall provide necessary equipment outages to allow the other Party to perform periodic testing, maintenance, repair or replacement of its facilities. Such outages can be scheduled at mutually agreeable times, unless conditions exist which a Party believes, in accordance with Good Utility Practice, may endanger person or property.

7. Customer understands and agrees that ce rtain contingencies could affect delivery service to the CSI POD due to the system curtailment plans of the transmission loop system serving the area and therefore delivery service to the CSI POD may be interrupted.

8. Customer's full connected future load is estimated to be 300 MVA by 2026 and will coordinate load additions in excess with Company.

9. TNMP requires a detailed load ramp schedule to ensure the necessary shunt capacitance is available in the timeframe Customer requires load support. The cost to serve and security required will be revised upon determination of the final load ramp timi ng and shunt capacitor bank need.
.

ACCEPTED BY COMPANY:

Signature _Keith Nix_ —04BD48EF23664C3

Name **Keith Nix**

Title **Vice President**

Date Signed **8/27/2021**

ACCEPTED BY CUSTOMER:

Signature _Weston Adams_ —631B456D5113460

Name **Weston Adams**

Title **CCO**

Date Signed **8/27/2021**

# Exhibit A

## Contribution in Aid of Construction

| Cost to Serve CSI Substation from Cottonwood Substation | |
|---|---|
| 138kV Service Station | |
| Engineering | $250,000.00 |
| Procurement | $1,500,000.00 |
| Construction | $1,750,000.00 |
| **Total Estimated Costs** | **$3,500,000.00** |
| | |
| **Less: Minimum Facilities Revenue** | **$3,500,000.00** |
| | |
| Balance of Estimated Costs | $0.00 |
| Gross-up for Federal Tax | $0.00 |
| State Tax | $0.00 |
| Local Tax | $0.00 |
| | |
| **Total Upfront Contribution** | **$0.00** |

## Revenue Credit Calculation

Transmission Customer Addition: CSI Substation fed from Cottonwood Substation

| Customer | Load (KVA) | In-Service | Monthly | Annual Revenue | Method |
|---|---|---|---|---|---|
| CSI | 50,000 | 1/1/2021 - 12/31/2021 | $207,623 | $2,491,473 | NCP |
| CSI | 100,000 | 1/1/2022 - 12/31/2022 | $414,055 | $4,968,664 | 4CP |
| CSI | 150,000 | 1/1/2023 - 12/31/2023 | $620,488 | $7,445,856 | 4CP |

| Composite Total | $14,905,993 |
|---|---|

| | Applied to Credit |
|---|---|
| Customer Charge | $31.96 |
| Meter Charge (per meter) | $1,158.21 |
| Transmission System Charge (per KVA)(TCRF) | $0.000000 |
| Distribution System Charge (per KVA) | $0.00 |
| TCRF (Per 4CP KVA) | $4.128652 |
| CTC Charge | $0.0000000 |
| SBF Charge | $0.0000000 |
| RCE#3 | $0.0000000 |
| HCRF | $0.0000000 |
| Rates effective as of September 1, 2021 | |

DocuSign Envelope ID: 5B7EC78D-08DA-4535-A041-440B3584498E

# Exhibit B

# Facility Schedule

1. **Name:** CSI POD

2. **Point of Interconnection Location:**
   TNMP Cottonwood Substation, located at 2023 FM 2119, Pecos, TX 79772 At approximately
   31°32'42.03"N, 103°49'36.14"W. The detailed location will be at the Company property line
   where the Customer can acquire transmission line easement.

3. **Delivery Voltage:** 138kV Nominal

4. **Metering (Voltage, Location, Other):**
   Metering is accomplished by using 138kV potential and current metering accuracy instrument
   transformers located at Company's Cottonwood substation. Metering equipment will provide
   for one retail transmission point of delivery.

5. **One line diagram attached:** YES

6. **Customer Facilities Furnished by Customer:**
   i.    Customer will provide all necessary facilities on the load side of the TNMP Metering
         Station, consisting of a transmission line and substation operated at a nominal 138,000
         volts or higher.
   ii.   Customer substation will consist of multiple transformers rated at approximately 250
         MVA each with primary and secondary circuit breakers and relays compatible with
         Company's relays and protective schemes at Company service station

7. **Company Facilities Furnished by TNMP:**
   Company will install and construct a metered line terminal at its Cottonwood substation
   consisting of a line terminal structure, breaker, relays, switches, metering instrument
   transformers and metering, control and communications cabinet at its substation. In addition,
   Company will construct a portion of the service line to the boundary of TNMP fee owned
   property.

