Hearing Date: Court's Earliest Convenience on or After November 9, 2022
Objection Deadline: November 4, 2022

**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
David J. Lender
Ronit J. Berkovich
Theodore E. Tsekerides

*Counsel to Core Scientific, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------------x
In re                                    :    Chapter 11
                                         :
CELSIUS NETWORK LLC, et al.,             :    Case No. 22-10964 (MG)
                                         :
              Debtors. 1                 :    (Jointly Administered)
-----------------------------------------------------------------x
```

### NOTICE OF HEARING ON CORE SCIENTIFIC, INC.'S MOTION (I) TO COMPEL IMMEDIATE PAYMENT OF ADMINISTRATIVE EXPENSES, AND (II)(A) FOR RELIEF FROM AUTOMATIC STAY TO EXERCISE RIGHTS UNDER MASTER SERVICES AGREEMENT AND RELATED ORDERS, OR (B) IN THE ALTERNATIVE, TO COMPEL ASSUMPTION OR REJECTION OF MASTER SERVICES AGREEMENTAND RELATED ORDERS

**PLEASE TAKE NOTICE** that a hearing on Core Scientific, Inc.'s *Motion (I) To Compel*

*Immediate Payment of Administrative Expenses and (II)(A) For Relief from Automatic Stay to*

---

1 The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

*Exercise Rights Under Master Services Agreement and Related Orders or (B) In the Alternative, to Compel Assumption or Rejection of Master Services Agreement and Related Orders* (the "**Motion**") will be held **at the Court's earliest convenience on or after November 9, 2022** (the "**Hearing**").[2]  In accordance with General Order M-543 dated March 20, 2020, the Hearing will be conducted remotely using Zoom for Government. Parties wishing to appear at the Hearing, whether making a "live" or "listen only" appearance before the Court, need to make an electronic appearance through the Court's website at https://ecf.nysb.uscourts.gov/cgi-bin/nysbAppearances.pl.

    **PLEASE TAKE FURTHER NOTICE** that any responses or objections to the relief requested in the Motion shall: (a) be in writing; (b) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York; (c) be filed electronically with the Court on the docket of In re Celsius Network LLC, No. 22-10964 (MG) by registered users of the Court's electronic filing system and in accordance with all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York (which are available on the Court's website at http://www.nysb.uscourts.gov); and (d) be served so as to be actually received by **November 4, 2022,**[3] by (i) the entities on the Master Service List available on the case website of

---

[2] On October 19, 2022, this Court entered the *Joint Stipulation and Agreed Scheduling Order By and Among the Debtors, the Official Committee of Unsecured Creditors, and Core Scientific, Inc. With Respect to Schedule* (ECF No. 1114) (the "**Scheduling Stipulation Order**").  Pursuant to the Scheduling Stipulation Order, Core Scientific Inc. agreed to (i) file the Motion by October 19, 2022 and (ii) a hearing on the Motion at the Court's earliest convenience on or after November 9, 2022.

[3] Pursuant to the Scheduling Stipulation Order, the UCC and the Debtors agreed to file a response to the Motion by November 4, 2022.

the above-captioned debtors and debtors in possession (the "Debtors") at https://cases.stretto.com/celsius and (ii) any person or entity with a particularized interest in the subject matter of the Motion.

      **PLEASE TAKE FURTHER NOTICE** that only those responses or objections that are timely filed, served, and received will be considered at the Hearing. Failure to file a timely objection may result in entry of a final order granting the Motion as requested by Core Scientific, Inc.

      **PLEASE TAKE FURTHER NOTICE** that copies of the Motion and other pleadings filed in these chapter 11 cases may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/celsius. You may also obtain copies of the Motion and other pleadings filed in these chapter 11 cases by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

Dated: October 19, 2022
New York, New York

                                               */s/    Ray C. Schrock, P.C.*

                                            WEIL, GOTSHAL & MANGES LLP
                                            767 Fifth Avenue
                                            New York, New York 10153
                                            Telephone:  (212) 310-8000
                                            Facsimile:  (212) 310-8007
                                            Ray C. Schrock, P.C.
                                            David J. Lender
                                            Ronit J. Berkovich
                                            Theodore E. Tsekerides

                                            *Counsel to Core Scientific, Inc.*

**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
David J. Lender
Ronit J. Berkovich
Theodore E. Tsekerides

*Counsel to Core Scientific, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
```
| | | |
|---|---|---|
| In re | : | **Chapter 11** |
| | : | |
| **CELSIUS NETWORK LLC,** *et al.*, | : | **Case No. 22-10964 (MG)** |
| | : | |
| **Debtors.** [1] | : | **(Jointly Administered)** |

```
------------------------------------------------------------x
```

**MOTION OF CORE SCIENTIFIC, INC. (I) TO COMPEL IMMEDIATE PAYMENT
OF ADMINISTRATIVE EXPENSES AND (II)(A) FOR RELIEF FROM AUTOMATIC
STAY TO EXERCISE RIGHTS UNDER MASTER SERVICES AGREEMENT AND
RELATED ORDERS OR (B) IN THE ALTERNATIVE, TO COMPEL ASSUMPTION
OR REJECTION OF MASTER SERVICES AGREEMENT AND RELATED ORDERS**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................1

FACTS .....................................................................................................................5

RELIEF REQUESTED.................................................................................................5

JURISDICTION AND VENUE ....................................................................................6

ARGUMENT .............................................................................................................7

I.     CORE IS ENTITLED TO IMMEDIATE PAYMENT OF ITS ALLOWED
ADMINISTRATIVE EXPENSE CLAIMS PURSUANT TO SECTIONS 503(A)
AND 503(B)(1)(A) OF THE BANKRUPTCY CODE ....................................................7

     A.     The PPT Charges Result from a Direct Transaction with the Debtor.....................9

     B.     The Debtor's Estate Benefited Directly from the Power Used to Run Its
Machines ...................................................................................................9

     C.     Core is Entitled to the Immediate Payment of its Allowed Administrative
Expense Claims.........................................................................................11

II.     CAUSE EXISTS TO GRANT CORE RELIEF FROM THE AUTOMATIC
STAY TO EXERCISE ITS RIGHTS AND REMEDIES UNDER THE
AGREEMENT .....................................................................................................17

     A.     The Automatic Stay Does Not Require Core to Continue to Perform Under
the Agreement...........................................................................................17

     B.     Cause Exists to Lift the Stay to Allow Core to Exercise All Rights Under
the Agreement ..........................................................................................17

          i.    A Balancing of Harms Supports Lifting the Stay ...........................................20

          ii    Lifting the Stay is Necessary to Avoid Creating New Rights for
Celsius and Taking Away Core's Rights ...............................................24

          iii.  Celsius's Bad Faith Actions in Connection with the Agreement
Support Lifting the Stay......................................................................30

III.    TIMELY ASSUMPTION OR REJECTION OF THE AGREEMENT IS
WARRANTED .....................................................................................................32

     A.     The Debtors Conceded the Importance of the Agreement to their Business........34

B.      Core is Disproportionally Harmed by the Debtor's Nonperformance...................35

C.      The Nature of the Interest at Stake Favors Finality ................................................37

NOTICE.................................................................................................................................38

CONCLUSION.......................................................................................................................39

Core Scientific, Inc. ("**Core**"), by and through its undersigned counsel, hereby files this motion (the "**Motion**") and respectfully states as follows:

## PRELIMINARY STATEMENT

1.      Core and Celsius Mining LLC ("**Celsius**" or the "**Debtor**", and together with the above captioned debtors, the "**Debtors**") entered into an agreement, dated December 18, 2020 (the "**MSA**"), and related work orders ("**Orders**," together with the MSA, the "**Agreement**") for Core to host Celsius's cryptocurrency mining equipment at Core's data centers and provide certain "Services" to Celsius in connection therewith (the "**Services**").  The Agreement included several provisions that were important to Core, including:

- Core's right to pass through to Celsius any increases in utility tariffs (the "**PPT Charges**"), i.e., any increased electricity costs, *see Core Objection* ¶¶ 14–24, 34–44, 69–76;

- Core's ability to exit the business relationship at any time for any reason by capping Core's liability to Celsius for any damages at one month's fee (the "**Effective Termination Right**"), *see id.* at ¶ 53; and

- Core's right to terminate the Agreement due to Celsius's failure to pay any amounts due thereunder, *see id.* at ¶¶ 51–52, as well as its right to exercise the following remedies in the event of a Celsius breach of the Agreement: (i) suspend the provision of Services; (ii) disconnect Celsius's equipment and store it; (iii) declare all amounts due under the applicable Order through the balance of the Term to be immediately due and payable; (iv) operate Celsius's equipment for cryptocurrency mining and other activities at Core's sole discretion and direct all resulting proceeds to Core's own account until Core has recovered all amounts due, including, without limitation, any reinstatement, disconnection, or store fees and costs; (v) terminate the Agreement and all Orders; and (vi) exercise all other rights under the Agreement, at law, in equity or otherwise.  *See* MSA (Pratt Decl. Ex. A), § 4(d).

2.      These same provisions or ones that are substantially similar appear in almost all of Core's customer agreements.  *See* Pratt Decl. ¶ 8.  These terms are fundamental to Core's hosting business.  *Id.*

3.      Core has relied on these provisions in its dealings with Celsius and other customers. For example, it added PPT Charges to its customers' invoices, including Celsius, starting in October 2021 and ending in April 2022 due to actions from its utility companies. *See Core Objection* ¶ 36. Celsius paid those without objection. *Id.* at ¶ 36. More recently, Core passed through PPT Charges to customers due to the skyrocketing increase in electricity prices beginning in May 2022; such charges first appeared on June 2022 invoices. *See id.* at ¶¶ 40–42. In addition, it recently relied on the Effective Termination Right in a customer contract to exit that business relationship. *See id.* at ¶¶ 44, 53. As Core considers the future of its hosting business in today's climate, the existence of the Effective Termination Right in its customer contracts is an important consideration. *See id.* at ¶ 53.

