WILLIAM K. HARRINGTON
UNITED STATES TRUSTEE, REGION 2
U.S. Department of Justice
Office of the United States Trustee
201 Varick Street, Suite 1006
New York, New York 10014
Telephone: (212) 510–0500

Hearing Date: November 1, 2022
Hearing Time: 11:00 a.m.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ x
: 
In re : Chapter 11
:
CELSIUS NETWORK LLC., *et al.*,[1] : Case No. 22-10964 (MG)
:
: Jointly Administered
Debtors. :
------------------------------------------------------ x

# OBJECTION OF THE UNITED STATES TRUSTEE TO MOTION OF DEBTORS FOR ENTRY OF ORDER APPROVING DEBTORS' KEY EMPLOYEE RETENTION PLAN

TO: **THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:**

William K. Harrington, the United States Trustee for Region 2 (the "United States Trustee"), hereby submits this objection (the "Objection") to the Motion (the "Bonus Motion") of Celsius Network LLC, *et al.* (the "Debtors") for Entry of an Order Approving Debtors' Key Employee Retention Plan (the "KERP") [ECF. Doc. No. 1021]. In support thereof, the United States Trustee respectfully states:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

## PRELIMINARY STATEMENT

The Debtors filed for bankruptcy over three months ago, with no plan of reorganization on the horizon, a company-wide pause on all of its retail and lending platforms, and great uncertainty as to the recoveries of creditors in these cases. Nevertheless, the Debtors seek approval of a KERP to pay retention bonuses to 62 employees (the "KERP Participants") totaling $2.96 million. It defies logic, not to mention the Bankruptcy Code, that a company where the majority of its functions are no longer providing services, would now propose a multi-million dollar bonus scheme.

The Bonus Motion fails to identify *any* factual information that would allow for approval. Most significantly, there is no information provided to determine whether any of the KERP Participants are insiders and therefore there is no way to determine if Section 503(c)(1) applies. The Debtors have attempted to bypass the stringent standard of Section 503(c)(1) by seeking relief pursuant to Section 503(c)(3), which is only applicable *if* the participant is not an insider. Although the Debtors assert that none of the KERP Participants is an insider, their support for that assertion is found in an unredacted chart that was provided only to the Court, counsel to the Official Committee of Unsecured Creditors (the "Committee"), and the United States Trustee. Other parties-in-interest can only guess who the KERP Participants might be, and whether they might be able to argue that one or more of the KERP Participants is, in fact, an insider.

Section 503(c)(3) is not without its own strict standards. Among the hurdles that must be met are that bonuses must be justified by the facts and circumstances of the cases as well as the thresholds must be genuinely incentivizing and not solely for the purpose of inducing those insiders to remain with the Debtors' business. As discussed more fully below, the Debtors have failed to meet their burden for many reasons:

- The KERP bonuses are not tied to any identifiable metric that would enable parties-in-interest and the Court to determine whether the bonus payments are reasonable based on the facts and circumstances of these cases.

- The Bonus Motion fails to identify the KERP Participants' (1) identities, (2) job titles, (3) the job responsibilities, (4) salary and other forms compensation (current and historical), and (5) supervisors and/or who they supervise.

- The Bonus Motion fails to identify whether the KERP Participants are employed by Debtors or non-Debtor affiliates.

- Debtors' management structure and where the KERP Participants fall within that structure should be disclosed.

- No information regarding the historical bonus structure for any KERP Participant is provided in the Bonus Motion.

- Certain, if not all, of the KERP Participants received prepetition CEL (defined below) token awards and, perhaps, lump sum amounts as part of their salaries; however, the amounts paid to the KERP Participants in CEL tokens or otherwise, are not addressed in the Bonus Motion.

- Certain of KERP Participants might have sold their prepetition CEL tokens and realized USD or other cryptocurrency as a result of such transactions. Those awards are not disclosed.

