Immanuel Herrmann
*Pro se Celsius creditor*
Admin of the worldwide Celsius
Earn Customer Telegram group
**https://t.me/celsiusearn**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____
                                                              )
In re:                                                       )          Chapter 11
                                                              )
CELSIUS NETWORK LLC, *et al.*,[1]      )          Case No. 22-10964 (MG)
                                                              )
                    Debtors.                         )          (Jointly Administered)
_____)


**PARTIAL JOINDER AND RESPONSE TO IGNAT TUGANOV'S (A) RESPONSE TO**

**EXAMINER'S MOTION TO APPROVE WORK PLAN, AND (B) MOTION TO CLARIFY OR**

**EXPAND SCOPE OF THE INVESTIGATION**


Now comes Immanuel Herrmann, a Celsius Network LLC *pro se* creditor and party in

interest in the above-referenced bankruptcy proceeding, to file this Partial Joinder and

Response to D.R. 1104. In support thereof, I respectfully submit as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

**INTRODUCTION**

This case is, in some ways, novel and unusual. It is, for one thing, the first crypto bankruptcy *of its size* in the United States. Yet, in other ways, "the thing that hath been, it is that which shall be; and that which is done is that which shall be done: and there is no new thing under the sun."

What appears to have likely happened here–and what is at least to some degree undisputed even by the Debtor–is a tale as old as human nature and financial markets: taking people's assets, promising them unsustainable, steady, largely single-digit returns on those assets and, rather than earning all of those returns through legitimate operations, paying out old investors with new investors' money to keep the operation going.

Is the above description sufficient to make something a Ponzi? If so, Celsius was one, for at least periods of time and, quite possibly, for most of the time. It really depends on the definition of Ponzi, CEL token, when the company's executives knew they were insolvent, and for how long.

**IMAGINE FAHRENHEIT INVESTMENTS, A "NEW" 1928 INVESTMENT COMPANY**

Imagine it's 1928. The stock market is roaring. An investment product emerges that asks people to mail in their bearer bonds, stock certificates, and gold depository receipts and earn a safe yield–"Safer than a Bank!"

In exchange for turning over their certificates, people are promised a steady, safe yield–*on top of* the price appreciation of the roaring stock market. (We'll call this company Fahrenheit Investments.)

Fahrenheit Investments starts as a legitimate offering: The founder discovers that bucket shops–which let people take directional up-or-down bets on stocks–will pay reasonably high interest on people's borrowed stock certificates, bearer bonds, and gold certificates. The problem is the bucket shops have only a *limited demand* for these certificates, because they only need so much liquidity. At first, the supply of certificates provided by customers equals the demand from customers, and they continue to engage in "1:1 over-collateralized lending." But soon, the promoter is *flooded* with customers, who are thrilled to earn a safe yield on top of the price appreciation they are already receiving in a booming bull market.

Bucket shops also have a high demand for people's boring old U.S. dollar-denominated bearer bonds, so people mail those in too, and they are promised nearly a 10% return on them. Unable to get funding from "legitimate" banks who don't like bucket shops, bucket shops are able to use the bearer bonds as collateral with local gambling dens to get cash to fund their operations, bet against their customers (with a spread), allow futures and naked short selling, and make side deals with other bucket shops.

To keep returns up, Fahrenheit Investments starts lending out customers' stocks to gambling dens and borrowing more bearer bonds against its customers' stocks, and which it then lends out more bucket shops to try to earn more interest, and, well, so on …

Now here's the problem: As Fahrenheit Investments is flooded with money in the bull market, the interest rates that bucket shops and gambling dens will pay Fahrenheit for lending out its customers' certificates starts to go down.

Wanting to turn no one away, however–and to keep growing the business–Fahrenheit Investments pays market conditions no mind: They continue offering the same high yields to all their new customers. It's boom times, and they're prioritizing "customer growth." Even though they know that they have no capacity to earn the posted yield for the large (and growing) number of customers they now have, they figure that eventually–in 1930 or so–stocks will go to the moon, and Fahrenheit Investments will go public, and, when this happens, they will get enough cash to make the founders obscenely rich and make all their customers whole.

As the bull market continues into 1929, more and more depositors mail in their stock certificates, gold certificates, and bearer bonds to Fahrenheit. Fahrenheit uses some of the money that comes in to take out more and more full-page ads in the newspaper promoting the company. During this time, they don't lower their interest rates much; if they do, they are still well above the overall rate they are actually receiving from lending activities and other activities. They also take on new investors into the company itself, sell lots of their customers' stocks to make new investments, and invest the proceeds to build what will become the biggest stock exchange in North America (which seems like a great idea since its the 1920s and stocks can only go up, and that will only increase, and it will make them even more money.)

While Fahrenheit is knowingly insolvent all this time, and is getting deeper and deeper into a hole, the strategy remains all about customer acquisition, as always. They figure they'll make it all back during their IPO in 1930 or 1931.

