Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

**OMNIBUS REPLY IN SUPPORT
OF DEBTORS' MOTION FOR ENTRY OF AN ORDER
(I) APPROVING THE DEBTORS' KEY EMPLOYEE RETENTION
PLAN AND (II) GRANTING RELATED RELIEF AND MOTION FOR
ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO REDACT
AND FILE UNDER SEAL CERTAIN CONFIDENTIAL INFORMATION
RELATED TO THE DEBTORS' KEY EMPLOYEE RETENTION PLAN**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") submit this omnibus reply to the *Objection of the United States Trustee to Motion of Debtors for Entry of Order Approving Debtors' Key Employee Retention Plan* [Docket No. 1207] (the "U.S. Trustee Objection"), and *Omnibus Objection to Debtors' Motion for Entry of an Order*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

1

*Authorizing the Debtors to Redact and File Under Seal Certain Confidential Information Related to the Debtors' Key Employee Retention Plan (Dk. 1020) and Debtors' Motion for Entry of an Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief (Dk. 1021)* [Docket No. 1202] filed by Victor Ubierna de las Heras (the "Pro Se Objection"), and together with the U.S. Trustee Objection, the "Objections").

The Objections should be overruled, and the relief requested in the KERP Motion (as defined herein) and Motion to Seal (as defined herein) should be granted. In further support of the KERP Motion and Motion to Seal, the Debtors state as follows:[2]

### Preliminary Statement

1. The Debtors' ability to continue their dual-track sale and standalone reorganization processes depends on their workforce. Each of the Participants provides critical support to the Debtors' operations, which will maximize the value of the estates and inure to the benefit of all stakeholders. To ensure their workforce remains motivated and engaged, the Debtors require the ability to provide competitive compensation, particularly during the uncertainty of these chapter 11 cases—indeed, the Debtors have faced significant attrition in their workforce, with at least 123 employees departing since the Petition Date. The Debtors terminated 325 employees following the Petition Date, further reducing their workforce. More specifically, the Debtors employed over 900 employees at the beginning of this year, over 600 employees on the Petition Date, and only over 200 employees at present. Any further workforce reduction is unsustainable. As a result, the Participants' technical expertise and institutional knowledge is needed to operate and market the

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Debtors' Motion for Entry of an Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 1021] (the "KERP Motion").

2

Debtors' business or pursue a standalone restructuring. Therefore, the Debtors must retain key non-insider employees to administer these chapter 11 cases towards a successful resolution.

2.  Notably, the KERP is supported by the Committee.[3] The UCC recognizes that the KERP "will have the intended effect to retain the key personnel required to administer a value–maximizing restructuring" and shares the same concern that "continued attrition among key non-insider employees could undermine the Debtors' ability to meet their obligations in these chapter 11 cases, run an efficient sales process, and develop and prosecute a standalone plan of reorganization. UCC Statement ¶¶ 3, 5. Only two parties object: the U.S. Trustee and Mr. Ubierna. Despite the U.S. Trustee's assertion that the KERP includes insiders as defined by section 101(31) of the Bankruptcy Code, no Participant is an "insider." The U.S. Trustee does not identify a specific Participant as an "insider." The U.S. Trustee also argues that the Debtors do not demonstrate that the KERP is justified by the facts and circumstances. To the contrary, the KERP is critical to maximizing the value of the Debtors' estates considering the institutional knowledge of the employees in this highly specialized and technical field. The Debtors' employees have legitimate reasons to be concerned about their long-term employment status given, among other things, the uncertainty created by the Debtors' ongoing reorganization and marketing efforts. Indeed, more than twenty additional employees have resigned since the filing of the KERP Motion.

3.  The Pro Se Objection raises similar concerns as the U.S. Trustee Objection and should be overruled on the same grounds. The KERP is in the best interests of all stakeholders, including individual creditors. The Debtors have satisfied their burden of proof, and the relief requested in the KERP Motion and Motion to Seal should be granted.

