Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 22-10964-mg

4    - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    CELSIUS NETWORK, LLC,

8            Debtor.

9    - - - - - - - - - - - - - - - - - - - - - - - - - x

10                   United States Bankruptcy Court

11                   One Bowling Green

12                   New York, NY   10004

13

14                   November 1, 2022

15                   11:15 A.M.

16

17

18

19

20

21    B E F O R E :

22    HON MARTIN GLENN

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO:   KS

Page 2

1   HEARING re Status Conference Using Zoom for Government RE:

2   Debtors Motion Seeking Entry of an Order (I) Permitting the

3   Sale of Stablecoin in the Ordinary Course and (II) Granting

4   Related Relief. (Doc# 832, 853, 855, 895, 901, 922, 925,

5   936, 954, 967, 970, 1043, 1058, 1076, 1085, 1086, 1186,

6   1188, 1228, 528)

7

8   Hearing Using Zoom for Government RE: Debtor's Motion for

9   Entry of an Order Authorizing the Debtors to Redact and File

10  Under Seal Certain Confidential Information Related to the

11  Debtors Key Employee Retention Plan. (Doc# 1020, 1202, 1231)

12

13  Hearing Using Zoom for Government RE: Debtor's Motion for

14  Entry of an Order (I) Approving the Debtors Key Employee

15  Retention Plan and (II) Granting Related Relief. (Doc## 1021

16  to 1023, 1187, 1202, 1207, 1231)

17

18  Hearing Using Zoom for Government RE: Motion Seeking a

19  Ruling of Full Title of Ownership of Funds With Respect to

20  Users Who Have Been Blocked Access By Debtor Prior to

21  Bankruptcy and to Request Disclosure From Debtor on the

22  Number and Amount of Suspended/Closed Accounts Which Funds

23  Still Kept by Debtor Filed by Kwok Mei Po. (ECF DOC. ## 877,

24  882, 1106, 1121).

25

Page 3

1    Hearing Using Zoom for Government RE: Motion To Consider All

2    USDC Investors And Account Holders of Celsius Network, LLC

3    As Secured Creditors Instead of Unsecured Creditors filed by

4    Nicole Barstow. (Doc #950, 1017, 1185, 1188, 1201, 1213)

5

6    Hearing Using Zoom for Government RE: Motion to Consider

7    Stablecoin Creditors as Secured Creditors. filed by Lucas

8    Holcomb. (Doc ## 965, 1017, 1185, 1188, 1213)

9

10   Hearing Using Zoom for Government RE: Motion to Consider

11   Tethergold (XAUT) Creditors as Secured Creditors filed by

12   Douglas Saker. (Doc ## 990, 1017, 1185, 1188, 1201, 1223).

13

14   Hearing Using Zoom for Government RE: Amended Motion to

15   Compel Insider Clawbacks by the Debtors, UCC. (Doc ## 1052,

16   1135, 1178, 1211, 1212, 1218)

17

18   Hearing Using Zoom for Government RE: Motion to Compel The

19   Debtors To Institute Significant Cost Cutting Measures filed

20   by Daniel Frishberg. (Doc # 1041, 1052, 1137, 1178, 1194,

21   1199, 1211, 1212, 1218, 1220)

22

23   Hearing Using Zoom for Government RE: Rule 2004 motion. (Doc

24   # 1053, 1189, 1219)

25

Page 4

1    Hearing Using Zoom for Government RE: Responses filed by

2    Ignat Tuganov and Gregory Pesce to Notice of Presentment RE:

3    Examiner's Motion to Approve Work Plan. (Doc. # 1013, 1081,

4    1104, 1105, 1127, 1221, 1222, 1227, 1229 to 1231, 1237)

5

6    Hearing Using Zoom for Government RE: Examiner's Motion to

7    Confirm Examination Scope or Alternatively for Expansion of

8    the Scope of the Examination. (Doc# 1112, 1134, 1149, 1159,

9    1161, 1217, 1229, 1230, 1235, 1236, 1237)

10

11    Hearing Using Zoom for Government RE: Examiners Application

12    for Entry of an Order Authorizing the Retention and

13    Employment of Jenner & Block LLP as Attorneys for the

14    Examiner Effective as of September 29, 2022. (Doc# 958, 962)

15

16    Hearing Using Zoom for Government RE: Application to Employ

17    Huron Consulting Services LLC as Financial Advisor to the

18    Examiner, Effective as of October 10, 2022 filed by Vincent

19    Edward Lazar on behalf of Shoba Pillay. (Doc # 1070)

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

Page 5

1    A P P E A R A N C E S :

2

3    MCCARTER ENGLISH, LLP

4         Attorneys for Ad Hoc Committee of Borrowers

5         245 Park Avenue

6         New York, NY 10167

7

8    BY:  DAVID J. ADLER

9

10   UNITED STATES DEPARTMENT OF JUSTICE

11        Attorneys for U.S. Trustee

12        201 Varick Street, Suite 1006, 10th Floor

13        New York, NY 10014

14

15   BY:  MARK BRUH

16        SHARA CORNELL

17        BRIAN S. MASUMOTO

18

19   WHITE CASE LLP

20        Attorneys for Official Committee of Unsecured Creditors

21        1221 Avenue of the Americas

22        New York, NY 10020

23

24   BY:  ANDREA AMULIC

25

Page 6

1    WHITE & CASE LLP

2         Attorneys for the Official Committee of Unsecured

3         Creditors

4         555 South Flower Street, Suite 2700

5         Los Angeles, CA 90071

6

7    BY:  AARON COLODNY

8         GREGORY F. PESCE

9         DAVID TURETSKY

10

11   TOGUT SEGAL SEGAL, LLP

12        Attorneys for Ad Hoc Group of Custodial Account Holders

13        One Penn Plaza, Suite 3335

14        New York, NY 10119

15

16   BY:  BRYAN KOTLIAR

17

18   TROUTMAN PEPPER HAMILTON SANDERS, LLP

19        Attorneys for Ad Hoc Group of Withhold Account Holders

20        4000 Town Center, Suite 1800

21        Southfield, MI 48075

22

23   BY:  DEBORAH KOVSKY-APAP

24

25

Page 7

```
 1   KIRKLAND & ELLIS LLP

 2         Attorneys for Debtor

 3         300 North Salle

 4         Chicago, IL 60654

 5

 6   BY:  DAN LATONA

 7         GABRIELA HENSLEY

 8

 9   KIRKLAND ELLIS LLP

10         Attorneys for Debtor

11         601 Lexington Avenue

12         New York, NY 10022

13

14   BY:  TOMMY SCHEFFER

15

16   KIRKLAND ELLIS LLP

17         Attorneys for Debtor

18         1301 Pennsylvania Avenue

19         Washington, DC 20004

20

21   BY:  GRACE BRIER

22

23

24

25
```

```
                                                      Page 8

 1   JENNER BLOCK

 2         Attorneys for the Examiner

 3         353 N. Clark Street

 4         Chicago, IL 60654

 5

 6   BY:  VINCENT LAZAR

 7         SHOBA PILLAY

 8

 9   MILBANK

10         Attorney for The Series B Shareholders

11         1850 K St NW

12         Washington, DC 20006

13

14   BY:  ANDREW LEBLANC

15

16   JONES DAY

17         Attorneys for CDP Instissements, Inc.

18         555 S Flower Street, 50th FL

19         Los Angeles, CA 90071

20

21   BY:  JOSHUA MESTER

22

23

24

25
```

Page 9

 1    TEXAS OFFICE OF ATTORNEY GENERAL

 2          Attorneys for TX State Securities Board, Department of

 3          Banking

 4          P.O. Box 12548

 5          Austin, TX 78711-2548

 6

 7    BY:  LAYLA MILLIGAN

 8

 9    SULLIVAN CROMWELL LLP

10          Attorney for Alameda

11          125 Broad Street

12          New York, NY 10004

13

14    BY:  BRIAN D. GLUECKSTEIN

15

16    VERMONT ATTORNEY GENERAL'S OFFICE

17          Attorney for VT Department of Financial Regulation

18          89 Main Street, Third Floor

19          Montpelier, VT 05620

20

21    BY:  JENNIFER ROOD

22

23

24

25

Page 10

1    VENABLE LLP

2         Attorneys for Ignat Tuganov

3         Rockefeller Center

4         1270 Avenue of the Americas

5         New York, NY 10020

6

7    BY:  JEFFREY S. SABIN

8

9    ALSO APPEARING TELEPHONICALLY:

10   MEI PO KWOK - pro se creditor

11   CAMERON CREWS - pro se creditor

12   CHRIS FERRARO - Celsius Network LLC declarant

13   DANIEL ANATOLY FRISHBERG -- pro se creditor

14   JOSEPHINE GARTRELL - Celsius declarant

15   IMMANUEL HERRMANN -- pro se creditor

16   LUCAS J. HOLCOMB

17   VICTOR L. UBIERNA DE LAS HERAS -- pro se creditor

18   NICOLE BARSTOW -- pro se

19   JOHAN BRONGE -- pro se creditor

20

21

22

23

24

25

Page 11

1

2                    P R O C E E D I N G S

3              CLERK:  All right, good morning.  Starting the

4    recording for November 1st, 2022 at 10 a.m.  Calling Celsius

5    Network LLC, Case No. 22-10964.  Start admitting

6    participants.  All right, good morning.  The parties from

7    Kirkland's that are going to be joining, if you want to test

8    the microphone and unmute and just give me appearances, that

9    would be helpful.

10             MR. SCHEFFER:  You've got Tommy Scheffer of

11   Kirkland and Ellis here in New York.

12             CLERK:  Okay, thank you, Tommy.  And Chicago, are

13   you just listening or is someone going to be speaking from

14   your office?  Oh, she walked away.  All right, that's fine.

15   All right.  Glad the New York office can speak.  Do you

16   know, Tommy, who from the New York office is going to appear

17   on your line?

18             MR. SCHEFFER:  It should be just me.

19             CLERK:  Okay.  Okay, so everyone else is separate.

20   All right, thank you.

21             MR. SCHEFFER:  Yeah, I'm muted.  I even double

22   checked when I saw --

23             THE COURT:  All right, Jeffrey, maybe we could

24   have you give your appearance if you're speaking today.

25             MR. SCHEFFER:  Unmuted --

Page 12

1          WOMAN 1:  Yeah, we might need a mic.

2          CLERK:  Go ahead.  Sorry, I can't hear you.

3          MR. SABIN:  How about now?

4          CLERK:  Yes, I can, thank you.

5          MR. SABIN:  So Jeffrey Sabin of Venable LLP on

6     behalf of creditor Ignat Tuganov in connection with Agenda

7     Item 11 on today's hearing.

8          CLERK:  Thank you very much.

9          MR. SABIN:  You're welcome.  All right, Jennifer,

10    if you could give your appearance please.

11         MS. ROOD:  Jennifer Rood, Vermont Department of

12    Financial Regulation.

13         THE COURT:  Thank you very much.  All right.

14    Victor, are you going to be speaking this morning?  If you

15    could --

16         MR. UBIERNA DE LAS HERAS:  Good morning, yes.

17         THE COURT:  Yes.  Go ahead.  Go ahead.  Sorry.

18    Yeah, sorry.  Victor, if you could unmute again and just

19    give your appearance?

20         MR. UBIERNA DE LAS HERAS:  Yes, I'm Victor

21    Ubierna.  I'm a pro se creditor and I'll be speaking to you

22    this morning.

23         CLERK:  Okay, thank you.

24         WOMAN 2:  Yeah, you --

25         CLERK:  Sorry.  Sorry, please unmute again.

Page 13

1              WOMAN 2:  You've got the Kirkland Chicago line.

2      Are you able to hear us?

3              CLERK:  Yes I am.  Do you know who's going to be

4      speaking on this line or is this just a listen only line?

5              WOMAN 2:  This is the speaking line and here

6      you'll have Chris Koenig, Dan Latona, Gabrielle Hensley, and

7      --

8              CLERK:  Ross Kwasteniet?

9              WOMAN 2:  Ross Kwasteniet as well.

10             CLERK:  Okay, perfect.  Those appearances are

11     noted.  Thank you.

12             WOMAN 2:  Perfect.  And then we also have in the

13     waiting room a 312 number who will not be speaking, just

14     listening but if they could be admitted we'd appreciate it.

15             CLERK:  Is that the 312-862-355 --

16             WOMAN 2:  Yes, ma'am.

17             CLERK:  Okay.  Oh there's some -- seems to be some

18     background noise.  I don't know, if it's okay I'll just mute

19     you for now unless you need to test your microphone because

20     I need to keep taking appearances.

21             WOMAN 2:  We're good.  Thank you so much.

22             CLERK:  All right, thank you.

23             All right.  For the parties that have been

24     admitted if anyone is going to be speaking on the record

25     this morning and you have not given your appearance yet,

Page 14

1   please do so at this time again.

2            Again, any parties that have been admitted and

3   have not given their appearance yet and are speaking on the

4   record this morning, please unmute and give your appearance

5   for the record.

6            MS. GARTRELL:  Hello, Your Honor.  My name is

7   Josephine Gartrell and I am with Willis Towers Watson.  I

8   will be presenting on the KERP this -- in this matter.

9            CLERK:  Okay, thank you, Josephine.

10           MS. GARTRELL:  Sure.

11           MR. CREWS:  Hello there.  Creditor Cameron Crews

12   may also be speaking regarding the KERP.

13           CLERK:  Okay, thank you very much.  All right,

14   Jonathan, please pause the recording for now.

15           (Recess)

16           CLERK:  Nicole, if you could just give your

17   appearance for the record please?

18           MS. BARSTOW:  Yes, hi.  I'm Nicole Barstow, pro se

19   creditor.

20           CLERK:  Thank you very much.  Again, if any

21   parties have been admitted and have not given their

22   appearance and are speaking on the record, please unmute one

23   at a time and give your appearance please.

24           MR. PESCE:  Good morning.  It's Gregory Pesce,

25   White and Case, on behalf of the Committee joining.

Page 15

```
 1              CLERK:  Thank you.  And Aaron, I just am admitting

 2   him as well.  Greg, besides yourself and Aaron, are -- is

 3   anyone else going to be joining and speaking on the record

 4   this morning?

 5              MR. PESCE:  Yes, my colleagues David Turetsky, Sam

 6   Hershey, and Andrea Amulic will join.  They might speak as

 7   well, depending on the circumstances.

 8              CLERK:  Okay.  And Keith Wofford will not be

 9   speaking; is that correct?

10              MR. PESCE:  That's correct.

11              CLERK:  Thank you.  All right, has anyone else

12   joined from the Creditors Committee?  Aaron, I don't -- I

13   think you haven't given your appearance yet, correct?

14              MR. COLODNY:  That's right.  Aaron Colodny from

15   White and Case on behalf of the Official Committee of

16   Unsecured Creditors.

17              CLERK:  Thank you.  And I admitted David as well.

18              MR. TURETSKY:  Good morning, David Turetsky on

19   behalf of the Committee from White and Case.

20              CLERK:  Thank you.  All right for the parties that

21   have been admitted, if anyone is speaking on the record this

22   morning and has not given their appearance yet please unmute

23   one at a time and give your appearance.  Deb, if you could

24   unmute and give your appearance please.

25              MS. KOVSKY-APAP:  Good morning, Deanna.  It's Deb
```

Page 16

1    Kovsky, Troutman Pepper for the Ad Hoc Group of Withhold

2    Account Holders.

3              CLERK:   Thank you.  All right, just waiting for

4    some participants to join.  All right, Shoba?

5              MS. PILLAY:  Yes, good morning.

6              CLERK:  Good morning.

7              MS. PILLAY:  Shoba Pillay from Jenner and Block.

8    Thank you.

9              CLERK:  Thank you.  And you're appearing on behalf

10   of the examiner, correct?

11             MS. PILLAY:  Yes.  Well, I am the examiner, so

12   yes.

13             CLERK:  I'm sorry.  You are the examiner.  Is Mr.

14   Lazar still appearing?

15             MS. PILLAY:  He will be, yes.

16             CLERK:  Okay, thank you.

17             MS. PILLAY:  Thank you.

18             CLERK:  All right, for the additional participants

19   that have joined, if you are speaking on the record and you

20   have not given your appearance yet, please un[mute one at a

21   time and give your appearance.

22             All right.  For now, you can pause the recording.

23             (Recess)

24             CLERK:  All right, for the parties that have

25   joined, if anyone is going to be speaking on the record and

Page 17

1   has not given their appearance yet, please unmute one at a

2   time and give your appearance.  Joshua Mester, are you going

3   to be speaking this morning?

4           MR. MESTER:  Good morning.  I do not expect to be

5   speaking today.

6           CLERK:  Okay, thank you.

7           All right.  You can pause the recording again.

8           (Recess)

9           CLERK:  Yeah, so if you could just identify

10  yourself, please.

11          MS. BRIER:  This is Grace Brier from Kirkland and

12  Ellis.  I may be appearing today but I may not as well.

13          THE COURT:  Okay, thank you very much.

14          MS. BRIER:  Thank you.

15          CLERK:  Brian Masumoto, are you --

16          MR. MASUMOTO:  Good morning, Brian Masumoto for

17  the Office of the United States trustee.

18          CLERK:  Thank you.  Are Mark Bruh or Shara Cornell

19  going to be joining as well?

20          MR. MASUMOTO:  Yes, I just got off the Teams with

21  them and they'll be logging on shortly.

22          CLERK:  Okay.  Thank you.  Good morning, Shara.

23  If you could unmute and give your appearance please.

24          MS. CORNELL:  Hi, it's Shara Cornell at the Office

25  of the United States Trustee.  Deana, I may need to log in

Page 18

1    and log out.  I'm having some video problems.

2              CLERK:  No problem.

3              MS. CORNELL:  I'll let you know.  Thank you.

4              CLERK:  Okay.  You're welcome.  All right, Daniel

5    Frishberg, if you could unmute and give your appearance

6    please.  All right.  Again, Daniel Frishberg, if you could

7    unmute and give your appearance please?

8              MR. FRISHBERG:  Yeah, Daniel Frishberg, pro se.

9    I'm here.  Sorry.

10             CLERK:  Thank you.  Oh, not a problem.  I know you

11   were still connecting to audio.  It takes a few minutes

12   sometimes.

13             MR. FRISHBERG:  Yeah.  Sorry.

14             CLERK:  No problem.

15             All right, Shara, do you want to just unmute to

16   check your microphone?

17             MS. CORNELL:  Yeah, thank you very much.  I

18   appreciate it, Deanna.  Shara Cornell at the Office of the

19   United States Trustee.

20             CLERK:  Okay, you're welcome, Shara.  All right,

21   Kwok Mei Po, if you could unmute and give your appearance

22   please.

23             MS. KWOK:  Yes, I would like to speak for my

24   motion today.

25             CLERK:  Okay, thank you, and you're a creditor,

Page 19

1    correct?

2              MS. KWOK:  Yes, pro se creditor.

3              CLERK:  Okay.  Thank you very much.

4              MS. KWOK:  Thank you very much.

5              CLERK:  All right.  Immanuel Herrmann, if you

6    could unmute and give your appearance, please.

7              MR. HERRMANN:  Yes.  Immanuel Herrmann, pro se

8    Celsius creditor.

9              CLERK:  Thank you.

10             And I see some parties are joining.  For the

11   parties that have just joined that have not given their

12   appearance, if you could unmute one at a time and give your

13   appearance for the record, if you have not done so.

14             Mark Bruh, if you could unmute and give your

15   appearance, please?

16             MR. BRUH:  Good morning, Mark Bruh for the United

17   States Trustee.  Thank you, Deanna.

18             CLERK:  Thank you, Mark.  All right.  Vincent

19   Lazar -- oh there you are, Vincent.  If you could just give

20   your appearance please.

21             MR. LAZAR:  Thank you.  Vincent Lazar, Jenner and

22   Block, on behalf of the examiner.

23             CLERK:  Thank you.

24             All right, Andrew Leblanc, are you speaking this

25   morning?

Page 20

```
 1              MR. LEBLANC:  Unlikely but possibly.  Andrew
 2    Leblanc of Milbank on behalf of certain Preferred B
 3    Shareholders -- yeah, Preferred Shareholders.
 4              THE COURT:  Okay, thank you.  And the other
 5    parties that signed up, is anyone else from Milbank going to
 6    be speaking on the record?
 7              MR. LEBLANC:  No.  If anyone, it will be me.
 8              CLERK:  Okay, thank you.
 9              MR. LEBLANC:  I think Mr. Dunn will join, but he
10    won't be speaking.
11              CLERK:  All right.  Perfect, thank you.
12              All right.  Dan Kaplan, are you going to be
13    speaking this morning?  All right, for the parties that have
14    joined, if anyone -- speaking on the record and has not
15    given their appearance yet, please unmute one at a time and
16    give your appearance please.
17              Layla, are you -- Layla Milligan, are you speaking
18    this morning?
19              MS. MILLIGAN:  Good morning.  Can you hear me
20    okay?
21              CLERK:  Yes, I can.
22              MS. MILLIGAN:  Yes.  Layla Milligan with the Texas
23    Attorney General's Office appearing on behalf of the Texas
24    State Securities Board and Department of Banking.  I may
25    comment, depending on how the proceedings go, but I will go
```

Page 21

1    ahead and enter my appearance.

2              CLERK:  All right, thank you.

3              MS. MILLIGAN:  Thank you.

4              CLERK:  And for the parties that have joined that

5    have not given their appearance yet and are speaking on the

6    record this morning, if you have not given appearance please

7    unmute one at a time and give your appearance for the

8    record.

9              MS. AMULIC:  Hi, can you hear me?

10             CLERK:  Yes, Andrea.

11             MS. AMULIC:  Hi, thanks.  Andrea Amulic from White

12   and Case for the Committee.

13             CLERK:  All right, thank you.

14             MS. AMULIC:  Thank you.

15             CLERK:  All right, Bryan Kotliar, are you going to

16   be speaking on the record this morning?

