**TROUTMAN PEPPER HAMILTON SANDERS LLP**
Deborah Kovsky-Apap
875 Third Avenue
New York, NY 10022
Telephone: (212) 704-6000
Facsimile: (212) 704-6288
Email: deborah.kovsky@troutman.com
*Counsel to the Ad Hoc Group of*
*Withhold Account Holders*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

**AD HOC GROUP OF WITHHOLD ACCOUNT HOLDERS' PHASE I BRIEF
PURSUANT TO THE JOINT STIPULATION AND AGREED SCHEDULING ORDER
BY AND AMONG THE DEBTORS, THE COMMITTEE, AND THE AD HOC GROUPS
WITH RESPECT TO THE CUSTODY AND WITHHOLD ISSUES**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

# TABLE OF CONTENTS

Page

I.    PRELIMINARY STATEMENT ....................................................................... 1

II.   FACTUAL BACKGROUND ........................................................................... 3

    A.    Celsius used "Withhold Accounts" as a workaround in states where it was
        not licensed to provide custody services. ........................................................... 3

    B.    There are no agreed contractual terms between Celsius and the Withhold
        Group members with respect to coins in the Withhold Accounts. ......................... 8

    C.    At all relevant times, Celsius has held far more of each type of coin than
        the number of such coins transferred by the Withhold Group members to
        the Withhold Accounts. ................................................................................... 10

III.  ARGUMENT ............................................................................................... 11

    A.    The Withhold Group members' coins in the Withhold Accounts are not
        property of the estate. ..................................................................................... 11

        1.    Any contractual grant to Celsius of rights or title to coins
            terminated when the Withhold Group members withdrew the coins
            from the Earn Program. ............................................................................. 11

        2.    The fact that Celsius did not maintain a dedicated "Withhold"
            wallet does not transform Withhold Group members' assets into
            property of the estate. ............................................................................... 14

        3.    The Preference Limitation and Loan Limitation are not valid bases
            for denying customers access to their own property. ................................. 19

IV.   CONCLUSION ............................................................................................ 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baker v. Maclay Properties Co.*,
    648 So.2d 888 (La. 1995) ....................................................................................................16

*Butler v. Butler*,
    768 S.E.2d 332 (N.C. Ct. App. 2015) ................................................................................16

*In re Columbia Gas Systems, Inc.*,
    997 F.2d 1039 (3d Cir.1993) ..............................................................................................15

*In re Dewey & Leboeuf LLP*,
    493 B.R. 421 (Bankr. S.D.N.Y. 2013) (Glenn, J.) ............................................................16

*In re Drexel Burnham Lambert Grp., Inc.*,
    142 B.R. 633 (S.D.N.Y. 1992) ..........................................................................................18

*In re Edison Bros., Inc.*,
    243 B.R. 231 (Bankr. D. Del. 2000) ..................................................................................15

*FedEx Corp. Servs., Inc. v. Heat Surge, LLC*,
    131 N.E.3d 397 (Ohio Ct. App. 2019) ..............................................................................16

*In re First Cent. Fin. Corp.*,
    377 F.3d 209 (2d Cir. 2004) ..............................................................................................16

*In re Flanagan*,
    503 F.3d 171 (2d Cir.2007) ................................................................................................15

*In re Grubb & Ellis Co.*,
    No. 12-10685 MG, 2012 WL 1036071 (Bankr. S.D.N.Y. Mar. 27, 2012)
    (Glenn, J.), *aff'd,* 523 B.R. 423 (S.D.N.Y. 2014) ............................................................16

*Hausler v. JP Morgan Chase Bank, N.A.*,
    127 F. Supp. 3d 17 (S.D.N.Y. 2015) ..................................................................................13

*Hoodho v. Holder*,
    558 F.3d 184 (2d Cir. 2009) ..............................................................................................13

*Kanne v. Visa U.S.A. Inc.*,
    723 N.W.2d 293 (Neb. 2006) ............................................................................................16

*Katz Agency, Inc. v. The Evening News Association*,
    514 F.Supp. 423 (S.D.N.Y.1981) ......................................................................................20

*Lagemann v. Spence*,
   2020 WL 5754800 (S.D.N.Y. May 18, 2020) ........................................................17

*Lyon v. Contech Constr. Prods., Inc. (In re Computrex, Inc.)*,
   403 F.3d 807 (6th Cir. 2005) .................................................................................14

*Moran v. Arcano*,
   1990 WL 96761 (S.D.N.Y. July 3, 1990) ...............................................................21

*In re Moyer Grp., Inc.*,
   586 B.R. 401 (Bankr. S.D.N.Y. 2018) (Glenn, J.) .................................................16

*In re Munroe*,
   183 B.R. 667 (Bankr. D.R.I. 1995) ........................................................................14

*Musket Corp. v. PDVSA Petroleo S.A.*,
   512 F.Supp.2d 155 (S.D.N.Y.2007) .......................................................................20

*Owens v. Taliban*,
   2022 WL 1090618 (S.D.N.Y. Apr. 11, 2022) .........................................................20

*Purgess v. Sharrock*,
   33 F.3d 134 (2d Cir. 1994) ....................................................................................13

*In re Rodgers*,
   333 F.3d 64 (2d Cir. 2003) ....................................................................................14

*In re Schick*,
   234 B.R. 337 (Bankr. S.D.N.Y. 1999) ...................................................................17

*Simonds v. Simonds*,
   380 N.E.2d 189 (NY 1978) .....................................................................................16

*Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
   559 U.S. 662 (2010) ..............................................................................................12

*TAGC Mgmt., LLC v. Lehman*,
   842 F. Supp. 2d 575 (S.D.N.Y. 2012) ....................................................................20

*Vertex, Inc. v. City of Waterbury*,
   898 A.2d 178 (Conn. 2006) ...................................................................................16

**Statutes**

11 U.S.C. § 362 ..............................................................................................................24

11 U.S.C. § 541 ...............................................................................................10, 13, 15

**Other Authorities**

Fed. R. Civ. P. 64 ........................................................................................................................19

N.Y. C.P.L.R § 6201 ..............................................................................................................20, 21

N.Y. C.P.L.R. § 6212 ...................................................................................................................20

The Ad Hoc Group of Withhold Account Holders (the "**Withhold Group**") of Celsius Network LLC and its affiliated debtors and debtors-in-possession (collectively, "**Celsius**" or the "**Debtors**"), by and through its undersigned counsel, and in accordance with the *Joint Stipulation and Agreed Scheduling Order by and Among the Debtors, the Committee, and the Ad Hoc Groups with Respect to the Custody and Withhold Issues* [Docket No. 1044] (the "**Scheduling Order**"), hereby submits this Phase I Brief (I) in support of the Withhold Group's position that (A) assets in the Withhold Accounts (defined below) are not property of the Debtors' estates and (B) the Debtors should not be allowed to continue to hold assets in the Withhold Accounts notwithstanding any potentially viable claims the Debtors may hold; and (II) asserting a limited objection to the Debtors' Custody and Withhold Motion (as defined in the Scheduling Order). The Withhold Group respectfully states as follows:

