**Hearing Date:** December 7-8, 2022 at 9:00 a.m. (prevailing Eastern Time)
**Response Deadline**: December 2, 2022 at 4:00 p.m. (prevailing Eastern Time)

**WHITE & CASE LLP**
David M. Turetsky
Keith H. Wofford
Samuel P. Hershey
Andrea Amulic
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email:  david.turetsky@whitecase.com
         kwofford@whitecase.com
         sam.hershey@whitecase.com
         andrea.amulic@whitecase.com

– and –

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
Email:  mandolina@whitecase.com
         gregory.pesce@whitecase.com

**WHITE & CASE LLP**
Aaron E. Colodny (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone: (213) 620-7700
Facsimile:  (213) 452-2329
Email:   aaron.colodny@whitecase.com

*Counsel to the Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' (A) OPENING BRIEF ON PHASE I CUSTODY AND WITHHOLD ISSUES AND (B) STATEMENT IN PARTIAL SUPPORT OF AND LIMITED OBJECTION TO DEBTORS' CUSTODY AND WITHHOLD MOTION**

---

[1]      The Debtors in these chapter 11 cases and the last four digits of their federal tax identification number are as follows: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ................................................................................................ 6

    A. Creation of Custody Program ........................................................ 6

    B. Coin Movement With Respect to the Custody Program................................ 9

    C. Coin Movement With Respect to Withhold Accounts ................................ 12

    D. Custody Balances Before and After the Pause ............................................ 13

    E. Procedural History.................................................................................. 14

ARGUMENT...................................................................................................... 17

I.   Assets Held in Custody Wallets Are not Property of the Debtors' Estates ......... 17

    A. The April 14, 2022 Terms of Use Clearly Provide that Custody
       Account Holders Retain Title to Assets in Custody Wallets ........................ 17

    B. Custody Assets Were Segregated in Separate Custody Wallets .................. 18

II.  Assets Corresponding to Balances Associated with Withhold Accounts
    Are Likely Property of the Debtors' Estates........................................................ 20

    A. The April 14, 2022 Terms of Use Do Not Provide That Withhold
       Account Holders Have Title to Assets Corresponding to Balances
       Associated with Withhold Accounts............................................................ 21

    B. Celsius did not Segregate Assets Corresponding to Balances
       Associated with Withhold Accounts, and Deployed Such Assets
       in the Course of its Operations ................................................................... 22

III. The Court Should Not Compel the Debtors to Distribute Assets While
    the Debtors' Presumptively Valid Claims Against Those Assets Remain
    to Be Adjudicated............................................................................................. 25

    A. The April 14, 2022 Terms of Use Provide That Celsius May Retain
       Assets Pending Legal Processes or Suspend Access to Accounts
       for Any Reason........................................................................................... 26

    B. Requiring the Debtors to Distribute Assets that Are Subject to
       Presumptively Valid Claims Would Be Wasteful, Inefficient and
       Detrimental to the Estates ......................................................................... 28

IV. The Committee Supports the Relief Requested in the Debtors' Motion
    to the Extent it Applies to Assets Held in Custody Wallets .............................. 31

CONCLUSION................................................................................................... 34

# TABLE OF AUTHORITIES

## CASES

*AEI Life LLC v. Lincoln Benefit Life Co.*,
    892 F.3d 126 (2d Cir. 2018) .................................................................................7

*Benjamin v. Benjamin*, 482 N.Y.S. 2d 418 (2d Dep't 1984).......................................21

*Breed v. Ins. Co. of N. Am.*,
    46 N.Y.2d 351, 385 N.E.2d 1280 (1978) ...........................................................18

*Citibank, N.A. v. Werner.*
    113 Misc. 2d 748 (Sup. Ct. N.Y. Cnty. 1981) ....................................................23

*Citizens Bank v. Strumpf,*
    516 U.S. 16 (1995)......................................................................................27, 28

*Giddens v. 344 Individuals (In re Lehman Bros. Inc.)*,
    574 B.R. 52 (Bankr. S.D.N.Y. 2017),
    *aff'd*, No. 17-6246, 2018 U.S. Dist. LEXIS 166806 (S.D.N.Y. Sept. 26, 2018),
    *aff'd*, 792 F. App'x 16 (2d Cir. 2019) .................................................................17

*In re Rochester Drug Coop., Inc.*,
    2020 Bankr. LEXIS 1960 (Bankr. W.D.N.Y. July 24, 2020).................................30

*In re Westchester Ave. Marina Realty, Inc.*,
    124 B.R. 161 (Bankr. S.D.N.Y. 1991) ................................................................30

*Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*,
    595 F.3d 458 (2d Cir. 2010) .............................................................................17

*Metro. Life Ins. Co. v. RJR Nabisco, Inc.*,
    906 F.2d 884 (2d Cir. 1990) .............................................................................18

*Photopaint Techs., LLC v. Smartlens Corp.*,
    335 F.3d 152 (2d Cir. 2003) .............................................................................18

*President and Dir. Of Manhattan Co. v. Morgan*, 192 N.Y.S. 239 (1st Dep't 1922) .................21

*ResCap Liquidating Tr. Mortg. Purchase Litig. V. HSBC Mortg. Corp. (US)
    (In re Residential Capital, LLC)*,
    524 B.R. 563 (Bankr. S.D.N.Y. 2015) ..................................................................7

## STATUTES AND OTHER AUTHORITY

11 U.S.C. § 105(a) .........................................................................................5, 30

11 U.S.C. § 362.............................................................................................5, 27

11 U.S.C. § 541 .................................................................................... 5, 14, 27, 29

28 U.S.C. § 157 ............................................................................................. 5

28 U.S.C. § 1334 ........................................................................................... 5

28 U.S.C. § 1408 ........................................................................................... 5

28 U.S.C. § 1409 ........................................................................................... 5

Fed. R. Bankr. P. 2002 ............................................................................... 34

## OTHER AUTHORITIES

Adam J. Levitin, NOT YOUR KEYS, NOT YOUR COINS: UNPRICED CREDIT RISK IN
    CRYPTOCURRENCY, 101 Tex. L. Rev. (forthcoming, 2022) ............................................ 30, 33

5 COLLIER ON BANKRUPTCY (Alan N. Resnick & Henry J. Sommer eds. 16th ed. 2022) ...... 27, 29

James Y. Stern, THE ESSENTIAL STRUCTURE OF PROPERTY LAW,
    115 Mich. L. Rev. 1167, 1175 (2017) ................................................................... 22

Law Commission, DIGITAL ASSETS CONSULTATION PAPER (Law Com No 256, 2022) .............. 33

The Official Committee of Unsecured Creditors (the "**Committee**"), appointed in the chapter 11 cases (the "**Chapter 11 Cases**") of the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**" or "**Celsius**"), by and through its undersigned counsel, hereby files this (a) opening brief (the "**Opening Brief**")[2] with respect to (i) whether assets in the Custody and Withhold Accounts are property of the Debtors' estates, including whether the April 14, 2022 Terms of Use are unambiguous on the issue of ownership of such assets; and (ii) if the assets are not property of the Debtors' estates, whether the Debtors should nonetheless be allowed to continue to hold those assets, and maintain the status quo, with respect to individuals and/or accounts where the Debtors have potentially viable claims, including, without limitation, preference claims (together, the "**Phase I Issues**") and (b) statement in partial support of and limited objection to the *Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to Reopen Withdrawals for Certain Customers with Respect to Certain Assets Held in the Custody Program and Withhold Accounts and (II) Granting Related Relief* [Docket No. 670] (the "**Debtors' Motion**"), and respectfully states as follows:

## Preliminary Statement

1.      There are, effectively, four questions presented at this stage of the proceedings: (i) whether assets corresponding to balances in Custody Accounts are property of the Debtors' estates, (ii) whether assets corresponding to balances associated with Withhold Accounts are property of the Debtors' estates, (iii) to the extent such assets are not property of the Debtors' estates, whether the Debtors can continue to possess those assets pending the adjudication of the

---

[2]      Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the *Declaration in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 23] (the "**Mashinsky Declaration**") or the *Declaration of Oren Blonstein, Head of Innovation and Chief Compliance Officer of Celsius Network Limited, with Respect to Certain Phase I Issues Pursuant to the Joint Stipulation and the Agreed Scheduling Order by and among the Debtors, the Committee, and the Ad Hoc Groups with Respect to the Custody and Withhold Issues* [Docket No. 1192] (the "**Blonstein Declaration**"), as applicable.

Debtors' presumptively valid claims against Account Holders, and (iv) whether the Debtors should be allowed to immediately distribute certain assets to certain Custody Account Holders and Withhold Account Holders.

