Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

## DEBTORS' MEMORANDUM OF LAW
## REGARDING PHASE I CUSTODY AND WITHHOLD ISSUES

The above-captioned debtors and debtors in possession (collectively, the "Debtors" and, together with their non-Debtor affiliates, "Celsius") submit this memorandum of law (this "Memorandum") pursuant to the *Joint Stipulation and Agreed Scheduling Order By and Among the Debtors, the Committee, and the Ad Hoc Groups With Respect to the Custody and Withhold Issues* [Docket No. 1044] (the "Scheduling Order")[2] regarding Phase I Issues.  Specifically, this Memorandum addresses: (a) whether Custody Assets and Withhold Assets are property of the Debtors' estate, including whether the Terms of Use are unambiguous on the issue of ownership of such assets (the "Property Issue"); and

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2]     Capitalized terms used but not defined herein shall have the meanings ascribed to such terms elsewhere in this Memorandum or in the Scheduling Order, as applicable.

(b) if such assets are not property of the Debtors' estate, whether the Debtors should nonetheless be allowed to continue to hold the Custody Assets and Withhold Assets, and maintain the status quo, with respect to individuals or accounts where the Debtors have potentially viable claims, including, without limitation, preference claims (the "Status Quo Issue" and, together with the Property Issue, the "Phase I Issues").   On October 25, 2022, the Debtors also filed the *Declaration of Oren Blonstein, Head of Innovation and Chief Compliance Officer of Celsius Network Limited, With Respect to Certain Phase I Issues Pursuant to the Joint Stipulation and Agreed Scheduling Order By and Among the Debtors, the Committee, and the Ad Hoc Groups With Respect to the Custody and Withhold Issues* [Docket No. 1192] (the "Phase I Declaration"), in accordance with the Scheduling Order, and which is incorporated by reference herein.  In support of this Memorandum, the Debtors state as follows.

### Preliminary Statement

1.      Celsius' Terms of Use is the agreement that governs Celsius' relationship with its account holders, and the Terms of Use unambiguously provide that cryptocurrency assets in Celsius' custody service (the "Custody Program," and such assets, the "Custody Assets") remain the property of the account holders while on the Celsius platform.  Specifically, the Terms of Use provide that ownership in cryptocurrency assets in the Custody Program shall "at all times remain with the [user] . . . ."[3]  On the other hand, the Terms of Use do not explicitly reference, nor address, the issue of ownership of digital assets for assets transferred to Celsius' platform and reflected in Celsius' internal ledger in "withhold" accounts (the "Withhold Accounts," and such assets, the "Withhold Assets").  This is because such Withhold Accounts were not reflective of any service offering provided by Celsius but, rather, were used as an internal label by Celsius to track certain digital asset transfers from users who resided in certain states where Celsius did not offer its Custody Program or Earn Program to such users.[4]  Because the

---

[3]    *See* Terms of Use at § 4.B.

[4]    *See* Phase I Decl. at ¶¶ 5-6.

Debtors never intended to receive the digital assets in the first place, the Debtors likely never received title to these assets, and the Withhold Assets appear to remain property of the applicable users.

2.      At the same time, the Debtors have colorable causes of action with respect to certain Custody Assets and Withhold Assets that were transferred from the Earn Program or Borrow Program in the 90 days before the Petition Date.[5]  The Debtors have established that they have *prima facie* preference claims with respect to such assets, and the defenses to these preference claims will be litigated in Phase II.[6]

3.      The Debtors have setoff rights pursuant to New York law, section 558 of the Bankruptcy Code, and the Terms of Use, preserving the Debtors' statutory and contractual setoff rights.  Such rights constitute property of the Debtors' estates.  The Debtors' ability to exercise these setoff rights, however, would be imperiled if the Transferred Assets were to leave the Debtors' estates before this Court reaches a final judgment on the Debtors' preference claims.  Additionally, consistent with the purpose of section 502(d) of the Bankruptcy Code, which disallows claims for which property may be clawed back pursuant to a debtor's avoidance powers, customers should not be allowed to withdraw the Transferred Assets pending this Court's ruling on whether the Debtors have valid preference claims.  In the event the Debtors prevail on such preference claims, recovering such property would be costly and may not be possible, especially with respect to foreign property, after it has left the Debtors' platform.  Accordingly,

---

[5]     As outlined in the *Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to Reopen Withdrawals for Certain Customers with Respect to Certain Assets Held in the Custody Program and Withhold Accounts and (II) Granting Related Relief* [Docket No. 670] (the "Custody and Withhold Motion"), the Debtors believe that they have viable preference claims for certain assets that were transferred to the Custody Program or to Withhold Accounts during the 90-day period prior to the Petition Date, that were above the statutory cap of $7,575 pursuant to section 547(c)(9) of the Bankruptcy Code (such assets, collectively, the "Transferred Assets").  As described in the Custody and Withhold Motion, in the 90 days before the Petition Date, "the preference elements may be satisfied with respect to the assets transferred from the Earn or Borrow Programs to the Custody Program or Withhold Accounts.  Among other things, each transfer was made to or for the benefit of a creditor on account of an antecedent debt . . . ."). *See* Custody and Withhold Motion at ¶ 33.

[6]     Pursuant to the Scheduling Order, "all inferences regarding the existence, validity, and merit of preference or other claims against the Custody and Withhold claimants will be drawn in favor of the Debtors' estates." *See* Scheduling Order at ¶ 9.

3

the Debtors should be able to retain the Transferred Assets pending adjudication of their preference claims associated therewith. This Court has recognized that "[i]t is important that assets properly belonging to the estate do not leave the estate, and that any assets that have wrongfully been withdrawn from the estate are returned efficiently."[7]

4.    Additionally, the Debtors should have the authority to retain Custody Assets to the extent that such assets are linked to a customer with an outstanding loan, as the Debtors hold a right to set off coins owed to such customers against outstanding loans owed to the Debtors. As further discussed herein, the Debtors have a right to set off against customers under the Custody Program under the Terms of Use, which establishes that Celsius may deduct from any obligations owed to the customers, including assets in the Custody Program, any obligations that the customers owe Celsius.[8]  Accordingly, the Debtors submit that it is appropriate for them to retain the Transferred Assets as well as other Custody Assets that are linked to a customer with an outstanding loan to preserve material available assets pending adjudication of preference claims and any setoff rights under the Terms of Use and applicable law.

<b><u>Background</u></b>

**I.    Case Background and Procedural History.**

5.    The Debtors and other parties in these cases have filed a number of pleadings regarding issues related to the Custody Assets and Withhold Assets (collectively, the "<u>Custody and Withhold Issues</u>"). These pleadings include the Custody and Withhold Motion, the *Ad Hoc Group of Withhold Account Holders' Motion for Relief from the Automatic Stay* [Docket No. 737] (the "<u>Withhold Lift Stay Motion</u>"), and the Complaint [Adv. Pro. Docket No. 1] filed in the adversary proceeding captioned

---

[7]    *See Memorandum Opinion and Order Denying Daniel A. Frishberg's Motion to Compel the Debtors or UCC to Bring Insider Clawback Actions* [Docket No. 1267] at Section II.

