TOGUT, SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Kyle J. Ortiz
Bryan M. Kotliar
Jared C. Borriello

*Counsel to the Ad Hoc Group of Custodial Account Holders*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
                                              :
In re:                                        :        Chapter 11
                                              :
CELSIUS NETWORK LLC, et al.,[1]               :        Case No. 22-10964 (MG)
                                              :
                                              :        (Jointly Administered)
                               Debtors.       :
                                              :
--------------------------------------------------------------x

## AD HOC GROUP OF CUSTODIAL ACCOUNT HOLDERS' (A) PHASE I OPENING BRIEF AND (B) LIMITED OBJECTION TO THE DEBTORS' MOTION SEEKING ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO REOPEN WITHDRAWALS FOR CERTAIN CUSTOMERS WITH RESPECT TO CERTAIN ASSETS HELD IN THE CUSTODY PROGRAM AND WITHHOLD ACCOUNTS AND (II) GRANTING RELATED RELIEF

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... ii

PRELIMINARY STATEMENT .............................................................................1

OVERVIEW OF PHASE I ISSUES .......................................................................4

FACTUAL OVERVIEW ........................................................................................4

A. The Custody Service...........................................................................................4

    (1)    Formation of the Custody Service ............................................................4

    (2)    Custody Service Terms of Use ..................................................................7

B.  The Debtors Freeze Customer Withdrawals and File for Bankruptcy ...........9

C.  The Complaint and Limited Withdrawal Motion...........................................10

OPENING BRIEF AND LIMITED OBJECTION ...................................................13

A. The Custody Assets Are Not Property of the Estate ........................................13

    (1)    Section 541(a) & 541(d) of the Bankruptcy Code ................................13

    (2)    Under Applicable New York Law, the Clear and Unambiguous Terms of Use
           Clearly Establish That the Custody Assets Are Not Property of the Debtors'
           Estates .....................................................................................................15

B.  The Debtors Have Provided No Basis to Hold  Custody Assets That Are Not
    Property of their Estates ...................................................................................18

    (1)    Transferred Assets Do Not Become Property  of the Estate Until Avoided
           and Recovered .......................................................................................18

    (2)    Withholding Custody Assets Violates State Law.................................22

    (3)    Withholding Custody Assets Violates the Bankruptcy Code............25

    (4)    Withholding Custody Assets Violates Constitutional Due Process ...............28

C.  Preference Claims May Never Be Brought and Are Unlikely to Succeed....................33

CONCLUSION........................................................................................................36

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Begier v. IRS,*
   496 U.S. 53 (1990) ............................................................................................................15

*Butner v. United States,*
   440 U.S. 48 (1979) ............................................................................................................14

*Byblos Bank Euro., S.A. v. Sekerbank Turk Anonym Syrketi,*
   853 N.Y.S.2d 51 (1st Dep't 2008) .....................................................................................32

*Citizens Bank of Md. v. Strumpf,*
   516 U.S. 16 (1995) ............................................................................................................23

*Correspondent Servs. Corp. v. J.V.W. Inv. Ltd.,*
   524 F.Supp.2d 412 (S.D.N.Y. 2007) .................................................................................31

*Dean v. James McHugh Const., Co.,*
   56. A.D. 2d 716 (4th Dep't 1977) .....................................................................................32

*Eden Place, LLC v. Perl (In re Perl),*
   513 B.R. 566 (B.A.P. 9th Cir. 2014) .................................................................................26

*Eden Place, LLC v. Perl (In re Perl),*
   811 F.3d 1120 (9th Cir. 2016)......................................................................................26, 27

*Finucane v. Interior Constr. Corp.,*
   264 A.D.2d 618, 695 N.Y.S.2d 322 (1st Dept. 1999)........................................................15

*Glob. Reinsurance Corp. of Am. v. Century Indem. Co.,*
   22 F.4th 83 (2d Cir. 2021).................................................................................................15

*Greenfield v. Philles Records,*
   98 N.Y.2d 562 (2002) ..................................................................................................15, 16

*In re 1031 Tax Grp., LLC,*
   439 B.R. 47 (Bankr. S.D.N.Y. 2010).................................................................................15

*In re Colonial Realty Co.,*
   980 F.2d 125 (2d Cir. 1992).......................................................................................18, 19, 20, 21

*In re Enron Corp.,*
   Case No. 01-16034 (ALG), 2003 WL 23965469 (Bankr. S.D.N.Y. Jan. 22, 2003) ..............24

*In re Focus Media Inc.,*
   387 F.3d 1077 (9th Cir. 2004)...........................................................................29

*In re Lenox Healthcare, Inc.,*
   343 B.R. 96 (Bankr. D. Del. 2006).....................................................................15

*In re MCZ, Inc.,*
   82 B.R. 40 (Bankr. S.D. Tex. 1987) ...................................................................15

*In re MortgageAmerica Corp.,*
   714 F.2d 1266 (5th Cir. 1983).................................................................19, 20, 21

*In re Peralta,*
   Case No. 18-16661, 2020 WL 13547175 (E.D. Pa. Dec. 4, 2020)..................25, 26

*In re Peralta,*
   48 F.4th 178 (3d Cir. 2022)..............................................................................25

*In re Peralta,*
   617 B.R. 834 (Bankr. E.D. Pa. 2020).................................................................25

*In re R. Bastyr & Assocs.,*
   81 B.R. 978 (Bankr. D. Minn. 1988) ..................................................................23

*In re S.W. Bach & Co.,*
   435 B.R. 866 (Bankr. S.D.N.Y. 2010)................................................................15

*In re Saunders,*
   101 B.R. 303 (Bankr. N.D. Fla. 1989)........................................................18, 19, 21

*In re St. Clair,*
   351 B.R. 660 (D.N.J. 2000)...............................................................................26

*In re Turner,*
   326 B.R. 563 (Bankr. W.D. Pa. 2005) ................................................................26

*In re Westchester Structures, Inc.,*
   181 B.R. 730 (Bankr. S.D.N.Y. 1995).................................................................23

*Intelligen Power Sys., LLC v. dVentus Techs. LLC,*
   Case No. 14 CIV 7392 PAE, 2015 WL 7168527 (S.D.N.Y. Nov. 12, 2015) ........32

*Investors Ins. Co. of Am. v. Dorinco Reinsurance Co.,*
   917 F.2d 100 (2d Cir.1990)...............................................................................17

*Jacobson v. Sassower,*
   66 N.Y.2d 991 (1985) ......................................................................................16

*Katz Agency, Inc. v. The Evening News Association,*
514 F. Supp. 423 (S.D.N.Y. 1981) .......................................................................30

*Kornblum v. Kornblum,*
34 A.D. 3d 748 (2d Dep't 2006) ..........................................................................31

*L. Debenture Tr. Co. of New York v. Maverick Tube Corp.,*
595 F.3d 458 (2d Cir. 2010) ................................................................................16

*Marshall v. Shipman Elevator Co. (In re Marshall),*
240 B.R. 302 (Bankr. S.D. Ill. 1999) ..................................................................24

*Mascis Inv. P'Ship v. SG Cap. Corp.,*
2017 N.Y. Slip. Op. 30813 (Sup. Ct. N.Y. Co. Apr. 21, 2017) ..........................30

*McCann v. Schnitzler,*
254 N.Y. 107 (1930) ...........................................................................................31

*Moody v. Amoco Oil Co.,*
734 F.2d 1200 (7th Cir. 1984) .............................................................................14

*Moran v. Arcano,*
Case No. 89 Civ. 6717 (CSH), 1990 WL 96761 (S.D.N.Y. July 3, 1990) ..........30

*Muskey Corp. v. PDVSA Petroleo S.A.,*
512 F.Supp.2d 155 (S.D.N.Y. 2007) ...................................................................30

*Musso v. Ostashko,*
468 F.3d 99 (2d Cir. 2006) ..................................................................................14

*N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.,*
883 F.3d 32 (2d Cir. 2018) ..................................................................................29

*Northeast United Corp. v. Lewis,*
137 A.D.3d 1387 (3d Dep't 2016) ........................................................................30

*Owens v. Taliban,*
Case No. 22-CV-1949 (VEC), 2022 WL 1090618 (S.D.N.Y. Apr. 11, 2022) ......30

*Pearlman v. Reliance Ins. Co.,*
371 U.S. 132 (1962) .............................................................................................14

*Rajala v. Gardner,*
709 F.3d 1031 (10th Cir. 2013) .....................................................................21, 28

*RJE Corp. v. Northville Indus. Corp.,*
329 F.3d 310 (2d Cir. 2003) ..........................................................................15, 17

*S.I Acquisition, Inc. v. Eastway Delivery Serv., Inc. (In re S.I. Acquisition, Inc.)*,
    817 F.2d 1142 (5th Cir. 1987) ................................................................................20

*Schiavone Const. Co. v. City of New York*,
    99 F.3d 546 (2d Cir. 1996) ......................................................................................15

*Schick v. Herskowitz (In re Schick)*,
    234 B.R. 337 (Bankr. S.D.N.Y. 1999) ....................................................................15

*Sherk v. Texas Bankers Life & Loan Ins. Co. (In re Sherk)*,
    918 F.2d 1170 (5th Cir. 1990) ................................................................................20

*Subin v. U.S. Fidelity & Guaranty Co.*,
    208 N.Y.S.2d 278 (1960) .........................................................................................32

*TAGC Mgmt., LLC v. Lehman*,
    842 F.Supp.2d 575 (S.D.N.Y. 2012) .......................................................................30

*United States v. Whiting Pools, Inc.*,
    462 U.S. 198 (1983) .................................................................................................14

*VisionChina Media Inc. v. Shareholder Representative Servs., LLC*,
    109 A.D.3d 49 (1st Dep't 2013) ..............................................................................31

*W.W.W. Assocs., Inc. v. Giancontieri*,
    77 N.Y.2d 157, 566 N.E.2d 639 (1990) ...................................................................17

*World Ambulette Transpo., Inc. v. Lee*,
    161 A.D.3d 1028 (N.Y. App. Div. 2018) .................................................................16

**Statutes**

11 U.S.C. § 105(a) ...........................................................................................................29

11 U.S.C. § 362 ...............................................................................................................20

