**Objection Deadline: November 8, 2022, at 5:00 p.m. (prevailing Eastern Time)**

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

### DEBTORS' SUPPLEMENTAL OBJECTION TO CREDITOR'S NOTICE OF MOTION AND MOTION SEEKING FOR RULING OF FULL TITLE OF OWNERSHIP OF FUNDS WITH RESPECT TO USERS WHO HAVE BEEN BLOCKED ACCESS BY DEBTOR PRIOR TO BANKRUPTCY AND TO REQUEST DISCLOSURE FROM DEBTOR ON THE NUMBER AND AMOUNT OF SUSPENDED/CLOSED ACCOUNTS WHICH FUNDS STILL KEPT BY DEBTOR

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file

this supplemental objection (this "Supplemental Objection") to *Creditor's Notice of Motion and*

*Motion Seeking For Ruling of Full Title of Ownership of Funds With Respect to Users Who Have*

*Been Blocked Access By Debtor Prior to Bankruptcy and to Request Disclosure From Debtor On*

*the Number and Amount of Suspended/Closed Accounts Which Funds Still Kept By Debtor*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, NJ 07030.

[Docket No. 877] (the "Motion"), filed by *pro se* creditor Kwok Mei Po ("Kwok").[2]  In support of this Supplemental Objection, the Debtors submit the *Declaration of Charles Roberts, Deputy Chief Compliance Officer and Data Protection Officer, in Support of the Debtors' Supplemental Objection to Creditor's Notice of Motion and Motion Seeking For Ruling of Full Title of Ownership of Funds With Respect to Users Who Have Been Blocked Access By Debtor Prior to Bankruptcy and to Request Disclosure From Debtor On the Number and Amount of Suspended/Closed Accounts Which Funds Still Kept By Debtor Appointment of an Examiner* (the "Roberts Declaration"), attached hereto as **Exhibit A**, and respectfully state as follows.

## **Preliminary Statement**

1.      Kwok is a customer who established multiple Earn Accounts on the Debtors' platform under her own name and also appears to control several other Earn Accounts established under other names.[3]   Over a period of approximately five months, Kwok transferred cryptocurrency between certain of these accounts to receive Bitcoin rewards, in the process activating the same promotional codes more than once.  In mid-May 2022, the Debtors suspended all Earn Accounts held by or associated with Kwok because her ownership and control of multiple Earn Accounts violated the Terms of Use, which specify that an individual is only allowed to have one individual Earn Account (which can be owned by only one natural person) and one corporate Earn Account, and the Promo Terms, which specify that a customer may not participate in a single promotion more than once.  In June 2022, when the Pause was in effect, Kwok contacted the

---

[2]     The Debtors previously filed their *Objection to Creditor's Notice of Motion and Motion Seeking For Ruling of Full Title of Ownership of Funds With Respect to Users Who Have Been Blocked Access By Debtor Prior to Bankruptcy and to Request Disclosure From Debtor On the Number and Amount of Suspended/Closed Accounts Which Funds Still Kept By Debtor* (the "Initial Objection") [Docket No. 1106].

[3]     Capitalized terms used but not defined in this section shall have the meanings ascribed to such terms elsewhere in this Supplemental Objection.

Debtors to attempt to initiate return of the assets in her Earn Accounts.  The Debtors were unable to do so as a result of the Pause and then, following the Petition Date, the automatic stay.

2.      Now, Kwok asks the Court to rule that, following her account suspension, she is no longer an Earn Account customer, title to the assets in her suspended Earn Accounts reverted from the Debtors to her, and, as a result, the cryptocurrency in her Earn Accounts must therefore be returned to her.  Kwok's request for a ruling that she holds title to the assets in her suspended Earn Accounts must be denied, as should her request to lift the automatic stay.

3.      Kwok provides no legal argument that title to the assets in the accounts at issue reverted from the Debtors to her once they were suspended.  Instead, she relies on her own interpretation of the April 2022 Terms of Use to support her claim.  Yet the plain language of both the August 2021 Terms of Use and the April 2022 Terms of Use indicates that, once an account that earns rewards is suspended, it merely stops earning rewards; it is neither closed nor transformed into any other type of account, and title to the assets therein does not revert to the account holder.  Accordingly, the provisions in the Terms of Use that provide that title to assets in Earn Accounts resides with the Debtors continue to apply to Kwok's Earn Accounts.

4.      Kwok has not met her initial burden of demonstrating that "cause" exists to lift the automatic stay for her claim.  Kwok's requests to lift the stay and for a ruling on title to Earn Account assets implicate legal questions at the core of these chapter 11 cases, and resolving her claim in isolation would be inappropriate.  The Court will likely rule on the issue of who holds title to Earn assets on the Debtors' platform in the context of broader litigation in the coming weeks and months.  Accordingly, because Kwok's request cannot be resolved without comprehensive resolution of these overarching legal questions, which affect all of the Debtors' creditors, the stay should not be lifted with respect to her claim.

5.      In addition, the facts demonstrate that Kwok is similarly situated to other Earn Account holders and should therefore be subject to the same rules.  Kwok argues that the April 2022 Terms of Use required the Debtors to return the cryptocurrency assets in her accounts. There is no such requirement.  Even if the April 2022 Terms of Use called for reversion of title to assets in suspended accounts, which they do not, the Pause and then the automatic stay went into effect during the period when Kwok expected the Debtors to transfer those assets to her. Accordingly, even though Kwok's accounts were suspended, Kwok is similarly situated to the majority of the Debtors' account holders:  she is an unsecured creditor to whom the Pause and the automatic stay apply.

6.      If the Court grants the Motion, a necessary but absurd conclusion would follow: that anyone who *violated* the Terms of Use and the Promo Terms and whose accounts were suspended could receive title to cryptocurrency in their accounts while everyone else must wait. Because this is an untenable proposition and because Kwok's arguments run counter to the plain language of the Terms of Use, the Debtors respectfully request that the Court deny the Motion.

## Background

### I.    Summary of Motion.

7.      Kwok has multiple accounts on the Debtors' platform;  all of which are in the Debtors' "Earn" program (the "Earn Program" and accounts therein, "Earn Accounts") and are suspended.[4]  *See generally* Motion.  Kwok requests that the Court determine who holds title to assets in accounts that have been suspended or closed.  *Id.*  In the Motion, Kwok explains that her Earn Accounts were suspended before the Debtors initiated a freeze on all withdrawals, transfers,

---

[4]    On April 15, 2022, the Debtors began providing a custody service to certain users located in the United States (the "Custody Service" and accounts therein, "Custody Accounts").  For eligible users, the Custody Service serves as the central hub of their digital asset account at Celsius, enabling the user to move their digital assets from Celsius' "Custody Wallet" to other service offerings.  Non-U.S. users were required to use the Earn Program.

and activity on June 12, 2022 (the "Pause"), yet does not state why her accounts were suspended. *Id.*

8.      Kwok states that, for the first time, on June 20, 2022, in response to her email to Celsius asking why her Earn Accounts were suspended, she received an email informing her that her accounts were suspended for violating Sections 5(A) and 5(C) of the Terms of Use (as defined herein), that any rewards that she had earned via the Earn Program would be cancelled, and that any cryptocurrency assets remaining in the Earn Accounts after thirty days would be returned to her. *Id.* ¶ 1; *see also* Roberts Decl., Exhibit A.[5]  As a result of the suspension, Kwok states that her Earn Accounts were "blocked." *Id.* ¶ 2.

9.      Kwok argues that Section 19(A) of the April 2022 Terms of Use provides for return of a user's assets if the Debtors close the customer's account. *Id.* ¶¶ 2, 3.  Kwok further argues that the April 2022 Terms of Use do not differentiate between "suspended" and "closed" accounts and that, accordingly, when an account is suspended, the Debtors are required to return assets to the account holder in the same way as if the account were closed. *Id.* ¶ 3.

10.     Kwok further argues that, under Section 4(D) of the April 2022 Terms of Use, once an Earn Account is suspended or closed and stops earning rewards, such account no longer qualifies as an Earn Account, the customer is no longer a valid customer of the Debtors and, therefore, the Debtors do not hold title to the assets in any of her suspended Earn Accounts. *Id.* ¶¶ 4, 5.

---

[5]      Exhibit A to the Roberts Decl. reproduces the June 14, 2022 email from Kwok to the Debtors and the June 20, 2022 response from the Debtors to Kwok regarding the status of her accounts.

II.    **Kwok's Account Activity.**

11.    Kwok first established an Earn Account on the Debtors' platform on October 13, 2021 ("Account 1"). Roberts Decl. ¶ 5. Subsequently, from October 2021 to March 2022, Kwok opened eight more Celsius accounts from the same physical address, as further explained herein. *Id.* ¶¶ 5–9.

12.    Specifically, on October 27, 2021, a second Earn Account under Kwok's name was opened ("Account 2"). *Id.* ¶ 5. On November 13, 2021, two additional Earn Accounts were opened under Kwok's name ("Account 3" and "Account 4"). *Id.* On November 19, 2021, a fifth Earn Account under Kwok's name was opened ("Account 5"); however, the registration process for Account 5 was not fully completed. *Id.* As part of the registration process for Account 1, Account 2, Account 3, and Account 4, Kwok represented that she was thirty-one years old at the time of registration. *Id.* On November 19, 2021 and December 28, 2021, Earn Accounts under the name of Wai Mui Lui ("Wai") were also opened ("Account 6" and "Account 7," respectively). *Id.* ¶ 6. As part of the registration process for Account 6 and Account 7, Wai represented that she was fifty-eight years old at the time of registration. *Id.* On February 25, 2022, an Earn Account under the name of Kwok Kam King ("Kwok Kam") was opened ("Account 8"). *Id.* ¶ 7. As part of the registration process for Account 8, Kwok Kam represented that he was sixty-eight years old at the time of registration. *Id.* On February 25, 2022, an Earn Account under the name of Kwok Chi Hang ("Kwok Chi") was opened ("Account 9"). *Id.* ¶ 8. As part of the registration process for Account 9, Kwok Chi represented that he was twenty-seven years old at the time of registration. *Id.*

13.    All nine accounts were registered using the same physical address, and almost all log-in attempts to these accounts were completed through the same mobile device. *Id.* ¶ 9.

