Hearing Date: December 5, 2022, at 10:00 a.m. (prevailing Eastern Time)
Objection Deadline: November 29, 2022, at 5:00 p.m. (prevailing Eastern Time)

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**NOTICE OF HEARING ON DEBTORS'**
**AMENDED MOTION FOR ENTRY OF AN ORDER**
**(I) ESTABLISHING OWNERSHIP OF ASSETS IN THE DEBTORS'**
**EARN PROGRAM, (II) PERMITTING THE SALE OF STABLECOIN**
**IN THE ORDINARY COURSE AND (III) GRANTING RELATED RELIEF**

**PLEASE TAKE NOTICE** that the United States Bankruptcy Court for the Southern District of New York (the "Court") scheduled a hearing (the "Hearing") on the *Debtors' Amended Motion Seeking Entry of an Order (I) Establishing Ownership of Assets in the Debtors' Earn Program, (II) Permitting the Sale of Stablecoin in the Ordinary Course and (III) Granting Related Relief* (the "Amended Motion") for **Monday, December 5, 2022, at 10:00 a.m., prevailing**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

**Eastern Time**. If necessary, the Court has scheduled another day and time for a continuation of the Hearing on the Amended Motion for **Tuesday, December 6, 2022, at 10:00 a.m., prevailing Eastern Time**.

**PLEASE TAKE FURTHER NOTICE** that the Hearing on the Amended Motion will take place in a hybrid fashion both in person and via Zoom for Government. Those wishing to participate in the Hearing in person may appear before the Honorable Martin Glenn, Chief United States Bankruptcy Judge, in the United States Bankruptcy Court for the Southern District of New York, in Courtroom No. 523, located at One Bowling Green, New York, New York 10004-1408. For those wishing to participate remotely, in accordance with General Order M-543 dated March 20, 2020, the Hearing will be conducted remotely using Zoom for Government. Parties wishing to appear at the Hearing, whether making a "live" or "listen only" appearance before the Court, need to make an electronic appearance (an "eCourtAppearance") through the Court's website at https://ecf.nysb.uscourts.gov/cgi-bin/nysbAppearances.pl. Electronic appearances (eCourtAppearances) need to be made by **4:00 p.m., prevailing Eastern Time, the business day before the hearing (i.e., on Friday, December 2, 2022)**.

**PLEASE TAKE FURTHER NOTICE** that due to the large number of expected participants in the Hearing and the Court's security requirements for participating in a Zoom for Government audio and video hearing, all persons seeking to attend the Hearing remotely at 2:00 p.m., prevailing Eastern Time on December 5, 2022 must connect to the Hearing beginning at 1:00 p.m., prevailing Eastern Time on December 5, 2022. When parties sign in to Zoom for Government and add their names, they must type in the first and last name that will be used to identify them at the Hearing. Parties that type in only their first name, a nickname, or initials will not be admitted into the Hearing. When seeking to connect for either audio or video participation

2

in a Zoom for Government Hearing, you will first enter a "Waiting Room" in the order in which you seek to connect. Court personnel will admit each person to the Hearing from the Waiting Room after confirming the person's name (and telephone number, if a telephone is used to connect) with their eCourtAppearance. Because of the large number of expected participants, you may experience a delay in the Waiting Room before you are admitted to the Hearing.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections to the relief requested in the Amended Motion shall: (a) be in writing; (b) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York; (c) be filed electronically with the Court on the docket of *In re Celsius Network LLC*, No. 22-10964 (MG) by registered users of the Court's electronic filing system and in accordance with all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York (which are available on the Court's website at http://www.nysb.uscourts.gov); and (d) be served in accordance with the *Amended Final Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief* [Docket No. 1181] (the "Case Management Order") by **November 29, 2022, at 5:00 p.m., prevailing Eastern Time**, to (i) the entities on the Master Service List (as defined in the Case Management Order) and available on the case website of the Debtors at https://cases.stretto.com/celsius and (ii) any person or entity with a particularized interest in the subject matter of the Amended Motion. Service in accordance with the Case Management Order shall include emailing a copy of any response or objection to the relief requested in the Amended Motion to Debtors' counsel, Kirkland & Ellis LLP, at CelsiusRx@kirkland.com.

3

**PLEASE TAKE FURTHER NOTICE** that, as stated by the Court on the record at the November 1, 2022 hearing, **the Court will not consider any filings in connection with the Amended Motion submitted after December 2, 2022 at 5:00 p.m., prevailing Eastern Time**.

**PLEASE TAKE FURTHER NOTICE** that the Debtors are seeking to have the Court's rulings or opinions regarding the Amended Motion be generally applicable and binding on all parties in interest, including in connection with confirmation of a chapter 11 plan.

**PLEASE TAKE FURTHER NOTICE** that copies of the Amended Motion and other pleadings filed in these chapter 11 cases may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/Celsius.  You may also obtain copies of the motions and other pleadings filed in these chapter 11 cases by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

*[Remainder of page intentionally left blank.]*

New York, New York
Dated: November 10, 2022

*/s/ Joshua A. Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900
Email:            jsussberg@kirkland.com

  - and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200
Email:            patrick.nash@kirkland.com
                  ross.kwasteniet@kirkland.com
                  chris.koenig@kirkland.com
                  dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

Hearing Date: **December 5, 2022, at 10:00 a.m. (prevailing Eastern Time)**
Objection Deadline: **November 29, 2022, at 5:00 p.m. (prevailing Eastern Time)**

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) Case No. 22-10964 (MG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**DEBTORS' AMENDED MOTION**
**FOR ENTRY OF AN ORDER (I) ESTABLISHING**
**OWNERSHIP OF ASSETS IN THE DEBTORS' EARN**
**PROGRAM, (II) PERMITTING THE SALE OF STABLECOIN**
**IN THE ORDINARY COURSE AND (III) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") submit this amended motion (the "Amended Motion") to supplement and renew the requests for relief in the *Debtors' Motion Seeking Entry of an Order (I) Permitting the Sale of Stablecoin in the Ordinary Course and (II) Granting Related Relief* [Docket No. 832] (the "Original Motion").[2]  In further

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the *Declaration of Robert Campagna, Managing Director of Alvarez & Marsal North America, LLC, in Support of Chapter 11 Petitions and*

support of the Amended Motion, the Debtors submit the *Declaration of Oren Blonstein], Head of Innovation and Chief Compliance Officer of the Debtors, in Support of the Debtors' Motion Regarding Ownership of Earn Assets and the Sale of Stablecoin* (the "Blonstein Declaration"), the *Declaration of Chris Ferraro, Interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer, in Support of the Debtors' Motion Regarding Ownership of Earn Assets and the Sale of Stablecoin* (the "Ferraro Declaration"), and the *Declaration of Robert Campagna, Managing Director of Alvarez & Marsal North America, LLC, in Support of the Debtors' Motion Regarding Ownership of Earn Assets and the Sale of Stablecoin* (the "Campagna Declaration"), filed substantially contemporaneously herewith and state the following:

### Preliminary Statement

1.      On the first day of these chapter 11 cases, the Debtors identified seven key questions, the answers to which would chart the trajectory of these cases.[3]  To date, none of these questions have been resolved, but the coming weeks will provide all parties with answers that should provide significant clarity in these cases.  The Examiner's interim report is expected imminently, with her final report to follow next month, and a trial regarding the title to assets in Celsius' custody service (the "Custody Program," and such assets, the "Custody Assets") and in "withhold" accounts on Celsius's internal ledger (the "Withhold Accounts," and such assets, the "Withhold Assets") is

---

*First Day Motions* [Docket No. 22] (the "First Day Declaration").  The Original Motion is incorporated herein by reference.

[3]    The questions were, in the order presented: (1) Are the crypto assets in Celsius' possession property of the estate? Is the answer to this question different for crypto assets held under the Custody vs. the Earn program? What about crypto assets transferred to Celsius to collateralize institutional and retail loans?  (2) What does it mean to unimpair a crypto claim or to pay a crypto claim in full?  (3) Are customers entitled to the return of crypto in-kind? (4) The amount of a crypto claim is determined as of what date (e.g., as of the petition date, effective date, distribution date)?  (5) Which Celsius entities do customers have claims against?  (6) Do retail and institutional borrowers have a setoff right where they (a) borrowed cash, stablecoins, or other crypto from Celsius and (b) transferred crypto to Celsius? and (7) Can Celsius recover customer withdrawals or loan liquidations completed in the 90 days before filing as preferences?

scheduled to commence on December 7, 2022.  These milestones are important, but they will not resolve the largest question relating to property of the estate:  who holds title to the assets transferred into the Debtors' earn program and any proceeds thereof (the "Earn Program," and such assets, including any proceeds thereof, the "Earn Assets").  The Debtors file this Amended Motion to resolve this critical issue.

2.      As the Court has observed, the Debtors' liquidity is anticipated to tighten significantly in the new year.  *See generally* Campagna Declaration; *Memorandum Opinion and Order Granting Motion to Approve Bidding Procedures in Connection with the Sale of Substantially All the Debtors' Assets* [Docket No. 1167] at 19 ("[T]he reality is that the Debtors will have significant liquidity issues to continue operating in 2023.").  It is for this reason that the Debtors filed the Original Motion nearly two months ago, requesting permission to sell stablecoins in the ordinary course of business—the Debtors wanted to get ahead of any potential liquidity crunch to ensure that the ability to progress these chapter 11 cases was not jeopardized.

3.      Fortunately, while the question of title to the Earn Assets is important, it is not complex.  In a case of seemingly endless issues of first impression, resolution of this particular legal question depends on one of the most fundamental aspects of law—contract interpretation.  Questions of contract interpretation can be challenging when a contract's terms are ambiguous, but the Terms of Use are explicit, as to both the initial title transfer and the consequences thereof:

> In consideration for the Rewards payable to you on the Eligible Digital Assets using the Earn Service . . . and the use of our Services, ***you grant Celsius . . . all right and title to such Eligible Digital Assets, including ownership rights, and the right, without further notice to you, to hold such Digital Assets in Celsius' own Virtual Wallet or elsewhere, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such***

3

***Digital Assets in Celsius' full discretion***.  You acknowledge that with respect to Digital Assets used by Celsius pursuant to this paragraph:

1.  You will not be able to exercise rights of ownership;

2.  Celsius may receive compensation in connection with lending or otherwise using Digital Assets in its business to which you have no claim or entitlement; and

3.  ***In the event that Celsius becomes bankrupt, enters liquidation or is otherwise unable to repay its obligations, any Eligible Digital Assets used in the Earn Service or as collateral under the Borrow Service may not be recoverable, and you may not have any legal remedies or rights in connection with Celsius' obligations to you other than your rights as a creditor of Celsius under any applicable laws***.

Terms of Use at § 13 (emphasis added).

4.      The Debtors understand that their request to monetize stablecoins from the Earn Program to fund administrative costs is a source of controversy, but the Terms of Use are crystal clear—any assets transferred into the Earn Program, and the proceeds thereof, are the Debtors' property.  In light of this, the Debtors own all of the Earn Stablecoins they propose to sell, and their monetization will not unduly prejudice any creditor.  Monetization of the Earn Stablecoins would provide the Debtors with a much-needed liquidity infusion, without unnecessary distraction or delay.  For these reasons and as further set forth herein, the Amended Motion should be granted.[4]

### **Relief Requested**

5.      The Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"):[5]  (a) establishing ownership of assets transferred into the Debtors' Earn Program (and any proceeds thereof), (b) permitting the Debtors to sell certain stablecoins on a

---

[4]      If the Court grants the Debtors' request to sell the Earn Stablecoins, such relief will not be borne disproportionately by the associated Account Holders.  Any Account Holder with an allowed unsecured claim relating to Earn Stablecoins will be entitled to their *pro rata* share of any applicable recovery under the Debtors' chapter 11 plan.

[5]      A redline of the Order against the order in the Original Motion is provided as **Exhibit A-1**.

postpetition basis in the ordinary course of business, and (c) granting related relief, including all Requested Findings (as defined herein).

## Jurisdiction and Venue

6.      The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the Southern District of New York, entered February 1, 2012.  The Debtors confirm their consent to the Court entering a final order in connection with this Amended Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

7.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      The statutory bases for the relief requested herein are sections 363(c)(1), 363(f), 541, 1107(a), and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), rules 6003(b) and 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 9013-1 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules").

## Background

9.      The Debtors, together with their non-Debtor affiliates (collectively, "Celsius"), are one of the largest and most sophisticated cryptocurrency based finance platforms in the world and provide financial services to institutional, corporate, and retail clients across more than 100 countries.  Celsius was created in 2017 to be one of the first cryptocurrency platforms to which users could transfer their crypto assets and (a) earn rewards on crypto assets and/or (b) take loans using those transferred crypto assets as collateral.  Headquartered in Hoboken, New Jersey, Celsius has more than 1.7 million registered users and approximately 300,000 active users with account balances greater than $100.

10.      On July 13, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. A detailed description of the facts and circumstances of these chapter 11 cases is set forth in the Campagna Declaration.

11.      The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. These chapter 11 cases have been consolidated for procedural purposes only and are jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket No. 53]. On July 27, 2022, the U.S. Trustee appointed an official committee of unsecured creditors [Docket No. 241] (the "Committee"). On September 14, 2022, the Court entered an order authorizing the appointment of an examiner [Docket No. 820] (the "Examiner").

