Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) ) ) | Case No. 22-10964 (MG) |
| Debtors. | ) ) | (Jointly Administered) |

**DECLARATION OF CHRISTOPHER FERRARO,
INTERIM CHIEF EXECUTIVE OFFICER, CHIEF
RESTRUCTURING OFFICER, AND CHIEF FINANCIAL
OFFICER OF THE DEBTORS, IN SUPPORT OF THE DEBTORS' MOTION
REGARDING OWNERSHIP OF EARN ASSETS AND THE SALE OF STABLECOIN**

I, Christopher Ferraro, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.  I am the interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer of Celsius Network LLC ("Celsius"). Celsius, along with certain of its

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

subsidiaries and affiliates, are debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors").

2.    I am familiar with the Debtors' day-to-day operations, businesses and financial affairs, and books and records. I have had an opportunity to review the *Debtors' Amended Motion for Entry of an Order (I) Establishing Ownership of Assets in the Debtors' Earn Program, (II) Permitting the Sale of Stablecoin in the Ordinary Course, and (III) Granting Related Relief* (the "Amended Motion"), filed substantially contemporaneously herewith, and am familiar with the facts contained, and relief requested, therein.

3.    I submit this declaration (this "Declaration") in support of the relief requested in the Amended Motion. Except as otherwise indicated, the statements set forth in this Declaration are based upon my personal knowledge, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, and information obtained from other members of the Debtors' management team and advisors. I am over the age of eighteen and, if called upon to testify, I could and would testify competently to the facts and opinions set forth in this Declaration.

## Qualifications

4.    I am the interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer of Celsius. I was appointed as Chief Financial Officer on July 11, 2022, and was appointed as interim Chief Executive Officer and Chief Restructuring Officer on September 27, 2022. I have approximately two decades of experience in financial planning and analysis, asset and liability management, and product control.

5. Before my roles with Celsius, I was a Senior Managing Director at Cerberus Operations & Advisory Company ("Cerberus"), where I focused on improving the operating returns for two legacy portfolio positions. In this role, I advised the chief executive officer and leadership team on increasing profitability by changing and repricing business mix, restructuring costs, and optimizing the balance sheet.

6. Prior to Cerberus, I served in various roles at JP Morgan Chase & Co. from 2001 to 2018. I was the head of Financial Analysis and a Senior Leader. In this role, I oversaw all financial planning and analysis activities, developed analytical tools, and authored a patent application in forecasting. Before my role as head of Financial Analysis and a Senior Leader, I was the Treasurer of the Consumer Bank and the Retail Loan Pricing Manager.

7. I hold a Bachelor's degree in Economics, Finance & Accounting from the University of Washington. I also passed the Washington state Uniform Certified Public Accountant Examination.

## Cryptocurrency Generally[2]

8. Cryptocurrency is a digital currency designed to serve as a medium of exchange or store of value that is not necessarily tied to any government or physical asset. Cryptocurrency is used to execute transactions on a "blockchain," a digital technology that vets and verifies transactions through a fully decentralized, community-driven, rigorous mathematical process. Each blockchain instantiates, or represents, a specific cryptocurrency or a limited number of

---

[2] The following overview has been simplified to avoid confusion caused by unnecessary detail. For the avoidance of doubt, the statements in this overview are generally applicable but may not be specifically applicable to *every* cryptocurrency.

3

cryptocurrencies to execute transactions (for example, the Ethereum blockchain uses Ether as its primary cryptocurrency). The blockchain is often called a digital "ledger" because it records every single transaction of the "native" cryptocurrency ever made.

9. Cryptocurrencies are decentralized (they are not issued or created by a government or central institution). Transactions are mostly anonymized, but each transaction is recorded by the blockchain and viewable by any individual. Instead of needing to consult a third party (like a bank or title company) to verify that a transaction took place, an individual can consult the blockchain for free. There are thousands of cryptocurrencies and blockchain protocols, certain of which offer specific advantages or use cases.

