# **EXHIBIT A**

**Written Deposition Questions**

# INTRODUCTION

1. The Debtors seek to sell the Proposed Sale Stablecoin to raise liquidity to fund their reorganization efforts and Chapter 11 Cases. *Amended Mot. for Entry of an Order (I) Establishing Ownership of Assets in the Debtors' Earn Program, (II) Permitting the Sale of Stablecoin in the Ordinary Course and (III) Granting Related Relief* [Docket No. 1325] (the "**Motion**"). To sell the Proposed Sale Stablecoin, the Debtors first must establish that such Proposed Sale Stablecoin is property of the Debtors' estates. To that end, the Motion seeks the following determinations: (1) ownership rights to digital assets transferred by Account Holders designated to be part of the "Earn" program, based on the unambiguous plain language of each version of the terms of use (if more than one version is applicable); (2) whether each applicable version of the terms of use forms a binding contract with Account Holders who transferred digital assets to the Debtors while such terms of use were in effect (*i.e.*, whether the elements of a contract are present); (3) whether subsequent amendments to the terms of use are binding on Account Holders who transferred their digital assets to the Debtors prior to the effectiveness of the subsequently amended terms of use (*e.g.*, whether an Account Holder who transferred digital assets in July 2020 is bound by the Terms of Use Version 8); and (4) whether the Proposed Sale Stablecoin is property of the Debtors' estates (if not covered by the previous three issues). Mot. ¶ 16.

2. The Debtors have not sought a determination of whether digital assets that are held as collateral for loans are property of the estate. *Id.* The interests of Account Holders with digital assets in Custody Wallets and obligations associated with Withhold accounts are also subject to a separate briefing and trial schedule and not part of the Debtors' Motion. *Id.* The Debtors have also agreed that defenses to the formation of a contract would not be tried at this stage. *Id.* Many contract defenses, such as mistake, fraud, and misrepresentation, may require further factual

discovery that is not practicable in the currently contemplated trial schedule. The Examiner is also currently investigating public representations made by Celsius and will issue a report on December 10, 2022 (*i.e.* after the proposed December 5, 2022 hearing date). All parties' rights are reserved at this time with respect to any contract defense. *Id.*

3.  The Debtors, however, seek Court authority to sell the Proposed Sale Stablecoin now. The Debtors have requested authority to sell the Proposed Sale Stablecoin free and clear of all interests (including ownership interests) under section 363(f) of the Bankruptcy Code. Mot. ¶ 54. Any party that believes it has an interest in the Proposed Sale Stablecoin will have the burden of proof to establish its ownership interest therein at the hearing scheduled for December 5, 2022. 11 U.S.C. § 363(p). In light of the Debtors' request and its consultation with certain Account Holders, the Committee has included several questions that are relevant to whether Account Holders that transferred stablecoin to the Debtors in connection with the Earn program may have interests in the Proposed Sale Stablecoin.

4.  The Debtors and the Committee have negotiated a litigation schedule that they each believe (1) allows for the Debtors to present their case that the Terms of Use Version 8 is a valid contract between Account Holders and Celsius and provides that digital assets held with respect to Earn Accounts are the Debtors' property and (2) provides Account Holders and interested parties with access to public discovery and information relevant to the Motion. *See Notice of Filing of Proposed Scheduling Order Regarding Title to Earn Program Assets and the Sale of Certain Stablecoins* [Docket No. 1324] (the "**Proposed Scheduling Order**").

5.  The discovery portion of the Proposed Scheduling Order will proceed in two stages. First, the Debtors will answer the Written Deposition Questions on the public docket by 5:00 p.m., prevailing Eastern Time, on November 18, 2022. Second, the Debtors will make each of

Christopher Ferraro, Oren Blonstein, and Robert Campagna available for no more than one deposition of one day. Parties wishing to appear and ask questions at these depositions are required to notify the Debtors in writing before November 17, 2022 at 5:00 p.m., prevailing Eastern Time, and indicate whether such party intends to attend in person or remotely. Each deposition will last no more than seven hours on the record. The Committee proposes the first three hours of each deposition be reserved for the Committee, one hour be reserved for the United States Trustee, one hour be reserved for state regulators, and two hours be reserved for *pro se* Account Holders or other parties in interest.

