**US Bankruptcy Court**
**Southern District of New York**
_____

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC,) | | Case No. 22-10964 |
| Debtor) | | |

_____)

### RE: DEBTORS' SUPPLEMENTAL OBJECTION TO CREDITOR'S NOTICE OF MOTION AND MOTION SEEKING FOR RULING OF FULL TITLE OF OWNERSHIP OF FUNDS WITH RESPECT TO USERS WHO HAVE BEEN BLOCKED ACCESS BY DEBTOR PRIOR TO BANKRUPTCY AND TO REQUEST DISCLOSURE FROM DEBTOR ON THE NUMBER AND AMOUNT OF SUSPENDED/CLOSED ACCOUNTS WHICH FUNDS STILL KEPT BY DEBTOR

1. "Suspension" carries a sense that is to be carried out throughout a temporary restricted time period, it is by nature reversible, whereas, "Closure", on the other hand, is considered irreversible.

The term used by Debtor, "suspension", is inaccurate and intentionally misleading. A "suspension" without any date to unsuspend, is not actually a "suspension", but a permanent process of "closure".

If we look at the events that follow what happened after "suspension" (the alleged term used by the Debtor), as stated in the Exhibit 1 in my motion of Debtor's Compliance Team reply:

i)All "Bonuses"[1], the term they used in their Promo Term (Celsius General Promo Terms & Conditions) point 8 to describe promo code rewards; and all "Rewards"[2], the term they used to describe interests earned by Earn User in Terms of Use Section 4D, Earn Rewards, has been cancelled by Debtor.

ii)The return of funds within next 30 days.

Both of these events are irreversible, the term "suspension" is inappropriate and invalid.

In the following paragraphs, the term "blocked/ closed" will therefore be used.

2. I would like to point out that, point 10 of Declaration by Debtor's Chief Compliance Officer and Data Protection Officer, Charles Roberts, regarding my father's (Kwok Kam Wing) and my brother's (Kwok Chi Hang) accounts, that promo code HODL500 has been rewarded to these two accounts. This is not a fact that has happened.

_____

[1] Celsius General Promo Terms & Conditions
8. Unless otherwise stated in any Specific Promo Terms, any amount, prize or bonus (the "Bonus") you may receive under any Promo, shall be credited into your account .

[2] Terms of Use 4D. Earn Rewards
Our Earn Service allows you to earn a financing fee from Celsius, referred to as "Rewards,"

i) As stated in Declaration point 13, promo code of HODL500 requires 90 days to be rewarded. Funds in my father's account locked in this promo code on March 5, 2022 and funds in my brother's account locked in on March 14, 2022. On May 16 their accounts were blocked by Debtor.

ii) All these accounts have been blocked access and disabled login before any promo codes were credited (requires 90 days to be credited to the account) and received - it is inaccurate to say that the rewards were credited to these accounts if they could never be received.

iii) It is one-sided claim from Debtor to say that the promo codes were credited because these accounts were never been able to log in on or after 90 days to verify any account status - the supposed date which the promo codes were released and credited.

iv) These two accounts have never made any withdrawals

On the other hand, from Debtor's Compliance Team, they also told us that once they blocked our accounts, all Rewards and Bonuses were cancelled.

On the back end of fund management, there was no way for us to verify what actually happened to these accounts (to this day, these blocked accounts are still denied login) and whether or not they have removed us from Earn activities.

While on the front end of User-Debtor interaction, these blocked/ closed account Users were notified by Debtor that they will not qualify to receive any Rewards or Bonuses. Together with the fact that there was no way to access or view any balance or account activities after being blocked, meaning that even if Earn activities were still continued with these funds, by Debtor one-sidedly, they were never meant to or possibly received by these blocked account Users.

In the case that Debtor argues that blocked account funds have not been removed from Earn funds and were still engaging these blocked account funds to Earn activities, if this has been what has happened to these blocked account funds in the back end (blocked account Users were denied access by Debtor to any account information to verify anything about their funds), while Debtor refused to provide any Rewards or Bonuses as service agreed to provide as stated in Terms of Use, **what was happening at the back end does not deny the fact that, in the front end perspective between Debtor's and blocked account Users' interaction, that the Debtor did not fulfill any contractual relationship to provide Rewards and Bonuses as stated by contract, which was the basis of contractual relationship.**

**In any case that these blocked funds were earning yields in the background for months but no Rewards were paid to these blocked account Users , that means such yields have either been taken by Debtor (without Debtor honouring its service agreement) or being distributed to other Users, which either case was unethical. It was also inappropriate that the Debtor managed the funds as if the blocked account Users were earning interest, but was effectively not the case.**

3. As pointed out above, with all Rewards and Bonuses (if any), being cancelled by Debtor and funds contributed to Debtor froze by them, alongside the fact that my father and brother had never made any withdrawals.

The fact that **Debtor had refused to provide the service as described and agreed per the Terms of Use to my father and brother, on top of blocking their accounts' access and funds, while Debtor is still using the contract to claim one-sided interest to their funds while barely had provided any service agreed, it inevitably has turned the nature of the contract into an unconscionable contract.** When the contract is unconscionable, it is not legally

enforceable, which in turns means that there was no meaningful contractual relationship established between the Debtor and my family.

With the action that the **Debtor is claiming one-sided interest on title of ownership to my family's funds while had refused to provide any Earn service agreed, effectively highlighting the extremely unfair situation this contract puts my family into, the act of Debtor claiming ownership of their funds is not justified.**

In addition, **claiming ownership to my father's and brother's funds by the Debtor puts the contract in an abusive condition that while the Debtor froze the funds in Ch 11 bankruptcy refused to return it as promised, my family was forced to accept the overwhelmingly unfair agreement with no real meaningful choice to them: that the Debtor had held hostage to their funds and claimed ownership of their funds, without the service promised provided.**

**4. The situation where the blocked accounts is in, is unique and different from most other Earn Users.** While other Earn Users were earning Rewards while Debtor filed for Ch 11 bankruptcy, these blocked accounts ceased to earn any Rewards (depending on the date of suspension), **yet earning Rewards is essentially the key basis of agreement for Debtor and Earn Users to enter into the contractual relationship. Missing this key component of the contractual relationship distinguish these blocked account Users from other Earn Users.**

However, there is <u>no explicit terminology/ account types in the Terms of Use explaining such key important difference</u> that exists between these blocked accounts and Earn account, **giving rise to the room of ambiguity.**

**5. While the status and definition of blocked accounts was ambiguous in Terms of Use, on the other hand, the definition and purpose of Earn accounts has been clearly defined and stated without ambiguity, throughout the entire Terms of Use, consistently.**

**Point 37 of Kirkland's Supplemental Objection stated that, when a contract's terms are unambiguous, courts apply the meaning of such terms as written. So in the next point, details about Earn account from the Terms of Use will be presented and summarized.**

6. Point 45 of of Kirkland's Supplemental Objection claimed that, "*Kwok's claim is also inextricably intertwined with these chapter 11 cases because she is similarly situated to the Debtors' other unsecured creditors.*"

Point 46 of of Kirkland's Supplemental Objection claimed that, "*Accordingly, Kwok's circumstances place her squarely in the ranks of the Debtors' general unsecured creditors, and her claim is part and parcel of these chapter 11 cases. See In re Celsius Network LLC, 642 B.R. 497, 499 (Bankr. S.D.N.Y. 2022) (Glenn, J) ("Mr. Frishberg and other 'Earn Account' holders appear to be unsecured creditors of Celsius, whether or not they demanded a return of the balance of their earn account before the chapter 11 petitions were filed . . .").* "

Kirkland used point 45, 46 to support their claim against lifting the automatic stay, claiming that my claim is inextricably intertwined with the Debtor's Chapter 11 cases and are considered the same as the rest of other unsecured creditors.

**Kirkland's Supplemental Objection point 45, 46 of treating and claiming my blocked accounts situation is similarly situated to Debtor's other unsecured creditors is selectively and intentionally omitting the fact that the key contractual component of these blocked accounts are missing while the majority of unsecured creditors (general Earn users) are not.**

**7. Throughout the Terms of Use, Debtor stated the exchange of interests between Debtor and Earn Users, including what is an Celsius (Earn) account, eligibility of Earn service, how are Rewards for Earn accounts earned and calculated, the role of eligible digital assets, obligation to provide Rewards in exchange of assets being loaned/ role of rewards as a result of engaging in Earn service, highlighting Debtor's obligation to return of assets when the loans are terminated as well as risks of engaging in Earn service.**

**Below will provide a summary of various details extracted and stated throughout different sections of Terms of Use on Earn accounts:**

i)   Definition of a Celsius (Earn) account and highlighting Debtor's obligation to return assets when loans are terminated

In the section 2, Definitions, of Terms of Use, it states that:

> **2. Definitions**
>
> Capitalized terms shall have the meanings assigned to them in these Terms, unless the context requires otherwise.
>
> **"Account" or "Celsius Account" means a User 's designated User account on the Celsius website or mobile application, allowing a User to access and use the Services, view the User 's balance of Eligible Digital Assets held in custody on the User 's behalf or loaned by the User to Celsius, and any rewards gained on <u>loaned Eligible Digital Assets</u>, and manage the User 's personal information and profile.** YOUR CELSIUS ACCOUNT IS NOT A BANK ACCOUNT, DEPOSIT ACCOUNT, SAVINGS ACCOUNTS, CHECKING ACCOUNT, OR ANY OTHER TYPE OF ASSET ACCOUNT AND SHOULD NOT BE CHARACTERIZED AS A BANKING PRODUCT OR SERVICE. THE USE OF TERMS SUCH AS "ACCOUNT," "ACCOUNT BALANCE," "WITHDRAW" AND SIMILAR LANGUAGE IN CONNECTION WITH THE EARN SERVICE AND THE BORROW SERVICE (SEE FURTHER SECTIONS 4(D) AND 4(E) BELOW, RESPECTIVELY) DOES NOT IMPLY OR ESTABLISH, AND SHALL NOT BE TAKEN TO SUGGEST, ANY FORM OF CUSTODY RELATIONSHIP, AND SUCH LANGUAGE IS USED HEREIN AS TERMS OF CONVENIENCE ONLY IN REFERRING TO Users' BORROWING OR LENDING OF DIGITAL ASSETS TO OR FROM CELSIUS AS PART OF THE EARN SERVICE AND BORROW SERVICE, **AND CELSIUS' OBLIGATION TO TRANSFER DIGITAL ASSETS TO Users UPON THE TERMINATION OF SUCH LOANS OR REPAYMENT OF SUCH BORROWING IN CONNECTION WITH THESE SERVICES.**

Summary of section 2 of Terms of Use:

- Section 2 defines that the account allows Earn Users to access and use services and view balance of eligible digital assets that are loaned to Debtor and the Rewards that gained from that, hence established the loan and reward relationship.

- It is noted particularly that the Rewards was gained on "loaned eligible digital assets".

- Section 2 also highlights that this Terms of Use defines Debtor's obligation to transfer digital assets to Users upon the termination of such loans.

<u>ii) Eligibility of Earn service</u>

In the section 3, Eligibility and Proof of Identity, it states that:

**3. Eligibility and Proof of Identity**
In order to use the Services you must first register for a Celsius Account.

**In order to be eligible to access and use the Services, you must** (i) be eighteen (18) years of age or older, (ii) have the legal ability to enter into and be bound by these Terms, (iii) comply with these Terms, and **(iv) register for and maintain an active and valid Celsius Account.** Celsius is not obligated to accept any application from any applicant and has sole and absolute discretion to accept or reject applications to create Celsius Accounts.

