1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 22-10964-mg

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   CELSIUS NETWORK, LLC,

8            Debtor.

9   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10                 United States Bankruptcy Court

11                 One Bowling Green

12                 New York, NY  10004

13

14                 November 15, 2022

15                 2:00 P.M.

16

17

18

19

20

21   B E F O R E :

22   HON MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  JONATHAN

1    HEARING Using Zoom for Government RE: Debtor's Motion for

2    Entry of an Order (I) Setting Bar Dates for Submitting

3    Proofs of Claim, (II) Approving Procedures for Submitting

4    Proofs of Claim, (III) Approving Notice Thereof, and (IV)

5    Granting Related Relief. (Doc# 1019, 1184, 1331 to 1333,

6    1339, 1351)

7

8    Hearing Using Zoom for Government RE: Motion to Amend /

9    Series B Preferred Holders Motion Pursuant to Bankruptcy

10   Rule 1009 for Entry of an Order Directing The Debtors to

11   Amend Their Schedules. (Doc# 1183, 1303, 1304, 1333, 1334,

12   1342, 1351)

13

14   Hearing Using Zoom for Government RE: Approving Sale of

15   Certain of the Debtors Assets. (Doc## 687, 715, 727, 748,

16   876, 878, 910, 956, 188, 192, 357, 409, 430, 445, 626, 1060,

17   1299)

18   Adjourned Reset for 12/05/2022 at 2:00 pm

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

1   A P P E A R A N C E S :

2

3   MCCARTER ENGLISH, LLP

4        Attorneys for Certain Borrowers

5        245 Park Avenue

6        New York, NY 10167

7

8   BY:  DAVID J. ADLER

9

10   UNITED STATES DEPARTMENT OF JUSTICE

11        Attorneys for U.S. Trustee

12        201 Varick Street, Suite 1006, 10th Floor

13        New York, NY 10014

14

15   BY:  MARK BRUH

16        SHARA CORNELL

17        BRIAN MASUMOTO

18

19

20

21

22

23

24

25

```
 1    WHITE & CASE LLP

 2         Attorneys for the Official Committee of Unsecured

 3         Creditors

 4         555 South Flower Street, Suite 2700

 5         Los Angeles, CA 90071

 6

 7    BY:  AARON COLODNY

 8         GREGORY F. PESCE

 9         DAVID TURETSKY

10

11    TOGUT SEGAL SEGAL, LLP

12         Attorneys for Ad Hoc Group of Custodial Account Holders

13         One Penn Plaza, Suite 3335

14         New York, NY 10119

15

16    BY:  BRYAN KOTLIAR

17

18    TROUTMAN PEPPER HAMILTON SANDERS, LLP

19         Attorneys for Ad Hoc Group of Withhold Account Holders

20         4000 Town Center, Suite 1800

21         Southfield, MI 48075

22

23    BY:  DEBORAH KOVSKY-APAP

24

25
```

1    KIRKLAND & ELLIS LLP

2         Attorneys for Debtor

3         300 North Salle

4         Chicago, IL 60654

5

6    BY:  ROSS M. KWASTENIET

7

8    JENNER BLOCK

9         Attorneys for the Examiner

10        353 N. Clark Street

11        Chicago, IL 60654

12

13   BY:  VINCENT LAZAR

14        SHOBA PILLAY

15

16   MILBANK

17        Attorney for The Series B Shareholders

18        1850 K St NW

19        Washington, DC 20006

20

21   BY:  ANDREW LEBLANC

22        DENNIS DUNN

23

24

25

Page 6

1    JONES DAY

2         Attorneys for CDP Investissements, Inc.

3         555 S Flower Street, 50th FL

4         Los Angeles, CA 90071

5

6    BY:  JOSHUA MESTER

7

8    VERMONT ATTORNEY GENERAL'S OFFICE

9         Attorney for VT Department of Financial Regulation

10        89 Main Street, Third Floor

11        Montpelier, VT 05620

12

13   BY:  JENNIFER ROOD

14

15   ALSO APPEARING TELEPHONICALLY:

16

17   ARIE PELED

18   CHRISTOPHER FERRARO

19   IMMANUEL HERRMANN, Pro Se Creditor

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              CLERK:  All right.  Good afternoon.  Starting the

3       recording for November 15th, 2022, at 2 p.m.  Calling

4       Celsius Network, LLC, Case Number 22-10964.  All right.  Is

5       counsel for -- I'm admitting counsel for Kirkland.  Is

6       anyone there for Kirkland that's going to be speaking on the

7       record this afternoon or if you could unmute in the

8       conference rooms and just tell me who will be speaking on

9       the record and from where?

10             MR. KWASTENIET:  Hi, it's Ross Kwasteniet from

11      Kirkland.  Can you hear me?

12             CLERK:  Yes, I can, Ross.  Thank you.

13             MR. KWASTENIET:  It is my -- is the video coming

14      through?

15             CLERK:  Yes.  Very clear.

16             MR. KWASTENIET:  Okay.  I think, I think it's just

17      going to be me today from Kirkland.  We may have another

18      conference room or two that dial in or that patch in but --

19             WOMAN 1:  312862 number.

20             MR. KWASTENIET:  There's a 312862 number that you

21      may also see but I think they will be in listen-only mode.

22      So I think it's just, just me, just this feed, this room for

23      today's hearing.

24             CLERK:  Okay.  So you said 312862; is that

25      correct?

1          MR. KWASTENIET:  That's correct.

2          CLERK:  All right, great.  I'll look out for that

3    number.  Thank you for making the appearance.  And then is

4    Chris Koenig just joining to listen or?

5          MR. KWASTENIET:  Yeah.  You know he actually got

6    tied up in a in a mediation today, so if he does tie it,

7    it'll be listen only but we don't need a presenter line for

8    him.  The only other presenter line that we've requested is

9    for our CEO, Mr. Chris Ferraro.

10          CLERK:  Okay.  I don't see him yet, but I will

11    look out for him.

12          MR. KWASTENIET:  Yeah.  I asked, I asked him to

13    join by 1:30.  So I'll text him now.  He should be on in the

14    next, you know, 10 minutes or so.

