Immanuel Herrmann
*Pro se Celsius creditor*
Admin of the worldwide Celsius
Earn Customer Telegram group
**https://t.me/celsiusearn**

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| _____ ) | | |
| In re: ) | Chapter 11 | |
| ) | | |
| CELSIUS NETWORK LLC, *et al.,*[1] ) | Case No. 22-10964 (MG) | |
| ) | | |
| Debtors. ) | (Jointly Administered) | |
| _____ ) | | |

**OMNIBUS OBJECTION AND RESERVATION OF RIGHTS TO THE DEBTORS'
PROPOSED SCHEDULING ORDER, D.R. 1324, AND THE DEBTORS' AMENDED
MOTION FOR ENTRY OF AN ORDER (I) ESTABLISHING OWNERSHIP OF ASSETS
IN THE DEBTORS' EARN PROGRAM, (II) PERMITTING THE SALE OF
STABLECOIN IN THE ORDINARY COURSE AND (III) GRANTING RELATED RELIEF,
D.R. 1276**

Now comes Immanuel Herrmann, Celsius Network LLC, *et al., pro se* creditor, and

submits the following omnibus objection to D.R. 1324 and D.R. 1276. I object on

procedural and due process grounds, and to the assertion that there is clear

"unambiguous plain language" of the contracts that will allow Earn property rights to be

cleanly resolved.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

Most theories that would find in favor of Earn customers *as a class* are based upon New

York law, Federal law, unconscionability, fraud, insolvency, contractual *ambiguity*, and

lack of clarity including, but not limited to, the loan vs disposal question and the " best

efforts" question, and other *general group* defenses rather than *individual* defenses.)

Furthermore, in this filing, I record my objection to the Debtor's refusal to answer written

deposition questions that are crucial to have an answer to "whether contracts were

formed between the Debtors and Account Holders and what the terms of those

contracts were." Given the contract's significant ambiguity, and the Debtor's lack of

cooperation and assertions to the contrary, I reserve all rights to determine this question

without stipulating to any particular "threshold question," without limiting my discovery to

any particular "deposants" (who may not even know the answers needed for proper

discovery), and to look beyond the "plain language" of the contract (which does not fully

exist due to confusing, unclear, and conflicting language). In support of my omnibus

objection and reservation of rights, I respectfully state as follows:

## OBJECTION

I object to the amended order and its associated proposed scheduling order. I ask that

this Court:

1. **Decline to approve the Debtor's Proposed Scheduling Order as it is**, and extend

the timeline for the hearing into January, replacing it with a process that respects due

process and determines property rights based on all appropriate legal theories put

forward in court. This should also include expanded discovery and a process for adjudicating discovery disputes.

2. **Ensure that any ruling on the property rights for all Earn customers considers arguments that the Terms of Use are *ambiguous* and self-contradictory–and allow for defenses for Earn as a class**, *not just for individuals or subcategories.* Any ruling must allow for a look at the ambiguous nature of the Debtors contracts in a holistic way (including interactions between different contracts that modify terms.) I object to the Debtor's assertion that recent versions of their Terms of Use have "unambiguous plain language" that allow for the clean resolution of property rights issues based on cherry-picked sections from the recent Terms of Use versions that users purportedly agreed to. **See 11/20 Objection of Rebecca Gallagher, Page 7, "Is the language of each of the versions of the written TOS unambiguous and plain?**"

3. **Determine whether customer assets were *loaned* to Celsius or *transferred* to Celsius in a formal title transfer as part of any ruling on Earn property rights**. The question is not merely a tax question but gets at the heart of the relationship between depositors and Celsius. To the extent that the loan question *is* a tax question–which it only is *in part*–a tax disposal event would likely be unconscionable because of the terrible tax consequences for customers, as well as the Debtor's false and misleading advertising and communications about avoiding tax events.

4. **Determine whether one Earn customer's interest payments–payments which were ostensibly offered in consideration for agreeing to the contract–were actually return of another depositor's principle.** When and for how long Celsius was insolvent is being addressed by the examiner. Even if Celsius is not ruled to be a *pure* Ponzi scheme, simply recycling customer deposits among customers while the company knew it was insolvent and losing money, can not be true *consideration*. Once Earn payments to one customer became a return of another Earn customers' principle, rather than 80% of Celsius earnings, as they advertised, on a consistent basis–and Celsius was losing money on a consistent basis–the contract may have been null and void due to a lack of legitimate consideration.  Continuing to pay interest while insolvent would also be inconsistent with the clause of the contract that says Celsius will make their "best commercial and operational efforts" to avoid losses, other clauses, and other laws—such as securities laws—making it an illegal and unenforceable contract.

