Hearing Date: **December 5, 2022 at 2:00 p.m. (prevailing Eastern Time)**
Objection Deadline: **December 2, 2022 at 4:00 p.m. (prevailing Eastern Time)**

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

*Counsel to the Debtors and Debtors in Possession*

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) Case No. 22-10964 (MG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**NOTICE OF HEARING ON DEBTORS' AMENDED**
**MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE DEBTORS'**
**KEY EMPLOYEE RETENTION PLAN AND (II) GRANTING RELATED RELIEF**

**PLEASE TAKE NOTICE** that a hearing on the *Debtors' Amended Motion for Entry of*

*an Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related*

*Relief* (the "Amended Motion") will be held on **December 5, 2022 at 2:00 p.m., prevailing**

**Eastern Time** (the "Hearing").  In accordance with General Order M-543 dated March 20, 2020,

the Hearing will be conducted remotely using Zoom for Government.  Parties wishing to appear

at the Hearing, whether making a "live" or "listen only" appearance before the Court, need to

make an electronic appearance (an "eCourtAppearance") through the Court's website at

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

https://ecf.nysb.uscourts.gov/cgibin/nysbAppearances.pl.         Electronic     appearances
(eCourtAppearances) need to be made by **4:00 p.m., prevailing Eastern Time, the business
day before the hearing (i.e., on December 2, 2022)**.

  **PLEASE TAKE FURTHER NOTICE** that due to the large number of expected
participants in the Hearing and the Court's security requirements for participating in a Zoom for
Government audio and video hearing, all persons seeking to attend the Hearing at 2:00p.m.,
prevailing Eastern Time on December 5, 2022, must connect to the Hearing beginning at 1:00
p.m., prevailing Eastern Time on December 5, 2022.   When parties sign in to Zoom for
Government and add their names, they must type in the first and last name that will be used to
identify them at the Hearing.  Parties that type in only their first name, a nickname, or initials
will not be admitted into the Hearing.  When seeking to connect for either audio or video
participation in a Zoom for Government Hearing, you will first enter a "Waiting Room" in the
order in which you seek to connect.  Court personnel will admit each person to the Hearing from
the Waiting Room after confirming the person's name (and telephone number, if a telephone is
used to connect) with their eCourtAppearance.  Because of the large number of expected
participants, you may experience a delay in the Waiting Room before you are admitted to the
Hearing.

  **PLEASE TAKE FURTHER NOTICE** that any responses or objections to the relief
requested in the Amended Motion shall:  (a) be in writing; (b) conform to the Federal Rules of
Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and
all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the
Southern District of New York; (c) be filed electronically with the Court on the docket of
*In re Celsius Network LLC*, No. 22-10964 (MG) by registered users of the Court's electronic

filing system and in accordance with all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York (which are available on the Court's website at http://www.nysb.uscourts.gov); and (d) be served in accordance with the *Amended Final Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief* [Docket No. 1181] (the "Case Management Order") by **December 2, 2022, at 4:00 p.m., prevailing Eastern Time**, to (i) the entities on the Master Service List (as defined in the Case Management Order and available on the case website of the Debtors at https://cases.stretto.com/celsius) and (ii) any person or entity with a particularized interest in the subject matter of the Amended Motion.

PLEASE TAKE FURTHER NOTICE that only those responses or objections that are timely filed, served, and received will be considered at the Hearing.  Failure to file a timely Objection may result in entry of a final order granting the Amended Motion as requested by the Debtors.

PLEASE TAKE FURTHER NOTICE that copies of the Amended Motion and other pleadings filed in these chapter 11 cases may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/Celsius.  You may also obtain copies of the Amended Motion and other pleadings filed in these chapter 11 cases by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

*[Remainder of page intentionally left blank]*

New York, New York
Dated: November 21, 2022

*/s/ Joshua A. Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:           jsussberg@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:           patrick.nash@kirkland.com
                 ross.kwasteniet@kirkland.com
                 chris.koenig@kirkland.com
                 dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

Hearing Date: **December 5, 2022 at 2:00 p.m. (prevailing Eastern Time)**
Objection Deadline: **December 2, 2022 at 4:00 p.m. (prevailing Eastern Time)**

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DEBTORS' AMENDED MOTION FOR ENTRY
## OF AN ORDER (I) APPROVING THE DEBTORS' KEY
## EMPLOYEE RETENTION PLAN AND (II) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state the following in support of this motion (this "Amended Motion"):

### Relief Requested

1.    The Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"), (a) approving and authorizing the Debtors' proposed key employee retention plan (the "KERP"), (b) authorizing the Debtors to make payments to certain non-insider employees under the KERP, and (c) granting related relief.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

**<u>Preliminary Statement</u>**

2.      The Debtors file this Amended Motion to provide additional information about the KERP, the Participants, and the analysis the Debtors and their advisors undertook in creating the KERP and selecting the Participants.   The Debtors require a motivated and engaged workforce with institutional knowledge and understanding of the cryptocurrency industry that shares the same vision—indeed, both the Committee[2] and Court[3] recognize the importance of the Debtors' workforce.   Since the Debtors filed the initial KERP motion, seventeen Participants resigned.   Furthermore, the Debtors are losing between approximately thirty and forty employees each month, an unsustainable level of attrition.[4]   The KERP is more critical than ever to assuage Participants' concerns amid the uncertainty of these chapter 11 cases.

3.      Historically, the Debtors' employees have been the backbone of their business, and with recent management changes, the Debtors' employees are more vital than ever to the Debtors' success.   In addition to their regular responsibilities, these key employees also have shouldered the burden of extensive chapter 11-related tasks, including, among others:[5]

- receiving and reviewing nearly 300 diligence requests from the Committee, over 100 diligence requests from the U.S. Trustee, and produced over 100,000 documents;

---

[2]      *See The Official Committee of Unsecured Creditors' Statement With Respect to the Debtors' Motion for Entry of an Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related relief* [Docket No. 117] ("[T]he Committee also recognizes that many of the Debtors' remaining employees possess important institutional knowledge regarding the Debtors' businesses, have taken on increased responsibilities as part of these chapter 11 cases, and face uncertainty while working for a company in chapter 11.").

[3]      *See* Nov. 1, 2022 Hr'g Tr. at 34:22-24 ("[I]t's important that the Debtors have a workforce consistent with its size and operations to be able to carry it forward to a standalone plan or sale.").

[4]      *See* Nov. 15, 2022 Hr'g Tr., 37:9–11 ("It's hard to keep up with the attrition on a daily basis.  We're losing 30–40 employees per month.").

[5]      *See* Ferraro Declaration ¶ 13.

- receiving and reviewing nearly 200 diligence requests from potential bidders with respect to the sale of the Debtors' GK8 Assets[6] and retail platform;[7]

- responding to over fifty requests from the Examiner and participating in numerous telephone and Zoom conferences with the Examiner;

- participating in developing a business plan regarding a standalone reorganization, analyzing regulatory requirements, and developing a new platform and product offerings;

- analyzing and developing a business plan for the Debtors' mining assets, including analyzing attendant risks;

- engaging in discussions and interviews with the Committee surrounding security policies and developed security protocols, which culminated in the security stipulation;

- overseeing the termination and departure procedures for over 400 employees;

- reviewing information related to the Debtors' monthly operating reports required under the Bankruptcy Rules and U.S. Trustee Guidelines;

- preparing for the 341 Meeting;

- reviewing information related to the schedules of assets and liabilities and statements of financial affairs, each of which totaled tens of thousands of pages;

- reviewing and analyzing pleadings filed in these chapter 11 cases, including consulting with their advisors;

- preparing the Debtors' coin reports filed in these chapter 11 cases; and

- preparing weekly full freeze files, which are provided to the Committee and Examiner.

---

[6]  *See Order (I) Approving Bidding Procedures for the Potential Sale of Certain of the Debtors' Assets, (II) Scheduling Certain Dates with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving Contract Assumption and Assignment Procedures, and (V) Granting Related Relief* [Docket No. 687].

[7]  *See Order (I) Approving Bidding Procedures In Connection with the Sale of Substantially All of the Debtors' Assets, (II) Scheduling Certain Dates with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving Contract Assumption and Assignment Procedures, and (V) Granting Related Relief* [Docket No. 1272].

4.      The KERP is narrowly tailored to ensure that key employees are motivated to stay with the Debtors for at least the next year—providing valuable services in support of a plan of reorganization or a sale of some or all of the Debtors' assets that preserve value for the Debtors' stakeholders.  Since the Petition Date, 136 employees have resigned, and the Debtors require the ability to offer competitive compensation or risk a "brain drain" in a vigorously competitive and highly technical industry.  The Debtors must retain key non-insider employees to administer these chapter 11 cases towards a successful resolution.

5.      In an effort to address the Court's concern regarding the list of Participants, the Debtors conferred with the U.S. Trustee on November 2, 2022 and, based on the results of that call, provided a revised Participant list on November 3, 2022.  A further revised Participant list is attached hereto as **Exhibit B**, which was provided to the United States Trustee, Committee, and Examiner on November 21, 2022, prior to filing this Amended Motion.

