Joshua A. Sussberg, P.C.  
**KIRKLAND & ELLIS LLP**  
**KIRKLAND & ELLIS INTERNATIONAL LLP**  
601 Lexington Avenue  
New York, New York 10022  
Telephone:     (212) 446-4800  
Facsimile:     (212) 446-4900  

*Counsel to the Debtors and Debtors in Possession*

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)  
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)  
Christopher S. Koenig  
Dan Latona (admitted *pro hac vice*)  
**KIRKLAND & ELLIS LLP**  
**KIRKLAND & ELLIS INTERNATIONAL LLP**  
300 North LaSalle Street  
Chicago, Illinois 60654  
Telephone:     (312) 862-2000  
Facsimile:     (312) 862-2200  

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) Case No. 22-10964 (MG) |
| Debtors. | ) (Jointly Administered) |

**SUPPLEMENTAL DECLARATION OF CHRISTOPHER FERRARO, INTERIM CHIEF EXECUTIVE OFFICER, CHIEF RESTRUCTURING OFFICER, AND CHIEF FINANCIAL OFFICER OF THE DEBTORS, IN SUPPORT OF THE DEBTORS' AMENDED MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE DEBTORS' KEY EMPLOYEE RETENTION PLAN AND (II) GRANTING RELATED RELIEF**

I, Christopher Ferraro, hereby declare as follows under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I am the Interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer of Celsius Network, LLC ("Celsius"). Celsius, along with certain of its debtor

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

subsidiaries and affiliates, are debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors").

2. I am familiar with the Debtors' day-to-day operations, businesses and financial affairs, and books and records, including the Debtors' proposed key employee retention plan (the "KERP") as set forth in the *Debtors' Amended Motion for Entry of an Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief*, filed contemporaneously herewith (the "Amended KERP Motion").[2]

3. I submit this supplemental declaration (this "Supplemental Declaration") in support of the Amended KERP Motion. Except as otherwise indicated, the statements set forth in this Supplemental Declaration are based upon my personal knowledge, my review of relevant documents and information concerning the Debtors' operations, financial affairs, restructuring initiatives, and information obtained from other members of the Debtors' management team and advisors. I am authorized to submit this Supplemental Declaration on behalf of the Debtors. I am over the age of eighteen and, if called upon to testify, I could and would testify competently to the facts and opinions set forth in this Supplemental Declaration.

## Qualifications

4. I am the Interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer of Celsius. I was appointed as Chief Financial Officer on July 11, 2022 and was appointed as interim Chief Executive Officer and Chief Restructuring Officer on

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Amended KERP Motion.

September 27, 2022. I have approximately two decades of experience in financial, planning, and analysis activities, asset and liability management, and product control.

5. Before my roles with Celsius, I was a Senior Managing Director at Cerberus Operations & Advisory Company ("Cerberus"), where I focused on improving the operating returns for two legacy portfolio positions. In this role, I advised the chief executive officer and leadership team on increasing profitability by changing and repricing business mix, restructuring costs, and optimizing the balance sheet.

6. Prior to Cerberus, I served in various roles at JP Morgan Chase & Co. from 2001 to 2018. I was the head of Financial Analysis and a Senior Leader, where I was responsible for all financial, planning, and analysis activities, developed analytical tools, and authored a patent application in forecasting. Before my role as head of Financial Analysis and a Senior Leader, I was the Treasurer of the Consumer Bank and the Retail Loan Pricing Manager.

7. I hold a Bachelor's degree in Economics, Finance, & Accounting from the University of Washington. I also passed the Washington state Uniform Certified Public Accountant Examination.

### The Debtors' Employees

8. In light of recent management changes, the Debtors' employees are more vital than ever to the Debtors' success. Since the Petition Date, the Debtors experienced significant turnover in senior leadership, including the:

- chief executive officer and co-founder;
- chief strategy officer and co-founder;
- chief operating officer;

- chief financial officer;

- chief executive officer of the mining business;

- head of corporate/VIP

- vice president of finance; and

- vice president of engineering.

9.      Each Participant performs a vital role in cash and digital asset management, IT infrastructure and data management, digital security, accounting, legal, compliance, and other critical functions.  Many of the Participants have developed valuable institutional knowledge regarding the Debtors' operations that would be difficult and expensive to replace, particularly on an expedited basis.  Furthermore, the Debtors' employees, particularly the Participants, will be critical to the success of the Debtors' go-forward business, in either a standalone restructuring or sale process.  The KERP is necessary at this time to halt the significant attrition the Debtors continue to face.

