| | |
|---|---|
| Joshua A. Sussberg, P.C.<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone:   (212) 446-4800<br>Facsimile:    (212) 446-4900<br><br>*Counsel to the Debtors and Debtors in Possession* | Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)<br>Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)<br>Christopher S. Koenig<br>Dan Latona (admitted *pro hac vice*)<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Telephone:   (312) 862-2000<br>Facsimile:    (312) 862-2200 |

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**SUPPLEMENTAL DECLARATION OF
JOSEPHINE GARTRELL IN SUPPORT OF DEBTORS' AMENDED
MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE DEBTORS'
KEY EMPLOYEE RETENTION PLAN AND (II) GRANTING RELATED RELIEF**

I, Josephine Gartrell, hereby declare under penalty of perjury:

1.  I am a Senior Director at Willis Towers Watson US LLC ("<u>WTW</u>"). On July 5, 2022, Celsius Network LLC (one of the debtors and, together with the above-captioned debtors and debtors in possession in these chapter 11 cases, collectively, the "<u>Debtors</u>") engaged WTW to provide certain compensation consulting services.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

2.  I am a compensation consultant for companies in and out of bankruptcy and am familiar with the prepetition and postpetition structure of the Debtors' compensation programs, including the Debtors' key employee retention plan (the "KERP"), as set forth in the *Debtors' Amended Motion for Entry of an Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief* (the "Amended KERP Motion"), filed contemporaneously herewith.[2] My team and I assisted the Debtors in developing the proposed KERP and advised them on, among other things, sizing, participation considerations, and structure of the KERP.

3.  I submit this supplemental declaration (this "Supplemental Declaration") in support of the Amended KERP Motion. Except as otherwise indicated, I have personal knowledge of all facts in this Supplemental Declaration, based on my review of the Debtors' business and compensation practices, my research into compensation practices for similarly sized companies, my research into the designs of retention plans approved in comparable chapter 11 proceedings, my significant experience in developing such programs, and information supplied to me by members of the Debtors' management team and the Debtors' other advisors. For the reasons described below, it is my opinion that the KERP is reasonable, consistent with market practice, and generally consistent with my consulting experience with similarly situated companies that have sought relief under chapter 11. If called upon to testify, I could and would testify competently to the facts and opinions set forth in this Supplemental Declaration.

## Background and Qualifications

4.  I received my Juris Doctor from the University of San Diego School of Law in 1998, graduating *magna cum laude* and Order of the Coif. I received my Bachelor of Arts in

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to such terms in the Amended KERP Motion.

2

international business from San Diego State University in 1994. After working as an associate at Gibson, Dunn & Crutcher LLP in the corporate practice, Pillsbury Winthrop Shaw Pittman LLP as an associate in the executive compensation practice, and The Loftin Firm, P.C. as a partner and then of counsel in the corporate practice, I became an executive compensation consultant at the Hay Group LLC in 2014. I joined WTW in 2016, where I have been employed ever since.

5. WTW is an international professional services firm offering a wide variety of services to public and private clients, including expert analysis of executive and management compensation. WTW designs and delivers solutions that manage risk, optimize benefits, cultivate talent, and expand the power of capital to protect and strengthen institutions and individuals. WTW focuses on two key business segments: health, wealth, and career & risk and broking.

6. My responsibilities at WTW primarily involve advising for-profit companies and not-for-profit organizations, specifically regarding executive compensation. I routinely assist public and private companies in various industries with compensation philosophy, pay-competitiveness issues, incentive plan design, and other compensation-related analyses. I have participated in the development and design of hundreds of management and employee incentive plans for companies in and outside of bankruptcy.

7. I am highly experienced in executive, management, and employee compensation, having over twenty years of experience in the field. During my tenure at WTW, I have worked closely with a range of companies undergoing financial restructurings to develop a variety of prepetition and postpetition compensation arrangements, including compensation plans and programs for senior executive and non-executive employees. Specifically, I have led or co-led the review and design of key employee incentive plans, key employee retention plans, and other similar plans in a number of chapter 11 cases, including: *In re Mallinckrodt plc*, No: 20-12522

3

(JTD) (Bankr. D. Del. Apr. 5, 2021); *In re PES Holdings, LLC*, No. 19-11626 (KG) (Bankr. D. Del. Nov. 14, 2019); *In re Cloud Peak Energy Inc.*, No. 19-11047 (KG) (Bankr. D. Del. July 1, 2019); *In re FULLBEAUTY Brands Holdings Corp.*, No. 19-22185 (RDD) (Bankr. S.D.N.Y.); *In re Parker Drilling Co.*, No. 18-36958 (MI) (Bankr. S.D. Tex.); *In re Aegean Marine Petroleum Network Inc.*, No. 18-13374 (MEW) (Bankr. S.D.N.Y.); *In re Westmoreland Coal Co.*, No. 18-35672 (DRJ) (Bankr. S.D. Tex.); *In re ATD Corp.*, No. 18-12221 (KJC) (Bankr. D. Del.); *In re Claire's Stores, Inc.*, No. 18-10584 (MFW) (Bankr. D. Del. June 13, 2018).

