UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x
In re:                                                    :    Case No. 22-10964 (MG)
                                                          :
    CELSIUS NETWORK LLC, *et al.*[1]                :    Chapter 11
                                                          :
    Debtors.                                          :
                                                          :
---------------------------------------------------------x

# OBJECTION TO DEBTORS' AMENDED MOTION FOR ENTRY OF AN ORDER (I) ESTABLISHING OWNERSHIP OF ASSETS IN THE DEBTORS' EARN PROGRAM, (II) PERMITTING THE SALE OF STABLECOIN IN THE ORDINARY COURSE, AND (III) GRANTING RELATED RELIEF

    Now comes Eric Wohlwend, by and through his undersigned counsel, and hereby submits his Objection to Debtors' Amended Motion for Entry of an Order (i) Establishing Ownership of Assets in the Debtors' EARN Program, (ii) Permitting the Sale of Stablecoin in the Ordinary Course, and (iii) Granting Related Relief (the "Motion") (Doc. No. 1325). For his Objection, Eric Wohlwend ("Wohlwend") states as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

**FACTS:**

1. Wohlwend is a customer of the Debtors and the holder of an account in the Debtors' EARN Program.[2]

2. The Debtors allege in their Motion that by virtue of their Terms of Use that the Earn Assets were conveyed to the Debtors and are, therefore, the Debtors' property and not the property of their customers. The Debtors submit not less than 4 declarations and over one thousand pages of documents to support their argument. Notwithstanding the effort the Debtors put into supporting their argument, it fails.

3. The Debtors rely on paragraph 13 of the Terms of Use to support their argument that they own the Earn Assets. The Debtors attach to the Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network, LLC Providing Terms of Use Dating Back to February 18, 2018 (the "Mashinsky Declaration") (Doc. No. 393) as evidence of their Terms of Use. The Mashinsky Declaration has over one thousand of pages of exhibits including the various iterations of the Debtors' Terms of Use and other documents, some of which are incorporated into the Terms of Use.

4. Exhibit A-8 are the Terms of Use the Debtors allege were in effect on the Petition Date and the Debtors allege that paragraph 13 provides that Earn Assets were conveyed to the Debtors. However, the Terms of Use themselves assert the contrary. For example, the Terms of Use attached to the Mashinsky Declaration as Exhibit A-8, at page 525, state the following "ANY ELIGIBLE DIGITAL ASSET THAT YOU **LOANED** TO CELSIUS THROUGH THE EARN SERVICE PRIOR TO THE MODIFICATION DATE, WILL CONTINUE TO EARN REWARDS. ANY ELIGIBLE ASSET **TRANSFERRED** TO CELSIUS WILL BE INITIALLY

---

[2] Capitalized terms used shall have the same meaning as used in the Motion unless defined otherwise herein.

TRANSFERRED TO THE EARN SERVICE AND CONSTITUTE A **LOAN** FROM YOU TO CELSIUS." Emphasis added. The Terms of Use also contain the following statement.

> **YOUR CELSIUS ACCOUNT IS NOT A BANK ACCOUNT, DEPOSIT ACCOUNT, SAVINGS ACCOUNTS, CHECKING ACCOUNT, OR ANY OTHER TYPE OF ASSET ACCOUNT AND SHOULD NOT BE CHARACTERIZED AS A BANKING PRODUCT OR SERVICE. THE USE OF TERMS SUCH AS "ACCOUNT," "ACCOUNT BALANCE," "WITHDRAW" AND SIMILAR LANGUAGE IN CONNECTION WITH THE EARN SERVICE AND THE BORROW SERVICE (SEE FURTHER SECTIONS 4(D) AND 4(E) BELOW, RESPECTIVELY) DOES NOT IMPLY OR ESTABLISH, AND SHALL NOT BE TAKEN TO SUGGEST, ANY FORM OF CUSTODY RELATIONSHIP, AND SUCH LANGUAGE IS USED HEREIN AS TERMS OF CONVENIENCE ONLY IN REFERRING TO USERS' BORROWING OR <u>LENDING OF DIGITAL ASSETS TO OR FROM CELSIUS AS PART OF THE EARN SERVICE</u> AND BORROW SERVICE, AND CELSIUS' OBLIGATION TO TRANSFER DIGITAL ASSETS TO USERS UPON THE TERMINATION OF SUCH LOANS OR REPAYMENT OF SUCH BORROWING IN CONNECTION WITH THESE SERVICES.**

Exhibit A-8 to Mashinsky Declaration at pg. 526. (Bold in original, underline added.)

