# EXHIBIT A

**In the Matter Of:**

*Re CELSIUS NETWORK LLC, et al.*

---

*CHRISTOPHER FERRARO*

*November 21, 2022*

---



1

1

2                UNITED STATES BANKRUPTCY COURT

3                SOUTHERN DISTRICT OF NEW YORK

4
     In re:                        )
5                                  )  Chapter 11
                                   )
6    CELSIUS NETWORK LLC, et al.   )  Case No. 22-10964
                                   )  (MG)
7                                  )
     _____ )
8

9

10

11

12

13                    CONFIDENTIAL

14    VIDEOCONFERENCE VIDEO-RECORDED DEPOSITION OF

15            CHRISTOPHER JAMES FERRARO

16              New York, New York

17            Monday, November 21, 2022

18

19

20

21

22

23    Reported Stenographically By:
      PATRICIA A. BIDONDE
24    Registered Professional Reporter
      Realtime Certified Reporter
25    JOB#:  2022-872581

2

<br>

1

2

3

4                         November 21, 2022
                          9:09 a.m.
5

6

7          Confidential Videoconference

8    Video-Recorded Deposition of

9    CHRISTOPHER JAMES FERRARO, held at

10   the offices of Kirkland & Ellis LLP,

11   601 Lexington Avenue, New York, New

12   York, before Patricia A. Bidonde,

13   Stenographer, Registered

14   Professional Reporter, Realtime

15   Certified Reporter, Certified

16   eDepoze Court Reporter, Notary

17   Public of the States of New York,

18   New Jersey, and Connecticut.

19

20

21

22

23

24

25

Confidential        Christopher Ferraro - November 21, 2022

3

```
 1

 2                     A P P E A R A N C E S

 3

 4    KIRKLAND & ELLIS LLP

 5    Attorneys for Debtors Celsius Network LLC

 6          1301 Pennsylvania Avenue, N.W.

 7          Washington, D.C. 20004

 8    BY:   T.J. MCCARRICK, ESQ.

 9          202-389-3136

10          tj.mccarrick@kirkland.com

11

12    BY:   JOSEPH D' ANTONIO, ESQ.

13          202-389-3370

14          joseph.dantonio@kirkland.com

15          (Via Videoconference)

16

17          601 Lexington Avenue

18          New York, New York 10022

19    BY:   ELIZABETH JONES, ESQ.

20          212-390-6935

21          elizabeth.jones@kirkland.com

22

23

24

25
```

```
                                                    4
 1

 2        A P P E A R A N C E S  (CONTINUED)

 3

 4   KIRKLAND & ELLIS LLP

 5   Via Videoconference:

 6        300 North LaSalle

 7        Chicago, Illinois 60654

 8   BY:   GABRIELA ZAMFIR HENSLEY, ESQ.

 9        312-862-4007

10        gabriela.zamfir@kirkland.com

11   BY:   AMILA GOLIC, ESQ.

12        312-862-4488

13        amila.golic@kirkland.com

14   BY:   CHRISTOPHER S. KOENIG, ESQ.

15        312-862-2372

16        chris.koenig@kirkland.com

17   BY:   ROSS KWASTENIET, ESQ.

18        312-862-2069

19        ross.kwasteniet@kirkland.com

20   BY:   DAN LATONA, ESQ.

21        312-862-3445

22        dan.latona@kirkland.com

23

24

25
```

5

1

2          A P P E A R A N C E S   (CONTINUED)

3    WHITE & CASE LLP

4    Attorneys for Official Committee of Unsecured

5    Creditors

6          1221 Avenue of the Americas

7          New York, New York 10020-1095

8    BY:    KATHRYN SUTHERLAND-SMITH, ESQ.

9          212-819-8437

10          kathryn.sutherland.smith@whitecase.com

11

12    Via Videoconference:

13          1221 Avenue of the Americas

14          New York, New York 10020-1095

15    BY:    SAMUEL P. HERSHEY, ESQ.

16          212-819-2699

17          sam.hershey@whitecase.com

18    BY:    ANDREA AMULIC, ESQ.

19          212-819-7061

20          andrea.amulic@whitecase.com

21          Southeast Financial Center

22          Miami, Florida 33131-2352

23    BY:    KEITH H. WOFFORD, ESQ.

24          212-819-7595

25          kwofford@whitecase.com

6

1

2          A P P E A R A N C E S   (CONTINUED)

3

4   U.S. DEPARTMENT OF JUSTICE

5   Attorneys for Office of the United States

6   Trustee

7          950 Pennsylvania Avenue, NW

8          Washington, D.C. 20530-0001

9   BY:    SHARA CORNELL, ESQ.

10         shara.cornell@usdoj.gov

11  BY:    MARK BRUH, ESQ.

12         mark.bruh@usdoj.gov

13

14  NATIONAL ASSOCIATION OF ATTORNEYS GENERAL

15  Attorneys for Coordinating States

16         1850 M Street NW

17         12th floor.

18         Washington, D.C. 20036

19  BY:    KAREN CORDRY, ESQ.

20         202-326-6000

21         (Via Videoconference)

22

23

24

25

7

1

2        A P P E A R A N C E S  (CONTINUED)

3

4   TEXAS ATTORNEY GENERAL'S OFFICE

5   Office of the Attorney General

6        300 West 15th Street

7        Austin, Texas 78701

8   Via Videoconference:

9   BY:   ABIGAIL R. RYAN, ESQ.

10        abigail.Ryan@oag.texas.gov

11  BY:   LAYLA D. MILLIGAN, ESQ.

12        layla.Milligan@oag.texas.gov

13  BY:   ROMA N. DESAI, ESQ.

14        roma.Desai@oag.texas.gov

15

16

17

18

19

20

21

22

23

24

25

Confidential          Christopher Ferraro - November 21, 2022

8

1

2         A P P E A R A N C E S   (CONTINUED)

3

4   STATE OF VERMONT DEPARTMENT OF FINANCIAL

5   REGULATION

6         Consumer Services

7         89 Main Street

8         Montpelier, Vermont 05620

9   BY:   JENNIFER ROOD, ESQ.

10        (Via Videoconference)

11

12  FEDERAL TRADE COMMISSION

13        600 Pennsylvania Avenue, NW

14        Washington, D.C. 20580

15  BY:   KATHERINE M. AIZPURU, ESQ.

16        202-326-2222

17        (Via Videoconference)

18

19

20

21

22

23

24

25

9

1

2        A P P E A R A N C E S   (CONTINUED)

3

4   MILBANK LLP

5   Attorneys for Series B Preferred Holders

6        1850 K Street, NW

7        Suite 1100

8        Washington, D.C. 20006

9   BY:    MELANIE WESTOVER YANEZ, ESQ.

10        202-835-7560

11        mwyanez@milbank.com

12   BY:    TRUMAN WHITNEY, ESQ.

13        202-835-7553

14        twhitney@milbank.com

15

16   TOGUT, SEGAL & SEGAL LLP

17   Attorneys for Ad Hoc Group of Custodial

18   Account Holders

19        One Penn Plaza

20        Suite 3335

21        New York, New York 10119

22   BY:    JARED C. BORRIELLO, ESQ.

23        212-201-6571

24        jborriello@teamtogut.com

25        (Via Videoconference)

```
                                                          10
1

2          A P P E A R A N C E S   (CONTINUED)

3

4   VENABLE LLP

5   Attorneys for Igmat Tuganuv

6          1290 Avenue of the Americas

7          20th Floor

8          New York, New York 10104

9   BY:    ARIE PELED, ESQ.

10         212-503-0896

11         apeled@venable.com

12         (Via Videoconference)

13

14  WEIR GREENBLATT PIERCE LLP

15  Attorneys for Matthew Pinto

16         The Widener Building

17         1339 Chestnut Street

18         Suite 500

19         Philadelphia, Pennsylvania 19107

20  BY:    CAROLINE BOJARSKI, ESQ.

21         cbojarski@wgpllp.com

22         (Via Videoconference)

23

24

25
```

Confidential        Christopher Ferraro - November 21, 2022

```
                                                    11
 1

 2        A P P E A R A N C E S  (CONTINUED)

 3

 4   AKIN GUMP STRAUSS HAUER & FELD LLP

 5   Via Videoconference:

 6         2300 North Field Street

 7         Suite 1800

 8         Dallas, Texas 75201-2481

 9   BY:    MICHAEL STANLEY, ESQ.

10         214-969-4752

11         mstanley@akingump.com

12

13         One Bryant Park

14         Bank of America Tower

15         New York, New York 10036-6745

16   BY:    MITCHELL P. HURLEY, ESQ.

17         212-872-1011

18         mhurley@akingump.com

19

20

21

22

23

24

25
```

Confidential        Christopher Ferraro - November 21, 2022

```
                                                     12
 1

 2         A P P E A R A N C E S   (CONTINUED)

 3

 4   MCCARTER & ENGLISH, LLP

 5   Attorneys for Certain Borrowers

 6          Worldwide Plaza

 7          825 Eighth Avenue

 8          31st Floor

 9          New York, New York 10019

10   BY:    DAVID ADLER, ESQ.

11          212-609-6847

12          dadler@mccarter.com

13          (Via Videoconference)

14

15   THE GORDON LAW FIRM LLP

16   Pro se creditor

17          57 River Street

18          Suite 206

19          Wellesley, Massachusetts 02481

20   BY:    TODD GORDON, ESQ.

21          617-261-0100

22          tgordon@gordonfirm.com

23          (Via Videoconference)

24

25
```

13

1

2        A P P E A R A N C E S   (CONTINUED)

3

4    PRO SE CREDITORS VIA VIDEOCONFERENCE:

5    CAMERON CREWS

6    KULPREET KHANUJA

7    IMMANUEL HERRMANN

8    NICOLE BARSTOW

9    JARNO OBERG

10   JEREMY COHEN HOFFING

11   VICTOR UBIERNA DE LAS HERAS

12   DANIEL FRISHBERG

13

14   THOMAS DIFIORE, UCC Co-Chair

15   MICHAEL MORRIS

16   MIKE G

17

18   ALSO PRESENT:

19   CHRISTIAN BIDONDE, Legal Video Specialist

20

21   Via Videoconference:

22   AYDALINE GARCIA, Zoom Tech

23

24                - - -

25

14

1

2        IT IS HEREBY STIPULATED AND

3   AGREED, by and between the attorneys

4   for the respective parties, that all

5   objections, except as to the form of

6   the questions, shall be reserved to

7   the time of the trial.

8        IT IS FURTHER STIPULATED AND

9   AGREED that the within examination

10  may be signed and sworn to before

11  any Notary Public with the same

12  force and effect as if signed and

13  sworn to before the court.

14       IT IS FURTHER STIPULATED AND

15  AGREED that the filing of the

16  original transcript of the

17  examination is waived.

18

19

20

21

22

23

24

25

Confidential      Christopher Ferraro - November 21, 2022

15

1

2                    - - -

3           P R O C E E D I N G S

4                    - - -

5         THE VIDEOGRAPHER:  We are now

6   on the record.  The time is

7   9:09 a.m. on November 21, 2022.

8   Audio and video recording will

9   continue to take place until all

10  parties agree to go off the record.

11  Please note that microphones are

12  sensitive and may pick up whispering

13  and private conversations.

14        This is the video-recorded

15  deposition of Christopher Ferraro in

16  the matter of In re Celsius Network,

17  et al.  This deposition is being

18  held at Kirkland & Ellis, New York,

19  New York.

20        My name is Christian Bidonde.

21  I am the legal video specialist.  On

22  behalf of Lexitas.  The certified

23  stenographer is Patricia Bidonde on

24  behalf of Lexitas.

25        Counsel will state their

16

1

2  appearances for the record and all

3  those parties on Zoom, except for

4  those speaking, will be noted for

5  the record.  Then the certified

6  stenographer will swear in the

7  witness.

8         MR. HERSHEY:  Sam Hershey from

9  White & Case on behalf of the

10  official committee of unsecured

11  creditors.

12         MR. WOFFORD:  You also have

13  Keith Wofford from White & Case on

14  behalf of the official committee.

15         MR. McCARRICK:  T.J.

16  McCarrick, Kirkland & Ellis, on

17  behalf of the debtors.

18         MS. CORNELL:  You have Shara

19  Cornell on behalf of the office of

20  the United States Trustee and Mark

21  Bruh.

22         MR. CREWS:  Cameron Crews, pro

23  se creditor.

24         MR. HERRMANN:  Immanual

25  Herrmann, pro se creditor.

Confidential        Christopher Ferraro - November 21, 2022

17

1

2              MR. ADLER:  David Adler from

3        McCarter English on behalf of

4        certain borrowers.  Can everyone

5        hear me?

6              THE VIDEOGRAPHER:  Yes.

7              MR. ADLER:  Thank you.

8              MS. WESTOVER YANEZ:  Melanie

9        Westover Yanez from Milbank for

10        Series B Preferred Holders.

11              MS. SUTHERLAND-SMITH:  Kathryn

12        Sutherland-Smith of White & Case for

13        the Official Committee of Unsecured

14        Creditors.

15              MS. JONES:  Elizabeth Jones of

16        Kirkland & Ellis on behalf of the

17        debtors.

18    C H R I S T O P H E R   F E R R A R O, called

19          as a witness, having been duly sworn by

20          a Notary Public, was examined and

21          testified as follows:

22    EXAMINATION BY

23    MR. HERSHEY:

24         Q.   Okay.  Good morning, Mr. Ferraro.

25    My name is --

18

```
1              C. Ferraro - Confidential
2         A.    Good morning.
3         Q.    Morning.  My name is Sam Hershey.
4    As I said, I'm an attorney at White & Case.  I
5    represent the official committee of unsecured
6    creditors in the Celsius bankruptcy
7    proceeding.
8              I'll be asking you some questions
9    this morning, and I will not be the only party
10   asking questions.  As you're likely aware, we,
11   sort of, divided the deposition off where I'll
12   start and then I'll pass it off, I believe, to
13   the United States Trustee.  And then other
14   parties as well will get to ask you questions.
15             I've been allotted three of the
16   seven hours to ask you questions.  I don't
17   think I'm going to use all that time.  I'd
18   rather have you out there trying to reorganize
19   this company and return value to customers,
20   but I do have some questions for you.
21             And before I start, I'm not in the
22   room with you, so I just want to be sure, is
23   there an attorney with you who will be
24   defending you during this deposition?
25        A.    Yes.
```

```
                                                      19
 1              C. Ferraro - Confidential

 2       Q.    And who is that attorney?

 3       A.    T.J., right to the left of me.

 4       Q.    T.J. McCarrick?

 5       A.    Yes, sir.

 6       Q.    Okay.

 7              MR. HERSHEY:  Good morning,

 8       Mr. McCarrick.

 9              MR. McCARRICK:  Good morning,

10       Mr. Hershey.

11       Q.    So before I start, Mr. Ferraro,

12   I'll just ask you a few preliminary questions.

13              MR. McCARRICK:  Actually --

14       Q.    Have you ever --

15              MR. McCARRICK:  Mr. Hershey --

16       Q.    Oh, okay.

17              MR. McCARRICK:  Yeah,

18       Mr. Hershey, just before we start,

19       I'd like to designate the entire

20       transcript confidential under the

21       terms of the protective order.  No

22       information discussed during the

23       deposition can be recorded and/or

24       publicly disclosed, whether orally,

25       on Twitter, by podcast, or other
```

20

```
 1       C. Ferraro - Confidential
 2   means.
 3        The only individuals,
 4   entities, agencies, et cetera, that
 5   are entitled to participate in this
 6   deposition or have knowledge of its
 7   contents are those who provided
 8   prior notice that they would attend
 9   or participate and who are bound by
10   the terms of the protective order.
11        So if there's anyone present
12   virtually or in person who that's
13   not the case for, they should log
14   off now.  We don't want an issue
15   with folks live-streaming today's
16   deposition, commenting about the
17   testimony, or holding a public
18   discussion about it with anyone who
19   hasn't signed the protective order.
20        We're happy to meet and confer
21   on the back end, I should say, about
22   dedesignating parts of the
23   transcript.  We expect there's going
24   to be plenty that's not
25   confidential, but the only way for
```

Confidential       Christopher Ferraro - November 21, 2022

21

1           C. Ferraro - Confidential

2       us to protect our rights in the

3       first instance is to designate it

4       all at the outset.

5               And with that, all you, Sam.

6               MR. HERSHEY:  Thank you,

7       Mr. McCarrick.

8   BY MR. HERSHEY:

9       Q.    Before I start, Mr. Ferraro, I'm

10  going to ask you a few preliminary questions,

11  the first of which is:  Have you ever been

12  deposed before?

13      A.    No, sir.

14      Q.    Okay.  So I'm just going to go

15  over some ground rules on the assumption that,

16  having never been deposed, you may not be

17  completely familiar with how depositions work.

18              So the first is:  You understand

19  that you're testifying under oath today.

20  Right?

21      A.    Yes, sir.

22      Q.    And that means that by your oath,

23  you're going to tell the full truth today.

24  Right?

25      A.    Yes.

Confidential         Christopher Ferraro - November 21, 2022

22

```
 1              C. Ferraro - Confidential
 2        Q.    Is there any reason why you would
 3   not be able to testify truthfully today?
 4        A.    No.
 5        Q.    Okay.  A few more ground rules.
 6   If you don't understand any of the questions I
 7   ask you, please feel free to ask me to clarify
 8   it.  I won't be offended.
 9              Sometimes in depositions questions
10   are made up on the fly, and it may be that the
11   question I pose to you is not comprehensible.
12              Does that make sense?
13        A.    Yes.
14        Q.    Okay.  And if you don't ask me to
15   clarify a question, I'm going to assume that
16   you understand.  Is that fair?
17        A.    Yes.
18        Q.    Okay.  We can take as many breaks
19   as you want to take during the deposition.  It
20   is not my goal to trap you here.  The only
21   thing I ask is that if there's a question
22   pending -- in other words, if I ask you a
23   question and you haven't answered it -- that
24   you answer that pending question, then we can
25   take a break.  Is that fair?
```

23

1              C. Ferraro - Confidential

2          A.    Yes.

3          Q.    Okay.  All of your answers have to

4     be verbal.  There's a court reporter in the

5     room, and so if you nod or make some other

6     nonverbal cue, it won't get picked up by the

7     transcript.  So please make sure always to say

8     "yes" or "no" or any other verbal response the

9     court reporter can record.

10              Does that make sense?

11         A.    Yes.

12         Q.    And then the last thing -- and

13    this is especially important given that I'm

14    questioning you by Zoom -- let's do our best

15    not to talk over each other.  So please make

16    sure to let me answer my question -- I mean,

17    ask my question, and I will make sure to let

18    you answer my question before I start talking.

19              Does that work?

20         A.    Yes.

21         Q.    Okay.  So tell me --

22              MR. McCARRICK:  Mister --

23         Mr. Hershey, just one more thing.  I

24         just wanted to inform you, since

25         you're not in the room, Mr. Ferraro

24

1              C. Ferraro - Confidential

2        has a clean copy of his declaration

3        in front of him.

4              MR. HERSHEY:  Perfect.

5              MR. McCARRICK:  Just wanted to

6        let you know that.

7              MR. HERSHEY:  Great.  Thank

8        you very much.  And soon enough,

9        I'll be offering that as

10       Exhibit Number 1.  So I appreciate

11       that.

12  BY MR. HERSHEY:

13       Q.   Mr. Ferraro, how did you prepare

14  for this deposition?

15       A.   I prepped with my legal advisors,

16  I read the related motions and declarations on

17  this specific item.

18       Q.   Okay.  So you say you "prepped"

19  with your advisors."  Who are the advisors

20  you're referring to?

21       A.   Kirkland & Ellis, my legal

22  advisors --

23       Q.   And who at Kirkland -- sorry.  I

24  didn't mean to cut you off.  Go ahead.

25       A.   My legal advisors.

25

1           C. Ferraro - Confidential

2       Q.    Okay.  Who at Kirkland & Ellis?

3       A.    Predominantly T.J.

4       Q.    Anyone else?

5       A.    There was a handful of associates.

6   I don't remember their names off the top of my

7   head.

8       Q.    Okay.  And how many times did you

9   and Mr. McCarrick conduct a prep session for

10  this deposition?

11      A.    We did two, two prep sessions.

12      Q.    And when -- and when were those?

13      A.    One was on Friday, I believe, and

14  the other was Saturday of this week.

15      Q.    And how long was each of those

16  sessions?

17      A.    One hour, I believe, was the first

18  session and about three hours was the second

19  session.

20      Q.    Got it.  Were there any other

21  phone calls or any other prep sessions with

22  Mr. McCarrick besides those two that you

23  mentioned?

24      A.    Not that I recall.

25      Q.    And you said that you reviewed the

26

1           C. Ferraro - Confidential

2    declarations and the motion relevant to this

3    present dispute.  Is that correct?

4           A.    Yes.

5           Q.    Okay.  And so when you say "the

6    declarations," what documents specifically are

7    you referring to?

8           A.    So my declaration, Oren

9    Blonstein's declaration, the motion to sell

10   stablecoins, and Alex Mashinsky's declaration

11   where the terms of use were listed out.

12          Q.    Got it.  Did you review any other

13   documents in preparation for today's

14   deposition?

15          A.    Not off the top of my head.

16          Q.    Okay.  I want to talk a bit about

17   your background.  Can you describe your

18   educational background for me, starting with

19   he college.

20          A.    Yeah.  I went to the University of

21   Washington in Seattle.  I studied at two

22   different schools:  One, the school of

23   economics, I got a bachelor of arts in

24   economics; and I also got a bachelor of arts

25   in the business school with concentrations in

Confidential        Christopher Ferraro - November 21, 2022

27

```
1              C. Ferraro - Confidential
2      accounting and finance.
3           Q.    Okay.  How about after that?
4           A.    No.  I went straight into work.
5           Q.    Got it.  So you had no graduate
6      degree?
7           A.    No graduate degree.
8           Q.    Any professional certification of
9      any kind?
10          A.    I did pass the certified public
11     accountant's exam back in 1999.
12          Q.    And so are you a CPA?
13          A.    I was but I have not fulfilled my
14     credits because I am not in that field.
15          Q.    Got it.
16          A.    So I am not in good standing, yup.
17          Q.    Okay.  Thank you.  And so you say
18     that after college you went right to work.
19     Where did you go to work after college?
20          A.    I went to work for Arthur Andersen
21     in their audit and insurance practice in
22     Seattle.  I audited not-for-profit healthcare
23     providers.
24          Q.    Okay.  And how about after that?
25          A.    I was there for about two and a
```

28

```
 1                  C. Ferraro - Confidential
 2     half to three years.  And after that, I went
 3     to Bank One in Phoenix, Arizona.
 4          Q.    Okay.  You can continue.
 5          A.    Yeah, and I was at Bank One, which
 6     got acquired by JPMorgan Chase.  And I was
 7     there for almost 18 years.
 8          Q.    And what was your last position at
 9     JPMorgan Chase before you left?
10          A.    Head of financial analysis, which
11     included, effectively, financial planning and
12     analysis for global -- so for the entire firm,
13     as well as I had numerous, kind of, roles
14     within the finance organization and projects,
15     including automation, you know, creating new
16     models, developing -- stress-testing was big
17     at the point in time when I was at JPMorgan.
18     So we were doing a lot of CCAR and capital
19     stress-testing work.
20          Q.    And how long did you hold the
21     position of head of financial analysis at
22     JPMorgan Chase?
23          A.    Five-plus years.
24          Q.    Is that the last job you had
25     before you joined Celsius?
```

29

```
 1              C. Ferraro - Confidential
 2        A.    No.  I was at Cerberus Advisory
 3   and -- Advisory Company, yeah.
 4        Q.    How long were you at Cerberus?
 5        A.    Under a year.  Just a little bit
 6   over six months.
 7        Q.    And what was your position there?
 8        A.    Senior managing director.
 9        Q.    And so you left Cerberus then for
10   Celsius.  Is that right?
11        A.    No, no.  Then I -- I own a couple
12   farms in Ecuador.  My wife is Ecuadorian.  We
13   moved there with our children a couple years
14   back.  So I took almost three years off
15   developing my farms in Ecuador.
16        Q.    So you left the world of finance
17   to pursue the life of a farmer.  Is that safe
18   to say?
19        A.    Exactly correct.  Yes, sir.
20        Q.    Okay.  So after that time off, did
21   you then go to Celsius?
22        A.    Yes, I did.
23        Q.    Okay.  And when did you join
24   Celsius?
25        A.    March 21, 2022.
```

Confidential        Christopher Ferraro - November 21, 2022

```
                                                          30
 1                 C. Ferraro - Confidential
 2         Q.    And what role did you have when
 3    you joined Celsius?
 4         A.    Head of financial planning and
 5    analysis and head of investor relations.
 6         Q.    And please take me through your
 7    career development during your time at
 8    Celsius.
 9               Are you still in that role or has
10    your role changed?
11               MR. McCARRICK:  Object to
12         form.
13         A.    My role --
14               MR. McCARRICK:  You can
15         answer.
16         A.    Yeah, my role has changed.
17    Shortly before petition, middle of July, I was
18    promoted to the CFO, chief financial officer
19    of Celsius.  And then on, I believe,
20    September 27 of this year, I was appointed as
21    chief restructuring officer and interim chief
22    executive officer, still retaining the chief
23    financial officer title.
24         Q.    What motivated you to join
25    Celsius?
```

31

```
1              C. Ferraro - Confidential

2         A.    Well, for one, I wanted the

3    flexibility of having different locations --

4    right? -- my family is in Ecuador.  Celsius

5    provided me with that benefit of being able to

6    work part of the time in Seattle, part of the

7    time in Ecuador.

8              I also found crypto to be quite

9    fascinating.  At that point in time, you know,

10   my farms are in very rural areas of Ecuador

11   where there is zero opp- -- very little

12   opportunity and extreme poverty.

13             And I, you know, drove by many

14   times the banks on Fridays with the lines

15   going all the way down the street.  And

16   something about crypto, I believe, is a great

17   use case for, kind of, banking the unbanked in

18   the long term.

19        Q.    Did you have experience with

20   cryptocurrency before joining Celsius?

21        A.    No, sir.

22        Q.    Now, at the time you joined

23   Celsius in March of 2022, the crypto winter

24   had already started.  Is that safe to say?

25             MR. McCARRICK:  Object to
```

Confidential      Christopher Ferraro - November 21, 2022

```
                                                    32
1              C. Ferraro - Confidential
2         form.
3              You can answer.
4         A.    Yeah, there was a downturn at that
5    point in time.  I'm not sure if it was winter
6    or not, but there was definitely a severe
7    downturn in crypto.
8         Q.    Did -- did that fact at all
9    influence your decision to join Celsius?
10        A.    No.  I'm not -- I'm not -- being
11   at JPMorgan Chase for almost two decades
12   taught me about risk and how to manage risk,
13   and I'm not af- -- you know, I don't avoid
14   risk; I try to manage risk.  So, no, it didn't
15   scare me.
16        Q.    Well, did it incentivize you?
17   Were you attracted to working for a company at
18   a time when it was going through financial
19   difficulties?
20             MR. McCARRICK:  Object to
21        form.
22             You can answer.
23        A.    I -- the position of the industry
24   and where crypto prices were at that point in
25   time, to me, was not part of my decision.  I
```

33

1              C. Ferraro - Confidential

2     believed in and I still do believe in the

3     long-term potential of crypto.

4              Q.    Okay.  So my colleague Kathryn

5     Sutherland-Smith is in the room with you.  And

6     I'm going to ask her to pass a copy of your

7     declaration to the court reporter.  I know you

8     already have one.

9              MR. HERSHEY:  But I'd like the

10            court reporter to mark it as Ferraro

11            Exhibit Number 1.  And then

12            Ms. Sutherland-Smith can also give

13            copies to anyone else who is there

14            in person.

15              I'll note that, for those

16            joining by Zoom, we are not going to

17            bring this document up on the

18            screen.  The reason for that is it's

19            publicly available on the docket in

20            this case, Docket Number 1326.

21              And so I'd rather not have to

22            deal with the logistical issue of

23            going back and forth to a document

24            on Zoom when everyone who wants to

25            see the document can find it and

34

1           C. Ferraro - Confidential

2        follow along.

3           CERTIFIED STENOGRAPHER:  You

4        have to give me a moment to mark the

5        exhibit, please.

6           MR. HERSHEY:  Oh, sure, take

7        your time.

8           (Ferraro Exhibit 1,

9        Declaration of Christopher Ferraro,

10       marked for identification, as of

11       this date.)

12   BY MR. HERSHEY:

13       Q.   Mr. Ferraro, to ask a silly

14   question, you recognize this document, don't

15   you?

16       A.   Yes, sir.

17       Q.   Okay.  Who drafted this document?

18       A.   It was Kirkland & Ellis, my legal

19   advisors.

20       Q.   It was Kirkland & Ellis who

21   drafted your declaration?

22       A.   Yes.

23       Q.   What role did you play in drafting

24   the declaration, if any?

25       A.   I'm the declarant.  So, you know,

35

```
 1              C. Ferraro - Confidential
 2    I was -- I was there, kind of, hand in glove
 3    in drafting the declaration.
 4         Q.    What do you mean by that when you
 5    say you were there "hand in glove"?
 6         A.    Well, there are certain aspects in
 7    here that cross over into the business side.
 8    You know, I was able to review and help
 9    narrate some of that, give feedback,
10    et cetera.
11         Q.    But the primary role for drafting
12    the declaration was with Kirkland & Ellis?
13              MR. McCARRICK:   Object to
14         form.
15              You can answer.
16         A.    Yes.
17         Q.    Are there paragraphs that you can
18    identify that you did not review in the
19    declaration?
20         A.    No.
21         Q.    So you reviewed the entire
22    declaration?
23         A.    Yes, sir.
24         Q.    Okay.  Are there paragraphs that
25    you can identify as being written entirely by
```

36

```
1              C. Ferraro - Confidential
2     Kirkland & Ellis?
3         A.    I don't -- I don't recall.
4         Q.    Okay.  There may be paragraphs
5     drafted entirely by Kirkland & Ellis, you just
6     don't recall?
7              MR. McCARRICK:  Object to
8         form.
9              You can answer.
10        A.    Yes.  There may be.
11        Q.    Okay.  Are there any subject
12    matters covered in the declaration that you
13    recall Kirkland & Ellis doing the drafting
14    for?
15        A.    Not specifically.  They were the
16    main -- the key people drafting it.
17        Q.    And was a completed draft
18    presented to you for review before you
19    provided input?
20        A.    A working draft was provided to me
21    when I provided input, yeah.
22        Q.    So in other words, just to be
23    clear, Kirkland & Ellis made a draft of the
24    declaration and then presented it to you for
25    your input?
```

37

1              C. Ferraro - Confidential

2         A.    And then I would comment -- yes.

3         Q.    Let's turn -- actually, I'm going

4    to ask -- just to get the exhibits out of the

5    way, I'm going to ask Ms. Sutherland-Smith to

6    pass the court reporter and to you a copy of

7    the debtors' responses and objections to the

8    written deposition questions posed by the

9    committee, which we marked as Ferraro Exhibit

10   Number 2.

11             MR. HERSHEY:  And I'll take a

12        pause to let the court reporter do

13        that.

14             (Ferraro Exhibit 2, Debtors'

15        responses and objections to the

16        written deposition questions posed

17        by the committee, marked for

18        identification, as of this date.)

19             CERTIFIED STENOGRAPHER:  You

20        can continue, thank you.

21             MR. HERSHEY:  Thank you.

22             Okay.  Just for reference for

23        everyone on Zoom, again, we're not

24        going to pull this up on the screen.

25        But this document is available on

38

```
 1              C. Ferraro - Confidential
 2        the public docket as Docket Number
 3        1406.
 4              And I'll also note that,
 5        unless something unexpected happens,
 6        this is the only -- these two are
 7        the only documents that I intend to
 8        introduce as exhibits during this
 9        deposition today.
10   BY MR. HERSHEY:
11        Q.    Mr. Ferraro, do you recognize this
12   document?
13        A.    Yes, I do.
14        Q.    And what is it?
15        A.    (Reading):
16              "Debtors' responses and
17        objections to the official committee
18        of unsecured creditors' written
19        deposition questions for the debtors
20        in connection with the debtors'
21        amended motion for entry of an order
22        establishing ownership of assets in
23        the debtors' earn program,
24        permitting the sale of stablecoins
25        in the ordinary course, and granting
```

39

```
 1              C. Ferraro - Confidential

 2         related relief."

 3         Q.    Thank you.  When did you first see

 4    this document?

 5         A.    I cannot remember whether it was

 6    Friday or Saturday, to tell you the truth.

 7    The days are blurry.

 8         Q.    But it was in the course of your

 9    preparation for this deposition?

10         A.    It was in connection with this

11    topic, this legal topic, and, yes, I was --

12    during of which I was prepping for my

13    deposition.  But I wouldn't say I saw this in

14    preparation of my deposition.

15         Q.    Can you explain a little more what

16    you mean.  I found that answer a bit

17    confusing.

18              So it was in connection with this

19    topic but not preparation for your deposition?

20         A.    It was done in the same time.

21    This document was not for my preparation of my

22    deposition.  This document was done

23    separately.  And I was brought into the

24    discussion Friday or Saturday around this

25    document.  It was not part of my deposition
```

40

```
 1              C. Ferraro - Confidential
 2    prep, this document.
 3         Q.    Okay.  Understood.
 4         A.    Yeah.
 5         Q.    So when you say you were "brought
 6    into the discussion" regarding this document,
 7    what discussion are you referring to?
 8         A.    There was a --
 9              MR. McCARRICK:  Let me just
10         caution you to exclude any
11         communications -- Sam, I'm not quite
12         sure what discussions -- I mean, are
13         you asking for his discussions with
14         counsel about the document?
15              MR. HERSHEY:  I'm not sure,
16         T.J. He referenced a discussion.
17         I'm wondering what he's referring
18         to.
19              MR. McCARRICK:  Okay.  So --
20              THE WITNESS:  Yeah, my counsel
21         from Kirkland & Ellis was there.
22              MR. McCARRICK:  Okay.  So to
23         the extent that you had any
24         discussions with people other than
25         counsel, you should feel free to
```

41

1              C. Ferraro - Confidential

2         disclose those.  But don't disclose

3         any discussions with counsel.

4         A.    Yeah, the only --

5    BY MR. HERSHEY:

6         Q.    Yeah, so I think -- go ahead.

7    Sorry.

8         A.    The only discussions that I had on

9    this document was with counsel.

10        Q.    Understood.  Okay.  Well, I

11   certainly won't ask you to describe the

12   content of those discussions.  But let me ask

13   you:  Was that discussion in the context of

14   answering the questions in the document?

15        A.    Yes.

16        Q.    Okay.  Do you recall which

17   questions specifically you discussed answers

18   to?

19        A.    I don't remember myself

20   specifically discussing answers to any of the

21   questions.  I was actively working on my prep

22   while the meeting was happening.

23        Q.    So I just want to hone in on that.

24   So in other words, let me -- let me take a

25   step back and ask a broader question.

42

```
 1                C. Ferraro - Confidential

 2                Did you contribute to the answers

 3    in this document?

 4        A.    Not in any meaningful way, no,

 5    sir.

 6        Q.    Okay.  And so to be clear, is it

 7    your testimony that, while you were preparing

 8    for your deposition, there happened to be a

 9    conversation about this document taking place

10    in your vicinity?

11        A.    There was a separate meeting.  I

12    was part of that meeting but I was

13    multitasking.  These -- the questions in this

14    document weren't rel- -- in my opinion, at

15    least in my practice or prep sessions, was not

16    relevant to my testimony or my deposition.

17                So I was, sort of, paying

18    attention to the discussion, but I was not the

19    key player in these -- answering these

20    questions.  Like I said, I did not provide any

21    significant input into these answers.

22        Q.    Nor were you asked to provide

23    input into the answers?

24                MR. McCARRICK:  Object to

25        form.
```

43

```
 1           C. Ferraro - Confidential

 2           You -- calls for privileged

 3      information.  Instruct you not to

 4      answer.

 5      Q.    Your statement that you didn't

 6  view these questions as relevant to your

 7  testimony today, why do you say that?

 8      A.    Well, my testimony is more related

 9  to, at least the way that I was preparing for

10  it and was thinking about it, was more related

11  to, number one, kind of, how we manage the

12  business and how we would deploy coins within

13  the terms of use, as well as, kind of, the

14  cash flow budget and the liquidity needs

15  that's facing the debtors.

16      Q.    Have you reviewed all of the

17  questions in this document?

18      A.    I reviewed -- I reviewed -- I

19  cursory reviewed the document.  And I was part

20  of the discussion of listening, not actively,

21  but as part of the discussion for probably the

22  first ten to 15.

23      Q.    So is the answer then that you

24  have not reviewed all of the questions in this

25  document?
```

Confidential        Christopher Ferraro - November 21, 2022

44

1              C. Ferraro - Confidential

2        A.    I've read it.  I haven't studied

3   it.

4        Q.    Okay.  But it's your opinion that

5   these questions -- none of these questions is

6   relevant -- let me start over with a clean

7   question.

8              It's your view that none of these

9   questions is relevant to your testimony today?

10             MR. McCARRICK:  Object to

11        form.

12             You can answer.

13        A.    I need to -- let me review the

14   questions real quick, if you could give me a

15   moment.

16        Q.    Well, before you do that, I just

17   want to understand your views coming into the

18   deposition --

19        A.    I do not --

20        Q.    -- yeah, go ahead.

21        A.    I do not -- yeah, I do not

22   remember a -- multiple questions being

23   directly the point of my deposition today.  I

24   think the questions were more around specific

25   terms of use, how people accepted, you know,

45

```
 1               C. Ferraro - Confidential
 2     the double-click of the terms in use and some
 3     of those related things.
 4               I do not -- off of memory, I do
 5     not remember anything in here about the cash
 6     flow budget -- right? -- the 13-week or the
 7     professional-eyes-only cash flow budget that
 8     goes through March.  And I also don't remember
 9     anything about, kind of, how we deployed
10     assets in the past.
11          Q.   Okay.  That's helpful.  Thank you.
12               And so just to be clear, what in
13     your opinion, are the topics for which you are
14     being offered today to testify?
15               MR. McCARRICK:  Object to
16          form.
17               You can answer.
18          A.   Yeah, largely around the need for
19     liquidity and, second, any related, kind of,
20     ordinary, prepause ordinary course of how we
21     used Celsius coins to deploy assets.
22          Q.   Anything else?
23          A.   Not off of memory -- not off of
24     the top of my mind, but I'm here to support
25     the process, so ...
```

46

```
 1              C. Ferraro - Confidential

 2        Q.    Okay.  Now, to be clear, though,

 3   your declaration does cover more than just

 4   those two topics.  Right?

 5        A.    Yeah, it probably does.  Again, I

 6   mean, I prepped for this for two days, so I

 7   focused on my areas, and those are the ones

 8   that are most top of mind.  There could be

 9   more stuff that's related to the depositions,

10   of course, yes, in this declaration.

11        Q.    Okay.  Do you know who contributed

12   to answering the questions in this document?

13        A.    There was business folks that were

14   on the discussion as well as legal advisors

15   from Kirkland & Ellis.

16        Q.    Who were the business folks?

17        A.    There was the general counsel, Ron

18   Deutsch.  There was another lawyer, internal

19   lawyer, Joseph Golding.  I'm losing his last

20   name, I apologize.

21        Q.    Okay.  Well, what do you

22   understand his last name to be, sitting here

23   today?

24        A.    I can't remember.  It's Golding,

25   Golding.  Joseph Golding.
```

47

1                    C. Ferraro - Confidential

2          Q.     Okay.  Anyone else?

3          A.     I think Oren Blonstein might be on

4     the -- might have been on there, but I'm

5     honestly having trouble remembering everybody

6     who was on the call.

7          Q.     Okay.

8          A.     I think Oren was on the call.

9     Yeah.

10         Q.     Is that all you can recall?

11         A.     That's all I can recall.

12         Q.     Okay.  Let's turn back to

13    Exhibit 1, which is your declaration.

14         A.     Yes.

15         Q.     And let me know.  Then turn to

16    page 11, please.

17                All right.  Do you see --

18                MR. McCARRICK:  Page or --

19         page or paragraph 11, Mr. Hershey?

20                MR. HERSHEY:  Oh, I'm sorry.

21         I'm sorry, paragraph 11.  Thank you.

22         A.     Okay.  Good.  Okay.  Perfect.

23         Q.     Yeah.

24         A.     If you get -- yeah.

25         Q.     All right.  And do you see just

48

1              C. Ferraro - Confidential

2    above paragraph 11 the header that says "The

3    earn program"?

4         A.    Yes, sir.

5         Q.    Okay.  What was the earn program?

6         A.    The earn program was a program in

7    which users could put cryptocurrency on the

8    platform.  And in consideration for putting

9    the cryptocurrency on the platform, users

10   would earn rewards.  And the rewards were set,

11   kind of, weekly and were different based upon

12   the different types of cryptocurrency.

13        Q.    Before April 15, 2022, did Celsius

14   offer any other program to its customers

15   besides the earn program?

16        A.    We have lending programs.

17        Q.    Okay.

18        A.    I think they referred to it as the

19   borrow program.  That was for retail and

20   institutional.  Before April, I cannot -- I

21   don't remember exactly when we started rolling

22   out the swap program.  It was, sort of,

23   beta-tested early on.  I'm not sure if it was

24   out in April.  It might have been, if not

25   shortly after that.  That's --

49

1              C. Ferraro - Confidential

2         Q.    What is the swap program?

3         A.    That's the ability to effectively

4    swap.  Let's say you own Bitcoin and you want

5    ETH, you can swap Bitcoin for ETH.  It's

6    effectively like a trade.

7         Q.    Got it.  But you're not sure when

8    that program was rolled out?

9         A.    It was sometime around April, May.

10        Q.    Was the prime rate program offered

11   by Celsius before April 13, 2022, the earn

12   program?

13             MR. McCARRICK:  Objection

14        to -- object to form.

15             You can answer.

16        A.    The earn program was the biggest

17   product offering with the biggest uptake, for

18   sure.

19        Q.    And as of -- if you know, as of

20   April 15, 2022, approximately how many users

21   participated in the earn program?

22        A.    I was prep- -- creating a budget

23   for the company, so I'm going off of numbers

24   that are, kind of -- they should be

25   directionally accurate and in magnitude, but

50

1              C. Ferraro - Confidential

2      around, I believe, 600,000 customers-ish were

3      in the earn program.  Some of those --

4          Q.    And do you know -- oh, sorry.  Go

5      ahead.

6          A.    Some of those could have small

7      balances; some of them could have large

8      balances, yeah.

9          Q.    Right.  And do you know how

10     they -- let me start that over.

11             Do you know, as of April 15, 2022,

12     what percentage of the users participating in

13     the earn program were unaccredited investors?

14             MR. McCARRICK:   Object to

15         form.

16             You can answer.

17         A.    I do not know.  Off the top of my

18     head, I do not know.

19         Q.    Okay.  Did Celsius conduct any

20     marketing in connection with the earn program?

21         A.    Any what?  I'm sorry.

22         Q.    Marketing.

23         A.    Marketing.  As I stated earlier, I

24     started March 21.  So my, kind of, knowledge

25     of events that occurred before then are

51

```
 1              C. Ferraro - Confidential
 2    limited.  But from -- we had different
 3    versions of marketing that I remember,
 4    referral bonuses, if you brought additional
 5    funds on the platform, you might get a coupon
 6    for, you know, $50 or $100 of some
 7    cryptocurrency.
 8              There was also blog posts and
 9    Twitter channels and YouTube channels and
10    ask-me-anything that occurred weekly, I
11    believe, yeah.  I believe those are
12    predominantly the channels in which they would
13    market.
14         Q.   So it sounds like there was
15    significant marketing conducted by Celsius in
16    connection with the earn program?
17              MR. McCARRICK:  Objection to
18         form.  Mischaracterizes.
19              You can answer.
20         A.   I mean, there was marketing
21    activities.  Right?  Like, whether -- I'm used
22    to a world in which you, kind of, measure
23    those, the significance in dollars.  So I
24    don't know how much of the total -- what the
25    total budget was for marketing historically,
```

52

```
 1              C. Ferraro - Confidential
 2    but I think there -- I think it's safe to say
 3    there was a considerable amount -- amount of
 4    attention paid to marketing, yeah.
 5         Q.    And did Celsius have a target
 6    demographic for the earn program marketing?
 7         A.    Not that I'm aware of.
 8         Q.    Would you expect the marketing
 9    that you just described generally to reach
10    accredited investors or not accredited
11    investors?
12              MR. McCARRICK:  Objection.
13         Calls for speculation.
14              You can answer to the extent
15         you know.
16         A.    I -- honestly, I don't know.  I
17    wasn't very close to the marketing program.
18    We had shut it down by the time I became CFO
19    and acting CEO.  So -- yeah.
20         Q.    Well, let me ask it a different
21    way.  You mentioned blog posts as one form of
22    marketing.  Right?
23         A.    From my understanding, though I
24    have -- I've read two blog posts from Celsius,
25    so my amount of time that I've spent on any of
```

Confidential       Christopher Ferraro - November 21, 2022

                                                              53
1              C. Ferraro - Confidential

2      these channels is limited.  But, yes, my

3      understanding is there was blog posts.

4          Q.    So just to be clear, your

5      understanding is there were blog posts in

6      connection with marketing the earn program?

7              MR. McCARRICK:  Object to

8          form.

9              You can answer.

10         A.    I don't know if it was direct to

11     the earn program, but I know that Celsius was

12     writing on the -- posting blogs.  That's what

13     I know.

14         Q.    Okay.  And would you expect blog

15     posts to predominantly reach accredited

16     investors or nonaccredited investors?

17             MR. McCARRICK:  Objection.

18         Calls for speculation.

19             You can answer.

20         A.    I -- honestly, I don't know

21     because I'm not involved in looking at the web

22     traffic and where it was coming from.  I would

23     assume it was probably a pretty consistent,

24     kind of, slice of the customer base.

25         Q.    Okay.  What about ask-me-anything

Confidential       Christopher Ferraro - November 21, 2022

```
                                                          54
 1              C. Ferraro - Confidential

 2    videos?  Would you expect those predominantly

 3    to be viewed by accredited investors or

 4    nonaccredited investors?

 5         A.    I --

 6              MR. McCARRICK:  Object to --

 7         object to form.

 8              You can answer.

 9              THE WITNESS:  Okay.

10         A.    I wouldn't know -- right? -- I

11    think it would be consistent with, kind of,

12    the customer makeup.  So there would be some

13    accredited, some nonaccredited.

14         Q.    And you have no opinion regarding

15    the proportion of accredited versus

16    nonaccredited that's likely to view an

17    ask-me-anything video on YouTube?

18              MR. McCARRICK:  Object to

19         form.

20              You can answer.

21         A.    Other than when I was interviewing

22    with Celsius, I've probably spent total time

23    of one or two hours watching AMAs.

24              So I have a job to do.  Watching

25    AMAs was not one of them.  So I have very
```

55

```
 1              C. Ferraro - Confidential
 2    limited knowledge on this topic.
 3        Q.    And just to be clear, I'm asking
 4    more for your opinion on this than your
 5    personal experience watching AMA videos.  So
 6    I'll give one more example based on your
 7    testimony.
 8              Referral bonuses.  Do you think
 9    that referral bonuses would more attract
10    accredited investors or nonaccredited
11    investors to Celsius' products?
12              MR. McCARRICK:  Objection to
13        form.
14              You can answer.
15        A.    I would think that both
16    nonaccredited and accredited investors would
17    be interested in the referral bonuses.
18        Q.    Okay.
19        A.    So ...
20        Q.    Now, at some point, Celsius
21    started offering other products in addition to
22    the earn program.  Right?
23        A.    Yes.
24        Q.    And, in particular, Celsius
25    started offering a custody program.  Right?
```

56

1              C. Ferraro - Confidential

2        A.    Yes.

3        Q.    And that product was first offered

4   April 15, 2022.  Right?

5        A.    That's my understanding, yes.

6        Q.    Okay.  What is your understanding

7   as to why Celsius created the custody product?

8              MR. McCARRICK:  Object to

9         form.

10             Sam, could you explain how

11        this is relevant to this motion?

12             MR. HERSHEY:  T.J., I'm not

13        here to answer questions.  You can

14        preserve your objection if you want

15        to.

16             MR. McCARRICK:  Okay.  I mean,

17        I'm just trying to understand how

18        questions about custody, which we

19        all carved out, you know, of the

20        requested findings in this case are

21        relevant.

22             But I'll object to form.  It's

23        outside of the scope.

24             You can answer.

25        A.    Mr. Hershey, can you give me the

57

```
 1              C. Ferraro - Confidential
 2   question again.  I want to make sure I heard
 3   it right.
 4   BY MR. HERSHEY:
 5        Q.    Sure.  Why did Celsius create the
 6   custody program?
 7        A.    It is my understanding, again, I
 8   was -- maybe two weeks when it got launched, I
 9   was with Celsius.  That's the total amount of
10   my tenure at that point in time.
11              But from my understanding, there
12   was a project that had been going on for some
13   time related to looking into launching a
14   custody product.  Some of this was due to --
15   my understanding, some of this was due to,
16   kind of, our understanding of what the
17   regulatory backdrop was and changes in that,
18   as well as customer preference -- right? --
19   some might want custody over earn and hold
20   title to their assets under the custody -- and
21   retain title of their assets under the custody
22   program.
23        Q.    You made a reference just now to
24   the regulatory backdrop.  What do you mean by
25   that?
```

58

1        C. Ferraro - Confidential

2            MR. McCARRICK:   Object to

3    form.

4            Sam, this is so far outside

5    the scope.  I mean ...

6            MR. HERSHEY:  T.J., I --

7    you've preserved your objection.  He

8    said "regulatory backdrop."  I'm

9    asking him to clarify his testimony.

10           MR. McCARRICK:  Yeah.  And a

11   question that was also outside the

12   scope.

13           I mean, you can answer to

14   the -- you know, to the extent you

15   know.  But, I mean, if we -- if, you

16   know -- I'll give you a little leash

17   here, Sam, but I'd rather focus on

18   the, you know, ownership under the

19   earn program, not custody.

20           MR. HERSHEY:  Yeah, I think

21   there is a connection between earn

22   and custody here, and I promise,

23   T.J., we're going to get there.  But

24   I want to understand his

25   understanding and his testimony.

59

```
 1              C. Ferraro - Confidential
 2    BY MR. HERSHEY:
 3         Q.    So I'd like to ask again:  You
 4    referred to a regulatory backdrop.  What did
 5    you mean by that?
 6         A.    Yeah, so it's important to know,
 7    when I was at JPMorgan, I was not a -- I was
 8    not on the institutional or the custody side,
 9    I was a retail person and then I was in
10    corporate.  So my understanding of the custody
11    offering is largely what I've learned really
12    since I've joined Celsius, just as a backdrop
13    to that.
14              You know, the earn program carries
15    with it certain risks -- right? -- the
16    customer is transferring title to Celsius.
17    Celsius can lend, rehypothecate, et cetera.
18    So making sure that that product was -- my
19    understanding is making sure that that product
20    was, kind of, aligned with regulatory
21    securities laws, et cetera.
22              And I think given that it was a
23    marquee product, we needed to have a backup
24    plan or a secondary product in case there
25    was -- you know, we wanted to, kind of,
```

60

```
 1              C. Ferraro - Confidential
 2    de-risk.  Right?  We're in the business --
 3    when you have one product that's your primary
 4    product, you have a lot of eggs in one basket.
 5              So my understanding was the
 6    custody solution was to diversify against any
 7    sort of, you know, changes, either in the
 8    regulatory landscape, customer preference,
 9    risk in the marketplace, et cetera.
10        Q.    Was there a change in the
11    regulatory landscape that contributed to the
12    creation of custody?
13              MR. McCARRICK:  Object to
14         form.
15              Exclude from your answer any
16         information that you solely know
17         from counsel.  To the extent you
18         have any other knowledge or
19         information, you can answer.
20        A.    Sam, could you repeat the question
21    one more time.  I'm sorry.
22        Q.    Yeah.  You mentioned in your
23    testimony a change in the regulatory
24    landscape.  Was there a change in the
25    regulatory landscape that contributed to
```

61

```
 1              C. Ferraro - Confidential
 2   Celsius' creation of the custody program?
 3         A.    I wasn't with the company at that
 4   point in time.  So I do not know.  I'm only --
 5         Q.    You don't know whether there was a
 6   change in the regulatory landscape that
 7   contributed to the custody --
 8         A.    I was working on my farm in
 9   Ecuador at this time, Mr. Hershey.
10         Q.    Okay.
11         A.    Yeah.
12         Q.    So you're not aware whether
13   regulatory issues regarding nonaccredited
14   investors keeping funds in the earn program
15   contributed to the creation of the custody
16   program?
17              MR. McCARRICK:  Object to
18         form.
19              You can answer.
20         A.    I've heard those concerns.  I was
21   not aware at the time of the launch or any of
22   those.  My understanding of this is largely in
23   my capacity as CFO, some of it -- some of it
24   on the product launch -- right? -- the back
25   end, planning, analysis, we had to deal with
```

62

1              C. Ferraro - Confidential

2    some reporting and things like that.

3              But, in general, I was not

4    involved with this, not close to it.  I didn't

5    have an understanding.  I wasn't privy to

6    those conversations.

7         Q.    So I just want to be crystal

8    clear, Mr. Ferraro, that every question I'm

9    asking you today I'm asking for your

10   understanding sitting here today.  I'm not

11   asking for your understanding when you joined

12   the company.  I'm not asking you the basis for

13   that understanding, though you're free to

14   clarify that.

15             I'm just asking you:  Sitting here

16   today, you have an awareness that there was a

17   change in the regulatory landscape that led to

18   the creation of the custody program?

19        A.    I --

20             MR. McCARRICK:  Object --

21        Q.    It sounds like sitting here

22   today -- let me just finish.  It sounds like

23   sitting here today, you do have that

24   understanding.  So if that is the case, I'd

25   like you to expand on that.

                                                                63
1              C. Ferraro - Confidential

2              MR. McCARRICK:  So objection

3         to form.

4              And exclude from your answer

5         anything that you learned solely

6         through counsel.  Otherwise, feel

7         free to answer.

8         A.    Most of my understanding,

9    Mr. Hershey, related to this is privileged,

10   has to do with communication that I've had

11   with legal advisors, internal and external.

12              And my knowledge of this is also

13   not that fulsome.  Right?  I'm dealing with

14   what's facing this company today, not what

15   happened in April or before.  So I have very

16   little to provide here.

17              I know there was -- I'll say, kind

18   of, at a high level, I know there was

19   discussion about, kind of, concerns about the

20   earn product.  There was regulators that were

21   asking -- my understanding is that there was

22   some pressure -- right? -- around it.  And

23   that's about all I can say on this topic.

24        Q.    What do you mean "there was some

25   pressure around it"?

Confidential       Christopher Ferraro - November 21, 2022

64

1                C. Ferraro - Confidential

2        A.    Well, this goes back to privileged

3   communication that I've had.

4        Q.    Okay.  You can't say more because

5   that would require you to divulge privileged

6   communications?

7        A.    Yes.

8        Q.    Okay.  After Celsius created the

9   custody program, it allowed nonaccredited

10  investors to continue to keep assets that were

11  already in the earn program in that program.

12  Is that right?

13       A.    Yeah.  Grandfathered, yes.

14       Q.    Why did Celsius choose to do that?

15            MR. McCARRICK:  Objection to

16       form.  Outside the scope.

17            You can answer.

18       A.    I do not know.

19       Q.    How was that decision made?

20            MR. McCARRICK:  Object to

21       form.  Outside the scope.

22            You can answer.

23       A.    I was -- I was two weeks into the

24  company at that point in time and in a very

25  different facility.  I do not know,

65

1              C. Ferraro - Confidential

2     Mr. Hershey.

3         Q.    Okay.  After April 15, 2022, if a

4     nonaccredited investor had assets in the earn

5     program, would those assets remain -- sorry --

6     would those assets remaining in the earn

7     program by fault -- excuse me.  Let me start

8     that question over.  It's a bit of a long

9     question.

10              After April 15, 2022, if a

11    nonaccredited investor had assets in the earn

12    program, would those assets remain in the earn

13    program by default unless that customer chose

14    to remove them?

15              MR. McCARRICK:  Objection to

16        form.  Outside the scope.

17              You can answer.

18        A.    My understanding is they would

19    remain in the earn program.

20        Q.    And the customer would continue to

21    earn rewards on those assets until the

22    petition date.  Is that right?

23              MR. McCARRICK:  Objection to

24        form.  Outside the scope.

25        Foundation.

66

```
 1              C. Ferraro - Confidential

 2              You can answer.

 3      A.    That's my understanding, yes.

 4      Q.    Okay.  Do you think that allowing

 5  nonaccredited investors to continue to accrue

 6  awards may have incentivized them to keep

 7  their assets in the earn program?

 8              MR. McCARRICK:  Objection to

 9      form.  Calls for speculation.

10              You can answer.

11      A.    I do not know.

12      Q.    You have -- you have no view on

13  whether allowing a customer to accrue awards

14  would incentivize them to keep their assets in

15  that award-accruing program?

16      A.    Well --

17              MR. McCARRICK:  Object to

18      form.

19              You can answer to the extent

20      you know.

21      A.    I mean, as a us- -- let me think

22  about it from a user standpoint -- right? --

23  I'm giving my cryptocurrency, basically

24  changing title, to Celsius, putting it on

25  their platform.  What I get in return is
```

67

1                   C. Ferraro - Confidential

2      rewards.  So I think there is a linkage

3      between, kind of, what each individual gets.

4      I think that's a reasonable assumption.

5           Q.   So I take it the answer to that

6      is, yes, you do think that allowing

7      individuals to accrue awards would incentivize

8      them to keep the assets on the earn program?

9                   MR. McCARRICK:   Object to

10          form.  Mischaracterizes.

11                  You can answer.

12          A.   What I'm saying is people put --

13     people opted in -- people chose to go into the

14     earn program, I would think, predominantly to

15     earn rewards.

16          Q.   And so the awards incentivized

17     them to join the earn program?

18                  MR. McCARRICK:   Objection to

19          form.  Same objection.

20                  You can answer.

21          A.   I mean, it's a consideration they

22     got for being part of the earn program.  That

23     was the value proposition to the customer, was

24     to earn, yeah, rewards.

25          Q.   So the answer to my question is

68

1                    C. Ferraro - Confidential

2    yes?

3                    MR. McCARRICK:   Object to

4         form.  Asked and answered four times

5         now.

6                    You can answer again.

7         A.    I mean, yes, people put assets

8    onto the Celsius platform so Celsius could pay

9    them rewards.  Whether that incented them to

10   stay or there was other things going on, I

11   don't know.  It's a case-by-case basis.  But

12   they were there to earn rewards.

13        Q.    When the custody program was

14   created, did Celsius consider moving all

15   assets belonging to nonaccredited investors

16   from earn to custody?

17                   MR. McCARRICK:   Objection.

18        Outside the scope.

19                   You can answer.

20        A.    I have -- I was not part of those

21   discussions.  I was not with the company

22   probably when the majority of those

23   discussions occurred.  I do not know the

24   answer to that.

25        Q.    Okay.  Did Celsius take any steps

69

```
 1              C. Ferraro - Confidential
 2   to determine whether there were potential
 3   legal issues with allowing nonaccredited
 4   investors to continue to keep assets in the
 5   earn program?
 6              MR. McCARRICK:  Objection.
 7         Calls for privileged information.
 8         Instruct you not to answer.
 9         Q.   Okay.  Was Celsius in discussion
10   with regulatory authorities around the time
11   that it created the custody program?
12              MR. McCARRICK:  Object to
13         form.  Well outside the scope.
14              You can answer.
15         A.   I wouldn't know.  I wasn't part of
16   the company at that point in time.
17         Q.   Okay.  I'm going to change gears,
18   and I want to talk about the formative assets,
19   which I think is one of the subjects that you
20   said you view it as your role here today to
21   testify about.
22              What was the debtors' process for
23   determining how to deploy assets transferred
24   by account holders into the earn program?
25              MR. McCARRICK:  Object to
```

Confidential        Christopher Ferraro - November 21, 2022

70

```
 1                  C. Ferraro - Confidential

 2          form.

 3                  You can answer.

 4          A.    What was the method of deploying

 5    assets?

 6          Q.    Yeah, I'll ask it again.

 7                  What was the debtors' process for

 8    determining how to deploy assets transferred

 9    by account holders into the earn program?

10          A.    Okay.  I'll speak to it from my

11    understanding where I sit today, joining the

12    company in March 21st.

13                  You know, we pay rewards to

14    customers to transfer title, become part of

15    the earn program.  And with those

16    cryptocurrencies, Celsius would then deploy

17    into different type of deployment activities.

18                  Could be your regular lending, so

19    retail lending.  You know, usually those were

20    loans that were collateralized by

21    cryptocurrencies up to 50 percent.  It was

22    lower for certain cryptocurrencies, and the

23    higher the LTV, up to 50 -- I think there was

24    three price points, 25, 33, and 50 percent

25    LTV -- the rate would change.
```

71

```
 1                C. Ferraro - Confidential
 2                And those would usually be either
 3     dollars or stablecoins that we would lend to
 4     the customer; so backed by other
 5     cryptocurrencies, and we would give them
 6     dollars or stablecoins.  Those two -- those
 7     two are really fungible and interchangeable in
 8     the space that we operate in.
 9                The other program was the
10     Institutional Lending Program.  Obviously, it
11     was for institutions.  These would be a little
12     bit higher.  These could be unsecured.  They
13     could be higher, above 100 percent LTV.  Some
14     of them were below 100 percent LTV.  And
15     typically, like a bank rate, any lending type
16     of protocol, the higher the risk, the higher
17     the rate.  Right?  So those were the two, kind
18     of, key lending programs.
19                We also staked assets.  So we
20     would stake -- predominantly it was ETH.  We
21     would deploy into DeFi protocols.  And we
22     would also use the cryptocurrencies to
23     borrow -- to pledge and borrow against for
24     operational purposes.
25          Q.    So I appreciate the answer, but I
```

72

1              C. Ferraro - Confidential

2    actually don't think it's responsive to the

3    question that I asked.  So I'm going to ask my

4    question again.  I'd like you to try to answer

5    my question.

6              What was the debtors' process for

7    determining how to deploy assets transferred

8    by account holders into the earn program?

9              MR. McCARRICK:  Objection to

10        form.

11             You can answer to the extent

12        you know.

13        A.    Are you talking about internal

14   deployment, risk management, liquidity, that

15   type of stuff?

16        Q.    Yes.

17        A.    Okay.  I'm sorry.  I thought you

18   were asking for a description of the programs.

19        Q.    Okay.

20        A.    Okay.  None of these were in my --

21   I didn't -- I wasn't owner of these policies.

22   So I'm, kind of, speaking to my understanding,

23   just to give that as a backdrop.

24             There was a liquidity framework,

25   so if we -- and it would go coin by coin.  So

73

1            C. Ferraro - Confidential

2    if we had excess liquidity, there would be a

3    signal to the deployment team that you could

4    deploy XYZ coin.

5            So maybe if we had excess Bitcoin,

6    Bitcoin would be sitting there as a deployable

7    coin, and that would be on a

8    cryptocurrency-by-cryptocurrency basis.  And

9    then there was also --

10       Q.    Okay.  Any other -- sorry.  Go

11   ahead.

12       A.    Yeah.

13       Q.    Please go ahead.

14       A.    Yeah.  To my understanding -- and

15   I do not know all the specifics to it -- but

16   then there was also, kind of -- kind of, hard

17   limits that risk management would put in

18   place.  So you can't stake above X percent of

19   the total coins.  You know, maybe deploying

20   into liquidity pools, you can't be above X

21   percent of the pool, things like that.  So we

22   didn't get too -- you know, own too much of

23   the trade, and it would be very hard to get

24   out of.

25       Q.    Okay.  And who is involved in

74

1              C. Ferraro - Confidential

2     making those sorts of risk assessment

3     decisions?

4              MR. McCARRICK:  Objection to

5         form.  Outside the scope.

6              You can answer.

7         A.    Risk management.  And there was a

8     risk committee.  I didn't join the risk

9     committee until I took the CFO title, so it's

10    hard for me to speak about before.  But these

11    things would be discussed at the risk

12    committee.

13             There was also daily, kind of,

14    deployment meetings where the deployment team,

15    risk, and the executives would meet.  And

16    there was also a weekly, kind of, investment

17    meeting.  It wasn't a committee but it was --

18    it acted almost like a discussion of where we

19    should be investing and where we might want to

20    pull back on.

21        Q.    And who, if anyone, was required

22    to sign off on those deployment decisions?

23        A.    The limits or the deployment

24    decisions?

25        Q.    Let's do both.

Confidential        Christopher Ferraro - November 21, 2022

75

```
 1                  C. Ferraro - Confidential
 2          A.    Well, I'm only -- my understanding
 3    would be risk would be responsible for the
 4    limits and any of those policies and that the
 5    deployment team's responsibility was to be
 6    within those limits -- right? -- so that was,
 7    kind of, the way that the -- that -- you know,
 8    risk set the rules and the deployment team had
 9    to follow those rules.
10          Q.    So who was involved in setting the
11    rules?
12                MR. McCARRICK:   Object to
13          form.   Outside the scope.
14                You can answer.
15          A.    Again, I think it was risk
16    management.   I wasn't here for the vast
17    majority of the history of Celsius, but my
18    understanding would be risk would be setting
19    those limits and the policies and procedures
20    in place to make sure that folks stayed within
21    those limits.   And then there was reporting
22    that was done.
23          Q.    So -- okay.   So you refer to risk
24    management.   So who was on the risk management
25    team?
```

76

1          C. Ferraro - Confidential

2              MR. McCARRICK:  Object to

3          form.  Outside the scope.

4              You can answer.

5          A.    It was ran -- it was led by an

6    individual named Rodney Wong.  And then, you

7    know, there was probably five or six risk

8    professionals in addition to Rodney that made

9    up the team.

10         Q.    Did the debtors take any steps to

11   make customers with assets in the earn program

12   aware of the risks from the debtors' asset

13   deployment strategies?

14             MR. McCARRICK:  Object to

15         form.  It escapes me what this has

16         to do with the terms of use and

17         their plain and unambiguous meaning.

18             But you can answer.

19         A.    In just reviewing the terms of

20   use, I think there was a risk disclosure in

21   the terms of use, at least in the latter ones.

22             As I mentioned before, I didn't --

23   I didn't watch the AMAs.  And I don't

24   typically read blog posts.  You know, I -- so

25   limited, kind of -- I'm not the right -- the

Confidential        Christopher Ferraro - November 21, 2022

77

1              C. Ferraro - Confidential

2    best person to answer that.  But I know I did

3    come across it in the terms and uses in one of

4    the risk disclosures.

5          Q.    Okay.  So outside of the risk

6    disclosure and the terms of use, are you aware

7    of any other risk disclosures shared with

8    customers with assets in the earn program?

9              MR. McCARRICK:  Object to

10         form.  Outside the scope.

11             You can answer.

12         A.    Off of memory, I believe there was

13   disclosures on the AMA.  But I could be wrong.

14   I believe there was disclosures on the screen.

15         Q.    So you recall viewing a risk

16   disclosure on the screen during --

17         A.    No -- like, "this is not

18   investment advice," all that type of stuff.  I

19   believe.  You should verify.  But I believe

20   there was.

21         Q.    And do you view that as the same

22   thing as a risk disclosure regarding Celsius'

23   deployment of assets in the earn program?

24             MR. McCARRICK:  Object to

25         form.  Outside the scope.

78

```
 1              C. Ferraro - Confidential

 2              You can answer.

 3      A.    I don't know the details of what

 4   the disclosure was.  But I think it was a

 5   disclosure that said, you know, "this is not

 6   investment advice" and some other stuff on

 7   there.

 8      Q.    Okay.

 9      A.    I don't know about the blog posts.

10   I can't remember anything specific on whether

11   or not there was disclosures there.  So I'd go

12   back to the terms of use.

13      Q.    Okay.  Let's talk with the terms

14   of use.  Let's actually turn to paragraph 23

15   of your declaration, which, again, is marked

16   as Exhibit 1.  Let me know when you're there.

17      A.    Yeah, I'm there.  I'm just reading

18   it, if that's okay.

19      Q.    Yeah.  Take your time.

20      A.    Okay.  Thank you.

21      Q.    In fact, yeah, read that

22   paragraph.  When you're done, let me know.

23      A.    (Document review.)

24            Yeah.

25      Q.    You're done?
```

Confidential         Christopher Ferraro - November 21, 2022

```
                                                          79
  1                 C. Ferraro - Confidential

  2        A.    Yeah, I'm done.  Thank you.

  3        Q.    So in the first sentence, you

  4   state:

  5             "It is my understanding that

  6        every version of the terms of use

  7        includes one or more provisions

  8        authorizing the debtors to make

  9        unilateral updates to the terms of

 10        use."

 11             Do you see that?

 12        A.    Yes, sir.

 13        Q.    Okay.  So you say "it is my

 14   understanding."

 15             What is that understanding based

 16   on?

 17        A.    Reading the terms of use.

 18        Q.    Which terms of use?

 19        A.    Well, I -- in the Alex Mashinsky

 20   declaration, I believe he included all terms

 21   of use, 1 through 8, if I'm correct.  They're

 22   not in front of me, so -- but, yeah, in

 23   reviewing them for my declaration and also for

 24   preparation of this deposition, that's my

 25   understanding --
```

80

1           C. Ferraro - Confidential

2       Q.    You --

3       A.    -- is --

4       Q.    So just to be clear, you're

5   stating that you've read each version of the

6   terms of use, 1 through 8?

7       A.    I've gone through the terms of

8   use.  I've read them and I've seen some

9   reversions of them.  I'm not an expert in the

10  terms of use or a lawyer, but yes.

11      Q.    Okay.  So your understanding is

12  based on your own review of the terms of use?

13      A.    Yes, sir.  And discussions I've

14  had about the terms of use, but predominantly

15  me reading them, yes.

16      Q.    Okay.  And so just to be clear,

17  each sentence in this paragraph -- I believe

18  there are three sentences total -- starts with

19  "It is my understanding," or "It is also my

20  understanding."

21           And so in each case, your

22  understanding that you're representing is

23  based on your review of the terms of use and

24  other discussions you've had regarding the

25  terms of use?

81

1              C. Ferraro - Confidential

2              MR. McCARRICK:  Object to

3        form.

4              You can answer.

5        A.    Yes, sir.

6        Q.    Okay.  Celsius has customers who

7   are located all around the world.  Right?

8        A.    Yes, sir.

9        Q.    And some of those customers speak

10  languages other than English.  Right?

11             MR. McCARRICK:  Object to the

12       form.

13             You can answer.

14       A.    I would think so, yes.

15       Q.    Were there versions of Celsius'

16  website or app in languages other than

17  English?

18             MR. McCARRICK:  Object to

19       form.

20             You can answer.

21       A.    Honestly, I don't know the answer

22  to that.  I've never seen any other version

23  other than English.

24       Q.    Or terms of use provided to users

25  in any language other than English?

Confidential        Christopher Ferraro - November 21, 2022

```
                                                    82
 1              C. Ferraro - Confidential

 2              MR. McCARRICK:  Object to

 3       form.

 4              You can answer.

 5       A.    Not to my knowledge.

 6       Q.    And when you say not to your

 7  knowledge, do you mean you don't believe

 8  that --

 9       A.    I've only --

10       Q.    -- terms of use were offered in a

11  language other than English, or you're just

12  not aware --

13       A.    I've only seen --

14       Q.    -- that the terms of use are

15  offered in a language other than English?

16       A.    Sorry -- sorry for not letting you

17  finish.

18       Q.    That's okay.

19       A.    I've only seen the English --

20  English versions.  My understanding -- I don't

21  know of any other terms of use that were in

22  other languages.

23       Q.    Okay.

24              MR. HERSHEY:  T.J., I'm about,

25       I'd say, halfway through my
```

83

1              C. Ferraro - Confidential

2          questions.  We've been going for an

3          hour.  I don't know if you want to

4          take a break now.  I'm happy to keep

5          going.

6                  Or I should really ask you,

7          Mr. Ferraro, if you want to take a

8          break or if you want to keep going.

9                  THE WITNESS:  Let's keep on

10         going.  I don't need a break right

11         now.  Thank you for asking.

12                 MR. HERSHEY:  Okay.

13                 THE WITNESS:  Yeah.

14    BY MR. HERSHEY:

15         Q.   I want to turn to paragraph 26 of

16    your declaration now.

17         A.   Yeah.

18         Q.   Let me know when you're there.

19                 MR. McCARRICK:  I'm sorry,

20         Mr. Hershey, did you say paragraph

21         26?

22                 MR. HERSHEY:  Yeah, I did.

23                 MR. McCARRICK:  Okay.

24                 MR. HERSHEY:  Does that not

25         exist?

84

```
 1              C. Ferraro - Confidential
 2              MR. McCARRICK:  No, I just
 3          didn't hear you.
 4
 5          MR. HERSHEY:  Okay.  I was having
 6          a --
 7              MR. McCARRICK:  Yeah, no,
 8          unlike page 11, paragraph 26 is
 9          there, yes.
10              MR. HERSHEY:  Okay.  Good.
11  BY MR. HERSHEY:
12          Q.    Are you there, Mr. Ferraro?
13          A.    Yes, Mr. Hershey, I am.  Thank
14  you.
15          Q.    Okay.  Do you see the header "Sale
16  of the Earn Stablecoin" above paragraph 26?
17          A.    Yes.
18          Q.    Okay.  What is stablecoin?
19          A.    Stablecoin is a cryptocurrency
20  that is pegged to a specific fiat.  So in the
21  case of stablecoins that are a USDC, USDT,
22  these are pegged to the US dollar nearly one
23  for one.  They really don't trade above $1,
24  but they could trade slightly below $1.
25          Q.    Got it.  Okay.  Let's turn
```

Confidential        Christopher Ferraro - November 21, 2022

85

```
 1              C. Ferraro - Confidential
 2    actually now to Exhibit 2, which is your
 3    responses and objections.  And when you are
 4    there, please turn to page 17, and
 5    specifically on page 17, if you could look at
 6    Question Number 23.
 7         A.    (Document review.)
 8         Q.    So whenever you're there, just let
 9    me know.
10         A.    I see Question Number 23, yes,
11    sir.
12         Q.    Okay.  So you see Question
13    Number 23, and I'll read it for the record:
14              "Provide the amount of
15         obligations related to each type of
16         proposed sale stablecoin associated
17         with earn accounts by amount and
18         number of account holders as of the
19         petition date."
20              Do you see that question?
21         A.    Yes, sir.
22         Q.    Okay.  Now, you testified earlier
23    that you were not consulted regarding the
24    answers to any of the questions in this
25    document.  Correct?
```

86

1              C. Ferraro - Confidential

2         A.    Yeah, off of memory that's

3    correct.

4         Q.    And so I take it, then, you were

5    not consulted specifically regarding this

6    question either?

7         A.    That's correct.

8         Q.    Okay.  Let's look at where it says

9    "Response to Question Number 23."

10             And the second sentence reads:

11             "Subject to those general

12        objections, Celsius states that, as

13        of petition date, Celsius earn

14        obligations related to each type of

15        proposed sale stablecoin were as

16        follows."

17             Do you see that?

18        A.    Yes.

19        Q.    And there's a chart underneath.

20   Right?

21        A.    Yes.

22        Q.    Okay.  And you see the column on

23   the left says "Coin Type"?

24        A.    Yes.

25        Q.    Just take a minute and look

87

```
1              C. Ferraro - Confidential
2    through the entries in that column.  Are these
3    all types of stablecoins?
4              MR. McCARRICK:  Object to
5         form.
6              You can answer.
7         A.    Are these all -- I believe there's
8    more stablecoins than just this in
9    existence --
10         Q.    Right.  Let me -- let me -- yeah,
11   just to be clear, my question is:  Are these
12   types of coin listed in this column all
13   stablecoin?  In other words, is each of these
14   a type of stablecoin?
15         A.    Yeah.  Yes, it looks that way to
16   me.
17         Q.    Okay.  And you see the second
18   column says "Number of Coins"?
19         A.    Yes.
20         Q.    Okay.  So looking at the first row
21   which says "USDC," you agree with me that, as
22   of the petition date, Celsius earn obligations
23   with respect to USDC was over 800 million
24   coins.  Is that right?
25         A.    Yes.
```

88

```
 1              C. Ferraro - Confidential
 2         Q.    And going to the next row, USDT
 3    ERC20, you agree with me that Celsius
 4    obligations or earn obligations as of the
 5    petition date was approximately, say, 100
 6    million coins.  Is that right?
 7              MR. McCARRICK:  Object to
 8         form.  Foundation.
 9              You can answer.
10         A.    Yes.
11         Q.    Okay.  And to be clear, do you
12    have -- did you know these numbers before
13    seeing them in this document?
14         A.    These are numbers that my finance
15    team would have put together.  I've seen
16    reports of existing, kind of, coins in the
17    freeze report that we run.  But I don't know
18    them off of memory.
19         Q.    Okay.  And just to finish off with
20    this document, the GUSD, approximately 80
21    million coins as of the petition date.  Right?
22         A.    Yes, sir.
23         Q.    And BUSD, approximately 30 million
24    coins as of the petition date.  Right?
25         A.    Yes.
```

Confidential        Christopher Ferraro - November 21, 2022

89

```
 1              C. Ferraro - Confidential
 2        Q.    And so if you can do some quick
 3   math with me, we add up the number of coins in
 4   those first four rows, that's over 1 billion
 5   in stablecoins.  Is that right?
 6        A.    About 1 -- 1. -- 1 billion and 50
 7   million-ish, yeah.
 8        Q.    Your math is better than mine.
 9              Are you familiar with an entity
10   known as Tether?
11              MR. McCARRICK:  Object to
12        form.
13        A.    I've heard of Tether, yes.
14        Q.    And what is Tether?
15              MR. McCARRICK:  Object to
16        form.
17        A.    To my understanding, Tether is a
18   player in the cryptocurrency industry.  They
19   lend.  They borrow.
20        Q.    All right.  Well, speaking of
21   lending, are you aware that before the
22   petition date, Celsius received a loan from
23   Tether?
24              MR. McCARRICK:  Objection to
25        form.  Outside the scope.
```

Confidential        Christopher Ferraro - November 21, 2022

90

```
 1              C. Ferraro - Confidential

 2                   You can answer.

 3         A.    We had a loan from Tether, yes.  I

 4    understand that --

 5         Q.    Oh, sorry.  Did not mean to cut

 6    you off.  Please finish.

 7         A.    I understood it to be that Celsius

 8    did borrow money from Tether and that that was

 9    collateralized with different types of

10    cryptocurrencies.

11         Q.    Do you understand or do you have

12    an understanding regarding the amount of the

13    loan that Celsius received from Tether?

14              MR. McCARRICK:  Object to

15         form.  Outside the scope.

16              You can answer.

17         A.    I don't know the exact amount, but

18    it was south of a billion dollars, maybe 800

19    million, 7- to 800 million, I believe.

20         Q.    And are you aware of the

21    denomination of that loan?

22              MR. McCARRICK:  Object to

23         form.  Outside the scope.

24         A.    My understanding was that the loan

25    was probably stablecoins was what we got,
```

91

1              C. Ferraro - Confidential

2   yeah.

3        Q.    So your recollection is roughly

4   800 million in stablecoin from Tether?

5        A.    -ish, yeah, around that zip, yup.

6        Q.    Okay.  So before the petition

7   date, the debtors had borrowed roughly 800

8   million in stablecoin from Tether and

9   according to this chart we just looked at had

10  received stablecoin deposits from customers in

11  connection with the earn program totaling more

12  than $1 billion.  Right?

13             MR. McCARRICK:  Object to

14        form.  Outside the scope.

15             You can answer.

16        A.    Yeah, that's my understanding.

17        Q.    So again, doing the math, between

18  Tether and earn, that's approximately or

19  almost $2 billion worth of stablecoin as of

20  the petition date.  Right?

21             MR. McCARRICK:  Object to

22        form.  Outside the scope.

23        A.    Yeah 1 -- let's say 1.8, yeah.

24        Q.    Okay.  Between 1.8 and 2 billion.

25        A.    That's fair --

Confidential      Christopher Ferraro - November 21, 2022

```
                                                    92
 1              C. Ferraro - Confidential

 2       Q.    Is that safe to say?

 3       A.    Yeah.

 4       Q.    Okay.  What amount of stablecoin

 5  are the debtors currently seeking authority to

 6  sell?

 7       A.    About 18 million of stablecoin.

 8       Q.    And is that 18 million of

 9  stablecoin the total amount of stablecoin

10  currently in the debtors' possession?

11       A.    That's not related to custody,

12  withheld, or lending collateral, yes.

13       Q.    So given that before the petition

14  date the debtors possessed nearly 2 billion in

15  stablecoin, why do the debtors have only 18

16  million of stablecoin available to sell today?

17            MR. McCARRICK:  Object to

18       form.

19            You can answer.

20       A.    Well, the Tether loan was

21  liquidated.

22       Q.    Okay.

23       A.    So, you know, unfortunately they

24  liquidated BTC and I believe some E to pay

25  down that loan.
```

93

```
 1              C. Ferraro - Confidential

 2              The 1.8 to $2 billion of

 3   stablecoin, as an ongoing, kind of, business

 4   prepetition was used in normal course to pay

 5   for expenses.  You know, there was lending

 6   that it used.  Like I said, the retail lending

 7   program was largely stablecoins or dollars.

 8   So we would fund loans that way.  The mining

 9   asset was stablecoins and dollars.  So we'd

10   have to fund it that way.

11              There was a lot of stablecoins

12   that went into illiquid deployments.  That's

13   part of the issue.

14        Q.    So I want to return your testimony

15   to the liquidation of the Tether loan.  So you

16   said that that loan was paid back with

17   Bitcoin.  Is that right?

18              MR. McCARRICK:  Object to

19        form.

20              You can answer.

21        A.    It wasn't paid back, it was

22   liquidated.

23        Q.    Excuse me, liquidated with

24   Bitcoin.

25        A.    Yeah.
```

94

1                    C. Ferraro - Confidential

2          Q.     But in that case, what happened to

3      the stablecoin that Celsius had borrowed?

4                    MR. McCARRICK:   Object to

5          form.

6                    You can answer if you know.

7          A.     Nothing would have happened to

8      stablecoin.   What would have happened was the

9      Bitcoin was liquidated.   I believe might have

10     been some E too, but ...

11                  (Stenographer clarification.)

12         Q.     So Celsius remained in possession

13     of --

14         A.     Might have been some ETH.

15         Q.     So Celsius remained in possession

16     of the stablecoin following the liquidation of

17     the Tether loan?

18         A.     The liquidation of the Tether loan

19     had no impact on the stablecoins of Celsius.

20         Q.     Okay.   Just wanted to confirm

21     that.

22                  And so returning to your testimony

23     after that statement.   So Celsius just spent

24     the stablecoin in the ordinary course?

25         A.     Yes, and invested --

95

1              C. Ferraro - Confidential

2        Q.      Approx- --

3        A.      -- specs -- invested.

4        Q.      Approximately 1.8 billion of it?

5        A.      Yeah.   I -- there was uses of the

6    stablecoin, and clearly most of it got used to

7    pay for operations, for lending, for the

8    mining asset, certain -- certain losses that

9    we had to take that we took.   We had to go

10   back and buy cryptocurrencies -- right? --

11   with stablecoins.

12              So, yeah, there was many purposes

13   that stablecoins were used for.   Some were

14   operations, some were to buy back coins that

15   were actual losses, and some was mining

16   assets, lending programs, et cetera.

17       Q.      So you listed a few things that

18   the stablecoin went to.   Do you know the

19   amount of stablecoin that was dedicated to

20   each of those things?

21       A.      Well, I think it's pretty safe to

22   say that predominantly the entire mining

23   asset, so call it almost 600 million.

24   Predominantly the entire retail lending book,

25   call it another 400-and-something million.

Confidential        Christopher Ferraro - November 21, 2022

                                                            96
1              C. Ferraro - Confidential

2      You're at a billion.

3              There was operating expenses for

4      2021 and 2022 that totaled, off of memory,

5      about a half a billion.

6              And then you had certain

7      currency -- cryptocurrencies that we had to go

8      back and buy because there was losses.  Think

9      EFH.  So that's how you get to the 1.8 to 2

10     billion.

11         Q.    Okay.  So just -- so sticking with

12     your math.  So mining, lending, and

13     operations, you said 600 for mining, 400 for

14     lending, 500 for operations.  That totals

15     1.5 billion.  Right?

16         A.    Yeah.

17         Q.    So would the loss that you just

18     described be 300 million in your estimation?

19         A.    Losses in which we had to go back

20     and purchase cryptocurrencies for the accounts

21     so we didn't have a directional position.  I

22     don't have that number off the top of my head,

23     but, yeah, it was in that range.

24         Q.    Can you explain that a little more

25     of losses for which you had to go back and --

Confidential        Christopher Ferraro - November 21, 2022

97

1              C. Ferraro - Confidential

2         A.    Well, let's say --

3         Q.    -- purchase cryptocurrency?

4         A.    Yeah.  Let's say, for example,

5    EFH.  We -- we borrowed money from EFH, and I

6    believe this dates back to 2020.  Right?  We

7    lent money -- we borrowed money from EFH, and

8    we posted Bitcoin and ETH as collateral.

9              When we went to pay down the loan

10   with EFH, they said, We don't have your

11   collateral.  So now we thought we had an asset

12   of Bitcoin -- right? -- and now we don't.  So

13   we had to use stablecoins to go out and buy

14   Bitcoin so that our risk positions would be

15   neutralized.

16        Q.    Understood.  Okay.  All right.

17   This may retread some of the ground we've just

18   gone over.  Let's turn to paragraph 26 of your

19   declaration.

20        A.    Of my declaration.  Okay.

21              Yes, sir.  I'm there.

22        Q.    And, actually, before we get

23   there, just one quick question:  Is Celsius

24   able to trace stablecoins in its possession to

25   specific transfers made by account holders?

                                                             98
```
 1                 C. Ferraro - Confidential
 2         A.    The coins go into, like, an
 3    omnibus account -- I always struggle to say
 4    that word, I'm sorry -- omnibus account.  So
 5    kind of -- we don't link a specific stablecoin
 6    to a customer.  We think of them more as
 7    fungible.
 8         Q.    And there's no way to, let's say,
 9    analyze the blockchains to determine where it
10    came from before it went to the omnibus
11    account?
12              MR. McCARRICK:  Object to
13         form.
14              You can answer.
15         A.    To my understanding, it all gets
16    mixed in the omnibus account.  So we --
17         Q.    Are you now aware -- go ahead.
18    Sorry.
19         A.    I was going to say, we can look
20    and say 100 stablecoins were sent from 100
21    different wallets and we have 100 in the
22    omnibus account, but we -- and then when we
23    deploy them, we don't go back in time to say
24    which ones were deployed for -- related to
25    which cryptocurrency obligations that Celsius
```

99

```
 1                  C. Ferraro - Confidential
 2    has to the customers.
 3             Obviously the stablecoins are
 4    Celsius', the transfer.  The title has been
 5    transferred to Celsius in the terms of use.
 6    Celsius has the right, which we're describing
 7    right here, to pledge, deploy, otherwise
 8    rehypothecate, et cetera.  So ...
 9         Q.    But just to be clear, putting
10    aside what Celsius may or may not do in terms
11    of trying to trace stablecoin to their source,
12    my question is could it do so?
13             MR. McCARRICK:  Object to
14         form.
15             You can -- you can answer.
16         A.    I'm sure in a massive data
17    exercise, you could probably track and trace
18    things.  It's all public blockchain.  We, kind
19    of, mix it all together in the omnibus wallet
20    and then deploy it from there.  So it gets --
21    we didn't in an active managing trace because
22    it wasn't important.  We just had the
23    obligation to the customer, the liability to
24    the customer.  That's what we tracked.
25         Q.    Right.  And I just want to be
```

100

```
1              C. Ferraro - Confidential
2    clear, I'm not trying to pass judgment on
3    whether Celsius should have or did or did not.
4    But it -- so basically your answer, it sounds
5    like your testimony is it may be possible to
6    trace the stablecoin, but it would be -- I
7    think the word you used is "a massive
8    undertaking."  Is that right?
9         A.    I'm not a blockchain expert.  So
10   my understanding is it's possible.  We weren't
11   set up that way to do it.
12              If it were to be done, I would
13   think there's a lot of data out there, but it
14   would be a big exercise.
15        Q.    Okay.  And now we can go to
16   paragraph 26.  I apologize we didn't do it
17   before.
18              In the first sentence of that
19   paragraph, you state:
20              "It is my understanding that,
21         prior to the petition date, the
22         debtors monetized stablecoin as
23         needed to meet their fiat
24         obligations in the ordinary course."
25              So you state "it is my
```

101

1              C. Ferraro - Confidential

2    understanding."  What is that understanding

3    based on?

4         A.    General understanding of how the

5    business operated by, you know, being here for

6    six to nine months, by looking at reports, by

7    having conversations.

8         Q.    Okay.  What does "monetize" mean?

9         A.    They use them -- could either use

10   them as payment or liquidate them to cash, to

11   fiat.

12        Q.    And can you explain the process

13   the debtors use for monetizing stablecoin

14   prior to the petition date?

15        A.    There's multiple ways in which you

16   could do it.  You could go on an exchange and

17   sell it on the exchange, have it wired to your

18   fiat bank account.  You could go to a provider

19   like Circle and for effectively no cost, just

20   convert stablecoin to fiat and have it put in

21   your bank account.

22              So the industry works in a way in

23   which fiat and stablecoins are very

24   interchangeable.

25        Q.    Okay.  How frequently do the

102

```
 1              C. Ferraro - Confidential
 2    debtors monetize stablecoin prepetition?
 3         A.    How what, sorry?
 4         Q.    How frequently do the debtors
 5    monetize stablecoin before the petition date?
 6         A.    I would -- I would -- my
 7    understanding would be multiple, multiple,
 8    multiple times per day.
 9         Q.    And you mentioned "fiat
10    obligations."  What fiat obligations are you
11    referring to in this sentence?
12         A.    Payroll, vendor expense,
13    professional fees.
14         Q.    Anything else?
15         A.    All ordinary course business, any
16    expenditures related to the activities that
17    Celsius was doing.  The vast majority of them
18    were paid in fiat.
19         Q.    Is there any reason the debtors
20    would choose to monetize stablecoin as opposed
21    to other types of cryptocurrency?
22         A.    Well, stablecoins don't really --
23    you know, if -- you know, you're --
24    stablecoins don't have a risk position next to
25    them, meaning they're not sensitive to prices
```

103

1                  C. Ferraro - Confidential

2     because everything is one-for-one for the

3     dollar.

4                  So stablecoins act as though, in

5     crypto, that they're almost like fiat.  If you

6     were to -- if you were to sell other coins,

7     then you could open up risk position.  So if I

8     had customer obligations of 100 Bitcoin and I

9     had 101 Bitcoin in my asset account, I could

10    sell one Bitcoin.

11                 But in general, what we would do

12    would be sell Bitcoin.  You'd probably earn --

13    you'd probably sell Bitcoin for stables, and

14    then you would have stables that would fund

15    operations.

16                 But usually what would happen is

17    you'd manage risk so you were neutral from a

18    asset liability net position; so stablecoin

19    would be effectively the cryptocurrency that

20    you would use for payments, converting to

21    fiat, et cetera.

22         Q.   Do you know what fraction of the

23    cryptocurrency monetized by the debtors to

24    meet their fiat obligations prepetition was

25    stablecoin?

104

```
1                   C. Ferraro - Confidential

2                   MR. McCARRICK:   Object to

3         form.

4                   You can answer.

5         A.    I do not know.  I would guess that

6    the vast majority of it was stablecoins that

7    were put into fiat.  So liquidated into fiat.

8         Q.    And do you know what fraction of

9    those stablecoins were deposited by customers

10   into earn accounts?

11                  MR. McCARRICK:   Object to

12        form.

13                  You can answer if you know.

14        A.    What portion of the stablecoins

15   that we used to fund?  I would -- I would

16   venture to guess all of them.

17        Q.    So all of the stablecoin that the

18   debtors monetized prepetition was associated

19   with customer accounts?

20                  MR. McCARRICK:   Object to

21        form.

22                  You can answer.

23        A.    Yeah, to my understanding.  We

24   didn't have a perfect process on custody, but

25   we would exclude custody from it.  So, yeah, I
```

Confidential       Christopher Ferraro - November 21, 2022

105

1               C. Ferraro - Confidential

2     mean, the vast, vast, vast majority of them

3     would be related to earn accounts.

4           Q.    Okay.  Do you know when the last

5     time was before the petition date that the

6     debtors monetized stablecoin?

7           A.    I would assume we did it right

8     before the -- right leading up to the petition

9     date, to the filing.  I mean, any payments

10    across cryptocurrency, gas fees, things like

11    that, you pay a lot in stablecoins.  So

12    you're -- in reality, you're using stablecoins

13    multiple times.

14          Q.    Okay.  And do you have a sense of

15    how much stablecoin was monetized?

16          A.    I don't know off the top of my

17    head.  That was -- I was not the CFO, and this

18    was handled largely with the CFO and the

19    treasury team.  I wasn't part of those

20    conversations.

21          Q.    Do you know whether the debtors

22    have continued to monetize stablecoin after

23    the petition date?

24          A.    Well, we're not able to sell,

25    trade cryptocurrency.

Confidential        Christopher Ferraro - November 21, 2022

                                                              106
 1                  C. Ferraro - Confidential

 2        Q.    So the answer is no, they haven't?

 3        A.    So the answer is no.  Yeah.

 4        Q.    Okay.  Let's turn to paragraph 24

 5   of your declaration.  And let me know when

 6   you're there.

 7        A.    Yes, sir.

 8        Q.    Okay.  In the first sentence of

 9   that paragraph, you state:  "Post-petition,

10   the debtors have faced continued liquidity

11   challenges."

12              Do you see that?

13        A.    Yes.

14        Q.    Okay.  When do the debtors project

15   they will run out of liquidity?

16        A.    On a consolidated basis of the

17   debtors, in the first quarter of 2023.

18        Q.    Is there any more specific

19   projection for when the liquidity runs out

20   beyond the first quarter of 2023?

21        A.    It's really -- it gets very tight

22   at the end of February, and we go negative in

23   the beginning of March.

24        Q.    Okay.

25        A.    That's on a consolidated basis.  I

107

1               C. Ferraro - Confidential

2     think the mining -- the mining entity, I

3     believe, runs out of cash in January, late

4     January.

5          Q.    And when do the debtors project

6     they will run out of liquidity if they're

7     permitted to sell stablecoin?

8          A.    Stablecoin sale would at least

9     give us another month of runway, if not a

10    little bit more.

11         Q.    So -- I'm sorry.

12         A.    If not a little bit more.  So that

13    should get us into probably April.

14         Q.    Okay.  Do the debtors intend to be

15    out of bankruptcy before that time?

16         A.    It's highly unlikely.  We would

17    love to be, but --

18         Q.    Why -- I'm sorry, I feel like I

19    keep cutting you off, and that's my fault.

20    You said, "It's highly unlikely, we'd like to

21    be."  Was there anything you wanted to say?

22         A.    Of course we would like to be, but

23    it's doubtful that we'll be out in early

24    second quarter.  It's probably a few months

25    later if we do everything properly.

Confidential      Christopher Ferraro - November 21, 2022

                                                              108
1                   C. Ferraro - Confidential

2         Q.     So let's break that answer down.

3    So why do you say it's highly unlikely?

4         A.     Well, we have to -- I mean, we're

5    in a dual-track process right now where we're

6    going through sales and marketing of the

7    assets.  We're also working on a standalone

8    reorganization plan working with the committee

9    and their professionals as well.

10                You know, we're just in a world in

11   which we're trying to maximize value for the

12   estate.  I think there's also key legal

13   questions, to my understanding, that still

14   need to be answered, investigations that need

15   to be finished.

16                But most importantly for me, I'm

17   working on the reorganization plan, and my

18   understanding of the timelines and, kind of,

19   how the plan gets approved -- gets commented

20   on, gets approved and -- right? -- is early

21   second quarter of 2023 is a stretch to get out

22   of bankruptcy.

23        Q.     What happens -- what happens if

24   the debtors run out of liquidity before

25   they're able to exit from bankruptcy?

109

```
1              C. Ferraro - Confidential
2         A.    Well, that would be administrative
3    bankruptcy, and you'd effectively cease to
4    operate in this Chapter 11 proceeding, is my
5    understanding.
6         Q.    Are the debtors trying to avoid
7    that outcome?
8         A.    Absolutely.
9         Q.    Well, so I'd like you to, then,
10   kind of, reconcile those two things for me
11   because the debtors are running out of money.
12   Right now, even with the sale of stablecoin,
13   they're going to run out, let's say, by April,
14   but you say it's highly unlikely that the
15   debtors will be out of bankruptcy by April.
16              So what's the plan?
17              MR. McCARRICK:  Object to
18        form.
19              You can answer.
20        A.    Well, I think we have to raise
21   liquidity.  Stablecoins, in my opinion, is the
22   cheapest and easiest way to fund the case.
23   That does not mean that the case is completely
24   funded.  We'd have to go -- we'd have to go
25   out and either raise financing, debt
```

Confidential        Christopher Ferraro - November 21, 2022

110

```
 1              C. Ferraro - Confidential
 2    financing, which is incredibly expensive.
 3    This comes at a major cost to the estate, and
 4    the value that we'll be able to provide to
 5    borrowers.  Debt financing is incredibly
 6    expensive.  Stablecoin, effectively no cost to
 7    liquidate.
 8              We also have the ability -- right?
 9    -- to, if -- if so is approved, if said is
10    approved, we have the ability to use coins to
11    borrow, and we can fund that way, either
12    through DeFi protocols or centralized
13    counterparty.  That's going to be cheaper than
14    DIP financing.  And then, of course, you could
15    sell other coins to fund the case.  I think --
16         Q.    Are those are all --
17         A.    I think --
18         Q.    Sorry.  Go ahead.
19         A.    Yeah, sorry.  I think we've pulled
20    the expense management lever really hard.
21    We've gone from 920 employees to about 167
22    employees as of, really, last week.
23              So I think that we're in a world
24    in which, you know, we've cut expenses, we've
25    cut vendor costs.  We've gotten rid of -- out
```

111

```
 1              C. Ferraro - Confidential
 2   of all of our debtors' real estate offices.
 3   So we've tried to reduce the cost of this case
 4   as much as we can.
 5              I think that lever, albeit, we can
 6   still optimize a little but, but that's been
 7   pulled about as hard as we can without
 8   jeopardizing our ability to furnish diligence
 9   questions, help out with the sales process, or
10   come up with the reorg plan.
11              So I don't think cutting expenses
12   is going to be a significant benefit at this
13   point.  So I think it really comes down to
14   financing vis-à-vis the coins, DIP financing,
15   and other protocols that we can borrow
16   against.
17       Q.    Okay.  Yeah.  So you mentioned
18   three possible ways to increase liquidity:
19   DIP financing, borrowing, or selling coins.
20   Right?
21       A.    Yeah.
22       Q.    Okay.  So are those all options
23   the debtors are considering pursuing?
24       A.    We've analyzed all options.
25       Q.    Have the debtors taken any steps
```

112

```
1              C. Ferraro - Confidential

2    towards actually achieving any of those three

3    things?

4         A.    Yeah, the sale of stablecoins.

5    That's what we're here discussing today.  This

6    is the cheapest and the first step.  We

7    also --

8         Q.    Okay.  Anything else?

9         A.    Well, we did do -- working with

10   Centerview Partners, there was a DIP process

11   early on in the case, and I believe the

12   decision was to pause that given its cost.  So

13   we're hoping we don't have to go to the DIP

14   financing.

15        Q.    All right.  But sitting here

16   today, is the -- besides the sale of

17   stablecoins, is the debtor doing anything else

18   to decrease liquidity?

19        A.    We need approval to be able to

20   deploy coins into DeFi protocols or to use

21   them as collateral to borrow against.  We've

22   analyzed the costs and the risks.  We have not

23   done anything that would require approval, to

24   my understanding.

25        Q.    So sitting here today, these are
```

113

```
 1              C. Ferraro - Confidential

 2    all hypothetical ways of bringing in

 3    liquidity, but there is no certainty that any

 4    one of them will actually bring in liquidity?

 5         A.    The --

 6              MR. McCARRICK:  Object to

 7         form.

 8              You can answer.

 9         A.    The most certain one is the sale

10    of stablecoins.

11         Q.    Okay.  But that by itself is not

12    sufficient to fund these cases as long as you

13    think that --

14         A.    I anticipate that the case -- the

15    case will go past April.  That's just -- first

16    time I'm in Chapter 11.  So it's my, you know,

17    kind of, semi-educated take on this.  We'll

18    need some other ways of financing.

19              But, first, stablecoins is the

20    cheapest.  It's what we use in our ordinary

21    course.  It's how we operate.  It's how the

22    industry operates.  So that's the relief we're

23    asking for right now.

24         Q.    Okay.  And you mentioned, part of

25    your answer before, was that in order to exit
```

114

```
 1              C. Ferraro - Confidential

 2   bankruptcy responsibly, I think was the words

 3   you used, you're going to need more time than

 4   you would have just to be read.  Is that

 5   right?

 6         A.    Again, with my, kind of,

 7   uneducated, nonexperienced eye, and looking at

 8   the, kind of, legal calendar and how things

 9   progress, it's probably going to be a little

10   bit more than April.  That's my guess.

11         Q.    And you mentioned in your

12   testimony what I think you called "key legal

13   questions" that need to be resolved before the

14   company can exit from bankruptcy.

15              Do you remember that testimony?

16         A.    Yeah, I believe they called --

17         Q.    What are those -- go ahead.

18         A.    -- you know, key questions of

19   first impression or key, you know, gating

20   legal questions.

21         Q.    What are those key legal

22   questions?

23         A.    I'm probably not the right person

24   to ask that, you know.  I can give you --

25         Q.    Well, I mean -- go ahead.  I
```

Confidential        Christopher Ferraro - November 21, 2022

115

```
1                  C. Ferraro - Confidential

2     didn't mean to cut you off.  Go ahead.

3          A.    Yeah.  I said I'm probably not the

4     right person to ask that.  The key legal

5     questions are the ones that are being brought

6     up for the judge to decide through the

7     procedure and process.

8          Q.    Are there other legal questions or

9     key legal questions that you're referring to?

10              MR. McCARRICK:  Object to

11         form.

12         A.    Yeah.  I think -- I mean, I think

13    the key -- one of the key legal questions is

14    the title of the -- of -- you know, for us,

15    terms and use is clear, crystal career.  But I

16    don't think that the judge has ruled on that

17    yet.

18         Q.    But the judge is going to rule on

19    that next month.  Right?

20         A.    I don't know the legal calendar.

21    I don't have it in front of me.

22         Q.    Okay.  Well, let me ask you:  Are

23    there any other key legal questions besides

24    the question of title over the earn assets

25    that you were referring to when you said there
```

116

1              C. Ferraro - Confidential

2     are key legal questions that need to be

3     resolved before we can exit bankruptcy?

4              MR. McCARRICK:  Object to

5         form.

6              You can answer.

7         A.    Custody.  Is custody separate from

8     earn, and does the customer retain title?  I

9     think that's a big one.

10        Q.    Okay.

11        A.    Obviously in our stablecoin

12    motion, we're not -- we're excluding custody

13    coins, withheld coins, and lending coins.  I

14    think the lending program and how you deal

15    with both the collateral as well as the

16    outstanding balance that the customers owe is

17    also a key gating legal question.  I think

18    those are three of them that come to my mind.

19        Q.    Okay.  And it's your understanding

20    those questions aren't likely to be resolved

21    before April?

22        A.    Oh, I don't know that answer.  I

23    mean, we also have to do a reorganization plan

24    and get through the sales process.  There's

25    investigations going on.  So my April comment

117

1              C. Ferraro - Confidential

2    was not just about the legal questions, it was

3    about the entire case.

4          Q.    Got it.  Okay.

5              CERTIFIED STENOGRAPHER:

6          Counsel, can we take a break?

7              MR. HERSHEY:  Absolutely.

8          Mr. Ferraro, are you okay with

9          taking a break?

10             THE WITNESS:  I am.  Thank

11         you.

12             MR. HERSHEY:  Let's go off the

13         record and we can talk about a time.

14             THE VIDEOGRAPHER:  Stand by.

15         The time now is 10:38 a.m.  This

16         concludes Media 1.  Off the record.

17             (Recess taken from 10:38 a.m.

18         to 10:59 a.m.)

19             THE VIDEOGRAPHER:  The time

20         now is 10:59 a.m.  This begins Media

21         2.  On the record.

22   BY MR. HERSHEY:

23         Q.    Okay.  Welcome back, Mr. Ferraro.

24   Can you hear me okay?

25         A.    Yes.  Yes, I can, Mr. Hershey.

118

```
           C. Ferraro - Confidential
```

1          C. Ferraro - Confidential

2     Thank you.

3          Q.    Okay.  I don't have too many more

4     questions.  I actually wanted to return to a

5     few of your answers.  I think that will be

6     easier before I continue through, so I'd ask

7     just to, sort of, return to a few things we

8     discussed.

9               The first thing I want to return

10    to is your testimony regarding whether Celsius

11    can trace the stablecoins it intends to sell.

12              I want to distinguish between

13    tracing things on the blockchain and tracing

14    things within Celsius' platform.

15              Just to be clear, once the

16    stablecoins are deposited onto Celsius'

17    platform and moved around within Celsius, at

18    that point can Celsius trace them, their

19    movements within Celsius' platform?

20         A.    We do not trace cryptocurrencies

21    specifically across the platform.  We look at

22    it where it is within our frameworks of, like,

23    liquidity, where it's deployed, et cetera.

24              So honestly I'm not a blockchain

25    expert, so -- but I do know that the way that

Confidential        Christopher Ferraro - November 21, 2022

119

1                    C. Ferraro - Confidential

2    we run it is not to, kind of, trace from one

3    point -- spot to the next because the coins

4    are fungible.

5          Q.    Right.   Right.   Okay.   That makes

6    sense.   And you say you're not a blockchain

7    expert.   Is there someone at Celsius you're

8    aware of with more knowledge of these subjects

9    who might be able to discuss more

10   authoritatively whether the coins are

11   traceable?

12               MR. McCARRICK:   Object to

13         form.

14               You can answer.

15         A.    Yeah, I think you -- you know,

16   Oren Blonstein would be -- he runs product.

17   He would be, you know -- and he's been with

18   Celsius for a longer period of time.

19   Obviously in product, you have to understand

20   the systems very tightly.   So he would

21   probably be a good person to ask.

22         Q.    Okay.   Anyone else you can think

23   of?

24         A.    Probably some of the folks within

25   the technology team.

Confidential     Christopher Ferraro - November 21, 2022

120

1                    C. Ferraro - Confidential

2          Q.    So is that, like, Nuke Goldstein?

3          A.    Nuke or Guillermo, the head of

4    technology.

5          Q.    Okay.  Let me ask you one more

6    question before I return to what we were

7    talking about.  And this is, again, so I

8    understand the mechanics.

9                Let's say I'm an earn customer.

10   This is before the petition date, before even,

11   let's say, April 15 of 2022.  I'm an earn

12   customer and I take out a loan, and I want to

13   pledge my coins that are associated with my

14   earn account as collateral for that money.

15               Would those coins then be moved

16   out of the earn account into a separate

17   collateral wallet somewhere?  Or how would

18   they travel, if at all, across Celsius'

19   platform once I pledge those assets as

20   collateral?

21               MR. McCARRICK:  Object to the

22          form and the characterization.

23               You can answer.

24          A.    It would be marked no longer as

25   earn, it would move to the collateral account,

121

1              C. Ferraro - Confidential

2    and it would not accrue rewards.

3         Q.    So just to be clear, when you say

4    it would still be marked no longer as earned.

5    So would the change only be on a ledger, or

6    would there actually be movement of the coins?

7         A.    I don't know the specific answer

8    to whether it was moved or not, but I do know

9    that the -- that we would code it no longer an

10   earn.  It would now be coded as part of the

11   collateral for the lending program.

12        Q.    Got it.  So there, at least, was a

13   ledger total, whether there was a

14   corresponding movement of coins, you don't

15   know?

16             MR. McCARRICK:  Object to

17        form.

18             You can answer.

19        A.    Yeah.  I mean, in the -- in our

20   back office system -- right? -- there's some

21   sort of a ledger entry.  I'm not sure that the

22   coin is moved or not.  I don't know.

23        Q.    And who -- who would know whether

24   the coin is moved or not?

25             MR. McCARRICK:  Object to

Confidential        Christopher Ferraro - November 21, 2022

122

1              C. Ferraro - Confidential

2         form.

3              You can answer.

4         A.    The deployment team, the product

5    team.  I think Oren would be a good one to

6    ask.

7         Q.    All right.  But now we can return

8    to what we were talking about before.  I

9    appreciate your indulgence.

10             So I asked you before how the

11   debtors intend to get out of bankruptcy, and

12   you said right now there are two potential

13   paths that are being considered.  There's a

14   sale process that's being pursued, and also a

15   standalone plan option that's being pursued.

16             Is that an accurate representation

17   of your testimony?

18        A.    Yes.

19        Q.    Okay.  Had the debtors

20   communicated with any potential bidders

21   regarding their preference between a sale or a

22   standalone plan?

23             MR. McCARRICK:  Object to

24        form.

25             You can answer.

123

```
1                    C. Ferraro - Confidential
2            A.     Our preference is to maximize
3     value for the estate, not to do one or the
4     other.  We work closely with the committee on
5     the reorganization plan, and we make sure that
6     we're aligned there.  But the goal is single,
7     single purpose under dual-track process to
8     maximize value for the estate for the benefit
9     of our creditors.
10           Q.     So just to be clear, the debtors
11    have no preference between a sale or a
12    standalone plan?
13           A.     Only to maximize value would be
14    the preference.
15           Q.     Got it.  And then either one of
16    those could potentially maximize value?
17                  MR. McCARRICK:  Object to
18           form.
19                  You can answer.
20           A.     Yeah, I -- that's the goal.  Yes.
21           Q.     Okay.
22           A.     Those are the two --
23           Q.     And -- sorry.  Go ahead.
24           A.     Those are the two -- those are the
25    two types of transactions that we're focused
```

Confidential       Christopher Ferraro - November 21, 2022

124

```
 1              C. Ferraro - Confidential
 2    on.  Right?  The sale process is tricky in a
 3    downturn.  Right?  It's hard selling assets.
 4    There's very little capital out there.  But,
 5    you know, we're actively doing it.  I've sat
 6    on hours of diligence calls related to
 7    potential bidders asking questions and
 8    providing documentation.
 9              Q.    And just to be clear, the debtors
10    have not formed any conclusion regarding which
11    process is more likely to maximize value?
12              A.    We haven't received the bids.  We
13    can't conclude until we see what people are
14    willing to pay.  So no.
15              Q.    Okay.  And I take it, therefore,
16    just to go back to my original question, the
17    debtors have not communicated with any
18    potential bidders regarding their preference
19    for a sale process or a standalone plan
20    process?
21              MR. McCARRICK:  Object to
22         form.
23              You can answer.
24              A.    I mean, no.  Our goal is to
25    maximize value.  We have to go through both
```

125

```
 1              C. Ferraro - Confidential
 2   processes.
 3        Q.    Okay.  Again, returning to some of
 4   your prior testimony, you testified that --
 5   well, let me -- sorry, I take that back.  Let
 6   me just ask you a fresh question.
 7              When do the debtors anticipate
 8   proposing a plan?
 9        A.    We're currently actively working
10   with the committee on this today.  We were
11   supposed to -- we are having a meeting.  I
12   wasn't able to participate because I'm here.
13   But the internal team, our advisors, the
14   committee, and the committee's advisors are
15   discussing the current thinking around a
16   reorganization plan that's led by the product
17   team, Oren's team.  I sit on those.  I'm
18   incredibly involved in those -- in that
19   process.
20              This is -- we take this as a very
21   serious process.  This is how we're going to
22   return value back to the estate and to the
23   creditors, this and the sale process.  So,
24   yeah, and we work with the committee
25   hand-in-hand with this.
```

126

1              C. Ferraro - Confidential

2        Q.    So I appreciate the answer.  But I

3    just want to hone in on my specific question.

4    I understand the debtors are -- sorry, I

5    thought someone said something.

6              I understand the debtors are

7    working on proposing a plan.  My question is:

8    When do the debtors intend to propose a plan?

9              MR. McCARRICK:  Object to

10        form.

11        A.    I mean, we have to -- we have

12    questions we're working through with the

13    committee.  If you're asking when do I hope?

14    Okay.

15        Q.    Sure.

16        A.    When do I hope?  I hope that we

17    can lock down on what a reorganized entity

18    looks like by year end and then we can start

19    working on the disclosure statement.

20        Q.    Is it safe to say the debtors are

21    trying to propose a plan as soon as reasonably

22    possible?

23              MR. McCARRICK:  Object to

24        form.  Beyond the scope.

25              You can answer.

127

1             C. Ferraro - Confidential

2        A.     Tirelessly, seven days a week,

3    nonstop, yes, sir.

4        Q.     And the debtors wouldn't

5    potentially do anything to delay its proposal

6    of a plan.  Right?

7             MR. McCARRICK:  Object to

8        form.

9             You can answer.

10       A.     There's nothing more that we want

11   to do than to get out of Chapter 11 the right

12   way.

13       Q.     So the answer is yes, the debtors

14   would not intentionally delay the proposal of

15   a plan.  Right?

16             MR. McCARRICK:  Objection.

17        Asked and very much answered.

18             THE WITNESS:  Can I answer?

19       Q.     You can answer again.

20             MR. McCARRICK:  Answer again.

21             THE WITNESS:  Oh, sorry.

22       A.     We are doing everything we can to

23   get out as fast as possible.  Delays hurt us,

24   hurt the estate, hurt our customers, hurt our

25   stakeholders.  We want to get out of this

128

```
 1            C. Ferraro - Confidential
 2   process and do it the right way.
 3        Q.    Thank you.  All right.  This is
 4   actually my last line of questions, so we're
 5   almost done.  And I will pass you on to
 6   someone else who wants to ask questions.
 7        A.    Okay.
 8        Q.    Are you aware, Mr. Ferraro, that
 9   since Celsius filed for bankruptcy, individual
10   account holders have filed letters and
11   statements on the bankruptcy court docket
12   regarding this bankruptcy?
13            MR. McCARRICK:  Objection to
14        form.
15            You can answer.
16        A.    Yes, I'm aware.  The judge has
17   also spoke about the letters.
18        Q.    Have you read any of those
19   letters?
20        A.    I have read some of the letters,
21   yes.
22        Q.    Do you remember which ones?
23        A.    There's too many to remember.
24   I -- I went through over 50 letters.  There
25   was a lot of letters.
```

Confidential        Christopher Ferraro - November 21, 2022

```
                                                        129
 1              C. Ferraro - Confidential

 2       Q.    Sorry.  Keep going.

 3       A.    Yeah, the letters that are on

 4   Stretto?

 5       Q.    Yeah.

 6       A.    I was able to read letters, yes.

 7       Q.    Did you just testify that you've

 8   read over 50 of them?

 9       A.    Yeah.  I've read numerous letters,

10   lots of letters, yeah.  And they're all

11   heartbreaking -- heartbreaking letters.  It's

12   a very difficult read.  People are in a very

13   difficult position.

14       Q.    So, again, tell me -- tell me more

15   about that, because I am curious to hear the

16   reaction to the letters since you just

17   described them as "heartbreaking."

18              Is there anything more you would

19   like to say?

20              MR. McCARRICK:  This is well

21         outside the scope, but I want to

22         hear Mr. Ferraro's answer.

23              So you can answer.

24       A.    I mean, I think we're aligned --

25   right? -- the creditors want their coins back.
```

130

1             C. Ferraro - Confidential

2   And the company, its advisors, the committee,

3   its advisors are working tirelessly to do

4   that.

5             There is nothing -- there is

6   nothing out there that is, like, keep on, you

7   know -- stay in bankruptcy, keep on processing

8   the Chapter 11.  No.  We want to get coins in

9   kind back to customers as soon as possible,

10  and I think that's consistent with the message

11  in the letters.

12       Q.   Are you aware whether anyone else

13  at Celsius has read those letters?

14       A.   I don't --

15            MR. McCARRICK:  Object to

16       form.

17            You can answer.

18       A.   I don't -- I'm not aware.  I don't

19  track the reading of letters.

20       Q.   Have you discussed the letters

21  with anyone else at Celsius?

22       A.   Likely, but not off of memory.  I

23  can't -- you know.  I'm sure it's come up.

24       Q.   Okay.  So it seems from your

25  testimony that you do think it's important

Confidential        Christopher Ferraro - November 21, 2022

131

1                    C. Ferraro - Confidential

2       that Celsius listen to the concerns of its

3       customers.

4              A.    The customer --

5                    MR. McCARRICK:  Object.

6              Q.    Is that right?

7                    THE WITNESS:  Sorry.

8                    MR. McCARRICK:  Object to

9              form.  Well outside the scope.

10             Vague.  Not really sure what's going

11             on here.

12                    But you can answer.

13             A.    I think our stakeholders with the

14      customers -- right? -- kind of at the center

15      of this plan, it's important to understand

16      where they're coming from, right?  We work for

17      the benefit of the estate.  So, yes, I think

18      it's important.

19             Q.    Have you spoken with any of the

20      debtor/stakeholders regarding a potential plan

21      of reorganization?

22             A.    Any of the debtors what?

23                    MR. McCARRICK:  Ob- --

24                    THE WITNESS:  Oh, sorry.

25                    MR. McCARRICK:  I'm sorry, I'm

Confidential        Christopher Ferraro - November 21, 2022

132

1                   C. Ferraro - Confidential

2        just going to object -

3               MR. HERSHEY:  Let me re-ask

4        the question and then you can

5        object, T.J. --

6               MR. McCARRICK:  Yup.

7               MR. HERSHEY:  -- so he hears

8        it and I'll speak a little more

9        clearly.

10       Q.    Have you spoken -- you personally,

11   have you spoken with any of the

12   debtor/stakeholders regarding a potential plan

13   of reorganization?

14               MR. McCARRICK:  Object to

15       form.  Outside the scope.

16               You can answer.

17       A.    I speak with the committee,

18   they're stakeholders.  We have -- we have

19   regular conversations.

20       Q.    Anyone else?

21       A.    I've discussed it in my 341

22   testimony about the dual-track process.  I

23   have not asked specifically to the employees

24   that are working on the plan if they are also

25   a customer.  Yeah.

Confidential        Christopher Ferraro - November 21, 2022

```
                                                    133
 1               C. Ferraro - Confidential

 2          Q.    Okay.  So just to be clear, you

 3     mentioned speaking with members of committee

 4     about the potential plan of organization.

 5               Is there any other stakeholders or

 6     debtors with whom you've had conversations

 7     regarding a potential plan of reorganization?

 8               MR. McCARRICK:   Objection.

 9          Outside the scope.

10               You can answer.

11          A.    I told you the 341 testimony is

12     with stakeholders; creditors ask questions at

13     the end.  Some of it was about maximizing

14     value for the estate.  I would have discussed

15     the dual-track process.

16               And then, you know, in

17     conversations with potential buyers, every now

18     and then the reorganization, standalone

19     reorganization comes up, and my discussion

20     with them is the same as I'm having here; it's

21     a dual-track process, we have to execute

22     across both to maximize value for the estate.

23          Q.    Right.  Okay.  I just want to be

24     crystal clear.  I'm including advisors of

25     stakeholders as well in this question.
```

134

1          C. Ferraro - Confidential

2               Are there any other stakeholders

3     or their advisors with whom you have discussed

4     plan of reorganization?

5               MR. McCARRICK:   Object to

6          form.

7               You can answer to the extent

8          you understand.

9     ████████████████████████████

10    ██████████████████████████████████

11    ████████████████████████████████

12    ██████████████████████████

13    ██████████████████████████████████████

14    ████████████████████████████████████

15    ██████████████████████████████████████

16         ███████████████████████████████

17    ██████████████████████████████████████

18    ██████████████████████████████████████

19    ████████████████████████████

20    ██████████████████████████████

21    █████████████

22         Q.    And those are the only

23    conversations I'm asking about.

24         A.    Yeah.

25         Q.    So I appreciate the answer.

135

1              C. Ferraro - Confidential

2                  Have you spoken with any

3    individual account holders since becoming CEO?

4                  MR. McCARRICK:   Object to

5          form.

6                  You can answer.

7          A.    The committee are account holders.

8    I've spoken with them.

9          Q.    Anyone -- any account holders

10   besides the members of the committee?

11                 MR. McCARRICK:   Object to

12         form.   Outside the scope.   Don't

13         know where this is going.   Let's

14         move it along, Sam.

15         A.    I think I've, you know --

16         Q.    You can answer.

17         A.    On the 341 hearing, there was

18   creditors on the 341 hearing.

19         Q.    Okay.  So other than the 341

20   hearing and other than conversations with the

21   committee members, have you had -- since

22   becoming CEO, have you had any conversations

23   with Celsius account holders?

24                 MR. McCARRICK:   Object to

25         form.

136

C. Ferraro - Confidential

1

2        A.      Employees.  But I don't know if

3    they're account holders because I don't ask

4    them.  Oh, and I --

5        Q.      So is it --

6        A.      -- I did --

7        Q.      Do you agree -- sorry.  Go ahead.

8        A.      And I did have -- thank you.  My

9    memory is now jogged.  I did have a

10   conversation with one account holder, yes.

11       Q.      Can you describe that

12   conversation?

13   ███████████████████████████████

14   ████████████████████████████████████

15   ████████████████████████████████████

16   ███████████████████████████████

17   ████████████████████████████████████

18       Q.      Okay.

19       A.      So that's the only -- that's the

20   only person that I can think of outside the

21   committee, the committee's advisors, internal,

22   and our advisors.

23       Q.      Okay.  Great.

24           MR. HERSHEY:  That is actually

25       the end of my questions,

137

```
1         C. Ferraro - Confidential
2    Mr. Ferraro.  I'm just going to
3    reserve the right if your attorney
4    asks you questions at the end of the
5    deposition, to then do some further
6    questioning of you.  But other than
7    that, I'm finished.  Thank you very
8    much for your time.  I appreciate
9    it.
10        And I will pass the witness.
11        THE WITNESS:  Thank you, Sam
12   Hershey.  Thank you.
13        MR. McCARRICK:  I think the US
14   Trustee is on -- on deck.
15        MS. CORNELL:  You want to take
16   a break?
17        THE WITNESS:  I'm okay.
18        MS. CORNELL:  Yeah?  You sure?
19        THE WITNESS:  Yeah.  Thank
20   you.
21        MR. McCARRICK:  Let's go off
22   the record.
23        THE VIDEOGRAPHER:  The time
24   now is 11:15 a.m.  This concludes
25   Media 2.  Off the record.
```

```
                                                      138
 1              C. Ferraro - Confidential

 2              (Recess taken from 11:15 a.m.

 3       to 11:17 a.m.)

 4              THE VIDEOGRAPHER:  The time

 5       now is 11:17 a.m.  This begins Media

 6       3.  On the record.

 7  EXAMINATION BY

 8  MS. CORNELL:

 9       Q.    This is Shara Cornell, S-h-a-r-a

10  C-o-r-n-e-l-l, on behalf of the office of the

11  United States Trustee.

12              Okay.  So I had a couple of

13  follow-up questions and some additional

14  questions also.

15              Previously, at the beginning of

16  your deposition, you discussed your

17  background, and specifically your different

18  appointments while at Celsius.

19  ████████████████████████████████

20  ██████████████████████████████████

21  ████████████████████████████

22  ████████████████████████████████

23  ██████████████████████████████

24  ██████████████████████████████████

25  █████████████████████████████
```



139

1        C. Ferraro - Confidential

140



17    Q.    Thank you.  Also earlier in your

18  testimony, you discussed a little bit about

19  your educational background and your

20  employment background.

21          As part of that testimony, as I

22  understand it, you did not have any specific

23  experience with cryptocurrency or related.

24          Can you please explain just a

25  little bit about how you educated yourself

Confidential       Christopher Ferraro - November 21, 2022

141

1                    C. Ferraro - Confidential

2      prior to joining Celsius?

3            A.    Yeah.  You know, spending almost

4      two decades at JPMorgan, I tend to view the

5      world as a bank.  I tend to see things as a

6      risk/return type of lens, risk management.

7                  So when I joined Celsius, I think,

8      in the negotiations I was able to study --

9      right? -- that's what I do.  I like to read up

10     and study things.

11                 And in my mind, I, kind of, look

12     at cryptocurrency as another set of assets

13     that fits into the shelf of my mental model of

14     how to think about risk.

15           Q.    Okay.

16           A.    So for me it wasn't that different

17     to think about a fiat or a stablecoin or about

18     a cryptocurrency token versus a loan position

19     or something like that.  It comes with risk

20     and reward and balance sheet -- right?  And

21     that's what I did for two decades was balance

22     sheet management.

23           Q.    What about the blockchain itself

24     and how it worked and how assets are

25     transferred on the blockchain?

Confidential      Christopher Ferraro - November 21, 2022

142

```
 1                 C. Ferraro - Confidential
 2                 Was there any specific ways that
 3     you educated yourself on the workings of that?
 4          A.    Well, there's a lot of stuff out
 5     there to read, right?  I mean, it's nothing
 6     more than a super-sized ledger where multiple
 7     copies and people have -- it's all public,
 8     people have access to it.
 9                 So if you think about it in a
10     world of it's just recording transactions, it
11     makes it pretty simple.
12          Q.    Did you own any cryptocurrency
13     prior to joining Celsius?
14          A.    No.  I bought my first Bitcoin
15     yesterday.
16          Q.    It's a good time a buy.
17          A.    Yeah.  I wasn't able to buy that
18     much.  It was only about probably 1/20 of a
19     Bitcoin.  But I did want to see the
20     experience, so ...
21          Q.    At times during your earlier
22     testimony, you referred to Kirkland & Ellis as
23     your "advisors."
24                 For the record, can you just
25     clarify in what capacity Kirkland & Ellis
```

143

1              C. Ferraro - Confidential

2    represents you and whether or not you have

3    your own personal counsel with respect to

4    Celsius?

5         A.     Yeah.  So Kirkland & Ellis is

6    legal advisors to the debtors, to the company.

7    I have my own legal representative, Paul

8    Hastings --

9         Q.     Okay.

10        A.     -- is my pool coverage.

11        Q.     Thank you.  I'm going to try not

12   to repeat questions that were asked or

13   answered earlier, but sometimes I just need to

14   re-ask them to make sure that it flows a

15   little bit and it's not coming out of nowhere.

16   So I apologize.

17              The interrogatory responses that

18   were released earlier, did you provide any of

19   the responses to the interrogatories?

20              MR. McCARRICK:  Object to

21         form.

22              You mean the written

23         deposition questions?

24              MS. CORNELL:  The written

25         depo- -- yeah.  Is that --

144

1           C. Ferraro - Confidential

2               MR. McCARRICK:  I think that's

3       what he would probably refer to them

4       as.

5       Q.    The written deposition questions.

6       A.    I didn't craft any of them.

7       Q.    Do you know who from Celsius did

8   or was a part of those answers?

9       A.    I only know the single meeting

10  that I was on.

11      Q.    Okay.

12      A.    And, like I said, I was

13  multitasking.  Unfortunately, in my job I'm in

14  meetings all day.  So what I do is multitask

15  all day long.  And I was prepping, reading the

16  declarations, reading the motion on

17  stablecoins.  I honestly -- I think Oren

18  Blonstein was on the call.  But I can't even

19  recall.

20      Q.    Uh-huh.  You testified earlier

21  that today's testimony is in connection with

22  the deployment of coins and the terms of use.

23          Just for the record, are you

24  familiar with the terms of use?

25      A.    I'm not an expert.  I didn't craft

145

```
 1              C. Ferraro - Confidential
 2    them.  But I've read through them so I'm
 3    familiar with them in general.
 4         Q.    Were you employed at Celsius when
 5    they were drafted?
 6         A.    I started working at Celsius
 7    March 21, 2022.  So that probably is somewhere
 8    around when the custody was launched.  So they
 9    would have been drafting, but I wasn't part of
10    those conversations or the drafting.  So ...
11         Q.    Do you --
12         A.    I would assume that that was going
13    on while I was at Celsius but in a different
14    capacity.
15         Q.    In a different capacity.
16               Under -- we've been discussing
17    drafts, like 1, 2, 3, 4, 5, 6, 7, 8.  Around
18    the time that you started, are you aware of
19    which draft number would have been employed by
20    Celsius?
21         A.    It would have been between 6 and
22    8, is my understanding.  And I say that
23    because I believe 8 is when the custody was
24    launched.  And I joined March.  And I believe
25    custody was launched in mid-April.  So we
```

146

1                    C. Ferraro - Confidential

2      were, kind of, right between those two

3      versions.

4           Q.    After you were immediately

5      employed by Celsius until today's date, were

6      there any amendments to the terms of use that

7      you're aware of?

8           A.    I think that was the Version 8

9      that came out, I believe.  I think when I

10     joined it would have been 6 and then 8.

11          Q.    Were there any suggestions to

12     further revise or amend the terms of use since

13     you've been employed at Celsius?

14          A.    I --

15                MR. McCARRICK:  Object to

16          form.

17                Just exclude anything that you

18          know solely from legal counsel.

19          Otherwise you can answer based on

20          anything --

21          A.    I'm not part of those

22     conversations.  I have not been.

23          Q.    If there were to be an amendment,

24     are you familiar with what the process would

25     be for there to be an amendment ratified or

147

C. Ferraro - Confidential

1

2   instituted by Celsius?

3       A.    No.  Because in bankruptcy we're

4   not talking about amending the terms of use,

5   and that's my focus.

6       Q.    So you wouldn't be familiar with

7   the amendment process outside of bankruptcy if

8   Celsius was still operating in its regular

9   course?

10      A.    I would only -- from what I've

11  heard, I would expect that that would

12  continue.  Between legal and regulatory, you

13  know, they would, with product, draft the

14  terms of use, make any changes, broadcast

15  that, et cetera.  I think in these materials

16  it's been explained, kind of, how we

17  communicated with customers and how that was

18  done.

19      Q.    I understand.  I just want to try

20  to get a little bit more information about how

21  the process for approving or ratifying the

22  amendments would have occurred at Celsius

23  itself, not with respect to customers.

24          Would it have been approved by the

25  board?  Would it have been approved by

148

```
 1              C. Ferraro - Confidential
 2    separate division heads?  What would the
 3    process have been with respect to Celsius
 4    exclusively?
 5              MR. McCARRICK:  Object to
 6       form.
 7              You can answer.
 8       A.    I do not know.  All I know is that
 9    in listening and being a part of this, that
10    legal and regulatory teams were the primary
11    drafters of this, and that they would have had
12    approvals to go through.
13              In today's world that I operate
14    in, any cha- -- I mean, we wouldn't make
15    changes to the terms of use; it would make no
16    sense.  But if we did, it would go through the
17    special committee, right?  But in ordinary
18    course before?  I don't know the process.  I'm
19    sorry.
20       Q.    Okay.  Other than Kirkland &
21    Ellis, who are outside counsel for Celsius?
22       A.    I know Akin Gump represents us on
23    certain matters.  We have local counsel in
24    Israel and Serbia.  I cannot remember their
25    names.  I apologize.
```

Confidential        Christopher Ferraro - November 21, 2022

149

1              C. Ferraro - Confidential

2          Q.     Sure.  As part of the

3     interrogatory responses -- I believe it was

4     Interrogatory Number 1 -- there were

5     references made to outside counsel that may

6     have assisted with the drafting of the terms

7     of use.

8              Are you familiar with which law

9     firm that would be?

10         A.     I do not know.  This was before my

11    time.

12         Q.     So is it your understanding that

13    it would be a law firm that is not currently

14    employed by Celsius?

15         A.     I do not know.

16         Q.     Are you familiar with the firm

17    Latham & Watkins?

18         A.     Yes.

19         Q.     Are Latham & Watkins regulatory

20    counsel for Celsius?

21         A.     Thank you, yes.  Sometimes I need

22    a memory.  Sorry, Latham is our regulatory

23    counsel.  I was thinking in the Chapter 11

24    construct.  I'm sorry.

25         Q.     Oh, don't worry about it.  There's

150

               C. Ferraro - Confidential

1    a lot of -- there's a lot of firms involved so

2    it's understandable.

3          A.   They would have been involved, I

4    would think, working with regulatory and legal

5    on the terms of use.

6          Q.   Have they been employed by Celsius

7    during your entire tenure?

8          A.   My -- yes.  During my tenure and,

9    I believe, before.  I don't know when it

10   started, but I know the relationship is

11   pre- -- has been going on for a while.

12         Q.   So would it be fair to say that if

13   there were outside regulatory counsel that

14   assisted in the drafting of the terms of use,

15   it would have been Latham & Watkins?

16              MR. McCARRICK:  Object to

17         form.

18              You can answer to the extent

19         you know.

20         A.   I would -- I would assume they

21   would have been involved, yes.

22         Q.   Okay.  Do you know who Ron Deutsch

23   is?

24         A.   He's the general counsel for the

Confidential      Christopher Ferraro - November 21, 2022

151

```
 1              C. Ferraro - Confidential
 2    company, Celsius, yeah.
 3         Q.    How long has he been employed by
 4    Celsius?  Your knowledge.
 5         A.    Over a year.  I don't know if he
 6    started in 2020 or 2021.  I believe it was
 7    2021.  Mid/early 2021.
 8         Q.    So he's been general counsel since
 9    you've been employed by Celsius?
10         A.    Yes.
11         Q.    Are you familiar with his
12    background?
13         A.    Generally.  Not -- not the firms
14    he worked for.  I know he did represent
15    financial services clients.
16         Q.    Okay.  A little bit earlier you
17    made reference to Joseph Golding-Ochsner.  Are
18    you familiar with him?
19         A.    Yes.
20         Q.    Do you know what his position is
21    at Celsius?
22         A.    He's on the legal team, on the
23    internal legal team.
24         Q.    And what about Yarden Noy?
25         A.    He's on the regulatory team.
```

152

```
 1              C. Ferraro - Confidential
 2         Q.    And what about Roni Cohen-Pavon?
 3         A.    He's on the regulatory team as
 4    well.  He leads the regulatory team.
 5         Q.    He leads the regulatory.  I just
 6    listed four different attorneys that are
 7    employed by Celsius.
 8              Were all four of those attorneys
 9    employed -- strike that.
10              Since you were employed at
11    Celsius, have all four employees -- have all
12    four of those employees been employed by the
13    legal department at Celsius?
14         A.    And the reg department, yes.  They
15    were all -- all four of them have been here
16    since my tenure.
17         Q.    Can you explain a little bit about
18    the legal and the regulatory teams.  Are they
19    two separate and distinct teams?
20         A.    Yeah, two separate and distinct
21    teams.  The regulatory team is lead by Roni
22    Pavon, he's on -- is also an ExCo member.  And
23    the legal team is ran by Ron Deutsch, the
24    general counsel, and he's also on the ExCo
25    leadership team, executive committee
```

153

```
 1              C. Ferraro - Confidential
 2   leadership team.
 3              (Stenographer clarification.)
 4       Q.    Since you've been employed at
 5   Celsius, were there or have there been other
 6   attorneys employed by Celsius?
 7       A.    Yeah.  There's a legal team, yeah.
 8       Q.    But the folks that I just
 9   mentioned, would you consider them the
10   leadership?
11       A.    Yeah.  I mean, you have the two
12   heads of the group, and I think Joseph and
13   Yarden are, kind of -- I don't know that
14   they're officially called "deputies," but they
15   are definitely the more senior folks within
16   the team.
17       Q.    And all four of them still work at
18   Celsius?
19       A.    Yes.  In the update I gave to the
20   Court, I believe there was six on the legal
21   team currently and three on the reg team
22   currently, off of memory.
23       Q.    And if you know, are you familiar
24   with who would have hired any of those
25   individuals?  My understanding is they may
```

Confidential      Christopher Ferraro - November 21, 2022

154

1              C. Ferraro - Confidential

2    have all started before your tenure.

3         A.    Yeah, yeah.

4         Q.    Okay.

5         A.    I mean, it was a small company

6    then so, you know, I would think that most --

7    the leadership team would have been involved

8    in hiring them, but I'm only guessing.

9         Q.    Okay.  Are you familiar with the

10   budget that was filed at ECF Docket 1111 on

11   October 17, 2022?

12        A.    The cash flow budget?

13        Q.    Yup.

14        A.    Not the specific one but, yes,

15   with the processing and the -- yeah.

16        Q.    I'm not going to ask specific

17   questions, but I just wanted to know if you

18   were generally familiar with --

19        A.    I approve each one of those that

20   gets filed.

21        Q.    To your knowledge, has there been

22   an updated 13-week forecast?

23        A.    Yes.  We update it -- we update it

24   regularly.

25        Q.    When do you anticipate that an

Confidential        Christopher Ferraro - November 21, 2022

155

C. Ferraro - Confidential

1

2    updated would be filed with the Court?

3        A.    We're probably getting to -- it's

4    either this week or next.  It's usually --

5    it's usually towards the middle of the month

6    when we file a new report, so...

7        Q.    So you expect it probably to be

8    filed with your monthly operating reports or

9    about that?

10       A.    Yeah, very soon.

11       Q.    So obviously it hasn't been filed

12   yet, but perhaps you've reviewed some of the

13   first drafts.

14           Are there any stark differences

15   between the 13-week forecast that you are

16   aware of?

17           MR. McCARRICK:  Object to

18       form.

19           You can answer.

20       A.    I'm just -- I'm just thinking.

21       Q.    Yeah.

22       A.    Because we do regular versions and

23   we walk them, effectively, explain the

24   variances.  I'm just trying to think

25   through -- I don't know of anything that was

156

```
1              C. Ferraro - Confidential
2    significant.  I mean, there's always a handful
3    of millions that, kind of, in the launch point
4    that impacts our forecast.  And then we
5    obviously have a lot of people looking at,
6    kind of, expected inflows and outflows.
7         Q.    Sure.
8         A.    But I don't know of anything
9    meaningful that's changed.
10        Q.    Okay.  At the last hearing last
11   week, do you remember a discussion about
12   whether or not Celsius was currently cash flow
13   positive?
14        A.    Yeah, in the mining company,
15   operational cash flow positive.
16        Q.    As of today's date, is that still
17   accurate?
18        A.    Operationally cash flow positive,
19   yes.  Because we curtail and it's neg- -- so
20   we have only six people in mining.
21        Q.    Okay.
22        A.    And if the energy cost is more
23   expensive than what we can produce in new
24   Bitcoin, we just shut off the machines.
25              So, you know, our operational cash
```

Confidential        Christopher Ferraro - November 21, 2022

157
1              C. Ferraro - Confidential

2     flows are positive.  There is some remaining

3     CapEx as we build out the midland proprietary

4     sites and some power deposits, and things like

5     that.

6          Q.    Have you or anyone at Celsius that

7     you're aware of, or Alvarez & Marsal who is

8     the financial advisors for the debtors,

9     prepared a liquidation analysis to date for

10    Celsius?

11         A.    We did a very high-level

12    liquidation analysis, and we shared it with

13    the committee.

14         Q.    As of today's date -- and

15    obviously you don't have the numbers in front

16    of you -- can you estimate offhand how much

17    general cryptocurrency Celsius has as of

18    today's date?

19         A.    Versus the obligations?

20         Q.    Yes.

21         A.    I'm working off of memory.  It's

22    probably around 50 cents on the dollar

23    liquidation value.

24         Q.    What about cash on hand?

25         A.    Cash on hand is in the 150-60

158

1              C. Ferraro - Confidential

2     million range.  Cash has been pretty steady.

3     I think it's right around 170.  We topped up

4     around 190 and we've drawn down a little bit,

5     but it's hanging in there.  Now the

6     professional fees are starting to come.

7              Q.    Yeah.  A little bit earlier, we

8     touched just -- we touched a little bit on a

9     potential debtor in possession or DIP

10    financing.  Just for the record, are you still

11    planning to procure DIP financing as of

12    today's date?

13             A.    It's, kind of, the option of last

14    resort.

15             Q.    Sure.

16             A.    So we're not -- we're hoping that

17    we don't have to do DIP financing.

18             Q.    Have the debtors met with any

19    potential financer -- financiers or --

20             A.    Centerview ran a process early on

21    in the case.

22             Q.    Okay.

23             A.    And we -- I did see some of the,

24    kind of, proposals, and they were very

25    expensive.

Confidential        Christopher Ferraro - November 21, 2022

159

1              C. Ferraro - Confidential

2          Q.    Based on your understanding of the

3     ledgers and liquidation analysis at Celsius,

4     would the sale of stablecoin affect any future

5     positioning if you were to seek a debtor in

6     possession finance loan later on down the

7     line?

8              MR. McCARRICK:  Object to

9          form.

10             You can answer.

11         A.    Not that I know of.

12         Q.    Are you familiar with the de

13    minimis asset motion, an order that was

14    previously requested and granted in this case?

15         A.    Yes, I am.

16             MR. McCARRICK:  Objection to

17         form.

18             THE WITNESS:  Oh, sorry.

19             MR. McCARRICK:  You can

20         answer.  It's fine.

21         Q.    In it, the debtors sought to sell

22    certain share stocks and other de minimis

23    assets.

24             To your knowledge, has there been

25    any flow of cash or liquidity from those

Confidential       Christopher Ferraro - November 21, 2022

160

1                    C. Ferraro - Confidential

2       sales?

3            A.    Unfortunately, no.  The items in

4       which we hold are marketed, not actively

5       marketed, but there is very little interest.

6       We hold notes on mining companies in the

7       marketplace.  Mining companies are crushed.

8                    We also hold some stock

9       certificates in a few companies.  Typically

10      the flow of daily volume is pretty light in

11      those, and we would move the markets, although

12      we did get nonobjections to sell one.  It was

13      under a million dollars.  But in general,

14      these are very illiquid and not much in

15      demand.

16           Q.    Are you familiar with the status

17      of the sale of the GK8 entity?

18           A.    Generally familiar, yes.

19           Q.    Would the sale of the GK8 entity

20      or the interest in it affect the liquidity

21      position of Celsius?

22           A.    If we were to sell it, it would be

23      a help, yeah.  We would have positive net cash

24      proceeds.

25           Q.    Do you have an estimate for --

161

```
 1              C. Ferraro - Confidential
 2    earlier we -- you discussed that you might be
 3    able to extend through March without any
 4    additional infusion of cash, and with the sale
 5    of stablecoin, potentially April.  If the GK8
 6    entity was sold, do you have an estimation
 7    for --
 8         A.   I -- I estimate that would get us
 9    through the second quarter.
10         Q.   Through the second quarter.
11         A.   So with the stablecoin sale and
12    the GK8 sale, I think that would give us ample
13    liquidity, albeit it would be tight, to
14    probably fund this case.
15         Q.   And I know you -- this was asked
16    earlier, but I just want to confirm.  How much
17    stablecoin are you currently seeking to sell?
18              MR. McCARRICK:  Object to
19         form.
20         A.   18 million.
21         Q.   I think the previous request may
22    have been for 23 million.  Could you just
23    explain the change from 23 to 18 million for
24    the record?
25         A.   Yeah.  We wanted to be sure
```

162

C. Ferraro - Confidential

1

2    that -- make sure that we didn't sell anything

3    that had to do with custody or withheld,

4    because those are key outstanding legal items,

5    as well as the loan program.

6              So I think when we looked at the

7    total stablecoin in all the wallets, all the

8    assets that we have, and then we effectively

9    subtract at a coin level, custody, withheld in

10   the lending programs, you get to 18.

11        Q.    Are there any costs associated

12   with the sale of stablecoins?

13        A.    Very little.  Near zero.

14        Q.    Just for clarification, where or

15   what wallets are the stablecoins that you're

16   seeking to sell located in?

17              MR. McCARRICK:  Object to

18        form.

19              You can answer.

20        A.    I believe these are in the main

21   Fireblock accounts.

22        Q.    Is it correct that on that main

23   Fireblock account that the coins may be

24   sitting in are commingled accounts?

25              MR. McCARRICK:  Object to

Confidential       Christopher Ferraro - November 21, 2022

163

```
 1              C. Ferraro - Confidential
 2        form.
 3              You can answer.
 4        A.    Yeah, it's an omnibus structure.
 5   So multiple -- multiple coins are in there,
 6   right?  We have customer obligations.  And
 7   then we, on our asset side of the balance
 8   sheet, we put them into Fireblocks workspaces
 9   for deployment.
10              Right now, obviously, we're
11   preserving the estate, so everything is locked
12   down in the Fireblocks workspaces.
13        Q.    Are the coins you're seeking to
14   sell held by a debtor, or are any coins held
15   by a nondebtor entity?
16              MR. McCARRICK:  Object --
17        object to form.
18              You can answer.
19        A.    All are held by the debtor.
20        Q.    Do any nondebtor entities hold
21   stablecoins?
22        A.    Not that I'm aware of.  There
23   could be a few small amount in, like, the
24   Lithuanian entity, but not that I know of.
25        Q.    Would those be in the same
```

164

1              C. Ferraro - Confidential

2     account, the same commingled Fireblocks

3     account, or would they be held separately?

4          A.    They would be held with other

5     coins in the main account.  Coins are pooled

6     to coin types, and then they're held within a

7     certain workspace.  So you would have multiple

8     coins in that workspace.

9          Q.    Are the debtors paying any

10    expenses for any nondebtors?

11             MR. McCARRICK:  Object to

12        form.

13             You can answer.

14         A.    Within the limits granted by the

15    Court.  So there's the Israeli entity,

16    including the GK8 entity, and the Serbian

17    entity that are nondebtors.  They were funded

18    in the normal course.  And then I believe

19    we've also pushed down regular funding to the

20    Israeli and GK8 entity since the case started.

21         Q.    Do any nondebtors have any assets

22    that could be used to fund their own

23    operations?

24         A.    I can't remember specifically

25    where the GK8 asset sits.

165

```
 1              C. Ferraro - Confidential

 2        Q.    I think it's a -- I think it's a

 3   nondebtor entity.

 4        A.    Yeah.  So -- but I believe that's

 5   a nondebtor entity owes the debtors.  There's

 6   a loan extended.  But, yeah, my understanding

 7   is other than GK8 and certain IP in the

 8   Israeli entity, there's not much to sell.

 9        Q.    So turning a little bit to your

10   declaration, is it fair to say that the

11   debtors have been primarily relying on

12   proceeds generated from the debtors' Bitcoin

13   mining activities in order to fund these cases

14   and its operating expenses?

15        A.    I would say that in general, the

16   mining activities fund mining.

17        Q.    Solely mining?

18        A.    Yeah.  Those -- the production of

19   mined -- of new mined coins is for the sole

20   benefit of the mining company.  What the other

21   debtor entities have is loan collection.

22   There was significant loans that we called,

23   including Bitfinex maturities, as well as well

24   as the funding that we had as of the petition

25   date.
```

166

```
 1              C. Ferraro - Confidential
 2         Q.    Is it fair to say that Bitcoin
 3    mining is, as of today's date, a primary
 4    operation of the debtor?
 5         A.    No.  There's -- I mean, we have
 6    167-ish employees, this is as of last week,
 7    and the mining organization makes up a total
 8    of six.  So you can imagine that the folks in
 9    legal, the folks in finance were doing cash
10    flow budgets for mining in what we would call
11    "network."  So there's a lot of activity in
12    the nonmining debtors.
13         Q.    Are you familiar with when the
14    mining activities and mining operations began
15    at Celsius?
16              MR. McCARRICK:  Object to
17         form.
18              You can answer if you know.
19         A.    My understanding is that it
20    started at scale in 2021.
21         Q.    Are you familiar with the
22    purchasing of the mining rigs since you were
23    an employee at Celsius?
24         A.    Most of those purchases predate my
25    employment.
```

167

1              C. Ferraro - Confidential

2         Q.    Okay.

3         A.    But I'm familiar with the process.

4    Most of them were Bitmains, machines that were

5    purchased, some of which are still waiting to

6    be shipped.   A lot of them are already in our

7    center or in third-party hosting.

8         Q.    At the last hearing, I think there

9    were some comments made that mining is cash

10   flow positive right now.  Are you familiar

11   with the more specifics about the mining

12   operation?

13             MR. McCARRICK:  Object to

14        form.

15             You can answer.

16        A.    Yeah, I manage -- I mean, I

17   supervise the mining business.  So I'm

18   familiar with the strategy and the result.

19        Q.    Do you know -- strike that.

20             Can you provide an estimate of how

21   many Bitcoin are currently mined per day by

22   Celsius?

23        A.    It ranges between 15 and 18

24   Bitcoin per day.

25        Q.    Can you provide an estimate of

168

           C. Ferraro - Confidential

1        ongoing mining expenses?  I know you don't

2        have the figures in front of you.

3            A.    I don't have my calculator either.

4        We have about a 20 percent margin.

5            Q.    Okay.

6            A.    So our expenses make up about

7        80 percent of that Bitcoin that's mined.  So

8        if you were to take the, let's say, 16

9        Bitcoin, multiply it by 30 times the price,

10       you know, and then take times 80 percent, that

11       would give you, effectively, the cost base.

12               The vast majority of the costs of

13       mining are to pay for hosting charges, which

14       are predominantly electricity.

15           Q.    Now that we're going into the

16       cooler months, is it your anticipation that

17       possibly those expenses will increase or

18       decrease?

19               MR. McCARRICK:  Object to

20           form.

21               You can answer.

22           A.    Yeah.  I mean, I'm not an energy

23       guy.  I was more of a rates guy --

24           Q.    Okay.

169

```
 1                    C. Ferraro - Confidential

 2          A.     -- in my -- in my background, but

 3   energy and rates are both traded instruments

 4   that depend on market sentiment.  I think the

 5   Federal Reserve, with removing accommodation

 6   and increasing the funds rate, is slowing

 7   demand.  But we have the wildcard of the

 8   unfortunate war.

 9                 So it's hard to, kind of, make a

10   bet on one way or the other.  Traditionally I

11   like to be neutral on these things.

12                 My understanding is there's

13   probably more downward pressure than upward

14   pressure, just given where we are in the

15   cycle.  So hopefully things ease a little bit

16   due to demand going down, as well as the hot

17   months or, you know, the air conditioning

18   months in the peak summer.

19          Q.     Are you familiar with how ongoing

20   mining expenses are funded?

21          A.     Largely with the production of

22   Bitcoin and the cash they have on hand.

23          Q.     What about the build-out in -- was

24   it west Texas?  Was that where you --

25          A.     Yeah, west Texas.  Midland, Texas,
```

170

```
1                    C. Ferraro - Confidential
2      yeah.
3           Q.    Are you familiar with how that
4      buildout is being funded?
5           A.    Yeah.  That's funded with both the
6      cash on hand -- there was a -- there was a
7      loan that came down to mining at the petition
8      date that gave them cash, as well as the mined
9      Bitcoin is what's used to fund the mining
10     operations, including the CapEx.
11          Q.    The loan for the buildout, do
12     you -- are you familiar with whether or not
13     Celsius is currently making payments on that
14     loan?
15               MR. McCARRICK:  Object to
16          form.  Outside the scope.
17               You can answer.
18          A.    I'm not familiar with that.  I
19     don't believe they are.
20          Q.    Are you familiar with the critical
21     vendor payments in this case?
22          A.    More familiar in the beginning
23     than I am now, but yes.
24          Q.    Is it your understanding that the
25     debtors are making ongoing payments on behalf
```

171

C. Ferraro - Confidential

1
2    of or for GK8?

3              MR. McCARRICK:  Object to

4        form.

5              You can answer.

6        A.    I know -- I know that GK8 has

7    funding.  The debtors have provided funding to

8    GK8.  And GK8 also has revenue coming in.  I

9    believe the net of the two is around $500,000

10   per month that they effectively need for

11   funding.

12             But GK8 has been ran and continues

13   to be ran semi-independently, so we don't have

14   too much involved in the operations.  My

15   understanding is they're trying to get new

16   clients, they're building the technology, and

17   they're paying their engineers.

18        Q.    Has there been any discussion of

19   moving the assets of Celsius from Fireblocks

20   to GK8?

21             MR. McCARRICK:  Object to --

22        A.    We did --

23             MR. McCARRICK:  Object to

24        form.

25             You can answer.

Confidential      Christopher Ferraro - November 21, 2022

172

1              C. Ferraro - Confidential

2         A.    We did have discussions early on

3    about moving significant amount of coins to

4    Fireblocks, and we decided not to do that for

5    a few reasons:  One, the sale process.  We

6    didn't want to move assets then to have to

7    potentially bring them back.

8              And, two, GK8 is a cold storage,

9    physical security type of play, and the

10   thought of having billions of dollars in a GK8

11   suitcase with armed guards around it doesn't

12   seem to be the best idea.

13        Q.    Okay.  Is it your understanding

14   that the debtors are making ongoing payments

15   on or behalf of for Celsius mining?

16             MR. McCARRICK:  Object to

17        form.

18             You can answer.

19        A.    Mining is funding their own with

20   the cash that they have on hand as well as the

21   mined Bitcoin.

22        Q.    Okay.  Are there any employees

23   exclusively working on mining operations that

24   are not being funded exclusively by mining

25   revenues?

173

```
 1              C. Ferraro - Confidential
 2              MR. McCARRICK:   Object to
 3       form.  Outside the scope.
 4              You can answer.
 5       A.    Not that I know of.
 6       Q.    Are you familiar with the
 7  preferred equity holders and the allegations
 8  that they're making regarding GK8?
 9              MR. McCARRICK:   Object to
10       form.  Outside the scope.
11              You can answer.
12       A.    Not in detail, but I've had --
13  I've had discussions around it.  Yeah.
14       Q.    All right.  If successful, based
15  on your knowledge, would it be fair to say
16  that it is possible that certain value from
17  either GK8 or mining might inure to those
18  preferred shareholders and not to the debtors'
19  bankruptcy estate?
20       A.    I understand that's a risk, and I
21  believe this is a key legal question for the
22  judge to rule upon.
23       Q.    To the best of your knowledge, if
24  successful -- and when I say "if successful,"
25  I mean if the preferred shareholders are
```

174

```
1              C. Ferraro - Confidential
2    successful in obtaining that value -- what
3    does the debtor intend to do, if anything, to
4    recoup any of those ongoing expenses that are
5    paid for by the estate, and specifically with
6    respect to this motion and the sale of
7    stablecoins that have benefited a different
8    constituency?
9              MR. McCARRICK:  Object to
10        form.
11             You can answer.
12        A.    We track the outstanding loans
13   that we've given to GK8.  So every time we
14   push down funding, there's a related, you
15   know, entry to record.  If the Series B were
16   to get assets, that would come at a great,
17   great cost to the estate and to the creditors.
18             We understand the cash that has
19   moved from debtor to nondebtor.  We track it
20   and we can size it.
21        Q.    So to confirm, will the stablecoin
22   sale be used to fund the mining operations?
23             MR. McCARRICK:  Object to
24        form.
25             You can answer.
```

175

1                    C. Ferraro - Confidential

2          A.    The mining company has cash flows

3    through January.  A lot of that depends on the

4    price of Bitcoin at these levels.  Right?

5    It's difficult.

6                    The mining company could take out

7    a loan, and it's possible that we would

8    provide funding to them.  It's also possible

9    that the mining company would sell mining

10   rigs.

11                   So, you know, I think mining is

12   something that we're working on.  It's tough

13   to sell rigs in the middle of a sale process.

14   But, you know, that's a possibility.  We do

15   have people that are interested in buying

16   thousands of our rigs.  So ...

17         Q.    So the instant sale of stablecoin,

18   the $18 million worth, will any of that sale

19   or funding be used to fund the mining

20   operations?

21                   MR. McCARRICK:  Objection to

22         form.

23         Q.    As of -- as of today's date?

24         A.    No.  No, the money will sit in

25   network.  It will not go to mining.  Like I

176

1                  C. Ferraro - Confidential

2      said, mining in January does have a cash flow

3      issue.  You know, they'll need to --

4      they'll -- we'll need to figure out a way to

5      fund that.  It could be selling rigs.  It

6      could be an additional loan.  I don't know.

7                  I think it depends -- and we'll be

8      close with -- we'll work with the committee on

9      determining what's the best -- what's the best

10     execution for the estate.

11          Q.    To that end, are you aware of the

12     debtors marketing or selling the mining

13     company separately?

14          A.    Yeah, that process has kicked off.

15          Q.    As of today's date, in your

16     knowledge, will the stablecoin sale that

17     you're seeking be used to fund the continued

18     mining buildout in west Texas?

19          A.    No, mining has enough on hand to

20     fund the buildout.  That's --

21          Q.    To the completion?

22          A.    To its completion.  But in

23     January, late January, they'll need money for

24     operational expenses.

25          Q.    If the buildout is not completed,

Confidential       Christopher Ferraro - November 21, 2022

177

```
 1              C. Ferraro - Confidential
 2    or if the buildout is -- if the buildout is in
 3    some way paused, what impact would that have
 4    on the liquidity of Celsius?
 5         A.    Well, we're at the tail end of the
 6    buildout, so probably the biggest expense has
 7    to do with the sales and use taxes when we
 8    deploy the rigs.
 9              So if we were to not -- if we were
10    to slow down production and not deploy the
11    rigs, that would save on sales and use taxes,
12    but we would forego the 20 to 30 percent
13    margin that we have in Midland, Texas.
14              So assuming that we're going to
15    deploy those rigs, you're going to pay the
16    sales and use tax, we should start producing
17    Bitcoin at a positive margin as early as we
18    can.  That's the strategy.
19              Now, the actual buildout and the
20    electrification, kind of, does go into the
21    first quarter, early first quarter, but that
22    should all be basically done in earnest by
23    January.
24         Q.    As of today's date and your
25    knowledge, will the sale of the current
```

178

1              C. Ferraro - Confidential

2   stablecoin be used to fund GK8?

3        A.    Not directly.  GK8, like I said,

4   has a little bit of a cash burn, about a half

5   a million per month.  If the sale goes

6   through, obviously the proceeds will come back

7   to the estate.  If it continues, there could

8   be subsequent funding that might be needed to

9   preserve the value in GK8.

10             But there's nothing on the table

11  expecting that.  We're expecting the sales

12  process to be successful.  But if it's not for

13  whatever reason, GK8 may need more funding

14  next year.

15       Q.   Are any assets of GK8 -- and when

16  I say "assets," I'm specifically talking about

17  either stablecoin or other forms of

18  cryptocurrency -- held in that commingled

19  Fireblocks account we were discussing earlier?

20             MR. McCARRICK:  Object to

21       form.

22             You can answer.

23       A.    Are any of the assets of GK8?  Not

24  that I know of, no.  We hold about

25  $1.5 million worth of cryptocurrency in GK8,

179

```
 1              C. Ferraro - Confidential
 2    but I don't know of GK8 holding anything with
 3    Celsius.
 4         Q.    Are you familiar with the Prime
 5    Trust settlement?
 6         A.    Not very --
 7              MR. McCARRICK:  Object to
 8         form.  Outside the scope.
 9              You can answer.
10         A.    Not very familiar.
11         Q.    To the best of your knowledge,
12    does the Prime Trust settlement adjust when
13    liquidity will change for Celsius?
14              MR. McCARRICK:  Object to
15         form.
16              You can answer.
17         A.    I don't know the specific coins in
18    Prime Trust.  We have -- we include them in
19    our positions.  So, of course, if the
20    settlement with Prime Trust brings the coins
21    back, I'm assuming the vast majority of them
22    are Bitcoin and ETH, so they won't change the
23    liquidity.
24         Q.    It's based on my understanding of
25    the Prime Trust settlement that it's an
```

180

1              C. Ferraro - Confidential

2    estimated somewhere around $15 million, and

3    you're seeking to sell about $18 million worth

4    of stablecoin.  If you were to receive that

5    $15 million from the Prime Trust, would that

6    reduce or eliminate your need to immediately

7    sell the stablecoin?

8         A.    No, but my under- -- I don't think

9    so.  My understanding is the Prime Trust

10   settlement will return coins, not fiat.

11        Q.    Okay.

12        A.    So there could be other coins that

13   we're not asking to sell that's part of that

14   settlement.

15        Q.    So it won't immediately impact

16   your liquidity position?

17        A.    Not -- to my understanding, it

18   will not.

19        Q.    And if you know, and I understand

20   you're not intimately familiar with the Prime

21   Trust settlement, the proceeds from the Prime

22   Trust settlement, will those be put in the

23   same commingled Fireblocks account?

24             MR. McCARRICK:  Object to

25        form.  Outside the scope.

181

```
 1              C. Ferraro - Confidential
 2              You can answer.
 3     A.    I would think that we would put
 4   all the keys under lock and key the way the
 5   security stip requires.  So we'll follow the
 6   Court's rules, which likely means bringing it
 7   back to Fireblocks in a locked network space.
 8     Q.    I only have a few more questions.
 9     A.    Okay.
10     Q.    Throughout the case, there's been
11   some discussion about in-kind distribution.
12              As of today's date, is that
13   something that you're still contemplating?
14     A.    We hope to distribute back to our
15   customers in kind.  They clearly want in-kind
16   distribution.  So we're fighting for that,
17   yes.
18     Q.    Does the sale of stablecoin in any
19   way impact an in-kind distribution?
20     A.     No, because stablecoins are
21   effectively one-for-one with dollars.  So if
22   you were to say, Let's sell Bitcoin, that, I
23   think, people could argue the price might go
24   up, so you're impacting the estate, where
25   stablecoins is a dollar-for-dollar.  I don't
```

Confidential       Christopher Ferraro - November 21, 2022

182

1              C. Ferraro - Confidential

2    see it as impacting returning in kind.

3         Q.    What if the customer either loaned

4    or has on deposit with Celsius stablecoins?

5              MR. McCARRICK:   Object to

6         form.

7              You can answer.

8         A.    My understanding of the bankruptcy

9    code is that they have a IOU to Celsius, not

10   the coin specifically.  So we owe them

11   consideration of that, and we hope to return

12   it in kind.  But I don't know that, if you had

13   a stablecoin, you're going to get a stablecoin

14   back.  You might get back BTC and ETH.

15        Q.    Just one second.

16             Is it your understanding or do you

17   have any knowledge about what has been, I

18   guess, referred to as the custody shortfall?

19             MR. McCARRICK:   Object to

20        form.  Outside the scope.

21             You can answer.

22        A.    Yes, I do have a general

23   understanding of that, yeah.

24        Q.    It's -- and is it fair to say that

25   there's a custody shortfall of about

Confidential        Christopher Ferraro - November 21, 2022

183
1              C. Ferraro - Confidential

2     $16 million?

3          A.    That's my understanding, yes.

4          Q.    Does the sale of stablecoin at

5     this time impact those custody accounts or a

6     return of those custody assets?

7          A.    No.  Not at all because we're

8     not -- we're not asking for relief to sell any

9     of the stablecoin related to custody.  So we

10    will not be increasing the shortfall.

11         Q.    To the best of your knowledge, how

12    do you plan to make up for that shortfall?

13              MR. McCARRICK:  Object to

14         form.  Outside the scope.

15              You can answer.

16         A.    So most of the coins we can source

17    from our main Fireblocks.  We just need to

18    move them over to the custody workspace.

19              I think there is -- if you assume

20    all custody and all withheld get paid out,

21    there might be a few million dollars of coins

22    that we have to source.  But, in general, we

23    have the coins.

24         Q.    A little earlier there was some

25    discussions about whether coins may be

184

1              C. Ferraro - Confidential

2    actually moved or if they're just redesignated

3    on the ledger.

4              Just for clarification, and maybe

5    this is -- maybe I should know this, do they

6    pass through a main or aggregator wallet at

7    that point, or how does -- what's your

8    understanding of how those coins move?

9              MR. McCARRICK:   Object to

10        form.   Outside the scope.

11             You can answer.

12        A.    Yeah, and I think it's consistent

13   with the examiner report that things move into

14   the main wallet omnibus structure.

15        Q.    Okay.   Also, earlier in your

16   testimony, there was just a little discussion

17   about marketing.

18        A.    Yeah.

19        Q.    So I just wanted to ask a few

20   follow-up questions.

21             So earlier in your testimony, you

22   stated that the marketing program had been

23   shut down by the time you were CFO.   Is that

24   correct?

25             MR. McCARRICK:   Object to

185

1                   C. Ferraro - Confidential

2           form.  Outside the scope.

3                   You can answer.

4           A.    Yeah.  We stopped soliciting new

5    customers and new funds when I became CFO.

6    Effectively, all new customer activities is

7    not ongoing.  So we're not actively marketing.

8    We do not have a marketing team.  That does

9    not mean that customers can still, via the

10   blockchain, send coins to our wallets.  We

11   can't stop that from happening.

12          Q.    Do you know when that marketing --

13   when those marketing efforts would have

14   ceased --

15                  MR. McCARRICK:  Object to

16          form.  Outside --

17          Q.    -- approximately?

18                  MR. McCARRICK:  Oh, I'm sorry.

19          A.    I think right around the pause.

20   Now, we were looking in May at reducing

21   marketing expense as part of our program to,

22   kind of, restructure the company, but we ran

23   out of time with the pause, so ...

24          Q.    Who was previously in charge of

25   marketing at Celsius?

186

1          C. Ferraro - Confidential

2               MR. McCARRICK:  Object to

3          form.  Outside the scope.

4               You can answer.

5          A.    I'm very bad with names, so I'm

6     only going to be able to say the first name.

7     Or I'll say, I believe there was Tushar who

8     ran product and marketing.  But -- and I

9     wasn't in these discussions.  I saw it

10    firsthand, seldomly, and also heard about it.

11              Alex Mashinsky also had a heavy

12    hand in marketing.  Alex ran marketing before

13    Tushar, and then around the petition date,

14    Tushar was let go of and Alex started thinking

15    about the communication side as well.

16              I think even right before the

17    pause, I believe Alex may have taken marketing

18    back.  I could be wrong but I believe he may

19    have.

20         Q.    Okay.  At any point during your

21    time at Celsius, did Celsius engage with an

22    outside marketing or public relations or

23    advertising firm?

24              MR. McCARRICK:  Objection to

25         form.  Outside the scope.

187

```
 1              C. Ferraro - Confidential
 2              You can answer.
 3     A.    We're engaged with C Street on
 4   communications right now.  I know we did paid
 5   marketing through, like, Google and Facebook.
 6   I don't know if there was agencies, but I
 7   would venture to guess there was some.  But I
 8   don't think that was a significant amount of
 9   spend.
10     Q.    It's possible that they may have
11   had some kind of contractual relationship with
12   a traditional marketing or advertising firm
13   that may have assisted Celsius in its
14   outreach?
15              MR. McCARRICK:  Objection.
16        Calls for speculation.
17              You can answer.
18     A.    I would assume but do not know for
19   sure.
20     Q.    And during your tenure, you're
21   unaware of that?
22     A.    Other than C Street handling
23   communications internal and external, I'm not
24   aware of marketing.
25              Now, I know through going through
```

Confidential        Christopher Ferraro - November 21, 2022

188

```
 1              C. Ferraro - Confidential

 2    the budget process, there was significant

 3    amounts that were, kind of, earmarked for,

 4    like, Google leads, Facebook leads, and stuff

 5    like that.  But that's really, to my

 6    knowledge -- I never went line by line by

 7    agencies.

 8         Q.    And just for clarification, those

 9    type of efforts are not analytical, they're

10    just actual advertisements?

11              MR. McCARRICK:  Object to

12         form.  Outside the scope.

13              You can answer.

14         Q.    If you know?

15         A.    It's always hard to determine the

16    actual capture rate when you're doing, kind

17    of, brand impression.  But you can't measure

18    it.  I don't know how well it was measured

19    here.

20              I know at JPMorgan Chase, we spent

21    a lot of time and effort tracking the success

22    of our marketing programs.  I just haven't

23    been able to do the forensics to understand

24    what was done in the past.  I haven't had time

25    for that.
```

189

```
 1              C. Ferraro - Confidential
 2        Q.    And so I just have, like, one --
 3   one more question.  And maybe it's the coup de
 4   grace question.  What -- in your
 5   understanding, what exactly is the sale of
 6   stablecoin going to fund?
 7        A.    Oh, operations, payroll,
 8   professionals, all the people around this
 9   table, the US Trustee's office.  So we
10   actually -- yeah, it's true.  We have normal,
11   kind of, payroll, vendor costs, and
12   professional fees related to the case.  We
13   have some money coming in, but we do have a
14   burn rate.  So the burn rate will fund core
15   operations.
16              MS. CORNELL:  I think that's
17         all that I have.
18              MR. McCARRICK:  Thank you.
19              MS. CORNELL:  Thank you.
20              MR. McCARRICK:  Yeah, let's
21         take a five-minute.
22              THE VIDEOGRAPHER:  The time
23         now is 12:06 p.m.  This concludes
24         Media 3.  Off the record.
25              (Recess taken from 12:06 p.m.
```

190

1           C. Ferraro - Confidential

2       to 12:18 p.m.)

3           THE VIDEOGRAPHER:  The time

4       now is 12:18 p.m.  This begins Media

5       4.  On the record.

6   EXAMINATION BY

7   MS. MILLIGAN:

8       Q.    Hello, my name Layla Milligan.

9   It's L-a-y-l-a, Milligan, M-i-l-l-i-g-a-n.

10  I'm with the Texas Attorney General's office.

11  We represent the Texas State Securities Board

12  and the Texas Department of Banking.

13          I'm going to have just a few

14  questions for you, Mr. Ferraro, just to follow

15  up and maybe a couple of clarifying questions.

16  If you -- again, if you don't understand my

17  question or it's unclear, I'm 100 percent sure

18  it's my fault, so please just let me know, and

19  I'll do my best to rephrase.

20      A.    Okay.

21      Q.    When you took your job, which I

22  understand was in March of 2022, with Celsius,

23  what did you review or research to get an

24  understanding of the operations of Celsius

25  itself?

Confidential        Christopher Ferraro - November 21, 2022

191
1                    C. Ferraro - Confidential

2          A.     Before or after I started?

3          Q.     At any time.

4          A.     Okay.

5          Q.     Either before or after you

6      started, what did you do to understand --

7          A.     Yeah.

8          Q.     -- how Celsius itself works, not

9      necessarily cryptocurrency in general?

10         A.     Yeah, so I had a -- I'd started

11     talking with folks at the company probably in

12     January.  So I had a couple months of

13     discussions with a handful of individuals, but

14     nothing really specific about the operations.

15              I would say I hit the ground

16     running March 21, working on the first budget

17     for Celsius.  So, you know, you already, as a

18     guy who did this for a living, you're already

19     really late in May, April-May to deliver a

20     budget to the board.  It was -- there was a

21     board meeting on May 2.

22              So I, kind of, dove head first

23     into understanding, kind of, the financial

24     architecture of the company and, kind of, how

25     they made money, where they lost money,

Confidential      Christopher Ferraro - November 21, 2022

192

1              C. Ferraro - Confidential

2    et cetera.

3         Q.    Okay.  And since your role at the

4    company has changed over time, have you done

5    additional research or tried to learn how the

6    operational functions worked at Celsius --

7         A.    I mean, since --

8         Q.    -- as --

9         A.    -- since my role changed, we went

10   into petition.  So the operational aspects

11   that Celsius did prepetition and prepause to

12   when I became CFO or CEO are very different.

13              So my efforts are today and in the

14   future, not looking in the past, because I'm

15   trying to maximize value for the estate and

16   for all of stakeholders.

17        Q.    You -- just to follow up on some

18   questions that you testified about before, one

19   of the issues is that you've been asked, I

20   think, by the committee and by the US Trustee

21   is regarding the ability to trace stablecoin

22   when it was added to the platform.

23              And I just want to make sure,

24   because I don't want to repeat the question,

25   that my understanding from your testimony was

Confidential        Christopher Ferraro - November 21, 2022

193

```
 1                C. Ferraro - Confidential
 2   that they do not trace stablecoin.  But I
 3   thought I heard you say that they can, it
 4   would just take a huge amount of effort.
 5                Is that an accurate statement?  I
 6   don't want to misstate what you said --
 7        A.    Yeah, I mean --
 8        Q.    -- I just want to clarify.
 9        A.    Yeah, we have an omnibus account
10   structure, meaning when customers lend us
11   their coins and we take title to it, we don't
12   trace it back to the customer because it's
13   Celsius' property at that point in time.  It's
14   pooled with other like cryptocurrencies
15   typically on Fireblocks.  Now --
16        Q.    And I understand -- I'm sorry to
17   interrupt.
18        A.    I was just going to say that my
19   understanding of the blockchain is that
20   there's lots of data and every transaction is
21   recorded.
22                But in the ledger, what it would
23   say is we owe X, we have X obligation to this
24   person or this individual or this entity.
25        Q.    Okay.  And you said Mr. Blonstein
```

194

```
 1              C. Ferraro - Confidential

 2   would be the person who would be able to --

 3        A.    I think, yeah --

 4        Q.    -- accurately testify?

 5        A.    As the head of product -- as the

 6   head of product, and he's also been with the

 7   company longer than I have, he would probably

 8   be a great resource for you guys to -- for

 9   that question.

10        Q.    Thank you.

11              You testified about the terms of

12   use generally including a transfer of

13   ownership or lending provisions.  That -- did

14   you testify that it was all that you're

15   interested in, was all terms being used

16   included that type of agreement, or just the

17   more recent terms of use?  And I'm only asking

18   to -- as to your knowledge?

19        A.    Yeah, my knowledge is really --

20   I've gone through the previous terms of use.

21   My understanding is that in all of them,

22   Celsius had the right to rehypothecate,

23   pledge, et cetera.  In Terms of Use 6, I think

24   that there was a double-click that needed to

25   happen, both to accept the terms and to click
```

195

```
 1              C. Ferraro - Confidential
 2     "accept."  And those were, you know, very
 3     robust in explaining title, transfer,
 4     et cetera.
 5              But I believe that that provision
 6     of ownership and transfer of ownership was
 7     throughout all the terms of use.
 8         Q.   So I -- in reviewing, I -- I will
 9     say I'm certainly not debating you about this,
10     but as far as -- let me, sort of, clarify my
11     question.
12              When a person was signed up with
13     Celsius and they would initially agree to the
14     terms of use, say, someone who joined in June
15     of 2018, did Celsius maintain which terms of
16     use they initially had signed up for?  So say
17     Bob Smith signed up for an account on
18     January of '18, does Celsius maintain
19     information and records as far as the initial
20     date --
21         A.   Well, because --
22         Q.   -- and the terms of use that was
23     agreed to?
24         A.   Because you --
25              MR. McCARRICK:  Object to
```

Confidential        Christopher Ferraro - November 21, 2022

196

```
 1            C. Ferraro - Confidential

 2       form.

 3            You can answer.

 4            THE WITNESS:  Okay.  Sorry

 5       about that.

 6       A.    We know when the customer came,

 7  you know, when the customer opened the

 8  account.  I don't -- and we know that in order

 9  to have opened an account, you have to accept

10  the terms of use.  So I think, one, it would

11  be very reasonable just to go back to the

12  timing of when the account was opened.

13       Q.    Okay.  And Celsius maintains that

14  information, the --

15       A.    The timing of -- my understanding

16  is yes.

17       Q.    Okay.  Do you know how they

18  maintain that information?  Like, is it in a

19  spreadsheet?  Is it in a system somewhere?

20       A.    It's -- it would be in the back

21  office system -- right? -- where you track the

22  obligations, the customer information,

23  et cetera.  I haven't -- I haven't seen the

24  screens.  I think Oren would also be a great

25  place to ask the detailed questions on that.
```

Confidential        Christopher Ferraro - November 21, 2022

197

1              C. Ferraro - Confidential

2        Q.    Okay.  And just to clarify,

3    Celsius still has that information, it's

4    just --

5        A.    Oh, yeah, we protect all the

6    data --

7              CERTIFIED STENOGRAPHER:  I'm

8        sorry, you have to let her ask the

9        question.

10             Can you start the question

11       over again, please.

12             MS. MILLIGAN:  Yes.  Sorry.

13       Q.    So -- and just to clarify, Celsius

14   still maintains that information somewhere in

15   its system currently?

16       A.    All data is preserved and

17   protected, yes.

18       Q.    Okay.  The terms of use did change

19   after you joined Celsius.  Understanding that

20   you joined in a different capacity, did you

21   have any involvement in that process, the

22   change of terms of use, after you joined the

23   company?

24       A.    No.

25       Q.    Okay.  Regarding the omnibus or

Confidential       Christopher Ferraro - November 21, 2022

198

1                   C. Ferraro - Confidential

2       main account, I'm going to, kind of, refer to

3       "omnibus" because that's the word you've been

4       using during your testimony.

5                   To your knowledge, were customers

6       informed that their coins were going to be

7       placed in an omnibus or main account and not

8       held in individual wallets?

9                   MR. McCARRICK:   Object to

10             form.  Outside the scope.

11             You can answer.

12         A.   To my knowledge, in the terms of

13      use, it's stated clearly that the customers

14      were transferring ownership to Celsius, and it

15      didn't go into exactly -- there was a risk

16      disclosure, but it didn't go into how the

17      account structures worked, at least off of

18      memory.  It wouldn't --

19         Q.   Right.  So there wasn't specific

20      information provided as --

21         A.   I don't know why --

22             CERTIFIED STENOGRAPHER:  You

23             have -- I'm sorry, repeat your

24             question again.

25         Q.   To your knowledge, there was not

199

```
 1              C. Ferraro - Confidential
 2    specific information provided to customers
 3    that they -- their funds were going into an
 4    overall main wallet versus individual wallets?
 5              MR. McCARRICK:  Object to
 6         form.  Outside the scope.
 7              You can answer.
 8         A.   I don't know why we wouldn't
 9    disclose that.  I don't know.  I don't
10    remember reading it.  And I don't know the
11    purpose of it.
12         Q.   But to your knowledge, the answer
13    is, no, they weren't informed of that?
14              MR. McCARRICK:  Object to
15         form.  Outside the scope.
16              You can answer.
17         A.   I don't remember.
18         Q.   Okay.
19         A.   I don't remember reading it
20    through.  So I don't want to confirm one way
21    or another.
22         Q.   Okay.  All right.  I certainly
23    don't want to put words in your mouth.  So if
24    you don't know, that's fine.
25              To your knowledge, did Celsius
```

Confidential        Christopher Ferraro - November 21, 2022

200

```
 1              C. Ferraro - Confidential
 2    ever use funds from these omnibus or main
 3    wallets to pay interest or rewards to earn
 4    program participants?
 5              MR. McCARRICK:  Object to
 6         form.
 7              You can answer.
 8         A.    It's fungible.  So coins in the
 9    main account, property of Celsius, were used
10    to fund operations, to pledge and borrow, or
11    to pay rewards along with the other funds from
12    capital contributions, et cetera, that are in
13    the main account and in the fiat accounts.
14         Q.    Were stablecoins used to pay
15    interest or rewards to earn program
16    participants?
17         A.    In kind, stablecoin rewards, yes.
18         Q.    To your knowledge -- okay.  So I
19    guess, the frictional wallets, as described,
20    would be the same as the main or omnibus
21    wallets.  Is that right?
22              MR. McCARRICK:  Object to
23         form.
24              You can answer.
25         A.    My understanding is the frictional
```

201

1              C. Ferraro - Confidential

2    wallets are wallets to process withdrawals and

3    are not the main.  Because that way, if

4    anything happened to the frictional wallet,

5    they wouldn't have access to all of the coins;

6    it's just the frictional wallet.  So they

7    would be replenished based on the expectation

8    of withdrawals.  That's my understanding.

9         Q.    Do you know if any information was

10   specifically given to customers about the

11   frictional wallets?

12             MR. McCARRICK:  Objection to

13        form.  Outside the scope.

14             You can answer.

15        A.    I don't know off the top of my

16   head.

17        Q.    Do you know who would know that?

18             MR. McCARRICK:  Same

19        objection.

20             You can answer.

21        A.    Probably talk to Oren about that.

22        Q.    Oren?  Okay.  Part of that may be

23   marketing.  So I think you testified that

24   Mashinsky himself did the marketing, or there

25   was somebody else named Tushar.  Is that --

202

```
 1              C. Ferraro - Confidential
 2         A.    Yeah.  And Oren would probably
 3    have better details on the handoffs.  I even
 4    think Oren was responsible for marketing for a
 5    short period of time.
 6         Q.    Okay.  Thank you.  Regarding the
 7    questions -- let's see.  I guess, would Oren
 8    have information about any sort of outside
 9    communications, like content videos, Twitter,
10    YouTube, that kind of involvement, that kind
11    of information provided to the public as well?
12              MR. McCARRICK:  Objection.
13         Outside the scope.  Contract
14         information issues are outside the
15         scope.
16              But you can answer.
17         A.    He would be in a better position
18    to talk about it than I would be because I had
19    no involvement in that.
20         Q.    Okay.  You came on as, I guess,
21    CFO -- and if I'm wrong, please correct me --
22    you came on as CFO in March of 2022.
23              Do you know when the Celsius board
24    first became aware that Celsius was insolvent?
25              MR. McCARRICK:  Objection.
```

203

```
 1              C. Ferraro - Confidential

 2         Well beyond the scope.

 3              You can answer if you know.

 4         A.    I did not come on as CFO.

 5         Q.    I'm sorry.  Okay.

 6         A.    I came on as -- yeah.  I came on

 7    as head of financial planning and analysis and

 8    investor relations.  I was not at the -- I was

 9    not at the board meeting.

10         Q.    Okay.  So you don't know the

11    answer as to when the board knew the company

12    was insolvent?

13         A.    I've never met with the acting

14    board.  I've only met with the special

15    committee board.  I did not review the

16    minutes.  I do not know the answer to that.

17         Q.    Okay.  Thank you.

18              You mentioned the focus on

19    reorganization or sale of the company.  I

20    think you testified here and at the last

21    hearing that, out of your 170 employees on

22    staff, you have three focused on regulatory

23    compliance.

24              And I think it's clear that before

25    the case was filed, there were over 40
```

204

1             C. Ferraro - Confidential

2    regulatory bodies by states, including the

3    federal governmental entities in the US, and I

4    don't know what's going on internationally.

5             Is that correct, that you have

6    three employees that are focused on regulatory

7    compliance going forward -- I mean currently,

8    I guess?

9             MR. McCARRICK:   Object to

10        form.  Compound.

11             You can answer.

12        A.    One clarification, I didn't

13   testify.  I gave an opening statement.

14        Q.    My apologies.

15        A.    I just -- for the record, I just

16   want to make sure that the record is accurate.

17   Second, yes, three people in regulatory.  We

18   work very close with Latham & Watkins as a

19   regulatory legal counsel.

20   ████████████████████████████████

21   ██████████████████████████████

22   ██████████████████████████████

23   ██████████████████████████████

24   ████████████████████████████████████

25   ████████████████████████████████████

205

1       C. Ferraro - Confidential



20      Q.     I think my last question -- and I

21  apologize for the delay -- regarding the

22  actual movement of the digital assets on the

23  platform and entries on the debtors' ledger,

24  who at the company currently -- or in the

25  past, is no longer there -- would have the

Confidential      Christopher Ferraro - November 21, 2022

```
                                                          206
 1              C. Ferraro - Confidential
 2     most information or be the most knowledgeable
 3     as far as that movement and ledger activity?
 4              MR. McCARRICK:  Object to
 5          form.  Outside the scope.
 6              You can answer.
 7          A.   I -- I'm processing.  I apologize.
 8     It's probably going to be the best -- the best
 9     discussion would either be with Oren, who I
10     believe is being deposed tomorrow, or the head
11     of technology, Guillermo.
12          Q.   And I apology -- I apologize, do
13     you know Guillermo's last name --
14          A.   Starts --
15          Q.   -- or could you find it out for
16     us?  I apologize.
17          A.   We can find it out and get right
18     back to you.  I apologize, I'm a
19     first-name-basis guy.  You know, nowadays with
20     e-mail, you just type in G-u and boom, it up
21     pops.  I think it starts with a b.
22          Q.   Completely understand.  If you're
23     able to figure it out and provide that
24     information, that would really be helpful.
25          A.   Okay.  Yeah, we'll get it to you.
```

Confidential        Christopher Ferraro - November 21, 2022

207
1            C. Ferraro - Confidential
2    Sorry about that.
3               MS. MILLIGAN:   Thank you, sir.
4               That's all the questions I
5         have.  I'll turn it over to any
6         other state regulator.
7               And I appreciate your time
8         today, sir.
9               THE WITNESS:   Thank you.
10              MS. CORDRY:   I guess that
11        might make me next up.
12   EXAMINATION BY
13   MS. CORDRY:
14        Q.    I only have a few very simplistic
15   questions, I think, going back to this whole
16   motion of what you're spending and then your
17   stablecoins and so forth.
18              I think you've specified in here
19   that you have -- the debtor has regular
20   operating accounts, and those have real dollar
21   deposits in them, I would assume, at this
22   point?
23              CERTIFIED STENOGRAPHER:   Could
24        you state your name and spell it for
25        me, please.

208

1           C. Ferraro - Confidential

2                MS. CORDRY:  Oh, I'm sorry,

3           I'm sorry.  It's Karen Cordry.  And

4           that's K-a-r-e-n and last name is

5           Cordry, C-o-r-d-r-y.  And I'm with

6           the National Association of

7           Attorneys General.  I'm the

8           bankruptcy counsel there, and I'm

9           working with a group of about ten

10          states that are also participating

11          in this case that we filed an

12          appearance fee for.

13               CERTIFIED STENOGRAPHER:  Thank

14          you.

15   BY MS. CORDRY:

16          Q.    Okay.  So going back to the

17   company, its ordinary course operating

18   expenses, are those primarily funded at this

19   point with normal, sort of, dollar deposits,

20   which, I guess, you call fiat currency?

21          A.    Yeah.  Most of the expenses are

22   paid in fiat currency.  There are some

23   expenses historically where vendors took

24   stablecoins as payments.  We would send it to

25   their wallet.

Confidential        Christopher Ferraro - November 21, 2022

209

 1              C. Ferraro - Confidential

 2                   Largely interchangeable native

 3     crypto companies might take stablecoins,

 4     payroll, you know, fiat.  Most vendors --

 5          Q.    Yes.

 6          A.    -- fiat, yeah.

 7          Q.    And then currently you had I think

 8     you said something in the range of about 160

 9     to $180 million in those accounts?

10          A.    That's correct, yeah.

11          Q.    Okay.  And that you're currently

12     holding about $18 million in stablecoin.  Is

13     that in those same accounts as well?

14          A.    The stablecoins are in the

15     Fireblocks wallets, not in the fiat accounts.

16     And the 18 million is not all of our

17     stablecoin, it's the stablecoin related to the

18     earn accounts.

19          Q.    Okay.  All right.  So I was

20     thinking I was hearing you saying that this

21     $18 million is not associated with any of the

22     earn, custody, or withhold accounts.  But

23     you're saying it's not associated with custody

24     or withhold, but it does relate to the earn

25     accounts.

Confidential        Christopher Ferraro - November 21, 2022

210

1              C. Ferraro - Confidential

2         A.    This --

3         Q.    Is that correct?

4         A.    The stables relates to obligations

5    of earn, because what we've done is we've

6    excluded the custody holdings of stables, the

7    withheld amount in stables, and any of the

8    lending collateral that's stables.

9              Now, the lending collateral in

10   stables, there's very little because it would

11   be silly to borrow stables and provide

12   collaterals stables and then pay an interest

13   rate for it.  So, in general, it's mostly the

14   custody program and the withheld program.

15        Q.    Okay.  So I was mishearing

16   earlier.  So one of my questions was going to

17   be, if it wasn't associated with any of the

18   customer accounts, where did it come from?

19   But you're saying it does still associate back

20   to the earn accounts at this point?

21        A.    There's obligations in earn but

22   these stablecoins are not associated with the

23   earn accounts.  What I'm saying is we're

24   taking the total amount of stablecoins and

25   we're subtracting what relates to withheld and

211

```
 1                C. Ferraro - Confidential
 2    what relates to custody and lending.
 3                So the remaining stablecoins are
 4    due to operations and converting
 5    cryptocurrency, as well as any obligations
 6    that came in from earn.  It could be -- it
 7    could be dollars, stable -- excuse me -- it
 8    could be stables that we borrowed from Tether.
 9    Right?
10                These stables are fungible, so
11    it's -- we can't directly link them to
12    anything.  But we know they're not related to
13    custody, withheld, or the lending program.
14         Q.    Okay.  And at this point, if I
15    understand what your view is that these are
16    essentially equivalent to fiat currency, they
17    can be converted to the same price, and what
18    you want to do is simply convert them into
19    dollars and then spend them in the same way
20    that you would spend any of your other funds.
21                Is that what I'm hearing you say?
22                MR. McCARRICK:  Objection to
23         form.
24                You can answer.
25         A.    Basically, yes.
```

212

1          C. Ferraro - Confidential

2          MS. CORDRY:  I think that's

3    really all the questions I have.

4    Thank you.

5          THE WITNESS:  Thank you.

6          MR. McCARRICK:  Thanks.

7          Are there any other state

8    regulators who have any questions?

9          Well, hearing nothing, is this

10   a good time for a lunch break, then

11   we can come back and do the last

12   session?  Does that work for

13   everyone?

14         MR. HERSHEY:  Yeah, I think

15   that's a good idea.

16         MR. McCARRICK:  Okay.  Great.

17   Well, why don't we come back at

18   1:45.

19         MR. HERSHEY:  Perfect.

20         MR. McCARRICK:  Actually, you

21   know what, let's do 1:15.

22         THE VIDEOGRAPHER:  The time is

23   12:38 p.m.  This concludes Media 4.

24   Off the record.

25         (Continued on the next page.)

213

1           C. Ferraro - Confidential

2              (Lunch recess taken from

3        12:38 p.m. to 1:43 p.m.)

4                   - - -

5        A F T E R N O O N   S E S S I O N

6                   - - -

7            (Time noted:  1:43 p.m.)

8                   - - -

9            THE VIDEOGRAPHER:  The time

10       now is 1:43 p.m.  This begins Media

11       5.  On the record.

12

13    C H R I S T O P H E R   F E R R A R O, resumed

14          and testified further as follows:

15    EXAMINATION BY

16    MR. CREWS:

17        Q.    Okay.  Hey, there.

18        A.    Hi.

19        Q.    So I figured I'd just start

20    introducing myself.  My name is Cameron Crews.

21    I'm a pro se creditor.  I opened my Celsius

22    account in August of last year.  And

23    initially, I started with a small deposit of

24    3.5 ETH, and as of today, I have $27,000 worth

25    of stablecoins, a little under 1 Bitcoin, and

214

1                  C. Ferraro - Confidential

2    21 Ethereum and then some related assets.  So

3    at one point it was worth up to $120,000, but

4    now it's a little under 70,000.

5              I, kind of, wanted to start, you

6    mentioned you began with Celsius in March of

7    this year.  Correct?

8         A.    Yes, yeah, March 21.

9         Q.    And then do you yourself have a

10   Celsius account?

11        A.    No.  I am employed out of

12   Washington State, and I was not able to open

13   one.

14        Q.    Okay.  Are you -- would you have

15   been able to open one in Ecuador, though,

16   or ...

17        A.    I don't know.

18        Q.    I was wondering, in terms of the

19   terms of service, could you describe material

20   differences that were introduced in July

21   of 2021?

22             MR. McCARRICK:  Objection to

23        form.

24             You can answer.

25        A.    I don't have -- I don't have the

Confidential        Christopher Ferraro - November 21, 2022

215

1              C. Ferraro - Confidential

2     details.  I'm not an expert in it.  So it

3     would be hard for me to describe the deltas

4     between one version and another other than,

5     kind of, 6 and 8.  I know that that was the

6     big -- that was the launch of custody and the

7     terms of the exchange for that.

8          Q.   Okay.  So would you say -- would

9     you agree that at some point, when the assets

10    were custodied by -- it was Prime Trust, when

11    the company was headquartered in the UK or

12    England, those assets were considered customer

13    assets?

14              MR. McCARRICK:  Objection.

15         Objection to form.

16              You can answer.

17         A.   I think they were Celsius assets

18    with obligations to the customer.  I don't --

19    I don't know that that was a custody

20    relationship.  Like I said earlier, I'm not an

21    expert in the Prime Trust.

22         Q.   Okay.  So you would say at that

23    point that the title would still remain with

24    Celsius even at that point of the contract?

25              MR. McCARRICK:  Object to

216

```
 1              C. Ferraro - Confidential
 2         form.
 3         A.    I'm not --
 4              THE WITNESS:  Sorry.
 5              MR. McCARRICK:  You can
 6         answer.
 7         A.    I'm not an expert in the Prime
 8    Trust, so I don't know exactly what was going
 9    on.
10         Q.    Okay.  Are you familiar with a
11    change to Clause 8 titled "Ownership of
12    Digital Assets" that was made in July of 2001?
13         A.    Not specifically, no.
14         Q.    Okay.  Let me share my screen.  So
15    I have up here a highlighted version of a
16    prior to July 2001 and subsequent.  And you
17    can see in the prior version, it says that
18    you:
19              "Hereby represent a warrant at
20         all times to us during which you
21         hold digital assets in your Celsius
22         wallet, that any digital asset used
23         by you in connection with your
24         Celsius wallet is owned by you."
25              Is that what it says?
```

217

1        C. Ferraro - Confidential

2            MR. McCARRICK:  Could -- could

3    I just ask, is this -- are these

4    excerpts from -- I -- could you

5    just --

6            MR. CREWS:  Yes.

7            MR. McCARRICK:  -- lay a

8    little bit of foundation for what

9    you're asking about.  I'm happy to

10   --

11           MR. CREWS:  Certainly.

12           MR. McCARRICK:  -- your

13   question.

14           MR. CREWS:  Yeah.  So I have a

15   GitHub repository here which looked

16   using the Internet archive Wayback

17   Machine at the different versions of

18   the terms of service at different

19   points in time.

20           So what you see here is a DIF

21   between the prior version and the

22   one that was introduced in July

23   of 2021.

24           So I've zoomed in on the

25   specific changes to this clause.  So

218

1              C. Ferraro - Confidential

2       you can see the one that was

3       removed, this is -- the prior

4       version is here.  And it's

5       highlighted in red.  And I can send

6       the link to this.

7              MR. McCARRICK:  We may ask for

8       it after.

9              MR. CREWS:  Yeah.

10             MR. McCARRICK:  I would

11      just -- Mr. Ferraro, if you don't

12      know what this is, what it comes

13      from, or what different kind of

14      versions it's, you know, dealing

15      with, just make sure you're

16      testifying as to your, kind of, own

17      personal knowledge.

18             But feel free to inquire.

19             MR. CREWS:  Yeah.  Okay.

20             THE WITNESS:  I should have

21      brought my glasses.

22             MR. CREWS:  Yeah.  Sorry.

23   BY MR. CREWS:

24        Q.   So then subsequently, the language

25   changes to say that:

Confidential        Christopher Ferraro - November 21, 2022

219

```
 1              C. Ferraro - Confidential
 2                  "Any digital asset delivered
 3          by you for the purpose of utilizing
 4          Celsius services."
 5                  So it's -- you're delivering it,
 6      and then it added this clause here that:
 7                  "All digital assets transfer
 8          to Celsius as part of the services
 9          are owned and held by Celsius for
10          its own account."
11                  So that didn't exist in the prior
12      terms of service?
13                  MR. McCARRICK:  Objection to
14          form.
15                  You can answer to the extent
16          you know.
17          A.    I don't know -- I don't know the
18      details of each terms of use.  Like I said,
19      I've read through them, but I was not part of
20      drafting them, reviewing them, approving them,
21      so it's hard for me to give insight on the
22      specific changes.
23          Q.    Yeah.  Would you be surprised if
24      customers such as myself weren't aware that we
25      were transferring title of our assets?
```

220

```
 1              C. Ferraro - Confidential

 2              MR. McCARRICK:  Objection to

 3      form.

 4      A.      From my understanding, not a

 5  customer, but in looking through the

 6  materials, to me it is crystal clear in

 7  Version 6 with a double-click necessary in

 8  order to say the terms in use is transferring

 9  the title to the Celsius.

10      Q.      Yeah.  Now, I happened to join in

11  August of that year, and I didn't get the

12  notifications that Oren Blonstein had sent --

13  there was all those e-mails.  So because I had

14  joined subsequent to that, I wasn't made

15  aware of those -- I didn't receive any of

16  those e-mails.

17      A.      But you would have clicked on the

18  terms of use when you opened your account.

19      Q.      Presumably.  I don't have

20  recollection of that.

21      A.      Well, we know systematically that

22  everybody clicked on it, double-clicked on it,

23  Version 6, and it was crystal clear that the

24  ownership was transferring to Celsius --

25      Q.      So --
```

Confidential        Christopher Ferraro - November 21, 2022

221

1              C. Ferraro - Confidential

2         A.      -- in order to pledge,

3    rehypothecate, lend, et cetera, sell.

4         Q.     And did you have a digital

5    signature?

6         A.     The system -- we -- Oren is

7    probably going to be the best way of going

8    through this, but the system does not process

9    new accounts without accepting.

10        Q.     Yeah.  Now, would you say that the

11   marketing efforts have been consistent with

12   the terms of service?

13              MR. McCARRICK:  Objection to

14       form.  Outside the scope.

15              You can answer.

16        A.    I wasn't part of the company at

17   this point in time.  I've read the risk

18   disclosure.  I personally think it's clear.

19   Like I said, I focused on 6 and 8.

20              I did not -- like I said earlier,

21   I watched the sum total of about two or three

22   AMAs.  So I was not following the marketing,

23   especially when you were coming on board as a

24   customer.

25        Q.     Great.

222

```
 1              C. Ferraro - Confidential
 2              Yeah, I wanted to bring up Exhibit
 3   E from my filing, 914.  And it's just a
 4   snapshot of one of the marketing things on the
 5   home page that was from May 8 of this year.
 6   And it says "Access your coins whenever, keep
 7   them safe forever?"
 8              Does that seem consistent with the
 9   terms of service?
10              MR. McCARRICK:  Just one
11        second.
12              First, object to form.
13        Outside the scope.  Second, is the
14        bolding of "your" --
15              MR. CREWS:  That was added by
16        me.
17              MR. McCARRICK:  Okay.
18              You can answer.
19        A.   My understanding is that users in
20   ordinary course prepause could take their
21   coins off the platform.  So, you know, once
22   they took the coins off the platform, title
23   transferred back to the customer.
24        Q.   Okay.  And could customers
25   unilaterally take coins off the platform?
```

223

1              C. Ferraro - Confidential

2              MR. McCARRICK:  Object to

3        form.  Outside the scope.

4              You can answer.

5        A.    My understanding is in ordinary

6   course, if the customer wanted a withdrawal,

7   the customer would have a withdrawal.

8        Q.    Okay.

9        A.    Prepause.

10       Q.    And let's say a customer deposited

11  USDC.  What asset would they then be able to

12  withdraw?

13       A.    They have an obligation to be

14  returned USDC in normal course.

15       Q.    Okay.  So if a customer has

16  deposited USDC in normal course, they'd be

17  able to withdraw the USDC.  Did I get that

18  right?

19             MR. McCARRICK:  Object to --

20       A.    Prepause.

21             MR. McCARRICK:  Object to

22       form.

23             You can answer.

24       A.    Prepause, yes.

25       Q.    Okay.  Now, are you familiar with

224

1              C. Ferraro - Confidential

2    the swap feature?

3         A.    Yes.

4         Q.    Would a customer be able to swap

5    their USTC for another asset?

6              MR. McCARRICK:   Object to

7         form.

8              You can answer.

9         A.    If it was rolled out in their

10   location prepause.

11        Q.    Okay.  Now, could you help -- I'm

12   a little confused by that because, if the

13   asset -- the USDC is Celsius and the title

14   belongs to Celsius, how is a customer able to

15   direct the changing of that asset into another

16   cryptocurrency?

17             MR. McCARRICK:   Object to

18        form.

19             You can answer.

20        A.    They're changing the obligation in

21   the ledger.  So the Celsius owes you a USDC,

22   you swap it, we now owe you a Bitcoin.  It's

23   in the obligation.

24             Celsius assets, we didn't

25   necessarily go out and swap USDC for anything.

225

1                    C. Ferraro - Confidential

2    This is a ledger back-office transaction.

3    It's your obligation that was updated on the

4    swap.

5        Q.    So if -- typically, as far as I'm

6    aware, if you have title to something, you

7    control what happens to that thing.

8             For instance, I can't -- if I had

9    a relation- -- like, if somebody had title to

10   a house, I'm not able to just change it to

11   something else, to a car.  So the title holder

12   has the ability to determine what happens to

13   that asset.

14            So you help -- do you understand,

15   then, how the customer is able to direct this

16   change that Celsius holds title to?

17       A.    Yes.

18            MR. McCARRICK:  Objection --

19       to the form.

20            But you can answer.

21            THE WITNESS:  Sorry.

22       A.    Yeah, a little bit different than

23   the house.  If you choose to sell your house,

24   the house actually sells.  When you choose to

25   swap USDC for, let's say, Bitcoin, there's not

226

```
 1              C. Ferraro - Confidential
 2   necessarily an action on the side of Celsius.
 3   We are not necessarily changing the coin
 4   buying and selling Bitcoin for USDC.
 5              Your obligation changes.  So you
 6   telling Celsius to swap this for that does not
 7   necessarily change what we do with the actual
 8   coin.  That is under our control and under our
 9   ownership.  We're just changing the
10   back-office obligation to you.  Now we owe you
11   a Bitcoin and not USDC.
12        Q.   And the fact that it -- a swap
13   would not actuate, like, a blockchain
14   transaction would be how you were able to
15   provide that service free of charge?
16              MR. McCARRICK:  Object to
17         form.
18              You can answer.
19        A.   I don't -- I don't think it has --
20   the transfer title has anything to do with
21   free of charge.  Free of charge was a pricing
22   decision, a marketing positioning place.  We
23   wanted to roll out swap and make it have a
24   high uptake by the customers.
25              In May we were starting to think
```

Confidential       Christopher Ferraro - November 21, 2022

227

1              C. Ferraro - Confidential

2      about charging swap fees, and those were being

3      rolled out until the pause happened.

4              Q.    Okay.  Let's see.  Now, you

5      mentioned earlier that you'd read 50 letters

6      from customers.  Is that correct?

7              A.    Yeah.  Over 50.

8              Q.    Do you happen to recall a letter

9      from Rebecca Gallagher?

10             A.    I wouldn't remember any names at

11     this point in time.

12             Q.    Okay.  Well, I can tell you a bit

13     about her situation.  She's a fellow pro se

14     creditor.  And she had sold her house and put

15     the proceeds into Celsius and has in her

16     account about $350,000 in USDC stablecoins and

17     4 Bitcoin, among other assets.  And she was

18     not aware that she was, you know, literally

19     giving her house away.  We talked about house

20     titles a little while ago.

21                  Can you -- do you think that, just

22     as a human, do you think that's fair, that she

23     now stands to potentially lose her life's

24     savings?

25                  MR. McCARRICK:  Object to the

228

```
 1              C. Ferraro - Confidential

 2         form.

 3              You can answer.

 4         A.    So I grew up in a regulated

 5    company.  I worked for JPMorgan right down the

 6    street.  Okay?  I joined Celsius March 21,

 7    2022.  I'm heartbroken.  I'm sitting here in

 8    front of you, and I'm heartbroken at this

 9    situation.

10              And what I'm -- kind of, come from

11    a background where things were regulated and

12    stuff, this didn't happen -- right? -- the

13    FDIC would close down the company.

14              So Celsius and the customers

15    are -- it's a horrible situation.

16              THE VIDEOGRAPHER:  Your

17         microphone.

18              THE WITNESS:  Sorry.

19         A.    It's a horrible situation.  And

20    I -- every single day I wake up trying to get

21    value back.  I can't control the previous

22    mistakes.  I think this situation with Rebecca

23    is awful.  And I want to help the situation.

24    That's why I'm here.  That's why I sit in this

25    chair right now.
```

229

1                    C. Ferraro - Confidential

2          Q.    That's good to hear.  Just, I

3    guess, switching to a somewhat related topic.

4    Are you familiar with promotional codes that

5    users were offered to deposit?

6          A.    I've seen some of the, lack of a

7    better word, coupons of them.  Right?  Yeah.

8          Q.    Yeah.  One of them was offered in

9    the spring of this year, was labeled

10   B22SATS20000, where users could receive $500

11   worth of Bitcoin if they were to deposit

12   $20,000 worth of Bitcoin and then hold them on

13   the platform for, I believe, six months.

14             Now, I think part of the terms

15   would be, like, your deposit would be voided

16   if you were to withdraw any of the assets from

17   the platform.

18             Would that potentially encourage

19   users to keep their assets on the platform, do

20   you think?

21             MR. McCARRICK:   Object to

22        form.

23             You can answer.

24        A.    I mean, I think customers who

25   bring additional balances onto the platform

230

C. Ferraro - Confidential

1

2  because they're getting rewarded with Bitcoin,

3  $500 of Bitcoin or whatever it is, there's

4  a -- there is a marketing program to try to

5  get people to come onto the platform and grow

6  balances.  And yes.

7         So I think people probably added

8  additional funds, just like they would open a

9  checking account across the street if they

10 gave them $250.  Right?

11        So there was an incentive there

12 for people to bring on and to keep it there

13 for six months under your example.

14    Q.    Yeah.  Now, that particular promo

15 code had a clause where if the value of your

16 deposit declined, you would also forfeit the

17 rewards.

18        Are you aware of any notice that

19 was provided to customers if their account

20 balance dropped below that threshold?

21    A.    I --

22        MR. McCARRICK:  Object to

23        form.

24        Are you summarizing or reading

25        from something?  Just want to make

231

1              C. Ferraro - Confidential

2        sure the record's clear.

3              MR. CREWS:  I'm summarizing,

4        yeah.

5              MR. McCARRICK:  Okay.  Object

6        to form.

7              You can answer.

8        A.    I don't know the details.

9        Q.    Okay.  I suppose, just to share a

10   bit of my situation, I had claimed that

11   deposit code in addition to a few others and

12   deposited $26,000 worth of Bitcoin on around

13   March 9, I believe.  And the promotion code

14   was voided because market price declined.

15              But I wasn't provided notice, in

16   which case there wasn't going to be a reason

17   to keep assets on the platform.  So I just

18   wanted to fill you in on that.

19        A.    We can -- we can look into --

20              MR. McCARRICK:  Object --

21        yeah, object to form.

22              But I don't think there was a

23        question, so no call for a response.

24              THE WITNESS:  Yeah.

25              MR. CREWS:  Yeah.

232

```
 1              C. Ferraro - Confidential
 2         Q.    Are you familiar with Aliza
 3   Landes, who is or was the VP of retail lending
 4   at Celsius?
 5         A.    I've heard the name.  I believe
 6   she is the wife of Daniel Leon and used to run
 7   retail lending.  This is way before my time,
 8   and I've never met Aliza -- Aliza.  Yeah.
 9         Q.    Okay.  There was a statement she
10   made in 2020 about ownership of USDC and fiat
11   that customers would receive when taking out a
12   collateralized loan at Celsius.  And I wanted
13   to just share that.
14              MR. CREWS:  Share my screen
15         again.
16         Q.    So in an AMA she hosted with
17   Celsius, she said -- this is in relation to
18   avoidance of default of loans.  She said:
19              "Those are their funds and
20         their crypto, and they get to decide
21         what to do with it."
22              And there is a Twitter link here
23   where -- well, I don't think this is going to
24   play, but she's, you know, saying those words.
25              And do you think that this is
```

233

1               C. Ferraro - Confidential

2       consistent with the terms of service, as you

3       understand them?

4               MR. McCARRICK:  Object to

5           form.  Outside the scope.

6           Incomplete information.

7               But answer to the best of your

8           ability.

9           A.    I'm not quite sure the context,

10      what she said around it.  I go back to the

11      contract, the terms of use, and what it

12      explicitly states.

13              Like I said, I don't -- I have a

14      job.  I don't watch YouTube.  I -- I didn't

15      watch the AMAs.  I definitely have not seen

16      Aliza.  So I can't remark on what she may or

17      may have not said in 2020.

18          Q.    Do you think Celsius has an

19      obligation to correctly inform their customers

20      of the obligations and risks when opening a

21      Celsius account?

22              MR. McCARRICK:  Object to

23          form.

24              You can answer.

25          A.    I would think -- again, I come

234

```
 1              C. Ferraro - Confidential
 2    from two decades in banking where -- highly
 3    regulated.  So I tend to look at the world
 4    through that lens.  Crypto is completely
 5    different.  But I generally think that
 6    customers, you know -- or, sorry -- companies
 7    that want to have customers for the long run
 8    speak truth to them.
 9         Q.   I agree to that.  There was one
10    other quote from that same AMA when she was
11    addressing customers who would be leery about
12    taking out a loan.  And the way she explained
13    it was:
14              "You're not going into debt,
15         you're just borrowing against
16         something that you own."
17              And again, does that seem
18    consistent with the terms of service?
19              MR. McCARRICK:  Objection.
20         Outside the scope.  Incomplete
21         information.
22              Answer to the best of your
23         ability.
24         A.   I don't know the context of what
25    she's saying, but this statement --
```

Confidential        Christopher Ferraro - November 21, 2022

235

        C. Ferraro - Confidential

1

2             THE WITNESS:  Can you hold it

3       for one second --

4             MR. CREWS:  Yeah.

5             THE WITNESS:  -- just

6       because -- can you scroll up --

7             MR. CREWS:  Oh, sorry.

8             THE WITNESS:  -- because that

9       camera is in the way.  I'm sorry.

10      Sorry about that.

11            A.   Her -- the statement she makes --

12  says makes no sense to me.  You're not going

13  into debt, you're borrowing.  So I don't --

14  I'm not quite understanding what the sentence

15  even means.  It's contradicting itself.

16            Q.   I'd agree with that.  And when I

17  went to withdraw stablecoins on June 13, I

18  wasn't able to.  Could you explain why?

19            MR. McCARRICK:  Object to

20      form.  Outside the scope.

21            You can answer.

22            A.   I believe that was under the

23  pause.

24            Q.   Correct.  So could you explain why

25  the pause was enacted.

236

```
 1              C. Ferraro - Confidential
 2              MR. McCARRICK:  Object to
 3        form.
 4              You can answer.
 5        A.    I think most of this is noted in
 6    the first-day declaration where it gives the
 7    reasons for it.  Right?  Backdrop, difficult
 8    marketplace; backdrop, have taken significant
 9    legacy losses; backdrop, a lot of customer
10    withdrawals.
11              All of those things gave rise to
12    the pause, so we can take a breather, get
13    bankruptcy protection -- right, well, not at
14    that point in time -- take a breather.  Then
15    when we filed, decided to get bankruptcy
16    protection, that way we can treat the estate
17    fairly.  So ...
18        Q.    So would part of that be that the
19    funds were not available to pay out more
20    withdrawals beyond that?
21              MR. McCARRICK:  Objection to
22        form.  Outside the scope.
23              You can answer.
24        A.    I think we paused because
25    liquidity was getting short.  And we didn't
```

237

```
 1              C. Ferraro - Confidential
 2    want to give benefit to the first person in
 3    line to the detriment of the last person in
 4    line.
 5         Q.    Now, would you say that somebody
 6    who withdrew on June 12 benefited to the
 7    detriment of somebody who tried to withdraw on
 8    June 13?
 9              MR. McCARRICK:  Object --
10         object to form.  Outside the scope.
11              You can answer.
12         A.    I think that's a leg- -- like,
13    kind of, a bankruptcy question about our
14    withdrawals before the bankruptcy date
15    preferential.  I don't know.  I'm not an
16    expert in this space.  I'm probably not the
17    right one to answer that question.
18         Q.    Okay.  But you estimated that
19    potentially there would be, if we were to go
20    to liquidation, customers might receive 50
21    cents on the dollar.
22              So do -- did the customer who
23    tried to withdraw on June 13 do anything
24    themselves differently, materially different
25    than the customer who withdrew 100 percent on
```

238

```
 1                    C. Ferraro - Confidential

 2       the dollar plus rewards on June 12?

 3                    MR. McCARRICK:  Objection to

 4            form.  Outside the scope.

 5                    You can answer.

 6            A.    I think that distinction is pre

 7       and post pause.  If you were pre, the -- you

 8       know, you got a withdrawal.  And if you were

 9       post, the accounts were frozen.

10            Q.    But the customer themselves wasn't

11       responsible for that, were they?

12                    MR. McCARRICK:  Object --

13            object to form.  Outside the scope

14            and vague.

15                    You can answer.

16            A.    Not quite sure of the question.

17       I'm sorry.

18            Q.    The question was:  Did the

19       customer do anything to potentially get half

20       as much, in the event of a liquidation, if

21       they missed withdrawing before the pause?

22                    MR. McCARRICK:  Objection to

23            form.  Outside the scope.

24                    You can answer.

25            A.    I mean, I don't think the customer
```

239

```
 1                 C. Ferraro - Confidential
 2     would just withdraw before the pause, so they
 3     were able to get their funds.  Post pause, you
 4     can't withdraw.  Now it's handled by a
 5     bankruptcy estate.  So I think that's the
 6     marker, is just pre and post pause.
 7                 I'm not going to cast, like, was
 8     that customer hurting the other customer.
 9     What I can say is we thought the pause was
10     right because we wanted to protect the people
11     that were on the platform.
12          Q.   Okay.  Maybe I'll put it just one
13     more way:  Would you say that it's, like, a
14     customer -- the customer's fault for not
15     withdrawing it prior to the pause?
16          A.   I don't think the fault is with
17     the customer at all.  I mean, I think -- I
18     think it's -- again, go back to the backdrop
19     that I stated, bad marketplace, legacy losses,
20     there are significant withdrawals.  It's a bad
21     situation.
22                 The customer is not at fault.
23     Celsius -- Celsius had title to the assets.
24     Celsius took some -- did some bad
25     investments -- right? -- looking back.  It's,
```

240

1            C. Ferraro - Confidential

2    kind of, a risk -- risk deployment.  So

3    sometimes you win; sometimes you lose.

4    Celsius lost too many times.

5         Q.    And you testified -- or -- this is

6    a testimony, I think.  Right?  That's the

7    correct term?  You testified earlier today

8    that the return for what you deem

9    "surrendering of title" to our assets to

10   Celsius, that we received yield in return.  Is

11   that right?

12            MR. McCARRICK:  Object to

13        form.

14            You can answer.

15        A.    And the ability to be on the

16   platform.  Yield was the main consideration

17   but also, you know, safeguarding your crypto,

18   being able to see your account balance, stuff

19   like that, that was all listed in the terms of

20   use as well.

21        Q.    Okay.  Would you say that for

22   somebody such as myself who has only deposited

23   onto the platform, never withdrawn, that I've

24   not realized a benefit to this supposed

25   interest rate or return, whatever we want to

241

```
 1              C. Ferraro - Confidential
 2    call it?
 3              MR. McCARRICK:  Object to
 4         form.  Outside the scope.
 5              You can answer.
 6         A.    Can you -- can you restate it, I'm
 7    sorry.
 8         Q.    Yeah.  Having deposited into
 9    Celsius without withdrawing, I suppose, like,
10    in what real sense have I benefited from the
11    earn program?
12              MR. McCARRICK:  Same
13         objections.
14              You can answer.
15         A.    Your obligations have accrued
16    rewards.  The problem is is we paused so you
17    couldn't get your funds out and now we're in
18    bankruptcy.  That's the issue.  The intent was
19    that you would earn your rewards and that you
20    would be able to quietly enjoy them.
21         Q.    Yeah.  So in order to realize that
22    benefit, the company needs to be able to have
23    the resources in order to pay those rewards
24    or -- and the principal?
25              MR. McCARRICK:  Objection to
```

Confidential        Christopher Ferraro - November 21, 2022

242

```
 1              C. Ferraro - Confidential

 2         form.

 3              You can answer.

 4         A.    Yeah, in order to realize the

 5    benefit, to monetize the benefit, there's some

 6    benefit in just accruing -- right? -- you

 7    stayed on the platform while you were

 8    accruing.  My understanding you didn't

 9    withdraw.  So there was some benefit as you

10    looked at your balance and the balance was

11    increasing over time.

12              The problem was we paused and now

13    we're in bankruptcy.  So, yeah, I mean, the

14    issue is now we're an estate and we're trying

15    to maximize value to give back to yourself and

16    the other creditors.

17              So it's, kind of, like -- all of

18    your balance -- your balance includes all the

19    rewards, your obligation -- right? -- the

20    claim.  So that's what we're fighting for is

21    to get you as much back on that claim amount

22    as possible.

23         Q.    Okay.  And was Celsius solvent

24    when it paused on June 12?

25              MR. McCARRICK:  Object.
```

Confidential        Christopher Ferraro - November 21, 2022

243

```
 1              C. Ferraro - Confidential

 2          Outside the scope.  Form.

 3              You can answer.

 4      A.    I think at the point when we

 5  paused, when I think back, I think that's,

 6  kind of, the point where Celsius said, We have

 7  a solvency problem.

 8              I was not part of that decision.

 9  I was not with the board.  I did not have

10  knowledge of that decision.  I'm only saying

11  from where I sit today thinking back probably

12  that's the event where they said, We have an

13  issue with solvency.

14      Q.    Yeah.  And in the Mashinsky

15  declaration I believe he listed a $1.2 billion

16  deficit which included assets with sell tokens

17  valued at hundreds of millions of dollars.

18              So that would seem to be

19  insolvency.  Right?

20              MR. McCARRICK:  Object to

21      form.  Outside the scope.

22              You can answer.

23      A.    I mean, that was at the bankruptcy

24  filing.

25      Q.    Okay.
```

244

```
 1              C. Ferraro - Confidential

 2        A.    So that was post the pause.

 3        Q.    Yeah.  Sure.

 4        A.    And we filed for bankruptcy.  So I

 5   would assume that, kind of, says, yeah, we're

 6   not solvent.

 7        Q.    And this insolvency would have

 8   occurred over time, presumably.  Correct?

 9              MR. McCARRICK:  Objection to

10        form.  Outside the scope.

11              You can answer.

12        A.    No.  The balance sheet, the

13   balance sheet accrues and that takes losses

14   over time.  But solvency is not a, you know,

15   sort of thing -- right? -- you at some point

16   in time become insolvent.

17              Now, I haven't studied -- studied

18   the definitions and all that type of stuff.

19   But, you know, there was ample liquidity, the

20   balance sheet, to my knowledge back then with

21   the value -- the accounting, following

22   accounting principles was, you know, had

23   equity.

24              The mining company, we had people

25   who wanted to invest that would have made the
```

245

1               C. Ferraro - Confidential

2    mining asset worth literally over $1 billion.

3               So with the balance sheet, there

4    was a lot of value in that balance sheet.  And

5    what happened was when the crypto prices and

6    the crypto market, kind of, went into this ice

7    age, the value of those assets decreased

8    massively, and our ability to monetize those

9    assets and get liquidity went away, and that's

10   what let up to the pause and then the filing.

11        Q.    And just for clarity, when we're

12   talking insolvency, my understanding is it

13   would be when your liabilities exceed your

14   assets.

15               Is that a reasonable definition?

16               MR. McCARRICK:  Object to

17        form.  Outside the scope.

18               You can answer.

19        A.    I think of it as, well, accounting

20   is like a -- not a practicing CPA anymore, but

21   from thinking back to my school days 25 years

22   ago, I think it's when you can no -- when you

23   believe that you cannot pay your obligations.

24               So it's a little bit of, you know,

25   your balance sheet is following specific

Confidential        Christopher Ferraro - November 21, 2022

246

```
 1              C. Ferraro - Confidential
 2    things but, if you have a mining asset that
 3    you think is going to be worth $2 billion and
 4    that you're going to monetize, you're probably
 5    still solvent.
 6              But again, I'm not a lawyer.  I'm
 7    not looking at the definition.  That's my
 8    understanding.
 9         Q.   Yeah.  I mean, I would think that
10    liquidity would be your ability to pay your
11    obligations because you might have, you know,
12    hundreds of millions locked in mining that you
13    can't get access to today, so you can't pay
14    depositors who necessarily want their funds
15    back today, but you would be solvent, just
16    illiquid.  So that would be a distinction
17    between those two terms.
18              But then insolvency would be you
19    have obligations that exceed even those
20    illiquid assets.
21              MR. McCARRICK:  Are you asking
22         him to agree or disagree?
23              MR. CREWS:  Just in terms of
24         clarifying the terms, yeah.
25              MR. McCARRICK:  Okay.
```

Confidential       Christopher Ferraro - November 21, 2022

247

```
 1              C. Ferraro - Confidential
 2         Objection to form.  Outside the
 3         scope.
 4              You can respond.
 5         A.    I mean, I think insolvency is when
 6    you can no longer pay your bills to some
 7    extent, and your idea of a going concern goes
 8    away.  That means that the value of your
 9    franchise is worth less than the liabilities
10    that you have.
11         Q.    Yeah.
12         A.    Crypto was booming.  And the
13    balance sheet was, you know, recorded largely
14    at cost.  Some of the investments were
15    mark-to-market.
16              Again, we thought the mining asset
17    was going to be worth billions.  I don't -- I
18    wasn't with the company at that time.  But
19    looking back, I think it's easy to think why
20    there was a going concern.
21         Q.    Mm-hmm.
22         A.    Right?  And I think at the pause,
23    we were in the middle of this crypto winter.
24    We didn't think that there was a way out.  I
25    think that's when they said, you know, that's
```

248

```
1              C. Ferraro - Confidential
2    triggered insolvency, pause, don't let people
3    go out anymore.  And then we got to a point
4    where we decided that we have to file.
5         Q.    Just for -- as clarity, I'll just
6    propose my definition of insolvency being when
7    all your assets, including liquid assets, are
8    subsumed by a greater -- your liabilities
9    essentially are larger than those -- all those
10   assets combined.  So you have more liabilities
11   than your assets.
12              And under that definition, with
13   the bankruptcy filing there was a deficit of
14   1.2 billion?
15        A.    1.2 approximately, yeah.
16        Q.    So you don't go from zero to 1.2.
17   It would have occurred over a period of time.
18   Correct?
19              MR. McCARRICK:  Objection to
20         form.  Outside the scope.
21              You can answer.
22        A.    Yeah.  It's what I said at the
23   beginning is that it just -- it doesn't
24   happen, but there's a tipping point where you
25   say, We're not a going concern anymore.
```

Confidential      Christopher Ferraro - November 21, 2022

249

1              C. Ferraro - Confidential

2              It's important to note the

3    accounting includes the sell token on the

4    balance sheet, and when the sell token started

5    to decrease in value -- right? -- this, kind

6    of, hit the perfect storm.

7              So it wasn't just sell token, it

8    was other crypto assets were going down, the

9    mining company on -- in reality the bids went

10   dry, there was really no way to monetize that

11   asset.  You see what's happening right now in

12   the space, we need a turnaround, and I think

13   that's when they, kind of, came to the

14   conclusion, Yeah, we need to pause.

15        Q.    And you mentioned that you were

16   aware of a May board meeting that happened,

17   really, a couple of months after you joined?

18        A.    Yeah.  It was, I think, May 2.  I

19   think it was one day, I could be wrong, but I

20   believe it was May 2.

21        Q.    And were you present at that board

22   meeting?

23        A.    No.  I was in Quito, Ecuador.

24        Q.    Did you have a chance to review

25   the examiner's interim report in reference to

250

```
 1              C. Ferraro - Confidential
 2   that meeting?
 3        A.    I read the examiner's report, yes.
 4        Q.    Yeah.  There was a quote on page
 5   78 that referenced the board meeting minutes
 6   where it was acknowledged that Celsius'
 7   capital "sits at near zero."
 8              Would this have been May 2?
 9              MR. McCARRICK:  Objection to
10        form.  No foundation.  Calls for
11        speculation.
12              You can answer to the extent
13        that you're able.
14        A.    My understanding the board
15   meeting -- my understanding is the board
16   meeting was on May 2.  I was not at the board
17   meeting.  I have not reviewed the minutes.  I
18   reviewed the examiner's report just like you
19   did.
20        Q.    Okay.  I suppose the last on this
21   topic before changing would be:  Would you
22   agree that the inability to withdraw assets
23   impairs their utility to your customers?
24              MR. McCARRICK:  Objection to
25        form.  Outside the scope.
```

Confidential      Christopher Ferraro - November 21, 2022

251

```
 1              C. Ferraro - Confidential
 2              You can answer.
 3      A.    Yeah, I mean, clearly if the
 4  customer is trying to withdraw, they want
 5  their -- they want to get their title back to
 6  the digital currency.  And post pause that
 7  wasn't -- that wasn't available.  So obviously
 8  that had a detriment to the overall customer.
 9  And that's why we're here.
10      Q.    Yeah.
11      A.    We're here to maximize the value
12  and get as much as we possibly can back.  It's
13  unfortunate how we got here, but, you know,
14  from the pause to the filing, you know, we now
15  go into an estate, and we're trying to fight
16  to get you back as much of your obligations as
17  we possibly can.
18      Q.    And are you aware if rewards in
19  your Celsius account compound?
20              MR. McCARRICK:  Objection to
21      form.  Outside the scope.
22              You can answer.
23      A.    My understanding is they get
24  deposited into your account every Monday.  So
25  that would go into your balance, and then you
```

Confidential        Christopher Ferraro - November 21, 2022

252

```
 1                 C. Ferraro - Confidential
 2     would have a higher balance to earn off of.
 3          Q.    Okay.  Is it fair, then, to say
 4     that you're earning rewards on the rewards
 5     that you're building?
 6                 MR. McCARRICK:  Objection to
 7           form.  Outside the scope.
 8                 You can answer.
 9          A.    My understanding is that the
10     rewards on every Monday go into the overall
11     balance, and you earn on that higher balance
12     the next week.  So you would be able to
13     compound or earn on your rewards or withdraw
14     it before the pause.
15          Q.    And would title of the rewards --
16     could you address the title of those rewards.
17          A.    Well, nothing's really happened.
18     Celsius is deploying assets, enjoying the
19     returns, and setting a reward rate that
20     increases your obligation.
21                 There's nothing happening in the
22     marketplace for those rewards necessarily.
23     Yes, we're going to go out and we're going to
24     buy some sell tokens so we can pay them out in
25     rewards.  If we have Bitcoin, that's on the
```

Confidential        Christopher Ferraro - November 21, 2022

253

1              C. Ferraro - Confidential

2    balance sheet, we can pay -- give that out,

3    maybe we have to buy Bitcoin.

4              But a lot of the times we actually

5    didn't have to go into the marketplace to buy

6    what we were paying in rewards.  It was just a

7    book entry into your obligation, the

8    liability, the back-office system.

9        Q.    Okay.  So if I have .78 Bitcoin in

10   my account and I earn some fractional reward,

11   you're saying that the title of the Bitcoin is

12   Celsius'.  So I'm wondering what's the title

13   of the reward?

14       A.    It's the oblig- --

15             MR. McCARRICK:  Ob- --

16             THE WITNESS:  I'm sorry.

17             MR. McCARRICK:  No, you're

18       fine.  You're fine.

19       A.    No.

20             MR. McCARRICK:  Objection to

21       the form.

22             You can answer.

23       A.    It's the obligation that's

24   increasing, the IOU to the customer.

25       Q.    Okay.

254

1              C. Ferraro - Confidential

2        A.    That's accruing weekly.  Every

3    Monday the obligation to the customer

4    increases.

5        Q.    Okay.  So it's an IOU.

6        A.    Yeah.  It's a loan from the

7    customer to Celsius transferring title for the

8    right to pledge or rehypothecate, sell,

9    otherwise invest.

10             MR. CREWS:  Okay.  I just want

11        to share my screen again.  I have a

12        copy of this in paper.

13             MR. McCARRICK:  Mark it as

14        Exhibit 3?

15             MR. CREWS:  Sorry if it's a

16        bit small.  This is a copy of the

17        1099-MISC form that I received for

18        the prior tax year.

19        Q.    Could you explain why customers

20    were issued these tax forms?

21             MR. McCARRICK:  Objection to

22        form.  Well outside the scope.

23             But you can answer.

24        A.    Sorry.  You know, this is tax

25    code.  So my understanding is that you were

Confidential        Christopher Ferraro - November 21, 2022

255

```
 1              C. Ferraro - Confidential
 2    getting rewards which is counted as income.
 3    Whether or not you actually pull, you know,
 4    withdraw the coins or the rewards, the IRS
 5    still recognizes that as income because your
 6    obligation has increased.
 7              In normal course you can withdraw,
 8    get title back, and take your coins and put
 9    them elsewhere.  Right?  In a world in which
10    you don't, the IRS is not interested in
11    whether or not you actually took it off or
12    kept it on.  You're accruing reward income
13    here.  Right?
14              So just like the liability, the
15    obligation in the back office, that's
16    increasing, and we're reporting that increase
17    as a taxable event for you.
18         Q.    So --
19         A.    That's my understanding, at least.
20         Q.    Yeah.  So you're saying because
21    the material amount of your account has
22    increased, the customers would then owe a tax
23    obligation based on that increase?
24              MR. McCARRICK:  Object to
25         form.  Outside the scope.
```

Confidential       Christopher Ferraro - November 21, 2022

256

1           C. Ferraro - Confidential

2                Answer.

3        A.    You're earning a reward.  Whether

4   or not you take that reward off the platform

5   and turn it into fiat, the tax code, in my

6   understanding, doesn't care.  They're saying

7   you earned a consideration of the rewards for

8   placing your coins on Celsius and transferring

9   title.  You get a reward.  That's a taxable

10  event.  That's my understanding of the

11  situation.

12       Q.    Okay.  So rewards increase the

13  balance of your account, which you just said

14  was essentially an IOU?

15       A.    It's an obligation.  It's a loan

16  from the customer to Celsius, yeah, according

17  to the terms of use.

18       Q.    Do customers have a tax obligation

19  if the value of their account increases with

20  the crypto markets?

21           MR. McCARRICK:  Objection to

22       form.  Outside the scope.

23           You can answer if you know

24       about customers' tax obligations.

25       A.    I'm not a tax lawyer.  I did pass

Confidential       Christopher Ferraro - November 21, 2022

257

```
 1                C. Ferraro - Confidential
 2      the CPA exam 25 years ago.  It's been a long
 3      time.
 4                My understanding is that price
 5      appreciation or depreciation doesn't change
 6      your tax.  It's not until you actually have a
 7      taxable kind of event where you sell your
 8      crypto or something like that.
 9                Just earning a rewards against
10      your obligation is also you earning something
11      in the IRS's mind.  So if your price of your
12      coin is going up and down, your rewards will
13      go up and down.
14                But I believe, I'm not giving tax
15      advice, but I believe the only taxable event
16      if you do not trade, sell, swap, whatever,
17      crypto would be the rewards that you're
18      accruing to the obligation.
19           Q.   So if I bought my Bitcoin at a
20      lower price prior to my depositing it with
21      Celsius, would I have a tax obligation upon
22      deposit?
23                MR. McCARRICK:  Objection to
24           form.  Very far outside the scope.
25                You can answer to the extent
```

258

```
 1                  C. Ferraro - Confidential
 2         that you know about tax obligations.
 3         A.    I don't know.  I think your basis
 4    just goes up and down until you take it out.
 5    But I'm not a tax expert.  So --
 6         Q.    Yeah.
 7         A.     -- I'm not sure the answer to
 8    that.
 9         Q.    The reason I ask is because if
10    title is transferred, presumably this would be
11    a tax disposal event.
12              Would you know anybody if you're
13    not able answer who --
14         A.    I don't.
15         Q.    -- at Celsius could advise?
16         A.    I -- I don't know what the
17    question is.  I'm sorry.
18         Q.    The question is if we're saying
19    that title transfers from the customer to
20    Celsius upon deposit, would that be a tax
21    disposable --
22         A.    I'm not a tax accountant.  I can't
23    give you advice on tax.  I don't know the
24    answer to that.  What I do know is the terms
25    of use and what it says.  I'm not giving tax
```

259

```
 1              C. Ferraro - Confidential
 2   advice.  I'm not qualified to do that.
 3        Q.    Is there somebody at Celsius who
 4   would be able to answer the tax obligation
 5   questions?
 6              MR. McCARRICK:  Objection to
 7         the form.  Still outside the scope.
 8              But you can answer if you know
 9         anyone.
10        A.    You would probably have to -- we
11   would probably have to have the conversation
12   with somebody in the tax department or the
13   legal department.
14        Q.    Okay.  Do you see how it could be
15   confusing for a customer to be paying taxes on
16   assets that Celsius holds title to?
17              MR. McCARRICK:  Objection to
18         form.
19              You can answer.
20        A.    What I know is we control the
21   terms of use.  We do not control tax law.  We
22   are not giving tax advice in the terms of use.
23              This is a contract between Celsius
24   and the customer that, in my opinion -- and
25   I've studied 6 and 8 -- is very clear.  I
```

260

1              C. Ferraro - Confidential

2     can't speak to the tax side of it, sir.  I'm

3     sorry, I can't.

4          Q.    And do you think, just to bring up

5     my situation where I paid taxes on my rewards

6     and yet I'm missing, say, like $100,000 worth

7     of crypto, does that feel like a fair

8     situation?

9              MR. McCARRICK:  Objection to

10         form.  Outside the scope.

11              You can answer to the extent

12         that you can.

13         A.    I mean, my -- again, I'm not a tax

14    advisor.  I'm not giving tax advice.  If for

15    some reason the estate were to give you

16    everything back -- right? -- there would

17    probably be no taxing event.  You'd get

18    everything back.  You're made whole.  If you

19    get back less, you might get a refund for the

20    rewards you accrued.  But, again, I'm not

21    giving tax advice.

22              But let's say that we were only be

23    able to pay you back 50 cents on the dollar,

24    hypothetical, I think that that would be a tax

25    impact, and you would get some of your reward

Confidential        Christopher Ferraro - November 21, 2022

261

1              C. Ferraro - Confidential

2     accrual back.

3              I'm not being an expert on tax

4     code.  I'm just giving you my, kind of, mental

5     model of how I understand it works.  So I

6     think it's timing.  That's my understanding.

7         Q.    Okay.  And are you familiar with

8     the fact that there have been insiders who

9     have withdrawn assets from the platform in the

10    last year?

11             MR. McCARRICK:  Objection to

12        form.  This has nothing to do with

13        the motion.

14             You can answer.

15        A.    I've seen the statements and

16    schedules, I signed off on them.  I spoke at

17    the 341 meetings where I took questions on

18    this, so I'm aware of the distributions.  And

19    I'm also aware that two of the founders, Alex

20    Mashinsky and Daniel Leon, are no longer with

21    this company.

22        Q.    And they both withdrew millions of

23    dollars worth of assets from the platform?

24             MR. McCARRICK:  Object to

25        form.  Well outside the scope.

262

1              C. Ferraro - Confidential

2              You can answer.

3        A.    It was in the statements and

4    schedules, yes, sir.  Yeah, it was

5    disappointing to see one way or another --

6    right? -- It's ...

7        Q.    And are you familiar with Celsius

8    having relationships with crypto influencers,

9    partnerships?

10             MR. McCARRICK:  Object to

11        form.  Outside the scope.

12             You can answer.

13       A.    Not directly, not even loosely,

14   but from -- and, like, my Twitter account is

15   not very old.  I've never posted on Twitter.

16   I don't have Facebook or any of that type of

17   stuff.  So I'm not an active what you would

18   call a social media guy.  So I don't like the

19   influencer thing.  I've never really followed

20   it.

21             But my understanding is that there

22   was influencers that were, kind of, explaining

23   how Celsius worked, but that's the

24   knowledge -- that's the extent of the

25   knowledge that I have.

263

```
 1                  C. Ferraro - Confidential
 2          Q.    Yeah, my understanding is from the
 3     court filings that there was some compensation
 4     that certain Celsius partners were provided.
 5                  Would that be a reasonable guess?
 6                  MR. McCARRICK:  Object to
 7          form.  Don't know the basis for
 8          that.
 9                  You can answer to the extent
10          you know.
11          A.    I basically know what you just
12     said -- right? -- there was influencers, they
13     probably got some, sort of, consideration for
14     their efforts.  I'm not sure -- I don't know
15     how they were paid, I don't who was paid, I
16     don't know how much it was.
17                  But I understand that there was
18     influencers that got consideration for
19     marketing Celsius.
20          Q.    Okay.  I wanted to bring up a few
21     of the most well-known influencers who
22     withdrew assets from the platform.
23                  Are you familiar with one called
24     Lark Davis?
25                  MR. McCARRICK:  Just before we
```

Confidential        Christopher Ferraro - November 21, 2022

264

1              C. Ferraro - Confidential

2         get there, what court filings is

3         this from, just for the record?

4              MR. CREWS:  This is from the

5         947-1.  So page 2,930.  It's a

6         combination of the balances report,

7         the 947 plus the SOFA 940 -- 973.

8              MR. McCARRICK:  Okay.  So this

9         is information from --

10             MR. CREWS:  Combined, yeah.

11             MR. McCARRICK:  -- separate?

12        Okay.  Understood.  I'm just going

13        to have a standing objection to

14        this, but -- I think it's outside

15        the scope but continue to ask

16        questions.

17   BY MR. CREWS:

18        Q.    So Lark Davis, aka CryptoLark, I

19   believe had a partnership with Celsius.  He

20   drew down his balance to virtually nothing and

21   withdrew 2.45 million over the course of May.

22             Were you aware of that?

23             MR. McCARRICK:  Objection to

24        the form.  Outside the scope.

25             You can answer.

265

```
 1                    C. Ferraro - Confidential

 2          A.    I don't -- I don't know the

 3    individual.  I don't know the specifics of

 4    those withdrawals.

 5          Q.    Okay.  There's another individual

 6    known as Ben Armstrong, goes by the handle

 7    Bitboy.  This is on page 1,555 of

 8    Document 947.

 9              There are three different Ben

10    Armstrongs listed, two Ben Armstrongs and one

11    Benjamin Armstrong, both of which have

12    depleted accounts.  However, his -- Ben

13    Armstrongs, these two Ben Armstrongs are

14    missing from the 973 SOFA filing.

15              Would you be able to explain why

16    an entry might be missing from the SOFA

17    document?

18              MR. McCARRICK:  Objection to

19          form.  Outside the scope.  Not sure

20          it is an accurate rendering.

21              But you can answer to the

22          extent that you're able.

23          A.    We spent an immense amount of time

24    preparing the schedules, internally and with

25    the advisors; I reviewed them.  Obviously I
```

266

```
 1              C. Ferraro - Confidential
 2   don't review it, every line on them, it
 3   wouldn't be possible.  And it wouldn't be a
 4   good use of my time while I'm trying to work
 5   on the dual-track process.
 6              So I think that -- I can't speak
 7   to an individual transaction or whatnot.  But
 8   I can tell you that we spent a tremendous
 9   amount of effort on the schedules.  This was a
10   massive lift.  You're talking about a company
11   that, you know, venture to guess that none of
12   the employees have been through a Chapter 11
13   process and everything changes -- right? --
14   after that.
15              And you have to do these types of
16   reports, and these -- you got to really
17   mobilize the organization in order to do it.
18   And I think we did it.  We can follow up on
19   any specifics, but I can't speak to it.
20       Q.    In terms of following up, what's
21   the best mechanism for doing that?
22              MR. McCARRICK:  Objection to
23       form.  Outside the scope.
24       A.    We would have to analyze the
25   schedules and see what's happening.  I mean,
```

Confidential        Christopher Ferraro - November 21, 2022

267

1                    C. Ferraro - Confidential

2      there's so many transactions embedded in the

3      schedules.  I think it was something like

4      10,000-plus pages.  So we just have to go

5      through it.  But there was quality checks and

6      reviews.  Anything's possible but there was a

7      lot of effort in checks that went into this.

8          Q.    And in terms of this specific case

9      where an entry I'm asserting is missing, is

10     there a mechanism by which I can raise that

11     with you?

12              MR. McCARRICK:  Object to

13          form.  This has absolutely nothing

14          to do with the current motion.

15              You can answer it to the

16          extent that you're able.

17          A.    I'd have to follow up internally

18     with the specifics.  Maybe you can provide it

19     to T.J. and Kirkland, and then we can follow

20     up.  I'm not sure of the channels and how I

21     can get back to you, if that's even allowed.

22              I know this is -- I don't believe

23     this is your account.  So this would be -- I

24     don't know if I can go in transaction history

25     and give you information about it.  But we can

268

1            C. Ferraro - Confidential

2    verify it and follow up and get back to you.

3            MR. McCARRICK:  Can I just

4        take a pause.  It's my understanding

5        that someone on the Zoom is tweeting

6        live.  Perhaps they weren't here at

7        the beginning.  Anyone who's on the

8        Zoom has signed the protective

9        order.  The entire transcript has

10       been designated confidential, which

11       means that you can't live tweet it,

12       you can't disclose it outside of

13       those who have a right or bound by

14       the protective order.  So I'm going

15       to ask that individual to

16       discontinue that.

17            And as I said on the back end,

18       we're happy to work with the

19       designations as to confidentiality,

20       but the reason I designated the

21       entire transcript confidential was

22       exactly for this reason.  So I would

23       just ask that person to stop

24       tweeting.  And if it continues, we

25       will end the deposition.

269

```
 1              C. Ferraro - Confidential
 2              You can continue.
 3   BY MR. CREWS:
 4       Q.    So I think we just left off with
 5   the mechanism being to speak to T.J. about
 6   deficiencies, if there were anything missing.
 7              I'm going to switch to -- I have
 8   here a spreadsheet that I believe was
 9   extracted from the SOFA report or I think it
10   was the 947 document.  This is a listing of
11   merchandise purchases that Celsius made with
12   USA Strong.
13              Are you familiar with the company
14   USA Strong?
15              MR. McCARRICK:  Objection to
16         form.  Outside the scope.  I don't
17         know that we're able to review the
18         full document.
19              But you can answer to the
20         extent that you're able based on the
21         information that's displayed.
22       A.    I can't see the information on the
23   screen, but if you're asking me do I know what
24   USA Strong is, I believe it's a related party
25   to Alex Mashinsky, but his wife, Krissy
```

270

1          C. Ferraro - Confidential

2    Mashinsky, I believe owns and runs USA Strong.

3          Q.    Yes.  And last year -- or I guess

4    over the last year, not calendar year, but in

5    the filing they've made $118,000 worth of

6    purchases with USA Strong -- Celsius has made

7    those purchases with USA Strong.

8              MR. McCARRICK:  Object to

9         form.  Outside the scope of the

10        limited stablecoin motion.

11             You can answer to the extent

12        that you're able to understand or

13        able to verify the information

14        that's up there.

15        A.    Was there a question?  I'm sorry.

16        Q.    I'm wondering if you could maybe

17   just put into context this relationship with

18   USA Strong.

19        A.    Okay.

20             MR. McCARRICK:  Same

21        objections.

22             Go ahead and answer.

23        A.    So I'm not going to focus on the

24   numbers, I'm going to just explain -- answer

25   your question, my understanding of the

271

```
 1              C. Ferraro - Confidential
 2    relationship.
 3              So like I said, I believe it's
 4    Alex Mashinsky's wife, Krissy Mashinsky.  USA
 5    Strong, I believe these were for the purchases
 6    of merchandise largely for promotional
 7    giveaways.  I think Bitcoin conferenced they
 8    need to make 1,000 Celsius T-shirts.  This is,
 9    I believe, the merchandise that that would be
10    related to.  T-shirts, backpacks, you know,
11    things that you give away for promotional
12    events.
13        Q.   Okay.  And does this seem like a
14    reasonable purchase figure for the types of
15    events that you're talking about?
16              MR. McCARRICK:  Object to
17         form.  Outside the scope.
18              You can answer.
19        A.   I haven't studied and looked at
20    the price per item and shopped it to other
21    items -- right? -- because this has all
22    happened in the past, and I'm focused on the
23    estate.
24              My understanding is, you know,
25    there was a lot of Celsius T-shirts, there was
```

272

1              C. Ferraro - Confidential

2    a lot of Celsius backpacks, and that this

3    would have been done in the ordinary course,

4    to my understanding.

5              Q.    And is it correct that Celsius'

6    headquarters is in Hoboken, New Jersey, at 221

7    River Street?

8              A.    Yes.

9              Q.    And are you aware or would you

10   know somebody who is aware --

11             A.    It was, sorry.  It was the

12   headquarters.  We rejected the lease and we're

13   no longer in that office space, yeah.

14             Q.    Would you know or be able to

15   confirm if USA Strong previously held a lease

16   in that building?

17             MR. McCARRICK:  Objection to

18        form.  Outside the scope.

19             A.    I do not know.  I've never heard

20   anything about that, so this would be the

21   first time I heard it.  I -- I visited the

22   office building on my first day of work on the

23   22nd, and I think I left the Wednesday.  So I

24   was at that building Monday, Tuesday,

25   Wednesday, and that was the last time I saw

Confidential        Christopher Ferraro - November 21, 2022

273

1              C. Ferraro - Confidential

2      it.

3              MR. CREWS:  Okay.  I think

4          that is the balance of the questions

5          that I have.  So I'll yield to the

6          other per ses.

7              THE WITNESS:  Thank you.

8              MR. McCARRICK:  Okay.  I think

9          we're now to the virtual pro ses.

10         I'm not sure if you all internally

11         worked out an order about who would

12         be next.  But next questioner up to

13         that, if you could announce yourself

14         and say and spell your name for the

15         court reporter's benefit.

16             And thank you, Mr. Crews.

17             MR. CREWS:  Thanks.

18             MR. KHANUJA:  This is Kulpreet

19         Khanuja.  I'm a pro se own creditor

20         K-u-l-p-r-e-e-t K-h-a-n-u-j-a.

21     EXAMINATION BY

22     MR. KHANUJA:

23         Q.    Mr. Ferraro, before I begin

24     specific questions, can I ask one generic one.

25     So when you became the current CEO, would you

274

```
 1                  C. Ferraro - Confidential
 2      say in terms of doing your job, you would be
 3      required to gather knowledge and background on
 4      Celsius' business operations and decisions
 5      taken before your time by Celsius business
 6      executives?
 7           A.    As it pertains to decisions I have
 8      to make about the future, absolutely.
 9           Q.    So I'm asking this because many
10      questions you mentioned, this was before your
11      time or you weren't aware what happened.
12                 So my particular question is:  Was
13      there any formal knowledge transfer session,
14      and also if there was any obstruction or
15      pushback from Celsius to provide you
16      historical -- required historical knowledge to
17      answer questions?
18           A.    I -- I go to work every day
19      fighting to make -- create value, preserve
20      value for the estate.  If there was historical
21      things that impact my go-forward decisions, I
22      studied them, I asked about them.
23                 If it's historical stuff for
24      historical purposes that don't change the
25      future, I don't think it would be a good use
```

Confidential        Christopher Ferraro - November 21, 2022

275

```
1                 C. Ferraro - Confidential
2    of my time to maximize value for the estate
3    going back, looking at every decision, every
4    thing.
5                 I'm trying to understand where the
6    business is today, maximize value under a
7    dual-track process.  I'm doing my best to
8    answer every question I possibly can.  I've
9    been with this company since March 21.
10        Q.    Yeah.  That's fair.  One thing I
11   would recommend is to go through the terms of
12   service, prior versions, not just 6 and 8 as
13   well, because there were things in there, no
14   mention of rights of ownership and those kinds
15   of things, and people actually signed up
16   before Version 6 as well.
17                So that would probably give you
18   more idea about the other questions we're
19   going to pose as well.
20            MR. McCARRICK:  Object --
21        object --
22        Q.    No --
23            MR. McCARRICK:  Hold on.
24        Object to form.  That wasn't a
25        question, that was a statement.
```

276

1                C. Ferraro - Confidential

2                So just wait for the next

3        question, and then you can answer.

4                MR. KHANUJA:   Okay.

5        Q.   Mr. Ferraro, you mentioned to

6   Mr. Hershey that, per your knowledge,

7   customers deposited their assets and

8   transferred ownership of assets to Celsius in

9   exchange for rewards.  Say, if a customer

10  deposited, say, 100 Bitcoins and was paid 5

11  percent in rewards, would the customer expect

12  105 Bitcoins back or just 5 Bitcoins back?

13               MR. McCARRICK:   Object to

14        form.

15               You can answer.

16        A.   The obligation would be the

17  Bitcoin you deposited, plus your rewards.

18        Q.   105.  So you would say the

19  customers would not be happy exchanging their

20  100 Bitcoins for 5 Bitcoins in return?

21        A.   I don't know why --

22        Q.   They'd get 105.

23        A.   Yeah, I think that's how the back

24  office system works.  That's -- we would

25  accrue rewards to your obligation, and your

277

```
 1              C. Ferraro - Confidential
 2     obligation in this example would be 105 and
 3     the claim would be 105.
 4          Q.   Yes.  Okay.  So are there Celsius
 5     insiders or employees who transferred their
 6     assets from earn to custody after custody
 7     f- --
 8              MR. McCARRICK:  Objection to
 9          form.
10          Q.   -- say, from April 2022 --
11     April 2022 until, say, when the deposits were
12     warranted?
13              MR. McCARRICK:  Objection to
14          form.  Outside the scope.
15              You can answer.
16          A.   I have seen the statements and
17     schedules, as you probably have, yes.
18          Q.   Yes.  So they're -- so now they're
19     able to get 105 percent back while other
20     owning customers are not able to?
21          A.   I don't --
22              MR. McCARRICK:  Objection to
23          form.
24              You can answer.
25          A.   I'm not sure that's accurate.  I
```

Confidential        Christopher Ferraro - November 21, 2022

278

```
 1                  C. Ferraro - Confidential
 2   believe people in custody right now were
 3   trying -- you know, this is still an
 4   outstanding legal question, and the employees
 5   and transfers has not been decided.  And it's
 6   outside of my lane, sir.  It's outside of my
 7   lane.
 8        Q.    But -- okay.  Thank you.  But
 9   that's a relevant question with regards to
10   custody and earn and who gets what?
11             MR. McCARRICK:  Objection to
12        form.
13             You can respond.
14        Q.    Okay.
15        A.    I mean, I think it's a relevant
16   question that the judge will rule on.
17        Q.    Sure.  Yeah.  Now, in your
18   document or the statement you filed, I'm
19   looking at paragraph 21.  And I can quote.  It
20   says:
21             "The functioning of these
22        deployment activities depended upon
23        the debtors having unilateral
24        authority to effectuate these
25        methods and strategies in their
```

279

1              C. Ferraro - Confidential

2         discretion.  To accomplish this, the

3         terms of use included a variety of

4         provisions regarding the formal

5         transfer of ownership rights for

6         coins transferred into the earn

7         program."

8              Now, can you explain what

9    constitutes a formal transfer of ownership?

10   No title transfer document, no sale agreement,

11   no price of sale, no tax liability, just

12   transferring assets into Celsius to earn

13   rewards, will that constitute a formal

14   transfer of ownership?

15             MR. McCARRICK:  Object to --

16        object to form.

17             You can answer.

18        A.   My understanding is in the terms

19   of use, there's a contract between the

20   customer and Celsius.  And the customer

21   clicked the box to accept and clicked

22   "accept."

23             That was the contract that

24   transferred title from the customer to

25   Celsius.  That was the action and the

280

```
 1              C. Ferraro - Confidential
 2   consideration that was done at that point in
 3   time in time.
 4        Q.    Can you point to me the specific
 5   language in the terms of service that states
 6   "formal transfer of ownership"?
 7              MR. McCARRICK:  Object to
 8         form.  The terms of service aren't
 9         in front of me.
10              But you can answer to the
11         extent that you know generally.
12        A.    I will tell you, sir, Oren
13   Blonstein tomorrow will be here to talk about
14   the terms and use.  I believe he is
15   knowledgeable in this space.
16        Q.    Okay.
17        A.    I have not been part of
18   discussions of terms of use with Oren in
19   detail so I don't -- I just don't know the
20   answer to what terms of use said in that.  But
21   to me in looking at the screenshots and in
22   reading the terms and use, to me it's clear,
23   it's crystal clear.
24        Q.    So to you it's crystal clear that
25   the customers transferred the ownership of the
```

281

1                C. Ferraro - Confidential

2    assets to Celsius.  Now, what about the

3    customers who transferred assets to Celsius

4    before this particular clause and section of

5    paragraph was included in terms of service,

6    the prior version's terms -- before terms 5 or

7    6?  They didn't sign up for that, so they

8    didn't transfer the ownership?

9                MR. McCARRICK:  Objection to

10        form.  Mischaracterizes.

11               You can answer.

12        A.    I'm just going to read back what

13   you read to me, sir:

14               "It is my understanding that

15        every version of the terms and use

16        includes one or more provisions

17        authorizing the debtors to make

18        unilateral updates to the terms and

19        use."

20               I stand by that statement.

21        Q.    Okay.  Now, in the very first

22   terms of service for Celsius, there is the

23   Section 14 or paragraph 14, it's called

24   "Consent to Celsius' Use of Your Digital

25   Assets."  Now -- emphasis on "Your Digital

282

```
 1            C. Ferraro - Confidential
 2   Assets."
 3            Also the terms of use Version 1,
 4   paragraph 31, expressly it's stated that
 5   notice of changes to the terms of service
 6   would be provided with the specific additions,
 7   deletions, or subtractions to the terms of
 8   use.
 9            Would you say additional losses
10   around transfer of ownership to Celsius from
11   customers in the July 2021 version is a
12   material change --
13            MR. McCARRICK:  Object --
14       Q.    -- if that clause was not there
15   earlier?
16            MR. McCARRICK:  Object --
17       objection to form.  Incomplete
18       hypothetical.
19            You can answer.
20       Q.    Can you still answer?
21            MR. McCARRICK:  Yeah, I'm
22       going to let him answer.
23       A.    Sorry, I just have to --
24       Q.    Do you -- do you think that was a
25   material change that was inserted in the new
```

Confidential        Christopher Ferraro - November 21, 2022

283
```
 1              C. Ferraro - Confidential
 2    versions?
 3         A.    Sir, I do not have the terms and
 4    use in front of me.  I have two different
 5    documents in front of me, neither which is the
 6    terms of use.  I don't off the top of my mind
 7    know those details.  I apologize.
 8         Q.    But in your statements --
 9         A.    In this --
10         Q.    In your statements, you do mention
11    that, to your knowledge, and it's crystal
12    clear, all the terms of version -- all the
13    terms of use --
14         A.    Yes --
15         Q.    -- state that these --
16         A.    It is.
17         Q.    -- account transfer of ownership,
18    but you also claim you have not read the
19    initial versions?
20              MR. McCARRICK:  Objection to
21         form.  Mischaracterizes the
22         testimony.
23              You can -- you can answer as
24         to whether or not you've read all
25         the different versions.
```

Confidential       Christopher Ferraro - November 21, 2022

284

```
1                   C. Ferraro - Confidential
2          A.     That's not what I said.  I said
3   I've read the versions.  I don't memorize
4   them.  I didn't draft them.  I'm not an expert
5   in it.  I've done my best to prep for this
6   session so that I could take questions from
7   creditors and try to give you guys as much
8   information as I possibly can.  But, sir, I
9   have not memorized the terms of use.
10         Q.     But --
11         A.     They're not -- they're not in --
12  let me just finish, I'm sorry -- they're not
13  in front of me.  What I've read is 6 and 8 is
14  very clear to me.  And what I've also read is
15  the unilateral updates to the terms of use is
16  also very clear to me.
17              I've also seen in the filings
18  screenshots of what the customer would have
19  checked boxes twice, and I've seen the
20  e-mails, pop-ups, et cetera.
21              We even had a period that I read
22  of two weeks where they would, kind of, lose
23  access to swap trade deploy, and they would
24  have to talk to a customer care person.  To
25  me, I read that as a pretty strong process to
```

285

```
1              C. Ferraro - Confidential
2    make sure that the customers knew that they
3    were double-checking things.
4              MR. McCARRICK:  We've been
5         going for -- we've been going for
6         about an hour, maybe an hour and two
7         minutes.  I've got it here.  Can we
8         take a ten-minute break, and then I
9         think the balance of the hour that's
10        remaining for the pro se creditors,
11        if -- I know you all are, kind of,
12        forming your own queue, but --
13             MR. KHANUJA:  Well, I have
14        just a few small portions if we
15        can stop after that.
16             MR. McCARRICK:  Sure.  Yeah,
17        if you want to finish your few
18        questions, then we can take a break
19        and the queue can form.  Sure, thank
20        you.
21             MR. KHANUJA:  And I'll try to
22        be quick now, you know, so that I'm
23        fair to other questioners, other
24        people as well.
25   BY MR. KHANUJA:
```

286

1              C. Ferraro - Confidential

2          Q.    Now, Celsius' terms of use clearly

3    state that customers can withdraw their

4    digital assets at any time.  Now, this is from

5    all versions, including the versions you

6    reference, terms of use Versions 6 and 8.  It

7    says you can withdraw your digital assets at

8    any time.

9              Now, if these were Celsius' assets

10   and not our assets, why would you allow your

11   customers to withdraw them?

12         A.    We have --

13              MR. McCARRICK:  Object to

14        form.

15              You can answer.

16              THE WITNESS:  Sorry.

17         A.    We have an IOU to the customer.

18   The customer has loaned us the digital assets.

19   So upon withdrawal in normal, ordinary course,

20   the user can request the obligation to be

21   returned to them.

22         Q.    Yes.  Right.  So these were our

23   assets.  Now, you mentioned -- you use the

24   term "loan."  Can you define a loan?

25              You come from a rates background

287

```
 1              C. Ferraro - Confidential
 2   in JPMC.  You cite a rates department.  You
 3   were probably an FP&A for them.  Correct?
 4        A.    No, sir, I was not.  I was not
 5   FP&A for rates.  I was --
 6        Q.    Okay.  Well, so in general, rates
 7   and loans, they're a fairly similar kind of
 8   product.  Would you be able to define a loan
 9   for me?
10              MR. McCARRICK:  Object to
11         form.
12              You can answer the definition
13         of loan.
14        A.    I think rates is also derivatives
15   of -- and futures and spot markets --
16        Q.    And --
17        A.    -- for interest rates --
18   whereas --
19              CERTIFIED STENOGRAPHER:
20         Sorry.  One at a time.  One at a
21         time.
22        A.    -- whereas loans is a credit.  One
23   person is -- has net value to provide to the
24   other that wants to borrow that.
25              So in reality, a loan is different
```

288

```
 1                  C. Ferraro - Confidential
 2    from a rate.  Lending demand does have
 3    influence on overall rate at a macro level,
 4    but I wouldn't say the two are one-for-one the
 5    same.
 6         Q.    No, not one-to-one the same.  But
 7    rates do impact the loans, as you said.  And
 8    you have decent understanding of that.
 9               In loans have you ever seen
10    transfer of ownership?
11               MR. McCARRICK:  Objection to
12         form.
13               You can answer.
14         A.    I -- I've seen the loan between
15    Celsius and its customers in reading the terms
16    of use.
17         Q.    No, I'm talking others.  I'm
18    talking about in general.  Have you ever seen
19    a definition of loan saying transfer of
20    ownership?
21               MR. McCARRICK:  Objection to
22         form.
23               You can answer.
24         A.    Off the top of my memory, I was
25    in -- you've got to remember that I was in
```

289

```
 1              C. Ferraro - Confidential
 2    consumer lending.  So when somebody -- when
 3    somebody borrows against their house, the bank
 4    will put a lien on their house.
 5              When somebody borrows against --
 6    for a car, the bank will put a lien on a car.
 7    That's my understanding of --
 8         Q.   Is a lien the same as transfer of
 9    ownership?
10         A.   That's --
11              MR. McCARRICK:  Objection to
12         form.
13              You can answer.
14         A.   It's a different instrument.  It's
15    a different terms of use.
16         Q.   Yeah.  I'm from the same
17    background as you, so I don't think lien is
18    the same as transfer of ownership.  But we can
19    move on.
20              It also says, you know, that --
21    and I'm going to quote from the terms of use
22    Version 5.  It says:
23              "You may make a complete or
24         partial withdrawal of eligible
25         digital assets from your Celsius
```

Confidential      Christopher Ferraro - November 21, 2022

```
                                                      290
1              C. Ferraro - Confidential

2         wallet at any time," and that

3         "Celsius initiates the withdrawal

4         process immediately."

5              And then the latest version, which

6    was from, I think, April 14, 2022, subject to

7    these terms, per any of your eligible digital

8    assets that you elect to utilize in the earn

9    service, you have a call option on all loans

10   made to Celsius to demand immediate, complete,

11   or partial repayment of any loan.

12              You can, through a complete or

13   partial withdrawal of eligible digital assets

14   from your Celsius account balance at any time.

15              So for us it was always available

16   to, you know, based on this language, would

17   you say we would always have access to our

18   assets from Celsius?

19         MR. McCARRICK:  Objection to

20         form.  Incomplete.  The document is

21         not in front of him.

22              But answer to the best of your

23         ability.

24         A.    And my understanding in reading

25   through the terms of use is that in normal
```

291

```
 1              C. Ferraro - Confidential
 2    course, the customers can withdraw.  I think
 3    there was areas in the terms of use that
 4    allowed us to pause; market events, Celsius
 5    events, et cetera.
 6              So I think in normal terms, yes,
 7    the customer should be able to demand
 8    withdrawal and get their cryptocurrencies.
 9         Q.    So again, my argument goes back
10    again that to you it's crystal clear that
11    these were Celsius assets, yet customers would
12    be able to withdraw all their assets at all
13    times?
14         A.    In normal course, yes, sir.
15         Q.    So these were our assets as well
16    as Celsius' assets?
17              MR. McCARRICK:  Objection.
18         Mischaracterizes.
19              You can answer.
20         A.    Celsius' assets with an obligation
21    to the customer, sir.
22         Q.    Okay.  Now, Mr. Ferraro, you
23    mentioned in a response to Mr. Hershey, and I
24    quote, your sole objective is to maximize the
25    value to the estate and the creditors.
```

292

```
 1                    C. Ferraro - Confidential
 2                    You also mentioned in another
 3     response, and I quote:
 4                    "We are aligned with
 5            creditors, and the creditors want
 6            their coins back."
 7                    So you want to maximize the value
 8     to the creditors, and creditors want their
 9     coins back, yet you are also arguing in your
10     prior statements that these are not creditor
11     assets.  Celsius controls ownership of the
12     assets.
13                    What is the guarantee that if you
14     go ahead with the Celsius reorg, you end up
15     declaring all of these coins as Celsius assets
16     and then return nothing to depositors -- to
17     creditors?
18                    MR. McCARRICK:  Objection to
19            form.
20                    You can respond to that, I
21            suppose.
22            A.   My understanding of the Chapter 11
23     process is that there's maximizing value for
24     the estate in the claims process.  And through
25     the claims process, the value will be
```

Confidential       Christopher Ferraro - November 21, 2022

293

1           C. Ferraro - Confidential

2    distributed back to the creditors.

3           Q.    But technically, you can claim

4    these as your assets, the way you -- the way

5    Celsius is doing it right now.  So the claims

6    will become invalid then, won't they?

7               MR. McCARRICK:  Objection to

8          form.

9               You can answer.

10          A.    I'm a little bit confused about

11   where you're going.  My understanding --

12          Q.    We are -- we are confused as well

13   and exactly why our question, whether these

14   are our assets or your assets.

15          A.    Well, we -- sir, I'm sorry.  We

16   went through that.  I think your question was

17   about the bankruptcy process in maximizing

18   value for the estate and the claims process.

19   What I was --

20          Q.    My question is:  Beyond maximizing

21   value, you can still claim these as your

22   assets and then give nothing back to

23   creditors?

24              MR. McCARRICK:  Objection to

25          form.  Mischaracterizes.

Confidential        Christopher Ferraro - November 21, 2022

294

1           C. Ferraro - Confidential

2               Mr. Ferraro, you can respond.

3               And I'd appreciate if you

4       would allow him to finish his

5       response.

6               THE WITNESS:  Thank you, sir.

7       A.    My understanding is that's not the

8   way the bankruptcy code works and that's not

9   the way that the judge or any trustees will

10  protect and distribute value in the estate.

11      Q.    Okay.  Now, Mr. Ferraro, in

12  response to United States Trustee today, you

13  mentioned you joined sometime in March 2022, I

14  think it was --

15      A.    Yes, March 21, 2022.

16      Q.    Was it as the CFO?

17      A.    No.  It was the head of financial

18  planning and analysis and investor relations.

19  I became the CFO in the middle of July.  I

20  believe it was July 13.

21      Q.    Okay.  So until you became a CFO,

22  you were not responsible for asset liability

23  management or treasury or even payroll and

24  taxes.  Is that fair?

25      A.    I was not the treasurer.  I was

Confidential       Christopher Ferraro - November 21, 2022

295

```
 1            C. Ferraro - Confidential
 2   not the controller.  I worked with those
 3   areas, but I was not responsible for them.
 4        Q.   Okay.  I'll -- I'll ask just one
 5   question from this track.  In any
 6   organization, for example, your previous
 7   employer, JPMC, any policy or policy
 8   documents, including, you know, smaller policy
 9   documents, even the terms of service, they
10   have to be typically reviewed, approved, and
11   signed off with certain sequelas, like legal,
12   finance, FP&A, CFO office, CEO office, head of
13   departments, you know, pertaining to that
14   policy.  Correct me if I'm wrong.
15            Now, to your knowledge, who were
16   the people signing off on these terms of
17   service at Celsius?  And if you do not have
18   that information, can you provide that
19   evidence to us?
20            MR. McCARRICK:  You can
21        answer.
22        A.   My understanding is that the legal
23   team and the regulatory team worked with the
24   product team to update terms of use.  I was
25   not part of the approval process.  I was not
```

Confidential        Christopher Ferraro - November 21, 2022

296

                    C. Ferraro - Confidential

1

2    part of drafting it.  So my knowledge, kind

3    of, ends there.  I apologize, sir.  That's,

4    kind of, what I --

5         Q.   No, I appreciate you answering

6    that.  But would you know if the prior CFO was

7    signing off on these documents?

8              MR. McCARRICK:  Objection to

9         form.

10             You can answer.

11        A.   I do not know.

12        Q.   Sir, if the -- I'm asking this

13   because the assets being moved from one

14   account to another as it's being able to

15   withdraw, no commission being paid on custody,

16   and all of these things were happening.

17             So obviously there was a -- and

18   asset liability component, which would impact

19   the financial forecasting analysis and

20   whatever, whatnot.

21             So these will come under the

22   purview of at least the review of the CFO or

23   CFO office, and somebody from the CFO office

24   would have signed off on -- signed off on

25   this.

297

```
 1                   C. Ferraro - Confidential
 2                   You're saying you weren't there as
 3    a CFO then, you haven't signed it and
 4    reviewed -- or reviewed, approved, or signed
 5    off on any of these terms of uses?
 6                   MR. McCARRICK:  Object to
 7          form.
 8                   You can answer.
 9          A.    That's what I'm saying.
10    Absolutely.  I was not part of this.  I did
11    not sign off on it.  I do not know what the
12    sign-off process was.
13          Q.    Okay.  And the same for the taxes
14    as well.  Now, as Mr. Crews said as well, I
15    and he are in the same boat.  I paid taxes on
16    my assets for three years based on the
17    Celsius-generated 1099 forms.
18                   Now, would you know who was
19    signing off on these -- on these taxes or the
20    forms that were generated for the customers?
21                   MR. McCARRICK:  Object to
22          form.  Outside the scope.
23                   You can answer.
24          A.    My understanding is it's tax
25    compliance reporting.  So there's
```

298

1              C. Ferraro - Confidential

2      professionals in the space who understand how

3      to report to the IRS.  Certain --

4          Q.    But they didn't -- I'm sorry.

5      Please go ahead.

6          A.    -- certain kind of activities.

7      And that's, I believe, the tax statements that

8      we went through earlier from Mr. Crews, yes.

9          Q.    Now, Mr. Ferraro, you -- one last

10     question.  You mentioned you spend majority of

11     your time -- actually, I think you answered

12     this one.

13             MR. KHANUJA:  So I'll concede

14         to the next.

15             THE WITNESS:  Thank you.

16             MR. KHANUJA:  Thank you so

17         much.

18             MR. McCARRICK:  All right.

19         Let's take a ten-minute break.

20         There's 47 minutes left on the

21         clock, for those keeping track at

22         home, for the remaining pro se

23         creditors, at which point the

24         deposition will end.  So we'll take

25         a ten-minute break.  Be back at

Confidential        Christopher Ferraro - November 21, 2022

299

1        C. Ferraro - Confidential

2    3:07.

3        THE VIDEOGRAPHER:  The time is

4    2:57 p.m.  This concludes Media 5.

5    Off the record.

6        (Recess taken from 2:57 p.m.

7    to 3:15 p.m.)

8        THE VIDEOGRAPHER:  The time

9    now is 3:25 p.m.  This begins Media

10   6.  On the record.

11       MR. McCARRICK:  Okay.  Just a

12   quick logistical item.  Before we

13   return to the pro se creditor phase,

14   our friends from Milbank have one

15   question which won't be counted

16   against the pro se time, of course.

17       And just before we go any

18   further, could -- it looks like

19   there's someone on Zoom, RAR.  Could

20   that person just, kind of, identify

21   themselves or their affiliation.

22       MS. ANDERSON RYNDERS:

23   Certainly.  I'm Rachel Anderson

24   Rynders, and I'm with the Texas

25   State Securities Board.

Confidential        Christopher Ferraro - November 21, 2022

300

```
 1              C. Ferraro - Confidential

 2              MR. McCARRICK:  Great.  Thanks

 3         very much.

 4              And with that, we'll turn it

 5         over to ...

 6   EXAMINATION BY

 7   MS. WESTOVER YANEZ:

 8         Q.    Good afternoon, Mr. Ferraro.  My

 9   name is Melanie Westover Yanez.  I'm an

10   attorney with Milbank and we represent the

11   Series B preferred holders.

12              Do you know what I mean by the

13   "Series B preferred holders"?

14         A.    Yes.

15         Q.    I just wanted to ask you something

16   to follow up on something you discussed with

17   Mr. Crews earlier.  I don't think the record

18   is clear.  So I just want to make sure it is.

19              Did you -- let me just ask a

20   background question first.  Did you

21   participate in preparing the debtor's amended

22   motion for the stablecoin sale?

23         A.    I read through it.  I was not an

24   active drafter.

25         Q.    Okay.  But you didn't object to or
```

301

1              C. Ferraro - Confidential

2    find inaccurate anything that was presented in

3    the motion.  Right?

4         A.    Not that I'm aware of, no.

5         Q.    Is it the debtors' position that

6    under any version of the terms of use, that

7    assets deposited into the earned accounts, the

8    right, title, and interest to those assets

9    were transferred to Celsius?

10        A.    Yes.

11        Q.    And that's true at the time when

12   the customer-facing business was operating out

13   of the UK from Celsius Network Limited.  Is

14   that correct?

15        A.    To my understanding, yes.

16             MS. WESTOVER YANEZ:  Okay.  No

17        further questions at this time.

18        Thank you.

19             MR. McCARRICK:  Okay.  Great.

20        And now we'll return to the pro se

21        portion.  Could the next questioner

22        identify themselves and spell their

23        name.

24             MS. BARSTOW:  Hi, I'm Nicole

25        Barstow.  N-i-c-o-l-e B-a-r-s-t-o-w,

302

1                    C. Ferraro - Confidential

2            pro se creditor.

3                    MR. McCARRICK:   Thanks,

4            Ms. Barstow.   You're a little bit

5            fuzzy -- or at least it sounds a

6            little bit like you're under water.

7                    If you could just speak very

8            slowly so the court reporter can get

9            it, I think that'd be good.

10                   THE VIDEOGRAPHER:   Please move

11           closer -- please move closer to your

12           microphone, please.   This is the

13           videographer.

14                   MS. BARSTOW:   Okay.   I'm

15           pretty close, so is that good?

16                   CERTIFIED STENOGRAPHER:

17           That's good.

18                   THE VIDEOGRAPHER:   That's

19           better.

20     EXAMINATION BY:

21     MS. BARSTOW:

22           Q.   Okay.   Does the debtor claim to

23     have full and exclusive, meaning 100 percent

24     ownership and 100 percent title to the earn

25     account assets?

303

1          C. Ferraro - Confidential

2              MR. McCARRICK:   Object to

3      form.

4              You can answer.

5      A.     Yes.

6      Q.     Okay.  Does the debtor claim to

7  have full and exclusive 100 percent ownership

8  and 100 percent title to the borrow account

9  assets?

10     A.     The loan collateral, yes.  To my

11 understanding, yes.

12     Q.     Does the debtor claim to have a

13 security interest in the borrow program?

14             MR. McCARRICK:   Object to

15     form.  Outside the scope.

16             You can answer.

17     A.     The loan collateral -- the

18 collateral that is backed up by the loan,

19 Celsius holds the title to.  And in return for

20 that, they are giving the loan in either

21 stablecoins or dollars to the borrower.

22     Q.     Right.  But in the terms of use,

23 is there a claim that the debtor has a

24 security interest in the debtors' borrow -- in

25 the debtors' borrow program?

304

1           C. Ferraro - Confidential

2                MR. McCARRICK:   Same

3        objections.  Asked and answered.

4        A.    I don't have the loan terms of use

5    in front of me, so it's hard for me to point

6    to any specific thing.

7        Q.    Okay.  And you said you reviewed

8    Version 6 of the terms of use.  Is Version 6

9    the last terms of use that was agreed upon

10   with an actual electronic acceptance, an "I

11   agree" box to check and submit with the

12   amended terms of use?

13       A.    I know there was the click route

14   on Version 6.  I'm not sure, as Version 7 and

15   Version 8 came out, exactly, you know, what

16   the acceptance was.  Obviously in the terms of

17   use, it says clearly unilateral right to

18   change the terms of use.  So I think 6 was a

19   clickwrap, and I'm not quite sure about 7 and

20   8.

21                (Stenographer clarification.)

22       Q.    You're not sure about 7 and 8, but

23   you're sure that the terms of use 6 was agreed

24   by everybody and there was a "submit," and

25   everybody submitted to continue user?

305

1              C. Ferraro - Confidential

2          A.    That's my understanding.  Yeah,

3    sorry.  That's my understanding.  And Oren

4    Blonstein will be here tomorrow to walk

5    through all of those details.

6          Q.    Okay.  Does the particular

7    mentioned, Version 6 terms of use, state your

8    Celsius account allows you to view your

9    balances in connection with the services

10   provided to you by Celsius and -- as the

11   services and conduct certain transactions

12   online?

13              MR. McCARRICK:  Object to

14         form.  The terms of use aren't in

15         front of him, but you can answer to

16         the best of your memory.

17         A.    I don't know specifically.  It's

18   not in front of me.  I apologize.

19         Q.    All these questions relate to

20   statements in the version of terms of use 6

21   that I have read, and all of these statements

22   are on there.  But I will just skip through

23   those questions anyway.

24              Did everyone who entered into a

25   contract via Celsius' terms of use have the

306

1             C. Ferraro - Confidential

2    requisite financial standing to do so in

3    accordance with the SEC public policy of

4    accredited investor status?

5             MR. McCARRICK:  Objection.

6         Outside the scope.  Form.

7             You can answer if you can.

8         A.    I'm not an expert on securities

9    laws and accreditation, so I don't know.

10        Q.    So you're not familiar with what

11   an accredited investor means as an accountant?

12        A.    I'm familiar with accredited

13   investor.  But I'm not familiar with the -- I

14   don't have the knowledge --

15        Q.    Are you familiar --

16            MR. McCARRICK:  Hold on.

17        Let --

18        Q.    Are you familiar if there are

19   unaccredited investors on Celsius?

20            MR. McCARRICK:  Okay.  Object

21        to form.  Outside the scope.

22            Mr. Ferraro, answer.

23            And if you could just let him

24        finish his answer before the next

25        question, that would be great.

307

 1              C. Ferraro - Confidential

 2         Thank you.

 3         A.    I understand there are customers

 4    that -- that have been accredited on the

 5    platform, and I understand there's also

 6    customers who were -- who have not been

 7    accredited on the platform.

 8         Q.    Okay.  So you're aware that there

 9    are unaccredited investors on the platform?

10              MR. McCARRICK:  Objection.

11         Outside the scope.

12              You can answer.

13         A.    Yes.

14         Q.    Okay.  Did any party to the

15    debtors propose the estate ever make any

16    statement verbally or in writing that

17    misrepresented the facts or omitted certain

18    information?

19              MR. McCARRICK:  Object to

20         form.  Contract formation is not at

21         issue here.  That was carved out.

22              But you can answer to the

23         extent you're able to.

24         A.    As I stated earlier, Ms. Barstow,

25    I am not an active viewer of the AMAs or the

Confidential        Christopher Ferraro - November 21, 2022

308

1              C. Ferraro - Confidential

2    blog posts.  During the numerous ones, I was

3    probably out in the fields at my farms in

4    Ecuador.

5              More recently since I've come to

6    work for Celsius, I've had my head down

7    working on a day-to-day basis and I haven't

8    gone back to watch old AMAs or look at blog

9    posts.

10        Q.    What is Celsius US Holdings?

11              MR. McCARRICK:  Object to

12        form.  Outside the scope.

13              You can answer, although I'm

14        not sure I heard the question.

15        A.    Can you repeat, please.

16        Q.    What is Celsius US Holdings --

17              MR. McCARRICK:  Object to

18        form.

19        Q.    -- the company Celsius US

20    Holdings?

21              MR. McCARRICK:  Object to

22        form.  Outside the scope.

23              You can answer.

24        A.    I believe you're referring to a

25    legal entity in Celsius.

309

1          C. Ferraro - Confidential

2          Q.    Yes.  What is that?  What is that

3     company?  What does it do?

4          A.    I think it's a --

5               MR. McCARRICK:  Object to

6          form.

7               You can answer.

8          A.    To my understanding, it's a, kind

9     of, a roll-up that holds certain activities

10    that are done out of the US entities.  So it

11    could be lending.  It could be DeFi.

12    Different types of deployment activities.

13         Q.    So different deployment activities

14    are outside of the US?

15              MR. McCARRICK:  Object to

16         form.  Outside the scope.

17              You can answer.

18         A.    No, no, I said within the US

19    entities.  So it's -- so it's entities that

20    hold certain activities that are in the US

21    holding company including things like DeFi, I

22    believe, retail lending, I believe.

23         Q.    What is the current market value

24    of Celsius Network LLC, et al.?

25              MR. McCARRICK:  Object to

310

```
1              C. Ferraro - Confidential
2         form.  Outside the scope.
3              You can answer.
4         A.    I don't have that in front of me,
5    and in theory, with the cryptocurrency
6    holdings that Celsius has on its balance
7    sheet, the value changes by the second.  But I
8    don't have it in front of me.  I'm sorry.
9         Q.    What are the investments, stock,
10   et cetera, held by Celsius US Holdings?
11             MR. McCARRICK:  Object to
12        form.  Outside the scope.
13             You can answer.  And then I'll
14        answer the time question that I just
15        saw posted.
16        A.    Okay.  So I -- sorry, Ms. Barstow.
17   Can you ask the question again.  I get
18   confused with all the -- it's been a long day.
19   I'm sorry.
20        Q.    What are the investments, stock,
21   et cetera, held by US -- Celsius US Holdings?
22        A.    Okay.  Thank you.  I'm not sure
23   exactly the investments that are in Holdings.
24   My understanding of the investments are there
25   are certain debt and equity type of
```

311

1              C. Ferraro - Confidential

2    investments.

3              There's lending receivables.  I

4    believe there's collateral DeFi activities, et

5    cetera.  So, I mean, all -- most of -- a lot

6    of the activity is out of the US entities.

7              MR. McCARRICK:  And there's --

8         just for the record, there's around

9         30- -- between 37 and 38 minutes

10        left.

11        Q.    Okay.  Is all of the asset value

12   of Celsius US Holdings fully reported on the

13   debtors' asset liability schedules that is on

14   record with the bankruptcy court?

15             MR. McCARRICK:  Object to

16        form.  Outside the scope.

17             You can answer.

18        A.    Yes, to our best of our abilities,

19   it would include all of the assets and the

20   liabilities of the entity, of course.

21        Q.    Of Celsius US Holding as well?

22        A.    For --

23             MR. McCARRICK:  Same

24        objections.

25             You can answer.

312

```
 1                 C. Ferraro - Confidential

 2        A.    For any of the entities within

 3   Celsius.

 4        Q.    Is it true that Celsius Network

 5   only has 3 million of USDC assets and 25,000

 6   of GUSD assets in the different -- accounts

 7   receivable?

 8              MR. McCARRICK:   Same

 9        objections.

10              You can answer.

11        A.    I don't have it in front of me,

12   but it should be included in monthly operating

13   reports and other schedules that we file with

14   the court.

15        Q.    What date were the debtors

16   insolvent in regards to the nonalgorithm

17   stablecoin assets?

18              (Stenographer clarification.)

19              MR. McCARRICK:   Objection to

20        form.   Outside the scope.

21              You can answer to the extent

22        that you're able or no.

23        A.    I can't -- I'm sorry, I can't -- I

24   can't hear.   I couldn't make it out.

25        Q.    What date were the debtors
```

313

1              C. Ferraro - Confidential

2    insolvent in regards to the nonalgorithm

3    stablecoin assets?

4              MR. McCARRICK:   Same

5         objections.

6              You can answer to the extent

7         that that you're able or no.

8         A.    I'm sorry, I don't understand the

9    question.

10        Q.    What dates were the debtors

11   insolvent that you're aware of?  When were the

12   debtors aware that they were insolvent?

13             MR. McCARRICK:   This question

14        has been asked at least two or three

15        times today.  But you can answer it

16        again, Mr. Ferraro.

17        A.    Yeah, I wasn't part of the

18   decisions for the pause that the board made,

19   but that's -- that's in my opinion, when we

20   stopped being a going concern.

21             We had paused operations, all

22   activities, and then about a month later we

23   filed for bankruptcy.  So I go back to the

24   pause date.

25        Q.    Was the debtor paying stablecoin

314

1              C. Ferraro - Confidential

2    customers' earn account withdrawals using new

3    funds that were deposited into the earn

4    program?

5         A.    I think, you know, the way we

6    managed the balance sheet is the coins are

7    fungible.  They're, you know, property of

8    Celsius so we try to manage the risk

9    positions, meaning we don't take directional,

10   kind of, positions with regards to any

11   cryptocurrencies.

12             So I think -- I think at the --

13   you know, we were always, in a fungible way,

14   using Bitcoin to pledge.  We were always using

15   stablecoins for operations.  If institutions

16   wanted to borrow ETH, we would lend them ETH.

17   Right?  So coins -- coins are fungible across

18   all deployment activities.

19        Q.    But back to my question:  Did the

20   debtors use earn withdrawals to fund -- I

21   mean, did the debtors honor earn account

22   withdrawals using the new funds deposited in

23   the earn program?

24             MR. McCARRICK:  Objection to

25        form.  Outside the scope.

315

```
 1              C. Ferraro - Confidential
 2              You can answer.
 3      A.    We -- we -- like I said, the
 4  balance sheet, the way we operate the business
 5  is using fungibility -- right? -- we optimize
 6  across the balance sheet.
 7              We had raised Series A, we had
 8  raised Series B.  We had an ICO.  So at the
 9  end of the day, you know, we raised capital,
10  so there was lots of different sources in
11  which we could pay reward rates out, if I'm
12  understanding your question appropriately.
13              CERTIFIED STENOGRAPHER:
14         Somebody has to turn their audio
15         off.
16              THE VIDEOGRAPHER:  Somebody
17         has the mic open.
18              CERTIFIED STENOGRAPHER:
19         There's an echo.
20      A.    Coins are fungible.  We would --
21      Q.    -- that answer, but I'll move on.
22              Did the debtor ever have any
23  profits to pay its staff and executive
24  management team salaries from?
25      A.    I believe you said "did the
```

316

```
 1             C. Ferraro - Confidential
 2   debtors have profits to pay management
 3   salaries?"  Was that the question?
 4        Q.    Yes, did the debtors ever have any
 5   profits to pay the salaries from --
 6             MR. McCARRICK:  Objection.
 7        Outside the --
 8        Q.    -- rather than deposit --
 9             MR. McCARRICK:  Objection.
10        Outside the scope.
11             You can answer.
12        A.    Like I said, the balance sheet was
13   fungible.  Through the equity raises, we did
14   have significant amount of yield and revenue
15   in order to pay out rewards -- rewards as well
16   as the operational cost.
17             So we had money -- we had revenue
18   come -- we had revenue coming in that was
19   allowing us -- as well as raises, capital
20   raises, that were allowing us to operate.
21             The company -- from my standpoint,
22   the company was positioned for growth really
23   up until when I joined.  So, you know, we were
24   growing and you know, we had done two equity
25   raises.
```

317

```
1                    C. Ferraro - Confidential

2                    So the resources were fungible

3     across the balance sheet, whether it was

4     stablecoins or whether it was BTC or whether

5     it was capital infusion Series A and B.

6          Q.    Did the debtors believe that

7     having title and ownership of the loan within

8     the Celsius account means that there are no

9     Celsius customers, creditors that had secured

10    claims against Celsius security interest?

11                 (Stenographer clarification.)

12                 MR. McCARRICK:  Objection to

13         form.  Calls for a legal conclusion.

14                 You can answer.

15         A.    Not to my knowledge that there's

16    any secured claims.

17         Q.    Did Celsius ever refer to its

18    creditors as "customers" verbally or in

19    writing?  I know I heard you use the word

20    "customers" to refer to us, as a matter of

21    fact, a few times within this testimony.

22                 MR. McCARRICK:  Objection to

23         form.

24                 You can answer.

25         A.    I think of the customers as
```

318

1            C. Ferraro - Confidential

2    customers of Celsius.  And I also think of

3    the, largely, the customers as the creditors

4    of Celsius.

5            So they are slightly different but

6    also very similar.  Most of our customers are

7    also creditors and most of our creditors are

8    customers.

9            MR. McCARRICK:  Just a time

10           update, 30 minutes left on the pro

11           se portion.

12       Q.   Why is Celsius requesting to turn

13   Bitcoin and USD coin to cash after repaying

14   the DeFi loan and giving back the collateral?

15           MR. McCARRICK:  Objection to

16           form.

17           I couldn't understand the

18           question, if you could repeat it.

19       Q.   Why is Celsius requesting to turn

20   Bitcoin and USD coin to cash after repaying

21   the DeFi loan and getting back the collateral?

22   Celsius has a motion to repay a DeFi loan is

23   that the Bitcoin and USD coin --

24       A.   Yes.

25       Q.   -- and why turn that into cash --

319

1                C. Ferraro - Confidential

2     why do they want to turn the collateral into

3     cash?

4                MR. McCARRICK:   Objection to

5          form.

6                You can answer.

7          A.    I think I understand what you're

8     talking about.  I believe this is the notional

9     DeFi loan.  You know, we think that DeFi for a

10    very small amount of loan that is highly

11    over-collateralized, we think it's probably

12    better for the estate to pay off the loan and

13    bring the collateral back.

14               MR. McCARRICK:   Let's go off

15         the record.

16               THE VIDEOGRAPHER:   The time is

17         3:35 p.m.  This concludes Media 6.

18         Off the record.

19               (Recess taken from 3:35 p.m.

20         to a owe a 3:49 p.m.)

21               THE VIDEOGRAPHER:   The time

22         now is 3:49 p.m.  This begins Media

23         7.  On the record.

24               MR. McCARRICK:   Okay.  We are

25         going to go the full seven hours if

320

```
 1        C. Ferraro - Confidential
 2   that's what people feel the need to
 3   do.  I would note that most of this
 4   deposition has been outside of the
 5   scope of what the committee agreed
 6   to.
 7        In their filing last night at
 8   ECF 1412, paragraph 1, they stated:
 9        "The debtors and the committee
10   made two agreements:  (1) defenses
11   to the formation of a contract with
12   respect to all account holders who
13   transferred cryptocurrency to the
14   debtors, such as fraud, mistake, and
15   misrepresentation, would be fully
16   reserved and would not be tried at
17   this time."
18        That's been the lion's share
19   of this deposition today.  I would
20   ask that people try to hew to that
21   agreement going forward.  We do
22   want, kind of, the pro se creditors
23   to be heard, particularly those who
24   have stayed here throughout the day.
25        But I would, I guess, commend
```

321

1                C. Ferraro - Confidential

2          or encourage you not to feel the

3          need to use every single second of

4          the deposition on issues that will

5          be tried at some point.  The

6          question isn't whether or not there

7          is going to be discovery into some

8          of these defenses or individualized

9          defenses, the question really is

10         just when.

11              So with that we can keep

12         rolling.  But it's up to you guys to

13         divide the rest of the, kind of,

14         allocation, all right, the kind of

15         time allocation.  You guys need to,

16         you know, kind of, do that

17         yourselves.  And when we're, kind

18         of, at seven, we're at seven.

19   BY MS. BARSTOW:

20         Q.   Okay.  I just have -- I'm just

21   going to wrap up a few more questions, a

22   couple more of the most important ones that I

23   want to ask and that is:  For the unaccredited

24   investors that were not in the custody states,

25   are those individuals considered in the

Confidential        Christopher Ferraro - November 21, 2022

322

```
 1              C. Ferraro - Confidential
 2    withhold account or still in the earn account?
 3              MR. McCARRICK:  Objection.
 4         Outside the scope.
 5              You can answer.
 6         A.    Are the customers -- can you,
 7    Nicole, Ms. Barstow can you say it one more
 8    time, I'm sorry.
 9         Q.    The customer earn accounts that
10    are not in the states that allow custody
11    accounts, are those accounts still considered
12    earn accounts or are they withhold accounts?
13         A.    For new deposits after the --
14         Q.    Not new deposits, no.  Not new
15    deposits.  No, for deposits that are prior to
16    the Version 8 terms of use?
17              MR. McCARRICK:  Object to
18         form.
19              You can answer.
20         A.    I think I testified earlier that
21    they were in the earn account and that they
22    stayed in the earn account.  But if there was
23    new deposits that occurred in a noncustody
24    state, the new deposits would go to withheld.
25    That's my understanding.
```

Confidential        Christopher Ferraro - November 21, 2022

323

1                    C. Ferraro - Confidential

2          Q.    My final question would be:  Did

3    retail and institutional borrowers pledge

4    collateral in order to get loans from Celsius?

5          A.    In retail and most institutional,

6    there was some institutional clients that took

7    out unsecured loans.

8          Q.    What about for retail?

9          A.    Yeah, I said for retail and most

10   of institutional.

11         Q.    Okay.  And most of institutional

12   loans were also pledging collateral as well?

13              MR. McCARRICK:  Objection.

14              Outside the scope.

15         A.    Yeah, that's what I said, yes.

16              MS. BARSTOW:  Well, this is

17              related to the scope because it has

18              to do with whether or not those

19              assets belong to the estate,

20              because, yeah, for a specific

21              reason.  But -- okay.  That's all my

22              questions.  Thank you.

23              THE WITNESS:  Thank you.

24              MR. McCARRICK:  All right.

25              Next -- next up to bat, if you could

324

```
 1              C. Ferraro - Confidential

 2         state and spell your name before you

 3         start questioning.

 4              MR. HERRMANN:  Hello,

 5         Mr. Ferraro.  I am Immanuel

 6         Herrmann, pro se creditor.

 7         I-m-m-a-n-u-e-l H-e-r-r-m-a-n-n.

 8              MR. McCARRICK:  Great.

 9         Thanks, Mr. Herrmann.  I just want

10         to tell you, your connection seemed

11         a little bit shaky or choppy, so

12         there may come a point where you

13         need to, kind of, reconnect.  So

14         just make sure you're asking your

15         questions slowly so the connection,

16         kind of, stays stable or whatever.

17              MR. HERRMANN:  Okay.  Great.

18         I'll do my best to speak very

19         clearly.  Also, hello, this is my

20         first deposition, so I'll try my

21         best to do it in order and its not

22         just yours, so ...

23    EXAMINATION BY

24    MR. HERRMANN:

25         Q.   So actually, my first question,
```

Confidential        Christopher Ferraro - November 21, 2022

325

1              C. Ferraro - Confidential

2     Mr. Ferraro, is actually about -- it is a

3     terms of service question, actually.

4              I'm wondering, are you familiar

5     with the September 29, 2022, terms of service

6     update that's posted on the Celsius website?

7          A.    Not specifically.

8          Q.    Are you aware that the terms of

9     use were updated post-petition on

10    September 29, 2022?

11              MR. McCARRICK:   Object to

12          form.

13              You can answer.

14         A.    I haven't studied those, no.

15         Q.    Okay.   I'm raising this issue

16    because some of us discovered -- I don't

17    believe we received any notice about it,

18    however, there have been -- I believe Cam

19    Crews, who spoke to you earlier, compared this

20    terms of use to others and that material

21    changes have been made.

22              So you're not aware of any changes

23    post-petition and you did not approve changes

24    post-petition?

25              MR. McCARRICK:   Object to

Confidential      Christopher Ferraro - November 21, 2022

326

```
 1              C. Ferraro - Confidential

 2        form.

 3              You can answer.

 4        A.    Yeah, I'm a little bit confused in

 5   the conversation, honestly, I'm not aware.

 6        Q.    Okay.  I mean, I could share, but

 7   I think in the interest of time, I'll just

 8   state here that if you go to the website and

 9   you just look at the current terms of use, it

10   says "September 29, 2022," and that they are

11   not the same as the last version that's filed

12   in the declaration of Alex Mashinsky.

13              And so I don't believe they're in

14   the docket, but I think we could just say this

15   is a matter for follow-up and I don't need to

16   ask you further questions on it, but I will

17   follow up with T.J. about it, if that's all

18   right.

19        A.    Yeah, like I said, I'm not quite

20   following, so I apologize, but yeah.

21        Q.    No, just to be clear, I mean, what

22   it really is, is there's a new terms of use,

23   if you just go to the website, that's not

24   identical to what was there before.

25        A.    Okay.
```

Confidential        Christopher Ferraro - November 21, 2022

327

1          C. Ferraro - Confidential

2                MR. McCARRICK:  Object to

3          form.  You can -- yeah, I think you

4          were just making a statement.  So

5          okay got it.

6                MR. HERRMANN:  I mean that was

7          just a statement.  You don't need to

8          answer.

9          Q.    So I guess another question I have

10   is just related to your conversations with

11   creditors.

12                Earlier in the deposition, the UCC

13   had asked if you spoke with retail investors

14   yourself.  And you had said that you spoke

15   with members of the UCC, including the

16   co-chairs.  Is that correct?

17          A.    Yes, sir, yes.

18          Q.    Great.  So I'm told -- I, like

19   you, am not a bankruptcy lawyer, however, I am

20   told that in restructurings, it's often

21   typical to speak with creditor groups and to

22   resolve some of the types of problems we are

23   having with property issues, for example, by

24   working it out and making deals among the

25   groups.

328

```
 1                 C. Ferraro - Confidential

 2                 Is that something that would

 3      interest you, speaking with creditors from

 4      earn and loans and trying to mediate some of

 5      these groups to get us out of Chapter 11 more

 6      quickly?

 7                 MR. McCARRICK:  Object to

 8          form.  Outside the scope.

 9                 But you can answer.

10          A.    As long as it's within the code

11      and it maximizes value for the estate, no

12      stone is left unturned, absolutely.

13          Q.    As far as I understand, it's all

14      doable within the code, Mr. Ferraro.  There

15      may, however, be issues around some of the

16      agreements that require extreme secrecy that,

17      you know, with bidders, or just who's allowed,

18      what we're allowed to talk about.

19                 So, you know, I know that we --

20      Celsius in general has talked about

21      transparency.  But are you willing to consider

22      opening up conversations about the reorg with

23      more groups of customers?

24                 MR. McCARRICK:  Object to

25          form.  Well outside the scope.
```

329

1               C. Ferraro - Confidential

2                    You can answer.

3          A.     I would love to.  My understanding

4     is that we need to get to a disclosure

5     statement before we can market the plan.  We

6     are working actively on the reorganization

7     plan.  And I tremendously look forward to

8     being able to discuss it with all of the

9     stakeholders, absolutely, Mr. Herrmann.

10         Q.     All right.  Thank you.  Well, I

11    would just encourage you, you know, remind

12    you -- I mean, I guess, one question is:  Does

13    Kirkland work for you?  Like, who do they

14    actually report to?  Who's, like, the big boss

15    at ...

16              MR. McCARRICK:  Object to

17         form.  I don't think anyone knows

18         the answer to that question.

19                    You can answer.

20         A.     Yeah, my understanding is that

21    Kirkland is legal advisors to the company

22    engaged through the special committee of the

23    board.  So I work -- I work closely with them.

24    They do not represent me personally.

25         Q.     Yeah, I wasn't actually implying

Confidential        Christopher Ferraro - November 21, 2022

330

```
1               C. Ferraro - Confidential
2     that.  I know you've gotten questions on that
3     line before.  I was more just stating that,
4     you know, I think that there may be certain
5     requirements, but that requirements can be
6     waived by the debtor.
7               And so there's just questions
8     about, you know, I'm not actually sure -- for
9     example, let's talk about exclusivity for a
10    moment.
11              I think part of the issue here is
12    that because of exclusivity, we can't talk
13    about -- you may have to put forward a plan
14    first.
15              So who made the decision to extend
16    exclusivity?
17              MR. McCARRICK:  Objection to
18         form.  Well outside the scope.
19              You can answer.
20         A.   My understanding is that that's a
21    special committee decision, a decision in
22    which I support.  We're actively working on a
23    plan.  That would be very difficult to work on
24    multiple plans at the same time.
25              We do listen to the community.
```

331

```
 1              C. Ferraro - Confidential
 2   And we are trying to, kind of, take the best
 3   ideas and bring them forth in a reorganization
 4   plan that will, you know, provide as much
 5   value back to the customers and the creditors
 6   as we possibly can.
 7        Q.    Okay.  Well, I would just
 8   encourage you, again, to consider leaving no
 9   stone unturned, as you said, and really
10   explore your options with the special
11   committee and with Kirkland.
12              And you know, one last question I
13   have for you in this area is:  Would you be
14   willing to meet with groups of creditors from
15   loans and earn -- you or a designee from
16   Celsius -- regularly?
17              MR. McCARRICK:  Object to
18        form.
19              You can answer.
20        A.    I would love to.  And I will
21   follow up with my legal advisors on what the
22   art of the possible is here.
23        Q.    Okay.  Thank you.  So now I'm
24   going to move on to some different kinds of
25   questions.  I'm sorry if I'm a bit out of
```

Confidential       Christopher Ferraro - November 21, 2022

332

```
 1              C. Ferraro - Confidential
 2    order.  But I just had a lot of people ask
 3    things that I tried to get through.
 4              So one question is about the
 5    bidding, on how many viable bids would you say
 6    that you have right now?
 7              MR. McCARRICK:  Object to
 8         form.  Outside the scope.
 9              You can answer.
10         A.    I'm not going to discuss about the
11    sales and marketing process and the number of
12    bidders.  I don't think that would be helpful
13    to the estate.
14              MR. McCARRICK:  And can I
15         just -- are those subject to NDAs?
16              THE WITNESS:  In the overall
17         practice -- is NDA, yes, of course.
18              MR. McCARRICK:  Okay.  Then
19         I'm going to instruct you not to
20         breach any NDA or NDA, nondisclosure
21         agreement, in response to any of
22         these questions.
23              You can continue to ask.
24              MR. HERRMANN:  Okay.  So for
25         the record, you're directing your
```



333

1          C. Ferraro - Confidential

2       client not to answer?

3          MR. McCARRICK:  Correct.  I'm

4       not going to instruct him to violate

5       an NDA, no.

6    BY MR. HERRMANN:



335

C. Ferraro - Confidential



24          Q.     Thank you.  So, yeah, I mean, one

25    reason I encourage you to talk to the

336

```
1                 C. Ferraro - Confidential
2    different credit groups is, for example, earn
3    and loans have been in very close
4    conversation, and just as an example, you
5    know, the loans people -- I mean, look, this
6    is nothing binding here -- but you know,
7    they're willing to talk about increasing
8    interest rates and lengthening term.  We
9    haven't quite figured out how to deal with
10   haircuts, for example.
11                 And then on the earn side, some
12   potential bidders that we've talked to have
13   been willing to do all sorts of things.  For
14   example, converting earn deposits into loans
15   or other creative ideas or, you know, giving
16   incentives to lock up funds, but that's more
17   complicated --
18                 CERTIFIED STENOGRAPHER:  We
19        lost you there, Mr. Herrmann.
20                 MR. HERRMANN:  What do I need
21        to repeat?
22                 CERTIFIED STENOGRAPHER:  I'll
23        repeat the last thing.
24                 (Record read.)
25        Q.    Okay.  Yeah, I kind of lost my
```

337

1                    C. Ferraro - Confidential

2      train of thought.  I'm sorry.

3                    I would just encourage you -- I'll

4      just restate it from the beginning.

5                    I would just say that basically

6      loans, you know, the earn has been talking to

7      loans.  We talked about increasing interest

8      rates, lengthening terms, and then on the earn

9      side, we talked about could we convert them

10     into loans or something that increases the

11     value of the loan, these sorts of ideas.

12                   These are the kinds of

13     conversations that are happening.  I'm sure

14     the UCC has brought some of these ideas to

15     you.  This is just one reason I was

16     encouraging you to talk to creditors.  And I

17     think I can just leave it at that.  Hopefully,

18     you got all of that, and I'll ask the next

19     question.

20                   The next question is actually on

21     clawbacks.  Do you support insider clawbacks

22     for people who withdrew in the one-year period

23     prior to the petition date?

24                   MR. McCARRICK:  Objection to

25         form.  Wildly outside the scope.

338

```
 1              C. Ferraro - Confidential
 2              You can answer.
 3      A.    The clawbacks are not in my lane.
 4   I don't -- I don't have a say in the
 5   clawbacks.  That's, you know, with the special
 6   committee and through the bankruptcy process.
 7   So I -- it's not -- it's not something that I
 8   focus on.
 9              I'm a guy who believes in fairness
10   and following the rules of the law.  So
11   whatever the outcome of that is is the
12   outcome.  And if it brings money back to the
13   estate, it brings money back to the estate.
14   But that's something that's not on my agenda,
15   not in my lane, and not in my control.
16      Q.    All right.  Will you set an
17   example by not using estate resources to fight
18   against insider clawbacks and encourage other
19   executives to not fight, to not aggressively
20   fight back against clawbacks?
21              MR. McCARRICK:  Object to
22         form.  I'm not sure what the
23         question there was.
24              Could you rephrase?
25              MR. HERRMANN:  Sure.
```

339

```
 1              C. Ferraro - Confidential

 2        Q.    Will you set an example by not

 3   using estate resources, i.e., not paying

 4   Kirkland & Ellis to fight insider clawbacks?

 5              MR. McCARRICK:   Object to

 6        form.  Outside the scope.

 7              You can answer.

 8        A.    I'm not pushing against clawbacks

 9   at all.  I'm not actively working against

10   clawbacks.  I can't promise you, Mr. Herrmann,

11   that the activities of the special committee

12   and other stakeholders won't look into this.

13   My belief is they will make the right

14   decision.

15              But I can give you my word that I

16   will not be pushing back against clawing back

17   value for the estate in any means.  My job is

18   to maximize value for the estate and to bring

19   money into the estate.

20        Q.    All right.  So now I have some

21   questions about Alex Mashinsky.

22              Can you describe Alex Mashinsky's

23   current role of the company as chairman of the

24   UK company?

25              MR. McCARRICK:   Object to
```

340

```
 1              C. Ferraro - Confidential

 2          form.  Outside the scope.

 3              You can answer.

 4        A.    My understanding is he has no

 5    interaction with the company whatsoever.  I

 6    have not spoken to Alex Mashinsky since the

 7    resignation.  I have not engaged with him as

 8    the board.  To my understanding, the full

 9    board has not met, only the special committee

10    is holding session.

11              So from my vantage point, Alex

12    Mashinsky is nowhere to be seen in any of the

13    business or governance of what's happening.

14    The only time I hear from Alex Mashinsky is

15    when I see a tweet.

16        Q.    Okay.  Is he receiving any

17    compensation currently from Celsius?

18        A.    To my knowledge, nothing.  He went

19    off of the payroll in September, and there is

20    no other compensation being paid.

21        Q.     All right.  Another terms of use

22    question that we will move on to:  Are you

23    familiar with the best commercial and

24    operational efforts language in the terms of

25    use?
```

Confidential       Christopher Ferraro - November 21, 2022

                                                                    341
1                    C. Ferraro - Confidential

2          A.    Not specifically.

3          Q.    The terms of use recent versions,

4    including the ones that you reviewed

5    carefully, I believe 7 and 8 -- 6, 7, and 8

6    are the ones that you said that you reviewed.

7    Yes?

8          A.    Yeah.  But I didn't memorize every

9    word, and I do not have it in front of me.  So

10   I need a little help.

11         Q.    Sure.  I can try to find the exact

12   clause.  It says "best commercial and

13   operational efforts."  Let me see if I can

14   find it.  Yes.  Okay.  So I can read it to you

15   here.  It says:

16              "We may lend, sell, pledge,

17         hypothecate, assign, invest, use,

18         commingle, or otherwise dispose of

19         assets and eligible digital assets

20         that are not held in a custody

21         wallet, if available to you, to

22         counterparties, or hold the eligible

23         digital assets with counterparties.

24         And we will use our best commercial

25         and operational efforts to prevent

342

```
 1                C. Ferraro - Confidential

 2        losses."

 3        A.    Yeah.  Yeah.

 4        Q.    When was the first time that you

 5   became familiar with this language?

 6        A.    In preparation for this, in

 7   signing the declarations, and reviewing

 8   things.  So -- and --

 9        Q.    Understood.  So as chief financial

10   officer, you were not aware that you were

11   required to use best commercial and

12   operational efforts to prevent losses?

13             MR. McCARRICK:  Object to

14        form.

15        Q.    And what that meant?  You were

16   never advised --

17        A.    From my --

18        Q.    You were never advised about that?

19             MR. McCARRICK:  Object to

20        form.  Outside the scope.

21             You can answer.

22        A.    From my understanding, that's what

23   we do.  We might have not been perfect, but

24   that is what we attempted to do, best business

25   operational, kind of, processes, strategic
```

343

1                C. Ferraro - Confidential

2    thinking, et cetera.

3            So I don't think that -- I don't

4    think that there's anything, since I joined

5    March 21, 2022, that I've done otherwise other

6    than what that clause states.

7        Q.    I mean, there's a lot of missing

8    Bitcoin.  So was that best commercial -- was

9    that -- was that best efforts to preserve

10   depositor property?

11           MR. McCARRICK:  Obj- --

12       Q.    Whatever happens --

13           MR. McCARRICK:  Okay.  Object

14       -- object to form.

15           You can answer.

16       A.    There's unfortunate events

17   occurred.  Some of them in 2020, some of them

18   in 2021, and some of them in 2022.  They're

19   unfortunate.

20           I would say the front-to-back,

21   kind of, understanding of risk in this

22   industry, it's a nascent industry, clearly was

23   not adequate, the measurement and

24   understanding of risk.  I think that's

25   industry-wide.  Did Celsius fail in its

344

1              C. Ferraro - Confidential

2      attempts?  Yes.  Did it attempt?  Absolutely.

3           Q.    All right.  How is a signature

4      recorded, an individual -- and this maybe is

5      better for tomorrow if you are not the person

6      for this.

7                 How is an individual signature

8      recorded?

9           A.    I think --

10          Q.    -- by --

11          A.    Yeah.  I think it's best for

12      tomorrow.

13          Q.    All right.  So I have some

14      tax -- following up on some of the tax

15      questions, we covered your users treatment of,

16      you know, the 1099s, Cam Crews covered that.

17                I have some follow-up questions

18      about how Celsius treated certain, you know,

19      whatever you want to call it, you know, when

20      you -- when you receive the funds from users,

21      let's say.

22                Did Celsius consider -- on

23      Celsius' tax returns, did it claim that it

24      owned earn deposits?

25          A.    I'm sorry.  Does -- on

Confidential        Christopher Ferraro - November 21, 2022

345

```
 1              C. Ferraro - Confidential
 2    Celsius' -- any deployment?
 3         Q.    Audits -- let's just say --
 4    okay -- let's -- I'll restate.
 5              Did Celsius in its books and
 6    records -- let's start with the books and
 7    records.  Celsius in its books and records
 8    reflect earn deposits as its property?
 9         A.    Consistent with the terms in
10    use -- consistent with the terms in use, the
11    user coins that are put on the platform are --
12    not in the custody, in the earned product, are
13    a liability on the balance sheet.
14              We have a contractual IOU between
15    Celsius and the customer.  We represent that
16    as an asset of Celsius, the coin, and an
17    obligation or liability to the customer.
18              So, yes, earn deposits, earn
19    placements are considered to be a liability on
20    the balance sheet.
21         Q.    Okay.  And then when Celsius
22    would -- because you say that title was
23    transferred -- you were doing things like
24    discretionary trading -- although that was
25    never marketed, but we know that that was
```

Confidential        Christopher Ferraro - November 21, 2022

346

|    |                                               |
|----|-----------------------------------------------|
| 1  | C. Ferraro - Confidential                     |
| 2  | happening.                                     |
| 3  | So when those sort of events                   |
| 4  | happened, did Celsius record that as -- in     |
| 5  | other words, you took possession of the coins  |
| 6  | and then you had to pay taxes on it, you were  |
| 7  | trading it.  It was your property?             |
| 8  | MR. McCARRICK:  Mr. Herrmann,                  |
| 9  | you broke up in the middle of your            |
| 10 | question there.  Could you re-ask             |
| 11 | it?                                            |
| 12 | MR. HERRMANN:  Yes.                            |
| 13 | Q.    When you traded coins, for              |
| 14 | example, like you sold coins, was that treated |
| 15 | as Celsius' property?  You were paying taxes  |
| 16 | on it?                                         |
| 17 | MR. McCARRICK:  Object to                     |
| 18 | form.  Outside the scope.                      |
| 19 | You can answer.                               |
| 20 | A.    To my understanding, yes.  Those       |
| 21 | are all taxable events for the company.  The   |
| 22 | coins are on our balance sheet, we have title  |
| 23 | to them.  If we trade them and take gains or   |
| 24 | losses versus the basis, those flow through to |
| 25 | taxable income or loss.                        |

347

```
 1              C. Ferraro - Confidential
 2         Q.    Great.  And then for your taxes
 3    themselves, did you record gains and losses
 4    based on those trades?
 5              MR. McCARRICK:  Object to
 6         form.  Outside the scope.
 7              You can answer if you know.
 8         A.    I think that's what I just
 9    answered -- right? -- was that --
10         Q.    Yeah, I think we were talking
11    about books and records.  So I was just
12    clarifying that that's what rooted to the
13    company's tax return.
14         A.    Yeah, that would flow through the
15    company's tax return.
16         Q.    Thank you.  What is -- what is
17    a lo- -- so earn deposits were loans to
18    Celsius.  Correct?
19              MR. McCARRICK:  Object to
20         form.
21              You can answer.
22         A.    Yes.
23         Q.    How can you loan something and
24    also give up all rights and title?
25              MR. McCARRICK:  Object to
```

Confidential        Christopher Ferraro - November 21, 2022

348

```
1              C. Ferraro - Confidential
2         form.  Asked and answered.
3              You can answer again.
4         A.   It's transferred title and we have
5    an obligation to return the coin to you in
6    normal course.
7         Q.   So it's something like an ETN or
8    something like that?
9         A.   I would say --
10             MR. McCARRICK:  Object to
11        form.
12             You can answer.
13        A.   I would say just very clearly, the
14   customers place the coins in the earn program.
15   They are transferring title and ownership to
16   Celsius.  Celsius has an obligation to return
17   that coin in kind back to the customer in
18   normal course.
19             That's the terms in use.  That's
20   the way we record it on the balance sheet.
21   That's the way we manage the business.
22        Q.   All right.  I guess, going back to
23   the commercial best efforts, you know,
24   reasonable best efforts, I guess that's where
25   people may beg to differ about whether those
```

Confidential       Christopher Ferraro - November 21, 2022

349

```
 1              C. Ferraro - Confidential
 2   efforts were taken.
 3              In your view, was -- was -- you
 4   know, you talked about some unfortunate events
 5   that took place.  Do you think that those
 6   actions were appropriate within the industry?
 7              MR. McCARRICK:  Object to
 8         form.  Outside the scope.  Also just
 9         vague as to "actions."
10              But you can answer to the
11         extent you understand the question.
12         A.   I mean, we're in the lending
13   business, and in DeFi we did some centralized,
14   kind of, trading.  I think that's pretty
15   similar to what other similar platform players
16   were doing to Celsius.
17         Q.   All right.  Well, maybe the
18   industry needs to have better risk management
19   because it's pretty ...
20              CERTIFIED STENOGRAPHER:  We
21         lost you again, Mr. Herrmann.
22         Q.   -- but I think that might, given
23   the amount of missing funds.
24              Does Celsius have net operating
25   losses on its balance sheet?
```

350

1              C. Ferraro - Confidential

2              MR. McCARRICK:  Object to

3        form.  Outside the scope.

4              You can answer.

5        A.    There are net operating losses on

6   the balance sheet, yes.

7        Q.    Is there a way that those losses

8   can accrue to the benefit of creditors?

9              MR. McCARRICK:  Object to

10       form.  Outside the scope.

11             You can answer to the extent

12       you understand it.

13       A.    I'm not a tax advisor or an

14   expert.  I know we've had conversations around

15   this base.  I think it comes down to a legal

16   discussion about changing control and the

17   ability to carry forward NOLs.  But that's --

18   that's, kind of, the sum total of my knowledge

19   on the topic.

20             I know we looked into it.  There's

21   a lot of value there, but I think it's

22   difficult according to the IRS code.  My

23   understanding would change in control.

24             MR. HERRMANN:  Okay.  I just

25       need a minute to go through

351

1          C. Ferraro - Confidential

2        questions here to find some, but ...

3        Q.    How often would you say you speak

4    with the special committee?

5             MR. McCARRICK:  Object to

6        form.  Outside the scope.

7             You can answer.

8        A.    Regularly.



352

1    C. Ferraro - Confidential



17    Q.   Understood.  So just going back to

18   taxes for a second.  It sounds like the

19   company did treat digital assets corresponding

20   to balances and earn accounts differently from

21   digital aspects -- assets corresponding to

22   balances and custody accounts.

23         Is that correct?

24         MR. McCARRICK:  Objection.

25    Outside the scope in multiple ways.

Confidential      Christopher Ferraro - November 21, 2022

353

```
 1              C. Ferraro - Confidential

 2              You can answer to the extent

 3         you know.

 4         A.    Yeah, my understanding is that

 5    it's different.  One is an asset of the

 6    company vis-a-vis earn that can be deployed,

 7    rehypothecated, lent out, otherwise invested,

 8    or sold.  And the other is custody, title

 9    remains with the customer, segregated in a

10    custody workspace, not to be deployed.

11         Q.    All right.  Can you tell me the

12    first time you talked about grandfathering in

13    nonaccredited US investors to earn?

14              MR. McCARRICK:  Object to

15         form.  Outside the scope.

16              You can answer.  And you may

17         have answered this actually already

18         today, but you can answer again.

19         A.    The first time I talked about

20    accredited and nonaccredited investors with

21    earn?

22         Q.    Grandfathering specifically.

23         A.    I wasn't part of --

24         Q.    Grandfathering them in.

25         A.    I wasn't part of those discussions
```

354

1              C. Ferraro - Confidential

2    or decisions.

3          Q.    Okay.   When -- in your opinion,

4    are the terms of use clear and unambiguous?

5          A.    In my opinion, 100 percent clear

6    and -ambiguous.

7          Q.    Are they clear and unambiguous

8    about what happens when a nonaccredited US

9    investor, after April 15, pays off a loan?

10   Are they clear and unambiguous about what

11   happens?

12             MR. McCARRICK:   Object to

13        form.

14             You can answer.

15        A.    Before the freeze or after the

16   freeze?  Are you talking normal course or --

17        Q.    Let's say before the freeze.  It's

18   May 15, 2022.  A nonaccredited US investor

19   pays off a loan.  Their collateral is placed

20   in earn.

21             Do you believe that the contract

22   is clear and unambiguous, the loan and the

23   earn contracts, and that the relationships

24   between the two contracts are clear and

25   unambiguous, and that if completely clear from

355

```
 1              C. Ferraro - Confidential

 2    reading those contracts, that the collateral

 3    should be placed in earn?

 4              MR. McCARRICK:   Object to

 5         form.  You can answer to the extent

 6         you understand or know.

 7         A.    I think title has been transferred

 8    to Celsius in the earn program.  If a customer

 9    then wants to use that collateral in the

10    lending program, title is going to remain with

11    Celsius.

12              And if it goes back to the earn

13    program and the customer chose to stay in the

14    earn program, the asset would be deployed.

15    Celsius would use its balance sheet to

16    maximize from a risk-based standpoint the

17    yield in order to pay rewards back to the

18    customers.

19         Q.    Have you read the loan agreements,

20    Mr. Ferraro?

21         A.    I believe I've cursory reviewed

22    them but not in detail.

23         Q.    I would encourage you to do so,

24    and in particular, the section that says,

25    coins that are deposited, that the customer
```

Confidential       Christopher Ferraro - November 21, 2022

356

```
1              C. Ferraro - Confidential

2    has sole title to the coins.

3              MR. McCARRICK:  Object to

4         form.

5         Q.   Are you familiar with that

6    language?  Are you familiar that the loan

7    agreement has language that coins deposited,

8    that the customer has sole title to the coins?

9              MR. McCARRICK:  Object to the

10        form.

11        A.   Sir, it's not in front of me.  So

12   I can't -- I'm under -- giving testimony under

13   oath.  I don't have it in front of me.  It

14   doesn't -- you know, we'd have to go through

15   the specifics.

16             MR. HERRMANN:  How much time

17        do we have left overall?  I just

18        want to be sensitive to not taking

19        up too much of the creditors' time

20        here.

21             MR. McCARRICK:  I'll defer to

22        the videographer.

23             MS. BARSTOW:  Object to form.

24             THE VIDEOGRAPHER:  About an

25        hour and 55.
```

357

```
 1              C. Ferraro - Confidential

 2              MR. McCARRICK:  About an hour

 3         55 left, it sounds like.

 4              And Ms. Barstow, could you go

 5         on mute.

 6              MS. BARSTOW:  Whoops.

 7              MR. HERRMANN:  All right.

 8         Then I think I will see if I can try

 9         to find this line of language.

10              Q.    But I think it may be hard,

11    Mr. Ferraro, in this deposition with me, sort

12    of, just reading it to you, if you're not

13    familiar with the contracts, it might take

14    quite a long time to have you read it through

15    and, sort of, figure out the re- -- I'll save

16    this for another day.

17              A.    Yeah.

18              Q.    But there is language.  I would

19    just state here that I would encourage you to

20    prepare for this, because there is language

21    that customers have sole title.

22              MR. HERRMANN:  So I would --

23         you know, I will state for the

24         record that I object to the

25         supposition that the contracts are
```

358

1                C. Ferraro - Confidential

2          plain and unambiguous, especially

3          the relationship between the

4          contracts, but the contracts in

5          general.

6          Q.    So I do have a follow-up question,

7     actually, that you can answer.

8                After April 14, when a loan

9     extended under the borrow program was repaid

10    or liquidated, how did Celsius determine

11    whether the collateral securing such a loan

12    would be placed in an earn account or a

13    custody account?

14               MR. McCARRICK:   Object to

15          form.  Outside the scope.

16               You can answer.

17         A.    Tomorrow Oren Blonstein will be

18    here.  He's an expert in this space.  My

19    understanding is when the loan was paid off or

20    liquidated, any remaining collateral, post the

21    custody launch in the US, any of the remaining

22    collateral went back to the custody account

23    for the nonaccredited.

24               Obviously, if you were accredited,

25    there was no custody account and it would have

Confidential        Christopher Ferraro - November 21, 2022

359

1                C. Ferraro - Confidential

2     gone to earn.

3          Q.    Okay.  That's incorrect because

4     I'm a nonaccredited US customer whose

5     collateral was placed into earn after

6     April 15.  So I can talk tomorrow with Oren

7     about that.

8          A.    Perfect.  Thank you, sir.

9          Q.    So I'm not going to -- no need to

10    ask you another question about it, unless you

11    want to correct something.

12         A.    I don't have anything in front of

13    me to correct it with.  I apologize.

14         Q.    That's fine.  That's just -- so

15    you're aware, there are nonaccredited US

16    investors who had their collateral placed in

17    earn after April 15.

18              MR. McCARRICK:  Object to

19         form.

20         Q.    Okay.  I have a follow-up

21    question.  Now that you're aware of that, do

22    you believe the contracts are clear and

23    unambiguous for that specific situation?

24         A.    In my --

25              MR. McCARRICK:  No.  Object to

360

```
 1              C. Ferraro - Confidential

 2         form.  Mischaracterizes.

 3              You can answer.

 4         A.    In my preparation, I -- I studied

 5    the terms of use related to the earn product

 6    and the custody offering in 8.  That's

 7    consistent with my declaration and my

 8    deposition.

 9              Tomorrow, Oren will be here to

10    further discuss this, Mr. Herrmann.

11         Q.    All right.  Has Celsius removed,

12    edited, or altered content or videos on or

13    from its application, website, Twitter

14    account, YouTube account, Medium account, or

15    other Internet space since March 1, 2022?

16              MR. McCARRICK:  Objection to

17         the form.  This is specifically

18         carved out, these kind of formation

19         defenses, defenses related to fraud

20         and misrepresentation and the like.

21              You can respond to the extent

22         you know.  I think you've answered

23         the question about these kind of

24         statements multiple times today, but

25         please answer it again.
```

Confidential       Christopher Ferraro - November 21, 2022

361

```
              C. Ferraro - Confidential
 1
 2          A.    Sir, I had no part in editing,
 3    putting up videos.  I was never part of an
 4    AMA.  I'm not in marketing.  I'm a, kind of,
 5    finance guy who tries to, you know, run a
 6    business effectively.  I can't speak to any of
 7    these edits or anything like that.
 8               I had no first-hand knowledge of
 9    the process or what occurred, what was edited,
10    or if it was edited or not.
11    BY MR. HERRMANN:
12          Q.    Who at Celsius approved this,
13    noting that you were in a senior leadership
14    position while all these things were approved?
15               MR. McCARRICK:   Object to
16          form.  Outside the scope.
17          A.    I became the CFO on July 13, 2022,
18    and in my capacity as CFO and as my capacity
19    as acting chief executive officer and chief
20    restructuring officer, I have not been part of
21    editing videos or heard of editing videos
22    under my control or watch, sir.
23          Q.    Will you commit to ceasing any
24    more removal of videos, editing, that sort of
25    thing?
```

Confidential       Christopher Ferraro - November 21, 2022

362

1                C. Ferraro - Confidential

2                     MR. McCARRICK:   Object to

3          form.

4          Q.    So to, like, restate it clearly

5      because the form was poor, will you commit as

6      the acting CEO to order the immediate

7      cessation of going through all of Celsius'

8      content using estate funds --

9                     MR. McCARRICK:   Objection --

10         Q.    -- and editing it?

11                    MR. McCARRICK:   Object to the

12         form.

13         Q.    And removing it?

14                    MR. McCARRICK:   Object to the

15         form.  Mischaracterizes.  Outside

16         the scope.

17                You can answer.

18         A.    I am not a part of or will be part

19     of editing videos or making videos for

20     YouTube, sir.

21         Q.    Sir, to be clear, you are not

22     willing to -- you're not willing to basically

23     order people at the company to stop this

24     activity?

25                    MR. McCARRICK:   Object to the

363

```
 1                  C. Ferraro - Confidential

 2          form.

 3          Q.    But you're the CEO, you could

 4   direct people not to do this activity anymore.

 5                  MR. McCARRICK:   Object --

 6          Q.    You're not willing to make that

 7   commitment?

 8                  MR. McCARRICK:   Okay.   Object

 9          to the form.   Well outside the

10          scope.   Was specifically carved out

11          pursuant to the agreement.

12          Mischaracterizes.

13                  And now you can answer.

14          A.    To -- to my -- best of my ability,

15   there will be no editing or production of

16   videos going to YouTube.   I run a very classic

17   business.   The idea of putting out

18   ask-me-anythings and, as you are describing,

19   potentially editing them, not on my watch,

20   sir.

21                  I don't need to say it's not going

22   to happen.   It's not happening on my watch.   I

23   don't -- I don't partake in this stuff.   I

24   don't think it's valuable to the estate.   I

25   can't speak to what happened in the past, but
```

364

1              C. Ferraro - Confidential

2     this is not an activity that I'm involved in

3     or would condone.

4              If it's happening, I don't know

5     about it and it will stop, sir.  Unless

6     there's a good reason for it, it should not go

7     on.  I do not know of any editing that's

8     happening right now with videos.

9              MR. McCARRICK:  Object to --

10       Q.    Excellent.  I do not either, to be

11    clear, at the moment.  I know there's been a

12    lot of it, and maybe even including as you

13    transitioned into the role, which is not

14    saying you oversaw it or knew.

15              But I think it has been going on

16    and it may still be going on.  I don't know.

17    But I'll leave it at that.  Thank you for

18    stating that you don't support that.

19              So from the time you've been CFO

20    and just during your time at Celsius, in the

21    ordinary course of business, did Celsius pass

22    on 80 percent of its gross revenue to account

23    holders in the form of rewards?

24              MR. McCARRICK:  Object --

25       Q.    There were definitely statements

365

```
 1              C. Ferraro - Confidential
 2   about that, so I just want to ask if that was
 3   true.
 4              MR. McCARRICK:  Okay.  Object
 5         to form.  Again, this was carved
 6         out.  We didn't respond to this
 7         written deposition question.
 8              We'll let you respond to it
 9         here if you have personal knowledge.
10         If you don't, you should say so.
11         A.    Yeah, my understanding is that
12   they targeted a payout at 80 percent, but in
13   reality, because the deployment didn't return
14   the income that was expected, it was actually
15   above 80 percent.
16         Q.    It was above 80 percent, that's
17   your understanding?
18         A.    Yeah, the pay out ratio was above
19   80 percent.  I know this through the budgeting
20   exercise that I worked on.
21              I will say this:  I grew up in an
22   industry where you don't price to things like
23   80 percent.  You look at the risk-based return
24   on risk-based capital, and you accrete value
25   based on upon making the right decisions.
```

366

1              C. Ferraro - Confidential

2              So I would not support, nor would

3    I go out in a new company saying 80 percent or

4    anything like that.  I would -- I would do my

5    best to earn a reasonable market-based return

6    on the capital and manage the risk.

7         Q.   All right.  Do any retail or

8    institutional borrowers who had stablecoin

9    loans from Celsius still have these cash loans

10   in their possession?

11             MR. McCARRICK:  Object to the

12        form.  Outside the scope.

13             You can answer, Mr. Ferraro.

14        A.   If I understand the question

15   correctly, outstanding loans, do customers

16   still have the fiat or the stablecoins?

17        Q.   Yeah.

18        A.   I think that's based upon their

19   spending habits and what they wanted to do

20   with the money.  I don't know what customers

21   do with the money that we give them, whether

22   it's in stables or whether it's in fiat.

23             They could have bought a car.

24   They could have paid off bills.  They could

25   have gone on a vacation.  Honestly, I don't

Confidential        Christopher Ferraro - November 21, 2022

367

1                  C. Ferraro - Confidential

2    know what remains in their bank account, sir.

3        Q.    All right.  Is Celsius -- is the

4    parent company an LLP?  Is it a C Corp.?  What

5    is the corporate structure of the parent

6    company of Celsius?

7             MR. McCARRICK:  Objection.

8         Doesn't have any apparent relevance

9         to the current motion.  Outside the

10        scope.

11             You can answer.

12        A.    Not in front of me, and I don't --

13    honestly, I don't know the answer to that.

14    We're a corporation.  We have numerous LLCs,

15    but I don't know what the total rollup is.

16        Q.    I'm surprised you don't know, but

17    I'll leave it at that.

18        A.     I'm busy on a lot of stuff, sir.

19             MR. McCARRICK:  Objection.  No

20        need -- no need -- objection.  No

21        need to comment on the witness'

22        answer.

23             MR. HERRMANN:  Fair.

24        Q.    When did -- when did you -- when

25    did you first become aware that Celsius was

368

```
 1              C. Ferraro - Confidential
 2    insolvent?
 3              MR. McCARRICK:  Object to
 4         form.  I think he's answered this
 5         question now three or four times
 6         today.
 7              MR. HERRMANN:  All right.  We
 8         can move on then actually.  That's
 9         fine.
10              I think I'm pretty much -- I
11         think that's -- I think I'm good.  I
12         want to leave time for the other pro
13         se questioners.  So thank you.
14              THE WITNESS:  Thank you.
15              MR. HERRMANN:  And I'll pass
16         it
17         onto the next person.
18              MR. McCARRICK:  Thank you,
19         Mr. Herrmann.
20              Could the next questioner
21         announce their name, spell it for
22         the record.
23              MR. FRISHBERG:  Yes.  My name
24         is Daniel Frishberg, D-a-n-i-e-l,
25         Frishberg, F-r-i-s-h-b-e-r-g.  I've
```

Confidential        Christopher Ferraro - November 21, 2022

369

```
 1              C. Ferraro - Confidential

 2         got a couple of questions.

 3    EXAMINATION BY

 4    MR. FRISHBERG:

 5         Q.    I'll start off with something

 6    fairly easy.  I don't think this has been

 7    covered yet.  Has Celsius modified any dates

 8    in the app showing when the awards were paid

 9    out and/or the amount of the awards paid out?

10              MR. McCARRICK:  Objection to

11         form.

12              You can answer.

13         A.    Not to my knowledge, sir.

14         Q.    Okay.  Because they were modified.

15    Also this is -- yeah, this is a big one that I

16    tried communicating -- when I was in

17    communication with Mr. Latona with Kirkland &

18    Ellis, he said:

19              "Prior to the petition date,

20         the company sold approximately

21         31,000 Bitcoin worth approximately

22         $750 million on the FTX platform to

23         repay DeFi borrowings, freeing up

24         approximately 41K of collateral."

25              I assume this is reference to the
```

370

1              C. Ferraro - Confidential

2    41K Bitcoin collateral:

3              "In the form of WBTC worth

4        approximately $950 million, which

5        was returned to the company's

6        treasury."

7              My question is where did the --

8    sorry, end quote at the "treasury."

9              Where did that 41,000 W Bitcoin

10   go?  Because according to court filings,

11   Celsius only had approximately 24,000 W

12   Bitcoin and about 14,000 Bitcoin, which is

13   less than the amount withdrawn from FTX, and

14   blockchain data shows that Celsius pulled out

15   about 55,000 Bitcoin from DeFi petition.

16             MR. McCARRICK:  Okay.  First,

17        object to form.  Outside the scope.

18             You can answer to the extent

19        that you know.

20             And Mr. Frishberg, I can talk

21        at a pretty quick clip.  If you can

22        just slow it down a hair.

23             MR. FRISHBERG:  Sorry.  I'm

24        nervous.

25             MR. McCARRICK:  No, it's

Confidential        Christopher Ferraro - November 21, 2022

371

1          C. Ferraro - Confidential

2     totally fine.  Just especially when

3     the questions are so long, it's

4     easier to break it down if you slow

5     down just a hair.

6          But you can answer.

7          THE VIDEOGRAPHER:  Hold on one

8     second.  I need to go off the

9     record.  The camera is dark in here

10    because of the lighting.  I need to

11    go off the record, reset, and go

12    back.  Take a quick minute.

13         MR. McCARRICK:  Mr. Frishberg,

14    re-ask the question.

15         (Discussion off the record.)

16         MR. McCARRICK:  Off the

17    record.

18         THE VIDEOGRAPHER:  The time

19    now is 4:40 p.m.  This concludes

20    Media 7.  Off the record.

21         (Recess taken from 4:40 p.m.

22    to a 4:49 p.m.)

23         THE VIDEOGRAPHER:  The time

24    now is 4:49 p.m.  This begins Media

25    8.  On the record.

372

1           C. Ferraro - Confidential

2                MR. FRISHBERG:  May I ask my

3        question again, or are you guys

4        ready?

5                THE VIDEOGRAPHER:  Yes.

6                MR. FRISHBERG:  Okay.  Cool.

7    BY MR. FRISHBERG:

8        Q.    Because I have a statement

9    ventured in the question.  When I was in

10   communication with Mr. Latona, he said:

11               "Prior to the petition date,

12        the company sold approximately

13        31,000 Bitcoin worth approximately

14        $750 million on the FTX platform to

15        repay DeFi borrowings, freeing

16        approximately 41,000 collateral in

17        the form of W Bitcoin worth

18        approximately $750 million, which

19        was returned to company's treasury."

20               So my question is:  Where did that

21   41,000 W Bitcoin go according to Celsius --

22   according to court filings, Celsius has

23   approximately 24,000 W Bitcoin and about

24   14,000 Bitcoin, which is 3,000 less than the

25   central FTX.

373

```
 1              C. Ferraro - Confidential
 2              Blockchain data also shows that
 3    Celsius ended up pulling out about 55,000
 4    Bitcoin from DeFi prepetition, but it's not
 5    showing up in the court filings, along
 6    with -coins, about half a billion dollars
 7    worth of ETH, Ethereum, Matic, and Chainlink
 8    Celsius all sent, FTX, along with a large
 9    amount of stablecoins, et cetera.
10              MR. McCARRICK:  Okay.  Object
11         to --
12         Q.   So --
13              MR. McCARRICK:  Object to
14         form.  Object.  Outside the scope.
15         Object.  Compound.  And not sure if
16         everything is being accurately
17         characterized.
18              But to the extent that you're
19         able to comment, please do.
20         A.   Yeah, I don't -- I don't have all
21    those numbers in front of me.  I was not the
22    CFO at that time.  So I'm going to do my best
23    to explain what I understood that happened.
24              You know, we did have DeFi
25    borrowers.  We thought that it would be a good
```

Confidential        Christopher Ferraro - November 21, 2022

374

1                  C. Ferraro - Confidential

2     thing to not have risk in DeFi, all of that

3     collateral risk while we were going into the

4     filing.  So my understanding is that the DeFi

5     loans were paid down and the collateral was

6     freed up.

7                  Now, the collateral was freed up

8     and brought back into Fireblocks as quick as

9     we possibly could, also my understanding.

10    And, you know, some of these -- some coins

11    were converted to dollars, which is why you

12    see the fiat bank account at the petition of

13    $170 million.

14                 So there was a lot -- a flurry of

15    movement on the balance sheet leading up to

16    petition as the balance sheet was

17    restructured.  We paid down debt, we got fiat

18    cash on hand, and we brought coins home to

19    Fireblocks.

20         Q.   Okay.  Just moving on to the terms

21    of service.  If someone did not consent to the

22    terms of service such as via e-mail --

23                 CERTIFIED STENOGRAPHER:  I'm

24         sorry, you're going to have to slow

25         down, please.

Confidential        Christopher Ferraro - November 21, 2022

375

```
 1              C. Ferraro - Confidential
 2        Q.    When people were asked to consent
 3   to the new terms of service, like they were
 4   notified by e-mail or in the app or however,
 5   and let's say someone did not agree to the
 6   change for whatever reason, would them
 7   e-mailing Celsius support be enough for them
 8   to terminate the contract, or what would be
 9   required for the contract to terminate or not
10   to take effect, I guess, the updated version?
11        A.    There was a period of time where
12   the customers could withdraw.  I think after a
13   couple of weeks, they needed to talk to
14   somebody in customer care.  But upon that
15   conversation, if they did not want to accept
16   the terms and use, they could withdraw their
17   coins from the platform.
18        Q.    Okay.  Thank you.
19              MR. FRISHBERG:  Sorry.  Just
20        give me a second.
21              THE WITNESS:  Take your time.
22        No problem.
23              MR. FRISHBERG:  That was my
24        cat.
25        Q.    Okay.  Could you describe the
```

376

1                    C. Ferraro - Confidential

2    general process, if you're aware, of how long

3    it took for someone's account to be closed

4    after it was requested to be closed?

5            A.    Related to not accepting the terms

6    of use?  I wasn't --

7            Q.    In general.  Generally, in

8    general.

9            A.    Yeah, I don't have a -- I don't

10   have an answer to that question.  We opened

11   and closed customer accounts as normal course

12   of business.  We process withdrawals as a

13   normal course of business.

14                 I don't think that it would have

15   been outside of any normal service level in

16   the crypto industry for returning coins or

17   closing accounts.

18           Q.    Okay.  Could -- do you by chance

19   have Docket Number 393 in front of you?  It's

20   all the various terms of services.

21           A.    I couldn't -- you spoke too fast,

22   I'm sorry, sir.  Could you --

23           Q.    Do you have a declaration -- not

24   declaration -- Docket Number 393, it's the

25   various versions of the terms of service, in

377

1              C. Ferraro - Confidential

2    front of you?

3          A.    No.

4          Q.    It's the document with the

5    April 15, 2022, terms of service.

6          A.    No, I have my declaration, and I

7    also have the responses to the questions, the

8    written deposition questions in front of me.

9          Q.    I guess, then, I can read it to

10   you and you can tell me which understanding of

11   it is -- this is the first section of -- the

12   first paragraph of Section 12, page 629 of

13   Docket 393:

14              "All eligible digital assets

15         that you elect to utilize in the

16         earn service, if available to you,

17         and thus are loaned to Celsius (1)

18         are not being used as collateral for

19         loans; (2) have not had all rights

20         in connection with them assigned to

21         another Celsius user using CelPay,

22         and (3) were not requested for

23         external transmission or withdrawal

24         (eligible digital assets meeting

25         each one of these three criterias,

378

```
1              C. Ferraro - Confidential
2         'loan digit assets') entitle you to
3         rewards while credited to your
4         account."
5              Is it your understanding of the
6    contract that the title is only being
7    transferred when the criterias are being met
8    and when interest is being paid in exchange
9    for a title?
10             MR. McCARRICK:  Object to
11        form.  Incomplete.  Document's not
12        in front of him.
13             But you can respond based on
14        the snippet that Mr. Frishberg read.
15        A.   I think, Mr. Frishberg, I believe
16   what you're reading is, kind of, how the
17   rewards worked.
18        Q.   Correct.
19        A.   If you are in the earn program and
20   you transfer title to Celsius, you earn
21   rewards.  But if you use that cryptocurrency
22   as collateral, obviously that is no longer
23   going to earn rewards.  It's set aside for --
24        Q.   And --
25        A.   -- collateral.
```

Confidential       Christopher Ferraro - November 21, 2022

379

```
 1              C. Ferraro - Confidential
 2        Q.    And also the subsection said that
 3   they were also not requested for external
 4   transmission.  If they are requested for
 5   external transmission, they are not earning
 6   interest and not part of the rewards program.
 7   Is that correct?
 8              MR. McCARRICK:  Object to
 9        form.  Were you reading that or
10        summarizing it just so the record is
11        clear?
12              MR. FRISHBERG:  Summarizing.
13        I was summarizing.
14              MR. McCARRICK:  Okay.  You can
15        answer.
16              I'll object to form.
17              And you can answer based on
18        your understanding.
19        A.    I mean, I think if somebody -- my
20   understanding would be if you wanted to
21   withdraw funds from the point of withdrawal,
22   you would not earn rewards.
23        Q.    Correct.  Thank you.  That's my
24   understanding as well.  Generally, your
25   understanding of the contract, what terms in
```

380

1                    C. Ferraro - Confidential

2       the contract allowed Celsius to halt or limit

3       withdrawals or prevent them, whatever -- in

4       the pause and would they be in Sections 10,

5       11, and 13?

6                    MR. McCARRICK:  Object to

7            form.  Outside the scope.  The

8            document is not in front of him.

9                    But you can answer to the best

10           of your ability.

11           A.    There was language around, kind

12      of, non-normal course.  I don't remember the

13      specific language.  Again, the document's not

14      in front of me, but I think it, you know, was

15      related to unforeseen market events and

16      idiosyncratic events that Celsius was going

17      under.

18           Q.    Makes sense.  This is again Docket

19      Number 393, page 644, Section 19:

20                    "In the event of irregular

21           activity, we may hold assets until

22           we close your Celsius account.  Any

23           digital access that Celsius returns

24           to you will be sent to the

25           designated withdrawal addresses in

381

```
1              C. Ferraro - Confidential
2         the usual profile on the Celsius
3         platform for each respective digital
4         asset."
5              Would this mean that, say, once an
6    account has been closed, the withdrawal will
7    be processed regardless of these
8    circumstances?
9              MR. McCARRICK:  Object to
10        form.
11        Q.   Other than, like, an attachment or
12   court-ordered lien, et cetera, generally
13   speaking to the designated withdrawal
14   addresses?
15             MR. McCARRICK:  Object to
16        form.  Outside the scope.
17        Incomplete documents not in front of
18        you.
19             You can answer based on your
20        understanding.
21        A.   My understanding is that's talking
22   about certain activity in which they would
23   freeze an account.  So I think what they're
24   saying is you've broken the terms of service,
25   your account is frozen, we're going to
```

382

1              C. Ferraro - Confidential

2     distribute it back to you, and close your

3     account.

4         Q.    So if the account is closed, the

5     assets will be distributed back?

6         A.    Under what you're reading, if I

7     understand what you're summarizing, yes.  That

8     would be for activities on the platform that

9     were outside the terms and service, we would

10    then freeze the account and close the account

11    is what it's saying.

12             If the user doesn't, kind of,

13    fulfill the terms of service, their account

14    would be suspended.

15        Q.    Okay.  I'm going to read you a

16    quote from Docket Number 393, page 632:

17             "In consideration for the

18             rewards payable to you the eligible

19             digital assets used in the earn

20             service for us entering into any

21             loan agreement and the use of our

22             services, you grant Celsius subject

23             to applicable law and for the

24             duration of the period during which

25             you elect to utilize the eligible

383

1           C. Ferraro - Confidential

2           digital stock assets in the earn

3           service if available to you.  And

4           thus loan such eligible digital

5           assets to us through your Celsius

6           account or as collateral under the

7           borrow service, if available to you,

8           all right and title to such eligible

9           digital assets."

10          My question is:  The quote that I

11   just read to you, does it seem that a Celsius

12   customer's only lending the assets and

13   transferring title while they are earning

14   interest, and, if so, is it unambiguous?

15          MR. McCARRICK:  Objection to

16          the form.  Incomplete.  Document's

17          not in front of them.  If you're not

18          going to show him the document

19          you've got to read it slower.

20          MR. FRISHBERG:  I can send the

21          document over.

22          MR. McCARRICK:  Or you can

23          screen share it.  Long story short

24          is if -- you don't have to share the

25          document.  We just need you to read

Confidential      Christopher Ferraro - November 21, 2022

                                                                    384

1              C. Ferraro - Confidential

2         it slower.  There's no way for --

3              MR. FRISHBERG:  Okay.  I'll

4         read it slower.  And I can also

5         screen share it.

6              MR. McCARRICK:  Either one I

7         think will help keep all of the

8         language, which is long, in

9         everyone's head, and I think will

10        also help the court reporter.

11             MR. FRISHBERG:  Sorry.  This

12        is loading because it's 1,200 pages

13        long.

14             THE WITNESS:  Sir, I won't be

15        able to read it, because I don't

16        have my glasses.  And I'm quite far

17        away.  Maybe if you just read it

18        slower, I think we can get to the

19        right spot.

20             MR. FRISHBERG:  Fair enough.

21        There we are.

22   BY MR. FRISHBERG:

23        Q.   Can you see this now?

24        A.   I can't see that, no.

25        Q.   Is it showing on the screen?

Confidential        Christopher Ferraro - November 21, 2022

385

```
 1                    C. Ferraro - Confidential

 2           A.    Is on the screen.  I just can't

 3      read it.

 4           Q.    Okay.  There we are.  This is the

 5      Section 28.  Is it better?

 6           A.    Yeah.  Thank you.  Maybe if you

 7      could -- there we go.  Perfect.  Thank you.

 8      Just give me a moment to read it.

 9           Q.    No worries.

10           A.    (Document review.)

11                 Yes, sir.

12           Q.    Does what you just read state that

13      Celsius' customers own lending their access to

14      Celsius and therefore the title once they have

15      earned interest and, if so, is it unambiguous?

16                 MR. McCARRICK:  Objection.

17           Incomplete.  Full document is not

18           featured here.

19                 You can answer to the extent

20           you're able to answer.

21           A.    My understanding is in normal

22      course, that as long as the customer was in

23      the earn program, they would earn rewards.  If

24      they would draw coins, obviously the rewards

25      would stop accruing when it was withdrawn.
```

386

```
 1                C. Ferraro - Confidential
 2                What we're living under since the
 3    pause is, kind of, nonordinary course.  We
 4    paused all swaps, transfers, withdrawals, et
 5    cetera.  And then in the bankruptcy
 6    proceedings, we stopped accruing rewards.  And
 7    I think that's consistent with, kind of, how
 8    you operate under bankruptcy.  It's not normal
 9    course.
10        Q.    Makes sense.  You state in your
11    declaration that having an earn account,
12    thereby having use of Celsius' services,
13    "services is expressly conditioned on consent
14    being bound."
15                Does this mean that somebody could
16    close their account at any time prepetition?
17        A.    At ordinary course prepause, yes,
18    sir.
19        Q.    Okay.  What do you mean by
20    "prepause"?  There's no exceptions in the
21    contract saying that after that, an account
22    closure means you cannot draw assets -- sorry.
23    That the pause -- that you cannot close your
24    account if limitations on withdrawals have
25    been instituted, such as the pause, there's
```

387

             C. Ferraro - Confidential

1

2    nothing in the contract that says you cannot

3    close your account.

4             MR. McCARRICK:   Object to

5         form.  Mischaracterizes.  Calls for

6         a legal conclusion.

7             You can answer to the extent

8         that you understand the question.

9         A.   It's not my understandings of the

10   agreement, sir.  I think under certain events,

11   we can pause withdrawals.  I don't have it in

12   front of me, but upon my mind -- recollection

13   of going through it, we had the right under

14   certain conditions to pause withdrawals.

15            Obviously if withdrawals are

16   paused, people have coins on the platform, we

17   can't close the account.

18        Q.   Where does that say that, that

19   accounts cannot be closed if withdrawals are

20   stopped?

21            MR. McCARRICK:   Object to

22        form.  Outside the scope.

23            You can answer.

24        A.   I don't understand the question.

25   Where does it say what?

Confidential        Christopher Ferraro - November 21, 2022

388

1                    C. Ferraro - Confidential

2           Q.     The question:   Where does it state

3      that an account cannot be closed if

4      withdrawals are paused?

5           A.     Well, how could -- if withdrawals

6      are paused and somebody has coins in their

7      account, how can you close it?

8           Q.     Closing an account, it terminates

9      the terms that therefore allows for

10     withdrawals, as per the section -- let's

11     see -- Section 19, I'll make it bigger for

12     you.  Actually, I'll just skip straight to the

13     actual document so that that's not an issue

14     for an objection.

15                 Right here, Section B.  If you

16     could read that into the record, please, up

17     until Subsection A, that's not relevant.

18          A.     Sir, I can't see it.

19          Q.     Okay.  That's fine.  Then I can

20     just -- I had it copied and pasted onto my

21     screen.  I can increase the font size a bunch.

22          A.     (Document review.)

23                 Sorry.  So what's the question?

24          Q.     The question is:  Could you please

25     read this and after that, is -- have you read

389

                    C. Ferraro - Confidential

1

2    that?

3        A.    Yeah, this is talking about

4    closing an account in ordinary course.  We

5    went through this.  I think post --

6        Q.    There's -- nothing's been stated

7    in ordinary course to the subsection.  And

8    right here it says that after an account has

9    been requested to be closed, the terms

10   terminate.  So my understanding is if the

11   terms terminate, thereby anything that is not

12   in Section 35, which is these ones --

13             MR. McCARRICK:  Object --

14        object to form.  These are, like,

15        snippets of a contract that aren't

16        full sections.

17        Q.    I mean, the thing is, if you read

18   the contract fully, it is quite confusing and

19   ambiguous.  So is it unambiguous or is it

20   ambiguous?

21             MR. McCARRICK:  Well, I think

22        our position on that's clear, but --

23        Q.    -- that's your position?

24             MR. McCARRICK:  Just give me a

25        second.  I'm objecting to the form.

Confidential        Christopher Ferraro - November 21, 2022

390

```
 1              C. Ferraro - Confidential

 2         I'm objecting to the incomplete

 3         nature of the document that's being

 4         displayed.  You can re-ask your

 5         question to Mr. Ferraro.

 6  BY MR. FRISHBERG:

 7         Q.    Okay.  My question for Mr. Ferraro

 8  is:  Did anywhere in the sections that

 9  governed closing the account or limitations on

10  withdrawals, did anything mention an account

11  cannot be closed if withdrawals were

12  instituted?

13              MR. McCARRICK:  Object to

14         form.

15         A.    Sir, I do not have the contracts

16  in front of me.  There's eight different terms

17  of use that I understand.  They total over

18  1,000 pages.  In preparation, I did my best to

19  prepare for it.

20              My understanding is that in

21  ordinary course, we would process withdrawals

22  according to the customer wishes, including

23  closing the accounts, and that there's

24  language in the contract that gives us the

25  right to pause -- to pause withdrawals given,
```

391

```
 1                  C. Ferraro - Confidential
 2    kind of, events that are occurring.
 3                  So in normal course, you're right.
 4    We would -- we would return coins and close an
 5    account.  Once we pause, we can't return
 6    coins.  We've paused that activity.  We can't
 7    close an account if there's coins in there.
 8         Q.   So the sections that allow you to
 9    not return the coins, AKA, the pause, would
10    they not terminate with the termination of the
11    entirety of the terms minus the survival
12    section?
13                  MR. McCARRICK:  Objection to
14         the form.  Same objections as I've
15         been making.
16                  You can answer this one again.
17         A.   I'm not a lawyer.  I didn't draft
18    the contract.  In my reading of it and
19    understanding of it, it's clear.  I'll restate
20    it.
21                  In normal course, if a customer
22    wants to close their account, they would
23    withdraw their coins and close the account.
24                  Post pause, it was -- no one had
25    the ability to withdraw coins.  We can't close
```

392

C. Ferraro - Confidential

2  your account if you have ten Bitcoin in there.

3      Q.    Where does it say that?

4      A.    Again, the contract is not in

5  front of me.  I'm not a lawyer.  I didn't

6  draft it.  I did my best to review it and

7  prepare for this.

8      Q.    So wouldn't that mean there is

9  some ambiguity and disagreement in there

10  because it doesn't specifically say anything

11  one way or the other clearly, therefore,

12  ambiguity?

13          MR. McCARRICK:  Object --

14      object to form.

15      A.    These are legal questions.  I

16  think the contract's clear.  I think it's

17  unambiguous.  Clearly you're in a different

18  position.  That's why we're under, you know, a

19  judge's supervision in these key gating legal

20  questions.  The judge will rule on them.

21      Q.    So the entirety of the contract,

22  in its entirety, including the various

23  subsections that I mentioned are unambiguous,

24  per your opinion?

25      A.    Sorry, there's a fly buzzing

393

1              C. Ferraro - Confidential

2     around me.  I don't know how it got to the

3     50th floor but somehow the fly got up here.

4              I apologize.

5              Yeah, to me it's clear, title is

6     transferred.  I've done through that in my six

7     hours of testimony today.  Yes.

8         Q.   I'm asking about the entirety of

9     the contract.  Is the entirety of the contract

10    clear and unambiguous, not just the sections

11    about transferring title?

12             MR. McCARRICK:  Yeah,

13        object --

14             MS. WESTOVER YANEZ:

15        Objection.

16             MR. McCARRICK:  Object to

17        form.  It's not the relevant

18        question, it's also a legal

19        question.

20             You can answer.

21        A.   It's a legal question.  I'm not a

22    lawyer.  I'll leave that for the lawyers to

23    decide.  To me in reading through it, it was

24    clear, Mr. Frishberg.

25             MR. FRISHBERG:  Thank you.

394

```
1              C. Ferraro - Confidential

2         That's it for today.  Thank you so

3         much.

4              THE WITNESS:  Thank you.

5              MR. McCARRICK:  Thanks,

6         Mr. Frishberg.

7              All right.  Next pro se

8         creditor up to bat, if you can state

9         your name and spell it for the court

10        reporter.

11             MR. COHEN HOFFING:  Hi, I am

12        Jeremy Cohen Hoffing, pro se

13        creditor.  And to spell my first

14        name, J-e-r-e-m-y, last name Cohen

15        Hoffing, C-o-h-e-n H-o-f-f-i-n-g.

16   EXAMINATION BY

17   MR. COHEN HOFFING:

18        Q.   Hi, Mr. Ferraro, I just have a

19   couple brief questions.  If I were to request

20   proof of acceptance of different versions of

21   the TOS for an individual user like myself,

22   would you be able to provide that proof?

23        A.   Me, not personally, but tomorrow

24   Oren Blonstein will be here to talk in detail

25   about these questions, sir.
```

395

```
 1              C. Ferraro - Confidential
 2         Q.    Okay.  Thank you.
 3         A.    My understanding is you had to
 4    accept the terms of use in order to progress
 5    with opening your account, full stop.
 6         Q.    Right.  But if you -- but if I
 7    were to request for proof of that, that that
 8    actually took place, would I be able to
 9    receive evidence?
10         A.    Again, to open your account and,
11    kind of, process-wise, you had to go through
12    those steps.  Oren tomorrow will have a more
13    fulsome discussion about those details,
14    including the aspects of his declaration.  So
15    I would probably save that for there.
16              To me, my understanding is in
17    order to open an account, you had to progress
18    through these screens and click acceptance.
19    Contract or Terms of Use 6, you had to
20    clickwrap.  You had to not only check it, you
21    also had to accept it.  That's my
22    understanding, sir.
23         Q.    Understood.  And while that may be
24    true, and your back office systems will have
25    recorded that.  So hopefully Oren Blonstein
```

396

```
 1              C. Ferraro - Confidential
 2    can provide any proof if requested.
 3              My next question:  Was the
 4    creation of the custody account product, was
 5    that to help protect nonaccredited investors?
 6              MR. McCARRICK:  Objection.
 7         Outside the scope.
 8              You can answer.
 9         A.    Yeah, I think we went through this
10    a little bit earlier.  The earn product was
11    our marquee product.  Pretty much all of the
12    customers came to Celsius for earn.  Given the
13    backdrop, you know, we felt that we needed to
14    launch a custody product in order to suit
15    certain customers.
16              Our belief was that we wanted to
17    be able to have the customers on the
18    platform -- right? -- we wanted to provide the
19    services to the customer.  And my
20    understanding was -- again, I was not part of
21    this.  I've done my best to try to understand
22    what happened and the decisions that were
23    made.
24              My understanding was the custody
25    product was launched in order to, kind of,
```

397

1                    C. Ferraro - Confidential

2     give a secondary product to the earn product.

3     And the earn product was starting to get --

4     you know, there was chatter about whether or

5     not it would be able to be offered --

6     right? -- regulatory inquiries, things like

7     that.

8              So we needed -- you know, we had

9     600,000 customers with a balance with us.  So

10    we were trying to make sure that we had

11    products and services and not lose our

12    customers.

13        Q.    So do you think there was any

14    regulatory pressure that helped initiate the

15    offering of a custody product?

16        A.    I don't know if it was direct or

17    not.  I know that there was plenty of

18    regulatory scrutiny around these products.

19    That's my understanding, yes.

20        Q.    Do you think there's any relation

21    to those regulatory bodies considering, you

22    know, the offering of unregistered securities?

23              MR. McCARRICK:  Objection to

24        form.  Outside the scope.  Calls for

25        speculation.

398

```
 1                C. Ferraro - Confidential

 2                You can answer.

 3        A.    I think what I've said is the earn

 4   was our marquee product.  We didn't want to

 5   risk losing customers because we couldn't

 6   offer them services anymore.

 7                So what we wanted to do was

 8   diversify and come up with a secondary product

 9   offer in custody.  I think regulatory scrutiny

10   might have been one thing.  Again, I wasn't

11   here.  There probably was others as well.

12                I think the custody product has

13   proven today, given the macro events with

14   other platforms, I think custody is the future

15   in this business.  So I think the custody

16   product offering is a good product.

17        Q.    What was the percentage of your

18   customers in earn versus custody?

19                MR. McCARRICK:  Object to

20        form.  I think you answered this

21        already, but you can answer it

22        again.

23        A.    Yeah, I mean, I think it's in the

24   first day declaration.  We had, you know,

25   north of about 200 million or so in custody
```

Confidential       Christopher Ferraro - November 21, 2022

399

                    C. Ferraro - Confidential

1

2    balances, and the vast majority, rest was in

3    earn.  So 90-plus percent was in earn.

4          Q.    So it seems like earn is the

5    product that enticed people to participate in

6    your platform.  Is that correct?

7                MR. McCARRICK:  Object --

8          objection to form.

9                You can answer.

10         A.    There's a customer, kind of,

11   adoption curve that occurs when you launch a

12   new product.  So it's not like you launch a

13   new product and everybody just goes there.

14   Earn was the product offering for probably

15   four-plus years.  So it would make sense that

16   the custody, kind of, offering would have an

17   adoption curve like any other product that

18   gets released.

19         Q.    Okay.  So after April 15, 2022, is

20   when you offered custody, and so if you were

21   to make new deposits to an earn account, did

22   you have to be an accredited investor?

23                MR. McCARRICK:  Objection.  I

24         think we covered this ground

25         earlier.

400

1            C. Ferraro - Confidential

2            But you can answer it again to

3       the best of your understanding.

4       A.    Yeah, I'll try to echo what I said

5  earlier.  I believe that if you were

6  nonaccredited post the launch of custody in

7  the US, any new deposits went to custody.  If

8  you were accredited, you could continue to,

9  you know, fulfill inbound transfers into earn

10 and internationally as well.  That's my

11 understanding in this situation.

12      Q.    Can you define the difference

13 between an unaccredited investor versus an

14 accredited one?

15            MR. McCARRICK:  Objection.

16      Calls for a legal conclusion.

17            THE WITNESS:  Yeah.

18            MR. McCARRICK:  But you can

19      answer based on your subjective

20      understandings.

21      A.    There's a process in which you're

22 trying to show that you have the, kind of,

23 capability for more complex offerings, et

24 cetera.  So that could be a level of

25 sophistication, kind of, the activities that

401

```
1                C. Ferraro - Confidential
2    you invest in, or your overall wealth is my
3    understanding of the accreditation process.
4                It's trying to make sure that for
5    sophisticated products, it's for sophisticated
6    or accredited investors.
7         Q.    Okay.  So by that reasoning, why
8    would I not be allowed to make new deposits to
9    earn as an unaccredited investor?
10               MR. McCARRICK:  Object.
11          Outside the scope.
12               You can answer.
13        A.    I don't understand the question.
14   I'm sorry.
15        Q.    So after April 15, if I'm
16   unaccredited, what is the reasoning why I
17   wouldn't be able to make new deposits to earn?
18               MR. McCARRICK:  Object to
19          form.  Outside the scope.
20               You can answer to the extent
21          you understand.
22        A.    Yeah, I believe you can make
23   new --
24        Q.    I wouldn't be able to because I'm
25   not unaccredited.  Right?
```

Confidential        Christopher Ferraro - November 21, 2022

402

```
 1              C. Ferraro - Confidential

 2              MR. McCARRICK:  Objection to

 3        form.  Mischaracterizes.  Outside

 4        the scope.

 5              You can finish your last

 6        answer.

 7        A.    I forgot what I was saying but --

 8   I lost my thought, I'm sorry.

 9        Q.    Okay.  Sorry.  Let me re-ask the

10   question.

11              By your reasoning that to be

12   defined as an accredited investor you have to

13   have a certain amount of wealth, is one of the

14   reasons you gave, and if you don't meet those

15   requirements, you are not allowed to be able

16   to make new deposits onto an earn account

17   because you didn't meet those -- that

18   accredited status.  Correct?

19              MR. McCARRICK:  Object to

20        form.

21              You can answer.

22        A.    Yeah, my understanding is after

23   the launch of custody, if you were in the US

24   and you were not accredited, new deposits

25   would go to your custody account.  That was
```

Confidential       Christopher Ferraro - November 21, 2022

403

1                    C. Ferraro - Confidential

2    the product we were offering for that slice of

3    customers, nonaccredited customers after

4    April 15 went to custody.  That's correct.

5         Q.    Okay.  Thank you.  So my question

6    then is:  If you were an unaccredited investor

7    and you had already made deposits into earn

8    after the new products changed in an offering

9    of custody, why were users that were

10   unaccredited -- why did they remain -- why did

11   their deposits remain in earn instead of being

12   moved over to custody?

13              MR. McCARRICK:  Objection to

14        form.  Outside the scope.

15              You can answer.

16        A.    Yeah, I think I answered this

17   earlier.  Existing deposits post the launch

18   of -- pre the launch of custody for

19   nonaccredited were grandfathered, I'm using

20   the term "grandfathered," into the earn

21   product.

22              The customers could have moved

23   their balances to custody, and if they moved

24   their balances from earn to custody, they

25   wouldn't have been able to move them back.

404

1                  C. Ferraro - Confidential

2          Q.    Do you support the decision to

3    keep them grandfathered into earn, especially

4    for unaccredited investors that weren't aware

5    of the differences between the custody and

6    earn?

7          A.    I --

8                MR. McCARRICK:  Object to the

9          form.

10               I think he's testified

11         multiple times that he wasn't

12         involved in any grandfathering

13         decision, that he wasn't there.

14               But you can repeat that

15         testimony.

16         A.    I think the custody product

17   offering is a key offering in crypto.  I think

18   it's a great idea to, kind of, have the

19   industry move to that space.  The users could

20   have transferred their balances from earn to

21   custody.

22               I believe I was not part of the

23   decision.  I was probably not even with the

24   company when a lot of these decisions were

25   occurring.

405

```
 1                   C. Ferraro - Confidential
 2                   Do I -- do I support that?  You
 3      know, I haven't thought about it in that way.
 4      I think the custody product is a great
 5      offering.  And for people who want to be in
 6      custody, you know, it's not a bad idea in this
 7      industry and in this marketplace.
 8                   Do I think it was the right
 9      decision?  I don't know.  I haven't thought
10      about it.
11           Q.   Do you believe in consumer
12      protections for, you know, unaccredited
13      investors?
14                   MR. McCARRICK:  Object to the
15           form.  Outside the scope.  Vague.
16                   You can answer to the extent
17           that you understand the question.
18           A.   I come from a very regulated
19      background where consumer protections were
20      very well understood, and I support those
21      protections and I support smart regulations.
22      That's my background.
23                   I worked with regulators very
24      closely for a decade.  And I found them to
25      be -- they made -- they made me better at my
```

Confidential        Christopher Ferraro - November 21, 2022

406

1              C. Ferraro - Confidential

2    job, let's put it that way.  So I welcome

3    regulation.  I welcome customer protections.

4              I think for this industry to

5    really get out and being nascent and to grow

6    and to be widely adopted, we need those

7    protections.  And as long as I'm involved with

8    this company, you know, that will be the goal,

9    is to, you know, think ahead to future

10   regulation and protections and be on the right

11   side of that.

12           MR. COHEN HOFFING:  Thank you.

13       That ends my questioning.

14           THE WITNESS:  Thank you, sir.

15           MR. McCARRICK:  Thanks,

16       Mr. Hoffing.

17           Okay.  Next creditor up, if

18       you could state your name for the

19       record, and spell it and just, yeah.

20           MR. DE LAS HERAS:  Okay.

21       Yeah.  I am Victor Ubierna De Las

22       Heras.  I am a pro se creditor.  I'm

23       from Spain so maybe if you don't

24       understand me, you can stop me.  So

25       I apologize that.

Confidential       Christopher Ferraro - November 21, 2022

407

1              C. Ferraro - Confidential

2    EXAMINATION BY

3    MR. DE LAS HERAS:

4         Q.    The first question is:  Are you

5    familiar with the Slack channels of the

6    company?

7              MR. McCARRICK:  Object to

8         form.  Sorry I could not understand.

9              (Stenographer clarification.)

10             (Discussion off the record.)

11        A.    I couldn't understand.  Oh, Slack

12   channels.  Am I familiar with Slack channels.

13        Q.    Yeah.  The ones from Celsius?

14        A.    Yeah, yeah.  No, I use Slack.

15   That's the internal messaging system, the

16   software that we use to communicate, yes.

17        Q.    Are you familiar with a leaked

18   channel in which realtime, big withdrawals

19   were posted for approval or completion?

20             (Stenographer clarification.)

21             MR. McCARRICK:  Would it be

22        possible for you to type the

23        question into the chat?

24             MR. DE LAS HERAS:  I will

25        share my screen if that's okay with

408

1                    C. Ferraro - Confidential

2         you.

3                    MR. McCARRICK:  Oh, I see.

4                    MR. DE LAS HERAS:  So this is

5         the question asked.

6                    MR. McCARRICK:  Sir, can you,

7         kind of, make it a little bit

8         bigger, please?

9                    Okay.  All right.  So just for

10        the record, the question is:

11                   "Are you familiar with a

12        leaked channel," I assume referring

13        to Slack channel, "in which

14        realtime, big withdrawals were

15        posted for approval or completion?"

16                   And I'm going to object to

17        that question as outside the scope

18        on the basis of form, but you can

19        answer to the extent you understand

20        it.

21        A.    I'm not familiar with the

22   withdrawal Slack channel.  There could be --

23   there could have been one.  I just, to my

24   knowledge, was not part of it and didn't

25   follow it.

409

C. Ferraro - Confidential

1

2  ████████████████████████████

3  ████████████████████████████████

4  ████████████████████████████

5  ████████████████████████████████

6  ████████████████████████████████████

7  ██████████████████████████████████████

8  ██████████████████████████████████████

9  ████████████████████████████████████

10 ██████████████

11        Q.    Okay.  Thank you.  So now on

12  another topic, and in your declaration in

13  paragraph Number 23, you say that:

14              "Debtors typically advised

15         existing users of updates to the

16         terms of use via e-mail and other

17         official Celsius channels, such as

18         the Celsius app."

19              Is that correct?

20        A.    Yeah, that's my understanding that

21  any changes to the terms of use would be --

22  there would be a pop-up in the Celsius app.

23  There would be e-mail.

24        Q.    Do all Celsius users use the

25  Celsius app or are there users who don't use

410

1            C. Ferraro - Confidential

2      the app?

3            MR. McCARRICK:  Object to

4        form.

5            You can answer.

6      A.    My understanding is it went

7   through the app.  So they would have seen the

8   pop-ups.  They could have probably accessed

9   their account online as well.  But it would've

10  seen the similar things.  I think Oren would

11  be a great resource to talk in specifics about

12  this tomorrow.

13      Q.    Okay.  So you don't know anything

14  about customers who don't have the Celsius app

15  and that access their Celsius account through

16  a third party?

17      A.    Oh, partnership channel.  You're

18  talking about an AP- -- the partner API so

19  folks --

20      Q.    Yeah --

21      A.    -- who came in through the

22  partnership channel?  Yeah, I think that's --

23  I think if you could that would be a best --

24  question best suited for Oren tomorrow.

25            MR. DE LAS HERAS:  Okay.  So

411

1          C. Ferraro - Confidential

2     with that, I don't have any more

3     questions, thank you.

4          THE WITNESS:  Thank you, sir.

5          MR. McCARRICK:  Thank you,

6     sir.

7          Okay.  Are there any other pro

8     se creditors with questions at this

9     time?

10         Okay.  Hearing nothing, we

11    will close the deposition.  We'll

12    read and sign.

13         And thank you, Mr. Ferraro,

14    for your time.

15         And thank you to all the

16    participants for yours.

17         THE WITNESS:  Thank you.

18         (Continued on the next page.)

19

20

21

22

23

24

25

412

1        C. Ferraro - Confidential

2         CERTIFIED STENOGRAPHER:  This

3    is the stenographer.  If anyone

4    wants to order a copy of the

5    transcript, you must e-mail me.  My

6    e-mail is going is in the chat right

7    now.

8         (Discussion off the record.)

9         THE VIDEOGRAPHER:  The time

10   now is 5:28 p.m.  This concludes

11   Media 8 of 8 today's deposition.

12   Off the record.

13        (Time noted:  5:28 p.m.)

14              - - -

15

16

17

18

19

20

21

22

23

24

25

413

1

2               A C K N O W L E D G M E N T

3

4    STATE OF            )

5                        : ss

6    COUNTY OF           )

7

8            I, CHRISTOPHER FERRARO, hereby

9        certify that I have read the transcript

10       of my testimony taken under oath in my

11       deposition of November 21, 2022; that

12       the transcript is a true, complete, and

13       correct record of my testimony, and that

14       the answers on the record as given by me

15       are true and correct.

16

17                    _____

18                    CHRISTOPHER FERRARO

19

20   Signed and subscribed to

21   before me this _____

22   day of _____, 2022.

23   _____

24   Notary Public

25

414

```
 1
 2              C E R T I F I C A T E
 3   STATE OF NEW YORK    )
 4                        : ss.
 5   COUNTY OF NASSAU     )
 6
 7              I, PATRICIA A. BIDONDE, a Notary
 8         Public within and for the State of New
 9         York, do hereby certify:
10              That CHRISTOPHER FERRARO, the
11         witness whose deposition is hereinbefore
12         set forth, was duly sworn by me, and
13         that such deposition is a true record of
14         the testimony given by the witness.
15              I further certify that I am not
16         related to any of the parties to this
17         action by blood or marriage, and that I
18         am in no way interested in the outcome
19         of this matter.
20              IN WITNESS WHEREOF, I have
21         hereunto set my hand this day,
22         November 22, 2022.
23         _____
24         PATRICIA A. BIDONDE
           Stenographer
           Registered Professional Reporter
25         Realtime Certified Reporter
```

415

1                      I N D E X

                                    Page      Line
2   Examinations

    MR. HERSHEY                     17        23
3   MS. CORNELL                    138        8

    MS. MILLIGAN                   190        7
4   MS. CORDRY                     207        13

    MR. CREWS                      213        16
5   MR. KHANUJA                    273        22

    MS. WESTOVER YANEZ             300        7
6   MS. BARSTOW                    302        21

    MR. HERRMANN                   324        24
7   MR. FRISHBERG                  369        4

    MR. COHEN HOFFING              394        17
8   MR. DE LAS HERAS               407        3


9                    E X H I B I T S
10  Ferraro                         Page      Line
11  Exhibit 1        Declaration of
12                   Christopher Ferraro........34     9
13  Exhibit 2        Debtors' responses and
14                   objections to the
15                   written deposition
16                   questions posed by the
17                   committee..................37     14
18

19

20  DIRECTIONS:                     43        4
21  DIRECTIONS:                     69        8
22  DIRECTIONS:                    333        5
23

24                   - - -
25

416

1                         E R R A T A

2                 INSTRUCTIONS TO WITNESS

3

4           Please read your deposition over

5   carefully and make any necessary corrections.  You

6   should state the reason in the appropriate space

7   on the errata sheet for any corrections that are

8   made.

9           After doing so, please sign the errata

10  sheet and date it.

11          You are signing same subject to the

12  changes you have noted on the errata sheet, which

13  will be attached to your deposition.

14          It is imperative that you return the

15  original errata sheet to the deposing attorney

16  within thirty (30) days of receipt of the

17  deposition transcript by you.  If you fail to do

18  so, the deposition transcript may be deemed to be

19  accurate and may be used in court.

20

21

22

23

24

25

417

1                           E R R A T A

2    ERRATA SHEET FOR THE TRANSCRIPT OF:

3    Case Name:        In Re:  Celsius Network LLC

4    Dep Date:        November 21, 2022

5    Deponent:        Christopher Ferraro

6    Pg. Ln.  Now Reads        Should Read          Reason

7    ___ ____ _____  _____  _____

8    ___ ____ _____  _____  _____

9    ___ ____ _____  _____  _____
10   ___ ____ _____  _____  _____
11   ___ ____ _____  _____  _____
12   ___ ____ _____  _____  _____
13   ___ ____ _____  _____  _____
14   ___ ____ _____  _____  _____
15   ___ ____ _____  _____  _____
16   ___ ____ _____  _____  _____
17   ___ ____ _____  _____  _____
18   ___ ____ _____  _____  _____
19   ___ ____ _____  _____  _____
20   ___ ____ _____  _____  _____
21   ___ ____ _____  _____  _____
22   ___ ____ _____  _____  _____
23   ___ ____ _____  _____  _____
24   ___ ____ _____  _____  _____
25   ___ ____ _____  _____  _____

418

1              E R R A T A (Continued)

2    Pg. Ln.  Now Reads           Should Read              Reason

3    ___ ____ _____ _____ _____

4    ___ ____ _____ _____ _____

5    ___ ____ _____ _____ _____

6    ___ ____ _____ _____ _____

7    ___ ____ _____ _____ _____

8    ___ ____ _____ _____ _____

9    ___ ____ _____ _____ _____
10   ___ ____ _____ _____ _____
11   ___ ____ _____ _____ _____
12   ___ ____ _____ _____ _____
13   ___ ____ _____ _____ _____
14   ___ ____ _____ _____ _____
15   ___ ____ _____ _____ _____
16   ___ ____ _____ _____ _____
17   ___ ____ _____ _____ _____
18
19                         _____
20                         Christopher Ferraro
21   Signed and subscribed to before me
22   this _____ day of _____, 2022
23   _____
24   Notary Public
25

---

**$**

---

**$1** 84:23,24 91:12 245:2

**$1.2** 243:15

**$1.5** 178:25

**$100** 51:6

**$100,000** 260:6

**$118,000** 270:5

**$120,000** 214:3

**$15** 180:2,5

**$16** 183:2

**$170** 374:13

**$18** 175:18 180:3 209:12,21

**$180** 209:9

**$2** 91:19 93:2 246:3

**$20,000** 229:12

**$250** 230:10

**$26,000** 231:12

**$27,000** 213:24

**$300,000** 138:24

**$350,000** 227:16

**$50** 51:6

**$500** 229:10 230:3

**$500,000** 171:9

**$750** 369:22 372:14,18

**$950** 370:4

---

**(**

---

**(1)** 320:10 377:17

**(2)** 377:19

**(3)** 377:22

---

**-**

---

**-ambiguous** 354:6

**-coins** 373:6

**-ish** 91:5

---

**1**

---

**1** 24:10 33:11 34:8 47:13 78:16 79:21
    80:6 89:4,6 91:23 117:16 145:17
    149:4 213:25 282:3 320:8 360:15

**1,000** 271:8 390:18

**1,200** 384:12

**1,555** 265:7

**1.2** 248:14,15,16

**1.5** 96:15

**1.8** 91:23,24 93:2 95:4 96:9

**1/20** 142:18

**10** 380:4

**10,000-plus** 267:4

**100** 71:13,14 88:5 98:20,21 103:8
    190:17 237:25 276:10,20 302:23,24
    303:7,8 335:4 354:5

**100,000** 139:4 140:8

**101** 103:9

**105** 276:12,18,22 277:2,3,19

**1099** 297:17

**1099-MISC** 254:17

**1099s** 344:16

**10:38** 117:15,17

**10:59** 117:18,20

**11** 47:16,19,21 48:2 84:8 109:4
    113:16 127:11 130:8 149:23 266:12
    292:22 328:5 351:24 380:5

**1111** 154:10

**11:15** 137:24 138:2

**11:17** 138:3,5

**12** 237:6 238:2 242:24 377:12

**125** 138:25

**12:06** 189:23,25

**12:18** 190:2,4

**12:38** 212:23 213:3

**13** 49:11 235:17 237:8,23 294:20
    361:17 380:5

**13-week** 45:6 154:22 155:15

---

**1326** 33:20

**135** 138:25

**14** 281:23 290:6 358:8

**14,000** 370:12 372:24

**1406** 38:3

**1412** 320:8

**15** 43:22 48:13 49:20 50:11 56:4 65:3,
    10 120:11 167:23 354:9,18 359:6,17
    377:5 399:19 401:15 403:4

**150-60** 157:25

**16** 168:9

**160** 209:8

**167** 110:21

**167-ish** 166:6

**17** 85:4,5 154:11

**170** 158:3 203:21

**18** 28:7 92:7,8,15 161:20,23 162:10
    167:23 195:18 209:16

**19** 380:19 388:11

**190** 158:4

**1999** 27:11

**1:15** 212:21

**1:43** 213:3,7,10

**1:45** 212:18

---

**2**

---

**2** 37:10,14 85:2 91:24 92:14 96:9
    117:21 137:25 139:15,18 145:17
    191:21 249:18,20 250:8,16

**2,930** 264:5

**2.45** 264:21

**20** 168:5 177:12

**200** 398:25

**2001** 216:12,16

**2018** 195:15

**2020** 97:6 151:6 232:10 233:17
    343:17

**2021** 96:4 151:6,7 166:20 214:21
    217:23 282:11 343:18

**2022** 29:25 31:23 48:13 49:11,20 50:11 56:4 65:3,10 96:4 120:11 145:7 154:11 190:22 202:22 228:7 277:10, 11 290:6 294:13,15 325:5,10 326:10 343:5,18 354:18 360:15 361:17 377:5 399:19

**2023** 106:17,20 108:21

**21** 29:25 50:24 145:7 191:16 214:2,8 228:6 275:9 278:19 294:15 343:5

**21st** 70:12

**221** 272:6

**22nd** 272:23

**23** 78:14 85:6,10,13 86:9 161:22,23 409:13

**24** 106:4

**24,000** 370:11 372:23

**25** 70:24 245:21 257:2

**25,000** 312:5

**26** 83:15,21 84:8,16 97:18 100:16

**27** 30:20

**28** 385:5

**29** 325:5,10 326:10

**2:57** 299:4,6

---

### 3

**3** 138:6 145:17 189:24 254:14 312:5

**3,000** 372:24

**3.5** 213:24

**30** 88:23 168:10 177:12 318:10

**30-** 311:9

**300** 96:18

**31** 282:4

**31,000** 369:21 372:13

**33** 70:24

**341** 132:21 133:11 135:17,18,19 261:17

**35** 389:12

**37** 311:9

**38** 311:9

**393** 376:19,24 377:13 380:19 382:16

---

**3:07** 299:2

**3:15** 299:7

**3:25** 299:9

**3:35** 319:17,19

**3:49** 319:20,22

---

### 4

**4** 145:17 190:5 212:23 227:17

**40** 203:25

**400** 96:13

**400-and-something** 95:25

**41,000** 370:9 372:16,21

**41K** 369:24 370:2

**47** 298:20

**4:40** 371:19,21

**4:49** 371:22,24

---

### 5

**5** 145:17 213:11 276:10,12,20 281:6 289:22 299:4

**50** 70:21,23,24 89:6 128:24 129:8 157:22 227:5,7 237:20 260:23

**500** 96:14

**50th** 393:3

**55** 356:25 357:3

**55,000** 370:15 373:3

**5:28** 412:10,13

---

### 6

**6** 145:17,21 146:10 194:23 215:5 220:7,23 221:19 259:25 275:12,16 281:7 284:13 286:6 299:10 304:8,14, 18,23 305:7,20 319:17 341:5 395:19

**600** 95:23 96:13

**600,000** 50:2 397:9

**600-** 139:8

**629** 377:12

**632** 382:16

**644** 380:19

---

### 7

**7** 145:17 304:14,19,22 319:23 341:5 371:20

**7-** 90:19

**70,000** 214:4

**700,000** 139:12

**78** 250:5 253:9

---

### 8

**8** 79:21 80:6 145:17,22,23 146:8,10 215:5 216:11 221:19 222:5 259:25 275:12 284:13 286:6 304:15,20,22 322:16 341:5 360:6 371:25 412:11

**80** 88:20 168:8,11 364:22 365:12,15, 16,19,23 366:3

**800** 87:23 90:18,19 91:4,7

---

### 9

**9** 205:17 231:13

**90-plus** 399:3

**914** 222:3

**920** 110:21

**940** 264:7

**947** 264:7 265:8 269:10

**947-1** 264:5

**973** 264:7 265:14

**9:00** 134:11

---

### A

**a.m.** 117:15,17,18,20 137:24 138:2,3, 5

**abilities** 311:18

**ability** 49:3 110:8,10 111:8 192:21 225:12 233:8 234:23 240:15 245:8 246:10 290:23 350:17 363:14 380:10 391:25

**absolutely** 109:8 117:7 267:13 274:8 297:10 328:12 329:9 344:2

**accept** 194:25 195:2 196:9 279:21, 22 375:15 395:4,21

---

**acceptance** 304:10,16 394:20
 395:18

**accepted** 44:25

**accepting** 221:9 376:5

**access** 142:8 201:5 222:6 246:13
 284:23 290:17 380:23 385:13 410:15

**accessed** 410:8

**accommodation** 169:5

**accomplish** 279:2

**accordance** 306:3

**account** 69:24 70:9 72:8 85:18 97:25
 98:3,4,11,16,22 101:18,21 103:9
 120:14,16,25 128:10 135:3,7,9,23
 136:3,10 162:23 164:2,3,5 178:19
 180:23 193:9 195:17 196:8,9,12
 198:2,7,17 200:9,13 213:22 214:10
 219:10 220:18 227:16 230:9,19
 233:21 240:18 251:19,24 253:10
 255:21 256:13,19 262:14 267:23
 283:17 290:14 296:14 302:25 303:8
 305:8 314:2,21 317:8 320:12 322:2,
 21,22 358:12,13,22,25 360:14 364:22
 367:2 374:12 376:3 378:4 380:22
 381:6,23,25 382:3,4,10,13 383:6
 386:11,16,21,24 387:3,17 388:3,7,8
 389:4,8 390:9,10 391:5,7,22,23 392:2
 395:5,10,17 396:4 399:21 402:16,25
 410:9,15

**accountant** 258:22 306:11

**accountant's** 27:11

**accounting** 27:2 244:21,22 245:19
 249:3

**accounts** 85:17 96:20 104:10,19
 105:3 162:21,24 183:5 200:13 207:20
 209:9,13,15,18,22,25 210:18,20,23
 221:9 238:9 265:12 301:7 312:6
 322:9,11,12 352:20,22 376:11,17
 387:19 390:23

**accreditation** 306:9 401:3

**accredited** 52:10 53:15 54:3,13,15
 55:10,16 306:4,11,12 307:4,7 353:20
 358:24 399:22 400:8,14 401:6
 402:12,18,24

**accrete** 365:24

**accrual** 261:2

**accrue** 66:5,13 67:7 121:2 276:25
 350:8

**accrued** 241:15 260:20

**accrues** 244:13

**accruing** 242:6,8 254:2 255:12
 257:18 385:25 386:6

**accurate** 49:25 122:16 156:17 193:5
 204:16 265:20 277:25

**accurately** 194:4 373:16

**achieving** 112:2

**acknowledged** 250:6

**acquired** 28:6

**act** 103:4

**acted** 74:18

**acting** 52:19 139:8 203:13 361:19
 362:6

**action** 226:2 279:25

**actions** 349:6,9

**active** 99:21 262:17 300:24 307:25

**actively** 41:21 43:20 124:5 125:9
 160:4 185:7 329:6 330:22 339:9

**activities** 51:21 70:17 102:16
 165:13,16 166:14 185:6 278:22 298:6
 309:9,12,13,20 311:4 313:22 314:18
 339:11 382:8 400:25

**activity** 166:11 206:3 311:6 362:24
 363:4 364:2 380:21 381:22 391:6

**actual** 95:15 177:19 188:10,16
 205:22 226:7 304:10 388:13

**actuate** 226:13

**add** 89:3

**added** 192:22 219:6 222:15 230:7

**addition** 55:21 76:8 231:11

**additional** 51:4 138:13 161:4 176:6
 192:5 229:25 230:8 282:9

**additions** 282:6

**address** 252:16

**addresses** 380:25 381:14

**addressing** 234:11

**adequate** 343:23

**adjust** 179:12

**administrative** 109:2

**adopted** 406:6

**adoption** 335:14 399:11,17

**advertisements** 188:10

**advertising** 186:23 187:12

**advice** 77:18 78:6 257:15 258:23
 259:2,22 260:14,21

**advise** 258:15

**advised** 342:16,18 409:14

**advisor** 260:14 350:13

**advisors** 24:15,19,22,25 34:19 46:14
 63:11 125:13,14 130:2,3 133:24
 134:3,10 136:21,22 142:23 143:6
 157:8 205:13 265:25 329:21 331:21

**Advisory** 29:2,3

**af-** 32:13

**affect** 159:4 160:20

**affiliation** 299:21

**afternoon** 300:8

**age** 245:7

**agencies** 20:4 187:6 188:7

**agenda** 338:14

**aggregator** 184:6

**aggressively** 338:19

**agree** 87:21 88:3 136:7 195:13 215:9
 234:9 235:16 246:22 250:22 304:11
 375:5

**agreed** 195:23 304:9,23 320:5

**agreement** 194:16 279:10 320:21
 332:21 356:7 363:11 382:21 387:10

**agreements** 320:10 328:16 355:19

**ahead** 24:24 41:6 44:20 50:5 73:11,
 13 98:17 110:18 114:17,25 115:2
 123:23 136:7 270:22 292:14 298:5
 406:9

**air** 169:17

**aka** 264:18 391:9

**Akin** 148:22

**albeit** 111:5 161:13

**Alex** 26:10 79:19 186:11,12,14,17
 261:19 269:25 271:4 326:12 339:21,
 22 340:6,11,14

**aligned** 59:20 123:6 129:24 292:4

Aliza 232:2,8 233:16

allegations 173:7

allocation 321:14,15

allotted 18:15

allowed 64:9 267:21 291:4 328:17,
18 380:2 401:8 402:15

allowing 66:4,13 67:6 69:3 316:19,
20

altered 360:12

Alvarez 134:14 157:7

AMA 55:5 77:13 232:16 234:10 361:4

AMAS 54:23,25 76:23 221:22 233:15
307:25 308:8

ambiguity 392:9,12

ambiguous 389:19,20

amend 146:12

amended 38:21 300:21 304:12

amending 147:4

amendment 146:23,25 147:7

amendments 146:6 147:22

amount 52:3,25 57:9 85:14,17 90:12,
17 92:4,9 95:19 163:23 172:3 187:8
193:4 210:7,24 242:21 255:21 265:23
266:9 316:14 319:10 349:23 352:4
369:9 370:13 373:9 402:13

amounts 188:3

ample 161:12 244:19

analysis 28:10,12,21 30:5 61:25
157:9,12 159:3 203:7 294:18 296:19

analytical 188:9

analyze 98:9 266:24

analyzed 111:24 112:22

and/or 19:23 369:9

Andersen 27:20

Anderson 299:22,23

announce 273:13 368:21

answering 41:14 42:19 46:12 296:5

answers 23:3 41:17,20 42:2,21,23
85:24 118:5 144:8

anticipate 113:14 125:7 154:25

anticipation 168:17

anymore 245:20 248:3,25 363:4
398:6

Anything's 267:6

AP- 410:18

API 410:18

apologies 204:14

apologize 46:20 100:16 143:16
148:25 205:21 206:7,12,16,18 283:7
296:3 305:18 326:20 351:20,25 352:4
359:13 393:4 406:25

apology 206:12

app 81:16 369:8 375:4 409:18,22,25
410:2,7,14

apparent 367:8

appearance 208:12

applicable 382:23

application 360:13

appointed 30:20 139:7

appointments 138:18,21

appreciation 257:5

appropriately 315:12

approval 112:19,23 295:25 407:19
408:15

approvals 148:12

approve 154:19 325:23

approved 108:19,20 110:9,10
147:24,25 295:10 297:4 361:12,14

approving 147:21 219:20

Approx- 95:2

approximately 49:20 88:5,20,23
91:18 95:4 185:17 248:15 369:20,21,
24 370:4,11 372:12,13,16,18,23

April 48:13,20,24 49:9,11,20 50:11
56:4 63:15 65:3,10 107:13 109:13,15
113:15 114:10 116:21,25 120:11
161:5 277:10,11 290:6 354:9 358:8
359:6,17 377:5 399:19 401:15 403:4

April-may 191:19

architecture 191:24

archive 217:16

area 331:13

areas 31:10 46:7 291:3 295:3

argue 181:23

arguing 292:9

argument 291:9

Arizona 28:3

armed 172:11

Armstrong 265:6,11

Armstrongs 265:10,13

art 331:22

Arthur 27:20

arts 26:23,24

ask-me-anything 51:10 53:25
54:17

ask-me-anythings 363:18

asks 137:4

aspects 35:6 192:10 352:21 395:14

asserting 267:9

assessment 74:2

asset 76:12 93:9 95:8,23 97:11
103:9,18 159:13 163:7 164:25 216:22
219:2 223:11 224:5,13,15 225:13
245:2 246:2 247:16 249:11 294:22
296:18 311:11,13 345:16 353:5
355:14 381:4

assets 38:22 45:10,21 57:20,21
64:10 65:4,5,6,11,12,21 66:7,14 67:8
68:7,15 69:4,18,23 70:5,8 71:19 72:7
76:11 77:8,23 95:16 108:7 115:24
120:19 124:3 141:12,24 159:23 162:8
164:21 171:19 172:6 174:16 178:15,
16,23 183:6 205:22 214:2 215:9,12,
13,17 216:12,21 219:7,25 224:24
227:17 229:16,19 231:17 239:23
240:9 243:16 245:7,9,14 246:20
248:7,10,11 249:8 250:22 252:18
259:16 261:9,23 263:22 276:7,8
277:6 279:12 281:2,3,25 282:2 286:4,
7,9,10,18,23 289:25 290:8,13,18
291:11,12,15,16,20 292:11,12,15
293:4,14,22 296:13 297:16 301:7,8
302:25 303:9 311:19 312:5,6,17
313:3 323:19 335:3 341:19,23
352:19,21 377:14,24 380:21 382:5,19
383:2,5,9,12 386:22

assets' 378:2

assign 341:17

**assigned** 377:20

**assisted** 149:6 150:15 187:13

**associate** 210:19

**associates** 25:5

**Association** 208:6

**assume** 22:15 53:23 105:7 145:12 150:21 183:19 187:18 207:21 244:5 369:25 408:12

**assuming** 177:14 179:21

**assumption** 21:15 67:4

**attachment** 381:11

**attempt** 344:2

**attempted** 342:24

**attempts** 344:2

**attend** 20:8

**attention** 42:18 52:4

**attorney** 18:4,23 19:2 137:3 190:10 300:10

**attorneys** 152:6,8 153:6 208:7

**attract** 55:9

**attracted** 32:17

**audio** 315:14

**audit** 27:21

**audited** 27:22

**Audits** 345:3

**August** 213:22 220:11

**authoritatively** 119:10

**authorities** 69:10

**authority** 92:5 278:24

**authorizing** 79:8 281:17

**automation** 28:15

**avoid** 32:13 109:6

**avoidance** 232:18

**award-accruing** 66:15

**awards** 66:6,13 67:7,16 369:8,9

**aware** 18:10 52:7 61:12,21 76:12 77:6 82:12 89:21 90:20 98:17 119:8 128:8,16 130:12,18 145:18 146:7 155:16 157:7 163:22 176:11 187:24 202:24 219:24 220:15 225:6 227:18

230:18 249:16 251:18 261:18,19 264:22 272:9,10 274:11 301:4 307:8 313:11,12 325:8,22 326:5 342:10 359:15,21 367:25 376:2 404:4

**awareness** 62:16

**awful** 228:23

---

**B**

**B-A-R-S-T-O-W** 301:25

**B22sats20000** 229:10

**bachelor** 26:23,24

**back** 20:21 27:11 29:14 33:23 41:25 47:12 61:24 64:2 74:20 78:12 93:16, 21 95:10,14 96:8,19,25 97:6 98:23 117:23 121:20 124:16 125:5,22 129:25 130:9 138:19 139:20 172:7 178:6 179:21 181:7,14 182:14 186:18 193:12 196:11,20 206:18 207:15 208:16 210:19 212:11,17 222:23 228:21 233:10 239:18,25 242:15,21 243:5,11 244:20 245:21 246:15 247:19 251:5,12,16 255:8,15 260:16, 18,19,23 261:2 267:21 268:2,17 275:3 276:12,23 277:19 281:12 291:9 292:6,9 293:2,22 298:25 308:8 313:23 314:19 318:14,21 319:13 331:5 338:12,13,20 339:16 348:17,22 352:17 355:12,17 358:22 371:12 374:8 382:2,5 395:24 403:25

**back-office** 225:2 226:10 253:8

**backdrop** 57:17,24 58:8 59:4,12 72:23 236:7,8,9 239:18 396:13

**backed** 71:4 303:18

**background** 26:17,18 138:17 140:19,20 151:12 169:2 228:11 274:3 286:25 289:17 300:20 405:19,22

**backpacks** 271:10 272:2

**backup** 59:23

**bad** 186:5 239:19,20,24 405:6

**balance** 116:16 141:20,21 163:7 230:20 240:18 242:10,18 244:12,13, 20 245:3,4,25 247:13 249:4 251:25 252:2,11 253:2 256:13 264:20 273:4 285:9 290:14 310:6 314:6 315:4,6 316:12 317:3 345:13,20 346:22 348:20 349:25 350:6 355:15 374:15, 16 397:9

**balances** 50:7,8 229:25 230:6 264:6 305:9 352:20,22 399:2 403:23,24 404:20

**bank** 28:3,5 71:15 101:18,21 141:5 289:3,6 367:2 374:12

**banking** 31:17 190:12 234:2

**bankruptcy** 18:6 107:15 108:22,25 109:3,15 114:2,14 116:3 122:11 128:9,11,12 130:7 147:3,7 173:19 182:8 208:8 236:13,15 237:13,14 239:5 241:18 242:13 243:23 244:4 248:13 293:17 294:8 311:14 313:23 327:19 338:6 386:5,8

**banks** 31:14

**Barstow** 301:24,25 302:4,14,21 307:24 310:16 321:19 322:7 323:16 356:23 357:4,6

**base** 53:24 138:23,24 168:12 350:15

**based** 48:11 55:6 79:15 80:12,23 101:3 146:19 159:2 173:14 179:24 201:7 255:23 269:20 290:16 297:16 335:12 347:4 365:25 366:18 378:13 379:17 381:19 400:19

**basic** 335:21

**basically** 66:23 100:4 177:22 211:25 263:11 337:5 362:22

**basis** 62:12 68:11 73:8 106:16,25 258:3 263:7 308:7 346:24 408:18

**basket** 60:4

**bat** 323:25 394:8

**beg** 348:25

**began** 166:14 214:6

**begin** 273:23

**beginning** 106:23 138:15 170:22 248:23 268:7 337:4

**begins** 117:20 138:5 190:4 213:10 299:9 319:22 371:24

**behalf** 138:10 170:25 172:15

**belief** 339:13 396:16

**believed** 33:2

**believes** 338:9

**belong** 323:19

**belonging** 68:15

**belongs** 224:14

**Ben** 265:6,9,10,12,13

**benefit** 31:5 111:12 123:8 131:17 165:20 237:2 240:24 241:22 242:5,6, 9 273:15 350:8

**benefited** 174:7 237:6 241:10

**Benjamin** 265:11

**bet** 169:10

**beta-tested** 48:23

**bidders** 122:20 124:7,18 134:17 328:17 332:12 336:12

**bidding** 136:15 332:5 333:22

**bids** 124:12 249:9 332:5

**big** 28:16 100:14 116:9 215:6 329:14 369:15 407:18 408:14

**bigger** 388:11 408:8

**biggest** 49:16,17 177:6

**billion** 89:4,6 90:18 91:12,19,24 92:14 93:2 95:4 96:2,5,10,15 243:15 245:2 246:3 248:14 373:6

**billions** 172:10 247:17

**bills** 247:6 366:24

**binding** 336:6

**bit** 26:16 29:5 39:16 65:8 71:12 107:10,12 114:10 138:20 140:18,25 143:15 147:20 151:16 152:17 158:4, 7,8 165:9 169:15 178:4 217:8 225:22 227:12 231:10 245:24 254:16 293:10 302:4,6 324:11 326:4 331:25 396:10 408:7

**Bitboy** 265:7

**Bitcoin** 49:4,5 73:5,6 93:17,24 94:9 97:8,12,14 103:8,9,10,12,13 142:14, 19 156:24 165:12 166:2 167:21,24 168:8,10 169:22 170:9 172:21 175:4 177:17 179:22 181:22 213:25 224:22 225:25 226:4,11 227:17 229:11,12 230:2,3 231:12 252:25 253:3,9,11 257:19 271:7 276:17 314:14 318:13, 20,23 343:8 369:21 370:2,9,12,15 372:13,17,21,23,24 373:4 392:2

**Bitcoins** 276:10,12,20

**Bitfinex** 165:23

**Bitmains** 167:4

**blockchain** 99:18 100:9 118:13,24 119:6 141:23,25 185:10 193:19

226:13 370:14 373:2

**blockchains** 98:9

**blog** 51:8 52:21,24 53:3,5,14 76:24 78:9 308:2,8

**blogs** 53:12

**Blonstein** 47:3 119:16 144:18 193:25 220:12 280:13 305:4 358:17 394:24 395:25

**Blonstein's** 26:9

**blurry** 39:7

**board** 147:25 190:11 191:20,21 202:23 203:9,11,14,15 221:23 243:9 249:16,21 250:5,14,15,16 299:25 313:18 329:23 340:8,9

**boat** 297:15

**Bob** 195:17

**bodies** 204:2 397:21

**bolding** 222:14

**bonuses** 51:4 55:8,9,17

**book** 95:24 253:7

**books** 345:5,6,7 347:11

**boom** 206:20

**booming** 247:12

**borrow** 48:19 71:23 89:19 90:8 110:11 111:15 112:21 200:10 210:11 287:24 303:8,13,24,25 314:16 358:9 383:7

**borrowed** 91:7 94:3 97:5,7 211:8

**borrower** 303:21

**borrowers** 110:5 323:3 366:8 373:25

**borrowing** 111:19 234:15 235:13

**borrowings** 369:23 372:15

**borrows** 289:3,5

**boss** 329:14

**bought** 142:14 257:19 366:23

**bound** 20:9 268:13 386:14

**box** 279:21 304:11

**boxes** 284:19

**brand** 188:17

**breach** 332:20

**break** 22:25 83:4,8,10 108:2 117:6,9 137:16 212:10 285:8,18 298:19,25 371:4

**breaks** 22:18

**breather** 236:12,14

**bring** 33:17 113:4 172:7 222:2 229:25 230:12 260:4 263:20 319:13 331:3 339:18

**bringing** 113:2 181:6

**brings** 179:20 338:12,13

**broad** 333:7 335:17

**broadcast** 147:14

**broader** 41:25

**broke** 346:9

**broken** 381:24

**brought** 39:23 40:5 51:4 115:5 218:21 337:14 374:8,18

**brushes** 335:18

**BTC** 92:24 182:14 317:4

**budget** 43:14 45:6,7 49:22 51:25 154:10,12 188:2 191:16,20

**budgeting** 365:19

**budgets** 166:10

**build** 157:3

**build-out** 169:23

**building** 171:16 252:5 272:16,22,24

**buildout** 170:4,11 176:18,20,25 177:2,6,19

**bunch** 388:21

**burn** 178:4 189:14

**BUSD** 88:23

**business** 26:25 35:7 43:12 46:13,16 60:2 93:3 101:5 102:15 167:17 274:4, 5 275:6 301:12 315:4 335:5 340:13 342:24 348:21 349:13 361:6 363:17 364:21 376:12,13 398:15

**busy** 367:18

**buy** 95:10,14 96:8 97:13 142:16,17 252:24 253:3,5

**buyers** 133:17

**buying** 175:15 226:4

**buzzing** 392:25

## C

**C-O-H-E-N** 394:15

**C-O-R-D-R-Y** 208:5

**C-O-R-N-E-L-L** 138:10

**calculator** 168:4

**calendar** 114:8 115:20 270:4

**call** 47:6,8 95:23,25 144:18 166:10 208:20 231:23 241:2 262:18 290:9 344:19

**called** 114:12,16 153:14 165:22 263:23 281:23

**calls** 25:21 43:2 52:13 53:18 66:9 69:7 124:6 187:16 250:10 317:13 387:5 397:24 400:16

**Cam** 325:18 344:16

**camera** 235:9 371:9

**Cameron** 213:20

**capability** 400:23

**capacity** 61:23 142:25 145:14,15 197:20 361:18

**Capex** 157:3 170:10

**capital** 28:18 124:4 200:12 250:7 315:9 316:19 317:5 365:24 366:6

**capture** 188:16

**car** 225:11 289:6 366:23

**care** 256:6 284:24 375:14

**career** 30:7 115:15

**careful** 333:17

**carefully** 341:5

**carries** 59:14

**carry** 350:17

**carved** 56:19 307:21 360:18 363:10 365:5

**case** 18:4 20:13 31:17 33:20 56:20 59:24 62:24 80:21 84:21 94:2 109:22, 23 110:15 111:3 112:11 113:14,15 117:3 134:10 158:21 159:14 161:14 164:20 170:21 181:10 189:12 203:25 205:13 208:11 231:16 267:8

**case-by-case** 68:11

**cases** 113:12 165:13

**cash** 43:14 45:5,7 101:10 107:3 139:18 154:12 156:12,15,18,25 157:24,25 158:2 159:25 160:23 161:4 166:9 167:9 169:22 170:6,8 172:20 174:18 175:2 176:2 178:4 318:13,20, 25 319:3 366:9 374:18

**cast** 239:7

**cat** 375:24

**caution** 40:10

**cautious** 351:24

**CCAR** 28:18

**cease** 109:3

**ceased** 185:14

**ceasing** 361:23

**Celpay** 377:21

**Celsius** 18:6 28:25 29:10,21,24 30:3, 8,19,25 31:4,20,23 32:9 45:21 48:13 49:11 50:19 51:15 52:5,24 53:11 54:22 55:20,24 56:7 57:5,9 59:12,16, 17 64:8,14 66:24 68:8,14,25 69:9 70:16 75:17 81:6 86:12,13 87:22 88:3 89:22 90:7,13 94:3,12,15,19,23 97:23 98:25 99:5,6,10 100:3 102:17 118:10, 17,18 119:7,18 128:9 130:13,21 131:2 135:23 138:18 139:19 141:2,7 142:13 143:4 144:7 145:4,6,13,20 146:5,13 147:2,8,22 148:3,21 149:14, 20 150:7 151:2,4,9,21 152:7,11,13 153:5,6,18 156:12 157:6,10,17 159:3 160:21 166:15,23 167:22 170:13 171:19 172:15 177:4 179:3,13 182:4, 9 185:25 186:21 187:13 190:22,24 191:8,17 192:6,11 194:22 195:13,15, 18 196:13 197:3,13,19 198:14 199:25 200:9 202:23,24 213:21 214:6,10 215:17,24 216:21,24 219:4,8,9 220:9, 24 224:13,14,21,24 225:16 226:2,6 227:15 228:6,14 232:4,12,17 233:18, 21 239:23,24 240:4,10 241:9 242:23 243:6 251:19 252:18 254:7 256:8,16 257:21 258:15,20 259:3,16,23 262:7, 23 263:4,19 264:19 269:11 270:6 271:8,25 272:2 274:5,15 276:8 277:4 279:12,20,25 281:2,3,22 282:10 288:15 289:25 290:3,10,14,18 291:4, 11 292:11,14,15 293:5 295:17 301:9, 13 303:19 305:8,10 306:19 308:6,10, 16,19,25 309:24 310:6,10,21 311:12, 21 312:3,4 314:8 317:8,9,10,17 318:2,4,12,19,22 323:4 325:6 328:20

331:16 333:9 335:2 340:17 343:25 344:18,22 345:5,7,15,16,21 346:4 347:18 348:16 349:16,24 355:8,11,15 358:10 360:11 361:12 364:20,21 366:9 367:3,6,25 369:7 370:11,14 372:21,22 373:3,8 375:7 377:17,21 378:20 380:2,16,22,23 381:2 382:22 383:5,11 385:14 396:12 407:13 409:17,18,22,24,25 410:14,15

**Celsius'** 55:11 61:2 77:22 81:15 99:4 118:14,16,19 120:18 193:13 250:6 253:12 272:5 274:4 281:24 286:2,9 291:16,20 305:25 344:23 345:2 346:15 362:7 385:13 386:12

**Celsius-generated** 297:17

**center** 131:14 167:7

**centered** 334:20,21

**Centerview** 112:10 158:20

**central** 372:25

**centralized** 110:12 349:13

**cents** 157:22 237:21 260:23

**CEO** 52:19 135:3,22 139:9 192:12 273:25 295:12 362:6 363:3

**Cerberus** 29:2,4,9 139:16

**certainty** 113:3

**certificates** 160:9

**certification** 27:8

**certified** 27:10 34:3 37:19 117:5 197:7 198:22 207:23 208:13 287:19 302:16 315:13,18 336:18,22 349:20 374:23 412:2

**cessation** 362:7

**cetera** 20:4 35:10 59:17,21 60:9 95:16 99:8 103:21 118:23 147:15 192:2 194:23 195:4 196:23 200:12 221:3 284:20 291:5 310:10,21 311:5 334:17 335:16 343:2 373:9 381:12 386:5 400:24

**CFO** 30:18 52:18 61:23 74:9 105:17, 18 139:7 140:4 184:23 185:5 192:12 202:21,22 203:4 294:16,19,21 295:12 296:6,22,23 297:3 361:17,18 364:19 373:22

**cha-** 148:14

**Chainlink** 373:7

**chair** 228:25

**chairman** 339:23

**chairs** 134:13

**challenges** 106:11

**chance** 249:24 376:18

**change** 60:10,23,24 61:6 62:17
69:17 70:25 121:5 161:23 179:13,22
197:18,22 216:11 225:10,16 226:7
257:5 274:24 282:12,25 304:18
350:23 375:6

**changed** 30:10,16 156:9 192:4,9
403:8

**changing** 66:24 224:15,20 226:3,9
250:21 350:16

**channel** 407:18 408:12,13,22
410:17,22

**channels** 51:9,12 53:2 267:20 407:5,
12 409:6,7,17

**Chapter** 109:4 113:16 127:11 130:8
149:23 266:12 292:22 328:5 351:24

**characterization** 120:22

**characterized** 373:17

**charge** 185:24 226:15,21

**charges** 168:14

**charging** 227:2

**chart** 86:19 91:9

**Chase** 28:6,9,22 32:11 188:20

**chat** 407:23 412:6

**chatter** 397:4

**cheaper** 110:13

**cheapest** 109:22 112:6 113:20

**check** 304:11 395:20

**checked** 284:19

**checking** 230:9

**checks** 267:5,7

**chief** 30:18,21,22 139:9 342:9 361:19

**children** 29:13

**choose** 64:14 102:20 225:23,24

**choppy** 324:11

**chose** 65:13 67:13 355:13

**Christopher** 34:9

**Circle** 101:19

**circumstances** 381:8

**cite** 287:2

**claim** 242:20,21 277:3 283:18 293:3,
21 302:22 303:6,12,23 344:23

**claimed** 231:10

**claims** 292:24,25 293:5,18 317:10,16

**clarification** 94:11 153:3 162:14
184:4 188:8 204:12 304:21 312:18
317:11 407:9,20

**clarify** 22:7,15 58:9 62:14 142:25
193:8 195:10 197:2,13

**clarifying** 190:15 246:24 347:12

**clarity** 245:11 248:5

**classic** 363:16

**clause** 216:11 217:25 219:6 230:15
281:4 282:14 341:12 343:6

**clawbacks** 337:21 338:3,5,18,20
339:4,8,10

**clawing** 339:16

**clean** 24:2 44:6

**clear** 36:23 42:6 45:12 46:2 53:4 55:3
62:8 80:4,16 87:11 88:11 99:9 100:2
115:15 118:15 121:3 123:10 124:9
133:2,24 203:24 220:6,23 221:18
231:2 259:25 280:22,23,24 283:12
284:14,16 291:10 300:18 326:21
335:4,5 354:4,5,7,10,22,24,25 359:22
362:21 364:11 379:11 389:22 391:19
392:16 393:5,10,24

**click** 194:25 304:13 395:18

**clicked** 220:17,22 279:21

**clickwrap** 304:19 395:20

**client** 333:2

**clients** 151:15 171:16 323:6

**clip** 370:21

**clock** 298:21

**close** 52:17 62:4 176:8 204:18
228:13 302:15 336:3 380:22 382:2,10
386:16,23 387:3,17 388:7 391:4,7,22,
23,25 411:11

**closed** 376:3,4,11 381:6 382:4
387:19 388:3 389:9 390:11

**closely** 123:4 205:19 329:23 405:24

**closer** 302:11

**closing** 376:17 388:8 389:4 390:9,23

**closure** 386:22

**co-chairs** 327:16

**code** 121:9 182:9 230:15 231:11,13
254:25 256:5 261:4 294:8 328:10,14
350:22

**coded** 121:10

**codes** 229:4

**Cohen** 394:11,12,14,17 406:12

**Cohen-pavon** 152:2

**coin** 72:25 73:4,7 86:23 87:12
121:22,24 162:9 164:6 182:10 226:3,
8 257:12 318:13,20,23 345:16 348:5,
17

**coins** 43:12 45:21 73:19 87:18,24
88:6,16,21,24 89:3 95:14 98:2 103:6
110:10,15 111:14,19 112:20 116:13
119:3,10 120:13,15 121:6,14 129:25
130:8 144:22 162:23 163:5,13,14
164:5,8 165:19 172:3 179:17,20
180:10,12 183:16,21,23,25 184:8
185:10 193:11 198:6 200:8 201:5
222:6,21,22,25 255:4,8 256:8 279:6
292:6,9,15 314:6,17 315:20 335:7
345:11 346:5,13,14,22 348:14 355:25
356:2,7,8 374:10,18 375:17 376:16
385:24 387:16 388:6 391:4,6,7,9,23,
25

**cold** 172:8

**collateral** 92:12 97:8,11 112:21
116:15 120:14,17,20,25 121:11
210:8,9 303:10,17,18 311:4 318:14,
21 319:2,13 323:4,12 334:22 354:19
355:2,9 358:11,20,22 359:5,16
369:24 370:2 372:16 374:3,5,7
377:18 378:22,25 383:6

**collateralized** 70:20 90:9 232:12

**collaterals** 210:12

**colleague** 33:4

**collection** 165:21

**college** 26:19 27:18,19

**column** 86:22 87:2,12,18

**combination** 264:6

**combined** 248:10 264:10

**commend** 320:25

**comment** 37:2 116:25 367:21 373:19

**commented** 108:19

**commenting** 20:16

**comments** 167:9

**commercial** 340:23 341:12,24 342:11 343:8 348:23

**commingle** 341:18

**commingled** 162:24 164:2 178:18 180:23

**commission** 296:15

**commit** 361:23 362:5

**commitment** 363:7

**committee** 18:5 37:9,17 38:17 74:8, 9,12,17 108:8 123:4 125:10,14,24 126:13 130:2 132:17 133:3 134:9,10, 13,14 135:7,10,21 136:21 148:17 152:25 157:13 176:8 192:20 203:15 205:12 320:5,9 329:22 330:21 331:11 338:6 339:11 340:9 351:4

**committee's** 125:14 136:21 205:12

**common** 139:2 140:16

**communicate** 407:16

**communicated** 122:20 124:17 147:17

**communicating** 369:16

**communication** 63:10 64:3 186:15 369:17 372:10

**communications** 40:11 64:6 187:4, 23 202:9

**community** 330:25

**companies** 160:6,7,9 209:3 234:6

**company** 18:19 29:3 32:17 49:23 61:3 62:12 63:14 64:24 68:21 69:16 70:12 114:14 130:2 143:6 151:2 154:5 156:14 165:20 175:2,6,9 176:13 185:22 191:11,24 192:4 194:7 197:23 203:11,19 204:25 205:24 208:17 215:11 221:16 228:5,13 241:22 244:24 247:18 249:9 261:21 266:10 269:13 275:9 308:19 309:3,21 316:21,22 329:21 334:6,8,10,11 339:23,24 340:5 346:21 352:19 353:6

362:23 366:3 367:4,6 369:20 372:12 404:24 406:8 407:6

**company's** 347:13,15 370:5 372:19

**compared** 325:19

**compensation** 138:23 139:4,25 263:3 340:17,20

**complete** 289:23 290:10,12

**completed** 36:17 176:25

**completely** 21:17 109:23 206:22 234:4 354:25

**completion** 176:21,22 407:19 408:15

**complex** 400:23

**compliance** 203:23 204:7 297:25

**compliant** 204:25

**complicated** 336:17

**component** 296:18

**compound** 204:10 251:19 252:13 373:15

**comprehensible** 22:11

**concede** 298:13

**concentrations** 26:25

**concern** 247:7,20 248:25 313:20

**concerns** 61:20 63:19 131:2

**conclude** 124:13

**concludes** 117:16 137:24 189:23 212:23 299:4 319:17 371:19 412:10

**conclusion** 124:10 249:14 317:13 387:6 400:16

**conditioned** 386:13

**conditioning** 169:17

**conditions** 387:14

**condone** 364:3

**conduct** 25:9 50:19 305:11

**conducted** 51:15

**confer** 20:20

**conferenced** 271:7

**confidential** 18:1 19:1,20 20:1,25 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1

42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1 198:1 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1 210:1 211:1 212:1 213:1 214:1 215:1 216:1 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1 225:1 226:1 227:1 228:1 229:1 230:1 231:1 232:1 233:1 234:1 235:1 236:1 237:1 238:1 239:1 240:1 241:1 242:1 243:1 244:1 245:1 246:1 247:1 248:1 249:1 250:1 251:1 252:1 253:1 254:1 255:1 256:1 257:1 258:1 259:1 260:1 261:1 262:1 263:1 264:1 265:1 266:1 267:1 268:1,10,21 269:1 270:1 271:1 272:1 273:1 274:1 275:1 276:1 277:1 278:1 279:1 280:1 281:1 282:1 283:1 284:1 285:1 286:1 287:1 288:1 289:1 290:1 291:1 292:1 293:1 294:1 295:1 296:1 297:1 298:1 299:1 300:1 301:1 302:1 303:1 304:1 305:1 306:1 307:1 308:1 309:1 310:1 311:1 312:1 313:1 314:1 315:1 316:1 317:1 318:1 319:1 320:1 321:1 322:1 323:1 324:1 325:1 326:1 327:1 328:1 329:1 330:1 331:1 332:1 333:1 334:1 335:1 336:1 337:1 338:1 339:1 340:1 341:1 342:1 343:1 344:1 345:1 346:1 347:1 348:1 349:1 350:1 351:1 352:1 353:1 354:1 355:1 356:1 357:1 358:1 359:1 360:1 361:1 362:1 363:1 364:1 365:1 366:1 367:1 368:1 369:1 370:1 371:1 372:1 373:1 374:1 375:1 376:1 377:1 378:1 379:1 380:1 381:1 382:1 383:1 384:1 385:1 386:1 387:1 388:1 389:1 390:1

391:1 392:1 393:1 394:1 395:1 396:1
397:1 398:1 399:1 400:1 401:1 402:1
403:1 404:1 405:1 406:1 407:1 408:1
409:1 410:1 411:1 412:1

**confidentiality** 268:19

**confirm** 94:20 161:16 174:21 199:20
272:15

**confused** 224:12 293:10,12 310:18
326:4

**confusing** 39:17 259:15 389:18

**connection** 38:20 39:10,18 50:20
51:16 53:6 58:21 91:11 144:21
216:23 305:9 324:10,15 377:20

**consent** 281:24 374:21 375:2 386:13

**considerable** 52:3 352:3

**consideration** 48:8 67:21 182:11
240:16 256:7 263:13,18 280:2 382:17

**considered** 122:13 215:12 321:25
322:11 345:19

**consistent** 53:23 54:11 130:10
136:17 184:12 221:11 222:8 233:2
234:18 345:9,10 360:7 386:7

**consolidated** 106:16,25

**constituency** 174:8

**constitute** 279:13

**constitutes** 279:9

**construct** 149:24

**consulted** 85:23 86:5

**consumer** 289:2 405:11,19

**contemplating** 181:13 352:14

**content** 41:12 202:9 360:12 362:8

**contents** 20:7

**context** 41:13 233:9 234:24 270:17

**continue** 28:4 37:20 64:10 65:20
66:5 69:4 118:6 147:12 264:15 269:2
304:25 332:23 400:8

**continued** 105:22 106:10 176:17
212:25 411:18

**continues** 171:12 178:7 268:24

**contract** 139:10 140:3 202:13
215:24 233:11 259:23 279:19,23
305:25 307:20 320:11 354:21 375:8,9
378:6 379:25 380:2 386:21 387:2
389:15,18 390:24 391:18 392:4,21

393:9 395:19

**contract's** 392:16

**contracts** 354:23,24 355:2 357:13,
25 358:4 359:22 390:15

**contractual** 187:11 345:14

**contradicting** 235:15

**contribute** 42:2

**contributed** 46:11 60:11,25 61:7,15

**contributions** 200:12

**control** 225:7 226:8 228:21 259:20,
21 334:9 335:7 338:15 350:16,23
361:22

**controlled** 334:7

**controller** 295:2

**controls** 292:11

**conversation** 42:9 136:10,12,13,14
205:14 259:11 326:5 336:4 375:15

**conversations** 62:6 101:7 105:20
132:19 133:6,17 134:20,23 135:20,22
145:10 146:22 204:21 327:10 328:22
337:13 350:14

**convert** 101:20 211:18 337:9

**converted** 211:17 374:11

**converting** 103:20 211:4 336:14

**Cool** 372:6

**cooler** 168:17

**copied** 388:20

**copies** 33:13 142:7

**copy** 24:2 33:6 37:6 254:12,16 412:4

**Cordry** 207:10,13 208:2,3,5,15 212:2

**core** 189:14

**Cornell** 137:15,18 138:8,9 143:24
189:16,19

**Corp** 367:4

**corporate** 59:10 367:5

**corporation** 367:14

**correct** 26:3 29:19 79:21 85:25 86:3,
7 140:9 162:22 184:24 202:21 204:5
209:10 210:3 214:7 227:6 235:24
240:7 244:8 248:18 272:5 287:3
295:14 301:14 327:16 333:3 347:18
352:23 359:11,13 378:18 379:7,23

399:6 402:18 403:4 409:19

**correctly** 233:19 366:15

**cost** 101:19 110:3,6 111:3 112:12
156:22 168:12 174:17 247:14 316:16

**costs** 110:25 112:22 162:11 168:13
189:11

**counsel** 40:14,20,25 41:3,9 46:17
60:17 63:6 117:6 143:3 146:18
148:21,23 149:5,20,23 150:14,25
151:8 152:24 204:19 208:8

**counted** 255:2 299:15

**counterparties** 341:22,23

**counterparty** 110:13

**coup** 189:3

**couple** 29:11,13 138:12 190:15
191:12 249:17 321:22 369:2 375:13
394:19

**coupon** 51:5

**coupons** 229:7

**court** 23:4,9 33:7,10 37:6,12 128:11
153:20 155:2 164:15 263:3 264:2
273:15 302:8 311:14 312:14 370:10
372:22 373:5 384:10 394:9

**Court's** 181:6

**court-ordered** 381:12

**cover** 46:3

**coverage** 143:10

**covered** 36:12 344:15,16 369:7
399:24

**CPA** 27:12 245:20 257:2

**craft** 144:6,25

**create** 57:5 274:19

**created** 56:7 64:8 68:14 69:11

**creating** 28:15 49:22

**creation** 60:12 61:2,15 62:18 396:4

**creative** 336:15

**credit** 287:22 336:2

**credited** 378:3

**creditor** 213:21 227:14 273:19
292:10 299:13 302:2 324:6 327:21
394:8,13 406:17,22

**creditor-owned** 334:11

**creditors** 18:6 123:9 125:23 129:25 133:12 135:18 174:17 242:16 284:7 285:10 291:25 292:5,8,17 293:2,23 298:23 317:9,18 318:3,7 320:22 327:11 328:3 331:5,14 334:7 337:16 350:8 411:8

**creditors'** 38:18 356:19

**credits** 27:14

**Crews** 213:16,20 217:6,11,14 218:9, 19,22,23 222:15 231:3,25 232:14 235:4,7 246:23 254:10,15 264:4,10, 17 269:3 273:3,16,17 297:14 298:8 300:17 325:19 344:16

**criterias** 377:25 378:7

**critical** 170:20

**cross** 35:7

**crushed** 160:7

**crypto** 31:8,16,23 32:7,24 33:3 103:5 209:3 232:20 234:4 240:17 245:5,6 247:12,23 249:8 256:20 257:8,17 260:7 262:8 335:3,14 376:16 404:17

**cryptocurrencies** 70:16,21,22 71:5, 22 90:10 95:10 96:7,20 118:20 193:14 291:8 314:11

**cryptocurrency** 31:20 48:7,9,12 51:7 66:23 84:19 89:18 97:3 98:25 102:21 103:19,23 105:10,25 140:23 141:12,18 142:12 157:17 178:18,25 191:9 211:5 224:16 310:5 320:13 378:21

**cryptocurrency-by-cryptocurrency** 73:8

**Cryptolark** 264:18

**crystal** 62:7 115:15 133:24 220:6,23 280:23,24 283:11 291:10 335:5

**cue** 23:6

**curious** 129:15

**currency** 96:7 208:20,22 211:16 251:6

**current** 125:15 177:25 267:14 273:25 309:23 326:9 333:8 339:23 367:9

**cursory** 43:19 355:21

**curtail** 156:19

**curve** 399:11,17

**custodian** 334:25 335:2,18,20

**custodied** 215:10

**custody** 55:25 56:7,18 57:6,14,19, 20,21 58:19,22 59:8,10 60:6,12 61:2, 7,15 62:18 64:9 68:13,16 69:11 92:11 104:24,25 116:7,12 145:8,23,25 162:3,9 182:18,25 183:5,6,9,18,20 209:22,23 210:6,14 211:2,13 215:6, 19 277:6 278:2,10 296:15 321:24 322:10 335:6,12 341:20 345:12 352:22 353:8,10 358:13,21,22,25 360:6 396:4,14,24 397:15 398:9,12, 14,15,18,25 399:16,20 400:6,7 402:23,25 403:4,9,12,18,23,24 404:5, 16,21 405:4,6

**customer** 53:24 54:12 57:18 59:16 60:8 65:13,20 66:13 67:23 71:4 98:6 99:23,24 103:8 104:19 116:8 120:9, 12 131:4 132:25 163:6 182:3 185:6 193:12 196:6,7,22 210:18 215:12,18 220:5 221:24 222:23 223:6,7,10,15 224:4,14 225:15 236:9 237:22,25 238:10,19,25 239:8,14,17,22 251:4,8 253:24 254:3,7 256:16 258:19 259:15,24 276:9,11 279:20,24 284:18,24 286:17,18 291:7,21 322:9 345:15,17 348:17 353:9 355:8,13,25 356:8 359:4 375:14 376:11 385:22 390:22 391:21 396:19 399:10 406:3

**customer's** 239:14 383:12

**customer-facing** 301:12

**customer-owned** 335:18

**customers** 18:19 48:14 70:14 76:11 77:8 81:6,9 91:10 99:2 104:9 116:16 127:24 130:9 131:3,14 147:17,23 181:15 185:5,9 193:10 198:5,13 199:2 201:10 219:24 222:24 226:24 227:6 228:14 229:24 230:19 232:11 233:19 234:6,7,11 237:20 250:23 254:19 255:22 256:18 276:7,19 277:20 280:25 281:3 282:11 285:2 286:3,11 288:15 291:2,11 297:20 307:3,6 317:9,18,20,25 318:2,3,6,8 322:6 328:23 331:5 334:16 335:7 348:14 355:18 357:21 366:15,20 375:12 385:13 396:12,15,17 397:9,12 398:5,18 403:3,22 410:14

**customers'** 256:24 314:2

**customers-ish** 50:2

**cut** 24:24 90:5 110:24,25 115:2

**cutting** 107:19 111:11

**cycle** 169:15

---

## D

**D-A-N-I-E-L** 368:24

**daily** 74:13 160:10

**Daniel** 232:6 261:20 368:24

**dark** 371:9

**data** 99:16 100:13 193:20 197:6,16 370:14 373:2

**date** 34:11 37:18 65:22 85:19 86:13 87:22 88:5,21,24 89:22 91:7,20 92:14 100:21 101:14 102:5 105:5,9,23 120:10 140:7 146:5 156:16 157:9,14, 18 158:12 165:25 166:3 170:8 175:23 176:15 177:24 181:12 186:13 195:20 237:14 312:15,25 313:24 337:23 369:19 372:11

**dates** 97:6 313:10 369:7

**Davis** 263:24 264:18

**day** 102:8 144:14,15 167:21,24 228:20 249:19 272:22 274:18 310:18 315:9 320:24 352:5 357:16 398:24

**day-to-day** 308:7

**days** 39:7 46:6 127:2 245:21

**de** 159:12,22 189:3 406:20,21 407:3, 24 408:4 410:25

**de-risk** 60:2

**deal** 33:22 61:25 116:14 336:9

**dealing** 63:13 218:14

**deals** 327:24

**debating** 195:9

**debt** 109:25 110:5 234:14 235:13 310:25 374:17

**debtor** 112:17 158:9 159:5 163:14,19 165:21 166:4 174:3,19 207:19 302:22 303:6,12,23 313:25 315:22 330:6

**debtor's** 300:21

**debtor/stakeholders** 131:20 132:12

**debtors** 38:19 43:15 76:10 79:8 91:7 92:5,14,15 100:22 101:13 102:2,4,19 103:23 104:18 105:6,21 106:10,17 107:5,14 108:24 109:6,11,15 111:23, 25 122:11,19 123:10 124:9,17 125:7

126:4,6,8,20 127:4,13 131:22 133:6
143:6 157:8 158:18 159:21 164:9
165:5,11 166:12 170:25 171:7 172:14
176:12 278:23 281:17 307:15 312:15,
25 313:10,12 314:20,21 316:2,4
317:6 320:9,14 409:14

**debtors'** 37:7,14 38:16,20,23 69:22
70:7 72:6 76:12 92:10 111:2 165:12
173:18 205:23 301:5 303:24,25
311:13

**decade** 405:24

**decades** 32:11 141:4,21 234:2

**decent** 288:8

**decide** 115:6 232:20 393:23

**decided** 172:4 236:15 248:4 278:5

**decision** 32:9,25 64:19 112:12
226:22 243:8,10 275:3 330:15,21
339:14 404:2,13,23 405:9

**decisions** 74:3,22,24 274:4,7,21
313:18 354:2 365:25 396:22 404:24

**deck** 137:14

**declarant** 34:25

**declaration** 24:2 26:8,9,10 33:7
34:9,21,24 35:3,12,19,22 36:12,24
46:3,10 47:13 78:15 79:20,23 83:16
97:19,20 106:5 165:10 236:6 243:15
326:12 360:7 376:23,24 377:6 386:11
395:14 398:24 409:12

**declarations** 24:16 26:2,6 144:16
342:7

**declaring** 292:15

**declined** 230:16 231:14

**decrease** 112:18 168:19 249:5

**decreased** 245:7

**dedesignating** 20:22

**dedicated** 95:19

**deem** 240:8

**default** 65:13 232:18

**defending** 18:24

**defenses** 320:10 321:8,9 360:19

**defer** 356:21

**Defi** 71:21 110:12 112:20 309:11,21
311:4 318:14,21,22 319:9 349:13
369:23 370:15 372:15 373:4,24

374:2,4

**deficiencies** 269:6

**deficit** 243:16 248:13

**define** 286:24 287:8 400:12

**defined** 402:12

**definition** 245:15 246:7 248:6,12
287:12 288:19

**definitions** 244:18

**degree** 27:6,7

**delay** 127:5,14 205:21

**Delays** 127:23

**deletions** 282:7

**deliver** 191:19

**delivered** 219:2

**delivering** 219:5

**deltas** 215:3

**demand** 160:15 169:7,16 288:2
290:10 291:7

**demographic** 52:6

**denomination** 90:21

**department** 152:13,14 190:12
259:12,13 287:2

**departments** 295:13

**depend** 169:4

**depended** 278:22

**depends** 175:3 176:7

**depleted** 265:12

**deploy** 43:12 45:21 69:23 70:8,16
71:21 72:7 73:4 98:23 99:7,20 112:20
177:8,10,15 284:23

**deployable** 73:6

**deployed** 45:9 98:24 118:23 353:6,
10 355:14

**deploying** 70:4 73:19 252:18

**deployment** 70:17 72:14 73:3 74:14,
22,23 75:5,8 76:13 77:23 122:4
144:22 163:9 240:2 278:22 309:12,13
314:18 345:2 365:13

**deployments** 93:12

**depo-** 143:25

**deposed** 21:12,16 206:10

**deposit** 182:4 213:23 229:5,11,15
230:16 231:11 257:22 258:20 316:8

**deposited** 104:9 118:16 223:10,16
231:12 240:22 241:8 251:24 276:7,
10,17 301:7 314:3,22 355:25 356:7

**depositing** 257:20

**deposition** 18:11,24 19:23 20:6,16
22:19 24:14 25:10 26:14 37:8,16
38:9,19 39:9,13,14,19,22,25 42:8,16
44:18,23 79:24 134:12 137:5 138:16
143:23 144:5 205:16 268:25 298:24
320:4,19 321:4 324:20 327:12 357:11
360:8 365:7 377:8 411:11 412:11

**depositions** 21:17 22:9 46:9

**depositor** 343:10

**depositors** 246:14 292:16

**deposits** 91:10 157:4 207:21 208:19
277:11 322:13,14,15,23,24 336:14
344:24 345:8,18 347:17 399:21 400:7
401:8,17 402:16,24 403:7,11,17

**depreciation** 257:5

**deputies** 153:14

**derivatives** 287:14

**describe** 26:17 41:11 136:11 214:19
215:3 333:7 339:22 375:25

**describing** 99:6 363:18

**description** 72:18

**designate** 19:19 21:3

**designated** 268:10,20 380:25
381:13

**designations** 268:19

**designee** 331:15

**detail** 173:12 280:19 355:22 394:24

**detailed** 196:25

**details** 78:3 202:3 215:2 219:18
231:8 283:7 305:5 395:13

**determine** 69:2 98:9 188:15 225:12
333:23 358:10

**determining** 69:23 70:8 72:7 176:9

**detriment** 237:3,7 251:8

**Deutsch** 46:18 150:23 152:23

**developing** 28:16 29:15



23 412:5,6

**e-mailing** 375:7

**e-mails** 220:13,16 284:20

**earlier** 50:23 85:22 140:17 142:21
143:13,18 144:20 151:16 158:7
161:2,16 178:19 183:24 184:15,21
210:16 215:20 221:20 227:5 240:7
282:15 298:8 300:17 307:24 322:20
325:19 327:12 396:10 399:25 400:5
403:17

**early** 48:23 107:23 108:20 112:11
158:20 172:2 177:17,21

**earmarked** 188:3

**earn** 38:23 48:3,5,6,10,15 49:11,16,
21 50:3,13,20 51:16 52:6 53:6,11
55:22 57:19 58:19,21 59:14 61:14
63:20 64:11 65:4,6,11,12,19,21 66:7
67:8,14,15,17,22,24 68:12,16 69:5,24
70:9,15 72:8 76:11 77:8,23 84:16
85:17 86:13 87:22 88:4 91:11,18
103:12 104:10 105:3 115:24 116:8
120:9,11,14,16,25 121:10 200:3,15
209:18,22,24 210:5,20,21,23 211:6
241:11,19 252:2,11,13 253:10 277:6
278:10 279:6,12 290:8 302:24 314:2,
3,20,21,23 322:2,9,12,21,22 328:4
331:15 336:2,11,14 337:6,8 344:24
345:8,18 347:17 348:14 352:20
353:6,13,21 354:20,23 355:3,8,12,14
358:12 359:2,5,17 360:5 366:5
377:16 378:19,20,23 379:22 382:19
383:2 385:23 386:11 396:10,12
397:2,3 398:3,18 399:3,4,14,21 400:9
401:9,17 402:16 403:7,11,20,24
404:3,6,20

**earned** 121:4 256:7 301:7 345:12
385:15

**earnest** 177:22

**earning** 252:4 256:3 257:9,10 379:5
383:13

**ease** 169:15

**easier** 118:6 371:4

**easiest** 109:22

**easy** 247:19 369:6

**ECF** 154:10 320:8

**echo** 315:19 400:4

**economics** 26:23,24

**Ecuador** 29:12,15 31:4,7,10 61:9
214:15 249:23 308:4

**Ecuadorian** 29:12

**edited** 360:12 361:9,10

**editing** 361:2,21,24 362:10,19
363:15,19 364:7

**edits** 361:7

**educated** 140:25 142:3

**educational** 26:18 140:19

**effect** 375:10

**effectively** 28:11 49:3,6 101:19
103:19 109:3 110:6 155:23 162:8
168:12 171:10 181:21 185:6 361:6

**effectuate** 278:24

**effort** 188:21 193:4 266:9 267:7

**efforts** 185:13 188:9 192:13 221:11
263:14 340:24 341:13,25 342:12
343:9 348:23,24 349:2

**EFH** 96:9 97:5,7,10

**eggs** 60:4

**elect** 290:8 377:15 382:25

**electricity** 168:15

**electrification** 177:20

**electronic** 304:10

**eligible** 289:24 290:7,13 341:19,22
377:14,24 382:18,25 383:4,8

**eliminate** 180:6

**Ellis** 24:21 25:2 34:18,20 35:12 36:2,
5,13,23 40:21 46:15 142:22,25 143:5
148:21 205:6 339:4 369:18

**embedded** 267:2

**emphasis** 281:25

**employed** 145:4,19 146:5,13 149:14
150:7 151:3,9 152:7,9,10,12 153:4,6
214:11

**employee** 166:23

**employees** 110:21,22 132:23 136:2
152:11,12 166:6 172:22 203:21 204:6
266:12 277:5 278:4

**employer** 295:7

**employment** 140:20 166:25

**enacted** 235:25

**encourage** 229:18 321:2 329:11
331:8 335:25 337:3 338:18 355:23
357:19

**encouraging** 337:16

**end** 20:21 61:25 106:22 126:18
133:13 136:25 137:4 176:11 177:5
268:17,25 292:14 298:24 315:9 370:8

**ended** 373:3

**ends** 296:3 406:13

**energy** 156:22 168:23 169:3

**engage** 186:21

**engaged** 187:3 329:22 340:7

**engineers** 171:17

**England** 215:12

**English** 81:10,17,23,25 82:11,15,19,
20

**enjoy** 241:20

**enjoying** 252:18

**entered** 305:24

**entering** 382:20

**enticed** 399:5

**entire** 19:19 28:12 35:21 95:22,24
117:3 150:8 268:9,21

**entirety** 391:1 392:21,22 393:8,9

**entities** 20:4 163:20 165:21 204:3
309:10,19 311:6 312:2

**entitle** 378:2

**entitled** 20:5

**entity** 89:6 107:2 126:17 160:17,19
161:6 163:15,24 164:15,16,17,20
165:3,5,8 193:24 308:25 311:20

**entries** 87:2 205:23

**entry** 38:21 121:21 174:15 253:7
265:16 267:9

**equity** 139:2 173:7 244:23 310:25
316:13,24 352:12

**equivalent** 211:16

**ERC20** 88:3

**escapes** 76:15

**essentially** 211:16 248:9 256:14

**establishing** 38:22

**estate** 108:12 110:3 111:2 123:3,8 125:22 127:24 131:17 133:14,22 163:11 173:19 174:5,17 176:10 178:7 181:24 192:15 236:16 239:5 242:14 251:15 260:15 271:23 274:20 275:2 291:25 292:24 293:18 294:10 307:15 319:12 323:19 328:11 332:13 333:24 338:13,17 339:3,17,18,19 351:22 352:4 362:8 363:24

**estimate** 157:16 160:25 161:8 167:20,25

**estimated** 180:2 237:18

**estimation** 96:18 161:6

**et al** 309:24

**ETH** 49:5 71:20 94:14 97:8 179:22 182:14 213:24 314:16 373:7

**Ethereum** 214:2 373:7

**ETN** 348:7

**event** 238:20 243:12 255:17 256:10 257:7,15 258:11 260:17 380:20

**events** 50:25 271:12,15 291:4,5 343:16 346:3,21 349:4 380:15,16 387:10 391:2 398:13

**everyone's** 384:9

**evidence** 295:19 395:9

**exact** 90:17 341:11

**exam** 27:11 257:2

**EXAMINATION** 138:7 190:6 207:12 213:15 273:21 300:6 302:20 324:23 369:3 394:16 407:2

**examiner** 184:13

**examiner's** 249:25 250:3,18

**exceed** 245:13 246:19

**Excellent** 364:10

**exceptions** 386:20

**excerpts** 217:4

**excess** 73:2,5

**exchange** 101:16,17 215:7 276:9 378:8

**exchanging** 276:19

**exclude** 40:10 60:15 63:4 104:25 146:17

**excluded** 210:6

**excluding** 116:12

**exclusive** 302:23 303:7

**exclusively** 148:4 172:23,24

**exclusivity** 330:9,12,16

**Exco** 152:22,24

**excuse** 65:7 93:23 211:7

**execute** 133:21

**execution** 176:10

**executive** 30:22 152:25 315:23 361:19

**executives** 74:15 274:6 338:19

**exercise** 99:17 100:14 365:20

**exhibit** 24:10 33:11 34:5,8 37:9,14 47:13 78:16 85:2 222:2 254:14

**exhibits** 37:4 38:8

**exist** 83:25 219:11

**existence** 87:9

**existing** 88:16 403:17 409:15

**exit** 108:25 113:25 114:14 116:3

**expand** 62:25

**expect** 20:23 52:8 53:14 54:2 147:11 155:7 276:11

**expectation** 201:7

**expected** 156:6 365:14

**expecting** 178:11

**expenditures** 102:16

**expense** 102:12 110:20 177:6 185:21

**expenses** 93:5 96:3 110:24 111:11 164:10 165:14 168:2,7,18 169:20 174:4 176:24 208:18,21,23

**expensive** 110:2,6 156:23 158:25

**experience** 31:19 55:5 140:23 142:20

**expert** 80:9 100:9 118:25 119:7 144:25 215:2,21 216:7 237:16 258:5 261:3 284:4 306:8 350:14 358:18

**explain** 39:15 56:10 96:24 101:12 140:24 152:17 155:23 161:23 235:18, 24 254:19 265:15 270:24 279:8 373:23

**explained** 136:15 147:16 234:12

**explaining** 195:3 262:22

**explicitly** 233:12

**explore** 331:10

**exploring** 134:18

**expressly** 282:4 386:13

**extend** 161:3 330:15

**extended** 165:6 358:9

**extent** 40:23 52:14 58:14 60:17 66:19 72:11 134:7,15 150:19 219:15 247:7 250:12 257:25 260:11 262:24 263:9 265:22 267:16 269:20 270:11 280:11 307:23 312:21 313:6 349:11 350:11 353:2 355:5 360:21 370:18 373:18 385:19 387:7 401:20 405:16 408:19

**external** 63:11 187:23 377:23 379:3, 5

**externally** 136:17

**extracted** 269:9

**extreme** 31:12 328:16

**eye** 114:7

---

**F**

**f-** 277:7

**F-R-I-S-H-B-E-R-G** 368:25

**Facebook** 187:5 188:4 262:16

**faced** 106:10

**facility** 64:25

**facing** 43:15 63:14

**fact** 32:8 78:21 226:12 261:8 317:21

**facts** 307:17

**fail** 343:25

**fair** 22:16,25 91:25 150:13 165:10 166:2 173:15 182:24 227:22 252:3 260:7 275:10 285:23 294:24 351:9 367:23 384:20

**fairly** 236:17 287:7 369:6

**fairness** 334:14 338:9

**familiar** 21:17 89:9 144:24 145:3 146:24 147:6 149:8,16 151:11,18 153:23 154:9,18 159:12 160:16,18

166:13,21 167:3,10,18 169:19 170:3,
12,18,20,22 173:6 179:4,10 180:20
216:10 223:25 229:4 232:2 261:7
262:7 263:23 269:13 306:10,12,13,
15,18 325:4 340:23 342:5 356:5,6
357:13 407:5,12,17 408:11,21

**family** 31:4

**farm** 61:8

**farmer** 29:17

**farms** 29:12,15 31:10 308:3

**fascinating** 31:9

**fast** 127:23 376:21

**fault** 65:7 107:19 190:18 239:14,16,
22

**FDIC** 228:13

**feature** 224:2

**featured** 385:18

**February** 106:22

**federal** 169:5 204:3,22

**fee** 208:12

**feedback** 35:9

**feel** 22:7 40:25 63:6 107:18 218:18
260:7 320:2 321:2 334:3

**fees** 102:13 105:10 158:6 189:12
227:2

**fellow** 227:13

**felt** 396:13

**ferraro** 18:1 19:1,11 20:1 21:1,9 22:1
23:1,25 24:1,13 25:1 26:1 27:1 28:1
29:1 30:1 31:1 32:1 33:1,10 34:1,8,9,
13 35:1 36:1 37:1,9,14 38:1,11 39:1
40:1 41:1 42:1 43:1 44:1 45:1 46:1
47:1 48:1 49:1 50:1 51:1 52:1 53:1
54:1 55:1 56:1 57:1 58:1 59:1 60:1
61:1 62:1,8 63:1 64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1 72:1 73:1 74:1
75:1 76:1 77:1 78:1 79:1 80:1 81:1
82:1 83:1,7 84:1,12 85:1 86:1 87:1
88:1 89:1 90:1 91:1 92:1 93:1 94:1
95:1 96:1 97:1 98:1 99:1 100:1 101:1
102:1 103:1 104:1 105:1 106:1 107:1
108:1 109:1 110:1 111:1 112:1 113:1
114:1 115:1 116:1 117:1,8,23 118:1
119:1 120:1 121:1 122:1 123:1 124:1
125:1 126:1 127:1 128:1,8 129:1
130:1 131:1 132:1 133:1 134:1 135:1
136:1 137:1,2 138:1 139:1 140:1

141:1 142:1 143:1 144:1 145:1 146:1
147:1 148:1 149:1 150:1 151:1 152:1
153:1 154:1 155:1 156:1 157:1 158:1
159:1 160:1 161:1 162:1 163:1 164:1
165:1 166:1 167:1 168:1 169:1 170:1
171:1 172:1 173:1 174:1 175:1 176:1
177:1 178:1 179:1 180:1 181:1 182:1
183:1 184:1 185:1 186:1 187:1 188:1
189:1 190:1,14 191:1 192:1 193:1
194:1 195:1 196:1 197:1 198:1 199:1
200:1 201:1 202:1 203:1 204:1 205:1
206:1 207:1 208:1 209:1 210:1 211:1
212:1 213:1 214:1 215:1 216:1 217:1
218:1,11 219:1 220:1 221:1 222:1
223:1 224:1 225:1 226:1 227:1 228:1
229:1 230:1 231:1 232:1 233:1 234:1
235:1 236:1 237:1 238:1 239:1 240:1
241:1 242:1 243:1 244:1 245:1 246:1
247:1 248:1 249:1 250:1 251:1 252:1
253:1 254:1 255:1 256:1 257:1 258:1
259:1 260:1 261:1 262:1 263:1 264:1
265:1 266:1 267:1 268:1 269:1 270:1
271:1 272:1 273:1,23 274:1 275:1
276:1,5 277:1 278:1 279:1 280:1
281:1 282:1 283:1 284:1 285:1 286:1
287:1 288:1 289:1 290:1 291:1,22
292:1 293:1 294:1,2,11 295:1 296:1
297:1 298:1,9 299:1 300:1,8 301:1
302:1 303:1 304:1 305:1 306:1,22
307:1 308:1 309:1 310:1 311:1 312:1
313:1,16 314:1 315:1 316:1 317:1
318:1 319:1 320:1 321:1 322:1 323:1
324:1,5 325:1,2 326:1 327:1 328:1,14
329:1 330:1 331:1 332:1 333:1,13
334:1 335:1 336:1 337:1 338:1 339:1
340:1 341:1 342:1 343:1 344:1 345:1
346:1 347:1 348:1 349:1 350:1 351:1
352:1 353:1 354:1 355:1,20 356:1
357:1,11 358:1 359:1 360:1 361:1
362:1 363:1 364:1 365:1 366:1,13
367:1 368:1 369:1 370:1 371:1 372:1
373:1 374:1 375:1 376:1 377:1 378:1
379:1 380:1 381:1 382:1 383:1 384:1
385:1 386:1 387:1 388:1 389:1 390:1,
5,7 391:1 392:1 393:1 394:1,18 395:1
396:1 397:1 398:1 399:1 400:1 401:1
402:1 403:1 404:1 405:1 406:1 407:1
408:1 409:1 410:1 411:1,13 412:1

**Ferraro's** 129:22

**fiat** 84:20 100:23 101:11,18,20,23
102:9,10,18 103:5,21,24 104:7
141:17 180:10 200:13 208:20,22
209:4,6,15 211:16 232:10 256:5
366:16,22 374:12,17

**field** 27:14

**fields** 308:3

**fight** 251:15 338:17,19,20 339:4

**fighting** 181:16 242:20 274:19

**figure** 176:4 206:23 271:14 357:15

**figured** 213:19 336:9

**figures** 168:3

**file** 155:6 248:4 312:13

**filed** 128:9,10 154:10,20 155:2,8,11
203:25 208:11 236:15 244:4 278:18
313:23 326:11

**filing** 105:9 222:3 243:24 245:10
248:13 251:14 265:14 270:5 320:7
374:4

**filings** 263:3 264:2 284:17 370:10
372:22 373:5

**fill** 231:18

**final** 323:2

**finance** 27:2 28:14 29:16 88:14
159:6 166:9 295:12 361:5

**financer** 158:19

**financial** 28:10,11,21 30:4,18,23
32:18 151:15 157:8 191:23 203:7
294:17 296:19 306:2 342:9

**financiers** 158:19

**financing** 109:25 110:2,5,14 111:14,
19 112:14 113:18 158:10,11,17

**find** 33:25 206:15,17 301:2 341:11,14
351:2 357:9

**findings** 56:20

**fine** 159:20 199:24 253:18 359:14
368:9 371:2 388:19

**finish** 62:22 82:17 88:19 90:6 284:12
285:17 294:4 306:24 402:5

**finished** 108:15 137:7

**Fireblock** 162:21,23

**Fireblocks** 163:8,12 164:2 171:19
172:4 178:19 180:23 181:7 183:17
193:15 209:15 374:8,19

**firm** 28:12 149:9,13,16 186:23
187:12

**firms** 150:2 151:13

**first-day** 236:6

**first-hand** 361:8

**first-name-basis** 206:19

**firsthand** 186:10

**fits** 141:13

**five-minute** 189:21

**Five-plus** 28:23

**flexibility** 31:3

**floor** 393:3

**flow** 43:14 45:6,7 154:12 156:12,15,
18 159:25 160:10 166:10 167:10
176:2 346:24 347:14

**flows** 143:14 157:2 175:2

**flurry** 374:14

**fly** 22:10 392:25 393:3

**focus** 58:17 147:5 203:18 270:23
338:8

**focused** 46:7 123:25 203:22 204:6
221:19 271:22

**folks** 20:15 46:13,16 75:20 119:24
153:8,15 166:8,9 191:11 410:19

**follow** 34:2 75:9 181:5 190:14
192:17 266:18 267:17,19 268:2
300:16 326:17 331:21 408:25

**follow-up** 138:13 184:20 326:15
344:17 358:6 359:20

**font** 388:21

**forecast** 154:22 155:15 156:4

**forecasting** 296:19

**forego** 177:12

**forensics** 188:23

**forever** 222:7

**forfeit** 230:16

**forgiven** 140:4

**forgot** 402:7

**form** 30:12 32:2,21 35:14 36:8 42:25
44:11 45:16 49:14 50:15 51:18 52:21
53:8 54:7,19 55:13 56:9,22 58:3
60:14 61:18 63:3 64:16,21 65:16,24
66:9,18 67:10,19 68:4 69:13 70:2
72:10 74:5 75:13 76:3,15 77:10,25
81:3,12,19 82:3 87:5 88:8 89:12,16,
25 90:15,23 91:14,22 92:18 93:19
94:5 98:13 99:14 104:3,12,21 109:18

113:7 115:11 116:5 119:13 120:22
121:17 122:2,24 123:18 124:22
126:10,24 127:8 128:14 130:16 131:9
132:15 134:6 135:5,12,25 143:21
146:16 148:6 150:18 155:18 159:9,17
161:19 162:18 163:2,17 164:12
166:17 167:14 168:21 170:16 171:4,
24 172:17 173:3,10 174:10,24 175:22
178:21 179:8,15 180:25 182:6,20
183:14 184:10 185:2,16 186:3,25
188:12 196:2 198:10 199:6,15 200:6,
23 201:13 204:10 205:3 206:5 211:23
214:23 215:15 216:2 219:14 220:3
221:14 222:12 223:3,22 224:7,18
225:19 226:17 228:2 229:22 230:23
231:6,21 233:5,23 235:20 236:3,22
237:10 238:4,13,23 240:13 241:4
242:2 243:2,21 244:10 245:17 247:2
248:20 250:10,25 251:21 252:7
253:21 254:17,22 255:25 256:22
257:24 259:7,18 260:10 261:12,25
262:11 263:7 264:24 265:19 266:23
267:13 269:16 270:9 271:17 272:18
275:24 276:14 277:9,14,23 278:12
279:16 280:8 281:10 282:17 283:21
285:19 286:14 287:11 288:12,22
289:12 290:20 292:19 293:8,25 296:9
297:7,22 303:3,15 305:14 306:6,21
307:20 308:12,18,22 309:6,16 310:2,
12 311:16 312:20 314:25 317:13,23
318:16 319:5 322:18 325:12 326:2
327:3 328:8,25 329:17 330:18 331:18
332:8 337:25 338:22 339:6 340:2
342:14,20 343:14 346:18 347:6,20
348:2,11 349:8 350:3,10 351:6,12
353:15 354:13 355:5 356:4,10,23
358:15 359:19 360:2,17 361:16
362:3,5,12,15 363:2,9 364:23 365:5
366:12 368:4 369:11 370:3,17 372:17
373:14 378:11 379:9,16 380:7
381:10,16 383:16 387:5,22 389:14,25
390:14 391:14 392:14 393:17 397:24
398:20 399:8 401:19 402:3,20 403:14
404:9 405:15 407:8 408:18 410:4

**formal** 274:13 279:4,9,13 280:6

**formation** 307:20 320:11 360:18

**formative** 69:18

**formed** 124:10

**forming** 285:12

**forms** 178:17 254:20 297:17,20

**forward** 204:7,25 205:14 320:21
329:7 330:13 333:10 335:21 350:17

**found** 31:8 39:16 405:24

**foundation** 65:25 88:8 217:8 250:10

**founders** 261:19

**four-plus** 399:15

**FP&A** 287:3,5 295:12

**fraction** 103:22 104:8

**fractional** 253:10

**framework** 72:24 333:14

**frameworks** 118:22

**franchise** 247:9

**fraud** 320:14 360:19

**free** 22:7 40:25 62:13 63:7 218:18
226:15,21

**freed** 374:6,7

**freeing** 369:23 372:15

**freeze** 88:17 354:15,16,17 381:23
382:10

**frequently** 101:25 102:4

**fresh** 125:6

**frictional** 200:19,25 201:4,6,11

**Friday** 25:13 39:6,24

**Fridays** 31:14

**friends** 299:14

**Frishberg** 368:23,24,25 369:4
370:20,23 371:13 372:2,6,7 375:19,
23 378:14,15 379:12 383:20 384:3,
11,20,22 390:6 393:24,25 394:6

**front** 24:3 79:22 115:21 157:15 168:3
228:8 280:9 283:4,5 284:13 290:21
304:5 305:15,18 310:4,8 312:11
341:9 356:11,13 359:12 367:12
373:21 376:19 377:2,8 378:12 380:8,
14 381:17 383:17 387:12 390:16
392:5

**front-to-back** 343:20

**frozen** 238:9 381:25

**fruits** 352:16

**FTX** 369:22 370:13 372:14,25 373:8

**fulfill** 382:13 400:9

**fulfilled** 27:13

**full** 21:23 269:18 302:23 303:7
319:25 340:8 385:17 389:16 395:5

**fully** 311:12 320:15 389:18

**fulsome** 63:13 395:13

**functioning** 204:24 278:21

**functions** 192:6

**fund** 93:8,10 103:14 104:15 109:22
110:11,15 113:12 161:14 164:22
165:13,16 170:9 174:22 175:19
176:5,17,20 178:2 189:6,14 200:10
314:20

**funded** 109:24 164:17 169:20 170:4,
5 172:24 208:18

**funding** 164:19 165:24 171:7,11
172:19 174:14 175:8,19 178:8,13

**funds** 51:5 61:14 169:6 185:5 199:3
200:2,11 211:20 230:8 232:19 236:19
239:3 241:17 246:14 314:3,22 336:16
344:20 349:23 362:8 379:21

**fungibility** 315:5

**fungible** 71:7 98:7 119:4 200:8
211:10 314:7,13,17 315:20 316:13
317:2

**furnish** 111:8

**future** 159:4 192:14 274:8,25 335:14
398:14 406:9

**futures** 287:15

**fuzzy** 302:5

---

**G**

**G-U** 206:20

**gains** 346:23 347:3

**Gallagher** 227:9

**game** 334:9

**gas** 105:10

**gather** 274:3

**gating** 114:19 116:17 392:19

**gave** 153:19 170:8 204:13 230:10
236:11 402:14

**gears** 69:17

**general** 46:17 62:3 86:11 101:4
103:11 145:3 150:25 151:8 152:24
157:17 160:13 165:15 182:22 183:22
191:9 208:7 210:13 287:6 288:18
328:20 358:5 376:2,7,8

**General's** 190:10

**generally** 52:9 151:13 154:18
160:18 194:12 234:5 280:11 376:7
379:24 381:12

**generated** 165:12 297:20

**generic** 273:24

**Github** 217:15

**give** 33:12 34:4 35:9 44:14 55:6
56:25 58:16 71:5 72:23 107:9 114:24
138:20 161:12 168:12 219:21 237:2
242:15 253:2 258:23 260:15 267:25
271:11 275:17 284:7 293:22 339:15
347:24 351:17 366:21 375:20 385:8
389:24 397:2

**giveaways** 271:7

**giving** 66:23 227:19 257:14 258:25
259:22 260:14,21 261:4 303:20
318:14 336:15 356:12

**GK8** 160:17,19 161:5,12 164:16,20,
25 165:7 171:2,6,8,12,20 172:8,10
173:8,17 174:13 178:2,3,9,13,15,23,
25 179:2

**glasses** 218:21 384:16

**global** 28:12

**glove** 35:2,5

**go-forward** 274:21 334:14

**goal** 22:20 123:6,20 124:24 406:8

**Golding** 46:19,24,25

**Golding-ochsner** 151:17

**Goldstein** 120:2

**good** 18:2 19:7,9 27:16 47:22 84:10
119:21 122:5 142:16 212:10,15 229:2
266:4 274:25 300:8 302:9,15,17
335:10 364:6 368:11 373:25 398:16

**Google** 187:5 188:4

**governance** 340:13

**governed** 390:9

**governmental** 204:3

**grace** 189:4

**graduate** 27:5,7

**grandfathered** 64:13 403:19,20
404:3

**grandfathering** 353:12,22,24
404:12

**grant** 382:22

**granted** 159:14 164:14

**granting** 38:25

**great** 24:7 31:16 136:23 174:16,17
194:8 196:24 212:16 221:25 300:2
301:19 306:25 324:8,17 327:18
334:16 347:2 404:18 405:4 410:11

**greater** 248:8

**grew** 228:4 365:21

**gross** 364:22

**ground** 21:15 22:5 97:17 191:15
399:24

**group** 153:12 208:9

**groups** 327:21,25 328:5,23 331:14
336:2

**grow** 230:5 406:5

**growing** 316:24

**growth** 139:23 316:22

**guarantee** 292:13

**guaranteed** 139:16,18

**guards** 172:11

**guess** 104:5,16 114:10 182:18 187:7
200:19 202:7,20 204:8 207:10 208:20
229:3 263:5 266:11 270:3 320:25
327:9 329:12 348:22,24 375:10 377:9

**guessing** 154:8

**Guillermo** 120:3 206:11

**Guillermo's** 206:13

**Gump** 148:22

**GUSD** 88:20 312:6

**guy** 168:24 191:18 206:19 262:18
338:9 361:5

**guys** 134:17 194:8 284:7 321:12,15
372:3

---

**H**

**H-E-R-R-M-A-N-N** 324:7

**H-O-F-F-I-N-G** 394:15

**habits** 366:19

**hair** 370:22 371:5

**haircuts** 336:10

**half** 28:2 96:5 139:16,19 178:4 205:8 238:19 373:6

**halfway** 82:25

**halt** 380:2

**hand** 35:2,5 157:24,25 169:22 170:6 172:20 176:19 186:12 374:18

**hand-in-hand** 125:25

**handful** 25:5 156:2 191:13

**handle** 265:6

**handled** 105:18 239:4

**handling** 187:22

**handoffs** 202:3

**hanging** 158:5

**happen** 103:16 194:25 227:8 228:12 248:24 363:22

**happened** 42:8 63:15 94:2,7,8 201:4 220:10 227:3 245:5 249:16 252:17 271:22 274:11 346:4 363:25 373:23 396:22

**happening** 41:22 185:11 249:11 252:21 266:25 296:16 337:13 340:13 346:2 363:22 364:4,8

**happy** 20:20 83:4 217:9 268:18 276:19

**hard** 73:16,23 74:10 110:20 111:7 124:3 169:9 188:15 215:3 219:21 304:5 357:10

**Hastings** 143:8

**head** 25:7 26:15 28:10,21 30:4,5 50:18 96:22 105:17 120:3 191:22 194:5,6 201:16 203:7 206:10 294:17 295:12 308:6 384:9

**header** 48:2 84:15

**headquartered** 215:11

**headquarters** 272:6,12

**heads** 148:2 153:12

**healthcare** 27:22

**hear** 84:3 117:24 129:15,22 229:2 312:24 340:14

**heard** 57:2 61:20 89:13 147:11 186:10 193:3 232:5 272:19,21 308:14 317:19 320:23 361:21

**hearing** 135:17,18,20 156:10 167:8 203:21 209:20 211:21 212:9 411:10

**hears** 132:7

**heartbreaking** 129:11,17

**heartbroken** 228:7,8

**heavy** 186:11

**held** 163:14,19 164:3,4,6 178:18 198:8 219:9 272:15 310:10,21 341:20

**helped** 397:14

**helpful** 45:11 206:24 332:12

**Heras** 406:20,22 407:3,24 408:4 410:25

**Herrmann** 324:4,6,9,17,24 327:6 329:9 332:24 333:6 336:19,20 338:25 339:10 346:8,12 349:21 350:24 351:18 356:16 357:7,22 360:10 361:11 367:23 368:7,15,19

**Hershey** 18:3 19:7,10,15,18 21:6,8 23:23 24:4,7,12 33:9 34:6,12 37:11, 21 38:10 40:15 41:5 47:19,20 56:12, 25 57:4 58:6,20 59:2 61:9 63:9 65:2 82:24 83:12,14,20,22,24 84:5,10,11, 13 117:7,12,22,25 132:3,7 136:24 137:12 212:14,19 276:6 291:23

**hew** 320:20

**Hey** 213:17

**high** 63:18 226:24

**high-level** 157:11

**higher** 70:23 71:12,13,16 252:2,11

**highlighted** 216:15 218:5

**highly** 107:16,20 108:3 109:14 234:2 319:10

**hired** 153:24

**hiring** 154:8

**historical** 274:16,20,23,24

**historically** 51:25 208:23

**history** 75:17 267:24

**hit** 191:15 249:6

**Hoboken** 272:6

**Hoffing** 394:11,12,15,17 406:12,16

**hold** 28:20 57:19 160:4,6,8 163:20 178:24 216:21 229:12 235:2 275:23 306:16 309:20 341:22 371:7 380:21

**holder** 136:10 225:11

**holders** 69:24 70:9 72:8 85:18 97:25 128:10 135:3,7,9,23 136:3 173:7 300:11,13 320:12 364:23

**holding** 20:17 179:2 209:12 309:21 311:21 340:10

**holdings** 210:6 308:10,16,20 310:6, 10,21,23 311:12

**holds** 225:16 259:16 303:19 309:9 335:3

**home** 222:5 298:22 374:18

**hone** 41:23 126:3

**honestly** 47:5 52:16 53:20 81:21 118:24 144:17 326:5 366:25 367:13

**honor** 314:21

**hope** 126:13,16 181:14 182:11

**hoping** 112:13 158:16

**horrible** 228:15,19

**hosted** 232:16

**hosting** 167:7 168:14

**hot** 169:16

**hour** 25:17 83:3 285:6,9 356:25 357:2

**hours** 18:16 25:18 54:23 124:6 319:25 393:7

**house** 225:10,23,24 227:14,19 289:3,4

**huge** 193:4

**human** 227:22

**hundreds** 243:17 246:12

**hurt** 127:23,24

**hurting** 239:8

**hypothecate** 341:17

**hypothetical** 113:2 260:24 282:18

---

**I**

**I-M-M-A-N-U-E-L** 324:7

**i.e.** 339:3

**ice** 245:6

**ICO** 315:8

**idea** 172:12 212:15 247:7 275:18 363:17 404:18 405:6

**ideas** 331:3 333:15 336:15 337:11,14

**identical** 326:24

**identification** 34:10 37:18

**identify** 35:18,25 299:20 301:22

**idiosyncratic** 380:16

**illiquid** 93:12 160:14 246:16,20

**imagine** 166:8

**Immanuel** 324:5

**immediately** 146:4 180:6,15 290:4

**immense** 265:23

**impact** 94:19 177:3 180:15 181:19 183:5 260:25 274:21 288:7 296:18

**impacting** 181:24 182:2

**impacts** 156:4

**impairs** 250:23

**implying** 329:25

**important** 23:13 59:6 99:22 130:25 131:15,18 249:2 321:22 334:6 335:4 351:19

**importantly** 108:16

**impression** 114:19 188:17

**in-kind** 181:11,15,19

**inability** 250:22

**inaccurate** 301:2

**inbound** 400:9

**incented** 68:9

**incentive** 230:11

**incentives** 336:16

**incentivize** 32:16 66:14 67:7

**incentivized** 66:6 67:16

**include** 179:18 311:19

**included** 28:11 79:20 194:16 243:16 279:3 281:5 312:12

**includes** 79:7 242:18 249:3 281:16

**including** 28:15 133:24 164:16 165:22 170:10 194:12 204:2 205:13 248:7 286:5 295:8 309:21 327:15 341:4 364:12 390:22 392:22 395:14

**income** 255:2,5,12 346:25 365:14

**incomplete** 233:6 234:20 282:17 290:20 378:11 381:17 383:16 385:17 390:2

**incorrect** 359:3

**increase** 111:18 139:12 168:18 255:16,23 256:12 388:21

**increased** 139:7 255:6,22

**increases** 252:20 254:4 256:19 337:10

**increasing** 169:6 183:10 242:11 253:24 255:16 336:7 337:7

**incredibly** 110:2,5 125:18

**independent** 335:2

**individual** 67:3 76:6 128:9 135:3 193:24 198:8 199:4 265:3,5 266:7 268:15 344:4,7 394:21

**individualized** 321:8

**individuals** 20:3 67:7 153:25 191:13 321:25

**indulgence** 122:9

**industry** 32:23 89:18 101:22 113:22 139:22 343:22 349:6,18 365:22 376:16 404:19 405:7 406:4

**industry-wide** 343:25

**inflows** 156:6

**influence** 32:9 288:3

**influencer** 262:19

**influencers** 262:8,22 263:12,18,21

**inform** 23:24 233:19

**information** 19:22 43:3 60:16,19 69:7 147:20 195:19 196:14,18,22 197:3,14 198:20 199:2 201:9 202:8, 11,14 206:2,24 233:6 234:21 264:9 267:25 269:21,22 270:13 284:8 295:18 307:18 351:14,17

**informed** 198:6 199:13

**infusion** 161:4 317:5

**initial** 195:19 283:19

**initially** 195:13,16 213:23

**initiate** 397:14

**initiates** 290:3

**innovating** 335:22

**input** 36:19,21,25 42:21,23

**inquire** 218:18

**inquiries** 397:6

**inserted** 282:25

**insider** 337:21 338:18 339:4

**insiders** 261:8 277:5

**insight** 219:21

**insolvency** 243:19 244:7 245:12 246:18 247:5 248:2,6

**insolvent** 202:24 203:12 244:16 312:16 313:2,11,12 368:2

**instance** 21:3 225:8

**instant** 175:17

**instituted** 147:2 386:25 390:12

**institutional** 48:20 59:8 71:10 323:3,5,6,10,11 366:8

**institutions** 71:11 314:15

**instruct** 43:3 69:8 332:19 333:4

**instrument** 289:14

**instruments** 169:3

**insurance** 27:21

**intend** 38:7 107:14 122:11 126:8 174:3

**intends** 118:11

**intent** 241:18

**intentionally** 127:14

**interaction** 340:5

**interchangeable** 71:7 101:24 209:2

**interest** 160:5,20 200:3,15 210:12 240:25 287:17 301:8 303:13,24 317:10 326:7 328:3 336:8 337:7 378:8 379:6 383:14 385:15

**interested** 55:17 175:15 194:15 255:10

**interim** 30:21 249:25

**internal** 46:18 63:11 72:13 125:13 136:21 151:23 187:23 351:10 407:15

**internally** 265:24 267:17 273:10

**international** 204:23

internationally 204:4 400:10

Internet 217:16 360:15

interrogatories 143:19

interrogatory 143:17 149:3,4

interrupt 193:17

interviewing 54:21

intimately 180:20

introduce 38:8

introduced 214:20 217:22

introducing 213:20

inure 173:17

invalid 293:6

invest 244:25 254:9 341:17 401:2

invested 94:25 95:3 353:7

investigations 108:14 116:25
409:5,9

investing 74:19

investment 74:16 77:18 78:6

investments 239:25 247:14 310:9,
20,23,24 311:2

investor 30:5 65:4,11 203:8 294:18
306:4,11,13 354:9,18 399:22 400:13
401:9 402:12 403:6

investors 50:13 52:10,11 53:16
54:3,4 55:10,11,16 61:14 64:10 66:5
68:15 69:4 306:19 307:9 321:24
327:13 353:13,20 359:16 396:5 401:5
404:4 405:13

involved 53:21 62:4 73:25 75:10
125:18 150:2,4,22 154:7 171:14
364:2 404:12 406:7

involvement 197:21 202:10,19

IOU 182:9 253:24 254:5 256:14
286:17 345:14

IP 165:7

irregular 380:20

IRS 255:4,10 298:3 350:22

IRS's 257:11

Israel 148:24

Israeli 164:15,20 165:8

issue 20:14 33:22 93:13 176:3
241:18 242:14 243:13 307:21 325:15

330:11 388:13

issued 254:20

issues 61:13 69:3 192:19 202:14
321:4 327:23 328:15

item 24:17 271:20 299:12

items 160:3 162:4 271:21

iteration 333:8

---

## J

J-E-R-E-M-Y 394:14

January 107:3,4 175:3 176:2,23
177:23 191:12 195:18

jeopardizing 111:8

Jeremy 394:12

Jersey 272:6

job 28:24 54:24 144:13 190:21
233:14 274:2 339:17 406:2

jogged 136:9

join 29:23 30:24 32:9 67:17 74:8
139:20 220:10

joined 28:25 30:3 31:22 59:12 62:11
138:22 139:20,21 141:7 145:24
146:10 195:14 197:19,20,22 220:14
228:6 249:17 294:13 316:23 343:4

joining 31:20 33:16 70:11 141:2
142:13

Joseph 46:19,25 151:17 153:12

JPMC 287:2 295:7

JPMORGAN 28:6,9,17,22 32:11
59:7 141:4 188:20 228:5

judge 115:6,16,18 128:16 173:22
278:16 294:9 392:20

judge's 392:19

judgment 100:2

July 30:17 214:20 216:12,16 217:22
282:11 294:19,20 361:17

June 195:14 235:17 237:6,8,23 238:2
242:24

---

## K

K-A-R-E-N 208:4

K-H-A-N-U-J-A 273:20

K-U-L-P-R-E-E-T 273:20

Karen 208:3

Kathryn 33:4

keeping 61:14 298:21

key 36:16 42:19 71:18 108:12
114:12,18,19,21 115:4,9,13,23 116:2,
17 162:4 173:21 181:4 392:19 404:17

keys 181:4

Khanuja 273:18,19,22 276:4 285:13,
21,25 298:13,16

kicked 176:14

kickoff 205:11

kind 27:9 28:13 31:17 35:2 43:11,13
45:9,19 48:11 49:24 50:24 51:22
53:24 54:11 57:16 59:20,25 63:17,19
67:3 71:17 72:22 73:16 74:13,16 75:7
76:25 88:16 93:3 98:5 99:18 108:18
109:10 113:17 114:6,8 119:2 130:9
131:14 141:11 146:2 147:16 153:13
156:3,6 158:13,24 169:9 177:20
181:15 182:2,12 185:22 187:11
188:3,16 189:11 191:22,23,24 198:2
200:17 202:10 214:5 215:5 218:13,16
228:10 237:13 240:2 242:17 243:6
244:5 245:6 249:5,13 257:7 261:4
262:22 284:22 285:11 287:7 296:2,4
298:6 299:20 309:8 314:10 320:22
321:13,14,16,17 324:13,16 331:2
333:15 334:4,10 335:9,15,22 336:25
342:25 343:21 348:17 349:14 350:18
360:18,23 361:4 378:16 380:11
382:12 386:3,7 391:2 395:11 396:25
399:10,16 400:22,25 404:18 408:7

kinds 275:14 331:24 337:12

Kirkland 24:21,23 25:2 34:18,20
35:12 36:2,5,13,23 40:21 46:15
134:14 142:22,25 143:5 148:20 205:6
267:19 329:13,21 331:11 339:4
369:17

knew 203:11 285:2 364:14

knowledge 20:6 50:24 55:2 60:18
63:12 82:5,7 119:8 140:3 151:4
154:21 159:24 173:15,23 176:16
177:25 179:11 182:17 183:11 188:6
194:18,19 198:5,12,25 199:12,25
200:18 204:21 218:17 243:10 244:20
262:24,25 274:3,13,16 276:6 283:11
295:15 296:2 306:14 317:15 340:18
350:18 361:8 365:9 369:13 408:24

---

**knowledgeable** 206:2 280:15 409:3

**Krissy** 269:25 271:4

**Kulpreet** 273:18

---

**L**

**L-A-Y-L-A** 190:9

**labeled** 229:9

**lack** 229:6

**Landes** 232:3

**landscape** 60:8,11,24,25 61:6 62:17

**lane** 278:6,7 338:3,15

**language** 81:25 82:11,15 218:24
280:5 290:16 340:24 342:5 356:6,7
357:9,18,20 380:11,13 384:8 390:24

**languages** 81:10,16 82:22

**large** 50:7 373:8

**largely** 45:18 59:11 61:22 93:7
105:18 169:21 209:2 247:13 271:6
318:3

**larger** 248:9

**Lark** 263:24 264:18

**Las** 406:20,21 407:3,24 408:4 410:25

**late** 107:3 176:23 191:19

**latest** 290:5

**Latham** 134:14 149:17,19,22 150:16
204:18 205:5

**Latona** 369:17 372:10

**launch** 61:21,24 156:3 215:6 358:21
396:14 399:11,12 400:6 402:23
403:17,18

**launched** 57:8 145:8,24,25 396:25

**launching** 57:13

**law** 149:8,13 259:21 338:10 382:23

**laws** 59:21 306:9

**lawyer** 46:18,19 80:10 246:6 256:25
327:19 391:17 392:5 393:22

**lawyers** 393:22

**lay** 217:7

**Layla** 190:8

**lead** 152:21

**leadership** 152:25 153:2,10 154:7
361:13

**leading** 105:8 374:15

**leads** 152:4,5 188:4

**leaked** 407:17 408:12

**leaning** 335:21

**learn** 192:5

**learned** 59:11 63:5

**lease** 272:12,15

**leash** 58:16

**leave** 337:17 364:17 367:17 368:12
393:22

**leaving** 331:8

**led** 62:17 76:5 125:16

**ledger** 121:5,13,21 142:6 184:3
193:22 205:23 206:3 224:21 225:2

**ledgers** 159:3

**leery** 234:11

**left** 19:3 28:9 29:9,16 86:23 269:4
272:23 298:20 311:10 318:10 328:12
356:17 357:3

**leg-** 237:12

**legacy** 236:9 239:19

**legal** 24:15,21,25 34:18 39:11 46:14
63:11 69:3 108:12 114:8,12,20,21
115:4,8,9,13,20,23 116:2,17 117:2
143:6,7 146:18 147:12 148:10 150:5
151:22,23 152:13,18,23 153:7,20
162:4 166:9 173:21 204:19 259:13
278:4 295:11,22 308:25 317:13
329:21 331:21 350:15 351:23 387:6
392:15,19 393:18,21 400:16

**lend** 59:17 71:3 89:19 193:10 221:3
314:16 341:16

**lending** 48:16 70:18,19 71:10,15,18
89:2 92:12 93:5,6 95:7,16,24 96:12,
14 116:13,14 121:11 162:10 194:13
210:8,9 211:2,13 232:3,7 288:2 289:2
309:11,22 311:3 334:19 335:13
349:12 355:10 383:12 385:13

**lengthening** 336:8 337:8

**lens** 141:6 234:4

**lent** 97:7 353:7

**Leon** 232:6 261:20

**letter** 140:13 227:8

**letters** 128:10,17,19,20,24,25 129:3,
6,9,10,11,16 130:11,13,19,20 227:5

**letting** 82:16

**level** 63:18 162:9 288:3 376:15
400:24

**levels** 175:4

**lever** 110:20 111:5

**liabilities** 245:13 247:9 248:8,10
311:20

**liability** 99:23 103:18 253:8 255:14
279:11 294:22 296:18 311:13 345:13,
17,19

**licensed** 335:19

**lien** 289:4,6,8,17 381:12

**life** 29:17

**life's** 227:23

**lift** 266:10

**light** 160:10

**lighting** 371:10

**limit** 380:2

**limitations** 386:24 390:9

**limited** 51:2 53:2 55:2 76:25 270:10
301:13

**limits** 73:17 74:23 75:4,6,19,21
164:14

**lines** 31:14

**link** 98:5 211:11 218:6 232:22

**linkage** 67:2

**lion's** 320:18

**liquid** 248:7

**liquidate** 101:10 110:7

**liquidated** 92:21,24 93:22,23 94:9
104:7 358:10,20

**liquidation** 93:15 94:16,18 157:9,12,
23 159:3 237:20 238:20

**liquidity** 43:14 45:19 72:14,24 73:2,
20 106:10,15,19 107:6 108:24 109:21
111:18 112:18 113:3,4 118:23 159:25
160:20 161:13 177:4 179:13,23
180:16 236:25 244:19 245:9 246:10

**listed** 26:11 87:12 95:17 152:6

240:19 243:15 265:10

**listen** 131:2 330:25

**listening** 43:20 148:9

**listing** 269:10

**literally** 227:18 245:2

**Lithuanian** 163:24

**live** 268:6,11

**live-streaming** 20:15

**living** 191:18 386:2

**LLC** 309:24

**LLCS** 367:14

**LLP** 367:4

**lo-** 347:17

**loading** 384:12

**loan** 89:22 90:3,13,21,24 92:20,25
93:15,16 94:17,18 97:9 120:12
141:18 159:6 162:5 165:6,21 170:7,
11,14 175:7 176:6 232:12 234:12
254:6 256:15 286:24 287:8,13,25
288:14,19 290:11 303:10,17,18,20
304:4 317:7 318:14,21,22 319:9,10,
12 334:13 337:11 347:23 354:9,19,22
355:19 356:6 358:8,11,19 378:2
382:21 383:4

**loaned** 182:3 286:18 377:17

**loans** 70:20 93:8 165:22 174:12
232:18 287:7,22 288:7,9 290:9 323:4,
7,12 328:4 331:15 334:17 336:3,5,14
337:6,7,10 347:17 366:9,15 374:5
377:19

**local** 148:23

**located** 81:7 162:16

**location** 224:10

**locations** 31:3

**lock** 126:17 181:4 336:16

**locked** 163:11 181:7 246:12

**log** 20:13

**logistical** 33:22 299:12

**long** 25:15 28:20 29:4 31:18 65:8
113:12 144:15 151:3 234:7 257:2
310:18 328:10 352:5 357:14 371:3
376:2 383:23 384:8,13 385:22 406:7

**long-term** 33:3

**longer** 119:18 120:24 121:4,9 194:7
205:25 247:6 261:20 272:13 378:22

**looked** 91:9 162:6 217:15 242:10
271:19 350:20

**loosely** 262:13

**lose** 227:23 240:3 284:22 397:11

**losing** 46:19 398:5

**loss** 96:17 346:25

**losses** 95:8,15 96:8,19,25 236:9
239:19 244:13 282:9 342:2,12 346:24
347:3 349:25 350:5,7

**lost** 191:25 240:4 336:19,25 349:21
402:8

**lot** 28:18 60:4 93:11 100:13 105:11
128:25 142:4 150:2 156:5 166:11
167:6 175:3 188:21 236:9 245:4
253:4 267:7 271:25 272:2 311:5
332:2 343:7 350:21 364:12 367:18
374:14 404:24

**lots** 129:10 193:20 315:10

**love** 107:17 329:3 331:20

**lower** 70:22 257:20

**LTV** 70:23,25 71:13,14

**lunch** 212:10 213:2

---

# M

**M-I-L-L-I-G-A-N** 190:9

**Machine** 217:17

**machines** 156:24 167:4

**macro** 288:3 398:13

**made** 22:10 36:23 57:23 64:19 76:8
97:25 149:5 151:17 167:9 191:25
216:12 220:14 232:10 244:25 260:18
269:11 270:5,6 290:10 313:18 320:10
325:21 330:15 396:23 403:7 405:25

**magnitude** 49:25

**main** 36:16 162:20,22 164:5 183:17
184:6,14 198:2,7 199:4 200:2,9,13,20
201:3 240:16

**maintain** 195:15,18 196:18

**maintains** 196:13 197:14

**major** 110:3

**majority** 68:22 75:17 102:17 104:6

105:2 168:13 179:21 298:10 399:2

**make** 22:12 23:5,7,10,15,17 57:2
75:20 76:11 79:8 123:5 143:14
147:14 148:14,15 162:2 168:7 169:9
183:12 192:23 204:16 205:16 207:11
218:15 226:23 230:25 271:8 274:8,19
281:17 285:2 289:23 300:18 307:15
312:24 324:14 339:13 363:6 388:11
397:10 399:15,21 401:4,8,17,22
402:16 408:7

**makes** 119:5 142:11 166:7 235:11,12
380:18 386:10

**makeup** 54:12

**making** 59:18,19 74:2 170:13,25
172:14 173:8 327:4,24 362:19 365:25
391:15

**manage** 32:12,14 43:11 103:17
167:16 314:8 348:21 366:6

**managed** 314:6

**management** 72:14 73:17 74:7
75:16,24 110:20 141:6,22 294:23
315:24 316:2 335:15,23 349:18

**managing** 29:8 99:21

**March** 29:25 31:23 45:8 50:24 70:12
106:23 145:7,24 161:3 190:22 191:16
202:22 214:6,8 228:6 231:13 275:9
294:13,15 343:5 360:15

**margin** 168:5 177:13,17

**mark** 33:10 34:4 254:13

**mark-to-market** 247:15

**marked** 34:10 37:9,17 78:15 120:24
121:4

**marker** 239:6

**market** 51:13 169:4 231:14 245:6
291:4 309:23 329:5 333:17 380:15

**market-based** 366:5

**marketed** 160:4,5 345:25

**marketing** 50:20,22,23 51:3,15,20,
25 52:4,6,8,17,22 53:6 108:6 176:12
184:17,22 185:7,8,12,13,21,25 186:8,
12,17,22 187:5,12,24 188:22 201:23,
24 202:4 221:11,22 222:4 226:22
230:4 263:19 332:11 333:18,22 361:4

**marketplace** 60:9 160:7 236:8
239:19 252:22 253:5 405:7

**markets** 160:11 256:20 287:15

**marquee** 59:23 396:11 398:4

**Marsal** 134:15 157:7

**Mashinsky** 79:19 186:11 201:24 243:14 261:20 269:25 270:2 271:4 326:12 339:21 340:6,12,14

**Mashinsky's** 26:10 271:4 339:22

**massive** 99:16 100:7 266:10

**massively** 245:8

**material** 214:19 255:21 282:12,25 325:20

**materially** 237:24

**materials** 147:15 220:6

**math** 89:3,8 91:17 96:12

**Matic** 373:7

**matter** 317:20 326:15

**matters** 36:12 148:23

**maturities** 165:23

**maximize** 108:11 123:2,8,13,16 124:11,25 133:22 192:15 242:15 251:11 275:2,6 291:24 292:7 339:18 355:16

**maximizes** 328:11

**maximizing** 133:13 292:23 293:17, 20

**Mccarrick** 19:4,8,9,13,15,17 21:7 23:22 24:5 25:9,22 30:11,14 31:25 32:20 35:13 36:7 40:9,19,22,24 44:10 45:15 47:18 49:13 50:14 51:7 52:12 53:7,17 54:6,18 55:12 56:8,16 58:2,10 60:3 61:17 62:20 63:2 64:15,20 65:15,23 66:8,17 67:9,18 68:3,17 69:6,12,25 72:9 74:4 75:12 76:2,14 77:9,24 81:2,11,18 82:2 83:19,23 84:2,7 87:4 88:7 89:11,15, 24 90:14,22 91:13,21 92:17 93:18 94:4 98:12 99:13 104:2,11,20 109:17 113:6 115:10 116:4 119:12 120:21 121:16,25 122:23 123:17 124:21 126:9,23 127:7,16,20 128:13 129:20 130:15 131:5,8,23,25 132:6,14 133:8 134:5 135:4,11,24 137:13,21 143:20 144:2 146:15 148:5 150:17 155:17 159:8,16,19 161:18 162:17,25 163:16 164:11 166:16 167:13 168:20 170:15 171:3,21,23 172:16 173:2,9 174:9,23 175:21 178:20 179:7,14 180:24 182:5,19 183:13 184:9,25 185:15,18 186:2,24 187:15 188:11 189:18,20

195:25 198:9 199:5,14 200:5,22 201:12,18 202:12,25 204:9 205:2 206:4 211:22 212:6,16,20 214:22 215:14,25 216:5 217:2,7,12 218:7,10 219:13 220:2 221:13 222:10,17 223:2,19,21 224:6,17 225:18 226:16 227:25 229:21 230:22 231:5,20 233:4,22 234:19 235:19 236:2,21 237:9 238:3,12,22 240:12 241:3,12, 25 242:25 243:20 244:9 245:16 246:21,25 248:19 250:9,24 251:20 252:6 253:15,17,20 254:13,21 255:24 256:21 257:23 259:6,17 260:9 261:11,24 262:10 263:6,25 264:8,11, 23 265:18 266:22 267:12 268:3 269:15 270:8,20 271:16 272:17 273:8 275:20,23 276:13 277:8,13,22 278:11 279:15 280:7 281:9 282:13,16,21 283:20 285:4,16 286:13 287:10 288:11,21 289:11 290:19 291:17 292:18 293:7,24 295:20 296:8 297:6, 21 298:18 299:11 300:2 301:19 302:3 303:2,14 304:2 305:13 306:5,16,20 307:10,19 308:11,17,21 309:5,15,25 310:11 311:7,15,23 312:8,19 313:4, 13 314:24 316:6,9 317:12,22 318:9, 15 319:4,14,24 322:3,17 323:13,24 324:8 325:11,25 327:2 328:7,24 329:16 330:17 331:17 332:7,14,18 333:3,11 337:24 338:21 339:5,25 342:13,19 343:11,13 346:8,17 347:5, 19,25 348:10 349:7 350:2,9 351:5,11 352:24 353:14 354:12 355:4 356:3,9, 21 357:2 358:14 359:18,25 360:16 361:15 362:2,9,11,14,25 363:5,8 364:9,24 365:4 366:11 367:7,19 368:3,18 369:10 370:16,25 371:13,16 373:10,13 378:10 379:8,14 380:6 381:9,15 383:15,22 384:6 385:16 387:4,21 389:13,21,24 390:13 391:13 392:13 393:12,16 394:5 396:6 397:23 398:19 399:7,23 400:15,18 401:10,18 402:2,19 403:13 404:8 405:14 406:15 407:7,21 408:3,6 410:3 411:5

**meaning** 76:17 102:25 193:10 302:23 314:9

**meaningful** 42:4 156:9

**means** 20:2 21:22 181:6 235:15 247:8 268:11 306:11 317:8 339:17 386:22

**meant** 342:15

**measure** 51:22 188:17

**measured** 188:18

**measurement** 343:23

**mechanics** 120:8

**mechanism** 266:21 267:10 269:5

**media** 117:16,20 137:25 138:5 189:24 190:4 212:23 213:10 262:18 299:4,9 319:17,22 371:20,24 412:11

**mediate** 328:4

**Medium** 360:14

**meet** 20:20 74:15 100:23 103:24 331:14 402:14,17

**meeting** 41:22 42:11,12 74:17 125:11 134:13 144:9 191:21 203:9 205:8,12 249:16,22 250:2,5,15,16,17 377:24

**meetings** 74:14 144:14 261:17

**Melanie** 300:9

**member** 152:22

**members** 133:3 135:10,21 327:15

**memorize** 284:3 341:8

**memorized** 284:9

**memory** 45:4,23 77:12 86:2 88:18 96:4 130:22 136:9 139:2,13 149:22 153:22 157:21 198:18 288:24 305:16

**mental** 141:13 261:4

**mention** 275:14 283:10 390:10

**mentioned** 25:23 52:21 60:22 76:22 102:9 111:17 113:24 114:11 133:3 153:9 203:18 214:6 227:5 249:15 274:10 276:5 286:23 291:23 292:2 294:13 298:10 305:7 392:23

**merchandise** 269:11 271:6,9

**message** 130:10

**messaging** 407:15

**met** 158:18 203:13,14 205:5 232:8 340:9 378:7

**method** 70:4

**methods** 278:25

**mic** 315:17

**microphone** 228:17 302:12

**mid-april** 145:25

**Mid/early** 151:7

**middle** 30:17 155:5 175:13 247:23

294:19 346:9

**midland** 157:3 169:25 177:13

**Milbank** 299:14 300:10

**Milligan** 190:7,8,9 197:12 207:3

**million** 87:23 88:6,21,23 90:19 91:4, 8 92:7,8,16 95:23,25 96:18 139:16 158:2 160:13 161:20,22,23 175:18 178:5,25 180:2,3,5 183:2,21 209:9, 12,16,21 264:21 312:5 369:22 370:4 372:14,18 374:13 398:25

**million-ish** 89:7

**millions** 156:3 243:17 246:12 261:22

**mind** 45:24 46:8 116:18 141:11 257:11 283:6 387:12

**mine** 89:8

**mined** 165:19 167:21 168:8 170:8 172:21

**minimis** 159:13,22

**mining** 93:8 95:8,15,22 96:12,13 107:2 156:14,20 160:6,7 165:13,16, 17,20 166:3,7,10,14,22 167:9,11,17 168:2,14 169:20 170:7,9 172:15,19, 23,24 173:17 174:22 175:2,6,9,11,19, 25 176:2,12,18,19 244:24 245:2 246:2,12 247:16 249:9

**minus** 391:11

**minute** 86:25 350:25 371:12

**minutes** 203:16 250:5,17 285:7 298:20 311:9 318:10

**Mischaracterizes** 51:18 67:10 281:10 283:21 291:18 293:25 360:2 362:15 363:12 387:5 402:3

**mishearing** 210:15

**misrepresentation** 320:15 360:20

**misrepresented** 307:17

**missed** 238:21

**missing** 260:6 265:14,16 267:9 269:6 343:7 349:23

**misstate** 193:6

**mistake** 320:14

**mistakes** 228:22

**Mister** 23:22

**mix** 99:19

**mixed** 98:16

**Mm-hmm** 247:21

**mobilize** 266:17

**model** 141:13 261:5

**models** 28:16

**modified** 369:7,14

**moment** 34:4 44:15 330:10 364:11 385:8

**Monday** 251:24 252:10 254:3 272:24

**monetize** 101:8 102:2,5,20 105:22 242:5 245:8 246:4 249:10

**monetized** 100:22 103:23 104:18 105:6,15

**monetizing** 101:13

**money** 90:8 97:5,7 109:11 120:14 175:24 176:23 189:13 191:25 316:17 338:12,13 339:19 366:20,21

**month** 107:9 115:19 155:5 171:10 178:5 313:22

**monthly** 155:8 312:12

**months** 29:6 101:6 107:24 168:17 169:17,18 191:12 229:13 230:13 249:17

**morning** 18:2,3,9 19:7,9 134:11 205:11

**motion** 26:2,9 38:21 56:11 116:12 144:16 159:13 174:6 207:16 261:13 267:14 270:10 300:22 301:3 318:22 367:9

**motions** 24:16

**motivated** 30:24

**mouth** 199:23

**move** 120:25 135:14 160:11 172:6 183:18 184:8,13 289:19 302:10,11 315:21 331:24 340:22 368:8 403:25 404:19

**moved** 29:13 118:17 120:15 121:8, 22,24 174:19 184:2 296:13 403:12, 22,23

**movement** 121:6,14 205:22 206:3 374:15

**movements** 118:19

**moving** 68:14 171:19 172:3 374:20

**multiple** 44:22 101:15 102:7,8 105:13 142:6 163:5 164:7 330:24 334:17 352:25 360:24 404:11

**multiply** 168:10

**multitask** 144:14

**multitasking** 42:13 144:13

**mute** 357:5

## N

**N-I-C-O-L-E** 301:25

**named** 76:6 201:25

**names** 25:6 148:25 186:5 227:10

**narrate** 35:9

**nascent** 139:22 343:22 406:5

**National** 208:6

**native** 209:2

**nature** 390:3

**NDA** 332:17,20 333:5,12 351:15

**NDAS** 332:15

**necessarily** 191:9 224:25 226:2,3,7 246:14 252:22

**needed** 59:23 100:23 178:8 194:24 375:13 396:13 397:8

**neg-** 156:19

**negative** 106:22

**negotiated** 139:14

**negotiations** 141:8

**nervous** 370:24

**net** 103:18 160:23 171:9 287:23 349:24 350:5

**network** 166:11 175:25 181:7 301:13 309:24 312:4

**neutral** 103:17 169:11

**neutralized** 97:15

**Nicole** 301:24 322:7

**night** 320:7

**nod** 23:5

**NOLS** 350:17

**non-normal** 380:12

**nonaccredited** 53:16 54:4,13,16
55:10,16 61:13 64:9 65:4,11 66:5
68:15 69:3 353:13,20 354:8,18
358:23 359:4,15 396:5 400:6 403:3,
19

**nonalgorithm** 312:16 313:2

**noncustody** 322:23

**nondebtor** 163:15,20 165:3,5
174:19

**nondebtors** 164:10,17,21

**nondisclosure** 332:20

**nonexperienced** 114:7

**nonmining** 166:12

**nonobjections** 160:12

**nonordinary** 386:3

**nonstop** 127:3

**nonverbal** 23:6

**normal** 93:4 164:18 189:10 208:19
223:14,16 255:7 286:19 290:25
291:6,14 348:6,18 354:16 376:11,13,
15 385:21 386:8 391:3,21

**north** 398:25

**not-for-profit** 27:22

**note** 33:15 38:4 249:2 320:3

**noted** 213:7 236:5 412:13

**notes** 160:6

**nothing's** 252:17 389:6

**notice** 20:8 230:18 231:15 282:5
325:17

**notifications** 220:12

**notified** 375:4

**noting** 361:13

**notional** 319:8

**nowadays** 206:19

**Noy** 151:24

**Nuke** 120:2,3

**number** 24:10 33:11,20 37:10 38:2
43:11 85:6,10,13,18 86:9 87:18 89:3
96:22 145:19 149:4 332:11 334:5
376:19,24 380:19 382:16 409:13

**numbers** 49:23 88:12,14 157:15
270:24 373:21

**numerous** 28:13 129:9 308:2 367:14

## O

**oath** 21:19,22 356:13

**Ob-** 131:23 253:15

**Obj-** 343:11

**object** 30:11 31:25 32:20 35:13 36:7
42:24 44:10 45:15 49:14 50:14 53:7
54:6,7,18 56:8,22 58:2 60:13 61:17
62:20 64:20 66:17 67:9 68:3 69:12,25
75:12 76:2,14 77:9,24 81:2,11,18
82:2 87:4 88:7 89:11,15 90:14,22
91:13,21 92:17 93:18 94:4 98:12
99:13 104:2,11,20 109:17 113:6
115:10 116:4 119:12 120:21 121:16,
25 122:23 123:17 124:21 126:9,23
127:7 130:15 131:5,8 132:2,5,14
134:5 135:4,11,24 143:20 146:15
148:5 150:17 155:17 159:8 161:18
162:17,25 163:16,17 164:11 166:16
167:13 168:20 170:15 171:3,21,23
172:16 173:2,9 174:9,23 178:20
179:7,14 180:24 182:5,19 183:13
184:9,25 185:15 186:2 188:11 195:25
198:9 199:5,14 200:5,22 204:9 205:2
206:4 215:25 222:12 223:2,19,21
224:6,17 226:16 227:25 229:21
230:22 231:5,20,21 233:4,22 235:19
236:2 237:9,10 238:12,13 240:12
241:3 242:25 243:20 245:16 255:24
261:24 262:10 263:6 267:12 270:8
271:16 275:20,21,24 276:13 279:15,
16 280:7 282:13,16 286:13 287:10
297:6,21 300:25 303:2,14 305:13
306:20 307:19 308:11,17,21 309:5,
15,25 310:11 311:15 322:17 325:11,
25 327:2 328:7,24 329:16 331:17
332:7 338:21 339:5,25 342:13,19
343:13,14 346:17 347:5,19,25 348:10
349:7 350:2,9 351:5,11,12 353:14
354:12 355:4 356:3,9,23 357:24
358:14 359:18,25 361:15 362:2,11,
14,25 363:5,8 364:9,24 365:4 366:11
368:3 370:17 373:10,13,14,15 378:10
379:8,16 380:6 381:9,15 387:4,21
389:13,14 390:13 392:13,14 393:13,
16 398:19 399:7 401:10,18 402:19
404:8 405:14 407:7 408:16 410:3

**objecting** 389:25 390:2

**objection** 49:13 51:17 52:12 53:17
55:12 56:14 58:7 63:2 64:15 65:15,23
66:8 67:18,19 68:17 69:6 72:9 74:4

89:24 127:16 128:13 133:8 159:16
175:21 186:24 187:15 201:12,19
202:12,25 211:22 214:22 215:14,15
219:13 220:2 221:13 225:18 234:19
236:21 238:3,22 241:25 244:9 247:2
248:19 250:9,24 251:20 252:6 253:20
254:21 256:21 257:23 259:6,17 260:9
261:11 264:13,23 265:18 266:22
269:15 272:17 277:8,13,22 278:11
281:9 282:17 283:20 288:11,21
289:11 290:19 291:17 292:18 293:7,
24 296:8 306:5 307:10 312:19 314:24
316:6,9 317:12,22 318:15 319:4
322:3 323:13 330:17 337:24 352:24
360:16 362:9 367:7,19,20 369:10
383:15 385:16 388:14 391:13 393:15
396:6 397:23 399:8,23 400:15 402:2
403:13

**objections** 37:7,15 38:17 85:3 86:12
241:13 270:21 304:3 311:24 312:9
313:5 391:14

**objective** 291:24

**oblig-** 253:14

**obligation** 99:23 193:23 223:13
224:20,23 225:3 226:5,10 233:19
242:19 252:20 253:7,23 254:3 255:6,
15,23 256:15,18 257:10,18,21 259:4
276:16,25 277:2 286:20 291:20
345:17 348:5,16

**obligations** 85:15 86:14 87:22 88:4
98:25 100:24 102:10 103:8,24 157:19
163:6 196:22 210:4,21 211:5 215:18
233:20 241:15 245:23 246:11,19
251:16 256:24 258:2

**obstruction** 274:14

**obtaining** 174:2

**occurred** 50:25 51:10 68:23 147:22
244:8 248:17 322:23 343:17 361:9

**occurring** 205:18 391:2 404:25

**occurs** 399:11

**October** 154:11

**offended** 22:8

**offer** 48:14 140:13 205:10 398:6,9

**offered** 45:14 49:10 56:3 82:10,15
229:5,8 397:5 399:20

**offering** 24:9 49:17 55:21,25 59:11
360:6 397:15,22 398:16 399:14,16
403:2,8 404:17 405:5

**offerings** 400:23

**offhand** 157:16

**office** 121:20 138:10 189:9 190:10 196:21 255:15 272:13,22 276:24 295:12 296:23 395:24

**officer** 30:18,21,22,23 139:9 342:10 361:19,20

**offices** 111:2

**official** 18:5 38:17 409:17

**officially** 153:14

**omitted** 307:17

**omnibus** 98:3,4,10,16,22 99:19 163:4 184:14 193:9 197:25 198:3,7 200:2,20

**one-for-one** 103:2 181:21 288:4

**one-to-one** 288:6

**one-year** 337:22

**ongoing** 93:3 168:2 169:19 170:25 172:14 174:4 185:7

**online** 305:12 410:9

**open** 103:7 214:12,15 230:8 315:17 395:10,17

**opened** 196:7,9,12 213:21 220:18 376:10

**opening** 204:13 233:20 328:22 395:5

**operate** 71:8 109:4 113:21 148:13 315:4 316:20 386:8

**operated** 101:5

**operates** 113:22

**operating** 96:3 147:8 155:8 165:14 207:20 208:17 301:12 312:12 349:24 350:5

**operation** 166:4 167:12

**operational** 71:24 156:15,25 176:24 192:6,10 316:16 340:24 341:13,25 342:12,25

**Operationally** 156:18

**operations** 95:7,14 96:13,14 103:15 164:23 166:14 170:10 171:14 172:23 174:22 175:20 189:7,15 190:24 191:14 200:10 211:4 274:4 313:21 314:15

**opinion** 42:14 44:4 45:13 54:14 55:4 109:21 259:24 313:19 354:3,5 392:24

**opp-** 31:11

**opportunity** 31:12 333:20 334:18

**opposed** 102:20

**opted** 67:13

**optimize** 111:6 315:5

**option** 122:15 158:13 290:9

**options** 111:22,24 331:10

**orally** 19:24

**order** 19:21 20:10,19 38:21 113:25 159:13 165:13 196:8 220:8 221:2 241:21,23 242:4 266:17 268:9,14 273:11 316:15 323:4 324:21 332:2 355:17 362:6,23 395:4,17 396:14,25 412:4

**ordinary** 38:25 45:20 94:24 100:24 102:15 113:20 148:17 208:17 222:20 223:5 272:3 286:19 364:21 386:17 389:4,7 390:21

**Oren** 26:8 47:3,8 119:16 122:5 144:17 196:24 201:21,22 202:2,4,7 206:9 220:12 221:6 280:12,18 305:3 358:17 359:6 360:9 394:24 395:12,25 410:10,24

**Oren's** 125:17

**organization** 28:14 133:4 166:7 266:17 295:6

**original** 124:16

**outcome** 109:7 338:11,12

**outflows** 156:6

**outreach** 187:14

**outset** 21:4

**outstanding** 116:16 162:4 174:12 278:4 366:15

**over-collateralized** 319:11

**overcollateralized** 334:19

**oversaw** 364:14

**owe** 116:16 182:10 193:23 224:22 226:10 255:22 319:20

**owes** 165:5 224:21

**owned** 216:24 219:9 334:6 344:24

**owner** 72:21

**ownership** 38:22 58:18 194:13 195:6 198:14 216:11 220:24 226:9 232:10 275:14 276:8 279:5,9,14 280:6,25 281:8 282:10 283:17 288:10,20 289:9,18 292:11 302:24 303:7 317:7 348:15

**owning** 277:20

**owns** 270:2

---

**P**

**p.m.** 189:23,25 190:2,4 212:23 213:3, 7,10 299:4,6,7,9 319:17,19,20,22 371:19,21,22,24 412:10,13

**package** 138:24 139:5,15,25

**pages** 267:4 384:12 390:18

**paid** 52:4 93:16,21 102:18 174:5 183:20 187:4 208:22 260:5 263:15 276:10 296:15 297:15 340:20 358:19 366:24 369:8,9 374:5,17 378:8

**paper** 254:12

**paragraph** 47:19,21 48:2 78:14,22 80:17 83:15,20 84:8,16 97:18 100:16, 19 106:4,9 278:19 281:5,23 282:4 320:8 377:12 409:13

**paragraphs** 35:17,24 36:4

**parent** 367:4,5

**part** 31:6 32:25 39:25 42:12 43:19,21 67:22 68:20 69:15 70:14 93:13 105:19 113:24 131:34 134:16 139:14, 25 140:21 144:8 145:9 146:21 148:9 149:2 180:13 185:21 201:22 205:14 219:8,19 221:16 229:14 236:18 243:8 280:17 295:25 296:2 297:10 313:17 330:11 353:23,25 361:2,3,20 362:18 379:6 396:20 404:22 408:24

**partake** 363:23

**partial** 289:24 290:11,13

**participants** 200:4,16 411:16

**participate** 20:5,9 125:12 300:21 399:5

**participated** 49:21

**participating** 50:12 208:10

**parties** 18:14

**partner** 410:18

**partners** 112:10 263:4

**partnership** 264:19 410:17,22

**partnerships** 262:9

**parts** 20:22

**party** 18:9 269:24 307:14 410:16

**pass** 18:12 27:10 33:6 37:6 100:2 128:5 137:10 184:6 256:25 364:21 368:15

**past** 45:10 113:15 188:24 192:14 205:25 271:22 363:25

**pasted** 388:20

**paths** 122:13

**Paul** 143:7

**pause** 37:12 112:12 185:19,23 186:17 227:3 235:23,25 236:12 238:7,21 239:2,3,6,9,15 244:2 245:10 247:22 248:2 249:14 251:6,14 252:14 268:4 291:4 313:18,24 380:4 386:3, 23,25 387:11,14 390:25 391:5,9,24

**paused** 177:3 236:24 241:16 242:12, 24 243:5 313:21 386:4 387:16 388:4, 6 391:6

**Pavon** 152:22

**pay** 68:8 70:13 92:24 93:4 95:7 97:9 105:11 124:14 139:15 168:14 177:15 200:3,11,14 210:12 236:19 241:23 245:23 246:10,13 247:6 252:24 253:2 260:23 315:11,23 316:2,5,15 319:12 346:6 355:17 365:18

**payable** 382:18

**paying** 42:17 164:9 171:17 253:6 259:15 313:25 339:3 346:15

**payment** 101:10

**payments** 103:20 105:9 170:13,21, 25 172:14 208:24

**payout** 365:12

**payroll** 102:12 189:7,11 209:4 294:23 340:19

**pays** 354:9,19

**peak** 169:18

**pegged** 84:20,22

**pending** 22:22,24

**people** 36:16 40:24 44:25 67:12,13 68:7 124:13 129:12 142:7,8 156:5,20 175:15 181:23 189:8 204:17 230:5,7, 12 239:10 244:24 248:2 275:15 278:2

**percent** 70:21,24 71:13,14 73:18,21 168:5,8,11 177:12 190:17 237:25 276:11 277:19 302:23,24 303:7,8 335:4 354:5 364:22 365:12,15,16,19, 23 366:3 399:3

**percentage** 50:12 398:17

**Perella** 134:10

**perfect** 24:4 47:22 104:24 212:19 249:6 342:23 359:8 385:7

**period** 119:18 202:5 248:17 284:21 337:22 375:11 382:24

**permitted** 107:7

**permitting** 38:24

**person** 20:12 33:14 59:9 77:2 114:23 115:4 119:21 136:20 193:24 194:2 195:12 237:2,3 268:23 284:24 287:23 299:20 344:5 368:17 409:3

**personal** 55:5 143:3 218:17 365:9

**personally** 132:10 134:21 221:18 329:24 394:23

**pertaining** 295:13

**pertains** 274:7

**petition** 30:17 65:22 85:19 86:13 87:22 88:5,21,24 89:22 91:6,20 92:13 100:21 101:14 102:5 105:5,8,23 120:10 140:7 165:24 170:7 186:13 192:10 337:23 369:19 370:15 372:11 374:12,16

**phase** 299:13

**Phoenix** 28:3

**phone** 25:21

**physical** 172:9

**pick** 352:16

**picked** 23:6

**pickier** 334:22

**place** 42:9 73:18 75:20 196:25 204:25 226:22 348:14 349:5 395:8

**placements** 345:19

**placing** 256:8

**plain** 76:17 358:2

**plan** 59:24 108:8,17,19 109:16 111:10 116:23 122:15,22 123:5,12 124:19 125:8,16 126:7,8,21 127:6,15 131:15,20 132:12,24 133:4,7 134:4,9, 18 136:16 183:12 205:7 329:5,7 330:13,23 331:4 333:9,16,18,21 334:3 351:10 352:14

**planning** 28:11 30:4 61:25 158:11 203:7 294:18

**plans** 204:23 330:24

**platform** 48:8,9 51:5 66:25 68:8 118:14,17,19,21 120:19 192:22 205:23 222:21,22,25 229:13,17,19,25 230:5 231:17 239:11 240:16,23 242:7 256:4 261:9,23 263:22 307:5,7,9 345:11 349:15 369:22 372:14 375:17 381:3 382:8 387:16 396:18 399:6

**platforms** 352:10 398:14

**play** 34:23 172:9 232:24

**player** 42:19 89:18

**players** 349:15

**pledge** 71:23 99:7 120:13,19 194:23 200:10 221:2 254:8 314:14 323:3 341:16

**pledging** 323:12

**plenty** 20:24 397:17

**podcast** 19:25

**point** 28:17 31:9 32:5,24 44:23 55:20 57:10 61:4 64:24 69:16 111:13 118:18 119:3 156:3 184:7 186:20 193:13 207:22 208:19 210:20 211:14 214:3 215:9,23,24 221:17 227:11 236:14 243:4,6 244:15 248:3,24 280:2,4 298:23 304:5 321:5 324:12 340:11 379:21

**points** 70:24 217:19

**policies** 72:21 75:4,19

**policy** 295:7,8,14 306:3

**pool** 73:21 143:10

**pooled** 164:5 193:14

**pools** 73:20

**poor** 362:5

**pop-up** 409:22

**pop-ups** 284:20 410:8

**pops** 206:21

**portion** 104:14 301:21 318:11

**portions** 285:14

**pose** 22:11 275:19

**posed** 37:8,16

**position** 28:8,21 29:7 32:23 96:21 102:24 103:7,18 129:13 141:18 151:20 160:21 180:16 202:17 301:5 361:14 389:22,23 392:18

**positioned** 316:22

**positioning** 159:5 226:22

**positions** 97:14 179:19 314:9,10

**positive** 156:13,15,18 157:2 160:23 167:10 177:17

**possessed** 92:14

**possession** 92:10 94:12,15 97:24 158:9 159:6 346:5 366:10

**possibility** 175:14

**possibly** 168:18 251:12,17 275:8 284:8 331:6 374:9

**post** 238:7,9 239:3,6 244:2 251:6 358:20 389:5 391:24 400:6 403:17

**post-petition** 106:9 325:9,23,24

**posted** 97:8 262:15 310:15 325:6 407:19 408:15

**posting** 53:12

**posts** 51:8 52:21,24 53:3,5,15 76:24 78:9 308:2,9

**potential** 33:3 69:2 122:12,20 124:7, 18 131:20 132:12 133:4,7,17 134:17 158:9,19 205:7 336:12

**potentially** 123:16 127:5 161:5 172:7 227:23 229:18 237:19 238:19 335:19 363:19

**poverty** 31:12

**power** 157:4

**practice** 27:21 42:15 332:17

**practicing** 245:20

**pre** 238:6,7 239:6 403:18

**pre-** 150:12

**predate** 166:24

**predominantly** 25:3 51:12 53:15 54:2 67:14 71:20 80:14 95:22,24 168:15

**preference** 57:18 60:8 122:21 123:2, 11,14 124:18

**preferential** 237:15

**preferred** 173:7,18,25 300:11,13

**preliminary** 19:12 21:10

**prep** 25:9,11,21 40:2 41:21 42:15 284:5

**prep-** 49:22

**preparation** 26:13 39:9,14,19,21 79:24 342:6 360:4 390:18

**prepare** 24:13 357:20 390:19 392:7

**prepared** 157:9

**preparing** 42:7 43:9 265:24 300:21

**prepause** 45:20 192:11 222:20 223:9,20,24 224:10 386:17,20

**prepetition** 93:4 102:2 103:24 104:18 192:11 373:4 386:16

**prepped** 24:15,18 46:6

**prepping** 39:12 144:15

**present** 20:11 26:3 249:21

**presented** 36:18,24 301:2

**preserve** 56:14 178:9 274:19 343:9 352:7

**preserved** 58:7 197:16

**preserving** 163:11

**pressure** 63:22,25 169:13,14 397:14

**pretty** 53:23 95:21 142:11 158:2 160:10 284:25 302:15 349:14,19 368:10 370:21 396:11

**prevent** 341:25 342:12 380:3

**previous** 161:21 194:20 228:21 295:6

**previously** 138:15 159:14 185:24 272:15

**price** 70:24 168:10 175:4 181:23 211:17 231:14 257:4,11,20 271:20 279:11 365:22

**prices** 32:24 102:25 245:5

**pricing** 226:21

**primarily** 165:11 208:18

**primary** 35:11 60:3 148:10 166:3

**prime** 49:10 179:4,12,18,20,25 180:5,9,20,21 215:10,21 216:7

**principal** 241:24

**principles** 244:22

**prior** 20:8 100:21 101:14 125:4 140:7 141:2 142:13 216:16,17 217:21 218:3 219:11 239:15 254:18 257:20 275:12 281:6 292:10 296:6 322:15 337:23 369:19 372:11

**privileged** 43:2 63:9 64:2,5 69:7

**privy** 62:5

**pro** 213:21 227:13 273:9,19 285:10 298:22 299:13,16 301:20 302:2 318:10 320:22 324:6 368:12 394:7,12 406:22 411:7

**problem** 241:16 242:12 243:7 352:9 375:22

**problems** 327:22

**procedure** 115:7

**procedures** 75:19 333:22

**proceeding** 18:7 109:4

**proceedings** 351:23 386:6

**proceeds** 160:24 165:12 178:6 180:21 227:15

**process** 45:25 69:22 70:7 72:6 101:12 104:24 108:5 111:9 112:10 115:7 116:24 122:14 123:7 124:2,11, 19,20 125:19,21,23 128:2 132:22 133:15,21 134:16,19 136:15 146:24 147:7,21 148:3,18 158:20 167:3 172:5 175:13 176:14 178:12 188:2 197:21 201:2 221:8 266:5,13 275:7 284:25 290:4 292:23,24,25 293:17,18 295:25 297:12 332:11 333:23 338:6 351:22 361:9 376:2,12 390:21 400:21 401:3 409:10

**process-wise** 395:11

**processed** 381:7

**processes** 125:2 342:25

**processing** 130:7 154:15 206:7

**procure** 158:11

**produce** 156:23

**produced** 409:7,8

**producing** 177:16

**product** 49:17 56:3,7 57:14 59:18, 19,23,24 60:3,4 61:24 63:20 119:16, 19 122:4 125:16 147:13 186:8 194:5, 6 287:8 295:24 335:12 345:12 360:5 396:4,10,11,14,25 397:2,3,15 398:4, 8,12,16 399:5,12,13,14,17 403:2,21 404:16 405:4

**production** 165:18 169:21 177:10 363:15

**products** 55:11,21 205:9 335:21 397:11,18 401:5 403:8

**professional** 27:8 102:13 158:6 189:12

**professional-eyes-only** 45:7

**professionals** 76:8 108:9 189:8 298:2

**profile** 381:2

**profits** 315:23 316:2,5

**program** 38:23 48:3,5,6,14,15,19,22 49:2,8,10,12,16,21 50:3,13,20 51:16 52:6,17 53:6,11 55:22,25 57:6,22 58:19 59:14 61:2,14,16 62:18 64:9,11 65:5,7,12,13,19 66:7,15 67:8,14,17, 22 68:13 69:5,11,24 70:9,15 71:9,10 72:8 76:11 77:8,23 91:11 93:7 116:14 121:11 162:5 184:22 185:21 200:4,15 210:14 211:13 230:4 241:11 279:7 303:13,25 314:4,23 335:6 348:14 355:8,10,13,14 358:9 378:19 379:6 385:23

**programs** 48:16 71:18 72:18 95:16 162:10 188:22

**progress** 114:9 395:4,17

**project** 57:12 106:14 107:5

**projection** 106:19

**projects** 28:14

**promise** 58:22 339:10

**promo** 230:14

**promoted** 30:18

**promotion** 231:13

**promotional** 229:4 271:6,11

**proof** 335:9 394:20,22 395:7 396:2

**properly** 107:25

**property** 193:13 200:9 314:7 327:23 343:10 345:8 346:7,15

**proportion** 54:15

**proposal** 127:5,14

**proposals** 158:24

**propose** 126:8,21 248:6 307:15

**proposed** 85:16 86:15

**proposing** 125:8 126:7

**proposition** 67:23

**proprietary** 157:3

**protect** 21:2 197:5 239:10 294:10 351:21 396:5

**protected** 197:17

**protection** 236:13,16

**protections** 405:12,19,21 406:3,7, 10

**protective** 19:21 20:10,19 268:8,14

**protocol** 71:16

**protocols** 71:21 110:12 111:15 112:20

**proven** 398:13

**provide** 42:20,22 63:16 85:14 110:4 143:18 167:20,25 175:8 206:23 210:11 226:15 267:18 274:15 287:23 295:18 331:4 394:22 396:2,18

**provided** 20:7 31:5 36:19,20,21 81:24 171:7 198:20 199:2 202:11 230:19 231:15 263:4 282:6 305:10 409:4

**provider** 101:18

**providers** 27:23

**providing** 124:8

**provision** 195:5

**provisions** 79:7 194:13 279:4 281:16

**public** 20:17 27:10 38:2 99:18 142:7 186:22 202:11 306:3

**publicly** 19:24 33:19

**pull** 37:24 74:20 255:3

**pulled** 110:19 111:7 370:14

**pulling** 373:3

**purchase** 96:20 97:3 271:14

**purchased** 167:5

**purchases** 166:24 269:11 270:6,7 271:5

**purchasing** 166:22

**purpose** 123:7 199:11 219:3

**purposes** 71:24 95:12 274:24

**pursuant** 363:11

**pursue** 29:17

**pursued** 122:14,15

**pursuing** 111:23

**purview** 296:22

**push** 174:14

**pushback** 274:15

**pushed** 164:19

**pushing** 339:8,16

**put** 48:7 67:12 68:7 73:17 88:15 101:20 104:7 163:8 180:22 181:3 199:23 227:14 239:12 255:8 270:17 289:4,6 330:13 333:10 345:11 352:13 406:2

**putting** 48:8 66:24 99:9 361:3 363:17

## Q

**qualified** 259:2 335:19

**quality** 267:5

**quarter** 106:17,20 107:24 108:21 161:9,10 177:21

**question** 22:11,15,21,23,24 23:16, 17,18 34:14 41:25 44:7 57:2 58:11 60:20 62:8 65:8,9 67:25 72:3,4,5 85:6,10,12,20 86:6,9 87:11 97:23 99:12 115:24 116:17 120:6 124:16 125:6 126:3,7 132:4 133:25 173:21 189:3,4 190:17 192:24 194:9 195:11 197:9,10 198:24 205:20 217:13 231:23 237:13,17 238:16,18 258:17, 18 270:15,25 274:12 275:8,25 276:3 278:4,9,16 293:13,16,20 295:5 298:10 299:15 300:20 306:25 308:14 310:14,17 313:9,13 314:19 315:12 316:3 318:18 321:6,9 323:2 324:25 325:3 327:9 329:12,18 331:12 332:4 334:2 337:19,20 338:23 340:22 346:10 349:11 358:6 359:10,21 360:23 365:7 366:14 368:5 370:7 371:14 372:3,9,20 376:10 383:10

387:8,24 388:2,23,24 390:5,7 393:18,
19,21 396:3 401:13 402:10 403:5
405:17 407:4,23 408:5,10,17 410:24

**questioner** 273:12 301:21 368:20

**questioners** 285:23 368:13

**questioning** 23:14 137:6 324:3
406:13

**questions** 18:8,10,14,16,20 19:12
21:10 22:6,9 37:8,16 38:19 41:14,17,
21 42:13,20 43:6,17,24 44:5,9,14,22,
24 46:12 56:13,18 83:2 85:24 108:13
111:9 114:13,18,20,22 115:5,8,9,13,
23 116:2,20 117:2 118:4 124:7
126:12 128:4,6 133:12 136:25 137:4
138:13,14 143:12,23 144:5 154:17
181:8 184:20 190:14,15 192:18
196:25 202:7 207:4,15 210:16 212:3,
8 259:5 261:17 264:16 273:4,24
274:10,17 275:18 284:6 285:18
301:17 305:19,23 321:21 323:22
324:15 326:16 330:2,7 331:25 332:22
339:21 344:15,17 351:2 369:2 371:3
377:7,8 392:15,20 394:19,25 411:3,8

**queue** 285:12,19

**quick** 44:14 89:2 97:23 285:22
299:12 370:21 371:12 374:8

**quickly** 328:6

**quietly** 241:20

**Quito** 249:23

**quote** 234:10 250:4 278:19 289:21
291:24 292:3 370:8 382:16 383:10

_____

R

**Rachel** 299:23

**raise** 109:20,25 267:10

**raised** 315:7,8,9

**raises** 316:13,19,20,25

**raising** 325:15

**ran** 76:5 152:23 158:20 171:12,13
185:22 186:8,12

**range** 96:23 158:2 209:8

**ranges** 167:23

**rapid** 139:22

**RAR** 299:19

**rate** 49:10 70:25 71:15,17 169:6
188:16 189:14 210:13 240:25 252:19
288:2,3

**rates** 168:24 169:3 286:25 287:2,5,6,
14,17 288:7 315:11 336:8 337:8

**ratified** 146:25

**ratifying** 147:21

**ratio** 365:18

**re-** 357:15

**re-ask** 132:3 143:14 346:10 371:14
390:4 402:9

**reach** 52:9 53:15

**reaction** 129:16

**read** 24:16 44:2 52:24 76:24 78:21
80:5,8 85:13 114:4 128:18,20 129:6,
8,9,12 130:13 141:9 142:5 145:2
219:19 221:17 227:5 250:3 281:12,13
283:18,24 284:3,13,14,21,25 300:23
305:21 336:24 341:14 355:19 357:14
377:9 378:14 382:15 383:11,19,25
384:4,15,17 385:3,8,12 388:16,25
389:17 411:12

**reading** 38:15 78:17 79:17 80:15
130:19 144:15,16 199:10,19 230:24
280:22 288:15 290:24 355:2 357:12
378:16 379:9 382:6 391:18 393:23

**reads** 86:10

**ready** 372:4

**real** 44:14 111:2 207:20 241:10

**reality** 105:12 249:9 287:25 365:13

**realize** 241:21 242:4

**realized** 240:24

**realtime** 407:18 408:14

**reason** 22:2 33:18 102:19 178:13
231:16 258:9 260:15 268:20,22
323:21 335:25 337:15 364:6 375:6

**reasonable** 67:4 196:11 245:15
263:5 271:14 348:24 366:5

**reasoning** 401:7,16 402:11

**reasons** 172:6 236:7 402:14

**Rebecca** 227:9 228:22

**recall** 25:24 36:3,6,13 41:16 47:10,11
77:15 144:19 227:8

**receivable** 312:7

**receivables** 311:3

**receive** 180:4 220:15 229:10 232:11
237:20 344:20 395:9

**received** 89:22 90:13 91:10 124:12
140:8,15 240:10 254:17 325:17

**receiving** 139:24 340:16

**recent** 194:17 341:3

**recently** 308:5

**recess** 117:17 138:2 189:25 213:2
299:6 319:19 371:21

**recognize** 34:14 38:11

**recognizes** 255:5

**recollection** 91:3 220:20 387:12

**recommend** 275:11

**reconcile** 109:10

**reconnect** 324:13

**record** 23:9 85:13 117:13,16,21
137:22,25 138:6 142:24 144:23
158:10 161:24 174:15 189:24 190:5
204:15,16 212:24 213:11 264:3
299:5,10 300:17 311:8,14 319:15,18,
23 332:25 336:24 346:4 347:3 348:20
357:24 368:22 371:9,11,15,17,20,25
379:10 388:16 406:19 407:10 408:10
412:8,12

**record's** 231:2

**recorded** 19:23 193:21 247:13
344:4,8 395:25

**recording** 142:10

**records** 195:19 345:6,7 347:11

**recoup** 174:4

**red** 218:5

**redesignated** 184:2

**reduce** 111:3 180:6

**reducing** 185:20

**refer** 75:23 144:3 198:2 317:17,20

**reference** 37:22 57:23 151:17
249:25 286:6 369:25

**referenced** 40:16 250:5

**references** 149:5

**referral** 51:4 55:8,9,17

**referred** 48:18 59:4 142:22 182:18

**referring** 24:20 26:7 40:7,17 102:11 115:9,25 308:24 408:12

**reflect** 345:8

**refund** 260:19

**reg** 152:14 153:21

**regular** 70:18 132:19 147:8 155:22 164:19 207:19

**regularly** 154:24 331:16 351:8

**regulated** 228:4,11 234:3 405:18

**regulation** 406:3,10

**regulations** 405:21

**regulator** 207:6

**regulatorally** 204:24

**regulators** 63:20 204:22 212:8 405:23

**regulatory** 57:17,24 58:8 59:4,20 60:8,11,23,25 61:6,13 62:17 69:10 147:12 148:10 149:19,22 150:5,14 151:25 152:3,4,5,18,21 203:22 204:2, 6,17,19 295:23 397:6,14,18,21 398:9

**rehypothecate** 59:17 99:8 194:22 221:3 254:8

**rehypothecated** 353:7

**rehypothecation** 334:20

**rejected** 272:12

**rel-** 42:14

**relate** 209:24 305:19

**related** 24:16 39:2 43:8,10 45:3,19 46:9 57:13 63:9 85:15 86:14 92:11 98:24 102:16 105:3 124:6 140:23 174:14 183:9 189:12 209:17 211:12 214:2 229:3 269:24 271:10 323:17 327:10 360:5,19 376:5 380:15

**relates** 210:4,25 211:2

**relation** 232:17 397:20

**relation-** 225:9

**relations** 30:5 186:22 203:8 294:18

**relationship** 150:11 187:11 215:20 270:17 271:2 358:3

**relationships** 262:8 354:23

**released** 143:18 399:18

**relevance** 367:8

**relevant** 26:2 42:16 43:6 44:6,9 56:11,21 278:9,15 388:17 393:17

**relief** 39:2 113:22 183:8

**relying** 165:11

**remain** 65:5,12,19 215:23 355:10 403:10,11

**remained** 94:12,15

**remaining** 65:6 157:2 211:3 285:10 298:22 358:20,21

**remains** 353:9 367:2

**remark** 233:16

**remember** 25:6 39:5 41:19 44:22 45:5,8 46:24 48:21 51:3 78:10 114:15 128:22,23 139:13 148:24 156:11 164:24 199:10,17,19 227:10 288:25 380:12

**remembering** 47:5

**remind** 329:11

**remote** 139:21

**removal** 361:24

**remove** 65:14

**removed** 218:3 360:11

**removing** 169:5 362:13

**rendering** 265:20

**reorg** 111:10 134:18 292:14 328:22 333:16 334:15

**reorganization** 108:8,17 116:23 123:5 125:16 131:21 132:13 133:7, 18,19 134:4 136:16 203:19 204:24 205:7 329:6 331:3 333:9,20 334:2 352:14

**reorganize** 18:18

**reorganized** 126:17 134:9

**repaid** 358:9

**repay** 318:22 369:23 372:15

**repaying** 318:13,20

**repayment** 290:11

**repeat** 60:20 143:12 192:24 198:23 308:15 318:18 336:21,23 404:14

**rephrase** 190:19 338:24

**replenished** 201:7

**report** 88:17 155:6 184:13 249:25

250:3,18 264:6 269:9 298:3 329:14

**reported** 311:12

**reporter** 23:4,9 33:7,10 37:6,12 302:8 384:10 394:10

**reporter's** 273:15

**reporting** 62:2 75:21 255:16 297:25

**reports** 88:16 101:6 155:8 266:16 312:13

**repository** 217:15

**represent** 18:5 151:14 190:11 216:19 300:10 329:24 345:15

**representation** 122:16

**representative** 143:7

**representing** 80:22

**represents** 143:2 148:22 352:2,3

**request** 161:21 286:20 394:19 395:7

**requested** 56:20 159:14 376:4 377:22 379:3,4 389:9 396:2

**requesting** 318:12,19

**require** 64:5 112:23 328:16

**required** 74:21 274:3,16 342:11 375:9

**requirements** 330:5 402:15

**requires** 181:5

**requisite** 306:2

**research** 190:23 192:5

**reserve** 137:3 169:5

**reserved** 320:16

**reserves** 335:9

**reset** 371:11

**resignation** 340:7

**resolve** 327:22 351:10

**resolved** 114:13 116:3,20

**resort** 158:14

**resource** 194:8 410:11

**resources** 241:23 317:2 338:17 339:3

**respect** 87:23 143:3 147:23 148:3 174:6 320:12

**respective** 381:3

**respond** 247:4 278:13 292:20 294:2 360:21 365:6,8 378:13

**response** 23:8 86:9 231:23 291:23 292:3 294:5,12 332:21

**responses** 37:7,15 38:16 85:3 143:17,19 149:3 377:7

**responsibility** 75:5

**responsible** 75:3 202:4 238:11 294:22 295:3

**responsibly** 114:2

**responsive** 72:2

**rest** 321:13 399:2

**restate** 241:6 337:4 345:4 362:4 391:19

**restructure** 185:22

**restructured** 374:17

**restructuring** 30:21 361:20

**restructurings** 327:20

**result** 167:18

**resumed** 213:13

**retail** 48:19 59:9 70:19 93:6 95:24 232:3,7 309:22 323:3,5,8,9 327:13 334:19 366:7

**retain** 57:21 116:8

**retaining** 30:22

**retirement** 335:16

**retread** 97:17

**return** 18:19 66:25 93:14 118:4,7,9 120:6 122:7 125:22 180:10 182:11 183:6 240:8,10,25 276:20 292:16 299:13 301:20 303:19 347:13,15 348:5,16 365:13,23 366:5 391:4,5,9

**returned** 223:14 286:21 370:5 372:19

**returning** 94:22 125:3 182:2 376:16

**returns** 252:19 344:23 380:23

**revenue** 171:8 316:14,17,18 364:22

**revenues** 172:25

**reversions** 80:9

**review** 26:12 35:8,18 36:18 44:13 78:23 80:12,23 85:7 190:23 203:15 249:24 266:2 269:17 296:22 385:10 388:22 392:6

**reviewed** 25:25 35:21 43:16,18,19, 24 155:12 250:17,18 265:25 295:10 297:4 304:7 341:4,6 355:21

**reviewing** 76:19 79:23 195:8 219:20 342:7

**reviews** 267:6

**revise** 146:12

**reward** 141:20 252:19 253:10,13 255:12 256:3,4,9 260:25 315:11

**rewarded** 230:2

**rewards** 48:10 65:21 67:2,15,24 68:9,12 70:13 121:2 200:3,11,15,17 230:17 238:2 241:16,19,23 242:19 251:18 252:4,10,13,15,16,22,25 253:6 255:2,4 256:7,12 257:9,12,17 260:5,20 276:9,11,17,25 279:13 316:15 355:17 364:23 378:3,17,21,23 379:6,22 382:18 385:23,24 386:6

**rid** 110:25

**rights** 21:2 275:14 279:5 347:24 377:19

**rigs** 166:22 175:10,13,16 176:5 177:8,11,15

**ripest** 352:15

**rise** 236:11

**risk** 32:12,14 60:9 71:16 72:14 73:17 74:2,7,8,11,15 75:3,8,15,18,23,24 76:7,20 77:4,5,7,15,22 97:14 102:24 103:7,17 141:6,14,19 173:20 198:15 221:17 240:2 314:8 343:21,24 349:18 366:6 374:2,3 398:15

**risk-based** 355:16 365:23,24

**risk/return** 141:6

**risks** 59:15 76:12 112:22 233:20

**River** 272:7

**robust** 195:3

**Rodney** 76:6,8

**role** 30:2,9,10,13,16 34:23 35:11 69:20 192:3,9 339:23 364:13

**roles** 28:13

**roll** 226:23

**roll-up** 309:9

**rolled** 49:8 224:9 227:3

**rolling** 48:21 321:12

**rollup** 367:15

**Ron** 46:17 150:23 152:23

**Roni** 152:2,21

**room** 18:22 23:5,25 33:5

**rooted** 347:12

**roughly** 91:3,7

**route** 304:13

**row** 87:20 88:2

**rows** 89:4

**rule** 115:18 173:22 278:16 392:20

**ruled** 115:16

**rules** 21:15 22:5 75:8,9,11 181:6 338:10

**run** 88:17 106:15 107:6 108:24 109:13 119:2 232:6 234:7 361:5 363:16

**running** 109:11 191:16

**runs** 106:19 107:3 119:16 270:2

**runway** 107:9

**rural** 31:10

**Rynders** 299:22,24

---

### S

**S-H-A-R-A** 138:9

**safe** 29:17 31:24 52:2 92:2 95:21 126:20 222:7

**safeguarding** 240:17

**salaries** 138:20 315:24 316:3,5

**salary** 138:23,24 139:8

**sale** 38:24 84:15 85:16 86:15 107:8 109:12 112:4,16 113:9 122:14,21 123:11 124:2,19 125:23 134:16 159:4 160:17,19 161:4,11,12 162:12 172:5 174:6,22 175:13,17,18 176:16 177:25 178:5 181:18 183:4 189:5 203:19 279:10,11 300:22

**sales** 108:6 111:9 116:24 134:19 160:2 177:7,11,16 178:11 332:11 333:22

**Sam** 18:3 21:5 40:11 56:10 58:4,17 60:20 135:14 137:11

**sat** 124:5

**Saturday** 25:14 39:6,24

**save** 177:11 357:15 395:15

**savings** 227:24

**scale** 166:20

**scare** 32:15

**scheduled** 205:15

**schedules** 261:16 262:4 265:24 266:9,25 267:3 277:17 311:13 312:13

**school** 26:22,25 245:21

**schools** 26:22

**scope** 56:23 58:5,12 64:16,21 65:16, 24 68:18 69:13 74:5 75:13 76:3 77:10,25 89:25 90:15,23 91:14,22 126:24 129:21 131:9 132:15 133:9 135:12 170:16 173:3,10 179:8 180:25 182:20 183:14 184:10 185:2 186:3,25 188:12 198:10 199:6,15 201:13 202:13,15 203:2 206:5 221:14 222:13 223:3 233:5 234:20 235:20 236:22 237:10 238:4,13,23 241:4 243:2,21 244:10 245:17 247:3 248:20 250:25 251:21 252:7 254:22 255:25 256:22 257:24 259:7 260:10 261:25 262:11 264:15,24 265:19 266:23 269:16 270:9 271:17 272:18 277:14 297:22 303:15 306:6,21 307:11 308:12,22 309:16 310:2,12 311:16 312:20 314:25 316:10 320:5 322:4 323:14,17 328:8,25 330:18 332:8 337:25 339:6 340:2 342:20 346:18 347:6 349:8 350:3,10 351:6,12 352:25 353:15 358:15 361:16 362:16 363:10 366:12 367:10 371:10 373:14 380:7 381:16 387:22 396:7 397:24 401:11,19 402:4 403:14 405:15 408:17

**screen** 33:18 37:24 77:14,16 216:14 232:14 254:11 269:23 383:23 384:5, 25 385:2 388:21 407:25

**screens** 196:24 395:18

**screenshots** 280:21 284:18

**scroll** 235:6

**scrutiny** 397:18 398:9

**Seattle** 26:21 27:22 31:6

**SEC** 306:3

**secondary** 59:24 397:2 398:8

**secrecy** 328:16

**section** 281:4,23 355:24 377:11,12 380:19 385:5 388:10,11,15 389:12 391:12

**sections** 380:4 389:16 390:8 391:8 393:10

**secured** 317:9,16

**securing** 358:11

**securities** 59:21 190:11 299:25 306:8 397:22

**security** 172:9 181:5 303:13,24 317:10

**seek** 159:5

**seeking** 92:5 161:17 162:16 163:13 176:17 180:3

**segregated** 353:9

**seldomly** 186:10

**sell** 26:9 92:6,16 101:17 103:6,10,12, 13 105:24 107:7 110:15 118:11 139:4,24 140:5,8,15 159:21 160:12, 22 161:17 162:2,16 163:14 165:8 175:9,13 180:3,7,13 181:22 183:8 221:3 225:23 243:16 249:3,4,7 252:24 254:8 257:7,16 341:16 351:10 352:2,3,7,11

**selling** 111:19 124:3 176:5,12 226:4

**sells** 225:24

**semi-educated** 113:17

**semi-independently** 171:13

**send** 185:10 208:24 218:5 383:20

**senior** 29:8 153:15 361:13

**sense** 22:12 23:10 105:14 119:6 148:16 235:12 241:10 380:18 386:10 399:15

**sensitive** 102:25 356:18

**sentence** 79:3 80:17 86:10 100:18 102:11 106:8 235:14

**sentences** 80:18

**sentiment** 169:4

**separate** 42:11 116:7 120:16 148:2 152:19,20 264:11 334:25 335:18

**separately** 39:23 164:3 176:13

**September** 30:20 325:5,10 326:10 340:19

**sequelas** 295:11

**Serbia** 148:24

**Serbian** 164:16

**Series** 174:15 300:11,13 315:7,8 317:5

**service** 214:19 217:18 219:12 221:12 222:9 226:15 233:2 234:18 275:12 280:5,8 281:5,22 282:5 290:9 295:9,17 325:3,5 374:21,22 375:3 376:15,25 377:5,16 381:24 382:9,13, 20 383:3,7

**services** 151:15 219:4,8 305:9,11 376:20 382:22 386:12,13 396:19 397:11 398:6

**ses** 273:6,9

**session** 25:9,18,19 212:12 274:13 284:6 340:10

**sessions** 25:11,16,21 42:15

**set** 48:10 75:8 100:11 141:12 338:16 339:2 378:23

**setting** 75:10,18 252:19

**settlement** 179:5,12,20,25 180:10, 14,21,22

**severe** 32:6

**shaky** 324:11

**Shara** 138:9

**share** 159:22 216:14 231:9 232:13, 14 254:11 320:18 326:6 383:23,24 384:5 407:25

**shared** 77:7 157:12

**shareholders** 173:18,25

**shares** 138:25 139:2

**sheet** 141:20,22 163:8 244:12,13,20 245:3,4,25 247:13 249:4 253:2 310:7 314:6 315:4,6 316:12 317:3 345:13, 20 346:22 348:20 349:25 350:6 355:15 374:15,16

**shelf** 141:13

**shipped** 167:6

**shopped** 271:20

**short** 202:5 236:25 383:23

**shortfall** 182:18,25 183:10,12

**shortly** 30:17 48:25



340:6

**spot** 119:3 287:15 384:19

**spreadsheet** 196:19 269:8

**spring** 229:9

**stable** 211:7 324:16

**stablecoin** 84:16,18,19 85:16 86:15
87:13,14 91:4,8,10,19 92:4,7,9,15,16
93:3 94:3,8,16,24 95:6,18,19 98:5
99:11 100:6,22 101:13,20 102:2,5,20
103:18,25 104:17 105:6,15,22 107:7,
8 109:12 110:6 116:11 141:17 159:4
161:5,11,17 162:7 174:21 175:17
176:16 178:2,17 180:4,7 181:18
182:13 183:4,9 189:6 192:21 193:2
200:17 209:12,17 270:10 300:22
312:17 313:3,25 366:8

**stablecoins** 26:10 38:24 71:3,6
84:21 87:3,8 89:5 90:25 93:7,9,11
94:19 95:11,13 97:13,24 98:20 99:3
101:23 102:22,24 103:4 104:6,9,14
105:11,12 109:21 112:4,17 113:10,19
118:11,16 144:17 162:12,15 163:21
174:7 181:20,25 182:4 200:14 207:17
208:24 209:3,14 210:22,24 211:3
213:25 227:16 235:17 303:21 314:15
317:4 366:16 373:9

**stables** 103:13,14 210:4,6,7,8,10,11,
12 211:8,10 366:22

**staff** 203:22 315:23

**stake** 71:20 73:18

**staked** 71:19 334:23

**stakeholders** 127:25 131:13 132:18
133:5,12,25 134:2 192:16 329:9
339:12

**stakes** 334:10

**stand** 117:14 281:20

**stand-alone** 333:9,20 334:2,15

**standalone** 108:7 122:15,22 123:12
124:19 133:18 136:16

**standing** 27:16 264:13 306:2

**standpoint** 66:22 316:21 355:16

**stands** 227:23

**stark** 155:14

**start** 18:12,21 19:11,18 21:9 23:18
44:6 50:10 65:7 126:18 177:16
197:10 213:19 214:5 324:3 335:10,15

345:6 351:24 369:5

**started** 31:24 48:21 50:24 55:21,25
145:6,18 150:11 151:6 154:2 164:20
166:20 186:14 191:2,6,10 205:7
213:23 249:4

**starting** 26:18 158:6 226:25 397:3

**starts** 80:18 206:14,21

**state** 79:4 100:19,25 106:9 190:11
204:22 207:6,24 212:7 214:12 283:15
286:3 299:25 305:7 322:24 324:2
326:8 357:19,23 385:12 386:10 388:2
394:8 406:18

**stated** 50:23 184:22 198:13 239:19
282:4 307:24 320:8 389:6

**statement** 43:5 94:23 126:19 193:5
204:13 232:9 234:25 235:11 275:25
278:18 281:20 307:16 327:4,7 329:5
372:8

**statements** 128:11 261:15 262:3
277:16 283:8,10 292:10 298:7
305:20,21 360:24 364:25

**states** 18:13 86:12 138:11 204:2
208:10 233:12 280:5 294:12 321:24
322:10 343:6

**stating** 80:5 330:3 364:18

**status** 160:16 306:4 402:18

**stay** 68:10 130:7 334:8 355:13

**stayed** 75:20 242:7 320:24 322:22

**stays** 324:16

**steady** 158:2

**stenographer** 34:3 37:19 94:11
117:5 153:3 197:7 198:22 207:23
208:13 287:19 302:16 304:21 312:18
315:13,18 317:11 336:18,22 349:20
374:23 407:9,20 412:2,3

**step** 41:25 112:6

**steps** 68:25 76:10 111:25 395:12

**sticking** 96:11

**stip** 181:5

**stock** 140:5,16 160:8 310:9,20 383:2

**stocks** 159:22

**stone** 328:12 331:9

**stop** 185:11 268:23 285:15 362:23
364:5 385:25 395:5 406:24

**stopped** 185:4 313:20 386:6 387:20

**storage** 172:8

**storm** 249:6

**story** 383:23

**straight** 27:4 388:12

**strategic** 342:25

**strategies** 76:13 278:25

**strategy** 139:9 167:18 177:18

**street** 31:15 187:3,22 228:6 230:9
272:7

**stress-testing** 28:16,19

**stretch** 108:21

**Stretto** 129:4

**strike** 152:9 167:19

**strokes** 333:8

**strong** 269:12,14,24 270:2,6,7,18
271:5 272:15 284:25

**structure** 163:4 184:14 193:10 367:5

**structures** 198:17

**struggle** 98:3

**studied** 26:21 44:2 244:17 259:25
271:19 274:22 325:14 360:4

**study** 141:8,10

**stuff** 46:9 72:15 77:18 78:6 142:4
188:4 228:12 240:18 244:18 262:17
274:23 363:23 367:18

**subject** 36:11 86:11 290:6 332:15
351:15 382:22

**subjective** 400:19

**subjects** 69:19 119:8

**submit** 304:11,24

**submitted** 304:25

**subsection** 379:2 388:17 389:7

**subsections** 392:23

**subsequent** 178:8 216:16 220:14

**subsequently** 218:24

**subsumed** 248:8

**subtract** 162:9

**subtracting** 210:25

**subtractions** 282:7

**success** 188:21 334:11

**successful** 173:14,24 174:2 178:12

**sufficient** 113:12

**suggestions** 146:11

**suit** 396:14

**suitcase** 172:11

**suited** 410:24

**sum** 221:21 350:18

**summarizing** 230:24 231:3 379:10,
12,13 382:7

**summer** 169:18

**super-sized** 142:6

**supervise** 167:17

**supervision** 392:19

**support** 45:24 330:22 337:21 364:18
366:2 375:7 404:2 405:2,20,21

**suppose** 231:9 241:9 250:20 292:21

**supposed** 125:11 240:24

**supposition** 357:25

**surprised** 219:23 367:16

**surrendering** 240:9

**survival** 391:11

**suspended** 382:14

**Sutherland-smith** 33:5,12 37:5

**swap** 48:22 49:2,4,5 224:2,4,22,25
225:4,25 226:6,12,23 227:2 257:16
284:23

**swaps** 335:12 386:4

**switch** 269:7

**switching** 229:3

**system** 121:20 196:19,21 197:15
221:6,8 253:8 276:24 407:15

**systematically** 220:21

**systems** 119:20 395:24

---

**T**

**T-SHIRTS** 271:8,10,25

**T.J.** 19:3,4 25:3 40:16 56:12 58:6,23

82:24 132:5 267:19 269:5 326:17

**table** 178:10 189:9 334:10

**tail** 177:5

**takes** 244:13

**taking** 42:9 117:9 210:24 232:11
234:12 356:18

**talk** 23:15 26:16 69:18 78:13 117:13
201:21 202:18 280:13 284:24 328:18
330:9,12 335:25 336:7 337:16 359:6
370:20 375:13 394:24 410:11

**talked** 227:19 328:20 336:12 337:7,9
349:4 353:12,19

**talking** 23:18 72:13 120:7 122:8
147:4 178:16 191:11 245:12 266:10
271:15 288:17,18 319:8 337:6 347:10
352:5 354:16 381:21 389:3 410:18

**talks** 205:18

**target** 52:5

**targeted** 365:12

**taught** 32:12

**tax** 177:16 254:18,20,24 255:22
256:5,18,24,25 257:6,14,21 258:2,5,
11,20,22,23,25 259:4,12,21,22 260:2,
13,14,21,24 261:3 279:11 297:24
298:7 344:14,23 347:13,15 350:13

**taxable** 255:17 256:9 257:7,15
346:21,25

**taxes** 177:7,11 259:15 260:5 294:24
297:13,15,19 346:6,15 347:2 352:18

**taxing** 260:17

**team** 73:3 74:14 75:8,25 76:9 88:15
105:19 119:25 122:4,5 125:13,17
151:22,23,25 152:3,4,21,23,25 153:2,
7,16,21 154:7 185:8 295:23,24
315:24

**team's** 75:5

**teams** 134:12 148:10 152:18,19,21

**technically** 293:3

**technology** 119:25 120:4 171:16
206:11

**telling** 226:6

**ten** 43:22 208:9 392:2

**ten-minute** 285:8 298:19,25

**tend** 141:4,5 234:3

**tenure** 57:10 150:8,9 152:16 154:2
187:20

**term** 31:18 240:7 286:24 336:8
403:20

**terminate** 375:8,9 389:10,11 391:10

**terminates** 388:8

**termination** 391:10

**terms** 19:21 20:10 26:11 43:13 44:25
45:2 76:16,19,21 77:3,6 78:12,13
79:6,9,17,18,20 80:6,7,10,12,14,23,
25 81:24 82:10,14,21 99:5,10 115:15
139:11 144:22,24 146:6,12 147:4,14
148:15 149:6 150:6,15 194:11,15,17,
20,23,25 195:7,14,15,22 196:10
197:18,22 198:12 214:18,19 215:7
217:18 219:12,18 220:8,18 221:12
222:9 229:14 233:2,11 234:18 240:19
246:17,23,24 256:17 258:24 259:21,
22 266:20 267:8 274:2 275:11 279:3,
18 280:5,8,14,18,20,22 281:5,6,15,
18,22 282:3,5,7 283:3,6,12,13 284:9,
15 286:2,6 288:15 289:15,21 290:7,
25 291:3,6 295:9,16,24 297:5 301:6
303:22 304:4,8,9,12,16,18,23 305:7,
14,20,25 322:16 325:3,5,8,20 326:9,
22 337:8 340:21,24 341:3 345:9,10
348:19 354:4 360:5 374:20,22 375:3,
16 376:5,20,25 377:5 379:25 381:24
382:9,13 388:9 389:9,11 390:16
391:11 395:4,19 409:16,21

**testified** 85:22 125:4 144:20 192:18
194:11 201:23 203:20 213:14 240:5,7
322:20 404:10

**testify** 22:3 45:14 69:21 129:7 194:4,
14 204:13

**testifying** 21:19 218:16

**testimony** 20:17 42:7,16 43:7,8 44:9
55:7 58:9,25 60:23 93:14 94:22 100:5
114:12,15 118:10 122:17 125:4
130:25 132:22 133:11 140:18,21
142:22 144:21 184:16,21 192:25
198:4 240:6 283:22 317:21 356:12
393:7 404:15

**Tether** 89:10,13,14,17,23 90:3,8,13
91:4,8,18 92:20 93:15 94:17,18 211:8

**Texas** 169:24,25 176:18 177:13
190:10,11,12 299:24

**that'd** 302:9

**theory** 310:5

**thing** 22:21 23:12,23 77:22 118:9 225:7 244:15 262:19 275:4,10 304:6 336:23 361:25 374:2 389:17 398:10

**things** 45:3 62:2 68:10 73:21 74:11 95:17,20 99:18 105:10 109:10 112:3 114:8 118:7,13,14 141:5,10 157:4 169:11,15 184:13 222:4 228:11 236:11 246:2 271:11 274:21 275:13, 15 285:3 296:16 309:21 332:3 334:3, 23 336:13 342:8 345:23 361:14 365:22 397:6 410:10

**thinking** 43:10 125:15 149:23 155:20 186:14 209:20 243:11 245:21 335:15 343:2

**third-party** 167:7

**thought** 72:17 97:11 126:5 172:10 193:3 239:9 247:16 337:2 352:11 373:25 402:8 405:3,9

**thousands** 175:16

**threshold** 230:20

**tight** 106:21 161:13

**tightly** 119:20

**time** 18:17 28:17 29:20 30:7 31:6,7,9, 22 32:5,18,25 34:7 39:20 52:18,25 54:22 57:10,13 60:21 61:4,9,21 64:24 69:10,16 78:19 98:23 105:5 107:15 113:16 114:3 117:13,15,19 119:18 137:8,23 138:4 142:16 145:18 149:11 174:13 183:5 184:23 185:23 186:21 188:21,24 189:22 190:3 191:3 192:4 193:13 202:5 207:7 212:10,22 213:7, 9 217:19 221:17 227:11 232:7 236:14 242:11 244:8,14,16 247:18 248:17 257:3 265:23 266:4 272:21,25 274:5, 11 275:2 280:3 286:4,8 287:20,21 290:2,14 298:11 299:3,8,16 301:11, 17 310:14 318:9 319:16,21 320:17 321:15 322:8 326:7 330:24 340:14 342:4 353:12,19 356:16,19 357:14 364:19,20 368:12 371:18,23 373:22 375:11,21 386:16 411:9,14 412:9,13

**timelines** 108:18

**times** 25:8 31:14 68:4 102:8 105:13 142:21 168:10,11 216:20 240:4 253:4 291:13 313:15 317:21 360:24 368:5 404:11

**timing** 196:12,15 261:6

**tipping** 248:24

**tired** 352:6

**tirelessly** 127:2 130:3

**title** 30:23 57:20,21 59:16 66:24 70:14 74:9 99:4 115:14,24 116:8 193:11 195:3 215:23 219:25 220:9 222:22 224:13 225:6,9,11,16 226:20 239:23 240:9 251:5 252:15,16 253:11,12 254:7 255:8 256:9 258:10, 19 259:16 279:10,24 301:8 302:24 303:8,19 317:7 345:22 346:22 347:24 348:4,15 353:8 355:7,10 356:2,8 357:21 378:6,9,20 383:8,13 385:14 393:5,11

**titled** 216:11

**titles** 227:20

**today** 21:19,23 22:3 38:9 43:7 44:9, 23 45:14 46:23 62:9,10,16,22,23 63:14 69:20 70:11 92:16 112:5,16,25 125:10 192:13 205:16 207:8 213:24 240:7 243:11 246:13,15 275:6 294:12 313:15 320:19 353:18 360:24 368:6 393:7 394:2 398:13

**today's** 20:15 26:13 144:21 146:5 148:13 156:16 157:14,18 158:12 166:3 175:23 176:15 177:24 181:12 412:11

**token** 140:16 141:18 249:3,4,7 351:10 352:3,12

**tokens** 139:4,25 140:5,8 243:16 252:24 352:10

**told** 133:11 327:18,20

**tomorrow** 206:10 280:13 305:4 344:5,12 358:17 359:6 360:9 394:23 395:12 410:12,24

**tongue** 352:6

**top** 25:6 26:15 45:24 46:8 50:17 96:22 105:16 201:15 283:6 288:24

**topic** 39:11,19 55:2 63:23 229:3 250:21 350:19 351:18 409:12

**topics** 45:13 46:4

**topped** 158:3

**TOS** 394:21

**total** 51:24,25 54:22 57:9 73:19 80:18 92:9 121:13 139:3 162:7 166:7 210:24 221:21 350:18 367:15 390:17

**totaled** 96:4

**totaling** 91:11

**totally** 371:2

**totals** 96:14

**touched** 158:8

**tough** 175:12

**trace** 97:24 99:11,17,21 100:6 118:11,18,20 119:2 192:21 193:2,12

**traceable** 119:11

**tracing** 118:13

**track** 99:17 130:19 174:12,19 196:21 295:5 298:21

**tracked** 99:24

**tracking** 188:21

**trade** 49:6 73:23 84:23,24 105:25 257:16 284:23 346:23

**traded** 169:3 346:13

**trades** 335:13 347:4

**trading** 345:24 346:7 349:14

**traditional** 187:12

**Traditionally** 169:10

**traffic** 53:22

**train** 337:2

**transaction** 193:20 225:2 226:14 266:7 267:24

**transactions** 123:25 142:10 267:2 305:11

**transcript** 19:20 20:23 23:7 268:9,21 412:5

**transfer** 70:14 99:4 194:12 195:3,6 219:7 226:20 274:13 279:5,9,10,14 280:6 281:8 282:10 283:17 288:10,19 289:8,18 378:20

**transferred** 69:23 70:8 72:7 99:5 141:25 222:23 258:10 276:8 277:5 279:6,24 280:25 281:3 301:9 320:13 345:23 348:4 355:7 378:7 393:6 404:20

**transferring** 59:16 198:14 219:25 220:8,24 254:7 256:8 279:12 348:15 383:13 393:11

**transfers** 97:25 258:19 278:5 386:4 400:9

**transitioned** 364:13

**transmission** 377:23 379:4,5

transparency 328:21

trap 22:20

travel 120:18

treasurer 294:25

treasury 105:19 294:23 370:6,8
372:19

treat 236:16 352:19

treated 344:18 346:14

treatment 344:15

tremendous 266:8

tremendously 329:7

tricky 124:2

triggered 248:2

trouble 47:5

true 189:10 301:11 312:4 365:3
395:24

Trust 179:5,12,18,20,25 180:5,9,21,
22 215:10,21 216:8

Trustee 18:13 137:14 138:11 192:20
294:12

Trustee's 189:9

trustees 294:9

truth 21:23 39:6 234:8

truthfully 22:3

Tuesday 272:24

turn 37:3 47:12,15 78:14 83:15 84:25
85:4 97:18 106:4 207:5 256:5 300:4
315:14 318:12,19,25 319:2

turnaround 249:12

turning 165:9

Tushar 186:7,13,14 201:25

tweet 268:11 340:15

tweeting 268:5,24

Twitter 19:25 51:9 202:9 232:22
262:14,15 360:13

type 70:17 71:15 72:15 77:18 85:15
86:14,23 87:14 141:6 172:9 188:9
194:16 206:20 244:18 262:16 310:25
407:22

types 48:12 87:3,12 90:9 102:21
123:25 164:6 266:15 271:14 309:12
327:22

typical 327:21

typically 71:15 76:24 160:9 193:15
225:5 295:10 409:14

U

Ubierna 406:21

UCC 327:12,15 337:14

Uh-huh 144:20

UK 215:11 301:13 339:24

unaccredited 50:13 306:19 307:9
321:23 400:13 401:9,16,25 403:6,10
404:4 405:12

unambiguous 76:17 354:4,7,10,22,
25 358:2 359:23 383:14 385:15
389:19 392:17,23 393:10

unaware 187:21

unbanked 31:17

unclear 190:17

under- 180:8

underneath 86:19

understand 21:18 22:6,16 44:17
46:22 56:17 58:24 90:4,11 119:19
120:8 126:4,6 131:15 134:8 140:22
147:19 173:20 174:18 180:19 188:23
190:16,22 191:6 193:16 206:22
211:15 225:14 233:3 261:5 263:17
270:12 275:5 298:2 307:3,5 313:8
318:17 319:7 328:13 349:11 350:12
355:6 366:14 382:7 387:8,24 390:17
396:21 401:13,21 405:17 406:24
407:8,11 408:19

understandable 150:3

understanding 52:23 53:3,5 56:5,6
57:7,11,15,16 58:25 59:10,19 60:5
61:22 62:5,10,11,13,24 63:8,21 65:18
66:3 70:11 72:22 73:14 75:2,18 79:5,
14,15,25 80:11,19,20,22 82:20 89:17
90:12,24 91:16 98:15 100:10,20
101:2,4 102:7 104:23 108:13,18
109:5 112:24 116:19 140:6 145:22
149:12 153:25 159:2 165:6 166:19
169:12 170:24 171:15 172:13 179:24
180:9,17 182:8,16,23 183:3 184:8
189:5 190:24 191:23 192:25 193:19
194:21 196:15 197:19 200:25 201:8
220:4 222:19 223:5 235:14 242:8
245:12 246:8 250:14,15 251:23 252:9
254:25 255:19 256:6,10 257:4 261:6
262:21 263:2 268:4 270:25 271:24
272:4 279:18 281:14 288:8 289:7
290:24 292:22 293:11 294:7 295:22
297:24 301:15 303:11 305:2,3 309:8
310:24 315:12 322:25 329:3,20
330:20 340:4,8 342:22 343:21,24
346:20 350:23 353:4 358:19 365:11,
17 374:4,9 377:10 378:5 379:18,20,
24,25 381:20,21 385:21 389:10
390:20 391:19 395:3,16,22 396:20,24
397:19 400:3,11 401:3 402:22 409:20
410:6

understandings 387:9 400:20

understood 40:3 41:10 90:7 97:16
264:12 342:9 352:17 373:23 395:23
405:20

undertaking 100:8

uneducated 114:7

unexpected 38:5

unforeseen 380:15

unfortunate 169:8 251:13 343:16,19
349:4

unilateral 79:9 278:23 281:18
284:15 304:17

unilaterally 222:25

United 18:13 138:11 294:12

University 26:20

unlike 84:8

unregistered 397:22

unsecured 18:5 38:18 71:12 323:7

unturned 328:12 331:9

update 153:19 154:23 295:24 318:10
325:6

updated 154:22 155:2 225:3 325:9
375:10

updates 79:9 281:18 284:15 409:15

uptake 49:17 226:24

upward 169:13

us- 66:21

US-BASED 335:20

USA 269:12,14,24 270:2,6,7,18 271:4
272:15

USD 318:13,20,23

**USDC** 84:21 87:21,23 223:11,14,16, 17 224:13,21,25 225:25 226:4,11 227:16 232:10 312:5

**USDT** 84:21 88:2

**user** 66:22 286:20 304:25 345:11 377:21 382:12 394:21

**users** 48:7,9 49:20 50:12 81:24 222:19 229:5,10,19 344:15,20 403:9 404:19 409:15,24,25

**USTC** 224:5

**usual** 381:2

**utility** 250:23 352:10

**utilize** 290:8 377:15 382:25

**utilizing** 219:3

**V**

**vacation** 366:25

**vague** 131:10 238:14 349:9 351:21 405:15

**valuable** 333:23 363:24

**valued** 243:17

**vanilla** 335:20

**vantage** 340:11

**variances** 155:24

**variety** 279:3

**vast** 75:16 102:17 104:6 105:2 168:13 179:21 399:2

**vendor** 102:12 110:25 170:21 189:11

**vendors** 208:23 209:4

**venture** 104:16 187:7 266:11

**ventured** 372:9

**verbal** 23:4,8

**verbally** 307:16 317:18

**verify** 77:19 268:2 270:13

**version** 79:6 80:5 81:22 146:8 215:4 216:15,17 217:21 218:4 220:7,23 275:16 281:15 282:3,11 283:12 289:22 290:5 301:6 304:8,14,15 305:7,20 322:16 326:11 375:10

**version's** 281:6

**versions** 51:3 81:15 82:20 146:3

155:22 217:17 218:14 275:12 283:2, 19,25 284:3 286:5,6 341:3 376:25 394:20

**versus** 54:15 141:18 157:19 199:4 346:24 398:18 400:13

**ves-** 140:14

**vested** 140:12,16

**viable** 332:5

**vicinity** 42:10

**Victor** 406:21

**video** 54:17

**videos** 54:2 55:5 202:9 360:12 361:3,21,24 362:19 363:16 364:8

**view** 43:6 44:8 54:16 66:12 69:20 77:21 141:4 211:15 305:8 349:3

**viewed** 54:3

**viewer** 307:25

**viewing** 77:15

**views** 44:17

**violate** 333:4

**violating** 333:12

**virtual** 273:9

**virtually** 20:12 264:20

**vis-a-vis** 353:6

**vis-à-vis** 111:14

**visited** 272:21

**voided** 229:15 231:14

**volume** 160:10

**VP** 232:3

**W**

**wait** 276:2

**waiting** 167:5

**waived** 330:6

**wake** 228:20

**walk** 155:23 305:4 333:14

**wallet** 99:19 120:17 184:6,14 199:4 201:4,6 208:25 216:22,24 290:2 341:21

**wallets** 98:21 162:7,15 185:10 198:8 199:4 200:3,19,21 201:2,11 209:15

**wanted** 23:24 24:5 31:2 59:25 94:20 107:21 118:4 154:17 161:25 184:19 214:5 222:2 223:6 226:23 231:18 232:12 239:10 244:25 263:20 300:15 314:16 366:19 379:20 396:16,18 398:7

**war** 169:8

**warrant** 216:19

**warranted** 277:12

**Washington** 26:21 214:12

**watch** 76:23 233:14,15 308:8 361:22 363:19,22

**watched** 221:21

**watching** 54:23,24 55:5

**water** 302:6

**Watkins** 149:17,19 150:16 204:18 205:6

**Wayback** 217:16

**ways** 101:15 111:18 113:2,18 142:2 352:25

**WBTC** 370:3

**wealth** 335:15,22 401:2 402:13

**web** 53:21

**website** 81:16 325:6 326:8,23 360:13

**Wednesday** 272:23,25

**week** 25:14 110:22 127:2 155:4 156:11 166:6 205:8 252:12

**weekly** 48:11 51:10 74:16 254:2

**weeks** 57:8 64:23 284:22 375:13

**well-known** 263:21

**west** 169:24,25 176:18

**Westover** 300:7,9 301:16 393:14

**whatnot** 266:7 296:20

**whatsoever** 340:5

**White** 18:4 134:10 205:13

**Whoops** 357:6

**widely** 406:6

**wife** 29:12 232:6 269:25 271:4

wildcard 169:7

Wildly 337:25

win 240:3

winter 31:23 32:5 247:23

wired 101:17

wishes 390:22

withdraw 223:12,17 229:16 235:17
237:7,23 239:2,4 242:9 250:22 251:4
252:13 255:4,7 286:3,7,11 291:2,12
296:15 375:12,16 379:21 391:23,25

withdrawal 223:6,7 238:8 286:19
289:24 290:3,13 291:8 377:23 379:21
380:25 381:6,13 408:22

withdrawals 201:2,8 236:10,20
237:14 239:20 265:4 314:2,20,22
376:12 380:3 386:4,24 387:11,14,15,
19 388:4,5,10 390:10,11,21,25
407:18 408:14

withdrawing 238:21 239:15 241:9

withdrawn 240:23 261:9 370:13
385:25

withdrew 237:6,25 261:22 263:22
264:21 337:22

withheld 92:12 116:13 162:3,9
183:20 210:7,14,25 211:13 322:24

withhold 209:22,24 322:2,12

witness' 367:21

wondering 40:17 214:18 253:12
270:16 325:4

Wong 76:6

word 98:4 100:7 198:3 229:7 317:19
339:15 341:9

words 22:22 36:22 41:24 87:13
114:2 199:23 232:24 346:5

work 21:17 23:19 27:4,18,19,20
28:19 31:6 123:4 125:24 131:16
139:21 153:17 176:8 204:18 212:12
266:4 268:18 272:22 274:18 308:6
329:13,23 330:23

worked 141:24 151:14 192:6 198:17
228:5 262:23 273:11 295:2,23 365:20
378:17 405:23

working 32:17 36:20 41:21 61:8
108:7,8,17 112:9 125:9 126:7,12,19
130:3 132:24 139:10 145:6 150:5
157:21 172:23 175:12 191:16 205:18

208:9 308:7 327:24 329:6 330:22
339:9

workings 142:3

works 101:22 191:8 261:5 276:24
294:8

workspace 164:7,8 183:18 353:10

workspaces 163:8,12

world 29:16 51:22 81:7 108:10
110:23 141:5 142:10 148:13 234:3
255:9

worries 385:9

worry 149:25

worth 91:19 175:18 178:25 180:3
213:24 214:3 229:11,12 231:12 245:2
246:3 247:9,17 260:6 261:23 270:5
369:21 370:3 372:13,17 373:7

would've 410:9

wrap 321:21

writing 53:12 307:16 317:19

written 35:25 37:8,16 38:18 143:22,
24 144:5 365:7 377:8

wrong 77:13 186:18 202:21 249:19
295:14

---

## X

XYZ 73:4

---

## Y

Yanez 300:7,9 301:16 393:14

Yarden 151:24 153:13

year 29:5 30:20 126:18 151:5 178:14
213:22 214:7 220:11 222:5 229:9
254:18 261:10 270:3,4

years 28:2,7,23 29:13,14 245:21
257:2 297:16 399:15

yesterday 142:15

yield 240:10,16 273:5 316:14 355:17

Youtube 51:9 54:17 202:10 233:14
360:14 362:20 363:16

yup 27:16 91:5 132:6 154:13

---

## Z

zip 91:5

Zoom 23:14 33:16,24 37:23 268:5,8
299:19

zoomed 217:24