Karen Cordry
D.C. Bar No. 278051
Bankruptcy Counsel,
National Association of Attorneys General
1850 M St., NW, 12th Floor
Washington, DC 20036
Telephone: (301) 933-3640
kcordry@naag.org

ATTORNEY FOR THE STATES OF ALABAMA, ARKANSAS,
CALIFORNIA, DISTRICT OF COLUMBIA, HAWAII, IDAHO, MAINE,
NORTH DAKOTA, OKLAHOMA, AND SOUTH CAROLINA

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
|  | : | CHAPTER 11 |
| In re: | : | |
|  | : | Case No. 22-10964 |
| CELSIUS NETWORK LLC, *et al.*,1 | : | |
|  | : | (Jointly Administered) |
| Debtors.2 | : | |
-------------------------------------------------------------x

## LIMITED OBJECTION OF THE COORDINATING STATES WITH RESPECT TO THE DEBTORS' AMENDED MOTION FOR ENTRY OF AN ORDER (I) ESTABLISHING OWNERSHIP OF ASSETS IN THE DEBTORS' EARN PROGRAM, (II) PERMITTING THE SALE OF STABLECOIN IN THE ORDINARY COURSE AND (III) GRANTING RELATED RELIEF

The States of Alabama, Arkansas, California, District of Columbia, Hawaii, Idaho,

Maine, North Dakota, Oklahoma, and South Carolina, collectively the "Coordinating States," file

the following statement of position and limited objection with respect to the *Debtors' Amended*

*Motion For Entry Of An Order (I) Establishing Ownership Of Assets In The Debtors' Earn*

---

1 The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius Kofi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

*Program, (II) Permitting The Sale Of Stablecoin In The Ordinary Course And (III) Granting
Related Relief* (the "Amended Motion") (Docket No. 1325).

The Amended Motion requests the Court to authorize the Debtors to sell the Debtors'
"stablecoin" assets (as originally requested at Docket No. 832) and further seeks resolution of the
underlying ownership question as to those assets.  As such, it raises many of the same issues
relating to the ownership status of customer accounts as property of the estate that are being
separately briefed with respect to the "Custody" and "Withhold" Accounts pursuant to a
scheduling stipulation entered on October 13, 2022 (Docket No. 1044).

All of these proceedings relate to what is one of the most fundamental aspect of this case
– i.e., what is the exact status of the cryptocurrency assets now held by the Debtors?  Are they
unencumbered *property of the estate* that can be used and sold by the Debtors at will?  Or are
they the *property of the customers* that are only being held by the Debtors but that are not its
assets to dispose of without their consent?  Or do they exist in some sort of hybrid status between
those two?  The answers appear to have evolved  over time and differ between the various types
of accounts that customers now hold and must be analyzed under "Terms of Use" documents that
have been unilaterally created and repeatedly unilaterally altered by the Debtors.  (See the
Mashinsky Declaration. Docket No. 393 for a compilation of those documents.)  Over that period
of time, as Mr. Blonstein conceded in his deposition (pp. 275-78), there was no effort made to
ascertain whether customers actually *understood* those Terms of Use to convey the rights for
which the Debtors now argue.

There were extensive written deposition questions submitted and limited answers
provided, and there were three depositions held on November 21 and 22, 2022, during which
there was exhaustive (and, to a degree, exhausting) questioning of several officials of the

Debtors.  The Coordinating States will leave to other parties the effort to parse through the verbiage on a line-by-line basis – but they believe  all parties would concede the following bottom-line points.

First, the language of the Terms of Use provisions has evolved over time and it would be a monumental task to evaluate whether each customer actually read and understood those terms even if they clicked on them in order to access their accounts.  And, clearly, as the Debtors' difficulties with the regulators have emerged, they have attempted to write more protections for themselves into the language of those Terms of Use – and the nature of those changes and added protections were not necessarily clearly brought to the attention of the lay customers or their significance emphasized.  Moreover, notwithstanding all of those changes, the Debtors have remained under investigation by numerous states, including the Coordinating States and others, as to whether those operations and the Terms of Use applicable thereto have, *inter alia*, resulted in the Debtors marketing securities without necessary registrations and without complying with the regulatory framework of state (and federal) law.  As such, there are significant issues with respect to whether the Debtors can rely on their own, arguably unlawful, Terms of Use to determine the purported ownership of these assets and what rights they have in them.

