Hearing Date: December 5, 2022 at 10:00 a.m. (EDT)
Objection Deadline: November 29, 2022 at 5:00 p.m. (EDT)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

**IGNAT TUGANOV'S OBJECTION TO THE DEBTORS' AMENDED MOTION FOR ENTRY OF AN ORDER (I) ESTABLISHING OWNERSHIP OF ASSETS IN THE DEBTORS' EARN PROGRAM, (II) PERMITTING THE SALE OF STABLECOIN IN THE ORDINARY COURSE AND (III) GRANTING RELATED RELIEF**

Ignat Tuganov, by and through his undersigned counsel, hereby submits this Objection to the Debtors' Amended Motion for Entry of an Order (I) Establishing Ownership of Assets in the Debtors' Earn Program, (II) Permitting the Sale of Stablecoin in the Ordinary Course and (III) Granting Related Relief [Dkt. No. 1325] (the "Motion"), and respectfully represents as follows:

**Preliminary Statement[2]**

1. The Debtors have asked this Court to rule that, pursuant to certain selected provisions of selected versions of the online Terms of Use purportedly governing the Earn Program, the Debtors hold title to all of the assets customers deposited in Earn Program accounts, such that Earn Assets should be deemed property of the Debtors' bankruptcy estate. Furthermore,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

[2] Capitalized terms used in the Preliminary Statement are defined further below in the Objection.

based solely on those same online Terms of Use provisions, the Debtors have requested permission to sell any stablecoins that customers deposited in Earn Program accounts free and clear of all claims and interests (while specifically preserving and excluding from sale any stablecoins that were purportedly deposited in Custody or Withhold accounts).

2.      Since the filing of the Debtors' Motion, however, the Examiner filed her Interim Report, which confirms that the Debtors comingled Earn, Custody, and Withhold Assets, and used Earn Assets to initially fund and to fill recurring shortfalls in Custody accounts.  These findings suggest that the Debtors' businesses practices may be deemed a Ponzi scheme, which could result in the Court setting aside the Terms of Use on which the Debtors rely for purported title to and authority for the sale of Earn Assets.  The Examiner's findings also show that the Debtors' manufactured distinction between Earn Assets on the one hand, and Custody and Withhold Assets on the other, was not implemented in practice and cannot support the Debtors' disparate treatment of customers with Earn, Custody, and/or Withhold accounts.

3.      Moreover, the Court has ordered that the Examiner's Investigation be expanded to specifically include a factual inquiry into whether the Debtors used customer deposits to make payments or otherwise meet obligations to existing customers at a time when the Debtors had no other sources from which to make such payments or meet such obligations—such facts being a critical factor to any determination of whether the Debtors engaged in a Ponzi scheme.

4.      In light of the Examiner's troubling findings thus far, and the fact that the Examiner's Investigation is ongoing and her final report may not be issued until January 2023, it is premature for the Court to allow the sale of Earn Assets—while preserving Custody and Withhold Assets—solely on the basis of Terms of Use that the Debtors appear not to have abided

by in practice, especially if the legal consequence of a Ponzi adjudication is to render the terms of use void *ab initio*. Accordingly, the Motion should be denied.

## Background

5. On July 13, 2022 (the "Petition Date"), the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") filed voluntary petitions for relief in this Court under chapter 11 of the Bankruptcy Code.

6. Mr. Tuganov is the owner of an Earn Program (as defined herein) account that contains stablecoins. *See* Dkt. No. 974-1 (Schedule F-1) at p. 432.

7. On September 14, 2022, the Court entered an *Order Directing the Appointment of an Examiner Pursuant to Section 1104(c) of the Bankruptcy Code* [Dkt. No. 820] (the "Examiner Order"). Pursuant to the Examiner Order, the U.S. Trustee was directed to appoint an examiner to investigate certain aspects of the Debtors' conduct and financial affairs (collectively, the "Investigation"). On September 29, 2022, the Court entered an order approving the appointment of Shoba Pillay as the Examiner [Dkt. No. 923].

8. On November 11, 2022, the Debtors filed the instant Motion, seeking to establish—based solely on selected provisions of certain versions of the Debtors' online Terms of Use—that the Debtors hold title to all the assets customers transferred into the Debtors' earn program and any proceeds thereof (the "Earn Program," and such assets, including any proceeds thereof, the "Earn Assets"), and that Earn Assets are therefore property of the Debtors' bankruptcy estate. *See* Motion ¶¶ 1-4. Pursuant to the Motion, the Debtors also seek authorization to sell Earn Stablecoins[3] to fund their bankruptcy cases and ongoing operations. *Id.* ¶ 4.

