**Hearing Date:** December 5, 2022 at 10:00 a.m. (prevailing Eastern Time)
**Response Deadline**: November 29, 2022 at 5:00 p.m. (prevailing Eastern Time)

**WHITE & CASE LLP**
David M. Turetsky
Keith H. Wofford
Samuel P. Hershey
Andrea Amulic
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113
Email:   david.turetsky@whitecase.com
         kwofford@whitecase.com
         sam.hershey@whitecase.com
         andrea.amulic@whitecase.com

– and –

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile:  (312) 881-5450
Email:   mandolina@whitecase.com
         gregory.pesce@whitecase.com

**WHITE & CASE LLP**
Aaron E. Colodny (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone: (213) 620-7700
Facsimile:  (213) 452-2329
Email:   aaron.colodny@whitecase.com

*Counsel to the Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' LIMITED OBJECTION
WITH RESPECT TO THE DEBTORS' AMENDED MOTION FOR ENTRY OF AN
ORDER (I) ESTABLISHING OWNERSHIP OF ASSETS IN THE DEBTORS' EARN
PROGRAM, (II) PERMITTING THE SALE OF STABLECOIN IN THE
ORDINARY COURSE AND (III) GRANTING RELATED RELIEF**

---

[1]    The Debtors in these chapter 11 cases and the last four digits of their federal tax identification number are as follows: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND ....................................................................................................................7

    A.  Overview of the Earn Program .............................................................7

    B.  Coin Movement With Respect to the Earn Program ......................................9

    C.  The Terms of Use...............................................................................10

    D.  Notice and Acceptance of the Revised Versions of the Terms of Use ...........15

    E.  The Stablecoin Sale Motions ................................................................18

LIMITED OBJECTION ...........................................................................................................23

  I.  The Debtors Have Demonstrated That At Least 55% Of Account Holders Accepted the
Terms of Use..................................................................................................23

    A.  Acceptance of Clickwrap Agreements........................................................24

    B.  Version 6 of the Terms of Use Is Binding on Account Holders that Created Accounts
Prior to July 22, 2022 and Clicked to Accept the Terms of Use ....................26

    C.  The Debtors Have Not Produced Evidence With Respect to Whether Versions 6, 7,
and 8 Are Enforceable With Respect to Users Who Created Accounts After July 22,
2021        ....................................................................................................28

  II.  The Terms of Use Unambiguously Provide that Title to Earn Assets Was Transferred to
Celsius and that Celsius Had the Right to Sell Earn Assets Assets ...............................29

    A.  The Language of the Terms of Use is Unambiguous Regarding Celsius's Title in and
Right to Sell Earn Assets .....................................................................29

    B.  The Characterization of the Nature of the Transaction Between Account Holders and
Celsius as a Loan Does Not Create an Ambiguity........................................32

  III.  The Sale of Stablecoins (or Other Crypto Assets) To Fund Operating Expenses Is Not
the Ordinary Course of the Debtors' Business ................................................35

RESERVATION OF RIGHTS ....................................................................................................38

CONCLUSION....................................................................................................................38

AMERICAS 116616989 v1

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*55 Eckford Realty LLC v. Bank of E. Asia (U.S.A.) N.A.*,
   31 Misc. 3d 1229(A), (N.Y. Sup. Ct. 2011)................................................................3

*AEI Life LLC v. Lincoln Benefit Life Co.*,
   892 F.3d 126 (2d Cir. 2018)................................................................................10

*Ally Fin. Inc. v. Wells Fargo Bank, N.A. (In re Residential Capital, LLC)*,
   531 B.R. 25 (Bankr. S.D.N.Y. 2015)................................................................29, 32

*B. Lewis Prods., Inc. v. Maya Angelou, Hallmark Cards, Inc.*,
   No. 01 Civ. 0530 MBM, 2005 WL 1138474 (S.D.N.Y. May 12, 2005)....................11

*Breckenridge Edison Dev., L.C. v. Sheraton Operating Corp.*,
   13-CV-6804 (VB), 2015 WL 5459833 (S.D.N.Y. June 2, 2015)............................30

*Centrifugal Force, Inc. v. Softnet Commc'n, Inc.*,
   No. 08-CV-5463 CM GWG, 2011 WL 744732 (S.D.N.Y. Mar. 1, 2011)................25

*Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co., N.A.*,
   773 F.3d 110 (2d Cir. 2014)................................................................................29

*Citadel Mgt., Inc. v. Telesis Tr., Inc.*,
   123 F. Supp. 2d 133 (S.D.N.Y. 2000)................................................................33

*Commodity Futures Trading Commn. v. McDonnell*,
   287 F. Supp. 3d 213 (E.D.N.Y. 2018) ................................................................30

*Curley v. AMR Corp.*,
   153 F.3d 5 (2d Cir. 1998)................................................................................11

*Donohue v. Cuomo*,
   980 F.3d 53 (2d Cir. 2020)................................................................................23

*Flynn v. McGraw Hill LLC*,
   No. 21-CV-614 (LGS), 2022 WL 103537 (S.D.N.Y. Jan. 11, 2022) ........................29

*Giddens v. 344 Individuals (In re Lehman Bros.)*,
   574 B.R. 52 (Bankr. S.D.N.Y. 2017)................................................................28

*In re Brown*,
   No. 18-10617 (JLG), 2022 WL 4390454 (Bankr. S.D.N.Y. Sept. 22, 2022) ............30

AMERICAS 116616989 v1

*In re Lavigne*,
   114 F.3d 379 (2d Cir. 1997) ............................................................................................ 35

*In re Residential Capital, LLC*,
   501 B.R. 549 (Bankr. S.D.N.Y. 2013) ....................................................................... 29, 30

*In re Residential Capital, LLC*,
   524 B.R. 563 (Bankr. S.D.N.Y. 2015) ............................................................................. 10

*In re Residential Capital, LLC*,
   No. 12-12020 (MG), 2015 Bankr. LEXIS 2595 (Bankr. S.D.N.Y. Aug. 5, 2015) .............. 29, 32

*In re SunEdison, Inc.*,
   620 B.R. 505 (Bankr. S.D.N.Y. 2020) ............................................................................. 30

*In re TerreStar Networks, Inc.*,
   457 B.R. 254 (Bankr. S.D.N.Y. 2011) ............................................................................. 30

*India.com, Inc. v. Dalal*,
   412 F.3d 315 (2d Cir. 2005) ............................................................................................ 29

*Jerez v. JD Closeouts, LLC*,
   943 N.Y.S.2d 392 (N.Y. Dist. Ct. 2012) .......................................................................... 23

*Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*,
   595 F.3d 458 (2d Cir. 2010) ....................................................................................... 28, 29

*Luitpold Pharms., Inc. v. Ed. Giestlich Söhne A.G. Für Chemische Industrie*,
   784 F.3d 78 (2d Cir. 2015) .............................................................................................. 29

*Marin v. Const. Realty, LLC*,
   28 N.Y.3d 666 (N.Y. 2017) ............................................................................................. 29

*Metro. Life Ins. Co. v. RJR Nabisco, Inc.*,
   906 F.2d 884 (2d Cir. 1990) ............................................................................................ 28

*Meyer v. Uber Techs., Inc.*,
   868 F.3d 66 (2d Cir. 2017) ...................................................................................... 23, 24, 25

*Moezinia v. Ashkenazi*,
   136 A.D.3d 988 (N.Y. App. Div. 2016) .......................................................................... 23

*Nguyen v. Barnes & Noble Inc.*,
   763 F.3d 1171 (9th Cir. 2014) ......................................................................................... 10

*Olin Corp. v. Am. Home Assur. Co.*,
   704 F.3d 89 (2d Cir. 2012) .............................................................................................. 29

AMERICAS 116616989 v1

*Photopaint Techs., LLC v. Smartlens Corp.*,
    335 F.3d 152 (2d Cir. 2003)...................................................................................28

*Plazza v. Airbnb, Inc.*,
    289 F. Supp. 3d 537 (S.D.N.Y. 2018).............................................................25, 27

*S.E.C. v. Drysdale Sec. Corp.*,
    785 F.2d 38 (2d Cir. 1986).............................................................................29, 32

*Sacchi v. Verizon Online LLC*,
    14-CV-423-RA, 2015 WL 765940 (S.D.N.Y. Feb. 23, 2015)................................25

*Sgouros v. TransUnion Corp.*,
    817 F.3d 1029 (7th Cir. 2016) ............................................................................23

*Starke v. Squaretrade, Inc.*,
    913 F.3d 279 (2d Cir. 2019).................................................................................23

*Steiner v. Lewmar, Inc.*,
    816 F.3d 26 (2d Cir. 2016)...................................................................................29

*Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
    464 F. Supp. 3d 634 (S.D.N.Y. 2020)............................................................23, 24, 25

*Zachman v. Hudson Valley Fed. Credit Union*,
    49 F.4th 95 (2d Cir. 2022) ..............................................................................22, 25

## TREATISES

Restatement 2d of Contracts § 17 (Am. L. inst. 1981) ....................................................23

## ARTICLES

Michael Shulman, Loans of Securities, Digital Assets, and Other Fungible Property,
    102 *Tax Notes State* 4, 413 (Oct. 25, 2021) ...............................................................31

AMERICAS 116616989 v1

The Official Committee of Unsecured Creditors (the "**Committee**"), appointed in the chapter 11 cases (the "**Chapter 11 Cases**") of the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**" and, together with their non-Debtor affiliates, "**Celsius**"), files this limited objection (the "**Limited Objection**") with respect to the *Debtors' Amended Motion for Entry of an Order (I) Establishing Ownership of Assets in the Debtors' Earn Program, (II) Permitting the Sale of Stablecoin in the Ordinary Course and (III) Granting Related Relief* [Docket No. 1325] (the "**Amended Stablecoin Sale Motion**").[2]

### Preliminary Statement

1.     Celsius's primary business has always been to use digital assets transferred by Account Holders to generate yield to pay weekly interest to its Account Holders and other operating expenses.  Each version of the Terms of Use provided Celsius with the ability to do exactly that.  Celsius did not, however, invest Account Holders' digital assets responsibly and made admittedly "poor asset deployment decisions" that, among other things, ultimately caused the Debtors to file for bankruptcy.[3]  Many Account Holders feel misled by Celsius and assert that they relied on statements by Celsius about its business and financial status that now appear to have been false.  Those concerns, among others, may form the basis for claims against the Debtors and responsible parties that should (and will) be pursued at the appropriate time.  Nonetheless, thus far, no Account Holder has contested that the Terms of Use authorized Celsius to use digital assets that were transferred to Celsius to participate in the Earn Program (such digital assets, the "**Earn Assets**") to generate yield.

