## Exhibit C

Oren Blonstein Deposition Transcript Excerpts

**In the Matter Of:**

*In Re - Celsius Network LLC*

---

*OREN BLONSTEIN*

*November 22, 2022*

---



1

1    UNITED STATES BANKRUPTCY COURT

2      SOUTHERN DISTRICT OF NEW YORK

3

4    In re                        )
                                  )
5    CELSIUS NETWORK LLC,         )
     et al.,                      )   Case No.
6                                 )   22-10964 (MG)
                   Debtor.        )
7                                 )

8

9

10
                ** CONFIDENTIAL **
11
     _____
12

13    VIDEO RECORDED EXAMINATION OF

14            OREN BLONSTEIN

15   _____

16              TAKEN ON

17      TUESDAY, NOVEMBER 22, 2022

18

19

20

21

22
     CERTIFIED STENOGRAPHER:
23    JESSIE WAACK, RDR, CRR, CCRR, NYRCR, NYACR,
      CCR-NJ (No. 30XI008238700) CSR-TX (No. 11958)
24    CCR-WA (No. 21007264), CSR-CA (No. 14420),
      REALTIME SYSTEMS ADMINISTRATOR
25    JOB NO.:  872582

22-10964-mg   Doc 1504-3   Filed 11/29/22   Entered 11/29/22 17:30:18   Exhibit C
In Re - Celsius Network LLC
Pg 4 of 57
Confidential
Oren Blonstein
November 22, 2022

13

1              ******

2              PROCEEDINGS

3        November 22, 2022, 9:51 a.m.

4           New York, New York

5              ******

6        THE VIDEOGRAPHER:  Good morning,

7    everyone.  We are now on the record.

8    My name is Kevin-Scott van Vlijmen.

9    I'm the videographer retained by

10   Lexitas.

11       This is a video deposition for

12   the United States Bankruptcy Court,

13   Southern District of New York.

14       Today's date is November 22 of

15   2022, and the video time is 9:51 a.m.

16       This deposition is being held

17   both remotely via Zoom as well as in

18   person at Kirkland & Ellis LLP, at

19   601 Lexington Avenue, New York,

20   New York, 10022, in the matter of In

21   Re: Celsius Network LLC, et al., Case

22   No. 22-10964 (MG).

23       The deponent is Oren Blonstein.

24       All counsel will be noted on the

25   stenographic record.

14

1          Our court reporter is Jessica

2      Waack and will now swear in the

3      witness.

4                    *****

5          OREN BLONSTEIN, sworn

6      on oath and/or affirmed, called as a

7    witness herein, was examined and testified

8              as follows:

9                    *****

10         THE VIDEOGRAPHER:  You may

11     proceed.

12         MS. BRIER:  At the outset, I'm

13     just going to designate this transcript

14     as confidential -- the entire

15     transcript as confidential.

16         ZOOM PARTICIPANT:  On Zoom, you

17     can't [inaudible] do that?

18         MS. BRIER:  You can't hear us?

19         THE STENOGRAPHER:  I think

20     someone just wasn't muted.

21         ZOOM PARTICIPANT:  You are

22     currently muted.

23         THE STENOGRAPHER:  Can we go off

24     the record?

25         THE VIDEOGRAPHER:  Yes.  All

22-10964-mg    Doc 1504-3    Filed 11/29/22    Entered 11/29/22 17:30:18    Exhibit C
In Re - Celsius Network LLC                                                                    Oren Blonstein
Pg 6 of 57                                                                November 22, 2022
Confidential

15

 1   right.

 2         The time is currently 9:53 a.m.

 3   And we are going off the record for

 4   Media Unit No. 1.

 5         (Whereupon, a recess was taken at

 6         9:53 a.m.)

 7         THE VIDEOGRAPHER:  All right.

 8   The time is currently 9:53 a.m.  And

 9   we're back on the record for Media Unit

10   No. 1.

11         MS. BRIER:  At the outset, I am

12   going to designate the entire

13   transcript as confidential under the

14   terms of the protective order.

15         No information discussed during

16   this deposition may be recorded or

17   publicly disclosed whether orally, on

18   Twitter, on podcasts or any other

19   means.

20         At this point, the only

21   individuals who should be on this

22   deposition, or entities and agencies,

23   are those who have provided prior

24   notice that they would attend or

25   participate in the deposition and those

16

1      that are bound by the terms of the

2      protective order.

3           So if you don't meet that

4      description, please sign off.  We don't

5      want to have any issues with folks

6      livestreaming or Tweeting thoughts or

7      commentary on what's going on today who

8      hasn't agreed to the protective order.

9           And as before, we're happy to

10     meet and confer with folks after this

11     about de-designating portions of this.

12     But just to protect confidential

13     information for purposes of today,

14     we're designating the transcript as

15     confidential.

16           MR. COLODNY:  All right.

17           MS. BRIER:  Go ahead.

18               EXAMINATION

19  BY MR. COLODNY:

20     Q.   Mr. Blonstein, my name is Aaron

21  Colodny.  I'm a partner at White & Case.  I

22  represent the Official Committee of

23  Unsecured Creditors in these cases.

24           Can you please introduce

25  yourself, again, for the record?

17

```
 1         A.    Sure.   My name is Oren Blonstein.
 2    I work at Celsius Network.   Head of
 3    innovation and chief compliance officer.
 4         Q.    Thank you.
 5               So I'm going to ask you a series
 6    of questions today.   If you don't
 7    understand the question that I ask you,
 8    please let me know.
 9         A.    Sure.
10         Q.    I'll try to restate it.
11               If you don't ask me for any
12    clarification, I'll assume that you
13    understand the question that I'm asking.
14               You've taken an oath today.
15    That's the same oath that you're going to
16    take in a courtroom.   You understand that
17    everything that you say today is going to
18    be true and correct to the best of your
19    knowledge?
20         A.    Yes.
21         Q.    Is there any reason you can't
22    testify truthfully today?
23         A.    No.
24         Q.    Have you taken any medications or
25    other substances that would affect your
```

22-10964-mg   Doc 1504-3   Filed 11/29/22   Entered 11/29/22 17:30:18   Exhibit C
In Re - Celsius Network LLC                                                          Oren Blonstein
Pg 9 of 57                                                  November 22, 2022
Confidential

18

1    ability to testify truthfully?

2         A.    No.

3         Q.    Thank you.

4              We have a court reporter here

5    today.  She's got the hardest job in the

6    room.  And so I would ask that we try not

7    to talk over each other.

