**Hearing Date / Time: December 20, 2022, 10amET**
**Objection Deadline: January 13th, 4pmET**

Michael Benzaken
*Pro se Celsius creditor*
michael.benzaken@gmail.com

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*, [1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered.) |
| | ) | |

**NOTICE OF HEARING ON MICHAEL BENZAKEN'S MOTION SEEKING A RULING FROM THIS COURT THAT THE STABLECOINS AND ASSETS HIS EARN ACCOUNTS ARE NOT PROPERTY OF THE ESATE, THAT THE ASSETS AND COLLATERAL ON HIS ACCOUNT ARE ALSO NOT PROPERTY OF THE ESTATE, AND THAT ALL OF THE DIGITAL ASSETS HELD WITHIN HIS EARN ACCOUNT BE RECATEROGIZED AND TREATED NO DIFFERENTLY THAN THOSE ASSETS HELD WITHIN HIS CUSTODY ACCOUNTS UNDER 11 USC § 541.**

I, Michael Benzaken, a Pro se unsecured Celsius Network LLC *et al.* creditor, an unaccredited investor, with residence in the State of New Jersey, USA, hereby humbly submit this motion (the "Motion") for the entry of an order, substantially in the form attached hereto per Exhibit A (the "Proposed Order"), that the ownership of the stablecoins (Doc 1325) are not property of the estate, that the assets in Earn are not property of the estate (Doc1325), that the digital assets in my Celsius account, both Earn and Custody and any associated collateral thereto, are not property of the estate, that I am the sole owner and title holder of the digital assets in my Celsius account, and that all digital assets in my Celsius account recategorized and treated no differently than those assets in so-called Custody, and that at no time was the digital assets in my account the unconditional property, title and ownership, of the estate under 11 USC § 541.

**PLEASE TAKE NOTICE** that a hearing on Michael Benzaken's Motion Seeking a Ruling From

This Court That Stablecoins and Assets in Earn Currently Held by Celsius *et. al.* are not property of

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

the estate, that Michael Benzaken's Returned Collateral, Outstanding Collateral, as well as all Assets

on his Celsius User Account, Are Not, Nor Have They Ever Been, Nor Ought They Ever Be Property

of the Estate Under 11 USC § 541 (the "Motion") will be held on December 20, 2022 at 10:00am

(prevailing Eastern Time) (the "Hearing").

**PLEASE TAKE FURTHER NOTICE** that in accordance with General Order M-543 dated March

20, 2020, the Hearing will be conducted remotely using Zoom for Government. Parties wishing to

appear at the Hearing, whether making a "live" or "listen only" appearance before the Court, need to

make an electronic appearance through the Court's website at https://ecf.nysb.uscourts.gov/cgi-

bin/nysbAppearances.pl. Electronic appearances (eCourtAppearances) need to be made by 4:00 p.m.

(prevailing Eastern Time), the business day before the Hearing (i.e., on December 19, 2022).

**PLEASE TAKE FURTHER NOTICE** that due to the large number of expected participants in the

Hearing and the Court's security requirements for participating in a Zoom for Government audio and

video hearing, all persons seeking to attend the Hearing at 10am (prevailing Eastern Time) on

December 20, 2022, must connect to the Hearing beginning at 9am. (prevailing Eastern Time). When

parties sign in to Zoom for Government and add their names, they must type in the first and last

name that will be used to identify them at the Hearing. Parties that type in only their first name, a

nickname or initials will not be admitted into the Hearing. When seeking to connect for either audio

or video participation in a Zoom for Government Hearing, you will first enter a "Waiting Room," in

the order in which you seek to connect. Court personnel will admit each person to the Hearing from

the Waiting Room after confirming the person's name (and telephone number, if a telephone is used

to connect) with their eCourtAppearance. Because of the large number of expected participants, you

may experience a delay in the Waiting Room before you are admitted to the Hearing.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections to the relief requested in

the Motion shall: (i) be in writing; (ii) conform to the Federal Rules of Bankruptcy Procedure, the

Local Bankruptcy Rules for the Southern District of New York, and all General Orders applicable to

chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York; (iii)

be filed electronically with the Court on the docket of In re Celsius Network LLC, No. 22-10964

(MG) by registered users of the Court's electronic filing system and in accordance with all General

Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District

of New York (which are available on the Court's website at http://www.nysb.uscourts.gov); and (iv)

be served so as to be actually received by January 13, 2022, at 5:00 p.m. (prevailing Eastern Time),

by (a) Michael Benzaken, the undersigned *pro se* creditor, (b) the entities on the Master Service List

available on the case website of the above-captioned debtors at https://cases.stretto.com/celsius, and

(c) any person or entity with a particularized interest in the subject matter of the Motion.

**PLEASE TAKE FURTHER NOTICE** that only those responses or objections that are timely filed,

served, and received will be considered at the Hearing. Failure to file a timely objection may result in

entry of a final order granting the Motion as requested by Michael Benzaken(as defined in the

Motion).

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion and other pleadings filed in these

chapter 11 cases may be obtained free of charge by visiting the website of Stretto at

https://cases.stretto.com/celsius. You may also obtain copies of the Motion and other pleadings filed

in these chapter 11 cases by visiting the Court's website at http://www.nysb.uscourts.gov in

accordance with the procedures and fees set forth therein.

**Dated: November 21, 2022**
**Fort Lee, New Jersey**

**/s/ Michael Benzaken**
**Michael Benzaken**
**michael.benzaken@gmail.com**

Your Honor,

Kindly consider the following facts as to why I assert this Motion:

First, all stablecoins and assets in Earn accounts currently held by Celsius *et. al.* are not nor have ever been, and ought never be considered property of the estate but rather the sole property of the creditors like myself who deposited them, both ownership and title. That all of digital assets held within my Earn and Custody accounts are, have always been, and should always remain my property, both ownership and title. I humbly request the following arguments be ruled on in the affirmative in favor of the creditors owning the assets they deposited into Celsius due to the clear and unambiguous language in Celsius's Terms of Use (herein, the "TOU"), Terms of Use Representations as in the consumer-facing notifications alerting the user as to the changing conditions to be in effect within the Celsius app (herein, the "TOU Representations"); the associated Loan Agreements (herein, the "Loan Agreements"); specfically, the consistent clause across Loan Agreements unchanging relative to their associated TOU, the clause termed by Celsius *et al.* as The "Borrower's Representation," which expressly states the ownership of the assets and collateral and the that the language therein would supersede any other language contradicting such ownership claims existed in associated TOUs or any other Agreement, Kindly note that I do not believe such ambiguous language exists, and focus on the alleged ambiguous language along with the surround unambiguous language per TOUV5-8 in association with the Loan Agreement, for Earn and Custody alike.

