Cameron Crews
*Pro se creditor*
camcrews@proton.me

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| Celsius Network LLC, et al.,[1] | ) ) | Case No. 22-10964 (MG) |
| Debtors. | ) ) ) | Jointly Administered |

**OBJECTION TO DEBTORS' AMENDED MOTION FOR ENTRY OF AN ORDER (I) ESTABLISHING OWNERSHIP OF ASSETS IN THE DEBTORS' EARN PROGRAM, (II) PERMITTING THE SALE OF STABLECOIN IN THE ORDINARY COURSE, AND (III) GRANTING RELATED RELIEF**

Now returns Cameron Crews, pro se creditor, objecting to the debtors' claims of ownership of Earn assets and consequently their right to utilize stablecoins to fund their operations and related relief. Based upon their own claims of ownership of customer funds, withdrawals from the platform constitute fraudulent conveyances under New York Debtor Consumer Law 273 and 274 as they have not credibly shown they were solvent when these transactions occurred. As such, the debtors have no legal right to use depositors' assets to fund their next venture; if the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

debtors wish to restart their failed business, they must seek new equity investors or raise corporate bonds. Holding innocent depositors hostage while draining the estate of valuable resources is untenable and the Court is asked to **DENY** the three aforementioned motions filed by the debtors.

**A Lack of Consideration for Depositors**

1. Depositors received a promise of rewards in return for their deposits. The debtors did not disclose that were deeply insolvent and lacked the capacity to fulfill these rewards. Because these promised rewards could not be actualized, depositors were materially mislead into accepting unconscionable losses without any chance of benefit.

2. Chris Ferraro acknowledged that the liquidation value of Celsius today would afford creditors 50¢ on the dollar[2] and that this is not the fault of the customer[3]. Indeed, Celsius had a responsibility to inform customers of its financial health, which it failed to do.

3. Celsius has failed to protect depositors. Ferraro claimed the pause was effectuated so that they did not "give benefit to the first person in line to the detriment of the last person in line"[4]. However, they took this action far too late.

4. Celsius was obligated to pause withdrawals the moment they lacked sufficient assets to cover their obligations. Indeed, a person withdrawing on 6/12/22 received 100% of their deposits plus

---

[2] Ferraro Deposition 11/21/22, Page 157, line 22
[3] Ibid, Page 239, line 16
[4] Ibid, Page 237, line 3

accrued rewards, to the detriment of those attempting to withdraw subsequently on 6/13/22 who now face financial ruin and emotional distress.

5. Because Celsius lacked the means to pay rewards, these rewards cannot be considered fair consideration for purported surrender of title of customers' digital assets. The reward rates offered customers were not commensurate with any real returns that Celsius was generating to pay these rewards. Instead, these rates appear to have been tailored to persuade customers to keep deposits with Celsius by offering the highest rates regardless of their capacity to fulfill these promised returns.[5]

6. The debtors mislead customers that they paid out 80% of revenues as rewards. Chris Ferraro acknowledged in his deposition that Celsius did not generate sufficient revenue to pay this 80% their revenue figure[6]. Likewise, Oren Blonstein acknowledged that Celsius' claim of 80% revenue paid out as rewards was inaccurate.[7]

7. Indeed, the debtors have failed to explain how they paid over $1B in customer rewards as of January of this year. To date, the only confirmed source of rewards paid out has been from incoming deposits from other customers.

---

[5] Blonstein Deposition 11/22/22, Page 269, line 14 Blonstein discusses funds customer flowing from BlockFi to Celsius when BlockFi's rates were below Celsius
[6] Ferraro Deposition 11/21/22 page 365 "Yeah, my understanding is that they targeted a payout at 80 percent, but in reality, because the deployment didn't return the income that was expected, it was actually above 80 percent."
[7] Blonstein Deposition 11/22/22 page 306

8. In Exhibit 9 presented in the Blonstein deposition, I show an example of a customer depositing into Celsius with their funds flowing to source withdrawals by other customers on June 12th, the day of the pause. This is an example of a customer who deposited funds into Celsius entirely contrary to their own interests, and to the benefit of those who were paid out their rewards and deposits by way of these incoming deposits.



