Georges Georgiou, *Pro se* Celsius Creditor

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____
                                                        )
In re:                                                )          Chapter 11
                                                        )
CELSIUS NETWORK LLC, *et al.,*[1]          )          Case No. 22-10964 (MG)
                                                        )
                        Debtors.                  )          (Jointly Administered)
_____)

**GEORGES GEORGIOU'S OBJECTION TO THE DEBTORS' AMENDED MOTION
FOR ENTRY OF AN ORDER (I) ESTABLISHING OWNERSHIP OF ASSETS IN THE
DEBTORS' EARN PROGRAM, (II) PERMITTING THE SALE OF STABLECOIN IN
THE ORDINARY COURSE AND (III) GRANTING RELATED RELIEF**

I, Georges Georgiou, a Celsius Network LLC, et al., *pro se* creditor, submit the following

objection to the *Debtor's Amended Motion for Entry of an Order (i) Establishing Ownership of*

*Assets in the Debtors' Earn Program, (ii) Permitting the Sale of Stablecoin in the Ordinary*

*Course and (iii) Granting Related Relief*, Docket No. 1325.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

## **BACKGROUND**

On or around October 12, 2022, my Bitcoin collateral which had been backing a loan that I paid off–collateral that had been previously categorized by Celsius as "pending" withdrawal[2] was unilaterally re-classified by Celsius as an Earn deposit. The status "pending" is something of a misnomer because the withdrawal had already been approved and "initiated" by Celsius, in their words, indicating mutual acceptance of the withdrawal and and end to interest payments pre-Pause and pre-Petition–with no more action required on my part.

To be clear, at the time of the Pause, I had completed all necessary steps to withdraw my Bitcoin Collateral from my paid-off loan, as my email correspondence with Celsius Customer care shows. Not only that, but they had already been *removed* from Earn account before the Pause with the immediate cessation of interest payments, terminating my participation in Celsius' Earn service pre-Pause *and* pre-Petition.

My Bitcoin Collateral was only placed into Earn by Celsius *for mere hours*. To the extent that it went into an Earn account, Celsius did this as a mere holding ground or "waystation" on the way to my hardware wallet. I never consented to the coins being stored in Earn by Celsius, and the loan agreement I had signed said that I was the "sole owner" of the bitcoin collateral backing my loan and that my early repayment would terminate the loan, with no mention of an Earn account.

Not only did my Bitcoin Collateral spend only hours in an Earn account, but before Celsius' Pause, my withdrawal had been approved and initiated to commence to an external wallet, and

---

[2] For the sake of clarity, "pending" refers to funds still held by Celsius. In my case, the withdrawal was approved, and security checks were completed, before transactions were frozen, although Celsius disputes this, and more discovery is needed.

Celsius confirmed that I had completed all required security and KYC checks. (See Exhibit A for the timeline of how Celsius unilaterally recharacterized my approved withdrawal, which was initiated on June 12 at 6:33pm ET, and placed it back into Earn on or around October 6th, months later, and Exhibit B where Celsius representative Jasmine Wyche said, "Thank you for successfully providing the video and document needed to complete this request. We have initiated the withdrawal for you…")

The Bitcoins in question had been collateral backing a loan, although I also dispute that the Earn agreement is clear and unambiguous with respect to *any* of my Celsius deposits. The loan agreement I had signed when I took out the loan stated clearly that I was the "sole owner of all Digital Assets used in connection with the loan."

The "sole owner" language modified and superseded my Earn agreement with Celsius and followed my Bitcoin Collateral even as it (very temporarily) passed through Earn on what should have been a brief pit-stop on the way to my external hardware wallet. The loan agreement I had signed also stated that the Bitcoin collateral was "free from any claims, indebtedness, liens, or third-party interests."

Celsius had stated in my loan contract that, "Should you make a full Early Repayment of your Loan in accordance with the terms hereof, Celsius shall release the Collateral to your Celsius Account, within ten (10) days of your full repayment. Upon Celsius' release of the Collateral, the Loan shall be immediately and automatically terminated." The contract had no mention of an Earn account.

When I paid back my loan, and Bitcoin Collateral was placed in my Celsius account, per the

contract, the return of the assets did not suddenly make them Celsius' property, because the loan

agreement stating that I was the "sole owner" modified and superseded the Celsius Earn contract.

After my Bitcoin collateral spent just a few hours in an Earn account, I was able to successfully

complete all the steps to withdraw my released Collateral, and got approval to withdraw. I

stopped earning interest, and the coins were marked as "Pending," which, as I said, is something

of a misnomer, given that the withdrawal had been initiated and that I had completed all required

steps.

Now, Celsius is trying to claim ownership of all of my assets, including my Bitcoin collateral, as

Earn assets, through their stablecoin motion. Although the motion only contemplates selling

stablecoins *for now*, Celsius is asking for a sweeping ruling that they *own* all the assets that *they*

*placed* into Earn–or *labeled* as Earn in their internal database and app–whether or not users such

as myself placed our coins in Earn, or consented to have our coins put into Earn by Celsius, or

signed a contract stating that their coins could go into Earn. I object.

## <u>MY "PENDING" WITHDRAWAL IS NOT PROPERTY OF THE DEBTORS' ESTATES</u>

My released Bitcoin Collateral that had already been approved for withdrawal by Celsius, and on

which withdrawal had been initiated by mutual consent, is held by Celsius on my behalf and not

property of the estate under 11 USC 541(d)–both because of the Loan Agreement I had signed,

which I outlined above, because the Earn contract is ambiguous *even for* the typical depositor who did not take out a loan, and for the following additional reasons:

1. **These funds had already been withdrawn from Earn with bilateral approval from Celsius and me, including security checks, <u>both pre-Pause *and* pre-Petition</u>. As a Celsius Customer Service representative told me, I had passed KYC and security checks, pre-Pause, and the withdrawal had been initiated on their end, pre-Pause. Interest had stopped accruing, pre-Pause, which corroborates the contractual language that the "call option" under Section 11, "Withdrawals," had *already* been exercised by me pre-Pause, and the coins had been removed from Earn, by mutual consent of me and Celsius, and interest had stopped accruing, and it was changed to a "Pending" status, <u>all before the Pause began</u>.** (See Exhibit B, "Email Correspondence with Celsius.") Any and all loans between me and Celsius, or accidental participation in the Earn program with respect to my returned Bitcoin Collateral, which lasted mere hours, was terminated both pre-Pause and pre-Petition, making the returned Bitcoin Collateral not property of the estate. The language in the contract about this is clear and unambiguous: "Subject to these Terms, for any of your Eligible Digital Assets that you elect to utilize in the Earn Service (if available to you), **you have a call option on all loans made to Celsius to demand immediate, complete or partial repayment of any loan at any time through (i) transfer to a Custody Wallet, if available to you, or (ii) <u>a complete or partial withdrawal of Eligible Digital Assets at any time. Such repayment will terminate in whole or in part your loan to Celsius and you shall no longer accrue Rewards on the amount of loans as of the time of your exercise of the call option.</u>** Celsius initiates the withdrawal process immediately following a withdrawal request when possible, however, we

may require up to three (3) days after you submit your withdrawal request to process the withdrawal." (Emphasis added.) Even if the withdrawal was not fully *processed* on Celsius' end, that Customer Service confirmed that I had submitted all of my KYC materials and other required steps, and that they had had stopped paying interest and changed my status to "Pending", all indicates that my "call option" rights in Section 11 had been exercised both pre-Pause *and* pre-Petition, and the coins were no longer the Debtor's property (if they had ever been, which I dispute based on the overall ambiguity of the Terms of Use Version 8 for all users, and especially dispute based upon combining those terms with Loan Terms of Use Version 9 I signed, which modified and superseded Celsius' terms of use for me around core issues, such as property ownership, when I signed it on February 22, 2022.) For the dates of my loan application and initiation, which corresponds to my signing of the Loans Terms of Use Version 9, see Exhibit E.

