Immanuel Herrmann
*Pro se Celsius creditor*
Admin of the worldwide Celsius
Earn Customer Telegram group
**https://t.me/celsiusearn**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.,*[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## SUPPLEMENTAL OMNIBUS OBJECTION AND RESERVATION OF RIGHTS TO THE DEBTORS' PROPOSED SCHEDULING ORDER, AND THE DEBTORS' AMENDED MOTION FOR ENTRY OF AN ORDER (I) ESTABLISHING OWNERSHIP OF ASSETS IN THE DEBTORS' EARN PROGRAM, (II) PERMITTING THE SALE OF STABLECOIN IN THE ORDINARY COURSE AND (III) GRANTING RELATED RELIEF

Now comes Immanuel Herrmann, Celsius Network LLC, *et al., pro se* creditor, and

submits this supplemental omnibus objection to the foregoing filings.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

## I REASSERT AND SUPPLEMENT MY ORIGINAL OBJECTIONS

This filing supplements my original objections found in 2 filings: D.R. 954, my *Omnibus Objection to Court Filings Taking Positions on Which Coins are Customer Property* filed back September 29, and D.R. 1417, my *Omnibus Objection and Reservation of Rights to the Debtors Proposed Scheduling Order And the Debtors' Amended Motion*, which taken together, contain the substance of my objections to the Debtor's propose stable coin motion and positions on property rights.

## THE CONTRACT IS UNCONSCIONABLE AND UNEFORCABLE

In addition the the arguments I made in my first original omnibus objection, D.R. 1417, about unconscionability, I also add all of the arguments on unconscionability as outlined in D.R. 1490, the Objection of Keith Ryals and Jennifer Ryals, through counsel, and from any and all other objections that reference unconscionability.

## THE EARN CONTRACT IS *HOPELESSLY AMBIGUOUS*, COINS ARE *GENERALLY NOT* PROPERTY OF THE ESTATE; A "LOAN" CANNOT PERMANENTLY TRANSFER "ALL RIGHTS AND TITLE" OR IT IS NOT A LOAN

Assuming this Court does not rule the contract unconscionable overall, as it should, and set it aside, ruling that the Earn contract is ambiguous *overall,* and that coins are customer property *overall* is appropriate in this case. It will streamline distribution of customer property, radically simplify the case and let us skip rulings on contract formation defenses, Custody, Withhold, and other issues that threaten to keep us mired

in Chapter 11–along with the Debtor's lack of being willing to work out any of these issues outside the courtroom or present any sort of *restructuring plan*.

The bottom line, summed up in D.R. 1490, the Objection of Keith Ryals and Jennifer Ryals, through counsel, "is that they are replete with language providing that at most, Respondents were 'lending' their assets to Debtors for a period of time until Respondents, in their sole discretion, asked their assets to be returned."

In addition to my past filings on this matter, new filings have made, and continue to make, excellent points about why, and how, this is true. In particular, D.R. 1417, the Objection of Eric Wohlwend, through counsel, and D.R. 1416, the objection Rebecca Gallagher, *pro se,* and other motions that continue to hit the docket, all make excellent points regarding the ambiguity and true meaning of Celsius' contracts, which I endorse without rearguing all of them. I incorporate herein and join in any and all other objections to the Earn Motion that make these, and similar points.

I add to the excellent arguments made in these filings by noting that if the Debtor had wanted to make it clear to customers that they were purchasing unsecured debt that would be denominated in cryptocurrency, it would have been easy to draft a contract that was clear and unambiguous: It would have called the transaction something akin to the "purchase of a bitcoin-indexed note" a "Bitcoin Sales and Repurchase–or REPO agreement" (or something similar for other cryptocurrencies, such as an "Ethereum-indexed note" or "Ethereum REPO agreement").

