Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DEBTORS' RESPONSIVE BRIEF ON PHASE I CUSTODY AND WITHHOLD ISSUES**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

# TABLE OF CONTENTS

Page

**Preliminary Statement**................................................................................................2

**Background** .............................................................................................................4

    I.     Case Background and Procedural History ..................................................4

    II.    Factual Background ...................................................................................5

**Response** .................................................................................................................5

    I.     The Custody Assets Do Not Constitute Property of the Estate. .................5

    A.    The Debtors, the Committee, and the Custody Ad Hoc Group Agree that the Terms of Use Govern the Issue of Whether the Custody Assets are Property of the Debtors' Estates. ...................................................5

    B.    The Debtors Disagree with the Committee that Custody Assets Should Be Distributed on a *Pro Rata* Basis........................................................6

    II.    It is Unclear as to Whether All Withhold Assets Constitute Property of the Debtors' Estates. ...................................................................................8

    A.    The Debtors, the Committee, and the Withhold Ad Hoc Group Agree that the Terms of Use Do Not Address the Issue of Whether the Withhold Assets are Property of the Debtors' Estates....................................8

    B.    The Withhold Ad Hoc Group Has Not Met its Burden that All Withhold Assets Are Not Property of the Debtors' Estates........................................9

        1.    The Withhold Ad Hoc Group has failed to establish termination of Celsius' contractual right of title...................................................10

        2.    The Withhold Ad Hoc Group's constructive trust theory fails......13

            (1)    The Withhold Ad Hoc Group does not allege that Celsius was a fiduciary nor that a confidential relationship existed.15

            (2)    The Debtors did not make any implied promise to Withhold Account Holders. ............................................................17

            (3)    The Withhold Ad Hoc Group fails to allege a transfer of the subject res made in reliance on a promise. ........................17

            (4)    The Debtors were not unjustly enriched by legitimate retainment of the Withhold Assets....................................18

(5)     The Withhold Ad Hoc Group's tracing arguments are not relevant...............................................................................20

III.     The Debtors Are Entitled to Retain the Transferred Assets and Certain Other Custody Assets....................................................................20

A.     The Debtors and the Committee Agree that the Debtors Are Entitled to Retain the Transferred Assets and Certain Other Custody Assets............20

B.     The Debtors Are Not Required to Seek Injunctions or Prejudgment Attachment to Retain Custody Assets and Withhold Assets. ....................21

1.     Prejudgment attachment...................................................................22

2.     Injunction. ......................................................................................26

C.     The Custody Ad Hoc Group's Remaining Arguments Likewise Fail. ......27

1.     The Custody Ad Hoc Group misstates the Debtors' arguments and its reliance on *Colonial Realty* is misplaced. ..................................27

2.     The Debtors' retention of the Custody Assets does not violate state law....................................................................................................31

3.     The Debtors' retention of the Custody Assets does not violate the Bankruptcy Code. .........................................................................34

4.     The Debtors' retention of the Custody Assets does not violate constitutional due process. ............................................................36

D.     The Withhold Ad Hoc Group's Remaining Arguments Likewise Fail. ....37

**Conclusion** ...........................................................................................................39

**Page(s)**

**Cases**

*A. Brod, Inc v. SK&I Company, L.L.C.*,
  998 F. Supp. 314 (S.D.N.Y 1998) ........................................................................16

*In re Allegiance Telecom, Inc.*,
  356 B.R. 93 (Bankr. S.D.N.Y. 2006) .....................................................................6

*In re Ames Dep't Stores, Inc.*,
  274 B.R. 600 (Bankr. S.D.N.Y. 2002) ..................................................................16

*Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc.*,
  448 F.3d 573 (2d Cir. 2006) ................................................................................14

*In re Chowaiki & Co. Fine Art Ltd.*,
  593 B.R. 699 (Bankr. S.D.N.Y. 2018) ............................................................15, 18

*In re Chrysler LLC*,
  No. 09–50002, 2009 WL 1360863 (Bankr .S.D.N.Y. May 04, 2009)....................28

*In re Colonial Realty*,
  980 F.2d 125 (2d Cir. 1992).........................................................................27, 29, 30, 37

*In re Condado Plaza Acquisition LLC*,
  620 B.R. 820 (Bankr. S.D.N.Y. 2020) .....................................................................6

*Connecticut General Life Ins. Co. v. Universal Ins. Co.*,
  838 F.2d 612 (1st Cir. 1988)............................................................................9, 13

*Delgado Oil, Inc. v. Torres*,
  785 F.2d 857 (10th Cir. 1986) ............................................................................29

*In re Dreier LLP*,
  429 B.R. 112 (Bankr. S.D.N.Y. 2010) ..................................................................14

*Eden Place, LLC v. Perl (In re Perl)*,
  811 F.3d 1120 (9th Cir. 2016) .......................................................................35, 36

*In re Enron Corp.*,
  Case No. 01-16034 (ALG), 2003 WL 23965469 (Bankr. S.D.N.Y. Jan. 22,
  2003) ....................................................................................................................32

*In re First Cent. Fin. Corp.*,
  377 F.3d 209 (2d Cir. 2004)...............................................................14, 15, 27, 31

*In re Flanagan*,
    503 F.3d 171 (2d Cir. 2007)......................................................................13, 14

*In re Focus Media*,
    387 F.3d 1077 (9th Cir. 2004) ...............................................................................26

*In re Grubb & Ellis Co.*,
    No. 12-10685 (MG), 2012 WL 1036071 (Bankr. S.D.N.Y 2012)...................13, 16

*In re Haber Oil Co.*,
    12 F.3d 426 (5th Cir. 1994) ...................................................................................14

*In re Ionosphere Clubs, Inc.*,
    164 B.R. 839 (Bankr. S.D.N.Y. 1996)...................................................................33

*In re Jackson*,
    593 F.3d 171 (2d Cir. 2010)...................................................................................28

*Knoll, Inc. v. Zelinsky*,
    No. 05-CV-1499, 2008 WL 11504632 (N.D.N.Y. Apr. 8, 2008)......................29, 30

*Kornblum v. Kornblum*,
    34 A.D.3d 748, 828 N.Y.S.2d 404 (2006) .............................................................23

*In re Maple Mortgage, Inc.*,
    81 F.3d 593 (5th Cir. 1996) ...................................................................................13

*Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemp.*
*Dance, Inc.*,
    380 F.3d 624 (2d Cir. 2004)...................................................................................15

*Mascis Inv. Partnership v. SG Capital Corp.*,
    No. 654981/2016, 2017 WL 1423682 (N.Y. Sup. Ct. Apr. 21, 2017)....................24

*In re Megan-Racine Assocs., Inc.*,
    192 B.R. 321 (Bankr. N.D.N.Y. 1995) ..................................................................23

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
    473 U.S. 614 (1985)..................................................................................................6

*In re Moyer Grp., Inc.*,
    586 B.R. 401 (Bankr. S.D.N.Y. 2018).............................................................16, 18

*Musket Corp. v. PDVSA Petroleo, S.A.*,
    512 F. Supp. 2d 155 (S.D.N.Y. 2007) ...................................................................24

*Ne. United Corp. v. Lewis*,
    137 A.D.3d 1387 (2016) .........................................................................................24

*In re Omegas Group, Inc.*,
  16 F.3d 1443 (6th Cir. 1994) ...................................................................................14

*In re Peralta*,
  48 F.4th 178 (3d Cir. 2022) ...............................................................................35, 36

*In re PSA, Inc.*,
  277 B.R. 51 (Bankr. D. Del. 2002) .......................................................................33

*Rajala v. Gardner*,
  709 F.3d 1031 (10th Cir. 2013) ............................................................................37

*Rocchio v. Biondi*,
  835 N.Y.S.2d 401 (N.Y. App. Div. 2007) ............................................................16

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC*,
  460 B.R. 106 (Bankr. S.D.N.Y. 2011), *aff'd*, 474 B.R. 76 (S.D.N.Y. 2012) .........28

*State Bank of Florence v. Miller (In re Miller)*,
  459 B.R. 657 (B.A.P. 6th Cir. 2011) .....................................................................33

*Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
  559 U.S. 662 (2010) .................................................................................................6

*TAGC Mgmt., LLC v. Lehman*,
  842 F. Supp. 2d 575 (S.D.N.Y. 2012) ...................................................................23

**Statutes**

11 U.S.C. § 553(a) ...........................................................................................33, 39

Bankruptcy Code chapter 5...................................................................................28

Bankruptcy Code section 105...............................................................................26

Bankruptcy Code section 105(a)...............................................................21, 26, 27

Bankruptcy Code section 362...............................................................................29

Bankruptcy Code sections 362(a), 365(a), and 105(a) .........................................20

Bankruptcy Code section 502(d) ..........................................................................20

Bankruptcy Code section 541...............................................................................28

Bankruptcy Code section 541(a)(1) ...................................................................9, 28

Bankruptcy Code section 546(a)...........................................................................30

Bankruptcy Code section 553 ...........................................................................................25, 33, 39

Bankruptcy Code section 558 ...............................................................................................20, 33

Bankruptcy Code, section 558, section 553 ....................................................................................33

N.Y. Debt. & Cred. Law § 151(a)..............................................................................................39

**Other Authorities**

Fed R. Bankr. P. 7065.......................................................................................................................26

NY CPLR § 6201 ..............................................................................................................................25

The above-captioned debtors and debtors in possession (collectively, the "Debtors" and, together with their non-Debtor affiliates, "Celsius") submit this responsive brief (this "Response Brief") in response to *The Official Committee of Unsecured Creditors' (A) Opening Brief on Phase I Custody and Withhold Issues and (B) Statement in Partial Support of and Limited Objection to Debtors' Custody and Withhold Motion* [Docket No. 1290] (the "Committee Brief"), the *Ad Hoc Group of Custodial Account Holders' (A) Phase I Opening Brief and (B) Limited Objection to the Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to Reopen Withdrawals for Certain Customers With Respect to Certain Assets Held in the Custody Program and Withhold Accounts and (II) Granting Related Relief* [Docket No. 1292] (the "Custody Ad Hoc Group Brief"), and the *Ad Hoc Group of Withhold Account Holders' Phase I Brief Pursuant to the Joint Stipulation and Agreed Scheduling Order By and Among the Debtors, the Committee, and the Ad Hoc Groups With Respect to the Custody and Withhold Issues* [Docket No. 1289] (the "Withhold Ad Hoc Group Brief"), and in further support of the *Debtors' Memorandum of Law Regarding Phase I Custody and Withhold Issues* [Docket No. 1291] (the "Phase I Brief").[1]  In support of this Response Brief,[2] the Debtors state as follows.

---

[1]  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Phase I Brief or the Custody and Withhold Motion, as applicable.

