TOGUT, SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Kyle J. Ortiz
Bryan M. Kotliar
Jared C. Borriello

*Counsel to the Ad Hoc Group of Custodial Account Holders*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                   :

In re:                            :         Chapter 11
                                   :

CELSIUS NETWORK LLC, et al.,[1]   :         Case No. 22-10964 (MG)
                                   :

                                   :         (Jointly Administered)
                  Debtors.     :

------------------------------------------------------------x

# AD HOC GROUP OF CUSTODIAL ACCOUNT HOLDERS' RESPONSE TO THE DEBTORS' AND THE CREDITORS' COMMITTEE'S PHASE I OPENING BRIEFS

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................1

RESPONSE ......................................................................................................................2

    A.   Custody Assets Are Not Property of the Estate ...........................................................2

          (1)   Analogous Circumstances Involving Custodians................................................5

          (2)   Analogous Circumstances Involving Bailments .................................................7

          (3)   Analogous Circumstances Involving Special Deposits....................................10

    B.   The Debtors and the Creditors' Committee Have Not Satisfied Their Burden to Demonstrate a Basis to Withhold Custody Assets from Custody Service Users ......................................................................................................12

          (1)   The Terms of Use Is Not a Basis to Withhold Custody Assets ......................14

          (2)   The Preference Limitation Is Not a Basis to Withhold Custody Assets ........18

          (3)   The Loan Limitation Is Not a Basis to Withhold Custody Assets .................21

          (4)   The Bankruptcy Code Is Not a Basis to Withhold Custody Assets................24

    C.   The Debtors' and Creditors' Committee's Requests for Affirmative Relief from the Court to Withhold Custody Assets are Woefully Deficient.....................28

          (1)   The Debtors' Request for an Injunction is Procedurally Improper ...............28

          (2)   The Debtors' Asserted Bases (Without Evidence) for an Injunction are Grossly Inadequate..............................................................................29

          (3)   The Existence of Facially Valid Preference Claims Is Not a Basis for an Injunction .......................................................................................33

          (4)   The Debtors and Creditors' Committee  Cannot Obtain an Administrative Freeze.........................................................................35

    D.   All Other Equitable Bases Fail ............................................................................36

CONCLUSION................................................................................................................38

**TABLE OF AUTHORITIES**

**Page(s)**

<u>Cases</u>

*Amusement Indus., Inc. v. Citigroup Glob. Mkts. Realty Corp.*
 *(In re First Republic Group Realty, LLC.)*, 421 B.R. 659 (Bankr. S.D.N.Y. 2009) ...............30

*Blackrock Capital Inv. Corp. v. Fish*,
 239 W. Va. 89 (2017) ...........................................................................................................17

*Buena Vista Television v. Adelphia Commc'ns Corp.*
 *(In re Adelphia Commc'ns Corp.)*, 307 B.R. 404 (Bankr. S.D.N.Y. 2004) ..............................5

*Butner v. United States*,
 440 U.S. 48 (1979) ...............................................................................................................22

*BWP Media USA, Inc. v. Gossip Cop Media, Inc.*,
 196 F. Supp. 3d 395 (S.D.N.Y. 2016) ....................................................................................2

*CFTC v. McDonnell*,
 332 F. Supp. 3d 641 (E.D.N.Y. 2018) ....................................................................................2

*CFTC v. Reynolds*,
 Case No. 19-cv-05631-MKV, 2021 WL 796683, (S.D.N.Y. Mar. 2, 2021) ............................2

*Chemetron Corp. v. Jones*,
 72 F.3d 341 (3d Cir. 1995) ...................................................................................................29

*Citizens Bank v. Strumpf*,
 516 U.S. 16 (1995) ...............................................................................................................35

*Day Op of N. Nassau, Inc. v. Viola*,
 16 Misc. 3d 1122(A), 847 N.Y.S.2d 901 (Sup. Ct. 2007) ....................................................17

*De Jesus v. Gregorys Coffee Mgmt., LLC*,
 Case No. 20-CV-6305 (MKB), 2021 WL 5591026 (E.D.N.Y. Nov. 29, 2021) .....................17

*Diamond Fortress Techs., Inc. v. EverID, Inc.*,
 274 A.3d 287 (Del. Super. Ct. 2022) ......................................................................................2

*Empire Props. Corp. v. Manufacturers Trust Co.*,
 288 N.Y. 242 (1942) .............................................................................................................15

*General Motors Corp. Bristol Indus. Corp. (In re Bristol Indus. Corp.)*,
 690 F.2d 26 (2d Cir. 1982) .....................................................................................................9

*Gillman v. Chase Manhattan Bank*,
 73 N.Y.2d 1 (1988) ...............................................................................................................17

*Gray v. First Nat'l Bank & Trust Co.,*
   263 N.Y. 479 (1934) ..................................................................................11

*Gulf Oil Corp. v. Banque De Paris (In re Fuel Oil Supply & Terminaling, Inc.),*
   72 B.R. 752 (S.D. Tex. 1987)...................................................................9

*Hawaii Structural Ironworkers Pension Tr. Fund v. Calpine Corp.,*
   Case No. 06 CIV. 5358 (PKC), 2006 WL 3755175 (S.D.N.Y. Dec. 20, 2006) .........30, 31, 32

*In re Adelphia Commc'ns Corp.,*
   336 B.R. 610, 664 (Bankr. S.D.N.Y.), *aff'd*, 342 B.R. 122 (S.D.N.Y. 2006) .........................37

*In re Allen,*
   Case No. 11–37671(GMB), 2012 WL 693461 (Bankr. D.N.J. Mar. 2, 2012) .....................19

*In re Applied Logic Corp.,*
   576 F.2d 952 (2d Cir. 1978).....................................................................23

*In re Calpine Corp.,*
   365 B.R. 401 (S.D.N.Y. 2007) ..............................................................30, 32

*In re Consol. Indem. & Ins. Co.,*
   287 N.Y. 34 (1941) ...................................................................................23

*In re Enron Corp.,*
   2003 WL 23965469 (Bankr. S.D.N.Y. Jan. 22, 2003)................................7, 8, 9, 10

*In re Enron Corp.,*
   340 B.R. 180 (Bankr. S.D.N.Y. 2006)...................................................25, 26

*In re Enron Corp.,*
   379 B.R. 425 (S.D.N.Y. 2007) ...............................................................25

*In re Hypnotic Taxi LLC,*
   543 B.R. 365 (Bankr. E.D.N.Y. 2016) ...................................................34

*In re Joliet-Will Community Action Agency,*
   847 F.2d 430 (7th Cir. 1988).................................................................5, 6

*In re Lehman Bros. Holdings, Inc.,*
   439 B.R. 811 (Bankr. S.D.N.Y. 2010)................................................11, 23

*In re Midland Euro Exch. Inc.,*
   347 B.R. 708 (Bankr. C.D. Cal. 2006)...................................................19

*In re Mississippi Valley Livestock, Inc.,*
   745 F.3d 299 (7th Cir. 2014)..................................................................20

*In re Motors Liquidation Co.,*
   829 F.3d 135 (2d Cir. 2016)..............................................................28, 30

*In re Papercroft Corp.*,
127 B.R. 346 (Bankr. W.D. Pa. 1991) ................................................................22

*In re PSA, Inc.*,
277 B.R. 51 (Bankr. D. Del. 2002)................................................................21, 22

*In re Rochester Drug Coop., Inc.*,
2020 Bankr. LEXIS 1960 (Bankr. W.D.N.Y. July 24, 2020) ...............................27

*In re Saunders*,
101 B.R. 303 (Bankr. N.D. Fla. 1989) ................................................................19

*In re Viking Pump, Inc.*,
27 N.Y.3d 244 (2016) .........................................................................................16

*In re Westchester Avenue Marina Realty, Inc.*,
124 B.R. 161 (Bankr. S.D.N.Y. 1991).................................................................26

*In re Westchester Structures, Inc.*,
181 B.R. 730 (Bankr. S.D.N.Y. 1995).................................................................23

*In re WorldCom Inc.*,
Case No. 02-13533, 2003 WL 22025051 (Bankr. S.D.N.Y. Jan. 30, 2003) .................34, 35

*In re Yelverton*,
Case No. 09-00414, 2015 WL 5602889 (Bankr. D.D.C. Sept. 22, 2015) ............19

*Klingman v. Levinson*,
158 B.R. 109 (N.D. Ill. 1993) .............................................................................19

*Kulhawik v. Holder*,
571 F.3d 296 (2d Cir. 2009)................................................................................30

*Lyondell Chem. Co. v. CenterPoint Energy Gas Servs. Inc. (In re Lyondell Chemical)*,
402 B.R. 571 (Bankr. S.D.N.Y. 2009).............................................................30, 31

*Marchant v. Summers*,
79 F.2d 877 (4th Cir. 1935)..........................................................................7, 8, 10

*Merrill Lync Mortg. Cap. Inv. v. FDIC*,
293 F.Supp.2d 98 (D.C. 2003)............................................................................11

*Mission Prod. Holdings, Inc. v. Tempnology, LLC*,
139 S. Ct. 1652 (2019) .......................................................................................20

*Mullane v. Cent. Hanover Bank & Tru. Co.*,
339 U.S. 306 (1950) ...........................................................................................28

*Nat'l Corp. Housing P'Ship v. Liberty State Bank*,
836 F.2d 433 (8th Cir. 1988)................................................................................8

*Nayal v. HIP Network Servs. IPA, Inc.,*
  620 F.Supp.2d 566 (S.D.N.Y. 2009) .................................................................17

*Public Service Elec. & Gas Co. v. Fed. Power. Comm'n,*
  371 F.2d 1 (3d Cir. 1967) ...................................................................................8

*Queenie, Ltd. v. Nygard Int'l,*
  321 F.3d 282 (2d Cir. 2003) ..............................................................................32

*Ragone v. Alt. Video at Manhattan Ctr.,*
  595 F.3d 115 (2d Cir. 2010) ..............................................................................17

*Rajala v. Gardner,*
  709 F.3d 1031 (10th Cir. 2013) .........................................................................19

*Reading Co. v. Brown,*
  391 U.S. 471 (1968) .............................................................................................5

*Shuster v. First Nat. Monetary Corp.,*
  113 Misc. 2d 1058, 450 N.Y.S.2d 711 (Civ. Ct. 1982) ......................................17

*Spradlin v. Khouri (In re Bruner),*
  561 B.R. 397 (B.A.P. 6th Cir. 2017) .................................................................19

*Staff Mgmt. Solutions LLC v. Feltman (In re Corp. Res. Servs., Inc.),*
  Case No. 15-12329 (MG), 2020 WL 1907538 (Bankr. S.D.N.Y. Apr. 15, 2020) ...............30

