**TROUTMAN PEPPER HAMILTON SANDERS LLP**          Hearing: December 7-8, 2022 at 9:00 a.m.
Deborah Kovsky-Apap
875 Third Avenue
New York, NY 10022
Telephone: (212) 704-6000
Facsimile: (212) 704-6288
Email:   deborah.kovsky@troutman.com
*Counsel to the Ad Hoc Group of*
*Withhold Account Holders*

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

## AD HOC GROUP OF WITHHOLD ACCOUNT HOLDERS' PHASE I RESPONSE BRIEF WITH RESPECT TO THE CUSTODY AND WITHHOLD ISSUES

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

# TABLE OF CONTENTS

Page

I.    COINS IN THE WITHHOLD ACCOUNTS, JUST LIKE COINS IN THE
      CUSTODY ACCOUNTS, BELONG TO THE CUSTOMERS AND NOT
      THE DEBTOR'S ESTATES.................................................................................. 1

      A.    Celsius has no contractual rights with respect to cryptocurrency in the
            Withhold Accounts................................................................................. 2

      B.    The lack of segregated Withhold Wallets does not prevent the
            Withhold Group members from recovering their property. ........................... 8

II.   THE DEBTORS MAY NOT CONTINUE TO HOLD CRYPTOCURRENCY
      THAT BELONGS TO THE WITHHOLD GROUP MEMBERS ............................ 16

III.  CONCLUSION ........................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ally Fin. Inc. v. Wells Fargo Bank, N.A. (In re Residential Capital, LLC)*,
    412 F.3d 315 (2d Cir. 2005)................................................................................................3

*A & Z Appliances, Inc. v. Elec. Burglar Alarm Co.*,
    90 A.D.2d 802, 455 N.Y.S.2d 674 (1982) ........................................................................5

*Benjamin v. Benjamin*,
    483 N.Y.S.2d 418 (2d Dep't 1984) ...................................................................................4

*In re Columbia Gas Systems, Inc.*,
    997 F.2d 1039 (3d Cir.1993)............................................................................................14

*In re Drexel Burnham Lambert Grp., Inc.*,
    142 B.R. 633 (S.D.N.Y. 1992).........................................................................................14

*In re Edison Bros., Inc.*,
    243 B.R. 231 (Bankr. D. Del. 2000) ...............................................................................16

*India.com, Inc. v. Dalal*,
    412 F.3d 315 (2d Cir. 2005)................................................................................................3

*Knickerbocker Retail LLC v. Bruckner Forever Young Soc. Adult Day Care Inc.*,
    204 A.D.3d 536, 167 N.Y.S.3d 462 (2022) ....................................................................18

*Longman v. Allstate Ins. Co.*,
    635 So. 2d 343 (La. Ct. App. 1994).................................................................................18

*Milner v. McKennan Hosp.*,
    529 N.W.2d 498 (Minn. Ct. App. 1995)..........................................................................18

*President and Dir. of Manhattan Co. v. Morgan*,
    192 N.Y.S. 239 (1st Dep't 1922) .......................................................................................4

*In re Residential Capital, LLC,* No. 12-12020 (MG),
    2015 Bankr. LEXIS 2595 (Bankr. S.D.N.Y. Aug. 5, 2015) ..............................................3

*Stump v. State Farm Mut. Auto. Ins. Co.*,
    387 Pa. Super. 310, 564 A.2d 194 (1989)........................................................................18

*In re U.S. Lines, Inc.*,
    79 B.R. 542 (Bankr. S.D.N.Y. 1987)...............................................................................15

*In re U. S. N. Co., Inc.*,
　2 B.R. 468 (Bankr. S.D.N.Y. 1979) ................................................................................5

*Westchester Resco Co., L.P. v. New England Reinsurance Corp.*,
　818 F.2d 2 (2d Cir. 1987) .............................................................................................5

**Statutes**

11 U.S.C. § 502(d) .................................................................................................17, 18

The Ad Hoc Group of Withhold Account Holders (the "**Withhold Group**")[2] of Celsius Network LLC and its affiliated debtors and debtors-in-possession (collectively, "**Celsius**" or the "**Debtors**"), by and through its undersigned counsel, and in accordance with the *Joint Stipulation and Agreed Scheduling Order by and Among the Debtors, the Committee, and the Ad Hoc Groups with Respect to the Custody and Withhold Issues* [Docket No. 1044] (the "**Scheduling Order**"), hereby submits this Phase I Response Brief and respectfully states as follows:

## I.    COINS IN THE WITHHOLD ACCOUNTS, JUST LIKE COINS IN THE CUSTODY ACCOUNTS, BELONG TO THE CUSTOMERS AND NOT THE DEBTOR'S ESTATES.

1.    In its opening brief, the Committee concedes that Custody Assets belong to the Custody customers, but argues that Withhold Assets are property of the Debtors' estates. The Committee bases its distinction on two arguments. First, the Committee argues that, because the Withhold Accounts are not mentioned in Celsius' Terms of Use, "there is no contract providing that Withhold Account Holders have title to assets corresponding to balances in Withhold Accounts."[3] Second, the Committee argues that (unlike with respect to the Withhold Accounts), "[t]he Debtors took steps to maintain digital assets corresponding to Custody Account balances in segregated wallets that only held, and have only ever held, Custody Assets (the "**Custody Wallets**")."[4] Neither of the Committee's arguments is availing.

