Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DEBTORS' REPLY IN SUPPORT OF**
**DEBTORS' AMENDED MOTION FOR ENTRY**
**OF AN ORDER (I) ESTABLISHING OWNERSHIP OF ASSETS**
**IN THE DEBTORS' EARN PROGRAM, (II) PERMITTING THE SALE**
**OF STABLECOIN IN THE ORDINARY COURSE, AND (III) GRANTING**
**RELATED RELIEF AND RESPONSE TO CERTAIN OBJECTIONS THERETO**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") submit

this reply ("Reply") in support of the *Debtors' Amended Motion for Entry of an Order*

*(I) Establishing Ownership of Assets in the Debtors' Earn Program, (II) Permitting the Sale of*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

Stablecoin in the Ordinary Course and (III) Granting Related Relief [Docket No. 1325][2] (the "Amended Motion")[3] and in response to certain of the objections to the Amended Motion (the "Objections" filed by the "Objectors") and any letters filed on the docket of these chapter 11 cases that are treated as objections.[4]  In further support of the Motion and this Reply, the Debtors submit the *Supplemental Declaration of Oren Blonstein, Head of Innovation and Chief Compliance Officer of the Debtors, in Support of the Debtors' Motion Regarding Ownership of Earn Assets and the Sale of Stablecoin* (the "Supplemental Blonstein Declaration"),[5] filed substantially contemporaneously herewith and state the following:

**Preliminary Statement**

1.    That the Court's ruling on the Amended Motion will be the most important decision of these chapter 11 cases thus far is one of the few points on which everyone may agree.  As a

---

[2]    The Debtors filed the *Debtors' Motion Seeking Entry of an Order (I) Permitting the Sale of Stablecoin in the Ordinary Course and (II) Granting Related Relief* [Docket No. 832] (the "Original Motion") on September 15, 2022.  The Amended Motion incorporated the Original Motion by reference.

[3]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Original Motion and Amended Motion, as applicable.

[4]    A summary of all of the Objections filed in response to the Amended Motion and responses thereto are provided in the objection chart attached hereto as **Exhibit A** (the "Objection Chart").  Consistent with the scope limitations negotiated with the Committee and documented in the *Notice of Filing of Proposed Scheduling Order Regarding Title to Earn Program Assets and the Sale of Certain Stablecoins* [Docket No. 1324] (the "Proposed Scheduling Order"), the Debtors have not responded to the substance of certain "out of scope" objections.  *See* Proposed Scheduling Order at ¶ 3; *see also* UCC Objection ¶ 56 ("As part of the Proposed Scheduling Order, the Committee and the Debtors agreed that any defenses to the formation of a contract would not be tried at this time. . . . All rights to bring defenses to the formation of a contract with respect to the Terms of Use, generally, should therefore be preserved for a later date when the parties have been able to conduct full discovery.").  The Debtors reiterate their reservation of rights from the Amended Motion.  The omission of a response to an Objection should not be taken as a waiver of the Debtors' arguments.  The Debtors reserve all rights with respect to such arguments, including the right to supplement the Reply with arguments live at the hearing.  *See* Amended Motion ¶ 57.

[5]    In support of the Amended Motion, the Debtors submitted the *Declaration of Chris Ferraro, Interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer, in Support of the Debtors' Motion Regarding Ownership of Earn Assets and the Sale of Stablecoin* [Docket No. 1326] (the "Ferraro Declaration"), the *Declaration of Oren Blonstein, Head of Innovation and Chief Compliance Officer of the Debtors, in Support of the Debtors' Motion Regarding Ownership of Earn Assets and the Sale of Stablecoin* [Docket No. 1327] (the "Blonstein Declaration"), and the *Declaration of Robert Campagna, Managing Director of Alvarez & Marsal North America, LLC, in Support of the Debtors' Motion Regarding Ownership of Earn Assets and the Sale of Stablecoin* [Docket No. 1328] (the "Campagna Declaration").  As described in the Blonstein Declaration, the relevant Terms of Use, and redlines reflecting changes between versions, are set forth in the *Declaration of Alex*

consequence, the Amended Motion is the most contested matter to date: the Debtors received over thirty Objections to the Amended Motion (many from *pro se* creditors).[6] Certain of the Objections express feelings of betrayal, sadness, anger, and disbelief, and nearly all plead for a swift and fair resolution. The descriptions of hardships recounted in the Objections are sobering, and the significance of the relief requested in the Amended Motion is not lost on the Debtors.

2.      Rather than illuminating the "fair" result, the Objections illustrate the difficulty of fully resolving over 600,000 individual (and often deeply personal) claims through the Amended Motion. Multiple Objectors have expressed exasperation with a perceived lack of progress in these chapter 11 cases, but the same Objectors appear determined to wait for a day where all parties are fully aligned on the facts and satisfied with the process before they will agree that the Court can adjudicate the Amended Motion. With stakes so high for so many, such a day is unlikely to ever come, and the Debtors cannot sit idly by and hope it does. The Committee, with certain reservations, agrees.[7]

3.      Indeed, to resolve the tension between due process and progress, the Debtors and the Committee negotiated a schedule under which the Amended Motion would be heard on full notice with a limited scope (and correspondingly tailored discovery).[8] Pursuant to this agreement, the

---

*Mashinsky, Chief Executive Officer of Celsius Network LLC, Providing Terms of Use Dating Back to February 18, 2018*, filed on August 8, 2022 [Docket No. 393] (the "Terms of Use Declaration").

[6]    For the avoidance of doubt, this figure includes responsive *motions*.

[7]    *See* Committee Objection ¶ 10 ("[T]he Committee and the Debtors negotiated a litigation schedule with respect to the Amended Stablecoin Sale Motion that balanced the need to develop a factual record with the accelerated timetable sought by the Debtors in an attempt to move these cases forward."); *but see id.* ¶¶ 44 (arguing that the Debtors have not presented evidence on whether version 6, 7, and 8 of the Terms of Use are enforceable against users who created accounts after July 22, 2021); *id.* ¶¶ 57–62 (arguing that the sale of stablecoins to fund the Debtors' operating expenses is not in the ordinary course of the Debtors' business, but acknowledging that "the Debtors have demonstrated a valid business reason to sell" the Earn Stablecoins).

[8]    More specifically, under the proposal, the requested findings are expressly limited to: (a) determining the plain meaning of the Terms of Use with respect to the title of assets transferred into the Earn Program, (b) determining whether the elements of a contract were present for each version of the Terms of Use, (c) whether subsequent versions of the Terms of Use were binding on account holders who had accepted a prior version of the Terms of Use, and (d) whether the specific stablecoin sought to be sold is property of the Debtors' estates. The negotiations

Amended Motion only seeks two broadly applicable rulings:  (i) that the plain language of the Terms of Use unambiguously provides that the cryptocurrency assets in the Earn Program are the property of the Debtors' estates and (ii) that the Terms of Use are an enforceable contract (subject to certain individualized contract formation defenses).[9]  In other words, the Amended Motion seeks a presumption that each Account Holder is party to a binding contract with the Debtors, which presumption is rebuttable to the extent an Account Holder succeeds on an individual contract formation defense in the future.[10]

4.      The goal of these limitations was to advance these chapter 11 cases as efficiently as possible—allowing for certain universal issues to be resolved to streamline future proceedings while still offering each Account Holder a fair opportunity to adjudicate their rights in connection with any individual claims or defenses.  The Debtors also worked (and continue to work) with the Committee and other constituents to make the Proposed Order both clearer and narrower than

---

leading to such limitations are further described in the Amended Motion at ¶ 16 and the Committee's Objection at ¶ 28.  While the Amended Motion and the Reply state the Debtors' positions on certain issues that may stray beyond the scope for purposes of fully articulating the Debtors' position, the proposed findings are expressly narrowed to those contained in the Proposed Scheduling Order.

Further, the Debtors anticipate adopting the Committee's proposed limitations regarding the sale of Earn Stablecoins with few, if any, revisions.  *See* Committee Objection ¶ 61.  The Debtors will file a revised proposed order (the "Proposed Order") reflecting such changes once exact language is agreed.

[9]     The Amended Motion also requests certain findings limited to the Earn Stablecoins.

[10]    At least one Objector argues that certain defenses are generally applicable and that the Debtors are seeking to "force customers to file alternative claims, one at a time, to challenge their schedules. . . . [M]ost of these defenses apply to large groups of customers, they are not just corner cases that apply to a single individual."  *See* Supplemental Herrmann Objection at 13.  This is not the Debtors' intention. *To the extent that a fact-specific defense is established to be generally applicable*, the presumption could be widely rebutted.  As the same Objection notes, "some corner-case defenses will be unique."  *Id* at 14.  The Debtors' intent is to preserve such individuals' arguments.  The Debtors' approach to the schedules and bar date has always been to streamline the process and minimize the burden on Account Holders.  *See generally Debtors' Objection to Series B Preferred Holders' Motion Pursuant to Bankruptcy Rule 1009 for Entry of an Order Directing the Debtors to Amend Their Schedules* [Docket No. 1304] (describing the consideration the Debtors have given to the challenges of running a claims process with over 600,000 creditors, many of whom are retail investors).  That has not changed.

4

originally proposed (nearly eighty days ago) in recognition of the concerns of the Objectors.[11]  These

compromises, however, only led to further allegations of conspiracies and due process violations.[12]

5.      This reaction—and the pervasive cynicism in these chapter 11 cases—reflect a

fundamental misunderstanding of the Debtors' position.  The Objections assume, implicitly and

explicitly, that the Debtors and their advisors are acting maliciously and attempting to enrich

themselves by "stealing" assets from Account Holders through trickery and back-room deals.[13]

***Nothing could be further from the truth.***  The Debtors are working tirelessly to maximize value

and distribute their remaining cryptocurrency assets to creditors as quickly and as equitably as

possible.  Indeed, the ultimate purpose of these chapter 11 cases is to distribute all property of the

Debtors' estates in a fair and equitable manner pursuant to a plan approved by the Court.  Arguments

by individual creditors that they should be entitled to "these" assets or "those" assets and thereby

"jump the line" ahead of similarly situated creditors will only delay, not hasten, the goal of returning

assets to all customers.

6.      The Debtors are simultaneously pursuing the dual paths of marketing their assets for

sale and developing a standalone reorganization plan.  Although many Objectors are dubious of the

Debtors' progress in these chapter 11 cases, the Debtors expect that in the coming weeks they will

determine (in close consultation and cooperation with the Committee) the value-maximizing path

---

[11]   Such changes include, among others:  (i) specifying, by coin, the specific Earn Stablecoins to be sold, (ii) narrowing the requested findings, and (iii) agreeing to explicit limitations on the proposed sale of Earn Stablecoins.

[12]   *See, e.g.*, Michael Benzaken Motion at Exhibit B (reflecting distrust of the Debtors, the Committee, and the Examiner) ("[The Examiner's characterization of the Terms of Use] is misleading and a clear danger in the upcoming determination of asset ownership being that of anyone else other than the creditors.  Her conclusion and selective work [sic] choice and factual inaccuracy, all in favor of the debtor regarding asset ownership, warrants further investigation by a neutral 3rd subject domain expert to be hired by the CEC, a new creditor lead [sic] voluntary associate, and NOT hired by W&C.  Ms. Pillay chose select language damning to the creditors . . . .").

