Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

**OMNIBUS REPLY IN SUPPORT**
**OF DEBTORS' AMENDED MOTION FOR ENTRY OF AN ORDER**
**(I) APPROVING THE DEBTORS' KEY EMPLOYEE RETENTION**
**PLAN AND (II) GRANTING RELATED RELIEF AND RELATED MOTIONS**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

submit this omnibus reply to the *Objection of the United States Trustee to the Amended Motion of*

*Debtors for Entry of Order Approving Debtors' Key Employee Retention Plan* [Docket No. 1551]

(the "U.S. Trustee Objection"),[2] *Victor Ubierna de las Heras Objection to Debtors' Amended*

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, 209F, Hoboken, New Jersey 07030.

[2]   The U.S. Trustee incorporates by reference its *Objection of the United States Trustee to Motion of Debtors for Entry of Order Approving Debtors' Key Employee Retention Plan* [Docket No. 1207] in the U.S. Trustee Objection.

*Motion for Entry of an Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 1544] (the "<u>Ubierna de las Heras Objection</u>"), and *Daniel A. Frishbergs'* [sic] *Objection to the Debtors Motion to Schedule an Expedited Hearing and Shorten the Notice Period on the Debtors' (A) Amended Motion for Entry of an Order (I) Approving The Debtors' Key Employee Retention Plan and (II) Granting Related Relief and (B) Amended Motion For Entry of an Order Authorizing the Debtors To Redact and File Under Seal Certain Confidential Information Related to the Debtors' Key Employee Retention Plan* [Docket No. 1466] (together with the Ubierna de las Heras Objection, the "<u>Pro Se Objections</u>," and collectively with the U.S. Trustee Objection, the "<u>Objections</u>").

The Debtors incorporate herein the arguments put forth in their *Omnibus Reply in Support of Debtors' Motion for Entry of an Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief and Motion for Entry of an Order Authorizing the Debtors to Redact and File Under Seal Certain Confidential Information Related to the Debtors' Key Employee Retention Plan* [Docket No. 1231].  The Objections should be overruled, and the relief requested in the Amended KERP Motion[3], Amended Motion to Seal, and Motion to Expedite should be granted.  In further support of the Amended KERP Motion, Amended Motion to Seal, and Motion to Expedite, the Debtors state as follows:

---

[3]. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Debtors' Amended Motion for Entry of an Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 1021] (the "<u>Amended KERP Motion</u>"), *Amended Motion for Entry of an Order Authorizing the Debtors to Redact and File Under Seal Certain Confidential Information Related to the Debtors' Key Employee Retention Plan,* (the "<u>Amended Motion to Seal</u>"), or the *Motion to Schedule an Expedited Hearing and Shorten the Notice Period on the Debtors' (A) Amended Motion for Entry of an Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief and (B) Amended Motion for Entry of an Order Authorizing the Debtors to Redact and File Under Seal Certain Confidential Information Related to the Debtors' Key Employee Retention Plan* (the "<u>Motion to Expedite</u>"), as applicable.

**Preliminary Statement**

1.      The Debtors' ability to continue their dual-track sale and standalone reorganization processes depends on their workforce, and the evidence is clear that even with the proposed KERP, many of the Debtors' employees have not been motivated to stay with the company. Approximately 143 employees have left since the Petition Date, and forty-five employees resigned since the filing of the original KERP motion, including seventeen of the originally proposed Participants.  The remaining employees have thus taken on additional work to support the Debtors and their advisors while operating in chapter 11.  Each of the Participants provides critical support to the Debtors' operations, which will maximize the value of the Debtors' estates and inure to the benefit of all stakeholders.  Any further workforce reduction is unsustainable.  The Participants' unique technical expertise and institutional knowledge is required to operate and market the Debtors' business or pursue a standalone restructuring.  Therefore, the Debtors must retain key non-insider employees to administer these chapter 11 cases toward a successful resolution, and believe the KERP is critically important to retain these key employees.

