Jarno Öberg

*Pro se creditor*

**UNITED STATES BANKRUPTCY COURT**

**SOUTHERN DISTRICT OF NEW YORK**

_____
                                        )
In re:                                  )    Chapter 11
                                        )
Celsius Network LLC, et al.,            )    Case No. 22-10964 (MG)
                                        )
                 Debtors                )    (Jointly Administered)
_____  )


**JOINDER TO OBJECTIONS (#1430, #1492)**

**ERIC WOHLWEND'S OBJECTION TO DEBTORS' AMENDED MOTION FOR ENTRY OF AN ORDER (I) ESTABLISHING OWNERSHIP OF ASSETS IN THE DEBTORS' EARN PROGRAM, (II) PERMITTING THE SALE OF STABLECOIN IN THE ORDINARY COURSE, AND (III) GRANTING RELATED RELIEF (#1430)**

**KAREN CORDRY'S LIMITED OBJECTION OF THE COORDINATING STATES WITH RESPECT TO THE DEBTORS' AMENDED MOTION FOR ENTRY OF AN ORDER (I) ESTABLISHING OWNERSHIP OF ASSETS IN THE DEBTORS' EARN PROGRAM, (II) PERMITTING THE SALE OF STABLECOIN IN THE ORDINARY COURSE AND (III) GRANTING RELATED RELIEF (#1492)**

Respectfully,

    1. I wish to indicate my will to join these objections (dockets 1430 and 1492) to the debtor's respective motions. It is my view, that the ownership of earn service deposits should not be construed against the depositors. The case theory behind the debtor's motion should be based on facts about the control that the users have given to Celsius, not on adversary concepts about ownership.

1

2. What is the essential relationship between the earn service depositor and Celsius according to the terms of service? There are two incompatible answers to this question. The first one (A) implies that asset ownership should not be construed against the depositors (4.–7. of the following), and the second one (B) says that the depositors have conveyed full ownership of their assets to Celsius (8.–10. of the following). Both answers appear understandable when set before the matter-of-fact situation of Celsius's operations, and both give a coherent reading of the contract. Both answers give a clear and unproblematic picture of the earn service's relationship to other contractual items such as custody accounts and investments in equipment, such as GK8 and mining.

3. However, the reading (A) is correct, because a proper receipt of a full and unlimited conveyance is never given to the depositor. The reading (B) is wrong because of the same reason. It is wrong also because it leads depositors to a relationship that can be construed as unconscionable because of the unlimited sense in which it claims to deliver the ownership from the user. Therefore, with even more reason, the first reading is correct. The first reading is also obviously the factually correct one, as the ownership right transfer is indeed limited to the utilization of the user's assets in the earn service. The problem in the debtor's motion is simply, that they incorrectly construe the full ownership of the assets as a finding against the depositors.

4. (A: from 4.–7.). When the user deposits their funds to Celsius, he receives no proper and acceptable record of a conveyance of full ownership of his assets to Celsius. Instead, the contract indicates, that the transaction is a loan and that there is a transfer of title to Celsius within an innovative loan structure. Because this transaction is not properly recorded as a conveyance of full ownership, the user will not believe that this transfer of title transfers full ownership. The earn service contract doesn't mark a conveyance from the user to Celsius in any other way than within the very specific language of sections 4(D) and 13. These sections don't create a proper receipt of a transaction of full ownership in any acceptable sense.

5. The language of sections 4(D) and 13 of the terms of service describes a conveyance of "all" rights and title in a functionally conditioned and therefore limited sense. There appears to be no other language in the contract that marks or notes the nature of this conveyance. Therefore, the language is to be understood as a conditioning and a limitation of this conveyance. The contract says that the

limitation is the following: It is necessary for Celsius to have "all" rights and title *in order to sell, rehypothecate, etc. during and within the earn service activity,* so that a counterparty doesn't have to confirm this permission from the user. The contract describes a functional permission to use the depositors' right of ownership to their assets, but this is not the same thing as obtaining the full ownership. One will ask in what sense is a conveyance of ownership limited if not in a sense where that from which it is limited remains more substantial? Why would the one who has the more substantial right lose this by giving the limited and less substantial right to someone? It appears likely, that the idea of this limited conveyance of title can appear to any depositor in the foregoing meaning where the full ownership is not transferred.

