Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

**NOTICE OF FILING OF PROPOSED**
**ORDER (I) APPROVING THE SALE OF THE GK8 DEBTORS'**
**ASSETS FREE AND CLEAR OF ALL CLAIMS, LIENS, RIGHTS,**
**INTERESTS AND ENCUMBRANCES, (II) AUTHORIZING THE GK8**
**DEBTORS TO ENTER INTO AND PERFORM THEIR OBLIGATIONS**
**UNDER THE ASSET PURCHASE AGREEMENT, (III) AUTHORIZING**
**THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY**
**CONTRACTS AND UNEXPIRED LEASES, AND (IV) GRANTING RELATED RELIEF**

**PLEASE TAKE NOTICE** that, on September 1, 2022, the United States Bankruptcy
Court for the Southern District of New York (the "Court") entered the *Order (I) Approving Bidding
Procedures for the Potential Sale of Certain of the Debtors' Assets, (II) Scheduling Certain Dates
with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving
Contract Assumption and Assignment Procedures, and (V) Granting Related Relief*

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius
Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks
Lending LLC (3390); and Celsius US Holding LLC (7956).  The location of Debtor Celsius Network LLC's
principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite
209F, Hoboken, New Jersey 07030.

[Docket No. 687] (the "Bidding Procedures Order")[2] approving procedures to govern the marketing and sale of the equity interests in or some or all of the assets of GK8 (together, the "GK8 Assets").

PLEASE TAKE FURTHER NOTICE that, on December 2, 2022, the Debtors filed the *Notice of Successful Bidder* [Docket No. 1549] declaring Galaxy Digital Trading LLC as the Successful Bidder with respect to the GK8 Assets in accordance with the Bidding Procedures Order.

PLEASE TAKE FURTHER NOTICE that on December 2, 2022, the Debtors filed the *Notice of Filing of Asset Purchase Agreement* [Docket No. 1586].

PLEASE TAKE NOTICE that the Debtors hereby file the proposed *Order (I) Approving the Sale of the GK8 Debtors' Assets Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances, (II) Authorizing the GK8 Debtors to Enter into and Perform Their Obligations Under the Asset Purchase Agreement, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* (the "Sale Order") attached hereto as **Exhibit A**.

PLEASE TAKE FURTHER NOTICE that the hearing will be held on **December 8, 2022, at 9:00 a.m. (prevailing Eastern Time)** before the Honorable Martin Glenn, Chief United States Bankruptcy Judge (the "Sale Hearing"). In accordance with General Order M-543 dated March 20, 2020, the Sale Hearing will be conducted remotely using Zoom for Government. Parties wishing to appear at the Sale Hearing, whether making a "live" or "listen only" appearance before the Court, need to make an electronic appearance (an "eCourtAppearance") through the Court's website at https://ecf.nysb.uscourts.gov/cgibin/nysbAppearances.pl. Electronic appearances (eCourtAppearances) need to be made by **4:00 p.m., prevailing Eastern Time, the business day before the Sale Hearing (*i.e.*, on December 7, 2022)**.

PLEASE TAKE FURTHER NOTICE that due to the large number of expected participants in the Sale Hearing and the Court's security requirements for participating in a Zoom for Government audio and video Sale Hearing, all persons seeking to attend the Sale Hearing at 9:00 a.m., prevailing Eastern Time on December 8, 2022, must connect to the Sale Hearing beginning at 8:00 a.m., prevailing Eastern Time on December 8, 2022. When parties sign in to Zoom for Government and add their names, they must type in the first and last name that will be used to identify them at the Sale Hearing. Parties that type in only their first name, a nickname, or initials, will not be admitted into the Sale Hearing. When seeking to connect for either audio or video participation in a Zoom for Government Sale Hearing, you will first enter a "Waiting Room" in the order in which you seek to connect. Court personnel will admit each person to the Sale Hearing from the Waiting Room after confirming the person's name (and telephone number, if a telephone is used to connect) with their eCourtAppearance. Because of the large number of expected participants, you may experience a delay in the Waiting Room before you are admitted to the Sale Hearing.

---

[2]    Capitalized terms used but not defined herein have the meaning ascribed to them in the Bidding Procedures Order.

**PLEASE TAKE FURTHER NOTICE** that copies of all documents filed in these chapter 11 cases may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/Celsius.  You may also obtain copies of the motions and other pleadings filed in these chapter 11 cases by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

**PLEASE TAKE FURTHER NOTICE** that parties in interest reserve all rights with respect to subsequent drafts of the Sale Order prior to or following the Sale Hearing.

*[Remainder of page intentionally left blank]*

New York, New York
Dated: December 6, 2022

/s/ *Joshua A. Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:       (212) 446-4900
Email:            jsussberg@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:       (312) 862-2000
Facsimile:       (312) 862-2200
Email:            patrick.nash@kirkland.com
                  ross.kwasteniet@kirkland.com
                  chris.koenig@kirkland.com
                  dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

**<u>Exhibit A</u>**

**Sale Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

### ORDER (I) APPROVING THE SALE OF THE GK8 DEBTORS' ASSETS FREE AND CLEAR OF ALL CLAIMS, LIENS, RIGHTS, INTERESTS AND ENCUMBRANCES, (II) AUTHORIZING THE GK8 DEBTORS TO ENTER INTO AND PERFORM THEIR OBLIGATIONS UNDER THE ASSET PURCHASE AGREEMENT, (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (IV) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, and together with the GK8 Debtors (as defined herein), the "Debtors") for entry of an order (this "Sale Order") (a) authorizing and approving GK8 Ltd, GK8 UK Limited, and GK8 USA LLC (collectively, the "GK8 Debtors") entry into and performance under the terms and conditions of the Asset Purchase Agreement substantially in the form attached hereto as **Exhibit A** (the "APA"), whereby the GK8 Debtors have agreed to sell, and Galaxy Digital Trading LLC (the "Successful Bidder") has agreed to purchase, all of the assets of the GK8 Debtors (as that term is defined in the APA, the "Acquired Assets"), and the GK8 Debtors have agreed to transfer and

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or the APA, as applicable.

the Successful Bidder has agreed to assume liabilities (the "Assumed Liabilities") other than those specifically as set forth and defined in the APA (the "Excluded Liabilities" and collectively, and including all actions taken or required to be taken in connection with the implementation and consummation of the APA, the "Sale"), (b) authorizing and approving the Sale of the Acquired Assets free and clear of any and all liens, claims, interests, and encumbrances, (c) authorizing the assumption and assignment to the Successful Bidder of contracts (as that term is defined in the APA, the "Assigned Contracts") in accordance with the provisions of the *Order (I) Approving Bidding Procedures for the Potential Sale of Certain of the Debtors' Assets, (II) Scheduling Certain Dates with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving Contract Assumption and Assignment Procedures, and (V) Granting Related Relief* [Docket No. 687] (the "Bidding Procedures Order") and the APA, all as more fully set forth in the Motion; and upon the Ferraro Declaration; and upon the Kielty Declaration; and this Court having entered the Bidding Procedures Order on September 1, 2022; and the Court having conducted a hearing on the Motion on December 8, 2022 (the "Sale Hearing"), at which time all interested parties were offered an opportunity to be heard with respect to the Motion; and the Court, having reviewed and considered the Motion and the APA, approved the Bidding Procedures Order, and all objections to the Sale and the APA filed in accordance with the Bidding Procedures Order; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York, entered February 1, 2012; and this Court having the power to enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of these chapter 11 cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the

Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and the APA and opportunity for a hearing thereon were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and the APA and having heard the statements in support of the relief requested therein at the Sale Hearing; and this Court having determined that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefore, THE COURT HEREBY FINDS AS FOLLOWS:

## Final Order

A.      This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Federal Rule of Civil Procedure 54(b), as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, and expressly directs entry of judgment as set forth herein.

### I.      Notice of the Sale, APA, Sale Hearing, and the Cure Costs

B.      As evidenced by the affidavits of service previously filed with this Court, proper, timely, adequate, and sufficient notice of the Motion, Sale Hearing, APA, and Sale has been provided in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, and 9014.  The Debtors have complied with all obligations to provide notice of the Motion, Sale Hearing, APA, and Sale as required by the Bidding Procedures Order.  The foregoing notice was good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, Sale Hearing, APA, or Sale is required.

C.      A reasonable opportunity to object or to be heard regarding the relief requested in the Motion was afforded to all interested persons and entities.

D.      In accordance with the Bidding Procedures Order, the Debtors have served a notice of their intent to assume and assign the Assigned Contracts and of the Cure Costs (as defined in the APA) upon each non-Debtor counterparty to an Assigned Contract.  The service and provision of such notice was good, sufficient, and appropriate under the circumstances, and no further notice need be given in respect of assumption and assignment of the Assigned Contracts or establishing a Cure Cost for the respective Assigned Contracts.  Non-Debtor counterparties to the Assigned Contracts had an adequate opportunity to object to assumption and assignment of the applicable Assigned Contracts and the Cure Costs set forth in the notice (including objections related to the adequate assurance of future performance and objections based on whether applicable law excuses the non-Debtor counterparty from accepting performance by, or rendering performance to, the Successful Bidder for purposes of section 365(c)(1) of the Bankruptcy Code).  All objections, responses, or requests for adequate assurance, if any, have been resolved.

## II.    **Highest and Best Offer**

E.      As demonstrated by the evidence proffered or adduced at the Sale Hearing and the representations of counsel made on the record at the Sale Hearing, the Debtors conducted a sale process in accordance with, and otherwise complied in all respects with, the Bidding Procedures Order.

F.      The Acquired Assets were adequately marketed by the Debtors, and the consideration provided by the Successful Bidder under the APA constitutes the highest or otherwise best offer and provides fair and reasonable consideration to the Debtors for the Sale of the Acquired Assets and the assumption of the Assumed Liabilities.  The GK8 Debtors' determination that the consideration provided by the Successful Bidder under the APA constitutes

4

the highest and best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtors' business judgment.

G.      Approval of the Motion and the APA, and the consummation of the Sale contemplated thereby, is in the best interests of the Debtors, their respective creditors, estates, and other parties in interest. The GK8 Debtors have demonstrated good, sufficient, and sound business reasons and justifications for entering into the Sale and the performance of their obligations under the APA.

H.      The consummation of the Sale outside a plan of reorganization pursuant to the APA neither impermissibly restructures the rights of the GK8 Debtors' creditors nor impermissibly dictates the terms of a liquidating plan of reorganization for the Debtors.

I.      Entry of an order approving the APA and all the provisions thereof is a necessary condition precedent to Successful Bidder's consummation of the Sale, as set forth in the APA.

### III.    **Good Faith of Successful Bidder**

J.      The APA and the Sale contemplated thereunder were proposed, negotiated, and entered into by and among the GK8 Debtors and the Successful Bidder without collusion, in good faith, and at arm's-length, and there is no evidence that the sale price was controlled by Potential Bidders at the Sale.

### IV.    **Validity of Transfer**

K.      The special committee of the board of directors of Debtor Celsius Network Limited, and each applicable Debtors' board of directors or managers or managing members, as applicable, authorized the execution, delivery, and approval of the APA and associated sale process, the Sale of the Acquired Assets, and the assignment of the Assumed Liabilities to the Successful Bidder. The Debtors and their affiliates:  (i) have full corporate power and authority to execute and deliver the APA and all other documents contemplated thereby, as applicable; (ii) have all of the power

and authority necessary to consummate the Sale; and (iii) have taken all action necessary to authorize and approve the APA and to consummate the Sale, and no further consents or approvals are required for the Debtors to consummate the transactions contemplated by the APA, except as otherwise set forth in the APA.  The Acquired Assets constitute property of the GK8 Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code and title thereto is presently vested in the GK8 Debtors' estates.

### V.    Section 363(f) Is Satisfied

L.      The Sale of the Acquired Assets to the Successful Bidder and the assumption and assignment to the Successful Bidder of the Assigned Contracts under the terms of the APA meets the applicable provisions of section 363(f) of the Bankruptcy Code because any entity asserting an interest in such assets could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest, and the interest will attach to the proceeds in the same order of priority that the holder of the interest had prior to the sale, such that the Sale of the Acquired Assets will be free and clear of any and all liens, claims, interests, and encumbrances, other than the Permitted Encumbrances, and will not subject the Successful Bidder to any liability for any liens, claims, interests, and encumbrances, other than the Permitted Encumbrances, whatsoever (including, without limitation, under any theory of equitable law, antitrust, or successor or transferee liability), except as expressly provided in the APA with respect to the Excluded Liabilities.  All holders of liens, claims, interests, and encumbrances who did not object, or withdrew their objections to the Sale, are deemed to have consented to the Sale pursuant to section 363(f)(2) of the Bankruptcy Code, and all holders of liens, claims, interests, and encumbrances, other than the Permitted Encumbrances, are adequately protected—thus satisfying section 363(e) of the Bankruptcy Code—by having their liens, claims, interests, and encumbrances, if any, other than the Permitted Encumbrances, attach to the proceeds of the Sale ultimately attributable to the property against or

in which they assert liens, claims, interests, and encumbrances, or other specifically dedicated funds, in the same order of priority and with the same validity, force, and effect that such holder had prior to the Sale, subject to any rights, claims and defenses of the GK8 Debtors or their estates, as applicable, or as otherwise provided herein.

M.     The transfer of the Acquired Assets to the Successful Bidder under the APA will be a legal, valid, and effective transfer of all of the legal, equitable, and beneficial right, title, and interest in and to the Acquired Assets free and clear of all liens, claims, interests, and encumbrances.  The GK8 Debtors may sell their interests in the Acquired Assets free and clear of all liens, claims, interests, and encumbrances because, in each case, one or more of the standards set forth in section 363(f) has been satisfied.

## VI.    <u>Assumption and Assignment of the Assigned Contracts</u>

N.     The assumption and assignment of the Assigned Contracts pursuant to the terms of this Sale Order are integral to the APA, are in the best interests of the Debtors, GK8 Debtors, and their respective estates, creditors, and other parties in interest, and represent the reasonable exercise of sound and prudent business judgment by the Debtors and GK8 Debtors.

O.     The Debtors have met all requirements of section 365(b) of the Bankruptcy Code for each of the Assigned Contracts.  The GK8 Debtors and/or the Successful Bidder, as applicable under the APA, have (i) cured and/or provided adequate assurance of cure of any default existing prior to the Closing under all of the Assigned Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code and (ii) provided compensation or adequate assurance of compensation to any counterparty for actual pecuniary loss to such party resulting from a default prior to the Closing under any of the Assigned Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code.

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED THAT:**

  **I.    General Provisions**

1.       All objections, statements, or reservation of rights to the Motion or relief requested therein that have not been withdrawn, waived, or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court or as resolved in this Sale Order are, except as provided in other orders of the Court, hereby overruled on the merits with prejudice.  All persons and entities given notice of the Motion that failed to timely object thereto are deemed to consent to the relief sought therein including, without limitation, all non-Debtor counterparties to the Assigned Contracts and have waived any objection.

2.       Where appropriate herein, findings of fact shall be deemed conclusions of law and conclusions of law shall be deemed findings of fact.

  **II.    Approval of the APA**

3.       The APA is approved, and all of the terms and conditions thereof, and all of the transactions contemplated therein, are approved in all respects.  The failure to specifically include any particular provision of the APA in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in its entirety.

4.       The Debtors and GK8 Debtors are authorized to: (a) take any and all actions necessary or appropriate to perform, consummate, implement, and close the Sale without further order of the Court, including the Sale to Successful Bidder of the Acquired Assets, in accordance with the terms and conditions set forth in the APA and this Order; (b) to assume and assign any and all Assigned Contracts; and (c) to take all further actions and to execute and deliver the APA and any and all additional instruments and documents that may be (i) reasonably requested by the Successful Bidder for the purpose of assigning, transferring, granting, conveying, and conferring

8

to the Successful Bidder, or reducing to possession, the Acquired Assets, (ii) necessary, appropriate, or desirable to the performance of the obligations contemplated by the APA, and (iii) as may be reasonably requested by Successful Bidder to implement the APA and consummate the Sale in accordance with the terms thereof, all without further order of the Court.

5.　　All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with, or which would be inconsistent with, the ability of the GK8 Debtors or the other Debtors to transfer the Acquired Assets to the Successful Bidder in accordance with the APA and this Sale Order.

6.　　Nothing contained in any chapter 11 plan confirmed in these chapter 11 cases or the order confirming any such chapter 11 plan shall conflict with or derogate from the provisions of the APA or this Sale Order, and to the extent of any conflict or derogation between this Sale Order or the APA and such future plan or order, the terms of this Sale Order and the APA shall control.

## III.　Sale and Transfer Free and Clear of Liens, Claims, Interests, and Encumbrances

7.　　At Closing, all of the GK8 Debtors' right, title, and interest in and to, and possession of, the Acquired Assets shall be immediately vested in the Successful Bidder pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code free and clear of all liens, claims, interests, and encumbrances to the fullest extent permitted by law, with such liens, claims, interests, and encumbrances shall attaching to the proceeds in the same order of priority that they had in the Acquired Assets prior to the Sale.  All persons or entities, presently or on or after the Closing, in possession of some or all of the Acquired Assets, are directed to surrender possession of the Acquired Assets to the Successful Bidder or its respective designees on the Closing or at such time thereafter as the Successful Bidder may request.

9

8.      This Sale Order:  (a) shall be effective as a determination that, as of the Closing, (i) no claims other than Assumed Liabilities will be assertable against the Successful Bidder or any of its respective assets, (ii) the Acquired Assets shall have been transferred to the Successful Bidder free and clear of all liens, claims, interests, and encumbrances, other than the Permitted Encumbrances, and (iii) the conveyances described herein have been effected; and (b) is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease, and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA provided that nothing herein shall relieve any entity of the obligation to pay any filing fees required under non-bankruptcy law.  The Acquired Assets are sold free and clear of any reclamation rights. For the avoidance of doubt, all liens, claims, interests, and encumbrances on the Acquired Assets attach to the proceeds of the Sale ultimately attributable to the property against which such liens, claims, interests, and encumbrances applied or other specifically dedicated funds, in the same order of priority and with the same validity, force, and effect that such liens, claims, interests, and encumbrances applied prior to the Sale, subject to any rights, claims, and defenses of the Debtors or their estates, as applicable, or as otherwise provided herein.

9.      The cash proceeds of the Sale shall be held by GK8 Debtor GK8 Ltd., and GK8

Ltd. (and/or such other GK8 Debtor that is allocated Sale proceeds pursuant to the second sentence

of this paragraph 9) shall retain the Sale proceeds and, notwithstanding anything to the contrary in

the *Final Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management

System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing

Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Granting

Superpriority Administrative Expense Status to Postpetition Intercompany Balances, and

(III) Granting Related Relief* [Docket No. 1152], or any other order of the Court relating to the

subject matter thereof, not use, sell, or lease such proceeds, and such proceeds shall not otherwise

flow through the Debtors' cash management system absent further order of the Court after notice

and a hearing, and all parties' rights are reserved with respect to any such request.  The Debtors

may only allocate Sale proceeds to a GK8 Debtor other than GK8 Ltd. with (i) consent

from  counsel to the Official Committee of Unsecured Creditors and consent from Milbank LLP

and Jones Day, as counsel to certain preferred equity holders or (ii) further order of the Court after

notice and a hearing; *provided* that, if such allocation could impose any tax or withholding

obligation or otherwise have an adverse tax effect on the Successful Bidder Group, the GK8

Debtors shall promptly notify the Successful Bidder of the proposed allocation of the Sale proceeds

and such allocation shall require a prior written consent of the Successful Bidder.  For the

avoidance of doubt, the Successful Bidder shall not be liable for the use, distribution, or allocation

of proceeds by or among the GK8 Debtors or their non-Debtor subsidiaries.

10.     Except as otherwise provided in the APA, and with respect to the Assumed

Liabilities, all persons and entities (and their respective successors and assigns), including, but not

limited to, all debt security holders, equity security holders, affiliates, governmental, tax and

11

regulatory authorities, lenders, customers, vendors, employees, trade creditors, litigation claimants, and other creditors holding claims arising under or out of, in connection with, or in any way relating to, the GK8 Debtors, the Acquired Assets, and the ownership, Sale, or operation of the Acquired Assets prior to Closing or the transfer of the Acquired Assets to the Successful Bidder, are barred from asserting such claims against the Successful Bidder, its property or the Acquired Assets.  Following the Closing, no holder of any claim shall interfere with the Successful Bidder's title to or use and enjoyment of the Acquired Assets based on or related to any such claim, or based on any action the GK8 Debtors or the other Debtors, as applicable, may take in their respective chapter 11 cases.

11.     If any person or entity that has filed financing statements, mortgages, mechanic's claims, lis pendens, or other documents or agreements evidencing claims against or in the GK8 Debtors or the Acquired Assets shall not have delivered to the GK8 Debtors prior to the Closing of the Sale, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all claims that the person or entity has with respect to the GK8 Debtors or the Acquired Assets or otherwise, then only with regard to the Acquired Assets that are purchased by the Successful Bidder pursuant to the APA and this Sale Order:  (a) the GK8 Debtors are hereby authorized and directed to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Acquired Assets; (b) the Successful Bidder is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all liens, claims, interests, and encumbrances against the Successful Bidder and the Acquired Assets; and (c) upon consummation of the Sale, the Successful Bidder may seek in this Court or any other court to compel appropriate parties to

execute termination statements, instruments of satisfaction, and releases of all claims and liens that are extinguished or otherwise released pursuant to this Sale Order under section 363 of the Bankruptcy Code, and any other provisions of the Bankruptcy Code, with respect to the Acquired Assets.  This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office.  Notwithstanding the foregoing, the provisions of this Sale Order authorizing the Sale and assignment of the Acquired Assets free and clear of claims and liens shall be self-executing, and neither the Debtors, GK8 Debtors, nor Successful Bidder shall be required to execute or file releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and implement the provisions of this Sale Order.

12.    None of the Successful Bidder, any of its affiliates, present or contemplated members, officers, directors, shareholders, or any of their respective successors and assigns (each such entity individually and taken together, the "Successful Bidder Group") shall be deemed, as a result of any action taken in connection with the APA, the consummation of the Sale contemplated by the APA, or the transfer, operation, or use of the Acquired Assets to:  (a) be a legal successor, or otherwise be deemed a successor to the GK8 Debtors (other than, for the Successful Bidder, with respect to any obligations as an assignee under the Assigned Contracts arising after the Closing) to the fullest extent provided by law; (b) have, de facto or otherwise, merged with or into the GK8 Debtors; or (c) be an alter ego or a mere continuation or substantial continuation of the GK8 Debtors or the enterprise of the GK8 Debtors including, without limitation, within the meaning of any foreign, federal, state, or local revenue law, pension law, ERISA, tax law, labor law, products liability law, employment law, environmental law, or other law, rule, or regulation (including without limitation filing requirements under any such laws, rules or regulations), or

under any products liability law or doctrine with respect to the GK8 Debtors' liability under such law, rule or regulation, or doctrine.

13.     The Successful Bidder shall not have any responsibility for (a) any liability or other obligation of the GK8 Debtors or the other Debtors or related to the Acquired Assets other than as expressly set forth in the APA (including the Assumed Liabilities) or (b) any claims against the GK8 Debtors or the other Debtors or any of their predecessors or affiliates.  Except as expressly provided in the APA with respect to the Successful Bidder, the Successful Bidder shall have no liability whatsoever with respect to the GK8 Debtors or the other Debtors (or their predecessors' or affiliates') respective businesses or operations or any of the GK8 Debtors' or the other Debtors (or their predecessors' or affiliates') obligations (as described below, "Successor or Transferee Liability") based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor or transferee liability, de facto merger or substantial continuity, labor and employment or products liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Acquired Assets prior to the Closing.

14.     Except with respect to the Assumed Liabilities, effective upon the Closing, all persons and entities are forever prohibited and enjoined from commencing or continuing in any matter any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against the Successful Bidder, or its assets (including the Acquired Assets), with respect to any (a) claim or (b) Successor or Transferee Liability including, without limitation, the following actions with respect to clauses (a) and (b):  (i) commencing or continuing

any action or other proceeding pending or threatened; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any lien, claim, interest, or encumbrance; (iv) asserting any setoff, right of subrogation, or recoupment of any kind; (v) commencing or continuing any action, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Sale Order or other orders of this Court, or the agreements or actions contemplated or taken in respect hereof; or (vi) revoking, terminating, or failing, or refusing to renew any license, permit, or authorization to operate any of the Acquired Assets or conduct any of the businesses operated with such assets.

### IV.    **Good Faith Purchaser**

15.    The Successful Buyer is entitled to the protections afforded under section 363(m) of the Bankruptcy Code.  The Sale contemplated by the APA is undertaken by the Successful Bidder without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including the assumption and assignment of the Assigned Contracts), unless such authorization and consummation of such Sale are duly and properly stayed pending such appeal.

16.    No evidence has been offered showing that the Debtors, GK8 Debtors, nor the Successful Bidder has engaged in any action or inaction that would cause or permit the Sale to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code.

### V.    **Assumption and Assignment of Assigned Contracts**

17.    The GK8 Debtors are authorized and directed at the Closing to assume and assign each of the Assigned Contracts to the Successful Bidder pursuant to sections 105(a) and 365 of the Bankruptcy Code and to execute and deliver to the Successful Bidder such documents or other

instruments as may be necessary to assign and transfer the Assigned Contracts to the Successful

Bidder.  The payment of the applicable Cure Costs (if any) shall:  (a) effect a cure of all defaults

existing thereunder as of the Closing; (b) compensate for any actual pecuniary loss to such

non-Debtor counterparty resulting from such default; and (c) together with the assumption of the

Assigned Contracts by the Debtors and the assignment of the Assigned Contracts to the Successful

Bidder, constitute adequate assurance of future performance thereof.

18.     Pursuant to section 365(f) of the Bankruptcy Code, subject to the payment of the

applicable Cure Costs, the Assigned Contracts to be assumed and assigned under the APA shall

be assigned and transferred to, and remain in full force and effect for the benefit of, the Successful

Bidder notwithstanding any provision in the contracts or other restrictions prohibiting their

assignment or transfer.  Except as otherwise provided in section 365(c) of the Bankruptcy Code,

any provisions in any Assigned Contract that prohibit or condition the assignment of such

Assigned Contract to the Successful Bidder or allow the counterparty to such Assigned Contract

to terminate, recapture, impose any penalty, condition on renewal or extension, or modify any term

or condition upon the assignment of such Assigned Contract to the Successful Bidder, constitute

unenforceable anti-assignment provisions that are void and of no force and effect.  All other

requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the

assumption by the GK8 Debtors and assignment to the Successful Bidder of the Assigned

Contracts have been satisfied.  Upon the Closing, in accordance with sections 363 and 365 of the

Bankruptcy Code, the Successful Bidder shall be fully and irrevocably vested with all right, title,

and interest of the GK8 Debtors under the Assigned Contracts, and such Assigned Contracts shall

remain in full force and effect for the benefit of the Successful Bidder.  Each non-Debtor

counterparty to the Assigned Contracts shall be forever barred, estopped, and permanently

16

enjoined from: (a) asserting against the GK8 Debtors or the Successful Bidder or their respective property any assignment fee, acceleration, default, breach or claim or pecuniary loss, or condition to assignment existing, arising or accruing as of the Closing or arising by reason of the Closing, including any breach related to or arising out of change-in-control provisions in such Assigned Contracts, or any purported written or oral modification to the Assigned Contracts and (b) asserting against the Successful Bidder (or its property, including the Acquired Assets) any claim, counterclaim, defense, breach, condition, setoff asserted, or assertable against the GK8 Debtors existing as of the Closing or arising by reason of the Closing.

