Hearing Date: December 20, 2022 at 10:00 a.m. (EDT)
Objection Deadline: December 13, 2022 at 4:00 p.m. (EDT)

VENABLE LLP
Jeffrey S. Sabin
Carol Weiner Levy
Arie Peled
1270 Avenue of the Americas, 24th Floor
New York, New York 10020
Telephone (212) 503-0896
Facsimile: (212) 307-5598
Email: JSSabin@venable.com
Email: CWeinerLevy@venable.com
Email: APeled@venable.com

VENABLE LLP
Andrew Currie (*admitted pro hac vice*)
600 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: (202) 344-4586
Facsimile: (202) 344-8300
Email: AJCurrie@venable.com

*Counsel for Ignat Tuganov*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| In re: | Chapter 11 |
|---|---|
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

**IGNAT TUGANOV'S JOINDER AND SUPPLEMENT
TO MOTION APPOINTING A MEDIATOR**

Ignat Tuganov, by and through his undersigned counsel, hereby submits this Joinder and Supplement to, *Immanuel Herrmann's Motion For the Entry of an Order (I) Appointing a Chapter Eleven Mediator (II) Directing Mandatory Mediation and (III) Granting Related Relief* [Dkt. No.1630] (the "Herrmann Motion"), and respectfully represents as follows:

**PRELIMINARY STATEMENT[2]**

1.  Mediation has been increasingly used by bankruptcy courts as a cost-efficient, streamlined and inclusive method for resolving complex disputes and negotiating consensual reorganization plans in large chapter 11 cases. While mediation is frequently used in mass tort cases, it is often used in other complex cases as well, including *Perdue*, *LTL Management, Boy Scouts of America, Residential Capital LLC, The Woodbridge Group*, *Pacific Drilling*, *Altera Infrastructure*, and *Energy Futures Holding, Inc.* In these cases and many others, mediation has been utilized to resolve complex, multi-party disputes that would otherwise have been the subject of costly litigation and in-court battles. Like many of the cases that have successfully used mediation, the Debtors' chapter 11 cases involve numerous creditors around the globe (likely hundreds of thousands), complex and unique legal and factual issues, accusations of securities fraud, Ponzi scheme activity, and common law fraud, and the conflicting interests of a number of different groups of stakeholders, including at least 14 state regulators, *pro se* creditors, organized ad hoc committees of different categories of customers, and equity investors. The professional fees incurred in this case are already climbing to unprecedented levels, forcing concerns over

---

[2] Capitalized terms used in the Preliminary Statement are defined further below.

administrative solvency and, accordingly, issues concerning asset sales needed to fund these chapter 11 proceedings. Professional fees will most certainly continue to multiply as stakeholders litigate the many issues that need to be resolved before a plan can be proposed that has any hope of being accepted by the requisite classes of creditors and confirmed by this Court. This case is ripe for plan mediation.

2. Mediation is warranted in these chapter 11 cases, because it is the best way to preserve value, minimize mounting administrative costs, consensually formulate frameworks to resolve numerous legal issues (without more litigation), and facilitate the plan process by providing a forum for stakeholders to address and negotiate their various interests. Addressing the myriad of issues plaguing these cases through litigation is not only time-consuming and expensive, but it delays distributions to creditors, and it does not afford parties the ability to compromise for the good of all interested parties. Mediation, on the other hand, will focus stakeholders on the essential elements necessary to propose a consensual plan and move this case forward.

3. Accordingly, Mr. Tuganov joins with, and supplements, Mr. Herrmann's request that this Court enter an order appointing a mediator (the "Mediator") in these Chapter 11 Cases, in accordance with the *Procedures Governing Mediation of Matters and the Use of Early Neutral Evaluation and Mediation/Voluntary Arbitration in Bankruptcy Cases and Adversary Proceedings (General Order M-390)* ("SDNY Mediation Protocol"), to mediate any and all issues related to the comprehensive resolution of these chapter 11 cases and referring the Mediation Parties (as defined herein) to Mediation.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. § 362(d).

5. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

6. The issue raised in this Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(G). The statutory predicate for the relief requested is 11 U.S.C. § 105(a).

## BACKGROUND

7. On July 13, 2022 (the "Petition Date"), the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") filed voluntary petitions for relief in this Court under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors are continuing to operate their businesses as debtor-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code.

