Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 22-10964-mg

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

5   In the Matter of:

6

7   CELSIUS NETWORK LLC,

8             Debtor.

9   - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          United States Bankruptcy Court

2          One Bowling Green

3          New York, NY   10004

4

5          December 8, 2022

6          9:00 AM

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21   B E F O R E :

22   HON MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:   FRANCES F.

1    HEARING re Hearing Using Zoom for Government RE: Debtors

2    Motion Seeking Entry of an Order (I) Setting A Briefing

3    Schedule and (II) Granting Related Relief. (Doc# 1338, 1524,

4    1554, 1592, 1619, 1631)

5

6    HEARING re Hearing Using Zoom for Government RE: Debtors'

7    Motion for Entry of an Order (I) Applying Certain Orders in

8    the Initial Debtors' Chapter 11 Cases to GK8 Ltd., GK8 USA

9    LLC, and GK8 UK Limited and (II) Granting Related Relief

10   filed by Joshua Sussberg on behalf of Celsius Network LLC.

11   (Doc # 1626)

12

13   HEARING re Hearing Using Zoom for Government RE: Approving

14   Sale of Certain of the Debtors Assets. (Doc## 687, 715,

15   727, 748, 876, 878, 910, 956, 188, 192, 357, 409, 430, 445,

16   626, 1060, 1299, 1323, 1413, 1440, 1455, 1460, 1461, 1480,

17   1522, 1524, 1548, 1549, 1586, 1617, 1615, 1620, 1621, 1622)

18

19   HEARING re Hearing Using Zoom for Government RE: Debtors'

20   Motion (I) Authorizing the GK8 Debtors to (A) Continue to

21   Operate the GK8 Cash Management System, (B) Honor Certain

22   Prepetition Obligations Related Thereto, (C) Maintain

23   Existing GK8 Business Forms, and (D) Continue to Perform GK8

24   Intercompany Transactions, (II) Granting Superpriority

25   Administrative Expense Status to Postpetition GK8

Page 4

1    Intercompany Balances, and (III) Granting Related Relief.

2    (Doc# 1627)

3

4    HEARING re Hearing Using Zoom for Government RE: Debtors'

5    Motion for Entry of an Order (I) Authorizing Christopher

6    Ferraro to Act as Foreign Representative and (II) Granting

7    Related Relief. (Doc# 1628, 1629)

8

9    HEARING re Hearing Using Zoom for Government RE: Debtor's

10   Motion for Entry of an Order (I) Authorizing the Debtors to

11   Pay Certain Decentralized Finance Loans and (II) Granting

12   Related Relief. (Doc# 1360, 1383, 1524)

13

14   HEARING re Hearing Using Zoom for Government RE: Debtors'

15   Motion for an expedited hearing (ECF Doc. 1622)

16

17   HEARING re Hearing Using Zoom for Government RE: Debtors'

18   Amended Motion Seeking Entry of an Order (I) Directing

19   Joint Administration of the Chapter 11 Cases and (II)

20   Granting Related Relief. (Doc # 1632)

21

22   HEARING re Hearing Using Zoom for Government RE: Motion to

23   Authorize/Notice of Filing of Proposed order. (ECF 1615)

24   Hearing Using Zoom for Government RE: Debtors' Supplemental

25   Motion Seeking Entry of (I) An Order (A) Approving Bidding

Page 5

1    Procedures for the Potential Sale of Certain of the Debtors

2    Assets, (B) Scheduling Certain Dates with Respect Thereto,

3    (C) Approving the Form and Manner of Notice Thereof, (D)

4    Approving Bid Protections, (E) Approving Contract Assumption

5    and Assignment Procedures, (II) an Order Authorizing the

6    Debtors to Enter Into a Definitive Purchase Agreement, and

7    (III) Granting Related Relief. (Doc# 1620 to 1622)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

Page 6

1    A P P E A R A N C E S :

2

3    KIRKLAND & ELLIS LLP

4          Attorneys for Celsius Network, LLC

5          300 N. LaSalle

6          Chicago, IL 60654

7

8    BY:  PATRICK JAMES NASH

9          CHRISTOPHER KOENIG

10         DAN LATONA

11

12   KIRKLAND & ELLIS LLP

13         Attorneys for Celsius Network, LLC

14         601 Lexington Avenue

15         New York, NY 10022

16

17   BY:  SIMON BRIEFEL

18

19   KIRKLAND & ELLIS LLP

20         Attorneys for Celsius Network, LLC

21         1301 Pennsylvania Avenue, N.W.

22         Washington, D.C. 20004

23

24   BY:  T.J. MCCARRICK

25

```
 1   WHITE & CASE LLP

 2        Attorneys for Official Committee of Unsecured Creditors

 3        1221 Avenue of the Americas

 4        New York, NY 10020

 5

 6   BY:  ANDREW ZATZ

 7        DAVID TURETSKY

 8

 9   WHITE & CASE LLP

10        Attorneys for Official Committee of Unsecured Creditors

11        111 South Wacker Drive, Suite 5100

12        Chicago, IL 60606

13

14   BY:  GREGORY F. PESCE

15

16   UNITED STATES DEPARTMENT OF JUSTICE

17        Attorneys for the U.S. Trustee

18        201 Varick Street, Suite 1006

19        New York, NY 10014

20

21   BY:  SHARA CLAIRE CORNELL

22        MARK BRUH

23

24

25
```

1    CAMERON CREWS

2        Pro Se

3        92 Hudson Street

4        Hoboken, NJ 07030

5

6    MCCARTER ENGLISH, LLP

7        Attorneys for Ad Hoc Group of Borrowers

8        245 Park Avenue

9        New York, NY 10167

10

11    BY:  DAVID ADLER

12

13    MILBANK, TWEED, HADLEY & MCCLOY LLP

14        Attorneys for Certain Series B Preferred Shareholders

15        55 Hudson Yards

16        New York, NY 10001

17

18    BY:  ANDREW LEBLANC

19        DENNIS DUNNE

20

21

22

23

24

25

Page 9

1    TOGUT SEGAL & SEGAL

2        Attorneys for Ad Hoc Group of Custodial Account Holders

3        One Penn Plaza, Suite 3335

4        New York, NY 10119

5

6    BY:  BRIAN KOTLIAR

7

8    JENNER BLOCK LLP

9        Attorneys for Fee Examiners

10       1155 Avenue of the Americas

11       New York, NY 10036

12

13   BY:  VINCENT LAZAR

14       SHOBA PILLAY

15

16   ORRICK, HERRINGTON SUTCLIFFE LLP

17       Attorneys for Galaxy Digital Trading LLC

18       51 W. 52nd Street

19       New York, NY 10019

20

21   BY:  RANIERO D'AVERSA

22

23

24

25

Page 10

1   JONES DAY LLP

2        Attorneys for CDP Investments

3        555 South Flower Street, 50th Floor

4        Los Angeles, CA 90071

5

6   BY:  JOSHUA M. MESTER

7

8   SIMON DIXON

9        Pro Se

10

11  ALSO PRESENT:

12  CHRISTOPHER FERRARO, Acting CEO of Celsius

13  STEVEN WALD, Galaxy

14  RYAN KIELTY, Centerview Partners

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              CLERK:  All right, starting the recording for

3    December 8th, 2022 at 9:00 a.m.  Calling Celsius Networks

4    Limited, Case Number 22-10964.

5              All right, admitting the participants.  Is anyone

6    from Kirkland available?  If you could please unmute and

7    start giving your appearances.

8              MR. KOENIG:  Good morning, Deanna.  This is Chris

9    Koenig from Kirkland for Celsius.  Can you hear us okay?

10             CLERK:  Yes, I can.  Can you hear me?

11             MR. KOENIG:  Yes, thank you.  We're here.  Good

12   morning.

13             CLERK:  Good morning.  If I could just have the

14   list of participants that will be speaking this morning.

15             MR. KOENIG:  Sure.  It's Pat Nash, Dan Latona,

16   Chris Koenig, and Simon Briefel.

17             CLERK:  Okay, thank you.

18             MR. KOENIG:  Thank you.

19             CLERK:  All right.  Do we have counsel from White

20   & Case yet that are speaking this morning?  I see we

21   admitted the conference room.

22             Good morning, Mr. Lazar.  Are you speaking this

23   morning?

24             MR. LAZAR:  Good morning, Deanna.  Vincent Lazar,

25   Jenner & Block, on behalf of the examiner.  I'll only be

Page 12

1    speaking if the judge has questions.

2              CLERK:  Okay, thank you.  All right.  Is there any

3    other counsel that has joined that will be speaking on the

4    record and has not given their appearance yet?  If you could

5    just raise your hand one at a time and I'll take your

6    appearances.  All right.  Is there anyone else that will be

7    speaking on the record this morning who has not given an

8    appearance yet?

9              MR. D'AVERSA:  Good morning, Deanna.  I raised my

10   hand.  I don't know if you saw that.

11             CLERK:  I see it now, yes.  Good morning.

12             MR. D'AVERSA:  Raniero D'Aversa from Orrick,

13   Herrington & Sutcliffe for Galaxy Digital Trading.

14             CLERK:  Okay, thank you so much.  All right.

15   Shara?

16             MS. CORNELL:  Hey, Deanna.

17             CLERK:  Good morning.  Are you speaking on the

18   record this morning, or is Mar, going to?

19             MS. CORNELL:  I'll be speaking on the record.  Let

20   me see if I can get my -- Shara Cornell on behalf of the

21   Office of the United States Trustee.

22             CLERK:  Okay, thank you.

23             MS. CORNELL:  I may need to sign back in, Deanna.

24   Just to...

25             CLERK:  That's fine.  No problem.

Page 13

```
 1                    MS. CORNELL:  Thank you.

 2                    CLERK:  All right.  Bryan Kotliar, are you there?

 3                    MR. KOTLIAR:  Yes, speaking.

 4                    CLERK:  Good morning.  If you could just give your

 5       appearance for the record, please.

 6                    MR. KOTLIAR:  Sure.  Bryan Kotliar of Togut, Segal

 7       & Segal on behalf of the Ad Hoc Group of Custodial

 8       Accountholder.

 9                    CLERK:  Okay, thank you.  And is Kyle Ortiz also

10       going to be speaking this morning, or joining?

11                    MR. KOTLIAR:  He is unlikely to join.  I'm also

12       unlikely to speak.

13                    CLERK:  Okay, thank you.

14                    MR. KOTLIAR:  Thank you.

15                    MR. MCCARRICK:  You've also got T.J. McCarrick

16       from Kirkland.

17                    CLERK:  Okay, thank you, T.J.

18                    All right.  Is there anyone from White & Case on

19       the line that will be speaking on the record this morning?

20       I know we have the conference room has been admitted.

21       Again, anyone from White &  Case that will be speaking on

22       the record this morning?  All right.

23                    Are there any other participants that have joined

24       that will be speaking on the record this morning?  You can

25       raise your hands one at a time and I'll take your
```

Page 14

1    appearance.

2              Yes, Christopher Ferraro.

3              MR. FERRARO:  Hello, yes.  I might be speaking

4    today.

5              CLERK:  Okay.  Just please give your appearance.

6              MR. FERRARO:  Sorry.  How do I do that?

7              CLERK:  Okay, just state your name and just say

8    how you're involved in the case, like who you represent or

9    if you're a creditor.

10             MR. FERRARO:  Sorry.  Okay.  Christopher Ferraro,

11   Acting CEO, Chief Restructuring Officer and CFO of Celsius,

12   the Debtors.

13             CLERK:  Thank you.  All right.  For the parties

14   that have joined, is there anyone that is going to be

15   speaking on the record this morning?  Again, for the parties

16   that have joined, is there anyone that's going to be

17   speaking on the record this morning that has not given their

18   appearance yet?  Please raise your hands and give your

19   appearance one at a time.

20             Yes, Mr. LeBlanc.

21             MR. LEBLANC:  Good morning.  Andrew LeBlanc of

22   Milbank on behalf of certain Series B preferred

23   shareholders.  I'll be joined by my partner, Dennis Dunne.

24   And I will be speaking.

25             CLERK:  Okay, thank you.

1           MR. LEBLANC:  Thank you.

2           CLERK:  Andrew Zatz.

3           MR. ZATZ:  Yes.  Good morning.  Andrew Zatz with

4    White & Case on behalf of the Committee.  And I'll have the

5    speaking role today.

6           CLERK:  Okay.  Thank you, Andrew.

7           Is anyone else going to be speaking on behalf of

8    the Committee this morning, or is it just yourselves?

9           MR. ZATZ:  I believe Greg Pesce will also be

10   speaking.  And if he's on now, he might know if anyone else

11   is.  But I think he is still logging in at the moment.

12          CLERK:  Okay, thank you.  All right, for the

13   parties that have joined, is anyone going to be speaking on

14   the record this morning?  If you could just raise your hand.

15   I'll take your appearance one at a time.

16          Yes, Mr. Turetzky.

17          MR. TURETSKY:  Good morning.  David Turetzky of

18   White & Case for the Unsecured Creditor's Committee.  I

19   don't anticipate that I will be speaking this morning, but I

20   do want to flag Mr. Pesce will be -- my partner will be

21   joining momentarily.  I think he got booted off the Zoom.

22   So he asked that we let you know that he'll be joining

23   shortly.

24          CLERK:  All right, thank you.

25          All right, again, for the parties that have

Page 16

1    joined, if you are speaking on the record this morning,

2    please raise your hand and I will take your appearance one

3    at a time.  Again, for the parties that have joined, if you

4    are speaking on the record this morning and you have not

5    given your appearance yet, please raise your hand.  I will

6    take your appearances one at a time.  Mr. Adler?

7              MR. ADLER:  Hi, Deanna.  It's David Adler from

8    McCarter & English on behalf of the Ad Hoc Group of

9    borrowers as Celsius.  I don't think I'm going to be saying

10   anything today, but I just wanted to note my appearance for

11   the record.

12             CLERK:  All right, thank you.

13             MR. ADLER:  You're welcome.

14             CLERK:  Mark Bruh, are you speaking this morning?

15   I know Shara is.

16             MR. BRUH:  Yeah.  I'll just note my appearance for

17   the record.  Mark Bruh for the United States Trustee.

18             CLERK:  Thank you.

19             All right.  Good morning, Gregory.  If you could

20   unmute and give your appearance for the record, please.

21             MR. PESCE:  Sure.  Good morning.  Gregory Pesce,

22   White & Case, on behalf of the Official Creditors'

23   Committee.  And I saw my partner, Andrew Zatz, was also on.

24   And Mr. Zatz and myself are the primary speakers today.

25             CLERK:  Okay, thank you.  Yes, he has noted his

1    appearance already.  Thank you so much.

