Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 22-10964-mg

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

5    In the Matter of:

6

7    CELSIUS NETWORK LLC,

8            Debtor.

9    - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

10

11                    United States Bankruptcy Court

12                    One Bowling Green

13                    New York, NY  10004

14

15                    December 7, 2022

16                    9:00 AM

17

18

19

20

21    B E F O R E :

22    HON MARTIN GLENN

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO:  UNKNOWN

Page 2

1      HEARING re Phase I of Hybrid Trial RE: Withhold Account

2      Holders. (Doc## 737, 745, 857, 914, 937, 951, 954, 988, 996,

3      1044, 1192, 1234, 1245, 1288 to 1293, 1338, 1360, 1369,

4      1370, 1411, 1465, 1531, 1532, 1550, 1563, 1567, 1571

5      to 1574, 1580, 1581, 1609, 1611, 662)Trial Scheduled for

6      12/7/22 and 12/8/22 staring at 9 AM each day. Case

7      Management Conference set for 11/22/2022 at 10:00 am.

8

9      HEARING re Hybrid Hearing RE: Motion Seeking Entry of an

10     Order (I) Authorizing the Debtors to Reopen Withdrawals for

11     Certain Customers with Respect to Certain Assets Held in the

12     Custody Program and Withhold Accounts and (II)

13     Granting Related Relief (Docket No. 670, 725, 753, 857, 914,

14     933, 937, 951, 954, 1043, 1058, 1292, 1293, 1311,

15     1312, 1565, 1574).

16

17

18

19

20

21

22

23

24

25     Transcribed by:  Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    KIRKLAND & ELLIS LLP

4         Attorneys for Celsius Network, LLC

5         300 N. LaSalle

6         Chicago, IL 60654

7

8    BY:  CHRISTOPHER KOENIG

9

10   WHITE & CASE LLP

11        Attorneys for Official Committee of Unsecured Creditors

12        1221 Avenue of the Americas

13        New York, NY 10020

14

15   BY:  ANDREA AMULIC

16        SAMUEL P. HERSHEY

17

18   WHITE CASE LLP

19        Attorneys for Official Committee of Unsecured Creditors

20        555 South Flower Street, Suite 2700

21        Los Angeles, CA 90071

22

23   BY:  AARON COLODNY

24

25

```
1    UNITED STATES DEPARTMENT OF JUSTICE

2         Attorneys for the U.S. Trustee

3         201 Varick Street, Suite 1006

4         New York, NY 10014

5

6    BY:  SHARA CLAIRE CORNELL

7         MARK BRUH

8

9    VICTOR L UBIERNA DE LAS HERAS

10        Pro Se

11        Calle Casillas 9

12        Burgos, 09002

13

14   KULPREET KHANUJA

15        Pro Se

16

17   ERIK MENDELSON

18        Pro Se

19        11760 SW 25th Court

20        Miramar, FL 33025

21

22   JEREMY COHEN HOFFING

23        Pro Se

24        189 Cherokee

25        Topanga, CA 90290
```

Page 5

1    GILBERT CASTILLO

2         Pro Se

3

4    CAMERON CREWS

5         Pro Se

6         92 Hudson Street

7         Hoboken, NJ 07030

8

9    TONY VEJSELI

10        Pro Se

11        21 Almroth Drive

12        Wayne, NJ 07470

13

14   GREG KIESER

15        Pro SE

16        223 Bedford Avenue, PMB 223

17        Brooklyn, NY 11249

18

19   MICHAEL YANKOSKI

20        Pro Se

21        6 Averill Terrace

22        Waterville, ME 04901

23

24

25

Page 6

1    TOGUT SEGAL & SEGAL

2         Attorneys for Ad Hoc Group of Custodial Account Holders

3         One Penn Plaza, Suite 3335

4         New York, NY 10119

5

6    BY:  KYLE J. ORTIZ

7

8    TOGUT, SEGAL SEGAL, LLP

9         Attorneys for Ad Hoc Group of Custodial Account Holders

10        162 Camino De Los Jazmines

11        Dorado, PR 00646

12

13   BY:  ROBERT K. BUTRYN

14

15   JENNER BLOCK LLP

16        Attorneys for Fee Examiners

17        1155 Avenue of the Americas

18        New York, NY 10036

19

20   BY:  CARL N. WEDOFF

21

22   SIMON DIXON

23        Pro Se

24

25

1    CHERYL BIERBAUM

2        Pro Se

3        7273 S Yarrow Way

4        Littleton, CO 80128

5

6    TROUTMAN PEPPER HAMILTON SANDERS LLP

7        Attorneys for Ad Hoc Group of Withhold Account Holders

8        4000 Town Center, Suite 1800

9        Southfield, MI 48075

10

11    BY:  DEBORAH KOVSKY-APAP

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 8

1                      P R O C E E D I N G S

2                  CLERK:  (indiscernible).

3                  MR. KOENIG:  Good morning.  We in the courtroom

4      can't hear you.  We could hear you a moment before, but we

5      can't hear you anymore.  It's sort of muffled.

6                  CLERK:  Can you hear me now?

7                  MR. KOENIG:  It's still pretty muffled, Deanna.

8                  CLERK:  All right.  I don't know what to do, then.

9      (audio drops).

10                 MR. KOENIG:  Yeah, we're catching maybe ever third

11     word in the courtroom.

12                 CLERK:  (indiscernible), are you there?  Hear me

13     now?

14                 MR. KOENIG:  Yes, Deanna, we could hear that a

15     little bit more clearly.

16                 CLERK:  Okay.  I have my -- hopefully, this

17     recording goes well.  I'm going to try to screen it so that

18     get it, but we'll see.  It's just a thing.  All right.  If

19     you cannot hear me, just interrupt me, okay?

20                 MR. KOENIG:  Will do.  It sounds much better now.

21     Thank you.

22                 CLERK:  Okay, thank you.  All right, starting the

23     recording.  You know what?  I'll restart.  Let me stop and

24     restart.

25                 MR. KOENIG:  Okay.

1          (Recess)

2          CLERK:  All right, starting the recording for

3   December 7th, 2022 at 9 a.m.  Calling Celsius Networks, Case

4   No. 22-10964.  Can we have the parties in the courtroom come

5   to the podium one at a time and give their appearances,

6   please.

7          MR. KOENIG:  Good morning, Deanna.  This is Chris

8   Koenig from Kirkland and Ellis on behalf of the Debtors.

9   I'm joined in the courtroom by my colleagues, Elizabeth

10  Jones and Simon Briefel.

11         CLERK:  Okay, thank you.  Is there any other

12  counsel in the courtroom?

13         MS. KOVSKY-APAP:  Good morning, Deanna.  Deb

14  Kovsky, Troutman Pepper, on behalf of the Ad Hoc Group of

15  Withhold Account Holders.

16         CLERK:  Okay, thank you.  Is the U.S. Trustee on

17  the call yet?  All right, let's do it this way.  One at a

18  time, the parties that need to make an appearance, please

19  raise your hand and I will ask you to unmute and you will

20  give your appearance.  Please start doing that.

21         The parties on the -- on Zoom, please start

22  raising your hand so that we can take your appearance one at

23  a time.  Can you hear me?

24         WOMAN 1:  We can hear you.

25         CLERK:  Okay, thank you.  Link Smith, please

1    unmute and take -- and give your appearance.

2              MR. SMITH:  I'm here.

3              CLERK:  Okay, please state now you're involved in

4    the case.

5              MR. SMITH:  Creditor.

6              CLERK:  Okay, thank you.  (indiscernible) Butryn.

7              MR. BUTRYN:  Here.  I'm a creditor.

8              CLERK:  Okay, thank you.  Again, if you're

9    speaking on the record this morning only and you are wanting

10   (indiscernible) -- everyone that speaks at the podium,

11   please keep in mind that your conversations are being

12   recorded, so if you need to speak please try to go away from

13   the podium.

14             All right, going back to the participants on Zoom.

15   If you are speaking on the record this morning and you have

16   not given your appearance yet, please raise your hand so you

17   can give your appearance.  Rebecca, please unmute and give

18   your appearance.

19             MS. GALLAGHER:  Yes, this is Rebecca Gallagher and

20   I may be speaking.

21             CLERK:  Thank you.  And you are a creditor,

22   correct?

23             MS. GALLAGHER:  Yes, I am.

24             CLERK:  Thank you so much.  All right, anyone else

25   that is speaking on the record this morning?  Mr. Wedoff?

1          MR. WEDOFF:  Morning, Deanna.  I do not believe I

2     will be speaking, but I am putting my appearance for the

3     examiner in case there are any questions.

4          CLERK:  All right, thank you.  All right, anyone

5     else that will be speaking on the record this morning,

6     please raise your hand so we can take your appearance.

7          Is anyone from the U.S. Trustee's office going to

8     be making appearance this morning?  Shara, I know that I

9     admitted you.  Is anyone speaking this morning?

10          Again, taking appearances for this morning's

11     hearing.  Is anyone going to be speaking on the record this

12     morning?  If you are and you have not given your appearance

13     yet, please raise your hands and I will ask you to unmute

14     and give your appearance.

15          MR. COLODNY:  Hi, Deanna.  This is Aaron Colodny

16     from White and Case on behalf of the Official Committee of

17     Unsecured Creditors.  With me today is Sam Hershey, David

18     Turetsky, and Andrea Amulic.

19          CLERK:  Okay, thank you, Aaron.  Is there anyone

20     else that will be speaking on the record this morning and

21     needs to make an appearance?

22          MR. ORTIZ:  Hi, Deanna.

23          CLERK:  Okay --

24          MR. ORTIZ:  In the courtroom, it's Kyle Ortiz of

25     Togut Segal for the Ad Hoc Group of Custodial Account

1    Holders.  I'm here with my colleague Brian Collier.

2           CLERK:  Okay, thank you. .

3           MR. ORTIZ:  Thank you.

4           MS. CORNELL:  Morning, Deanna.  You have Shara

5    Cornell here with the Office of the United States Trustee.

6    I believe that my colleagues, assistant United States

7    Trustee Linda Rifkin and Mark Bruh will also be joining

8    virtually today.

9           CLERK:  Okay, thank you.

10          MS. CORNELL:  Thank you.

11          CLERK:  There any additional participants that are

12   joining that have not given their appearance yet?

13          Again, for the parties that have joined, if you're

14   going to be speaking on the record this morning and you have

15   not given your appearance, please raise your hands and I

16   will ask you to unmute one at a time and give your

17   appearance.

18          All right, again, for the parties that have

19   joined, if anyone is (audio drops) their appearance this

20   morning, is speaking on the record and had not given their

21   appearance yet, please unmute your line.  Please raise your

22   hand, I'll take your appearance, and I'll ask you to unmute

23   and give your appearance.

24          Good morning, Mark.

25          MR. BRUH:  Good morning, Deanna.  Mark Bruh for

Page 13

1    the United States Trustee.  I'm not sure if we'll be

2    speaking, but I just wanted to note our appearance.

3            CLERK:  Okay, thank you, and Shara also gave her

4    appearance as well.

5            MR. BRUH:  Okay, great.  Thank you, Deanna.

6            CLERK:  All right.  Again for the parties that

7    have joined, please raise your hand, use the raise hand

8    function if you're going to be speaking on the record this

9    morning and I will ask you to unmute one at a time and give

10   your appearance.

11           Yes, Victor, please unmute and give your

12   appearance.

13           MR. UBIERNA DE LAS HERAS:  Good morning, Deanna.

14   I'm Victor Ubierna de las Heras, pro se creditor, and I'll

15   be speaking today on the record.

16           CLERK:  Thank you.  All right, for the parties

17   that have joined, are there any participants that are

18   speaking on the record this morning that have not given your

19   appearance?  Please use the raise hand function to give your

20   appearance.  I'll ask you to unmute one at a time.

21           All right, for the parties that have joined, if

22   anyone is speaking on the record today and has not given

23   their appearance, please use the raise hand function and I

24   will ask you to unmute one at a time and take your

25   appearance.

Page 14

1              All right, for the parties in the courtroom, when

2       are -- is the witness going to be joining?

3              MR. KOENIG:  Deanna, it's Chris Koenig from

4       Kirkland for the record.  The parties agreed to a

5       stipulation that --

6              COURT OFFICER:  All rise.

7              THE COURT:  Please be seated.  Just give me a

8       chance to refresh my computer.

9              All right, good morning.  We're here in connection

10      with the Ad Hoc Group of Custody Account Holders and Hold

11      Account Holders with respect to the phase one issues.  Let's

12      start with the Custody Account Holders.  Mr. Ortiz?

13             MR. ORTIZ:  Good morning, Your Honor.  Kyle Ortiz,

14      Togut Segal and Segal on behalf of the Custodial Account

15      Holders.  Your Honor, I think it might be worthwhile just to

16      do the quick housekeeping for the group.

17             I think you probably saw the stipulation was filed

18      the way that the parties had set it up and I think the

19      intent for the day is that they're going to divide the two

20      issues and Custody would -- and Withhold would go, Debtors,

21      the Committee, and then response and then the same thing for

22      the follow-up question of if it's not property of the

23      estate, what does that mean for whether or not the Debtors

24      can hold it?  So I just want to make sure we're all on the

25      same page on that, Your Honor.

1          THE COURT:  Okay.  So I saw on the docket this

2     morning that the joint -- I think what you're talking about

3     is the joint stipulation and agreed order by and among the

4     Debtors, ad hoc groups, and the Official Committee of

5     Unsecured Creditors regarding the phase one issues here.

6          MR. ORTIZ:  That's correct, Your Honor.

7          THE COURT:  Okay.  It's approved.

8          MR. ORTIZ:  All right, thank you, Your Honor.  So

9     to get into the substance, the first question is whether or

10    not the custodial assets are property of the estate.  And

11    Your Honor, we're five months into the case and you've been

12    hearing a lot about this for all of those five months and

13    it's been extensively briefed.  So we're going to try to be

14    relatively brief particularly on this issue and obviously

15    any questions you have and then we'll respond to the other

16    parties because I think this is a somewhat interesting case,

17    at least for the Custody account holders in that we're --

18          THE COURT:  Especially --

19          MR. ORTIZ:  -- instance where all of the parties

20    are in agreement.

21          THE COURT:  Hang on a second.  Anybody who is

22    tuned in on Zoom needs to mute their line or you will be

23    disconnected from the hearing.  Just please mute your, the

24    sound on your line.  Go ahead, Mr. Ortiz.

25          MR. ORTIZ:  Thank you, Your Honor.  Again, for the

Page 16

1   record, Kyle Ortiz of Togut Segal for the Custodial Account

2   Holders.

3         So I was saying, Your Honor, this is the rare

4   instance where we're standing in a courtroom for a contested

5   hearing where we actually all agree on this point.  At

6   least, we agree with the Debtors a hundred percent.  I think

7   we agree with the Committee.  The precise number is 94

8   percent of the way that the Custody assets are, by the clear

9   and unambiguous terms of the terms of use, property of the

10  custodial service users and not property of the estate,

11  which makes that pretty unique.

12        Most of the case law we're looking at, somebody

13  thinks that the contract says something different or that

14  the intent that they all claim they had at the beginning was

15  different than various parties are saying.  Here, we have

16  unambiguous language with unambiguous agreement.

17        THE COURT:  Let me just stop you, just so we're

18  clear.  I approved the stipulation and that's Paragraph 3 of

19  the stipulation, dealt with the -- all of the exhibits and

20  declarations that were submitted and it was agreed in the

21  stipulation it was all admissible and it is all -- just to

22  be clear for the record, that's all admitted into evidence.

23  But go ahead.  I didn't mean to interrupt you.

24        MR. ORTIZ:  No, no worries, Your Honor.  I think

25  that's important and appreciate the clarification.

Page 17

1           So I'm going to just briefly focus, because we

2      have that 94 percent agreement, on that 6 percent where we

3      do have disagreement and that really relates to a small

4      subset that were subject to pending withdrawals at the time

5      of the freeze that essentially caused them to be overlooked

6      in the Custody wallet rebalancing effort that occurred prior

7      to the petition date.

8           I'll just cut to the chase, Your Honor.  Frankly,

9      we don't think that that distinction matters because the

10     subjective intent of the parties, the Debtors and the

11     account holders was to maintain a custodial account

12     relationship.  When we look at the case law in custodial

13     accounts like Judge Posner's Joliet-Will case, says that

14     that relationship is established by contract and depends on

15     the terms under which the transfers were made and the

16     relationship between the parties.

17          Here, once the customer, whether they were

18     transferring from completely outside the platform or

19     transferring from another service on the platform, makes the

20     requests to transfer assets to the Custody service, such

21     transfer is reflected immediately on the Debtors' internal

22     ledger and the user's account also reflects that and at that

23     point, this custodial relationship is forged, Your Honor.

24          The subjective intent of the parties in that

25     moment is that the Debtors have no colorable claim for title

Page 18

1    over assets held in Custody on their ledger as Custody

2    assets.  In our view, the movement of assets between wallets

3    does not impact that relationship.  The parties have

4    contracted that the user will transfer digital assets to the

5    Debtor.  The Debtor will hold them or digital assets of the

6    same sort -- I actually think that's important.  I'll get to

7    that -- in Custody for the user and there is of course

8    consequence to that.

9         What the user gets is a safe place to hold it, but

10   it gets nothing else.  It doesn't get interest.  It doesn't

11   get the ability to earn anything and the location of those

12   assets within the Debtors' larger system and how they store

13   them when it's all on the ledger as custodial, in our view,

14   is no more relevant, Your Honor, than in the fungible

15   commodity context with the location of your specific

16   hydrocarbon within a pipeline where it's always agreed that

17   it's your title.

18        So particularly here where we have a contract that

19   is very clear that you don't get back the exact same coin,

20   but get back a coin of the same kind, I think that makes it

21   no different than the Enron case or the Marchin case with

22   the bonds where as long as you can get back the same thing,

23   which makes, you know, obviously perfect sense in the

24   fungible commodity context, you could never track and write

25   your name on a hydrocarbon and pull it out of the pipeline

1    at the other end, but everybody agrees that you hold title

2    throughout and that was our contractual agreement.  That was

3    the intent of the parties and you're --

4              THE COURT:  Let me just --

5              MR. ORTIZ:  Of course, Your Honor.

6              THE COURT:  Your position is that the internal

7    ledger of selling Celsius accurately reflects the -- we'll

8    call them the Custody assets, whatever wallet they were in,

9    your position is that the internal ledger itself is the

10   document that actually reflects what assets belong to the

11   Custody account holders?

12             MR. ORTIZ:  That's correct, Your Honor, and that's

13   what we believe is the subjective intent of the parties.

14   And again, you have a situation that's a little bit unique

15   in that both parties are going to stand up and say they

16   intended the exact same thing, which is an unusual situation

17   and I do think that is what makes the difference.  And maybe

18   it's easiest to look at it through the context of what we

19   call or what the Debtors have called kind of pure Custody.

20             Because that person who was coming from completely

21   outside the system, the moment they sent assets to the

22   Debtors to hold them in Custody, they formed this custodial

23   relationship and there was never any other type of

24   relationship that these parties would ever have, and that's

25   kind of the simplest way to look at it.  They put it in what

1    essentially is a big tanker of custodial coins, of digital

2    assets, and they have an agreement that someday they'll be

3    able to pull out of that big tanker, some digital assets of

4    the exact same kind, which I think really makes it squarely

5    like Enron.

6            That was our intent.  That was their intent.  So

7    that's why we think that we should be in 100 percent

8    agreement instead of 96 percent agreement.

9            THE COURT:  When you say it was the intent, what

10   contract language, if any, are you relying on to say that

11   reflects what you describe as the intent?  Because I mean,

12   am I supposed to -- is extrinsic evidence relevant to this?

13   What extensive evidence do I have?  But let's start with,

14   what are the contract terms that you believe support your

15   argument?

16           Let me just as an aside for Ms. Kovsky, one of the

17   -- when we get to the issue of Withhold, that's one of the

18   things that I'm sort of struggling with is there are -- are

19   there contract terms, written contract terms that govern it

20   and what happens in the absence of written contract terms?

21           But I didn't mean to push you off your argument,

22   but on this point, that's why I'm asking, what are the --

23   are there specific written contract terms that you're

24   relying on as reflecting what you describe as the intent of

25   the parties?

1          MR. ORTIZ:  Right, Your Honor, and you didn't

2     throw me off my argument.  I was actually done with my

3     argument on this particular matter, because we're not trying

4     to -- I know you've had a lot of paper and been in Court a

5     lot the last --

6          THE COURT:  It's been a busy week.

7          MR. ORTIZ:  So we're trying to keep it relatively

8     focused.  I mean, look, you can look at, its section, I

9     guess, 4(b) talks about Custody.  And I think first, the

10    fact that the section is --

11         THE COURT:  We're talking about Version 8?

12         MR. ORTIZ:  Yeah.  I'm sorry, Your Honor.  The --

13    I guess that would be Version 8, April 14th, 2022 Terms of

14    Use.

15         So I think when you're looking at intent, you

16    know, you could start with the fact that it's in a section

17    called Custody.  The intent was that this would be a

18    custodial relationship.  It says that that service allows

19    you to store eligible digital assets and I'll acknowledge it

20    says in a Custody wallet.  But it's not just that it's in a

21    wallet.  It is also that you will not receive any financing

22    fee.  You will not receive rewards.  You're not going to

23    receive financial compensation (indiscernible) any time, and

24    there's -- I think when you look at the intent, it's clear

25    that it's not going to necessarily be specifically in that

Page 22

1    Custody wallet because you might have a third party

2    custodian that is mentioned in there.

3              And the -- when we talk about whether we want to

4    look at subjective intent and you look at the declaration

5    that the Debtors put in, they talk about how they handled

6    this initially and they had a practice of --

7              THE COURT:  You're talking about Mr. Blonstein's -

8    -

9              MR. ORTIZ:  Mr. Blonstein's declaration that it's,

10   you know, initially, immediately reflected on an internal

11   ledger and that there is a periodic manual rebalancing.  And

12   I don't think if you took out the word Custody wallet

13   everywhere it showed up, you could still have this section

14   read much like it reads today.  You know, the fact that the

15   Debtors attempted to set up Custody wallets and try their

16   best to segregate assets at all times doesn't actually

17   matter for purposes of what you need to do to create a

18   custodial relationship under the case law.

19              In some senses, they -- I don't think anyone is

20   going to say differently.  There was a lot of scrambling at

21   the time of trying to set up a program --

22              THE COURT:  -- set up the Custody program.  They

23   were scrambling and --

24              MR. ORTIZ:  Right.

25              THE COURT:  The state regulators were on their

Page 23

1    back about it and --

2              MR. ORTIZ:  Right, but --

3              THE COURT:  They weren't ready to go.

4              MR. ORTIZ:  Terms of use, exactly that the Debtors

5    -- and not just people who participated in the Custody

6    program, but everybody who was using their service anywhere

7    acknowledged that this was going to be a new service and

8    that the stuff in that program, in that service, was going

9    to be considered to be custodial assets by both the Debtors

10   and the users.  And you know, they at times attempted to

11   have a cushion.  And their ability as we -- what we all

12   acknowledge, it was somewhat frantic time to check their

13   ledgers and make sure that they were keeping things in --

14             THE COURT:  Was the rebalancing that they --

15             MR. ORTIZ:  Rebalancing didn't always keep up and

16   really the only reason that these particular assets were

17   missed, interestingly enough, Your Honor, is because they

18   were -- had requested withdrawal.  So the only reason they

19   didn't show up as needing to be rebalanced is because they

20   were in the Debtors' ledger on the way back to the customer.

21   Of course, they saw that.  I think it's interesting that

22   some of that stuff was put back post-petition.  I think

23   that's for another day.

24             THE COURT:  Can you give me an estimate of the

25   value of the assets where account holders sought to withdraw

Page 24

1    assets from Celsius rather than just keep them in Custody?

2              MR. ORTIZ:  I want to make sure I understand your

3    question.  So --

4              THE COURT:  Because you're --

5              MR. ORTIZ:  The shortfall --

6              THE COURT:  You head down this -- one, stop.

7              MR. ORTIZ:  Sorry.

8              THE COURT:  We headed down this road because you

9    said there's a disagreement about pending withdrawals and

10   that's what my question, maybe inartfully, was trying to

11   focus on.  Approximately what was the value of the pending

12   withdrawals that never actually took place?

13             MR. ORTIZ:  Yeah, Your Honor.  My understanding

14   and I'm sure one of these gentlemen behind me will correct

15   me if I'm wrong, is that it was in the neighborhood $15 to

16   $16 million, which is roughly 6 percent of the kind of total

17   amount of Custody assets.

18             THE COURT:  That's all right.  You can go --

19   somebody else will have a chance to --

20             MR. ORTIZ:  But yeah, so -- and that one, again,

21   was stuff that had been tracked and the only reason it

22   wasn't then they looked to rebalance before the petition

23   date, they didn't see it was because it had moved to a

24   ledger that said, this is on the way to the customer.  So it

25   was -- they were that close.  But the intent was always that

Page 25

1        that would be Custody and when they returned it, it reflects

2        again in the customer's accounts as Custody.

3                So we do think under the contract that it was --

4        that the clear intent was to create a custodial

5        relationship.  The debtors made their best efforts to go the

6        extra step of having segregated wallets, which again, I

7        don't think under Joliet-Will or the other caselaw we've

8        seen is actually a necessary step.  It was a nice step and

9        hopefully, you know, the customers aren't punished for that.

10       But again, I think if you look back at the simplest case of

11       someone who came from off the platform all together as a

12       pure Custody, if they were to come into this program and

13       then seek to withdraw and be one of the people who got

14       trapped in that little pending withdrawal group, the only

15       relationship they ever had was Custody.

16               THE COURT:  The cases that you're relying on, on

17       this point about you don't need segregated Custody wallets,

18       what you said was Judge Posner decision?

19               MR. ORTIZ:  Yeah, Justice Posner's decision in

20       Joliet-Will and, you know, Your Honor, it's somewhat

21       interesting, there's not as much caselaw as we expected on

22       the concept of Custody generally, but it's interesting

23       because Custody is almost a larger concept that underneath

24       you have additional concepts like Bailey's and special

25       deposits and trusts and other things, but in a very basic,

Page 26

1    just creating a custodial relationship, it was looking at --

2    I think again, yeah, the -- what the contract says, the

3    terms under the transfers and then the relationship that was

4    forged between the parties, and again, I think that's a very

5    important point, that it's really the moment that you say,

6    I'm going to transfer something to the Custody program that

7    the custodial relationship is forged.

8            And a lot of the stuff that some of the caselaw

9    that's has been cited by other parties that's talking about

10   trust and when you -- Your Honor asked about the lowest

11   intermediate balance test, all that stuff really comes into

12   play if there was a universe where if I go back to the

13   pipeline example or the oil tanker or the, you know, gas

14   tanker, is if somehow there's a leak and there just wasn't

15   enough for everybody.

16           That only really comes into play if we ever dip

17   below that, but we're only talking about $16 million, Your

18   Honor, so I don't think that really comes into play in the

19   context of there was never a time when the assets and the

20   digital assets that the Debtors held dipped below what they

21   were saying they were holding in Custody program.

22           So that's all I have initially, unless you have

23   questions, Your Honor, and then we'll respond to the other

24   parties.

25           THE COURT:  I don't have any questions.  Okay.

1          MR. ORTIZ:  Thank you, Your Honor.

2          THE COURT:  All right.  I thought that -- what did

3    you work out that -- Withhold --

4          MR. ORTIZ:  I thought we were splitting Custody

5    and Withhold.  I'm happy for you to go.

6          MS. KOVSKY-APAP:  I -- we can go either way, but I

7    (indiscernible) Custody, Withhold --

8          THE COURT:  I'm happy to -- did you work this out,

9    how you were going to do it?

10         MS. KOVSKY-APAP:  Yeah, it was late last night,

11    Your Honor.

12         MR. ORTIZ:  We --

13         MS. KOVSKY-APAP:  In Paragraph 4 of the

14    stipulation we filed last night at ECF 1623 --

15         THE COURT:  Yes, I have it in front of me.

16         MS. KOVSKY-APAP:  Yes.

17         MR. ORTIZ:  We split it --

18         MS. KOVSKY-APAP:  We go property issue with

19    Custody assets, Custody ad hoc group, Debtors, Committee,

20    Custody ad hoc group.

21         MR. ORTIZ:  And then withholders.  I'm happy to --

22         THE COURT:  Go ahead.

23         MR. ORTIZ:  We did sort of change it last night.

24         MR. KOENIG:  Good morning, Your Honor.  For the

25    record, Chris Koenig of Kirkland and Ellis for the Debtors.

1           Your Honor, the Debtors have been evaluating their

2    cryptocurrency -- whether their cryptocurrency assets are

3    property of the estate in various contexts.  On Monday, we

4    were talking about Earn.  Today we're talking about Custody

5    and Withhold.  We don't take this issue lightly.  This is a

6    key gating --

7           THE COURT:  You seem to swap your -- change your

8    position between your opening brief and reply, though.

9           MR. KOENIG:  Your Honor, what I would say is we

10   were focused on our opening brief on pure Custody -- pure

11   Withhold.  This is with respect to Withhold.  I don't --

12          THE COURT:  Yes.

13          MR. KOENIG:  -- think that we've changed our

14   position on --

15          THE COURT:  Okay.  Go ahead with your argument.

16   We'll --

17          MR. KOENIG:  Sorry, Your Honor.  Today we're

18   talking about Custody and Withhold.  We don't take this

19   issue lightly because the outcome of this issue with respect

20   to any one program necessarily affects the other programs

21   and the other customers.  If certain cryptocurrency in one

22   program is not property of the state, that means one less

23   digital asset that could be property of the estate and

24   shared ratably among all unsecured creditors.

25          The way that the Debtors have analyzed this issue

Page 29

1   in every situation and every program has been to evaluate

2   the plain language of the terms of use.  And as Mr. Ortiz

3   explained, the Debtors, the Custody Ad Hoc Group and the

4   Committee agree that as a threshold matter, the terms of use

5   are clear and unambiguous that Custody assets are not

6   property of the estates.

7          But the open question is, what are the Custody

8   assets?  Is it just those cryptocurrency assets that today

9   are in the Custody fire blocks workspace or is it all assets

10  that are designated in the Debtors' books and records as

11  Custody assets?  So I'll focus on the language that Your

12  Honor was asking Mr. Ortiz about because it does say in many

13  places Custody wallet.

14         But what I want to focus on in Section 4(b) and

15  this is at the bottom of the page.  This is at the bottom of

16  the page, the Version 8 of the terms of use was filed at

17  docket No. 393 and I'm referring to Page 533 of 1126 on the

18  top.

19         THE COURT:  Give me a -- let me get his open on my

20  screen.

21         MR. KOENIG:  I'm sorry, Your Honor.  Your Honor, I

22  also have a binder with the relevant language, if --

23         THE COURT:  Yeah, that would make my life easier.

24         MR. KOENIG:  May I approach?

25         THE COURT:  Yeah, come up.  All right, so that

Page 30

1    we're all on the same place, Mr. Koenig has given me ECF

2    Docket No. 393 at Page 533 of 1126.

3           MR. KOENIG:  That's correct, Your Honor.  And

4    we've all been reading the language very carefully, as I'm

5    sure you have.  And the way that we square the circle here

6    is at the bottom of the page, the language, the last

7    sentence on this page, Page 533, says "Eligible digital

8    assets in a Custody wallet may be commingled with the

9    eligible digital assets of other users and Celsius is under

10   no obligation to return the actual eligible digital assets

11   initially transferred by you to a Custody wallet" -- and

12   then here's the key language -- "but will return eligible

13   digital assets of the identical type reflected in your

14   Celsius account at the time you request such a return."

15          It doesn't say of the identical type reflected in

16   your Custody wallet.  It says of the type reflected in your

17   Celsius account.  And so we think that that, Mr. Ortiz --

18          THE COURT:  -- Celsius account, in your view, is

19   the internal ledger --

20          MR. KOENIG:  That's right.

21          THE COURT:  -- that Celsius was maintaining?

22          MR. KOENIG:  That's right, Your Honor.  And what's

23   more, the Committee's position that only the assets that are

24   actually in the Custody wallet, the Custody fire blocks

25   workspace, I mean, are property of the customers could lead

1 to an absurd result.  What if the Debtors never performed

2 any reconciliation despite promising to do so in the

3 agreement?  That doesn't seem --

4    THE COURT:  Well, may I -- is their agreement

5 among the parties to this dispute that the internal ledger

6 is accurate?

7    MR. KOENIG:  I've heard no such dispute.  I don't

8 want to speak for the other parties but I don't believe that

9 that was raised --

10    THE COURT:  I take it, Mr. Ortiz, that you agree

11 with that?  You have to answer audibly.

12    MR. ORTIZ:  Yes, Your Honor.

13    THE COURT:  Okay.  And what about the Committee?

14 I don't know who's going to speak for the Committee.

15    MS. AMULIC:  Yeah, we agree.

16    THE COURT:  Yeah.  Just state your name.

17    MS. AMULIC:  Oh, sorry.  Andrea Amulic for the

18 Committee.

19    THE COURT:  Thank you.  Okay.  Okay.

20    MR. KOENIG:  So Your Honor, that's really the --

21 again, Chris Koenig for the Debtors.  Your Honor, that's the

22 way that we have read the language.

23    THE COURT:  That's what I was understanding as

24 well, but I just want to make sure we're all on the same

25 page.

1           MR. KOENIG:  Right.  Right.  And so the language

2     that I just cited from the terms of use is the way that we

3     read, you know, Mr. Ortiz was talking about how, you know,

4     the language really reads the same if you don't read Custody

5     wallets and there's language in here that doesn't mention

6     Custody wallets.  So you don't even have to read it out of

7     the language.  It's already not in that language in that

8     way.