8. **Company One Line**



## 9. Customer One Line



DocuSign Envelope ID: 5B7EC78D-08DA-4535-A041-140D3584498E

## TEXAS-NEW MEXICO POWER COMPANY

### ELECTRIC FACILITIES EXTENSION AGREEMENT

Contract No. _____
Project/Year_____
Customer Account No:_____

This Agreement is made by and between Texas-New Mexico Power Company, a Texas Corporation (Company) and Core Scientific, Inc.,hereafter called (Customer) for the extension of Company's Electric Transmission and Distribution System facilities to the following location:

> Location described by GPS Coordinates as:   approximately 31°30'49.02"N, 103°27'3.56"W in Ward
> County, Texas, at the end of TNMPs existing line extension.

Customer's mailing address is:

2800 Northup Way, #220
Bellevue,  WA 98004

Customer Has Requested Extension Of Service For The Following: [Check All That Apply]

**___**       **Standard Electric Facilities for Loads Less Than 12kW**

Company will extend its standard electric facilities that it determines are necessary to serve **____** Residential lot(s) or business (es).  The character of these facilities is generally identified as _____ volt, _____ phase, alternating current, at 60 hertz, with reasonable variation permitted.

**_X_**       **Standard Electric Facilities for Loads Greater Than 12kW**

Company will extend its standard electric facilities that it determines are necessary to serve Customer's demand requirement of 3,982kW ("Threshold kW").  The character of these facilities is generally identified as 24,940 volts, 3 phase, alternating current, at 60 hertz, with reasonable variation permitted.

**___**       **Non-Standard Electric Facilities**

Company will extend, install, or modify the following non-standard electric facilities:

_____
_____
_____
_____

## ARTICLE I.  TARIFF

As approved by, and filed with, the Public Utility Commission of Texas (or its successor), the Company's current tariff (Tariff) will apply to this Agreement and for the class of service applicable to Customer's request. Both Company and Customer acknowledge and accept that the Tariff imposes obligations and limitations on both the Company  and Customer.  This Agreement, including the applicable Tariff, shall at all times be subject to change or modification by regulatory authority or other change in law. A copy of Company's current Tariff may be obtained from Company on request.

## ARTICLE II. CUSTOMER PAYMENT AND COMMITMENTS

Customer will pay a Contribution-In-Aid-Of-Construction (CIAC) to Company of $0.00 as payment f o r Customer's portion of the facility extension, installation, or modification costs in accordance with Company's Tariff. Per the Tariff the CIAC was calculated based on the following: CIAC = (Project Investment of 450,000.00 minus Standard Allowance of $450,000.00) plus Applicable Taxes of $0.00. Such payment is due within 15 days following Company's mailing, first class, an invoice to Customer at:

Core Scientific Inc.
2800 Northup Way, #220
Bellevue, WA 98004

or such other billing address provided to Company by the Customer.  Such non-refundable payment will remain the property of the Company.

The Customer will provide, without cost to Company, all rights-of-way (in a form acceptable to Company), permits and suitable space for the installation of poles, wires, transformers, meters, and such other equipment Company deems necessary to enable it to deliver the power and energy herein described.

The Customer will install and maintain in good working condition at all times adequate protection and protective devices for his electric motors and other equipment against overload, low voltage, single-phasing, and similar risks or hazards incident to the use of electricity.  The Customer assumes all responsibility for the electric current upon the Customer's side of the point of delivery, and for the wires, apparatus, and appurtenances used in connection therewith.  In addition to the terms of the Tariff, Customer will protect and save the Company harmless from all claims for injury or damage to persons or property occurring upon the Customer's side of such point of delivery, occasioned by such electric current or said wire and apparatus, except where said injury or damage shall be shown to have been occasioned solely by the negligence of the Company. In no event shall the Company be responsible for consequential damages whether or not found to have negligently caused injury to Customer.

## ARTICLE III. TERM

This Agreement shall expire three (3) years (the "Term") from the date agreement is executed. The Initial Date is the date this agreement is executed.  Customer's payment obligations shall survive expiration of this Agreement.