4.      It is well-known that companies in the cryptocurrency business have experienced financial distress since May 2022, fall-out from the so-called "crypto winter" when the prices of Bitcoin and other cryptocurrencies dropped significantly. The price of a Bitcoin remains at a fraction of what it was about a year ago. Crypto mining companies, which require substantial power to operate their machines, have experienced additional headwinds due to high electricity power prices. Due to these industry woes, Core has suffered a decrease in liquidity and value, as its share price has declined by more than 80% in the last six months or so.

5.      As part of its hosting business, Core stays in frequent communications with its customers, including Celsius, discussing issues relating to deployment, available power, and power prices. *See* Xia Decl. ¶ 8; Pratt Decl. ¶ 18. At times, Core turns off its customers' machines when the pricing of power increases and the customers do not want to pay the high electricity costs associated with mining during those periods. *See* Xia Decl. ¶ 8. When Core experienced unexpected difficulties at its facilities in the past year resulting from COVID-19, significant supply

chain disruptions, a severe winter storm, permitting issues, power transformer issues, and power procurement issues, it kept Celsius well-informed about how these events would impact the deployment of its machines. *See Core Objection* ¶ 29.

6.      A few months after the Debtor filed for chapter 11, it decided to put forth a novel interpretation of its Agreement to try to extract value out of Core. Even though prepetition it paid the increased tariffs associated with increased power costs charged by utilities as passed through by Core, it changed its position postpetition and now claims that tariffs do not include utility tariffs. Celsius did not care that this interpretation makes no sense in the context of the Agreement and industry, the frequent communications between Core and Celsius relating to these issues, and their course of dealing on this issue for almost a year. Having found a new interpretation for an old concept, Celsius abruptly stopped paying the PPT Charges in September and clawed back postpetition PPT Charges it paid in August by unilaterally crediting those amounts against its September invoice. *See id.* at ¶ 43.

7.      It gets worse. Not only did Celsius use a new and twisted interpretation of the Agreement to stop paying the PPT Charges that all of Core's other customers have paid (except for one whose contract is being terminated), and that Celsius previously paid without objection, but it also filed the *Debtors' Motion to Enforce the Automatic Stay and for Civil Contempt* (the "**Contempt Motion**") on September 28, 2022 (ECF No. 917), arguing that Core is violating the automatic stay by including the PPT Charges on its invoices, among other baseless contentions. The Contempt Motion also asserts that Core agreed to host an unlimited number of Celsius machines and prioritize deploying those machines over Core's own machines (the "**Additional Hosting Dispute**"). The Contempt Motion and accompanying declaration are misleading; they misstate certain critical facts and omit others. *See Core Objection*.

3

8.      The evidence demonstrates that Core's interpretation of the Agreement is correct.
If the Court rules in Core's favor on the Contempt Motion, Celsius may pay Core the past due
postpetition PPT Charges and may timely pay the PPT Charges going forward, as Celsius has been
paying its undisputed postpetition invoices.  However, given the games Celsius has been playing
with Core relating to the Agreement, Core cannot be certain what Celsius will do.  Accordingly,
Core is seeking immediate payment of its administrative expense claims for overdue PPT Charges
and an order compelling Celsius to pay timely all other amounts due under the Agreement for
postpetition services, including PPT Charges.

9.      Core's liquidity and overall financial condition deteriorate each month that goes by
without Celsius paying the PPT Charges while Core continues to perform its side of the
Agreement.  *See Core Objection* ¶¶ 61, 117.  Core is losing approximately $1.65 million per month
subsidizing Celsius's business.  *See id.* at ¶ 63; Pratt Decl. ¶ 50.  It is effectively being forced to
provide an interest-free, unsecured debtor-in-possession loan to the Debtors.  It cannot continue to
do this in perpetuity while its own finances suffer due to industry-wide headwinds.  It is not fair
or appropriate for Celsius to be treated differently than all of Core's other customers, which are
paying the PPT Charges, and the case law does not support Core continuing to perform for Celsius
while Celsius does not compensate Core appropriately.

10.     Core also seeks to lift the automatic stay (to the extent it applies) to allow it to
exercise any and all rights and remedies under the Agreement, including the Effective Termination
Right.  This is especially important in the event the Court rules against Core on the PPT Charges
issue or the Additional Hosting Dispute.  Celsius agreed prepetition to an agreement where it was
always subject to Core exercising a right to exit the business relationship, for any reason
whatsoever, in exchange for paying damages of no more than one month's worth of fees.

4

Conversely, Core did not agree to provide services to Celsius indefinitely no matter how bad the business deal became for Core. The case law is clear that Celsius's contractual rights under the Agreement do not increase as a result of its bankruptcy filing. Accordingly, cause exists to modify the automatic stay to protect Core's contractual rights.

11.    If the Court does not grant Core's request to lift the stay, Core requests that the Court order Celsius to assume or reject the Agreement by November 30, 2022. Core is being prejudiced from having to continue to perform while Celsius is not performing its end of the bargain. As Celsius's position contributes to Core's deteriorating liquidity, Core needs to make strategic decisions about its business, and there is no reason why Celsius cannot make a decision by that time on the Agreement.

12.    The three forms of relief sought in this Motion work together to ensure Celsius does not use its bankruptcy as a weapon to tilt the scales in its favor well beyond what is contemplated by the Bankruptcy Code, rewrite the parties' commercial agreement, and drive Core into financial distress.

## FACTS

13.    Core incorporates by reference the facts set out in Core Scientific, Inc.'s Objection to Debtors' Motion to Enforce the Automatic Stay and for Civil Contempt (the "**Core Objection**"), filed contemporaneously herewith.[2]

## RELIEF REQUESTED

14.    By this Motion, Core requests that the Court enter an order (i) compelling Celsius to pay Core's allowed administrative expenses pursuant to 11 U.S.C. § 503(b)(1)(A) immediately, including interest on past due amounts calculated at the rate set forth in section 3(a) of the MSA,

---

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Core Objection.

and to pay timely for all Services that Celsius is receiving under the Agreement pursuant to the terms of the Agreement and (ii)(a) granting Core relief from the automatic stay pursuant to 11 U.S.C. § 362(d) to exercise all of its rights under the Agreement, including the Effective Termination Right or (b) in the alternative, compelling Celsius to assume or reject the Agreement by November 30, 2022 pursuant to 11 U.S.C. § 365(d).

15.     A proposed form of order granting the relief requested herein is attached hereto as **Exhibit A** (the "**Proposed Order**").

## JURISDICTION AND VENUE

16.     The United States Bankruptcy Court for the Southern District of New York (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the Southern District of New York, dated January 31, 2012.

17.     This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Core confirms its consent to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

18.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

19.     The statutory bases for the relief requested herein are §§ 362(d), 365(d)(2), 503(a), 503(b)(1)(A), and 507(a)(2) of title 11 of the United States Code (the "**Bankruptcy Code**").

## ARGUMENT

**I.    CORE IS ENTITLED TO IMMEDIATE PAYMENT OF ITS ALLOWED ADMINISTRATIVE EXPENSE CLAIMS PURSUANT TO SECTIONS 503(A) AND 503(B)(1)(A) OF THE BANKRUPTCY CODE**

20.     The law relating to the payment of administrative expense claims is not complicated.  In short, section 503(b) of the Bankruptcy Code provides for the priority payment

of nine enumerated categories of allowable administrative expenses.  11 U.S.C. § 503(b).  The

underlying purpose of section 503 is to incentivize third parties to provide necessary goods and

services to a debtor in exchange for administrative expense priority.  *See In re Adelphia Bus. Sols.,*

*Inc.*, 296 B.R. 656, 663 (Bankr. S.D.N.Y. 2003).

21.    One of the categories of administrative expenses permitted under the Bankruptcy

Code are the "the actual, necessary costs and expenses of preserving the estate."  11 U.S.C.

§ 503(b)(1)(A).   Courts reward administrative expense status to transactions incurred in the

ordinary course of business where the estate received a postpetition benefit.  *See e.g., Food Emp'rs*

*Labor Rels. Ass'n v. A&P*, 620 F. App'x 31, 33 (2d Cir. 2015) (noting that courts recognize

administrative expenses that arise from a transaction between a creditor and debtor to the extent

the benefit was "both supplied to and beneficial to" the debtor); *In re Crystal Apparel, Inc.*, 220

B.R. 816, 830 (Bankr. S.D.N.Y. 1998) (providing that transactions in the ordinary course of a

debtor's business are expenses of administration).   Creditors carry the burden of proving

entitlement to administrative expense priority.  *Supplee v. Bethlehem Steel Corp. (In re Bethlehem*

*Steel Corp.)*, 479 F.3d 167, 172 (2d Cir. 2007).

22.    When determining whether an expenditure constitutes an "actual and necessary"

expense under section 503(b)(1)(A) of the Bankruptcy Code, courts assess (i) whether the expense

arose from a transaction between the creditor and the debtor and (ii) whether the benefit supporting

a right to payment was both supplied to and beneficial to the debtor's estate in the operation of its

business.  *See Bethlehem Steel Corp.*, 479 F.3d at 172 (reciting the two-factor test); *In re Ames*

*Dep't Stores, Inc.*, 306 B.R. 43, 55 n.28 (Bankr. S.D.N.Y. 2004) (collecting cases applying this

two-factor test).  The first factor examines the question of when (pre or postpetition) and with

whom (the debtor or pre-debtor) a transaction arose, while the second factor focuses on the nature

of the transaction.  *See Adelphia*, 296 B.R. at 663 n.8 (stating that under this factor, "[t]he emphasis is on when, and with whom, the transaction took place, as compared and contrasted to the nature of the 'transaction'").

23.    In this case, Celsius does not appear to dispute that Core is entitled to administrative expense claim status for postpetition Services Core provides to Celsius under the Agreement. Other than the PPT Charges, which are in dispute, Celsius has been paying the amounts Core has invoiced for postpetition Services.  As discussed above and more fully in the Core Objection, the Agreement unambiguously requires the Debtor to pay PPT Charges for Services based on Core's right to pass through increased electricity tariffs.  On this issue, Core incorporates by reference the arguments set forth in the Core Objection.  *Core Objection* ¶¶ 69–76.