To require the inclusion of this information as part of a bonus motion is consistent with the customary case-by-case analysis that courts perform to evaluate a KERP. Given that the Bonus Motion provides no way to ascertain the basis for conferring cash awards on the KERP Participants, the Bonus Motion does not provide sufficient information to enable the Court to make an independent determination that the KERP passes muster under the facts and circumstances of these cases. For all these and additional reasons, as fully detailed below, the United States Trustee respectfully objects to the Bonus Motion.

## BACKGROUND

A. **General Background**

1. On July 13, 2022 (the "Petition Date"), Celsius Network LLC, Celsius KeyFi LLC, Celsius Lending LLC, Celsius Mining LLC, Celsius Network Inc., Celsius Network Limited, Celsius Networks Lending LLC, and Celsius US Holding LLC (collectively, the

"Debtors") each commenced a voluntary case under Chapter 11 of the Bankruptcy Code. *See* Voluntary Petitions, SDNY Case No. 22-10964(MG), ECF Doc. No. 1. Declaration of Shara Cornell (the "Cornell Decl.") at ¶ 3.

2. On July 19, 2022, the Court entered an Order directing that these cases be jointly administered. ECF Doc. No. 53.

3. An Official Committee of Unsecured Creditors was appointed on July 27, 2022. ECF Doc. No. 241.

**B. The Bonus Motion**

4. On October 11, 2022, the Debtors filed the Bonus Motion. The Bonus Motion was accompanied by the declaration of Josephine Gartrell (the "Gartrell Declaration") [ECF Doc. No. 1023] and the declaration of Christopher Ferraro (the "Ferraro Declaration") [ECF Doc. No. 1022].

5. As described by the Debtors, "the Debtors require a motivated and engaged workforce with institutional knowledge and understanding of the cryptocurrency industry that shares the same vision." Bonus Motion at ¶ 2.

6. The Debtors have designated 62 of its 275 current employees as KERP Participants. Bonus Motion at ¶ 12. According to the Debtors, these proposed KERP Participants "perform a variety of important business functions that are vital to the Debtors' ability to preserve and enhance stakeholder value." *Id*.

7. Additionally, according to the Debtors, "certain employees have not been paid their agreed-upon compensation during these chapter 11 cases. The Debtors previously compensated certain of their employees with their proprietary cryptocurrency ("CEL") token in addition to cash compensation. This practice is currently suspended, and as such, eligible

employees have been missing this portion of their compensation since the first quarter of 2022." *Id*. at ¶ 13.

8. Upon information provided by the Debtors in response to the United States Trustee's inquiries regarding the Bonus Motion, on March 30, 2022, there was a CEL distribution, in which 54 of the KERP Participants participated. Cornell Decl. at ¶ 5. How much each employee received is not described in the Bonus Motion. Cornell Decl. at ¶ 4.

9. The Bonus Motion admits that "certain Participants have titles incorporating the word 'head,' 'director,' 'vice president,' or 'chief'. . ." Bonus Motion at ¶ 14.

10. The KERP contemplates retention-based payments to the KERP Participants in an approximate aggregate amount of $2.96 million over an unknown period. *Id*. at ¶ 16.

11. The proposed KERP awards are equal to thirty-five, twenty-five, or fifteen percent of the Participant's annual salary depending on whether the Participant is identified as most critical (thirty-five percent of base salary) or a Tier Two or Tier Three level of criticality, which would pay twenty-five and fifteen percent of such Participant's base salary, respectively. *Id*.

12. The dates for payment of the KERP are 50% payable on the date of execution of the retention agreement, 25% to be paid on the earlier of the Effective Date or Confirmation of a chapter 11 plan, and 25% upon the earlier of the first anniversary of execution of the retention agreement or confirmation of a chapter 11 plan. *Id*. As of the date of the filing of the Bonus Motion, no chapter 11 plan has been filed. Cornell Decl. at ¶ 3.

13. The Bonus Motion also seeks to reserve funds (the "<u>KERP Reserve Pool</u>") of $200,000 to be distributed on an as-needed basis at the discretion of management. *Id*.