Throughout all this, Fahrenheit's executives are knowingly, and on an ongoing basis, paying out more interest than they are taking in. Furthermore, they know that they have no path to ever earn the interest they are paying out through business operations. Not directly anyway. But no matter, they reason: they'll make it all back through price appreciation–via an IPO or other exit event.

Complicating matters further, the promoter, all along, has been selling hisown certificates directly to customers and offering interest on those certificates, too. Everyone wants these new certificates during the bull market. They call the stock certificates "CEL shares." Rather than trading on a public stock exchange, "CEL Shares" are only available in select bucket shops that Fahrenheit has relationships with. They also trade peer-to-peer, in the back of coffee shops. The number of "CEL shares" that bucket shops have is largely controlled by Fahrenheit Investments, who have their own private arrangements with bucket shops and control the price and the quantity available at each bucket shop. When the price starts to fall, the company is able to prop it up. Sometimes, with customers' funds. Other times, they simply call the bucket shops and tell them to send back CEL shares to the company, or just to put them in the back room of the bucket shop, to make them more scarce. That way, they only have to buy a few shares to make the price spike.

Since the vast majority of CEL shares belong to the company, calling them back to create fake scarcity costs them nothing. It's a great system: whenever insiders want to cash out,

they pump the price on low volume when CEL shares are scarce, and then, they take their own CEL shares to a bucket shop and dump them onto the market while they can freely use customer funds to keep the price from dropping too much.

Everyone is winning and everything looks great in a bull market: CEL Shares have a really high market cap, or so it appears. People who multiply the number of shares by the price are amazed at the price, and price appreciation, and feel they are "in the money." The company even seems solvent, sometimes. People lucky enough to have a CEL share can exchange it for quite a lot. To keep this going, and let some customers cash out to spread the word, Fahrenheit Investments starts trading in depositors' stock certificates and bearer bonds to buy more CEL shares and pump the price even more. Insiders and early adopters cash out. At times, the company looks solvent on paper, when they're able to get a high "market cap" for their CEL shares. Everything is great.

In October of 1929, however, the bubble pops. The IPO never comes. Fahrenheit Investments declares bankruptcy. As the market crashes, some bucket shops, including one called the Famous Trading eXchange, or FTX, starts offering the naked shorting of spot and future CEL shares to help drive it into liquidation and snap up shares and assets on the cheap.

In this instance, while there is, at all times, some legitimate business activity going on at all times–and no one says otherwise–and there are also "CEL Shares"–a new type of stock promoted by the company that isn't backed by anything except price manipulation by Fahrenheit, it also sounds a lot like a Ponzi scheme, or, at least, some kind of *Ponzi-like* scheme.

Maybe this is not exactly a Ponzi at all, by the old 1919 Charles Ponzi definition. Maybe it is. Or maybe, it's just a bit different: a *better version* of a Ponzi. A "better mousetrap" as Ralph Waldo Emerson once said; something that will go on longer, and perform better, for longer.

When the company goes bust and files for bankruptcy–and the scheme is finally exposed in bankruptcy court–it's no surprise that it's a mess and nobody knows quite what to make of it or how to clean it up. Is this whole thing a Ponzi? Maybe a *very fancy* new version of one. Or, at least, something quite similar, at least morally, conceptually, and practically speaking. But, in court, you never know. Or, as Bill Clinton once said, "it depends what the meaning of the word 'is' is."

**A VOLATILE-ASSET-DENOMINATED PONZI CREATES A CONFOUNDING PROBLEM**

Maybe Celsius *was* indeed a Ponzi, or something like it. What does that mean, practically speaking? And what's to be done about it? Well, for one thing, denominating the thing in US dollars could be a disaster.

Going back to my Fahrenheit example, if you considered Fahrenheit to be a Ponzi since 1928, that doesn't mean that starting clawbacks, during its 1930 bankruptcy, in dollars, based on withdrawal prices would make any sense really. In fact, doing so would be absolutely catastrophic to retail investors in 1930 because of stock market volatility. Innocent depositors who withdrew at the top of the bull market October of 1929 and spent the money would simply go bankrupt if you tried to get them to pay back their "fair share" in dollars in 1930.

Due to the extreme volatility of crypto markets, akin to stocks between 1929-1930, a dollar-denominated Ponzi wouldn't work here, just practically speaking; it's inequitable and would go against basic principles of justice and therefore should, likely, not be done under the court's broad equitable powers–even if this thing is technically is a Ponzi, which it well may be.

Treating Celsius as a dollar-denominated Ponzi also fails to address a unique problem in this case: Celsius was never operating in U.S. dollars as its primary currency; its balance sheet was denominated in the cryptocurrencies it held. It never promised people returns denominated in dollars; it promised people in-kind returns, denominated in what people deposited. And, to the extent there was "fake" interest that was a return of other users' principle, it paid out was largely in-kind, or in CEL token.