---

[3] *The Official Committee of Unsecured Creditors' Statement with Respect to the Debtors' Motion for Entry of An Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 1187] (the "UCC Statement").

**Response to the U.S. Trustee Objection**

4.      The U.S. Trustee Objection is without merit. The KERP was developed with the goal of (a) maximizing the value of the Debtors' estates for the benefit of all stakeholders and (b) ensuring that the Debtors will be able to operate their business in the ordinary course during these chapter 11 cases. The Participants are responsible for critical business activities, including cash and digital asset management, IT infrastructure and data management, digital security, accounting, legal, compliance, and other critical functions for the Debtors. These critical business activities, which are required to facilitate the dual-track process of pursuing a sale of some or all of the Debtors' assets or a standalone restructuring, maximize value for the Debtors' estates. Despite the fact that the Debtors' Platform is frozen, the Debtors' employees continue to perform maintenance, updates, and essential security functions on the Platform to facilitate a successful reorganization or sale as well as prepare the Platform for making distributions to creditors and for any post-emergence operations. In addition, since the Petition Date, the Debtors' employees have, in addition to their primary responsibilities:

- Received nearly 300 diligence requests from the Committee, over 100 diligence requests from the U.S. Trustee, and produced over 100,000 documents;

- received nearly 200 diligence requests from potential buyers;

- responded to over fifty requests from the Examiner and participated in numerous telephone and Zoom conferences;

- engaged in interviews with the Committee surrounding security policies;

- overseen the termination and departure procedures of over 400 employees;

- prepared the Debtors' monthly operating reports required under the Bankruptcy Code;

- prepared schedules of assets and liabilities and statements of financial affairs, each of which totaled tens of thousands of pages;

- reviewed and analyzed pleadings filed in these chapter 11 cases, including consulting with their advisors;

- prepared the Debtors' coin reports filed in these chapter 11 cases; and

- prepared weekly full freeze files, which were provided to the Committee and Examiner.

Simply put, the Participants are critical to maximizing the value of the Debtors' estates in these chapter 11 cases.

5. Furthermore, the law is clear that approval of a key employee retention plan rests on the sound exercise of a debtor's business judgment. It is therefore inappropriate for another party to seek to supplant the Debtors' business judgment with its own. The Debtors worked closely with their advisors and the Special Committee to prepare the KERP to address the significant attrition resulting from the Debtors' chapter 11 filings. The Debtors and the Special Committee, working with WTW, analyzed the best method to retain and incentivize employees throughout this chapter 11 process. As discussed in further detail in the KERP Motion, concerns regarding attrition were not speculative. At least 123 of the Debtors' employees, approximately fifty-one percent of the current workforce, have resigned since the Petition Date, and more than twenty employees have resigned since the filing of the KERP Motion. Denying the relief requested in the KERP Motion would exacerbate attrition, destroy value, and cost significantly more than retaining each Participant pursuant to the KERP.

6. The Debtors must preserve the Participants' institutional and technical knowledge to ensure a value-maximizing emergence from chapter 11. The KERP will cost approximately $2.76 million[4] in the aggregate, assuming that all Participants are successfully retained by the Debtors and earn the proposed payments, and it is a worthwhile investment in pursuit of a value–

---

[4] This amount is exclusive of the proposed retention pool.

5

maximizing reorganization or sale.  There is no evidence to suggest that the Debtors can maximize the value of their estates without the continued efforts of their employees.  The KERP is a sound exercise of the Debtors' business judgment.

### Response to Mr. Ubierna's Objection

**I.    Mr. Ubierna's Objection**

7.    Mr. Ubierna opposes the KERP Motion on similar grounds as the U.S. Trustee and also opposes the Motion to Seal.  Both objections should be overruled.