17             MR. KOTLIAR:  Hi.  Good morning.  No, I don't plan

18   to speak, but I'm appearing for the Ad Hoc Group of

19   Custodial Account Holders.

20             CLERK:  Okay, thank you.

21             MR. KOTLIAR:  Thank you.

22             CLERK:  All right.  Parties that have been

23   admitted, if anyone is speaking on the record and has not

24   given their appearance yet, please unmute one at a time to

25   give your appearance.

Page 22

 1              All right, Brian Glueckstein, are you going to be

 2   speaking this morning?

 3              MR. GLUECKSTEIN:  I do not anticipate speaking

 4   this morning.  Thank you.

 5              CLERK:  All right, thank you.

 6              Again for the parties that have joined and have

 7   not given their appearance yet, if you're speaking on the

 8   record, please unmute one at a time and give your

 9   appearance.

10              All right.

11              MR. LATONA:  Hi, Deanna?

12              CLERK:  Yes.

13              MR. LATONA:  Our -- one of our declarants,

14   Christopher Ferraro, is still in the waiting room.

15              CLERK:  All right.  How do you spell the last

16   name?

17              MR. LATONA:  F-E-R-R-A-R-O.

18              MAN 1:  I have his phone number, too.  It's a --

19   well, I don't want to give that out, actually.

20              CLERK:  I do not see --

21              MAN 1:  It's 718 phone number.

22              MR. LATONA:  It's a 718 number.

23              CLERK:  Okay.  I'm looking.  I don't see a 718

24   number.  They might have dropped off for some reason.

25              MR. LATONA:  Okay, thank you.  We'll coordinate

Page 23

1    with him.

2              CLERK:  All right, thank you.

3              All right, for the parties that have joined, if

4    you have not given your appearance and you're speaking on

5    the record this morning please give your appearance one at a

6    time.

7              Can I get the name of the declarant again, in case

8    they join?

9              MR. LATONA:  Yes, it's Christopher Ferraro, F-E-R-

10   R-A-R-O.

11             CLERK:  Okay.  Thank you.

12             MAN 1:  He's in the waiting room waiting for host.

13             MR. LATONA:  Yeah, he says he's in the waiting

14   room waiting for host.

15             CLERK:  Okay.  I don't see someone by that name in

16   the waiting room.  Maybe it's another number that he's

17   joining with, because I don't see a 718 number.

18             MR. LATONA:  Okay, thank you.

19             CLERK:  Hi, is Chris Ferraro on the line?

20             MR. FERRARO:  Hi, I'm here.  I just joined.

21             CLERK:  Okay.  Yeah, if you could in the future

22   join with the first and last, full first and last name that

23   way we'll -- we can go by the list and admit you.

24             MR. FERRARO:  Apologize.  Sorry about that.

25             CLERK:  No problem.  All right.  Are we waiting on

Page 24

1   anyone else?  We'll keep admitting as the -- as parties

2   join, but they join constantly throughout the hearing.  So

3   if there's nothing holding up starting, I'll speak with the

4   judge.  Anyone have any feedback on that?

5           MAN 2:  We're ready to go.

6           MR. SCHEFFER:  Debtors are ready to proceed, Your

7   Honor.

8           CLERK:  Okay.  All right.  Please pause the

9   recording.

10          (Recess)

11          CLERK:  All right, go ahead, please.

12          MR. ADLER:  David Adler from McCarter and English

13  on behalf of the Borrowers.  I apologize but for some reason

14  I could not get through on my other phone.  It kept me in

15  the waiting room, so apologies for that.

16          CLERK:  Okay.  Thank you.  All right, Lucas

17  Holcomb, are you going to be speaking on the record this

18  morning?

19          Yes.  The parties that are speaking, I'm going to

20  mute you if you're not giving your appearance right now.

21  All right.  Again, Lucas Holcomb, are you speaking on the

22  record this morning?

23          MR. HOLCOMB:  No, I'm not.

24          CLERK:  Okay, thank you.  All right, we will be

25  starting in a few minutes.  The judge just needs a few

Page 25

1   minutes.

2          For the parties that have joined, if you're

3   speaking on the record this morning and you have not given

4   your appearance yet, please unmute one at a time and give

5   your appearance.

6          All right, let's pause the recording for now.

7          (Recess)

8          CLERK:  I just have a few brief announcements.  If

9   everyone could please state their name each time they speak

10  on the Court record.  Also parties are strictly prohibited

11  from making any recording of Court proceedings, whether by

12  video, audio, screenshot, or otherwise.  Violation of this

13  prohibition may result in the imposition of monetary and

14  nonmonetary sanctions.  The clerk of the court maintains an

15  audio recording of all proceedings which constitutes the

16  official record.

17         Judge, would you like me to go through some of the

18  appearances or would you like to just get started?

19         THE COURT:  We'll just get started.

20         CLERK:  All right.

21         THE COURT:  All right.  Good morning, everyone.

22  This is Judge Glenn.  We have a long agenda for today.  We

23  will go through the agenda in the order which they're

24  included.  The amended agenda was filed last night or this

25  morning and that's what I'm using.  We will -- again, I will

Page 26

1   again try to provide an opportunity for pro se parties to

2   speak -- that are speaking in relation to one of the motions

3   that the Court is hearing.  Some of the motions on the

4   docket today have been filed by pro se parties and I

5   certainly will hear them in those matters.

6           At the bottom of your screen as in the past there

7   is a raise hand function.  If you wish to be heard, please

8   raise your hand and I will try to recognize you in the order

9   in which hands are raised.  Again, comments should be

10  directed to specific motions that will be heard by the Court

11  today.

12          First, let me get an update from the Debtors'

13  counsel as to where things stand.

14          MR. LATONA:  Your Honor, diving right into the

15  agenda today, Dan Latona on behalf of the Debtors from

16  Kirkland and Ellis.  Item No. 1 on the agenda is the

17  Debtors' KERP motion.  This was filed at Docket No. 1021.

18          THE COURT:  Mr. Latona, I would -- is there any

19  update that you or your colleagues would like to give before

20  we dive into the specific agenda for today?

21          MR. LATONA:  Not today, Your Honor.

22          THE COURT:  All right.  Go ahead, Mr. Latona.

23          MR. LATONA:  Again, Dan Latona from Kirkland and

24  Ellis on behalf of the Debtors.  Diving right into the

25  agenda, Item No. 1 is the Debtors' KERP motion which was

Page 27

1    filed at Docket No. 1021.  In support of the KERP motion,

2    the Debtors filed the declarations of Christopher Ferraro,

3    the acting chief executive officer, chief restructuring

4    officer, and chief financial officer of the Debtors and

5    Josephine Gartrell, senior director of Willis Towers Watson,

6    the Debtors' compensation consultant.

7            Mr. Ferraro and Ms. Gartrell are each available

8    today to the extent any party wishes to cross examine them,

9    but to the extent that Your Honor has any questions, the

10   Debtors would offer each of those declarations into evidence

11   at this time.

12           THE COURT:  You'll have to refer specifically by

13   ECF document -- docket number.

14           MR. LATONA:  Yes.  Mr. Ferraro's declaration was

15   filed at Docket 1022 and Ms. Gartrell's declaration was at

16   Docket 1023.

17           THE COURT:  All right.  Are there any objections

18   to the Court admitting in evidence the Ferraro and Gartrell

19   declarations, ECF 1022 and 1023?  All right.  Those

20   declarations are admitted as evidence for purposes of this

21   hearing.

22           MR. LATONA:  Thank you, Your Honor.  As the Court

23   is aware, the Debtors are pursuing a dual track process.

24           THE COURT:  Before you --

25           MR. LATONA:  One --

Page 28

1              THE COURT:  Before you begin, the Debtors also

2    filed a motion authorizing the Debtors to redact and file

3    under seal certain information relating to the KERP.  I'll

4    refer to that as the KERP sealing motion, ECF Docket No.

5    1020.  Please take that up before you take up the KERP

6    motion itself.

7              MR. LATONA:  Of course, Your Honor.  As Your

8    Honor, mentioned, the seal motion was filed at Docket No.

9    1020.  The exhibit to the KERP motion contains commercially

10   sensitive information.  The Debtors operate in a highly

11   competitive industry and the information filed under seal

12   would potentially allow competitors to poach the Debtors'

13   employees.  That includes information such as the employee's

14   job title, reporting structure, KERP award amount, and job

15   title.

16             The employees are not voluntarily providing this

17   particular data and any data that the employees do publicly

18   volunteer themselves does not link this highly sensitive

19   information.  Furthermore, disclosing this information would

20   negatively impact employee morale at a time when maintaining

21   the morale of the Debtors' employees is crucial to moving

22   these Debtors' Chapter 11 cases forward.

23             THE COURT:  Mr. Latona, I have to tell you, I've

24   ruled on a lot of KERP and KEIP motions over the years.

25   I've never seen one where the proponent has essentially

Page 29

1    proposed to seal everything.  I'm looking.  I have both the

2    redacted and unredacted copies, but the Exhibit B to the

3    motion, the KERP participant detail, has nothing, no

4    information whatsoever.  The U.S. Trustee in its objection

5    to the KERP has also objected to the sealing motion.  The

6    U.S. Trustee's objection is ECF Docket No. 1207.  I've made

7    this point -- whoever speaking in the background, please put

8    your device on mute or you will be cut off.  All right.

9            Mr. Latona, you provided no information to the

10   public about what it is you're seeking to do.  You have not

11   provided -- first off, you haven't even provided the Court

12   with the names, even in the unredacted information.  You

13   haven't provided the court with the names of the KERP

14   participants.  You have titles, job description, supervisor,

15   name and title, hired, appointed by, salary, and KERP award.

16           It's completely blacked out on this exhibit.

17   That's completely unacceptable to me.  So I'm going to

18   thwart your presentation because the KERP sealing motion is

19   denied.

20           Second, absent -- even with respect to the

21   unredacted information that you did provide, absent a

22   sufficient evidentiary basis for the Court to decide whether

23   the proposed KERP satisfies the high standards that must be

24   met before the Court approves a KERP, based on both the

25   redacted and unredacted (indiscernible) you provided in the

Page 30

1    KERP motion, the KERP motion is denied without prejudice.

2            The Debtors propose to redact any meaningful

3    information that would allow parties in interest and the

4    public to evaluate whether the KERP motion should

5    (indiscernible).  Even the unredacted information that has

6    been provided to the Court, Committee, and the U.S. Trustee

7    fails to provide sufficient information for the Court to

8    decide whether to approve the KERP.

9            I planned a written order today denying without

10   prejudice Debtors KERP motion and denying the sealing

11   motion.  Let me just state briefly, I don't -- I will not

12   provide an extensive legal analysis of the requirements for

13   approval of a KERP in the order, but it's undisputed that

14   KERP payments to insiders must satisfy the exacting

15   requirements of Section 503(c)(1) of the Bankruptcy Code to

16   be approved and KERP payments to non-insiders is tested

17   against a more permissive standard of Section 503(c)(3), but

18   even then, the Debtor must establish a nexus between the

19   KERP and the results sought to be achieved.

20           Debtors haven't provided enough information to

21   determine who is an insider and even assuming that the

22   proposed recipients are not insiders, the Debtor has not

23   provided enough information for the Court to evaluate the

24   relationship between the proposed KERP payments and the

25   results sought to be achieved.

Page 31

1            So the Committee filed a statement in support of

2    the KERP.   That statement is at ECF Document 1187 and the

3    Committee emphasized that since the start of these cases,

4    the Debtor has begun to right size their workforce based on

5    their current business operations.

6            It goes through the specific -- some of the

7    specific merits of the changes in size and says that it

8    recognizes that many of the Debtors' remaining employees

9    possess important institutional knowledge requiring the

10   Debtors' business, taken on increased responsibilities as

11   part of the Chapter 11 case, and face uncertainty while

12   working for a company in Chapter 11.

13           I agree with all that, but your showing in support

14   of the motion, both redacted or unredacted, is not

15   sufficient to allow me to conclude that this KERP is proper.

16   So I recognize that under the facts and circumstances of

17   this case, the Debtor may be able to make the factual

18   showing required to obtain approval from the Court for the

19   KERP, but the record before the Court is not permitted to do

20   so.   I'm cutting you off now because without a sufficient

21   public record, I'm not prepared to go forward and rule on

22   the motion.

23           So let me make a couple other points.   With

24   respect to sealing, I'm not going to require that the public

25   record include the names of each of the proposed

Page 32

1   participants.  What I've done in the past in situations like

2   this is to require a code where each proposed participant is

3   given a code number.  The Committee, the U.S. Trustee, and

4   here the examiner must be given the unredacted information

5   including the code.  A greater factual showing is going to

6   be -- have to be required, I think first to show that none

7   of the participants are insiders.

8            There's some conclusory arguments that you've made

9   certainly in the unredacted information when I looked at

10  salary, none -- salaries for the participants.  None of them

11  seems inordinately high, but I can't -- I also have

12  difficulty putting them in the context of the salary ranges

13  for the Debtors.  I'm certainly -- and I'm sensitive to the

14  commercial aspects of disclosing the names, what the precise

15  salaries are.

16           I -- what I would ask you to do is to work with

17  the Committee and the U.S. Trustee and I would certainly

18  permit within reasonable limits if you showed salary ranges

19  for different categories of employees, not the precise

20  salary amounts for each individual and if you showed within

21  reasonable limits the proposed KERP awards with respect to

22  particular salary ranges.

23           So I'm not requiring that for employee one, you

24  show exactly what his or her salary is, an exact dollar

25  amount, and what the exact dollar amount of the award is.

Page 33

1    But I want anyone looking at the record to be able to see

2    that the proposed awards are reasonable in relation to the

3    current salary ranges of different categories of people.

4    You're also going to have to provide evidentiary support in

5    declarations that show the job responsibilities before

6    bankruptcy, the job -- the expanded job responsibilities.

7            The Committee in its filing states in Paragraph 2

8    (indiscernible) likewise makes the point that, "The

9    Committee also recognize many of the Debtors' remaining

10   employees possess important institutional knowledge

11   regarding the Debtors' business, have taken on increased

12   responsibilities as part of these Chapter 11 cases, and face

13   uncertainty while working for a company in Chapter 11."

14   That's close quote.  That's from Paragraph 2 of Committee's

15   response.

16           So there needs to be information that explain what

17   the increased responsibilities are, and certainly given that

18   the number in the Committee's filing is public, it indicates

19   that the Debtors had -- this is quote -- "The Debtors had

20   approximately 274, down from over 900 employees at the

21   beginning of 2022.  The reduction in force has saved the

22   Debtors tens of millions of dollars annually in compensation

23   costs.  See the Committee statement, Paragraph 1."

24           So there needs to be, you know, the record needs

25   to show the facts that -- on which I can base a finding.  So

Page 34

1    with respect to the objection of the U.S. Trustee, I guess

2    let me say -- let me back up a second.  I do believe that

3    the Court should be able to approve a KERP in these cases if

4    the required factual showing's made.

5             If the U.S. Trustee wishes to take depositions of

6    any of the Debtors' employees or its advisors who formulated

7    the KERP, you can cooperate and make the witnesses available

8    promptly.  I will only permit counsel for the Debtors or

9    your advisers if they wish to have their own -- the

10   Committee, and the U.S. Trustee to be present during the

11   depositions.

12            With respect to the transcripts of depositions, if

13   any are taken, I expect them to be filed on the docket.  If

14   any party is going to move to seal some portion of the

15   transcript, the motion -- obviously I'm not going to have

16   unredacted copies filed until I have an opportunity to rule

17   on any motion to redact.  Those motions do not need to be

18   brought on the omnibus hearing date.

19            I'll hear it expeditiously.  I understand the need

20   for the Debtor to be able to -- if (indiscernible) organized

21   either on a standalone basis or we're going (indiscernible),

22   it's important that the Debtors have a workforce consistent

23   with its size and operations to be able to carry it forward

24   to a standalone plan or a sale.  And if in fact employees'

25   responsibilities have expanded, that ought to be made clear.

Page 35

1          So look, I'm telling you, I was shocked when I saw

2     the redactions.  I've never seen anyone attempt to redact

3     everything.  That's not going to happen in this case.  I

4     thought that should have been clear after I ruled on, you

5     know, what was going to go into the schedules and then I get

6     something, everything is blacked out.  You've got to be

7     joking.

8          Let me hear from the U.S. Trustee at this point.

9          MS. CORNELL:  Thank you, Your Honor.  Shara

10    Cornell at the Office of the United States Trustee.  I'm not

11    sure how detailed you'd like me to go into right now.

12    Obviously, we agree with your ruling.

13          THE COURT:  What do you want to do?  I mean, I

14    thought -- you make the point, well, you can't tell who's an

15    insider.

16          MS. CORNELL:  Yeah.

17          THE COURT:  From the salary amounts, I have some

18    question about that, but --

19          MS. CORNELL:  Yeah.

20          THE COURT:  -- the evidentiary showing, they

21    haven't shown it.  I mean, have you met and conferred?  Have

22    you talked about either what you would require in additional

23    declarations?  Are there depositions that you want to take?

24    Because I -- look, I do believe there's a basis for

25    approving a KERP in this case.

Page 36

1            MS. CORNELL:  Sure.

2            THE COURT:  But it hasn't been made out.  But I

3   don't --

4            MS. CORNELL:  Sure.

5            THE COURT:  -- want this to drag on for months.

6            MS. CORNELL:  Sure, Your Honor.  That makes sense.

7            THE COURT:  What do you (indiscernible)?

8            MS. CORNELL:  Well, for starters, Your Honor, I

9   think we need more historical information, both about the

10  historical salary structure of the Debtors in addition to

11  the use of the CEL token as part of a salary.  The motion

12  and the reply are, you know, mute as to how either of those

13  functioned in the past.  And we haven't received that

14  information from the Debtors to date.  And I think we do

15  need quite a bit more information about that.

16           Whether or not we need depositions, I'm not sure

17  yet.  We do have some questions about the Debtors' declarant

18  in this case.  For example, it looks like the Gartrell

19  declaration of Willis Towers Watson, Willis Towers Watson is

20  not a retained professional in this case.

21           When they were employed or how they were employed

22  is not included in their declaration and it doesn't appear

23  as though they are in fact experts.  But we know from the

24  monthly operating reports and bank statements that they've

25  received three post-petition payments that we're also

Page 37

1    looking into at this point where they've received $225,000

2    for their work on this KERP analysis.

3              So we may need to do further depositions with

4    respect to that and further investigate.

5              THE COURT:  Further.  Have you taken any

6    depositions so far?

7              MS. CORNELL:  In this case, not yet, Your Honor.

8              THE COURT:  Let's talk about the sealing.  I --

9    look, I read your opposition.

10             MS. CORNELL:  Sure.

11             THE COURT:  It's like the opposition your office

12   has filed in almost every KEIP or KERP case I've ever had.

13   I'm trying to think whether -- I think I may have had one

14   when your office finally agreed that the KEIP or KERP was

15   okay.  So, you know, it's a little bit of a broken record.

16             MS. CORNELL:  Sure, sure.

17             THE COURT:  But I think the points that you make

18   here, I think fundamentally are well taken.  There's just

19   there's no evidentiary showing.  And then look, you oppose

20   the sealing.  I think this is a case of sealing everything

21   is clearly overbroad.  Sealing something, I think, may be

22   appropriate.

23             Your office has agreed in some prior cases to use

24   the code where the names of specific employees are not

25   listed, but you -- did you try and reach an agreement with

Page 38

1    the Debtors about what information you think needs to be

2    part of the public record and what can properly be sealed?

3          MS. CORNELL:  Not yet, Your Honor, but we

4    certainly will after this hearing.

5          THE COURT:  Please do it sooner rather than later.

6    This is important.  Okay.  The Debtors have shrunk their

7    workforce, which is appropriate.  Okay.  I'd like to hear

8    from the Debtors about what business they're actually

9    conducting now.  That's not clear to me, but it's, you know,

10   as the workforce substantially reduces, if they're going to

11   reorganize either on a standalone or going concern basis,

12   they have to have a core workforce to carry on the tasks

13   that have to be done.

14          And I think in those circumstances a KERP, if it's

15   properly calibrated is appropriate.  When I saw the

16   unredacted information and I see the salaries, you know,

17   nothing jumped out at me as clearly -- these are not huge

18   salary amounts.  I don't know.  The point you make about

19   where they compensated with CEL tokens, I don't -- that, I

20   don't have a grasp of.  Okay.  So I think your points are

21   valid on that.  But what I want is I want you to meet and

22   confer with the Committee's counsel and the Debtors' counsel

23   promptly and see whether you can -- maybe you can come to an

24   agreement.  Okay.

25          MS. CORNELL:  Absolutely, Your Honor.

Page 39

1           THE COURT:  Anything you want -- I'm not hearing

2     this on the merits today because I just -- there's not

3     enough information.  Is there anything else you want to say

4     at this point, Ms. Cornell?

5           MS. CORNELL:  No thank you, Your Honor.

6               THE COURT:  All right.  Can I hear from

7     Committee's counsel?  Go ahead.

8           MR. PESCE:  Your Honor, my partner Mr. Colodny was

9     going to handle this, but I don't see him on the Zoom, so I

10    can briefly speak.  Gregory Pesce, White and Case on behalf

11    of the Committee.  You can hear me all right, Your Honor?

12          THE COURT:  I can.

13          MR. PESCE:  We're happy to confer with the Debtor

14    and the U.S. Trustee.  Our overall goal in the cases is

15    transparency and preserving value.  so your comments are

16    well taken.  We can talk more about the substance of why we

17    were supporting this at that later hearing, but in the

18    meantime we will speak with the U.S. Trustee to make sure

19    this can go forward on a full evidentiary record which we

20    had, but it seems the rest of the public did not have, which

21    we can rectify.