## I.    PRELIMINARY STATEMENT

1.    On September 1, 2022, Celsius filed its *Motion Seeking Entry of an Order (I) Authorizing the Debtors to Reopen Withdrawals for Certain Customers with Respect to Certain Assets Held in the Custody Program and Withhold Accounts and (II) Granting Related Relief* [Docket No. 670] (the "**Custody and Withhold Motion**"). In the Custody and Withhold Motion, Celsius conceded that "the Debtors have never claimed or acquired an equitable interest in the cryptocurrency stored in Withhold Accounts. Thus . . . Withhold Assets are held by the Debtors on behalf of customers and are not property of the Debtors' estates." Custody and Withhold Motion, ¶ 30. Nonetheless, the Custody and Withhold Motion does not seek to allow customers to withdraw their own assets that may be subject to a colorable preference claim (the "**Preference Limitation**"), or where the customer has a loan and the Debtors believe they may have a contractual right of setoff (the "**Loan Limitation**"). *Id.* at pp. 16-18.

2.    On September 7, 2022, the Withhold Group filed its *Motion for Relief from*

*the Automatic Stay* [Docket No. 737] (the "**Stay Relief Motion**"). In the Stay Relief Motion, the

Withhold Group argued that neither the Preference Limitation nor the Loan Limitation is warranted

with respect to the Withhold Accounts, where the Debtors have conceded that the coins in the

Withhold Accounts are not property of the estates and the Debtors lack the necessary licenses to

hold cryptocurrency on behalf of customers.

        3.      The Official Committee of Unsecured Creditors (the "**Committee**")

indicated its opposition to both the Custody and Withhold Motion and the Stay Relief Motion,

leading to the Court's request at a hearing on September 14, 2022 that the parties meet and confer

to determine the best path forward to resolve the issues related to both motions, as well as a

separate adversary proceeding filed by the Ad Hoc Group of Custodial Account Holders. As a

result, the parties agreed on a two-phase schedule, with the following issues to be briefed and

decided in Phase I:

- whether assets in the Custody and Withhold accounts are property of the Debtors' estates, including whether the Terms of Use are unambiguous on the issue of ownership of such assets; and
- if the assets are not property of the Debtors' estates, whether the Debtors should nonetheless be allowed to continue to hold those assets, and maintain the status quo, with respect to individuals and/or accounts where the Debtors have potentially viable claims, including, without limitation, preference claims.

Scheduling Order at 3.

        4.      As to the first issue, the Terms of Use are unambiguous that any grant of

right or title to coins in the Earn Program lasted only so long as customers elected to utilize the

Earn Program. Once customers pulled coins out the Earn Program—as the Withhold Group

members did when they transferred the coins out of Earn and into the Withhold Accounts—the

contractual grant of right and title terminated. As to the second issue, Celsius cannot continue to

hold coins that belong to customers for at least two reasons: (i) because it has not demonstrated its

entitlement to the extraordinary remedy of pre-judgment attachment, and (ii) because it cannot legally hold cryptocurrency on behalf of customers in the Prohibited States.

## II.    FACTUAL BACKGROUND

### A.    Celsius used "Withhold Accounts" as a workaround in states where it was not licensed to provide custody services.

5.    Celsius – with the tagline "Unbank Yourself" – advertised its mission as placing "unparalleled economic freedom in the hands of the people."[2] Through its "Earn Rewards" program (the "**Earn Program**"), Celsius encouraged retail customers to place eligible cryptocurrency into interest-bearing accounts, which Celsius then pooled to generate returns. Earn Program accounts offered high interest rates (purportedly "up to 17% APY") that were paid on a weekly basis in bitcoin and more than 40 other cryptocurrencies.[3]

6.    On September 17, 2021, Alabama, New Jersey, and Texas each announced a cease-and-desist action against Celsius concerning the company's Earn Program, which each state classified as an offering of unregistered securities. The Alabama Securities Commission announced that it had issued an order to show cause, providing Celsius 28 days to show cause why it should not order Celsius to cease and desist from further offers or sales of securities in the state.[4] The New Jersey Bureau of Securities issued a summary cease-and-desist order, requiring Celsius to cease offering Earn Program accounts as of November 1, 2021.[5] The Texas State Securities

---

[2] See The Mission and Values of Celsius Network, *available at* https://celsiusnetwork.medium.com/the-mission-and-values-of-celsius-network-b5715732dc7 (accessed on August 24, 2022).

[3] See Earn Rewards, *available at* https://celsius.network/earn (archived on April 8, 2022 and accessed via the Wayback Machine).

[4] See Order to Show Cause Why the Alabama Securities Commission Should Not Order Respondents to Cease and Desist from Further Offers or Sales of Securities in the State, *available at* https://asc.alabama.gov/Orders/2021/SC-2021-0012.pdf.

[5] See Summary Cease and Desist Order, *available at* https://www.nj.gov/oag/newsreleases21/Celsius-Order-9.17.21.pdf.

Board issued a notice of hearing on whether to issue a proposed cease-and-desist order to Celsius.[6]

On September 23, 2021, the Kentucky Department of Financial Institutions issued Celsius

an emergency order to cease and desist.[7]

       7.     In April 2022, citing "ongoing discussions with United States regulators

regarding our Earn product,"[8] Celsius stopped offering the Earn Program with respect to new

deposits from non-accredited investors in the United States.[9] Instead, in those states where Celsius

was legally permitted to do so, Celsius offered a new "Custody" product to non-accredited

investors. As described in an April 11 Celsius blog post:

> **On April 15, 2022, Celsius will be launching a new Custody solution for users in the United States.** Custody will serve as the centerpiece of your home for crypto, providing a secure way to navigate across Celsius' products, including store, access, borrow, spend, earn and grow.
>
> **New transfers made by non-accredited investors in the United States will be held in their new Custody accounts and will not earn rewards.** Non-accredited investors can continue to swap, borrow, and transfer within their Custody accounts based on their local jurisdiction.[10]

      8.     A footnote to Celsius' announcement cautioned that "users in some US

jurisdictions will not have access to the Custody service at this point due to local licensing

requirements."[11] The Debtors' filings refer to those jurisdictions as the "**Prohibited States**"—that

---

[6] *See* Notice of Hearing, *available at* https://www.ssb.texas.gov/sites/default/files/2021-09/20210917_FINAL
_Celsius_NOH_js_signed.pdf.