2.     As to the first question, digital assets held in the Custody Wallets are not property of the Debtors' estates.  The April 14, 2022 Terms of Use unambiguously provide that digital assets in the Custody Wallets are the Account Holders' property and not the Debtors' property. The Debtors maintained separate Custody Wallets in which they set aside digital assets that were intended to track, in the aggregate, customer balances in accounts within the Custody Program (the "**Custody Accounts**" and, such holders, the "**Custody Account Holders**").[3]  To the extent needed to satisfy customer entitlements with respect to their Custody Accounts, the digital assets held in Custody Wallets are generally not subject to competing claims of other Account Holders and are not property of the estate.[4]  It appears, however, that the Debtors did not accurately track and account for Custody assets in the periods before and after the Pause.  As a result, there are now approximately $15 million fewer digital assets segregated in Custody Wallets than there are Custody obligations, as reported in the Debtors' ledger.  It is unclear what assets existed in Custody Wallets compared to Custody obligations on the Petition Date.

3.     As to the second question, the digital assets to which Withhold Account Holders may look to satisfy their entitlements are likely property of the Debtors' estates.  So-called "Withhold Accounts" (the "**Withhold Accounts**") were created as a way to track balances of Account Holders who were ineligible to participate in the Custody or Earn Programs or whose

---

[3]     Digital assets are not held in particular accounts, but rather "wallets," whereas "accounts" reflect Account Holders' balances on the Celsius platform.

[4]     As more fully described below, there may be preference or other claims against certain Custody Account Holders or such Custody Account Holders may otherwise have obligations to the Debtors.  In such instances, the Debtors and their estates may have competing rights to digital assets in the Custody Wallets.

deposits were not supported by Celsius' platform (such Account Holders, the "**Withhold Account Holders**").  There were no applicable terms of use for such Withhold Accounts, so there is no contractual support for the Withhold Account Holders' arguments that they have ownership interests in digital assets on the Debtors' platform (as opposed to claims against the Debtors). Unlike with the Custody Program, the Debtors did not establish separate wallets to hold assets that correspond to balances associated with Withhold Accounts.  Rather, based on the Declaration of Oren Blonstein, the digital assets that would be available to satisfy obligations associated with Withhold Accounts were used by the Debtors in the ordinary course of their business (*e.g.*, loaned, staked, rehypothecated, etc.) and now may be held in the Debtors' Aggregator Wallets, or may have been lost or spent on the Debtors' investments.  Those assets may be subject to the claims and interests of other creditors of the Debtors.  Account Holders that are owed obligations associated with Withhold Accounts would therefore have claims against the Debtors' estates.

4.      As to the third question, the Debtors should be allowed to retain possession of the digital assets held in Custody Wallets (or elsewhere) to maintain the status quo until the Debtors' presumptively valid claims are adjudicated or otherwise resolved.  The Debtors' estates have setoff and other rights with respect to the digital assets in Custody Wallets arising from such claims. Those rights are property of the estate and should not be destroyed by a premature distribution before claims are adjudicated.  Moreover, the April 14, 2022 Terms of Use plainly state that, if a legal action is commenced, the Debtors may refuse to permit withdrawals until that legal action is concluded.  For purposes of this Phase I, it is presumed that such legal action has been brought, and that it is valid.  Furthermore, courts regularly deny motions for relief from the automatic stay to recover assets that may be subject to preference claims so that the debtor may have time to evaluate whether to bring such claims.  As the Court has noted, that approach makes economic

3

sense: Assets should not be distributed if the estate may ultimately bring and prevail on an avoidance claim, only to find that the assets are no longer recoverable (or may be recoverable only with a costly collections process).

5.       That does not mean the Debtors have sought, or should seek, to hold on to digital assets in the Custody Wallets indefinitely, which leads to the fourth question: whether the Debtors should be granted authority to distribute digital assets that are not subject to potential preference or other claims.  The Committee supports distributing assets in the Custody Wallets to Custody Account Holders who are not subject to potential preference or other claims and, if permitted by the Court, will work with the Debtors to return a *pro rata* share of such digital assets (by cryptocurrency type) in Custody Wallets to such Custody Account Holders.[5]  That relief will return over $50 million worth of cryptocurrency (dollar figures as of August 29, 2022) to a majority of Custody Account Holders.[6]

6.       The second phase of the briefing in this matter will address the two primary defenses to a preference action, which (if necessary) will provide helpful data points regarding the merits of any potential preference action.  No party has brought a preference action against any Account Holder at this time.  And the Committee is open to the possibility of a global resolution of these issues that would obviate any need to litigate preference claims related to Custody assets. The Committee does, however, have a fiduciary duty to all unsecured creditors and must ensure

---

[5]      The Committee's support here is subject to the development of protections that are satisfactory to the Committee and that ensure that no distributions are made to Insiders, employees, or affiliates of Insiders (as defined in section 101 of the Bankruptcy Code) or employees that may have had inside information regarding the Debtors' financial issues.  Because there are no identifiable segregated assets associated with obligations related to Withhold Accounts, and the Debtors are not holding such Account Holders' property, assets should not be returned to Account Holders on account of such claims at this time.

[6]      For the avoidance of any doubt, the Committee does not, at this time, support a distribution of assets held outside of the Custody Wallets or a distribution of any assets to Withhold Account Holders.  The Committee believes that any such distributions should be subject to a further order of the Court (presumably in connection with a plan with respect to the Debtors) and after the rights of all other Account Holders (including in the Earn and Borrow Programs) have been determined.  To do otherwise would be to potentially threaten the rights of other Account Holders.

that the cryptocurrency and other assets held by the Debtors are equitably distributed.  The declaration filed by the Debtors and the shortfall in the Custody Wallets, both on the date of the Pause and today, raise concerns regarding the Debtors' books and records and the assets available to fully satisfy the Custody obligations.  By the same token, an Account Holder who transferred assets from the Earn Program or another program into the Custody Program during the days or weeks before the Pause should not receive undue preferential treatment over the vast majority of Account Holders who did not do so.  In light of these considerations, the Committee submits this brief to explain its position on some of the most important issues in these Chapter 11 Cases, preserve the legal entitlements of all Account Holders, and ensure that the Debtors' assets are distributed fairly and in accordance with the law.

## Jurisdiction and Venue

7.      The United States Bankruptcy Court for the Southern District of New York (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, entered February 1, 2012.  The Court has core authority pursuant to 28 U.S.C. § 157(b)(2)(A) to enter a final order with respect to this matter.  The Committee confirms its consent to the Court entering a final order in connection with the Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgment in connection herewith consistent with Article III of the United States Constitution.

8.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The bases for the relief requested herein are sections 105(a), 362, and 541 of title 11 of the United States Code (the "**Bankruptcy Code**").

## **Background**

### A.    **Creation of Custody Program**

10.    The Debtors' business was (and is) premised on individuals and entities ("**Account Holders**") transferring their digital assets to the Debtors.  Once Account Holders transferred digital assets to the Debtors, they could, among other things, earn rewards on such assets in the form of payment-in-kind interest or "CEL Tokens" (the Debtors' native cryptocurrency) (the "**Earn Program**") or borrow fiat or stablecoin loans collateralized by the transferred digital assets (the "**Borrow Program**").  Mashinsky Decl. ¶ 4.  The Debtors have taken the position that digital assets transferred by Account Holders to the Debtors for participation in the Earn and Borrow Programs are property of the Debtors' estates (Debtors' Mot. ¶ 27) and that such Account Holders have unsecured claims against the Debtors (*e.g.*, *Schedule of Assets and Liabilities for Celsius Network, LLC*, No. 22-90164 [Docket No. 974], Sch. F-1 ("**Debtors' Schedule E/F**").  Certain Account Holders have asserted that digital assets transferred to the Earn and Borrow Programs are their property.[7]

11.    On September 17, 2021, the New Jersey Bureau of Securities entered a *Summary Cease and Desist Order* (the "**NJ Order**") with respect to the Debtors which, among other things, prohibited the Debtors from offering the Earn Program to unaccredited investors in the United States.  *Summary Cease and Desist Order*, Celsius Network, LLC (State of New Jersey Bureau of Securities, Sept. 17, 2021), available at https://www.nj.gov/oag/newsreleases21/Celsius-Order-9.17.21.pdf.  Thereafter, other state and federal regulatory bodies launched investigations of the Debtors.

---

[7]    *See, e.g.*, *Omnibus Objection to Court Filings Taking Positions on which Coins are Customer Property, D.R. Nos. 855, 737, 760, and 662* [Docket No. 954]; *Letter from Lindsey Derence* [Docket No. 333]; *Letter from L. Anne Yeilding* [Docket No. 475].

12.     On April 14, 2022, in response to, among other things, the NJ Order, Celsius created a program for Account Holders based in the United States, under which Celsius held assets as a custodian for those Account Holders (the "**Custody Program**").  Blonstein Decl. ¶¶ 4, 15.  The Custody Program was not available to Account Holders residing in nine states (the "**Prohibited States**") or countries other than the United States.  Blonstein Decl. ¶ 5; Debtors' Mot. ¶ 18.  The Committee understands that applicable state regulations prohibited Celsius from offering Custody services in those states without additional licenses.