[8]    *See* Terms of Use at § 4(b) ("Celsius retains the right to set-off any Eligible Digital Assets in a Custody Wallet against any obligations you may have to us.").

*Ad Hoc Group of Custodial Account Holders v. Celsius Network LLC, et. al.*, Adv. Pro. No. 22-10964 (MG) (Bankr. S.D.N.Y. Aug. 31, 2022) (the "Custody Complaint").

6.      In light of the overlapping issues addressed in these pleadings, the Debtors, the Ad Hoc Group of Custodial Account Holders (the "Custody Ad Hoc Group"), the Ad Hoc Group of Withhold Account Holders (the "Withhold Ad Hoc Group") and the official committee of unsecured creditors (the "Committee" and, together with the Debtors, the Custody Ad Hoc Group, and the Withhold Ad Hoc Group, the "Parties") reached an agreement on a path forward with respect to the Custody and Withhold Issues, which is memorialized in the Scheduling Order.  Specifically, the Parties agreed upon a two-phase process, "Phase I" and "Phase II", with Phase I to include the resolution of the Phase I Issues through the filing of a sworn declaration by the Debtors on a set of limited factual issues and otherwise without discovery, and the resolution of which would shape the discovery and proceedings that followed, if any, in Phase II.

## II.    Factual Background.

7.      On April 15, 2022, 89 days prior to July 13, 2022—the date that the Debtors filed these chapter 11 cases (the "Petition Date")—the Debtors began providing the Custody Program to certain users located in the United States.[9]  Users eligible for the Custody Program could use the Custody Program to move the balance of digital assets owed to them in the Celsius' Custody Program to other eligible service offerings provided by the Company.[10]  For example, an accredited user or qualified institutional buyer in the United States could move their balance of digital assets from the Custody

---

[9]      *See Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, Providing Terms of Use Dating Back to February 18, 2018* [Docket No. 393] (the "Terms of Use Declaration"); *see also* Phase I Decl. at ¶ 4.  The current controlling terms of use, which went into effect on April 14, 2022, (the "Terms of Use") are attached as Exhibit A-8 to the Terms of Use Declaration.

[10]     *See* Phase I Decl. at ¶ 4.

Program to the Earn Program to earn certain rewards.[11]  Similarly, a U.S. customer residing in a state

where Celsius offered loans could move their balance of digital assets from the Custody Program to the

Borrow Program, pursuant to which users could take out a fiat or stablecoin loan from Celsius.[12]  For

clarity, in instances in which movement of digital assets between Celsius' programs is referenced in this

Memorandum, such discussion refers to changes in internal ledger balances and not actual

cryptocurrency movements on the blockchain.  As a result, any transfer of digital assets to or from the

Custody Program by a customer would not necessarily be met by an immediate and corresponding

transfer of coins between or from Custody Wallets.[13]  Instead, Celsius periodically rebalanced Custody

Wallets in an effort to ensure that Custody Wallets collectively held digital assets equal to or in excess

of the balance of each type of cryptocurrency in the Custody Program (on an aggregated basis) as

reflected in the Company's internal ledger.[14]  The digital assets that Celsius owes to customers as

reflected in each of Celsius' programs constitute liabilities of Celsius.

8.      The latest Terms of Use became effective on April 14, 2022 upon the launch of the

Custody Program.[15]  Pursuant to the Terms of Use, cryptocurrency assets in the Custody Program

remained the property of the user and do not earn rewards.[16]  Specifically, the Terms of Use provide that

ownership in cryptocurrency assets in the Custody Program shall "at all times remain with the [user]"

and "Celsius will not transfer, sell, loan or otherwise rehypothecate" digital assets in custody unless

---

[11]  *See id.*

[12]  *See id.* at ¶ 8.

[13]  *See* Phase I Decl. at ¶ 13.

[14]  *See id.*  (noting also that "digital assets were moved on the blockchain, to or from Custody Wallets, only if such movement was necessary to maintain the requisite number of coins in Custody Wallets on an aggregate basis.").

[15]  *See* Terms of Use Decl. at ¶ 13.

[16]  *See* Terms of Use at § 4.B.

"specifically instructed by [users], except as required by valid court order, competent regulatory agency, government agency or applicable law."[17]

9.      When the Debtors launched the Custody Program, the Debtors did not offer the Custody Program in nine states (the "<u>Prohibited States</u>").[18]  There were nevertheless residents of Prohibited States who attempted to transfer cryptocurrency to the Custody Program from an external platform.[19]  Due to the nature of cryptocurrency transfers on the blockchain, it was impossible to halt those transfers from residents of Prohibited States who already had a Celsius wallet address used to transfer cryptocurrency to Celsius' platform (prior to the launch of the Custody Program).[20]  These circumstances led the Debtors to use the Withhold Accounts to keep such digital asset transfers distinct from assets relating to those in the Custody Program or the Earn Program.

10.     Withhold Accounts also existed before the launch of the Custody Program.[21] Specifically, prior to the launch of the Custody Program, Withhold Accounts were used to track cryptocurrency transferred to the Celsius platform that were not eligible for any given service and not supported on the platform.[22]  For instance, if customers (wherever located) transferred BNB coins (*i.e.*, the Binance token) to the Celsius platform, those transfers would be reflected in Withhold Accounts because that coin was not eligible for the Earn Program for any customer in the United States.[23]

---

[17]   *See id.*

[18]   *See* Phase I Decl. at ¶ 5.

[19]   *See id.*

[20]   *See id.*

[21]   *See id.* at ¶ 6.

[22]   *See id.*

[23]   *See id.*

11.    Digital assets transferred to Celsius' platform that were associated with a Withhold Account were not held in any specific "Withhold Wallet" but, rather, were transferred into Celsius' wallets and used across Celsius' platform along with other digital assets transferred to Celsius' platform.[24]    For this reason, "Withhold Wallet" is a misnomer, and there is no single date when "Withhold Wallets" were created.[25]

## Legal Argument

I.    **The Custody Assets and Withhold Assets Do Not Constitute Property of the Estate.**

A.    **The Terms of Use Govern the Issue of Whether the Custody Assets are Property of the Debtors' Estate.**

12.    As a threshold matter, the Terms of Use govern the issue of whether Custody Assets are property of the Debtors' estate.

13.    The estate's rights to digital assets transferred to Celsius' platform are governed by state law.  Section 541 of the Bankruptcy Code provides that all property in which a debtor has a legal or equitable interest, including any interest in property that a debtor acquires postpetition, becomes property of the estate upon the commencement of a chapter 11 case.[26]  Whether a debtor has a legal or equitable interest in property for purposes of defining "property of the estate" is determined by state law.[27] "Contracts create property rights for the parties to the contract," and a "debtor's contract rights are intangible property of the debtor."[28]

---

[24]    *See id.* at ¶ 7.

[25]    *See id.*

[26]    11 U.S.C. § 541(a)(1), (a)(7).

[27]    *See In re DeFlora Lake Dev. Assocs., Inc.*, 628 B.R. 189, 197 (Bankr. S.D.N.Y. 2021); *see also Butner v. United States*, 440 U.S. 48, 54–55 (1979) (noting that "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law").