11 U.S.C. § 363(e) ...........................................................................................................3

11 U.S.C. § 541 .......................................................................................10, 14, 20, 21

11 U.S.C. § 541(a) ..........................................................................................12, 13, 20

11 U.S.C. § 541(a)(1) ......................................................................................................14

11 U.S.C. § 541(a)(3) .................................................................................................18, 21

11 U.S.C. § 541(d) ......................................................................................................12, 14

11 U.S.C. § 546(e) ........................................................................................................35

11 U.S.C. § 547(b) ........................................................................................................34

11 U.S.C. § 547(c)(1)(B) ..............................................................................................35

11 U.S.C. § 550(a) .....................................................................................................2, 18

11 U.S.C. § 553 .............................................................................................................23

11 U.S.C. § 1129(a)(11) ...............................................................................................24

11 U.S.C. § 1129(a)(3) .................................................................................................24

11 U.S.C. § 1322(b)(8) .................................................................................................25

**Rules**

Fed. R. Bankr. P. 7065 ..................................................................................................29

Fed. R. Civ. P. 65 .........................................................................................................29

N.Y. C.P.L.R. § 5004 ....................................................................................................32

N.Y. C.P.L.R. § 6201 ....................................................................................................30

N.Y. C.P.L.R. § 6212(a) ...............................................................................................30

N.Y. C.P.L.R. § 6212(b) ...............................................................................................31

N.Y. C.P.L.R. § 6212(e) ...............................................................................................31

**Other Authorities**

10 Collier on Bankruptcy ¶ 7065.01 at 7065-5 & 6, nn. 21-23 ...................................29

5 Collier on Bankruptcy ¶ 541.12[4], n.8 (16th ed. rev. 2012) ...................................19

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 367 (1977) ...........................................14

The Ad Hoc Group of Custodial Account Holders (the "Ad Hoc Group")[2] of Celsius Network LLC and its affiliated debtors (the "Debtors" and together with their non-debtor affiliates, "Celsius") in the above-captioned chapter 11 cases (the "Chapter 11 Cases") hereby submits this opening brief and limited objection (this "Opening Brief and Limited Objection") in connection with (a) the Phase I Issues (as defined in that certain *Joint Stipulation and Agreed Scheduling Order By and Among the Debtors, the Committee, and the Ad Hoc Groups with Respect to the Custody and Withhold Issues* [Docket No. 1044, Adv. Pro. Docket No. 12] (the "Scheduling Order")) and (b) the *Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to Reopen Withdrawals for Certain Customers with Respect to Certain Assets Held in the Custody Program and Withhold Accounts and (II) Granting Related Relief,* filed on September 1, 2022 [Docket No. 670] (the "Limited Withdrawal Motion").[3]  In support of this Opening Brief and Limited Objection, the Ad Hoc Group, by and through its undersigned counsel, respectfully states:

## PRELIMINARY STATEMENT[4]

1.      Custody Assets are not property of the Debtors' estates.  The Debtors and the Ad Hoc Group have both argued that under the clear and unambiguous Terms of Use, title to Custody Assets is held by the Custody Service user.  The implications of

---

[2]    Substantially contemporaneously herewith, the Ad Hoc Group filed the *First Supplemental Verified Statement Pursuant to Bankruptcy Rule 2019,* filed on November 4, 2022 [Docket No. 1284].  References herein to (a) "Docket No. __" are to the main chapter 11 case docket under jointly administered case number 22-10964, and (b) "Adv. Pro. Docket No. __" are to the adversary proceeding *Ad Hoc Group of Custodial Account Holders v. Celsius Network LLC* docket under case number 22-01142.

[3]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Scheduling Order or the Limited Withdrawal Motion, as applicable.

[4]    Capitalized terms used but not otherwise defined in this Preliminary Statement have the meanings ascribed to such terms below.

this finding are clear:  the Debtors must unfreeze Custody Assets and permit Custody

Service users to withdraw their property on demand consistent with the Terms of Use.

There is no legal basis for the Debtors to hold property that is not theirs in

contravention of the will of the title holders and true owners of such property—yet the

Debtors seek to distort the Bankruptcy Code to do so.

2.      The Debtors' attempt to distinguish which Custody Assets are returned to

customers because of potential preference claims likewise has no basis in law.  Rather,

Second Circuit precedent is clear—the Debtors' rights to assets that are not property of

the estate only arises once property is actually recovered under section 550 of the

Bankruptcy Code.  To withhold property of third parties prior to recovery violates

section 541 of the Bankruptcy Code; violates state law (potentially resulting in claims

and causes of action against the Debtors for, among other things, breach of contract,

conversion, and other theories of damages); and violates the Custody Service users'

constitutional due process.

3.      Where courts have found that a debtor files for bankruptcy holding only

possession but no other legal or equitable interest in the property—as the Debtors'

position in these Chapter 11 Cases—the debtor cannot use the tools of the Bankruptcy

Code to retain possession where no such right exists.  Instead, the Debtors must satisfy

the high burdens applicable to various procedural remedies like pre-judgment orders of

attachment and injunctions, which the Debtors have not sought—let alone succeeded—

in doing here.

4.      The Second Circuit standard that property cannot be retained until

recovery is legally and logically sound.  The direction of these Chapter 11 Cases is

unclear.  Preference claims may never be brought even if they are viable (which they

may not be).  The Second Circuit drew the line at recovery.  The alternative would

otherwise deprive third parties of their property on grounds untethered from the Bankruptcy Code and without due process.

5.      This deprivation of Custody Service users' property rights has significant consequences.  Without access to their property, the Custody Service users are deprived of their property rights, including, among other things, the ability to sell their assets and reinvest the proceeds, de-risk their holdings due to cryptocurrency market fluctuations, or choose a new custodian or other means of storage for their property.  To make matters worse, Custody Service users are not compensated for the Debtors continuing to hold their Custody Assets, and the Custody Assets may be harmed by the vagaries of the market which Custody Service users are not able to avoid because they are deprived of the right to sell (or otherwise use) their property.[5]  The Debtors do not get to keep property belonging to others and subject them to potentially significant losses simply because it would be administratively convenient for the Debtors to do so.  To rule otherwise would be to essentially require Custody Service users to provide the Debtors with a no-cost option at the users' risk.

6.      Therefore, the Ad Hoc Group files this Opening Brief and Limited Objection and respectfully requests that the Court modify the Proposed Order to (a) issue a finding that Custody Assets are not property of the estate, and (b) require that the Debtors honor all non-insider requests for withdrawals of Custody Assets.

---

[5]     Custody Service users may be entitled to adequate protection under section 363(e) of the Bankruptcy Code.  *See The Official Committee of Unsecured Creditors Objection to the Debtors' Motion Seeking Entry of an Order (I) Permitting the Sale of Stablecoin in the Ordinary Course and (II) Granting Related Relief*, filed on October 25, 2022 [Docket No. 1186] ¶¶ 11-14 (arguing that if cryptocurrency held by the Debtors is not property of the estate, the users with title to such assets may be entitled to adequate protection, including replacement liens for any diminution in value).

## OVERVIEW OF PHASE I ISSUES

7.    Pursuant to the Scheduling Order, the two threshold legal issues for

briefing in Phase I are (together, the "Phase I Issues"):

- whether assets in the Custody and Withhold accounts are property of the Debtors' estates, including whether the Terms of Use are unambiguous on the issue of ownership of such assets; and

- if the assets are not property of the Debtors' estates, whether the Debtors should nonetheless be allowed to continue to hold those assets, and maintain the status quo, with respect to individuals and/or accounts where the Debtors have potentially viable claims, including, without limitation, preference claims.[6]

8.    As is undisputed among the parties to the Terms of Use, the Custody

Assets are not property of the estate, and under applicable law, the consequence of that

fact is that the property must be returned to its rightful owners—the Custody users.

## FACTUAL OVERVIEW

9.    While the Ad Hoc Group believes that under applicable law, this Court

need only consider the clear and unambiguous text of the Terms of Use to determine

ownership of the Custody Assets, the Ad Hoc Group nevertheless includes a recitation

of certain facts relevant to the Custody Service (as defined below).[7]

**A.    The Custody Service**

(1)    Formation of the Custody Service

10.    Celsius was created in 2017 as a cryptocurrency platform in which users

could transfer their cryptocurrency assets and earn rewards on crypto assets (referred to

as the "Earn" program (the "Earn Program")) and/or take loans using those transferred

---

[6]    Scheduling Order ¶ 5.

[7]    The Ad Hoc Group reserves the right to take discovery of the Debtors and/or any third parties to the extent that the Court determines that the Terms of Use are ambiguous.

crypto assets as collateral (referred to as the "Borrow" program (the "<u>Borrow</u>

<u>Program</u>")).[8]  In late 2021, several state securities regulators issued cease and desist or

other similar orders that sought to ban the Earn Program in their states on the grounds

that the Earn Program constituted the offer and sale of unregistered securities.[9]  In

April 2022, following "continued work with regulators around the world," the Debtors

announced changes to "the way our Earn product will function for users in the United

States," and on April 15, 2022, began providing a new product called the "Custody

Service."[10]

11.    For U.S.-based non-accredited investors in states where the Custody

Service was available, (a) any new cryptocurrency transferred to the Debtors went into

the Custody Service, and (b) any existing cryptocurrency in the Earn Program would

continue to remain in the Earn Program and earn rewards.[11]  As such, non-accredited

investors could not transfer cryptocurrency from the Custody Service into the Earn

---

[8]    *See Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, in Support of Chapter 11 Petitions and First Day Motions*, filed on July 14, 2022 [Docket No. 23] (the "<u>First Day Declaration</u>") ¶ 4.