14.    On May 14, 2022, the Debtors' compliance team (the "Compliance Team") initiated a review of these nine Earn Accounts to determine whether they violated the Terms of Use (as defined herein) and abused the promotional rewards available through the Earn Program. *Id.* ¶ 4.

15.    The Compliance Team determined that, in addition to the five accounts opened under Kwok's name, the four accounts set up under other names (Accounts 6, 7, 8, and 9) were nonetheless being accessed and controlled by Kwok. *Id.* ¶ 15.  Based on the age of the registered users, the Compliance Team determined that Account 6 and Account 7 were likely set up under Kwok's mother's name, Account 8 was likely set up under her father's name, and Account 9 was likely set up under her brother's name. *Id.*

16.    From November 2021 to March 2022, cryptocurrency was transferred back and forth between certain of these accounts, triggering approximately $2,010.00 worth of promotional Bitcoin rewards; these rewards were credited by the Debtors to these accounts.[6] *Id.* ¶ 10.

17.    Specifically, on November 17, 2021, initial transfers of cryptocurrency from an external wallet were made into Account 3 and several promotional codes were submitted (HODL500, STABLE10, STABLE600, STABLE50, CELSIUSCARES), triggering $510.00 worth of Bitcoin rewards.[7] *Id.*  On December 29, 2021, a transfer was made from Account 3 (registered to Kwok) to Account 7 (registered to Wai) and one promotional code (HODL500) was submitted; this transfer triggered $500.00 worth of Bitcoin rewards. *Id.*  On March 5, 2022, two

---

[6]    The Debtors occasionally offered promotional rewards, such as $500 in Bitcoin, to users who opened an Earn Account, transferred cryptocurrency to that account, and maintained a certain balance in an account for a set period of time, such as 90 days.  Roberts Decl. n.3.

[7]    The $510.00 worth of Bitcoin rewards reflect the collection of the HODL500 and STABLE10 promotional codes only.  The transaction did not fulfill the terms and conditions of the other promotional codes submitted. Roberts Decl. n.5

transfers were made from Account 3 (registered to Kwok) to Account 8 (registered to Kwok Kam) and one promotional code (HODL500) was submitted; this transfer triggered $500.00 worth of Bitcoin rewards. *Id.* From March 10, 2022 to March 14, 2022, multiple transfers were made from Account 3 (registered to Kwok) to Account 9 (registered to Kwok Chi) and one promotional code (HODL500) was submitted; these transfers triggered $500.00 worth of Bitcoin rewards. *Id.* Thus, multiple promotional codes were used for these transfers, and one specific promotional code, HODL500, was submitted five times and successfully unlocked foure times. *Id.* ¶¶ 10, 22.

18.      The Compliance Team determined that such activity violated the Celsius General Promo Terms and Conditions (the "Promo Terms"), as well as the general terms of use applicable to all users at the time of such transfers, including Kwok. *Id.* ¶¶ 17–23. The terms of use in effect as of the date of the transfers—and which Kwok accepted for each of the Earn Accounts—were dated August 3, 2021 (the "August 2021 Terms of Use"). *Id.* ¶ 17. The August 2021 Terms of Use were subsequently amended by terms of use dated April 14, 2022 (the "April 2022 Terms of Use," and together with the August 2021 Terms of Use, the "Terms of Use"). *Id.* The August 2021 Terms of Use provide that continued use of accounts after the introduction of revised terms of use constitutes acceptance of the revised terms of use.[8] *Id.* All of the Earn Accounts except for Account 1, Account 3, and Account 6 were accessed after April 2022. *Id.* Accordingly, because Kwok continued using the Accounts following the effectiveness of the April 2022 Terms of Use,

---

[8]    31. Changes in Terms:  Please be aware that the terms and conditions governing the Services can change over time.  We reserve the right to discontinue or make changes to any of the Services.  We may change these Terms, and we may add to or delete from these Terms, and the updated version will supersede all prior versions.  We will provide notice of changes, additions, and deletions, as required by law.  If we have provided advance notice and you do not agree with a change, you may close your Celsius Account(s) and demand repayment of outstanding loans before the effective date of the change, which shall be your sole remedy.  The continued maintenance of your Celsius Account following the effective date of any change will constitute your acceptance of such change and subject your Celsius Account to the modified Terms.

she also accepted the April 2022 Terms of Use for Account 2, Account 4, Account 5, Account 7, Account 8, and Account 9.[9]  *Id.*

19.    Section 7 of the Promo Terms provides that "[u]nless otherwise stated in any Specific Promo Terms each User may not participate in any single Promo more than once.  This includes Users having more than one Celsius account."  *Id.* ¶ 20.

20.    Section 5(A) of the Terms of Use provides the following with respect to the number of accounts an individual may have on the Debtors' platform:

> *This Celsius Account is owned by only one natural person who is and will continue to be the only person authorized to take any action in the Celsius Account.*  By opening an Individual Celsius Account, you represent and warrant that you are and shall at all times continue to be the sole beneficial owner of the Celsius Account and user of all Services facilitated or generated therefrom.

(emphasis added).  *Id.* ¶ 18.

21.    Section 5(C) of the April 2022 Terms of Use also provides as follows:

> Each User is authorized to have *a maximum of one Individual Celsius Account* and one Corporate Account (as in the case of a sole proprietorship) at any given time. . . .  *Celsius may merge, freeze, suspend, or terminate any Account(s) in its sole discretion and for any reason, including to the extent Celsius reasonably believes any such Account(s) to be in breach of this policy.*  Referral awards and any interest credited to this account will therefore be canceled.

(emphasis added).  *Id.*

22.    On May 16, 2022, the Debtors finalized their review and suspended all nine Earn Accounts they believed to have been opened or controlled by Kwok for violating the Terms of Use and the Promo Terms.  *Id.* ¶ 15, 23.  Section 12 of the Terms of Use explains the effect of account

---

[9]    As of September 28, 2022, the only accounts with a non-zero balance were Account 3 (cryptocurrency worth $3.35), Account 6 (cryptocurrency worth $0.03), Account 7 (cryptocurrency worth $2,666.77), Account 8 (cryptocurrency worth $25,656.91), and Account 9 (cryptocurrency worth $25,123.72).  Roberts Decl. n.12.

suspension as follows: "If, at any time, for legal or other reasons, a Celsius Account is suspended or frozen by Celsius, Loaned Digital Assets connected to such Celsius Account shall not be eligible to earn Rewards." *Id.* ¶ 23.

23.    As discussed above, Section 5(C) of the April 2022 Terms of Use authorized the Debtors to "merge, freeze, suspend, or terminate any Account(s) in [their] sole discretion and for any reason, including to the extent Celsius reasonably believes any such Account(s) to be in breach of this policy." The Debtors' actions were also consistent with their right to limit access to, otherwise restrict, or close accounts at any time, as provided in Section 23 of the Terms of Use:

> We reserve the right to limit access to your Celsius Account, which can include temporarily or permanently removing your Celsius Account access via the internet, and/or restricting your Celsius Account, and/or closing your Celsius Account without prior notice to you (unless prior notice is required by law), and we shall have no liability for such actions. In addition, Celsius reserves the right to withhold or delay the transmission of assets to you if you fail to comply with these Terms.

*Id.* ¶ 18. Finally, the Debtors' suspension of Kwok's Earn Accounts was also in accordance with the Promo Terms. Section 11 of the Promo Terms provides as follows:

> Celsius reserves the right to disqualify, revoke or deduct from your account any Bonus (in addition to taking any additional action and exercising any other right Celsius may have in law, agreement or equity) if it determines, in its sole reasonable discretion, that you: have violated any term of the Promo Terms (which include these General Promo Terms, the Terms of Use and the applicable Specific Promo Terms); have misused, manipulated or abused any Promo in any way; or are no longer eligible, for any reason whatsoever, to use Celsius' services.

*Id.* ¶ 21. Because the Debtors determined that Kwok violated the Terms of Use, "misused, manipulated, or abused" the promotional rewards program, the Debtors had the right to take the "additional action" of suspending her accounts and to exercise their right to suspend her accounts,

as provided for in Section 5(C) of the April 2022 Terms of Use and Section 23 of the Terms of Use.[10]

24.     The Debtors notified Kwok of the suspension when she attempted to log into her accounts after May 16, 2022. *Id.* ¶ 24. Upon attempting to log in after May 16, 2022, a message informed Kwok that her accounts were suspended, and she was unable to access her accounts. *Id.* This notification was in accordance with Section 17 of the Terms of Use, which requires the Debtors to directly provide information on account activity to users and only via the platform:

> We will make all logs and records of activities concerning your use of the Services available to you through our platform only. We do not generate periodic statements showing the activity conducted through your use of the Services. You must examine these logs and records and notify us of any unauthorized use of your Celsius Account or credentials, or any error or irregularity with respect to the records of your use of the Services, within fourteen (14) calendar days after the error occurs. If notice is not received within the fourteen (14) calendar-day period, you will not be able to raise any further claim in this respect.

*Id.* n.18.