12.      On September 15, 2022, the Debtors filed the Original Motion, seeking authority to sell certain stablecoins in their possession in the ordinary course to fund operating expenses, including the costs of administering these chapter 11 cases. The Debtors received a number of responses to the Original Motion, most of which raised concerns regarding the status of the title of the stablecoins the Debtors proposed to sell.

13.      On October 21, 2022, the Court entered the *Final Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Granting Related Superpriority Administrative Expense Status to Postpetition Intercompany Balances, and (III) Granting Related Relief* [Docket No. 1152] (the "Final Cash Management Order"). Pursuant to paragraph 5 of the Final Cash Management Order, the Debtors cannot liquidate or convert any cryptocurrency into cash absent an order of the Court.

14.    On October 29, 2022, the Debtors filed the *Debtors' Statement Regarding November 1 Hearing On Debtors' Motion Seeking Entry of an Order (I) Permitting the Sale of Stablecoin in the Ordinary Course and (II) Granting Related Relief* [Docket No. 1228], disclosing their intent to use the November 1, 2022 hearing as a status conference on the Original Motion rather than requesting that the Court grant relief at the November 1, 2022 hearing as initially intended.

15.    On November 1, 2022, the Court held a status conference regarding the Original Motion.  During the status conference, the Debtors committed to file this Amended Motion to address parties' concerns regarding the title of the proposed sale of stablecoins on full notice to all Account Holders.  In recognition that a resolution of the title to the stablecoins in the Earn Program would involve identical facts and questions to a determination applicable to all Earn Assets, the Debtors explained at the status conference that this Amended Motion would request that the Court address the title of all Earn Assets to avoid unnecessary duplication of a determination of title to all Earn Assets other than stablecoins, with its attendant costs and delay.

16.    Contemporaneously herewith, the Debtors filed the *Notice of Filing of Proposed Scheduling Order Regarding Title to Earn Program Assets and the Sale of Certain Stablecoins* (the "Proposed Scheduling Order").  In addition to proposing a briefing and discovery schedule for this Amended Motion, the Proposed Scheduling Order reflects comments from the Committee regarding the scope of the proposed findings.  The Proposed Scheduling Order provides that the findings the Debtors will seek in connection with this Amended Motion (the "Requested Findings") include:  (a) determining ownership rights to assets transferred by Account Holders designated to be part of the "Earn" program, based on the unambiguous plain language of each version of the Terms of Use (if more than one version is applicable); (b) whether each applicable version of the Terms of Use forms a binding contract with users who transferred assets to the Debtors while such Terms of

Use were in effect (*i.e.*, whether the elements of a contract are present); (c) whether subsequent amendments to the Terms of Use are binding on users who transferred their assets to the Debtors prior to the effectiveness of the subsequently amended Terms of Use (*e.g.*, whether a user who deposited coins in July 2020 is bound by the April 2022 Terms of Use); and (d) whether the specific stablecoin sought to be sold is property of the Debtors' estates (if not covered by the previous three issues); *provided*, *however*, that the foregoing will not preclude the Debtors from responding to any objections to the Amended Motion that are beyond the scope of the Requested Findings.  For the avoidance of doubt, this Amended Motion does not seek findings with respect to (x) the ownership of assets in the Debtors' Custody Program, Withhold Accounts, or Borrow Program[6] or (y) whether any Account Holder has valid defenses to the purported contract between Account Holders and the Debtors under the Terms of Use, and all parties' rights are reserved with respect to each of the foregoing.

## Basis for Relief

I.    **All Earn Assets Are Property of the Estate Pursuant to Section 541 of the Bankruptcy Code.**

17.    The Debtors' bankruptcy estates consist of "all legal or equitable interests of the debtor in property as of the commencement of the case."   *In re Lehman Bros. Holdings. Inc.*, 422 B.R. 407, 418 (Bankr. S.D.N.Y. 2010) (emphasis removed) (citing 11 U.S.C. § 541(a)(1)). Pursuant to the Debtors' Terms of Use, the Debtors have "all right and title" to the digital assets in the Earn Program.  Terms of Use at § 13.[7]  When a contract's terms are unambiguous, courts must

---

[6]    To date, the Debtors have not taken a position regarding assets transferred to the Debtors in connection with the Debtors' borrowing services (the "<u>Borrow Program</u>," and such assets, including any proceeds thereof, the "<u>Borrow Assets</u>").  Nothing herein shall be interpreted as a position regarding the Borrow Assets (or a waiver of any position regarding the Borrow Assets).

[7]    Per the Terms of Use, the current version supersedes all prior versions.  Terms of Use at § 31; *see also infra* Part I.A.3. (supporting the enforceability of this provision of the Terms of Use and its predecessors).  All references to the "Terms of Use" included herein reference the version in effect ***as of the Petition Date*** (an additional version was implemented postpetition) unless context requires otherwise; all references to prior terms of use include the

8

apply them as written. *In re Enron Corp.*, 292 B.R. 752, 762 (Bankr. S.D.N.Y. 2003) ("If the contract language is 'unambiguous,' this Court must enforce the plain, ordinary, and common meaning of those terms as a matter of law without reference to extrinsic evidence."). As a result, if the Terms of Use are enforceable as written, the digital assets transferred to Celsius via the Earn Program are property of the Debtors' estates.

### A.    The Terms of Use Are a Valid and Enforceable Contract.

18.    A contract requires an offer and acceptance (mutual assent), consideration, and an intent to be bound. *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004) (reciting the requirements for formation of a contract). These requirements are not different for electronic contracts. *See id.* at 403 ("While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract."). That said, courts have had to develop new analytical frameworks under which to apply these requirements to avoid disrupting business that is now being conducted on scales that were unimaginable when the fundamentals of contract law were first articulated. *See, e.g.*, *Berkson v. Gogo LLC*, 97 F.Supp.3d 359, 384–85 (E.D.N.Y. 2015) ("Most Americans now do some business over the Internet—whether making purchases or participating in a community at the pleasure of a forum host. When we do, we are

---

relevant prior version number. As described in the Blonstein Declaration, the relevant Terms of Use, and redlines reflecting changes between versions, are set forth in the *Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, Providing Terms of Use Dating Back to February 18, 2018*, filed on August 8, 2022 [Docket No. 393] (the "Terms of Use Declaration"). The Terms of Use are governed by New York law. *See Terms of Use* § 33. As of the Petition Date, the Terms of Use had been updated seven times: (a) the Terms of Service in effect from on or around February 1, 2018 to March 4, 2020 (the "Terms of Use Version 1"); (b) the Terms of Use in effect from on or around March 5, 2020 to May 4, 2020 (the "Terms of Use Version 2"); (c) the Terms of Use in effect from on or around May 5, 2020 to June 14, 2020 (the "Terms of Use Version 3"); (d) the Terms of Use in effect from on or around June 15, 2020 to September 29, 2020 (the "Terms of Use Version 4"); (e) the Terms of Use in effect from on or around September 30, 2020 to July 21, 2021 (the "Terms of Use Version 5"); (f) the Terms of Use in effect from on or around July 22, 2021 to August 2, 2021 (the "Terms of Use Version 6"); (g) the Terms of Use in effect from on or around August 3, 2021 to April 13, 2022 (the "Terms of Use Version 7"); (h) the Terms of Use in effect from on or around April 14, 2022 to September 28, 2022 (the "Terms of Use"); and (i) the Terms of Use in effect from on or around September 29, 2022 to present.

almost always presented (clearly or opaquely) with contractual terms governing our use of the site. The studies conducted to date and their implications reinforce the need to reconsider principles underlying contract law, developed in an age of paper and orality.") (internal citations omitted).  This is particularly true for the requirement of mutual assent.

### 1.    The Requirement of Mutual Assent Is Satisfied.

19.    The Debtors' process for soliciting assent to the Terms of Use, which requires affirmative acceptance by all users, satisfies the mutual assent requirement.  *See* Blonstein Declaration ¶ 14.

20.    Traditionally, mutual assent was conceptualized as the culmination of a bargaining process, with an emphasis on both parties' intent to be bound following an active negotiation of terms.  Donald P. Harris, *Trips and Treaties of Adhesion Part II:  Back to the Past or a Small Step Forward?*, 2007 Mich. St. L. Rev. 185, 191 [hereinafter *Adhesion Contracts*] ("The exemplary contract is one between parties of relatively equal bargaining power, and achieved through a negotiation process that reflects this power balance.") (citing E. Allan Farnsworth, Contracts § 4.26 (4th ed. 2004)).   Modern contracts often involve a fundamentally different process, where consumers' participation is limited to deciding if they will, in fact, participate.  *See Register.com*, 356 F.3d at 403 ("It is standard contract doctrine that when a benefit is offered subject to stated conditions, and the offeree makes a decision to take the benefit with knowledge of the terms of the offer, the taking constitutes an acceptance of the terms, which accordingly become binding on the offeree."); *see also Adhesion Contracts* at 192 ("The only alternative to complete adherence is outright rejection.").

21.    Given consumers' passive role in negotiating many electronic contracts, the issue of mutual assent often turns on whether a consumer should have been aware that they were being bound by the relevant terms.  *See Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74–75 (2d Cir. 2017) ("Where

there is no evidence that the offeree had actual notice of the terms of the agreement, the offeree will

still be bound by the agreement if a reasonably prudent user would be on inquiry notice of the

terms."); *Sultan v. Coinbase, Inc.*, 354 F.Supp.3d 156, 161 (E.D.N.Y. 2020) ("Actual notice . . . is

irrelevant.").  To determine what a "reasonably prudent user" would have been aware of, courts

generally evaluate the method of manifesting acceptance and the conspicuousness of the terms that

were purportedly accepted.  *See Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 464 F.Supp.

3d 634, 640 (S.D.N.Y. 2020) (discussing the means for manifesting acceptance); *Uber Techs.*, 868

F.3d at 75–78 (evaluating the conspicuousness of a Terms of Service hyperlink).

22.    With respect to the first inquiry, courts have categorized electronic contracts based

on the process for accepting their terms.  The primary categories are (i) "scrollwrap" agreements,

(ii) "clickwrap" agreements, and (iii) "browsewrap" agreements:[8]

- ***Scrollwrap***.  Scrollwrap agreements require a user to scroll through the entirety of the proposed terms prior to acceptance.

- ***Clickwrap***.  Clickwrap agreements require a user to manifest assent by clicking a button confirming that they accept the terms, or a button that implies that they have accepted the terms, but do not necessarily require the user to actually view the terms.

- ***Browsewrap***.  Browsewrap agreements imply assent by virtue of the user utilizing (or "browsing") the applicable website.

*See Plazza v. Airbnb, Inc.*, 289 F.Supp.3d 537, 548 (S.D.N.Y. 2020) ("Clickwrap agreements are

generally defined by the requirement that users 'click' some form of 'I agree' after being presented

with a list of terms and conditions.  Browsewrap agreements, on the other hand, are usually found

'where a website's terms and conditions are . . . posted on the website via a hyperlink at the bottom

---

[8]    Given that the Debtors' contracts were entered exclusively through electronic means, "shrinkwrap" contracts are not addressed herein.  *See Specht v. Netscape Comms. Corp.*, 306 F.3d 17, fn 4 ("[Shrinkwrap contracts are] used in the licensing of tangible forms of software sold in packages . . . breaking the shrinkwrap seal and using the enclosed computer program after encountering notice of the existence of governing license terms has been deemed by some courts to constitute assent to those terms in the context of tangible software.") (citing *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1451 (7th Cir. 1996)).

of the screen' and a user's assent is given merely by his or her use of the website and nothing more.")
(internal citations omitted); *Uber Techs.*, 868 F.3d at 75 ("Some online agreements require the user
to scroll through the terms before the user can indicate his or her assent by clicking 'I agree.'")
(citing *Berkson*, 97 F.Supp.3d at 386, 398 (labeling such agreements "scrollwraps")).

23.      Under this framework, the Terms of Use are a "clickwrap" agreement because new

users are required to affirmatively click to check a box confirming that they have read and agree to

the Terms of Use. *See, e.g.*, Blonstein Declaration ¶ 18 (describing the process for acceptance of

Terms of Use Version 6).  Clickwrap contracts are routinely enforced under New York law.  *Whitt*

*v. Prosper Funding LLC*, No. 15-00136 (GHW), 2015 WL 4254062, at *4 (S.D.N.Y. July 14, 2015)

("In New York, clickwrap agreements are valid and enforceable contracts.") (quoting *Centrifugal*

*Force, Inc. v. Softnet Commc'n, Inc.*, No. 08-05463 (CM), 2011 WL 744732, at *7 (S.D.N.Y. Mar. 1,

2011)); *see also Moore v. Microsoft Corp.*, 741 N.Y.S.2d 91, 92 (N.Y. App. Div. 2002) (affirming

the trial court's finding that a software clickwrap contract was enforceable to bar the plaintiff's

claims because it was "prominently displayed on the program user's computer screen before the

software could be installed," and "the program's user was required to indicate assent to the [contract]

by clicking on the 'I agree' icon before proceeding with the download of the software"); *Uber Techs.*,

868 F.3d at 75 ("Courts routinely uphold clickwrap agreements for the principal reason that the user

has affirmatively assented to the terms of agreement by clicking 'I agree.'").