10. All cryptocurrency is stored, or "lives," on its native blockchain and can only be accessed/controlled using a private cryptographic "key." Private keys are held in cryptocurrency "wallets" designed to easily and securely manage the keys to cryptocurrency assets and to safely conduct cryptocurrency transactions. Stablecoins are an important subset of cryptocurrencies that are designed to be tied (or "pegged") to another currency, commodity, or financial instrument.

### The Earn Program

11. Celsius is a cryptocurrency-based finance platform. Prepetition, Celsius' primary operations consisted of financial services and Bitcoin mining. With respect to financial services, Celsius generally (subject to certain geographic and other restrictions) offered retail and institutional users the ability to: (a) earn rewards on cryptocurrency they transferred to Celsius, (b) securely store and access cryptocurrency, (c) borrow fiat or stablecoins using cryptocurrency as collateral, and (d) transfer account balances to other Celsius users using Celsius' CelPay service.

In June 2022, the Debtors "paused" withdrawals, swaps, and transfers. Postpetition, the Debtors have not been providing their typical services to customers.

12. Celsius "accounts" are not bank accounts, deposit accounts, savings accounts, checking accounts, or any other types of asset accounts. Rather, Celsius accounts (a) grant users access to Celsius' platform to use its services, (b) show the balance of users' digital assets in the "Custody Service" and the earn program (the "Earn Program"), (c) show users' rewards, and (d) permit users to manage their personal information and profile.

13. Through the Debtors' prepetition "Earn" program, users who transferred certain cryptocurrencies to Celsius earned "rewards" on those transferred assets in the form of in-kind tokens ("PIK Tokens") or, where available, the Debtors' native cryptocurrency token ("CEL Tokens"). The rewards accrued over a week-long period and were calculated every Friday and credited to users' Celsius accounts every Monday. The amount of rewards a user received depended on the type and amount of digital asset transferred to the Company's platform and the rates the Company set for each digital asset, with additional rewards available for users that elected to receive rewards in CEL Tokens (where available). Reward rates were published by the Debtors on a weekly basis on the Celsius App (as defined herein).

14. CEL Tokens were primarily used in connection with the Company's loyalty and rewards program (the "CEL Loyalty Program"). CEL holdings entitled users to tiered benefits on the Celsius platform, similar to retail or airline loyalty programs. Active users on the Celsius platform could earn incentives, such as lower borrower fees and higher rewards. Members of the CEL Loyalty Program sometimes also received priority access to new products.

15.     Starting in April 2022, the Earn Program was only offered to international-based users and U.S. accredited users. U.S. non-accredited users who had a balance in the Earn Program prior to April 15, 2022, were allowed to keep such balances in the Earn Program and continue to earn rewards thereon. As of the Petition Date, there were over 600,000 active Earn Program users with Earn Program balances of approximately $4.2 billion.[3] Beginning on the Petition Date, Celsius discontinued reward accruals.

### The Debtors' Deployment Strategies

16.     The Debtors deployed the assets transferred from users in the Earn Program (and other of their assets) using a variety of different practices and strategies including:

17.     ***Borrowing Services***. Celsius provided borrowing services to institutional and retail parties. The institutional lending service involved bespoke borrowing arrangements with institutional clients that are governed by master loan agreements and term sheets that set forth the detailed terms of any specific transaction. The retail lending, which was limited to certain jurisdictions, allowed individual and corporate users to borrow fiat or stablecoins in exchange for posting certain types of cryptocurrency as collateral.

18.     ***Automated Protocols***  Celsius deployed digital assets into yield generating automated market maker or lending protocols.

19.     ***Staking***. Celsius deployed assets on DeFi protocols and also engaged in "staking" on the Ethereum 2.0 Beacon Chain as well as other proof-of-stake blockchains, such as Polygon, Cardono, and Solana.

---

[3]    Calculated as of July 10, 2022.