6.  The Committee has formulated the following Written Deposition Questions following consultation with (1) the United States Trustee, (2) certain state regulators including the Texas Attorney General, the Vermont Attorney General, and the National Association of Attorneys General, and (3) certain *pro se* Account Holders. The Committee has attempted to narrow the Written Deposition Questions to what it believes to be questions that are relevant to the determination of the issues raised in the Motion. Many questions (including questions raised by parties that consulted with the Committee) were not included due to practical constraints. Those questions may be asked at the depositions or at another time.

# DEFINITIONS

For the purposes of these Written Deposition Questions, the following definitions shall apply. Any capitalized term used in the Written Deposition Questions and not otherwise defined below shall have the definition set forth in the *Declaration in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 23] (the "**Mashinsky Declaration**") or the Motion, as applicable. Unless otherwise stated, the relevant time period is February 18, 2018 to present.

1. "**Account Holders**" means individuals and entities that transferred digital assets to Celsius.

2. "**Any**" or "**each**" should be understood to include and encompass "all;" "**or**" should be understood to include and encompass "and;" and "**and**" should be understood to include and encompass "or."

3. "**Affiliate**" shall have the meaning ascribed to it in section 101(2) of the Bankruptcy Code.

4. "**Blonstein Declaration**" shall mean the *Declaration of Oren Blonstein, Head of Innovation and Chief Compliance Officer of the Debtors, in Support of the Debtors' Motion Regarding Ownership of Earn Assets and the Sale of Stablecoin* [Docket No. 1327].

5. "**Celsius**," the "**Company**" or the "**Debtors**" means Celsius Network LLC together with the other above-captioned debtors and debtors in possession, and any of their respective current or former Affiliates, subsidiaries, parent corporations, predecessors, or successor entities and all of their respective current or former directors, officers, employees, agents, attorneys, advisors, and representatives.

6. "**Chapter 11 Cases**" means the cases filed by the Debtors under chapter 11 of the Bankruptcy Code, which are jointly administered for procedural purposes only under Case No. 22-10964 (Bankr. S.D.N.Y. 2022).

7. "**Communication**" shall have the meaning afforded to it by Local District Rule 26.3 made applicable to this matter by Local Bankruptcy Rule 7026-1 and, for the avoidance of doubt, shall include any oral or written utterance, notation, or statement of any nature whatsoever between or among two or more persons, by or to whomsoever made, and including without limitation, correspondence, documents, conversations, dialogues, discussions, e-mail, interviews, consultations, agreements, and other understandings, including text messages, Bloomberg, Facebook, Twitter, LinkedIn, Instagram, WhatsApp, Yahoo, Blackberry, Myspace, Google+, Snapchat, Medium, YouTube, Telegram, Reddit or other social media posts, photos, tweets, info pages, updates, notes, videos, blogs, comments, statuses, likes, messages, push notification, banner notification, or pop-ups within an application or otherwise.

8. "**Concerning**," "**regarding**," "**in connection with**," "**relating to**," and/or "**referring to**" shall be construed to mean, without limitation, relating to, referring to, describing, evidencing, constituting, discussing, supporting, pertaining to, containing, analyzing, evaluating, studying, recording, showing, memorializing, reporting on, commenting on, mentioning, reviewed in conjunction with, setting forth, contradicting, refuting, considering, or recommending, in whole or in part.

9. "**Custody Accounts**" shall mean accounts reflecting Account Holder obligations in connection with the Custody program.