Summary of section 3 of Terms of Use:

This section defines the condition to be eligible for Debtor's service, which one of the conditions stated that "maintain an active and valid Celsius Account" is required to be eligible.

<u>iii) How are Rewards for Earn accounts earned and calculated</u>

In the section 12, how rewards are calculated and earned, it states that:

**12. How Rewards Are Calculated and Earned**

**All Eligible Digital Assets that you elect to utilize in the Earn Service (if available to you) and thus are loaned to Celsius (1) are not being used as collateral for Loans, (2) have not had all rights in connection with them assigned to another Celsius User using CelPay, and (3) were not requested for external transmission or withdrawal (Eligible Digital Assets meeting each of these three criteria, "Loaned Digital Assets") entitle you to Rewards while credited to your Celsius Account.**

Summary of section 12 of Terms of Use:

- Section 12 is a subset of section 2 and it serves to provide supplemental criteria on Earn service.

- Section 12 is consistent with section 2, by specifying that participating in the Earn service is rewarded with Rewards credited to the account.

- Section 12 is also consistent with section 2 about rewards are being earned on "loaned digital assets". ("loaned digital asset" is a subset of "eligible digital asset", ie. "loaned digital asset" must be have existed as "eligible digital asset")

- It specifies that the asset of "eligible digital assets" as the fundamental assets being deployed in Earn service. This is a pre-requisite for assets to become "loaned digital assets", to which Rewards are earned on.

- There are additional 3 criteria (as specified in this section 12) for "eligible digital assets" to be considered as "loaned digital assets", which is the ultimate qualified asset type (consistent with section 2) for Rewards to be earned and credited.

- Section 12 of Terms of Use also specified that in order to receive the Rewards, the account has to be active on the date it was meant to be paid, quoted below:

We will reflect the Rewards earned for the previous week on or around the first business day of each week, through our platform. **Your Celsius Account must be active on the date the Rewards are payable for you to receive the applicable Rewards.** All Rewards will be added to your Celsius Account balance in-kind (in the same Eligible Digital Asset that is reflected in your Celsius Account) or, subject to your in-app choice and regulatory and business considerations, in CEL.

iv) <u>What is "eligible digital assets"</u>

Section 21 of Terms of Use provides the details and characteristics of "eligible digital assets", which was the underlying asset type deployed to Earn service and formed the basis of Earn service.

### 21.Eligible Digital Assets

We may, from time to time and in our sole discretion, add and/or remove certain Digital Assets from our list of Eligible Digital Assets. If a Digital Asset is removed, it will no longer be available to be used in connection with our Services. We will seek in good faith to notify our Users of our intention to add and/or remove Digital Assets in connection with any of our Services as soon as commercially reasonable. However, under certain circumstances (e.g., for regulatory reasons) such changes may be required to be made immediately and without prior notice. **In the event any Digital Asset ceases to be an Eligible Digital Asset, you will no longer be entitled to receive any Rewards in connection with our Earn Service (if available to you), or otherwise make any other use of it via our Services.** We may choose to disallow the use of any Eligible Digital Asset for certain Services, or treat any Digital Asset as an Eligible Digital Asset for certain Users or groups of Users for certain Services, in our sole discretion. We may, from time to time, provide certain Services in connection with certain Eligible Digital Assets by different entities within the Celsius group, and any change in and/or assignment by the contracting entity shall not be considered an amendment of these Terms.

Summary of section 21 of Terms of Use:

- Section 21 states that no Rewards in connection with Earn service could be received if the digital asset is no longer "eligible digital assets".

- Section 21 is consistent with section 2 and 12, that "eligible digital assets" is the pre-condition for funds to be loaned and hence receiving Rewards.

v) <u>Role of Rewards as a result of engagement in Earn service</u>

Section 4D of Terms of Use explains why are Rewards being earned and what are these Rewards by nature.

### 4D. Earn Rewards
**Our Earn Service allows you to earn a financing fee from Celsius,** referred to as "Rewards," in the form of Digital Assets (either in-kind, i.e., in the same Digital Asset you transfer, or in CEL Tokens, where permitted) **in exchange for entering into open-ended loans of your Eligible Digital Assets to Celsius under the terms hereof.** If our Earn Service is available to you, upon your election, you will lend your Eligible Digital Assets to Celsius and grant Celsius all rights and

title to such Digital Assets, for Celsius to use in its sole discretion while using the Earn Service.

....

The balance of Eligible Digital Assets loaned by you to Celsius, and any Rewards gained thereon (see further Section 12 below, "How Rewards are Calculated and Earned") are visible via your Celsius Account.

.....

**The Earn Service is not an investment program nor a speculative tool. Rather, you are earning Rewards as a financing fee on the loan of Eligible Digital Assets you have transferred to Celsius in connection with the Earn Service,** and in accordance with the rates published by Celsius from time to time, pursuant to these Terms.

Summary of section 4D of Terms of Use:

- It states that Rewards are in effect the financing fee paid by Debtor to Earn User for providing out loans.

vi) <u>Risks of engaging in Earn service</u>

In the section 13, Consent to Celsius' Use of Digital Assets, it states that:

**13.Consent to Celsius' Use of Digital Assets**

**In consideration for the Rewards payable to you on the Eligible Digital Assets using the Earn Service, for us entering into any Loan Agreement, and the use of our Services**, you grant Celsius, subject to applicable law and for the duration of the period during which you elect to utilize the Eligible Digital Assets in the Earn Service (if available to you) and thus loan such Eligible Digital Assets to us through your Celsius Account, or as collateral under the Borrow Service (if available to you), all right and title to such Eligible Digital Assets, including ownership rights, and the right, without further notice to you, to hold such Digital Assets in Celsius' own Virtual Wallet or elsewhere, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets in Celsius' full discretion. You acknowledge that with respect to Digital Assets used by Celsius pursuant to this paragraph:

1. You will not be able to exercise rights of ownership;

2. Celsius may receive compensation in connection with lending or otherwise using Digital Assets in its business to which you have no claim or entitlement; and

3. **In the event that Celsius becomes bankrupt, enters liquidation or is otherwise unable to repay its obligations, any Eligible Digital Assets used in the Earn Service or as collateral under the Borrow Service may not be recoverable**, and you may not have any legal remedies or rights in connection with Celsius' obligations to you other than your rights as a creditor of Celsius under any applicable laws.

Summary of section 13 of Terms of Use:

- Section 13 is consistent with section 2, 12, 4D, to confirm that a loan agreement has been entered to use Earn service on "eligible digital assets", so as for Rewards to be payable

- Section 13 describes the composition of bankruptcy estate, which is made up of "eligible digital assets" deployed to Earn service and collateral in Borrow service.

**8. In my last point of point 7, multiple sections from Terms of Use describing what is an Earn service and account have been presented and summarized.**

**Overviewing all the presented sections, an Earn account is an account that is engaged in Earn service (Section 2 of Terms of Use), by qualifying as "eligible digital assets" (Section 2, 12, 21, 4D, 13 of Terms of Use) and further qualifying to be regarded as "loaned eligible digital assets" (Section 2, 12, 4D of Terms of Use) , to obtain Rewards credited to their accounts rewarded as financing fee (section 4D of Terms of Use), by provision of loans (Section 2, 12, 13, 4D of Terms of Use).**

**Eligibility to use services includes maintaining an active and valid account (section 3 of Terms of Use). Eligibility to receive Rewards includes maintaining an active account on the date Rewards are payable (section 12 of Terms of Use).**

**Termination of loans in connection with Earn service results in Debtor's obligation to return assets to User (section 2 of Terms of Use).**

9. Point 3 of Kirkland's Supplemental Objection claimed that, "*once an account that earns rewards is suspended, it merely stops earning rewards, it is neither closed nor transformed into any other type of account, and title to the assets therein does not revert to the account holder*".

As stated in my point 4, missing this key component of "earning rewards", which is the key element and basis of the contractual relationship, and as claimed here in point 3 by Kirkland's Supplemental Objection, "it is neither closed nor transformed into any other type of account", **it gave room to ambiguity as to why such an decisive difference arose.**

**Such an important difference has failed to be stated, explained explicitly or verified, by Terms of Use, whether of not these accounts have been closed or transformed into any other type of account.**

**Yet, such distinguishing difference: whether or not there is this key component of the contractual relationship of "earning rewards", has segregated Earn Users and blocked account Users.**

10. Point 36 of of Kirkland's Supplemental Objection claimed that, "*The nature of an account cannot change simply because it loses certain benefits due to the customer's own violation of the Terms of Use. A suspended Earn Account does not cease to be an Earn Account, nor is it transformed into any other type of account. Earn Accounts are not Earn Accounts solely because they earned rewards; they are Earn Accounts because of the nature of the relationship between the customer and the Debtors, and they are the accounts that are available to international customers like Kwok. As such, Kwok continued to be an Earn Account holder after her suspension.*"

Here, Kirkland argues that "*Earn Accounts are not Earn Accounts solely because they earned rewards; they are Earn Accounts because of the nature of the relationship between the customer and the Debtors.* "

As presented in my point 7, which has extracted and summarized multiple sections of Terms of Use and as summarized in my point 8, which overviewed my point 7, we have defined Earn account.

The nature of relationship between Debtor and Earn Users arises from the exchange of Earn service and Rewards provided and received between the two parties. **Earn service describes the participation of Earn activity by Earn Users and as both an exchange and a result of this participation, Rewards are credited to Earn Users.**

**Absence of such an exchange eliminates the essential existence of element that brings Debtor and Earn Users into the contract, hence forming any sort of contractual relationship: the only meaningful relationship that was meant to form between Debtor and Earn User.**

**Kirkland's claim in point 36 of Supplemental Objection that a relationship exists between Debtor and User, without the very nature that built the relationship, is self-contradictory in nature.**

**11. As summarized in my point 7 and 8, participation in Earn service requires "eligible digital assets" to be further transformed into "loaned eligible digital assets", so as to be provided as a loan to Debtor.**

Section 12 of Terms of Use listed 3 specific conditions for "eligible digital assets" to be transformed into "loaned digital assets": (1) are not being used as collateral for Loans, (2) have not had all rights in connection with them assigned to another Celsius User using CelPay, and (3) were not requested for external transmission or withdrawal.

**All my blocked accounts have passed all three of these specific conditions.**

According to section 12 of Terms of Use (listed in my point 5iii), "Eligible Digital Assets meeting each of these three criteria, "Loaned Digital Assets") entitle you to Rewards while credited to your Celsius Account.".

12. In Point 44 of of Kirkland's Supplemental Objection claimed that, "*The plain language of the April 2022 Terms of Use indicates that Kwok's accounts did not stop being Earn Accounts once they were suspended; they only stopped earning rewards. Consequently, because she is still an Earn Account customer, Kwok's claim can only be resolved once the Court rules on the overarching question of who holds title to the assets on the Debtors' platform, specifically assets held in Earn Accounts.*"
Kirkland first claimed that "Kwok's accounts did not stop being Earn Accounts once they were suspended; they only stopped earning rewards.".

Following this claim made by Kirkland, they hence deduced that "Consequently, because she is still an Earn Account customer….specifically assets held in Earn Accounts."

**Here, Kirkland's point 44 of Supplemental Objection made a deduction that my blocked account assets are owned by Debtor as part of Earn assets, and hence considered as part of the bankruptcy estate, because I am still an Earn customer, due to their claim that my blocked accounts did not stop being Earn account when they were blocked. They have**

made a statement that, "*my blocked accounts did not stop being Earn accounts when they were "suspended""*, except for the fact that "earning rewards" are stopped.