15          CLERK:  Perfect, thank you so much, Ross.

16          MR. KWASTENIET:  Okay, yep.  Thank you.

17          (Pause)

18          CLERK:  All right.  For the parties that have

19    joined, is anyone going to be speaking on the record this

20    afternoon?  Again, for the parties that have joined, is

21    anyone going to be speaking on the record this afternoon?

22    Again, for the parties that have joined, is anyone going to

23    be speaking on the record this afternoon?  Andrew, will you

24    be speaking?  Andrew Rudolph?  I'm going to take that as a

25    no.  Again, is anyone that -- is there anyone that has

Page 9

1    joined that will be speaking on the record this afternoon

2    and has not given their appearance yet?  David Adler, are

3    you going to be speaking this afternoon?

4              MR. ADLER:  Hi, Deanna.  I may be, so it's David

5    Adler, on behalf of certain borrowers from McCarter and

6    English?  I'm traveling right now but I'll be in a

7    stationary location by 2 p.m.

8              CLERK:  Okay, thank you.  All right.  For the

9    parties that have joined, is there anyone that is going to

10   be speaking on the record this afternoon?

11             MR. COLODNY:  Hi, I don't know if you're taking

12   appearances but Aaron Colodny, White and Case on behalf of

13   the Official Committee of Unsecured Creditors.

14             CLERK:  Thank you, Aaron.

15             MR. COLODNY:  Thank you.  Yeah.

16             CLERK:  All right.  For the parties that have

17   joined, is anyone speaking on the record this afternoon that

18   has not given their appearance yet?  Again, for the parties

19   that have joined, is anyone speaking on the record that has

20   not given their appearance yet?  All right.  Again, is

21   anyone speaking on the record this afternoon that has not

22   given their appearance yet?  All right, please stop the

23   recording for now.  Deb Kovsky, are you speaking this

24   afternoon?

25             MS. KOVSKY:  I don't anticipate doing that, no.

1           CLERK:  Okay, thank you.  And then my apologies if

2    I mispronounce the name, Arie Peled, are you going to be

3    speaking this afternoon?

4           MR. PELED:  Good afternoon.  Not unless called

5    upon.

6           CLERK:  Okay, thank you.  And you and you're from

7    Venable, correct?

8           MR. PELED:  That's correct.

9           CLERK:  All right, pause the recording please.

10          (Pause)

11          CLERK:  All right.  So Brian Masumoto, are you

12    going to be speaking this afternoon?

13          MR. MASUMOTO:  No, I don't plan to.  This is Brian

14    Masumoto from the U.S. Trustee's Office.

15          CLERK:  Okay.  Shara, are you going to be

16    speaking?

17          MS. CORNELL:  Possibly, yes.  Shara Cornell on

18    behalf of the Office of the United States Trustee.

19          CLERK:  Thank you.  Is Mark Bruh going to be

20    joining as well?

21          MS. CORNELL:  If he does, he'll be joining us a

22    little bit late this afternoon.  Here's a conflict.  I'm

23    sorry.

24          CLERK:  No, that that's fine.  I just want to know

25    who's speaking and who's listening.  Thank you.

1              MS. CORNELL:  You're welcome.

2              MR. KWASTENIET:  Hi, Deanna, i's Ross Kwasteniet

3      again from Kirkland.

4              CLERK:  yes.

5              MR. KWASTENIET:  I'm informed that our CEO, Mr.

6      Ferraro has patched in.

7              CLERK:  Yes, he's joining now.  Yes.  Good

8      afternoon, Mr. Ferraro, just unmute and give your appearance

9      for the record please.

10             MR. FERRARO:  Hi, Christopher Ferraro, acting CEO,

11     CFO, and Chief Restructuring Officer at Celsius.

12             CLERK:  Thank you.  Andrew Leblanc, are you

13     speaking this afternoon?  Andrew Leblanc, I don't know if

14     you can hear me.  Can you let me know who from Milbank is

15     going to be speaking this afternoon?  If anyone?

16             MR. LEBLANC:  Yes.  Hi, sorry.  Andrew Leblanc at

17     Milbank.  It will be me.

18             CLERK:  Okay, thank you.

19             MR. LEBLANC:  Thank you.

20             CLERK:  And everyone else, and the other parties

21     are just listening only; is that correct?  I could tell you

22     who I have on the list for a speaking line, if you want.

23     Okay, Mr. Lazar, can you unmute and give your appearance,

24     please?

25             MR. LAZAR:  Yes, Vincent Lazar on behalf of the

Page 12

1    examiner.

2              CLERK:  Thank you.  All right, please pause the

3    recording again.

4              (Pause)

5              CLERK:  All right.  Sorry, Mr. Herman, can you

6    give your appearance again?

7              MR. HERRMANN:  Sure.  Immanuel Herrmann pro se

8    creditor.  I might speak.

9              CLERK:  All right, thanks.  All right, for the

10   parties that have joined, if anyone is going to be speaking

11   on the record this afternoon and has not given their

12   appearance yet, please unmute one at a time and give your

13   appearance.

14             MS. ROOD:  Jennifer Rood from our Department of

15   Financial Regulation.  I probably will not speak, but just

16   in case.

17             CLERK:  Thank you, Jennifer.  All right, Josh

18   Mester, are you going to be speaking this afternoon?

19             MR. MESTER:  I may not speak but I'd like to make

20   the appearance, please.

21             CLERK:  Please do.

22             MR. MESTER:  Josh Mester of Jones Day on behalf of

23   CDP Investissements, Inc.

24             CLERK:  Thank you.  Is anyone else from Jones Day

25   going to be speaking this afternoon potentially besides

1    yourself?

2              MR. MESTER:  No, no one else.

3              CLERK:  Okay, just confirming.  Thank you.

4              MR. MESTER:  Thank you.

5              CLERK:  All right.  I know Mr. Leblanc joined, but

6    is there anyone else from Milbank on behalf of the Series B

7    Preferred Shareholders that is going to be speaking this

8    afternoon?