5. **Add a process for the expedited resolution of discovery disputes**. I expect the Debtor will likely refuse to answer–or refuse to give meaningful answers to–deposition questions this Monday and Tuesday, as they already have with their written deposition questions. Given the Debtor's opaqueness on the docket so far, discovery disputes in the coming days are likely.

6. **Order the Debtor to provide *adequate notice* to Earn Customers of its Motion to the extent it is allowed to move forward.** See Exhibit A for case law on adequate notice. See Exhibit B for my proposed email that I ask the court order the Debtor to

send to all Earn customers, worldwide, to provide adequate notice that their property
rights may be impacted.

## THERE ARE MAJOR DUE PROCESS ISSUES TO ADDRESS AND ADEQUATE NOTICE TO EARN CUSTOMERS NEEDS TO BE GIVEN

I enter into the record the paper "Procedural Due Process Requirements in Bankruptcy
Cases" by Bryant Churbuck as Exhibit A. I urge Your Honor to read the paper, which
outlines some issues that are important and relevant to this case, the Scheduling Order,
and notice requirements.

I have attached a draft email notice in Exhibit B. Please order the Debtor to send this
notice to all Earn customers worldwide, advising them of their due process rights, and to
meet their notice requirements before this motion moves forward.

Most Earn customers worldwide are unaware that the Debtor is filing this motion and its
implications. Because these customers are unaware, they are unable to submit
objections. For Earn Customers, this motion, which seeks a binding ruling on property
rights, is as serious a matter as a 363 sale of the entire company or a vote on a Chapter
11 Plan, and so a similar level of notice is warranted. We cannot count on existing *pro
se* filers to make all relevant arguments, especially not on this timeline. The debtor has
not, thus far, given adequate notice to Earn customers, and in some instances has
given as less than one day of notice on the docket.

As the article in Exhibit A notes, in *Mullane*, 339 U.S. at 309:

> *An elementary and fundamental element of procedural due process was "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Notice also had to convey required information and "afford a reasonable time for those interested to make their appearance.*
>
> ***Importantly, the mere gesture of giving notice is not enough if the form of notice given is not likely to actually inform an individual of the pendency of the proceedings…***

Under the circumstances, in addition to an email, an in-app popup for all Earn Customers worldwide would also be reasonable and the Court should consider it as well.

## EVEN FOR THOSE IN RECEIPT OF NOTICE, DUE PROCESS ISSUES REMAIN

Here, even those most interested in objecting, such as myself, are struggling to keep up with the shifting procedural sands of the Debtor, which keeps changing its mind on how to handle basic issues, such as discovery, and announced depositions with a one business day turnaround time. While I will be attending depositions on Monday and Tuesday, I object to the short timeline, the lack of time to prepare, and to the fact that there is no mechanism to do additional discovery, no way to compel discovery or resolve discovery disputes on a reasonable timeline or at all, a decision based on narrow issues which isan assumption the contract is clear and enforceable. The overall timeline is *far too short* to prepare arguments to make what may be the most monumental decision in the entire case: The property status of Earn customers.

## THE CONTRACT'S "ALL RIGHTS AND TITLE" LANGUAGE IS AS ABSURD AND UNREASONABLE AS THE PEPSICO "HARRIER JET" CASE; CELSIUS WAS IN BREACH OF ITS "BEST COMMERCIAL AND OPERATIONAL EFFORTS" CLAUSE PREPETITION

No objective person could reasonably have concluded that the customers would give "all rights and title" to Celsius *in the sense the Debtor claims they did*, in exchange for low single-digit interest rates, beyond a *temporary* transfer of *control* of the property to earn an income, similar to the way an investor loans their stock to a brokerage house and allows the brokerage to hypothecate and rehypothecate that stock. Hypothecation and rehypothecation are one thing; selling customer's assets and dissipating or potentially embezzling them, and claiming contractual cover to do so, is another. The

contract allowed for a *loan* where the Debtor was allowed to *possess* the crypto during the pendency of the loan *for particular purposes*. Or, as the contract stated:

> We may lend, sell, pledge, hypothecate, assign, invest, use, commingle or otherwise dispose of assets and Eligible Digital Assets that are not held in a Custody Wallet (if available to you) **to *counterparties* or hold the Eligible Digital Assets with *counterparties*, and <u>we will use our best commercial and operational efforts to prevent losses</u>.** [Emphasis added]

In *Showtime Networks Inc. v. Comsat Video Enterprises, Inc.,* 5, the New York Supreme Court interpreted a contract for distribution of cable television programming in which the distributor agreed to use its "best efforts" in promoting certain programming and its "reasonable business efforts" to maintain the customer base for the programming. **The court, in deciding a summary judgment motion, held that unprofitability did not excuse performance under either standard.**