6.      To that end, the Debtors seek approval of the KERP, which allows the Debtors to retain these key non-insider employees.[8]  The KERP, which provides for the payment of cash retention awards to fifty-nine of the Debtors' non-insider employees (each, a "Participant" and collectively, the "Participants"), is consistent with retention programs in similar chapter 11 cases. No Participant is a statutory insider; rather, each Participant performs a vital role in cash and digital asset management, IT infrastructure and data management, digital security, accounting, legal, compliance, and other critical functions.

---

[8]      **Exhibit B** includes details regarding the proposed Participants including their job title, job description, the division they work in, their supervisor's name and title, who hired the Participant, and a range that encompasses their cash salary, as well as a range for their award under the KERP.  In addition to this information, prior to filing this Amended Motion the Debtors provided counsel to the Committee (as defined herein), counsel to the Examiner (as defined herein), and the U.S. Trustee (as defined herein) with the names of the Participants, their precise cash salary, their precise award under the KERP and additional information as requested by the U.S. Trustee.  The Debtors also provided this information to the Court contemporaneously with the filing of this Amended Motion, along with an unredacted version of **Exhibit B**.

4

7.    Importantly, the KERP complies with the requirements and mandates of the Bankruptcy Code.  After the November 1, 2022 hearing, the Debtors and their outside advisors, including their independent compensation consultant Willis Towers Watson US LLC ("WTW"),[9] financial advisor Alvarez & Marsal North America, LLC, and external legal counsel Kirkland & Ellis LLP, reevaluated the KERP to address the continuing attrition and cryptocurrency industry developments.  In light of the rapid attrition, the Debtors have had to adjust employee roles and responsibilities on a near-continuous basis in recent weeks.  In late October, in recognition of the increased responsibilities being assumed by many of the Debtors' remaining employees, the special committee of the Board of Directors of Debtor Celsius Network Limited (the "Special Committee") approved promotions and/or pay increases for approximately sixty-nine employees, including approximately twenty-seven Participants, as an emergency measure to mitigate attrition.  KERP awards for these Participants are based on pre-raise salary.  Since the initial KERP motion was filed, seventeen Participants resigned and five additional Participants were added, reducing the aggregate cost of the KERP by approximately $125,000.  The KERP provides flexibility for the Debtors to add new Participants and reallocate KERP awards as a tool to encourage retention.  The revised KERP falls below the 50th percentile of the market on a per-Participant basis.  *See* Gartrell Decl. ¶ 21.

8.    The revised KERP was approved by the Special Committee, which is comprised of two directors with extensive restructuring experience that have no personal stake in the KERP. The Special Committee undertook a deliberative process, convening frequently with the Debtors' various advisors, to understand how to best incentivize the workforce in light of a likely in-court restructuring.  After considering various potential options, the Special Committee approved the

---

[9]    WTW has not been formally retained as a professional in these chapter 11 cases.

KERP, which will cost an aggregate amount of approximately $2.84 million if all Participants satisfy the applicable retention objectives.

9.     The KERP complies with the applicable provisions of the Bankruptcy Code, is similar to plans recently approved in chapter 11 cases, is justified by the facts and circumstances of these chapter 11 cases, and is within the Debtors' sound and reasonable business judgment. Similarly, the Debtors have provided diligence information to, and engaged in discussions with, the advisors to the official committee of unsecured creditors ("Committee") regarding the cost and scope of the KERP.  As a result of these efforts, the Committee supported the Debtors' original motion to approve the KERP.  *See The Official Committee of Unsecured Creditors' Statement with Respect to the Debtors' Motion for Entry of An Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 1187] (the "UCC Statement").  The Debtors have also engaged in discussions with the U.S. Trustee regarding the KERP and the disclosure of Participant information.  The Debtors will continue to engage with the Committee and its advisors and the U.S. Trustee regarding the KERP. Moreover, this Amended Motion provides additional information regarding the Participants.  For these reasons and those set forth below, the Court should enter an order authorizing the Debtors to implement the KERP.

**Jurisdiction and Venue**

10.     The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York, entered February 1, 2012.  The Debtors confirm their consent to the Court entering a final order in connection with this Amended Motion to the extent that it is later

determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

11.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

12.     The bases for the relief requested herein are sections 105(a), 363(b), and 503(c) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and rule 6004 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

## Background

13.     The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  These chapter 11 cases have been consolidated for procedural purposes only and are jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket No. 53].  On July 27, 2022, the United States Trustee for the Southern District of New York (the "<u>U.S. Trustee</u>") appointed the Committee [Docket No. 241].  On September 29, 2022, the Court entered an order approving the appointment of an examiner [Docket No. 923] (the "<u>Examiner</u>").

## The Key Employee Retention Program [10]

**I.      The Participants.**

    **A.  The Participants Have Increased Responsibilities During These Chapter 11 Cases.**

14.     Of the Debtors' approximately 167 [11] current employees, the Debtors have designated fifty-nine key employees as Participants who perform a variety of important business

---

[10]     Contemporaneously with the Amended Motion, the Debtors filed the *Supplemental Declaration of Josephine Gartrell in Support of Debtors' Amended Motion for Entry of An Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief* (the "<u>Gartrell Declaration</u>") and *Supplemental Declaration of Christopher Ferraro, Acting Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer of the Debtors, in Support of the Debtors' Amended Motion for Entry of An Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief* (the "<u>Ferraro Declaration</u>").

functions that are vital to the Debtors' ability to preserve and enhance stakeholder value.[12]  Many

of the Participants have developed valuable institutional knowledge regarding the Debtors'

operations that would be difficult and expensive to replace, particularly on an expedited basis.

See Ferraro Declaration ¶ 9.  Since the commencement of these chapter 11 cases, and as set forth

in the Ferraro Declaration, the Debtors' employees have, in addition to their primary

responsibilities, assumed the burden of significant chapter 11-related tasks.  *Id.* ¶ 13.    In

particular, the employees have expended extraordinary effort performing tasks related to the

mining business line, operational activities and reporting, platform maintenance, and drafting a

new business plan.  *Id.* ¶ 14.  The Debtors' employees continue to perform the above-mentioned

tasks in light of significant attrition, including significant turnover in senior leadership,

including, among others, the chief executive officer and co-founder, chief security officer and

co-founder, chief operating officer, and chief financial officer.  *Id.* ¶ 8.  Furthermore, the

headcount reductions by department place further burdens on the remaining employees,

including the Participants.  *Id.* ¶ 15.  As such, the Participants are essential to the successful

administration of the Debtors' chapter 11 cases.  *Id.* ¶ 12.  The cost of the KERP on a

Participant-by-Participant basis is significantly less than the cost of replacing each Participant.

Moreover, the Participants provide important support to the Debtors' advisors in meeting the

additional demands imposed by chapter 11, as described further in the Ferraro Declaration.

*Id.* ¶ 13.

---

[11]   This total does not include employees that have been given notice of termination or have resigned but are working to fulfill any relevant notice periods and thus remain on the payroll as of this filing.

[12]   As of early 2022, the Debtors had over 900 employees, and since the reduction in operations due to the Pause (as described further in the Campagna Declaration), the Debtors have reduced the workforce to the current headcount of approximately 167 as of this filing.  *See* Ferraro Declaration ¶ 9.  These reductions in force have saved the Debtors approximately $70 million per year in compensation costs.  *Id.*

15.     The Participants may be motivated to leave the Debtors during the pendency of these chapter 11 cases due to, among other things, the uncertainty created by the Debtors' ongoing reorganization and marketing efforts.  Indeed, since the Petition Date, 136 employees have resigned.

16.     Additionally, certain employees have not been paid their agreed-upon compensation during these chapter 11 cases.  *See* Ferraro Declaration ¶ 11.  The Debtors previously compensated certain of their employees with their proprietary cryptocurrency ("CEL") token in addition to cash compensation.  *Id.*  This practice is currently suspended, and as such, eligible employees have been missing this portion of their compensation since the first quarter of 2022.  *Id.*  Not all employees or Participants received CEL tokens as part of their compensation, and the number and value of tokens varied.  *Id.*  Thirty-nine of the Participants received, on average, approximately 15,000 CEL tokens.  *Id.*  As of December 31, 2021, this average award was worth approximately $66,000.  *Id.*  As of the Petition Date, the average award of 15,000 tokens was worth approximately $13,800.  *Id.*  On average, Participants are owed an additional 25,500 CEL tokens that have not been issued by the Debtors, some of which would have been awarded if not for the Pause and the chapter 11 filings.  *Id.*  In light of (i) the uncertainty around the treatment of CEL tokens in either a plan of reorganization or a sale process, and (ii) that the Debtors do not have authority from this Court to pay Participants with CEL, the Debtors believe the prior issuances of CEL to employees as compensation strongly favors approval of the KERP.  This will compensate Participants whose effective postpetition compensation is lower due to the Debtors' inability to issue CEL tokens as compensation during these chapter 11 cases.  Preserving each Participant's institutional and technical knowledge is crucial to the Debtors' ability to maximize value.  The Debtors believe the KERP will incentivize

9

Participants to remain with the Debtors during the restructuring process, thereby preserving value for the Debtors, their estates, their customers, and other creditors. *Id.* ¶ 22.