10.     Due to the rapid growth of the cryptocurrency industry, the labor market for employees who possess the qualifications and skills necessary to operate a sophisticated cryptocurrency trading platform is extremely limited and therefore highly competitive.  I believe it is likely that the Debtors would struggle to adequately source potential candidates who could operate the Celsius platform effectively, and hiring a new employee (if even possible) would require the Debtors to incur significant operational and financial costs.  Indeed, since the Petition Date, 136 employees have resigned, and certain employees continue to receive offers to join competitors, in some instances, for compensation significantly above their current compensation. While the Debtors had over 900 employees early in 2022, the Debtors reduced the workforce to

the current headcount of approximately 167[3] to reflect the reduced operations during the Pause. These reductions in force have saved the Debtors approximately $70 million in annual compensation costs.

11. Moreover, the Debtors previously compensated certain of their employees with their proprietary cryptocurrency token ("CEL") in addition to cash compensation. This practice is currently suspended during the pendency of these chapter 11 cases, and as such, eligible employees have been missing this portion of their compensation since the first quarter of 2022. The treatment of CEL tokens under a plan of reorganization is presently not clear. Furthermore, because of the Pause, employees are not able to sell CEL tokens. If additional CEL tokens were issued to employees, the tokens would be taxed as compensation and employees would need to pay taxes in the near-term without knowing whether any recovery on account of CEL was forthcoming. As a result, management paused CEL awards pending further assessment regarding the utility of CEL as incentive compensation. Over the course of the program, CEL tokens were granted in several ways: as signing bonuses, one-off bonuses, annual bonuses, and/or referral bonuses. Not all of the employees received CEL tokens as part of their compensation packages, and while the number and value of the tokens varied, the average amount received by the thirty-nine eligible Participants was approximately 15,000 CEL tokens. As of December 31, 2021, that averaged to an award of approximately $66,000 given that the CEL token value at the time was $4.39. As of the Petition Date, however, the CEL token award value averaged approximately $13,800 given that the CEL

---

[3] This total does not include employees that have been given notice of termination or have resigned but are working to fulfill any relevant notice periods and thus remain on the payroll as of this filing.

token value was $0.92. On average, Participants are owed an additional 25,500 CEL tokens that have not been issued by the Debtors, some of which would have been awarded if not for the Pause and the chapter 11 filings. The Debtors' practice of compensating some Participants with CEL tokens in addition to their usual salaries strongly favors approval of the KERP to provide additional compensation to the Participants, because the CEL tokens were part of the Participants' regular compensation prepetition and is not paid postpetition.

12. Notwithstanding the fact that the Debtors' trading, lending, staking, and custody platform (the "Platform") is frozen, the Debtors' employees continue to perform maintenance and updates on the Platform to facilitate a successful reorganization or sale as well as prepare the Platform for post-emergence operations. As such, the Debtors must retain the Participants to administer these chapter 11 cases towards a successful resolution. The Debtors' employees are also working closely with the Debtors' advisors to facilitate the administration of these chapter 11 cases and satisfy all chapter 11 reporting obligations. A failure to retain the Participants would cause the Debtors to incur significant time and money to hire and train replacement employees, which would, in turn, hinder their reorganization to the detriment of all parties in interest. I believe the Participants are essential to the successful administration of the Debtors' chapter 11 cases. Accordingly, I believe that retaining key employees is critical to the Debtors' reorganizational efforts and, ultimately, the viability of the Debtors' chapter 11 cases.

13. Since the commencement of these chapter 11 cases, and as a result of the recent attrition, the Debtors' employees have, in addition to their primary responsibilities, assumed the burden of significant chapter 11-related tasks as described below. The employees provide

important support to the Debtors and their advisors in meeting the additional demands imposed by chapter 11, as set forth below.

| Department/Relevant Field of Work | Chapter 11 Related Tasks | Post "Pause" Ongoing Tasks |
|---|---|---|
| **Operations** | <ul><li>Prepare and review monthly operating reports;</li><li>Provide marketing services for the Debtors' assets;</li><li>Respond to over fifty Examiner diligence requests and participate in numerous telephone and Zoom conferences;</li><li>Respond to approximately over 100 U.S. Trustee diligence requests;</li><li>Receive nearly 300 Committee diligence requests;</li><li>Engage in interviews with the Committee surrounding security policies;</li><li>Produce over 100,000 documents; and</li><li>Oversee insurance and chapter 11 due diligence.</li></ul> | <ul><li>Engage in tactical operations;</li><li>Engage in client relations;</li><li>Develop business strategy and future business model analysis;</li><li>Oversee build out of Midland, TX rig sites; and</li><li>Engage in scenario planning for rig-related negotiations.</li></ul> |