**WTW's Involvement with the Debtors**

8. The details of WTW's engagement is as follows: The Debtors signed and executed a statement of work document from WTW on July 5, 2022. The statement encompassed the relationship between the parties and identified the KERP as a priority. Since WTW began work, and as of November 12, 2022, WTW has received approximately $414,253.96 in payments from the Debtors.

9. After WTW was engaged by the Debtors, I familiarized myself with the Debtors' operations, business, and restructuring efforts. At the outset of our engagement, the Debtors, the Debtors' other advisors, and WTW discussed the Debtors' operational history, financial performance, restructuring process, and various other issues and areas of concern regarding the Debtors' workforce and employee programs. WTW analyzed the structure of the Debtors' prepetition base salary and primary incentive programs, paying specific attention to the various incentive plans' performance metrics, participating employees, payout frequency, and target payout levels.

10. In particular, WTW analyzed whether the structure of the Debtors' compensation programs for non-insiders formally included a base salary and a target annual bonus opportunity

4

(the sum of which would constitute "Target Total Cash Compensation").  WTW also analyzed whether the Debtors' compensation structure for non-insiders included a target long-term incentive award opportunity (collectively with any Target Total Cash Compensation, "Target Total Direct Compensation").

11. WTW determined that, although non-insiders received an award of CEL tokens upon their respective hire dates, each with a three-year quarterly vesting schedule, these awards were not part of a formal annual bonus opportunity.  In addition, WTW learned that non-insiders were not provided annual long-term equity incentive pay.  Accordingly, WTW concluded that the Debtors' non-insiders were only entitled to their annual base salaries.  Specifically, there were no annualized Target Total Cash Compensation or Target Total Direct Compensation opportunities for Debtors' non-insiders.

12. My team and I performed significant due diligence in helping the Debtors develop the KERP and closely collaborated with the Debtors' management and other advisors in reviewing and advising on the same.  My team and I were provided information concerning the Debtors' historical compensation structure, recent financial and operational performance, and ongoing restructuring efforts.  My team and I also discussed the rationale for the proposed KERP with the Debtors, the Debtors' advisors, and the special committee of the board of directors of Debtor Celsius Network Limited.  WTW's primary goal was to provide an independent assessment of the Debtors' compensation planning that drew directly upon relevant market data as well as my significant experience in designing comparable programs for similarly-situated companies, including companies in chapter 11.

## KERP Overview

13. The KERP provides fixed cash payments in three installments to select non-insiders[3] who I understand are essential to the Debtors' ongoing operations and pose significant retention risks during the pendency of the Debtors' chapter 11 process. The aggregate maximum award under the KERP is approximately $2.84 million, which may be allocated to certain key non-insider employees. This is inclusive of a $200,000 KERP Reserve Pool, which is expanded upon below.

14. The key terms of the KERP are as follows:

- ***Participants***: Limited to fifty-nine non-insider key employees who will remain with the go-forward business, or approximately thirty-five percent of the Debtors' current workforce. Each Participant is a critical employee that performs, among other things, accounting, finance, engineering, compliance, legal, human resources, and other critical functions for the Debtors.

- ***KERP Awards and Payment Dates***: KERP awards represent fixed cash amounts payable as follows: (i) 50% of the award will be paid on the next administratively practicable payroll date following the date of execution of the retention agreement (the "KERP Effective Date" and "First Payment") subject to a clawback for termination for any reason other than without cause prior to the date that is six months following the KERP Effective Date; (ii) 25% of the award will be paid upon the earlier to occur of (x) the nine-month anniversary of the Effective Date, or (y) confirmation of a chapter 11 plan (the "Second Payment"); and (iii) the remaining 25% of the award will be paid upon the earlier to occur of (x) the first anniversary of the KERP Effective Date, or (y) confirmation of a chapter 11 plan (the "Third Payment") based on continued employment of the Participant through the applicable payment dates (except as provided below); *provided* that, to the extent the Second Payment and/or the Third Payment become payable on the earlier confirmation of the chapter 11 plan, such payment(s) will be made as soon as practicable following the confirmation of the chapter 11 plan (and in any event within seven business days following the date of confirmation of the chapter 11 plan). KERP awards