In the specific section of the Terms of Use applicable to the Earn Program, the Terms of Use state the following:

> If our Earn Service is available to you, upon your election, you will **lend** your Eligible Digital Assets to Celsius and grant Celsius all rights and title to such Digital Assets, for Celsius to use in its sole discretion while using the Earn Service. The balance of Eligible Digital Assets **loaned** by you to Celsius, and any Rewards gained thereon (see further Section 12 below, "How Rewards are Calculated and Earned") are visible via your Celsius Account.

Exhibit A-8 to Mashinsky Declaration at pg. 538-39 (emphasis added).

And again, the Terms of Use state:

> The Earn Service is not an investment program nor a speculative tool. Rather, you are earning Rewards as a financing fee **on the loan of Eligible Digital Assets** you have transferred to Celsius in connection with the Earn Service, and in accordance with the rates published by Celsius from time to time, pursuant to these Terms.

Exhibit A-8 to Mashinsky Declaration at pg. 540 (emphasis added).

The Terms of Use are replete with references to Earn Assets being loaned to the Debtors and not conveyed to the Debtors.

     5.     The "Setoff and Security Interest Rights" section of the Terms of Use contains the following statement:

> Your acceptance of these Terms serves as your consent to Celsius' asserting its security interest or exercising its right of setoff should any laws governing your Celsius Account require your consent. If the law restricts our ability to take, transfer, or setoff from any obligations to you, or if your Celsius Account balance is protected from attachment, levy, or legal process, you waive those conditions and limits to the full extent that you may do so by contract, and you authorize us to take any actions to offset your Obligations in your Celsius Account being used in the Earn Service.

Exhibit A-8 to Mashinsky Declaration at pg. 546-47

If the Debtors actually owned the Earn Assets as they allege, there would be no purpose served by the foregoing text. The Earn Assets would not be subject to the Debtors' customers' limitations on attachment, levy, or legal process because the customer would have already conveyed them to the Debtors. Similarly, the Debtors would not be exercising rights of setoff against Earn Assets they already claim to own. The Terms of Use again state:

> By transferring Digital Assets to Celsius, or **lending** Eligible Digital Assets to Celsius while using the Earn Service, or otherwise using the Services, you will not be entitled to any profits or income Celsius may generate from any subsequent use of any Digital Assets (or otherwise), nor will you be exposed to any losses which Celsius may suffer as a result thereof.

Exhibit A-8 to Mashinsky Declaration at pg. 547-48 (emphasis added).

It is significant that the Terms of Use themselves contain many references to customers "lending" their Earn Assets to the Debtors and provisions that would have no effect if the Debtors actually owned the Earn Assets.

     6.     Even the paragraph relied upon by the Debtors does not provide for a conveyance of Earn Assets to the Debtors. Paragraph 13 states in pertinent as follows:

4

> In consideration for the Rewards payable to you on the Eligible Digital Assets using the Earn Service, for us entering into any Loan Agreement, and the use of our Services, you grant Celsius, subject to applicable law and for the duration of the period during which you elect to utilize the Eligible Digital Assets in the Earn Service (if available to you) and thus **loan** such Eligible Digital Assets to us through your Celsius Account, or as collateral under the Borrow Service (if available to you), all right and title to such Eligible Digital Assets, including ownership rights….”

Exhibit A-8 to Mashinsky Declaration at pg. 554 (emphasis added).

Even paragraph 13 relied on by the Debtors refers to Earn Assets being loaned to the Debtors, not conveyed. Finally, paragraph 13 of the Terms of Use notably contains no language indicating that it is the exclusive provision addressing ownership of Earn Assets. It does not state "notwithstanding anything in these Terms of Use to the contrary, the following terms govern ownership of Earn Assets". Accordingly, all of the other references to loans of Earn Assets to the Debtors are of equal force and effect.