Second, the description of the overall operating framework (prior to creation of the Custody and Withhold accounts earlier this year) remained basically the same over time. Customers were told over and over again that they were *loaning* their assets to the Debtors and they could recall that loan at any time they chose and receive them back.  The use of the term "loan" would certainly lead normal lay persons to assume they retained ownership of the crypto they entrusted to the Debtors.  (See, e.g., as just one example the recent opposition (Docket No. 1463) filed by such a lay customer making those points.)  And, indeed, if there were an actual

transfer of full ownership, that transaction might well be a taxable event, but there is no evidence

that such occurred or that any full purchase price was ever agreed to or paid out by the Debtors.

Rather, the assets always remained subject to the customers' unilateral right to withdraw them at

any time (with no need to pay anything to "buy" them back from the Debtors) and the further

right to be paid "rewards" during the time that they "loaned" those assets to the Debtors to use.

Third, the fact that a transaction is a loan does not preclude the lending party from

voluntarily authorizing the person receiving the asset to use it to engage in profit-making

ventures. And, indeed, that is what the Debtors are arguing for here by relying on paragraphs 13

and/or 14 of the Terms of Use documents, which state that the customers grant to Celsius the

right to "pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use

any amount of such Digital Assets" that had been loaned to it. It is on that basis that the Debtors

argues that it has the right to sell the stablecoin that it holds for the customers.

Fourth, at least in its more recent versions of the Terms of Use, the Debtors also claim to

*own* the assets that were deposited by its customers and not merely to have lawful possession

thereof, pointing, for instance, to language in the most recent paragraph 13 that refers to such

purported ownership. But, that language is itself highly ambiguous, stating that "you grant

Celsius, . . . for the duration of the period *during which the Eligible Digital Assets are loaned to

us* through your Celsius Account*, all right and title to such Digital Assets, including ownership

rights.*" In other words, the very language upon which the Debtors rely to show a transfer or

ownership states, in the very same sentence, that the assets are being *loaned* to Celsius. Clearly,

such contradictions rebut any claim that customers *understood* that they were giving away all

rights to control their assets. (And that leaves aside the effect of any verbal statements made by

Mr. Mashinsky or others that may have confused matters further, see., e.g., the recent filing at

Docket No. 1464 by customer K. David Flora referring to those verbal assurances as to his retained *ownership* of his assets).

Finally, while the hodgepodge of contradictory and ever-changing language in the Terms of Use did remain constant in giving Celsius that power to sell, loan, and use crypto assets in its possession so that it could implement the Earn program and pay rewards to its customers, that power was given within the context of an overall agreement that guaranteed customers the right to withdraw their assets without notice or conditions whenever they wished to do so and in the same form of cryptocurrency that they originally deposited.  (See Terms of Use, Ver. 8. Par. 11, pp. 416-17 of Mashinsky Decl.)  While there is some mention in the Terms of Use that technical issues might require limits or delays in access to the account, that is not the same as a general reservation of a right to eliminate the guaranteed withdrawal privileges customers were promised.  It is far from clear that parties would have been as willing to sign those Terms of Use if they were aware that the Debtors would interpret those terms as broadly as they do now.  As such, it is also unclear that the Debtors should be able to exercise that discretionary right to sell these forms of crypto assets without the consent of the customers who deposited them and then found they had been barred by the Debtors from retrieving them as promised.