---

[3] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

9.  On November 14, 2022, shortly after the Debtors filed their Motion, the Court entered the *Stipulation and Agreed Order Modifying the Scope of Examiner Order* [Dkt. No. 1343] (the "Ponzi Investigation Stipulation"). Pursuant to the Ponzi Investigation Stipulation, the scope of the Examiner's Investigation was expanded to include "an investigation and report on whether the Debtors used new deposits being made by customers to make payments or otherwise meet obligations to existing customers at a time when the Debtors had no other sources (whether liquid or which could have been monetized) from which to make such payments or meet such obligations" (the "Ponzi Investigation"). Ponzi Investigation Stipulation ¶ 1.

10. On November 19, 2022, the Examiner filed the *Interim Report of Shoba Pillay, Examiner* [Dkt. 1411] (the "Interim Report"). The Interim Report contains a number of factual findings that are relevant to the Motion and Ponzi Investigation, including that:

   i. "Custody accounts did not regularly reconcile with assets held in the Custody wallets," Interim Report at 9;

   ii. "[s]hortfalls in the Custody wallets were funded by the [Debtors'] Main wallets, where Earn deposits and other crypto assets were held," *id.*;

   iii. shortfalls in the Custody wallets mounted after the so-called "pause" on withdrawals (the "Pause") went into effect on June 12, 2022, and the Debtors continued to transfer assets from Main wallets to Custody wallets to cover such shortfalls after the Pause—including transferring nearly $50 million of assets from Main wallets into Custody wallets on June 28, 2022, *see id.* at 76-81;

   iv. "no effort was made to segregate or separately identify any assets associated with the Withhold Accounts, which were commingled in the Main wallets," *id.* at 9; and

4

      v.    as a result of the Debtors' conduct, "customers now face uncertainty regarding which assets . . . belonged to them as of the bankruptcy filing." *Id.*

11. On November 22, 2022, the Examiner filed a *Motion to Approve Amended Work Plan* [Dkt. No. 1438], in which she seeks to extend to January 17, 2023 the deadline to file her final report (the "Final Report"), including her findings regarding the Ponzi Investigation.

12. According to the Debtors' financial advisors, the Debtors currently possess sufficient liquidity—without selling any stablecoins—to fund their operations until at least March 2023, and potentially longer if they sell certain non-customer assets and/or receive certain contemplated settlement payments. *See* Robert Campagna Depo. Tr. ("Campagna Tr.") 12:18-13:8, 14:19-15:1, 21:7-21:21.[4]

## Discussion

13. The Debtors seek to establish title over all Earn Assets—and to obtain the Court's permission to sell Earn Stablecoins—by relying exclusively on certain provisions of the online Terms of Use that purportedly govern the Earn Program. *See* Motion ¶ 3.

14. Though they acknowledge that customers may have valid defenses to any purported contract between the Debtors and the customers based on the Terms of Use, *see id.* ¶ 16—including fraud-based defenses, *see id.* ¶ 33 n.9—the Debtors propose that the Court ignore these defenses at this stage and allow them to sell nearly $20 million of Earn Stablecoins, free and clear of any rights of Earn Program customers, leaving adjudication of the customers' defenses for some unspecified time in the future, at which point the customers' assets may be unrecoverable. *See* Debtors' Response to Daniel A. Frishberg's Objection to Debtors' Proposed Scheduling Order

---

[4] The relevant excerpts of the Campagna Transcript are attached hereto as **Exhibit 1**.

Regarding Title to Earn Program Assets and the Sale of Certain Stablecoins [Dkt. No. 1414] ("Debtors' Response") ¶¶ 1-3.

15. The Debtors assert that their proposed approach "will enable the Court to resolve threshold legal and common issues of fact, while deferring discovery and resolution [of] individualized contract formation issues." *Id.* ¶ 8. They also claim their approach "provide[s] for judicial economy . . . [and] treats all interested parties equally." *Id.* It does neither.

16. Specifically, the Debtors' approach ignores the most consequential "threshold legal and common issue[] of fact" in this case: whether the Debtors' business practices at some time before the Petition Date amounted to a Ponzi scheme.

17. As this Court has previously explained, "[a] 'Ponzi' scheme . . . refers to an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments. Typically, investors are promised large returns for their investments. Initial investors are actually paid the promised returns, which attract additional investors." *In re Dreier LLP*, 452 B.R. 391, 402 n.9 (Bankr. S.D.N.Y. 2011) (Glenn, J.) (internal quotations and citation omitted); *S.E.C. v. Credit Bancorp, Ltd.*, 290 F.3d 80, 83 (2d Cir. 2002) (Paying "investors a return out of the assets transferred by later investors" is a "classic Ponzi scheme").