---

[2]    Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Amended Stablecoin Motion. All references to the Terms of Use are to the applicable version(s) of the Terms of Use appended to the *Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, Providing Terms of Use Dating Back to February 18, 2018* [Docket No. 393].

[3]    *Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 23] (the "**Mashinsky Declaration**") ¶ 10.

AMERICAS 116616989 v1

2.      The Debtors filed these chapter 11 cases to obtain a '"breathing spell" to "negotiate and implement a plan that will maximize the value of [their] business and generate meaningful recoveries to [their] stakeholders as quickly as possible."    Mashinsky Decl. ¶ 16.    Those stakeholders are predominantly Account Holders that transferred Earn Assets worth approximately $4.2 billion as of the Petition Date.    The Debtors now seek authority to sell approximately $18 million of stablecoin (such stablecoin, the "**Proposed Sale Stablecoin**"), which is a type of Earn Asset, in the ordinary course of business to fund these Chapter 11 Cases and achieve their goal of a value-maximizing reorganization.    The Debtors assert that each version of the Terms of Use is an enforceable contract that provides that Earn Assets are the Debtors' property.    The Debtors' request to sell stablecoin raises three legal questions: (1) are the Terms of Use an enforceable contract, (2) if so, does the unambiguous language of the Terms of Use operate to transfer title from Account Holders to the Debtors or otherwise allow the Debtors to sell Earn Assets, and (3) should the Debtors be permitted to sell the Proposed Sale Stablecoin in the ordinary course of business or otherwise?

3.      With respect to the first question, the Debtors produced screen shots and testimony demonstrating that 55% of existing Account Holders accepted Version 6 of the Terms of Use when it was released in July and August 2021.    The Terms of Use are binding as to those Account Holders.    The Debtors have not, however, publicly provided any evidence or testimony showing how the 44% of Account Holders who created accounts *after* July 22, 2021 accepted the Terms of Use, notwithstanding the Committee requests that the Debtors do so.[4]    The Debtors should be required to cure their failure of proof.    Based on the existing evidentiary record, it is not possible

---

[4]    The Debtors' records do not reflect when 1% of Account Holders created their accounts (and, thus, which version of the Terms of Use initially applied to such Account Holders).    *Declaration of Oren Blonstein, Head of Innovation and Chief Compliance Officer of the Debtors, in Support of the Debtors' Motion Regarding Ownership of Earn Assets and the Sale of Stablecoin* [Docket No. 1327] (the "**Blonstein Declaration**") ¶ 14.

AMERICAS 116616989 v1

for Account Holders or this Court to determine whether the Terms of Use were accepted by the 44% of Account Holders who created accounts and purportedly accepted the Terms of Use after Version 6 was released. The Debtors have committed to file a supplemental declaration that will provide the relevant evidence to remedy this evidentiary failure. It is not clear at this time when the Debtors intend to file that declaration and the Committee reserves all rights in that regard.

4. With respect to the second question, the version of the Terms of Use in effect as of the Petition Date ("**Version 8**") unambiguously provides that Account Holders who elected to participate in the Earn Program transferred title to their relevant digital assets to Celsius and authorized Celsius to sell or otherwise use such digital assets in its sole discretion without further permission from the Account Holders. Moreover, since September 30, 2020, each version of the Terms of Use has explicitly provided that title to Earn Assets transferred to Celsius. According to the Debtors, 89% of existing Account Holders first accepted a version of the Terms of Use after September 30, 2020. The remaining 11% of existing Account Holders accepted Version 6 of the Terms of Use on or about July and August 2021. Moreover, each version of the Terms of Use unambiguously provided that Celsius could use the Earn Assets, and every version of the Terms of Use starting with Version 2 has provided that the Debtors could sell Earn Assets and that any transfer of Earn Assets could include "all attendant rights of ownership." The Terms of Use are also clear that the Debtors and their Affiliates (as such term is defined in Version 8) have an obligation to return an in-kind amount of digital assets deposited (and not the Account Holder's specific digital assets) when an Account Holder elects to withdraw Earn Assets.

5. Many Account Holders have argued that Version 8 is ambiguous with respect to who holds title to Earn Assets because, on the one hand, it describes the transaction between Account Holders and Celsius as a loan while, on the other hand, it provides that Account Holders

3

transferred title to Earn Assets to Celsius.  However, those concepts are not mutually exclusive.

For instance, in the securities context, it is common for a loan of securities to a broker to also

constitute a transfer of title thereto (or the incidents of ownership thereof) so that the broker can

sell, lend, hypothecate, or rehypothecate the securities.  In that instance, title to the securities is

transferred to the securities broker, and the securities broker has a contractual obligation to return

equivalent securities (but not the exact same securities) to the initial transferor.

6.      More importantly, reading the reference to a "loan" in the Terms of Use to mean

that title did not transfer would require the reader to ignore several provisions from the Terms of

Use, including  provisions regarding the transfer of title and Celsius's ability to sell or otherwise

transfer digital assets (including rights of ownership).  It is a bedrock principle of contract

interpretation that courts should not adopt an interpretation of a contract that has the effect of

rendering at least one clause superfluous or meaningless, but rather, to the extent possible, should

seek to read contractual provisions in harmony.  Under their plain language, and in accordance

with established rules of contractual interpretation, the Terms of Use provide the Debtors with title

to Earn Assets (including stablecoin) and the authority to sell the Proposed Sale Stablecoin subject

to the provisions of the Bankruptcy Code.

7.      As to the third question, the Debtors are not operating in the ordinary course.  Since

filing these Chapter 11 Cases, the Debtors have continued their prepetition "Pause" on customer

withdrawals and have ceased all investing activities.  Moreover, Account Holders would not have

expected Celsius to sell digital assets transferred by Account Holders to fund its operations.

Rather, Celsius was clear that it operations were funded with the 20% of gross revenue it did not

pass back to its Account Holders as rewards.  Given these circumstances, the Debtors should not

be permitted to sell or otherwise dispose of any stablecoin or other digital assets as an ordinary-

course matter.  Nonetheless, the Committee believes that the Debtors have established cause to sell stablecoin outside of the ordinary course of business to fund these cases provided that they are being operated for the benefit of the Debtors' estate and most importantly, Account Holders.  To be clear, the Committee does not endorse granting the Debtors a blank check to sell any and all digital assets in the Debtors' possession but only the Proposed Sale Stable Coins when necessary.  The Debtors must seek Court authority and justify their business decision each time they seek to sell any digital assets to further fund their reorganization.  Put simply, the Debtors should not be granted unfettered discretion to throw good money after bad.

8.      The Committee is mindful that its position on these issues may not be popular among certain (or many) Account Holders who contend they have ongoing ownership of Earn Assets.  The Committee has, however, come to its position based on an extensive and careful review of the Terms of Use and applicable law.  The Committee also believes that this position is in the best interests of Account Holders and unsecured creditors as a whole.  The Debtors do not have enough digital assets to return all coins that Account Holders transferred to the Debtors.  To the extent that Account Holders are determined to have ownership interests in the digital assets in the Debtors' possession, litigation to determine whose digital assets the Debtors currently hold will likely be lengthy and costly.  That litigation would require the parties to conduct complicated tracing exercises to determine competing rights to those digital assets, with no guarantee of reaching definite conclusions.  It would result in inter-creditor conflicts and create "haves" and "have nots" between similarly-situated Account Holders.  For instance, if Account Holders who transferred stablecoin are limited to recovering from the stablecoin the Debtors held as of the Petition Date, they would receive (on an aggregate basis) a recovery of less than one percent from the Debtors' liquid stablecoin.  By contrast, Account Holders who transferred LINK to the Debtors

5

would receive approximately 36% (as the Debtors report holding $23.3 million of LINK against $65.8 million of LINK liabilities). *Expanded Coin Report* [Docket No. 811]. Likewise, Account Holders that transferred digital assets to Celsius just before the Pause may have a better ability to trace their specific assets than long-time Celsius Account Holders. The Committee believes that it would not be equitable, for example, for Account Holders with stablecoin balances to experience a 35% lower recovery than those with LINK balances because the Debtors lost more stablecoin than LINK. It also does not seem not fair for new users to be preferred over long-time Account Holders (or vice-versa).

9.    A finding that Account Holders have claims against the Debtors (and not property interests in the remaining liquid digital assets held by the Debtors) may lead to the most equitable and orderly distribution of the Debtors' estate to Account Holders. If that determination is made, Account Holders will still have the opportunity to object to any sale of the Debtors' digital assets (as holders of stablecoin may do at this time), the right to vote on and object to any chapter 11 plan, and all other protections afforded by the Bankruptcy Code and applicable law to ensure their rights are safeguarded.

10.    Finally, the Committee and the Debtors negotiated a litigation schedule with respect to the Amended Stablecoin Sale Motion that balanced the need to develop a factual record with the accelerated timetable sought by the Debtors in an attempt to move these cases forward. That negotiated schedule included a commitment by the Debtors to answer written deposition questions submitted by the Committee, on behalf of itself, Account Holders, and other case parties. The Debtors refused to answer many of the question compiled by the Committee, and objected based on relevance. As mentioned above, certain of those questions are directly relevant to the Amended Stablecoin Sale Motion, including how the 44% of Account Holders that created accounts after

6

August 2021 accepted the Terms of Use.  The morning this objection was due, the Debtors

provided the Committee with relevant screen shots on a professional's eyes only basis and

committed to file a supplemental declaration prior to the hearing.  That additional evidence may

resolve the issue with respect to whether Versions 6, 7, and 8 of the Terms of Use were accepted

by the relevant Account Holders.  However, other Account Holders and other parties in interest

may continue to raise objections to the Debtors' refusal to provide adequate discovery in the period

provided under the proposed schedule.  Importantly, as part of the negotiated litigation schedule,

the Debtors agreed that all defenses to the formation of a contract were not to be tried at this time.

Those preserved issues may require further proceedings before this Court.

**Background**

A.    **Overview of the Earn Program**

11.    From its inception, the Debtors' business has been to use digital assets transferred

to them by individuals and entities ("**Account Holders**") to generate revenue and pass that revenue

back to Account Holders as interest or "rewards."  The Debtors allocated rewards to Account

Holders by reference to the digital assets that Account Holders transferred to the Debtors.  Ferraro

Decl. ¶ 13.  The Debtors represented that they would pass 80% of their gross revenue to the

Account Holders.[5]  Account Holders could elect to receive payment-in-kind interest (*i.e.*, payment

in the specific type of digital asset(s) that Account Holders had transferred to the Debtors) or

payment in CEL tokens (the Debtors' own, native digital asset).  Ferraro Decl. ¶¶ 13-14.  If

Account Holders elected to receive interest in CEL instead of in kind, on most occasions they

would receive a significantly higher interest rate—sometimes as high as 17%.  Mashinsky Decl.