8              Sometimes I speak too fast.  I

9    know that's something people do, you know,

10   but it is best to slow it down.  And if she

11   asks you to restate something, just say it

12   again in the best -- best words you can.

13             And then the last ground rule for

14   that is answer verbally.  You know, no

15   "uh-huhs" or --

16        A.    No nodding.

17        Q.    -- no nodding, just yeses and

18   nos.

19             And then your counsel may lodge

20   objections to my questions.  As a general

21   matter, that's to make her objection on the

22   record.  I'll give her time and ask her if

23   she's going to instruct you not to answer

24   the question.

25             Unless she instructs you not to

22-10964-mg   Doc 1504-3   Filed 11/29/22   Entered 11/29/22 17:30:18   Exhibit C
In Re - Celsius Network LLC                Pg 10 of 57                      Oren Blonstein
Confidential                           November 22, 2022

19

1  answer the question, you're supposed to

2  answer everything that I ask you today.

3          And then the last thing is, you

4  know, we can take as many breaks as you

5  want.  If you're getting tired, if you want

6  to get a drink, just let me know.  I just

7  ask if there's a question pending, we just

8  not take a break during a pending question.

9      A.   Understood.

10     Q.   Thanks.

11          Have you ever been deposed

12  before?

13     A.   No.

14     Q.   First time for everything, I

15  guess.

16          MR. COLODNY:  Can I get one.

17          (Whereupon, Exhibit 4 is marked

18          for identification.)

19          MR. COLODNY:  Let's start with

20      exhibit -- can I get one for the court

21      reporter.

22          Let's start with Exhibit 4.

23  BY MR. COLODNY:

24     Q.   Have you seen this document

25  before?

20

```
 1        A.    Could you just give me one minute
 2   to review it?
 3              (Pause for reading/reviewing.)
 4        A.    Yes.
 5        Q.    What is this document?
 6        A.    It's a -- me attesting to the --
 7   to the ownership of the assets in the
 8   program.
 9        Q.    It's a notice of your deposition
10   today, why we're all here today.
11        A.    Okay.
12        Q.    And do you understand that you're
13   here today in your personal capacity, or
14   are you here as a representative of
15   Celsius?
16        A.    I'm sorry.  Can you restate that?
17        Q.    Are you here in your personal
18   capacity or as a representative of Celsius?
19              MS. BRIER:  Object to form.
20              THE WITNESS:  Yeah, I don't think
21        I understand the -- I mean, in my
22        personal capacity --
23   BY MR. COLODNY:
24        Q.    Are you testifying as Oren
25   Blonstein, or are you testifying as the
```

22-10964-mg   Doc 1504-3   Filed 11/29/22   Entered 11/29/22 17:30:18   Exhibit C
In Re - Celsius Network LLC                                                Oren Blonstein
Pg 12 of 57                                    November 22, 2022
Confidential

49

1        Q.    A lot of hats.

2        A.    It is.

3        Q.    And do your responsibilities as a

4   chief product officer differ from what we

5   talked about as a chief innovation officer?

6        A.    Yeah, tremendously.  Yeah.  Very

7   different.

8        Q.    Okay.  And what are your roles as

9   a chief product officer?

10       A.    Chief product officer -- so the

11  distinction between innovation and product

12  is that innovation was supposed to be all

13  of the new products going forward.

14            The product team, you know,

15  historically was responsible for the kind

16  of -- the existing set of products, the

17  platform, you know, all the maintenance and

18  the administration of all those things.

19            So since there is no separate

20  innovation -- since I'm the innovation

21  person and the product person, I'm kind of

22  doing the whole thing.

23            Again, you can just say --

24  similar to compliance, you can say that in

25  a lot of different organizations they'll

50

```
 1   have, like, new products and existing

 2   products as the -- under the same umbrella.

 3            And in the case of Celsius, it

 4   was distinct when I started.

 5       Q.   And did you segment your teams

 6   underneath you?  So, like, you would have

 7   your product team and your innovation team,

 8   or was it kind of blended between each

 9   other?

10       A.   Yeah, this change happened post

11   the Chapter 11 filing, so there is -- you

12   know, there's one person left from the

13   innovation team.  So -- and he's -- and

14   we've incorporated him into the product

15   team.

16       Q.   And your appointment as chief

17   product officer happened after the

18   Chapter 11 case?

19       A.   And -- yeah, and actually --

20   sorry to -- I should clarify, there has

21   been no official appointment.  You know,

22   I'm not designated as the chief compliance

23   officer -- as a chief product officer.

24            I've just been taking on that

25   responsibility.  I think the -- from my
```

22-10964-mg   Doc 1504-3   Filed 11/29/22   Entered 11/29/22 17:30:18   Exhibit C
In Re - Celsius Network LLC                    Pg 14 of 57                    Oren Blonstein
                                        Confidential                    November 22, 2022

                                                                              51

1    perspective, we wanted to make sure that we

2    had a transition plan for the CCO role

3    before we changed my, you know, official

4    title.

5         Q.   Okay.  And prior to the

6    Chapter 11 case, did you do any work on the

7    existing earned product or the existing

8    offerings of the company?

9              MS. BRIER:  Objection to form.

10   BY MR. COLODNY:

11        Q.   I guess I'll ask it again.

12             You said that you became the

13   chief product officer or assumed the roles

14   of the chief product officer after the

15   Chapter 11 case, and you described the

16   chief product officer -- the difference

17   between the chief product officer and the

18   chief innovation officer as product being

19   focused on earned and existing offerings,

20   and innovation being premised on future

21   earnings and future products.

22             Did you have any involvement in

23   the earn and past products prior to the

24   Chapter 11 cases?

25        A.   In my product capacity -- product

                                                                    52

1    or innovation capacity, not really.  I

2    mean, nothing of substance that I can

3    remember.

4         Q.   Okay.  And the other capacity

5    would be?

6         A.   Compliance.  I mean, so, you

7    know, since -- until April 2022, every

8    customer was an earn customer pretty

9    much --

10        Q.   Uh-huh.

11        A.   -- to my knowledge.  Every single

12   customer we had fell under my purview as

13   the chief compliance officer.

14        Q.   Okay.  So then we're here today

15   to talk about the terms of use.

16             Can you describe your involvement

17   in the terms of use after -- let's start in

18   September when you joined.  September 2021,

19   correct?

20        A.   Correct.

21        Q.   So what was your -- what was your

22   involvement in the terms of use on

23   September 2021, in that first period before

24   you got promoted?