I will conclude this argument with what I believe to be definitive proof of ownership to be of the creditors, that is, amongst other points I will argue, in the very practice of Celsius *et al.* regarding the absence of 1099 forms to conclude a sale had been made (thus, indicating they had no intent and did not believe at any point the unconditional ownership of depositors' assets was transferred to Celsius), as supported by case law and outline in (cite). Further, this critical question at hand, who owns the assets, Celsius or the creditors, could be easily solved by a cursory glance at Celsius' internal book-keeping practices and 2020 tax filings.

Secondly, I assert and will hereafter support that no ruling ought to be made on the basis of so-called Earn accounts (herein, "Earn") and so-called Custody accounts (herein, "Custody"), due to commingling of assets as demonstrated by Ms. Pillay per the Interim Examiner Report (Doc 1411). Further, as indicated by a Celsius Shareholder on Twitter,  Celsius, assets were moved without the consent or knowledge of the depositor, across Earn and Custody account type (Exhibit F), ostensibly in furtherance of maintain sufficient liquidity in the ill-prepared Custody feature. Lastly, due to TOUV5-8 Clause #15, which outlined the conditional state whereby title and ownership would be made furtherance of providing the services and can thereafter be withdrawn at any time, and since we no longer have the optionality to withdraw from Earn and since services we could both withdraw from earn at any time, no language to the contrary, and the services within earn are  no longer being rendered, that all Earn Assets by virtue of opt-out optionality and moreover, the stopping of the services with which the conditional rights were temporarily handed over,  for all users be migrated into their respective Custody account and any legal determination made hereafter be made on merely Custody accounts and all collateral retuned to unaccredited users following the hastily engineered bifurcation of accounts on April 15, 2022, be treated as having been sent to custody and thus bound to the TOU thereof Custody. This would impact all my retuned collateral following that date, information to be provided.

**Argument 1 – User Stablecoins and assets in Earn are not part of the estate, all of Michael Benzaken's stablecoins in across account types and assets in Earn and Custody are not property of the estate, nor have they ever been property of the estate, per clear and unambiguous contract law and NY precedent regarding a single point of what some argue is ambiguity relative to asset ownership whilst receiving the services in earn, services that are no longer being rendered.**

1. Per TOU Versions 5-8 (Doc 393, paged 217 - 577), the contract language is clear and unambiguous that the digital asset transferred into the Celsius App, from TOUV5-8, both title and ownership, no matter the account type, is that property of the creditors. This is contrary to the claim made by the Interim Examiner's Report (Doc 1411), claiming from TOUSV5 onward that assets in the Earn Program and subsequently user Earn accounts had been transferred. As I see this conclusion as a material threat to the well-being of the creditors and a complete misreading and misrepresentation of the TOUs, TOU Representations, and Loan Agreements for my Earn account, I have dissected TOUV5 (after having concluded the positions taken thereafter applied through TOUV8) to demonstrated the court in detail the numerous ways in which the Ms. Pillay's conclusion is wrong and in fact the very opposite is true and clearly so through the clear and unambiguous language of contracts with which the users were bound since the matter of ownership speculation came into focus, TOUV5. Further, I have isolated specifically where in TOUV5 (while holding true for TOUV5-8), where one could potentially claim otherwise. I do this by contextualizing the claim into the entirety of the TOU, whereby in my opinion definitively demonstrates that no reasonable person would conclude any such unconditional transfer of asset title and ownership ever occurred as a result of any contract binding the user, his/her assets, and Celsius *et. al.*

2. Per Celsius Loan Agreements (Doc 393, pages 789-965), I have provided a table that correlates the TOUs with the Loan Agreements that Ms. Pillay alleged impacted general asset title ownership (Exhibit C) and the effective time periods, beginning with TOUV#5. Note that Loan Agreement Version # and TOU Version # differ in this effective period, and so this table will help illustrate which loan agreement was in effect during the correlating TOU. This, in my opinion, is what is colloquially referred to as a "legal kill-shot," 1 of only several I intend to mention in this motion. Every single Loan Agreement available to Earn account holders, contained a stipulation that made it clear and unambiguous that the collateral and returning owner was that of the creditor and that this stipulation regarding ownership superseded any potentially conflicting terms/language in the associated TOU. Your honor, I present to you, my first hopefully agreed upon legal kill shot within all Loan Agreement available to myself and I would assume virtually all other Celsius users , the great "Borrower's Representation," per Exhibit D.

   a. Without reiterating the language, it is clear and unambiguous that: the User (regardless of the account type), could take out a loan against his/her digital asset, that the user owned the collateral, and that once the loan was paid, the returning collateral (now asset) was again, owned by the creditor. Further, once the loan was paid, the leveraged asset was then to be returned to the "Celsius User Account" and not the originating user account type (i.e., Earn or Custody).

   b. Finally, as pertinent to Loan Agreements and asset ownership, the Loan Agreements state explicitly that the loan collateral is owned by the creditors. It is to follow that the transfer of ownership and title never occurred (even in furtherance of this particular service), and therefore follows, since loans were not restricted at any time

for myself personally out of Earn, that all of digital assets within my Earn account no property of the estate by rather owned by myself, as is the case for all others in Earn (the creditors).

    i. Finally, there is what is colloquially referred to as the Basic-B Argument, or <u>Basic-Basic Argument</u> (not aware of the specific legal terminology), which draws attention to clear and unambiguous <u>actions</u> that cannot occur if such transference of ownership actually occurred… which it did not. Several Basic-Bs for your enjoyment:

        1. One cannot take a loan out against an asset one does not own.

        2. One cannot withdraw an asset one does not own.

3. All TOUs regarding asset ownership and title are clear and unambiguously in favor of the creditors on their own(TOUV5-8). Further, this is position of asset ownership be the creditors in, in my opinion, demonstrated definitively by the associated TOU Representations and Loan Agreements. Such TOUs and the associated Loan Agreements have been correlated along with their respective effective dates and provided in Exhibit C.

    a. In furtherance of dispelling any claims that ownership and title of the digital assets across account types are not property of the estate, I focus on clause #14 of TOUV5-8, that contract language which has been typically referred to as being ambiguous, and demonstrate how the clear and unambiguous language throughout the TOUs with which this clause is embedded, nullifies such ambiguity in favor of the creditor per Exhibit C, ironically named, "*Consent to Celsius' Use of Your Digital Assets*" (D.R. 393, pages 217). One we have taken a moment to enjoy the fact this this is title of the clause at the very the crux of the ambiguity piece, we should follow that enjoyment by definitively dispelling that is such ambiguity did in fact exist, such ambiguous language would default to terms favorable to the creditors per the Eric Wohlmend Objection (Doc 1430, Pg 12), under New York, and in short, for good reason[2].