9. In the example above, an Australian corporate customer deposits $131k into their Celsius bridge wallet (personalized deposit address) at 8:28AM UTC, which flows into the Celsius omnibus wallet five minutes later. A $789k transfer from the omnibus wallet into Frictional Wallet 0xd86C occurs 9 minutes later. This Frictional wallet would be topped up and drained nine times throughout the day, sourcing over $7M of withdrawals from incoming deposits.

10. Blonstein acknowledged the flow of funds in the diagram appeared generally consistent with his understanding[8] of Celsius's operations, though it must be acknowledged he did not have the benefit of inspecting the exhibit prior to the deposition.

11. Of the explanations offered for the flow of funds, Blonstein suggested the omnibus wallet may have funded DeFi deployments[9]. There is no evidence for this, and indeed all $7M flowing into the frictional wallet appears to have exclusively been used to fund withdrawals.

12. Blonstein further suggested that it's possible the withdrawing customers may have re-deposited into Celsius.[10] However this was not the case in the examples cited; the customer whom withdrew $99k into FTX has only $180 left in his account[11] while the customer whom withdrew $136k into Coinbase has only ~$400 left in her account[12].

13. These are examples of customers being made whole at the expense of incoming depositors who were mislead about the financial health of the company. The examiner will be able to find many more examples of this, should she choose to look into this matter.

**Withdrawals from Celsius constitute fraudulent conveyances under DCL 273 and 274**

14. Under DCL § 273, every conveyance made without fair consideration by a person who is or will be rendered insolvent is deemed fraudulent. Celsius qualifies as an insolvent person who fraudulently transferred title to withdrawing customers.

---

[8] Blonstein Deposition 11/22/22 page 311, line 1
[9] Ibid, page 313, line 21
[10] Ibid, page 313, line 25
[11] Doc 974, page 5,448: Claim 3.1.229770
[12] Ibid, page 2,690: Claim 3.1.109932

15. As covered in Eric Wholwend's objection[13], Celsius treated deposits as "open-ended loans". Therefore, according to the debtors' own logic, withdrawals constitute a conveyance of title to creditors which would be fraudulent unless they could demonstrate their solvency.

16. As observed in Ackerman v. Ventimiglia (In re Ventimiglia), 362 B.R. 71 (2007), "Under well-settled New York law, a voluntary conveyance made while a debtor is indebted to creditors is presumptively fraudulent. *Matter of Russo,* 1 B.R. 369, 379 (Bankr.E.D.N.Y.1979) (citing *Feist v. Druckerman,* 70 F.2d 333, 334 (2nd Cir. 1934)).

17. By the debtors' own logic, they conveyed title to outgoing withdrawals and interest while they were hopelessly insolvent, likely in an attempt to hide the truth of their precarious financial circumstances. This must be viewed as a fraudulent conveyance unless they are able to prove their solvency during the time of these transfers.

18. As such, it is now up to Celsius to demonstrate their solvency to the court to justify these transfers. As found in the Ackerman case, "The burden of proof shifts from the plaintiff to the defendant where the facts regarding the nature of the consideration are in the defendant's control, and in an intra-family transfer where there is an absence of tangible consideration."[14]

19. Absent proof of their solvency, title of deposits sent to Celsius could not legally transfer to them, because these deposits lacked fair consideration and qualify as fraudulent conveyances

---

[13] Doc 1430
[14] See Ackerman, 362 B.R. at 82

due to the company's insolvency. To the extent Celsius was insolvent, they were consequently unable to offer fair consideration for digital assets entrusted to their care.

20. The debtors acknowledge they were insolvent on 7/13/22 when they filed for bankruptcy, though they have endeavored to avoid addressing when this insolvency first occurred due to obvious legal implications. This lack of transparency to their books must not absolve the debtors of their evident wrongdoings

21. Chris Ferraro in his deposition repeatedly avoided answering questions as to when Celsius became insolvent. He responded that he did not know when the board became aware, and suggested that knowledge of their insolvency occurred around when they implemented a Pause on withdrawals.