2. Celsius placed my returned Bitcoin Collateral into my Earn Account–for just mere hours. The Earn account was only a temporary holding ground on the way to my external hardware wallet, not a service I "elected" to use for my Bitcoin Collateral, which was only transiting through on the way to withdrawal. The Earn terms of use are clear that "upon your election" you will loan your coins to Celsius. I never elected to use the service with respect to the returned Bitcoin Collateral. **Celsius** elected to place the Returned Bitcoin Collateral into an Earn account when I paid off my loan, and, within hours, I elected to remove these coins to an external wallet.

I never ***deposited*** my Bitcoin Collateral into an Earn account; Celsius did. What I did take immediate action to do, was ***withdraw*** my Bitcoin Collateral. As soon as my withdrawal was

approved, and my Bitcoin Collateral was moved from an Earn account (which I had taken no

action to place the coins in) to a Pending account, and Celsius stopped paying interest on it. The

contract is, at the least, *ambiguous* with respect to the Bitcoin Collateral, for the following

reasons:

a. The funds no longer appeared in an Earn Account, but a Pending Account, in the app, after

receiving just a few hours of interest when Celsius–not myself–placed the coins in Earn.

b. The funds no longer received any interest, as they were not in Earn Account, which is

confirmed in my exhibits.

3. As these funds no longer appeared in any of my accounts; they were locked and totally

inaccessible to me once the funds were marked as "Pending." Since Celsius maintained "control"

of the funds, but they were not in Earn, Celsius held these coins in bailment or trust for the sole

purpose of returning the coins to me. Their communications with me were clear that they were

holding onto the coins for the *sole purpose* of completing a withdrawal *which had already been

initiated by Celsius*; the Bitcoin Collateral is my property, not property of the estate under 11

USC § 541. I believe that the communications were so clear that the coins may have been held in

**express trust** but if not, they certainly qualify for **constructive trust.**


In my exhibits, you will find the proof behind my claims in the form of screenshots taken of my

emails as well as the Celsius website and app. Times and dates shown on screenshots of the

Celsius app and website are Japan Standard Time (JST) which is +13 hours ahead of Eastern

Standard Time (EST). Where relevant, times have been calculated to reflect Eastern Standard

Time (EST).

## CELSIUS *ADMITTED* THAT MY WITHDRAWAL HAD BEEN INITIATED; THEY CANNOT UNDO THEIR ADMISSION NOW

As I will show in my filing, Celsius Customer Service had admitted that my withdrawal from Earn had been initiated, and I also present evidence that they had stopped paying interest.

All statements made by Celsius, or its representatives, such as lawyers–but also customer service representatives–are binding on Celsius as judicial admissions. Judicial admissions "are formal concessions in the pleadings in the case . . . that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." *Hoodho v. Holder,* 558 F.3d 184, 191 (2d Cir. 2009).

Statements other than pleadings, including those made by attorneys in briefs, also bind the client as judicial admissions. *See Purgess v. Sharrock*, 33 F.3d 134, 144 (2d Cir. 1994). "When a party makes a judicial admission, that party 'normally is bound [by that admission] *throughout the course of the proceeding.*' " *Hausler v. JP Morgan Chase Bank, N.A.*, 127 F. Supp. 3d 17, 37 (S.D.N.Y. 2015) (alteration in original; citation omitted).

Even if my communications with Celsius customer service representatives are not found by this Court to be judicial admissions, which I believe they are, my communications with Celsius along with my account statements still show, by clear and convincing evidence, that Celsius had completed all security checks, and that there was nothing left to do on my end, that my call option to end the loan under Section 11, "Withdrawals," had been exercised, and that the funds were on the way to my external wallet, in spite of Kirkland & Ellis' statements to the contrary.

While the Debtor claims that my withdrawal was still undergoing security review and would imply that my call option to demand immediate withdrawal from Earn had not been exercised, (see Exhibit E), my email correspondence with Celsius in Exhibit B, and the fact that interest had stopped accruing pre-Pause, makes is very clear that I had exercised my call option, and that the funds were no longer in Earn and property of the Debtors Estates (if they ever were, which, I dispute because of the overall contract's ambiguous terms, and *in particular* the way the contract was modified and superceded for me, by signing Loan Agreement 9.)

It is my belief, and Celsius must prove otherwise through providing evidence, that Celsius hung onto my coins because they already knew they'd be pausing withdrawals, but had not yet begun the Pause. Furthermore, Celsius may well have been processing other withdrawals while they held onto my coins, perhaps because of the amount of my withdrawal or other arbitrary reason, *even though all necessary security steps had already been completed.*

## THE CONTRACTS I SIGNED, TAKEN TOGETHER, AND EVEN SEPARATELY, ARE EXTREMELY AMBIGUOUS

Exhibit A-8 of the *Declaration of Alex Mashinsky,* D.R. 393, are the Terms of Use that were in effect when I attempted to withdraw my Bitcoin Collateral, and on the Petition Date.  Exhibit B-9 of the *Declaration of Alex Mashinsky,* D.R. 393, are the Loans Terms of Use that were in effect on February 22, 2022, when I borrowed 250,000 USDT (worth $250,000) against 26.53294065 Bitcoin. (See attached "Loan Details" for the loan request, origination, and completion dates.)

The loan agreement I had signed on February 22, 2022 (Loans Terms of Use Version 9), stated that:

- You are the **sole owner of all Digital Assets used in connection with the Loan** (including the Collateral and any Margin Call delivery); (Emphasis added)[3]
- All Digital Assets used in connection with the Loan are, and will continue to be for the duration of the Term, **free from any claims, indebtedness, liens, or third-party interests**;[4]
- Within ten (10) days of your full repayment of the Principal amount and all outstanding Obligations, **Celsius shall release all remaining Collateral to your Celsius Account**.[5]

To succeed in their arguments that I made an Earn deposit, the Debtors must argue that the Terms of Use provide that my Bitcoin Collateral was *transferred into Earn by me* when I paid off my loan, Celsius manually accepted my payment, and closed out the loan on their end.

However, the Terms of Use themselves assert the contrary. For example, the Terms of Use attached to the Mashinsky Declaration as Exhibit A-8, at page 525, state the following: "ANY ELIGIBLE ASSET **TRANSFERRED TO CELSIUS** WILL BE INITIALLY TRANSFERRED TO THE EARN SERVICE AND CONSTITUTE A LOAN FROM YOU TO CELSIUS."

In this case, I did not "transfer" my Bitcoin Collateral "to Celsius" nor was the Bitcoin Collateral that I was the sole owner of "Transferred to Celsius." Rather, the Bitcoin Collateral, that Celsisu was *already* in possession of, was "released" to my Celsius account *by Celsius*. To the extent there was any sort of transfer, it was completed *by Celsius, not by me.* According to the terms of Loan Terms of Use Version 9, it remained Collateral that I was the "sole owner," as per the loan agreement that I had signed.