In fact, in the United Kingdom, Celsius had three "Sales and Repurchase Agreements." See Exhibits C-1, C-2, and C-3 from D.R. 393, the *Declaration of Alex Mashinsky.*

**The existence of three Sales and Repurchase agreements from Celsius, in other contexts, shows that their contract language, which was *ambiguous*, referred to Earn deposits as a loan, when it could have referred to Earn deposits as not deposits at all, but an "Earn Sales and Repurchase Agreement," which would have been *unambiguous***

Celsius made an intentional choice, for some reason, to avoid a sales and repurchase agreement or similar structure for the Earn program in the United States, which would have been a clear and unambiguous transfer of title in exchange for unsecured debt, and would have likely avoided the situation we find ourselves in today. More discovery into exactly why this decision was made is still needed, but one strong possibility is that a sales and repurchase agreement would be treated as a tax disposal event for customers, undermining the advertising–and the entire stated purpose of–the Earn program. Wanting to "have their cake and eat it too," the Debtor likely decided to use an *ambiguous* contract that spoke to both a loan and a transfer of title even though such an agreement was hopelessly contradictory.

"Upon deposit of your bitcoin," a clear and unambiguous Bitcoin Sales and Repurchase Agreement contract might have stated, "it will be exchanged for an unsecured note

indexed to the price of bitcoin, with interest, payable in-kind at regularly-updated rates of interest, as additional amounts of unsecured bitcoin-indexed notes. When you end your agreement by calling your loan and terminating your loan agreement, Celsius will re-purchase your note with bitcoin, and send you the bitcoin." Instead, the Debtor kept things contradictory and ambiguous by *avoiding* calling the transaction an *exchange* of cryptocurrency for a crypto-indexed unsecured note payable in-kind on demand–but, again and again, a *callable loan.*

Importantly, to purchase a structured note, or Sales and Repurchase Agreement, the buyer *purchases* or otherwise *acquires* the note. They exchange money, or other consideration (which could have been bitcoin, Ethereum, or other consideration, *for* the note.) Their purchase of the note *is <u>not a loan</u> of money or property*, it is either a purchase or other type of acquisition (such as a trade), making the purchaser the clear *owner* of the note, on the one hand–and *no longer* the owner of the money or property they exchanged for the note. The owner of the note, in other words, has *disposed* of the cash or property they used to acquire the note *in exchange for* the note. They are no longer the owner of what they parted with (money or other consideration); instead, they now *own* the structured note and *do not* own the original property. That sort of transaction–the exchange of one thing for the other–is clear and unambiguous.

Here, the Debtor *made a considered choice to avoid a full transfer of title through a Sale and Repurchase Agreement*. Instead, they repeated in many ways in many forms (outlined in the filings I referenced above) that users would *loan* their assets to

Celsius and that the transaction was a ***callable loan***. While the loan also had clause

grant of "all rights and title," which was ambiguous and in contradiction of the loan

language, interpreting that to mean the Debtor permanently owned the coins (outside of

the stated uses in the contract while it was in the Earn program, which has permanently

ended), is a nonsensical contradiction in terms that is hopelessly ambiguous.

It is simply not possible to ***loan*** something, while concurrently transferring "all rights and

title" to it. If I loan you my car, I am not transferring the title of my to you. If I transfer title

to you, it is, definitionally, not a loan, but something else such as a REPO agreement

that involves a sale and the agreement to repurchase at a later date. Mr. Blonstein

agreed with this in depositions, because it is simply common sense. Transferring title

has to happen through some sort of *transaction*: a purchase, a trade, or a gift, or

another property disposal event.

When we speak of leading a car, it is a prime example of this: I can loan you a car that I

own. I might grant you "all rights of ownership" while it's on loan, in some sense, while

you borrow it. If I do, then, if you total the car, you might be forgiven in terms of your

liability for wrecking it, per the terms of the granting of rights of ownership that are

contractually granted while you possess the car. **Yet, it is still *my* car and I can still

terminate the loan and reclaim the wreckage, if I would like; it does not somehow

convert into an unsecured loan.**

The point is, if I loan you my car, it is not a title transfer. Instead of loaning you my car I could sell it to you or enter into a REPO agreement which would let me *repurchase* the car at a future date, thereby closing out and reversing a transfer of "all rights and title". However, I still would not be **loaning** the car to you for the duration of the time you held title to it under a REPO agreement. Instead, such a transaction would be a "sale and repurchase," or REPO, agreement.