[2]  Specifically, this Response Brief reiterates the Debtors' position in the Phase I Brief and responds to the positions set forth in the Committee Brief, the Custody Ad Hoc Group Brief, and the Withhold Ad Hoc Group Brief on the following issues:  (a) whether Custody Assets and Withhold Assets (both as defined below) are property of the Debtors' estate, including whether the Terms of Use are unambiguous on the issue of ownership of such assets (the "Property Issue"); and (b) if such assets are not property of the Debtors' estate, whether the Debtors should nonetheless be allowed to continue to hold the Custody Assets and Withhold Assets, and maintain the status quo, with respect to individuals or accounts where the Debtors have potentially viable claims, including, without limitation, preference claims (the "Status Quo Issue" and, together with the Property Issue, the "Phase I Issues").

<u>**Preliminary Statement**</u>

1. From the outset of these chapter 11 cases, the Debtors recognized the need to raise and resolve key legal issues to move these cases forward.  In furtherance of that goal, the Debtors, the Committee, the Custody Ad Hoc Group, and the Withhold Ad Hoc Group all agreed to the terms of the Scheduling Order, which provided a roadmap to resolution of issues related to the Custody Program and the Withhold Accounts in two different phases, if necessary.  The hearing Phase I Issues will lead to resolution of important gating issues in these chapter 11 cases—namely, whether Custody Assets and/or Withhold Assets are property of the Debtors' estates.

2. The briefing to date has helped to narrow the open issues before the Court.  More specifically, the Debtors, the Custody Ad Hoc Group, and the Committee agree that the Terms of Use are clear that Custody Assets are not property of the Debtors' estates. Similarly, the Debtors, the Withhold Ad Hoc Group, and the Committee agree that the Terms of Use are silent on whether Withhold Assets are property of the Debtors' estates.  This consensus represents notable progress and provides the Court a foundation on which to rule with respect to the remaining issues.

3. Equally as important, as a result of the briefing on the Phase I Issues, the Court and the Parties have a clearer sense of the disagreement that remains.  For example, while the Debtors, the Committee, and the Withhold Ad Hoc Group agree that the Terms of Use are silent with respect to the Withhold Assets, there is significant disagreement with respect to how to interpret that silence.  The Withhold Ad Hoc Group urges this Court to interpret silence in its favor and rule that the silence means that the title to the Withhold Assets reverted to the account holders, and Withhold Assets are not property of the Debtors' estates.  Furthermore, the Withhold Ad Hoc Group argues that in the absence of specific contractual language, the Debtors were holding the Withhold Assets in constructive trust for holders of Withhold Accounts.  A constructive trust is an

extraordinary remedy under New York law, and the Withhold Ad Hoc Group has failed to demonstrate the existence of one here.[3]

4. With respect to the Status Quo Issue, the Debtors and the Committee agree that the Debtors should be able to retain the Transferred Assets because the Debtors have colorable causes of action with respect to certain Custody Assets and Withhold Assets, including *prima facie* preference claims with respect to such assets. The Ad Hoc Groups' arguments that the Debtors' failure to seek an injunction or prejudgment attachment are extremely inapposite and unpersuasive. The Debtors have the right, pursuant to multiple provisions in the Terms of Use, to retain these assets and to exercise setoff rights, and their *prima facie* preference claims are property of the estates protected by the automatic stay. Moreover, given that the Debtors currently maintain possession of the Custody Assets and the Withhold Assets, prejudgment attachment is not the appropriate remedy to seek here. Put simply, this Court should not mandate an early distribution of property when the Debtors maintain *prima facie* preference claims with respect to such property. Such distribution would likely be value-destructive; the Debtors may be unable to claw back these distributions following the adjudication of the preference claims (either because the recipients are judgment proof or beyond the jurisdiction of the Court).

5. For these reasons, the Debtors submit that (a) with respect to the Property Issue, it is clear that Custody Assets are not property of the Debtors' estates and unclear as to whether Withhold Assets are property of the Debtors' estates, and (b) with respect to the Status Quo Issue,

---

[3] In the Phase I Brief, the Debtors took the position that Pure Withhold Assets are not property of the Debtors' estates because there would be no meeting of the minds on how to treat these assets. The Debtors stand by that position; however, it has become clear that virtually all Withhold Assets are Transferred Withhold Assets— meaning it is ***not*** the case that there was no valid agreement or meeting of the minds when those assets were transferred to the Debtors.

the Debtors should be allowed to retain all Transferred Assets pending resolution of issues set forth in Phase II.

**Background**

**I.      Case Background and Procedural History[4]**

6.      On November 19, 2022, the examiner in these chapter 11 cases, Shoba Pillay (the "Examiner"), filed the *Interim Report of Shoba Pillay, Examiner* [Docket No. 1411] (the "Examiner Interim Report"). The Examiner Interim Report focused on five different factual issues related to the Custody Program and the Withhold Accounts.[5] As further set forth in the Examiner Interim Report, the Examiner's investigation detailed how the Custody Program was launched in response to regulatory scrutiny and was a work-in-process after the launch date of the program in mid-April and continuing to the Petition Date.[6] The Examiner Interim Report explains the structural processes of the Custody Program and how digital assets move from external wallets through Celsius' primary wallets before reaching the Custody Wallets.[7] It also explains the genesis of the Withhold Accounts,[8] and provides that Withhold Assets "were not segregated from any other assets on Celsius's platform, or in any other way treated as customer assets."[9] Finally, the Examiner Interim Report provides some details on the Custody Assets, Withhold Assets, and

---

[4]    This Case Background and Procedural History sets forth the events relevant to the Phase I Issues from the time period between the filing of the Phase I Brief and the filing of this Response Brief.

[5]    *See* Examiner Interim Report at 2.

[6]    *Id.* at 3–5.

[7]    *Id.* at 50–65.

[8]    *Id*. at 42–44.

[9]    *Id*. at 70.

related liabilities in the time immediately before and after the Pause Date.[10] The Examiner did not reach any "formal" conclusions in the Examiner Interim Report.[11]

7. On December 1, 2022, the Debtors filed the *Supplemental Declaration of Oren Blonstein, Head of Innovation and Chief Compliance Officer of Celsius Network Limited, With Respect to the Custody and Withhold Issues* [Docket No. 1532].

## II. Factual Background

8. The Factual Background set forth in in the Phase I Brief is incorporated herein by reference.[12]

## Response

## I. The Custody Assets Do Not Constitute Property of the Estate.

### A. The Debtors, the Committee, and the Custody Ad Hoc Group Agree that the Terms of Use Govern the Issue of Whether the Custody Assets are Property of the Debtors' Estates.

9. The Debtors, the Committee, and the Custody Ad Hoc Group agree that, as a threshold and fundamental matter, the Terms of Use govern the issue of whether Custody Assets are property of the Debtors' estates.[13] Further, the Debtors, the Committee, and the Custody Ad Hoc Group all agree that the Terms of Use are clear and unambiguous that Custody Assets do not constitute property of the Debtors, but are instead customers' property.[14]

---

10  *Id.* at 74–81.

11  *Id.* at 81.

12  *See* Phase I Brief ¶¶ 7–11.

13  *See* Phase I Brief ¶ 12; Custody Ad Hoc Group Brief ¶¶ 32–33; Committee Brief ¶ 35.

14  *See* Phase I Brief ¶ 22; Custody Ad Hoc Group Brief ¶¶ 32–33; Committee Brief ¶¶ 35, 37.

10.     Absent a contrary legal or regulatory framework, courts look to the intent of the parties as evidenced in a written agreement.[15]  Here, all customers who wanted to access the Debtors' platform were required to affirmatively agree to the Terms of Use in a manner that satisfies the "clear and conspicuous" standard.[16]  Customers' acceptance of the Terms of Use, combined with use of the Debtors' services thereunder, constitutes a contract.[17]  Therefore, the parties' intent, as reflected in the Terms of Use, controls the issue of ownership of Custody Assets. Under New York law, which governs the Terms of Use, contracts are interpreted and enforced in accordance with their plain meaning and clear and unambiguous terms.[18]  The Terms of Use expressly provide that title and ownership of the Custody Assets remain with customers at all times and are clear that Celsius merely serves as an agent of its customers with respect to the Custody Assets and in the capacity of a custodian thereof.[19]

### B.     The Debtors Disagree with the Committee that Custody Assets Should Be Distributed on a *Pro Rata* Basis.

11.     While the Debtors and the Committee agree that Custody Assets do not constitute property of the Debtors' estates, the Committee seeks to limit the relief requested in the Custody

---

[15]  *See* Custody Ad Hoc Group Brief ¶ 29; *see also Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010) (holding that, as a general matter with respect to contracts, the intent of the parties controls); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985) (same); *The Elgee Cotton Cases*, 89 U.S. 180, 186 (1874) (applying intent of parties doctrine to question of transfer of title); *In re Allegiance Telecom, Inc.*, 356 B.R. 93, 98 (Bankr. S.D.N.Y. 2006) ("Under New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed.") (internal citations omitted).

[16]  *See* Phase I Brief ¶ 16.

[17]  *See id.*

[18]  *See id.* ¶ 17; *see also* Terms of Use § 33 (providing that the Terms of Use is "governed exclusively by the laws of the state of New York"); *In re Condado Plaza Acquisition LLC*, 620 B.R. 820, 831 (Bankr. S.D.N.Y. 2020) (finding that under New York Law, contracts are interpreted and enforced in accordance with their plain meaning and their clear and unambiguous terms).

[19]  *See id.* ¶¶ 19–22.

and Withhold Motion by arguing for a *pro rata* distribution of Custody Assets back to Custody users based on the current amount of Custody Assets in Custody Wallets.[20]  As an initial matter, this is not a Phase I Issue, but rather, appears to be the Committee's limited objection to the Custody and Withhold Motion.[21]  The Debtors address this issue in this Response Brief, however, because such argument could be extended to all Custody Assets.

12.     The Committee points to an approximate six percent shortfall between the Custody Program customers' account balances and the amounts in the Custody Wallets as justification that "Pure Custody Users and the Custody Account Holders that transferred assets below the Statutory Cap should receive a *pro rata* share of digital assets, by cryptocurrency type, held in the Custody Wallets as of the Petition Date."[22]  As set forth in the Phase I Brief, the Terms of Use expressly provide that title and ownership of the Custody Assets remain with customers at all times and that ownership of the Custody Assets belong to the Custody Program customers ***regardless of where such assets were stored or transferred***.[23]  Though the Debtors' reconciliation processes for accounting for Custody Assets in Custody Wallets was not automatic, that does not override the express language of the Terms of Use that Custody Assets are not property of the Debtors' estates.[24]  Any shortfall of Custody Assets in Custody Wallets created by the Debtors' manual reconciliation processes should not prejudice Custody Program customers.  This is particularly true given that the Terms of Use are silent with respect to such reconciliation process.