*State Bank of Florence v. Miller (In re Miller),*
  459 B.R. 657 (B.A.P. 6th  Cir. 2011) .................................................................22

*State v. Wolowitz,*
  96 A.D.2d 47 (2d Dep't 1983) ...........................................................................17

*Stillwater Liquidating LLC v. SFN Dekalb Holdings*
  *(In re Stillwater Asset Backed Offshore Fund Ltd.),* 729 F. App'x 69 (2d Cir. 2018) ...........19

*Sussman v. Crawford,*
  488 F.3d 136 (2d Cir. 2007) ..............................................................................30

*Swan Brewery Co. v. United States Trust Co.,*
  832 F.Supp. 714 (S.D.N.Y. 1993) .................................................................11, 23

*U.S. v. Sabbeth,*
  262 F.3d 207 (2d Cir. 2001) ..............................................................................19

*Westinghouse Credit Corp. v. D'Urso,*
  2788 F.3d 138 (2d Cir. 2000) ............................................................................23

*Westview Assocs. v. Guaranty Nat'l Ins. Co.,*
  95 N.Y.2d 334 (2000) ........................................................................................16

*Williams Press v. State of N.Y.*,
  37 N.Y. 2d 434 (1975) ............................................................................................15

Statutes

11 U.S.C. § 105(a) ...........................................................................................28, 29, 37

11 U.S.C. § 362(a)(3).............................................................................................18, 19

11 U.S.C. § 362(d)(2) ..................................................................................................13

11 U.S.C. § 362(g)(1)..................................................................................................12

11 U.S.C. § 362(g)(2)..................................................................................................13

11 U.S.C. § 363(p)(1) .................................................................................................13

11 U.S.C. § 363(p)(2) .................................................................................................12

11 U.S.C. § 541 ...........................................................................................................20

11 U.S.C. § 541(a)(3)..................................................................................................19

Rules

Fed. R. Bankr. P. 7001(7) ...........................................................................................28

Other Authorities

Adam J. Levitin, *Not Your Keys, Not Your Coins: Unpriced Credit Risk in Cryptocurrency*,
  101 Tex. L. Rev. (forthcoming, 2022) at 51 ..........................................................27

Collier on Bankruptcy ¶ 558.02 (15th ed. 1991)......................................................21

The Ad Hoc Group of Custodial Account Holders (the "<u>Ad Hoc Group</u>")[2] hereby submits this response (this "<u>Response</u>")[3] to the opening briefs regarding the Phase I Issues filed by the Debtors [Docket No. 1291] (the "<u>Debtors' Brief</u>") and the Creditors' Committee [Docket No. 1290] (the "<u>UCC Brief</u>"). In support of this Response, the Ad Hoc Group, by and through its undersigned counsel, respectfully states:

## PRELIMINARY STATEMENT

1. Since the Pause Date, Custody Service users have been deprived of access to their property. Many Custody Service users entrusted their entire life savings to the Debtors for safe keeping as custodians. Now, without demonstrating any contractual, statutory, or equitable basis, the Debtors and the Creditors' Committee seek to continue to deprive the Custody Service users of their property indefinitely because it would be more administratively convenient to collect on potential future preference claims (that may never be brought and are unlikely to succeed).

2. The burden to deprive someone of their property (without any compensation) is far higher than administrative convenience. Instead, the Debtors and the Creditors' Committee must overcome a high legal and evidentiary burden to obtain affirmative and *extraordinary* relief from this Court—in the form of an injunction or pre-judgment order of attachment—which the Debtors and the Creditors' Committee have not satisfied, and cannot satisfy. And to what end? The Debtors and the Creditors' Committee have put forth no evidence that the Custody Service users pose a

---

[2] On November 4, 2022, the Ad Hoc Group filed the *Second Verified Statement Pursuant to Bankruptcy Rule 2019* [Docket No. 1284].

[3] Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the *Ad Hoc Group of Custodial Account Holders' (A) Phase I Opening Brief and (B) Limited Objection to the Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to Reopen Withdrawals for Certain Customers With Respect to Certain Assets Held in the Custody Program and Withhold Accounts and (II) Granting Related Relief*, filed on November 5, 2022 [Docket No. 1292] (the "<u>AHG Opening Brief</u>").

collection risk. The price being paid by Custody Service users to afford the Debtors the convenience of protecting against this hypothetical risk is the loss of the fundamental right to hold and enjoy their property—property that is, and has been, subject to the real risk of market fluctuations that Custody Service users are locked out of protecting against by deploying their own capital as they wish.[4]

3.      This Court should reject the Debtors' and the Creditors' Committee's attempts to protect against risks they have provided no evidence are real by depriving Custody Service users of such users' property and modify the Proposed Order to require that the Debtors honor all non-insider customer withdrawals of Custody Assets.

## <u>RESPONSE</u>

## A.      **Custody Assets Are Not Property of the Estate**

4.      All parties agree that Custody Assets are not property of the estate. *See* Debtors' Br. ¶¶ 12-22; UCC Br. ¶¶ 35-39; AHG Opening Br. ¶¶ 26-33. The Creditors' Committee argues, however, that only coins in the Custody Wallets are not property of the estate and that any distributions of Custody Assets to Custody Service users should be pro rata based on the coin balances in the Custody Wallets as of the Petition Date. *See* UCC Br. ¶¶ 40 n.20 & 67. The Creditors' Committee is wrong.

---

[4]    Attached as **<u>Exhibit A</u>** hereto is a snapshot of the price changes in Bitcoin and Ethereum from the Pause Date to the date hereof from CoinMarketCap. The Court may take judicial notice of historical exchange rates. *See e.g., BWP Media USA, Inc. v. Gossip Cop Media, Inc.*, 196 F. Supp. 3d 395, 401 n.4 (S.D.N.Y. 2016) (taking judicial notice of historical exchange rates in the foreign currency context). In the context of cryptocurrency exchange rates, courts have recently found that that "CoinMarketCap is a reliable cryptocurrency valuation tool." *Diamond Fortress Techs., Inc. v. EverID, Inc.*, 274 A.3d 287, 306 (Del. Super. Ct. 2022)("[T]he Court is satisfied CoinMarketCap is a reliable cryptocurrency valuation tool. As such, the Court will rely on historical pricing data published by CoinMarketCap to determine the proper USD value of ID Tokens in calculating the Plaintiffs' forthcoming judgment") (citing *CFTC v. McDonnell*, 332 F. Supp. 3d 641, 670–71 (E.D.N.Y. 2018); *CFTC v. Reynolds*, Case No. 19-cv-05631, 2021 WL 796683, at *4 n.2 (S.D.N.Y. Mar. 2, 2021) (citing *McDonnell*, 332 F. Supp. 3d at 670-71) (holding "CoinMarketCap is a reliable valuation tool . . .").

5.     Consistent with the Terms of Use and the Debtors' practice of balancing the Custody Wallets with cryptocurrency from the Aggregator Wallets to cover Custody Service users' deposits of Custody Assets, cryptocurrency held by the Debtors in the Aggregator Wallets sufficient to cover any alleged shortfall belong to the affected Custody Service users. *See Declaration of Oren Blonstein, Head of Innovation and Chief Compliance Officer of Celsius Network Limited, With Respect to Certain Phase I Issues Pursuant to the Joint Stipulation and Agreed Scheduling Order By and Among the Debtors, the Committee, and the Ad Hoc Groups with Respect to the Custody and Withhold Issues,* filed on October 25, 2022 [Docket No. 1192] ("Blonstein Declaration") ¶¶ 15-18; Terms of Use § 4(B).  The fact that the affected Custody Assets that will be used to cover this alleged shortfall comes from the Aggregator Wallets is irrelevant because the parties intended for Custody Assets to belong to the user and the Terms of Use, as supported by the Debtors' course of dealings, permit this very result.  Furthermore, it was the Debtors' practice to honor all withdrawals of Custody Assets from the Aggregator Wallets in the first instance and subsequently conduct a manual rebalance. *See* Blonstein Decl. ¶¶ 8, 11-14.[5]

6.     According to the Blonstein Declaration, the postpetition alleged shortfall in the Custody Wallets of approximately $15 million arose on account of certain cancelled "Pending Withdrawals." *Id*. ¶¶ 24-25.  Subsequent to the filing of the Blonstein Declaration, the Debtors have revised how they report Custody Assets and liabilities **as of the Petition Date** to take into account the **subsequently** cancelled

---

[5]     Because the Terms of Use and the Debtors' course of dealings support the Court's finding that Custody Assets are not property of the estate, the Ad Hoc Group is not seeking the imposition of any equitable remedies, such as a constructive trust, at this time.  As such, the "intermediate balance test" and other types of tracing analyses are not relevant for the Phase I Issues.  However, the Ad Hoc Group reserves all rights with respect to constructive trust and tracing arguments to the extent they become relevant.

Pending Withdrawals.  *See Supplemental Declaration of Oren Blonstein, Head of Innovation and Chief Compliance Officer of Celsius Network Limited, With Respect to the Custody and Withhold Issues*, filed on December 1, 2022 [Docket No. 1532] (the "<u>Supplemental Blonstein Declaration</u>"), Ex. B.  In other words, having ***subsequently*** cancelled the Pending Withdrawals, the Debtors now show the Custody Assets associated with Pending Withdrawals as the basis for the alleged shortfall on the Petition Date.  Furthermore, Exhibit B to the Supplemental Blonstein Declaration shows slight variances in the amount of the Custody Assets and Custody liabilities as of the Petition Date and November 28, 2022.  *Id.*, Ex. B.  This variance indicates that cryptocurrency has continued to move into and out of the Custody Wallets after the Petition Date, in violation of the Scheduling Order and the rights of Custody Service users.[6]

7.      The Debtors, moreover, make no serious attempt to explain and have provided no authority for why the Debtors did not complete the Pending Withdrawals by the Pause Date or for their unilateral cancellation of the Pending Withdrawals on or before October 25, 2022—more than three months after the Petition Date and nearly two weeks after the Court entered the Scheduling Order.  The only explanation offered by the Debtors for this cancellation is "so that customer balances would accurately reflect the amount owed to the customer."  Blonstein Decl. ¶ 25.  However, if such Pending Withdrawals were honored, there would be no need for the Debtors' postpetition cancellation, which is now alleged to give rise to an apparent shortfall in the Custody Wallets.  To the extent the cryptocurrency subject to the Pending Withdrawals is not

---

[6]     *See Joint Stipulation and Agreed Order By and Among the Debtors, the Committee, and the Ad Hoc Groups with Respect to the Custody and Withhold Issues* [Docket No. 1044, Adv. Pro. Docket No. 12] (the "<u>Scheduling Order</u>") ¶ 13 ("During the pendency of the foregoing litigation, the Debtors will not seek to use the Custody Assets and/or the Withhold Assets other than as authorized by an order granting the Custody and Withhold Motion or as agreed to by the Parties in writing.").

returned to the affected customers—including, without limitation, by way of the rightful return of Custody Assets—the affected customers have postpetition administrative expense claims for breach of contract and conversion. *See, e.g., Buena Vista Television v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 307 B.R. 404, 421-22 (Bankr. S.D.N.Y. 2004) ("[T]he actual, necessary costs and expenses of preserving the estate have been held, since the days of the old Bankruptcy Act, to also include post-petition torts committed by a trustee or debtor in possession . . . ") (cleaned up) (citing *Reading Co. v. Brown*, 391 U.S. 471 (1968) (holding that postpetition tort committed by a debtor within the scope of its business is entitled to administrative expense priority status)).