---

[2] Capitalized terms not otherwise defined herein have the meanings set forth in the Ad Hoc Group of Withhold Account Holders' Phase I Brief Pursuant to the Joint Stipulation and Agreed Scheduling Order by and among the Debtors, the Committee and the Ad Hoc Groups with respect to the Custody and Withhold Issues [Docket No. 1289] (the "**Withhold Initial Br.**").

[3] *Id.* ¶ 42.

[4] The Official Committee of Unsecured Creditors' (A) Opening Brief on Phase I Custody and Withhold Issues and (B) Statement in Partial Support and Limited Objection to Debtors' Custody and Withhold Motion [Docket No. 1290] ("**Committee Br.**") ¶ 19.

## A.    Celsius has no contractual rights with respect to cryptocurrency in the Withhold Accounts.

2.    The Committee notes, correctly, that "'Withheld Assets' and Withhold Accounts are not mentioned in the April 14, 2022 Terms of Use and, accordingly, are not governed thereby."[5] The Committee then makes the unwarranted and illogical leap that in the absence of a contractual agreement between Celsius and the Withhold Account holders, *Celsius* must retain title to digital assets after they are transferred from the Earn Program into the Withhold Accounts.

3.    The Committee gets it exactly backwards. As Celsius itself concedes, "[t]he Withhold Accounts were not part of Celsius' service offerings, and **the Debtors have no contractual claim to title to the cryptocurrency in Withhold Accounts**."[6] This is true whether the cryptocurrency was newly deposited into a Withhold Account or transferred from the Earn Program.[7] In either case, those digital assets belonged, in the first instance, to the customers. Celsius only temporarily gained the rights and incidents of ownership over the assets when and if the customers agreed to lend them to Celsius in exchange for the benefits of the Earn Program.

---

[5] Committee Br. ¶ 42.

[6] Debtors' Memorandum of Law Regarding Phase I Custody and Withhold Issues [Docket No. 1291] ("**Debtors' Br.**") ¶ 23.

[7] The Debtors' initial brief fails to address their use of Withhold Accounts to hold coins that were transferred out of the Earn Program. This is curious because the Debtors are certainly aware of the existence of such coins. *See* Custody and Withhold Motion ¶ 4 ("The Debtors have also determined that many of the transfers made to the Custody Program and Withhold Accounts were made from the Earn Program or the Borrow Program in the 90 days before the Petition Date (respectively, the 'Transferred Custody Assets' and the 'Transferred Withhold Assets' and, together, the 'Transferred Assets')."). By contrast, assets in Withhold Accounts that were transferred directly from external wallets and were never in the Earn Program or Borrow Program are referred to as "Pure Withhold Assets," and the Transferred Withhold Assets and Pure Withhold Assets together are defined by the Debtors as the "Withhold Assets." *Id.* ¶ 5. The only distinction made by the Debtors between the Transferred Withhold Assets and Pure Withhold Assets is their claim that the latter "could not be subject to a preference action." *Id.* However, as to *all* of the "Withhold Assets"—a defined term that includes the Transferred Withhold Assets—the Debtors concede that they "have never claimed or acquired an equitable interest in the cryptocurrency stored in Withhold Accounts. Thus, . . . Withhold Assets are held by the Debtors on behalf of customers and are not property of the Debtors' estates. Such assets are owned in the first instance by the respective customers." *Id.* ¶ 30. Indeed, the Debtors' Withdrawal Motion seeks authority to reopen withdrawals of Transferred Withhold Assets to the extent that they fall below the statutory preference cap. *Id.* ¶¶ 31, 33-35. The Debtors could not have made such a request if they believed that Transferred Withhold Assets were potentially property of their estates as a result of previously having been in the Earn Program.

And even if the Terms of Use[8] are silent as to the Withhold Accounts, they are clear as to the Earn

Program. The Terms of Use provide, in relevant part:

> If our Earn Service is available to you, upon your election, you
> will lend your Eligible Digital Assets to Celsius and grant
> Celsius all rights and title to such Digital Assets, for Celsius to
> use in its sole discretion **while using the Earn Service**. . . .[9]
>
> In consideration for the Rewards payable to you on the Eligible
> Digital Assets using the Earn Service, for us entering into any
> Loan Agreement, and the use of our Services, you grant
> Celsius, subject to applicable law and **for the duration of the
> period during which you elect to utilize the Eligible Digital
> Assets in the Earn Service** . . . all right and title to such
> Eligible Digital Assets. . . .[10]

4.    The Committee notes that "[w]here the terms of a contract are

unambiguous, courts will give effect to their plain meanings."[11] The Withhold Group concurs. The

Second Circuit has instructed that to determine whether ambiguity exists, "effect and meaning

must be given to every term of the contract, and reasonable effort must be made to harmonize all

of its terms." *India.com, Inc. v. Dalal,* 412 F.3d 315, 323 (2d Cir. 2005). Moreover, "the court

must consider the entire contract to safeguard against adopting an interpretation that would render

any individual provision superfluous." *Ally Fin. Inc. v. Wells Fargo Bank, N.A. (In re Residential

Capital, LLC),* 531 B.R. 25, 42-43 (Bankr. S.D.N.Y. 2015). It is "crucial that the contract 'be read

to give effect to all its provisions and to render them consistent with each other.'" *In re Residential

Capital, LLC,* No. 12-12020 (MG), 2015 Bankr. LEXIS 2595, at *27-29 (Bankr. S.D.N.Y. Aug.