[13]   *See, e.g.*, Flora Objection at 2 ("The AMAs take precedence over a couple sentences hatched in the 'smoke filled back rooms' with the intent of stealing our coins and forcing anyone wanting to gain access to the Celsius platform to agree to their terms."); Second Gallagher Objection at 10 ("We were also forced into accepting the new TOS passively; by default and through trickery.").

forward; the final bids in the sale process are due in mid-December, and the Debtors expect to announce additional details regarding their standalone reorganization plan in the near term.

7.      But before any go-forward plan or sale process can be meaningfully advanced, the Debtors must understand the nature of their rights, assets, and liabilities.  To this end, the Debtors analyzed the potential arguments, considered the applicable legal standards, and proposed what they believe to be the correct position on the issue:  the Terms of Use constitute an enforceable contract that provides that the assets in the Earn Program are the property of the Debtors.[14]  This position is not only clear on the face of the contract, but it is also consistent with notions of equity and the realities of the Debtors' prepetition business operations:  Account Holders transferred title to the Debtors through the Earn Program and, in exchange, earned rewards from the Debtors as consideration for the risk the customers were taking.  By contrast, the Terms of Use provided that the assets in the Custody Program remained the property of the customers, and accordingly, did not earn rewards.

8.      To be clear, the Debtors do not assert a "no strings attached" entitlement to all digital assets transferred into the Earn Program forever and for no consideration.  Instead, the Debtors intend to return digital assets to Account Holders through a chapter 11 plan.  Relatedly, it is not (as many *pro se* creditors appear to believe) the case that Account Holders will simply receive all of the digital assets owed to them if the Terms of Use are somehow "invalidated."  That is an impossibility—the Debtors do not possess sufficient coins, and the coins the Debtors possess are hopelessly comingled.[15]  Indeed, in the event that the Court determines that the Debtors do not own the assets

---

[14]   The Debtors' position on this matter is consistent across all property-related arguments.  *See, e.g.*, *Debtors' Responsive Brief on Phase I Custody and Withhold Issues*, filed substantially contemporaneously herewith.

[15]   *See Examiner Interim Report* at 23 (As of the Petition Date, "Celsius report[ed] holding $4.3 billion in assets and reported $5.5 billion in liabilities, primarily to its customers"); *id.* at 25 ("[S]oon after a customer deposited her crypto assets in her individual bridge wallet, Celsius "swept" into one of Celsius's commingled wallets, known as "aggregator" or "Main" wallets.  As a general matter, there was a single commingled wallet for each asset type.").

in the Earn Program, the ensuing analysis (in the absence of a contract) will be mind-bogglingly complex, litigious, time-consuming, and expensive, and would likely pit Account Holders against each other in a mad scramble to claim the remaining cryptocurrency assets—the exact outcome that bankruptcy, as a collective process, is intended to avoid.[16]  Other significant consequences could flow from an "invalidation" of the Terms of Use—*e.g.*, it would likely be the case that claims for "rewards" earned on assets in the Earn Program would need to be reduced on the basis that all rewards were granted pursuant to the Terms of Use.  Arguments in equity would abound, but without the Terms of Use, there is no principled or equitable way to return assets to Earn Program participants, and the process may descend into fact-specific inquiries for over 600,000 Account Holders.

9.    The Debtors maintain, and the Committee agrees, that the proper (and most equitable) solution is to apply the plain language of the Terms of Use, which is an enforceable contract governing the relationship between the Debtors and each Account Holder.  The legal framework for determining if these requirements are met is discussed at length in the Amended Motion, and the Committee does not dispute it.  Instead, the Committee notes that the Debtors must provide additional evidentiary support that certain Account Holders accepted the Terms of Use under this

---

[16]    It would be the Debtors' understanding that the "best" possible outcome for the Objectors would be that they share ratably with *all* other creditors, but in a scenario where the contract is invalidated, equitable arguments could be entertained.  As between, for example, Custody Program participants and Earn Program participants, equity would seem to favor Custody Program participants, who were engaging in "no risk, no reward" activities as compared to Earn Program participants who were, by several creditors' admissions, participating in at least "low risk" activities for "high rewards."  *See, e.g.*, Gallagher Objection at 2 ("I was participating in a low-risk, high-interest alternative to a bank savings account."); Hoffing Objection at 2 ("I . . . saw this program as a relatively low-risk investment to receive high yield interest on my crypto assets.").  These issues are merely illustrative.  The necessary analysis would be intensive and would need to start as soon as possible, particularly in light of the Debtors' upcoming liquidity needs.

framework.  The Debtors have submitted the Supplemental Blonstein Declaration to address the

Committee's concerns.  ***Critically, no Objector has argued that they did not accept the terms***.[17]

10.     Assuming that the basic requirements of a contract are present, the next step is to

determine if the Terms of Use have an unambiguous meaning regarding the title to the assets

transferred to Celsius via the Earn Program.  The language speaks for itself:

> In consideration for the Rewards payable to you on the Eligible Digital Assets using
> the Earn Service . . . and the use of our Services, ***you grant Celsius . . . all right and
> title to such Eligible Digital Assets, including ownership rights, and the right,
> without further notice to you, to hold such Digital Assets in Celsius' own Virtual
> Wallet or elsewhere, and to pledge, re-pledge, hypothecate, rehypothecate, sell,
> lend, or otherwise transfer or use any amount of such Digital Assets, separately or
> together with other property, with all attendant rights of ownership, and for any
> period of time, and without retaining in Celsius' possession and/or control a like
> amount of Digital Assets or any other monies or assets, and to use or invest such
> Digital Assets in Celsius' full discretion***.  You acknowledge that with respect to
> Digital Assets used by Celsius pursuant to this paragraph:
>
> 1. You will not be able to exercise rights of ownership;
>
> 2. Celsius may receive compensation in connection with lending or
>    otherwise using Digital Assets in its business to which you have no claim
>    or entitlement; and
>
> 3. ***In the event that Celsius becomes bankrupt, enters liquidation or is
>    otherwise unable to repay its obligations, any Eligible Digital Assets
>    used in the Earn Service or as collateral under the Borrow Service may
>    not be recoverable, and you may not have any legal remedies or rights
>    in connection with Celsius' obligations to you other than your rights as
>    a creditor of Celsius under any applicable laws.***

---

[17]    One Account Holder (who filed a response to an earlier pleading, rather than an Objection to the Amended Motion)
argues that the Debtors did not comply with the Terms of Use notification requirements, citing language from Terms
of Use Version 1.  *See Response to Debtors' Statement Regarding November 1 Hearing on Debtors' Motion Seeking
Entry of an Order (I) Permitting the Sale of Stablecoin in the Ordinary Course and (II) Granting Related Relief and
Declaration in Support of Earn Program Assets Being Deemed Property of the Creditors and Earn Accounts
Receiving the Same Standing (Seniority and Preference) in Bankruptcy Proceedings as Custody Accounts* [Docket
No. 1253] ¶ 3(b) (the "Khanuja Response").  This Account Holder, however, does not deny that he accepted Terms
of Use Version 6 pursuant to the procedures described in the Blonstein Declaration.  *See* Khanuja Response ¶ 3(b).
Similarly, one Objector (an international Account Holder) argues that he did not receive notice of Terms of
Version 8 because he registered through a third party, but similarly, the Objector also does not deny that he accepted
Terms of Use Version 6 pursuant to the procedures described in the Blonstein Declaration.  *See* Ubierna de las Heras
Objection ¶ 5.  The Texas State Securities Objection argues that the Debtors did not meet their burden, but the Texas
State Securities Board and the Texas Department of Banking are not Account Holders.

Terms of Use Version 8 at § 13 (emphasis added).

11.     The Committee and the Debtors—the two fiduciaries in these chapter 11 cases—agree that the Terms of Use unambiguously provide that any assets transferred into the Earn Program, and the proceeds thereof, are property of the Debtors' estates, subject to any defenses.[18] Rather than meaningfully engaging with the Debtors' position, however, the majority of the Objectors summarily dismiss it, decrying as "nonsensical" an interpretation the Debtors **do not advance**—that Account Holders *gifted* their cryptocurrency to the Debtors.[19]  These Objectors point to language regarding Account Holders "loaning" their digital assets to the Debtors and argue that this language renders the entirety of the Terms of Use hopelessly contradictory and, by extension, ambiguous.

12.     Several of these Objectors employ the hypothetical of a friend loaning another friend a car to illustrate their point.  In the car hypothetical, the Objectors highlight that the Terms of Use refer to the transfer of assets to the Earn Program as a "loan."  The Objectors then posit that if you loaned your friend your car, no one would understand that to mean that you are *giving* your friend the car, citing to the customary understanding of the effect of that transaction.[20]  Cryptocurrency,

---

[18]    *See generally* Committee's Objection, Part II ("The Terms of Use Unambiguously Provide that Title to Earn Assets Was Transferred to Celsius and that Celsius Had the Right to Sell Earn Assets").

   The Examiner has not formally taken a position regarding the title to digital assets transferred to the Earn Program (and may never), but the Debtors' position is consistent with the Examiner's interim report.  *See Examiner Interim Report* at 3 ("Each of the Terms of Use after September 29, 2020 stated that by depositing crypto to Celsius's Earn program, a customer transferred 'all right and tittle' to their crypto assets to Celsius[.]").

[19]    The Debtors' position is that Earn Program participants transferred (and did not recall) full title to the Debtors prior to the Petition Date and, as a result, the Debtors held full title as of the Petition Date, which automatically became part of the bankruptcy estate under section 541 of the Bankruptcy Code.  *See generally* Amended Motion, Part I. The effect of this is that Account Holders have a corresponding claim, and those claims will be satisfied in accordance with the parties' respective rights and priorities under the Bankruptcy Code and applicable non-bankruptcy law.

[20]    *See, e.g.*, Supplemental Hermann Objection at 6 ("While the loan also had clause grant of 'all rights and title,' . . . interpreting that to mean the Debtor permanently owned the coins . . . is a nonsensical contradiction in terms that is hopelessly ambiguous.  It is simply not possible to **loan** something, while concurrently transferring 'all rights and title' to it.  If I loan you my car, I am not transferring the title of my car to you.  If I transfer title to you, it is, definitionally, not a loan, but something else such as a REPO agreement that involves a sale and the agreement to

however, is different in kind from cars—no universally understood custom practice exists.  Further, unlike in the car hypothetical, the Debtors and Account Holders entered into a commercial contract that unambiguously provides that Account Holders transferred the title of their cryptocurrency assets to the Debtors so that the Debtors could generate rewards to be shared with the Account Holder pursuant to the contract.[21]  To make the car hypothetical comparable, the Objectors would need to argue that their position would remain true if, in advance of the friendly car "loan":  (i) the friends signed a written contract involving services being provided in connection with the car, (ii) the contract provided that the car's owner was transferring title and warned the car's owner of the bankruptcy implications, (iii) the purpose of the transaction could not be fulfilled without a transfer of title, and (iv) the car was not being loaned as a mere favor (*i.e.*, the exchange was supported by consideration).  None so argue.  The car hypothetical, as the Objectors present it, is inapposite.