2.      Notably, the KERP is supported by the Committee.[4]  The UCC recognizes that the KERP "will have the intended effect to retain the key personnel required to administer a value maximizing restructuring" and shares the Debtors' concern that "continued attrition among key non-insider employees could undermine the Debtors' ability to meet their obligations in these chapter 11 cases, run an efficient sales process, and develop and prosecute a standalone plan of reorganization."  UCC Statement ¶¶ 3, 5.  This Court also recognizes the importance of the

---

[4]    *The Official Committee of Unsecured Creditors' Statement with Respect to the Debtors' Motion for Entry of An Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 1187] (the "UCC Statement").

3

Debtors' workforce.[5]  Only three parties object:  the U.S. Trustee, Mr. Ubierna de las Heras, and

Mr. Frishberg (together the "Objectors").  Despite the assertions made by certain Objectors that

certain Participants are "insiders" as defined by section 101(31) of the Bankruptcy Code, no

Participant is an "insider," nor does any party identify any specific Participant as an "insider."  The

U.S. Trustee also argues that the Debtors do not demonstrate that the KERP is justified by the facts

and circumstances, that job descriptions of the proposed Participants are too general and cannot be

associated with a specific Participant, that the KERP Reserve Pool provides the Debtors with an

"unfettered" ability to offer KERP awards to replacement participants, and that the risk of

Participants resigning is low due to changing cryptocurrency market conditions.  These arguments

are not persuasive.  The KERP is narrowly tailored to only non-insider employees in critical roles,

and the Debtors can only add employees through the notice protocol agreed to with the Committee,

which includes notice to the Committee and the U.S. Trustee—the Debtors do not have

"unfettered" discretion.  Further, U.S. Trustee's musings about job market conditions are not

relevant to the question of whether the KERP is needed in these cases and the evidence of attrition

in these cases speaks for itself.

   3.   The Pro Se Objections argue that it is inappropriate for the Amended KERP Motion

to be heard on shortened notice and that KERP awards should not be given to certain employees.

The Debtors sought this relief after the Court stated on the record that it would consider hearing

an amended KERP motion "expeditiously" as this Court made clear that it is aware of the Debtors'

---

[5] *See* Nov. 1, 2022 Hr'g Tr. at 34:22–24 ("[I]t's important that the Debtors have a workforce consistent with its size and operations to be able to carry it forward to a standalone plan or sale.").

need to retain its workforce.[6]  The need to have the KERP approved expeditiously is clear given that forty-five employees have resigned since the initial KERP motion was filed.  The Debtors also engaged in significant diligence with its advisors in the selection process of Participants.  That said, the objection of Mr. Ubierna de las Heras raises serious questions regarding potential transactions by employees and whether any transactions were motivated by inside information.  To address these concerns, the Debtors will agree that any Participant who withdrew cryptocurrency from the Platform within 90 days before the Petition Date, or who transferred cryptocurrency from another program into Custody within 90 days before the Petition Date, will be excluded from the KERP pending further investigation and analysis.  If, following analysis and investigation, the Debtors determine that any Participant excluded from the initial KERP order on the basis of their transaction activity in the 90 days before the Petition Date did not transact on the basis of inside information, the Debtors reserve the right, on notice to the Committee and the U.S. Trustee, to propose their re-inclusion in the KERP.

4.      The KERP is in the best interests of all stakeholders, including individual creditors. The Debtors have satisfied their burden of proof, and the relief requested in the Amended KERP Motion and Amended Motion to Seal should be granted.

## Response to the U.S. Trustee Objection

5.      The U.S. Trustee Objection should be overruled.  The KERP was developed with the goal of (a) maximizing the value of the Debtors' estates for the benefit of all stakeholders and (b) ensuring that the Debtors will be able to operate their business in the ordinary course during these chapter 11 cases with a sufficient workforce.  As described in the Ferraro Declaration, the

---

[6]    *See* Nov. 1, 2022 Hr'g Tr. at 34:19–24 ("I'll hear it expeditiously.  I understand the need for the Debtor to be able to – if … organized either on a standalone basis or we're going …, it's important that the Debtors have a workforce consistent with its size and operations to be able to carry it forward to a standalone plan or a sale.").