      6. It is clear, that all conveyances of property, all sell-events and all securities, etc., should be unambiguously marked and noted in contracts. When that is not what the depositor sees, the depositors will only have an incompletely defined picture of the semantics at their disposal. This applies to our situation, where there will be users who, like me, clearly read the contract as not implying a full transfer of ownership. To those readers, the full and unlimited conveyance of property from user to Celsius does not appear to be there at all. If there is that transaction, it is certainly improperly marked and recorded, and the user does not receive any token or receipt of this transaction. *This is in itself evidence for those users, that the full ownership has not been transferred.* The e-mail receipt upon depositing funds to Celsius only indicates to the user that he has merely deposited his funds to Celsius. And in the "Celsius app", the depositor receives a token of his virtual control over his deposits, similar to what people see when they use cryptocurrency exchanges. The problem is not that these tokens of control in the "Celsius app" are virtual, but that the conveyance is not properly recorded within these tokens of control, or anywhere else.

      7. As appears to be standard practice in the field, Celsius's API system and the csv-files that are downloadable from their service don't mark the "deposits" by a different logical token than the underlying asset types are standardly marked with. For better semantics, cryptocurrency platforms should probably indicate these "tokens of deposit" as items that "carry obligations" for the types of the underlying assets, instead of indicating them in the same form as the assets themselves are marked. It appears that this basic semantic flaw is transferred to the earn service contract in a curious sense, where

this "unmarking of difference" becomes a feature of the earn service contract itself. In Celsius's hands the unmarking widens in its scope to concern questionable security-like features of the earn service, among other things. I would not be at all surprised if the earn service contract appears to legal professionals as a deconstructive exercise. When considering these details, it should be clear, that when depositing to the earn service, a transaction of title is claimed by Celsius, but this concept is not properly transferred into the tokens of control that are available to the user. And as said many times, neither is any proper receipt given to the user as a mark of this transaction.

8. (B: from 8.–10.). Let's consider the other, mistaken reading: In that reading the contract entails a full conveyance of rights and title, that is not conditioned and limited in any way. Here the user owns nothing against the transaction in which they send their savings and property to Celsius. The user has a virtual IOU promise made toward them, which is itself unlimited in a way that would release Celsius from many if not all liabilities if things go wrong. This promise of repayment is abstractly bound together with the token of control that the user has within the "Celsius app". However, the same essential problem of the improper marking of the conveyance remains in this reading. The begged question would be answered by showing a proper and acceptable marking, booking and receipt of the conveyance of full ownership, but that remains absent.

9. This reading is also wrong because of a reductio ad absurdum. The problem is that people have deposited important assets such as life savings into Celsius while giving them a *carte blanche*. In this reading (B) people would have to place extraordinary trust in Celsius to also give them full ownership of their assets, to the point where it is prudent to question the rationality of this trust. Consider that A: "People don't willfully sign absurd contracts", B: "Contract X is absurd", and C: "If A and B, then no-one can have willfully accepted contract X, as that would mean they would have realized that it is a bad idea while signing it." Does this second reading (B) describe an absurd contract with these entailments? If yes, the contract loses its conscionability because it would lead people to take an unreasonable risk that they wouldn't rationally agree to as moral agents. The required trust would appear to mean that these depositors truly don't care about the conveyance of full ownership to Celsius at all, and don't find that it has been improperly indicated in any way. But would this not simply make Celsius unconscionable and the customer a fool? Even the most deconstructive author of the contract

would want to avoid *that* as being the basic economic relationship. Transferring the ownership of people's property away from them in this way is clearly unconscionable, so this cannot be the real reading of the contract.

10. Against this it can be said that there is in fact nothing extraordinary in this trust that is involved with (B), because the user expects to profit economically in the advertised way (and when the ads say, "your coins", that is just an oversight, and a bug in the system).

11. But it remains the case, that a proper and responsible recognition of this full conveyance of ownership is not spelled out in any acceptable way. The conclusion is either that because I don't have a proper receipt of full transfer of ownership, I have not given it over at all, or alternatively it is the case, that I have given funds to Celsius within an environment of unconscionable and extraordinary trust. The conclusion where ownership should not be constructed against the depositors follows from both situations. These issues combined, including the possibility indicated in (10.) above, spell out different senses in which Celsius depositors can read the contract. I have personally believed that my relationship with Celsius is of the nature of the first reading (A), that is, that I am forming an innovative fund with other Celsius users, with Celsius as an entity taking the driver's seat to manage our assets efficiently. This is absolutely the obvious reading of the contract for me. Within this notion, I have had the clear idea, that I am quite naturally the owner of my assets when I use the earn service, as the control and title that I have shared with Celsius are clearly granted and limited in the foregoing sense.

**Signature**

December 2, 2022                                               */s/ Jarno Öberg*

                                                                            Jarno Öberg,  pro se creditor