19.     Upon the Closing and the payment of the relevant Cure Costs, if any, the Successful Bidder shall be deemed to be substituted for the GK8 Debtors as a party to the applicable Assigned Contracts, and the GK8 Debtors shall be released, pursuant to section 365(k) of the Bankruptcy Code, from any liability under the Assigned Contracts. There shall be no rent accelerations, assignment fees, increases, or any other fees charged to the Successful Bidder or GK8 Debtors as a result of the assumption and assignment of the Assigned Contracts. The failure of the GK8 Debtors or the Successful Bidder to enforce at any time one or more terms or conditions of any Assigned Contract or Assigned Lease shall not be a waiver of such terms or conditions or of the right of the GK8 Debtors or the Successful Bidder, as the case may be, to enforce every term and condition of such Assigned Contract. The validity of the assumption and assignment of any Assigned Contract to the Successful Bidder shall not be affected by any existing dispute between the Debtors and any counterparty to such Assigned Contract or Assigned Lease. Any party that may have had the right to consent to the assignment of any Assigned Contract is deemed to have consented for the purposes of section 365(e)(2)(A)(ii) of the Bankruptcy Code.

20.     All defaults or other obligations of the GK8 Debtors under the Assigned Contracts arising or accruing after the Sale Objection Deadline and prior to the Closing (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured on the Closing, or as soon thereafter as reasonably practicable.

## VI.     **Other Provisions**

21.     To the maximum extent permitted by applicable law, and in accordance with the APA, the Successful Bidder shall be authorized, as of the Closing, to operate under any license, permit, registration, and governmental authorization or approval (collectively, the "Licenses") of the GK8 Debtors with respect to the Acquired Assets.  To the extent the Successful Bidder cannot operate under any Licenses in accordance with the previous sentence, such Licenses shall be in effect while the Successful Bidder, with assistance from the GK8 Debtors, works promptly and diligently to apply for and secure all necessary government approvals for new issuance of Licenses to the Successful Bidder.  The GK8 Debtors shall maintain the Licenses in good standing to the fullest extent allowed by applicable law for the Successful Bidder's benefit until equivalent new Licenses are issued to the Successful Bidder.

22.     The Successful Bidder shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the APA or any other Sale-related document.  The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence; *provided*, *however*, that this Court shall retain exclusive jurisdiction over any and all disputes with respect thereto.

23.     The terms and provisions of the APA and this Sale Order shall be binding in all respects upon the GK8 Debtors, their affiliates, their estates, all creditors of (whether known or

unknown) and holders of equity interests in any GK8 Debtor, any holders of claims against or on all or any portion of the Acquired Assets, all counterparties to the Assigned Contracts, the Successful Bidder, and all of their respective successors and assigns including, but not limited to, any subsequent trustee(s), examiner(s) or receiver(s) appointed in any of the Debtors' chapter 11 cases or upon conversion to Chapter 7 under the Bankruptcy Code, as to which trustee(s), examiner(s) or receiver(s) such terms and provisions likewise shall be binding. The APA shall not be subject to rejection or avoidance by the GK8 Debtors, their estates, their creditors, their shareholders, or any trustee(s), examiner(s), or receiver(s).

24.    The APA may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof, without further order of the Court; *provided* that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors' estates or their creditors.

25.    The Court shall retain exclusive jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the APA, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the GK8 Debtors are a party or which has been assigned by the Debtors to the Successful Bidder, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale. This Court retains jurisdiction to compel delivery of the Acquired Assets, to protect the Successful Bidder and its assets, including the Acquired Assets, against any claims and Successor and Transferee Liability and to enter orders, as appropriate, pursuant to sections 105, 363 or 365 (or other applicable provisions) of the Bankruptcy Code necessary to transfer the Acquired Assets and the Assigned Contracts to the Successful Bidder.

26.    Notwithstanding anything to the contrary in the Motion, this Sale Order, or any findings announced at the Hearing, nothing in the Motion, this Sale Order, or announced at the Hearing constitutes a finding under the federal securities laws as to whether crypto tokens or transactions involving crypto tokens are securities, and the rights of the United States Securities and Exchange Commission and the Committee to challenge transactions involving crypto tokens on any basis are expressly reserved.

27.    Notwithstanding the possible applicability of Rules 6004(h), 6006(d), 7062 and 9014 of the Bankruptcy Rules or otherwise, the terms and conditions of this Order shall be effective immediately upon entry and the Debtors, GK8 Debtors, and Successful Bidder are authorized to close the Sale immediately upon entry of this Order.

28.    All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

29.    To the extent there are any inconsistencies between the terms of this Sale Order and the APA, the terms of this Sale Order shall control.

30.    The APA and the Sale contemplated hereunder shall not be subject to any bulk sales laws or any similar law of any state or jurisdiction.

New York, New York
Dated: _____, 2022

                                    _____
                                    THE HONORABLE MARTIN GLENN
                                    CHIEF UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit A</u>**

**Asset Purchase Agreement**

**Execution Version**

**ASSET PURCHASE AGREEMENT**

**DATED AS OF DECEMBER 2, 2022**

**BY AND BETWEEN**

**GALAXY DIGITAL TRADING LLC, AS PURCHASER,**

**GK8 LTD., AS THE COMPANY,**

**AND**

**THE OTHER SELLERS NAMED HEREIN**

## Table of Contents

**PAGE**

**Article I** PURCHASE AND SALE OF THE ACQUIRED ASSETS; ASSUMPTION OF ASSUMED LIABILITIES ................................................................................................5

| | | |
|---|---|---|
| 1.1 | Purchase and Sale of the Acquired Assets | 5 |
| 1.2 | Excluded Assets | 8 |
| 1.3 | Assumption of Certain Liabilities | 9 |
| 1.4 | Excluded Liabilities | 10 |
| 1.5 | Assumption/Rejection of Certain Contracts | 10 |

**Article II** CONSIDERATION; PAYMENT; CLOSING ................................................12

| | | |
|---|---|---|
| 2.1 | Consideration; Payment | 12 |
| 2.2 | Deposit | 12 |
| 2.3 | Closing Certificate; Adjustment of Purchase Price | 13 |
| 2.4 | Closing | 15 |
| 2.5 | Closing Deliveries by Sellers | 16 |
| 2.6 | Closing Deliveries by Purchaser | 16 |
| 2.7 | Withholding | 16 |

**Article III** REPRESENTATIONS AND WARRANTIES OF SELLERS ..............................17

| | | |
|---|---|---|
| 3.1 | Organization and Good Standing | 17 |
| 3.2 | Authority and Enforceability | 17 |
| 3.3 | No Conflict | 18 |
| 3.4 | Financial Statements. | 18 |
| 3.5 | Title to Properties | 19 |
| 3.6 | Insurance | 19 |
| 3.7 | Material Contracts | 19 |
| 3.8 | Litigation | 21 |
| 3.9 | Permits; Compliance with Laws | 22 |
| 3.10 | Environmental Matters | 22 |
| 3.11 | Intellectual Property | 22 |
| 3.12 | Tax Matters | 26 |
| 3.13 | Seller Plans | 28 |
| 3.14 | Employees | 29 |
| 3.15 | Affiliate Transactions | 30 |
| 3.16 | Brokers | 30 |
| 3.17 | Privacy and Data Security | 30 |
| 3.18 | Bankruptcy Actions | 31 |
| 3.19 | No Other Representations or Warranties | 32 |

**Article IV** REPRESENTATIONS AND WARRANTIES OF PURCHASER ...........................32

| | | |
|---|---|---|
| 4.1 | Organization and Qualification | 32 |
| 4.2 | Authorization of Agreement | 33 |
| 4.3 | Conflicts; Consents | 33 |
| 4.4 | Financing | 33 |

i

# Table of Contents

**PAGE**

4.5    Tax Residency for VAT Purposes ...................................................33
4.6    Brokers...........................................................................................33
4.7    No Litigation .................................................................................34
4.8    Certain Arrangements ...................................................................34
4.9    No Additional Representations or Warranties ..............................34

**Article V BANKRUPTCY COURT MATTERS** ......................................................**34**

5.1    Bankruptcy Actions ......................................................................34
5.2    Sale Order .....................................................................................36
5.3    Approval .......................................................................................37

**Article VI COVENANTS AND AGREEMENTS** ...................................................**37**

6.1    Conduct of Business of Sellers .....................................................37
6.2    Access to Information ...................................................................40
6.3    Employee Matters .........................................................................41
6.4    Regulatory Approvals ...................................................................45
6.5    Reasonable Efforts; Cooperation .................................................45
6.6    Notification of Certain Matters ....................................................46
6.7    Further Assurances........................................................................46
6.8    Insurance Matters .........................................................................47
6.9    Receipt of Misdirected Assets .....................................................47
6.10   Acknowledgment by Purchaser ...................................................47
6.11   Certain Consents ..........................................................................48
6.12   Interim Financial Statements .......................................................48
6.13   Confidentiality ..............................................................................49
6.14   Guaranty........................................................................................50
6.15   Israeli Innovation Authority.........................................................51
6.16   IMOD .............................................................................................52
6.17   280G Matters .................................................................................52
6.18   Transfer of Utilities.......................................................................53
6.19   Intellectual Property Registration Title Updates..........................53
6.20   No Solicitation ..............................................................................53

**Article VII CONDITIONS TO CLOSING**............................................................**54**

7.1    Conditions Precedent to the Obligations of Purchaser and Sellers........................54
7.2    Conditions Precedent to the Obligations of Purchaser .................54
7.3    Conditions Precedent to the Obligations of Sellers .....................56
7.4    Waiver of Conditions ....................................................................56

**Article VIII TERMINATION** ...........................................................................**56**

8.1    Termination of Agreement............................................................56
8.2    Effect of Termination....................................................................58

ii

**Table of Contents**

**PAGE**

**Article IX Taxes** .................................................................................................**59**

9.1    Transfer Taxes ....................................................................................59
9.2    Cooperation .........................................................................................59
9.3    Straddle Period....................................................................................60
9.4    VAT .....................................................................................................60
9.5    Pre-Closing Taxes ..............................................................................60

**Article X Miscellaneous** ....................................................................................**60**

10.1    Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers .................................................................................60
10.2    Expenses ..............................................................................................61
10.3    Notices .................................................................................................61
10.4    Binding Effect; Assignment................................................................62
10.5    Amendment and Waiver ......................................................................63
10.6    Third Party Beneficiaries ....................................................................63
10.7    Non-Recourse ......................................................................................63
10.8    Severability ..........................................................................................63
10.9    Construction .........................................................................................63
10.10    Schedules .............................................................................................63
10.11    Complete Agreement ...........................................................................64
10.12    Specific Performance ...........................................................................64
10.13    Jurisdiction and Exclusive Venue .......................................................65
10.14    Governing Law; Waiver of Jury Trial .................................................65
10.15    No Right of Set-Off .............................................................................66
10.16    Counterparts and PDF..........................................................................66
10.17    Publicity ...............................................................................................67
10.18    Bulk Sales Laws ..................................................................................67

**Article XI Additional Definitions and Interpretive Matters** .......................**67**

11.1    Certain Definitions...............................................................................67
11.2    Index of Defined Terms .......................................................................76
11.3    Rules of Interpretation .........................................................................77

## INDEX OF EXHIBITS

EXHIBIT A    FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

EXHIBIT B    FORM OF PATENT ASSIGNMENT AGREEMENT

EXHIBIT C    FORM OF TRADEMARK ASSIGNMENT AGREEMENT

EXHIBIT D    FORM OF SALE ORDER

EXHIBIT E    IDENTIFIED EMPLOYEE TERM SHEETS

EXHIBIT F    IIA APPLICATION

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of December 2, 2022, by and among (i) Galaxy Digital Trading LLC, a Delaware limited liability company ("Purchaser"), GK8 LTD., a company formed under the Laws of the State of Israel under registration number 51 5881209 (the "Company"), and (ii) the Subsidiaries of the Company that are indicated on the signature pages attached hereto (together with the Company, each a "Seller" and collectively, "Sellers"), and (iii) solely for the purposes of Section 6.14, Galaxy Digital Holdings LP, a Cayman Islands exempted limited partnership ("Guarantor"), and (iv) solely in accordance with the last paragraph of Section 1.1, Celsius Network IL Ltd., a company formed under the Laws of the State of Israel ("CE Seller"). Purchaser and Sellers are referred to herein individually as a "Party" and collectively as the "Parties." Capitalized terms used herein shall have the meanings set forth herein or in Article XI.

WHEREAS, certain Affiliates of the Company (not including the Company or its Subsidiaries) have filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), to be jointly administered for procedural purposes (collectively, the "Bankruptcy Case"), and Sellers shall join the Bankruptcy Case prior to entry of the Sale Order by the Bankruptcy Court; and

WHEREAS, Purchaser desires to purchase the Acquired Assets and assume the Assumed Liabilities from Sellers, and Sellers desires to sell, convey, assign, and transfer to Purchaser the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105, 363, and 365 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement and the Sale Order and subject to entry of the Sale Order and recognition of the Bankruptcy Case and enforcement of the Sale Order by Order of a competent court in Israel (the "Israeli Court"), or issuance of an Order by the Israeli Court that otherwise permits the sale and transfer of the relevant Acquired Assets and Assumed Liabilities by the Company or on its behalf to Purchaser free and clear of any Encumbrances (other than Permitted Encumbrances) (either such Order issued by the Israeli Court, the "Israeli Court Order").

WHEREAS, concurrently with the signing of this Agreement, and as a material inducement for Purchaser to enter into this Agreement, each of the Identified Employees (as defined herein) has agreed with Purchaser to one or more term sheets, attached hereto as Exhibit E, setting forth the material terms of (a) a non-competition and non-solicitation agreement with Purchaser or one of its Affiliates (the "Non-Competition Agreements"), and (b) an employment agreement with Purchaser or one of its Affiliates (the "Identified Employee Agreements"), in each case of (a) and (b), to become effective as of the Closing Date.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth herein, and intending to be legally bound hereby, the Parties hereby agree as follows.

# ARTICLE I

## PURCHASE AND SALE OF THE ACQUIRED ASSETS;
## ASSUMPTION OF ASSUMED LIABILITIES

1.1    <u>Purchase and Sale of the Acquired Assets</u>. Pursuant to sections 105, 363, and 365 of the Bankruptcy Code and sections 302 or 303 of the Israeli Insolvency and Economic Rehabilitation Law, 5778-2018 (the "<u>Israeli Insolvency Law</u>") and section 34A of the Israeli Sales Law – 1968 (the "<u>Israeli Sales Law</u>"), on the terms and subject to the conditions set forth herein and in the Sale Order and the Israeli Court Order, at the Closing, Sellers shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from Sellers, all of Sellers' right, title, and interest as of the Closing in and to the Acquired Assets, free and clear of all Encumbrances other than Permitted Encumbrances. "<u>Acquired Assets</u>" means all of the properties, rights, interests and other assets of Sellers as of the Closing, whether tangible or intangible, real, personal or mixed, wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP, including the following assets of Sellers, but excluding in all cases the Excluded Assets:

(a)    all Contracts to which any Seller is a party (other than Excluded Contracts), including the Contracts listed on <u>Schedule 1.1(a)</u> and the Leases set forth therein relating to the Acquired Leased Real Property (collectively, the "<u>Assigned Contracts</u>");

(b)    all accounts receivable, credit card receivable, notes receivable, negotiable instruments, chattel paper and other receivables, together with any unpaid financing charges accrued thereon and any payments with respect thereto, of Sellers as of the Closing, including amounts owing to Sellers from the Company's Subsidiaries, but not including amounts owing to Sellers from Affiliates of the Company that are not the Company's Subsidiaries, which amounts will constitute Excluded Assets for all purposes hereunder, except with respect to any Liabilities of any such Affiliates under or pursuant to the CE Commercial Agreement, which Liabilities (in terms of being receivables owed to Sellers) shall constitute Acquired Assets;

(c)    without duplication of any other Acquired Assets, all royalties, advances, credits, prepaid assets (excluding prepaid Taxes of Sellers), security and other deposits, escrows, prepayments and other current assets (excluding current Tax assets), in each case relating primarily to the Business or the Acquired Assets as of the Closing;

(d)    all Documents relating primarily to the Business, the Acquired Assets or the Assumed Liabilities;

(e)    the Leased Real Property listed on <u>Schedule 1.1(e)</u> (the "<u>Acquired Leased Real Property</u>"), and any such agreement and rights related thereto or under such lease to the extent that such lease is an Assigned Contract, in each case, including any leasehold improvements and all permanent fixtures, improvements, and appurtenances thereto;

(f)    all tangible assets (including equipment, computer systems, computer hardware, supplies furniture, fixtures, machinery and fixed assets) of Sellers, including the tangible assets of Sellers located at any Acquired Leased Real Property and any tangible assets on order to

5

be delivered to any Seller; <u>provided</u> that if any such asset is leased by any Seller, the underlying lease for such asset is an Assigned Contract;

(g)      all demands, allowances, refunds (other than Tax refunds), rebates (including any vendor or supplier rebates, but excluding Tax rebates), express or implied guarantees, warranties, representations, covenants, indemnities, rights, claims, counterclaims, demands, defenses, credits, causes of action, rights of set off, rights of recovery or rights of recoupment, including rights under vendors' and manufacturers' warranties, indemnities and guaranties, in each case arising out of or relating to events occurring on or prior to the Closing Date with respect to the Business or any of the Acquired Assets or Assumed Liabilities (in each case, other than against any Seller or any of its Affiliates, except pursuant to the CE Commercial Agreement);

(h)      all of the rights and benefits accruing under all Permits, to the extent transferable;

(i)      to the extent transferable, all current and prior insurance policies (not including manager insurance policy or disability insurance of the Transferred Employees which is not part of the Acquired Assets) of the Company or its Subsidiaries that relate to the Acquired Assets or Assumed Liabilities, and all rights and benefits of Sellers or their Subsidiaries of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, but excluding all interests in any rights to insurance recovery required to be paid to Persons other than Purchaser under any Order of the Bankruptcy Court relating to debtor-in-possession financing obtained by Sellers or their Affiliates;

(j)      all rights of Sellers under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with any Transferred Employee or any current or former employee of Sellers, current or former directors, consultants, independent contractors and agents of Sellers or their Subsidiaries or any of their Affiliates or with third parties;

(k)      all Company Intellectual Property (including the Intellectual Property set forth on <u>Schedule 3.11</u>), including all rights to collect royalties and proceeds in connection therewith, and all rights to sue and recover for past, present and future infringements, misappropriations or other violations of such Intellectual Property against Persons (including Subsidiaries) and all rights of indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery, possessed by Sellers as of Closing (regardless of whether such rights are currently exercisable);

(l)      all goodwill associated with the Acquired Assets, including all goodwill associated with the Company Intellectual Property;

(m)      all inventory, supplies, and materials of Sellers as of the Closing (including all rights of Sellers to receive such inventory, supplies, materials, and spare parts that are on order), including all open purchase orders with suppliers that are, or are under or relate to, Assigned Contracts;

(n)      all sales and promotional materials, marketing materials and databases, catalogues and advertising literature, supplier lists, customer lists, rights to the telephone and

6

facsimile numbers and email addresses owned by Sellers primarily in connection with the Business, as well as rights to receive mail and other communications addressed to Sellers related primarily to the Business (including mail and communications from customers, suppliers, distributors and agents of Sellers); and

(o)    all other assets that are owned or leased by any Seller as of the Closing that are not Excluded Assets.

Notwithstanding anything to the contrary herein, Sellers agree that to the extent any Affiliate of a Seller (other than any other Seller, but including CE Seller) owns or holds any assets, properties or rights exclusively related to the Business that otherwise would have been an Acquired Asset if owned or held by any Seller as of immediately prior to the Closing, such assets, properties and rights shall be deemed to be Acquired Assets hereunder and Sellers shall cause such Acquired Assets then owned or held by such Affiliate to be sold, transferred, assigned and delivered by such Affiliate to Purchaser or its designee for no additional consideration (as if such Affiliate was a Seller hereunder) in accordance with the terms and conditions of this Agreement.

In addition, the Acquired Assets shall include, and, subject to the terms and conditions herein (other than as set forth in this sentence and subject to the limitations of this paragraph), at the Closing, CE Seller shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from CE Seller, all of CE Seller's right, title, and interest (but no obligations or Liabilities of Celsius Network Ltd. or its Affiliates as of the Closing) under (x) the Share Purchase Agreement, free and clear of all Encumbrances other than Permitted Encumbrances, to (a) indemnification by sellers thereunder (Section 8.1), (b) cause third parties to hold information related to the Business confidential (Section 6.2), (c) cause third parties to refrain from competing against the Company or the Business or from soliciting or inducing any employee, customer, supplier or other business relation of the Company (Section 6.4), and (d) any escrow funds (Section 2.3) (if any) (the items described in clauses (a) through (d), the "Assigned SPA Rights"), to the extent permitted under applicable Law (it being understood and agreed that such CE Seller is not and will not be a Debtor in the Bankruptcy Case and such transfer will not be pursuant to sections 105, 363, and 365 of the Bankruptcy Code and sections 302 or 303 of the Israeli Insolvency Law and section 34A of the Israeli Sales Law, and not on the terms and subject to the conditions set forth in the Sale Order and the Israeli Court Order) and (y) the Indemnification Escrow Agreement. CE Seller hereby represents and warrants that it is a party to each of the Share Purchase Agreement and the Indemnification Escrow Agreement and that it has not assigned, transferred, sold or delegated such agreements (or any of its rights or obligations under such agreements) to any Person as of the date hereof. For the avoidance of doubt, all Liabilities of CE Seller arising under the Share Purchase Agreement shall be an Excluded Liability. CE Seller shall be considered a Seller hereunder solely for purposes of, and solely to the extent set forth in the immediately preceding sentence and solely to the extent necessary in connection with, transferring its right, title, and interest under the Assigned SPA Rights and the Indemnification Escrow Agreement in accordance herewith and, for such purposes and only to such extent, only with respect to Sections 1.1, 1.2, and 1.3, Article II, Sections 3.1, 3.2, 3.3, 3.5(b), 3.16, and 3.19, Sections 6.7, 6.9, 6.10, 6.11, and 6.12, Article VII, Article VIII, Article X, and Article XI. Sellers shall use reasonable best efforts to seek any Consents necessary in connection with the transfer of the Assigned SPA Rights hereunder.

1.2     Excluded Assets. Notwithstanding anything to the contrary in this Agreement, in no event shall Sellers be deemed to sell, transfer, assign, convey, or deliver, and Sellers shall retain all right, title and interest to, in and under the following assets, properties, interests, and rights of each such Seller (collectively, the "Excluded Assets"):

(a)     all cash and cash equivalents;

(b)     all bank accounts listed on Schedule 1.2(b);

(c)     all Personal Data that any Seller is required by Law to retain or is prohibited by or would otherwise contravene applicable Law or Sellers' applicable policies from transferring to Purchaser, including credit card numbers or related customer payment source or social security numbers;

(d)     Tax Returns that do not constitute Documents; provided that Purchaser shall have the right to make copies of any portions of such Tax Returns;

(e)     all Documents (i) to the extent they relate to any of the Excluded Assets or Excluded Liabilities; provided that Purchaser shall have the right to make copies of any portions of such documents, or (ii) that any Seller is required by Law to retain or is prohibited by Law from transferring to Purchaser;

(f)     all shares of capital stock or other equity interests of any Seller or securities convertible into, exchangeable or exercisable for any such shares of capital stock or other equity interests;

(g)     any records, documents, or other information relating to employees consultants or independent contractors employed or engaged by Sellers or former employees, consultants or independent contractor of Sellers (however the Company will provide the Purchaser for its review and allow it to retain copies of all personnel, discipline, performance, compensation, medical and benefits and labor relations records relating to Transferred Employees, including their employment and termination agreements);

(h)     any rights, claims, actions, rights of recovery, rights of set-off and rights of recoupment that any Seller may have against any Person to the extent relating to any Excluded Assets or any Excluded Liabilities;

(i)     Sellers' financial accounting books and records, corporate charter, minute and stock record books, corporate seal, checkbooks and canceled checks (whether written, electronic or in any other medium), advertising and promotional materials and similar items to the extent relating to any Excluded Assets or Excluded Liabilities; provided that Purchaser shall have the right to make copies of any portions of such documents;

(j)     Sellers' rights under this Agreement, including the Purchase Price hereunder, or any agreement, certificate, instrument or other document executed and delivered between any Seller and Purchaser in connection with the transactions contemplated hereby, or any other agreement between any Seller and Purchaser entered into on or after the date hereof;

(k)      any Tax asset other than Tax assets solely attributable to the Acquired Assets or Tax assets that transfer by automatic operation of Law to Purchaser as a result of acquiring the Acquired Assets;

(l)      the properties and assets set forth on Schedule 1.2(l);

(m)      the Contracts listed on Schedule 1.2(m) (the "Excluded Contracts");

(n)      any right, title, interest, properties, rights, and other assets expressly excluded by the provisions of Section 1.1;

(o)      the sponsorship of each Seller Plan;

(p)      (i) any claims or causes of action where any Seller and any of their Affiliates are co-plaintiffs and (ii) any legal privilege or copies of documents related to such claims or causes of action; and

(q)      any Contract or asset that was not disclosed to Purchaser at least two Business Days prior to Purchaser's execution and delivery of this Agreement to Sellers to the extent such Contract or asset is designated for exclusion by Purchaser upon notice to the Company at any time during the period commencing on the date of this Agreement and ending on the date that is 15 Business Days after the date such Contract or asset is first disclosed in writing to Purchaser or, if later, the date such Contract is made available to Purchaser and its legal counsel in the Dataroom (it being understood that the exclusion of any such Contract or asset will not change the Purchase Price); provided that any Contract or asset so designated for exclusion by Purchaser in accordance with this Section 1.2(q) shall be deemed an Excluded Contract or Excluded Asset, as applicable, effective as of such designation and automatically added to Schedule 1.2(m) or Schedule 1.2(l), as applicable. Any Contract set forth in the Schedules shall be deemed to be disclosed to Purchaser for purposes of this Section 1.2(q), and any Contracts listed in Sellers' disclosures or notices (e.g., cure notices) in connection with Sellers filing voluntary petition for relief under the Bankruptcy Code in the Bankruptcy Court as contemplated by Section 5.1(b) shall be deemed to be disclosed to Purchaser after the date of this Agreement, and upon the filing of such disclosures in the Bankruptcy Court or, if later, the date such Contract is made available to Purchaser and its legal counsel in the Dataroom, the 15 Business Day period described above shall commence.

1.3      Assumption of Certain Liabilities. On the terms and subject to the conditions set forth herein and in the Sale Order and the Israeli Court Order, effective as of the Closing, in addition to the payment of the Cash Payment in accordance with Section 2.1, Purchaser shall irrevocably assume from Sellers (and, from and after the Closing, pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Sellers shall irrevocably convey, transfer, and assign to Purchaser, only the following Liabilities, without duplication and only to the extent not paid, performed, discharged, or otherwise satisfied prior to the Closing (collectively, the "Assumed Liabilities"):

(a)      all Liabilities and obligations of Sellers arising out of or relating to the Assigned Contracts;

(b)    all Liabilities of the Company owing to Affiliates of the Company (other than its Subsidiaries) pursuant to the CE Commercial Agreement solely to the extent such Liabilities first accrue and are to be performed from and after the Closing and which relate to periods of time on or after the Closing;

(c)    any Liabilities arising out of the ownership and operation of the Acquired Assets and the Business by Purchaser from and after the Closing Date;

(d)    all Liabilities set forth on Schedule 1.3(d);

(e)    any Liabilities required to be paid to the IIA pursuant to the R&D Law in connection with the transactions contemplated hereby in excess of the IIA Redemption Payment amount included in the definition of "Cash Payment", including arising from or relating to Purchaser's non-compliance with or breach of the IIA Undertaking; and

(f)    any Liabilities relating to trade accounts payable of Sellers or otherwise arising under or in connection with any Assigned Contract outstanding as of immediately prior to the Closing, in each case that are (i) expressly set forth on Schedule 1.3(f) or (ii) otherwise included in the Final Aggregate Payables Amount.