8. On July 27, 2022, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "UCC"), and on September 29, 2022, at this Court's direction, the Office of the United States Trustee appointed an examiner (the "Examiner") to investigate certain aspects of the Debtors' conduct and financial affairs.

9. On December 6, 2022, Mr. Herrmann, as a *pro se* creditor, filed the Herrmann Motion requesting that this Court appoint a mediator in these chapter 11 cases.

10. Mr. Tuganov is the owner of an Earn Program account and is a creditor of the Debtors' estates.

## RELIEF REQUESTED AND REASONS THEREFOR

11. Like Mr. Herrmann, Mr. Tuganov respectfully requests that this Court enter an order (i) appointing the Mediator to mediate any and all issues related to the comprehensive resolution of these chapter 11 cases and (ii) directing (a) the Debtors, (b) the UCC, (c) Community First Partners, LLC, Celsius SPV Investors, LP, Celsius New SPV Investors, LP, and CDP Investissements, Inc. (collectively, the "Series B Preferred Holders"), (d) the Ad Hoc Committee

of Custodial Account Holders, (e) the Ad Hoc Group of Withhold Account Holders, (f) the Ad Hoc Group of Borrowers, (g) the New Jersey Bureau of Securities, (h) the Texas State Securities Board, (i) the Vermont Department of Financial Regulation, (j) Karen Cordry on behalf of the National Association of Attorneys General, (k) Stephen Manning on behalf of the State of Washington, (l) a group of three borrowers who have repaid, or are about to repay, their loans to the Debtors, (m) a group of three to four individual Earn customers, including Ignat Tuganov, Immanuel Herrmann, and two additional active Earn customers chosen by the Mediator to represent the interests of the Earn customers, and (n) any other parties the Court, the Mediator, or the Mediation Parties agree in the future should participate in the Mediation (collectively, the "Mediation Parties") to participate in the Mediation.[3]

12.     Section 105(a) of the Bankruptcy Code empowers bankruptcy courts to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code. 11 U.S.C. § 105(a); *see, also In re A.T. Reynolds & Sons, Inc.*, 424 B.R. 76, 85 (Bankr. S.D.N.Y. 2010) ("While it goes without saying that a court may not order a party to settle, this Court has authority to order the parties to participate in the process of mediation, which entails discussion and risk analysis."), *rev'd on other grounds*, 452 B.R. 374 (S.D.N.Y. 2011).

13.     Pursuant to the SDNY Mediation Protocol, this Court has established a procedure for implementing requests for mediation by parties in interest in chapter 11 cases.

---

[3] In the Herrmann Motion, Mr. Herrmann requests that this Court appoint a sitting bankruptcy judge as a mediator. Mr Tuganov takes no position regarding whether the mediator is a sitting bankruptcy judge or not. In addition, Mr. Herrmann suggests that the "Consulted Parties" agree on the parties to join in the Mediation. Mr. Tuganov respectfully submits that this Court could save time by directing many of those same parties (other than the United States Trustee) to serve as the participants in the Mediation, as the "Consulted Parties" that Mr. Herrmann identifies constitute most of the active parties in interest in these cases.

14. There are a number of elements of the Debtors' chapter 11 cases that make them ripe for mediation. Most importantly, these are complex cases involving hundreds of thousands of creditors, novel issues of law, and a myriad of disputed (and perhaps never-to-be confirmed) facts. Indeed, since the Petition Date, numerous requests for relief have been filed by various stakeholders involving complex issues of fact and law concerning how to treat cryptocurrency, and its various uses by creditors and the Debtors, under the Bankruptcy Code, including whether crypto coins held by the Debtors constitute property of the estate, whether borrowers who have now repaid their loans are entitled to a return of their collateral, whether creditors' claims should be in cryptocurrency or converted to dollars, whether creditors have claims against all of the Debtors or a subset of Debtors, whether the Debtors' businesses were run, at some time prepetition, as a Ponzi scheme (and, if so, the consequences to creditors and others), and interpretation and enforceability of the Debtors' Terms of Use. Some of these issues are novel legal issues that have never before been addressed under the Bankruptcy Code.