2              MR. PESCE:  Thank you.

3              CLERK:  All right.  Are there any additional

4    parties that have joined that are speaking on the record

5    this morning?  If you could -- and have not given their

6    appearance yet, if you could just unmute one at a time,

7    raise your hands, and I will take your appearance.

8              All right.  Again, for the parties that have

9    joined, if anyone is speaking on the record this morning,

10   please raise your hands one at a time and I will ask you to

11   unmute your line and I will take your appearance.

12             CLERK:  Hi, Judge.  Can you hear me?

13             THE COURT:  I can, Deanna.

14             CLERK:  Okay, great.

15             Okay, again, good morning.  For the parties that

16   have joined, if you're going to be speaking on the record

17   this morning and have not given your appearance yet, please

18   raise your hands and I will ask you to unmute and take your

19   appearance.

20             Yes, Josh Mester.

21             MR. MESTER:  Good morning.  I don't expect to

22   speak, but I would like to make an appearance.  Josh Mester,

23   Jones Day, on behalf of CDP Investments.

24             CLERK:  Thank you.  Shoba?

25             MS. PILLAY:  Good morning.  Likewise.  Not likely

1    to speak unless the Court has questions for me but want to

2    make an appearance.  Shoba Pillay from Jenner & Block as the

3    examiner.

4              CLERK:  Thank you.

5              MS. PILLAY:  Thank you.

6              CLERK:  Okay.  For the parties that have joined,

7    if anyone is going to be speaking on the record this morning

8    and you have not given your appearance, please raise your

9    hands one at a time and I will take your appearance.

10             Yes, Steven Wald.

11             MR. WALD:  Yeah.  Not expecting to specifically

12   say anything, but in case the Judge has questions, on behalf

13   of Galaxy Digital.

14             CLERK:  Thank you.  Yes, Ryan Kielty.  Is that

15   correct?

16             MR. KIELTY:  Hi, yes.  This is Ryan Kielty from

17   Centerview Partners, investment banker to the Debtors.  I am

18   a declarant in the GK8 sale motion.

19             CLERK:  Thank you.  Again, for the parties that

20   have joined, if anyone is speaking on the record this

21   morning and has not given their appearance, please raise

22   your hands one at a time and I will take your appearance.

23             All right, are we waiting on anyone or can we

24   begin?

25             THE COURT:  We're going to begin, Deanna.

1          CLERK:  Okay.  Thanks, Judge.

2          THE COURT:  All right.  Good morning, everybody.

3    This is Judge Glenn.  We are here on the record in Celsius

4    Network LLC, 22-10964.  An amended agenda for today's

5    hearing was filed.  Let's go forward with the order of the

6    agenda.  The first contested matter on the agenda is the

7    motion to set a briefing schedule with respect to which

8    debtor or debtors the accountholders have claims against.

9          Who is going to argue for the Debtor first?

10         MR. NASH:  Good morning, Your Honor.  Pat Nash

11   from Kirkland &  Ellis for the Debtors.

12         THE COURT:  Good morning, Mr. Nash.

13         MR. NASH:  So, Judge, it's our motion.  Consistent

14   with the theme of the week, a number of from our perspective

15   gating issues that to the extent that we can get a ruling

16   from Your Honor, it's going to clearly be helpful in

17   connection with the plan process.

18         Similar, Judge, to how we handled the custody and

19   withhold issues, it is the view to the extent that we enter

20   a briefing schedule, or if we don't enter a briefing

21   schedule at some point, you know, in a plan or the

22   pleadings, it's the Debtor's view that the terms of use

23   unambiguously provide that the customers have claims not

24   only at Celsius Network LLC, but also Celsius Network LLC's

25   affiliates.  We know that the preferred equity holders have

Page 20

1    a different point of view.  We know that the Official

2    Committee of Unsecured Creditors shares the Debtor's view.

3         I think, Your Honor, from our perspective, it's

4    going to be challenging to put a plan together without

5    having guidance on this issue.  We are reticent, hesitant to

6    solicit a plan that, for example, adopts the Debtor's point

7    of view only to find out at a confirmation hearing, whenever

8    that is, sometime in early 2023, maybe call it April,

9    possibly May.  If we can do it sooner, great.  But if we get

10   to a confirmation hearing and Your Honor has a different

11   point of view with respect to where the customers have

12   claims and we have to then start over, that's something that

13   from the Debtor's perspective we would like to avoid.

14        Our friends for the Committee, they are focused of

15   course, as we all are, on the need for speed and, you know,

16   do we have the time to put this issue in front of Your Honor

17   in advance of filing a plan.  We suggested a schedule.  Of

18   course whatever schedule would work for the Court and would

19   work for the parties at the end of the day would work for

20   the Debtors.  But our friends at the Committee said, you

21   know, why can't we just do all this at confirmation.

22   Obviously Your Honor has dealt with plenty of complicated

23   issues at confirmation.  And from the Committee's

24   perspective, we don't have the luxury to wait.  Right?  Or

25   we don't have the luxury to necessarily engage in a briefing

Page 21

```
1   schedule, why can't we just handle it all at confirmation.

2   And --

3               THE COURT:  Mr. Nash, let me ask you to do this if

4   you would.  Without going into great depth, could you just

5   outline the arguments that you anticipate being made by the

6   respective parties as to which debtors the accountholders

7   have claims against?

8               MR. NASH:  I can, Your Honor.

9               THE COURT:  Yeah.  That would be helpful to me.

10              MR. NASH:  So the terms of use -- pursuant to the

11  terms of use, the terms of use provide that when our

12  depositors put coin on the platform, they are contracting

13  with Celsius Network LLC and its Affiliates, capital A.  So

14  Celsius Network LLC and its Affiliates, then defined as

15  Celsius, and Affiliates is a defined term in the terms of

16  use.  And the definition of Affiliates in the terms of use

17  is clearly broad enough to pick up all of the Debtors of GK8

18  and the various affiliates.  And you'll her from either --

19  you'll hear form counsel to the preferred equity holders.

20  They have a different read of the document.

21              From my perspective, Judge, it appears that I

22  would imagine that at this point you've probably memorized

23  the terms of use.  I know you've read it more than once.  I

24  don't think it requires time.  I mean, we could get a brief

25  on very quickly.  I'm sure the preferred equity holders
```

Page 22

1     could get a brief in front of Your Honor pretty quickly.

2     And to the extent that we're right and Your Honor rules that

3     pursuant to the terms of use -- which, after all, are the

4     Debtor's north star in these cases -- and we are of course

5     asking Your Honor to read the terms of use very literally as

6     it relates to our retail depositors, and we will be asking

7     Your Honor to read the terms of use very literally as it

8     relates to our sophisticated preferred equity holders.  Your

9     Honor will rule the way you rule.  If you do rule in our

10    favor, it will streamline and make our job easier in terms

11    of putting a plan on file.

12            THE COURT:  Let me ask another question, Mr. Nash.

13    Are there any contracts other than the terms of use that you

14    understand that any of the parties rely upon in supporting

15    their argument?  So are there any guarantees or indemnities

16    provided by affiliates, anything?  This is essentially in

17    your view an issue controlled by the terms of use.

18            MR. NASH:  Yes, Judge.

19            THE COURT:  Okay.  And with respect to this issue,

20    I think we've all seen that we're on version eight of the

21    terms of use.  Has the language varied in versions one

22    through eight with respect to this issue?

23            MR. NASH:  It hasn't, Judge.  And most

24    importantly, when the investment was made, I don't know what

25    version we were on, but we were in the middle -- I should,

Page 23

1    Your Honor, before I get up to the podium today.  But we

2    were in the middle of versions one through eight if I'm

3    remembering correctly.  But the language hasn't changed.

4            THE COURT:  Okay.  All right.  Let me briefly hear

5    from counsel for the preferred equity holders with respect

6    to this.  And I know -- look, I've read the papers.  I know

7    that you've had -- you and your colleagues have had very

8    extensive discussions with counsel for the preferred equity

9    holders about how this issue would be teed up.  I've read

10   the Committee's objection.  I understand that.  But let me -

11   - and I'll hear from the Committee's counsel as well.  But

12   let me briefly hear from the preferred equity's counsel.

13   Who wants to be heard?

14           MR. LEBLANC:  Your Honor, it's Andrew LeBlanc of

15   Milbank on behalf of the preferred equity holders.  Your

16   Honor, can you hear me okay?

17           THE COURT:  Yes, I can.

18           MR. LEBLANC:  Thank you, Your Honor.  Your Honor,

19   this topic, the topic of this briefing schedule came up at

20   the November 15th hearing when we were talking about our

21   1009 motion.  And we mentioned at that time that this was

22   part of a coordinated agreement that we had reached with the

23   Debtors both to deal with the schedules as it related to

24   dollarization and then also to deal with the bar date motion

25   to make sure that everybody had notice that this was going

Page 24

1    out and that a schedule was being proposed.  And then

2    thirdly, the proposal of the schedule itself.  We think it's

3    critical that this issue be resolved.

4            THE COURT:  Mr. LeBlanc, I understand all that.

5    Just give me a little preface of your argument as to why

6    it's not -- they don't have claims against each debtor.

7            MR. LEBLANC:  Sure.  Your Honor, we agree -- the

8    terms of use we do think are the governing document here.

9    We think it's unambiguous in our favor.  There are

10   limitations on liability provisions stated in the document

11   that exclude claims against affiliates.  And that's

12   consistent, Your Honor.  I think we all know that's

13   consistent with the idea of the novation or the migration of

14   the accounts between -- from the U.K. entity down to the

15   Delaware entity, when that occurred and the revision of the

16   terms of use.  And, Your Honor, I know you talked about this

17   this week with parties about the very clear indication that

18   that was what was being done with that sixth revision to the

19   terms of use that people had to -- that was expressly told

20   to them that that was what was occurring.  We think the

21   terms of use are clear in that respect.

22           THE COURT:  May I ask you this?  Which version of

23   the terms of use were in force at the time of the

24   investment?

25           MR. LEBLANC:  Your Honor, I believe it was number

Page 25

```
 1   six.
 2            THE COURT:  Okay.
 3            MR. NASH:  I believe that's right, Judge.
 4            MR. LEBLANC:  Right.  And to be clear, the
 5   investment was only made after -- it was made into the U.K.
 6   entity only after the customer accounts became a Delaware
 7   entity issue.  So once the customer accounts became a
 8   Delaware counterparty, then the investment was made into the
 9   U.K. entity.  And that's what's critical here.  We also
10   think it's entirely consistent -- and I won't go into this,
11   Your Honor, but there's reams of other evidence that we've
12   already put before the court in connection with the Equity
13   Committee Motion that are entirely consistent with this.
14   The SEC filings --
15            THE COURT:  Let me ask another question and I'll
16   give Mr. Nash and certainly I'll give the Creditors'
17   Committee an opportunity as well.  Is it your view that this
18   is a pure contract interpretation issue on the plain meaning
19   of the contract term, or is extrinsic evidence required
20   before the Court can decide this?
21            MR. LEBLANC:  Your Honor, we believe --
22            MR. NASH:  Your Honor -- oh, I'm sorry.  I thought
23   that was --
24            THE COURT:  Hold on.  Mr. LeBlanc has the floor.
25   Hold on.
```

Page 26

1            MR. NASH:  Apologies, Andy.

2            MR. LEBLANC:  Sure.  Thank you, Your Honor.  Your

3    Honor, we believe -- and I think Your Honor alluded to this

4    yesterday -- we believe it is unambiguous in our favor.  The

5    Debtors obviously have stated they believe it's unambiguous

6    in their favor.

7            THE COURT:  How many times have I heard that over

8    the years?  Everybody thinks it's unambiguous, but they

9    completely disagree about what it means.

10           MR. LEBLANC:  Right.  And one might question

11   whether that's the very definition of the ambiguity.

12           THE COURT:  It's not.

13           MR. LEBLANC:  We think to the extent that there's

14   ambiguity, Your Honor -- and Your Honor will obviously have

15   to decide if those two strongly held views are reasonable,

16   and that then creates ambiguity.  In which case Your Honor

17   would then have to look at other evidence which we think is

18   overwhelming.  But we think it's unambiguous, Your Honor, in

19   our favor.  We will argue to Your Honor that it is

20   unambiguous in our favor.

21           THE COURT:  And, Mr. Nash, your view as to whether

22   it's unambiguous?

23           MR. NASH:  Our view is that it's unambiguous in

24   our favor.  If Your Honor rules in either of our favor on

25   that issue, we don't need to get into parol evidence.  If

Page 27

1    Your Honor rules that it is ambiguous, then there will be

2    parol evidence.

3              THE COURT:  All right.

4              MR. NASH:  But in our view, Judge, that would have

5    to come later.

6              THE COURT:  I'll come back to that issue.  Because

7    doing it seriatim like that is not going to -- may not -- if

8    the Court concludes that it's not resolved by the clear

9    terms of the agreement and that extrinsic evidence is not

10   permissible for purposes of interpreting it, it would be

11   fairly quick.  But if I concluded it is ambiguous and

12   extrinsic evidence is needed, I'm reluctant to get, okay,

13   then how much time is everybody going to want to put in

14   evidence, et cetera.

15             But let me hear from the Committee's counsel.

16             MR. PESCE:  Thank you, Your Honor.  For the

17   record, Gregory Pesce, White & Case, on behalf of the

18   Official Creditors' Committee.  Let me make a couple quick

19   points here.

20             As we mentioned earlier in the week, fundamentally

21   we just want to move these cases forward.  And in

22   particular, we don't want to delay the proposing or the

23   filing of a plan for this issue.  There's been a lot of

24   gating issues that have been presented.  We've tried to move

25   those forward as quickly as possible.  But at some point you

Page 28

1      have to just let the process work as it typically works and

2      file a plan, let people object to claims, let people object

3      to confirmation.

4              Second and more profoundly, even if you were to

5      order briefing on the so-called brief legal issue, this

6      isn't going to resolve the issue with the preferred equity.

7      And even if you were to order briefing and were to make a

8      ruling on that particular issue as it's been framed, it's

9      just going to defer the day of reckoning because they will

10     be -- either the Committee, the Debtor, or the preferred

11     equity holders will be dissatisfied with that answer.  And

12     that's important because we disagree that the terms of use

13     are going to be dispositive on this issue.  And let me state

14     why.