9           So how -- was there a designation of a specific

10    line?  I don't know which, what ledger.  Is this the general

11    ledger?  What ledger of the Debtors reflected these

12    balances?

13          MR. KOENIG:  Your Honor, Mr. Blonstein talked

14    about the ledger generally and how --

15          THE COURT:  I know, but I couldn't figure out, you

16    know, there could be lots of pages of a ledger on a screen.

17          MR. KOENIG:  It is many pages on the screen and

18    its many lines and many pages and we've produced that some

19    of the parties here.

20          THE COURT:  Does it have a label, that line?

21          MR. KOENIG:  Yes, it does, that it's, you know --

22          THE COURT:  Somebody know what it is?

23          MR. KOENIG:  Yeah, that it would designate the

24    user and the transaction and how it's to be recorded in the

25    company's books and records.  And then that ledger was used

1     to update the app that each customer saw that said I

2     transferred one Bitcoin from Earn to Custody.  And as Mr.

3     Blonstein testified, the transaction occurred immediately on

4     the ledger and in the app, but of course it didn't --

5               THE COURT:  Reconciliation --

6               MR. KOENIG:  The reconciliation --

7               THE COURT:  -- later, but --

8               MR. KOENIG:  Correct.

9               THE COURT:  -- the actual, what you're telling me

10    is that the actual transaction was recorded virtually

11    simultaneous with the -- when the transaction was intended

12    to occur.

13              MR. KOENIG:  And immediately and automatically

14    pursuant to the Debtors' technology.

15              THE COURT:  All right.  Okay.

16              MR. KOENIG:  And so --

17              THE COURT:  Somebody could hit on their phone or

18    their app, on their laptop, or whatever and when they made

19    that change, it was instantly reflected in the Debtors'

20    books and records?

21              MR. KOENIG:  That's correct, Your Honor.  And

22    again, this all goes back to whether there's contractual

23    language because I'm sure Ms. Kovsky is going to stand up

24    and say well, everything that Mr. Koenig just said is

25    exactly the same for Withhold.  We'll get to that, but you

Page 34

1    know, just to be clear, we're only arguing this because

2    there -- we believe that there is clear language on Custody

3    that Custody is not property of the estate and that the

4    ledger, you know, enforces that the parties in --

5              THE COURT:  Okay.

6              MR. KOENIG:  Your Honor, I'm not going to repeat

7    everything that Mr. Ortiz said.  I think we're largely in

8    agreement with Mr. Ortiz, so I'll cede the lectern to

9    counsel for the Committee, unless you have any further

10   questions for me.

11             One other thing, Your Honor.  I apologize.  You

12   asked Mr. Ortiz about the size of the pending withdrawals.

13   We agree that it's around 15 to 16 million, just for the

14   record.  Wanted to confirm that.

15             THE COURT:  Okay.  Who am I going to hear, from

16   the Committee?  Mr. Hershey.

17             MR. HERSHEY:  Good morning, Your Honor.  Sam

18   Hershey from White and Case on behalf of the Official

19   Committee of Unsecured Creditors.

20             I'll just note that I'm joined at counsel table

21   with my colleague Andrea Amulic who will be handling the

22   argument regarding the Withhold issues.

23             Your Honor, Mr. Ortiz began his presentation by

24   saying he agrees with the Committee 94 percent of the way.

25   I actually think it might be more than that.  I was

1    surprised how much I agree with much of what Mr. Ortiz had

2    to say.

3            THE COURT:  Record that, Mr. Ortiz, for the next

4    case.  Okay?

5            MR. HERSHEY:  Our disagreement is going to come

6    soon.  Specifically, Mr. Ortiz doesn't argue that the terms

7    of use are ambiguous.  I think we all, everyone here agrees

8    they're clear and unambiguous.  Yet at the same time, he

9    argues that we should look at --

10           THE COURT:  -- opposed to yesterday morning when

11   all I heard was --

12           MR. HERSHEY:  Correct, Your Honor.  We finally

13   have agreement on this point among this group.  He at the

14   same time argues, though, that we should look at the pre-

15   petition practices of the Debtors to determine what the

16   parties intended.  Those two points are mutually

17   inconsistent.  We should not look at the pre-petition

18   practices of the Debtors.  We look solely under New York law

19   to the terms of the agreement.

20           THE COURT:  I don't consider extrinsic evidence.

21           MR. HERSHEY:  Thank you, Your Honor.

22           THE COURT:  But what's the point?  What's the

23   issue where -- is there a substantive issue that you

24   disagree with Mr. Ortiz?

25           MR. HERSHEY:  Well, having read the examiner's

Page 36

1     report, Your Honor, I don't really see how looking at pre-

2     petition practices is going to help his clients, frankly.  I

3     think that we all know that the pre-petition accounting

4     practices and ledger entries were a mess and were not

5     reliable or accurate.  So that's really his argument to make

6     if he thinks -- you're not going to look at the extrinsic

7     evidence, so we won't hear the argument, but no, I don't

8     think that if we looked at pre-petition practices, they

9     would support his clients, but fortunately we don't have to

10    go there.

11          I'll go right to the terms of the agreement that

12    everyone agrees governs and is unambiguous.  So let's start

13    with Section 4(b) and I'm again looking at Version 8 which

14    is the April 14th, 2022 terms of use, and just to be crystal

15    clear, this is PDF Page 533, Docket No. 393.  And this

16    provision's already been mentioned.  It provides the Custody

17    account holders' ownership interest in assets in Celsius'

18    possession extends only so far as the assets actually held

19    in Custody wallets, and I'll just read the provision.

20          "Title to any of your eligible assets in a Custody

21    wallet shall at all times remain with you and not

22    transferred to Celsius."  Now, Mr. Ortiz actually mentioned

23    this section.  He said, well if we remove the term Custody

24    wallet, it would generally have the same meaning, but we

25    can't remove the term Custody wallet.  It's there for a

Page 37

1     reason and it matters because Custody wallet is actually a

2     defined term in these terms of use.  If Your Honor turns to

3     page -- PDF Page 527 of the same document --

4              THE COURT:  Just give me a second.

5              MR. HERSHEY:  Yeah, take your time, Your Honor,

6     under the definition section.

7              THE COURT:  Okay.

8              MR. HERSHEY:  Okay.  Your Honor will see the

9     definition.  "Custody wallet means a virtual wallet where

10    all eligible digital assets held therein are custodial

11    assets maintained either by us or a third party institution

12    or other entities selected by Celsius."  So in other words,

13    Custody wallets means a specific type of wallet and only

14    that type of wallet.  And the definition of Custody wallet

15    reinforces that custodial assets are eligible digital assets

16    held in a virtual Custody wallet.  It's not the internal

17    ledger.  It's not some other wallet.  It's the Custody

18    wallets.  Okay.

19             Now there's one more term in the terms of use that

20    I would like to highlight and I have to ask Your Honor to

21    turn back actually to Page 533 which is the Custody section

22    of the terms of use.  Let me know when Your Honor --

23             THE COURT:  I'm there.

24             MR. HERSHEY:  Okay.  So the terms of use after

25    saying that only assets in Custody wallets are Custody

Page 38

1    assets, the terms of use go on to say that the Custody

2    account holders and solely the Custody account holders bear

3    the risk of Celsius losing their assets, and I'll quote from

4    the terms of use.  "As title owner of the assets, you bear

5    all risks of loss.  Celsius shall have no liability for any

6    digital asset price fluctuations or any or all loss of

7    digital assets."

8            So we're in the exact situation contemplated by

9    the terms of use.  There has been an approximately $15

10   million loss of digital assets in the Custody wallets.  The

11   Custody group argues that they can force Celsius' other

12   customers to cover that loss by claiming ownership over

13   assets outside the Custody wallets.  There is simply no

14   support for that position in the plain language of the terms

15   of use.

16           To the contrary, the terms of use make crystal

17   clear that Custody account holders bear the sole risk for

18   any loss and can only look to the Custody wallets, the

19   assets to which they have title.  Now, in an effort to avoid

20   that plain language, the Custody group points its response

21   brief and Mr. Ortiz's presentation to a series of cases to

22   argue their agreement with Celsius is like a bailment or is

23   like a special deposit which gives them ownership rights

24   beyond what they bargained for.

25           And so the Custody group's argument seems to be --

Page 39

1    I think I heard this in Mr. Ortiz's argument -- that once

2    parties agree to a custodial relationship, all other terms

3    of the contract cease to matter, terms that limit or define

4    the custodial relationship, like the ones I just read, can

5    simply be ignored.  There's a custodial --

6                THE COURT:  Can you put this in dollar terms?

7    What was the value of assets in Custody wallet at the

8    petition date and what's the delta that was reflected in the

9    ledger, not reflected in the Custody wallet?

10               MR. HERSHEY:  So the delta, as I understand it,

11   Your Honor, is $15 million.

12               THE COURT:  What's the total?

13               MR. HERSHEY:  I actually am not -- I don't know if

14   any of my team or the Debtors know the total.

15               THE COURT:  Can somebody help me on that?

16               MR. COLODNY:  I believe it's 220 --

17               THE COURT:  Who is speaking?

18               MR. COLODNY:  This is Aaron Colodny --.

19               THE COURT:  Just come to the microphone, Mr.

20   Colodny.  Just so we're sure.

21               MR. COLODNY:  Aaron Colodny, counsel for the

22   Official Creditors Committee.  I believe it's around $200 to

23   $220 million.

24               THE COURT:  Okay.

25               MR. HERSHEY:  And if I were better at math, Your

1    Honor, I could've divided $15 million by 94 percent and

2    gotten there, but fortunately Mr. Colodny was able to help

3    me out.

4            So anyway, the Custody group offers no authority

5    to support the proposition that once a custodial

6    relationship is formed the other terms of the contract can

7    be ignored.  In fact, the case that they principally rely on

8    which is the Joliet-Will case, says specifically that the

9    answer as to how to treat assets in the Debtors' possession,

10   whether they are held in Custody or not -- and I'm going to

11   quote -- "depends on the terms under which the grants were

12   made."  That's the Joliet-Will case.  The pincite is 432.

13           THE COURT:  That's Judge Posner's --

14           MR. HERSHEY:  That's Judge Posner's decision.

15   Exactly, Your Honor.  So here the terms as I said plainly

16   provide --

17           THE COURT:  What's the cite of his opinion --

18           MR. HERSHEY:  O, you want me to give the full

19   cite, Your Honor?

20           THE COURT:  Yeah.

21           MR. HERSHEY:  It's In re Joliet-Will County

22   Community, I believe, Action Agency, 847 F.2d 430, pincite

23   432 (7th Cir. 1988).

24           THE COURT:  Okay, go ahead.

25           MR. HERSHEY:  And indeed in that case, I'll just

1    note, the Court did in fact look at the terms of the grant

2    to determine whether the assets were held in a custodial

3    relationship.  Your Honor, the terms here plainly provide

4    Custody account holders' ownership interest is limited to

5    assets in Custody wallets.

6           The last thing I'll say Your Honor before ceding

7    the podium is if Your Honor looks at the terms of use again,

8    the term Custody wallet is used with intention.  It's used

9    repeatedly to refer to where the assets are held by the

10   Debtors.  Now turning to the language that Mr. Koenig cites,

11   that does not expand or change the custodial relationship.

12   That merely repeats the same promise that Celsius made to

13   every customer.  We're going to give you back like assets,

14   may not be your assets.  Right?  That's what every customer

15   claims the right to here and is going to, you know, assert a

16   proof of claim for.

17          That language, just as it doesn't create a

18   custodial relationship for all other Celsius customers,

19   doesn't create a custodial relationship for these Celsius

20   customers.  That custodial relationship is created by the

21   plain language providing that the Custody wallet holds their

22   assets and only the Custody wallet.

23          Unless Your Honor has any other questions, I'll

24   cede the podium.

25          THE COURT:  Thank you.

Page 42

1                MR. HERSHEY:  Thank you very much.

2                THE COURT:  All right.  Is there anyone else who

3       is speaking to the issue of the Custody account holders?  I

4       guess we move to Withhold.  Are you --

5                MR. ORTIZ:  I think we have a brief reply, but --

6                THE COURT:  Go ahead.

7                MR. ORTIZ:  I don't know if you want to do --

8                THE COURT:  That's fine.  I do.  I do want to hear

9       it, Mr. Ortiz.

10               MR. ORTIZ:  So I just wanted to note a couple of

11      things in response to the 6 percent that we have our

12      disagreement on.  Counsel pointed to the definition of

13      Custody wallet and if you look at that definition, Your

14      Honor --

15               THE COURT:  That's back on 527 of 1126?

16               MR. ORTIZ:  Yeah, five -- back on 527 of Docket

17      393.  It doesn't go as far as counsel says it does because

18      it -- means a virtual where all digital assets held therein

19      are custodial assets maintained either by us or by a third

20      party institution or other entities selected by Celsius.

21      That just says that if it's a Custody wallet, that -- to be

22      a Custody wallet, it has to have only assets that are

23      custodial assets.  It doesn't say that that is the only

24      place a Custody asset could be.  So I don't think that

25      definition necessarily changes the analysis that we made.

1              And then I would also point to the concept in the

2    terms of use that we as title owner bear all the risk of

3    loss.  I mean we're either a title owner or we're not.  If

4    not, we're the title owner and we bear all risk of loss,

5    then you are acknowledging that we have title over those

6    assets.  If you're going to point to that section, then

7    we're the ones that actually have title at that time to bear

8    risk of loss, which I think in any event that's probably a

9    misuse of that language.  I think that language is really

10   acknowledging that this is a asset that has a market

11   fluctuation.  But in any event you can't --

12              THE COURT:  Let me ask you a question.  Let me --

13   let's assume that I accept Mr. Hershey's construction of the

14   contract, has to be in the Custody wallet and approximately

15   $15 million was reflected on the ledger but not in the

16   Custody wallet.  How would that 15 million be treated if I

17   accept that it is -- I don't treat it as Custody?

18              MR. ORTIZ:  I think it's a difficult question

19   which in some senses, Your Honor, to me demonstrates why it

20   should stay in Custody because again, if I look at the

21   simplest case, which I think is the -- what the Debtors

22   called in their motion the pure Custody, so you're sending

23   something over with a contract that says that it's going to

24   be a custodial relationship.  It doesn't say, you know,

25   there's going to be four immediate steps and once it reaches

Page 44

1    this custodial wallet you have a relationship and in

2    between, we have a creditor-debtor relationship.

3           If that relationship is never formed, I guess --

4    you know, but to try to get around to the question you're

5    getting to and not do the lawyerly thing of answering it

6    differently, you know, if you were to rule that, which I

7    don't -- obviously don't think is the right ruling, but if

8    you were to rule that, then they probably have some sort of

9    --

10          THE COURT:  Unsecured claim for breach --

11          MR. ORTIZ:  -- relationship for a breach of

12   contract or a conversion or something of the sort,

13   particularly if --

14          THE COURT:  There's -- I understand your -- I'm

15   not deciding this issue.

16          MR. ORTIZ:  No, I understand that, Your Honor.

17          THE COURT:  But would you agree that the amount

18   reflected in the ledger that was not reflected in the

19   Custody wallet would give rise to an unsecured claim for

20   breach of contract?

21          MR. ORTIZ:  In the universe where we're

22   determining that that -- the contract doesn't go far enough

23   to give those people a Custody relationship, then yes, Your

24   Honor.

25          THE COURT:  Okay.  All right.  Is there another

1     point you want to make?  I see your colleagues.

2            MR. ORTIZ:  Yeah, no, I think the point he wanted

3     to make is, you know, this is kind of, depending on where we

4     end up today, if -- depending on where you come out on this

5     issue, it's somewhat interesting and I think the Committee

6     argued for pure Custody and for some other folks that the

7     solution is pro rata and I think we would have to

8     collectively, us, the Debtors, and the Committee, really

9     think through whether that's the right answer because if

10    it's specific people who have specific pending withdrawals,

11    that may be the bucket versus, you know, making a pro rata,

12    everybody shares that little bit.

13            But I don't -- you know, this all came to light,

14    you know, after we had a scheduling order, after we had

15    breached some things, so it's -- I think people are still

16    getting through what that means.  But hopefully we never

17    have to reach that because we believe that it's all

18    custodial assets.

19            THE COURT:  Just to be clear, I have not made up

20    my mind on any of this.  But what -- if I were to agree with

21    the Committee's view, probably what I would do, would ask

22    that counsel meet and confer and see if they can reach an

23    agreement on what rules should apply, pro rata, lowest

24    intermediate value, just simply unsecured claim, and have

25    you try and resolve that.  I'm not -- you know, I don't know

1   where I'm coming out yet.

2           MR. ORTIZ:  Understood, Your Honor, and I wouldn't

3   expect you to have come out on all these things with the

4   amount of papers you have in front of you.  I think I'll

5   acknowledge --

6           THE COURT:  And if I added the pile --

7           MR. ORTIZ:  -- the attorneys --

8           THE COURT:  -- yesterday, would be --

9           MR. ORTIZ:  Right.  Well, we have this view that

10  when we file something in ECF, it's just like magically in

11  your head and I will acknowledge --

12          THE COURT:  I wish.

13          MR. ORTIZ:  -- that that's not the case and that

14  the good folks sitting here and you have to do a lot of work

15  to actually get through that and we appreciate that.

16          THE COURT:  Okay.

17          MR. ORTIZ:  Thanks, Your Honor.

18          THE COURT:  There was a hand raised on the screen

19  by Ms. Gallagher.  I'll give you an opportunity to speak as

20  long as you're speaking to this issue of the Custody account

21  because that's the issue that the Court is dealing with.  So

22  please, go ahead.  I can see you on the screen.

23          MS. GALLAGHER:  Yes, Your Honor.  I think we're

24  missing an important point here with all the discussion of

25  the terms of service.  We're not addressing the fact that

Page 47

1    Celsius did not hold a license to offer any Custody

2    services.  So without that license, this whole category

3    cannot exist.  And we have to look at why they formed this

4    category so hastily.

5              THE COURT:  Ms. Gallagher --

6              MS. GALLAGHER:  -- because the regulations --

7              THE COURT:  May I ask you a question? May I ask

8    you a question?  There clearly are states where they could

9    not offer Custody accounts, but there were many where they

10   could.  So I don't know what the basis for your statement

11   that they didn't hold a license to have Custody accounts.

12   What are you pointing to?

13             MS. GALLAGHER:  I -- well, Custody is a legal

14   thing, and so to be able to offer Custody, you have to have

15   the licenses for it.

16             THE COURT:  Let me -- do you have some support --

17   Ms. Gallagher --

18             MS. GALLAGHER:  Company was based in New Jersey --

19             THE COURT:  Ms. Gallagher.

20             MS. GALLAGHER:  Yes.

21             THE COURT:  Do you have --

22             MS. GALLAGHER:  Yes.

23             THE COURT:  -- legal support for the statement

24   you're making?  Because it seems contrary to everything that

25   I've read in the papers.  That's why we have the Withhold

Page 48

1    issues, because those were people in states where Celsius

2    was not eligible to set up the Custody accounts.  So they

3    have what were called to the Withhold accounts, but in the

4    vast bulk of the states, they were eligible and did have the

5    Custody program.  So what is it that you're relying on to

6    say they had no authority to have Custody accounts?

7              MS. GALLAGHER:  I'm relying on the examiner's

8    report where she made it clear that New Jersey had issued a

9    cease and desist order which was meant to come into effect

10   in December.

11             THE COURT:  And she also makes clear -- she also

12   makes clear in the examiner's report that New Jersey kept

13   extending the deadline by which Celsius had to comply with

14   the cease and desist order.  And it was the impending

15   exploration of that deadline that resulted in Celsius, in

16   effect, rushing the Custody program into effect.  But the

17   New Jersey cease and desist order, as I understand it, dealt

18   with that they were not eligible to have Earn accounts for

19   unaccredited investors.  Do you have some --

20             MS. GALLAGHER:  That's --

21             THE COURT:  I hear what you're saying, but I don't

22   know if you have support for your position, please let me

23   know specifically, not just your argument.  Point to some

24   document.  Is there something in a New Jersey cease and

25   desist order?  Is there something else that you're relying

1     on?

2              MS. GALLAGHER:  Well, I can't put my hands on

3     anything at this very moment, but I think --

4              THE COURT:  All right.  What -- may I ask, Ms.

5     Gallagher, where do you -- Ms. Gallagher, what was your

6     account relationship with Celsius?  An Earn account?

7              MS. GALLAGHER:  My account is an Earn account.  So

8     for my --

9              THE COURT:  Where do you reside?  Where do you

10    reside?

11             MS. GALLAGHER:  I am British, but I reside in the

12    United States.

13             THE COURT:  Where in the United States do you

14    reside?

15             MS. GALLAGHER:  In Tennessee.

16             THE COURT:  Okay.  Last question.  Whether you're

17    an accredited investor or not.

18             MS. GALLAGHER:  I'm an unaccredited investor.

19             THE COURT:  Okay.  All right.  I've heard you're

20    argument.  Thank you very much, Ms. Gallagher.  Is there

21    anybody else who wishes to be heard with respect to the

22    Custody accounts?

23             CLERK:  Judge, there's two more raised hands.

24    There's a Kulpreet -- last name is K-H-A-N-U-J-A, and then

25    Eric Mendelson.  We also have a Jeremy Hoffing.

1          THE COURT:  All right.  Let me hear -- what was --

2     spell the first one again, Deanna?

3          CLERK: Sure.  The first name is Kulpreet, K-U-L-P-

4     R-E-E-T, last name is K-H-A-N-U-J-A.

5          THE COURT:  All right.  May I hear from you, Mr.

6     Khanuja.

7          MR. KHANUJA:  Thank you, Your Honor.  So Your

8     Honor, as you make the decision on the Custody, I want to

9     point out two things.  One is essentially the distinction

10    between the pure Custody as well as against the transport

11    Custody.  What I mean is there were people who would have

12    used the services and the subjective intent that the counsel

13    mentioned earlier with regards to safekeeping of their

14    assets.  There -- I don't have the exact numbers but a very

15    small proportion of the number of the customers actually use

16    Celsius for pure Custody purposes, even beyond the April

17    terms of change uses and all.

18          Second, most of them, most of the customers were

19    grandfathered based on the, you know, the regulatory issues

20    you just mentioned or some other issues, grandfathered from

21    one account to another, essentially from Earn account into

22    Custody account.  Why it's important, it's important because

23    some of the other users from other states do not get -- do

24    not get that kind of preferential treatment; whereas, the

25    account and the terms of service they signed up for

Page 51

1    essentially remains the same.

2              It's just like some -- based on the states they

3    decide on, they get to have a preferential treatment.  And

4    secondly, we also know by the transaction analysis some of

5    our colleagues have done, many of the insiders also

6    transferred their assets from one account type like Earn

7    into Custody.  So it's very important to make a distinction

8    between what purposes, whether it was a pure Custody or it

9    was grandfathered into Custody or transported into Custody

10   by insiders.

11             THE COURT:  All right, thank you.  Deanna, who was

12   the next person who wanted to speak?  Because I can't see --

13   I can't identify them from my screen.

14             CLERK:  No problem, Judge.  It's Eric Mendelson.

15             THE COURT:  All right.  Mr. Mendelson?

16             MR. MENDELSON:  Yes, good morning, Judge.  Eric

17   Mendelson.  I have most of my assets in the Custody account

18   as well as in the Earn account and I'm from the great

19   country of Florida.  I just want to -- regarding the 6

20   percent, it sounds like that 6 percent may be or could

21   potentially be Custody holder that were trying to --

22   individuals that were trying to withdraw potentially from

23   the Earn account and because it wasn't -- because the

24   transaction wasn't executed, it went into the Custody

25   system.

Page 52

1          It sounds like Mr. Ortiz and I are aligned in that

2    those assets shouldn't be treated any different than the

3    Custody assets and that 6 percent should not be thrown in

4    the same bucket as Earn.  Quite -- I hate using the term

5    preferential, but I would assume and I certainly don't have

6    case law here because I'm not a lawyer, but I assume that

7    being able -- a request of a withdrawal of assets probably

8    takes the most precedence in this case over any other asset

9    class or bucket.

10         And I just I wanted to point that out, that if

11   individuals were trying to withdraw assets and because

12   Celsius claimed bankruptcy 12, 23 hours later, that they

13   shouldn't just be thrown back into Earn bucket for that

14   reason.  Again, I'm not sure if that's where the 6 percent

15   comes from.  It sounds like it could potentially be from

16   that.  And I just wanted to draw your attention to that, and

17   I do appreciate your time.

18         THE COURT:  Thank you very much, Mr. Mendelson.

19   Deanna, who was the next person?

20         CLERK:  We have Jeremy Hoffing and then two

21   additional parties after that.

22         THE COURT:  All right.  Mr. Hoffing.

23         MR. HOFFING:  Good morning, Your Honor.  My name's

24   Jeremy Cohen Hoffing.  I'm a unaccredited creditor in pure

25   Earn in the State of California.  And the argument that I

1   want to make is that I should not have been grandfathered in

2   to Earn.  I think I should have been moved into Custody when

3   those accounts were established.  It was clear in the

4   examiner's report that Custody was created to meet the

5   regulatory pressure from the State of New Jersey and a

6   couple other states.

7          And the creation of Custody was to meet those and

8   it's clear that there was no services offered in Custody

9   that anyone in Earn wouldn't want.  Ninety percent of

10  customers were using Earn to receive rewards.  And after the

11  creation of Custody, they continued to offer rewards in

12  Earn, incentivizing people to remain in that type of

13  account.

14          THE COURT:  Yeah, I think the point, Mr. Hoffing,

15  is that account holders, whether they were in New Jersey or

16  anywhere else could elect to keep their assets, existing

17  assets in Earn accounts, but any additional deposits they

18  made of assets, if they were unaccredited investors, would

19  have to go into the Custody accounts.

20          MR. HOFFING:  Right.

21          THE COURT:  People were not forced -- there was no

22  requirement.  There was no automatic transfer of existing

23  crypto assets from Earn accounts to Custody accounts.

24  People had to either elect to move their assets to Custody

25  or seek to deposit additional assets.  Mr. Ortiz, do I have

```
 1    that correct?  I guess I should ask Mr. Koenig but go ahead.

 2    Go ahead.  Mr. Ortiz, if you have an answer to that, go

 3    ahead.  What's your view?

 4             MR. ORTIZ:  Again, Your Honor, I was looking at my

 5    notes and --

 6             THE COURT:  Okay.  Mr. Koenig, go ahead.

 7             MR. KOENIG:  Your Honor, for the record -- Your

 8    Honor, for the record, Chris Koenig.  Your understanding is

 9    correct.  The existing unaccredited investors were

10    grandfathered in with respect to their existing assets.

11    They could not deposit new assets into Earn.  That had to go

12    into --

13             THE COURT:  There was no automatic transfer --

14             MR. KOENIG:  Correct.

15             THE COURT:  -- of assets from Earn to Custody.

16             MR. KOENIG:  Correct, and the examiner's report

17    explains why, that it was consistent with a settlement that

18    was reached between the regulators in a different company

19    other than Celsius, and so Celsius' intent was to effectuate

20    that settlement, the same settlement that was entered into

21    with the regulators and that other company.

22             THE COURT:  Okay.  Thank you very much, Mr.

23    Koenig.

24             MR. KOENIG:  Thank you.

25             THE COURT:  All right.
```

1           MR. ORTIZ:  And Your Honor -- and now knowing the

2    question, yes, you had to actively move into Custody.

3           THE COURT:  Pay attention now, Mr. Ortiz.  I'm

4    sorry.  I'm being -- I meant that as a joke.

5           MR. ORTIZ:  Understood, Your Honor.

6           THE COURT:  You're always very well prepared and

7    on point.  Deanna, was there someone else who wanted to be

8    heard?

9           CLERK:  Yes --

10          MR. HOFFING:  I wasn't finished, but --

11          THE COURT:  Yes, you have.  Go ahead.  Who's the

12   next person?

13          CLERK:  So we have three more parties.  The next

14   is Gilbert Castillo.

15          THE COURT:  All right, Mr. Castillo --

16          MR. CASTILLO:  Hello, Your Honor.  Yes.  Can you

17   hear me?

18          THE COURT:  Yes, I can.

19          MR. CASTILLO:  Great --

20          THE COURT:  Go ahead.

21          MR. CASTILLO:  Okay, great.  I just wanted to

22   bring to light, we were talking about the pendings and the

23   terms of service.  There's Section 11 of terms of service

24   called withdrawal and it says that subject the terms for any

25   of your eligible digital assets that you elect to utilize an

1    Earn service, you have a call option on all loans made to

2    Celsius, demand immediate complete or partial repayment of

3    any loan at any time through transfer of Custody wallet

4    available to you, a complete, partial withdrawal of eligible

5    digital assets at any time.  Such repayment will terminate

6    in whole, a part of your loan to Celsius and you no longer

7    accrue rewards.

8            So I would, just want to point out that when

9    someone made a pending withdrawal or withdrawal, they used

10   their call option to demand the repayment and I feel that

11   they are entitled to that money and should be considered as

12   Custody as well.

13           THE COURT:  Well, they had to -- if I understand

14   Version 8 of the terms of use, after Version 8 came into

15   effect, withdrawals first had to go into the Custody wallet

16   and then from the Custody wallet to wherever the account

17   holder wanted it to go.

18           MR. CASTILLO:  And --

19           THE COURT:  That's a change from -- stop.  That's

20   a change from what existed before the Custody wallet program

21   came into existence in April of 2022.  But it had to be the

22   account holder who initiated the effort to withdraw assets,

23   in which case they moved first to the Custody wallet and

24   then to wherever the account holder wanted it to go.  Mr.

25   Koenig, do I have that understanding correct?

1           MR. KOENIG:  Your Honor, for the record, Chris

2    Koenig.  Your understanding is correct.

3           THE COURT:  Okay.  All right.

4           MR. CASTILLO:  But I --

5           THE COURT:  I don't -- Mr. Castillo, I'm not sure

6    I understand your point because it had to be the account

7    holder who initiated the transfer.  We're not dealing with

8    deposit of new assets.  We're dealing with an effort to

9    withdraw assets from Earn.  To do that, you had -- it had to

10   be moved to Custody and then from Custody to wherever the

11   account holder wanted it to go.  So --

12          MR. CASTILLO:  Well, in my case it was -- that

13   function was bypassed because when I withdraw, when I made a

14   withdraw request I did a test function with a small amount

15   and it withdrew out of my account immediately.  It doesn't -

16   - it didn't go from Earn to Custody.  It just went Earn

17   straight to an external wallet.  And when I did the larger

18   amount, it was just stopped at that point.  So there was a -

19   - my --

20          THE COURT:  Well, when you say you did the larger

21   amount, was it after the pause?

22          MR. CASTILLO:  No.  It was before the pause.  I

23   did a transaction five minutes before of a small amount as a

24   test transaction and then five minutes later I did the

25   larger amount from my Earn directly to my external wallet,

Page 58

1    and it was frozen.  Later when I printed the transaction

2    history on the CSV file that they sent to me on email, it

3    shows that the transaction was completed.  And then just

4    recently maybe a month ago they changed that and now it's a

5    different, saying that it was not completed.

6           THE COURT:  I mean that -- here's what I would

7    suggest, that you need to communicate with the Debtors'

8    counsel.  I don't have any exhibits or paperwork.  Your

9    situation is different than the sort of the general issues

10   that the Court is dealing with today.  I'm not

11   underestimating the importance of this issue to you.  At

12   least on the record today without documents in front of me,

13   I don't want to get into the amounts that you were trying to

14   transfer.  Mr. Koenig, can you or one of your colleagues

15   reach out to Mr. Castillo and endeavor to see whether this

16   issue can be either crystallized or resolved or whatever?  I

17   don't want to get into the specific amounts at this stage.

18          MR. KOENIG:  Your Honor, Chris Koenig.  We will

19   certainly do so.  Mr. Castillo, we'll reach out to you but

20   if -- I don't know if we have your email address but my

21   email address is in the signature block of every Court

22   pleading that the Debtors file and likewise, we're just not

23   aware, your individual facts and circumstances but we're

24   happy to take it offline and to look into it with you.

25          THE COURT:  Okay, so Mr. Castillo, reach out to

Page 59

```
 1    Mr. Koenig and he'll either himself or have one of his

 2    colleagues deal with you directly about it and we'll see

 3    whether it can get resolved.  Okay, Mr. Castillo?

 4              MR. CASTILLO:  Okay, thank you.

 5              THE COURT:  All right.  Is -- Deanna, is there

 6    anybody else who wants to be heard?

 7              CLERK:  Yes, two more part -- well, now three.

 8    Cam Crews is next.

 9              MR. CREWS:  Hello, Your Honor.

10              THE COURT:  Okay.  Mr. Crews?

11              MR. CREWS:  Yes.

12              THE COURT:  Go ahead.

13              MR. CREWS:  So I'm predominantly an Earn account

14    holder, although I have since become a Custody account

15    holder subsequent to the bankruptcy filing by transferring a

16    small amount of assets into my wallet.  And just so we're

17    aware, that does not result in a transfer on the blockchain;

18    it's just a ledger in the sequel database that Celsius

19    maintains.

20              Two points.  The 94 percent ration that's been

21    discussed, this rebalanced weeks after the pause date.  If

22    you were to look, say, at the Ethereum Custody wallet, they

23    had only 65 percent of their obligations met.  And I would

24    also urge Your Honor to reference Document 1515 which I

25    prepared.  On Page 4, there's a diagram of deposits and
```

Page 60

1     withdrawals which I think can assist in seeing how on the

2     blockchain the payments transfer.