## ARTICLE IV.  UNDER UTILIZATION CHARGE

A.      Based on estimated information provided by the Customer, Company calculated the CIAC amount referenced in Article II above. Such estimated information included, but was not limited to, the Threshold kW and the number of lots or businesses to be built, sold, and occupied. Company will review actual load or the number of lots or businesses at the pertinent location to evaluate the accuracy of the information supplied by Customer.  At the end of the Term, the Company will recalculate the CIAC amount if the estimated Threshold kW billing demand for the designated location has not been realized or the estimated number of lots or businesses have not been built, sold, and occupied. The CIAC amount, including applicable taxes, will be recalculated based on the actual kW billing demand achieved or the actual number of lots or businesses built, sold, and occupied at the time of the recalculation. Company may also make such recalculation in the event of a breach during the Term.

B.      If Customer does not realize the estimated Threshold kW or the number of estimated lots or businesses are not built, sold, and occupied, Customer will pay Company an amount (the "Under Utilization Charge") equal to the difference between the CIAC amount paid under Article I and the

amount of any recalculated CIAC, including any applicable taxes, determined under the preceding Subparagraph A of Article IV. Customer shall pay any such Under Utilization Charge within 15 days after Company deposits an invoice for such amount, addressed to Customer, in the U.S. mail.

C.       Article IV only applies to standard electrical facilities.


# ARTICLE V.  GENERAL PROVISION


Customer understands and agrees that Company shall retain title to, own, and control all electric facilities up to the point of delivery that are extended, installed, or modified under this Agreement. Company may use any such facilities to serve other customers when Company Determines that it is feasible to do so. Customer also understands that the delivery of service is not governed by this Agreement, but the delivery of electricity procured by customer will be provided in accordance with Company's Tariff and any subsequent amendments thereto. Customer understands that Company is not a generator, power marketer, or retail electric provider and therefore Company will not procure, generate, or supply power to Customer.   Customer accepts responsibility for selecting, enrolling and contracting with a retail electric provider of Customer's choice. The Company does not assume any responsibility associated with Customer's equipment used or the methods employed for the installation and/or maintenance thereof.

This Agreement supersedes all prior agreements between the Company and the Customer for service mentioned herein and all representations, promises or other inducements, written or verbal, made with respect to the matters herein contained.  This Agreement shall not be assignable by Customer without the written consent of the Company. This Agreement is not binding upon Company until executed by one of its authorized representatives.

# ARTICLE VI. SECURITY


In accordance with the Company's Tariff, Customer must furnish surety in the amount of $450,000.00 in a form acceptable to Company. The amount of the surety shall be equal to the Standard Allowance used to calculate the initial CIAC. The surety instrument may be a bond, letter of credit ("LOC") or other security acceptable to Company and shall survive the expiration of this Agreement.  Such surety instrument must be for a term of 48 months (the "Security Term") from the Initial Date. Company may, but is not required to, accept a LOC of a shorter term provided that such LOC is renewed annually for the length of the Security Term. If a LOC or other security instrument is terminated, canceled or withdrawn, or if Company receives notice that the LOC or other security instrument will not be renewed, the Customer will be considered to be in immediate breach. In addition to any other remedies permitted at law, Company may recalculate the CIAC amount, including applicable taxes, as set forth in Article IV as of the date of breach.  Any difference between the initial CIAC and the revised CIAC, including applicable taxes, will be due within 15 days of Company's mailing of an invoice to Customer as described in Article IV. Thereafter, Company may execute or draw on said LOC or other surety prior to the expiration of such LOC/surety and/or the Agreement. Any surety instrument/LOC shall be non-cancelable; however, the face amount of the instrument may be reduced each year when approved by the Company.  The surety instrument/LOC may not be replaced with other surety without consent of the Company.

# ARTICLE VII.  FORCE MAJEURE


The Company shall not be liable for damages occasioned by interruptions or failure to commence delivery or unsatisfactory service caused by an Act of God or the public enemy, inevitable accidents, fire, explosions, strikes, riots, war, delay in receiving shipments of required material, order of any court or judge granted in any bona fide adverse legal proceedings or

action, or any order of any commission or tribunal having jurisdiction in the premises; or, without limitation by the preceding enumeration, any other act or thing reasonably beyond its control or incident to interruptions necessary for repairs or changes in the Company's generating equipment, lines or other electric facilities.