24.    Similarly, Core believes Celsius may actually pay the postpetition PPT Charges if the Court determines they are due and owing under the Agreement.  To ensure, however, that Celsius immediately pays all past due postpetition amounts and timely pays all such amounts as they become due in the ordinary course of business, Core seeks an order compelling the Debtor to do so.  If the Court agrees with Core's interpretation of the Agreement, there can be no genuine dispute that Core is entitled to an administrative expense for the PPT Charges.

25.    If Celsius commits now to paying timely the postpetition PPT Charges (past and ongoing) in the event the Court determines they are appropriate under the Agreement, Core can withdraw this request for relief.

### A.  The PPT Charges Result from a Direct Transaction with the Debtor

26.    When determining whether an expense arose from a transaction with the debtor (*i.e.*, the first factor), courts assess when the transaction occurred to determine whether it is a

postpetition transaction.[3]  Here, it is irrefutable that the PPT Charges for postpetition Services arise

from a postpetition transaction with the Debtor.  *See* Pratt Decl. ¶ 51.  To be clear, Core is not

seeking payment as an administrative expense of the PPT Charges relating to Services provided

prior to July 13, 2022, the petition date.  Thus, this prong is clearly satisfied.

### B.   The Debtor's Estate Benefited Directly from the Power Used to Run Its Machines

27.    Under the second factor, administrative expense claimants must show that the

proposed administrative expense is tied to a postpetition benefit that was beneficial to the estate in

the operation of its business.  *See In re Patient Educ. Media*, 221 B.R. 97, 101–04 (Bankr. S.D.N.Y.

1998) (granting a nondebtor's request for an administrative expense where the debtor willingly

used a nondebtor's property for the benefit of the estate).

28.    A benefit to the estate is generally found when either (i) the debtor induced a

nondebtor to perform postpetition or (ii) the nondebtor performed under an executory contract

prior to rejection.  *Id.* at 101.  In *Patient Educ.*, the court found that a nondebtor's performance

under an executory contract provided a benefit to the estate, because the debtor knowingly and

willingly used the counterparty's storage facility to maximize the estate's value and did nothing to

dissuade the counterparty's postpetition performance.  *Id*. at 101–04.  The court concluded that the

counterparty was entitled to an administrative expense for the complete rental period and further

noted that whether the debtor profited from the transaction was not a relevant factor.  *Id*. at 103.[4]

---

[3] *See, e.g., Bethlehem Steel*, 479 F.3d at 172–75 (holding that prepetition accrued benefits that did not come due until after the petition date cannot be given administrative expense status because the claim did not arise from a transaction with the debtor); *Route 21 Assocs. of Belleville v. MHC, Inc.*, 486 B.R. 75, 92 (S.D.N.Y. 2012), *aff'd*, 542 F. App'x 41 (2d Cir. 2013) (holding that the nondebtor's postpetition costs did not arise out of a postpetition transaction with the debtor because the benefit supporting the expense was provided prepetition).

[4] *See also In re ATP Oil & Gas Corp.*, 2014 WL 1047818, at *4 (Bankr. S.D. Tex. Mar. 18, 2014) (holding that a creditor that provided services requested by the debtor-in-possession was entitled to an administrative expense claim and rejecting the argument that a vendor must independently determine whether there is a benefit, expressing concern that such a rule would chill vendors' willingness to provide goods and services to debtors-in-possession "and ultimately, frustrate the goal of rehabilitation") (citing *Patient Educ.*, 221 B.R. at 103).

29.    Courts can find a benefit to the estate even where the estate did not profit.  *See In re Klein Sleep Prods., Inc.*, 78 F.3d 18, 26 (2d Cir. 1996) (holding that the debtor's profit or loss from the transaction was not a relevant factor in determining if an expense was entitled to administrative status).[5]

30.    There can be no doubt that the Debtor's estate benefits from Core providing postpetition Services to operate the Debtor's machines under the Agreement, including connecting the Debtor's machines to electricity.  *See* Pratt Decl. ¶ 51.  The consideration Core provides to Celsius under the Agreement—*i.e.*, the hosting Services at its data centers—enables Celsius's mining machines to operate and produce Bitcoin for the estate.  Specifically, and germane to the instant action, the cost of electricity, which Core passes on without markup to its customers—including Celsius—is by any interpretation an "actual and necessary" expense of the estate, as the Debtor's machines cannot run without a substantial amount of power.

31.    Since the petition date, Core continued business with Celsius in the ordinary course, which has benefited Celsius's estate, as Celsius is generating revenue from data-mining through the machines hosted.  *See* Pratt Decl. ¶ 51.  This value creation is literally impossible without electricity.

32.    Consequently, the postpetition Services provided by Core to Celsius, including the PPT Charges, are clearly an actual and necessary expense of the estate that provide a clear benefit

---

[5] *In re ATP Oil & Gas Corp.*, 2014 WL 1047818, at *4 (Bankr. S.D. Tex. Mar. 18, 2014) ("The estate does not need to actually profit from [creditor's] services in order to qualify as a 'benefit' under Section 503(b)(1)(A).  A trade vendor who provides inventory to a debtor in possession that cannot be sold is entitled to an administrative expense. A debtor in possession must pay for the use of nondebtor's property, even where the use turns out to be unprofitable. Likewise, [creditor] is entitled to an administrative expense for its postpetition services, even where the services turn out to be unprofitable for the estate.  [Creditor's services] were deemed necessary by [debtor] to maintain the platform so that it could be sold to a third party for the benefit of the estate.  Accordingly, [creditor's services] are entitled to an administrative expense under Section 503(b)(1)(A).") (internal citations omitted).

to the estate, and thus create an obligation *vis-à-vis* the Agreement for the Debtor to pay the PPT

Charges.  Accordingly, Core's PPT Charges should be granted administrative expense status.

### C.  Core is Entitled to the Immediate Payment of its Allowed Administrative Expense Claims

33.     Pursuant to section 503(a) of the Bankruptcy Code, "[a]n entity may timely file a

request for payment of an administrative expense."   11 U.S.C. § 503(a).   The "timing of

distributions for administrative expense payments, other than at the close of the case, is within the

discretion of the court."  *In re Shihai*, 392 B.R. 62, 67–68 (Bankr. S.D.N.Y. 2008) (collecting cases

supporting bankruptcy court's discretion to determine when administrative expenses are paid).

34.     Courts in this Circuit have not articulated a clear standard for how a court should

exercise its discretion on this issue.  The issue most frequently arises when there are questions of

a debtor's administrative solvency and courts sometimes exercise their discretion to defer payment

of an administrative expense claim when this risk exists.  *See, e.g., In re Korea Chosun Daily

Times*, *Inc.*, 337 B.R. 773, 784–85 (Bankr. E.D.N.Y. 2005) (providing that the timing of

administrative expense payments is left to the sound discretion of the court, but "[w]here a debtor

is insolvent, courts may defer paying administrative expenses until [plan] confirmation").  In such

cases, the court is primarily concerned with ensuring the "orderly and equal distribution among

creditors and the need to prevent a race to a debtor's assets."  *Shihai*, 392 B.R. at 68 (denying pre-

conversion counsel's request for payment of an administrative expense claim prior to the chapter

7 estate being fully administered); *Korea Chosun*, 337 B.R. at 784–85 (stating that where a debtor

is insolvent, courts may defer administrative expense payments to "prevent a race to a debtor's

assets").

35.     Here, there is no evidence that Celsius is administratively insolvent.  And, Celsius

continues to require Services under the Agreement.  It is not paying the PPT Charges only because

of its erroneous interpretation of the Agreement, not because of an inability to pay. Accordingly, there is no basis in this district to deny Core the immediate payment of its administrative expense claims arising from the Agreement and Core's performance thereof.

36.    Outside of this district, when exercising discretion to determine the timing of administrative expenses, courts consider the (i) prejudice to the debtor, (ii) hardship to the creditor from a delay in payment, and (iii) potential detriment to other creditors. *In re Garden Ridge Corp.*, 323 B.R. 136, 143 (Bankr. D. Del. 2005). The underlying consideration for courts is the goal of providing "orderly and equal distribution[s] among creditors and the need to prevent a race to a debtor's assets." *In re HQ Glob. Holdings, Inc.*, 282 B.R. 169, 173 (Bankr. D. Del. 2002). Each of these factors supports the immediate payment of Core's administrative expense claim.

37.    *Immediate Payment Does Not Prejudice the Debtor.* Factor one considers the prejudice to a debtor immediate payment may cause. *Garden Ridge*, 323 B.R. at 143. In *In re Global Home Products*, the court found the debtor would be prejudiced if required to make immediate administrative expense payments only after the debtor had provided "uncontroverted testimony" regarding the harm to the estate of immediate payment. 2006 WL 3791955, at *4 (Bankr. D. Del. Dec. 21, 2006).[6]

38.    Here, unlike in *Global Homes*, there is no evidence the Debtor would be prejudiced by payment of Core's administrative expense claim, including the continued payment of all amounts as and when due under the Agreement. The only reason Celsius thus far has posited for not paying such amounts is its erroneous interpretation of the Agreement. There is no evidence of

---

[6] In particular, the court found persuasive the debtor's chief restructuring officer's testimony regarding the following harms to the estate of such payment: (i) the administrative claims far exceeded the debtor's borrowing ability under its DIP agreement and requiring immediate payment would adversely affect the debtor's borrowing ability, (ii) the debtor did not have sufficient funds to pay its administrative claims, (iii) the debtor's financing was allocated to funding continuing operations, and (iv) the debtor's reorganization effort would completely collapse if it was required to immediately pay its administrative expenses. *Id.*

the Debtor's administrative insolvency. If the Debtor's administrative solvency was questionable, this would raise additional issues. For one, it would be inequitable for force Core to continue performing under the Agreement, while losing approximately $1.65 million every month running Celsius's machines absent payment of the PPT Charges, and simply wait to be paid its administrative expenses at the end of the case or when Celsius decides to assume the Agreement, if ever. If it is questionable whether Core will in fact recover the PPT Charges in full at any point in this case, the support for the other forms of relief Core seeks herein are further strengthened.