14. The Bonus Motion also contemplates that the Debtors may need to retain additional employees who are not currently designated as KERP Participants or non-insider new hires in the event initial KERP Participants resign or are terminated for cause; thus, it provides for replacement of initial KERP Participants. *Id*. at ¶ 16.

## DISCUSSION

**A.     The Statutory Framework**

Section 503 governs the allowance of administrative expenses "for actual, necessary costs and expenses of preserving a debtor's bankruptcy estate." 11 U.S.C. § 503(b)(1)(A). The two general overriding policies of Section 503 of the Bankruptcy Code are: (i) to preserve the value of the estate for the benefit of its creditors and (ii) to prevent the unjust enrichment of the insiders of the estate at the expense of its creditors. *In re Journal Register Co.*, 407 B.R. 520, 535 (Bankr. S.D.N.Y. 2009) (citing *Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98. 101 (2d Cir. 1960)) (additional citations omitted).

Section 503(c)(1) of the Bankruptcy Code prohibits any transfer:

> made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtors' business, absent a finding by the court based on evidence in the record that
>
> (A)   the transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;
>
> (B)   the services provided by the person are essential to the survival of the business; and
>
> (C)   either –
>
>       (i)   the amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given to nonmanagement employees for any purpose during

>    > the calendar year in which the transfer is made or the obligation is incurred; or
>
>    (ii) if no such similar transfers were made to, or obligations were incurred for the benefit of, such nonmanagement employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose during the calendar year before the year in which such transfer is made or obligation is incurred;

11 U.S.C. § 503(c)(1).

A transfer to an insider to induce the insider to remain with the debtor's business must satisfy the requirements under subdivisions (A), (B), and (C) of Section 503(c)(1) of the Bankruptcy Code to be subject to this subdivision's exception. *4 Collier on Bankruptcy* ¶ 503.17 (15th ed. rev. 2007); *see also In re Dana Corp.*, 358 B.R. 567, 575 (Bankr. S.D.N.Y. 2007) ("*Dana II*") (summarizing the requirements under Section 503(c)(1) of the Bankruptcy Code). Attempts to characterize what are essentially prohibited retention programs as "incentive" programs to bypass the requirements of Section 503(c)(1) of the Bankruptcy Code are looked upon with disfavor, as the courts consider the circumstances under which particular proposals are made, along with the structure of the compensation packages, when determining whether the compensation programs are subject to section 503(c)(1) of the Bankruptcy Code. *See In re Mesa Air Group, Inc.*, No. 10-10018, 2010 WL 3810899, at *2 (Bankr. S.D.N.Y. Sept. 24, 2010) (citing *In re Dana Corp.*, 351 B.R. 96, 102 n.3 (Bankr. S.D.N.Y. 2006) ("*Dana I*") (stating that if a bonus proposal "walks like a duck (KERP), and quacks like a duck (KERP), it's a duck (KERP)."). In other words, retention bonuses cannot be paid to insiders absent proof that (1) the insider has a "bona fide job offer from another business at the same or greater rate of compensation;" (2) the services provided by the insider are essential to the survival of the

business; and (3) the bonus cannot be more than ten times the mean retention bonus paid to non-management employees in the same calendar year. *See* 11 U.S.C. § 503(c)(1). Because this exacting standard for retention bonuses is difficult to satisfy, most Debtors, including the Debtors here, instead seek authority to pay bonuses to insiders under section 503(c)(3).

Section 503(c) of the Bankruptcy Code, added in 2005 as part of the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA"), was intended to curtail payments of retention incentives to insiders, including bonuses granted to other employees without factual and circumstantial justification. *See Journal Register*, 407 B.R. at 535; *see also In re Pilgrim's Pride Corp.*, 401 B.R. 229, 234 (Bankr. N.D. Tex. 2009) ("Section 503(c) was enacted to limit a debtor's ability to favor powerful insiders economically and at estate expenses during a chapter 11 case.") (citing *In re Airway Indus., Inc.,* 354 B.R. 82, 87 n.12 (Bankr. W.D. Pa. 2006)) (additional citations omitted); *In re Global Home Prods., LLC*, 369 B.R. 778, 783-84 (Bankr. D. Del. 2007) (the amendments were added to "eradicate the notion that executives were entitled to bonuses simply for staying with the Company through the bankruptcy process."). This section establishes specific evidentiary standards that must be met before a bankruptcy court may authorize payments made to an insider for the purpose of inducing such person to remain with a debtor's business. *Dana I*, 351 B.R. at 100; 11 U.S.C. § 503(c)(1).