So, customers deposited specific amounts of cryptos in and expected the same thing out–in kind: one bitcoin in, one bitcoin plus "interest" out. Depositors were promised a steady, low-single-digit rate of return *denominated in what they deposited, and not in dollars*.

Ponzi or not, Celsius had a balance sheet *correlated* to crypto markets and made up of crypto all along. So, while looking into whether it was a Ponzi is interesting and important to the case. But, if it is, the question becomes: What's to be done about that? Could something be a Ponzi, but still be handled in *crypto denominated terms?*

**INVESTIGATING WHETHER CELSIUS WAS A PONZI IN *CRYPTO TERMS* IS BEST**

**If** Celsius was paying out more crypto than it was earning on a consistent basis, then it could certainly be ruled to be a form of Ponzi scheme–perhaps a new 21st Century form

because of the technology. (But if we just ignore the technology, the same basic thing *could have* been done in the 1920s–*a la* "Fahrenheit Investments").

Additionally, even though normally bankruptcy is adjudicated in U.S. dollars, this court has acknowledged that many customers seek to receive *in-kind* distributions.

Even if this is a modern form of Ponzi, that desire would remain. In fact, in the interests of an equitable outcome, such a desire would likely only grow stronger–and would be the only reasonable path because of the devastating consequences of a dollar-denominated Ponzi ruling.

And it makes sense: Users deposited specific cryptocurrencies in specific amounts into Celsius. The optimal outcome, if this is deemed to be a Ponz, would be to recover as much as possible of the *same* cryptos that users deposited. Being made whole, in this case, means that someone who deposited one bitcoin should get as close to one bitcoin as they can.

Because of the plain representations of the company, the relationship of the company to its depositors, and the obvious intent of customers (withdrawing the same amount and type of crypto they deposited, in-kind, at a future date), the *promise* that was broken was the *promise* to deliver the number of coins a user deposited. Even if the contract were completely overturned and if substantive consolidation were to happen–as should happen in this case in my view–keeping things *denominated in the originally deposited cryptos* would be the only method that would really make sense.

**PARTIAL JOINDER AND RESPONSE**

I agree with the general thrust of the Movant's arguments that it is worth *investigating* whether the Debtors' business operations constitute a Ponzi scheme, and if so, when the Ponzi scheme began. Additionally, I have added some clarifying language below should such an order be approved by the court.

However, I do have serious reservations about actually declaring Celsius to be a traditional Ponzi scheme; particularly one denominated in dollars. For a few reasons:

1. Practically speaking, a Ponzi determination may actually stop a reorganization, even though the company has a valuable customer list, app, team, etc.
2. A dollar-denominated Ponzi was not what was going on here. And, that outcome would likely be absolutely devastating and potentially unjust due to crypto market volatility. Therefore, I would be very cautious about actually declaring Celsius to be a dollar-denominated Ponzi scheme. Dollar-denominated clawbacks, based on people who withdrew at the top of a bull market, for example, could decimate retail investors and would be profoundly unjust. (I say this as someone who didn't withdraw much on net from Celsius and might benefit from such a thing on paper. Even though that's the case, I take the position that it would be much better to keep everything denominated in the originally-deposited cryptocurrency.)

**PROPOSED EDITS TO IGNAT TUGANOV'S PROPOSED MOTION TO CLARIFY**

To carefully consider these issues in an investigation, I would amend the Examiner order to include time-of-insolvency issues (even if Celsius is not ultimately found to be a Ponzi), by

amending item 2 of the proposed order of Ignat Tuganov with the following redline/underlined edits:

> 2. The Examiner is directed to amend her Work Plan[2] to specifically provide that the Examiner will investigate, among other things, <u>when the Debtors first became insolvent, when Insiders first became aware of the insolvency of the Debtors, and</u> whether the Debtors engaged in a Ponzi or <u>Ponzi-like</u> scheme <u>in US Dollar-denominated terms and/or in cryptocurrency-denominated terms</u>, and if so, when <u>the scheme</u> began and the consequences thereof (the "Ponzi Investigation")

I would also recommend that the examiner's investigation of CEL token be expanded to include <u>"whether the CEL token was effectively used to facilitate a Ponzi or Ponzi-like scheme through the manipulation of its liquidity and market capitalization."</u>

It is critical that, if this investigation takes place, any investigation of whether Celsius was a Ponzi or Ponzi-like scheme, at least *consider* the view that depositors expected to get out of Celsius what they deposited, *in-kind*.

And in doing so, the question becomes: Was Celsius knowingly paying out more of various sorts of coins than it was taking in–apart from its investment losses and other legitimate activities–for a substantial period of time? Were they aware that they controlled the liquidity for the CEL token and that it was thinly traded? If so, when did the Debtor first become aware of these things? If paying out more coins than they were taking in was a substantial part of the company's history, then, perhaps, it is something similar to a Ponzi scheme.

Thank you, Your Honor.


Dated: October 27, 2022
Silver Spring, Maryland

/s/ Immanuel Herrmann
Immanuel Herrmann