8.    Mr. Ubierna argues that the Motion to Seal should be denied and that the Confidential Information should be filed on the public docket.  He also argues that since ***some*** employees have voluntarily made their job titles publicly available on LinkedIn, ***all*** Participants' information should be publicly disclosed without their consent.[5]  Critically, the information that is already publicly available was voluntarily disclosed and does not link sensitive information, such as salaries and KERP awards, to job descriptions or job titles.  Additionally, as discussed in the Motion to Seal, the job titles are filed under seal to ensure that employee morale is not negatively affected due to disclosure of Participant identities.

### Argument

**I.    The Participants are Non-Insiders, and the KERP is Not Subject to Section 503(c)(1) of the Bankruptcy Code.**

9.    The U.S. Trustee asserts that some Participants are "insiders" and, as such, the KERP is subject to section 503(c)(1) of the Bankruptcy Code.  The U.S. Trustee is incorrect.  No Participant is an insider of the Debtors even though certain Participants have titles such as "officer," "head," "director," "vice president," or "chief."  Ferraro Decl. ¶ 13.  As set forth in the

---

[5]    As the Debtors filed the Participant job titles under seal, the Debtors will not address whether any of the individuals listed on <u>Exhibit A</u> to the Pro Se Objection are Participants.

6

KERP Motion, the Ferraro Declaration, and the Gartrell Declaration, no Participant: (a) sits on, or directly reports to, the Debtors' board of directors; (b) is appointed or hired directly by the Debtors' board of directors; (c) exercises managerial control over, or has responsibility for, the Debtors' operations as a whole; or (d) directs the Debtors' overall corporate policy or governance. KERP Motion ¶ 14, Ferraro Decl. ¶ 13, Gartrell Decl. ¶ 10.

10. Although the Bankruptcy Code does not define the term "officer," courts have looked to Black's Law Dictionary as a source of authority. *See In re Borders Grp., Inc.*, 453 B.R. 459, 468 (Bankr. S.D.N.Y. Apr. 27, 2011). Black's Law Dictionary defines an officer of a corporation as "a person elected or appointed by the board of directors to manage the daily operations of a corporation, such as a CEO, president, secretary, or treasurer." Black's Law Dictionary (11th ed. 2019). An employee's title alone (for example, "Vice President") does not make that employee an insider. *See In re LSC Commc'ns, Inc.*, 631 B.R. 818, 824 (S.D.N.Y. July 9, 2021) (emphasizing that "it is not simply the title of 'director' or 'officer' that renders an individual an insider; rather, it is the set of legal rights that a typical corporate director or officer holds") (quoting *In re Longview Aluminum, L.L.C.*, 657 F.3d 507, 510 (7th Cir. 2011)). This reflects the reality of modern-day corporate America: "[c]ompanies often give employees the title 'director' or 'director-level' but do not give them decision-making authority akin to an executive." *In re Glob. Aviation Holdings, Inc.*, 478 B.R. 142, 148 (Bankr. E.D.N.Y. July 24, 2012) (quoting *Borders Grp.*, 453 B.R. at 469).

11. Courts evaluate whether particular employees are insiders "on a case-by-case basis from the totality of the circumstances, including whether the individual has at least a controlling interest in the debtor or exercises sufficient authority over the debtor so as to qualifiably dictate corporate policy and disposition of corporate assets." *In re AMR Corp.*, 490 B.R. 158, 166

7

(Bankr. S.D.N.Y. Apr. 11, 2013) (citing *In re Velo Holdings Inc.*, 472 B.R. 201, 208 (Bankr. S.D.N.Y. June 6, 2012)) (internal quotations omitted). The Debtors submitted evidence describing why each of the Participants does not have the duties or responsibilities of an insider. Ferraro Decl. ¶ 13; Gartrell Decl. ¶ 10. The U.S. Trustee offers none in response.