22          THE COURT:  I mean, when I read your statement, it

23    sounds like there were weeks of discussion that went on

24    between the Committee's professionals and the Debtors'

25    professionals in designing the KERP in a manner that was

Page 40

```
 1    acceptable to you.  That's all well and good, but all I see

 2    is the conclusions, that's what happened.

 3            MR. PESCE:  That's very well taken by us.  We got

 4    a lot of information but obviously more information is

 5    needed for Your Honor and the public and we'll work with the

 6    Debtor to minimize the redactions and make sure the full

 7    record gets out there because I think as we said in our

 8    pleading, this is a difficult issue and it was a

 9    controversial one but it's one that we felt was appropriate

10    given the size and all of the work they did with us to get

11    our buy-in and cut costs and reduce the size of it over the

12    last couple of -- really it's over a month probably at this

13    point, but to get this ready for today and we'll work with

14    them to find a way to try to get that record in front of

15    you.

16            THE COURT:  Okay.  Let me ask you whether you have

17    any view about the sealing issue.  I mean, look, I'm

18    sensitive to the commercial nature.  I'm sensitive to any

19    physical risks that any of the employees might face.  But on

20    the other hand, there's got to be a record on which not only

21    me but the public can see that this is why I did what I did.

22            MR. PESCE:  Yeah, I appreciate that.  We -- I

23    think we would be open to having some type of coding

24    mechanism so their names and titles aren't evident but the

25    amounts of compensation and other relevant information is.
```

Page 41

1   From our experience, you know, we've gotten a lot of

2   information sent to us for your -- just for your benefit

3   from LinkedIn and job boards, you know, basically telling us

4   about who works at Celsius.  So we do feel a little

5   concerned that if their names or their titles are out there,

6   it would be easy to sort of triangulate who they are.

7           That said, a coding mechanism for that information

8   coupled with disclosure of their salaries and a way to, you

9   know, make sure the underlying information underlying those

10  coded names or titles can get to the right people would be

11  something that we would support and can think about with the

12  Trustee and the Debtor.

13          THE COURT:  I mean the last point I'd make, I

14  talked about salary ranges.  I'm looking at the unredacted.

15  I'm not going to say what the salaries are, but you know, a

16  lot of them fall within bands.  You could -- you know, if

17  the band was $50,000 spread maybe, you know, just picking

18  that number out of the air -- so that I can understand

19  avoiding the situation one employee says, you're getting

20  that much more than I am.  And --

21          MR. PESCE:  Right.

22          THE COURT:  At least if there's -- if the ranges

23  are reasonable and the KERP awards are reasonably banded as

24  well, I would be satisfied and permit the --

25          MR. PESCE:  Okay.

Page 42

1          THE COURT:  -- a showing along those lines.

2          MR. PESCE:  That makes sense to us, too.  We can

3     think about what the appropriate bands are for the next

4     hearing.

5          THE COURT:  Okay.  Mr. Latona, is there anything -

6     - so I'm -- basically I'm denying without prejudice the KERP

7     motion and denying the sealing motion.  Is there anything

8     you want to add?  Look, let me just -- again, this does not

9     have to come on at an omnibus hearing.  There needs to be

10    appropriate notice of it, but it can be hearing on shortened

11    notice that just focuses on the KERP.  I can understand the

12    need, if it's going to be approved, to try and get it

13    approved reasonably promptly.  So I'm amenable to that.  Mr.

14    Latona, is there anything you want to add?

15          MR. LATONA:  No, Your Honor.  The Debtors will

16    confer with the United States Trustee and the Committee and

17    according to your Court schedule, will seek to file on an

18    expedited basis.

19          THE COURT:  Okay, so that takes care of Items 1

20    and 2 on the agenda.  (indiscernible) from there.

21          MR. LATONA:  Thank you, Your Honor.  I believe Mr.

22    Lazar from Jenner will handle the examiner motion up next

23    and I'm going to ceded the lectern to my partner Mr.

24    Kwasteniet.

25          THE COURT:  Mr. Lazar.

Page 43

1            MR. LAZAR:  Good morning, Your Honor.  Vincent

2    Lazar, Jenner and Block, on behalf of the examiner.  Can you

3    hear me okay, Your Honor?

4            THE COURT:  I can.  I can.

5            MR. LAZAR:  Great.  Your Honor, I assume you've

6    had a chance to review the parties' submissions so I will

7    endeavor to be brief.  First I wanted to advise the Court

8    that yesterday and this morning the examiner heard from a

9    number of the state regulators in response to the pleadings

10   that were filed over this weekend.  The financial regulators

11   from the States of Wisconsin, Vermont, and Texas have

12   informed the examiner that they support an examination on

13   both the CEL token program and what public representations

14   were made to customers.

15           I believe that I saw appearances from

16   representatives of each of those agencies entered this

17   morning, and they can address the Court if you'd like them

18   to.  We also understand from Ms. Cordry who represents a

19   group of state regulators -- and if I've got them right, I

20   think it's Alabama, Arkansas, California, Hawaii, Maine,

21   Missouri, New York, North Dakota, Oklahoma, and South

22   Carolina -- that those states also support a report on the

23   CEL token program and what public representations were made

24   to customers, and I believe that I saw Ms. Cordry made an

25   appearance as well.

Page 44

1           Your Honor, turning the substance of the

2   examiner's requested relief --

3           THE COURT:  Before you do that, just let me say.

4   There are two examiner motions that are on the docket today.

5   The examiner work plan motion which is the ECF Docket No.

6   1013 and the examiner motion to confirm scope which is ECF

7   Docket No. 1112.  I believe that's the two motions that are

8   on the agenda for today.  Go ahead, Mr. Lazar.

9           MR. LAZAR:  Thank you, Your Honor.

10           THE COURT:  -- treat those together.  Okay.

11           MR. LAZAR:  Yes.  Thank you.  So Your Honor, all

12   the customers filing responses on the docket supported the

13   examiner's motions.  And the Debtors did not object to the

14   motions but reserved their rights concerning costs and

15   timing.  So the Committee is the lone objector to portions

16   of the scope suggested by the examiner.

17           I do want to note that with respect to the scope

18   of the CEL token investigation, we heard from the Committee

19   yesterday that in its response the Committee was proposing a

20   scope that was somewhat different than what the examiner was

21   proposing.  When we submitted our reply, we didn't

22   appreciate that there was a nuance in the Committee's

23   proposal with respect to that issue, and so I'll let the

24   Committee address it.

25           But it's the examiner's position that the scope

Page 45

1    that was suggested in our motion is appropriate and

2    consistent with the concerns voiced by customers.  So Your

3    Honor, I think everyone's in agreement that the Court asked

4    the examiner to look at pro se filings and no one appears to

5    be asserting that the examiner didn't accurately summarize

6    the fundamental concerns voiced by customers.  And so the

7    Committee's objection really boils down to timing, cost, and

8    duplication of effort.

9           With respect to the timing issue, the examiner is

10   on track to deliver her interim report on schedule.  We also

11   believe that the final report, including a report on the CEL

12   token program and representations made by the Debtors can be

13   completed on schedule or with a very short extension.  Your

14   Honor, this of course assumes access to all the necessary

15   documents and witnesses.

16          As the Committee noted in its response, there have

17   been some issues getting documents as quickly as the

18   Committee or examiner would like, but we've had discussions

19   with the Debtors' counsel as recently as last night, and

20   we've received assurances that the Debtors are committed at

21   all levels to providing the examiner with all the materials

22   she will need as quickly As possible.

23          With respect to cost, the examiner fully

24   recognizes that this is an expensive case with a lot of

25   professional fees and she will do everything that she can to

Page 46

1    complete her report within budget.  The examiner also

2    intends to make most of the underlying material that will be

3    referenced in her final report available to all parties

4    following delivery of her report.  We therefore hope that

5    the report will serve as a vehicle for ultimately reducing

6    the need for fact discovery and thus hopefully reduce the

7    overall cost of the case.

8              Finally, with respect to duplication, a key reason

9    that this matter is before the Court today is so that we can

10   in fact clarify precisely what work is expected to be

11   performed by the examiner, such that others won't be

12   duplicating that work.  We've also been in regular

13   discussions with the Committee's professionals and to the

14   extent the Committee has performed some work that would be

15   helpful to the examiner's investigation, we would hope that

16   the examiner would be able to leverage any non-privileged

17   work already performed by any of the Committee's

18   professionals.

19             Unlike the Committee, which is a fiduciary for the

20   unsecured creditors and will be obligated to make arguments

21   advancing their positions, the examiner is a neutral party

22   and will not be advancing legal arguments on behalf of any

23   party, simply reporting facts.  We therefore submit that the

24   examiner is the appropriate and best suited party to report

25   on the issues identified in the examiner's motions.

Page 47

```
1              THE COURT:  So I guess I'll hear from the

2    Committee next, but your last point, Mr. Lazar, the

3    Committee's fiduciary responsibility is to the unsecured

4    creditors, as you point out, and in some ways -- I may make

5    this comment again later -- a little curious that with

6    respect to determining whether or not any of the claims are

7    secured, it's odd coming from the Committee because to the

8    extent that any of the account holders are determined to be

9    secured creditors, it may mean that much less available to

10   unsecured creditors for recovery.

11             So it's a little bit of an odd argument to be

12   hearing -- a valid argument, but surprising from the

13   Unsecured Creditors Committee.  It may well be that the

14   examiner's investigation discloses facts that may decrease

15   the value of the estate and the potential recovery by

16   unsecured creditors, so it may be that the examiner's report

17   will have the effect of not fully supporting what the

18   Committee might want to argue or reveal.

19             And as you say, I mean, I think the examiner has

20   got to play it straight and disclose the facts with evidence

21   to support it as, you know, whatever the examination

22   investigation reveals, but that's more of an issue.  Let me

23   hear from the Committee next.

24             MR. PESCE:  Thank you, Your Honor.  Sorry, Gregory

25   Pesce, White and Case on behalf of the Committee.  You can
```

Page 48

1    hear me all right?

2              THE COURT:  Yes, I can.

3              MR. PESCE:  Let me just offer some context up

4    front here and apologies for being overly blunt here, but

5    these cases are taking too long to come to closure.  They

6    cost too much.  Account holders are demanding transparency

7    and, you know, despite extensive efforts by the Committee

8    and the Debtors, there's insufficient clarity exactly how

9    and when this case is going to end.

10             This was the case when the examiner motion was

11   filed.  It's still the case today, although significant

12   progress is being made on a variety of fronts.  But with

13   this context in mind, Your Honor will recall from the

14   pleadings we filed at the September 14 hearing, it was --

15   the Committee very reluctantly supported the appointment of

16   an examiner.

17             The cost of delay and -- the cost and the prospect

18   of delay were obviously very relevant.  We also question

19   though, the need for an independent examiner here because

20   other than the preferred equity, the customers are the only

21   constituency in the case and the committee represents those

22   parties.

23             THE COURT:  Well, you don't -- if the Court would

24   determine, for example, that some of the customers have

25   secured claims and that most of them did not, that would not

Page 49

1    work to the advantage of the Committee.

2           MR. PESCE:  That's true.  We don't think that

3    there are secured claims, and even if there were, would see

4    --

5           THE COURT:  It's funny.  You didn't say that in

6    the paper that you filed.  You filed a paper saying, well,

7    the Debtors right from day one said this is an important

8    issue.  And so it was a little odd that -- accurate but odd

9    that it came from you.

10          MR. PESCE:  Well, I guess we don't think that

11   there are secured creditors, at least of the type that

12   you're going to hear from later in the hearing today.  Even

13   if there are, just math would imply there's a pretty big

14   deficiency claim which would be within our constituency in

15   any event.  But you know, with this kind of context in mind,

16   when we spoke to the U.S. Trustee, we insisted on having an

17   order regarding scope that was tailored to the circumstances

18   of this case.

19          And in particular, we wanted to avoid duplicating

20   the work which was already underway when the motion was

21   filed and was pretty advanced at the time of the hearing and

22   today is even further advanced in this regard and at the

23   time it was filed, you know, there wasn't an agreement on

24   the cost of the examination, but we did tell the U.S.

25   Trustee with pretty clear specificity what we thought it was

Page 50

1    appropriate to run this examination in light of what was

2    going on, the liquidity runway, and the exigencies of this

3    case.

4           So all of that context informed why we agreed to

5    the scope that we agreed to, you know, basically over nearly

6    two months ago at this point.  And you know, with that

7    context in mind, let me just address a few things on the

8    examiner's scope and then the work plan that was the two

9    pleadings filed by the Jenner and Block firm.

10          First on the CEL token, as Mr. Lazar noted, we do

11   believe that aspects of the CEL token that were cited in the

12   examination scope expansion motion or already in the scope

13   of examination, and we do not have an objection to that.

14          There's really kind of two issues that we carved

15   out of the proposed scope expansion that we think are not

16   clarifying in nature and are an expansion that would

17   infringe upon a lot of work that's already been done.

18   First, they wanted to look at why other digital assets may

19   have been converted into CEL tokens and how those tokens are

20   marketed.

21          The why question is a pretty significant one

22   because CEL tokens were really a significant source of

23   compensation and return on investment for Mr. Mashinsky

24   01:28:50 and others.  It was a pretty significant aspect of

25   how Celsius marketed its services to the public and by

Page 51

1    looking at why digital assets may have been converted and

2    why CEL became an issue, that really is just sort of a back

3    door in our view to the rest of the investigation we're

4    already doing.

5            And like I said at the outset, we want

6    transparency.  We're trying to be as transparent as

7    possible.  Just last week we had, you know, another town

8    hall.  We talk to people every day.  We want transparency,

9    but we also just want to make sure this stays on track

10   because they don't have infinite funds and this type of

11   expansion going into the why this happened is a big one.

12           Second, there was sort of a valuation question

13   embedded there.  So we had struck finding the resulting

14   value of CEL tokens as a result of the trading practices and

15   other things.  Again, you know, we think that the scope as

16   prepared speaks to how tokens were stored prepetition and

17   post-petition and commingling.  We always viewed that as

18   sort of like an enhanced coin reporting mandate.

19           We didn't view that as sort of a way to look at

20   why, big picture, the company was doing things with the

21   tokens and then how that resulted the value of -- that might

22   have affected the value of CEL, which is very part and

23   parcel of our own investigation.

24           On the customer communications, I'll just be very

25   clear on this because it seems like there's some confusion

Page 52

1    in the examiner's response.  Again, we're already doing this

2    work.  We've looked at the -- all of the publicly available

3    Ask Me Anything videos.  As a result of us speaking to

4    regulators and account holders and even our own members of

5    our Committee, it was made clear to us that there are

6    potentially important videos that were taken down at various

7    times prepetition or post-petition.

8            We've made demands on the Debtor to get those

9    videos, to the extent they are in their possession.  We've

10   served discovery on Mr. Mashinsky, Mr. Leon, and others to

11   obtain those videos if they have them in their possession.

12   At the -- we've already reviewed the ones we have.  Once we

13   get the rest, we can kind of include those in the fuller

14   picture of what we're doing.  But again, those videos, you

15   know, are already out there to the extent that they weren't

16   taken down.  We're going to incorporate those in our

17   investigation.

18           We don't think it's necessary to have a further

19   investigation into this matter, particularly because as

20   unfortunate and disturbing as some of the statements were in

21   those videos, given the context in which they were made, the

22   company is not engaged in crypto financial services today,

23   so we don't think there's a risk that people are going to

24   continue following the advice of Mr. Mashinsky or others

25   that appeared there.

Page 53

1          So we don't think the customer communication

2     should be there.  And then -- yes, Your Honor.  Apologies.

3          THE COURT:  I will hear from Ms. Cordry or the

4     other regulators, but aren't their interests different than

5     yours?  I mean, you're --

6          MR. PESCE:  Yeah.

7          THE COURT:  You focused on, essentially what are

8     they telling customers now, if there are any customers

9     versus what happened in the past.  But the regulators who

10    have been investigating for a considerable period of time,

11    their interest is retrospective as well as prospective; is

12    that a fair statement?

13         MR. PESCE:  Yeah, great -- sorry, I heard an echo

14    there.  It's great you raise the regulators.  So the

15    regulators do have a different mission and priority and

16    different client base than we do.  When we negotiated the

17    scope of order, it was the very issue you're flagging here

18    that, as you might recall at the time, the examiner motion

19    was pending, a lot of regulators weighed in to say that it

20    should cover potential state law, regulatory violations, or

21    criminal violations, or other things.

22         The regulators might be drawing on the same pool

23    of facts that we are to make our causes of action or our

24    investigation.  Those causes of action though, if they

25    exist, are going to inure to the benefit of the account

Page 54

1   holders and the unsecured creditors.  Those same facts, if

2   they're utilized by the regulators or prosecutors or other

3   government interests are going to inure to the treasuries of

4   the various states or the federal government or whoever is

5   pursuing those claims.  They're not going to go to the

6   constituency that's paying for it.  So it's really

7   inappropriate in our view to have them subsidizing that

8   work.

9            THE COURT:  If the state regulators conclude for

10  now at least we're happy to allow the examiner to pursue

11  this investigation, if she can't, the Debtor is going to

12  wind up with subpoenas from 34 or more or 50 state

13  regulators, the SEC, and those investigations and

14  proceedings probably are not stayed.  And the cost to the

15  estate will be substantially higher than if the examination

16  for now at least is conducted by the examiner because your

17  constituency's interests, you've acknowledged, differs from

18  that of the regulators.  That's the dilemma.

19            Isn't your constituency better off if it's the

20  examiner for now -- of course, doesn't prevent the state

21  regulators or the SEC from -- or the U.S. Attorney from

22  launching whatever it's going to do, but aren't you better

23  off if it's focused through the examiner rather than through

24  every regulator known to the face of the earth?

25            MR. PESCE:  That's a great question.  You know,

Page 55

1    look, at the end of the day, if the examiner is charged with

2    this, it's still my constituency that's going to be paying

3    for it because it's going to be administrative expenses paid

4    by the estate.  But I think it's also just a bit of a --

5    it's a bit of a solution in search of a problem because I,

6    if not every day, at least several times a week we're

7    speaking with state and federal regulators to hear what they

8    are seeing and to, you know, get their perspective on the

9    case.

10             As a result of that, we've been able to sort of

11   narrow and help the Debtor resolve objections to the bidding

12   procedures and other things.  So I think this is already

13   sort of playing out well with the Committee being in the

14   middle of it because, we're kind of appropriately

15   coordinating where there's interests that coincide.  But you

16   know, I don't think we need to vest the examiner with some

17   sort of mandate to do that which is already happening.

18             And we just candidly think the Committee is better

19   positioned to sort of weigh that and push back because we

20   are both, you know, inquisitor and we're also going to be

21   helping implement whatever transaction is here and getting

22   these different constituencies that might be affected by the

23   regulators' activities on board with that ultimate

24   transaction.

25             THE COURT:  All right.  Let me hear from --

Page 56

1              MR. PESCE:  I could just make one, just final

2    point just to -- because I think it is important here

3    because we've heard a lot about it.  We are not trying and

4    don't intend to keep our -- the findings of our

5    investigation including involving CEL customer

6    communications, et cetera confidential.  We expect that they

7    will become part of the Court record.

8              You know, we don't have a deadline to produce a

9    report, but we can see a lot of situations in the near

10   future where we put them in pleadings and at a minimum, we

11   would expect that the disclosure statement to go out to say

12   nothing of having our support for going out would need to

13   have a pretty exhaustive summation of what we have found on

14   different topics.  So we don't think that there's

15   necessarily going to be secrecy here.  We'll work to make it

16   as public and transparent as we can.  So I appreciate Your

17   Honor's time and can do any other questions.  Thank you.

18             THE COURT:  Thank you, Mr. Pesce.  Do any of the

19   attorneys for any of the state regulators want to be heard?

20             MS. MILLIGAN:  Your Honor, if I may, this is Layla

21   Milligan with the Texas Attorney General's office appearing

22   on behalf of the Texas State Securities Board and the Texas

23   Department of Banking.  Can you hear me okay?

24             THE COURT:  I can.  Nice to see you again.  Go

25   ahead.

Page 57

```
 1              MS. MILLIGAN:  Thank you.  Good to see you, Your

 2   Honor.  I do want to just clarify a couple of things.  One,

 3   I do agree with Mr. Pesce that we have had active

 4   communications between the state regulator body and the

 5   Committee as well as the examiner and the states do have an

 6   interest in understanding what happened with the Debtor

 7   prepetition, what is happening now, how -- and we appreciate

 8   the work that the Committee is doing.

 9              However in our view, the more information that's

10   publicly available in this case, especially in light of the

11   very significant activities and involvement of pro se

12   creditors and the charge of this Court to the examiner to

13   read all of those pleadings and determine if her examination

14   should be expanded, in light of that, the expansion of the

15   scope of the examiner's report is appropriate.

16              This is a unique bankruptcy case, one where there

17   are a lot of different constituencies.  However, I do take

18   exception to the assertion whether implied or direct that

19   the state's interest is in the state's coffers.  The state's

20   interests are that the business moving forward is done

21   regulatorily compliant and that these consumers and

22   investors are made right and that they continue to be made

23   right and the company complies in the future as well as an

24   investigation of the past.

25              And so to that end -- forgive the colloquialism, I
```

Page 58

1    guess, or the informality of this, but sometimes sunlight is

2    the best disinfectant and in this case more information

3    provided by a non -- I guess, by a party that is not subject

4    to a constituency we think would be helpful to everyone.

5    And as I said, I appreciate -- and we appreciate the work

6    the Committee is doing.  If they intend to issue a report of

7    some sort that is providing information and not necessarily

8    in support of a plan or in support of an assertion or

9    movement, a pleading, that would be fantastic, but I think

10    that's what the examiner is charged with doing and I think

11    that our position is and the position of many of the states

12    is that her request is appropriate in this case.