[7] *See* Emergency Order to Cease and Desist, *available at* https://kfi.ky.gov/Documents/Celsius%20Network%
20LLC%202021AH00024.pdf.

[8] Important Celsius Update for our Users in the United States (the "**Celsius Update**"), *available at*
https://celsiusnetwork.medium.com/ important-celsius-update-to-our-us-clients-
6df471420cc7#:~:text=On%20April%2015%2C%202022%2C%20Celsius,%C2%B9 (accessed on August 24,
2022).

[9] Celsius advised customers that coins deposited prior to April 15, 2022 would be permitted to remain in the Earn
Rewards program and continue to earn rewards. *Id.*

[10] *Id.* (emphasis in original).

[11] *Id.*

is, states in which Celsius was prohibited from holding coins on behalf of customers because it lacked the necessary licenses to do so.

9.      Each of the Withhold Group members lives in a Prohibited State. See **Exhibit A**, Withhold Group Declarations, ¶ 3. On or about April 12, 2022, each of the Withhold Group members received an email from Celsius explaining that "[y]our Celsius account is currently not eligible for the new Custody solution and will have new limitations, due to regulatory requirements in your state. New transfers made by non-accredited investors in your state, will not be accepted in Celsius for you to use. You will need to withdraw any new coins from your account. Unless you are a verified accredited investor, you will not be able to access Celsius services including Buy, Swap, CelPay and Borrow until we are able to offer Custody in your state." *Id*. ¶ 5.

10.      After the "Custody solution" was implemented on April 15, 2022, members of the Withhold Group learned for the first time about a type of account with which none of them had previously been familiar: an account variously referred to as the "Withheld" or "Withhold" account ("**Withhold Account**"), which appeared without explanation in the Celsius app. *Id.*, ¶ 6.

11.      The creation of the Withhold Accounts actually predated the launch of the Custody program. *See Declaration of Oren Blonstein, Head of Innovation and Chief Compliance Officer of Celsius Network Limited, with Respect to Certain Phase I Issues Pursuant to the Joint Stipulation and Agreed Scheduling Order by and among the Debtors, the Committee, and the Ad Hoc Groups with Respect to the Custody and Withhold Issues* [Docket No. 1192] ("**Blonstein Declaration**"), ¶ 6. Prior to the implementation of the Debtors' Custody solution, "Withhold Accounts were used to track cryptocurrency transferred to the Celsius platform that were not eligible for any given service and not supported on the platform. For instance, if customers

(wherever located) transferred BNB coins (*i.e.,* the Binance token) to the Celsius platform, those transfers would be reflected in the customers' Withhold Accounts because that coin was not eligible for the Earn Program for any customer in the United States." *Id.*

12.     After Celsius stopped accepting new Earn Program deposits from U.S. customers who were not verified accredited investors, it also began using Withhold Accounts as a holding place for unauthorized transfers of coins from external wallets belonging to residents in the nine Prohibited States. "Due to the nature of cryptocurrency transfers on the blockchain, it was impossible to halt those transfers from residents of Prohibited States who already had a Celsius wallet address used to transfer cryptocurrency to Celsius' platform. . . . These circumstances led the Debtors to use 'withhold' accounts . . . **to keep such digital asset transfers distinct from assets relating to those in the Custody Program or the Earn Program**." *Id.* ¶ 5 (emphasis added).

13.     In addition to temporarily holding non-supported coins and unauthorized new deposits of coins, the Withhold Accounts were also used by Celsius for a third purpose: as a temporary waystation for coins after they were withdrawn from the Earn Rewards program on their way to being transferred to external wallets belonging to residents of Prohibited States. This was the context in which the Withhold Group members learned of the existence of Withhold Accounts. They discovered that in order to withdraw coins from Celsius after April 15, 2022, customers in Prohibited States could no longer transfer coins to an external wallet directly from the Earn Rewards account. Instead, coins first had to be withdrawn from Earn Rewards to a Withhold Account through an internal account transfer in the Celsius app, then transferred to an

external wallet from Withhold. *See* **Exhibit A**, Withhold Group Declarations ¶ 6.[12]

14.    As with transfers from external wallets to Withhold Accounts, the Debtors keep digital asset transfers from Earn Rewards to Withhold Accounts "distinct from assets relating to those in the Custody Program or the Earn Program." Although coins in Withhold Accounts (whether transferred from external wallets or from Earn Rewards) are not kept in a dedicated wallet on the Celsius platform, *see* Blonstein Declaration ¶ 7, transfers out of the Earn Rewards program and into Withhold Accounts are tracked with unique, 32-character transaction identifiers. *See* **Exhibit A**, Withhold Group Declarations, ¶ 7. The Debtors are able to verify, by type and amount of coin, all of the cryptocurrency that is allocated to the Withhold Accounts. Blonstein Declaration Ex. A.

15.    The Debtors also treat coins allocated to the Withhold Accounts very differently from coins designated for the Earn Program or Custody Accounts. Unlike coins in the Earn Program, coins in Withhold Accounts do not earn interest. *See* **Exhibit A**, Withhold Group Declarations ¶ 9 (coins stopped earning interest immediately upon transfer from the Earn Program to a Withhold Account). And, unlike coins in Custody Accounts, coins in Withhold Accounts cannot be used to repay loans,[13] to post as collateral, or to buy or swap for other coins. *Id.* ¶ 5.

16.    On June 12, 2022, Celsius froze all customer withdrawals (the "**Pause**"). *See Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 23], ¶ 14. The Pause continued through

---

[12] Similarly, if a customer in a non-Prohibited State had coins in the Earn Rewards program and wished to transfer them off of the Celsius platform, "the user first had to request a transfer from the Earn Program to the Custody Program. Only then could the customer withdraw digital assets from the platform." Blonstein Declaration ¶ 21.

[13] An Ad Hoc Group member with an outstanding loan that matured in October 2022 received an email from Celsius advising him that "[i]f you wish to repay and close a maturing loan, your payment must be made by a wire transfer of fiat currency (USD)." *See* **Exhibit A-1**, Declaration ¶ 11. Celsius did not give him the option to use cryptocurrency in, or transfer coins into, his Withhold Accounts to pay the loan.

the Debtors' bankruptcy filings on July 13, 2022 and is still in place today.