13.     After April 15, 2022, the day the Custody Program was launched, Account Holders based in the United States and not residing in one of the Prohibited States "were automatically enrolled in the Custody Program."  *Id.* ¶ 15.  Following that date, Celsius did not permit non-accredited U.S. investors to transfer digital assets to the Earn Program.  *Id.*  Digital assets transferred by non-accredited U.S. investors into the Earn Program before April 15, 2022 were permitted to remain in the Earn Program.  *Id.*

14.     The rights and obligations of Celsius and the Custody Account Holders with respect to assets in the Custody Program are governed by the terms of use regarding that program and New York law.[8]  The Debtors amended their terms of use on April 14, 2022 to reflect the creation of the Custody Program.  *See Decl. of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC Providing Terms of Use Dating Back to February 18, 2018* [Docket No. 393], Ex. A-8 (the "**April 14, 2022 Terms of Use**") .[9]  The April 14, 2022 Terms of Use address the Custody Program

---

[8]     The April 14, 2022 Terms of Use provide that New York law shall govern.  April 14, 2022 Terms of Use ¶ 33.  Courts in the Second Circuit have held that "a contractual choice-of-law provision is generally binding on a party claiming rights under a contract."  *In re Residential Capital, LLC*, 524 B.R. 563, 595 (Bankr. S.D.N.Y. 2015); *see also AEI Life LLC v. Lincoln Benefit Life Co.*, 892 F.3d 126, 132 (2d Cir. 2018) ("Under New York law, courts will generally enforce choice-of-law clauses, because contracts should be interpreted so as to effectuate the parties' intent.") (internal citations omitted).

[9]     The April 14, 2022 Terms of Use appear to have been subsequently updated on September 29, 2022.  *See* https://celsius.network/terms-of-use (last visited Nov. 3, 2022).  The provisions discussed in this Opening Brief with

(as well as the Earn and Borrow Programs), but do not explicitly address Withhold Accounts.  *See generally* April 14, 2022 Terms of Use; *see also* Debtors' Mot. ¶ 18 n.16.

15.     With respect to digital assets in the Custody Program, the April 14, 2022 Terms of Use provide that:

> [t]itle to any of your Eligible Digital Assets in a Custody Wallet shall at all times remain with you and not transfer to Celsius. Celsius will not transfer, sell, loan or otherwise rehypothecate Eligible Digital Assets held in a Custody Wallet unless specifically instructed by you, except as required by valid court order, competent regulatory agency, government agency or applicable law.

April 14, 2022 Terms of Use ¶ 4(B).  "Custody Wallet" is defined as "a Virtual Wallet where all Eligible Digital Assets held therein are custodial assets maintained either by us or by a third party institution or other entity selected by Celsius."  *Id.* at 527.  "Virtual Wallet" is defined to mean an "on-Blockchain virtual address in which digital assets can be held and transferred."  *Id.* at 528.

16.     The April 14, 2022 Terms of Use provide that "[e]ligible Digital Assets held in a Custody Wallet are subject to the other provisions of these Terms, unless where expressly stated otherwise."  *Id.* at 534.  Paragraph 24 of the April 14, 2022 Terms of Use entitled "Legal Process Affecting Celsius Account," states that:

> If any legal action, such as an attachment, garnishment, levy, seizure, third party claim or enforcement action by any competent authority in any jurisdiction ("**Legal Process**") is brought against or in connection with your Celsius Account, we may refuse to permit (or may limit) withdrawals or transfers from your Celsius Account until the Legal Process is satisfied or dismissed.

April 14, 2022 Terms of Use ¶ 24.  That paragraph also provides that, in all instances, Celsius has first rights to assets in the accounts.  *Id.*  Custody Accounts are not excluded from paragraph 24. The April 14, 2022 Terms of Use further state that Celsius has "the right to suspend, freeze or

_____

respect to the Custody and Withhold Accounts appear to be identical to such terms in the April 14, 2022 Terms of Use.

close your Celsius Account at any time for any reason without advance notice, including by blocking your access to the Celsius Account or the Services." *Id.* ¶ 19.

17.    The April 14, 2022 Terms of Use provide the Debtors with a right of setoff against digital assets held in Custody Wallets:

> We also may take or set off from any Digital Asset in your Celsius Account, including any of your Digital Assets using the Custody Service (i.e., in a Custody Wallet), or deduct from any obligations Celsius may have to you, any direct, indirect, and acquired Obligations[10] that you owe us or our Affiliates.  These rights are in addition to other rights we may have to take, transfer, or charge from any assets or balance in your Celsius Account for Obligations you owe us or our Affiliates pursuant to these Terms.

*Id.* ¶ 9.

18.    Finally, the April 14, 2022 Terms of Use state that:

> Celsius does not make any representation as to the likely treatment of the Digital Assets in your Celsius Account, including those in a Custody Wallet, in the event that you, Celsius or any Third Party Custodian becomes subject to an insolvency proceeding whether in the U.S. or in any other jurisdiction.  You explicitly understand and acknowledge that the treatment of Digital Assets in the event of such an insolvency proceeding is unsettled, not guaranteed, and may result in a number of outcomes that are impossible to predict reliably, including, but not limited to you being treated as an unsecured creditor and/or the total loss of any and all Digital Assets reflected in your Celsius Account, including those in a Celsius Wallet.

*Id.* ¶ 4(B).

## B.    Coin Movement With Respect to the Custody Program[11]

19.    Digital assets transferred to Celsius from Account Holders' external wallets were initially received in customer-specific bridge wallets at Celsius (the "**Customer Associated**

---

[10]    "Obligations" are defined as "debts, amounts owed, or liabilities incurred to us or any of our Affiliates by you or any of your Authorized Representatives, if any."  April 14, 2022 Terms of Use ¶ 9.

[11]    A schematic illustrating the Committee's simplified understanding of the flow of coins between wallets is attached hereto as **Exhibit A**.

**Wallets**"). *Id.* ¶ 8. Digital assets were then swept into Celsius's main aggregator/omnibus wallets (the "**Aggregator Wallets**")[12] at periodic intervals and commingled with all other digital assets held by Celsius in those wallets. *Id.* ¶¶ 8, 17. Celsius tracked Account Holders' Custody Account balances on a ledger that accounted for increases and decreases in an Account Holder's Custody Account balance based on the Account Holder's activity. *Id.* ¶ 8. The Debtors took steps to maintain digital assets corresponding to Custody Account balances in segregated wallets that only held, and have only ever held, Custody assets (the "**Custody Wallets**"). *Id.* ¶¶ 4, 8.[13] The Company would periodically transfer digital assets to or from Custody Wallets to match the aggregate amounts of cryptocurrency balances in Custody Accounts, as reported on the Company's ledger. *Id.* ¶¶ 12-13.[14]

20. The Committee understands that, following the creation of the Custody Program, digital assets transferred by Account Holders to Celsius, regardless of whether the Account Holders intended to transfer such assets into the Custody, Earn, or Borrow Programs, would first be reflected as balances in the Account Holders' Custody Accounts. Accredited Account Holders in the United States could then transfer digital assets to the Earn Program. *Id.* ¶ 5. Account Holders with digital assets in the Earn Program could also transfer such assets to the Custody Program, provided that they did not reside in Prohibited States. *Id.* For Account Holders in the United States, withdrawals could be executed only through the Custody Program. *Id.* ¶ 21.[15] In other

---

[12]    Celsius maintained separate aggregator/omnibus wallets for different types of cryptocurrency. Blonstein Decl. ¶ 17.

[13]    The wallets used as Custody Wallets were pre-existing wallets that had remained largely unused, and were designated in early 2022 to be used for the Custody Program. Blonstein Decl. ¶¶ 4, 8.

[14]    No assets held in Custody Wallets were pledged as loan collateral. *Id.* ¶ 9. If an Account Holder wished to pledge digital assets as collateral for a loan, the amount of such collateral would be deducted from that Account Holder's Custody Account balance, and a corresponding amount of digital assets would be transferred from the Custody Wallets, if necessary, on an aggregate basis. *Id.*

[15]    The Committee understands that in certain circumstances international Account Holders were able to directly withdraw digital assets from Earn accounts.

words, to make withdrawals from Earn accounts, Account Holders had to *first* request to transfer balances from their Earn accounts to their Custody Accounts on the Celsius app and *then* request withdrawals of digital assets corresponding to such balances to their external wallets. *Id.* Celsius recorded such transfer and withdrawal requests on its ledger. *Id.* ¶¶ 8, 21.

21.    Even though Account Holders in the United States were required to first request transfers of balances from their Earn accounts to their Custody Accounts before withdrawing digital assets to an external wallet, it does not appear that digital assets always moved to Custody Wallets before being withdrawn. Blonstein Decl. ¶ 21. Rather, withdrawals would most often be sourced from Frictional Wallets and Aggregator Wallets, not Custody Wallets, and aggregate Custody Wallet holdings were reconciled with Custody Account balances during the periodic re-balancing process. *Id.* ¶ 21.