[28]    *In re Berau Cap. Res. Pte Ltd.*, 540 B.R. 80, 83 (Bankr. S.D.N.Y. 2015).

14.     Here, cryptocurrency is a new asset class, and existing regulatory and legal frameworks have not yet determined the rules on the ownership of cryptocurrency assets.   The treatment of cryptocurrencies as a general matter is not well-trod in bankruptcy courts, property law, or contract law.[29] Notably, the law is unsettled on whether cryptocurrency assets are akin to, and should be regulated as, securities, commodities, currency, bank deposits, or some other type of asset class.[30]

15.     In many ways, how to think about ownership of cryptocurrency assets is a novel issue, but our legal system is well-equipped to answer these types of questions of property ownership.  Absent a contrary legal or regulatory framework (such as the recording system governing the transfers of real property), courts look to the intent of the parties as evidenced in a written agreement.[31]   A contract requires an offer, acceptance, consideration, mutual asset, and an intent to be bound.[32]   It is irrelevant whether customers actually read or were aware of the specific contents of the contract, so long as the

---

[29]   *See, e.g.*, Adam J. Levitin, *Not Your Keys, Not Your Coins:  Unpriced Credit Risk in Cryptocurrency*, 101 Tex. L. Rev. (forthcoming, 2022); *see also* Law Commission, *Digital Assets: Consultation Paper*, sec. 11.72 (July 28, 2022) ("We also consider that the proper legal characterisation of on-chain transfers of crypto-tokens is not entirely straightforward.").

[30]   *See Not Your Keys, Not Your Coins:  Unpriced Credit Risk in Cryptocurrency*, 101 Tex. L. Rev; *see also Digital Assets: Consultation Paper*, sec. 12.1 ("The mechanism for the transfer of crypto-tokens as a matter of law might . . . be different from the methods and instruments of transfer used to transfer legal title to shares, securities and other registered intangible assets.").

[31]   *See Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010) (holding that, as a general matter with respect to contracts, the intent of the parties controls); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985) (same); *The Elgee Cotton Cases*, 89 U.S. 180, 186 (1874) (applying intent of parties doctrine to question of transfer of title); *In re Allegiance Telecom, Inc.*, 356 B.R. 93, 98 (Bankr. S.D.N.Y. 2006) ("Under New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed.") (internal citations omitted).

[32]   *See Nowak v. JPMorgan Chase & Co.*, 847 Fed.Appx. 31, 34 (2d Cir. 2021) (reciting the requirements for formation of a contract).

terms were "clear and conspicuous."[33]    The fact that the contract is electronic does not change this outcome, and hyperlinked terms can be sufficient to satisfy this standard.[34]

16.    To access the Debtors' platform, all customers were required to affirmatively agree to the Terms of Use upon sign-up.  The Terms of Use were linked twice on the Debtors' sign-up page (including immediately above the "sign up" button) and again at the bottom of every web page.  Courts routinely hold that similar contracts satisfy the "clear and conspicuous" standard.[35]  In addition, Celsius typically advised existing users of updates to the Terms of Use via email and other official Celsius channels, such as its blog.[36]  All new customers were required to view, agree to, and accept Celsius' then-effective Terms of Use at the time of account creation.[37]  Customers' acceptance of the Terms of Use combined with use of the Debtors' services thereunder, constitutes a contract.[38]  For these reasons, and in the absence of any pre-existing legal framework applicable to these issues, the Debtors believe the parties' intent, as reflected in the Terms of Use, must control here.[39]

---

[33]    *See Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 464 F. Supp.3d 634, 640 (S.D.N.Y. 2020) ("Even if there is no evidence that the offeree had actual notice of the terms of the agreement, the offeree will still be bound by the agreement if a reasonably prudent user would be on inquiry notice of the terms.")

[34]    *See id.* ("Although a clickwrap agreement's terms and conditions must be clear and conspicuous, they need not all be simultaneously and immediately visible; the terms may be binding and enforceable even if they are only accessible through a hyperlink.")

[35]    *See Valelly v. Merrill Lynch* 464 F. Supp.3d at 6401 (S.D.N.Y. 2020) (finding that "[t]he combination of the conspicuous hyperlinks, the text box with . . . attestations . . . and the box at the bottom of the page requiring the user to click "I Agree," provided sufficiently clear notice of the terms of the agreement . . . and formed a binding agreement.").

[36]    *See* Terms of Use Decl. at ¶ 14.

[37]    *See id.*

[38]    *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004) ("It is standard contract doctrine that when a benefit is offered subject to stated conditions, and the offeree makes a decision to take the benefit with knowledge of the terms of the offer, the taking constitutes acceptance of the terms, which accordingly become binding on the offeree.").

[39]    As discussed above, the Terms of Use do not explicitly address Withhold Accounts.

**B.      The Terms of Use Unambiguously Provide that the Cryptocurrency Assets in the Custody Program Do Not Constitute Property of the Debtors' Estate.**

17.      The Terms of Use were updated effective April 14, 2022 to implement the Custody Program, and have not been updated since then.[40]   The Terms of Use are unambiguous that Custody Assets do not constitute property of the Debtors but, rather, that such assets are customers' property. Under New York law, which governs the Terms of Use, contracts are interpreted and enforced in accordance with their plain meaning and clear and unambiguous terms.[41]   The ultimate objective in interpreting an agreement is to determine "the intention of the parties as derived from the language employed."[42]

18.      Here, ownership and title to the Custody Assets should be determined by the parties' respective contractual rights, as articulated in the Terms of Use.  The Terms of Use clearly provide that title and ownership of Custody Assets remain with the customers.

---

[40]   *See* Terms of Use Decl. at ¶ 13 (noting that the Terms of Use was "in effect from on or around April 14, 2022 to date.").

[41]   *See* Terms of Use at § 33 (providing that the Terms of Use is "governed exclusively by the laws of the state of New York"); *see also In re Condado Plaza Acquisition LLC*, 620 B.R. 820, 831 (Bankr. S.D.N.Y. 2020) (finding that under New York Law, contracts are interpreted and enforced in accordance with their plain meaning and their clear and unambiguous terms).

[42]   *In re Lehman Bros. Holdings Inc.*, 439 B.R. 811, 825 (Bankr. S.D.N.Y. 2010) (quoting *Tom Doherty Assocs. Inc. v. Saban Entm't Inc.*, 869 F. Supp. 1130, 1137 (S.D.N.Y. 1994)).