[9]    *See e.g., In the Matter of Celsius Network, LLC, Respondent*, Summary Cease and Desist Order (Sept. 17, 2021) (prohibiting the Debtors from "offering for sale any security, including any Earn Rewards product to or from New Jersey unless the security is registered with the [New Jersey Bureau of Securities], is a covered security, or is exempt from registration" and "accepting any additional assets into an existing Earn Rewards account"); Ala. Sec. Comm., Admin. Order No. SC_2021-0012 (Sept. 16, 2021) ¶ 8 (ordering Debtors to show cause why they "should not be ordered to cease and desist from any further violations of the Alabama Securities Act" because "the Earn Rewards product is not currently registered with the Commission"); Ken. Dep't Fin. Inst., Admin. Order 2021-AH-00024 (Sept. 23, 2021) at 9 (ordering Debtors to cease and desist from "soliciting or selling any security in Kentucky unless that security is registered with the Department"); Tex. State Sec. Bd., SOAH Docket No. 312-220160 (Sept. 17, 2021) ¶ 46 ("At the hearing, the Enforcement Division will present testimony and other admissible evidence in support of its prayer for relief for a proposal for decision for entry of a [cease and desist order] against [r]espondents.").  The Debtors were also recipients of information requests from the New York Attorney General in or around early October 2021 in connection with the New York Attorney General's investigation into the unlawful selling or offering for sale securities and/or commodities within or from the State of New York that are not registered with the state.  *See* Office of the Attorney General of New York, Press Release (Oct. 18, 2021).

[10]    *See* Celsius FAQ (available at https://support.celsius.network/hc/en-us/articles/4838161060381-Custody-FAQ).

[11]    *See* Celsius FAQ.

Program, and no new cryptocurrency could be transferred into the Earn Program unless

the user became an accredited investor.[12]  For U.S.-based accredited investors, such

users would continue to earn rewards through the Earn Program.[13]  Similar to their non-

accredited counterparts, U.S.-based accredited investors would also have their accounts

divided between the Custody Service and the Earn Program; however, accredited

investors could transfer cryptocurrency into the Earn Program.[14]

12.    In connection with the creation of the Custody Service, on April 14, 2022,

the Debtors updated the Terms of Use applicable to the majority of their products,

including the Earn Program and the Custody Service.[15]  "All new customers were

required to view, agree to, and accept Celsius' then effective Terms of Use at the time of

account creation."[16]  In addition to requesting each customer's acceptance to

modifications, the Terms of Use in effect prior to April 14, 2022 provided that a

_____

[12]    *Id.*  The Debtors did not transfer all cryptocurrency of their non-accredited users from the Earn
Program into the Custody Service.  Rather, only new cryptocurrency transferred to the Debtors by
non-accredited users would be held in the Custody Service.

[13]    *Id.*

[14]    *Id.*

[15]    *See Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, Providing Terms of Use
Dating Back to February 18, 2018,* filed on August 8, 2022 [Docket No. 393] ("TOU Declaration") ¶¶ 13
("The Terms of Use Version 8 [dated April 14, 2022] were implemented in response to, among other
things, significant changes in the services offered to customers in the United States, including the
Custody Service.").  Unless otherwise indicated, all references herein to "Terms of Use" are to the
latest version from April 14, 2022, a copy of which is attached hereto as **Exhibit A** and was attached
as Exhibit A-8 to the TOU Declaration.  The April 14, 2022 version of the Terms of Use are the only
version ever applicable to the Custody Service as the Custody Service was created on April 15, 2022
and the Debtors did not subsequently amend, revise, modify and/or supplement the Terms of Use.

[16]    TOU Decl. ¶ 14; First Day Decl. ¶ 60 ("Users sign up for a Celsius account . . . on the Celsius [web or
mobile application] and must digitally execute Celsius' user agreement and 'Terms of Use,' before
being permitted to use the platform or facilitate the purchase or transfer of cryptocurrency."); *see also*
Terms of Use § 1 ("**BY ACCESSING OR USING OUR SERVICES, YOU AGREE TO BE BOUND
BY THE TERMS.  IF YOU DO NOT AGREE TO ANY OF THE PROVISIONS OF THESE TERMS
YOU SHOULD IMMEDIATELY STOP USING THE SERVICES.**") (emphasis in original); *Id.* § 3
("In order to be eligible to access and use the Services, you must (i) be eighteen (18) years of age or
older, (ii) have the legal ability to enter into and be bound by these Terms, (iii) comply with these
Terms, and (iv) register for and maintain an active and valid Celsius Account.").

customer's continued maintenance of its account following the effective date of any change of the Terms of Use constituted acceptance to such modified terms.[17]

13.     Customers and counterparties in the United States were advised of the Terms of Use via email on the date the Terms of Use went into effect (April 15, 2022) and were requested to consent to the Terms of Use prior to using the Debtors' platform.[18]  "In addition, when the General Terms of Use were published, Celsius often sent push notifications to existing users, who were prompted to review, agree to, and accept the General Terms of Use before accessing their accounts."[19]  Finally, the Debtors also "typically advised existing users of updates to the Terms of Use via email and other official Celsius channels, such as its blog."[20]

(2)     Custody Service Terms of Use

14.     The rights of the Debtors and their customers with respect to cryptocurrency assets in the Custody Service (the "Custody Assets") are set forth in the Terms of Use.[21]  Under the Terms of Use, Custody Assets remain property of the user and do not earn rewards.  Specifically, the Terms of Use provide:

---

[17]   TOU Decl., Ex. A-7 (Terms of Use Version 7 in effect from on or around August 3, 2021 to April 13, 2022) § 31 ("Please be aware that the terms and conditions governing the Services can change over time. . . . ***The continued maintenance of your Celsius Account following the effective date of any change will constitute your acceptance of such change and subject your Celsius Account to the modified Terms.***") (emphasis added).

[18]   TOU Decl. ¶ 13.  A copy of a sample email to customers regarding the foregoing update and request to consent is attached as Exhibit L to the TOU Declaration.

[19]   *Id.* ¶ 14.

[20]   *Id.*

[21]   *See id.* ¶¶ 3, 13; Terms of Use.  The Terms of Use are governed by New York law.  Terms of Use § 4(B).

- "Title to any of your Eligible Digital Assets in a Custody Wallet shall at all times remain with you and not transfer to Celsius."[22]

- "Celsius will not transfer, sell, loan or otherwise rehypothecate Eligible Digital Assets held in a Custody Wallet unless specifically instructed by you, except as required by valid court order, competent regulatory agency, government agency or applicable law."[23]

- "As title owner of assets, you bear all risk of loss.  Celsius shall have no liability for any Digital Asset price fluctuations or any or all loss of Digital Assets."[24]

- "When you use the Custody Service, you understand and agree that Celsius may act as the custodian or we may use a Third Party Custodian to provide the Custody Service."[25]

- "By using the Custody Service, you understand and agree to appoint Celsius or a Third Party Custodian selected by Celsius as your agent to store and secure Eligible Digital Assets in a Custody Wallet, and perform other duties customarily performed by a custodian."[26]

15.    The Terms of Use permit any Custody Service user to initiate a withdrawal request with the Debtors at any time for any reason, which could require up to three (3) days for processing.[27]  In the "event of market disruptions or periods of volatility," the Debtors are permitted to suspend customers' access to services, including the Custody Service.[28]  The Terms of Use provide that the Debtors are not obligated to return the exact same digital assets transferred to a Custody Wallet but will

---

[22]    Terms of Use § 4(B).

[23]    *Id.*

[24]    *Id.*

[25]    *Id.*

[26]    *Id.*

[27]    *Id.* § 11.

[28]    *Id.* § 4(B) ("Notwithstanding the foregoing, Celsius may suspend your access to Services, including the Custody Service and your access to a Custody Wallet, in the event of market disruptions or periods of volatility.").

return digital assets of the identical type reflected in a user's Custody account at the time the user requests a return.[29]

## B.    The Debtors Freeze Customer Withdrawals and File for Bankruptcy

16.    On June 12, 2022 (the "Pause Date"), the Debtors paused all withdrawals, swaps, and transfers on the Debtors' platform (the "Pause").  Since the Pause Date, customer withdrawals of Custody Assets have been frozen, and users have been unable to obtain the return of their Custody Assets.[30]  Without access to their Custody Assets, many Custody Service users have experienced tremendous personal hardship, as reflected in the hundreds of letters filed on the docket.

17.    On July 13, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  According to the Debtors, as of the Petition Date, approximately 58,000 users were utilizing the Custody Service, with Custody Assets worth a market value of approximately $180 million (as of July 10, 2022).[31]

---

[29]    *Id.*  ("Celsius is under no obligation to return the actual Eligible Digital Assets initially transferred by you to a Custody Wallet but will return Eligible Digital Assets of the identical type reflected in your Celsius Account at the time you request such a return.").

[30]    The Ad Hoc Group reserves all rights with respect to withdrawals by the Debtors' insiders and employees prior to the Pause Date.  In addition, parties have raised serious questions whether the Debtors' insiders and employees have been able to withdraw cryptocurrency after the Pause Date, including after the filing of these Chapter 11 Cases.  *See, e.g.,* Sam Reynold, *Former CEO of Bankrupt Crypto Lender Celsius Cashes Out $960K in CEL, USDC, Data Shows,* CoinDesk (Oct 11, 2022) (available at https://www.coindesk.com/markets/2022/10/11/former-ceo-of-bankrupt-crypto-lender-celsius-cashes-out-960k-in-cel-usdc-data-show/?outputType=amp) (last visited Oct. 17, 2022) (explaining that data shows the Debtors' former chief executive officer continues to withdraw cryptocurrency after the Petition Date).

[31]    First Day Decl. ¶ 59.  According to the Limited Withdrawal Motion, as of September 1, 2022, approximately 58,300 users hold Custody Assets that are worth approximately $210.02 million in the aggregate (as of August 29, 2022).  Limited Withdrawal Mot. ¶ 9.

C.       **The Complaint and Limited Withdrawal Motion**

18.      Since its formation on or about August 1, 2022, the Ad Hoc Group and its counsel have been working with the Debtors and their advisors and the official committee of unsecured creditors (the "Creditors' Committee") and its advisors regarding the lifting of the Pause and the allowance for continued withdrawals of Custody Assets in accordance with the Terms of Use.