25.     On June 14, 2022—when the Pause was already in effect—Kwok contacted the Debtors via email to inquire about the reason for the suspensions and to request to have her accounts unfrozen as soon as possible. *Id.* ¶ 26, *see also Id.*, Exhibit A. Kwok stated that she "[had] 4 active accounts in Celsius (me and my family)" and that these accounts were registered

---

[10]     On October 31, 2022, contrary to the Court's *Order Setting Hearing Schedule on Motion Filed by Kwok Mei Po (ECF Doc. #877)* (the "Order") [Docket No.882], Kwok filed a reply to the Debtors' Initial Objection at [Docket No. 1251]. Kwok argues therein that, "Not to mention that the version of Terms of Use that we read and relied upon when we signed up for Debtor's service and opened our accounts, before they changed their terms in April 2022, such sections of 5A and 5C did not exist." Kwok also includes an email purportedly from Celsius Customer Support stating, "Unfortunately there is no option for having a side account but you can use a different email and register a new account on your name and where you can deposit your ETH…" It is unclear what year this email was sent. Although the Debtors are not required to respond to Kwok's reply per the Court's Order, the Debtors submit that Section 5(A) was included in the August 2021 Terms of Use, which were in effect when Kwok opened her Earn Accounts and which she was required to accept. Kwok also continued using certain of the Earn Accounts at issue after the April 2022 Terms of Use went into effect. In any event, Kwok's Earn Accounts were suspended not only for violating the Terms of Use, but also for violating the Promo Terms and abusing the promotional rewards available.

under different names. *Id.* ¶ 26, <u>Exhibit A</u>. Kwok further stated that "there may be multiple account created for one person because some of them when we applied for the account, we noted that we got the promo code entered wrongly," and that she "helped them restart over with a new account." *Id.*

26. As noted above, on June 20, 2022, the Debtors responded to Kwok and informed her that her accounts were suspended because she had violated Sections 5(A) and 5(C) of the Terms of Use. *Id.* ¶ 27, <u>Exhibit A</u>.

27. The Debtors further informed Kwok that any cryptocurrency assets in her suspended Earn Accounts that were not withdrawn from the platform would be transferred to her within the next thirty days and that they had instituted the Pause on all withdrawals, Swap transactions, and transfers between accounts. *Id.* ("Celsius has paused all withdrawals, Swap, and transfers between accounts.").

28. Prior to the expiration of the thirty days (which would have occurred on July 20, 2022), the Debtors filed for chapter 11 on July 13, 2022 (the "<u>Petition Date</u>") and the automatic stay went into effect. *Id.* ¶ 28. On the Petition Date, the Pause was still in place. *Id.*

29. On August 24, 2022, Kwok again contacted the Debtors by email. This time, she stated, "I was trying to withdraw *my* funds from these accounts and found out that *my accounts* were suspended…I want to check how much funds *I have* totals regarding these accounts…" (emphasis added). *Id.* ¶ 29; *see also Id.*, <u>Exhibit B</u>. She listed eight Earn Accounts and requested the account balances and a breakdown of holdings in each account. *Id.* On August 25, 2022, Wai contacted the Debtors by email with the same inquiry, again pointing to eight Earn Accounts. *Id.* ¶ 30; *see also Id.*, <u>Exhibit C</u>. Wai wrote, "*My accounts* named below have been suspended for

at least 3 months and I have been writing to request to resume *my account* and withdraw *my money* from it since early Jun [sic] and no action has been taken from your side" (emphasis added).  *Id.*

30.     As of September 2022, Kwok has less than $4.00 in the aggregate of cryptocurrency in the five accounts under her name and approximately $53,000.00 in the aggregate in the four other accounts that she appears to control but are listed under the names of family members. *Id.* ¶ 31.

31.     The Debtors scheduled the five accounts associated with Kwok with non-zero balances on Schedule F of their Schedules of Assets and Liabilities as general unsecured claims. *See Global Notes and Statements of Limitations, Methodology and Disclaimers Regarding the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs* [Docket No. 974]. The Debtors scheduled the claim  associated with each account separately, since the accounts are under different names, as indicated in the chart below.  *Id.*; see also Roberts Decl. ¶¶ 32–34.

| Name | Page and Line Number | Scheduled Claim Amount |
|---|---|---|
| Chi Hang Kwok | *Page C – 343,* 3.1.097477 | • BTC 0.0451248339413346<br>• USDC 24242.4420501093 |
| Kam Wing Kwok | *Page K – 47,* 3.1.303514 | • BTC 0.0169961014760104<br>• USDC 25324.9756207688 |
| Mei Po Kwok | *Page M – 859,* 3.1.387493 | • BTC 0.000025603077140031<br>• USDC 2.85245766510975 |
| Wai Mui Lui | *Page U-Z – 283,* 3.1.579492 | • BTC 0.135270618607581<br>• USDC 24.96370147379 |
| Wai Mui Lui[11] | *Page U-Z – 283,* 3.1.57949 | • USDC 0.025008929021561 |

---

[11]    Wai Mui Lui is listed twice since two accounts were established under her name.  Roberts Decl. ¶ 34.

## Objection

I.    **The Assets in Kwok's Earn Accounts are Property of the Debtors' Estates.**

32.    Kwok seeks a declaratory judgment on "full title of ownership of funds to respective account holders who experienced a blocked access to the accounts (called "suspended"/"closed" accounts) and been promised by the compliance team of return of funds within 30 days." *See generally* Motion.  The Motion should be denied.

    A.    **Under the Terms of Use, Assets in Kwok's Suspended Earn Accounts Are the Debtors' Property.**

33.    The plain language of both the August 2021 Terms of Use and the April 2022 Terms of Use indicates that the assets in Kwok's suspended Earn Accounts are property of the Debtors' estates.

34.    Section 4(D) of the April 2022 Terms of Use expressly provides that title and ownership of assets in Earn Accounts reside with the Debtors:

> If our Earn Service is available to you, upon your election, you will lend your Eligible Digital Assets to Celsius and grant Celsius all rights and title to such Digital Assets, for Celsius to use in its sole discretion while using the Earn Service…Once such Eligible Digital Assets are received by Celsius into your Earn balance, they shall be Celsius' property, in every sense and for all purposes…

Furthermore, Section 13 of the April 2022 Terms of Use provides:

> In consideration for the Rewards payable to you on the Eligible Digital Assets using the Earn Service, for us entering into any Loan Agreement, and the use of our Services, you grant Celsius, subject to applicable law and for the duration of the period during which you elect to utilize the Eligible Digital Assets in the Earn Service (if available to you) and thus loan such Eligible Digital Assets to us through your Celsius Account, or as collateral under the Borrow Service (if available to you), all right and title to such Eligible Digital Assets, including ownership rights, and the right, without further notice to you, to hold such Digital Assets in Celsius' own Virtual Wallet or elsewhere, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius'

possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets in Celsius' full discretion.  You acknowledge that with respect to Digital Assets used by Celsius pursuant to this paragraph:

1.  You will not be able to exercise rights of ownership;

2.  Celsius may receive compensation in connection with lending or otherwise using Digital Assets in its business to which you have no claim or entitlement; and

3.  In the event that Celsius becomes bankrupt, enters liquidation or is otherwise unable to repay its obligations, any Eligible Digital Assets used in the Earn Service or as collateral under the Borrow Service may not be recoverable, and you may not have any legal remedies or rights in connection with Celsius' obligations to you other than your rights as a creditor of Celsius under any applicable laws.

Section 13 of the August 2021 Terms of Use is substantially the same.[12]

35.    Kwok acknowledges that title lies with the Debtors per the April 2022 Terms of Use ("Per section 4 D. Earn Rewards, it stated that Debtor has title and rights to such digital assets while using the Earn service.").  Motion ¶ 4.  She argues that once her Earn Accounts were suspended such that they stopped earning rewards, however, they were no longer Earn Accounts, in which case "it would not justify that such accounts would have title and rights owned by Debtor as these accounts were neither active Earn account."  *Id.*  Kwok also argues that the Debtors did

---

[12]    In consideration for the Rewards payable to you on your Celsius Account and the use of our Services, you grant Celsius, subject to applicable law and for the duration of the period during which the Eligible Digital Assets are loaned to us through your Celsius Account, all right and title to such Digital Assets, including ownership rights, and the right, without further notice to you, to hold such Digital Assets in Celsius' own Virtual Wallet or elsewhere, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets in Celsius' full discretion. You acknowledge that with respect to Digital Assets used by Celsius pursuant to this paragraph:
    i. You will not be able to exercise rights of ownership;
    ii. Celsius may receive compensation in connection with lending or otherwise using Digital Assets in its business to which you have no claim or entitlement; and
    iii. In the event that Celsius becomes bankrupt, enters liquidation or is otherwise unable to repay its obligations, you may not be able to recover or regain ownership of such Digital Assets, and other than your rights as a creditor of Celsius under any applicable laws, you may not have any legal remedies or rights in connection with Celsius' obligations to you.

not distinguish between "suspended" and "closed" accounts and that, as a result, Section 19(A) of

the April 2022 Terms of Use required the Debtors to return the assets in her suspended Earn

Accounts, as if her account had been closed ("If your Celsius Account has a balance when we

close it, we will repay and return the remaining Digital Assets to you. . ."). *Id.* ¶¶ 2–3.

36.    Kwok's arguments are unavailing.  Kwok fails to provide a sound legal basis for

her argument that title to the assets in her Earn Accounts reverted back to her once her Earn

Accounts were suspended.  Furthermore, Section 12 of the Terms of Use clarifies that when an

Earn Account is suspended, it only stops earning rewards.  See Roberts Decl. ¶ 23.  Because the

plain language of the Terms of Use defines a suspended account independently of a closed account,

a suspended account is distinguishable from a closed account.  The nature of an account cannot

change simply because it loses certain benefits due to the customer's own violation of the Terms

of Use.  A suspended Earn Account does not cease to be an Earn Account, nor is it transformed

into any other type of account.  Earn Accounts are not Earn Accounts solely because they earned

rewards; they are Earn Accounts because of the nature of the relationship between the customer

and the Debtors, and they are the accounts that are available to international customers like Kwok.

As such, Kwok continued to be an Earn Account holder after her suspension.