24.      The second, and closely related, aspect courts evaluate is how apparent it was that

the contract's terms would apply to the assenting party.  The ultimate inquiry is "whether [a]

reasonable pe[rson] . . . would have known about the terms and the conduct that would be required

to assent to them." *Uber Techs.*, 868 F.3d at 74–75 (quoting *Schnabel v. Trilegiant Corp*, 697 F.3d

110, 124 (2d Cir. 2012) (applying California or Connecticut state law) (internal quotation marks

omitted)).    In making this determination, courts look to see if the terms were "reasonably conspicuous," with an emphasis on considerations like the clutter on the page that contained the terms (or a link thereto), whether hyperlinks were in a different color or style of font, and the presence (or absence) of spatial and temporal coupling with acceptance.  *See*, *e.g.*, *Uber Techs.*, 868 F.3d at 74–75 ("[T]he presentation of these terms at a place and time that the consumer will associate with the initial purchase or enrollment, or the use of, the goods or services from which the recipient benefits at least indicates to the consumer that he or she is taking such goods or employing such services subject to additional terms and conditions that may one day affect him or her." (quoting *Schnabel*, 697 F.3d at 127 (applying California or Connecticut state law) (internal quotation marks omitted))).

25.    Identifying precisely what the acceptance mechanism looked like at the exact moment that every one of the approximately 600,000 scheduled users (the "<u>Account Holders</u>") joined the Celsius platform would be an onerous undertaking.  Fortunately, this exercise is not necessary because in August 2021—notwithstanding the language in the Terms of Use permitting unilateral modification by the Debtors—the Debtors also specifically required all Account Holders to affirmatively accept the latest version of the Terms of Use, thus replacing their existing contract. *See* Blonstein Declaration ¶ 16; *see also* **<u>Exhibit C</u>** (compiling the text of the modification provision of the first eight versions of the Terms of Use, each of which provides that the current version supersedes any prior versions).  If a user did not affirmatively accept within two weeks, the user's account was suspended until such time as the user affirmatively accepted the latest version of the Terms of Use.  *See* Blonstein Declaration ¶ 18.

26.    Regardless of whether the adoption of Terms of Use Version 6 is viewed as a modification of an existing contract or an entirely new contract, the requirements and the results are

the same. *Janover v. Bernan Foods, Inc.*, 901 F.Supp. 695, 700 (S.D.N.Y. 1995) ("[T]here is no question that a contract may be modified if the contract provides for its modification."); *Ward v. TheLadders.com, Inc.*, 3 F. Supp. 3d 151, 159 (S.D.N.Y. 2014) (stating that modification of a contract requires the same elements as contract formation).

27.    Acceptance of Terms of Use Version 6 occurred on the Debtors' platform. *See* Blonstein Declaration ¶ 18.  Regardless of whether a user accessed the platform from a mobile device or a computer, an in-application pop-up window appeared, stating in large letters:  "We have updated our Terms of Use."  *See* Blonstein Declaration ¶ 18, <u>Exhibit C</u>.  The pop-up then noted that "[i]t's tempting to skip reading Terms of Use, but it's important to establish what you can expect from continuing using our product.  These are not all of the changes, please read the updated Terms of Use in full."  *See* Blonstein Declaration, <u>Exhibit C</u>.  This text was followed by a few bullets highlighting key changes and a hyperlink reading "Read the full Terms of Use," which linked to the full Terms of Use.  *See* Blonstein Declaration ¶ 18, <u>Exhibit C</u>.  Below the hyperlink, the pop-up contained three check boxes adjacent to statements, one of which was "I have read and agree to the new Terms of Use."  *See* Blonstein Declaration, <u>Exhibit C</u>.  In addition, the acceptance button itself included the word "Agree."  *See* Blonstein Declaration, <u>Exhibit C</u>.



Screen captures from the development stage to demonstrate the appearance of in-app pop-ups.
*See* Blonstein Declaration, <u>Exhibit C</u>.



Screen capture from the development stage to demonstrate the appearance of web-based pop-ups.
*See* Blonstein Declaration, <u>Exhibit C</u>.


28.    As part of the update to Terms of Use Version 6, the Debtors undertook extensive outreach to existing Account Holders.   *See* Blonstein Declaration ¶ 17.   The communications occurred in three phases.  *See* Blonstein Declaration ¶ 17.

29.     Phase one commenced on July 22, 2021, when the new Terms of Use were posted.
*See* Blonstein Declaration ¶ 17.  In phase one, the Debtors announced the posting of Terms of Use
Version 6 via multiple communications channels, including on-platform pop-ups on both the web
browser and the mobile application.    *See* Blonstein Declaration ¶ 17, Exhibit A.    These
communications urged Account Holders to accept the new Terms of Use and warned them of the
consequences of failing to timely comply:  (i) account suspension after two weeks and (ii) cessation
of rewards accruals after four weeks.  *See* Blonstein Declaration ¶ 17.  Following the commencement
of phase one outreach, the Debtors ran regular compliance reports to evaluate the acceptance rates.
*See* Blonstein Declaration ¶ 19.

30.     Phase two commenced on August 5, 2021, the deadline for Account Holders to accept
the Terms of Use to avoid an account suspension.  *See* Blonstein Declaration ¶ 17.  In phase two,
the Debtors conveyed suspensions to users who failed to meet the deadline for acceptance of Terms
of Use Version 6.  *See* Blonstein Declaration ¶ 17.  Suspended Account Holders could view their
dashboard but could not unilaterally complete any on-platform transactions (including withdrawals).
*See* Blonstein Declaration ¶ 19.  The phase two communications continued to encourage Account
Holders to review and accept the updated Terms of Use in advance of the second-round deadline to
avoid cessation of rewards activity.  *See* Blonstein Declaration ¶ 17.

31.     Phase three commenced on August 19, 2021, the deadline for Account Holders to
accept the Terms of Use to avoid cessation of rewards activities.  *See* Blonstein Declaration ¶ 17.  In
phase three, the Debtors conveyed the discontinuation of rewards activities to users who failed to
meet the second-round deadline for acceptance of Terms of Use Version 6.    *See* Blonstein
Declaration ¶ 17.  Phase three communications continued to encourage Account Holders to review

and accept the updated Terms of Use and notified Account Holders that they would regain access to

the Debtors' services upon acceptance. *See* Blonstein Declaration ¶ 17.

32.    Following these outreach efforts, 90.06% of Account Holders, representing 99.86%

of all Earn Program liabilities affirmatively accepted Terms of Use Version 6 or a later version.

*See* Blonstein Declaration ¶ 20.   Each of these Account Holders was presented with a pop-up

stressing the importance of reading Terms of Use Version 6 and requiring *two* clicks (one check box,

one "Accept").   *See* Blonstein Declaration ¶ 18, <u>Exhibit C</u>.   The pop-ups contained hyperlinks as

part of the phrase "Read our updated Terms of Use."   *See* Blonstein Declaration ¶ 18, <u>Exhibit C</u>.

If an Account Holder declined to accept, they were informed of the significance of that decision.

*See* Blonstein Declaration ¶ 18, <u>Exhibit C</u>.   The pop ups were clean and compact, containing all of

the information in close proximity in a clearly bounded or full-screen window.   *See* Blonstein

Declaration ¶ 18, <u>Exhibit C</u>.   Together, these characteristics easily meet the standard for "clear and

conspicuous."   *See*, *e.g.*, *Uber Techs.*, 868 F.3d at 74–75 ("[T]he presentation of these terms at a

place and time that the consumer will associate with the initial purchase or enrollment, or the use of,

the goods or services from which the recipient benefits at least indicates to the consumer that he or

she is taking such goods or employing such services subject to additional terms and conditions that

may one day affect him or her." (quoting *Schnabel*, 697 F.3d at 127 (applying California or

Connecticut state law) (internal quotation marks omitted))).

### 2.    The Requirement of Consideration Is Satisfied as to the Terms of Use (Including Any Modifications).

33.    A contract must also be supported by "consideration."   This requirement is not

exacting—each party must simply receive "something of value."   *Apfel v. Prudential-Bache Secs.*

*Inc.*, 616 N.E.2d 1095, 1097 (N.Y. 1993) (observing that anything with "real value in the eye of the

law" can serve as consideration) (quoting *Mencher v. Weiss*, 114 N.E.2d 177, 181 (N.Y. 1953)).

Courts generally will not opine on the adequacy of consideration. *Id.* ("Absent fraud or unconscionability, the adequacy of consideration is not a proper subject for judicial scrutiny.") (citations omitted).[9]

34.    With respect to the Earn Program, the Terms of Use clearly spell out the "benefit of the bargain": "Our Earn Service allows you to earn a financing fee from Celsius, referred to as 'Rewards,' in the form of Digital Assets . . . *in exchange for* entering into open-ended loans of your Eligible Digital Assets to Celsius under the terms hereof." Terms of Use at § 4.D (emphasis added). As discussed in the following section, "the terms hereof" transferred full title of the Earn Assets to the Debtors. *See infra* Part I.B.

35.    Further, each iteration of the Terms of Use was an at-will contract and each version of the Terms of Use conditioned further use of the Debtors' services on acceptance of any updated terms. *See* **Exhibit C**. As such, the continued ability to participate in the Earn Program following updates to the Terms of Use serves as consideration for the contract. *See Byrne v. Charter Commc'ns*, 581 F.Supp.3d 409, 419 (D. Conn. 2022) ("[T]he service provider is required to provide notice of the intended change [to the terms], and the customer has the choice of accepting the new arrangement or ceasing to use the services, and these respective promises by the parties together are sufficient to constitute valid consideration.") (citing *Iberia Credit Bureau, Inc. v. Cingular Wireless LLC*, 379 F.3d 159 (5th Cir. 2004)).

---

[9]    The Debtors are aware of general allegations of prepetition fraud raised by various *pro se* participants in these cases. Fraud must be pled with particularity. *See* Bankruptcy Rule 7009(b); *Sec. Inv. Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 309 (Bankr. S.D.N.Y. 1999) (describing the requirements of Federal Rule of Civil Procedure 9, incorporated by Bankruptcy Rule 7009(b)). Understanding that *pro se* litigants are not familiar with the heightened pleading standards applicable to such claims—but mindful of the near-impossibility of proving a negative—the Debtors prepared the Ferraro Declaration to explain why the transfer of title of the Earn Assets was necessary to the functioning of the Earn Program in an attempt to alleviate concerns regarding alleged impropriety.

### 3. Modified Versions of the Terms of Use Supersede Prior Versions in Accordance with Their Terms.

36.     Each historical iteration of the Terms of Use provided that the Debtors could amend the Terms of Use by posting them to their website, that the amended terms would replace the prior terms, and that continued use of the Debtors' services following such posting would be deemed consent to the updated terms. *See* **Exhibit C** (compiling the text of the modification provisions of the first eight versions of the Terms of Use). Accordingly, once it has been established that an Account Holder assented to at least one version of the Terms of Use, the modification provision contained therein allows consent to future iterations to be implied by continued use of the platform. *See Ward*, 3 F.Supp. 3d at 159 (S.D.N.Y. 2014) (describing a substantively similar provision and noting that there was a "plausible inference" that the plaintiff "clearly assented" to updated terms of use by continuing use of the website following their implementation where the customer was seeking to enforce the contract).

37.     The Debtors generally do not need to rely on this rolling consent because of the "consent event" surrounding the implementation of Terms of Use Version 6, which provides a recent, active renewal of Account Holders' consent. *See supra* Part I.A.1. That said, to the extent there are any potential "gaps" in consent, the modification provisions in each iteration of the Terms of Use can provide a bridge.

### B. Under the Terms of Use, Assets Transferred to the Earn Program Are the Debtors' Property.

38.     When a contract's terms are unambiguous, courts generally will apply them as written. *In re Enron Corp.*, 292 B.R. at 762 ("If the contract language is 'unambiguous,' this Court must enforce the plain, ordinary, and common meaning of those terms as a matter of law without reference to extrinsic evidence."); *see also In re Allegiance Telecom, Inc.*, 356 B.R. 93 (Bankr. S.D.N.Y. 2006) ("Under New York law, a written contract is to be interpreted so as to give effect to

20

the intention of the parties as expressed in the unequivocal language they have employed.") (internal

citations omitted). Here, the plain language of the Terms of Use requires a finding that digital assets

transferred into the Earn Program, and the proceeds thereof, are property of the Debtors' estates.

> **1.    The Terms of Use Are Unambiguous that Earn Assets Are the Debtors' Property.**

39.    For the reasons described above, the version of the Terms of Use in effect as of the

Petition Date is the relevant version for evaluating the Debtors' interest in the Earn Assets.

The Terms of Use provide as follows:

> In consideration for the Rewards payable to you on the Eligible Digital Assets using the Earn Service . . . and the use of our Services, ***you grant Celsius . . . all right and title to such Eligible Digital Assets, including ownership rights, and the right, without further notice to you, to hold such Digital Assets in Celsius' own Virtual Wallet or elsewhere, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets in Celsius' full discretion***. You acknowledge that with respect to Digital Assets used by Celsius pursuant to this paragraph:
>
>   1.  You will not be able to exercise rights of ownership;
>
>   2.  Celsius may receive compensation in connection with lending or otherwise using Digital Assets in its business to which you have no claim or entitlement; and
>
>   3.  ***In the event that Celsius becomes bankrupt, enters liquidation or is otherwise unable to repay its obligations, any Eligible Digital Assets used in the Earn Service or as collateral under the Borrow Service may not be recoverable, and you may not have any legal remedies or rights in connection with Celsius' obligations to you other than your rights as a creditor of Celsius under any applicable laws***.

Terms of Use at § 13 (emphasis added).