20. ***Exchange Deployments***. Celsius engaged in four different types of exchange deployments that were overall intended to be market neutral: (a) cash and carry, (b) market making, (c) swing trading, and (d) funding. The "cash and carry" strategy involved Celsius trading and leveraging demand in the futures markets to benefit from the funding costs that long futures holders were willing to pay short holders. To achieve this without market exposure, Celsius would usually buy a digital currency in the spot market while shorting the digital currency in the futures market. The "market making" strategy involved Celsius holding both long and short future positions (ensuring market neutrality) in a manner that allowed Celsius to benefit from inefficiencies in the futures markets. Similar to market making, "swing trading" involved Celsius holding both long and short futures positions, but with an imbalance between the amount of long and short options Celsius held, thereby allowing Celsius to benefit from its experience being an active participant in the market. Given that swing trading is not market neutral at any given time, Celsius set narrow risk limits on such activities, which were also accompanied by stop-loss mechanisms. The "funding" strategy was a yield-generating strategy where Celsius allowed users on several exchanges to borrow different digital assets from Celsius' account on such exchange, to be used for trading on the same exchange in return for yield. In addition, Celsius engaged in spot trading as a hedging strategy to balance its assets and liabilities, minimizing cross-currency exposure.

21. The functioning of these deployment activities depended upon the Debtors having unilateral authority to effectuate these methods and strategies in their discretion. To accomplish this, the Terms of Use included a variety of provisions regarding the formal transfer of ownership

rights for coins transferred into the Earn Program (and the ownership of Celsius' profits or returns thereon). Users did not opt into programs specific to any particular deployment strategy—they either participated in the Earn Program or they did not. As such, provisions in the Terms of Use regarding the Debtors' title to assets transferred into the Earn Program were fundamental to (and reflective of) the Debtors' business operations.

### The Terms of Use

22. Prepetition, users accessed the Company's entire suite of services through Celsius' web or mobile application (collectively, the "Celsius App"). Users signed up for a Celsius account on the Celsius App and were required to digitally execute Celsius' user agreement and various forms of terms of use (the "Terms of Use") before being permitted to use the platform (among other requirements). At the time of account creation, new users were required to certify (via "click") that they read and agreed to Celsius' Terms of Use.

23. It is my understanding that every version of the Terms of Use includes one or more provisions authorizing the Debtors to make unilateral updates to the Terms of Use. It is also my understanding that the Debtors typically advised existing users of updates to the Terms of Use via e-mail and other official Celsius channels, such as the Celsius App, and that such communications encouraged users to review the updated Terms of Use. I further understand that use of the Debtors' services is expressly conditioned on consent to being bound by and remaining in compliance with the Terms of Use.

### The Debtors' Need for Liquidity

24. Postpetition, the Debtors have faced continued liquidity challenges, as the majority of the Debtors' traditional income sources have been eliminated as a result of the cessation of

crypto asset deployments and customer-facing services. The Debtors have primarily been relying on proceeds generated from the Debtors' Bitcoin mining activities and the unwinding of prior asset deployments.

25. To help manage their liquidity while receipts are low, the Debtors have implemented substantial cost-cutting measures, reducing personnel costs by over 60% (approximately $40 million per year) since the Petition Date and reducing daily operational costs unrelated to personnel by more than 70% (approximately $45 million per year) since the Petition Date. The Debtors are continuing to analyze cost reduction and streamlining opportunities (targeting a minimum annual savings of an additional $5–10 million). Despite these efforts, the costs of administering these estates remains significant.

## Sale of the Earn Stablecoins

26. It is my understanding that, prior to the Petition Date, the Debtors monetized stablecoin as needed to meet their fiat obligations in the ordinary course. I also understand that this practice is commonplace among businesses similar to the Debtors', as stablecoins are generally viewed as substitutes for fiat currencies provided they remain "pegged" to their benchmark currency or commodity.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: November 11, 2022  
Quito, Ecuador

*/s/ Christopher Ferraro*  
Name: Christopher Ferraro  
Title: Interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer of Debtor Celsius Network LLC