10. "**Document(s)**" shall have the meaning afforded to it by Local District Rule 26.3 made applicable to this matter by Local Bankruptcy Rule 7026-1 and, for the avoidance of doubt,

9

shall include any printed, written, typed, recorded, transcribed, taped, photographic, or graphic mater, however produced or reproduced, including, but not limited to: any letter, correspondence, or communication of any sort, including Bloomberg or text messages; film, print or negative of photograph; sound recording; video recording; note, notebook, diary, calendar, minutes, memorandum, contract, agreement, or any amendment thereto; telex, telegram, cable; summary, report or record of telephone conversation, voice mail or voice mail back-up, personal conversation, discussion, interview, meeting, conference, investigation, negotiation, act or activity; projection, work paper, or draft; computer or compute network output or input, hard or floppy disc, e-mail, magnetic and/or optical medias, archived or back up data on any of these medias, and documents that have been deleted but are recoverable from any of these medias; opinion or report of consultant; request, order, invoice or bill of lading; analysis, diagram, map, index, sketch, drawing, plan, chart, manual, brochure, pamphlet, advertisement, circular, newspaper or magazine clipping, press release; receipt, journal, ledger, schedule, bill, or voucher; financial statement, statement of account, bank statement, checkbook, stubs, or register, cancelled check, deposit slip, charge slip, tax return (income or other), requisition, file, study, graph, tabulation; text messages, Bloomberg, Facebook, Twitter, LinkedIn, Vine, Instagram, WhatsApp, Yahoo, Blackberry, Myspace, Google+, Snapchat, Medium, YouTube, Telegram, Reddit or other messaging applications, social media posts, photos, tweets, info pages, updates, notes, videos, blogs, comments, statuses, likes or messages; and any and all other writings and recording of whatever nature, whether signed or unsigned or transcribed, and any other data compilation from which information can be obtained, translated, if necessary, by the respondent through detection devices into reasonable usable form; including, without limitation, all things meeting the definition of "Documents" or "electronically stored information" set forth in Rule 34 of the Federal Rules of

Civil Procedure, as incorporated by Rules 7034 and 9014 of the Federal Rules of Bankruptcy Procedure, as applicable, or meeting the definition of "writings and recordings" set forth in Rule 1001 of the Federal Rules of Evidence. Any document with any marks as initials, comments, or notations of any kind is not deemed to be identical to one without such marks and is a separate document within the meaning of this term.

11. "**Earn Accounts**" shall mean accounts reflecting Account Holder obligations in connection with the Earn program.

12. "**Petition Date**" shall mean July 13, 2022.

13. "**Proposed Sale Stablecoin**" shall mean the stablecoin that the Debtors seek to sell pursuant to the Motion.

14. "**Terms of Use Version 8**" shall mean the terms of use in effect from on or around April 14, 2022 to September 28, 2022.

15. "**You**" and "**Your**" shall mean and refer to the Debtors.

## INSTRUCTIONS

1. For each question, provide a complete answer in writing that includes the identity of the declarant or other representative of the Debtor who will serve as the corporate representative for that question.

2. In responding to any question that requests a response as to multiple versions of the terms of use, you may indicate that the response under multiple versions would be the same, if applicable.

3. Produce all Documents relied on to answer the questions set forth below to counsel to the Committee no later than November 18, 2022.

## QUESTIONS

1.  Identify the individual or individuals at Celsius responsible for drafting each version of the terms of use and describe the process for approval of each version of the terms of use, including the individual or individuals at Celsius who approved such versions.

2.  Describe whether and how individuals seeking to use the Celsius platform were required to affirmatively indicate acceptance of each version of the terms of use before being allowed to create accounts, to the extent such indication of acceptance differs from that described in the Blonstein Declaration with respect to the Terms of Use Version 6.

3.  Describe whether and how Account Holders were required to affirmatively indicate acceptance of each new, subsequent, or revised version of the terms of use before being allowed to continue to access their pre-existing accounts (*i.e.*, accounts that had been created prior to the effective date of the new, subsequent, or revised version of the terms of use) on the Celsius platform, to the extent such indication of acceptance differs from that described in the Blonstein Declaration with respect to the Terms of Use Version 6.

4.  How were the terms of use presented to, and accepted by, institutional and international Account Holders that did not access the Celsius platform through the Celsius application or website (*i.e.*, Account Holders that accessed through an Application Programming Interface)?  Indicate if such process was different with respect to any version of the terms of use and describe such process, if applicable.

5.  Describe any instances during which the terms of use were not displayed or available to Account Holders on the Celsius app or website following account registration and during subsequent log-ins.