**Point 44 of Supplemental Objection by Kirkland is self-contradictory in nature.**

13. I would like to point out that this was not the only difference that happened when accounts were "suspended". On top of that, all Rewards and Bonuses credited to the accounts were cancelled; login to accounts were all disabled. (hence funds were locked alongside the accounts being locked). The sentence made by Kirkland was inaccurate.

**14. Continuing on point 12, I would like to point out that the argument made by Kirkland in Point 44 of Supplemental Objection, which Kirkland is using to claim title of ownership to my funds and to regard my funds as part of the bankruptcy estate, is founded on an erroneous ground and hence faulty.**

**The fact that "earning rewards stopped" is adequate to prove that it has stopped being an Earn account.**

**15. "Earning rewards stopped" does not only have an implication that Rewards are not being received, but more importantly, it implies that it was a direct result of assets ceased to be an "eligible digital assets", which is the fundamental component required to participate in Earn service, ie. to provide the loan to Debtor, as I stated in point 11 (which was based on what was extracted and concluded in point 7 and 8).**

**As summarized consistently in point 7, 8 and 11, with reference to different sections of Terms of Use, to participate in Earn service requires funds being qualified as "eligible digital assets" as a pre-condition.**

Section 12 of Terms of Use has explicitly mentioned "All Eligible Digital Assets that you elect to utilize in the Earn Service…". **There is no room for ambiguity on the required asset type being able to engage in Earn service other than the "eligible digital assets" stated clearly here.**

**In fact, Earn service stated in different sections by Terms of Use, does not refer to a one-sided service provided by Debtor. Earn service refers to the exchange of interests between Debtor and Earn User.**

**Earn service will not take place if Earn User does not engage their assets in being provided as loan to Debtor, which loan to Debtor, has been clearly defined in section 12, 13 and 4D of Terms of Use particularly (refer back to point 5), is being directly referred as the "loaned (eligible) digital assets" in section 2 and 12, and indirectly implied in section 4D.**

On top of that, section 13 of Terms of Use further confirmed the saying that Earn service does not mean that Debtor is not providing a one-sided offer of service, but rather an exchange of benefits between the two parties. It was stated as a risk disclosure in section 13 of Terms of Use that, "In the event that Celsius becomes bankrupt, enters liquidation or is otherwise unable to repay its obligations, any Eligible Digital Assets used in the Earn Service or as collateral under the Borrow Service may not be recoverable…". This is equivalent to add on a further "give" from the Earn User , which is a potential risk to be accepted and considered.

16. **In a legally enforceable contract, give and take takes place in both parties involved. Earn service is no exception, as stated in last point of point 13, this "service" never meant a one-sided provision of service/ benefit offered by Debtor to Earn User , but an engagement of give and take by both parties, an exchange of benefits between them.**

**From Earn User , it gives/ provides the loans/ resources to Debtor** (additionally, allegedly, give away title of ownership/ use of their funds, as attempted by Debtor), as well as, **a willingness to accept the counterparty risk** in case of insolvency/ bankruptcy from Debtor.

**Earn User takes the financing fee as a return to provide the loans.**

**From Debtor, it gives away Rewards/ financing fee to receive such a loan. I**n return, it gained access to the resources in the form of <u>loan</u> provided by Earn User and further to **make use** of these resources independently, as stated in section 4D of Terms of Use, "…for Celsius to use in its sole discretion while using the Earn Service.".

**Failure of this give and take relationship also signifies a one-sided benefit and for the benefit to be regarded as a gift and invalidated the legal enforceability of this agreement.**

**17. Whether a provision of loan was still happening at the time of Ch 11 bankruptcy filing, is adequate to determine what was stated in my point 16, as to whether or not, Earn service was taken place as an exchange of benefits between Debtor and Earn User.**

**As presented and summarized consistently in point 7, 8, 11 and 15, Earn service is carried out in the form of provision of loans between Earn User to Debtor, via the form of "loaned eligible digital assets", which required the assets to be regarded as "eligible digital assets" in the first place.**

i) In the section 3 Terms of Use, Eligibility and Proof of Identity, it states that,

"In order to be eligible to access and use the Services, you must …(iv) register for and maintain an active and valid Celsius Account."

**Eligibility of service in section 3 had explicitly stated that, without an active and valid Celsius account you would not be eligible to use Debtor's service, ie. Earn service. Here directly defeats Kirkland's claim to say that blocked accounts still are Earn accounts and hence regarded as Earn customer.**

ii) On the other hand, it could also be proved that funds in blocked accounts were not regarded as "eligible digital assets" in the first place. **As established that "eligible digital assets" is required to transform into "loaned digital assets", an absence of such "eligible digital assets" would directly mean that a provision of loan is not possible**, hence Kirkland's claim that "*Kwok's accounts did not stop being Earn Accounts*" could be proved defective.

In section 12 of Terms of Use, it states that,

"Loaned Digital Assets entitle you to Rewards while credited to your Celsius Account."

It explicitly stated the entitlement of Rewards if Earn User had "loaned digital assets", without any additional clause/ conditions here.

**As stated in my point 11, all three criteria of my blocked accounts has passed all the specific requirements to transform from "eligible digital assets" to "loaned digital assets", which they are the only explicitly stated conditions stated in Terms of Use to elaborate the difference and transformation between "eligible digital assets" and "loaned digital assets".**

**What follows that being qualified as "loaned digital assets" shall entitle you to Rewards, as stated in section 12 of Terms of Use, "Loaned Digital Assets entitles you to Rewards while credited to your Celsius Account".**

**Then accordingly, a failure to be entitled Rewards, as stated by Kirkland's "earning rewards stopped", could only happen under one and only one condition, that the assets in the first place, have not been qualified as "eligible digital assets". Hence, it was not possible to engage in Earn service for the provision of loans to carry out.**

**This is to respond and elaborate to my point 14, which I stated that, ""earning rewards stopped" is adequate to prove that it has stopped being an Earn User ."**

**This is closely aligned and consistent with the description in section 21 of Terms of Use on what is "eligible digital assets",  which states that, "In the event any Digital Asset ceases to be an Eligible Digital Asset, you will no longer be entitled to receive any Rewards in connection with our Earn Service".**

**Hence, it has been proved that Rewards stopped was not only a "punishment" applied to blocked accounts, but more importantly, an immediate and direct result that assets are no longer being regarded as "eligible digital assets".**

iii) If Kirkland is to defend their argument to state the terms such as section 12 of Terms of Use, that "...our Celsius Account must be active on the date the Rewards are payable for you to receive the applicable Rewards…"

If Kirkland tried to justify that that Rewards could not be earned even if it was "loaned eligible digital assets solely because the blocked accounts were not active to receive any Rewards, then this justification would be deemed highly inadequate.

I would like to state that terms like this only goes along to further proves and justify that Rewards not being earned is aligned with Terms of Use, but **this status of account would fail to provide justification as to why my accounts were not earning interests if the assets in my blocked account was deemed "loaned digital asset".**

Kirkland would not be able to disprove my established argument in this point 17 that, my blocked account assets were not regarded as "eligible digital assets", or "loaned eligible digital assets", with this term.

iv) The established argument in point 17ii that assets in blocked accounts are not "eligible digital assets" is all found to be consistent with all Terms of Use about viewing the account balance of "eligible digital assets" (section 2, 4D, 7), as well as point 24 of Declaration by Charles Roberts that "*Due to this suspension, she was unable to access her accounts or view balances.*"

Section 7 of Terms of Use stated below:

> 7. Account Balance
>
> Your Celsius Account balance visible through the platform shall indicate, the balance of Eligible Digital Assets attributed to each Service, to the extent applicable and available.

**It is all consistent to our blocked account users' situations that account balance could not be viewed and denied access, since the account was meant to show "eligible digital assets"**

to Earn Users only, since our funds are not "eligible digital assets" anymore and we were no longer Earn Users, it has been denied access and ability to view balance.

On this note, it once again defeats point 36 of Kirkland's Supplemental Objection that, "*Earn Accounts are not Earn Accounts solely because they earned rewards; they are Earn Accounts because of the nature of the relationship between the customer and the Debtors*".

**It is hard to justify that any kind of relationship exists between Debtor and us, that our funds was not only denied out of Earn service, but even the basic features of accounts, such as login to use the app or view account balance or make any transactions, has been entirely blocked and disabled. Any customer-company relationship could hardly be justified to exist under such situation, as opposed to what was stated in point 36 of Kirkland's Supplemental Objection.**

It can be seen that, the argument that our funds in these blocked accounts were not "eligible digital assets" and hence provision of loans could not have taken place, can be proved from both ends of perspectives, as presented in point 17i,17ii and 17iv.

**As presented as above point 17i to 17iv, which was developed and summarized consistently from point 7, 8, 11, 15, I have proved what was stated in point 12, that Kirkland's objection against my motion with the argument that, "I did not stopped being Earn User, I only stopped earning Rewards", is itself self-contradictory.**

**Neither the assets in these blocked accounts were regarded as "eligible digital assets" in the first place to qualify as loans to Debtor (section 2, 12, 21 of Terms of Use), nor the status of blocked account allowed it being eligible for Earn service (section 3 of Terms of Use), nor Rewards have been resulted from the participation of Earn service (section 12, 4D of Terms of Use), nor the composition of estate to include assets that were not engaged in Earn service (section 13 of Terms of Use).**

**Debtor's claim to consider my blocked account assets as theirs because my blocked account assets were considered by Debtor as Earn assets, alongside with other general Earn Users, has been proved wrong and one-sided. The intention that Debtor to include our blocked account funds as part of the bankruptcy estate, the same way as the rest of the Earn customers, is one-sided and dishonest.**

**18.The claims that Kirkland used to object the lift of automatic stay by stating that:**

**In point 45, "*Kwok's claim is also inextricably intertwined with these chapter 11 cases because she is similarly situated to the Debtors' other unsecured creditors*";**

**Or in point 46, "*Accordingly, Kwok's circumstances place her squarely in the ranks of the Debtors' general unsecured creditors, and her claim is part and parcel of these chapter 11 cases.*";**

**Or in point 44, "*Consequently, because she is still an Earn Account customer, Kwok's claim can only be resolved once the Court rules on the overarching question of who holds title to the assets on the Debtors' platform, specifically assets held in Earn Accounts.*"**

**These claims against lift of automatic stay are all based on the assumption that our blocked accounts are Earn accounts (because it did not cease to be Earn account) and hence should be regarded the same way as general Earn accounts. In point 17, this assumption that blocked accounts are still Earn accounts has been proved wrong.**

**In addition, these blocked accounts have established a pre-existing and unique <u>extraordinary circumstance</u> that, these are the minority of accounts which have been regarded by Debtor as Earn account, while missing the distinctive Earn account feature of "earning Rewards", which is not only a feature of Earn account but also the basis and key element of the contractual relationship, due to the reason that it has been failed to be regarded as "eligible digital assets" before Ch 11 petition by Debtor (as presented in point 17), yet the Terms of Use has failed to give a definitive meaning to, ie. It was ambiguous what these funds have been regarded as, while failed to be regarded as"eligible digital assets", yet kept by the Debtor in the bankruptcy estate.**

**My point 7 to 17 have been all presented based on the Terms of Use.**

**In my following point, I would like to include the specific facts outside of Terms of Use, to provide a better overall picture on these blocked accounts.**

19. Point 15 of Kirkland's Supplemental Objection stated this:

"*If the Court grants the Motion, a necessary but absurd conclusion would follow: that anyone who violated the Terms of Use and the Promo Terms and whose accounts were suspended could receive title to cryptocurrency in their accounts while everyone else must wait. Because this is an untenable proposition and because Kwok's arguments run counter to the plain language of the Terms of Use, the Debtors respectfully request that the Court deny the Motion.* "

On the surface, what Kirkland stated would stir the pot among unsecured creditors, especially general Earn Users, who have not been blocked by Debtor before Ch 11 bankruptcy petition, to feel provoked towards the blocked account Users.