9              MR. LEBLANC:  No, I expect it will only be me.

10   Mr. Dennis Dunn from Milbank may also join, but I don't

11   anticipate he would have to speak.

12             CLERK:  Thank you, Mr. Leblanc.

13             MR. LEBLANC:  Thanks, Deanna.

14             CLERK:  All right, Joel Anthony, are you speaking

15   on the record this afternoon?  All right, I'm going to take

16   that as a no.  All right, please pause the recording again.

17             (Pause)

18             CLERK:  Please give your appearance again.

19             MR. PESCE:  Thank you.  Hi, it's Gregory Pesce,

20   White and Case on behalf of the Official Creditors

21   Committee.

22             CLERK:  Thank you.  And Mr. Turetsky.

23             MR. TURETSKY:  Hi, it's David Turetsky of White

24   and Case on behalf of the Committee.

25             CLERK:  Okay, is anyone else going to be speaking

1  this afternoon on behalf of White and Case?

2          MR. TURETSKY:  Has Aaron Colodny entered his

3  appearance yet?

4          MR. COLODNY:  I have, David.

5          MR. TURETSKY:  Okay.

6          CLERK:  Okay, thank you.  All right, for the

7  parties that have been admitted, if anyone is going to be

8  speaking on the record this afternoon that has not given

9  their appearance, please do so at this time.

10          Okay.  Again, for anyone that has joined, been

11  admitted to the afternoon's hearing, if you have not given

12  your appearance and are speaking on the record, please give

13  your appearance at this time.  All right, please pause the

14  recording.

15          (Pause)

16          CLERK:  Shoba, please unmute and give your

17  appearance, please.

18          MS. PILLAY:  Thank you.  Shoba Pillay from Jenner

19  Block.  I'm here as the examiner.  Thank you, Deanna.

20          CLERK:  Thank you.  You're welcome.  All right.

21  For the parties that have been admitted, if anyone is going

22  to be speaking this afternoon, please unmute your line and

23  give your appearance for the record if you have not already

24  done so.  All right please pause the recording again.

25          (Pause)

Page 15

```
 1              CLERK:  For the parties that have joined the

 2    hearing that have not given their appearance and are

 3    speaking on the record this afternoon, if you have not given

 4    your appearance yet, please unmute one at a time and give

 5    your appearance for the record.

 6              MR. KOTLIAR:  Hi, Deanna, this is Bryan Kotliar of

 7    Togut Segal and Segal on behalf of the Ad Hoc Group of

 8    Custodial Account Holders.  I don't expect to speak, but I

 9    may have to if something comes up.

10              CLERK:  Okay.  Thank you, Bryan.

11              MS. KOVSKY:  This is Deb Kovsky on behalf of the

12    Withhold Account Holders.  I also, as I said before, I'm not

13    anticipating having to speak unless called on or if I need

14    to answer something specific, so that Withhold Account

15    Holders.

16              CLERK:  Okay, thank you.  All right.  Judge, would

17    you -- it's almost two o'clock.  Can I state the

18    announcements or do you, would you like --

19              THE COURT:  Yes, please do.

20              CLERK:  All right.  If everyone could please pay

21    attention to the following.  All persons are strictly

22    prohibited from making any recording of court proceedings

23    whether by video, audio, screen chat or otherwise.

24    Violation of this prohibition may result in the imposition

25    of monetary and non-monetary sanctions.  The clerk of the
```

Page 16

1    court maintains an audio recording of all proceedings which

2    constitutes the official record.

3              Parties must state their name each time they speak

4    on the court record.  A party must join from the waiting

5    room with a full first and last name to be admitted from the

6    waiting room.  Parties that join with initials, a partial

7    name, a designation such as iPhone, et cetera, will not be

8    admitted.  Judge, would, would you like to begin?

9              THE COURT:  Yes, I would.  Thank you very much.

10   Good afternoon, everyone.  We're here in Celsius 22-10964.

11   We have three things on the agenda today.  There's the

12   Debtor's motion to set the bar date, I think it was ECF

13   1019, as to which there was an objection by the Preferred

14   Holders.  And there's also the Preferred Holders' motion to

15   amend schedules, ECF 1183.

16             The Court is advised of a resolution between the

17   Debtors and the Preferred Holders with respect to both of

18   those matters.  I want to take those up very quickly first.

19   Then additionally, we were going to have this afternoon an

20   update on the Debtor's business activities, I think, by Mr.

21   Ferraro.  So let's deal quickly with the bar date and motion

22   to amend the schedules.  Who's going to begin for the

23   Debtors?

24             MR. KWASTENIET:  Great, it's Ross Kwasteniet from

25   Kirkland and Ellis on behalf of the Debtors.  Can you see me

```
 1    and hear me okay, Your Honor?

 2              THE COURT:  I can.  Go ahead.

 3              MR. KWASTENIET:  Great, thank you, Your Honor.

 4    The first item on the agenda today is the Debtor's bar date

 5    motion.  We did get one -- I'm getting some background

 6    noise.  Is everybody else hearing that?  If not, I'll push

 7    through, but I don't want --

 8              THE COURT:  Okay.  Anybody -- everybody needs to

 9    mute their line except for the person who's addressing the

10    Court.  Go ahead, Mr. Kwasteniet.

11              MR. KWASTENIET:  Thank you very much, Your Honor.

12    That that seems to have taken care of it on my end.  So,

13    Your Honor, the first item on the Debtor's agenda today is

14    our motion to set a bar date.  It was filed at Docket Number

15    1019.  There was a limited objection filed by certain Series

16    B Preferred Holders, who I believe are represented on the

17    line here today, at Docket Number 1184.

18              And we worked with the parties, including the

19    Official Committee, Your Honor.  And we came up with a

20    revised form of order that I will represent resolves

21    everybody's objections, but they can speak for themselves

22    certainly, Your Honor.  And we filed that revised proposed

23    form of order at Docket Number 1339.  And the main change to

24    that order, Your Honor, is simply an affirmation, a

25    confirmation by the Debtors that to the extent Your Honor
```

Page 18

1   issues rulings in the case that impact the claims process,

2   whether the need to list claims in US dollars or to amend

3   the legal entities at which the Debtor's scheduled claims,

4   that we will promptly amend the schedules as necessary to

5   comply with Your Honor's order, whatever that may be.