The Debtor clearly did not make "best efforts" to avoid losses, pre-petition, but instead gambled user funds–for example, selling almost all of its users' Bitcoin with no clear plan to make the Bitcoin back. (On information and belief, the mining operation was not *exactly* how the Debtor planned to make the Bitcoin back, either; originally, the Debtor seems to have marketed the Bitcoin Mining to the Preferred Series B Shareholders, which is creating additional problems for depositors in this case. Excluding the mining, Celsius was *hopelessly insolvent* and *grossly negligent* for months and perhaps even

years prepetition, to the point of breach of the "best efforts" clause.) The Debtor also released billions of dollars in funds pre-petition; stopping withdrawals earlier and "coming clean" would have been the appropriate action under a "best efforts" standard.

This is not to say that Celsius could not make deals with industry counterparties and do business to enrich itself under such a standard. In *Van Valkenburgh v. Hayden Publishing Company,* the New York Court of Appeals noted that even where a publisher had agreed to use its best efforts to promote an author's work, the publisher could still issue books on the same subject and promote them accordingly to the publisher's economic interest even if adversely affecting the contracting authors' sales. The court noted that the publisher had the right to act in "its own interest" without regard to external comparisons. **However, the court also noted that there may be a point where its acts are so harmful as to constitute a breach of a best efforts covenant.** Gambling depositors' life savings, especially given the statements of the Debtor about its business activities, which were lies, and while Celsius ***knew it was hopelessly insolvent,*** is such a breach.

Additionally, any permanent transfer of title is absurd, to the extent that it doesn't require the Debtor to make "best efforts" to return the funds. Their lack of diligence in safeguarding depositor assets would be laughable, if not for the tragic human consequences many depositors now face. If the Debtor was making "best efforts" to avoid losing customer property, they would have filed for bankruptcy long ago when the balance sheet hole first appeared and/or stopped withdrawals much earlier. Instead,

they gambled customer money in a "heads-I-win-tails-you-lose" strategy to "trade out" of

their losses, while letting billions of customer dollars out the door.

Many people have their life savings in Celsius, such as Rebecca Gallagher. (See

Rebecca Gallagher's Objection of 11/20.) They relied on other language in the contract,

which was contradictory, such as the fact that the transfer was a "callable loan"; the idea

that anyone would transfer "all of their worldly goods" to Celsius is just as absurd as the

idea of Pepsi giving a customer a free Harrier jet. See *Leonard v. Pepsico*, 130 (Pepsico

Harrier jet case). Additionally, to overrule such a clause would only help public policy;

upholding such a clause protects no plausible legitimate business activity. Instead, it

gives an olive branch to criminal activities and provides a loophole where a Ponzi, boiler

room, or other embezzlement scheme is not illegal if the operator writes into the

contract that their marks grant the operator "all rights and title" to their deposited funds.

Allowing for such a contract with no checks and balances about what the drafter can do

with the property is against public policy because it would set a precedent that allows

such language to be used to perpetuate such activities–all based upon a contract.

I ask that there be an opportunity to conduct discovery and argue in a way that allows

for me to properly argue these and many additional points, including requiring the

Debtor to answer relevant questions. It is not up to the Debtor to tell me what arguments

are "in scope" and "out of scope" for determining whether there was a meeting of the

minds on the Terms of Use or whether they are enforceable. An assertion that the

contract is unambiguous does not make it so. And to the extent that the contract is

found by this court to be ambiguous, the contract's ambiguity is a question at the

intersection of the contract terms and state and federal laws. If the contract terms are

ambiguous, they should be resolved in favor of customers, including myself. If there's a

"best efforts" clause, it must be examined. If the Debtor will not answer all relevant

questions at oral depositions and commit to providing relevant discovery, I will seek

additional discovery from this court via court order to compel discovery.

## THE CONTRACT IS NOT "CLEAR AND UNAMBIGUOUS." IT DOES NOT HAVE "UNAMBIGUOUS PLAIN LANGUAGE."

The Debtor claims that their contracts, particularly Terms of Use Versions 6 and 7 have

a "plain meaning" and "clear and unambiguous" terms, and that, therefore, the

limitations on discovery and deciding who earns Earn assets based upon the purported

"clear and unambiguous" terms of the contract is an appropriate process.

I disagree. The contracts have always been confusing and ambiguous to retail

customers. The contract's interaction with other contracts, such as previous versions of

contracts, loan contracts, and other public written and oral statements by the Debtor

and its leadership makes it even more ambiguous. These defenses are not necessarily

limited to just individuals.