**B. None of the Participants are "Insiders."**

17.     Although certain Participants have titles incorporating the word "head," "director," "vice president," or "chief," no Participant is an "insider" of the Debtors. First, no Participant in the proposed KERP is an employee who was appointed or hired directly by the Debtors' board of directors. *See* Ferraro Declaration ¶ 19. Second, none of the Participants have discretionary control over substantial budgetary amounts. *Id.* Third, no Participant exercises managerial control over, or has responsibility for, the Debtors' operations as a whole. *Id.* Finally, none of the Participants directs the Debtors' overall corporate policy or governance. For example, as set forth in **Exhibit B**, Participants perform, among other tasks, coin-based reporting and cash flow forecasting for public consumption, offer cash and digital asset management assistance, monitor transaction compliance, maintain constant communication amongst the workforce throughout period of high attrition, and oversee maintenance of the Debtors' application and website. *See also id* ¶ 13.

18.     Additional details regarding the Participants and the KERP are set forth in **Exhibit B** attached hereto and as set forth herein.

**II.      The KERP.**

19.     As noted above, the KERP will cost approximately $2.84 million in the aggregate, assuming all Participants are successfully retained by the Debtors and earn the proposed payments. The key terms of the KERP are as follows:[13]

---

[13]     Any description of the KERP contained in this Motion is provided for purposes of convenience only. In the event of any inconsistency between the summary contained herein and the terms and provisions of the KERP, the terms of the KERP shall control unless otherwise set forth herein, *provided* that the terms relating to the total amount of the KERP and the timing of payments provided in this Motion shall control.

- ***Participants***:   Limited to fifty-nine non-insider key employees who will remain with the go-forward business, or approximately thirty-five percent of the Debtors' current workforce.  Each Participant is a critical employee that performs, among other things, accounting, finance, engineering, compliance, legal, human resources, and other critical functions for the Debtors.

- ***KERP Awards and Payment Dates***:   KERP awards represent fixed cash amounts payable as follows: (i) 50% of the award will be paid on the next administratively practicable payroll date following the date of execution of the retention agreement (the "KERP Effective Date" and "First Payment") subject to a clawback for termination for any reason other than without cause prior to the date that is six months following the KERP Effective Date; (ii) 25% of the award will be paid upon the earlier to occur of (x) the nine-month anniversary of the Effective Date, or (y) confirmation of a chapter 11 plan (the "Second Payment"); and (iii) the remaining 25% of the award will be paid upon the earlier to occur of (x) the first anniversary of the KERP Effective Date, or (y) confirmation of a chapter 11 plan (the "Third Payment") based on continued employment of the Participant through the applicable payment dates (except as provided below); *provided* that, to the extent the Second Payment and/or the Third Payment become payable on the earlier confirmation of the chapter 11 plan, such payment(s) will be made as soon as practicable following the confirmation of the chapter 11 plan (and in any event within seven business days following the date of confirmation of the chapter 11 plan).  KERP awards are equal to thirty-five, twenty-five, or fifteen percent of the Participant's annual salary depending on whether the Participant is identified as most critical (thirty-five percent of base salary) or a Tier Two or Tier Three level of criticality, which would pay 25% and 15% of such Participant's base salary, respectively.

- ***Termination of Employment***:   If a Participant voluntarily terminates employment or is terminated for cause prior to the end of the clawback or retention period, the Participant will be required to repay on an after-tax basis, any amounts subject to clawback and forfeit any unpaid KERP award.  If a Participant's employment is terminated due to death, disability, or by the Debtors without cause prior to the end of the clawback or retention period, the clawback will be waived and unpaid retention amounts will vest and be paid.

- ***KERP Reserve Pool.***  The Debtors will reserve funds in the amount of $200,000 (the "KERP Reserve Pool") to be allocated as retention-based cash awards to incentivize and/or retain non-insider employees who are not currently Participants on an as-needed basis at the discretion of management. The KERP Reserve Pool is $200,000 set aside to provide capacity for a few additional awards as needed, which would be noticed consistent with the below procedures.  As stated above, the maximum total cost inclusive of the KERP Reserve Pool is $2.84 million.

11

- **Reallocation.**  Following the resignation or the termination for cause of a Participant (a "Former KERP Participant") during any Retention Period, the Debtors shall have the right to replace any Former KERP Participant with any non-insider employee of the Debtors; *provided* that, prior to replacing any Former KERP Participant, the Debtors will provide (a) the U.S. Trustee; and (b) White & Case LLP as counsel to the Committee; (collectively, the "Notice Parties"), with three-days' notice of the non-insider employee(s) proposed to be added to the KERP (the "New KERP Participant"), including the New KERP Participant's proposed title and the estimated aggregate amount of the cash retention award the New KERP Participant(s) will be eligible to receive in respect of the remaining Retention Periods.  The Notice Parties will have the opportunity to object to New KERP Participants, which objection may be made (and resolved) informally, or, if not informally resolved, may be filed on the docket and resolved by the Court on an emergency basis.

20.    Additional details regarding the Participants are set forth below:

| Salary Range | Number of Participants |
|---|---|
| $25,000–$74,999 | 10 |
| $75,000–$124,999 | 9 |
| $125,000–$174,999 | 19 |
| $175,000–$224,999 | 11 |
| $225,000–$274,999 | 3 |
| $275,000-324,999 | 4 |
| $325,000-374,999 | 0 |
| $375,000–$425,000 | 3 |
| **Award Range** | **Number of Participants** |
| $0– $24,999 | 19 |
| $25,000–$49,999 | 16 |
| $50,000–$74,999 | 17 |
| $75,000–$99,999 | 3 |
| $100,000-$124,999 | 2 |
| $125,000-$150,000 | 2 |

## III.    Reasonableness of the KERP.

21.    As set forth in the Gartrell Declaration and Ferraro Declaration, the Debtors, the Special Committee, and each of their respective advisors reviewed the KERP to determine whether the design, structure, and cost of the KERP is reasonable and consistent with market

practice.  The Debtors designed the KERP with the goal of maximizing the value of their estates for the benefit of all stakeholders and ensuring that the Debtors will be able to operate their business in the ordinary course upon emergence from chapter 11.

22.     The KERP is reasonable compared with postpetition retention plans implemented in other chapter 11 cases.  *See* Gartrell Declaration ¶ 17.  In particular, and as set forth in more detail in the Gartrell Declaration, personnel from WTW analyzed comparable non-insider retention plans approved in recent chapter 11 cases.  *See id* ¶ 17.  WTW benchmarked comparable retention plans from select chapter 11 cases of twenty-six different companies that filed for chapter 11 from 2017 through 2021 with prepetition annual revenues ranging between $375 million and $1.5 billion.  *See id* ¶ 17.  Based on this benchmarking analysis, the total cost of the KERP is reasonable relative to comparable companies.  *See id* ¶ 22.

23.     The award opportunities in the KERP reflect a reasonable, market-based approach and are justified under the circumstances of these chapter 11 cases.  Furthermore, the KERP's total aggregate cost of $2.84 million is reasonable in absolute terms when compared to the aggregate costs of key employee plans approved in other chapter 11 cases.  *See id* ¶ 22.

## Basis for Relief

### I.        The KERP Is a Sound Exercise of the Debtors' Business Judgment.

24.     The KERP is a sound exercise of the Debtors' business judgment.  Section 363(b) of the Bankruptcy Code provides that a debtor "after notice and a hearing may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  To approve the use of estate property under section 363(b)(1) of the Bankruptcy Code, a debtor must show that the decision to use the property outside of the ordinary course of business was based on the debtor's business judgment.  *See, e.g.*, *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge determining a 363(b) application must find a good business reason to

grant such application); *see also In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring "some articulated business justification" to approve the use, sale or lease of property outside the ordinary course of business); *In re Glob. Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003) (holding that entry into a sale agreement including certain mutual release provisions was an exercise of reasonable business judgment); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (noting that the standard for determining a Section 363(b) motion is "a good business reason"); *In re Borders Grp., Inc.*, 453 B.R. 459, 473 (Bankr. S.D.N.Y. 2011) ("In approving a transaction conducted pursuant to section 363(b)(1), courts consider whether the debtor exercised sound business judgment.").

25.     Once a debtor articulates a valid business justification, the law vests the debtor's decision to use property outside of the ordinary course of business with a strong presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was taken in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (citations and internal quotations omitted), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993); *see also In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) (finding that a "presumption of reasonableness attaches to a debtor's management decisions" and courts will generally not entertain objections to the debtor's conduct after a reasonable basis is set forth).  Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

26.     Implementing the KERP is a sound exercise of the Debtors' business judgment and in the best interests of their estates and all stakeholders in these chapter 11 cases.  The Participants—along with their skills, knowledge, and hard work—are critical to the Debtors'

14

ability to maximize stakeholder value. The Participants are familiar with the Debtors' business and have the experience and knowledge necessary to ensure that the Debtors are able to respond to diligence, maintain key data, technology, and security services, and ultimately make distributions to creditors. The Debtors cannot easily replace the Participants without adversely affecting the Debtors' operating efficiency and distracting management from the Debtors' restructuring efforts. Accordingly, the KERP is a sound exercise of the Debtors' business judgment and in the best interest of their estates and all parties in interest in these chapter 11 cases.