| Department/Relevant Field of Work | Chapter 11 Related Tasks | Post "Pause" Ongoing Tasks |
|---|---|---|
| **Finance** | • Prepare and review Monthly Coin and Budget Reports;<br>• Prepare weekly freeze files, which are provided to the Committee and the Examiner;<br>• Prepare and review the Debtors' statements of financial affairs and schedules of assets and liabilities, each of which total tens of thousands of pages; and<br>• Prepare and review the Debtors' monthly operating reports. | • Provide coin-based reporting and cash flow forecasting for public consumption.<br>• Engage in company-wide accounting;<br>• Offer cash and digital asset management assistance;<br>• Abide by financial reporting requirements; and<br>• Oversee tax and payroll obligations. |
| **Legal** | • Review and analyze key chapter 11 filings; and<br>• Engage in discussions with advisors regarding key legal updates and analyzing ongoing legal issues, including custody-withhold issues and ongoing Committee and Examiner investigations. | • Address regulatory requirements and external testing;<br>• Oversee intercompany interaction standards;<br>• Provide risk oversight; and<br>• Monitor transaction compliance. |
| **Human Resources** | • Oversee the termination and departure procedures of over 400 employees;<br>• Respond to questions from employees regarding chapter 11;<br>• Prepare and review bi-weekly and monthly headcount, payroll and labor cost reporting; and<br>• Prepare reporting and data gathering in response to committee, examiner and regulator diligence requests. | • Oversee internal reporting procedures regarding hiring and attrition;<br>• Maintain constant communication with all employees throughout period of high attrition and replacement of at least five key executives;<br>• Manage all payroll, employee tax and benefits strategic and tactical operations;<br>• Drive restructuring and workforce planning of employee resources through attrition changes;<br>• Investigate and respond to employee inquiries; and |

8

| Department/Relevant Field of Work | Chapter 11 Related Tasks | Post "Pause" Ongoing Tasks |
|---|---|---|
| | | • Ensure compliance with local labor laws and regulations in employment matters. |
| **IT Infrastructure** | • Engage in platform maintenance to maintain for post-"pause" activity; and<br>• Engage with various constituents, including the Committee, regarding cryptocurrency security. | • Provide technical analytics;<br>• Oversee crypto-related calculations;<br>• Analyze automation processes; and<br>• Develop software and maintain extraction of significant coding data. |
| **Digital Security** | • Maintain cyber defense mechanisms for post-"pause" activity. | • Oversee maintenance of application and website; and<br>• Engage in 24/7 crypto security oversight. |

14. More specifically, the Debtors' employees have expended extraordinary effort performing the following:

- *Mining Activities*: The Debtors continue to face significant headwinds with respect to their mining assets, particularly near-low Bitcoin prices and rising energy prices. Furthermore, the Debtors are completing a build-out of their Midland proprietary sites in Texas, totaling approximately 20% of the Debtors' rigs. This build-out requires managing third-party contractors, vendors, and power contracts while simultaneously negotiating new power contracts. Moreover, the mining business is facing uncertainty in light of the financial troubles of Core Scientific, Inc., which hosts a significant number of the Debtors rigs. In addition, the Debtors are in negotiations with certain of their other hosting providers.

- *Operational Activities*: The Debtors' employees continue to create and produce coin-based reporting for constituent and public consumption and develop 13-week cash-flow model to manage tight liquidity. Furthermore, the Debtors' employees worked with the Debtors' advisors to prepare voluminous statements and scheduled, completed required reporting under the Bankruptcy Code, and otherwise continue to engage with the Debtors' vendors and customer base. In addition, the Debtors' employees continue to analyze potential tax liabilities, the timing of any potential payments, and any impact on liquidity. The Debtors' employees also continue to manage communications to key stakeholders and monitor the flow of press.

- *Platform Activities*: Notwithstanding the fact that the Platform is frozen, the Debtors continue to protect and secure the Platform, which is a never-ending process. The Debtors continue to establish, socialize, and revise best practices for cryptocurrency security with inputs from multiple constituencies.[4] The Debtors continue to work with their advisors regarding key legal issues regarding the Platform, specifically around the custody program.

- *Business Plan*: The Debtors' employees are preparing a new business plan, including analyzing regulatory requirements and new product offerings, among other things, based upon evolving circumstances, which supports creditor diligence and go-forward resource allocation and the dual-track standalone reorganization and sale process. The Debtors' goal is maximizing value under any transaction structure, the success of which will be overwhelmingly due to the Debtors' employees.

15. Furthermore, the headcount reductions by department place further burdens on the remaining employees, including the Participants. Specifically, the reductions in headcount by department are depicted below:

| Department/Relevant Field of Work | Headcount as of January 1, 2022 | Headcount as of Filing this Declaration[5] |
|---|---|---|
| **Operations** | 246 | 55 |
| **Finance** | 32 | 17 |
| **Legal** | 10 | 5 |
| **Human Resources** | 41 | 11 |
| **Technology** | 294 | 59 |
| **Compliance** | 139 | 20 |
| **Revenue** | 116 | 21 |
| **Risk** | 18 | 2 |
| **Other** | 30 | 15 |

---

[4] *See Joint Stipulation and Agreed Order Between the Debtors and the Committee with Respect to Cryptocurrency Security* [Docket No. 1265].