---

[3] Based on my experience and discussions with the Debtors' advisors, I understand that an "insider" for purposes of the KERP refers to the definition under section 101(31) the Bankruptcy Code and that no Participant in the proposed KERP is an employee who: (a) sits on, or directly reports to, the Debtors' board of directors; (b) was appointed or hired directly by the Debtors' board of directors; (c) exercises managerial control over, or has responsibility for, the Debtors' operations as a whole; or (d) directs the Debtors' overall corporate policy or governance. My understanding is that, as a result, none of the Participants is an "insider" under the Bankruptcy Code.

6

are equal to thirty-five, twenty-five, or fifteen percent of the Participant's annual salary depending on whether the Participant is identified as most critical (thirty-five percent of base salary) or a Tier Two or Tier Three level of criticality, which would pay 25% and 15% of such Participant's base salary, respectively.

- ***Termination of Employment***: If a Participant voluntarily terminates employment or is terminated for cause prior to the end of the clawback or retention period, the Participant will be required to repay on an after-tax basis, any amounts subject to clawback and forfeit any unpaid KERP award. If a Participant's employment is terminated due to death, disability, or by the Debtors without cause prior to the end of the clawback or retention period, the clawback will be waived and unpaid retention amounts will vest and be paid.

- ***KERP Reserve Pool.*** The Debtors will reserve funds in the amount of $200,000 (the "KERP Reserve Pool") to be allocated as retention-based cash awards to incentivize and/or retain non-insider employees who are not currently Participants on an as-needed basis at the discretion of management. The KERP Reserve Pool is $200,000 set aside to provide capacity for a few additional awards as needed, which would be noticed consistent with the below procedures. The maximum total cost inclusive of the KERP Reserve Pool is $2.84 million.

- ***Reallocation.*** Following the resignation or the termination for cause of a Participant (a "Former KERP Participant") during any Retention Period, the Debtors shall have the right to replace any Former KERP Participant with any non-insider employee of the Debtors; *provided* that, prior to replacing any Former KERP Participant, the Debtors will provide (a) the U.S. Trustee; and (b) White & Case LLP as counsel to the Committee; (collectively, the "Notice Parties"), with three-days' notice of the non-insider employee(s) proposed to be added to the KERP (the "New KERP Participant"), including the New KERP Participant's proposed title and the estimated aggregate amount of the cash retention award the New KERP Participant(s) will be eligible to receive in respect of the remaining Retention Periods. The Notice Parties will have the opportunity to object to New KERP Participants, which objection may be made (and resolved) informally, or, if not informally resolved, may be filed on the docket and resolved by the Court on an emergency basis.

15. Additional details regarding the Participants are set forth below:

| Salary Range | Number of Participants |
|---|---|
| $25,000–$74,999 | 10 |
| $75,000–$124,999 | 9 |
| $125,000–$174,999 | 19 |
| $175,000–$224,999 | 11 |

7

| | |
|---|---|
| $225,000–$274,999 | 3 |
| $275,000-324,999 | 4 |
| $325,000-374,999 | 0 |
| $375,000–$425,000 | 3 |
| **Award Range** | **Number of Participants** |
| $0– $24,999 | 19 |
| $25,000–$49,999 | 16 |
| $50,000–$74,999 | 17 |
| $75,000–$99,999 | 3 |
| $100,000-$124,999 | 2 |
| $125,000-$150,000 | 2 |

### Analysis of the KERP

16.     The purpose of this KERP is to provide the Debtors' a mechanism by which they can retain their most critical employees throughout the duration of this chapter 11 case. It is WTW's understanding that the Debtors identified those roles and individuals for participation in the KERP based on the significantly negative financial and operational impact of their loss. Simply, without maintaining Participants' continuity of employment, the Debtors would experience great hardship in effectively maintaining operations, emerging from these chapter 11 cases, and delivering the maximum value possible to creditors.