7.  The Debtors also point to section 2 of the Terms of Use as support for their argument that the Debtors' own the EARN Assets. The opposite is actually true. The pertinent parts of section 2 are as follows:

> "Account" or "Celsius Account" means a User's designated user account on the Celsius website or mobile application, allowing a User to access and use the Services, view the User's balance of Eligible Digital Assets **held in custody on the User's behalf or loaned by the User to Celsius**, and any rewards gained on loaned Eligible Digital Assets, and manage the User's personal information and profile. YOUR CELSIUS ACCOUNT IS NOT A BANK ACCOUNT, DEPOSIT ACCOUNT, SAVINGS ACCOUNTS, CHECKING ACCOUNT, OR ANY OTHER TYPE OF ASSET ACCOUNT AND SHOULD NOT BE CHARACTERIZED AS A BANKING PRODUCT OR SERVICE. THE USE OF TERMS SUCH AS "ACCOUNT," "ACCOUNT BALANCE," "WITHDRAW" AND SIMILAR LANGUAGE IN CONNECTION WITH THE EARN SERVICE AND THE BORROW SERVICE (SEE FURTHER SECTIONS 4(D) AND 4(E) BELOW, RESPECTIVELY) DOES NOT IMPLY OR ESTABLISH, AND SHALL NOT BE TAKEN TO SUGGEST, ANY FORM OF CUSTODY RELATIONSHIP, AND SUCH LANGUAGE IS USED HEREIN AS TERMS OF CONVENIENCE ONLY IN REFERRING TO USERS' BORROWING OR **LENDING OF DIGITAL ASSETS TO OR FROM CELSIUS AS PART OF**

5

**THE EARN SERVICE** AND BORROW SERVICE, AND CELSIUS' OBLIGATION TO TRANSFER DIGITAL ASSETS TO USERS UPON THE TERMINATION OF SUCH **LOANS** OR REPAYMENT OF SUCH BORROWING IN CONNECTION WITH THESE SERVICES.

Exhibit A-8 to Mashinsky Declaration at pg. 526 (Emphasis added.)

Contrary to the Debtors' assertions, there is no mention of the Debtors' customers conveying their digital assets to the Debtors in section 2 of the Terms of Use.

8.   Similarly with section 4 of the Terms of Use, there is no mention of the Debtors' customers conveying their digital assets to the Debtors. The pertinent language in section 4 of the Terms of Use is as follows:

> Your Celsius Account is not a bank account, deposit account, savings accounts, checking account, or any other type of asset account and should not be characterized as a banking product or service. All Eligible Digital Asset balances on your Celsius Account represent Digital Assets that are either (1) **held** in your Custody Wallet by Celsius or a Third Party Custodian, (2) **loaned by you to Celsius**, or (3) **posted** to Celsius as collateral and, therefore, owned, held and/or controlled by Celsius (under the applicable Service, as further detailed herein), and subject to Celsius' obligation to deliver such Digital Assets back to you upon the termination of the applicable Service.

Exhibit A-8 to Mashinsky Declaration at pg. 540.

Again, contrary to the Debtors' arguments, the Terms of Use refer to Celius "holding" digital assets, being "loaned" digital assets, and having digital assets "posted" as collateral. The Terms of Use do refer to digital assets being "owned, held and/or controlled by Celsius" but that language does not constitute language of conveyance of the Debtors' customers' digital assets.

9.   Next the Debtors allege section 10 of the Term of Use support their claim of ownership of their customers' digital assets. The pertinent language in section 10 of the Terms of Use is set forth below:

> By **transferring** Digital Assets to Celsius, or **lending** Eligible Digital Assets to Celsius while using the Earn Service, or otherwise using the Services, you will not be entitled to any profits or income Celsius may generate from any subsequent use

6

of any Digital Assets (or otherwise), nor will you be exposed to any losses which Celsius may suffer as a result thereof.

Exhibit A-8 to Mashinsky Declaration at pg. 547-48.

The Term of Use in section 10 do refer to "transferring" or "lending" digital assets to the Debtors. Unfortunately, the Terms of Use do not define the meaning of "transfer". Transfer can have many meanings and applications depending on the circumstances. The above language does more to muddy the water and sheds no light on exactly what was the relationship between the Debtors and their customers.

10. Finally, the Debtors argue that section 12 of the Terms of Use support their argument. It does not. The pertinent text from section 12 of the Terms of Use is below:

> All Eligible Digital Assets that you elect to utilize in the Earn Service (if available to you) and thus are **loaned** to Celsius (1) are not being used as collateral for Loans, (2) have not had all rights in connection with them assigned to another Celsius user using CelPay, and (3) were not requested for external transmission or withdrawal (Eligible Digital Assets meeting each of these three criteria, "Loaned Digital Assets") entitle you to Rewards while credited to your Celsius Account.
> Exhibit A-8 to Mashinsky Declaration at pg. 552 (emphasis added).