As a bottom line, the Coordinating States believe there are several factors that should guide the Court's decision in how far to go in granting the Amended Motion should the Court decide to do so.  The Amended Motion does correctly limit itself to only seeking to sell the stablecoins that are in the Debtors' own general accounts, and not in the Custody and Withhold Accounts, which the Debtors concede are not its property.  That reduces the extent to which the Court must try to address the broader question of whether the assets in the Earn accounts are "owned" by the Debtors – an issue that many of the Coordinating States believe still warrants

further review.  And, it appears that the Debtors will be able to realize the full value of the assets

at this time; i.e., to carry out an essentially one-for-one exchange of stablecoins for dollars, so

that this is more akin to a simple exchange of one form of objectively valued currency for an

equivalent form than a traditional sale of a tangible asset whose value may be in dispute.  In that

regard, the Coordinating States understand that while stablecoin is intended to always trade at

that specified ratio, that may not always occur (especially if the turmoil in crypto market

increases further), so there may be a practicable concern with making the sale now to ensure that

this asset does retain its value even if the very difficult ownership issues warrant further scrutiny.

But, even if the Court should conclude that it may allow the stablecoin to be exchanged

for dollars despite the dispute over ownership of the assets, that does not resolve the question of

what should be done with the dollars obtained from the sale.  The case is now well into its fourth

month and it remains thoroughly unclear what direction is planned for its ultimate resolution.

Probably the most fundamental question is whether this entity has any viable business model as

an operating entity and if so, if the operations will entail anything other than serving as a purely

custodial business.  (As noted above, the nature of the Debtors' current business operations and

its terms of use have triggered numerous investigations and the precise ownership and control of

the Debtors over any assets they hold figure prominently into those investigations and how they

should be characterized and regulated under applicable state and federal law.)  In light of the

rapid contagion in the overall industry, it is difficult to predict if there will be a workable

business model for this entity that will be in line with what regulators at the state and federal

levels are willing to approve under current law, much less under new regulatory efforts that are

likely to be considered in the new Congress.

Accordingly, the Coordinating States would object to any portion of the Amended Motion that seeks authority to have the sale proceeds simply placed into the Debtors' coffers and used to fund current administrative expenses. It is our understanding from the deposition given by Mr. Compagna on November 22, that the Debtors have existing liquidity sufficient to run through at least March (and there appeared to still be substantial remaining funds even at that point).[3] That is ample time for management to be able to determine whether there is a viable reorganizational path forward. In particular, it should be made clear what sort of continuing business operation the Debtors will propose (including whether such operations are intended to include any new (and lawful) form of the Earn program) and/or whether there is any market for these accounts or the business as a whole to be bought by third parties. It should also be possible to gauge whether the customers/investors are likely to support any such going-forward effort or whether it would make more sense to concentrate efforts on an expeditious and efficient shutdown at the lowest possible costs.

While those discussions are proceeding, the Coordinating States believe the appropriate treatment for the proceeds of any stablecoin sales is for said proceeds to be retained in escrow by the Debtors to ensure that they can be used for the benefit of the creditors who are arguably having *their* property used to support the Debtors' case without their approval or consent. Escrowing the proceeds will ensure that funds can be held for those parties' benefit if the final determination is in their favor.

---

3 See page 12, of his deposition -- $172 million in assets as of October 31, projection of liquidity through March 2023;  pp. 59-60, 66-67 - discussing "burn rate" of cash as being in the range of $15-20 million per month the great bulk of which is for professional fees.  Even at a burn rate of $20 million per month, five months spent through March would leave a remaining balance of $72 million in the estate.

Dated: November 29, 2022

Respectfully submitted,

KAREN CORDRY,
Bankruptcy Counsel

*/s/ Karen Cordry*

Karen Cordry
D.C. Bar No. 278051
Bankruptcy Counsel,
National Association of Attorneys General
1850 M St., NW, 12th Floor
Washington, DC 20036
Telephone: (301) 933-3640
kcordry@naag.org

ATTORNEY FOR THE STATES OF ALABAMA, ARKANSAS,
CALIFORNIA, DISTRICT OF COLUMBIA, HAWAII, IDAHO,
MAINE, NORTH DAKOTA, OKLAHOMA, AND SOUTH CAROLINA

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing has been served via the Court's Electronic Filing System on all parties requesting notice in this proceeding on November 29, 2022.

*/s/ Karen Cordry*

KAREN CORDRY