18. The possibility that the Debtors' pre-petition business practices may be determined to have been a Ponzi scheme has been raised early and often in these proceedings. For instance, in August 2018, the U.S. Trustee acknowledged in its Motion for Entry of an Order Directing the Appointment of an Examiner [Dkt. No. 546] (the "Examiner Motion") that multiple stakeholders have credibly alleged the Debtors engaged in a Ponzi scheme by relying on new deposits to pay

6

the yield owed to existing account holders.  *See* Examiner Motion ¶¶ 26, 39; *see also* Dkt. No. 123; Dkt. No. 914 at pp. 6-8.

19. Similarly, in joining the Examiner Motion, the Vermont Department of Financial Regulation noted that:

> Celsius [] admitted at the 341 meeting that the company had never earned enough revenue to support the yields being paid to investors. This shows a high level of financial mismanagement and also suggests that at least at some points in time, yields to existing investors were probably being paid with the assets of new investors.

Dkt. No. 730 ¶ 12.

20. Indeed, the Examiner has already confirmed in her recent Interim Report that the Debtors comingled Earn, Custody and Withhold Assets, and used Earn Assets to initially fund and to fill shortfalls in the Debtors' obligations to Custody customers to the tune of tens of millions of dollars.  *See* Interim Report at 9, 76-81.

21. Moreover, the Court recently authorized the Examiner to specifically investigate whether the Debtors engaged in the hallmarks of a Ponzi scheme, namely "whether the Debtors used new deposits being made by customers to make payments or otherwise meet obligations to existing customers at a time when the Debtors had no other sources (whether liquid or which could have been monetized) from which to make such payments or meet such obligations."  Ponzi Investigation Stipulation ¶ 1.

22. If the Debtors are found to have engaged in a Ponzi scheme—which seems increasingly likely with each passing day and new revelation—the purported contracts between the Debtors and their customers may be deemed "unenforceable as a matter of public policy." *In re Bernard L. Madoff Inv. Sec. LLC*, 12 F.4th 171, 202 (2d Cir. 2021) (Menashi, J., concurring) (internal quotation marks and citation omitted); *see also Merrill v. Abbott (In re Indep. Clearing*

*House Co.)*, 77 B.R. 843, 858 (D. Utah 1987) (concluding, in the context of a Ponzi scheme, that underlying contracts were unenforceable as a matter of public policy). In such event, the Debtors' Terms of Use could be set aside and would not provide a basis for the sale of any Earn Assets. Nor would there be a basis to continue to discriminate between Earn, Custody and Withhold Assets on the basis of the Terms of Use, as customers that deposited such assets would all have claims for rescission, among other remedies. *See Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 596 B.R. 451, 464 (S.D.N.Y. 2019) (recognizing that investors in Ponzi schemes have claims for rescission), *aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC*, 976 F.3d 184 (2d Cir. 2020).[5]

23. In light of the potentially far-reaching ramifications of a determination that the Debtors engaged in a Ponzi scheme, both expedience and equity counsel in favor of deciding whether, and if so, when the Debtors engaged in a Ponzi scheme ***before*** ruling on whether the Debtors' online Terms of Use—which could be thrown out in the event a Ponzi scheme is found— grant the Debtors title over Earn Assets.

24. Moreover, as the Debtors possess sufficient liquidity to continue operations into the second quarter of next year without selling any Earn Stablecoins, *see* Campagna Tr., 12:18-13:8, 14:19-15:1, 21:7-21:21, and as stablecoins can be sold virtually instantaneously, *id.* 75:19-23, it is particularly inappropriate for the Debtors to attempt to strongarm the Court into ruling on one of the key issues in these proceedings on the basis of an incomplete factual record.

---

[5] A Ponzi adjudication may also provide customers with various tax benefits.

## Reservation of Rights

25. Mr. Tuganov reserves all of his rights, claims, defenses, and remedies, including, without limitation, the right to amend, modify, or supplement this Objection, and to raise additional arguments regarding the Motion and/or the relief requested therein.

## Conclusion

26. For the reasons stated herein, Mr. Tuganov respectfully requests that the Court: (i) deny the Motion in its entirety, and (ii) grant any other and further relief to which Mr. Tuganov may be justly entitled.

Dated: New York, New York
       November 29, 2022

                        VENABLE LLP

By:   */s/ Jeffrey S. Sabin*
      Jeffrey S. Sabin
      Carol Weiner Levy
      Arie Peled
      1270 Avenue of the Americas, 24th Floor
      New York, New York 10020
      Telephone: (212) 503-0896
      Facsimile: (212) 307-5598
      Email: JSSabin@venable.com
      Email: CWeinerLevy@venable.com
      Email: APeled@venable.com

      - and -

      Andrew J. Currie (*admitted pro hac vice*)
      600 Massachusetts Avenue, NW
      Washington, DC 20001
      Telephone: (202) 344-4586
      Facsimile: (202) 344-8300
      Email: AJCurrie@venable.com

      *Counsel for Ignat Tuganov*