---

[5]    *See, e.g.*, *Celsius*, available at, https://twitter.com/CelsiusNetwork/status/1108040455281766401 (last accessed
Nov. 26, 2022) ("Our model is simple, we give 80% back to the community.  Banks keep 80% for themselves.
It's not like there is a complicated algorithm that nobody knows about.").

7

¶¶ 47-48.

12.    Celsius advertised that it invested conservatively through overcollateralized loans.[6] It is unclear when the Debtors began taking on additional risk. However, the Debtors have disclosed that, prior to the Petition Date, they had been participating in market-making trades, had entrusted tens of millions of dollars worth of coins to an individual to participate in decentralized finance ("**DeFi**") deployment activities, and had an over $500 million obligation to one third party lender. *See Celsius Network Limited & Celsius KeyFi LLC v. Jason Stone & KeyFi Inc.*, No. 22-01139 (MG) (Bankr. S.D.N.Y. Aug. 23, 2022) [Docket No. 1] ¶ 5; Mashinsky Decl. ¶¶ 69-73. In the months leading up to the Petition Date, the Debtors "paid out over a hundred percent of the yield [that they] took in from deployments." Section 341(a) Meeting Tr. at 72:17-74:3.[7]

13.    Many Account Holders have cited the Debtors' representations as to the safety and security of their coins as one of the reasons they chose to transfer digital assets to the Earn Program.[8] The Debtors' declarants testified, however, that Celsius did not, to their knowledge,

---

[6]    *E.g.*, Lark Davis, *Putting Wall Street on Notice! Crypto is Coming! Alex Mashinsky Celsius Network*, YouTube, at 10:15 (Nov. 25, 2019), https://www.youtube.com/watch?v=O0vZR-v0Kpo&t=615s (statement by Mr. Mashinsky on November 25, 2019 that "we lend out against collateral. So for example when you take a loan from Celsius, you have to give me $2 worth of Bitcoins for every dollar that I give you out. So I always have more deposits than withdrawals right? So I have more on deposit than I lend out in dollars or in other stable coins or things like that. So net net Celsius has more assets than it lends out"); Celsius Network, *Crypto for the Masses - Celsius Network w The Godfather of VOIP Alex Mashinsky*, YouTube, at 18:41 (May 19, 2020), https://www.youtube.com/watch?v=vmqMPL51v_4&t=1122s (statement by Mr. Mashinsky on Mary 19, 2020 that "we are only doing asset backed lending unlike the banks, and the credit card companies, and all the other guys who lend you money . . . We don't do any of that stuff."); Celsius Network, *Celsius AMA - Ask Mashinsky Anything*, YouTube, at 32:25 (Nov. 6, 2020), https://www.youtube.com/watch?v=apWkwq8uscU&t=1945s (statement by Mr. Mashinsky on November 6, 2020 that "we only lend to the first tier institutions, first tier exchanges. We do not do all kinds of unsecured lending like a lot of people are talking about or saying Celsius does unsecured. We do not do unsecured lending"); Emersoft, *From Zero to Self-Made BILLIONAIRE - Alex Mashinsky | Życie Bez Gruchy #8*, YouTube, at 37:00 (Aug. 21, 2021), https://www.youtube.com/watch?v=PHPvrORsAE0&t=2220 (statement by Mr. Mashinsky on August 31, 2021 that "the way Celsius makes money is that we always have two or three or four times more collateral than the money you need for your loan").

[7]    The "**Colodny Declaration**" is the *Declaration of Aaron E. Colodny in Support of the Official Committee of Unsecured Creditors Limited Objection With Respect to the Debtors' Amended Motion for Entry of an Order(I) Establishing Ownership of Assets in the Debtors' Earn Program, (II) Permitting the Sale of Stablecoin in the Ordinary Course, and (III) Granting Related Relief.* Relevant excerpts of the Section 341(a) Meeting of Creditors is attached as **Exhibit A** to the Colodny Declaration.

[8]    *See, e.g., Rebecca Gallagher's Objection to the Debtors' Amended Motion For Entry of an Order (I) Establishing*

pass 80% of revenues on to Account Holders.  Ferraro Tr. at 364:19-365:15; Blonstein Tr. 306:1-23.[9]  As of the Petition Date, there were over 600,000 active Earn Program users with Earn Program balances of approximately $4.2 billion – comprising over 82% of the Debtors' outstanding obligations to Account Holders as of the Petition Date.  Ferraro Decl. ¶ 15.

### B.    Coin Movement With Respect to the Earn Program

14.    When Account Holders transferred digital assets to the Debtors, the digital assets were initially received in customer-specific bridge wallets controlled by Celsius (the "**Customer Associated Wallets**").  Blonstein Tr. at 310:9-312:5; *Interim Report of Shoba Pillay, Examiner* [Docket No. 1411] (the "**Examiner's Report**") at 24.  At regular intervals, the Debtors swept the digital assets held in Customer Associated Wallets into the Debtors' coin-specific main aggregator (or omnibus) wallets (the "**Aggregator Wallets**") where they were commingled with similar coins (*e.g.*, Bitcoin was comingled in the Bitcoin Aggregator Wallet).  Blonstein Tr. at 310:9-312:5; Examiner's Report at 24-26.   The Debtors then deployed the digital assets in the Aggregator Wallets to attempt to generate returns.  Ferraro Decl. ¶¶ 16-21.

15.    The Debtors did not segregate Earn Assets into separate wallets that were specific to the Earn Program.  Blonstein Tr. at 143:20 – 146:25, 156:26-157:17; Examiner's Report at 24-26.  The Debtors also did not record specific Earn Assets as owed to the Account Holders who deposited them, or otherwise treat such digital assets as customer property.  Blonstein Tr. at 143:20 – 146:25, 156:26-157:17; Examiner's Report at 24-26.  Rather, the Debtors recorded a liability on

---

*Ownership of Assets in the Debtors' Earn Program, (II) Permitting the Sale of Stablecoins in the Ordinary Course and (III) Granting Related Relief* [Docket No. 1416] ("**Gallagher Objection**").  Ms. Gallagher, an Account Holder who participated in the Earn Program, reports that, "[l]ike most depositors who sent their hard earned funds and life savings to the Celsius platform, I believed that I was participating in a low-risk, high-interest alternative to a bank savings account." *Id.* at 2.

[9]    Relevant excerpts of the deposition transcripts of Christopher Ferraro and Oren Blonstein taken in these Chapter 11 Cases are attached as **Exhibit B** and **Exhibit C** to the Colodny Declaration, respectfully.

their ledger to return a like-kind digital asset to an Account Holder when they requested to withdraw their digital assets. Blonstein Tr. at 143:20 – 146:25, 156:26-157:17; Ferraro Tr. 99:9-24. The Debtors' application (the "**Celsius App**") showed Account Holders the type, amount, and value of the digital assets (in USD) (plus any rewards generated through the Earn Program) reflected as balances in their Celsius Earn Accounts. Blonstein Tr. at 143:20 – 146:25, 156:26-157:17; Ferraro Tr. 99:9-24; Examiner's Report at 24-26. That balance did not correspond to any specific digital assets held by the Debtors or to any wallet or account maintained by the Debtors for such Account Holders' benefit. Blonstein Tr. at 143:20 – 146:25, 156:26-157:17; Ferraro Tr. 99:9-24; Examiner's Report at 24-26.

16.    If an Account Holder elected to withdraw digital assets from the Earn Program, the Debtors would transfer digital assets from frictional or Aggregator Wallets, which contained commingled assets received from numerous Account Holders or generated by the Debtors' deployment activities (*i.e.*, not the Account Holders' specific digital assets). Ferraro Tr. at 199:22-201:8; Examiner's Report at 26.

## C.    The Terms of Use

17.    The Debtors have asserted that the rights and obligations of the Debtors and Account Holders with respect to Earn Assets are governed by the Debtors' Terms of Use and New York law.[10] From the outset, the Terms of Use constituted an acknowledgement that the Account

---

[10]    Version 8 of the Terms of Use, which was in effect as of the Petition Date, provides that New York law shall govern. *Terms of Use, Version 8* § 33. Courts in the Second Circuit have held that "a contractual choice-of-law provision is generally binding on a party claiming rights under a contract." *In re Residential Capital, LLC*, 524 B.R. 563, 595 (Bankr. S.D.N.Y. 2015); *see also AEI Life LLC v. Lincoln Benefit Life Co.*, 892 F.3d 126, 132 (2d Cir. 2018) ("Under New York law, courts will generally enforce choice-of-law clauses, because contracts should be interpreted so as to effectuate the parties' intent.") (internal citations omitted). The threshold question of whether New York law applies (as opposed to New Jersey law, given Celsius's domicile) depends on whether the parties agreed to be bound by the Terms of Use. *E.g.*, *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014). Under New York law, courts only engage in a choice of law analysis when there is an actual conflict between the possible applicable laws. *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998) ("In New York, the forum state in this case, the first question to resolve in determining whether to undertake a choice of law analysis is whether there is an actual conflict of laws."). Where there are no material differences between the possible

Holder understood Celsius was going to use digital assets that were transferred by the Account

Holder to generate a return:

> User represents and warrants that i[t] understands that Celsius may, for its own account, pledge and repledge from time to time, without notice to the User, either separately or in common with other such cryptocurrency, any or all of the Digital Currency that comprises the Deposited Amount held by Celsius for the benefit of User and that Celsius may do so without retaining in its possession or control for delivery, a like amount of similar cryptocurrency.[11]

The initial Terms of Use did not expressly address whether Account Holders transferred title to

Celsius with respect to the digital assets transferred to the Debtors to participate in the Earn

Program. *See generally Terms of Use, Version 1.* Four percent of existing Account Holders first

accepted Version 1 of the Terms of Use. Blonstein Decl. ¶ 14.

18.  On March 5, 2020, Celsius Network Limited amended the Terms of Use for the

first time. Version 2 of the Terms of Use provided that "Celsius Network allows Users to take

advantage of a variety of services . . . including, "[h]old[ing] your Digital Assets in the Celsius

wallet and gain rewards."[12] Version 2 of the Terms of Use required Account Holders to represent

that "at all times during which you hold Digital Assets in your Account ***that any Digital asset used***

***by you in connection with your Account is owned by you*** or that you are validly authorized to

carry out transactions using such Digital Assets . . . ." *Id.* § 8 (emphasis added). Version 2 included

---

applicable laws, courts may apply New York law to the issues at bar. *See, e.g., B. Lewis Prods., Inc. v. Maya Angelou, Hallmark Cards, Inc.*, No. 01 Civ. 0530 MBM, 2005 WL 1138474, at *4 n.4 (S.D.N.Y. May 12, 2005) ("[W]hen there is no material difference between the applicable laws of the states involved, the court need not decide the choice of law issue and may apply New York law.") (collecting cases). Here, there are no material differences between New York and New Jersey law with respect to this question. Moreover, no party has argued that a different state's law applies. The Court should therefore apply New York law.