25        A.   I -- again, just to -- I

22-10964-mg   Doc 1504-3   Filed 11/29/22   Entered 11/29/22 17:30:18   Exhibit C
In Re - Celsius Network LLC                Pg 16 of 57                    Oren Blonstein
                                          Confidential                November 22, 2022

53

1    continued with my role as head of

2    innovation while I was the chief compliance

3    officer, so I was also dual hatting at that

4    time.

5              I was not involved in writing

6    terms of use.  I was not involved in,

7    like -- you know, I was not like a step in

8    the process of having those reviewed or

9    approved.

10             I often consulted with them with

11   my innovation hat on from, you know, just

12   verifying, like, how we -- you know, how we

13   talked about certain things.

14             I often reviewed them in my

15   compliance role for, like, the -- the one

16   that stands out to me was we often had

17   questions about, like, our privacy policy

18   and, you know, what information we were

19   able to share with, you know, regulators or

20   other kind of third parties that were

21   asking for data about our customers.

22             So I was consulting mainly for

23   those purposes.

24        Q.   And you mentioned how we talked

25   about certain things.  What are you

54

1    referring to there?

2        A.   So, for example, the first

3    product that the innovation team kind of

4    sponsored or -- was the swap product.  So

5    we worked with our legal and regulatory

6    teams on crafting -- on the final outcome

7    of the terms -- the changes to the terms of

8    use for the swap product.

9            Just like seeing how do we talk

10   about that, is that consistent with how

11   competitors talk about it, things like

12   that.

13       Q.   And when was the swap product

14   released?

15       A.   We went into alpha in October

16   '21, and then just did like a slow rollout

17   over the months that followed.  I think we

18   went general availability May 2022 or

19   something in that range.

20       Q.   And did you have any other role

21   in how the terms of use referred to

22   products other than swap?

23       A.   No.

24       Q.   Were you involved in the

25   solicitation of acceptances of the terms of

55

1    use?

2         A.    No.

3         Q.    Could you describe your

4    involvement in the release of terms of use

5    Version 6?  And when I -- I'm using terms

6    from your declaration.

7               Do you understand what I'm

8    saying --

9         A.    Yep.

10        Q.    -- when I say Version 6?

11              What do you understand Version 6

12   to be?

13        A.    This was the -- when we

14   transferred the customer relationship from

15   the UK entity to the U.S. entity.

16        Q.    Okay.  And what was your role in

17   the rollout of Version 6?

18        A.    That was -- that happened when I

19   was the head of innovation, not the chief

20   compliance officer.  So I had zero -- zero

21   direct analysis or influence on it.

22              Again, because I was involved

23   with a lot of different parts of company.

24   I knew it was taking place.  I also

25   reported to Roni at the time.

56

1          So, you know, I'm sure, you know,

2    parts of that came up in conversation, but

3    it wasn't something that I was tracking

4    directly.

5          Q.    Okay.   What was Mr. Cohen-Pavon's

6    role in the release of Version 6?

7          A.    I think as our -- I should say I

8    don't know exactly, because -- because that

9    wasn't the area that I worked in.

10          But my overall understanding was

11   that he was kind of leading that

12   initiative.

13         Q.    Do you know -- who were the other

14   main people that worked on the rollout of

15   Version 6?

16         A.    I'm sure there were many, many

17   people involved in it.   The individual --

18   one individual that I think had a -- played

19   a significant role is a guy named

20   Matthew de la Fuente.   He was on the

21   project management team.   I think he was

22   coordinating a lot of the activities.

23         Q.    Does Matthew still work at the

24   company?

25         A.    I think -- no, he was let go, I

22-10964-mg   Doc 1504-3   Filed 11/29/22   Entered 11/29/22 17:30:18   Exhibit C
In Re - Celsius Network LLC              Pg 20 of 57                    Oren Blonstein
                                      Confidential                  November 22, 2022

                                                                              57

 1   think, last week.

 2        Q.   And what was his role in the

 3   rollout of Version 6?

 4        A.   I think as, like, a coordinator.

 5   You know, he's -- I think he headed our

 6   project management office.  So just

 7   coordinating different -- coordinating

 8   various initiatives across different

 9   departments.

10        Q.   So Matthew de la Fuente was the

11   project -- project manager that was in

12   charge of the rollout?

13        A.   I'm not certain, like, if he was,

14   you know -- if there's a piece of paper

15   that says, like, here's the name of the

16   project and who's the head.  I'm not sure

17   if he's the guy.  But I know that function

18   reported to him.  So he would have been,

19   you know, up to date on it.

20        Q.   So I have a little bit of

21   background here because my wife is a

22   product manager.

23        A.   Okay.

24        Q.   But generally in Celsius, when

25   you had a project like this, would you have

1    a product manager, project manager that

2    would lead it?

3         A.   Yeah, yeah.  So, like, when

4    you -- you know, my experience -- you know,

5    20-something years of experience in this --

6    in product development and mostly in

7    startups, so small startups usually don't

8    have project managers, right?  Product

9    managers do it all.  Celsius was scaling

10   pretty dramatically.

11          And Matthew came in as part of

12   that, to build out a project management

13   function to kind of -- you know, so that

14   product managers could focus on their --

15   their area, you know, empathizing with the

16   user, building products that the people

17   want.

18          And project managers could take

19   the work of coordinating between the

20   departments.

21        Q.   Okay.  And so Matthew, while he

22   might not have been the project manager,

23   per se, he was the one that was organizing,

24   tracking milestones, work plans?

25        A.   Exactly, yeah.

59

1          Q.   Who was the product manager?

2          A.   I'm not sure.  Because I wasn't

3     the -- I wasn't in charge of product at

4     that time.  I wasn't -- I'm not sure.  We

5     also -- we've had, like, a lot of people

6     leaving from the product team.

7          Q.   Uh-huh.

8          A.   So, yeah, I'm not sure.

9          Q.   Okay.  And other than Roni and

10    Matthew, any other individuals that jump

11    out as -- at you as being kind of the main

12    people involved in the rollout of terms of

13    use Version 6?

14         A.   Those are the two people I would

15    think.  Like, if I had a question about it,

16    I would go to those guys for more details.

17    I mean -- yeah.

18         Q.   Were you involved in the rollouts

19    of Version 7 or 8 of the terms of use?

20         A.   Not directly.

21         Q.   And who was involved in those

22    two?

23         A.   I'm not sure, actually.  I

24    don't -- I mean, my assumption would be the

25    same individuals that were involved in a

22-10964-mg   Doc 1504-3   Filed 11/29/22   Entered 11/29/22 17:30:18   Exhibit C
In Re - Celsius Network LLC                                Oren Blonstein
Pg 23 of 57                              November 22, 2022
Confidential

60

1  lot of the terms of use rollout, so legal,

2  regulatory, potentially product -- I mean,

3  likely product.