4. Per the Blonstein report (cite), who conveniently elected to utilize TOUV6 to demonstrate Celsius *et. al.'s* adhered to regulatory mandate regarding the legal obligation of Celsius *et. al.* by providing TOUV6 Representations, to sufficiently notifying the customer of any material change occurring from a new TOU to be in effect. I say convenient because the critical matter at hand is answering the question: who owns the assets currently held by Celsius *et al*, the estate or the creditor? Ms. Pillay claimed this material change of TOU occurred in TOUV5 while the Mr. Blonstein, the Chief Compliance officer at Celsius *et al.* in his rather detailed Blonstein Declaration, decided to use TOU Representations based on TOU5-6 changes without any note to a material change in the TOU. If such a material change had occurred, he must certainly would have conducted the exercise for TOUV4-5 representation, but since no material change relative to general asset ownership change in furtherance of the services in earn, he did not supply the public who those TOU Representations and I am willing to bet if he did, they would have made no mention of something that never occurred,

---

[2] The Eric Wohlmend Objection (Doc 1430) - Under New York law, any ambiguity in a contract must be construed against the drafter. See, Aron Sec., Inc. v Unkechaug Indian Nation, 151 A.D.3d 674, 676; 54 N.Y.S.3d 668, 671 (NY Supreme Court, Appellate Div., Second Dept. 2017). As stated above, the Debtors' EARN customers had no role in actually negotiating the terms of the Terms of Use, EARN Terms, SWAP Terms, and Risk Disclosure. Those agreements are wholly the product of the Debtors and the only role the EARN customers played in the process was to have to click "accept" to continue being a customer of the Debtors. As such, the contract must be strictly construed against the Debtors.

as Mr. Blonstein seemed to understand his job and executed it faithfully. Still, such an area of discovery would be in the interest of settling this question, if your honor feels the other arguments that I have made are insufficient.

5. One of my strongest argument relative to asset ownership focuses on the taxable event that would have occurred if the assets in Earn, per TOUV5-8, where in fact ever considered to have been swapped hands from the depositor to Celsius. There are various considerations and some case law that supports the notion that at no point was TOUV5-8 and specifically TOUV5-8, Clause #14 (the allegedly ambiguous clause was ever so much considered by the very company that wrote and individuals who approved it to be interpretated as a change of ownership between the Earn depositor and Celsius in pursuance of the Earn services.

   a. It is my firm believe that in the US, when we speak truthfully and admit our faults, justice will prevail. As such, I submit for your consideration, your honor, that Celsius *et al.* was not a criminal enterprise attempting to defraud the IRS. The only way the transfer of asset title and ownership may occur would be by the asset being gifted (max $15k per recipient entity), donated (to a nonprofit, which Celsius Network is not), or sold. Any gift over $15k, donation, and sale is a taxable event and thus would be itemized different in kind than all other transactions to comply with Federal/State tax law and report individuals or company's taxable earnings and credits. While I personally do not have access to Celsius Network's 2020 filings, which would have been following the alleged TOUV5 material change related to asset ownership to be transferred from the user to Celsius in the Earn program and then Earn account respectively, I am willing to bet all my digital assets (read, nearly my entire life savings) that Celsius *et al.* was accurate, diligent, and compliant in regard to their internal book-keeping and subsequent tax filings and had not made any attempt to evade any taxable event that would have increased their taxable earnings.

   b. Further, I am willing to bet my remaining resources, mainly the computer with which I have used to type this motion, cloths, and whatever is left of my IRA, that not 1 single Celsius Network executive filed their personal taxes noting, assuming they were also creditors i.e., Simon Dixon, that a taxable event had occurred while within Earn TOUV5-8. Why? It would appear they are all law-abiding citizens and at no point prior to their Chapter 11 filings was the TOU language and the 'Borrower's Representation' clause, virtually unchanged across all TOUV5-8, within the Loan Agreement, with clear and unambiguous language asserting the ownership is that of the loaner (creditor), with contract language asserting clearly this clause supersedes any conflicting terms, notably, what some construe as ambiguous language relative to ownership in Clause #14 of the TOUV5-8, whereby asserting definitively the asset ownership is that of the creditors that can be withdrawn at any time following repayment, withdrawn without mention of that constituting a change in ownership/title and thus creating a taxable event. To further reiterate Celsius et al.'s own position on if asset ownership transferred to Earn was to change hands outside in furtherance of the services (so in any meaningful way which they would need to represent in a TOU Representation… which we have no evidence of) the following language in each TOU tells us exactly how Celsius et. al. felt about TOU5-8, asset ownership… simply, hat no genera ownership of the assets ever occurred by simply depositing or having deposits within Earn, per the following language:

*"Within Celsius' platform, you will be able to see a record of the transactions related to your use of the Services which you may wish to use for the purposes of making any required tax filings or payments."*

As for the record of the transactions relative to, this is important in respect to earn and ownership of assets while even in pursuance of the services, note the wording "related to your services." So, if V5-8, Clause #14 Earn was in anyway ambiguous, per their own admission, any alleged language ambiguity ought to be consider no longer ambiguous. <u>Even "in pursuance of the services"</u> in earn, at no point did Celsius intend, behave as if, or interrupt the no longer ambiguous language to be one where the general ownership of the digital asset in earn while in pursuance of the services themselves (the hardest argument to make regarding Earn and asset ownership while benefiting from the services), has now been clarified by Celsius.

c.  I will rely on Eric Wohlmend's Objection to nail this point home, that in the event there lies still a shred of alleged contract language ambiguity (relevant to my account and earn more broadly, that is TOUV5-8 Clause #14), that the conduct of the parties is relevant to determine the intent of the parties to a contract. See, <u>In re Lehman Bros.</u>, 439 B.R. page 825[3]. As no 1099 was provided for .csv upload, this is further evidence that the debtors didn't so much as intend to consider for a moment that ownership switched hands in respect to Earn customers' digital assets.

d.  My final argument in support of our assets being our assets, clear and without ambiguity no matter if in Earn or Custody, collateralize loan or otherwise, would be that any material change to a TOU must have been reasonably brought to the attention of the depositors and that they had reasonable time to reject (if active TOU push) or withdraw (if passive notification) their assets from Celsius. I find it unfortunate, suspicious, and urge the court to demand that Mr. Blonstein provide a complete set of TOU Representations for each the original TOUV5 when the questions of ownership of assets in Earn has been said to originate and following the bifurcating of accounts, with the creation of the Earn account, TOUV8. If these TOU Representations are provided to the court by Mr. Blondstein, and do NOT reflect a material change in asset ownership in the TOU representation, that would solidify his compliance and their interpretation of intent of said TOU changes and definitively determine asset ownership regarding earn accounts.