22. This beggars belief as we know the debtors had a $1.8B hole when they filed for bankruptcy from the Mashinsky declaration (once $600M of a CEL token surplus is properly excluded). The debtors must have been aware of their precarious situation, and the examiner may shed light on the extent of this question when she concludes her examination.

23. It must be noted that a "run on the bank" does not directly[15] contribute to insolvency because Customers withdrawing their assets from the platform reduce Celsius liabilities in equal measure. For each Satoshi leaving the platform, the debtors liabilities also decrease by one Satoshi.

---

[15] There may be losses incurred from a surge of depositor withdrawals, to the extent that deployed assets are recalled to fund such withdrawals, since these un-windings are likely occur under disadvantageous circumstances

24. By minting 692,753,441.4971 CEL tokens in the Fall 2018, Celsius planted the seeds of a mechanism to deceive equity investors and depositors. As depicted in the adjacent graph, CEL token pumped in price in 2021 as Celsius scaled their operations. This created the illusion of a robust balance sheet which was used to persuade Series B investors to commit to an investment in Celsius.



25. An analysis of Celsius's solvency must recognize that CEL is an intangible asset with limited fair market value.  As Celsius controls the majority of the supply of this token they made up, they could crash the price down to a fraction of $0.01 if they elected to market sell their reserves into what limited markets exist for this token, markets the debtors themselves played an essential role in creating.

26. To analyze the market capacity for absorbing sales of CEL token, the best means to do this would be to look at former-CEO Alex Mashinsky's dumping of his own CEL tokens on hapless retail customers. Alex withdrew 1,130,100 CEL tokens[16] valued at $6.5M on July 28th 2021 via

---

[16] Balance report docket 974, page 14,391 under AM Ventures 7/28/21

"AM Ventures". He then proceeded to cash out of these tokens via Uniswap, cashing out for $1M USDC in the first eight days of August alone.[17]

27. The Court should set precedent with regards to determining self-issued digital assets and solvency: any surplus in self-issued digital assets cannot offset liabilities not also denominated in that "asset". To the extent customers were convinced by hook or by crook to accept a CEL-denominated obligation from Celsius, the company may offset those liabilities by CEL token, but must not count this otherwise valueless asset to offset otherwise denominated liabilities.

**Objection to the Sale of Stablecoins**

28. Granting the debtors rights to sell Stablecoins is ineffectual and would only reward their general incompetence. BlockFi filed for bankruptcy yesterday and already has presented a reorganization plan to the Court, whereas the debtors in this case have yet to present a plan now months after filing for bankruptcy protection.

29. Meanwhile, the debtors scrounged up $65 million from under the proverbial under the couch cushions by withdrawing from Bitfinex[18] to fund their operations.

30. The debtors identified no viable revenue streams, nor prospects for financial recovery. They are a dishonest, incompetent organization that deserves the corporate death penalty, not endless extensions.

31. Celsius management bet the farm on the price of Bitcoin rising to six-figure valuations when they secured a Bitcoin-backed loan from Tether to invest in a Bitcoin mining operation. This was essentially a leveraged, long bet on Bitcoin that blew up spectacularly, leaving a 60,000 Bitcoin

---

[17] https://etherscan.io/tokentxns?a=0x6d27ba372b148a190f0806899e53a6d4009cf5af&p=7
[18] Campagna deposition 11/22/22, page 12, line 4

deficit and a mining operation that is in litigation with its partners and is burning millions of capital per month without producing incremental bitcoin reserves.

32. Accordingly, for the reasons described above, the debtors have no right to claim title to depositors' assets that were deposited onto the platform while they were insolvent. While the examiner may help shed light on matters of solvency, it is up to the debtors to credibly convince the court that they were solvent when these transactions took place. As such, the Court is asked to properly **DENY** the debtors motions and properly find that title to depositors' assets did not legally transfer from them.

Respectfully submitted,

Dated November 29, 2022

/s/Cameron Crews
Cameron Crews
*pro se creditor*