---

[3] *Declaration of Alex Mashinsky,* D.R. 393, p. 940
[4] Ibid.
[5] *Declaration of Alex Mashinsky,* D.R. 393, p. 935

The Terms of Use at Exhibit A-8 to Mashinsky Declaration on pg. 526 (emphasis added, bold in original, underline added) also contain the following statement: **YOUR CELSIUS ACCOUNT IS NOT A BANK ACCOUNT, DEPOSIT ACCOUNT, SAVINGS ACCOUNTS, CHECKING ACCOUNT, OR ANY OTHER TYPE OF ASSET ACCOUNT AND SHOULD NOT BE CHARACTERIZED AS A BANKING PRODUCT OR SERVICE. THE USE OF TERMS SUCH AS "ACCOUNT," "ACCOUNT BALANCE," "WITHDRAW" AND SIMILAR LANGUAGE IN CONNECTION WITH THE EARN SERVICE AND THE BORROW SERVICE (SEE FURTHER SECTIONS 4(D) AND 4(E) BELOW, RESPECTIVELY) DOES NOT IMPLY OR ESTABLISH, AND SHALL NOT BE TAKEN TO SUGGEST, ANY FORM OF CUSTODY RELATIONSHIP, AND SUCH LANGUAGE IS USED HEREIN AS TERMS OF CONVENIENCE ONLY IN REFERRING TO USERS' BORROWING OR <u>LENDING OF DIGITAL ASSETS TO OR FROM CELSIUS AS PART OF THE EARN SERVICE AND BORROW SERVICE,</u> AND CELSIUS' OBLIGATION TO TRANSFER DIGITAL ASSETS TO USERS UPON THE TERMINATION OF SUCH LOANS OR REPAYMENT OF SUCH BORROWING IN CONNECTION WITH THESE SERVICES.**

In the specific section of the Terms of Use applicable to the Earn Program, the Terms of Use state at  Exhibit A-8 to Mashinsky Declaration on pg. 538-39 (emphasis added) the following:

> If our Earn Service is available to you, **upon your election**, you will **lend** your Eligible Digital Assets to Celsius and grant Celsius all rights and title to such Digital Assets, for Celsius to use in its sole discretion while using the Earn Service. The balance of Eligible

Digital Assets **loaned** by you to Celsius, and any Rewards gained thereon (see further

Section 12 below, "How Rewards are Calculated and Earned") are visible via your

Celsius Account.

I never **elected** to **lend these** Digital Assets to Celsius in any way. The Bitcoin Collateral from

my paid-off loan, which spent only hours in an Earn account before going into a Pending

account, had nowhere else but Earn to go for non-US customers, practically speaking, but that

does not mean the contract was clear and unambiguous that I gave permission for the coins to go

into Earn in the sense that I would lose "sole ownership" of them as defined in Loan Terms of

Use Version 9. Rather, the contract requires my specific action. "Upon your election," states the

contract, "you will lend your Digital Assets to Celsius." I did the opposite of *electing* to be in the

Earn service, by removing my Bitcoin Collateral within hours of my loan being paid off.

And again, the Terms of Use state at Exhibit A-8 to Mashinsky Declaration on pg. 540 (emphasis

added):

"The Earn Service is not an investment program nor a speculative tool. Rather, you are earning

Rewards as a financing fee **on the loan of Eligible Digital Assets <u>you have transferred</u>** to

Celsius in connection with the Earn Service, and in accordance with the rates published by

Celsius from time to time, pursuant to these Terms."

Again, **I *did not transfer* the coins to Celsius in connection with the Earn service.** Celsius,

upon repayment, took it upon themselves to place the coins in Earn under the clause that the

collateral was "release[d] to my Celsius account."

Even to the extent that you find my coins were actually in Earn, under the entire Terms of Use, for a few hours, the Terms of Use are replete with references to Earn Assets being *loaned* to the Debtors and not conveyed to the Debtors.

The "Setoff and Security Interest Rights" section of the Terms of Use contains the following statement at Exhibit A-8 to Mashinsky Declaration at pg. 546-47.:

> "Your acceptance of these Terms serves as your consent to Celsius' asserting its security interest or exercising its right of setoff should any laws governing your Celsius Account require your consent. If the law restricts our ability to take, transfer, or setoff from any obligations to you, or if your Celsius Account balance is protected from attachment, levy, or legal process, you waive those conditions and limits to the full extent that you may do so by contract, and you authorize us to take any actions to offset your Obligations in your Celsius Account being used in the Earn Service."

If Celsius *actually* owned the Earn Assets as they claim, there would be no purpose served by the above text. The Earn Assets would not be subject to the Debtors' customers' limitations on attachment, levy, or legal process because the customer would have already conveyed them to Celsius. Similarly, the Debtors would not be exercising rights of setoff against Earn Assets they *already* claim to own.

The Terms of Use again state at Exhibit A-8 to Mashinsky Declaration at pg. 547-48 (emphasis added):

"By transferring Digital Assets to Celsius, or **lending** Eligible Digital Assets to Celsius while using the Earn Service, or otherwise using the Services, you will not be entitled to any profits or income Celsius may generate from any subsequent use of any Digital Assets (or otherwise), nor will you be exposed to any losses which Celsius may suffer as a result thereof."

It is significant that the Terms of Use themselves contain many references to customers "lending" their Earn Assets to the Debtors and provisions that would have no effect if the Debtors actually owned the Earn Assets. 6. Even the paragraph relied upon by the Debtors does not provide for a conveyance of Earn Assets to the Debtors.

Paragraph 13 states[6] as follows:

In consideration for the Rewards payable to you on the Eligible Digital Assets using the Earn Service, for us entering into any Loan Agreement, and the use of our Services, you grant Celsius, subject to applicable law and for the duration of the period during which you **elect to utilize** the Eligible Digital Assets in the Earn Service (if available to you) and thus **loan** such Eligible Digital Assets to us through your Celsius Account, or as collateral under the Borrow Service (if available to you), all right and title to such Eligible Digital Assets, including ownership rights…."

Even paragraph 13 relied on by the Debtors refers to Earn Assets being loaned to the Debtors, *not conveyed*. Finally, paragraph 13 of the Terms of Use notably contains no language indicating that it is the exclusive provision addressing ownership of Earn Assets. It does *not* state something

---

[6] Exhibit A-8 to Mashinsky Declaration at pg. 554 (emphasis added).

to the effect of: "notwithstanding anything in these Terms of Use to the contrary, the following

terms govern ownership of Earn Assets". Accordingly, all of the other references to loans of Earn

Assets to the Debtors are of equal force and effect.