The Debtor is asking for this contract to, in effect, be treated akin to a Sales and Repurchase Agreement–**even though they made a considered decision *not* to write the agreement as a Sales and Repurchase Agreement, which they used only for their UK entity**. They are claiming that, on the petition date, they held all rights and title because customers had effectively disposed of their property when they entered the Earn program and **exchanged** it for something else, akin to an unregistered Earn security or structured note that was not, in fact, the original property they deposited. The problem with this argument is that the contract is very clear that the transaction is a *loan*, as distinct from a Sales and Repurchase Agreement. And it is also clear that Debtor did not treat transfers into the Earn program as tax disposal events; they issued 1099s for interest paid, but that was it, making it a **loan.**

## OREN BLONSTEIN ADMITS THAT THE TERMS CAN BE READ TO BE AMBIGUOUS

The ambiguity between a loan and a transfer of ownership isn't just unclear to customers such as myself; Celsius' own Chief Compliance Officer understands how reasonable people can interpret to contract differently, i.e. *ambiguity*.

BY MR. KHANUJA:

Let's me ask you just one last question on that.

But then, you know, you weren't able to make a distinction between a loan and transfer of ownership as you mentioned. Now, if that is unclear and unambiguous, you know -- or rather, I'm sorry. If the distinction is not clear and unambiguous to a chief compliance officer of a regulated financial instruction -- I am sorry, not regulated – registered financial institution as an MSB, do you think it will be ambiguous to unaccredited investor or unsophisticated investors or even sophisticated investor but who are not as legal savvy as the chief compliance officer?

MS. BRIER: Objection to form. Misstates testimony and calls for a legal conclusion.

THE WITNESS: Yeah. You know, it's hard -- it's hard to answer that on behalf of other people. I -- obviously, I understand your point. I'm -- I follow the -- you know, the comments from our customers and stuff like that. I understand the frustrations. I understand how people feel about it. But, yeah, just commenting on how people may have interpreted it, I'm not the right person to answer that.[2]

---

[2] Deposition of Oren Blonstein, p. 390

You can earn income from the car–whether I lend it to you or sell it to you; it is your income to keep either way. If you wreck my car after I loan it to you, I still get the wrecked car back if you crash it–and, it remains my property. That may not be true if the car is first sold via a REPO agreement, with me intending to repossess it at a future date. **However, the problem is that the Debtor said the transfer was a *loan*, not a REPO agreement; they cannot make it a REPO agreement now.**

Oren Blonstein admitted in depositions numerous times that the contracts, and particularly the *interactions of* the contracts, can be treated in *ambiguous* ways.

When asked about this ambiguity, that if you loan someone your car, it remains your car. Cryptocurrency, while virtual, has a clear legal status, just like a car: That of *property*. It is no different than a car: if you lend it to someone, they may have sole possession of it while it's on loan, and you may give them the rights to do things with it to earn income, and they may lose some of it while trying to use it for gain, but it still belongs to you until it is sold, given, or otherwise transferred or disposed of. In depositions, Mr. Blonstein admitted that a loan–at least when it comes to a car–is not a transfer of title:

> BY MS. CORDRY: Q. I understand. I understand. But when I -- when I loan you my car, I'm giving up control over my car while you're out driving around. You might smash it up. But it would still be my car, would it not?
>
> MS. BRIER: Objection to form.
>
> THE WITNESS: Yeah, I agree. It would still be -- it would still be your car.[3]
>
> …

---

[3] Oren Blonstein Transcript, p. 279, line 17

Now, let me ask you this: You responded to the UCC counsel's analogy of a

house and car saying when you signed up for terms of use, you didn't think or

make a distinction between a loan … And transfer of ownership. Celsius as a

customer and you reviewed the And transfer of ownership.

MS. BRIER: Objection to form. Outside the scope. You can answer.

THE WITNESS: Yeah, yeah. So, like, just in my capacity as a -- or in my -- just as

a customer, that wasn't material to me, because I'm not an attorney.