---

[20]     *See* Committee Brief ¶ 67.

[21]     *See* Scheduling Order ¶ 5 (setting forth the Phase I Issues).

[22]     *See* Committee Brief ¶ 67.

[23]     *See* Phase I Brief ¶ 22.

[24]     *See* Phase I Declaration ¶¶ 11–14; *see generally* Examiner Interim Report § V.J.

13.     Moreover, a strict interpretation of the Committee's *pro rata* distribution argument would lead to an absurd result. For example, if the Debtors never transferred cryptocurrency into the Custody Wallets, then applying the Committee's reasoning, Custody Program customers would not be entitled to any recovery of Custody Assets, despite the clear language in the Terms of Use stating that Custody Assets are not property of the Debtors' estates.

## II.     It is Unclear as to Whether All Withhold Assets Constitute Property of the Debtors' Estates.

### A.     The Debtors, the Committee, and the Withhold Ad Hoc Group Agree that the Terms of Use Do Not Address the Issue of Whether the Withhold Assets are Property of the Debtors' Estates.

14.     The Debtors, the Committee, and the Withhold Ad Hoc Group agree that, as a threshold and fundamental matter, the Terms of Use are silent on whether Withhold Assets are property of the Debtors' estates.[25]

15.     As set forth in the Phase I Brief, the Debtors submit that it is likely that two different types of Withhold Assets in Withhold Accounts are not property of the Debtors' estates: (a) digital assets transferred by a U.S. resident of a Prohibited State to Celsius' platform despite not being eligible for the Custody Program or Earn Program ("Ineligible Customers"); and (b) digital assets transferred by users to Celsius' platform where such digital assets were not eligible for any service offering nor supported on the platform ("Ineligible Assets").[26] The Withhold Ad Hoc Group, however, focus on a third subset of Withhold Assets that the Debtors did not address in the Phase I

---

[25]     *See* Phase I Brief ¶ 23; Committee Brief ¶ 42; *and* Withhold Ad Hoc Group Brief ¶ 21.

[26]     Phase I Brief ¶¶ 24–25.

Brief: digital assets that a Celsius customer in a Prohibited State with an Earn account attempted to transfer from the Earn Program to the Custody Program (*i.e.*, the Transferred Withhold Assets).[27]

16. The Debtors maintain the position that the Withhold Assets other than the Transferred Withhold Assets likely do not constitute property of the Debtors' estates.[28] Notwithstanding the Debtors' position, in all circumstances, the Withhold Ad Hoc Group bears the burden of proving that the Withhold Assets are not property of the Debtors' estates on the Property Issue.[29] With respect to the Transferred Withhold Assets in particular, it is unclear based on the briefing to date and the facts in the record as to whether these Withhold Assets are property of the estate and the Withhold Ad Hoc Group has not met its burden.

**B.     The Withhold Ad Hoc Group Has Not Met its Burden that All Withhold Assets Are Not Property of the Debtors' Estates.**

17. The Withhold Ad Hoc Group argues that the Withhold Assets are not property of the Debtors' estates for two primary reasons: first, any contractual right the Debtors had to the Withhold Assets terminated the moment any such assets were transferred out of the Earn Program; and second, the Debtors hold Withhold Assets in constructive trust, and thus, such assets are not property of the Debtors' estates.[30] With respect to both of these arguments, the Withhold Ad Hoc

---

27  *See* Custody and Withhold Motion ¶ 4.

28  *See* Phase I Brief ¶¶ 23–28.

29  *See* Scheduling Order ¶ 8; *see also Connecticut General Life Ins. Co. v. Universal Ins. Co.*, 838 F.2d 612, 618–19 (1st Cir. 1988) (holding that the burden of proof was on the claimant to show that a trust existed such that the property in question was not property of the estate); *see also* 5 Collier on Bankruptcy ¶ 541.28 (16th ed. 2022) ("When property in the possession of a debtor is alleged to be held in trust by the debtor for a nondebtor, ***and therefore not estate property under section 541(a)(1) or (2), the burden rests upon the entity seeking to exclude the property from the estate*** . . .") (emphasis added).

30  *See* Withhold Ad Hoc Group Brief ¶¶ 11–14; 34–43.

Group fails to satisfy the requisite burden of proof necessary to demonstrate that the Withhold Assets are not property of the Debtors' estates.

### 1. The Withhold Ad Hoc Group has failed to establish termination of Celsius' contractual right of title.

18. The Scheduling Order provides that all burdens of proof remain as though the Ad Hoc Groups had commenced actions through adversary proceedings.[31] The Withhold Ad Hoc Group thus holds the burden of proof in showing that the property in question is not property of the estate.[32]

19. The Withhold Ad Hoc Group alleges that the Terms of Use establish that Celsius takes title to digital assets ***only*** when such assets are located in the Earn Program.[33] The Terms of Use cited by the Withhold Ad Hoc Group, however, provide only that: "If our Earn Service is available to you, upon your election, you will lend your Eligible Digital Assets to Celsius and grant Celsius all rights and title to such Digital Assets, for Celsius to use in its sole discretion while using the Earn Service" and "[i]n consideration for the Rewards payable to you on the Eligible Digital Assets using the Earn Service, for us entering into any Loan Agreement, and the use of our Services, you grant Celsius, subject to applicable law and for the duration of the period during which you elect to utilize the Eligible Digital Assets in the Earn Service (if available to you)."[34] The Withhold Ad Hoc Group therefore concludes that "Withhold Group members' grant of rights and title to Celsius ended when the Withhold Group members transferred their digital assets out

---

[31] *See* Scheduling Order ¶ 8.

[32] *See supra* note 29.

[33] *See* Withhold Ad Hoc Group Brief ¶ 19.

[34] Terms of Use §§ 4.D, 13.

of the Earn Program and into the Withhold Accounts."[35]  This conclusion, however, is not in the express language of the Terms of Use; it is merely a negative inference read into the above statement by the Withhold Ad Hoc Group and unsupported by the Phase I Declaration and the Examiner Interim Report.[36]

20.     In comparison, the Terms of Use are clear on who retains title to assets in other programs.  For example, the Terms of Use clearly establish that users that transfer assets into Custody Accounts do not transfer title to Celsius.[37]  In addition, the Terms of Use state that title to assets in the Earn Program and assets held as part of the Borrow Program are transferred to Celsius.[38]  Even some of Celsius' more ancillary products are clear on who retains title during the use of such product.[39]  Moreover, the Terms of Use suggest that title remains with Celsius only unless transferred to Custody or to an external wallet.[40]

---

[35]   Withhold Ad Hoc Group Brief ¶ 26.

[36]   *See* Phase I Declaration ¶ 5 (explaining the origin of the Withhold Accounts but not specifying whether the Terms of Use were implicated); Examiner Interim Report at 70 (stating that Withhold Assets were not treated like Custody Assets, or otherwise treated like customer assets, and were deployed in the same manner as assets in the Earn Program or other assets existing on Celsius' platform).

[37]   Terms of Use § 4.B.

[38]   Terms of Use § 4.D ("If our Earn Service is available to you, upon your election, you will . . . grant Celsius all rights and title to such Digital Assets."); Terms of Use § 13 ("[Y]ou grant Celsius . . . and thus loan such Eligible Digital Assets to us through your Celsius Account, or as collateral under the Borrow Service . . ., all right and title to such Eligible Digital Assets, including ownership rights . . .").

[39]   With respect to CelPay, the Terms of Use provide that:  "[Y]ou are transferring your ownership to, or assigning your rights in, the Eligible Digital Assets you select when using CelPay, and that such transfers of ownership or assignment of rights may not be recorded on any Blockchain, but rather on Celsius' ledger; by making any CelPay transaction, you are authorizing Celsius to deduct the corresponding amount of Eligible Digital Assets from your Celsius Account balance, and to transfer or credit such amount to the balance of the receiving User's Celsius Account."  *Id.* § 15.

With respect to the Swap Service, the Terms of Use provide that:  "By using Celsius' Swap Service, you will allow Celsius to exchange the type and amount of the Digital Asset in your Celsius Account that you choose to swap (the "Swapped Assets") into the type of Digital Asset you choose to receive (the "New Assets").  The amount of New Assets to be received in exchange for the Swapped Assets is determined by the amount of

21.     Thus, where the Terms of Use are silent as to who holds title, the Court should look to the intent of the parties.[41]   Here, as demonstrated by the Examiner Interim Report and the Phase I Declaration, there is no clear intent to relinquish title to the Transferred Withhold Assets. For example, in the Examiner Interim Report, the Examiner noted that Withhold Accounts were created only because of the nature of the blockchain being such that Celsius could not reject transfers from Prohibited States, that Withhold Assets were not treated like Custody Assets, or otherwise treated like customer assets, and were deployed in the same manner as assets in the Earn Program or other assets existing on Celsius' platform.[42]   The Phase I Declaration further established that the offering was not a formal service and existed only to hold incoming transfers from residents of Prohibited States until such residents could withdraw them from the platform.[43] In addition, the Committee contends that without explicit grant of title to the Withhold Ad Hoc Group in the Terms of Use, "there is no contract providing that Withhold Account Holders have title to assets corresponding to balances in Withhold Accounts."[44]   Further, the Committee contends that "possession of property creates a rebuttable presumption of ownership" that the Committee argues will be difficult to overcome.[45]

---

Swapped Assets multiplied by the applicable conversion rate of the relevant Digital Asset pair (the "Exchange Rate"). *Id.* § 4.C.i.

[40]   *See* Terms of Use § 4.D ("You may terminate any loan to Celsius . . . by transferring such EDAs and Rewards to your external Virtual Wallet . . . or to the Custody Service, if available.").

[41]   *See* Phase I Brief ¶ 28.

[42]   Examiner Interim Report at 42–43, 70.

[43]   Phase I Declaration ¶ 5.

[44]   Committee Brief ¶ 42.

[45]   *Id.* ¶ 43 (citation omitted).

22.     In sum, given that the Terms of Use are silent and factual, the Withhold Ad Hoc Group has not met its burden in proving that the Transferred Withhold Assets are not property of the Debtors' estates.

### 2.     The Withhold Ad Hoc Group's constructive trust theory fails.

23.     The Withhold Ad Hoc Group has also failed to meet its burden of proof that the Withhold Assets are not property of the Debtors' estates because they were held in constructive trust.[46]  When a trust is alleged, "the burden rests upon the entity seeking to exclude the property from the estate to establish the existence of the claimed fiduciary relationship.  That entity must prove title and identify the trust fund or property and, where the fund or property has been commingled with the general property of the debtor, must sufficiently trace the property."[47]  Courts in this circuit and others have held "that when property that otherwise would be considered part of a debtor's estate is alleged to be held in trust for another, '[t]he burden of establishing the existence of the constructive trust rests on the claimant.'"[48]

24.     Establishing a constructive trust is an extraordinary remedy that will "take the property out of the debtor's estate and [] place the constructive trust claimant ahead of other creditors with respect to the trust *res*."[49]  In the Second Circuit and elsewhere, "bankruptcy courts are generally reluctant to impose constructive trusts without a substantial reason to do so" because

---

[46]  *See, e.g.*, Withhold Ad Hoc Brief ¶¶ 33–34.