8.     Even in circumstances involving an apparent shortfall where the counterparty requests its property back and the debtor does not have it segregated from the debtor's other property, there is ample case law in numerous situations involving custodians, bailments (including in the fungible commodities context) and special deposits analogous to the circumstances here, where courts have found that assets contractually belonging to a non-debtor third party were not property of the estate.

(1)     <u>Analogous Circumstances Involving Custodians</u>

9.     When assets are held by a trustee or custodian for the benefit of a third party, the assets are owned by the third party and do not form part of the debtor's bankruptcy estate. *See, e.g., In re Joliet-Will Community Action Agency*, 847 F.2d 430, 432 (7th Cir. 1988). In *Joliet-Will*, the debtor, a non-profit community service organization, was financed with federal and state grants. *Id.* at 431-32. After the debtor was mismanaged and filed for chapter 7 liquidation, federal and state agencies brought an action for the return of grant money, arguing that the money and the debtor's assets belonged to them. *Id.* at 430. The bankruptcy court and the district court disagreed and

held that the grant money and acquired assets should be liquidated and distributed to creditors pro rata. *Id.*

10. On further appeal, the Seventh Circuit reversed. *Id.* at 435. In doing so, the Seventh Circuit held that property a debtor possesses as custodian or other intermediary generally lacks beneficial ownership rights, and as such, those assets are not property of the estate. *Id.* at 432. The Seventh Circuit then looked to whether the relationship between the debtor and those who transferred the funds was "custodial," which itself turned on (a) the terms under which the transfers were made to the debtor, and (b) the relationship between the holder of the funds and its customer. *Id.* at 433-34. In that case, the applicable agreements provided for controls on the holder's (the debtor's) use of funds, and the holder was "in effect an agent to carry out specific tasks rather than as a borrower, or an entrepreneur using invested funds." *Id.* at 432. The debtor had very little discretion on how it could use the funds as there was a budget with a list of permitted expenses. As such, the Seventh Circuit reversed the lower courts, finding the relationship to be custodial, and the funds held by the debtor were not property of the estate. *Id.* at 435.

11. Here, the Terms of Use provide for a custodial arrangement similar to that in *Joliet-Will* where the funds at issue were found to not be property of the estate. The Terms of Use expressly provide that title at all times remains with the Custody Service user, and the Debtors act as "custodian" and "perform other duties customarily performed by a custodian." Terms of Use § 4(B). Like the debtor in *Joliet-Will* that had very little discretion under its agreement with the transferees to use obtained funds, here the Debtors expressly cannot "transfer, sell, loan or otherwise rehypothecate Eligible Digital Assets held in a Custody Wallet unless specifically instructed by you [the Custody Service user]." *Id.*

(2)     Analogous Circumstances Involving Bailments

12.     A bailment is "[t]he delivery of personal property by one person (the *bailor*) to another (the *bailee*) who holds the property for a certain purpose under an express or implied in fact contract.  Unlike a gift of personal property, a bailment involves a change in possession but not in title."  *In re Enron Corp.*, 2003 WL 23965469 (Bankr. S.D.N.Y. Jan. 22, 2003) (citations omitted).  While bailments typically require the return of the exact same property transferred, courts have found bailments where the parties' contract permitted that the bailor use the transferred property but return property of a like amount.  *See, e.g., Marchant v. Summers*, 79 F.2d 877 (4th Cir. 1935) (finding bailment where bank accepted bonds for safe-keeping pursuant to an agreement that allowed the bank to use the bonds as collateral for its own purposes and return "not necessarily the identical bonds, but bonds of the same issue, same denomination and value").

13.     In *Marchant*, a bondholder deposited bonds with a bank for safe-keeping pursuant to an agreement that (a) required the bank to deposit the bond's coupon payments into the bondholder's account, and (b) permitted the bank to pledge the bonds on its own behalf provided that the bank return "not necessarily the identical bonds, but bonds of the same issue, same denomination and value." *Id.* at 878.  The bank did not segregate the bonds and instead used them in connection with its business, including as collateral for its own investment purposes.  *Id.*  After the bank failed and a receiver was appointed to liquidate its assets, the bondholder sought return of similar bonds to that which it had deposited in accordance with its agreement with the bank.  *Id.* at 878-80.  The lower court ordered that the receiver turnover similar bonds to the bondholder-plaintiff, and on appeal, the Fourth Circuit affirmed.  *Id.*  The Fourth Circuit disagreed with the receiver that the arrangement for the bank to act as a

7

bailor was destroyed and became an ordinary debtor/creditor relationship simply because the bank was given the right to use the bonds for its own purpose. *Id.* While the general rule is that a bailment does not occur if the bailee can use the property as it sees fit, the court found the facts and circumstances evidenced the parties' intent to maintain the bailor/bailee relationship subject to permitted contractual uses, including a clause governing replacement bonds when requested by the bondholder. *Id.* The Fourth Circuit likened this situation to the bailment of fungible commodities (discussed in greater detail below), where the bailee returns a similar but not the exact same item. *Id.* On this point, the Fourth Circuit explained:

> Bonds, of course, are not fungibles, but there is no difference between one bearer bond and another, where both are of the same issue, denomination, and value; and the effect of the provision in question was to impart to the bailment of the bonds the advantage of a bailment of fungibles, i.e., the right of the bailee to return similar articles without the burden of keeping separate and returning the identical articles bailed.

*Id.*

14.     In the fungible commodities context, courts have also found bailments where the transferred commodities are comingled with the bailor's other property (such as natural gas held in a tanker), and the bailee would receive the same type of property when requested. *See, e.g., Enron*, 2003 WL 23965469 (collecting cases).[7] For example, in

---

[7]     On this point, *Enron* cites the following cases: *Public Service Elec. & Gas Co. v. Fed. Power. Comm'n*, 371 F.2d 1 (3d Cir. 1967) ("We conclude that the mere physical commingling of Texaco's gas in Transcon's lines with gas Transcon has purchased for subsequent resale does not compel rejection of historic notions of bailments and require us to transform the transportation agreement into a succession of sales. . . . An essential feature of this transaction is that Texaco is the owner of the gas both at the beginning and the end of its journey . . . ."); *Nat'l Corp. Housing P'Ship v. Liberty State Bank*, 836 F.2d 433, 436 (8th Cir. 1988) (rejecting argument that unless a landlord was required to return to the tenant the identical check or money the tenant deposited, the relation cannot be bailment. The court stated that "[w]hile such appears to have been the ancient rule regarding bailment of money[,] requiring return of the identical item has been liberalized in the case of bailment of fungible goods") (citations omitted); *General Motors Corp. Bristol Indus. Corp. (In re Bristol Indus. Corp.)*, 690 F.2d 26, 30–31 (2d Cir. 1982) (Mansfield, J., concurring) (concluding that the bankruptcy judge erred by holding that the law of bailments is inapplicable to fungible goods and stating that "[w]hen commingling is required by

8

*Enron*, a large natural gas pipeline company that both transported and stored natural gas ("TCO") entered into a number of agreements with a purchase and seller of natural gas ("ENA"). *Id.* at *2. Under some of these agreements, TCO would receive gas from ENA to hold in TCO's system. Pursuant to certain "parking services," ENA could deliver a specified quantity of gas to TCO at agreed upon locations (the gas is said to be "parked"). *Id.* at *3. TCO would hold the parked quantities in its system until TCO delivered gas back to ENA at an agreed upon location. *Id.* In order for ENA to have gas returned from TCO, ENA was required to follow several steps to request a return. *Id.*

15.     ENA subsequently filed for bankruptcy, and TCO sought relief from the stay to exercise its setoff rights under the agreements. *Id.* at *4.[8] The court rejected TCO's argument that this was not a bailment *per se* because ENA never received exactly the same gas that it deposited with TCO. *Id.* at *1, 11. Instead, the court looked to the subjective intent of the parties as set forth in the contract. *Id.* at *20-21. The parties' agreements provided that ENA maintained title to the gas, including when parked with TCO (except in certain specific circumstances), and furthermore that TCO was required to account to ENA for parked gas quantities. *Id.* Based on the record, the court found TCO maintained possession but not title to the natural gas placed in its system, and as

---

the needs of the trade and is done with the consent of the parties a bailment is established if that is the intent of the parties") (citing *Public Service Elec.*, 371 F.2d at 4)); *Gulf Oil Corp. v. Banque De Paris (In re Fuel Oil Supply & Terminaling, Inc.)*, 72 B.R. 752, 758 (S.D. Tex. 1987), *rev'd on other grounds*, 837 F.2d 224, 227 (5th Cir. 1988) (the district court reasoned in a "loan exchange" context where there is no indication of a sale and where Gulf agreed to deliver and Fuel Oil agreed to replace at a later date the same amount and grade of gasoline that: "[i]f, as in the majority of situations involving fungible goods, the commodity is placed in another's receptacle where similar commodities belonging to others are deposited, the transaction is a bailment."

[8]     Relevant to Part B.3 below, the parties agreed that bailees cannot exercise setoff (because there is no mutual debts/credits owed; only property held), and as such, agreed that the issue for the court to determine was whether there was a bailment, as that would preclude setoff. *Id.* at *4-5.

such, the arrangement was a bailment.  *Id.* at *18.