5, 2015).

---

[8] *See* Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, Providing Terms of Use
Dating Back to February 18, 2018 [Docket No. 393], Ex. A-8 ("**Terms of Use**").

[9] *Id.* ¶ 4.D.

[10] *Id.* ¶ 13.

[11] Committee Br. ¶ 36.

5.      Under the plain and unambiguous language of the Terms of Use, giving effect and meaning to every term of the contract, the Withhold Group members did not grant Celsius ownership of their coins absolutely and forever. They lent their coins, in exchange for yield, only for the duration of the period (if any) during which they elected to utilize the Eligible Digital Assets in the Earn Service. The Committee seeks to read that provision out of the Terms of Use, insisting that the Withhold Group members' grant of right and title to their assets extends *beyond* the duration of the period that they utilized the Earn Program.[12] The Committee's strained interpretation would impermissibly render contract terms superfluous.

6.      Moreover, the Committee's interpretation—in essence, that as long as Celsius has possession of the digital assets, it has title to them—is explicitly premised on its misreading of a pair of New York state court cases, which the Committee claims stand for the proposition that "as a general rule, possession of property creates a rebuttable presumption of ownership."[13] In fact, those two cases at most establish a general rule that possession *of a bearer instrument* (bearer bonds and a lottery ticket, respectively) creates a rebuttable presumption of ownership. The Withhold Assets are not bearer instruments; thus, the cases relied on by the Committee are entirely inapposite. As soon as customers transferred their assets out of the Earn Program, Celsius lost its temporary ownership rights despite the fact that it still had possession of the assets.[14]

---

[12] *Id.* ¶ 43.

[13] *Id.* (citing *President and Dir. of Manhattan Co. v. Morgan*, 192 N.Y.S. 239 (1st Dep't 1922) and *Benjamin v. Benjamin*, 483 N.Y.S.2d 418 (2d Dep't 1984)).

[14] There is ample case law recognizing that a debtor can have possession of property in which it has no legal or equitable rights, and that such bare possessory interest does not qualify as property of the estate. *See, e.g., In re Rodgers*, 333 F.3d 64, 69 (2d Cir. 2003) (stating that where a debtor has lost legal and equitable interests in property prior to the petition date, that property does not become property of the estate upon the bankruptcy filing—even if the debtor still retains possession of the property; *Lyon v. Contech Constr. Prods., Inc. (In re Computrex, Inc.)*, 403 F.3d 807, 812-13 (6th Cir. 2005) (holding that where a debtor had only a possessory interest in funds, such funds were not property of the estate); *In re Munroe*, 183 B.R. 667, 669 (Bankr. D.R.I. 1995) ("There is hardly any

7.     Even if the contractual terms "while using the Earn Service" and "for the duration of the period during which you elect to utilize the Eligible Digital Assets in the Earn Service" were somehow deemed to be ambiguous, it is black-letter law that the Court must resolve that ambiguity against Celsius, the drafter of the standard-form Terms of Use. *Westchester Resco Co., L.P. v. New England Reinsurance Corp.*, 818 F.2d 2, 3 (2d Cir. 1987) ("Where an ambiguity exists in a standard-form contract supplied by one of the parties, the well-established *contra proferentem* principle requires that the ambiguity be construed against that party."); *In re U. S. N. Co., Inc.*, 2 B.R. 468, 471 (Bankr. S.D.N.Y. 1979) ("In resolving an ambiguity such as this, it is axiomatic that when the contract is a form supplied by one of the parties, it is to be construed against that party should a question arise to interpretation or effect."); *A & Z Appliances, Inc. v. Elec. Burglar Alarm Co.*, 90 A.D.2d 802, 455 N.Y.S.2d 674, 675 (1982) ("It is a canon of contract construction that a form contract will be construed most strongly against the party who prepared it. . . .") (citation omitted). Construing the Terms of Use strictly against Celsius leads to the same conclusion as above: Celsius' temporary ownership rights terminated when assets were transferred out of the Earn Program.

8.     The Committee next tries to characterize the transfer of assets from the Earn Program to a Withhold Account not as a transfer at all but as a "failed withdrawal[]," arguing that such assets actually remained in the Earn Program.[15] The Committee's position cannot be squared with the facts. All of the transfers between various types of accounts on the Celsius platform, including Earn, Custody, Withhold and Borrow, were reflected as ledger entries:

---

question that an entity which has no legal or equitable interest in the property and has nothing more but a bare possession has no interest which qualified to be the 'properties of the estate.'") (internal quotation marks and citation omitted).

[15] Committee Br. ¶ 49.