13.    Other Objectors ignore the text of the contract entirely, resorting to formation defenses and equitable arguments to resist enforcement of the Terms of Use.  The Debtors expressly preserved these issues—*e.g.*, misrepresentation, fraud, duress, and other contract formation defenses—for adjudication on another day, not to destroy anyone's rights, but because they are heavily fact dependent (in contrast to the commonly applicable questions "did users click 'Accept'" and "what did the web page / mobile application look like").  The experience in connection with the Amended Motion provides a cautionary tale of how quickly individuals' interests can derail a collective process.  These perils will be even greater when the issues at hand are fact intensive and present equitable dilemmas, such as claims of illegality, fraud, and misrepresentation (*e.g.*, many

---

repurchase at a later date. . . ."); *id.* at 9 ("In depositions, Mr. Blonstein admitted that a loan–at least when it comes to a car–is not a transfer of title.").

[21]    The Terms of Use further warned that, as a consequence of the transfers, the Account Holders may not get the assets back in the event of a bankruptcy.

Objectors allege that they watched AMA videos and were misled—should the Court "punish" more sophisticated users for researching the contract itself, rather than watching videos on YouTube? should the Court require each Account Holder to provide a sworn statement that they watched the videos and believed them (assuming they are shown to have been misleading)? do vocal participants jump the line?). Those are matters for another day, but one not far from now.

14.    Finally, certain Objections argue that the Debtors should not be permitted to fund these cases through the sale of stablecoin. But the Debtors project that they will need additional liquidity in the mining business in January, and for the entire enterprise by the end of March. Absent authority from the Court that the Debtors can generate additional liquidity (through the sale of stablecoin or otherwise), the Debtors will have to seek alternative forms of liquidity (such as DIP financing). That financing would be more expensive for the Debtors' estates and would likely require the Debtors to provide the lenders with liens that would prime the claims of account holders. In any event, the Committee has suggested several limitations on the Debtors' ability to sell stablecoin pursuant to the Amended Motion, which the Debtors expect to incorporate in a revised Proposed Order. Given these agreed revisions to the Proposed Order, the Debtors and the Committee agree that the proposed sale satisfies the requirements of section 363 of the Bankruptcy Code and that the Debtors should be permitted to sell the Earn Stablecoins, subject to the limitations contained in the Proposed Order. The requested relief is in the best interests of the Debtors' estates and a critical step forward in these cases. As such, the Debtors request that all Objections be overruled and the Amended Motion be granted as provided in the Proposed Order.

**Reply**

I.    **All Earn Assets Are Property of the Estate Pursuant to Section 541 of the Bankruptcy Code and the Terms of Use.**

15.    As detailed in the Amended Motion, the Debtors' estates include all legal or equitable interests to the digital assets deposited in the Earn Program pursuant to the Debtors' Terms of Use. The Terms of Use are a valid "clickwrap" agreement under New York law because new users are required to affirmatively click to check a box confirming that they have read and agree to the Terms of Use. *See, e.g.*, Blonstein Declaration ¶ 18 (describing the process for acceptance of Terms of Use Version 6 for existing users); Supplemental Blonstein Declaration ¶¶ 9–12 (describing the process for acceptance of Terms of Use Version 6, 7, and 8 for new users); *see also Plazza v. Airbnb, Inc.*, 289 F. Supp. 3d 537, 548 (S.D.N.Y. 2020) ("Clickwrap agreements are generally defined by the requirement that users 'click' some form of 'I agree' after being presented with a list of terms and conditions."); *Whitt v. Prosper Funding LLC*, No. 15-00136 (GHW), 2015 WL 4254062, at *4 (S.D.N.Y. July 14, 2015) ("In New York, clickwrap agreements are valid and enforceable contracts.").

1.    **The Requirement of Mutual Assent Is Satisfied.**

16.    No Objection disputes that the Debtors required affirmative consent to the Terms of Use for Account Holders to access the Celsius platform. Rather, the Objections question the validity of the process. *See* Gallagher Objection at 10 ("The App allowed you to 'click' and enter without having read the new TOS, rather than requiring you to scroll through them in their entirety prior to acceptance. Uninformed consent is not true consent. It was very easy for a normal person to be unaware of what they were being bound by as was I. The TOS were not made reasonably conspicuous because of the Clickwrap nature of the electronic agreement."); Altunbay Objection at 6 ("Clicking yes without obligation to read fully the terms of use . . . does not reflect a full

12

understanding and acceptance of the terms of use."). These arguments are inconsistent with appliable law—clickwrap agreements, like the Terms of Use, are generally enforceable, and this remains true even if the customer did not actually read the applicable terms. *See Plazza v. Airbnb, Inc.*, 289 F. Supp. 3d 537, 550, 550 n.20 (S.D.N.Y. 2018) ("a party cannot avoid the terms of a contract on the ground that he or she failed to read it before signing"). Furthermore, Objectors' arguments asserting that they did not read the Terms of Use prior to acceptance directly contradict their assertions during sign up. *See, e.g.*, Blonstein Declaration ¶ 18 (describing the acceptance process of checking a box adjacent to the statement "I have read and agree to the Terms of Use"). These parties should not be rewarded for their negligence—and the law says we need not waste time on a pointless and fundamentally unknowable and unprovable inquiry into what was in the mind of each individual Account Holder when they clicked "accept."

17.    The Committee objected to the sufficiency of the Debtors' evidence as to certain users' acceptance of the Terms of Use. *See* Committee's Objection ¶ 3 ("The Debtors have not, however, publicly provided any evidence or testimony showing how the 44% of Account Holders who created accounts after July 22, 2021 accepted the Terms of Use, notwithstanding the Committee requests that the Debtors do so".)  In response to the Committee's Objection, the Debtors filed the Supplemental Blonstein Declaration to provide additional evidentiary support regarding the process by which certain Account Holders accepted the Terms of Use. *See* Supplemental Blonstein Declaration ¶ 4 ("I am providing this Supplemental Declaration to offer additional detail regarding the process by which new users opening Celsius accounts on or after July 22, 2022 (the effective date of Terms of Use Version 6) . . . accepted the Terms of Use Versions 6, 7, or 8.").  Through the Blonstein Declarations, the Debtors establish that 90.06% of Account Holders (accounting for 99.86% of all Earn Program liabilities) in these chapter 11 cases formally assented to Terms of Use

Version 6 or a later version of the Terms of Use under circumstances that satisfy the requirements for contract formation under New York law. *See* Blonstein Declaration ¶ 20; Supplemental Blonstein Declaration ¶ 4. Any remaining Objections to mutual assent should be overruled.

### 2. The Terms of Use Are Unambiguous that Earn Assets Are the Debtors' Property.

18. The plain meaning of the Terms of Use—as described in the Amended Motion—should control, regardless of the Objectors' proposed interpretations of the contract. Assertions of alternative interpretations are insufficient to constitute ambiguity. *See L. Debenture Tr. Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) ("[T]he court should not find the contract ambiguous where the interpretation urged by one party would strain [ ] the contract language beyond its reasonable and ordinary meaning."). Furthermore, many of the Objectors' cited sources of "ambiguity," such as issues surrounding tax preparation, constitute extrinsic evidence. This evidence is only relevant if the contract at hand is ambiguous on its face. *See Greenfield v. Philles Recs., Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002) ("Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous."); *Powlus v. Chelsey Direct, LLC*, No. 09 Civ. 10461, 2011 WL 135822, at *4 (S.D.N.Y. Jan. 10, 2011) ("Ambiguity is determined by looking within the four corners of the document, not to outside sources. Extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face. A contract is unambiguous if on its face it is reasonably susceptible of only one meaning. The threshold decision of whether a writing is ambiguous is a matter of law for the court to decide.").

19. Both the Debtors and the Committee, the only estate fiduciaries in these chapter 11 cases, interpret the Terms of Use as unambiguous, while a small faction of *pro se* creditors strain the language of the Terms of Use to advocate for their individualized interests at the expense of other

creditors. *See* Amended Objection ¶¶ 39–40; UCC Objection ¶¶ 45–55. The stakeholders' self-serving assertions of confusion and ambiguity need not—and should not—be adopted. *See Steiner v. Lewmar, Inc.*, 816 F.3d 26, 32 (2d Cir. 2016) ("Courts are not required to find contract language ambiguous where the interpretation urged by one party would strain the contract language beyond its reasonable and ordinary meaning."); *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012) ("Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation."); *Roman Cath. Diocese of Brooklyn v. Christ the King Reg'l High Sch.*, 84 N.Y.S.3d 246, 248 (N.Y. App. Div., 2018) ("[I]t is the role of the courts to enforce the agreement made by the parties—not to add, excise or distort the meaning of the terms they chose to include, thereby creating a new contract under the guise of construction."); *Norman Realty & Constr. Corp. v. 151 E. 170th Lender LLC*, 162 N.Y.S.3d 925 at *8 (N.Y. Sup. Ct. 2022) ("[I]f the contract is not reasonably susceptible to multiple meanings, it is unambiguous and the court is not free to alter it, even if such alteration reflects personal notions of fairness and equity." ) (citation omitted); *see, e.g.* Ferraro Dep. at 389:17–20 (D. Frishberg, questioning C. Ferraro) ("I mean, the thing is, if you read the contract fully, it is quite confusing and ambiguous. So is it unambiguous or is it ambiguous?") (urging the witness to admit ambiguity in the questioner's favor); Blonstein Dep. at 389:9–12 (I. Herrmann, questioning O. Blonstein) ("Do you agree that this is clear and unambiguous that the person taking out a loan is the sole owner of all digital assets used in connection with the loan?") (urging the witness to admit plain meaning in the questioner's favor). As a result, all Objections asserting ambiguity should be overruled.

20.    Lastly, many Objectors argue that the Debtors are "cherry-picking" contract clauses to highlight to their advantage. *See, e.g.*, Ryals Objection ¶ 5 ("However a simple reading of the Terms of Use as a whole, as opposed to the cherry-picked provisions noted by the Debtors, evidences

that the Terms of Use are anything but clear and unambiguous."); McLean Objection ¶ 5 (same);

Tornetta Objection (joining in the Ryals Objection); Michael Benzaken Objection ("Per the

Blonstein report (cite), who conveniently elected to utilize TOUV6 . . . ."); Georgiou Objection at

23 ("[T]he Debtors argue that one provision, paragraph 13, trumps the entirety of the agreements.")

(emphasis removed). For the avoidance of doubt, the Debtors have highlighted sections of the Terms

of Use that are most relevant to Earn Assets because the Amended Motion addresses such assets,

but the Debtors' position is that the Terms of Use are unambiguously enforceable, and should govern

all customer claims in these chapter 11 cases.