Participants are responsible for critical business activities, including cash and digital asset management, IT infrastructure and data management, digital security, accounting, legal, compliance, and other critical functions for the Debtors. *See* Ferraro Declaration ¶ 9. These critical business activities, which are required to facilitate the dual-track process of pursuing a sale of some or all of the Debtors' assets or a standalone restructuring, maximize value for the Debtors' estates. Furthermore, the law is clear that approval of a key employee retention plan rests on the sound exercise of a debtor's business judgment and that it is inappropriate for another party to seek to supplant the Debtors' business judgment with its own. The Debtors have spent significant time and effort fine-tuning the KERP and have concluded it is the best way to address attrition and maximize value.

6.      If all Participants are successfully retained by the Debtors and earn the proposed payments, and no additional amounts are drawn from the KERP Reserve Pool, the KERP will cost $2.64 million, which is a worthwhile investment in pursuit of a value-maximizing reorganization or sale.

7.      The U.S. Trustee asserts that some Participants are "insiders" and, as such, the KERP is subject to section 503(c)(1) of the Bankruptcy Code. No Participant is an insider of the Debtors even though certain Participants have titles such as "officer," "head," "director," "vice president," or "chief." Ferraro Decl. ¶ 19. As set forth in the Amended KERP Motion, the Ferraro Declaration, and the Gartrell Declaration, no Participant: (a) sits on, or directly reports to, the Debtors' board of directors; (b) is appointed or hired directly by the Debtors' board of directors; (c) exercises managerial control over, or has responsibility for, the Debtors' operations as a whole; or (d) directs the Debtors' overall corporate policy or governance. Amended KERP Motion ¶ 17, Ferraro Decl. ¶ 19, Gartrell Decl. ¶ 13 n.3.

8.      Although the Bankruptcy Code does not define the term "officer," courts have looked to Black's Law Dictionary as a source of authority.  *See In re Borders Grp., Inc.*, 453 B.R. 459, 468 (Bankr. S.D.N.Y. Apr. 27, 2011).  Black's Law Dictionary defines an officer of a corporation as "a person elected or appointed by the board of directors to manage the daily operations of a corporation, such as a CEO, president, secretary, or treasurer."  Black's Law Dictionary (11th ed. 2019).  An employee's title alone (for example, "Vice President") does not make that employee an insider.  *See In re LSC Commc'ns, Inc.*, 631 B.R. 818, 824 (S.D.N.Y. July 9, 2021) (emphasizing that "it is not simply the title of 'director' or 'officer' that renders an individual an insider; rather, it is the set of legal rights that a typical corporate director or officer holds") (quoting *In re Longview Aluminum, L.L.C.*, 657 F.3d 507, 510 (7th Cir. 2011)). This reflects the reality of modern-day corporate America: "[c]ompanies often give employees the title 'director' or 'director-level' but do not give them decision-making authority akin to an executive."      *In re Glob.     Aviation     Holdings,     Inc.*,     478     B.R. 142,     148 (Bankr. E.D.N.Y. July 24, 2012) (quoting *Borders Grp.*, 453 B.R. at 469).

9.      Courts evaluate whether particular employees are insiders "on a case-by-case basis from the totality of the circumstances, including whether the individual has at least a controlling interest in the debtor or exercises sufficient authority over the debtor so as to qualifiably dictate corporate policy and disposition of corporate assets."  *In re AMR Corp.*, 490 B.R. 158, 166 (Bankr. S.D.N.Y.  Apr.  11,  2013)  (citing  *In re Velo  Holdings  Inc.*,  472  B.R. 201,  208 (Bankr. S.D.N.Y. June 6, 2012)) (internal quotations omitted).  The Debtors submitted evidence describing why each of the Participants does not have the duties or responsibilities of an insider. Ferraro Decl. ¶¶ 19, 20.  The U.S. Trustee offers none in response.

10.    The U.S. Trustee asserts that some Participants receive a similar salary to some known insiders, but the salary levels do not change the fact that Participants do not exercise broad responsibilities over the Debtors' entire business.  Rather, each Participant manages only certain aspects of specific departments of the Debtors' business and is removed from general managerial control over the Debtors by at least one direct supervisor.  Despite the opportunity to review the unredacted job descriptions, the U.S. Trustee does not, and cannot, identify any Participant whose job duties indicate they should be considered an "insider."  Attempting to circumvent a clear showing that any Participant is an insider by questioning the Participants' salaries is insufficient, and the relief sought in the Amended KERP Motion should be granted.