1.4    Excluded Liabilities. Notwithstanding anything to the contrary herein, Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, Sellers, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing, in each case, that are not Assumed Liabilities (all such Liabilities not being assumed by Purchaser, the "Excluded Liabilities"). For avoidance of doubt, Excluded Liabilities shall include all Liabilities for or relating to (a) any indebtedness of any Seller (including credit card Liabilities), (b) any Liability to any direct or indirect member, shareholder or Affiliate of Sellers (including any intercompany loans owed to any Affiliate of Sellers) other than pursuant to the CE Commercial Agreement, (c) any and all Liabilities for: (i) costs and expenses incurred by Sellers or owed in connection with the administration of the Bankruptcy Cases (including the U.S. Trustee fees, the fees and expenses of attorneys, accountants, financial advisors, consultants and other professionals retained by Sellers or the Unsecured Creditors Committee and the fees and expenses of the post-petition lenders and pre-petition lenders incurred or owed in connection with the administration of the Bankruptcy Case) and (ii) all costs and expenses of Sellers incurred in connection with the negotiation, execution and consummation of the transactions contemplated under this Agreement, and (d) any Liability with respect to any Excluded Assets.

1.5    Assumption/Rejection of Certain Contracts.

(a)    Assumption and Assignment of Executory Contracts. Sellers shall provide timely and proper written notice to all parties to any executory Contracts or unexpired leases to which any Seller is a party that are Assigned Contracts in accordance with the Bidding Procedures Order and take all other actions reasonably necessary to cause such Contracts to be assumed by

10

Sellers and assigned to Purchaser pursuant to section 365 of the Bankruptcy Code and section 75 or 72 together with sections 302 or 303 of the Israeli Insolvency Law. The Sale Order and the Israeli Court Order shall provide that as of and conditioned on the occurrence of the Closing, Sellers shall assign to Purchaser the Assigned Contracts, which assumption shall be effectuated in accordance with the Bidding Procedures Order. The notice of assumption to be filed and served in accordance with the Bidding Procedures Order shall, among other things, set forth Sellers' good faith estimate of the amounts necessary to cure any defaults under each of the Assigned Contracts as determined by Sellers based on Sellers' books and records or as otherwise determined by the Bankruptcy Court. At the Closing, Sellers shall, pursuant to the Sale Order and the Israeli Court Order, Bidding Procedures Order, and the Assignment and Assumption Agreement, assume and assign to Purchaser (the consideration for which is included in the Purchase Price), all Assigned Contracts pursuant to sections 363 and 365 of the Bankruptcy Code and section 75 (or section 72, if applicable) of the Israeli Insolvency Law. All cure costs required to be paid pursuant to section 365 of the Bankruptcy Code or section 75 (or section 72, if applicable) of Israeli Insolvency Law in connection with the assumption and assignment of or to cure any defaults under each of the Assigned Contracts ("Cure Costs") shall be paid by Sellers on or within one (1) Business Day of the Closing Date, and not by Purchaser, and Purchaser shall have no Liability therefor, and neither the Cure Costs nor the expense of any other obligation set forth in this Section 1.5 shall increase, directly or indirectly, any consideration received by Sellers hereunder. At the Closing, Purchaser shall assume, and thereafter in due course and in accordance with its respective terms pay, fully satisfy, discharge and perform all of the Assumed Liabilities under each Assigned Contract pursuant to section 365 of the Bankruptcy Code or section 75 (or section 72, if applicable) of the Israeli Insolvency Law.

      (b)     <u>Non-Assignment</u>.

      (i)     Notwithstanding anything to the contrary in this Agreement, a Contract shall not be an Assigned Contract hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that such Contract is terminated by any party thereto (other than any Seller), or terminates or expires by its terms, on or prior to such time as it is to be assumed by Purchaser as an Assigned Contract hereunder and is not continued or otherwise extended upon assumption.

      (ii)     Notwithstanding anything to the contrary in this Agreement, to the extent an Acquired Asset requires a Consent or Governmental Authorization (other than, and in addition to, that of the Bankruptcy Court or the Israeli Court) notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, in order to permit the sale or transfer to Purchaser of any Seller's rights over such asset, and such Consent or Governmental Authorization has not been obtained prior to such time as it is to be transferred by Purchaser as an Acquired Asset hereunder, such asset shall not be an Acquired Asset hereunder and shall not be transferred to, or received by, Purchaser. In the event that any Acquired Asset is deemed not to be assigned pursuant to this <u>clause (ii)</u>, the Closing shall nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earlier of such time as such Consent or Governmental Authorization is obtained and twelve (12) months following the Closing (or the closing of the Bankruptcy Case, if shorter), Sellers and Purchaser shall (A) use reasonable best efforts to secure such Consent or Governmental Authorization as promptly as practicable after the

Closing and (B) cooperate in good faith in any lawful and commercially reasonable arrangement reasonably proposed by Purchaser, including subcontracting, licensing, or sublicensing to Purchaser any or all of such Seller's rights and obligations with respect to any such Acquired Asset, under which (1) Purchaser shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related actual Tax costs imposed on such Seller or its Affiliates or any direct costs associated with the retention and maintenance of such Acquired Asset incurred by such Seller or its Affiliates) under such Acquired Asset with respect to which the Consent or Governmental Authorization has not been obtained and (2) Purchaser shall assume any related burden and obligation with respect to such Acquired Asset. Upon satisfying any requisite Consent or Governmental Authorization requirement applicable to such Acquired Asset after the Closing, such Acquired Asset shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement, the Sale Order, the Israeli Court Order and the Bankruptcy Code.

## ARTICLE II

## CONSIDERATION; PAYMENT; CLOSING

2.1    Consideration; Payment.

(a)    The aggregate consideration (collectively, the "Purchase Price") to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) the assumption of Assumed Liabilities and (ii) a cash payment of (A) $44,000,000, less (B) the IIA Redemption Payment (the payment of which will be made by the Purchaser on the Closing Date), less (C) the Aggregate Payables Amount, less (D) the Escrow Adjustment Amount (the "Cash Payment"). Notwithstanding any other provision of this Agreement, all sums payable, or consideration given, by Purchaser under this Agreement, including the Purchase Price, are exclusive of VAT, which shall be paid by the Purchaser to the Company, to the extent applicable, when due pursuant to the Israeli VAT Law - 1975 (the "VAT Law") , against a valid tax invoice duly issued by the Company.

(b)    At the Closing, Purchaser shall deliver, or cause to be delivered, (i) to the Company the Cash Payment (determined using the Estimated Aggregate Payables Amount in place of the Aggregate Payables Amount) less the Deposit (the "Closing Date Payment"), (ii) to the Company the Estimated Aggregate Cure Amount, which amount shall be held by the Company in a segregated account free and clear of all Encumbrances and used solely to pay any Cure Costs required to be paid by Sellers pursuant to Section 1.5(a), and (iii) to the applicable Governmental Body, the IIA Redemption Payment. The Closing Date Payment and any payment required to be made pursuant to any other provision hereof shall be made in cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by the applicable Party to (or for the benefit of) whom such payment is to be made at least two Business Days prior to the date such payment is to be made.

2.2    Deposit.

(a)    Purchaser has, on or prior to the date hereof, made an earnest money deposit with SRS Acquiom (the "Escrow Agent") in an amount equal to $5,400,000 (the "Deposit"), by

wire transfer of immediately available funds for deposit into a separate escrow account (the "Escrow Account") pursuant to an escrow agreement dated as of November 3, 2022, as amended on or about the date hereof (the "Escrow Agreement") among Purchaser, Sellers and Escrow Agent. The Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of any of Sellers or Purchaser.

(b)     If this Agreement has been terminated by the Company pursuant to Section 8.1(f) or 8.1(h), then the Company shall retain the Deposit together with all received investment income, if any.

(c)     If (i) Purchaser is not selected as the Successful Bidder or the Backup Bidder on or before the conclusion of the Auction if there is an Auction, (ii) Purchaser is not selected as the Successful Bidder or the Backup Bidder on or before December 5, 2022 if there is not an Auction, or (iii) this Agreement has been terminated by any Party, other than as contemplated by Section 2.2(b), then the Deposit, together with all received investment income, if any, shall be returned to Purchaser within five (5) Business Days after Purchaser is notified it is not the Successful Bidder or such termination, as applicable.

(d)     The Parties agree that the Company's right to retain the Deposit, as set forth in Section 2.2(b), is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate Sellers for their respective efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision.

(e)     If the Closing occurs, (i) the Deposit less the Escrow Adjustment Amount shall be transferred to the Company and applied against payment of the Purchase Price on the Closing Date; and (ii) the Escrow Agent shall retain the Escrow Adjustment Amount until such amount is disbursed in accordance herewith and the Escrow Agreement.

2.3     Closing Certificate; Adjustment of Purchase Price.

(a)     At least three (3) Business Days prior to the Closing, Sellers shall prepare and deliver to Purchaser a statement setting forth Sellers' good faith estimate of the Aggregate Cure Amount (the "Estimated Aggregate Cure Amount") and the Pre-Closing Payables Amount and the Aggregate Payables Amount (the "Estimated Aggregate Payables Amount"), together with a reasonably detailed calculation thereof (such statement and calculation, the "Closing Statement"). In the event that the Purchaser objects to or disputes the Closing Statement (in whole or in part), Sellers and the Purchaser will each make a good faith effort to resolve such objections or disputes prior to the Closing and Sellers shall deliver a revised Closing Statement reflecting any such agreed resolutions; provided that if any such objections or disputes are not resolved by 5:00 p.m. (prevailing Eastern time) on the calendar day immediately prior to the Closing Date, the Closing Statement will be the statement delivered by Sellers pursuant to this Section 2.3(a), as modified by any such objections and disputes that have been so resolved, if any, as of such time. For purposes of complying with the terms set forth in this Section 2.3(a), Section 2.3(b), and Section 2.3(c), Sellers and the Purchaser shall cooperate with and make available to the other Party and their Representatives all information, records, data and working papers used by such Persons

in connection with the preparation of the Closing Statement and the Final Statement, and shall permit access to its facilities and personnel (upon reasonable advance notice), as may be reasonably required in connection with the analysis of the Closing Statement and the Final Statement and the calculations thereon, such information, records, data and work papers and the resolution of any disputes with respect thereto. Notwithstanding anything to the contrary herein, in the event any Cure Cost has not been finally determined (whether by the Bankruptcy Court, mutual agreement of the parties to the applicable Assigned Contract or otherwise) at the time of Sellers' delivery of the Closing Statement, the maximum amount claimed or asserted by any party to the applicable Assigned Contract shall be used as the Cure Cost for such Assigned Contract for purposes of calculating the Estimated Aggregate Cure Amount and the Estimated Aggregate Payables Amount.

(b)    Promptly, but in any event within seventy-five (75) days after the Closing Date, Purchaser shall prepare and deliver to Sellers a statement setting forth in reasonable detail Purchaser's good faith calculation of the Aggregate Payables Amount (the "Final Aggregate Payables Amount"), and Purchaser's calculation of the amount of any payments required pursuant to Section 2.3(d) (together with the Final Aggregate Payables Amount, the "Final Statement"). The Closing Statement and the Final Statement shall be prepared in accordance with the definitions set forth herein and the Accounting Methodology. For the avoidance of doubt, Sellers and Purchaser agrees that the calculation of the Final Aggregate Payables Amount shall not permit the introduction of any accounting methods, policies, principles, practices, procedures, classifications, judgments, estimations or other methodologies that are different from the Accounting Methodology.

(c)    If Sellers disagree with the Purchaser's determination of the Final Statement, Sellers may, within thirty (30) days after receipt of the Final Statement, deliver a written notice (a "Dispute Notice") to the Purchaser setting forth in reasonable detail Sellers' good faith calculation of each disputed amount (each an "Item of Dispute") and the basis therefor. If the Purchaser does not receive a Dispute Notice within thirty (30) days after delivery by the Purchaser of the Final Statement, the Final Statement shall be conclusive and binding upon each of the Parties. If the Purchaser receives a Dispute Notice from Sellers within thirty (30) days after delivery by the Purchaser of the Final Statement, the Purchaser and Sellers shall negotiate in good faith to resolve each Item of Dispute, and, if any Item of Dispute is so resolved, the Final Statement shall be modified to the extent necessary to reflect such resolution. If any Item of Dispute remains unresolved as of the thirtieth (30th) day after delivery by Sellers of the Dispute Notice, the Purchaser and Sellers shall jointly retain WithumSmith+Brown, PC or, if such firm is unavailable or unwilling to serve, a nationally or regionally recognized accounting firm mutually acceptable to the Company and the Purchaser (the "Accounting Firm") within ten (10) Business Days following the expiration of such thirty (30) day period, including by executing a customary engagement letter with the Accounting Firm. The Purchaser and Sellers shall instruct the Accounting Firm to render a determination as to each unresolved Item of Dispute within thirty (30) days after its retention, and the Purchaser and Sellers shall cooperate fully with the Accounting Firm so as to enable it to make such determination as quickly and accurately as reasonably practicable, including the provision by each such Person of all books and records and work papers (including those of their accountants and auditors following the execution of customary work paper access letters) relating to the Final Statement and all other items reasonably requested by the Accounting Firm (in each case in such a manner so as not to waive or eliminate any privilege

14

applicable to any such information). The Accounting Firm shall consider only those items and amounts that were set forth on the Dispute Notice and that remain unresolved by the Purchaser and Sellers. In resolving any Item of Dispute, the Accounting Firm may not assign a value to any such item greater than the greatest value for such item claimed by either Party, or less than the smallest value for such item claimed by either Party, on the Final Statement or the Dispute Notice, as applicable. The Accounting Firm's determination(s) shall be as an expert, not as an arbiter, and shall be based upon the definitions of Aggregate Payables Amount, Aggregate Cure Amount and Pre-Closing Payables Amount included herein and the Accounting Methodology. The Accounting Firm's determination of each Item of Dispute submitted to it shall be in writing, shall conform with this Section 2.3(c) and shall be conclusive and binding upon each of the Parties, and the Final Statement shall be modified to the extent necessary to reflect such determination(s). The Accounting Firm shall allocate its fees, costs and expenses between the Purchaser, on the one hand, and Sellers, on the other hand, based upon the percentage which the portion of the contested amount not awarded to each such Party bears to the amount actually contested by such Party.

(d)     If the Final Aggregate Payables Amount as finally determined pursuant to this Section 2.3 is greater than the Estimated Aggregate Payables Amount, then the Purchaser and Sellers will instruct the Escrow Agent to deduct the amount of such excess from the Escrow Adjustment Amount, promptly pay the amount of such excess to Purchaser by wire transfer of immediately available funds, and then promptly pay to the Company the balance (if any) of the Escrow Adjustment Amount after such deduction to the Company by wire transfer of immediately available funds. If the Final Aggregate Payables Amount as finally determined pursuant to this Section 2.3 is less than the Estimated Aggregate Payables Amount, then the Purchaser will promptly pay to the Company, by wire transfer of immediately available funds, an amount equal to such deficit, and the Purchaser and Sellers will instruct the Escrow Agent to release to the Company the Escrow Adjustment Amount.

(e)     For Tax purposes, any payment by any Party hereto pursuant to this Section 2.3 shall be treated as an adjustment to the Purchase Price unless otherwise required by Law.

(f)     The process set forth in this Section 2.3 shall be the sole and exclusive remedy of any of the Parties and their respective Affiliates against any of the other Parties for any disputes related to the Final Aggregate Payables Amount, the Estimated Aggregate Payables Amount, and the calculations and amounts on which they are based or set forth in the related statements and notices delivered in connection therewith.

2.4     Closing. The closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price, the assumption of the Assumed Liabilities, and the consummation of the other transactions contemplated by this Agreement (the "Closing") will take place by telephone conference and electronic exchange of documents (or, if the Parties agree to hold a physical closing, at the offices of Kirkland & Ellis LLP, located at 300 North LaSalle, Chicago, Illinois 60654) at 9:00 a.m. Chicago time on the second (2nd) Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article VII (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions), or at such other place and

15

time as the Parties may agree. The date on which the Closing occurs is referred to herein as the "Closing Date."

2.5    Closing Deliveries by Sellers. At or prior to the Closing, Sellers shall deliver to Purchaser:

(a)    a bill of sale and assignment and assumption agreement substantially in the form of Exhibit A (the "Assignment and Assumption Agreement"), duly executed by Sellers;

(b)    a short-form patent assignment agreement substantially in the form of Exhibit B, duly executed by Sellers;

(c)    a short-form trademark assignment agreement substantially in the form of Exhibit C, duly executed by Sellers;

(d)    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of the Company certifying that the conditions set forth in Sections 7.2(a) and 7.2(b) have been satisfied;

(e)    a joint written instruction, duly executed by the Company, instructing the Escrow Agent to release to the Company by wire transfer of immediately available funds, the Deposit; and

(f)    such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Purchaser, as may be required to give effect to this Agreement as reasonably requested by Purchaser, except for such instruments or documents as are, pursuant to applicable Law, required to be made after the Closing, in which case Sellers shall deliver such instruments or documents to Purchaser as reasonably requested by Purchaser promptly following the Closing.

2.6    Closing Deliveries by Purchaser. At the Closing, Purchaser shall deliver to (or at the direction of) the Company:

(a)    the Assignment and Assumption Agreement, duly executed by Purchaser;

(b)    evidence that the IIA Redemption Payment has been paid directly to the IIA bank account;

(c)    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Purchaser certifying that the conditions set forth in Sections 7.3(a) and 7.3(b) have been satisfied; and

(d)    a joint written instruction, duly executed by Purchaser, instructing the Escrow Agent to release to the Company by wire transfer of immediately available funds, the Deposit.

2.7    Withholding. Purchaser shall be entitled to deduct and withhold from any amounts payable pursuant to this Agreement such amounts as are required to be deducted or withheld under

16

applicable tax Law; provided further that, without derogating from the generality of the foregoing in this Section 2.7, in the event that the applicable Seller delivered to the Purchaser, prior to the Closing, a Valid Tax Certificate then the deduction and withholding of any amounts under the Israeli Tax Ordinance [New Version], 1961 (the "Ordinance") from the amounts payable to the applicable Seller shall be made only in accordance with the provisions of such Valid Tax Certificate. To the extent such amounts are so deducted and withheld, (i) such amounts shall be promptly and timely remitted to the applicable Governmental Body, (ii) such amounts shall be treated for all purposes under this Agreement as having been paid to Sellers in respect of whom such deduction and withholding was made, and (iii) Purchaser shall promptly (and in any event, no later than within 30 days following payment of such amounts) provide to the applicable Seller a written confirmation of the amount so withheld and its transfer to the appropriate Governmental Body. "Valid Tax Certificate" means: a valid certificate of exemption from withholding (or approving a reduced rate of withholding tax) in form and substance reasonably satisfactory to the Purchaser issued by the Israeli Tax Authority ("ITA"); provided that the certificate issued by ITA to the Company pursuant to the Israeli Income Tax Regulations (Withholding from Payments for Services or Assets), 5737-1977 valid on the payment date ("פטור מנכסים ושירותים"), in the form attached hereto as Schedule 2.7 shall be deemed to be satisfactory to Purchaser.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as (i) disclosed in any forms, statements or other documents filed with the Bankruptcy Court or (ii) set forth in the Schedules delivered by the Company concurrently herewith and subject to Sections 6.6(a) and 10.10, Sellers represent and warrant to Purchaser as of the date hereof as follows.

3.1    Organization and Good Standing.

(a)    The Company is an entity organized, validly existing, and not a defaulting company ("חברה מפרה") under the Laws of Israel and has all requisite corporate power and corporate authority necessary to carry on its business as it is now being conducted, subject to the provisions of the Bankruptcy Code and the Israeli Insolvency Law.

(b)    Each of the Company's Subsidiaries is duly organized, validly existing, and in good standing (where such concept is recognized under applicable Law) under the Laws of the jurisdiction of its organization, has all requisite corporate or similar organizational power and authority necessary to carry on its business as it is now being conducted, subject to the provisions of the Bankruptcy Code and the Israeli Insolvency Law.

3.2    Authority and Enforceability. Each Seller has all necessary corporate power or similar organizational power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery, and performance by each Seller of this Agreement, and the consummation by each Seller of the transactions contemplated hereby, subject to requisite Bankruptcy Court and Israeli Court approvals, have been duly authorized by all requisite corporate or similar organizational action and no other corporate or similar organizational proceedings on its part are necessary to authorize

the execution, delivery, and performance by such Seller of this Agreement and the consummation by it of the transactions contemplated hereby. Subject to requisite Bankruptcy Court and Israeli Court approvals, this Agreement has been duly executed and delivered by such Seller and, assuming due authorization, execution and delivery hereof by the other Parties, constitutes a legal, valid, and binding obligation of such Seller, enforceable against such Seller in accordance with its terms, except that such enforceability (a) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium, and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (b) is subject to general principles of equity, whether considered in a proceeding at law or in equity ((a) and (b), collectively, the "Enforceability Exceptions").

3.3    No Conflict. Assuming that (a) requisite Bankruptcy Court and Israeli Court approvals are obtained, (b) the notices, authorizations, approvals, Orders, permits, or Consents set forth on Schedule 3.3 are made, given, or obtained (as applicable), and (c) the requirements of any applicable antitrust, competition, merger control, foreign direct investment, or similar Laws ("Competition Laws") are complied with, neither the execution and delivery by Sellers of this Agreement, nor the consummation by Sellers of the transactions contemplated hereby, nor performance or compliance by Sellers with any of the terms or provisions hereof, will (i) conflict with or violate any provision of the Company's Organizational Documents or the Organizational Documents of any of the Company's Subsidiaries, (ii) violate any Law or Order applicable to the Company or any of its Subsidiaries, (iii) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit under, any of the terms or provisions of any Material Contract or accelerate the Company's or, if applicable, any of its Subsidiaries' obligations under any Material Contract, or (iv) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of the Company or any of its Subsidiaries, except, in the case of clauses (ii) through (iv), as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.4    Financial Statements.

(a)    Attached to Schedule 3.4(a) is (i) the unaudited balance sheet of the Company as at September 30, 2022 and the related unaudited statements of comprehensive loss, changes in equity, and cash flows for the 9-month period then ended, (ii) the audited balance sheet of the Company as at December 31, 2021 and the related audited statements of comprehensive loss, changes in equity, and cash flows for the 12-month period then ended, and (iii) the audited balance sheet of the Company as at December 31, 2020 and the related audited statements of comprehensive loss, changes in equity, and cash flows for the 12-month period then ended (collectively, the "Financial Statements").

(b)    Except as described in Schedule 3.4(b), the Financial Statements (i) have been prepared in accordance with GAAP, consistently applied throughout the periods involved, and (ii) fairly present in all material respects the financial condition and results of operations of the Company and its Subsidiaries.

3.5    Title to Properties.

(a)    Schedule 3.5(a) contains a list of all real property leased by the Company and its Subsidiaries (the "Leased Real Property," and the agreements pursuant to which such Leased Real Property is leased, the "Leases"). Except as set forth on Schedule 3.5(a), the Company or its Subsidiaries have a valid leasehold estate in all Leased Real Property, free and clear of all Encumbrances, other than Permitted Encumbrances and any exceptions that are not material to the Business and the Acquired Assets, taken as a whole. Sellers have made available to Purchaser a true and correct copy of each of the Leases (including all amendments thereto). Except as set forth on Schedule 3.5(a), neither the Company nor its Subsidiaries has leased or otherwise granted to any Person rights to use or occupy any of the Leased Real Property that would reasonably be expected to materially impair the use or occupancy of the Leased Real Property in the operation of the Business and the Acquired Assets, taken as a whole.

(b)    Neither the Company nor any of its Subsidiaries owns any real property. Neither the Company nor its Subsidiaries is a party to any agreement or option to purchase any real property or interest in any real property.

(c)    The Company and its Subsidiaries own good title to, or hold a valid leasehold interest in, all of the material tangible property used by them in the conduct of their business as now conducted, free and clear of all Encumbrances, except for Permitted Encumbrances, other than any failure to own or hold such tangible property that is not material to the Business and the Acquired Assets, taken as a whole.

(d)    Neither the Company nor any of its Subsidiaries owns or holds any third-party cryptocurrency or funds in any custodial capacity.

3.6    Insurance. Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business and the Acquired Assets, taken as a whole, (a) the Company and its Subsidiaries own or hold policies of insurance, or are self-insured, in amounts providing reasonably adequate coverage against all risks customarily insured against by companies in similar lines of business as the Company and its Subsidiaries and (b) all such insurance policies are in full force and effect except for any expiration thereof in accordance with the terms thereof, no written notice of cancelation or modification has been received other than in connection with ordinary renewals, and there is no existing default or event which, with the giving of notice or lapse of time or both, would constitute a default by any insured thereunder.

3.7    Material Contracts.

(a)    Schedule 3.7 sets forth a list of all Material Contracts as of the date of this Agreement. "Material Contract" means any Contract to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries or any of their respective properties or assets is bound (in each case, excluding any Seller Plan) that:

(i)    relates to the formation, creation, governance, economics, or control of any joint venture, partnership, or other similar arrangement, other than with respect to any partnership that is wholly owned by the Company or any of its wholly-owned Subsidiaries;

19

(ii)    provides for indebtedness for borrowed money of the Company or any of its Subsidiaries, other than (A) indebtedness solely between or among any of the Company and any of its wholly-owned Subsidiaries or (B) letters of credit;

(iii)    is a collective bargaining or similar Contract with any labor union, works council, or similar organization of employees;

(iv)    is a Contract for the employment or engagement of any employee or independent contractor involving annual compensation in excess of $130,000;

(v)    relates to the acquisition or disposition of any business, assets, or properties (whether by merger, sale of stock, sale of assets, or otherwise) (A) that was entered into after October 28, 2021 or (B) pursuant to which any earn-out, indemnification or deferred or contingent payment obligations remain outstanding after the Closing (in each case, excluding, for the avoidance of doubt, acquisitions or dispositions of supplies, equipment, inventory, merchandise, or products in the Ordinary Course and dispositions of supplies, equipment, inventory, merchandise, products, properties, or other assets that are obsolete, worn out, surplus, or no longer used or useful in the conduct of business of the Company or its Subsidiaries);

(vi)    is a Contract (other than purchase orders) for the purchase of materials, supplies, goods, services, equipment, or other assets pursuant to which the Company or any of its Subsidiaries would reasonably be expected to make payments of more than $100,000 during any fiscal year;

(vii)    is a Contract (other than purchase orders) with a customer of the Company or any of its Subsidiaries pursuant to which the Company or any of its Subsidiaries received aggregate net payments of more than $100,000 during the fiscal year ended December 31, 2021;

(viii)    is a material license of any material Intellectual Property or a license of any material Intellectual Property that involves payments (by or to the Company or any of its Subsidiaries) in excess of $50,000 per annum and is not terminable by the Company or such Subsidiary upon notice of thirty (30) days or less for a cost of $125,000 or less (other than licenses of commercially available, off-the-shelf software, customer agreements, and licenses to customers entered into in the Ordinary Course);

(ix)    is for the delivery of goods or provision of services with an outstanding balance as of the date hereof in excess of $100,000 payable to or by the Company or any of its Subsidiaries;

(x)    contains any provision (A) limiting, in any material respect, the right of the Company or any of its Subsidiaries to engage in any business, make use of any Company Intellectual Property that is material to the Company or any of its Subsidiaries, compete with any Person, or operate anywhere in the world, or (B) granting any exclusivity right to any third party, or containing a "most favored nation" provision in favor of any third party, in each case, other than (x) a Contract that can be terminated on 90 days' notice or less without resulting in a breach or violation of, or any acceleration of any rights or

20

obligations or the payment of any penalty under, such Contract, (y) Contracts entered into in the Ordinary Course granting exclusive rights to sell or distribute certain of the Company's and its Subsidiaries' products or containing "most favored nation" provisions with respect to certain of the Company's and its Subsidiaries' products or (z) any provision in any license agreements for Intellectual Property limiting the Company's and its Subsidiaries' use of such Intellectual Property to specified fields of use or specified territories;

(xi)     involves any resolution or settlement of any actual or threatened Action involving the Company or any of its Subsidiaries involving (A) outstanding payment obligations by the Company or its Subsidiaries in excess of $50,000 or (B) any other ongoing requirements or restrictions that are material to the Business and the Acquired Assets, taken as a whole; or

(xii)     is a Contract to enter into any of the foregoing.