15. Moreover, it is likely that the Examiner's factual findings to date, and the findings that will be contained in her Final Report (due in January 2023), will engender further litigation among the different creditor constituencies as to the competing rights of customers to whatever cryptocurrency remains in the Debtors' possession. For instance, in her Initial Report [Dkt. No. 1411], the Examiner found that the Debtors had improperly commingled assets[4], transferred coins among various wallets in a haphazard effort to reconcile accounts without observing any "memorialized rules or other policies"[5], and made transfers on numerous occasions simply to cover

---

[4] Initial Report at p. 6.

[5] *Id.*

unaccounted for shortfalls in custody accounts.[6] To the extent the Examiner's soon-to-be-released Final Report discloses additional indicia of financial mismanagement, and facts that appear or could be argued to potentially support a Ponzi adjudication, this will only increase the likelihood that creditors will file additional individual motions/adversary proceedings, either to obtain a declaration that the Debtors' business constituted a Ponzi scheme or to have a chapter 11 trustee appointed in these cases. The result would be increased piecemeal litigation, protracted and expensive discovery, including depositions, potentially termination of the Debtors' exclusivity period, and most important, delay recovery by creditors.

16. The day-long depositions that have already been conducted in connection with the Debtors' motion to declare their ownership over Earn assets and sell Stablecoins offer a preview of the crushing burden and costs of litigation that likely lie ahead. These depositions were not only attended by counsel to the Debtors and the UCC, but also by counsel to the U.S. Trustee, counsel to several state regulators, counsel to ad hoc committees of creditors, counsel to individual creditors, and numerous *pro se* creditors—all, or many of which, sought to actively participate. A large number of creditors appear to believe that, despite their best efforts, the UCC cannot represent the interests of all the various unsecured creditors in these cases, and they do not appear content to sit back and await the results of the UCC's efforts. As the Debtors' exclusivity may soon expire, those who are formulating a plan (or plans) need to hear the voices of creditors who believe their interests are not being advocated by the UCC. Finally, no plan of reorganization can be formulated without some input by the regulators.

---

[6] *Id*. at p. 7.

17. The Debtors have already obtained an extension of their exclusive periods to file a reorganization plan to February 15, 2023 [Dkt. No. 1645]. Each month the Debtors remain in bankruptcy, however, costs the estate approximately $15 million and there appears to be little progress towards the formulation of any plan.[7] These chapter 11 cases simply cannot continue this way.

18. Instead of expending enormous Debtor, creditor, and regulator resources—as well as the Court's resources—fighting over each and every issue, motion and adversary proceeding that will need to be resolved before a plan can be confirmed, mediation will minimize the mounting administrative costs of these chapter 11 cases, provide a forum and structured process for stakeholders to address and negotiate a global resolution of the complex legal and factual issues underlying these cases, and focus stakeholders on the essential elements necessary to propose a consensual plan. In addition, the Court should consider whether to "pause" all existing litigation and "freeze" of any new litigation until the Mediation is completed.

19. For these reasons, Mr. Tuganov respectfully submits that Mediation will benefit the Debtors' estates, its creditors and all parties in interest.

## NOTICE

20. Notice of this Joinder and Supplement has been served on the Debtors, counsel for the UCC, the Office of the United States Trustee and those parties who are on the Master Service List in accordance with the Amended Final Order (I) Establishing Certain Notice, Case Management and Administrative Procedures and (II) Granting Related Relief [Dkt. No. 1181] entered in these cases.

---

[7] Campagna Dep. Tr. 60:12-14 [Dkt. No. 1489-3]

**CONCLUSION**

WHEREFORE, Mr. Tuganov joins in the Herrmann Motion and respectfully requests that this Court enter an order (i) appointing the Mediator to mediate any and all issues related to the comprehensive resolution of these chapter 11 cases, (ii) directing the Mediation Parties to participate in the Mediation, and (iii) granting such other and further relief as is just and proper.

Dated: December 13, 2022
New York, New York

VENABLE LLP

By:  /s/ Jeffrey S. Sabin
Jeffrey S. Sabin
Carol Weiner Levy
Arie Peled
1270 Avenue of the Americas, 24th Floor
New York, New York 10020
Telephone: (212) 503-0896
Facsimile: (212) 307-5598
Email: JSSabin@venable.com
Email: CWeinerLevy@venable.com
Email: APeled@venable.com

- and -

Andrew J. Currie (*admitted pro hac vice*)
600 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: (202) 344-4586
Facsimile: (202) 344-8300
Email: AJCurrie@venable.com

*Counsel for Ignat Tuganov*