15             We agree with Mr. Nash that the terms of use are

16     unambiguous and provide that the customers have claims at

17     every entity.  That said, even if that were not the case,

18     there are other issues that need to be resolved to fully

19     adjudicate where the preferred equity sit in the case.  And

20     we highlighted those in the motion or in the objection.

21             First, there is another contract.  As part of the

22     preferred equity holders' investment, there was effectively

23     an intercompany loan between Celsius Network Limited, the

24     topco entity, and Celsius Network LLC where assets were kept

25     at the CNL, the top entity, but the liabilities were

Page 29

1    effectively passed down.  That loan at the time that it was

2    documented was $9 billion.  The price of crypto has

3    fluctuated.  You know, we understand that the Debtor is

4    looking at possibly reconciling that to a lower amount.  But

5    one way or the other, it's going to be billions of dollars

6    that is owed to the CNL -- I'm sorry, owed to the customer

7    entity.

8           Second, the preferred equity want to have the

9    value of the mining business such as it is.  The customer

10   business had a revolver with the mining business that lent

11   it customer money effectively to fund that business.  So

12   those two documents.  And even if you get past the terms of

13   use, the intercompany loan, the intercompany revolver, we

14   have significant questions about whether substantive

15   consolidation or potential fraudulent transfers related to

16   the dropdown might be relevant.

17          So long story short, even if you deal with the

18   briefing issue, whoever loses there -- and it could be me,

19   it could be the Debtor, it could be preferred equity, these

20   issues are all going to be before the Court as part of the

21   confirmation hearing.

22          THE COURT:  If I understand the Committee's

23   arguments, you don't disagree that in the first instance,

24   the terms of use are controlling as to whether the

25   accountholders have claims against all of the Debtors or

Page 30

1    some -- or one or a few.  You don't disagree about that.

2              MR. PESCE:  No, we agree with that.  That's

3    correct.

4              THE COURT:  And so what you're telling me I think

5    as I understand it is that the intercompany loan, potential

6    substantive consolidation arguments, all of that, even if

7    the Court were to conclude that the claims lie only against

8    one or a fewer number of the Debtors, there would be these

9    non-contract issues that would have to be -- that may have

10   to (indiscernible) if they couldn't be resolved in plan

11   negotiations.

12             MR. PESCE:  That's correct.

13             THE COURT:  Okay.

14             MR. PESCE:  But I think just to -- I think

15   fundamentally though our key concern is this.  We don't

16   disagree that this is an important issue.  We don't disagree

17   that it has to be resolved.  Our big concern though is

18   having this be a gating item to just really filing a plan.

19   And our preference is to have this issue resolved later

20   closer -- as part of or closer to confirmation so that we

21   can at least get the ball moving and get something on file

22   early in the year so that we can start moving towards

23   confirmation before the company starts running tight on

24   liquidity, which we heard earlier in the week is -- March in

25   particular looks like it's going to be challenging absent

Page 31

1    further liquidation of customer assets.

2            THE COURT:  All right.  Let me ask -- first turn

3    to Mr. Nash.  Well, I'll first tell all three of you.  I am

4    not going to do this with the potential of doing it

5    seriatim.  You know, I've had many cases over the years, and

6    as a lawyer before I came a judge, where people had

7    competing arguments that the plain language of a contract

8    (indiscernible) their view and extrinsic evidence is not

9    admissible.  And then a court decides that, no, it's

10   ambiguous and we need extrinsic evidence.  So we're not

11   going to resolve this gating issue if I have to do it in

12   parts.  Because if months from now I conclude that it's

13   ambiguous and then you tell me, well, this is the discovery

14   we need, et cetera, it's going to be months further before

15   the issue can be resolved.

16           So first, Mr. Nash, if the Court -- what's the

17   potential extrinsic evidence that you would offer?

18           MR. NASH:  I believe it is primarily Mr. LeBlanc

19   and the preferred equity holders who would be introducing

20   extrinsic evidence, Your Honor, more so than the Debtors.

21           THE COURT:  Okay.  So, Mr. LeBlanc, what's the

22   extrinsic evidence that you would be seeking to introduce if

23   the Court concluded it was ambiguous?

24           MR. LEBLANC:  Your Honor, we think -- and I'm glad

25   Your Honor asked this question.  Because we think there's

Page 32

1    extensive course of dealing evidence that is entirely

2    consistent with our view.  So, for example, there are SEC

3    filings in connection with the mining entity that are

4    audited financial statements that reflect the absence of

5    customer claims at the mining entity, which is inconsistent

6    with the conclusion or the view that there were claims at

7    those entities.  There is claims data in this case itself

8    that shows that prior to the scheduling of claims at every

9    entity -- I believe the number was 96 percent of all

10   customer claims were filed only at the Delaware entity, the

11   LLC entity and not anywhere else.  That's the type of

12   evidence, Your Honor.

13            And frankly, it was always our intent in the way

14   that we negotiated this schedule with the Debtors, we had

15   originally proposed, Your Honor, a schedule that included a

16   round or a time for discovery after the opening briefs were

17   served.  We ceded to the Debtor's request to do it in this

18   way, without discovery and discovery coming as a second

19   phase.  But it was never our intent to only argue to the

20   Court that it was unambiguous.  We were always going to

21   argue it was unambiguous.  But if the Court concluded it was

22   ambiguous, we have already evidence of course of dealing

23   throughout the parties' interactions, monthly operating

24   reports that were filed with the Court that are inconsistent

25   with the view that there are claims at every entity, for

Page 33

1    example.  We were going to put all that before the Court --

2              THE COURT:  Let me stop you.  Tell me -- so far

3    what you've told me about is documentary evidence that you

4    would rely on to support an argument about course of

5    dealing.  Your position is that would be extrinsic evidence

6    that would support your interpretation of the contract.  Are

7    there depositions that you would want?

8              MR. LEBLANC:  Your Honor, I think that would be

9    frankly -- I think we would be comfortable relying on the

10   documentary record that exists.  But I'm sure other people

11   are going to want depositions because they're -- we're

12   unaware of any evidence that --

13             THE COURT:  Well, I'm starting with you.  Are

14   there depositions that you would want?  You're telling me

15   no, that you're going to rely on documentary evidence

16   showing the course of dealing that you believe would support

17   your proposed contract interpretation.

18             MR. LEBLANC:  That's what I'm telling Your Honor

19   only because I haven't seen what the arguments from anyone

20   on the other side is.  If the Debtors obviously were to put

21   in a declaration from their general counsel saying that they

22   believe that there were claims at every entity, then of

23   course we would want to depose that person.  We have not

24   seen -- we have not seen --

25             THE COURT:  What you're telling me is if they put

Page 34

```
 1    in declarations, you want to be able to depose the

 2    declarants.

 3            MR. LEBLANC:  Absolutely, Your Honor.  Whatever

 4    evidence -- I need to see what their arguments are.  We have

 5    not heard arguments from anyone on the other side as to why

 6    beyond the use of the word affiliated in the definition,

 7    beyond that in the terms of use, why there are claims

 8    against every entity.  I need to know what that is.  I know

 9    what evidence I would offer affirmatively based on what I

10    know today, but obviously I reserve the right to depose

11    people if they put in new evidence that we need to respond

12    to.

13            THE COURT:  Mr. Nash, is there -- what extrinsic

14    evidence do you believe the Debtors would want to introduce

15    on this issue if the Court could not determine that it was

16    the unambiguous language that controlled and no extrinsic

17    evidence would be considered?

18            MR. NASH:  It's hard for me to say standing here

19    right now, Your Honor.  I think we would want to -- of

20    course if we're talking about parol evidence, the other

21    documents that we would be admitting into evidence, perhaps

22    we would require the depositions of certain of the preferred

23    equity holders about what they -- you know, the diligence

24    they did, what it is they understood.

25            I think if we get into parol evidence, Your Honor,
```

Page 35

1    I don't know that we have the luxury of time to deal with

2    these issues, you know, short of confirmation or in advance

3    of confirmation, candidly.  We may, but we may not.

4              THE COURT:  Okay.  Mr. Pesce, what is the -- if

5    the Court could not resolve the matter as a matter of the

6    unambiguous language of the contract, what if any extrinsic

7    evidence would you seek to introduce?

8              MR. PESCE:  Sure.  Just in terms of the contract

9    issue and not these other ancillary issues I mentioned?

10             THE COURT:  Well, no.  I want -- look, substantive

11   consolidation, those issues are going to have to get

12   resolved as part of confirmation in my view, and not

13   earlier.  And what is it about the intercompany loan that --

14   is there language in the intercompany loan?  Is there a loan

15   agreement, or is it -- how is that documented?

16             MR. PESCE:  Yeah, sure.  So a few points here.  I

17   think in terms of where the customers are, I don't know

18   whether depositions are necessary, but there is definitely

19   documentary written evidence that customers were for a

20   period of time dealing with CNL, Celsius Network Limited

21   entity prior to these internal reorganizations.  So we would

22   be presenting evidence to that effect and whoever would be

23   necessary to attest to that.  So course of dealing in other

24   words where customers were dealing prior to these internal

25   reorganizations, that would definitely be one big piece.

Page 36

1                Second, we would -- there are written loan

2       agreements.  There's effectively two main loan arrangements.

3       One is a written intercompany revolver as it's called

4       between the LLC entity and the mining entity.  We would

5       present that to provide evidence that even if the preferred

6       equity had a claim at CNL, to get the value of the mining

7       business, they would have to pay back this intercompany

8       revolver, which we think is a valid claim.  And a related

9       point --

10               THE COURT:  That's not really -- stop for a

11      second.  I mean, that really doesn't go to where the account

12      holders have claims.  That really goes to what's the value

13      of the entity against which the preferred holders are

14      claiming.  I'm focusing on -- stop for a second.  You know,

15      based on what I was reading from everybody's papers, it was

16      the -- you know, what Mr. Nash started with was the terms of

17      use.  Is there anything in the intercompany loan agreement

18      that you think bears on this issue?  What you're saying is

19      there is this intercompany liability that would have to be

20      satisfied before the preferred holders recover anything.

21               MR. PESCE:  That's right.  So turning back to --

22               THE COURT:  That may well be true, but that's a

23      different kind of issue than the issue of contractually

24      where do the claims lie.

25               MR. PESCE:  All right, fair enough.  As to the

Page 37

1    terms of use issue and where the customers sit, like I said,

2    I think there would be written and potentially deposition

3    evidence that we would need about the course of dealing of

4    customers dealing with other entities other than the CNL

5    entity that we would need to present.  But again, we would

6    also need to see that the debtors present, probably want to

7    depose them.  And if preferred equity holders had their own

8    witnesses, we would have to consider that.

9          THE COURT:  Well, I would -- if the discovery --

10   if the depositions you're talking about are depositions of

11   the declarants, that's all well and good.  That's fine.

12   Okay.  I can't imagine that anybody is going to put in more

13   than one or two declarations.  And so, you know, if each of

14   you wind up putting in one or two declarants, we're talking

15   about six depositions.  We're not talking about months of

16   discovery.

17          Look, my reaction is that on the legal -- on the

18   issue of against which entity do the account holders have

19   claims, I agree that it is really a gating issue and it

20   should be decided sooner rather than later.  I agree with

21   that.  Where I parted company with Mr. Nash and Mr. LeBlanc

22   was somehow doing this seriatim -- okay, Judge, you -- we'll

23   do the briefing and then you'll decide, is it clear and

24   unambiguous.  You know, each side argues diametrically

25   opposed positions based on the terms of use.  And if I don't

1    decide it, then you start putting together your evidence on

2    the custom and practice or whatever as it bears on it.

3           So I will tell you I want to go -- I will go

4    forward on relatively expedited basis to resolve this issue,

5    but I want as part of the filings the evidence that each of

6    you would rely on, the extrinsic evidence that each of you

7    would rely on in the event the Court concludes that the

8    contract terms are ambiguous and it can't be resolved solely

9    from the contract terms.

10          I mean, there's lots of decisions I read where the

11   Court has a full record and (indiscernible) says the

12   contract terms are clear and unambiguous and the rule is X.

13   But even if I consider the extrinsic evidence, I would reach

14   the same result.  Okay.  I don't want this being prolonged.

15   I think this is an important issue.  I think it's different,

16   Mr. Pesce, from the issue of, for example, is there billions

17   of dollars of an intercompany loan that would have to be

18   satisfied before the preferred holders can recover or issues

19   of substantive consolidation, which are truly rare indeed

20   when a court rules that substantive -- other than -- you

21   know, I don't think I've had a case where complete

22   substantive consolidation has occurred.  I've had plans of

23   multiple -- you know, where there are many debtors and as

24   part of a plan, the parties agree four of the debtors can be

25   substantively consolidated because the claims against each

Page 39

1    really are the same.  But it's just -- I mean, the law,

2    whether you look at the Second Circuit or you look at the

3    Third Circuit, where I think it's a little clearer at this

4    point, is such a hard standard to satisfy.  I'm not saying

5    it can't be, but it's a tough one if that's your argument.

6           Whether the intercompany loan requires that that

7    loan be satisfied before the preferred can recover anything,

8    that's a different issue.  And if you can't resolve as part

9    of a plan, well, that will be plan confirmation.

10          But on this issue of against which entities do the

11   accountholders have claims, I am prepared to do it.  So the

12   three of you need to go back and work out a new schedule.  I

13   agree completely, Mr. Pesce, and I've said it so many times

14   in this case, we need to move this forward.  And I don't --

15   you know, the discovery that each of you has talked about --

16   you know, SEC filings, they're going to be admissible,

17   right?  And the Court is going to take judicial notice of

18   them.  You're all going to stipulate to that.  So stipulate

19   to as many facts as you can.  And I just don't want -- I

20   don't want this to become a six-month or a nine-month issue

21   because you take the first three months briefing and then

22   the Court deciding and then I can't decide it purely on the

23   unambiguous language and then you're going to go off and

24   say, well, now we've got to gather evidence.  So I want the

25   extrinsic evidence that each of you wishes to rely on.  And

Page 40

1   to the extent the schedule ought to include dates when you

2   will provide declarations in support of your position, when

3   the declarants will be made available for cross-examination,

4   when we set the hearing, we probably will set it as an

5   evidentiary hearing and I'll probably -- I'll listen to this

6   extrinsic evidence and may ultimately decide, nope, it's

7   just the plain language of the contract.  That's what we're

8   going to do.  Okay?

9           MR. PESCE:  Yes, Judge.

10          MR. LEBLANC:  Your Honor, if I might, just one

11  piece of clarification real quick.