3            And then lastly, the point that Mr. Ortiz made

4     about Custody not requiring segregated wallets, I'd be very

5     interested in seeing that caselaw if it could be referenced,

6     the docket somewhere because in the context of blockchain,

7     that is very much not in keeping with the way people

8     perceive things.  Thank you, Your Honor.

9            THE COURT:  You know, Mr. Crews, I will -- ^have

10    to go back and read Judge Posner's decision, the Joliet-Will

11    case.  I think that's the issue where there's a disagreement

12    between Mr. Ortiz and Mr. Hershey, in other words between

13    the Ad Hoc Committee of Custody Holders and the Unsecured

14    Creditors Committee.  Mr. Hershey's argument is the terms of

15    use specifically define Custody account and it has to be

16    that, and not just an entry in a ledger that didn't make it

17    into the Custody account.

18           So the Court is going to have to resolve that

19    issue and I -- the Court will look at your -- you refer to

20    ECF 1515 and look at that before making any decision.  Okay?

21    Thank you very much, Mr. Crews.

22           Deanna, who's next?

23           CLERK:  We have Tony Vejseli -- my apologies if I

24    mispronounce your name.

25           MR. VEJSELI:  Good morning --

Page 61

1          THE COURT:  Go ahead.

2          MR. VEJSELI:  My name is Tony Vejseli.  I am an

3     accredited investor.  I have money in Earn, Custody.  I have

4     an active learn -- an active loan, excuse me.  I'm actually

5     in the Custody Ad Hoc Group.  I'm going to be joining the

6     Loan Ad Hoc Group.

7          I just want to make a note.  We already touched on

8     it a little bit, but in order to move your money from Earn

9     to Custody, it was like a three-step process.  You have to

10    say that you know what you're doing and that you intend to

11    do it.  Also, some people like myself, we ended up putting

12    more money into Celsius because they had a Custody solution.

13    I actually read the terms of service.  I liked the part

14    where we hold the title.  I ended up putting more money into

15    Custody where it was considered, I guess they're calling it

16    pure Custody now.

17         I had the opportunity, I had the ability to go

18    from Earn to Custody and I chose to stay in Custody.  I

19    moved money from Earn to Custody.  Didn't move it back to

20    Earn when I put it in.  I think it's very important, you

21    know, that we keep this Custody solution or at least that we

22    honor the Custody contracts.  A lot of people like myself,

23    we want a custodian.  We want to make sure that Custody is

24    honored.

25         We want to make sure that we're not just throwing

Page 62

1    it away because clearly Celsius didn't know how to do it

2    correctly.

3             THE COURT:  Well, let me ask.  Mr. Koenig, the

4    relief that the Debtor was seeking in its separate motion

5    was to return to account holders if anything if Mr. Vejseli

6    deposited crypto into a Custody account, there's no issue

7    about who owns it.  And the Debtors' motion is to return

8    that money to people like Mr. Vejseli, correct?

9             MR. KOENIG:  Your Honor, Chris Koenig.  That's

10   correct.  And the reason is the preference claim has to

11   involve a transfer of the Debtors' interest and property --

12            THE COURT:  And it never had an interest in the

13   property, it's not a preference.

14            MR. KOENIG:  That's exactly right, Your Honor.

15            THE COURT:  So the Debtor is seeking at least that

16   much of the relief that you're asking for, Mr. Vejseli, is

17   to return to account holders who deposited directly into

18   Custody --

19            MR. KOENIG:  Pure Custody.

20            THE COURT:  -- because you retain title to it,

21   assuming that -- I don't have the facts of your specific

22   case, but under the relief that the Debtor is seeking,

23   that's on the calendar as well, you would get that money

24   back.  The issue is where funds were transferred from Earn

25   to Custody within 90 days of the bankruptcy petition, where

Page 63

1    there is this preference, avoidable preference issue.

2                MR. KOENIG:  Right.  And there, likewise Your

3    Honor, there's another wrinkle of the threshold in order to

4    be an avoidance preference --

5                THE COURT:  Yes, it has to be above the 7,500 --

6                MR. KOENIG:  Correct.

7                THE COURT:  Okay.

8                MR. VEJSELI:  If I may --

9                THE COURT:  -- he's an accredited investor.  It's

10   above 7,500, I --

11               MR. VEJSELI:  Yeah.  If I may, Your Honor, they're

12   also not looking to do that because I have an active loan

13   which is collateralized like to (audio drops).

14               THE COURT:  We're not dealing with that today, Mr.

15   Vejseli.  I can't -- okay.  All right.  Deanna, additional?

16               CLERK:  All right, two more participants.  Gregory

17   Kieser is next.

18               THE COURT:  Okay.  Mr. Kieser?

19               MR. KIESER:  Hello, Your Honor.  Can you hear me?

20               THE COURT:  yes, I can.  Go ahead.

21               MR. KIESER:  My name is Greg Kieser and I'm a

22   creditor with primarily loans, but I have money in Earn now

23   and I'm primarily going to give a brief overview of loans

24   with respect to loans that were liquidated and those funds

25   were transferred into Earn when it is more than likely those

Page 64

1    -- that when they were liquidated, the excess collateral

2    should have gone into Custody.  So I'm not sure you're

3    aware, but during -- after the pause, there were lots of

4    liquidations of loans based on having reached the -- an LTV

5    of 80 percent.

6          There's a whole group of us.  I'm on a steering

7    committee representing hundreds of people who believe that

8    their loans were unfairly liquidated.  That's another issue

9    to be addressed at a later time, but what I would like to

10   bring to your attention today is that much of the funds --

11   so when alone gets liquidated, the excess collateral has to

12   go somewhere and it got dumped into Earn.  And I believe

13   that was inappropriate and there are hundreds of other

14   people who believe that was inappropriate.  So I deposed

15   Oren Blonstein a couple of weeks ago and asked him about

16   this question in particular, and what he -- the point he

17   made was that -- I'm waiting.  Is that a siren on your side?

18         THE COURT:  It is.  It's out on the street.  Go

19   ahead.

20         MR. KIESER:  Okay.  Yeah, so the point he made was

21   that wherever the money came from to form the loan is where

22   the money would go after a liquidation event happened.  But

23   the problem with that rationale is that in order to open a

24   loan, we had to transfer it into Earn, even if we had no

25   intention of going into an Earn account.  So --

 1                  THE COURT:  Not after the Custody accounts were

 2      set up.  I don't think that's correct.

 3                  MR. KIESER:  Yeah, I mean, that was a point that

 4      Blonstein made is that -- and that's where my excess

 5      collateral went and there's a whole other --

 6                  THE COURT:  Mr. Kieser, let -- I'm only

 7      interrupting because --

 8                  MR. KIESER:  Sure.

 9                  THE COURT:  -- that's not an issue that's going to

10      get resolved today.

11                  MR. KIESER:  Okay.

12                  THE COURT:  All right.

13                  MR. KIESER:  Yep.  That's all I have.  Thanks.

14                  THE COURT:  Thank you, Mr. Kieser.  Deanna, who's

15      next?

16                  CLERK:  Michael Yankoski.

17                  MR. YANKOSKI:  Yes, good morning.  Can you hear

18      me?

19                  THE COURT:  Okay.  Yes, go ahead, Mr. Yankoski.

20                  MR. YANKOSKI:  Yes, hello, Judge.  Good morning.

21      My name is Dr. Michael Yankoski.  I am an unsecured pro se

22      creditor, and unaccredited creditor of Celsius.  Thank you

23      for hearing me this morning.  I wanted to bring to the

24      Court's attention and Judge, I believe you're already aware

25      of this, but the distinction between the Earn and Custody

Page 66

1      accounts was introduced by the Debtor in April of 2022, but

2      my understanding is that the distinction between Earn and

3      Custody was introduced within the 90 days of the Debtors

4      filing for bankruptcy.

5           And although you pointed out earlier in an earlier

6      statement this morning, Your Honor, that it was the option

7      of the customers to transfer assets from Earn to Custody,

8      the fact that -- the distinction between Earn and Custody

9      was introduced within 90 days of the filing of bankruptcy

10     means that anyone who chose to move from Earn to Custody is

11     subject to preference actions.  So in a sense, although it

12     was the responsibility of the customer to do so, to transfer

13     between Earn and Custody, having done so by the structure of

14     the Debtors' distinction between the accounts, those

15     customers are subject or potentially subject to preference

16     actions and to clawbacks.

17          So I know you're already aware of that.  I believe

18     you mentioned that at one of the hearings several weeks ago

19     and sort of pointed out to the Kirkland and Ellis counsel

20     how curious it was that the Earn and Custody distinction was

21     introduced within the 90-day period, but I just want to

22     bring it to your attention again today because there's

23     significant emphasis being put on the distinction between

24     Earn and Custody, but it seems to me as someone who moved

25     from Earn to Custody within the 90 days that I have

1    significant concerns about the way that was structured and

2    the potential exposure to preference actions, even when I

3    was doing exactly what I was allowed to do as a client and

4    as a customer of Custody.  Thank you, Your Honor.

5              THE COURT:  Okay.  I guess what I would respond

6    now, I'm keenly aware of the issues that you're raising.  I

7    think everybody here is.  So under the schedule, the

8    stipulated schedule, if we move to phase two, there are

9    provisions in the agreement about how all of this would

10   unfold before me, and so I think the -- there's the

11   opportunity for taking of depositions of some number of the

12   potential preference claimants.

13             The issue about preference is not entirely

14   straightforward.  There are potential defenses that would

15   have to be addressed by the Court.  That's not being done

16   today.  But you're -- I'm keenly aware of everything you've

17   said and I have been for quite some time.  You refer to

18   things that I've said before.  I mean, it's -- yes, you

19   know, the 90-day look back period is in the statute and

20   there are consequences that flow from it.

21             This is not the first case where this kind of

22   issue has come up or something here, 89 days before.  You

23   know, if it was 91 days, it would be an entirely different

24   situation.  But we're at 89 days.  I deal with the facts as

25   they are.  So -- but I understand the point you raised, Mr.

Page 68

1    Yankoski.

2              Deanna, is there anybody else?

3              CLERK:  Yes.

4              MR. YANKOSKI:  Thank you, Your Honor.

5              CLERK:  Two more parties, John Bazolist is next.

6    My apologies if I mispronounce your name.

7              MR. BAZOLIST:  You pronounced that correctly, and

8    I thank you for the time, Your Honor.  I actually just

9    raised my hand based off that last question, just to add a

10   little bit of further clarification because there are some

11   edge cases.  So me, for example, when I signed up for my

12   account, there was no previous Custody account at the time.

13   So for example, I signed up in March of 2022.  I moved funds

14   over to take out a loan against my collateral, which means I

15   had to go into Earn because Earn was the only account at the

16   time.

17             In early June, I started to be a little bit

18   worried about the market, so I repaid my collateral and

19   moved my funds back from Earn to Custody.  And so basically

20   what that means is my funds were never in Earn for more than

21   a fraction of a minute.  But because of the way this account

22   was set up, I'm technically subject to a preferential claim

23   even though I was a net contributor to Celsius by interest

24   and never actually received interest from them.  So it

25   sounds like you're aware of these issues but I just wanted

Page 69

1    to kind of paint the full picture for you there.

2            THE COURT:  Yes, I'm aware of these issues.  It

3    can get complicated, obviously, whether there are others in

4    precisely the same circumstance as you, I don't know.  The

5    issues about the collateral and the loan program, I'm

6    certainly aware of.  They're going to have to be resolved.

7    I'm trying as expeditiously as I can to be able to get

8    through these, to get through as many issues as soon as

9    possible.  So I'm not aware of your particular factual

10   circumstances, but it's an example of issues that I was

11   aware of, okay.

12           MR. BAZOLIST:  Yeah --

13           THE COURT:  So it's not going to get -- it's not

14   going to get resolved with what I'm being asked to do now.

15   It isn't going to disappear.  Okay.

16           MR. BAZOLIST:  Right, and I'm firmly in a Custody

17   account now.  It's just this whole concept of tainted funds

18   if you've ever touched the Earn program I think is what a

19   lot of people are having an issue with.

20           THE COURT:  Sure.  Okay.  Thanks very much.

21   Deanna, who else do we have to hear from?

22           CLERK:  Next is Rob Butryn; is that correct?

23           MR. BUTRYN:  That's correct.  Thank you, Your

24   Honor.  I'm a accredited investor.  I've been involved with

25   Celsius since 2019.  I was mainly in the Earn Program, but I

1    did move a lot of funds into -- actually transferred all my

2    funds almost off the account just before the freeze.  Tried

3    to get the remaining out just before the freeze actually,

4    day before the freeze, and I was told I had to wait 48 hours

5    to establish a new wallet address for them which they knew

6    which wallet it came from.  They just wanted to have that

7    time of reference for security.  So in that timeframe, I

8    moved it to Custody.

9           Now, a previous person from the audience spoke

10   about the ledger system and how wallets are, you know, in

11   the cryptocurrency space looked at and, you know, I manage

12   many wallets.  I'm the manager of several trusts with my

13   family, but this is a different instance, Your Honor, where

14   a company was holding our funds.  The only wallet we were

15   aware of was the wallet we saw on our app or our screen.  I

16   don't think we could look at a ledger system as far as where

17   the assets were held.  We went by what we agreed with in the

18   terms of use when we said to move them.  Thank you, Your

19   Honor.

20          THE COURT:  Okay.  Deanna, next?

21          CLERK:  I don't see any additional raised hands,

22   Judge.

23          THE COURT:  Okay.  Is there any response from --

24   reply on this issue from counsel in the courtroom?

25          CLERK:  Sorry, Judge.  Simon Dixon just raised his

1    hand.

2            THE COURT:  All right, please go ahead.

3            MR. DIXON:  Hi, Simon Dixon, creditor.  Just

4    wanted to bring to the attention that the option for using

5    Custody wasn't available for any international clients.  So

6    it was the only option available for U.S. customers.  So we

7    were never presented with that option, just for the record.

8            THE COURT:  Okay, thank you.  All right, anybody

9    in the courtroom wish to reply?  All right.  Let's move on

10   to the Withhold.

11           MR. COLODNY:  Your Honor, Aaron Colodny for the

12   Official Creditors Committee.  I don't have a reply, but I

13   just wanted to clarify my previous comments.

14           THE COURT:  Sure.

15           MR. COLODNY:  If you look at Docket No. 1411,

16   which is the examiner's report, PDF Page 213 to 214, it has

17   the amounts in Custody wallets as of the petition date.

18           THE COURT:  What does it show?

19           MR. COLODNY:  It shows --

20           THE COURT:  Somewhere I have the examiner's

21   report.

22           MR. COLODNY:  So it shows --

23           THE COURT:  Hold on a second.  I really did --

24   which page?

25           MR. COLODNY:  It's PDF Page 214.  It's in the

1     exhibits, Your Honor.  Looks like --

2             THE COURT:  Oh, I don't --

3             MR. COLODNY:  -- short a copy.

4             THE COURT:  Go ahead and tell me what it shows.

5             MR. COLODNY:  So it shows $182,934,763.78 -- and

6     that's U.S. dollars -- worth of assets in the Custody

7     wallets as of the petition date.  The difference equals that

8     200 approximate number I gave you before.

9             THE COURT:  Thanks very much, Mr. Colodny.

10            MR. COLODNY:  Thank you.

11            THE COURT:  I appreciate it.  All right, let's

12    move on to Withhold, then.  Ms. Kovsky.

13            MS. KOVSKY-APAP:  Good morning, Your Honor.  Deb

14    Kovsky, Troutman Pepper on behalf of the Withhold account

15    holders.  If Your Honor will indulge me for a few minutes, I

16    think it's important to give a little bit of background and

17    context on the Withhold group members' position, how we got

18    here, and why legally we should be treated the same as

19    Custody.

20            Because Your Honor's asked this of the Custody

21    account holders, I will say that the size of the Withhold

22    accounts across the board, across all nine prohibited

23    states, not just the Withhold group, is actually smaller

24    than the entirety of the 6 percent of Custody assets that

25    are in question between the parties.  I believe it's about

Page 73

1     $15 million.

2          So how did we get here?  As Your Honor previously

3     stated, once the Custody Program was launched by Celsius,

4     the Debtors changed the architecture of their platform.  So

5     if you were a nonaccredited investor in the United States,

6     you could no longer transfer your digital assets from Earn

7     to an external wallet.  You have to go first through a

8     default account.

9          From the default account, you could then initiate

10    a transfer to a whitelisted external wallet.  In most

11    states, the default account was Custody.  In the nine

12    prohibited states where the Debtors were not permitted

13    because they lacked the necessary licenses to Custody coins

14    on behalf of customers, it was the Withhold account which

15    basically served the same sort of central way station or

16    lobby function as the Custody accounts.

17          THE COURT:  So let me ask you.  There was no

18    withhold wallet; do you agree with that?

19          MS. KOVSKY-APAP:  I do agree with that, Your

20    Honor.

21          THE COURT:  So we're talking about ledger entries?

22          MS. KOVSKY-APAP:  We are, Your Honor.

23          THE COURT:  Okay.

24          MS. KOVSKY-APAP:  And just like Mr. Ortiz and Mr.

25    Koenig, the Withhold Group believes that it's the ledger

1    entries, it's the contractual relationship as reflected on

2    Celsius' ledger --

3              THE COURT:  Well, when you say the contractual

4    relationship, you can educate me if I've got this wrong, but

5    this is what I've sort of struggled with, with respect to

6    Withhold.  There is no -- there are no terms of use that

7    deal with what -- the Ad Hoc Group, the Withhold account

8    holders, the approximately $15 million of people who are in

9    this broader category.  Okay.  That's correct, right?

10              MS. KOVSKY-APAP:  That is correct, Your Honor.

11              THE COURT:  Okay.  So what I have puzzled about is

12    in the absence of a written contract dealing with hold --

13    with the Withhold issues, what's the construct, the contract

14    construct?  How do I determine what are the rules?  It is an

15    implied contract?  Is it -- I don't even know that -- I

16    mean, there's no -- I can't, I don't have anything pointing

17    to -- there was an oral agreement that was reached.

18              There was -- they had this problem.  When I say

19    they, the Debtors.  They couldn't provide Custody accounts

20    to people in the nine states.  So they created -- I'll call

21    it a fiction, but I mean it -- they had some intent when

22    they did it.  There are ledger entries.  How do I -- is it a

23    contract claim?  What is it?

24              MS. KOVSKY-APAP:  Well, Your Honor, I think it is

25    a contract claim, but I think we need to --

1              THE COURT:  What's the contract?

2              MS. KOVSKY-APAP:  Well, we need to approach it

3     from the opposite direction.  Remember, all of the assets

4     that belong to the Withhold Group -- and I'm speaking just

5     for my clients, not for the Withhold accounts as a whole --

6     but all of them had assets that were originally in the Earn

7     program and then left the Earn --

8              THE COURT:  Well, they're not -- well, maybe your

9     group, but -- so there was a category of, I think there was

10    a category of Withhold before Custody was established.  And

11    so if an account holder tried to deposit a species of crypto

12    that Celsius couldn't accept but the transfers happened

13    through blockchain and the stuff came to Celsius, okay, what

14    do they do with it?  And that problem existed before the

15    Custody accounts were held, right?  Am I right about that?

16             MS. KOVSKY-APAP:  Yes, Your Honor, and in fact, I

17    think that's what the Debtors referred to as pure withhold

18    accounts, coins that either weren't eligible digital assets

19    or once the Custody program launched, coins that were coming

20    in newly deposited on the platform from customers in the

21    prohibited states.  And the Debtors' position on those

22    coins, which we agree with, which I think even the Committee

23    doesn't dispute, is that the pure withhold assets are not

24    property of the estate, notwithstanding the fact that there

25    are no contractual terms.  Nobody is disputing that the --

1    nobody says that the lack of contractual terms around those

2    coins somehow makes them property of the estate.

3              THE COURT:  You know, when --

4              MS. KOVSKY-APAP:  So that's --

5              THE COURT:  -- I took a bar exam, I took the New

6    York Bar in 1971, I think.  Bailments were still covered on

7    the New York Bar exam in 1971.  Fortunately, I don't

8    remember any questions on the exam, but you had to study it.

9    So -- but there's law about bailment.  And I guess in the

10   absence of the written contract, I mean the law bailment may

11   still apply.  I don't know whether it had to be in writing.

12             I mean, they received these coins.  They weren't

13   eligible coins.  I believe that the Debtors and the

14   Committee agree that title never transferred to the Debtor

15   of those coins.  There's no issue about tracing because they

16   were coins that came in and couldn't be put into an Earn

17   Program, right?

18             MS. KOVSKY-APAP:  That's my understanding, Your

19   Honor.  Although as a practical matter, they went into the

20   aggregated main wallets and were used however they were

21   used, and yet notwithstanding that fact, the Debtors and the

22   Committee and the Withhold group all are in alignment that

23   those pure withhold assets, not property of the estate.

24             THE COURT:  Okay.  So what's the legal framework

25   that I -- so there's no contract terms you can -- no written

1    contract terms you can point to.  Is it that you're relying

2    on principles of constructive trust law?  What is it that

3    you're -- in the absence of the written contractual terms

4    that you're relying on to establish the rights of each of

5    the respective parties?

6              MS. KOVSKY-APAP:  Your Honor, let me separate this

7    because (audio drops) my clients --

8              THE COURT:  I understand.

9              MS. KOVSKY-APAP:  -- and I can only speak for my

10    clients.  With respect to what we'll call the transferred

11    Withhold assets which the Debtors have put in the bucket of

12    in general, the Withhold assets, those are assets that were

13    transferred from the Earn Program.  And why is that

14    meaningful?  The Debtors and the Committee seem to be taking

15    the position or certainly the Committee is taking the

16    position that the default position is, if you transferred

17    assets onto the platform, then by default you must be

18    granting right and title to those assets --

19              THE COURT:  This is where the Debtor -- they'll

20    correct me if I'm wrong.  They sort of flip-flopped between

21    their opening position and their reply.

22              MS. KOVSKY-APAP:  They did indeed, Your Honor, and

23    had I been doing --

24              THE COURT:  Committee says no, no, no, no, no.

25              MS. KOVSKY-APAP:  Had I been going in order with

1    my presentation, I would have gone through and highlighted

2    how over and over and over again.  And Your Honor, the whole

3    reason we're here today, how this all got started, the

4    Debtors filed their, what we've been calling their Custody

5    and Withhold motion, their motion to reopen withdrawals for

6    pure Custody assets and pure Withhold assets.  And, great,

7    that's a great start.

8             It doesn't go far enough though, because the

9    transferred assets should really be released to the

10   customers as well.  And so we ended up, you know, in this --

11   you know, that led to our motion for stay relief which led

12   to the scheduling order, which led to the phase one

13   briefing.  But it all ties back to the Debtors' original

14   motion and if you go through that motion again and again,

15   they concede that the Withhold assets are not property of

16   the estate.

17            They're saying some of them may be subject to a

18   preference claim, but --

19            THE COURT:  Well, this where they may have flip

20   flopped, okay?

21            MS. KOVSKY-APAP:  They have indeed flip flopped

22   Your Honor.

23            THE COURT:  Okay.  Do you agree with respect to

24   your -- the withhold that you're -- not the pure Withhold,

25   the Withhold that you're talking about, title to the assets

Page 79

1      when in the Earn Program were with the Debtors?

2              MS. KOVSKY-APAP:  I agree that that is what the

3      terms of use say that that's the contractual provision that

4      granted Celsius right and titled to the assets.  Celsius

5      didn't magically acquire right and titled in a vacuum,

6      absent contractual terms.

7              THE COURT:  No, but I guess the point is that when

8      your clients deposited crypto with the Debtors, title to the

9      crypto, those crypto assets because -- went into Earn

10     accounts, title passed to the Debtors.  And then the issue

11     is, well, when they wanted to move out of the Earn accounts,

12     where did title go?

13             MS. KOVSKY-APAP:  Exactly, Your Honor, and to

14     determine that --

15             THE COURT:  that's what I -- where do I go to

16     determine that/

17             MS. KOVSKY-APAP:  We go to Sections 4(d) and 13 of

18     the Terms of Use.

19             THE COURT:  So let's go there and point that out

20     to me specifically.

21             MS. KOVSKY-APAP:  All right.  So Section 4(d), and

22     we have to --

23             THE COURT:  Let me get to it.  Okay.

24             MS. KOVSKY-APAP:  Sure.  And it's page --

25             THE COURT:  I'm there.

1           MS. KOVSKY-APAP:  -- five -- okay.  For the

2      record, 538 of 1126 pages in Docket No. 393.

3           THE COURT:  Right.

4           MS. KOVSKY-APAP:  And so what it says, if you go

5      to the bottom of the page.  "If our Earn service is

6      available to you, upon your election, you will lend your

7      eligible digital assets to Celsius and grand Celsius all

8      rights and title to such digital assets for Celsius to use

9      in its sole discretion while using the Earn service."

10          That's a limitation on the contractual --

11          THE COURT:  You're focusing on the last words,

12      while used in the Earn service.  And when your clients say

13      move it and they're no longer in the Earn service, then we

14      have to ask the question, well, where'd title go.

15          MS. KOVSKY-APAP:  Exactly, Your Honor.  And if the

16      grant of title is by its expressed terms limited in time to

17      the period that they were using the Earn service, I think

18      that has to be the answer because they -- Celsius doesn't

19      acquire more than what the customers grant them.  And the

20      same thing if you look at Section 13 of the terms of use,

21      consent to Celsius --

22          THE COURT:  Let me switch --

23          MS. KOVSKY-APAP:  Sure.

24          THE COURT:  Go ahead.

25          MS. KOVSKY-APAP:  Consent to --

1              THE COURT:  I'm on 554; are you on the same page?

2              MS. KOVSKY-APAP:  Yes, Page 554 of 1126, still in

3    Docket No. 393.  Section 13 says, "In consideration for the

4    rewards payable to you on the eligible digital assets using

5    the Earn service for us entering into any loan agreement" --

6    not really relevant here -- "and the use of our services,

7    you grant Celsius, subject to applicable law and for the

8    duration of the period during which you elect to utilize" --

9              THE COURT:  Okay.

10             MS. KOVSKY-APAP:  -- "the eligible digital assets

11   in the Earn service" -- et cetera, et cetera -- "all right

12   and title to such eligible digital assets."  It specifically

13   says that you are only granting your consent for the

14   duration of this period.

15             THE COURT:  So your argument is that while the

16   words of the term -- Version 8 of the terms of use do not

17   state what happens to title when the stuff is moved out of

18   Earn.  You agree with me, they don't -- it doesn't

19   specifically -- there are no words in the Version 8 that

20   deal with the circumstance you're talking about.  The people

21   elected, I want out of Earn, I'm no longer receiving

22   rewards, and you're saying that the language going back

23   earlier, the language only so long as it's in the Earn

24   Program, you're saying the negative implication of that is

25   title passes back to the Withhold people?

Page 82

1          MS. KOVSKY-APAP:  Essentially, Your Honor.  I

2     think it's a little bit more than a negative implication

3     because the grants of right and title in the first instance

4     was expressly limited and Celsius couldn't get more of a

5     grant of title than the customer granted to it.  You know,

6     the Debtors said, oh well this is just a negative

7     implication, so we can just read it out of the contract.

8          THE COURT:  But I'm not sure.  I don't necessarily

9     agree with reading it out of the contract, but there are no

10    express words that say, that deal with title after it comes

11    out of the Earn.  Right?

12         MS. KOVSKY-APAP:  Your Honor, I disagree.  I

13    believe that the grant of title being limited to the

14    duration of a specific period cannot extend beyond that

15    period.  There's no express language in the contract saying

16    that by the way, once you're no longer using the Earn

17    service, despite the fact it says only for this duration,

18    Celsius will still get to retain right and title.  There's

19    no express terms there and the question is really, who are

20    we going to be construing this contract against and who are

21    we construing it in favor of?

22         This is a contract of adhesion.  This is a take it

23    or leave it clickwrap, you know, click a button contract

24    that could not be negotiated or modified by the customers,

25    and Celsius wants this contract to be construed in its favor

1    to say, well, you know, maybe there's an ambiguity here that

2    it doesn't say expressly that right and titled reverts.  It

3    does say expressly right and title is granted for this

4    duration --

5                THE COURT:  Right.

6                MS. KOVSKY-APAP:  But Judge, construe this in

7    favor of Celsius and allow Celsius to retain right and title

8    beyond the express terms of the grant?  That is absolutely

9    contract to black letter law --

10               THE COURT:  That is --

11               MS. KOVSKY-APAP:  I'm sorry, absolutely contrary

12   to black letter law.  A contract --

13               THE COURT:  Just humor me.  Point me to the black

14   letter law that you say it's contrary to.

15               MS. KOVSKY-APAP:  Give me one second, Your Honor.

16               THE COURT:  Fine.  I have your brief here,

17   somewhere.

18               MS. KOVSKY-APAP:  It is in our brief.

19               THE COURT:  Yeah, I'm sure it is.  So --

20               MS. KOVSKY-APAP:  I should have marked the page.

21               THE COURT:  Is this your phase one response brief

22   or the earlier?

23               MS. KOVSKY-APAP:  I believe it was in our response

24   brief.

25               THE COURT:  Okay.  I've got that right in front of

1     me.

2              MS. KOVSKY-APAP:  So, we've got Westchester Resco

3     --

4              THE COURT:  Tell me the page.

5              MS. KOVSKY-APAP:  Page 9 of 24.

6              THE COURT:  Okay.

7              MS. KOVSKY-APAP:  Paragraph 7.

8              THE COURT:  I must have the wrong briefing.

9              MS. KOVSKY-APAP:  It's Docket 1573.

10             THE COURT:  Hang on.  See if I have -- okay, I'm

11    at Page 9.  Which paragraph?

12             MS. KOVSKY-APAP:  Paragraph 7.

13             THE COURT:  Okay, go ahead.  I have it in front of

14    me.  That wasn't the same ECF docket number you gave me.

15             MS. KOVSKY-APAP:  The docket number at the top of

16    my page is 1573.

17             THE COURT:  Okay.  It is.  Go ahead.  I've got it

18    -- have it on paper and I have it open on the screen.  Just

19    -- forgive me.

20             MS. KOVSKY-APAP:  Not a problem at all, Your

21    Honor, and --

22             THE COURT:  Paragraph 7 on Page 5.

23             MS. KOVSKY-APAP:  I have -- I'm sorry, Page 5 of

24    the document, page 9 of 24 of the PDF.  And in answer to

25    your question, the -- some of the cases that set forth the

Page 85

```
 1     fairly uncontroversial principle that contracts get

 2     construed against the drafter, we have Westchester Resco Co

 3     LP v. New England Reinsurance Corp, 818 F.2d 2, and that's

 4     second -- .

 5               THE COURT:  I have -- now I've got the cites open

 6     in front of me.  So you're relying on these, the cases that

 7     you've cited in Paragraph 7 of this briefing?

 8               MS. KOVSKY-APAP:  Correct, Your Honor, and this is

 9     just a representative sampling --

10               THE COURT:  Sure.

11               MS. KOVSKY-APAP:  -- of cases.  It's a fairly, as

12     I said, I think a fairly noncontroversial principle,

13     although in application here, there seems to be quite a lot

14     of disagreement between the parties and Celsius and the

15     Committee seem to be advocating for a construction of the

16     Earn terms of use in a way that is materially detrimental to

17     the customers and in favor of Celsius.

18               THE COURT:  Okay.

19               MS. KOVSKY-APAP:  So -- I'm sorry --

20               THE COURT:  You're just -- but I guess the point

21     is, the legal principle that you're relying on in support of

22     your argument is that ambiguity should be construed against

23     Celsius.

24               MS. KOVSKY-APAP:  Our first point is that we think

25     it's not ambiguous, that it's clear that the term of the
```

1    grant was time limited but in the event the Court does find

2    that there is an ambiguity there, it must be construed

3    against Celsius and in favor of the customers.

4            THE COURT:  It was -- the specific grant appears

5    to be time limited, but where it went after the time expired

6    is not stated clearly.

7            MS. KOVSKY-APAP:  That's correct.  It could have

8    gone anywhere.  It could have gone to another service where

9    the customers regranted title to Celsius.

10           THE COURT:  Right.  I just want to be sure I've

11   got your -- okay.

12           MS. KOVSKY-APAP:  Yes.  All right.  So have I

13   fully answered Your Honor's question --

14           THE COURT:  You did.

15           MS. KOVSKY-APAP:  -- about the contractual --

16           THE COURT:  Absolutely.

17           MS. KOVSKY-APAP:  All right.

18           THE COURT:  I don't know if I agree, but -- I

19   haven't decided one way or the other, but I understand your

20   point.

21           MS. KOVSKY-APAP:  Understood, Your Honor.  Thank

22   you.  Then with respect to, so where did they go, they went

23   to his no man's land, this holding place that the Debtors

24   have called Withhold.  It's a separate account on the

25   system.  It's separately tracked --

Page 87

```
 1                    THE COURT:  Separate --
 2                    MS. KOVSKY-APAP:  -- the ledger.
 3                    THE COURT:  -- the ledger.  It was transferred on
 4     the ledger.
 5                    MS. KOVSKY-APAP:  Yes, it was, Your Honor.
 6                    THE COURT:  Transferred from Earn to -- did they
 7     call it Withhold on the ledger?
 8                    MS. KOVSKY-APAP:  I don't know if they called it
 9     Withhold on the ledger.  It certainly appeared that way in
10     the app.
11                    THE COURT:  Withhold?
12                    MS. KOVSKY-APAP:  Withhold.
13                    THE COURT:  Okay.
14                    MS. KOVSKY-APAP:  And I know that the Debtors have
15     variously called it withheld or withhold, but it appears as
16     Withhold account --
17                    THE COURT:  Okay.
18                    MS. KOVSKY-APAP:  -- if you go on your phone, and
19     --
20                    THE COURT:  Sure.
21                    MS. KOVSKY-APAP:  -- go into the app.  So I guess
22     part of the question is, how do we treat this no man's land
23     of Withhold.  And one of the things I think we need to look
24     to is what's the Debtors' stated intent.  How did the Debtor
25     think about this Withhold account that it created and that
```

Page 88

1    as I said, how we got here, why we're in Court today, it all

2    started with the Debtors' initial Custody and Withhold

3    motion.  And that's inextricably tied to the issues of

4    ownership that we're discussing here.  So I'd like to --

5            THE COURT:  But you would agree, I take it, if

6    ownership transferred back to your clients, then we got to

7    deal with the preference issues.