## ARTICLE VIII. SPECIAL PROVISIONS

1.  Notices -- Notices given under this Agreement are deemed to have been duly delivered if hand delivered, Currier Service or sent by United States certified mail, return receipt requested, postage prepaid, to:

    a.  If to Company:

        Jonathan Lozano,
        Texas New-Mexico Power Company
        1126 Stafford Blvd
        P. O. Drawer 1960
        Pecos, Texas 79772

    b.  If to Customer:

        Weston Adams
        Core Scientific Inc.
        2800 Northup Way, #220
        Bellevue, WA 98004

    c.  The above-listed names, titles, and addresses of either Party may be changed by written notification to the other.

2.  Company shall provide one primary meter Points of Delivery (POD) located approximately at the edge of TNMPs Cedarvale Substation property as required by Customers site plan. TNMP will commence design and determine the final locations of the PODs upon coordination with Customer and delivery of Customer site plans suitable to determine the appropriate location. The final POD location as required by Customer, may require additional security to be provided , Customer and Company will coordinate any additional security as needed.

3.  Customer shall provide all necessary facilities on the load side of the point of delivery.

4.  Company shall use reasonable efforts to construct the PODs within 12 weeks from the effective date of this agreement or 4 weeks from determination of the POD locations, whichever is longer.

5.  Customer agrees to maintain a Power Factor of ninety-five percent (95%) lagging or greater as measured at the COMPANY service tap station meter. If Customer does not maintain a Power Factor of ninety-five percent (95%), and Customer does not correct its Power Factor within 30 days of receipt of notice from Company, Company may install equipment on the Delivery System necessary to correct the Customer Power Factor.  In the event Company installs such equipment, Customer shall reimburse Company for all reasonable costs and expenses related to the procurement and installation of such equipment within thirty (30) days after receipt of Company's invoice therefor.

6.  The Customer shall design, install, construct, operate and maintain the Customer Facilities and its other electrical equipment in compliance with the Company Tariff and Applicable Legal and Electrical Requirements.

7.  This Agreement does not provide for interconnection of generation to Company's system or interconnection for any purpose other than for Company to provide retail delivery service.

8.  Customer's full connected future load is estimated to be 22.5 MW by 2022 and will coordinate load additions in excess with Company.

**CORE SCIENTIFIC, INC.**

By (Print): Weston Adams

Signature: _____

Title: CCO

Date: 8/19/2021

**TEXAS-NEW MEXICO POWER COMPANY**

By (Print): Keith Nix

Signature: _____

Title: Vice President

Date: 8/20/2021

## TEXAS-NEW MEXICO POWER COMPANY

**ELECTRIC FACILITIES EXTENSION AGREEMENT**

Contract No. _____
Project/Year_____
Customer Account No:_____

This Agreement is made by and between Texas-New Mexico Power Company, a Texas Corporation (Company) and Core Scientific, Inc.,hereafter called (Customer) for the extension of Company's Electric Transmission and Distribution System facilities to the following location:

Location described by GPS Coordinates as:  approximately  31°32'42.03"N, 103°49'36.14"W in Reeves County, Texas, at the end of TNMPs existing line extension.

Customer's mailing address is:

2800 Northup Way, #220
Bellevue,  WA 98004

Customer Has Requested Extension Of Service For The Following: [Check All That Apply]

___     **Standard Electric Facilities for Loads Less Than 12kW**

Company will extend its standard electric facilities that it determines are necessary to serve ____ Residential lot(s) or business (es).  The character of these facilities is generally identified as _____ volt, _____ phase, alternating current, at 60 hertz, with reasonable variation permitted.

__X__     **Standard Electric Facilities for Loads Greater Than 12kW**

Company will extend its standard electric facilities that it determines are necessary to serve Customer's demand requirement of 8,850kW ("Threshold kW").  The character of these facilities is generally identified as 24,940 volts, 3 phase, alternating current, at 60 hertz, with reasonable variation permitted.

___     **Non-Standard Electric Facilities**

Company will extend, install, or modify the following non-standard electric facilities:

_____
_____
_____
_____

## ARTICLE I.  TARIFF

As approved by, and filed with, the Public Utility Commission of Texas (or its successor), the Company's current tariff (Tariff) will apply to this Agreement and for the class of service applicable to Customer's request. Both Company and Customer acknowledge and accept that the Tariff imposes obligations and limitations on both the Company  and Customer.  This Agreement, including the applicable Tariff, shall at all times be subject to change or modification by regulatory authority or other change in law. A copy of Company's current Tariff may be obtained from Company on request.