39.    *Core Suffers Every Day Payment Is Withheld.*  Factor two considers the hardship or prejudice to a claimant from a delay in the payment of its administrative expense claims. *Garden Ridge*, 323 B.R. at 143. In *Global Home Products,* the court found the creditor would suffer little hardship if payment of its claim was deferred until after confirmation, noting that the creditor provided no evidence of any individual hardship it would suffer or that immediate payment was necessary to keep the creditor in business. 2006 WL 3791955, at *4–5; *see also ATP*, 2014 WL 1047818, at *10 (a creditor's bare assertion that the harm from a delay in payment was "self-evident" did not raise a compelling reason to provide for immediate payment).

40.    In contrast to *Global Homes*, Core will certainly be prejudiced if Celsius does not pay the PPT Charges. The crypto mining industry is experiencing distress due to the combination of low Bitcoin prices and high electricity costs.[7]  Indeed, like others in the industry, Core is experiencing lower liquidity and other financial headwinds, with its stock decreasing in price by more than 80% in the last six months. Core and its stakeholders may suffer irreparable harm if Celsius, one of Core's largest customers, is permitted to withhold millions of dollars of payments

---

[7] *See generally*, Victoria Vergolina, *Bitcoin Miners Are in Distress*, BLOOMBERG, Aug. 15, 2022, https://www.bloomberg.com/news/articles/2022-08-15/bitcoin-miners-are-in-distress.

(and growing) for any meaningful amount of time. *See* Core Scientific, Inc., Current Report (Form 8-K) (Oct. 12, 2022).[8] As noted, Core is sustaining substantial daily losses to cover the postpetition increased electricity tariffs that Celsius refuses to pay, which harms Core and its stakeholders, and threatens the viability of Core's own business. *See* Pratt Decl. ¶ 50. Indeed, Core has stated publicly that if Celsius continues to retain the benefits of Core's Services without full payment, this "would have a material effect on [Core's] business, financial condition, results of operations and cash flows." *See supra* n.8.

41.    *Other Creditors Are Not Harmed by Immediate Payment*. Factor three considers the potential detriment to other creditors of immediate payment. *Garden Ridge*, 323 B.R. at 143. Under this factor courts determine if an immediate payment will compromise the equitable distribution among other administrative claimants, or if the estate is administratively insolvent such that compelling immediate payment will encourage a race to the courthouse. *See Global Home*, 2006 WL 3791955, at *5 (denying an immediate payment to preserve the option for an equitable distribution among administrative claimants later). For example, in *ATP Oil*, the court found that factor three favored delaying payment of administrative claims because the debtor was administratively insolvent and had limited cash resources, and granting a request for immediate payment would "encourage [] a race to the courthouse." 2014 WL 1047818, at *10.

42.    Here, in contrast to *ATP Oil*, there is no evidence that other creditors would be harmed by immediate payment. As stated above, there is no evidence that the Debtor is administratively insolvent. As of the Petition Date, Celsius owned 43,632 operational mining

---

[8] Core's October 12, 2022 8-K can be located at https://investors.corescientific.com/investors/financials/sec-filings/sec-filings-details/default.aspx?FilingId=16130394.

machines that generated approximately 14.2 Bitcoin per day.[9]  Celsius projected that in 2022 it

will generate more than 10,100 Bitcoin.[10]  Accordingly, providing for immediate payment will not

compromise the equitable distribution among other administrative claimants or result in a race for

Debtors' assets.

43.     In fact, equitable considerations favor Core.  It is inherently inequitable to force

Core to subsidize the Debtors' business to the detriment of Core and its stakeholders.  Furthermore,

Core's Services create value for the estate by enabling it to continue to mine Bitcoin, which

benefits all of Celsius's stakeholders.  *See* Pratt Decl. ¶ 51.  Thus, if anything, payment of Core's

administrative expenses, which will aid Core in running the Debtors' machines and creating value

for Debtors' estate, is adding value, not depleting value, for the Debtors' estate and creditors.

44.     There is another important reason supporting Core's request that makes it different

from most cases addressing this issue.  In most cases, the vendor seeking payment provided the

services in the past and all that is left is payment.  Here, in contrast, Celsius is continuing to request,

and Core continues to provide, Services under the Agreement.  The U.S. Supreme Court has stated

that if a "debtor-in-possession elects to continue to receive benefits from the other party to an

executory contract pending a decision to reject or assume the contract, the debtor-in-possession is

obligated to pay for the reasonable value of those services."  *NLRB. v. Bildisco & Bildisco*, 465

U.S. 513, 531 (1984).

45.     Similarly, in *In re Mirant Corp.*, the Fifth Circuit rejected the debtor's argument

that "unless and until an executory contract is assumed or rejected, [the debtor] has no legal

obligation to perform under that contract."  197 F. App'x 285, 294–95 (5th Cir. 2006).  Applying

---

[9] *Debtors' Motion Seeking Entry of an Order (I) Permitting the Sale of the Debtors' Mined Bitcoin in the Ordinary Course and (II) Granting Relief* ¶ 9, ECF No. 187.

[10] *Id.*

*Bildisco*, the court held "there is no authority to support the position that [a debtor] may force [a counterparty] to continue performance under [an executory contract] while [the debtor] discontinues and refuses payment without court permission." *Id*. Such a position is "contrary to the universally accepted rule that a trustee [or debtor] cannot accept the benefits of an executory contract without accepting the burdens as well." *Id*. (internal quotation marks omitted); *see also Metro. Life Ins. v. Sharon Steel Corp. (In re Sharon Steel Corp.)*, 161 B.R. 934, 937 (Bankr. W.D. Pa. 1994) (holding that because the debtor elected to continue receiving benefits under its insurance policy from nondebtor pending its decision to assume or reject the contract, the debtor was obligated to pay the premiums as an administrative expense).

46.    Similarly in *In re Broadstripe*, a case Celsius cited in its Contempt Motion (¶43), the court ordered the counterparty to perform under an executory contract only after finding that the counterparty "will suffer neither injury nor prejudice" by performing "in exchange for current payment by the Debtors on a postpetition basis." 402 B.R. 646, 657–59 (Bankr. D. Del. 2009). In contrast, Core will suffer great harm from continuing to perform if Celsius refuses to pay under the Agreement.

47.    If Celsius believes that mining digital assets is a profitable venture, notwithstanding a period of relatively low Bitcoin prices and relatively high electricity prices, then it should pay the associated costs, including the cost to power its mining machines. If, on the other hand, Celsius concludes that Bitcoin mining is no longer a profitable venture, then it can discontinue mining Bitcoin, which would avoid all future PPT Charges. Celsius should not, however, be permitted to continue to receive the benefit of Core's Services to produce Bitcoin without paying for it, including the PPT Charges.

48.     Thus, Core respectfully requests the Court to order Celsius to pay past due administrative expenses immediately and pay ongoing administrative expenses timely.

## II.    CAUSE EXISTS TO GRANT CORE RELIEF FROM THE AUTOMATIC STAY TO EXERCISE ITS RIGHTS AND REMEDIES UNDER THE AGREEMENT

### A.    The Automatic Stay Does Not Require Core to Continue to Perform Under the Agreement

49.     As discussed in detail in the Contempt Objection, the case law is clear—including Supreme Court precedent—that a counterparty not performing under a contract does not violate the automatic stay. *Contempt Objection* ¶¶ 93–100; *City of Chicago v. Fulton*, 141 S. Ct. 585, 590 (2021) (requiring an "affirmative act" for a violation of section 362(a)(3)).  However, because Celsius has taken the position in the Contempt Motion that Core failing to perform is a stay violation, Core requests that this Court confirm that Core may cease providing services to Celsius without violating the automatic stay.

### B.    Cause Exists to Lift the Stay to Allow Core to Exercise All Rights Under the Agreement

50.     To the extent the automatic stay applies to any actions Core may want to take under the Agreement, Core requests that the Court lift the automatic stay so that it may exercise all rights and remedies available under the Agreement, including ceasing to perform Services, pursuing all remedies based on Celsius's non-performance, and exercising its Effective Termination Right. The need for Core to exercise such rights is even more urgent if the Court finds (i) that Celsius is not required to pay the PPT Charges or (ii) in connection with the Additional Hosting Dispute, that Core is required to prioritize hosting, in its space-limited data centers, an unlimited number of new mining machines Celsius delivers over Core's own machines.

51.     Pursuant to section 362(d) of the Bankruptcy Code, a court may grant relief from the automatic stay "for cause, including the lack of adequate protection of an interest in property

of such party in interest." 11 U.S.C. § 362(d).  A movant requesting relief from the automatic stay

"must initially produce evidence establishing 'cause' for the relief." *In re Project Orange Assocs.,*

*LLC*, 432 B.R. 89, 103 (Bankr. S.D.N.Y. 2010) (internal citation omitted).  "Once the moving

party establishes a prima facie case for 'cause,' the burden shifts to the debtor to disprove its

existence." *Id.* (citing *Burger Boys, Inc. v. South St. Seaport Ltd. P'ship (In re Burger Boys, Inc.*),

183 B.R. 682, 687 (S.D.N.Y. 1994) (citing 11 U.S.C. § 362(g)(1)); *see also In re Froman*, 566

B.R. 641, 652 (S.D.N.Y. 2017) ("The movant must make an initial showing of cause, and then the

burden shifts to the party opposing the motion to prove that it is entitled to the continued

protections of the automatic stay.").  "Whether to lift the stay is committed to the discretion of the

bankruptcy judge." *Burger Boys*, 183 B.R. at 687–88.

52.     To determine whether cause exists to lift the automatic stay for cause, courts in this

Circuit generally utilize one of three tests:  (i) application of the 12 "*Sonnax* factors;"[11] (ii) "fact-

intensive inquiries which appear to be loosely based on the *Sonnax* factors, mainly attempting to

maintain the prepetition status quo ante between the parties;" or (iii) a bad faith analysis similar to

that used to determine whether to dismiss a chapter 11 case for cause under section 1112 of the

Bankruptcy Code.  *Project Orange,* 432 B.R. at 103.  In general, cause is an "intentionally broad

---

[11] The "*Sonnax* factors" are: (1) whether relief would result in a partial or complete resolution of the issues; (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) impact of the stay on the parties and the balance of harms. *See., e.g., In re Breitburn Energy Partners LP*, 571 B.R. 59, 64 (Bankr. S.D.N.Y. 2017) (citing *In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1286 (2d Cir. 1990)).

and flexible concept which must be determined on a case by case basis." *Froman*, 566 B.R. at 652

(quoting *Project Orange*, 432 B.R. at 103).