The BAPCPA amendments make it abundantly clear that if a proposed transfer falls within Section 503(c)(1), then the business judgment rule does not apply, irrespective of whether a sound business purpose may actually exist. *Id.* The effect of Section 503(c) of the Bankruptcy Code was to put in place "a set of challenging standards" and "high hurdles" for debtors to overcome before the Court is in a position to determine that retention bonuses should be paid. *Mesa Air Group*, 2010 WL 3810899, at *2 (*citing Global Home Prods.*, 369 B.R. at 785)

B.  **The Debtors Have Failed to Establish that Section 503(c) Is Not Applicable to Employees Covered by the KERP**

Section 503(c) restricts transfers made to "insiders" of a debtor. 11 U.S.C. § 503(c). The Debtors bear the burden of establishing that the KERP satisfies all of the Code's requirements. *See GT Advanced Tech., Inc. v. Harrington*, 2015 WL 4459502, *5 (Bankr. D.N.H. July 21, 2015) (*citing In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012)). Therefore, the Debtors must satisfy their burden and prove that all the KERP Participants are not "insiders," as defined under the 11 U.S.C. § 101(31). The Debtors have not met their burden here. Simply put, statements in the Bonus Motion that none of the KERP Participants are statutory "insiders" do not provide this Court with an evidentiary basis to make a conclusion on the status of these individuals.

While disclosing to the United States Trustee that certain of the KERP Participants hold titles such as "vice president" and "director," the Debtors nevertheless maintain that all such employees are not insiders. The Debtors provide no evidence regarding the specific duties or authority of any of its KERP Participants and simply generalize that the KERP Participants do not have control over the Debtors' operations, policy or budget, and do not have any connection to the Board.

The potential facts that the KERP Participants may not be classified as executive officers and may not have input in the KERP is not dispositive as to whether the KERP Participants are insiders. Pursuant to the Section 101(31) of the Bankruptcy Code, if a debtor is a corporation, the term "insider" includes an officer of the debtor. 11 U.S.C. § 101(31)(B)(ii). A vice president as an officer is presumptively an insider. *In re Foothills Texas, Inc.*, 408 B.R. 573, 579 (Bankr. D. Del. 2009). Moreover, regardless of title, a person with broad responsibilities over significant aspects of a debtor's business is considered an insider, even if he or she is not a member of

senior management. *Id*. at 584 (finding vice presidents who had broad responsibilities over significant aspects of debtor's business, to be insiders); *see also Borders Group*, 453 B.R. at 469 (Bankr. S.D.N.Y. 2011) ("[i]nsider status can also be determined on a case by-case basis based on the totality of the circumstances, including the degree of an individual's involvement in a debtor's affairs"); *Office of the United States Trustee v. Fieldstone Mortgage Co.*, No. CCB-08-755, 2008 WL 4826291, at *5 (D. Md. Nov. 5, 2008) ("[C]ontrol . . . is an independent additional ground for finding a person an insider, not a feature that officers or directors are required to possess in order to be deemed insiders"); *In re Krehl*, 86 F.3d 737, 741 (7th Cir. 1996) (definition of insider is illustrative rather than exhaustive); *compare In re Kunz*, 489 F.3d 1072 (10th Cir. 2007) (it is not simply the title "director" or "officer" that renders an individual an insider; rather it is the set of legal rights that a typical corporate director or officer holds).