12. The U.S. Trustee asserts that employees holding a title containing "director" or "vice president" are presumptively insiders, but none of the Participants have broad responsibilities over the Debtors' entire business. Rather, any Participant with a "vice-president" or "director" title manages only certain aspects of specific departments of the Debtors' business and is removed from general managerial control over the Debtors by at least one direct supervisor. Despite the opportunity to review the unredacted job descriptions, the U.S. Trustee does not, and cannot, identify any Participant whose job duties indicate they should be considered an "insider."

13. Moreover, each of the Participants' roles are limited in scope—none of the Participants make "company-wide or strategic decisions," and they are all "distance[d] from the board and senior management." *See Glob. Aviation Holdings*, 478 B.R. at 150. None of the Participants were appointed by the Debtors' board of directors, sit on the board of directors, or directly report to the board of directors. Ferraro Decl. ¶ 13. The Participants do not dictate overall corporate policy, nor do they exercise control over the Debtors' significant business or strategic decisions. *Id*.

14. The U.S. Trustee incorrectly asserts that the Debtors failed to provide specific information regarding the job descriptions of the Participants. To the contrary, and as noted in the U.S. Trustee Objection, the Debtors provided an unredacted list of the Participants' job titles, job descriptions, supervisors, hiring personnel, corresponding salaries, and proposed KERP awards to the U.S. Trustee (and the Committee). The Debtors also responded to additional questions from

8

the U.S. Trustee and made themselves available for discussion. The U.S. Trustee, which did not take the Debtors up on that offer, nonetheless continues to blithely assert that the Debtors are not being transparent, repeating this assertion despite every indication to the contrary.

15. As set forth in the KERP Motion, the Ferraro Declaration, and the Gartrell Declaration, the Participants perform functions such as accounting, cash and digital asset management, IT infrastructure, legal, human resources, and other functions for the Debtors. KERP Motion ¶ 3; Ferraro Decl. ¶ 8; Gartrell Decl. ¶ 11. These descriptions are sufficiently detailed to establish that each Participant is not an insider and the relief requested does not implicate section 503(c)(1) of the Bankruptcy Code.

**II.    The KERP Is Justified by the Facts and Circumstances of these Chapter 11 Cases.**

16. The U.S. Trustee argues that the KERP is not justified by the facts and circumstances of these chapter 11 cases as required by section 503(c)(3) of the Bankruptcy Code. This assertion ignores the reality of the significant attrition the Debtors continue to experience.

17. The KERP is justified in light of, among other things, the nature of the Debtors' business, the need to retain these key employees, and the significant attrition the Debtors continue to experience. The Debtors, in consultation with their advisors, including their independent compensation consultant WTW, designed the KERP to avoid further attrition. Ferraro Decl. ¶ 9; 10/13/2022 Hr'g Tr. 58:5–59:3.

18. The U.S. Trustee highlights the issue of benchmarks and the difficulty of whether they can be achieved—this issue is irrelevant. The sufficient nexus between the KERP and the results sought to be achieved is the primary purpose of the KERP—to stop the attrition of employees. The purpose of the KERP is to retain employees who may otherwise leave the Debtors' employ during the course of these chapter 11 proceedings, and there is a clear relationship between the relief requested in the KERP Motion and the outcome of retaining employees.

9

Whether the KERP includes difficult-to-reach incentives is irrelevant to a retention program for non-insider employees.

19. Courts in this district and elsewhere recognize that satisfying section 503(c)(3) of the Bankruptcy Code requires a showing that the proposed plan is within the Debtors' business judgment. *See Velo Holdings*, 472 B.R. at 212 (noting "the 'facts and circumstances' language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b)"); *see also Borders*, 453 B.R. at 473–74 (evaluating debtors' key employee retention plan under the framework of the business judgment rule); *In re Dana Corp.*, 358 B.R. 567, 576–77 (Bankr. S.D.N.Y. Nov. 30, 2006) (describing six factors that courts may consider when determining whether the structure of a compensation proposal meets the "sound business judgment" test in accordance with section 503(c)(3) of the Bankruptcy Code). Accordingly, the KERP is a sound exercise of the Debtors' business judgment.