13            THE COURT:  Thank you, Ms. Milligan.  Ms. Cordry,

14    be --

15            MS. MILLIGAN:  Thank you.

16            THE COURT:  -- heard?

17            MS. CORDRY:  Yes, Your Honor.  I agree with pretty

18    much everything that Ms. Milligan just said.  I would just

19    add to this that the Committee has a lot of things on their

20    plate right now.  The examiner has a more focused motion.

21    Everybody in this case has bits and pieces of information on

22    a lot of these topics that she's proposing to discuss.

23            I think it's a single neutral centralized forum,

24    where that information can be gathered and brought together.

25    I don't think there's any need to assume that there would be

Page 59

```
1    duplication.  What she does will come out and will be a

2    report that the Committee can then use at some later point,

3    if it's bringing litigation and so forth.

4           But I don't think anybody expects it to get to

5    that stage before the time that her report is due.  And she

6    does have a deadline, so there is a very focused need to

7    deal with those issues.  And I think she can gather the

8    information from the estates, from the Creditor's Committee,

9    what it has gathered today from the Debtor, from all those

10   other parties in the case, where there -- somebody -- ad hoc

11   kind of committees and constituencies popping up.

12          We do agree that I think it just seems like in

13   this case, and it's an appropriate scope for her work to be

14   done, and we would support that.  Thank you.

15          THE COURT:  Thank you, Ms. Cordry.  Do any of the

16   other estate regulators wish to be heard?

17          MS. ROOD:  Just briefly, Your Honor, Jennifer Rood

18   for the Department of Financial Regulation.  We also support

19   the Examiner's Motion to extend or clarify the scope.  We do

20   think her role is very distinct from the Committee, and the

21   Committee is certainly doing good work here, but they have a

22   different constituency.

23          We likewise take exception to the comment about

24   our state treasuries.  We are freely focused on the interest

25   of retail investors, the folks that have the entire you
```

Page 60

1    know, education or retirement fund you know, taken up by

2    Celsius.  And certainly to the extent there was a market

3    manipulation or fraudulent representations pre-petition, we

4    want that looked into carefully.

5              And you know, if we pursue our own regulatory

6    actions against Celsius, you know, there are lots of ways to

7    resolve those and they don't always involve fine store

8    treasuries.  There are lots of creative ways to structure

9    those outcomes.

10             So to this -- I guess finally, to the extent that

11   there might be any duplication on some of these points, we

12   are pretty confident the Examiner and the Committee can work

13   that out and end up with a result that's not, you know, a

14   lot of duplication.

15             I think the Court's point about the 40 states

16   subpoena-ing is well-taken.  It's, as a matter of resources,

17   both of the bankruptcy estate and of the states, it's much

18   more efficient to have one neutral party, you know, looking

19   into some of these issues.

20             THE COURT:  All right.  Do any -- I see Mr. Cruz

21   with his hand raised, but before we get to you, are there

22   any other state regulators who wish to be heard?

23             MR. MORRIS:  Just briefly, Your Honor, if I could?

24   This is Michael Morris on behalf of the State of Wisconsin.

25   Just very briefly, I would just -- just want to state on the

Page 61

1    record that Wisconsin joins the other states in their

2    remarks and supports the Examiner's motions.

3            THE COURT:  Thank you very much.  All right, Mr.

4    Crews?

5            MR. CREWS:  Yes.  I agree with the state

6    regulators.  This is -- there's a lot that needs to be

7    looked into here.  In particular, there was a -- earlier

8    before the Court, it was argued that Kirkland & Ellis did

9    not have conflicts of interest representing both Voyager and

10   Celsius simultaneously.

11           What they did not disclose was that Voyager is a

12   Celsius customer, who withdrew $5.6 million worth of crypto

13   in late May.  They also withdrew $100 million worth of

14   stable coin on March 9th, which could be subject to

15   preference claims.

16           And these are matters which existing legal

17   representation, including White & Case, including Kirkland &

18   Ellis conveniently overlooked.  So Kirkland & Ellis is

19   simultaneously representing Voyager, which managed to file

20   for bankruptcy before Celsius.  They're going to exit

21   bankruptcy before Celsius, get out of their bankruptcy

22   potentially before Celsius, with their $100 million plus

23   crypto that they've extracted.

24           And then that would make it much more difficult to

25   deal with these preference claims.  And these are matters

Page 62

1    that should be substantiated by the Examiner, which existing

2    legal representation has not sufficiently dealt with.  Thank

3    you.

4              THE COURT:  Thank you, Mr. Crews.  Mr. Herrmann,

5    you were next.

6              MR. HERRMANN:  Oh.  Thank you, Your Honor.  I'm

7    having a video issue, so maybe -- oh here we go.  So I'll

8    aim to not go too long here.  First, I just want to say, I

9    agree with the state regulators, and I do fully join in the

10   reply of the Examiner, DR1236.

11             And second, I agree with you, Your Honor, that I

12   believe it's cheaper and more efficient to deal with

13   regulators through the Examiner than to have 34 state

14   regulators going through the UCC and the Debtor, and then to

15   have them fighting back and forth, when we need

16   transparency.

17             So that's a couple just points that I wanted to

18   make.  And then, on the examiner work plan more broadly, I

19   just wanted to bring up two additional issues.  The first is

20   that -- is actually related to substantive consolidation in

21   light of the filings of the Preferred Equity Committee and

22   what they're trying to do with their recent filings.

23             I'll note that in a filing DR779, filed on

24   September 12th, I requested an examination concerning

25   whether Celsius' books and records reflected that they acted

Page 63

1    as a unitary company.  Now that the preferred shareholders

2    have asked to resolve which entity its customers have claims

3    against, it seems potentially important to address, or at

4    least I would like to hear from other parties how they plan

5    to address this issue.

6            I'm not sure how it's possible to resolve these

7    issues quickly without looking into substantive

8    consolidation and whether Celsius acted as a unit -- unitary

9    company, if the preferred shareholders are pushing so hard.

10   And it'll ultimately be up to the Court to determine whether

11   Celsius' entities should be substantively consolidated.

12           But I do believe the Examiner could help build a

13   factual record.  And while I could file a new motion, you

14   know, I'll already note that that motion's out there.  And

15   so, you know, I may or may not need to file it, but you

16   know, I guess we can see how that goes with the Preferred

17   Equity Committee.

18           And then, the second issue really that I wanted to

19   raise, which I probably will be filing a motion on shortly

20   is whether pre-petition and post-petition misconduct, mainly

21   based on statements, but also the acts of the Debtors rises

22   to the level that the appointment of a Chapter 11 Trustee is

23   warranted.

24           I have not yet explicitly filed anything asking

25   the examiner to look into whether to appoint a Chapter 11

Page 64

1   Trustee, but I will note that I and other pro se filers have

2   requested it be looked into in general.  We've talked about

3   filing our own motions.

4          You know, after thinking about this, talking with

5   some experts and others, I think I'm inclined to say I

6   probably will file a motion asking you know, an examination

7   -- for an examination of those issues, rather than filing my

8   own motion for a Trustee or something like that.

9          So those were just a couple of things I wanted to

10  note.  And then, the last thing, really briefly, on the

11  Ponzi issue, I filed a long responsive pleading on that.  I

12  have some big concerns about something so volatile being

13  labeled a Ponzi and what the practical implications of that

14  are, yet it does seem like the Debtor has admitted to paying

15  out one person's earnings with another person's principle.

16         And it seems like regardless of whether it meets

17  the traditional definition of a Ponzi, and whatever the

18  Court decides on that, it seems like we do need to have a

19  public understanding of how long that went on for, which is

20  also related to clawbacks in addition to Ponzi questions.

21  So it's -- it just seems like an important issue for this

22  case.

23         And so, I believe the Examiner's proposed

24  examination is articulated in her filings.  Did the Debtors

25  use deposits by later customers to repay amounts due to

Page 65

1   earlier customers?  And if this occurred, what was the

2   extent of the practice?  When did it start?  And for how

3   long did it occur is -- probably strikes the right balance.

4   Thank you.

5           THE COURT:  Thank you, Mr. Herrmann.  Mr.

6   Frishberg next.

7           MR. FRISHBERG:  Thank you, Your Honor.  I'll try

8   to keep this pretty brief.  I do concur with what everyone

9   else said, such as Mr. Herrmann and Mr. Crews.  I do believe

10  that the Examiner should be investigating this stuff.  I'm

11  not sure if it should be -- I don't think -- I don't agree

12  with the UCC statement that they shouldn't investigate this.

13          I think it's much faster if they do investigate

14  it, instead of getting subpoenaed by like, 50 different

15  regulators.  I think they -- the Debtors have been able to

16  investigate themselves for far, far too long, and it's quite

17  ridiculous, honestly.

18          I think the (indiscernible) should also, in

19  addition to everything that she stated it should be expanded

20  to investigate clawbacks, since the UCC has a conflict,

21  since we're the target of the clawbacks potentially is

22  Tether, which is a current client of White & Case.

23          I think the -- I agree with Mr. Herrmann, that the

24  Examiner scope should see if it's -- should be -- to

25  determine if it is a Ponzi scheme, whether it's -- whether

Page 66

1    Celsius was a Ponzi scheme in the traditional definition or

2    in a non-traditional definition, and if a Ponzi declaration

3    would benefit the depositor/Creditors.

4            And it should also expand it to see what claims

5    the estate has against entities such as FTX, and if they

6    have claims against various lawyers or financial advisors

7    potentially, who -- like whoever wrote the contract, the

8    original one, there's -- it could -- they could have claims

9    against them.  Thank you.

10           THE COURT:  Thank you.  Mr. Sabin?

11           MR. SABIN:  Good morning, Your Honor.  A pleasure

12   to be back in front of you.  Jeff Sabin of --

13           THE COURT:  One of these days we'll get everybody

14   in the courtroom.  (indiscernible) --

15           MR. SABIN:  We hope that will be soon, Your Honor.

16   We hope that will be soon.  I'm from Venable.  We are on

17   behalf of Creditor Ignat Tuganov, who is an undisputed

18   Creditor as an earned rewards customer.  And I'm assuming

19   you read all of our papers.  I'm going to get right to the

20   heart of it, okay?

21           We requested further to what was contemplated and

22   permitted under Docket Number 820 on September 14th, which

23   was your order appointing the Examiner and defining the

24   initial scope.

25           And we filed at Docket 1104 on October 18th, not

Page 67

1    only our response to the work plan, but also our motion to

2    clarify our expand, the Examiner scope to include, and I'm

3    going to be specific here, whether the Debtors engaged in a

4    Ponzi scheme, if so, beginning when, and what were the

5    consequences thereof, and most importantly consistent with

6    the theme of transparency, sunlight, etc., requesting the

7    Examiner and its work plan to otherwise expand to include

8    this, especially since some of the areas of scope as we read

9    it are relevant to the factual finding.

10          And that publicly, the Examiner include it in

11   their report to be filed December 10th.  I will say now on

12   the record that as a result of yesterday's filing in

13   response to our pleadings by the Examiner, Docket Number

14   1236, in particular, Paragraph 12, it makes clear the

15   Examiner's willingness to investigate Ponzi issues factually

16   but does not want to include in its report an articulation

17   of the legal conclusion of facts it reported on.

18          That is acceptable to us, no ifs, ands or buts.

19   What's not acceptable is the response of the Committee and

20   the Debtors.  And those responses filed on yesterday by the

21   Committee at Docket Number 1237 and by the Debtor at Docket

22   1230 effectively say, as you read it, we should do, says the

23   Committee, the Ponzi investigation, not the Examiner.  And

24   the Debtor's response is effectively supporting the

25   Committee's response.

Page 68

1              THE COURT:  Why shouldn't the Committee

2   (indiscernible)?

3              MR. SABIN:  Because there's no obligation to do

4   it.  There's no obligation as to when to do it.  There's no

5   obligation to report on it.  And so, that's the essence of

6   the most important points set forth in Paragraph 5 of our

7   pleadings.

8              And from our perspective, it is critical that the

9   facts be found, that the facts be reported, that they be

10  reported if at all possible as part of the Examiner's

11  December 10th report.

12             THE COURT:  The Examiner's got an awful lot on her

13  plate for December 10th.

14             MR. SABIN:  Understood.  But also, as you know

15  well, having written 11 years ago on this very issue, that

16  many things that she's already looking at can simply be

17  looked at again with a little wider scope, or a little more

18  focused scope as to the facts that relate to Ponzi.

19             And so, to us, if that were to happen, and based

20  upon an experience that I lived through not too long ago in

21  the Woodbridge cases, it's not asking for the consequences,

22  it's not asking for a determination that this case is a

23  Ponzi, etc., it's otherwise saying to all the Creditors,

24  whatever they think of themselves, their treatment could be

25  affected by such a determination.

Page 69

1            In addition, there's nothing that otherwise would

2     stop any of the regulators, state or federal from doing and

3     continuing to do their work, and from possibly, okay,

4     deciding that they need to indict that would -- may or may

5     not be relevant to a Ponzi.

6            And so, from our perspective in that history we

7     lived through in the Woodbridge case, I think a report, and

8     quite frankly, we're neutral.  If the Committee wants to do

9     it and be obligated to do it in a timely fashion and be

10    obligated to publicly report, we're neutral, whether it's

11    the Committee or whether it's the Examiner.

12            It is do the homework, do the public

13    (indiscernible) so that hopefully, the Creditor

14    constituency, the equity constituency, otherwise can assess

15    with their own lawyers the consequences of the fact finding

16    and maybe it otherwise precipitates a mediation sooner

17    rather than later as opposed to proliferation of litigation

18    in these cases.

19            We have no desire to slow down the case.  We have

20    no desire to interfere with sale.  We have every desire to

21    say that this is an important issue to get investigated.

22    Thank you, Your Honor.

23            THE COURT:  Thank you, Mr. Sabin.  Mr.

24    (indiscernible), before I'll recognize you, I want to see

25    whether there's anyone else who's not been heard yet who

Page 70

1    wishes to be heard yet.

2            MAN:  Good morning, Your Honor --

3            MR. CORNELL:  Your Honor, this is Shara Cornell

4    with the Office of the United States Trustee.  How are --

5    speaking again.  I just wanted to say very briefly that we

6    agree with the requested scope of the Examiner.

7            THE COURT:  Does anybody else who has not been

8    heard yet wish to be heard now?

9            MR. KWASTENIET:  Good morning, Your Honor.  It's

10   Ross Kwasteniet from Kirkland & Ellis on behalf of the

11   Debtors.  We filed a statement, I believe due to the ECF

12   being down over the weekend, it was docketed yesterday.

13           In any event, we have acknowledged from day one in

14   these cases that there are important issues here that need

15   to be investigated so we're not saying that there are things

16   that really shouldn't be looked into.  And in fact, Your

17   Honor, to one of your questions earlier in the case, you

18   know, what are the Debtors up to right now?

19           We're happy to provide you more information.  One

20   of the key things the Debtors have been focused on, it may

21   not come as a surprise, but is the provision of information.

22   It's sitting for interviews, it's producing documents, it's

23   making sure that we maintain the key people with historical

24   knowledge, not necessarily to run active business

25   operations, but people who were involved in business

Page 71

1    operations that were run historically in making sure that we

2    maintain the people who can sit down, as many of them have,

3    with the Committee, with the Examiner, and provide

4    interviews and provide information and facilitate the

5    different parties who want to kind of get to the bottom of

6    what happened historically, and then make sense out of, you

7    know, what a go forward plan that's regulatory compliant

8    might look like.

9              Those are among, of course maintaining crypto

10   security, you know, safeguarding the assets.  There are many

11   people whose -- you know, that is their day job, guarding

12   against hacks and the like.  But certainly providing

13   information and helping the parties who have legitimate

14   goals of getting to the bottom of things, that's one of our

15   main objectives.

16             THE COURT:  (indiscernible) you just triggered a

17   thought, and I didn't make a note about it before.

18   (indiscernible) a proposed stipulation regarding security

19   issues of crypto securities.  And I don't believe I approved

20   that stipulation yet.  I want to see whether anybody else,

21   and particularly whether the US Trustee has a position on

22   it.

23             It looked fine to me, but there were not, you

24   know, I didn't see objections to it, and I do -- it is an

25   important issue.  It was an important issue from day one.

Page 72

1    It remains an important issue.  Mr. Kwasteniet, I don't know

2    when -- when is our next omnibus hearing?

3            MR. KWASTENIET:  I believe the next omnibus

4    hearing is December 5th, Your Honor.  We do have a hearing

5    on November 15 that is starting to take the look of an

6    omnibus hearing.  There is a few things that have been

7    bolted onto it, and but so, we have a November 15 hearing,

8    and then a December 5th hearing, Your Honor.

9            THE COURT:  For the November 15th hearing, I would

10   like to hear you or one of your colleagues to provide a

11   description of what if any current business are the Debtors

12   actually engaged in.

13           MR. KWASTENIET:  Happy to do, Your Honor.

14           THE COURT:  You don't need to do it.

15           MR. KWASTENIET:  Absolutely.

16           THE COURT:  Why don't you plan on -- at the start

17   of the next hearing, I'll ask for an update on the Debtor.

18   That's what I would like to hear, is what, if anything the

19   Debtor is actually doing other than responding to

20   investigation, important -- don't -- I don't want to mistake

21   that.

22           MR. KWASTENIET:  Yes.

23           THE COURT:  It's a crucial role here.  But that's

24   important to me, okay?

25           MR. KWASTENIET:  Thank you, Your Honor.  We will

Page 73

1   do that.  And we would appreciate Your Honor entering the

2   securities stipulation order at your convenience.  That is -

3   - we did work very hard on that.

4           THE COURT:  Let me see.  Is -- (indiscernible)

5   specific -- does anybody want to be heard with respect to

6   the securities stipulation?  Otherwise, I'm going to go

7   ahead and enter it and approve it, Ms. Cornell?

8           MS. CORNELL:  Your Honor, this is Shara Cornell

9   with the Office of the United States Trustee.  We had no

10  objection to the stipulation.

11          THE COURT:  I think it's very important.

12          MS. CORNELL:  Yes.

13          THE COURT:  I really do.  I have (indiscernible)

14  that it's central to this ongoing case.  Does anybody else

15  want to be heard on that stipulation?  All right, it's

16  approved.

17          THE COURT:  It will be entered.

18          MR. KWASTENIET:  Great.  Thanks, Your Honor.

19          THE COURT:  (indiscernible) we had, Mr.

20  Kwasteniet, I don't know whether I have a Word -- the Word

21  format of it has been submitted or not.  Check with your

22  colleagues.

23          MR. KWASTENIET:  I believe it has, Your Honor, but

24  that was maybe in connection with the last hearing.  We will

25  re-send it after this hearing concludes to your Chambers.

Page 74

```
 1              THE COURT:  (indiscernible), okay.  Anybody with
 2   respect to the Examiner, the Committee, you know --
 3              MR. KWASTENIET:  Your Honor, if I may, I just had
 4   30 seconds more in conclusion, Your Honor, as we noted in
 5   our statement, our main objective here is of course
 6   efficiency and avoiding duplication.  We do not object to
 7   the topics raised in the Examiner's motion to clarify scope
 8   as being appropriate topics to look into.
 9              I'll note, Your Honor, the Examiner was tasked
10   with reviewing all the various submissions on the Docket.
11   The Examiner came up with the two, you know, topics that
12   they wanted to include in their clarification motion.  We do
13   not object to those.
14              We do take issue with going, you know, further
15   afield, but we don't think that that's appropriate, but more
16   importantly, Your Honor, that's not my decision.  That's how
17   the Examiner came out, and we support.  We have no issue
18   with those topics.
19              The only question from our standpoint is, we don't
20   want to be responding to multiple sets of inquiries,
21   multiple interviews, etc., with respect to those topics.
22   And so long as there's clarification on who is doing those,
23   who is taking the lead on those, if you will, the Debtors
24   remain happy and willing to cooperate and to facilitate
25   those inquiries.
```

Page 75

1          THE COURT:  Happy may be an overstatement, but

2     willingly, okay.

3          MR. KWASTENIET:  Understanding it's our

4     responsibility, Your Honor, which we take seriously.

5          THE COURT:  Thank you, Mr. Kwasteniet.  I'm going

6     to mispronounce the name, Johan Bronge.  I don't know -- Mr.

7     Pesce, I'm going to give you your chance, but I want to hear

8     from people I haven't heard from.

9          MR. BRONGE:  Yes, good morning, I think.  My name

10    is Johan Bronge.  I'm a pro se Creditor.  I just want to

11    comment and support the request for that enlarged scope of

12    the Examiner.  And also, to have the most neutral entity

13    doing this investigation, as it will enhance the confidence

14    in the end result.  So I certainly think that should be the

15    right way forward.  Thank you.

16         THE COURT:  Thank you very much.  Mr. Pesce?

17         MR. PESCE:  Yes, thank you, Your Honor.  For the

18    record, Gregory Pesce, White & Case for the Committee.  I

19    just want to make a couple of quick comments in response to

20    Mr. Sabin's pleading, which was well taken, frankly, because

21    it is, in our view, already what we were doing.

22         So I've made these statements to other people in

23    the -- ahead of this hearing.  It seems like there is some

24    confusion among the constituency and others here today over

25    what our investigation is doing.  You know, we have read and

Page 76

1    seen all of the press and media and social media reports.

2    We get calls.  We get emails.  We've seen the discovery

3    that's come in to date.

4              You know, we don't know today if Celsius was a

5    Ponzi scheme.  But you know, there's -- there are some flags

6    there that have been sufficient for us already, you know,

7    over month -- a month, two months ago from the day we --

8    from right around when we got started to look into that

9    issue.

10             So let me make it clear today.  The Committee is

11   looking into whether Celsius did things that would've made

12   it a Ponzi scheme.  We don't know that today.  We're going

13   to keep doing that, though, during our investigation.  We

14   don't -- it's a fundamental part of our fiduciary duty to

15   run this down.  We don't think we need an order doing it.