17.    At or around the time of the Pause, each member of the Withhold Group had removed cryptocurrency from the Earn Program by transferring them to their Withhold Accounts and were in the process of selecting or whitelisting external wallets to which those coins would be transferred, or had already initiated a transfer to an external wallet. **Exhibit A**, Withhold Group Declarations, ¶ 8. One of the Withhold Group members initiated a transfer to an external wallet on June 12 that appears as a "confirmed" transfer on the transaction activity report downloaded from Celsius. **Exhibit A-12**, Declaration ¶ 8. However, as a result of the Pause, the Withhold Group members' coins were frozen in the Withhold Accounts, or else were stuck in "Pending" status and subsequently returned to the Withhold Accounts by Celsius in October 2022. *Id.*; *see also* Blonstein Declaration ¶¶ 24-25.

18.    Notwithstanding Celsius' lack of the licenses required to provide custody services in the Prohibited States, Celsius has held the coins in the Withhold Accounts on behalf of customers since the Pause. *See* Custody and Withhold Motion ¶ 30 ("Withhold Assets are held by the Debtors on behalf of customers and are not property of the Debtors' estates.").

**B.    There are no agreed contractual terms between Celsius and the Withhold Group members with respect to coins in the Withhold Accounts.**

19.    Celsius was only able to acquire rights to customers' coins if, and solely to the extent that, customers agreed to grant Celsius such rights. To the extent that Withhold Group members contractually granted Celsius rights in or title to their cryptocurrency,[14] Celsius' Terms

---

[14] To be clear, the Withhold Group members do not concede that Celsius actually acquired any legitimate property interest in or rights to coins that they deposited in the Earn Program.

of Use[15] make it clear that such grant was limited to the time that the coins were part of the Earn Program. *See, e.g.,* Terms of Use,[16] § 4.D ("If our Earn Service is available to you, upon your election, you will lend your Eligible Digital Assets to Celsius and grant Celsius all rights and title to such Digital Assets, for Celsius to use in its sole discretion **while using the Earn Service**.") (emphasis added); *id.* § 13 ("In consideration for the Rewards payable to you on the Eligible Digital Assets using the Earn Service, for us entering into any Loan Agreement, and the use of our Services, you grant Celsius, subject to applicable law and **for the duration of the period during which you elect to utilize the Eligible Digital Assets in the Earn Service** . . . all right and title to such Eligible Digital Assets. . . .") (emphasis added).

20.     The period during which the Withhold Group members "elect[ed] to utilize the Eligible Digital Assets in the Earn Service" terminated when they transferred them out of the Earn Program and into the Withhold Accounts. Because any grant of right to and title to Celsius was, by the terms of the contract, effective only while customers used the Earn Service, the transfer of coins out of the Earn Program terminated that contractual grant.

21.     Coins in the Withhold Accounts are not subject to any agreed terms of use between depositors and Celsius. In fact, neither the current nor any prior iteration of the Terms of Use makes any reference to Withhold Accounts at all. *See* Docket No. 393. Under the Terms of Use, customers who withdrew coins from Earn and transferred them to *Custody* Accounts authorized Celsius to transfer the customers' cryptocurrency to a third party custodian without further notice or consent; agreed that Celsius could suspend customer access to Custody Accounts

---

[15] For purposes of this analysis, the Withhold Group assumes that the operative Terms of Use (if any) were those in effect at the time that they withdrew their coins from the Earn Program and transferred them to their Withhold Accounts.

[16] The Terms of Use are attached as Exhibit A-8 to the *Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, Providing Terms of Use Dating Back to February 18, 2018* [Docket No. 393].

in the event of market disruptions or volatility; consented to the transfer of assets out of their

Custody Accounts for use in other Celsius services such as Swap, CelPay and Borrow; and granted

Celsius the right to set off cryptocurrency in a Custody Wallet against any obligations the customer

might have to Celsius. *See* Terms of Use ¶ 4.B. By contrast, customers granted Celsius no such

rights with respect to coins in the Withhold Accounts.

22.    Celsius has admitted its lack of interest in coins in the Withhold Accounts.

As stated in the Custody and Withhold Motion, "the Debtors have never claimed or acquired an

equitable interest in the cryptocurrency stored in Withhold Accounts. Thus, . . . Withhold Assets

are held by the Debtors on behalf of customers and are not property of the Debtors' estates. Such

assets are owned in the first instance by the respective customers." Custody and Withhold Motion

¶ 30.

**C.    At all relevant times, Celsius has held far more of each type of coin than the number of such coins transferred by the Withhold Group members to the Withhold Accounts.**

23.    The coins in the Withhold Accounts that belong to the Withhold Group

members (by type, number and value, on an aggregate basis),[17] are shown in the table below,

together with the value of such types of coins currently held by the Debtors:

---

[17] *See* Celsius Network LLC Schedules of Assets and Liabilities [Docket No. 974]. Note that the Debtors explain that "[d]ue to the voluminous nature of this data, amounts held in custody and/or withhold accounts are listed alongside amounts held in earn accounts on Schedule F. For the avoidance of doubt, the listing of such amounts on Schedule F is purely for clerical simplicity and efficiency, and does not amount to an assertion that such amounts are general unsecured claims or property of the estate pursuant to section 541 of the Bankruptcy Code." *Global Notes and Statement of Limitations, Methodology and Disclaimers Regarding the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs* [Docket No. 974] (the "**Global Notes**"), at 6.

| Coin[18] | Number Owned by the Withhold Group | Value ($USD) Owned by the Withhold Group[19] | Value ($USD) Held by the Debtors[20] |
|---|---|---|---|
| ADA | 1,347.31773153 | $577.59 | $100,000.00 |
| AAVE | 105.597994972054 | $8,181.74 | $200,000.00 |
| BTC | 45.52236645 | $908,515.36 | $181,700,000.00 |
| ETH | 156.3099052 | $211,305.98 | $11,300,000.00 |
| LINK | 12873.54551 | $98,320.42 | $22,000,000.00 |
| LTC | 89.213213991632 | $4,772.91 | $5,300,000.00 |
| MATIC | 20,937.9719765684 | $17,443.42 | $6,400,000.00 |
| SOL | 71.076084679142 | $2,369.68 | $100,000.00 |
| USDC | 67492.22665 | $67,491.42 | $3,100,000.00 |

24.     Upon information and belief, at no point, from the time that the Withhold Group members transferred their coins into the Withhold Accounts until now, have the Debtors' balances of any of the listed coins fallen below the amounts belonging to the Withhold Group members.

## III.    ARGUMENT

### A.    The Withhold Group members' coins in the Withhold Accounts are not property of the estate.

#### 1.    Any contractual grant to Celsius of rights or title to coins terminated when the Withhold Group members withdrew the coins from the Earn Program.

---

[18] Certain of the Withhold Group members also hold very small amounts of MANA and SNX coins, with a total aggregate value of less than $65 as of October 7. These coins are part of the "Other Coins" referenced in the Debtors' coin reports. While the Debtors have not provided publicly-available information regarding their holdings of MANA and SNX, the Withhold Group believes that it will be able to demonstrate at the hearing that such holdings far exceed the number of such coins that belong to Withhold Group members.