22.    Withdrawal requests were processed automatically unless (a) Celsius identified anti-money laundering, security, or fraud concerns, (b) an Account Holder's aggregate withdrawals in a single day exceeded a certain threshold, or (c) Celsius did not have sufficient assets in its automated Frictional Wallets to process the amount of requested withdrawals, in which case it would move digital assets from Aggregator Wallets or unwind deployment activities to meet the amount of digital assets to be withdrawn. *Id.* ¶¶ 12, 20.

23.    Celsius "would be able to draw upon digital assets from the Aggregator Wallets or the coin-specific Custody Wallets (first passing through the Aggregator Wallets) to be used on the platform, solely to the extent it was consistent with the internal ledger as to the amount of digital assets to be held as Custody assets." *Id.* ¶ 18. Assets in Aggregator Wallets, or excess assets in Custody Wallets, could also be used for Celsius's business needs, including to be deployed. *Id.*

C. **Coin Movement With Respect to Withhold Accounts**

24.     Because of the nature of the blockchain, the Debtors could not prevent Account Holders with Celsius accounts from transferring digital assets to Celsius.  *Id.* ¶ 5.  However, just because Account Holders transferred digital assets to Celsius did not mean that Celsius agreed to (or even could) handle the digital assets in the way that those Account Holders intended.  For example, Celsius did not offer Custody services in the Prohibited States.  *Id.* ¶ 5.  It also prohibited non-accredited investors in the United States from transferring assets to the Earn Program after April 14, 2022.  *Id.* ¶ 15.  It also did not support a number of cryptocurrency coins on its platform. *Id.* ¶ 6.

25.     Once digital assets that Celsius could not accept for any of the reasons described above were transferred to Celsius, Celsius noted that balances corresponding to those assets would be associated with Withhold Accounts.  *Id.*  Mr. Blonstein describes that the Withhold Account designation was used to "keep such digital asset transfers distinct from assets relating to those in the Custody Program or the Earn Program."  *Id.*  As Mr. Blonstein acknowledges, however, the term "'Withhold Wallet' is a misnomer."  *Id.* ¶ 7.  Celsius did not segregate digital assets that were associated with Withhold Accounts into separate wallets.  *Id.* ¶¶ 7, 14.  Nor does it appear from Mr. Blonstein's declaration that digital assets corresponding to balances associated with Withhold Accounts were kept in Customer Associated Wallets.  *Id.*  Rather, the Committee understands that digital assets associated with Withhold Accounts were swept into the Aggregator Wallets, commingled with all other assets in the Aggregator Wallets, and used by Celsius as if the assets had been transferred to the Earn Program.  *Id.* ¶¶ 7, 10 (describing assets corresponding to balances associated with Withhold Accounts as being "used across Celsius' platform along with other digital assets transferred to Celsius's platform" and "not treated differently than other digital assets transferred to Celsius' platform.").

26.     The Committee understands that, upon designation of a Withhold Account, Celsius sent an automated email to the user with digital assets corresponding to balances associated with that account, directing the user to withdraw digital assets corresponding to balances associated with that account as soon as possible. *Ad Hoc Group of Withhold Account Holders' Motion for Relief from the Automatic Stay* [Docket No. 737] (the "**Withhold Lift Stay Motion**"), ¶¶ 12, 16. Account Holders were not able to transfer digital assets corresponding to balances associated with Withhold Accounts to any Celsius program, pledge such assets as collateral, or earn interest on such assets. *Id.* ¶¶ 10, 12, 16.

### D.     Custody Balances Before and After the Pause

27.     Celsius "Paused" all withdrawals on June 12, 2022 (the "**Pause Date**"). Mashinsky Decl. ¶ 14. Between June 3, 2022 and June 13, 2022, Custody obligations increased from $156,865,889 to $216,074,037. *See* Blonstein Decl., Ex. A. On June 13, 2022, Custody obligations exceeded digital assets held in Custody Wallets by $68,717,044. *Id.* After the Pause Date, Custody obligations and assets held in Custody Wallets continued to fluctuate. On June 20, 2022, assets held in Custody Wallets had decreased to $137,577,456 and Custody obligations decreased to $205,258,115 (a shortfall of $67,680,659). *Id.* Mr. Blonstein testified that this mismatch of assets and liabilities was "due to, among other things, the quantum of transactions leading up to the Pause and the manual nature of the reconciliation process in which assets were rebalanced on a periodic basis." *Id.* at ¶ 7 n.7. Celsius transferred digital assets to Custody Wallets to address that mismatch after the Pause. *Id.* However, as of October 21, 2022, there remained a $15 million mismatch. *Id.*[16]

---

[16]     It is unclear if the USD figures referenced above are using the market prices as of the date of the report or some date around the execution of the Blonstein Declaration. The Committee presumes that the $15 mismatch detailed in the Blonstein Declaration was present on the Petition Date and has not changed since that date; however, that is not confirmed by Mr. Blonstein.

28.     As noted above, withdrawing digital assets from Celsius's platform required Account Holders to, as a first step, request to transfer the balances corresponding to the assets they sought to withdraw from their Earn accounts to their Custody Accounts.   According to Mr. Blonstein, as of the Pause Date, 55 requests to withdraw digital assets in the Custody Program or corresponding to balances associated with Withhold Accounts had not been completed.  Blonstein Decl. ¶ 24.  Those requests were cancelled by Celsius on or before October 5, 2022, the Custody and Withhold Account balances were adjusted to reflect such cancellation, and a corresponding balance was added to relevant Account Holders' originating accounts.  *Id.*  Accordingly, as of October 25, 2022, the Committee understands that there were no digital assets segregated as a step in an unsuccessful attempt to withdraw assets from the Celsius platform.  *Id.* ¶ 23.

E.     **Procedural History**

29.     On August 31, 2022, the Ad Hoc Group of Custodial Account Holders (the "**Custody Ad Hoc Group**") filed a complaint against the Debtors seeking a declaratory judgment that "digital assets transferred into the Custody service are property of the Custody Account Holders and not property of the estate pursuant to section 541 of the Bankruptcy Code."  *Ad Hoc Grp. Of Custodial Account Holders v. Celsius Network, LLC et al.*, Adv. Pro. 22-01142 [Adv. Pro. Docket No. 1][17] at 23 (Aug. 31, 2022) (the "**Complaint**" and, such adversary proceeding, the "**Custody Adversary Proceeding**").  The Custody Ad Hoc Group also asserted that "[t]he Debtors should be required to permit withdrawals of Custody Assets in accordance with the Terms of Use."  *Id.* ¶ 62.  The Committee intervened in the Custody Adversary Proceeding on September 20, 2022. Adv. Pro. Docket No. 6.

---

[17]     References to "Adv. Pro. Docket No." refer to docket entries in the Custody Adversary Proceeding.

30.    On September 1, 2022, the Debtors filed the Debtors' Motion, seeking to permit Account Holders who (a) transferred assets directly to the Custody program from external wallets (*i.e.*, not from the Earn or Borrow programs) (the "**Pure Custody Users**"), (b) transferred assets directly onto the Celsius platform, while residing in a Prohibited State, from external wallets (*i.e.*, not from the Earn or Borrow programs) (the "**Pure Withhold Users**"), and (c) transferred assets to the Custody or Withhold programs, or onto the Celsius platform while residing in a Prohibited State, in an aggregate amount less than $7,575 per user (the "**Statutory Cap**") to withdraw such assets.  Debtors' Mot. ¶¶ 4-5.  The Debtors' Motion does not seek to permit the release of (i) any assets to any current or former employee, insider, or affiliate of any current or former employee or insider or (ii) any customer with an outstanding loan.  *Id.* ¶ 6.

31.    On September 7, 2022, the Ad Hoc Group of Withhold Account Holders (the "**Withhold Ad Hoc Group**" and, together with the Custody Ad Hoc Group, the "**Ad Hoc Groups**") filed the Withhold Lift Stay Motion requesting that the Debtors reopen withdrawals for members of the Withhold Ad Hoc Group with respect to all of their assets corresponding to balances associated with Withhold Accounts.

32.    Following the filing of the Debtors' Motion, Custody Adversary Proceeding and Withhold Lift Stay Motion, the Debtors, the Committee, and the Ad Hoc Groups engaged in extensive discussions regarding a unified process by which the issues raised in the various motions and proceedings could be resolved.  The parties reached agreement, and on October 13, 2022, the Court entered the *Joint Stipulation and Scheduling Order By and Among the Debtors, the Committee, and the Ad Hoc Groups with Respect to Custody and Withhold Issues* [Docket No. 1044] (the "**Scheduling Stipulation**").  The Scheduling Stipulation divided the Custody and Withhold issues into two phases of briefing.  The legal issues for briefing in Phase I are as follows:

a.  Whether assets in the Custody and Withhold accounts are property of the Debtors' estates, including whether the [April 14, 2022] Terms of Use are unambiguous on the issues of ownership of such assets; and

b.  If the assets are not property of the Debtors' estates, whether the Debtors should nonetheless be allowed to continue to hold those assets, and maintain the status quo, with respect to individuals and/or accounts where the Debtors have potentially viable claims, including, without limitation, preference claims.