19.    ***First***, the Terms of Use expressly provide that title and ownership of the Custody Assets remain with customers at all times:

> "Title to any of your Eligible Digital Assets in a Custody Wallet shall at all times remain with you and not transfer to Celsius.  Celsius will not transfer, sell, loan or otherwise rehypothecate Eligible Digital Assets held in a Custody Wallet unless specifically instructed by you, except as required by valid court order, competent regulatory agency, government agency or applicable law.  As title owner of assets, you bear all risk of loss."[43]

20.    ***Second***, the Terms of Use are clear that Celsius serves merely as an agent of its customers with respect to the Custody Assets and in the capacity of a custodian thereof.  For instance, the Terms of Use describe Custody Assets as being "held in custody [by the Company] on the User's behalf."[44] The Terms of Use also state that:

> "When you use the Custody [Program], you understand and agree that Celsius may act as the custodian or we may use a Third Party Custodian to provide the Custody [Program] . . . .  By using the Custody [Program], you understand and agree to appoint Celsius or a Third Party Custodian selected by Celsius as your agent to store and secure Eligible Digital Assets in a Custody Wallet, and perform other duties customarily performed by a custodian . . . .  By using the Custody [Program], you authorize Celsius to transfer your Eligible Digital Assets to a Third Party Custodian or Custodians as may be selected by Celsius, and to instruct and cause any such Third Party Custodian to transfer your Eligible Digital Assets to another Third Party Custodian or Custodians as may be selected by Celsius, or to Celsius, in each case without the need for any further notice to or consent from you, and consistent with providing the Custody [Programs] as set forth herein."[45]

21.    The Terms of Use make it clear that the parties' intent with respect to the Custody Assets was to ***not*** pass any degree of ownership to Celsius, meaning that such assets, once in the Custody

---

[43]    *See* Terms of Use at § 4.B.

[44]    *See id.* at § 2.

[45]    *See id.* at § 4.B.

Program, cannot be property of the estate.[46]  Such conclusion is consistent with the nature of the economic relationship between Celsius and a Custody Program customer.  As described above, Celsius was proscribed from using the Custody Assets for its own benefit,[47] was acting as an agent of customers,[48] and was merely holding the Custody Assets on the customers' behalf.[49]  Customers under the Custody Program made a bargain to store (and keep title and ownership of) their assets with Celsius and, in return, do not receive economic consideration.

22.    The Debtors submit that the Terms of Use govern ownership of the Custody Assets regardless of how the Custody Assets were stored or transferred.  Any digital assets transferred to Celsius' platform were typically initially swept into Celsius' main wallets and thereafter commingled within Celsius' Fireblocks infrastructure, and no single individual coin was attributable to any specific customer.[50]  Although any transfer of digital assets to or from the Custody Program by a customer would not necessarily be met by a corresponding transfer of coins to or from Custody Wallets due to Celsius' aggregation of digital assets and internal system for tracking customer account balances, customers still clearly retained ownership of the Custody Assets pursuant to the Terms of Use.[51]  The Terms of Use are unambiguous that title to the Custody Assets remain with Celsius' customers.  For these reasons, the Debtors submit that the Custody Assets are not property of the Debtors' estates.

---

[46]  This is different than the Earn Program, which provides that ownership and title of the assets thereunder pass to Celsius. *See* Terms of Use at § 13 ("In consideration for the Rewards payable to you on the Eligible Digital Assets using the Earn Service . . . and the use of our Services, you grant Celsius . . . all right and title to such Eligible Digital Assets . . . .").

[47]  *See* Terms of Use at § 4.B.

[48]  *See id.* at § 2.

[49]  *See id.*

[50]  *See* Phase I Decl. at ¶ 8.

[51]  *See Digital Assets: Consultation Paper*, sec. 16.43 (noting that "[a] custody facility will be recognised as taking effect . . . that would be consistent with the intention of the parties.  As a matter of law, this determination will be made by construing the terms of the contract that governs the operation and provision of the arrangement.").

**C.**     **The Withhold Assets Likely Do Not Constitute Property of the Debtors' Estates.**

23.     The Terms of Use do not mention nor address title and ownership rights with respect to Withhold Assets and, therefore, do not control the determination of the parties' respective interests in such assets.  The Withhold Accounts were not part of Celsius' service offerings, and the Debtors have no contractual claim to title to the cryptocurrency in Withhold Accounts.

24.     Withhold Accounts were primarily used in two scenarios.  ***First***, the Withhold Accounts were used when a U.S. resident of a Prohibited State transferred digital assets to Celsius' platform despite not being eligible for the Custody Program or Earn Program.  After the launch of the Custody Program, U.S. customers who did not reside in a Prohibited State were automatically enrolled in the Custody Program.[52]  Additionally, non-accredited U.S. users were not permitted to transfer new amounts to the Earn program.[53]  Any digital assets that were transferred to Celsius after April 15, 2022, by non-accredited U.S. users residing in Prohibited States were reflected in Withhold Accounts.[54]

25.     ***Second***, Withhold Accounts were used prior to the launch of the Custody Program to track cryptocurrency transferred to the Celsius platform that was not eligible for any service offering and not supported on the platform.[55]

26.     As noted above, digital assets transferred to Celsius' platform that were associated with a Withhold Account were not held in any specific "Withhold Wallet" and were not treated differently

---

[52]    *See* Phase I Decl. at ¶ 15.

[53]    *See id.*

[54]    *See id.*

[55]    *See id.* at ¶ 6.

than other digital assets transferred to Celsius' platform.[56]  For this reason, no "Withhold Wallet" ever existed.[57]

27.      Because of the nature of the blockchain, Celsius cannot refuse or cancel the transactions associated with the Withhold Accounts.  Any customer (residing in a Prohibited State or otherwise) that had an existing Celsius wallet address could send digital assets to such wallet without Celsius being able to refuse or halt the transfer.  Conversely, Celsius could not transfer these digital assets back to customers because a transfer on the Blockchain may only be effectuated to a specific wallet address—not a specific customer.  If Celsius were to return such assets to the wallet address from which the transaction originated, there is a risk that such wallet is no longer associated with the customer that had transferred the assets initially.  Accordingly, absent a voluntary request for withdrawal, Celsius could not be certain to which address to send these coins.

28.      Accordingly, Withhold Assets were held by the Debtors until the customer withdrew its assets.  Celsius notified non-accredited investors in the Prohibited States that any new transfers would not be accepted by Celsius and that they should withdraw any new coins from their account. Celsius reflected these customers' assets in a Withhold Account pending such customers' withdrawing from the platform.  Because Celsius never intended to accept these assets, they appear to have remained, at all times, property of the customers who transferred such assets.  In fact, it is a general rule of contract law that title to goods cannot pass prior to being identified in the contract and title being accepted by the

---

[56]  *See id.* at ¶ 10.

[57]  *See id.*

transferee.[58]  In other words, Celsius likely could not receive title to assets it did not intend to accept.[59]

Celsius seemingly did not have, or claim to have, title to or ownership to such assets.  Ownership of the

Withhold Assets is admittedly a closer call than the Custody Assets because the Custody Assets were

explicitly governed by the Terms of Use whereas the Terms of Use do not address the Withhold Assets.

Even so, for the reasons above, the Debtors submit that the Withhold Assets are likely not property of

their estates.

## II.    The Debtors Are Entitled to Retain the Transferred Assets and Certain Other Custody Assets.

29.    The Debtors further submit that they have setoff rights associated with, and are entitled

to retain certain Custody Assets and Withhold Assets—irrespective of the fact that such assets are not

property of the estate—which are either (a) subject to colorable preference actions or (b) in the account

of a customer with an outstanding loan.