19.      However, shortly after the Debtors declined to commit to immediately unpausing withdrawals of all Custody Assets, on August 31, 2022, the Ad Hoc Group filed the *Complaint for Declaratory Judgment* [Adv. Pro. Docket No. 1] (the "Complaint"). The Complaint sought a "declaratory judgment that digital assets transferred into the Custody Service are property of the Custody users and not property of the estate pursuant to section 541 of the Bankruptcy Code."[32]  The Complaint also sought to require the Debtors to permit withdrawals of Custody Assets in accordance with the Terms of Use.[33]

20.      Hours after the filing of the Complaint, on September 1, 2022, the Debtors filed the Limited Withdrawal Motion.  The Limited Withdrawal Motion requests the entry of an order (the "Proposed Order") allowing the Debtors to permit customers to withdraw certain digital assets in the Custody Program and Withhold Accounts only if (a) such digital assets were only ever in the Custody Program or Withhold Account and (b) such digital assets were transferred from the Earn Program or the Borrow Program in the 90 days before the Petition Date and at the time of such transfer(s), the aggregate value of such transfer(s) was less than $7,575.  *See* Proposed Order ¶ 2.  The Limited

---

[32]    Compl. ¶ 62.

[33]    *Id.*

Withdrawal Motion does not seek to allow customers to withdraw their own assets that may be subject to what the Debtors describe as a "colorable preference claim[]" (the "<u>Preference Limitation</u>") or where the customer has a loan and the Debtors believe they may have a contractual right of setoff (the "<u>Loan Limitation</u>").[34]

21.    In the Limited Withdrawal Motion, the Debtors take the position that Custody Assets are not property of the estate:

- "Following their analysis, the Debtors have identified significant cryptocurrency assets that they do not believe are property of their estates, and as to which the Debtors do not believe they have any colorable causes of action under applicable law."[35]

- "[T]he Debtors believe, following analysis by their advisors and with input from certain of their key stakeholders, *that the cryptocurrency assets in the Custody Program and Withhold Accounts likely do not constitute property of their estates.*"[36]

- "The Debtors submit that the Pure Custody Assets and Pure Withhold Assets do not constitute property of their bankruptcy estates . . . ."[37]

- **"The Withdrawable Assets Do Not Constitute Property of the Estate."**[38]

- **"The Withdrawable Assets Are Property of the Customers."**[39]

- "[T]he parties' intent with respect to the Custody Assets was to *not* pass any degree of ownership to Celsius, meaning such assets (once in the Custody Program) cannot be property of the estate, subject to the one exception when a customer also has an outstanding loan under the Borrow Program."[40]

---

[34]    *See id.*; Limited Withdrawal Mot. ¶¶ 4, 23, 32-38.

[35]    Limited Withdrawal Mot. ¶ 3.

[36]    *Id.* ¶ 4 (emphasis added).

[37]    *Id.* ¶ 21.

[38]    *Id.* at 11 (emphasis in original).

[39]    *Id.* at 13 (emphasis in original).

[40]    *Id.* ¶ 28 (emphasis in original).

- "Consistent with this understanding, in connection with Custody Assets, the terms outline a relationship where, inter alia, Celsius was proscribed from using the Custody Assets for its own benefit, Celsius was acting merely as an agent of customers, Celsius was merely holding the Custody Assets on the customers' behalf, and an economic relationship between the customers and Celsius as to Custody Assets simply was not created."[41]

22.    In addition, in paragraphs 23 through 31 of the Limited Withdrawal Motion, the Debtors explain that the Custody Assets are not property of the estate under sections 541(a) and 541(d) of the Bankruptcy Code because the Debtors have no legal or equitable interest in such assets.  As explained by the Debtors:

> Under New York law, which governs the Latest Terms of Use, contracts are interpreted and enforced in accordance with their plain meaning and clear and unambiguous terms.  The ultimate objective in interpreting an agreement is to determine "the intention of the parties as derived from the language employed." *Here, the ownership and title to the Custody Assets should be determined by the parties' respective contractual rights, as articulated in the Latest Terms of Use, which are clear and provide ample evidence that the parties' intent was that the title and ownership of the Custody Assets remain with the Customers*, and that title and ownership of assets in the Earn Program and the Borrow Program are held by the Debtors . . . .

> Accordingly, the parties' intent with respect to the Custody Assets was to *not* pass any degree of ownership to Celsius, meaning such assets (once in the Custody Program) cannot be property of the estate, subject to the one exception when a customer also has an outstanding loan under the Borrow Program . . .

> Consistent with this understanding, in connection with Custody Assets, the terms outline a relationship where, inter alia, Celsius was proscribed from using the Custody Assets for its own benefit, Celsius was acting merely as an agent of customers, Celsius was merely holding the Custody Assets on the customers' behalf, and an economic relationship between the customers and Celsius as to Custody Assets simply was not created.[42]

---

[41]    *Id.* ¶ 29 (internal citations omitted).

[42]    Limited Withdrawal Mot. ¶¶ 27-28 (internal citations omitted) (emphasis added).

## OPENING BRIEF AND LIMITED OBJECTION

23.     As the Debtors explain in the Limited Withdrawal Motion, the Custody Assets are not property of the estate—an issue that should be decided, without discovery, on the clear and unambiguous language of the Terms of Use.  As the Custody Assets are not property of the estate, the Debtors should not be permitted to continue to hold them and have articulated no legal basis to do so.

24.     Under the clear text of the Bankruptcy Code and controlling Second Circuit law, an *asserted* preference claim (or any other claim) is insufficient to make an asset that belongs to a third-party non-debtor property of a debtor's estate unless and until it is recovered.  Here, the Debtors ask the Court to rule that they can retain the property of potential defendants, to potential causes of action, in a theoretical adversary proceeding that the Debtors may (or may never) file at their discretion.

25.     However, having agreed that title remains with the user, the Debtors continuing to hold the Custody Assets violates state law, the Bankruptcy Code, and constitutional due process.  If the Debtors wish to hold the Custody Assets, they must satisfy the high burden of demonstrating their entitlement to various remedies, such as a pre-judgment order of attachment or injunction, which they have not done so here. Thus, the Court should order the Debtors to honor non-insider withdrawal requests.

**A.     The Custody Assets Are Not Property of the Estate**

(1)     Section 541(a) & 541(d) of the Bankruptcy Code

26.     Section 541 of the Bankruptcy Code provides that the commencement of a bankruptcy case creates an "estate" comprised of all of several categories of enumerated property interests "wherever located and by whomever held."  11 U.S.C. § 541(a).  The Bankruptcy Code does not, by itself, create new legal or equitable interests in property; instead, "[p]roperty interests are created and defined by state law."  *Butner v. United*

*States*, 440 U.S. 48, 54-55 (1979); *Musso v. Ostashko*, 468 F.3d 99, 105 (2d Cir. 2006)

("Whether the debtor has a legal or equitable interest in property such that it becomes

'property of the estate' under section 541 is determined by applicable state law. (citing

*Butner*, 440 U.S. at 54)).

27.    Indeed, Congress was clear that section 541(a)(1) of the Bankruptcy Code

"is not intended to expand the debtor's rights against others more than they existed at

the commencement of the case." H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 367, 368

(1977). Instead, the "rights a debtor has in property at the commencement of the case

continues in bankruptcy—no more, no less." *Moody v. Amoco Oil Co.*, 734 F.2d 1200,

1213 (7th Cir. 1984); *see also Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 135–36 (1962)

("The Bankruptcy Act simply does not authorize a [debtor] to distribute other people's

property among a bankrupt's creditors . . . [S]uch property rights existing before

bankruptcy in persons other than the bankrupt must be recognized and respected in

bankruptcy.").[43]

28.    Importantly, section 541(d) of the Bankruptcy Code provides that

"[p]roperty in which the debtor holds, as of the commencement of the case, ***only legal***

***title and not an equitable interest . . . becomes property of the estate . . . only to the***

***extent of the debtor's legal title to such property, but not to the extent of any equitable***

***interest in such property that the debtor does not hold.***" 11 U.S.C. § 541(d) (emphasis

added). Courts have interpreted this provision to "expressly" provide that "property in

which the debtor ***holds only bare legal title is not property of the estate.***" *In re Lenox*

---

[43]    While the Ad Hoc Group is not seeking at this time the imposition of a constructive trust or other
equitable remedies regarding the Custody Assets, the Supreme Court has held that property held by
a debtor in trust is not property of the estate. *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n.10
(1983) ("Congress plainly excluded property of others held by the debtor in trust at the time of the
filing of the petition.").

*Healthcare, Inc.*, 343 B.R. 96, 100 (Bankr. D. Del. 2006) (emphasis added); *In re S.W. Bach & Co.*, 435 B.R. 866, 878 (Bankr. S.D.N.Y. 2010) (holding that property held in trust, escrow, or as part of bailment is not property of the estate); *In re MCZ, Inc.*, 82 B.R. 40, 42 (Bankr. S.D. Tex. 1987) ("Where Debtor merely holds bare legal title to property as agent or bailee for another, Debtor's bare legal title is of no value to the estate, and Debtor ***should convey the property to its rightful owner.***") (citations omitted) (emphasis added); *see also* Limited Withdrawal Mot. ¶ 24.  As this Court has noted, "[i]f the debtor holds only legal title to the property, that is all that vests in the estate . . . The equitable title or interest is neither 'property of the estate' under section 541 nor 'property of the debtor' under section 547(b)." *In re 1031 Tax Grp., LLC*, 439 B.R. 47, 70-71 (Bankr. S.D.N.Y. 2010) (quoting *Schick v. Herskowitz (In re Schick)*, 234 B.R. 337, 343 (Bankr. S.D.N.Y. 1999) (quoting *Begier v. IRS*, 496 U.S. 53, 59 (1990))).