37.    Kwok relies only on her own interpretation of the April 2022 Terms of Use to

support her arguments.  When a contract's terms are unambiguous, however, courts apply the

meaning of such terms as written.  *In re Enron Corp.*, 292 B.R. 752, 762 (Bankr. S.D.N.Y. 2003)

("If the contract language is unambiguous, this Court must enforce the plain, ordinary, and

common meaning of those terms as a matter of law without reference to extrinsic evidence."); *see*

*also In re Allegiance Telecom, Inc.*, 356 B.R. 93 (Bankr. S.D.N.Y. 2006) ("Under New York law,

a written contract is to be interpreted so as to give effect to the intention of the parties as expressed

in the unequivocal language they have employed.") (internal citations omitted).  Here, both the April 2022 Terms of Use and the August 2021 Terms of Use are unambiguous that title to the assets in Kwok's Earn Accounts resides with the Debtors, and there is no provision indicating that this changes once an account is suspended.  Accordingly, title to the assets in the Earn Accounts did not revert to Kwok upon suspension of her Earn Accounts.

**B.      Kwok Misstates the Debtors' Requests for Relief with Regard to Custody and Withhold Accounts.**

38.      Kwok also misstates certain of the Debtors' efforts to seek authority to allow withdrawal of assets in the Custody Program and Withhold Accounts, and as such, her arguments on that point are inapplicable.  Kwok appears to argue that the nature of Earn Accounts can change because the Debtors themselves have "written a motion to verify and declare titles of ownership of custody accounts for custody account holders (*irrespective of their previous Earn status*)" (emphasis added) and that "the release of their funds has yet to be ruled for custody accounts who were previously in Earn, *however their title of ownership to funds has been verified*" (emphasis added). *Id.* ¶ 5.

39.      To the extent Kwok refers to the *Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to Reopen Withdrawals for Certain Customers with Respect to Certain Assets Held in the Custody Program and Withhold Accounts and (II) Granting Related Relief* [Docket No. 670] (the "Motion to Return Custody/Withhold Assets"), Kwok misstates the relief requested and the arguments made therein.  Kwok asserts that "Regarding the potential clawback subject, the release of their funds has yet to be rules for custody accounts who were previously in Earn, however their title of ownership to funds has been verified."  Motion ¶ 5.  In the Motion to Return Custody/Withhold Assets, the Debtors request authority from the Court to allow the withdrawal of assets that were only ever in the Custody Program or Withhold Accounts.

*See* Motion to Return Custody/Withhold Assets ¶ 5 (describing such assets "Pure Custody Assets" and "Pure Withhold Assets").  Furthermore, the Debtors request authority to allow withdrawal of assets transferred from the Earn Program and the "Borrow Program" to Custody that are below the statutory preference amount set out in section 547 of the Bankruptcy Code.  *Id.* ¶ 4.   Accordingly, the Debtors did not as Kwok asserts, "verify and declare titles of ownership of custody accounts for custody account holders (irrespective of their previous Earn status)."  Motion ¶ 5.  In any case, as an international customer, Kwok was never eligible for a Custody Account, and never transferred assets from an Earn Account to a Custody Account.  Accordingly, she cannot analogize her situation to that of customers who did, and arguments relevant to the Custody Service and Withhold Accounts are inapplicable.

## II.     Kwok Has Failed to Demonstrate Cause for Relief from the Automatic Stay.

40.     Because Kwok's core argument is that she stopped being a customer of the Debtors once her Earn Accounts were suspended such that the cryptocurrency in those suspended Earn Accounts must be returned to her,  Kwok's Motion is also a request for relief from the automatic stay.[13]   The automatic stay is "one of the fundamental debtor protections provided by the bankruptcy laws," and Congress intended that it have broad application.  *See Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 503 (1986) (citation omitted).   It gives the debtor a "breathing spell," shielding the debtor from creditor litigation in various forums when the debtor should focus on its restructuring efforts.  *E. Refractories Co. v. Forty Eight Insulations Inc.*, 157

---

[13] Kwok stated at the November 1, 2022 hearing that she was not asking for relief from the automatic stay, but any ruling that she has title to the assets in her suspended Earn Accounts—and any resulting return of such assets— necessarily requires lifting the automatic stay ("At this point, I understand that with all the other matters going on, including custody accounts, it's not a mature time to ask for relief of automatic stay, so this is not what I am currently asking for my motion . . . But then, according to what was stated in my motion, I want to make the arguments that we have the title of ownership of our funds . . ." Nov. 1 Hr'g Tr. 96:1-11).  Similarly, in her emails to the Debtors, she requested the return of the assets in her accounts.  *See* Roberts Decl., Exhibits A-C.

F.3d 169, 172 (2d Cir. 1998) (citation omitted).   The stay remains in place until the plan of

reorganization is consummated.   *See In re Old Carco LLC*, 500 B.R. 683, 689 (Bankr. S.D.N.Y.

2013) (noting the automatic stay terminated on the effective date of the plan) (citing

11 U.S.C. § 362(c)(2)(C)).

41.    The movant bears the burden of showing "cause" to lift the stay.   *In re Pioneer

Com. Funding Corp.*, 114 B.R. 45, 47–48 (Bankr. S.D.N.Y. 1990).   In the Second Circuit, the

*Sonnax* factors determine whether "good cause" exists to lift the stay.   *In re Sonnax Indus., Inc.*,

907 F.2d 1280, 1285–87 (2d Cir. 1990).[14]   Courts will not lift the stay with regard to unsecured

claims, such as Kwok's claims, unless "extraordinary circumstances are established to justify such

relief."   *In re Res. Cap., LLC*, 501 B.R. 624, 643–44 (Bankr. S.D.N.Y. 2013) (Glenn, J.) (citing

*In re Leibowitz*, 147 B.R. 341, 345 (Bankr. S.D.N.Y. 1992)).

42.    Kwok does not establish "extraordinary circumstances," nor has she carried the

burden of demonstrating a *prima facie* showing of "cause" to lift the stay.   *In re Mazzeo*, 167 F.3d

139, 142 (2d Cir. 1999); *see also In re Leibowitz*, 147 B.R. at 345.   Specifically, Kwok's claim

*does* have a connection to the chapter 11 cases such that resolution of her claim would disrupt the

Debtors' restructuring, lifting the stay would prejudice other creditors, and the harm to the

Debtors' reorganization by lifting the stay outweighs any harm the stay imposes on Kwok.

---

[14]   The *Sonnax* factors are: (1) whether relief would result in a partial or complete resolution of the issues, (2) the lack of any connection with or interference with the bankruptcy case, (3) whether the other proceeding involves the debtor as a fiduciary, (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action, (5) whether the debtor's insurer has assumed full responsibility for defending the action, (6) whether the action primarily involves third parties, (7) whether litigation in another forum would prejudice the interests of other creditors, (8) whether the judgment claim arising from the other action is subject to equitable subordination, (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor, (10) the interests of judicial economy and the expeditious and economical resolution of litigation, (11) whether the parties are ready for trial in the other proceeding, and (12) the impact of the stay on the parties and the balance of harms.   *Sonnax*, 907 F.2d at 1286 (citing *In re Curtis*, 40 B.R. 795 (Bankr. D. Utah 1984)).

**A.      The Automatic Stay Cannot be Lifted for Kwok Because Her Claim is Inextricably Intertwined with the Debtors' Chapter 11 Cases.**

43.      Although Kwok argues that, once her Earn Accounts were suspended and stopped earning rewards, they stopped being Earn Accounts, the first applicable *Sonnax* factor, "lack of any connection with or interference with the bankruptcy case," demonstrates that Kwok's claim "is connected to, and would interfere with, the bankruptcy case" because it is "inextricably intertwined" with the chapter 11 cases. *Sonnax*, 907 F.2d at 1286–87. Because Kwok's claim cannot be resolved without comprehensive resolution of gating legal issues in the Debtors' chapter 11 cases, this factor weighs against lifting the stay.

44.      The plain language of the April 2022 Terms of Use indicates that Kwok's accounts did not stop being Earn Accounts once they were suspended; they only stopped earning rewards. Consequently, because she is still an Earn Account customer, Kwok's claim can only be resolved once the Court rules on the overarching question of who holds title to the assets on the Debtors' platform, specifically assets held in Earn Accounts. The answer to this question affects all of the Debtors' customers and will likely be addressed by the Court in the coming weeks and months. Initial declarations and briefs on these core legal questions were filed in the last two weeks as part of the briefing schedule the Debtors negotiated with the Unsecured Creditors' Committee (the "Committee"), the Ad Hoc Group of Custodial Account Holders, and the Ad Hoc Group of Withhold Account Holders to decide which of the assets on the Debtors' platform are part of the bankruptcy estate. *See Declaration of Oren Blonstein, Head of Innovation and Chief Compliance Officer of Celsius Network Limited, With Respect to Certain Phase I Issues Pursuant to the Joint Stipulation and Agreed Scheduling Order By and Among the Debtors, the Committee, and the Ad Hoc Groups With Respect to the Custody and Withhold Issues* [Docket No. 1192]; *Debtors' Memorandum of Law Regarding Phase I Custody and Withhold Assets* [Docket No. 1291]; *The*

*Official Committee of Unsecured Creditors' (A) Opening Brief on Phase I Custody and Withhold Issues and (B) Statement in Partial Support of and Limited Objection to Debtors' Custody and Withhold Motion* [Docket No. 1290]; and *Ad Hoc Group of Custodial Account Holders' (A) Phase I Opening Brief and (B) Limited Objection to the Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to Reopen Withdrawals for Certain Customers With Respect to Certain Assets Held in the Custody Program and Withhold Accounts and (III) Granting Related Relief* [Docket No. 1292]. Accordingly, it would be inappropriate to grant the relief Kwok requests at this time.