40.    The above text is in addition to at least four other references (express or implied) to

Earn Assets (including income thereon) being the Debtors' property. *See*, *e.g.*, Terms of Use §§ 2,

4, 10, 12. The Terms of Use are as clear as can be, not only as to ownership generally but also to

the potential consequences of a chapter 11 filing. As such, the Terms of Use should be enforced as written, and the Court should find that the Earn Assets are property of the Debtors' estates. *See In re Condado Plaza Acquisition LLC*, 620 B.R. 820, 831 (Bankr. S.D.N.Y. 2020) (finding that under New York Law, contracts are interpreted and enforced in accordance with their plain meaning and their clear and unambiguous terms); *In re Lehman Bros. Holdings Inc.*, 439 B.R. 811, 825 (Bankr. S.D.N.Y. 2010) ("[T]he ultimate objective in interpreting an agreement is to determine "the intention of the parties as derived from the language employed.") (quoting *Tom Doherty Assocs. Inc. v. Saban Entm't Inc.*, 869 F. Supp. 1130, 1137 (S.D.N.Y. 1994)).[10]

## 2.    Prior Versions of the Terms of Use, to the Extent Relevant, Support the Debtors' Position.

41.    As stated above, 90.06% of Account Holders (accounting for 99.86% of all Earn Program liabilities) in these chapter 11 cases formally assented to Terms of Use Version 6 or a later version of the Terms of Use. *See* Blonstein Declaration ¶ 20. Terms of Use Version 6 contains language substantially similar to the quoted language from the current Terms of Use.[11] As such, to the extent that the Court determines that active, affirmative consent to the current Terms of Use was required, notwithstanding the language of the Terms of Use providing that continued use of the

---

[10]    The Law Commission, *Digital Assets: Consultation Paper*, discusses various arrangements regarding, *inter alia*, possession, control, and custody of cryptocurrency. The majority of the *Digital Assets: Consultation Paper* is focused on programs that are distinguishable from the Earn Program, but the basic conclusion logically extends to the issue presented: "As contractual arrangements, the rights and obligations of the parties to an outright transfer or title retention custody facility will be determined fundamentally by the terms of the agreement(s) on which the facility is based." Law Commission, *Digital Assets: Consultation Paper* sec. 16.48 (July 28, 2022). "If a shortfall occurs and the custodian enters insolvency proceedings, then the allocation of losses will again be dependent on the legal nature of the custody facility and the rights granted to users under it. If the facility is purely contractual, then users will have no proprietary rights of recourse to any specific crypto-tokens retained by the insolvent estate but will instead rank as general unsecured creditors." *Id*. at sec. 17.63.

[11]    Redlines reflecting the changes made between Terms of Use Version 5 and Terms of Use Version 6, between Terms of Use Version 6 and Terms of Use Version 7 (which were entirely nonsubstantive), and between Terms of Use Version 7 and the Terms of Use in effect on the Petition Date (which incorporated clarifications based on the establishment of the Custody Program), can be found at the end of Exhibit A-6, Exhibit A-7, and Exhibit A-8 of the Terms of Use Declaration, respectively.

platform constitutes consent, the Court can grant the requested relief based on Account Holders' assent to Terms of Use Version 6.

42.     Nevertheless, to provide the Court and all parties in interest with as much detail as possible, the Debtors identified the version of the Terms of Use that each Account Holder first accepted.  The following table summarizes the results of those records, expressed as a percentage of Account Holders, rounded to the nearest whole percent:

| Version | Percentage of Account Holders |
|---|---|
| Version 1 (effective February 1, 2018) | 4% |
| Version 2 (effective March 5, 2020) | 1% |
| Version 3 (effective May 5, 2020) | 1% |
| Version 4 (effective June 15, 2020) | 4% |
| Version 5 (effective September 30, 2020) | 45% |
| Version 6 (effective July 22, 2021) | 3% |
| Version 7 (effective August 3, 2021) | 39% |
| Version 8 (effective April 14, 2022) | 2% |
| No record located. | 1% |

Blonstein Declaration ¶ 14.

43.     Every version of the Terms of Use has (i) allowed the Debtors to make unilateral updates to the Terms of Use and (ii) been clear that the Debtors had the right to "pledge and repledge from time to time" assets transferred to the Debtors.  *See*, *e.g.*, Terms of Use Version 1 at § 4; *see also* **Exhibit C** (compiling the text of the modification provision from each iteration of the Terms of Use); **Exhibit C** (compiling provisions relating to the title of Earn Assets).  Starting with Terms of Use Version 2, each iteration of the Terms of Use explicitly stated that the Debtors had "all attendant rights of ownership" to such assets.  *See, e.g.*, Terms of Use Version 2 at § 14; *see also*

**Exhibit C**.  As such, to the extent prior versions of the terms of use are relevant, they also support the requested relief.

### C. Purported Modifications to the Terms of Use Are Ineffective.

44.    The Debtors are aware that certain *pro se* Account Holders believe that the plain meaning of the Terms of Use should not be honored on the basis that the Terms of Use have been modified by subsequent statements of the Debtors or their former employees.  These arguments fail for two reasons.  First, the alleged modifications do not meet the requirements of a contract.  Second, pursuant to the Terms of Use, any updates to the Terms of Use are to be implemented through posting on the Debtors' website.  As such, any alleged amendments via other means were not valid.

45.    Modifications to a contract typically require the same elements as a freestanding contract.  *See In re Coudert Bros.*, 487 B.R. 375, 393–94 (S.D.N.Y. 2013) ("Under New York law, it is [f]undamental to the establishment of a contract modification [that] proof of each element requisite to the formulation of a contract be shown.") (internal quotation marks omitted).  The party seeking to enforce an alleged contract bears the burden of establishing the contract to be enforced. *See Paz v. Singer Co.*, 542 N.Y.S.2d 10, 11 (N.Y. App. Div. 1989) ("It is black letter law that the burden of proving the existence, terms and validity of a contract rests on the party seeking to enforce it.").

46.    Throughout these cases, certain Account Holders have cited to one-sided communications as the source of alleged amendments to the Terms of Use, including weekly "Ask Mashinsky Anything" videos featuring the Debtors' co-founder and former Chief Executive Officer, Alex Mashinsky.  Advertisements and other statements like those identified by Account Holders, however, do not generally constitute offers, and an offer is a necessary predicate for any "amendment" to the Terms of Use.  *See Leonard v. Pepsico, Inc.*, 88 F.Supp. 2d 116, 122–24 (S.D.N.Y. 1999), *aff'd*, 210 F.3d 88 (2d Cir. 2000) ("The general rule is that an advertisement does

not constitute an offer.") (internal quotation marks omitted).  Where a contract exists, arguments

regarding reliance are difficult to win.[12]  *See, e.g.*, *Scott v. Bell Atl. Corp.*, 726 N.Y.S.2d 60, 64 (N.Y.

App. Div. 2001) ("[I]t would be highly unlikely, upon a reading of defendants' representations along

with the [s]ervice [a]greement, that a reasonably prudent consumer would rely on the representations

in the face of the agreement's conspicuous, unequivocal disclamations.").

47.     Further, the Terms of Use themselves provide that modifications to the Terms of Use

will be implemented via posting on the Debtors' website:  "Celsius can modify the Terms at any

time and in its sole discretion ***by posting the revised Terms on the Celsius website***."  *See* Terms of

Use at ¶ Introduction (emphasis added).  The Terms of Use do not provide for any other method of

amendment.  Under New York law, "[i]n general . . . a written agreement that expressly states it can

be modified in writing cannot be modified orally."  *Towers Charter & Marine Corp. v. Cadillac Ins.*

*Co.*, 894 F.2d 516, 522 (2d Cir. 1990) (applying New York state law); *see also In re Enron Corp.*,

292 B.R. at 762 ("If the contract language is 'unambiguous,' this Court must enforce the plain,

ordinary, and common meaning of those terms as a matter of law without reference to extrinsic

evidence.").

48.     Therefore, the plain language of the Terms of Use should govern, notwithstanding

any arguments seeking to invalidate it on the basis of purported amendments.  Pursuant to the Terms

of Use, all Earn Assets are property of the Debtors' estates.

## II.     The Debtors May Sell Their Earn Stablecoins Pursuant to Section 363 of the Bankruptcy Code.

49.     Prior to the Petition Date, the Debtors monetized stablecoin assets as needed to fund

operations in the ordinary course.  Ferraro Declaration ¶ 25.  As of the date hereof, the Debtors or

---

[12]   Several arguments regarding alleged "amendments" may be better characterized as equitable arguments regarding
reliance.  In either circumstance, the clear and unambiguous Terms of Use should be enforced.

their affiliates hold eleven different forms of stablecoins totaling approximately $23 million in their

Fireblocks account.  Campagna Declaration ¶ 10.  Pursuant to the Final Cash Management Order,

however, the Debtors agreed that they would not liquidate or exchange any cryptocurrency absent

further order of the Court.  *See* Final Cash Management Order ¶ 5.  For the reasons stated herein,

and in the Original Motion, the Debtors seek entry of the Order authorizing them to sell the

approximately $18 million worth of stablecoins identified on <u>Exhibit 1</u> to the Order (the "<u>Earn</u>

<u>Stablecoins</u>") in the ordinary course of business.[13]

A.    **Selling Earn Stablecoins in the Ordinary Course of Business Is Appropriate Pursuant to Section 363(c)(1) of the Bankruptcy Code.**

50.    While the Debtors' business functions are novel, the relief requested in the Amended

Motion—once contextualized—is not.  Section 363(c)(1) of the Bankruptcy Code provides, in

relevant part, that:

> If the business of the debtor is authorized to be operated under section 721, 1108, 1183, 1184, 1203, 1204 or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

51.    The "ordinary course of business" standard was intended to allow a debtor in

possession the flexibility required to run its business.  *See In re Roth Am., Inc.*, 975 F.2d 949, 952

(3d Cir. 1992) ("The framework of section 363 is designed to allow a trustee (or debtor-in-

---

[13]    For the avoidance of doubt, the Debtors will not sell any stablecoins that constitute Custody Assets and/or Withhold Assets pending the outcome of the *Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to Reopen Withdrawals for Certain Customers with Respect to Certain Assets Held in the Custody Program and Withhold Accounts and (II) Granting Related Relief* [Docket No. 670] (both as defined therein) and/or any other motions, pleadings, and proceedings addressing the return and/or release of Custody Assets and/or Withhold Assets. To ensure no prejudice to creditors whose property rights remain uncertain, the Debtors worked with their advisors to establish reserves for stablecoins identified as Custody Assets, Withhold Assets, or collateral in the Borrow Program.  Following that reconciliation, the Debtors identified approximately $18 million worth of Earn Stablecoins, net of these reserves, as reflected on <u>Exhibit 1</u> to the Order.  Campagna Declaration ¶¶ 11–12.

possession) the flexibility to engage in ordinary transactions without unnecessary creditor and bankruptcy court oversight."). "Ordinary course of business" is not defined within the Bankruptcy Code. In the absence of statutory guidance, courts apply the Second Circuit's two-prong test that looks to: (1) whether the transaction at issue is the sort commonly undertaken by companies of the relevant industry (the "Horizontal Test"); and (2) whether a hypothetical creditor would expect the nature of the economic risk when they entered into contracts with the Debtors (the "Vertical Test"). *See In re Lavigne*, 114 F.3d 379, 384–85 (2d Cir. 1997). Bankruptcy courts in the Southern District of New York have noted that section 363 of the Bankruptcy Code "confers upon the debtor the corresponding discretion to exercise reasonable judgment in ordinary affairs bounded only by the debtor's fiduciary duties." *In re Enron Corp.*, No. 01-16034 (AJG), 2003 WL 1562202, at *16 (Bankr. S.D.N.Y. Mar. 21, 2003).

52.    The proposed sale of Earn Stablecoins plainly satisfies both the Horizontal Test and the Vertical Test, comparable to a business selling unencumbered inventory (that has a fixed and stable market price) rather than holding that inventory when the business has a cash need. But for the Final Cash Management Order, and the gating issues regarding the title to the Earn Stablecoins, the Debtors likely would not have needed to file a motion at all. While creditors may object to the overall costs of these chapter 11 cases, that does not change the nature of the relief requested. *See In re James A. Phillips, Inc.*, 29 B.R. 391, 394 (S.D.N.Y. 1983) ("[O]bjections to [ordinary course] transactions are likely to relate to the [debtor's] chapter 11 status, not the particular transactions themselves.").

53.    Once the court has confirmed that the Earn Stablecoins are property of the Debtors' estates, the sale of the Earn Stablecoins is clearly a reasonable exercise of the Debtors' business judgment that should be approved. The Debtors have managed their liquidity carefully throughout

these chapter 11 cases by implementing substantial cost-cutting measures, but the costs of administering these estates remain significant and the Debtors' income has been sharply reduced as a result of the ongoing freeze of all customer-facing activities.    Ferraro Declaration ¶ 23. The Debtors undeniably require liquidity, and the sale of the Earn Stablecoins in the ordinary course of business would meaningfully extend the Debtors' liquidity runway.  Campagna Declaration ¶ 9. The Debtors have reserved sufficient stablecoins to avoid prejudice to any creditors of the Custody Program, Withheld Program, or Borrow Program whose rights are reserved pending a ruling on ownership of these assets.[14]  Campagna Declaration ¶ 10.  Therefore, the proposed sale of the Earn Stablecoins is appropriate and should be approved.