6.  What options were Account Holders provided with if they did not click "Accept" to the Terms of Use Version 6, and how were such options disclosed to Account Holders prior to the request to click "Accept"?  If the Terms of Use Version 7 or the Terms of Use Version 8 provided Account Holders with a different option or disclosed such option differently, describe such option and disclosure and identify the applicable version of the terms of use.

7.  The screenshot at Exhibit A-8 of the Blonstein Declaration indicates that Account Holders were able to click "Remind me later" rather than "Accept" with respect to the Terms of Use Version 6, and that the next screen would ask "Are you Sure?" and enable Account Holders to click "Continue Anyway."   Provide screenshots of the successive screens shown to Account Holders that clicked "Continue Anyway."  If a different process was used with respect to the Terms of Use Version 7 or the Terms of Use Version 8, describe the acceptance and deferral process with respect thereto and identify the applicable version of the terms of use.

8.  Were Account Holders able to withdraw digital assets from the Celsius platform on the Celsius app or website (*i.e.*, without speaking to customer support representatives) if they did not accept the Terms of Use Version 6?  If the answer is different with respect to any other version of the terms of use, provide the relevant answer with respect thereto and identify the applicable version of the terms of use.

12

9. Why were Account Holders not provided with an option to immediately withdraw digital assets (*i.e.*, without speaking to customer support representatives) if they did not agree to the Terms of Use Version 6?

10. If Account Holders or individuals seeking to use the Celsius platform did not click "Accept" to Terms of Use Version 6 and failed to withdraw digital assets, what did Celsius do with those assets? Identify the applicable period of time, if any, during which Account Holders or such individuals were required to withdraw assets. If the answer is different with respect to any other version of the terms of use, provide the answer with respect thereto and identify the applicable version of the terms of use.

11. Are the templates and mock-ups attached to the Blonstein Declaration true and correct copies of the Communications that were actually sent to Account Holders?

12. Explain why Account Holders' accounts were suspended if they failed to accept the Terms of Use Version 6 by August 5, 2021, but did not stop earning rewards unless the Account Holders failed to accept the Terms of Use Version 6 by August 19, 2021.

13. Describe how Celsius determined the period that Account Holders were provided within which to decide whether to accept the Terms of Use Version 6 before their accounts were suspended.

14. Were all Communications with respect to the terms of use, or to individuals seeking to use the Celsius platform, in English? Was all content on the Celsius application or website in English? If not, identify other languages in which such Communications or content were/was conveyed.

15. Did Celsius send written Communications to Account Holders that included the full text of each version of the terms of use or a link to such terms of use when such version of the terms of use was purported to be effective? If so, provide a copy of such Communications, if available.

16. Did Celsius send written Communications to Account Holders describing or identifying any changes that had been made to any version of the terms of use when such terms of use were amended, modified, or otherwise revised? If so, provide a copy of such Communications, if available.

17. Describe why and how Celsius selected changes to highlight to Account Holders or individuals seeking to use the Celsius platform in Communications regarding the Terms of Use Version 6.

18. Describe (i) the rationale underlying the changes from the Terms of Use Version 1 to the Terms of Use Version 2, particularly with respect to ownership of digital assets and Celsius's ability to unilaterally amend the terms of use, and (ii) whether and how Celsius's business practices changed from the period in which the Terms of Use Version 1 were purported to be in effect and the Terms of Use Version 2 were purported to be in effect.

19. Confirm the email at page C-3 of the Blonstein Declaration is the only Communication Celsius sent to Account Holders who did not accept the Terms of Use Version 6 after August 19, 2021 with respect to the Terms of Use Version 6. If not, provide copies of any Communications sent to such Account Holders regarding the Terms of Use Version 6 after August 19, 2021, if available.

20. As of what date are the percentages of Account Holders and Earn program liabilities reported in Paragraph 32 of the Motion?

21. Is it possible for Celsius to return digital assets to Account Holders without the Account Holders requesting such return? If so, describe the process of such a return.

22. Identify the individual or individuals that is/are most knowledgeable with respect to matters regarding each of (i) movement of digital assets and (ii) the Debtors' ledger, in each case with respect to the Earn Accounts.