But as the truth behind such violation of Terms of Use unveil, we will find out that a significant amount of these blocked account Users are not the ones who intentionally broke the rules set by Debtor, but rather are the ones who were being abused by the system set by Debtor in pre-bankruptcy period.

The attempt that Kirkland tried to portray blocked account Users as bad players, will bring out the multiple incidents of abuses, double standards and predatory business practice by Debtor towards these blocked account Users.

Point 15 of Kirkland's Supplemental Objection will be proved to be counterproductive.

20. Since my accounts are still all blocked and denied login by Debtor until this day, there is no way for me to provide facts and evidence of why I had multiple accounts under my name.

My multiple accounts was never meant to cheat or abuse the promo code system from Debtor. On the contrary, my multiple accounts was a direct result to shows that Debtor's promo code system was highly abusive and confusing instead.

Point 10 of Declaration by Charles *"Of the five accounts under Kwok's own name, only one, Account 3, was active."*

Point 15 of Kirkland's Supplemental Objection stated that, *"Thus, multiple promotional codes were used for these transfers, and one specific promotional code, HODL500, was submitted five times and successfully unlocked four times."*

It stated that me and my family members of total 4 people, we have unlocked a total of 4 promo codes of HODL500 (which two of them were never actually credited, as pointed out in my point 2):

As confirmed by Debtor, I used only one active account even though I had opened five accounts. Most of the accounts I opened I barely even used or transferred any funds into. I have also only unlocked promo code <u>once</u> only.

It should naturally bring out a question, why did I open so many accounts when I only intended to and ended up using one of them only?

If other unsecured creditors thought that I did it to take advantage of Debtor's promo codes or referrals (I never knew Debtor had any referrals codes so I have never used any referrals), I even made sure that the promo codes were unlocked only once by myself, due to the fact that I did not wish to cheat Debtor's promo code system, even with the condition that at that time of my account opening, multiple accounts under the same user were allowed.

I also did not open multiple accounts to gain any benefits or to get around tax or any regulations as I barely even used the extra accounts that I opened.

I opened multiple accounts because I was defeated and abused by Debtor's promo code system multiple times.

In fact, Debtor's promo code system was so complicated and illogical that people had to create cheat sheets for it. (Refer to Exhibit A1, A2, A3)

Exhibit A1:

# ☾ Celsius Promo Codes  

## Promo Code FIFO Cheat Sheet

Celsius users can use multiple promo codes but ENTERING them
into the mobile app requires a specific order.

Here are some tips, tricks and recommendations:

**do I need to ENTER the promo codes in a specific order?**

### SIMPLE ANSWER is YES! 

The promo code system works on a
**chronological FIFO (first-in, first-out) order.**

*What does this mean?*

The order in which you ENTER the promo codes needs
to be the order in which you deposit your assets for
multiple promo codes to 'lock'.

 you enter 3 promo codes in the following order:

STABLE50, BNB40 and ADA40

*your deposit order:*

USDC, BNB and then ADA

*the result:*

all 3 promo codes will 'lock'

 you enter the same 3 promo codes in the following order:

STABLE50, BNB40 and ADA40

*your deposit order:*

ADA, USDC and then BNB

*the result:*

only STABLE & BNB will 'lock'

 **why the difference?**

In the '**correct**' example, the asset deposits followed the chronological order of
when the promo codes were entered. **Therefore, all 3 promotions are 'locked'.**

However, in the '**wrong**' example, ADA was added **before** both STABLE and BNB
promo codes were 'locked'. Therefore, even after adding the required ADA to
'lock' the ADA promo code, it remains 'unlocked' as the STABLE50 (USDC) and
BNB40 required assets were not yet deposited.

After depositing USDC to 'lock' STABLE50, the required amount of BNB was
deposited to 'lock' BNB40. However, you will notice that the first ADA deposit
is NOT retroactive and will NOT 'lock' the ADA40 promo code. You will need to
deposit an extra $400 worth of ADA to 'lock' it.

 The **SAME SITUATION** arises when you enter multiple promo codes requiring
the same asset deposits...

Exhibit A2:



The **SAME SITUATION** arises when you enter multiple promo codes requiring the same asset deposits...

✓ you enter 3 promo codes in the following order:

**STABLE10, STABLE50 & STABLE600**
[ascending order in terms of USD amount required]

*your deposit amount:*

**$25,250 USDC total deposits**

*the result:*

**all 3 promo codes will 'lock'**

✗ you enter the same 3 promo codes but in a **different order:**

**STABLE600, STABLE50 & STABLE10**
[descending order in terms of USD amount required]

*your deposit amount:*

**$250 USDC total deposits**

*the result:*

**no promo code will 'lock'**

🔔 *why the difference?*

In the '**correct**' example, promo codes were **ENTERED** from the promotion requiring the **LEAST** amount of asset deposits **first** (STABLE10) to the most amount of asset deposits last (STABLE600). With a cumulative deposit of $25,250 USDC, this satisfies the deposit requirements of all 3 promotions. **Therefore, all 3 promos are 'locked'.**

However, in the '**wrong**' example, promo codes were **ENTERED** from the promotion requiring the **MOST** amount of asset deposits first (STABLE600) which requires $25,000 USDC to 'lock'. Since only $250 USDC was deposited, **NO** promo codes were 'locked' even though $250 USDC satisfies the deposit requirements of STABLE50 and STABLE10.

This is a classic example of **FIFO** (first-in, first-out).

Exhibit A3:

# Tips on how to ENTER Promo Codes which works every time

 Please note that you **cannot delete a promo code** NOR can you **change the order of promo codes** that you've already entered. Therefore, following these simple steps is imperative to getting your promotions 'locked':

Refer to Exhibit A1 to A3 above, these are just some of the very basic examples on the promo code logic. But here, it can be seen that promo codes cannot be cancelled, amended or removed. Yet, if you put in the promo codes in wrong order, they would not be unlocked even though the account balance of the funds you transferred met the promo code requirement.

The first time I registered for the account, I have already transferred the funds in, only to find out that promo codes I entered could not be unlocked when you already have the funds transferred.

Since the promo codes entered could not be removed, I could only spend more time and effort to register for new emails just to sign up for a new account under my name.

Throughout the multiple account registrations, I kept on failing to enter promo codes in correct order, as opposed to what I thought, I entered the promo code with largest amount first thinking that was the most significant one to go into the system, and found out that it would not be unlocked again.

21. In fact, even after promo code has been unlocked by Debtor, it could be cancelled by Debtor even though Earn User has maintained the required account balance has stated by Debtor's promo code conditions.

Refer to Exhibit B1 to B6 as an example of the confusing situation where my promo code has been cancelled where I had no idea about why, because I was previously told by Customer Care Team that as long as my balance does not go lower than the required amount, then I could make withdrawals.

Summary of Exhibit B:

Exhibit B1 - Initial email inquiry about how much funds I could withdraw out of my account to keep my promo code locked

Exhibit B2 - Email reply from Customer Care to confirm that I can withdraw as long as I keep the required account balance

Exhibit B3 - Incidence that my withdrawal, following what I was told by Customer Care previously, had triggered my promo code to be cancelled

Exhibit B4 to Exhibit 6 - Email exchange of expression of confusion and frustration about how promo codes work, and the reply from Customer Care Team about the still confusing logic of why my promo code was cancelled by Debtor

## Exhibit B1:

 **mei po kwok** <mabelkwokearnfire2@gmail.com>
to Celsius

Sat, Nov 27, 2021, 11:15 PM

Hi Celsius,

I have some urgent need that I want to withdraw some funds out of my account - however I am so confused as it says that "it will cancel my locked funds for promo code!"

I don't understand how and is it really the case, as I have 20007 USDC in excess of my promo code.

Doesn't it basically mean I am allowed to withdraw 20007 USDC without cancelling the promo code? I don't understand and that doesn't make sense if I can't make a single withdrawal at all until Feb…

## Exhibit B2:

 **Zelislav Kukucka** (Celsius Network)
Dec 2, 2021, 14:18 GMT+1

Hello Mei Po,

Thank you for contacting us.

We apologize for the delay you experienced. Celsius is currently experiencing immense growth as a company, and we have new customers creating accounts by thousands each day, which creates new emails and inquiries, and we are working 24/7 to answer every request as best as possible. as soon as possible.

Rewards are calculated every Friday and distributed every Monday. That means that if you transfer funds to your Celsius account in the middle of the week, you will still earn prorated rewards on those assets through the accrual period on Friday, however, they won't be full rewards for that accrual period. In this case, 11/17/21 was Wednesday, so the rewards were for period Wednesday –Friday.

**Our reward calculation schedule is as follows:**

- Reward accrual period: Friday 05:00:00 UTC to Friday 04:59:59 UTC.
- Reward calculation price snapshot: Friday 05:00:00 UTC.
- Reward payment day: Monday, no set time.

To answer your second question, the promo codes are now locked. This means that you are able to withdraw coins from your account, but must at all times be careful not to go below the required cumulative account balance in order not to cancel the promo codes.

Don't hesitate to contact us if you have further questions.

Best regards and HODL on!

Zelislav Kukucka
Customer Care Expert | Celsius

## Exhibit B3:

**mei po kwok** <mabelkwokearnfire2@gmail.com>
To: Celsius Network <support@celsius.network>

Tue, Dec 7, 2021 at 9:11 AM

Hi,

I just transferred some balance out of usdt - making my balance at 50250 - which is the required amount to keep all my promo codes.

And I added celsius cares earlier so I thought it would activate my code by transferring 5000 back - so now I keep 55250

And then for some reason - this celsius cares code is still pending and today I checked - my stable 50 was cancelled! I have always kept my required balance of 50250 - what has happened? This is so frustrating



## Exhibit B4:



**Nicoletta Koursari** (Celsius Network)
Dec 15, 2021, 17:25 GMT+1

Hello Mei,

Thank you for contacting Celsius.

After a closer look at your account, we noticed that you activated the promo code CELSIUSCARES on 11/27/21 and it is still pending.

This is because, after the activation of your promo code, you have initiated two withdrawals on 12/04/21. Therefore, all actions are taken into account after the date of activating the code. After that we noticed that you have successfully transferred funds on 12/05/21 and 12/08/21. However, due to the reason that you have withdrawn funds before transferring, your initially had a negative balance due to the withdrawals before making your balance positive.

Please bear in mind, that promo codes do not take into account the balance and transfers made before the activation. So all actions that are considered are the ones initiated after 11/27/21 in your case.

I trust this assists, should you have any further queries, please feel free to reach out.

Best regards and HODL on!

Nicoletta Koursari
Customer Care Expert | Celsius

## Exhibit B5:



**Mabelkwokearnfire2**
Dec 29, 2021, 15:45 GMT+1

This is being ridiculous- I kept my account balance at 50250 USDC, making sure that it does not disqualify the promo code that I have been trying to keep. Stable600 and hodl500.

I kept that account balance and somehow Celsius has cancelled my stable 600.

Your staff has previously replied me about as long as I keep account balance of 50250 USDC , then I will be fine.