6        Your Honor, I'd also represent that the resolution

7   of the bar date motion was also tied up with the resolution

8   of the credit -- the Shareholders' 1009 motion.  So they're

9   sort of part and parcel, Your Honor.

10        THE COURT:  Why don't you describe that?  I agree

11   that they clearly are.  They're clearly related and the

12   resolution would resolve both of those.  So go ahead and

13   describe that, if you would.

14        MR. KWASTENIET:  I'd be happy to, Your Honor.  The

15   resolution of the 1009 order just goes into a little bit

16   more detail, Your Honor, with respect to the potential

17   resolution in the future of the claims issue and what we're

18   calling the, you know, the form of currency or is it dollar

19   or crypto issue?  And we went into more detail in connection

20   with that order about how we would revise the schedules.  Of

21   course, any -- if we revise the schedules, that would give

22   affected creditors the opportunity, there would be a notice

23   to any creditor affected and an opportunity for them to then

24   file a proof of claim form, Your Honor.  But it really is

25   just a more detailed version of the resolution that I've

1    already described with respect to the bar date motion.

2              THE COURT:  And as I understand it, you'll include

3    a table that will show the dollar value of various forms of

4    crypto assets as of the petition date; is that correct?

5              MR. KWASTENIET:  That is correct, Your Honor.

6    We're in in the process of circulating and discussing the

7    Debtor's proposed form of table.  It won't surprise you that

8    it matters at what point in time you pick and on what, you

9    know, exchange you pick.  But the Debtors do have their own,

10   I don't call proprietary, but their own view of, you know,

11   how we track cryptocurrency pricing and we've submitted what

12   we think the table would be as of the effective date or as

13   of the petition date rather, Your Honor.  And assuming

14   agreement between the parties, and again, everybody's

15   reserving rights to, you know, later object as to what the

16   particular dollar amount is.  The table is not intended to

17   be binding and conclusive for all purposes, but rather

18   illustrative of the Debtor's view of the crypto pricing as

19   of the petition date.  And we're going to take the time to

20   answer any questions that the Series B Holders or the

21   Committee have in advance of us filing that schedule.

22              But again, from the Debtor's standpoint, Your

23   Honor, these, you know, one of the unique features of these

24   cases, of course, is the fact that customers deposited

25   cryptocurrency and we thought as a baseline for any

1    efficient claims process, it's important that we first get

2    agreement on -- and we've stated our views voluminously in

3    our schedules and statements -- as to what the

4    cryptocurrency coin-like counts were by creditor as of the

5    petition date.  And the idea with the form, Your Honor, is

6    that anybody can use that form to calculate the dollar value

7    of any particular crypto right?  It's, you know, it'll be

8    listed by coin type.  And then so for the individual

9    customer, they can look at what coins they had and how many

10   they had and then they can look at the table and do -- it's

11   a pretty simple, you know, multiplication exercise to come

12   up with what the dollar value would be.

13            THE COURT:  All right.  I'm quite happy with that

14   resolution.  First, everyone should understand this is going

15   to be without prejudice to any ultimate determination of

16   claim amount in U.S. dollars or otherwise, depending on what

17   -- obviously, that's an important issue.  It's premature for

18   the Court to get to that now.  And the fact that there may

19   have been fluctuations in the value of coins during the day

20   of the petition filing or on various exchanges is also going

21   to be without prejudice.  I view this as an important piece

22   of information for all parties in interest to be able to

23   use.

24            So it's not going to be binding on any

25   determination by the Court as to what the appropriate

Page 21

1    currency or let me take -- withdraw the term currency -- the

2    appropriate form in which claims should be allowed.  So let

3    me say that.

4            Mr. Leblanc, you have your hand raised.  Go ahead.

5            MR. LEBLANC:  Thank you, Your Honor.  Andrew

6    Leblanc of Milbank on behalf of the Series B Preferred

7    Holders.  Your Honor, I can, I can just confirm Mr.

8    Kwasteniet's discussion of the resolution of the two issues

9    and like you, we think this is an efficient solution to the

10   issue to make sure that everybody has available to it the

11   information to do the calculation to the extent that that

12   becomes a relevant question as we move forward in the cases.

13   And then obviously, it has the other elements of the

14   resolution, that if it does become relevant, the Debtors

15   will amend their schedules.

16           I would also add, Your Honor, another element of

17   the discussion that we had with the Debtors was the filing

18   of a procedures motion which was just filed yesterday.  It

19   is not for hearing today.  It will be considered at the

20   December 5th hearing.  But we negotiated a schedule with

21   them with respect to the issue that is tied up in the bar

22   date order.  The question of where claims sit and that

23   schedule will be considered.  But that was the third leg of

24   the stool of our discussions with the Debtors and resolving

25   these two open issues.  But as I said, Your Honor, we were

Page 22

1   satisfied with the resolution of these and we think this is

2   an efficient way to move forward with issues that are global

3   to these cases and ultimately will have to be resolved for

4   the company to get to a plan of reorganization and to

5   confirmation.

6           THE COURT:  Thank you, Mr. Leblanc.  I just want

7   to make one comment on schedule.  Mr. Pesce, I'll recognize

8   you in a moment.  The December 5th hearing already has a

9   very, very full agenda.  There are a number of motions, most

10  of which I think were filed by pro se creditors, but it

11  isn't because of that that I've moved them.  The Court is

12  very mindful of the importance of deciding matters in this

13  case and I've tried throughout to do that, to decide things

14  as promptly as possible.  So no one should think that

15  because some or all motions are moved to a different date --

16  I haven't seen your procedures motion yet, Mr. Leblanc.  I

17  don't guarantee that will actually be heard on December 5th.

18  I will look at the agenda as a whole.  I'm trying to see

19  whether I can schedule things in an orderly fashion.  There

20  are some, I don't want to necessarily call them gating

21  issues, but there are some issues that once resolved, I

22  think will point to the answers for other motions that may

23  ultimately be filed.  So I'm not suggesting one way or the

24  other that your procedures motion and schedule are going to

25  get moved, but it's a possibility.