I ask that the court have an evidentiary process to determine whether the contract is

ambiguous and not agree to go along with unsupported *assertions* by the Debtor or any

other parties that the contract is "unambiguous." The Debtor must *prove* their contract is

unambiguous, and respond to evidence that it is not, not simply assert that as fact and cherry-pick sentences from the contract that it would like to enforce while ignoring others. Furthermore, they must answer questions, such as whether Earn deposits were a loan or where Celsius typically placed deposits.

In Rebecca Gallaher's November 20 objection to the Debtor's Amended Stablecoin Motion, D.R. 1276, page 7, under section "**Is the language of each of the versions of the written TOS unambiguous and plain?,**" Ms. Gallagher points out that the contract is ambiguous, particularly with regards to whether Earn deposits are loans or something other than loans, in addition to making other arguments.

Because the contract is ambiguous, a Motion deciding based on the faulty assumption of "clear and unambiguous" language does not work. Furthermore, depositions that "shall be limited to the individuals providing declarations in support of the Amended Motion," which are already full of written objections to basic questions, and with no process for forcing additional discovery, is insufficient for something as critical to this case as the Debtor's Amended Motion, which decides the property rights status of all Earn customers.

Finally, the Committee of Unsecured Creditors has already provided a path forward to sell stable coins, should the Debtor truly need the cash, without giving short shrift to Earn customers' due process rights. The solution is giving customers Adequate Protection. See *The Official Committee of Unsecured Creditors' Objection to the*

*Debtors' Motion Seeking Entry of an Order (i) Permitting the Sale of Stablecoin in the*

*Ordinary Courts and (iii) Granting Related Relief* (D.R. 1186).


## EARN CUSTOMERS ARE PREJUDICED BY THIS SCHEDULING ORDER, AND MOTION, AS AS CLASS, AND THE CONTRACT MAY BE ILLEGAL

While the motion allows individuals to assert *individual* defenses to the contract even after a ruling, the order is prejudiced against Earn customers as a *class*. It asserts that the contract is *clear and unambiguous* for the typical Earn customer, when in fact the Debtor has failed to demonstrate that, and Rebecca Gallagher has already demonstrated some of the many ambiguities. Many other filings have also touched on them and many more will. There has been no holistic review of the contract from the perspective of Earn by this court, nor a ruling on whether the contract is enforceable or even legal. The contract may well be illegal or unconscionable under state and Federal laws. For example, it may be an illegal securities contract according to regulators including the SEC and New Jersey. If so, then, depositors never could have signed over "all rights and title" pre-petition, since an illegal contract is not generally enforceable. The Debtor has failed to show that the contract would be enforceable or stand up to scrutiny; it merely asserts that the contract is "plain and unambiguous," as if asserting something makes it so.


## RESERVATION OF RIGHTS

I have a direct interest in these matters. I reserve all rights as a party-in-interest with respect to the property rights status of Earn customer deposits (which are the type of

deposit that I have.) I reserve all procedural and substantive rights with respect to any process to determine the property status of Earn customer deposits and, specifically, to my deposits.

I request that I continue to be included in any further status conferences and settlement conversations, written or telephonic, related to Earn customer property rights and my property rights that may impact my future claims, consistent with Local Rules and the Bankruptcy Code.

I reserve rights to file a motion or adversary proceeding asserting my own property rights and to conduct any replated discovery that I need to defend my property rights separate and apart from the Debtor's Motion; I do not consent to any stipulations between the Debtor or other parties to determine the property rights of my deposits on my behalf, or to determine which questions are or are not relevant to adjudicating such disputes. I do not consent to any procedural relief for the Debtor on this matter that may impact my rights to assert my own property rights without either my explicit consent, or a court order authorizing such relief, and an opportunity for me to respond to any such request for relief.

I do not consent to filings under seal or motions to shorten time, on this matter, without my explicit consent or a court order allowing for such actions.

I do not consent to any final determination or stipulation on which issues must be

adjudicated to the status of Earn deposits without a chance to respond to such a

determination or stipulation on a reasonable timeline, or a court order or opinion. I

reserve all rights, including but not limited to the right to supplement or amend this filing,

and to submit additional filings.

Respectfully submitted,

Dated: November 21, 2022
Silver Spring, Maryland

/s/ Immanuel Herrmann
Immanuel Herrmann
immanuelherrmann@gmail.com

Exhibit A

| Procedural Due Process Requirements in Bankruptcy Cases |

| 2016 | Volume VIII | No. 4 |

## Procedural Due Process Requirements in Bankruptcy Cases

### Bryant Churbuck, J.D. Candidate 2017

Cite as: *Procedural Due Process Requirements in Bankruptcy Cases,* 8 ST. JOHN'S BANKR. RESEARCH LIBR. NO. 4 (2016)

## Introduction

The Fifth Amendment[1] of the United States Constitution guarantees that an individual will not be deprived "of life, liberty, or property without due process of law."  In the context of bankruptcy, procedural due process requirements are especially important because although bankruptcy tries to ensure that rights that exist outside of bankruptcy are maintained in bankruptcy, title 11 of the United States Code (the "Bankruptcy Code") or other federal laws may require a different result.[2]  Given that the rights of an individual can be altered in bankruptcy proceedings, the adequacy of notice of the bankruptcy proceeding is of great importance.  However, courts have had to grapple with determining the extent that procedural due process applies, including whether procedural due process requirements apply at all.