## II.    The KERP Is Justified by the Facts and Circumstances of these Chapter 11 Cases.

27.    Section 503(c)(3) of the Bankruptcy Code permits payments to a debtor's employees outside the ordinary course of business if such payments are justified by "the facts and circumstances of the case." 11 U.S.C. § 503(c)(3). Importantly, section 503(c)(3)'s "facts and circumstances" justification test "creates a standard no different that the business judgment standard under section 363(b) of the Bankruptcy Code." *In re Velo Holdings, Inc.*, 472 B.R. 201, 209 (Bankr. S.D.N.Y. 2012); *see also Borders Grp.*, 453 B.R. at 473–74 (evaluating debtors' key employee retention plan under business judgment rule); *In re Dana Corp.*, 358 B.R. 567, 576–77 (Bankr. S.D.N.Y. 2006) (describing six factors that courts may consider when determining whether the structure of a compensation proposal meets the "sound business judgment test" in accordance with section 503(c)(3) of the Bankruptcy Code). Accordingly, whether a retention plan is justified by the facts and circumstances of the case and the analysis of whether the approval of such plan is a sound exercise of the debtor's business judgment are the same.

28.    In the context of approving compensation programs, courts in the Second Circuit have considered the factors identified in *In re Dana Corporation* when determining if a

15

compensation proposal and the process for developing it meet the "sound business judgment"

test:

- Is there a reasonable relationship between the plan proposed and the results to be obtained (i.e., will the key employee stay for as long as it takes for the debtor to reorganize or market its assets?);

- Is the cost of the plan reasonable in the context of the debtor's assets, liabilities, and earning potential;

- Is the scope of the plan fair and reasonable: does it apply to all employees, or if not, does it discriminate unfairly;

- Is the plan or proposal consistent with industry standards;

- What were the due diligence efforts of the debtor in investigating the need for a plan, analyzing which key employees need to be incentivized, what is available, and what is generally applicable in a particular industry; and

- Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

*Dana Corp.*, 358 B.R. at 576–77; *see, e.g.*, *In re Res. Cap., LLC*, 491 B.R. 73, 85–86

(Bankr. S.D.N.Y. 2013) (applying the *Dana* factors to the debtors' retention plan for non-insiders

and approving the plan as an exercise of sound business judgment); *Borders Grp.*, 453 B.R. at

473–74 (same).  No single factor is dispositive, and the Court has discretion to weigh each of

these factors based on the specific facts and circumstances before it.  *See, e.g.*, *In re AMR Corp.*,

490 B.R. 158, 166 (Bankr. S.D.N.Y. 2013) (applying the factors in the context of a non-insider

severance program, noting that "[c]ourts evaluate who is an insider on a case-by-case basis from

the totality of the circumstances").  Even the total absence of a factor may be permissible so long

as the interests of the Debtors are sufficiently protected.  *See Borders Grp.*, 453 B.R. at 477

(finding that the lack of independent counsel was "not fatal" where the presence of other factors

ensured     "that     the     [d]ebtors'     interests     were     sufficiently     protected.");

*In re Glob. Aviation Holdings Inc.*, 478 B.R. 142 (Bankr. E.D.N.Y. 2012) (noting that "the

relatively modest size of the proposed bonus payouts made the retention of independent legal counsel economically inefficient."). The proposed KERP satisfies the standard set forth above, each as discussed more fully below.

29.    ***First***, there is a reasonable relationship between the KERP and Debtors' need to retain key employees. The KERP will ensure that the Debtors have the appropriate staff on hand to facilitate the reorganization or sale and the Debtors' operations upon emergence from chapter 11, thereby maximizing value for the Debtors' estates. Despite the fact that the Debtors' trading, lending, staking, and custody platform (the "Platform") is frozen, the Debtors' employees continue to perform maintenance, updates, and essential security functions on the Platform to facilitate a successful reorganization or sale as well as prepare the platform for making distributions to creditors and for any post-emergence operations. Specifically, the Debtors implemented a protocol that provides for constant surveillance and monitoring of wallets, hack attempts on user accounts, production environments, and employee machines.[14] Additionally, various Participants have assumed tasks relating to these chapter 11 proceedings in addition to their company-related tasks.[15] A failure to retain the Participants would cause the Debtors to incur significant time and money to hire and train replacement employees, which would, in turn, hinder their reorganization to the detriment of all parties in interest.

---

[14]    *See* Nov. 15, 2022 Hr'g Tr., 29:21–23 ("We have a 24/7 team of security experts monitoring wallets, hack attempts on our user accounts, production environments, and employee machines").

[15]    *See* Nov. 15, 2022 Hr'g Tr., 31:8–14 ("On a daily basis, the Debtors oversee and sustain the company's digital security, IT infrastructure, and manage all aspects of their business while also continuing to comply with the requirements of operating the company in Chapter 11, including responding to requests from parties and interests and addressing new issues raised in these cases."). *See also*, Ferraro Decl. ¶ 13.

30.     Moreover, the risk of Participants resigning is real.  Since the Petition Date, 136 of the Debtors' employees have resigned.[16]  Certain of these employees played key roles in the Debtors' operations, and the cost and time required to search for, hire, and train new employees is substantial.  The KERP is designed to prevent further attrition and avoid the further cost and time required in connection with replacing employees.  Courts in this district have granted debtors similar relief, including in cases where the issue of employee resignation appears to have been less acute than it is here.  *See In re Voyager Digital Holdings, Inc.*, No. 22-10943 (MEW) (Bankr. S.D.N.Y. Aug. 25, 2022) (approving KERP for thirty-eight of the debtors' non-insider employees for a maximum aggregate cost of $1.9 million after only eighteen employees resigned); *In re Revlon, Inc.*, No. 22-10760 (DSJ) (Bankr. S.D.N.Y. July 25, 2022) (approving KERP for 160 of the debtors' non-insider employees for a maximum aggregate cost of $15.3 million after facing turnover between twelve percent to twenty-five percent as well as releasing nearly half of U.S. employees); *In re A.B.C. Carpet Co., Inc.*, No. 21-11591 (DSJ) (Bankr. S.D.N.Y. Oct. 5, 2021) (approving KERP for twenty-one of the debtors' non-insider employees for a maximum aggregate cost of $17 million after certain critical employees to the debtors' operation resigned and seventy employees were released); *In re OneWeb Glob. Ltd.*, No. 20-22437 (RDD) (Bankr. S.D.N.Y. May 29, 2020) (approving KERP for forty-seven of the debtors' non-insider employees for a maximum aggregate cost of $3.0 million after ninety percent of the workforce was released); *In re Fairway Grp. Holdings Corp.*, No. 20-10161 (JLG) (Bankr. S.D.N.Y. Apr. 17, 2020) (approving KERP for twenty-seven of the debtors' non-insider

---

[16]    *See* Ferraro Decl. ¶ 10.

employees for a maximum aggregate cost of $1.1 million after twenty-four of the debtors'
employees resigned with five KERP participants having resigned postpetition).[17]

31.     Accordingly, there is a reasonable relationship between the KERP and the
Debtors' need to retain important employees.

32.     **Second**, the cost of the KERP is reasonable given the Debtors' assets and
liabilities.  As discussed above and in the Gartrell Declaration, WTW performed a benchmarking
analysis to assist the Debtors with the design of the KERP.  *See* Gartrell Decl. ¶ 17.  The costs
associated with the KERP are within the range of market practice as compared to plans proposed
and approved at similarly situated companies in chapter 11.  Furthermore, the total cost of the
KERP is only a fraction of the Debtors' total revenue and liabilities, while the costs, both
financial and operational, of losing Participants would be far greater.  Accordingly, the costs are
reasonable and well-justified given the size of the Debtors' business.

33.     **Third**, the scope of the KERP is fair and reasonable.  As noted herein, the Debtors
undertook a careful selection process and received input from their advisors in determining the
specific employees that should be eligible.  In fact, the fifty-nine Participants represent a small
portion of the Debtors' total employee base of approximately 167 people.[18]  These employees
are critical for the Debtors to maximize value for stakeholders.

34.     **Fourth**, the KERP is consistent with industry practice.  The Debtors' senior
management team, none of whom will receive payment under the KERP, in consultation with the
Special Committee and the Debtors' advisors, developed the KERP after a rigorous analysis.  As

---

[17]   Because of the voluminous nature of the orders cited herein, such orders have not been attached to this
Amended Motion.  Copies of these orders are available upon request to the Debtors' counsel.