[5] These totals reflect certain employees that have been given notice of termination or have resigned but are continuing out any relevant notice periods and thus remain on the payroll as of this filing.

10

16.     Accordingly, I believe that the KERP is necessary and appropriate to limit the further attrition of key employees.

## KERP Participants

17.     To develop the KERP, the Debtors consulted with outside advisors, including their independent compensation consultant Willis Towers Watson US, LLC ("WTW"), financial advisor Alvarez & Marsal North America, LLC ("A&M"), and external legal counsel Kirkland & Ellis LLP, to develop a retention plan that is market-based, consistent with competitive practices, and compliant with the Bankruptcy Code.  The Debtors, their advisors, and the Special Committee (which is comprised of two experienced directors that have no personal stake in the KERP) undertook a deliberative process, convening frequently with the Debtors' various advisors, to understand how to best incentivize the workforce in light of a likely in-court restructuring.  In the end, the Special Committee approved the KERP.

18.     Of the approximately 167 current employees, the Debtors identified fifty-nine key non-insider employees as Participants who perform a variety of important business functions that are vital to the Debtors' ability to preserve and enhance stakeholder value.  Without an incentive to remain with the Debtors throughout the chapter 11 process, these key employees will likely seek alternative employment opportunities elsewhere.  Thus, the Debtors require the ability to offer competitive compensation or risk a "brain drain" in a vigorously competitive industry.

19.     Although certain Participants have titles incorporating the word "officer," "head," "director," "vice president," or "chief," none of the Participants are in reality insiders and merely holding such title conveys no special privileges within the Debtors' hierarchy.  Although the Participants are important to the Debtors' business operations, no Participant in the proposed

11

KERP is an employee who: (a) sits on, or directly reports to, the Debtors' board of directors; (b) was appointed or hired directly by the Debtors' board of directors; (c) exercises managerial control over, or has responsibility for, the Debtors' operations as a whole; (d) directs the Debtors' overall corporate policy or governance; (e) maintains substantial independent decision-making authority; (f) has the ability to determine their own compensation. Additionally, Participants with a "vice president" or "director" title manage only certain aspects of specific departments of the Debtors' business and are removed from general managerial control over the Debtors by at least one direct supervisor. In each case, a Participant must receive direction or consent from a senior manager or company officer before such Participant can take any significant action with respect to the Debtors' corporate policies, the disposition of significant assets, or any other action with material economic consequences. Furthermore, the Participants had no involvement in the Debtors' deliberations with respect to the KERP. Authority and decision-making over organization-wide strategy and corporate policy are the responsibility of the Debtors' executive committee which is made up of executives and officers, including myself, the Chief Revenue Officer, Chief Compliance Officer, Chief Technology Officer, General Counsel, Chief Human Resources Officer, among others. No Participant is on the executive committee. My understanding is that, as a result, none of the Participants is an "insider" under the Bankruptcy Code.

20.     Attached to the Amended KERP Motion as <u>Exhibit B</u>, and incorporated herein by reference, is a comprehensive chart that details the Participant's name, job title, division of Celsius in which the Participant is employed, job descriptions, supervisors, hiring managers, salary ranges,

12

and proposed KERP award ranges. I have reviewed the chart and attest that, based on my knowledge of the Debtors, it is complete and accurate.

21. I believe that certain Participants may be motivated to leave the Debtors' employ during the pendency of these chapter 11 cases due to, among other things, the uncertainty created by the Debtors' ongoing reorganization and marketing efforts. I believe that preserving each Participant's valuable institutional and technical knowledge is crucial to the Debtors' ability to maximize value. This institutional and technical knowledge would be difficult and expensive to replace, especially on an expedited basis. I further believe that the KERP will increase the likelihood that the Participants are properly incentivized to remain with the Debtors during the restructuring process, thereby preserving value for the Debtors, their estates, and their stakeholders. I believe that preserving each Participant's institutional and technical knowledge is crucial to the Debtors' ability to maximize value. The Participants are critical to the continued maintenance of customer accounts, and the platform more generally by, among other things, performing essential security functions and building enhanced features and functionality for the Debtors' system and assets. In the absence of the KERP, there is a very real chance of material further attrition that will limit the Debtors' ability to maximize value for all stakeholders.

22. In light of the foregoing, I believe that the KERP will increase the likelihood that the Participants are properly incentivized to remain with the Debtors during the restructuring process, thereby preserving value for the Debtors, their estates, and their stakeholders.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: November 21, 2022  /s/ Christopher Ferraro
New York, New York  Name: Christopher Ferraro
 Title: Interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer of Debtor Celsius Network LLC