17.     In assessing the reasonableness of the KERP, I worked with my team to analyze the retention plans authorized and approved in the chapter 11 cases of the following twenty-six similarly-sized companies (the "Comparison Group") that filed chapter 11 petitions from 2017 through 2021 and had approximate prepetition annual revenues of $375 million to $1.5 billion: Aceto Corporation; AcuSport Corporation; Appvion, Inc.; Bristow Group Inc.; Brookstone Inc. (2018); Celadon Group, Inc.; Charlotte Russe Holding, Inc.; Ciber, Inc.; Claire's Inc.; Cloud Peak Energy Inc.; Fairway Group Holdings Corp.; FTD Companies, Inc.; Gander Mountain Company Inc.; Gordmans Stores, Inc.; Gymboree Group, Inc.; Ignite Restaurant Group;

8

Legacy Reserves Inc.; Marsh Supermarkets; Nine West Holdings, Inc.; PHI, Inc.; RadioShack (General Wireless); RTW Retailwinds, Inc.; The McClatchy Company; Tuesday Morning Corporation; and Welded Construction, L.P.

18. In conducting this analysis, I also relied upon my significant consulting experience in the research and design of key employee retention plans generally at dozens of other companies.

19. The structure of the KERP comports with my general experience and the findings of my review of retention plans approved in similarly-sized companies. Based on my experience, when a reorganizing debtor's primary market for talent is comprised of non-distressed companies in the general industry, financial services and high tech, the reorganizing debtor lacks material short- and long-term incentive pay opportunities for critical employees that they could otherwise receive if they sought employment at a competitor in one of these industries. Based on my experience, similarly-sized companies operating in the financial services, technology, or general industry would not offer only base salaries as the sole form of compensation, and it is my opinion the Participants would very likely receive incentive opportunities should they leave the Debtors for other jobs. A cash-based KERP will mitigate this weakness in the Debtor's compensation program and help bring them closer to an appropriately competitive range of pay.

20. I note the following observations:

- No 2022 KERP Participant is an insider;

- The retention awards are limited to a subset of critical key employees whose continued employment is necessary to preserve and maximize the value of the Debtors' estates;

- The use of fixed cash retention payouts, expressed as a percentage of salary, is common in key employee retention plans;

- The retention awards expressed as a percentage of salary (*i.e.*, thirty-five, twenty-five, and fifteen percent for Tiers one, two, and three, respectively) are generally consistent with awards in comparable key employee retention plans;

9

- The installment payout feature is consistent with market practice as thirty-eight percent of key employee retention plans reviewed by WTW provided awards through installments;

- Companies providing for installment payments frequently provide for initial awards with a clawback and subsequent installment payments (*e.g.*, initial award representing a portion of the total award with a corresponding clawback and subsequent installment award(s) which make up all or a portion of the remainder of the total retention award value); and

- Accelerated vesting and payment of retention awards is common in the event of an involuntary termination.

21. My team and I also reviewed the annualized total cost of the KERP without the KERP Reserve Pool as it is not currently, and may not be, allocated. Analyzing annual cost is consistent with other key employee retention plans analyzed by WTW. As depicted in the table below:

- the total aggregate cost of the KERP is just below the 75th percentile of the market;

- the average cost per Participant is between the 25th and 50th percentile of the market;

- the cost of the KERP as a percentage of the Debtors' prepetition revenue is between the 75th and 90th percentile of the market; and

- the cost of the KERP as a percentage of the Debtors' assets is less than the 25th percentile of the market.

| Plan Design | Celsius | 25th Percentile in Comp. Group | 50th Percentile in Comp. Group | 75th Percentile in Comp. Group | 90th Percentile in Comp. Group |
|---|---|---|---|---|---|
| Total Cost ($mm) | $2.635 M | $1.1 M | $1.5 M | $2.7 M | $4.4 M |
| Average Cost per Participant | $44,668 | $27,300 | $52,500 | $55,800 | $103,000 |
| Cost as a Percentage of Revenue | 0.35% | 0.16% | 0.22% | 0.32% | 0.39% |
| Cost as a Percentage of Assets | .06% | 0.17% | 0.30% | 0.55% | 0.88% |

22. Based on these analyses, I observed that the Debtors' KERP opportunities per Participant generally were positioned, on average, between the twenty-fifth percentile and median of the market. Given this relationship, I believe the KERP opportunities are reasonable and appropriate in light of competitive market practice. Based on the market data my team and I reviewed, and my significant experience with postpetition non-insider retention programs in other matters, the structure of the KERP is also generally consistent from a key design perspective (such as the frequency of payments, participation levels, and use of cash) of similar non-insider award plans approved on a postpetition basis.

## Conclusion

23. Based on my education and my experience in these and in similar chapter 11 cases, I believe that the design, structure, cost, and award opportunities available under the KERP are reasonable given the facts and circumstances of these chapter 11 cases.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

| | |
|---|---|
| Dated: November 21, 2022<br>San Francisco, California | By: */s/ Josephine Gartrell*<br>Name: Josephine Gartrell<br>Title: Senior Director<br>Willis Towers Watson US LLC |