Section 10 only refers to digital assets being loaned to the Debtors, not conveyed to the Debtors. The Debtors even introduce a new defined term "Loaned Digital Assets" which further confuses the relationship between the Debtors and their customers. Nowhere in section 12 of the Terms of Use does the agreement describe the transaction as a sale or conveyance of customers' digital assets to the Debtors.

11. Also attached to the Mashinsky Declaration as Exhibit D is the Earn in CEL Terms of Use (the "Earn Terms"). The introduction section of the Earn Terms states as follows:

> Earn in CEL allows you to earn a financing fee from Celsius referred to as Rewards on Eligible Digital Assets in the form of CEL Token in exchange for entering into **open-ended loans** of your Eligible Digital Assets to Celsius under the terms set forth here and in Celsius Terms of Use By lending your Eligible Digital Assets to

7

> Celsius you grant Celsius all rights and title to such Digital Assets for Celsius to use in its sole discretion.

Exhibit D to Mashinsky Declaration at pg. 1039 (emphasis added). There is no reference at all to conveyances of Earn Assets to the Debtors in the Earn Terms.

12. Yet another attachment to the Mashinsky Declaration refers to Earn Assets being loaned to the Debtors, not conveyed to the Debtors. Exhibit F, the SWAP Payment Terms of Use (the "SWAP Terms") states that "These Swap Beta Terms apply in addition to Celsius' Terms of Use ("Celsius Terms of Use"), which govern all use of Celsius' services." Exhibit F to Mashinsky Declaration at pg. 1052. The introduction to the SWAP Terms states that "Our Swap service allows you to exchange a certain Eligible Digital Asset you **loaned** to Celsius as part of the Earn Rewards service…." Exhibit F to Mashinsky Declaration at pg. 1052 (emphasis added). The Execution section of the SWAP Terms states that "Each Swap transaction is entered into between you and Celsius (as buyer or seller, as applicable), and Celsius does not act as your broker, agent or intermediary. By entering into any Swap transaction, you instruct and authorize us to (i) terminate your existing **loan** of the Swapped Assets to Celsius…." Exhibit F to Mashinsky Declaration at pg. 1053 (emphasis added). Finally, the Custody section of the SWAP Terms states in pertinent part that "We will hold your Swapped Assets in custody for your benefit only as part of the Swap service, and only for the minimal period of time required for the purpose of completing your Swap transaction. **Celsius will not have ownership rights** over the Digital Assets you place in its custody for purposes of exchanging them. You will be considered the legal owner of the Swapped Assets in Celsius' custody when engaged in a Swap transaction." Exhibit F to Mashinsky Declaration at pg. 1054 (emphasis added). The SWAP Terms express incorporation into the Debtors' Terms of Use creates significant issues and is in direct conflict with the Debtors' contention that they own their customers' digital assets.

8

13. Second, the SWAP Terms contain provisions that are nonsensical if the Debtors owned the EARN Assets. There would be no reason for the execution section to provide that the Debtors would act as "buyer or seller, as applicable" if it already owned the EARN Assets. Finally, the SWAP Terms refer to terminating the customers' existing loans in exchange for new loans.

14. Next, the Mashinsky Declaration refers to the Risk Disclosure attached thereto as Exhibit I. The "Risks Related to Using the EARN Service" state as follows: "You acknowledge that by utilizing the Earn service, **your digital assets** are not custodied by Celsius and may be subject to total loss if an event occurs at the protocol level, which is outside of Celsius' control. You understand and agree that notwithstanding anything else contained in this Risk Disclosure, Celsius will not be responsible for any such loss (whether total or otherwise) of **your digital assets** and will not replace them or otherwise compensate you." Exhibit I to Mashinsky Declaration at pg. 1113 (emphasis added). The Risk Disclosure continues to state that:

> Celsius deploys digital assets **that you loan to Celsius** through the Earn service in a variety of income generating activities, including lending such digital assets to third parties and transferring them to external platforms and systems. Celsius conducts in-depth due diligence reviews of any such third party or platform or system, including security, financial and credibility tests. However, Celsius cannot guarantee that these third parties, platforms or systems shall not suffer any breaches, lose such assets or fail to return any assets to Celsius, resulting in financial loss. Celsius may also sell, trade or stake digital assets, which may result in financial loss.