[11]  *See Terms of Use, Version 1* § V.B; *Terms of Use, Version 2* § 14 ("In consideration for the rewards earned on your Account and the use of our Services, you grant Celsius the right, subject to applicable law, without further notice to you, to hold the Digital Assets available in your account in Celsius' name or in another name, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets at Celsius' own risk.").

[12]  *Terms of Use, Version 2* § 1.

AMERICAS 116616989 v1

a section titled "Consent to Celsius' Use of Your Digital Assets" that stated that:

> In consideration for the rewards earned on your Account and the use of our Services, ***you grant Celsius the right***, subject to applicable law, without further notice to you, ***to hold the Digital Assets available in your account in Celsius' name or in another name, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership***, and for any period of time and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets at Celsius' own risk.[13]

Versions 3 and 4 of the Terms of Use included similar provisions regarding Celsius's ability to transfer digital assets with all attendant rights of ownership. *Terms of Use, Version 3* § 14; *Terms of Use, Version 4* § 14.

19.    On September 30, 2020, the Debtors amended their Terms of Use for a fourth time.[14]  Version 5 made the following changes to Section 14 ("Consent to Celsius' Use of Your Digital Assets"), including explicitly stating that the Account Holder was transferring "all right and title to [] Digital Assets, including ownership rights" to Celsius:

> In consideration for the rewards earned on your ~~Account~~Celsius Wallet and the use of our Services, you grant Celsius ~~the right~~, subject to applicable law and for the duration of the period during which the Digital Assets are available through your Celsius Wallet, all right and title to such Digital Assets, including ownership rights, and the right, without further notice to you, to hold ~~the~~such Digital Assets ~~available in your account~~ in Celsius' ~~name or in another name~~own virtual wallet or elsewhere, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets. You acknowledge that with respect to Digital ~~a~~Assets used by Celsius pursuant to this paragraph:

Version 5 included the same representation as in Version 2 that "at all times during which you

---

13   *Id.* § 14 (emphasis added).

14   The Debtors had amended the Terms of Use twice in the intervening period.

AMERICAS 116616989 v1

hold Digital Assets in your Celsius Wallet that any Digital Asset used by you in connection with your Celsius Wallet is owned by you or that you are validly authorized to carry out transactions using such Digital Assets . . . ." *Terms of Use, Version 5* § 8.

20.    On July 22, 2021, the Debtors amended the Terms of Use again.  Version 6 contained additional revisions to the description of the nature of the transaction between the Account Holders and the Debtors.  Section 8 was substantially revised to remove the representation regarding ownership while the digital assets were transferred to Celsius and instead provided:

You hereby represent and warrant to us ~~at all times during which you hold Digital Assets in your Celsius Wallet~~ that any Digital Asset ~~used~~delivered by you ~~in connection with your~~for the purpose of utilizing Celsius ~~Wallet~~' Services is owned by you or that you are ~~validly authorized~~fully permitted to carry out transactions using such Digital Assets~~, and that all transactions initiated with your Celsius Wallet are~~ without restriction or limitation, and that your use of the Services is solely for your own ~~Celsius Wallet~~account and benefit, and not on behalf of any other person or entity. You

further represent and warrant that all such Digital Assets are free from any claims, indebtedness, liens, or third-party interests.

**ALL DIGITAL ASSETS TRANSFERRED TO CELSIUS AS PART OF THE SERVICES ARE OWNED AND HELD BY CELSIUS FOR ITS OWN ACCOUNT IN ACCORDANCE WITH THESE TERMS, AND UNDER NO CIRCUMSTANCES DOES CELSIUS HOLD DIGITAL ASSETS ON YOUR BEHALF AS PART OF THE SERVICES.**

The Terms of Use were also changed to provide that the transfer of digital assets from the Account Holder to Celsius was an open-ended loan.  Version 6 § 1. Section 13, now titled "Consent to Celsius' Use of ~~Your~~ Digital Assets," was amended to include references to the loan transaction and, for the first time, include a bankruptcy related disclosure:

13

In consideration for the ~~r~~Rewards ~~earned~~payable to you on your Celsius ~~Wallet~~Account and the use of our Services, you grant Celsius, subject to applicable law and for the duration of the period during which the Eligible Digital Assets are ~~available~~loaned to us through your Celsius ~~Wallet~~Account, all right and title to such Digital Assets, including ownership rights, and the right, without further notice to you, to hold such Digital Assets in Celsius' own ~~v~~Virtual ~~w~~Wallet or elsewhere, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets in Celsius' full discretion. You acknowledge that with respect to Digital Assets used by Celsius pursuant to this paragraph:

(i) You ~~may~~will not be able to exercise ~~certain~~ rights of ownership;

(ii) Celsius may receive compensation in connection with lending or otherwise using Digital Assets in its business to which you have no claim or entitlement; and

(iii) ~~Celsius borrowers may default partially or entirely, which can result in partial or total loss of your Digital Assets. In that event, you authorize Celsius to use Eligible Digital Assets to absorb the losses;~~In the event that Celsius becomes bankrupt, enters liquidation or is otherwise unable to repay its obligations, you may not be able to recover or regain ownership of such Digital Assets, and other than your rights as a creditor of Celsius under any applicable laws, you may not have any legal remedies or rights in connection with Celsius' obligations to you.

21.     The Terms of Use also include the following provisions:

- **Introduction**. "Celsius is a lending and borrowing platform. When you transfer digital assets to Celsius, those digital assets are a loan from you to Celsius, in accordance with the terms hereof. Under no circumstances does Celsius hold digital assets in custody on your behalf as part of the services governed by these terms. *All Digital Assets Transferred to Celsius as part of the Services are owned and held by Celsius for its own account*." *Id.* ¶ 1 (emphasis added).

- **Earn Rewards**. "By lending your Eligible Digital Assets to Celsius you grant Celsius *all rights and title* to such Digital Assets, for Celsius to use in its sole discretion." *Id.* ¶ 4(B) (emphasis added).

- **Account Balance**. "*Once such Eligible Digital Assets are received by Celsius, they shall be Celsius' property for all intents and purposes*, and you will immediately start accruing Rewards on such Digital Assets in accordance with the terms hereof (unless explicitly provided for the purpose of being utilized for any

14

other Services), and the corresponding amount (and kind) of Eligible Digital Assets shall be reflected in your Celsius Account balance." *Id.* ¶ 7 (emphasis added).

Finally, Section 11, which concerns withdrawals, was amended to provide that "[f]or the avoidance of doubt, any repayment shall be in-kind (i.e. in the same type of Eligible Digital Assets loaned by you but not the actual same Digital Assets originally transferred by you)." *Id.* § 11.  That section also provided that Account Holders had "a call option on all loans made to Celsius to demand immediate complete or partial repayment of any loan at any time through a complete or partial withdrawal of Eligible Digital Assets from [their] Celsius Account balance[s] at any time." *Id.*

22.    Similar language remained in Version 8 of the Terms of Use,[15] which was dated as of April 14, 2022 and was in effect on the Petition Date.  That version included the following revisions to Section 13 – "Consent to Celsius' Use of Digital Assets":

> In consideration for the Rewards payable to you on ~~your Celsius Account~~the Eligible Digital Assets using the Earn Service, for us entering into any Loan Agreement, and the use of our Services, you grant Celsius, subject to applicable law and for the duration of the period during which you elect to utilize the Eligible Digital Assets ~~are loaned~~in the Earn Service (if available to you) and thus loan such Eligible Digital Assets to us through your Celsius Account, or as collateral under the Borrow Service (if available to you), all right and title to such Eligible Digital Assets, including ownership rights, and the right, without further notice to you, to hold such Digital Assets in Celsius' own Virtual Wallet or elsewhere, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets in Celsius' full discretion. You acknowledge that with respect to Digital Assets used by Celsius pursuant to this paragraph:

**D.    Notice and Acceptance of the Revised Versions of the Terms of Use**

23.    Each version of the Terms of Use provided that the Debtors could amend the Terms

---

[15]    The Debtors made minor changes to Version 6 of the Terms of Use on August 3, 2021, 12 days after Version 6 was released.  The changes between Version 6 and Version 7 are not relevant to the Amended Stablecoin Sale Motion.

AMERICAS 116616989 v1

of Use by posting an amended version and providing notice, as required by law.[16]  Each version

of the Terms of Use also provided that Account Holders' continued use of the Celsius platform

after the effective date of any amended version constituted consent to the amended terms.[17]

24.    The Debtors provided notice to Account Holders each time they updated the Terms

of Use "via e-mail and other official Celsius channels, such as its blog."  Blonstein Decl. ¶ 15.

In July 2021, the Debtors resolicited acceptances of Version 6 and required all Account Holders

to click to "accept" that Version of the Terms of Use.  *Id.* ¶ 16.  On July 22, 2021, Celsius emailed

Account Holders notifying them of the revised Terms of Use and informed Account Holders that

they would lose access to the Debtors' services if they did not accept Version 6 of the Terms of

Use by August 5, 2021.  *Id.* ¶ 17.  The email described three "main" changes to the Terms of Use—

the insertion of new language characterizing the nature of the transaction as a loan from the

Account Holders to Celsius was not one of the changes flagged.  *See generally id.* Ex. A.  Celsius

did not provide Account Holders with any other description or way to see the changes between

Version 5 and Version 6 of the Terms of Use.  Blonstein Tr. at 13:5-18.  Celsius sent emails to

Account Holders on August 5, 2021 and August 19, 2021 advising them that their accounts were

suspended and they had stopped accruing Earn rewards, as applicable, if they had not accepted the

revised Terms of Use by such dates.  Blonstein Decl. Ex. B, C.  Celsius also pushed notifications

through its mobile application and website that stated in a pop-up window that Celsius had

---

[16]   *See, e.g., Terms of Use, Version 1* § X ("All modifications or amendments to the Deposit Terms shall be effective upon posting by Celsius."); *Terms of Use, Version 2* § 31 ("We may change these Terms, and we may add o or delete from these Terms, and the updated version will supersede all prior versions. We will provide notice of changes, additions, and deletions as required by law.").

[17]   *See, e.g., Terms of Use, Version 1* at 4 ("Your continued use of our Website following any such amendments will be considered as your consent to the amended Terms. At all times, the latest version of these Terms shall be binding and prevail over any other version."); *Terms of Use, Version 2* § 31 ("The continued maintenance of your Account following the effective date of any change will constitute your acceptance of such change and subject your Account to modified terms.").