4          Actually, 100 percent product.

5  Somebody from product would have had to

6  have been involved because of the way that

7  terms of use -- the way that it's

8  implemented.

9          A product manager sort of has to

10  take the text of the terms of use and put

11  it into the -- into the apps.  So a product

12  person would have been involved, and a

13  project manager would have been involved.

14      Q.   Okay.  Are you familiar with the

15  QA processing in releasing products that

16  Celsius uses?

17      A.   I am familiar -- I am getting

18  more familiar with it now since I've

19  assumed the product -- the head of product

20  role or the -- taken on those

21  responsibilities.  I don't know the details

22  around it, though.

23      Q.   And do you know if there was a QA

24  head on the rollout of terms of use

25  Version 6?

                                                                              140

1          you know, it might be missing a page or

2          something at a later date.

3               MR. COLODNY:  That's fine.

4     BY MR. COLODNY:

5          Q.   So what you have in front of you

6     is an attachment to the declaration of Alex

7     Mashinsky that you reference in your

8     declaration.  And it is showing a redline

9     of terms of use Version 5 to terms of use

10    Version 6.

11              Have you reviewed this document

12    before?

13         A.   I definitely, like I mentioned

14    before, reviewed -- reviewed the Mashinsky

15    declaration.  And I'm aware of it to the

16    extent that anybody can be aware, you know,

17    keep in their mind 1100 pages of content.

18              But, yeah, I would have seen this

19    because I scrolled through the entire

20    document.

21         Q.   So I'll help -- try to move

22    through it quickly, because, agree, it's a

23    long document.

24              On page 1, you'll see Celsius

25    Network Ltd. has been crossed out, and now

141

1    it is Celsius Network LLC and its

2    affiliates, collectively we, our, us and

3    Celsius.

4            Was this one of the main changes

5    that you referred to in the previous

6    screen?

7        A.   That's correct.

8            MS. YANEZ:  Objection.  Form.

9    BY MR. COLODNY:

10       Q.   And then if you look at the next

11   page, the second full paragraph in all bold

12   and capitalized letters, it says, "Celsius

13   is a lending and borrowing platform.  When

14   you transfer digital assets to Celsius,

15   those digital assets are a loan from you to

16   Celsius in accordance with the terms

17   hereof.  Under no circumstances does

18   Celsius hold digital assets in custody or

19   on behalf as a part of the services

20   governed by these terms."

21           Are you aware of any time before

22   this terms of use where Celsius described

23   the transaction between its users and it as

24   a loan?

25       A.   I would have to go back and

142

1    review those again.  But, yeah, from -- off

2    the top of my head, I'm not aware of that,

3    yeah.

4         Q.   Do you think it's material that

5    the transaction changed to be a loan?

6              MS. BRIER:  Object to form.

7              THE WITNESS:  I don't think

8         it's -- yeah, that's not my -- that's

9         kind of not my area.  So I don't think

10        my -- my -- I'm not really qualified to

11        weigh in on that.

12   BY MR. COLODNY:

13        Q.   Do you think that as a customer

14   of Celsius, this would have jumped out at

15   you from the new terms of use?

16             MS. BRIER:  Object to form.

17             THE WITNESS:  I think that

18        because it's bolded and underlined, it

19        certainly would jump out to someone.

20             So, yeah.

21   BY MR. COLODNY:

22        Q.   And prior to this version, are

23   you aware of Celsius considering the

24   transaction between it and its

25   accountholders to be a loan?

143

1      A.   I wasn't really --

2           MS. BRIER:  Objection to form.

3           Sorry, Oren.  You can answer.

4           THE WITNESS:  Yeah, I wasn't

5      really part of the group of people that

6      was considering, like, the regulatory

7      or legal implications of the terms of

8      use; so...

9   BY MR. COLODNY:

10     Q.   Okay.  I want to turn to page --

11  it's 327 at the top.

12          So here Celsius changes the term

13  "Celsius wallet" to "Celsius account."

14          Do you know why that change was

15  made?

16     A.   I don't know.  I don't know.

17     Q.   Are there any specific wallets

18  associated with the earn service?  I guess

19  strike that.

20          Do customers have a specific

21  wallet at Celsius linked to their account

22  in connection with the earn service?

23          MS. BRIER:  Objection to form.

24          THE WITNESS:  So all customers

25     are given a deposit address, which

22-10964-mg   Doc 1504-3   Filed 11/29/22   Entered 11/29/22 17:30:18   Exhibit C
In Re - Celsius Network LLC                                Oren Blonstein
Pg 28 of 57                      November 22, 2022
Confidential

144

1          is -- so people will commonly call that

2          a wallet.  That deposit address is kind

3          of the -- the initial lending place of

4          all digital assets that are sent to the

5          company.

6                  And that's the extent of a

7          distinct or separate or a

8          customer-specific wallet or address

9          that Celsius maintains for customers.

10   BY MR. COLODNY:

11        Q.   And then what happens once you

12   deposit your coins to that

13   customer-specific wallet?

14        A.   Depending -- depending on the

15   volume or the amount of cryptocurrency,

16   periodically that cryptocurrency is swept

17   into main -- other wallets inside the

18   company, pooled omnibus wallets.

19        Q.   Okay.  But there's -- so there's

20   no specific wallet that holds an

21   individual's assets in the earn program?

22        A.   Yeah, again, like the --

23   there's -- the way -- I talked about this

24   in my custody declaration was that, you

25   can -- a helpful way to think about this is

145

1   that there is what the customer could see

2   via the app, and there's the coin movement.

3          And this is a common -- a common

4   practice across the industry.  There's a

5   ledger that is maintaining the balance that

6   the customer is shown, and then there's the

7   actual underlying asset.  This is common in

8   traditional finance and in crypto.

9          And so your question was -- your

10  question was --

11  BY MR. COLODNY:

12      Q.   I can ask another question.

13      A.   Yeah.

14      Q.   So you say there's -- is your

15  understanding that what the customer would

16  see, is that the Celsius account as it's

17  defined in this terms of use?

18          So when I open up the app and I

19  see Aaron Colodny has three Bitcoin, that's

20  not kept in an Aaron Colodny wallet within

21  Celsius?

22      A.   That is correct.

23      Q.   But my Celsius account would say,

24  three Bitcoin?

25          MS. BRIER:  Objection to form.

146

1          THE WITNESS:  Yeah, so to -- so,

2     yeah, just going back to that split.