**Argument #2: No Ruling ought to be made with Account Type as a legal determinate (Earn vs Custody) of how different creditors with assets held in either or both Earnings and or Custody accounts. Due to the points hereafter, I argue all digital assets across Earn and Custody by reclassified as simply being in Celsius Creditor Accounts and that any ruling pertaining to these assets and the creditors who own them be treated equally and without prejudice.**

---

[3] In this instance, the Debtors' conduct leads to the conclusion that the EARN customers retained ownership of their digital assets. The Debtors' conduct includes the fact that they did not issue 1099 forms to the EARN customers upon the alleged conveyance of their digital assets to the Debtors. If the Debtors actually took title to the EARN customers' digital assets, one would believe that the Debtors would comply with the Internal Revenue Code and issue 1099 forms to their customers. The fact that they did not issue 1099 forms indicates that the Debtors did not even treat the transaction as a conveyance of EARN customers' digital assets.

1. As the Examiner asserts in the Interim Examiner's Report and I believe has definitely demonstrated that Celsius *et al.* engaged in the rampant and ongoing comingling of user assets across different  user accounts and account types (Earn and Custody). The consequence, thereof, is that no digital asset held within Celsius regardless of user transaction data can be definitively linked to the user of said asset.

    a. **Why this is important**: While one may think that one i.e., 1 $BTC is equal to another $BTC, this is assuredly not the case. Each digital asset is denominated into many fractions as represented if you will be the number of decimals that each asset type was designed to track. Thus, these decimals or fractions of said asset all have varying origin stories if you will… a journey they all took across the world until they combined to become i.e., 1 $BTC. For example, it is not unusual for individuals generally with means to people pay a sizeable premium to ensure their $BTC is composed of all origination points that would be clear of any potential OFAC infraction or "fake" $BTC as was notably found on the FTX US platform. In the wake of Ms. Pillay's report, how are we to know if the tokens in our Earn vs. Custody accounts are our own and if they are real or not? Simply put, due to the aggregate process which Ms. Pillay describes was the norm of coin transference internally by Celsius following the account bifurcating of April 15, 2022, there is simply no longer a way we can verify an asset anymore with its depositor nor can anyone really recall for certain which account, Earn or Custody, each of our tokens were at time of pause vs. where they are now. The answer to that is no. I have no way to know for certain if what has been docketed (cite) as my tokens and in which accounts are in the accounts with which I originally deposited them and have no way to tracking this if here was to be an internal audit demanded by the court. Thus, your honor, we are being asked to confirm to the court the accuracy of our holdings per account is effectively welcoming people to either give in to the numbers and not contest them or argue in furtherance of likely trying to opportunistically increase their holdings. Without an audit trail, now virtually impossible, how we can be sure of where assets are were supposed to be versus where they are now and the actual number of assets overall and per account kind.

    b. Further movement across user account types (and perhaps across user accounts more broadly) is asserted by a Celsius Shareholder going by the name of Nuke Goldstein @NukeGold on Twitter, per Exhibit F. This reveals that Celsius's internal practices in no way reflected their external policies from TUS5 onward and had engaged in what we in the industry see as having engaged in suspicious activity, having to take assets off-chain in order to transfer them across accounts to make up for liquidity shortfalls when they could have just as easily kept he assets on change (on the books, if you will) so that the movement assets under management and the movement therein by Celsius *et. al.* could provide the necessary information in the event someone had called for an audit of their transaction data and internal financials.

    c. As such, I believe it is inaccurate to say we have any idea who is holding onto whose digital assets and combined with the undocumented (in the industry, referred to as "off-chain") transactions between user earning and custody accounts, all TOUs that govern each account ought be consider null and void, and thus all user assets, as none are receiving rewards at this time (thus, services are not being rendered, which is the only reason one would be in an Earn account), ought all default into the user's

Custody account and be treated no differently in regards to legal determination of asset ownership and the order whereby the user has funds returned. All should be treated equally.

    d. Per Exhibit G – As Protos Publication published on 11.21.22, in their article: Investigation finds Celsius Custody was ploy to remain relevant, due to Celsius' inability to maintain necessary liquidity to offer such an account, which offered no custody guarantees (insurance, that would constitute actual custody services, despite such insurance being in process and never having materialized as an option with the Celsius App. I consider the Custody account to be a fluke product with no legal standing and a differentiating factor from earn, and therefore assert the only valid account type is Earn and as such all Earn and Custody should be shifted into the User account of the asset holders and to no longer differentiate between a Custody account whose services never existed. As pe the author of this article and the conclusion of his investigation, "*Celsius didn't bother to develop a custody solution" and simply offered one to its customer to "buy time".'*

2. As previously mentioned in support of Argument #1 and in great detail in Exhibit B, per TOUV5 onward, "the services" necessitated the temporary transfer of asset ownership (V5) of digital assets in furtherance of the generating yield (earn rewards) for Earn account holders. As the user can withdraw their funds at any time and since the services are no longer being rendered, the condition which has been broken and thus all assets ought to be returned to the Users full ownership and title and transferred into all Earn and Custody accounts be removed, at least by name, and all digital assets placed in the rightful owners'(read: creditors') unambiguously wholly owned Celsius wallet.


**Your Honor,**

As an aside and pls forgive me if I am speaking out of turn. I do not know if you have had the opportunity to hear what's happening outside that which is told to you and handed to you by the major players in this case. As such, the following I see as my opportunity to inform you on the general consensus formed outside the amin parties with whom you are in frequent contact, which I believe represent that of the majority of the most concerned unsecured creditors based on their online activity and ongoing involvement in this case.

    Thus, it is in my opinion that since no Earn services are longer being rendered, all assets unambiguously owned that are permitted to be withdrawn at any time by the creditors who own aid assets are to be recategorized and treated no differently that those asset in Custody and bound to Custody TOU. As such, in the months ahead, in the event of a return of creditors' assets to their rightful owners, the creditors, there ought to be given no preferential treatment regarding the order with which the funds are received and, furthermore, any shortfalls within any said grouping of creditors should land evenly across the creditors. Finally, in the event of a successful bid, those with the greatest shortfalls should be recipients of a fair increase in equity offered relative to the other creditors.