The Debtors also point to section 2 of the Terms of Use as support for their argument that

the Debtors' own the EARN Assets. The opposite is actually true. The pertinent parts of section

2 are as follows (found at Exhibit A-8 to Mashinsky Declaration at pg. 526 (Emphasis added.)):

> " "Account" or "Celsius Account" means a User's designated user account on the Celsius
> website or mobile application, allowing a User to access and use the Services, view the
> User's balance of Eligible Digital Assets **held in custody on the User's behalf or
> loaned by the User to Celsius**, and any rewards gained on loaned Eligible Digital
> Assets, and manage the User's personal information and profile. YOUR CELSIUS
> ACCOUNT IS NOT A BANK ACCOUNT, DEPOSIT ACCOUNT, SAVINGS
> ACCOUNTS, CHECKING ACCOUNT, OR ANY OTHER TYPE OF ASSET
> ACCOUNT AND SHOULD NOT BE CHARACTERIZED AS A BANKING
> PRODUCT OR SERVICE. THE USE OF TERMS SUCH AS "ACCOUNT,"
> "ACCOUNT BALANCE," "WITHDRAW" AND SIMILAR LANGUAGE IN
> CONNECTION WITH THE EARN SERVICE AND THE BORROW SERVICE (SEE
> FURTHER SECTIONS 4(D) AND 4(E) BELOW, RESPECTIVELY) DOES NOT
> IMPLY OR ESTABLISH, AND SHALL NOT BE TAKEN TO SUGGEST, ANY FORM
> OF CUSTODY RELATIONSHIP, AND SUCH LANGUAGE IS USED HEREIN AS
> TERMS OF CONVENIENCE ONLY IN REFERRING TO USERS' **BORROWING
> OR LENDING OF DIGITAL ASSETS TO OR FROM CELSIUS AS PART OF**

**THE EARN SERVICE** AND BORROW SERVICE, AND CELSIUS' OBLIGATION TO TRANSFER DIGITAL ASSETS TO USERS UPON THE TERMINATION OF SUCH **LOANS** OR REPAYMENT OF SUCH BORROWING IN CONNECTION WITH THESE SERVICES."

Contrary to the Debtors' assertions, there is **no** mention of the Debtors' customers *conveying* their digital assets to the Debtors in section 2 of the Terms of Use. Similarly with section 4 of the Terms of Use, there is **no** mention of the Debtors' customers conveying their digital assets to the Debtors.

The pertinent language in section 4 of the Terms of Use is at Exhibit A-8 to Mashinsky Declaration at pg. 540 and is as follows:

"Your Celsius Account is not a bank account, deposit account, savings accounts, checking account, or any other type of asset account and should not be characterized as a banking product or service. All Eligible Digital Asset balances on your Celsius Account represent Digital Assets that are either (1) **held** in your Custody Wallet by Celsius or a Third Party Custodian, (2) **loaned by you to Celsius**, or (3) **posted** to Celsius as collateral and, therefore, owned, held and/or controlled by Celsius (under the applicable Service, as further detailed herein), and subject to Celsius' obligation to deliver such Digital Assets back to you upon the termination of the applicable Service.

Once again, *contrary* to the Debtors' arguments, the Terms of Use refer to Celsius "holding" digital assets, being "loaned" digital assets, and having digital assets "posted" as collateral. As *further* proof of **ambiguity**, the Terms of Use do refer to digital assets being "owned, held and/or

controlled by Celsius" but that language does **not** constitute language of **conveyance** of the Debtors' customers' digital assets. Next the Debtors *allege* section 10 of the Term of Use supports their claim of ownership of their **customers'** digital assets. The pertinent language in section 10 of the Terms of Use at Exhibit A-8 to Mashinsky Declaration at pg. 547-48 is set forth below:

> "By **transferring** Digital Assets to Celsius, or **lending** Eligible Digital Assets to Celsius while using the Earn Service, or otherwise using the Services, you will not be entitled to any profits or income Celsius may generate from any subsequent use of any Digital Assets (or otherwise), nor will you be exposed to any losses which Celsius may suffer as a result thereof."

The Term of Use in section 10 do refer to **"transferring"** or **"lending"** digital assets to the Debtors. Unfortunately, the Terms of Use do not define the meaning of "transfer". Transfer *can* have *many* meanings and applications depending on the circumstances, especially in my instance, where Celsius initiated the transfer themesleves, after I paid off a loan. Notably, in the process of paying off my loan, Celsius had to manually approve it being closed out. While I did the action of paying off my loan, it was Celsius, ***not me,*** who did the manual action of **transferring** the Bitcoin collateral into an Earn account upon manual approval (by a Celsius staff person) to close out the loan.

As I have shown, the above Earn contract language is ambiguous even for a typical Earn customer ***who never had a loan.*** It is ***extremely ambiguous*** for someone in my position. It does

more to muddy the waters and sheds no light on *exactly* what was the relationship between the

Debtors and their customers, which is basically the textbook definition of **ambiguity**.

Finally, the Debtors argue that section 12 of the Terms of Use support their argument. It does not.

The pertinent text from section 12 of the Terms of Use is below at Exhibit A-8 to Mashinsky

Declaration at pg. 552 (emphasis added):

> "All Eligible Digital Assets that **you elect to utilize in the Earn Service** (if available to
>
> you) and thus are **loaned** to Celsius (1) are not being used as collateral for Loans, (2)
>
> have not had all rights in connection with them assigned to another Celsius user using
>
> CelPay, and (3) **were not requested for external transmission or withdrawal** (Eligible
>
> Digital Assets meeting each of these three criteria, "Loaned Digital Assets") entitle you
>
> to Rewards while credited to your Celsius Account."

Section 10 *only* refers to digital assets being **loaned** to the Debtors, not conveyed to the Debtors,

and which were not requested for external transmission or withdrawal.

My assets were not being lent to the Debtors at the time of the petition, because they were

"**requested for external transmission or withdrawal**" and they were not earning interest. If the

assets were not earning interest and they were requested for withdrawal, they were not being lent

to the Debtors, and that includes the title/transfer of assets (which they claim was being lent, but

I dispute this, and believe the overall contract is ambiguous even for a typical earn customer, as I

have outlined about), so in no circumstance are my assets property of the Debtors' estates. The

Debtors even introduce a new defined term "Loaned Digital Assets" in Terms of Use Version 8,

which **further confuses** the relationship between the Debtors and their customers. **Nowhere** in section 12 of the Terms of Use does the contract describe the transaction as a **sale or conveyance** of customers' digital assets to the Debtors.

Yet *another* attachment to the Mashinsky Declaration refers to Earn Assets being **loaned** to the Debtors, **not conveyed** to the Debtors. Exhibit F, the SWAP Payment Terms of Use (the "SWAP Terms") states at Exhibit F to Mashinsky Declaration at pg. 1052 that: "These Swap Beta Terms apply in addition to Celsius' Terms of Use ("Celsius Terms of Use"), which govern all use of Celsius' services." The introduction to the SWAP Terms states that "Our Swap service allows you to exchange a certain Eligible Digital Asset you **loaned** to Celsius as part of the Earn Rewards service…."

The Execution section of the SWAP Terms states at Exhibit F to Mashinsky Declaration at pg. 1053 (emphasis added) that: "Each Swap transaction is entered into between you and Celsius (as buyer or seller, as applicable), and Celsius does not act as your broker, agent or intermediary. By entering into any Swap transaction, you instruct and authorize us to (i) terminate your existing **loan** of the Swapped Assets to Celsius….".

The SWAP Terms contain provisions that are absolutely **nonsensical** *if* the Debtors (actually) owned the Earn Assets. There would be *no reason* for the execution section to provide that the Debtors would act as "buyer or seller, as applicable" if it already owned the Earn Assets. Finally, the SWAP Terms refer to terminating the customers' existing **loans** in exchange for new **loans**. Next, the Mashinsky Declaration refers to the Risk Disclosure attached thereto as Exhibit I.

The "Risks Related to Using the EARN Service" state as follows (Exhibit I to Mashinsky Declaration at pg. 1113 (emphasis added)) :

> "You acknowledge that by utilizing the Earn service, **your digital assets** are not custodied by Celsius and may be subject to total loss if an event occurs at the protocol level, which is outside of Celsius' control. You understand and agree that notwithstanding anything else contained in this Risk Disclosure, Celsius will not be responsible for any such loss (whether total or otherwise) of **your digital assets** and will not replace them or otherwise compensate you".