What I believed happened here is that to avoid writing a proper Sales and Repurchase

Agreement, that treats deposits as a purchase of an unsecured note and is a clear tax

disposal event, the Debtors instead wrote a hopelessly ambiguous contract that speaks

both of a loan and of a title transfer *at the same time*.


Regardless of the Debtors' intent, the *outcome* was ambiguity. New York courts

construe issues of ambiguity against the drafting party—in this case, the Debtors.

*Jacobson v. Sassower,* 66 N.Y.2d 991, 993 (1985) ("[I]n cases of doubt or ambiguity, a

contract must be construed most strongly against the party who prepared it, and

favorably to a party who had no voice in the selection of its language.").


## CELSIUS MAY BE AT LEAST A PARTIAL PONZI SCHEME AND A FRAUDULENT OPERATION; TO THE EXTENT IT'S FOUND NOT TO BE, THE ONGOING INVESTIGATION IS RELEVANT INTO THIS MOTION

The Examiner's investigation into whether the Debtors used new deposits made by customers to make payments or otherwise meet obligations to existing customers at a time when the Debtors had no other sources (whether liquid or which could have been monetized) from which to make such payments or meet such obligations is relevant to this motion, because the Earn contract, to be valid, requires real *consideration.*

There are real questions about whether Earn customers who received rewards as "numbers on a screen" were receiving any form of actual consideration–especially considering that users who withdrew ended up doing so at the expense of users who remained.

The entire basis of the Earn contract was consideration in the form of rewards. If such consideration was missing–and if rewards were not based upon market demand or were primarily paid out using the deposits of other customers, then, the clauses in the contract that imply users signed up to earn rewards may be unenforceable. If that section of the contract falls, so does the rest; the contract is very much contingent on rewards being Earn's key differentiator from other services, such as Custody.

## THE DEBTOR'S PLAN TO ADJUDICATE CONTRACT FORMATION DEFENSES VIA THE CLAIMS PROCESS INEQUITABLY SHIFTS THE BURDEN TO INDIVIDUAL CUSTOMERS, ALLOWING THE DEBTOR TO BAR CREDITORS FROM THE CLAIMS THEY ARE CONTRACTUALLY ENTITLED TO

Assuming that the Earn contract is not entirely overturned due to ambiguity–and to be clear–I believe it should be, and that all Celsius should receive a *pro rata pari passu* distribution of what is left, so that we can move on from the madness of adjudicating every last contract claim, which could keep us locked up in bankruptcy, potentially for years–the Debtors' method of dealing with contract formation defenses is inequitable to customers, and fatally flawed.

The Debtors first tried to convince this Court, the UCC, and its customers, that there is "unambiguous plain language" that *all* Earn users agreed to in a similar way by merely *asserting* any deposit that the Debtors placed an "Earn" label next to was property of the Debtors' estates.

Having failed in this effort due to, I believe, *twelve* objections to their original stablecoin motion, they have all but conceded that there are defenses to the formation of the contract, which, they assure us, will be litigated at a later date and time (conveniently, of the Debtor's choosing). They are therefore rushing to get a ruling for *most* Earn customers now (those without so-called contract formation defenses), so that they can treat most Earn deposits as people with no defense, and seize their property by submitting potentially incorrect *default* claims for huge swaths of customers in the run-up to the January 3 bar date.

To the extent that the Earn contract is *generally* upheld, but there are ruled to be defenses, the Debtor proposes to use incomplete schedules–schedules that do not

reflect the contractual claims that customers really have–to file potentially inaccurate

default claims on behalf of many customers with these defenses, and then force

customers to file alternative claims, one at a time, to challenge their schedules.