[47]  *See* Collier on Bankruptcy ¶ 541.28; *see also Connecticut General Life Ins. Co.* 838 F.2d at 618.

[48]  *In re Maple Mortgage, Inc.*, 81 F.3d 593, 596 (5th Cir. 1996) (quoting *In re Southmark*, 49 F.3d 1111, 1118 (5th Cir. 1995)); *see also In re Flanagan*, 503 F.3d 171, 182 (2d Cir. 2007) ("It is therefore not the debtor who generally bears the burden of a constructive trust in bankruptcy, but the debtor's general creditors."); *In re Grubb & Ellis Co.*, No. 12-10685 (MG), 2012 WL 1036071, (Bankr. S.D.N.Y 2012) ("The burden of establishing the existence of a trust falls upon [the party seeking a constructive trust].").

[49]  *Flanagan*, 503 F.3d at 182 (citations omitted).

constructive trusts remove property from the estate and favor one creditor over the other, disrupting the Bankruptcy Code's priority scheme.[50]

25.     In addition, although "actual fraud or wrongful conduct" are not necessary, "New York law is clear that a constructive trust is an equitable remedy intended to be 'fraud-rectifying' rather than 'intent-enforcing.'"[51]     Finally, "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."[52]

26.     Under New York law, constructive trusts generally require four elements: "(1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer of the subject *res* made in reliance on that promise; and (4) unjust enrichment."[53]     Parties seeking a constructive trust remedy must set forth "clear and convincing" evidence.[54]  Unjust enrichment is

---

[50]  *In re First Cent. Fin. Corp.*, 377 F.3d 209, 217-18 (2d Cir. 2004) (quoting *In re Haber Oil Co.,* 12 F.3d 426, 436 (5th Cir. 1994)); *see also Flanagan*, 503 F.3d at 182 ("This type of privileging of one unsecured claim over another clearly thwarts the principle of ratable distribution underlying the Bankruptcy Code"); *In re Omegas Group, Inc.*, 16 F.3d 1443, 1452 (6th Cir. 1994) ("The equities of bankruptcy are not the equities of the common law. Constructive trusts are anathema to the equities of bankruptcy since they take from the estate, and thus directly from competing creditors, not from the offending debtor."); *In re Haber Oil Co., Inc.*, 12 F.3d 426, 436 (5th Cir. 1994) ("[C]reditors of the bankrupt debtor have every incentive to argue that their unsecured claims are eligible under state law for the remedy of a constructive trust" when "the constructive trust doctrine can wreak such havoc with the priority system . . ."); *In re Dreier LLP*, 429 B.R. 112, 136 (Bankr. S.D.N.Y. 2010) ("[R]ecent Second Circuit rulings, as well as decisions by Courts of Appeals in other Circuits, counsel against automatically recognizing constructive trusts in bankruptcy.").

[51]  *First Cent. Fin. Corp.*, 377 F.3d at 216 (quoting *Bankers Sec. Life Ins. Soc'y,* 406 N.E.2d 440, 441 (N.Y. 1980)).

[52]  *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 587 (2d Cir. 2006) (quoting *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388–89 (1987)).

[53]  *Id.* at 212 (quoting *United States v. Coluccio,* 51 F.3d 337, 340 (2d Cir. 1995)).

[54]  *Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemp. Dance, Inc.*, 380 F.3d 624, 646 (2d Cir. 2004).

the dispositive element because ""the key purpose of [the constructive trust] is to prevent unjust enrichment."[55]

> (1) *The Withhold Ad Hoc Group does not allege that Celsius was a fiduciary nor that a confidential relationship existed.*

27. The Withhold Ad Hoc Group has not alleged a fiduciary relationship or a confidential relationship between the holders of Withhold Accounts, in particular the members of the Withhold Ad Hoc Group, and Celsius.[56] Though the establishment of fiduciary relationship is not a mandatory element for constructive trusts, "many cases in this circuit have ruled that a failure to plead a confidential relationship precludes a constructive trust remedy as a matter of law, even after acknowledging that this element is not a *sine qua non* of a constructive trust."[57] In this context, "[o]rdinarily, a conventional, arms-length commercial relationship does not give rise, in and of itself, to a confidential or fiduciary relationship."[58]

28. The holders of Transferred Withhold Assets consented to the Terms of Use as a condition of opening a Celsius Account and depositing assets on the platform.[59] Thus, those

---

[55] *In re Chowaiki & Co. Fine Art Ltd.*, 593 B.R. 699, 718–22 (noting that "[w]hile the absence of unjust enrichment, standing alone, is fatal to a request for a constructive trust" party seeking constructive trust also did not plead a fiduciary relationship).

[56] *See, e.g.,* Withhold Ad Hoc Group Brief ¶ 36 (failing to allege fiduciary relationship and noting that "a person wrongfully acquiring property can be treated as a constructive trustee notwithstanding the lack of a fiduciary relationship.")

[57] *Chowaiki & Co. Fine Art Ltd.,* 593 B.R. at 723 (noting that "in *In re Koreag, Controle et Revision S.A.*, the case most often cited in New York for the proposition that the absence of a confidential or fiduciary relationship does not 'automatically defeat [a] claim of constructive trust,' the court nevertheless concluded that '[c]learly, [defendant] was acting in *some* fiduciary capacity towards *some* entities at the time it received the Disputed Funds.'" (quoting *In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 354 (2nd Cir. 1992))).

[58] *A. Brod, Inc v. SK&I Company, L.L.C.*, 998 F. Supp. 314, 327 (S.D.N.Y 1998) (citing *Koreag*, 961 F.2d at 353); *see also Rocchio v. Biondi*, 835 N.Y.S.2d 401, 403 (N.Y. App. Div. 2007) (noting that a confidential or fiduciary relationship "may arise when a bond of trust and confidence exists between the parties . . . .").

[59] *See Declaration of Christopher Ferraro, Interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer of the Debtors, in Support of the Debtors' Motion Regarding Ownership of Earn Assets and*

Withhold Account holders were bound by the Terms of Use at all times when using the Celsius platform, regardless of whether the Terms of Use set forth the ownership of the Withhold Assets.[60] The Terms of Use clearly state that "[t]hese Terms and your use of any of our Services do not create a fiduciary relationship between us and you" and that "**ELIGIBLE DIGITAL ASSETS REPRESENTED IN YOUR CELSIUS ACCOUNT ARE NOT HELD BY CELSIUS AS A FIDUCIARY.**"[61]   Under New York law, fiduciary relationships do not "exist[] where parties were acting and contracting at arms-length to a business transaction."[62]   Furthermore, "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."[63] As such, the relationship between the Debtors and the Withhold Ad Hoc Group (given that each of the members hold Transferred Withhold Assets) is governed by the Terms of Use and courts are reluctant to impose a quasi-contractual remedy where there is a contractual agreement.  Thus, the Withhold Ad Hoc Group has failed to satisfy the first element of a constructive trust.

> (2)     *The Debtors did not make any implied promise to Withhold Account Holders.*

29.     The Withhold Ad Hoc Group alleges that "there was an implied promise by Celsius" to "respect the Withhold Group members' property rights" once Withhold Assets were

---

*the Sale of Stablecoin* [Docket No. 1326] ¶ 22 ("Users . . . were required to digitally execute Celsius' user agreement and various forms of terms of use . . . before being permitted to use the platform . . . .).

[60]   Any arguments that the Terms of Use are not enforceable or individual contract disputes are not relevant to the Phase I Issues.

[61]   Terms of Use ¶ 10.

[62]   *In re Ames Dep't Stores, Inc.,* 274 B.R. 600, 626 (Bankr. S.D.N.Y. 2002) (citation omitted).

[63]   *In re Moyer Grp., Inc.*, 586 B.R. 401, 408 (Bankr. S.D.N.Y. 2018); *see also Grubb & Ellis Co.*, 2012 WL 1036071, at *7 (noting that "the Court cannot and will not modify [contractual] terms based on the theory of constructive trust" when rights already clarified under employment agreement) (emphasis added).

transferred out of the Earn Program since such assets were "no longer subject to any agreed contractual terms."[64] That contention is incorrect. As discussed above, the holders of Celsius Accounts were at all times subject to the Terms of Use while using the Celsius platform.[65] As such, Debtors retained the right to "prohibit use of part or all of the Services and/or close, freeze or suspend Celsius Accounts."[66] There can be no "implied promise . . . [to] respect the [Withhold Account holders'] property rights" to form the basis for a constructive trust where the Terms of Use are silent with respect to such property rights and where the Debtors maintained explicit rights to suspend access to all Celsius Accounts.

> (3)    *The Withhold Ad Hoc Group fails to allege a transfer of the subject* res *made in reliance on a promise.*

30.    The Withhold Ad Hoc Group notes the elements of a constructive trust but then fails to allege the existence of a transfer in reliance on a promise, let alone demonstrate clear and convincing evidence of such an element. As such, the Withhold Ad Hoc Group has failed to plead and establish this element.

> (4)    *The Debtors were not unjustly enriched by legitimate retainment of the Withhold Assets.*

31.    Here, the Debtors were not unjustly enriched when they retained the Withhold Assets pending a Withhold Account user's withdrawal of such assets from the platform.[67]

---

[64]    Withhold Ad Hoc Group Brief ¶ 41.

[65]    *See supra* ¶ 28.

[66]    Terms of Use § 3.

[67]    *See* Examiner Interim Report at 70–73 (describing ways Withhold customers learned such assets were no longer supported on the Celsius platform); *see also* Withhold Ad Hoc Group Brief Ex. A-1-A-12 (noting receipt of email informing Withhold user "will need to withdraw any new coins from [Withhold user's] account" and that Withhold users "learned that [Withhold users] could no longer whitelist an external wallet . . . coins first had to be transferred from Earn Rewards to a Withhold Account, then transferred to an external wallet from the Withhold Account.").