16.     Here, the Debtors have possession of Custody Assets, but not title.  Like the bailment arrangement in *Marchant* where the court ordered that the receiver return similar bonds to the bondholder because that is what the contract required, here, the Terms of Use contain a substantially similar provision to that in *Marchant* requiring the Debtors to return cryptocurrency "of the identical type" but not "the actual [cryptocurrency] initially transferred by you to a Custody Wallet."  Terms of Use § 4(B).  This result is also consistent with the result in *Enron* where the bailee (here the Custody Service users) own the bailed property (here the Custody Assets) at the beginning and end of their journey like the natural gas in *Enron*.  Furthermore, unlike where a bailment was found in *Marchant* even where the bank was permitted to use the deposited bonds, here the Debtors have agreed not to use Custody Assets transferred into the Custody Service.[9]

(3)     <u>Analogous Circumstances Involving Special Deposits</u>

17.     The result here is also consistent with situations where Courts have found that an account was a special deposit.  A special deposit "resembles but is not exactly like a bailment; under New York law, a special deposit, unlike a bailment, does not require return of the identical thing."  *See Merrill Lynch Mortg. Cap. Inc. v. FDIC*, 293 F.Supp.2d 98, 107 (D.C. 2003) (citations omitted).[10]  Under New York law, whether a deposit is general or specific depends on the mutual understanding and intent of the

---

[9]     Further highlighting the similarities between the bond agreement in *Marchant* and the Custody Services, at a hearing in this case, counsel for the Creditors' Committee referred to "the nature of cryptocurrency" as "an intangible bearer asset."  Sept. 15, 2022, Hr'g Tr. 67:18-21.

[10]    On this point, the *Merrill Lynch* decision cites *Genesee Wesleyan Seminary v. U.S. Fidelity & Guaranty Co.*, 247 N.Y. 52, 55 (1928), where the New York Court of Appeals noted that a special deposit "may exist where the duty of the depository is to hold, ***not the identical bills or coins, but an equivalent sum, to be kept intact, however, for the use of the depositor***." (emphasis added)

parties when the deposit is made absent evidence of an intent to make a special deposit, a deposit is presumed to be general. *Id.* at 105 (citations omitted). A depositor can overcome this presumption by proving the existence of an agreement, express or implied, that an account was a special deposit—*i.e.*, that the parties mutually intended to set aside the funds for a specific purpose. *See, e.g., Bank of Am., N.A. v. Lehman Bros. Holdings Inc. (In re Lehman Bros. Holdings Inc.)*, 439 B.R. 811, 824-25 (Bankr. S.D.N.Y. 2010) (citing *Swan Brewery Co. v. United States Trust Co.*, 832 F.Supp. 714, 718 (S.D.N.Y. 1993) ("Whether an account is general or specific depends upon the mutual intent of the parties.") (citations omitted)); *Gray v. First Nat'l Bank & Trust Co.*, 263 N.Y. 479 (1934) (explaining that whether a deposit is a "special deposit or fund, to be kept intact and used for a specific purpose, depends . . . upon the intent of the parties.").

18. In addition to the parties' written agreement, other factors that the courts have examined to ascertain the parties' mutual intent include: "(a) whether the parties agreed to segregate the funds; (b) whether the bank paid interest; (c) whether the deposit lacked an unfettered right to withdraw the funds; and (d) whether a third party possessed an interest in the funds." *Lehman Bros.*, 439 B.R. at 825 (colleting cases); *see also Merrill Lynch*, 293 F.Supp.2d at 105-06 (collecting case examples of intent to establish special deposit.

19. Here, the Terms of Use is an express written agreement that provides for a relationship analogous to a special deposit of the Custody Assets to be used for a specific purpose: held in custody and not to be used by the Debtors. In addition, the other factors considered by courts support a finding of a relationship akin to a special deposit—the Debtors agreed to segregate Custody Assets under the Terms of Use; the Debtors did not pay interest on the Custody Assets; Custody Service users have a near unfettered right to withdraw Custody Assets other than in the event of market

disruptions or periods of volatility, factors not present or argued here; and no third party has an interest in the Custody Assets.

**B.  The Debtors and the Creditors' Committee Have Not Satisfied Their Burden to Demonstrate a Basis to Withhold Custody Assets from Custody Service Users**

20.     The Creditors' Committee asserts, in passing and without citation, that "the Custody Ad Hoc Group bears the burden of identifying appropriate authority" to have Custody Assets returned to Custody Service users.  UCC Br. ¶ 62.  Not only would this upend basic property rights and common sense, it is also inconsistent with the Bankruptcy Code.

21.     Under the Bankruptcy Code in other circumstances, the party asserting an interest in property of the estate has the initial burden of proof on the issue of demonstrating the extent of such interest—such as in a dispute regarding the debtor's ability to use, sell, or lease property of the estate (11 U.S.C. § 363(p)(2)) or in a request for relief from the stay (11 U.S.C. § 362(g)(1)) (here, it has already been established that the Custody Service users have title to the Custody Assets).  In these examples, after the movant satisfies its burden, the burden of proof shifts to the debtor to demonstrate that it is entitled to use, sell, or lease property of the estate because the movant is adequately protected (11 U.S.C. § 363(p)(1)) or it is entitled to keep the property subject to the stay relief motion because it is necessary to an effective reorganization (11 U.S.C. § 362(d)(2); (g)(2)) ).[11]  In both of these analogous circumstances, the burden is on the debtor or party opposing relief to demonstrate a basis to continue doing what they are doing.

---

[11]   The Creditors' Committee has been inconsistent with its assertions regarding the burden, and in other pleadings has argued that it is the Debtors' burden to establish which assets constitute property of the estate.  *See The Official Committee of Unsecured Creditors' Objection to the Debtors' Motion Seeking Entry of an Order (I) Permitting the Sale of Stablecoin in the Ordinary Course and (II) Granting Related Relief*, filed on October 25, 2022 [Docket No. 1186] ¶¶ 2, 8-9.

22.     In these other circumstances, the estate has a competing interest in the property at issue, and the property at issue is part of the estate.  Yet, the debtor in these examples has the burden of demonstrating a basis to keep its own property.  However, unlike these other circumstances, Custody Assets are not part of the estate—further illustrating that the Debtors have the burden of demonstrating some basis to keep them.  It would be an absurd result for the Debtors to have the burden of demonstrating an entitlement to maintain the automatic stay to prevent foreclosure *of its own property* but not have the burden of demonstrating an entitlement to hold something that admittedly *belongs to someone else*.

23.     Consistent with the above-cited legal principles, it is obvious that the burden is on the Debtors and the Creditors' Committee to put forth some basis to withhold property belonging to others that they themselves agree the estate does not own.  This is even more clear when the Debtors and the Creditors' Committee are asserting that the estate can withhold the Custody Assets from the Custody Service users *for free* without providing any compensation.  Withholding Custody Assets has serious implications, including potential damages claims against the estate.  *See* AHG Opening Br. ¶ 41.  And when it comes to withholding Custody Assets on account of the Preference Limitation and Loan Limitation—*i.e.*, potential, but not-yet-asserted claims and causes of action—the Custody Service users must be compensated or adequately protected, which has not happened here.

24.     For the reasons set forth in the AHG Opening Brief and as explained in greater detail below, none of the Debtors' or the Creditors' Committee's arguments are a basis to withhold Custody Assets from Custody Service users.

(1)     The Terms of Use Is Not a Basis to Withhold Custody Assets

25.     The Creditors' Committee argues that Section 24 of the Terms of Use permit the Debtors to withhold Custody Assets.  *See* UCC Br. ¶¶ 52 & 55.  That argument fails because it misreads the Terms of Use.  The Terms of Use provide that "[i]f any legal action, such as an attachment, garnishment, levy, seizure, third party claim or enforcement action ***by any competent authority in any jurisdiction*** ("**Legal Process**") is brought against or in connection with your Celsius Account, we may refuse to permit (or may limit) withdrawals or transfers from your Celsius Account until the Legal Process is satisfied or dismissed."  Terms of Use § 24 (emphasis added).  By its terms, this provision does not apply to actions by the Debtors—such as the estate's pursuit of a preference lawsuit with respect to, or the exercise of setoff against, Custody Assets—because any such actions are plainly not a "legal action . . . ***by any competent authority*** in any jurisdiction" and thus is not within the covered categories of "Legal Process."  Tellingly, the drafters of this provision (the Debtors) have not made this argument.  The Creditors' Committee's interpretation of this provision would create an absurd result because it would allow the Debtors to unilaterally withhold Custody Assets by instituting a proceeding.  The Debtors cannot withhold Custody Assets indefinitely by putting the Custody Assets in dispute as that would vitiate other provisions of the Terms of Use (as discussed in greater detail below).

26.     Both the Debtors and the Creditors' Committee argue that because the Terms of Use purport to allow the Debtors to indefinitely suspend, freeze, or close accounts at any time without notice, the estates can withhold the Custody Assets during

these Chapter 11 Cases.  *See* Debtors' Br. ¶ 42; UCC Br. ¶ 52.[12]  That is not the case.

27.     *First*, a holistic reading of the Terms of Use confirms that the Debtors cannot use this as a basis to freeze withdrawals of all Custody Assets indefinitely.  *See Williams Press Inc. v. State of N.Y.*, 37 N.Y. 2d 434, 440 (1975) ("A written contract 'will be read as a whole' and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose.") (quoting *Empire Props. Corp. v. Manufacturers Trust Co.*, 288 N.Y. 242, 248-49 (1942)).  Section 19 is titled "Closing a Celsius Account" and sets forth procedures in connection with account closings—in fact, the very next sentence explains what happens when an account is closed.  On the other hand, Section 4(B) that applies specifically to Custody Assets provides that "Celsius may suspend your access to Services, including the Custody Service and your access to a Custody Wallet, in the event of market disruptions or periods of volatility."  Terms of Use § 4(B).[13]  Reading Section 19 of the Terms of Use to authorize the Debtors to suspend, freeze, or close accounts, including withholding Custody Assets, would render the above-cited provision of Section 4(B) superfluous.  New York courts interpret contracts to avoid surplusage.  *See, e.g., Westview Assocs. v. Guaranty Nat'l Ins. Co.*, 95 N.Y.2d 334, 337 (2000) ("Thus, defendant's interpretation would render the umbrella policy's specific exclusions mere surplusage, a result to be avoided."); *see also In re Viking Pump, Inc.*, 27 N.Y.3d 244, 257-58 (2016) (collecting cases).

28.     In analogous contexts, "market disruptions" and "periods of volatility" refer to short-term events.  For example, the Securities & Exchange Commission

---

[12]    Section 19 of the Terms of Use provides that:  "We have the right to suspend, freeze or close your Celsius Account at any time for any reason without advanced notice, including by blocking your access to the Celsius Account or the Services."

[13]    No parties have argued that market disruptions or periods of volatility provide the Debtors with a basis to withhold the Custody Assets.