> Celsius' internal system for keeping track of account holders'
> balances was primarily based on its ledger, which accounted for
> both increases and decreases in each customer's account balance.
> This internal ledger system was not based on tracking the
> movement of digital assets in Celsius' wallets held at Fireblocks.
> In practice, when an account holder sought to transfer digital assets
> balances between Celsius' programs, Celsius processed such a
> request by adjusting corresponding liabilities on Celsius' books
> (also referred to as its ledger) as between such programs, but that
> did not necessarily correspond with a movement of digital assets.[16]

9.     Consistent with Celsius' internal system, "Celsius kept digital asset transfers into Withhold Accounts distinct from assets relating to those in the Custody Program or Earn Program by maintaining a record on its ledger of customer Withhold Account balances."[17] As described in the Withhold Group's initial brief, each transfer from the Earn Program to a Withhold Account is tracked with a unique, 32-character transaction identifier.[18] Celsius is able to verify, by type and amount of coin, all of the cryptocurrency that is allocated to the Withhold Accounts.[19]

10.     Celsius' communications with customers further emphasized that, from Celsius' perspective, an actual transfer took place when customers moved their assets out of the Earn Program and into Withhold Accounts. When a customer sought to transfer assets from their Earn Account to their Withhold Account using the Celsius web app, the following prompt appeared:[20]

---

[16] Supplemental Declaration of Oren Blonstein, Head of Innovation and Chief Compliance Officer of Celsius Network Limited, with respect to the Custody and Withhold Issues [Docket No. 1532] ("**Blonstein Suppl. Dec.**") ¶ 6.

[17] *Id.* ¶ 5.

[18] Withhold Initial Br. ¶ 14.

[19] Declaration of Oren Blonstein, Head of Innovation and Chief Compliance Officer of Celsius Network Limited, with respect to Certain Phase I Issues Pursuant to the Joint Stipulation and Agreed Scheduling Order by and among the Debtors, the Committee, and the Ad Hoc Groups with respect to the Custody and Withhold Issues [Docket No. 1192] ("**Blonstein Dec.**") Ex. A.

[20] Blonstein Suppl. Dec. ¶ 25.



11.     A similar prompt appeared in the mobile app:[21]



12.     These pop-up warnings show that an actual transfer was about to occur from
the Earn Program to the Withhold Account. If customers clicked "Continue" or "Next"—as each

---

[21] *Id.* ¶ 26.

of the Withhold Group members did—the transfer was irreversibly completed.

13.    Contrary to the Committee's arguments, the transfers from the Earn Program to the Withhold Accounts were not comparable to incomplete withdrawals like the "Pending Withdrawals" described in the Blonstein Declaration, where certain "requests for withdrawals of coins located in the Custody Program or Withhold Accounts . . . were not completed by the time the Company effectuated the Pause."[22] Those incomplete Pending Withdrawals were subsequently cancelled in October 2022 and the balances returned to the accounts from which they had originated.[23] That would not have been possible with respect to transfers from Earn to Withhold: due to the regulatory actions Celsius was facing, once non-accredited customers left the Earn Program, they could not return.

14.    The fact that coins in the Withhold Accounts were fully and irrevocably out of the Earn Program was reflected in the way that Celsius treated those assets. Celsius did not treat them as being part of the Earn Program. In addition to tracking the coins as residing in Withhold Accounts on its internal ledger, Celsius immediately stopped paying interest on the transferred coins and shut down customers' ability to use those coins in any of Celsius' other services.[24]

**B.    The lack of segregated Withhold Wallets does not prevent the Withhold Group members from recovering their property.**

15.    The Committee seeks to justify its position that Custody Assets are customer property, while Withhold Assets are estate property, by arguing that (unlike with respect to the Withhold Accounts) digital assets corresponding to Custody Account balances were maintained in segregated Custody Wallets that "only held, and have only ever held, Custody

---

[22] Blonstein Dec. ¶ 24.

[23] *Id.* ¶ 25.

[24] Withhold Initial Br. ¶ 15.

Assets."[25] Not only is this argument a red herring—as the Debtors cogently explained, ownership and title "should be determined by the parties' respective contractual rights, as articulated in the Latest Terms of Use"[26]—it is factually inaccurate.

16.     The Blonstein Declaration and Examiner's Interim Report make it clear that the Custody Wallets have *never* actually held what can fairly be called "Custody Assets." Instead, all of the crypto assets in the Custody Wallets arrived there in aggregate transfers from Celsius' commingled "aggregator" or "Main" wallets (the "**Main Wallets**")—the same wallets into which deposits were made in the Earn Program.[27] Assets in the Main Wallets "were considered part of 'Treasury' at Celsius and, subject to a liquidity reserve, the assets in Treasury were considered available for Celsius to deploy to generate revenue, such as for institutional lending or to DeFi protocols."[28]

17.     The Custody Wallets were initially pre-funded the morning that the Custody Program launched with assets manually transferred by Celsius from the Main Wallets—*not* with assets transferred by customers from external wallets or from their Earn Accounts to their Custody Account.[29] When customers actually began making deposits into their new Custody Accounts, Celsius failed to segregate those new Custody deposits from Earn deposits. When a customer marked a new deposit for their Custody Account, Celsius did not transfer the deposit from the customer's individual bridge wallet to a Custody Wallet. Instead, Celsius would sweep the deposit from the customer's bridge wallet into the Main Wallet for that particular asset, "where all assets

---

[25] Committee Br. ¶ 19.