## II.    The Debtors May Sell Their Earn Stablecoins Pursuant to Section 363 of the Bankruptcy Code.

21.    Section 363(c)(1) of the Bankruptcy Code authorizes the Debtors to operate in the

"ordinary course of business," a standard that allows a debtor in possession the flexibility required

to run its business. *See In re Roth Am., Inc.*, 975 F.2d 949, 952 (3d Cir. 1992) ("The framework of

section 363 is designed to allow a trustee (or debtor-in-possession) the flexibility to engage in

ordinary transactions without unnecessary creditor and bankruptcy court oversight."). As stated in

the Amended Motion, the proposed sale of Earn Stablecoins is well within the standards set for

ordinary course transactions. *See* Amended Motion ¶ 52.

22.    To the extent that the Court determines that the sale of Earn Stablecoin is not an

ordinary course transaction, it should still be approved as a sound exercise of the Debtors' business

judgment. Section 363(b) of the Bankruptcy Code permits a debtor, subject to court approval, to

enter into a transaction outside the ordinary course of its business so long as there is a "sound

business purpose" that justifies such action. *See* 11 U.S.C. § 363(b)(1); *Comm. of Equity Sec.*

*Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (holding that

judicial approval under section 363 of the Bankruptcy Code requires a showing that there is a good

business reason); *see also In re Glob. Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003) (same). "Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted). *See also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task").

23.    The sale of Earn Stablecoin is a sound exercise of the Debtors' business judgment, as the Debtors will soon require liquidity and the sale of the Earn Stablecoin will satisfy this need with virtually no transaction costs. Ferraro Dep. at 106:21–23 ("[Liquidity g]ets very tight at the end of February, and we go negative in the beginning of March"); *id*. at 110:20–7 ("Stablecoins, in my opinion, [are] the cheapest and easiest way to fund the case . . . [because] Stablecoin [has] effectively no cost to liquidate."); *see also* UCC Objection ¶ 61 ("[The Committee] believe[s] that the Debtors have demonstrated a valid business reason to sell the Proposed Sale Stablecoin" and "Mr. Campagna has testified that the Debtors will likely run out of liquidity in March 2023.").

## III.    The Requested Relief Need Not Be Pursued in an Adversary Proceeding, and the Schedule Reflected in the Proposed Scheduling Order is Sufficient.

24.    Several Objectors—all through counsel—argue that the Amended Motion is procedurally improper because the Debtors were required to file an adversary proceeding to seek the relief requested by the Amended Motion based solely on the title of the Amended Motion, which references "establishing ownership." *See*, *e.g.*, Texas State Securities Objection ¶¶ 9-14; Saraiva Objection ¶¶ 9-14, New Jersey Objection at 2. These Objections decry the process employed but— much like in arguing that an adversary proceeding is necessary—put form over substance and ignore that the narrowed findings and requested relief do not require a final determination of property rights.

25.     As stated above, the Debtors are seeking a declaratory judgment establishing a presumption that each Account Holder is party to a binding contract with the Debtors, which presumption is rebuttable to the extent an Account Holder succeeds on an individual contract formation defense in the future.  The Bankruptcy Rules do not require *every* declaratory action to be brought as an adversary proceeding, only those that relate to a subject that is already required to be brought as an adversary proceeding.  Fed. Bankr. R. 7001(9) (referring to a declaratory judgment "relating to any of the foregoing" matters that must be brought as an adversary proceeding).  The requested declaratory findings—which leave open the ultimate issue of ownership—do not fall within the scope of Bankruptcy Rule 7001.[22]  As such, these Objections should be overruled.

26.     To the extent the proposed sale of Earn Stablecoin, which is proposed to be sold free and clear of any "interests in property" requires a determination of property rights at all, there is no prejudice due both to the availability of an adequate remedy (via damages) and the process employed to date.  *See* 11 U.S.C. § 363(f) (allowing sales free and clear of "any interest in such property" if the party claiming an interest "could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest"); *cf*. Fed. Bankr. R. 7001(2) (requiring an adversary proceeding to determine "the validity, priority, or extent" of a lien or other interest in property) (cited by the Objectors) (allowing property to be sold free and clear of an interest).  The Debtors first filed the Original Motion on September 15, 2022 to ensure that they had sufficient runway to adjudicate these matters and regroup in the event of an adverse ruling.  The Debtors have now (i) filed and noticed the Original Motion, (ii) participated in a status conference regarding the Original Motion, (iii) filed and noticed the Amended Motion, (iv) provided notice of the Proposed Scheduling Order, and

---

[22]   For the avoidance of doubt, the Debtors do not concede that an adversary proceeding would be required if they were seeking such findings and reserve all rights.

(v) offered three declarants' written and live testimony (which will be offered again at the hearing) *and* the Debtors have narrowed the requested relief.  Further delay should not be countenanced absent specific and compelling reasons, particularly where none of the parties objecting to process have alleged that they have an entitlement to Earn Stablecoins, the only assets for which a determination of ownership is arguably required to grant the requested relief.

### Conclusion

27.    For the foregoing reasons, the Debtors request that the Court overrule the Objections and enter the Proposed Order.

New York, New York
Dated: December 2, 2022

/s/ Joshua A. Sussberg

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:         (212) 446-4900
Email:              jsussberg@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:         (312) 862-2200
Email:              patrick.nash@kirkland.com
                        ross.kwasteniet@kirkland.com
                        chris.koenig@kirkland.com
                        dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

**<u>Exhibit A</u>**

**Objection Chart**

**In re Celsius Network LLC, et al., Case No. 22-10964 (MG)**

**CHART OF OBJECTIONS AND RESPONSES[1] TO THE AMENDED MOTION[2]**

*The following chart summarizes the Objections filed in response to the Amended Motion and provides high-level responses thereto. Consistent with the scope limitations negotiated with the Committee and documented in the* Notice of Filing of Proposed Scheduling Order Regarding Title to Earn Program Assets and the Sale of Certain Stablecoins *[Docket No. 1324] (the "Proposed Scheduling Order"), the Debtors have not responded to the substance of certain "out of scope" Objections. See Proposed Scheduling Order at ¶ 3. The Debtors are aware that the Court has not entered the Proposed Scheduling Order, but the Debtors continue to abide by the agreement contained within the Proposed Scheduling Order regardless because the discovery conducted to date was conducted in accordance therewith.*

*The Debtors have done their best to accurately summarize the Objections and to provide responses to their key points where such responses are within the scope of findings sought. The omission of a response to an Objection should not be taken as a waiver of the Debtors' arguments. The Debtors reincorporate their reservation of rights with respect to such arguments, including the right to supplement the Reply with argument live at the hearing. See Amended Motion ¶ 57.*

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| Official Committee of Unsecured Creditors<br><br>(the "Committee")<br><br>[Docket No. 1502] | 1.  The Terms of Use are binding on the 55% of account holders who accepted Version 6 of the Terms of Use, but the Debtors should be required to provide evidence or testimony on how the remaining 44% of account holders accepted the Terms of Use.<br><br>2.  The sale of stablecoin is outside the ordinary course of the Debtors' prepetition business, but nonetheless | 1.  The Debtors agree with the Committee that the Terms of use are binding on the 55% of account holders who accepted Version 6 of the Terms of Use and have filed he Supplemental Blonstein Declaration to remedy any perceived deficiencies in the evidentiary record.  Reply ¶ 9. |

---

[1]    This chart includes Objections received to the Amended Motion.  This chart does not include objections received to the Original Motion except for the objection of Georgios Papadakis, because all other parties filed updated Objections in response to the Amended Motion and referenced the docket number of their original objection therein.  If a party filed an objection to the Original Motion, the chart includes the docket number of that objection.

[2]    Capitalized terms used but not defined herein have the meanings given to them in the Reply.

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| (the "<u>Committee Objection</u>")<br><br>Objection to Original Motion: [Docket No. 1186] | the Debtors should be allowed to sell the proposed stablecoin so long as the cases are being operated for the benefit of the Debtors' estates.<br><br>a.   The Order allowing the Debtors to sell stablecoin should include a trigger provision.<br><br>3.   Should the Debtors have to address ownership on a case-by-case basis, as account holders have requested, the process will be lengthy and costly, and the Debtors have a finite supply of coins. | 2.   The Debtors address arguments regarding whether the sale of stablecoin is in the ordinary course in the Reply.  Reply ¶ 2–3.<br><br>3.   The Debtors agree with the Committee's statement about the length and cost of the process if account holders address ownership on a case-by-case basis.  Reply ¶ 2. |
| United States Trustee for the Southern District of New York ("<u>U.S. Trustee</u>")<br><br>[Docket No. 1489]<br><br>(the "<u>U.S. Trustee Objection</u>")<br><br>Objection to Original Motion: [Docket No. 933] | 1.   The Debtors do not have the evidentiary basis to show they own the stablecoin.<br><br>2.   The Debtors do not have the evidentiary basis to show what the proceeds of the sale of stablecoin will fund.  The stablecoin sale will only provide an extra month of liquidity, which likely is not needed until March 2023.  The U.S. Trustee also wants to know the extent to which the proceeds may be used to fund the mining business or GK8.<br><br>3.   Even if the Debtors have the right to sell the stablecoin, it is unclear how the sale will impact in-kind distributions. | 1.   The Debtors filed the Supplemental Blonstein Declaration to remedy any perceived deficiencies in the evidentiary record.  To the extent further concerns remain, the Debtors will address such concerns at the hearing or as directed by the Court.<br><br>2.   The Debtors believe that their acceptance of the Committee's limitations on the Debtors' ability to sell Earn Stablecoins should resolve any remaining concerns regarding the breadth of the relief granted.  See Proposed Order.<br><br>3.   The Amended Motion does not seek to determine the ultimate form of distributions in these cases.  To the extent that the Earn Stablecoins are determined to be the Debtors' property (as the Debtors maintain), creditors who initially deposited stablecoins will not be prejudiced, as |

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| | | they will have exactly the same claims in the bankruptcy after the sale as they did before the sale. All creditors will share in plan distributions in accordance with their respective rights and priorities as required by the Bankruptcy Code. |
| | **Regulators** | |
| Alabama, Arkansas, California, District of Columbia, Hawaii, Idaho, Maine, North Dakota, Oklahoma, and South Carolina

(the "Coordinating States")

[Docket No. 1492]

(the "Coordinating States Objection") | 1. The Debtors failed to clearly identify changes to the Terms of Use to customers.

2. The Debtors' use of the word "loan" in the Terms of Use would lead a layperson to believe they retained ownership of digital assets deposited on the Debtors' platform.

3. The Debtors are currently being investigated by numerous states regarding whether they operated without the proper licenses or sold unregistered securities.

4. There is no evidence of an actual transfer, such as an agreed full purchase price.

5. The language in the Terms of Use is self-contradictory and such contradictions rebut any claim that customers understood that they were giving away all rights to control their assets.

6. References in the Terms of Use to technical issues that may limit or delay a customers access to their | 1. The Debtors address arguments regarding the language of the Terms of Use and the enforceability of clickwrap contracts in the Reply. Reply ¶ 15–16, 18–20.