11.    Moreover, each of the Participants' roles are limited in scope—none of the Participants make "company-wide or strategic decisions," and they are all "distance[d] from the board and senior management."  *See Glob. Aviation Holdings*, 478 B.R. at 150.  None of the Participants were appointed by the Debtors' board of directors, sit on the board of directors, or directly report to the board of directors.  Ferraro Decl. ¶ 19.  The Participants do not dictate overall corporate policy, nor do they exercise control over the Debtors' significant business or strategic decisions.  *Id.*

12.    As set forth in the Amended KERP Motion, the Ferraro Declaration, and the Gartrell Declaration, the Participants perform functions such as accounting, cash and digital asset management, IT infrastructure, legal, human resources, and other functions for the Debtors.  Amended KERP Motion ¶ 6; Ferraro Decl. ¶ 9.  The job descriptions filed in <u>Exhibit B</u> to the Amended KERP Motion are sufficiently detailed to establish that each Participant is not an insider and the relief requested does not implicate section 503(c)(1) of the Bankruptcy Code.

Additionally, where job descriptions appear to apply to more than one Participant, it is because these tasks are shared across the relevant division and require the efforts of more than one person.

13.     The U.S. Trustee further argues that the Debtors seek "unfettered discretion" in allocating the KERP Reserve Pool to any proposed replacement participants.  However, the Debtors have explicitly provided that the U.S. Trustee and counsel to the Committee will receive notice prior to any replacement.

14.     The U.S. Trustee also argues that because the cryptocurrency industry has changed, the job prospects for Participants are no longer as prevalent as they once were.  This argument misses the mark:  the Debtors continue to face significant attrition, and where and in which industry those employees find employment is irrelevant.  Since the filing of the original KERP motion, forty-five employees have resigned, including seventeen of the originally proposed Participants. The Debtors are further aware that many of these former employees now hold roles at other cryptocurrency and technology-focused companies.  Because this is a vigorously competitive and highly technical industry, there are still plenty of opportunities; the Debtors themselves are seeking to hire employees.

I.     **The KERP Is Justified by the Facts and Circumstances of These Chapter 11 Cases.**

15.     The U.S. Trustee argues that the KERP is not justified by the facts and circumstances of these chapter 11 cases as required by section 503(c)(3) of the Bankruptcy Code. This assertion ignores the reality of the significant attrition the Debtors continue to experience.

16.     The KERP is justified in light of, among other things, the nature of the Debtors' business, the need to retain these key employees, and the significant attrition the Debtors continue

to experience.  The Debtors, in consultation with their advisors, including their independent compensation consultant WTW, designed the KERP to avoid further attrition.  Ferraro Decl. ¶ 17.[7]

17.    The U.S. Trustee highlights the issue of benchmarks and the difficulty of whether they can be achieved—this issue is irrelevant.  The sufficient nexus between the KERP and the results sought to be achieved is the primary purpose of the KERP—to stop the attrition of employees.  The purpose of the KERP is to retain employees who may otherwise leave the Debtors' employ during the course of these chapter 11 proceedings, and there is a clear relationship between the relief requested in the Amended KERP Motion and the outcome of retaining employees.  Whether the KERP includes difficult-to-reach incentives is irrelevant to a retention program for non-insider employees.

18.    Courts in this district and elsewhere recognize that satisfying section 503(c)(3) of the Bankruptcy Code requires a showing that the proposed plan is within the Debtors' business judgment.  *See Velo Holdings*, 472 B.R. at 212 (noting "the 'facts and circumstances' language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b)"); *see also Borders*, 453 B.R. at 473–74 (evaluating debtors' key employee retention plan under the framework of the business judgment rule); *In re Dana Corp.*, 358 B.R. 567, 576–77 (Bankr. S.D.N.Y. Nov. 30, 2006) (describing six factors that courts may consider when determining whether the structure of a compensation proposal meets the "sound business judgment" test in accordance with section 503(c)(3) of the Bankruptcy Code).  Accordingly, the KERP is a sound exercise of the Debtors' business judgment.