(b)     Except (i) as a result of the commencement of the Bankruptcy Case or Actions before the Israeli Court and (ii) with respect to any Contract that has previously expired in accordance with its terms, been terminated, restated or replaced, (v) each Material Contract is valid and binding on the Company or its Subsidiary to the extent such Person is a party thereto, as applicable, and to the Knowledge of Sellers, each other party thereto, and is in full force and effect, except where the failure to be valid, binding or in full force and effect would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (w) the Company or its Subsidiaries to the extent such Person is a party thereto, as applicable, and, to the Knowledge of Sellers, any other party thereto, have performed all obligations required to be performed by it under each Material Contract, except where such nonperformance would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (x) neither the Company nor any of its Subsidiaries have received written notice of the existence of any breach or default on the part of the Company or any of its Subsidiaries under any Material Contract, except where such default would not, individually or in the aggregate, reasonably be expected to be material to the Business and the Acquired Assets, taken as a whole, (y) there are no events or conditions which constitute, or, after notice or lapse of time or both, will constitute a default on the part of the Company or any of its Subsidiaries, or to the Knowledge of Sellers, any counterparty under such Material Contract, and (z) to the Knowledge of Sellers, the Company has not received any notice from any Person that such Person intends to terminate, or not renew, any Material Contract, except as would not, individually or in the aggregate, reasonably be expected to be material to the Business and the Acquired Assets, taken as a whole. The Company has made available to Purchaser a true and correct copy of each written Material Contract.

3.8     Litigation. Schedule 3.8 sets forth, as of the date hereof, each Action pending against the Company or any of its Subsidiaries by or before any Governmental Body that seeks or reasonably would be expected to result in fines or damages of more than $100,000 or relates to a criminal matter. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, there is no (a) pending or, to the Knowledge of Sellers, threatened Action against the Company or any of its Subsidiaries or (b) outstanding Order imposed upon the Company or any of its Subsidiaries, in each case, by or before any Governmental Body.

21

3.9     Permits; Compliance with Laws. The Company and each of its Subsidiaries are, and have been since October 28, 2021, in compliance in all material respects with all Laws or Orders that are applicable to the Company or any of its Subsidiaries. The Company and each of its Subsidiaries hold all licenses, franchises, permits, certificates, approvals, and authorizations from Governmental Bodies necessary for the lawful conduct of their respective businesses (collectively, "Permits"), except where the failure to hold the same would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. The Company, each of its Subsidiaries and each of its and their directors, officers, and employees acting in such capacity and, to the Knowledge of Sellers, each of its and their other agents acting on its or their behalf, is, and has been since October 28, 2021, in compliance in all material respects with the Foreign Corrupt Practices Act of 1977 and any rules and regulations promulgated thereunder.

3.10     Environmental Matters. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (a) the Company and each of its Subsidiaries is, and have been since October 28, 2021, in compliance with all applicable Environmental Laws, (b) since October 28, 2021, neither the Company nor any of its Subsidiaries have received any written notice alleging that the Company or its Subsidiaries is in violation of or liable under, or any other written request for information pursuant to, any Environmental Law, (c) the Company and its Subsidiaries possess and are in compliance with all Permits required under Environmental Laws for the operation of their respective businesses ("Environmental Permits"), (d) there is no Action under or pursuant to any Environmental Law or Environmental Permit that is pending or, to the Knowledge of Sellers, threatened against the Company or any of its Subsidiaries, (e) neither the Company nor any of its Subsidiaries are subject to any Order imposed by any Governmental Body pursuant to Environmental Laws under which there are uncompleted, outstanding, or unresolved obligations on the part of the Company or its Subsidiaries, and (f) there are no Hazardous Substances at the Leased Real Property that are reasonably likely to result in any obligation to conduct remedial activities for, or Action against, the Company or any of its Subsidiaries under Environmental Laws.

3.11     Intellectual Property.

(a)     Schedule 3.11(a) contains a correct, current, and complete list of: (i) all Company Intellectual Property that is subject to any issuance, registration, or application by or with any governmental authority or authorized private domain name registrar in any jurisdiction, including issued patents, registered trademarks, domain names, and registered copyrights, and pending applications for any of the foregoing (collectively, "Intellectual Property Registrations"), and specifying as to each, as applicable: the title, mark, or design; the record owner, if any; the jurisdiction by or in which it has been issued, registered, or filed; and the patent, registration, or application serial number; the issue, registration, or filing date; (ii) all unregistered trademarks included in the Company Intellectual Property that are material to the Business and the Acquired Assets; and (iii) all proprietary Software of the Company and its Subsidiaries that is material to the Business and the Acquired Assets. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, the Company and its Subsidiaries own all of the rights, title and interest in and to the Company Intellectual Property, free and clear of all Encumbrances (other than Permitted Encumbrances). Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, all of the Company Intellectual Property is subsisting, valid and enforceable.

22

(b)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) the Company and its Subsidiaries own or have legally enforceable and sufficient rights to use all Intellectual Property necessary to the conduct of the business of the Company and its Subsidiaries as currently conducted free and clear of all Encumbrances (other than Permitted Encumbrances) and (ii) the Company and its Subsidiaries have taken commercially reasonable steps in accordance with industry practice to maintain the confidentiality of non-public Intellectual Property.

(c)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, no Actions are pending or, to the Knowledge of Sellers, threatened against the Company or its Subsidiaries, and since October 28, 2021, neither the Company nor any of its Subsidiaries has received any written (or, to the Knowledge of Sellers, oral) notice or claim, (i) challenging the ownership, validity, enforceability or use by the Company or any of its Subsidiaries of any Intellectual Property owned by or exclusively licensed to the Company or any of its Subsidiaries or (ii) alleging that the Company or any of its Subsidiaries are infringing, misappropriating or otherwise violating the Intellectual Property of any Person.

(d)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, since October 28, 2021, (i) no Person has infringed, misappropriated or otherwise violated the rights of the Company or any of its Subsidiaries with respect to any Company Intellectual Property or Intellectual Property exclusively licensed to the Company or a Subsidiary of the Company and (ii) the operation of the business of the Company and its Subsidiaries has not violated, misappropriated or infringed the Intellectual Property of any other Person.

(e)     Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business and the Acquired Assets, taken as a whole, the Company or one of its Subsidiaries has entered into written, valid and enforceable (subject to the Enforceability Exceptions) Contracts with each current and former employee and independent contractor of the Company and its Subsidiaries who has developed material Intellectual Property for or on behalf of the Company and its Subsidiaries where such developed Intellectual Property is intended by the Company to be owned by the Company or one of its Subsidiaries, whereby such employee or independent contractor assigns to the Company or its Subsidiary any ownership interest such employee or independent contractor may have in or to such Intellectual Property, to the extent such Intellectual Property does not constitute a "work made for hire" or otherwise vest automatically in the Company or one of its Subsidiaries under applicable Law and irrevocably waives any right or interest, including any moral rights, regarding any such Intellectual Property, to the extent permitted by applicable Law. Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business and the Acquired Assets, taken as a whole, all assignments and other instruments necessary to establish, record, and perfect the Company's ownership interest in the Intellectual Property Registrations have been validly executed, delivered, and filed with the relevant governmental authorities and authorized registrars.

(f)     The consummation of the transactions contemplated hereby will not result in the grant of any right or license to any third party of any Intellectual Property that is owned by or exclusively licensed to the Company or any of its Subsidiaries and is material to the Company and its Subsidiaries.

(g)     Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business and the Acquired Assets, taken as a whole, Sellers are in actual possession of a complete and correct copy of the source code for all proprietary components owned by the Company of all proprietary Software products of the businesses of the Company or any of its Subsidiaries that are currently, or at any time since October 28, 2021 have been, offered, licensed, sold, distributed, hosted, maintained or supported, or otherwise provided or made available by or on behalf of the Company or any of its Subsidiaries ("Company Products"). Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business and the Acquired Assets, taken as a whole, neither the Company nor any of its Subsidiaries has disclosed, delivered, licensed, or otherwise made available, or has a duty or obligation (whether present, contingent, or otherwise) to disclose, deliver, license, or otherwise make available, any source code included in the Company Intellectual Property for any Company Products to any escrow agent or any other Person, other than (A) an employee, independent contractor, or consultant of the Company or one of its Subsidiaries pursuant to a valid and enforceable (subject to the Enforceability Exceptions) written agreement prohibiting use or disclosure except in the performance of services for the Company or any of its Subsidiaries; or (B) an independent third-party escrow agent pursuant to a valid and enforceable (subject to the Enforceability Exceptions) written source code escrow agreement providing for limited release only upon the occurrence of specified release events, and no such release event has occurred and no circumstance or condition exists that would reasonably be expected to result in the occurrence of any such release event. Without limiting the foregoing, neither the execution of this Agreement nor the consummation of any of the transactions contemplated by this Agreement will result in the release from escrow or other delivery to any Person of any source code for any Company Product, except as would not, individually or in the aggregate, reasonably be expected to be material to the Business and the Acquired Assets, taken as a whole. As of the date hereof, except as would not, individually or in the aggregate, reasonably be expected to be material to the Business and the Acquired Assets, taken as a whole, to the Knowledge of Sellers, there has been no unauthorized theft, reverse engineering, decompiling, disassembling, or other unauthorized disclosure of or access to any source code for any Company Product.

(h)     Schedule 3.11(h) sets forth a correct, current, and complete list of each material item of Open Source Software that the Company or any of its Subsidiaries has incorporated into, combined with, linked with, distributed with, or provided to any Person as a service (including via a network as a service or application) with any Company Product, and for each such item: (i) the applicable Company Product; and (ii) the name and version number of the applicable license agreement. Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business and the Acquired Assets, taken as a whole, the Company and its Subsidiaries have complied with all notice, attribution, and other requirements of each license applicable to the Open Source Software incorporated into, combined with, linked with or distributed with any Company Product. Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business and the Acquired Assets, taken as a whole, neither the Company nor any of its Subsidiaries has used any Open Source Software in a manner that does or will require the (A) disclosure or distribution of any Company Product in source code form; (B) license or other provision of any Company Product on a royalty-free basis; or (C) grant of any patent license, non-assertion covenant, or other rights under any Company Intellectual Property or rights to modify, make derivative works based on, decompile, disassemble, or reverse engineer any Company Product.

24

(i)      Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business and the Acquired Assets, taken as a whole, all Company Products currently, or at any time since October 28, 2021, offered, licensed, sold, distributed, hosted, maintained or supported, or otherwise provided or made available by or on behalf of the Company or any of its Subsidiaries, comply with all industry standards to which the Company has agreed to comply with in writing and comply with all applicable Laws, including with respect to security; and conforms to all applicable contractual commitments to which the Company is bound. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, no such Company Product contains any bug, defect, or error that adversely affects, or would reasonably be expected to adversely affect, the value, functionality, or performance of such Company Product. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, no such Company Products contain any "time bomb," "Trojan horse," "back door," "worm," virus, malware, spyware, or other device or code designed or intended to (i) disrupt, disable, harm, or otherwise impair the normal and authorized operation of, or provide unauthorized access to, any computer system, hardware, firmware, network, or device on which any Company Product is installed, stored, or used; or (ii) damage, destroy, or prevent the access to or use of any data or file without the user's consent.

(j)      Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business and the Acquired Assets, taken as a whole, all Software, computer hardware, servers, networks, platforms, peripherals, and similar or related items of automated, computerized, or other information technology (IT) networks and systems (including telecommunications networks and systems for voice, data, and video) included in the Acquired Assets or otherwise under the Company's or its Subsidiaries' control (collectively, "Company IT Systems") are in good working condition and are sufficient for the operation of such business as currently conducted. Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business and the Acquired Assets, taken as a whole, since October 28, 2021, there has been no material malfunction, failure, continued substandard performance, denial-of-service, or other cyber incident, including any cyberattack, or other substantial impairment of the Company IT Systems that has resulted in material disruption or damage to the business of the Company and its Subsidiaries and that has not been remedied in all material respects. The Company and its Subsidiaries have taken commercially reasonable steps designed to safeguard the confidentiality, availability, security, and integrity of the Company IT Systems.

(k)      Schedule 3.11(k) sets forth the status of account report from the IIA (titled "Keren Tmura Status of Account") issued as of the date of this Agreement listing all amounts received in funding in support of Company's research and development efforts received under the R&D Law, as well as all amounts repaid to-date as required by the R&D Law and all amounts remaining due to the IIA. Other than as stated in Schedule 3.11(k) and detailed in Schedule 3.4(a), neither the Company nor Affiliate has received any Governmental Grants. The Company has made available to the Purchaser correct copies of all letters of approval, certificates of completion, undertakings, and supplements that are material to the existence and continuance of the Governmental Grants, and the Company is in compliance, in all material respects, with the terms and conditions of all Governmental Grants and has duly fulfilled all the undertakings relating thereto, including all payment obligations relating thereto, and no event has occurred or circumstances exist that would reasonably be expected to result in the revocation or material modification of any Governmental Grant. Other than the restrictions under the R&D Law and the

25

limitations imposed under the Israeli Encryption Regulations, except as would not, individually or in the aggregate, reasonably be expected be material to the Business and the Acquired Assets, taken as a whole, there are no other restrictions under Law whatsoever that impair the transfer, assignment, licensing or other disposition, whether inside or outside the State of Israel, by the Company or any Affiliate of any of the Company Intellectual Property.

(l)     Except as detailed in Schedule 3.11(k) or as would not, individually or in the aggregate, reasonably be expected to be material to the Business and the Acquired Assets, taken as a whole, neither the Company nor any of its Affiliates has any obligation to pay any royalties, license fees or other amounts or provide or pay any other consideration to any third party by reason of ownership, use, exploitation, practice, sale or disposition of any Company Intellectual Property (or any tangible embodiment thereof) or reproducing, manufacturing, making, using, selling, offering for sale, distributing or importing any product which incorporates Company Intellectual Property. Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business and the Acquired Assets, taken as a whole, the consummation of the transaction contemplated by this Agreement will not result in any increase or other change to any such royalties, license fees or other amounts or consideration, other than as set forth in the R&D Law with respect to Intellectual Property funded by the IIA.

(m)     Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business and the Acquired Assets, taken as a whole, the execution or performance of this Agreement or any ancillary agreement contemplated hereby, the consummation of the transactions contemplated by this Agreement or such ancillary agreements will not contravene, conflict with or result in any termination of or new or additional limitations on Purchaser's right, title or interest in or to the Company Intellectual Property, nor will it cause the Company to be obligated to pay any additional, increased or amended royalties or other fees or consideration with respect to Company Intellectual Property in excess of those listed in Schedule 3.11(k) payable to the IIA.

(n)     Except for the restrictions set out in the R&D Law with respect to such Company Intellectual Property funded by the IIA or as would not, individually or in the aggregate, reasonably be expected to be material to the Business and the Acquired Assets, taken as a whole, and subject to limitations imposed under the Israeli Encryption Regulations by IMOD in respect of Company's encryption technology, all Company Intellectual Property is and will be fully transferable, alienable and licensable by the Company without restriction and without payment of any kind to any other Person.

3.12    Tax Matters. Except as set forth on Schedule 3.12 or as would not reasonably be expected to be material to the Business and the Acquired Assets, taken as a whole, since October 28, 2021:

(a)     the Company and its Subsidiaries have filed all material Tax Returns that are required to be filed by them and paid all material Taxes, whether or not shown as due and owning thereon, other than Taxes that are not yet due and payable or Taxes that are being contested in good faith;

26

(b)      all Taxes that the Company or any of its Subsidiaries is obligated to withhold from amounts paid or owing to any Person have been withheld in accordance with applicable law and regulations;

(c)      as of the date hereof, neither the Company nor any of its Subsidiaries has received from any Governmental Body any written notice of deficiency or proposed adjustment that has not been paid or resolved for any amount of material Tax;

(d)      as of the date hereof, neither the Company nor any of its Subsidiaries has consented to extend the time in which any Tax may be assessed or collected by any taxing authority of any Governmental Body, which extension is still in effect, other than pursuant to extensions of time to file Tax Returns obtained in the Ordinary Course;

(e)      as of the date hereof, there are no ongoing or pending Tax audits, examinations or other proceedings by any taxing authority of any Governmental Body against the Company or any of its Subsidiaries;

(f)      neither the Company nor any of its Subsidiaries is a party to or bound by any written Tax allocation or sharing agreement (other than leases, credit agreements, and other Contracts of which Tax is not the principal subject matter);

(g)      neither the Company nor any of its Subsidiaries (i) has been a member of an affiliated group filing a consolidated federal income Tax Return or any other similar group for Tax purposes, other than a group the common parent of which was the Company or any of its Subsidiaries, or (ii) has any Liability for the Taxes of any Person (other than the Company or its Subsidiaries) under Section 1.1502-6 of the Treasury Regulations or any other similar Laws or as a transferee or successor;

(h)      neither the Company nor any of its Subsidiaries has participated in any "listed transaction" as defined in Section 6707A of the Code;

(i)      there are no Encumbrances for Taxes upon any of the Acquired Assets (other than Permitted Encumbrances);

(j)      neither the Company nor any of its Subsidiaries participates in, and has never participated in or been engaged in, any transaction listed in Section 131(g) of the Ordinance and the Income Tax Regulations (Reportable Tax Planning), 5767-2006 promulgated thereunder, or any similar provision under any other local or foreign applicable Tax law;

(k)      neither the Company nor any of its Subsidiaries is subject to any reporting obligations under Sections 131D and 131E of the Ordinance or any similar provision under any other local or foreign applicable Tax law, including with respect to VAT;

(l)      neither the Company nor any of its Subsidiaries have never been a real estate corporation (Igud Mekarke'in) within the meaning of this term under Section 1 of the Israeli Land Taxation Law (Appreciation and Acquisition), 5723-1963. No Acquired Asset constitutes a real property right ("זכות במקרקעין") pursuant to the Real Estate Tax Law (Gain and Acquisition) of 1963; and

27

(m)     neither the Company nor any of its Subsidiaries is subject to any restrictions or limitations pursuant to Part E2 of the Ordinance or pursuant to any Tax ruling made with reference to the provisions of such Part E2 or otherwise.

No representation or warranty is made with respect to the availability of any Tax attribute for any Tax period (or any portion thereof) following the Closing.

3.13     Seller Plans.

(a)     Schedule 3.13(a) lists all material Seller Plans. With respect to each such material Seller Plan, Sellers have delivered to Purchaser true, current, accurate and complete copies of each of the following: (i) the plan document together with all material amendments thereto (or, if the plan has not been reduced to writing, a written summary of the material terms thereof) and (ii) if applicable, copies of the most recent summary plan descriptions and summaries of material modifications.

(b)     None of the Seller Plans is, and neither Sellers nor any ERISA Affiliate currently maintains, sponsors, participates in or contributes to or is required to contribute to or has any Liability with respect to, or in the past six (6) years maintained, established, sponsored, participated in, or contributed to or been required to contribute to: (i) a "multiemployer plan," as defined in Section 4001(a)(3) of ERISA or Section 3(37) of the Code, (ii) a plan subject to Title IV or ERISA or Section 412 of the Code, (iii) a "multiple employer welfare arrangement" (within the meaning of Section 3(40) of ERISA), (iv) a "multiple employer plan" as described in Section 413(c) of the Code, or (v) a plan that has two or more contributing sponsors at least two of whom are not under common control within meaning of Section 4063 of ERISA and to which Sellers or any ERISA Affiliate contributes or has an obligation to contribute.

(c)     Except as set forth on Schedule 3.13(c), there are no Seller Plans that provide any material benefits to any employee or former employee of the Company or any of its Subsidiaries who is, or was at the time of termination of employment, employed by the Company or any of its Subsidiaries in any jurisdiction.

(d)     Each Seller Plans has been sponsored, maintained, operated, funded and administered in all material respects in accordance with its terms and the requirements of all applicable Law. Sellers have performed all material obligations required to be performed by them under, are not in any respect in default under or in violation of, and to the Knowledge of Sellers there is no default or violation by any party to, any Seller Plan.

(e)     Neither the execution of this Agreement nor the consummation of the transactions contemplated herein will (either alone or together with any other event) constitute an event under any Seller Plan that will or may result (either alone or together with any other event) in any payment (whether of severance pay or otherwise), forgiveness of indebtedness, vesting, or increase in compensation or benefits with respect to any current or former employee, officer, director, or independent contractor of the Company or any of its Subsidiaries.

(f)     No Seller is party to any agreement, plan, contract or arrangement that would reasonably be expected to result, upon execution of this Agreement or upon consummation of the transactions contemplated herein (alone or together with any other event), in the payment or

series of payments of any "excess parachute payments" within the meaning of Section 280G of the Code to any current or former employee, officer, director, or individual independent contractor of the Company or any of its Subsidiaries, in each case, who is a "disqualified individual" (within the meaning of Section 280G of the Code and the regulations thereunder).

3.14    <u>Employees</u>.

(a)    <u>Schedule 3.14(a)</u> sets out a complete and accurate list of all employees and current individual independent contractors of the Company and its Subsidiaries as of the date hereof (collectively, the "<u>Employees</u>") and sets forth for each such individual the following, as applicable: (i) name; (ii) title or position (including whether full or part time and whether treated as an employee or independent contractor); (iii) employing or engaging entity; (iv) hire date; (v) work location; (vi) current annual base compensation rate (and in case of global overtime payment, the split between the base salary and such global overtime payment), annual entitlement to vacation, sick leave and other paid time-off allowance, recreation pay, travel pay, car maintenance or car entitlement, pension arrangement and notice period; (vii) target annual commission, bonus or other annual cash incentive-based compensation and any other material compensation or benefits payable; (viii) leave status (and, if on leave, the anticipated return date, if known) and (ix) visa status (if applicable).

(b)    Neither the Company nor any of its Subsidiaries is party to or bound by any collective bargaining agreement, agreement with any works council, labor union, agreement with any employees' committee or representative, or other Contract with any labor union, works council, or representative of any employee group, including any extension order (other than as applicable to all employees in Israel), nor is any such Contract being negotiated by the Company or any of its Subsidiaries. No employee of the Company is subject to or benefits from any extension order other than extension orders that are generally applicable to all employers in Israel. Neither the Company nor any of its Subsidiaries is a member of any employers' association or organization or has ever paid, been required to pay, or been requested to pay any payment (including professional organizational handling charges) to any employers' association or organization. To the Knowledge of Sellers, there is no current union organizing, election, or other activities made or threatened by or on behalf of any union, works council, employees' committee or representative, or other labor organization or group of employees with respect to any employees of the Company or any of its Subsidiaries. There is no union, works council, employees' committee or representative, or other labor organization in the Company or any of its Subsidiaries that, pursuant to applicable Law, must be notified, consulted, or negotiated with in connection with the transactions contemplated hereby.

(c)    The Company and its Subsidiaries are and have been since October 28, 2021 in compliance in all material respects with all applicable Laws, policies, procedures, customs, plans, Contracts (including collective bargaining agreement), and with any Order (including extension orders), ruling, decree, judgment, or arbitration award of any arbitrator or any court or other Governmental Body, relating to the employment of labor, engagement, classification of employees or termination of such, except as would not reasonably be expected to be material to the Business and the Acquired Assets, taken as a whole, and, except as would not reasonably be expected to be material to the Business and the Acquired Assets, taken as a whole, each of the Company and its Subsidiaries has paid in full (or has fully contributed to funds managed on behalf

29

of its employees) to all of its employees, consultants, individual service providers, officers and managers all compensation, wages, salaries, commissions, bonuses, benefits, severance pay and other compensation that have become due and payable to such.

(d)     All Employees are subject to Section 14 to the Israeli Severance Pay Law – 1963 ("Section 14 Arrangement"), which was implemented properly and in full, from the commencement date and on the basis of such Employee's entire salary such that the upon termination Sellers should not have to make any payment under the Israeli Severance Pay Law - 1963, except for release of the funds accumulated in accordance with Section 14 Arrangement, and the Company has paid to the Employees all due payments relating to their employment.

(e)     There is no material unfair labor practice charge pending or, to the Knowledge of Sellers, threatened against the Company or any of its Subsidiaries before the National Labor Relations Board or any similar foreign, state or local Governmental Body.

(f)     As of the date hereof, no current employee or individual independent contractor of the Company or its Subsidiaries has given or received notice resigning or terminating such person's employment or engagement, except as expressly contemplated in this Agreement.

3.15   Affiliate Transactions. Except as set forth on Schedule 3.15, no Affiliate of the Company (other than its Subsidiaries), or any officer or director of the Company or any of its Subsidiaries (a) is a party to any agreement or transaction with the Company or its Subsidiaries, other than (i) loans and other extensions of credit to directors, officers, and employees of the Company and its Subsidiaries for travel, business, or relocation expenses or other employment-related purposes in the Ordinary Course, (ii) employment arrangements in the Ordinary Course, (iii) the Seller Plans, or (iv) as will be terminated prior to the Closing, (b) has any material interest in any material assets, rights or property used or owned by the Company or its Subsidiaries, or (c) owns any material interest in, or is an officer, director, employee, or consultant of, any Person which is, or is engaged in business as a material supplier or customer of the Company or any of its Subsidiaries. There are no material services provided (i) by Sellers' Affiliates (other than Sellers) to the Company or (ii) by Company to Sellers' Affiliates (other than Sellers), in each case, other than (x) general advisory and strategic guidance and funding from time to time, (y) human resource and legal services (which, together with (x), will cease as of the Closing), and (z) the CE Commercial Agreement.

3.16   Brokers. Except for Centerview Partners, the fees and expenses of which will be paid by Seller, no broker, investment banker, financial advisor, or other Person is entitled to any broker's, finder's, financial advisor's, or other similar fee or commission, or the reimbursement of expenses, in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of the Company or any of its Subsidiaries.

3.17   Privacy and Data Security.

(a)     Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business and the Acquired Assets, taken as a whole, the Company and its Subsidiaries comply with, and have since October 28, 2021 complied with all Data Protection Obligations.

30

(b)     Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business and the Acquired Assets, taken as a whole, since October 28, 2021, the Company and its Subsidiaries have not in writing received any subpoenas, demands, or other written notices from any Governmental Body investigating, inquiring into, or otherwise relating to any actual or potential violation of any Data Protection Obligation by the Company, to the Knowledge of Sellers, and neither the Company nor any of its Subsidiaries are under investigation by any Governmental Body for any actual or potential violation of any Data Protection Obligation. Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business and the Acquired Assets, taken as a whole, since October 28, 2021, no written complaint, notice, or action of any kind has been served on, or initiated against, the Company or any of its Subsidiaries under any applicable Data Protection Obligation.

(c)     Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business and the Acquired Assets, taken as a whole, the Company and its Subsidiaries have implemented and maintain commercially reasonable technical and organizational measures, compliant with applicable Data Protection Obligations, designed to protect (i) the operation, confidentiality, integrity, and security of its Personal Data and proprietary information and its software, systems, and websites that are involved in the collection or processing of Personal Data, Intellectual Property, and proprietary information, and (ii) against the loss or unauthorized access, use, modification, or disclosure of Personal Data in its respective possession or control or of any of its proprietary information, including Intellectual Property.

(d)     Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business and the Acquired Assets, taken as whole, since October 28, 2021, the Company and its Subsidiaries have not experienced any failures, crashes, security breaches, unauthorized access, use, or disclosure, or other adverse events or incidents involving Personal Data. Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business and the Acquired Assets, taken as whole, there are no actual, pending, or threatened, in writing, complaints, claims, enforcement actions, or litigation of any kind against the Company or any of its Subsidiaries in connection with any such failures, crashes, security breaches, unauthorized access, use, or disclosure, or other adverse events or incidents involving Personal Data.

(e)     Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business and the Acquired Assets, taken as whole, the Company and its Subsidiaries are not subject to any written or oral Data Protection Obligations that, immediately following the Closing Date, would prohibit the Purchaser from receiving or using the Personal Data in accordance with and subject to such Data Protection Obligations to which the Company or any of its Subsidiaries are subject.