12          THE COURT:  Go ahead.

13          MR. LEBLANC:  So I hear you on the fraudulent

14  transfer and subcon being off the table.  And that's a

15  confirmation issue.  But on the intercompany loan, that 0--

16  I do see that being potentially relevant to this, because

17  some of the extrinsic evidence that has been mentioned bears

18  on whether there are claims of particular entities.  So in

19  your view is that part of this litigation or is that for

20  later?

21          THE COURT:  Mr. Nash, what's your view?

22          MR. NASH:  I would like to confer with Mr. Pesce

23  and Mr. LeBlanc.  I'm not -- I understand that there are

24  theories and arguments that would suggest that the U.K.

25  entity is a value trap before value -- pardon me, gets up to

Page 41

```
1     the preferred equity holders.  But to Your Honor's point,

2     I'm not positive that that is literally related to the legal

3     issue of where customers have claims.

4              Your Honor, I think your notion that we should

5     confer and get back to you with a schedule, understanding

6     that you want to deal with not only the contract itself, but

7     any -- pardon me, any extrinsic evidence that we think is

8     relevant to the issue.  I will be surprised and disappointed

9     if we can't present to Your Honor an agreed framework and

10    schedule.  And I think that we ought to confer with each

11    other and do that.

12             THE COURT:  That's what I want you to do.  Look,

13    I'll tell you, Mr. Pesce, I don't understand the facts at

14    this point well enough to be able to say whether the

15    intercompany loan -- how that bears on the -- the three of

16    you consult promptly, see if you can come up with an agreed

17    schedule.

18             I think, look, the way that the issues were

19    handled with respect to earned accounts, with respect to

20    custody and withhold, largely stipulated facts -- and I'm

21    not saying you're going to be able to agree on all that --

22    it presented the Court with a clear package of what it had

23    to deal with.  And I found that to be quite efficient.  I

24    haven't resolved it, but quite efficient.

25             MR. LEBLANC:  Your Honor, Andrew LeBlanc again.
```

Page 42

1    And we will do so, and I agree with Mr. Nash.  I just --

2    there's one factual issue that I just want to make -- I

3    don't want to leave this record as it's unsaid.  Mr. Pesce

4    has referred a bunch of times to an intercompany loan that

5    he said is from LLC to the mining entity.  I think that's

6    factually incorrect.  That's actually referred to in Mr.

7    Machinsky's first day declaration.  It's a loan from CNL,

8    the U.K. entity, to the mining entity.  I just don't want

9    that factual issue to be misunderstood.

10           THE COURT:  Mr. LeBlanc, I have no clue.

11           MR. LEBLANC:  And we don't need to resolve it,

12   Your Honor.  I just didn't want it to be unsaid.

13           THE COURT:  Look, the three of you come up with a

14   schedule.  Okay?  And if you can't come up with a schedule,

15   the three of you will have a hopefully relatively brief Zoom

16   hearing with the court.  You'll come to an agreement on

17   this.  Okay?

18           MR. LEBLANC:  We will, Your Honor.

19           MR. NASH:  We will, Your Honor.

20           THE COURT:  Thanks.  Thanks very much.

21           Let's move on on the agenda, the sale of the GK8

22   assets.

23           MR. NASH:  I'm going to yield the podium to my

24   partner, Dan Latona, Judge.

25           THE COURT:  Okay.

Page 43

1              MR. LATONA:  Good morning, Your Honor.  For the

2     record, Dan Latona from Kirkland & Ellis on behalf of the

3     Debtors.  And as Your Honor mentioned, the next item on the

4     agenda is the Debtor's proposed sale of the GK8 assets to

5     Galaxy Digital Trading.

6              The Debtor at the outset, we are mindful of the

7     papers that were filed in support of this pleading in the

8     midst of a very busy week for the Court, its chambers, and

9     all parties in interest.  This process has continuously

10    evolved over the course of the last few months as part of a

11    robust months' long marketing process against the backdrop

12    of changing facts and circumstances in these cases, a very

13    tumultuous time in the cryptocurrency market, a holiday

14    schedule in Israel and competing time zones, and of course

15    but not least, hard-fought and arms-length negotiations

16    between the Debtors, potential bidders, and their respective

17    advisors.

18              THE COURT:  Well, more than just about them,

19    because apparently it's also heavily negotiated by insiders

20    of the Israeli debtors who are insisting on employment

21    contracts, are insisting on transfer of all potential

22    avoidance claims.  I have real questions whether this is an

23    arms-length transaction.

24              MR. LATONA:  Understood, Your Honor.  And in

25    support of the proposed sale and the marketing process, the

Page 44

1    Debtors do submit the declaration of Ryan Kielty, partner of

2    a debt advisory and restructuring practice at Centerview

3    Partners, the Debtor's investment banker.  That declaration

4    was filed at Docket 1622.  Mr. Kielty is available for

5    questioning to the extent Your Honor or any party in

6    interest wishes to speak to them.

7            THE COURT:  Do you want to offer that declaration

8    into evidence?

9            MR. LATONA:  I was about to do that, Your Honor.

10           THE COURT:  All right.  Are there any objections

11   to the Court admitting in evidence the Kielty declaration,

12   ECF 1622?

13           Hearing none, it's admitted into evidence.

14           MR. LATONA:  Thank you, Your Honor.  Before

15   beginning, I would also note that the Debtors filed two

16   additional motions in support of a sale.  The first is a

17   supplemental bidding procedures motion disclosing additional

18   extraordinary provisions contained in the APA.  That was

19   filed at Docket Number 1620.  And there was a related motion

20   to expedite filed at Docket 1621.

21           Your Honor, what I propose to do is give a brief

22   background on the GK8 business, including the critical and

23   integral role that its two cofounders play in its continued

24   success, provide some context around the backdrop of

25   Celsius' acquisition of the GK8 entities, and then walk

Page 45

```
 1    through the Debtor's marketing process that has continuously

 2    evolved over the past few months and the reasons for the

 3    transaction structure that we are presenting today.

 4              THE COURT:  Tell me first when did Celsius acquire

 5    the GK8 entities?

 6              MR. LATONA:  In October of 2021.

 7              THE COURT:  And what did it pay for them?

 8              MR. LATONA:  Approximately $115 million.

 9              THE COURT:  And as I understand it, you are

10    proposing to sell it for $44 million?

11              MR. LATONA:  That's correct, Your Honor.

12              THE COURT:  All right.  Go ahead with your

13    presentation.

14              MR. LATONA:  Thank you, Your Honor.

15              The GK8 business was founded in 2018 in Israel by

16    its CEO, Lior Lamesh, and its CTO, Shamar Shamai.  Both Mr.

17    Lamesh and Mr. Shamai are former Israeli governmental

18    cybersecurity experts.  Bidders and all parties in interest

19    view both Mr. Lamesh and Mr. Shamai as critical and integral

20    to the continued success of the GK8 business.  And as set

21    forth in Mr. Kielty's declaration, many bidders were

22    unwilling to consider purchasing the GK8 assets without

23    ensuring that both Mr. Lamesh and Mr. Shamai would continue

24    their involvement with GK8.

25              GK8, Your Honor, is a blockchain security company
```

Page 46

1    that offers its customers an end-to-end platform for

2    managing its digital assets without internet connectivity.

3    The patented technology is combined with multi-party

4    computation to achieve cold security, or in other words,

5    off-chain security with hot functionality, or on-chain

6    functionality.  That means that customers can manage and

7    store their digital assets remaining fully secure without

8    ever connecting to the internet.

9          The GK8 platform is asset-agnostic and supports a

10   vast number of digital assets and also allows for an

11   additional array of services.  For example, trading,

12   staking, and self-custody.

13         And, Your Honor, it was this last functionality

14   custody that led Celsius to acquire GK8 in October of 2021.

15   The intent was to integrate GK8's custody services into its

16   own platform so that Celsius can in turn offer its own

17   customers with a self-custody service.

18         Unfortunately, headwinds in the cryptocurrency

19   industry affected Celsius' liquidity and its ability to

20   integrate the GK8 platform into its own platform.  Being

21   that it is still a relatively new business, GK8 needs

22   continued support to continue growing.  And with the

23   backdrop and drag of the Celsius liquidity problems and the

24   GK8 co-founders' reluctance to continue without further

25   guarantee of employment or continued support, in June 2022,

Page 47

1      the Debtors determined in their business judgement to

2      conduct a marketing process for the GK8 assets.

3              To that end, the Debtor's investment banker,

4      Centerview, began a robust marketing process.  And in turn,

5      the Debtors filed a bidding procedures motion, and that

6      order was entered at Docket 687.

7              Centerview initially contacted 44 parties

8      consisting of strategic partners, other platforms in the

9      cryptocurrency industry, and other traditional financial

10     institutions.  Of those 44, 30 parties executed NDA and were

11     granted access to a virtual data room containing diligence

12     with respect to the GK8 assets.

13             At the initial bid deadline, the Debtors received

14     six initial bids.  Four of those bidders advanced to a

15     second round.  And during an interim non-binding deadline,

16     three of those four bidders submitted revised bids.

17             THE COURT:  Let me ask.  The bidding procedures

18     that were -- because the three entities were non-debtors and

19     the bidding procedures motion proposed a sale of the equity

20     of these three entities, not of the assets.

21             MR. LATONA:  Initially the bidding procedures for

22     the GK8 assets contemplated only an equity sale.  The

23     revised order --

24             THE COURT:  And there has not been until now any

25     request that it be a sale of assets versus a sale of equity.

Page 48

1              MR. LATONA:  The revised order for the bidding

2      procedures at Docket 687 does contemplate either an equity

3      sale or an asset sale.  And that's a great segue, Your

4      Honor.

5              It was during this second round of bids that

6      prospective bidders were only willing to structure this

7      transaction as an asset sale --

8              THE COURT:  And I fully understand that the

9      bidders want to buy pursuant to an asset sale and want

10     protection against claims, liens, et cetera.  They want a

11     free and clear sale.  They want to know what they're buying

12     free of any claims or liens.  That's their desire.  So that

13     I all understand.

14             I think -- I want to be satisfied that the sale

15     process was a fair process to all interested parties.  And

16     since the initial bidding procedures were for a sale of the

17     equity and not of assets, because they were non-debtors,

18     whether all of the potential interested parties knew that

19     they could -- that it was possible to structure bids for

20     assets rather than the equity.

21             MR. LATONA:  Absolutely, Your Honor.  The Debtors

22     would have preferred an equity sale.  That would have been

23     the path of least resistance.  But as you'll find out and as

24     is set forth in Mr. Kielty's declaration, as we continued on

25     and the (indiscernible) facts and circumstances in these

Page 49

1    cases, it was the bidders who insisted on an asset sale

2    given the backdrop of a potential claims at every box issue

3    and post-closing exposure of substantially potentially

4    billions of dollars in customer-related claims related to --

5              THE COURT:  What you've said is there were 30

6    parties that signed NDAs, six submitted initial bids.  At

7    least as to the six who submitted initial bids, were those

8    all bids for assets as opposed to the equity?

9              MR. LATONA:  If Mr. Kielty is on, he can certainly

10   speak to the content of those bids and whether they were for

11   assets or equity.

12             MR. KIELTY:  I'm on, Dan.

13             THE COURT:  Go ahead.

14             MR. KIELTY:  Sure.  Good morning, Your Honor.

15             THE COURT:  Good morning.

16             MR. KIELTY:  So the 30 parties that signed NDAs,

17   despite the fact that the bid procedures at that time were

18   for equity only given the tumultuous crypto market, we were

19   clear with bidders that we were open to entertaining all

20   bids.  And while our strong preference at that time was for

21   those bids to be for an equity sale, it was clear that we

22   were open to other potential structures.  And so the six

23   non-binding indications of interest that we received in mid-

24   August, some of those bids specified a structure consistent

25   with what we asked.  Others were just silent on the topic.

                                                              Page 50

1    I think at that stage what we often see in these processes

2    is it's just a bidder looking at the company almost

3    structure-agnostic, putting forth an indication of the value

4    that they could achieve once they dig in with diligence.

5    Parties at that point had not hired legal counsel.  And

6    that's why when we got to the second round when parties

7    started retaining advisors that dug into the claim structure

8    of the company and the potential risk that's when the

9    conversations quickly shifted to an asset sale.  So we were

10   very open from the beginning that we were willing to

11   entertain all structures.

12          THE COURT:  Thanks very much.  Okay.  Mr. Latona,

13   go ahead.

14          MR. LATONA:  Thank you, Your Honor.  And as Mr.

15   Kielty said, it was during this second round where

16   prospective bidders were only willing to consider the

17   transaction as an asset sale.

18          So while Centerview continued its marketing

19   efforts, the Debtors pivoted and analyzed the number of

20   alternative structures.  And given that the Debtor's GK8

21   business is located in Israel, the Debtors engaged local

22   Israeli counsel to determine what was the most efficient and

23   value-maximizing path forward.  And after months of

24   diligence and conversation with advisors, the debtors and

25   their advisors determined that filing the GK8 entities for

1    Chapter 11, pursuing a sale pursuant to Section 363 of the

2    Bankruptcy Code and seeking recognition of those proceedings

3    in Israel for enforcement of the sale order was the most

4    efficient path forward that minimized the risk and maximized

5    the value of the assets.

6            THE COURT:  Is it a condition to the effectiveness

7    of the sale that an Israeli court recognizes and enforce any

8    order that this Court enters regarding the sale.

9            THE COURT:  It is, Your Honor.  And during this

10   process, all prospective bidders were represented by

11   sophisticated and competent counsel.

12           So during this backdrop, Your Honor, Centerview

13   continued to engage with bidders, including further

14   diligence in the data room including negotiations with

15   management with respect to the retention packages that were

16   ultimately entered into and also with respect to the GK8

17   technology and business.   On the final bid deadline, the

18   Debtors received one revised bid from Galaxy Digital Trading

19   LLC.  After receiving that bid, the Debtors continued

20   negotiating with Galaxy to improve its bid.  That bid, Your

21   Honor, was conditioned on retaining Mr. Lamesh and Mr.

22   Shamai as part of the go forward process.

23           THE COURT:  whose condition was that?

24           MR. LATONA:  That if --

25           THE COURT:  Whose condition was it?

Page 52

1           MR. LATONA:  Galaxy's, Your Honor.

2           THE COURT:  Okay.

3           MR. LATONA:  And in turn, Your Honor, Mr. Lamesh

4    and Mr. Shamai were unwilling to continue with Galaxy

5    without certainty as to their future.