8            MS. KOVSKY-APAP:  Yes, Your Honor.  I do agree,

9    and in fact, that's -- it's a little bit of an odd position

10   that the Debtors are taking now because they were so clear

11   in their Custody and Withhold motion that look, none of

12   these are property of the estate, but if they transferred --

13           THE COURT:  I'm not sure it was quite as clear as

14   you just said.  They -- I don't have the brief, the first

15   briefs.  I sort of remember when this issue came up in

16   Court.  They acknowledged that could be the result, but I'm

17   not sure that they committed -- I don't think there was a

18   concession that they could be bound to.  What -- go ahead.

19           MS. KOVSKY-APAP:  Well, if you look at Paragraph

20   30 of their Custody and Withhold motion, and if we treat

21   these as judicial admissions as I think they are, the Debtor

22   said that the Withhold assets, which by the way they define,

23   they expressly define in their motion that the transferred

24   Withhold assets are included in this defined term Withhold

25   assets.

1            And what they say at Paragraph 30 is with respect

2    to the Withhold assets, the Debtors have never claimed or

3    acquired an equitable interest in the cryptocurrency stored

4    in Withhold accounts.  Thus Custody and Withhold assets are

5    held by the Debtors on behalf of customers and are not

6    property of the Debtors' estate.

7            But I think even more meaningfully specifically,

8    with respect to the transferred Withhold assets, the

9    argument that they're making that they have -- and they've

10   said this flat out -- we have a prima facie claim for a

11   preference against these assets.  Why?  Because they said

12   that each transfer from the Earn Program to a Withhold

13   account was -- and I'm going to quote them here -- "made to

14   or for the benefit of a creditor on account of an antecedent

15   debt, i.e., extinguishing the Debtors' contractual

16   obligations to return the cryptocurrency to the customers" -

17   -

18            THE COURT:  That was before they changed their

19   position in --

20            MS. KOVSKY-APAP:  -- "pursuant to the latest terms

21   of use."  Yes, that was before they changed their position,

22   but this is -- they admitted their intent at this point and

23   they're still claiming that they have a prima facie case for

24   a preference.  Your Honor, if there was no transfer --

25            THE COURT:  Only -- no.  They only have a prima

1     facie case for preference if title was transferred back to

2     your clients.

3             MS. KOVSKY-APAP:  And they have asserted that they

4     do.  I'm not saying -- I'm not saying that Your Honor has to

5     accept their assertion.  I'm saying that if we want to

6     understand what the Debtors' intent was with respect to

7     these Withhold accounts, there's no better evidence to look

8     to than their own statement.  You know, if the transfer from

9     Earn to Withhold extinguished their contractual obligation

10    to return assets, that's about as clear a statement of

11    intent as you can get.

12            THE COURT:  Then it throws us (audio drops)

13    problem of tracing.

14            MS. KOVSKY-APAP:  It does, problem of tracing.

15    And in that regard, I have to say I agree wholeheartedly

16    with all of the arguments that Mr. Ortiz was making with

17    respect to the Custody accounts.  I think he's absolutely

18    correct.  It doesn't -- what happens on the blockchain,

19    where the assets happened to be stored is not the relevant

20    question here.  The relevant question is, what's the

21    contractual relationship?  What was reflected on the ledger?

22    What did the parties agree to?  What was their intent?

23            THE COURT:  Well, if they disregarded the contract

24    and put the assets into an aggregated wallet, that included

25    everybody else's crypto or lots of other people's crypto,

Page 91

1    then you're faced with the issue of how do I determine which

2    of that -- what's in that aggregated wallet really is mine,

3    and if there's a shortfall, how is it allocated?

4              MS. KOVSKY-APAP:  Well, here's the thing, Your

5    Honor.  If you look at all of the assets that were held on

6    the Debtors' platform, with the exception of a couple of

7    minor coins that are not at issue for any members of my

8    group, there was no shortfall.  If you look at all of the

9    assets across the platform that Celsius held with respect to

10   the Custody assets, there was no shortfall.  The coins are

11   there and the Committee has made the point, oh well,

12   Withhold is asking for special treatment.  You know, they

13   think just because they sued first, they should get to the

14   front of the line.

15             That is absolutely not the case, Your Honor.  The

16   issue is that contractually, legally according to the terms

17   of use, title reverted from Celsius back to the owners.

18             THE COURT:  Let's assume I come out the way you

19   just said.  Where were those -- on their ledger?  Well,

20   first, in wallet, where were the coins held?

21             MS. KOVSKY-APAP:  Based on Oren Bronstein's

22   declaration, coins that were associated with the Withhold

23   accounts were held in main aggregator wallets.

24             THE COURT:  Okay.  And what about on the ledger?

25   Where -- what's reflected on the ledger about who owned the

Page 92

1    assets in the aggregated wallet?

2              MS. KOVSKY-APAP:  Your Honor, I don't think the

3    ledger speaks to ownership interests.

4              THE COURT:  Well, is there any designation in the

5    ledger for the aggregated -- I assume there's a ledger for

6    it?

7              MS. KOVSKY-APAP:  I believe it's -- and I will

8    defer to Debtors' counsel if I get this wrong.  My

9    understanding is there's one big ledger that tracks

10   everything and it will show what coins are allocated to

11   borrow, what coins are allocated to Earn, what coins are

12   allocated to Withhold, to Custody.  And it's all one big

13   database.

14             THE COURT:  Okay.

15             MS. KOVSKY-APAP:  At least that is my very

16   layman's lawyer understanding.

17             THE COURT:  So you believe that --  and I don't

18   know if I have an exhibit that shows this -- that there's an

19   accurate accounting in Celsius' ledger about what crypto

20   coins of various species or types are Celsius' property,

21   which are Withhold, which are Custody?

22             MS. KOVSKY-APAP:  Well, again, I don't know that

23   the ledger speaks to who owns what property, but I do

24   believe there's a -- I have no reason to question the

25   accuracy of the ledger when it says there's this many coins

Page 93

1    associated with Custody, this many coins associated with

2    hold, this many with Earn.  I'm basing that in part on the

3    fact that I know customers -- and this is attached to -- in

4    declarations attached to our initial filing -- they're able

5    to download CSV files to show their transaction history.  My

6    understanding is that those came directly from Celsius'

7    ledger and they appear to be accurate.

8              THE COURT:  Okay.  All right.

9              MS. KOVSKY-APAP:  One point that I think is

10   important to clarify, so the Debtors and the Committee spent

11   a lot of time focusing in their response briefs on

12   distinguishing between the Custody assets, which everybody

13   agrees -- including the Withhold Group by the way -- and

14   notwithstanding comments we made in our response brief, I

15   don't want to give the impression that we believe Custody

16   assets are property of the estate.  We believe they belong

17   to the customers.

18             But the Debtors and the Committee spent a lot of

19   time trying to distinguish those assets from the Withhold

20   assets.  For example, they spent a lot of time focusing on

21   the fact that the Withhold assets were commingled in main

22   wallets, the concern that Your Honor just raised, and those

23   could be deployed across the platform.

24             Well, so are the Custody assets.  The examiner's

25   report makes it clear that when Custody assets were

Page 94

1    deposited into what a customer thought was a Custody

2    account, that was a ledger entry.  It popped up immediately

3    on the ledger.  It was in the app.  But the assets

4    themselves went into the main aggregator wallets.  They were

5    commingled.  They could have been deployed by Celsius.  They

6    might have been taken off of the platform altogether by the

7    customer before there was ever any true-up by Celsius of the

8    amounts in the Custody wallet.

9         And if a depositor transferred from Earn into the

10   Custody account, again, nothing happened on the blockchain.

11   It was a ledger entry.  The assets stayed right where they

12   were in the main aggregator wallet and at some point, maybe

13   days later, Celsius would transfer some of the commingled

14   assets from the main wallet to the Custody wallet to try to

15   backstop the Custody assets, but those weren't Custody

16   customers' assets.

17        They were commingled from the main wallet.  They

18   could have come from anyone.  They could have come from

19   members of the Withhold Group.  And as I said, because of

20   the timing and the delays in true-ups, a Custody customer

21   could transfer from Earn to Custody to an external wallet

22   all before Celsius even performed a single reconciliation or

23   true-up.  So if having assets --

24        THE COURT:  That's the problem, isn't it?

25        MS. KOVSKY-APAP:  Well, here's the thing, though.

Page 95

1    Everybody agrees though, that Custody assets belong to

2    Custody.  And if having assets in the comingled main wallets

3    don't make Custody assets property of the estate, that

4    shouldn't make Withhold assets property of the estate

5    either.  Another thing that the Committee points out is that

6    when a customer transferred assets from Earn to Withhold, no

7    coins immediately moved from one wallet to another.  It was

8    a block -- it was, nothing happened on the blockchain.  It

9    was just a ledger entry.

10         Okay, well, you know, what was true of Withhold is

11   true of Custody as well.  The fact that Custody customers

12   were able to move their assets from one legal status under

13   Earn to a different legal status under Custody by pushing a

14   button and making a ledger entry without any movement on the

15   blockchain, if they could do that, then Withhold could do

16   that, too.

17         All right.  So then the Committee says, well, the

18   Withhold account holders were only entitled to get back the

19   same type and amount of assets they deposited, not the

20   actual coins.  It wasn't 100 percent clear to me, but that

21   appeared to be an argument against Withhold assets belonging

22   to the Withhold customers.

23         THE COURT:  That was true for all customers,

24   period.

25         MS. KOVSKY-APAP:  Exactly.  That was true for all

1    customers.  So that's not a valid reason to --

2              THE COURT:  Earn account holders, they're -- they

3    just had to get in-kind.  If they wanted to withdraw, they

4    got in-kind distributions of Bitcoin or whatever that that

5    they deposited.

6              MS. KOVSKY-APAP:  Exactly.  The same with Custody.

7    The same as with Withhold.  So that fact doesn't argue in

8    favor of Custody being property of the estate, but not

9    Withhold or -- I said that backwards.  That doesn't mean

10   that Custody is not property of the estate but Withhold is.

11   That was the point I was trying to make.

12             If customers wanted to withdraw assets to an

13   external wallet, a Custody customer hits the button to do a

14   transfer to an external wallet.  Nothing comes out of the

15   Custody wallet.  The examiner's report, the Blonstein

16   declaration make it clear that those withdrawals came out of

17   a frictional wallet that was pulling from the aggregated

18   main wallet, same as Withhold.

19             Well, if it was good enough for Custody and

20   Custody is not property of the estate, the same should be

21   true of Withhold.  At the end of the day, the only real

22   difference between Custody and Withhold is that the Debtors

23   did make a somewhat sloppy, somewhat imperfect attempt to

24   maintain a liquidity reserve to backstop Custody.

25             THE COURT:  When I look at the universe of Earn,

Page 97

1    Custody, Withhold, do you agree there is a shortfall for at

2    least some of the coins that were supposedly being held by

3    Celsius?

4            MS. KOVSKY-APAP:  I agree that if you look at

5    everything solely in the aggregate without making any

6    distinctions between coins that are still on loan to Celsius

7    and subject to a grant of right and title versus coins that

8    have legally already been returned to the customers, then

9    yes, that's a true statement.

10           THE COURT:  All right.  And how's -- if I accept

11   your argument, how does the Court order relief recognizing

12   that there -- there isn't a shortfall in every category of

13   crypto.  There are -- there is a shortfall in some, right?

14           MS. KOVSKY-APAP:  Your Honor, I haven't looked at

15   the shortfalls across the board.  I've only looked at the

16   Withhold assets and there are, I believe, five coins with

17   respect to which there is a shortfall with respect --

18           THE COURT:  How does the Court -- let's just deal

19   with that, okay, so you say five coins is a shortfall.  How

20   is the Court in your view supposed to deal with awarding

21   relief where there is a shortfall in five of the species of

22   coins?

23           MS. KOVSKY-APAP:  Well, every Withhold account

24   customer knows and Celsius knows exactly what coins they

25   held and in what amounts.  As long as the balance of those

Page 98

1    coins never fell below what those customers are owed, they

2    should be able to recover them, so --

3              THE COURT:  To the disadvantage of Earn account

4    holders.

5              MS. KOVSKY-APAP:  It's not a disadvantage --

6              THE COURT:  It is.

7              MS. KOVSKY-APAP:  -- Your Honor.

8              THE COURT:  Every coin, every piece, you know --

9    call them dollars.  It's just easier for me to do that.

10   Every dollar paid back to Withhold that's coming out of an

11   aggregated wallet is that much less available for pro rata

12   distribution to unsecured creditors; yes or no?

13             MS. KOVSKY-APAP:  Can I give the yes but lawyer

14   answer?  Yes --

15             THE COURT:  Yes, then you can go ahead and explain

16   your answer.  Go head.

17             MS. KOVSKY-APAP:  Okay.  I would say --

18             THE COURT:  I'm not trying to -- I'm not trying to

19   trick you.  I just --

20             MS. KOVSKY-APAP:  Yes, but as Your Honor has

21   stated at a number of other hearings, that is the

22   unfortunate result that happens when legally some of those

23   coins are property of the estate and some of them are not.

24             THE COURT:  Well, but the law has developed a

25   variety of ways of allocating a shortfall.  And the ways of

Page 99

1    allocating the shortfall is not to give your clients 100

2    percent and diminish what unsecured creditors recover.  It

3    doesn't mean you don't get anything but there's a short --

4    and it may be on a coin-by-coin basis.  You say there's only

5    five.  I'll accept that for present purposes.

6              MS. KOVSKY-APAP:  And Your Honor, that comes from

7    the stipulation that we --

8              THE COURT:  Yeah, that's fine.  I read -- I reread

9    the stipulations this morning.  If I accept your position

10   that title transferred back to your clients and there was no

11   separate wallets that the coins went into, they were in an

12   aggregated wallet, and for certain for five of the types of

13   coins, there's not enough to go around; that means

14   allocating a shortfall.  And you're -- you seem to be taking

15   the view of we get everything, they suffer the loss.  Why is

16   that?

17             MS. KOVSKY-APAP:  Your Honor, I'm not saying we

18   get everything and they suffer the loss.  And certainly just

19   to clarify, with respect to the five shortfall coins, none

20   of them, none of my clients are owed or own any of those

21   coins in their Withhold accounts.

22             THE COURT:  Okay, but --

23             MS. KOVSKY-APAP:  Put those to the side.

24             THE COURT:  You're asking me to decide issues.

25   You've got an Ad Hoc Committee.  There are specific members

1      of it, but there are others who aren't part of the Ad Hoc

2      Committee.

3                  MS. KOVSKY-APAP:  Correct.

4                  THE COURT:  And I'm trying to come up with, okay,

5      here's the -- you know, it may be that if your clients

6      aren't faced with the shortfall, the issue of allocating the

7      shortfall, good for them, you know, assuming I find for you

8      on the other issues.  But there are people who would have

9      the coins for which there is a shortfall.

10                 MS. KOVSKY-APAP:  Right.  So if we're looking at

11     all of the Withhold account holders as a group and we're

12     looking at the shortfall to satisfy their ownership rights

13     in their assets, yes, there is a shortfall as to specific

14     coins, but then we go to the lowest intermediate balance

15     test and that's the unfortunate fact.  If you own assets,

16     they're not property of the estate, they're still in the

17     Debtors' possession, the Debtor has wrongfully commingled

18     them, and there's not enough of a particular type of asset

19     to satisfy what you own, then you're not going to get it.

20     so if --

21                 THE COURT:  And I can say, the only -- in the last

22     16 years, I think I've only had one case where this was the

23     issue, was an issue.  And you know, the parties argued

24     Colorado law applied in the case and what their way of

25     allocating shortfall.  I got law in different states and

Page 101

1    mercifully  the parties resolved the issue by agreement and

2    there was a 1919 and it got approved.  But otherwise, I

3    would have ultimately had to -- I had bench memos analyzing

4    the different ways of allocating the loss.  I didn't

5    actually have to decide it.  I thought I might have.  I went

6    back to look at the cases.  I didn't have to decide.  The

7    party's resolved it.

8              So -- but you're again, you say not your clients

9    and I'll ask the Committee and the Debtor how many potential

10   Withhold account holders deposited coins for which there's a

11   shortfall and for which some rules on allocation would have

12   to be made.  You say that doesn't involve your specific

13   clients on the Ad Hoc Committee, right?

14             MS. KOVSKY-APAP:  Right.  So unfortunately I

15   didn't delve further into --

16             THE COURT:   That's okay.

17             MS. KOVSKY-APAP:  -- to investigate what the

18   numbers would look like or consider how it would be

19   allocated.  But yes.  So if we're talking about a shortfall

20   within the, all of the interests of the Withhold account

21   holders across the board, there are five types of coins

22   where there would have to be some type of allocation made.

23   With respect to the vast majority, the vast majority of

24   assets, for all Withhold account holders, there are more

25   than ample assets available on the platform to satisfy all

Page 102

1    of them in full, because the entire --

2            THE COURT:  We'll see whether Mr. Koenig and Mr.

3    Hershey agree with you or not on that point, but that's --

4            MS. KOVSKY-APAP:  Well, I mean, the entirety of

5    all of the Withhold accounts, as I said before, across all

6    nine prohibited states, it's a de minimis amount compared to

7    the totality of the assets on Celsius' platform.  And just

8    to close the loop on Your Honor's question, you know --

9    about doesn't this, you know, reduce dollar-for-dollar or I

10   guess coin-for-coin, the distributions available to Earn

11   account holders or other account holders.  Well, of course

12   it does, but that is the consequence of these not being

13   property of the estate.

14           THE COURT:  Well, it's not a consequence that it's

15   a dollar-for-dollar diminution if the shortfall has to be

16   allocated.  You know, some rules for how you determine how

17   that shortfall is resolved.  Somebody will educate me about

18   this, but my recollection is it doesn't mean you get

19   everything and they get nothing.

20           MS. KOVSKY-APAP:  Well, we're not suggesting that

21   the Earn account holders get nothing.  We're suggesting that

22   out of the billions of dollars of cryptocurrency assets on

23   Celsius' platform, there's about 15 million in that

24   aggregated bucket of assets that don't belong to the estate.

25           THE COURT:  And I guess the point is, if it's

Page 103

1    commingled, you don't get the -- the Withhold as an entire

2    group don't -- doesn't get the 15 million and the unsecured

3    creditors suffer the consequences of that.  You get all,

4    they get nothing of that 15 million.

5              MS. KOVSKY-APAP:  Well, that --

6              THE COURT:  That's not my understanding of the

7    law.  You think it is?

8              MS. KOVSKY-APAP:  Your Honor, I -- my

9    understanding of the law is that if there's a constructive

10   trust around --

11             THE COURT:  You have -- wait, wait, wait -- you've

12   now jumped to a constructive trust?

13             MS. KOVSKY-APAP:  Your Honor, we argued it at

14   length --

15             THE COURT:  I know you did in your brief.  But

16   that's not the argument you made to me today.  You argued

17   plain meaning of the contract, even though it's silence

18   about what happens to title.  You said the negative

19   implication of title, you know, they only had title for as

20   long as it was in an Earn account.  You didn't argue -- it's

21   in your brief, no question about it.

22             MS. KOVSKY-APAP:  Well, Your Honor, we get -- we

23   only get to constructive trust -- and perhaps I should have

24   laid this out more chronologically.  I was trying to jump in

25   and answer your questions as they came up.  But we get to

Page 104

1    the constructive trust because these contractually were

2    returned to the ownership of the Withhold account holders.

3              THE COURT:  Just let me -- constructive trust or

4    otherwise, your position is the Withhold account holders for

5    -- with coins for which there is a shortfall, they get

6    everything.  The unsecured creditors get -- take the hit

7    completely.  That's your position?

8              MS. KOVSKY-APAP:  Our position is --

9              THE COURT:  Yes or no?

10             MS. KOVSKY-APAP:  Yes, Your Honor.  That is our

11   position.

12             THE COURT:  You got -- give me a case that says

13   that.

14             MS. KOVSKY-APAP:  You'll give me just a moment,

15   Your Honor.

16             THE COURT:  Constructive trusts are disfavored in

17   bankruptcy, precisely for the reason that recognizing the

18   constructive trust and giving the beneficiaries of a

19   constructive trust 100 percent results in a diminution in

20   the recovery of unsecured creditors.  That's one of the

21   reasons there's such a strong bias against -- I won't say

22   never, but that's why Courts are very reluctant to impose a

23   constructive trust that gives everything to the

24   beneficiaries of this constructive trust and takes it

25   dollar-for-dollar away from the unsecured creditors.

Page 105

1              So tell me what case you're relying on -- cases.

2              MS. KOVSKY-APAP:  So if you go to our initial

3       brief with -- which is Docket 1289.

4              THE COURT:  Yes.  I've got that in front of me.

5              MS. KOVSKY-APAP:  We discussed constructive trust

6       at Page 15 of the brief.  It's Page 20 out of 31 of the PDF.

7              THE COURT:  Okay, I'm at 15.  Yes.  What's the

8       case that you're --

9              MS. KOVSKY-APAP:  So one of the cases that we're

10      relying on is In re Edison Brothers, 243 B.R. 231.  It's a

11      Delaware bankruptcy court case from 2000 in which the Court

12      stated, "Courts have concluded that property which a Debtor

13      holds in trust, express or constructive, for another does

14      not become property of the estate when the Debtor files for

15      bankruptcy."

16             You also have In re Columbia Gas Systems Inc., 997

17      F.2d 1039 (3d Cir. 1993).  Congress clearly intended the

18      exclusion created by Section 541(d) to include not only

19      funds held in express trust, but also funds held in

20      constructive trust.

21             THE COURT:  But I would have to find that you

22      satisfy each and every requirement for there to be a

23      constructive trust.  You didn't -- with your contract

24      argument, you didn't rely on that, but you're making a

25      separate argument that if I don't find that the express

Page 106

1      contract deals with this, then you rely on a constructive

2      trust and you believe you satisfy each and every element

3      required to establish a constructive trust.  Is that your

4      position?

5               MS. KOVSKY-APAP:  Your Honor, let me back up and

6      take those things --

7               THE COURT:  Are you able to answer that?

8               MS. KOVSKY-APAP:  I am able to answer that, but I

9      think I need to back up for a minute because I think we may

10     be talking past each other and conflating two separate

11     issues.  We are not saying -- my argument is not that there

12     is an express contract, therefore it's our property or

13     there's an express trust, therefore it's our property.

14               What I'm saying is there's an express contract.

15     Property rights were returned to the customers, to the

16     account holders, because their grant of right and title

17     terminated.  Now what happened then, Celsius misused those

18     customer funds, the customers' property.  Celsius commingled

19     the funds.  Celsius may -- who knows what Celsius may have

20     done with them.

21               But that -- there was a misuse of customer

22     property as is unfortunately all too common in the crypto

23     space.  And as a result of the misuse of what was customer

24     property, not estate property, that justifies the imposition

25     of a constructive trust.

1              As far as meeting each and every element of a

2      constructive trust, New York law is clear that all four

3      elements do not have to be met, that these -- this is a

4      flexible test.

5              THE COURT:  Just give me a second.  I'm looking

6      for something specifically that I should have here.  In all

7      the paper I brought out, it's not in what I brought out.

8      Everybody just stay and -- I just want to grab something off

9      my desk.  Don't have to get up or anything, just -- I just

10     want to have -- okay.

11             What (audio drops) do is we're going to take a 15-

12     minute recess because I want to read a couple of cases as

13     well.  So by my watch it's 10 after 11.  We'll -- 11:25,

14     we'll come back and we'll continue with this point.  Okay?

15     All right.  When I come back in, everybody can remain

16     seated.  You don't have to get up.

17             (Recess)

18             THE COURT:  All right, Court's back in session.

19     Ms. Kovsky, go ahead.

20             MS. KOVSKY-APAP:  Your Honor, before we took a

21     break, we were talking about constructive trust and I think

22     I just need to back up for a second again and make sure that

23     I'm clearly explaining what our position is.  Our position,

24     the Withhold Group's position is that just like the Custody

25     assets and just like the pure Withhold assets, the

Page 108

1    transferred Withhold assets are not property of the estate.

2            Now, there are different ways of looking at that.

3    The Debtor seems to be taking the position well, if it's not

4    property of the estate, it can be withdrawn from the main

5    aggregated wallets because it's pretty easy to trace those

6    assets.  You look --

7            THE COURT:  It's not easy to trace the assets.

8    That's the point.  It's not easy to trace the assets.  Maybe

9    that you trace value, you can say, well, yeah, the

10   aggregated account holds $100 million or whatever and I'm

11   only asking for 15 million of it.  You're not tracing the

12   assets.

13           MS. KOVSKY-APAP:  Well, you're not tracing the

14   specific coin --

15           THE COURT:  That's right.  Exactly that point.

16   You can't trace the specific assets.  You can say that your

17   clients are entitled in the aggregate to $15 million in

18   value, but you can't trace specific assets.

19           MS. KOVSKY-APAP:  Well, Your Honor, we're not

20   saying they're entitled to $15 million in aggregate value.

21   We're saying that they're entitled to certain coins of

22   certain types and in certain amounts, the same as Custody,

23   the same as pure Withhold, and those absolutely can, you

24   know, as Mr. Ortiz said, it's the same thing with

25   hydrocarbon.  You're not going to put your name on a

Page 109

1    particular hydrocarbon molecule, but --

2              THE COURT:  I don't think there was a shortfall in

3    the pipeline case that Mr. Ortiz talked about.  The question

4    is how much of what's in the pipeline belongs to this

5    predator or this creditor or that creditor.  They weren't

6    dealing -- I don't think they were dealing with shortfall.

7    Here, we're dealing with shortfall.

8              MS. KOVSKY-APAP:  Well, Your Honor, it's the same

9    as any case where somebody has a superior claim because they

10   own the assets.

11             THE COURT:  Superior claim until it got comingled.

12   And at that point, I don't think you have a superior claim.

13             MS. KOVSKY-APAP:  Your Honor, we disagree.  We

14   think that --

15             THE COURT:  Well, we disagree.

16             MS. KOVSKY-APAP:  -- we have a --

17             THE COURT:  Go on to your next argument.

18             MS. KOVSKY-APAP:  Well, the argument is the

19   constructive trust argument and that's what we were talking

20   about before the break and Your Honor said, well can you

21   meet all four of the elements.  My response was, all four of

22   the elements don't have to be met in order to establish a

23   constructive trust.

24             THE COURT:  Well, that's not exactly true.  There

25   are some cases that say maybe we won't all cases rigidly

Page 110

1    require satisfaction of all four elements of New York law

2    with respect to the existence of a constructive correct.

3            MS. KOVSKY-APAP:  Correct.  As Your Honor stated

4    in the Dewey & LeBoeuf case in 2013.  Although these factors

5    provide important guideposts, the constructive trust

6    doctrine is equitable in nature and should not be rigidly

7    limited.

8            THE COURT:  Equitable in nature.  And is it

9    equitable where assets have been comingled to say that your

10   clients get everything and they take the whole hit; that's

11   the point.  Is that equitable?  That's contrary to the

12   equality of distribution principle in bankruptcy.

13           MS. KOVSKY-APAP:  Your Honor, it's not contrary to

14   the equality of distribution principle.  The customers that

15   are taking the hit have coins that they lent to Celsius that

16   are subject to a grant of right and title to Celsius.

17           THE COURT: And they don't have --

18           MS. KOVSKY-APAP:  My clients do not.

19           THE COURT:  -- shortfall. You've agreed there's a

20   shortfall.

21           MS. KOVSKY-APAP:  I agree there's a shortfall, but

22   that's the risk that they took.  They lent --

23           THE COURT:  That's the risk that who took?

24           MS. KOVSKY-APAP:  The customers in Earn.

25           THE COURT:  It's also a risk that the customers

1    who think that they have a trust or they think the terms of

2    use, that it belongs to them, it doesn't exist anymore.

3    Okay, then the question is, it was in a commingled account.

4    Do the rules require an allocation of that loss?  You say

5    no; we'll see.  I have your point.

6              MS. KOVSKY-APAP:  Thank you, Your Honor.  And I've

7    been up here for quite a while so I will try to wrap up and

8    I just want to return to one more point about constructive

9    trust, which is the unjust --

10             THE COURT:  No.  Go on.

11             MS. KOVSKY-APAP:  All right, just to sum up, the

12   question is, should the Withhold account holders, should the

13   Withhold assets be treated differently from the Earn assets?

14   Should they be treated like the Custody assets?  We believe

15   that there is a material distinction between assets that are

16   on loan to Celsius and subject to a contractual grant of

17   title and assets that were already legally returned to the

18   customers and subsequently converted and misused by the

19   Debtors.  Because these assets were returned to the

20   customers, they were separately tracked.  They were in a

21   different account.  They were legally different --

22             THE COURT:  They weren't in a separate account.

23   They were on a separate ledger entry.

24             MS. KOVSKY-APAP:  And that's how Celsius set up

25   its accounts, by ledger entries.  They weren't in a separate

Page 112

 1    wallet.  They were in a separate account.  Those are two

 2    different things, Your Honor.  We believe that it would be

 3    appropriate and equitable to treat the Withhold assets the

 4    same as the Custody assets because legally that's really how

 5    they're situated.  There's no rational distinction,

 6    particularly when you're talking about Withhold -- just

 7    Withhold assets, there's no (audio drops).  The pure

 8    Withhold assets can go back to the customers, but the

 9    transferred Withhold assets cannot.

10          Either way, if it's a Withhold asset, it's not

11    property of the estate.  It's no longer on loan to Celsius.

12    Celsius had no contractual right to do anything with these

13    assets.  The fact that Celsius misused them should not be to

14    the detriment of --

15          THE COURT:  They lost track of them.  That's --

16          MS. KOVSKY-APAP:  Well, no, they tracked the

17    Withhold assets.  They know to the, you know, hundredth or

18    thousandth of a piece of Bitcoin exactly how many coins are

19    allocated to the Withhold accounts.  And they're -- all of

20    the coins that are necessary to make all of those coin

21    owners whole, to give them back their coins, they're there.

22          THE COURT:  There's not enough in the commingled

23    account to give everyone who had Bitcoin what they believe -

24    - what they're entitled to.

25          MS. KOVSKY-APAP:  There's enough in the commingled

Page 113

1   account to give everyone whose assets were legally already

2   returned to them all of the Bitcoin that they're entitled

3   to, whether they're pure Withhold, pure Custody, regular

4   Custody, or regular --

5              THE COURT:  I have your point.  Anything else?

6              MS. KOVSKY-APAP:  That's it, Your Honor.

7              THE COURT:  Okay.  All right.  Let me hear from

8   the Debtor.

9              MR. KOENIG:  Your Honor, again, it's Chris Koenig,

10   Kirkland and Ellis, for the Debtors.  We start as we did

11   with Custody with the contractual language because as I

12   noted when we when we were speaking about Custody, every

13   digital asset that is transferred to one user is one less

14   digital asset for everybody else that is general unsecured

15   creditors.

16              Our position is that Custody is different because

17   Custody has clear language providing that the digital assets

18   remain the property of the customers even while they are in

19   the Custody program.  Not so for Withhold.  There are

20   several places in the terms of use that we should look at.

21   Ms. Kovsky pointed you to Section 4(d) and she's effectively

22   reading words on the page that are not there.

23              I thought I heard her concede that the words were

24   not actually on the page and that that she is reading some

25   sort of inference that it was -- the grant of title was

1    somehow time limited, but I just don't see the words on the

2    page there.  But what's more is if Your Honor turns to --

3    and I think this section will be clearer.  Your Honor turns

4    to Section 10 of the Version 8 of the terms of use which is

5    Page 547 of 1126.

6              THE COURT:  I'm there.

7              MR. KOENIG:  And I'm reading down towards the end

8    of the page.  It's the sentence that starts with "We may

9    lend."

10             THE COURT:  Yes, go ahead.

11             MR. KOENIG:  "We may lend, sell, pledge,

12   hypothecate, assign, invest, use, comingle, or otherwise

13   dispose of assets and eligible digital assets that are not

14   held in a Custody wallet if available to you to

15   counterparties or hold the eligible digital assets with

16   counterparties and we will use our best commercial and

17   operational efforts to prevent losses," and it continues.

18             "By transferring digital assets to Celsius or

19   lending eligible digital assets to Celsius while using the

20   Earn service or otherwise using the services, you will not

21   be entitled to any profits or income Celsius may generate

22   from any subsequent use of any digital assets, nor will you

23   be exposed to any losses which Celsius may suffer as a

24   result thereof.  You agree and acknowledge that you are

25   exposed to the possibility that Celsius may become unable to

Page 115

1    repay its obligations to you in part or in full, in which

2    case, any digital assets in your Celsius account that are

3    not using the Custody service may be at risk of partial or

4    total loss."

5           So Your Honor, that was a lot of words on the

6    page, but what it boils down to is the Custody service is

7    expressly carved out and is treated differently from other

8    digital assets on the Celsius platform, including Withhold.