## ARTICLE II. CUSTOMER PAYMENT AND COMMITMENTS

Customer will pay a Contribution-In-Aid-Of-Construction (CIAC) to Company of $0.00 as payment f o r Customer's portion of the facility extension, installation, or modification costs in accordance with Company's Tariff. Per the Tariff the CIAC was calculated based on the following: CIAC = (Project Investment of 1,000,000.00 minus Standard Allowance of $1,000,000.00) plus Applicable Taxes of $0.00. Such payment is due within 15 days following Company's mailing, first class, an invoice to Customer at:

Core Scientific Inc.
2800 Northup Way, #220
Bellevue, WA 98004

or such other billing address provided to Company by the Customer. Such non-refundable payment will remain the property of the Company.

The Customer will provide, without cost to Company, all rights-of-way (in a form acceptable to Company), permits and suitable space for the installation of poles, wires, transformers, meters, and such other equipment Company deems necessary to enable it to deliver the power and energy herein described.

The Customer will install and maintain in good working condition at all times adequate protection and protective devices for his electric motors and other equipment against overload, low voltage, single-phasing, and similar risks or hazards incident to the use of electricity. The Customer assumes all responsibility for the electric current upon the Customer's side of the point of delivery, and for the wires, apparatus, and appurtenances used in connection therewith. In addition to the terms of the Tariff, Customer will protect and save the Company harmless from all claims for injury or damage to persons or property occurring upon the Customer's side of such point of delivery, occasioned by such electric current or said wire and apparatus, except where said injury or damage shall be shown to have been occasioned solely by the negligence of the Company. In no event shall the Company be responsible for consequential damages whether or not found to have negligently caused injury to Customer.

## ARTICLE III. TERM

This Agreement shall expire three (3) years (the "Term") from the date agreement is executed. The Initial Date is the date this agreement is executed. Customer's payment obligations shall survive expiration of this Agreement.

## ARTICLE IV.  UNDER UTILIZATION CHARGE

A.    Based on estimated information provided by the Customer, Company calculated the CIAC amount referenced in Article II above. Such estimated information included, but was not limited to, the Threshold kW and the number of lots or businesses to be built, sold, and occupied. Company will review actual load or the number of lots or businesses at the pertinent location to evaluate the accuracy of the information supplied by Customer. At the end of the Term, the Company will recalculate the CIAC amount if the estimated Threshold kW billing demand for the designated location has not been realized or the estimated number of lots or businesses have not been built, sold, and occupied. The CIAC amount, including applicable taxes, will be recalculated based on the actual kW billing demand achieved or the actual number of lots or businesses built, sold, and occupied at the time of the recalculation. Company may also make such recalculation in the event of a breach during the Term.

B.    If Customer does not realize the estimated Threshold kW or the number of estimated lots or businesses are not built, sold, and occupied, Customer will pay Company an amount (the "Under Utilization Charge") equal to the difference between the CIAC amount paid under Article I and the

amount of any recalculated CIAC, including any applicable taxes, determined under the preceding Subparagraph A of Article IV. Customer shall pay any such Under Utilization Charge within 15 days after Company deposits an invoice for such amount, addressed to Customer, in the U.S. mail.

C.        Article IV only applies to standard electrical facilities.

# ARTICLE V.  GENERAL PROVISION

Customer understands and agrees that Company shall retain title to, own, and control all electric facilities up to the point of delivery that are extended, installed, or modified under this Agreement. Company may use any such facilities to serve other customers when Company Determines that it is feasible to do so. Customer also understands that the delivery of service is not governed by this Agreement, but the delivery of electricity procured by customer will be provided in accordance with Company's Tariff and any subsequent amendments thereto. Customer understands that Company is not a generator, power marketer, or retail electric provider and therefore Company will not procure, generate, or supply power to Customer.   Customer accepts responsibility for selecting, enrolling and contracting with a retail electric provider of Customer's choice. The Company does not assume any responsibility associated with Customer's equipment used or the methods employed for the installation and/or maintenance thereof.

This Agreement supersedes all prior agreements between the Company and the Customer for service mentioned herein and all representations, promises or other inducements, written or verbal, made with respect to the matters herein contained. This Agreement shall not be assignable by Customer without the written consent of the Company. This Agreement is not binding upon Company until executed by one of its authorized representatives.