53.     The *Sonnax* factors are most often applied when a court is deciding whether to lift

the automatic stay to allow litigation to proceed or begin outside of the bankruptcy court.  *B.N.*

*Realty Assocs. v. Lichtenstein*, 238 B.R. 249, 258–59 (S.D.N.Y. 1999) (vacating and remanding

bankruptcy court's decision not to lift the stay to permit non-debtor party to commence litigation

outside of the bankruptcy court where the bankruptcy court failed to apply the *Sonnax* factors in

its analysis).  Indeed, many of the *Sonnax* factors are irrelevant outside of the litigation context.[12]

54.     In this case, *Sonnax* is not directly applicable because Core does not seek to begin

or continue litigation.  *In re Payam, Inc.*, 642 B.R. 365, 370 n.2 (Bankr. S.D.N.Y. 2022) ("[T]he

*Sonnax* Factors are inapplicable because they apply when a movant is moving to continue an

underlying state court action involving unadjudicated state law issues.").  Rather, Core is seeking

to lift the automatic stay (to the extent applicable), so that it may exercise its bargained-for contract

rights under the Agreement.   In *In re Velo Holdings Inc.*, as in *Payam*, this Court did not apply

*Sonnax* factors where it analyzed whether cause existed to lift the stay to terminate a contract,

instead engaging in a balancing of harms analysis.  475 B.R. 367, 390 (Bankr. S.D.N.Y. 2012) (not

mentioning the *Sonnax* factors in an opinion deciding whether to lift the automatic stay to permit

contract termination and instead discussing a balance of harms) (discussed below in more detail);

*see also In re Lucre, Inc.*, 339 B.R. 648, 663 (Bankr. W.D. Mich. 2006) (focusing primarily on

parties' contract rights and fairness, rather than traditional litigation factors, in a contract dispute

---

[12] *Accord In re Breitburn Energy Partners LP*, 571 B.R. 59, 64 (Bankr. S.D.N.Y. 2017) ("Not all factors are relevant
in every case, and the court need not assign equal weight to each factor.").  When applying the *Sonnax* factors, Courts
"need only apply the factors that are relevant to the particular case, and [do] not need to give each factor equal weight."
*Id.* at 104 (Bankr. S.D.N.Y. 2010) (quoting *In re Burger Boys, Inc.*, 183 B.R. 682, 687 (S.D.N.Y. 1994)).

between the debtor and a contract counterparty to determine whether to let a contract counterparty

proceed to remove state court injunctions compelling its performance under an agreement).

55.     Core submits that this balancing approach (which is one of the 12 *Sonnax* factors)

is an appropriate framework to use to analyze whether cause exists to lift the automatic stay and

allow Core to exercise remedies under an executory contract.  The other two tests articulated in

*Project Orange* also support cause to lift the stay, including the second test (seeking to maintain

the status quo ante) and the third test (bad faith).  432 B.R. at 103.

### i.  A Balancing of Harms Supports Lifting the Stay

56.     Cause exists to allow Core to exercise all of its rights under the Agreement, because

absent a relief from stay, (i) Celsius is receiving greater rights than exist under the Agreement or

provided by the Bankruptcy Code while (ii) Core is suffering great prejudice.

57.     Importantly, there is <u>no legal detriment</u> to Celsius from Core ceasing to perform or

exercising its right to terminate.  As discussed below, with the exception of a few specified

provisions, bankruptcy is not intended to change or enlarge a debtor's state law rights under a

contract.  In this case, Core Scientific has bargained for the Effective Termination Right—the right

to stop performing at any point for any reason and pay simple damages of one month's fee under

the Agreement.  MSA § (5)(d).  Before Celsius's bankruptcy, Core could have exercised this

bargained-for contractual right at any time, and there is no bankruptcy-related reason why this

right should not continue to be available to Core in bankruptcy.  As such, cause exists to lift the

stay, because Celsius cannot adequately protect Core's Effective Termination Right.

58.     The balance of harms in the event the Court rules against Core on the PPT Charges

issue is particularly pronounced.  Celsius is benefitting unfairly from the automatic stay, while

Core is continuously harmed by this arrangement.  *See Core Objection* ¶¶ 61–63.  Core has been

forced for months by virtue of Celsius's chapter 11 case to continue to provide Services to Celsius

even while Celsius has refused to pay postpetition amounts Core expected all customers to pay (and others have been paying). If Celsius had not been in chapter 11, Core could have terminated the Agreement and capped damages (if any) at one month's fees if it believed the business arrangement with Celsius was no longer beneficial.

59.     By forcing Core to continue to provide services even though Celsius is not paying amounts that other customers are paying, Core is also losing its bargained-for right and opportunity to terminate Celsius as a customer and instead provide its limited hosting capacity to its other customers, which are willing to pay the PPT Charges. Core Scientific is losing approximately $1.65 million a month as a result of providing Celsius with free energy. *See* Pratt Decl. ¶ 50. Again, there is no bankruptcy-related reason why Core should be forced to continue an uneconomic arrangement in bankruptcy if it could have discontinued it outside of bankruptcy.

60.     Similarly, if the Court finds in favor of Core on the Additional Hosting Dispute, Core will suffer grave harm. Under Celsius's interpretation, Core would be forced to host an unlimited number of Celsius machines in its data centers, prioritizing those machines over Core's own, for an indefinite period of time, further damaging Core's business in this difficult period.

61.     The balance of harms also favors Core in the event that the Court finds in favor of Core that the PPT Charges were properly included on the invoice, but does not require Celsius to pay the PPT Charges timely.[13] Core has already been shorted millions of dollars due to Celsius's postpetition non-payment and is losing approximately $53,000 every day Celsius continues not to pay. *See Core Objection* ¶ 63. Core is in a struggling industry and has seen its liquidity and stock price decrease dramatically. There is no reason why it should take the risk on Celsius not being

---

[13] This outcome appears unlikely given the strength of the case law supporting the Court ordering Celsius to pay currently its administrative expenses for the services it is receiving, as discussed above. Core discusses the effect of an alternate outcome out of an abundance of caution.

able to pay in the future.  If Celsius is unable or unwilling to pay Core currently in accordance with the Agreement, cause exists to lift the automatic stay to enable Celsius to exercise its termination rights.  And even if the Court orders Core to pay the PPT Charges, the balancing of the harms favors allowing Celsius to exercise its valid rights under the Agreement in good faith, for example if Core determines to scale down its hosting business during a time its industry is in financial distress and many companies are making difficult decisions.

62.    Case law supports the relief requested.  In *Velo Holdings Inc. v. Paymentech, LLC (In re Velo Holdings Inc.)*, this Court refused to lift the automatic stay to allow the nondebtor party to terminate an executory contract, because the circumstances were different than those Core faces here. 475 B.R. 367 (Bankr. S.D.N.Y. 2012).  There, the court refused to lift the automatic stay in part because "Paymentech [the counterparty] sought to terminate the [contract] post-petition based on an unenforceable ipso facto clause." *Id.* at 379.  The court also found that the provisions in the agreement on which the counterparty based its termination rights had not actually been triggered. *Id.* at 390.  In other words, the court was unwilling to give the counterparty a right to terminate the agreement for either (i) an invalid bankruptcy reason or (ii) a reason it did not have outside of bankruptcy (untriggered termination event).

63.    The *Velo* court concluded that the balance of hardships test favored the debtor, as the debtor would have faced irreparable harm if the court lifted the automatic stay to allow termination of the parties' contract, because the debtor's business and any chance for an orderly sale process "would [have] suffer[ed] immediate and irreparable harm if Paymentech terminated the [contract]." *Id.* at 375, 386.  At the same time, the counterparty's purported hardships were "at best, hypothetical and speculative." *Id.*  Among other things, Paymenttech was adequately protected, holding $10 million in reserve funds from the debtor, increased from $8 million in the

months leading up to the filing, "to protect Paymentech from exposure" from the debtor's postpetition noncompliance with the agreement. *Id.* at 375.

64.    The facts before the Court here are markedly different.  First, unlike Paymentech, Core is not trying to terminate for an invalid *ipso facto* reason.  Second, unlike Paymentech, Core has the Effective Termination Right, whereas the *Velo* court found that the purported condition for Paymentech to exercise its termination rights was not satisfied.  As such, Core, unlike Paymentech, is being deprived of a right it bargained for prior to bankruptcy.  Moreover, in contrast to *Velo*, any harm to Celsius from Core exercising its rights under the Agreement is unclear.  There is no evidence that terminating the Agreement will prevent Celsius from finding hosting services elsewhere or what the costs of switching hosting providers would be; instead, the evidence shows that Celsius may be pivoting to a self-hosting business model.  *See* Pratt Decl. ¶ 11.  Furthermore, unlike Paymentech, Core has no adequate assurance or other safety net provided by Celsius to account for any of the financial losses Core has incurred or may incur due to Celsius's non-payment and Core's inability to terminate if it is losing money.  Each day Core is forced to provide Celsius with energy that goes unpaid, Core's losses increase.  There is also evidence of Core's own precarious financial position in a struggling industry, Contempt Objection ¶¶ 61–63, something that was not present in *Velo*.