Accordingly, unless the Debtors disclose the KERP Participants, together with a statement as to their job descriptions, and to whom they report, the officers participating in the KERP are presumed to be insiders. *Foothills Texas, Inc*., 408 B.R. at 584. Insiders are subject to the requirements of Section 503(c)(1) and the Debtors have neither met their burden of proof under that subsection nor have they rebutted the presumption of insider status absent a more fulsome discussion of the roles and responsibilities of each KERP Participant.

Because the Debtors have failed to establish the KERP Participants are not insiders, and because the Debtors have characterized their KERP as entirely for the purpose of retaining their employees, the insider employees fail to satisfy the requirements of Section 503(c)(1).

C.     **The KERP Does Not Satisfy Section 503(c)(3)**

The KERP is not justified by the facts and circumstances of these chapter 11 cases and therefore fails the more permissive test of Section 503(c)(3). In order for the bonus plan to pass

10

muster under Section 503(c)(3) of the Bankruptcy Code, the movant must show that it is warranted by "the facts and circumstances of the case." 11 U.S.C. § 503(c)(3); *Dana II*, 358 B.R. at 576. To evaluate whether a proposed bonus plan passes muster under Section 503(c)(3), courts generally consider the following factors outlined in *Dana II*:

> [1] Is there a reasonable relationship between the plan proposed and the results to be obtained, i.e., will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, is the plan calculated to achieve the desired performance?
>
> [2] Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?
>
> [3] Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?
>
> [4] Is the plan or proposal consistent with industry standards?
>
> [5] What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?
>
> [6] Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

*Dana II*, 358 B.R. at 576-77.[2] "'[T]he court must make its own determination that the transaction will serve the interests of creditors and the debtor's estate.'" *GT Advanced Tech. Inc*, 2015 WL 4459502, at *7.

---

[2] Some courts in this district have determined that the standard under Section 503(c)(3) is not different from the business judgment test under Section 363, *see In re Residential Capital, LLC*, 491 B.R. 73, 84 (Bankr. S.D.N.Y. 2013), nonetheless, courts continue to apply the *Dana II* factors. *See, e.g., Borders*, 453 B.R. at 474 (evaluating an incentive plan under the business judgment standard of Section 363 by applying the factors listed in *Dana II*); *but see In re Pilgrim's Pride Corp.*, 401 B.R. 229, 236-37 (Bankr. N.D. Tex. 2009) (standard for approval under section 503(c)(3) is higher than the business judgment test; if payments to employees outside the ordinary course were only subject to the business judgment test, then the language of section 503(c)(3) would ostensibly be rendered meaningless).

1. **The KERP Does Not Establish a Relationship Between Effort and Outcome**

The Debtors have not established a nexus between the KERP and the results sought to be achieved. Even under the less rigorous standards of Sections 503(c)(3) and 363, the benchmarks for the payment of bonuses must be "difficult targets to reach." *Dana II*, 358 B.R. at 583.

The Bonus Motion fails to establish a relationship between the KERP and the Debtors' need to retain the KERP participants. First, the Debtors acknowledge that the "Debtors' trading, lending, staking, and custody platform (the "Platform") is frozen" but provide no meaningful explanation as to what that means.[3] The only information provided by the Bonus Motion is that "employees continue to perform maintenance, updates, and essential security functions on the Platform to facilitate a successful reorganization or sale as well as prepare the platform for making distributions to creditors and for any post-emergence operations." Bonus Motion at ¶ 25. This description does not provide for a reasonable relationship between the KERP Participants and the KERP and leaves open questions as to what these employees are actually doing.

Second, the KERP contains no performance metrics. The only requirements for the installment payments are that the KERP participants remain employed during the indeterminate employment period that spans through confirmation of a hypothetical plan that is yet to be filed. Bonus Motion at ¶ 11. This, however, is the goal in every Chapter 11 case, and one which the KERP Participants will need to accomplish as part of their employment and fiduciary duties even in the absence of the KERP. Moreover, facilitating a successful reorganization are the responsibilities and services to be performed by the talented professionals retained or to be

---

[3] The creditor body deserves factual information regarding what the Debtors are doing while the Platform is frozen. This information vacuum created by the Debtors has led, in part, to *pro se* creditors making requests for cost saving measures in this case. *See, e.g.*, Daniel A. Frishberg's Motion to Compel the Debtors to Institute Significant Cost Cutting Measures [ECF Doc. No. 1041].

retained by the Debtors in these cases, not the KERP Participants. Other than conclusory statements that the services are critical to the Debtors' reorganization, no specifics have been provided that would allow a determination of need for KERP Participants that justified additional and confidential bonuses.