20. ***First***, the risk of Participants resigning is real. Since the Petition Date, at least 123 of the Debtors' employees resigned—furthermore, since the KERP Motion was filed, more than twenty employees resigned. Considering this high level of attrition, the Debtors' remaining employees are more critical to the Debtors' ability to operate and administer these chapter 11 cases. The continued harm caused by employee attrition is tangible and costly. The employees left positions that must be filled, played key roles in the Debtors' operations, and possessed knowledge that the Debtors cannot afford to lose. The cost and time required to search for, hire, and train new employees is substantial when compared to the cost of the KERP.

21. ***Second***, implementing the KERP would only benefit these chapter 11 cases. Failing to retain the Participants would destroy value to the detriment of all stakeholders. Regardless of whether the Debtors pursue a standalone plan or a sale of some or substantially all

10

of their assets, the Debtors need the knowledge and skills of the Participants to prepare and eventually operate successfully upon emergence from chapter 11.

22.    *Third*, while the Platform is temporarily frozen during the pendency of these chapter 11 cases, the Debtors' employees continue to perform maintenance, updates, and essential security functions on the Platform to facilitate a successful reorganization or a sale as well as prepare the platform for making distributions to creditors and for any post-emergence operations. Furthermore, the Debtors are continuing to provide voluminous diligence to the Committee, the Examiner, regulators, and prospective bidders, a significant undertaking that impacts employees across all departments.  A disruption to the Debtors' workforce could negatively impact these efforts, leading to a lower recovery and lower distribution to the Debtors' customers.

23.    In assessing the soundness of the Debtors' business judgment, courts in the Second Circuit consider the following non-exhaustive list of factors:

(a)    Is there a reasonable relationship between the plan proposed and the results to be obtained, *i.e.*, will the key employee stay for as long as it takes for the debtor to reorganize or market its assets?

(b)    Is the cost of the plan reasonable in the context of the debtor's assets, liabilities, and earning potential?

(c)    Is the scope of the plan fair and reasonable:  does it apply to all employees, or if not, does it discriminate unfairly?

(d)    Is the plan or proposal consistent with industry standards?

(e)    What were the due diligence efforts of the debtor in investigating the need for a plan, analyzing which key employees need to be incentivized, what is available, and what is generally applicable in a particular industry?

(f)    Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

*Dana Corp.* at 576–77.  All of these standards are satisfied.

24.    *First*, there is a reasonable relationship between the KERP and the results to be obtained—namely, the retention of the Participants through the Debtors' restructuring process.

The loss of critical employees could put the Debtors' entire restructuring effort at risk. As a result, the Debtors' management team, with the assistance of their advisors, carefully developed a plan and a process by which the Participants were selected. Given the job insecurity and disquiet surrounding these chapter 11 cases, the Debtors may lose more employees than they already have.

25. While the U.S. Trustee expresses concern that the KERP is not subject to any performance metrics, that is not its intent—the goal of the KERP is the ***retention*** of the Participants. The proposed initial KERP payments are subject to a clawback, and the remaining KERP payments are subject to continued employment with the Debtors and/or confirmation of a plan, which provides an incentive for the Participants to remain with the Debtors' during these chapter 11 cases. Furthermore, the U.S. Trustee's contention that "facilitating a successful reorganization are (*sic*) the responsibilities and services to be performed by the talented professionals retained or to be retained by the Debtors in these cases, not the KERP Participants" is patently untrue and denigrates the time and effort the Participants exerted (and continue to exert) to facilitate responding to the mountains of diligence requests, assisting with the Debtors' sale and reorganization strategy, and otherwise assisting with the administration of these chapter 11 cases.

26. ***Second***, the total cost of the KERP is only a fraction of the Debtors' total revenue and assets, while the costs, both financial and operational, of losing the Participants would be far greater. KERP Motion ¶ 28; Gartrell Decl. ¶ 15.