16             But yeah, we don't want to leave any doubt that we

17   are doing it, and if there's anything that comes of it,

18   we're going to make sure those claims are preserved.  And if

19   there is a go forward business, that those actions by

20   whomever is running Celsius or whatever it's called in the

21   future do not befall people again.

22             So with that, we don't think it's necessary to

23   expand the scope to cover that.  And we reiterate the need

24   to -- the need for speed here to get out of bankruptcy as

25   fast as possible to help the account holders, and to that

Page 77

1    end, would hope the Court tries to limit the prospect of

2    duplication of between our work, the Examiner and other

3    parties' work here, as we have said earlier, so thank you,

4    Your Honor.

5              MAN:  Let me have the docket for (indiscernible).

6              THE COURT:  One other, Mr. Pesce.  At least on an

7    interim report, the Examiner committed to producing an

8    interim report by December 10th.  There obviously will be

9    further reports.  You haven't committed as to when you're

10   going to report on whatever it is you're -- you know, the

11   Committee is doing.

12             So on the one hand, I have an Examiner who, and

13   her Counsel who said we'll do an interim report by December

14   10th.  We can talk about what the rest of the schedule is,

15   versus an undefined, open-ended role work that the Committee

16   is doing.  So that's certainly, you know, a lot of the

17   Creditors, pro se Creditors and not only pro se Creditors,

18   have raised these issues about, was this a Ponzi scheme?

19             Okay?  And you say you're investigating it.  But

20   that's one of my concerns is, who is investigating, what

21   constituencies do they represent?  When will they provide a

22   report or facts, etc.?  So let's take the Ponzi scheme

23   issue.  What's the status of your work now?

24             MR. PESCE:  We've gotten so far from the Debtor,

25   you know, tens of thousands of documents that exceed 100,000

Page 78

1    pages in length.  We've spoken to them at --

2              THE COURT:  Well, is that just on the Ponzi scheme

3    issue or that's what you -- that's the universal documents

4    you've gotten?

5              MR. PESCE:  I think a significant portion of that

6    pool of documents would be relevant to the things that are

7    being said about whether this is a Ponzi scheme or not,

8    because they go to how the money was being generated and

9    then distributed to Creditors prior to the case filing.

10             THE COURT:  Right.

11             MR. PESCE:  So we've done a significant amount of

12   work to date.  You know, we did not plan to commit today to

13   giving a date for that part of our investigation.  If you

14   would like us to give some type of interim report, you know,

15   in the near future regarding what we have found regarding

16   Ponzi scheme or related matters, that's something we could -

17   - that's definitely something we could take, could

18   definitely do to provide further clarity here.

19             Yeah, candidly, we've been a little remiss to do

20   that because one, while the Examiner has a drop dead date

21   for her report, you know, our claims, if we think they're

22   viable, will just be preserved for the later litigation

23   trust to pursue.  And you know, candidly, we filed a bill

24   last week and have gotten a lot of feedback from the

25   community about how expensive this case is.

Page 79

1             I'm a little reluctant to commit to take on

2      another project that would require further expenditure, but

3      if the Court requires us to do it, we would do it.  But I

4      also think we could be made you know, Mr. -- if any of the

5      movants today have questions or they want to confer with us

6      about what we're doing, we're happy to do that.

7             I just -- I am a little concerned about the cost

8      of trying to generate these interim reports, as I'm sure the

9      Examiner was when, you know, we had the custody hearing a

10     few weeks ago.  So but we will do whatever the Court --

11            THE COURT:  I'm not pressing you for -- I raised

12     the point because a lot of the concerns that are being

13     expressed by Creditors, not only pro se Creditors is, okay,

14     we don't know whether it's next month, next year, whatever.

15     I'm not pressing at this point.  Okay.  Mr. Lazar?

16            MR. LAZAR:  Yes, Your Honor.

17            THE COURT:  What is the -- yours or the Examiner's

18     view about whether investigating whether or not the Debtor

19     operated a Ponzi scheme?  Is that covered by the scope of

20     your investigation, not covered?

21            MR. LAZAR:  Your Honor, we can -- a number of the

22     facts are probably already covered within the scope of the

23     examination.  We would need to expand it a little bit in

24     terms of you know, some of the transfers we're looking at.

25     We need to look more specifically at customer deposits and

Page 80

1   money going in and out.

2          But a good bit of that is covered already.  As

3   Your Honor knows, we -- you know, we looked at the

4   customers', you know, and pro se submissions and we

5   generated what we thought were the two kind of fundamental

6   questions they were asking.

7          If Your Honor directs us to, we could certainly

8   include at least the facts from which parties could then

9   make arguments about whether there was a Ponzi scheme.

10          THE COURT:  Here's what I want.  First off, the

11   Examiner Work Plan motion, ECF 1013.  And the Examiner

12   Motion to Convert Confirmed Scope, ECF 1112 are both

13   granted.

14          I would request direct that you and Mr. Pesce

15   confer and see whether you can come to an understanding

16   about who will focus on the so-called Ponzi scheme issues

17   that have been raised by today, Mr. Sabin, by other

18   Creditors as well.

19          What I would hope, not only on that issue, but

20   others, is that you maintain an open line of communication

21   with the Committee's Counsel, and as best you can, try and

22   avoid issues of duplication.  I am sure that Mr.

23   (indiscernible), when he reviews fee applications, will keep

24   a keen eye on duplication, was it necessary or appropriate.

25          I am not going today on the record before me to

Page 81

1   say who should do it, how they should do it, whether they

2   should deliver reports, what should happen.  But what I

3   would like is for you and Mr. Pesce and the Examiner to

4   discuss this further, and certainly, you know, Mr. Sabin

5   wasn't the only one to raise the issues today, but I would

6   encourage you, both of you, to talk with him as well.

7            I think I really to the fullest extent possible

8   want to avoid duplication.  I understand, you know, the

9   regulators who spoke all spoke in favor of both the work

10  plan and confirming the scope, and that's been granted.  But

11  I'm certainly mindful of, this is an incredibly expensive

12  case.

13           And I'm mindful and worried about that.  But so

14  that's going to be the Court -- Mr. Sabin, I don't want to

15  hear anymore today.  Talk with Mr. Pesce, talk with Mr.

16  Lazar.  If you can come to an agreement, see if you can put

17  it in the form of a stipulation with the Committee.  If not,

18  you can raise it at a subsequent hearing, okay?

19           MR. LAZAR:  Thank you, Your Honor.  We will do so.

20           THE COURT:  So let's move on, if we can.

21           MR. LAZAR:  Your Honor?

22           THE COURT:  Mr. Lazar, go ahead.

23           MR. LAZAR:  If you can indulge me, would you mind

24  taking the two retention applications, which are unopposed

25  next so that I can let my team go?

Page 82

1          THE COURT:  Yes, absolutely.  This is 13 on the

2     agenda.  It's the Jenner & Block retention, and the Huron

3     Consulting retention.  The Jenner & Block retention is ECF

4     962.  The Huron retention is 1070.  Those are the two, Mr.

5     Lazar?

6          MR. LAZAR:  Yes, Your Honor.

7          THE COURT:  All right.  Ms. Cornell, do you want

8     to be heard on those?

9          MS. CORNELL:  Shara Cornell on behalf of the

10    Office of the United States Trustee.  No objection, Your

11    Honor.

12         THE COURT:  Okay.  Mr. Pesce, is your hand raised

13    on those two?  Yeah, you're muted, but you've taken it down.

14    Okay, those motions are granted.

15         THE COURT:  So Mr. Lazar, so the Jenner retention

16    and Huron Consulting retention 962 and 1070 are both

17    granted.  And if you wish to be excused, you are.

18         MR. LAZAR:  Thank you very much, Your Honor.

19         THE COURT:  All right.  Moving on.  The Frishberg

20    Cost Cutting Motion, ECF Docket Number 1041.  Mr. Frishberg?

21         MR. FRISHBERG:  Yes, Your Honor.  Thank you.  I

22    want to bring up briefly, basically the Debtors and the UCC

23    objected to my amended motions.  Are we going to be going

24    off of the amended motion or the original motions today?

25         THE COURT:  Mr. Frishberg, I'm going to try and

Page 83

1    say this in a nice way.  When you file motions, this came up

2    once before, okay?  There are deadlines for filing motions.

3    There are deadlines for responses to motions, and there are

4    deadlines for reply.  You think they don't apply to you.

5    They do.  Okay?

6              MR. FRISHBERG:  I filed them on the 13th.  And

7    they said (indiscernible) --

8              THE COURT:  You've got to stop, okay?

9              MR. FRISHBERG:  Okay, yes, Your Honor.

10             THE COURT:  I am -- you know, I realize you're not

11   a lawyer.  I bend over backwards to try and listen to what

12   everybody has to say.  But motions, you know, and objections

13   and response -- and replies to them, they're meaningful for

14   me, for me and my staff and for all of the parties in

15   interest.

16             So I'm going to deal with your first amended

17   motion.  You have two motions.  We can deal with them both

18   together.  The cost cutting motion is 1041.  The so-called

19   clawback motion is 1042.  So go ahead and speak to both of

20   them.

21             MR. FRISHBERG:  Yes, Your Honor.  The fact that

22   the Debtors are spending estate -- (indiscernible) resources

23   to effectively fight cost cutting -- needed cost cuts is, in

24   my opinion, ridiculous.  I don't think that actively

25   delaying or stopping the (indiscernible) from saving money

Page 84

1    is in the best interests of the estate.

2            The only people who benefit from the preventing

3    cost cuts are insiders and executives and not the Creditors.

4    I believe that it is crucial to the recovery of the

5    Creditors that are -- that the costs are cut as much as

6    humanly possible and as fast as possible.

7            Every day, the estate loses over a million

8    dollars, and that is not including the various lawyers'

9    consultants, which are billing quite a lot.  The Debtors

10    have failed to adequately cut costs, in my opinion.

11            And in their objection to my motion, they claim

12    that costs have been cut in certain sections between 70 and

13    80 percent in certain areas.  But I did the math, and those

14    seem to be fairly minor because they add up to roughly $160

15    million.  And going off of the previously released numbers

16    that I -- was the most up to date that I have, there's a

17    total of roughly half a billion dollars remaining that has

18    not been cut.

19            Because originally, roughly $660 million a year.

20    The Debtors -- and they also reference their business

21    judgment in how they have, how do you call it -- they can

22    use their business judgment and discretion.  I believe their

23    business judgment is quite poor.  Their business judgment is

24    actually what got us into this entire bankruptcy.

25            They have allegedly lied to their customers,

Page 85

1    investors and regulators, and are -- if opposing, basically

2    the examination of their statements.  And the Debtors are

3    specifically opposing examination of other -- Celsius and

4    other parties participating in the manipulation of these

5    sell tokens.

6            I believe that this examination would gain the

7    estate significant claims, which they could use to recover

8    large sums of money.  Their business judgment has lost the

9    depositors and Creditors and some investors approximately $3

10   billion, which is roughly (indiscernible), which has

11   seemingly vanished into thin air.

12           Various regulators have alleged that they have

13   committed securities fraud, fraud, gross incompetency, and

14   gross mismanagement, which obviously is not the best

15   business judgment.  And they also continue to resist cutting

16   costs.  Celsius is not only not cutting costs, but they

17   recently with the current motion attempted to spend

18   approximately $3 million on what the US Trustee noted also

19   may include bonuses to insiders.

20           And Celsius was losing approximately $14 million a

21   month with the mining venture by mining Bitcoin at a loss.

22   And but right now, it's currently unclear exactly what's the

23   size of the mining company at its core, the company that, to

24   the best of my knowledge, hosted the majority of Celsius

25   (indiscernible) is getting ready to declare bankruptcy

Page 86

1   potentially.

2          And the Debtors claim to be transparent.  My

3   favorite quote of theirs is, if I recall it correctly, there

4   is nothing to see here, Your Honor, which they said in your

5   courtroom.  Obviously, there is quite a lot to see here.

6   The UCC has been unable to get certain documents.

7          And such as those are (indiscernible) by the

8   Debtors, I believe.  And Celsius exposed the -- opposed the

9   expansion of the Examiner's scope.  And I believe the UCC

10  opposed it as well for supposed cost cutting reasons.  But

11  they have no problem giving out large bonuses and billing

12  millions of dollars to the estate.

13          I think it's way past time to stop letting the

14  Celsius investigate themselves, because of course, they will

15  find that they did nothing wrong, regardless of the

16  circumstances of the facts.  They are so transparent, in

17  fact, that they apparently have updated documents for their

18  financials, which they referenced in their objection.

19          But they have not publicly released and I haven't

20  seen them.  What I find ironic is they criticized me for

21  using so-called outdated information while not providing any

22  new information.  They can't have it both ways.  They can't

23  both be concerned about the rising costs for stuff like the

24  Examiner, while spending millions of dollars fairly

25  (indiscernible) and they can't accuse me of using outdated

Page 87

1    information while failing to share outdated information with

2    everyone except the people that are privy to the so-called

3    (indiscernible) room for bidders which cost about $10

4    million to gain access to.

5           They need to either start doing their jobs or be

6    replaced by either a Chapter 11 Trustee or a Chief

7    Restructuring Officer that is not a Chapter 11 Trustee who

8    will do the job for them.  While Celsius may have indeed

9    quite -- cut quite a bit of costs and done some cost cutting

10   measures, they still have quite a bit more fat to be

11   trimmed.

12          In my opinion, the Special Committee, which has

13   its own conflicts of interest need to be cut.  We are paying

14   Mr. David (indiscernible), the Head of the Special

15   Committee, one of the elected members roughly $108,000 a

16   month.  And he somehow has enough time to go onto TD

17   Ameritrade's TD program and talk about stocks, which are

18   (indiscernible) to Celsius.

19          Nobody, including the UCC outside of Celsius has

20   been able to get a direct meeting with the Special

21   Committee.  And only the UCC has been able to get a meeting

22   with -- through various counsels as far as I can understand.

23   It begs the question, what exactly are they doing, if

24   they're not meeting with people and they're not proposing a

25   plan because they don't actually have a plan.

Page 88

1          They have not -- they're not making a plan.

2    Celsius seems to have as much of a plan as they did on day

3    one.  The executives and insiders should also be cut without

4    severance packages since not only are they the ones who got

5    us into this huge mess in the first place, but a lot of them

6    are likely to be targets of clawbacks.

7          And I think they bring no value to Celsius and

8    actually, they do farm more harm than good, as they are

9    likely actively hindering clawbacks, which would be

10   targeting them or their associates and investigation

11   efforts.

12         The Debtors noted in their reply that in their

13   view, the UCC is unable to start clawbacks yet.  And they

14   only are the ones able to do clawbacks and they reserve all

15   discretion to do so, but they're not actually doing any of

16   it.  We can't (indiscernible) the Debtors to decide if they

17   and their buddies and the people who basically appoint them

18   to their positions should be getting clawed back.  It defies

19   logic and it's a massive conflict.

20         In the filing of the (indiscernible) motion, the

21   Debtors actually told us who is essential, and I guess who

22   is not, essentially speaking.  All employees that not on the

23   (indiscernible) list, including executives, insiders and

24   board members, committee members, etc., should be terminated

25   immediately because they're unessential apparently.

Page 89

1           The Debtors pointed out an issue of employee

2    morale in the (indiscernible) motion about how some

3    employees already started resigning after it was filed.  I

4    do agree with them.  It is a serious issue.

5           I ask everyone, how would you feel if you were

6    effectively marked unessential, which just basically means

7    expendable, and you did not receive a bonus (indiscernible)

8    --

9           THE COURT:  I'll give you one more minute.

10          MR. FRISHBERG:  Okay, I'll wrap it up.  Just for

11   the cost cutting motion or for all motions combined?

12          THE COURT:  (indiscernible).

13          MR. FRISHBERG:  Okay.  I'll skip over to the

14   clawbacks.  The Debtors don't seem to have any plan of

15   action starting clawbacks.  They've had over four months to

16   do so.  They seem to be quite happy just sitting around

17   wasting money and billing hours to Creditors.

18          They don't really care because they get paid by

19   the amount of time elapsed, not by if the bankruptcy is

20   exited successfully.  They seem to be waiting to do this for

21   years and years.  We are not closer to any sort of

22   restructuring or returning funds to the Creditors, which

23   were effectively stolen by insiders and (indiscernible) four

24   months ago.

25          This cannot be allowed to continue.  A lot of the

Page 90

1    stuff that the Debtors have done is grounds for the Trustee.

2    And if they are unable to start doing it, they should be

3    replaced by a Trustee.  The Debtors do not seem to want to

4    get to the real issue at hand, which is the executives and

5    the insiders to the root causes of the bankruptcy.

6              And because also, insiders would (indiscernible)

7    almost $110 million within a year of depositing withdrawals.

8    And this doesn't even take into account the salary,

9    potentially hundreds of millions of dollars in salaries and

10   compensations paid out to employees, which insiders got the

11   lion's share of.

12             Also to address the Debtor's response to my

13   objection in Savina, in one of the cases they cited, the

14   reason one of the Creditors, I believe Bayside was denied

15   the ability to pursue clawbacks was because the UCC was

16   already pursuing it vigorously.

17             Obviously, the same is not true in this case.

18   Various institutions such as Tether and FTX received very

19   large preferential payments, which cost the estate literally

20   hundreds of millions of dollars.  Those payments should be

21   clawed back fully, regardless of the fact that they had a

22   business relationship for a while at Celsius (indiscernible)

23   fairly meaningless in the eyes of the bankruptcy law, I

24   believe.

25             And they should get in line with the rest of the

Page 91

1    Creditors and receive the pro rata distributions, literally

2    billions of Celsius' dollars flowed through FTX and 60

3    percent of massive conflict.  These are the easiest

4    clawbacks to receive and Celsius seems to have not even

5    started on those.

6            FTX -- but it is highly (indiscernible) that FTX

7    helped Celsius manipulate the price of sell tokens, which

8    inflated its value and made Celsius appear to be solvent

9    when they were factually insolvent, which effectively helped

10   continue this deception.

11           And the estate potentially passed claims against

12   them for that, because they could be partially fill

13   (indiscernible).  The longer we take to do clawbacks, the

14   less and less money is able to be recoverable.  It is

15   crucial that they start as soon as possible, because the

16   funds are getting harder to recover by the second.

17           It is likely that a large percent of the funds are

18   now irrecoverable because once they leave US jurisdiction,

19   it'll be very hard to recover them, even if nobody attempts

20   to take steps to (indiscernible).

21           If certain individuals like insiders decide to

22   attempt to hide them using assets such as (indiscernible) or

23   various NFTs, such as the ones that were moved from KeyFi's

24   wallet to USA (indiscernible) wallet, it'll be almost

25   impossible to recover them.

1            NFTs are a way that could've potentially been used

2    to effectuate transfers of assets from Debtors to other

3    parties such as insiders.  They were used in the I guess,

4    I'll call it the KeyFi embezzlement, where Jason Stone

5    allegedly stole hundreds of millions of dollars.

6            It has been noted that he did buy numerous NFTs,

7    most of which are still unaccounted for.  The Debtor's UCC

8    or the Examiner should --

9            THE COURT:  Mr. Frishberg, finish up.

10           MR. FRISHBERG:  Okay.  They should be ordered to

11   compile a list of all NFTs that were bought from Celsius'

12   assets or the proceeds of those assets.  And the list should

13   include basically how much they were bought for, if they

14   were sold for, and where they currently are now.

15           If the UCC is unwilling to pursue the clawbacks

16   because of various conflicts, which one of the targets of

17   the clawbacks is Tether, one of their clients, then

18   (indiscernible) Counsel should be brought in to pursue those

19   matters.  I have to admit that I and many Celsius Creditors

20   are extremely disappointed by the lack of action from the

21   UCC.  They should be the ones filing these motions, not me.

22           THE COURT:  All right, stop.

23           MR. FRISHBERG:  Thank you very much.  Have a good

24   day.

25           THE COURT:  Debtor?

Page 93

1          MR. LATONA:  Good morning, Your Honor.  Again, for

2    the record, Dan Latona of Kirkland & Ellis on behalf of the

3    Debtors.  I'll address directly the substance of the

4    motions, and I'll take each in turn, because I think

5    proceeding down the course that Mr. Frishberg proposes would

6    significantly undermine his goals of cutting costs and

7    proceeding (indiscernible) through these Chapter 11 cases.

8          First, with the respect to the cost cutting

9    motion, the motion does not state a proper relief -- basis

10   for relief under the Bankruptcy Code.  The Debtors are

11   operating their business as Debtors in possession under

12   Section 1107 of the Bankruptcy Code.

13         And as such, their actions are subject to the

14   Business Judgment Rule.  And as stated in our objection, the

15   Debtors have already significantly reduced expenses,

16   proceeding down with the Draconian personnel reductions that

17   Mr. Frishberg implies could significantly impact other state

18   regulatory regimes, regarding mass layoffs, including the

19   Warren Act, which would require the Debtors to do a state by

20   state analysis of whether the Debtors are subject to the

21   Warren Act or any other statutes in that state, which could

22   further increase costs and subject the Debtors to statutory

23   notice requirements in other potential liability.

24         With respect to the clawback motion, avoidance

25   actions are property of the estate and will remain property

Page 94

1    of the estate.  And parties in interest cannot compel the

2    Debtors to pursue clawbacks, unless they unjustifiably state

3    to do so.

4         It should be noted that the Debtors are briefing

5    relative legal issues to clawbacks in connection with the

6    custody and withhold motions and will be pursuing test cases

7    with respect to clawbacks.  Furthermore, the Debtor's

8    Special Committee and the Creditor's Committee are

9    investigating whether and to what extent avoidance actions

10   do exist.

11        Pursuing avoidance actions now would involve

12   initiating a number of costly and costly adversary

13   proceedings, which would further delay this process and

14   bring us no closer to concluding these Chapter 11 cases.  So

15   in short, both the cost cutting motion and the clawback

16   motion should be denied.

17        THE COURT:  All right.  The Court's taking both

18   under submission.  Let's move onto the Kwok Mei Po motion.