[19] For ease of comparison with the Debtors' most recent coin report, dated as of October 7, 2022 [Docket No. 1111], these values are calculated using the opening price for each coin type as of that date, as reflected on Yahoo! Finance. *See* https://finance.yahoo.com/crypto/.

[20] *See* Docket No. 1111. These values exclude coins held in the Custody Wallets.

25.     The Withhold Group agrees with the Debtors that, in order to determine the ownership of cryptocurrency that was withdrawn from the Earn Program and transferred into Withhold Accounts, "the Court should first examine the Debtors' and customers' intent in connection with these assets, as reflected in the Latest Terms of Use. . . ." Custody and Withhold Motion ¶ 25. Specifically, ownership and title "should be determined by the parties' respective contractual rights, as articulated in the Latest Terms of Use." *Id.* ¶ 27.

26.     The Debtors correctly note that, in questions of property ownership, courts generally "look to the intent of the parties as evidenced in a written agreement." *Id.* (citing, *inter alia*, *Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010)). Here, the intent of the parties is clear and unambiguous: customers' grant of rights and title to their digital assets lasts **only** "for the duration of the period during which [the customer] elect[s] to utilize the Eligible Digital Assets in the Earn Service." Terms of Use ¶ 13; *see also id.* ¶ 4.D. That period of utilization—and the Withhold Group members' grant of rights and title to Celsius—ended when the Withhold Group members transferred their digital assets out of the Earn Program and into the Withhold Accounts. For its part, Celsius recognized that those transfers changed its relationship to the coins, as evidenced by the fact that it immediately stopped accruing or paying interest on them once the coins were no longer part of the Earn Program. **Exhibit A**, Withhold Group Declarations, ¶ 9.

27.     Consistent with the fact that Celsius' right and title terminated when coins were moved from the Earn Program to the Withhold Accounts, Celsius has admitted that "[w]ith respect to the Withhold Assets"—a term defined by Celsius to include digital assets transferred from the Earn Program to a Withhold Account[21]—"**the Debtors have never claimed or acquired**

---

[21] *See* Custody and Withhold Motion ¶ 5.

**an equitable interest in the cryptocurrency stored in Withhold Accounts**." Custody and

Withhold Motion ¶ 30 (emphasis added). This statement is binding on Celsius as a judicial

admission. Judicial admissions "are formal concessions in the pleadings in the case . . . that have

the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the

fact." *Hoodho v. Holder*, 558 F.3d 184, 191 (2d Cir. 2009). Statements other than pleadings,

including those made by attorneys in briefs, also bind the client as judicial admissions. *See Purgess

v. Sharrock*, 33 F.3d 134, 144 (2d Cir. 1994). "When a party makes a judicial admission, that party

'normally is bound [by that admission] throughout the course of the proceeding.' " *Hausler v. JP

Morgan Chase Bank, N.A.*, 127 F. Supp. 3d 17, 37 (S.D.N.Y. 2015) (alteration in original; citation

omitted).

28.     In the Global Notes to their schedules of assets and liabilities, the Debtors

reiterated their position that, as a contractual matter, the Withhold Assets belong to the account

holders and not to the estates: "[T]he Debtors have taken the position that, consistent with the

applicable terms of use, certain other cryptocurrency held on the Debtors' platform, such as those

coins held in 'custody' or 'withhold' accounts, is not property of the Debtors' estate pursuant to

section 541 of the Bankruptcy Code." The Debtors' intent with respect to the status of the Withhold

Accounts under the Terms of Use could not be clearer.

29.     Accordingly, pursuant to the unambiguous language of the Terms of Use

and Celsius' own admissions, all right and title to the coins at issue reverted to the Withhold Group

members when they removed those coins from the Earn Program and transferred them to the

Withhold Accounts.

30.     Where a debtor has lost legal and equitable interests in property prior to the

petition date, that property does not become property of the estate upon the bankruptcy filing—

even if the debtor still retains possession of the property. *In re Rodgers*, 333 F.3d 64, 69 (2d Cir. 2003); *see also Lyon v. Contech Constr. Prods., Inc. (In re Computrex, Inc.)*, 403 F.3d 807, 812-13 (6th Cir. 2005) (holding that where a debtor had only a possessory interest in funds, such funds were not property of the estate); *In re Munroe*, 183 B.R. 667, 669 (Bankr. D.R.I. 1995) ("There is hardly any question that an entity which has no legal or equitable interest in the property and has nothing more but a bare possession has no interest which qualified to be the 'properties of the estate.'") (internal quotation marks and citation omitted).

31.     Accordingly, Celsius is—as it has admitted—merely holding the Withhold Assets on behalf of customers such as members of the Withhold Group, and "[s]uch assets are owned in the first instance by the respective customers." *See* Custody and Withhold Motion ¶ 30.

**2.     The fact that Celsius did not maintain a dedicated "Withhold" wallet does not transform Withhold Group members' assets into property of the estate.**

32.     The Withhold Group anticipates that the Committee will argue that the Withhold Assets are property of the estates because they were commingled with other coins in Celsius' Aggregator Wallets. As an initial matter, it is not clear that "commingling" in the traditional sense is applicable here. The Debtors' Chief Compliance Officer testified in his declaration that Celsius was able to use the Withhold Accounts, with respect to unauthorized new deposits in the Prohibited States, "to keep such digital asset transfers distinct from assets relating to those in the Custody Program or the Earn Program." Blonstein Declaration ¶ 5. If new deposits were kept "distinct from assets relating to those in the Custody or the Earn Program" by putting them into the Withhold Accounts, it follows logically that *any* transfers into the Withhold Accounts likewise were kept "distinct," particularly given the regulatory concerns driving the use of the Withhold Accounts in the first place. Furthermore, the transaction activity reports show that Celsius tracked every transfer to the Withhold Accounts with a unique, 32-character identifier.

**Exhibit A**, Withhold Group Declarations, ¶ 7. The Debtors' ability to keep digital asset transfers

into Withhold Accounts distinct from other assets (even without a separate wallet) and their use of

unique transaction identifiers undermines the idea that coins in the Withhold Accounts were

actually, or fully, commingled with other assets.

33.    Even if the Court were to find that coins in the Withhold Accounts were

commingled, that does not mean that the Withhold Group members' assets thereby became

property of the Debtors' estates. Section 541(d) of the Bankruptcy Code provides, in relevant part:

> (d) Property in which the debtor holds, as of the commencement of the
> case, only legal title and not an equitable interest . . . becomes property
> of the estate under subsection (a)(1) or (2) of this section only to the
> extent of the debtor's legal title to such property, but not to the extent of
> any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d).