Scheduling Stip. ¶ 5. The opening briefs filed in Phase I may include objections to the Debtors' Motion, and the deadline for such objections is coterminous with the deadline to file opening briefs. *Id.* ¶ 7. The Debtors' motion will be heard together with the Phase I issues. *Id.* Deadlines to respond to the Complaint and Withhold Lift Stay Motion are adjourned pending resolution of the Custody and Withhold issues. *Id.* ¶¶ 3-4.

33.      The Parties agreed, and the Court ordered, that, during Phase I:

a.  The burden on the Parties on the Phase I Issues shall not be changed by the Phase I briefing format and the burden on the Parties shall be the same as if both of the Ad Hoc Groups had commenced actions through adversary proceedings;

b.  All inferences regarding the existence, validity, and merit of preference or other claims against the Custody and Withhold claimants will be drawn in favor of the Debtors' estates;

c.  The absence of a pending action for preference or other claims against the Custody and Withhold claimants will not constitute either a basis for the Court to rule in the Ad Hoc Groups' favor or waiver by the Debtors' estates of the right (or any party asserting rights on behalf of the estates, including, without limitation, the Debtors, the Committee, or a trust) to bring such claims; and

d.  The Court will not be asked to adjudicate the rights of any of the Debtors' other customers as part of Phase I and, for the avoidance of doubt, the rights of Earn and Borrow customers are fully reserved.

Scheduling Stip. ¶ 8.

34.      Phase II of the briefing will address the applicability of certain defenses to potential preference actions with respect to assets transferred from the Earn and Borrow programs to the

Custody program, or to Aggregator Wallets to be associated with Withhold Accounts.  Scheduling Stip. ¶ 10.

## Argument

### I.    Assets Held in Custody Wallets Are not Property of the Debtors' Estates

35.    Pursuant to the plain and unambiguous language of the April 14, 2022 Terms of Use, Custody Account Holders have an exclusive property interests (corresponding to their respective Custody Account balances) in digital assets held in Custody Wallets.  The April 14, 2022 Terms of Use explicitly provide that title to assets in the Custody Wallets remains with Custody Account Holders, notwithstanding the Account Holders' transfer of those assets to the Custody Program.  April 14, 2022 Terms of Use ¶ 4(B).  The digital assets held in Custody Wallets are segregated from all other assets held on the Celsius platform, and are not used for Celsius's business purposes.  Blonstein Decl. ¶¶ 4, 8.  The digital assets held in Custody Wallets are therefore not property of the Debtors' estates (except to the extent of any claims the Debtors or their estates may have against Custody Account Holders or any surplus of digital assets in Custody Wallets which exceeds the entitlements of Custody Account Holders).

### A.    The April 14, 2022 Terms of Use Clearly Provide that Custody Account Holders Retain Title to Assets in the Custody Program

36.    Where the terms of a contract are unambiguous, courts will give effect to their plain meanings.  *Giddens v. 344 Individuals (In re Lehman Bros.)*, 574 B.R. 52, 57 (Bankr. S.D.N.Y. 2017) ("Where an agreement is unambiguous, a court is to enforce the contract according to its plain terms."), *aff'd*, No. 17-6246, 2018 U.S. Dist. LEXIS 166806 (S.D.N.Y. Sept. 26, 2018), *aff'd*, 792 F. App'x 16 (2d Cir. 2019); *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467–68 (2d Cir. 2010).  Courts have held that "contract language is unambiguous if it has a 'definite and precise meaning, unattended by danger of misconception in the purport of the

[contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'"

*Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990) (citing *Breed v. Ins.*

*Co. of N. Am.*, 46 N.Y.2d 351, 355, 385 N.E.2d 1280, 1282 (1978)); *accord Photopaint Techs.,*

*LLC v. Smartlens Corp.*, 335 F.3d 152, 160 (2d Cir. 2003).

37.    Here, the April 14, 2022 Terms of Use clearly and unambiguously provide that

(i) Celsius will act as a custodian of assets in the Custody Wallets and (ii) title to those assets will

remain with the Custody Account Holders.  April 14, 2022 Terms of Use ¶ 4(B).  The April 14,

2022 Terms of Use state:

> When you use the Custody Service, you understand and agree that
> Celsius may act as the custodian or we may use a Third Party
> Custodian to provide the Custody Service . . . Title to any of your
> Eligible Digital Assets in a Custody Wallet shall at all times remain
> with you and not transfer to Celsius.  Celsius will not transfer, sell,
> loan or otherwise rehypothecate Eligible Digital Assets held in a
> Custody Wallet unless specifically instructed by you, except as
> required by valid court order, competent regulatory agency,
> government agency or applicable law.

April 14, 2022 Terms of Use ¶ 4(B).  All parties seem to agree that such language unambiguously

provides that Custody Account Holders retain title to assets in the Custody Wallets.  Debtors' Mot.

¶ 17 (citing April 14, 2022 Terms of Use ¶¶ 4(B), 13); Complaint at ¶¶ 44-45 (citing April 14,

2022 Terms of Use ¶ 4(B)).  The Committee agrees.

**B.    Custody Assets Were Segregated in Separate Custody Wallets**

38.    In addition to the unambiguous language in the April 14, 2022 Terms of Use, the

facts and circumstances of how the Debtors handled and maintained assets in the Custody Program

(as recounted by Mr. Blonstein) support the conclusion that digital assets in the Custody Wallets

are property of the Account Holders, not the estates.  Celsius held a pool of digital assets associated

with the Custody Program in separate Custody Wallets.  Blonstein Decl. ¶¶ 4, 8.  Celsius tracked

Account Holders' Custody Account balances on a ledger that accounted for increases and

decreases in balances based on Account Holders' activity. *Id.* ¶¶ 8, 17. Celsius would periodically reconcile aggregate Custody Account balances with aggregate assets held in the separate Custody Wallets. *Id.* ¶¶ 12-13. Upon Account Holder requests to transfer assets into or out of Custody Wallets, Celsius should have transferred (and, it appears, intended to transfer) coins in corresponding amounts into or out of the separate Custody Wallets to maintain the correct amounts therein on an aggregate basis. *Id.* ¶ 13. The Custody Account Holders are therefore the only parties with a property interest in the pool of assets held in the Custody Wallets.[18]

39.     Importantly, returning digital assets held in Custody Wallets to Custody Account Holders who are not subject to claims by (or other obligations to) the Debtors would not entail returning assets in which other parties may have ownership interests. The April 14, 2022 Terms of Use provide that Custody Account Holders' property interests are limited to digital assets actually held in Custody Wallets—their property interests do not extend to digital assets held elsewhere on the Celsius platform, including in the Aggregator Wallets. April 14, 2022 Terms of Use ¶ 4(B). If the Custody assets had not been segregated, the Debtors would not be entitled to return any digital assets in the Custody Program prior to determining the property interests of all parties in all assets, as other parties may have competing interests in a pool of assets that is insufficient to satisfy each interest. But, because Celsius segregated digital assets corresponding to Custody Account balances in Custody Wallets that were separate from other assets on the

---

[18]     This is subject to the previously noted exceptions that the Debtors and their estates may have competing rights with respect to such assets to the extent of any avoidance or other claims against Custody Account Holders or that assets in the Custody Wallets are greater than needed to satisfy the entitlements of Custody Account Holders (which appears to not be the case). Several parties may also have claims against or interests in digital assets held in Celsius's Aggregator Wallets, but that issue is not presently before the Court.

Celsius platform, and agreed that such assets would be the property of the Custody Account Holders, no other customer party[19] has ownership interests in assets held in the Custody Wallets.[20]

## II.    Assets Corresponding to Balances Associated with Withhold Accounts Are Property of the Debtors' Estates

40.    Prior to the formation of the Custody Program, Celsius used Withhold Accounts to track holdings of customers who sought to transfer digital assets that were not supported by the Celsius platform.  Blonstein Decl. ¶ 6.  Around the time of the formation of the Custody Program, Celsius also began to use Withhold Accounts to track account balances of unaccredited Account Holders residing in Prohibited States that had attempted to transfer digital assets to the Custody Program (whether from an Earn account or from an external wallet).   Blonstein Decl. ¶ 5. Accordingly, "Withheld Assets" may include, among other things, coins that Celsius did not support (*e.g.*, Binance tokens), digital assets that unaccredited Account Holders in the Prohibited States attempted to transfer to the Custody Program, or digital assets that Account Holders in the Prohibited States attempted to withdraw, but failed to withdraw or were prohibited from withdrawing, from the Celsius platform.  *Id.* ¶¶ 5-6

41.    Unlike with respect to assets associated with the Custody Program, there was no separate workspace or wallet for assets corresponding to balances associated with Withhold Accounts.  *Id.* ¶¶ 7, 10, 14.  Rather, the Committee understands that those assets were commingled with other Celsius assets in Aggregator Wallets and deployed in the course of Celsius's operations. *Id.*

---

[19]    To the extent that Custody Account Holders are subject to claims by (or other obligations to) the Debtors, there may be competing interests in those assets.