30.    As a threshold matter, this Memorandum does not argue whether *prima facie* claims to

avoid transfers of certain assets to the Custody Program and Withhold Accounts exist.[60]  The Debtors

have established *prima facie* preference claims in the Custody and Withhold Motion and incorporate

such arguments by reference herein.[61]  Consistent with the Scheduling Order, the merits of such claims

---

58    *See, e.g.,* Uniform Commercial Code at § 2-401(1) ("Title to goods cannot pass under a contract for sale prior to their identification to the contract . . . ."); *Ellis & Myers Lumber Co. v. Hubbard*, 123 Va. 481, 494 (1918) ("Whether or not the property or title thereto passes becomes wholly a matter of the mutual intention of the parties . . . wholly a matter of contract between them . . . ."); *Moody v. Brown*, 34 Me. 107, 107 (1852) ("To pass the title, there must be an acceptance, either express or implied.").

59    As discussed above, Celsius could not refuse or cancel the transactions associated with the Withhold Assets and such assets, upon transfer, were commingled with other coins on Celsius' platform.

60    Pursuant to the Scheduling Order, the Parties agreed that, during Phase I, "all inferences regarding the existence, validity, and merit of preference or other claims against the Custody and Withhold claimants will be drawn in favor of the Debtors' estates."  *See* Scheduling Order at ¶ 9.

61    *See* Custody and Withhold Motion at ¶ 33 ("[T]he preference elements may be satisfied with respect to the assets transferred from the Earn or Borrow Programs to the Custody Program or Withhold Accounts.  Among other things, each transfer was made to or for the benefit of a creditor on account of an antecedent debt . . . .").

will be adjudicated in connection with the briefing of Phase II. Accordingly, the analysis under this Memorandum assumes that *prima facie* preference claims exist with Transferred Assets.

31.    The Debtors have setoff rights associated with their preference claims with respect to the Transferred Assets as well as certain other Custody Assets that are in the accounts of customers with outstanding loans.[62] Turnover of such assets to customers pending adjudication of legal issues that could lead such assets to be brought back into the estate would not only be costly and wasteful of estate and judicial resources but could also imperil the Debtors' ability to enforce and realize the value of those causes of action, to the detriment of the estate and the Debtors' customer community as a whole. Therefore, the Debtors should have the authority to retain (a) the Transferred Assets pending adjudication of their preference claims associated therewith and (b) Custody Assets held by a customer that has an outstanding loan, pending a further court order.

**A.    The Debtors Are Entitled to Retain Custody Assets in Furtherance of Their Setoff Rights.**

32.    The Debtors have setoff rights associated with certain Custody Assets pursuant to section 558 of the Bankruptcy Code. As such, it would not be appropriate to turn over property to customers before the merits of preference actions or other setoff rights with respect to such property are adjudicated. Doing so would adversely affect the Debtors' ability to exercise their setoff rights associated therewith and thus diminish the value of the Debtors' estates. For that reason, the Debtors should have the authority to retain Custody Assets to the extent that (a) the Debtors have a viable preference claim associated therewith or (b) such Custody Assets are in the account of a customer with an outstanding loan.

---

[62]    Consistent with this approach, the Custody and Withhold Motion seeks authority to return to customers all Custody Assets and Withhold Assets that do not fall within these categories, with the exception of Custody Assets and Withhold Assets transferred by current or former employees or insiders of the Debtors.

33.     The Debtors' right to set off arises pursuant to section 558 of the Bankruptcy Code.[63] Section 558 of the Bankruptcy Code preserves any defenses that a debtor held prepetition under nonbankruptcy law.[64]  A debtor's setoff right must be valid and enforceable under nonbankruptcy law on the petition date.[65]  Importantly, unlike a creditor's right to set off under section 553 of the Bankruptcy Code, section 558 of the Bankruptcy Code is broader and "eliminates the pre-petition/post-petition distinction and, in essence, obliterates the requirement that the mutual debts must both be pre-petition obligations . . . ." [66]  Courts regularly hold that section 558 of the Bankruptcy Code preserves a debtor's setoff rights under nonbankruptcy law.[67]  Moreover, such setoff rights, although arising prepetition, are also property of the Debtors' estates.[68]

---

[63]  It is worth noting that section 553 of the Bankruptcy Code recognizes and preserves a creditor's setoff rights under applicable nonbankruptcy law subject to certain conditions and limitations and is thus inapplicable here.  Pursuant to section 553 of the Bankruptcy Code, a creditor must establish that they have underlying setoff rights as well as the following three criteria:  (i) the debtor must owe a debt to the creditor which arose prepetition, (ii) the debtor must have a claim against the creditor which arose prepetition, and (iii) the debts must be mutual.  *See* 11 U.S.C. § 553(a) ("Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case . . . ."); *see also In re Ionosphere Clubs, Inc.*, 164 B.R. 839, 841 (Bankr. S.D.N.Y. 1996) (outlining the requirements for a creditor to exercise their setoff rights).

[64]  *See* 11 U.S.C. § 558 ("The estate shall have the benefit of any defense available to the debtor as against any entity other than the estate . . . .  A waiver of any such defense by the debtor after the commencement of the case does not bind the estate.").

[65]  *See In re Westchester Structures, Inc.*, 181 B.R. 730, 740 (Bankr. S.D.N.Y. 1995) ("In the same manner that we look to the parties' agreement and to applicable nonbankruptcy law to ascertain a creditor's right to setoff under 11 U.S.C. § 553, we look to the parties' contract and to applicable nonbankruptcy law to ascertain whether a debtor may offset its claim against a creditor's claim under either 11 U.S.C. § 502(b)(1) or 11 U.S.C. § 558.") (internal citations omitted).

[66]  *See In re PSA, Inc.*, 277 B.R. 51, 53 (Bankr. D. Del. 2002) (citations omitted); *see also State Bank of Florence v. Miller* (*In re Miller*), 459 B.R. 657, 675 n. 16 (B.A.P. 6th Cir. 2011) (holding that, unlike setoff under section 553 of the Bankruptcy Code, setoff under section 558 does not require that the mutual debts both be prepetition obligations).

[67]  *See In re PSA, Inc.*, 277 B.R. 51 (Bankr. D. Del. Apr. 19, 2002) (holding that section 558 of the Bankruptcy Code preserves debtors' setoff rights); *see also, e.g., In re Papercraft Corp.*, 127 B.R. 346 (Bankr. W.D. Pa. 1991) (holding that section 558 of the Bankruptcy Code preserves all rights to set off that a debtor may have under state law); *In re M.W. Ettinger Transfer Co.*, 1988 WL 129334 at *3 (Bankr. D. Minn. Nov. 29, 1988) (explaining that a debtor's right to set off is governed by section 558).