> (2)     Under Applicable New York Law, the Clear and
>           Unambiguous Terms of Use Clearly Establish That
>           the Custody Assets Are Not Property of the Debtors' Estates

29.     "The fundamental objective of contract interpretation is to give effect to the expressed intentions of the parties." *Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*, 22 F.4th 83, 94 (2d Cir. 2021) (internal quotation marks and citations omitted). Under New York law, a written agreement that is "complete, clear and unambiguous on its face, must be enforced according to the plain meaning of its terms."[44] *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (2002); *RJE Corp. v. Northville Indus. Corp.*, 329 F.3d 310, 314 (2d Cir. 2003) ("Where a contract is clear and unambiguous on its face, the

---

[44]   Section 33 of the Terms of Use sets forth a choice of law provision selecting New York law:  "The relationship between you and Celsius is governed exclusively by the laws of the state of New York, without regard to its conflict of law provisions (other than Sections 5-1401 and 5-1402 of the New York General Obligations Law)."  The "general policy of New York courts to enforce choice of law provisions." *Northville*, 329 F.3d at 314 (first citing *Finucane v. Interior Constr. Corp.*, 264 A.D.2d 618, 619–20, 695 N.Y.S.2d 322, 324 (1st Dept. 1999); and then citing *Schiavone Const. Co. v. City of New York*, 99 F.3d 546, 548 (2d Cir. 1996)).

intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence."). Extrinsic evidence of the parties' intent—*i.e.*, the course of performance—"may be considered only if the agreement is ambiguous, which is an issue of law for the court to decide." *Greenfield*, 98 N.Y.2d at 569; *World Ambulette Transpo., Inc. v. Lee*, 161 A.D.3d 1028, 1031-32 (N.Y. App. Div. 2018) ("[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.") (collecting cases); *see also L. Debenture Tr. Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) ("'Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous.'" (quoting *Greenfield*, 98 N.Y.2d at 569)).

30.    A contract is unambiguous "if the language it uses has a 'definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion." *Greenfield*, 98 N.Y. 2d at 569 (citations omitted); *Maverick Tube Corp.*, 595 F.3d at 466 ("An ambiguity exists where the terms of the contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.") (internal quotation marks and citations omitted). Thus, "if the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity." *Greenfield*, 98 N.Y. 2d at 569-70. (citations omitted).

31.    New York courts construe issues of ambiguity against the drafting party— here, the Debtors. *Jacobson v. Sassower*, 66 N.Y.2d 991, 993 (1985) ("[I]n cases of doubt or ambiguity, a contract must be construed most strongly against the party who prepared

16

it, and favorably to a party who had no voice in the selection of its language."). The reason for this rule is that the party who is drafting the contract is presumably weighting the contract in its favor, and heavily.

32.    Here, the Terms of Use clearly and unambiguously demonstrate the parties' intent that title to Custody Assets remain with the Custody Service users. There are multiple indicia that the Terms of Use are clear and unambiguous on their face—an issue of law for this Court to decide—and should be enforced according to their terms. *First*, the Terms of Use clearly and expressly provide, in numerous provisions, that title to the Custody Assets is and always remains with the user. *See* Terms of Use § 4(B); *see also supra* ¶ 13. *Second*, the creators of the Custody Service (the Debtors) and the drafters of the Custody Service Terms of Use (again, the Debtors) agree with what the contract says and how it should be interpreted. *See* Limited Withdrawal Mot. ¶ 27 ("Here, the ownership and title to the Custody Assets should be determined by the parties' respective contractual rights, as articulated in the Latest Terms of Use, which are clear and provide ample evidence that the parties' intent was the title and ownership of Custody Assets remain with the customers . . . .").

33.    Accordingly, this Court need only look to Terms of Use to find that the Custody Assets were never property of the Debtors, and that agreement must be enforced as written without regard to any extrinsic evidence. *See e.g., Northville*, 329 F.3d at 314; *Investors Ins. Co. of Am. v. Dorinco Reinsurance Co.*, 917 F.2d 100, 104 (2d Cir. 1990) ("Parol evidence may be admitted to explain a writing only when the terms of the writing itself are ambiguous."); *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 163, 566 N.E.2d 639, 642 (1990) ("It is well settled that extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face.") (internal citations omitted).

Thus, for the foregoing reasons, the Court should modify the Proposed Order to find that the Custody Assets are not property of the Debtors' estates.

**B.      The Debtors Have Provided No Basis to Hold
         Custody Assets That Are Not Property of their Estates**

34.      By the Limited Withdrawal Motion, the Debtors seek permission to allow certain, limited withdrawals of Custody Assets that are not subject to the Preference Limitation and the Loan Limitation.  The Debtors—and no other party for that matter—have not provided any authority, in the Limited Withdrawal Motion or otherwise, to discriminate among which Custody Assets are returned to title owners.  For the reasons set forth below, there is no legal basis to differentiate among the return of Custody Assets.

        (1)      Transferred Assets Do Not Become Property
              <u>of the Estate Until Avoided and Recovered</u>

35.      As an initial matter, property does not become property of the estate until it is actually avoided and recovered under the clear text of the Bankruptcy Code and controlling Second Circuit law.  Section 541(a)(3) of the Bankruptcy Code provides that estate property includes "[a]ny interest in property that the trustee recovers under section . . . 550" of the Bankruptcy Code.  11 U.S.C. § 541(a)(3).  Section 550 of the Bankruptcy Code authorizes a trustee or debtor-in-possession to recover transferred property for the benefit of the estate to the extent that a transfer is avoided, among other things, as a preferential or fraudulent transfer under sections 544, 547, and 548 of the Bankruptcy Code.  11 U.S.C. § 550(a) .

36.      In the Second Circuit, under clear and controlling precedent, property recoverable by the trustee or debtor-in-possession is not property of the estate until it is actually recovered.  *In re Colonial Realty Co.*, 980 F.2d 125, 131 (2d Cir. 1992) (citing *In re Saunders*, 101 B.R. 303, 305 (Bankr. N.D. Fla. 1989)); *see also* 5 Collier on Bankruptcy

¶ 541.12[4], n.8 (16th ed. rev. 2012) ("The better rule is that fraudulent conveyed property does not become property of the estate until it has been recovered."). As the Second Circuit has explained, "[T]he inclusion of property recovered by the trustee pursuant to his avoidance powers in a separate definitional subparagraph [of § 541(a)] clearly reflects the congressional intent that such property is not to be considered property of the estate until it is recovered." *Colonial Realty*, 980 F.2d 125, 131 (citing *Saunders*, 101 B.R. at 305 (explaining that if "property that has been fraudulently transferred is included in the § 541(a)(1) definition of property of the estate, then § 541(a)(3) is rendered meaningless with respect to property recovered pursuant to fraudulent transfer actions)). In addition, if property avoidable as a preferential transfer was property of the estate, then a bankruptcy trustee or a debtor-in-possession could recover such property with a turnover action under section 542 of the Bankruptcy Code, which is not the case as a debtor could avoid the two-year statute of limitations on post-petition avoidance actions. *Id.*

37.    In *Colonial Realty*, the Court of Appeals for the Second Circuit revisited a line of decisions from the Fifth Circuit previously cited favorably by the Second Circuit on the question of whether certain claims and causes of action, including fraudulent transfers and state law claims, are property of the estate. Certain of those decisions held that a debtor has a "continuing 'legal or equitable' interest in" property fraudulently transferred so as to bring it within section 541(a) of the Bankruptcy Code. *See Colonial Realty*, 980 F.2d at 131 (citing *In re MortgageAmerica Corp.*, 714 F.2d 1266, 1275 (5th Cir. 1983)).[45] In reaching that conclusion, those decisions relied on section 70a of the

---

[45]    In addition to *MortgageAmerica*, the Second Circuit in *Colonial Realty* cited to two other Fifth Circuit decisions, which were decided after *MortgageAmerica* and relied on *MortgageAmerica* for the

Bankruptcy Act of 1898, which expressly included a reference to "property transferred by [the debtor] in fraud of his creditors." *MortgageAmerica*, 714 F.2d at 1275 (describing the legislative history to section 541(a)(1) of the Bankruptcy Code). On this basis, the Fifth Circuit decisions concluded that actions to recover property fraudulently transferred by the debtor prior to the bankruptcy case belong to the debtor and not the creditor and, thus, are subject to the automatic stay under section 362 of the Bankruptcy Code. *Id.* That holding was subsequently cited favorably by the Second Circuit. *See Colonial Realty*, 980 F.2d at 131 (collecting cases).[46]

38.     After reviewing *MortageAmerica*, the Court of Appeals for the Second Circuit changed course: "[w]e are now persuaded, however, by [*Saunders*] that the correct result was reached in *MortgageAmerica*, but a different statutory analysis is

---

proposition that a debtor has a continuing legal or equitable interest in property fraudulently transferred by the debtor prior to its bankruptcy for purposes of property of the estate under section 541 of the Bankruptcy Code and the automatic stay under section 362 of the Bankruptcy Code. In *S.I Acquisition, Inc. v. Eastway Delivery Serv., Inc.* (*In re S.I. Acquisition, Inc.*), 817 F.2d 1142, 1149-50 (5th Cir. 1987), the Fifth Circuit held that an estate's *cause of action* to recover property is property of the estate. In reaching this decision, the Fifth Circuit summarized *MortgageAmerica* and its holding that fraudulently transferred property itself is property of the estate; a result disagreed with by the Second Circuit in *Colonial Realty* and no longer good law in this circuit. In *Sherk v. Texas Bankers Life & Loan Ins. Co.* (*In re Sherk*), 918 F.2d 1170, 1175-77 (5th Cir. 1990), a spousal bankruptcy case involving a homestead exemption, the Fifth Circuit cited to *MortgageAmerica* in describing Section 70(a) of the Bankruptcy Act of 1898 which included in the estate property transferred by a debtor "in fraud of his creditors." Again, this decision is no longer good law in this circuit after *Colonial Realty*.

[46]     In addition to the reasons that the Fifth Circuit's holding in *MortgageAmerica* is no longer good law in light of *Colonial Realty*, the language cited to by *MortgageAmerica* that property of the estate includes property transferred "in fraud of his creditors" would not include preference payments because preferences were not considered "fraudulent" under the Bankruptcy Act of 1898. Under Section 60(a) of the Bankruptcy Act of 1898, the elements of a preference are (1) the bankrupt was insolvent on the date of the conveyance, (2) the recording of such instrument was within four months before the filing of the petition in bankruptcy, and (3) the person receiving the preference had reasonable cause to believe that a preference was affected. As the Second Circuit has explained "[a]n attempt to prefer is not to be confounded with an attempt to defraud, nor a preferential transfer with a fraudulent one. . . . A preferential payment may be constructively fraudulent, but it is not in and of itself a fraudulent conveyance. It can become the latter in the unusual case where actual fraud in addition to the preference is established." *Van Iderstine v. Nat'l Discount Co.*, 174 F.518, 521-22 (2d Cir. 1909) (citations omitted); *see also* Jacob J. Lesser, *Preferences Under the Bankruptcy Act*, Fordham Law Review (1916) at 13-14 (explaining that "[t]he intent on the part of the debtor must be only to prefer, and involves neither fraud nor bad faith."). No party has alleged that non-insider transfers from the Earn Program to the Custody Service were fraudulent transfers.

appropriate.  *Id.* at 131 (citing *Saunders*, 101 B.R. at 304-06).  In *Saunders*, the United

States Bankruptcy Court for the Northern District of Florida disagreed with the Fifth

Circuit and the *MortgageAmerica* line of cases because of its "inconsistency with other

provisions of the Bankruptcy Code and in the problems associated with applying that

conclusion to other aspects of practice under the Code."  *Saunders*, 101 B.R. at 304-05.