45.    Kwok's claim is also inextricably intertwined with these chapter 11 cases because she is similarly situated to the Debtors' other unsecured creditors. When Kwok contacted the Debtors on June 14, 2022 to inquire about the reason for her suspension, the Pause was already in effect, and Kwok was subject to the Pause like all other similarly situated customers. Furthermore, when the Debtors notified Kwok on June 20, 2022 by email that the assets in her suspended Earn Accounts would be transferred to her within thirty days to the extent not withdrawn, the Debtors also notified her that the Pause was in effect and no transfers were being made. Kwok was therefore treated like all other customers. The Debtors subsequently filed for chapter 11 on July 13, 2022, before the end of the thirty-day period, which invoked the automatic stay. Since the Petition Date, the automatic stay has been in place, further restricting the transfer of assets off the Debtors' platform unless and until it is determined that such assets are not property of the Debtors' estates.

46.    Accordingly, Kwok's circumstances place her squarely in the ranks of the Debtors' general unsecured creditors, and her claim is part and parcel of these chapter 11 cases. See *In re Celsius Network LLC*, 642 B.R. 497, 499 (Bankr. S.D.N.Y. 2022) (Glenn, J) ("Mr. Frishberg and

other 'Earn Account' holders appear to be unsecured creditors of Celsius, whether or not they demanded a return of the balance of their earn account before the chapter 11 petitions were filed . . .").  This overlap between Kwok's claim and the chapter 11 cases weighs strongly in favor of denying the Motion.  *In re New York Classic Motors, LLC*, 2021 WL 2285440, at *5 (Bankr. S.D.N.Y. June 4, 2021) (adopting debtors' argument that "given that the Concession Agreement, the remaining term and the amounts due by the Debtor thereunder are issues central to the chapter 11 case, . . . the Bankruptcy Court is the most economical and expeditious forum to adjudicate the disputes between the parties").

> **B.    Kwok's Claim Interferes with the Debtors' Chapter 11 Cases, and Granting Her Lift Stay Request Would Undermine the Debtors' Efforts to Resolve these Chapter 11 Cases.**

47.    Additionally, under the first *Sonnax* factor ("lack of any connection with or interference with the bankruptcy case"), Kwok's request to lift the stay must be denied because the Debtors are at a critical juncture in the restructuring process, and Kwok's request is a disruptive and impermissible intrusion.  "A principal purpose of the automatic stay" is to allow the Debtors to "focus [their] energies on reorganizing and managing [their] business affairs without facing diversions and litigation . . . ."  *See In re Nw. Airlines Corp.*, 2006 WL 694727, at *1 (Bankr. S.D.N.Y. Mar. 13, 2006).  The Debtors have made significant progress in moving towards a resolution of these chapter 11 cases and should continue to receive the protection of the automatic stay.

48.    For instance, in the last two weeks, the Debtors and their stakeholders filed initial declarations and briefs to determine whether certain of the assets on the Debtors' platform are property of the estates.  Moreover, on September 15, 2022, the Court entered an order approving the appointment of an examiner (the "Examiner") and subsequently, on November 1, 2022, also broadened the scope of the Examiner's investigation.  *See* [Docket Nos. 829, 1260].  The Debtors

are focused on cooperating with the Examiner in order to make progress on these chapter 11 cases. The Debtors are also continuing to cooperate with the Committee's investigation into the Debtors' prepetition operations, which requires constant communication, fulfillment of diligence requests, and negotiations. The Debtors have also moved the claims reconciliation process forward by filing the *Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Submitting Proofs of Claim, (II) Approving Procedures for Submitting Proofs of Claim (III) Approving Notice Thereof, and (IV) Granting Related Relief* (the "Bar Date Motion") [Docket No. 1019]. An objection to the Bar Date Motion has since been filed, and the hearing is scheduled for November 15, 2022. *See* [Docket Nos. 1184, 1226].

49.    The Debtors are mindful of the need to expeditiously pursue a plan of reorganization, confirmation, and emergence, and submit that these activities require their utmost efforts and attention. Lifting the stay for Kwok's claim risks inviting further such requests which will divert and strain the Debtors' resources when they should be singularly focused on the resolution of these chapter 11 cases. *See In re Celsius Network LLC*, 642 B.R. at 504; *In re Res. Cap., LLC*, 2012 WL 3555584, at *3; *In re SunEdison, Inc.*, 557 B.R. 303, 308-9 (Bankr. S.D.N.Y. Sept. 13, 2016) (finding for debtors on this factor based, in part, on risk of "encourag[ing] other claimants to file their own stay relief motions"); *In re Bally*, 402 B.R. 616, 623 (Bankr. S.D.N.Y. Apr. 7, 2009) (similar). That is "the very state of affairs the automatic stay was enacted to prevent." *In re Motors Liquidation Co.*, 2010 WL 4966018, at *5 (S.D.N.Y. Nov. 8, 2010).

### C.    Lifting The Stay Would Compromise the Interests of Other Creditors.

50.    The automatic stay protects not only debtors, but also their creditors. It levels the playing field and ensures that creditors will be treated equally. The second applicable *Sonnax* factor, "the impact of the stay on the parties and the balance of harms," indicates that granting Kwok's Motion would be inconsistent with two key tenets of chapter 11: equal treatment among

similarly situated creditors and an orderly process. Only Kwok stands to benefit from a successful outcome on the Motion, while the automatic stay would continue to prohibit other constituents from recovering any of the value in their accounts on the Debtor's platform. This is especially problematic here, where it was Kwok's violations of the Terms of Use that caused the Debtors to suspend her accounts in the first instance. Kwok laments that it is not "fair" for her suspended accounts to still be considered Earn Accounts. Motion ¶ 5. But it would be fundamentally unfair if Kwok, who violated the Terms of Use and the Promo Terms, is able to receive the cryptocurrency in her suspended Earn Accounts while the majority of the Debtors' other unsecured creditors, including those whose accounts were not suspended, must wait for the resolution of these chapter 11 cases.

### D.    The Balance of Harms Weighs Against Lifting the Automatic Stay.

51.    Unsecured creditors bear a heavy burden in proving that the balance of hardships favors lifting the stay. *See Res. Cap., LLC*, 501 B.R. at 648 (Bankr. S.D.N.Y. 2013) (Glenn, J.) ("If the movant is an unsecured creditor, the policies of the automatic stay weigh against granting the relief requested." (citation omitted)); *In re W.R. Grace & Co.*, 2007 WL 1129170, at *3 (Bankr. D. Del. Apr. 13, 2007) (stating that creditors bear "the heavy and possibly insurmountable burden of proving that the balance of hardships tips significantly in favor of granting relief") (quoting *In re Micro Design, Inc.*, 120 B.R. 363, 369 (E.D. Pa. 1990)).

52.    The harm to the Debtors if the stay is lifted is substantial—if the Motion is granted, it will invite other lift stay motions that will be filed by similarly situated claimants, leading to an unnecessary strain on the Debtors' resources. Kwok has not demonstrated that she will be more prejudiced than any other potential creditor by a short-term delay until key legal issues are resolved. *See In re W.R. Grace & Co.*, 2007 WL 1129170, at *3 ("There is no indication that the state court claims are in any way unique, or that, if proven, Debtors' liability to the [movant], if

any, will be distinguishable from liability for any of the other hundreds of thousands of asbestos claims asserted against Debtors.").

### **Conclusion**

53.    For the foregoing reasons, the Court should deny the Motion because Kwok has not provided a single credible legal argument that the title to the assets in her Earn Accounts reverted to her from the Debtors.  Neither has she established "extraordinary circumstances" to lift the stay at a time when the Debtors and all parties in interest must remain focused on moving these chapter 11 cases forward to a value-maximizing resolution in an efficient and equitable manner.  Accordingly, the Court should deny the Motion.

*[Remainder of page intentionally left blank]*

New York, New York
Dated: November 8, 2022

/s/ Joshua A. Sussberg

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:       (212) 446-4900
Email:             jsussberg@kirkland.com

 - and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:       (312) 862-2000
Facsimile:       (312) 862-2200
Email:             patrick.nash@kirkland.com
                      ross.kwasteniet@kirkland.com
                      chris.koenig@kirkland.com
                      dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

## __Exhibit A__

**Roberts Declaration**

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF CHARLES ROBERTS, DEPUTY CHIEF
COMPLIANCE OFFICER AND DATA PROTECTION OFFICER,
IN SUPPORT OF THE DEBTORS' SUPPLEMENTAL OBJECTION TO
CREDITOR'S NOTICE OF MOTION AND MOTION SEEKING FOR RULING OF
FULL TITLE OF OWNERSHIP OF FUNDS WITH RESPECT TO USERS WHO
HAVE BEEN BLOCKED ACCESS BY DEBTOR PRIOR TO BANKRUPTCY AND TO
REQUEST DISCLOSURE FROM DEBTOR ON THE NUMBER AND AMOUNT OF
SUSPENDED/CLOSED ACCOUNTS WHICH FUNDS STILL KEPT BY DEBTOR**

I, Charles Roberts, Deputy Chief Compliance Officer and Data Protection Officer of

Celsius Network Limited (together with the above-captioned debtors and debtors in possession,

the "Debtors") and certain of its Debtor affiliates (collectively, with their non-Debtor

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, NJ 07030.

affiliates, "Celsius" or the "Company") hereby declare under penalty of perjury:

1.      I am Deputy Chief Compliance Officer and Data Protection Officer of Celsius

Network Limited and certain of its subsidiaries.  I have held the position of Deputy Chief

Compliance Officer since November 2021 and Data Protection Officer at Celsius since

September 2020.  Immediately prior to joining Celsius, I served as the Head of Compliance &

Risk - Transformational Change at Travelex Limited, a foreign exchange company.  Previously,

I was a Director and Chief Compliance Officer at RVB Currency UK Ltd., an authorized payment

institution, and Head of Global Middle Office at World First UK Ltd., an international financial

services company.