**B.    The Sale of Earn Stablecoin Should Be Approved "Free and Clear" Under Section 363(f) of the Bankruptcy Code.**

54.    Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if:  (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.  *See* 11 U.S.C. § 363(f).

---

[14]    As described in the Campagna Declaration, to determine the size and scope of the reserves, the Debtors worked with their advisors to determine the types of stablecoins to potentially sell, deciding on USD Coin, Tether, Gemini Dollar, Binance USD, Multi-Collateral Dai, TrueUSD, Paxos Standard, Synthetix USD, Zytara USD, Tether EURT, and USDT ERC20.  Campagna Declaration ¶ 11.  Next, for each coin type, we determined:  (i) how many of that type of coin are in the Debtors' main and custody Fireblocks accounts, and (ii) what the Debtors' total potential customer liability exposure was as to that coin type in connection with the Custody Program, the Withhold Accounts, and collateral in the Borrow Program (this second figure amounting to the "Reserve Liabilities").  Campagna Declaration ¶ 11.  Once the Debtors identified each of these figures, they determined on a coin-by-coin basis how many stablecoins to propose to sell, if any.  The Debtors do not propose to sell any stablecoins of a particular type if the Debtors do not have a sufficient number of that type of stablecoin to honor the Reserve Liabilities for that coin in kind.

55.     Section 363(f) of the Bankruptcy Code is drafted in the disjunctive.  Thus, satisfaction of any of the enumerated requirements will suffice to warrant the sale free and clear of all liens, security interests, pledges, charges, defects, or similar encumbrances (collectively, the "Encumbrances").  *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").  The burden of establishing the existence of Encumbrances falls to the party asserting them.  *See* 11 U.S.C. § 363(p).

56.     In the first instance, the Debtors do not believe there are Encumbrances on any of the Earn Stablecoins, and any asserted Encumbrances would likely be subject to a bona fide dispute. Further, to the extent that any Earn Stablecoins are determined to be encumbered notwithstanding the Debtors' position, the beneficiary of such Encumbrance could be compelled to accept a money judgment, as the underlying claim arises out of the Terms of Use.  *See In re Grubb & Ellis Co*., No. 12-10685 (MG), 2012 WL 1036071, at *8, 10 (Bankr. S.D.N.Y. Mar. 27, 2012), *aff'd*, 523 B.R. 423 (S.D.N.Y. 2014) (permitting the sale of substantially all of debtor's assets under section 363(f) after finding that creditors who objected to the sale could be compelled to accept a money satisfaction under section 363(f)(5), when such interests arose from commissions and fees from past sales, and the employment agreements between the debtor-broker and the creditor-agents provided that the debtor owned the commissions); *cf. In re First Cent. Fin. Corp*., 377 F.3d 209, 215 (2d Cir. 2004) (finding that under New York law, "where a valid agreement controls the rights and obligations of the parties, an adequate remedy at law typically exists"); *Coleman v. Kirby*, 156 N.Y.S.3d 723 (N.Y. App. Div. 2022) (finding, in a breach of contract action, that "[p]laintiff's claims for injunctive and declaratory relief fail because he has an adequate remedy at law in the form of monetary damages").  The Debtors therefore request authority to sell Earn Stablecoin free and clear of any and all

Encumbrances, including liens, claims, rights, interests, charges, and encumbrances, with any such Encumbrances to attach to the proceeds of a sale.

## **Reservation of Rights**

57.     Nothing contained herein or any actions taken pursuant to any relief granted by the Order is intended or should be construed as:  (a) an admission as to the validity of any particular claim against the Debtors, (b) a waiver of the Debtors' rights to dispute or challenge any particular claim on any grounds, including through avoidance and/or recovery actions, (c) a promise or requirement to pay any particular claim, (d) an implication or admission that any particular claim is of a type specified or defined in this objection or any order granting the relief requested by this objection, (e) an implication or admission as to any position the Debtors may take with respect to outstanding legal issues in these chapter 11 cases, including the issue of how distributions to stakeholders under a chapter 11 plan should be calculated or the form such distributions should take; (f) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, (g) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law, or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this objection are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens.

## **No Prior Request**

58.     This Amended Motion amends the Original Motion.  Other than the Original Motion, no prior request for the relief sought in this Amended Motion has been made to this or any other court.

## **Conclusion**

59.     For the foregoing reasons, the Debtors request that the Court enter the Order.

New York, New York
Dated: November 10, 2022

*/s/ Joshua A. Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        jsussberg@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        patrick.nash@kirkland.com
              ross.kwasteniet@kirkland.com
              chris.koenig@kirkland.com
              dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

**<u>Exhibit A</u>**
**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) Case No. 22-10964 (MG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**ORDER (I) ESTABLISHING**
**OWNERSHIP OF ASSETS IN THE DEBTORS' EARN**
**PROGRAM, (II) PERMITTING THE SALE OF STABLECOIN**
**IN THE ORDINARY COURSE AND (III) GRANTING RELATED RELIEF**

Upon the amended motion (the "<u>Amended Motion</u>")[2] of the above-captioned debtors and

debtors in possession (collectively, the "<u>Debtors</u>") for entry of an order (this "<u>Order</u>"),

(a) establishing ownership of assets transferred into the Debtors' Earn Program (and any proceeds

thereof), (b) permitting the Debtors to continue to sell stablecoin consistent with past practice and

in the ordinary course of the Debtors' business, and (c) granting related relief, all as more fully set

forth in the Amended Motion; and upon the Blonstein Declaration, the Ferraro Declaration, and

the Campagna Declaration (collectively, the "<u>Declarations</u>"); and this Court having jurisdiction

over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of*

*Reference* from the United States District Court for the Southern District of New York, entered

February 1, 2012; and this Court having the power to enter a final order consistent with Article III

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius
Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks
Lending LLC (3390); and Celsius US Holding LLC (7956).  The location of Debtor Celsius Network LLC's
principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite
209F, Hoboken, New Jersey 07030.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Amended
Motion.

of the United States Constitution; and this Court having found that venue of these cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Amended Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Amended Motion and opportunity for a hearing thereon were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Amended Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Amended Motion and the Declarations and at the Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

**THE COURT HEREBY FINDS AS FOLLOWS**:[3]

A.      The statutory and other legal predicates for the relief sought in the Amended Motion are sections 363(c)(1), 363(f), 541, 1107(a), and 1108 of the Bankruptcy Code, Bankruptcy Rules 6003(b) and 6004(h), and Local Rule 9013-1.

B.      All parties entitled to notice have had a fair and reasonable opportunity to object to and to be heard with respect to the Amended Motion and the relief requested therein, in compliance with all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, Local Rules, and the *Case Management Procedures* appended to the *Amended Final Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief* [Docket No. 1181].

---

[3]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

2

C.      All objections to the Amended Motion [were withdrawn or overruled prior to or on the record at the Hearing // are hereby overruled].

D.      Each holder of any claim against or interest in (as applicable) the Debtors, their estates, or any of the Earn Stablecoins: (i) has, subject to the terms and conditions of this Order, consented to the sale of the Earn Stablecoins or is deemed to have consented to such sale(s); (ii) could be compelled, in a legal or equitable proceeding, to accept money satisfaction of such claim or interest; or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code.

**The Terms of Use**

E.      As to each Account Holder, the Terms of Use constitute a valid and enforceable contract, and each modified version of the Terms of Use superseded any prior version pursuant to its terms.

F.      Pursuant to the unambiguous plain language of the Terms of Use, the Earn Assets were the Debtors' property as of the Petition Date.

G.      As a result, the Earn Assets (including the Earn Stablecoins) constitute property of the Debtors' estates and good title is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.  The Debtors are the sole and rightful owners of the Earn Assets, and no other person has any ownership, right, title, or interest therein; *provided* that, notwithstanding the foregoing, nothing herein shall be considered a finding or ruling regarding (1) the ownership of assets in the Debtors' Custody Program, Withhold Accounts, or Borrow Program or (2) whether any Account Holder has valid defenses to the purported contract between Account Holders and the Debtors under the Terms of Use, and all parties' rights are reserved with respect to each of the foregoing.

3

**NOW THEREFORE, IT IS ORDERED THAT**:

1.      The Amended Motion is granted as set forth herein.

2.      Pursuant to section 363(c)(1) of the Bankruptcy Code, the Debtors are authorized, but not directed, to sell and/or exchange any Earn Stablecoin, whether currently held or received in the future, on a postpetition basis consistent with prepetition practices and in the ordinary course of business without further notice and hearing; *provided* that the Debtors shall not sell any stablecoins that constitute Custody Assets, Withhold Assets, and/or Borrow Assets pending further order of the Court; *provided*, *further*, that the Debtors are authorized and directed to reserve approximately $55.9 million worth of stablecoins in the coin types and amounts denoted as Reserved Liabilities on **Exhibit 1** hereto to ensure compliance with this Order; *provided*, *further*, that all parties' rights are expressly reserved as to the ultimate amount and treatment of all Custody Assets, Withhold Assets, and Borrow Assets.

3.      Notwithstanding anything to the contrary herein, upon the Debtors' sale of stablecoin, such cash proceeds shall be subject to the applicable provisions of the *Final Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Granting Superpriority Administrative Expense Status to Postpetition Intercompany Balances, and (III) Granting Related Relief* [Docket No. 1152] and any other order of the Court relating to the subject matter hereof.

4.      All persons and entities that failed to timely object, or withdrew their objections, to the Amended Motion or this Order are deemed to consent to the relief granted herein for all purposes, including pursuant to sections 363(f)(2) of the Bankruptcy Code.

4

5.      Pursuant to section 363(f) of the Bankruptcy Code, except as otherwise provided for in this Order, any sale(s) of the Earn Stablecoins are free and clear of (i) all liens, claims, interests or encumbrances on the Earn Stablecoins with all such liens, claims, interests and encumbrances attaching to the proceeds of the Earn Stablecoins with the same force, effect and priority that such liens, claims, interests and encumbrances had on the Earn Stablecoins sold, and (ii) payment on account of any such liens, claims, interests, and encumbrances being subject to further order of the Court.

6.      Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed:  (a) an admission as to the validity of any particular claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Order or the Amended Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Amended Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens.  Any payment made pursuant to this Order is not intended and should not be construed as an admission as the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

7.      The requirements set forth in Bankruptcy Rule 6003(b) are satisfied by the contents of the Amended Motion or are otherwise deemed waived.

5

8.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

9.      The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Amended Motion.

10.      This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

New York, New York
Dated: _____, 2022

_____
THE HONORABLE MARTIN GLENN
CHIEF UNITED STATES BANKRUPTCY JUDGE

6

**Exhibit 1**

*As of October 28, 2022*

| Coin Type | Price | Main Accounts # | Main Accounts $ | Custody Account # | Custody Account $ | Reserve Liabilities # | Reserve Liabilities $ | Net Earn Assets # | Net Earn Assets $ |
|---|---|---|---|---|---|---|---|---|---|
| | | \multicolumn Stablecoin Assets on Fireblocks | | | | | | | |
| USDC | $1.000 | 3,142,311 | $3,141,683 | 36,124,008 | $36,116,783 | 44,643,836 | 44,634,907 | - | - |
| USDT ERC20 | $1.000 | 17,848,309 | 17,848,309 | 1,939,202 | 1,939,202 | 3,345,738 | 3,345,738 | 16,441,773 | 16,441,773 |
| GUSD | $1.002 | 25,447 | 25,485 | 4,638,752 | 4,645,710 | 6,017,598 | 6,026,624 | - | - |
| BUSD | $1.000 | 363,672 | 363,527 | 157,750 | 157,687 | 160,536 | 160,472 | 360,887 | 360,743 |
| MCDAI | $1.000 | 1,476,016 | 1,476,016 | 468,665 | 468,665 | 825,592 | 825,592 | 1,119,089 | 1,119,089 |
| TUSD | $1.000 | 1,341 | 1,341 | 291,142 | 291,142 | 292,788 | 292,788 | - | - |
| PAX | $0.997 | 218 | 218 | 393,165 | 391,985 | 590,902 | 589,129 | - | - |
| SUSD | $1.020 | 1,000 | 1,020 | - | - | - | - | 1,000 | 1,020 |
| ZUSD | $1.025 | 79,119 | 81,097 | 1 | 1 | 0 | 0 | 79,120 | 81,098 |
| EURT | $0.997 | 343 | 342 | - | - | - | - | 343 | 342 |
| USDT | $1.000 | 107,486 | 107,486 | - | - | - | - | 107,486 | 107,486 |
| **Total** | | | **$23,046,523** | | **$44,011,176** | | **$55,875,249** | | **$18,111,551** |

Note: For certain stablecoin types (USDC, GUSD, TUSD, PAX), the Debtors do not hold sufficient quantities in order to fulfil the amount of the Reserve Liabilities. For such coin types, the Debtors do not intend to monetize any amounts.