23. Provide the amount of obligations related to each type of Proposed Sale Stablecoin associated with Earn Accounts by amount and number of Account Holders as of the Petition Date.

24. Is Celsius able to trace any of the Proposed Sale Stablecoin to specific transfers made by Account Holders?

25. What is the lowest balance of Proposed Sale Stablecoin by type that was held in Aggregator Wallets by month from January 1, 2022 to the Petition Date? Indicate the date of each such balance.

26. Did the Company treat digital assets corresponding to balances in Earn Accounts as owned by the Company for U.S. tax purposes?

27. Did the Company report taxable income or record revenue with respect to value attributable to airdropped or hard-forked cryptocurrency from the digital assets corresponding to balances in the Earn Accounts?

28. Did the Company withhold any U.S. taxes related to digital assets corresponding to balances in Earn Accounts?

29. Did the Company treat digital assets corresponding to balances in Earn Accounts differently from digital assets corresponding to balances in Custody Accounts for tax purposes? If so, describe such difference in treatment.

30. Did the Company treat digital assets corresponding to balances in Earn Accounts differently for any non-U.S. tax purpose, as opposed to a U.S. tax purpose, on account of ownership? If so, describe such treatment.

31. In the ordinary course of business, how did the Company record digital assets corresponding to balances in Earn Accounts on their books and records?

14

32. Was the transfer of a digital asset by an Account Holder to Celsius in connection with the Earn program a loan from that Account Holder to Celsius?

33. After April 14, 2022, when a loan extended under the Borrow program was repaid or liquidated, how did Celsius determine whether the collateral securing such loan would be sent to an Earn Account or a Custody Account?

34. When did Celsius first receive Communications from state, federal, international or other applicable regulatory bodies regarding concerns with the Earn program, CEL Token, or other products or issues? Include the identity of the regulatory bodies and describe the Communications with such regulatory bodies.

35. Describe all licenses, regulatory approvals, or other applicable authority upon which Celsius relied to hold digital assets on behalf of Account Holders.

36. Describe why unaccredited Account Holders were grandfathered into the Earn program following the creation of the Custody program on April 14, 2022.

37. Has Celsius removed, edited, or altered content or videos on or from its application, website, Twitter account, YouTube account, Medium account, or other internet space since March 1, 2022? If so, describe such removed, edited, or altered content, as well as the dates on which it was removed, edited, or altered, as applicable.

38. From March 1, 2019 through the Petition Date, in the ordinary course of its business, did Celsius pass on 80% of its gross revenue to Account Holders in the form of rewards on amounts transferred to Earn Accounts?

39. Why did Celsius repeatedly refer to digital assets in the Earn program as Account Holders' assets in marketing and other materials?[2]

40. When did the Celsius board first become aware that Celsius was insolvent?

41. Describe the process at Celsius for reviewing and approving the statements that Latham & Watkins LLP proposed to make to state and federal regulators on behalf of Celsius and its Affiliates.

42. Did Celsius add a disclaimer to any of the AMAs at any time providing that the views expressed in that AMA might not be those of Celsius? If so, identify the applicable AMA(s) as well as when and at whose direction the disclaimer was added.

43. Identify the amount of institutional loans in default, under forbearance, or otherwise under workout or non-performing by month from June 1, 2021 to the Petition Date?

---

[2] For instance, in the description of "Rewards Explorer" on its website, Celsius stated: "The Rewards Explorer is a product that community members can use to verify the rewards they've received, and the rewards received by the entire community, for holding their crypto assets with us." *See* web.archive.org/web/20220613053822/https://support.celsius.network/hc/en-us/articles/4403380984721-What-is-the-Rewards-Explorer-How-do-I-use-it- (last accessed on Nov. 14, 2022).

44. Identify any outstanding (i) unsecured and (ii) undercollateralized institutional loans, by number and outstanding amount, issued by Celsius by month from June 1, 2021 to the Petition Date.

45. Did Celsius insiders or employees receive any financial benefits that were not available to Celsius Account Holders who were not insiders or employees, including loans in jurisdictions in which Account Holders were not eligible to receive loans or at loan-to-value ratios that were not available to Account Holders?