If the account balance is not meant for reference of my actual account balance, why is it put there, instead of the actual one? This is a scam tactic and I am deeply disappointed about it.

I request to reactivate the promo code that has been cancelled (stable 600 and stable 50 in fact) as I indeed has kept that account balance. It is being ridiculous.

It takes too long to answer the request as well.

Reminder: Be aware of phishing sites and always make sure you are visiting the official https://celsius.network website and app. Celsius will never ask you for confidential information such as passwords, private keys, seed phrases, or secret codes. You should store this information privately and securely and report any suspicious activity.

©2021 Celsius Network

221 River Street, 9th Floor
Hoboken, NJ 07030 USA

Registered as a Money Services Business (MSB) number 31000192265811 with the US Financial Crimes Enforcement Network (FinCEN).

## Exhibit B6:



**Charlotte Brown** (Celsius Network)
Dec 30, 2021, 14:58 GMT+1

Hello Mei Po,

My name is Charlotte from the Specialist Customer Care Team and I have been assigned your request for review.

Based on my understanding your request was transferred following you comments regarding the cancellation of the STABLE600 promotion code.

The reference number assigned to you is 796068/2112/CB

Upon a full review of the communications and your account I can confirm that STABLE600 has correctly cancelled and the advice offered is correct. For future reference in order to clear any confusion, when you enter a promotion code this will register your account as 0.00 balance pending the additional assets being received. So for example if you have $25,000 and then add a code you would need to imagine that your balance is 0.00 so this means any withdrawals will negatively impact the balance.

I understand where the confusion lies here. Yes, you need to maintain the account balance after you have made the required transfers so again as an example if you had $400 in your account and the promotion required $20,000 then you would need to maintain $20,400. However, it is very important to note that your balance on your app will reflect the weekly earnings and rewards you have received whereas the promotion code does not take that into account as you did not transfer this in. So what happened is when you removed assets and still maintained the $50,250.00 so in your case around $620 of your balance was from weekly earnings. This meant that you balance actually was $49,353.79 which was under the required maintenance balance.

So here is what I can do for you in order to resolve this matter. I can see you still have HODL500 successfully locked as the balance is above the $25,000 required which leaves $24,353.79 on the balance for STABLE600. You met the transfer requirement for STABLE600 on 15th November and there is a 90 day lock period so on this occasion as this was a genuine misunderstanding on the 15th February I will review your account again. If I can see that no further withdrawals have been made I will honor this code and then manually credit you the reward for STABLE600. So you will receive HODL500 and STABLE600 on 15th February providing you do not withdraw any further assets.

I look forward to your reply to see if you are happy with this as resolution, once you have confirmed I will then book you in for a review to be completed.

22. Following what was stated in the point 21 that "even with the condition that at that time of my account opening, multiple accounts under the same user were allowed".

I would like to point out interesting facts found about Debtor's policy on allowing multiple accounts per User.

Refer to Exhibit C1 and C2 which was provided by an Earn User in June 2019 asking about whether or not he could register for more than one account under his name. He was told that he was allowed to do so and it is not against the rules.

**Interestingly, in July 2021, he was contacted by Debtor that he could no longer keep his multiple accounts because of an updated policy, as they called it, an amendment of Terms of Use. (Refer to Exhibit C3)**

**It implies that throughout at least two years, between 2019 and 2021, Debtor advocated its Users to register for multiple accounts.**

Exhibit C1:

**Honest way to have two separate accounts**
5 messages

| | |
|---|---|
| **Yeshaya Clair** <yeshaya86@gmail.com><br>To: Celsius Network <app@celsius.network> | Wed, Jun 12, 2019 at 1:38 PM |

Hi, I bought enough CEL to qualify for Platinum loyalty for my interest payments. I have some extra ETH that I'd like to get interest on, but right now ETH's interest rate is low enough that if I would send it to Celsius it would knock me down a loyalty level, and I'd end up getting less in interest. Is there a legitimate way to have a main Celsius account, where CEL is 10% of my holding and I get paid in CEL, and to also have a side account would I could put my lower-earning coins to get some interest in their native currency? Thanks

| | |
|---|---|
| **Bojan Zečević (Celsius Network)** <zendesk@celsius.network><br>Reply-To: Celsius Network <zendesk@celsius.network><br>To: Yeshaya Clair <yeshaya86@gmail.com> | Wed, Jun 12, 2019 at 2:23 PM |

##- Please type your reply above this line -##

Your request (#3237) has been updated. To add additional comments, reply to this email.

**Bojan Zečević** (Celsius Network)
Jun 12, 20:23 CEST

Hello Clair,

Thank you for contacting Celsius Network.

Unfortunately, there is no option for having a side account but you can use a different email and register a new account on your name and where you can deposit your ETH ( if that option suits you) and get an interest payment. You will have to do also again the KYC process but at this moment that is the only thing which might be interesting for you to explore because we still didn't limit our users to one-person-one-account (this could happen in the future updates but currently it is not a priority so as adding a side account).

If there is anything else we can help you with please contact us.

Best regards,

Customer Support | Celsius Network

https://celsius.network/frequently-asked-questions/

## Exhibit C2:

**Yeshaya Clair** <yeshaya86@gmail.com>                                    Wed, Jun 12, 2019 at 2:35 PM
To: Celsius Network <zendesk@celsius.network>

To confirm, it is not against the rules to make two accounts? I don't want my account to be locked because of a breach of terms. If there is no problem making a second account I will do that to keep my extra crypto there. Can I use my referral code for the second account? Thank you
[Quoted text hidden]

---

**Bojan Zečević (Celsius Network)** <zendesk@celsius.network>                Wed, Jun 12, 2019 at 3:02 PM
Reply-To: Celsius Network <zendesk@celsius.network>
To: Yeshaya Clair <yeshaya86@gmail.com>

##- Please type your reply above this line -##

Your request (#3237) has been updated. To add additional comments, reply to this email.

---

**Bojan Zečević** (Celsius Network)
Jun 12, 21:02 CEST

Hello Clair,

Yes, it is not against the rules. You can make two accounts and you won't be locked and you should be able to use the referral as well.

If there is anything else we can help you with please contact us.

Best regards,

Customer Support | Celsius Network

https://celsius.network/frequently-asked-questions/

## Exhibit C3:

## [Celsius Network] Re: Account details
8 messages

**Celsius Network** <complianceteam@celsius.network>                        Thu, Jul 15, 2021 at 6:48 AM
Reply-To: Celsius Network <complianceteam@celsius.network>
To: Jason Clair <yeshaya86@gmail.com>

##- Please type your reply above this line -##

Your request (#536632) has been updated. To add additional comments, reply to this email.

---

**Keri Jansone** (Celsius Network)
Jul 15, 2021, 12:48 GMT+2

Dear Jason,

I hope this email finds you well,

I would like to inform you, as per our amendment of terms and conditions, we can only offer one account per customer,
therefore we kindly ask you, within the next seven days, to consolidate your funds in one account.

Please kindly inform us which account would you like to keep.

If you need any further assistance, don't hesitate to ask

Thank you for your cooperation

23. In point 22, it was established that, Earn Users were allowed to register for multiple accounts, throughout at least June 2019 to July 2021.

Below shows Exhibit D1 and D2, which is extracted from court docket 393, Exhibit A7 section 5 of Terms of Use, that was in effect from on or around August 3, 2021 to April 13, 2022, which was the Terms of Use that I relied on when I registered for my accounts.

Exhibit D1:

in writing, against Eligible Digital Assets in your Celsius Account (each, a "**Fiat Loan**"). If approved, such application shall be subject to a separate agreement to be entered into between you and the Celsius Affiliate (the "Fiat Loan Agreement"), and Celsius or its Affiliates shall hold the Digital Assets provided as collateral under the Fiat Loan Agreement for the benefit of the Lender subject to the terms hereof, including without limitation Sections 9, 10 and 13. In no circumstances shall it be permissible to use the proceeds of such Fiat Loans to purchase additional Digital Assets through any third-party fiat "on-ramp" service providers that may be integrated in or connected with the Celsius platform from time to time, and you represent and warrant that you will not do so. Celsius further does not recommend or encourage any use of borrowed funds for purchasing Digital Assets or making any financial investment. Any use of the proceeds of Fiat loans must be in full compliance with the terms of all applicable laws and regulations, these Terms and the applicable Fiat Loan Agreement, and you shall be solely responsible and liable for any breach of any of the foregoing.

Any Eligible Digital Assets you provide as collateral under a Fiat Loan Agreement shall not generate Rewards for your benefit under the Earn Rewards service, as set out below, and you explicitly authorize Celsius or its Affiliates to temporarily deduct such amounts of Eligible Digital Asset from the balance of your loan to Celsius under the Earn Rewards Service, until such time that your Fiat Loan is repaid in full and your Eligible Digital Assets cease to act as collateral for your Fiat Loan under the applicable Fiat Loan Agreement, at which point such Digital Assets shall be added to the balance of your loan to Celsius and resume being regarded as a loan to Celsius and entitle you to accrue Rewards under the Earn Rewards Service.

Celsius may offer other forms of commercial arrangement under the Borrow service, such as a sale and repurchase arrangement, based on its regulatory, business or other considerations.

**D. CelPay**

CelPay is Celsius' proprietary Digital Asset tool for Celsius Users, which allows you to assign your rights with Celsius in connection with selected Eligible Digital Assets to other registered Users (see further Section 15 below, "CelPay").

By entering into any CelPay transaction you explicitly authorize Celsius or its Affiliates to deduct such amounts of Eligible Digital Asset as you instruct us to transfer to another user from the balance of your loan to Celsius under the Earn Rewards Service, and to be added to the balance of the loan to Celsius of such other User. Conversely, by accepting any CelPay transaction from another User you agree that the amounts of Eligible Digital Asset sent to you shall be added to the balance of your loan to Celsius under the Earn Rewards Service.

**5. Celsius Account Types**

**A. Individual Account**
This Celsius Account is owned by only one natural person who is and will continue to be the only person authorized to take any action with the Celsius Account. By opening an Individual Celsius Account, you represent and warrant that you are and shall at all times continue to be the sole beneficial owner of the Celsius Account and user of all Services facilitated or generated therefrom.

Exhibit D2:

**B. Corporate Celsius Account**
This Celsius Account is owned by a corporation, unincorporated association, a company, a partnership, fiduciary, sole proprietorship or other legally recognized group (interchangeably defined as an "Entity") holding a Celsius Account in any capacity other than an individual capacity. An Entity can apply to open a Celsius Account through any natural person(s) who is duly authorized by the Entity to do so (an "Authorized Representative").

Such Authorized Representative represents and agrees, on behalf of the Entity, as well as on his or her own behalf, that he or she:

    i.  is fully authorized to execute all documents or otherwise complete our requirements in his or her stated capacity;

    ii.  has provided us all documents or other information necessary to demonstrate that authority; and

    iii.  will provide other documents and complete other requirements as we may request from time to time.

We may refuse to recognize any such authorization if, in our reasonable judgment, it appears to be incomplete or improperly executed.

By opening a Corporate Celsius Account, the Authorized Representative represents and warrants on behalf of the Entity that the Entity is and shall at all times continue to be the sole beneficial owner of the Celsius Account and user of all Services facilitated or generated therefrom and that the ultimate

beneficial owners of all assets and assets belonging to the Entity are as represented during the establishment of the Corporate Celsius Account. The Entity registered as holder of a Corporate Celsius Account, the ultimate beneficial owner(s) of such Entity and any Authorized Representative(s) shall each be responsible for updating Celsius immediately of any change in the details of the Entity, ultimate beneficial owner(s) and/or Authorized Representative(s), including any appointment or termination of the same, change of control in the Entity or change in the registration details of the Entity, and such persons shall be jointly and severally liable to Celsius for any breach of these Terms in connection with the Corporate Celsius Account.