1           Mr. Pesce, let me recognize you.

2           MR. LEBLANC:  Your Honor, I'm sorry.  Andrew

3    Leblanc again.  Just to be clear, just for your purposes,

4    Your Honor, it's actually the Debtors who filed the schedule

5    motion.

6           THE COURT:  Whoever filed it.  I just, I don't

7    guarantee anybody that things will be heard precisely when

8    they think it should be heard because I need to control the

9    agendas for each hearing, so that I can get through all of

10   those things.  But thank you very much, Mr. Leblanc.  Mr.

11   Pesce, do you want to be heard?

12          MR. PESCE:  Yes.  With respect to the bar day and

13   the 1009 motion, my colleague, Mr. Colodny, was going to

14   speak to those, but as to the briefing schedule, just

15   because we're getting a lot of inquiries from creditors.

16   You know we are not signed off on briefing that issue

17   outside of confirmation.  It's something we're looking at

18   and we want to move the case along quickly, and we're not

19   sure that motion would accomplish that.  So we want to just

20   put on the record that we don't agree with it.  We're

21   reviewing it.  We expect it will be a factor that we look

22   into it, the confirmation -- or the exclusivity hearing.

23   And, you know, we reserve rights on that for the time being

24   and I just want to put that on the record, Your Honor.

25          THE COURT:  All right.  Thank you very much.  All

1    right.  With everything that's been said so far, the two

2    motions, the bar date, motion and the motion to amend the

3    schedules are granted subject to the changes that have been

4    discussed.  I'm very satisfied with those resolutions of

5    those issues.

6         All right.  So the other thing that's on the

7    agenda for today that I do want to hear is the business

8    update and I believe Mr. Ferraro was going to give that.

9         MR. KWASTENIET:  Yes, Your Honor.  Again, Ross

10   Kwasteniet from Kirkland and Ellis for the record.  We

11   appreciate you making time in the calendar today for us to

12   give an update.  You requested it at our last hearing.  The

13   need for an update is perhaps, you know, all the greater

14   given the events of the past week and part of the update,

15   Your Honor, I propose to proceed in the form of a bit of a Q

16   and A where I'll maybe ask Mr. Ferraro some questions and he

17   can respond.  We also intend this, Your Honor, as an

18   opportunity to the extent Your Honor has questions, you

19   know, of Mr. Ferraro, please jump in.  But Mr. Ferraro is a

20   relatively new chief executive officer and we've been

21   working very, very closely with him.  Mr. Ferraro has also

22   been engaging directly with the Creditors Committee and the

23   examiner and other parties in the case, but it occurred to

24   us that he has not yet had an opportunity to present to Your

25   Honor.  And so without further ado unless Your Honor has

1   anything off the top, I would like to proceed with a brief

2   presentation from Mr. Ferraro.

3            THE COURT:  All right.  Let me say it the outset

4   it is not my intention that Mr. Ferraro be sworn and that he

5   be giving testimony today.  Because I don't plan to have

6   cross-examination.  Let me make that clear.

7            MR. KWASTENIET:  Thank you, Your Honor.

8            THE COURT:  I want to hear the business update.

9   I'll certainly, I'll let you start with some questions and

10  see how that's going.  Mostly I want to hear from Mr.

11  Ferraro.  I think what you and your colleagues had suggested

12  that when I raised the issue about a business update, you

13  offered up Mr. Ferraro to do that and I certainly would like

14  to hear that.

15           Let me raise right now one question I do have that

16  I would like addressed at some point in light of the events

17  of the last week with respect to FTX.  And that is did the

18  Debtors make any transfers of value, whether it's in

19  cryptocurrency or dollars, to FTX before or after the freeze

20  on accounts?  And obviously, I'm assuming there were, and

21  you can confirm this, there were no transfers post-petition.

22  So are you able to confirm that, Mr. Kwasteniet?

23           MR. KWASTENIET:  I'll ask Mr. Ferraro.  My

24  understanding, Your Honor, is that there were no transfers

25  of cryptocurrency after the pause or after the petition

Page 26

1    date.

2              THE COURT:  Okay.  And just to be clear, I'm also

3    interested if there were transfers to FTX before the freeze

4    date.  And, if so, when?  Obviously, there are a lot of

5    questions about the freeze that have been raised by pro se

6    creditors and others and I'm sure it's something the

7    Committee has looked at as well.  So that's something I'm

8    interested in.  I don't, as I say, Mr. Ferraro is not being

9    put under oath and there will not be any cross-examination

10   today, but I do want to hear the business update.  So go

11   ahead, Mr. Kwasteniet.

12             MR. KWASTENIET:  Great.  Thank you, Your Honor.

13   And we did, we will definitely cover, you know, the

14   relationship and the impact as we see it today.  It's still

15   a developing situation obviously.  But the impact as we see

16   it today of the FTX and Alameda and their related entities,

17   they're filing, that is definitely a key part of what we

18   plan to cover.  But maybe just at the beginning, Mr.

19   Ferraro, do you mind please just describing your background

20   to the Judge?  What did you do before you started at

21   Celsius?

22             MR. FERRARO:  Yeah.  Thanks, Ross.  And good

23   afternoon, Your Honor.  My name is Christopher Ferraro.  I'm

24   the chief, interim CEO, chief restructuring officer, and

25   chief financial officer of Celsius.  I was appointed as

Page 27

1   chief financial officer on July 11th, 2022 and was appointed

2   as acting chief executive officer and chief restructuring

3   officer on September 27th of this year.  I have

4   approximately two decades of experience in financial

5   planning and analysis, asset and liability management, and

6   product control.  Before my roles with Celsius, I was a

7   senior managing director of Cerberus Operations and Advisory

8   Company where I focus on improving the operations for two

9   legacy portfolio positions.

10          In this role, I advised the chief executive

11  officer and leadership team on increasing profitability by

12  changing and repricing business mix, restructuring costs,

13  and optimizing the balance sheet.