In *In re Motors Liquidation Company*,[3] the Bankruptcy Court of the Southern District of New York evaluated competing claims about whether procedural due process requirements applied and, if so, whether a showing of prejudice was needed in order to show that procedural

---

1 U.S. Const. amend. V.

2 *See Butner v. United States*, 440 U.S. 48, 55 ("Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.").

3 *In re Motors Liquidation Co.,* 529 B.R. 510 (Bankr. S.D.N.Y. 2015).

due process rights had been violated.  The court looked to the Supreme Court's landmark procedural due process case *Mullane v. Central Hanover Bank & Trust Corporation*4 which, although not a bankruptcy case, defined procedural due process requirements and enunciated principles of general application.  However, the *Motors Liquidation* court acknowledged that although there are requirements to be met for procedural due process to be satisfied, the standard is still a flexible one dependent upon on the facts and circumstances of every case.5

Part I of this article details the *Mullane* court's understanding of procedural due process rights and requirements in a general sense.  Part II discusses the application of *Mullane*'s principles in the bankruptcy context by the *Motors Liquidation* court as well as other federal courts.  Part III explores the current state of the law regarding procedural due process requirements and its interaction with various provisions of the Bankruptcy Code.  This article concludes that a court's determination of whether procedural due process requirements have been met depends largely on the exigency of the circumstances and the practicality of actual notice to interested parties.

II.***Mullane* and Constitutional Procedural Due Process Requirements.**

In *Mullane*, the Supreme Court evaluated the adequacy of notice given to trust holders whose trusts were compiled into common trusts under New York law.6  These common trusts were set up under the theory that small or moderate size trusts would be undesirable for large corporate entities to administer, so the trusts were allowed by law to be compiled together to make one larger trust for investment administration.7  Income, capital gains and losses would all be shared proportionally among the common trust constituents.

---

4 339 U.S. 306 (1950).
5 *See Motors Liquidation*, 529 B.R. at 546.
6 *Mullane*, 339 U.S. at 309.
7 *Id.*

Central Hanover Bank established a common trust by combining 113 trusts and naming itself as the common trustee.8  While the number of beneficiaries, or their residences, was not known, at the very least some of them were not New York residents.9  Notice of the bank's actions was given by publication in a local newspaper, the bare minimum required under New York law.10  Only later, after the first investment had been made, was actual notice provided to trust fund beneficiaries that the bank was aware of.11  The appellant, a beneficiary, appeared and objected that the notice given was inadequate under the Fourteenth Amendment.12  The objections to notice were overruled.13  A final decree was entered by the Supreme Court, New York County, which was affirmed by the Appellate Division, First Department, and the New York Court of Appeals.14

In reversing the judgment, the Supreme Court outlined the basics of procedural due process.  An elementary and fundamental element of procedural due process was "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."15  Notice also had to convey required information and "afford a reasonable time for those interested to make their appearance."16

Importantly, the mere gesture of giving notice is not enough if the form of notice given is not likely to actually inform an individual of the pendency of the proceedings.17  A person needs

---

8 *Id.*
9 *Id.*
10 *Id.* at 309-10.
11 *Id.* at 310.
12 *Id.* at 311.
13 *Id.*
14 *Id.*
15 *Id.* at 314.
16 *Id.*
17 *See id.* at 315.

sufficient information to choose to "appear or default, acquiesce, or contest."18  Notice did not have to be perfect, but appropriate under the circumstances of the case.19  As long as an individual interest was represented in some capacity, that may be enough.20

III. **Application of *Mullane* in Bankruptcy Proceedings.**

*Mullane* established the principle of a case-by-case analysis of the adequacy of notice.  In applying *Mullane*, courts have had to determine whether or not the facts and circumstances of a given case have justified the use and specificity of the notice given or lack thereof.21  A clear pattern that has emerged, however, is that both procedural due process and statutory due process requirements must be met in order to enforce a sale order or confirmation plan.22

A. *In re Motors Liquidation Company.*

In *In re Motors Liquidation Company*, several classes of plaintiffs sued General Motors ("GM") for personal injuries and property damage sustained due to an ignition switch defect in their vehicles that GM knew about as far back as 2003.23  On June 1, 2009, GM filed for chapter

---

18 *Id.* at 314.
19 *See id.* at 314-15.
20 *See id.* at 319.  The *Mullane* court stated:

> The individual interest does not stand alone but is identical with that of a class. The rights of each in the integrity of the fund and the fidelity of the trustee are shared by many other beneficiaries. Therefore notice reasonably certain to reach most of those interested in objecting is likely to safeguard the interests of all, since any objection sustained would inure to the benefit of all. We think that under such circumstances reasonable risks that notice might not actually reach every beneficiary are justifiable.