[18]   Of the fifty-nine Participants, eighteen of the Participants relate to non-debtor entities.  The proposed award to
these Participants is approximately fifteen percent of the total KERP.

outlined in the Gartrell Declaration, the KERP is cost-effective when compared to retention plans in other, similar chapter 11 cases. With respect to eligibility, metrics, and payout timing, the KERP is similar to other plans recently approved in chapter 11 cases.

35.    *Fifth*, the Debtors performed due diligence in determining the need for the KERP. In developing the plan, the Debtors' management team consulted with department heads to determine which employees were most critical to retain and most at risk absent a retention plan. The Debtors also discussed the KERP and list of Participants with department heads and identified the need for the KERP Reserve Pool and the option to reallocate KERP funds to New KERP Participants given the increasing rate of employee departures. As set forth more fully in the Ferraro Declaration, the Debtors then compared their proposed retention awards for Participants against similarly situated companies in chapter 11.

36.    *Sixth*, the Debtors relied in part on the independent review of WTW and their other advisors in developing the KERP. Moreover, prior to filing the Amended Motion the Debtors shared information regarding the KERP with the U.S. Trustee, the Examiner, and counsel to the Committee. Because of this open engagement, the KERP is justified by the facts and circumstances of these chapter 11 cases.

37.    Accordingly, the KERP satisfies the "business judgment standard" identified in *In re Dana Corporation*. Courts in this district also grant relief well in excess of that requested herein. *See, e.g.*, *In re Revlon, Inc.*, No. 22-10760 (DSJ) (Bankr. S.D.N.Y. July 25, 2022) (approving a KERP for 160 of the debtors' non-insider employees with a maximum aggregate cost of $15.3 million); *In re Frontier Commc'ns Corp.*, No. 20-22476 (RDD) (Bankr. S.D.N.Y. May 26, 2020) (approving a KERP with an aggregate approximate maximum cost of $37.6 million covering 390 of the debtors' non-insider employees and including a $2.0 million reserve

pool to incentivize or retain employees not currently covered under the plan); *In re Windstream Holdings, Inc.*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. May 15, 2019) (approving a KERP for up to $5.0 million in the aggregate for a to-be-determined number of employees); *In re Westinghouse Electric Co. LLC*, No. 17-10751 (MEW) (Bankr. S.D.N.Y. Sept. 12, 2017) (approving a KERP for 210 of the debtors' non-insider employees with total cost of $13.8 million); *In re SunEdison Inc.*, No. 1610992 (SMB) (Bankr. S.D.N.Y. July 29, 2016) (approving a KERP for 126 employees with an estimated payout of $7.0 million).[19]

### III.    Section 503(c)(1) of the Bankruptcy Code Is Inapplicable to The KERP as No Participants Are "Insiders."

38.    Section 503(c)(1) of the Bankruptcy Code restricts payments made to "insiders of the debtor for the purpose of inducing such person to remain with the debtor's business"—*i.e.*, those insider plans that are essentially "pay to stay" plans.  11 U.S.C. § 503(c)(1).  By its terms, section 503(c)(1) of the Bankruptcy Code does not apply where participants in a retention-based program are not insiders, as is the case here.

39.    Under section 101(31) of the Bankruptcy Code, where a debtor is a corporation, insiders include any "(i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor . . . or (iv) relative of a . . . director, officer or person in control of the debtor."  11 U.S.C. § 101(31)(B).  Courts have also concluded that an employee may be an "insider" if such employee has "at least a controlling interest in the debtor or . . . exercise[s] sufficient authority over the debtor so as to unqualifiably dictate corporate policy and the disposition of corporate assets."  *Velo Holdings, Inc.*, 472 B.R. at 208 (citations omitted).  Moreover, because the Bankruptcy Code does not define the term "officer," courts look to Black's Law Dictionary

---

[19]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Amended Motion.  Copies of these orders are available upon request to the Debtors' counsel.

as a source of authority.  *See Borders Grp.*, 453 B.R. at 468 ("The term 'officer' is likewise not defined by the Code.  However, courts have looked to Black's Law Dictionary as a source of authority.").  Black's Law Dictionary defines an officer of a corporation as "a person elected or appointed by the board of directors to manage the daily operations of a corporation, such as a CEO, president, secretary, or treasurer."  Black's Law Dictionary (11th ed. 2019).  This reflects the reality of modern-day corporate America—namely, that an employee's job title, alone, does not make such employee an "insider" as defined by the Bankruptcy Code.  *See Borders Grp.*, 453 B.R. at 469 (noting that "[c]ompanies often give employees the title 'director' or 'director-level,' but do not give them decision-making authority akin to an executive" and concluding that certain "director level" employees in that case were not insiders); *Glob. Aviation*, 478 B.R. at 148 ("The fact that some of the KERP Employees have the word 'director' in their titles does not make them insiders.  The label an employer chooses to attach to a position is not dispositive for purposes of insider analysis because '[c]ompanies often give employees the title 'director' or 'director-level' but do not give them decision-making authority akin to an executive.'").

40.    Although certain Participants hold titles including the term "head," "director," "vice president," or "chief," none of the Participants are "insiders," as such term is defined by section 101(31) of the Bankruptcy Code.  Absent appointment by a board of directors, an employee's title alone (for example, "Vice President") does not make that employee an insider. *See In re LSC Commc'ns, Inc.*, 631 B.R. 818, 824–825 (S.D.N.Y. 2021) (emphasizing that "it is not simply the title of 'director' or 'officer' that renders an individual an insider; rather, it is the set of legal rights that a typical corporate director or officer holds" and "*in the absence of board appointment*, a title is insufficient" and "*title* should not be conflated with *board appointment*.")

(quoting *In re Longview Aluminum, L.L.C.*, 657 F.3d 507, 510 (7th Cir. 2011)).  Courts evaluate whether particular employees are insiders "on a case-by-case basis from the totality of the circumstances." *In re AMR Corp.*, 490 B.R. 158, 166 (Bankr. S.D.N.Y. 2013) (citing *In re Velo Holdings Inc.*, 472 B.R. 201, 208 (Bankr. S.D.N.Y. 2012)) (internal quotations omitted). Participants with a "vice president" or "director" title manage only certain aspects of specific departments of the Debtors' business and are removed from general managerial control over the Debtors by at least one direct supervisor. *See* Ferraro Declaration ¶ 18.  None of the Participants have discretionary control over substantial budgetary amounts or significant control with respect to the Debtors' corporate policies or governance.  Moreover, each of the Participants' roles are limited in scope; none make "company-wide or strategic decisions," and none "exercise sufficient authority over the debtor as to unqualifiably dictate corporate policy." *See Glob. Aviation*, 478 B.R. at 148, 150.  None of the Participants were appointed by the Board, sit on the Board, or directly report to the Board.[20]  *See In re LSC Commc'ns,* 631 B.R. at 826 (finding that the employees who were appointed by the board and would be deemed officers under Delaware corporate law should "weigh heavily in concluding that the employees are officers for Bankruptcy Code purposes").  The Participants do not dictate overall corporate policy, nor do they exercise control over the Debtors' significant business or strategic decisions. *See* Ferraro Decl. ¶ 19.  Rather, the Participants perform tasks such as coin-based reporting and cash flow forecasting for public consumption, offer cash and digital asset management assistance, monitor transaction compliance, maintain constant communication amongst the workforce throughout period of high attrition, and oversee maintenance of the Debtors' application and website. *Id*. ¶ 13.

---

[20]    *See* Ferraro Decl. ¶ 19.

41.     Moreover, the Participants do not maintain substantial independent decision-making authority. *Id.* ¶ 19. Instead, the Participants each have limited decision-making authority that is generally operational in nature. *Id.* No Participants have authority or control to dictate corporate policy. *Id.* Similarly, the Participants all lack authority to implement organization-wide strategic policies and operating decisions. *Id.* Authority and decision-making over organization-wide strategy and corporate policy are the responsibility of the Debtors' executive committee which is made up of executives and officers including the interim Chief Executive Officer/Chief Restructuring Officer/Chief Financial Officer, the Chief Revenue Officer, Chief Compliance Officer, Chief Technology Officer, the General Counsel, the Chief Human Resources Officer, and others. *Id.* No Participant is on the Debtors' executive committee. *Id.* Additionally, no Participants have the ability to determine their own compensation. *Id.*

42.     Importantly, in each case, a Participant must receive direction or consent from a senior manager or company officer before such Participant can take any significant action with respect to the Debtors' corporate policies, the disposition of significant assets, or any other action with material economic consequences. *Id.* Furthermore, the Participants had no involvement in deliberations with respect to the KERP. *Id.*

43.     None of the Participants constitute "insiders" of the Debtors, and the restrictions of section 503(c)(1) of the Bankruptcy Code are inapplicable to the KERP.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

44.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the fourteen-day stay period under Bankruptcy Rule 6004(h).

24

**Motion Practice**

45.     This Amended Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Amended Motion.  Accordingly, the Debtors submit that this Amended Motion satisfies Local Rule 9013-1(a).