Exhibit I to Mashinsky Declaration at pg. 1113 (emphasis added).

The Risk Disclosure, as with many other of the Debtors' documents and agreements provided to customers refers to assets loaned to the Debtors, not conveyed to the Debtors. The Risk Disclosure also refers multiple times to "your digital assets". How else would a person interpret that language other than the customers continued to own their digital assets held by the Debtors.

15.     Lastly, if the transactions between the Debtors and their customers were actual conveyances of digital assets to the Debtors, those transactions would have been taxable events. The customers would have incurred either taxable gains or losses upon the conveyance of their digital assets to the Debtors. That taxable event would have triggered the obligation on the Debtors to issue 1099 statements to their customers. The Debtors issued no 1099 to Wohlwend and Wohlwend is not aware of any customer being issued a 1099 statement upon the deposit of their digital assets into an EARN Account. That fact, in and of itself, leads to the conclusion that the Debtors did not receive a conveyance of their customers' EARN Assets.

**ARGUMENT:**

16.     All the foregoing can lead to only one conclusion, the Debtors do not own the Earn Assets because their agreements are ambiguous. They are internally inconsistent and are replete with references of their customers loaning assets in EARN Accounts to the Debtors rather than conveying EARN Assets to the Debtors and provisions that are nonsensical if the Debtors actually owned their customers' assets.

17.     Under New York law, to determine if a clause in a contract is ambiguous "it is necessary to consider it in the context of the entire" agreement. <u>Bayerische Hypo-Und Vereinsbank AG v. Banca Nazionale Del Lavoro, S.p.A. (In re Enron Corp.)</u>, 292 B.R. 752, 763 (Bankr. S.D.NY 2003) (citations omitted). See also, <u>Bank of America, N.A. v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings, Inc.)</u>, 439 B.R. 811 (Bankr. SDNY 2010) 37 N.Y.2d 434, 335 N.E. 2d 299, 302, 373 N.Y.S.2d 72 (N.Y. 1975) ("We read the writing as a whole. We seek to give each clause its intended purpose in promotion of the primary and dominant purpose of the contract.") (citations omitted)."

18. In this instance, the agreement between the Debtors and their Earn customers consists of the Terms of Use document together with all the other effective documents related thereto including the EARN Terms, SWAP Terms, and the Risk Disclosure. Every one of those documents either expressly states in multiple places that the Debtors' EARN customers are loaning their digital assets to the Debtors or contain provisions that make no sense if the Debtors actually owned their customers' EARN Assets. Those provisions in the agreements are in direct conflict with the Debtors' argument that paragraph 13 of the Terms of Use acts to convey the EARN customers' digital assets to the Debtors.

19. The Court in In re Allegiance Telecom, Inc., 356 B.R. 93 (Bankr. SDNY 2006) stated that "a court should find contractual provisions ambiguous only if they are reasonably susceptible to more than one interpretation by reference to the contract alone." Id. at 99 (citations omitted). The Allegiance court also emphasized that "[t]his is particularly appropriate if the contract 'was negotiated between sophisticated, counseled business people negotiating at arm's length.'" Id. (citations omitted). Finally, the Allegiance court stated that "'Under New York law,[8] a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the **unequivocal** language they have employed.'" Id. at 98 (emphasis added, citations & footnotes omitted).

20. In this instance, the agreement between the Debtors' and their EARN customers was not negotiated between sophisticated business people. In fact, there was no negotiation at all. As the Debtors represented at length in the Motion, the agreement was a take it, or leave it proposition. Motion at pgs. 10-14. The EARN customers had an opportunity to review the Terms of Use and related documents incorporated therein, but no opportunity to negotiate anything. Their expression of the terms of the agreement consisted of clicking on "accept". So, after an EARN

11

customer reviewed the Terms of Use, EARN Terms, SWAP Terms, and Risk Disclosure, with their multiple references to loaning digital assets, and one reference purporting to convey their digital assets to the Debtors, the parties' intent is anything but clear.

21.     Even the Debtors' intent cannot be gleaned from the Terms of Use, EARN Terms, SWAP Terms, and Risk Disclosure. Again, every one of those documents has multiple references to EARN customers lending their digital assets to the Debtors and provisions that are nonsensical if the Debtors owned the EARN customers' digital assets. Against that backdrop, the Debtors argue that one provision, paragraph 13, trumps the entirety of the agreements. The Debtor's intent with respect to who actually owns the EARN Assets is anything but clear and what their customers thought they were agreeing to, or their intent, is even less clear.