AMERICAS 116616989 v1

"updated [its] Terms of Use" and that Account Holders should "read the updated Terms of Use in full." *Id.* ¶ 18. That text was followed by a few bullets highlighting the three "key" changes and a hyperlink reading "Read the full Terms of Use," which linked to the full Terms of Use:



*Id.* Ex. A at A-7.

25.    Between July 22, 2021 and August 5, 2021, if Account Holders clicked to "Remind Me Later," the Celsius App generated another pop-up that asked "Are You Sure?", encouraged Account Holders to "Go Back" to the prior screen and consent to the revised Terms of Use, and required Account Holders to click "Continue Anyway" to access the platform without consenting

17

to the revised Terms of Use. *Id.* Ex. A, at A-8. If Account Holders clicked "Continue Anyway," they could continue using the Celsius platform without accepting the revised Terms of Use for two weeks and could withdraw their digital assets. *Id.* ¶ 17. If Account Holders did not accept the revised Terms of Use by August 5, 2021, Celsius suspended their accounts. *Id.* ¶¶ 17, 19. Once their accounts were suspended, Account Holders could view their account dashboards but could not conduct any transactions. *Id.* ¶ 19. Customers who wished to withdraw their digital assets after their accounts were suspended were required to coordinate with the Debtors' customer service team to complete such withdrawals. *Id.* If Account Holders still had not accepted the revised Terms of Use by August 19, 2021, any digital assets associated with their Earn Accounts stopped earning rewards. *Id.* ¶¶ 17, 19.

26.     In total, 90.06% of current Account Holders accepted Version 6 of the Terms of Use or a later version, each of which included language providing that the right and title to assets transferred to the Earn Program passes to Celsius upon such transfer. *Id.* ¶ 20. Forty-four percent of Account Holders accepted Version 6, Version 7, or Version 8 of the Terms of Use as new users. *Id.* ¶ 14. While the Debtors have not publicly provided any screen shots or descriptions of how those users accepted the Terms of Use at this time, the Debtors have committed to file a supplemental declaration providing the relevant evidence, including such requested screenshots, by the end of this week.

### E.     The Stablecoin Sale Motions

27.     On September 15, 2022, the Debtors filed their *Motion Seeking Entry of an Order (I) Permitting the Sale of Stablecoin in the Ordinary Course and (II) Granting Related Relief* [Docket No. 832] (the "**Initial Stablecoin Sale Motion**"), seeking to sell approximately $23 million in stablecoin that was held by the Debtors as of the Petition Date. Initial Stablecoin Sale Motion ¶¶ 9-11. The Committee, certain *pro se* Account Holders, and certain regulators

objected to the Initial Stablecoin Sale Motion.  Docket No. 1186 (the "**Initial Committee Objection**"); *see also* Docket Nos. 853, 901, 922, 925, 933, 967, 970, 1085, 1253.  The Committee argued that the stablecoin appeared to be Earn Assets and that the Debtors had not proven that such stablecoin was property of the Debtors' estates, rather than property of Account Holders who participated in the Earn Program.  Initial Committee Objection ¶¶ 6-10. In addition, the Committee argued that the Debtors had not shown that Account Holders' potential interests in the stablecoin (if any) would be adequately protected in the event of a sale, or that selling stablecoin was actually necessary to protect the Debtors' liquidity.  *Id.* ¶¶ 11-14.  The Debtors agreed to present evidence regarding the validity of the Terms of Use and their ownership of the Earn Assets.  *See* Nov. 1, 2022 Hr'g Tr. [Docket No. 1280] at 128:5-129:5.  The Court determined to hear the issues of whether Earn Assets are property of the Debtors' estates together with the issue of whether the Debtors should be permitted to sell the Proposed Sale Stablecoin on December 5 and 6, 2022.  *Id.* at 143:2-145:16.

28.    The Debtors and the Committee negotiated a proposed scheduling order with respect to the Amended Stablecoin Sale Motion.  [Docket No. 1324] (the "**Proposed Scheduling Order**").  The Proposed Scheduling Order reflected two agreements between the Debtors and the Committee.  First, due to the time constraints, in lieu of traditional document and other discovery, the Committee would consult with case parties and submit written deposition questions, which the Debtors would then answer on the public docket.  *Id.* ¶ 2.  The Debtors would then make their declarants, and only their declarants, available for seven hours of questioning each at oral depositions.  *Id.* ¶¶ 5-6.  Second, the Proposed Scheduling Order provided that the Debtors would not seek a ruling with respect to "whether any Account Holder has valid defenses to the purported contract between Account Holders and the Debtors under the Terms of Use, and all parties' rights

are reserved with respect to each of the foregoing." *Id.* ¶ 3.  However, because the Debtors sought court authority to sell the Proposed Sale Stablecoin free and clear of any interest, any Account Holder would be required to raise an objection with respect to the sale of that stablecoin at this time. *Id.*

29.    On November 11, 2022, the Debtors filed the Amended Stablecoin Sale Motion, under which they seek authority to sell the Proposed Sale Stablecoin, in order to raise liquidity to fund their reorganization efforts and these Chapter 11 Cases.  *See generally* Am. Stablecoin Mot. The Debtors have argued that they require that authority now.  Without the additional liquidity provided from the sale of the Proposed Sale Stablecoin, the Debtors have projected that they will run out of liquidity (on a consolidated basis) by March 2023.  Campagna Tr. 12:18-13:8.[18]

30.    The Debtors argue that the Terms of Use are "crystal clear" and unambiguously provide that "any assets transferred into the Earn Program, and the proceeds thereof, are the Debtors' property" that may be sold by the Debtors or otherwise used to operate their businesses. Am. Stablecoin Mot. ¶ 4.[19]

31.    In his declaration, Oren Blonstein, the Debtors' Chief Innovation and Compliance Officer, testified to the process by which the Debtors solicited acceptances to the sixth version of the Terms of Use ("**Version 6**") and the process by which Account Holders accepted those Terms

---

[18]    The "**Campagna Transcript**" is the transcript of the deposition of Robert Campagna taken on November 22, 2022.  Relevant excerpts of the Campagna Transcript are attached as **Exhibit D** to the Colodny Declaration.

[19]    The Debtors submitted declarations of Christopher Ferraro (the Debtors' Interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer), Oren Blonstein (the Debtors' Chief Innovation and Compliance Officer), and Robert Campagna (the Debtors' financial advisor) in support of the Amended Stablecoin Motion. *See Declaration of Christopher Ferraro, Interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer of the Debtors, in Support of the Debtors' Motion Regarding Ownership of Earn Assets and the Sale of Stablecoin* [Docket No. 1326] (the "**Ferraro Declaration**"); Blonstein Declaration; *Declaration of Robert Campagna, Managing Director of Alvarez & Marsal North America, LLC, in Support of the Debtors' Motion Regarding Ownership of Earn Assets and the Sale of Stablecoin* (the "**Campagna Declaration**" and, collectively, the "**Declarations**").

AMERICAS 116616989 v1

of Use in July and August 2021.  Blonstein Decl. ¶¶ 14-20.[20]  Mr. Blonstein's declaration describes

and attaches several emails, blog posts, and other communications to Account Holders notifying

them of the revised Version 6, as well as screenshots of the Celsius interface that was shown to

users with respect to the revised Terms of Use.  *Id.*, Exs. A, B, C.  According to Mr. Blonstein,

44 percent of Account Holders signed up after the effective date of Version 6, and the Debtors had

no record of the acceptance of one percent of Account Holders.  Blonstein Decl. ¶ 14.[21]  The

Committee asked in its written discovery requests (and directly to Debtors' counsel) for

descriptions and screen shots of the process by which those Account Holders accepted the Terms

of Use.  Docket No. 1345 (the "**Written Deposition Questions**"), Question No. 2.  To date, the

Debtors have not provided any screen shots or description of the process by which new users

accepted the Terms of Use.  *See* Docket No. 1406 ("**Debtors' Responses**"), Response No. 2.

Moreover, at his deposition, Mr. Blonstein could not testify regarding how those Account Holders

accepted the Terms of Use.  The Debtors have, however, committed to file a supplemental

declaration addressing these questions by the end of this week.

      32.      Mr. Ferraro, the Debtors' Interim CEO, has submitted a declaration that addresses

---

[20]  Mr. Blonstein testified that he was not personally involved in the solicitation of Version 6.  Rather, that process was completely overseen by the Debtors' current Chief Revenue Officer, Roni Cohen-Pavon.  Blonstein Tr. 52:14-56:12.  It is unclear why Mr. Cohen-Pavon was not produced as the Debtors' declarant in support of the Amended Stable Coin Sale Motion and the Debtors did not disclose Mr. Blonstein's involvement prior to his deposition.  The Committee has sought to serve Rule 2004 discovery on Mr. Cohen-Pavon, but Mr. Cohen-Pavon, who is located in Israel, has refused to cooperate with the Committee's discovery requests and insists that he will not respond unless the Committee serves him under the Hague Convention.  Mr. Pavon-Cohen did agree to speak to the Examiner for two hours.  The Committee attended that interview, but was not permitted (nor was there adequate time afforded) to ask any questions.

[21]  The Committee asked in its written discovery requests (and directly to Debtors' counsel) for descriptions and screen shots of the process by which those Account Holders accepted the Terms of Use.  Docket No. 1345 (the "**Written Deposition Questions**"), Question No. 2.  To date, the Debtors have not provided any screen shots or description of the process by which new users accepted the Terms of Use.  *See* Docket No. 1406 ("**Debtors' Responses**"), Response No. 2.  Moreover, at his deposition, Mr. Blonstein could not testify regarding how those Account Holders accepted the Terms of Use.  The Debtors have, however, committed to file a supplemental declaration addressing these questions by the end of this week.

AMERICAS 116616989 v1

the purpose of the Earn Program generally, as well as the deployment strategies that the Debtors employed to generate yield to fund Earn rewards. According to Mr. Ferraro's declaration, the design of the Earn Program and associated deployment strategies "depended upon the Debtors having unilateral authority to effectuate these methods and strategies in their discretion." Ferraro Decl. ¶ 21. Mr. Campagna, a Managing Director at Alvarez & Marsal, the Debtors' financial advisor, testified that the Debtors must sell the Proposed Sale Stablecoin to preserve the Debtors' "liquidity runway." Campagna Decl. ¶ 9.

33.    On November 14, 2022, following consultation with the U.S. Trustee, certain state attorneys general, and certain *pro se* Account Holders, the Committee submitted the Written Deposition Questions. Docket No. 1345. The Debtors submitted the Debtors' Responses on November 18, 2022. Docket No. 1406. The Debtors ultimately objected to and refused to answer 30 of the 45 Written Deposition Questions, and provided incomplete responses to most of the questions that they did answer. In response to an order of the Court [Docket No. 1396], on November 20 and 21, 2022, the Committee and the Debtors, respectively, submitted statements regarding whether the Proposed Litigation Schedule satisfied the due process requirements of the Constitution. Docket Nos. 1412; 1414. As of the filing of this Limited Objection, the Court has not entered the Proposed Scheduling Order.