3          What you see in your app is a

4     representation of what we maintain on a

5     ledger of transactions.  Where the

6     coins actually sit and whether they're

7     in the customer-specific wallet or the

8     omnibus pooled wallet, what we call the

9     main wallet, totally separate and

10    distinct.

11         So you may have -- if you put in

12    three Bitcoin, those three Bit -- and

13    those are your only Bitcoin -- for a

14    period of time those three Bitcoin may

15    sit in your individual wallet or the

16    add deposit address, but they could

17    just as easily be -- have been swept,

18    you know, a second after you deposited

19    them to the main wallet.

20         So that's why we don't refer --

21    we don't connect your view of your

22    balance to where the coins are sitting

23    in our infrastructure.  We tie that to

24    the -- our tracking of your balances in

25    the ledger.

22-10964-mg   Doc 1504-3   Filed 11/29/22   Entered 11/29/22 17:30:18   Exhibit C
In Re - Celsius Network LLC                     Pg 31 of 57                    Oren Blonstein
                                            Confidential                    November 22, 2022

                                                                                        147

 1    BY MR. COLODNY:

 2         Q.    And so your Celsius account would

 3    be your ledger balance?

 4         A.    Correct.

 5         Q.    And was a Celsius wallet a

 6    different thing prior to Version 6?

 7              MS. BRIER:  Objection to form.

 8              THE WITNESS:  I don't -- yeah, I

 9         don't know the -- I don't know the

10         reasoning why they decided to change it

11         from wallet to account.

12    BY MR. COLODNY:

13         Q.    Could you turn to page 351 at the

14    top.

15         A.    I'm sorry.  What was the page?

16         Q.    351 at the top, the docket

17    stamps.

18         A.    Got it.

19         Q.    So if you look at the title,

20    "Celsius Removes" -- "Consent to Celsius'

21    Use of Your Digital Assets," and changes it

22    to "Consent to Celsius' Use of Digital

23    Assets."

24              Do you know why "your" was taken

25    out of the title?

148

1          MS. BRIER:  Objection to form.

2          THE WITNESS:  Yeah, don't have

3     firsthand knowledge.  I mean, I wasn't

4     involved in the drafting of it, but,

5     you know, it's -- it's obviously more

6     clear, you know, based on the other --

7     the other terms of use if -- that

8     customers are transferring their assets

9     to the company, so there -- they

10    wouldn't be the customer's assets.

11 BY MR. COLODNY:

12         Q.   Okay.  And, again, three

13 sentences down -- or three lines down -- I

14 am sorry -- it says -- well, I'll read the

15 whole thing.

16         "In consideration for the rewards

17 payable to you on your Celsius account and

18 the use of your services, you grant

19 Celsius, subject to the applicable law and

20 for the duration of the period during which

21 the eligible digital assets are loaned to

22 us through your Celsius account, all right

23 and title to such digital assets," and it

24 continues.

25         Do you know why there was a

149

1   change from "available" to "loaned to us"?

2              MS. BRIER:  Object to form.

3              THE WITNESS:  I don't know.

4        Yeah, I don't know the reason why

5        they -- that change was made.

6   BY MR. COLODNY:

7        Q.   Two more changes to this

8   paragraph on the next page, 352 at the top.

9   There's a change where it previously said,

10  "You may not be able to exercise certain

11  rights of ownership" to "You will not be

12  able to exercise rights of ownership."

13             Do you know why that change was

14  made?

15       A.   I don't know.

16       Q.   And then the last romanette iii,

17  there is a change where it introduces now a

18  bankruptcy disclaimer that says that a

19  customer "may lose its rights to recover or

20  regain ownership of such digital assets and

21  other than your rights as a creditor of

22  Celsius under any applicable laws, you may

23  not have any legal remedies or rights in

24  connection with Celsius' obligations to

25  you."

150

1          Do you know why that change was

2   made?

3          MS. BRIER:  Object to form.

4          THE WITNESS:  I don't know.

5   BY MR. COLODNY:

6      Q.  So we talked about the Coinbase

7   disclosure before where they disclosed in

8   their 10-Q that there was now a bankruptcy

9   risk disclosure with respect to the

10  ownership ability to recover assets in

11  accounts on the Coinbase site that was

12  highlighted for users in the 10-Q.

13          Are you aware of any

14  communication where Celsius highlighted

15  sub-romanette iii for its customers?

16     A.  I'm not aware.

17     Q.  And it wasn't listed on the three

18  main changes to the terms of use we

19  discussed before, correct?

20     A.  That's correct.

21     Q.  Are you aware of any

22  communications discussing flagging these

23  changes in paragraph 13 for accountholders?

24          MS. BRIER:  Objection to form.

25          THE WITNESS:  Am I aware of any

151

1           communications where we tried to make

2           sure our customers were aware of this,

3           the changes?  That was the question?

4    BY MR. COLODNY:

5           Q.   I was asking a slightly different

6    question.

7                Are you aware of any

8    conversations within Celsius when Version 6

9    was released where people considered

10   flagging these changes for customers?

11               MS. BRIER:  Objection to form.

12               THE WITNESS:  No.  And just to

13          provide more con- -- you know, just as

14          a reminder, like, at the time that

15          these -- these changes were being

16          considered or were implemented, I was

17          head of innovation.  So I wouldn't have

18          been involved.

19               It makes even more sense, like,

20          why I wouldn't have been involved

21          firsthand in it.

22   BY MR. COLODNY:

23          Q.   But you're not aware one way or

24   another if those conversations did or did

25   not happen?

152

1       A.   The part -- the thing that I am

2  sure that they happened among counsel --

3  you know, among the attorneys for the

4  company.  So -- but I was not a part of

5  those discussions.  And, yeah.

6            MR. COLODNY:  I'm at a pretty

7       good breaking point if you want to take

8       a break now?

9            MS. BRIER:  Okay.  Sounds good.

10            MR. COLODNY:  Five minutes?

11            MS. BRIER:  Do you want to break

12       for lunch or --

13            THE STENOGRAPHER:  Do you want to

14       go off the record for this?

15            MS. BRIER:  Yeah, let's go off

16       the record.  Yes.

17            THE VIDEOGRAPHER:  All right.

18       The time is currently 12:33 p.m., and

19       we are going off the record for Media

20       Unit No. 2 of today's testimony.

21            (Whereupon, a recess was taken at

22            12:33 p.m.)

23            THE VIDEOGRAPHER:  All right.

24       The time is currently 12:44 p.m.  This

25       is continuation of Media Unit No. 2 of

153

1        today's testimony.