    As my only aside, your Honor, it is important to realize that people are suffering and it's easy to get caught up in the legal weeds. If you gave me 2 months and 5% of W&Cs budget, I could nearly guarantee you that I could, along with my fellow cohort of dedicated and mission-driven Pro

se individuals volunteering 8-12hr+ days/5-7 days/wk. for the past 3-4mo. now, with my connections with market makers and patent holders of game changing IP to ensure something like this is virtually unable to occur again. I hope we one day have the opportunity to speak if the law allows but kindly understand I lost everything within Celsius and have no capital as of yet to make myself heard and put together a proper proposal given while I would have all the constituent parts. Required, I would need access to the data vault and a long and had candid conversation with Kirkland. I know this is not what this motion is intended to convey, but in the event you personally read this, I wanted to make sure you knew that people are being pinned against one another, bad actors are shutting down cooperative efforts online through clear and ongoing mass flagging campaigns, and that not a single person of the over 3k we hear fairly regularly believe the UCC along with W&C are at all effective (at best) or are actively working against the best interest of the creditors. That is the sentiment in case no one is being forthright with you, I thought it best you heard it hear and I could validate that claim if your honor wished. I am President and Founder of the Citizen Warrior Foundation and we have investigated many aspects of this case and other similar cases like FTX and others. We know what's happening outside the court room and know that if we or a nonprofit like us does not intervene in a material way by combing with a funded ad hoc… that the US Middle class, possibly 100k of us tied to this case, are done for. We can't let that happen, your honor, and so will dedicate ourselves FT to the following:

Grant us and our soon to be ad hoc 2mo ad hoc Earn group 5% of W&C's budget, access to the data vault, and arrange a few 30min meetings with Kirkland, our team will make more progress in 2mo that would have the highest probability of producing the highest value bid to Kirkland and concurrently ensure the IP would be as such where this type of event COULD NOT happen again. This would result in the greatest outcome for everyone, were as in the best possible outcome for any type of war with irreconcilable differences, virtually all parties would have the ability to walk away claiming they had won. 5% of W&C's budget, access to data room, a few meetings with Kirkland, and we will end this based on solid principals and set an example for the bevvy of Chapter 11s following suite in the months ahead.

**In Explicit Regard to Michael's Personal Account Holdings (notwithstanding the aforementioned assertions and request for a ruling).**
Per my own use account holdings with my wholly owned Celsius Wallet on the Celsius Platform (Doc 973, Page 9316), all active and closed loans and associated TOUs and Loan Agreement Versions (per Exhibit F) with note that the closed loans ID 147795, 120554 & 119246 should have had the collateral returned to my Custody account following April 14, 2022 (TOUV8), as I did not consent to have the returned collateral move to Earn, and per Exhibit H relevant to unaccredited investors, it was grossly irresponsible of Celsius *et al.* to force by default the reentrance of the collateral into a high risk account type without the expressed agreement upon fulfillment of loan obligations by the user to Celsius *et. al.*

This movement was done without my consent due to the lack of optionality to unaccredited investors made upon the return of my collateral, especially to those unaccredited investors who took out a loan prior to TOUV8 under the terms of TOU V&, and where granted no optionality as to where the return of collateral would go and to which TOUV8 as differentiating across account type it would therefore be bound. I assert this despite it is my stance that all assets on my user account default to Custody as services are no longer being rendered, the sole condition with which I and everyone else had decided to retain their assets Earn.

Further, considering my position on comingling and the movement of my assets off-chain without my consent between Earn and Custody that all assets, including open/closed loans/collateral to be moved to my Celsius user account or at last treated as being in Custody.

**EXHIBIT A:**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ———————————————— ) | | |
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[4] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| ———————————————— ) | | |

Upon the motion (the "Motion") of Michael Benzaken for entry of an order (this "Order"), granting relief and humbly requesting that the all stablecoins and his stablecoins and the assets on his user account on the Celsius platform in particular are not property of the estate, all as more fully set forth in the Motion; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the Southern District of New York, entered February 1, 2012; and this Court having the power to enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of these cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that Mr. Benzaken's notice of the Motion and the Order and opportunity for a hearing thereon were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefore, it is HEREBY ORDERED THAT:

1. The Motion is granted on a final basis as set forth herein.

2. The Debtors are authorized and directed to determine that Michael Benzaken's assets, collateral returned, and collateral outstanding on his user account on the Celsius platform be deemed not property of the estate, and is the property of, both title and ownership, of Michael Benzaken.

---

[4] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

3. That due to the arguments set here forth in this Motion, that the assets on Michael Benzaken's user account on the

Celsius platform in Earn, ought to be transferred to Custody, as the Earn services are no longer being provided, Michael is

executing his right, per the Celsius TOU and Loan Agreements, to transfer those assets to Custody. This action ought have

been executed by default for all unaccredited investors upon the termination of the services.

4. Notice of the Motion satisfies the requirements of Bankruptcy Rule 6004(a).

5. Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and

enforceable upon its entry.

6. The Debtors are authorized and directed to take all actions necessary to effectuate the relief granted in this Order in

accordance with the Motion.

7. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation,

interpretation, and enforcement of this Order.

____

**Your Honor,**

For the foregoing reasons, I, Michael Benzaken, humbly appeal to you, your honor, to rule on this Motion that the Stablecoins in question are not part of the estate, that the digital assets on my Celsius user account are not Property of the Estate, that they are my property, and that the categorization of both Earn and Custody accounts be withdrawn as differentiating factors. I humbly submit for your consideration for all reason stated above that assets held on Celsius user accounts ought to be treated as simply being within the Celsius user account and not treated differentially based on account type, as Custody never existed in the way it was represented and due to rampant comingling and the inability to verify user asset location within their accounts.

Lastly, that if a payout was to occur, that all assets ought to be returned to their rightful owners (the creditors) and no-account user is to be returned his/her digital assets as a priority position, in that all users ought to be treated the same relative to the return of their assets if and when that is to occur.

Thank you for your kind consideration,

Respectfully submitted by:

s/ Michael Benzaken
Michael Benzaken
*Pro se creditor and US Non-Accredited "Earn" Customer*

Dated: November 17th, 2022

Signed:

*Michael Benzaken*

Fort Lee, New Jersey

Dated: _____, 2022

_____
THE HONORABLE MARTIN GLENN
CHIEF UNITED STATES BANKRUPTCY JUDGE

**Exhibit B:**
**Dispelling Examiner's Conclusion user assets deposited into Earn (TOUV5-V8), had at any point transferred unconditional ownership to the Celsius estate, TOUV5-V8**

"The contract governing the relationship between Celsius and its customers was called its Terms of Use. Celsius revised its Terms of Use eight times from its original Terms of Use dated February 1, 2018, until its last pre-petition Terms of Use dated April 14, 2022. Each of the Terms of Use after September 29, 2020 stated that by depositing crypto to Celsius's Earn program, a customer transferred "all right and title" to their crypto assets to Celsius <u>and</u> that Celsius had the right to pledge, lend, or otherwise transfer or use a customer's crypto assets."