The Risk Disclosure continues to state that (Exhibit I to Mashinsky Declaration at pg. 1113 (emphasis added).):

> "Celsius deploys **digital assets that you loan to Celsius through the Earn service** in a variety of income generating activities, including lending such digital assets to third parties and transferring them to external platforms and systems. Celsius conducts in-depth due diligence reviews of any such third party or platform or system, including security, financial and credibility tests. However, Celsius cannot guarantee that these third parties, platforms or systems shall not suffer any breaches, lose such assets or fail to return any assets to Celsius, resulting in financial loss. Celsius may also sell, trade or stake digital assets, which may result in financial loss."

The Risk Disclosure, as with many other of the Debtors' documents and agreements provided to customers **refers to assets loaned to the Debtors, not conveyed to the Debtors.** The Risk Disclosure also refers multiple times to **"your digital assets"**. How else would anyone,

especially an average consumer, interpret that language, *other* than that the customer continued to own their digital assets held by the Debtors.

If the transactions between the Debtors and their customers were actual conveyances of digital assets to the Debtors, those transactions would have been taxable events. The customers would have incurred either taxable gains or losses upon the conveyance of their digital assets to the Debtors. That taxable event would have triggered the obligation on the Debtors to issue 1099 statements to their customers. The Debtors issued **no** 1099 to that showed trades and I am not aware of ***any*** customer being issued a 1099 statement upon the deposit of their digital assets into an Earn Account. That fact, in and of itself, leads to the conclusion that the Debtors did not receive a **conveyance** of their *customers'* Earn Assets.

All the foregoing can lead to only one conclusion, the Debtors **do not** own my assets because their contracts are **ambiguous**. The contract is internally inconsistent and is replete with references of their customers **loaning** assets in Earn Accounts to the Debtors *rather* than **conveying** Earn Assets to the Debtors and contains provisions that are **nonsensical** if the Debtors actually owned their customers' assets.

Under New York law, to determine if a clause in a contract is **ambiguous** "it is necessary to consider it in the context of the entire" agreement. *Bayerische Hypo-Und Vereinsbank AG v. Banca Nazionale Del Lavoro, S.p.A. (In re Enron Corp). See* also, *Bank of America, N.A. v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings, Inc.*), ("We read the writing as a

whole. We seek to give each clause its intended purpose in promotion of the primary and dominant purpose of the contract.") (citations omitted)."

In this instance, the agreement between the Debtors and their Earn customers consists of the Terms of Use document together with all the other effective documents related including the Loan Agreement I signed, the Earn Terms, the SWAP Terms, and the Risk Disclosure. Every one of those documents either **expressly** states in multiple places that the Debtors' Earn customers are **loaning** their digital assets to the Debtors **or contain provisions that make no sense if the Debtors *actually* owned their customers' Earn Assets.**

Those provisions in the agreements are **in direct conflict** with the Debtors' argument that paragraph 13 of the Terms of Use acts to convey the Earn customers' digital assets to the Debtors. The Court in *In re Allegiance Telecom, Inc*, stated that: "a court should find contractual provisions ambiguous only if they are reasonably susceptible to more than one interpretation by reference to the contract alone." Id. at 99. The *Allegiance* court also emphasized that "[t]his is particularly appropriate if the contract 'was negotiated between **sophisticated, counseled business people negotiating at arm's length.**'" Id. Finally, the *Allegiance* court stated that "'Under New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed[7].'"

In this instance, the agreement between the Debtors' myself was not negotiated between "sophisticated business people". In fact, there was no negotiation at all. As the Debtors

---

[7] Id. at 98 (emphasis added, citations & footnotes omitted).

represented at length in their motion[8], the agreement was a take it, or leave it proposition. Motion at pgs. 10-14. The EARN customers had an opportunity to review the Terms of Use and related documents incorporated therein, but no opportunity to negotiate anything. Their expression of the terms of the agreement consisted of clicking on "accept". So, after an Earn customer reviewed the Terms of Use, EARN Terms, SWAP Terms, and Risk Disclosure, with their *multiple* references to **loaning** digital assets, and <u>one</u> reference *purporting* to **convey** their digital assets to the Debtors, the parties' intent is <u>**anything but clear**</u>.

Additionally, for international borrowers such as myself, there was **no way** to end a loan, without first paying the loan back, the funds temporarily being placed into Earn, and then initiating a withdrawal from Earn into a hardware wallet. The fact that the **debtor, rather than me,** transferred my coins to Earn, and that I took immediate action (within hours) to remove my coins from Earn, shows that I did not consent to their storage there.

Even the Debtors' intent cannot be gleaned from the Loan Terms of Use, the Terms of Use, EARN Terms, SWAP Terms, and Risk Disclosure. Every one of those documents has multiple references to Earn customers **lending** their digital assets to the Debtors. The Loan Agreement explicitly says I am the "sole owner" of the Bitcoin Collateral. All of these <u>provisions are</u> <u>**nonsensical**</u> <u>if the Debtors owned the Earn customers' digital assets</u>.

Against that backdrop, the Debtors argue that **one provision**, paragraph 13, <u>trumps the entirety</u> <u>of the agreements</u>. The Debtor's intent (in the contract) with respect to who actually owns the

---

[8] *Debtors' Amended Motion for Entry of an Order (i) Establishing Ownership of Assets in the Debtors' EARN Program, (ii) Permitting the Sale of Stablecoin in the Ordinary Course, and (iii) Granting Related Relief* (Doc. No. 1325).

Earn Assets is **anything but clear** and what their customers (including myself) thought we were agreeing to, or their intent, is even less clear.

Under New York law, any ambiguity in a contract must be construed against the drafter. See, *Aron Sec., Inc. v Unkechaug Indian Nation*.

As stated above, I played no role in actually negotiating the terms of the Loan Terms of Use, the Terms of Use, the EARN Terms, the SWAP Terms, or the Risk Disclosure, with the Debtors. Those agreements are wholly the product of the Debtors and the only role the Earn customers played in the process was to have to click "accept" to continue being a customer of the Debtors. As such, **the contract must be strictly construed against the Debtors**.

Additionally, the conduct of the parties is relevant to determine the intent of the parties to a contract. See, *In re Lehman Bros.*, 439 B.R. at 825. In this instance, the Debtors' conduct leads to the conclusion that the Earn customers *retained ownership of their digital assets, in general with all Earn deposits, and in particular with respect to loan collateral where the contracts are even more clearly in favor of customers*.

The Debtors' conduct includes the fact that they did not treat deposits of coins as a **conveyance** digital assets to the Debtors. If the Debtors actually took title to the Earn customers' digital assets, one would believe that the Debtors would comply with the Internal Revenue Code and issue 1099 forms to their customers showing something other than interest payments on **loaned**

coins. The fact that they did not issue 1099 forms indicates that the Debtors did not even treat the transaction as a conveyance of Earn customers' digital assets.

Finally, the Terms of Use *expressly* deny that customers' "accounts" were bank accounts or gave **customers the rights of a bank account holder**.