Filing potentially incorrect default claims based on inaccurate schedules that are not

based on the contractual rights of customers improperly shifts the burden to individual

customers to assert individual "contract format defenses" one customer–and one

claim–at a time (i.e. during the claims process or in other litigation). Yet most of these

defenses apply to large groups of customers, they are not just corner cases that apply

to a single individual.[4]


While I can only represent myself as a *pro se* creditor, it is invariably the case that, to

the extent that a given contract formation defense applies to one customer, it almost

always applies to many similarly-situated customers; the equitable remedy to to litigate

defenses to contract formation is not the one-off, one-at-a-time approach the Debtor

proposes; it is is for the Debtor to power through the different contract defenses that

apply to groups where possible, get a ruling on each specific contract defense, and,

ultimately, armed with declaratory judgements about which customers are entitled to

which claims, revise its schedules with additional contractual categories such as

"returned collateral" after ruling on each defense and *before* finalizing its schedules and

submitting *potentially inaccurate* default claim forms on behalf of customers. This would

be similar to the Custody and Withhold litigation on preference action defenses, which

---

[4] I have not, at this time, filed a motion to move the bar date forward and require the Debtor to update its
schedules to bring them in line with the contracts that Celsius customers signed, after rulings on contract
defenses. I reserve the right to file such a motion in the future.

must take place before preference actions begin. Only for truly individual claims, such as contract modification via oral or written statements, would individual claims make sense, as a last resort (but I believe a better–and justified path, given everything–would be to find that the contract was modified for all users to make coins user property, or, failing that, to adjudicate contract defenses using "test cases;" I suppose that individual *pro se* creditors could, potentially serve as a test case for a particular type of defense.)

Turning back to individual defenses, if we must look at those, some corner-case defenses will be unique, many will not be, and will apply to claims worth tens of millions of dollars or more in many users' accounts.

As it stands, the Debtor is asking for a ruling from this court, via this Motion, that it can knowingly use *incorrect* or at least *ambiguously correct claims information that is likely to be subsequently overturned* in its schedules to prepare *incorrect or ambiguously correct* default claims for large groups of customers–without marking the claims as *disputed* on customers' default claim forms, as they arguably should, if the contractual status for certain customers is unclear and yet-to-be-adjudicated.

The Debtor is attempting, via this Motion, to pick and choose which contracts, and which contract terms, it wishes to honor in its schedules–and which to ignore, and to get the Court's blessing to do so. After which customers who rely on the Debtor's honesty would forever be barred from making the *correct* claim for what they are actually owed

because of a group contract defense (if such a decision comes after the bar date

passes.) Such a ruling should be **DENIED**.


## A LOAN IN THE ORDINARY COURSE, WHICH BECOMES UNSECURED DEBT ONLY IN BANKRUPTCY, IS LIKELY AN IMPERMISSIBLE *IPSO FACTO* CONTRACT


To the extent the Debtors contracts imply that the contract is a novel kind of contract

that starts as a loan of property–but *becomes* unsecured debt in bankruptcy, that

amounts to an unenforceable *ipso facto* contract. This language, in particular, should be

held to be unenforceable:

> In the event that Celsius becomes bankrupt, enters liquidation or is otherwise
>
> unable to repay its obligations, any Eligible Digital Assets used in the Earn
>
> Service or as collateral under the Borrow Service may not be recoverable, and
>
> you may not have any legal remedies or rights in connection with Celsius'
>
> obligations to you other than your rights as a creditor of Celsius under any
>
> applicable laws.


Contract clauses that shift property rights due to bankruptcy on an *ipso facto* basis are

generally unenforceable. I believe that a contract where customers loan Celsius their

property and are owed their property back in-kind and have priority above any other

unsecured creditors and entitled to *in kind* return of property *without* conversion and tax

disposal of that property–*unless and until Celsius files for bankruptcy in which case it*

*becomes an unsecured crypto-indexed note*–is an impermissible *ipso facto* contract and must be overturned.

The priority shifting done here, from an *in-kind* return of deposited property that was *loaned* to Celsius and belongs to the lender (i.e. the Celsius customer) pre-bankruptcy, to a forced conversion upon bankruptcy into something resembling a *structured note* or Sale and Repurchase agreement that is merely unsecured debt and a tax disposal event in the event of insolvency or bankruptcy, should be ruled unenforceable. They are akin to the "Type 1" Priority Provisions that were found to be impermissible in *In re Lehman Bros. Holdings Inc.*, 533 B.R. 476 (Bankr. S.D.N.Y. 2016).