Unjust enrichment is found when "the acts of the parties or others have placed in the possession of [the defendant] money, or its equivalent, under such circumstances that in equity and good conscience he ought not to retain it."[68] Here, the Debtors do not dispute that users with Withhold Accounts have valid claims for the return of cryptocurrency transferred to the Celsius platform. As such, a constructive trust is not needed to establish a claim. Rather, it is an overbroad remedy that would only serve to elevate one type of customer claim over other types of customer claims— an outcome that is wholly unsupported by the current record. The "absence of unjust enrichment, standing alone, is fatal to a request for a constructive trust."[69]

32. Moreover, the Withhold Ad Hoc Group does not allege actual fraud such that the constructive trust remedy would rectify fraud.[70] Rather, the Withhold Ad Hoc Group argues that because Celsius did not have a "contractual right" to hold the Withhold Assets, Celsius converted those assets or otherwise violated state regulations.[71] The Withhold Ad Hoc Group provides no legal support for either of these allegations or support that either of these claims, if proven, are sufficient to show unjust enrichment, as opposed to a mere contractual breach.[72] And to the contrary, the record demonstrates that the Debtors' legitimately intended to transfer the Withhold Assets from the Celsius platform to customer wallets in compliance with regulations despite

---

[68] *Chowaiki & Co. Fine Art Ltd.,* 593 B.R. at 720 (Bankr. S.D.N.Y. 2018) (quoting *Miller v. Schloss,* 113 N.E. 337, 407 (N.Y. 1916)); *see also Moyer Grp., Inc.,* 586 B.R. at 408 ("Under New York law, to recover for unjust enrichment, the plaintiff must establish that (1) the defendant was enriched; (2) the enrichment was at the plaintiff's expense; and (3) equity and good conscience require restitution.").

[69] *Chowaiki & Co. Fine Art Ltd.,* 593 B.R. at 720.

[70] *See, e.g.,* Withhold Ad Hoc Group Brief ¶ 38 (alleging only that the Debtors were unjustly enriched by retaining Withhold Ad Hoc Group assets "without any contractual right to do so").

[71] Withhold Ad Hoc Group Brief ¶¶ 38–39.

[72] *Id.*

commingling and deploying the assets.[73]   The Debtors retained the assets pending customer withdrawal from the platform because the Debtors "could not return the assets without user/customer involvement" as the Debtors could not be sure the assets were being returned to the proper wallet.[74]  The Withhold Account holder's failure to remove the Withhold Assets from the platform, thus rendering the Debtors' intention unenforced, is not sufficient cause to impose a constructive trust and place the Withhold Account holder at the front of the line ahead of other customers.

33.     As outlined above, though silent on the property rights of Withhold Assets, users with Celsius Accounts remained at all times subject to the Terms of Use—the same Terms of Use that granted the Debtors the right to suspend accounts for regulatory or policy reasons.[75]  Thus, the Withhold Ad Hoc Group has not offered clear and convincing evidence of unjust enrichment, and as a result, cannot establish the existence of a constructive trust.

> (5)     *The Withhold Ad Hoc Group's tracing arguments are not relevant.*

34.     Unless and until the Withhold Ad Hoc Group can demonstrate that the Debtors were unjustly enriched, whether the Withhold Ad Hoc Group can trace with Withhold Assets in the absence of a "Withhold Wallet" is irrelevant.  As a result, the Withhold Ad Hoc Group's emphasis on being able to satisfy the lowest intermediate balance rule to recover comingled Withhold Assets is nothing more than a misdirection.[76]

---

[73]   *See, e.g.,* Examiner Interim Report at 70–73.

[74]   *See* Examiner Interim Report at 43 ("While Celsius could identify the transmitting wallet address, it would not know whether the relevant user still held the private keys to that address or had exclusive or secure access to the private key.").

[75]   *See supra* ¶¶ 28, 29.

[76]   Withhold Ad Hoc Group Brief ¶ 42.  In addition, on December 2, 2022, the Debtors stipulated to certain coin balances to address the Withhold Ad Hoc Group's "lowest intermediate balance" test argument.  *See Joint*

**III.** **The Debtors Are Entitled to Retain the Transferred Assets and Certain Other Custody Assets.**

    **A.** **The Debtors and the Committee Agree that the Debtors Are Entitled to Retain the Transferred Assets and Certain Other Custody Assets.**

35.     As set forth in the Phase I Brief, the Debtors are entitled to retain the Transferred Assets and certain other Custody Assets, even though such assets are not, or may not be, property of the Debtors' estates, for the following reasons: (a) the Debtors have setoff rights associated with certain Custody Assets pursuant to section 558 of the Bankruptcy Code and it would be inappropriate to turn over such assets to customers before those preference actions or other setoff rights can be adjudicated; (b) the Debtors are entitled to retain the Transferred Assets consistent with the purpose of section 502(d) of the Bankruptcy Code to promote the *pro rata* sharing of the Debtors' estate among all creditors; (c) the Debtors are entitled to retain Custody Assets pursuant to sections 362(a), 365(a), and 105(a) of the Bankruptcy Code as the Debtors' rights under the Terms of Use constitute property of the estate protected by the automatic stay, or in the alternative, should be protected by the automatic stay pursuant to the Court's equitable powers under 105(a) of the Bankruptcy Code; and (d) the Debtors should be allowed to retain the Transferred Assets pending adjudication of potentially viable preference claims to avoid making clawback of any assets nearly impossible.[77]

36.     The Committee agrees and sets forth similar and additional arguments as to why the Debtors are entitled to retain the Transferred Assets and certain other Custody Assets, including: (a) the Terms of Use provide that the Debtors may retain assets pending legal processes,

---

*Stipulation and Agreed Order By and Among the Debtors and the Withhold Ad Hoc Group Regarding Cryptocurrency Amounts to Satisfy Withhold Liabilities* [Docket No. 1550].

[77]   *See generally* Phase I Brief ¶¶ 32–53.

set off against assets held in Custody Wallets, or suspend access to accounts for any reason; and (b) requiring the Debtors to distribute assets that are subject to presumptively valid claims and setoff rights would be wasteful, inefficient, and detrimental to the estates, and the Debtors' retention of such assets is supported by the Court's equitable authority under section 105(a) of the Bankruptcy Code.[78]

37.     In comparison, both the Custody Ad Hoc Group and the Withhold Ad Hoc Group argue that the Debtors are not entitled to hold the Custody Assets or the Withhold Assets, respectively, pending resolution of the Debtors' preference claims. The Ad Hoc Groups raise several arguments, as further set forth below, but both groups argue to some extent that the Debtors must satisfy the standard for prejudgment attachment under New York law. This argument is wrong and should be rejected.

### B.     The Debtors Are Not Required to Seek Injunctions or Prejudgment Attachment to Retain Custody Assets and Withhold Assets.[79]

38.     The Ad Hoc Groups argue that if the Debtors wish to retain Custody Assets and Withhold Assets subject to colorable preference claims, they should seek an injunction or a prejudgment order of attachment.[80] The Ad Hoc Groups' arguments regarding the need for injunctions or prejudgment orders of attachment are invalid.

#### 1.     Prejudgment attachment.

39.     The Withhold Ad Hoc Group—and to a lesser extent, the Custody Ad Hoc Group— argues that the Debtors must seek prejudgment suits of attachment (governed by state law) under

---

[78]     *See generally* Committee Brief ¶¶ 52–63.

[79]     The Custody Ad Hoc Group address injunctions and pre-judgment attachment in their section arguing that the Debtors are violating Custody users' constitutional due process by retaining Custody Assets. The Debtors' response to the constitutional due process arguments are further addressed herein.

[80]     *See* Custody Ad Hoc Group Brief ¶¶ 54–55; Withhold Ad Hoc Group Brief ¶¶ 45–53.

Federal Rule of Civil Procedure 64, applicable to these chapter 11 cases by Bankruptcy Rule 7064, to continue to retain the assets at issue.[81]  As an initial matter, the Withhold Ad Hoc Group appears to assume that the only way for the Debtors to retain possession is through prejudgment attachment.   To the contrary, as the Debtors set forth in the Phase I Brief, they have the right to retain the Custody Assets and the Withhold Assets, as well as suspend services, pursuant to many different contractual and Bankruptcy Code provisions.[82]  Thus, the Debtors' ability to enforce and realize the value of those causes of action should be protected without needing to obtain a state court ruling attaching such assets.

40.     Prejudgment attachment is a remedy pursued by plaintiffs when defendants maintain control over the property at issue—a situation not present here, where the Debtors (the plaintiffs in a prejudgment attachment action) *already have possession and control over the property*.   As such, it is illogical to argue that the Debtors need to satisfy the prejudgment attachment standard to retain the Custody Assets and the Withhold Assets already in their possession.

41.     Specifically, prejudgment attachment is often sought in cases where there is a risk of dissipation of property:  "[r]emedies such as an attachment or injunction have been utilized by trustees when seeking to prevent a party from disposing of assets or to secure the amount of a potential judgment."[83]  Prejudgment attachment is therefore understood to "impound the debtor's property before judgment to insure the availability after judgment of sufficient assets from which

---

[81]   *See* Withhold Ad Hoc Group Brief ¶ 45–56; Custody Ad Hoc Group Brief ¶¶ 55–60.  The Custody Ad Hoc Group also discusses prejudgment orders of attachment but does not specifically reference Federal Rule of Civil Procedure 64.

[82]   *See, e.g.*, Phase I Brief ¶¶ 29–53.

[83]   § 5:273. Rule 64: Bankruptcy Rule 7064—Enforcement of prejudgment remedies, 1 Bankruptcy Litigation § 5:273.

to satisfy the creditor's claim" since the concern is that, "[d]uring this period, the debtor may dispose of his property or others may take it in satisfaction of their claims."[84]  In effect, the purpose of prejudgment attachment is to "conserve" the property of the debtor for eventual enforcement on a judgment.[85]  Moreover, under New York law, "[a] prejudgment attachment is *ancillary* to a suit to collect a debt or enforce a lien or other special right."[86]  Thus, prejudgment attachment is pursued in a specific context, as both Ad Hoc Groups recognize, noting that "attachment under New York law solely for security purposes is appropriate only when it appears likely that a plaintiff will have difficulty enforcing a judgment."[87]

42.    The cases cited by the Ad Hoc Groups as support for their prejudgment attachment arguments are inapposite, where the plaintiffs seeking prejudgment attachment lack present possession of the assets and have no existing right to them.[88]  Here, the Custody Assets and Withhold Assets do not need to be "conserved" through a prejudgment attachment; they already

---

[84]    *In re Megan-Racine Assocs., Inc.*, 192 B.R. 321, 325 (Bankr. N.D.N.Y. 1995).

[85]    *Kornblum v. Kornblum*, 34 A.D.3d 748, 749, 828 N.Y.S.2d 404 (2006).

[86]    *In re Megan-Racine Assocs., Inc.*, 192 B.R. at 325 (emphasis added).

[87]    *See* Custody Ad Hoc Group Brief ¶ 55; Withhold Ad Hoc Group Brief ¶ 49.  *See also TAGC Mgmt., LLC v. Lehman*, 842 F. Supp. 2d 575, 586–87 (S.D.N.Y. 2012) (*quoting Katz Agency, Inc. v. The Evening News Association*, 514 F. Supp. 423, 429 (S.D.N.Y.1981)).