(the "<u>SEC</u>") can suspend trading of any security or any national securities exchange if it is in the "public interest and the protection of investors so require." 15 U.S.C. § 781(k)(1). This is limited to 10 business days in the case of any security and 90 calendar days in the case of an exchange. 15 U.S.C. § 781(k)(1)-(B). SEC trading halts typically last less than an hour. *See* FINRA, Trading, Delays and Suspensions, available at https://www.finra.org/investors/investing/investment-products/stocks/trading-halts-delays-suspensions (last visited Dec. 2, 2022). Similarly, the New York Stock Exchange ("<u>NYSE</u>") implements certain measures to temporarily halt trading to mitigate market volatility. NYSE trading halts are for less than the full trading day except in cases of "extreme circumstances" involving "severe market decline" or "extreme price movement," in which case trading may be halted through the end of the day. *See* NYSE, U.S. Equity Market Resiliency During Times of Extreme Volatility, available at https://www.nyse.com/network/article/nyse-increases-resiliency-during-extreme-volatility (last visited Dec. 2, 2022). Here, the Custody Service has been frozen for nearly six months, with no end in sight—grossly exceeding either the SEC's and the NYSE's response times.

29. *Second*, if the Debtors and the Creditors' Committee wish to rely on Section 19 regarding "Closing a Celsius Account" then the Debtors should be required to follow the provisions set forth therein. Specifically, Section 19 provides that "[i]f your Celsius Account has a balance when we close it . . . we will repay and return the remaining Digital Assets to you, including accrued Rewards earned (if applicable) until the close date, less any applicable Obligations, withholding tax and other applicable deductions, unless prohibited by applicable law." Terms of Use § 19. To the extent that the Debtors and the Creditors' Committee seek to rely on this provision, considering that the Debtors have ceased all of their retail business operations, doing so would be a

de facto closing of Custody accounts and thus the Custody Assets should be returned to the Custody Service users.

30.     *Finally*, taking the Debtors' and the Creditors' Committee's reading of the Terms of Use as true, that the Debtors can freeze or suspend services at any time for any duration without notice under the Terms of Use, there are serious questions whether such a provision is enforceable under New York Law.  When "a contract is . . . [so] unconscionable in light of the mores and business practices of the time and place as to be unenforceable," it can be set aside by the court if there is a showing that the contract is both "procedurally and substantively unconscionable."  *De Jesus v. Gregorys Coffee Mgm't, LLC*, Case No. 20-CV-6305 (MKB), 2021 WL 5591026, at *4 (E.D.N.Y. Nov. 29, 2021) (quoting *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 121 (2d Cir. 2010)). The "procedural element of unconscionability concerns the contract formation process and the alleged lack of meaningful choice; the substantive element looks to the content of the contract."  *Nayal v. HIP Network Servs. IPA, Inc.*, 620 F.Supp.2d 566, 571 (S.D.N.Y. 2009).  "While determinations of unconscionability are ordinarily based on the court's conclusion that *both* the procedural and substantive components are present . . . there have been exceptional cases where a provision of a contract is so outrageous as to warrant it unenforceable on the ground of substantive unconscionability alone." *Gillman v. Chase Manhattan Bank*, 73 N.Y.2d 1, 25 (1988) (citations omitted).

31.     Substantive unconscionability goes to "whether a contractual provision is unreasonably favorable to one side."  *Day Op of N. Nassau, Inc. v. Viola*, 16 Misc. 3d 1122(A), 847 N.Y.S.2d 901 at *6 (Sup. Ct. 2007) (citing *State v. Wolowitz*, 96 A.D.2d 47, 67-68 (2d Dep't 1983)).  Examples are "virtually limitless" and "include inflated prices, *unfair termination clauses*, unfair limitations on consequential damages and improper disclaimers of warranty."  *Wolowitz*, 96 A.D. at 67-68 (emphasis in original).  In addition,

courts have a "loathsome disposition to forfeiture"—"contract provisions that are oppressive, unjust, and ***unreasonably deprive a party of the benefits of his or her bargain*** are substantively unconscionable." *Day Op. of N. Nassau, Inc.*, 16 Misc. 3d at *7 ((citing *Shuster v. First Nat. Monetary Corp.*, 113 Misc. 2d 1058, 1065, 450 N.Y.S.2d 711, 716 (Civ. Ct. 1982)). Courts have found that contracts where one party "has no responsibility to adequately perform under the agreement" are substantively unconscionable. *See Blackrock Capital Inv. Corp. v. Fish*, 239 W. Va. 89, 102 (2017) (applying New York law). To the extent that Section 19 of the Terms of Use can be read to effectuate an indefinite freeze of the Custody Service, such provision is substantively unconscionable and unenforceable. If the Debtors can freeze Custody Assets without closing the related account and return the cryptocurrency, the Debtors have no responsibility to adequately perform under the Terms of Use, and this is contrary to the Terms of Use as a whole.[14]

(2)      The Preference Limitation Is Not a Basis to Withhold Custody Assets

32.      As set forth in greater detail in the AHG Opening Brief, under black letter Second Circuit law, the Preference Limitation is not a basis to withhold Custody Assets because the Custody Assets do not become property of the estate until after avoidance and recovery. *See* AHG Opening Br. ¶¶ 34-39. There is no separate basis for retaining possession under the law.

33.      The Creditors' Committee fails to distinguish *In re Colonial Realty Co.*, 980 F.2d 125 (2d Cir. 1992). The Creditors' Committee asserts that the portion of the Second

---

[14]   Further, the text of the Section 19A demonstrates that it is not intended to provide for the indefinite continuation of freeze on the withdrawal of Customer Assets during the pendency of a "suspen[sion], freeze, or clos[ing]" of an account. Specifically, Section 19A provides, that "[in] the event of irregular activity, [Celsius] may hold assets until we close your Celsius Account." Terms of Use § 19A. The implication being, that absent such "irregular activity," a user is otherwise entitled to withdraw its assets, even if other account services, such as trading or loans are suspended.

Circuit's ruling cited by the Ad Hoc Group "is not central to the court's holding in that case." UCC Br. ¶ 60. This is plainly wrong. The Second Circuit's decision concluded that the pending district court action against non-debtors was "not an act to obtain possession of property of the estate" within the meaning of section 362(a)(3) of the Bankruptcy Code because of its central holding that fraudulently transferred property is not property of the estate until it is avoided and recovered. *Colonial Realty*, 980 F.2d at 132. Multiple courts—including decisions in the Second Circuit that the Committee does not cite or address—have cited to *Colonial Realty* for the proposition that assets subject to preference or fraudulent transfer claims are not property of the estate until the transfers are avoided and recovered. *See, e.g., Stillwater Liquidating LLC v. SFN Dekalb Holdings (In re Stillwater Asset Backed Offshore Fund Ltd.)*, 729 F. App'x 69, 71 (2d Cir. 2018) ("In *Colonial Realty*, we explained that fraudulently conveyed property is not 'property of the estate' within the meaning of 11 U.S.C. § 362(a)(3) unless and until the property is recovered by the estate.") (citations omitted); *U.S. v. Sabbeth*, 262 F.3d 207, 215 (2d Cir. 2001) (citing *Colonial Realty* and explaining that the decision "hel[d] that 'property of the estate' excludes assets that have been transferred because of a preferential or fraudulent transfer until those assets have been recovered.").[15]

---

[15] In addition, *Colonial Realty* represents the majority rule followed in nearly every circuit. *See, e.g., In re Allen*, Case No. 11–37671(GMB), 2012 WL 693461, at *8-10 (Bankr. D.N.J. Mar. 2, 2012) (adopting the reasoning from *Colonial Realty* and noting the decision reflects "the majority position on this subject"); *Spradlin v. Khouri (In re Bruner)*, 561 B.R. 397, 405 (B.A.P. 6th Cir. 2017) ("It is not until the transfer is avoided under § 549(a) that the property becomes property of the estate"); *Klingman v. Levinson*, 158 B.R. 109, 113 (N.D. Ill. 1993) (adopting *Colonial Realty* and holding that "fraudulently transferred property does not become property of the bankruptcy estate until there has been a judicial determination that the property was fraudulently transferred"); *In re Midland Euro Exch. Inc.*, 347 B.R. 708, 718 (Bankr. C.D. Cal. 2006) (noting "criticisms" of the minority approach and siding with the "more logical and defensible" decisions of the majority courts that follow *Colonial Realty*); *Rajala v. Gardner*, 709 F.3d 1031, 1038 (10th Cir. 2013) (explaining that reading equitable title to "include any property a trustee merely alleges to have been fraudulently transferred would violate the concept of equity" because it would create an interest in property without any showing of merit); *In re Saunders*, 101 B.R. 303, 305 (Bankr. N.D. Fla. 1989) ("The inclusion of property recovered by the trustee pursuant to his avoidance powers in a separate definitional subparagraph clearly reflects the

34.	The Creditors' Committee also asserts that *Colonial Realty* is distinguishable because here the Debtors are still in possession of the Custody Assets. This distinction also fails.  The Second Circuit's decision was based on the plain language of the Bankruptcy Code which evidences clear Congressional intent as to what does (and does not) constitute property of the estate.  And more to this point, the Debtors and the Creditors' Committee both agree that the Debtors' estates have no legal or equitable interest in the Custody Assets under section 541 of the Bankruptcy Code. Thus, under *Colonial Realty*, the Custody Assets are not property of the estate until the underlying transfers are avoided and recovered, which has not happened here.

35.	If adopted, the Creditors' Committee's position would mean that simply because of the Debtors' bankruptcy filing, the Debtors obtained greater rights in the Custody Assets than existed prior to the Petition Date.  This is not only contrary to *Colonial Realty* as discussed above, but also contrary to the policy and the purposes behind section 541 of the Bankruptcy Code and Congressional intent in defining the scope of property of the estate.  *See* AHG Opening Br. ¶ 27; *see, e.g., Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1663 (2019) ("A debtor's property does not shrink by happenstance of bankruptcy, but it does not expand, either.") (citing D. Baird, Elements of Bankruptcy 97 (6th ed. 2014)); *In re Mississippi Valley Livestock, Inc.*, 745 F.3d 299, 305 (7th Cir. 2014) ("The transferee in possession does not own the property any more than a parking garage owns a customer's car, or a pickpocket owns the wallet he swipes from a purse.  Nor does the transferee become the rightful owner

---

Congressional intent that such property is not be considered property of the estate until it is recovered"); *In re Yelverton*, Case No. 09-00414, 2015 WL 5602889, at *2 n. 3 (Bankr. D.D.C. Sept. 22, 2015), *aff'd sub nom. Matter of Yelverton*, 689 F. App'x 641 (D.C. Cir. 2017) ("[W]hen a trustee has the power under § 548 to avoid a transfer of property, it is only once the trustee prevails in avoiding the transfer that the property becomes property of the estate pursuant to 11 U.S.C. § 541(a)(3).").

of such property by filing a bankruptcy petition.").

        (3)    <u>The Loan Limitation Is Not a Basis to Withhold Custody Assets</u>

36.     For the reasons set forth in the AHG Opening Brief, the Debtors cannot exercise setoff rights against the Custody Assets because they are not debts owed by Custody Service users to the Debtors. *See* AHG Opening Br. ¶¶ 42-44. Accordingly, nearly all of the Debtors' and Creditors' Committee's arguments set forth in their opening briefs have already been addressed. *See* Debtors' Br. ¶¶ 33-36; UCC Br. ¶ 52.