[26] Custody and Withhold Motion ¶ 27.

[27] Blonstein Dec. ¶¶ 16-18; Interim Report of Shoba Pillay, Examiner [Docket No. 1411] ("**Examiner's Interim Report**") at 6, 38.

[28] Examiner's Interim Report at 25.

[29] *Id.* at 50.

were commingled with other customer deposits."[30] "[A]ssets in the Main wallets were 'pooled and aggregated' to the point that Celsius lost the ability to track the assets back to the customer who deposited them."[31] Accordingly, the deposits marked by customers for their Custody Accounts were actually commingled in Main Wallets and made available for use and deployment by Celsius across its platform.

18.    Nor did Celsius segregate Custody assets when they were transferred out of the Earn Program and into a Custody Account. Instead, when a customer transferred crypto assets from the Earn Program to a Custody Account, that "was a ledger transfer only."[32] In other words, nothing whatsoever happened on the blockchain. No coins moved automatically from a Main Wallet to a Custody Wallet. The coins remained pooled and aggregated and available for deployment. And when a customer withdrew coins from their Custody Account, "Celsius did not actually transfer coins from the Custody wallets. Instead, Celsius used crypto assets in the frictional wallets located outside of the Custody workspace in Fireblocks"—that is, crypto assets that did not belong to Custody Account holders—"to fund withdrawals."[33]

19.    Despite being unable to "attribute a specific crypto asset to a specific customer" once the assets were commingled in the Main Wallets,[34] Celsius did track Custody Account balances on its internal ledger and made irregular attempts, with varying degrees of

---

[30] *Id.* at 57.

[31] *Id.*

[32] *Id.* at 79 n.284; *see also* Blonstein Dec. ¶ 13 (explaining that "the Company's internal system was tied to its ledger that was maintained on an aggregate basis. As a result, any transfer of digital assets to or from the Custody Program by a customer would not necessarily be met by a corresponding transfer of coins to or from Custody Wallets.").

[33] Examiner's Interim Report at 59; Blonstein Dec. ¶ 20.

[34] Examiner's Interim Report at 57.

success, to true up the Custody Wallet assets to match the Custody Account balances.[35] Celsius

employees performed these reconciliations by manually moving crypto assets, which were not

ascribable to any particular customer, from commingled Main Wallets to Custody Wallets.[36]

20.    The Examiner notes that "Celsius did not have any memorialized rules or

policies to guide this reconciliation process,"[37]—and its lack of internal controls shows. Celsius

had shortfalls in the Custody Wallets on 16 dates between April 20, 2022 and July 13, 2022, with

a deficit by June 24, 2022 of more than $50 million.[38] At other times, the Custody Wallets were

deliberately overfunded, a strategy on Celsius' part to try to ensure it had a buffer, but one that

meant that Treasury assets were commingled with assets in the Custody Wallets.[39] This resulted

in accounting issues for Celsius, because assets that should have been on Celsius' balance sheet

were not. As Dean Tappen, Celsius's Coin Deployment Specialist, wrote in an email, "'currently

we have sent more coins to our custody account that Users balances flagged as Custody' and that

'methodology . . . is making it really difficult to access our net positions.'"[40]

21.    Celsius itself acknowledged internally that what it was calling "Custody"

was not a true custody program.[41] The undisputed facts show that what customers had intended to

---

[35] *Id.* at 63-64 (noting that "Celsius only completed 53 reconciliations during the 83-day period between April 20, 2022 and July 12, 2022" and failed to perform reconciliations over weekends).

[36] *Id.* at 57-58 and Schedule 1 to Appendix A.

[37] Examiner's Interim Report at 6.

[38] *Id.* at 7.

[39] *Id.* at 7-8, 37-38.

[40] *Id.* at 53.

[41] *See, e.g.,* Examiner's Interim Report at 39 ("As the Custody launch date grew closer, however, Celsius employees discussed internally whether the Custody program was truly custodial. . . .[D]uring the program's development, it was determined that Celsius could not, in the time allotted, devote the resources necessary to create a 'pure custody' product. . . ."); *id.* at 40 (Celsius director Juwon Layiwola "stated that other titles for the program were considered (such as default wallet) at least in part because there was no 'common understanding' of the concept of custody between team members with a 'finance background' and those without, but that Celsius stuck with the 'Custody' title based on Celsius's 'future plans for the program.'").

be "Custody Assets" instead were commingled with deployable assets in Celsius' Main Wallets. The Custody Wallets were manually trued up against the Custody Account balances on an ad hoc basis, not with assets belonging to the Custody Account holders but with assets pulled from commingled Main Wallets, in a process that Celsius' Chief Compliance Officer *was not even aware of* and now agrees "was 'not sufficiently robust.'"[42] Cryptocurrency in the Custody Wallets was transferred and held on an aggregate basis, with no particular asset in the Custody Wallets treated as belonging to any particular customer.[43] In short, Celsius did not actually provide custody services. What it did instead was try to maintain enough coins, more or less (sometimes quite a lot less), in an aggregate reserve, to backstop the Custody Account balances.