2. The Debtors address arguments regarding the use of the word "loan" in the Terms of Use in the Reply. Reply ¶ 11–12.

3. With respect to fact-specific claims and defenses, like illegality, the Debtors propose to address such issues in connection with the claims process or a future request for relief (or at some other time as determined by the Court), as described in the Amended Motion and the Proposed Scheduling Order, to promote due process while advancing key legal issues in these chapter 11 cases. *See* Amended Motion ¶ 12, 16; Proposed Scheduling Order ¶ 3.

4. Same as above. |

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| | account do not allow the Debtors to entirely Pause withdrawals.<br><br>7.  Stablecoin should not be sold simply to fund administrative expenses in these cases. | 5.  The Debtors address arguments regarding the unambiguous language of the Terms of Use in the Reply.  Reply ¶ 17–19.<br><br>6.  The unambiguous language of the Terms of Use allows the Debtors to institute the Pause.  *See* Exhibit A-6 § 19 ("We have the right to suspend, freeze or close your Celsius Account at any time for any reason without advance notice, including by blocking your access to the Account or the Services."); Exhibit A-7 § 19 (same); Exhibit A-8 § 19 (same).<br><br>7.  The Debtors address arguments regarding section 363 issues in the Reply.  Reply ¶ 21–23. |
| New Jersey Bureau of Securities<br><br>("New Jersey")<br><br>[Docket No. 1498]<br><br>(the "New Jersey Objection") | 1.  The Debtors should have filed an adversary proceeding pursuant to Fed. R. Bankr. P. 7001.<br><br>2.  Debtors operated and marketed the Earn Program in violation of New Jersey securities law after the state issued a cease and desist for selling unregistered securities.<br><br>3.  Regarding ownership of Earn assets, the Bureau says it takes no position, but states that if the Court rules that the Debtors may sell stablecoin, the Bureau asserts that the sale proceeds should be held in escrow while awaiting a determination of ownership and the Examiner's Final Report. | 1.  The Debtors address New Jersey's procedural arguments in the Reply.  Reply ¶ 24–28.<br><br>2.  With respect to fact-specific defenses (*e.g.*, illegality, etc.) or claims (*e.g.*, breach of contract), the Debtors propose to address such issues in connection with the claims process or a future request for relief (or at some other time as determined by the Court), as described in the Amended Motion and the Proposed Scheduling Order, to promote due process while advancing key legal issues in these chapter 11 cases.  *See* Amended Motion ¶ 16; Proposed Scheduling Order ¶ 3. |

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| | | 3.  The Debtors believe that their acceptance of the Committee's limitations on the Debtors' ability to sell Earn Stablecoins should resolve any remaining concerns regarding the breadth of the relief granted. *See* Proposed Order. |
| Texas State Securities Board and the Texas Department of Banking<br><br>("Texas State Securities")<br><br>[Docket No. 1496]<br><br>(the "Texas State Securities Objection")<br><br>Objection to Original Motion: [Docket No. 922] | 1.  The Debtors should have filed an adversary proceeding pursuant to Fed. R. Bankr. P. 7001.<br><br>2.  The Debtors' Proposed Briefing Schedule violates creditors' due process rights.<br><br>3.  The Debtors have failed to provide sufficient evidence that their customers agreed to the Term of Use.<br><br>4.  It is premature to determine whether the Terms of Use create a binding and enforceable contract, because creditors have significant defenses to the same and the Examiner has not yet completed her Final Report.<br><br>5.  The proceeds of a sale of stablecoin should be held in trust for the benefit of the estates' creditors. | 1.  The Debtors address Texas State Securities' procedural arguments in the Reply.  Reply Part III.<br><br>2.  Same as above.<br><br>3.  The Debtors filed the Supplemental Blonstein Declaration to remedy any perceived deficiencies in the evidentiary record.  To the extent further concerns remain, the Debtors will address such concerns at the hearing or as directed by the Court.<br><br>4.  With respect to fact-specific defenses (*e.g.*, illegality, etc.) or claims (*e.g.*, breach of contract), the Debtors propose to address such issues in connection with the claims process or a future request for relief (or at some other time as determined by the Court), as described in the Amended Motion and the Proposed Scheduling Order, to promote due process while advancing key legal issues in these chapter 11 cases. *See* Amended Motion ¶ 16; Proposed Scheduling Order ¶ 3. |

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| | | 5. The Debtors believe that their acceptance of the Committee's limitations on the Debtors' ability to sell Earn Stablecoins should resolve any remaining concerns regarding the breadth of the relief granted. *See* Proposed Order. |
| Vermont Department of Financial Regulation<br><br>("Vermont")<br><br>[Docket No. 1484]<br><br>(the "Vermont Objection")<br><br>Objection to Original Motion: [Docket No. 925] | 1. Vermont filed a limited objection to the extent the Amended Motion authorizes the Debtors to spend the proceeds of the sale of stablecoin. Vermont argued proceeds of any sale of stablecoin should be escrowed pending further Order of the Court.<br><br>2. Regarding the ownership of Earn Assets, Vermont says it takes no position. However, Vermont does question how ownership could be temporarily transferred during the duration of the loan of digital assets to the Debtors and finds the Terms of Use internally inconsistent.<br><br>3. Even if the Debtors are the owners of the Earn Assets, the Debtors' depositor account maintenance protocols make it difficult for customers to understand or protect their rights. | 1. The Debtors believe that their acceptance of the Committee's limitations on the Debtors' ability to sell Earn Stablecoins should resolve any remaining concerns regarding the breadth of the relief granted. *See* Proposed Order.<br><br>2. The Debtors address arguments regarding the language of the Terms of Use in the Reply. Reply ¶ 17–19.<br><br>3. With respect to fact-specific defenses (*e.g.*, illegality, unconscionability, etc.) or claims (*e.g.*, breach of contract), the Debtors propose to address such issues in connection with the claims process or a future request for relief (or at some other time as determined by the Court), as described in the Amended Motion and the Proposed Scheduling Order, to promote due process while advancing key legal issues in these chapter 11 cases. *See* Amended Motion ¶ 16; Proposed Scheduling Order ¶ 3. |

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| Retail Creditors | | |
| Volkan Altunbay<br><br>("Altunbay")<br><br>[Docket No. 1511 and 1516]<br><br>(the "Altunbay Objection") | *Altunbay's objection was docketed twice, but there are no differences between the two versions besides the docket number.*<br><br>1. The differences between Earn and Custody/Withhold is a "legal fiction" because<br><br>   a. The differentiation was artificial;<br><br>   b. Custody/Withhold were not available to non-US based customers; and<br><br>   c. The Examiner's Interim Report points out that "there were no separate wallets or accounts [for each service] and that different types of accounts were manually and deliberately commingled by [the Debtors]."<br><br>2. The Terms of Use are illegal because regulators have accused the Debtors of selling unregistered securities or operating without the proper licenses.<br><br>3. Even if the Earn product is legal, the applicable Terms of Use did not provide for the transfer of full ownership to the Debtors, because there was no donation or sale. | 1. The unambiguous language of the Terms of Use treats the Earn Program differently from the Custody Program. *Compare* Terms of Use Declaration, <u>Exhibit A-8</u> § 4B ("Title to any of your Eligible Digital Assets in a Custody Wallet shall at all times remain with you and not transfer to Celsius.") *with id.* § 4D ("[Y]ou will lend your Eligible Digital Assets to Celsius and grant Celsius all rights and title to such Digital Assets, for Celsius to use in its sole discretion while using the Earn Service.").<br><br>2. With respect to fact-specific defenses (*e.g.*, illegality, unconscionability, etc.) or claims (*e.g.*, breach of contract), the Debtors propose to address such issues in connection with the claims process or a future request for relief (or at some other time as determined by the Court), as described in the Amended Motion and the Proposed Scheduling Order, to promote due process while advancing key legal issues in these chapter 11 cases. *See* Amended Motion ¶ 16; Proposed Scheduling Order ¶ 3.<br><br>3. The Debtors address arguments regarding the language of the Terms of Use in the Reply. Reply ¶ 18–20. |

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| | 4. The Terms of Use are ambiguous because it provides that digital assets are "loaned" to the Debtors. | 4. The Debtors address arguments regarding the use of the word "loan" in the Terms of Use in the Reply. Reply ¶ 11–12. |
| | 5. Even if the Terms of Use unambiguously provided that the Debtors have title to Earn Assets, the Debtors have not proven informed consent by the customers. | 5. The Debtors address arguments regarding "informed consent" and the enforceability of clickwrap contracts in the Reply. Reply ¶ 15–16. |
| | 6. The Debtors do not own the digital assets, because the Debtors did not pay taxes on the digital assets. | 6. The Debtors address arguments regarding the language of the Terms of Use in the Reply. Reply ¶ 18–20. With respect to fact-specific defenses (*e.g.*, illegality, unconscionability, etc.) or claims (*e.g.*, breach of contract, tax treatment), the Debtors propose to address such issues in connection with the claims process or a future request for relief (or at some other time as determined by the Court), as described in the Amended Motion and the Proposed Scheduling Order, to promote due process while advancing key legal issues in these chapter 11 cases. *See* Amended Motion ¶ 16; Proposed Scheduling Order ¶ 3. |
| Cameron Crews<br><br>("Crews")<br><br>[Docket No. 1515] | 1. The Terms of Use fail for lack of consideration.<br><br>2. The Debtors materially misled customers as to their insolvency.<br><br>3. The Debtors allegedly paid customer withdrawals using the digital assets deposited by other customers. | 1. Crews' Objection regarding consideration is more an argument alleging fraud or misrepresentation.<br><br>2. With respect to this and other fact-specific defenses (*e.g.* illegality, etc.) or claims (*e.g.*, breach of contract), the Debtors propose to address such issues in connection with the claims |

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| (the "Crews Objection") | 4.  If the Debtors owned the digital assets, then any withdrawal while the Debtors were insolvent was a fraudulent conveyance.<br><br>5.  The Debtors should not be given an extension of exclusivity. | process or a future request for relief (or at some other time as determined by the Court), as described in the Amended Motion and the Proposed Scheduling Order, to promote due process while advancing key legal issues in these chapter 11 cases. *See* Amended Motion ¶ 16; Proposed Scheduling Order ¶ 3.<br><br>3.  Same as above.<br><br>4.  Same as above.<br><br>5.  The Debtors address the extension of exclusivity in their Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File A Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief [Docket No. 1317] and in their reply in support of the same. |
| K. David Flora<br><br>("Flora")<br><br>[Docket No. 1464]<br><br>(the "Flora Objection") | 1.  If the Terms of Use transfer title of the digital assets to the Debtors, the Debtors deceived customers in the AMAs and through the HODL motto.<br><br>2.  The Debtors deceived its customers as to the contents of the Terms of Use because the Debtors failed to provide a meaningful explanation of the changes to the Terms of Use. | 1.  The Debtors propose to address fact-specific defenses (*e.g.*, fraud, illegality, misrepresentation, etc.) or claims (*e.g.*, breach of contract) in connection with the claims process or a future request for relief (or at some other time as determined by the Court), as described in the Amended Motion and the Proposed Scheduling Order, to promote due process while advancing key legal issues in these chapter 11 |