---

[7]    *See also* Oct. 13, 2022 Hr'g Tr. at 58:5–59:3 ("So [the KERP] is a very important part of the process where we hope to retain critical employees." … "[The KERP] is absolutely critical for the success of the case of maximizing value.").

19.    *First*, the risk of Participants resigning is real.  Since the Petition Date, 143 of the Debtors' employees have resigned, which includes forty-five employee resignations since the original KERP Motion was filed and thirteen resignations since the Amended KERP Motion was filed.  Considering this high rate of attrition, the Debtors' remaining employees have to take on additional responsibilities and are more critical to the Debtors' ability to operate and administer these chapter 11 cases.  The continued harm caused by employee attrition is tangible and costly.  The employees left positions that must be filled, played key roles in the Debtors' operations, and possessed knowledge that the Debtors cannot afford to lose.  The cost and time required to search for, hire, and train new employees is substantial when compared to the cost of the KERP.

20.    *Second*, implementing the KERP would only benefit these chapter 11 cases.  Failing to retain the Participants would destroy value to the detriment of all stakeholders.  Regardless of whether the Debtors pursue a standalone plan or a sale of some or substantially all of their assets, the Debtors need the knowledge and skills of the Participants to prepare and eventually operate successfully upon emergence from chapter 11.

21.    *Third*, while the Platform is temporarily frozen during the pendency of these chapter 11 cases, the Debtors' employees continue to perform maintenance, updates, and essential security functions on the Platform to facilitate a successful reorganization or a sale as well as prepare the platform for making distributions to creditors and for any post-emergence operations.  Furthermore, the Debtors are continuing to provide voluminous diligence to the Committee, the Examiner, regulators, and prospective bidders, a significant undertaking that impacts employees across all departments.  A disruption to the Debtors' workforce could negatively impact these efforts, leading to a lower recovery and lower distribution to the Debtors' customers.

11

22.    In assessing the soundness of the Debtors' business judgment, courts in the Second

Circuit consider the following non-exhaustive list of factors:

(a)    Is there a reasonable relationship between the plan proposed and the results to be obtained, *i.e.*, will the key employee stay for as long as it takes for the debtor to reorganize or market its assets?

(b)    Is the cost of the plan reasonable in the context of the debtor's assets, liabilities, and earning potential?

(c)    Is the scope of the plan fair and reasonable:  does it apply to all employees, or if not, does it discriminate unfairly?

(d)    Is the plan or proposal consistent with industry standards?

(e)    What were the due diligence efforts of the debtor in investigating the need for a plan, analyzing which key employees need to be incentivized, what is available, and what is generally applicable in a particular industry?

(f)    Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

*Dana Corp.* at 576–77.  All of these standards are satisfied.

23.    *First*, there is a reasonable relationship between the KERP and the results to be

obtained—namely, the retention of the Participants through the Debtors' restructuring process.

The loss of critical employees could put the Debtors' entire restructuring effort at risk.  As a result,

the Debtors' management team, with the assistance of their advisors, carefully developed a plan

and a process by which the Participants were selected.  Given the job insecurity and disquiet

surrounding these chapter 11 cases, the Debtors may lose more employees than they already have.

24.    *Second*, the total cost of the KERP is only a fraction of the Debtors' total revenue

and assets, while the costs, both financial and operational, of losing the Participants would be far

greater.  Amended KERP Motion ¶ 32; Gartrell Decl. ¶ 21.

25.    *Third*, the scope of the KERP is fair and reasonable under the circumstances and

does not unfairly discriminate.  As discussed above, selecting the Participants was the result of an

in-depth process and based on the advice of the Debtors' advisors.  The result of that process is

the narrowly tailored KERP that applies to fifty-nine of the Debtors' non-insider employees (out of a population of approximately 170 employees), at modest cost considering the devastating economic effect should the Debtors lose the ability to operate without this key talent. Furthermore, the KERP's maximum cost of $2.84 million is reasonable in absolute terms when compared to the aggregate costs of key employee retention plans approved in other chapter 11 cases, and the retention awards expressed as a percentage of salary are consistent with awards in comparable key employee retention plans. Gartrell Declaration ¶¶ 17, 22.