3.18    Bankruptcy Actions. Except as set forth on Schedule 3.18, Sellers have complied in all material respects with all applicable noticing and other provisions of the Bidding Procedures Order, the Sale Order and any Order approving the assignment and assumption of any Assigned Contracts and Acquired Leased Real Property, and have otherwise provided all notices related to the Auction or the sale of the Acquired Assets in accordance with applicable Law, including to all entities known or reasonably believed to have asserted an Encumbrance or other interest in the

31

Acquired Assets. The Bidding Procedures Order, as originally entered by the Court, remains valid and enforceable and has not been amended.

3.19    No Other Representations or Warranties. Except for the representations and warranties expressly contained in this Article III (in each case, as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "Express Representations") (it being understood that Purchaser and the Purchaser Group have relied only on such express representations and warranties), Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that neither Sellers, nor any other Person on behalf of Sellers makes, and neither Purchaser nor any member of the Purchaser Group has relied on, the accuracy or completeness of any express or implied representation or warranty with respect to the Company or any of its Subsidiaries, the Acquired Assets, or the Assumed Liabilities or with respect to any information, statements, disclosures, documents, projections, forecasts, or other material of any nature made available or provided by any Person (including in the Projections, the Confidential Information Memorandum prepared by Centerview Partners (the "Information Presentation") or in that certain datasite entitled "Project Knox" administered by SecureDocs (the "Dataroom") or elsewhere) to Purchaser or any of its Affiliates or Advisors on behalf of Sellers or any of their Affiliates or Advisors. Without limiting the foregoing, neither Sellers nor any other Person will have or be subject to any Liability whatsoever to Purchaser, or any other Person, resulting from the distribution to Purchaser or any of its Affiliates or Advisors, or Purchaser's or any of its Affiliates' or Advisors' use of or reliance on, any such information, including the Information Presentation, the Projections, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise or any discussions with respect to any of the foregoing information.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Sellers as of the date hereof and as of the Closing Date as follows.

4.1    Organization and Qualification. Purchaser is a limited liability company duly incorporated, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and corporate authority necessary to carry on its business as it is now being conducted, except (other than with respect to Purchaser's due incorporation and valid existence) as would not, individually or in the aggregate, reasonably be expected to prevent or materially delay the ability of Purchaser to consummate the transactions contemplated hereby. Purchaser is duly licensed or qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned or leased by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser. Purchaser is not in violation of any of the provisions of its Organizational Documents, except as would not reasonably be expected to prevent or materially delay the ability of Purchaser to consummate the transactions contemplated hereby.

32

4.2     Authorization of Agreement. Purchaser has all necessary corporate power and corporate authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery, and performance by Purchaser of this Agreement, and the consummation by Purchaser of the transactions contemplated hereby, have been duly authorized by all requisite corporate or similar organizational action and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery, and performance by Purchaser of this Agreement and the consummation by it of the transactions contemplated hereby. This Agreement has been duly executed and delivered by Purchaser and, assuming due authorization, execution, and delivery hereof by the other parties hereto, constitutes a legal, valid, and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, subject to the Enforceability Exceptions.

4.3     Conflicts; Consents. Assuming that (a) requisite Bankruptcy Court and Israeli Court approvals are obtained, (b) the notices, authorizations, approvals, Orders, permits or Consents set forth on Schedule 4.3 are made, given, or obtained (as applicable), and (c) any filings required by any applicable international, federal, or state securities or "blue sky" Laws are made, neither the execution and delivery by Purchaser of this Agreement, nor the consummation by Purchaser of the transactions contemplated hereby, nor performance or compliance by Purchaser with any of the terms or provisions hereof, will (i) conflict with or violate any provision of Purchaser's Organizational Documents, (ii) violate any Law or Order applicable to Purchaser, (iii) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit under, any of the terms or provisions of any material Contract to which Purchaser is a party or accelerate Purchaser's obligations under any such Contract, or (iv) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Purchaser or any of its Subsidiaries, except, in the case of clauses (ii) through (iv), as would not, individually or in the aggregate, reasonably be expected to prevent or materially delay the ability of Purchaser to consummate the transactions contemplated hereby.

4.4     Financing. Purchaser has, and will have at the Closing, sufficient funds in an aggregate amount necessary to pay the Purchase Price, to perform the Assumed Liabilities as they become due in accordance with their terms, and to consummate all of the other transactions contemplated by this Agreement, including the payment of the Purchase Price and all fees and expenses of, and other amounts required to be paid by Purchaser in connection with the transactions contemplated by this Agreement. Purchaser is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts and the related Assumed Liabilities.

4.5     Tax Residency for VAT Purposes. Purchaser is a 'foreign resident' (תושב חוץ) pursuant to Section 30(C) of the VAT Law.

4.6     Brokers. There is no investment banker, broker, finder, or other intermediary which has been retained by or is authorized to act on behalf of Purchaser that might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement.

4.7    No Litigation. There are no Actions pending or, to Purchaser's knowledge, threatened against or affecting Purchaser that will adversely affect Purchaser's performance under this Agreement or the consummation of the transactions contemplated by this Agreement.

4.8    Certain Arrangements. As of the date hereof, there are no Contracts, undertakings, commitments, agreements, or obligations, whether written or oral, between any member of the Purchaser Group, on the one hand, and any member of the management of the Company or any of its Subsidiaries or board of directors (or applicable governing body of any Subsidiary), any holder of equity or debt securities of the Company or its Subsidiaries, or any lender or creditor of the Company or its Subsidiaries, on the other hand, (a) relating in any way to the acquisition of the Acquired Assets or the transactions contemplated by this Agreement or (b) that would be reasonably likely to prevent, restrict, impede, or affect adversely the ability of the Company to entertain, negotiate, or participate in any such transactions.

4.9    No Additional Representations or Warranties. Except for the representations and warranties contained in this Article IV, Sellers acknowledges that neither Purchaser nor any other Person on behalf of Purchaser makes any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to Sellers by Purchaser.

## ARTICLE V

## BANKRUPTCY COURT MATTERS

5.1    Bankruptcy Actions.

(a)    Sellers may modify the Bidding Procedures or the proposed Sale Order following consultation with the unsecured creditors' committee appointed in the Bankruptcy Case, in accordance with the Bidding Procedures Order, or any other party in interest, including Purchaser, with any such modifications being subject to Purchaser's prior written consent (not to be unreasonably withheld, conditioned or delayed). The bidding procedures to be employed with respect to this Agreement shall be those reflected in the Bidding Procedures Order.

(b)    No later than December 6, 2022, each Seller shall file a voluntary petition for relief under the Bankruptcy Code in the Bankruptcy Court and for the entry of an order by the Bankruptcy Court authorizing any of Sellers to act as foreign representative on behalf of Sellers' estates. Sellers have filed with the Bankruptcy Court a motion seeking entry of the Sale Order. Sellers shall promptly provide Purchaser with drafts of any and all material pleadings material with respect to the sale of the Business or the Acquired Assets, including proposed Orders to be filed or submitted in connection with this Agreement for Purchaser's prior review and comment. The proposed form of Sale Order shall be reasonably acceptable to Purchaser to the extent such Sale Order relates to the Acquired Assets, any Assumed Liabilities, this Agreement or any of Purchaser's obligations hereunder. Sellers shall materially comply with all notice requirements (x) of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure or (y) imposed by Sale Order or the Israeli Court Order, in each case in connection with any pleading, notice or motion to be filed in connection herewith. The Parties shall use their respective commercially reasonable efforts to (i) obtain entry by the Bankruptcy Court of the Sale Order (including any enforcement thereof and obtainment of any other Orders required or appropriate in connection therewith by the

34

Israeli Court and any actions or decisions required or appropriate by any court appointed officer, if applicable), (ii) obtain entry by the Israeli Court of the Israeli Court Order and (iii) consummate the transactions contemplated hereby as promptly as practicable and in any case prior to the Outside Date. In the event the entry of the Sale Order is appealed, Sellers and Purchaser shall use their respective commercially reasonable efforts to defend such appeal. To the extent Sellers have not previously provided parties holding Encumbrances or other interests in the Acquired Assets notice that the Acquired Assets are intended to be sold free and clear of all such Encumbrances or other interests, Sellers will promptly serve such notice upon any such party.

(c)    Within ten (10) days after the entry of an order by the Bankruptcy Court authorizing any of Sellers to act as foreign representative on behalf of Sellers' estates, each Seller shall (i) commence a proceeding under the Israeli Insolvency Law in the Israeli Court seeking recognition of the Bankruptcy Case and (ii) file with the Israeli Court the appropriate motion or motions seeking entry of the Israeli Court Order, which shall provide, among other things, that the Sale Order is enforceable in Israel.

(d)    Purchaser agrees to use its commercially reasonable efforts to promptly take all actions as are reasonably requested by Sellers to assist in obtaining the Bankruptcy Court's entry of the Sale Order, the Israeli Court's entry of the Israeli Court Order, and any other Order reasonably necessary to authorize the consummation of the transactions contemplated by this Agreement as promptly as practicable, including furnishing affidavits, financial information, or other documents or information for filing with the Bankruptcy Court (including the Israeli Court) and making such employees and Advisors of Purchaser and its Affiliates available to testify before the Bankruptcy Court and the Israeli Court for the purposes of, among other things providing necessary assurances of performance by Purchaser under this Agreement, adequate assurance of future performance as required under section 365 of the Bankruptcy Code or as may be required by the Israeli Court according to section 75 of the Israeli Insolvency Law, for the Assigned Contracts, and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, as well as demonstrating Purchaser's ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing and satisfying any conditions set by the Israeli Court for the assignment, including providing assurance for fulfillment of Assumed Liabilities under the Assigned Contracts (including providing adequate guarantee if such guarantee is required by the Israeli Court).

(e)    Each of Sellers and Purchaser shall (i) appear formally or informally in the Bankruptcy Court or the Israeli Court if reasonably requested by the other Party or required by the Bankruptcy Court or the Israeli Court or to obtain authority to consummate the transactions contemplated by this Agreement and (ii) keep the other reasonably apprised of the status of material matters related to the transactions contemplated by this Agreement, including, upon reasonable request promptly furnishing the other with copies of notices or other communications received by Sellers from the Bankruptcy Court, the Israeli Court, or any third party or any Governmental Body with respect to the transactions contemplated by this Agreement.

(f)    If an Auction is conducted and Purchaser is not the prevailing party at the conclusion of such Auction (such prevailing party, the "Successful Bidder") but is the second highest or otherwise best bidder at the Auction, Purchaser shall be required to serve as a back-up bidder (the "Backup Bidder") and keep Purchaser's bid to consummate the transactions

contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be revised in the Auction) open and irrevocable until this Agreement is otherwise terminated. If the Successful Bidder fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Successful Bidder, Purchaser, as the Backup Bidder, will be deemed to have the new prevailing bid, and Sellers shall consummate the transactions contemplated by this Agreement subject to the terms and conditions set forth in this Agreement (as the same may have been revised in the Auction).

(g)    Sellers and Purchaser acknowledge that this Agreement and the sale of the Acquired Assets are subject to higher and better bids and Bankruptcy Court and Israeli Court approval. Sellers and Purchaser acknowledge that Sellers and their Affiliates must take reasonable steps to demonstrate that Sellers have sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice of the sale of the Acquired Assets to the creditors of Sellers and their Affiliates and other interested parties, providing information about the Company to prospective bidders, entertaining higher and better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Acquired Assets, conducting an Auction.

(h)    Notwithstanding any other provision of this Agreement to the contrary, Purchaser acknowledges that, until such time as the Successful Bidder is selected in accordance with the Bidding Procedures, Sellers and their Affiliates and Advisors are and may continue soliciting inquiries, proposals or offers for the Acquired Assets in connection with any Alternative Transaction.

(i)    Prior to such time as the Successful Bidder is selected in accordance with the Bidding Procedures, nothing in this Section 5.1 (but subject to Section 5.1(a)) shall prevent Sellers, in consultation with Purchaser, from modifying the Bidding Procedures as necessary or appropriate to maximize value for Sellers' estate in accordance with Sellers' fiduciary obligations and the Bidding Procedures Order.

(j)    Within one (1) Business Day of Sellers filing a voluntary petition for relief under the Bankruptcy Code in the Bankruptcy Court, Sellers shall serve on all non-debtor counterparties to all of the Assigned Contracts (that are known as of such date) a notice specifically stating that Sellers are or may be seeking the assumption and assignment of such Contracts and shall notify such non-debtor counterparties of the deadline for objecting to the Cure Costs, if any, which deadline shall be not less than fourteen (14) days after entry of the Sale Order. Upon receipt of any notice from a non-debtor counterparty rejecting, challenging, or otherwise disputing any Cure Cost, Sellers shall immediately notify Purchaser and provide timely updates with respect to all negotiations with such counterparty related to the settlement of such contested Cure Cost.

5.2    Sale Order. The Sale Order and the Israeli Court Order, respectively, shall, among other things, (a) approve, pursuant to sections 105, 363, and 365 of the Bankruptcy Code and sections 302 (or 303) and 75 and section 72 of the Israeli Insolvency Law together with section 34A of the Israeli Sales Law, (i) the execution, delivery and performance by Sellers of this Agreement, (ii) the sale of the Acquired Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), (iii) the assumption and assignment by Sellers pursuant to Section 365

of the Bankruptcy Code of the Assigned Contracts and the Acquired Leased Real Property, and (iv) the performance by Sellers of their obligations under this Agreement; (b) authorize and empower Sellers to assume and assign to Purchaser the Assigned Contracts; (c) find that Purchaser is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code and of section 75 (or section 72, if applicable) of the Israeli Insolvency Law and section 34A of the Israeli Sales Law, find that Purchaser is not a successor to Sellers, and grant Purchaser the protections of section 363(m) of the Bankruptcy Code; (d) find that Purchaser shall have no Liability or responsibility for any Liability or other obligation of Sellers arising under or related to the Acquired Assets and the Assigned Contracts other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, *de facto* merger, or substantial continuity; (e) find that Purchaser has provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code or the requirements of section 75(b) and 72 of the Israeli Insolvency Law) of future performance in connection with the assumption of the Assigned Contracts; and (f) find that Purchaser shall have no Liability for any Excluded Liability.

5.3     Approval. Sellers' obligations under this Agreement and in connection with the transactions contemplated hereby are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including the Bidding Procedures Order and the Sale Order) or the Israeli Court (including the Israeli Court Order). Nothing in this Agreement shall require Sellers or their Affiliates to give testimony to or submit a motion to the Bankruptcy Court or the Israeli Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or the Israeli Court or its stakeholders.

## ARTICLE VI

## COVENANTS AND AGREEMENTS

6.1     Conduct of Business of Sellers.

(a)     Except (i) as required by applicable Law, Order or a Governmental Body, (ii) due to any limitations on operations imposed by the Bankruptcy Court, the Israeli Court, the Bankruptcy Code, the Israeli Insolvency Law, or Sellers' or their Affiliates' debtor in possession financing or use of cash collateral, as the case may be, (iii) as expressly contemplated, required, or permitted by this Agreement, (iv) actions taken in good faith (with reasonable notice to Purchaser) in response to any COVID-19 Measure, or (v) as set forth in Schedule 6.1(a), during the period from the date of this Agreement until the Closing Date (or such earlier date on which this Agreement is terminated pursuant to Article VIII), unless Purchaser otherwise consents in writing (such consent not to be unreasonably withheld, delayed, or conditioned), the Company shall, and shall cause each of its Subsidiaries to, use its and their commercially reasonable efforts to carry on its business in the Ordinary Course, except as would not reasonably be expected to be material to the Business and the Acquired Assets, taken as a whole; provided that no action by the Company or any of its Subsidiaries with respect to matters specifically addressed by Section 6.1(b) shall be deemed to be a breach of this Section 6.1(a) unless such action would constitute a breach of Section 6.1(b).

(b)        Except (v) as required by applicable Law, Order or a Governmental Body, (w) due to any limitations on operations imposed by the Bankruptcy Court, the Israeli Court, the Bankruptcy Code, the Israeli Insolvency Law, or Sellers' or their Affiliates' debtor in possession financing or use of cash collateral, as the case may be, (x) as expressly contemplated, required, or permitted by this Agreement, (y) actions taken in good faith (with reasonable notice to Purchaser) in response to any COVID-19 Measure, or (z) as set forth in Schedule 6.1(b), during the period from the date of this Agreement until the Closing (or such earlier date on which this Agreement is terminated pursuant to Article VIII), unless Purchaser otherwise consents in writing (such consent not to be unreasonably withheld, delayed, or conditioned), the Company shall not, and shall not permit any of its Subsidiaries to:

(i)        (A) incur, assume, or otherwise become liable for any indebtedness for borrowed money, issue or sell any debt securities or warrants or other rights to acquire any debt securities of the Company or any of its Subsidiaries, guarantee any such indebtedness or any debt securities of another Person, or enter into any "keep well" or other agreement to maintain any financial statement condition of another Person (collectively, "Indebtedness");

(ii)        sell or lease to any Person, in a single transaction or series of related transactions, any of its properties or assets, except Ordinary Course dispositions of inventory and dispositions of obsolete, surplus, or worn out assets or assets that are no longer used or useful in the conduct of the business of the Company or any of its Subsidiaries;

(iii)        make capital expenditures, except for those (A) in connection with the repair or replacement of facilities, properties or assets destroyed or damaged due to casualty or accident (whether or not covered by insurance) or (B) otherwise in an aggregate amount for all such capital expenditures made pursuant to this clause (B) not to exceed $100,000 in the aggregate;

(iv)        except as permitted under Section 6.1(b)(iii) and except for acquisitions made with Purchaser's prior written consent, make any acquisition of, or investment in, any securities or business (including by merger), except in the Ordinary Course (which for the avoidance of doubt and without limitation of the foregoing shall be deemed to include any acquisition of inventory in the Ordinary Course and which shall be deemed to exclude any acquisition of capital stock or of a material portion of the assets of any other Person);

(v)        except (A) as required by applicable Law or (B) as required pursuant to the terms of any Seller Plan in effect on the date of this Agreement or adopted, established, entered into or amended after the date of this Agreement not in violation of this Agreement, (1) grant to any employee or independent contractor any material increase in compensation, (2) grant to any current employee any material increase in severance, retention, or termination pay, (3) grant or amend any equity or other incentive awards, (4) hire, appoint, or promote any employee whose base salary exceeds $100,000 per annum, hire or appoint any employee to a position at or above the vice president level, or promote any employee to a position at or above the director level, (5) establish, adopt, enter

38

into, amend, or terminate in any material respect any Seller Plan, or (6) take any action to accelerate any rights or benefits under any Seller Plan; provided, however, that the foregoing shall not restrict the Company or any of its Subsidiaries from entering into or making available to (x) newly hired employees hired in compliance with this Section 6.1(b)(v) or (y) employees as of the date hereof or hired after the date hereof in compliance with this Section 6.1(b)(v) in the context of promotions based on job performance or workplace requirements, in each case of clauses (x) and (y), in the Ordinary Course, plans, agreements, benefits and compensation arrangements (including incentive grants) that have a value that is consistent with the past practice of making compensation and benefits available to newly hired or promoted employees in similar positions;

(vi)    make any changes in financial accounting methods, principles, or practices materially affecting the consolidated assets, Liabilities, or results of operations of the Company and its Subsidiaries, except insofar as may be required by (A) GAAP (or any interpretation thereof), (B) any applicable Law, or (C) any Governmental Body or quasi-governmental authority;

(vii)    adopt a plan of liquidation, dissolution, merger, consolidation, or other reorganization;

(viii)    grant any Encumbrance (other than Permitted Encumbrances) on any of its material assets other than (A) to secure Indebtedness and other obligations in existence at the date of this Agreement (and required to be so secured by their terms) or permitted under Section 6.1(b)(i) or (B) to the Company or to a wholly owned Subsidiary of the Company;

(ix)    settle any pending or threatened Action against the Company or any of its Subsidiaries, unless such settlement involves payments of less than $50,000 and involves no material injunctive relief;

(x)    (A) terminate or amend any Assigned Contract or any Permit or (B) enter into any Contract that would be a Material Contract and would be breached by, or require the Consent of any third party in order to continue in full force following, consummation of the transactions contemplated hereby and such breach or the failure to obtain such amount would reasonably be expected to be material to the Business and the Acquired Assets, taken as a whole;

(xi)    (A) delay or otherwise extend the time for payment of any Liabilities (including accounts payable) beyond their respective due dates or otherwise fail to pay such Liabilities on or prior to the date such Liabilities are due or (B) accelerate the collection of any debts (including accounts receivable) sooner than their respective due dates; or

(xii)    authorize any of, or commit or agree, in writing or otherwise, to take any of, the foregoing actions.

(c)    Nothing contained in this Agreement is intended to give Purchaser or its Affiliates, directly or indirectly, the right to control or direct the Company's or its Subsidiaries'

operations or business prior to the Closing. Prior to the Closing, each of Purchaser and the Company shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its and its Subsidiaries' respective operations.

6.2    Access to Information.

(a)    From the date hereof until the Closing (or the earlier termination of this Agreement pursuant to Article VIII), the Company will provide Purchaser and its authorized Advisors with reasonable access and upon reasonable advance notice and during regular business hours to the books and records of the Company and its Subsidiaries, in order for Purchaser and its authorized Advisors to access such information regarding the Company and its Subsidiaries as is reasonably necessary in order to consummate the transactions contemplated by this Agreement; provided that (i) such access does not unreasonably interfere with the normal operations of the Company and its Subsidiaries, (ii) such access will occur in such a manner as the Company reasonably determines to be appropriate to protect the confidentiality of the transactions contemplated by this Agreement, (iii) all requests for access will be directed to Centerview Partners or such other Person(s) as the Company may designate in writing from time to time, and (iv) nothing herein will require the Company to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A) would require the Company or any of its Subsidiaries to disclose any financial or proprietary information of or regarding the Affiliates of the Company (other than the Subsidiaries of the Company) or otherwise disclose information regarding the Affiliates of the Company (other than the Subsidiaries of the Company), (B) would waive any legal privilege, or (C) would be in violation of applicable Laws (including Competition Laws) or the provisions of any Contract to which the Company or any of its Subsidiaries is bound or would violate any fiduciary duty; provided that the Company and its Subsidiaries will use commercially reasonable efforts to provide a reasonable alternative means of accessing any such information in a manner that would not result in the waiver of any legal privilege or violation of applicable Laws, the provisions of any agreement or any fiduciary duty; provided further that no such access shall be required in connection with a proceeding between Purchaser or any of its Affiliates, on the one hand, and any Seller or any of its Affiliates, on the other hand.

(b)    The information provided pursuant to this Section 6.2 will be used solely for the purpose of consummating the transactions contemplated hereby and will be governed by the terms and conditions of the Confidentiality Agreement, which Confidentiality Agreement shall not terminate upon the execution of this Agreement notwithstanding anything to the contrary therein. Purchaser will, and will cause its Advisors to, abide by the terms of the Confidentiality Agreement with respect to such access and any information furnished to Purchaser or any of its Advisors. Sellers make no representation or warranty as to the accuracy of any information, if any, provided pursuant to this Section 6.2, and Purchaser may not rely on the accuracy of any such information, in each case, other than the Express Representations.

(c)    For a period of commencing on the Closing Date and ending on the later of (i) the date that is eighteen (18) months following the Closing Date and (ii) the closing of the Bankruptcy Case, Purchaser will provide Seller and its Affiliates and its and their Advisors with reasonable access, during normal business hours, and upon reasonable advance notice, to the books and records, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other documents (for the purpose of examining and copying) relating to the Acquired

Assets, the Excluded Assets, the Assumed Liabilities, or the Excluded Liabilities with respect to periods or occurrences prior to the Closing Date, and reasonable access, during normal business hours, and upon reasonable advance notice, to employees, officers, Advisors, accountants, offices, and properties of Purchaser (including for the purpose of better understanding the books and records). Unless otherwise consented to in writing by Seller, Purchaser will not, for a period of three (3) years following the Closing Date, destroy, alter or otherwise dispose of any of the books and records of the Company and its Subsidiaries without first offering to surrender to Seller such books and records or any portion thereof that Purchaser may intend to destroy, alter, or dispose of. From and after the Closing, Purchaser will, and will cause its employees to, provide Seller and its Affiliates with reasonable assistance, support, and cooperation with their wind-down and related activities (*e.g.*, helping to locate documents or information related to preparation of Tax Returns or prosecution or processing of insurance/benefit claims).

(d)    Purchaser will not, and will not permit any member of the Purchaser Group to, contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender, licensee, licensor, distributor, noteholder, or other material business relation of the Company or its Subsidiaries prior to the Closing with respect to the Company, its Subsidiaries, their business, or the transactions contemplated by this Agreement without the prior written consent of the Company, which will not be unreasonably withheld or delayed, and the Company will cooperate reasonably in coordinating such contacts as may reasonably be necessary in connection with Purchaser's preparations for Closing; provided, however, that the foregoing shall in no way restrict or prohibit (i) contacts between any member of the Purchaser Group and any third Persons in the ordinary course of Purchaser's business so long as such contacts do not specifically relate to the Company, its Subsidiaries or the transactions contemplated by this Agreement or (ii) any member of the Purchaser Group from responding to inbound inquiries from third Persons that are not solicited by the Purchaser Group.

(e)    For a period of commencing on the Closing Date and ending on the earlier of (i) the date that is eighteen (18) months following the Closing Date and (ii) the closing of the Bankruptcy Case, Sellers will provide Purchaser and its Affiliates and its and their Advisors with reasonable access, during normal business hours, and upon reasonable advance notice, to the books and records, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other documents (for the purpose of examining and copying) relating to the Acquired Assets, or the Assumed Liabilities with respect to periods or occurrences prior to the Closing Date, and reasonable access, during normal business hours, and upon reasonable advance notice, to employees, officers, Advisors, accountants, offices, and properties of Sellers (including for the purpose of better understanding the books and records). Unless otherwise consented to in writing by Purchaser, Sellers will not, during such period, destroy, alter or otherwise dispose of any of the books and records of Sellers without first offering to surrender to Purchaser such books and records or any portion thereof that Sellers may intend to destroy, alter, or dispose of.

6.3    Employee Matters.

(a)    Each individual who (i) is employed by Sellers as of immediately prior to the Closing and becomes an employee of Purchaser or one of its Affiliates at or following the Closing pursuant to Sections 6.3(g) or 6.3(h) or (ii) is an independent contractor engaged by Sellers as of immediately prior to the Closing (each, a "Seller Independent Contractor") and becomes an

41

employee of Purchaser or one of its Affiliates as of immediately following the Closing (or at such later time as mutually agreed prior to the Closing by and between such independent contractor and Purchaser or its applicable Affiliate) pursuant to an offer of employment or otherwise, and, in each case, is terminated by Sellers as of immediately prior to the Closing (or at such later time as mutually agreed by Purchaser and the applicable Seller) shall, in each case, be referred to herein as a "Transferred Employee."

(b)     For a period of one year from and after the Closing Date (or until the earlier termination of employment of a Transferred Employee), Purchaser shall provide each Transferred Employee, or cause each Transferred Employee to be provided, with: (i) a base salary or wage rate, as applicable, and cash bonus (other than token or token based incentives, commissions or retention bonus) opportunities that are substantially comparable in the aggregate to those provided to such Transferred Employee as of immediately prior to the date hereof; and (ii)  specific health and welfare benefits that are substantially comparable in the aggregate than those provided by Sellers to such Transferred Employees as of immediately prior to the Closing. For purposes of eligibility, vesting and determining level of statutory benefits under the benefit plans and programs that will be maintained for the benefit of the Transferred Employees by Purchaser or any of its Affiliates after the Closing Date (the "Purchaser Plans"), subject to applicable Law, each Israeli Transferred Employee shall be credited with his or her years of service with Sellers and their Affiliates (and any predecessor thereof) before the Closing Date under those Purchaser Plans that according to the law the entitlements are based on the length of employment period, except to the extent such credit would result in a duplication of benefits. Purchaser's and its Affiliates' compliance with this Section 6.3(b) is subject to Sellers' making available to Purchaser sufficiently in advance of Closing such information as may be reasonably necessary to assess or confirm Purchaser's compliance with such terms.