6           THE COURT:  Okay.

7           MR. LATONA:  Your Honor, the Debtors continued to

8    negotiate with Galaxy.  Unfortunately, on November 11th, as

9    Your Honor is aware, FTX and a number of its subsidiaries

10   filed for bankruptcy.  And that threw the cryptocurrency

11   market into pretty tumultuous times.  Bitcoin prices

12   declined approximately 25 percent.

13          Nevertheless, the Debtors, their advisors, and

14   Galaxy and their advisors continued negotiating.  And on

15   December 2nd reached terms of a definitive agreement.  The

16   headline purchase price of that agreement is for $44

17   million, including $100,000 of assumed liabilities.

18          THE COURT:  Who owns Galaxy?

19          MR. LATONA:  Mr. Kielty?

20          MR. KIELTY:  Sure.  So Steven Wald is on from

21   Galaxy for questions.  But Galaxy Digital Holding is a

22   publicly traded company on the TSX Exchange.

23          THE COURT:  Is it based in Israel?

24          MR. KIELTY:  No.

25          THE COURT:  No.  Okay.  All right.  Go ahead, Mr.

Page 53

1    Latona.

2           MR. LATONA:  Thank you, Your Honor.  Between the

3    final bid deadline and the cancellation of the auction, the

4    Debtors and their advisors continued negotiating with other

5    parties, but ultimately Galaxy remained the only qualified

6    bid.  As a result, the Debtors and their advisors cancelled

7    the auction and declared Galaxy the successful bidder.

8           Consistent with discussions, Your Honor, to

9    implement this sale, the Debtors filed the GK8 entities for

10   Chapter 11.  And if we continue, Mr. Briefel will walk

11   through those pleadings.  But overview, the Debtors will

12   file for Chapter 11, seek to appoint Mr. Christopher Ferrara

13   as foreign representative, and subsequently file recognition

14   proceedings in Israel to seek enforcement of the sale order.

15   Notice has been provided in both English and Hebrew to U.S.

16   and Israeli customers.  And, Your Honor, the bid and the APA

17   contemplates assuming all operational liabilities including

18   vendors, employee-related contracts, and other contract

19   counterparties.  The purpose of this sale is to insulate the

20   GK8 assets from the hang of potential Celsius account-

21   related customer claims.  It was very important during the

22   negotiations that we communicated to bidders that we wanted

23   to minimize the impact of this process on local creditors in

24   Israel.  And as a result, Galaxy's bid contemplates assuming

25   all liabilities known to them as of the closing date.

Page 54

1              With that, Your Honor, the Debtor has received one

2    limited objection to the sale.  It was filed at Docket 1617

3    by a proposed class of securities plaintiffs in the

4    securities litigation.  I am happy to report and I will let

5    Counsel speak for themselves.  But that issue has been

6    resolved in the revised proposed order at Docket Number 1640

7    filed this morning.

8              THE COURT:  This is over preservation of

9    documents, access to records, et cetera.

10             MR. LATONA:  Correct, Your Honor.  Because of the

11   way the GK8 debtors store their documents in the cloud and

12   digitally, the Debtors are able to image those documents and

13   maintain them.

14             THE COURT:  And Mr. (indiscernible) represents --

15   is the bankruptcy counsel for the --

16             MR. LATONA:  Mr. Behlmann from Lowenstein.

17             THE COURT:  Okay.

18             MR. LATONA:  I don't see him on the...

19             THE COURT:  Okay.  All right.  We'll turn to that

20   in a minute.

21             Let me sort of cut to the chase what questions I

22   have.  First, tell me who insisted on -- in the negotiations

23   who insisted on the sale including all avoidance actions

24   against any of these Debtors.  You know, I guess Mr. Shamai,

25   Mr. Lamesh, and potentially -- I don't know who else is

Page 55

1    listed.  I didn't see a list of all of the people who would

2    have any avoidance claims against them transferred to

3    Galaxy.

4            MR. LATONA:  Your Honor, it wasn't a very

5    contentious point of negotiation.

6            THE COURT:  It is with me.

7            MR. LATONA:  Understood, Your Honor.  The GK

8    Debtors are not aware of any avoidance actions.  We --

9            THE COURT:  Well, let me ask some specific

10   questions then.

11           MR. LATONA:  Sure.

12           THE COURT:  How many -- it's 44 people who would

13   have their -- have avoidance claims transferred to Galaxy?

14           MR. LATONA:  It's approximately 40 employees and a

15   similar number of contract counterparties.

16           THE COURT:  Okay.  Do any of those employees

17   against whom avoidance claims would be transferred to

18   Galaxy, have any of -- are any of them listed in the

19   Debtor's schedules as having claims against the Debtors?

20           MR. LATONA:  Not to my knowledge, Your Honor,

21   because those entities were not debtors when the schedules

22   were filed.

23           THE COURT:  I know.  But did Mr. Lamesh, Mr.

24   Shamai, or any of these other employees have earn accounts

25   with the Debtors?

Page 56

```
 1              MR. LATONA:  No, not to my knowledge.

 2              THE COURT:  You're going to have to put in -- is

 3     there -- I haven't seen any declarations or evidence as to

 4     whether any of the people who would have avoidance --

 5     potential avoidance claims transferred to Galaxy are listed

 6     on schedules or have filed claims.  I mean...

 7              MR. LATONA:  We'll look at that, Your Honor.

 8              THE COURT:  Because the 502(d) issue, they would

 9     be left with their claims and the Debtors wouldn't be able

10     to take advantage of 502(d) and say, well, they've got to

11     pay back whatever they received from the Debtors.  Okay.

12              Have any of those people -- those people being the

13     people who would have avoidance claims transferred to Galaxy

14     -- received any payments -- or other than salary, what

15     payments have they received from any of the Debtors in the

16     last year?  I don't know how many of these 40 would be

17     determined to be insiders.  So whether we're talking about a

18     90-day period, a one-year period, a two-year period for

19     fraudulent conveyance under the bankruptcy code, let me --

20     I'll start by saying this.  I didn't see anything where the

21     Debtors or -- and then I'll have questions for the Committee

22     about this as well, whether anyone has done an analysis of

23     whether the Debtors have avoidance claims that can be

24     pursued against any of the people for whom avoidance claims

25     would be transferred to Galaxy.
```

1             So if that analysis showed that there potentially

2    is $50 million in claims against the individuals, the $44

3    million price tag just disappeared.  You know, you're

4    getting nothing.

5             MR. LATONA:  Understood, Your Honor.  Without

6    having done any analysis, I can say that it's unlikely that

7    that it would be $50 million in avoidance actions given --

8             THE COURT:  Oh, okay.  Well, how much might it be?

9             MR. LATONA:  To our knowledge, Your Honor, none.

10            THE COURT:  You didn't put in any evidence to show

11   -- you know, you've listed it because these are

12   extraordinary provisions.  But you've provided the Court

13   with absolutely zero analysis of what potential claims are

14   the potential avoidance claims against any of these people

15   and what the potential range of value of those claims might

16   be.  I wouldn't doubt they'll assert defenses.  And maybe

17   there aren't any.  But I don't know whether you're proposing

18   to transfer a valuable asset of the estate to Galaxy.  Okay?

19   And I'm not approving a sale until I understand that, with

20   evidence.

21            MR. LATONA:  Your Honor, the Debtors are happy to

22   submit a declaration with that analysis.

23            THE COURT:  Well, I don't know whether a single

24   declaration is going to do it.  I will -- after you've

25   finished your presentation, I want to hear from the

Page 58

1    Committee.  And I know the examiner has also appeared at the

2    hearing.  You know, I don't know.  I mean, how you could

3    dump in yesterday papers -- that's when I first saw it.

4    Okay?  And yes, you disclosed the extraordinary provisions.

5    Okay?  But you provided zero evidence as to what -- that the

6    Debtor has done any evaluation.  I don't know whether the

7    Committee has done any evaluation, whether anybody has done

8    any evaluation.  What are the potential avoidance claims?

9    Okay.  And without knowing that, I mean, you know, for every

10   potential dollar of recovery against any of these employees,

11   subtract that from the $44 million.

12           Look, you bought the company for $115 million in

13   October 2021 and you're selling it now for $44 million.

14   Obviously the market has turned upside down.  But -- let me

15   stop there.  Bottom line is you agree you have not provided

16   any evidence whatsoever about what the potential avoidance

17   claims are and what the range of possible values of those

18   claims would be, correct?

19           MR. LATONA:  Yes, Your Honor.  The Debtor has not

20   done an analysis on that.

21           THE COURT:  Do you think it's material?

22           MR. LATONA:  We don't know until we analyze it,

23   but we find it unlikely.

24           THE COURT:  Why is that?

25           MR. LATONA:  Given the short amount of time that

1    the GK8 debtors have been in business, that they're not

2    profitable at this point, that they've required continued

3    funding from the Debtors to continue operating.  It's very

4    unlikely that a material number of avoidance actions exist.

5              THE COURT:  Well, whatever evidence you submit

6    also needs to include specifically whether any of the

7    individuals against whom avoidance claims would be assigned

8    to Galaxy, whether any of them had earn accounts with the

9    Celsius debtors and whether within one year before the

10   filing of the petitions for these Israeli companies --

11   what's the net -- have they received any net distributions

12   from accounts?  I mean, if they withdrew -- for example, if

13   they had millions of -- ostensibly crypto valued at millions

14   of dollars and they withdrew their assets from those

15   accounts in the 90 days or their insiders within a year

16   before the filing of the bankruptcy, it's going to raise

17   potential avoidance issues.  And I need an analysis.  I am

18   not approving a sale -- if they want to drop -- if they want

19   to go back and renegotiate and no longer transfer avoidance

20   actions, that may put this issue to rest for now.  But if

21   that's a deal stopper, then I need a complete analysis on

22   it.  And not only from the Debtors.  I'm going to ask the

23   Committee and also ask the examiner.  Somebody has got to do

24   an analysis of it.

25             MR. LATONA:  Understood, Your Honor.  We will, and

Page 60

1    we will submit a declaration.

2              MR. D'AVERSA:  Your Honor, may I be heard?

3    Raniero D'Aversa from Orrick, Herrington & Sutcliffe for --

4              THE COURT:  Not yet.  Not yet.  Not yet.  Okay.

5    I'll give you a chance, obviously.  But I want to...

6              Mr. Latona, have you finished your presentation?

7              MR. LATONA:  Yes.

8              THE COURT:  All right.  Who else wants to be

9    heard?

10             CLERK:  Judge, we have a few hands up.

11             THE COURT:  I see that.  But let me hear -- before

12   I hear from any pro se creditors, I want to hear from -- let

13   me hear from the Committee's counsel next.

14             MR. ZATZ:  Yes.  Good morning, Your Honor.  Andrew

15   Zatz from White & Case on behalf of the Official Committee

16   of Unsecured Creditors.

17             So let me speak to the issue first about the

18   potential claims that could potentially exist against

19   employees of GK8 related to accounts they may have had at

20   Celsius.

21             If you look at the purchase agreement, Section 1.1

22   lists out all of the assets that are being sold.  Section

23   1.1(g) describes the sale of causes of action.

24             In Section 1.2, you have the excluded assets.  And

25   the excluded assets in Section 1.2(p) excludes claims and

Page 61

1    causes of action where debtors other than the GK8 entities

2    are co-plaintiffs.

3              So for any claim that is a shared claim of all the

4    debtors, those are not being sold.  For any claim that is an

5    exclusive claim of a Debtor that is not a GK8 entity, those

6    claims are also not being sold.

7              So for any type of preference or other action that

8    may or may not exist for any employee of GK8 related to

9    accounts that they may have had at Celsius, those are being

10   preserved and not being sold.  So we got comfortable on that

11   front because of the way the purchase agreement works on

12   that point.

13             We did an analysis of the legal basis for any

14   other potential claims that may exist.  Your Honor, as you

15   noted, there is a meaningful difference between what the

16   company paid for GK8 not too long ago and what it is

17   purporting to sell it for today.  That value diminution ties

18   closely to the diminution of the cryptocurrency market

19   generally.  And in fact, the price that the Debtor's

20   achieved in this marketing process reflects less of an

21   impact than the cryptocurrencies themselves.  The Committee

22   has been involved every step of the way in this process.  We

23   believe this is a fair price.

24             Putting aside the fairness of the price, the fact

25   of the matter is we were not able to identify a good claim

Page 62

1    or cause of action, or even one that we think really that

2    would survive a motion to dismiss based on the original

3    acquisition.  The fact of the matter is in total hindsight,

4    this purchase should not have been made.  That's the reality

5    given what the company paid and what it can now sell it for.

6    But that doesn't make it a fraudulent transfer or anything

7    of that ilk.  Everything --

8              THE COURT:  I understand.  But, you know, I just

9    get blindsided when I look at papers that were filed

10   yesterday, and they quite properly showed this as an

11   extraordinary provision but give no explanation for it or no

12   analysis.  And I'm certainly glad to hear that it's

13   something that the Committee appears to have focused on.

14   But I need it addressed --

15             MR. ZATZ:  I understand, Your Honor.  And we are

16   absolutely sympathetic to the Court's desire to get

17   additional evidence of the analysis, and we're in support of

18   that.  And we are happy to work with the Debtors on putting

19   that together.

20             THE COURT:  Let me just -- so it's your reading of

21   Section 1.2(p) of the purchase agreement that any potential

22   avoidance actions against either the two founders or any of

23   the other employees that arise from any earn accounts they

24   had, any transfers relating to any of that, none of that is

25   being transferred to Galaxy.

1          MR. ZATZ:  Correct, that is our understanding.

2          THE COURT:  What is being transferred to them?

3          MR. ZATZ:  It's really all claims and causes of

4    action that GK8 has.  But if we're talking specifically

5    about employees of GK8, you could -- you know, there are two

6    sources of income that those employees may have gotten along

7    the way.  One is proceeds of the original sale and salary,

8    bonuses, what have you.  And again, we've looked at the

9    legal credibility of any claims associated with that, and we

10   as the Committee got comfortable that there is little to no

11   value in those potential claims.

12         THE COURT:  Just to be clear, has the Committee

13   looked at whether any of the approximately 40 people

14   involved, whether any of them had Celsius earn accounts?

15         MR. ZATZ:  I'm not aware that we had done that

16   analysis because we had gotten comfortable with the

17   preservation of the claims.

18         THE COURT:  Okay.  I'm just making some notes

19   here.

20         Anything else you want to add, Mr. Zatz?

21         MR. ZATZ:  I did have some remarks I wanted to

22   make in support of the Debtor's motion.