9    So not only is Ms. Kovsky reading language into Section 4(d)

10   that isn't there, but her reading is inconsistent with the

11   language in Section 10.

12          THE COURT:  Let me ask, because --  I thought I

13   had marked it.  The language Ms. Kovsky was referring to

14   where it basically said that the transfer of title is time

15   limited.  Which paragraph?

16          MR. KOENIG:  That's in 4(d), Your Honor.  That's

17   on page 538 and there's another section that Ms. Kovsky was

18   referring to.  The language is substantially identical.

19          THE COURT:  Okay.

20          MR. KOENIG:  Section 13.

21          THE COURT:  It's the -- on 538, 539 carryover.

22   "If our Earn service is available to you, upon your election

23   you will lend your eligible digital assets to Celsius and

24   Grant Celsius all rights and titled to such digital assets

25   for Celsius to use in its sole discretion while using the

Page 116

1    Earn service."  And I guess her point was that once somebody

2    moves it out of the service, you no longer have title to it.

3    Why is that wrong?

4              MR. KOENIG:  Your Honor, I believe that the

5    language is -- I think she's reading words into the language

6    that are not there and those words are inconsistent with the

7    language that I just read from Paragraph 10, which is pretty

8    clear, I think, that to the extent there are digital assets

9    -- eligible digital assets, excuse me, that are on Celsius'

10   platform that are not the Custody assets, Celsius -- just

11   flipping back to the language on Pages 547 and 548.

12              "Celsius may lend, sell, pledge, hypothecate,

13   assign, invest, use, comingle, or otherwise dispose of

14   assets.  By transferring digital assets, you will not be

15   entitled to any profits or income.  You agree and

16   acknowledge that you are exposed to the possibility that

17   Celsius may be unable to repay the obligations to you in

18   part or in full."

19              THE COURT:  Okay.

20              MR. KOENIG:  And that's exactly the situation that

21   we're in.

22              THE COURT:  Okay.  Well, when you say that's

23   exactly the situation that you're in, your position now,

24   which again did seem to change from your opening brief, was

25   that Withhold account holders have no -- received no title

Page 117

1    to any of the assets when they came out of our -- that was

2    reflected on a ledger, but that didn't alter Celsius having

3    title.

4            MR. KOENIG:  Your Honor, I agree.  It didn't alter

5    Celsius having title.  I'd make a distinction.  There were

6    pure Withhold assets for which there was never a contractual

7    grant of title.  The example you gave earlier, there's a

8    coin that simply wasn't supported on the platform and

9    couldn't be part of your Celsius account, that's different

10   because the customer never conveyed title and the Debtors

11   never accepted that title.

12           With respect to Withhold assets that were at one

13   in Earn, there was a contractual grant of title in Section

14   4(d) and elsewhere in the terms of use and the language in

15   4(d) is silent about what happens when the title is moved to

16   another service.

17           THE COURT:  So this really -- you've got a

18   contract that's silent on Withhold.  And are there legal

19   principles by which a Court finds an implied contract or do

20   you have to move directly to the constructive trust

21   arguments?  I mean, what -- it clearly, your position is

22   that the four corners of Version 8 of the terms of use do

23   not contractually explain what happens when crypto assets

24   move out of Earn accounts into no man's land of the

25   Withhold.

Page 118

1          MR. KOENIG:  That's right, Your Honor.  What I'd

2     also add is I think, to put a little bit of a finer point on

3     our position, which I admit changed from the first brief to

4     the second brief, these are tough contractual issues.  We

5     said in our first brief that we thought it was a close call.

6     And you know, as we continued to review and had the benefit

7     of reading --

8          THE COURT:  Well, you had the benefit of the

9     Committee's position --

10          MR. KOENIG:  And --

11          THE COURT:  -- and changed your mind.

12          MR. KOENIG:  I don't disagree with that, Your

13     Honor.

14          THE COURT:  You still agree it's a close call?

15          MR. KOENIG:  I still agree it's a close call, Your

16     Honor.  I still think it's a close call.

17          THE COURT:  So assuming the close call was decided

18     in favor of Withhold, what are the consequences of that?

19          MR. KOENIG:  If by close call was decided in favor

20     of Withhold, that Withhold is property of the customers

21     under the contract?  I think in that situation they would be

22     identical to Custody in that they are entitled to the return

23     of their property, subject to the issue we're going to talk

24     about in a minute about whether we can maintain possession

25     and control because of pending preference and other claims.

1            But I think that, you know, we certainly conceded

2    that Custody assets to the extent they are not property of

3    the estate should be returned to their owners, subject to

4    what we're going to talk about in a minute.  And I have the

5    same view on Withhold.

6            THE COURT:  And what about the shortfall that Ms.

7    Kovsky and I were fencing about?

8            MR. KOENIG:  I think that the shortfall, Your

9    Honor --

10           THE COURT:  Is it only five coins that we're

11   talking about?

12           MR. KOENIG:  It's only five coins that we're

13   talking about.  The shortfall that we're talking about, I

14   think comes more into play in the constructive trust realm.

15   And as we laid out in our brief, and I'm happy to walk

16   through in more detail, I don't think that Ms. Kovsky has --

17   I don't think that Ms. Kovsky has addressed the other

18   elements.  She said, oh, maybe you don't need all the

19   elements.  I don't think that she's met any of the elements.

20           She suggests that there is a promise, express or

21   implied.  What's the promise?  There's language that is

22   missing from the agreement.  What's the promise?  There's an

23   element that's a transfer in reliance on the promise.

24   There's no promise and her own clients' declarations say

25   that they weren't even aware of a Withhold account until

Page 120

1    after they transferred.  So how could the transfer have been

2    in reliance on a promise about Withhold program that they

3    knew nothing about?

4            I just don't think that they've met the elements

5    of a constructive trust, and as Your Honor explained, a

6    constructive trust is extraordinary remedy.  And as we laid

7    out in our brief, a constructive trust is supposed to be

8    fraud rectifying.  And there's no -- I don't believe that

9    there's any allegation of fraud here.  I heard Ms. Kovsky

10   say oh, well, in cryptocurrency generally there's, you know,

11   fraud abounds, but that's not what we're talking about.

12           We're talking about this case and the record

13   before Your Honor.  I don't believe that there's any

14   credible allegation of fraud.

15           THE COURT:  So what would be the result if I

16   conclude that Ms. Kovsky is correct in interpreting the

17   contract, okay.  So in terms of the ledger, reflected it

18   came out of Earn and into Withhold, but it was comingled.

19   And at least some of the coins, there's a shortfall.  What

20   happens then?  What are the rules for allocating?  Do the

21   Withhold account holders get 100 percent and it diminishes

22   the recovery of unsecured creditors?

23           MR. KOENIG:  I think that to the extent Your Honor

24   rules that the contract provides that Withhold assets are

25   not property of the estate, then that is the outcome.

Page 121

1       That's the identical outcome that we believe would be

2       appropriate for Custody.  Again, assuming, you know, putting

3       to the side for the moment, you know, that the second issue

4       today.

5               THE COURT:  Okay.

6               MR. KOENIG:  But again, she has to have a

7       contractual argument and we don't believe that that's -- we

8       believe that Withhold is different from Custody --

9               THE COURT: Step one, you disagree with her that

10      the contract should be interpreted that when Celsius made

11      ledger entries removing assets from Earn and into Withhold

12      that that did not transfer title to the assets.

13              MR. KOENIG:  The ledger entries by themselves do

14      not transfer title.  A contractual agreement is needed.

15      That's what differentiates Custody from Withhold because the

16      terms of use are very clear in a variety of different areas

17      that we talked about this morning and that are in our brief,

18      that are clear that the Custody property, the Custody assets

19      remain property of the customers.  There is no such language

20      for Withhold.

21              THE COURT:  Okay.

22              MR. KOENIG:  And what's more, so if there isn't

23      clear language, what should the Court look to?  And then we

24      have to start to get into extrinsic evidence and what the

25      examiner found was that the Debtors treated the Withhold

1      assets as the Debtors' property.  They -- the Debtors

2      deployed the Withhold assets.  It is not as though they kept

3      them separate or kept them safe.  It is not as though they

4      tried.  It's not as though the Debtors tried to establish a

5      separate Withhold wallet or fire blocks workspace as they

6      did for Custody.

7                So the Debtors' intent not only in the terms of

8      the contract but in what played out in real life is very

9      different for both Custody and Withhold.  The Debtors never

10     -- the Debtors treated the Withhold assets as their property

11     and there wasn't a contractual agreement to the contrary.

12     So simply put, our view is that the Withhold users are

13     effectively the same as every other user that got stuck on

14     the system who tried to withdraw and were unable to get

15     fully off the platform before the pause.

16                THE COURT:  Let me ask specifically on that.

17     People tried to -- account holders tried to withdraw assets

18     from the platform.  Some thought they had succeeded only to

19     find out that they hadn't.  In terms of Celsius' ledger, how

20     were things recorded in the ledger when Joe Smith put in

21     instructions to withdraw everything that he or she -- you

22     know, that he had in an Earn account?  How was that --

23                MR. KOENIG:  From Earn to Withhold you mean, Your

24     Honor?

25                THE COURT:  No.  Now I'm talking about Custody

Page 123

1     again.

2               MR. KOENIG:  Okay.

3               THE COURT:  Let's put -- I'm just trying --

4     whether it's Withhold or Custody, I think would -- really

5     the same question.

6               MR. KOENIG:  Right,.

7               THE COURT:  How was -- so when an account holder

8     sought to withdraw assets and got caught in the pause, how

9     was -- how did that all get recorded in the books and

10    records of Celsius?

11              MR. KOENIG:  Your Honor, it depends on -- I hate

12    to say it depends, but it depends on where they were when

13    the pause sort of came down, right?  If the user tried to

14    withdraw at the moment of the pause or the moment after the

15    pause, they may have gotten caught in Earn.  If a user tried

16    to withdraw all the way off the platform in Earn and got

17    sort of in the way station of Custody or for the users in

18    the nine prohibited states in the way station of Withhold,

19    that transfer would take place on the ledger

20    instantaneously, pursuant to the Debtors' technology, but

21    then it needed to be further withdrawn.

22              And for the Withhold users, they received an email

23    saying you need to come and get this.  You need to tell us

24    where to send this property.  We cannot simply send it to

25    you.  And so it got stuck there.  And so that's why we have

Page 124

1       the Withhold users to begin with, but you can track it on

2       the ledger when it moves from Earn to Withhold and why it's

3       stuck there.

4               THE COURT: So what provision of the terms of use

5       are you relying on that title remain with Celsius until the

6       funds wound up back with -- well, when it went into Custody.

7       We'll deal with that separately.  Because you say when it

8       went into Custody, you say title passed.

9               MR. KOENIG:  Yes, Your Honor.

10              THE COURT:  Contract.

11              MR. KOENIG: Yes.

12              THE COURT:  What about with Withhold?

13              MR. KOENIG:  With Withhold, I'd point you again to

14      Section 10, Section 4(d).  I don't read the words into

15      Section 4(d) that Ms. Kovsky does.  I think the contract is

16      silent on what happens when it comes out of Earn.  I think

17      that I think that Section 10 is clear that it is excluding

18      from title being with Celsius only the Custody assets, not

19      any other assets that are on the Celsius account, and I

20      think that that's very significant.

21              THE COURT:  Would you agree that to the extent

22      that the written words of the contract don't state what the

23      legal status of Withhold assets are, that the Court can't

24      decide the issue based on the four corners of the contract?

25              MR. KOENIG:  By that --

Page 125

1            THE COURT:  Yesterday, I heard arguments about who

2    owns the Earn assets and it was a question of is the

3    contract clear and unambiguous.  Nothing in the contract.

4    Nothing in this contract deals with Withhold.

5            MR. KOENIG:  Your Honor, I think to the extent you

6    find that Section 10 is not talking about Withhold at all,

7    which I think would be, you know, one conclusion that Your

8    Honor could draw, if what you're saying is that there are no

9    words in the contract expressly dealing with Withhold, then

10   I don't see what other alternative Your Honor would have,

11   but to look outside the four corners of the contract.  And I

12   think when Your Honor --

13           THE COURT:  I'm just trying to figure out what I

14   can decide and what I can't decide --

15           MR. KOENIG:  Right. Right.

16           THE COURT:  -- on the motion.  And I think once

17   Your Honor does look outside the four corners of the

18   contract, the Debtors' intent and use of property is clear

19   as outlined in the examiner's report and Mr. Blonstein's

20   declarations.  But I don't need to belabor the point.

21           THE COURT:  Okay.

22           MR. KOENIG:  Just going back to the contractual

23   point for a moment, Ms. Kovsky hasn't pointed to any intent

24   of the Debtors other than the language in 4(d) that I think

25   she's reading into, to -- by the Debtors to relinquish title

Page 126

1    to the transferred Withhold assets.  I don't think there's

2    any disagreement that title was with the Debtors while it

3    was in Earn.  There is no language in the contract that

4    provides that title passed back to --

5              THE COURT:  Except for everybody yesterday --

6              MR. KOENIG:  -- Custody.

7              THE COURT:  All the pro ses yesterday would

8    disagree with that statement, but --

9              MR. KOENIG:  I understand their position, Your

10   Honor.  But there's no intent in the language of the

11   contract or intent in the actions of the Debtors to

12   relinquish the title.

13             Your Honor, I got into the constructive trust

14   argument a little bit.  I don't know if you have any

15   additional questions for me on that.  I don't want to

16   rehash.

17             THE COURT:  Tell me -- you say you don't believe

18   that the Withhold, the Ad Hoc Committee has established the

19   elements of a constructive trust.

20             MR. KOENIG:  Yes.

21             THE COURT:  Just give me a second.

22             What I understand the elements of constructive

23   trust in New York law, the party claiming a constructive

24   trust must establish four elements:  confidential or

25   fiduciary relationship; two, a promise expressed or implied;

Page 127

1    three, a transfer of the subject res made in reliance on

2    that promise; and four, unjust enrichment.  You agree with -

3    - those are the four elements?

4         MR. KOENIG:  Yes, Your Honor.

5         THE COURT:  And have the Withhold -- Ad Hoc

6    Committee of Withhold, have they established, one, a

7    confidential or fiduciary relationship?

8         MR. KOENIG:  Your Honor, I don't -- maybe I missed

9    it in their brief.  I don't believe they've even alleged it

10   and I don't believe that that -- that even if they had

11   alleged it, that that element has been met because the

12   Debtors and the customers that are arm's length commercial

13   relationship, that's not a confidential or fiduciary

14   relationship.  I'd point Your Honor to Ames Department

15   Stores, 274 B.R. 600 and Mid-Island Hospital, 276 F.3d 123.

16        THE COURT:  All right.  The second element, a

17   promised express or implied.  Have they satisfied that?

18        MR. KOENIG:  They have not, Your Honor.  They

19   haven't.  They can't point to any language in the contract

20   that could be a promise.  I haven't seen any evidence that

21   they -- that these individuals, you know, received any

22   communications from Celsius that would constitute a promise.

23   And as I mentioned earlier, I think that their own

24   declarations say that they weren't even aware of the

25   Withhold accounts until after the transfer was made out of

1    Earn.

2              THE COURT:  And I guess that would -- you'd also

3    deal with the transfer of the subject res made in reliance

4    on that promise, they didn't know about -- didn't even know

5    about the Withhold accounts.

6              MR. KOENIG:  Yes.  Same answer.

7              THE COURT:  What about the unjust enrichment?

8              MR. KOENIG:  I don't think that there's unjust

9    enrichment here.  I think unjust enrichment is a high

10   standard to meet.  I think that the Debtors clearly

11   communicated to the affected users that they should withdraw

12   the assets off the platform.  It's not like the Debtors took

13   any untoward acts to retain this property.  These folks, the

14   Withhold users got stuck on the platform like everybody else

15   did.  It's not as though the Debtors took any actions that

16   should be unwound because they were unjust in some way.  The

17   Debtors were doing their best --

18             THE COURT:  Treat everybody the same.

19             MR. KOENIG:  The Debtors were doing their best to

20   handle the overwhelming amount of withdrawals around the

21   pause and these folks got caught just like everybody else

22   got caught on the system.  The only difference is Custody,

23   because Custody has the contract.

24             THE COURT:  If the Court agreed with Ms. Kovsky

25   that the contract should be interpretive, that title was

Page 129

1    held by the Debtors only when it was in Earn and it went

2    into this Withhold that's not covered by the contract, and

3    to the extent there is a shortfall and if it's five of the

4    coins, just hypothetically, how would the shortfall be

5    allocated?

6              MR. KOENIG:  Is this in a constructive trust

7    world, Your Honor, or are the coins the property of the

8    Withhold users?

9              THE COURT:  Well, let's take it if it's property

10   of the Withhold users.

11             MR. KOENIG:  I think --

12             THE COURT:  You agree with Ms. Kovsky that then

13   they get it and it's the unsecured creditors who bear the

14   entire --

15             MR. KOENIG:  I do, because that's the position

16   that we've taken with respect to Custody.  So to the extent

17   Your Honor finds that the contract provides that it remains

18   the property of the withhold users, then that's what the --

19   that's what the result should be.

20             THE COURT:  Okay.  And I guess if title didn't

21   pass, your view is then you don't even get to this issue of

22   shortfall and just, they're treated just the way all other

23   unsecured creditors --

24             MR. KOENIG:  They're unsecured creditors, just

25   like everybody else who tried to withdraw and failed to get

Page 130

1   off the platform, other than Custody.

2           THE COURT:  Okay.

3           MR. KOENIG:  I would just add that the burden is

4   on the Withhold users to demonstrate that it's their

5   property.  And I think that the contract -- and I may be

6   flip-flopping again and I apologize -- but just thinking out

7   loud, the contract provided for a clear conveyance of title

8   from the users to Celsius when it was in the Earn program.

9           It was not -- there was no clear conveyance of

10  title back.  I think that the burden is on the Withhold

11  users to demonstrate a clear conveyance of title back.  And

12  I don't believe that they have been able to point to any

13  language or action that that leads to that result.

14          THE COURT:  And what is the result if I find the

15  contract ambiguous with respect to relying on Ms. Kovsky's

16  argument about the last clause in 4(d) about basically title

17  for Celsius to use in its sole discretion using the Earn

18  (audio drops).  It came out the (audio drops) terms of the

19  ledgers of Celsius, the assets came out of Earn.  They no

20  longer earned a reward.  They were in this no man's land.

21  Is that an ambiguity?  Do I have (audio drops) to be able to

22  resolve this?

23          MR. KOENIG:  Your Honor, I don't think that it's

24  ambiguous.  I think the contract is silent.  I think silence

25  is different from ambiguity, and again, I'd point to Section

Page 131

1    10 which I think is a little bit clearer than Section 14,

2    which is silent.  I think Section 10 speaks to this issue a

3    little bit more directly.  It doesn't use the word Withhold,

4    but I think it clearly carves out Custody and only Custody.

5    And so all other eligible digital assets, using the defined

6    term, would be, you know, would remain property of Celsius

7    and Celsius would have the right to lend, sell, pledge,

8    rehypothecate, assign, invest, use, et cetera, as set forth

9    in Section 10.

10          THE COURT:  I've got to split back to the

11   definition of eligible digital assets on Page 527 of 1126.

12          MR. KOENIG:  I'm with you, Your Honor.

13          THE COURT:  Is services a defined term?  I don't

14   see it listed here.

15          MR. KOENIG:  It's on the prior -- it's before the

16   definitions, Your Honor.  It's on Page 521 of 1126.

17          THE COURT:  Okay.  Was Withhold a service?  I

18   mean, it was on the app.

19          MR. KOENIG:  Your Honor, reading the language, the

20   language in Section 1 that's on Page 521 is extremely broad.

21   It is, "Each user's access to and use of Celsius' products

22   and services as well as our mobile and web based

23   applications, websites, software programs, documentation,

24   tools" -- there's a lot of other words there but --

25   "provided to you by Celsius directly or indirectly through

Page 132

1    our mobile application, or website, or any other online

2    service" --

3              THE COURT:  Was Withhold on the app?

4              MR. KOENIG:  There were Withhold accounts and you

5    could see your balance as a Withhold account.  And so Your

6    Honor, I believe that it's within the definition of services

7    and just to correct something that I said on Paragraph 10, I

8    said "eligible digital assets" and I believe that the end of

9    Paragraph 10 actually says "in which case any digital

10   assets," not any eligible digital assets.

11             I think that's a distinction without a difference

12   given the definitions, but I just wanted to correct --

13             THE COURT:  All right.

14             MR. KOENIG:  -- the record.

15             THE COURT:  Thank you.

16             MR. KOENIG:  That's all I have, Your Honor.

17             THE COURT:  Thank you.

18             MR. KOENIG:  Thank you.

19             THE COURT:  For the Committee?

20             MS. AMULIC:  Good afternoon, Your Honor.  Andrea

21   Amulic, White and Case, for the Committee.

22             So as an initial matter, the Committee does not

23   agree that the terms of use are silent as to when title

24   transfers.  Section 11 of the terms of use say that a loan

25   obligation -- I'll give you a second --

```
 1                 THE COURT:  Just a second.  Let --
 2                 MS. AMULIC:  Yeah.
 3                 THE COURT:  Okay, I'm on Section 11.  Which
 4     language are you referring to?
 5                 MS. AMULIC:  The language that says a loan
 6     obligation terminates upon repayment.  So the exact language
 7     --
 8                 THE COURT:  Where is that?
 9                 MS. AMULIC:  Yep.
10                 THE COURT:  This goes on for several pages, so --
11                 MS. AMULIC:  So first paragraph, second sentence.
12     "Such repayment will terminate in whole or in part your loan
13     to Celsius."
14                 THE COURT:  Okay.  And the -- what's the import of
15     that language?
16                 MS. AMULIC:  They haven't been repaid.  So if the
17     Withhold group had requested to transfer out of Earn through
18     their Withhold account and received the funds in their
19     external wallets, that's repayment.  They have not been
20     repaid.  That's why they're here.
21                 THE COURT:  And essentially your argument based on
22     Section 11 would apply to all Earn account holders that
23     sought to withdraw their assets and because of the pause or
24     whatever was not completed?
25                 MS. AMULIC:  Correct, and regardless of where they
```

1   live, right, because the only difference between the

2   Withhold Group and other Earn account holders who similarly

3   got stuck during the pause is that the Withhold Group

4   happened to live in one of nine states.  So -- and your

5   Court's already denied a creditor's request to lift the stay

6   to recover his assets when he got stuck in a withdrawal

7   attempt.  There's no --

8              THE COURT:  (indiscernible).

9              MS. AMULIC:  That's right, yeah.  And--

10             THE COURT:  -- opinion on that.

11             MS. AMULIC:  -- there's no difference, there's no

12   meaningful difference between his entitlements to assets he

13   had initially transferred as part of the Earn Program --

14             THE COURT:  Okay.

15             MS. AMULIC:  -- and Withhold Group's assets they

16   had initially transferred as part of the Earn Program.

17             THE COURT:  Okay.

18             MS. AMULIC:  Ms. Kovsky also seems to be asking

19   Your Honor to do quite a bit by way of negative implication

20   and in light of the express terms I've just read, we submit

21   that the title did not transfer to Withhold account holders

22   at the time of clicking to transfer an account balance from

23   Earn to Withhold account.

24             Would also like to address just kind of a -- maybe

25   a mischaracterization that a lot of folks are operating

Page 135

1    under.  There are no Withhold assets.  There are assets that

2    --

3              THE COURT:  They're comingled assets.

4              MS. AMULIC:  Exactly.

5              THE COURT:  -- account, but --

6              MS. AMULIC:  Exactly.  And the Withhold account

7    balances merely track obligations, amounts corresponding to

8    some assets in that pool.  And the big difference between

9    Custody -- and I disagree with Ms. Kovsky -- is that Celsius

10   created a space for Custody holders to look to for

11   recoveries.  They didn't yet maybe practically have the

12   technology to segregate individual coins, but they said,

13   here's this bucket and then they wrote the terms of use to

14   say, you look to that bucket.  Anything in that bucket in

15   the wallet is Custody.

16              Any -- that's why it doesn't say Custody assets.

17   It says assets in Custody wallets.  Celsius did not create a

18   space for the Withhold Group.  They knew the balances.  They

19   could have, you know, said, well, here's a little bucket for

20   you too and we're actually actively asking you to withdraw.

21   They didn't do that.  They treated these assets exactly as

22   their own assets, exactly as Earn assets.  And that's

23   relevant, right?  Like they saw no distinction between this

24   group and regular Earn account holders.

25              And just for completeness, to the extent Your

1    Honor finds that there is no terms of use that governs, it's

2    the conduct of the parties that's relevant.

3              THE COURT:  Conduct of the parties, I can't decide

4    right now.  I mean, do you agree with that?

5              MS. AMULIC:  On the --

6              THE COURT:  That's --

7              MS. AMULIC:  -- record?

8              THE COURT:  -- extrinsic evidence.

9              MS. AMULIC:  Correct, but I'm saying if you were

10   to find that the contract was not facially unambiguous, we

11   would look to that and we would look to the conduct of the

12   parties and understanding you can't decide it right now, it

13   clearly shows that Celsius treated these assets as estate

14   property.

15             I mean, unless Your Honor has -- oh sorry.  One

16   more.  With respect to the pure Withhold, we do actually

17   dispute that those assets should be returned to the

18   customers.  I believe Ms. Kovsky said we didn't.  Again,

19   that's a situation in which it's more arguable that a

20   contract does not govern because --

21             THE COURT:  How -- if somebody deposited an XYZ

22   coin that Celsius did not permit to be deposited on its

23   platform, how is it, in your view, that title to that passed

24   to Celsius?

25             MS. AMULIC:  Because Celsius didn't set it aside

1     or designate it or do any --

2              THE COURT:  -- have no trouble tracing it.  They

3     just -- it never went anywhere.  I mean, it was in no man's

4     land.  It didn't -- you know, your, the unsecured creditors

5     didn't have a claim to that particular species of -- isn't

6     that true?

7              MS. AMULIC:  That -- yes, that makes sense.  We

8     don't, however, know what the breakdown is between pure

9     Withhold users that transferred, for example, the Binance

10    coin which wasn't supported versus folks who transferred

11    after April 14th but we're in an unaccredited state.  And

12    those, that second category --

13             THE COURT: What I understand, the pure Withholds

14    to be and that goes back before they created the Custody

15    accounts.  People -- some people tried to deposit species of

16    crypto that Celsius did not accept for its platform.

17             MS. AMULIC:  So in the Debtors' initial motion

18    that kicked all of this off, they explained that pure

19    Withhold as we're using it, is yes, that group of people but

20    also people against whom there isn't really a preference

21    issue because they weren't coming from Earn to Withhold.

22    They were coming from external wallet to Withhold and

23    because of the nature of the blockchain, if they were

24    residing in one of the prohibited states and they put in

25    Celsius' wallet address as the recipient on the blockchain,

Page 138

1    Celsius can't block it.

2              Once it's at Celsius, they can say oh no, that

3    person is in a prohibited state.  This must be associated

4    with a withholding.

5              THE COURT:  Celsius never treated -- I don't know

6    what the volume of it is.  Does anybody know what the --

7              MS. AMULIC:  The pure Withhold is around 700,000.

8    I don't know how many of those are the unaccepted coins

9    versus the pure transfers.

10             THE COURT:  Okay.  Go ahead.

11             MS. AMULIC:  And again, with respect to that

12   second group which is the transfers external to Celsius but

13   marked Withhold, Celsius again commingled those assets,

14   treated them as Celsius assets, used them, deployed them,

15   didn't segregate them.  It's the same --

16             THE COURT:  It had to be of a crypto type that

17   Celsius would accept.

18             MS. AMULIC:  In that case, yes.  So there's two,

19   right.  There is the kind that Celsius can accept, there's

20   the kind that they can, and in that second case if I were

21   living in, I think Louisiana for example, and I transfer --

22   you know, I go on the blockchain and I, you know write

23   Celsius as the recipient, that's done, the transfer is done.

24   And so Celsius can't stop it.  So now they're holding this

25   asset which they can't really hold, so they're saying, okay

Page 139

1    this person has a withhold account balance, put the asset

2    into the aggregator, use it, do whatever you want with it.

3              THE COURT:  I'm sorry, I missed that last?

4              MS. AMULIC:  Use -- they can use it.

5              THE COURT:  Did they?

6              MS. AMULIC:  Yeah.  They comingled and --

7              THE COURT:  Well, did they use -- I mean, what did

8    they do?  They've got -- did they deploy the assets that

9    were not permitted to be -- that they didn't accept on their

10   platform?

11             MS. AMULIC:  The assets they didn't accept, for

12   example, the Binance coin, no, I don't think so actually,

13   rather.

14             THE COURT:  Okay.

15             MS. AMULIC:  The assets that were the kind they

16   could accept but came from a user in a prohibited state,

17   yes.

18             THE COURT:  Sure.

19             MS. AMULIC:  They aggregated those with --

20             THE COURT:  Just -- the Binance.

21             MS. AMULIC:  Yeah, that --

22             THE COURT:  They didn't deploy Binance.

23             MS. AMULIC:  I will defer to the Debtors on that,

24   but that's certainly not the group I'm trying to address.

25             THE COURT:  Okay.

1          MS. AMULIC:  And if Your Honor has no more

2     questions, that's all I have prepared.

3          THE COURT:  Okay.  Let me see whether anyone wants

4     to respond to the Committee or the Debtors with -- Ms.

5     Kovsky, do you want to respond?

6          MS. AMULIC:  Thank you.

7          MS. KOVSKY-APAP:  Okay.  Deb Kovsky for the Ad Hoc

8     Withhold Group again.  First, I want to address something

9     that Mr. Koenig said repeatedly, that I was reading words

10    that are not on the page and Your Honor, I'm very puzzled by

11    that because I'm pretty sure I read them verbatim off of the

12    page.

13         THE COURT:  Ms. Kovsky, you read the words that

14    were on the page.

15         MS. KOVSKY-APAP:  All right.  I just wanted to

16    make sure that --

17         THE COURT:  I think their point is that those

18    words don't do what you say they do.  You read the words

19    correctly.

20         MS. KOVSKY-APAP:  Thank you, Your Honor.  Just

21    wanted to make sure that that point was clear.

22         THE COURT:  Certainly.

23         MS. KOVSKY-APAP:  Then I think the Debtors, again,

24    are making the same argument with respect to the terms of

25    use around Earn that they were making previously that

Page 141

1    they're saying these words are on the page, which we all

2    agree they're actually on the page.  They say they don't

3    mean what I say they mean.  If there's any ambiguity in how

4    those words are to be interpreted, that ambiguity has to

5    fall in favor of the customers.

6              THE COURT:  No.  Then extrinsic evidence becomes

7    relevant to the Court's interpretation.  It may be at the

8    end of the day, the Court decides in your favor, but I don't

9    understand the rule to be that you look at the language of

10   the contract.  If the Court determines it's ambiguous, I

11   decide for you.  At that point, I may have to take extrinsic

12   evidence and that extrinsic evidence may be the treatment

13   that if there was a consistent treatment that Celsius

14   applied to the language.  Is there something you think that

15   says, don't take extrinsic evidence, just decide for me?

16             MS. KOVSKY-APAP:  No, Your Honor, not at all.  My

17   point was more that to the extent that there is ambiguous

18   language and it could be interpreted in a couple of

19   different ways potentially, case law indicates that it ought

20   to be construed against the drafter.

21             THE COURT: But --

22             MS. KOVSKY-APAP: That was my --

23             THE COURT:  Caselaw doesn't say don't consider the

24   extrinsic evidence.  First, I have to decide whether there's

25   ambiguity.  If there's ambiguity, then the Court can take

Page 142

1  extensive evidence.  When I listened to the -- I'm tired --

2  extrinsic evidence, it may be that the scale weighs to you

3  at that point, but I don't just look at the language and

4  say, oh that language is ambiguous.  I'll decide for the

5  Withhold.

6          MS. KOVSKY-APAP:  No, of course, Your Honor, and

7  that was not at all the point I was trying --

8          THE COURT:  That's what I thought you were saying.

9          MS. KOVSKY-APAP:  No, no, no, no, no.  No.  I was

10 saying that Celsius is saying the opposite that it's

11 ambiguous, therefore their interpretation must prevail and

12 I'm saying --

13         THE COURT:  They're saying it's not ambiguous.

14 They're saying that read the four corners of this document.

15 It's not ambiguous and the result is Celsius kept title to

16 it.  Okay.  You say it's unambiguous because title

17 transferred was time limited for the time that it was in

18 Earn.  Okay.  It's interesting because I've had other cases

19 where each side said the contract is clear and unambiguous

20 and favors my client, but they take diametrically opposed

21 views about what it means.

22         MS. KOVSKY-APAP:  And this --

23         THE COURT:  My view is at that point, one of you

24 is going to win at the end of the day, but only after I've

25 given each side a chance to provide the extrinsic evidence.

Page 143

1     It gets harder for you, perhaps, if your clients didn't even

2     have a clue that there was such a thing as Withhold.

3            MS. KOVSKY-APAP:  Well, Your Honor, let me address

4     that, because I heard Mr. Koenig say that a couple of times

5     and I was really shocked because that's actually contrary to

6     what every single one of my clients put in their

7     declarations.

8            THE COURT:  If we get to the issue about extrinsic

9     evidence, that isn't going to get decided right now, okay.

10    I will decide whether, I think this contract is clear and

11    unambiguous for you or for them and we'll see where we go

12    from there.

13           MS. KOVSKY-APAP:  Well, going back to the terms of

14    the contract, Mr. Koenig made quite a point about the risk

15    disclosure provision in Section 10 of the terms of -- are we

16    okay over here?