# ARTICLE VI. SECURITY

In accordance with the Company's Tariff, Customer must furnish surety in the amount of $1,000,000.00 in a form acceptable to Company. The amount of the surety shall be equal to the Standard Allowance used to calculate the initial CIAC. The surety instrument may be a bond, letter of credit ("LOC") or other security acceptable to Company and shall survive the expiration of this Agreement.  Such surety instrument must be for a term of 48 months (the "Security Term") from the Initial Date. Company may, but is not required to, accept a LOC of a shorter term provided that such LOC is renewed annually for the length of the Security Term. If a LOC or other security instrument is terminated, canceled or withdrawn, or if Company receives notice that the LOC or other security instrument will not be renewed, the Customer will be considered to be in immediate breach. In addition to any other remedies permitted at law, Company may recalculate the CIAC amount, including applicable taxes, as set forth in Article IV as of the date of breach.  Any difference between the initial CIAC and the revised CIAC, including applicable taxes, will be due within 15 days of Company's mailing of an invoice to Customer as described in Article IV. Thereafter, Company may execute or draw on said LOC or other surety prior to the expiration of such LOC/surety and/or the Agreement. Any surety instrument/LOC shall be non-cancelable; however, the face amount of the instrument may be reduced each year when approved by the Company.  The surety instrument/LOC may not be replaced with other surety without consent of the Company.

# ARTICLE VII.  FORCE MAJEURE

The Company shall not be liable for damages occasioned by interruptions or failure to commence delivery or unsatisfactory service caused by an Act of God or the public enemy, inevitable accidents, fire, explosions, strikes, riots, war, delay in receiving shipments of required material, order of any court or judge granted in any bona fide adverse legal proceedings or

action, or any order of any commission or tribunal having jurisdiction in the premises; or, without limitation by the preceding enumeration, any other act or thing reasonably beyond its control or incident to interruptions necessary for repairs or changes in the Company's generating equipment, lines or other electric facilities.

## ARTICLE VIII. SPECIAL PROVISIONS

1.  Notices -- Notices given under this Agreement are deemed to have been duly delivered if hand delivered, Currier Service or sent by United States certified mail, return receipt requested, postage prepaid, to:

    a.  If to Company:

        Jonathan Lozano,
        Texas New-Mexico Power Company
        1126 Stafford Blvd
        P. O. Drawer 1960
        Pecos, Texas 79772

    b.  If to Customer:

        Weston Adams
        Core Scientific Inc.
        2800 Northup Way, #220
        Bellevue, WA 98004

    c.  The above-listed names, titles, and addresses of either Party may be changed by written notification to the other.

2.  Company shall provide four primary meter Points of Delivery (POD) located approximately at the edge of TNMPs Cottonwood Substation property as required by Customers site plan. TNMP will commence design and determine the final locations of the PODs upon coordination with Customer and delivery of Customer site plans suitable to determine the appropriate location. The final POD location as required by Customer, may require additional security to be provided , Customer and Company will coordinate any additional security as needed.

3.  Customer shall provide all necessary facilities on the load side of the point of delivery.

4.  Company shall use reasonable efforts to construct the PODs within 12 weeks from the effective date of this agreement or 4 weeks from determination of the POD locations, whichever is longer.

5.  Customer agrees to maintain a Power Factor of ninety-five percent (95%) lagging or greater as measured at the COMPANY service tap station meter. If Customer does not maintain a Power Factor of ninety-five percent (95%), and Customer does not correct its Power Factor within 30 days of receipt of notice from Company, Company may install equipment on the Delivery System necessary to correct the Customer Power Factor.  In the event Company installs such equipment, Customer shall reimburse Company for all reasonable costs and expenses related to the procurement and installation of such equipment within thirty (30) days after receipt of Company's invoice therefor.

6.  The Customer shall design, install, construct, operate and maintain the Customer Facilities and its other electrical equipment in compliance with the Company Tariff and Applicable Legal and Electrical Requirements.

7.  This Agreement does not provide for interconnection of generation to Company's system or interconnection for any purpose other than for Company to provide retail delivery service.

8.  Customer's full connected future load is estimated to be 35MW on Transformer T2 and 45MW on Transformer T3 MW by 2022 and will coordinate load additions in excess with Company.

**CORE SCIENTIFIC, INC.**

By (Print): _____Weston Adams_____

Signature: _____

Title: __CCO_____

Date: __8/19/2021_____

**TEXAS-NEW MEXICO POWER COMPANY**

By (Print): _____Keith Nix_____

Signature: _____

Title: __Vice President_____

Date: __8/20/2021_____