### ii.    Lifting the Stay is Necessary to Avoid Creating New Rights for Celsius and Taking Away Core's Rights

65.    As noted above, in addition to using the *Sonnax* factors (which are not applicable here) or a balancing of hardships (as in *Velo*), some courts, including in this district, instead "focus on whether lifting the stay will return the parties to the prepetition status quo (and not create any new rights or take away any rights)."  *Project Orange*, 430 B.R at 110–12 (noting then applying this test).  The *Project Orange* court explained that, in the context of landlord-tenant disputes, for

example, the court is hesitant to lift the stay to permit a landlord to proceed with an eviction proceeding when it is possible the debtor may obtain a vacatur of the state court judgment and regain a right to possession, but will lift the stay in favor of the landlord when it believes the debtor has no chance of obtaining a vacatur. *Id.* at 111. Applying this test here, outside of bankruptcy, there is no mechanism under the contract or other applicable law where Celsius could avoid the Effective Termination Right and force Core to perform indefinitely. Thus, the only way to "return the parties to the prepetition status quo" and "not create any new rights or take away any rights" is to lift the automatic stay to allow Core to exercise its rights.

66.     The Bankruptcy Code explicitly modifies a debtor's contract rights only as set forth in certain specified provisions. For example, (i) it prohibits termination of a contract based on so called *ipso facto* clauses (11 U.S.C. § 365(e)) or nonpayment of a prepetition debt (11 U.S.C. § 362(a)(6)); (ii) it invalidates anti-assignment clauses (11 U.S.C. § 365(f)); and (iii) it permits assumption notwithstanding a default (if cured and subject to providing adequate assurance). (11 U.S.C. § 365(b)(1)). It does not otherwise change contract rights. *Lucre*, 339 B.R. at 655 (warning against "read[ing] into Section 365 more than that section actually provides. Section 365 is in fact simply a conglomeration of various rules relating to the post-petition assumption and rejection of executory contracts and unexpired leases."). Where the Bankruptcy Code does not explicitly modify a contract, courts must enforce it as written by and against a debtor, even when doing so negatively impacts the debtor's reorganization. *See, e.g., Gulf Tampa Drydock Co. v. Ins. Co. of N. Am. (In re of Gulf Tampa Drydock Co.)*, 49 B.R. 154, 158 (Bankr. M.D. Fla. 1985) (court cannot compel an insurer to renew policies that expire by their own terms during the bankruptcy case).[14]

---

[14] Courts outside of the bankruptcy context agree on the importance of courts enforcing parties' contracts as written. *See Coca-Cola Bottling Co. v. Coca-Cola Co.*, 769 F. Supp. 671, 707 (D. Del. 1991) ("Courts do not rewrite contracts to include terms not assented to by the parties."), *aff'd*, 988 F.2d 414 (3d Cir. 1993).

67.    The Celsius estate inherited Celsius's rights and obligations under the Agreement as they existed prepetition, except for those few modifications of the playing field explicitly stated in the Bankruptcy Code.  Specifically, under section 541 of the Bankruptcy Code, the estate is entitled to the rights the debtor possessed prepetition, and not any greater rights.  *Lucre,* 339 B.R. at 654 (Section 541 "is not intended to expand the debtor's rights against others more than they exist at the commencement of the case") (internal quotation marks and citation omitted); *see also Foothill Cap. Corp. v. Clare's Food Mkt., Inc. (In re Coupon Clearing Serv., Inc.)*, 113 F.3d 1091, 1099 (9th Cir. 1997) (finding that bankruptcy provides "no greater rights in property than those held by the debtor prior to bankruptcy").  The same applies to a debtor's contract rights:

> The corollary of the Section 541 "neutral transfer" rule is that the trustee *or debtor-in-possession can have no greater or different rights than the debtor with respect to an executory contract or unexpired lease unless the Bankruptcy Code itself provides those rights*.  If the Bankruptcy Code is silent, then the trustee or debtor-in-possession is subject to the same laws and regulations as those that had constrained the debtor pre-petition.

*Lucre*, 399 B.R. at 654–55 (emphasis added) (internal citation omitted).

68.    Courts in this District and across the country have consistently held that other than rights specifically mentioned in the Bankruptcy Code, bankruptcy is not intended to change or enlarge a debtor's state law rights under a contract.  As the District Court for the Southern District of New York stated, "[i]t is well-settled law that the filing of a bankruptcy petition does not alter a debtor's contractual rights or obligations."  *Penn Traffic Co. v. COR Route 5 Co., LLC (In re Penn Traffic Co.)*, 2005 WL 2276879, at *6 (S.D.N.Y. Sep. 16, 2005) (citing *In re M.J. & K. Co.*, 161 B.R. 586, 593 (Bankr. S.D.N.Y. 1993) ("The filing of a petition under the Code does not expand [contract] rights.")).  Courts in other circuits are in accord.[15]

---

[15] *See Tidewater Fin. Co. v. Kenney*, 531 F.3d 312, 314 (4th Cir. 2008) ("parties are bound to their contractual rights and obligations under operative state law, and the Bankruptcy Code does not command otherwise."); *Carrol v. Tri-Growth Ctr. City Ltd. (In re Carroll)*, 903 F.2d 1266, 1271 (9th Cir. 1990) ("It is well settled that '[t]he Bankruptcy

69.     The U.S. Supreme Court recently affirmed this basic principle in *Mission Prod.*

*Holdings, Inc. v. Tempnology, LLC*:

> Section 365 reflects a general bankruptcy rule: The estate cannot possess anything
> more than the debtor itself did outside bankruptcy. *See Board of Trade of Chicago*
> *v. Johnson*, 264 U.S. 1, 15, 44 S.Ct. 232, 68 L.Ed. 53 3 (1924) (establishing that
> principle); §541(a)(1) (defining the estate to include the "interests of the debtor in
> property") (emphasis added)). As one bankruptcy scholar has put the point:
> Whatever "limitation[s] on the debtor's property [apply] outside of bankruptcy []
> appl[y] inside of bankruptcy as well. A debtor's property does not shrink by
> happenstance of bankruptcy, but it does not expand, either." D. Baird, Elements of
> Bankruptcy 97 (6th ed. 2014). *So if the not-yet debtor was subject to a*
> *counterparty's contractual right . . . so too is the trustee or debtor once the*
> *bankruptcy petition has been filed.*

139 S. Ct. 1652, 1662 (2019) (some alterations in original) (emphasis added).

70.     Here, the best Celsius can do in its chapter case is assume the Agreement and

receive the rights that it had under the Agreement prepetition, which is the right to continue to

receive services from Core in accordance to the terms of the Agreement, including and subject to

Core's Effective Termination Right. There is no legitimate basis for Celsius to use its chapter 11

---

Code neither enlarges the rights of a debtor under a contract, nor prevents the termination of a contract by its own terms.'") (alteration in original); *Hazen First State Bank v. Speight* 888 F.2d 574, 576 (8th Cir. 1989) ("The automatic stay provided for by section 362(a) does not enlarge the rights of individuals under a contract . . . ."  ); *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984) ("The filing of the chapter 11 petition cannot expand [the] debtors' rights as against [the nondebtor]."*); Schokbeton Indus., Inc. v. Schokbeton Prods. Corp. (In re Schokbeton Inc.)*, 466 F.2d 171, 177 (5th Cir. 1972) ("The filing of an arrangement petition under Chapter XI does not divest the debtor in possession of its contractual rights, but it likewise does not provide a blanket exemption from contractual obligations. Debtor's failure to satisfy those obligations justified Products' termination of the agreement."); *In re Advent Corp.*, 24 B.R. 612, 614 (Bankr. App. 1st Cir. 1982) ("The Bankruptcy Code neither enlarges the rights of a debtor under a contract, nor prevents the termination of a contract by its own terms."); *Heaven Sent Ltd. v. Com. Union Ins. Co. (In re Heaven Sent Ltd.)*, 37 B.R. 597, 598 (Bankr. E.D. Pa. 1984) ("The Code does not [] grant the debtor in bankruptcy greater rights and powers under the contract than he had outside of bankruptcy. The court finds nothing in the Code which enlarges the rights of [the debtor] under the contract or which prevents the termination of the contract on its own terms on [the expiration date]."); *Cottman Transmissions Inc. v. Holland Enters., Inc. (In re Holland Enters., Inc.)*, 25 B.R. 301, 303 (E.D.N.C. 1982) (refusing to "construe the bankruptcy law as providing a debtor in bankruptcy with greater rights and powers under a contract than the debtor had outside of bankruptcy") (citing *White Motor Corp. v. Nashville White Trucks Inc. (In re Nashville White Trucks, Inc.)*, 5 B.R. 112, 117 (Bankr. M.D. Tenn. 1980) ("The assumption or rejection of executory contracts and leases allowed by the Bankruptcy Code is a unique power given to facilitate the rehabilitation of debtors. The Code does not, however, grant the debtor in bankruptcy greater rights and powers under the contract than he had outside of bankruptcy. The court finds nothing in the Code which enlarges the rights of [debtors] under [a] contract or which prevents the termination of [a] contract on it[s] own terms . . . .")).

filing as a basis to eliminate or delay Core's Effective Termination Right.  Doing so would impermissibly expand Celsius's contractual rights to compel performance that is greater and longer than it would have been able to prior to chapter 11.  The only way to maintain the "status quo ante" that existed prior to the Petition Date and "not create any new rights" is to lift the stay to permit Core to exercise any rights thereunder.

71.    It is also appropriate to allow Core to exercise its rights under the Agreement, because it is not doing so for an improper bankruptcy-related reason or in violation of any prohibitions under the Bankruptcy Code.  Other courts have found that lifting the automatic stay may be appropriate where a party has grounds to terminate an agreement for a legitimate reason (*i.e.*, not on the basis of the debtor's bankruptcy filing or the existence of a prepetition claim).  *See, e.g., In re Ernie Haire Ford, Inc.*, 403 B.R. 750, 760, n.3 (Bankr. M.D. Fla. 2009) (finding that counterparty violated stay by terminating on the basis of debtor's chapter 11 filing, but noting that "if the [creditors] believe that there are acceptable grounds for termination of the contracts, apart from the filing of the bankruptcy, they may present such ground in an appropriately filed motion for relief from stay.") (cited by Debtor in Contempt Motion ¶¶ 45, 52).