### 2. There is Insufficient Evidence to Conclude That the Costs are Reasonable

The Bonus Motion appears to rely on the fact that the total cost of the KERP is allegedly only a "fraction of the Debtors' total revenue and liabilities" and therefore is reasonable. However, no deeper analysis is provided by the Bonus Motion. The Debtors have a failed to establish whether the KERP is reasonable because there is no historical information to evaluate the proposed retention payments. While the Debtors have provided on a confidential basis the salaries the KERP Participants, among the participants are numerous employees who are highly compensated by any measure. In fact, 5 of the highly compensated employees are scheduled to receive bonus payments of $100,000 or more. *See* Cornell Decl. at ¶ 5.

The Bonus Motion references that certain of the KERP Participants were historically compensated in CEL token but since the CEL program has ceased (with no details regarding the end of this compensation program), the Debtors assert that its employees need additional monetary compensation. However, the Bonus Motion fails to identify which employees were previously compensated with CEL tokens, what quantity or value of CEL tokens were provided, if the receipt of CEL token was tied to any bonus program, or any other information that would allow a reasonable analysis of the KERP to determine if the proposed costs are reasonable. Without further information, the reasonableness of the KERP payments cannot be evaluated.

3. **There is Insufficient Evidence that the KERP Does Not Discriminate Unfairly**

The Debtors largely ignore this factor, and provide a mere four sentences that make no mention as to how the KERP is applied and whether or not it is fair or discriminatory. The question of whether the need for a particular employee is critical to the Debtors' reorganization appears not to have been applied evenly. Given the lack of specific information regarding the KERP Participants in comparison to other employees, it cannot be determined whether any of the other employees are performing functions comparable to employees included in the KERP.

4. **The Bonus Motion Provides No Basis to Conclude that the KERP is Consistent with Industry Standards**

The Bonus Motion provides mere lip service addressing the sixth *Dana* factor regarding industry standards. Bonus Motion at ¶ 32 and 33. However, not one sentence explains how any of the cited case examples – *Revlon*, *Frontier*, *Windstream*, *Westinghouse*, or *SunEdison* – are in any way similar to Celsius. The Debtors have, however, taken great pains to explain that Celsius is not a typical case and is in fact unique and unlike any other (*see, e.g.*, Bonus Motion at ¶ 2: *"*Many of the key issues in the Debtors' chapter 11 cases are of first impression"). Indeed, the Debtors are unique and is in fact operating in an entirely different industry than any of the cite cases. More importantly, the Debtors ceased operations months ago, prior to the Petition Date. None of the cited cases involve companies that ceased operations yet still required payment of bonuses to a quarter of its work force. The Debtors have yet to explain what these employees are doing while the Debtors lending, borrowing, banking, and retail platforms have been shut down since June. The Debtors' superficial string citations does not provide an adequate basis to conclude that the proposed KERP is consistent with industry standards. For these reasons, the

Debtors have failed to establish that the KERP is justified by the facts and circumstances of this case.

**WHEREFORE,** the United States Trustee respectfully requests that the Court sustain the foregoing Objection and grant such other and further relief as the Court may deem just and proper.

Dated: New York, New York
October 27, 2022

Respectfully submitted,

WILLIAM K. HARRINGTON
UNITED STATES TRUSTEE, Region 2

By: */s/ Shara Cornell*
Shara Cornell, Esq.
Brian Masumoto, Esq.
Mark Bruh, Esq.
Trial Attorneys
201 Varick Street, Room 1006
New York, New York 10014
Tel. (212) 510-0500