27. ***Third***, the scope of the KERP is fair and reasonable under the circumstances and does not unfairly discriminate. As discussed above, selecting the Participants was the result of an in-depth process and based on the advice of the Debtors' advisors. The result of that process is the narrowly tailored KERP that applies to sixty–two of the Debtors' non-insider employees (out of a population of over 200 employees), at modest cost considering the devastating economic effect

should the Debtors lose the ability to operate without this key talent. Furthermore, the KERP's maximum cost of $2.96 million is reasonable in absolute terms when compared to the aggregate costs of key employee retention plans approved in other chapter 11 cases, and the retention awards expressed as a percentage of salary are consistent with awards in comparable key employee retention plans. Gartrell Declaration ¶¶ 15–16.

28. The U.S. Trustee also argues that because no historical CEL token distribution analysis was provided, the KERP cannot be evaluated. Employee CEL token distributions were discontinued more than three months prior to the Petition Date. The fact that this compensation is not available to the employees weighs in favor of the KERP. In making this argument, the U.S. Trustee also inappropriately discloses the amount of KERP awards proposed for certain Participants. This information should remain redacted until a ruling by this Court on the Motion to Seal.

29. ***Fourth***, the KERP is consistent with industry standards. The Debtors' management team, none of whom will receive payment under the KERP, in consultation with the Debtors' advisors, developed the KERP after a rigorous analysis. Gartrell Decl. ¶ 16, KERP Motion ¶ 4. In fact, WTW benchmarked the retention plans approved in the cases of twenty–six similarly sized companies that filed for chapter 11 from 2017 through 2021. Gartrell Decl. ¶ 12. The Debtors' KERP opportunities generally are positioned between the twenty–fifth and median percentile of the market. Gartrell Decl. ¶ 16. The U.S. Trustee completely ignores the efforts of WTW, the Debtors' independent compensation consultant.

30. ***Fifth***, as discussed in detail above and the KERP Motion, Ferraro Declaration, and Gartrell Declaration, the Debtors, in consultation with their advisors, undertook an extensive process to determine the list of proposed Participants and the amount to be paid to each Participant.

13

Accordingly, the KERP was created after significant due diligence. KERP Motion ¶ 31; Ferraro Decl. ¶¶ 11–12; Gartrell Decl. ¶ 9.

31.     The business judgment rule allows the Debtors to consider their business needs and market conditions to make the best decision for stakeholders. The KERP will enhance and preserve value and is justified by the facts and circumstances of these cases.

### III. The Confidential Information Satisfies Section 107(b) of the Bankruptcy Code.

32.     The Debtors provided cogent reasons why the Confidential Information (as defined below) falls within the scope of "confidential information" that may be protected pursuant to Bankruptcy Code section 107(b)(1). Therefore, the Debtors have overcome the presumption of public disclosure.

33.     Section 107(b)(1) of the Bankruptcy Code provides that "the bankruptcy court shall . . . protect an entity with respect to . . . confidential . . . commercial information." 11 U.S.C. § 107(b)(1). Section 107(b)(1) does not require the Debtors to engage in a balancing test or show "good cause" to merit sealing. *Video Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion Pictures Corp.)*, 21 F.3d 24, 28 (2d Cir. 1994). If the material sought to be protected is, in fact, confidential information pursuant to section 107(b)(1), "… the Court is required to protect a requesting interested party and has no discretion to deny the application." *Id*. at 27.