19   It's --

20        MR. LATONA:  Your Honor, I'll be ceding the podium

21   to my colleague, Mr. Scheffer.

22        THE COURT:  I was saying that the Kwok Mei Po

23   motion --

24        MS. PO:  Your Honor?

25        THE COURT:  Stop, stop.  Just wait.  Wait.  The

Page 95

1    motion is filed as ECF Docket Number 877.  The Debtor has

2    filed an objection, which is ECF Docket Number 1106.  Go

3    ahead.

4              MS. PO:  Your Honor, thank you so much for the

5    opportunity to talk.  I am really nervous right now,

6    actually because it's my first time in Court, and English is

7    not my first language, and it's really late right now.  And

8    I have been preparing all these by myself without any legal

9    background, so please bear with me, if this is not sounding

10   very professional.

11             I would -- this motion has two main purpose, which

12   was filed as Docket 877, which is to see a ruling -- first

13   thing is to seek a ruling of title of ownership for the

14   suspended of closed account users.  And the second is for

15   the Debtor to release the relevant information regarding

16   these accounts, including a number of accounts, failure of

17   accounts and the stage of suspension.  Your Honor, I have

18   been --

19             THE COURT:  Let me, okay.  As a legal matter,

20   you're entitled to proceed with respect to your own

21   accounts.  As I understand it, you have multiple accounts.

22   To the extent that you're motion is seeking relief for other

23   people, not your accounts, you're not able to do that.  So

24   what I want you to do is on what relief you're seeking with

25   respect to your accounts, okay?

1             MS. PO:  Understood, Your Honor.  My accounts, I -

2     - sorry.  My motion's main purpose is to seek a ruling of

3     title of ownership.  At this point, I understand that with

4     all the other matters going on, including custody accounts,

5     it's not a mature time to ask for relief of automatic stay,

6     so this is not what I am currently asking for my motion, if

7     this has been cleared.

8             But then, according to what was stated in my

9     motion, I want to make the arguments that we have the title

10    of ownership of our funds, and which was stated in the

11    motion 877.

12            THE COURT:  Were your accounts earn accounts or

13    did they become custody accounts?

14            MS. PO:  My accounts was earn accounts, but they

15    were discontinued by the Debtor on -- in May, which has --

16    they have blocked my account access since then.  And then, I

17    had no -- I was not able to lock in and I was not able to

18    see my funds or have any control over my funds.

19            And according to the Section 19(a) in the term of

20    use, they have clearly stated that we have -- they have the

21    right to suspend our account and close our accounts,

22    including by blocking your access to the account.  But then,

23    if they block our account access when they -- and then, when

24    they close it, then they will repay and return the remaining

25    digital assets to you.

Page 97

1          So I believed in good faith that they were to

2    return our funds.  And also, we have contacted the Celsius

3    Compliance team, and then the email reply states that they

4    were going to return our funds back to us.

5          THE COURT:  May I ask you just which section of

6    the terms of use did you refer to?

7          MS. PO:  It was Section 19(a), Your Honor.

8          THE COURT:  Go ahead.  Yeah, go ahead.

9          MS. PO:  Yeah, and also, according to Section --

10   according to Section 4(d), earned rewards, they have also

11   stated that you will -- if an earned service is available to

12   you, you'll lend your digital assets to Celsius and grant

13   the rights to -- and title to these assets for Celsius to

14   use, while using the earned service.

15          But then, at the time that they have replied to us

16   and then they have blocked our accounts, they have actually

17   stated that in the email reply, from the compliance team,

18   they have actually stated very clearly that the account has

19   been blocked and suspended, which was equivalent to being

20   closed, because in the term of use, they have not made a

21   differentiation between suspension and closure.

22          It was not stated in the term of use.  It may be

23   intentionally and (indiscernible).  And also, Kirkland's

24   objection has also agreed to this point as well.  So they

25   have closed -- effectively closed our accounts, and then

Page 98

1    they have also stated that referral awards and any interest

2    presented to this account will be canceled.

3              So effectively, we were not earn account holders -

4    - we were de facto earn account holders.  And we were not

5    even active customers because the Debtor refused to provide

6    service for us, as they closed our accounts, which is why

7    they should follow the action that they have stated in the

8    Section 19(a) to repay and return the funds to us, and also

9    as confirmed by their compliance team, they were also going

10   to do that.

11             So we have the belief in good faith that the fund

12   return was in progress.  And also, according to Section

13   4(d), because we were not active earn customers, and then

14   order interest has been discontinued.  So we were not

15   actually even the (indiscernible) customers.

16             So and it was also not a valid -- fair acumen to

17   say that because we were previously in earn accounts, and

18   then we still belong to earn accounts because a group of

19   custody holders, although I am not from custody holders, but

20   then, they have been previously in earn, but then the Debtor

21   has verified and declared a title of ownership to these

22   accounts at -- to these custody account holders as well,

23   irrespective of their previous earn status.

24             So it would be unfair to say that because I was

25   previously in earn, that my surface has been discontinued

Page 99

1   from the Debtor.  I will still be considered the same as

2   earned because I am supposedly not even a valid customer of

3   them.

4          And should the Debtor come off Chapter 11 and form

5   a new reorganized company, we don't actually hold any

6   position in the new reorganized company because we are not

7   even the valid customers.  So while that -- and also, I

8   would like to state that while the US customers had an

9   option of exit to move their funds to the custody accounts,

10  this option was never available to international customers

11  like me.

12         So it is fair to say that the non-US customers

13  have been subjected to the lowest, least favorable priority

14  in this case, which this inherent unfairness was against the

15  co-principal of equity in the US bankruptcy system as well.

16         So I would like to humbly ask Your Honor to rule -

17  - to seek Your Honor's ruling on the title of ownership of

18  the funds to these accounts, and for these accounts to be

19  considered alongside the custody and (indiscernible)

20  accounts, which they have been declared title of ownership

21  to in the relevant hearing, and for the Debtor to release

22  other relevant information regarding these accounts.

23         I have also prepared some response to Kirkland's

24  objection to my motion, but in case, I don't want to be

25  spending all the time talking about my motion.  I would like

Page 100

1    to be considered -- and I would like to see if Kirkland has

2    anything to talk about regarding the objection.  And I can

3    provide a response to their objection as well.

4            THE COURT:  Let me stop you there.  Thank you very

5    much, Ms. Kwok.  All right, the Debtors --

6            WOMAN:  If I --

7            THE COURT:  -- ECF Docket Number 1106.  Who wants

8    to speak for the Debtor?

9            MS. SCHEFFER:  That'll be me, Your Honor.  Good

10   afternoon, it's Tommy Scheffer of Kirkland & Ellis on behalf

11   of the Debtors.  Kwok Mei Po is a customer of the Debtor's

12   earn program, whose earn accounts were suspended pursuant to

13   misuse of the referral program.

14           In her motion, she asked for relief from the stay,

15   set cryptocurrency and her earn accounts can be returned to

16   her.  She also asked the Court to rule on the question of

17   who holds title to the cryptocurrency assets and suspended

18   and closed earn accounts.

19           Kwok Mei Po's motion should be denied because she

20   has not demonstrated cause to lift the stay for a Claimant

21   of the (indiscernible) factors.  Not only does Kwok's motion

22   implicate larger legal questions that should not be resolved

23   on an individual basis, Kwok is similarly situated to all of

24   the other Unsecured Creditors, and therefore, should be

25   subject to the same rules as this Court -- go --

Page 101

```
 1              THE COURT:  I made -- hopefully made clear that

 2    I'm only considering her issues, and not the issues of any

 3    other parties.  You've indicated that her accounts were

 4    suspended for misuse.  Under the terms of use, was there any

 5    change or alteration in the ownership of the assets in her

 6    account, when her account was suspended?

 7              MS. SCHEFFER:  My understanding is that the

 8    withdrawals, or sorry, not the withdrawals, the interest

 9    that was earned pursuant to the misuse of the referrals was

10    taken back.  But other than that, no, Your Honor.

11              THE COURT:  Can you tell me in the Debtor's

12    schedule, whether you've included Ms. Po's claims in the

13    schedules and how you've listed them?

14              MS. SCHEFFER:  Amongst all the other earn account

15    holders, Your Honor.

16              THE COURT:  Specifically, what is it that you've

17    listed with respect to -- you know, finding anything in

18    almost 15,000 pages is not easy.  And so, my question is

19    specifically how have you listed her claims in the

20    schedules?

21              MS. SCHEFFER:  As a General Unsecured non-priority

22    claim.

23              THE COURT:  How many entries, or she had multiple

24    accounts.  How many entries are there in the schedules for

25    Ms. Po's account -- accounts, plural?
```

Page 102

1          MS. SCHEFFER:  I don't have that information in

2    front of me, Your Honor.

3          THE COURT:  Okay.  What, if anything, are you

4    relying on in the terms of use for the issues of ownership

5    of the property and these accounts, when they were

6    suspended?

7          MS. SCHEFFER:  Your Honor, I'm loathe to get into

8    that, because it implicates a lot of larger legal issues in

9    this case, but to just answer --

10          THE COURT:  You're loathe to get into it, but

11    she's raised the issue.  And I think it's relevant to her.

12    I'm not asking with respect to anyone else.  I'm asking you

13    with respect to Ms. Po.  You can't avoid my questions.

14          MS. SCHEFFER:  Understood, Your Honor.  The terms

15    of use provide the title transfers to the Debtors upon

16    deposit.  And also, that amounts -- accounts are allowed to

17    be frozen or suspended at any time.

18          THE COURT:  Is that in your objection?

19          MS. SCHEFFER:  I don't believe so, Your Honor.

20          THE COURT:  Do you think you might actually want

21    to address the issues that pro se's are raising?

22          MS. SCHEFFER:  Your Honor, we took this motion as

23    a motion for relief from the stay, as well as for a

24    declaratory judgment on the ownership of the assets.

25          THE COURT:  All right.  I want a supplemental

Page 103

1    filing from the Debtor with respect to Ms. Po's motion.  I

2    want the specifics of each entry in the claims register with

3    respect to her account.  I would like -- and you provided

4    the details of when her account was suspended?

5             MR. SCHEFFER:  I'm sorry, Your Honor?

6             THE COURT:  You provided the details of when her

7    accounts were suspended and why?

8             MR. SCHEFFER:  I believe so.

9             THE COURT:  (indiscernible) sworn in a

10   declaration?

11            MR. SCHEFFER:  Not in a declaration.

12            THE COURT:  I have to rule on evidence, not on

13   your non evidentiary assertions.

14            MR. SCHEFFER:  We've attached some email exchanges

15   as Exhibits A and B to the objection.  Those indicate a

16   little bit of the timing, but we did not file any

17   declarations in connection with the objection, Your Honor.

18            THE COURT:  When -- all right.  When will you file

19   details of her transactions and the reasons for the

20   suspension of her accounts and any legal argument you're

21   making as to what, in the terms of use, lie with respect to

22   the issues that Ms. Po has raised.  You can't simply blow

23   off pro se creditors.  I'm not going to put up with it.

24   Okay.  You may not like having to respond to motions of pro

25   se creditors, but I expect full responses and I don't

Page 104

1    believe you gave the with respect to Ms. Po's.  So when can

2    you do the supplemental?

3         MR. SCHEFFER:  I'd like to confer with my

4    colleagues, but I'm sure some time before the next hearing,

5    that we said 11/15 is fine, as long as it's all right with,

6    Your Honor.

7         THE COURT:  No that's too indefinite.  I'm going

8    to give you a deadline.  Okay.  The Debtor shall file

9    supplemental papers, including a declaration -- one or more

10   declarations on or before 5 p.m. November 8th.  Ms. Po can

11   respond on or before 5 p.m., New York time, November 15.

12   The Court will consider any supplemental response by the --

13   supplemental objection by the Debtor and any additional

14   response by Ms. Po, and after receiving them, I'll decide

15   whether to schedule another hearing (indiscernible) based on

16   the papers.  I'm so ordering the transcript with respect to

17   those dates to get them (indiscernible) the Debtor's filing

18   before 5 p.m., November 8th, that's New York time, and Ms.

19   Po's supplemental filing on or before 5 p.m., November 15th,

20   New York time.  With that, I'm going to take -- we'll --

21   I'll take up the matter after I get the supplemental

22   filings.

23        Do you understand Ms. Po what -- I'm going to give

24   you -- I'm requiring the Debtor to file an additional filing

25   and then I'm giving you, basically a week maybe to respond

```
                                                        Page 105
  1    to it.  Okay?

  2              MS. PO:  Understood, Your Honor.  May I

  3    supplemental a little bit more regarding what was discussed

  4    just now?

  5              THE COURT:  No, I don't want to hear any more.

  6              MS. PO:  Okay.

  7              THE COURT:  I've read all the papers.

  8              MS. PO:  Okay, thank you very much, Your Honor.

  9              THE COURT:  (indiscernible).  The Barstow motion

 10    to consider all, basically, all USDC Investors and Secured

 11    Creditors, that's ECF 950.  The whole motion to consider

 12    stable coin creditors as secured creditors.  It's ECF 965.

 13    And the Saker motion to consider tether gold creditors as

 14    secured creditors, as ECF 990.  I'm going to consider those

 15    three motions together.  Does Mr. or Ms. Barstow wish to be

 16    heard?

 17              MS. BARSTOW:  Hi, good morning, Your Honor.  Well,

 18    I would like to be heard.  I did just submit a supplemental

 19    -- not supplemental motion, but it's actually a response to

 20    the objections of the Debtor and unsecured -- excuse me --

 21    Creditor's Committee for the Motion.  And so, I just wanted

 22    to go briefly over that.  So basically the Debtor replied in

 23    their motion objecting to the request for USDC slash -- in

 24    my amendment, I include GUSD, which is another stable coin,

 25    which is the same as USDC, fundamentally.  And so in Article
```

```
                                                      Page 106
 1    I, Section 8 of the US Constitution, well -- Congress

 2    authorizes uniform laws on the subject of bankruptcy.  This

 3    is the Federal Bankruptcy Court.  The doctrine of

 4    presumption state that when a problem arises between state

 5    and federal law, pursuant to the supremacy clause, which is

 6    Article 6 of the US Constitution, federal law supersedes

 7    state or local law, and state or local law must give way for

 8    (indiscernible) the state law cited by the Debtors regarding

 9    the lien needing to be perfected by a written voluntary

10    agreement is invalid.

11            The undersigned has perfected a lien on her

12    interest in the estate through a financing statement, a UCC

13    financing statement, which is attached to this and which is

14    also filed the claim with the Bankruptcy Court.  In addition

15    to that, her and all other stable coin earn account holders

16    have perfected a lien through control of the account prior

17    to the bankruptcy, which was noted by Jack Sell and his

18    related Joinder motion.  And this was done by the ability to

19    deposit and withdraw, and close and account before the

20    bankruptcy petition, without the prior consent of the

21    Debtor.  And pursuant to USC5 SSA an allowed claim of the

22    creditors secured by a lien on a property in which the

23    estate has an interest; the creditors have an interest in

24    the estate because of the abovementioned perfection methods

25    of the lien, pursuant to Article 9 of the Uniformed
```

Page 107

1    Commercial Code, the undersigned and other stable coin

2    holders have made the interest in the estate public by the

3    motion.  And the undersigned UCC Financing statement that I

4    have submitted to this Bankruptcy Court.

5            Article 9 of the Uniformed Commercial Code states

6    the secured party has control of the deposit now the Debtor,

7    secured party, and bank have agreed and authenticated record

8    that the bank will comply with instructions originated by

9    the secured party, by a (indiscernible) disposition of the

10   fund in the deposit account without further consent by the

11   Debtor; or the secured party becomes the bank's customer

12   with respect to the deposit account.  The Debtor's right to

13   direct disposition of (indiscernible) for the secured party

14   that has satisfied subsection A has control, even if the

15   Debtor retains the right to direct the disposition of funds

16   from the deposit account.

17           The record that the Debtor agrees to disposition

18   of funds is in the terms of use where they state we may

19   deposit, withdraw, or close the account at any time and we

20   do not need prior consent for these transactions if not in

21   bankruptcy.  The Debtor and its counsel have referred to

22   Reachill Creditors as its customers, so that satisfies

23   number three of Article 9, Uniformed Commercial Code right

24   there without even perfecting it in the other respect.

25           The unsecured creditors committee state in the

Page 108

1    motion -- that the motions did not state why the liens are

2    unavoidable.  Pursuant to USC 523 Federal Bankruptcy Code

3    4007, Exceptions to Discharge that makes these liens

4    unavoidable, include for money, property, and services to

5    the extent obtained by false pretenses, or false

6    representation, or actual fraud.  The creditors in this case

7    have put voluminous evidence on the record with this

8    bankruptcy court in regards to the numerous false

9    misrepresentations that occurred in the weekly AMA videos of

10   CEO Alex Mashinsky.  These representations involved

11   pretenses or fact that cannot be disputed.  If it were not

12   for these false misrepresentations, the undersigned and

13   nearly every other creditor in this case would have ever put

14   any money into a (indiscernible) account.  See the numerous

15   letters, motions, slash responses written by (indiscernible)

16   creditors on the docket with YouTube links.  Use of

17   statement in writing that is materially false respecting the

18   Debtor's or insiders financial condition.  And in terms of

19   that, there was a letter written about a week prior to the

20   freezing of withdrawals, where there was a material false

21   statement regarding the financial condition, which is

22   submitted in evidence by other creditors, and I have a

23   printed copy of right here, entitled Damn the Torpedoes,

24   Full Speed Ahead.  In it, it says, associates continue to

25   process withdrawals without delay.  We have not had any

Page 109

1    issues meeting withdrawals with class, sales use honors all

2    withdrawals as quickly as possible and works hard to support

3    customers if and when there are delays.  Sales Piece has the

4    reserves and more than enough (indiscernible) to meet

5    obligations, as dictated by our comprehensive liquidity risk

6    management framework.  They go on to say that they have the

7    best risk management team in the world.  All of this clearly

8    false, since, you know, about a week later they withdraw and

9    a month later filed Chapter 11 Bankruptcy.

10           THE COURT:  All right.  So let me ask you -- let

11   me ask you a question.

12           MS. BARSTOW:  Sure.

13           THE COURT:  We're looked at the schedules, the

14   Debtor's Schedules that they've filed.  And it lined

15   3.1.426630 the schedules are lengthy.  It shows that you had

16   an Earn account.  Do you agree that you had a Earn account?

17           MS. BARSTOW:  Yes, Your Honor.

18           THE COURT:  And it lists in the amount of your

19   claim, they have, I think, two of -- there are four entries,

20   and I think two would be for stable coins, your motion

21   focused on -- bear with me.  Your motion focused on the

22   USDC, but you also had a GUSD --

23           MS. BARSTOW:  Yes, Your Honor.  And in my amended

24   motion I write that I'm including to consider the GUSD coin

25   as secured creditors as well, and that also goes along with

Page 110

1      the other motion, including stable coin holders as secured

2      creditors in general.  The US -- GUSD --

3              THE COURT:  It's not here.  Again, I'm not going

4      to consider what, if any, rights anybody else has.

5              MS. BARSTOW:  Okay.

6              THE COURT:  Your motion is focused on you and

7      we've seen that there are four entries in the schedules, one

8      for GUSD, one of USDC, both of which are stable coins.

9              MS. BARSTOW:  Those should be the only entries,

10     Your Honor.  I don't have any other coins.

11             THE COURT:  No, actually -- actually, if you look

12     at the schedules, there are two other entries.  One for Sell

13     Token, I guess.  It's listed as Sell and it's -- it's got a

14     long 1.  Very long --

15             MS. BARSTOW:  Yes, Your Honor, that's a very

16     minimal amount of Sell and I'm not claiming the Sell, and

17     the bitcoin is a very minimum amount of bitcoin, and I'm

18     also not claiming that.

19             THE COURT:  Well, they've listed you as a creditor

20     for both bitcoin and sell token.  I mean, there are four

21     entries for you --

22             MS. BARSTOW:  Okay.

23             THE COURT:  -- on the schedule.  I've indicated

24     the why.  Let me say, because I wanted to treat the motions,

25     your motion, the Holcomb Motion, and the Saker Motion

Page 111

1    together.  We've actually gone to the schedules and looked

2    for each of the -- those four creditors, what was listed on

3    the schedules, and yes for each of the four, there are

4    entries for stable coin.  I want to -- so there's multiple

5    entries for each, but just focusing on you.  What I don't

6    know -- can you tell me anything about what your history

7    with this account was?  You deposited.  Did you withdraw?

8    Did you deposit in different times?  Withdraw different

9    times?  Can you shed any light on that?

10             MS. BARSTOW:  Sure, Your Honor.  So I initially

11   deposited in, oh my goodness, I would say 2020, about 2020.

12   I'm not 100 percent sure on that, however, yes there were

13   multiple deposits and withdrawals from my account with the

14   prior consent of the Debtor's.  I withdrew many times on the

15   interest of the account while keeping the principle there.

16             THE COURT:  (indiscernible) for example, if you

17   had USDC deposit, was the interest paid in that stable coin

18   or in some other form of a payment of interest?

19             MS. BARSTOW:  So my interest was paid in the coin,

20   in the USD or GUSD coin.  So it was basically could be

21   traded and sold for cash, which is the underlying collateral

22   of those coins.

23             THE COURT:  And did you -- did you actually

24   withdraw the earnings?

25             MS. BARSTOW:  Yes, Your Honor, I did withdraw some

Page 112

1    of the interest earnings, several times.

2            THE COURT:  All right.  All right.  Is there

3    anything you want to add?  I have questions I'm going to

4    want to ask the Debtor because I -- you know, without

5    understanding the transaction histories or each of these

6    credit -- you and Holcomb, and Saker, I have a hard time

7    evaluating the arguments.  Well, I'll ask the Debtor --

8    Debtors about that.  Anything you want to add to your

9    argument?