34.    "Thus, courts have concluded that property which a debtor holds in trust

(express or constructive) for another does not become property of the estate when the debtor files

for bankruptcy." *In re Edison Bros., Inc.*, 243 B.R. 231, 235 (Bankr. D. Del. 2000) (citing *In re

Columbia Gas Systems, Inc.,* 997 F.2d 1039, 1059 (3d Cir.1993)) ("Congress clearly intended the

exclusion created by section 541(d) to include not only funds held in express trust, but also funds

held in constructive trust"); *see also In re Flanagan,* 503 F.3d 171, 180 (2d Cir.2007) ("The effect

of a constructive trust in bankruptcy is profound. While the bankrupt estate is defined very broadly

under § 541(a)(1) of the Bankruptcy Code to include all legal or equitable interests of the debtor,

any property that the debtor holds in constructive trust for another is excluded from the estate

pursuant to § 541(d)....").

35.    As this Court has explained,

> In determining whether to impose a constructive trust on property within
> the debtor's possession, the Court must look to state law. . . . Generally,
> New York law requires four elements for a constructive trust: (i) a

confidential or fiduciary relationship; (ii) a promise, express or implied; (iii) a transfer of the subject *res* made in reliance on that promise; and (iv) unjust enrichment (the most important of the four elements). . . . Nonetheless, "[a]lthough these factors provide important guideposts, the constructive trust doctrine is equitable in nature and should not be 'rigidly limited.'" . . . . "New York courts have consistently stressed the need to apply the doctrine with sufficient flexibility to prevent unjust enrichment in a wide range of circumstances," and "the absence of any one factor will not itself defeat the imposition of a constructive trust when otherwise required by equity."

*In re Dewey & Leboeuf LLP*, 493 B.R. 421, 431-32 (Bankr. S.D.N.Y. 2013) (Glenn, J.) (citations omitted).

36.     The New York Court of Appeals has expressly stated that a person wrongfully acquiring property can be treated as a constructive trustee notwithstanding the lack of a fiduciary relationship. *See Simonds v. Simonds*, 380 N.E.2d 189, 194 (NY 1978). Relying on *Simonds*, the Second Circuit has "found that the fourth element is the most important because 'the purpose of the constructive trust is prevention of unjust enrichment.'" *In re Grubb & Ellis Co.*, No. 12-10685 MG, 2012 WL 1036071, at *6 (Bankr. S.D.N.Y. Mar. 27, 2012) (Glenn, J.), *aff'd*, 523 B.R. 423 (S.D.N.Y. 2014) (quoting *In re First Cent. Fin. Corp.*, 377 F.3d 209, 212 (2d Cir. 2004).

37.     "Under New York law, to recover for unjust enrichment, the plaintiff must establish that (1) the defendant was enriched; (2) the enrichment was at the plaintiff's expense; and (3) equity and good conscience require restitution." *In re Moyer Grp., Inc.*, 586 B.R. 401, 408–09 (Bankr. S.D.N.Y. 2018) (Glenn, J.) (citations omitted).[22] "Unjust enrichment, however, does not

---

[22] Some of the Withhold Group members reside in Prohibited States other than New York. To the extent the laws of other states apply with respect to unjust enrichment, it is a distinction largely without a difference, as each of those states' laws regarding unjust enrichment are substantially similar to New York's. *See, e.g., Vertex, Inc. v. City of Waterbury*, 898 A.2d 178, 190 (Conn. 2006); *Baker v. Maclay Properties Co.*, 648 S.2d 888, 897 (La. 1995); *Kanne v. Visa U.S.A. Inc.*, 723 N.W.2d 293, 302 (Neb. 2006); *Butler v. Butler*, 768 S.E.2d 332, 336 (N.C. Ct. App. 2015); *FedEx Corp. Servs., Inc. v. Heat Surge, LLC*, 131 N.E.3d 397, 401 (Ohio Ct. App. 2019).

require the performance of any wrongful act by the one enriched. ... What is required, generally, is that a party hold property under such circumstances that in equity and good conscience he ought not to retain it." *Simonds,* 380 N.E.2d at 194.

38.    Here, Celsius was unjustly enriched when—without any contractual right to do so, and in the admitted absence of any equitable interest in the coins—it wrongfully retained the Withhold Group members' cryptocurrency. Once the Withhold Group members terminated their "loans" to Celsius and withdrew their coins from the Earn Program, no contract existed between the Withhold Group members and Celsius with respect to those coins. Celsius had no more contractual right to do anything with the coins in Withhold Accounts than it did with coins that had actually been transferred to external wallets.

39.    To the extent that Celsius has continued to hold, use, commingle, stake, or hypothecate coins in which it held no right or title, its actions not only constitute conversion of the Withhold Group members' property,[23] but also violate state law or regulations in the Prohibited States. For example, New York prohibits any person from engaging "in any virtual currency business activity" without a license. *See* 23 CRR-NY 200.3. "Virtual currency business activity" is defined to include, among other things, "storing, holding, or maintaining custody or control of virtual currency on behalf of others." 23 CRR-NY 200.2(q)(2). Celsius, which does not have a New York virtual currency license (also known as a BitLicense),[24] is violating New York

---

[23] A claim for conversion exists where "the defendant acted without authorization, defendant exercised dominion or right of ownership over property belonging to the plaintiff, plaintiff has made a demand for the property, and that demand has been refused." *Lagemann v. Spence,* 2020 WL 5754800, at *10 (S.D.N.Y. May 18, 2020), *report and recommendation adopted,* 2020 WL 7384009 (S.D.N.Y. Dec. 16, 2020) (citation omitted). Conversion claims apply to cryptocurrency. *Id.*

[24] *See* Regulated Entities (Updated: October 17, 2022), *available at* https://www.dfs.ny.gov/virtual_currency _businesses.

regulation by storing, holding, and maintaining control of cryptocurrency on behalf of the Withhold Group members. Celsius is similarly violating laws or regulations in the other Prohibited States.

40.     In equity and good conscience, Celsius ought not to retain the Withhold Group members' property under these circumstances.

41.     In addition to Celsius' unjust enrichment, there was an implied promise by Celsius that, once coins were removed from the Earn Program and no longer subject to any agreed contractual terms between Celsius and the Withhold Group members, Celsius would respect the Withhold Group members' property rights. Celsius instead blatantly violated those rights and denied the Withhold Group members access to their property—even though customers with Withhold Accounts, unlike those with Custody Accounts, never granted Celsius the contractual right to suspend customer access their accounts in the event of market disruptions or volatility. Accordingly, the Withhold Group members' coins in the Withhold Accounts are subject to a constructive trust.