[20]    To be clear, the Committee's position is limited to digital assets actually held in Custody Wallets.  If the Court finds that Custody Account Holders have an ownership right in digital assets held outside of Custody Wallets, those assets should not be distributed to Custody Account Holders until the property interests, if any, of other parties in those assets is determined.

**A.** **The April 14, 2022 Terms of Use Do Not Provide That Withhold Account Holders Have Title to Assets Corresponding to Balances Associated with Withhold Accounts**

42.     "Withheld Assets" and Withhold Accounts are not mentioned in the April 14, 2022 Terms of Use and, accordingly, are not governed thereby.  *See generally* April 14, 2022 Terms of Use; *see also* Debtors' Mot. ¶ 18 n.16.  Unlike with respect to assets in the Custody Program, the April 14, 2022 Terms of Use do not provided that Account Holders with balances associated with Withhold Accounts have or retain title to assets corresponding to such balances.  *See generally* April 14, 2022 Terms of Use.  Accordingly, there is no contract providing that Withhold Account Holders have title to assets corresponding to balances in Withhold Accounts, notwithstanding that they transferred such assets to the Celsius platform.

43.     There is also no evidence of an intent to create a trust or custodial relationship between the Debtors and Account Holders with obligations associated with Withhold Accounts. Courts have found that, as a general rule, possession of property creates a rebuttable presumption of ownership.  *President and Dir. Of Manhattan Co. v. Morgan*, 192 N.Y.S. 239, 241 (1st Dep't 1922) ("Possession is *prima facie* evidence of ownership."); *Benjamin v. Benjamin*, 482 N.Y.S. 2d 418, 419 (2d Dep't 1984) (with respect to ownership of a winning lottery ticket, the court explained that "[a]s possessor of the winning lottery ticket, which is a bearer instrument, [defendant] is presumed to be the owner and the burden of rebutting this presumption is on plaintiff").  Account Holders with obligations associated with Withhold Accounts that transferred assets to the Debtors which the Debtors could not accept may be able to overcome that presumption and establish that they never intended to transfer legal title to the Debtors.  It is less likely that Account Holders with obligations associated with Withhold Accounts that may have previously transferred title to the Debtors in connection with the Earn Program can establish that, by electing to transfer their obligations from an Earn account to a Withhold Account, they regain or obtain that title.

21

**B.** **Celsius did not Segregate Assets Corresponding to Balances Associated with Withhold Accounts, and Deployed Such Assets in the Course of its Operations**

44.     Even if title to assets corresponding to balances associated with Withhold Accounts was determined to reside with the Withhold Account Holders, the Withhold Account Holders cannot point to any identifiable pool of digital assets that Celsius had set aside to correspond to those balances.  Any assets that may have initially corresponded to balances associated with Withhold Accounts have been commingled or deployed and, accordingly, cannot be returned to Withhold Account Holders.  If Withhold Account Holders do have a property interest in the digital assets transferred to the Debtors, they likely have a conversion claim against Celsius.

45.     As an initial matter, there are no "Withhold Wallets" in which Celsius set aside digital assets corresponding to the balances associated with Withhold Accounts, and there are no digital assets that correspond to balances associated with Withhold Accounts.  Instead, whatever digital assets that were associated with Withhold Accounts appear to have been pooled and commingled in the Debtors' Aggregator Wallets, together with other Celsius assets, and the Debtors used those assets.  Blonstein Decl. ¶¶ 7, 10, 14.  Accordingly, there is no separate pool of digital assets corresponding to balances associated with Withhold Accounts that was protected from interference by other parties.

46.     The only assets against which Withhold Account Holders may have claims are held in Aggregator Wallets, and those assets are also subject to the claims or other rights (including potentially rights of ownership) held by other Celsius Account Holders.  *See* Blonstein Decl. ¶¶ 7, 10, 14.  That Celsius did not take steps to segregate assets corresponding to balances associated with Withhold Accounts means that those assets are indistinguishable from assets in which other Account Holders may have property interests (*e.g.*, assets in the Earn Program) or other rights.  And multiple parties cannot have valid ownership of the same property.  James Y. Stern, THE

ESSENTIAL STRUCTURE OF PROPERTY LAW, 115 Mich. L. Rev. 1167, 1175 (2017).  To determine which digital assets, if any, the Withhold Account Holders have property interests in, the Court would have to determine the property interests of all parties (including Earn Account Holders) in those commingled assets.  That question is not before the Court at this time. [21]

47.    In fact, it would appear that assets corresponding to balances associated with Withhold Accounts were used and deployed by Celsius in the course of its operations, much like assets in the Earn Program.  Blonstein Decl. ¶¶ 7, 10, 14.  The Debtors are therefore unable to return those assets to Withhold Account Holders.  This scenario is analogous to that in *Citibank, N.A. v. Werner*.  113 Misc. 2d 748 (Sup. Ct. N.Y. Cnty. 1981).  In *Werner*, a bank had mistakenly credited the account of defendant with a deposit made by a different customer.  *Id.* at 749.  Defendant promptly spent the money that had been mistakenly credited to her account, such that her account balance dropped below the amount initially mistakenly credited.  *Id.*  The bank sued defendant for willful conversion, and the court granted summary judgment in favor of the bank, finding that the bank was entitled to restitution from defendant, who had obtained the money "unjustly, or without authority."  *Id.* at 750-51.

48.    Here, the Withhold Account Holders transferred assets to Celsius notwithstanding Celsius's inability to hold such assets.  Blonstein Decl. ¶¶ 7, 14.  Celsius then commingled, used, or deployed those assets in the course of its operations, and failed to segregate any assets corresponding to balances associated with Withhold Accounts anywhere on its Platform.  Blonstein Decl. ¶¶ 7, 10, 14.  Accordingly, there are no identifiable assets for Celsius to give back to Withhold Account Holders.  As in *Werner*, to the extent the assets are Account Holders'

---

[21]    The Committee does not here – or elsewhere – take any position at this time on the ownership or other rights that other Account Holders may have.  Those rights will be decided in separate proceedings before the Court.

property, Celsius seemingly used those assets, despite not being able to hold them.  The Withhold

Account Holders would likely have a conversion claim against Celsius on account thereof, and

have a claim for damages resulting from that conversion.[22]

49.    Celsius emailed users that had balances associated with Withhold Accounts

instructing such users to withdraw assets corresponding to such balances promptly.  Withhold Lift

Stay Motion ¶¶ 12, 26.  Presumably, some, but not all, Withhold Account Holders complied and

withdrew.  With respect to any Withhold Account Holders seeking relief on the basis that their

attempted withdrawals were not completed (whether because they transferred assets that were not

eligible for the Earn or Custody Programs or were unsuccessful in an attempt to withdraw prior to

the Pause), this Court has already denied similar attempts by creditors to jump to the front of the

line.  Specifically, it has rejected an Account Holder's motion to lift the automatic stay to retrieve

digital assets he unsuccessfully attempted to withdraw from the Celsius platform.  *Memorandum

Opinion and Order Sustaining Objections to Lift Stay Motion Filed by Daniel A. Frishberg*

[Docket No. 695].  The Court found that such Account Holders are general unsecured creditors

and share entitlements with other similarly-situated creditors.  *Id.* at 11-12.  The same analysis

applies here.  To the extent that Account Holders residing in Prohibited States attempted to

withdraw assets from the Earn Program, such that (i) those withdrawal requests were associated

with Withhold Accounts, and (ii) the withdrawals were not completed due to the Pause or the

imposition of the automatic stay, this Court should find that such Account Holders have claims

against the estate on account of such failed withdrawals.

---

[22]    The Debtors represent that they "never claimed or acquired an equitable interest" in the assets corresponding
to balances associated with Withhold Accounts.  Debtors' Mot. ¶ 30.  But, despite not claiming an interest in those
assets, the Debtors proceeded to hold, use, and deploy those assets in the same way they held, used, and deployed
assets to which they do claim title (*e.g.*, assets in the Earn Program), and now seem to say that they cannot identify
such assets.  Blonstein Decl. ¶¶ 7, 10, 14.