[68]  *See In re Dittmar*, 618 F.3d 1199, 1208 (10th Cir. 2010) ("[C]ontingencies . . . do not transform . . . [an] interest into a mere expectancy that is excluded from the bankruptcy estate when the interest is rooted in the pre-bankruptcy past."); *In re Booth*, 260 B.R at 286  (noting that "'every conceivable interest of the debtor, future, nonpossessory, contingent,

34.     First, the Debtors have setoff rights with respect to the Custody Assets that they held prepetition both under New York Law and under the Terms of Use.  New York law recognizes both equitable and statutory setoff rights.[69]  Under section 151 of the New York Debtor and Creditor Law, a party has the right to set off mutual obligations of another party, whether matured or unmatured, if a triggering event has occurred with respect to the other party and notwithstanding the fact that such setoff right has not been exercised prior to that triggering event.[70]  Examples of triggering events include the filing of a petition for bankruptcy by the other party.[71]

35.     Second, the Debtors have setoff rights against customers that transferred digital assets to the Custody Program pursuant to the Terms of Use, which provide that Celsius:

> "may take or set off from any Digital Asset in your Celsius Account, including any of your Digital Assets using the Custody [Program] (i.e., in a Custody Wallet), or deduct from any obligations Celsius may have to you, any direct, indirect, and acquired Obligations that you owe us or our Affiliates."[72]

Similarly, the Terms of Use state that "Celsius retains the right to set-off any Eligible Digital Assets in a Custody Wallet against any obligations you may have to us."[73]

36.     In addition, the Debtors have setoff rights with respect to Custody Assets of customers that have an outstanding loan pursuant to the terms of use associated with the Borrow Program (the

---

speculative, and derivative, is within the reach of [section] 541.'") (quoting *In re Yonikus*, 996 F.2d 866, 869 (7th Cir. 1993)); s*ee also In re Gonzalez*, 559 B.R. 326, 331 (Bankr. E.D.N.Y. 2016) (finding that contingent rights which exist on the petition date but which do not ripen until the post-petition occurrence of the contingency, would become property of the estate).

[69]    *In re Prudential Lines, Inc.*, 148 B.R. 730, 751 (Bankr. S.D.N.Y. 1992) (noting that New York recognizes both equitable and statutory set-off).

[70]    *See* N.Y. Debt. & Cred. Law § 151.

[71]    *Id*.; s*ee also In re Prudential Lines*, 148 B.R. at 740–41 (noting that a debtor has a setoff right upon the filing of a bankruptcy petition).

[72]    *See* Terms of Use at § 9.

[73]    *See id.* at § 4(b).

"Loan Terms of Use").[74]  To enter into the Borrow Program, customers had to agree to the Loan Terms

of Use, which provide for a right to set off even as to certain Custody Assets, as set forth below:

> "If you fail to make any repayment of principal when due, in addition to any
> rights Celsius may have in connection with a Default Event, Celsius shall
> be entitled, and you hereby authorize Celsius, to: (a) deduct from your
> Celsius account any Eligible Stablecoins to recover your repayment
> obligation in full or in part; and/or (b) Liquidate the Collateral to recover
> your repayment obligation in full or in part, in accordance with the terms of
> Section 15 below."[75]

37.    As such, New York law, the Terms of Use, and the Loan Terms of Use give Celsius the

ability to set off any obligations owed to the customers under the Custody Program against any

obligations that such customers owe Celsius.  For that reason, any viable preference claims the Debtors

have for amounts subject to viable preference actions may be set off against liabilities owed by Celsius

to the customers.  These setoff rights constitute property of the Debtors' estates even though such rights

are contingent on the Court entering a judgment in favor of the Debtors with respect to such preference

claims.  The Debtors should thus be authorized to retain the Transferred Assets pending adjudication of

such causes of action.  Importantly, the Debtors are not seeking to keep such assets indefinitely.  Rather,

the Debtors solely seek to retain such property subject to and pending the Court's ruling on whether they

have valid preference actions.  In addition, the Debtors should be authorized to retain other Custody

Assets to the extent such assets are linked to a customer with an outstanding loan, as they have setoff

rights associated therewith pursuant to the Loan Terms of Use.

---

[74]    The Loan Terms of Use is attached as Exhibit B-9 to the Terms of Use Declaration.

[75]    *See* Loan Terms of Use at "Repayment," § 3.

**B.**  **The Debtors Are Also Entitled to Retain Transferred Assets Consistent with the Purpose of Section 502(d) of the Bankruptcy Code.**

38.    The Debtors should also be authorized to retain the Transferred Assets consistent with the purpose of section 502(d) of the Bankruptcy Code.  Section 502(d) of the Bankruptcy Code provides, in relevant part, that:

> "the court shall disallow any claim of any entity from which property is recoverable under section . . . 550 [providing for recovery of avoided transfers] . . . of this title . . . unless such entity . . . has paid the amount . . . for which such entity . . . is liable under section . . . 550 . . . of this title."[76]

The "purpose of section 502(d) is to promote the *pro-rata* sharing of the bankruptcy estate among all creditors . . . ."[77]  "Under the Bankruptcy Code a court must disallow 'any claim of any entity from which property is recoverable' because of a preferential transfer or fraudulent conveyance."[78] Importantly, a debtor is not required to obtain a judgment concerning an avoidance action prior to asserting that a claim should be disallowed under section 502(d).[79]  Rather, "to assure the effectuation of the purpose of section [502(d)], a claim may be disallowed at least temporarily and for certain purposes, subject to reconsideration, simply upon the *allegation* of an avoidable transfer."[80]

39.    Here, the same way section 502(d) of the Bankruptcy Code disallows claims of certain claimants for property that may be clawed back pursuant to a debtor's avoidance powers, claimants that are subject to *prima facie* preference claims should not be allowed to withdraw assets pending adjudication of the preference actions.  A primary motive of section 502(d) is "to preclude entities which

---

[76]    11 U.S.C. § 502(d).

[77]    5 Collier on Bankruptcy ¶ 502.05[2][a] (16th Ed. 2012).

[78]    *In re McLean Indus., Inc.,* 30 F.3d 385, 388 (2d Cir. 1994).

[79]    *See In re Enron Corp.*, 340 B.R. 180, 193 (Bankr. S.D.N.Y. 2006) (finding that no distribution can be made with respect to disputed claims pending a resolution of the debtor's viable cause of action in relation thereto).

[80]    *Id.* at 191 (citing 4 Collier on Bankruptcy ¶ 502.05[2][a]  at 559 (15th Ed. 2005) (emphasis added).

have received voidable transfers from sharing in the distribution of the assets of the estate unless and until the voidable transfer has been returned to the estate."[81]  Similar to the purpose of section 502(d), retaining the Transferred Assets will promote the pro-rata sharing of the Debtors' estate among all creditors rather than distributing certain Custody Assets and Withhold Assets to a subset of the estate creditors where such creditors may not ultimately be entitled to them.

### C. The Debtors Are Also Entitled to Retain Custody Assets Pursuant to Sections 362(a), 365(a), and 105(a) of the Bankruptcy Code.

40.    The Debtors have the express authority to retain the Custody Assets pursuant to the Terms of Use.  It is black-letter law that counterparties are obligated to continue to perform under executory contracts pending a debtor's decision to assume or reject them.[82]  Accordingly, the Terms of Use, which have not been rejected, are enforceable with respect to the Debtors' customers during the pendency of these cases, and the Debtors have the ability to exercise any rights that they may have thereunder.