Rather, the *Saunders* court held—and the Second Circuit agreed—that the proper

statutory analysis is that property allegedly fraudulently transferred does not become

property of the estate until it is actually avoided and recovered.  *Id.* at 305 ("Until a

judicial determination has been made that the property was, in fact, fraudulently

transferred, it is not property of the estate.").

39.     Similarly, in *Rajala v. Gardner*, 709 F.3d 1031 (10th Cir. 2013), the Court of

Appeals for the Tenth Circuit sided with the Second Circuit in *Colonial Realty* and

likewise rejected the Fifth Circuit's decision in *MortgageAmerica* because section 541 of

the Bankruptcy Code "plainly does not include fraudulently transferred property until

that property is recovered."  *Id.* at 1038.  In addition to the statutory interpretation

arguments set forth in *Colonial* and *Saunders* that a contrary reading would render

section 541(a)(3) of the Bankruptcy Code meaningless, the Tenth Circuit also ruled on

equitable grounds.  The Tenth Circuit rejected the trustee's argument that the debtor

retained an equitable interest in property fraudulently transferred because "equitable

title" requires "a beneficial interest in property [which] gives the holder the right to

acquire formal legal title."  *Id.* (citations omitted).  Instead, the Tenth Circuit reasoned

that reading "equitable title" to "include any property a trustee merely alleges to have

been fraudulently transferred would violate the concept of equity" because it would

create an interest in property without any showing of merit.  *Id.*

(2)    <u>Withholding Custody Assets Violates State Law</u>

40.    The Debtors agree, and once this Court finds that Custody Assets are not property of the estate, the Debtors' continuing holding of such assets that they do not own violates state law.  *First,* withholding the Custody Assets violates the Terms of Use. The Debtors are only permitted to suspend access to services, including the Custody Service, "in the event of market disruptions or periods of volatility."  *See* Terms of Use § 4(B).  No party has asserted that the Debtors are experiencing either "market disruptions or periods of volatility."  Putting aside whether either of those requirements existed on the Pause Date, any such circumstances, and the need for suspending access to services, has dissipated now that the Debtors are under chapter 11 protection and have the benefit of the automatic stay.  In addition, any market disruption and periods of volatility that may have been present during the Pause Date have largely subsided.[47]

41.    *Second*, depriving Custody Service users of their Custody Assets gives rise to claims and causes of action under state law against the Debtors, including on account of pre- and post-petition conduct.  Such claims and causes of action include, among other things, breach of contract, conversion, and other theories for damages.[48]

---

[47]    *See Bitcoin is now less volatile than S&P 500 and Nasdaq*, Cointelegraph (Nov. 4, 2022) (available at https://cointelegraph.com/news/bitcoin-is-now-less-volatile-than-s-p-500-and-nasdaq); *Bitcoin's volatility falls below Nasdaq and S&P 500's for the first time since 2020*, CNBC, Crypto World (Oct. 21, 2022) (available at https://www.cnbc.com/2022/10/21/bitcoins-volatility-falls-below-nasdaq-and-sp-500s-for-first-time-since-2020.html) ("Bitcoin volatility is at multi-year lows…"); *Bitcoin Flat as Volatility Hits 2-Year Low and Stocks Rise*, Coin Desk (Oct. 20, 2022) (available at https://www.coindesk.com/markets/2022/10/20/bitcoin-flat-as-volatility-hits-2-year-low-and-stocks-rise/); *see also* Sept. 15, 2022, Tr. of Hr'g at 34:19-25 ("There is so much misinformation out there regarding the rebound in crypto and who gets the value associated with the rebound.  As you can see on this slide, crypto, at least the two major coins, BIT and ETH, have recovered significantly since the petition date.  Twenty-five percent increase for Bitcoin, 82 percent increase for ETH."); *Notice of Filing of Second Day Hearing Presentation*, filed on August 15, 2022 [Docket No. 462] at Slide 6 (illustrating cryptocurrency rebound from the Petition Date).

[48]    The members of the Ad Hoc Group reserve the right to assert any claims and causes of action against the Debtors for their failure to return the Custody Assets.

42.    *Third*, the Debtors' asserted contractual rights of setoff regarding the
Borrow Program is not a basis to withhold the Custody Assets.  In the Limited
Withdrawal Motion, the Debtors assert that they "need to consider the extent to which
they may hold a right of setoff against obligations owed to customers, including
customers' obligation to repay loans under the Borrow Program" and, as such, the
Proposed Order "carves out from the relief the reopening of withdrawals for any
customer with any outstanding loans under the Borrow Program."  Limited
Withdrawal Mot. ¶ 36.[49]  Setoff allows entities that owe each other money to apply their
mutual debts against each other, thereby "avoiding the absurdity of making A pay B
when B owes A."  *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 18 (1995).  Setoff rights
arise under state law, and not the Bankruptcy Code.[50]

43.    Here, the Debtors' asserted setoff rights with respect to Custody Assets
are irrelevant because the Custody Assets belong to customers.  As this Court has
explained:

> [S]etoff is applicable only where the debtor and creditor
> "owe" one another.  It is inapplicable where the debtor's
> property is in the possession of the creditor as bailee or
> trustee.  In such an instance, the property is "owned" by the
> bankruptcy estate, and the creditor's obligation as bailee or
> trustee cannot form the basis for a debt which the creditor
> may set off against his claim against the debtor.

---

[49]  Section 9 of the Terms of Use provides that the Debtors "also may take or set off from any Digital
Asset in your Celsius Account, including any of your Digital Assets using the Custody Service (i.e., in
a Custody Wallet), or deduct from any obligations Celsius may have to you, any direct or indirect,
and acquired Obligations that you owe us or our Affiliates."  "Obligations" is defined as "You grant
us a security interest in any and all Eligible Digital Assets using the Earn Service for debts, amounts
owed, or liabilities incurred to us or any of our Affiliates by you or any of your Authorized
Representatives, if any ("Obligations")."  Terms of Use § 9

[50]  Section 553 of the Bankruptcy Code does not create an independent right of setoff; rather, (a) the
Bankruptcy Code preserves setoff rights of non-debtor parties under applicable non-bankruptcy law,
subject to certain limitations that apply in bankruptcy under section 553 of the Bankruptcy Code and
(b) the debtor's right to setoff is established under state law.  *In re Westchester Structures, Inc.*, 181 B.R.
730, 739 (Bankr. S.D.N.Y. 1995) (quoting *In re R. Bastyr & Assocs.*, 81 B.R. 978, 980 n.10 (Bankr. D.
Minn. 1988)).

*In re Enron Corp.*, Case No. 01-16034 (ALG), 2003 WL 23965469, at *1 (Bankr. S.D.N.Y.

Jan. 22, 2003) (quoting *Marshall v. Shipman Elevator Co. (In re Marshall)*, 240 B.R. 302, 304

(Bankr. S.D. Ill. 1999).  The Debtors have not identified any other amounts that Custody

Service users owe the Debtors other than potentially through the Debtors' separate

Borrow Program.  Nor could they as the Debtors did not charge Custody Service users a

fee for using the Custody Service.

44.    This alleged but yet-to-be exercised right of setoff is not a basis to

indefinitely withhold from Custody Service users their Custody Assets which belong to

them.  The Debtors have frozen the Borrow Program during these Chapter 11 Cases—

again, indefinitely—and borrowers are unable to obtain the return of the collateral

securing their loans.[51]  If the Debtors wish to assert the Loan Limitation for not

returning Custody Assets, they should unfreeze the Borrow Program so that customers

may repay their loans, liquidate their collateral (and obtain any surplus), and have their

Custody Assets returned to them.

45.    *Finally*, all of the foregoing creates issues with the Debtors' confirming a

plan in these Chapter 11 Cases.  A chapter 11 plan must be feasible and proposed in

good faith and not in any means forbidden by law.  11 U.S.C. §§ 1129(a)(3) & (11).  A

chapter 11 plan that violates Custody Service users' rights to obtain their property is not

feasible and violates state law for the reasons set forth above.

---

[51]    *See Notice of Filing of Debtors' Statement Regarding Account Holder Loan Obligations*, filed on September
30, 2022 [Docket No. 943] ("[C]onsistent with the pause of withdrawals enacted on June 12, 2022, **the
Debtors are not releasing collateral to Borrowers or setting off claims absent further order of the
bankruptcy court**.") (emphasis in original); *see also id.* ¶ 3 ("This pause also applies to matured loans,
including if the loan-to-value (LTV) ratio of such loan exceeds the liquidation threshold for the
outstanding loans.").

(3)    <u>Withholding Custody Assets Violates the Bankruptcy Code</u>

46.    The Debtors' withholding of the Custody Assets pending resolution of the
preference and loan issues is an improper attempt to use the Bankruptcy Code and
these Chapter 11 Cases to retain possession of property where no legal basis exists for
them to do so.

47.    For example, in *In re Peralta*, 48 F.4th 178 (3d Cir. 2022), a chapter 13
debtor sought to use section 1322(c) of the Bankruptcy Code to cure various missed
payments under a prepetition installment agreement relating to his personal residence,
in order to retain possession of the residence and payoff the remaining installments
pursuant to a chapter 13 plan.[52]  The bankruptcy court below ruled that the debtor's
possession of the property, even after the creditor had obtained a judgment of
possession in its favor, was sufficient to bring the property into the estate, which
enabled the debtor to pay off the remaining installments as part of his chapter 13 plan,
and the debtor did not need to surrender the property back to the owner.  *In re Peralta*,
617 B.R. 834, 840-41 (Bankr. E.D. Pa. 2020).