2.      I am generally familiar with the Debtors' compliance operations and oversee the

Compliance Team.  Except as otherwise indicated, the statements set forth in this declaration

(this "Declaration") are based upon my personal knowledge, my review of relevant documents and

information concerning the Debtors' compliance and fraud operations, and information obtained

from other members of the Debtors' team and advisors.  I am authorized to submit this Declaration

on behalf of the Debtors.  I am over the age of eighteen and, if called upon to testify, I could and

would testify competently to the facts and opinions set forth in this Declaration.

3.      I submit this Declaration in support of the *Debtors' Supplemental Objection to

Creditor's Notice of Motion and Motion Seeking for Ruling of Full Title of Ownership of Funds

with Respect to Users Who Have Been Blocked Access by Debtor Prior to Bankruptcy and to*

*Request Disclosure From Debtor on the Number and Amount of Suspended/Closed Accounts Which Funds Still Kept by Debtor* (the "Supplemental Objection").[2]

### Kwok's Transaction Details

4.    On May 14, 2022, the Debtors' compliance team (the "Compliance Team") initiated a review of nine Earn Accounts for potential violations of the Terms of Use and reward abuse.  The Compliance Team completed its review on May 16, 2022 and made the following findings with respect to these Earn Accounts.

5.    On October 13, 2021, a first Earn Account under the name of Kwok Mei Po ("Kwok"), an international customer, was opened ("Account 1").  On October 27, 2021, a second Earn Account under Kwok's name was opened ("Account 2").  On November 13, 2021, two additional Earn Accounts were opened under Kwok's name ("Account 3" and "Account 4").  On November 19, 2021, a fifth Earn Account under Kwok's name was opened ("Account 5").  The registration process for Account 5 was not completed.  As part of the registration process for Account 1, Account 2, Account 3, and Account 4, Kwok represented that she was thirty-one years old at the time of registration.

6.    On November 19, 2021 and December 28, 2021, Earn Accounts under the name of Wai Mui Lui ("Wai") were opened ("Account 6" and "Account 7," respectively).  As part of the registration process for Account 6 and Account 7, Wai represented that she was fifty-eight years old at the time of registration.

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Supplemental Objection.

7.      On February 25, 2022, an Earn Account under the name of Kwok Kam King ("Kwok Kam") was opened ("Account 8").  As part of the registration process for Account 8, Kwok Kam represented that he was sixty-eight years old at the time of registration.

8.      On March 5, 2022, an Earn Account under the name of Kwok Chi Hang ("Kwok Chi") was opened ("Account 9").  As part of the registration process for Account 9, Kwok Chi represented that he was twenty-seven years old at the time of registration.

9.      All nine accounts were registered using the same physical address and almost all log-in attempts to these accounts were completed through the same mobile device.

10.     Of the five accounts under Kwok's own name, only one, Account 3, was active. The Compliance Team identified several key transactions associated with these nine accounts, summarized below:[3]

| Transfer | Date | Amounts[4] | Promotional Reward Codes Submitted | Amounts Rewarded | Account Credited |
|---|---|---|---|---|---|
| From external wallet to Account 3 | Nov. 17, 2021 | 50,250.00 USDC 20,007.18 USDC | HODL500 STABLE10 STABLE600 STABLE50 CELSIUSCARES | BTC worth $510.00[5] | Account 3 |
| From Account 3 to Account 6 | Dec. 4, 2021 | 20,169.00 USDC 1.00 USDC | HODL500 STABLE600 STABLE50 STABLE10 | - | - |

---

[3]     From time to time, the Debtors offered promotional rewards, such as the receipt of Bitcoin, when customers transferred cryptocurrency into their Celsius accounts and held a certain balance for a set amount of time, such as 90 days.

[4]     Each approximate amount of cryptocurrency listed constituted a separate transfer.

[5]     These rewards reflect the collection of the HODL500 and STABLE10 rewards only.  The STABLE600 and STABLE50 rewards were never unlocked by the user because of subsequent withdrawals of USDC from the account causing the balance to fall below the minimum balance required to keep these rewards active.

| Transfer | Date | Amounts[4] | Promotional Reward Codes Submitted | Amounts Rewarded | Account Credited |
|---|---|---|---|---|---|
| | | | CELSIUSCARES[6] | | |
| From Account 6 to Account 3 | Dec. 5, 2021<br>Dec. 5, 2021<br>Dec. 8, 2021<br>Dec. 15, 2021 | 4,999.00 USDC<br>1.00 USDC<br>15,170.00 USDC<br>16.615993 USDC | - | - | - |
| From Account 3 to Account 7 | Dec. 29, 2021 | 20,920.00 USDC | HODL500 | BTC worth $500.00 | Account 7 |
| From Account 3 to Account 8 | Mar. 5, 2022<br>Mar. 5, 2022 | 1.00 USDC<br>24,999.00 USDC | HODL500 | BTC worth $500.00 | Account 8 |
| From Account 3 to Account 9 | Mar. 10, 2022<br>Mar. 11, 2022<br>Mar. 11, 2022<br>Mar. 11, 2022<br>Mar. 14, 2022 | 0.00003 BTC<br>0.02700779 BTC<br>1.00 USDC<br>23,952.00 USDC<br>4.00 USDC | HODL500 | BTC worth $500.00 | Account 9 |

11.     In March 2022, the majority of the cryptocurrency from Account 3 (approximately equivalent to $51,897.26) and the majority of the cryptocurrency from Account 7 (approximately equivalent to $20,044.27) were withdrawn.  Cryptocurrency from the other Earn Accounts was not withdrawn.

**Celsius' Promotional Program**

12.     In the ordinary course of Celsius' business, Celsius provides users with certain promotional offers, referrals, and other bonuses, subject to the Celsius General Promo Terms and Conditions (the "Promo Terms").[7]

---

[6]     These promotional codes were not successfully unlocked; all of the promotional codes except for CELSIUSCARES were automatically cancelled.  The CELSIUSCARES code expired.

[7]     A copy of the Promo Terms is attached to the *Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, Providing Terms of Use Dating Back to February 18, 2018* [Docket No. 393] (the "TOU Declaration") as Exhibit G.

13.     As explained in the Promo Terms, several requirements must be met to obtain certain offers, such as Bitcoin rewards. The following promotional codes and offers were submitted and successfully unlocked by Kwok's account activity, under the following conditions, as described in the Promo Terms:

- **HODL500**:
  - Transfer $25,000 or more of any supported asset(s) to your Celsius account and receive $500 in BTC.
  - Funds must be transferred within 20 days of activating your promo code.
  - You must maintain an account balance equal to or greater than your balance after completing your transfer of $25,000 or more.
  - Withdrawing from your account within 90 days of completing your transfer may disqualify you from receiving your reward.
  - Rewards are distributed after 90 days of maintaining a qualifying account balance.

- **STABLE10**:
  - Transfer $50 or more in USDC or USDT to your Celsius account and receive $10 in BTC.
  - Funds must be transferred within 30 days of activating your promo code.
  - You must maintain an account balance equal to or greater than your balance after completing your transfer of $50 or more.
  - Transferring assets out of your account within 30 days of completing your transfer will disqualify you from receiving your reward.
  - Rewards are distributed after 30 days of maintaining a qualifying account balance.
  - This promo code is valid for new and existing users.

14.     The other promotional codes applied to the above transactions (STABLE600, STABLE50, CELSIUSCARES) were not successfully unlocked; they either expired or were cancelled because the transactions did not meet the terms of the specific promotion.[8]

---

[8]     The terms applicable to these promotional codes were as follows:

STABLE600:  Transfer $25,000 or more in USDC or USDT to your Celsius account and receive $600 in BTC; Funds must be transferred within 30 days of activating your promo code; You must maintain an account balance equal to or greater than your balance after completing your transfer of $25,000 or more; Transferring assets out of your account within 90 days of completing your transfer will disqualify you from receiving your reward; Rewards are distributed after 90 days of maintaining a qualifying account balance; This promo code is valid for

**Suspension of Kwok's Accounts**

15.     The Compliance Team determined that the accounts registered under names other than Kwok's own were registered under the names of her family members.  This determination was corroborated by the age listed by each of Kwok, Wai, Kwok Kam, and Kwok Chi when registering.  Thus, the Compliance Team suspected that Account 6 and Account 7 were established under the name of Kwok's mother, Account 8 was established under the name of Kwok's father, and Account 9 was established under the name of Kwok's brother.  Because (a) all nine account holders registered using the same physical address associated with Kwok and (b) almost all log-in attempts to these accounts were completed through the same mobile device, the Compliance Team made a reasonable determination that all nine accounts were likely accessed and controlled by Kwok.  Based on these findings, the Compliance Team suspended all nine Earn Accounts on May 16, 2022.

16.     As such, the Compliance Team determined that cryptocurrency was transferred between certain of these nine Earn Accounts, all of which were determined to have been accessed

---

new and existing users.

STABLE50:  Transfer $200 or more in USDC or USDT to your Celsius account and receive $50 in BTC; Funds must be transferred within 30 days of activating your promo code; You must maintain an account balance equal to or greater than your balance after completing your transfer of $200 or more; Transferring assets out of your account within 30 days of completing your transfer will disqualify you from receiving your reward; Rewards are distributed after 30 days of maintaining a qualifying account balance; This promo code is valid for new and existing users.

CELSIUSCARES:  Transfer $5,000 or more of any supported asset(s) to your Celsius account and receive $150 in BTC; Funds must be transferred within 30 days of activating your promo code; You must maintain an account balance equal to or greater than your balance after completing your transfer of $5,000 or more; Transferring assets out of your account within 60 days of completing your initial transfer will disqualify you from receiving your reward; Rewards are distributed after 60 days of maintaining a qualifying account balance.

and controlled by Kwok, for the purpose of triggering approximately $2,010.00 worth of promotional Bitcoin rewards by participating in the same promotions repeatedly.