**<u>Exhibit A-1</u>**
**Redline of Proposed Order Against the Order in the Original Motion**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

## ORDER (I) ESTABLISHING OWNERSHIP OF ASSETS IN THE DEBTORS' EARN PROGRAM, (II) PERMITTING THE SALE OF STABLECOIN IN THE ORDINARY COURSE AND (III) GRANTING RELATED RELIEF

Upon the amended motion (the "Amended Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"), (a) establishing ownership of assets transferred into the Debtors' Earn Program (and any proceeds thereof), (b) permitting the Debtors to continue to sell stablecoin consistent with past practice and in the ordinary course of the Debtors' business, and (bc) granting related relief, all as more fully set forth in the Amended Motion; and upon the First Day Blonstein Declaration, the Ferraro Declaration, and the Campagna Declaration (collectively, the "Declarations"); and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York, entered February 1, 2012; and this Court having the power to enter a final

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River50 Harrison Street, PH05Suite 209F, Hoboken, New Jersey 07030.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Amended Motion.

order consistent with Article III of the United States Constitution; and this Court having found that venue of these cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Amended Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Amended Motion and opportunity for a hearing thereon were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Amended Motion and having heard the statements in support of the relief requested therein at a hearing (if any) before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Amended Motion and the Declarations and at the Hearing (if any) establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is HEREBY

**THE COURT HEREBY FINDS AS FOLLOWS:**[3]

A.    The statutory and other legal predicates for the relief sought in the Amended Motion are sections 363(c)(1), 363(f), 541, 1107(a), and 1108 of the Bankruptcy Code, Bankruptcy Rules 6003(b) and 6004(h), and Local Rule 9013-1.

B.    All parties entitled to notice have had a fair and reasonable opportunity to object to and to be heard with respect to the Amended Motion and the relief requested therein, in compliance with all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, Local Rules, and the *Case Management Procedures* appended to the *Amended Final Order*

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

2

*(I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief* [Docket No. 1181].

C.       All objections to the Amended Motion [were withdrawn or overruled prior to or on the record at the Hearing // are hereby overruled].

D.       Each holder of any claim against or interest in (as applicable) the Debtors, their estates, or any of the Earn Stablecoins: (i) has, subject to the terms and conditions of this Order, consented to the sale of the Earn Stablecoins or is deemed to have consented to such sale(s); (ii) could be compelled, in a legal or equitable proceeding, to accept money satisfaction of such claim or interest; or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code.

**The Terms of Use**

E.       As to each Account Holder, the Terms of Use constitute a valid and enforceable contract, and each modified version of the Terms of Use superseded any prior version pursuant to its terms.

F.       Pursuant to the unambiguous plain language of the Terms of Use, the Earn Assets were the Debtors' property as of the Petition Date.

G.       As a result, the Earn Assets (including the Earn Stablecoins) constitute property of the Debtors' estates and good title is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.  The Debtors are the sole and rightful owners of the Earn Assets, and no other person has any ownership, right, title, or interest therein; *provided* that, notwithstanding the foregoing, nothing herein shall be considered a finding or ruling regarding (1) the ownership of assets in the Debtors' Custody Program, Withhold Accounts, or Borrow Program or (2) whether any Account Holder has valid defenses to the purported contract

3

between Account Holders and the Debtors under the Terms of Use, and all parties' rights are reserved with respect to each of the foregoing.

**NOW THEREFORE, IT IS** ORDERED THAT:

1.      The Amended Motion is granted as set forth herein.

2.      Pursuant to section 363(c)(1) of the Bankruptcy Code, the Debtors are authorized, but not directed, to sell and/or exchange any Earn sStablecoin, whether currently held or received in the future, on a postpetition basis consistent with prepetition practices and in the ordinary course of business without further notice and hearing; *provided* that the Debtors shall not sell any stablecoins that constitute Custody Assets, Withhold Assets, and/or WithholdBorrow Assets pending further order of the Court.; *provided, further,* that the Debtors are authorized and directed to reserve approximately $55.9 million worth of stablecoins in the coin types and amounts denoted as Reserved Liabilities on **Exhibit 1** hereto to ensure compliance with this Order; *provided, further,* that all parties' rights are expressly reserved as to the ultimate amount and treatment of all Custody Assets, Withhold Assets, and Borrow Assets.

3.      Notwithstanding anything to the contrary herein, upon the Debtors' sale of stablecoin, such cash proceeds areshall be subject to the applicable provisions of the *Third InterimFinal* Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Granting Superpriority Administrative Expense Status to pPostpetition Intercompany Balances, and (III) Granting Related Relief [Docket No. 6991152] and any other order of the Court relating to the subject matter hereof.

4

4.      All persons and entities that failed to timely object, or withdrew their objections, to the Amended Motion or this Order are deemed to consent to the relief granted herein for all purposes, including pursuant to sections 363(f)(2) of the Bankruptcy Code.

5.      Pursuant to section 363(f) of the Bankruptcy Code, except as otherwise provided for in this Order, any sale(s) of the Earn Stablecoins are free and clear of (i) all liens, claims, interests or encumbrances on the Earn Stablecoins with all such liens, claims, interests and encumbrances attaching to the proceeds of the Earn Stablecoins with the same force, effect and priority that such liens, claims, interests and encumbrances had on the Earn Stablecoins sold, and (ii) payment on account of any such liens, claims, interests, and encumbrances being subject to further order of the Court.

6.      4.Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed:  (a) an admission as to the validity of any particular claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Order or the Amended Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Amended Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens.  Any payment made pursuant to this Order is not intended and should not be construed as an admission as the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

5

7.    ~~5.~~ The requirements set forth in Bankruptcy Rule 6003(b) are satisfied by the contents of the <u>Amended</u> Motion or are otherwise deemed waived.

8.    ~~6.~~ Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

9.    ~~7.~~ The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the <u>Amended</u> Motion.

10.    ~~8.~~ This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

New York, New York
Dated: _____, 2022

_____
THE HONORABLE MARTIN GLENN
CHIEF UNITED STATES BANKRUPTCY JUDGE

**Exhibit 1**

(Added)$^{\prime 8, 2022}$

| Coin Type | Price | Main Accounts | | Custody Account | | Reserve Liabilities | | Net Earn Assets | |
|---|---|---|---|---|---|---|---|---|---|
| | | # | $ | # | $ | # | $ | # | $ |
| USDC | $1.000 | 3,142,311 | $3,141,683 | 36,124,008 | $36,116,783 | 44,643,836 | 44,634,907 | – | – |
| USDT ERC20 | $1.000 | 17,848,309 | 17,848,309 | 1,939,202 | 1,939,202 | 3,345,738 | 3,345,738 | 16,441,773 | 16,441,773 |
| GUSD | $1.002 | 25,447 | 25,485 | 4,638,752 | 4,645,710 | 6,017,598 | 6,026,624 | – | – |
| BUSD | $1.000 | 363,672 | 363,527 | 157,750 | 157,687 | 160,536 | 160,472 | 360,887 | 360,743 |
| MCDAI | $1.000 | 1,476,016 | 1,476,016 | 468,665 | 468,665 | 825,592 | 825,592 | 1,119,089 | 1,119,089 |
| TUSD | $1.000 | 1,341 | 1,341 | 291,142 | 291,142 | 292,788 | 292,788 | – | – |
| PAX | $0.997 | 218 | 218 | 393,165 | 391,985 | 590,902 | 589,129 | – | – |
| SUSD | $1.020 | 1,000 | 1,020 | – | – | – | – | 1,000 | 1,020 |
| ZUSD | $1.025 | 79,119 | 81,097 | 1 | 1 | 0 | 0 | 79,120 | 81,098 |
| EURT | $0.997 | 343 | 342 | – | – | – | – | 343 | 342 |
| USDT | $1.000 | 107,486 | 107,486 | – | – | – | – | 107,486 | 107,486 |
| Total | | | $23,046,523 | | $44,011,176 | | $55,875,249 | | $18,111,551 |

Note:  For certain stablecoin types (USDC, GUSD, TUSD, PAX), the Debtors do not hold sufficient quantities in order to fulfil the amount of the Reserve Liabilities. For such coin types, the Debtors do not intend to monetize any amounts.

**Exhibit B**

| | | |
|---|---|---|

<table>
<tr><td colspan="3" align="center"><b>Earn Assets as Property of Celsius</b></td></tr>
<tr><td colspan="3" align="center"><b>Version 1</b></td></tr>
<tr><td><b>Section Number</b></td><td><b>Section Heading</b></td><td><b>Relevant Text</b></td></tr>
<tr><td>V</td><td>Representations and Warranties</td><td>(c) User represents and warrants that is understands that Celsius may, for its own account, pledge and repledge from time to time, without notice to the User, either separately or in common with other such cryptocurrency, any or all of the Digital Currency that comprises the Deposited Amount held by Celsius for the benefit of User and that Celsius may do so without retaining in its possession or control for delivery, a like amount of similar cryptocurrency.</td></tr>
<tr><td colspan="3" align="center"><b>Version 2</b></td></tr>
<tr><td><b>Section Number</b></td><td><b>Section Heading</b></td><td><b>Relevant Text</b></td></tr>
<tr><td>10</td><td>Risk Disclosure</td><td>These Terms and the holding of Digital Asset relationship does not create a fiduciary relationship between us and you; your Account is not a checking or savings account, and it is not covered by insurance against losses.  We may lend, sell, pledge, hypothecate, assign, invest, use, commingle or otherwise dispose of assets and Eligible Digital Assets to counterparties or hold the Eligible Digital Assets with counterparties, and we will use our best commercial and operational efforts to prevent losses.</td></tr>
<tr><td>14</td><td>Consent to Celsius' Use of Your Digital Assets</td><td>In consideration for the rewards earned on your Account and the use of our Services, you grant Celsius the right, subject to applicable law, without further notice to you, to hold the Digital Assets available in your account in Celsius' name or in another name, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets at Celsius' own risk.  You acknowledge that with respect to assets used by Celsius pursuant to this paragraph:<br>(i)     You may not be able to exercise certain rights of ownership;<br>(ii)    Celsius may receive compensation in connection with lending or otherwise using Digital Assets in its business to which you have no claim or entitlement;<br>(iii)   Celsius borrowers may default partially or entirely, which can result in partial or total loss of your coins. In that event, Celsius shall use its balance sheet to cover damages. If the losses exceed Celsius' balance sheet, you authorize Celsius to use Eligible Digital Assets to absorb the remaining losses of the same coin;</td></tr>
</table>

| | | (iv) | Celsius may use your Eligible Digital Assets as collateral to borrow other digital or fiat assets in different jurisdictions around the world. While such borrowing are for the purpose of optimizing the returns to all members, Celsius may experience losses or partial recovery of such collateral in certain situations. If the losses exceed Celsius' balance sheet, you authorize Celsius to use Eligible Digital Assets to absorb the remaining losses; and, |
| | | (v) | Celsius may lend your coins to exchanges, hedge and other counterparties, which may provide full or partial collateral for any coin or fiat loan. |

| **Version 3** | | |
|---|---|---|
| **Section Number** | **Section Heading** | **Relevant Text** |
| 10 | Risk Disclosure | These Terms and the holding of Digital Asset relationship does not create a fiduciary relationship between us and you; your Account is not a checking or savings account, and it is not covered by insurance against losses. We may lend, sell, pledge, hypothecate, assign, invest, use, commingle or otherwise dispose of assets and Eligible Digital Assets to counterparties or hold the Eligible Digital Assets with counterparties, and we will use our best commercial and operational efforts to prevent losses. |
| 14 | Consent to Celsius' Use of Your Digital Assets | In consideration for the rewards earned on your Account and the use of our Services, you grant Celsius the right, subject to applicable law, without further notice to you, to hold the Digital Assets available in your account in Celsius' name or in another name, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets at Celsius' own risk. You acknowledge that with respect to assets used by Celsius pursuant to this paragraph: |
| | | (i)     You may not be able to exercise certain rights of ownership; |
| | | (ii)    Celsius may receive compensation in connection with lending or otherwise using Digital Assets in its business to which you have no claim or entitlement; |
| | | (iii)   (iii) Celsius borrowers may default partially or entirely, which can result in partial or total loss of your coins. In that event, Celsius shall use its balance sheet to cover damages. If the losses exceed Celsius' balance sheet, you authorize Celsius to use Eligible Digital Assets to absorb the remaining losses of the same coin; |
| | | (iv)   Celsius may use your Eligible Digital Assets as collateral to borrow other digital or fiat assets in different jurisdictions around the world. While such borrowing are for the purpose of optimizing the returns to all members, Celsius may experience losses or partial recovery of such collateral in certain situations. If the losses exceed Celsius' balance sheet, you authorize Celsius to use Eligible Digital Assets to absorb the remaining losses; and, |

| | | (v) Celsius may lend your coins to exchanges, hedge and other counterparties, which may provide full or partial collateral for any coin or fiat loan. |
|---|---|---|
| **Version 4** | | |
| **Section Number** | **Section Heading** | **Relevant Text** |
| 10 | Risk Disclosure | These Terms and the holding of Digital Asset relationship does not create a fiduciary relationship between us and you; your Account is not a checking or savings account, and it is not covered by insurance against losses. We may lend, sell, pledge, hypothecate, assign, invest, use, commingle or otherwise dispose of assets and Eligible Digital Assets to counterparties or hold the Eligible Digital Assets with counterparties, and we will use our best commercial and operational efforts to prevent losses. |
| 14 | Consent to Celsius' Use of Your Digital Assets | In consideration for the rewards earned on your Account and the use of our Services, you grant Celsius the right, subject to applicable law, without further notice to you, to hold the Digital Assets available in your account in Celsius' name or in another name, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets.  You acknowledge that with respect to assets used by Celsius pursuant to this paragraph:<br>(i) You may not be able to exercise certain rights of ownership;<br>(ii) Celsius may receive compensation in connection with lending or otherwise using Digital Assets in its business to which you have no claim or entitlement;<br>(iii) Celsius borrowers may default partially or entirely, which can result in partial or total loss of your coins. In that event, you authorize Celsius to use Eligible Digital Assets to absorb the remaining losses;<br>(iv) Celsius may use your Eligible Digital Assets as collateral to borrow other digital or fiat assets in different jurisdictions around the world. While such borrowing are for the purpose of optimizing the returns to all members, Celsius may experience losses or partial recovery of such collateral in certain situations.<br>(v) You authorize Celsius to use Eligible Digital Assets to absorb the remaining losses; and,<br>(vi) Celsius may lend your coins to exchanges, hedge and other counterparties, which may provide full or partial collateral for any coin or fiat loan. |