**6. Authorized Users**

For both Individual and Corporate Celsius Accounts, we may follow any instructions regarding your Celsius Accounts provided that we reasonably believe such instructions are authorized by the Celsius Account holder, and we will not be held liable for following any instructions provided by a person designated or identified as an authorized User or Authorized Representative.

**7. Account Balance**

Your Celsius Account balance visible through the platform shall indicate the amounts of Eligible Digital Assets owed to you by Celsius. You can lend additional Eligible Digital Assets to Celsius by transferring the same to the Virtual Wallet Address(es) provided in your Celsius Account (or as otherwise notified by us to you). We reserve the right to reject entry into any loan transaction, and/or the right to repay any loan of Digital Asset already made,

As seen in Exhibit D1 and D2, no terms have specified that having multiple accounts was in violation of Terms of Use.

This was also confirmed in Footnote 10 of Kirkland's Supplemental Objection, "*Although the Debtors are not required to respond to Kwok's reply per the Court's Order, the Debtors submit that Section 5(A) was included in the August 2021 Terms of Use, which were in effect when Kwok opened her Earn Accounts and which she was required to accept.*"

Kirkland's reply here directly confirms that section 5C of Terms of Use, did not exist in version of August 2021 Terms of Use, which in the last hearing, it was stated as the reason of why my accounts were blocked in the first place.

24. Referencing among Exhibit D1 and D2 (August 2021 Terms of Use) and Exhibit C3, it can be deduced that between July 2021, when the Debtor contacted their User, stating that there would be an amendment on Terms of Use, yet such change was not reflected on August 2021 version of Terms of Use, but only the version later in April 2022 version of Terms of Use.

**There was a vacuum period between July 2021 and April 2022, that Users registered during this "vacuum period", that they did not know about the obscure policy change, as opposed to what  was previously advocating for multiple accounts per Users for years, and were somehow also allowed to open multiple accounts as one User without any explicitly written Terms of Use against it as well as passing KYC.**

<u>My blocked accounts fall under this situation.</u>

**Blocking my accounts based on Terms of Use in April 2022 is equivalent to applying a punishment on a past irreversible action (account opening that happened before April 2022), where the action itself was at the time acceptable under the rule at that time (August 2021 Terms of Use), but became a violation of rule when new rules come in (April 2022 Terms of Use), ie. Dating back punishment on a past irreversible action.**

25. **If multiple accounts at the time when I registered my accounts were already against Debtor's internal policy, how and why did all my multiple accounts pass validation by KYC, the process of identification verification, at the time of account registration?**

Section 3 of Terms of Use states that,

> 3. Eligibility and Proof of Identity
>
> Celsius is required to comply with applicable AML and KYC requirements before and after you register for a Celsius Account. **When you register for a Celsius Account, we will ask for documentation and information, including but not limited to copies of your government-issued identification document (e.g. Passport, driver's license).** For corporate Celsius Accounts, we may require identification information related to the directors, officers, authorized representatives, or equity owners of the business. **We may also gather and use information about you from third parties, to help us confirm your identity, perform our AML/KYC checks and/or determine your access to the Services** You represent and warrant at all times that any and all information provided by you to us is true, accurate, and not misleading in any respect. If any such information changes, it is your obligation to provide the new information to us as soon as practicable following such change.

As it can be seen, Debtor had process in place to confirm identity of my accounts, via KYC, which I passed them.

*26.* In fact, my father and my brother did not violate any rule of multiple accounts, as confirmed in point 7 by Declaration by Charles Roberts, *"On February 25, 2022, an Earn Account under the name of Kwok Kam King ("Kwok Kam") was opened ("Account 8"). As part of the registration process for Account 8, Kwok Kam represented that he was sixty-eight years old at the time of registration.";* (they spelt my father's name wrongly)

And point 8 of Declaration by Charles Roberts, *"On March 5, 2022, an Earn Account under the name of Kwok Chi Hang ("Kwok Chi") was opened ("Account 9"). As part of the registration process for Account 9, Kwok Chi represented that he was twenty-seven years old at the time of registration.*

But both my father's and my brother's accounts were blocked by Debtor.

27. Summarizing point 13, 15, 16 of Kirkland's Supplemental Objection, and from point 15 of Declaration by Charles Roberts, which states that, *"Because (a) all nine account holders registered using the same physical address associated with Kwok and (b) almost all log-in attempts to these accounts were completed through the same mobile device, the Compliance Team made a reasonable determination that all nine accounts were likely accessed and controlled by Kwok."*

**It was found out that the real reason behind "suspension" of my family's accounts was due to me accessing their accounts on my device.**

28. Debtor's Compliance Team has referred to section 5A of Terms of Use, to block and freeze all accounts that have been login using my device.

Section 5A of Terms of Use states that,

> 5. Celsius Account Types
>
> A. Individual Celsius Account
>
> **This Celsius Account is owned by only one natural person who is and will continue to be the only person authorized to take any action in the Celsius Account.** By opening an Individual Celsius Account, you represent and warrant that you are and shall at all times continue to be the sole beneficial owner of the Celsius Account and user of all Services facilitated or generated therefrom.

In point 18 of Declaration by Charles Roberts, it states that, *"The **Terms of Use are unambiguous** that a single user may only have one individual account, **which must be owned and controlled by the user that registers on the platform** and by no one else, and one corporate account. "*

**29.** On top of the fact that it was **very natural for a daughter** to use her device to assist her father and brother to register for their accounts, **given the nature of cryptocurrency, one mistake could result in irrevocable loss of assets during the transfer of assets,** as well as the **lack of technological knowledge of my 68 years old father, who could barely complete the registration himself on his mobile which was not highly functional. It would have been easier to do via one device, but how would one thought this to be causing a "suspension"?**

In addition, whether section 5A of Terms of Use is unambiguous is highly questionable. While the term owned and controlled is highly subjective, the way Debtor blocked accounts based on this "hidden rule" was unheard of and highly problematic.

**This hidden rule not only appears to be highly ambiguous, but also appears to be targeting the less technological savvy people like my father, or Luca's parents (Luca submitted Joinder to my motion), who are almost 70, that he got blocked because he shown his parents how their Celsius accounts work, via his own laptop.**

**Not to mention people who accessed their accounts on public computer, or even sharing wifi/ hotspot, families or couples living together with same physical address. From what I discovered online, a range of absurd reasons have been listed that Debtor's have blocked Users out of.**

Exhibit E1- Hidden rules found by Users on what Debtor has been blocking Users for

Exhibit E2 - People referred each other from the same office all got blocked because of sharing same wifi/ ip address in their office

Exhibit E3 - Account "suspensions" with no response and fund return lasted for months to be done

Exhibit E4 - Debtor has written on their Support Network, stating that, "we will not ban you without notifying you. We will contact you by your preferred contact method that you defined when you created your account with us". This was not true as none of my blocked accounts received any notification from Debtor to my contact method.

Exhibit E1:



Exhibit E2:



r/CelsiusNetwork
u/Intelligent-Design67 · 1y

## Suspended Accounts

Hello, I am from Argentina and I invited my office colleagues to create accounts in Celsius since now everyone had bitcoin, but all the accounts were suspended and they had made a valid Kyc. I guess it was because I referred them or because we did it from the workplace, I didn't know I couldn't create the accounts for them. Could you give an address for the BTC to be returned? several of them if they used the wallet and in fact they have loaded funds greater than those of the promotion, I sent several emails and did not get a response

↑ 11 ↓        💬 23        ↑ Share        🎁

Exhibit E3:



 d3vilsim · 1y

Welcome to Celsius network. One of the member here account get locked for 7 months if I remember correctly and my case 20 days and counting.

··· ↩ Reply   ↑ 4    ⌄

Exhibit E4:



## How will we be notified if one of our users is banned by Celsius?

1 year ago · Updated

[ Follow ]

We will not ban your users without notifying you. We will contact you by using your preferred contact method that you defined when you created your account with us.

AA  🔒 support.celsius.network  ↻

**30.** On top of the practice by Debtor on blocking User's accounts with hidden and preposterous rules that are unknown to Users, locking their funds for months with no obligations to fulfill contract agreement, their KYC came into a bigger question.

Identification documents were all submitted for me and my family's accounts.

Refer to Exhibit F1, F2, F3 and F4 for the email received regarding completed verification of identity regarding my father's, my mother's, my brother's and my accounts respectively.

Hence, all of my blocked accounts have passed their verification process and it was not an intention to create fake accounts to cheat Debtor.

**31.In connection with point 25 that my multiple accounts have passed KYC, all my family's accounts have also been created by my same device from the start of the registration process.**

If the administration to block Users from the same device, as per section 5A of Terms of Use, was for the reason to stop Users from abusing their promo code/ referral system, **why would Debtor allow me pass the registration process and identification submission process for me and my family, all via my same device from the onset of account opening?**

If Debtor was blocking Users out of concern for abuse, they should have blocked my device from registering for my family's accounts, since **from Debtor's perspective, it was already recognized as my own device.**

**If Debtor was concerned about Users' abuse, then there should have been a process in place, or an error message, stating that the registration for my family's accounts cannot go through: Device blocked due to registered device from an existing User.**

**Instead, it almost was a predatory trap, that while Users like me did not know about this "hidden interpretation" of section 5A of Terms of Use, Debtor allowed account registration to all go through my same device, and after the funds have been transferred to these accounts, Debtor used the ambiguous section 5A of Terms of Use, to block Users and lock their funds in Debtor's platform, without any legal consequences.**

**To say the least, it was an intentional loophole, or even a tactic deployed by Debtor, that Debtor gets to hold hostage of User's funds without paying any financing fees to obtain the funds in the first place, by blocking their accounts and using the funds to their own advantage while all blocked account Users can do is to hope that Debtor would return the blocked account funds back to them after some unknown period of time, which could take months or almost a year.**

Exhibit F1:



Exhibit F2:



Exhibit F3:



Exhibit F4:



32. I would like to **question the Deputy Chief Compliance Officer and Data Protection Officer of Debtor, Charles Robert, that while my accounts were blocked due to the reason of multiple accounts, it seems that selective enforcement has applied.**

It appears that certain Users who are closely related to Debtor, were able to have multiple accounts and were likely remain active.

Exhibit G1, G2, G3 attached below are extracted from court docket 974. It was found by other Earn Users that Otis Allen Davis (Otis Davis) and Zachary Allan Wildes (Zachary Wildes) have multiple accounts. Both of them are known to be closely tied to Debtor's management team. Zachary co-hosts weekly AMAs with Alex Maschinsky, CEO of Debtor before Ch11 and Otis is a high-profile marketing person for Debtor.

There is no way from us to verify if all these accounts under Zachary in Exhibit H2 and H3 belong to the same person but other creditors have raised suspicion, while Otis has spoken publicly about his multiple accounts to get around regulations.