14          Prior to Cerberus, I served in various roles at

15  JPMorgan Chase from 2001 to 2018.  I was head of financial

16  analysis where I responsible for all FP&A activities,

17  developed analytical tools and authored a patent application

18  in forecasting.  Before my role as financial, as head of

19  financial analysis, I was the treasurer of the consumer

20  bank.

21          MR. KWASTENIET:  Great.  Thank you, Mr. Ferraro.

22  Um can you maybe now turn to the Judge's question about what

23  financial exposure Celsius has to FTX or the FTX group of

24  companies including Alameda, et cetera, as best you know.

25          MR. FERRARO:  Yeah.  As of today, the company has

Page 28

1    four loans outstanding to Alameda totaling around $12

2    million or 11 million of net exposure, including the

3    collateral.  And the remaining coins deployed on FTX, mostly

4    unlocked SRM tokens with a value of approximately one

5    million, for a total net exposure of 12 million to FTX and

6    Alameda.  For context, the company's exposure to this group

7    was 3.6 billion in January of 2022, 437 million at the pause

8    in mid-June and 354 million just before the filing in mid-

9    July.

10            THE COURT:  Just give me those figures again, Mr.

11   Ferraro as of the pause.

12            MR. FERRARO:  I'll start back to early 2022 just

13   to go over it slowly.  3.6 billion in January of 2022.  437

14   million at the pause in mid-June and 354 million just before

15   the filing.  Just for context, the 12 million total net

16   exposure as of today is a 99.9% reduction from the peak in

17   early 2020.  This is in part as a result of Celsius efforts

18   to reduce exposure to third-party crypto platforms during

19   the week preceding its Chapter 11 filing.

20            So, Your Honor, we did pay down loans to FTX and

21   return collateral between the pause and the filing.

22            MR. KWASTENIET:  Mr. Ferraro, the loans that you

23   unwound or paid down before the filing, were those generally

24   over collateralized loans?

25            MR. FERRARO:  Yes, they were.

1             MR. KWASTENIET:  So they were, they were a secured

2      loan where part of the collateral was used to pay off the

3      exposure resulting in a return of the collateral, meaning

4      that, at that point, once the collateral was returned, we

5      were no longer a creditor of FTX, if you will, for that over

6      collateralized position.  Is that, is that a fair summary?

7             MR. FERRARO:  That's right, yes.

8             MR. KWASTENIET:  Okay.  Mr. Ferraro, there's also

9      been a lot of press this past week that has engendered a lot

10     of concern throughout the crypto community about the alleged

11     hack at FTX.  Can you let us know, just remind the Court,

12     you know, your perspective on crypto security at Celsius and

13     whether Celsius has taken steps to prevent the risk of the

14     type of hack that appears to have happened post-petition at

15     FTX?

16            MR. FERRARO:  Yeah, we're not sure exactly what

17     has happened, but I'm going to give you a little bit of our

18     kind of security posture.  So first I want to note that we

19     negotiated a comprehensive security protocol with the UCC.

20     This was recently approved by the Court and we are complying

21     with that protocol.  We have a 24/7 team of security experts

22     monitoring wallets, hack attempts on our user accounts,

23     production environments, and employee machines.  I want to

24     give some details specifically on the controls around the

25     movements of cryptocurrencies.

Page 30

1            As we unwind deployments, all coins are brought

2    back to Fireblocks and in Fireblocks, the coins are located

3    in several workspaces, which are all frozen except for the

4    mining work space, where there is a small amount of coins

5    given that we sell to BTC weekly.

6            To move any coins, first, a workspace must be

7    unfrozen.  To do this, a quorum of four executives are

8    required for the approval.  The approval is done using a

9    video verification with the staff of Fireblocks.  Then, to

10   whitelist a new wallet destination, four executives in

11   various locations are needed to sign in digitally in an MPC

12   or multi-party computation system.  In addition, any

13   transfers to existing wallets require approval by three

14   executives using the same MPC technology.

15           Workspaces are kept open only until the approved

16   transaction is complete and are then refroze immediately.

17   All coin movements are approved by key stakeholders and

18   documented.

19           MR. KWASTENIET:  Thank you.  Mr. Ferraro, can you

20   give the Judge a sense of what kind of business activities

21   Celsius is currently engaged in?

22           MR. FERRARO:  Yeah, thanks, Ross.  Starting June

23   12th, 2022, and throughout the filing of these Chapter 11

24   cases, the Debtor paused all withdrawals, swaps and

25   transfers on their platform.  While certain business

1    activities such as asset deployment and marketing are no

2    longer happening, other activities such as data and security

3    and platform maintenance remain critical.  Moreover, new

4    responsibilities have emerged, including developing a

5    potential go forward plan, populating more than 10,000 pages

6    of schedules and statements, responding to due diligence and

7    investigation requests and facilitating multiple sales

8    processes.  On a daily basis, the Debtors oversee and

9    sustain the company's digital security, IT infrastructure,

10   and manage all aspects of their business while also

11   continuing to comply with the requirements of operating the

12   company in Chapter 11, including responding to requests from

13   parties and interests and addressing new issues raised in

14   these cases.

15          Importantly, the Debtors are managing cash and

16   digital assets on the platform, including monitoring and

17   recovering deployed assets, sustaining data management and

18   cybersecurity, and performing, accounting, legal and

19   compliance oversight, as well as other critical functions,

20   in which I'll go to in detail shortly.

21          Specifically, the Debtor's employees are working

22   with the Debtor's advisors in terms of a new business plan

23   with the goal of using these Chapter 11 cases to reorganize

24   and emerge as a new cryptocurrency platform, a platform

25   owned by and operated for the benefit of the customer

Page 32

1   community and that complies with all applicable regulations.

2   Additionally, to date, the company has rejected 34 executory

3   contracts including all real estate leases on the Debtor's

4   entities at the time of filing and is currently working

5   through an assessment for rejection of an additional 323

6   executive contracts.

7           MR. KWASTENIET:  Thanks, Mr. Ferraro.  Can you

8   also give the Judge a sense of what are the different

9   business functions within the company and what employees in

10  those functions are working on on a daily basis?