21 *See, e.g., In re Drexel Burnham Lambert Grp.*, 995 F.2d 1138 (2d Cir. 1993) ("Notice may satisfy due process without setting forth verbatim the full text of a proposed settlement; it may describe the settlement in general terms."); *In re Polycel Liquidation, Inc.*, No. 00-62780 (RTL), 2006 Bankr. LEXIS 4545, at *23-26 (Bankr. D.N.J. Apr. 18, 2006) ("And while it is undisputed that Pool Builders learned of the bankruptcy proceedings from another supplier prior to the execution of the sale, this is not sufficient knowledge to satisfy the due process requirements."). ; *Fogel v. Zell*, 221 F.3d 955, 962 (7th Cir. 2000) ("Denver was not served with that notice, and there is no indication that it knew about it, which means that Denver would not have known how to compute the bar date--and so was entitled to notice of that date.").
22 *See, e.g., Miller v. Cappuccilli (In re Cappuccilli)*, 193 B.R. 483 (Bankr. N.D. Ill. 1996) (vacating a default judgment against a debtor on procedural due process grounds due to ineffective service of process).
23 529 B.R. at 521-22, 528.

11 bankruptcy due to a steep decline in revenues, operating losses, and decreased liquidity.24

When GM filed for bankruptcy protection, at least 24 then GM employees knew about the

ignition switch defect.25

Given the fact that the Treasury Department gave GM only 60 days to come up with a

viable plan to ensure GM's survival, GM sought to sell its assets in a section 363 sale to an entity

that would later become the new GM.26  After hearing objections to the section 363 sale and its

free and clear provision,27 GM's bankruptcy was resolved on July 10, 2009, creating the new

GM.28  Plaintiffs only received notice of the hearings by publication.29  It was not until the

spring of 2014 that GM finally acknowledged the ignition switch issue and recalled vehicles with

the ignition switch defect.30

After publicly announcing the ignition switch defect in March 2014,31 several class

action lawsuits asserting successor liability claims were brought against GM.32  In response to

the class action lawsuits, GM sought to enforce the free and clear33 provision of the 363 sale

order.34  Plaintiffs countered by alleging that their procedural due process rights were

violated.35  GM responded by asserting that procedural due process requirements did not apply

because there was no deprivation of property.36  The bankruptcy court disagreed with GM and

---

24 *Id*. at 529-30.
25 *Id*. at 525.
26 *Id*. at 530-31.
27 *Id*. at 531-32.
28 *Id*. at 534.
29 *Id*. at 535.
30 *Id*. at 538.
31 *Id*. at 521.
32 *Id*. at 539.
33 *See* 11 U.S.C. 363(f)
34 *Motors Liquidation*, 529 B.R at 538-39.
35 *Id*. at 539.
36 *Id*. at 550.

held that procedural due process requirements do apply, and examined whether those

requirements were met.37

      In regards to the accident victims whom GM was unaware of, the court found that notice

by publication was proper because actual notice to either the 27 million people with some defect

requiring a recall then or in the future, or the 70 million owners of all GM vehicles, would have

been impractical given the dire financial situation GM found itself in.38  However, notice by

publication for the plaintiffs in the *Motors Liquidation* case was held to be insufficient, because

GM was aware of the ignition switch defect and knew that those vehicle owners would qualify as

known claim holders.39

      However, the mere fact that actual notice was due to the plaintiffs was not enough to

establish a violation of the plaintiffs' procedural due process rights, as the plaintiffs also had to

show that they suffered prejudice as a result of the lack of actual notice.40  The bankruptcy court

found that most classes of plaintiffs suffered no prejudice, because the arguments plaintiffs were

making had previously been considered and rejected during GM's bankruptcy, provided no basis

to reconsider any prior rulings, and called for speculation as to political factors.41  In fact, the

bankruptcy court found that *Mullane* expressly stated that the presentation of an argument by one

among many with a shared interest, as had happened in *Motors Liquidation*,42 could protect the

---

37 *See id.* at 555.
38 *See id.* at 556.
39 *See id.* at 560.
40 *See id.* at 560-565.
41 *See id.* at 526, 573.
42 *Id.* at 566.

interests of all.43 Ultimately, only one class of plaintiffs, the "Economic Loss" class, was prejudiced in a way that allowed the court to provide some relief.44