**Notice**

46.     The Debtors will provide notice of this Amended Motion to the following parties or their respective counsel:  (a) the U.S. Trustee; (b) counsel to the Committee; (c) the Examiner and her counsel; (d) the United States Attorney's Office for the Southern District of New York; (e) the Internal Revenue Service; (f) the offices of the attorneys general in the states in which the Debtors operate;  (g) the Securities and Exchange Commission; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, no other or further notice need be given.

**No Prior Request**

47.     No prior request for the relief sought in this Amended Motion has been made to this or any other court, other than the relief requested in the *Debtors' Motion for Entry of an Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 1201].

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors request that the Court enter the Order granting the relief

requested herein and such other relief as the Court deems appropriate under the circumstances.

New York, New York                          /s/ Joshua A. Sussberg
Dated: November 21, 2022                     **KIRKLAND & ELLIS LLP**
                                             **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                             Joshua A. Sussberg, P.C.
                                             601 Lexington Avenue
                                             New York, New York 10022
                                             Telephone:      (212) 446-4800
                                             Facsimile:      (212) 446-4900
                                             Email:          jsussberg@kirkland.com

                                             - and -

                                             Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
                                             Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
                                             Christopher S. Koenig
                                             Dan Latona (admitted *pro hac vice*)
                                             300 North LaSalle Street
                                             Chicago, Illinois 60654
                                             Telephone:      (312) 862-2000
                                             Facsimile:      (312) 862-2200
                                             Email:          patrick.nash@kirkland.com
                                                             ross.kwasteniet@kirkland.com
                                                             chris.koenig@kirkland.com
                                                             dan.latona@kirkland.com

                                             *Counsel to the Debtors and Debtors in Possession*

26

## Exhibit A

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## ORDER (I) APPROVING THE DEBTORS' KEY
## EMPLOYEE RETENTION PLAN AND (II) GRANTING RELATED RELIEF

Upon the motion (the "Amended Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"), (a) approving and authorizing the Debtors' proposed key employee retention plan (the "KERP"), (b) authorizing the Debtors to make payments to certain non-insider employees under the KERP, and (c) granting related relief, all as more fully set forth in the Amended Motion; and upon the Ferraro Declaration; and upon the Gartrell Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York, entered February 1, 2012; and this Court having the power to enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of these cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Amended Motion is in the best interests of the Debtors'

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2]     Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Amended Motion.

estates, their creditors, and other parties in interest; and this Court having found that the Debtors'
notice of the Amended Motion and opportunity for a hearing thereon were appropriate under the
circumstances and no other notice need be provided; and this Court having reviewed the
Amended Motion and having heard the statements in support of the relief requested therein at a
hearing before this Court (the "Hearing"); and this Court having determined that the legal and
factual bases set forth in the Amended Motion and at the Hearing establish just cause for the
relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is
HEREBY ORDERED THAT:

1.       The Amended Motion is granted as set forth herein.

2.       Pursuant to sections 363(b)(1) and 503(c) of the Bankruptcy Code, the KERP is
approved.

3.       The Debtors are authorized, but not directed, to implement the KERP and make
the payments contemplated thereunder at the times specified in the Amended Motion.

4.       The Debtors may add a replacement participant(s) to the KERP
(a "New KERP Participant") upon the resignation or the termination for cause of any Participant
(a "Former KERP Participant"); *provided* that, prior to replacing any Former KERP Participant,
the Debtors will provide (a) the U.S. Trustee and (b) White & Case LLP, as counsel to the
Committee, with three-days' notice of the non-insider employee(s) proposed to be added to the
KERP, including the New KERP Participant's proposed title and the estimated aggregate amount
of the cash retention award the New KERP Participant(s) will be eligible to receive in respect of
the remaining Retention Periods.  The Notice Parties will have the opportunity to object to New
KERP Participants, which objection may be made (and resolved) informally, or, if not informally
resolved, may be filed on the docket and resolved by the Court on an emergency basis.

5.      Notice of the Amended Motion as provided therein shall be deemed good and sufficient notice of such Amended Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

6.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

7.      The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Amended Motion.

8.      This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

New York, New York
Dated: _____, 2022

_____
THE HONORABLE MARTIN GLENN
CHIEF UNITED STATES BANKRUPTCY JUDGE

## **Exhibit B**

**Participant Detail**

*Celsius Network LLC*
KERP Participant Information
Amended Exhibit

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **KERP Participants** | | | | | | | |
| | | | | | | | |
| **Number** | **Name** | **Job Description** | **Division** | **Supervisor's Name and Title** | **Hired By** | **Cash Salary Range** | **Award Range** |
| 1 | | Plans, directs, and coordinates all accounting ops functions; manages accumulation and consolidation of all financial data for accounting of consolidated business results; prepares internal and external financials; coordinates activities of external auditors; manages the budget process; prepares book reflecting blockchain activities, coordinates books of operating entities, and manages books of local subs; evaluates accounting and internal control systems; develops and monitor business performance metrics; oversees regulatory reporting, frequently including tax planning and compliance. | Finance | Kai Tang, VP of FP&A, Head of Deployment Evaluation & Analysis | Yaniv Tsur | $175,000-$224,999 | $50,000-$74,999 |
| 2 | | Collects and analyzes data, creates forecasting models, performs extended research projects, and prepares presentations. | Operations | Zeran Ji, Manager, Data Analytics | Gabe Ficht | $125,000-$174,999 | $25,000-$49,999 |
| 3 | | Oversees compliance to ensure financial and operational procedures and personal conduct comply with relevant and applicable laws, regulations, and agreements. | Compliance | Oren Blonstein, Chief Compliance Officer | Jeremy Beaudry | $175,000-$224,999 | $50,000-$74,999 |
| 4 | | Collects and analyzes data to drive business insights; Creates forecasting models; Performs extended research projects; Presents data findings. | Operations | Victor Vesnaver Jr., Vice President, Head of Business Initiatives | Oren Blonstein | $125,000-$174,999 | $25,000-$49,999 |
| 5 | | Executes and manages new loan originations with institutional clients; Works with operations team to ensure proper settlement and accounting; mark-to-market existing loan portfolio; Works with senior desk members to develop and implement new lending. | Revenue | Ron Sabo, Head of Research | Harumi Urata-Thompson | $125,000-$174,999 | $50,000-$74,999 |
| 6 | | Assists in managing the treasury strategy with a strong approach on Treasury structure, liquidity, risk models, and debt management. | Finance | Jason Perman, VP of Treasury | Connor Nolan | $125,000-$174,999 | $25,000-$49,999 |
| 7 | | Advisor for the designated internal client groups across all aspects of HR function; works with leaders of the business as well as all functional groups of HR to identify needs, provide input to the development of HR strategies and lead team to achieve strategies. | Human Resources | Trunshedda Ramos, Chief Human Resources Officer | Trunshedda Ramos | $175,000-$224,999 | $25,000-$49,999 |
| 8 | | Leads programs and projects across the global business; coaches, guides and supports projects across business functions; evaluates and monitors project portfolio. | Operations | Eugenia Antipas, Vice President, Head of Project Management Office (PMO) | Melissa Workman | $75,000-$124,999 | $0-$24,999 |

| Number | Name | Job Description | Division | Supervisor's Name and Title | Hired By | Cash Salary Range | Award Range |
|---|---|---|---|---|---|---|---|
| 9 | ▮ | Establishes the PMO role; seeks implementation efficiencies to meet or exceed the financial expectations established at project initiation; develops, implements, and governs program management processes, dashboards, templates, policies, and metrics; monitors compliance with project policies and standards. | Operations | Trunshedda Ramos, Chief Human Resources Officer | Aslihan Denizkurdu | $375,000-$424,999 | $125,000-$149,999 |
| 10 | ▮ | Builds and leads team creating and supporting cloud environment security; secures application infrastructure in AWS, GCP, & AZURE cloud providers; handles outages and security incidents, providing resolution and root cause analysis. | Technology | Guillermo Bodnar, Chief Technology Officer | Jacob Avidar | $175,000-$224,999 | $50,000-$74,999 |
| 11 | ▮ | Manages the review process of regulatory matters and information requests to ensure the organization complies with the applicable regulations. | Revenue | Yarden Noy, Head of Regulations | Odette Wohlman | $75,000-$124,999 | $25,000-$49,999 |
| 12 | ▮ | Assists in managing treasury strategy with a strong approach on Treasury structure, liquidity, risk models, and debt management. | Finance | Jason Perman, VP of Treasury | Connor Nolan | $125,000-$174,999 | $50,000-$74,999 |
| 13 | ▮ | Performs P&L reviews and balance sheet reconciliations for cryptocurrency strategies; performs independent price verification of cryptocurrency assets to ensure appropriate valuation of inventory; collaborates with trading teams and risk management to understand and provide key insights and recommendations on trading strategies; maintains and ensures data integrity for activity across various cryptocurrency strategies; works with Technology team to automate and enhance P&L reporting processes. | Finance | Kai Tang, VP of FP&A | Kai Tang | $125,000-$174,999 | $0-$24,999 |
| 14 | ▮ | Provides daily operations portfolio support, including monitoring transaction flow, resolving data integrity for position and valuation issues, and analyzing/processing cash flows on traditional and alternative interests; maintains accurate internal records to verify portfolio transactions and prepare associated financial reports. | Finance | Lior Koren, Director of Global Taxation | Yaron Shalem | $75,000-$124,999 | $0-$24,999 |
| 15 | ▮ | Manages US and cross border taxation of Celsius; oversees reporting; manages local audits; manages tax structuring activities; supports tax accounting activities. | Finance | Lior Koren, Director of Global Taxation | Lior Koren | $125,000-$174,999 | $50,000-$74,999 |
| 16 | ▮ | Assures clients are provided efficient and timely best in-class support; manages team staff including escalation support, training and assistance; drives and provides timely reports on KPI's; liaises between the Managed Services Remote Support Team to Managed Services Field team, NOC, Professional Services, and Account Management. | Technology | Shiran Kleiderman, Chief Security Officer | David Milner | $125,000-$174,999 | $25,000-$49,999 |
| 17 | ▮ | Supports all functions within the firm by leveraging firm-wide resources to craft standard responses for both formal and informal due diligence requests from third parties with whom the firm is engaging. | Operations | Melissa Workman, Senior Operations Director | Melissa Workman | $125,000-$174,999 | $25,000-$49,999 |