22.     Under New York law, any ambiguity in a contract must be construed against the drafter. See, <u>Aron Sec., Inc. v Unkechaug Indian Nation</u>, 151 A.D.3d 674, 676; 54 N.Y.S.3d 668, 671 (NY Supreme Court, Appellate Div., Second Dept. 2017). As stated above, the Debtors' EARN customers had no role in actually negotiating the terms of the Terms of Use, EARN Terms, SWAP Terms, and Risk Disclosure. Those agreements are wholly the product of the Debtors and the only role the EARN customers played in the process was to have to click "accept" to continue being a customer of the Debtors. As such, the contract must be strictly construed against the Debtors.

23.     Additionally, the conduct of the parties is relevant to determine the intent of the parties to a contract. See, <u>In re Lehman Bros</u>., 439 B.R. at 825. In this instance, the Debtors' conduct leads to the conclusion that the EARN customers retained ownership of their digital assets. The Debtors' conduct includes the fact that they did not issue 1099 forms to the EARN customers upon the alleged conveyance of their digital assets to the Debtors. If the Debtors actually took title

to the EARN customers' digital assets, one would believe that the Debtors would comply with the Internal Revenue Code and issue 1099 forms to their customers. The fact that they did not issue 1099 forms indicates that the Debtors did not even treat the transaction as a conveyance of EARN customers' digital assets.

24. Finally, the Terms of Use expressly disavow that customers' "accounts" were bank accounts or gave customers the rights of a bank account holder. The pertinent language in paragraph 13 of the Terms of Use state as follows:

> **YOUR CELSIUS ACCOUNT IS NOT A BANK ACCOUNT, DEPOSIT ACCOUNT, SAVINGS ACCOUNTS, CHECKING ACCOUNT, OR ANY OTHER TYPE OF ASSET ACCOUNT AND SHOULD NOT BE CHARACTERIZED AS A BANKING PRODUCT OR SERVICE. THE USE OF TERMS SUCH AS "ACCOUNT," "ACCOUNT BALANCE," "WITHDRAW" AND SIMILAR LANGUAGE IN CONNECTION WITH THE EARN SERVICE AND THE BORROW SERVICE (SEE FURTHER SECTIONS 4(D) AND 4(E) BELOW, RESPECTIVELY) DOES NOT IMPLY OR ESTABLISH, AND SHALL NOT BE TAKEN TO SUGGEST, ANY FORM OF CUSTODY RELATIONSHIP, AND SUCH LANGUAGE IS USED HEREIN AS TERMS OF CONVENIENCE ONLY**

A bank account creates a debtor-creditor relationship between a bank and its account holders. In re Lehman Bros. Holdings, 404 B.R. 752, 758 (Bankr. S.D.N.Y. 2009). Celsius' statement that its accounts are not bank accounts and do not function like a bank account lead to the conclusion that there is not a debtor creditor relationship between Celsius and its EARN customers. Instead, the only logical conclusion is that Celsius is holding its EARN account holders' digital assets, but the customers at all times retain ownership of their digital assets in Celsius' possession.

25. In light of the foregoing, construing the agreement against the Debtors, it is clear that the agreements with the EARN customers resulted in a loan of their digital assets to the Debtors with certain rights granted to the Debtors to use those digital assets to generate income for rewards. However, the EARN customers at all times retained ownership of their digital assets. As

such, the Debtors now have no right to sell the EARN Customers' digital assets for the Debtors' own use.

26. Accordingly, for the reasons stated above, the court should find the Debtors' agreement with their EARN customers is ambiguous and should be construed against the Debtors. The court should further find that the agreement with the Debtors' EARN customers resulted in the loan of digital assets to the Debtors with certain rights granted to the Debtors to use the EARN customers' digital assets to generate profits for rewards. Lastly, the Debtors' motion for authority to sell the EARN Assets should be denied in its entirety because the Debtors do not own the EARN Assets and, therefore, they are not assets that the Debtors may use, sell, or lease under section 363(b) of the Bankruptcy Code.