34.    The Committee and other case parties deposed Mr. Ferraro, Mr. Blonstein, and Mr. Campagna on November 21 and 22, 2022. Docket Nos. 1388, 1389, 1418. With limited exceptions, parties were provided the opportunity to ask questions of the deponents.[22]

---

[22]    Of the seven hours allotted to each deposition, *pro se* Account Holders were provided more than 2 hours to depose Mr. Ferraro and Mr. Blonstein, each. At the end of seven hours of time on the record for Mr. Blonstein's deposition, Mr. Frishberg, a *pro se* Account Holder who had not yet questioned, Mr. Blonstein sought to do so. Mr. Frishberg represented that his questions would not last more than 20 minutes. Counsel to the Committee and others asked the Debtors if they would permit Mr. Frishberg to ask his questions. The Debtors declined to do so, citing the Bankruptcy Rules and the deposition concluded.

## Limited Objection

**I.     The Debtors Have Demonstrated That At Least 55% Of Account Holders Accepted the Terms of Use**

35.     The Terms of Use are binding on Account Holders if they constitute an enforceable contract between Account Holders and the Debtors.  To form a contract, there must be: (a) an offer; (b) an acceptance; and (c) consideration.  *See Jerez v. JD Closeouts, LLC*, 943 N.Y.S.2d 392, 398 (N.Y. Dist. Ct. 2012); *Donohue v. Cuomo*, 980 F.3d 53, 67 (2d Cir. 2020).  The elements of a contract do not change in the context of online contracts.  *See Jerez*, 943 N.Y.S.2d at 398.  New York courts have consistently upheld online agreements that require users to affirmatively accept the agreement by clicking a box or button before being permitted to proceed to use the product— often referred to as "clickwrap" agreements. *See id.*; *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017); *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95 (2d Cir. 2022).  New York law provides that a take it or leave it "contract of adhesion," such as the Terms of Use, is "to be construed against the drafter."  *55 Eckford Realty LLC v. Bank of E. Asia (U.S.A.) N.A.*, 31 Misc. 3d 1229(A), at *10 (N.Y. Sup. Ct. 2011) (citing *Jacobson v. Sassowe*r, 489 N.E. 2d 1283, 1283 (N.Y. 1985)).

36.     Here, the first and third elements of a contract are met.  An offer is a promise that one party makes in exchange for another party's performance.  1 *Corbin on New York Contracts* § 1.05 (2022).  The Terms of Use present an offer from Celsius to an Account Holder, whereby the Account Holder accepts the Terms of Use in exchange for access to Celsius's services, including the Earn Program, under which Account Holders transferred digital assets to Celsius to earn rewards on such assets in the form of interest.  Next, consideration is the exchange of something of value.  *Moezinia v. Ashkenazi*, 136 A.D.3d 988, 988 (N.Y. App. Div. 2016) ("It is enough that something of real value was exchanged, and the fact that the seller may not have had

23

a property right in what he or she sold does not, by itself, render a contract void for lack of consideration."). Account Holders received consideration in the form of access to Celsius's services, including rewards earned in connection with the Earn Program, in exchange for being bound by the Terms of Use. In exchange, Celsius received consideration including, for example, the ability to lend or pledge digital assets and earn a return on those assets. The first two elements of a contract are met.

### A.    Acceptance of Clickwrap Agreements

37.    The key question is whether Account Holders accepted the Terms of Use. Acceptance is a demonstration of clear intent to agree to the terms of the offer. Restatement (Second) of Contracts § 17 (Am. L. Inst. 1981). A contract must evidence a meeting of minds, which "must include agreement on all essential terms." *Starke v. Squaretrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019) ("[C]ourts look to the basic elements of the offer and the acceptance to determine whether there was an objective meeting of the minds sufficient to give rise to a binding and enforceable contract."). Under New York law, the creation of an electronic contract is valid where the user (a) receives notice of the terms and conditions in a "clear and conspicuous way" and (b) unambiguously manifests their assent to the contract's terms. *Id.* at 289-90. "Courts around the country have recognized that [an] electronic 'click' can suffice to signify acceptance of a contract," and that "[t]here is nothing automatically offensive about such agreements, as long as the layout of the site give[s] the user reasonable notice that a click will manifest assent to an agreement." *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1033-34 (7th Cir. 2016). Terms of service are regularly enforced if they are presented as clickwrap agreements, which is a "common type of web-based contract [that is] formed when a user is presented with a message on his or her computer screen and is required to manifest her assent to the terms." *Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 464 F. Supp. 3d 634, 640 (S.D.N.Y. 2020) (internal quotations and

24

ellipses omitted) ("The Second Circuit routinely enforces clickwrap agreements as valid and binding contracts, for the principal reason that the user has affirmatively assented to the terms of agreement by clicking I agree."); *Centrifugal Force, Inc. v. Softnet Commc'n, Inc.*, No. 08-CV-5463 CM GWG, 2011 WL 744732, *7 (S.D.N.Y. Mar. 1, 2011) ("In New York, clickwrap agreements are valid and enforceable contracts."). Even if there is "no evidence that the offeree had actual notice of the terms of the agreement, the offeree will still be bound by the agreement if a reasonably prudent user would be on inquiry notice of the terms." *Valelly*, 464 F. Supp. 3d at 640. Importantly, whether the user actually read the agreement is not relevant. *Plazza v. Airbnb, Inc.*, 289 F. Supp. 3d 537, 550, 550 n.20 (S.D.N.Y. 2018) ("a party cannot avoid the terms of a contract on the ground that he or she failed to read it before signing," and users are bound by revised terms of service if they "click[] 'I agree' after being presented with those terms," even if they fail to read them).

38.     To determine whether the website provides sufficient notice, the terms must be presented in a clear and conspicuous way through the "design and content" of the relevant interface. *Valelly,* 464 F. Supp. 3d at 640. Courts examine a variety of factors to evaluate clarity and conspicuousness, including size, color, typeface, and proximity or placement of the terms of service, viewed in the context of the web page's overall design. 1 *Corbin on New York Contracts* § 2.07 (2022).

39.     In *Meyer v. Uber Technologies, Inc.*, the Second Circuit Court of Appeals found that electronic terms of service were enforceable because the defendant gave "reasonably conspicuous notice" of the Terms of Service when users were creating Uber accounts. 868 F.3d at 77. When a user created an account, the payment screen was uncluttered and only contained fields for the user to enter credit card details, a button to register for an account, and a warning that

AMERICAS 116616989 v1

creation of an account constituted agreement to the terms of service. *Id.* at 78. The court noted that the text included hyperlinks to the Terms, the hyperlinks appeared directly below the registration button, and there was "no[] need to scroll beyond what [wa]s immediately visible to find notice of the Terms." *Id.* Moreover, the court found that the notice being "spatially coupled" with the "mechanism for manifesting assent, i.e., the register button" found in favor of a "reasonably prudent smartphone user [] understand[ing] that the terms were connected to the creation of a user account." *Id.* The court also found that the language "[b]y creating an Uber account, you agree" was a "clear prompt directing users to read the terms and conditions and signaling that their acceptance of the benefit of registration would be subject to contractual terms." *Id.* at 78-79. The court specifically noted that "[a]lthough the contract terms are lengthy and must be reached by a hyperlink, the instructions are clear and reasonably conspicuous." *Id.* at 79.

40.    Courts in the Second Circuit have repeatedly followed *Meyer* and enforced clickwrap agreements. *E.g.*, *Zachman*, 49 F.4th at 103 ("[w]e have consistently upheld [clickwrap] agreements because the user has affirmatively assented to the terms of the agreement by clicking 'I agree' or similar language" in order to use a company's services"); *Valelly*, 464 F. Supp. 3d at 640-42 (S.D.N.Y. 2020) (enforcing clickwrap terms of service because "the terms were 'reasonably conspicuous,' and Plaintiff was required to affirmatively agree to them").

**B.    Version 6 of the Terms of Use Is Binding on Account Holders that Created Accounts Prior to July 22, 2022 and Clicked to Accept the Terms of Use**

41.    The Debtors provided Account Holders with adequate notice under New York law of the revisions to Version 6 of the Terms or Use. A modification to an existing electronic agreement is valid where (a) notice of the updated provisions is reasonably conspicuous and (b) manifestation of assent to the new terms is unambiguous. *Valelly*, 464 F. Supp. 3d at 640-44. As with initial contract formation, the user must have actual notice or inquiry notice of the new

AMERICAS 116616989 v1

contractual terms. *Id.* It is not necessary that the notice of modified terms explain or describe each modified term, so long as the user is "given adequate notice of the existence of additional documents" that contain the amended terms. *Sacchi v. Verizon Online LLC*, 14-CV-423-RA, 2015 WL 765940, at *8 (S.D.N.Y. Feb. 23, 2015) (applying New Jersey law); *see also Plazza*, 289 F. Supp. 3d at 550 n.20 (S.D.N.Y. 2018) (enforcing modified version of Airbnb's terms of service even though notifications "did not refer to the arbitration clause" that was added to the terms yet provided users opportunity to review terms in full).

42.    On July 22, 2021, Celsius announced that it had revised its Terms of Use through e-mails and pop-ups on the Celsius web browser and mobile application. Blonstein Decl. ¶ 17. The emails directed Account Holders to log into their Celsius accounts on mobile or desktop devices, and to review and accept Version 6. *Id.* Ex. A at A-2. When Account Holders logged in, they were shown a pop-up window that stated that "[Celsius] had updated [its] Terms of Use." *Id.* Ex. A at A-7. The pop-up window provided Account Holders with a summary of three changes and a link to view the entire text of the Terms of Use. Communications, including e-mails, informed Account Holders that they would lose access to their accounts if they did not accept the revised Terms of Use by August 5, 2021, and that any digital assets associated with their accounts on the Celsius platform would cease earning rewards if they did not accept the revised Terms of Use by August 19, 2021. *Id.* ¶ 17; Ex. A. Account Holders were provided with a limited period between July 22 and August 5, 2021 to access the Celsius application to withdraw their assets if they did not wish to agree to Version 6. After that limited time, Account Holders could withdraw their digital assets by calling customer support. Celsius sent follow-up emails to Account Holders that had not accepted by August 5, 2021, and again followed up with Account Holders that had not accepted by August 19, 2021. *Id.* ¶ 17; Ex. B, C.