2              And we are back on the record.

3   BY MR. COLODNY:

4        Q.   One question to follow up on

5   something we discussed before.

6              So when customers transferred

7   property to the earn program, you said that

8   they transferred title to the earn program.

9              How could they then take out a

10  loan with that property they had

11  transferred being collateral for that loan?

12             MS. BRIER:  Objection to form.

13             THE WITNESS:  Yeah.  So, I mean,

14        the way I -- I don't have these --

15        these terms memorized, but essentially

16        you would be foregoing the rewards that

17        you were -- so let me take a step back.

18             When you transfer title, you do

19        that in exchange for rewards that you

20        receive for giving the company your

21        coins.  When you wanted to then borrow

22        funds from the company, you would

23        forego those rewards that you are

24        exchanging your coins for.

25             So you basically give up your

154

1        rewards, but then get the ability to

2        borrow coins.

3   BY MR. COLODNY:

4        Q.   And what was the collateral that

5   the company was holding?

6        A.   The coins that had been

7   transferred to the company already.

8        Q.   And where was that collateral

9   held?

10              MS. BRIER:  Objection to form.

11              THE WITNESS:  Where was it held?

12              In the company's -- you mean,

13        like -- are you asking about, like --

14        like, what wallet?

15   BY MR. COLODNY:

16        Q.   Right.  When I think about having

17   collateral, you have an asset that you can

18   execute on if someone doesn't repay their

19   loan.

20              Where were the Bitcoins that were

21   held as collateral, using Bitcoin as a

22   general cryptocurrency, for a loan held by

23   the company?

24              MS. BRIER:  Object to form.

25              THE WITNESS:  Where were they

155

1       held?  Yeah, I think this is -- this

2       has been discussed, like, many times,

3       like, in other kind of venues.  But

4       there's really no material difference

5       between the way coins in earn and coins

6       that were collateral were treated.

7   BY MR. COLODNY:

8       Q.   So do you have an understanding

9   of how the company could hold collateral

10  that it didn't actually hold that was

11  deployed?

12          MS. BRIER:  Objection to form.

13          THE WITNESS:  How could...

14          I mean, the -- it would have

15      been, like, just -- logically, it would

16      be using the same -- the same

17      mechanisms for securing the -- its own

18      assets that it -- that it did for -- I

19      mean, in every other aspects.

20          So, for example, if it were

21      lending it out to an institution, it

22      should have done -- you know, it should

23      have performed creditworthiness check,

24      you know, to make sure it had

25      confidence it would be able to get

156

1          those loaned assets back or had

2          sufficient collateral to protect -- you

3          know, to protect against losses.

4                  And, I mean, without -- without

5          stepping through each one of those

6          things, like, the company should

7          have -- should have been taking steps

8          to make sure that that collateral

9          was -- was accessible.

10     BY MR. COLODNY:

11          Q.   But there was no separate wallet

12     or structure to hold collateral, correct?

13                  MS. BRIER:  Object to form.

14                  THE WITNESS:  That is my

15          understanding.  We basically -- we went

16          through this kind of in the custody

17          declaration.

18                  There was a main wallet, and

19          coins that were held in that main

20          wallet were -- other than the funds

21          that were there on their path to the

22          custody account, were eligible for

23          deployment.

24     BY MR. COLODNY:

25          Q.   Is there any way for the company

22-10964-mg   Doc 1504-3   Filed 11/29/22   Entered 11/29/22 17:30:18   Exhibit C
In Re - Celsius Network LLC                Pg 41 of 57                              Oren Blonstein
                                         Confidential                         November 22, 2022

                                                                                        157

1    to trace a coin that was deposited in earn

2    to a specific customer?

3          A.    Deposited...

4                So it's, like -- it's -- the

5    other way we can trace.  So as they come

6    in, we can -- we know where they came from,

7    obviously.  I mean, we know the blockchain

8    address that the coins came from.

9                Once they go into the omnibus

10   wallet, they're pooled, and they're largely

11   fungible.  Depends a little bit on the

12   blockchain, if you want to get into the --

13   you know, whether it's an account-based

14   blockchain or a UTXO blockchain.

15               But largely, they're fungible,

16   and you can't distinguish between the

17   coins.

18         Q.   So if I, Aaron Colodny, deposited

19   a Bitcoin in 2021 into Celsius, there's no

20   way to point to the coins that Celsius has

21   now and say, that one coin is

22   Aaron Colodny's Bitcoin?

23         A.   We --

24               MS. BRIER:  Objection to form.

25               THE WITNESS:  We treated them as

158

1      fungible.  So since you used Bitcoin as

2      an example, Bitcoin is UTXO blockchain.

3      So technically every single transaction

4      has a dependency on the prior

5      transaction.  So you could trace

6      fractions of your coin.

7           But your -- what started out as

8      your, let's say, three Bitcoin might

9      have been split into millions of

10     fractions of a Bitcoin.

11          And so, yeah, could we trace

12     every fraction of those?  It's possible

13     to do that.  I mean, that's what the

14     blockchain is for.  But practically

15     speaking, that's not how we looked at

16     the coins.  We treated them as

17     interchangeable.

18  BY MR. COLODNY:

19     Q.   Do you have an idea of what it

20  would take to trace every single coin that

21  was deposited into Celsius to figure out

22  where it ultimately landed?

23          MS. BRIER:  Objection to --

24     objection to form.

25          Sorry.  Outside the scope.

159

1          Go ahead.

2          THE WITNESS:  Yeah.  I mean,

3      that's only really possible with UTXO

4      blockchains.  And so, like, for the

5      vast majority of the assets on the

6      platform were Ethereum-based, ERC-20s,

7      where that's not really realistic.  I

8      mean, that's not possible.

9          For the UTXO blockchains, that

10     would be a massive undertaking.  I

11     don't know of any -- any CeFi

12     institution that tries to do that.

13 BY MR. COLODNY:

14     Q.   And you would be trying to trace

15 millions of -- hundreds of thousands of

16 customers to millions and billions of

17 assets?

18     A.   That's right.  And, again,

19 just -- you know, so if you have an address

20 that has three Bitcoin, you know, the

21 result -- like, if you -- let's say

22 somebody wanted to withdraw 10 Bitcoin.

23          We might collect the three

24 Bitcoin from the address that you sent it

25 to and then, you know, one other from seven

22-10964-mg   Doc 1504-3   Filed 11/29/22   Entered 11/29/22 17:30:18   Exhibit C
In Re - Celsius Network LLC
Pg 44 of 57
Confidential
Oren Blonstein
November 22, 2022

160

1   other addresses to piece that together into

2   10 Bitcoin that we would send to someone

3   who made a withdrawal request.