**Why this is misleading and a clear danger in the upcoming determination of asset ownership being that of anyone else other than the creditors. Her conclusion and selective work choice and factual inaccuracy, all in favor of the debtor regarding asset ownership, warrants further investigation by a neutral 3rd subject domain expert to be hired by the CEC, a new creditor lead voluntary association, and NOT hired by W&C.**


Ms. Pillay chose select language damning to the creditors, specifically those within the Earn Program and subsequently those with Earn accounts. Without further analysis dispelling such a confidently stated opinion, would materially mislead the court regarding ownership and title to the property in question:

1. The omission of preceding and subsequent TOU clauses within each TOUV5-8 and the associated Loan Agreements with clear and unambiguous language regarding asset ownership each point to that of the Celsius user and not the estate.
2. TOUV5-8. In the case of Earn, such contingent on the consent to the services and therefore such services being rendered. As to Title, at no point in TOUV5 express, indicate or in any way imply that transference of title. Why Ms. Pillay chose these specific words, one which has no bearing on asset ownership and the other which is factually incorrect in regard to the effective date with which she lays claim, is a matter that should be pressed further by the court. It would appear to this creditor that the examiner intended to mislead the court in such a way for a substantial legal determination to favor the debtors an inaccurate and incomplete interpretation of the TOUs and associated Agreements.
3. The transference was purely conditional and in furtherance of the services
4. The assets within the Earn Program can be withdrawn by the depositors at any time
5. All customers in the Earn Program could collateralize their digital assets to take out loans. Per all Loan Agreements; specfically, those associated with TOUV5-8, contained the <u>Borrower's Representation</u> clause, which was clear and unambiguous as to the following:
   a. The asset/collateral was owned by the depositors.
   b. That this language reinforcing ownership would supersede any potentially conflicting language in a corresponding TOU.
6. Per TOUV5 with which Ms. Pillay used as the origin TOU whereby "right and title" of assets was transferred, I have listed verbatim the same TOU language that preceded the language in for the Earn Program (subsequently, for Earn accounts) as well as subsequent language. TOUV5 (D.R. 393, pages 217-317). As such loans were available to, and many taken out by those in the Earn program and subsequently those with Earn accounts, this language by proxy of loan availability all Celsius Loan Agreements contained the 'Borrower's Representation clause" expressly stating asset ownership was that of the creditor (or borrower) and the

ownership and surrounding language therein would supersede any conflicting or ambiguous language, out be considered sufficient groups to eliminate any ambiguity regarding property ownership as disconnected from the ongoing voluntary use of the Earn services, within all TOU contracts. However, as I will demonstrate below, per TOUV5, specifically, Clauses #8 & #12 and other Clauses mentioned in that TOU in connection with the Loan Agreement; specifically, the Borrower's Representation, ought to be ruled as surpassing the threshold of any prior doubt and thus dispelling whatever ambiguated some may claim existed in Clause #14 per the NY law previous stated in the motion.

Further, I was unable to identify any material changes regarding unconditional (read: to the elected, opt-out anytime Earn services) transfer of asset ownership in TOUV6-8, especially no such material changes as noted in the associated TOU Representations that have been made available by Celsius *et. al.* or that I have been able to come across. Further, that this demonstration ought to be sufficient evidence that the contract language for Earn relative to asset ownership is both clear and unambiguous and a reasonable person would read Clause #14 as being purely conditional on services rendered with such assets to be withdrawn at any time by the user and assets with which loans can be taken upon the election of the user.

a. **8. Ownership of Digital Assets (D.R. 393, page 217) -** *You hereby represent and warrant to us at all times during which you hold Digital Assets in your* ~~Account~~*Celsius Wallet that any Digital Asset used by you in connection with your* ~~Account~~*Celsius Wallet is owned by you or that you are validly authorized to carry out transactions using such Digital Assets, and that all transactions initiated with your* ~~Account~~*Celsius Wallet are for your own* ~~Account~~*Celsius Wallet and not on behalf of any other person or entity. You further represent and warrant that all such Digital Assets are free from any claims, indebtedness, liens, or third-party interests.*

   i. Note: If Ms. Pillay was correct in her representation, and the assets ownership and title was transfer to the estate prior to account bifurcation in the standard user account, as is the case with TOUV5, then the Celsius TOU would have forced users to defraud themselves by agreeing to such terms, claiming ownership/title **at all times** when transacting within the creditors user account.

b. **12. Withdrawals (D.R. 393, pg. 236) -** *You may make a complete or partial withdrawal of Eligible Digital Assets from your* ~~Account~~*Celsius Wallet at any time. Celsius initiates the withdrawal process immediately following a withdrawal request when possible; however, we may require up to three (3) days after you submit your withdrawal request to process the withdrawal.*

   i. Note: If Ms. Pillay is correct in her representation concerning Earn and asset ownership having been transferred to the estate, how could the user reclaim ownership at any time without there being language regarding transfer of ownership given the withdrawal language for eligible assets is clear and unambiguous would be returned within a maximum of 3 days following notification to Celsius by the asset owner (the creditor) and the subsequent processing of the request.

**Exhibit C:**

**TOUs and Associated Loan Agreements since alleged transfer of property ownership (TOUV5) & Title and Ownership (TOUV6-8)**

| Exhibit D - Loan Agreements | | | | | |
|---|---|---|---|---|---|
| Declaration of Alex Mashinsky - Docket #393 | | | | | |
| Exhibit | Loan Agreement | Page # | Redlined Changes From Prior Loan Agreement | Effective Date | Overlapping TOUs |
| B-1 | | 680 | | | TOSV1 |
| B-2 | | 694 | 741 | | TOSV2 |
| B-4 | | 756 | 773 | | TOSV3 |
| B-5 | | 789 | 806 | | TOSV4 |
| B-6 | B-TOU6 | 824 | 840 | 5.05.20 - 12.7.20 | TOSV5 |
| B-7 | B-TOU7 | 857 | 874 | 12.8.20 - 6.26.21 | TOSV5 |
| B-8 | B-TOU8 | 891 | 908 | 5.27.21 - 10.18.21 | TOSV6 |
| B-9 | B-TOU9 | 931 | 948 | 10.19.21 - Present | TOSV7 & 8 |

**Exhibit D:**

**Loan Agreement – "Borrower's Representation"**

You hereby represent and warrant to us that, as of the Loan Effective Date and throughout the Loan Term:

(a) You are the sole owner of all Digital Assets used in connection with the Loan (including the Collateral and any Margin Call deposit);

(b) You are the sole beneficial owner of the digital wallet and/or bank account to which the principal is delivered;

(c) You are the sole beneficial owner of the Account;

(d) You represent and warrant that all Digital Assets are not owned, controlled, or received by any individual or entity subject to any sanctions administered or enforced by the United States.