The pertinent language in paragraph 13 of the Terms of Use state as follows:

>"**YOUR CELSIUS ACCOUNT IS NOT A BANK ACCOUNT, DEPOSIT ACCOUNT, SAVINGS ACCOUNTS, CHECKING ACCOUNT, OR ANY OTHER TYPE OF ASSET ACCOUNT AND SHOULD NOT BE CHARACTERIZED AS A BANKING PRODUCT OR SERVICE. THE USE OF TERMS SUCH AS "ACCOUNT," "ACCOUNT BALANCE," "WITHDRAW" AND SIMILAR LANGUAGE IN CONNECTION WITH THE EARN SERVICE AND THE BORROW SERVICE (SEE FURTHER SECTIONS 4(D) AND 4(E) BELOW, RESPECTIVELY) DOES NOT IMPLY OR ESTABLISH, AND SHALL NOT BE TAKEN TO SUGGEST, ANY FORM OF CUSTODY RELATIONSHIP, AND SUCH LANGUAGE IS USED HEREIN AS TERMS OF CONVENIENCE ONLY**".

A bank account creates a debtor-creditor relationship between a bank and its account holders. *In re Lehman Bros. Holdings*, 404 B.R. 752, 758 (Bankr. S.D.N.Y. 2009). **The Debtors cannot have it both ways**, they cannot both be immune to the oversight that a bank entails, and also be treated **exactly** like a bank is when it comes to a debtor-creditor relationship.

Celsius' statement that its accounts are not bank accounts and do not function like a bank, and that Earn deposits are loans, not tax disposal events or disposition of property events, lead to the to the conclusion that **there is not a debtor-creditor relationship between Celsius and its Earn customers**. This **only further** goes to prove *ambiguity*. The Debtors are directly contradicting (once again) their own Terms of Use to cherry pick one clause, while claiming that every single other clause is being overridden and irrelevant.


## <u>MERE POSSESSION IS NOT OWNERSHIP</u>

These assets should have been returned to my hardware wallet, and *not* transferred to the bankruptcy estate.


"Where a debtor has lost legal and equitable interests in property prior to the petition date, that property does not become property of the estate upon the bankruptcy filing—even if the debtor still retains possession of the property.  *In re Rodgers*, 333 F.3d 64, 69 (2d Cir. 2003); *see also Lyon v. Contech Constr. Prods., Inc. (In re Computrex, Inc.)*, 403 F.3d 807, 812-13 (6th Cir. 2005) (holding that where a debtor had only a possessory interest in funds, such funds were not property of the estate); *In re Munroe*, 183 B.R. 667, 669 (Bankr. D.R.I. 1995) ("There is hardly any question that an entity which has no legal or equitable interest in the property and has *nothing more but a bare possession* has *no interest* which qualified to be the 'properties of the estate.'") (internal quotation marks and citation omitted)."


The Debtor has *mere possession* of my assets, even though by law, and according to the contracts I signed, which are ambiguous in any case and should be construed against Celsius, they should

not. They hold only bare title, but have no equitable interest. Mere possession of my Bitcoin

Collateral is not a reason to allow the Debtor to maintain possession of it, without any title or

right to the assets. Celsius' assets are *not* a part of the estate, and should be returned to me as

soon as possible.


## THERE ARE STRICT REQUIREMENTS TO EARN INTEREST; FUNDS THAT ARE NOT EARNING INTEREST ARE NOT EARN FUNDS

According to the Celsius TOU, the requirements for being able to earn interest, **"thereby**

**loaning your assets to Celsius**" are: "All Eligible Digital Assets that **you elect to utilize in the**

**Earn Service** (if available to you) **and thus are loaned to Celsius** (1) are not being used as

collateral for Loans, (2) have not had all rights in connection with them assigned to another

Celsius user using CelPay, and (3) **were not requested for external transmission or**

**withdrawal** (Eligible Digital Assets meeting **each of these three criteria,** *"Loaned Digital*

*Assets")* entitle you to Rewards while credited to your Celsius Account." (Celsius TOU Section

12, emphasis added).


*All* of those criteria have to be met for those assets to be loaned to Celsius, which they were not,

as the assets were not just requested for external withdrawal, but that request was approved, and I

did not earn interest on my BTC after the withdrawal was processed (according to Celsius

customer support it was processed).


I also did **not** "elect" to send these funds in an Earn account at all. If the "election" is implied by

transferring my funds, it's important to note that I did not transfer any funds; Celsius did after, on

their end, manually closing our my loan. My Bitcoin Collateral was in Earn for approximately 5 hours after my loan was paid off, and before my withdrawal was approved pre-pause, at which point, interest stopped accruing. The withdrawal was also approved, and according to Celsius sent out, that makes those assets *not* eligible to be "Loaned Digital Assets", which means they were *not* loaned to Celsius in any way shape or form at the time of the petition.

Courts have interpreted section 541(d) to "expressly" provide that "property in which a debtor **holds only bare legal title is not property of the estate.**" *Golden v. Guardian (In re Lenox Healthcare, Inc.)*, 343 B.R. 96, 100 (Bankr. D. Del. 2006); s*ee also In re S.W. Bach & Co.*, 435 B.R. 866, 878 (Bankr. S.D.N.Y. 2010).

Here, my Bitcoin Collateral, which my loan agreement stated that I was the "sole owner" of, was requested to be withdrawn, the withdrawal was approved, it was not being loaned to Celsius, no interest was being paid. It is my position that that the title remained with me *even as my coins passed through Earn for a few hours* due to the Loan Agreement I had signed modifying and superceding the Terms of Use, to the extent they are even ruled to apply to Earn customers in general (which they should not me.) I did not "elect" to use the Earn service, nor "transfer" the coins to Earn (Celsius, rather than I, completed the transfer.) However, even if the coins *are* ruled to have legitimately been in Earn for hours, the coins are still not property of the Estate, because both immediately before the Pause, and at the time of the petition, the Bitcoin Collateral that was requested for withdrawal was not earning interest, and as clearly shown in the attached exhibits.

In equity and good conscience, Celsius ought not to attempt to retain my property under these circumstances.

In addition to Celsius' *unjust enrichment*, I agreed on contract terms stating that, once I requested to withdraw my assets, I would no longer be subject to any of the Earn Terms of Use. In effect that, upon termination of my Earn deposit and the cessation of interest payments, Celsius would respect my property rights. Celsius in the end, instead blatantly violated my rights and denied me access to my coins where a withdrawal had already been approved by mutual agreement, and initiated.

I *never* re-granted Celsius the "sole ownership" that they had granted me in the Loan Agreement Version 9. I never granted them the contractual right to hold onto my assets after a withdrawal had been mutually-approved and initiated, or to place them back into Earn.

I believe that Celsius held my coins in *express* trust prepetition, and was in breach of contract when they did not return my coins, when you review the contract terms, taken with the email correspondence I received. To the extent that my coins are not ruled to be held in express trust by Celsius, it was still not an Earn deposit pre-pause, or pre-petition. It was an initiated withdrawal. If it's not found to be in express trust, my Bitcoin Collateral is subject to a constructive trust, or otherwise held in bailment or trust. What is 100% clear is that there is no equitable or contractual basis for it to be in Earn.

Since I believe my coins were held in *express trust* upon approval of my withdrawal request and the movement of my coins from Earn to Pending, and since this is a motion by the Debtor, rather than a full-scale adjudication of my personal property rights, I am not not making constructive trust arguments at this time. However, I reserve all rights, including the right to file a Motion or Adversary Proceeding based on a constructive trust, and to seek a Declaratory Judgement ruling that my Bitcoin Collateral is not property of the estate.

Again, if my coins were not held in express trust–which I believe they were based on the contract language, on the petition date, the Debtors ended up holding my Bitcoin collateral in a constructive trust, having failed to honor their contracts and send my Bitcoin to my external wallet.