## CELSIUS PLACED UNITED STATES CUSTOMERS' RETURNED LOAN COLLATERAL (FROM PAID-OFF AND LIQUIDATED LOANS) INTO EARN AFTER APRIL 15, IN VIOLATION OF THE CONTRACT; IT CANNOT NOW SEEK A RULING GIVING IT OWNERSHIP OF ANY OF THAT COLLATERAL THROUGH THIS MOTION

When a Celsius customer took out a loan, it was the practice of Celsius to return collateral to the account type it had originally come from after April 15, 2022, "when possible" (with, I believe, exceptions for "withhold states," among other corner cases.)

Loan collateral that had previously been in Earn *before* taking out a loan, went back into Earn after loan repayment, according to Oren Blonstein.[5]

> · Q.· ·Okay.· So you should at least be familiar with this then, and so I'll just share my screen and zoom it in for you. So we're now on page 522 of the declaration of

---

[5] Depositions of Oren Blonstein, Page 348

Alex Mashinsky, and I'm under the section that says, "Beginning April 15, the modification date, the following terms shall apply for all users in the United States." So it says that any eligible digital asset transferred to your Celsius account on or after the modification date will be initially transferred to our custody wallet as a part of the custody service.

In your opinion, should collateral from a paid-off loan or a liquidated loan under this language have been transferred into custody for all United States users?

MS. BRIER:· Objection to form. Outside the scope.

THE WITNESS:· The practice at the company was that where -- where possible, when a loan was paid off, we would return the collateral assets to the account from where it originated. So if the collateral originated in an earn account when the loan was paid off, we would return the collateral to the earn account.· If the loan collateral originated from the custody account, if the loan were paid off, it was returned to the custody account.

BY MR. HERMANN: Q.· ·What was the contractual basis for that practice?

MS. BRIER:· Objection to form.

THE WITNESS:· Yeah, it wasn't my decision.· I wasn't involved in the drafting of any of these things.· I'm just -- I'm just kind of sharing with you what the practice was.· So I can look into that further, or -- but, yeah, I don't have the answer for that.

I will fully make my case for my returned loan collateral in another filing. However, I will note in this filing, as I have noted in earlier filings incorporated herein, that the Terms of Use was modified by the Loans TOU Version 9 I signed, making me the "sole owner" of all collateral.

## THE DEBTOR'S SCHEDULES HAVE BEEN PREPARED USING INTERNAL *LABELS* FROM ITS INTERNAL LEDGER, WHICH IS FLAWED, RATHER THAN PREPARED USING THE CONTRACTUALLY-AGREED-UPON *TREATMENT* OF ASSETS

In depositions, Mr. Blonstein was unable to point to any contractual language that authorized the practice of placing collateral into the account it originated from after a loan was repaid or liquidated.

In fact, nobody from The Debtor has been able to point to any contractual language that authorized the practice. However, there is clear language in the Terms of Use Version 8 that says all transfers will initially go into Custody, not Earn, for all United States users.

This claim is not appropriately an individually-asserted "contract formation defense" for a small subset of users, but a fundamental change in the contractual relationship which may apply to a universe as large as all United States users who read a loan agreement, signed it, and/or had loan collateral returned to an accounts after April 15, 2022. It may also apply to International users as well

Furthermore, as I asserted earlier in this filing and in other filings, the language "sole owner" in my loan agreement made it clear that users who read the agreement owned **all** the coins in their Earn accounts, not just coins that were ultimately used in the initiation of a loan.

Many users, such as myself, signed Loan Agreement Version 9 ***after*** they had agreed to the general Terms of Use. I take the position that language that I was the "sole owner" of the collateral *modified and superseded* Terms of Use for me while my coins were still in Earn for all of my Earn deposits. This is not an individual contract formation defense, given that many customers took out, and subsequently repaid, loans.

I will make my full case in full in a future filing, should I be required to make the case for my individual contract formation with the Debtor. If I am successful in making this case, it is clear that the same defense applies to a large subgroup, such as: all customers who have coins in Earn, who read and/or signed a loan agreement.

## THE LABELS IN THE CELSIUS APP, THEIR INTERNAL LEDGER, AND THEIR BANKRUPTCY SCHEDULES, DO NOT CONSISTENTLY MATCH THE APPROPRIATE CONTRACTUAL TREATMENT

Under oath, Mr. Blonstein admitted that Custody, Withhold, Earn, Suspended, and other labels in the app were just **labels**, and that what happens on the backend–and what happened contractually–remains separate from such labels.