[88]    *TAGC Mgmt., LLC v. Lehman*, 842 F. Supp. 2d 575, 578 (S.D.N.Y. 2012) ("After plaintiffs transferred over $1 million to defendants to begin the project, however, the relationship soured and plaintiffs demanded that the money be returned. Defendants refused to return the money, and plaintiffs subsequently initiated this action," which included an application for an order of attachment against the defendants); *Musket Corp. v. PDVSA Petroleo, S.A.*, 512 F. Supp. 2d 155 (S.D.N.Y. 2007) (Buyer of diesel oil sued seller and state-owned Venezuelan oil company, as third-party beneficiary of sales contract, claiming breach of contract and unjust enrichment for funds on which oil company initiated draw-down on buyer's letter of credit, issued to different broker, after buyer allegedly had already paid seller full amount of delivered oil.  Buyer moved to confirm *ex parte* attachment order on funds.); *Mascis Inv. Partnership v. SG Capital Corp.*, No. 654981/2016, 2017 WL 1423682 (N.Y. Sup. Ct. Apr. 21, 2017) (Plaintiffs moved for an order of attachment for defendant's portfolio investments held with a bank); *Ne. United Corp. v. Lewis*, 137 A.D.3d 1387 (2016) (Plaintiff moved by order to show cause for an order of attachment against defendants, seeking to attach the proceeds of an imminent arbitration.).  The remaining cases cited by the Custody Ad Hoc Group relating to prejudgment attachment do not explicitly address the granting of attachment itself but involve related issues.

are "conserved," since the Debtors have both the physical possession of and the right to retain, under the Terms of Use, the specified Custody Assets and Withhold Assets at issue.

43. Moreover, the Withhold Ad Hoc Group's argument that the Debtors must seek prejudgment attachment ignores the procedural context here.[89]  The Withhold Ad Hoc Group acknowledges the agreements and assumptions in the Scheduling Order but nonetheless proceeds to analyze "the Debtors' right—or lack thereof—to obtain prejudgment attachment *as though* (i) there were adversary proceedings pending against the members of the Withhold Ad Hoc Group, and (ii) those adversary proceedings were certain to be successful."[90]

44. The Withhold Ad Hoc Group explains that to meet the standard of prejudgment attachment under New York law, the Debtors would have to show:  (1) that they have a cause of action for a money judgment; (2) it is probable that their claims will succeed on the merits; (3) one or more grounds for attachment provided under New York law exist;[91] and (4) the amount demanded from the defendant exceeds all counterclaims known to the plaintiff.[92]  For unexplained reasons, the Withhold Ad Hoc Group states that only "the first two elements are deemed to be met

---

[89] The Parties agreed in the Scheduling Order that "the absence of a pending action for preference or other claims against the Custody and Withhold claimants will not constitute either a basis for the Court to rule in the Ad Hoc Groups' favor or waiver by the Debtors' estates of the right (or any party asserting rights on behalf of the estates, including, without limitation, the Debtors, the Committee, or a trust) to bring such claims."  *See* Scheduling Order ¶ 9.  The Parties further agreed that "all inferences regarding the existence, validity, and merit of preference or other claims against the Custody and Withhold claimants will be drawn in favor of the Debtors' estates."  *Id.* ¶ 8.

[90] *See* Withhold Ad Hoc Group Brief ¶ 46.

[91] Under New York law, this element is satisfied "where (1) the defendant is a nondomiciliary residing without the state, or is a foreign corporation not qualified to do business in the state; or (2) the defendant resides or is domiciled in the state and cannot be personally served despite diligent efforts to do so; or (3) the defendant, with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts."  *See* NY CPLR § 6201.  *See also* Withhold Ad Hoc Group Brief ¶ 51.

[92] *See* Withhold Ad Hoc Group Brief ¶ 48.

for purposes of Phase I solely due to the stipulations of the Scheduling Order," but not the last two elements, which the Withhold Ad Hoc Group argues the Debtors cannot satisfy.[93] Either all inferences with regard to hypothetical adversary proceedings are drawn in favor of the Debtors or the argument should not be made in the first place.

45.     In any event, the Debtors can satisfy the last two elements of the standard for prejudgment attachment. With respect to the third element, it is almost certain that at least some of the holders of Withhold Assets would "frustrate the enforcement of a judgment that might be rendered in plaintiff's favor" or otherwise assign, dispose, encumber, or secrete the assets away— especially given that the property in question is cryptocurrency and is easily disposed of or transferred. As to the fourth element, the known counterclaims held by holders of Withhold Assets are prepetition claims that cannot be used to diminish the Debtors' postpetition preference claims: any such prepetition causes of action cannot be alleged as counterclaims to "setoff" the Debtors' postpetition preference claims. Section 553 of the Bankruptcy Code prohibits any setoff by a creditor of a prepetition claim against a postpetition claim.

### 2.     Injunction.

46.     The Custody Ad Hoc Group argues that the Debtors should seek an injunction under Federal Rule of Civil Procedure 65, applicable to these chapter 11 cases by Bankruptcy Rule 7065.[94] Notwithstanding that the Debtors sought an injunction (pursuant to section 105(a) of the Bankruptcy Code) in their Phase I Brief, the Custody Ad Hoc Group does not show that the Debtors *must* seek an injunction where, as here, there are other additional bases that allow the Debtors to retain property. Moreover, injunctions pursuant to Bankruptcy Rule 7065 must be sought in an

---

[93]     *See id*. ¶ 49.

[94]     *See* Custody Ad Hoc Group Brief ¶ 54.

adversary proceeding.[95]  Specifically, "Bankruptcy Rule 7001(7) requires that any proceeding to obtain an injunction be an adversary proceeding" such that "a litigant wishing to secure injunctive relief pending the hearing and determination of a *contested matter* should commence an adversary proceeding and seek the injunction in the related adversary proceeding."[96]  The Debtors have not commenced any adversary proceedings yet, and as noted, the Parties stipulated in the Scheduling Order that this requirement need not be satisfied by the Debtors for purposes of Phase I briefing.[97]

47.     The Debtors dispute that it is necessary for them to establish the standard for a prejudgment attachment or an injunction to allow them to retain assets in their possession while their preference claims are litigated.  Nonetheless, if the Court agrees with the Ad Hoc Groups, the Debtors restate their request, first outlined in the Phase I Brief, to extend the protection of the automatic stay pursuant to section 105(a) of the Bankruptcy Code.  The Debtors have established that they meet the elements of a preliminary injunction pursuant to section 105(a) for the reasons set forth in the Phase I Brief and incorporate such arguments by reference herein.[98]

---

[95]  *See* Fed. R. Bankr. P. 7065.

[96]  *See* 10 Collier on Bankruptcy ¶ 7065.01 (16th 2022).  *But see* 10 Collier on Bankruptcy P 7065.01("Bankruptcy Rule 7065, however, does not limit the power of the bankruptcy court to issue an injunction pursuant to section 105 of the Bankruptcy Code.").

[97]  The Custody Ad Hoc Group also cites *In re Focus Media*, 387 F.3d 1077 (9th Cir. 2004) as support for the proposition that an asset-freezing injunction may be issued where fraudulent conveyances or other equitable causes of action are alleged.  *See* Custody Ad Hoc Group Brief ¶ 54.  *In re Focus Media*, however, specifically involved an adversary proceeding brought by the trustee in order to set aside, as fraudulent transfers, distributions made to corporate debtor's principal on eve of commencement of involuntary bankruptcy against it—a context not yet present here.  *In re Focus Media*, 387 F.3d 1077, 1049 (9th Cir. 2004).

[98]  *See* Phase I Brief ¶¶ 43–49.

## C. The Custody Ad Hoc Group's Remaining Arguments Likewise Fail.

### 1. The Custody Ad Hoc Group misstates the Debtors' arguments and its reliance on *Colonial Realty* is misplaced.

48. The Custody Ad Hoc Group argues that the Debtors' attempt to distinguish which Custody Assets are returned to customers has no basis in law and that the Debtors must honor all non-insider requests for withdrawals of Custody Assets.[99] Relying on *In re Colonial Realty*, 980 F.2d 125, 131 (2d Cir. 1992), the Custody Ad Hoc Group argues that property does not become property of the estate until it is actually avoided and recovered,[100] and that because the Debtors have yet to pursue preference claims, let alone successfully avoided any preferences, with respect to the Custody Assets, such assets cannot constitute property of the estate that the Debtors can retain pursuant to the automatic stay.[101]

49. The Custody Ad Hoc Group both misstates the Debtors' arguments and mistakenly relies on *Colonial Realty* for support. ***First***, the Debtors have not argued that Custody Assets subject to colorable preference claims constitute property of the estate. The Debtors have argued that because they have colorable preference claims against certain of the Custody Assets, they should retain the property in question while those preference claims are briefed and litigated.[102] The Debtors identified all the rights they possessed under the Terms of Use immediately before the commencement of these cases, which includes their right to freeze customers' access to the platform and their right to retain possession of the digital assets, which rights constitute property

---

[99]   *See* Custody Ad Hoc Group Brief ¶¶ 2, 23-25, 34–39.

[100]   *Id.* ¶¶ 25–39.

[101]   *Id.* ¶¶ 35–39, 61.

[102]   *See* Phase I Brief ¶ 29; Custody and Withhold Motion ¶35.

of the estate.[103]  Accordingly, the Custody Ad Hoc Group's statement that "an *asserted* preference claim (or any other claim) is insufficient to make an asset that belongs to a third-party non-debtor property of a debtor's estate unless and until it is recovered" is inapplicable here.[104]

50.     Moreover, courts in this district have held that avoidance actions such as preference claims constitute property of the debtor's estate and are therefore protected by the automatic stay. Pursuant to section 541(a)(1) of the Bankruptcy Code, property of the estate consists of "all legal or equitable interests of the debtor in property as of the commencement of the case, wherever located and by whomever held."  Because "[t]he term 'all legal and equitable interests of the debtor in property' is all-encompassing and includes rights of action as bestowed by either federal or state law . . . [p]roperty of the estate therefore includes any cause of action the debtor had on the petition date . . . as well as avoidance actions created on the petition date . . . ."[105]  Thus, even if the Custody Assets subject to colorable preference claims do not themselves constitute property of the estate, the preference actions do, and are therefore protected by the automatic stay pursuant to section 362 of the Bankruptcy Code.  Moreover, as the Committee emphasizes in its brief, the existence of a potential preference action is a defense to a motion to lift the stay.[106]

---

103   *See* Phase I Brief ¶ 42.

104   *See* Custody Ad Hoc Group's Brief ¶ 24 (emphasis in original).