37.     The Debtors also half-heartedly argue that a debtor has broader setoff rights than creditors who are limited by section 553 of the Bankruptcy Code. In making this argument, the Debtors assert that the Debtors' setoff rights under section 558 of the Bankruptcy Code "eliminates the pre-petition/post-petition distinction, and in essence, obliterates the requirement that the mutual debts must be both prepetition obligations." *See* Debtors' Br. ¶ 33.

38.     Section 558 of the Bankruptcy Code simply "preserves to the debtor defenses [to a claim] it would have had prepetition." *See In re PSA, Inc.*, 277 B.R. 51, 53 (Bankr. D. Del. 2002).[16] The purpose of section 558 of the Bankruptcy Code is to "defeat unjust or improper ***claims against the estate***" by allowing the "trustee [or debtor] . . . to assert all the defenses that the Debtor could have asserted had bankruptcy not intervened." *Id.* (citing *Collier* on Bankruptcy ¶ 558.02 (15th ed. 1991) (emphasis added). This is plainly not the case here where the Custody Assets are not property of the estate, belong to the users (as the Debtors and the Creditors' Committee admit) and

---

[16] Section 558 of the Bankruptcy Code provides that "[t]he estate shall have the benefit of any defense available to the debtor as against any entity other than the estate, including statutes of limitation, statutes of frauds, usury, and other personal defenses. A waiver of any such defense by the debtor after the commencement of the case does not bind the estate." 11 U.S.C. § 558.

do not implicate disallowing "claims" against the estate.

39.     In any event, consistent with that purpose, courts have held that section 558 of the Bankruptcy Code allows a debtor to exercise its setoff rights **under applicable state law** without complying with the section 553 limitations that otherwise apply to a creditors' right of setoff (like mutuality and timing).  *See, e.g., PSA, Inc.*, 477 B.R. 51 at 52 (Bankr. D. Del. 2002) (holding that debtor, under section 558, was entitled to exercise **a state law right of setoff**).  Neither of the two cases cited by the Debtors held that a debtor has broader setoff rights in bankruptcy than outside of bankruptcy— an obvious conclusion given that "[p]roperty interests are created and defined by state law." *Butner v. United States*, 440 U.S. 48, 54-55 (1979).

40.     For example, in *In re PSA, Inc.*, a creditor requesting payment of an administrative expense argued that the debtor could not set off such amount against the creditor's unpaid prepetition receivables that it owed to the debtor.  *PSA, Inc.*, 277 B.R. at 53.  The bankruptcy court overruled this argument and held that the prepetition receivables were subject to setoff against the administrative expense claim because a debtor's setoff rights are governed by section 558 of the Bankruptcy Code.  *Id.* at 54-55. As such, the pre/postpetition limitation ordinarily applied to creditors under section 553 of the Bankruptcy Code did not apply to the debtor.  *Id.*  However, in doing so, the court made clear that the "right to setoff must be established under state law so that the debtor then may assert the setoff as a defense reserved by § 558." *Id.* at 54.[17]  The

---

[17] Further to this point, the *PSA* decision relied on *In re Papercraft Corp.*, 127 B.R. 346 (Bankr. W.D. Pa. 1991) where the court explained that section 553 of the Bankruptcy Code "prescribes setoff but applies only to creditors" and that a debtor's rights to setoff (or recoupment) "must be based on the implicit incorporation of the doctrines into § 558, or by way of preservation of the Debtor's defenses by contract, or by some common law entitlement." *Papercraft*, 127 B.R. at 349-350.  In other words, *Papercraft* supports the Ad Hoc Group's position that the Debtors' setoff rights are no broader than what is available under non-bankruptcy law.

Debtors' Brief also cites to *State Bank of Florence v. Miller (In re Miller)*, 459 B.R. 657 (B.A.P. 6th Cir. 2011) again for the unremarkable proposition that section 558, not section 553 of the Bankruptcy Code, governs a debtor's rights to setoff. *Miller*, 459 B.R. at 675 n.16. That decision cites back to *PSA* for the basic principle that the Debtors' setoff rights are determined by state law and not the Bankruptcy Code. *Id.* at 675.

41. Again, the Debtors do not have state law setoff rights with respect to Custody Assets as they belong to the Custody Service users and are not a debit/credit subject to offset. Under New York law, debits and credits subject to setoff must be "mutual." *Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138, 149 (2d Cir. 2002) (citations omitted). "Claims 'lack the quality of mutuality' where one party 'asserts the right of a *cestui que trust* against a trustee [and] the other asserts a contractual obligation of a debtor to his creditor." *Id.* at 149 (quoting *In re Consol. Indem. & Ins. Co.*, 287 N.Y. 34, 38-39 (1941)); *see also In re Westchester Structures, Inc.*, 181 B.R. 730, 734 (Bankr. S.D.N.Y. 1995) ("We hold that neither party may offset general unsecured claims against trust obligations.").[18]

42. This result is confirmed by New York law on setoff as it relates to special deposits and bailments (discussed above in Part A.3). Under New York law, "funds within a 'special purpose' account are not subject to setoff . . . ." *In re Lehman Bros. Holdings Inc.*, 439 B.R. at 823 (citing *In re Applied Logic Corp.*, 576 F.2d 952, 958 (2d Cir. 1978) (stating that "a bank cannot exercise set-off against a deposit which is known by it to be dedicated to a special use . . . .") (citations omitted); *Swan Brewery Co. v. United States Trust Co.*, 832 F.Supp. 714, 718 (S.D.N.Y. 1993) (same). "This inability to setoff

---

[18] As an example, in *Enron* discussed above in Part A.3, the parties agreed that they could not setoff against bailed property because it was property held in trust.

funds deposited into a 'special' account is due to the fact that 'the bank becomes a bailee of the depositor, the title of the thing deposited remaining with the latter." *Id.* (quoting *Swan*, 832 F.Supp. at 717 (citations omitted)).

43.     It is worth emphasizing again the extremely unfair position that the Debtors have unilaterally imposed on Borrow customers.  Generally speaking, Borrow customers have (1) an obligation to repay their outstanding loan and (2) posted collateral to secure that obligation.  Now the Debtors and the Creditors' Committee are asserting that Borrow users' Custody Assets are also available to satisfy the outstanding loan balance—which for the reasons described above, they are not—and also that such Custody Assets cannot be returned to the Borrow users because of the outstanding loan balance.  Because the Debtors have indefinitely frozen the Borrow Program, users are unable to repay their loan, discharge their obligations to the Debtors, and obtain their posted collateral—and now they also cannot obtain their Custody Assets on this same basis.  The collateral has also lost significant value, putting Borrow users at risk of not being able to satisfy their loans with such collateral if necessary.

(4)     <u>The Bankruptcy Code Is Not a Basis to Withhold Custody Assets</u>

44.     The Debtors argue that section 502(d) of the Bankruptcy Code authorizes the Debtors to withhold "distribution" of the Custody Assets to the Custody Service users, "simply upon the '*allegation*' of an avoidable transfer."  *See* Debtors' Br. ¶¶ 37-38 (emphasis in original) (citations and quotation marks omitted).  This argument fails because the Debtors' return of Custody Assets to the Custody Service users are not distributions of estate property—because Custody Assets are not estate property—and none of the purposes of that section of the Bankruptcy Code which is focused on disallowing "claims" apply here.

45.     Section 502(d) of the Bankruptcy Code provides that:

> Notwithstanding subsections (a) and (b) of this section, the court shall disallow *any claim* of any entity from which property is recoverable under section 542 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

11 U.S.C. § 502(d) (emphasis added).

46.     The purpose of section 502(d) of the Bankruptcy Code is "to assure an *equality of distribution of the assets of the bankruptcy estate*" and to "have the coercive effect of insuring compliance with judicial orders." *In re Enron Corp.*, 379 B.R. 425, 435 (S.D.N.Y. 2007) ("Enron SDNY Decision") (citations and quotation marks omitted) (emphasis added). In addition, section 502(d) of the Bankruptcy Code was "not [intended] to punish, but to give creditors an option to keep their transfers (and hope for no action by the trustee) or to surrender their transfers and their advantages and share equally wither other creditors." *Id.* (citations and quotation marks omitted). Thus, Custody Assets, which are not property of the estate, do not fit within the plain letter or the purpose of section 502(d) of the Bankruptcy Code which only covers *claims* and *distributions of estate assets.* Even if section 502(d) did apply, the Debtors' unilateral decision to continue to hold the Custody Assets is inconsistent with the purpose of section 502(d) (and the choice afforded alleged creditors) as described in the Enron SDNY Decision to provide an option to keep the property and take their chances or surrender and share equally.

47.     The one decision cited by the Debtors for the proposition that unadjudicated preference claims are a basis to withhold distribution of estate property pending the creditor's return of assets subject to a potential preference claim later

further illustrates the inapplicability of section 502(d) of the Bankruptcy Code to the Custody Assets. In *In re Enron Corp.*, 340 B.R. 180 (Bankr. S.D.N.Y. 2006), *vacated and remanded on other grounds*, Enron SDNY Decision, 379 B.R. at 425, this Court held that, as a procedural matter, a debtor may use section 502(d) of the Bankruptcy Code as an affirmative "defense to the assertion of a claim" because section 502(d) refers to a transfer that is "avoidable" not "avoided." *Id.* at 183. Thus, the defendant need not be adjudicated to be liable for the return of the alleged preferential transfer in order for section 502(d) to apply. However, that decision relied on the purpose of section 502(d), again, which is to "promote the pro-rata sharing of the bankruptcy estate among all creditors" as noted above. *Id.* at 190. Here, that is not an issue because the Debtors and the Creditors' Committee agree that Custody Assets are not property of the estate that can be subject to distribution or pro rata sharing among creditors, and no parties are asserting section 502(d) as a defense to the assertion of a claim.