22.     The existence of a chronically out-of-balance, manually-reconciled, aggregate reserve, funded with commingled assets from Celsius' Main Wallets, simply isn't a credible basis for the Committee's position that Custody Assets belong to the customers,[44] whereas Withhold Assets—because they lack such a reserve—belong to the estate. The Committee argues that "it would appear that assets corresponding to balances associated with Withhold Accounts were used and deployed by Celsius in the course of its operations. . . . The Debtors are therefore unable to return those assets to Withhold Account Holders."[45] But exactly the same thing can be said of the Custody Assets. Coins deposited by customers into their Custody Accounts were swept into the Main Wallets where they were used and deployed by Celsius in the course of its operations—at least until the next manual true-up of the Custody Wallets occurred. And even then,

---

[42] *Id.* at 65.

[43] *Id.* at 6.

[44] To be clear, Celsius' flubbed attempt at a custody program isn't a basis for the position that Custody Assets *don't* belong to the customers, either. The Withhold Group's point here is that the existence of the reserve is not a good basis on which to distinguish the Custody Accounts from the Withhold Accounts.

[45] Committee Br. ¶ 47.

it was impossible to say whose assets were transferred into the Custody Wallets, since they all came from the commingled Main Wallets.

23.     With respect to the Withhold Assets, the Committee seems to laboring under the misapprehension that all of the assets in the Main Wallets—including all Withhold Assets—were dissipated by Celsius, leaving Celsius unable to return assets corresponding to the balances associated with Withhold Accounts. The Committee asserts that the scenario in this case "is analogous" to one in which "a bank had mistakenly credited the account of defendant with a deposit made by a different customer. . . . Defendant promptly spent the money that had been mistakenly credited to her account, such that her account balance dropped below the amount initially mistakenly credited."[46]

24.     The Committee is mistaken. As demonstrated in the Withhold Group's initial brief, the Debtors' holdings in the Main Wallets, on a coin-by-coin basis, far exceed the balances of each coin owned by the Withhold Group Members.[47] Furthermore, the Debtors have stipulated, for purposes of the Phase I Issues, that "it is assumed that with respect to each type of cryptocurrency held in Withhold Accounts, at all relevant times the cryptocurrency workspace in which the Withhold Assets are held had sufficient amounts of coins to fully satisfy all liabilities with respect to all Withhold Accounts on a coin-by-coin basis, except for the following coins:  (a) Avalanche (AVAX); (b) EOS (EOS); (c) TerraClassicUSD (UST); (d) Stellar Lumens (XLM); and (e) XRP (XRP)."[48] None of the Withhold Group members hold any of the five shortfall coins

---

[46] *Id.*

[47] Withhold Initial Br. ¶ 23.

[48] Joint Stipulation and Agreed Order by and among the Debtors and the Withhold Ad Hoc Group Regarding Cryptocurrency Amounts to Satisfy Withhold Liabilities [Docket No. 1550] (the "**Lowest Intermediate Balance Stipulation**").

in their Withhold Accounts.[49] Accordingly, Celsius is as capable of returning Withhold Assets to Withhold Account holders as it is of returning Custody Assets to Custody Account holders.

25.    In its initial brief, the Withhold Group set forth its entitlement to the imposition of a constructive trust over assets held by the Debtors.[50] As the Withhold Group explained, Celsius unjustly enriched itself by retaining and using cryptocurrency assets to which it had no contractual claim to title, a fact that Celsius now admits.[51] The Withhold Group argued that Celsius' conduct actually constituted conversion of the Withhold Group members' property—a position echoed by the Committee.[52]

26.    The Withhold Group posited in its initial brief that by the time of the hearing, it would be able to demonstrate that the coins held by Celsius always equaled or exceeded the amount of the Withhold Group's trust funds—that is, that the Withhold Group would be able to meet the "lowest intermediate balance" test and establish a nexus between their trust funds and the coins held by the Debtors. "When a trustee commingles trust funds with other monies in a single account, the lowest intermediate balance rule aids beneficiaries in tracing trust property." *In re Columbia Gas Systems, Inc.*, 997 F.2d 1039, 1063 (3d Cir.1993). Under the lowest intermediate balance test, "[t]he bankruptcy court will follow the trust funds and decree restitution where the amount of the deposit has at all times since the intermingling of funds equaled or exceeded the amount of the trust funds." *In re Drexel Burnham Lambert Grp., Inc.*, 142 B.R. 633, 637 (S.D.N.Y. 1992) (quoting 4 King, *Collier on Bankruptcy* ¶ 541.13, at 541–79–

---

[49] *See* Celsius Network LLC Schedules of Assets and Liabilities [Docket No. 974], Schedule F.

[50] Withhold Initial Br. ¶¶ 33-43.

[51] Debtors' Br. ¶ 23.

[52] Committee Br. ¶ 48 ("[T]o the extent the assets are Account Holders' property, Celsius seemingly used those assets, despite not being able to hold them. The Withhold Account Holders would likely have a conversion claim against Celsius on account thereof. . . .").

541–80 (15th ed. 1992)); *see also In re U.S. Lines, Inc.*, 79 B.R. 542, 545 (Bankr. S.D.N.Y. 1987) (applying the lowest intermediate balance test where trust funds were mingled with non-trust funds).