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| | 3. All depositors should be treated the same, irrespective of whether they participated in the Custody Program, Withhold Program, or Earn Program. | cases. *See* Amended Motion ¶ 16; Proposed Scheduling Order ¶ 3.<br><br>2. The Debtors address arguments regarding the language of the Terms of Use and the enforceability of clickwrap contracts in the Reply. Reply ¶ 15–16, 18–20.<br><br>3. The unambiguous language of the Terms of Use treats the Earn Program differently from the Custody Program. *Compare* Terms of Use Declaration, Exhibit A-8 § 4B ("Title to any of your Eligible Digital Assets in a Custody Wallet shall at all times remain with you and not transfer to Celsius.") *with id.* § 4D ("[Y]ou will lend your Eligible Digital Assets to Celsius and grant Celsius all rights and title to such Digital Assets, for Celsius to use in its sole discretion while using the Earn Service."). |
| Rebecca Gallagher ("Gallagher") [Docket No. 1416] (the "Gallagher Objection") | 1. Due to the Debtors' allegedly fraudulent misrepresentations made to customers through the weekly AMA videos and other media, the Terms of Use are not binding.<br><br>2. Under New Jersey and English law, oral modifications are allowed. Thus, the Debtors' electronic communications modified the Terms of Use. | 1. As detailed in the Amended Motion and the Reply, the Terms of Use constitute a legally enforceable contract between the Debtors and Account Holders. The Debtors reiterate their arguments in the Amended Motion regarding oral modification and their statements in the Reply regarding extrinsic/parol evidence. Amended Motion ¶ 44–48; Reply ¶ 18.<br><br>2. The Terms of Use are governed by New York law. *See* Original Motion ¶ 27. The Terms of |

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| Objection to Original Motion: [Docket No. 901] | 3. The Terms of Use are neither plain nor unambiguous to a reasonably intelligent person.<br><br>4. A person of reasonable intelligence would expect twenty-one days' written notice of changes to the Terms of Use, because the Debtors are a financial institution.<br><br>5. Debtor obtained consent to the Terms of Use through trickery because customers had to accept the Terms of Use to check their balances.<br><br>6. Uninformed consent is not consent.<br><br>7. Because the Debtors are not a bank, there is no debtor-creditor relationship under the Terms of Use.<br><br>8. The Terms of Use are illegal because regulators have accused the Debtors of selling unregistered securities or operating without the proper licenses.<br><br>9. The Terms of Use are void, because the Debtors breached the Terms of Use. | Use are not governed by New Jersey or English law.<br><br>3. The Debtors address arguments regarding the language of the Terms of Use in the Reply. Reply ¶ 18–20.<br><br>4. The Debtors address arguments regarding "informed consent" and the enforceability of clickwrap contracts in the Reply. Reply ¶ 15–16.<br><br>5. With respect to fact-specific defenses (*e.g.*, modification, illegality, etc.) or claims (*e.g.*, breach of contract), the Debtors propose to address such issues in connection with the claims process or a future request for relief (or at some other time as determined by the Court), as described in the Amended Motion and the Proposed Scheduling Order, to promote due process while advancing key legal issues in these chapter 11 cases. *See* Amended Motion ¶ 16; Proposed Scheduling Order ¶ 3.<br><br>6. The Debtors address arguments regarding "informed consent" and the enforceability of clickwrap contracts in the Reply. Reply ¶ 15–16.<br><br>7. The unambiguous language of the Terms of Use provides for a debtor-creditor relationship. *See, e.g.,* Terms of Use Declaration, Exhibit A-8 § 4A ("All Eligible Digital Asset balances on |

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| | | your Celsius Account represent Digital Assets that are either (1) held in your Custody Wallet by Celsius or a Third Party Custodian, (2) loaned by you to Celsius, or (3) posted to Celsius as collateral and, therefore, owned, held and/or controlled by Celsius (under the applicable Service, as further detailed herein), and subject to Celsius' obligation to deliver such Digital Assets back to you upon the termination of the applicable Service."). <br><br> 8. With respect to fact-specific defenses (*e.g.*, modification, illegality, etc.) or claims (*e.g.*, breach of contract), the Debtors propose to address such issues in connection with the claims process or a future request for relief (or at some other time as determined by the Court), as described in the Amended Motion and the Proposed Scheduling Order, to promote due process while advancing key legal issues in these chapter 11 cases. *See* Amended Motion ¶ 16; Proposed Scheduling Order ¶ 3. <br><br> 9. The Gallagher Objection confuses the words "void," "voidable," "breach," and "recission" and the associated consequences. *See Sphere Drake Ins. Ltd. v. Clarendon Nat. Ins. Co.*, 263 F.3d 26, 31 (2d Cir. 2001) (contrasting void and voidable contracts); *Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 227 (2d Cir. 2017) (describing recission as an equitable remedy |

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| | | available only where damages would not provide an adequate remedy following a breach). |
| Georges Georgiou ("Georgiou") [Docket No. 1517] (the "Georgiou Objection") | 1. Georgiou claims to have requested a withdrawal on the day of the Pause and that his withdrawal was pending at the time of the Pause.<br><br>2. The Loan Terms of Use modified and superseded the Terms of Use for individuals who took out a loan against Earn assets.<br><br>3. Georgiou did not transfer his digital assets to the Debtors when his loans were closed, because the Debtors were the ones to deposit his collateral in Earn.<br><br>4. His digital assets were already withdrawn from the Debtors' platform pre-Pause because (1) the Debtors stopped paying interest on his assets, (2) his account was marked "pending," and (3) both the Debtors and he agreed to the withdrawal. Thus, the Debtors are currently holding his funds in bailment or trust. He also qualifies for a constructive trust.<br><br>5. Assets that do not earn interest are not Earn Assets.<br><br>6. The Debtors breached their agreement with Georgiou when they failed to return the collateral. | 1. With respect to fact-specific issues (*e.g.*, "pending" transactions initiated before the Pause, etc.) or claims (*e.g.*, breach of contract), the Debtors propose to address such issues in connection with the claims process or a future request for relief (or at some other time as determined by the Court), as described in the Amended Motion and the Proposed Scheduling Order, to promote due process while advancing key legal issues in these chapter 11 cases. *See* Amended Motion ¶ 16; Proposed Scheduling Order ¶ 3.<br><br>2. Same as above.<br><br>3. Same as above.<br><br>4. Same as above.<br><br>5. Same as above.<br><br>6. Same as above.<br><br>7. The Debtors address arguments regarding the language of the Terms of Use in the Reply. Reply ¶ 18–20.<br><br>8. Same as above. |

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| | 7. The Terms of Use are ambiguous because it provides that digital assets are "loaned" to the Debtors.<br><br>8. The Terms of Use are ambiguous when read in conjunction with the Terms of Use for specific programs and the Risk Disclosure.<br><br>9. The setoff and securities interest language in the Terms of Use is superfluous if the Debtors owned the assets.<br><br>10. The Debtors do not own the digital assets deposited by Earn customers, because Earn customers received a 1099 from the Debtors.<br><br>11. Since the Terms of Use deny the accounts are bank accounts, they cannot be treated like a bank when it comes to a debtor-creditor relationship. | 9. The language in the Terms of Use that pertains to setoff and security interest rights is not rendered superfluous due to the unambiguous language that the Terms of Use provide the Debtors ownership of the Earn Assets. *See* Reply ¶ 18–20; Terms of Use Declaration, <u>Exhibit A-8</u> § 9 ("You grant us a security interest in any and all Eligible Digital Assets using the Earn Service for debts, amounts owed, or liabilities incurred to us or any of our Affiliates by you or any of your Authorized Representatives, if any"); *id.* ("We also may take or set off from any Digital Asset in your Celsius Account, including any of your Digital Assets using the Custody Service (i.e., in a Custody Wallet), or deduct from any obligations Celsius may have to you, any direct, indirect, and acquired Obligations that you owe us or our Affiliates."); *id.* ("Your acceptance of these Terms serves as your consent to Celsius' asserting its security interest or exercising its right of setoff should any laws governing your Celsius Account require your consent.").<br><br>10. The Debtors reiterate their arguments in the Reply regarding extrinsic/parol evidence. Reply ¶ 18.<br><br>11. The unambiguous language of the Terms of Use provides for a debtor-creditor relationship. *See, e.g.,* Terms of Use Declaration, <u>Exhibit A-8</u> § 4A ("All Eligible Digital Asset balances on |

14

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| | | your Celsius Account represent Digital Assets that are either (1) held in your Custody Wallet by Celsius or a Third Party Custodian, (2) loaned by you to Celsius, or (3) posted to Celsius as collateral and, therefore, owned, held and/or controlled by Celsius (under the applicable Service, as further detailed herein), and subject to Celsius' obligation to deliver such Digital Assets back to you upon the termination of the applicable Service."). |
| Immanuel Herrmann<br><br>("Herrmann")<br><br>[Docket No. 1417]<br><br>(the "Herrmann Objection")<br><br>Objection to Original Motion: [Docket No. 954] | *Herrmann's objection includes arguments against the Proposed Briefing Schedule.*<br><br>1.  The Debtors' Proposed Briefing Schedule violates due process because creditors are unable to perform additional discovery and some creditors may not have received notice of the Amended Motion.<br><br>2.  The Terms of Use were void when the Debtors allegedly used one depositor's principal to pay another depositor's withdrawal.<br><br>3.  The Terms of Use are invalid to the extent the securities laws make them illegal and unenforceable.<br><br>4.  The Terms of Use are invalid because Debtors failed to use their best efforts to prevent losses. | 1.  The Debtors address Herrmann's procedural arguments in the Reply.  Reply Part III.<br><br>2.  The Herrmann Objection confuses the words "void," "voidable," "breach," and "recission" and the associated consequences.  *See Sphere Drake Ins. Ltd. v. Clarendon Nat. Ins. Co.*, 263 F.3d 26, 31 (2d Cir. 2001) (contrasting void and voidable contracts); *Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 227 (2d Cir. 2017) (describing recission as an equitable remedy available only where damages would not provide an adequate remedy following a breach).  The Debtors generally dispute the conclusory allegations and unsubstantiated assertions in the Herrmann Objection.  The Debtors also dispute that, if such assertions were true, the consequences Herrmann describes would logically flow therefrom. |

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| | 5. The Terms of Use are ambiguous and contradictory to the extent they describe the transfer as a "callable loan." Further, the Terms of Use are ambiguous when considered in conjunction with previous versions of the Terms of Use, loan contracts, and other public written or oral statements.<br><br>6. No objective person would have concluded the "all rights and title" language in the Terms of Use meant that they gave all ownership of their assets to the Debtors. | 3. With respect to fact-specific defenses (e.g., fraud, illegality, misrepresentation, etc.) or claims (e.g., breach of contract), the Debtors propose to address such issues in connection with the claims process or a future request for relief (or at some other time as determined by the Court), as described in the Amended Motion and the Proposed Scheduling Order, to promote due process while advancing key legal issues in these chapter 11 cases. *See* Amended Motion ¶ 16; Proposed Scheduling Order ¶ 3.<br><br>4. Same as above.<br><br>5. The Debtors address arguments regarding the language of the Terms of Use in the Reply. Reply ¶ 18–20.<br><br>6. Herrmann's description of the Debtors' interpretation of the Terms of Use is inaccurate. *See generally* Reply, Preliminary Statement. As such, Herrmann's arguments are generally not responsive to the Amended Motion. See Amended Motion Exhibit B. |
| Immanuel Herrmann<br><br>[Docket No. 1519] | 1. Re-asserts the <u>unconscionability</u> arguments of Ryals Objection well as "all other objections that reference unconscionability." Also re-asserts the arguments in the Ryals Objection, Wohlwend Objection, and Gallagher Objection regarding contract ambiguity. | 1. With respect to fact-specific defenses (e.g., fraud, illegality, unconscionability, etc.) or claims (e.g., breach of contract), the Debtors propose to address such issues in connection with the claims process or a future request for relief (or at some other time as determined by the |