26.     ***Fourth***, the KERP is consistent with industry standards. The Debtors' management team, none of whom will receive payment under the KERP, in consultation with the Debtors' advisors, developed the KERP after a rigorous analysis. Gartrell Decl. ¶ 12, Amended KERP Motion ¶ 34. In fact, WTW benchmarked the retention plans approved in the cases of twenty–six similarly sized companies that filed for chapter 11 from 2017 through 2021. Gartrell Decl. ¶ 17. The Debtors' KERP opportunities generally are positioned between the twenty–fifth and median percentile of the market. Gartrell Decl. ¶ 17.

27.     ***Fifth***, as discussed in detail above and the Amended KERP Motion, Ferraro Declaration, and Gartrell Declaration, the Debtors, in consultation with their advisors, undertook an extensive process to determine the list of proposed Participants and the amount to be paid to each Participant. Accordingly, the KERP was created after significant due diligence. Amended KERP Motion ¶ 35; Ferraro Decl. ¶ 17; Gartrell Decl. ¶ 12.

28.     The business judgment rule allows the Debtors to consider their business needs and market conditions to make the best decision for stakeholders. The KERP will enhance and preserve value and is justified by the facts and circumstances of these cases.

### III.    The Confidential Information Satisfies Section 107(b) of the Bankruptcy Code.

29.    The Debtors provided cogent reasons why the Confidential Information (as defined below) falls within the scope of "confidential information" that may be protected pursuant to Bankruptcy Code section 107(b)(1).  Therefore, the Debtors have overcome the presumption of public disclosure.

30.    Section 107(b)(1) of the Bankruptcy Code provides that "the bankruptcy court shall . . . protect an entity with respect to . . . confidential . . . commercial information." 11 U.S.C. § 107(b)(1).  Section 107(b)(1) does not require the Debtors to engage in a balancing test or show "good cause" to merit sealing.  *Video Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion Pictures Corp.)*, 21 F.3d 24, 28 (2d Cir. 1994).  If the material sought to be protected is, in fact, confidential information pursuant to section 107(b)(1), "… the Court is required to protect a requesting interested party and has no discretion to deny the application." *Id*. at 27.

31.    Courts are required to provide protections "generally where open inspection may be used as a vehicle for improper purposes." *Orion Pictures*, 21 F.3d at 27.  Indeed, the "authority goes not just to the protection of confidential documents, but to other confidentiality restrictions that are warranted in the interests of justice."  *See In re Glob. Crossing Ltd.*, 295 B.R. 720, 724 (Bankr. S.D.N.Y. July 24, 2003).  Confidential commercial information "has been defined as information which would cause 'an unfair advantage to competitors by providing them information as to the commercial operations of the debtor.'"  *In re Faucett*, 438 B.R. 564, 567–68 (Bankr. W.D. Tex. Oct. 12, 2010) (quoting *Orion Pictures Corp.*, 21 F.3d at 27).  Commercial information need not rise to the level of a trade secret to be protected under section 107(b) of the Bankruptcy Code.  *Id*. at 28.  Additionally, Courts have also held that the resulting sealing order

should be broad (*i.e.*, "any order which justice requires"). *See, e.g.*, *Glob. Crossing, Ltd.*, 295 B.R. at 724 (citing Bankruptcy Rule 9018).

32.     The Amended KERP Motion contains commercially sensitive information, including employee names, exact KERP award, and exact salaries (the "<u>Confidential Information</u>"). The Debtors operate in a highly competitive industry, and the disclosure of the Confidential Information would make it easier for the Debtors' competitors to target those employees who are most necessary to the Debtors' operations and restructuring efforts. Moreover, the Debtors have not disclosed the specific names of each Participant in the Amended KERP Motion—a practice previously deemed acceptable by this Court. *See, e.g.*, *In re Aegerion Pharm., Inc.*, No. 19-11632 (MG) (identifying a key employee retention plan participant as "Employee 1" as opposed to including their full name); *In re Aralez Pharm. US Inc.*, No. 18-12425 (MG) (not disclosing any key employee retention plan participant names); *In re Quirky, Inc.*, No. 15-12596 (MG) (identifying a key employee retention plan participant as "Employee A" as opposed to including their full name).