(c)     Without limiting the generality of any other provision of this Agreement: subject to applicable Law and the terms and conditions of any Purchaser Plan: (i) each Transferred Employee shall be immediately eligible to participate, without any waiting time, in any and all Purchaser Plans; (ii) for purposes of each Purchaser Plan providing health or welfare benefits, Purchaser shall use commercially reasonable efforts to cause all pre-existing condition exclusions and actively-at-work requirements of such Purchaser Plan to be waived for such Transferred Employee who are not working in Israel or according to the Israeli law and his or her covered dependents (unless such exclusions or requirements were applicable under comparable Seller Plans); and (iii) in relation to any Transferred Employees who are not Israeli Transferred Employees, Purchaser shall cause any co-payments, deductible and other eligible expenses incurred by such Transferred Employee or his or her covered dependents during the plan year in which the Closing Date occurs to be credited for purposes of satisfying all deductible, coinsurance and maximum out-of-pocket requirements applicable to such Transferred Employee and his or her covered dependents for the applicable plan year of each comparable Purchaser Plan.

(d)     Sellers shall honor and be solely responsible for paying, providing, discharging and satisfying when due any and all Liabilities of Sellers arising on or prior to Closing to or in respect of any employees, consultants or individual independent contractors employed or engaged by Sellers or former employees, consultants or individual independent contractors of Sellers in respect of their employment or engagement with Sellers prior to Closing, including (i) any Liability under any employee plan or agreement (including with respect to token or token

42

based incentives, commissions or retention bonus) at any time maintained, contributed to or required to be contributed to by, or with respect to, Seller or under which Seller may incur Liability, or any contributions, benefits or Liabilities of Sellers therefor, or any Liability with respect to Seller's withdrawal or partial withdrawal from or termination of any employee plan and (ii) any claim and/or demand relating to any period on or prior to the Closing in connection with any and all matters related to such Person's employment or engagement by Sellers, even if such claim and/or demand raised following the Closing, including severance payments, termination process, payments regarding termination, payroll obligations, bonuses, retention or long term incentive plans and similar obligations and Liabilities, compensation (including salary, wages, commissions, bonuses, incentive compensation, overtime, premium pay and shift differentials), vacation, personal days, sick pay and other paid time off, benefits and benefit claims (including any employer Taxes or other payments related thereto), prior notice and fixed term, and all such Liabilities of Sellers shall be considered Excluded Liabilities for purposes of this Agreement. Notwithstanding the foregoing, all the amounts due (whether statutory or otherwise) that are payable to any employees, consultants or individual independent contractors employed or engaged by Sellers or former employees, consultants or individual independent contractors of Sellers as a consequence of cessation of their employment with the Company or its Subsidiaries, including *inter alia* salary up to the last working day, statutory severance (if any and to the extent applicable), gratuity (to the extent applicable) and/or any other contractual dues will be paid to the said employees or independent contractor by the Company on or before the Closing Date or otherwise in accordance with applicable Law.

(e)     The provisions of this Section 6.3 are for the sole benefit of the Parties to this Agreement and nothing herein, express or implied, is intended or shall be construed to confer upon or give any Person (including for the avoidance of doubt any employees of Sellers or Transferred Employees), other than the Parties and their respective permitted successors and assigns, any legal or equitable or other rights or remedies (with respect to the matters provided for in this Section 6.3 or under or by reason of any provision of this Agreement). Nothing contained herein, express or implied: (i) shall be construed to establish, amend, or modify any benefit plan, program, agreement or arrangement; (ii) shall, subject to compliance with the other provisions of this Section 6.3, alter or limit Purchaser's or Sellers' ability to amend, modify or terminate any particular benefit plan, program, agreement or arrangement; or (iii) is intended to confer upon any current or former employee any right to employment or continued employment for any period of time by reason of this Agreement, or any right to a particular term or condition of employment.

(f)     Effective as of the Closing, the Company hereby waives any claims against the Transferred Employees for disclosures to Purchaser or after the Closing Date of proprietary or confidential information related to the Acquired Assets. Effective as of the Closing, the Company hereby agrees that the conduct of Purchaser business following the Closing will not be considered a breach of any nondisclosure or noncompetition agreements by and between Company and each of the Transferred Employees.

(g)     Promptly following the date hereof, the Company shall summon each employee employed by the Company who is located in Israel (or is the one employee working remotely from outside of Israel) (an "Israeli Employee") to a hearing in accordance with Israeli law and notify such Israeli Employee of the sale of the assets of the Company to Purchaser and the expected rehire of the Israeli Employees by Purchaser or one of its Affiliates, as of immediately

after the Closing (or later as (1) may be agreed by Purchaser and Sellers or (2) required under applicable Law), subject to the termination of the employment of each such Israeli Employee as of and subject to the occurrence of the Closing and their execution of a customary employment agreement with the Purchaser or its applicable Affiliate on terms consistent with the provisions of this Section 6.3. A representative of the Purchaser shall participate in the hearing and shall present to each Israeli Employee a detailed offer of employment by the Purchaser or its applicable Affiliate. The Israeli Employees will be given four (4) days to decide whether to be employed with the Purchaser or its applicable Affiliate. With respect to Israeli Employees who choose to be employed by Purchaser or its applicable Affiliate ("Israeli Transferred Employees"), the date on which the relevant Israeli Transferred Employee accepted the Purchaser's or its applicable Affiliate's offer shall be deemed as the date on which, for all intents and purposes, prior written notice for the purposes of Prior Notice for Dismissal and Resignation Law – 2001 was given by the Company (subject to Closing), and the notice period applicable to each Israeli Transferred Employee shall be the period specified in each such Israeli Transferred Employee's employment agreement and not less than as required by the applicable Law and shall be paid solely by the Company, as well as all termination payments and rights that shall be paid solely by the Company, including all their accrued and unused vacation. Subject to Section 6.3(f), the Israeli Transferred Employees shall be terminated by the Company and shall be rehired by Purchaser or its applicable Affiliate and shall be deemed as Purchaser's or its applicable Affiliate's employees as of immediately after the Closing and as of such time, the Purchaser shall be solely responsible for the Transferred Employees' salaries, benefits and social rights only for the employment period by the Purchaser.

(h)    Any employee of Sellers who does not become a Transferred Employee is hereinafter referred to herein as an "Excluded Employee" up until such time, if any, as such employee becomes a Transferred Employee. Excluded Employees will not be, and shall not be construed to be, employees or consultants of Purchaser or any of its Affiliates at any time before or after Closing, and the applicable Seller shall remain and be in the future liable to and shall make or facilitate all such payments, transfers and fully fund all amounts that are or may become payable to, or in respect of, Excluded Employees in relation to their employment or termination of such employment by Sellers. Notwithstanding the foregoing, any employee who is engaged by any Seller, who does not become an Israeli Transferred Employee at Closing because his/her employment under applicable Law cannot be terminated by such Seller following reasonable efforts (including submission for a permit) (such limitation, a "Termination Limitation") (provided that such employee was given an offer of employment with Purchaser as of Closing (or upon expiration of the Limitation Period, as applicable) in accordance with Section 6.3(b) and 6.3(c)), and who would become a Transferred Employee but for such Termination Limitation, shall remain an employee of the applicable Seller until such Termination Limitation is eliminated (the "Limitation Period"), and: (i) during the Limitation Period shall continue to be employed or engaged by such Seller, and shall be allocated by such Seller for provision of services to Purchaser; provided that the Purchaser shall bear all costs associated with the employment or engagement of such employee during such Limitation Period only, and (ii) immediately following the end of the Limitation Period and provided that such individual meets the terms of becoming a Transferred Employee hereunder, such employee will become a Transferred Employee and the termination of his or her or its employment with such Seller and his or her or its employment by the Purchaser shall be adjusted respectively; provided that the Limitation Period shall not exceed three (3) months following the Closing or any longer period required by applicable Law.

44

(i)      Sellers shall comply with all applicable Laws and Contract, in connection with the termination of the Company's employees' employment and of the Seller Independent Contractors' engagement prior to the Closing, Sellers shall be responsible for the Transferred Employees' employment or engagement until the Closing Date, and Purchaser shall not assume any of the Seller Plans or any obligation or Liability thereunder. Each Seller shall take all actions possible at such time to ensure satisfaction of its employment and engagement and benefits obligations to such employees and Seller Independent Contractors' and to satisfy all of its employment, engagement and benefits obligations to such employees and Seller Independent Contractors as of and until the Closing Date, including funding of all pension, benefit, severance and other accounts.

(j)      As part of the termination of the Israeli Transferred Employees, the Company shall release to the Israeli Transferred Employees all of their rights in all severance funds or insurance policies, pension fund, disability fund and education fund that are fully funded and reflect the entire entitlement of the Israeli Transferred Employees to severance pay and pension arrangement through their entire engagement with the Company and the Company shall pay any additional severance related thereto.

6.4     Regulatory Approvals.

(a)      Sellers will (i) make or cause to be made all filings and submissions required to be made by the Company or its Subsidiaries under any applicable Laws for the consummation of the transactions contemplated by this Agreement set forth on Schedule 6.4, if any, (ii) cooperate with Purchaser in exchanging such information and providing such assistance as Purchaser may reasonably request in connection with any filings made by the Purchaser Group pursuant to Section 6.4(b), and (iii) (A) supply promptly any additional information and documentary material that may be requested in connection with the filings made pursuant to this Section 6.4(a) or Section 6.4(b) and (B) use reasonable best efforts to take all actions reasonably necessary to obtain all required clearances in connection with such filings.

(b)      Purchaser will, and will cause its Affiliates and Advisors to, (i) make or cause to be made all filings and submissions required to be made by any member of the Purchaser Group under any applicable Laws for the consummation of the transactions contemplated by this Agreement, if any, (ii) cooperate with Sellers in exchanging such information and providing such assistance as Sellers may reasonably request in connection with any filings made by Sellers or the Company pursuant to Section 6.4(a), and (iii) (A) supply promptly any additional information and documentary material that may be requested in connection with the filings made pursuant to this Section 6.4(b) or Section 6.4(a) and (B) use reasonable best efforts to take all actions reasonably necessary to obtain all required clearances.

6.5     Reasonable Efforts; Cooperation.

(a)      Subject to the other terms of this Agreement, each Party shall, and shall cause its Advisors to, use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper, or advisable to cause the transactions contemplated herein to be effected as soon as practicable, but in any event on or prior to the Outside Date, in accordance with the terms hereof and to cooperate with each

45

other Party and its Advisors in connection with any step required to be taken as a part of its obligations hereunder. The "reasonable best efforts" of Sellers will not require Sellers or any of their Subsidiaries, Affiliates, or Advisors to expend any money to remedy any breach of any representation or warranty, commence any Action, to waive or surrender any right, modify any Contract, or waive or forego any right, remedy, or condition hereunder.

(b)     The obligations of Sellers pursuant to this Agreement, including this Section 6.5, shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court, the Israeli Court, the Bankruptcy Code (including in connection with the Bankruptcy Case), the Israeli Insolvency Law, Sellers' or their Affiliates' debtor-in-possession financing, if any, Sellers' obligations as a debtor-in-possession to comply with any Order of the Bankruptcy Court (including the Bidding Procedures Order and the Sale Order) or the Israeli Court (including the Israeli Court Order), and Sellers' and their Affiliates' duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

6.6     Notification of Certain Matters.

(a)     Seller will promptly notify Purchaser of: (i) any notice or other communication received after the date hereof from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement; (ii) any notice or other communication received after the date hereof from any Governmental Body related to or in connection with the transactions contemplated by this Agreement; and (iii) promptly upon discovery thereof, any variances from, or the existence or occurrence of any event, fact, or circumstance arising after the execution of this Agreement that would reasonably be expected to cause to be untrue or inaccurate, any of the representations and warranties contained in Article III such that the condition set forth in Section 7.2(a) would not be satisfied.

(b)     Purchaser will promptly notify Seller of: (i) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement; (ii) any notice or other communication from any Governmental Body related to or in connection with the transactions contemplated by this Agreement; (iii) any Actions relating to or involving or otherwise affecting Purchaser or its Affiliates that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to Section 4.7 or that relate to the transactions contemplated by this Agreement; and (iv) any breach or inaccuracy of any representation or warranty contained in this Agreement that would reasonably be expected to cause the conditions set forth in Article VII not to be satisfied; provided that the delivery of any notice pursuant to this Section 6.6(a) will not limit the remedies available to Seller under or with respect to this Agreement.

6.7     Further Assurances. From time to time, as and when requested by any Party and at such requesting Party's expense, any other Party will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the transactions contemplated by this Agreement.

6.8    <u>Insurance Matters</u>. Purchaser acknowledges that, upon Closing, all nontransferable insurance coverage provided in relation to Sellers and the Acquired Assets that is maintained by any Sellers or its Affiliates (whether such policies are maintained with third party insurers or with Sellers or such Affiliates) shall cease to provide any coverage to Purchaser or the Acquired Assets and no further coverage shall be available to Purchaser or the Acquired Assets under any such policies.

6.9    <u>Receipt of Misdirected Assets</u>. From and after the Closing, if any Seller or any of their respective Affiliates receives any right, property, or asset that is an Acquired Asset, such Seller shall promptly transfer or cause such of its Affiliates to transfer such right, property, or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks, or other documents) to Purchaser, and such asset will be deemed the property of Purchaser held in trust by such Seller for Purchaser until so transferred. From and after the Closing, if Purchaser or any of its Affiliates receives any right, property, or asset that is an Excluded Asset, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such asset (and shall promptly endorse and deliver any such right, property, or asset that is received in the form of cash, checks, or other documents) to such Seller, and such asset will be deemed the property of such Seller held in trust by Purchaser for such Seller until so transferred.

6.10    <u>Acknowledgment by Purchaser</u>.

(a)    Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that Purchaser and the Purchaser Group have relied solely on the results of the Purchaser Group's own independent investigation and verification and have not relied on, are not relying on, and will not rely on, Seller, any Affiliate of Seller, any information, statements, disclosures, documents, projections, forecasts, or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom, the Information Presentation, or the Projections or any information, statements, disclosures, or materials, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or any other Seller Party, or any failure of any of the foregoing to disclose or contain any information, except for the Express Representations (it being understood that Purchaser and the Purchaser Group have relied only on the Express Representations). Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (i) the Express Representations are the sole and exclusive representations, warranties, and statements of any kind made to Purchaser or any member of the Purchaser Group and on which Purchaser or any member of the Purchaser Group may rely in connection with the transactions contemplated by this Agreement; and (ii) all other representations, warranties, and statements of any kind or nature expressed or implied, whether in written, electronic, or oral form, are, in each case, specifically disclaimed by Sellers, on its behalf and on behalf of the Seller Parties. Purchaser, on its own behalf and on behalf of the Purchaser Group: (x) disclaims reliance on the items in clause (ii) in the immediately preceding sentence and (y) acknowledges and agrees that it has relied on, is relying on and will rely on only the Express Representations. Without limiting the generality of the foregoing, Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that neither Seller, the Company, nor any other Person (including the Seller Parties), has made, is making, or is authorized to make, and Purchaser, on its own behalf and on behalf of the Purchaser Group, hereby waive, all rights and claims it or they may have against any Seller Party with respect to the accuracy of, any omission or concealment of, or any misstatement with respect to, (A) any potentially material information regarding the Company, its

47

Subsidiaries, or any of their respective assets (including the Acquired Assets), Liabilities (including the Assumed Liabilities), or operations and (B) any warranty or representation (whether in written, electronic, or oral form), express or implied, as to the quality, merchantability, fitness for a particular purpose, or condition of the Company's or its Subsidiaries' business, operations, assets, Liabilities, Contracts, environmental compliance, employee matters, regulatory compliance, business risks, and prospects or any portion thereof, except, in each case, solely to the extent expressly set forth in the Express Representations.

(b)    Without limiting the generality of the foregoing, in connection with the investigation by the Purchaser Group of the Company and its Subsidiaries, Purchaser and the members of the Purchaser Group, and the Advisors of each of the foregoing, have received or may receive, from or on behalf of Sellers, certain projections, forward-looking statements, and other forecasts (whether in written, electronic, or oral form, and including in the Information Presentation, Dataroom, management meetings, etc.) (collectively, "Projections"). Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (i) such Projections are being provided solely for the convenience of Purchaser to facilitate its own independent investigation of the Company and its Subsidiaries, (ii) there are uncertainties inherent in attempting to make such Projections, (iii) Purchaser is familiar with such uncertainties, and (iv) Purchaser is taking full responsibility for making its own evaluation of the adequacy and accuracy of all Projections (including the reasonableness of the assumptions underlying such Projections).

(c)    Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it will not assert, institute, or maintain, and will cause each member of the Purchaser Group not to assert, institute or maintain, any Action that makes any claim contrary to the agreements and covenants set forth in this Section 6.10.

(d)    Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that the covenants and agreements contained in this Section 6.10 are an integral part of the transactions contemplated by this Agreement and that, without these agreements set forth in this Section 6.10, Seller would not enter into this Agreement.

(e)    Notwithstanding anything in this Agreement to the contrary, nothing herein shall relieve any Person from any Liability for Fraud.

6.11    Certain Consents. Purchaser acknowledges and agrees, on its behalf and on behalf of the Purchaser Group, that Sellers will have no Liability whatsoever to Purchaser to the extent arising out of or relating to the failure in and of itself to obtain any Consents that may have been or may be required in connection with the transactions contemplated by this Agreement or because of the default, acceleration, or termination of or loss of right under any Contract as a result thereof. Sellers acknowledge and agree that Purchaser and its Affiliates will have no Liability whatsoever to Sellers to the extent arising out of or relating to the failure in and of itself to obtain any Consents that may have been or may be required in connection with the transactions contemplated by this Agreement or because of the default, acceleration, or termination of or loss of right under any such Contract as a result thereof.

6.12    Interim Financial Statements. From the date hereof until the Closing Date, the Company shall deliver to Purchaser, following (and using commercially reasonable efforts to

deliver within 21 days following) the end of any month, month internal reporting financial reports for the prior month consistent with past practice.

6.13    <u>Confidentiality</u>.

(a)    All Confidential Information of a Party shall remain the sole property of the disclosing Party (or other third party), and the receiving Party shall have no interest in, or rights with respect thereto, except as set forth herein. For avoidance of doubt, any Confidential Information of Sellers relating to the Acquired Assets, the Assigned Contracts, the Assumed Liabilities or the Business (other than information which may not be transferred or disclosed pursuant to contract or applicable Law or otherwise constitutes Excluded Assets) shall be deemed to be Confidential Information of Purchaser as of and following the Closing, notwithstanding the fact that Sellers or any of its officers, directors, employees or representatives have knowledge of such Confidential Information obtained prior to the negotiation and performance of this Agreement.

(b)    To the extent that any Seller receives Confidential Information of Purchaser in the course of negotiation of and performance of this Agreement, Seller agrees to treat such Confidential Information as confidential with the same degree of care and security as it treats its Confidential Information and, in any event, no less degree of care and security than a reasonably prudent business person would utilize to protect from disclosure and keep confidential its Confidential Information. Sellers may disclose such Confidential Information only to those Advisors who require such knowledge in connection with Sellers' performance, enforcement, or defense of (or exercise of rights under) this Agreement, the consummation of the transactions contemplated hereby, and the closing of the Bankruptcy Case and the wind-down and related activities of Sellers and their Affiliates. Sellers shall be liable for the acts of such Advisors acting on their behalf in breach of this <u>Section 6.12</u>. Except as otherwise contemplated by this Agreement or as requested or required by applicable Law or Governmental Body, Sellers shall not disclose the Confidential Information of Purchaser or Sellers, respectively, to any third party without the prior written consent of Purchaser, and the duty of confidentiality created by this <u>Section 6.13(b)</u> shall (i) survive any termination of the Agreement for a period of one (1) year and (ii) in the case of Sellers, with respect to Purchaser's Confidential Information, survive the Closing for a period of five (5) years (or such shorter period as Sellers or the last remaining Affiliate thereof remains in existence). Nothing in this <u>Section 6.13(b)</u> shall limit or be deemed to limit the terms and conditions of the Confidentiality Agreement.

(c)    As used herein, "<u>Confidential Information</u>" means all confidential, proprietary, or non-public information or data relating to any Party hereto and its Affiliates, operations, employees, products or services, clients, customers or potential customers, including any such confidential, proprietary, or non-public information or data that comprises: (i) internal business information (including historical and projected financial information and budgets and information relating to strategic and staffing plans and practices, business, training, marketing, promotional and sales plans and practices, cost, rate and pricing structures and accounting and business methods); (ii) identities of, individual requirements of, specific contractual arrangements with, and information about, suppliers, distributors, customers, independent contractors or other business relations and their confidential information; (iii) trade secrets, know-how, compilations of data and analyses, techniques, systems, formulae, recipes, research, records, reports, manuals,

49

documentation, models, data and data bases relating thereto; and (iv) inventions, innovations, improvements, developments, methods, designs, analyses, drawings, reports and all similar or related information (whether or not patentable). Further, information shall not be considered to be "Confidential Information" to the extent that such information: (A) is already lawfully known to or in the possession of the receiving Party or its Advisors prior to being disclosed to the receiving Party by the disclosing Party, as evidenced by reasonable documentary proof, so long as the such source of such information was not reasonably known by the receiving Party or such Advisor at the time it was obtained to be bound by a confidentiality agreement with, or other known contractual or legal obligation of confidentiality to, the disclosing Party; (B) subsequent to the Closing Date becomes available to the receiving Party or its Advisors from a source not reasonably known by the receiving Party or such Advisor at the time it was obtained to be bound by a confidentiality agreement with, or other known contractual or legal obligation of confidentiality to, the disclosing Party; (C) is, was, or becomes publicly available through no breach of this Agreement by the receiving Party; (D) was or is independently developed by the receiving Party or its Advisors without reference or access to any Confidential Information of the disclosing Party; or (E) is required to be disclosed by Law or Governmental Body.

6.14    Guaranty.

(a)    Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Sellers (i) the due and punctual performance, when and as due, of all obligations, covenants and agreements of Purchaser arising under or pursuant to this Agreement; (ii) the accuracy of Purchaser's representations and warranties set forth herein; and (iii) the punctual payment of all sums, if any, now or hereafter owed by Purchaser under and in accordance with the terms of this Agreement, including the payment obligations of the Purchaser pursuant to Sections 2.1 ((i), (ii), and (iii), collectively, "Guaranteed Obligations").

(b)    If the Purchaser fails to perform any of the Guaranteed Obligations, then the Guarantor shall itself be jointly and severally liable for the Guaranteed Obligations and shall perform or take whatever steps as may be necessary to procure performance of the same.

(c)    Notwithstanding any other provision of this Section 6.14, nothing herein shall be construed as imposing greater obligations or Liabilities on Guarantor than for which the Purchaser itself would be liable under this Agreement or obliging Guarantor to indemnify and hold harmless Sellers against any losses, costs, or expenses for which the Purchaser itself would not be liable under this Agreement, except as set forth in this Section 6.14, including Section 6.14(f) and 6.14(h).

(d)    The obligations of Sellers under this Agreement shall conclusively be deemed to have been created, contracted, or incurred in reliance upon this Section 6.14 and all dealings between Sellers and the Purchaser shall likewise be conclusively presumed to have been consummated in reliance upon this Section 6.14.

(e)    Guarantor's obligations hereunder shall not be affected by any facts or circumstances that might constitute a legal or equitable bar, discharge or defense to any Guaranteed Obligations available to Guarantor but not available to the Purchaser, and Guarantor hereby expressly waives and renounces any and all such bars, discharges and defenses.

(f)    The guarantee by Guarantor contained herein shall remain in full force and effect and shall continue to be enforceable by Sellers until the performance by the Purchaser of all of the Guaranteed Obligations and that upon completion of all of the Guaranteed Obligations, this guarantee shall terminate automatically and Guarantor shall stand discharged of all of its obligations under this guarantee. Guarantor's obligations under this Section 6.14 shall not be terminated, modified, affected or impaired by reason of any relief or discharge of the Purchaser from any of the Purchaser's respective obligations in bankruptcy or similar proceedings, or by liquidation or dissolution.

(g)    The liability of the undersigned under this Section 6.14 shall be unconditional, and this Section 6.14 shall be a continuing guaranty.

(h)    Guarantor hereby makes the representations and warranties set forth in Article IV as to itself, and such representations and warranties shall apply *mutatis mutandis* as if such party were substituted for Purchaser therein.

6.15    Israeli Innovation Authority.

(a)    Promptly following the date hereof, and in any event no later than four (4) Business Days after the date hereof, Sellers shall file an application for the receipt of IIA Approval as attached hereto as Exhibit F (the "IIA Application") in order to obtain the IIA Approval. If and to the extent required in order to reduce the IIA Redemption Payment, the IIA Application shall include an undertaking by the Purchaser to maintain for a period of at least three years from Closing, 75% of the Company's R&D positions and activity (as such terms are defined in the R&D Law) in Israel (the "IIA Undertaking") and, if required by the IIA, any security required by the IIA in connection with such IIA Undertaking. Without derogating from the generality of the foregoing, Purchaser and Seller will cooperate using reasonable commercial efforts to:

(i)    promptly and fully inform the other party of any written or oral communication received from or given to the IIA relating to the transactions contemplated hereby and promptly provide the other a copy of any written communication or filing received from or provided to the IIA regarding the transactions contemplated hereby;

(ii)    supply the IIA as soon as reasonably practicable with any information that may be reasonably required or requested by the IIA, including supplying any information and assistance that may be reasonably requested in connection with the making of such filings and determination of the IIA Redemption Payment;

(iii)    allow the other party to review in advance and, to the extent practicable, consult with one another on and consider in good faith the views of the other with respect to any written communication or submission to the IIA relating to the transactions contemplated hereby;

(iv)    agree not to participate in any meeting or discussion with the IIA regarding the transactions contemplated hereby unless, to the extent practicable, it consults with the other party in advance, and to the extent not prohibited by applicable Law and permitted by the IIA, gives the other party, including its outside counsel, reasonable notice

51

and an opportunity to attend and participate in any such meetings or discussions with the IIA; and

        (v)      transfer the IIA Redemption Payment to the IIA.

        (b)      Notwithstanding anything to the contrary herein, other than Purchaser's obligation to transfer the IIA Redemption Payment to the IIA hereunder, any and all Liabilities imposed by the Israeli Encouragement of Research, Development and Technological Innovation in Industry Law, 5744-1984, and the regulations and rules promulgated, promulgated thereunder, as well as Annex B to Benefit Program 1 of the IIA titled "Instructions Regarding Transfer of Know-How" (the "R&D Law") in relation to any projects funded by the Israel Innovation Authority (the "IIA") (but only to the extent arising on or before the Closing) and transferred hereunder as part of the Acquired Assets, including such that arise from the transfer thereof, shall be the sole responsibility of Sellers and all such Liabilities shall be deemed Excluded Liabilities hereunder; provided that in the event that the IIA Redemption Payment is determined by any applicable Governmental Body to be in excess of the amount included in the Closing Date Payment (including any Liabilities arising from or relating to Purchaser's non-compliance with or breach of the IIA Undertaking, including any amount required to be paid to the IIA pursuant to the R&D Law (in excess of the IIA Redemption Payment amount included in the definition of "Cash Payment") in connection with the transactions contemplated hereby), Purchaser shall be solely responsible for and shall indemnify and hold harmless Sellers from such Liabilities.

        6.16    IMOD. Promptly following the date hereof, and in any event no later than four (4) Business Days after the date hereof, Sellers shall file an application for the assignment and transfer of Sellers' right, title, and interest in and to the technology and know-how covered by the Encryption License to Purchaser hereunder. If and to the extent any information is required or requested by the IMOD for the IMOD Approval of such application Purchaser shall provide IMOD all required information pertaining to the Purchaser in support of such application.