23         THE COURT:  Yeah, please.  Go ahead.

24         MR. ZATZ:  So as I had mentioned, the marketing

25   process for the GK8 business entailed multiple bidders and

Page 64

1   extensions of failed deadlines in an ongoing attempt by the

2   Debtors to get the highest and best offer for GK8.  The

3   marketing process here was extensive.  Debtors kept the

4   Committee informed and involved throughout this process.

5   And we can verify that the Debtors took every action

6   possible in an attempt to maximize value in connection with

7   the GK8 sale.

8           We think that it's important that this sale happen

9   as soon as possible.  We considered whether taking more time

10  could result in more or better bids.  We also considered a

11  standalone reorganization of GK8 or including GK8 in a

12  potential standalone reorganization for the entire Celsius

13  enterprise.

14          The biggest obstacle to these alternatives was the

15  need to retain the two founders of GK8, Mr. Lamesh and Mr.

16  Shamai.  Founders are critical to GK8, a view shared by all

17  bidders involved in the process.  Without the founders, the

18  purchase price for GK8 would be expected to go down

19  significantly.

20          The founders have been patient, but there is no

21  assurance that they will remain with GK8 indefinitely so

22  it's important to lock down compensation packages for them,

23  which Galaxy successfully did after extensive negotiations.

24  And the money to pay the founders has to come from

25  somewhere, which complicates the notion of a standalone

Page 65

1    plan.

2            Moreover, there is no assurance that time is on

3    our side and no reason to think that the value of GK8 will

4    increase merely by waiting this out.  Our view is that the

5    Debtor's marketing process reached its logical conclusion,

6    and additional time would not change that.

7            In sum, the Galaxy bid is the classic bird in

8    hand.  Given the deterioration of value in the crypto market

9    generally, we believe the price for GK8 is a good one and is

10   the highest and best available.

11           The proceeds of the GK8 sale will be accretive to

12   this process.  With a further court order, they could be

13   available to fund these cases.  But we are hopeful that

14   won't be necessary, and those funds ultimately can be

15   distributed to customers under a plan of reorganization.

16   Those aren't issues for today, but ultimately disposing of

17   the GK8 business and obtaining a meaningful amount of cash

18   for the estate is beneficial and should be approved.  Thank

19   you, Your Honor.

20           THE COURT:  All right.  Thank you, Mr. Zatz.  Let

21   me next ask -- I see Ms. Cornell on the screen with her hand

22   raised, and I was going to ask for the position of the U.S.

23   Trustee.

24           MS. CORNELL:  Good morning, Your Honor.  Shara

25   Cornell on behalf of the Office of the United States

Page 66

```
1    Trustee.

2              The United States Trustee has some more concerns

3    to Your Honor, and at this time we are renewing our previous

4    objection to the Bid Procedures Motion in light of the

5    expedited nature and the new bankruptcy filing.  We should

6    allow creditors and parties in interest an opportunity to

7    review if they've changed their position in light of the

8    filings.

9              The sale procedures with respect to equity, they

10   were filed earlier in this case.  But as the Debtors have

11   said, they've pivoted to look at alternative structures.

12   But at no point prior to this week were new bid procedures

13   clearly filed on the docket letting all parties in interest

14   know that a new sale was being contemplated.  And it sounds

15   from both the Debtors and the Committee that this was as far

16   back as November, that they had pivoted to a sale of the

17   entire GK8 and not just the equity interest.

18             THE COURT:  Well, when you say a sale pivoted

19   toward a sale of the assets, I can't say -- I'm not

20   surprised at all that buyers wanted a 363 sale and

21   protection to the extent it's available against claims, et

22   cetera.  So none of that -- I mean, I commented yesterday

23   with Mr. Nash at the end of the hearing, so I'm not

24   surprised that it pivoted toward an asset sale rather than

25   an equity sale.
```

Page 67

```
 1            MS. CORNELL:  Sure.

 2            THE COURT:  You know, I wanted to be satisfied,

 3     and Mr. Kielty has addressed this, that the potential

 4     interested parties were all operating on a level playing

 5     field, and understanding that, the Debtor would be prepared

 6     to move forward with an asset sale as opposed to just an

 7     equity sale.  Based on what I've been told today, I am

 8     satisfied on that point.  Obviously I raised issues.  It was

 9     certainly unclear to me what avoidance, potential avoidance

10     claims against the founders or the larger number of

11     employees were being transferred.  Mr. Zatz certainly

12     addressed that more particularly.  Just to make clear, I'm

13     going to require the filing of one or more declarations that

14     specifically address it.  When I say it, that this would not

15     transfer avoidance claims against any of these people based

16     on earn accounts they had or other account relationships.

17     As I understand it, it would only transfer avoidance claims

18     that might exist by these three Israeli entities.  So, look,

19     you know, the issues surrounding timing of a 363 sale, if

20     this really were a first day hearing -- it is a first day

21     hearing with respect to these three entities.  But the fact

22     of the matter is the court approved -- it has been on the

23     radar screen and table for everyone for the sale of these

24     entities, whether it's equity or originally the equity in

25     the bidding procedures that was approved.
```

1          So, you know, certainly the Second Circuit's

2     Chrysler opinion -- you know, the Second Circuit is no

3     longer Lionel is no longer the controlling law in the Second

4     Circuit about the timing of a 363 sale.

5          MS. CORNELL:  Sure.  Sure.

6          THE COURT:  So this definitely is not a sale on

7     day one or two of these new debtor cases.  Everybody -- you

8     know, you've known it, everybody's known it.

9          MS. CORNELL:  I understand.  But just to add just

10    a little bit more to the conversation about this that hasn't

11    been brought up by the other parties, you know, GK8 has a

12    fiduciary obligation to its own creditors, and its creditors

13    and what's in the best interest of GK8's creditors may not

14    be the same as what's in the best interest of Celsius

15    creditors.  And prior to the petition, GK8 had a fiduciary

16    obligation regarding the sale of the equity.  And now as a

17    Debtor, there's new fiduciary obligations.  And a motion

18    should not be granted until such a time that a committee is

19    formed if one is possible to be formed.  Now the Debtors are

20    talking about bidding procedures that happened prior to the

21    filing of the petition.  And once that petition was filed,

22    the legal petition of  GK8 has changed.  So I think that

23    also --

24          THE COURT:  Ms. Cornell, I can't imagine there's

25    going to be a separate creditors' committee for these three

Page 69

1    entities.  So, you know, I realize I don't have a specific

2    motion addressed to this today, but this enormously

3    expensive case is not going to result with a separate

4    committee for the -- and we'll come back to Mr. Latona.  I

5    thought I understood him to say that all creditor claims of

6    these three entities are going to be paid by the buyer, that

7    they're riding through essentially and all of those claims

8    are going to be satisfied.  Mr. Latona, am I correct on

9    that?

10            MR. LATONA:  That is correct, Your Honor.  Between

11   the cure costs and the proposed first day relief, we do

12   expect that the overwhelming majority of the GK8 debtor or

13   creditors will be paid upon closing or pursuant to the first

14   day relief.

15            THE COURT:  Okay.

16            MS. CORNELL:  And, Your Honor, whether a committee

17   is formed is yet to be seen.  But the United States Trustee

18   has obligations under 1102 to solicit for a committee.  And

19   particularly in this case on the petitions that were filed

20   for GK8, all of the creditors listed in the top 20 creditors

21   are different than the creditors listed on the petitions of

22   any of the Celsius-related entities.

23            THE COURT:  Mr. Latona, does the purchase

24   agreement -- how does it deal with the payment of claims of

25   any of the GK8 creditors?  Does it?  Does it have any

Page 70

1    provisions that those claims will -- any -- will be

2    satisfied in full?  What does it provide, or does it?

3              MR. LATONA:  Your Honor, Dan Latona for Kirkland &

4    Ellis on behalf of the Debtors.  Part of the purchase price.

5              THE COURT:  I mispronounced your name.  I'm sorry.

6    Go ahead.

7              MR. LATONA:  Part of the purchase price includes

8    $100,000 of assumed liabilities.  And pursuant to the

9    assumption of those contracts, they will be cured in the

10   ordinary course.  And again, pursuant to the proposed first

11   day relief, we do anticipate that 100 percent of creditors

12   will be paid in closing or pursuant to the first day relief.

13             THE COURT:  Okay.  Ms. Cornell, go ahead.

14   Anything else?

15             MS. CORNELL:  Well, just to that point of Mr.

16   Latona, the schedules and statements have also not been

17   filed in this case, and the Debtor anticipates them not

18   being filed until the end of January as of today's date.

19   So, you know, just putting that on Your Honor's radar as

20   well, that we still don't have a complete picture.  And I

21   think that's all that I have for now.  Thank you.

22             THE COURT:  Thank you, Ms. Cornell.  All right.

23   Who else wants to be heard?  Mr. Crews, your hand is up.

24             MR. CREWS:  Thank you, Your Honor.  Just two

25   matters to bring before you today.  Mr. Latona mentioned the

Page 71

```
 1    sale price of GK8 being $115 million, which would lead one

 2    to believe that this was a cash offer.  The --

 3                THE COURT:  No, no, no, no, no.  Hold on, Mr.

 4    Crews.  The sale price is $44 million.  The $115 is what

 5    Celsius paid for it when it bought it.

 6                MR. CREWS:  Exactly.  Exactly, yes.  That's the

 7    point.  It made it seem like it was a cash purchase where we

 8    had heard, just leaked information, that it could be a sell

 9    token/equity purchase, which is relevant, I think, to

10    determining the origin of the initial bid.  If it's $115

11    million in cash, it's a very different thing from if they're

12    using sell token and --

13                THE COURT:  Mr. Crews, it's not $115 million, it's

14    $44 million.  And let me ask Mr. Latona, is it cash?

15                MR. LATONA:  So, Your Honor, I think I understand

16    what Mr. Crews is saying, so let me address that.  The GK

17    sale currently under contemplation today is for $44 million

18    in cash and $100,000 assumed liabilities.  I believe, Mr.

19    Crews, and he can correct me if I'm wrong, is referring to

20    Celsius's acquisition of GK8 back in 2021.  And from my

21    understanding, that purchase price was funded by a

22    combination of a little over $100 million in cash, the

23    remaining in equity in sell token.

24                THE COURT:  Okay.  But the point is, the purchase

25    price now is cash.
```

Page 72

1           MR. LATONA:  That's correct, Your Honor.

2           THE COURT:  Okay.  Mr. Crews, go ahead.  Anything

3      else?

4           MR. CREWS:  Yes.  One other matter and thank you

5      for clarifying.  That was exactly what I was asking about,

6      Mr. Latona.  The other matter, just when it comes to

7      avoidance concerns, the biggest elephant in the room would

8      be with regard to a co-founder of Celsius, Mr. Shlomi Daniel

9      Leon, who is an Executive Chairman of GK8.  And he extracted

10     millions of dollars from Celsius in the months before the

11     pause in bankruptcy filing.  So, any avoidance analysis

12     should involve just addressing him.

13          THE COURT:  I think -- I'll try and get

14     clarification on this.  As I understand what Mr.

15     (indiscernible) has described is, any claim by the Celsius

16     entities because of any value withdrawn from earn accounts

17     from the Celsius entities is not being -- those avoidance

18     claims remain -- to the extent that there are avoidance

19     claims, remain property of these debtors' estates, are not

20     being transferred.  Mr. Zatz, am I correct in that?

21          MR. ZATZ:  Yes, Your Honor.  That is correct.

22          THE COURT:  Okay.  Mr. Latona, do you want to just

23     -- do you agree with that, as well?  Those --

24          MR. LATONA:  That was the thing that, when I --

25     jumped out off the page to me yesterday when -- because it

Page 73

1    didn't define what avoidance claims were being transferred

2    and I was very concerned whether avoidance claims that the

3    Celsius debtors have against anybody associated with GK8,

4    are not going to disappear.

5            MR. LATONA:  That's correct, Your Honor.  For the

6    record, Dan Latona of Kirkland & Ellis.  Mr. Leon's

7    transactions are -- any insider transactions are being

8    investigated by the Special Committee and the Creditors'

9    Committee, so none of those actions would be transferred

10   pursuant to the sale.  Furthermore, Mr. Leon was never

11   directly employed by a GK8 entity.

12           THE COURT:  I'm sorry, was or wasn't?

13           MR. LATONA:  Was not.

14           THE COURT:  Okay.  All right.  Mr. D'Aversa?

15           MR. D'AVERSA:  Good morning, Your Honor.  Ran

16   D'Aversa from Orrick, Herrington & Sutcliffe for Galaxy

17   Digital Trading.  I was trying to speak before, but I thank

18   Mr. Zatz for making the clarification that I was going to

19   with respect to the avoidance actions.  Galaxy has an

20   interest in ensuring that its employees and counterparties

21   are not going to get dragged into a lawsuit, a potential

22   avoidance action by GK8 because the estate will still be

23   there after the sale, so that's the intent there.  And I

24   think that's typical often of buyers of operating companies

25   that want to continue to have good relationships with their

Page 74

1   employees and counterparties.

2          I do want to make the Court aware of one thing.

3   If, in fact, the Court is going to require additional

4   information from -- in the form of affidavits or what have

5   you from the company, just want to make the Court aware that

6   a delay may not be without consequences.  We're not here --

7          MR. COURT:  Mr. D'Aversa, if I require the

8   additional evidence, I want it in by Monday.

9          MR. D'AVERSA:  Oh, okay.  Well --

10         MR. COURT:  Well, let me stop you.  This -- we're

11  moving fast, okay.  So, this does not prolong -- I don't

12  view this as prolonging the issues.  I'll address the U.S.

13  Trustee's concerns, but I hope you appreciate what -- after

14  two full days of Celsius hearing, last night I read papers

15  relating to the matter we're talking about now.  And

16  obviously, I've expressed questions that I had, and I'm

17  comforted to some point, to some degree, by the

18  representations that Mr. Latona and Mr. Zatz have made with

19  respect to what claims against GK8 officers or employees are

20  being transferred to Galaxy.  Okay.  I want one or more

21  declarations that -- under oath, where that's put on the

22  record for everybody to see.  And I want a Memorandum of Law

23  that, essentially, goes through the analysis that Mr. Zatz

24  provided the Court about specific provisions of the Purchase

25  Agreement, what claims -- potential claims, there may not be

Page 75

1    any, but what potential claims are being transferred to

2    Galaxy and what remain with the Debtors.  I don't see this

3    as prolonging these issues very long.  So, if you have other

4    concerns, I'd like to hear it, as well.