17           THE COURT:  No, I think the door seems to be

18    locked from the out --

19           MR. KOENIG:  It locks when it closes.

20           THE COURT:  Yeah, I've got a key to -- we'll see

21    whether anybody knocks on the door.

22           MS. KOVSKY-APAP:  Okay.

23           THE COURT:  I have a key that'll unlock it.  I

24    thought it was -- I guess the doors were open when everybody

25    came in.  Go ahead, Ms. Kovsky.

Page 144

1          MS. KOVSKY-APAP:  All right.  So going back to

2     what Mr. Koenig was arguing about the risk disclosure

3     provision of the terms of use, at best, it's ambiguous

4     whether these -- this provision, the risk disclosures apply

5     to Withhold.  Withhold's never mentioned there and

6     importantly, the entire risk disclosure is framed in terms

7     of using Celsius' services and Your Honor had raised the

8     question as to whether Withhold constituted a Celsius

9     service.

10          Mr. Koenig said, well yeah, it was a service.

11     That's not what he said in his Custody and Withhold motion

12     where he expressly stated on behalf of his clients the

13     Debtors as a judicial admission, the Withhold account -- and

14     I'm going to read this directly --

15          THE COURT:  You know, I've had this issue of

16     what's a judicial admission or not.  I'm not -- you know, I

17     don't buy it exactly, in the briefs, but go ahead.

18          MS. KOVSKY-APAP:  Well, let's say for insight into

19     what the Debtors actually thought about whether this was a

20     service, what they said before was the Withhold accounts

21     were not part of Celsius' service offerings and the Debtors

22     have no contractual claim to title to the cryptocurrency and

23     Withhold accounts.

24          THE COURT:  (indiscernible).

25          MS. KOVSKY-APAP:  Previously, they said this was

Page 145

1     not a service and the reality is there was not a lot that

2     anyone could do with coins that were in the withhold

3     account.  Really, you could withdraw them, you could make

4     payments on a loan or you could meet a margin call.  Those

5     are the only things you could do, but you couldn't access

6     any of the services that Celsius was providing.  So it seems

7     a little disingenuous to then say, well, these risk

8     disclosures that apply to Celsius services apply to this,

9     what we've called the no man's land where services really

10    aren't being offered.

11            Interestingly, the Debtors'  argument is also

12    somewhat logically inconsistent regarding the risk

13    disclosure because if it applies to everything on the

14    platform regardless of how it got there or what its status

15    is, if it's not in Custody, if you're on the platform, well

16    then that would apply with equal force to pure Withhold, and

17    clearly the Debtors' position is pure Withhold is not

18    subject to these same issues, to these same contractual

19    provisions.  The Debtors' --

20            THE COURT:  The pure Withhold never -- did not go

21    into an Earn account.

22            MS. KOVSKY-APAP:  They never were -- right.  There

23    was never a contractual grant of right and title in the

24    first instance.  They did, however, go into commingled Earn

25    wallets.

Page 146

1              THE COURT:  I understand.  There isn't going to be

2       any tracing issue because it didn't go anywhere, it stayed

3       there.  They can trace back who it --

4              MS. KOVSKY-APAP:  No, I don't think that's

5       correct, Your Honor.

6              THE COURT:  Did they sell the Binance?  Did they

7       deploy the Binance?

8              MS. KOVSKY-APAP:  I'm not talking about Binance,

9       Your Honor.  I'm talking about Bitcoin and Ethereum and

10      other eligible digital -- otherwise --

11             THE COURT:  -- okay.

12             MS. KOVSKY-APAP:  Right.  No, so I think the

13      Binance issue is a very small side issue.  There are coins

14      that would otherwise have been eligible digital assets that

15      were deposited and the only reason that they weren't really

16      supposed to be there is because they were coming from

17      prohibited states,

18             THE COURT:  Okay.

19             MS. KOVSKY-APAP:  And those went right into the

20      aggregated main wallets.  They were used, deployed, et

21      cetera.  They can be traced in the sense that there's ample

22      coins of the same type that can be returned to the owners of

23      the coins and the Debtors are prepared to do that.  For

24      reasons that are really not clear to me, they're saying that

25      well, if they were transferred from Earn to withhold as

Page 147

1    opposed to landing in withhold from an external wallet, all

2    of a sudden the treatment is completely different.

3          I do want to correct the record.  I understand

4    that Your Honor is not taking extrinsic evidence, but Mr.

5    Koenig did make some factual statements about what my

6    clients knew and when they knew it that are just not

7    accurate.

8          THE COURT:  I understand that.

9          MS. KOVSKY-APAP:  Talked about the Debtors'

10   intent, that there was never any intent that these assets --

11         THE COURT:  I can determine -- I may or may not be

12   able to determine intent from the four corners of the

13   document.

14         MS. KOVSKY-APAP:  That is likely correct.  It's --

15         THE COURT:  It is correct.

16         MS. KOVSKY-APAP:  Yes.  Well, yes, it may or may

17   not be able to determine intent.  We think that you can

18   determine intent from the four corners of the document.

19   Again, customers who granted rights to their assets, their

20   property, weren't making, you know, a forever and ever grant

21   of that right and title without any kind of limitations.

22         THE COURT:  That's your position.

23         MS. KOVSKY-APAP:  You went through some questions

24   with Mr. Koenig about constructive trust and if Your Honor

25   will indulge me, I'd like to respond to some of those.

1                THE COURT:  Go ahead.

2                MS. KOVSKY-APAP:  You asked whether there was a

3      fiduciary or confidential relationship.  I do want to point

4      out that under New York law, and this is the New York Court

5      of Appeals, that stated a person wrongfully acquiring

6      property can be treated as a constructive trustee

7      notwithstanding the lack --

8                THE COURT:  They didn't wrongfully --

9                MS. KOVSKY-APAP:  -- fiduciary relationship.

10               THE COURT:  -- acquire the property.  Your --

11               MS. KOVSKY-APAP:  They wrongfully kept the

12     property.

13               THE COURT:  They didn't wrongfully acquire the

14     property.

15               MS. KOVSKY-APAP:  Well, they acquired it in the

16     first instance, but after it was returned to the customers -

17     -

18               THE COURT:  It wasn't returned to the customers.

19               MS. KOVSKY-APAP:  It was returned to the

20     customers, Your Honor, when it was transferred out of Earn

21     and into the Withhold accounts.  That's the Debtors' --

22               THE COURT:  Well, that's an issue that the Court

23     has to decided.  Was it --

24               MS. KOVSKY-APAP:  Right.

25               THE COURT:  Did that -- you know, the Committee

1    says you have to focus on when it's repaid.  Absent

2    repayment, it hasn't gone back to the customer.

3              MS. KOVSKY-APAP:  Well, the Debtors' position --

4              THE COURT:  That was, I think one of her points.

5              MS. KOVSKY-APAP:  That was one of the Committee's

6    points, but the Debtors point --

7              THE COURT:  No, the Committee is a party in

8    interest and has a very strong stake in the decision.  I'm

9    not going to disregard the Committee's argument.

10             MS. KOVSKY-APAP:  I'm not suggesting that you

11   disregard the Committee's argument, but I am suggesting that

12   it's important to look at what the actual parties to the

13   contract are saying.

14             THE COURT:  I've been reading it.

15             MS. KOVSKY-APAP:  And what the Debtors said from

16   the get-go was transferring coins on the ledger.  Remember,

17   this was not a blockchain transfer but transferring assets

18   out of Earn and into Custody or Withhold extinguished the

19   Debtor's contractual obligation to return those coins to the

20   customers.

21             THE COURT:  And Ms. Amulic points to Section 11 on

22   the withdrawals.

23             MS. KOVSKY-APAP:  And Section --

24             THE COURT:  Look, I'm not saying I'm accepting the

25   argument.  But her argument is that under Section 11, until

Page 150

 1    it's repaid, it remains property of the Debtor.  Ms. Amulic

 2    is that your -- that's your position?

 3              MS. AMULIC:  That's right, Your Honor.

 4              THE COURT:  Okay.

 5              MS. KOVSKY-APAP:  And my position is, these terms

 6    of use completely omitted any mention of Withhold.

 7              THE COURT:  They did.

 8              MS. KOVSKY-APAP:  And Withhold is very comparable

 9    to a Custody account.

10              THE COURT:  Maybe.

11              MS. KOVSKY-APAP:  It was the default account that

12    the Debtors set up.  They set up their architecture in this

13    way.  They could have left it so that if you want to --

14              THE COURT:  No man's land because it's not

15    expressly covered in the terms of use.  Each of you argue

16    about well, read this other section and it ought to apply to

17    Withhold as well, maybe.

18              MS. KOVSKY-APAP:  Look, the Debtors could have --

19              THE COURT:  I understand this argument, okay.

20    They did.

21              MS. KOVSKY-APAP:  Well, yeah, they didn't.  My

22    point about the way that Debtors set up their architecture

23    of the platform, they could have left it.  So if you're in a

24    prohibited state, you stay in Earn until you actually

25    transfer to an external wallet.

Page 151

1          THE COURT:  Right.

2          MS. KOVSKY-APAP:  They chose not to do that.

3          THE COURT:  They did what's in here.  When I say

4     "here," is the Terms of Use Version 8.

5          MS. KOVSKY-APAP:  They did what's here in the

6     terms of use version, but --

7          THE COURT:  What's your next argument.

8          MS. KOVSKY-APAP:  So going back to responding to

9     the questions that Your Honor had raised about constructive

10    trust, Mr. Koenig argued reliance on -- there was no

11    reliance because factually --

12         THE COURT:  Did you have to know about it in order

13    to rely on?

14         MS. KOVSKY-APAP:  I don't know that you even have

15    to reach that issue, Your Honor, because Mr. Koenig's

16    statement of the facts was incorrect.

17         THE COURT:  I'm sorry, I missed that last

18    statement --

19         MS. KOVSKY-APAP:  I don't know that you have to

20    reach the issue of whether you can rely on it without

21    knowledge because as a factual matter my clients did have

22    knowledge.

23         THE COURT:  That it went into Withhold?

24         MS. KOVSKY-APAP:  Yes.  And that's stated in their

25    declarations.  They absolutely knew about it and in terms of

Page 152

1    what they relied on, they relied on the fact that the terms

2    of use said that they were only granting title to the Debtor

3    while they were in Earn, not beyond that.  Mr. Koenig also

4    said that the Debtors didn't act -- do anything that was

5    unjust.  They didn't do anything wrong.  They were just

6    trying to handle this huge volume of withdrawals as best

7    they could.

8           I think that's also factually incorrect.  The

9    Debtors did do something wrong.  They were operating in

10   states where they weren't licensed to do so.  They created

11   an architecture --

12          THE COURT:  No, no, no, no, no, no.  They weren't

13   operating in states they weren't licensed to do so.  They

14   weren't licensed to have Custody accounts in nine states.

15          MS. KOVSKY-APAP:  They weren't -- it was beyond

16   not having Custody accounts.  They weren't licensed to hold

17   cryptocurrency on behalf of customers, whether you call that

18   Custody or whatever you want to call it, but that's exactly

19   what they did.  They allowed customers to transfer out of

20   Earn where they said -- and if you look at all of their

21   prior pleadings, they said we were holding these coins on

22   behalf of the customers.

23          They were doing that in states they weren't

24   entitled to do so and they were preventing those customers

25   for a month before the bankruptcy filed, prevented those

Page 153

1    customers from withdrawing their assets off of the platform,

2    even though they had already exited the Earn program.

3              THE COURT:  Okay.  Next point.

4              MS. KOVSKY-APAP:  The Committee says that there's

5    no meaningful difference between assets that customers

6    attempted to withdraw and assets that customers actually

7    transferred out of Earn to Withhold just because those

8    customers happen to live in prohibited states.  I think the

9    Committee gets it backwards.  There's no meaningful

10   difference between customers who transferred coins to

11   Withhold and customers who transferred coins to Custody.

12             In both cases, they exited the Earn program.  They

13   exited that contractual relationship.  In terms of looking

14   at what was the Debtors' intent about that, look at what Mr.

15   Nash argued on Monday to Your Honor.  In order to have a

16   contract, you have to have offer, acceptance, and

17   consideration.

18             The four corners of the contract make it clear

19   that the consideration for the grant of right and title that

20   the customers were giving to Celsius while they were in the

21   program, it was the rewards they were earning. It was the

22   interest.  Mr. Nash made that point himself.  He said that

23   that was -- and I have this exact words here somewhere --

24             THE COURT:  You don't dispute that in the first

25   instance --

Page 154

```
 1                    MS. KOVSKY-APAP:  But --

 2                    THE COURT:  -- your clients entered into a

 3     contract with Celsius as reflected in Version 11 of the

 4     terms of use --

 5                    MS. KOVSKY-APAP:  Version 8, Your Honor.

 6                    THE COURT:  Version 8.  Excuse me.  Version 8 of

 7     the terms of use.  You're not disputing that.

 8                    MS. KOVSKY-APAP:  I'm not disputing that they

 9     entered into a contract.  Correct, Your Honor.  And the

10     consideration with respect to the Earn program, that was the

11     contract that they had entered into.  They put coins in Earn

12     and the consideration that supported that grant -- and it's

13     spelled out in the terms of use themselves.  If you look at

14     Section 13, "In consideration for the rewards payable to you

15     on the eligible digital assets using the Earn service."

16     That's what you're granting your right and title to Celsius

17     for.  That's the quid pro quo.

18                    THE COURT:  Well, you know, people enter into

19     contracts and sometimes they breach it.  That doesn't

20     abrogate the contract.  It may give somebody a claim for

21     breach of contract.

22                    MS. KOVSKY-APAP:  But it wasn't --

23                    THE COURT:  It doesn't -- you know, Celsius' title

24     to the assets doesn't vanish into thin air because they

25     breached a contract.
```

Page 155

```
 1              MS. KOVSKY-APAP:  Your Honor, it wasn't a breach

 2    of contract.  I'm saying following the terms of the contract

 3    itself, consistent, compliant with the terms of the

 4    contract.

 5              THE COURT:  Well, there's no -- there's nothing in

 6    the contract about Withhold accounts, so I mean, that's just

 7    --

 8              MS. KOVSKY-APAP:  No, it's not about Withhold

 9    account, but there's plenty about Earn accounts and it tells

10    you when and to what extent you're granting right and title.

11    And that's the intent of the parties as reflected within the

12    four corners of the document.

13              THE COURT:  Any other arguments?

14              MS. KOVSKY-APAP:  New York.

15              THE COURT:  All right.  We're going to take a

16    recess until two o'clock and we're going to come back and

17    we're going to talk about preference.  And I want to put a

18    question that I want you all to address.

19              Could the Debtors, while -- this really goes to

20    the Custody account holders who filed an adversary

21    proceeding.  Could the Debtors file a counterclaim for

22    preference recovery?  And if so, does Federal Rule of

23    Bankruptcy Procedure 7054 (indiscernible) 54 -- well, hang

24    on.  Rule 54(b).

25              "When an action presents more than one claim for
```

1    relief, whether as a claim, counterclaim, cross claim, or

2    third party claim, when multiple parties are involved the

3    Court may direct entry of a final judgment as to one or more

4    but fewer than all claims or parties only if the Court

5    expressly determines that there is no just reason for

6    delay."  It goes on from there.

7            So if Celsius or if the Committee were granted

8    standing to do so filed preference avoidance claims against

9    the Custody account holders, would it then be clear that

10   only if there is no just reason for -- I (audio drops) your

11   partial judgment in favor of the Custody account holders

12   because I conclude yeah, it belongs (audio drops).  I'd have

13   to, I could wait and resolve the preference avoidance claim

14   before doing so.

15           So the only thing, you've stipulated that there's

16   no prejudice for the Debtors not having asserted the

17   preference claim at this point.  So isn't the result that

18   you've got to wait for the Court to resolve the preference

19   issues?  Anyway, I'd just like you to address that when we

20   come back.  So we're in recess until two o'clock.

21           CLERK:  Judge?  Judge?

22           THE COURT:  Yes.

23           CLERK:  Sorry.  There's a party who has their hand

24   up, Arshley --

25           THE COURT:  No, we're taking a recess now.  We're

Page 157

1    coming back at two o'clock.

2            CLERK:  Okay.  Thank you, Judge.

3            (Recess)

4            THE COURT:  All right, please be seated.  When we

5    broke for lunch, there was someone appearing by Zoom who

6    wanted to be heard, and Deanna, is that person still online

7    and wishes to be heard.

8            CLERK:  No one's raising their hands.  The party

9    that tried to speak before, can you please raise your hand

10   again?

11           THE COURT:  All right, we'll go on.  And if --

12   Deanna, if someone wants to be heard on what we were talking

13   about, the issues from this morning, I'll certainly hear

14   them but at an appropriate time.  Okay --

15           CLERK:  Thank you.

16           THE COURT:  So let's move forward with the

17   questions of should -- well, let me say this.  There is no

18   dispute with respect to title for the Custody account

19   holders.  There's agreement by the Debtors, the Committee,

20   and the Ad Hoc Custody Account Holders Group that title to

21   crypto assets pass to the Custody account holders when

22   assets were deposited in the Custody accounts on or after

23   April 15th, which is 89 days or less from the petition date

24   and therefore raises the preference issues.

25           So in the joint stipulation that the parties

Page 158

1    entered, it's ECF Docket No. 1044, under phase one, it

2    described "Two threshold legal issues for briefing in phase

3    one are as follows."  First bullet point, "Whether assets in

4    the Custody and Withhold accounts are property of the

5    Debtors' estates, including whether the terms of use are

6    unambiguous on the issue of ownership of such assets."  And

7    as to that point, there is no dispute as to the Custody

8    account holders.  There remains a dispute as to the withhold

9    account holders.

10          And then the second bullet point is, "If the

11   assets are not property of the Debtors' estates, whether the

12   Debtor should nonetheless be allowed to continue to hold

13   those assets and maintain the status quo with respect to

14   individuals and/or accounts where the Debtors have

15   potentially viable claims, including without limitation

16   preference claims."

17          So I think that clearly is a right of the account

18   holders.  There may still be issues about allocating

19   shortfall for Custody account holders.  The -- that same

20   stipulation, 1044, in Paragraph 9 provided that during phase

21   one, the parties agree that, first bullet point, "All

22   inferences regarding the existence, validity, and merit of

23   preference or other claims against the Custody and Withhold

24   claimants will be drawn in favor of the Debtors' estates."

25          The second bullet point, "The absence of a pending

Page 159

1    action for preference or other claims against the Custody

2    and Withhold claimants will not constitute either a basis

3    for the Court to rule in the Ad Hoc Group's favor or waiver

4    by the Debtors' estates of the right or any party asserting

5    rights on behalf of the estates, including without

6    limitation the Debtors, the Committee, or a trust to bring

7    such claims."

8           And then the third bullet point was "The Court

9    will not be asked to adjudicate the rights of any of the

10   Debtors or other -- of the Debtors' other customers as part

11   of phase one and for avoidance of doubt, the rights of Earn

12   and Borrow customers are fully reserved."

13          So, we need to go on and discuss this issue of

14   whether the Custody account holders should -- it should

15   await phase two, issue that I raised at the end of this

16   morning's hearing about the impact of Federal Civil

17   Procedure 54(b) (audio drops) -- 54 which, so I want that

18   addressed as well.

19          So, Mr. Ortiz, are you going to begin?  You want

20   the money back, the assets back, now rather than later.

21          MR. ORTIZ:  Good afternoon, Your Honor.  Kyle

22   Ortiz of Togut Segal and Segal on behalf of the Ad Hoc Group

23   of Custodial Account Holders.  So we're going to leave the

24   happy world of our 100 percent or 94 percent agreement and

25   despite agreeing on title, we are, I think at a 0 percent

Page 160

1      agreement on what that means, Your Honor.

2              And I've been thinking a lot as, I'm sure the

3      other parties have, about how to bring clarity to what is a

4      very kind of muddled picture today.  And I think the way to

5      do that is to really talk about what the parties have to

6      start with, because we really, Your Honor, have two sets of

7      assets that we've been talking about.

8              Not talking about Withhold, I'm just talking about

9      within the Custody universe, there's two sets of assets that

10     have been in a sense kind of mushed together and I think

11     it's important to pull them apart because doing so helps

12     demonstrate the legal entitlements and I think will provide

13     context for this conversation.

14             So one set of assets we have is the actual digital

15     assets in a Custody service that all parties agree is

16     property of the Custody service users and not property of

17     the estate.  And then, separately, we have preference

18     actions which are very clearly property of the estate.  The

19     estate owns those and they have owned those since the

20     petition date.

21             And that's a very critical distinction, Your

22     Honor, because it highlights where -- what the code provides

23     and what it doesn't and what the property rights were on the

24     petition date.  And when I kind of step back to first

25     principles, property rights as we all know, are defined by

Page 161

1    state law unless the code specifically provides for some

2    greater right.  That's the Butner principle.  Might have

3    been the very first thing I learned in law school.

4          And when we put that through the lens of what the

5    code brings in and what it doesn't, and how the Second

6    Circuit has interpreted that in Colonial Realty saying, you

7    know, you get this relatively broad estate under 541(a)(1)

8    which unquestionably also includes the preference actions,

9    but you don't get the proceeds on those actions until they

10   recovered under 541(a)(3).

11         And there's nothing in the code or in state law

12   that elevates the right they do have on the petition date,

13   preference actions, to expand to something they do not have

14   on the petition date which is title to this property.  I'd

15   note, Your Honor, the code also does not provide for any

16   right to reduce collection risk or the right to reduce the

17   cost of monetizing assets that are the Debtors such as the

18   preference actions.

19         What the Debtors and the Committee are asking the

20   Court to do is stretch the code.  They're asking you to

21   permit them a greater property right than they have and to

22   hold property --

23         THE COURT:  No, I don't think so.  I mean, the --

24   the Debtors and the Committee acknowledge that 89 days

25   before the bankruptcy, title to the assets transferred to

Page 162

1    the account holders, transferred from the Debtors to the

2    account holders.  But they also say because it's 89 days on

3    the face of it, it gives rise to potential preference

4    actions.  And so let me ask you this.  Looking at Federal

5    Rule of Civil Procedure 13, Compulsory -- A, Compulsory

6    Counterclaim, do you agree that preference avoidance is a

7    compulsory counterclaim to the claim asserted by the Custody

8    account holders?

9              Yeah, this was transferred to us.  You agree it

10   was transferred to us, but it happens to be 89 days and, you

11   know, Rule 13(a)(1)(A) so first, you know, (a)(1), "A

12   pleading must state as a counterclaim any claim that at the

13   time of its service the pleader has against an opposing

14   party if the claim, A, arises out of the transaction or

15   occurrence that is the subject matter of the opposing

16   party's claim; and B, does not require adding another party

17   over whom the court cannot acquire jurisdiction."

18             So this seems to me to have all -- the preference

19   claim has, appears to me, to have all of the earmarks,

20   characteristics of a compulsory counterclaim that would have

21   to be asserted as a counterclaim to the adversary complaint

22   that you filed.  You filed an adversary complaint, said it's

23   ours and it arises -- arising out of that same transaction

24   or occurrence.

25             They say, aha, it's yours, but it's subject to

Page 163

```
 1    avoidance and you know, the parties entered into a

 2    stipulation.  No one including me was particularly anxious

 3    at this stage to see a compulsory counterclaim of avoidable

 4    preference and have to deal with that as well at this stage.

 5    Indeed, in the somewhat unusual circumstances here, it

 6    essentially was agreed, well, you have a phase two where you

 7    could deal with the -- there may be defenses that -- to

 8    preference.

 9           And so I -- when I read 7054 and I read Rule 13,

10    you know, would you rather that the Debtor or the Committees

11    tomorrow file a compulsory counterclaim against all of your

12    clients for an avoidable preference?  I mean, I thought that

13    the -- I'm not advocating that, okay, and what I'm saying is

14    it seems to me that the stipulation which dealt with, okay,

15    what (indiscernible) move to phase two really was a way of,

16    let's try and deal with this issue now.  Let's see if we can

17    find that there are -- what are the defenses to preference,

18    et cetera.

19           And look, you know, so many of the cases I've had,

20    I'm not --  no reason to think this is going to get there --

21    you know, there's a reorganization plan where a term of the

22    plan is, particularly if it's a sale and there's another

23    buyer who wants to run the business, they agree they'll wave

24    preference claims.  Okay.

25           I don't know whether that will happen or not, but
```

Page 164

1   are you going to force the issue that the Debtor or the

2   Committee has to seek substitute standing, you know, STN

3   standing to file preference claims?  Are they going to file

4   it as a not only -- well, a class act, defendant class

5   action, so they name every Custody account holder, not just

6   the members of your Ad Hoc Committee or -- I don't think

7   that -- even just naming the members of your Ad Hoc

8   Committee - that's where I am.

9          I mean, look, I -- when this first came up, it's

10  no secret, I expressed the unstudied view really, you expect

11  me to return $200 million was the number people were

12  bandying about at that time to some large number of Custody

13  holders and basically saying to the Debtors or to the

14  Committee or a litigation trust, you find them, you sue

15  them, you try to collect later on.  Well, you filed an

16  adversary proceeding and it does seem to me to be a

17  compulsory counterclaim.

18          MR. ORTIZ:  Thank you, Your Honor.  So a couple

19  responses to that, Your Honor.  I think in the first

20  instance, there -- we filed an adversary proceeding in

21  response to kind of running out of time to continue to wait

22  for the Debtors, but the purpose of that was to just

23  establish that as of the petition date, it was property of

24  the estate.  They filed a motion that provided for certain

25  of those assets to be returned to certain people in

Page 165

1    different buckets.

2         And a lot of what we were trying to respond to was

3    to say in that motion, it should say that this is not

4    property of the state.  There was a declaratory judgment

5    that it's not property the estate, so they're not

6    disagreeing with that.  So what --

7         THE COURT:  I'm not disagreeing, either.  You

8    filed the adversary proceeding.  The consequence of that is,

9    if forced to do so, somebody is going to file a preference

10   avoidance counterclaim and I'm not going to decide the

11   issue.  You get $200 million back now and later on, somebody

12   can decide whether they can chase however number of people

13   there are to try and recover the preference avoidance.

14        I don't have to do -- under Rule 54(b), I don't

15   have to do that.  Okay.  We don't have the counterclaim, but

16   you didn't want the counterclaim and you entered into a

17   stipulation that says, you know, all inferences are drawn in

18   favor of the Debtors and the absence of a pending action for

19   preference or other claims will not constitute the basis for

20   the Court to rule in your favor or not.

21        So that's basically -- you know, you get in issues

22   about injunctions and everything else.  It doesn't seem to

23   me to be that.  This is a compulsory counterclaim.

24        MR. ORTIZ:  No, I --

25        THE COURT:  Well, let me -- do you agree it would

Page 166

1    be a compulsory counterclaim?

2              MR. ORTIZ:  I don't like disagreeing with judges.

3    I want to find a way to say I would --

4              THE COURT:  No, you can disagree with me.

5              MR. ORTIZ:  -- agree.  No, but I think the issue,

6    Your Honor --

7              THE COURT:  It's quite all right.

8              MR. ORTIZ:  -- is that the -- I don't think it's a

9    compulsory counterclaim to who had title.  It is a

10   compulsory counterclaim to --

11             THE COURT:  It is to getting it back.

12             MR. ORTIZ:  Yes, Your Honor.

13             THE COURT:  So you don't want it back?

14             MR. ORTIZ:  Not through that adversary proceeding.

15   I think the purpose was to get --

16             THE COURT:  You don't want it back?

17             MR. ORTIZ:  We do want it back, but --

18             THE COURT:  You don't want it back -- do you want

19   it back now?

20             MR. ORTIZ:  We do want it back now, Your Honor.

21             THE COURT:  Well, that raises this whole issue of

22   the compulsory counterclaim and the Court adjudicating it

23   all at the same time, not entering judgment until the issue

24   about -- because look, how much the Custody holders get back

25   is going to be determined in large measure by a resolution

Page 167

```
 1     of the preference issue.  I don't know.

 2              MR. ORTIZ:  I --

 3              THE COURT:  I'm not saying what the resolution of

 4     that is.

 5              MR. ORTIZ:  Your Honor --

 6              THE COURT:  Largely going to be determined by

 7     that.

 8              MR. ORTIZ:  A couple of responses to that.  I do

 9     think that there is no question that all of these users have

10     preference exposure.  They do.  And as you note, we don't

11     know that that will ever be brought.  And I should note that

12     this isn't -- there's 58,000 people that are in the Custody

13     program.  That is 200 million.  There are billions.  I don't

14     know the exact number.  I don't know off the top of my head,

15     but it's like two or three billion of people who got --

16              THE COURT:  Like 300,000 account holders.

17              MR. ORTIZ:  No, no, I'm not talking about account

18     holders, Your Honor.  I'm talking about people who got off

19     in the 90-day window.  So there are people who between when

20     Custody existed and between 90 days and when the pause

21     happened actually got off the platform and that's a number

22     in the billions, but --

23              THE COURT:  That's the statute.

24              MR. ORTIZ:  That's the statute, Your Honor.

25              THE COURT:  Unless they were insiders.
```

Page 168

1           MR. ORTIZ:  But all those people have that same

2      risk, and I think that the point that we're trying to make

3      is not only do we not know if they'll ever bring

4      preferences, but we don't know if they'll bring preferences

5      for in-kind, what was transferred, or if they'll bring for

6      the value that's transferred and that that matters, Your

7      Honor, because this is not just dollars sitting in an

8      account.

9           We keep talking about dollars but it's not.  It's

10     coins, the value of which is changing on a daily basis.  And

11     if they choose to bring dollarized claims against folks and

12     they didn't have access to their own property and they

13     didn't have the freedom to use their property to potentially

14     get out of crypto if that's what they want to do and put it

15     in an interest bearing account, if the Debtors come back

16     looking for dollarized claims or if there's just real harm

17     for real live people versus what I think really amounts to,

18     is there a collection risk and, you know, if we're going to

19     say that there -- I don't think we addressed the compulsory

20     issue and we could potentially brief that, but if we're

21     going to --

22           THE COURT:  It sure looks like it arises out of

23     the transaction or occurrence that is the subject matter of

24     the opposing party's claim.  Do you have any argument that

25     it's not?  And you know --

```
1              MR. ORTIZ:  Well --

2              THE COURT:  And if not, it's -- look, if it's not

3      compulsory it's permissive and for sure I'm going to let

4      them assert the permissive counterclaim.  I think it's

5      compulsory, but I don't have to decide that.  And Rule

6      54(b), it doesn't hinge on whether it's compulsory

7      counterclaim, permissive counterclaim.

8              You know, Mr. Ortiz, in Motors Liquidation when I

9      took it over from Judge Gerber and there was the avoidance

10     action about the messed up repayment to 500 financial

11     institutions of a loan that was mistaken, where the

12     collateral was mistakenly released, they were repaid, okay.

13     It was a headache to deal with 500 and it was streamlined

14     that the parties agreed, okay, who would participate in the

15     adversary proceeding and it was tried and decided.

16             It wasn't 50,000.  And it is certainly -- it's

17     unappealing to me and I would think to all of you out there

18     to say that 50,000 people are going to be dragged in and

19     named as a defendant in a preference avoidance action that

20     may never have to be brought.  That's really -- we don't

21     know.

22             MR. ORTIZ:  Right.  I think the issue, Your Honor,

23     is again, I come back to the fact that this is not something

24     that just sits idle, that the time impacts the actual users

25     and you have things like, you know, if they want to bring --
```

Page 170

```
1    even if it's compulsory counterclaim, there are things like

2    orders of attachment.  I mean, this is a lot of funds and it

3    lost 40 percent of its value between the petition date and

4    now, and that's significant value that could be -- that

5    folks could continue to lose, and if they ultimately decide

6    at the end of the day, we aren't going to bring a preference

7    action and these people get back something that's worth --

8              THE COURT:  Okay, I want the answer to the

9    question.  Is it a compulsory counterclaim?  You got the

10   code in front of you?  You have the rules in front of you?

11   Do you have any doubt?

12             MR. ORTIZ:  I -- unfortunately, Your Honor, I do

13   have a little bit of doubt just because of what we were

14   seeking.  And I'm not trying to be difficult, Your Honor.

15   I'm really not.

16             THE COURT:  You were seeking a determination that

17   it's owned by your clients and they want the assets now.  If

18   you stipulate on the record that all you want is a

19   determination that they own the assets and you're not

20   pressing for a return of the assets until the issues are all

21   resolved, tell me that now, too.  I mean, I -- look, Mr.

22   Ortiz I'm not -- I really don't want to give you -- not

23   trying to give you a hard time.

24             MR. ORTIZ:  No, I know you aren't, Your Honor.

25             THE COURT:  But what -- look.  I really think that
```

Page 171

1      the stipulation that you all worked out, the procedures,

2      made enormous sense.  Whether at the end of the day, that's

3      going to really get all the issues resolved or not, but it

4      tried to come up with a way that isn't going to bury people

5      in discovery forever and is going to try and sort of

6      crystallize the issues about it and you want to jump start

7      that, you want the assets now rather than a -- after phase

8      two.  I don't know whether you get it after phase two.

9              You might.  I don't -- you know, you might have

10     some very good arguments as to why they're not avoidable

11     preferences.  I don't know.  I'm not drawing any conclusions

12     about that at all.

13              MR. ORTIZ:  I understand, Your Honor.  I mean --

14              THE COURT:  I marveled at the start when I saw 89

15     days.  How did that happen?  But you know, I think at some

16     hearing I said that's how Baldwin-United came about.  There,

17     it was because of the workout agreement where they gave

18     security to previously unsecured creditors.  And you know,

19     the unsecureds were afraid if it goes 90 days, they're going

20     to have perfected security interest in most of the assets

21     and so they filed involuntary 89 days.