72.    In *In re El Paso Refinery, L.P.*, the court granted the counterparty relief from the automatic stay to terminate its executory contract with the debtor "based upon the estate's post-petition default."  220 B.R. 37, 40 (Bankr. W.D. Tex. 1998).  When later contemplating the appropriate damages resulting from such termination, the court noted that the question of a non-debtor party's options when the estate does not perform its obligations postpetition is "especially pointed" when the estate's non-performance "leav[es] the non-debtor party at a substantial risk of loss." *Id.* at 42.[16]

---

[16] At the damages stage, the court suggested that if lifting the automatic stay to allow termination of such contract for non-performance is not an appropriate remedy, the correct remedy to assure a counterparty that it is not "forced to, in

73.     In this case, Core has the legitimate right to terminate the Agreement unrelated to an ipso facto default or nonpayment of a prepetition claim.  For one, it has the Effective Termination Right.  Second, it has the right to terminate the Agreement based on the nonpayment of the postpetition PPT Charges.  *See Core Objection* ¶ 51.  The Agreement provides a specific mechanism to dispute charges thereunder.[17]  Celsius chose not to follow that mechanism and withheld postpetition payment (and the evidence is that this choice was not premised on it being a debtor in chapter 11) and now it has to live with the consequences.  One of those consequences is that Core Scientific now has the right to terminate the Agreement.  MSA § (4)(d).  This right exists whether or not the Court agrees with Core or Celsius regarding whether the PPT Charge was appropriate.

74.     The fact that applying a contract as written (other than exceptions explicitly provided in the Bankruptcy Code) may impact a debtor's ability to reorganize is not a reason to change the rules to provide greater rights to a debtor than it has under its contract:

> Bankruptcy judges and practitioners alike are uneasy whenever a party advocates a position which, if accepted, would interfere with the debtor's ability to reorganize. After all, one of the objectives of Chapter 11 is to give the debtor some breathing space. In this instance, [the counterparty's] desire to withhold further services under the [executory contract] jeopardizes not only [the debtor's] future but also other creditors' prospects of being repaid what they are owed. Consequently, there is the temptation to intervene in order to protect the integrity of the reorganization process. . . . Congress has not guaranteed all debtors success under Chapter 11. Nor has Congress guaranteed every debtor an equal opportunity to attempt a Chapter 11

---

[17] effect, extend credit to the estate by continuing to perform on the contract post-petition" is to compel the debtor to assume or reject the contract "by a date certain," as well as to ensure the counterparty "recoup[s] an administrative claim from the estate."  *Id.* at 45.  Indeed, here, Core Scientific is seeking the alternative relief of compelling assumption or rejection, as well as payment of the administrative expense claim to which the cases make clear Core Scientific is entitled as a result of its continued performance.  The three forms of relief work together to ensure that the balance of section 365 does not tip too far to the debtor so as to prejudice the third party.

[17] Specifically, Celsius may dispute any invoice by submitting a written notice of such dispute along with reasonable supporting documentation within three days of the date of the original invoice, at which time Core would review the dispute and provide Celsius with a credit if Celsius was indeed invoiced incorrectly.  MSA § 3(b).  If, upon review, Core determined that the invoice was correct, Celsius would be required to pay the amount by the due date of the next invoice.  *Id.*

> reorganization. All that Congress has done is to set up a system within which all
> debtors can try. Whether a particular debtor succeeds or not is a function of its
> ability to overcome its own unique circumstances sufficiently to take advantage of
> the tools Congress has provided. . . . [T]he fact that [the contract counterparty] is
> an impediment to the [debtor] does not mean that I should skew the system
> Congress has created in order to increase [the debtor's] chances. [The debtor] also
> complains that the leverage [the counterparty] is asserting is unfair. However, the
> Bankruptcy Code does not level all playing fields either. Its provisions do alter
> some outcomes. Providing for the cure of a pre-petition contract default under
> Section 365 when the contract itself does not allow for such a cure is one example.
> However, in many instances, the Bankruptcy Code leaves the debtor's fate to the
> vicissitudes of applicable non-bankruptcy law and the realities of the marketplace.

*Lucre*, 339 B.R. at 661.  In other words, even if Celsius could prove that an unfettered, perpetual

right to hosting services was beneficial, or even necessary, to its reorganization, this is not a

sufficient reason to allow the automatic stay to continue to apply in a manner that would rewrite

the parties' Agreement.

### iii.  Celsius's Bad Faith Actions in Connection with the Agreement Support Lifting the Stay

75.     As noted above, courts in this District will also lift the stay if they find the debtor

acted in bad faith, generally determined in accordance with the standard under section 1112 of the

Bankruptcy Code for conversion or dismissal of a bankruptcy case.  *Project Orange,* 432 B.R. at

103.[18]  *See also In re Froman*, 566 B.R. at 653 (S.D.N.Y. 2017) (affirming bankruptcy court's

---

[18] *See* 11 U.S.C. §1112(b)(4) ((A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation; (B) gross mismanagement of the estate; (C) failure to maintain appropriate insurance that poses a risk to the estate or to the public; (D) unauthorized use of cash collateral substantially harmful to 1 or more creditors; (E) failure to comply with an order of the court; (F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter; (G) failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor; (H) failure timely to provide information or attend meetings reasonably requested by the United States trustee (or the bankruptcy administrator, if any); (I) failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief; (J) failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court; (K) failure to pay any fees or charges required under chapter 123 of title 28; (L) revocation of an order of confirmation under section 1144; (M) inability to effectuate substantial consummation of a confirmed plan; (N) material default by the debtor with respect to a confirmed plan; (O) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and (P) failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition.).

order lifting the automatic stay based upon showing of debtor's bad faith); *In re Kaplan Breslaw Ash, LLC*, 264 B.R. 309, 334 (Bankr. S.D.N.Y. 2001) ("[E]ach of Code sections ... 1307(c) and 362(d)(1) states that the authority it provides—dismissal or relief from stay, respectively — may be granted for 'cause[.]' . . . Cause, for either dismissal or relief from the stay, may be found based on unenumerated factors, including 'bad faith.'").  Courts routinely hold that bad faith is a reason to dismiss a chapter 11 case, though not enumerated in the list of causes for dismissal of a chapter 11 case.  *In re Head*, 223 B.R. 648, 653 (Bankr. W.D.N.Y. 1998) ("a failure to proceed after filing in a fundamentally fair manner, with honesty of intention, and with the same type of reasonably founded proposals that Rule 11 requires of all documents that are filed with the court, constitutes a non-enumerated "cause" for dismissal under 11 U.S.C. § 1112").

76.    Although Core is not asserting at this time that bad faith exists to dismiss or convert Celsius's chapter 11 case generally, Core believes the evidence supports a conclusion that Celsius acted in bad faith in connection with the Agreement.  Celsius knew the status of the deployment of its machines and the reasons for its delay, yet feigned ignorance of these issues in the Contempt Motion.  *See Core Objection* ¶ 80.  Celsius knew the purpose and effect of the PPT Charges and paid them prepetition without objection.  *See id.* at ¶¶ 2, 34–38.  Yet, two months into its chapter 11 case, it took the position that it would seek to get out of millions of dollars of obligations by asserting a definition of tariff (import/export tariff) that it knew to be contrary to the expectations of the parties and the parties' frequent discussions, a definition that is nonsensical in the context of the Services provided under the Agreement and the industry in which the parties are operating. It filed a misleading declaration suggesting otherwise and falsely stating that it never paid the PPT Charges prepetition when in fact it had done so several times.  It has not only knowingly caused Core to lose out on millions of dollars of much needed liquidity in the last few months during a

difficult time in the industry, it has forced Core to incur significant litigation costs.  And it continued the litigation even after Core made it clear in its Form 8-K filing that Celsius's unsupported position could cause it grave harm.  All this time, it has expected Core to continue providing Celsius the energy it needs for its machines without paying the full cost.

77.    It is further evidence of bad faith that Celsius, which never disputed the PPT Charges prepetition, potentially because it knew that Core would exercise remedies, has used its chapter 11 case as an excuse to not pay those charges and then argue that Core must continue to perform no matter what.

## III.    TIMELY ASSUMPTION OR REJECTION OF THE AGREEMENT IS WARRANTED

78.    Celsius should be compelled to forthwith assume or reject the Agreement by November 30, 2022.  As set forth below, it would be manifestly inequitable to permit Celsius to continue to receive the benefits of the Agreement while refusing to perform its own payment obligations, and unconstrained delay is substantially prejudicial to Core due to the cash burn Core is currently experiencing running Celsius's machines without full payment.

79.    The Bankruptcy Code generally provides a chapter 11 debtor until confirmation of a chapter 11 plan to assume or reject its executory contracts.  11 U.S.C. § 365(d); *In re Dana Corp.*, 350 B.R. 144, 147 (Bankr. S.D.N.Y. 2006) (providing that a debtor may assume or reject its executory contracts any time before confirmation).  This provides debtors "breathing space" to decide whether to assume or reject its executory contracts.  *Dana Corp.*, 350 B.R. at 147.

80.    The Bankruptcy Code, however, provides a mechanism for a counterparty to compel a debtor to make the decision on assumption or rejection more quickly.  Pursuant to section 365(d)(2) of the Bankruptcy Code, at the request a counterparty to an executory contract, the court may "order [the debtor] to determine within a specific period of time whether to assume or reject

such contract . . . ."  11 U.S.C. § 365(d)(2).  The purpose of this provision is to reduce the

uncertainty of executory contract counterparties from "being left in doubt concerning their status

vis-à-vis the estate."  *In re Beker Indus. Corp.*, 64 B.R. 890, 898 (Bankr. S.D.N.Y. 1986) (quoting

H. Rep. No. 95-595, 95th Cong., 1st Sess. 348-9 (1977)).

81.     Parties seeking to compel assumption or rejection have the burden to demonstrate

cause.  *In re Dana Corp.*, 350 B.R. at 147.  Bankruptcy courts have discretion to determine what

constitutes a reasonable period of time for a debtor to assume or reject.  *Id.*  When determining

whether cause exists to compel assumption or rejection, courts in this district consider the

following factors:

1)     the nature of the interests at stake;

2)     the balance of the hurt to the litigants;

3)     the good to be achieved;

4)     the safeguards afforded to the litigants;

5)     whether the action to be taken is so in derogation of Congress' scheme that
       the court may be said to be arbitrary;

6)     the debtor's failure or ability to satisfy postpetition obligations;

7)     the damage that the nondebtor will suffer beyond the compensation
       available under the Bankruptcy Code;

8)     the importance of the contract to the debtor's business and reorganization;

9)     whether the debtor has sufficient time to appraise its financial situation and
       the potential value of its assets in formulating a plan of reorganization;

10)    whether there is a need for judicial determination as to whether an executory
       contract exists;

11)    whether exclusivity has been terminated; and

12)    the broad purpose of Chapter 11, which is to permit successful rehabilitation
       of debtors.