34.     Courts are required to provide protections "generally where open inspection may be used as a vehicle for improper purposes." *Orion Pictures*, 21 F.3d at 27. Indeed, the "authority goes not just to the protection of confidential documents, but to other confidentiality restrictions that are warranted in the interests of justice." *See In re Glob. Crossing Ltd.*, 295 B.R. 720, 724 (Bankr. S.D.N.Y. July 24, 2003). Confidential commercial information "has been defined as information which would cause 'an unfair advantage to competitors by providing them information as to the commercial operations of the debtor.'" *In re Faucett*, 438 B.R. 564, 567–68

14

(Bankr. W.D. Tex. Oct. 12, 2010) (quoting *Orion Pictures Corp.*, 21 F.3d at 27). Commercial information need not rise to the level of a trade secret to be protected under section 107(b) of the Bankruptcy Code. *Id.* at 28. Additionally, Courts have also held that the resulting sealing order should be broad (*i.e.*, "any order which justice requires"). *See, e.g.*, *Glob. Crossing, Ltd.*, 295 B.R. at 724 (citing Bankruptcy Rule 9018).

35.     The KERP Motion contains commercially sensitive information, including employee job titles, job descriptions, supervisors, hiring personnel, corresponding salaries, and proposed KERP awards (the "<u>Confidential Information</u>"). The Debtors operate in a highly competitive industry, and the disclosure of the Confidential Information would make it easier for the Debtors' competitors to attract the employees necessary to the Debtors' operations and restructuring efforts. Moreover, the Debtors have not disclosed the specific names of each Participant in the KERP Motion—a practice previously deemed acceptable by this Court. *See, e.g.*, *In re Aegerion Pharm., Inc.*, No. 19-11632 (MG) (identifying a key employee retention plan participant as "Employee 1" as opposed to including their full name); *In re Aralez Pharm. US Inc.*, No. 18-12425 (MG) (not disclosing any key employee retention plan participant names); *In re Quirky, Inc.*, No. 15-12596 (MG) (identifying a key employee retention plan participant as "Employee A" as opposed to including their full name).

36.     Additionally, filing the Confidential Information on the docket would enable the Debtors' employees to learn or intuit certain Confidential Information with respect to their colleagues, which is not only inappropriate, but is also likely to negatively affect employee morale to the detriment of the Debtors and their estates. Accordingly, an unredacted version of the Participant list would negatively impact the Debtors' business, put the Debtors at a competitive disadvantage, and undermine the Debtors' efforts to reorganize. The Debtors' competitors should

15

not be allowed to use the Confidential Information for their own gain. The Debtors seek redaction of the Confidential Information to inhibit inappropriate disclosure of the Confidential Information—a goal that the U.S. Trustee already undermined by inappropriately disclosing Confidential Information prior to a ruling by this Court on the Motion to Seal. Any further disclosure of the Confidential Information would only harm the Debtors, their estates, and all stakeholders.

## Conclusion

Implementing the KERP is necessary and appropriate to maximize value, regardless of the path of these chapter 11 cases. All parties will benefit if the Participants, none of whom are insiders, are incentivized to remain in the Debtors' employ. For the foregoing reasons, as well as the reasons set forth in the KERP Motion and the Motion to Seal, as applicable, the Debtors request that the Court (a) overrule the Objections and (b) grant the relief requested in the KERP Motion and the Motion to Seal.

[*Remainder of page intentionally left blank*]

WHEREFORE for the foregoing reasons, the Debtors request that the Court overrule the Objections and approve the KERP Motion.

| | |
|---|---|
| New York, New York<br>Dated: October 29, 2022 | */s/ Joshua A. Sussberg*<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>Joshua A. Sussberg, P.C.<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone:　(212) 446-4800<br>Facsimile:　(212) 446-4900<br>Email:　　　jsussberg@kirkland.com<br><br> - and -<br><br>Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)<br>Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)<br>Christopher S. Koenig<br>Dan Latona (admitted *pro hac vice*)<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Telephone:　(312) 862-2000<br>Facsimile:　(312) 862-2200<br>Email:　　　patrick.nash@kirkland.com<br>　　　　　　ross.kwasteniet@kirkland.com<br>　　　　　　chris.koenig@kirkland.com<br>　　　　　　dan.latona@kirkland.com<br><br>*Counsel to the Debtors and Debtors in Possession* |