10           MS. BARSTOW:  Yeah, sure.  So in my original

11   motion, I state that Page 7, Paragraph 17, the Debtors admit

12   to the fact that they used stable coin not only to fund

13   business operations, but also to fund loans backed by trust

14   and collateral.  And essentially, what that means is that

15   there are two different classes of retail customers on the

16   Sells use platform.  The earned customers, which are

17   essentially creditors, or lenders; and then there are

18   borrowers or co-debtors of the Sales Use.  These retail and

19   institutional borrowers typically -- well, 100 percent sure

20   that the retail borrowers always have to post collateral, as

21   that was the rule of Celsius.  So anytime a retail borrower

22   posted -- requested a loan, which was received in cash, they

23   -- they put five bitcoins deposited into Celsius.  And then

24   say they wanted a loan, they could loan up to, I believe it

25   was about 50 percent of the deposits and the rest was

Page 113

```
 1   pledged as collateral for that loan.  So they would get five
 2   bitcoins deposited and they wanted a two and a half bitcoin
 3   loan, they would apply for that with Celsius and upon
 4   approval from Celsius, they would post that collateral and
 5   get the loan in cash.  And Celsius would sell the stable
 6   coin for the cash to fund those loans.  Therefore, that's
 7   the interest in the collateral that I'm claiming.  That
 8   collateral was then rehypothecated to other institutional
 9   borrowers in order to probably swing, trade, swop trades and
10   all the other risky things that they did with those
11   bitcoins.
12            THE COURT:  Do you agree that the terms of use
13   permitted them to do that?
14            MS. BARSTOW:  I do not.  What I understood that
15   they were doing was essentially everything was
16   collateralized.
17            THE COURT:  Did the terms of use permit Celsius to
18   hypothecate, rehypothecate transfer anything that you
19   deposited into an Earn account?
20            MS. BARSTOW:  The initial terms of use, I'm not
21   sure.  I read it and if those terms were in there, I had no
22   idea what they meant.  I'm an unaccredited investor.  Part
23   of my -- part of my statement is also addressing the
24   violations of the SEC in terms of allowing individuals that
25   were unaccredited investors into what are essentially
```

Page 114

1    secure, unregistered securities.

2            THE COURT:  Yeah, but they -- look, you may be

3    right, you may be wrong.  I'm not -- I'm not taking a

4    position on that.  But I know of no authority that would

5    convert an unsecured claim into a secured claim because

6    Celsius violated state or federal securities laws in the way

7    they were conducting their business.  Have you read the

8    terms of  use?

9            MS. BARSTOW:  Yes, Your Honor, I read them in

10   2020, and they've changed multiple times since then.

11           THE COURT:  Did they ever change with respect to

12   each account holder that transfers crypto assets in an Earn

13   account transfers all right, title, and interest to Celsius?

14           MS. BARSTOW:  That, Your Honor, I cannot say 100

15   percent.  I do not remember everything that was written in

16   the original terms of use.  That was over two years ago.

17           THE COURT:  All right.

18           MS. BARSTOW:  I'd have to see and --

19           THE COURT:  Any last points you want to make?

20   What I'm going to do is I'm going to hear from Lucas

21   Holcomb, and then Douglas Saker and then I'm going to have

22   the Debtor respond to all three of those at the same time.

23   Okay?  Anything else you want to add?

24           MS. BARSTOW:  Yes, so essentially the process to

25   an allowed claim is a financing statement and a lien, and

Page 115

```
 1   control of that account, which I have satisfied both.

 2   That's all I have to say, Your Honor.  Thank you.

 3           THE COURT:  Okay.  The Holcomb Motion is ECF

 4   Docket 965.  Does Mr. Holcomb wish to be heard?

 5           MR. HOLCOMB:  No, Your Honor.

 6           THE COURT:  All right.  The Saker Motion is ECF

 7   990.  Douglas Saker, do you wish to be heard?

 8           MR. SAKER:  (indiscernible).

 9           THE COURT:  Mr. Saker, are you -- you made an

10   appearance today?

11           MR. SAKER:  (indiscernible).

12           THE COURT:  All right.  Hearing no, let me hear

13   from the Debtor response with respect to the Barstow,

14   Holcomb, and Saker Motion.

15           MR. SCHEFFER:  Ah -- Your Honor, Tommy Sheffer on

16   behalf of the Debtors, I'm going to ceded the podium to my

17   colleague in Chicago.

18           THE COURT:  Just stop it.  Someone other than the

19   Debtor's counsel wanted to be heard?  No.  Who is going to

20   address these motions?

21           MS. HENSLEY:  Your Honor, Gabriela Hensley of

22   Kirkland and Ellis, on behalf of the Debtors and Debtor's in

23   Possession.  Good afternoon.

24           THE COURT:  Good afternoon.

25           MS. HENSLEY:  Your Honor, the -- the arguments
```

Page 116

 1   raised today and the arguments in Ms. Barstow's supplemental

 2   filing from late yesterday evening, generally put the cart

 3   before the horse, in that the like perfection of a security

 4   interest only is relevant and matters if there is a security

 5   interest to perfect.  Ms. Holcomb argued that state law on

 6   this matter is preempted by the Constitution.  That's

 7   incorrect as a matter of law.  Rally v Illinois, Department

 8   of Revenue Code -- case site 530 US 15; states that

 9   generally in the claims process, you look to the

10   requirements of state law to give the bounds of substantive

11   rights of a claim, and then those claims are treated under

12   the bankruptcy laws of the Federal Bankruptcy laws.

13          To this end, New York State law requires that a

14   secured party have a grant of a security interest.  And none

15   of the claimants that filed motions on this issue could

16   point to any grant of a security interest in their favor

17   because none exists.  Within the terms of use, the only

18   reference to the grant of a security interest is in Section

19   9, and that is customer is granting Celsius a security

20   interest.  With respect to the point you made about, you

21   know, have the terms of use changed over time?  They have

22   from the beginning, allowed the Debtors to hypothecate

23   assets transferred into the Earn program.  Over time that

24   has been the precision of the language on that issue has

25   been expanded.  I will note that with the sixth version of

Page 117

1    the terms of use, which was implemented when the -- the

2    significant changes were implemented into the terms of use.

3    Users were specifically required to reauthorize and reaccept

4    the terms of use affirmatively.

5              THE COURT:  (indiscernible).  Let me just ask you

6    this question, Ms. Henley.  If Ms. Barstow had deposited,

7    transferred, stable coin into (indiscernible) in 2020,

8    wouldn't the terms of use enforce, at the time, determine

9    what, if any, property interest the Debtors or Ms. Barstow

10   had?  Could it -- could that be altered by a subsequent

11   change?  She had multiple transactions over time, but would

12   terms of use entered, for example in April 2021; would that

13   effect what right, title or interest she may have had in

14   what she had deposited in 2020?

15             MS. HENSLEY:  Your Honor, by their terms, the

16   terms of uses terms, the current version of the terms of

17   use, replaces all prior versions, and as noted with the

18   amendments.

19             THE COURT:  You addressed that specifically in

20   your objection to these motions?

21             MS. HENSLEY:  Your Honor, we did not in our

22   objection because the -- we viewed, and will happily

23   supplement our briefing, if you disagree, but we viewed the

24   issue of establishing the creditor as a secured claim.  As

25   in in the first incidents as a prima facia matter, falling

Page 118

1   on the creditor.

2          THE COURT:  (indiscernible) three of these Motions

3   that I'm going with now were filed by pro se creditors.  And

4   yes, I apply the rules with respect to pro se creditors, but

5   I also, and I believe the law appropriately recognizes that

6   the Court may take a broader look where I'm dealing the pro

7   se creditors, versus the Debtor that is represented by very

8   sophisticated counsel.  And so we can talk about this after,

9   as I understand it, the Debtor and the Committee, and I

10  don't know who else was involved in this and read that there

11  ought to be a briefing schedule dealing with ownership of

12  crypto assets, et cetera.

13          What I'm going to do with respect to Barstow,

14  Holcomb, and Saker, ECF Document 950 for Barstow, ECF 965

15  for Holcomb, and ECF 990 for Saker.  I want the Debtor's to

16  provide a written declaration -- a detailed transaction

17  history with each of these three creditors.  So we undertook

18  ourselves.  I say we, but the Clerks and I, to look at the

19  schedules and figure out what's been listed for these three

20  people and yes, I found entries for Holcomb, there are

21  actually three different line entries in eh schedules, all

22  four of -- all three of these people, Barstow, Holcomb, and

23  Saker had Earn accounts.

24          But I want to see with respect to stable coin, I

25  want what the transaction for each of these three account

Page 119

1    holders has been.  When assets were deposited and what were

2    they?  I said crypto assets, like in stable coin, or some

3    other form of crypto assets.  What were the terms of use

4    applicable at the time that the transaction -- each

5    transaction took place?  And so I want to see this complete

6    picture for Barstow, Holcomb, and Saker.  Yes, they

7    deposited stable coin on such and such date, terms of use

8    applicable at the time, provided that all right, title and

9    interest was transferred to the Debtor and what authority

10   the Debtor had to deal with it.  And I also want to know the

11   transaction history includes withdrawals.  Not just what

12   went in, but what came out.  And in terms of anything they

13   withdrew, what form was it stable coin or not?  I want to

14   see the complete transaction history.  What I want to be

15   sure about it -- not only addressed to you, but to each of

16   your colleagues, and we'll talk about the scheduling of

17   briefing with respect to the broader ownership interests.  I

18   want to be sure that I'm not deciding things when a motion

19   is raised by a pro se creditor, that may or may not be as

20   sophisticated, although I must say, you know, Ms. Barstow, I

21   think you did a very, very good job in putting your papers

22   together.  But I want to be sure that everybody's playing on

23   a level playing field.

24           And to the extent that requires the Debtor to go

25   the extra mile in terms of what they'll submit to me, that's

Page 120

1    what I'm going to require.  I want to be sure that if I rule

2    in favor of creditors on this issue, I have considered all

3    of the relevant and arguments.

4           So what I would like you to do is, because I may

5    be imposing a more substantial burden on you on this.  I

6    want you or your colleagues to confer with Ms. Barstow, Mr.

7    Holcomb, and Mr. Saker and agree on the schedule for you

8    submitting  the additional information I've requested and to

9    give them an opportunity to respond.  And after receiving

10   all of that, I will -- I'll see whether to schedule another

11   hearing or whether I'll decide it on the papers.

12           MS. HENSLEY:  Understood, Your Honor.  Just for --

13           THE COURT:  That's how I wanted to see it with

14   respect to the Barstow, Holcomb, and Saker motions.

15           MS. HENSLEY:  -- for clarification and not to

16   increase our workload, Mr. Sell filed several pleadings that

17   were in between Joinders and objections.  Just so we don't

18   have to come back a third time, would you like us to include

19   Mr. Sell in those proceedings?

20           THE COURT:  Yes.

21           MS. HENSLEY:   And I just want -- want the record

22   to be clear.

23           THE COURT:  Fair question.  So Jack Sell filed a

24   motion to object.  The official committee of unsecured

25   creditors and Kirkland Ellis were omitting security interest

Page 121

1    perfection, and not consider stable coin holders as secured

2    creditors.  That's filed as ECF Docket Number 1213.  No, he

3    didn't file a motion.  You're not, you know, it may be that

4    he's going to follow up with a separate motion, but I will

5    deal with the three who actually filed motions.  Okay?

6            MS. HENSLEY:  Understood, Your Honor.  Thank you.

7    I will now cede the podium to my colleague, Mr. Koenig.

8            THE COURT:  (indiscernible).  Okay, Mr. Koenig, I

9    think if I'm correct, Item 11 on the agenda is Victor

10   Ubierna de las Heras motion for an order pursuant to

11   Bankruptcy Rule 2004, compelling production documents.  It's

12   ECF Docket Number 1053 and the Debtor has filed an objection

13   and reservation of rights at ECF 1189 and Mr. Heras filed a

14   replay, which is at ECF docket number, 1290 -- go ahead.

15           MR. KOENIG:  Your Honor --

16           MR. HERAS:  Yes, Your Honor.  Thank you.

17           MR. KOENIG:  Oh, I'm sorry, go ahead.  I was going

18   to just cede the lectern to Mr. Ubierna.

19           THE COURT:  Okay.

20           MR. UBIERNA DE LAS HERAS:  Okay.  Thank you.

21   Well, first of all English is not my native language, so

22   excuse any mistake I may making in today's hearing

23   (indiscernible).

24           THE COURT:  Let me ask you something.  Stop it.

25   How do I address you?  As Mr. Ubierna or Mr. Heras?  I want

Page 122

```
 1   to be correct about it.

 2              MR. UBIERNA DE LAS HERAS:  Mr. Ubierna de las

 3   Heras.  In Spain we have two last names.

 4              THE COURT:  Okay.  All right.

 5              MR. UBIERNA DE LAS HERAS:  Thank you.

 6              THE COURT:  Please go -- thank you.

 7              MR. UBIERNA DE LAS HERAS:  Thank you.  Having you

 8   read my application, the sort of suggestion on my replying

 9   ought to be very brief today.  I am a citizen of another

10   country that is not the US, so my knowledge of US Bankruptcy

11   is not -- is limited.  However, when I first read Rule 2004,

12   it seems clear to me that there are no exception to Rule

13   2004.  Just because the Board has a special committee or UCC

14   or an examiner exist on the case.  If the legislature would

15   have wanted, they could have introduced resistance based on

16   the systems of the (indiscernible).  However, they didn't.

17   Here (indiscernible) the right of parties in bankruptcy

18   proceedings.  It is authority (indiscernible) on the grounds

19   of duplicate work, was granted to date.  And almost no

20   bankruptcy case worth any 2004 examination be allowed.  The

21   fact -- the fact that UCC has been appointed, that's another

22   brief (indiscernible) from requesting 2004 examination for

23   production of documents.  And so, I am an international

24   customer, which didn't have access to custody accounts, and

25   I did not hold any Sell documents.  Thus my interest may or
```

Page 123

1    may not be the same as other creditors.  I cannot be the

2    brief of my right to see the documents from the Debtors.

3    (indiscernible) if my request is granted, it will take time

4    from other matters, as most of these documents, how far away

5    the income buyers before they do not give any evidence as to

6    the (indiscernible) of regulation of time and

7    (indiscernible) also there has been (indiscernible)

8    creditors are going towards the claim from damages from the

9    proof of claims.  So discovery's also necessary for this

10   creditor to pursue this thing through a proof of claim or a

11   post (indiscernible).  That say, we need to (indiscernible)

12   that Celsius is not the interest (indiscernible) in an

13   ordinary basis.  For example, Celsius has the latest or

14   hidden videos in YouTube.  Based on what I have said in my

15   written motion and in my written reply to the

16   (indiscernible) my request should be granted.  Thank you for

17   your time, Your Honor.

18           THE COURT:  Thank you very much.  All right.  Let

19   me hear the Debtors response.

20           MR. KOENIG:  Your Honor, for the record, Chris

21   Koenig, Kirkland and Ellis for the Debtors.  Can you hear me

22   okay?

23           THE COURT:  Yes, I can.

24           MR. KOENIG:  Thank you.  So, Your Honor, we filed

25   an objection at Docket Number 1189, and as we articulated in

Page 124

1   the objection, our primary concern here is duplication of

2   efforts and straining the Debtor's limited resources to

3   respond to numerous diligence requests, which frankly have

4   been overwhelming in these cases.  The Debtor's employees

5   are working tirelessly to respond to high priority diligence

6   requests from among other parties, the committee, the

7   examiner, the ad hoc groups in connection with the custody

8   and withhold briefing, among many others.  And this was all

9   at the same time that the Debtors are running sale processes

10  for their mining business as  well as another sale process

11  for their platform at large.  And bidders continue to deluge

12  the businesses and provide revised diligence requests on a

13  regular basis.  And of course, timely responding to bidders

14  diligence requests is key to insuring that bidders continue

15  to be interested and that will ultimately maximize the value

16  of these estates for all stakeholders.

17          As explained earlier in the hearing, the Debtors

18  are responding to all of these critical diligence requests

19  with a severely reduced workforce, which is working around

20  the clock to make sure that these key parties have access to

21  the information that they have requested.  So the Debtors

22  are concerned about the overlap between these requests and

23  the investigations being conducted by the examiner and the

24  committee.  And these requests are broad requests that move

25  in -- seeking, for example, movant has requested any record

Page 125

1    of transactions after the pause was instituted, and all

2    documents regarding the functioning of internal transfers

3    for the accounting systems and how they are done off chain

4    within seconds.  Our view is this would significantly

5    overlap with the examiners investigation.  One of the topics

6    that the examiner is looking at is the Debtor's crypto

7    currency holdings including a determination as to where the

8    Debtor's crypto currency holdings were stored pre-petition

9    and are stored post-petition and whether different types of

10   accounts are co-mingled.

11          Separately, the movant is asking for documents

12   regarding insiders.  The committee has repeatedly

13   articulated that that is a key focus of the committee and

14   its investigation.

15          Your Honor, the Court is supposed to balance the

16   competing interests of the parties weighing the relevance of

17   the necessity of the information sought by examination.

18   Your Honor, these requests are exceptionally broad, would be

19   very burdensome to the Debtors, particularly at this time in

20   light of the other high priority requests that are needed in

21   order to move these Chapter 11 cases forward, and it's also

22   notable that many of these topics are being investigated

23   already.  The Court has broad discretion with respect to

24   Rule 2004 requests, again, we believe that these requests

25   are duplicative and should be either denied or at the very

Page 126

1    least, adjourned until the examiners work is done and the

2    report is submitted; and after the bid process is complete

3    given the burden on the debtors in responding to those high

4    priority requests from the examiner and from the bidders

5    that are trying to maximize the value of these estates.  And

6    if the Court is nonetheless inclined to grant the motion at

7    this time, as mentioned in our reservation of rights, we

8    would like to file responses and objections to the specific

9    requests.  And if we're unable to come to an agreement about

10   the scope of the examination with the movant, following a

11   meet and confer, you know, we would raise this - we would

12   raise this topic with, Your Honor.  Otherwise, I would rest

13   on the papers that we filed at Docket Number 1189, Your

14   Honor.

15            THE COURT:  Okay.  Mr. Ubierna de las Heras, is

16   there anything you want to say in reply?

17            MR. UBIERNA DE LAS HERAS:  No, Your Honor.

18            THE COURT:  All right.  I'm going to take the

19   motion under submission and I'll enter an opinion or order,

20   hopefully within a day or two.  Okay?  All right.  That

21   brings us, thank you Mr. Ubierna.  That brings us to the

22   stable coin motion, the status conference with respect to

23   stable coin -- stable coin motion.  The motion was

24   originally filed as ECF Docket Number 832.  There were

25   numerous objections to the motion that were filed.  I won't

Page 127

1   catalog all of them, in ECF Docket Number 1228, the Debtor's

2   filed a statement regarding its motion in briefing.  Who

3   wants to take this up for the Debtors?

4           MR. KOENIG:  Your Honor, again, Chris Koenig from

5   Kirkland and Ellis for the Debtors.  Your Honor, as you said

6   we would like to proceed as a status conference on the

7   stable coin motion.  The objection deadline was October

8   25th.  As you noted, numerous parties objected, even before

9   the objection deadline.  Since the objection deadline, we've

10  been working with the objecting parties to try to narrow

11  issues, resolve issues.  We've been having some success in

12  that regard but need some additional time to continue to

13  work with the parties.  So we've agreed to adjourn the

14  motion to narrow the issues.  Try to drive consensus and to

15  the extent we're unable to find consensus have Your Honor,

16  resolve any open objections.  As you noted, we filed a

17  notice on Saturday morning while ECF was out, we continued

18  to discuss with the parties, through the weekend, to

19  determine how to proceed with the motion, slightly different

20  -- what we would like to do is slightly different than what

21  we filed in the notice on Saturday morning.  I just wanted

22  to explain the Debtor's position this afternoon.  What we

23  would like to do is to have the motion heard at the November

24  15th hearing.  Many parties in their objections and

25  responses, including the committee, various state

Page 128

1    regulators, the US Trustee, and others, have raised it as a

2    gating issue to selling assets to the Debtor's means have

3    demonstrate that they own the assets they're trying to sell.

4    Of course, we agree with that and have no problem putting on

5    our case in that regard.  We've been clear from day one of

6    these cases that we believe that the earn coins are Celsius'

7    assets.  It's clear and unambiguous throughout the terms of

8    use that the earn coins are Celsius' property and of course,

9    that's the entire -- that's the entire model of our business

10   that Celsius owns the earn coins.  Can sell, stake or

11   otherwise, rehypothecate the coins in order to earn a return

12   on those assets and pay a portion of that return to their

13   customers.  So in short, we would like to put on our case on

14   November 15th in regard to the stable coin motion.  And what

15   we propose to do is to file one or more declarations a week

16   before the hearing.  So that's, I believe November 8th,

17   setting forth our case in chief, and the facts in support of

18   the stable coins that we are seeking to sell, being property

19   of the estate, and we'll file a reply in support of the

20   motion with respect to any objections that are not resolved

21   between now and the hearing.  And Your Honor, we expect that

22   we would have some sort of a short evidentiary presentation

23   on November 15th with respect to putting on our case in

24   chief on this important issue to demonstrate that the earn

25   coins belong to Celsius and can and should be sold pursuant

Page 129

1    to the business judgement of the Debtors.  And we would also

2    have revisions of the proposed order to reflect the

3    discussions that we've been having with various other

4    counterparties in order to try to drive consensus and

5    resolve objections.

6              THE COURT:  You know, Mr. Koenig, I gathered from

7    your last three motions where pro se creditors were seeking

8    to have stable coin, (indiscernible) varieties of stable

9    coin compelling to be secured assets of those creditors.