42.     Constructive trust property that is commingled with a debtor's assets does not become property of the estate where the trust funds can be identified or traced. *In re Schick*, 234 B.R. 337, 343 (Bankr. S.D.N.Y. 1999). The fact that the trust *res* has been commingled with other funds in an account does not prevent tracing, *"*but it requires the court to adopt a special procedure to determine which of the fungible funds in the account are traceable as part of the alleged trust *res*. When a bankrupt debtor is acting as trustee of a constructive trust and money held in trust has been commingled with other funds, the so-called 'intermediate balance rule' may be applied to determine how much money the beneficiary can actually recover." *In re Drexel Burnham Lambert Grp., Inc.*, 142 B.R. 633, 637 (S.D.N.Y. 1992). Under the intermediate balance

rule, "[t]he bankruptcy court will follow the trust funds and decree restitution where the amount

of the deposit has at all times since the intermingling of funds equaled or exceeded the amount of

the trust funds." *Id.* (quoting 4 King, *Collier on Bankruptcy* ¶ 541.13, at 541–79–541–80 (15th ed.

1992).

43.    As shown above, the amount of coins currently held by Celsius (excluding

those in the Custody Wallet) exceeds the amount of the Withhold Group's trust fund, on a coin-

by-coin basis, by orders of magnitude. And while the Withhold Group is still awaiting detailed

historical information from the Debtors regarding coins held by Celsius, the Withhold Group

believes that that information will show that those totals *always* equaled or exceeded the amount

of the trust funds.[25]

### 3.    The Preference Limitation and Loan Limitation are not valid bases for denying customers access to their own property.

44.    The Withhold Group is generally supportive of the Debtors' Custody and

Withhold Motion, and object only to the imposition of the Preference Limitation and Loan

Limitation.

#### a.    The Preference Limitation is an improper attempt by the Debtors to obtain pre-suit attachment of the Withhold Group's assets.

45.    In their Custody and Withhold Motion, the Debtors suggest that they should

be able to continue to hold coins that they concede are not property of the estate, because doing so

is necessary to enable the Debtors "to effectively pursue preference actions where colorable claims

exist." Custody and Withhold Motion ¶ 35. In doing so, the Debtors have conflated the ability to

---

[25] Although the Withhold Group members are only asserting their own rights and interests, they also anticipate that historical data will show that the amount of coins held by Celsius always equaled or exceeded the total amount of coins in *all* Withhold Accounts.

pursue preference actions with the ease of collection.

46.     Pursuant to the Scheduling Order, during Phase I, the parties agreed that "the absence of a pending action for preference or other claims against the Custody and Withhold claimants will not constitute either a basis for the Court to rule in the Ad Hoc Groups' favor." Scheduling Order at 5. The parties further agreed that "all inferences regarding the existence, validity, and merit of preference or other claims against the Custody and Withhold claimants will be drawn in favor of the Debtors' estates." *Id.* Accordingly, the Withhold Group will analyze the Debtors' right—or lack thereof—to obtain pre-judgment attachment *as though* (i) there were adversary proceedings pending against the members of the Withhold Group, and (ii) those adversary proceedings were certain to be successful.[26]

47.     Under Rule 64 of the Federal Rules of Civil Procedure, "every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment." Fed. R. Civ. P. 64(a). However, even assuming the existence of meritorious claims against members of the Withhold Group, the Debtors would still have to meet the high bar for pre-judgment attachment of the Withhold Group's assets.

48.     In order to obtain a pre-judgment attachment under New York law, a plaintiff must show, by affidavit or other written evidence, that: (1) the plaintiff has a cause of action for a money judgment; (2) it is probable that the plaintiff's claim will succeed on the merits; (3) one or more grounds for attachment provided under New York law exist; and (4) the amount demanded from the defendant exceeds all counterclaims known to the plaintiff. *See* NY CPLR § 6212; *Owens v. Taliban*, 2022 WL 1090618, at *2 (S.D.N.Y. Apr. 11, 2022).

---

[26] The Withhold Group believes that it has valid affirmative defenses that constitute a complete shield to any preference claims that the Debtors might bring, and will assert those defenses, if necessary, in Phase II. *See* Scheduling Order at 6.

49.    Satisfaction of the statutory criteria is not a guarantee that a court will issue an order of attachment. *TAGC Mgmt., LLC v. Lehman*, 842 F. Supp. 2d 575, 586 (S.D.N.Y. 2012). "[S]uch relief is discretionary, and since attachment is a harsh remedy, the court must exercise care in its application." *Musket Corp. v. PDVSA Petroleo S.A.,* 512 F.Supp.2d 155, 160 (S.D.N.Y.2007). Furthermore, "attachment under New York law solely for security purposes is appropriate only when it appears likely that a plaintiff will have difficulty enforcing a judgment." *TAGC*, 842 F. Supp. 2d at 586-87 (quoting *Katz Agency, Inc. v. The Evening News Association,* 514 F.Supp. 423, 429 (S.D.N.Y.1981)).

50.    Here, while the first two elements are deemed to be met for purposes of Phase I solely due to the stipulations in the Scheduling Order, the Debtors have not shown and cannot show that they can meet the last two elements and thus are not entitled to pre-judgment attachment of the Withhold Group members' property.

**(1)    The Debtors have no grounds for attachment under New York law.**

51.    Section 6201 of the New York CPLR provides, in relevant part,[27] that an order of attachment may be granted where "(1) the defendant is a nondomiciliary residing without the state, or is a foreign corporation not qualified to do business in the state; or (2) the defendant resides or is domiciled in the state and cannot be personally served despite diligent efforts to do so; or (3) the defendant, with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts." NY CPLR § 6201. However, non-domiciliary status is not sufficient ground for granting an attachment

---

[27] The other bases listed in the statute involve claims brought by victims of crimes and claims for recognition or domestication of orders of other courts, and are plainly not applicable.

"[w]here ... jurisdiction over the defendant is conceded and attachment is sought only to secure a judgment." *Moran v. Arcano,* 1990 WL 96761, at \*2 (S.D.N.Y. July 3, 1990). Rather, the inquiry in that case focuses on "whether petitioner's fear that the judgment will not be satisfied is reasonable." *Id.*

52.    Here, the Debtors have not and cannot make any showing that (i) any member of the Withhold Group has tried to avoid personal service, (ii) any member of the Withhold Group is fraudulently trying to hide assets from the Debtors, or (iii) there is any reasonable basis to fear that a judgment against any member of the Withhold Group will not be satisfied. These are the facts that the Debtors must demonstrate as to each and every individual member of the Withhold Group whose assets its seeks to attach, and it has not even attempted to do so in the Custody and Withhold Motion.