### III.   The Court Should Not Compel the Debtors to Distribute Assets While the Debtors' Presumptively Valid Claims Against Those Assets Remain to be Adjudicated

50.     In connection with negotiating the scheduling and scope of the Custody and Withhold disputes, the parties agreed, and the Court ordered, that (a) the Debtors would be deemed to have presumptively valid preference and other claims against Custody Account Holders and Withhold Account Holders, and (b) the burden with respect to Phase I issues would be as if each of the Ad Hoc Groups had commenced an adversary proceeding.  Scheduling Stip. ¶¶ 8-9.  The parties also agreed that the Debtors would not be prejudiced by not having filed preference or other actions.  *Id.*  The Debtors also have a right of setoff in digital assets held in Custody Wallets.  April 14, 2022 Terms of Use ¶ 9.  To the extent the Debtors possess digital assets of Account Holders against whom the Debtors have claims, the Debtors can look to those assets to satisfy such claims. *Id.*

51.     The Ad Hoc Groups have nevertheless demanded that the Debtors be required to distribute any digital assets not determined to be property of the estate, notwithstanding the existence of presumptively valid preference claims or other claims against Account Holders.  *See generally* Complaint, Withhold Lift Stay Motion.  The Committee believes that the Court's prior statements rejecting this argument were, and remain, correct.  Sept. 14, 2022 Hr'g Tr. 118:16-23 ("your client's not getting the money back until I decide whether the[re] are avoidable preferences. It's as simple as that . . . . Because whether it's a creditors' committee or post-confirmation trustee trying to chase 50,000 people who got money back and they're scattered around the world, that's not going to happen.").  To the extent the Court is inclined to hear argument on this issue notwithstanding its prior statements, the Court should deny this request.

A. **The April 14, 2022 Terms of Use Provide That Celsius May Retain Assets Pending Legal Processes, Set Off Against Assets Held in Custody Wallets, or Suspend Access to Accounts for Any Reason**

52.    The April 14, 2022 Terms of Use expressly state that Celsius may retain digital assets during the pendency of a legal process, exercise setoff rights against assets held in Custody Wallets, or suspend access to accounts for any reason.  Specifically, the April 14, 2022 Terms of Use provide that, "[i]f any legal action, such as an attachment, garnishment, levy, seizure, third party claim or enforcement action by any competent authority in any jurisdiction ("**Legal Process**") is brought against or in connection with your Celsius Account, we may refuse to permit (or may limit) withdrawals or transfers from your Celsius Account until the Legal Process is satisfied or dismissed."  April 14, 2022 Terms of Use ¶ 24.  Paragraph 24 of the April 14, 2022 Terms of Use also says that, in all instances, Celsius has first rights to digital assets in the accounts. *Id.*

53.    The April 14, 2022 Terms of Use also provide the Debtors with setoff rights against assets held in Custody Wallets (or otherwise held by the Debtors).  April 14, 2022 Terms of Use ¶ 9 ("We also may take or set off from any Digital Asset in your Celsius Account, including any of your Digital Assets using the Custody Service (i.e., in a Custody Wallet), or deduct from any obligations Celsius may have to you, any direct, indirect, and acquired Obligations that you owe us or our Affiliates.").

54.    The April 14, 2022 Terms of Use also state that Celsius can suspend access to the accounts for any reason.  April 14, 2022 Terms of Use ¶ 19 ("We have the right to suspend, freeze or close your Celsius Account at any time for any reason without advance notice, including by blocking your access to the Celsius Account or the Services.").

55.    As an initial matter, each of the present disputes, any avoidance action, any action with respect to any claim, and the chapter 11 cases more broadly, constitutes a "legal action," and

26

therefore a Legal Process, within the meaning of the April 14, 2022 Terms of Use.  Accordingly, the April 14, 2022 Terms of Use permit Celsius to retain digital assets in accounts on its platform. Moreover, the parties have stipulated (and the Court has ordered) that the present disputes would move forward as if they had been brought through an adversary proceeding, which is also a "legal action," and therefore a Legal Process, within the meaning of the April 14, 2022 Terms of Use. Scheduling Stip. ¶¶ 8, 15.

56.    The Debtors' presumptively valid claims against Custody Account Holders, and setoff and other rights against assets in the Custody Wallets under the April 14, 2022 Terms of Use, give rise to interests in those assets.  *See* April 14, 2022 Terms of Use ¶ 9.  As discussed herein, Celsius holds assets in Custody Wallets on behalf of Account Holders that do not reside in Prohibited States (*see supra* ¶ 13), and the April 14, 2022 Terms of Use clearly provide that Celsius may hold such assets as a custodian (*supra* ¶ 16) and may "take or set off" from digital assets held in Custody Wallets for any direct or indirect obligations owed by Account Holders (April 14, 2022 Terms of Use ¶ 9).  Celsius therefore has setoff rights and interests in, and claims against, those assets that are property of the Debtors' estates.  11 U.S.C. § 541(a); *see also* 5 COLLIER ON BANKRUPTCY ¶ 553.03[7][b] (Alan N. Resnick & Henry J. Sommer eds. 16th ed. 2022) ("**Collier**").  Accordingly, requiring the Debtors to distribute assets held in Custody Wallets prior to an adjudication of the Debtors' presumptively valid avoidance actions and other claims would destroy property of the estate in violation of the automatic stay.  11 U.S.C. § 362.

57.    In other circumstances, courts have recognized that non-debtor parties to a chapter 11 proceeding can institute administrative freezes to preserve rights against a debtor.  For instance, the Supreme Court has found that non-debtors can freeze payments to debtors to preserve setoff rights (*i.e.*, an administrative freeze).  *Citizens Bank v. Strumpf*, 516 U.S. 16, 21 (1995).  In

*Strumpf*, the Supreme Court found that, notwithstanding the automatic stay, a third-party bank was permitted to freeze a debtor's assets in order to preserve the bank's setoff rights. *Id.* at 21. It would make little sense for debtors to have fewer rights than third parties with respect to permitting administrative freezes.

**B.    Requiring the Debtors to Distribute Assets that Are Subject to Presumptively Valid Claims and Setoff Rights Would Be Wasteful, Inefficient and Detrimental to the Estates**

58.    Even if the April 14, 2022 Terms of Use did not permit Celsius to retain the subject digital assets—which they do—the Debtors should be allowed to retain possession of assets that are subject to presumptively valid claims and setoff rights. Requiring the Debtors to distribute those assets at this time, only to try to claw them back later if the Debtors' preference actions are successful, will (i) cause the estates to incur significant expenses in both the efforts to distribute assets and the efforts to claw them back, if necessary, (ii) create inefficiencies, as the Debtors may be distributing then clawing back the same assets, and (iii) potentially harm the estates and creditor recoveries by causing the Debtors to distribute assets that may be dissipated and they will never see again despite their valid claims against those assets.

59.    The Custody Ad Hoc Group has argued that, because the digital assets in the Custody Wallets are property of the Account Holders, all of those assets should be returned to the Account Holders notwithstanding the Debtors' valid claims against such Account Holders. Complaint ¶¶ 60-62; *see also* Scheduling Stip. ¶ 9.

60.    The case relied upon by the Custody Ad Hoc Group so far, *In re Colonial Realty Co.*, is factually and legally distinguishable from this case in material respects. When viewed in light of the facts at issue here, the reasoning in *Colonial Realty* favors the Debtors. Moreover, the portion of *Colonial Realty* that the Custody Ad Hoc Group relies on is not central to the court's holding in that case. In *Colonial Realty*, the court affirmed a district court finding that litigation

commenced by the Federal Deposit Insurance Corporation to recover assets that had been allegedly fraudulently conveyed by a debtor was subject to the automatic stay because it was an action taken against a debtor.  980 F.2d 125, 132 (2d Cir. 1992).  After reaching that dispositive holding, the *Colonial Realty* court also found that, although a cause of action to recover property that has been fraudulently transferred may belong to a debtor, the property itself is not property of the estate until it is recovered.  *Id.* at 131.  The *Colonial Realty* court reasoned that section 541(a)(3) of the Bankruptcy Code (which includes "[a]ny interest in property that the trustee recovers" as property of the estate) would be superfluous if property that is in the hands of a third party but subject to an avoidance action were found to be property of the estate under section 541(a)(1) (which includes "all legal or equitable interests of the debtor in property as of the commencement of the case" in the estate).  *Id.*  But the court's decision rested on its analysis of the automatic stay, not a determination as to whether assets subject to an avoidance action were property of the estate.  *Id.* at 132.

61.     The facts here are also distinguishable from those in *Colonial Realty*.  *Colonial Realty* addressed a situation in which assets had already been transferred away from the debtor's estate, such that the trustee would have needed to recover those assets to establish estate ownership thereof.  Here, on the other hand, the Debtors continue to possess the assets at issue and by virtue of that possession and their claims against Account Holders have, at the very least, an equitable or possessory interest with respect to such assets that is property of the estate.  11 U.S.C. § 541(a); Collier ¶ 541.03.  As noted above, the Debtors have even more than a possessory interest insofar as the Terms of Use provide for set off and other rights with respect to the digital assets in light of the claims of the Debtors and their estates.  *See supra* § III.A.  Moreover, the digital assets do not

need to be recovered from the estate at this time because they have not been distributed. The logic

of the *Colonial Realty* court therefore does not apply to this case.

62.     While the Custody Ad Hoc Group bears the burden of identifying appropriate

authority, the Committee believes that the facts at issue here are best informed by cases in which

courts have found that the existence of a potential preference action is a defense to a motion to lift

the automatic stay. *See, e.g.*, *In re Westchester Ave. Marina Realty, Inc.*, 124 B.R. 161, 166 (Bankr.