41.    Further, it is axiomatic that the Debtors' rights under the Terms of Use constitutes property of the estate that is protected by the automatic stay.  Section 362(a) of the Bankruptcy Code provides that the commencement of chapter 11 cases "operates as a stay, applicable to all entities, of . . . any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate . . . ."[83]  The phrase "property of the estate" is given broad meaning under section 541 of the Bankruptcy Code and embraces "all legal or equitable interests of the debtor in property as of the commencement of the case," regardless of who has title or possession, or whether the

---

[81]    *See Matter of Mid Atl. Fund, Inc.*, 60 B.R. 604, 609 (Bankr. S.D.N.Y. 1986).

[82]    *See, e.g., U.S. Postal Serv. v. Dewey Freight Sys., Inc.*, 31 F. 3d 620, 624 (8th Cir. 1994) ("[B]efore executory contracts are assumed or rejected under [section] 365(a), those contracts remain in existence, enforceable by the debtor but not against the debtor."); *see also In re Nat'l Steel Corp. et al.*, 316 B.R. 287, 305 (Bankr. N.D. Ill. 2004) ("The non-debtor party must continue to perform under the cont[r]act prior to assumption or rejection . . . ."); *In re McLean Indus., Inc.*, 96 B.R. 440, 449 (Bankr. S.D.N.Y. 1989) (holding that "[a] debtor-in-possession's ability to continue to perform and to compel performance with respect to assumable executory contracts is usually the life blood of reorganization").

[83]    11 U.S.C. § 362(a)(3).

property is transferable, leviable, or jointly owned.[84]   As such, a debtor's interest in a contract is property

of the estate and is thus protected by the automatic stay.[85]

42.    Accordingly, the Debtors continue to possess all rights they had under the Terms of Use

immediately before the commencement of these cases.   Here, the Terms of Use expressly provide that

the Debtors have "the right to suspend, freeze or close your Celsius Account at any time for any reason

without advance notice, including by blocking your access to the Celsius Account or the Services."[86]

The Terms of Use also state that:

> "we reserve the right to limit access to your Celsius Account, which can
> include temporarily or permanently removing your Celsius Account access
> via the internet, and/or restricting your Celsius Account, and/or closing your
> Celsius Account without prior notice to you (unless prior notice is required
> by law), and we shall have no liability for such actions."[87]

The Debtors' right to freeze customers' access to the platform and retain possession of the digital assets

is thus an asset of the estate which may be enforced by the Debtors and which is protected by the

automatic stay.   Any attempt to coerce the Debtors into returning the Custody Assets would be a clear

violation of the automatic stay imposed under section 362 of the Bankruptcy Code.

---

[84]    *See* 11 U.S.C. § 541(a)(1); *see also In re 48th Street Steakhouse, Inc.*, 835 F.2d 427, 431 (2d Cir. 1987) (landlord's termination notice given to prime tenant violated automatic stay in bankruptcy case of debtor subtenant because it would have resulted in destruction of debtor's subtenancy under nonbankruptcy law).

[85]    *See, e.g., In re Mirant Corp.*, 440 F.3d 238, 251–52 (5th Cir. 2006) (finding that a debtor's interest in a contract is property of the estate protected by the automatic stay, and that a counterparty must seek relief from the stay to terminate a contract); *In re Bd. of Dirs. of Compañía General De Combustibles S.A.*, 269 B.R. 104, 113 (Bankr. S.D.N.Y. 2001) (noting generally that an executory contract may not be terminated without seeking relief from the automatic stay). Note that in a recent case in the Southern District of New York, *Windstream Holdings, Inc. v. Charter Communications Inc.*, No. 21-cv-cv-4552 (S.D.N.Y. Oct. 6, 2022), the District Court held that the defendant's alleged misleading advertisements relating to the debtor's customer contracts was not an act to "exercise control" over such contracts and thus was not a stay violation.   The impact on the Debtors' property interests in this case, however, is notably distinguishable.   Unlike advertisements, which can merely influence customers' choices, allowing customers to withdraw Custody Assets would give such customers direct control over cryptocurrency the Debtors have an interest in and would eliminate a potentially valuable contractual right of setoff.

[86]    *See* Terms of Use at § 19.A.

[87]    *See id.* at § 23.

43.    In the alternative, if the Court were to find that the Custody Assets are not protected by the automatic stay, the Debtors seek to extend the protection of the automatic stay to the Custody Assets pursuant to section 105(a) of the Bankruptcy Code.  Section 105(a) of the Bankruptcy Code embodies the Court's equitable powers and authorizes the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."[88]  Courts in this Circuit have recognized that a section 105(a) injunction may be used to stay actions against non-debtors, for instance, if, among other things, allowing such litigation to advance would adversely affect a debtor's estate.[89]  For the same reasons, section 105(a) allows the Court to extend the stay to Custody Assets.

44.    Courts in this Circuit have applied a modified version of the traditional tests for preliminary injunctions: "(1) whether there is a likelihood of successful reorganization; (2) whether there is an imminent irreparable harm to the estate in the absence of an injunction; (3) whether the balance of harms tips in favor of the moving party; and (4) whether the public interest weighs in favor of an injunction."[90]  Under this standard, regardless of whether the Custody Assets are property of the Debtors' estates, the automatic stay should be extended to such assets while preference actions associated therewith are pending.

45.    *First*, the Debtors have a reasonable likelihood of having a successful reorganization. Despite the challenges and complexities of restructuring one of the largest crypto-based finance platforms in the world, the Debtors have been working towards a path to successfully restructuring in

---

[88]    11 U.S.C. § 105(a).

[89]    *See Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287 (2d Cir. 2003) ("[C]ourts have consistently utilized section 105(a) to extend section 362 to third-party actions against non-debtor entities 'when a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate.'"); *see also Nevada Power Co. v. Calpine Corp. (In re Calpine Corp.)*, 365 B.R. 401, 409 n. 20 (S.D.N.Y. 2007) ("Courts consistently have found that section 105(a) may be used to stay actions against non-debtors even where section 362 otherwise would not provide such relief, recognizing that section 105 grants broader authority than section 362.")

[90]    *Haw. Structural Ironworkers Pension Tr. Fund v. Calpine Corp.*, No. 06 CIV. 5358 (PKC), 2006 WL 3755175, at *4 (S.D.N.Y. Dec. 20, 2006); *In re Calpine Corp.*, 365 B.R. at 409; *Lyondell Chem. Co. v. CenterPoint Energy Gas Servs. Inc. (In re Lyondell Chemical)*, 402 B.R. 571, 588-89 (Bankr. S.D.N.Y. 2009).

the months since the Petition Date, including through ongoing conversations with the Committee on the terms of a go-forward plan and conducting a marketing process in accordance with the bidding procedures approved by the Court.[91]  The Debtors are "proceeding on track and have met the challenges they have faced" thus far and, as such, there is a reasonable likelihood they will successfully restructure.[92]

46.    ***Second***, turning over property before this Court rules on the merits of preference actions or other setoff rights with respect to such property would adversely affect the Debtors' ability to exercise their setoff rights associated therewith and diminish the value of the Debtors' estates.  Moreover, if customers are allowed to withdraw Custody Assets that are subject to preference claims and the Debtors are ultimately successful on such claims, recovering the Custody Assets, if possible at all, would be incredibly burdensome and costly to the Debtors' estates.  As such, absent the extension of the stay, the Debtors would suffer irreparable harm.