48.    On appeal, the district court reversed (*see In re Peralta*, Case No. 18-16661,
2020 WL 13547175 (E.D. Pa. Dec. 4, 2020) (the "<u>Peralta District Court Decision</u>"), and on
further appeal, the Court of Appeals for the Third Circuit affirmed the district court (*see
Peralta*, 48 F.4th at 179).  In finding that the debtor could not retain possession of the
premises, consistent with the case law cited in paragraphs 26-28 above, the district court
held that "[c]ontinued *possession alone* of the property by the debtor post-judgment will

---

[52]    Section 1322(c)(1) of the Bankruptcy Code provides that "[n]otwithstanding subsection (b)(2) and
applicable law—(1) a default with respect to, or that gave rise to, a lien on the debtor's principal
residence may be cured under paragraph (3) or (5) of subsection (b) until such residence is sold at a
foreclosure sale that is conducted in accordance with applicable nonbankruptcy law . . . ."  11 U.S.C.
§ 1322(c)(1).

not extend the cutoff point, because the debtor no longer has what is necessary for inclusion within the scope of § 541: 'a good-faith, colorable *claim* to possession.'" Peralta District Court Decision, 2020 WL 13547175, at *3 (quoting *In re St. Clair*, 251 B.R. 660, 666-67 (D.N.J. 2000)) (emphasis in original).  Relevant here, the district court criticized the bankruptcy court using the following analogy:  "[i]ndeed, under the Bankruptcy Court's expansive reading . . . even a 'squatter' on an unexpired leasehold could claim a protected property interest therein, simply by virtue of his possessory 'interest'."  *Id.* at *4 (citing *In re Turner*, 326 B.R. 563, 572–73 (Bankr. W.D. Pa. 2005)). The district court, affirmed by the Third Circuit, reversed for further proceedings as the debtor had no cognizable interest in the premises that could prevent the lender from repossessing the property.  *Id.* at *3 ("[Debtor] should not be able to evade [the judgment of possession] simply because he filed his Petition before physical eviction.").

49.    Similarly, in *Eden Place, LLC v. Perl (In re Perl)*, 811 F.3d 1120 (9th Cir. 2016), after a state court entered judgment on an unlawful retainer action and entered a writ of possession in favor of the purchaser of the debtor's property in a nonjudicial foreclosure sale, the debtor filed for chapter 13 bankruptcy protection, and sought to use the automatic stay to prevent the purchaser from obtaining possession.  *Id.* at 1123. The purchaser filed a motion to lift the automatic stay to repossess the property, but prior to the hearing on the motion, the purchaser locked the debtor out the premises and evicted the debtor.  *Id.* at 1124.  The bankruptcy court below determined that the purchaser violated the automatic stay because the debtor's bare possessory interest "coupled with the possibility of some sort of relief [from the pending litigation]" gave the estate a "protected interest that is subject to the automatic stay."  *Eden Place, LLC v. Perl (In re Perl)*, 513 B.R. 566, 570 (B.A.P. 9th Cir. 2014).

50.     However, on further appeal, the Court of Appeals for the Ninth Circuit

reversed. *Perl*, 811 F.3d at 1123.  In doing so, the Ninth Circuit reasoned that, the

prepetition unlawful detainer action already determined that the debtor had no rights

to the property.  *See id*. at 1130 ("Thus, at the time of the filing of the bankruptcy

petition, [debtor] had been completely divested of all legal and equitable possessory

rights that would otherwise be protected by the automatic stay.").  The lower courts had

therefore erred by allowing the debtor to retain possession of the property "by virtue of

his physical occupancy, notwithstanding the illegality of his continued occupancy." *Id*.

at 1124.  In sum, the debtor could not use the Bankruptcy Code as a sword to prevent

the purchaser from enforcing its state law rights with respect to the property where the

debtor could show no cognizable interests in the property as of the petition date.

51.     Here, the Debtors agree that Custody Service users held title to the

Custody Assets as of the Petition Date and that Custody Assets are not property of the

estate.  Like the courts in *Peralta* and *Perl*, the Debtors are virtual squatters on the

Custody Assets, in that they agree that they did not possess title or any equitable

interest in the Custody Assets as of the Petition Date, have no legal basis to continue to

hold them during the pendency of this case, yet continue to hold them because of

alleged rights under the Bankruptcy Code (that have not been adjudicated).  For the

same reasons that the *Peralta* and *Perl* appeals courts reversed the lower courts—the

debtors' continued "illegality" in retaining possession of property as of the petition date

did not endow the estates with any additional interests in the property during the

pendency of the bankruptcy case—the Court here should likewise order that the

Debtors are required to honor non-insider withdrawals of Custody Assets from the

Custody Service.  And for the same reasons that the *Peralta* and *Perl* appeals courts held

that the debtors in those cases could not use the Bankruptcy Code as a sword to retain

possession of property in which they lacked any rights under state law, here too, the Court should reject the Debtors' attempt to use preference actions (whether asserted or unasserted) arising under the Bankruptcy Code to retain possession of the Custody Assets where no rights to possess such assets exist under state law.

    (4)    <u>Withholding Custody Assets Violates Constitutional Due Process</u>

52.    In the Limited Withdrawal Motion, the Debtors argue, without any legal authority, that they should be able to continue to hold Custody Assets that they believe are not property of the estate because doing so is necessary to enable the Debtors to "effectively pursue preference actions where colorable claims exist." Limited Withdrawal Mot. ¶ 35. This administrative convenience asserted by the Debtors exercises control over property without the Debtors satisfying their burden to obtain various procedural relief that would entitle them to retain possession pending the resolution of preference claims.

53.    The Debtors' withholding Custody Assets they do not own merely on the allegation of potential preference claims violates the Due Process Clause of the U.S. Constitution by allowing the Debtors to enjoin the Ad Hoc Group's property rights on the basis of a mere allegation of a preference claim. *See, e.g., Gardner*, 709 F.3d at 1039 ("[W]e note that a broad reading could potentially violate the Due Process Clause by allowing a trustee to enjoin another party's property rights based only on the allegation of fraud.") (citation omitted). In rejecting the argument that property of the estate includes fraudulently transferred property before it is avoided and recovered (as discussed above), the Tenth Circuit in *Gardner* noted that "[m]ere filing of a fraudulent transfer claim could deprive a bona fide purchaser of his property without judicial supervision, a finding of probable cause, the posting of a bond, or a showing of exigent circumstances—let alone a pre-deprivation opportunity to be heard." *Id.* (citations

omitted).[53]

54.     There are a number of remedies available for parties in similar circumstances as the Debtors that wish to exercise control over property of a counterparty prior to or during the pendency of a litigation for which a judgment has not been issued.  For example, the Debtors could seek—but have not sought—an injunction under Federal Rule of Civil Procedure 65, made applicable to these Chapter 11 Cases under Federal Rule of Bankruptcy Procedure 7065, or under the Court's equitable powers under section 105(a) of the Bankruptcy Code.  *See e.g.,* 10 Collier on Bankruptcy ¶ 7065.01 at 7065-5 & 6, nn. 21-23 ("Because the determination of such claims [under chapter 5 of the Bankruptcy Code] typically takes considerable time, estate representatives have not uncommonly sought 'asset-freezing' injunctions, to prevent the dissipation of one or more of the defendants' assets while the litigation is ongoing."); *see also In re Focus Media Inc.*, 387 F.3d 1077, 1079 (9th Cir. 2004) (when a party in an adversary proceeding alleges fraudulent conveyance or other equitable causes of action, an asset-freezing injunction may issue so long as the requirements for obtaining an injunction have been met).[54]

---

[53] Ultimately, the Tenth Circuit did not resolve the constitutionality question; rather, the court relied upon a plain language reading of the statute, giving Congress's chosen language ordinary meaning, and abiding by the rule against surplusage, all of which the Tenth Circuit found to be consistent with the Bankruptcy Code's goal of equitable distribution.  *Id.*

[54] "A party seeking a preliminary injunction must show (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest."  *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018).  The Debtors have not sought any such injunctions.

55.     Similarly, parties in litigation may seek a prejudgment order of attachment.[55]  Section 6201 of the New York C.P.L.R. provides for a number of instances where an order of attachment may be granted.[56]  However, satisfaction of the statutory criteria is not a guarantee that a court will issue an order of attachment.  *TAGC Mgmt., LLC v. Lehman*, 842 F.Supp.2d 575, 586 (S.D.N.Y. 2012).  "[S]uch relief is discretionary, and since attachment is a harsh remedy, the court must exercise care in its application."  *Muskey Corp. v. PDVSA Petroleo S.A.*, 512 F.Supp.2d 155, 160 (S.D.N.Y. 2007); *see also Northeast United Corp. v. Lewis*, 137 A.D.3d 1387, 1388 (3d Dep't 2016) (because prejudgment attachment is a drastic remedy, New York courts "strictly construe[] C.P.L.R. 6201 "in favor of those against whom it may be employed.").  Furthermore, "attachment under New York law solely for security purposes is appropriate only when it appears likely that a plaintiff will have difficulty in enforcing a judgment."  *TAGC*, 842 F.Supp.2d at 586-87 (quoting *Katz Agency, Inc. v. The Evening News Association*, 514 F. Supp. 423, 429 (S.D.N.Y. 1981); *see also Mascis Inv. P'Ship v. SG Cap. Corp.*, 2017 N.Y. Slip. Op. 30813 (Sup. Ct. N.Y. Co. Apr. 21, 2017) (holding that plaintiff "must demonstrate an identifiable risk that the defendant will not be able to satisfy the judgment.") (quoting

---

[55]  To obtain a pre-judgment attachment under New York law, a plaintiff must show that:  (a) the plaintiff has a cause of action for a money judgment; (b) it is probable that the plaintiff's claim will succeed on the merits; (c) one or more grounds for attachment provided under New York law exist; and (d) the amount demanded from the defendant exceeds all counterclaims known to the plaintiff. *See* N.Y. C.P.L.R. § 6212(a); *Owens v. Taliban*, Case No. 22-CV-1949 (VEC), 2022 WL 1090618, at *2 (S.D.N.Y. Apr. 11, 2022) (citing N.Y. C.P.L.R. § 6212(a)).