### Terms Applicable to Kwok's Account Suspensions

17.    The Compliance Team suspended the Accounts based on its reasonable belief that these Earn Accounts were in breach of the Promo Terms and the general terms of use applicable to all users at the time of such transfers, including Kwok. The terms of use in effect as of the date of the transfers—and which Kwok accepted for each of the Earn Accounts—were dated August 3, 2021 (the "August 2021 Terms of Use").[9]   The August 2021 Terms of Use were subsequently amended and replaced by terms of use dated April 14, 2022 (the "April 2022 Terms of Use," and together with the August 2021 Terms of Use, the "Terms of Use").[10]   As an international customer, Kwok was not required to affirmatively accept the April 2022 Terms of Use. Under the August 2021 Terms of Use, continued use of Celsius accounts after the introduction of revised terms of use constituted acceptance of the revised terms of use.[11]   All of the Earn Accounts except for Account 1, Account 3, and Account 6, were accessed after April 2022. Accordingly, because Kwok continued using the Accounts following the effectiveness

---

[9]    A copy of the August 2021 Terms of Use is attached to the TOU Declaration as Exhibit A-7.

[10]    A copy of the April 2022 Terms of Use is attached to the TOU Declaration as Exhibit A-8.

[11]    31. Changes in Terms:  Please be aware that the terms and conditions governing the Services can change over time.  We reserve the right to discontinue or make changes to any of the Services.  We may change these Terms, and we may add to or delete from these Terms, and the updated version will supersede all prior versions.  We will provide notice of changes, additions, and deletions, as required by law.  If we have provided advance notice and you do not agree with a change, you may close your Celsius Account(s) and demand repayment of outstanding loans before the effective date of the change, which shall be your sole remedy.  The continued maintenance of your Celsius Account following the effective date of any change will constitute your acceptance of such change and subject your Celsius Account to the modified Terms.

of the April 2022 Terms of Use, she also accepted the April 2022 Terms of Use for Account 2, Account 4, Account 5, Account 7, Account 8, and Account 9.[12]

18.    The Terms of Use are unambiguous that a single user may only have one individual account, which must be owned and controlled by the user that registers on the platform and by no one else, and one corporate account.  Specifically, Section 5(A) of the Terms of Use provides that:

> This Celsius Account is owned by only one natural person who is and will continue to be the only person authorized to take any action in the Celsius Account.  By opening an Individual Celsius Account, you represent and warrant that you are and shall at all times continue to be the sole beneficial owner of the Celsius Account and user of all Services facilities or generated therefrom.[13]

Section 5(C) of the April 2022 Terms of Use also provides, in relevant part, that:

> Each User is authorized to have a maximum of one Individual Celsius Account and one Corporate Account (as in the case of a sole proprietorship) at any given time. . . .  Celsius may merge, freeze, suspend, or terminate any Account(s) in its sole discretion and for any reason, including to the extent Celsius reasonably believes any such Account(s) to be in breach of this policy.  Referral awards and any interest credited to this account will therefore be canceled.[14]

Relatedly, Section 23 of the Terms of Use provides, in relevant part, that:

> We reserve the right to limit access to your Celsius Account, which can include temporarily or permanently removing your Celsius Account access via the internet, and/or restricting your Celsius Account, and/or closing your Celsius Account without prior notice to you (unless prior notice is required by law), and we shall have no liability for such actions.  In addition, Celsius

---

[12]    As of September 28, 2022, the only accounts with a non-zero balance were Account 3 (cryptocurrency worth $3.35), Account 6 (cryptocurrency worth $0.03), Account 7 (cryptocurrency worth $2,666.77), Account 8 (cryptocurrency worth $25,656.91), and Account 9 (cryptocurrency worth $25,123.72).

[13]    Terms of Use, § 5(A).

[14]    April 2022 Terms of Use, § 5(C).

reserves the right to withhold or delay the transmission of assets to you if you fail to comply with these Terms.[15]

19.     Therefore, in opening and controlling multiple accounts for her beneficial interest, under the name of other individuals, the Compliance Team determined that Kwok violated the Terms of Use.

20.     Additionally, Section 7 of the Promo Terms further provides that "[u]nless otherwise stated in any Specific Promo Terms each User may not participate in any single Promo more than once.  This includes Users having more than one Celsius account."[16]

21.     Section 11 of the Promo Terms also makes clear that the Debtors can take action when they believe that a user is misusing, manipulating, or abusing promotions:

> Celsius reserves the right to disqualify, revoke or deduct from your account any Bonus (in addition to taking any additional action and exercising any other right Celsius may have in law, agreement or equity) if it determines, in its sole reasonable discretion, that you: have violated any term of the Promo Terms (which include these General Promo Terms, the Terms of Use and the applicable Specific Promo Terms); have misused, manipulated or abused any Promo in any way; or are no longer eligible, for any reason whatsoever, to use Celsius' services.[17]

22.     As such, in participating in the HODL500 promotion multiple times through multiple Earn Accounts, the Compliance Team determined that Kwok abused the promotional reward and violated the Promo Terms.

23.     Kwok's misuse of the Celsius platform led to the Compliance Team's

---

[15]   Terms of Use, § 23.

[16]   Promo Terms, § 7.

[17]   Promo Terms, § 11.

determination to suspend the Earn Accounts in her name or under her control. Accordingly, per Section 12 of the Terms of Use, her Earn Accounts stopped earning rewards ("If, at any time, for legal or other reasons, a Celsius Account is suspended or frozen by Celsius, Loaned Digital Assets connected to such Celsius Account shall not be eligible to earn Rewards.").

## **Communications Following Kwok's Account Suspensions**

24.    Following the suspension of Kwok's Earn Accounts on May 16, 2022, Kwok was notified that her Earn Accounts were suspended when she attempted to log in to her Earn Accounts.[18] Upon attempting to log in, she received a message that her Earn Accounts were suspended. Due to this suspension, she was unable to access her accounts or view balances.

25.    On June 12, 2022, the Debtors instituted the Pause, freezing all withdrawals, transfers, and activity on the platform.

26.    On June 14, 2022, Kwok contacted the Debtors by email to inquire about the suspension of four of her Earn Accounts and to request to have them reinstated. Kwok stated, "I have 4 active accounts in Celsius (me and my family)…Each registered with a different ID verification. These are me and my family's account…there may be multiple account created for one person because some of them when we applied for the account, we noticed that we got the promo code entered wrongly. So I helped them restart over with a new account."

---

[18]    *See* Terms of Use, § 17 ("We will make all logs and records of activities concerning your use of the Services available to you through our platform only. We do not generate periodic statements showing the activity conducted through your use of the Services. You must examine these logs and records and notify us of any unauthorized use of your Celsius Account or credentials, or any error or irregularity with respect to the records of your use of the Services, within fourteen (14) calendar days after the error occurs. If notice is not received within the fourteen (14) calendar-day period, you will not be able to raise any further claim in this respect.").

27.    On June 20, 2022, the Debtors responded to Kwok by email and stated that her accounts were suspended due to misuse of the Celsius platform and violation of Sections 5(A) and 5(C) of the Terms of Use.  The Debtors informed her that any cryptocurrency assets in her suspended Earn Accounts that were not withdrawn from the platform would be transferred to her within the next thirty days and that the Pause was in effect.  Attached hereto as **<u>Exhibit A</u>** is a copy of the June 14, 2022 email from Kwok to the Debtors, and the Debtors' response to Kwok dated June 20, 2022.

28.    Before thirty days expired (which would have occurred on July 20, 2022), the Debtors filed for chapter 11 protection on July 13, 202.  The Pause continued to be in effect.

29.    On August 24, 2022, Kwok contacted the Debtors by email, inquiring about the suspension of eight of her Earn Accounts and requesting the account balances and a breakdown of holdings in each account.  She stated, "I was trying to withdraw my funds from these accounts and found out that my accounts were suspended…I want to check how much funds I have totals regarding these accounts…"  She listed eight Earn Accounts.  Attached hereto as **<u>Exhibit B</u>** is a copy of Kwok's email to Celsius dated August 24, 2022.

30.    On August 25, 2022, Wai contacted the Debtors by email inquiring about the same eight Earn Accounts that Kwok inquired about in the email dated August 24, 2022.  Wai stated, "My accounts named below have been suspended for at least 3 months and I have been writing to request to resume my account and withdraw my money from it since early Jun and no action has been taken from your side."  Wai listed the same eight Earn Accounts that Kwok listed in her August 24, 2022 email.  Attached hereto as **<u>Exhibit C</u>** is a copy of Wai's email to Celsius dated

August 25, 2022.

31.     Upon information and belief, Kwok currently has less than $4.00 in the aggregate

worth of cryptocurrency in the accounts held under her name and approximately $53,000.00 in the

aggregate worth of cryptocurrency in the four other accounts that she appears to control for her

family members.

### Scheduling of Kwok's Claims

32.     On October 5, 2022, the Debtors filed their Schedules of Assets and Liabilities

(the "Schedules") in the Court.  *See* [Docket No. 974].

33.     On their Schedules, the Debtors scheduled claims for the five Earn Accounts

associated with Kwok as shown below:

| Claimant's Name | Page and Line Number | Scheduled Claim Amount | Scheduled Claim Priority |
|---|---|---|---|
| Chi Hang Kwok | Schedule F, Page C–343, Line 3.1.097477 | BTC 0.0451248339413346 USDC 24242.4420501093 | General unsecured claim |
| Kam Wing Kwok | Schedule F, Page K–47, Line 3.1.303514 | BTC 0.0169961014760104 USDC 25324.9756207688 | General unsecured claim |
| Mei Po Kwok | Schedule F, Page M–859, Line 3.1.387493 | BTC 0.000025603077140031 USDC 2.85245766510975 | General unsecured claim |
| Wai Mui Lui | Schedule F, Page U-Z–283, Line 3.1.579492 | BTC 0.135270618607581 USDC 24.96370147379 | General unsecured claim |
| Wai Mui Lui | Schedule F, Page U-Z–283, Line 3.1.579493 | USDC 0.025008929021561 | General unsecured claim |

34.     Wai Mui Lui is listed twice since two Earn Accounts were established under her

name.  The remaining four Earn Accounts had a zero balance as of the Petition Date and were

therefore not scheduled.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge, information, and belief.