| Version 5 | | |
|---|---|---|
| **Section Number** | **Section Heading** | **Relevant Text** |
| 4(B) | Loans (Subsection of Services) | In this clause 4B, notwithstanding the use of expressions such as "borrow", "loan", and "collateral" etc., which are used to reflect terminology adopted in the market for transactions of the kind provided for pursuant to the Loan Agreement, title to the Digital Assets shall pass from you to CNL on the basis of an outright sale, subject to your right to request at a later date the delivery of equivalent (but not identical) Digital Assets to those sold to CNL. As consideration for the sale of the Digital Assets to Celsius you will receive an agreed Fiat amount from CNL, which shall act as the purchase price for the sale, along with a fee that shall be calculated by reference to such matters as the Digital Assets sold and the length of time prior to the exercise of your right to request delivery of equivalent Digital Assets. In order to exercise your right to delivery of equivalent Digital Assets to those originally sold to CNL, you must pay an agreed Fiat amount to CNL. |
| 10 | Risk Disclosure | These Terms and the holding of Digital Asset relationship does not create a fiduciary relationship between us and you; your Celsius Wallet is not a checking or savings account, and it is not covered by insurance against losses. We may lend, sell, pledge, hypothecate, assign, invest, use, commingle or otherwise dispose of assets and Eligible Digital Assets to counterparties or hold the Eligible Digital Assets with counterparties, and we will use our best commercial and operational efforts to prevent losses. |
| 14 | Consent to Celsius' Use of Your Digital Assets | In consideration for the rewards earned on your Celsius Wallet and the use of our Services, you grant Celsius, subject to applicable law and for the duration of the period during which the Digital Assets are available through your Celsius Wallet, all right and title to such Digital Assets, including ownership rights, and the right, without further notice to you, to hold such Digital Assets in Celsius' own virtual wallet or elsewhere, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets. You acknowledge that with respect to Digital Assets used by Celsius pursuant to this paragraph: <br>(i) You may not be able to exercise certain rights of ownership; <br>(ii) Celsius may receive compensation in connection with lending or otherwise using Digital Assets in its business to which you have no claim or entitlement; <br>(iii) Celsius borrowers may default partially or entirely, which can result in partial or total loss of your Digital Assets. In that event, you authorize Celsius to use Eligible Digital Assets to absorb the losses; <br>(iv) Celsius may use your Eligible Digital Assets as collateral to borrow other digital or fiat assets in different jurisdictions around the world. While such borrowing are for the purpose of optimizing the returns to all members, Celsius may experience losses or partial recovery of such collateral in certain situations; and |

| | | (v)    Celsius may lend your coins to exchanges, hedge and other counterparties, which may provide full or partial collateral for any coin or fiat loan. |
| --- | --- | --- |
| **Version 6** | | |
| **Section Number** | **Section Heading** | **Relevant Text** |
| 1 | Introduction | Celsius is a lending and borrowing platform.  When you transfer digital assets to Celsius, those digital assets are a loan from you to Celsius, in accordance with the terms hereof.  Under no circumstances does Celsius hold digital assets in custody on your behalf as part of the services governed by these terms. All Digital Assets Transferred to Celsius as part of the Services are owned and held by Celsius for its own account. The use of terms such as "account," "account balance," "withdraw" and similar does not imply or establish, and shall not be taken to suggest, any form of custody relationship, and such language is used herein as Terms of convenience only in referring to users' borrowing or lending of digital assets to or from Celsius as part of the services and Celsius' obligation to transfer digital assets to users upon the termination of such loans or repayment of such borrowing. |
| 4(A) | Celsius Account (subsection of Services) | Your Celsius Account is not a deposit or checking account, and Celsius does not hold any Digital Assets on your behalf. All Eligible Digital Asset balances on your Account represent Digital Assets are either loaned from you to Celsius or held by it as collateral, and therefore, owned, held and/or controlled by Celsius (under the applicable Service, as further detailed herein), and Celsius' obligation to deliver such Digital Assets back to you upon the termination of the applicable Service. |
| 4(B) | Earn Rewards | By lending your Eligible Digital Assets to Celsius you grant Celsius all rights and title to such Digital Assets, for Celsius to use in its sole discretion. Earn Rewards is not an investment program nor a speculative tool. Rather, you are earning Rewards as a financing fee on the loan of Digital Assets you have transferred to Celsius, in accordance with the rates published by Celsius from time to time, in accordance with these Terms. |
| 7 | Account Balance | Once such Eligible Digital Assets are received by Celsius, they shall be Celsius' property for all intents and purposes, and you will immediately start accruing Rewards on such Digital Assets in accordance with the terms hereof (unless explicitly provided for the purpose of being utilized for any other Services), and the corresponding amount (and kind) of Eligible Digital Assets shall be reflected in your Celsius Account balance. |
| 8 | Ownership of Digital Assets | All Digital Assets Transferred to Celsius as part of the Services and Owned and held by Celsius for its own account in accordance with these terms, and under no circumstances does Celsius hold Digital Assets on your behalf as part of the Services. |
| 10 | Risk Disclosure | We may lend, sell, pledge, hypothecate, assign, invest, use, commingle or otherwise dispose of assets and Eligible Digital Assets to counterparties or hold the Eligible Digital Assets with counterparties, and we will use our best |

| | | commercial and operational efforts to prevent losses.  By lending Eligible Digital Assets to Celsius or otherwise using the Services, you will not be entitled to any profits or income Celsius may generate from any subsequent use of any Digital Assets (or otherwise), nor will you be exposed to any losses which Celsius may suffer as a result thereof. You are, however, exposed to the possibility of Celsius becoming unable to repay its obligations in part or in full, in which case your Digital Assets may be at risk. |
|---|---|---|
| 13 | Consent to Celsius' Use of Digital Assets | In consideration for the Rewards payable to you on your Celsius Account and the use of our Services, you grant Celsius, subject to applicable law and for the duration of the period during which the Eligible Digital Assets are loaned to us through your Celsius Account, all right and title to such Digital Assets, including ownership rights, and the right, without further notice to you, to hold such Digital Assets in Celsius' own Virtual Wallet or elsewhere, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets in Celsius' full discretion.  You acknowledge that with respect to Digital Assets used by Celsius pursuant to this paragraph:<br>(i)    You will not be able to exercise rights of ownership;<br>(ii)    Celsius may receive compensation in connection with lending or otherwise using Digital Assets in its business to which you have no claim or entitlement; and<br>(iii)    In the event that Celsius becomes bankrupt, enters liquidation or is otherwise unable to repay its obligations, you may not be able to recover or regain ownership of such Digital Assets, and other than your rights as a creditor of Celsius under any applicable laws, you may not have any legal remedies or rights in connection with Celsius' obligations to you. |
| **Version 7** | | |
| **Section Number** | **Section Heading** | **Relevant Text** |
| 1 | Introduction | Celsius is a lending and borrowing platform.  When you transfer digital assets to Celsius, those digital assets are a loan from you to Celsius, in accordance with the terms hereof.  Under no circumstances does Celsius hold digital assets in custody on your behalf as part of the services governed by these terms.<br><br>All Digital Assets Transferred to Celsius as part of the Services are owned and held by Celsius for its own account. The use of terms such as "account," "account balance," "withdraw" and similar does not imply or establish, and shall not be taken to suggest, any form of custody relationship, and such language is used herein as Terms of convenience only in referring to users' borrowing or lending of digital assets to or from Celsius as part of the services and Celsius' obligation to transfer digital assets to users upon the termination of such loans or repayment of such borrowing. |

| 4(A) | Services | All Eligible Digital Asset balances on your Account represent Digital Assets that are either loaned by you to Celsius or held by Celsius as collateral, and therefore, owned, held and/or controlled by Celsius (under the applicable Service, as further detailed herein), and subject to Celsius' obligation to deliver such Digital Assets back to you upon the termination of the applicable Service. |
|------|----------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| 4(B) | Earn Rewards | By lending your Eligible Digital Assets to Celsius you grant Celsius all rights and title to such Digital Assets, for Celsius to use in its sole discretion.<br><br>Earn Rewards is not an investment program nor a speculative tool. Rather, you are earning Rewards as a financing fee on the loan of Digital Assets you have transferred to Celsius, in accordance with the rates published by Celsius from time to time, in accordance with these Terms. |
| 7 | Account Balance | Once such Eligible Digital Assets are received by Celsius, they shall be Celsius' property for all intents and purposes, and you will immediately start accruing Rewards on such Digital Assets in accordance with the terms hereof (unless explicitly provided for the purpose of being utilized for any other Services), and the corresponding amount (and kind) of Eligible Digital Assets shall be reflected in your Celsius Account balance. |
| 8 | Ownership of Digital Assets | All Digital Assets Transferred to Celsius as part of the Services and Owned and held by Celsius for its own account in accordance with these terms, and under no circumstances does Celsius hold Digital Assets on your behalf as part of the Services. |
| 10 | Risk Disclosure | These Terms and your use of any of our Services do not create a fiduciary relationship between us and you; your Celsius Account is not a checking or savings account, and it is not covered by insurance against losses. We may lend, sell, pledge, hypothecate, assign, invest, use, commingle or otherwise dispose of assets and Eligible Digital Assets to counterparties or hold the Eligible Digital Assets with counterparties, and we will use our best commercial and operational efforts to prevent losses. By lending Eligible Digital Assets to Celsius or otherwise using the Services, you will not be entitled to any profits or income Celsius may generate from any subsequent use of any Digital Assets (or otherwise), nor will you be exposed to any losses which Celsius may suffer as a result thereof. You are, however, exposed to the possibility of Celsius becoming unable to repay its obligations in part or in full, in which case your Digital Assets may be at risk. |
| 13 | Consent to Celsius' Use of Digital Assets | In consideration for the Rewards payable to you on your Celsius Account and the use of our Services, you grant Celsius, subject to applicable law and for the duration of the period during which the Eligible Digital Assets are loaned to us through your Celsius Account, all right and title to such Digital Assets, including ownership rights, and the right, without further notice to you, to hold such Digital Assets in Celsius' own Virtual Wallet or elsewhere, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets in Celsius' full discretion.  You acknowledge that with respect to Digital Assets used by Celsius pursuant to this paragraph:<br>    (i)        You will not be able to exercise rights of ownership; |

| | | |
|---|---|---|
| | | (ii) Celsius may receive compensation in connection with lending or otherwise using Digital Assets in its business to which you have no claim or entitlement; and |
| | | (iii) In the event that Celsius becomes bankrupt, enters liquidation or is otherwise unable to repay its obligations, you may not be able to recover or regain ownership of such Digital Assets, and other than your rights as a creditor of Celsius under any applicable laws, you may not have any legal remedies or rights in connection with Celsius' obligations to you. |

| **Version 8** | | |
|---|---|---|
| **Section Number** | **Section Heading** | **Relevant Text** |
| 2 | Definitions | Your Celsius account is not a bank account, deposit account, savings accounts, checking account, or any other type of asset account and should not be characterized as a banking product or service. the use of terms such as "account," "account balance," "withdraw" and similar language in connection with the earn service and the borrow service (see further sections 4(d) and 4(e) below, respectively) does not imply or establish, and shall not be taken to suggest, any form of custody relationship, and such language is used herein as terms of convenience only in referring to users' borrowing or lending of digital assets to or from Celsius as part of the earn service and borrow service, and Celsius' obligation to transfer digital assets to users upon the termination of such loans or repayment of such borrowing in connection with these services. |
| 4(A) | Services | All Eligible Digital Asset balances on your Celsius Account represent Digital Assets that are either (1) held in your Custody Wallet by Celsius or a Third Party Custodian, (2) loaned by you to Celsius, or (3) posted to Celsius as collateral and, therefore, owned, held and/or controlled by Celsius (under the applicable Service, as further detailed herein), and subject to Celsius' obligation to deliver such Digital Assets back to you upon the termination of the applicable Service. |
| 4(D) | Earn Rewards | If our Earn Service is available to you, upon your election, you will lend your Eligible Digital Assets to Celsius and grant Celsius all rights and title to such Digital Assets, for Celsius to use in its sole discretion while using the Earn Service.

Once such Eligible Digital Assets are received by Celsius into your Earn balance, they shall be Celsius' property, in every sense and for all purposes, and you will immediately start accruing Rewards on such Digital Assets in accordance with the terms hereof (unless explicitly provided for the purpose of being utilized for any other Service), and the corresponding amount (and kind) of Eligible Digital Assets shall be reflected in your Celsius Account balance.