Exhibit G1:

| SCHEDULE F LINE | CREDITORS NAME | ADDRESS | INDICATE IF CLAIM IS CONTINGENT, UNLIQUIDATED, DISPUTED | IS THE CLAIM SUBJECT TO OFFSET (YES/NO) | EARN ACCOUNT | CUSTODY ACCOUNT | WITHHELD ACCOUNT | COLLATERAL ON LOAN RECEIVABLE |
|---|---|---|---|---|---|---|---|---|
| 3.1.438662 | OTIS ALLEN DAVIS | ADDRESS REDACTED | | Yes | 1INCH 5.0146425727577502 AVAX 0.08825704372419866 BCH 0.081400399156380999 BTC 0.000000841164308019 CEL 243440.338759965 DASH 0.006415696038898957 ETH 0.058056700519212 1 GUSD 70.769545823411 LINK 98.403694028668 LTC 0.023700351467437 LUNC 174.378264860 5 7 MATIC 5387 18.113016934 OMG 0.58269803322 1 5 8 1 PAXG 0.000704509977830843 SGB 0.5904547480661 5NX 1.58156045561818 UNI 0.015586242788667 USDT ERC20 7.7624407825801 5 UST 265.24041669044 XRP 3.87732323724227 | AVAX 0.056041266616634389 BTC 0.00000 89947645447 66 CEL 54716.411148433 6 ETH 0.000538290292573571 LINK 0.00007000527501424 MATIC 0.005665484090788 5 8 USDC 154.93532940934 | | BTC 16.80127618787618 |
| 3.1.438663 | OTIS ANTHONY HARDING III | ADDRESS REDACTED | | | ADA 0.002342353450252 ETH 0.000225499542367371 SOL 0.001851422309843 05 USDC 1.45746768456466 | BTC 0.00129516901955705 ETH 0.000065743441871 1 5 SOL 0.000023796867380 7 1 USDC 0.000007086030937856 XLM 0.0267623 | | |
| 3.1.438664 | OTIS CLARK | ADDRESS REDACTED | | | USDC 509.6884549 1266 | BTC 0.00137088799932377 | | |
| 3.1.438665 | OTIS CLINTON ROGER ODEHLER V | ADDRESS REDACTED | | | BCH 0.00005267723176052 6 BSV 0.005560528 27737005 BTC 0.00047384881 734225 DOT 2.4791 396812379 5 ETC 0.256387258967312 LTC 0.01070712978613 95 MATIC 7.14637494468212 SNX 2.34190959352705 | LTC 0.00113411 | | |
| 3.1.438666 | OTIS DAVIS | ADDRESS REDACTED | | | BTC 0.006915315 763203 3 CEL 134990.29278037 ETH 0.102503180680072 MATIC 20684038340937 14 PAXG 0.109865498 162099 | | | |

Exhibit G2:

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 3.1.597141 | ZACHARY ALLAN WILDES | ADDRESS REDACTED | | Yes | BTC 0.423725804354342 CEL 111606.41074659 5 DASH 0.000057097532 7109 LINK 0.0014234020776685 LTC 0.000054550385563674 LUNC 1200000 MATIC 90014.267782569 7 MCDAI 73.5485104089783 UNI 0.00018024872541393 79 | USDC 0.07773750116743707 | | BTC 4.705885170660626 ETH 50.0122523625879 |

Exhibit G3:

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | XLM 0.0606908741433971 | | | |
| 3.1.598004 | ZACHARY WILDES | ADDRESS REDACTED | | | CEL 1.051701302542 14 | | | |
| 3.1.598005 | ZACHARY WILDES | ADDRESS REDACTED | | | BTC 0.000603447751371997 CEL 4.99447703812374 ETH 0.00001429847090013954 USDC 0.06373075021745 24 | | | |
| 3.1.598006 | ZACHARY WILDES | ADDRESS REDACTED | | | BTC 0.00053444538451836 | | | |
| 3.1.598007 | ZACHARY WILDES | ADDRESS REDACTED | | | BTC 0.000000975960543 | | | |
| 3.1.598008 | ZACHARY WILDES | ADDRESS REDACTED | | | | | | |

Exhibit G4 is a transcript of recording where Otis has talked publicly about his multiple accounts.

Exhibit G4:

[TRANSCRIPT OF OTIS DAVIS ADMITTING TO MULTI-ACCOUNTING]


<<Mike Burgersburg: The fact he pushed people to buy CEL a little bit, obviously it wasn't a good choice for a lot of people given the company collapsed and I always thought the token was fundamentally fraudulent. So I was suspicious of his motives in that that sense. But other than that I thought he was an honest guy when I saw that people were showing evidence that was pretty consistent with someone like him having withdrawn a bunch of assets from the platform, I was concerned and I did the research and I found it on the blockchain. And that did happen.


Now, subsequently, what I found is that he did withdraw those tokens from the platform but then sent them through FTX and then deposited them under a slightly different name. Now I have no idea why he did any of that. And if you read my post I never made any allegation that he sold anything. If other people drew that conclusion, and they did, I can't control what people do with the work that I put out.


That was not my intention.


Jason Amerson: You are making-


The Celturian: One second, Jamers. I would like to point out that nobody has pushed anyone to buy CEL token. But we've outlined many, many times, if you'd want to get into it, this is a gamble. It's like you're playing blackjack. Never put anything that you're willing to lose. We weren't asking people to dump in tens of thousands of dollars.


It's like skip a coffee this week. And it was up to the individual if they would like to participate in the CEL short squeeze or not.


Now Otis would like to report on what you just said, would you like to outline what you explained at the start of the Space, Otis, on the actual situation of what happened?


**Otis Davis: With respect to going from my Celsius US Account? Jamaica account?**

The Celturian: Yeah.

**Otis Davis: Sure, I'll repeat it. US was having a lot of regulatory problems. I'm from Jamaica. I spent my first decade of life there, grew up there, was born there. So I'm also a Jamaican citizen.**

**So when the US was starting to misbehave, New Jersey, Texas, Alabama, Tenneseee, I said, I'm just going to open up my Jamaica account.  Screw this, because Jamaica has no restrictions. How do I know this?  Because I onboarded quite a few people from Jamaica, including family members.**

So during that week I was doing a lot of transfers. You'll also see a transfer of 600,000 one time. Interesting nobody questioned that. **It went from my Celsius US account to FTX and then back from FTX to my Celsius Jamaica account.**  And that's where all those CEL tokens sit today. That's where they sit.

So on the evening of the Pause which was on a Sunday June 12th, around nine o'clock or so, I think around 9:30, 9:45, somewhere around there, I started a transfer from my Celsius US account, it went to FTX. And then I sent it from FTX immediately to my Celsius Jamaica account.

And, as I said, the reason I was doing that was the US was just getting out of hand with all these stupid restrictions on loans and this and that.  And it was getting crazy. Especially after sometime in April when they instituted this Custody stuff where you have to go from Earn now to Custody then to withdraw. It's just a whole bunch of steps. It was getting out of control And that's what happened.

And that's what happened. Incidentally, the transaction came in around 9:50PM Eastern time and I think the pause was around 10 o'clock. As soon as I saw the Pause I was like, "Fuck, why didn't I leave this $235,000 on FTX?  Why am I so quick to do things?"

And that's how my Sunday went.  That's how my Pause went. I'm sure everyone remembers where they were on the date of the pause. So that's where I was and that's how my Sunday went. Especially my Sunday night.

*33.* In connection with point 19, which discussed the intention of Point 15 of Kirkland's Supplemental Objection, to state that, "*If the Court grants the Motion, a necessary but absurd conclusion would follow: that anyone who violated the Terms of Use and the Promo Terms and whose accounts were suspended could receive title to cryptocurrency in their accounts while everyone else must wait.*".

Throughout point 20, 21, which explained the reason of having multiple accounts was not to abuse Debtor's promo code system, but a result of Debtor's confusing system; in point 22 to 25, the contradictory policies and vacuum period Debtor's own business practice created, in point 26 to 29, the ambiguous, hidden and absurd rules that accounts were blocked based on, in point 30 to 31, the ineffective or intentionally loose KYC procedure, and lastly in point 32, the selective enforcement among Users.

If Kirkland were to say that **"granting my motion is absurd because I violated the Terms of Use",** then following this logic, **not granting my motion will in fact having a more long-lasting detrimental impact to the US justice system, that it will set a highly unsettling precedent case, that other financial companies could adopt all these kinds of predatory, malicious business practices and apply hidden ambiguous rules against their Users, without any legal consequences.** As well as to **encourage and recognize the unfair, selective, double standard business practice and rules like what Debtor did.**

**If it was to say that blocked accounts do not deserve to get back their funds because they violated the Terms of Use, having all Rewards and Bonuses taken away and having our funds locked in the account for months that we do not have access to, have already served the punishment we deserved for violating Debtor's rules. Debtor has the rights to not provide us with Rewards, however, they have no rights to keep our funds that is not theirs as a punishment for us. They do not have the rights to have used our blocked account funds for months to their own advantage either.**

Regarding Terms of Use presented and discussed in point 7 to 27, Debtor did not provide the service as they promised and as stated in my original motion, we were not valid customers of Debtor nor de facto Earn Users.

**Point 15 of of Kirkland's Supplemental Objection, served to be merely an attempt to shift the focus that in their eyes, Terms of Use has been violated, therefore, they did not have to honour their own Terms of Use to fulfill their obligation to return blocked account assets.**

As stated in point 19, Point 15 of Kirkland's Supplemental Objection has been proved to be counterproductive.

34. Lastly, I would like to include a letter written by a general Earn User, Jarno Oberg, in support of my blocked account case. I have not offered him any interest to do so and he does not have a "suspended" account. He did it out of the belief that it is the right thing to do, even doing so has costed him time with no extra benefit to his interest as unsecured creditor. Attached Exhibit H.

I am in fact very thankful to the kindness offered by other Earn Users, especially after this case that has ruined trust to people. We are all victims from this case and no one deserves to be hurt by case like this.

This also shows that Kirkland's attempt to drive hostile emotions from general Earn Users to blocked account Users, was a failed attempt and has backfired.

Respectfully submitted,<br>Kwok Mei Po

11/15/2022

Exhibit H1:

Jarno Öberg

*Pro se creditor*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Celsius Network LLC, et al., | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors | ) | (Jointly Administered) |
| | ) | |

## LETTER TO JUDGE GLENN IN SUPPORT OF CREDITORS WHO HAVE ASSETS IN SUSPENDED EARN ACCOUNTS

Your honor,

I am not a legal professional, and I am not stating the following as advice to anyone. But it stands to reason and the sense of justice to make the following observations:

1. As a long-time Celsius customer I submit, that it is known among Celsius users, and acknowledged by Celsius itself, that they have had a very confusing promotion system. (See Appendix 1 below.) The promotion has, among other things, incentivized enthusiastic depositors to add also their family members to the platform. Celsius has incentivized this by offering "promo codes" that have been a constant source of issues and logical problems. There are likely to be many depositors who have have stumbled with promo codes while creating their own accounts, and while helping their family join the platform, e.g. attempting to make their advertized promo code work by restarting the signup process multiple times. I question the evidence, that such people have intended to actually misuse the system, or have upon the concept of their own activity actually misused the system in their imprudence. (Of this is mere suspicion.) As far as I know, they have not benefited in any way from that

Exhibit H2:

activity, as promotional payments have not to my knowledge been paid out to any of these depositors.

2. In Celsius's terms of service, section 12, suspension of accounts means, that the assets connected to suspended accounts are not eligible to earn rewards. Considering the contract language in section 13, during account suspension, deposits that would be utilized in the earn service for available rewards are not eligible to earn them for the depositor. During suspension, such funds may remain in the earn service and presumably continue to earn rewards to which Celsius may according to section 13 claim unilateral rights. But from there merely being unilateral rights to compensation for Celsius it obviously does not follow, that unilateral rights of ownership to the underlying assets are given to Celsius. There is no conditioning language in the contract, that would confirm otherwise.