11          MR. FERRARO:  Yeah.  Thanks.  Thanks, Ross.  Your

12  Honor, the Debtor's technology team including engineering,

13  security and IT total 75 employees.  This group continues to

14  provide technical analytics, oversea crypto-related

15  calculations, ensuring the operation of the daily trial

16  balance and reconciliation processes, including tracing

17  transactions and identifying discrepancies, maintaining and

18  operating the backend data infrastructure, developing

19  software to integrate and maintain third-party data sources.

20  Importantly, the team is preparing the systems for the

21  eventual outcome of the process such as custody withdrawals

22  and maintains a 24/7 security watch over assets and

23  community accounts including the monitoring of social media

24  for threats of cyber and physical nature.

25          The Debtor's finance team comprised of 22

Page 33

1    employees, continues to engage in company-wide accounting,

2    cash flow management, tracking and monitoring of digital

3    asset movements, balance sheet reporting, financial

4    modeling, valuations and the group oversees the tax and

5    payroll obligations.

6         The Debtor's product team, comprised of 10

7    employees, is working to design a set of products and

8    services that are financially sustainable, secure,

9    innovative with a path towards full regulatory compliance.

10   And we look forward to having conversations further on this

11   topic.

12        The Debtor's regulatory team, comprised of three

13   employees, is working with the Debtor's advisors to address

14   inquiries from regulatory authorities, responding to and in

15   constant communication with regulators around the world to

16   address questions about both prior practices and as well as

17   how future services would comply with current and developing

18   regulations.

19        The Debtor's legal team, comprised of six

20   employees, is working to address corporate governance and HR

21   employment matters to provide oversight and input on

22   litigation and claims and affirmative actions against third

23   parties.

24        Finally, the Debtor's human resources department,

25   comprised of 13 employees, is working to maintain open

Page 34

1    communication with all employees, manage payroll, employee

2    tax and benefits, and ensure compliance with local labor

3    laws and regulations.  Additionally, the human resources

4    department has been overseeing the company's global

5    reduction in force.

6            MR. KWASTENIET:  Mr. Ferraro, are there any other

7    business activities or projects that you wanted to flag

8    specifically in addition to what you've already mentioned?

9            MR. FERRARO:  Yeah.  Thanks, Ross.  I wanted to

10   call out four specifically.  First, with respect to mining,

11   a lot of activity in the mining space.  The Debtor's

12   employees are overseeing and driving the build out of the

13   Debtor's Midland proprietary sites located in Texas, which

14   will house approximately 20 percent of the mining works.

15   The build out requires managing third-party contractors,

16   vendors, and power contracts.  The Debtors are also engaged

17   in negotiations with certain of their existing and potential

18   new hosting providers to ensure the effective continuation

19   of mining activities.

20           Second, the Debtor's employees are continuing to

21   work with the Debtor's advisors to continue and produce

22   digital asset based reports and update and improve the 13

23   week casual model to manage liquidity.

24           Third, the Debtor's employees are involved in the

25   ongoing maintenance and operation of the Debtor's security

1    protocols to ensure that the platform remains secure at all

2    times.  These security protocols include processes and

3    procedures involving multidisciplinary teams that are

4    designed much like that of a bank or a large enterprise with

5    enhanced security.

6            And finally, fourth, the Debtor's product ops

7    compliance and engineering employees have expended

8    significant time preparing for the potential withdrawal of

9    certain digital assets pursuant to the Debtor's pending

10   custody and withheld motion filed on Docket 670.  To ensure

11   strict compliance with any court order, employees are

12   working with the Debtor's advisors to identify a subset of

13   customers who will be authorized to withdraw certain digital

14   assets from the platform.  The group is also handling

15   various Chapter 11 reporting and diligence responsibilities.

16           MR. KWASTENIET:  Mr. Ferraro, can you -- is there

17   anything else you want to get into with respect to specific

18   activities related to the Chapter 11 cases themselves?

19           MR. FERRARO:  Yes.  As Your Honor is aware, the

20   Debtors have produced hundreds of thousands of pages of

21   information and documents in support of the court filings,

22   UCC requests, investigations and the examiner.  The Debtor

23   takes this reporting and diligence obligations seriously and

24   many employees are working tirelessly to respond to

25   information requests from the examiner, the UCC, aid and

Page 36

1    federal regulators, the Debtor Special Committee, potential

2    bidders in the Debtor's sales processes and other

3    stakeholders.

4         MR. KWASTENIET:  Mr. Ferraro, can you talk about

5    the current level of employees at the company and how

6    attrition has impacted the case, if at all?

7         MR. FERRARO:  Yeah, we faced significant

8    reductions in the workforce due to both voluntary and

9    involuntary attrition.  Just to give a couple of numbers.

10   At the start of 2022, the Debtors had approximately 920

11   employees.  As of today, including the attrition thus far in

12   November, we will be conducting operations with just under

13   170 employees, a decrease of over 80 percent from earlier

14   this year.  And we expect the number to be lower at year

15   end, given the attrition rate.  With the reduction of

16   workforce, extra burdens have fallen on our remaining

17   employees.  The employees are committed to dedicating

18   immense time and effort to successfully sustain and manage

19   the aforementioned aspects of the Debtor's businesses.

20        It is crucial to the success of these Chapter 11

21   cases that the Debtor retain their remaining employees

22   throughout this process and after to ensure value maximizing

23   resolution.

24        MR. KWASTENIET:  Mr. Ferraro, at our last hearing,

25   the Debtors were prepared to move forward with a key

Page 37

1   employee retention or KERP motion.  And there's been

2   significant attrition even within that population.  Is there

3   anything you want to say about our efforts to revamp the

4   KERP and to proceed forward with an amended, perhaps more

5   focused, responsive KERP in light of the ongoing attrition?

6        MR. FERRARO:  Yeah, this is incredibly important

7   to the estate and maximizing value.  We had, and the numbers

8   are a little bit foggy, but significant attrition from the

9   original 62 individuals on the KERP list.  It's hard to keep

10  up with the attrition on a daily basis.  We're losing 30-40

11  employees per month.  So I think flexibility in the pool to

12  adjust for changing workloads on the remaining employees is

13  key and an expedited kind of roll out of the KERP would be

14  much appreciated to the employees.

15       MR. KWASTENIET:  Thank you.  Mr. Ferraro, I didn't

16  have any further questions.  Is there anything else that you

17  wanted to add and then of course, Your Honor, to the extent

18  that um you have anything else you'd like to hear from Mr.

19  Ferraro, that was definitely part of our intent in having

20  Mr. Ferraro address Your Honor this afternoon.

21       MR. FERRARO:  Nothing more, Ross, thank you.  I'd

22  like to say thank you, Your Honor, for giving me the

23  opportunity to provide the update to the Court.  Unless you

24  have any further questions, this concludes my update.

25       THE COURT:  So I do have a few questions.  I think

1    first, let me thank you for your presentation.  I think as I

2    said at the start, this is not testimony under oath, so

3    there will not be cross examination.  I'm sure there are

4    parties and interests will have more questions that may be

5    for another day.  One question I have is whether there is --

6    is the Debtor -- are the Debtors generating any revenue

7    currently?  What you've primarily described to me, I would -

8    - it may be a misnomer to describe it as a back office, but

9    it's the maintaining the platform, assuring, very

10   importantly assuring security of all of its assets and

11   property, but is the Debtor actually generating revenue and

12   from what sources?

13            MR. FERRARO:  Yes, Your Honor.  The amount of

14   revenue that we're generating is obviously at a much lower

15   clip than it was pre-filing, pre-paused, but we have revenue

16   across staking deployments, predominantly the direct state

17   positions, obviously the mining business.  We do have both

18   retail and institutional loans outstanding where we are, you

19   know, recognizing interest income as it accrues up until

20   kind of maturity.  And then we're also collecting on

21   outstanding loans and other exposures.  So yeah, there is

22   moderate amount of top line revenue.

23            THE COURT:  Well, let me focus in on mining.  At

24   the beginning of this case, one of the motions that I did

25   approve was the Debtor's proposed investment in a larger

1    number of rigs.  That was approved.  I don't know what the

2    status of that is.  You briefly mentioned the work, some of

3    the work being done with respect to mining operation but dig

4    a little deeper for me if you would.  And certainly, while I

5    think the hearing has been put off on it, I think Core

6    Scientific was an important counterparty to a contract with

7    the Debtors and I don't know whether they're performing at

8    all.  But tell me, tell me, if you can, what is happening in

9    the mining operation?

10              MR. FERRARO:  Yeah, So we have -- well let's start

11   with Core.  We have about 37,000 rigs hashing at Core.  They

12   are performing.  They are plugged in.  The up-time is in the

13   mid 90 percent.  The margins are compressed with the market

14   backdrop, but they're still positive.  We also have machines

15   at another third-party host, hosting site, Mawson.  Up-time

16   is a little bit lower and there's a little bit less machines

17   there.  And then incredibly strategic and important is the

18   build out of the Midland's site in which one of the four

19   buildings -- and I was able to visit a couple of weeks back

20   -- one of the four buildings, the rigs are all racked and

21   hashing.  There's over 3000 rigs.  It's a beautiful sight,

22   new.  And then there's three other sites, the second of

23   which just got energized.  They'll be racking rigs really

24   throughout Thanksgiving week.  So that should be online and

25   hashing soon and then the other two sites will follow.

1          THE COURT:  Last question, and if you don't feel

2     comfortable answering it directly, I'll understand it, but,

3     you know, particularly over the last week or so, there's

4     been, I think roughly about a 15 percent reduction just in,

5     in the price of Bitcoin.  That's not precise, but from my

6     observation, somewhere in that range.  At the earlier

7     hearing when I approved the continued investment in

8     additional mining operations, I asked a question.  Maybe it

9     wasn't precise, but it was the question was it appeared to

10    me that the mining operations were cashflow negative and

11    would remain so for a while.  That was at a point where I

12    think the price of Bitcoin, for example, was I think closer

13    to $20,000 rather than where it is now.  Are the Debtor's

14    operations in mining cashflow positive or negative?

15         MR. FERRARO:  So we're at the very, very tail end

16    of building out these sites.  So there's a little bit tail

17    for those three remaining buildings that I talked about in

18    Midland.  But putting those aside, from an operational

19    perspective, we are cashflow positive.  The margins are

20    compressed.  It's probably around 20 percent where we sit

21    today.  But you know we have the ability to shut off

22    machines if cost more to produce a Bitcoin than the amount

23    that we can, you know, mint it for.  So we have curtailment,

24    kind of active curtailment management.  And because of that

25    we're able to mine profitably, yes, Your Honor.

1              THE COURT:  All right, thank you very much.  I

2     don't have any other questions for today, Mr. Kwasteniet.

3     Mr. Ferraro, I thank you for your presentation.  I think

4     that it doesn't need to be at every omnibus hearing that we

5     have, but I think, you know, to the extent that there are

6     additional updates, we probably ought to start each hearing

7     with just a brief report on anything that updates from what

8     I've heard today.  Okay.  And I'm practically certain that

9     there will be questions that arise from pro se or

10    represented parties.  And those questions I think will come

11    to the Debtor's counsel, the Committee's counsel, perhaps

12    the examiner.  And I hope that that all of those positions

13    will continue to look seriously and the U.S. Trustee, excuse

14    me, Miss Cornell, will look seriously at the issues as they

15    arise.  And thank you again, Mr. Ferraro.  We're going to

16    end now.  I'm constrained on time today.  And we have

17    additional hearings coming up very soon.  So we're

18    adjourned.  Thank you.

19             MR. KWASTENIET:  Thank you, Your Honor.  Thank you

20    very much.

21             (Whereupon these proceedings were concluded at

22    2:40 PM)

23

24

25

Page 42

1                                    **I N D E X**

2

3                              RULINGS

4                                                    Page        Line

5    **Motion: Bar date**                            24          3

6    **Motion: Amended schedules**                   24          3

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 43

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  November 16, 2022