B. *Western Auto Supply Company v. Savage Arms* (*In re Savage Industries*).

In *Western Auto Supply Company v. Savage Arms* (*In re Savage Industries*),45 a firearms manufacturer had declared bankruptcy, and attempted to sell its assets to a newly incorporated corporation.46  In approving the asset transfer, the bankruptcy court "prescribed safeguards for interests held by objecting creditors," but did not "require[] court approval of the asset-transfer terms" negotiated or "[make] provision[s] for the interests of holders of contingent product liability claims" against the firearm manufacturer.47  The asset transfer went through, and the new corporation continued manufacturing the same firearms.48  A consumer that was injured by a firearm prior to the bankruptcy sued the retailer that sold it, who in turn brought a third-party action against the new corporation under a theory of successor liability.49  The new corporation sought to enjoin the third-party action based on the disposition of the bankruptcy case.50  The bankruptcy court enjoined the action, but was reversed by the district court.51

In affirming the district court, the First Circuit held that lack of adequate notice to claimants of the chapter 11 proceedings was a violation of their procedural due process rights.52 The First Circuit stated that notice was "the cornerstone underpinning Bankruptcy Code procedure" and that it was the responsibility of the debtor-in-possession to ensure that all "parties

---

43 *See id.* at 543.
44 *See id.* at 575. ("The Plaintiffs could have made overbreadth arguments if given appropriate notice before the 363 Sale hearing, and to that extent they were prejudiced. And for that the Plaintiffs should be entitled to remedial relief to the extent the law otherwise permits.").
45 43 F.3d 714 (1st Cir. 1994).
46 *Id.* at 717.
47 *Id.*
48 *Id.*
49 *Id.*
50 *Id.* at 718.
51 *Id.* at 719
52 *Id.* at 720.

in interest" had adequate notice and an opportunity to be heard with respect to a proceeding that would be adverse to their interests.53  As no attempt was made in the case to give adequate notice to those whose pecuniary interests were at stake, the claims in the action could not be enjoined.

### C.  *In re Ex-Cel Concrete Company, Inc.*

In *In re Ex-Cel Concrete Company, Inc.*,54 a couple and the business they owned both filed for chapter 11 bankruptcy.55  The business held a secondary lien on the couple's home.56  The primary lien was a mortgage held by Citicorp.57  The bankruptcy cases were eventually converted to chapter 7 liquidations, and the trustee of the couple's estate attempted to sell the couple's home free and clear of the liens that existed in the business bankruptcy case.58  Notice was given to an individual attorney that represented Citicorp in prior bankruptcy cases, but did not represent Citicorp in either the personal or business bankruptcy cases.59  Additionally, this attorney was not even in the country at the time notice was given.60

Citicorp did not become aware of the hearings or the sale until two weeks after the sale order had been entered.61  Citicorp filed a motion to set aside the sale, and the court held subsequent hearings on whether the motion should be granted.62  The court ultimately denied

---

53 *Id*.  *See also* 11 U.S.C. 363(b)(1) ("The Trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . .").
54 178 B.R. 198 (9th Cir. B.A.P. 1995)
55 *Id*. at 199-200.
56 *Id*.
57 *Id*. at 200.
58 *Id*.
59 *Id*.
60 *Id*.
61 *Id*. at 201.
62 *Id*.

Citicorp's motion, holding that notice was sufficient and that the balance of equities favored the

purchasers of the home.63

On appeal, the Bankruptcy Appellate Panel found that notice was both constitutionally

and statutorily deficient. First, several provisions of the Bankruptcy Code provided that a sale

order could only be approved after notice and hearing.64 Because the Bankruptcy Code was

designed to provide assurances to lien holders that they would receive timely notice prior to any

sale, "the trustee failed to pass even the threshold of [the Bankruptcy Code's] requirements."65

Second, service of process on an attorney that has represented a party before but was no longer

doing so was insufficient to satisfy constitutional procedural due process requirements, even if

that lawyer had forwarded the notice to the client.66 Accordingly, the Bankruptcy Appellate

Panel voided the sale order and remanded the case back to the bankruptcy court for further

proceedings.67

### III. Current State of the Law.

While procedural due process notice requirements are flexible, certain principles are

nearly universal and readily applicable. Contrary to GM's assertions in *Motors Liquidation*,

procedural due process requirements do apply in bankruptcy cases.68 There are pecuniary

interests at stake in bankruptcy litigation, and the Fifth Amendment gives stakeholders the right

to have an opportunity to be heard and have their interests addressed. Not only does the due

---

63 *Id*. at 201-02.
64 *See* Fed. R. Bankr. P. 6004(a) ("Notice of a proposed use, sale, or lease of property, other than cash collateral, not
in the ordinary course of business shall be given pursuant to Rule 2002(a)(2), (c)(1), (i), and (k) and, if applicable, in
accordance with § 363(b)(2) of the Code.)" *See also* Fed. R. Bankr. P. 6004(c); Fed. R. Bankr. P. 9014 (reasonable
notice and opportunity for hearing shall be afforded the party against whom relief is sought. No response is required
under this rule unless the court directs otherwise.)
65 *Ex-Cel Concrete*, 178 B.R. at 202-03.
66 *See id*. at 203-04.
67 *Id*. at 205.
68 *Motors Liquidation*, 529 B.R at 550.

process clause mandate this result, but several provisions of the Bankruptcy Code provide that

action can only be taken upon notice and hearing.[69]

    This notice must be delivered in a manner most likely to reach the potential

stakeholder.[70]  It may very well be that actual notice by mail would be impractical under the

circumstances.[71] The stakeholders may be so numerous or hold claims of so little value that

notice by mail may not be economically feasible.[72]  In those instances, notice by publication

may be the most appropriate way to reach those with an interest in the outcome of the

litigation.[73]

    Notice must also give the stakeholder adequate information about the proceedings at hand

so that the stakeholder can decide to "appear or default, acquiesce, or contest."[74]  Again, with

interests in property at stake, notice that inadequately describes the impending proceedings does

not sufficiently inform an individual of what the consequences to their interests can be.

    However, the complication comes with *Mullane*'s holding that individuals in a class can

make arguments on behalf of the whole class, even if not every member of the class received

appropriate notice.[75]  In order to succeed in showing prejudice, the members receiving

inadequate notice will have to prove that the bankruptcy court "got it wrong" in some sense,

either by other objectors failing to bring case law to the court's attention, pointing to statutory

authority that would have mandated a different result, or suggesting any other way the result

would have otherwise been different had they received notice at an appropriate time.[76]  Mere

---

69 *Ex-Cel Concrete*, 178 B.R. at 202-03; *See also* 11 U.S.C. 363(b)(1) ("The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . .").
70 *Motors Liquidation*, 529 B.R. at 566.
71 *Fogel,* 221 F. 3d at 962.
72 *Id*. at 963.
73 *Id.*
74 *Mullane*, 339 U.S. at 314.
75 *Id*. at 319.
76 *Motors Liquidation*, 529 B.R. at 567.

speculation as to other factors that might have changed things is not enough.77  This is a particularly steep hurdle to climb.

**Conclusion**

Meeting procedural due process requirements can be complicated.  Even a bankruptcy as large and complex as GM's could involve circumstances where mass mailings to stakeholders are needed to adequately ensure that those interests can be protected if they so choose.  It is also the case that notice given to even one individual, who then appears at a hearing and presents an argument that all others would have made, may be enough to safeguard all from the harms of ineffective or improper notice.  That being said, selectively mailing notices also increases the risk that those who are due actual notice by mail may be able to attack orders entered by the courts on the grounds that they received inadequate notice and the results would have been different had they had the opportunity to appear and argue their case.  The *Motors Liquidation* case is a clear example of that risk, with certain classes of plaintiffs able to succeed in claiming a violation of their procedural due process rights.78  Wisdom would caution the debtor-in-possession to cast the widest net possible in serving notice on potentially interested parties for the sake of protecting any final order entered into by the bankruptcy court.

---

77 *Id*. at 568.
78 *Id*. at 570.

**EXHIBIT B: DRAFT EMAIL TO WORLDWIDE EARN CUSTOMERS**

Subject: Important notice for Earn customers

Dear Celsius Customer,

According to our records, you have assets deposited into the Earn program. This is an important email about your rights. Please read it.

1. Celsius has filed a motion with the US Bankruptcy Court in the Southern District of New York that is asking the Court to determine whether customers or Celsius holds title to the assets transferred into the Debtors' Earn program and any proceeds thereof (the "Earn Program" and such assets, including any proceeds thereof, the "Earn Assets").

2. There are important deadlines coming up, and the Court will not consider any filings in connection with the Amended Motion submitted after December 2, 2022 at 5:00 p.m., prevailing Eastern Time.

3. Celsius is seeking to have the Court's rulings or opinions regarding the Amended Motion be generally applicable and binding on all parties-in-interest, including in connection with confirmation of a Chapter 11 plan.

To read the Motion and the directions for filing a response, **click here.** To read the scheduling order with important deadlines, **click here.** If you have a response to the Motion, you may file it through your bankruptcy counsel or, if you do not have counsel, you may submit your response **here** in pdf form. A failure to respond to the filing by the deadlines set forth in the order may result in a binding decision that impacts your rights as an Earn customer.