| Number | Name | Job Description | Division | Supervisor's Name and Title | Hired By | Cash Salary Range | Award Range |
|---|---|---|---|---|---|---|---|
| 18 | | Assists with computer hardware and software; resolves IT issues for staff, log bugs and enhancement requests; performs installations, configurations, and updates as needed. | Technology | Shiran Kleiderman, Chief Security Officer | Jessie Gonzalez | $75,000-$124,999 | $0-$24,999 |
| 19 | | Reviews, drafts, and negotiates agreements; monitors and manages potential disputes; drafts complex legal documents; ensures compliance of corporate transactions, supports strategic initiatives. | Legal | Ron Deutsch, General Counsel | Ron Deutsch | $275,000-$324,999 | $75,000-$99,999 |
| 20 | | Performs analysis on forecasted and historical financial and strategic performance, both on a consolidated level and across various business units, products, and geographies; Owns the consolidation and creation of executive management presentations; Assists in the creation of forecasts, strategic and operating plans and financial outlooks. | Finance | Christopher Ferraro, CRO and Interim CEO | Roni Pavon Cohen | $275,000-$324,999 | $100,000-$124,999 |
| 21 | | Leads development of marketing strategy and tactical execution, manages new product marketing support team; responsible for growth metrics and KPIs. | Growth & Product | Oren Blonstein, Chief Product Officer | Oren Blonstein | $175,000-$224,999 | $50,000-$74,999 |
| 22 | | Synthesize user needs, technology constraints and business strategy. Work closely with product, engineering, and business stakeholders across the entire product development lifecycle: from product strategy to design, implementation and measurement. Ensure our products and services adhere to the latest accessibility standards. Help define and implement a multi-platform design system. Provide guidance and mentorship to other designers on team. | Growth & Product | Oren Blonstein, Chief Product Officer | Tushar Nadkarni | $175,000-$224,999 | $50,000-$74,999 |
| 23 | | Leads implementation of global tax compliance strategy; ensures compliance with applicable local country income tax rules and regulations. | Finance | Christopher Ferraro, CRO and Interim CEO | Roni Pavon Cohen | $125,000-$174,999 | $50,000-$74,999 |
| 24 | | Review, draft, negotiate and interpret a variety of agreements, including but not limited to, software, technology and data licensing agreements, as well as purchasing/vendor contracts and other complex agreements arising out of the company's domestic and international operations. | Legal | Ron Deutsch, General Counsel | Ron Deutsch | $75,000-$124,999 | $25,000-$49,999 |
| 25 | | Provide ongoing and proactive strategic advice regarding operational and financial business risks and counsel on contract interpretation and potential dispute issues. | Human Resources | Trunshedda Ramos, Chief Human Resources Officer | Trunshedda Ramos | $225,000-$274,999 | $50,000-$74,999 |
| 26 | | Proactively and cost-effectively monitor and manage potential disputes, and keep stakeholders advised regarding the status of those disputes. | Technology | Shiran Kleiderman, Chief Security Officer | Shiran Kleiderman | $225,000-$274,999 | $75,000-$99,999 |
| 27 | | Ensure that all agreements accurately reflect Celsius` business objectives and comply with all laws and regulatory requirements. | Human Resources | Trunshedda Ramos, Chief Human Resources Officer | Trunshedda Ramos | $175,000-$224,999 | $25,000-$49,999 |

| Number | Name | Job Description | Division | Supervisor's Name and Title | Hired By | Cash Salary Range | Award Range |
|---|---|---|---|---|---|---|---|
| 28 | | Draft and revise complex key legal documents in connection with major domestic and cross-border transactions, including merger agreements, stock purchase agreements, asset purchase agreements, and limited liability company agreements, and prepare issues lists in connection therewith; | Operations | Trunshedda Ramos, Chief Human Resources Officer | Daniel Leon | $225,000-$274,999 | $50,000-$74,999 |
| 29 | | Advise clients and negotiate with counterparty counsel on ancillary transaction documents (including disclosure schedules, transition services agreements, equity commitment letters and various side letters), draft and review transaction term sheets; | Operations | Melissa Workman, Senior Operations Director | Melissa Workman | $25,000-$74,999 | $0-$24,999 |
| 30 | | Maintain compliance of corporate transactions with domestic regulations imposed by regulatory bodies including the SEC, the NYSE, the FTC and the DOJ; | Technology | Stevan Koprivica, Software Architect | Stevan Koprivica | $25,000-$74,999 | $0-$24,999 |
| 31 | | Builds, maintains and owns a prioritized Infrastructure group roadmap in collaboration with the cross functional stakeholders; participates in daily project standups and weekly leadership meetings. | Growth & Product | Vladimir Bujošević, Sr Product Manager, Core Experiences & Platform | Filip Jorakovic | $25,000-$74,999 | $0-$24,999 |
| 32 | | Reviews, analyzes, and verifies payroll reports and documents for accuracy; makes necessary adjustments or corrections through journal entries or other established procedures; analyzes and responds to complex matters requiring comprehensive knowledge of payroll policies and procedures; authorizes exceptions to the policy within defined limits; researches, analyzes and resolves difficult or advanced technical problems or questions; prepares and files a variety of local, state, and federal forms including, but not limited to: NRA tax forms, monthly, quarterly and year end filings; responds to outside agency requests for production. | Human Resources | Tammi Walsh, HR Operations Senior Manager | Jalal Uddin | $25,000-$74,999 | $0-$24,999 |
| 33 | | Designs, builds, and optimizes automation systems that execute business web and data infrastructure platforms. Develops self-service solutions for the engineering department to deliver software with excellent quality and speed. | Technology | Nikola Djokic, VP of Engineering | Yossi Bello | $75,000-$124,999 | $0-$24,999 |
| 34 | | Establishes strategic direction of new and existing initiatives; collaborates with executive leadership to develop and meet company goals while supplying expertise and guidance on operations, projects, and systems; collaborates with other divisions and departments to carry out the goals and objectives of the operations and business of the organization; presents periodic performance reports and metrics to the COO and other executive leadership; maintains knowledge of emerging crypto technologies and trends in operations that may impact the overall operations and business strategies and work processes. | Operations | Jason Perman, Global Treasury Director | Aslihan Denizkurdu | $275,000-$324,999 | $25,000-$49,999 |

| Number | Name | Job Description | Division | Supervisor's Name and Title | Hired By | Cash Salary Range | Award Range |
|---|---|---|---|---|---|---|---|
| 35 | ▮ | Deploys and maintains infrastructure automation and configuration management tools; Designs and implements orchestration solution for dozens of containerized microservices. Supports, improves, and upgrades a continuous deployment & continuous integration environment (CI/CD). Deploys, manages, and monitors advanced security solutions to protect high volume/value trades and transactions. | Technology | Mladen Jordanov, DevOps Team Lead | Yossi Bello | $25,000-$74,999 | $0-$24,999 |
| 36 | ▮ | Develops and guides implementation of engineering strategy and team design; applies superior technology skills to help Engineering team unblock and execute at an extremely high level; Manages and continues to develop the Engineering Managers and Directors, who oversee multiple teams of high-performing engineers; represents Engineering at the company level through cross functional collaboration between Technology and Commercial teams. | Technology | Guillermo Bodnar, Chief Technology Officer | Nuke Goldstein | $125,000-$174,999 | $50,000-$74,999 |
| 37 | ▮ | Reviews, drafts, and negotiates agreements; monitors and manages potential disputes; drafts complex legal documents; ensures compliance of corporate transactions, supports strategic initiatives. | Legal | Ron Deutsch, General Counsel | Ron Deutsch | $275,000-$324,999 | $50,000-$74,999 |
| 38 | ▮ | Assists with computer hardware and software; resolves IT issues for staff, log bugs, and enhancement requests; performs installations, configurations, and updates as needed. | Technology | Jessie Gonzalez, Security & IT Team Lead | Jessie Gonzalez | $25,000-$74,999 | $0-$24,999 |
| 39 | ▮ | Drive growth and success metrics for marketing entire suite of products. Lead development, project management and execution of product marketing campaigns. Liaise closely with product development, security, legal and other internal teams to meet product-specific business goals and objectives. Drive evolution of product and service portfolio, including strategy for evolution of existing products and brainstorming new product and revenue opportunities. Inform Head of Growth Marketing on opportunities, gaps, risks and challenges facing the company through an embedded position within the larger product development and cross-functional teams. | Growth & Product | Oren Blonstein, Chief Product Officer | Matthew Martin | $125,000-$174,999 | $50,000-$74,999 |
| 40 | ▮ | Executes strategic direction and provides feedback with respect to initiative or program creation, alignment to business goals, stakeholder management, and executive communications; builds and manages relationships with key stakeholders, organizations, and business heads; identifies and drives resolution of issues, including those outside established programs of work as needed. | Operations | Guillermo Bodnar, Chief Technology Officer | Aslihan Denizkurdu | $375,000-$424,999 | $100,000-$124,999 |
| 41 | ▮ | Manages all staking activities; evaluates, selects, and oversees implementation of staking strategies. | Revenue | Ron Sabo, Head of Research | Gerrit van Wingerden | $175,000-$224,999 | $50,000-$74,999 |

5

| Number | Name | Job Description | Division | Supervisor's Name and Title | Hired By | Cash Salary Range | Award Range |
|---|---|---|---|---|---|---|---|
| 42 | ▉ | Drive growth and success metrics for marketing entire suite of products. Lead development, project management and execution of product marketing campaigns. Liaise closely with product development, security, legal and other internal teams to meet product-specific business goals and objectives. Drive evolution of product and service portfolio, including strategy for evolution of existing products and brainstorming new product and revenue opportunities. Inform Head of Growth Marketing on opportunities, gaps, risks and challenges facing the company through an embedded position within the larger product development and cross-functional teams | Growth & Product | Oren Blonstein, Chief Product Officer | Vanessa Harris | $175,000-$224,999 | $75,000-$99,999 |
| 43 | ▉ | Influences data sourcing strategy to address data requirements; partners with internal stakeholders to fully understand business strategy; and identifies off-chain data requirements in support of new and existing markets. Maintains reports and data room to help manage ongoing quality and performance of data. | Technology | Guillermo Bodnar, Chief Technology Officer | Daniel Leon | $175,000-$224,999 | $50,000-$74,999 |
| 44 | ▉ | Reports to Chief Risk Officer, serves as SME in identifying, assessing, measuring, and mitigating market and liquidity risks. | Risk | Rodney Sunada-Wong, CRO | Rodney Sunada-Wong | $175,000-$224,999 | $50,000-$74,999 |
| 45 | ▉ | Coaches and manages HR team; ensures standardized practices; project management; improves operational processes; consult with key business functions.  Manages Payroll &HRIS | Human Resources | Mariana Hall, VP/Head of HR Operations | Mariana Hall | $125,000-$174,999 | $25,000-$49,999 |
| 46 | ▉ | Advisor for the designated internal client groups across all aspects of HR function; works with leaders of the business as well as all functional groups of HR to identify needs, provide input to the development of HR strategies, and lead team to achieve strategies. | Human Resources | Darian Faulkner, Director/Executive Business Partner | Mariana Hall | $25,000-$74,999 | $0-$24,999 |
| 47 | ▉. | Establishes, implements, and communicates the strategic direction of new and existing Operations initiatives; collaborates with executive leadership to develop and meet company goals while supplying expertise and guidance on operations projects and systems; collaborates with other divisions and departments to carry out the goals and objectives of the operations business organization; maintains knowledge of emerging crypto technologies and trends in operations that may impact the overall operations and business strategies. | Operations | Oren Blonstein, Chief Product Officer | Aslihan Denizkurdu | $375,000-$424,999 | $125,000-$149,999 |

| Number | Name | Job Description | Division | Supervisor's Name and Title | Hired By | Cash Salary Range | Award Range |
|---|---|---|---|---|---|---|---|
| 48 | | Performs daily and monthly P&L review and balance sheet reconciliation for cryptocurrency strategies; performs independent price verification of cryptocurrency assets to ensure appropriate valuation of firm inventory; collaborates with trading teams and risk management to understand and provide key insights and recommendations on trading strategies. | Finance | Kai Tang, VP of FP&A | Kai Tang | $125,000-$174,999 | $25,000-$49,999 |
| 49 | | Oversees collection and analysis of data, creation of forecasting models, extended research projects, and preparation of presentations | Operations | Victor Vesnaver, VP, Head of Business Initiatives | Gabe Ficht | $125,000-$174,999 | $25,000-$49,999 |
| 50 | | Assures clients are provided efficient and timely best in-class support; manages team staff including escalation support, training and assistance; drives and provides timely reports on KPI's; liaises between the Managed Services Remote Support Team to Managed Services Field team, NOC, Professional Services, and Account Management. | Technology | Shiran Kleiderman, Chief Security Officer | Shiran Kleiderman | $75,000-$124,999 | $0-$24,999 |
| 51 | | Analyzes current operations; researches best practices; sets objectives for business optimization; properly allocates budgets; and oversees technicians and engineers | Technology | Nuke Goldstein, President of Labs | Nuke Goldstein | $75,000-$124,999 | $0-$24,999 |
| 52 | | Responsibility over the resolution of technical issues and debugging activities of software/products; coordinates with engineering department leadership on release timelines of software/products and establishment of minimum release qualifications; implements necessary changes in control documents for quality control measures. | Technology | Guillermo Bodnar, Chief Technology Officer | Nuke Goldstein | $125,000-$174,999 | $0-$24,999 |
| 53 | | Performs advanced R&D on cyber programs, technology development/implementation, assesses threats/vulnerabilities, leads technical teams, writes technical white papers/proposals, and supports customer needs (meetings, calls, emails, demonstrations, etc.); designs in-depth architecture focusing on core security services at the host and network layers; oversees operation of security tools, processes and policies to defend, detect and respond to threats; analyzes, consolidates and standardizes IT throughout the Company; identifies information security architecture gaps. | Technology | Shiran Kleiderman, Chief Security Officer | Shiran Kleiderman | $125,000-$174,999 | $25,000-$49,999 |

| Number | Name | Job Description | Division | Supervisor's Name and Title | Hired By | Cash Salary Range | Award Range |
|---|---|---|---|---|---|---|---|
| 54 | ▮ | Communicates with clients, colleagues, management and other stakeholders throughout the project lifecycle to identify problems or issues and ensure they are resolved; works with other engineers to create new products, features, and improvements to existing products based on client needs; designs software architectures that support the company's goals while ensuring high performance, scalability, and security; develops and maintains software code bases according to established coding standards and best practices; conducts code reviews to ensure that new code is error-free and conforms to established standards; evaluates emerging technologies to determine if they can be integrated into the company's products or services. | Technology | Vladimir Marković, Head of Engineering | Vlada Marković | $25,000-$74,999 | $0-$24,999 |
| 55 | ▮ | Advocates for technical best practices whilst designing innovative, evolutionary architectures; influences and drives team decisions in collaboration with our product managers with a focus on user value; contributes to software development of new features; supports other engineers in collaboration with  our engineering managers. | Technology | Đorđe Stevanović, Lead Software Engineer | Đorđe Stevanović | $25,000-$74,999 | $0-$24,999 |
| 56 | ▮ | Leads programs and projects across the global business; coaches, guides and supports Projects across the business functions; evaluates and monitors project portfolio; performs regular project analysis and makes recommendations. | Technology | Guillermo Bodnar, Chief Technology Officer | Matthew Martin | $125,000-$174,999 | $25,000-$49,999 |
| 57 | ▮ | Advocates for technical best practices whilst designing innovative, evolutionary architectures; influences and drives team decisions in collaboration with our product managers with a focus on user value; contributes to software development of new features; supports other engineers in collaboration with our engineering managers. | Technology | Guillermo Bodnar, Chief Technology Officer | Igor Markovic | $25,000-$74,999 | $0-$24,999 |
| 58 | ▮ | Compiles, organizes, analyzes, and reports information related to financial matters; creates and deploys queries, conducts data analysis, and produces reports and presentations to share critical findings with stakeholders; oversees data migration and verifies the accurate exchange of information between databases or systems; studies trends in historical data to inform financial recommendations or develop forecasts. | Technology | Seshu Vavilikolanu, VP & Head of Global Data Operations | Gabe Ficht | $75,000-$124,999 | $0-$24,999 |
| 59 | ▮ | Collects and analyzes data; creates forecasting models; performs extended research projects; and prepares presentations. | Technology | Seshu Vavilikolanu, VP & Head of Global Data Operations | Gabe Ficht | $125,000-$174,999 | $25,000-$49,999 |