    Respectfully submitted,

    /s/ Anthony J. DeGirolamo
    Anthony J. DeGirolamo (0059265)
    3930 Fulton Drive NW, Suite 100B
    Canton, Ohio 44718
    Telephone: 330-305-9700
    Facsimile: 330-305-9713
    Email: tony@ajdlaw7-11.com

    COUNSEL FOR ERIC WOHLWEND

**CERTIFICATE OF SERVICE**

I hereby certify that on November 22, 2022, a copy of the foregoing Objection was electronically transmitted via the Court's CM/ECF system to those listed on the Court's Electronic Mail Notice list:

- **David J. Adler**   dadler@mccarter.com
- **Susan L Adler**   nycsa@aol.com, susannycsa@gmail.com
- **Nelly Cessiska Almeida**   nalmeida@milbank.com, jbrewster@milbank.com;aheine@milbank.com;mwyanez@milbank.com;nelly-almeida-8701@ecf.pacerpro.com
- **Andrea Amulic**   andrea.amulic@whitecase.com, jdisanti@whitecase.com,mco@whitecase.com
- **Michael Andolina**   mandolina@whitecase.com, jdisanti@whitecase.com,mco@whitecase.com
- **Darren T. Azman**   dazman@mwe.com, mco@mwe.com;cgreer@mwe.com
- **Alexandra Steinberg Barrage**   abarrage@dwt.com
- **Malcolm M Bates**   mbates@duanemorris.com
- **Ronit Berkovich**   Ronit.Berkovich@weil.com
- **Jeffrey Bernstein**   jbernstein@mdmc-law.com, kpatterson@mdmc-law.com
- **Michael P. Broadhurst**   mbroadhurst@wgpllp.com
- **Dean Lindsay Chapman**   dchapman@akingump.com, AGSearch-Lit@akingump.com;kmanlove@akingump.com;nymco@akingump.com
- **Michael Chen**   mchen@akingump.com
- **Shawn M. Christianson**   schristianson@buchalter.com, cmcintire@buchalter.com
- **Jeffrey S. Cianciulli**   jcianciulli@wgpllp.com, imarciniszyn@weirpartners.com
- **Marvin E. Clements**   agbanknewyork@ag.tn.gov
- **Hollace T. Cohen**   hollace.cohen@fisherbroyles.com
- **Aaron Colodny**   aaron.colodny@whitecase.com, jdisanti@whitecase.com,mco@whitecase.com
- **Dawn R. Copley**   dcopley@dickinsonwright.com, tcorey@dickinsonwright.com
- **Karen Cordry**   kcordry@naag.org
- **Shara Claire Cornell**   shara.cornell@usdoj.gov
- **Anthony J. DeGirolamo**   tony@ajdlaw7-11.com
- **Roma N Desai**   roma.desai@oag.texas.gov
- **Thomas Robert Dominczyk**   tdominczyk@mauricewutscher.com, thomas-dominczyk-5025@ecf.pacerpro.com
- **Daniel Eggermann**   deggermann@kramerlevin.com, corporate-reorg-1449@ecf.pacerpro.com
- **Stuart P. Gelberg**   spg@13trustee.net
- **Jeffrey R. Gleit**   jeffrey.gleit@afslaw.com, lisa.indelicato@afslaw.com;alyssa.fiorentino@afslaw.com
- **Brian D. Glueckstein**   gluecksb@sullcrom.com, s&cmanagingclerk@sullcrom.com;brian-glueckstein-5384@ecf.pacerpro.com
- **Bonnie R. Golub**   bgolub@wgpllp.com

15

- **Andrew R. Gottesman**  gottesman@mintzandgold.com, gottesman@mintzandgold.com
- **Brian G. Hannon**  bhannon@norgaardfirm.com, sferreira@norgaardfirm.com;kcimmino@norgaardfirm.com;crose@norgaardfirm.com
- **Juandisha Harris**  harrisj12@michigan.gov
- **Samuel P Hershey**  shershey@whitecase.com, mco@whitecase.com,jdisanti@whitecase.com
- **Mitchell Hurley**  mhurley@akingump.com, bkemp@akingump.com;dkrasa@akingump.com
- **Monique Debrikka Jewett-Brewster**  mjb@hopkinscarley.com, eamaro@hopkinscarley.com
- **Katherine Johnson**  kjohnson3@ftc.gov, kaizpuru@ftc.gov
- **John Kane**  jkane@akingump.com
- **Barry R. Kleiner**  dkleiner@kkwc.com
- **Gregory Kopacz**  gkopacz@sillscummis.com
- **Lawrence J. Kotler**  ljkotler@duanemorris.com
- **Bryan Kotliar**  bkotliar@teamtogut.com, eblander@teamtogut.com;jmcclain@teamtogut.com;gquist@teamtogut.com;astolp@teamtogut.com
- **Deborah Kovsky-Apap**  deborah.kovsky@troutman.com, kay.kress@troutman.com
- **Erica Kravchenko**  ekravchenko@bernsteinlaw.com
- **Tyler Nathaniel Layne**  tyler.layne@wallerlaw.com, chris.cronk@wallerlaw.com
- **Vincent Edward Lazar**  vlazar@jenner.com
- **Thomas Scott Leo**  sleo@leolawpc.com, emartinez@leolawpc.com
- **Nicole A Leonard**  nleonard@mdmc-law.com, sshidner@mdmc-law.com
- **Seth H. Lieberman**  slieberman@pryorcashman.com, cfrench@pryorcashman.com
- **Edward J. LoBello**  elobello@msek.com
- **Stephen Manning**  stephen.manning@atg.wa.gov, GCEEF@atg.wa.gov
- **Hugh R. McCullough**  hughmccullough@dwt.com, elainehuckabee@dwt.com;SEADocket@dwt.com
- **Joshua Mester**  jmester@jonesday.com
- **Layla Milligan**  Layla.Milligan@oag.texas.gov
- **Julie F. Montgomery**  jmontgomery@brownconnery.com
- **Michael D. Morris**  morrismd@doj.state.wi.us, radkeke@doj.state.wi.us
- **Carl D. Neff**  carl.neff@fisherbroyles.com
- **Mark Norgaard**  mnorgaard@norgaardfirm.com, crose@norgaardfirm.com;sferreira@norgaardfirm.com
- **Kyle J. Ortiz**  kortiz@teamtogut.com, dperson@teamtogut.com;aoden@teamtogut.com;aglaubach@teamtogut.com;eblander@teamtogut.com;bkotliar@teamtogut.com;gquist@teamtogut.com;astolp@teamtogut.com;lebrahimi@teamtogut.com
- **Michael Todd Parker**  todd.parker@parkerpohl.com
- **Arie Peled**  aapeled@venable.com
- **Gregory F Pesce**  gregory.pesce@whitecase.com, jdisanti@whitecase.com,mco@whitecase.com
- **Richard J. Pilson**  richardjpilson@aol.com

16

- **David M Pohl**   david.pohl@parkerpohl.com
- **John Reding**   john.reding@ilag.gov
- **Annemarie V. Reilly**   annemarie.reilly@lw.com
- **Kyle William Roche**   kyle@kyleroche.law, akaradjas@rochefreedman.com
- **Jennifer Rood**   jennifer.rood@vermont.gov
- **Abigail Ryan**   abigail.ryan@oag.texas.gov
- **Jeffrey S. Sabin**   jssabin@venable.com
- **Ray C Schrock**   ray.schrock@weil.com, matthew.goren@weil.com
- **William D Schroeder**   schroeder@jrlaw.org, healey@jrlaw.org
- **Paul R. Shankman**   pshankman@fortislaw.com
- **Virginia T. Shea**   vshea@mdmc-law.com, tcolombini@mdmc-law.com;mtaranto@mdmc-law.com
- **Paul N. Silverstein**   paulsilverstein@huntonak.com
- **Scott D. Simon**   ssimon@goetzfitz.com
- **Katherine Stadler**   kstadler@gklaw.com, kboucher@gklaw.com
- **Catherine Steege**   csteege@jenner.com, jeffrey_cross@discovery.com
- **Howard Steel**   HSteel@goodwinlaw.com
- **Joshua Sussberg**   jsussberg@kirkland.com, hannah-kupsky-3566@ecf.pacerpro.com
- **Lucy Thomson**   lucythomson_cpo@earthlink.net
- **David Turetsky**   david.turetsky@whitecase.com, jdisanti@whitecase.com,mco@whitecase.com
- **United States Trustee**   USTPRegion02.NYECF@USDOJ.GOV
- **Morris D. Weiss**   morris.weiss@wallerlaw.com, sherri.savala@wallerlaw.com;annmarie.jezisek@wallerlaw.com
- **Dina L. Yunker Frank**   bcuyunker@atg.wa.gov
- **Evan J. Zucker**   ezucker@blankrome.com, eDocketing@blankrome.com

/s/ Anthony J. DeGirolamo
Anthony J. DeGirolamo