27

43.    The in-app pop-ups contained links to the revised Terms of Use, and highlighted three changes (*i.e.*, a change from English law to New York law, a change of the lead Celsius entity from Celsius Network Ltd. to Celsius Network, LLC, and a change to the arbitration provision).  *Id.* Ex. A.  Neither the e-mails nor the mobile pop-up window included the change to the description of the nature of the transaction to an open-ended loan or the addition of bankruptcy language but, under *Sacchi*, the provision of notice that the Terms of Use as a whole had changed, and the fact that these revisions could be found in other documents, is adequate notice. [23]

### C.    The Debtors Have Not Produced Evidence With Respect to Whether Versions 6, 7, and 8 Are Enforceable With Respect to Users Who Created Accounts After July 22, 2021

44.    The Debtors have not presented evidence that would permit parties in interest or the Court to determine whether Account Holders creating new accounts after July 22, 2021 (the effective date of Version 6) were provided with sufficient notice to accept the Terms of Use. Neither the Amended Stablecoin Sale Motion nor any of the Declarations discuss how the Terms of Use were presented to Account Holders when they signed up to join Celsius's platform.  The Debtors' filings also do not include any screenshots of the Debtors' account creation page.  The record therefore does not establish whether new Account Holders were notified that by creating an account they would be agreeing to the applicable version of the Terms of Use through clear instructions and a conspicuous link or other method by which they could review the Terms of Use in full prior to account creation.  The Debtors have committed to file a supplemental declaration to remedy this lack of evidence.  The Committee reserves all rights with respect to any supplemental evidence introduced at this late date.

---

[23]    The mock-up of the web browser screen shot that was provided did include the follow description "Change of custody services – Assets will not be held with Prime Trust but will be loaned to Celsius in exchange for weekly rewards."  *Id.* Ex. A at A-9.  That change was not included in the email or mobile pop-up.  The screenshots provided are drafts and it is unclear if that disclosure made it into the final version of the pop-up.

AMERICAS 116616989 v1

II.     **The Terms of Use Unambiguously Provide that Title to Earn Assets Was Transferred to Celsius and that Celsius Had the Right to Sell Earn Assets Assets**

     A.     **The Language of the Terms of Use is Unambiguous Regarding Celsius's Title in and Right to Sell Earn Assets**

45.     Where the terms of a contract are unambiguous, courts will give effect to their plain meanings. *Giddens v. 344 Individuals* (*In re Lehman Bros.*), 574 B.R. 52, 57 (Bankr. S.D.N.Y. 2017), *aff'd*, No. 17-6246, 2018 WL 10454936 (S.D.N.Y. Sept. 26, 2018), *aff'd*, 792 F. App'x 16 (2d Cir. 2019); *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467–68 (2d Cir. 2010). "Contract language is unambiguous if it has a 'definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990) (citing *Breed v. Ins. Co. of N. Am.*, 385 N.E.2d 1280, 1282 (N.Y. 1978)); *accord Photopaint Techs., LLC v. Smartlens Corp.*, 335 F.3d 152, 160 (2d Cir. 2003). On the other hand, contract language is ambiguous if its terms "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Law Debenture Tr. Co. of N.Y.*, 595 F.3d at 466.

46.     To determine whether ambiguity exists, "effect and meaning must be given to every term of the contract, and reasonable effort must be made to harmonize all of its terms." *India.com, Inc. v. Dalal*, 412 F.3d 315, 323 (2d Cir. 2005). Moreover, "the court must consider the entire contract to safeguard against adopting an interpretation that would render any individual provision superfluous." *Ally Fin. Inc. v. Wells Fargo Bank, N.A. (In re Residential Capital, LLC)*, 531 B.R. 25, 42-43 (Bankr. S.D.N.Y. 2015). It is "crucial that the contract 'be read to give effect to all its

AMERICAS 116616989 v1

provisions and to render them consistent with each other.'" *In re Residential Capital, LLC*, No. 12-12020 (MG), 2015 Bankr. LEXIS 2595, at *27-29 (Bankr. S.D.N.Y. Aug. 5, 2015). "Courts are not required to find contract language ambiguous where the interpretation urged by one party would strain the contract language beyond its reasonable and ordinary meaning." *Steiner v. Lewmar, Inc.*, 816 F.3d 26, 32 (2d Cir. 2016). In addition, "[l]anguage whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation." *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012).

47.     The best evidence of the parties' intent is the language of the contract. *Marin v. Const. Realty, LLC*, 28 N.Y.3d 666, 673 (N.Y. 2017). When the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract. *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co., N.A.*, 773 F.3d 110, 114 (2d Cir. 2014). Only when a court finds ambiguity in the parties' written agreement may it look to evidence outside of the document to discern the parties' intent. *Luitpold Pharms., Inc. v. Ed. Giestlich Söhne A.G. Für Chemische Industrie*, 784 F.3d 78, 87 (2d Cir. 2015); *Flynn v. McGraw Hill LLC*, No. 21-CV-614 (LGS), 2022 WL 103537, at *3 (S.D.N.Y. Jan. 11, 2022) ("When a contract is unambiguous on its face, it is improper to consider extrinsic evidence.").

48.     As a general matter, parties may transfer title to their securities, intangible assets, commodities, or money by contract. For securities, parties may agree that a borrower or purchaser "take[s] title to the securities received and can trade, sell or pledge them," subject to any "contractual obligation" to pay their counterparty in currency or return like or identical securities to them. *S.E.C. v. Drysdale Sec. Corp.*, 785 F.2d 38, 41 (2d Cir. 1986); *see also In re SunEdison, Inc.*, 620 B.R. 505, 515 (Bankr. S.D.N.Y. 2020) (discussing "securities contract[s]," which are "contract[s] for the purchase, sale, or loan of a security"). Parties may also transfer via contract

their interests in general intangibles. *In re TerreStar Networks, Inc.*, 457 B.R. 254, 266 (Bankr. S.D.N.Y. 2011) (parties may agree to a contractual "transfer, sale, or other disposition" of their general intangibles); *In re Residential Capital, LLC*, 501 B.R. 549, 574 (Bankr. S.D.N.Y. 2013) (share purchase agreement provided for sale of general intangibles, among other assets). Parties own general intangibles, and thus may transfer them, if they are able to exercise control over the general intangibles. *Breckenridge Edison Dev., L.C. v. Sheraton Operating Corp.*, 13-CV-6804 (VB), 2015 WL 5459833, at *1-2 (S.D.N.Y. June 2, 2015). Similarly, title to commodities may pass through "contracts of sale of a commodity for future delivery." *Commodity Futures Trading Commn. v. McDonnell*, 287 F. Supp. 3d 213, 223 (E.D.N.Y. 2018). Finally, when consumers deposit funds into their bank accounts, title to those funds passes to their bank. *In re Brown*, No. 18-10617 (JLG), 2022 WL 4390454, at *16 (Bankr. S.D.N.Y. Sept. 22, 2022) ("'Under law, funds deposited in a bank become the property of the bank, and the bank becomes indebted to the depositor for the amount of the funds.'") (quoting *Nwachukwu v. Chem. Bank*, No. 96-CV-5118, 1997 WL 441941, at *5 (S.D.N.Y. Aug. 6, 1997)).

49.    Each version of the Terms of Use unambiguously provided that Celsius could use Earn Assets, and the Terms of Use have explicitly permitted the Debtors to sell digital assets with all attendant rights of ownership since Version 2. *E.g.*, *Terms of Use, Version 1* § V.B; *Terms of Use, Version 2* § 14. Every version of the Terms of Use since September 30, 2020 (Version 5) has included language providing that Account Holders transfer all right, title and interest in the digital assets associated with their Earn Accounts to Celsius. *See Terms of Use, Version 5* § 14.[24] Version 8, in effect on the Petition Date, specifically stated in bold that "**[i]f our Earn Service is available**

---

[24]    For the avoidance of any doubt, the Committee is not taking the position that the transfer of digital assets from Account Holders to Celsius in exchange for a contractual right to the return of like-kind digital assets constituted a taxable event. *See* Michael Shulman, Loans of Securities, Digital Assets, and Other Fungible Property, 102 *Tax Notes State* 4, 413 (Oct. 25, 2021).

31

**to you, upon election, you will lend your Eligible Digital Assets to Celsius and grant Celsius all rights and title to such Digital Assets, for Celsius to use in its sole discretion while using the Earn Service.**" Version 8 § 4(D) (emphasis in original); *see also id.* § 13 ("you grant Celsius . . . all right and title to such Eligible Digital Asset, including ownership rights, and the right, without further notice to you, to hold such Digital Assets in Celsius' own Virtual Wallet or elsewhere, and to pledge, re-pledge, hypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets . . . with all attendant rights of ownership . . . .").

50.     Although it is not necessary to consider extrinsic evidence when contractual terms are unambiguous, such evidence also confirms that the Debtors have the right to sell Earn Assets, pursuant to the Terms of Use. Celsius's business model from the beginning was to sell, lend and otherwise use digital assets transferred by Account Holders to generate a return that it would pass along to Account Holders as interest or rewards. Mr. Ferraro explained that, in order to generate sufficient yield to fund these rewards, the Debtors deployed digital assets in various lending, staking, decentralized finance, and other trading transactions. Ferraro Decl. ¶ 21.

51.     A reasonable person who reviewed the Terms of Use or was familiar with Celsius's business model would therefore understand that participating in the Earn Program meant that they granted Celsius the right to sell or otherwise use the digital assets they transferred to Celsius, and that they would no longer be able to possess, control, use, or dispose of such assets. *Id.* § 13 ("You will not be able to exercise rights of ownership"). Accordingly, the Court should enforce the plain meaning of the Terms of Use as they are written and hold that Debtors have the right to sell Earn Assets pursuant thereto. *Id.* ¶ 13.

    **B.**    **The Characterization of the Nature of the Transaction Between Account Holders and Celsius as a Loan Does Not Create an Ambiguity**

52.     Certain Account Holders have argued that the repeated description of the

32

transaction between Account Holders and Celsius as a loan, beginning with Version 6 of the Terms

of Use, contradicts language that provides Celsius with all right and title to the digital assets

transferred by such Account Holders, thereby creating an ambiguity in the Terms of Use regarding

ownership of the applicable Digital Assets.  Gallagher Objection at 7; *Objection to Debtors'*

*Amended Motion For Entry of an Order (I) Establishing Ownership of Assets in the Debtors' Earn*

*Program, (II) Permitting the Sale of Stablecoins in the Ordinary Course and (III) Granting Related*

*Relief* [Docket No. 1430] ("**Wohlwend Objection**").  For several reasons, the inclusion of

provisions in the Terms of Use describing the transaction between the Account Holders and

Celsius as a "loan," together with provisions providing for a transfer of title to or ownership of,

and granting Celsius the right to sell or otherwise transfer, Earn Assets, does not result in a conflict

or ambiguity.

53.     First, contracts are to be interpreted in a manner that does not render provisions of

the agreement superfluous.  As this Court found in *Residential Capital*, where possible, a contract

must be read to give effect to all its provisions and to render them consistent with each other.  *See*

*In re Residential Capital, LLC*, 2015 Bankr. LEXIS 2595, at *27-29; *see also Ally Fin. Inc.*, 531

B.R. at 42-43 (finding that "the court must consider the entire contract to safeguard against

adopting an interpretation that would render any individual provision superfluous").  An

interpretation of the Terms of Use that continues to vest title to Earn Assets in Earn Account

Holders or precludes Celsius from selling such Earn Assets based upon the characterization of the

transaction as a loan would read the plain language concerning title out of the Terms of Use.  That

is especially evident in Section 4(D) of the Terms of Use which explains that the loan of the digital

asset by the Account Holder operates to transfer title: "If our Earn Service is available to you, upon

your election, you will lend your Eligible Digital Assets to Celsius ***and grant Celsius all rights***

33

*and title to such Digital Assets*, for Celsius to use in its sole discretion while using the Earn

Service." (emphasis added).  It is impossible to read that sentence and conclude that, because the

language references a loan, the Account Holder is not transferring title, unless the reader ignores

the words "and grant Celsius all rights and title to such Digital Assets."  That reading would

similarly render meaningless language in the Terms of Use that specifically states that Celsius can

sell digital assets, including all rights of ownership.  As in *Residential Capital*, the Court should

not adopt an interpretation that would strike those words from the Terms of Use.

54.    Second, in analogous circumstances, courts in the Second Circuit have found that

characterizing a transaction as a "loan" is not inconsistent with the transaction constituting a

transfer of title.  Indeed, the Second Circuit has recognized that issuing a loan can operate to

transfer title.  *Drysdale*, 785 F.2d at 41 (recognizing that, in securities loans, as opposed to

"ordinary secured loans," the securities intermediary can "take title to the securities received [from

the consumer] and can trade, sell or pledge them"); *see also Citadel Mgt., Inc. v. Telesis Tr., Inc.*,

123 F. Supp. 2d 133, 150 (S.D.N.Y. 2000) ("Once physical possession of funds is transferred to

the borrower or to a third party on the borrower's behalf, ownership transfers with it. . . . In other

words, in transferring the funds to the debtor, the creditor relinquishes title and ownership over the

funds in exchange for a claim for damages against the debtor in the amount of the loan when the

loan becomes due.").

55.    A loan that operates to transfer title is also consistent with commonly used

agreements in the securities lending context.  For instance, the International Securities Lenders

Association Global Master Securities Lending Agreement is an industry-standard securities

lending agreement routinely used to document the borrowing and lending of securities by banks,

institutional investors, broker-dealers, and hedge funds.  *See* Global Master Securities Lending

AMERICAS 116616989 v1

Agreement,        *https://www.fixedincome.global/uploaded_files/privacy_sercurity/GlobalMaster*

*SecuritiesLending Agreement(GMSLA).pdf.*    That commonly used form contemplates a loan of

securities which operates to transfer title in those securities from the lender to the borrower, with

the borrower enjoying all incidents of ownership thereof.    *See id.* §§ 3; 4.    Like Celsius under the

Terms of Use, the borrower then has an obligation to return an equivalent security.    *Id*

56.    Finally, certain Account Holders have raised defenses to the formation of a contract

such as fraud, misrepresentation, illegality, and unconscionability.    As part of the Proposed

Scheduling Order, the Committee and the Debtors agreed that any defenses to the formation of a

contract would not be tried at this time.    The parties' proposed litigation schedule and discovery

compromises embodied in the Proposed Scheduling Order were conditioned on that agreement.    In

the Amended Stablecoin Sale Motion, the Debtors sought entry of a broad order "establishing

ownership of assets transferred into the Debtors' Earn Program (and any proceeds thereof)."    *See*

Amended Stablecoin Sale Motion ¶ 5.    Based on the limited discovery produced by the Debtors to

date, the Committee has identified several repeated misrepresentation by Mr. Mashinsky and other

Celsius employees in YouTube videos and other marketing materials.    Account Holders have

informed this Court and the Committee that they relied on those materials in determining to

transfer digital assets to Celsius and accept the Terms of Use.    All rights to bring defenses to the

formation of a contract with respect to the Terms of Use, generally, should therefore be preserved

for a later date when the parties have been able to conduct full discovery.

### III.    The Sale of Stablecoins (or Other Crypto Assets) To Fund Operating Expenses Is Not the Ordinary Course of the Debtors' Business

57.    The Debtors indicate that the Proposed Sale Stablecoin constitutes Earn Assets.

Am. Stablecoin Sale Mot. at 49.    Both Mr. Campagna and Mr. Ferraro have testified that the

Debtors cannot trace those stablecoins to a specific Account Holders.    Campagna Tr. at 34:23-

AMERICAS 116616989 v1

35:3; Ferraro Tr. at 97:22-98:7.  Mr. Ferraro has testified that it is his understanding that, "prior to the Petition Date, the Debtors monitized stablecoin as needed to meet their fiat obligations." Ferraro Decl. ¶ 26.  Mr. Ferraro did not, however, testify as to what stablecoin the Debtors monetized prior to the Petition Date.

58.     The Debtors argue that, to sell assets in the ordinary course, they must demonstrate that (1) the transaction at issue is the sort commonly undertaken by companies in the cryptocurrency space, and (2) a hypothetical creditor would expect the nature of the economic risk when they entered into contracts with the Debtors.  *See In re Lavigne*, 114 F.3d 379, 384-85 (2d Cir. 1997).  The Debtors make no effort to prove either required element and instead state that the proposed sale is "comparable to a business selling unencumbered inventory . . . rather than holding that inventory when the business has a cash need."  Am. Stablecoin Sale Mot. ¶ 52.  That *non sequitur* argument is not sufficient.

59.     The Debtors are not currently operating in the ordinary course of business.  Since the Petition Date, have continued their pre-petition "Pause" on Account Holder withdrawals and have ceased all investing activities.  Selling stablecoin would therefore be inconsistent with the activities the Debtors are undergoing in the ordinary course of their operations.

60.     It is unsurprising that Account Holders are concerned by the thought of the Debtors selling Earn Assets to fund operating expenses.  Indeed, Celsius' prepetition advertising (much of which has been taken down from the internet) repeatedly stated that "[t]he Celsius business model is structured to do the exact opposite of what banks do – by giving 80% of total revenue <u>back to our community</u> each week in the form of earned interest."  Colodny Decl., Ex. E at 2 (emphasis in original).[25]  Celsius claimed that "[t]he other 20% of our profits go back into the company to pay

---

[25]    Both Mr. Ferraro and Mr. Blonstein testified that Celsius did not in actuality pass 80% of its revenues along to customers.  Ferraro Tr. at 364:19; Blonstein Tr. 306:1-23.  That may be because Celsius was not generating

salaries, manage expenses, buy back our CEL tokens, and scale our products and services." *Id.* at

3. Based on those statements, a reasonable Account Holder would expect Celsius to fund their

operating expenses (and these Chapter 11 Cases) with the 20% of the profits Celsius was

generating from deploying or otherwise using Earn Assets, rather than from proceeds generated

from sales of stablecoin  The simple truth is, even if it were business as normal for Celsius—it is

not—the proposed relief would not be ordinary course.

61.     The Committee does, however, believe that the Debtors have demonstrated a valid

business reason to sell the Proposed Sale Stablecoin.  Mr. Campagna has testified that the Debtors

will likely run out of liquidity in March 2023.  The confirmation and consummation of any

reorganization or sale transaction may not conclude until spring 2023.  The sale of approximately

$18 million of stablecoin will provide the Debtors with an additional month of runway and ensure

the Debtors are not pressured to accept a low offer with respect to any reorganization or sale

transaction due to liquidity concerns.  However, the Debtors should not be permitted to sell

stablecoin until it is necessary to do so.  The following language should be included in the proposed

order attached to the Amended Stablecoin Motion as Exhibit A, in order to ensure that the Debtors'

sale of the Proposed Sale Stablecoin is properly regulated:

(i)     The Debtors are only authorized to sell up to $18 million worth of stablecoin.

(ii)    The Debtors will only sell such stablecoin if their aggregate cash balance is below
        the $20 million minimum threshold indicated in their current cash flow forecasts.

(iii)   The Debtors will only spend the proceeds of such stablecoin on ordinary course
        business expenses and the costs of administering these estates.

(iv)    The Debtors will provide the Committee and the U.S. Trustee with three days'
        notice prior to selling any such stablecoin.

---

sufficient revenue to support the interest rates they were paying to Account Holders.  However, just because
Celsius was not living up to its statements to Account Holders does not mean Account Holders would expect
them to act otherwise.

AMERICAS 116616989 v1

(v)        Notwithstanding anything in the order to the contrary, the Debtors will not sell any other digital assets without further order of the Court.

62.        Finally, the Debtors' proposal to use assets transferred by Account Holders to continue to fund their reorganization efforts must be met with commitment to move these Chapter 11 Cases forward expeditiously.   To the extent the Debtors wish to sell further digital assets to fund these Chapter 11 Cases, they must request authority from this Court and prove their business justification to do so, including how the sale of such assets will benefit Account Holders.

**Reservation of Rights**

63.        The Committee reserves all of its rights to supplement or amend this Statement and to present evidence at the hearing on the Amended Stablecoin Motion and to assert any defense to the formation of a contract at a later date.

**Conclusion**

64.        For the reasons set forth herein, the Committee supports the relief requested in the Amended Stablecoin Motion to the extent it relates to the sale of the Proposed Sale Stablecoin and objects to any determination regarding ownership of digital assets associated with the Earn Program at this time.

[*Remainder of Page Intentionally Left Blank*]

AMERICAS 116616989 v1

Dated:   November 29, 2022
         New York, New York

Respectfully submitted,

/s/ Aaron Colodny
**WHITE & CASE LLP**
David M. Turetsky
Keith H. Wofford
Samuel P. Hershey
Andrea Amulic
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113
Email:  david.turetsky@whitecase.com
        kwofford@whitecase.com
        sam.hershey@whitecase.com
        andrea.amulic@whitecase.com

– and –

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile:  (312) 881-5450
Email:  mandolina@whitecase.com
        gregory.pesce@whitecase.com

– and –

**WHITE & CASE LLP**
Aaron E. Colodny (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone: (213) 620-7700
Facsimile:  (213) 452-2329
Email:  aaron.colodny@whitecase.com

*Counsel to the Official Committee of*
*Unsecured Creditors*

AMERICAS 116616989 v1