4           So it's -- yeah, it's very

5   complicated to do that.

6       Q.   So you said before that you

7   weren't involved in the product rollout of

8   solicitation of acceptances for Version 6

9   of the terms of use, correct?

10      A.   That's correct.

11      Q.   And I believe you mentioned that

12  Roni -- and I'm blanking on the

13  individual's name?

14      A.   Yarden.

15      Q.   Yarden was the head of product --

16      A.   Oh, sorry.

17      Q.   Not head of product, the product

18  head or -- of the Version 6 rollout?

19          MS. BRIER:  Object to form.

20          THE WITNESS:  So there was --

21      there was Roni, in his capacity as kind

22      of head of regulatory or the -- you

23      know, the person who kind of -- you

24      know, person at the top of the

25      regulatory.

22-10964-mg   Doc 1504-3   Filed 11/29/22   Entered 11/29/22 17:30:18   Exhibit C
In Re - Celsius Network LLC                                          Oren Blonstein
Pg 45 of 57                              November 22, 2022
Confidential

303

1   correct?

2           MS. BRIER:  Objection.  Outside

3      the scope.

4             You can answer.

5           THE WITNESS:  The -- so what I

6      was saying is that it's difficult to

7      trace the exact coin -- the exact coin

8      that a person -- an ERC-20 that a

9      person deposited into our platform as

10     it moved throughout the platform in

11     terms of -- you know, we treated them

12     as fungible once they came into the

13     platform.

14  BY MR. CREWS:

15     Q.   Makes sense.

16          So in the UTXO, you're seeing the

17  flow from wallet to wallet?

18     A.   Exactly, yeah.

19     Q.   Have you taken any steps as a

20  company to make sure that customer deposits

21  are going towards earning rewards for them?

22          MS. BRIER:  Objection to form.

23     And objection to scope, but you can

24     answer.

25             THE WITNESS:  Sorry.  Just

304

1    repeating...

2           So we maintain a record of coins

3    that our customers send to us on that

4    ledger, and then there's the coin

5    movements.

6           You know, and -- almost

7    regardless of what actually was going

8    on with those tokens that they sent in,

9    we were calculating based on the reward

10   rate what -- what rewards were owed to

11   them on the ledger.

12          So kind of regardless of, like,

13   where their coin was or if -- if a

14   particular coin that was sent -- that

15   was sent in was actually loaned out or

16   deployed on DeFi, that didn't really

17   matter, because how we calculated the

18   rate was -- or the rate that we set was

19   used by the software that calculated

20   the obligation to the customer on the

21   ledger.

22   BY MR. CREWS:

23          Q.   Yeah.  So a customer such as

24   myself, we could see the obligation that

25   we're owed, but in order for the reward to

22-10964-mg   Doc 1504-3   Filed 11/29/22   Entered 11/29/22 17:30:18   Exhibit C
In Re - Celsius Network LLC
Pg 47 of 57
Confidential
Oren Blonstein
November 22, 2022

305

1    be useful, Celsius would presumably have to

2    be actually using our deposit to actually

3    earn something?

4            MS. BRIER:  Objection to form.

5        Outside the scope.

6            THE WITNESS:  No, no.  I mean,

7        it's the -- it's -- I was gonna make

8        the point -- if I understood you

9        correctly, making kind of the opposite

10       point is that it doesn't -- you know,

11       those coins could have sat there and

12       not been deployed at all and we may

13       have not generated any yield.

14           But we would have calculated --

15       you know, the -- their interest rate

16       would have been -- there -- an interest

17       rate would have been set or rewards

18       rate would have been set and the ledger

19       would be calculating what is owed to

20       you based on that rate.

21           So it was kind of -- you know, it

22       was -- the activity of the coins was

23       separate from the rewards that were

24       paid out.

25   BY MR. CREWS:

306

1      Q.   So was the reward paid out

2   calibrated to the deployment activities?

3            MS. BRIER:  Objection to form.

4        Outside the scope.

5            THE WITNESS:  Yeah.  So I

6        should -- I mean, I was not involved in

7        setting rates.  I was not involved in

8        the payouts.  I was not involved in the

9        ledger.  I was not involved in -- you

10       know, like, almost all of those things.

11           And obviously, you know, kind of

12       the proof is in the pudding, right?

13       And the output is that obviously the

14       deployment activities were not

15       sufficient for the rates that were --

16       the rates that were advertised.

17  BY MR. CREWS:

18      Q.   So would you say that assertions

19  that 8 percent of revenues go towards

20  paying rewards would be inaccurate?

21           MS. BRIER:  Objection to form.

22       Outside the scope.

23           THE WITNESS:  Yes.

24  BY MR. CREWS:

25      Q.   And can you provide any

307

1    assurances that deposits that customers

2    made did not go towards paying out

3    departing customers?

4              MS. BRIER:  Objection to form.

5        Outside the scope.

6              THE WITNESS:  No, I can't.

7    BY MR. CREWS:

8        Q.   I want to do a screen share.  And

9    this is the exhibit I emailed the court

10   reporter.  Sorry, not my email box.  One

11   second.

12             So this was prepared looking at

13   the SOFA report in combination with the 974

14   document of balances.  And what's depicted

15   here from the left is a customer -- a

16   corporate customer based in Australia, who

17   deposited 131,000 USDC into their Celsius

18   account on 8:28 a.m., the date of the pause

19   on June 12.

20             Now, this specific entry in the

21   SOFA report is on page 5448.  And it was

22   used -- essentially a query -- pull the

23   transaction from the blockchain to show

24   that this was funded from their Binance

25   account.

308

1            So at 8:28, $131,000 flowed from

2    this customer's Binance account into their

3    personalized deposit address at Celsius.

4    Five minutes later those funds went into

5    Celsius's wallet No. 5.

6            There were nine transfers

7    throughout the day into a Celsius

8    frictional wallet, as you've referred to

9    it, and I believe you said it is a Celsius

10   terminology.

11           There was one particular

12   transfer, 8:41 a.m., in the amount of

13   $789,000 USDC, and there were a total of

14   7 million transfers and nine different

15   transactions that day, which were in the

16   table below.

17           Later that day, there were

18   withdrawals made by two separate customers,

19   refer to this as customer B and customer C,

20   at 5:19 p.m.  $99,000 were withdrawn to

21   this person's personal deposit address at

22   FTX, and it was then transferred internally

23   to their comingle address.

24           Another customer at 5:04 p.m.

25   withdrew $36,000 into their Coinbase

309

1   personalized deposit address and another

2   $100,000 just later.

3          Assuming that this exhibit is

4   accurate, would it be plausible for

5   customers B and C to the right to think

6   that their -- or, sorry, for customer A to

7   think that customers B and C were receiving

8   their USDC?

9          MS. BRIER:  And, Mr. Blonstein,

10      before you answer, Mr. Crews, can you

11      provide some additional context for

12      this document?

13          And who created this?

14      MR. CREWS:  I created it.

15      MS. BRIER:  Where did it come

16      from?

17      MR. CREWS:  Yeah.

18      MS. BRIER:  And what is it based

19      on?

20      MR. CREWS:  It's based upon the

21      SOFA report which is 973 document, the

22      balance transfer document, 974, and

23      blockchain analysis that I've

24      conducted.

25      MS. BRIER:  So, Mr. Blonstein --

310

```
 1        objection to foundation and outside the

 2        scope.

 3              And, Mr. Blonstein, to the extent

 4        that you can verify and know the

 5        information that he's asking you about,

 6        you can answer in that context and that

 7        context only.

 8   BY MR. CREWS:

 9        Q.   Perhaps first we can start, would

10   the flow of funds from a personalized

11   deposit address into Celsius's wallet

12   No. 5, into a frictional wallet, is that

13   consistent with your understanding of how

14   transfers work with Celsius?

15              MS. BRIER:  Objection to form.

16        And outside the scope.

17              THE WITNESS:  Should I -- okay to

18        answer, or...

19              MS. BRIER:  That question you can

20        answer.  To the extent he's asking you

21        questions about this chart, I would

22        answer if you know and understand that

23        what's there is true, and only if you

24        know what's there is true.

25              THE WITNESS:  I think some of
```

22-10964-mg   Doc 1504-3   Filed 11/29/22   Entered 11/29/22 17:30:18   Exhibit C

In Re - Celsius Network LLC

Pg 53 of 57

Confidential

Oren Blonstein

November 22, 2022

311

1    this is in line with my declaration on

2    the custody -- my concern -- my custody

3    declaration and the flow of coins

4    between wallets.

5         So the personalized deposit

6    address in the declaration, we call

7    those the bridge -- bridge wallets, and

8    those were periodically swept to a main

9    wallet, which maybe you're calling

10   wallet No. 5.

11        And then that is true that

12   periodically assets were moved from the

13   main wallet into frictional.  Also

14   true.

15        I mean, you know, my

16   understanding is that, like, because

17   this is a pooled account -- a pooled

18   wallet, it's not -- I don't think it's

19   like a -- it's not necessarily a good

20   conclusion to make that if you're

21   saying that the customer on the

22   right -- the customers on the right

23   were -- that's what I think your

24   question was.

25             Should the customers on the

312

1        right -- or should the customer on the

2        left think that the customers on the

3        right were withdrawing his coins -- his

4        or her coins, is that -- that was

5        your...

6   BY MR. CREWS:

7        Q.   Yeah.  Essentially, I think I'd

8   agree with you that when it comes to --

9   it's essentially similar to once you have

10  commingled funds in an account, you can't

11  specifically say that, you know -- like,

12  it's basically if you're pulled over by a

13  cop and you say, I pay your salary.  You

14  can't really say that, although maybe it's

15  true in a sense.

16       A.   Uh-huh.

17       Q.   But I suppose it was -- do you

18  think that -- put it this way, is there any

19  measure that Celsius has taken to prevent

20  commingling such that customer A wouldn't

21  think that their funds are just going to

22  pay out departing customers?

23            MS. BRIER:  Objection to form.

24       This is far outside the scope of the

25       terms of use issues that we're here to

22-10964-mg   Doc 1504-3   Filed 11/29/22   Entered 11/29/22 17:30:18   Exhibit C
In Re - Celsius Network LLC                                                          Oren Blonstein
Pg 55 of 57                                            November 22, 2022
Confidential

313

1  discuss today.

2        You can answer, if you know.

3        THE WITNESS:  Yeah, I mean,

4  it's -- yeah, it's pretty far outside

5  of what I worked on.  You're asking

6  about what measures were in place to --

7  you know, because of the -- what

8  measures were in place to potentially

9  prevent something like that from

10  happening.

11        Funds were commingled.  Coins

12  were commingled.  So it's very hard to

13  make that conclusion.

14        Like, you know, you're not -- in

15  this diagram, you're not necessarily

16  reflecting that other withdrawals might

17  have been made at this time to --

18  sorry, not withdrawals -- deployments

19  may have been made from wallet No. 5

20  to, you know, institutions that were

21  borrowing or to DeFi.

22        You know, other customers may

23  have deposited -- the same customers,

24  for instance, that you're showing on

25  the right may have also deposited.

314

1          So there's a lot of other -- so

2      there's a lot of other possibilities.

3          And I think, you know, the --

4      this is why generally a lot of the CeFi

5      crypto industry, the centralized crypto

6      industry has defaulted to this kind of

7      setup is that operationally this is

8      simpler to manage.  You're not trying

9      to have to track individual user coins

10     and -- you know -- you know, the

11     simplicity of having a pool of assets.

12         But, yeah -- so, I mean, that's

13     my answer.

14  BY MR. CREWS:

15     Q.   I'd like to move on to questions

16  regarding the API agreement with partners.

17         Are you aware that Vermont issued

18  a cease and desist letter, Docket

19  No. 22-021-S?

20         MS. BRIER:  Objection to form.

21     Outside the scope.

22         THE WITNESS:  I mean, I was aware

23     that there were many -- many states

24     were sending us -- yeah, we were --

25     yes.  I mean, I don't know -- actually

315

1        know of that specific document, but I

2        do remember Vermont had sent us -- had

3        sent us something.

4    BY MR. CREWS:

5        Q.   I have this excerpt from

6    Vermont's letter that I'd like you to read,

7    Sections 27 through 28.  And then 29 as

8    well.  I could read aloud.  It's about the

9    Celsius API partner program.  27 says --

10               MS. BRIER:  Can you read this,

11        Oren?

12               THE WITNESS:  I can't read what's

13        on the screen.

14               MR. CREWS:  I can make it bigger.

15               MS. BRIER:  And, Mr. Crews, can

16        you give us more detail on what you're

17        showing?  I can't read it myself.

18               MR. CREWS:  Yeah.  This is

19        describing the Celsius API partner

20        program in the letter that Vermont

21        sent.

22               MS. BRIER:  What page are you on,

23        for the record?

24               MR. CREWS:  It's on page 6 of the

25        document.