(e) You are validly authorized to carry out transactions using such Digital Assets, and that all transactions initiated with your Account are for your own Account and not on behalf of any other person or entity;

(f) All Digital Assets used in connection with the Loan are, and will continue to be for the duration of the Term, free from any claims, indebtedness, liens, or third-party interests;

**Exhibit E:**
**Proof of Off-Chain Across Count Type Activity**



* These steps are done off-chain within a few seconds

**Exhibit F:**
**Michael Benzaken's Open/Closed Loan Transaction History Details**

| Internal id | Loan ID | Date and time | Transaction type | Coin type | Coin amount | USD Value | TOU Version | Loan Agreement Ve | Active/Closed | Should have Return to Custody |
|---|---|---|---|---|---|---|---|---|---|---|
| 555c2ba6-88ec-4877-8b77-e6f6ef9e976d | 119246 | 6/11/22 18:46 | Collateral | ETH | 9.979501021 | 15,552.54 | TOUV* | Loan Agreement 9 | closed after tos change ETH | Yes |
| d99811d9-536a-4d2b-94d1-ca2fd91a456c | 119246 | 6/11/22 18:46 | Loan Principal Payment | USDC | -10000 | -10000 | TOUV8 | Loan Agreement 9 | closed after tos change ETH | Yes |
| 831fb9f8-e310-4962-a389-0b2921d7348e | 120554 | 5/9/22 21:51 | Collateral | DOT | 420.9049456 | 4,802.54 | TOUV8 | Loan Agreement 9 | closed after tos change DOT | Yes |
| c86c83f0-a117-4af4-860c-0d374e94eaa5 | 120554 | 5/9/22 21:51 | Loan Principal Payment | USDC | -3000 | -3000 | TOUV7 | Loan Agreement 9 | closed after tos change DOT | Yes |
| 84356823-1ddc-41d7-b23e-0d4181c31cf6 | 147795 | 3/29/22 14:25 | Loan Principal Payment | USDC | 11750 | 11750 | TOUV7 | Loan Agreement 9 | active BTC | |
| b9419557-2610-4260-8d3f-e823fb4eb074 | 147795 | 3/29/22 13:50 | Collateral | BTC | -0.983615555 | (47,000.00) | TOUV7 | Loan Agreement 9 | active BTC | |
| 81217a97-0ce9-4bca-b45a-a8e6a59da950 | | 12/25/21 17:03 | Collateral | DOT | -420.9049456 | (12,000.00) | | | | |
| ae8fa53f-6e80-4ae0-923a-c4e298f402b0 | | 12/21/21 9:03 | Loan Principal Payment | USDT ERC20 | 10000 | 10000 | | | | |
| 8cc92023-582c-41c8-a02e-6175aa82359a | | 12/21/21 7:41 | Collateral | ETH | -9.979501021 | (40,000.00) | | | | |
| 641e952c-bb04-4303-84cd-c15f47c472ff | 118445 | 12/20/21 9:53 | Loan Principal Payment | USDC | 30000 | 30000 | TOUV7 | Loan Agreement 9 | active BTC | |
| b759efb5-6b16-47af-a91c-ec17d2b64faa | | 12/19/21 4:16 | Collateral | BTC | -2.095463604 | (100,000.00) | | | | |
| 5ba003b2-5526-4fc5-8c8b-5e9a4abe07e6 | 118445 | 12/18/21 8:50 | Collateral | BTC | -2.585417662 | (120,000.00) | TOUV7 | Loan Agreement 9 | active BTC | |
| 8c69f052-23e8-491c-910d-4c5663a54590 | | 12/18/21 8:45 | Collateral | BTC | -0.859383392 | (40,000.00) | | | | |
| c343dacf-b691-4b92-b9a3-f5edc9c25a03 | | 9/5/21 16:54 | Collateral | MANA | 13176.3937 | 13,832.24 | | | | |
| 0647ac2e-2377-445c-9760-a9add06647e8 | | 9/5/21 16:54 | Loan Principal Payment | USDC | -2500 | -2500 | | | | |
| 51db463d-12fc-478a-b9c4-5d07f58b2a1c | | 9/4/21 3:49 | Collateral | MATIC | 48364.79989 | 71,579.90 | | | | |
| 933878df-cd76-4445-afb8-f6a3c9b7f25d | | 9/4/21 3:49 | Loan Principal Payment | USDC | -4500 | -4500 | | | | |
| fb295708-f2ba-4197-8935-5ac21a7d809a | | 8/9/21 14:41 | Collateral | MATIC | 6545.326205 | 7,396.22 | | | | |
| 0884db221-ec8e-4334-ad4e-baf9a1c27c05 | | 8/9/21 14:41 | Loan Principal Payment | USDT ERC20 | -2500 | -2500 | | | | |
| d431bae6-c3ac-45d9-b593-11c67c3b05a1 | | 8/9/21 14:36 | Loan Principal Payment | USDC | 2500 | 2500 | | | | |
| 1805d706-23ab-4506-9cf7-7fa2c32d246f | | 8/7/21 20:07 | Collateral | MANA | -13176.3937 | (10,000.00) | | | | |
| 43c8fbcb-7d8f-4275-b4ce-3640d4f45f49 | | 6/22/21 15:33 | Collateral | MANA | 19960.34292 | 8,630.26 | | | | |
| 8309e355-29f0-41b5-9dbb-df6a56a25f05 | | 6/22/21 15:33 | Loan Principal Payment | USDC | -5000 | -5000 | | | | |
| f4c63010-3ad1-4eb0-b453-96924f08eef1 | | 6/22/21 14:29 | Collateral | MANA | -82.74598013 | (32.59) | | | | |
| aee2669e-c1d9-4a4e-8cf9-c7894766cb3d | | 6/14/21 20:45 | Loan Principal Payment | USDC | 2500 | 2500 | | | | |
| a880b41d-f8ec-4a16-aa6e-ba34355817a4 | | 6/14/21 20:36 | Collateral | MATIC | -6545.326205 | (10,000.00) | | | | |
| c8209ae8-c1d9-4a4e-8cf9-c7894766cb3d | | 4/9/21 22:15 | Collateral | MATIC | -48364.79989 | (18,000.00) | | | | |
| 0db045b6-0e1c-4f2b-b49b-e8ee9abb4773 | | 4/9/21 19:19 | Loan Principal Payment | USDT ERC20 | 5000 | 5000 | | | | |
| f706a5dc-e71b-4b60-ad09-dbe62f7bd8de | | 4/9/21 2:14 | Collateral | MANA | -19877.59694 | (20,000.00) | | | | |
| ac24ddfa-c042-47c8-8974-2f8d1de482ea | | | | | | | | | | |

**Exhibit G:**

# Investigation finds Celsius 'Custody' was ploy to remain relevant

6:14 PM • Nov 21, 2022

—Celsius, Crypto

—by Protos Staff

Share



Listen to this article.

An interim investigative report filed in the ongoing bankruptcy of Celsius Network provides more context about its business practices and shows a predictable pattern of irresponsibility.

The report lays out a timeline where, in response to state investigations by New Jersey, Texas, and Kentucky in May of 2021, Celsius attempted to appease regulators by preparing a 'Custody' product.

These initial three states were followed by Arkansas, Oklahoma, Pennsylvania, and Washington. The Securities and Exchange Commission (SEC) had also served requests or subpoenas by August 2021, and in September both New Jersey and Kentucky announced cease-and-desist letters against Celsius Network.

After this cease-and-desist, the firm received additional requests from the SEC, along with new requests from Alabama, Massachusetts, and New York; **Texas filed to enforce its own cease-and-desist and Washington filed charges**.

In short, Celsius was being pursued on all sides, with the controversy centering on the accusation that it offered unregistered securities to unaccredited investors.

Celsius was also paying close attention to the SEC's ongoing case against competitor BlockFi. When BlockFi settled with the SEC and 32 states on Valentine's Day in 2022, **the SEC turned its attention to Celsius, and Celsius begin seriously developing Custody**.

This was a decision described by chief revenue officer Roni Cohen-Pavon as "mostly about number and effect on growth" and was about remaining viable in the United States since it could no longer offer 'Earn' to unaccredited investors.

Another Celsius employee described it as a "defensive play" meant to "**retain some sort of relevance**."

The launch date for the Custody product was not determined based upon when the offering was complete, but the date on the New Jersey cease-and-desist. Celsius had an office in New Jersey, so enforcement of the cease-and-desist in the state could have ended the Celsius Earn product across the United States.

How did Celsius Network's Custody work?

The Celsius Network Custody product functioned very differently from most custody products in the crypto industry. Rather than creating segregated wallets for each client and keeping track of which assets were owed to customers, Celsius instead **decided to throw all of the custody wallets in one wallet, only check it occasionally, let it regularly have shortfalls**, and then occasionally refill it.

This isn't how custody offerings normally operate. Generally, separate wallets are created for each client and the assets they deposit. This allows the company to easily ensure that its assets in custody match the liabilities it owes customers.



Celsius Custody shortfall/surplus from filing

*Read more: [FTX and Tether were closer to Celsius than anyone realized](#)*

Celsius' legal team instructed employees to tell customers asking about the safety of their funds that "Celsius continues to safeguard customer assets," even when there were deficits in the Custody accounts.

Due to the haphazard setup of Celsius' custody offering, **all user assets were first passed through the main wallets before sometimes being sent over to Custody**. The practical import of this is that when Custody experienced a shortfall, those funds were being used by Celsius Network to fund its activities, despite the promise in the terms of service that it would "not transfer, sell, loan, or otherwise rehypothecate" those assets.

In the nine states where Celsius was unable to convince regulators to provide adequate licensing for its Custody offering, it created a new type of account described as a 'withhold' account. These accounts could still accept deposits but were ineligible for earning rewards. However, the funds deposited were still swept to the main wallets that Celsius was using for its activities.

Users with withhold accounts couldn't earn rewards, but **Celsius could still use its assets for deployment and other purposes**.

Many of these issues were, at least in part, a byproduct of Celsius' inadequate record-keeping systems. Prior to May 2021, it lacked a system to track assets and liabilities and instead would just check individual wallets. Starting in May of 2021, Celsius began tracking its assets and liabilities in a Google Sheets document that regularly failed to break out the different types of accounts. It wasn't until 24 days after the launch of Custody that this report started showing the Custody accounts broken out, and it was a shortfall when they finally added it.

As the investigator explains in the filing: "Celsius chose to rely on manual reconciliations and transfers of crypto assets without robust controls for the Custody program." **Celsius didn't bother to develop a custody solution**, preferring a Custody solution, to buy time.

*For more informed news, follow us on [Twitter](Twitter) and [Google News](Google News) or listen to our investigative podcast [Innovated: Blockchain City](Innovated: Blockchain City).*

**Exhibit H: TOU Representation at time of account bifurcation, omitting any differential treatment within Earn and Custody and indicated all Earn collateral ought to have been transferred following repayment to my user Custody account on the Celsius platform:**

**Tuesday, April 12th, 2022**

Today, we are writing to give our community advance notice of upcoming changes, which will go into effect on April 15, 2022. These changes provide a path forward for our users in the United States to continue holding coins and earning rewards with Celsius.

As we previously have acknowledged, Celsius has been working closely with regulators around the world. It is our intention to be as transparent with our community as possible. More specifically, we have been in ongoing discussions with United States regulators regarding our Earn product.

As a result, there will be changes to the way our Earn product will work for users based in the United States.

Here's how these changes impact you:

- **All coins transferred to Celsius by users in the United States prior to April 15, 2022 will continue to earn rewards.** Those existing coins will continue to earn rewards from April 15th and onward, for as long as they remain in their Earn accounts.
- **On April 15, 2022, Celsius will be launching a new Custody solution for users in the United States.** Your Custody account will serve as the centerpiece of your home for crypto, providing a secure way to navigate across Celsius' products, including store, access, borrow, spend, earn and grow.
- **New transfers made by non-accredited investors in the United States will be held in their new Custody accounts and will not earn rewards.** Non-accredited investors can continue to swap, borrow, and transfer within their Custody accounts based on their local jurisdiction.
- All coins posted as collateral against a loan that is opened prior to April 15, 2022, will be returned to their Earn accounts when the loan is repaid. Those coins will resume earning rewards for as long as they remain in their Earn accounts.
- **Verified accredited investors in the United States will be able to add new coins into their Earn accounts to earn rewards.** For additional information on how to become an accredited investor, contact us at https://celsius.network/customer-care or read more.
- Users located outside of the United States will be unaffected by these changes. They will continue to have access to all of the products and services available to them prior to these changes.
- Watch our Custody tutorial video to learn more.

Celsius will never stop advocating for financial freedom and we thank our community for their ongoing support. We will continue to provide updates as we engage with regulators and ensure the delivery of our services to our users globally.

If you have questions or require additional assistance, contact us at 1-866-HODL-NOW (1-866-463-5669). Our Customer Care Center is available Monday - Saturday, from 10AM - 11PM EST or contact us at https://celsius.network/customer-care.

Sincerely,
The Celsius Team