Courts have concluded that "**property which a debtor holds in trust (express or constructive) for another does not become property of the estate when the debtor files for bankruptcy.**" (Emphasis added). *In re Edison Bros., Inc.*, 243 B.R. 231, 235 (Bankr. D. Del. 2000) (citing *In re Columbia Gas Systems, Inc.*, 997 F.2d 1039, 1059 (3d Cir.1993)) ("Congress clearly intended the exclusion created by section 541(d) to include not only funds held in express trust, but also funds held in constructive trust"); (Emphasis added) see also *In re Flanagan*, 503 F.3d 171, 180 (2d Cir. 2007) ("The effect of a constructive trust in bankruptcy is profound. While the bankrupt estate is defined very broadly under § 541(a)(1) of the Bankruptcy Code to include all legal or equitable interests of the debtor**, *any property that the debtor holds in constructive trust for another is excluded from the estate pursuant to § 541(d)....***") (Emphasis added). While I do not seek to argue constructive trust at this time, my assets were in a constructive trust when the

Debtors failed to return them to their rightful owner. Also, for the sake of judicial economy, the

Withhold group has made many of these arguments which are pending consideration right now.

What is clear is that my assets should not, and cannot be a part of the estate, because the estate

does *not* have any legal or equitable interest in them; *see Moody v. Amoco Oil Co*., 734 F.2d

1200, 1213 (7th Cir. 1984) (holding that the **"rights a debtor has in property at the**

**commencement of the case continue in bankruptcy—no more, no less"**) (Emphasis added).

Thus, if a debtor holds no legal or equitable interest in property as of the commencement of the

case, such property does n*ot* become property of the debtor's estate under section 541

postpetition, and the debtor is **prohibited** from distributing such property to its creditors.

My coins are in limbo, or "no man's land," similar–in some ways–to Withhold coins, on the way

to external wallets, but different in other key ways. For one thing, there is more of a clear

contractual status for the coins; the coins were pending withdrawal, and clearly *not* in Earn

according to the contracts I signed, and I *had* exercised my call option under Section 11 of the

Terms of Use. As of the petition date, my coins were still being held onto by the Debtors, outside

of an Earn account, and without them holding the title and rights to them. Not only are the

overall Earn contracts ambiguous overall, for all depositors, as I have argued, but they are

particularly ambiguous for me, because of the Loan Agreement I signed modifying and

superceding my agreements, which have to be looked at *as a whole*. The Debtors are violating

my due process and property rights by continuing to hold onto my Bitcoin Collateral.

**RESERVATION OF RIGHTS**

I reserve all rights as a party-in-interest with respect to the property rights status of my deposits, and of Earn customer deposits (since that is the type of deposit that I have been misclassified as having since October 12, when the Debtor unilaterally recharacterized my "Pending" withdrawal as "Canceled.")

I reserve all procedural and substantive rights with respect to any process to determine the property status of Earn customer deposits and, specifically, to my deposits. I request that I included in any further discovery, status conferences, and settlement conversations, related to this motion and to Earn customer property rights and my property rights that may impact my future claims.

I reserve rights to file a Motion or Adversary Proceeding asserting my own property rights and to conduct any replated discovery that I need to defend my property rights separate and apart from the Debtor's Motion; I do not consent to any stipulations between the Debtor or other parties to determine the property rights of my deposits, or to determine which questions are, or are not, relevant to adjudicating disputes related to my deposits.

I do not consent to any procedural relief for the Debtor on this matter that may impact my rights to assert my own property rights without either my explicit consent, or a court order authorizing such relief, and an opportunity for me to respond to any such request for relief.

I do not consent to any final determination or stipulation on which issues must be adjudicated to the status of Earn deposits, including my misclassified returned Bitcoin Collateral, without a

chance to respond to such a determination or stipulation on a reasonable timeline, or a court

order or opinion. I reserve all rights, including but not limited to the right to supplement or

amend this filing, and to submit additional filings.


Respectfully submitted,

Dated: November 29, 2022
Hiroshima, Japan

                                                          s/ Georges Georgiou
                                                          Georges Georgiou

## Exhibit A: Index/Timeline

## Index / Timeline

| Reference | Description | Date Received / Captured |
|-----------|-------------|--------------------------|
| **[1] BTC transactions - Celsius Website** | Completed "test" withdrawal | June 12 6:28pm (EDT) |
| **[2] BTC transactions - Celsius Website** | Withdrawal of ~26.532 BTC "In Progress" | June 12 6:33pm (EDT) |
| **[3] Email from Celsius** | KYC verification completed Withdrawal initiated | June 12 9:58pm (EDT) |
| **[4] Email from Me to Celsius** | Request to reconfirm withdrawal | June 13 12:13am (EDT) |
| **[5] 2nd email from Celsius** | Withdrawal reconfirmed | June 13 4:16pm (EDT) |
| **[6] BTC transactions - Celsius App** | Interest received after ~26.532 BTC withdrawal | August 28 |
| **[7] BTC transactions - Celsius App** | Interest received before freeze | August 28 |
| **[8] BTC transactions - Celsius App** | ~26.532 BTC withdrawal in "Pending" status | August 28 |
| **[9] BTC transactions - Celsius App** | Release of collateral after loan repayment | August 28 |
| **[10] BTC transactions - Celsius App** | ~26.532 BTC withdrawal in "Pending" status | September 21 |
| **[11] Earn Account - Celsius App** | Current BTC after ~26.532 BTC was withdrawn | September 21 |
| **[12] BTC transactions - Celsius App** | Pending withdrawal now "Cancelled" | October 12th |
| **[13] Screenshots Earn Account - Celsius App** | Balances in Earn Account - "Pending" status now "Cancelled" | October 12th |
| **[14] and [15] Section 11 of Celsius Terms of Use** | Terms of Use regarding withdrawals | |

## Exhibit B: Transactions and Email Correspondence

| BTC transactions - Celsius Website - Screenshot on June 18 | |
|---|---|
|  | ⇨ **[1]** Initiated a standard test wIthdrawal prior to making a large withdrawal. Funds arrived in my external wallet in under 5 minutes.<br>June 12 6:28pm (EDT)<br><br>⇨ **[2]** Main withdrawal for ~26.532 BTC was initiated immediately after the test withdrawal. Transaction shows as "In Progress" and never arrives in my external wallet.<br>June 12 6:33pm (EDT) |

| Email correspondence with Celsius | |
|---|---|
| **Jasmine Wyche** (Celsius Network)<br>Jun 13, 2022, 01:58 UTC<br><br>Hello Georges,<br><br>==Thank you for successfully providing the video and document needed== to complete this request. ==We have initiated the withdrawal for you==, the funds should be in the address specified within up to 24 hours and occasionally longer in rare cases. In addition, process time may be affected by the blockchain congestion.<br><br>If the coins have disappeared from your wallet, but have not yet arrived in the destination wallet, do not worry. This is normal, it has to do with our internal multi-step withdrawal process.<br><br>Please let us know if we can be of further assistance<br><br>Best Regards,<br>Corporate Agent \| Celsius<br><br>Wish to know more?<br>Check out Celsius Help Center<br>https://support.celsius.network/hc/en-us | Following the main withdrawal **[2]**, Celsius asked for additional documentation to fulfill KYC requirements, which I sent.<br><br>⇨ **[3]** Email from Celsius reconfirming that all KYC requirements have been met and the withdrawal had been initiated.<br>June 12 9:58pm (EDT) |
| **thegeorgioufamily**<br>Jun 13, 2022, 04:13 UTC<br><br>So has the transfer been initiated or not? I don't see it onchain.<br><br>gg | ⇨ **[4]** Email I sent to reconfirm that the transfer had been initiated.<br>June 13 12:13am (EDT) |

3

| | |
|---|---|
| **Jasmine Wyche** (Celsius Network)<br>Jun 13, 2022, 20:16 UTC<br><br>Hello Georges,<br><br>Thank you for reaching back out.<br><br>Yes, we have initiated the withdrawal for you.<br><br>Please let us know if we can be of further assistance, have a great day.<br><br>Best Regards,<br>Corporate Agent \| Celsius<br><br>Wish to know more?<br>Check out Celsius Help Center<br>https://support.celsius.network/hc/en-us | ⇨ **[5]** Response from Celsius verifying that the withdrawal has been initiated.<br>June 13 4:16pm (EDT) |



BTC transactions - Celsius app - Screenshot on August 28th

⇨ **[6]** $0 in weekly interest being deposited to my Earn Account after June 12 showing that I had no funds in Earn after the withdrawal of ~26.532 BTC on June 12.

⇨ **[7]** Weekly interest earned from BTC that was in the Earn Account immediately prior to being withdrawn*.

⇨ **[8]** Withdrawal amount shown as "Pending"

⇨ **[9]** Release of collateral into Earn Account after I repaid the loan in full. (June 12 1:43pm (EDT)

* After I paid back my loan in full, ~26.532 BTC was placed in my Earn Account. It stayed there for approximately 5 hours before I withdrew all of the BTC in my Earn Account. During those 5 hours, I earned interest on the ~26.532 BTC in the amount of $3.56.

That interest is calculated on a weekly basis and thus was paid out on June 17, after all transactions were frozen.

Since the $3.56 in interest was paid out after transactions were frozen, it remains in my account accruing nominal interest.

**BTC transactions - Celsius app - Screenshot on September 21st**



⇨ **[10]** Withdrawal amount shown as "Pending." Along with **[2]** and **[8]** together shows the continuous "Pending" status from June through September.

**Earn Account - Celsius App - Screenshot on September 21**



⇨ **[11]** BTC balance still only consists of nominal interest earned on June 12.

See page 5 for detailed explanation.



**BTC transactions - Celsius Website - Screenshot on October 12**

⇨ **[12]** June 13 pending withdrawal now shows "Cancelled" along with the original date I withdrew my entire BTC balance.

Celsius unilaterally and in violation of the Terms of Use **[14]** and **[15]** reversed my withdrawal. The transaction status was revised to "Cancelled" some time after September 21, although the date remains the same as the original withdrawal date**.**

As evidenced with screenshots **[2]**, **[8]** and **[10]**, this transaction was considered "Pending" from June 12 6:33 EDT until at least September 21.

**Earn Account - Celsius app - Screenshot on October 12**



⇨ **[13]** Balance now shows ~26.532 BTC has been moved back into my Earn Account against my wishes and possibly outside of approved, publicly disclosed bankruptcy processes.

**Exhibit C: Celsius Terms of Use**

| Section 11 of Celsius Terms of Use |
| --- |

## 11. Withdrawals

Subject to these Terms, for any of your Eligible Digital Assets that you elect to utilize in the Earn Service (if available to you), you have a call option on all loans made to Celsius to demand immediate, complete or partial repayment of any loan at any time through (i) transfer to a custody Wallet, if available to you, or (ii) a complete or partial withdrawal of Eligible Digital Assets at any time. Such repayment will terminate in whole or in part your loan to Celsius and you shall no longer accrue Rewards on the amount of loans as of the time of your exercise of the call option. Celsius initiates the withdrawal process immediately following a withdrawal request when possible; however, we may require up to three (3) days after you submit your withdrawal request to process the withdrawal.

For every withdrawal request, you will be required to provide the details of the Virtual Wallet to which you wish to receive your repayment of Digital Assets. For the avoidance of doubt, any repayment shall be in-kind (i.e., in the same type of Eligible Digital Assets loaned by you, but not the actual same Digital Assets originally transferred by you). In the event that the details you provide are inaccurate, incomplete, or misleading, your Digital Assets may be permanently lost. We will not be liable for any loss that results from inaccurate, incomplete, or misleading details that you may provide for such transfer. If the transfer address you specify is one to which we are unable to process transfers, we will have no liability for any resulting failure or delay in processing your requested withdrawal.

Celsius and our third-party partners may experience cyber-attacks, extreme market conditions, or other operational or technical difficulties which could result in the immediate halt of transactions either temporarily or permanently. Provided that Celsius has taken reasonable commercial and operational measures to prevent such

⇨ **[14]** According to the Terms of Use, once a request for funds is made, Celsius would initiate the withdrawal process immediately.

Simultaneously, any assets subsequently withdrawn from the Earn Account no longer accrues interest.

$0.00 of interest was earned after withdrawal was initiated on June 12, thus confirming Celsius acknowledged termination of the loan  and all funds had been withdrawn from the Earn Account.

given to Celsius was accepted and funds were already removed from the Earn Account.

events in technical systems controlled by Celsius, Celsius is not and will not be responsible or liable for any loss or damage of any sort incurred by you as a result of such cyber-attacks, operational or technical difficulties or suspensions of

transactions. Withdrawal limits based on amounts and/or frequency may apply from time to time, based on legal, regulatory, AML and/or security considerations. Our policies and procedures may require additional security and/or compliance checks that require additional time to complete. Any individual request to exceed withdrawal limits set by Celsius must be sent via email to app@celsius.network.

Every transmission request shall be deemed pending until accepted by us. We may refuse to accept such request, or delay the processing of an approved request for any reasonable reason, including but not limited to inaccurate or misleading information provided by you, or any doubt or suspicion of fraud, misrepresentation, a sanctioned transaction, money laundering, terrorism financing or other financial crime related to your Celsius Account.

⇨ **[15]** The two emails received from Celsius show that they accepted the required verification to complete the transaction (**[3]** and **[5]**), leaving no reason from either party to interrupt the withdrawal process.

## Exhibit D: Loan Details



## Exhibit E: Correspondence with Kirkland & Ellis



Hi Mr. Georges,

Thank you for your note and your patience. In an effort to be responsive I provide the following response, subject to ongoing review and analysis.

We have spoken to the company about your situation. You and several other customers had withdrawal transactions that were "pending" at the time the pause was instituted. The request for withdrawal may have been acknowledged by the company prior to the pause but the withdrawals were not completed as of the time of the pause. In your case, your withdrawal was sufficiently large that it likely triggered a security review, which was Celsius' standard operating procedure for transactions over a certain value threshold. Given the pause and the subsequent chapter 11 filing (and imposition of the automatic stay) Celsius is not in a position to complete the withdrawal requests. Celsius recently determined to update customers' account status by cancelling pending withdrawals (which we cannot honor at this point) and instead reflecting the cryptocurrency balances that were subject to the pending withdrawal requests back in the account where the coins were located immediately prior to the customer initiating the withdrawal request, whether that be Earn or Custody. We do not recognize or agree that there was a legal or de facto custody relationship created by your attempt to withdraw from the platform.

You are of course free to challenge that decision. You are also free to file a claim for rewards that you believe should have accrued had your balance been in Earn from the date you initiated your withdrawal request.

Regards,

**Ross M. Kwasteniet, P.C.**

---------------------------------------------

**KIRKLAND & ELLIS LLP**
300 North LaSalle, Chicago, IL 60654
**T** +1 312 862 2069  **M** +1 312 282 4356
---------------------------------------------
ross.kwasteniet@kirkland.com