My deposition question confirming that "Custody," "Earn," and other labels–appearing

on the app–are merely internal labels appearing in an internal ledger, is below:

BY MR. HERMANN: Q.· ·Great.· And now I have another·question.· This one's

about sort of labels at Celsius. So, you know, there's been some -- I think I've

seen in different declarations -- you know, just -- I think withhold was just called a

label essentially at one point by Celsius. I don't have it in front of me. You know,

custody is sort of treated as if it's something more than a label, although I believe

in your declarations -- this is my first question. Custody was never

exactly·one-to-one matched with any deposits,correct?

MS. BRIER:· Objection to form. Outside the scope of the issues related to the

earn motion. You can answer to the extent you know.

THE WITNESS:· Yeah, the company always endeavored to have one-to-one

matching for customers that had deposited assets that went to their --you know,

that were recorded on our ledger as being part of the custody program with the

actual assets held in the custody wallet. Like what was in my declaration, the --

because there was a process where the coins flowed from their deposit -- the

personal deposit address or the bridge wallet into main and then were swept to

the custody account. You know, the balance in the custody account at any given

time may not have exactly corresponded to what a customer -- in the aggregate,

what you would get if you summed up all the custody balances according to

the·ledger. So that was probably a little bit of a word salad.· But the idea is the

ledger -- if you took a -- if you froze at the moment in time when we performed

the reconciliation between the ledger and the custody wallet, there should have

been a one-to-one match, and there certainly was -- there was -- there certainly

was at many points in time. Did they fall out of -- did – was there a gap or

difference in the value between the custody -- the aggregate custody balance

according to the ledger and the balance of coins held in the custody wallet? That

would happen, let's say, one microsecond after the reconciliation was done just

based on deposits and withdrawal activity from customers.

BY MR. HERMANN: Q.· ·Yeah.· I mean, I guess my question is in terms of -- so

technically -- from a technical -- only a technical perspective -- ignore everything

that happened on the backend.·When something is labeled "withhold" or

"custody" or "suspended" – you know, I understand that there were after-the-fact

reconciliations, but -- and that there was a wallet and Fireblocks. But in terms of

the just labeling in the app, is there a technical difference from the way "custody"

was a label versus "withhold" or "suspended" or "earn" being a·label, or are they

just all labeled, and then on the backend you do your thing to reconcile?

MS. BRIER:· Objection to form. Compound and outside the scope. But you can

answer to the extent you know.

THE WITNESS:· Yeah, I mean, you can say everything single thing in there is a

label because of the difference between the ledger and the actual coin

movements. So even your balances in earn are a label.· Your balances in --

yeah, it's all a label, because those two things were, by design, not tied to each

other. That's the difference between – that's generally the difference between

centralized service providers and decentralized service providers.

## **OBJECTION**

I object to the amended order and its associated proposed scheduling order. I ask that

this Court:

1. **Rule that the Earn contract is *ambiguous*, or else allow more time to prove that
it is.** The brief discovery process we have gone through has already shown that the

Earn contract was ambiguous, in my view. At many times throughout depositions, Oren

Blonstein and Chris Ferraro conceded that points of the contract were ambiguous in

many ways.  The Court should extend the for deciding these questions, replacing it with

a process that respects due process and determines property rights based on all

appropriate legal theories put forward in court. This should also include expanded

discovery and a process for adjudicating discovery disputes.

2. **Ensure that any ruling on the property rights for all Earn customers considers
arguments that the Terms of Use are *ambiguous* and self-contradictory–and allow
for defenses for Earn as a class**, *not just for individuals or subcategories.* Any ruling

must allow for a look at the ambiguous nature of the Debtors contracts in a holistic way

(including interactions between different contracts that modify terms.) I object to the

Debtor's assertion that recent versions of their Terms of Use have "unambiguous plain

language" that allow for the clean resolution of property rights issues based on

cherry-picked sections from the recent Terms of Use versions that users purportedly

agreed to. **See 11/20 Objection of Rebecca Gallagher, Page 7, "Is the language of
each of the versions of the written TOS unambiguous and plain?**"

3. **To the extent that the contract is ruled to "clear and unambiguous" for most users over my objections, protect the rights of Earn customer subcategories as *classes* rather than individuals.** Earn contract defenses that apply to large subcategories are not *individual* contract formation defenses; they are defenses for large groups of customers. Resolving these contract formation defenses during the claims process will result in a flood of disputed claims, incentivize claims disputes, and result in inequitable treatment for those who allow for a default claim to be made by Celsius. Instead, the Debtors should be required to use best efforts to include accurate claims information–consistent with the contracts that users signed–in their schedules, and to mark unclear claims that are still being litigated or in dispute as "disputed," by default, in their schedules.

4. **Determine whether customer assets were *loaned* to Celsius or *transferred* to Celsius in a formal title transfer as part of any ruling on Earn property rights**. As I have shown in this motion and my discussion around the differences between the Debtor's contracts and the clear and unambiguous nature of structured notes, the question is not merely a tax question but gets at the heart of the relationship between depositors and Celsius. To the extent that the loan question *is* a tax question–which it only is *in part*–a tax disposal event would likely be unconscionable because of the terrible tax consequences for customers, as well as the Debtor's false and misleading advertising and communications about avoiding tax events.

5. **Determine whether one Earn customer's interest payments–payments which were ostensibly offered in consideration for agreeing to the contract–were actually return of another depositor's principle, as part of resolving questions around the broader Earn contract.** When and for how long Celsius was insolvent is being addressed by the examiner. Even if Celsius is not ruled to be a *pure* Ponzi scheme, simply recycling customer deposits among customers while the company knew it was insolvent and losing money, can not be true *consideration*. Once Earn payments to one customer became a return of another Earn customers' principle, rather than 80% of Celsius earnings, as they advertised, on a consistent basis–and Celsius was losing money on a consistent basis–the contract may have been null and void due to a lack of legitimate consideration.  Continuing to pay interest while hopelessly insolvent would also be inconsistent with the clause of the contract that says Celsius will make their "best commercial and operational efforts" to avoid losses, other clauses, and other laws—such as securities laws—making it an illegal and unenforceable contract.

6. **Order the Debtor to provide *adequate notice* to Earn Customers before Earn customers permanently lose the right to argue for their coins.** See D.R. 1417 for my proposed email to worldwide Earn customers, as an example of what I believe would provide adequate notice in advance of a final, binding ruling impacting all Earn customers.

## <u>RESERVATION OF RIGHTS</u>

I reassert, incorporate, and set into this filing all rights reserved in my original objection, D.R. 1417, my *Omnibus Objection and Reservation of Rights to the Debtors Proposed Scheduling Order And the Debtors' Amended Motion,* and in my *Response and Reservation of Rights,* D.R. 1263.

Additionally, I reserve and preserve any and all claims, causes of action, and defenses that I may have with regard to the Debtors or any other party in interest, including without limitation as to any alleged contract with the Debtors.

Furthermore, while some limited discovery has happened, the Debtor only released de-designated transcripts after 8pm ET yesterday evening. There has not been, and will not be, time to go through all the transcripts and properly process the depositions, to correct typographical errors in them, or to engage in discovery disputes before the deadline for this motion. While the overall timeline *might have worked* under ideal circumstances, but been tight, had the Debtor cooperated, due to the Debtor's intransigence, it was far too rushed.

In light of the rushed timeline, I reserve the right to assert additional arguments, to raise issues in open court that are not addressed in this objection, or to file a Motion to Reconsider or seek other relief if any key questions of fact or law are incorrectly stated in any ruling as a result of this motion.

I also reserve the right to amend and/or supplement this Objection based on discovery

of additional facts and information, including information that I discover because I was

not left with sufficient time to review the already-available information before the

Motion's filing deadline.

Respectfully submitted,

Dated: November 29, 2022
Silver Spring, Maryland

/s/ Immanuel Herrmann
Immanuel Herrmann