105   *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC*, 460 B.R. 106, 114 (Bankr. S.D.N.Y. 2011), *aff'd*, 474 B.R. 76 (S.D.N.Y. 2012) (internal citations omitted).  *See also In re Jackson*, 593 F.3d 171, 176 (2d Cir. 2010) ("Such [legal or equitable] interests include causes of action possessed by the debtor at the time of filing."); *In re Chrysler LLC*, No. 09–50002, 2009 WL 1360863, at *1 (Bankr .S.D.N.Y. May 04, 2009) (granting security interests in "all property of the estates of each of the [d]ebtors within the meaning of section 541 of the Bankruptcy Code (including avoidance actions arising under chapter 5 of the Bankruptcy Code and applicable state law)"); *Delgado Oil, Inc. v. Torres*, 785 F.2d 857 (10th Cir. 1986) (creditor has no standing to assert postpetition preference action because such action is property of the estate).

106   *See* Committee Brief ¶ 62.

51.     **Second**, to the extent that the Custody Ad Hoc Group is arguing that *Colonial Realty* holds that avoidance actions such as preference actions themselves do not constitute property of the estate, that is an incorrect reading of *Colonial Realty*.[107]  "The Second Circuit has not directly addressed the question of whether avoidance actions are property of the estate,"[108] and *Colonial Realty* cannot be read to hold that avoidance actions do not constitute property of the estate:

> [I]n a subsequent case, the Second Circuit noted, albeit in dicta, that although a trustee "cannot distribute property that it does not yet possess," the trustee "may be able to assign–or 'distribute'–the *right* to recover property that it does not yet possess."  This statement, which followed immediately on the heels of a discussion of *Colonial Realty*, tends to contradict the view that *Colonial Realty* held that avoidance actions are not property of the estate.[109]

This is a distinction **with** a difference.

52.     The Committee agrees that the Custody Ad Hoc Group's reliance on *Colonial Realty* is misplaced.  The Committee flagged, like the Debtors, that *Colonial Realty* found that "the property itself is not property of the estate until it is recovered" rather than that avoidance actions constitute property of the estate,[110]   and accordingly, *Colonial Realty* is "factually and legally distinguishable from this case in material respects."[111]

---

[107]  "[T]he Second Circuit held [in *Colonial Realty*] that property that is *the subject of* a fraudulent conveyance action is not property of the estate."  *Knoll, Inc. v. Zelinsky*, No. 05-CV-1499 (GLS/DRH), 2008 WL 11504632, at *6 (N.D.N.Y. Apr. 8, 2008) (emphasis in original).

[108]  *Knoll,* 2008 WL 11504632, at *6.  The court in Knoll notes that "two lower courts have construed *Colonial Realty* as holding that fraudulent conveyance actions are not property of the estate," but reiterates that "that is not precisely what the Second Circuit held."  *Id.*

[109]  *Id.* (internal citations omitted).

[110]  *Id.* ¶ 60.

[111]  *Id.*

53.     The Custody Ad Hoc Group subsequently argues that the Debtors cannot retain the Custody Assets at issue because "[p]reference claims may never be brought even if they are viable (which they may not be)."[112]   Preference claims, however, will be litigated in Phase II of this briefing, so such an argument is inappropriate at this time.  In any case, pursuant to section 546(a) of the Bankruptcy Code, the Debtors have **two years** after the Petition Date in which to bring preference actions.

54.     Finally, the Custody Ad Hoc Group complains that, "[t]o date, no preference claims have been brought by the Debtors against any parties, including any current or former Custody Service or Earn Program users," and that "[e]ven if the Debtors were to bring preference claims against Custody Service users for return of Custody Assets transferred from the Earn Program in the 90 days prior to the bankruptcy filing, such claims are not likely to succeed."[113]   But, the Parties agreed, as reflected in the Scheduling Order that, during Phase I of the briefing on these issues, "all inferences regarding the existence, validity, and merit of preference or other claims against the Custody and Withhold claimants will be drawn in favor of the Debtors' estates."[114]

**2.      The Debtors' retention of the Custody Assets does not violate state law.**

55.     The Custody Ad Hoc Group argues that if the Debtors retain Custody Assets further, they will be violating the Terms of Use and, therefore, state law.[115]   To the contrary, the Terms of Use provide the Debtors broad discretion and authority to suspend services—

---

112   *See* Custody Ad Hoc Group Brief ¶ 4.

113   *See id.* ¶¶ 61-62.

114   *See* Scheduling Order ¶ 9.

115   *See* Custody Ad Hoc Group Brief ¶ 40–45.

accordingly, the Debtors may continue to retain Custody Assets while these preference claims are briefed and litigated.

56.     ***First***, there is more than sufficient evidence that the cryptocurrency market is experiencing extreme volatility such that the Debtors may suspend the Custody Program in accordance with the applicable Terms of Use provisions.[116]  Moreover, section 4.B of the Terms of Use is only one of several provisions that provide the Debtors the discretion to suspend services. For instance, the Terms of Use expressly provide that the Debtors have "the right to suspend, freeze or close your Celsius Account at any time for any reason without advance notice, including by blocking your access to the Celsius Account or the Services."[117]  The Terms of Use also state that:

> "we reserve the right to limit access to your Celsius Account, which can include temporarily or permanently removing your Celsius Account access via the internet, and/or restricting your Celsius Account, and/or closing your Celsius Account without prior notice to you (unless prior notice is required by law), and we shall have no liability for such actions."[118]

---

[116] *See* Terms of Use § 4(B).  *See, e.g.*, Kevin Roose, *Is This Crypto's Lehman Moment?*, THE NEW YORK TIMES (Nov. 9, 2022), https://www.nytimes.com/2022/11/09/technology/cryptocurrency-binance-ftx.html  ("The crypto industry is known for dramatic twists, roller-coaster prices and fortunes that appear and disappear overnight. But even by crypto standards, what happened this week was bonkers."); Glenn Williams, *Crypto's Sharp Declines in Price, Trading Volatility Could Be Worse*, COIN DESK (Nov. 10, 2022, 12:09 p.m.), https://www.coindesk.com/markets/2022/11/10/cryptos-sharp-declines-in-price-trading-volatility-could-be-worse/ ("Amid the bitter cold crypto winter, will FTX's crumbling affect crypto prices in the short term or indefinitely prolong the harsh weather? And how does the movement in crypto prices this week compare with other challenges this market has faced in its brief history?"); James Mackintosh, *Crypto Speculation Is All But Over. Its Systemic Troubles Aren't*, THE WALL STREET JOURNAL (Nov. 22, 2022 12:09 p.m.), https://www.wsj.com/articles/crypto-speculation-is-all-but-over-its-systemic-troubles-arent-11669136978 ("There's no way to say for sure how much confidence in the crypto ecosystem was knocked by the cascading wave of failures.").

[117] *See* Terms of Use § 19.A.

[118] *Id.* § 23.

57.     **Second**, such rights under the Terms of Use also constitute property of the estate that is protected by the automatic stay.[119]   In any event, any alleged state claims and causes of actions the Custody Ad Hoc Group believes it may have against the Debtors are prepetition unsecured claims that will be treated as such in these chapter 11 cases.[120]

58.     **Third**, and contrary to the Custody Ad Hoc Group's assertions, the Debtors have valid setoff rights under the Bankruptcy Code that they have the right to realize and enforce, which provides a further basis for the Debtors to retain the Custody Assets.[121]   The Debtors have setoff rights associated with Custody Assets which are either (a) subject to colorable preference actions or (b) in the account of a customer with an outstanding loan.[122]

59.     The Custody Ad Hoc Group erroneously assumes that the only applicable setoff rights here are those pursuant to section 553 of the Bankruptcy Code, which requires the mutual debts the creditor and debtor owe to each other to have arisen prepetition.[123]   Section 553, however,

---

[119]   *See* Phase I Brief ¶ 42.

[120]   *See contra* Custody Ad Hoc Group Brief ¶ 41.

[121]   *Id.* ¶ 29. The Custody Ad Hoc Group misstates the Debtors' argument regarding setoff, arguing that the "Debtors have not identified any other amounts that Custody Service users owe the Debtors other than potentially through the Debtors' separate Borrow Program.  Nor could they as the Debtors did not charge Custody Service users a fee for using the Custody Service." Custody Ad Hoc Group Brief ¶ 43.  The Custody Ad Hoc Group also maintains that the Debtors cannot exercise setoff rights simply because the Debtors agree that the Custody Assets belong to the customers.  The Custody Ad Hoc Group here relies on *In re Enron Corp.*, Case No. 01-16034 (ALG), 2003 WL 23965469, (Bankr. S.D.N.Y. Jan. 22, 2003), which found that setoff is inapplicable where the debtor's property is in the possession of the creditor as bailee or trustee because the property there is owned by the estate.  *See* Custody Ad Hoc Group Brief ¶ 43.  The Custody Ad Hoc Group's implication that the Debtors are holding Custody Assets as bailee or trustee is incorrect—they are not, and the analogy is therefore inappropriate.

[122]   *See* Phase I Brief ¶ 29.

[123]   Pursuant to section 553 of the Bankruptcy Code, a creditor must establish that they have underlying setoff rights as well as the following three criteria:  (i) the debtor must owe a debt to the creditor which arose prepetition; (ii) the debtor must have a claim against the creditor which arose prepetition; and (iii) the debts must be mutual. *See* 11 U.S.C. § 553(a) ("Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor

provides **creditors**—rather than debtors—rights of setoff. The Debtors have setoff rights pursuant to section 558 of the Bankruptcy Code, which preserves any defenses that a debtor held prepetition under nonbankruptcy law.[124] Crucially, unlike a creditor's right to set off under section 553 of the Bankruptcy Code, section 558 is broader and "eliminates the pre-petition/post-petition distinction and, in essence, obliterates the requirement that the mutual debts must both be pre-petition obligations . . . ."[125] Accordingly, it is entirely appropriate for the Debtors to exercise setoff rights with respect to those Custody Assets that are either (a) subject to colorable preference actions or (b) in the account of a customer with an outstanding loan.

60. The Custody Ad Hoc Group also attempts to diminish the Debtors' setoff rights as expressly provided for in the Terms of Use by acknowledging such rights only in a footnote.[126] But here, as with the question of who holds title to the Custody Assets, the Terms of Use are clear and unambiguous, and the holders of Custody Assets are bound by all of those terms.[127]

61. Finally, the Custody Ad Hoc Group complains that the Debtors' setoff right is merely "alleged but yet-to-be-exercised," and therefore not a basis for retaining the Custody

---

that arose before the commencement of the case . . . ."); *see also In re Ionosphere Clubs, Inc.*, 164 B.R. 839, 841 (Bankr. S.D.N.Y. 1996) (outlining the requirements for a creditor to exercise their setoff rights).

[124] *See* 11 U.S.C. § 558 ("The estate shall have the benefit of any defense available to the debtor as against any entity other than the estate . . . . A waiver of any such defense by the debtor after the commencement of the case does not bind the estate.").

[125] *See In re PSA, Inc.*, 277 B.R. 51, 53 (Bankr. D. Del. 2002) (citations omitted); *see also State Bank of Florence v. Miller (In re Miller)*, 459 B.R. 657, 675 n. 16 (B.A.P. 6th Cir. 2011) (holding that, unlike setoff under section 553 of the Bankruptcy Code, setoff under section 558 does not require that the mutual debts both be prepetition obligations).

[126] *See* Custody Ad Hoc Group Brief ¶ 42 n.49.

[127] *See* Terms of Use § 9 (The Debtors "may take or set off from any Digital Asset in your Celsius Account, including any of your Digital Assets using the Custody [Program] *(i.e.*, in a Custody Wallet), or deduct from any obligations Celsius may have to you, any direct, indirect, and acquired Obligations that you owe us or our Affiliates.").

Assets.[128]  The Debtors' setoff rights are associated with their preference claims, however, which is an issue to be determined in Phase II of briefing and thus not relevant to the determination of the Phase I Issues.

62.     ***Finally***, the Custody Ad Hoc Group's "bad faith" arguments also fail as the Debtors will ultimately only retain the Custody Assets if this Court agrees with the Debtors' arguments and permits the Debtors to do so.[129]  In any event, confirmation arguments are premature and outside the scope of the Phase I Issues.

### 3.     The Debtors' retention of the Custody Assets does not violate the Bankruptcy Code.

63.     For the reasons set forth in the Phase I Brief and reiterated herein, the Debtors have established numerous legal bases under the Bankruptcy Code to maintain possession of the Custody Assets pending resolution of their viable preference claims.[130]

64.     The Custody Ad Hoc Group argues that the Debtors are "virtual squatters on the Custody Assets, in that they agree that they did not possess title or any equitable interest in the Custody Assets as of the Petition Date, have no legal basis to continue to hold them during the pendency of the case, yet continue to hold them because of alleged rights under the Bankruptcy Code (that have not been adjudicated)."[131]  The Debtors, however, have consistently argued that while they believe that title resides with Custody Program customers pursuant to the Terms of Use, the Debtors have preference claims against certain of the Custody Assets that arose as of the

---

[128]   *See* Custody Ad Hoc Group Brief ¶ 44.

[129]   *Id.* ¶ 45.

[130]   *See generally* Phase I Brief ¶¶ 32–53.

[131]   *See* Custody Ad Hoc Group Brief ¶ 51.

Petition Date.[132]  Indeed, the Debtors have established *prima facie* preference claims against certain Custody claimants. [133]

65.    The Custody Ad Hoc Group's reliance on *In re Peralta*, 48 F.4th 178 (3d Cir. 2022) and *Eden Place, LLC v. Perl (In re Perl)*, 811 F.3d 1120 (9th Cir. 2016), two chapter 13 cases, is misplaced.  As an initial matter, the Debtors certainly had the right, under the Terms of Use, to suspend services and retain customer assets, including Custody Assets, prior to the Petition Date, and in addition to the automatic stay, as of the Petition Date.[134]  On the Petition Date, the Debtors' colorable preference claims against the Custody claimants also arose.  Thus, there was no "illegality" that "endow[ed] the estates with any additional interests in the property."[135]  The Debtors are not using the Bankruptcy Code as a "sword to retain possession of property in which they lacked any rights under state law"[136] when they indeed had the rights to retain Custody Assets under state law.[137]

66.    Further, *In re Perl* is inapposite to the context here because *Perl* involved a postpetition dispute over possession of property after a state court had already entered a judgment on an unlawful retainer action prepetition.[138]  In that case, the debtor there had no rights to the

---

132    *See* Phase I Brief ¶ 30.

133    *See* Scheduling Order ¶ 9.

134    *See supra* ¶¶ 29, 39.

135    *See* Custody Ad Hoc Group Brief ¶ 50.

136    *Id.*

137    *See supra* ¶¶ 29, 39.

138    *See* Custody Ad Hoc Group Brief ¶ 49.

property as of the petition date.[139]   This is not the case here, where, as explained above, the Debtors had the right to suspend services and retain Custody Assets leading up to the Petition Date and on the Petition Date, and the Debtors' preference actions arose on the Petition Date.

67.     Similarly, although the debtor in *In re Peralta* had possession of his residence postpetition, judgment of possession in favor of his creditor had already been entered prior to the petition date.  Thus, the debtor had nothing more than possession—which is not the case here.  As noted above, the Debtors have more than just a simple right to possession.[140]

### 4.     The Debtors' retention of the Custody Assets does not violate constitutional due process.

68.     Finally, the Custody Ad Hoc Group makes the broad and bold argument that the Debtors are violating the Due Process Clause of the Constitution by retaining Custody users' property "on the basis of a mere allegation of a preference claim."[141]   As noted elsewhere, the Debtors have already established *prima facie* preference claims.[142]

69.     The fundamental problem with the Custody Ad Hoc Group's argument is its inappropriate reliance on *Rajala v. Gardner*, 709 F.3d 1031 (10th Cir. 2013), a Tenth Circuit case that addressed the question of whether a bankruptcy estate includes fraudulently transferred property.[143]   Akin to *Colonial Realty*, *Rajala v. Gardner* held that fraudulently transferred property is not included in the bankruptcy estate.[144]   Therefore, the question of whether retention of property

---

[139]   *Id.*

[140]   *See supra* ¶ 35.

[141]   *See* Custody Ad Hoc Group Brief ¶ 53.

[142]   *See* Scheduling Order ¶ 9.

[143]   *Rajala v. Gardner*, 709 F.3d 1031, 1037 (10th Cir. 2013).

[144]   *Id.* at 1039.

could violate the Due Process Clause was not even before the court. Instead, the court merely noted in dicta, "*[a]lthough neither party addressed the issue*, we note that a broad reading could *potentially* violate the Due Process Clause by allowing a trustee to enjoin another party's property rights based only on the allegation of fraud."[145]

70.    *Rajala v. Gardner* is therefore distinguishable on multiple grounds. Not only is it a Tenth Circuit case and therefore not binding here, but it also involves a fraudulent transfer rather than a preference action, and the Constitutional issue was not even before the court in such case. Further, because the Debtors have already established *prima facie* preference claims,[146] the context here involves more than a "mere allegation." Ultimately, the court's comment regarding the potential violation of the Due Process Clause was nothing more than the start of a thought. As the only authority that the Custody Ad Hoc Group cites on this point, it is both inappropriate and unpersuasive.

### D.    The Withhold Ad Hoc Group's Remaining Arguments Likewise Fail.

71.    The Withhold Ad Hoc Group makes two additional arguments in support of their position that the Debtors may not retain the Withhold Assets as any preference actions are evaluated. First, the Withhold Ad Hoc Group claims that the Debtors' potential right of setoff a return of any Withhold Assets where a customer holds a loan with Celsius (the "Loan Limitation") is inapplicable here.[147] Second, the Withhold Ad Hoc Group claims that the Debtors may not hold the Withhold Assets because the Debtors are not licensed to do so.[148]

---

[145]   *Id.* (emphasis added).

[146]   *See* Scheduling Order ¶ 9.

[147]   *See* Withhold Ad Hoc Group Brief ¶¶ 57–61.

[148]   *See id.* ¶¶ 62–63.

72.     With respect to the Loan Limitation, the Withhold Ad Hoc Group claims that: (i) the Loan Limitation is only applicable to one Withhold Ad Hoc Group member; (ii) the Terms of Use and Loan Terms of Service do not apply to Withhold Assets; and (iii) setoff rights are only applicable where required by contract.[149]  In response to the first argument, the Withhold Ad Hoc Group's claim that only one of its members has an outstanding loan with the Debtors ignores the fact that there are Withhold claimants not in Withhold Ad Hoc Group—thus, the Loan Limitation may be apply to more than just one Withhold claimant.  In response to the second argument, while the Terms of Use and Loan Terms of Service are silent as to whether Withhold Assets are property of the estate, they do apply to Celsius users with Celsius Accounts.  The Withhold Ad Hoc Group is comprised of individuals with Celsius Accounts, and thus, are bound by the Terms of Use.[150]  In response to the third argument, New York law is clear that setoff rights do not arise under contract but by default.[151]  These rights are expressly preserved for a debtor under section 553(a) of the Bankruptcy Code.[152]  Thus, it is not true that the Debtors' setoff rights here are inapplicable to the Withhold Assets simply because the right to setoff against Withhold Assets are not explicitly addressed in the Terms of Use.  For these reasons, the Withhold Ad Hoc Group's arguments with respect to the Loan Limitation fail.

73.     With respect to the licensing argument, the Debtors recognize that outside of the context of bankruptcy Celsius may not operate Custody accounts in the Prohibited States, hence

---

[149]  *See id.* ¶¶ 57–61.

[150]  *See generally* declarations of members of Withhold Ad Hoc Group attached as exhibits to the Withhold Ad Hoc Group Brief.

[151]  *See* 2022 N.Y. Debt. & Cred. Law § 151(a) ("Every debtor shall have the right [of setoff] upon . . . the filing of a petition under any of the provisions of the federal bankruptcy act . . .").

[152]  *See* 11 U.S.C. § 553.

the reason for the creation of Withhold Accounts.  Prior to the Petition Date, the Debtors repeatedly communicated to holders of Withhold Accounts that they should withdraw the Withhold Assets from the Celsius platform since Celsius could not conduct the Custody Program in the relevant Prohibited State.  In fact, the Debtors created the Withhold Accounts to avoid violating local licensing requirements.[153]  Now, postpetition, these assets and any claims holders of Withhold Accounts have to such assets will be dealt with through these chapter 11 cases.  The Debtors do not intend to retain these assets indefinitely, and the Debtors do not intend to hold assets postpetition such that the Debtors are in violation of any laws or regulations.  In sum, none of the Withhold Ad Hoc Group arguments in favor of an immediate return of the Withhold Assets are persuasive as the Debtors continue to evaluate whether the Withhold Assets are property of the estate and if any preference actions exist.

### Conclusion

74.     For the reasons set forth herein, the Debtors request that the Court find that (a) Custody Assets do not constitute property of the Debtors' estates, (b) the Withhold Ad Hoc Group has not met its burden of proof in showing that the Withhold Assets are not property of the estate, and (c) the Debtors should nonetheless be able to retain the Transferred Assets and certain other Custody Assets, pending adjudication of the attendant issues

---

[153]   *See* Examiner Report at 42–44; Phase I Declaration ¶ 5.

New York, New York
Dated: December 2, 2022

*/s/ Joshua A. Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:           jsussberg@kirkland.com

 - and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:           patrick.nash@kirkland.com
                     ross.kwasteniet@kirkland.com
                     chris.koenig@kirkland.com
                     dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*