48. The Creditors' Committee's argument that courts have found that a potential preference action is a defense to a motion to lift the stay fares no better. *See* UCC Br. ¶ 62. In *In re Westchester Avenue Marina Realty, Inc.*, 124 B.R. 161 (Bankr. S.D.N.Y. 1991), a secured creditor sought relief from the stay to foreclose on real property owned by the debtor. In determining whether the debtor lacked equity in the property, the court noted that that question turned on whether the debtor could set aside an alleged junior lien on the secured creditor's collateral held by another party as a voidable preference, which the debtor said it intended to pursue. *See id.* at 165. The court denied the secured creditor's stay relief motion but required the debtor to (a) pay certain outstanding real estate taxes that were secured by the property, (b) "promptly proceed to establish its allegation that the [junior] secured claim is a voidable preference," and (c) file a chapter 11 plan that reflected "realistic prospects for achieving

a reorganization" within five weeks of the decision.  *Id.* at 166.  The decision was clearly concerned with the impact that lifting the stay would have on the debtor's ability to reorganize, as the debtor owned the property but would not be able to use it in a reorganization if the stay was lifted.  These concerns are not present here where the Debtors and the Creditors' Committee agree that Custody Assets are not property of the estate, and the Debtors cannot use them in a reorganization.[19]

49.     Also inapplicable is the Creditors' Committee's citation to *In re Rochester Drug Coop., Inc.*, 2020 Bankr. LEXIS 1960 at *13-16 (Bankr. W.D.N.Y. July 24, 2020).[20]  In that case, two defendants to prepetition antitrust class action lawsuits sought relief from the stay to amend their answers to assert a right of setoff of their unsecured claims for trade debt against the debtor's claims for treble damages in the pending antitrust lawsuits.  *Id.* at *1.  In denying the defendants' motions to lift the stay, the court found that the movants lacked the mutuality required by section 553 of the Bankruptcy Code because the alleged setoffs concerned trade debts owed by the debtor, in its individual capacity, versus potential recovery by the debtor, as a class representative, in the antitrust litigation.  In doing so, the court emphasized that the mutuality requirement is

---

[19]   With respect to certain other assets that were oversecured, even though the court denied the creditor's motion to lift the stay because there was equity in the property, the court cautioned that "[t]he debtor cannot expect to remain sheltered indefinitely under the umbrella of the automatic stay. More than four months have elapsed since the debtor filed its Chapter 11 petition and very little progress has been made towards the filing of a plan or towards an effective reorganization." *Id.* at 165.

[20]   The Creditors' Committee also cites an unpublished draft of an article, which contains no case law or citations, for the proposition that "[i]f there are any concerns about the accuracy of the estate's books and records or if the estate lacks sufficient cryptocurrency holdings to satisfy all customer obligations, then the stay is unlikely to be lifted, even if the estate's interest is merely possessory." Adam J. Levitin, *Not Your Keys, Not Your Coins: Unpriced Credit Risk in Cryptocurrency*, 101 Tex. L. Rev. (forthcoming, 2022) at 51.  Not only should this article be given little weight, but the language cited by the Creditors' Committee concerned issues about determining whether assets belong to customers or the exchange.  Such concerns are not present here where the Debtors and the Creditors' Committee agree that the Custody Assets are not property of the estate.

narrowly construed to "ensure *equality of treatment of holders of unsecured claims*"—again, a policy concern that is not an issue in this case. *Id.* at *4. When it came to the alleged preference claims that were not yet adjudicated, the court simply noted that, in its review of the factors considered in lifting the stay, judicial economy would not be served by allowing such setoff claims to proceed in the antitrust litigation because it would add a layer of complexity to those actions while they were more appropriately handled in the bankruptcy court as part of the claims allowance process. *Id.* at *4-6.

**C.    The Debtors' and Creditors' Committee's Requests for Affirmative Relief from the Court to Withhold Custody Assets are Woefully Deficient**

50.    Having failed to meet their burden to demonstrate a basis to withhold the Custody Assets from their title owners, the Debtors assert, for the very first time in their opening brief that they are entitled to obtain affirmative relief from the Court in the form of an injunction preventing title owners from withdrawing their property. *See* Debtors' Br. ¶ 43 ("In the alternative, if the Court were to find that the Custody Assets are not protected by the automatic stay, the Debtors seek to extend the protection of the automatic stay to the Custody Assets pursuant to section 105(a) of the Bankruptcy Code."). The Creditors' Committee also suggests, in passing, that the Court can issue an "administrative freeze." UCC Br. ¶ 57. Both of these gambits fail.

(1)    The Debtors' Request for an Injunction is Procedurally Improper

51.    As an initial matter, to obtain an injunction under section 105(a) of the Bankruptcy Code, the Debtors must file an adversary complaint. *See* Fed. R. Bankr. P. 7001(7) (requiring an adversary proceeding to "obtain an injunction or other equitable relief"). This is not a mere technicality since an injunction would deprive Custody Service users of their property, they are entitled to notice and due process before an injunction is issued. *See In Matter of Motors Liquidation Co.*, 829 F.3d 135, 158-59 (2d Cir.

2016) ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.") (quoting *Mullane v. Cent. Hanover Bank & Tru. Co.*, 339 U.S. 306, 314 (1950)). The Custody Service users are known to the Debtors and require actual notice—*i.e.*, direct mailing and not publication or another means of notice—to affect their rights. *Id.* at 159 (citing *Chemetron Corp. v. Jones*, 72 F.3d 341, 345-46 (3d Cir. 1995)). The Debtors have not provided such notice to Custody Service users of the Debtors' Brief, where the injunction issue and the accompanying legal basis, was set forth for the first time. *See Affidavit of Service*, filed on November 16, 2022 [Docket No. 1372].

      (2)    <u>The Debtors' Asserted Basis' (Without Evidence)</u>
                 <u>for an Injunction are Grossly Inadequate</u>

     52.    When it comes to the standards for obtaining a section 105(a) injunction, the Debtors incorrectly apply the four-factor test commonly employed by courts in this district.[21] The Debtors' main argument can be summarized as follows: the Debtors are generally working towards a "reorganization" (citing to progress made in marketing their assets and "ongoing conversations" with the Creditors' Committee on the terms of a go-forward plan) and separately allowing the Custody Service users to withdraw their Custody Assets would potentially impact the ability of the estate to increase in the future if preference claims are successfully pursued to final judgment and collection.

---

[21]    The Debtors' Brief cites the following four factors from *Lyondell Chem. Co. v. CenterPoint Energy Gas Servs. Inc. (In re Lyondell Chem. Co.)*, 402 B.R. 571, 588-89 (Bankr. S.D.N.Y. 2009): "(1) whether there is a likelihood of successful reorganization; (2) whether there is an imminent irreparable harm to the estate in the absence of an injunction; (3) whether the balance of harms tips in favor of the moving party; and (4) whether the public interest weighs in favor of an injunction."

*See* Debtors' Br. ¶¶ 45-46.[22]  These generalities, set forth in a memorandum of law, **without any evidentiary support**, are insufficient to invoke this Court's jurisdiction to issue an injunction under the facts of this case.  *See, e.g. Kulhawik v. Holder*, 571 F.3d 296, 298 (2d Cir. 2009) ("An attorney's unsworn statements in a brief are not evidence."); *In re Motors Liquidation Co.*, 561 B.R. 36, 44 (Bankr. S.D.N.Y. 2016) ("The Movants provide only conclusory statements regarding the information's commercial importance, and statements made by lawyers in briefs are not evidence.") (citing *Kulhawik*).

53.     Courts in the Second Circuit recognize that a preliminary injunction is "'one of the most drastic tools in the arsenal of judicial remedies' that should be granted only in extraordinary circumstances."  *Staff Mgmt. Solutions LLC v. Feltman (In re Corp. Res. Servs., Inc.)*, Case No. 15-12329 (MG), 2020 WL 1907538, *6 (Bankr. S.D.N.Y. Apr. 15, 2020) (quoting *Amusement Indus., Inc. v. Citigroup Glob. Mkts. Realty Corp. (In re First Republic Group Realty, LLC.)*, 421 B.R. 659, 677 (Bankr. S.D.N.Y. 2009)).  "Because the issuance of a preliminary injunction is considered an extraordinary remedy, the movant bears a heavy burden to show it is entitled to an injunction."  *Id.* (citing *Sussman v. Crawford*, 488 F.3d 136, 139-40 (2d Cir. 2007)).

54.     In this District, courts have issued preliminary injunctions where "the action to be enjoined is one that threatens the reorganization process."  *Hawaii Structural Ironworkers Pension Tr. Fund v. Calpine Corp.*, Case No. 06 CIV. 5358 (PKC), 2006 WL 3755175, at *4 (S.D.N.Y. Dec. 20, 2006).  In other words, the Debtors must show there is a reasonable likelihood of successful reorganization "unless . . . the acts sought to be

---

[22]    The Debtors' alleged progress with respect to a chapter 11 plan of liquidation or reorganization is belied by their initial request for a 141-day extension of their exclusivity period, which is larger than the initial exclusivity period under the Bankruptcy Code.  *See Debtors' Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief*, filed on November 9, 2022 [Docket No. 1317] (requesting an extension of exclusivity until March 31, 2023).

enjoined *cause* it to fail." *Lyondell Chem. Co. v. CenterPoint Energy Gas Servs. Inc. (In re Lyondell Chem. Co.)*, 402 B.R. 571, 590 (Bankr. S.D.N.Y. 2009); *see, e.g., Hawaii*, 2006 WL 3755175, at *6 (affirming issuance of injunction because the record below reflected that if a state court action was not enjoined, the debtor was not likely to be successful in its reorganization efforts). Furthermore, "[e]ven under this narrow exception, the threat to the reorganization process must be imminent, substantial, and irreparable. *In re Calpine Corp.*, 365 B.R. 401, 409-410 (S.D.N.Y. 2007) (citing *Hawaii*).

55.      With these considerations in mind, the Debtors have not met their burden. What this comes down to is the Debtors' asserted administrative convenience that it would be "incredibly burdensome and costly to the Debtors' estates" to pursue preference claims for the return of Custody Assets if they are withdrawn by customers." Debtors' Br. ¶ 46. The Debtors' have not established that releasing Custody Assets threatens their reorganization, nor could they. Custody Assets are not property of the estate, and cannot be used by the Debtors for any purposes, including in connection with any chapter 11 plan of reorganization or a sale—thus, their return to their rightful owners now does not threaten the Debtors' reorganization efforts.[23] Furthermore, the allegations about Custody Assets being withdrawn as diminishing the estate is contingent on successful prosecution of future preference claims if and when they are

---

[23]      The Debtors have not even shown a reasonable likelihood of a successful reorganization. The Debtors assert that they are "on the right track" as the court noted in *Lyondell*, but the facts of that case were very different than the circumstances here. In *Lyondell*, the debtors obtained an injunction within a month of the petition date and, in connection therewith, the court noted the debtors had been doing what they needed to do to pursue a plan process. Furthermore, that case involved a large operating business with thousands of employees. Here, we are many months into these Chapter 11 Cases, there is no plan on file (and the Debtors' have sought a nearly five-month extension of exclusivity), the Debtors have ceased all retail customer operations and substantially reduced their workforce. Furthermore, there are serious questions about the Debtors' ability to reorganize given the substantial regulatory issues that exist and have existed with their business since before the Petition Date.

ever brought.  In other words, the Debtors have only alleged—again, without any evidentiary support—the hypothetical risk that *if* and when preference claims are ever brought and *if* they are successful, then **there may potentially be difficulty** in collecting and enforcing on any such judgment.  That is far from the imminent, substantial, and irreparable harm required by Courts in this District to issue the extraordinary relief of an injunction.[24]

56.     All of the foregoing should be considered in light of the factors comparing the relative harms between the parties and whether the public interest weighs in favor of an injunction.  As to the first, the court must "balance the comparative harm to the debtor, and to the debtor's reorganization, against that to the would-be-enjoined party should an injunction be issued."  *Hawaii*, 2006 WL 3755175, at *4.  The Debtors assert that "[i]f preference claims are ultimately unsuccessful, customers would simply suffer a short delay in recovering their assets."  Debtors' Br. ¶ 47.  This grossly misunderstands the ongoing harm to the Custody Service users caused by the Debtors withholding of the Custody Assets.  The only harm identified by the Debtors is the hypothetical risk that the Debtors may not be able to collect on a judgment in the future (for which there is no evidence), while the harm to the Custody Service users is the daily deprivation of the use of their property.  The Custody Service users cannot sell their property and use it for any other purpose.  They cannot de-risk their portfolios in response to recent events in the cryptocurrency markets.  For the Custody Service users, the harm is not simply a minor delay until preference claims are resolved.  The harm to

---

[24]  The Debtors' inability to show immediate harm is even more acute in their passing reference to *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282 (2d Cir. 2003) where the Second Circuit held that a court can extend the automatic stay to actions against non-debtors where, among other things, there will be an "**immediate adverse economic consequence** for the debtor's estate."  *Id.* at 287-88 (denying extension of the stay to non-debtor co-defendants where the only harm asserted was the risk of offensive collateral estoppel against the debtor depending upon the outcome of an appeal).

the Custody Service users is ongoing and compounding daily and results in damages for their losses.  It is more than mere inconvenience.[25]

57.     Finally, the general Bankruptcy Code policy about facilitating reorganizations, particularly on the facts here, given the status of these Chapter 11 Cases and the circumstances of their filing (including allegations of fraud and mismanagement) are vastly outweighed by public policy arguments respecting property rights and due process.

(3)     <u>The Existence of Facially Valid Preference Claims Is Not a Basis for an Injunction</u>

58.     The Debtors and the Creditors' Committee rely extensively in their opening briefs on the Parties' agreement that the Debtors' estates are "deemed to possess facially valid preference claims regarding the coins transferred from Earn to Custody and Withhold accounts" and "all inferences regarding the existence, validity, and merit of preference or other claims against the Custody and Withhold claimants will be drawn in favor of the Debtors' estates[.]"  Scheduling Order ¶¶ 9, 11.  As discussed in greater detail above, the Debtors have to meet a high burden and satisfy the applicable standards for obtaining an injunction, which they have not done.  The mere existence of facially valid preference claims, standing on its own, without more, is not a basis for an injunction.  Instead, the Debtors are required to put forth evidence—in an adversary proceeding against each potential defendant—demonstrating particular

---

[25] The Debtors' reliance on *In re Calpine Corp.*, 365 B.R. 401 (S.D.N.Y. 2007) is perplexing to say the least and turns that case on its head.  There, the court noted that "[t]he inability of [the defendant] to obtain a hypothetical recovery sooner . . . is not a harm—and is certainly not an irreparable harm—sufficient to outweigh the irreparable harm that [the debtors] will suffer if the . . . litigation were permitted to proceed." *Id.* at 413.  Here, it is the Debtors that are seeking to maintain a hypothetical recovery sooner than the Custody Service users as it is the Custody Users' property that the Debtors are seeking to hold until the Debtors, in their sole discretion, determine whether or not to bring a preference action to acquire title to the Custody Assets.  The Custody Assets are the hypothetical recovery that the Debtors want, not the other way around.

facts to justify an injunction.  Furthermore, facially valid preference claims are also not a basis for obtaining a pre-judgment order of attachment under New York law.  To establish probability of success on the merits under N.Y. C.P.L.R. 6212(a), a plaintiff must show "that it is more likely than not that it will succeed on the merits of its claim." *In re Hypnotic Taxi LLC*, 543 B.R. 365, 372-73 (Bankr. E.D.N.Y. 2016) (citations omitted). "This requires 'proof stronger than that require to establish a prima facie case.'" *Id.*

59.     The case of *Worldcom* is illustrative.  In that case, a secured creditor filed a motion to lift the automatic stay to enforce its rights to apply cash collateral to the debtor's matured and unpaid obligations by withdrawing $2.5 million that remained in an account that was available to satisfy these obligations.  *In re WorldCom Inc.*, Case No. 02-13533, 2003 WL 22025051, at *1 (Bankr. S.D.N.Y. Jan. 30, 2003).  The debtor opposed the motion, arguing that the debtor's CEO and the creditor bank worked together to use the debtor's funds to satisfy personal debts to the bank, and on that basis, the deposit of the $2.5 million in the account with the bank was avoidable under sections 547 or 548 of the Bankruptcy Code.  *Id.* at *8.  The debtor also argued that it was preparing an adversary proceeding against the bank for the return of these funds and thus not lifting the stay was analogous to a preliminary injunction.  *Id.*

60.     The bankruptcy court overruled the debtor and granted the creditor's stay relief motion.  *Id.* at *9.  In doing so, the court noted there was no evidence that allowing the stay relief would harm the debtor's other creditors and there was no evidence that the bank could not satisfy a later determined avoidance judgment.  *Id.*  The court, however, conditioned this relief on requiring that the bank to consent to the Court's jurisdiction to enter final orders regarding matters related to the anticipated litigation

involving the account funds.  *Id.*[26]

61.     Critically, neither the Debtors nor the Creditors' Committee have provided any evidence that the Custody Service users cannot satisfy a later determined avoidance judgment.  As *Worldcom* makes clear, it is their burden to demonstrate risk, with actual evidence, and not just general statements about the number of potential defendants and the nature of cryptocurrency.  They need to demonstrate risk for each user to hold on to such user's assets.

        (4)    The Debtors and Creditors' Committee
               Cannot Obtain an Administrative Freeze

62.     Finally, the Creditors' Committee provides no authority to support its assertion that the estate should be entitled to an administrative freeze over Custody Assets because creditors are entitled to administrative freezes to preserve setoff rights.  *See* UCC Br. ¶ 57.  The one decision cited by the Creditors' Committee on this point did not hold that a court could grant an administrative freeze in favor of a creditor, rather that decision solely held that an administrative freeze implemented by a creditor during the pendency of a motion to lift the stay during which it *did not setoff the debtor's funds* was not a violation of the stay.  *See Citizens Bank v. Strumpf*, 516 U.S. 16, 21 (1995) (finding that setoff had not occurred because the creditor did not reduce the funds or amount owed by the amount in controversy).  Importantly, that decision noted that no stay violation had occurred because the administrative freeze did not apply to property of the estate as the deposited funds did not belong to the debtor.  *Id.* ("Respondent's

---

[26]     Here, to the extent the Court is concerned with Custody Assets being unrecoverable later because of jurisdictional issues, the Court can modify the Proposed Order to require that any recipients of withdrawn Custody Assets consent to the Court's jurisdiction over any later asserted preference claims with respect to the return of those same funds.  The foregoing proposed resolution addresses the Debtors' assertion that "reversing transfers and recovering and enforcing judgments would be difficult because of [unique cryptocurrency circumstances] and foreign creditors."  Debtors' Br. ¶ 53.

reliance on these provisions rests on the false premise that petitioner's administrative hold took something from respondent, or exercised dominion over property that belonged to the responded.").

**D.     All Other Equitable Bases Fail**

63.     The Debtors' and the Creditors' Committee's remaining arguments are all at bottom some variation of a theme about fairness.  The Creditors' Committee asserts that it would be unfair and provide "undue preferential treatment" if account holders who transferred from the Earn Program into the Custody Service prior to the Pause Date are able to withdraw their Custody Assets while "the vast majority of Account Holders" did not do so.  UCC Br. ¶ 6.  There is no preferential treatment—the Custody Service users have different contractual rights, and the Terms of Use provides for different treatment of different customers.  Furthermore, this argument turns fairness on its head.  Custody Service users want to be treated consistent with their rights with respect to the Custody Assets, which, the Debtors and Creditors' Committee agree, are not property of the estate.  It puts them on equal footing with everyone else who did withdraw their cryptocurrency assets from the Debtors' platform and have had unrestricted control of them ever since (including those for which the estate may have potential preference claims) while the assets of the existing Custody Service users are tied up without compensation or adequate protection.

64.     Similarly, the Creditors' Committee complains that it would be "wasteful and harmful and inefficient" to require the Debtors to distribute the Custody Assets and then try to retrieve assets from thousands of holders because there would be no assurances of recovery.  UCC Br. ¶ 63.  Again, this turns due process and fairness on its head.  There are procedural and substantive protections that the Custody Service users are entitled to for an actual plaintiff to hold their property during pending litigation.

Here, litigation is not even pending, and yet, the Creditor's Committee's position is that the Custody Service users are not entitled to the basic safeguards available to defendants in pending litigation. Arguments of inefficiencies ring hollow to Custody Service users who have seen the value of their property decline and have experienced real—not hypothetical—harm.

65.     Although the text of the Bankruptcy Code, plus the authorities above, thoroughly refute the Creditor's Committee's position, it should not be lost on the Court that the Creditor's Committee is advocating for an absurd result. There is simply authority for the Court to authorize the withholding of Custody Assets during the Chapter 11 Cases without compensating Custody Service users during that period. Section 105(a) cannot accomplish things inconsistent with the Code. *In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 664 (Bankr. S.D.N.Y.), *aff'd*, 342 B.R. 122 (S.D.N.Y. 2006) ("The Second Circuit has repeatedly held that the lower courts cannot use section 105(a) to circumvent the Code.") (collecting case).

[*Remainder of page left blank intentionally*]

## CONCLUSION

WHEREFORE, for the reasons set forth herein and the AHG Opening Brief, the Ad Hoc Group respectfully requests that the Court (a) modify the Proposed Order as set forth in the AHG Opening Brief and (b) grant such other and further relief as may be just and proper.

DATED:      December 2, 2022
              New York, New York

AD HOC GROUP OF CUSTODIAL
ACCOUNT HOLDERS
By its Counsel,
TOGUT, SEGAL & SEGAL LLP
By:

*/s/ Kyle J. Ortiz*
KYLE J. ORTIZ
BRYAN M. KOTLIAR
JARED C. BORRIELLO
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
kortiz@teamtogut.com
bkotliar@teamtogut.com
jborriello@teamtogut.com