27.    The Lowest Intermediate Balance Stipulation establishes that, for purposes of Phase I, the lowest intermediate balance test is deemed to be met with respect to the Withhold Accounts. Accordingly, the Withhold Group satisfies the criteria for the imposition of a constructive trust due to Celsius' conduct, and its members can trace the *res* of that constructive trust into the Main Wallets.

28.    Equally important, not only does the Withhold Group meet the tests for imposition of a constructive trust and tracing of their assets, but as a matter of equity should be treated no differently than Custody Account holders. The two groups are virtually identically situated:

- Just as with the Custody Accounts, Celsius had no contractual claim to title to the cryptocurrency in Withhold Accounts.

- Just like non-accredited Custody Account holders, non-accredited Withhold Account holders could not withdraw coins directly out of the Earn Program. Instead, they first had to transfer the coins to a default account that functioned as a "waystation" or "lobby," and then initiate the withdrawal from the default account.[53]

- Just like the transfer of coins from the Earn Program to Custody Accounts, the transfer from the Earn Program to Withhold Accounts was effectuated through a ledger entry, without any corresponding movement on the blockchain necessarily occurring.

- Just like the withdrawal of Custody Assets from the Celsius platform, the withdrawal of Withhold Assets was funded by the frictional wallets with digital

---

[53] Blonstein Suppl. Dec. ¶ 9; Examiner's Interim Report at 49. Celsius' use of this identical architecture, regardless of whether the customer had a Custody Account or a Withhold Account, makes sense: Celsius Celsius *intended* to create a custody program for customers in Prohibited States by partnering with third-party providers—just as it *intended* to create a true custody program for customers in non-Prohibited States. Examiner's Interim Report at 42. In both instances, however, Celsius ran out of time before it could accomplish its goal.

assets pulled from the commingled Main Wallets.

- Just as with the Custody Accounts, Celsius has more than enough coins on hand to return the assets associated with the Withhold Accounts.

29.     The only real difference between the Custody and Withhold Accounts is that Celsius made an affirmative effort to have enough coins to cover the Custody Account balances, while it ended up with sufficient coins to cover Withhold Account balances through sheer happenstance. Ironically, Celsius arguably had a *greater* obligation to safeguard and refrain from using Withhold Assets than it did with respect to Custody Assets, since Celsius not only lacked contractual rights to the Withhold Assets, but was legally prohibited from using them.[54]  It would be profoundly inequitable to treat non-accredited Withhold Account holders worse than non-accredited Custody Account holders simply because Celsius' internal controls were lacking and Celsius failed to take appropriate steps to segregate and protect Withhold Assets as it should have done.[55]  Doing so would also run afoul of "the broader policy against allowing a party unilaterally to make a trust unenforceable by commingling assets." *EBS Pension LLC v. Edison Brothers Stores, Inc. (In re Edison Brothers, Inc.),* 243 B.R. 231, 239 (Bankr. D. Del. 2000).

## II.     THE DEBTORS MAY NOT CONTINUE TO HOLD CRYPTOCURRENCY THAT BELONGS TO THE WITHHOLD GROUP MEMBERS

30.     While the Debtors are aligned with the Withhold Group in requesting that the Court find that the Withhold Assets are not property of the estate, they join the Committee in seeking to prevent those non-estate assets from being returned to their rightful owners.[56]  In its

---

[54] *See, e.g.,* Withhold Initial Br. ¶ 39.

[55] Celsius' Chief Compliance Officer "could not explain why the assets associated with Withhold accounts were not treated as custodial assets and were commingled rather than kept in customers' respective customer bridge wallets, or even a separate wallet designated for Withhold accounts." Examiner's Interim Report at 70-71. Celsius' then-Chief Technology Officer—who presumably should have been overseeing the technical side of the Withhold accounts—did not even known about the existence of the Withhold Accounts until the chapter 11 filings. *Id.* at 72.

[56] Debtors Br. ¶ 54 ("For the reasons set forth herein, the Debtors request that the Court find that (a) Custody Assets and Withhold Assets do not constitute property of the estate and (b) the Debtors should nonetheless be able to retain

initial brief, the Withhold Group addressed at length why neither the Preference Limitation nor the

Loan Limitation is a valid basis for denying customers access to their own property, and it will not

repeat those arguments here. However, the Debtors' initial brief raises some additional variations

on the Preference Limitation that merit a response.

31.     The Debtors assert that they "have setoff rights associated with their

preference claims with respect to the Transferred Assets,"[57] which includes all of the crypto assets

in the Withhold Group's Withhold Accounts. The Debtors do not identify any case law or statute

(and the Withhold Group is aware of none) that permits the setoff of a wrongful, bare possession

against a monetary claim. The Withhold Group members do not have claims against the Debtors

for the Withhold Assets[58]; they *own* the Withhold Assets. The Debtors' attempt to continue to hold

the Withhold Assets, in contravention of the Withhold Group members' property rights and

applicable state laws and regulations, isn't the preservation of a setoff right—it's a hostage-taking.

32.     The Debtors further claim that they are entitled "to retain the Transferred

Assets consistent with the purpose of section 502(d) of the Bankruptcy Code."[59] Recognizing that

section 502(d) does not, by its terms, actually apply here, the Debtors attempt to craft a "spirit of

the law" argument, asserting that "[s]imilar to the purpose of section 502(d), retaining the

Transferred Assets will promote the pro-rata sharing of the Debtors' estate among all creditors."[60]

33.     The "spirit of the law" cannot override the letter of the law where the

---

the Transferred Assets and certain other Custody Assets for which they have setoff rights, pending adjudication of
the attendant issues."

[57] Debtors' Br. ¶ 31.

[58] Of course, the Withhold Group members may have separate damages claims against the Debtors for their
conversion of the Withhold Assets over the past six months. But that does not turn the Withhold Group members'
ownership interests in the Withhold Assets themselves into claims against the Debtors.

[59] Debtors' Br. ¶ 38.

[60] *Id.* ¶ 39.

language of a statute is clear. *Knickerbocker Retail LLC v. Bruckner Forever Young Soc. Adult Day Care Inc.*, 204 A.D.3d 536, 538, 167 N.Y.S.3d 462, 464 (2022); *see also Milner v. McKennan Hosp.*, 529 N.W.2d 498, 500 (Minn. Ct. App. 1995) (court cannot disregard an unambiguous statute's clear meaning to pursue the "spirit" of the law); *Longman v. Allstate Ins. Co.*, 635 So. 2d 343, 349 (La. Ct. App. 1994) (Where a statute is clear and unambiguous, the court must give credence to the mandate expressed by the Legislature and cannot resort to construing a statute based on the spirit of the law as opposed to the plain wording of the law."); *Stump v. State Farm Mut. Auto. Ins. Co.*, 387 Pa. Super. 310, 321, 564 A.2d 194, 199 (1989) ("It has been oft-stated that where the language of a statute is clear and unambiguous, it is to be enforced and not convoluted under the guise of pursuing the 'spirit of the law.'").

34.    Here, section 502(d) is clear: it provides for the disallowance of a "claim" against the Debtors. The Withhold Group members do not have claims against the Debtors for the Withhold Assets. Rather, they have ownership interests in the Withhold Assets. The spirit of the law cannot bring those ownership interests within the scope of section 502(d). And even the spirit of the law argument itself falls flat here: the Debtors state that "[a] primary motive of section 502(d) is 'to preclude entities which have received voidable transfers from *sharing in the distribution of the assets of the estate* unless and until the voidable transfer has been returned to the estate.'"[61]

35.    The whole point of the Debtors' Custody and Withhold Motion—the very thing that the Debtors have asked this Court to find!—is that the Withhold Assets are *not* assets of the estate. Section 502(d) has nothing whatsoever to say about precluding entities which have received voidable transfer from taking possession of their own assets that are not property of the

---

[61] *Id*. ¶ 39 (citation omitted) (emphasis added).

estate.

36.     Finally, the Debtors complain that enforcing judgments under section 550 "would be incredibly burdensome and costly to the Debtors' estate," requiring them to bring an adversary proceeding "to determine the validity, priority, or extent of a lien or other interest in property."[62] They grumble that even if they are successful securing judgments ordering the return of assets, "some transferees will likely be located in foreign countries." The Debtors assume that they can only seek the recovery of cryptocurrency and not its equivalent value, and fret that, due to the nature of blockchain transactions, "short of the customer's full cooperation to order assets be transferred back to Celsius' wallets, any clawback of assets would be challenging and, in some cases, likely impossible."[63]

37.     While the Debtors' evident horror at the thought of having to pursue clawback claims will doubtless delight the thousands of customers who withdrew billions of dollars' worth of crypto assets during the preference period, these arguments miss the mark. If the Debtors believe that an adversary proceeding will be required to ascertain the interests in the Withhold Assets, as they seem to indicate, they will need to bring that adversary proceeding regardless of who holds the Withhold Assets. As to the Debtors' assertion that they risk being forced to litigate in foreign courts, the Withhold Group is frankly baffled. Each member of the Withhold Group submitted a declaration with the Withhold Initial Brief, stating under penalty of perjury that he is a resident of a Prohibited State—i.e., a state *in the United States of America*.[64] With respect to the last argument, the Debtors have presented no evidence whatsoever to suggest

---

[62] *Id.* ¶ 52 & n.98.

[63] Debtors' Br. ¶ 54.

[64] Since the filing of the Withhold Initial Brief, an additional member joined the Withhold Group. His declaration is attached hereto as **Exhibit A**.

that any member of the Withhold Group would fail to cooperate in the return of assets should a judgment be entered requiring them to do so.

## III.    CONCLUSION

For the foregoing reasons, the Withhold Group respectfully requests that the Court (i) enter an order (i) finding that the Withhold Group members' coins in the Withhold Accounts are not property of the Debtors' estates, (ii) finding that the Debtors should not be allowed to continue to hold the Withhold Group members' coins, (iii) overruling the Custody and Withhold Motion solely to the extent of the Preference Limitation and Loan Limitation, and (iv) granting such other relief as the Court deems just and proper.

Respectfully submitted,

Dated: December 2, 2022
    New York, New York

/s/ Deborah Kovsky-Apap
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
Deborah Kovsky-Apap
875 Third Avenue
New York, New York 10022
Telephone: (212) 704-6000
Facsimile: (212) 704-6288
Email: deborah.kovsky@troutman.com

*Counsel to the Ad Hoc Group of*
*Withhold Account Holders*