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| (the "<u>Supplemental Herrmann Objection</u>") | 2. The Earn contract is ambiguous, coins are generally not property of the estate, and that a loan cannot permanently transfer all rights and title.<br><br>3. The Terms of Use are ambiguous because it provides that digital assets are "loaned" to the Debtors.<br><br>4. Oren Blonstein admitted that the terms can be read to be ambiguous.<br><br>5. The Examiner's investigation into ponzi scheme allegations must be considered before an ownership determination is made.<br><br>6. The Debtors' plan to adjudicate contract formation defenses through the claims process inequitably shifts the burden to individual creditors and allows Debtors to bar creditors from claims they are "contractually entitled to."<br><br>7. A contract where property starts as a loan but becomes an unsecured debt in bankruptcy (*i.e.*, priority shifting from in-kind return of deposited crypto to conversion resembling a structured note) is an unenforceable ipso facto contract.<br><br>8. The Debtors placed US customers' returned loan collateral into Earn after April 15, 2022, in violation | Court), as described in the Amended Motion and the Proposed Scheduling Order, to promote due process while advancing key legal issues in these chapter 11 cases. *See* Amended Motion ¶ 16; Proposed Scheduling Order ¶ 3.<br><br>2. The Debtors address arguments regarding the language of the Terms of Use in the Reply. Reply ¶ 18–20.<br><br>3. Same as above.<br><br>4. Same as above.<br><br>5. With respect to fact-specific defenses (e.g., fraud, illegality, unconscionability, etc.) or claims (e.g., breach of contract), the Debtors propose to address such issues in connection with the claims process or a future request for relief (or at some other time as determined by the Court), as described in the Amended Motion and the Proposed Scheduling Order, to promote due process while advancing key legal issues in these chapter 11 cases. *See* Amended Motion ¶ 16; Proposed Scheduling Order ¶ 3.<br><br>6. Same as above.<br><br>7. Same as above. |

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| | of the Terms of Use and as such cannot seek a ruling giving it ownership of any of that collateral | 8.  Same as above. |
| | 9.  The Debtors' schedules using internal labels from internal ledgers is flawed and does not consistently match the appropriate contractual treatment. | 9.  Same as above. |
| | 10. Blonstein was not able to pinpoint contractual language authorizing the practice of placing collateral into the account from which it originated after a loan was repaid or liquidated. | 10. Same as above.

11. Same as above.

12. Same as above.

13. Same as above. |
| | 11. Language in Version 8 of the Terms of Use states that all transfers will initially go to Custody, not Earn. | |
| | 12. The language "sole owner" modifies/supersedes The Terms of Use while Hermann's coins were in Earn from his Earn deposits. | |
| | 13. Blonstein admitted in his deposition that the labels in the Debtors' app were merely labels in the internal ledger and that whatever happened contractually is separate from such labels. | |
| Jeremy Cohen Hoffing

("Hoffing")

[Docket No. 1506] | 1.  The Terms of Use are ambiguous and describe the transfer of digital assets to the Debtors as a loan.

2.  The Terms of Use, when read in conjunction with the Terms of Use for the Loan Program, are ambiguous as to the ownership of digital assets. Specifically, in | 1.  The Debtors address arguments regarding ambiguity in the Reply. Reply ¶ 18–20.

2.  Same as above. |

18

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| (the "Hoffing Objection") | the Loan Program Terms of Use, customers represent that they are "the sole owner of all Digital Assets" underlying the loan.<br><br>3.  The Terms of Use are a contract of adhesion and there was a great imbalance in bargaining power between the Debtors and customers.<br><br>4.  If Blonstein, a sophisticated reader, cannot make a distinction between a loan and transfer of ownership, how could the average user? | 3.  The Debtors address arguments regarding the language of the Terms of Use and the enforceability of clickwrap contracts in the Reply. Reply ¶ 15–16; 18–20.<br><br>4.  Hoffing's description of the Debtors' interpretation of the Terms of Use is inaccurate. *See generally* Reply, Preliminary Statement. As such, Hoffing's arguments are generally not responsive to the Amended Motion. |
| Will Jelbert<br><br>("Jelbert")<br><br>[Docket No. 1545]<br><br>(the "Jelbert Objection") | 1.  The Debtors do not have title to the Earn Assets because they were deposits. | 1.  The Debtors address arguments regarding the language of the Terms of Use in the Reply. Reply ¶ 18–20. |
| Christopher Little<br><br>("Little")<br><br>[Docket No. 1463]<br><br>(the "Little Objection") | 1.  The Terms of Use are neither plain nor unambiguous to a reasonably intelligent person.<br><br>2.  The Terms of Use are illegal because regulators have accused the Debtors of selling unregistered securities or operating without the proper licenses. | 1.  The Debtors address arguments regarding the language of the Terms of Use in the Reply. Reply ¶ 18–20.<br><br>2.  With respect to fact-specific defenses (*e.g.*, illegality, etc.) or claims (*e.g.*, breach of contract), the Debtors propose to address such issues in connection with the claims process or a future request for relief (or at some other time as determined by the Court), as described in the |

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| | | Amended Motion and the Proposed Scheduling Order, to promote due process while advancing key legal issues in these chapter 11 cases. *See* Amended Motion ¶ 16; Proposed Scheduling Order ¶ 3. |
| Stuart McLean ("McLean") [Docket No. 1491] (the "McLean Objection") | 1. The Debtors' Terms of Use are not clear and unambiguous, because the Terms of Use are replete with language stating customers lend their digital 2. The Terms of Use fail for lack of consideration. The Debtors' promises under the Terms of Use were illusory, because the Debtors promise to return borrowed assets to customers but disclaim any real obligation to do so. Additionally, the customers' continued use of the Debtors' services is not sufficient consideration to support a modification. 3. The Terms of Use are procedurally and substantively unconscionable. 4. The Terms of Use void as illegal contracts. 5. The Debtors' request to sell stablecoin under 11 U.S.C. § 363(b) is unsupported, because stablecoin are not property of the estate and such sale would not be in the ordinary course of business. | 1. The Debtors address arguments regarding the language of the Terms of Use in the Reply. Reply ¶ 18–20. 2. The Terms of Use had sufficient consideration. *Mencher v. Weiss*, 114 N.E.2d 177, 181 (N.Y. 1953) ("The slightest consideration is sufficient to support the most onerous obligation; the inadequacy, as has been well said, is for the parties to consider at the time of making the agreement, and not for the court when it is sought to be enforced."). 3. With respect to fact-specific defenses (*e.g.*, modification, unconscionability, etc.) or claims (*e.g.*, breach of contract), the Debtors propose to address such issues in connection with the claims process or a future request for relief (or at some other time as determined by the Court), as described in the Amended Motion and the Proposed Scheduling Order, to promote due process while advancing key legal issues in these chapter 11 cases. *See* Amended Motion ¶ 16; Proposed Scheduling Order ¶ 3. |

20

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| | | 4. Same as above.<br><br>5. The Debtors address arguments regarding section 363 issues in the Reply. Reply ¶ 21–23. |
| Josh Medley<br><br>("Medley")<br><br>[Docket No. 1507]<br><br>(the "Medley Objection") | 1. The Debtors offered the Terms of Use in the context of a fiduciary responsibility that the Debtors allegedly violated. These fiduciary responsibilities were the consideration for the contract with the Debtors, thus the contract fails for lack of consideration. | 1. The plain language of the Terms of Use expressly provides that the Debtors are not fiduciaries. The Terms of Use had sufficient consideration. *Mencher v. Weiss*, 114 N.E.2d 177, 181 (N.Y. 1953) ("The slightest consideration is sufficient to support the most onerous obligation; the inadequacy, as has been well said, is for the parties to consider at the time of making the agreement, and not for the court when it is sought to be enforced."). |
| Georgios Papadakis<br><br>("Papadakis")<br><br>[Docket No. 853]<br><br>(the "Papadakis Objection") | 1. Coins should be considered and paid out as crypto, not cash.<br><br>2. A sale of those stable coins would irreversibly harm the creditors who have deposits in stable-coins because these stable-coins cannot be recovered or recreated in the future when creditor claims would/should be paid in kind (same as crypto deposits).<br><br>3. A sale of these stable-coins would be prejudicial to the stable-coins' holders of the Debtors in comparison to other crypto coins' holders | 1. The Amended Motion does not seek to determine the ultimate form of distributions in these cases. To the extent that the Earn Stablecoins are determined to be the Debtors' property (as the Debtors maintain), creditors who initially deposited stablecoins will not be prejudiced, as they will have exactly the same claims in the bankruptcy after the sale as they did before the sale. All creditors will share in plan distributions in accordance with their respective rights and priorities as required by the Bankruptcy Code.<br><br>2. The Debtors address arguments regarding the language of the Terms of Use and the enforceability of clickwrap contracts in the |

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| | 4.  Any permission to the Debtors to sell stable coins to merely finance its running operations could be used later by the Debtors as a pretext for more selective crypto coins conversions into cash, creating further prejudicial issues to arise. | Reply.   Reply ¶ 15–16, 18–20.   The Debtors address arguments regarding section 363 issues in the Reply.  Reply ¶ 21–23.<br><br>3.  Same as above.<br><br>4.  The Debtors believe that their acceptance of the Committee's limitations on the Debtors' ability to sell Earn Stablecoins should resolve any remaining concerns regarding the breadth of the relief granted.  *See* Proposed Order. |
| Keith and Jennifer Ryals<br><br>(the "Ryalses")<br><br>[Docket No. 1490]<br><br>(the "Ryals Objection") | 1.  The Debtors' Terms of Use are not clear and unambiguous, because the Terms of Use are replete with language stating customers lend their digital assets.<br><br>2.  The Terms of Use fail for lack of consideration. The Debtors' promises under the Terms of Use were illusory, because the Debtors promise to return borrowed assets to customers but disclaim any real obligation to do so.  Additionally, the customers' continued use of the Debtors' services is not sufficient consideration to support a modification.<br><br>3.  The Terms of Use are procedurally and substantively unconscionable.<br><br>4.  The Terms of Use void as illegal contracts. | 6.  The Debtors address arguments regarding the use of the word "loan" in the Terms of Use in the Reply.  Reply ¶ 11–12. The Debtors address arguments regarding the language of the Terms of Use in the Reply.  Reply ¶ 18–20.<br><br>7.  The Terms of Use had sufficient consideration. *Mencher v. Weiss*, 114 N.E.2d 177, 181 (N.Y. 1953) ("The slightest consideration is sufficient to support the most onerous obligation; the inadequacy, as has been well said, is for the parties to consider at the time of making the agreement, and not for the court when it is sought to be enforced.").<br><br>8.  With respect to fact-specific defenses (*e.g.*, illegality, modification, unconscionability, etc.) or claims (*e.g.*, breach of contract), the Debtors propose to address such issues in |

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| | 5. The Debtors' request to sell stablecoin under 11 U.S.C. § 363(b) is unsupported, because stablecoin are not property of the estate and such sale would not be in the ordinary course of business | connection with the claims process or a future request for relief (or at some other time as determined by the Court), as described in the Amended Motion and the Proposed Scheduling Order, to promote due process while advancing key legal issues in these chapter 11 cases. *See* Amended Motion ¶ 16; Proposed Scheduling Order ¶ 3.

9. Ryals' description of the Debtors' interpretation of the Terms of Use is inaccurate. *See generally* Reply, Preliminary Statement. As such, Ryals' arguments are generally not responsive to the Amended Motion.

10. The Debtors address arguments regarding section 363 issues in the Reply. Reply ¶ 21–23. |
| Nuno Saraiva ("Saraiva") [Docket No. 1485] (the "Saraiva Objection") | 1. The request for a determination of ownership of earn program assets must be brought by adversary proceeding pursuant to Fed. R. Bankr. P. 7001.

2. The Proposed Briefing Schedule for the Amended Motion violates due process.

3. International account holders were unfairly disadvantaged, because they did not have access to the Custody Program.

4. The Debtors' reply that it would take Saraiva's request regarding his post-Pause transfer to the | 1. The Debtors address Saraiva's procedural arguments in the Reply. Reply Part III.

2. Same as above.

3. With respect to fact-specific defenses (*e.g.*, individual contract formation defenses, etc.) or claims (*e.g.*, breach of contract), the Debtors propose to address such issues in connection with the claims process or a future request for relief (or at some other time as determined by the Court), as described in the Amended Motion and the Proposed Scheduling |

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| | Debtors into consideration is "blatantly mislead[ing]." | Order, to promote due process while advancing key legal issues in these chapter 11 cases. *See* Amended Motion ¶ 16; Proposed Scheduling Order ¶ 3. <br><br> 4. Same as above. |
| Ignat Tuganov <br><br> ("Tuganov") <br><br> [Docket No. 1495] <br><br> (the "Tuganov Objection") | 1. If adjudication of the customers' defenses is delayed, the customers' assets may be unrecoverable. <br><br> 2. The Terms of Use are void to the extent the Debtors operated their business as a ponzi scheme. <br><br> 3. Debtors possess sufficient liquidity to continue operations into the second quarter of 2023 without selling any Earn Stablecoins and stablecoin can be sold rapidly.  Deciding such an important issue on an incomplete factual record (prior to Examiner Final Report) is inappropriate. | 1. The Debtors generally dispute the conclusory allegations and unsubstantiated assertions in the Tuganov Objection. <br><br> 2. With respect to fact-specific defenses (*e.g.*, fraud, illegality, unconscionability, etc.) or claims (*e.g.*, breach of contract), the Debtors propose to address such issues in connection with the claims process or a future request for relief (or at some other time as determined by the Court), as described in the Amended Motion and the Proposed Scheduling Order, to promote due process while advancing key legal issues in these chapter 11 cases. *See* Amended Motion ¶ 16; Proposed Scheduling Order ¶ 3. <br><br> 3. The Debtors believe that their acceptance of the Committee's limitations on the Debtors' ability to sell Earn Stablecoins should resolve any remaining concerns regarding the breadth of the relief granted. *See* Proposed Order. |

24

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| Victor Ubierna de las Heras<br><br>("Ubierna de las Heras")<br><br>[Docket No. 1535]<br><br>(the "Ubierna de las Heras Objection")<br><br>Objection to Original Motion: [Docket No. 970] | 1. The sale of stablecoin is premature as the debtors may be out of chapter 11 when the extra liquidity is needed. Additionally, the sale of stablecoin will only provide a temporary patch, if needed.<br><br>2. Ubierna de las Heras joins in the Wohlleben Objections ambiguity arguments.<br><br>3. The Debtors did not provide clear notice of the modifications to the Terms of Use, because they did not include essential information, such as that customers were now making loans to the Debtors.<br><br>4. Based on a law review article, the Terms of Use may not be binding because a customer may have accepted the Terms of Use solely to view their balance.<br><br>5. The Terms of Use are illegal because regulators have accused the Debtors of selling unregistered securities or operating without the proper licenses.<br><br>6. Customers who accessed the platform through a third-party app, such as Nuri Bank, were not informed of any changes to the Terms of Use. While the Debtors may argue Version 8 of the Terms of Use did not impact international creditors, it may have impacted their decision to continue to use the Debtors' platform. | 1. The Debtors believe that their acceptance of the Committee's limitations on the Debtors' ability to sell Earn Stablecoins should resolve any remaining concerns regarding the breadth of the relief granted. *See* Proposed Order.<br><br>2. The Debtors address arguments regarding the language of the Terms of Use in the Reply. Reply ¶ 18–20.<br><br>3. The Debtors address arguments regarding the need for "informed consent" in the Reply. Reply ¶ 15–16.<br><br>4. With respect to fact-specific defenses (e.g., fraud, illegality, unconscionability, etc.) or claims (e.g., breach of contract), the Debtors propose to address such issues in connection with the claims process or a future request for relief (or at some other time as determined by the Court), as described in the Amended Motion and the Proposed Scheduling Order, to promote due process while advancing key legal issues in these chapter 11 cases. *See* Amended Motion ¶ 16; Proposed Scheduling Order ¶ 3.<br><br>5. Same as above.<br><br>6. Ubierna de las Heras's description of the Debtors' interpretation of the Terms of Use is inaccurate. *See generally* Reply, Preliminary |

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| | | Statement. As such, Ubierna de las Heras's arguments are generally not responsive to the Amended Motion. |
| Eric Wohlwend ("Wohlwend") [Docket No. 1430] (the "Wohlwend Objection") | 1. The Terms of Use are ambiguous because they include language that either expressly loans the assets to the Debtors or would make no sense if Debtors owned the Earn Assets.<br><br>2. The Terms of Use are also ambiguous because Debtors fail to define "transfer" in § 10 of the Terms of Use.<br><br>3. The Debtors issuance of 1099s to customers implied its customers retained ownership of the Earn Assets.<br><br>4. The Debtors' statements that customer accounts are not and do not act like bank accounts lead to the conclusion that there is no debtor creditor relationship between the Debtors and Earn customers. ¶ Thus Earn customers retained ownership of their digital assets. | 1. The Debtors address arguments regarding the use of the word "loan" in the Terms of Use in the Reply. Reply ¶ 11–12. The Debtors address arguments regarding the language of the Terms of Use in the Reply. Reply ¶ 18–20.<br><br>2. Same as above.<br><br>3. The Debtors reiterate their arguments in the Reply regarding extrinsic/parol evidence. Reply ¶ 18.<br><br>4. The unambiguous language of the Terms of Use provides for a debtor-creditor relationship. *See, e.g.,* Terms of Use Declaration, Exhibit A-8 § 4A ("All Eligible Digital Asset balances on your Celsius Account represent Digital Assets that are either (1) held in your Custody Wallet by Celsius or a Third Party Custodian, (2) loaned by you to Celsius, or (3) posted to Celsius as collateral and, therefore, owned, held and/or controlled by Celsius (under the applicable Service, as further detailed herein), and subject to Celsius' obligation to deliver such Digital Assets back to you upon the termination of the applicable Service."). |

**CHART OF RESERVATIONS OF RIGHTS FILING REGARDING EARN ASSET OWNERSHIP**

| Party and Docket No. | Summary | Response |
|---|---|---|
| Series B Preferred Holders<br><br>[Docket No. 1493]<br><br>(the "Series B Preferred Holders Reservation of Rights") | Issues pertaining to the Earn program, including interpreting the Terms of Use, overlap with other key matters, including the issue of which entities within the Debtors' corporate structure are liable to account holders under the Terms of Use (the "Briefed Legal Issue").<br><br>Any findings the Court may make regarding the Terms of Use in connection with the Amended Motion should be expressly limited to the issues raised in the Amended Motion and should not in any way be dispositive or binding with respect to the interpretation of, and determination of any ambiguity or lack thereof in the Terms of Use as they pertain to the Briefed Legal Issue. | Any findings here will not prejudice the Briefed Legal issue. |

**CHART OF JOINDERS TO OBJECTIONS REGARDING EARN ASSET OWNERSHIP**

| Joining Party and Docket No. | Objections Joined |
|---|---|
| Joe Breher<br><br>("Breher")<br><br>[Docket No. 1486]<br><br>(the "Breher Joinder") | Joins in the Wohlwend Objection [Docket No. 1430]. |
| Kim David Flora and Brett Flora<br><br>(the "Floras")<br><br>[Docket No. 1538]<br><br>(the "Flora Joinder") | Joins in the McLean Objection [Docket No. 1491]. |
| Daniel A. Frishberg<br><br>("Frishberg")<br><br>[Docket No. 1533]<br><br>(the "Frishberg Joinder") | Joins in the Wohlwend Objection [Docket No. 1430], the Ryals Objection [Docket No. 1490], and the Saraiva Objection [Docket No. 1485]. Partially joins in the U.S. Trustee Objection [Docket No. 1489]. Also joins in all other objections, including those not yet dockets, with the exception of the Committee Objection [Docket No. 1505]. |

| Joining Party and Docket No. | Objections Joined |
|---|---|
| Matthew Pinto<br><br>("Pinto")<br><br>[Docket No. 1499]<br><br>(the "Pinto Joinder") | Joins in the Wohlend Objection [Docket No. 1430], the Hoffing Objection [Docket No. 1506], the Saraiva Objection [Docket No. 1485], and the Ryals Objection [Docket No. 1490]. |
| Courtney Burks Steadman<br><br>("Steadman")<br><br>[Docket No. 1537]<br><br>(the "Steadman Joinder") | Joins in the McLean Objection [Docket No. 1491]. |
| Josh Tornetta<br><br>("Tornetta")<br><br>[Docket No. 1503]<br><br>("Tornetta Joinder") | Joins in the Wohlend Objection [Docket No. 1430], Ryals Objection [Docket No. 1490], and Saraiva Objection [Docket No. 1485].  Partially joins in the U.S. Trustee Objection [Docket No. 1489]. |

| Joining Party and Docket No. | Objections Joined |
|---|---|
| Washington State Department of Financial Institutions<br><br>("Washington")<br><br>[Docket No. 1497]<br><br>(the "Washington Joinder")<br><br>Joinder to Original Motion: [Docket No. 1085] | Joinder to the Coordinating States Objection [Docket No. 1492] and the Vermont Objection [Docket No. 1325]. |