33.     Additionally, filing the Confidential Information on the docket would enable the Debtors' employees to learn or intuit certain Confidential Information with respect to their colleagues, which is not only inappropriate, but is also likely to negatively affect employee morale to the detriment of the Debtors and their estates. Accordingly, an unredacted version of the Participant list would negatively impact the Debtors' business, put the Debtors at a competitive disadvantage, and undermine the Debtors' efforts to reorganize. The Debtors' competitors should not be allowed to use the Confidential Information for their own gain. The Debtors seek redaction of the Confidential Information to inhibit inappropriate disclosure of the Confidential Information.

Any further disclosure of the Confidential Information would only harm the Debtors, their estates, and all stakeholders.

### Response to Mr. Ubierna de las Heras' Objection

34.    Mr. Ubierna de las Heras opposes the Amended KERP Motion due to the Debtors' sealing of the Participants' names.  The Court indicated its willingness to allow the Debtors to redact the names (and exact salary and KERP award) of the Participants and replace those names with a code or other redacted format.[8]  As such, the relief sought in the Amended KERP Motion should be granted.

35.    Mr. Ubierna de las Heras also argues that no statutory insiders should be included in the KERP and that certain employees who made withdrawals from the platform in late May and early June should not receive KERP awards.  As an initial matter, and as discussed herein and in the Amended KERP Motion, no Participants are insiders.

36.    In response to Mr. Ubierna de las Heras' objection related to any employee who may have improperly transferred or withdrawn cryptocurrency in the lead-up to these chapter 11 cases, the Debtors will agree that any Participant who withdrew cryptocurrency from the Platform within 90 days before the Petition Date, or who transferred cryptocurrency from another program into Custody within 90 days before the Petition Date, will be excluded from the KERP pending further investigation and analysis.  If, following analysis and investigation, the Debtors determine that any Participant excluded from the initial KERP order on the basis of their transaction activity in the 90 days before the Petition Date did not transact on the basis of inside information, the

---

[8]    *See* Nov. 1, 2022 Hr'g Tr. at 31–32: 23–25; 1–3 ("With respect to sealing, I'm not going to require that the public record include the names of each of the proposed participants.  What I've done in the past in situations like this is to require a code where each proposed participant is given a code number.").

Debtors reserve the right, on notice to the Committee and the U.S. Trustee, to propose their re-inclusion in the KERP.

### Response to Mr. Frishberg's Objection

37.    Mr. Frishberg opposes the hearing of the Amended KERP Motion on shortened notice at an expedited hearing.  The Court indicated its willingness to hear the Amended KERP Motion on shortened notice at the November 1, 2022 hearing.[9]  As such, and given the bulk of the substance of the Amended KERP Motion is unchanged from the originally filed Amended KERP Motion filed with the notice required by the Bankruptcy Rules, the relief sought in the Motion to Expedite is appropriate.

### Conclusion

38.    Implementing the KERP is necessary and appropriate to maximize value, regardless of the path of these chapter 11 cases.  All parties will benefit if the Participants, none of whom are insiders, are incentivized to remain in the Debtors' employ.  For the foregoing reasons, as well as the reasons set forth in the Amended KERP Motion, Amended Motion to Seal, and Motion to Expedite, as applicable, the Debtors request that the Court (a) overrule the Objections and (b) grant the relief requested in the Amended KERP Motion, Amended Motion to Seal, and Motion to Expedite.

*[Remainder of page intentionally left blank]*

---

[9]    *See* Nov. 1, 2022 Hr'g Tr. at 34:19–24 ("I'll hear it expeditiously.").

WHEREFORE for the foregoing reasons, the Debtors request that the Court overrule the

Objections and approve the Amended KERP Motion, Amended Motion to Seal, and Motion to

Expedite.

New York, New York
Dated: December 3, 2022

*/s/ Joshua A. Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        jsussberg@kirkland.com

  - and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        patrick.nash@kirkland.com
              ross.kwasteniet@kirkland.com
              chris.koenig@kirkland.com
              dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

18