        6.17    280G Matters. Unless the parties agree that it is not necessary under Section 280G of the Code and the Treasury Regulations promulgated thereunder (which such agreement shall not be unreasonably withheld), prior to the Closing, the Company shall use commercially reasonable efforts to obtain, prior to the initiation of the stockholder approval procedure described below in this Section 6.17, from each Person to whom any payment or benefit will or could be made that could constitute "parachute payments" under Section 280G(b)(2) of the Code and Treasury Regulations promulgated thereunder, a written agreement waiving such Person's right to receive some or all of such payment or benefit (the "Waived Benefits"), to the extent necessary so that all remaining payments and benefits applicable to such Person shall not be deemed a parachute payment subject to the deduction restrictions imposed by Section 280G of the Code, and accepting in substitution for the Waived Benefits the right to receive the Waived Benefits only if approved by the requisite stockholders in a manner that complies with Section 280G(b)(5)(B) of the Code and the Treasury Regulations issued thereunder. To the extent applicable, prior to the Closing, the Company shall seek to obtain the approval by such the requisite stockholders in a manner that complies with the terms of Section 280G(b)(5)(B) of the Code and the Treasury Regulations thereunder, including Q-7 of Section 1.280G-1 of such Treasury Regulations, of the right of each Person described in this Section 6.17 who has executed the waiver described therein to receive or retain, as applicable, such Person's Waived Benefits. The Company shall provide Purchaser for its

52

review and comment advance copies of all documents (including the requisite calculations) and communications by which it intends to seek the waiver and approvals described in this Section 6.17, shall incorporate any reasonable comments by Purchaser with respect thereto, and shall promptly provide Purchaser with copies of any executed waivers and evidence of the stockholder approval contemplated by this Section 6.17. Notwithstanding the foregoing, to the extent that any contract, agreement, or plan is to be entered into by Purchaser and a disqualified individual in connection with the transactions contemplated by this Agreement before or effective as of the Closing Date, Purchaser shall provide a copy of such contract, agreement or plan to the Company and Sellers at least seven (7) days before the Closing Date (or, if not then known, as soon as practicable thereafter) and shall cooperate with the Company in good faith in order to calculate or determine the value (for the purposes of Section 280G of the Code) of any payments or benefits granted or contemplated therein, which may be paid or granted in connection with the transactions contemplated by this Agreement that could constitute a "parachute payment" under Section 280G of the Code.

6.18    Transfer of Utilities. Seller and Purchaser will cooperate to transfer utility services, including telephone, electric and gas services providing such services to any of the Acquired Assets as of the Closing Date, including notifying all utility companies serving the real estate covered by the Company's lease of the change in occupant, and request that meters be read and service transferred over to Purchaser.

6.19    Intellectual Property Registration Title Updates. Prior to the Closing Date, at the Company's expense, the Company shall, and shall cause all of its Subsidiaries, as applicable, to make filings with the United States Patent and Trademark Office and the applicable registries and recording Governmental Bodies in Israel to ensure that the chain of title of each Intellectual Property Registration in such jurisdiction reflects the change from the Company's prior name (Puzzzle Cybersecurity Ltd.) to its current name.

6.20    No Solicitation.

(a)    From and after the entry of the Sale Order, Sellers agree that they will not, and Sellers will not permit their respective Representatives to, take, directly or indirectly, any of the following actions with any party other than Purchaser and its designees: (i) solicit, facilitate or knowingly encourage the submission of any inquiries, indications of interest, proposals or offers involving any corporation, partnership, Person, entity or group, other than Purchaser and its Representatives (each, a "Third Party"), concerning any Alternative Transaction; (ii) participate in any discussions or negotiations regarding, or enter into any agreement or understanding relating to, an Alternative Transaction with, or provide any non-public information concerning an Alternative Transaction to, any Third Party; or (iii) otherwise knowingly cooperate in any way with any effort by any Third Party to do or seek any of the foregoing. After this Agreement is executed by each of Purchaser, Sellers and CE Seller, Company shall, and shall cause its Representatives to, terminate any existing discussions or negotiations with any Third Party with respect to an Alternative Transaction. From and after the entry of the Sale Order, upon its receipt of any inquiries, indications of interest, proposals or offers with respect to an Alternative Transaction, Sellers shall within two (2) Business Days provide Purchaser with a copy (to the extent written) or an oral summary (to the extent not written) of any such inquiries, indications of

53

interest, proposals or offers received, which shall include the identity of the parties making the proposal and the material terms thereof.

(b)     Notwithstanding the foregoing, at any time prior to the Closing, the Board of Directors of the Company, directly or indirectly through Advisors, agents or other intermediaries, may, subject to compliance with the last sentence of Section 6.20(a), (i) engage in negotiations or discussions with any Third Party that, subject to Sellers' compliance with Section 6.20(a), has made after the date of this Agreement an unsolicited proposal for an Alternative Transaction that the Board of Directors of the Company believes in good faith (after consultation with its financial advisor and outside legal counsel) constitutes a higher and better bid as compared to the consideration contemplated by this Agreement (after taking into account amounts that may be payable to Purchaser pursuant to Section 8.2(b)), (ii) thereafter furnish to such Third Party nonpublic information relating to Sellers pursuant to a customary confidentiality agreement; provided that all such information (to the extent that such information has not been previously provided or made available to Purchaser) is provided or made available to Purchaser, as the case may be, prior to or substantially concurrently with the time it is provided or made available to such Third Party, and (iii) terminate this Agreement under Section 8.1(i), but in each case referred to in the foregoing clauses (i) through (iii), only if the Board of Directors of the Company determines in good faith, after consultation with its financial advisor and outside legal counsel, that failure to take such action could reasonably be expected to be inconsistent with its fiduciary duties under applicable Law.

## ARTICLE VII

## CONDITIONS TO CLOSING

7.1     Conditions Precedent to the Obligations of Purchaser and Sellers. The respective obligations of each Party to this Agreement to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by each of Seller and Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)     the IIA Approval shall have been received;

(b)     no court or other Governmental Body shall have issued, enacted, entered, promulgated, or enforced any Law or Order (that is final and non-appealable and that has not been vacated, withdrawn, or overturned) restraining, enjoining, or otherwise prohibiting the transactions contemplated by this Agreement; and

(c)     the Israeli Court shall have entered the Israeli Court Order, which shall be in full force and effect and shall not be subject to a stay pending appeal as of the Closing Date;

(d)     the Bankruptcy Court shall have entered the Sale Order, which shall be in full force and effect and shall not be subject to a stay pending appeal as of the Closing Date.

7.2     Conditions Precedent to the Obligations of Purchaser. The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)    (i) the representations and warranties made by Sellers in Sections 3.1, 3.2, 3.3, 3.11 and 3.16 that are qualified by "materiality" or "Material Adverse Effect" shall be true and correct in all respects as of the date hereof and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date (except that representations and warranties that are made as of a specified date need be true and correct only as of such date), (ii) the representations and warranties made by Sellers in Sections 3.1, 3.2, 3.3, 3.11 and 3.16 that are not qualified by "materiality" or "Material Adverse Effect" shall be true and correct in all material respects as of the date hereof and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date (except that representations and warranties that are made as of a specified date need be true and correct in all material respects only as of such date), and (iii) the representations and warranties made by Sellers in Article III (other than those in Sections 3.1, 3.2, 3.3, 3.11 and 3.16) shall be true and correct, as of the date hereof and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date (except that representations and warranties that are made as of a specified date need be true and correct only as of such date), except where the failure of such representations and warranties described in this clause (iii) to be true and correct has not had a Material Adverse Effect, it being understood that, for purposes of determining the accuracy of such representations and warranties described in this clause (iii), all "materiality" and "Material Adverse Effect" qualifications or exceptions or any similar qualifications or exceptions in such representations and warranties will be disregarded;

(b)    Sellers shall have performed or caused to be performed, in all material respects, all of the obligations and covenants required by this Agreement to be performed by them prior to Closing;

(c)    no Material Adverse Effect shall have occurred;

(d)    Sellers shall have delivered, or caused to be delivered, all third party notices and obtained all third party consents as listed on Schedule 7.2(d), except to the extent any such consent or notice is not required to be obtained under the Sale Order or Israeli Court Order, as applicable;

(e)    each Non-Competition Agreement and Identified Employee Agreement shall have been duly executed and delivered and be in full force and effect and will not have been revoked, rescinded or otherwise repudiated;

(f)    at least two out of the three Named Employees (i) will have accepted and not revoked, rescinded or otherwise repudiated Purchaser's offer of employment, and (ii) will not have terminated his or her employment or engagement with the Company or, to the Knowledge of Sellers, expressed an intention to terminate his or her employment with the Purchaser or any of their Subsidiaries, as applicable, following the Closing; and

(g)    Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 2.5.

7.3    Conditions Precedent to the Obligations of Sellers. The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers in their sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)    the representations and warranties made by Purchaser in Article IV shall be true and correct, as of the date hereof and as of the Closing Date, with the same force and effect as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be so true and correct only as of such other specified date), except where the failure of such representations or warranties to be so true and correct has not had, and would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on Purchaser's ability to consummate the transactions contemplated hereby;

(b)    Purchaser shall have performed or caused to be performed, in all material respects, all of the obligations and covenants required by this Agreement to be performed by Purchaser by the Closing; and

(c)    Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in Section 2.6.

7.4    Waiver of Conditions. Upon the occurrence of the Closing, any condition set forth in this Article VII that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. None of Purchaser or Sellers may rely on the failure of any condition set forth in this Article VII, as applicable, to be satisfied if such failure was caused by such Party's failure to use, as required by this Agreement, its reasonable best efforts to consummate the transactions contemplated hereby.

## ARTICLE VIII

## TERMINATION

8.1    Termination of Agreement. This Agreement may be terminated only in accordance with this Section 8.1. This Agreement may be terminated at any time prior to the Closing:

(a)    by the mutual written consent of the Company and Purchaser;

(b)    by written notice of either Purchaser or the Company, upon the issuance by any Governmental Body of an Order restraining, enjoining, or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or declaring unlawful the transactions contemplated by this Agreement, and such Order having become final, binding, and non-appealable; provided that no termination may be made by a Party under this Section 8.1(b) if the issuance of such Order was caused by the breach or action or inaction of such Party;

(c)    by written notice of either Purchaser or the Company, in the event that the IIA denies the IIA Approval, respectively, or provides notice or other communication following receipt of which, taking into consideration all other relevant facts, circumstances, and communications, the IIA Approval, would not reasonably be expected to be received prior to the

Outside Date; provided that no termination may be made by a Party under this Section 8.1(b) if the foregoing was caused by the breach or action or inaction of such Party;

(d)      by written notice of either Purchaser or the Company, if the Closing shall not have occurred on or before January 16, 2023 (the "Outside Date"); provided that if on the Outside Date any of the conditions set forth in Sections 7.1(a), 7.1(b) (to the extent relating to matters set forth in Section 7.1(a)), or 7.1(c) have not been satisfied but all other conditions set forth in Article VII shall have been satisfied or waived (other than those conditions that by their nature are to be satisfied at the Closing; provided that such conditions shall then be capable of being satisfied if the Closing were to take place on such date), then each Party shall be entitled, upon written notice to the other Party, to extend the Outside Date to February 28, 2023 and such date shall become the Outside Date for purposes of this Agreement; provided further that a Party shall not be permitted to terminate this Agreement, or extend the Outside Date, pursuant to this Section 8.1(d) if the failure of the Closing to have occurred by the Outside Date was caused by the breach or action or inaction of such Party;

(e)      by written notice of either Purchaser or the Company, if the Bankruptcy Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of Sellers is appointed in the Bankruptcy Case;

(f)      by written notice from the Company to Purchaser, upon a breach of any covenant or agreement on the part of Purchaser, or if any representation or warranty of Purchaser will have become untrue, in each case, such that the conditions set forth in Section 7.3(a) or 7.3(b) would not be satisfied, including a breach of Purchaser's obligation to consummate the Closing; provided that (i) Sellers shall have provided notice to Purchaser of such breach at least five (5) Business Days prior to the effectiveness of such termination and, if such breach is curable by Purchaser then the Company may not terminate this Agreement under this Section 8.1(f) unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) thirty (30) days after such notice and (ii) the right to terminate this Agreement pursuant to this Section 8.1(f) will not be available to the Company at any time that Sellers are in material breach of any covenant, representation, or warranty hereunder;

(g)      by written notice from Purchaser to the Company, upon a breach of any covenant or agreement on the part of any Seller, or if any representation or warranty of any Seller will have become untrue, in each case, such that the conditions set forth in Section 7.2(a) or 7.2(b) would not be satisfied; provided that (i) Purchaser shall have provided notice to Sellers of such breach at least five (5) Business Days prior to the effectiveness of such termination and, if such breach is curable by such Seller then Purchaser may not terminate this Agreement under this Section 8.1(g) unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) thirty (30) days after such notice and (ii) the right to terminate this Agreement pursuant to this Section 8.1(g) will not be available to Purchaser at any time that Purchaser is in material breach of any covenant, representation, or warranty hereunder;

(h)      by written notice from the Company to Purchaser, if all of the conditions set forth in Sections 7.1 and 7.2 have been satisfied (other than conditions that by their nature are

57

to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Purchaser fails to complete the Closing at the time required by <u>Section 2.3</u>;

(i)    by written notice from the Company to Purchaser, if the board of directors (or similar governing body) of any Seller determines that proceeding with the transactions contemplated by this Agreement or failing to terminate this Agreement would be inconsistent with its or such body's fiduciary duties;

(j)    by written notice from either Purchaser or the Company to the other Party, if either of the Sale Order or the Israeli Court Order has been stayed, revoked, rescinded or modified in any material respect and the Order staying, revoking, rescinding or modifying the Sale Order is not reversed or vacated within by the later of (i) twenty-one (21) days after the entry thereof and (ii) the date of entry of the Israeli Court Order;

(k)    by written notice from Purchaser to the Company, if (i) Sellers shall have failed to file a voluntary petition for relief under the Bankruptcy Code and a motion seeking entry of an Order by the Bankruptcy Court authorizing any of Sellers to act as foreign representative on behalf of Sellers' estates within five (5) Business Days after the earlier to occur of (A) the conclusion of the Auction and (B) the date on which this Agreement is executed by each of Purchaser, Sellers and CE Seller; or (ii) the Sale Order shall not have been entered by the Bankruptcy Court on or before December 9, 2022; <u>provided</u> that Purchaser shall not be permitted to terminate this Agreement pursuant to this <u>Section 8.1(k)(ii)</u> if the failure of the Sale Order to be entered by the Bankruptcy Court on or before such date was caused by the breach or inaction of Purchaser; <u>provided</u> <u>further</u> that, notwithstanding anything to the contrary, the Parties may agree on the extension of such date via electronic transmission or electronic mail;

(l)    by written notice from Purchaser to the Company, if (i) any Seller enters into one or more Alternative Transactions with one or more Persons other than Purchaser (if Purchaser is the Successful Bidder) or the Successful Bidder (if Purchaser is the Backup Bidder) or (ii) the Bankruptcy Court approves an Alternative Transaction other than with Purchaser (if Purchaser is the Successful Bidder) or the Successful Bidder (if Purchaser is the Backup Bidder); or

(m)    by written notice from Purchaser to the Company, if Purchaser is not the Successful Bidder or the Backup Bidder.

8.2    <u>Effect of Termination</u>.

(a)    In the event of termination of this Agreement pursuant to <u>Section 8.1</u>, this Agreement shall forthwith become void and there shall be no Liability on the part of any Party or any of its partners, officers, directors or shareholders; <u>provided</u> that <u>Section 2.2</u>, this <u>Section 8.2</u>, and <u>Article X</u> shall survive any such termination; <u>provided</u> <u>further</u> that no termination will relieve Sellers or Purchaser from any Liability for damages, losses, costs, or expenses (including legal fees and expenses) resulting from any willful breach of this Agreement prior to the date of such termination (which, for the avoidance of doubt, will be deemed to include any failure by Purchaser to consummate the Closing if and when it is obligated to do so hereunder). For purposes of this Agreement, "willful breach" of any Party shall mean a deliberate act or a deliberate failure to act

by such Party with the intent to materially breach any provision applicable to such Party under this Agreement. Subject to Section 10.12, nothing in this Section 8.2 will be deemed to impair the right of any Party to be entitled to specific performance or other equitable remedies to enforce specifically the terms and provisions of this Agreement or any remedies in the event of Fraud by the other Party.

(b)    In the event that this Agreement is terminated (i) by any Party at any time after the entry of the Sale Order pursuant to Section 8.1(i) or 8.1(l) or (ii) by any Party pursuant to Section 8.1(d) or 8.1(e), in either case of this clause (ii) in circumstances where Purchaser would be entitled to terminate this Agreement pursuant to Section 8.1(l), then no later than, (x) solely in the event this Agreement is so terminated in connection with an Alternative Transaction and any Alternative Transaction is consummated, the closing of such Alternative Transaction or (y) in all other circumstances, the third Business Day after such termination, Sellers shall pay to Purchaser a break fee equal to $1,320,000 and reimbursement of Purchaser's documented out-of-pocket fees and expenses in connection with this Agreement the transactions contemplated hereby (including diligence and negotiation) up to an aggregate amount not to exceed $1,000,000, which fee and reimbursement shall constitute an allowed administrative expense of Sellers under Bankruptcy Code sections 503(b) and 507(a)(1); it being understood that in the cause of clause (x) above, such payment will be made from the proceeds of such Alternative Transaction.

## ARTICLE IX

## TAXES

9.1    Transfer Taxes. At the Closing or, if due thereafter, promptly when due, all transfer Taxes, real property transfer Taxes, sales Taxes, use Taxes, excise Taxes, stamp Taxes, conveyance Taxes and any other similar Taxes applicable to (and with respect to VAT, in accordance with Sections 2.1 and 9.4), arising out of, or imposed upon the transactions contemplated by this Agreement (the "Transfer Taxes") will be borne and paid by Purchaser. Purchaser will prepare any Tax Returns with respect to such Taxes (other than VAT), and Sellers will cooperate with Purchaser in the preparation and filing of such Tax Returns. Sellers and Purchaser shall use commercially reasonable efforts and cooperate in good faith to exempt all such transactions from any Transfer Taxes (it being understood, for the avoidance of doubt, that such efforts shall not require the transactions to be structured so that Section 1146(a) of the Bankruptcy Code applies). Other than Transfer Taxes allocated to Purchaser pursuant to this Section 9.1, Sellers shall be solely responsible for paying and satisfying when due any and all Taxes arising out of the sale or transfer of the Acquired Assets and the Assumed Liabilities pursuant to this Agreement (but not including any withholding Taxes imposed on Purchaser with respect to the payment of the Purchase Price), and all such Taxes shall be considered Excluded Liabilities for purposes of this Agreement.

9.2    Cooperation. Following the Closing, Purchaser, the Company, and its Subsidiaries shall cooperate with and provide such assistance to each other and their Affiliates as may be reasonably requested in connection with the preparation or review of any Tax Return or claim for refund (or credit in lieu of a refund). Such cooperation will include making available to the other Parties and their Affiliates, upon request and during normal business hours, all books and records, information and employees (without substantial disruption of employment) retained and remaining

in existence after the Closing that are necessary or useful to the preparation or review of such Tax Return or claim for refund (or credit in lieu of a refund).

9.3     Straddle Period. For all purposes of this Agreement, in the case of any Straddle Period, the amount of any Taxes or refunds of Taxes (or credits for overpayment of Taxes) (other than property or *ad valorem* Taxes) of the Company and its Subsidiaries for the Pre-Closing Tax Period shall be determined based on an interim closing of the books as of the end of the Closing Date; provided that exemptions, allowances, or deductions that are calculated on an annual basis (including depreciation and amortization deductions) shall be apportioned on a *per diem* basis, and the amount of property or *ad valorem* Taxes (other than VAT) or refunds of such Taxes (or credits for overpayment of such Taxes) of the Company and its Subsidiaries for a Straddle Period that relates to the Pre-Closing Tax Period shall be deemed to be the amount of such Tax or refund of such Tax (or credit or overpayment) for the entire taxable period multiplied by a fraction the numerator of which is the number of days in the taxable period ending on the Closing Date and the denominator of which is the number of days in such Straddle Period.

9.4     VAT. The Company shall comply with Section 12 of the VAT Regulations of 1976 in order for the Intellectual Property to qualify for a zero-rate VAT in connection with the sale thereof. If (i) a zero-rate VAT was applied in respect of the Intellectual Property (or deemed to be applied to the Israeli Transferred Employees) and (ii) it is determined by the ITA that the Purchaser is not a '*foreign resident*' (*תושב חוץ*) pursuant to Section 30(C) of the VAT Law, then the Purchaser shall pay to Seller the applicable VAT amount in respect of the Intellectual Property (or in respect of any deemed payment for the Israeli Transferred Employees to the extent such VAT was not previously paid). With respect to tangible assets exported out of Israel (if any), the Company shall use its commercially reasonable efforts to obtain a valid Export Entry (*הצהרת יצוא*) from a customs agent in compliance with all legal requirements prior to such export.

9.5     Pre-Closing Taxes. Sellers shall be solely responsible for paying and satisfying when due any and all Taxes (a) of Sellers or any of their Affiliates or predecessors for any Tax period and (b) arising out of or attributable to the ownership or operation of the Acquired Assets on or before the Closing Date (including any Taxes for the Pre-Closing Tax Period of any Straddle Period as determined under Section 9.3), and all such Taxes shall be considered Excluded Liabilities for purposes of this Agreement.

## ARTICLE X

## MISCELLANEOUS

10.1     Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant, or agreement, detrimental reliance, or other right or remedy (whether in Contract, in tort, or at law or in equity) may be brought with respect thereto after the Closing and accordingly, neither Purchaser nor Sellers shall have no right to claim any loss, damages or Liabilities arising

60

therefrom or in connection therewith. For the avoidance of doubt, the Purchaser shall not be entitled to terminate or rescind this Agreement following Closing other than in the case of Fraud. Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for five (5) years following the Closing Date, and nothing in this Section 10.1 will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Purchaser and Seller Parties acknowledge and agree, on their own behalf and on behalf of the Purchaser Group or the Seller Parties, as the case may be, that the agreements contained in this Section 10.1 (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for five (5) years or such longer period permissible by Law; and (b) are an integral part of the transactions contemplated hereby and that, without the agreements set forth in this Section 10.1, none of the Parties would enter into this Agreement. Purchaser Group, on its own behalf and on behalf of (after the Closing) the Company, hereby waives all rights and remedies with respect to any environmental, health or safety matters, including those arising under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, or any other Environmental Laws, relating to this Agreement or the transactions contemplated hereby.

10.2    Expenses. Whether or not the Closing takes place, except as otherwise provided herein (including, for the avoidance of doubt, Section 2.2 and Section 8.2), all fees, costs, and expenses (including fees, costs, and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby, and the consummation of the transactions contemplated hereby and thereby will be paid by the Party incurring such fees, costs, and expenses; it being acknowledged and agreed that (a) all fees in connection with any filing or submission that is necessary under any Competition Laws will be allocated pursuant to Section 6.4(a), and (b) all Transfer Taxes will be allocated pursuant to Section 9.1.

10.3    Notices. Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail, if by 5:00 PM local time of the recipient on a Business Day, otherwise on the next Business Day, (c) the Business Day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service, or (d) the third (3rd) Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address, or street address, as applicable, set forth below, or at such other number, electronic mail address, or street address as such Party may specify by written notice to the other Party in accordance with this Section 10.3.

Notices to Purchaser:

Galaxy Digital Trading LLC
300 Vesey St. 13th Floor
New York NY 10282
Attention:     Steven Wald
               Michael Marcantonio
Email:         steven.wald@galaxy.com
               michael.marcantonio@galaxy.com

with a copy to (which shall not constitute notice):

Orrick, Herrington & Sutcliffe LLP
51 West 52nd Street
New York, NY 10019-6142
Attention:     B.J. Rosen
               Raniero D'Aversa
               Justin Yi
Email:         bjrosen@orrick.com
               rdaversa@orrick.com
               justin.yi@orrick.com

Notices to Sellers:

c/o Celsius Network Limited
50 Harrison Street
Suite 209F Hoboken, NJ 07030
Attention:     Ron Deutsch, General Counsel
Email:         ron.deutsch@celsius.network

with a copy to (which shall not constitute notice):

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, Illinois 60654
Attention:     Patrick J. Nash Jr., P.C.
               Ross M. Kwasteniet, P.C.
               Steve Toth
               Dan Latona
Email:         patrick.nash@kirkland.com
               rkwasteniet@kirkland.com
               steve.toth@kirkland.com
               dan.latona@kirkland.com

10.4    Binding Effect; Assignment. This Agreement shall be binding upon Purchaser and, subject to the terms of the Bidding Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Sale Order, Sellers, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate

62

representative appointed in the Bankruptcy Case or any successor Chapter 7 case; provided that neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of Purchaser and the Company, and any attempted assignment or delegation without such prior written consent shall be null and void; provided further that without the consent of the Company, Purchaser shall be permitted to assign its right to acquire any of the Acquired Assets to one or more of its Affiliates (it being understood that if Purchaser exercises such right to assign, Purchaser may (at its option) determine to have a portion of the Purchase Price paid by the applicable Affiliate(s) to whom such right is assigned); provided further, however, that no such assignment shall relieve Purchaser of any of its obligations or Liabilities hereunder and shall not delay or adversely affect the likelihood of the Closing occurring hereunder.

10.5    Amendment and Waiver. Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by Purchaser and the Company or (b) waived only in a writing executed by the Party against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

10.6    Third Party Beneficiaries. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than the Parties any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

10.7    Non-Recourse. This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present, or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent, or Advisor of any Party or any Subsidiary of any Party will have any liability (whether in Contract, tort, equity, or otherwise) for any of the representations, warranties, covenants, agreements, or other obligations or Liabilities of any of the parties to this Agreement or for any Agreement Dispute.

10.8    Severability. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

10.9    Construction. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person. The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

10.10    Schedules. The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; provided that each

section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules, and any disclosure in the Schedules will be deemed a disclosure against any representation or warranty set forth in this Agreement, in each case, to the extent the relevance of such disclosure to an uninformed reader to such other section of the Schedules or such other representation or warranty set forth in this Agreement is reasonably apparent on the face of such disclosure. Capitalized terms used in the Schedules and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules, or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course, and no Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Schedules, or exhibits in any dispute or controversy between the Parties as to whether any obligation, item, or matter not set forth or included in this Agreement, the Schedules, or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course. No information set forth in the Schedules will be deemed to broaden in any way the scope of the Parties' representations and warranties. Any description of any agreement, document, instrument, plan, arrangement, or other item set forth on any Schedule is a summary only and is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item, which terms will be deemed disclosed for all purposes of this Agreement. The information contained in this Agreement or the Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

10.11  Complete Agreement. This Agreement, together with the Confidentiality Agreement and any other agreements expressly referred to herein or therein, contains the entire agreement of the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the transactions contemplated by this Agreement and supersedes all prior agreements among the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the transactions contemplated by this Agreement. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto, and will be deemed joint work product of the Parties.

10.12  Specific Performance. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement. It is accordingly agreed that (a) each of the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in Section 10.13 without proof of damages or otherwise,

this being in addition to any other remedy to which such Party is entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, neither Sellers nor Purchaser would have entered into this Agreement. The Parties acknowledge and agree that any Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Section 10.12 will not be required to provide any bond or other security in connection with any such Order. The remedies available to the Parties pursuant to this Section 10.12 will be in addition to any other remedy to which they were entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair, or otherwise limit any Party from seeking to collect or collecting damages.

10.13    Jurisdiction and Exclusive Venue. Each of the Parties irrevocably agrees that any Action of any kind whatsoever, including a counterclaim, cross-claim, or defense, regardless of the legal theory under which such Liability or obligation may be sought to be imposed, whether sounding in contract or tort or under statute, or whether at law or in equity, or otherwise under any legal or equitable theory, that may be based upon, arising out of, or related to this Agreement or the negotiation, execution, or performance of this Agreement or the transactions contemplated hereby and any questions concerning the construction, interpretation, validity and enforceability of this Agreement (each, an "Agreement Dispute") brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken, (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Delaware Chancery Court and any state court sitting in the State of Delaware to which an appeal from the Delaware Chancery Court may be validly taken (or, if the Delaware Chancery Court declines to accept jurisdiction over a particular matter, any state or federal court within the state of Delaware) or (c) solely as it relates to the Israeli Court Order or recognition of the Bankruptcy Case and of the Sale Order by Order of a competent court in Israel or in respect of any Agreement Dispute regarding the interpretation of Israeli laws, the District Court in Tel Aviv ((a), (b) and (c), the "Chosen Courts"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any Agreement Dispute. Each of the Parties agrees not to commence any Agreement Dispute except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree, or award rendered by any Chosen Court, and no Party will file a motion to dismiss any Agreement Dispute filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Courts, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of any Agreement Dispute. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 10.3. Nothing in this Agreement will affect the right of any Party to this Agreement to serve process in any other manner permitted by Law.

10.14    Governing Law; Waiver of Jury Trial.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code or the Israeli Insolvency Law apply, this Agreement and any Agreement Dispute will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to

agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply; provided that all matters relating to the Israeli Court Order or the recognition of the Bankruptcy Case and of the Sale Order by Order of a competent court in Israel shall be governed by and construed in accordance with the internal Laws of Israel.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY AGREEMENT DISPUTE IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY AGREEMENT DISPUTE. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH AGREEMENT DISPUTE WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY AGREEMENT DISPUTE, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.15   No Right of Set-Off. Purchaser, on its own behalf and on behalf the Purchaser Group and its and their respective successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment, or similar rights that Purchaser, any member of the Purchaser Group or any of its or their respective successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchaser pursuant to this Agreement or any other document or instrument delivered by or to Purchaser in connection herewith.

10.16   Counterparts and PDF. This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a facsimile machine, .PDF or other electronic transmission, will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. Minor variations in the form of the signature page to this Agreement or any agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining the effectiveness of such signature. At the request of any party or pursuant to any such Contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such Contract will raise the use of a facsimile machine, .PDF or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or

communicated through the use of facsimile machine, .PDF or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

10.17    Publicity. Neither the Company nor Purchaser shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Parties (which approval will not be unreasonably withheld or delayed), unless, in the reasonable judgment of the disclosing Party, disclosure is otherwise required by applicable Law or by the Bankruptcy Court or the Israeli Court with respect to filings to be made with the Bankruptcy Court or the Israeli Court, as applicable, in connection with this Agreement or by the applicable rules of any stock exchange on which Purchaser or the Company or any of their respective Affiliates lists securities; provided that the Party intending to make such release shall use its reasonable efforts consistent with such applicable Law or Bankruptcy Court or Israeli Court requirement to consult with the other Parties with respect to the text thereof.

10.18    Bulk Sales Laws. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances in the Acquired Assets including any liens or claims arising out of the bulk transfer laws except Permitted Encumbrances, and the parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the transactions contemplated by this Agreement.

## ARTICLE XI

## ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

11.1    Certain Definitions.

(a)    "Accounting Methodology" means GAAP and, to the extent inconsistent with GAAP, the principles, methods, practices, categories, estimates, judgments and assumptions set forth on Schedule 3.4(b).

(b)    "Action" means any action, claim (including a counterclaim, cross-claim, or defense), complaint, grievance, summons, suit, litigation, arbitration, mediation, audit, proceeding (including any civil, criminal, administrative, investigative, or appellate proceeding), prosecution, contest, hearing, inquiry, inquest, audit, examination, or investigation, of any kind whatsoever, regardless of the legal theory under which such Liability or obligation may be sought to be imposed, whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body.

(c)    "Advisors" means, with respect to any Person, any directors, officers, employees, investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other representatives of such Person.

67

(d)      "Aggregate Cure Amount" means the aggregate Cure Costs associated with all of the Assigned Contracts to be assumed by the Purchaser at the Closing.

(e)      "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(f)      "Aggregate Payables Amount" means the Aggregate Cure Amount, plus the Pre-Closing Payables Amount.

(g)      "Alternative Transaction" means any transaction (or series of transactions), whether direct or indirect, whereby any Person or group of Persons (other than Sellers and their Affiliates or Purchaser and its Affiliates) acquires (i) beneficial ownership of a majority of the equity interests of Sellers or (ii) a material portion of the Acquired Assets, in each case whether by merger, sale of assets or equity, recapitalization, plan of reorganization or otherwise. Notwithstanding the foregoing, a liquidation or wind-down of Sellers' estates shall be an Alternative Transaction.

(h)      "Auction" shall have the meaning ascribed to such term in the Bidding Procedures Order.

(i)      "Bidding Procedures" means the bidding procedures attached to the Bidding Procedures Order as Exhibit 1.

(j)      "Bidding Procedures Order" means the Bankruptcy Court's *Order (I) Approving Bidding Procedures for the Potential Sale of Certain of the Debtors' Assets, (II) Scheduling Certain Dates with Respect Thereto (III) Approving the Form and Manner of Notice Thereof, (IV) Approving Contract Assumption and Assignment Procedures, and (V) Granting Related Relief* [Docket No. 687].

(k)      "Business" means the business conducted by the Company and its Subsidiaries as of the date of this Agreement.

(l)      "Business Day" means any day other than a Friday, Saturday, Sunday, or other day on which banks in New York City, New York or Tel Aviv, Israel are authorized or required by Law to be closed.

(m)      "CE Commercial Agreement" means that certain License Agreement, dated as of September 1, 2021, by and between the Company and Celsius Network Limited, a company incorporated under the laws of England and Wales.

(n)      "Code" means the United States Internal Revenue Code of 1986.

(o)      "Company Intellectual Property" means all Intellectual Property owned or purported to be owned by the Company or any of its Subsidiaries.

68

(p)    "Confidentiality Agreement" means that certain letter agreement, dated as of June 13, 2022, by and between the Celsius Network Limited, a private company incorporated in England and Wales, and Galaxy Digital LP, an exempted limited partnership organized under the laws of the Cayman Islands.

(q)    "Consent" means any approval, consent, ratification, permission, waiver, or authorization, or an Order of the Bankruptcy Court or the Israeli Court that deems or renders unnecessary the same.

(r)    "Contract" means any contract, bargaining agreement or arrangement, purchase order, service order, sales order, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, license, or other agreement that is binding upon a Person or its property.

(s)    "COVID-19" means SARS-CoV-2 or COVID-19, and any evolutions or mutations thereof.

(t)    "COVID-19 Measure" means any (i) required or recommended quarantines, travel restrictions, or social distancing, in each case, issued by a Governmental Body, (ii) factory shutdowns or slowdowns, workplace or worksite shutdowns or slowdowns or work from home requirements or recommendations or other measures initiated or occurring in response to COVID-19, in each case, issued by a Governmental Body, or (iii) other interruptions or slowdowns, in each case, resulting from the matters contemplated by clause (i) or clause (ii).

(u)    "Data Protection Laws" means all applicable Laws related to data protection, privacy, data security, breach notification, consumer marketing, and cross-border data transfer and the Processing of Personal Data, in each case solely to the extent applicable to Sellers.

(v)    "Data Protection Obligations" means all applicable (a) Data Protection Laws, (b) published, posted, and internal policies, procedures, notices, and agreements relating to Sellers' Processing of Personal Data, and (c) contract terms, consents, codes of conduct, and applicable industry standards to which Sellers are bound relating to the Company's and its Subsidiaries' Processing of Personal Data.

(w)    "Documents" means all of Sellers' written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, and documents, Tax Returns, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

(x)    "Encryption License" means the limited license issued by the IMOD to the Company on February 3, 2020 in respect of the Company's encryption technology.

(y)    "Encumbrance" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code),

charge (fixed or floating), execution process ("Ikul"), mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, encroachments, Orders, conditional sale or other title retention agreements, and other similar impositions, imperfections, or defects of title or restrictions on transfer or use.

(z)    "Environmental Laws" all applicable Laws concerning pollution or protection of the environment.

(aa)    "ERISA" means the Employee Retirement Income Security Act of 1974.

(bb)    "ERISA Affiliate" means any person or entity under common control with Seller within the meaning of Section 4001(b) of ERISA or Section 414(b), (c), (m) or (o) of the Code from time to time.

(cc)    "Escrow Adjustment Amount" means $500,000.

(dd)    "Fraud" means an act committed by (a) Sellers, in the making to Purchaser of the Express Representations and (b) Purchaser, in the making to Sellers of the representations and warranties expressly contained in Article IV (in each case, as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement), in any such case, with intent to deceive another Party and to induce such other Party to enter into this Agreement and requires (i) a false representation of material fact made in such representation; (ii) with knowledge that such representation is false; (iii) with an intention to induce the Party to whom such representation is made to act or refrain from acting in reliance upon it; (iv) causing that Party, in justifiable reliance upon such false representation, to take or refrain from taking action; and (v) causing such Party to suffer damage by reason of such reliance, which together constitutes common law fraud under Delaware Law (and does not include any fraud claim based on constructive knowledge, negligent misrepresentation, recklessness or a similar theory).

(ee)    "GAAP" means with respect to the Company, Israeli GAAP, and with respect to the Subsidiaries, United States generally accepted accounting principles as in effect from time to time.

(ff)    "Governmental Authorization" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

(gg)    "Governmental Body" means any government, quasi-governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, state, or local, or any agency, branch, department, official, entity, instrumentality, or authority thereof, any court or arbitrator (public or private) of applicable jurisdiction or any subdivision of any of them, including the IIA and any other bi- or multi-national grant programs for the financing of research and development or other similar funds.

(hh)    "Governmental Grant" means any grants, incentives and subsidies or Tax benefits from the government of the State of Israel, the IIA or any agency thereof, or from any

other foreign Governmental Body, in each case, with respect to the research and development of the Company's products and services.

(ii)    "Hazardous Substance" means any toxic or hazardous material, substance or waste regulated under any Environmental Laws.

(jj)    "Indemnification Escrow Agreement" means the Indemnification Escrow Agreement, dated as of October 28, 2021, by and among Altshuler Shaham Trusts Ltd., as escrow agent, Celsius Network Ltd. and Altshuler Shaham Trusts Ltd., as Seller Representative.

(kk)    "Identified Employees" means Lior Lamesh and Shahar Shamai.

(ll)    "IIA Approval" means the approval of the IIA required in accordance with the R&D Law with respect to the transfer of any Intellectual Property developed through projects funded by the IIA and transferred hereunder as part of the Acquired Assets.

(mm)    "IIA Redemption Payment" means the amount required to be paid to the IIA pursuant to the R&D Law in order to enable the Company to transfer, at the Closing, the Intellectual Property developed through projects funded by the IIA and transferred hereunder as part of the Acquired Assets, which, for purposes of Section 2.1(a)(i)(B), shall not include any amounts arising from or relating to Purchaser's non-compliance with or breach of the IIA Undertaking.

(nn)    "IMOD" means the Israeli Ministry of Defense.

(oo)    "IMOD Approval" means the special license required to be obtained by the Company from the IMOD pursuant to the Special License granted by the IMOD to the Company on February 3, 2020 in order for the Company to transfer the encryption know-how and technology transferred hereunder as part of the Acquired Assets.

(pp)    "Intellectual Property" means any and all of the following: (i) patents, patent applications, and patent disclosures; (ii) trademarks, service marks, trade dress, corporate names, brand names, and Internet domain names, together with all goodwill associated with each of the foregoing; (iii) copyrights; (iv) registrations and applications for any of the foregoing; (v) trade secrets; (vi) computer software; (vii) drawings, schematics, and other technical plans; and (viii) all other intellectual property, including know-how.

(qq)    "Israeli Encryption Regulations" means the Law Governing the Control of Commodities and Services – 1957, the Order Regarding the Engagement in Encryption Items – 1974, the Declaration Regarding the Control of Commodities and Services (Engagement in Encryption Items) – 1974 and the Declaration Governing the Control of Commodities and Services (Engagement in Encryption Items) (Amendment) - 1998.

(rr)    "Israeli GAAP" means generally accepted accounting principles in Israel as in effect from time to time.

(ss)    "Knowledge of Sellers" means the actual knowledge of Lior Lamesh and Shahar Shamai.

(tt)    "<u>Law</u>" means any federal, state, provincial, local, municipal, foreign or international, multinational, or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, order, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion, or requirement issued, enacted, adopted, promulgated, implemented, or otherwise put into effect by or under the authority of any Governmental Body.

(uu)    "<u>Liability</u>" means, as to any Person, any debt, adverse claim, liability (including any liability that results from, relates to, or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred, or asserted or when the relevant events occurred or circumstances existed.

(vv)    "<u>Material Adverse Effect</u>" means any matter, event, change, development, occurrence, circumstance, or effect (each, an "<u>Effect</u>"), individually or when aggregated with any one or more of the other such Effects, has had or would reasonably be expected to have a material adverse effect on the Business and the Acquired Assets, taken as whole; <u>provided</u> that none of the following shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect: (i) any Effect in, arising from, or relating to general business or economic conditions affecting the industry in which the Company and its Subsidiaries operate, including Effects arising from or relating to competition or ordinary course matters and other Effects within such industry, new entrants into such industry, new products from other participants in such industry, changes in product pricing due to such competition, changes in market share or financial results due to such competition, and other related changes resulting from such competition, (ii) Effects in, arising from, or relating to national or international political or social conditions, including the engagement by any nation in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist attack upon any nation, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, equipment or personnel of the United States, (iii) Effects in, arising from, or relating to any fire, flood, hurricane, earthquake, tornado, windstorm, other calamity or act of God, global or national health concern, epidemic, pandemic (whether or not declared as such by any Governmental Body), viral outbreak (including COVID-19), or any quarantine or trade restrictions related thereto (including any COVID-19 Measure) or any other *force majeure*, (iv) Effects in, arising from, or relating to the decline or rise in cost of, or the limited or non-availability of, any currency or cryptocurrency, raw materials, or other supplies used in the manufacture and supply of the Company's and its Subsidiaries' products (including any resulting inability to meet customer demands or breaches of Contracts); (v) the Effects in, arising from, or relating to financial, banking, securities, currency, or cryptocurrency markets (including (A) any disruption of any of the foregoing markets, (B) any change in currency or cryptocurrency exchange rates, (C) any decline or rise in the price of any security, commodity, Contract, cryptocurrency, or index and (D) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the transactions contemplated by this Agreement), (vi) Effects in, arising from, or relating to changes in GAAP or interpretations thereof, (vii) Effects in, arising from, or relating to changes in, Laws or other binding directives or determinations issued or made by or agreements with or consents of any Governmental Body and

72

any increase (or decrease) in the terms or enforcement of (or negotiations or disputes with respect to) any of the foregoing (such as with respect to immigration, border, tariff, or import, export, or other trade matters), (viii) Effects in, arising from, or relating to (A) the taking of any action permitted or contemplated by this Agreement or at the request of Purchaser or its Affiliates, (B) the failure to take any action if such action is prohibited by this Agreement, (C) Purchaser's failure to consent to any of the actions restricted in Section 6.1, (D) the negotiation, announcement, or pendency of this Agreement or the transactions contemplated hereby, the identity, nature, or ownership of Purchaser or Purchaser's plans with respect to the Company and its Subsidiaries and their businesses, including the impact thereof on the relationships, contractual or otherwise, of the business of the Company or any of its Subsidiaries with employees, customers, lessors, suppliers, vendors, or other commercial partners, (ix) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics, or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or Advisors) (but, for the avoidance or doubt, not the underlying causes of any such failure to the extent such underlying cause is not otherwise excluded from the definition of Material Adverse Effect), (x) the effect of any action taken by Purchaser or its Affiliates with respect to the transactions completed by this Agreement or the financing thereof or any breach by Purchaser of the Agreement, (xi) (A) the commencement or pendency of the Bankruptcy Case; (B) any objections in the Bankruptcy Court to (1) this Agreement or any of the transactions contemplated hereby or thereby, (2) the reorganization of Sellers and their Affiliates, (3) the Bidding Procedures Order or the Sale Order (or, in the Israeli Court, the Israeli Court Order), or (4) the assumption or rejection of any Assigned Contract; (C) any Order of the Bankruptcy Court or the Israeli Court or any actions or omissions of Sellers or their Subsidiaries in compliance therewith; provided that Effects set forth in any of clauses (i) through (vii) may be taken into account in determining whether there has been or is a Material Adverse Effect if such Effects have a disproportionate impact on the Business and the Acquired Assets, taken as a whole, relative to the other participants in the industries and markets in which the Company operates.

(ww)    "Named Employees" means Adam Schreiber, Dmitry Danilov and Bernard Kulysz Fatuch.

(xx)    "Open Source Software" means any Software that is distributed as "free software," "open source software," or pursuant to any license identified as an "open source license" by the Open Source Initiative (www.opensource.org/licenses) or other license that substantially conforms to the Open Source Definition (opensource.org/osd), including the GNU General Public License (GPL), GNU Lesser General Public License (LGPL), GNU Affero General Public License (AGPL), MIT License (MIT), Apache License, Artistic License, and BSD Licenses.

(yy)    "Order" means any order, injunction, order, decree, ruling, writ, assessment or arbitration award of a Governmental Body, including any order entered by the Bankruptcy Court in the Bankruptcy Case (including the Bidding Procedures Order and the Sale Order) or by the Israeli Court (including the Israeli Court Order).

(zz)    "Ordinary Course" means the ordinary and usual course of operations of the business of the Company and its Subsidiaries taken as a whole consistent with past practice and taking into account the contemplation, commencement, and pendency of the Bankruptcy Case (and any related actions before the Israeli Court) and past practice in light of the current pandemic,

epidemic or disease outbreak; <u>provided</u> that any action taken, or omitted to be taken, that relates to, or arises out of, any pandemic, epidemic or disease outbreak shall be deemed to be in the Ordinary Course.

(aaa)    "<u>Organizational Documents</u>" means the certificate or memorandum and articles of association/incorporation, bylaws, charter, trust agreement, or similar document adopted or filed in connection with the creation, formation, or organization of an entity.

(bbb)    "<u>Permitted Encumbrances</u>" means (i) Encumbrances for utilities and current Taxes not yet due and payable, being contested in good faith, or the nonpayment of which is permitted or required by the Bankruptcy Code; (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments that do not, individually or in the aggregate, adversely affect the operation of the business of the Company and, in the case of the Leased Real Property, that do not, individually or in the aggregate, adversely affect the use or occupancy of such Leased Real Property as it relates to the operation of the business of the Company, (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law which are not violated by the current use or occupancy of the Leased Real Property, (iv) materialmans', mechanics', artisans', shippers', warehousemans', or other similar common law or statutory liens incurred in the Ordinary Course for amounts not yet due and payable, (v) licenses granted on a non-exclusive basis, (vi) such other Encumbrances or title exceptions as Purchaser may approve in writing in its sole discretion or that do not, individually or in the aggregate, materially and adversely affect the operation of the business of the Company, (vii) any Encumbrances set forth on <u>Schedule 11.1(bbb)</u>, (viii) any Encumbrances that will be removed or released by operation of the Sale Order; and (ix) any Encumbrances that will remain applicable to the Acquired Assets pursuant to the provisions of section 34A of the Israeli Sales Law.

(ccc)    "<u>Person</u>" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Body, or other entity or group.

(ddd)    "<u>Personal Data</u>" means data or information (i) that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular individual or household any other data or information that constitutes "personal data," "personal information," or the like under applicable Data Protection Laws, or (ii) that is otherwise subject to a Law relating to privacy or security of data or information (including if it constitutes "personal information" or "personal data" or other equivalent term under any such Law).

(eee)    "<u>Pre-Closing Payables Amount</u>" means the aggregate amount of (a) trade accounts payable of Sellers arising under or in connection with any Assigned Contract and outstanding and unpaid as of immediately prior to the Closing (excluding any Cure Costs that are taken into account in the calculation of the Aggregate Cure Amount) and (b) trade accounts payable assumed by Purchaser pursuant to <u>Section 1.3(f)(i)</u> that are outstanding and unpaid as of immediately prior to the Closing.

(fff)    "Pre-Closing Tax Period" means any Tax period ending on or before the Closing.

(ggg)    "Process" or "Processing" means any operation or set of operations which is performed on data, or on sets of data, including Personal Data, whether or not by automated means, such as the receipt, access, acquisition, arrangement, collection, copying, creation, maintenance, modification, recording, organization, processing, compilation, selection, structuring, storage, visualization, adaptation, alteration, retrieval, consultation, use, disclosure by transfer, transmission, dissemination or otherwise making available, alignment or combination, restriction, disposal, erasure or destruction of such data.

(hhh)    "Purchaser Group" means Purchaser, any Affiliate of Purchaser, and each of their respective former, current, or future Affiliates, officers, directors, employees, partners, members, managers, agents, Advisors, successors, or permitted assigns.

(iii)    "Sale Order" means an Order of the Bankruptcy Court, substantially in the form attached hereto as Exhibit D, with such changes as may be reasonably acceptable to the Parties.

(jjj)    "Seller Parties" means Sellers and each of their respective former, current, or future Affiliates, officers, directors, employees, partners, members, equityholders, controlling or controlled Persons, managers, agents, Advisors, successors, or permitted assigns.

(kkk)    "Seller Plan" means any plan for employee "benefits" and any other written or oral plan, Contract or arrangement involving compensation or benefits, including insurance coverage, welfare benefits, severance or other termination pay, termination indemnity or benefits, change in control, retention, performance, sickness, injury, vacation, or other leave in excess of the applicable Law, jubilee, disability benefits, retirement plans, profit sharing, deferred compensation, bonuses, or other forms of incentive compensation or post-retirement compensation, sponsored, maintained or contributed to by the Company or any of its Affiliates for the benefit of any current or former director, officer, employee, or consultant of the Company or any of its Subsidiaries or with respect to which the Company or any of its Affiliates has any Liability regardless of whether it is mandated under local Law, voluntary, private, funded, unfunded, financed by the purchase of insurance, contributory, or noncontributory; provided that (a) any governmental plan or program requiring the mandatory payment of social insurance taxes or other contributions to a governmental fund with respect to the wages of, or providing benefits to, an employee, and (b) any benefits applicable to Israeli Employees pursuant to expansion orders applicable to all employees in Israel, will not be considered a "Seller Plan."

(lll)    "Share Purchase Agreement" means, together, the Share Purchase Agreement, dated as of October 28, 2021, by and among Celsius Network Ltd., the Company and the other parties thereto, all certificates delivered by the Company in connection therewith.

(mmm)    "Software" means any and all computer software and code, including all new versions, updates, revisions, improvements, and modifications thereof, whether in source code, object code, or executable code format, including systems software, application software (including mobile apps), firmware, middleware, programming tools, scripts, routines, interfaces,

75

libraries, and databases, and all related specifications and documentation, including developer notes, comments and annotations, user manuals, and training materials relating to any of the foregoing.

(nnn)    "Straddle Period" means any Tax period beginning before, and ending after, the Closing.

(ooo)    "Subsidiary" or "Subsidiaries" means, with respect to any Person, any corporation of which a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association, or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

(ppp)    "Tax" or "Taxes" means (i) any federal, state, local, foreign, or other tax, custom, duty, governmental fee or other like assessment or charge, including income, gross receipts, capital stock, franchise, profits, withholding, capital gain, social security, (*Bituach Leumi*) (or equivalent), national health insurance (*Bituach Briyut*) (or equivalent) unemployment, disability, real property, *ad valorem* or personal property, stamp, excise, occupation, sales, use, transfer, value added (including VAT), import, export, alternative minimum, or estimated tax, including any interest, linkage differentials, penalty or addition thereto, whether disputed or not, and (ii) any Liability for or with respect to any amount described in clause (i) as a result of being or having been a member of any consolidated, combined, unitary, affiliated or similar group for any Tax purposes, as a result of any obligation under any agreement or arrangement, as a result of being a transferee or successor, or otherwise.

(qqq)    "Tax Return" means any return, claim for refund, report, statement, or information return relating to Taxes filed or required to be filed with a Governmental Body, including any schedule or attachment thereto, and including any amendments thereof.

(rrr)    "VAT" means value added tax within the meaning of the VAT Law.

11.2    Index of Defined Terms.

Accounting Firm ........................................ 14
Acquired Assets .......................................... 5
Acquired Leased Real Property ................. 5
Agreement................................................... 4
Agreement Dispute .................................. 65
Assigned Contracts .................................... 5
Assigned PSA Rights.................................. 7
Assignment and Assumption Agreement.. 16
Assumed Liabilities .................................... 9
Backup Bidder .......................................... 35

Bankruptcy Case ......................................... 4
Bankruptcy Code ........................................ 4
Bankruptcy Court........................................ 4
Cash Payment............................................ 12
CE Seller ..................................................... 4
Chosen Courts........................................... 65
Closing ...................................................... 15
Closing Date.............................................. 16
Closing Date Payment.............................. 12
Closing Statement ..................................... 13

| | | | |
|---|---|---|---|
| Company | 4 | Intellectual Property Registrations | 22 |
| Company IT Systems | 25 | Israeli Court | 4 |
| Company Products | 24 | Israeli Court Order | 4 |
| Competition Laws | 18 | Israeli Employee | 43 |
| Confidential Information | 49 | Israeli Insolvency Law | 5 |
| Cure Costs | 11 | Israeli Sales Law | 5 |
| Dataroom | 32 | Israeli Transferred Employees | 44 |
| Deposit | 12 | ITA | 17 |
| Deposit Escrow Account | 13 | Item of Dispute | 14 |
| Dispute Notice | 14 | Leased Real Property | 19 |
| Effect | 72 | Leases | 19 |
| Employees | 29 | Limitation Period | 44 |
| Enforceability Exceptions | 18 | Material Contract | 19 |
| Environmental Permits | 22 | Non-Competition Agreements | 4 |
| Escrow Agent | 12 | Ordinance | 17 |
| Escrow Agreement | 13 | Outside Date | 57 |
| Estimated Aggregate Cure Amount | 13 | Parties | 4 |
| Estimated Aggregate Payables Amount | 13 | Party | 4 |
| Excluded Assets | 8 | Permits | 22 |
| Excluded Contracts | 9 | Projections | 48 |
| Excluded Employee | 44 | Purchase Price | 12 |
| Excluded Liabilities | 10 | Purchaser | 4 |
| Express Representations | 32 | Purchaser Plans | 42 |
| Final Aggregate Payables Amount | 14 | R&D Law | 52 |
| Final Statement | 14 | Section 14 Arrangement | 30 |
| Financial Statements | 18 | Seller | 4 |
| Guaranteed Obligations | 50 | Seller Independent Contractor | 41 |
| Guarantor | 4 | Successful Bidder | 35 |
| Identified Employee Agreements | 4 | Termination Limitation | 44 |
| IIA | 52 | Transfer Taxes | 59 |
| IIA Application | 51 | Transferred Employee | 42 |
| IIA Undertaking | 51 | Valid Tax Certificate | 17 |
| Indebtedness | 38 | VAT Law | 12 |
| Information Presentation | 32 | Waived Benefits | 52 |

11.3    Rules of Interpretation. Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other certificate, instrument, agreement, or other document contemplated hereby or delivered hereunder.

(a)    Accounting terms which are not otherwise defined in this Agreement have the meanings given to them under GAAP consistently applied. To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under GAAP, the definition set forth in this Agreement will control.

(b)    The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, schedule, and exhibit references contained in this Agreement are references to

sections, clauses, schedules, and exhibits in or to this Agreement, unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)     Whenever the words "include," "includes," or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(d)     The words "to the extent" shall mean "the degree by which" and not "if."

(e)     When calculating the period of time before which, within which, or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(f)     Words denoting any gender will include all genders, including the neutral gender. Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(g)     The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(h)     All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

(i)     Any document or item will be deemed "delivered," "provided," or "made available" by Sellers, within the meaning of this Agreement if such document or item is (a) included in the Dataroom, (b) actually delivered or provided to Purchaser or any of Purchaser's Advisors, or (c) made available upon request, including at the Company's or any of its Subsidiaries' offices.

(j)     Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(k)     Any reference to any particular Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; provided that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance with, any Code section or Law, the reference to such Code section or Law means such Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(l)     All references to a day or days shall be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(m)     A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and permitted assigns.