5            But I do have a question for you.  When is the

6    cross-border case for these Debtors being filed in Israel

7    and what is the process -- in one of my other current

8    Chapter 11 cases, there also is a cross-border case in

9    Israel and I don't know, are the -- are there any regulatory

10   requirements in Israel?  What's the timing, okay?  I don't

11   know whether there are regulatory requirements that have to

12   be satisfied in Israel, how quickly you anticipate that a

13   cross-border case -- that any Order entered by this Court

14   will be recognized and enforced in Israel.

15           MR. D'AVERSA:  Yes, Your Honor.  So, there is a

16   date in the Asset Purchase Agreement by which the Israeli

17   Order must be entered, and I believe it's January 16th.

18   Debtors' Israeli counsel convinced us that we need every

19   minute of the negotiated timeline in the Asset Purchase

20   Agreement to get there in time.  And I just want to make the

21   Court aware, because I respect that the Court has only had

22   the pleadings for a day or so, maybe less, that there are

23   additional deadlines that the parties agreed to and the

24   Debtor agreed to in the Asset Purchase Agreement that could

25   be triggered as soon as tomorrow, within one day of a

Page 76

1    deadline, that the Debtors' know is very important to keep

2    in the overall case deadline and the path for closing on

3    track.  The timing, the sequence, along with every other

4    provision in this Agreement, was painstakingly negotiated

5    for months.

6              THE COURT:  Okay, but Mr. D'Aversa, let me tell

7    you, you may have been painstakingly negotiating deadlines

8    for a month, but you're not forcing me to enter -- you can't

9    force me and I'm not going to enter an Order today approving

10   this.  And the faster you all get your act together and give

11   me the information that I believe I need before I can prove

12   the sale, I'm not going to approve it.  And if you have to

13   go back to your clients and explain that, go ahead and do it

14   and adjust the deadlines.  I'm prepared to move

15   expeditiously, but you're not going to cram down

16   unreasonable deadlines for me to act.  So, go back to your

17   client and tell them that.  And you could either negotiate

18   now for a revised schedule or you can just blow up the deal.

19   But that's too bad as far as I'm concerned, okay.  So, don't

20   tell me that I have to act today or tomorrow or Monday,

21   because it isn't going to happen.  Maybe Monday, I don't

22   know.

23             MR. D'AVERSA:  Yes, Your Honor, and respectfully,

24   I did not mean that in any way.  I just didn't want --

25             THE COURT:  It came out that way.

Page 77

1          MR. D'AVERSA:  Yeah.  No, my intent was just to

2     say that I don't have the authority to change any dates.

3     There are dates in the Agreement.  It will require an

4     amendment or exercise their rights, whatever that may be.  I

5     didn't want my silence to be interpreted as any kind of

6     consent.  That's -- I don't have that authority.  That's all

7     it was intended for, Your Honor.

8          THE COURT:  All right.  Mr. Dixon, your hand is

9     raised.

10         MR. DIXON:  Simon Dixon, per se Creditor.  As the

11     estate is short about 60,000 bitcoin that they spent of

12     credits as money, it would make a significant difference to

13     use, as many are pushing for payment in kind, if the deal

14     was actually settled in bitcoin rather than dollars because

15     it would -- it could make a significant difference and it

16     would cost the buyer actually very little to do so as they

17     are an OTC trading desk that could convert all this to

18     bitcoin.  But we feel it would, as bitcoin is the main

19     missing part of the deal, that any sale in bitcoin at these

20     prices, would be very beneficial to the estate.

21         THE COURT:  I hear you, but that's not going to

22     happen.  Okay.  Anybody else want to be heard?

23         MR. NASH:  Judge, can I make one point?

24         THE COURT:  Go ahead.

25         MR. NASH:  Patrick Nash for the Debtors.

```
 1              THE COURT:  Go ahead, Mr. Nash.

 2              MR. NASH:  Your Honor, when I heard Ms. Cornell

 3    talking about soliciting for a new Committee or whatnot,

 4    there's a lot of equity value in GK8.  $44 million would be

 5    coming into GK8.  There is very little --

 6              THE COURT:  It would come into the Debtors.  The

 7    $44 million would come into the Debtors, not to GK8.

 8              MR. NASH:  Well, we're selling --

 9              THE COURT:  No, it would come into GK8 -- yes.

10              MR. NASH:  And to the extent that the customers

11    have claims at GK8, we have a committee for all that.  To

12    the extent that customers don't have claims at GK8, any

13    creditor of GK8 is going to be paid in full and then there

14    will be equity value that will dividend up and then the

15    equity value, the dollars in excess of the very small amount

16    of creditors at GK8 will then be available for the rest of

17    the estate.  But creditors of GK8, to the extent that they

18    exist and aren't being assumed, are going to be paid in full

19    unless we have $6 billion in customer claims of GK8.  But,

20    this whole idea of a separate committee and all this stuff,

21    Your Honor, we don't need it.

22              THE COURT:  Mr. Nash, I don't have a Motion for a

23    committee, but I can't imagine there's going to be a

24    separate committee for these three entities.

25              MR. NASH:  The thought terrifies me, Judge.  I
```

Page 79

1    just had to be heard on that.  Thank you, sir.

2              THE COURT:  That's fine.  Anybody else want to be

3    heard?  Mr. Porter?

4              MR. PORTER:  Thank you, Your Honor.  I appreciate

5    you more today than ever.  In my perspective, humiliating

6    these high-powered attorneys not having looked at this deal

7    in the way that you've discussed and described today.

8    Furthermore, Your Honor, I think they are really trying to

9    take advantage of your and the Court's and this country's

10   never having dealt in this newfangled cryptocurrency world,

11   and I believe, in many things that are going wrong here,

12   Simon Dixon's proposal -- I know it's difficult to get your

13   arms around it and I appreciate it, the edification process

14   is unbelievable, but being paid in $44 million of bitcoin,

15   designating those bitcoin to go to the Creditors, like

16   Simon's proposal, since this purchaser, the only purchaser,

17   it is a fair price, we believe.  The people that are

18   creditors, the $44 million, if there's nothing wrong with

19   the other parts of the transaction.  Anyways, Your Honor, I

20   appreciate you listening to me again today, and I believe

21   that these attorneys are trying to hoodwink you in many

22   aspects.  Thank you so much, Your Honor.

23             THE COURT:  Thank you, Mr. Porter.  I would just

24   say, I think -- I raised issues of concern to me when I read

25   the papers yesterday.  Both Mr. Latona and Mr. Zatz have, to

Page 80

1    a substantial extent, eased my concerns, but I'm going to

2    require the evidence and specific Memoranda of Law

3    addressing the issues I've raised.  So, obviously I raised

4    the issues that were of concern to me after reading papers

5    last night.  But let me see, does anybody else wish to be

6    heard?  All right.

7             I'm going to withhold a ruling for now on whether

8    to approve the sale of the GK8 assets until receiving the

9    Memoranda of Law and one or more Declarations specifically

10   addressing the issues that I raised regarding the avoidance

11   claims.  The sooner you get it in -- I'm not going to

12   schedule another hearing at this point.  The sooner you get

13   it in, the faster I expect to be in a position to be able to

14   rule.  I have to say that, while I'm not ruling today, I'm

15   tentatively inclined to approve the sale of the GK8 assets,

16   just -- and overrule the U.S. Trustee's objection.

17            To very briefly explain why, as I indicated

18   earlier, I think -- I don't view this as a proposed sale of

19   assets that ought to be evaluated as if it were Day One of

20   the new Chapter 11 cases, the new Chapter 11 cases referring

21   to the three Israeli entities.  Those cases are properly

22   filed in this District as affiliates of the existing

23   debtors, so this Court has -- they were properly filed here.

24   It would obviously be up to the Israeli Court to decide

25   whether to recognize and enforce -- recognize a cross-border

Page 81

1    case, recognize and enforce any sale order that this Court

2    approves.  That's for the Israeli Court, not for this Court.

3    Subject to me being satisfied with respect to the avoidance

4    claims issue, I think that the (indiscernible) Declaration,

5    which has come into evidence, ECF 1622, demonstrates that

6    the sale price of the assets of these three Debtors is fair

7    and reasonable and it is, in the Court's view, a value

8    maximizing transaction.

9         I'm also persuaded, and this has been part of the

10   record in this case, before these entities filed, that the

11   GK8 entities are not part of the core business of the

12   Debtors and sort of, starting with the Lionel case, but

13   moving forward to how the law in this Circuit has evolved

14   since, I think most particularly, the Second Circuit

15   decision in Chrysler, Judge Jacobs' opinion in the Second

16   Circuit and subsequent decisions, I think that the timing of

17   the sale is appropriate.  The U.S. Trustee's concerns about

18   whether there'll be a committee and there are no schedules

19   yet, I'm satisfied that the Creditors of these three

20   entities, their claims against the entities will be

21   satisfied, be assumed by the buyer or otherwise satisfied.

22   So, I think that the Creditors of the three GK8 entities are

23   more than adequately protected and indeed, a quick sale is

24   more likely to result in all of those Creditor claims being

25   satisfied.  So, to the extent that the U.S. Trustee argued

Page 82

1     otherwise, that objection is overruled.

2            Mr. Latona, when do you believe -- and I don't

3     know whether it's a single declaration or more than one

4     declaration that's going to be required, but when will you

5     be in the position to file that additional evidence?

6            MR. LATONA:  Again, Your Honor, for the record,

7     Dan Latona of Kirkland and Ellis on behalf of the Debtors.

8     I believe, Your Honor mentioned Monday.  We will endeavor to

9     do that by Monday 5 p.m., but the Debtors are going to move

10    as expeditiously as possible to get that declaration in as

11    soon as possible.

12           THE COURT:  Okay.  Mr. Zatz, not to -- I mean, the

13    Committee has done (indiscernible)'s work in this case on

14    multiple issues and I'm greatly appreciative of it.  But it

15    would be helpful if the Committee also did a filing

16    indicating its support for the sale.  And I think your

17    explanation of the analysis that the Committee made --

18    Committee counsel made with respect to potential avoidance

19    claims, what was being assigned, what was not.  It would be

20    -- the Court would consider it very helpful if the Committee

21    also, by Monday at 5, put in a Memorandum of Law that

22    doesn't have to be very lengthy, but explain what you did

23    today.  Okay?

24           MR. LATONA:  Yes, Your Honor.  We can do that.

25    Certainly.

Page 83

```
 1              THE COURT:  All right.  So, with respect to the

 2    issue that was raised by Mr. Porter -- or excuse me, Mr.

 3    Dixon.  I don't know if it was a he or she, I apologize.

 4    Okay, by Dixon and Porter about the price being in bitcoin

 5    or not.  To the extent that's viewed as an objection, it's

 6    overruled.  I think monetizing -- to the extent --

 7    monetizing the estate in a fiat currency at this stage is

 8    important, and whether this came up on the issue about the

 9    sale of the stable coin, which I haven't ruled on yet.  But

10    I think one of the things that was the evidence in that

11    hearing showed is, if the Debtor, because a plan that

12    proposes and is confirmed provides for in-kind distributions

13    to the extent the Debtor does not have sufficient crypto

14    assets to satisfy the plan, they'll have to require more.

15    But it's certainly unclear whether the plan will or won't

16    provide for distributions in kind and how the Court will

17    deal -- how the Court and the parties will deal with that.

18    So, to the extent that was an objection, I'm going to

19    overrule it.  I think the price is fair, paying it in fiat

20    currency, U.S. dollars is appropriate.  Mr. Latona, is there

21    anything else I need to deal with today with respect to the

22    sale?

23              MR. LATONA:  Again, Your Honor, for the record,

24    Dan Latona of Kirkland & Ellis on behalf of the Debtors.  I

25    have one clarification and one housekeeping matter.
```

Page 84

1          THE COURT:  Sure.

2          MR. LATONA:  First, with respect to the issue that

3   Mr. Crews raised about Mr. Leon, the withdrawals for Mr.

4   Leon were between the initial Debtor entities and Mr. Leon,

5   not any of the GK Debtors entities.  So, to the extent any

6   potential actions exist, they will remain property of the

7   Debtors' estates.

8          THE COURT:  Put that in a pleading that's filed by

9   Monday, as well.  Okay?

10          MR. LATONA:  We will.

11          THE COURT:  I just want the record, the

12   evidentiary record, clear as to issues such as that.  Okay?

13          MR. LATONA:  Understood.  The last housekeeping

14   matter, Your Honor, with respect to the Supplemental Bidding

15   Procedures Motion and Motion to Expedite, will the Court

16   consider that with the Sale Order when it's entered?

17          THE COURT:  Yeah.  Well, I'm granting the Motion

18   to Expedite now, on the record.  So, I'm not going to -- did

19   you submit a written Order for that?

20          MR. LATONA:  It's with the document that's filed

21   at 1621.

22          THE COURT:  Well, I need it in Word format.

23          MR. LATONA:  We'll submit it to Chambers, Your

24   Honor.

25          THE COURT:  So, that will be entered.  Likewise,

Page 85

1    the Motion to Modify the Bidding Procedures is, likewise,

2    granted, as well.  I'm quite comfortable about that.  I

3    raised the issues that were issues of concern to me and,

4    assuming the evidence that's provided is consistent with

5    what I've been told today, I expect to be able to approve

6    the sale.  Okay?

7              MR. LATONA:  Thank you, Your Honor.  I appreciate

8    the time.  At this time, I will cede the lectern to my

9    colleague, Mr. Briefel.

10             MR. BRIEFEL:  Good morning, Your Honor.  Can you

11   hear me okay?

12             THE COURT:  I can.

13             MR. BRIEFEL:  Good to see you.

14             THE COURT:  (indiscernible)

15             MR. BRIEFEL:  For the record -- yeah, good to see

16   you.  For the record, Simon Briefel of Kirkland & Ellis,

17   counsel to the Debtors.  So, as my colleague and Mr. Latona

18   mention, I will be handling the First Day Motions that we

19   filed in connection with the filing of the GK8 Debtors.  But

20   before I do that, I just wanted to take care of a

21   housekeeping item.  We filed, at Docket Number 1629, the

22   Declaration of Mr. Ferraro.  It's our First Day Declaration

23   evidentiary support for our First Day relief and so, I

24   wanted to take a minute to ask that the Court enter the

25   Declaration into evidence.

1          THE COURT:  Sure.  Is there any -- are there any

2     objections to the Court admitting into evidence the Ferraro

3     Declaration ECF 1629 in support of the First Day Motions?

4     Hearing no objection, that's admitted into evidence.

5          MR. BRIEFEL:  Thank you, Your Honor.  So, we have

6     four items on the agenda, as it relates to the First Day

7     relief.  The first one is the Joint Administration Motion

8     that was --

9          THE COURT:  Granted.

10          MR. BRIEFEL:  Great.  Thank you, Your Honor.  So,

11    I will move on to the second item on the agenda with respect

12    to the GK8 First Day relief is the Motion to Apply Certain

13    Orders that had been entered into Celsius cases since the

14    petition date in July.  That Motion was filed at Docket

15    Number 1626, and we filed a Revised Proposed Order late last

16    night at Docket Number 1637.  Your Honor, this Motion is

17    essentially a way for us to streamline the filing of the GK8

18    Debtors and the transition of the Debtors into Chapter 11.

19    We think that, had the Debtors been in bankruptcy at the

20    time the Orders had been entered, we think (indiscernible)

21    circumstances justifying the entry of such Orders with

22    respect to the GK8 Debtors.  We also think that the relief

23    that's requested in the Motion is narrowly tailored, and we

24    only are asking the Court to extend these Orders that we

25    think are necessary pursuant to transition of the GK8

Page 87

1   Debtors into a bankruptcy.

2           THE COURT:  So, which Orders are you asking the

3   Court to apply, as well, to the new Debtors?

4           MR. BRIEFEL:  I could go through each of them,

5   one-by-one if that would be helpful to the Court.

6           THE COURT:  Well, let me -- how many are there?

7           MR. BRIEFEL:  I believe it's 22 of them.  That

8   includes First Day relief, the Retention Applications,

9   certain other Orders, such as the Bidding Procedures Order,

10  the Order Authorizing the Service of Certain Parties by

11  Emails, the Bar Debt Order and the likes.

12          THE COURT:  Let me -- let me -- rather than go

13  through them individually at this stage, let me ask whether

14  -- first I'll ask the U.S. Trustee whether the U.S. Trustee

15  has any objection to the Court entering an Order recognizing

16  the -- and applying the list of Orders that the Debtor has

17  requested by applied to these three new Debtors.

18          MS. CORNELL:  Good morning again, Your Honor.

19  Shara Cornell on behalf of the Office of the United States

20  Trustee.  I can report that the Debtors and our office

21  worked up until quite late last night making sure that these

22  Orders worked for our office, and we have no objection at

23  this time.

24          THE COURT:  Okay.  Let me ask Committee's counsel,

25  as well, whether they have any objections.

Page 88

```
 1              MR. ZATZ:  Your Honor, Andrew Zatz again, White &

 2    Case, on behalf of the Unsecured Creditors Committee.  We

 3    have no objection to this Motion.

 4              THE COURT:  All right.  Let me ask --

 5              MS. CORNELL:  Your Honor, I'm sorry.  Just one

 6    more point I just wanted to make.  I'm sorry.  Shara Cornell

 7    again.  With respect to the application of the Retention

 8    Applications, I just wanted to note for the record that,

 9    after our discussions with counsel last evening for the

10    Debtor, they will be filing their Supplemental Declarations

11    quite soon.  So, thank you very much.

12              THE COURT:  Thank you.  Does anybody else want to

13    be heard on whether or not the Court should recognize and

14    apply these prior Orders to these new three -- to these

15    three new Debtors?  Okay.  I'll grant the Motion with

16    respect -- except with respect to the Retention Application.

17    Subject to the filing of the Supplemental Declaration,

18    assuming there are no objections from the U.S. Trustee when

19    that's submitted, then submit the Order relating to that.

20    So, strip out -- Mr. Briefel, strip out that Order from the

21    Order that I am prepared to enter promptly and then submit a

22    separate Order with respect to the retention -- the Kirkland

23    retention, once the Supplemental -- and if the Supplemental

24    Declaration is submitted to the U.S. Trustee and they

25    indicate they have no objection.  Okay?
```

Page 89

1           MR. BRIEFEL:  That sounds good.  Thank you, Your

2      Honor.  We will do so.

3           THE COURT:  Okay.  Go ahead.

4           MR. BRIEFEL:  So, that takes us to the third

5      Motion this morning, Your Honor.  This is the Motion that we

6      filed to receive authorization for Mr. Christopher Ferraro

7      to act as a foreign representative on behalf of the Debtors.

8      It was filed at Docket Number 1628.  As my colleague, Mr.

9      Latona, mentioned earlier, this Motion is critical in the

10     sale process that we have put together insofar as the

11     recognition of the Sale Order that we're hoping will be

12     entered soon in the U.S., needs to be recognized in Israel

13     and so, that Order will allow us to initiate that process,

14     file secondary proceedings in Israel and seek recognition of

15     the Sale Order.

16          THE COURT:  Okay.  So, this Motion is ECF Docket

17     Number 1628, and that Motion is granted, as well.  As law is

18     developed in the United States, while it's typical for the

19     foreign representative -- that an Order be entered approving

20     the selection of the foreign representative, in fact, as the

21     law is developed, the corporation can select who they wish

22     to have as the foreign representative.  Mr. Ferraro is the

23     acting CEO, the Chief Restructuring Officer, clearly, it's

24     appropriate.  The only thing I would add is, obviously,

25     we're dealing with three Israeli entities that have filed

Page 90

1    Chapter 11 in the United States.  As I said at the start of

2    this hearing, they're affiliates of the existing Debtors and

3    clearly the Court -- their Petitions for these foreign

4    entities are properly filed here, it's obviously going to be

5    for the Israeli Court do decide whether or not to recognize

6    and enforce the Chapter 11 cases filed by these three

7    Israeli entities.  But I will grant the Motion to appoint

8    Mr. Ferraro as the foreign representative for these

9    entities.

10              MR. BRIEFEL:  Thank you very much, Your Honor.

11   So, the last item that I will be handling today is the Cash

12   Management Motion that was filed by the Debtors at Docket

13   Number 1627.  Early this morning, we also filed a

14   Supplemental Cash Management Motion that was found at Docket

15   Number 1639, and I will get into the reason why in just a

16   little bit.  I'm sure Your Honor read the papers, but in

17   short, the Cash Management system of the GK Debtors is

18   comprised of a single bank account that is held by Debtor,

19   GK8 Ltd. at the Tel Aviv branch of Bank Hapoalim.  In the

20   ordinary course of (indiscernible) that account mainly

21   receives revenue generated by GK8's client, as well as

22   spending some non-Debtor Celsius network IL.

23              And so, I will mention briefly two points, Your

24   Honor, that I think are important.  The first one, and

25   that's the reason we filed a Supplemental Cash Management

Page 91

1    Motion is with respect to the 345(b) waiver.  So, it was our

2    understanding that Bank Hapoalim, which is the bank, again,

3    with which the Debtors have their bank account, is an

4    authorized depository with the -- under the United States

5    Trustee guidelines.  However, it came to our attention fully

6    in discussion with the United States Trustee's office that

7    it is possible that only the New York branch of that bank is

8    an authorized depository.  And so, we're still looking into

9    whether or not the Israeli branch is, in fact, or not, also

10   on that list.  And in the interim, as we were discussing

11   further with the United States Trustee and with Bank

12   Hapoalim, we thought it was appropriate to file that

13   Supplemental Motion to make clear that, to the extent that

14   bank account doesn't comply with Section 345(b) of the

15   Bankruptcy Code, we have an extension of 45 days to either

16   comply or seek further relief from the Court.  We discussed

17   this with the Office of the United States Trustee, and I

18   understand that they're supportive of that compromise.

19            THE COURT:  Ms. Cornell?

20            MS. CORNELL:  Yes, Your Honor.  We're working with

21   the Debtors and their professionals to come into compliance,

22   and we've agreed to the interim relief in the Order to allow

23   the Debtors a short opportunity to come into compliance

24   under 345.

25            THE COURT:  All right.

1          MS. CORNELL:  Thank you.

2          THE COURT:  The Debtors may be sold by the time

3     this becomes (indiscernible).

4          MS. CORNELL:  Maybe.

5          THE COURT:  An issue that has to be resolved.  So,

6     the Motion is granted, okay.  Obviously, with --

7          MR. BRIEFEL:  Thank you, Judge.

8          THE COURT:  -- without resolving whether or not

9     only the New York branch is an approved depository, the 45-

10    day extension of time to comply and, if necessary, you can

11    bring on another Motion.  Okay, so that's granted.

12         MR. BRIEFEL:  Thank you, Your Honor.  And with

13    that, I will cede the virtual podium to my colleague, Mr.

14    Chris Koenig, who will take you through the remaining

15    agenda.

16         THE COURT:  Thanks Mr. Briefel.

17         MR. KOENIG:  Good morning, Your Honor.  For the

18    record, Chris Koenig, Kirkland & Ellis, for the Debtors.  I

19    am presenting the last item on the agenda, which is the

20    uncontested Motion for the Debtors to Repay a Decentralized

21    Finance Loan.  The Motion was filed at Docket Number 1360.

22    We filed a revised Proposed Order last night at Docket

23    Number 1636.  The revised Proposed Order reflected an

24    agreement with the Committee to clarify, in the Order, that

25    we would only repay the loan to the extent that Your Honor

Page 93

1    enter a ruling that the earned assets are property of the

2    estate because, of course, if it's not property of the

3    estate, we can't pay it until Your Honor makes that

4    determination.

5            So, I'm happy to take Your Honor through the

6    Motion in more detail, if you'd like.  It's a fairly

7    straightforward Motion.  There's a loan.  We have more than

8    double the outstanding balance on the loan in collateral.

9    We'd like to get the collateral back and bring it back into

10   the estate where it can be kept for safekeeping.  And given

11   the turmoil in the market lately, we believe that it's

12   particularly appropriate at this time to repay the loan and

13   receive the collateral back now.

14           THE COURT:  Let me ask this, Mr. Koenig, obviously

15   I took under submission and didn't rule on whether the

16   earned assets are property of the estate.  I'm working on

17   it.  You're going to -- if this happens, if you repay the

18   loan, you will receive back collateral worth substantially

19   more than the loan you're repaying.

20           MR. KOENIG:  Correct.

21           THE COURT:  I'm just trying to think whether you

22   can -- awaiting a decision by me on whether the earned

23   assets are property of the estate, whether you could, in and

24   Order, provide, in effect, that the returned collateral will

25   be held in a separate account subject to the Court's

1  determination about whether the earned assets are property

2  of the estate.  And therefore, not have to wait for me to

3  rule on the Motion, which I heard earlier this week.

4          MR. KOENIG:  Your Honor, that's certainly fine

5  with us.  We could set forth, in an Order, that the

6  collateral that is returned -- perhaps a way to say it is,

7  we'll have the same characteristics as the property that was

8  transferred whenever Your Honor ultimately decides that to

9  be.  That would be fine with the Debtors.  I don't want to

10 speak for the Committee, but I'll let whoever from White &

11 Case wants to speak, but hopefully that'll work for them, as

12 well.  We have no objection to that.

13         THE COURT:  Let me hear from Committee's counsel.

14         MR. ZATZ:  Yes, Your Honor.  Andrew Zatz from

15 White & Case on behalf of the Committee.  We're supportive

16 of that.

17         THE COURT:  Okay.  Does anybody else want to be

18 heard on this issue?  I mean, I this adequately protects any

19 accountholders of --- earned accountholders of Celsius,

20 assuring that they're going to be no worse off if the

21 Debtors repay and get back their collateral.  Anybody want

22 to be heard?  Mr. Dixon?

23         MR. DIXON:  Simon Dixon, per se Creditor.  Is it

24 possible just to know what the collateral is?  What crypto

25 currency?

1          MR. KOENIG:  It's in the -- it's in the -- Chris

2     Koenig.  It's in the Motion.  It's wrapped bitcoin and USDC.

3          MR. DIXON:  Thank you.

4          THE COURT:  Okay.  Does anybody else want to be

5     heard?  Okay.  So, the Motion is granted subject to the

6     Debtor and the Committee working out an appropriate form of

7     Order that just will preserve the collateral that's coming

8     back in, subject to what the Court rules on the ownership

9     issue.

10         MR. KOENIG:  Thank you, Your Honor.  We'll confer

11    with the Committee; we'll submit a revised Proposed Order.

12         THE COURT:  Okay.  Thanks very much.

13         MR. KOENIG:  Thank you, Your Honor.  There's

14    nothing else on the agenda for today and on behalf of the

15    Debtor's professionals, and I'm sure the Committee's

16    professionals, as well, we just wanted to thank Your Honor

17    and Chambers for all the work, not only this week, but in

18    the last week, to get prepared for the hearing.  I know that

19    there were a lot of hearings and I know all the work that

20    goes into it from Chamber's perspective.  So, it's not lost

21    on the Debtors, their professionals or the business people.

22    We all greatly appreciate it.

23         THE COURT:  Okay.  Everybody's been working hard.

24    So, there's another hand raised.  It's Bronge.  I don't know

25    whether that's how you pronounce your last name.  Go ahead.

Page 96

1    I will recognize you now.  Mr. Bronge, go ahead.

2              CLERK:  You're unmuted, Mr. Bronge.

3              THE COURT:  Now you're muted.  Is there anything

4    you want to say now, Mr. Bronge?  Now is the time to do it.

5              CLERK:  You're unmuted, but we can't hear you.

6    All right.  The Court has been trying to recognize Mr.

7    Bronge, Johan, J-O-H-A-N, Bronge, B-R-O-N-G-E, who has his

8    hand raised and is unmuted, but I'm not able to hear what

9    he's had to say.  So, I think -- let me ask, is there

10   anybody else who wishes to be heard now?  All right.  We're

11   going to call this hearing to an end.  I will -- with

12   respect to the sale, I'm obviously awaiting further

13   evidentiary showing and memoranda.  They don't have to be

14   particularly long but need to address the issues I've raised

15   today.  With that, we're all adjourned.  Thank you very

16   much.

17             MR. KOENIG:  Thank you, Your Honor.

18             (Whereupon these proceedings were concluded at

19   11:03 AM)

20

21

22

23

24

25

1                              I N D E X

2

3                              RULINGS

4                                                    Page        Line

5      Motion Granted                                86          9

6

7      Motion Granted                                88          15

8

9      Motion Granted                                89          17

10

11     Motion Granted                                92          6

12

13     Motion Granted                                95          5

14

15

16

17

18

19

20

21

22

23

24

25

Page 98

1                 C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    *Sonya M. Ledanski Hyde*

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  December 9, 2022