22              That's not how  -- here the Debtors filed 89 days.

23     You know, I'm sure you wish it was 91 days.

24              MR. ORTIZ:  Yeah, although I'm not sure that would

25     matter.  I think the 89 days was the beginning of the

1    program.  There's lots of people who would have had

2    transfers after that.  I'll note that the very beginning of

3    my career was being pulled out of an orientation to help

4    work on Lehman and seeing the masters of the universe

5    throwing up in garbage cans.  So I don't believe in

6    conspiracy theories, because I just don't think there's

7    people that are smart enough, particularly when you're

8    dealing with an issue where things are falling apart.

9            But I do, I think we -- look, if we had the

10   opportunity to brief the issue, and I don't want to slow

11   down this process --

12           THE COURT:  Would it make a difference?  I mean,

13   look.  Because if it isn't compulsory, it's permissive and

14   the same result could apply.  Rule 54(b), 7054(b), doesn't

15   hinge on whether the counterclaim is permissive or

16   compulsive -- compulsory.

17           MR. ORTIZ:  Okay.  Well, so I guess if we're going

18   to say it doesn't matter if it's compulsive or permissive

19   and that's where we're going, we'll just, we'll speak from

20   that place.

21           THE COURT:  If you disagree with that, go ahead

22   and tell me.  Sometimes I get things wrong, you know.

23           MR. ORTIZ:  No, Your Honor.  I'm not going to

24   disagree with that at the moment.  But I think, you know,

25   some of the things, I still think there needs to be some

1    level of protection for these claimants, even if you're

2    saying we need to go through a phase two, and that's the

3    problem --

4             THE COURT:  You want them to liquidate all of the

5    crypto assets that are in Custody accounts?

6             MR. ORTIZ:  Liquidate them all?

7             THE COURT:  Yeah.

8             MR. ORTIZ:  But they're not the Debtors' to

9    liquidate at the moment.

10            THE COURT:  Well, you're saying you're afraid it's

11   going to depreciate in value.

12            MR. ORTIZ:  I'm not --

13            THE COURT:  You want to reach an agreement that

14   that provides that they'll sell it all in the ordinary, you

15   know, in an orderly fashion to try and -- most of the

16   creditors, the last thing they wanted was to be repaid in

17   fiat.

18            MR. ORTIZ:  No, I understand that, Your Honor.  I

19   think that the issue is, we may have agreed to something of

20   that sort in July, it was a very different market value.

21   But most of the creditors -- and I don't consider our

22   clients creditors at the moment -- but most of the people,

23   they are true believers.  I'll acknowledge that a lot of

24   them want it back, but they might not want it back to use it

25   in the particular way that the Debtors were going to use it.

Page 174

1    They -- and we shouldn't speculate on what they --

2           THE COURT:  The Debtors aren't using it now.

3           MR. ORTIZ:  They're not using it, but I think,

4    look, the -- part of the rights you have as a property

5    owner, as the title owner of a property is to do with it

6    what you will.  And when you're restricted from that ability

7    --

8           THE COURT:  Unless you're a preference defendant

9    and the Court, you know, compulsive or permissive, I think

10    it's compulsory counterclaim, is going to, okay, I'm not

11    putting you off forever.

12           MR. ORTIZ:  I mean, the time matters and I

13    understand --

14           THE COURT:  I've been bending over backwards to

15    try and get these issues resolved.  --

16           MR. ORTIZ:  You know, and look, I appreciate that

17    we've put this on a somewhat expedited schedule to try to

18    make that all happen, but when we're looking at holding

19    something pending an action involving it, there needs to be

20    --

21           THE COURT:  Persuade me what legal principles say

22    you should get the money back now.  When I say money, get

23    the crypto assets back now.

24           MR. ORTIZ:  Well, we don't necessarily --

25           THE COURT:  In light of the stipulation that you

Page 175

1    signed, Paragraph 9, you know, what is it that you're

2    saying, what legal principle requires that the Court order

3    that the assets be returned to the Custody account holders?

4              MR. ORTIZ:  Well, I think that the issue on that

5    and -- know judges hate when people say respectfully because

6    it's --

7              THE COURT:  Oh, just --

8              MR. ORTIZ:  -- but Your Honor, I don't think -- I

9    think that's actually, I hate to say flipping on its head

10   because there was a burden that we had, which was to show

11   title.  That's been agreed.  Burden then is on them to show

12   a basis to hold it.

13             THE COURT:  And if they filed the counterclaim --

14   look --

15             MR. ORTIZ:  But even if they filed a

16   counterclaims, Your Honor --

17             THE COURT:  It's not -- you don't -- look.  You're

18   not contending that the assertion of a preference claim

19   would be in bad faith.

20             MR. ORTIZ:  No, Your Honor, of course not.

21             THE COURT:  Okay.

22             MR. ORTIZ:  But I am asserting that they don't get

23   title to it and the ability to hold it and enjoy it and do

24   with it what they will until there is a recovery on that

25   preference claim.  That's what Colonial Realty said under

Page 176

1    541(a)(3) versus 541(a)(4), and I know what the concern is,

2    Your Honor.  I completely understand --

3            THE COURT:  But 54(b) makes clear that I

4    adjudicate -- I can, I probably should in these

5    circumstances, adjudicate them together.

6            MR. ORTIZ:  But even if we're adjudicating them

7    together, during that time, they don't hold title.

8            THE COURT:  They're not using it.

9            MR. ORTIZ:  They're preventing the title owners

10   from using it and enjoying their property and --

11           THE COURT:  Okay.

12           MR. ORTIZ:  -- deciding --

13           THE COURT:  It's in dispute, okay, and as to one

14   of the claims, you've come to an agreement with the

15   Committee and the Debtors about title.  Okay.  So, but I

16   come back to 54(b).  "When an action presents more than one

17   claim for relief, whether as a claim, counterclaim, cross

18   claim, or third party claim or when multiple parties are

19   involved, the Court may direct entry of a final judgment as

20   to one or more, but fewer than all claims or parties only if

21   the Court expressly determines there is no just reason for

22   delay."

23           And the just reason -- the no just reason for

24   delay here is that good luck, litigation trust or Committee

25   or Debtors chasing 50,000 people, entities to recover

Page 177

1    preferences.  That's -- you know, there is a just reason for

2    delay.  Okay?  And look, there's no question.  Nobody's

3    filed a counterclaim, but you essentially negotiated for

4    them not to do that at this stage, and you set out

5    procedures to follow for phase two, including, you know,

6    selecting -- I won't go through the whole thing.  This is

7    Paragraph 10 of that ECF 1044.  You know, paragraph -- "To

8    the extent necessary and depending on the Court's ruling on

9    the phase one issues, the parties shall further brief the

10   Custody and Withhold issues in phase two as set forth

11   herein."  And you had a schedule for doing that.

12            MR. ORTIZ:  I understand that Your Honor, but I

13   think the issue is that --

14            THE COURT:  Maybe more than I bargained for, no

15   later than 60 day -- calendar days after the filing of the

16   preference defense motion the Court's supposed to have a

17   hearing.  It is not getting put off for years.

18            MR. ORTIZ:  I'm not saying that, Your Honor, and I

19   think even if you're going to -- if you look at Rule 13 and

20   you look at, you know, Rule 54(b) which I really looked at

21   as more designed to prevent piecemeal appeals, but I think

22   the important thing there is that gets to final judgment.

23   It doesn't get to who today has the right to hold the

24   property.  They -- everyone agrees --

25            THE COURT:  They agree that your clients have the

Page 178

1    right to hold the property, but they don't want to give it

2    back until the preference issue is resolved because there is

3    a good faith basis to believe that the transfers 89 days

4    before bankruptcy are voidable.

5         MR. ORTIZ:  I appreciate that, Your Honor, but I

6    think the issue is that that's what they're trying to

7    accomplish.  That gets to -- if we all agree to title and

8    they want to say that there is also this preference action,

9    that essentially amounts to an injunction preventing these

10   people from having their property.

11        THE COURT:  Do you want --

12        MR. ORTIZ:  I think it's important --

13        THE COURT:  Do you want to force the Debtors or

14   the Committee if they get STN standing to file a preference

15   action against your clients?  Is that what you want?  You

16   know, if you're insisting, I'll think about it.  I don't

17   think I have to under the terms of the stipulation, but is

18   that what you really want or do you want to proceed in the

19   orderly fashion that the stipulation provided?

20        MR. ORTIZ:  I don't necessarily want preference

21   actions brought against our clients, but I do think that if

22   people are in -- while that is all waiting, being deprived

23   of their property, which is, you know, a very high burden

24   and -- I'm going to step back, Your Honor, just one second.

25   When we were talking in the 107 context about privacy and

Page 179

1    the U.S. Trustee made a point that I thought you liked,

2    which was you really need to show evidence for each person.

3            What we're talking about is there being a

4    potential risk of collection, but there's no evidence that

5    they'll have difficulty with these people other than the

6    quantity and like everybody would have to submit to the

7    jurisdiction of the Court and it would just put them on the

8    same plain as the people who --

9            THE COURT:  How many clients are on your

10   committee?

11           MR. ORTIZ:  On our committee?  It's about 70 right

12   now, 70 or 80.

13           THE COURT:  You know, Mr. Ortiz, it's the

14   combination of the stipulation that you entered into; the

15   requirements of Rule 13 on counterclaims, which I think here

16   is a compulsory counterclaim, but really almost doesn't

17   matter whether it's permissive, compulsory; and 54(b),

18   7054(b) that if -- that I don't have to make them file, I

19   don't have to put them to the test and say look, you either

20   filed a counterclaim or I'm going to order the funds given

21   back.

22           I think the stipulation that you entered into

23   allows me to continue, I'll call it the pause, and it's not

24   the same pause that Celsius put, that will go forward on the

25   schedule.  I don't know.  I mean, I'm sure -- I don't want,

Page 180

1    you don't need to do it now.  It's defenses to the

2    preference claim.

3              MR. ORTIZ:  Yeah, there -- look, clearly there's

4    defenses, but that doesn't change what Your Honor is saying,

5    whether it being permissive or mandatory that they have,

6    they can bring that.  I just, I'm going to take a slightly

7    different approach, Your Honor, and again, I get back to

8    what I essentially think if everyone's agreeing that there's

9    title, what the Debtors are essentially saying is that

10   because they have these preference actions and if you allow

11   the non-estate assets to leave, there's going to be a

12   potential cost to collecting them which might devalue

13   something that the Debtors do have.

14             They own preference actions.  Under no

15   circumstance deny that and the risk is if we let these

16   people go, it devalues that because you have to go find them

17   again.  And I think Your Honor actually addressed this issue

18   once before in a different context, in ResCap in the Invest

19   Vegas case where there was a lift stay in connection with

20   selling certain HOA rights that there was a junior lien that

21   the Debtors had and the main --

22             THE COURT:  -- that a law about priorities?  Is

23   that --

24             MR. ORTIZ:  No, Your Honor, so --

25             THE COURT:  -- recollection.

Page 181

1            MR. ORTIZ:  So what -- to just kind of refresh

2        your recollection --

3            THE COURT:  Please don't.

4            MR. ORTIZ:  Okay, I won't but the point there,

5        Your Honor, was that something that --

6            THE COURT:  You know, I kind of -- this is-- I'm

7        interrupting.  During -- ResCap was filed in 2012.  During

8        the course of that case, I decided law of 26 different

9        states, in written opinions.  I don't want to have to do

10       that again.

11           MR. ORTIZ:  The only point I'm going to make on

12       that is that what the defendant said, there was the

13       protection to the automatic stay extend to protect value of

14       the property of the Debtors' estate, and you ruled that that

15       is not the case.  If you don't own the property, even if

16       selling it will result in something that changes the value

17       of property, which in this case would be the preference

18       actions, that's not enough to say that there was, in that

19       case, a violation of the stay.  So I think there's some --

20           THE COURT:  --- the automatic stay.  I mean, this

21       is, as I say, maybe I'm wrong.  It's three things, the

22       stipulation that all inferences are in their favor around

23       the preference claim, no prejudice as a result of them not

24       having asserted it, and Rule 13 on counterclaims.  I think

25       this is compulsory but even if it's permissive, you know,

Page 182

1    okay.  And Rule 54(b).  If it got asserted as a

2    counterclaim, I could simply decide that under 54(b), you

3    can't establish no just reason for delay in entering a

4    partial judgment.

5           And just the opposite, the just reason for the

6    delay is that I don't want anybody having to chase 50,000

7    people to recover a total of approximately, you know,

8    somewhere, whether it's 200 million today or 180 million,

9    whatever, it's a moving target because the value of crypto.

10          MR. ORTIZ:  But that value of crypto matters, Your

11   Honor.  These are real people with real --

12          THE COURT:  Yeah, I understand that.

13          MR. ORTIZ:  -- dollars that have -- the delay, and

14   again, I don't think it's --

15          THE COURT:  Mr. Ortiz, you wouldn't be standing

16   before me today if I didn't understand this point about --

17   I've probably said and just -- if it's not the Debtors' and

18   it should go back to somebody else, it's got to go back

19   sooner rather than later.  I agree completely.  It was about

20   that point and someone says 89 days.  So yeah, there are

21   preference claims.  There are even good defenses to it.  You

22   have a schedule.  You agreed on a phase two schedule.

23   That's in Paragraph 10 of ECF 1044.

24          You know, unless you all agree to alter that

25   schedule, that's the schedule.

Page 183

1          MR. ORTIZ:  Something tells me, Your Honor, with

2     where we're headed that the other parties won't be looking

3     to modify that schedule.  But I don't -- the problem I'm

4     having, Your Honor, is just all of that doesn't change who

5     has possession at the moment.  And they have to have a right

6     to that and that's when I get to things like (indiscernible)

7     attachment or whatever you need to compensate people for the

8     fact that they're not getting to use and enjoy their

9     property and I think there's a serious risk.

10         If I'm the Debtor -- and I'm going to be honest,

11    what I would do if I was the Debtor, if the value drops

12    significantly, I'm going to bring preference actions, if I

13    bring them, based on the value.  If it goes up, I'm going to

14    bring them based on what was transferred.  That's what, you

15    know, most Debtors would do.  So there's a real --

16         THE COURT:  There's Paragraph 3 of the

17    stipulation.  "The deadline to respond to the Custody

18    complaint is adjourned pending resolution of the Custody and

19    Withhold issues."  So they haven't had to file a responsive

20    pleading.  If they filed a responsive pleading, I think

21    they'd have to file the counter -- the preference

22    counterclaim.

23         MR. ORTIZ:  Right, Your Honor, and part of the

24    reason that was delayed is if in the context of phase one

25    and in the context of the Debtors' motion, it was determined

Page 184

1    that the property is -- the title is with the account

2    holders, there's no reason to go forward with that action

3    and then we would have done what we would have otherwise

4    talked about today and turned to --

5              THE COURT:  So it says --

6              MR. ORTIZ:  -- Section 19(b).

7              THE COURT:  -- "is adjourned pending resolution of

8    the Custody and Withhold issues," which I view as involving

9    not just phase one but the phase two issues.

10             MR. ORTIZ:  Well, I don't think that was

11   necessarily the design, Your Honor.

12             THE COURT:  You don't think so?

13             MR. ORTIZ:  The reason you have a phase one and

14   phase two is if you can resolve it in Phase one, you don't

15   have a phase two.  Otherwise it would just been --

16             THE COURT:  So if you had lost on phase one, you

17   won on Phase one.  If you had lost on phase one, you

18   wouldn't have to get to phase two.  You won on phase one.

19   You won by their agreeing with your position.  Okay.  But

20   you hadn't one on phase two.

21             MR. ORTIZ:  Right.  Well I mean, we won on

22   question one of phase one, Your Honor.  Question two of

23   phase one was, "Does that mean they have to give it back?"

24   Okay.  And our view outside of -- even if you have Rule 13

25   and Rule 54, is that they do because it's not theirs.  And

Page 185

1    all of this will be adjudicated and that was the point I was

2    -- I think I was trying to make in the beginning was that

3    they don't lose a right.  They don't lose a property right.

4          THE COURT:  I'm not entering judgment for your

5    clients.  The title is theirs.  And they ought to get stuff

6    back now.  (indiscernible) the notion of I hope there are

7    never preference actions.  I hope the outcome of this case

8    somehow results in this issue getting resolved

9    satisfactorily to your -- to the Custody account holders.  I

10   don't know whether it will or not.  But for the stipulation,

11   I would tell them I'll hear your compulsory counterclaim,

12   let's go.

13         MR. ORTIZ:  But then wouldn't they be put in a

14   position, Your Honor, where they have to decide now --

15         THE COURT:  Yes, they have to decide now or have

16   judgment entered on your complaint that belongs to your

17   clients.  And then the issue of, if that's the only thing

18   that's said, if there's no preference claims -- you know, if

19   the Debtors -- I'm sure the Committee is going to ask for

20   standing to file it if the Debtor declines to do it.

21         MR. ORTIZ:  Well, I think that'll, you know,

22   depend on the outcome of various plan and sale discussions.

23   But you know, in a normal context, you have the choice that,

24   you know, it's interesting because the Debtors and the

25   Committee both point to 502(d), but that would make the

 1    people who are creditors, and I don't think --

 2            THE COURT: And your position is they have title,

 3    they're not creditors.  They're not filing a claim for it.

 4            MR. ORTIZ:  But even if they were --

 5            THE COURT:  -- under 502(d).

 6            MR. ORTIZ:  But, right.  But even if they were

 7    creditors, which they're not, 502(d) essentially provides

 8    you a choice.  You can sit there and say I'm going to keep

 9    these funds and not file a proof of claim and see if the

10    Debtor comes and then I'll share pro rata or I'm going to

11    give it all back and take what's pro rata and there's a risk

12    that you take there and that's -- they don't even have that

13    and they're in a higher position as titleholders.  And I

14    think --

15            THE COURT:  Higher position as titleholders with a

16    good faith basis for preference avoidance actions for their

17    having gotten title back.

18            MR. ORTIZ:  But I don't think it's even they

19    haven't got title back.  They have title, right.  It's --

20            THE COURT:  Got it back --

21            MR. ORTIZ:  Possession --

22            THE COURT:  -- 89 days before the bankruptcy

23    filing, giving rise to a good faith basis for preference

24    claims.

25            MR. ORTIZ:  Right.  Got title back within 90 days,

Page 187

1    Your Honor.

2            THE COURT:  Let me hear from other counsel.  Ms.

3    Kovsky, I -- come on up to the podium.

4            MR. ORTIZ:  Thank you, Your Honor.

5            THE COURT:  Thank you.  So let me just say, the

6    issue of whether the Withhold account holders have title or

7    not is not being decided today.  Okay.  But if the Court

8    decides let's push forward with phase two, my strong

9    preference is for you to agree that you will actively

10   proceed with phase two with your clients.  The stipulation

11   is less clear what happens if I don't decide phase one.

12           MS. KOVSKY-APAP:  Understood, Your Honor, and I

13   think we had all sort of contemplated there would be a

14   decision before triggering phase two.

15           THE COURT:  Well, there's a decision as to the

16   Custody.

17           MS. KOVSKY-APAP:  Absolutely.  And one thing I

18   just wanted to flag because Your Honor had said something in

19   the morning session that sort of struck me, but I wasn't

20   sure I fully understood it.  You said that in this phase,

21   you're only looking at whether the contract is ambiguous or

22   not and deciding within the four corners of the contract and

23   I don't think that's quite what the parties have stipulated

24   and what we had intended to put before Your Honor.

25           It was who owns it, including whether the contract

Page 188

1    is ambiguous, but not limited to that, which is sort of why

2    we put in all of these facts and had all this evidence that

3    was admitted into the record.  But I just wanted to make

4    sure that that was flagged as a housekeeping --

5             THE COURT:  Bullet point 1.5, bullet point,

6    Paragraph 5, whether the assets in the Custody and Withhold

7    accounts are property of the Debtors' estates, including

8    whether the terms of use are unambiguous on the issue of

9    ownership of such assets."  And including.  It doesn't say -

10   -

11            MS. KOVSKY-APAP:  I think the part -- just to

12   clarify, I think the parties' intent was that Your Honor

13   would look at everything, including the evidence that we

14   submitted to the record.  With respect --

15            THE COURT:  Do I have everything that either party

16   would want to introduce on the issue of extrinsic evidence

17   regarding the meaning of the contract with respect to

18   Withhold account holders?

19            MS. KOVSKY-APAP:  I have to be really honest, Your

20   Honor, I was kind of thrown for a loop when the Debtors

21   completely did a 180 on their position as to the ownership

22   of the Withhold assets.

23            THE COURT:   Well I noted with -- the flip, too --

24            MS. KOVSKY-APAP:  And -- yes.  And with the luxury

25   of more time and had Your Honor not been in hearings this

1    entire week with everybody tied up, you know, on various

2    different matters, I would have sought discovery on those

3    issues to pin that down, because it's an entirely different

4    factual landscape than what we thought we were dealing with.

5    So if --

6              THE COURT:  It's not entirely different from what

7    it was when you entered into the stipulation.  It's when you

8    got the first brief, this is their position, and then you

9    get the reply and the position changes.

10             MS. KOVSKY-APAP:  Well, really, if you go back to

11   the original Custody and Withhold motion, the motion to

12   reopen withdrawals, that was really where we were starting

13   from and then the Debtors went in completely the opposite

14   direction.  So in answer to your question is all of the

15   evidence in the record that we would want to have in the

16   record, probably not.  And if we had the opportunity to take

17   some additional discovery and to put the full universe of

18   facts before Your Honor --

19             THE COURT:  Don't start that before I issue some

20   sort of ruling, okay.

21             MS. KOVSKY-APAP:  Understood.  With respect to

22   phase two -- or let me back up.  With respect to the

23   question of if Your Honor were to rule in favor of the

24   Withhold account holders at some time before phase two,

25   should the Withhold account holders be allowed to withdraw

Page 190

1    their assets, we're a little bit differently situated than

2    the Custody account holders.  There's no pending adversary

3    proceeding.  We're in prohibited states where the Debtors

4    can't hold assets on behalf of customers.

5            So they've got a regulatory problem in nine

6    states.  It's a pretty small problem.  It's only nine

7    states.  It's only about 5,000 accounts.  So there is a

8    little bit of a different impetus to say, okay with these,

9    with this small bucket off to the side, maybe it makes sense

10   to send these off and send them back to the Withhold account

11   holders, even if there's some risk that there might be

12   increased cost or difficulty in collection later, if the

13   Debtors bring a preference, if they're successful, if -- you

14   know, there's a lot of ifs built in there.

15           And one thing I did want to just note, we framed

16   this in our brief as a basically a prejudgment attachment.

17   And I think that's really what it is, and I think that's

18   sort of what Mr. Ortiz was articulating that you have

19   something that is -- and certainly with Custody and arguably

20   our position with respect of the Withhold --

21           THE COURT:  If I rule that it's property of the

22   Withhold account holders, you have the same preference issue

23   Mr. Ortiz has.

24           MS. KOVSKY-APAP:  We do have the same preference

25   issue, but notwithstanding that same preference issue, there

1    are countervailing considerations.

2           THE COURT:  You have the same preference issue

3    that Mr. Ortiz's clients have.

4           MS. KOVSKY-APAP:  Yes, we do, Your Honor.

5           THE COURT:  And while you didn't file an adversary

6    proceeding, you filed a motion to lift the stay.  The

7    Debtors -- we've essentially gotten over that procedural

8    hurdle.  We did the stipulation.  I'm trying to deal with

9    them all together.  The Debtors could file their preference

10   action if I were to rule that it's property of the Withhold

11   account holders.

12          MS. KOVSKY-APAP:  Correct, Your Honor, and to

13   answer the question you haven't asked yet, no, we do not

14   want them to do that.

15          THE COURT:  I'm sure Mr. Ortiz doesn't want them

16   to do that either.  I'm sure his clients don't want them to

17   do that.

18          MS. KOVSKY-APAP:  I hear Your Honor and I hear

19   your position on this, and I won't take up more of your

20   time.  I just wanted to flag that there were some procedural

21   differences and some regulatory differences that

22   notwithstanding the Court's disinclination to let property

23   go that the Debtors have ready access to in the event that

24   they get a judgment, there are some countervailing

25   considerations that are applicable to the Withhold account

Page 192

1    holders.

2              THE COURT:  Thank you.

3              MS. KOVSKY-APAP:  Thank you.

4              THE COURT:  All right, let me hear from the

5    Debtors.  Mr. Koenig.

6              MR. KOENIG:  Good afternoon, Your Honor.  Chris

7    Koenig, Kirkland and Ellis, for the Debtors.  I'll keep it

8    brief here, but just wanted to raise a couple of points.

9    From the Debtors' perspective, we entered into the

10   stipulation to streamline the process, try to shorten the

11   process from what it would otherwise be if it was a full on

12   adversary proceeding and to try to minimize costs for the

13   estate.  The estate is very expensive.  We would like to get

14   to the right --

15             THE COURT:  -- also want to minimize the cost to

16   Mr. Ortiz's clients.

17             MR. KOENIG:  Certainly, certainly.  And so --

18             THE COURT:  And --

19             MR. KOENIG:  And for all parties to have answers

20   on key issues as promptly as possible.  I think all the

21   parties agree that the preference defenses are complex,

22   novel, and difficult, and we're going to be working through

23   that in phase two, but rather than, in the early days --

24             THE COURT:  -- try to settle them as well.

25             MR. KOENIG:  Of course.  In the early days of

Page 193

1    September, we filed our motion, the Custody Ad Hoc Group

2    filed their adversary proceeding.  I forget whether they

3    filed it first or we filed it first, but it was in a matter

4    of minutes or hours from each other.  And Ms. Kovsky filed

5    her lift stay motion maybe a day or two later.

6          We could have at the time filed our own

7    counterclaims, filed our own adversary proceeding, but we

8    didn't think that that made sense.  What we thought made

9    sense was to streamline the process, try to minimize the

10   cost, and try to get to the right answer as promptly as

11   possible.  Because if everybody just sues everybody, it's

12   going to create a lot of paper.  It's going to create a lot

13   of cost, but it's not going to necessarily get to the right

14   answer.

15         And so what we did is we entered into this

16   stipulation, which allows all the parties to pick what are

17   effectively bellwether defendants for these preference

18   claims so that all parties will receive from Your Honor in

19   phase two, indicative rulings under a whole host of

20   different factual circumstances.  Maybe the preference

21   claims are different if somebody withdrew the day before the

22   pause versus 89 days before the pause.  Maybe it matters how

23   much they withdrew.  Maybe it matters what remains on the

24   Debtors' platform, if any.

25         Those are all issues for phase two, but we did

1    this in order to get clarity and to try to minimize costs,

2    and that's why we did what we did.  Of course, in the

3    absence of a stipulation, we would have commenced a whole

4    host of other litigation because, you know, my litigation

5    partners, when they looked at this issue said we have to

6    file.  We have to file a complaint.  We have counterclaims

7    that have to be asserted, and we said that just doesn't make

8    sense here.  Let's get to the right answer.

9               THE COURT:  I agree with your partners.

10              MR. KOENIG:  They're certainly smarter than I am

11   on this issue, Your Honor.

12              THE COURT:  Well.

13              MR. KOENIG:  So in any event, simply put, today

14   the Debtors have an effective remedy with respect to the

15   Custody and Withhold assets to the extent Your Honor would

16   enter judgment in favor of the Debtors on any preference

17   claim.  We could simply move the assets on the ledger, on

18   the blockchain, whatever Your Honor ordered us to do, we

19   could do.  There would be no cost.  There would be no risk.

20   There would be no delay.

21              If we were to return those assets to the custodial

22   account holders and the Withhold account holders -- easy to

23   say -- we would undoubtedly have risk, cost, and delay.

24   That is a natural -- that is a natural consequence.

25              THE COURT:  Your Honor, in Motors Liquidation when

Page 195

1     they sued 500 financial institutions, many of whom were

2     outside the United States, there were a whole host of

3     problems about service of process outside the United States,

4     compliance with the Hague convention and it became -- and

5     that was only 500.  We got it resolved, but that issue, and

6     then tried -- they tried -- they agreed we would try as

7     certain of the parties and everybody would be bound.  But I

8     can't imagine what it would -- the issues, because they're

9     not all sitting down the street in New York.  The service of

10    process issues alone -- anyway.

11            MR. KOENIG:  So for that reason the Debtors

12    believe it is appropriate for them to maintain possession

13    and control over the Custody assets and the Withhold assets,

14    pending our expedited phase two proceeding.  And then

15    depending on what Your Honor rules, today we believe that we

16    have prima facie preference claims.  We have established

17    that we have prima facie preference --

18            THE COURT:  No one disputes that.

19            MR. KOENIG:  And at some point in the future we

20    may not, depending on how Your Honor rules in the various

21    defenses.  Perhaps Your Honor will rule that Section 546(e)

22    is a complete bar to any preference claim.  Perhaps Your

23    Honor will rule that ordinary course of business defense

24    applies in every possible circumstance.  Maybe Your Honor

25    will rule that it applies in some circumstances, but not

Page 196

1    others.  We don't know until we get there.  So we'd like to

2    hold onto the assets and preserve value until we get there.

3              THE COURT:  Okay.

4              MR. KOENIG:  I don't have anything else unless

5    Your Honor has questions for me.

6              THE COURT:  Did you want to be heard?

7              MR. KOENIG:  Thank you.

8              MR. HERSHEY:  Very, very briefly.

9              THE COURT:  Just go up to the microphone, Mr.

10   Hershey, so we get a clear record.

11             MR. HERSHEY:  Good afternoon now, Your Honor.  Sam

12   Hershey, White and Case for the Committee.  I'll be

13   extremely brief.

14             Your Honor asked a question.  I'll just briefly

15   say, we agree with Your Honor, it's a compulsory

16   counterclaim.  The last sentence actually of the complaint,

17   DI-662, this is Paragraph 62, says "The Debtor should be

18   required to permit withdrawals of Custody assets in

19   accordance with the terms of use."  They requested that

20   relief.  We viewed it as a compulsory claim.  That's why we

21   actually entered into the terms in the stipulation that Your

22   Honor read.  I think you've figured that out.  And we don't

23   believe Your Honor should exercise your discretion to grant

24   partial summary judgment.

25             THE COURT:  Okay.

1            MR. HERSHEY:  -- that, we'll rest on our brief.

2     Thank you.

3            THE COURT:  Thank you.  Ms. Kovsky, go ahead.

4            MS. KOVSKY-APAP:  Deb Kovsky for the Withhold

5     Group again.  Just wanted to raise one issue following on

6     something that Mr. Koenig just said, is that the Debtors are

7     able to hold on to these assets and are going to be there

8     and it's going to be just fine and, you know, there's no

9     risk or harm to them holding onto them, and that's true with

10    everything that's in the Custody wallet because they've put

11    those aside and aren't doing anything with them.  There's

12    still a question mark -- and Your Honor said you're not

13    prepared to rule on it today -- as to the ownership of the

14    Withhold assets which are currently sitting in an aggregated

15    wallet.

16            And so as we proceed down this path, I would

17    request that some measures be put into place to ensure that

18    at a minimum enough assets are kept sort of --

19            THE COURT:  Let me --

20            MS. KOVSKY-APAP:  -- set aside to satisfy the

21    Withhold --

22            THE COURT:  -- raising.  What I would ask you to

23    do is to confer with the Debtors' counsel and see if you can

24    come up with an appropriate solution for this by having some

25    agreed assets put into a separate a wallet to be held.  It's

Page 198

1    not a separate wallet because they're different coins in

2    those different wallets, but work out, see if you can work

3    out the arrangements.  If you can't, contact my chambers and

4    we'll have a, hopefully a very brief -- I have a feeling

5    you're going to work this out.

6            I understand your point and I'm not -- see if you

7    can work this out.  If you can't, we'll have another quick

8    hearing.

9            MS. KOVSKY-APAP:  Well do, Your Honor.  Thank you.

10           THE COURT:  All right.  Mr. Koenig, what's your

11   view about the issue Ms. Kovsky's just raised?

12           MR. KOENIG:  Your Honor, Chris Koenig.  I

13   understand and I had not thought about that.  I think it's a

14   great issue that Ms. Kovsky raised, I think that we need to

15   talk about.  I understand her point that, you know, her

16   client should not be prejudiced by, you know, the lowest

17   intermediate balance test is met for today with respect to

18   five coins and I understand her point that she doesn't want

19   to wake up tomorrow and have it be, you know, only five

20   coins that it is met for.  So we'll meet and confer and --

21           THE COURT:  You ought to be able to work this out.

22           MR. KOENIG:  Yes.

23           THE COURT:  Okay.  Ms. Kovsky, I guess the last

24   question is, are you prepared to push forward with phase two

25   even though I haven't ruled as to your clients with respect

Page 199

1    to phase one?

2              MS. KOVSKY-APAP:  Yes, Your Honor.

3              THE COURT:  Okay.  All right.

4              MR. ORTIZ:  Your Honor, I just want to make a --

5              THE COURT:  Go ahead, Mr. Ortiz.

6              MR. ORTIZ:  -- quick point of clarification on

7    something that you said.  Not rising to try to change your

8    mind.  I know how to read a room.  I just wanted to note

9    that with regard to the Custody assets that was only

10   eligible to people in the United States.  So when we get to

11   that point, if that's a thing, that the collection risk you

12   talked about in Motors Liquidation for, you know, service

13   and for foreign entities is not really a concern in

14   connection with this particular asset.

15             THE COURT:  Okay.  So we don't have the foreign

16   service issues, but we may well have service issues in the

17   U.S.  I don't -- look, just so that the record is clear, the

18   Court is declining to enter judgment in favor of the Custody

19   account holders with respect to the crypto assets in the

20   Custody -- held by Custody.

21             I'm also declining, even though there's no

22   disagreement about the title to it, I decline to order those

23   assets turned over to the Custody holders.  I do so for

24   three reasons at this point, the stipulation that counsel

25   entered and the Court -- the Court entered, counsel approved

Page 200

1    ECF Docket No. 1044; the agreement for how the procedures in

2    this case would go forward.  As to phase one at least for

3    the Custody holders I believe we've resolved that issue.

4    We're going to move forward with phase two.

5            I think you have all been overly aggressive in the

6    schedule you've set, but you put it in the stipulation so

7    either adjust the schedule or let us push forward with the

8    schedule.  I approved that stipulation.  So --

9            CLERK:  Your Honor --

10           THE COURT:  Hold on.  The basis for my ruling is

11   the stipulation, ECF Docket No. 1044, Bankruptcy Rule 7013

12   which makes Federal Rule of Civil Procedure 13 applicable to

13   adversary proceedings, the preference claims that the

14   Debtors or someone authorized to act in the Debtors' place

15   could assert their good faith claims.  They are either

16   compulsory counterclaims under 13(a) or permissive

17   counterclaims 13(b).  I don't have to fully resolve that

18   issue.  It certainly seems to me that they're compulsory

19   counterclaims under 13(a)(1)(A) and (B).

20           The stipulation that the parties entered extended

21   the time of the Debtors to answer the Custody holders

22   complaint until the issues set forth in the stipulation

23   setting forth the agreed schedule until they're resolved;

24   they're not all resolved.  And under Rule 7054(b), under

25   these -- under the circumstances we've talked about today, I

1    would not exercise my discretion to enter partial judgment

2    ordering that the Custody assets be returned to the Custody

3    holders.

4          So that's my ruling.  I'm not going to write a

5    separate order on it.  I'm so ordering the transcript and

6    we'll push forward from there.

7          CLERK:  Judge?

8          THE COURT:  Yes.

9          CLERK:  We have a raised hand.

10         THE COURT:  Okay, let me hear.

11         CLERK:  Mr. Mendelson, please unmute.

12         MR. MENDELSON:  Yes --

13         THE COURT:  Good afternoon, Mr. Mendelson.

14         MR. MENDELSON:  Thank you, Your Honor, for

15    acknowledging me again.  As a layperson, I'm a little

16    confused here because I'm confused if the estate is bringing

17    a preference claims, if the estate is bringing up preference

18    claims as Mr. Ortiz mentioned and as I believe you

19    mentioned, the preference claims wouldn't just be against

20    Custody.  It would be against the $2 billion of assets that

21    were removed from the platform including those international

22    individuals, non-U.S. citizens.  So it stretches beyond the

23    50,000 number that you mentioned.

24         And to me as a layperson sitting here, it's (audio

25    drops) impossible that the Court would do that, would allow

1    that.  Too much time, too much money.  I don't know how

2    we're going to collect from a dude in Bangladesh.  And if

3    that is not possible to do, then if the estate does bring up

4    preference issues, it would only negatively affect U.S.

5    citizens who are now stuck in Custody.  The old adage, the

6    man with the gold makes the rules.  They have our gold.

7    They would essentially be making the rules and we would be

8    unfairly treated if that was the case, and I just wanted to

9    bring that up.  I don't see how the Court is going to allow

10   preference for all the assets that were removed off the

11   platform within 90 days.

12          And Mr. Dixon brought up that international users

13   were not allowed Custody, which is 100 percent true, and to

14   the benefit of all those international users that were able

15   to remove assets off of the platform, unlike U.S. users who

16   were not able to just remove assets off the platform, rather

17   than go through Custody.  I just want to bring it to your

18   attention.  I feel like right now this preference issue is

19   just a filibuster and a time waster to get back our property

20   that I believe that we own and deserve to be in possession

21   back of, and I do appreciate your time.

22          THE COURT:  Thank you, Mr. Mendelson.  Let me just

23   say this.  I'm dealing with an adversary complaint filed by

24   the Ad Hoc Group of Custody account holders.  I'm not

25   dealing with the account holders at large in the U.S.,

1       outside the U.S.  I'm dealing only with the Custody account

2       holders who filed the adversary proceeding.

3               The issue about the compulsory counterclaim only

4       exists as of now as to those -- that group of people, not

5       anywhere else in the world.  The Custody is only people here

6       in the U.S., but you know, one of the things that I think in

7       good faith, both the Debtors' counsel, the Committee's

8       counsel, and the Ad Hoc Committee's counsel have tried to do

9       is identify things that are sort of what I would refer to as

10      the gating issues.

11              If the Court can resolve them as to some groups of

12      creditors, it may well be rules that would suggest the

13      outcome as to everybody else.  So that's what I'm trying to

14      do.  That's what I think the Ad Hoc Committees were trying

15      to do.  We'll see whether it accomplishes what the goal was

16      or not, but -- so I appreciate your comments and your

17      concerns.

18              Trust me when I tell you, I have concerns.  I want

19      this case to move forward.  I want the creditors to recover

20      as much as they possibly can as soon as they possibly can.

21      And I don't -- my own, you know, people can disagree about

22      this.  I don't think that the Debtors' counsel or the

23      Committee's counsel or Ad Hoc Committee's counsel have had

24      any other goal than trying to get as many issues resolved as

25      soon as possible.

1            You know, it's the same at the hearing yesterday,

2      this came up, I think.  The Debtors and the Committee have

3      committed to this dual path, standalone restructuring, sale.

4      The goal either way is to maximize the value of the estate

5      so that you and every other account holder, whether they're

6      in the U.S. or outside the U.S., can get the maximum

7      recovery possible.  And I'm trying to push this.  Trust me

8      when I tell you I'd be a lot happier myself if I wasn't

9      spending day and night working on the issues in this case,

10     okay, so I appreciate your comments.

11           Deanna, does anybody else wish to be heard?

12           MR. MENDELSON:  Your Honor, if I may just respond

13     really quickly?

14           THE COURT:  go ahead, Mr. Mendelson.

15           Mr. MENDELSON:  First of all, I absolutely do

16     trust you.  I think the U.S. Court system is the best Court

17     system on the planet.  However, when you, when you mentioned

18     Custody and preference, aren't we talking about clawbacks?

19     And if we're talking about clawbacks -- please correct me if

20     I'm wrong --  if we're talking about clawbacks, clawbacks

21     just don't apply to Custody.  It would apply to everyone

22     within that --

23           THE COURT:  Well, it potentially -- it could.  You

24     know, the issues about Custody are different because there

25     was this bright line of 89 days before.  It's a -- look, if

1      you assume that the assets in the Earn account were property

2      of the Debtors' estate, there was a transfer of that

3      property to the Custody account holders, 89 days before.

4      Ninety days is sort of one of the magic markers.  For

5      insiders, it's one year.  But that's what tees this up.  I

6      can't, you know, I can't see around every corner and I'm

7      trying to be careful not to rule on things that have

8      unintended consequences, but I'm ruling on the things that

9      are before me.  So, but I appreciate your concerns.

10              Deanna, is there anybody else who wants to be

11      heard?

12              CLERK:  I do not see any raised hands, Judge.

13              THE COURT:  All right.

14              CLERK:  Sorry, Judge.  Someone just raised a hand,

15      Michael Yankoski.

16              THE COURT:  All right, Mr. Yankoski, go ahead.

17              MR. YANKOSKI:  Yes, Judge Glenn, Your Honor.

18      Thank you for hearing me this me this afternoon and thank

19      you for all your time on this.  I simply want to raise the

20      point that due to the fluctuating nature of the

21      cryptocurrency markets and I assume that this is going to be

22      a point that's brought up in the phase two hearings, but due

23      to the massive volatility of the cryptocurrency markets,

24      should retail clawbacks preference actions be brought

25      against retail clawback -- retail customers of the Celsius

Page 206

1    platform, it's highly likely that that would cause tens if

2    not hundreds of thousands of personal bankruptcies because

3    assets have been withdrawn during that 90 days, which may

4    have, as Mr. Ortiz mentioned, collapsed by 40 percent or in

5    some instances 80, 90 percent and the possibility of

6    returning those to the Debtors' estate is virtually

7    impossible -- not just procedurally impossible, but it's

8    going to be literally impossible for tens, if not hundreds

9    of thousands of retail customers.  I'm sure you're aware

10   that.  I just wanted to put it on the record and bring it to

11   attention.  Thank you, sir.

12          THE COURT:  Look, I'm not going to get into the

13   issue of -- I'm not going to talk specifically about

14   defenses available under the -- for a preference action

15   under 547.  The transfers to the Custody accounts sort of

16   happened in, if not in one fell swoop, it happened pretty

17   quickly.  To the extent there were withdrawals in the

18   ordinary course of business, for example, there may well be

19   defenses.  And I'm not ruling out the defense of ordinary

20   course of business even here.  But it just -- Mr. Yankoski,

21   it raises a host of issues and there are a lot of good

22   lawyers involved and we'll just have to see how it plays

23   out.

24          Deanna, is there anybody else who wants to be

25   heard?

Page 207

1              CLERK:  Yes, Cheryl Bierbaum.

2              THE COURT:  Okay, Ms. Bierbaum, go ahead.

3              MS. BIERBAUM:  Yes, Judge.  Thank you for this

4      time.  I just want to relay I'm an advocate of course for

5      all Custody and Withhold to be released, if that's what's

6      deemed by the Court, but in the meantime, with this

7      preference (audio drops), there was the discussion of pure

8      Custody or pure Withhold accounts.  Those would not be

9      subject to preference, in my understanding.  Is that

10     something that could be determined to be released now as

11     we're awaiting phase two for the remainder accounts?

12             THE COURT:  And I'm glad you raised it because I

13     did have it on my list of issues before we close today.  Mr.

14     Koenig, let me ask you to rise.  Let's see if we can break

15     it down into the group.  So one group, is the pure Custody

16     accounts.  So people who never were in Earn and deposited

17     into Custody, are there objections to returning that portion

18     of the assets?

19             MR. KOENIG:  For the record, Your Honor, Chris

20     Koenig, Kirkland and Ellis, for the Debtors.  We filed the

21     motion three months ago.  There were a variety of

22     objections.  I think it's difficult to say that there were

23     no objections to that point because there were so many

24     folks.

25             THE COURT:  Let me -- I've considered this

Page 208

1    carefully and their -- the objections are overruled.  The --

2    what I would consider the pure Custody account holders,

3    people who deposited -- their assets were not moved from

4    Earn to Custody.  There is no preference.  There's no good

5    faith argument of an avoidable preference against them.

6    There's no dispute as to their having title and the assets

7    should be returned to them.  Prepare an order in appropriate

8    format.  Okay.  So that's the group of the pure, what I

9    would -- shorthand it by talking about the pure Custody

10   account holders.  Okay.

11          Then you've also included in your motion the

12   account holders where the potential preference claim is

13   below the statutory threshold, was, is it, $7,000 --

14          MR. KOENIG:  $7,575, Your Honor, and that's the

15   requirement of 547(ci)(9), so what we've been arguing about

16   today is that the Debtors have prima facie preference

17   claims, but we only have prima facie preference claims to

18   the extent that transfer is in excess of the --

19          THE COURT:  I agree.  Is there anybody objecting

20   to the return of assets from Custody for anyone with less

21   than the 7,500-odd dollars?

22          MR. COLODNY:  Your Honor, Aaron Colodny on behalf

23   of the Official Committee.  I believe we talked before about

24   our position that it should be a pro rata distribution due

25   to the shortfall.  I think that that applies to both pure

Page 209

1    Custody and the amount below to the extent you rule that

2    only the amounts in the wallets would be subject to their

3    property rights.

4              THE COURT:  So Mr. Colodny, let me ask you.  Is

5    there -- how many coins is there a shortfall?

6              MR. COLODNY:  I believe it's about 6 percent, Your

7    Honor.

8              THE COURT:  Six percent in --

9              MR. COLODNY:  In aggregate amount of the

10   obligations --

11             THE COURT:  But how many coins?

12             MR. COLODNY:  I believe there's a number of

13   different currencies, so I don't know the number of coins.

14             THE COURT:  So, you know --

15             MR. COLODNY:  About $16.9 million.

16             THE COURT:  I understand that.  But as to people

17   who deposited Bitcoin, is there a shortfall in Bitcoin?

18             MR. COLODNY:  Meaning, do -- is all --

19             THE COURT:  Maybe I'm --

20             MR. COLODNY:  All of the --

21             THE COURT:  Don't I have to resolve this issue on

22   a coin-by-coin basis?

23             MR. COLODNY:  I believe you do, Your Honor.  I

24   believe we said that in our papers.

25             THE COURT:  Okay.  And is there a disagreement?

Page 210

1    Can the Debtors and the Committee agree on the coins as to

2    which there is no shortfall?  And would you agree that as to

3    the Custody account holders, either the pure Custody account

4    holders or the below the preference threshold, how many, who

5    is -- how many are affected by a shortfall?  They have to

6    have deposited coins for which there is a shortfall, right?

7              MR. COLODNY:  Right.  To the extent there are

8    sufficient coins in the Custody wallets to cover the

9    obligations, I don't see any reason we couldn't agree with

10   the Debtors to let those go.

11             THE COURT:  Okay.  Do -- have you and the Debtor

12   tried to resolve that issue?  I don't know what -- I don't

13   know the numbers.  I mean I don't know what, how many

14   account holders, Custody account holders are faced with the

15   issue of a shortfall in the particular coins that they

16   deposited into Custody.

17             MR. COLODNY:  I don't know the answer to that coin

18   by coin, Your Honor, but I think that's something that

19   either Mr. Koenig and I or our financial advisors could

20   easily --

21             THE COURT:  Well, let me -- Mr. Koenig come on up.

22   Both of you stand at the podium.  I'm forcing you to stand

23   next to each other, even if you're unmasked.  Has the Debtor

24   tried to reconcile this?

25             MR. KOENIG:  We were -- Your Honor, Chris Koenig.

1     We were expecting to get a ruling and to meet and confer

2     with the Committee depending on the outcome of the phase one

3     --

4                   THE COURT:  Meet and confer with the Committee.

5                   MR. KOENIG:  We certainly intend to do so.  I

6     mean, certainly there are some shortfalls.  We'd like to

7     reach a resolution that is efficient and makes --

8                   MR. COLODNY:  Your Honor, just clarification.

9     We're looking at Docket No. 1532 which I think is the

10    supplemental declaration of Oren Blonstein and exhibit -- I

11    think this is Exhibit 1, shows as of petition date the

12    shortfall.  So we have the information.

13                  MR. KOENIG:  We'll speak with the Committee and

14    find a way to resolve this and if we can't we can't, but one

15    of the things -- in the original order that we attached to

16    the motion, we recognized that actually opening up

17    withdrawals and identifying which accounts are subject to

18    the 7575 is not the easiest task and we committed to work

19    with the Committee in that order that we would either agree

20    on the schedule of individuals to have their coins, you

21    know, they can be withdrawn because they're either pure

22    Custody or they're below the 7575 cap and that we would work

23    with the Committee to identify those individuals because

24    there's, of course, you know, maybe somebody had both pure

25    Custody and a transfer and so there's some work that I think

1    has to be done.

2            THE COURT:  And then I think what you have to do -

3    - and I see one of the pro se creditors wants to be heard

4    and I'll hear from you in just a moment -- see if you can

5    reach a stipulation agreement, then you're going to have to

6    serve the account holders and give them a chance if any of

7    them -- if they're getting back everything that they put in,

8    I mean, you've still got to give them notice.

9            But the issue for those where there is a shortfall

10   and -- so I understand that there was a difference in view

11   between a pro rata distribution and lowest intermediate

12   value.  See if you can reach an agreement as to that.  I

13   don't know.  I don't know how much of a delta that --

14           MR. KOENIG:  I don't believe the dollar amount

15   will be all that significant, but we can work with the

16   Committee and our financial advisors.

17           THE COURT:  Because you could easily spend more

18   money figuring it out.

19           MR. COLODNY:  And Your Honor, we don't have any

20   interest in holding up distribution.  So we're not standing

21   before you to belabor --

22           THE COURT:  Okay.

23           MR. KOENIG:  We will figure it out and we will

24   submit a proposed order and serve all account holders on

25   whatever notice Your Honor believes is appropriate, whether

Page 213

```
 1      you'd like to be seven days' notice or more regular --
 2                   THE COURT:  Fourteen days.
 3                   MR. KOENIG:  Fourteen days' notice.  Very good.
 4                   THE COURT:  Let me -- Deanna, who's on the screen?
 5      I should recognize you because you spoke this morning.
 6                   CLERK:  Tony Vejseli.  My apologies if I
 7      mispronounce your name.
 8                   THE COURT:  Go ahead. You've hung in there this
 9      afternoon, so --
10                   MR. VEJSELI:  Yes, I.  Sorry.  Tony Vejseli.  I
11      just wanted to make the point again, I know I made it
12      before, but the Debtor and the UCC are trying to hold up the
13      pure Custody for the ones that do have an active loan that
14      is still good -- in good standing.  So I just want to throw
15      that out there.
16                   THE COURT:  Okay.
17                   MR. VEJSELI:  Thank you, Judge.
18                   THE COURT:  Thank you.  Anybody else?
19                   CLERK:  Rebecca Gallagher.
20                   THE COURT:  Ms. Gallagher.
21                   MS. GALLAGHER:  Yes, Your Honor.  I have looked
22      into some of the things we were talking about earlier and
23      indeed the Debtor does have an MSB license but that does not
24      grant them the ability to offer a Custody service.
25                   THE COURT:  Ms. Gallagher, you don't have any
```

1    assets in a Custody account because you're not in the United

2    States.  You don't have any --

3             MS. GALLAGHER:  No, I have all -- I have all my

4    assets in Earn and every dollar that you pay to these people

5    that doesn't get the same haircut that I will get, is a very

6    --

7             THE COURT:  Okay.

8             MS. GALLAGHER:  -- unfair --

9             THE COURT:  Okay --

10            MS. GALLAGHER:  -- inequitable --

11            THE COURT:  The objection is overruled.  Okay.

12            MR. KOENIG:  Your Honor, I just want to clarify

13   for the record.  So you are granting the motion with respect

14   to pure Custody --

15            THE COURT:  I am.

16            MR. KOENIG:  -- and transferred Custody below the

17   7,575 --

18            THE COURT:  Correct.

19            MR. KOENIG:  -- threshold with the Debtor and the

20   Committee to meet and confer about the pro rata issue.

21            THE COURT:  Yes.

22            MR. KOENIG:  The Court is not granting the order

23   with respect to either pure Withhold or transferred

24   Withhold?

25            THE COURT:  Correct.  I can't decide -- Ms.

Page 215

1    Kovsky, you want to be heard further?  I don't have

2    everything decided today.  Sorry if I'm disappointing you,

3    but --

4              MS. KOVSKY-APAP:  Your Honor, Deb Kovsky for the

5    Withhold Group.  I think that given where we are and the

6    Committee raising objections, although the -- I think we and

7    the Debtors are aligned that pure Withhold is not property

8    of the estate and certainly, you know, anything that was

9    newly deposited on should go back promptly to the account

10   holders since there's no possible preference claim there.

11             THE COURT:  Let me ask.  Mr. Koenig, is that

12   correct?  The Debtor agrees with Ms. Kovsky about the pure

13   Withhold?

14             MR. KOENIG:  Your Honor, I -- Chris Koenig.  I

15   agree.  The pure Withhold is different than the transferred

16   Withhold.

17             THE COURT:  Okay.  And Mr. Colodny, do you

18   disagree?

19             MR. COLODNY:  We do, Your Honor, with respect to

20   the pure Withhold that is not the BNB or other tokens that

21   were not supported by the Debtors.

22             THE COURT:  Just articulate for me briefly why you

23   --

24             MR. COLODNY:  So BNB tokens are I think less than

25   half a percent of pure Withhold.  The majority of pure

```
 1    Withhold are unaccredited investors who transferred to the

 2    Debtors and the Debtors could not support it but took the

 3    assets and used them as if they were their own.  And it's

 4    our position that by taking the assets, using it as their

 5    own, they exercised control over the --

 6              THE COURT:  They comingled and deployed the

 7    assets.

 8              MR. COLODNY:  Correct, and so to take those assets

 9    and to distribute them now would take them away from other

10    Earn holders that may have an equal entitlement into those

11    assets.

12              THE COURT:  But there is some group of Withhold

13    account holders who deposited --

14              MR. COLODNY:  BNB tokens, other unsupported

15    tokens.

16              THE COURT:  You agree as to them?

17              MR. COLODNY:  Provided that the Debtors have them

18    sitting in their bank accounts, I don't have any problem

19    releasing those.

20              THE COURT:  Mr. Koenig, is there some group of

21    them that could be returned?

22              MR. KOENIG:  Chris Koenig.  I believe so, Your

23    Honor.  We'll work with the Committee --

24              THE COURT:  Work with the Committee and Ms.

25    Kovsky.  I would like whoever can get their property back
```

Page 217

1    now, I'd like them to get it back now.

2              MR. KOENIG:  We agree, Your Honor.

3              THE COURT:  Okay.  Mr. Ortiz?

4              MR. ORTIZ:  Sorry, Your Honor.  Good afternoon

5    again.  Kyle Ortiz for the Custody Group.  We have a couple

6    of people who either in whole or in part are pure Custody,

7    so we'd just ask to be part of those discussions.  We're --

8              THE COURT:  Absolutely.

9              MR. ORTIZ:  -- definitely not going to do anything

10   to slow it down.

11             THE COURT:  I agree.

12             MR. ORTIZ:  Thank you, Your Honor.

13             THE COURT:  Okay.

14             CLERK:  Sorry, Judge.  We have a few more raised

15   hands.

16             THE COURT:  Okay.  Take them in the order in which

17   they raise their hands.

18             CLERK:  Okay, John Bazolist.

19             MR. BAZOLIST:  Yes, thank you.  So Judge, I

20   appreciate your time today.  I actually had asked a question

21   earlier and as it seems with this case, there are a lot of

22   edge cases, so this one relates to the Custody and pure

23   Custody.  If somebody had funds in Custody that were -- had

24   touched Earn at one point who had subsequently transferred

25   additional pure Custody funds over to Custody, is it fair to

Page 218

1    say that those additional pure Custody funds are eligible

2    for repayment but not the original Custody funds?

3              THE COURT:  Mr. Koenig?

4              MR. KOENIG:  Your Honor, I --

5              THE COURT:  I think.

6              MR. KOENIG:  Make sure I heard the question

7    correctly.  To the extent that were pure Custody funds that

8    were never in Earn but there were also funds that were in

9    Earn and were transferred to Custody, are the pure Custody

10   funds still eligible?  The answer is yes.

11             THE COURT:  Yes.

12             MR. KOENIG:  From our perspective because --

13             THE COURT:  Yes.

14             MR. KOENIG:  -- there was no transfer --

15             THE COURT:  I agree.

16             MR. KOENIG:  -- of the Debtors' interest in

17   property.

18             THE COURT:  I hope that answers the question.

19   With respect to the pure Custody -- and you'll get notice

20   and an opportunity to object if you disagree.  And it ought

21   to set out clearly if there's some people that a combination

22   of Earn that moved over versus pure Custody, that that's

23   explained.

24             MR. KOENIG:  We'll do our best to explain the

25   mechanics because it will be a little bit complicated and

1    we'll work with the Committee, Your Honor.

2              THE COURT:  Okay.  All right.

3              MR. BAZOLIST:  Just one additional wrinkle there.

4    If you're not pure, if your original Custody funds are over

5    that statutory limit, but your pure Custody is under that

6    statutory limit, does that disqualify you or are you still

7    eligible for those funds?

8              THE COURT:  Pure Custody, there's no preference

9    issue.

10             MR. KOENIG:  Correct.  The Debtor agrees.

11             THE COURT:  Yeah.  Yeah, as to the pure Custody,

12   there is no preference issue because it wasn't property of

13   the estate that was transferred into a Custody account.  For

14   property that was in an Earn account and was transferred to

15   Custody, that raises the preference issue.

16             MR. BAZOLIST:  Okay, understood.

17             THE COURT:  Okay.  Anybody else?

18             CLERK:  We have Tony Vejseli again -- I'm sorry, I

19   keep mispronouncing your name.

20             MR. VEJSELI:  All right --

21             THE COURT:  You're getting close, though.

22             MR. VEJSELI:  Yeah, that's good enough.  You got

23   there.  Sorry, this is the last one for me.  I just wanted

24   just more clarity from the Debtor.  I just want to make sure

25   that they're aware of the situation I'm talking about and I

Page 220

1     don't really care too much about myself, but I know there's

2     a lot of people that fall under the 7,500 threshold, but

3     they have an active loan as well.  So just want clarity on

4     if those people would get their pure Custody or Custody

5     under the 7,500 back.

6              MR. KOENIG:  Again, Chris Koenig.  Our position is

7     that there's a potential setoff between whether it's 7,575.

8     That's a different issue than the preference.  So that's why

9     we --

10             THE COURT:  -- different issue.  We haven't -- the

11    Court has not dealt with the issue of loan and collateral

12    for loans.

13             MR. KOENIG:  That's right, Your Honor, and that's

14    why we included that carveout in the motion that we filed.

15             THE COURT:  That's not getting resolved today.

16    All right.  I'm not going to hear from anybody I've already

17    heard from.

18             CLERK:  There are a few people that had raised

19    hands, but they lowered them so I don't see anyone else's

20    hands right now.

21             THE COURT:  Thank you.  Thank you, Deanna.  All

22    right.  I think from the Court's standpoint, the most

23    important thing is you need to consult regarding the

24    schedule.  Obviously, there are issues about orders,

25    returning some assets that are not really in dispute.  It's

1    an aggressive schedule and that's fine if you all want to

2    spend your Christmas, New Year's holiday doing all that.

3            If, you know, if you all come to an agreement for

4    any adjustments in the schedule, put it into a proposed

5    stipulation and give it to me.  I've committed to moving

6    forward expeditiously.  Okay.

7            MR. KOENIG:  Wonderful.  Thank you, Your Honor.

8    One last housekeeping point for tomorrow.  I believe

9    tomorrow's hearing was initially noticed as a hybrid Zoom in

10   case this matter bled into tomorrow.  Would you like the

11   hearing to be hybrid as well or to go back to --

12           THE COURT:  No, I think we can go Zoom, but let me

13   raise this question now.  So you filed three new Debtor

14   cases.  And trust me, when I say I haven't looked at a piece

15   of paper or a computer screen dealing with three new cases.

16   When I approved bidding procedures, I -- my assumption was

17   because there was -- what was proposed to be sold was the

18   equity of non-Debtors held by, you know, directly or

19   indirectly by a Debtor.

20           And do I assume that what's happened now is the

21   buyer wants to buy assets free and clear and doesn't want

22   just the equity and so he filed three Debtor cases?  Is that

23   kind of --

24           MR. KOENIG:  That's exactly right, Your Honor.

25   That's to effectuate --

1          THE COURT:  And you really expect me to spend my

2     night reading all these papers and figuring out and

3     approving a sale tomorrow?

4          MR. KOENIG:  Your Honor, we're happy to reschedule

5     --

6          THE COURT:  We'll have a hearing, but don't count

7     on getting relief.

8          MR. KOENIG:  Understood.  Is this on the sale or

9     the first days or both?

10         THE COURT:  I haven't even looked at -- all I've

11    done for days is read papers for yesterday, for Monday, and

12    today.  You know, and I heard from my law clerks that they

13    got a call that Debtors were intending to file additional

14    cases.  Then we weren't told which ones.  Then we were told,

15    well, because of Israel, they -- not ready to file the cases

16    yet.  Get them pushed.

17         And I saw on an email that I had three new cases.

18    So the cases filed.  I haven't looked at a single page.  I

19    presumed that what happened was the buyer wanted to buy

20    assets free and clear, understand why, okay.  Was -- I don't

21    know, I mean, I'll ask these questions tomorrow or answer it

22    now.  Did the auction provide bid on assets, bid on shares?

23    Was it a -- you know, was the auction process a fair

24    process?  Did people know they could bid on some or all of

25    the assets, the equity?

Page 223

1            MR. KOENIG:  Your Honor, from very early on in the

2    process, bidders indicated an interest in buying only the

3    assets because they wanted the free and clear order.  And I

4    believe, and we can --

5            THE COURT:  I don't remember what's in the bidding

6    procedures.

7            MR. KOENIG:  Right, right.

8            THE COURT:  Whether it said assets --

9            MR. KOENIG:  But my understanding is --

10           THE COURT:  I couldn't approve.  They weren't

11   debtors so --

12           MR. KOENIG:  Right.

13           THE COURT:  The assets weren't the assets of the

14   Debtor.

15           MR. KOENIG:  Right.  But the buyers, the bidders

16   were aware from very early on that an asset sale was the

17   most likely outcome because that's what they indicated to

18   the Debtors that they were interested in, and of course,

19   they're the ones that are --

20           THE COURT:  Surprise, surprise.

21           MR. KOENIG:  -- writing the check.  They're the

22   ones that are writing the check, so of course --

23           THE COURT:  I understand that.

24           MR. KOENIG:  -- we talked to them about that.  We

25   talked to them about that structure, you know, for a very

Page 224

1   long time.  I don't believe that anybody was surprised but

2   we're happy to -- I don't think that any bidder would be

3   surprised to say, oh I would have bid if I knew I could --

4           THE COURT:  How many NDAs were signed?

5           MR. KOENIG:  Your Honor, I don't have that in

6   front of me.  I apologize.

7           THE COURT:  Did every party who signed an NDA --

8   I'll ask this question tomorrow.  Did every party who signed

9   an NDA know that they could also evaluate whether to bid on

10  assets, bid on stock, bidding on assets would in all

11  likelihood require that the Debtor cases be filed?  Are

12  these -- is it a foreign Debtor in Israel?  Is that --

13          MR. KOENIG:  That's right, Your Honor, and there

14  would be a chapter -- there would be the equivalent of a

15  Chapter 15 recognition and proceeding in Israel.

16          THE COURT:  In Israel.

17          MR. KOENIG:  In order to recognize the sale in the

18  United States, and that's part of the reason for the timing

19  here, is of course we want the sale to close as promptly --

20          THE COURT:  Have you laid it all out in a set of

21  papers that I can pull off my computer and --

22          MR. KOENIG:  I believe it's in the papers that

23  were overnight and this morning.

24          THE COURT:  I'll look at them, but no guarantee.

25          MR. KOENIG:  Understand.

Page 225

1          THE COURT:  I understand the reason for the -- how

2     many bidders were there?

3          MR. KOENIG:  Your Honor, I --

4          THE COURT:  Mr. Nash, how many bidders were there?

5          MR. NASH:  Good afternoon, Your Honor.  Pat Nash

6     from Kirkland and Ellis for the Debtors.  Of course we'll

7     make this case tomorrow, Judge, but there was a larger

8     universe of initially interested bidders which came down to

9     then a very small universe of actual bidders.  The evidence

10    tomorrow will suggest that all bidders understood the rules

11    of the road and what was available.

12         In light of Your Honor -- before we filed the

13    cases and this is, you know, an interesting case, came at

14    everybody so fast and came at the Court so fast that there

15    have been a few times where we've, the Debtors have started

16    down one direction and then, you know, recalibrated a bit

17    the issue that you heard so much about today being frankly

18    only one of those issues.

19         But as soon as the bidders and what became

20    actively, you know, written about in the press and whatnot

21    is this issue that, you know, where do the customers have

22    claims.  Do the customers potentially have claims at GK8 and

23    so who the heck is going to buy the equity of GK8 only to

24    find out that they are liable for billions?

25         THE COURT:  Yeah, that's why I say, surprise,

Page 226

1    surprise.  They want to buy assets free and clear.

2              MR. NASH:  Right.  So Your Honor -- and we'll see

3    how it goes tomorrow in terms of, you know, just how abrupt

4    the notice is and what it is Your Honor has been able to

5    digest or not digest.

6              If it's not tomorrow, I think you'll be

7    comfortable that at some point soon thereafter, I do think

8    that we will be able to put on a case that as it relates to

9    the GK8 assets and the process, we have elicited the highest

10   and best value and, you know, frankly if Bill Gates or

11   somebody wants to show up with a suitcase full of cash, you

12   know, it's not final until we drop the gavel, but I think,

13   Your Honor, with the benefit of the hearing tomorrow, we'll

14   be able to satisfy your concerns.

15             THE COURT:  Okay.  I'm not making any promises.

16             MR. NASH:  Understood.

17             THE COURT:  We'll go forward with the hearing.

18   It'll be a Zoom hearing.

19             MR. NASH:  Okay, Judge.  Thank you.

20             THE COURT:  Thank you, Mr. Nash.  All right --

21             CLERK:  Sorry to interrupt, Judge.  We have a few

22   new hands.

23             THE COURT:  No.

24             CLERK:  I don't know --

25             THE COURT:  It's over.  I --

Page 227

1              CLERK:  Okay.

2              THE COURT:  All the issues as to which people are

3    entitled to be heard have been heard.  We'll deal with -- I

4    had questions about the hearing for tomorrow.  Those issues

5    will be taken up at the hearing tomorrow.  I've expressed my

6    frustration at newly filed cases and the -- anyway.  We're

7    adjourned.

8              MR. KOENIG:  Thank you, Your Honor.

9              (Whereupon these proceedings were concluded at

10   11:03 AM)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 228

1                              **I N D E X**

2

3                                RULINGS

4                                              Page        Line

5     Joint Stipulation, GRANTED               16          7

6     Motion to Return Certain Assets, DENIED  200         18

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 229

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  December 12, 2022