*In re Hawker Beechcraft, Inc.*, 483 B.R. 424, 429 (Bankr. S.D.N.Y. 2012) (citing *In re Adelphia

Commc'ns Corp.*, 291 B.R. 283, 293 (Bankr. S.D.N.Y. 2003) (collecting factors from across

numerous cases)).  These factors are non-exhaustive, and courts may consider other factors based

32

on the circumstances. *Hawker Beechcraft*, 483 B.R. at 429. Furthermore, several of the above

factors often overlap. *Adelphia Commc'ns*, 291 B.R. at 296, 298 (finding overlap between several

of the factors in its analysis).

82.    Given the significant factual overlap between these factors, the court in *Hawker

Beechcraft* organized its analysis by grouping the factors into the following three categories: (i) the

importance of the Agreement to the debtors' business and reorganization effort—which helps

inform whether a debtor has had sufficient time to make an assumption or rejection decision

(implicating *Adelphia* factors 8, 9, and 12); (ii) the balance of the hurt to the parties and the

compensability of any injury (implicating *Adelphia* factors 2, 4, 6, and 7); and (iii) the good to be

achieved by accelerating shortening a debtor's assumption or rejection period (implicating

*Adelphia* factors 1 and 3). 483 B.R. at 429–30. Each supports Core's request.

### A. The Debtors Conceded the Importance of the Agreement to Their Business

83.    The fact that the Debtors acknowledge the importance of the Agreement to their

mining business supports compelling the Debtors to make a decision on assumption or rejection

sooner than would otherwise be the case. In *Hawker Beechcraft*, the court held that this factor

supported the counterparty's requested relief, as the debtors had already announced they would

continue producing their most profitable product when they emerged from bankruptcy and that

product utilized the intellectual property that was the subject of the contract at issue. 483 B.R. at

430. It found that because of the importance of this agreement, making a decision on it should

have been one of the debtors' most pressing considerations and, therefore, they had a reasonable

amount of time to make the decision. *Id.* ("The Agreement may be the single most important

agreement relating to the Debtors' single most important product, and their decision whether they

need the rights and licenses granted under the Agreement should have been among their first and

most pressing orders of business."). The court determined that the debtor had provided no

compelling reason for the need to have additional time and set a deadline of thirty days for the debtors to make the decision. *Id*. at 433.

84.     In *Adelphia*, the court determined that the contract at issue played an important role in the business of both parties and that while the debtors may benefit from some additional time to make an assumption or rejection decision, this factor would begin favoring the nondebtor party as time progressed. 291 B.R. at 299–300. The court, was sympathetic to both parties' interests but recognized that the harms in the near term fell mainly on the debtors while the harms in the longer term fell mainly on the nondebtor. *Id*. at 301–02. Accordingly, the court granted the debtors ninety days to assume or reject the agreement. *Id*.

85.     Here, the Debtors have conceded the importance of the Agreement to their business by bringing a motion to force Core to perform thereunder (which it is doing). Furthermore, as in *Hawker Beechcraft*, the Debtors have already determined they will continue mining Bitcoin.[19] Celsius has not provided any reason why it would not want to assume the Agreement. Therefore, the question, as in *Hawker Beechcraft*, is if the Debtors need the Agreement to mine Bitcoin, what benefit will the Debtors receive from additional time to assume/reject? Delaying assumption simply to get more time to avoid paying cure costs and timely administrative expenses is not a good reason for delay. Core submits no additional time is needed, and Celsius should be required to make a decision forthwith by November 30, 2022.

### B.  Core is Disproportionally Harmed by the Debtors' Nonperformance

86.     Core is suffering harm due to the Debtors' refusal to perform their obligations to pay postpetition PPT Charges, and Core has been provided no safeguards to protect it from prejudice. In *Hawker Beechcraft*, the court found that the balance of harm inquiry was neutral.

---

[19] *See generally Debtors' Motion Seeking Entry of an Order (I) Permitting the Sale of the Debtors' Mined Bitcoin in the ordinary Course, and (II) Granting Related Relief* (ECF. No. 187).

483 B.R. at 442–43.  The court also found the debtors' arguments about the prejudice they would suffer if they were forced to accelerate their decision unpersuasive, as the debtors had already been granted adequate time to make a decision, the marketing process was already over, and the risk of copycat litigation was minimal.  *Id.* at 443.   It also found the nondebtor's delay in receiving payment was compensable and could be addressed in connection with its motion to compel payment of administrative expenses, noting that "the successful resolution of that motion will resolve [the counterparty's] concern that it is subsidizing the competition."  *Id.*

87.     In *Adelphia*, the court first found that while the balance of the harm favored the debtors in the short run, the balance favored the nondebtor as time progressed.  291 B.R. at 296.  Second, the court found that the safeguards to the litigants was a significant issue favoring the nondebtor, as the debtors' delayed decision was adversely impacting the nondebtor's business.  *Id.* at 297–98.  Third, the court determined that the debtors' postpetition performance had not been particularly good, though not so bad that this factor should supersede the remaining factors.  *Id.* at 298.  Finally, the court accepted the nondebtor's argument that a loss of management rights was not compensable under the Bankruptcy Code, and therefore favored compelling the debtor to make a decision.  *Id.* at 297.

88.     Here, as discussed herein, Core faces numerous harms if it is forced to wait for the Debtor to make a final decision.  For example, forcing Core to continue to perform and subsidize the Debtors' business while Celsius refuses to pay properly owed amounts thereunder deprives Core of needed liquidity, causing an approximately $1.65 million a month cash burn to the detriment of Core and its stakeholders.  *See Core Objection* ¶ 63; Pratt Decl. ¶ 50.  This concern may be rectified if the Court grants Core its first requested relief—immediate and continued payment of all administrative expenses, including all PPT Charges.  Assumption would similarly

permit Core to mitigate this cash burn through the Debtor's payment of cure amounts, adequate assurance of future performance, and reinforcement of Core's Termination Rights should Celsius gamesmanship rear its head again in the future. *See In re Leslie Fay Companies, Inc.*, 166 B.R. 802, 808 (Bankr S.D.N.Y. 1994) ("An executory contract cannot be assumed in part or rejected in part."). Rejection would permit Core to mitigate the go forward cash burn.

89.     If the Court does not rule in favor of Core on the PPT Charges issue, the need for a quick assumption/rejection decision is even more important. Celsius should not be permitted to require Core to continue subsidizing its business without Core being able to exercise its bargained-for right to exit the business relationship through the Effective Termination Right. Rejection would, as noted, stop the cash burn. Assumption of the Agreement *cum onere* would similarly keep all of Core's rights in place, including its Effective Termination Right, which it could exercise as soon as the Agreement was assumed.

### C.     The Nature of the Interest at Stake Favors Finality

90.     The nature of the interest at stake—*i.e.*, Core's viability—favors a decision on assumption or rejection. In *Hawker Beechcraft*, the court determined that because the future prospects of the debtor likely depended on its assumption or rejection of the agreement, the debtor's decision "should be determined at the earliest possible date," and therefore this factor favored compelling the debtor to assume or reject on a specified date and not at some indefinite point in the future. *Id*. 483 B.R. at 433.

91.     In *Adelphia*, the court determined that the nondebtor's interest, and particularly its interest in receiving the benefit of its contractual bargain, constituted an important interest. 291 B.R. at 296. The court also determined that the debtor's interest in the agreement was important as well, and therefore balanced the interest of the nondebtor party. *Id*. Addressing the good to be

achieved, the court determined that the important good to be achieved for the nondebtor was relieving it "from sitting in limbo for an inordinate amount of time. *Id*. at 296–97.

92.      Likewise, here the good to be achieved and the nature of the interest at stake is the viability of Core's business, as well as the preservation of its contractual rights.  Being forced to sit in limbo for an indeterminate amount of time, while burning cash to provide Services to Celsius for which Celsius is not paying, jeopardizes Core's viability to the detriment of itself, its stakeholders, and frankly, Celsius.  This situation is exactly what Core bargained to avoid, with its Effective Termination Right.  The prejudice to Core and negative business impact on Core will be exponentially worse if the Court rules against Core on the PPT Charge issue or the Additional Hosting Dispute, further supporting the requested relief.  The sooner a decision can be made, the sooner both parties can reaffirm their business relationship or pivot and move on.  Core submits that the time to make that decision has come.

### NOTICE

93.      Notice of this Motion has been given in accordance with the Final Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures, and (II) Granting Related Relief (ECF No. 528).  Core submits that such notice is sufficient and no other or further notice need be provided.

*[Remainder of page intentionally left blank]*

## CONCLUSION

WHEREFORE, Core Scientific, Inc. respectfully requests that the Court enter an order (i) compelling Celsius to pay Core's allowed administrative expenses pursuant to 11 U.S.C. § 503(b)(1)(A) immediately, including interest on past due amounts calculated at the rate set forth in section 3(a) of the MSA, and to pay timely for all Services that Celsius is receiving under the Agreement pursuant to the terms of the Agreement and (ii)(a) granting Core relief from the automatic stay pursuant to 11 U.S.C. § 362(d) to exercise all of its rights under the Agreement, including the Effective Termination Right or (b) in the alternative, compelling Celsius to assume or reject the Agreement by November 30, 2022 pursuant to 11 U.S.C. § 365(d).

Dated: October 19, 2022
New York, New York

/s/ Ray C. Schrock, P.C.

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
David J. Lender
Ronit J. Berkovich
Theodore E. Tsekerides

*Counsel to Core Scientific, Inc.*

38