10   One of the things that I don't mean to be critical of you

11   and your colleagues have an enormous amount of things on

12   your plate, but I mean, I expressed my frustration that, you

13   know, people (indiscernible) earned account holders were

14   depositing and withdrawing assets at various times, there

15   were various iterations of terms of use in effect from time

16   to time.  The subsequent terms of use replace -- in effect

17   replace earlier terms of use as to transactions that

18   occurred before the new terms of use.  Those were all issues

19   that I was focused on.  Who are the counterparties to what

20   you're proposing that we hear on November 15th?  Who am I

21   going --

22              MR. KOENIG:  (indiscernible), I'm sorry, Your

23   Honor, you cut out there for a moment.

24              THE COURT:  Besides the Debtor's, I mean, who have

25   you been negotiating with?

Page 130

1              MR. KOENIG:  The objecting parties.  I mean, a

2      variety of individuals and other parties have, you know,

3      filed formal and informal responses to the motion and have

4      raised these issues throughout these cases.  And so we've

5      been -- we've been discussing with folks both that have

6      filed pleadings on the docket and those that have reached

7      out to us informally.

8              THE COURT:  But are any of them represented by

9      counsel?

10              MR. KOENIG:  Yes, Your Honor.  Ms. Kooskia has

11      raised her hand, and she's one of the individuals that did

12      not file a response, but that we've been working with on a

13      more informal basis.

14              THE COURT:  Any other counsel that you've been

15      working with?

16              MR. KOENIG:  Certainly, I mean, the committee, as

17      you know, Your Honor, filed an objection and we've been

18      working with them both before the objection was filed and

19      after as well.

20              THE COURT:  (indiscernible) you decide that the

21      piece of paper that the committee has filed is kind of

22      strange for a committee to file, but in any event, yes, I

23      noted that.

24              MR. KOENIG:  Yeah, and then, of course there's

25      other parties in the case as well.  The other ad hoc group

22-10964-mg    Doc 1280    Filed 11/04/22    Entered 11/04/22 07:51:19    Main Document
Pg 131 of 148

Page 131

1    and the US Trustee, among others.  And we've been working

2    with the state regulators as well.  We've been having calls

3    with them over the last week to week and a half to address

4    the issues that were raised in their objections.

5            THE COURT:  I have my concern; it is whether

6    there'll be a full record -- timely record for the Court to

7    go ahead on November 15th and address an important issue.

8    This is a very important issue in the case.  What's the

9    schedule?  Did you negotiate a schedule, for example with

10   Ms. Kovsky or with any of the other counsel as to who would

11   file what?

12           MR. KOENIG:  No, Your Honor, that's the Debtor's

13   proposal as far as what we would -- how we would like to

14   proceed.  We're happy to negotiate a briefing schedule and

15   submit it to Your Honor, if you'd like to proceed either at

16   the November 15th hearing or at the following Omnibus

17   hearing on December the 5th.  That seems like that's where,

18   Your Honor, is going with this anyways.

19           THE COURT:  Look, I understand the importance of

20   the issue.  I agree it should be resolved sooner rather than

21   later.  But I don't want to do what's been happening, I get

22   these untimely you know replies and things like that.  I

23   prepare for hearings.  And I want to be sure that the Court,

24   that I know what the schedule is.  There's sufficient time

25   after the last reply is filed for the Court to be sure that

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Page 132

1    it's prepared.  We can go on, I don't know, how -- are you

2    talking about why witnesses?

3              MR. KOENIG:  Your Honor, what we would do is we

4    would -- we would file one or more declarations in advance

5    of the hearing and then depending on how objecting parties

6    would like to proceed, whether they would like to cross

7    examine the witnesses that provided the declarations, you

8    know, their direct testimony, we expect, would be by their

9    deposition -- or sorry, by their declarations, and then to

10   the extent other parties wish to ask questions, you know,

11   they would certainly be free to do so at that hearing.

12             THE COURT:  Let me call on Ms. Kovsky.  I see her

13   hand raised and she's one of the people that you've

14   indicated you've had discussions with.  Ms. Kovsky?

15             MS. KOVSKY:  Thank you, Your Honor.  Deb Kovsky,

16   Troutman Pepper for the Withhold Group.  Are you able to

17   hear me?

18             THE COURT:  Go ahead.

19             MS. KOVSKY:  So the Withhold Group's issues are a

20   little bit tangential to those of the earned rewards

21   customers, at least with respect to this motion, since the

22   Debtors did expressly indicate in their motion that they are

23   not seeking to sell or otherwise dispose of any stable coins

24   that may belong to the custody or withhold account holders.

25   The concern that we had raised informally was how can you be

Page 133

1    sure?  How -- what's the mechanism to make sure that you're

2    not inadvertently selling coins that may not be property of

3    the estate?  We were able to get comfortable based on

4    information and some proposed modifications to the order

5    that the Debtor had discussed with us and that we anticipate

6    would be part of whatever the order is, going forward,

7    that's ultimately entered.  I understand there may still be

8    ongoing discussions, things are still fluid, so I just

9    wanted to put a reservation of rights on the record, that if

10   something does change, we may need to raise our hand and

11   speak up in a more formal way, but we have been discussing

12   with the Debtors and certainly will abide by any further

13   briefing schedule that, Your Honor, puts in place.

14           THE COURT:  All right.  Mr. Colodny, you're here

15   on behalf of the committee, is that correct?

16           MR. COLODNY:  That's right, Your Honor.  Can you

17   hear me?

18           THE COURT:  Oh yeah.

19           MR. COLODNY:  I have double muted before.  Your

20   Honor, I think our paper was meant to make the point that

21   the Debtors have to prove their ownership to sell the

22   assets.  I think that doing that in a way, on a schedule

23   that makes sense is appropriate.  And I'm not sure that

24   filing declarations seven days before a hearing and then

25   arriving at the court for people to cross-examine the

Page 134

1    witnesses on the stand is necessarily the best way to do

2    that.  I think setting forth a reasoned, but accelerated

3    time table, where we all have deadlines and we know what

4    targets to hit makes sense here.  But I'm not sure that can

5    happen in seven days before a hearing.

6              THE COURT:  I'm not sure it can either, but I

7    don't -- part of my concern is, no disrespect whatsoever

8    intended for the pro se creditors who filed motions, the

9    things they care about intensely, and I understand that.

10   But this is -- these are important issues and I want it to

11   be a fair fight.  Ms. Milligan, let me hear from you.

12             MS. MILLIGAN:  Thank you, Your Honor.  Lala

13   Milligan with the Texas Attorney General's office on behalf

14   of the State of Texas Regulatory Entities.  I share Mr.

15   Colodny's concerns with the timing.  My -- we have been in

16   discussions with the Debtor and provided some information as

17   recently, I think, as last night about coins that they're

18   proposing to sell.  The concern that I have is similar to

19   Mr. Colodny's in that our understanding that a briefing

20   schedule was being contemplated.  Further information was to

21   be provided.  The Debtors were to supplement their pleadings

22   so that we could be clear what was being sold, how much was

23   being sold.  So that everyone had more information about

24   what is actually happening.  The concern that I have, just

25   hearing the Debtor's plan, now for the first time is, we're

Page 135

1   going to get a series of declarations that everyone, not

2   just the committee and the US Trustee, but the regulator

3   body has to vet on a very short timeframe.  Understanding

4   that this case needs to move forward and the Debtor may need

5   to access funds.  We understand the pressure of this case,

6   but I share the committee's concerns that having a series of

7   declarations and minimal information walking into a hearing

8   on November 15th, that is getting longer by the moment

9   today, is a concern.  So we share that concern, and we also

10  understand the pressure to move with all deliberate speed.

11          THE COURT:  Does the US Trustee want to be heard

12  on this?  Ms. Cornell, are you still present at the hearing?

13  Is anybody from the US Trustee Office, still present at the

14  hearing?

15          CLERK:  Yes, Ms. Cornell is on and it looks like

16  Mr. Bruh was on the line.  I don't know if they walked away

17  or something.

18          THE COURT:  This is their opportunity.  I want to

19  give someone from the US Trustee's office an opportunity to

20  speak.  I just say, you know, I understand it's four minutes

21  to two, but I haven't walked away from the bench.

22          MR. BRUH:  Your Honor, Mark Bruh of the United

23  States Trustee.  I am here.  We do have a pending motion,

24  excuse me, objection to the motion and we would like the

25  opportunity to discuss things with the Debtor.  We haven't

Page 136

1    really had a open line of communication regarding the stable

2    coin issue, most recently, as there have been other matters

3    that have been the focus of this cases at this time.

4           THE COURT:  Okay.  Are there any other -- I'll

5    give the pro se's hands I see raised an opportunity in a

6    minute, but are there any other counsel who are appearing

7    today who want to be heard with respect to procedures for

8    determining ownership of stable coin?

9           MR. KOENIG:  Your Honor, just really quickly, it

10   sounds like December 5th, just to be clear from the Debtor's

11   perspective, we're happy to proceed on December 5th and to

12   negotiate with the other parties a reasonable schedule in

13   advance to make sure that all parties have an opportunity to

14   review the materials that the Debtors submit and respond in

15   a meaningful way.  Certainly these are important issues, but

16   it is not necessary from a liquidity perspective for

17   November 15th to December 5th, so I just wanted, Your Honor,

18   to have that benefit that from the Debtor's perspective, we

19   would be happy to proceed on December 5th, if that's the way

20   that, Your Honor would like to proceed.

21          THE COURT:  At this stage, Mr. Koenig, I'm not

22   expressing a preference for one date or another.  What I am

23   trying to make clear is that I want the parties in interest

24   to have an opportunity to prepare, to know what evidence is

25   being offered.  To have an opportunity -- I don't want a

Page 137

1    free for all in the courtroom.  Then this hearing is going

2    to take place.  It'll be a hybrid hearing.  It will include

3    anyone who wishes to appear in my courtroom, but we'll also

4    have the opportunity to appear on zoom.

5              MR. KOENIG:  Certainly, Your Honor, and as I

6    mentioned, we're happy to insure that our papers and or

7    declarations in support are filed enough in advance to give

8    parties in interest time to respond and to file -- to file

9    papers on the docket so that, Your Honor, has the benefit of

10   reading those before the hearing.

11             THE COURT:  Yeah, I don't know how many witnesses,

12   who wishes to cross-examine, what is the length of the

13   hearing that's anticipated?  So for December 5th, Celsius is

14   on the calendar at 2:00.  I have a disclosure statement

15   hearing in another matter, unless it's changed, scheduled

16   for 9 a.m. that day.  Dianna are you able to tell me whether

17   there's been any change in the date of the All Year

18   Holdings, December 5th and December 6th hearings?

19             CLERK:  Hi, Judge.  I reached out to counsel this

20   morning.  I'm just waiting to hear back.  They haven't

21   gotten back to me.

22             THE COURT:  Mr. Koenig, what I would like to do is

23   give you and your colleagues a chance to confer with other

24   parties at interest on this stable coin issue.  And it

25   really, whether you can sell it depends on is it yours?

Page 138

 1   When I say yours, obviously, the Debtor's and --

 2           MR. KOENIG:  Right.

 3           THE COURT:  That's an issue that came up in the

 4   motions today that I've put off.

 5           CLERK:  Judge?

 6           THE COURT:  Yeah, Dianna?

 7           CLERK:  My apologize.  Mr. McAnuff just emailed

 8   back.  He said they're fine with giving up the December 5th

 9   and 6th hearing dates.  This is for another matter they were

10   looking to schedule in a Linda Star, but would you like me

11   to have them move both dates or --

12           THE COURT:  We'll talk about that after this.

13           CLERK:  Okay.  Thank you.

14           THE COURT:  Let me give other people a chance to

15   speak.  Mr. Herman, go ahead.

16           MR. HERMAN:  Thank you, Your Honor.  Emanuel

17   Herman, pro se creditor.  So I filed a response and

18   reservation of rights yesterday, which I encourage the

19   parties to read, and I'm sure some of the parties have read.

20   Like to be clear, I expect to be a party that's negotiated

21   with here.  Also we need time for customers --

22           THE COURT:  Mr. Herman --

23           MR. HERMAN:  Yes, Your Honor?

24           THE COURT:  Do you have stable coin?

25           MR. HERMAN:  I have some, yes, I do.  But I can

Page 139

1   also speak to stable coins in general.  Sorry, go ahead,

2   Your Honor.

3         THE COURT:  Unless you have stable coin in a

4   Celsius account, I don't want to hear from you on this.

5         MR. HERMAN:  Oh, I do, Your Honor, yes, I have

6   some stable coins.  It's not primarily what I have, but I

7   have some.  I think about a ten percent of my account.  So I

8   will also just not that we can sell stable coins without

9   ruling on whose property they are and that the UCC proposed

10  a path forward on that.

11        THE COURT:  But we're not going to do that.  I'm

12  going to determine whose it is.

13        MR. HERMAN:  Okay.  So, yeah, I mean, I guess I

14  would just say I guess I feel that, you know, I feel that

15  this is a rushed process.  That you know, we've been in

16  litigation on a microcosm or a microcosm with small slivers

17  of custody and withhold, and I'm not sure why there's

18  expected to be a resolution of earns property rights in a

19  single day.

20        THE COURT:  Earns property rights -- it is well,

21  it is with respect to stable coin.  Okay.

22        MR. HERMAN: Got it.  I mean, I urge the Debtor to

23  consent to mediation and begin discussions with creditors.

24        THE COURT:  I understand you're suggesting it can

25  be put off.  It's happening.  Okay.

```
                                                                 Page 140
    1              MR. HERMAN:  Okay.

    2              THE COURT:  (indiscernible) schedule, but it's

    3    happening.  Mr. Cruz?

    4              MR. CRUZ:  Thank you, Your Honor, Cam Cruz, pro se

    5    creditor.  I have about $27,000 worth of finance USD, which

    6    is different from the GUSD and USDC, but similar in nature.

    7    I do want Kirkland Ellis to address the matter of voyager

    8    being a customer of Celsius --

    9              THE COURT:  Yes, I (indiscernible) this issue Mr.

   10    Cruz.

   11              MR. CRUZ:  Okay.  Well, --

   12              THE COURT:  This is going to be a hearing focused

   13    on stable coin.  Who owns it.

   14              MR. CRUZ:  Yep.  Well it's relevant in the sense

   15    that they withdrew $100 million of USDC stable coins on

   16    March 9th and other assets were moved into withheld status.

   17    They have about $1 million worth of withheld on platform.

   18              THE COURT:  I'm sure that, you know, it may be

   19    that Voyager issues will be dealt with at an appropriate

   20    time.  It's not going to be this time.  Okay.  There are

   21    enough account holders, it may be there are avoidance

   22    claims, I don't know.  I'm not speaking to that at all.

   23    There are enough account holders who have stable coin of one

   24    form or another, in their earned accounts, and it may be

   25    that with respect to custody account and withheld accounts,
```

1    there also may be issues of stable coin.  But that's what

2    I'm focused on is dealing with -- there've been enough

3    parties in interest who have raised issues about stable

4    coin, do they have secured claims?  Do they don't have

5    secure claims?  Who owns it?  Et cetera.  That's what we're

6    going to deal with now.

7              MR. CRUZ:  Um-hum.

8              THE COURT:  Mr. Bronge, do you

9              MR. BRONGE:  Yes, Your Honor, this is Johan

10   Bronge, pro se creditor and I do have in importer account,

11   earn account.  I  have sell tokens and stable coins and all

12   kinds of assets on the platform.  Now, the way I see this,

13   the issue of ownership status of all the kinds of different

14   assets are in question and has been in question since the

15   start, and I wonder why the Court cannot take the holistic

16   approach in this and rule on all assets, property, and title

17   rights in one go, to clear up these issues?  Because it just

18   seems to drag on and details with one issue after the other

19   without actually conclude the full thing.  And I would also

20   think that ruling on all assets status would enable bids and

21   clarity for the sale process to go forward a bit easier.

22             THE COURT:  Thank you.  Ms. Cordry?

23             MS. CORDRY:  Yes, Your Honor.  We did not

24   specifically file anything with respect to stable coin.  We

25   did make a notation with respect to the general sales motion

Page 142

1    that this whole question of what did the Debtor own, was a

2    major issue out there.  And I think a lot of the concerns

3    cut across both of the -- all portions of the Debtor's

4    assets, whatever they may be.  So I would agree that I think

5    -- it's time to T this up and I think it obviously needs to

6    be done in an expeditious fashion.  That said, I think

7    November 15th would be a very aggressive, to say the least,

8    timetable.  I think the December 5th date might be a very

9    reasonable date and would tie in well with some of the other

10   things going on in the case.  That kind of a time period

11   anyway, but yes, I think we would agree that it's time to

12   really sit down there and deal with this motion that has

13   been floating around and these concerns since the beginning

14   of the case.  Thank you.

15          THE COURT:  Thank you, Ms. Cordry.  Mr. Koenig,

16   should all -- ownership of all of the assets be dealt with

17   together?  All of these crypto assets be dealt with at the

18   same time?

19          MR. KOENIG:  Your Honor, Chris Koenig for the

20   Debtor, so we've already been -- we have a separate briefing

21   schedule on custody and withhold.  Those dates have been out

22   there for a while.  Our opening briefs on those are due this

23   Saturday.  So, you know, while we certainly would like to

24   proceed with earn, we already have separate proceedings

25   pending for custody and withhold and those are proceeding as

Page 143

1    planned, as I said the opening briefs are due on Saturday.

2    So our view is that we should proceed with earn at this

3    time, at December 5th, around December 5th, and perhaps what

4    makes sense is for the Debtors to file their supplemental

5    papers and declarations 21 days before that hearing.  I

6    think that that's November 11th, I have to check a calendar

7    and then we can just have a normal motion schedule where

8    folks can file objections seven days before the hearing and

9    the Debtor can file a reply in advance of the hearing in

10   connection with the case management motion.  That would be -

11   - I think that that works with the calendar and would give

12   parties an appropriate amount of time to review the

13   submission in advance of the hearing, but happy to do

14   whatever, Your Honor, proposes instead.

15            THE COURT:  As I understand, you have -- that

16   would apply as to all earn accounts, whatever, whether

17   stable coin or not stable coin?

18            MR. KOENIG:  That's right, Your Honor, we're happy

19   to do that, because that, of course, whether stable coin's

20   in an earn account belong to the Debtor, it's part of the

21   broader question of whether every coin in the earn account

22   belongs to the Debtor.  And so we can address both of those

23   at the same time, so we don't have to litigate that same

24   issue twice.

25            THE COURT:  Okay.  I agree.  All right.  But what

Page 144

1   you need to do -- what you're proposing sounds reasonable

2   and appropriate for me.  I've got to tell you; my December

3   calendar is a mess.  But we could go forward on -- it

4   certainly sounds to me that we could go forward on December

5   5th and 6th.  I want to make crystal clear that this

6   scheduling order has to put in all bold that no supplemental

7   filings will be permitted after the date for the Debtor's

8   reply.  I don't want this situation -- this is not you,

9   okay.  But you know, it's becoming the pattern that I get

10  these last minute supplemental filings, and that's -- they

11  won't be considered.  It's -- I want to make it clear as

12  day.  If you've got something you're going to put in your

13  objection or the Debtor in its reply, it better be there,

14  otherwise it won't be considered.  Okay?

15          MR. KOENIG:  Understood, Your Honor.  We'll submit

16  a form of scheduling order on the docket and we'll also send

17  a word version to your chambers, if that works.

18          THE COURT:  Well, what you need to do before you

19  submit it to chambers is confer with Ms. Kovsky, and other

20  counsel.  You know, I -- the State regulators to the extent

21  this is an issue that they raised, I'm -- I've expressed my

22  concern.  I think, you know, I very much respect the motions

23  and the arguments that have been made by the pro se

24  creditors, but in as plain and as simple terms as possible,

25  I want this to be a fair fight.  And it may be they're very

Page 145

1   knowledgeable about the facts and no so much about the law.

2   Again, I want it to be a fair fight, and I'll --

3           MR. KOENIG:  Understood, Your Honor.

4           THE COURT:  The Court will work to get those

5   issues resolved expeditiously, consistent with the -- a very

6   busy calendar right now.  Okay.

7           MR. KOENIG:  Understood, Your Honor.  And of

8   course we'll confer with the other represented parties

9   before submitting any schedule to chambers or posting it on

10  the docket.

11          THE COURT:  All right.  I think that takes us

12  through the agenda.  I know -- when have you -- the Bargate

13  Motion is listed as an adjourned matter.  When is that going

14  to be on?

15          MR. KOENIG:  Your Honor, that will be heard on

16  November 15th, the preferred equity holders have filed a

17  motion pursuant to bankruptcy 1009 and requested that those

18  matters be heard at the same time.  We thought that that

19  made sense, so those matters are up -- related matters are

20  up on November 15th and we would expect that the Bargate

21  motion would be considered at that time.

22          THE COURT:  Okay.  And just to be clear, with

23  respect to the evidentiary hearing regarding ownership in

24  earn accounts, it will a hybrid hearing.  I expect the all

25  parties interested are important, but the principle parties

Page 146

1    in interest and counsel should be present in my courtroom

2    for that hearing.  And there will be zoom access provided

3    and I may well listen to objections or arguments made by

4    other counsel, but I expect the main counsel to be.  All

5    right.  Just bear with me one more second.  All right.  I

6    know there were some additional hands raised, but I'm not

7    going to recognize anybody else at this point.  It is 13

8    minutes after two, we've been at it since 11:00, and I'm

9    certainly tired, let me put it that way.  So we are

10   adjourned.

11           MR. KOENIG:  Thank you, Your Honor.

12           (Whereupon these proceedings were concluded at

13   2:13 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

Page 147

1                           I N D E X

2

3                              RULINGS

4                                              Page      Line

5    KERP sealing motion is denied            29        17

6    KERP motion is denied                    29        25

7    Securities Stipulation is approved       73        16

8    ECF 1013 and ECF 1112 are granted        80        13

9    ECF 962 and ECF 1070 are granted         82        14

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 148

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    Sonya M. Ledanski Hyde

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  November 3, 2022