53.    Of course, it would be more *convenient* for the Debtors to have the Withhold Group's property under their control for payment of a future judgment. But the Court cannot order the attachment of the Withhold Group's assets for the Debtors' mere convenience; the Withhold Group members are entitled to the protection of the legal standard under New York law before they can be deprived of their property.

> **(2)    The Debtors cannot show that the amounts (hypothetically) demanded from the Withhold Group members exceed all counterclaims known to the Debtors.**

54.    As described above, the Withhold Group members have claims against the Debtors for unjust enrichment. They may have claims for damages for conversion arising out of the nearly five-month period that the Debtors have wrongfully exercised dominion and control over the Withhold Group members' property. They may have claims against the Debtors for fraud, as suggested (often credibly) in many of the filings on the docket in these cases. The

Debtors themselves may be aware of other claims that the Withhold Group members have, based on facts known to the Debtors but not yet discovered by the Withhold Group members.

55.    The Debtors have not enumerated all of the potential counterclaims known to them, much less shown that any claims they have against the Withhold Group members would exceed the total of such counterclaims.

56.    Thus, the Debtors are not entitled to the extraordinary remedy of pre-judgment attachment of the Withhold Group members' assets, and the Preference Limitation provides no basis for the Debtors to continue to hold coins that are not property of the estate.

> ### b.    The Loan Limitation does not apply to the Withhold Group members' coins in the Withhold Accounts.

57.    The Debtors state in their Custody and Withhold Motion that they "need to consider the extent to which they may hold a right of setoff against obligations owed to customers, including the customers' obligation to repay loans under the Borrow Program." Custody and Withhold Motion ¶ 36. The Debtors further note that customers in the Borrow Program agreed to Loan Terms of Use that provide for a right of setoff "even as to certain Custody Assets." *Id.* ¶ 37. Specifically, the Loan Terms of Service provide that if a customer fails to make any repayment of principal when due, Celsius may "deduct from [the customer's] Celsius account any Eligible Stablecoins to recover [the customer's] repayment obligation in full or in part." *Id.* (quoting Terms of Use, Ex. B-9).

58.    As an initial matter, the Loan Limitation is largely irrelevant to the Withhold Group. Only one member of the Withhold Group has any loans outstanding under the Borrow Program[28]—and Celsius waived any right it may have had to set off loan obligations

---

[28] *See* **Exhibit A**, Withhold Group Declarations ¶ 11.

against Eligible Stablecoins in that individual's Withhold Accounts by instead demanding that he

pay the loan by wiring fiat currency. **Exhibit A-1**, Declaration ¶ 11. Celsius cannot have it both

ways: it cannot refuse to allow borrowers to pay off their loans using coins in Withhold

Accounts, while simultaneously refusing to release those coins in order to preserve a supposed

right of setoff.

59.     Furthermore, the Withhold Accounts are not part of a customer's Celsius

Account and are not subject to this provision of the Loan Terms of Service. The Terms of Use

define "Account" or "Celsius Account" to mean "a User's designated user account on the Celsius

website or mobile application, ***allowing a User to access and use the Services***. . . ." Terms of

Use ¶ 2 (emphasis added). As discussed above, the Withhold Accounts expressly and

intentionally did not "allow[] a User to access and use the Services" on Celsius' platform.

Celsius thus does not have a right to deduct Eligible Stablecoins from Withhold Accounts to pay

off loans. And even under its own argument, Celsius certainly does not have a right to deduct

any coins that are *not* "Eligible Stablecoins" from Withhold Accounts. Any coins in the

Withhold Accounts of the Withhold Group borrower that are not "Eligible Stablecoins" are

plainly cannot be subject to the Loan Limitation.

60.     Celsius' lack of setoff rights against Withhold Accounts is highlighted by

the general Terms of Use, which expressly provide for a setoff right against "any Digital Asset in

your Celsius Account, including any of your Digital Assets using the Custody Service (i.e., in a

Custody Wallet)," but make no similar statement with respect to coins being withheld in the

Withhold Accounts. *Id.* ¶ 9. Likewise, users of Custody Accounts agreed, under the Terms of

Use, that Celsius "retain[ed] the right to set-off any Eligible Digital Assets in a Custody Wallet

against any obligations" the Custody customer might have to Celsius. *Id.* ¶ 4.B. The Withhold

Group members did not agree to such set-off with respect to Withhold Accounts.

61.     Accordingly, even with respect to the single member of the Withhold
Group who has outstanding loans, the Loan Limitation is inapplicable.

> **c.     The Debtors may not continue to hold coins in Withhold Accounts "on behalf of customers" because they are not licensed to do so.**

62.     The primary reason that Withhold Accounts are used at all is that Celsius cannot "lawfully offer the Custody Program in nine states (the 'Prohibited States')," as it lacks the necessary licenses to do so. Custody and Withhold Motion ¶ 18; *see also* Celsius Update (stating that "users in some US jurisdictions will not have access to the Custody service at this point due to local licensing requirements").

63.     In other words, although coins landed temporarily in Withhold Accounts on their way to external wallets, Celsius did not and does not have the necessary licenses to continue to hold those coins in Prohibited States "on behalf of customers," as the Debtors concede they are doing. *See* Custody and Withhold Motion ¶ 30. Celsius' Custody and Withhold Motion in effect asks the Court to allow it to do an end-run around state laws and regulations, and to permit it to provide what amount to custody services for customers' property (though without the necessary custody protections) in states where it is expressly prohibited from doing so. Not only does this violate customers' property rights in their assets, it may expose the Debtors to state and/or federal regulator actions, fines and penalties.

IV.    **CONCLUSION**

        For the foregoing reasons, the Withhold Group respectfully requests that the Court

(i) enter an order (i) finding that the Withhold Group members' coins in the Withhold Accounts

are not property of the Debtors' estates, (ii) finding that the Debtors should not be allowed to

continue to hold the Withhold Group members' coins, (iii) overruling the Custody and Withhold

Motion solely to the extent of the Preference Limitation and Loan Limitation, and (iv) granting

such other relief as the Court deems just and proper.


                                      Respectfully submitted,

Dated: November 5, 2022             /s/ Deborah Kovsky-Apap
      New York, New York         **TROUTMAN PEPPER HAMILTON**
                               **SANDERS LLP**
                               Deborah Kovsky-Apap
                               875 Third Avenue
                               New York, New York 10022
                               Telephone: (212) 704-6000
                               Facsimile: (212) 704-6288
                               Email: deborah.kovsky@troutman.com

                               *Counsel to the Ad Hoc Group of*
                               *Withhold Account Holders*