S.D.N.Y. 1991) (denying creditor's motion for relief from the automatic stay for, among other

reasons, allowing the debtors time to analyze and allege that a certain transaction is an avoidable

transfer); *In re Rochester Drug Coop., Inc.*, 2020 Bankr. LEXIS 1960, at *13-16 (Bankr. W.D.N.Y.

July 24, 2020) (denying movant's motion to lift the automatic stay to assert setoffs of unsecured

trade claims in defense of antitrust class actions because, among other reasons, a potential

preference existed and finding that, if the movant was allowed to proceed with its action it "would

directly interfere with the bankruptcy case and with the claims review process established by the

Code"). With respect to cryptocurrency specifically, Adam Levitin, a professor at Georgetown

University Law Center, has also observed that, "[i]f there are any concerns about the accuracy of

the estate's books and records or if the estate lacks sufficient cryptocurrency holdings to satisfy all

customer obligations, then the stay is unlikely to be lifted, even if the estate's interest is merely

possessory." Adam J. Levitin, NOT YOUR KEYS, NOT YOUR COINS: UNPRICED CREDIT RISK IN

CRYPTOCURRENCY, 101 Tex. L. Rev. (forthcoming, 2022), at 51.

63.     The Court's equitable authority under section 105(a) of the Bankruptcy Code

further supports permitting the Debtors to retain refrain from making distributions to Account

Holders against whom there are preference or other claims pending adjudication of those claims.

Requiring the Debtors to distribute assets to tens of thousands of Account Holders (including a

significant number of Account Holders not residing in the United States) that they may later need to recover would be wasteful, inefficient, and harmful to the Debtors' estates. Requiring the Debtors or an estate representative to unnecessarily retrieve digital assets from potentially thousands of Account Holders would add enormous expense and administrative burden. And there can be no assurance that the assets could be retrieved, as they may be dissipated during the intervening period. Such a course of action would therefore threaten to significantly diminish recoveries to the Debtors' creditors.

## IV. The Committee Supports the Relief Requested in the Debtors' Motion to the Extent it Applies to Assets Held in Custody Wallets

64.     The Debtors have requested authority to permit certain Account Holders to withdraw digital assets. *See generally* Debtors' Mot. The Debtors recognize that they may have colorable preference claims or other claims against Account Holders, including to recover digital assets transferred from the Earn or Borrow Programs into Custody Wallets, or into the Aggregator Wallets to correspond to balances associated with Withhold Accounts, during the 90 days preceding the Petition Date. Debtors' Mot. ¶ 4. Accordingly, by the Debtors' Motion, the Debtors request authority to distribute assets only to (i) Pure Custody Users, (ii) Pure Withhold Users, and (iii) Account Holders that transferred assets to the Custody program, or from Earn accounts to Withhold Account while residing in a Prohibited State after April 14, 2022, in an aggregate amount less than the Statutory Cap. *Id.* ¶¶ 5-6. The Debtors do not seek authority to release any assets to any current or former employee, insider, or affiliate of any current or former employee or insider. *Id.* ¶ 7. The Debtors will also not unfreeze any account held by a customer with an outstanding loan under the Borrow Program. *Id.*

65.     The Committee agrees with the Debtors' proposal to release digital assets held in the Custody Wallets to Pure Custody Users and Custody Account Holders that transferred assets

below the Statutory Cap, subject to certain clarifications.  As discussed in Section B hereof, digital assets corresponding to balances associated with Withhold Accounts are likely property of the estate.  *Supra* § B.  Accordingly, until those holders establish a property interest in an identifiable asset, the Committee objects to the release of any digital assets corresponding to balances associated with Withhold Accounts.

66.    The Debtors have committed to work with the Committee on a distribution schedule and methodology to ensure that insiders, employees, and their affiliates that potentially benefited from insider information are not preferred over other creditors, and have included consent rights for the Committee over distribution schedules in the proposed order they attached to the Debtors' Motion (the "**Debtors' Proposed Order**").  The Committee will work with the Debtors to propose certain changes to the Debtors' Proposed Order to clarify that commitment and ensure the Committee is able to provide effective oversight over the distribution of digital assets.

67.    The Debtors have represented that the Custody Wallets were short approximately $15 million as compared with balances in Custody Accounts as of October 21, 2022.  Blonstein Decl. ¶ 13 n.7.  The Debtors have also represented that they have recently unwound certain failed withdrawals.  *Id.* ¶ 25.  Finally, the reports the Debtors have provided the Committee with respect to assets and liabilities related to Custody Accounts and Custody Wallets have varied since the Petition Date, and the reasons for such variations remain unclear.  As of the date of the Blonstein Declaration, the aggregate amount of Custody Account balances was approximately $208 million, whereas the Custody Wallets held approximately $193 million in digital assets.  *Id.*  Accordingly, based on the Blonstein Declaration, there is an approximately aggregate 6% shortfall in the Custody Wallets.  To preserve all parties' rights with respect to the remaining digital assets, which are presumably held in the Aggregator Wallets and subject to competing rights of other creditors,

and ensure an equitable distribution of the digital assets currently held in Custody Wallets, the Pure Custody Users and the Custody Account Holders that transferred assets below the Statutory Cap should receive a *pro rata* share of digital assets, by cryptocurrency type, held in the Custody Wallets as of the Petition Date.[23]

68.     Custody Account Holders may have claims against the Debtors for any deficiency. This approach is supported by commentary on cryptocurrency insolvency and other foreign proceedings.   As one commentator posited, "[i]f any part of a customer's holdings of cryptocurrency have been lost—they have been stolen in a hack, the exchange has lost the private key, or the exchange has used and lost the cryptocurrency in its own business dealings—then the customer is merely an unsecured creditor of the exchange for the missing holdings and there would be no cause for lifting the automatic stay." Levitin at 51-52.  The Law Commission of England and Wales has also explained that, while there are several approaches that may be taken to address users' entitlements in the event of a shortfall in the context of a shared pool of assets in which tracing is impractical, the "most practical and least arbitrary" approach is to allocate losses on a *pro rata* basis.  Law Commission, DIGITAL ASSETS CONSULTATION PAPER (Law Com No 256, 2022), para. 17.66.

69.     Relatedly, if the Court later determines that insiders or other Account Holders that asserted rights in digital assets held in Custody Wallets are not entitled to any recovery, there may, as a result, be enough or a surplus of digital assets in the Custody Wallets to satisfy Custody Account Holders' entitlements.  The Court should determine how to distribute such digital assets at a later date.  At this time, reducing coin recoveries to a *pro rata* share of digital assets in the

---

[23]     The percentages cited in this paragraph and elsewhere in this Opening Brief are approximate amounts based on amounts provided in the Blonstein Declaration.

33

Custody Wallets, by cryptocurrency type, ensures that those Account Holders recover their digital assets quickly, and preserves all parties' rights with respect to the as-yet undetermined assets or deficiency claims.

### Notice

70.     The Committee will provide notice of this Opening Brief to the following parties or their respective counsel: (a) the U.S. Trustee; (b) the Debtors; (c) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (d) the United States Attorney's Office for the Southern District of New York; (e) the Internal Revenue Service; (f) the offices of the attorneys general in the states in which the Debtors operate; (g) the Securities and Exchange Commission; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Committee submits that, in light of the nature of the relief requested, no other or further notice need be given.

### Reservation of Rights

71.     The Committee reserves all of its rights to supplement or amend this Opening Brief and to present evidence at any hearing on the Opening Brief.

### Conclusion

72.     WHEREFORE, for the reasons set forth herein, the Committee respectfully requests that the Court find that (a) digital assets actually held in Custody Wallets (except to the extent that there is a surplus of digital assets held in Custody Wallets which exceeds the entitlements of Custody Account Holders), are not property of the Debtors' estates, (b) digital assets corresponding to balances associated with Withhold Accounts are property of the Debtors' estates until an appropriate evidentiary showing has been made by the relevant Account Holders, and (c) the Debtors are not compelled to distribute digital assets held in Custody Wallets or digital

assets corresponding to balances associated with Withhold Accounts (if the digital assets corresponding to balances associated with Withhold Accounts are not determined to be property of the Debtors' estates) to Account Holders that are subject to estate claims while those claims remain to be adjudicated.

[*Remainder of Page Intentionally Left Blank*]

Dated:  November 5, 2022                    Respectfully submitted,
        New York, New York

*/s/ Aaron Colodny*

**WHITE & CASE LLP**
David M. Turetsky
Keith H. Wofford
Samuel P. Hershey
Andrea Amulic
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113
Email:  david.turetsky@whitecase.com
        kwofford@whitecase.com
        sam.hershey@whitecase.com
        andrea.amulic@whitecase.com

– and –

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile:  (312) 881-5450
Email:  mandolina@whitecase.com
        gregory.pesce@whitecase.com

– and –

**WHITE & CASE LLP**
Aaron E. Colodny (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone: (213) 620-7700
Facsimile:  (213) 452-2329
Email:  aaron.colodny@whitecase.com

*Counsel to the Official Committee of*
*Unsecured Creditors*