47.    ***Third***, the likelihood of irreparable harm to the Debtors that would result if Custody Assets are withdrawn prior to this Court's ruling on preference claims associated therewith far outweighs any risk of harm to customers.  If the Debtors' preference claims are ultimately unsuccessful, customers would simply suffer a short delay in recovering their assets.  Mere delay is insufficient to overcome the dissipation of property belonging to the estate should the Court rule in the Debtors' favor.[93]

48.    ***Finally***, an injunction would serve the public interest.  "Evaluation of the public interest factor of the analysis 'requires a balancing of the public interest in successful bankruptcy reorganizations

---

[91]    *See Order (I) Approving the Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets (II) Scheduling Certain Dates With Respect Thereto, (III) Approving Form and Manner of Notice Thereof, (IV) Approving Contract Assumption and Assignment Procedures, and (V) Granting Related Relief* [Docket No. 1272].

[92]    *See In re Lyondell Chem.*, 402 B.R. at 590 (citation omitted).

[93]    *In re Calpine Corp.*, 365 B.R. at 413 ("The inability of [the defendant] to obtain a hypothetical recovery sooner … is not a harm—and is certainly not an irreparable harm—sufficient to outweigh the irreparable harm that [the debtors] will suffer if the . . . litigation were permitted to proceed.").

with other competing societal interests.'"[94]  Here, the section 105(a) injunction would preserve property of the Debtors' estates and enable equal recoveries between similarly situated creditors.

49.    Accordingly, the extension of the automatic stay pursuant to section 105(a) of the Bankruptcy Code would enable the Debtors to realize the benefits of their contractual rights and maximize the value of their estates to the advantage of all creditors.  As such, the Debtors should be afforded protection to retain the Custody Assets pending this Court's ruling on the merits of preference actions or other setoff rights associated therewith.

**D.    The Debtors Should Retain Certain Custody Assets and Withhold Assets Pending the Resolution of *Prima Facie* Preference Claims.**

50.    The Debtors should be allowed to retain the Transferred Assets pending the adjudication of potentially viable preference claims.  If the Court finds that certain transfers of cryptocurrency are avoidable transfers, there are significant legal and practical implications associated with seeking to enforce such judgment, especially where, here, such transfers relate to the return of cryptocurrency assets and that Celsius' customers reside all over the world.

51.    Section 550(a)(1) of the Bankruptcy Code provides, in relevant part:

> "[T]o the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from . . . the initial transferee of such transfer or the entity for whose benefit such transfer was made . . . ."[95]

---

[94]    *See id.* (quoting 2 Collier on Bankruptcy ¶ 105.02[2]).

[95]    11 U.S.C. § 550(a)(1).

The debtor or trustee's authority to recover property under section 550(a) is generally "coextensive with its authority to avoid fraudulent transfers."[96]  Where a transfer may be avoided, the property may also be recovered.[97]

52.      If the Court determines that the Debtors may recover certain prepetition transfers under section 550, enforcing such judgments in and of itself would be incredibly burdensome and costly to the Debtors' estate.  Typically, to recover assets that they believe are subject to an avoidance action, debtors must bring an adversary proceeding in the bankruptcy court pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") against the transferee.[98]  Upon entry of a final judgment, the Debtors would rely on that transferee's cooperation to comply with the terms of the judgment and return the avoided property.  If the transferee does not cooperate, enforcement measures must be taken to ensure compliance with the order (*e.g.*, law enforcement, sanctions, etc.).

53.      If the Debtors are successful in securing judgments ordering the return of assets, some transferees will likely be located in foreign countries.  Individual customers that reside outside of the United States may not necessarily have incentives to cooperate in the face of a judgment issued by a court in the United States, especially if they remain outside the reach of enforcement agents in the United States.  The Debtors would have to rely on foreign courts to enforce their rights and may need in certain countries to obtain recognition of the United States court order.  Lastly, once a transaction has been completed and written to the blockchain, the transferor, transferee, and the custodial or non-custodial platforms involved are all powerless to cancel, alter, or reverse the transfer.[99]  Transfers cannot be

---

[96]    *In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC*, 917 F.3d 85, 98 (2d Cir. 2019) (citations omitted).

[97]    *See id.*

[98]    *See* Bankruptcy Rule 7001(2) (an adversary proceeding is "a proceeding to determine the validity, priority, or extent of a lien or other interest in property").

[99]    *Can you cancel or reverse a transaction?*, Exodus Support, https://support.exodus.com/article/1732-cancel-or-reverse-transaction#:~:text=No,the%20blockchain%3B%20i.e.%2C%20confirmed (last visited November 5, 2022).

reversed "because doing so would require undoing all of the blocks that came before the block being altered.  This unique attribute of blockchain technology prevents the same cryptocurrency from being fraudulently transferred."[100]   Cryptocurrency was designed to avoid the interference of intermediaries which would otherwise allow for someone to reverse the transaction.[101]  The only way to accomplish a reversal of a transaction is by the transferee initiating a new transfer to the initial transferor.[102]  As such, short of the customer's full cooperation to order assets be transferred back to Celsius' wallets, any clawback of assets would be challenging and, in some cases, likely impossible.

## Conclusion

54.     For the reasons set forth herein, the Debtors request that the Court find that (a) Custody Assets and Withhold Assets do not constitute property of the estate and (b) the Debtors should nonetheless be able to retain the Transferred Assets and certain other Custody Assets for which they may have setoff rights, pending adjudication of the attendant issues.

---

[100]   Doug Fredrick, *Down the Rabbit Hole: Cryptocurrency & Blockchain*, Wis. Law., March 2019, at 22, 25.

[101]   *Can my transaction be canceled or reversed?*, Blockchain.com Support, https://support.blockchain.com/hc/en-us/articles/211162263-Can-my-transaction-be-canceled-or-reversed- ("[C]ryptocurrency transactions on the Bitcoin, Ethereum, and Bitcoin Cash networks are designed to be irreversible") (last visited November 5, 2022).

[102]   *See Some Things You Need to Know*, BITCOIN, https://Bitcoin.org/en/you-need-to-know (last visited Aug. 20, 2022) ("Bitcoin payments are irreversible.  A Bitcoin transaction cannot be reversed, it can only be refunded by the person receiving the funds."); *Regulatory Update*, 24 J. Internet L. 3, 5 (2021) ("Cryptocurrency payments typically are not reversible.  Once you pay with cryptocurrency, you can usually only get your money back if the person you paid sends it back."); Ethereum security and scam prevention, Ethereum, https://ethereum.org/en/security/ ("A transaction sent on Ethereum is irreversible. Unless you know the address owner and can convince them to send you your fund back, there will be no way for you to retrieve your funds.") (last visited November 5, 2022).

New York, New York
Dated: November 5, 2022

/s/ Joshua A. Sussberg

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:          jsussberg@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:          patrick.nash@kirkland.com
                    ross.kwasteniet@kirkland.com
                    chris.koenig@kirkland.com
                    dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*