[56]  An order of attachment may be granted where "(1) the defendant is a nondomiciliary residing without the state, or is a foreign corporation not qualified to do business in the state; or (2) the defendant resides or is domiciled in the state and cannot be personally served despite diligent efforts to do so; or (3) the defendant, with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiffs favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts." N.Y. C.P.L.R. § 6201.  Non-domiciliary status is not sufficient grounds for granting an attachment "[w]here . . . jurisdiction over the defendant is conceded and attachment is only to secure a judgment."  *Moran v. Arcano*, Case No. 89 Civ. 6717 (CSH), 1990 WL 96761, at *2 (S.D.N.Y. July 3, 1990).  Rather, the inquiry in that case focuses on "whether petitioner's fear that the judgment will not be satisfied is reasonable." *Id.*

*VisionChina Media Inc. v. Shareholder Representative Servs., LLC*, 109 A.D.3d 49, 60 (1st

Dep't 2013).  Here, the Debtors have not and cannot show that they would be entitled to

pre-judgment attachment of the Custody Assets.

56.    Even if Debtors could satisfy these standards, there are a number of

procedural protections for defendants under New York law that must be satisfied in

connection with the Debtors obtaining any pre-judgment orders of attachment.  For

example, the Debtors must post a bond "in a total amount fixed by the court, but not

less than five hundred dollars" covering the potential damages described below.  N.Y.

C.P.L.R. 6212(b).  The posting of a bond is mandatory, and failure to do so requires

vacatur of the order of attachment.  *See e.g., Kornblum v. Kornblum*, 34 A.D. 3d 748, 828

(2d Dep't 2006) ("The failure to timely comply with the undertaking filing requirement

in an order of attachment is a jurisdictional defect rendering the attachment, and any

judgment entered thereon, void."); *see also McCann v. Schnitzler*, 254 N.Y. 107, 110-11

(1930) (holding that the penalty for failure to give security is the loss of attachment).

Furthermore, the Debtors are liable to any defendants "for all costs and damages,

including reasonable attorney's fees, which may be sustained by reason of the

attachment if the defendant recovers judgment, or if it is finally decided that the

[Debtors] were not entitled to an attachment of the defendant's property."  N.Y.

C.P.L.R. 6212(e).

57.    "Under New York law, there is a presumption of damages for the loss of

use of an attached asset . . . ."  *Correspondent Servs. Corp. v. J.V.W. Inv. Ltd.*, 524

F.Supp.2d 412, 423 (S.D.N.Y. 2007) (citations omitted).  New York courts have held that

(a) at the minimum, there is a presumption of legal rate of interest during the period of

attachment, and (b) in addition, a defendant may recover damages "sustained as a

proximate result of the deprivation" of its property.[57]  *See, e.g., Subin v. U.S. Fidelity &*

*Guaranty Co.*, 208 N.Y.S.2d 278, 281 (1960) (holding legal rate presumptive indicator of

actual loss); *Byblos Bank Euro., S.A. v. Sekerbank Turk Anonym Syrketi*, 853 N.Y.S.2d 51, 51

(1st Dep't 2008) (citing *Dean v. James McHugh Const., Co.*, 56. A.D. 2d 716, 717 (4th Dep't

1977) ("[W]e perceive no reason why a party who is wrongfully deprived of the use of

his funds may not recover damages representing more than the legal interest rate,

provided that he can prove such damages were actually sustained as a proximate result

of the deprivation.")).  Examples of the damages considered by courts include the

defendant having to borrow funds at a very high rate of interest to maintain its cash

flow position during the period of attachment (*Dean*, 56 A.D. 2d at 717) and the

defendant's lost opportunity to earn more than the legal rate on his funds during the

period of attachment (*Byblos Bank*, 853 N.Y.S.2d at 51).

58.    Custody Service users are entitled to due process of law before they can be

deprived of their property on the basis of claims that may never be asserted and, if

asserted, may not be successful.  Asset freezing injunctions and pre-judgment orders of

attachment require the Debtors to demonstrate a high burden before depriving

customers of their Custody Assets.  The Debtors have not done so here.

59.    The Debtors also have a track record of losing both customers' and their

own digital assets, whether through hacks or misplacing keys.  For example, in

December 2021, it was reported that the Debtors lost an undisclosed amount of

cryptocurrency when Badger DAO, a lending platform that offers yields on

---

[57]    The legal rate under New York law is 9%.  N.Y. C.P.L.R. § 5004.  "New York has set 9% per year as a
presumptively reasonable interest rate." *Intelligen Power Sys., LLC v. dVentus Techs. LLC*, Case No. 14
CIV 7392 PAE, 2015 WL 7168527, at *6 (S.D.N.Y. Nov. 12, 2015) (citing N.Y. C.P.L.R. § 5004)).

cryptocurrency deposits, was hacked.[58]  Similarly, in June 2022, it was reported that another third party Stakehound lost 35,000 private keys to the Debtors' Ethereum tokens, worth approximately $71 million at the time.[59]  The Debtors have also sued third parties for the turnover and transfer of thousands of cryptocurrency assets worth tens of millions of dollars that the Debtors have been unable to recover, including on account of apparent loss or theft.  Although the Debtors have received final approval of the continued use of their cash management system and secured a backup custodian for their cryptocurrency, the Debtors have a history of losing cryptocurrency and cryptocurrency is inherently subject to hacking and other potential loss.  In any event, by withholding Custody Assets, the Debtors are depriving Custody Service users of their ability to transfer their Custody Assets to a different custodian of their choosing or maintain their Custody Assets in cold storage.

60.    Thus, the Court should allow for Custody Service users to be able to withdraw the Custody Assets that they own so that they can, consistent with their ownership of Custody Assets, determine how to use, store or monetize their property.

## C.    Preference Claims May Never Be Brought and Are Unlikely to Succeed

61.    To date, no preference claims have been brought by the Debtors against any parties, including any current or former Custody Service or Earn Program users.  It is unclear whether and when the Debtors will ever bring preference actions, and for various reasons, preference actions may never be brought.  For example, it is entirely

---

[58]    *See Crypto Lender Celsius Admits Losses in $120M BadgerDAO Hack*, Coin Desk Markets (Dec. 3, 2021) (available at https://www.coindesk.com/markets/2021/12/03/crypto-lender-celsius-admits-losses-in-120m-badgerdao-hack/ (last visited Oct. 19, 2022)).

[59]    *See* First Day Decl. ¶ 93; *see also Celsius Network Lost at Least 35,000 $ETH in Stakehound Key Blunder*, TokenInsight (June 7, 2022) (available at https://tokeninsight.com/en/news/celsius-network-lost-at-least-35-000-eth-in-stakehound-key-blunder (last visited Oct. 19, 2022)).

possible that the Debtors consummate a restructuring solution, either pursuant to a sale

of their assets or a reorganization (or both), in which the reorganized Debtors and/or

buyer do not wish to pursue preference actions because of the impact that it will have

on the future business.  In addition, there is a very active group of preferred

shareholders in these Chapter 11 Cases that have taken the position that the Debtors are

solvent, in which case, if such shareholders are successful and the Debtors are solvent,

there would be no preference claims.[60]

62.    Even if the Debtors were to bring preference claims against Custody

Service users for return of Custody Assets transferred from the Earn Program in the 90

days prior to the bankruptcy filing, such claims are not likely to succeed.  Such claims

would involve heavily contested, complex, difficult, time consuming litigation and

related delay, fees, and expenses.  Among other things, the Court will need to

determine, and the parties may need to take discovery with respect to, a myriad of

issues, such as:

- whether the Debtors can establish a *prima facie* claim for a
preference, including whether a user "moving" cryptocurrency
assets from the Earn Program to the Custody Service is a "transfer
of an interest of the debtor in property" (11 U.S.C. § 547(b));

- whether users withdrew their cryptocurrency from the Earn
Program according to their ordinary course of business with the
Debtors, which requires a fact-intensive analysis of all transfers
between each user and the Debtors in the 90 days prior to the
Petition Date (11 U.S.C. § 547(c)(1)(A));

- whether users withdrew their cryptocurrency from the Earn
Program according to ordinary business terms where the Terms of
Use allows Custody Service users to withdraw cryptocurrency at
any time, in any amount, and without any prior notice, which

---

[60]   *See Motion of Community First Partners, LLC, Celsius SPV Investors, LP, Celsius New SPV Investors, LP,
and CDP Investissements Inc. for Entry of an Order Directing the Appointment of an Official Preferred Equity
Committee*, filed on September 22, 2022 [Docket No. 880] ¶ 42 ("In fact, the Requesting Equity Holders
believe that a meaningful recovery for the Equity Holders is very likely, if not certain.").

requires expert testimony on industry practices and other cryptocurrency companies' terms of use (11 U.S.C. § 547(c)(1)(B));

• whether transfers from the Earn Program are protected by the securities settlement payment safe harbor (11 U.S.C. § 546(e));

• whether any other defendant or non-defendant specific defenses apply; and

• whether any other equitable defenses apply, such as whether a debtor can avoid a payment as a preference where the underlying debt to the counterparty was obtained as a result of fraud.

63.    This litigation is highly uncertain and not likely to be resolved in any preference plaintiff's favor.

64.    Thus, for the reasons set forth above, the Debtors should not withhold from Custody Service users their Custody Assets before final judgments on the underlying preference issues are entered.

[*Remainder of page left blank intentionally*]

## CONCLUSION

WHEREFORE, for the reasons set forth herein, the Ad Hoc Group respectfully requests that the Court modify the Proposed Order and require that the Debtors honor withdrawals by non-insider Custody Service users and grant such other and further relief as may be just and proper.

DATED:      November 5, 2022
               New York, New York

AD HOC GROUP OF CUSTODIAL
ACCOUNT HOLDERS
By its Counsel,
TOGUT, SEGAL & SEGAL LLP
By:

*/s/ Kyle J. Ortiz*
KYLE J. ORTIZ
BRYAN M. KOTLIAR
JARED C. BORRIELLO
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
kortiz@teamtogut.com
bkotliar@teamtogut.com
jborriello@teamtogut.com