Dated: November 8, 2022

/s/ Charles Roberts

Name: Charles Roberts
Title: Deputy Chief Compliance Officer
and Data Protection Officer of Debtor
Celsius Network Limited

**<u>Exhibit A</u>**

**June 14, 2022 and June 20, 2022 Email Exchange between Kwok and the Debtors**

## 📗 #1013468 Suspension of me and my family's account?

---

| **Submitted** | **Received via** | **Requester** |
|---|---|---|
| June 14, 2022 at 03:24 | Mail | Mabelkwokearnfire2 ████████ |

| **Status** | **Priority** | **Group** | **Assignee** |
|---|---|---|---|
| Closed | High | AML Monitoring | Mark Josse |

---

| **App Feature** | **Type** | **Topic** | **Department** |
|---|---|---|---|
| Sign-up/Login | Incidents | Website | Compliance |

---

**Mabelkwokearnfire2**  June 14, 2022 at 03:24

Hi,

I have 4 active accounts in Celsius (me and my family) and they have been suspended. Each registered with a different ID verification. These are me and my family's account.

I want to know what happened to the suspension and why there was a suspension - there may be multiple account created for one person because some of them when we applied for the account, we noticed that we got the promo code entered wrongly. So I helped them restart over with a new account. I am not sure if this is the reason they were suspended recently.

Can I know when the suspension end and can all accounts be unfreezed as soon as possible?

Thank you - pls reply soon

Reminder: Be aware of phishing sites and always make sure you are visiting the official https://celsius.network website and app. Celsius will never ask you for confidential information such as passwords, private keys, seed phrases, or secret codes. You should store this information privately and securely and report any suspicious activity.

©2022 Celsius Network

121 River Street,  Ste PH05
Hoboken, NJ 07030 USA
Registered as a Money Services Business (MSB) number 31000192265811 with the US Financial Crimes Enforcement Network (FinCEN).

Celsius is not a bank, depository institution, custodian or fiduciary and the assets in your Celsius account are not insured by any private or governmental insurance plan (including FDIC or SIPC), nor are they covered by any compensation scheme (including FSCS).

Holding, trading or using crypto assets carry significant risks, please carefully read our Risk Disclosure page. Celsius does not provide any financial, legal or tax advice, nor should this email be viewed as an offer or inducement to make any financial decision.

---

**Tamara Djurdjevic**  June 14, 2022 at 11:25                                      *Internal note*

AC Suspended for referral abuse – Device ID DE6FB7E8-474C-4507-BD9D-0AA921224E40 has been used to access 8 + accounts along with other devices overlapping . MJ FCFI , 16 MAY 2022.

---

**Mark Josse**  June 20, 2022 at 13:38

Hello,

Your account has been suspended after we noted the misuse of our referral program, which violates our terms of use related to individual ownership of individual accounts.

For reference, please see Sections 5A and 5C of our Terms of Use as noted below:

**5. Celsius Account Types**

**A. Individual Celsius Account**

This Celsius Account is owned by only one natural person who is and will continue to be the only person authorized to take any action in the Celsius Account. By opening an Individual Celsius Account, you represent and warrant that you are and shall at all times continue to be the sole beneficial owner of the Celsius Account and user of all Services facilitated or generated therefrom.

**C. Maximum Number of Accounts**

Each User is authorized to have a maximum of one Individual Celsius Account and one Corporate Account (such as in the case of a sole proprietorship) at any given time. Requests for additional accounts must be sent via email to app@celsius.network. Celsius may deny a request for an additional account in its sole discretion and for any reason. Celsius may merge, freeze, suspend, or terminate any Account(s) in its sole discretion and for any reason, including to the extent Celsius reasonably believes any such Account(s) to be in breach of this policy.

Referral awards and any interest credited to this account will therefore be cancelled and any deposits not already withdrawn will be returned within the next 30 days.

Celsius has paused all withdrawals, Swap, and transfers between accounts. We are taking this action today to put Celsius in a better position to honour, over time, its withdrawal obligations. As noted, this process will take time, and there may be delays.
Further updates when they are available will be rolled out to our community.

Compliance Team| Celsius Network

Support Software by **Zendesk**

**<u>Exhibit B</u>**

**August 24, 2022 Email from Kwok to the Debtors**

## #1060322 Re: [Celsius Network] Re: Suspension of me and my family's account?

---

| **Submitted** | | **Received via** | **Requester** |
|---|---|---|---|
| August 24, 2022 at 17:38 | | Closed Ticket | Mabelkwokearnfire2 ███████████████ |

**CCs**
Wai Mui Lui ███████████████████

| **Status** | **Priority** | **Group** | **Assignee** |
|---|---|---|---|
| Open | Normal | AML Monitoring | - |

---

| **App Feature** | **Type** | **Topic** | **Department** |
|---|---|---|---|
| Sign-up/Login | Incidents | Website | Compliance |

---

**Mabelkwokearnfire2**   August 24, 2022 at 17:38

This is a follow-up to your previous request #1013468 "Suspension of me and my fam..."

Hi,

I was trying to withdraw my funds from these accounts and found out that my accounts were suspended. They have been suspended for an extended period of time and now I found out that Celsius has filed for bankruptcy. I want to check how much funds I have totals regarding these accounts and how much and when or whether these funds could be recovered.

Account names:

Waimuiearnfire2

Waimuiearnfire3

Waimuiearnfire

Mabelkwokearnfire

Mabelkwokearnfire2

Mabelkwokearnfire3

Kamwingearnfire

Chihangearnfire

I want to know the account balance regarding each of these accounts and the break down of holdings.
I would like to take this to the request of proceedings.

---

**Tia**   September 1, 2022 at 16:21                                    Internal note

Request #1060378 "Account suspended for extended p..." was closed and merged into this request. Last comment in request #1060378:

Hi,

My accounts named below have been suspended for at least 3 months and I have been writing to request to resume my account and withdraw money from it since early Jun and no action has been taken from your side. Now that Celsius has gone under bankruptcy and my account is still suspended and I am not able to access all my account information.

Please unfreeze these accounts and provide account information for these accounts here:

waimuiearnfire

waimuiearnfire2

waimuiearnfire3

mabelkwokearnfire

mabelkwokearnfire2

mabelkwokearnfire3

kamwingearnfire

Chihangearnfire

Reminder: Be aware of phishing sites and always make sure you are visiting the official https://celsius.network website and app. Celsius will never ask you for confidential information such as passwords, private keys, seed phrases, or secret codes. You should store this information privately and securely and report any suspicious activity.

©2022 Celsius Network

121 River Street, Ste PH05
Hoboken, NJ 07030 USA
Registered as a Money Services Business (MSB) number 31000192265811 with the US Financial Crimes Enforcement Network (FinCEN).

Celsius is not a bank, depository institution, custodian or fiduciary and the assets in your Celsius account are not insured by any private or governmental insurance plan (including FDIC or SIPC), nor are they covered by any compensation scheme (including FSCS).

Holding, trading or using crypto assets carry significant risks, please carefully read our Risk Disclosure page. Celsius does not provide any financial, legal or tax advice, nor should this email be viewed as an offer or inducement to make any financial decision.

---

Support Software by **Zendesk**

**<u>Exhibit C</u>**

**August 25, 2022 Email from Wai to the Debtors**

# #1060378 Account suspended for extended period of f time

| **Submitted** | | **Received via** | **Requester** |
|---|---|---|---|
| August 25, 2022 at 03:27 | | Mail | Wai Mui Lui ███████████████████ |

| **Status** | **Priority** | **Group** | **Assignee** |
|---|---|---|---|
| Closed | Normal | AML Monitoring | Tia |

---

**Wai Mui Lui**  August 25, 2022 at 03:27

Hi,

My accounts named below have been suspended for at least 3 months and I have been writing to request to resume my account and withdraw money from it since early Jun and no action has been taken from your side. Now that Celsius has gone under bankruptcy and my account is still suspended and I am not able to access all my account information.

Please unfreeze these accounts and provide account information for these accounts here:

waimuiearnfire
waimuiearnfire2
waimuiearnfire3
mabelkwokearnfire
mabelkwokearnfire2
mabelkwokearnfire3
kamwingearnfire
Chihangearnfire

Reminder: Be aware of phishing sites and always make sure you are visiting the official https://celsius.network website and app. Celsius will never ask you for confidential information such as passwords, private keys, seed phrases, or secret codes. You should store this information privately and securely and report any suspicious activity.

©2022 Celsius Network

121 River Street,  Ste PH05
Hoboken, NJ 07030 USA
Registered as a Money Services Business (MSB) number 31000192265811 with the US Financial Crimes Enforcement Network (FinCEN).

Celsius is not a bank, depository institution, custodian or fiduciary and the assets in your Celsius account are not insured by any private or governmental insurance plan (including FDIC or SIPC), nor are they covered by any compensation scheme (including FSCS).

Holding, trading or using crypto assets carry significant risks, please carefully read our Risk Disclosure page. Celsius does not provide any financial, legal or tax advice, nor should this email be viewed as an offer or inducement to make any financial decision.

---

**Marko Pesic**  August 25, 2022 at 06:55                                   *Internal note*

https://celsiusnetwork.slack.com/archives/GMC0KTMGR/p1661410486561819

---

**Marko Pesic**  August 25, 2022 at 13:12                                   *Internal note*

passing to compliance, as per the thread.

---

**Tia**  September 1, 2022 at 16:21                                   *Internal note*

This request was closed and merged into request #1060322 "Re: [Celsius Network] Re: Suspen...".

---

Support Software by **Zendesk**