The Earn Service is not an investment program nor a speculative tool.  Rather, you are earning Rewards as a financing fee on the loan of Eligible Digital Assets you have transferred to Celsius in connection with the Earn Service, and in accordance with the rates published by Celsius from time to time, pursuant to these Terms. |

| 10 | Risk Disclosure | These Terms and your use of any of our Services do not create a fiduciary relationship between us and you; your Celsius Account is not a checking or savings account, and it is not covered by insurance against losses. Celsius has no duty to inquire into, supervise, or determine the suitability of any transaction you initiate involving Eligible Digital Assets in your Celsius Account. We may lend, sell, pledge, hypothecate, assign, invest, use, commingle or otherwise dispose of assets and Eligible Digital Assets that are not held in a Custody Wallet (if available to you) to counterparties or hold the Eligible Digital Assets with counterparties, and we will use our best commercial and operational efforts to prevent losses. |
| --- | --- | --- |
| 12 | How Rewards are Calculated | Once Rewards are added to your Celsius Account balance, they shall be treated as an integral part of your Eligible Digital Assets, you shall be deemed to have elected to utilize in the Earn Service (if available to you), including with respect to such Rewards, which shall thus be loaned to Celsius, for all purposes. |
| 13 | Consent to Celsius' Use of Digital Assets | In consideration for the Rewards payable to you on the Eligible Digital Assets using the Earn Service, for us entering into any Loan Agreement, and the use of our Services, you grant Celsius, subject to applicable law and for the duration of the period during which you elect to utilize the Eligible Digital Assets in the Earn Service (if available to you) and thus loan such Eligible Digital Assets to us through your Celsius Account, or as collateral under the Borrow Service (if available to you), all right and title to such Eligible Digital Assets, including ownership rights, and the right, without further notice to you, to hold such Digital Assets in Celsius' own Virtual Wallet or elsewhere, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets in Celsius' full discretion. You acknowledge that with respect to Digital Assets used by Celsius pursuant to this paragraph: <br> 1. You will not be able to exercise rights of ownership.; <br> 2. Celsius may receive compensation in connection with lending or otherwise using Digital Assets in its business to which you have no claim or entitlement; and <br> 3. In the event that Celsius becomes bankrupt, enters liquidation or is otherwise unable to repay its obligations, any Eligible Digital Assets used in the Earn Service or as collateral under the Borrow Service may not be recoverable, and you may not have any legal remedies or rights in connection with Celsius' obligations to you other than your rights as a creditor of Celsius under any applicable laws. |

**Exhibit C**

| colspan="3" Celsius's Right to Modify the Terms of Use |

| Version 1 |
| Section Number | Section Heading | Relevant Text |
| --- | --- | --- |
| [N/A] | Changes to the Terms | These Terms may be subject to periodical revisions or amendments, from time to time with or without notice, at our sole discretion; we encourage you to review the Terms regularly.  The last revision will be reflected in the "Last Updated" heading.<br><br>Your continued use of our Website following any such amendments will be considered as your consent to the amended Terms.  At all times, the latest version of these Terms shall be binding and prevail over any other version. |
| X | Modifications | All modifications or amendments to the Deposit Terms shall be effective upon posting by Celsius. |

| Version 2 |
| Section Number | Section Heading | Relevant Text |
| --- | --- | --- |
| 1 | Introduction | The Services are provided solely for use by you, and your use of the Services is expressly conditioned on your consent to, and compliance with, these Terms. By accessing or using our Services, *you agree to be bound by these Terms.* If you do not agree to any of the provisions of these Terms you should immediately stop using the Services. |
| 31 | Changes in Terms | Please be aware that the terms and conditions governing Accounts or the Services can change over time.  We reserve the right to discontinue or make changes to any Accounts or Services.  We may change these Terms, and the updated version will supersede all prior versions.  We will provide notice of changes, additions, and deletions as required by law.  If we have provided advance notice and you do not agree with a change, you may close your Account(s) before the effective date of the change, which shall be your sole remedy.  The continued maintenance of your Account following the effective date of any change will constitute your acceptance of such change and subject your Account to modified terms. |

| Version 3 | | |
|---|---|---|
| **Section Number** | **Section Heading** | **Relevant Text** |
| 1 | Introduction | The Services are provided solely for use by you, and your use of the Services is expressly conditioned on your consent to, and compliance with, these Terms. By accessing or using our Services, you agree to be bound by these Terms. If you do not agree to any of the provisions of these Terms you should immediately stop using the Services. |
| 32 | Changes in Terms | Please be aware that the terms and conditions governing Accounts or the Services can change over time. We reserve the right to discontinue or make changes to any Accounts or Services. We may change these Terms, and we may add to or delete from these Terms, and the updated version will supersede all prior versions. We will provide notice of changes, additions, and deletions as required by law. If we have provided advance notice and you do not agree with a change, you may close your Account(s) before the effective date of the change, which shall be your sole remedy. The continued maintenance of your Account following the effective date of any change will constitute your acceptance of such change and subject your Account to the modified Terms. |
| Version 4 | | |
| **Section Number** | **Section Heading** | **Relevant Text** |
| 1 | Introduction | The Services are provided solely for use by you, and your use of the Services is expressly conditioned on your consent to, and compliance with, these Terms. By accessing or using our Services, you agree to be bound by these Terms. If you do not agree to any of the provisions of these Terms you should immediately stop using the Services. |
| 32 | Changes in Terms | Please be aware that the terms and conditions governing Accounts or the Services can change over time. We reserve the right to discontinue or make changes to any Accounts or Services. We may change these Terms, and we may add to or delete from these Terms, and the updated version will supersede all prior versions. We will provide notice of changes, additions, and deletions as required by law. If we have provided advance notice and you do not agree with a change, you may close your Account(s) before the effective date of the change, which shall be your sole remedy. The continued maintenance of your Account following the effective date of any change will constitute your acceptance of such change and subject your Account to the modified Terms. |
| Version 5 | | |
| **Section Number** | **Section Heading** | **Relevant Text** |
| 1 | Introduction | The Services are provided solely for use by you, and your use of the Services is expressly conditioned on your consent to, and compliance with, these Terms. By accessing or using our Services, you agree to be bound by these Terms. If you do not agree to any of the provisions of these Terms you should immediately stop using the Services. |
| 4(B) | Loans | In each case the matters expressed above shall be set out in the Loan Agreement and nothing in this clause 4B shall be taken to modify, supplement or otherwise impact the Loan Agreement between you and CNL. |
| 32 | Changes in Terms | Please be aware that the terms and conditions governing Celsius Wallets or the Services can change over time. We reserve the right to discontinue or make changes to any Celsius Wallets or Services. We may change these |

| | | Terms, and we may add to or delete from these Terms, and the updated version will supersede all prior versions. We will provide notice of changes, additions, and deletions as required by law. If we have provided advance notice and you do not agree with a change, you may close your Celsius Wallets(s) before the effective date of the change, which shall be your sole remedy. The continued maintenance of your Celsius Wallet following the effective date of any change will constitute your acceptance of such change and subject your Celsius Wallet to the modified Terms. |
| [N/A] | Special Notice for New York, Texas, and Washington Accountants | The terms in these PT Terms may be amended, supplemented and/or replaced from time to time, in accordance with Clause 31 of the Celsius Network Terms of Use. |
| **Version 6** | | |
| **Section Number** | **Section Heading** | **Relevant Text** |
| 1 | Introduction | The Services are provided solely for use by you, and your use of the Services is expressly conditioned on your consent to, and compliance with, these Terms. By accessing or using our Services, you agree to be bound by these Terms. If you do not agree to any of the provisions of these Terms you should immediately stop using the Services.<br><br>We may, from time to time, provide certain Services by different entities within the Celsius group, and any change in and/or assignment of the contracting entity shall not be consider an amendment of these Terms. |
| 21 | Eligible Digital Assets | We may, from time to time, provide certain Services in connection with certain Eligible Digital Assets by different entities within the Celsius group, and any change in and/or assignment of the contracting entity shall not be consider an amendment of these Terms. |
| 27 | Disputes, Binding Individual Arbitration, and Class Actions and Class Arbitration Waiver | Notwithstanding any provision in these Terms to the contrary, you and Celsius agree that if Celsius makes any future amendments to the dispute resolution procedure and class action waiver provisions (other than a change to Celsius' address) in these Terms, Celsius will notify you and you will have thirty (30) days from the date of notice to affirmatively opt-out of any such amendments by sending a written letter to the Celsius Notice Address within thirty (30) days of Celsius' notification that specifies: (i) your name; (ii) your mailing address; and (iii) your request to optout of such amendments. If you affirmatively opt-out of any future amendments, you are agreeing that you will arbitrate any Dispute between us in accordance with the language of this Section as stated in these current Terms, without any of the proposed amendments governing. If you do not affirmatively opt-out of any future amendments, you will be deemed to have consented to any such future amendments. |
| 31 | Changes in Terms | Please be aware that the terms and conditions governing the Services can change over time. We reserve the right to discontinue or make changes to any of the Services. We may change these Terms, and we may add to or delete from the updated version will supersede all prior versions. We will provide notice of changes, additions, and deletions, as required by law. If we have provided advance notice and you do not agree with a |

| | | change, you may close your Celsius Account(s) and demand repayment of outstanding loans before the effective date of the change, which shall be your sole remedy. The continued maintenance of your Celsius Account following the effective date of any change will constitute your acceptance of such change and subject your Celsius Account to the modified Terms. |
|---|---|---|
| **Version 7** | | |
| **Section Number** | **Section Heading** | **Relevant Text** |
| 1 | Introduction | The Services are provided solely for use by you, and your use of the Services is expressly conditioned on your consent to, and compliance with, these Terms. By accessing or using our Services, you agree to be bound by these Terms. If you do not agree to any of the provisions of these Terms you should immediately stop using the Services.<br><br>We may, from time to time, provide certain Services by different entities within the Celsius group, and any change in and/or assignment of the contracting entity shall not be considered an amendment of these Terms. |
| 21 | Eligible Digital Assets | We may, from time to time, provide certain Services in connection with certain Eligible Digital Assets by different entities within the Celsius group, and any change in and/or assignment of the contracting entity shall not be consider an amendment of these Terms. |
| 27 | Disputes, Binding Individual Arbitration and Class Actions and Class Arbitrations Waiver | Notwithstanding any provision in these Terms to the contrary, you and Celsius agree that if Celsius makes any future amendments to the dispute resolution procedure and class action waiver provisions (other than a change to Celsius' address) in these Terms, Celsius will notify you and you will have thirty (30) days from the date of notice to affirmatively opt-out of any such amendments by sending a written letter to the Celsius Notice Address within thirty (30) days of Celsius' notification that specifies: (i) your name; (ii) your mailing address; and (iii) your request to opt-out of such amendments. If you affirmatively opt-out of any future amendments, you are agreeing that you will arbitrate any Dispute between us in accordance with the language of this Section as stated in these current Terms, without any of the proposed amendments governing. If you do not affirmatively opt-out of any future amendments, you will be deemed to have consented to any such future amendments. |

| 31 | Changes in Terms | Please be aware that the terms and conditions governing the Services can change over time. We reserve the right to discontinue or make changes to any of the Services. We may change these Terms, and we may add to or delete from these Terms, and the updated version will supersede all prior versions. We will provide notice of changes, additions, and deletions, as required by law. If we have provided advance notice and you do not agree with a change, you may close your Celsius Account(s) and demand repayment of outstanding loans before the effective date of the change, which shall be your sole remedy. The continued maintenance of your Celsius Account following the effective date of any change will constitute your acceptance of such change and subject your Celsius Account to the modified Terms. |
|---|---|---|
| **Version 8** | | |
| **Section Number** | **Section Heading** | **Relevant Text** |
| 1 | Introduction | Please take further notice that Celsius may modify the terms at any time and in its sole discretion by posting the revised Terms on the Celsius website.  You shall be bound by such modification effective immediately upon posting.  It is your responsibility to review these Terms prior to each use of the Service. |
| 21 | Eligible Digital Assets | We may, from time to time, provide certain Services in connection with certain Eligible Digital Assets by different entities within the Celsius group, and any change in and/or assignment by the contracting entity shall not be considered an amendment of these Terms. |
| 27(G) | Disputes, Binding Individual Arbitration and Class Actions and Class Arbitrations Waiver | Notwithstanding any provision in these Terms to the contrary, you and Celsius agree that if Celsius makes any future amendments to the dispute resolution procedure and class action waiver provisions (other than a change to Celsius' address) in these Terms, Celsius will notify you and you will have thirty (30) days from the date of notice to affirmatively opt-out of any such amendments by sending a written letter to the Celsius Notice Address within thirty (30) days of Celsius' notification that specifies: (i) your name; (ii) your mailing address; and (iii) your request to opt-out of such amendments. If you affirmatively opt-out of any future amendments, you are agreeing that you will arbitrate any Dispute between us in accordance with the language of this Section as stated in these current Terms, without any of the proposed amendments governing. If you do not affirmatively opt-out of any future amendments, you will be deemed to have consented to any such future amendments. |

| 31 | Changes in Terms | Please be aware that the terms and conditions governing the Services change over time. We reserve the right to discontinue or make changes to any of the Services. We may change these Terms, and we may add to or delete from these Terms, and the updated version will supersede all prior versions. We will provide notice of changes, additions, and deletions, as required by law. If we have provided advance notice and you do not agree with a change, you may close your Celsius Account(s) and demand repayment of outstanding loans before the effective date of the change, which shall be your sole remedy. The continued maintenance of your Celsius Account following the effective date of any change will constitute your acceptance of such change and subject your Celsius Account to the modified Terms. |