3. Instead, according to sections 4(D) and 13, the contract says that when all rights are granted to Celsius, the depositor will find himself in the situation where *he, by his elective action, is utilizing his funds to get payable rewards*. Because of the express way section 13 goes into defining this, it conditions the granting of rights and title as an issue of the depositor's agency. By this token it appears, that merely Celsius's agency as the other active participant in the earn contract, indicated in section 4(D), does not imply the granting of title and the unilateral ownership rights to Celsius. Similarly, it appears that merely being a customer of Celsius with funds in the earn service is not a sufficient condition for the granting of rights and title to Celsius.

4. In sections 4(D) and 13, the agency of the depositor concerns both his elective agency and him actively utilizing his assets. Concerning the utilization, the conditioning appears to be, that the rights and title are granted to Celsius if the depositor finds himself actively utilizing their funds towards rewards that are payable to them. If the depositor or his funds are not eligible to this activity, there is no such activity, and therefore no granting of rights and title to Celsius. When accounts are suspended, the depositor's agency is suspended with regard to this activity. And, from the foregoing it is then reasonable to conclude, that during account suspension, the rights and title are not being granted and transferred to Celsius by the depositors.

5. Concerning elective activity, if suspended depositors can't access their accounts, there is prima facie no standard way for the depositor to express and indicate elective activity to Celsius. As a question of prudence of the user, the situation is very problematic when one acknowledges, that Celsius was at the time a high-risk company with meaningful company interest to keep user deposits on the platform. So it may still follow, that concerning elective

2

Exhibit H3:

activity before the withdrawal freeze, regarding the practical situation where the people were actually in, the title transferring clause is not present either.

6. If the depositor's elective activity and active utilization are both necessary conditions for granting rights and title, because the depositor's active utilization of the platform is absent when the accounts are suspended, these accounts are not in a situation, where they grant rights and title to Celsius. It then also appears that this was also the situation of those accounts before the withdrawal freeze. And then it would seem that, if they belong to the bankruptcy at all, suspended earn accounts are probably not similarly situated than other earn accounts are. There is expected to be a very small number of such accounts, so any resolution where this reading of the letter of the terms of service is verified would not appear to disturb the bankruptcy. Furthermore, in any situation where the terms of service are ambiguous in their implications, it is because of the imprudence of Celsius, not the depositor, so the depositor should not be harmed if that is the case.

7. The foregoing appears to be an actual issue in the contract, and it makes the case of the suspended account holders understandable and justified. They have been incentivized by Celsius with promo codes to stumble into to the frying pan of account suspension because of the complicated promo codes themselves of which Celsius is responsible. In this situation the interest to the proceeds of their funds in the earn contract is unilaterally claimed from them by Celsius. And then, because of exactitudes of the contract that appears to contain an ambiguity in its entailments, the title and ownership rights are taken from them as well, and they are deemed to have become dispossessed of their funds. It is hardly surprising, that there are people who may view the situation as difficult and unjustified.

**Signature**

November 14, 2022                                    /s/ *Jarno Öberg*

Jarno Öberg, pro se creditor

(*The remainder of this page intentionally left blank.*)

Exhibit H4:

**APPENDIX 1**

1. The following is a webpage accessed on November 14, 2022 at
   https://celsiusnetwork.medium.com/lets-talk-promo-codes-b27c5d2f4cf8. The article
   attempts to mitigate user issues and concerns:



## Let's Talk Promo Codes.

Celsians, we understand there's been some confusion. We're here to
clear things up.



**Let's start with the basics. What types of codes are there?**

- Referral Codes: *Referral codes* have the main purpose of bringing new
  people in to join Celsius. Any new users can activate your referral code **at
  the time of signup** to create their account. Once that's done, as soon as
  they transfer at least $400 to their Celsius account, you will both receive
  $50 in BTC. (Notes: you must enter the actual referral code in the text box,
  even if a referral link was used. CelPay transfers do not activate promo
  codes.)

- First Transfer: Only users who have **never** transferred coins are eligible to
  activate *first transfer promo codes*. Please note: You can only activate one
  *first transfer promo code* per account. Since first transfer codes are designed
  for new users, you can either use a *first transfer promo code* **or** a *referral code*
  while signing up, **you can't use both**.

- General Transfer: New and existing users can transfer any kind of
  cryptocurrency, stablecoin, or gold token to meet the *general transfer*
  promo code conditions. Multiple coins can also be used to fulfill the
  required transfer amount. (Notes: This amount must equal the required
  USD $ value. The amount is recorded at the time of the addition to the
  app.)

4

## Exhibit H5:

- Coin-Specific Transfer: New and existing users can transfer a specific coin or coins to meet the *coin-specific transfer* promo code requirements. Eligible coins will be clearly stated in the promo code. Some promo codes may not be available to users in some jurisdictions if the coin is not supported by Celsius or where other limitations and regulations may apply. (Notes: Do not enter these codes if you're unable to add the coins. Celsius is unable to terminate the code and will have to allow it to naturally expire over time. This could prevent any additional promo codes from activating if entered after.)

*"Celsius' services, and any products or services mentioned, may not be available in all jurisdictions.*
*"Subject to Celsius' General Promo Terms & Conditions*

**How To: Activate a promo code**
1. Open the Celsius app
2. From mobile app, tap the 'profile' then 'promo codes'. From the web app, click 'promotions' from the dashboard.
4. Enter in *[ CODE ]* (promo will show as "pending")
5. Type your promo code and click "Confirm"
*(Your promo code will show as "Pending" until you have transferred in enough funds to "Lock" the promo code")*
Congrats! You have successfully activated your promo code. 😎



So let's say Celsius dropped three FIRE new Avalanche promo codes and I wanted to use all of them... assuming I read the T&Cs and the promo code was available in my jurisdiction where Avalanche is supported by Celsius or where other limitations and regulations may not apply.

**How to: Use multiple Coin-Specific Transfer promo codes (AVAX — edition)**

*Note that these rules also apply to *General Transfer* promo codes*

1. Find the "Promo Code" button in your app
2. Enter in "AVAX20" (promo will show as "pending")
3. Enter in "AVAX150" (promo will show as "pending")
4. Enter in "AVAX600" (promo will show as "pending")
5. Transfer or buy $25,550+ AVAX (all three promos will show as "locked")
6. Do not transfer AVAX from your app for: 90 days for AVAX20/AVAX150 and 180 days for AVAX 600
7. Once the respective holding period is finished, all promo codes will show as "claimed" and AVAX will be rewarded to your account.

TIP: You can use all three different "AVAX" promo codes, but you cannot use the same promo code more than once.

TIP: If you're planning on using multiple promo codes at once, the order of activation matters. Best practice is to enter the promo code with the lowest amount required first.

Head to the Celsius App to take advantage of these promo codes!

* The company reserves the right to cancel this Promotion at any time

* Funds must be transferred within 30 days of activating your promo code. You must maintain an account balance, equal to or greater than your balance after completing your transfer. Transferring assets out of your account within 90/180 days of completing your transfer will disqualify you from receiving your reward. Rewards are distributed after 90/180 days of maintaining a qualifying account balance. This promo code is valid for new and existing users. This promo is limited — One-time use per promo code per customer. Customers cannot swap out of AVAX during promo lock-up period. The company reserves the right to cancel this promotion at any time. T&C's apply: celsius.network/promotion-rules.

## Exhibit H6:

Commonly asked questions.

Q. Where can I find official, active promo codes?

A. On our website at celsius.network/download-app

Q. What are the four promo code statuses?

A.

- **Pending**: promo code has been entered and is waiting for the required coin amount
- **Locked**: you have transferred the required amount of coins needed
- **Claimed**: you have transferred the required amount of coins needed AND successfully waited for the lock period to end (usually 30, 60, or 90 days). Bonus amount will be rewarded to your account.
- **Canceled**: the promo code is no longer valid. This could mean you transferred the coins out of the app too early, or you did not transfer enough coins.

Q. Can I use the same promo code more than once?
A. No! You **cannot** use the same promo code twice (or three times, or four times, you get the gist)

Q. Can I transfer existing coins out, then back in, to lock a promo code?
A. No! You must add **new** coins to activate codes. Existing coins in the app will not trigger promo codes. You cannot transfer your coins out, enter a code, then add that back in to activate the code. This is not considered new coins and can be viewed as abusing the promo code system (which can result in account suspension). Don't do this.

Q. How long do I need to hold my coins?
A. You must hold the coins for the required minimum holding period stated in the T&Cs.

Q. How are promo codes honored?
A. Promo codes are honored "First in, First out". Meaning all coins transferred into Celsius will be honored for the first promo code you entered and is labeled as "Pending". You must fill these codes in the order in which they were activated. (Notes: if you activate a Coin-Specific Transfer promo code for Bitcoin, then activate a *general transfer* promo code, you will need to meet the terms for the **first** activated code by transferring the required amount of Bitcoin, then fulfill the requirements for the second promo code by transferring the required amount in any coin. A single transfer will not qualify and lock both codes)

Q. I used a *referral code*, but want to use a *first transfer* promo code. What can I do?
A. If you used a *referral code* at sign-up, you will be unable to use a *first transfer promo code*. We cannot delete the referral code and activate a *first transfer promo code*. Don't worry, you can still transfer $400+ so you and your referral both get $50 in BTC. (Creating a new account to circumvent this will be viewed as abusing the system, which can result in account suspension.)

Q. Can I use any/every coin-specific promo code that comes out?
A. No! Some promo codes may not be available to users in some jurisdictions if the coin is not supported by Celsius or where other limitations and regulations may apply. If you cannot see the coin supported in your app, do not activate the *coin-specific promo code*.

Q. Will the Celsius Swap feature potentially have an effect on promo code locking or canceling? (Assuming I have access to Swap, and Swap is available in my jurisdiction)
A. You cannot swap the asset required to lock the promo code. This will cancel the promotion.

Q. Will taking a loan affect my promo codes?
A. Loans should not affect promo codes if you remove **only** the loan amount. If this does terminate a code, please email loans@celsius.network and they will resolve matters.

## Exhibit H7:

**Some other (not-so-fun) fun facts.**

- All the required amounts shown in the T&Cs are in USD value **not** the number of coins
- You can either transfer coins into the app or purchase new coins in the app to activate a promo code
- A promo code has to be entered and "pending" in the app, before coins can be added
- We cannot back-date promo codes
- You must enter the promo code first, **then** add the required coins. It will not work in reverse order
- Promo codes can not be canceled, once entered into the app. You will need to wait until the end of the lock period for the promo code to show as "expired"
- Once the code is shown as "**locked**", the value of the coins does not matter. As long as you hold for the required period of time and **do not** remove any coins from the app
- You can not use CelPay to send coins to someone else to activate their code. This can be viewed as abusing the promo code system (which can result in both parties being suspended)

  - Please allow for 24 hours after your promo code unlock date for rewards to become available. If this does not unlock after this period of time, please reach out to the care team via our website request form by selecting "Promo Code" under "App Feature". Our care team will be able to handle your request efficiently, please do not open multiple tickets
  - You must maintain an account balance of equal or greater of your total account at the time you added the coins to lock the code. The best practice is to not transfer any coins during this period of time (if possible)

**Last, but certainly not least. Do not forget to read the "Terms & Conditions" for each promo code.**

2. The following is a message on a Celsius Community channel on Telegram Messenger, where a Celsius employee addresses user questions about promo codes in advance of them:



## Exhibit H8:



