Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Initial Debtors and Debtors in Possession*

*Proposed Counsel to the GK8 Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

**DEBTORS' OBJECTION
TO IMMANUEL HERRMANN'S MOTION
FOR THE ENTRY OF AN ORDER (I) APPOINTING
A CHAPTER ELEVEN MEDIATOR (II) DIRECTING
MANDATORY MEDIATION AND (III) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file

this objection (this "Objection") in response to Immanuel Herrmann's ("Mr. Herrmann") *Motion*

*for the Entry of an Order (I) Appointing a Chapter Eleven Mediator (II) Directing Mandatory*

*Mediation and (III) Granting Related Relief* [Docket No. 1630] (the "Motion"), Ignat Tuganov's

("Mr. Tuganov") *Joinder and Supplement to Motion Appointing Mediator* (the "Tuganov

---

[1].    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 USA LLC (9450); and GK8 UK Limited (0893). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

Joinder") [Docket No. 1680], and Víctor Ubierna de las Heras' ("Mr. Ubierna de las Heras") *Motion to Join and Supplement to Motion Appointing a Mediator* (the "Ubierna de las Heras Joinder"). In support of this Objection, the Debtors state as follows:

**Preliminary Statement**

1.  The Debtors are nearing the conclusion of their dual-track path of marketing their assets for sale and evaluating a potential standalone reorganization. The Debtors recently received final bids pursuant to the court-approved bidding procedures, and the Debtors continue to work closely with the Official Committee of Unsecured Creditors (the "Committee") to evaluate the potential options and select the transaction that will return the most value to the Debtors' stakeholders. The Debtors intend to share additional details publicly with all stakeholders in the near term and presently expect to file a chapter 11 plan prior to the expiration of their recently extended exclusivity period on February 15, 2023.

2.  Simply put, the Motion has not demonstrated that mediation would move these chapter 11 cases forward at this time. The Debtors continue to work closely with the Committee, but no transaction structure has been selected, and no plan has been filed yet—mediation would not be efficient until the path forward is clearer. Moreover, with over 600,000 account holders, engaging in mediation with only a handful of individual creditors (even those who are active in these chapter 11 cases and the community) will not be an efficient use of time or resources, particularly when the Committee is actively engaged as a fiduciary for all unsecured creditors. Notably, only a few individual creditors have expressed support for mediation at this stage of these cases. The Debtors understand that the Committee opposes the Motion, and various state agencies also indicated that they believe that mediation is premature.[2] As such, the Debtors believe that the proposed mediation is not in the best interests of their estates at this time.

---

[2]  *See Limited Omnibus Objection of the Texas State Securities Board and the Texas Department of Banking to Motion for the Entry of an Order (I) Appointing a Chapter Eleven Mediator (II) Directing Mandatory Mediation and (III) Granting Related Relief* [Docket No. 1723], *Response of Coordinating States to Motion for the Entry of an Order (I) Appointing A Chapter Eleven Mediator (II) Directing Mandatory Mediation and (III) Granting*

2

3.  The movant, Mr. Herrmann, one of the most active *pro se* creditors in these chapter 11 cases and a self-selected proposed mediation party, disagrees. Throughout these chapter 11 cases, Mr. Herrmann has gradually tested the limits of his (in)ability to represent others. At first, Mr. Herrmann appeared to respect the process and acknowledge his role in it—in early hearings, Mr. Herrmann asked a number of questions of the Court, including whether he could speak for others, and appeared to accept the Court's answer that he could not.[3] Recently, however, Mr. Herrmann has pushed the envelope. For example, in advance of the December 5, 2022 hearing, Mr. Herrmann collected signatures for several joinders,[4] filing them "in his personal capacity" (but purportedly on behalf of all "signatories").[5] Similarly, Mr. Herrmann originally hoped to speak to bidders but was informed by the Court that he would have no such opportunity.[6] In addition, the approved bidding procedures in these cases [Docket No. 1272, Ex. 1] (the "<u>Bidding Procedures</u>") make clear that "all substantive direct communications, including any diligence

---

*Related Relief* [Docket No. 1726], and *State of Washington's Joinder to Response of Coordinating States to Motion to Appoint Chapter 11 Mediator* [Docket No. 1730].

[3] *See, e.g.*, Oct. 7, 2022 Hr'g Tr., 61:22–62:20 ("Emanuel Herman [sic], pro se, Celsius LLC creditor and the admin of the Worldwide Earn Customer Group, which has 2,850 members representing hundreds of millions of dollars in assets. . . . As an earn customer and a leader of that group . . . "); Oct. 7, 2022 Hr'g Tr., 66:12–67:7 (Mr. Herrmann: "So, one question is just if I can file on behalf of similarly situated earn customers worldwide and those who've paid off loans or if I would just be filing for myself?" Court: "I think the issue of representing others is something I don't think you're in a position to do. So, I think you can file for yourself but . . . You can file for yourself. I'm very mindful that arguments you make may apply to a much broader swath of people. I'm mindful of that when I rule on things." Mr. Herrmann: "Okay.").

[4] It is the Debtors' understanding that the signatures were collected through an unsecured Google form (accessible by anyone). For the avoidance of doubt, the Debtors do not question Mr. Herrmann's belief in the validity of the signatures but do not concede that the filing can be read as more than an individual joinder by Mr. Herrmann.

[5] *See, e.g.*, *Joinder of Three Hundred and Seventy-Five Celsius Earn Creditors to the Borrowers' Limited Objection to the Debtors' Motion for Entry of an Order Extending the Debtors' Exclusive Period to File a Chapter 11 Plan [D.R. 1475]* [Docket No. 1553] ("This filing is consistent with our views and opinions on the issue of exclusivity. We strongly object to the Debtors' requested extension of exclusivity until March 31, 2023 to solicit votes on a plan until May 31, 2023."); *see also* Dec. 5, 2022 Hr'g Tr., 212:18–22 (Mr. Herrmann: "Yes, this is Immanuel Herrmann, pro se creditor. So I in my personal capacity, along with 374 other pro ses in their personal capacity . . . ." The Court: "Wait, wait, wait. You can speak for yourself. You can't speak for 374 other people.").

[6] *See* Oct. 26, 2022 Hr'g Tr., 79:8–22 ("Well, you're not going to get to talk to the bidders, Mr. Herrmann. . . . That isn't going to happen. . . . [I]n terms of the sale process, I mean, I'm not—you know, we'll see where the sale process comes out, with how many bidders, et cetera. You'd certainly have an opportunity to—if they're a stalking horse or proposed parties to a transaction, you'll certainly have an opportunity to object then, but not to participate in any negotiation with them.").

requests, with Potential Bidders and Qualified Bidders shall be through Centerview (email being sufficient)." *See* Bidding Procedures p. 7, ¶ A. Despite this, Mr. Herrmann disregarded the guidance from this Court and the requirements of the Bidding Procedures and asserts that he spoke not only to multiple bidders, but also to regulators, all without the knowledge or participation of the Debtors or their advisors.[7] Now, Mr. Herrmann, an individual *pro se* creditor, seeks to force mediation and seeks to mandate his own participation in this mediation process (despite representing no one other than himself). Moreover, Mr. Herrmann requests mediation on at least ten issues, several of which are amorphous and likely unanswerable.[8]

4. Mr. Herrmann has been included in the process as much as could reasonably be expected. In addition to filing dozens of pleadings, Mr. Herrmann participated in numerous hearings and several depositions and has enjoyed a "direct line" to Debtors' counsel when requested.[9] Some of Mr. Herrmann's feedback is helpful. Where it proves helpful, the Debtors consider it. In other circumstances, however, Mr. Herrmann overreaches. The Motion is one such instance.

5. The Debtors and their advisors are making progress, even if that progress is not as apparent and expedient as account holders would like. The Debtors are close to selecting the value-maximizing path forward in close consultation with the Committee, and the Debtors have simultaneously been pursuing resolution of key legal issues. The Debtors' process is moving at a

---

[7] *See* Motion p. 7, n.5–6 ("A group of Celsius Earn and Borrow customers had an excellent and extraordinarily productive meeting with state regulators . . . I am under NDA with one bidder, and have spoken with two bidders. Both bidders expressed dismay at the bidding process and the extreme difficulty and cost of putting together a bid and uncertainty about what, exactly they were buying."). The Debtors attempted to better understand Mr. Herrmann's conversations as part of their evaluation of the Motion but were rebuffed with accusations regarding the Debtors' intent.

[8] *See, e.g.*, Motion p. 12 ("How do we get a plan that will actually be popular with creditors? How do we get a plan that regulators will actually approve (especially given that there's been no communication thus far).").

[9] Debtors' counsel has spoken with Mr. Herrmann on several occasions at his request (most recently on November 18, 2022) and frequently corresponds with him via e-mail to answer his questions.

comparable—if not quicker—pace than that of peer cases, [10] and the Debtors could realistically be the first cryptocurrency company to emerge from chapter 11. In the interim, the Debtors expect to be able to share more information publicly in the near term, and the Debtors are actively evaluating proper channels to open a dialogue with the broader community regarding the terms of the path forward. Even if mediation might be helpful at some point in these chapter 11 cases to resolve open disputes, it is not now. For these reasons, the Motion is premature and should be denied.

## **Objection**

6.      The sole basis for appointing a mediator in chapter 11 is the Court's equitable powers. *See* 11 U.S.C. § 105; *see also In re Windstream Holdings, Inc.*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. July 30, 2019) (citing only section 105 of the Bankruptcy Code in appointing a mediator); *In re Res. Cap., LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. Dec. 26, 2012) (same). As the Tuganov Joinder observes, the Court adopted *Procedures Governing Mediation of Matters and the Use of Early Neutral Evaluation and Mediation/Voluntary Arbitration in Bankruptcy Cases and Adversary Proceedings* (General Order M-390 as amended by General Order M-452) (the "SDNY Mediation Protocol"). The SDNY Mediation Protocol does not provide a governing standard for when a mediator ***should*** be appointed; instead, it outlines when a mediator ***can*** be appointed (and procedures for use in such circumstances). As such, principles of equity govern, and under the circumstances, granting the relief requested in the Motion would not promote equity.

7.      As opposed to seeking mediation on a discrete legal issue or recently filed motion, Mr. Herrmann seeks to appoint a mediator to oversee a myriad of issues, several of which are currently subject to briefing schedules with the Court and/or currently under review by the

---

[10]  *See* Nov. 5, 2022 Hr'g Tr., 217:20–25; 218:1–2 ("And I'm mindful of all that, but really none of them have cited any legal authority that a failure to file a plan within four months constitutes a lack of substantial progress. I have to say in any of the larger cases I've had, I haven't had — other tha[n] prepacks, I don't think I've had really, you know, plans proposed within that timeframe. And here there's been a commitment to move forward with it.") (Hon. C.J. Glenn).

5

Examiner and other parties. Mr. Herrmann's nonexclusive list of proposed mediation topics includes: (i) "What happens with Earn, given that many contract defenses and unique situations exist even if this court is able to rule on the default contract for most customers."; (ii) "What happens with borrowers and their collateral."; (iii) "What happens with Custody and Withhold, after Phase I."; (iv) "What happens with 'withhold-like' claims such as suspended and pending accounts."; (v) "What happens with retail clawbacks (noting that an anti-clawback group, preparing to spend big money on legal fees, is forming)"; (vi) "What happens with CEL token." (vii) "What happens with liquidated loans and other situations where users have messy claims of wrongdoing against the estate."; (viii) "How do we get a plan that will actually be popular with creditors?"; (ix) "How do we get a plan that regulators will actually approve (especially given that there's been no communication thus far.)"; and "(x) How we ensure that insider clawback and industry counterparty clawback claims are preserved (and other bottom lines around accountability that nearly all creditors have in these cases)." *See* Motion pp. 12–13.

8.  Mediations—even under appropriate circumstances—are time and cost intensive.[11] Where disputed issues threaten to result in extensive litigation, the costs may be worth it. At the moment, however, the many issues Mr. Herrmann, Mr. Tuganov, and Mr. Ubierna de las Heras propose for mediation (a) were decided by the Court (*e.g.*, custody and withhold), (b) are currently under submission or the subject of further briefing schedules (*e.g.*, Earn/stablecoin, against which entities account holders may assert claims), or (c) are currently being investigated by the Examiner (*e.g.*, public statements). *See In re Diocese of Buffalo, N.Y.*, 634 B.R. 839, 847 (Bankr. W.D.N.Y. 2021) (deferring the commencement of mediation until the Court could fully consider mediation-

---

[11] Mr. Herrmann does not propose who would pay for the costs associated with appointing a mediator and conducting mediation proceedings. Presumably, Mr. Herrmann intends for the Debtors' estates to cover these costs. Introducing another estate-paid professional, particularly when professional fees are being closely scrutinized, *see* Tuganov Joinder at ¶ 1, is neither prudent nor value maximizing. Mr. Ubierna de las Heras explicitly requests that *pro se* creditors not pay for the costs associated with appointing a mediator and conducting mediation proceedings but also does not propose who would pay for the same. *See* Ubierna de las Heras Joinder at ¶¶ 3, 6.

6

related discovery requests and who would participate in a proposed mediation). Mediation, therefore, would largely duplicate ongoing processes and the investigative efforts of other parties in these chapter 11 cases. Moreover, mediation is premature and would distract from the momentum the Debtors are building, with little potential upside.

9. In approximately six-months' time, the Debtors briefed and argued several key legal issues, successfully marketed their GK8 assets for sale (and are preparing to file recognition proceedings in Israel to implement the sale), and are nearing the conclusion of a dual-track process of pursuing either a standalone restructuring or sale of the Debtors' retail platform. The Debtors anticipate sharing details regarding the go-forward business strategy for community feedback in advance of filing a chapter 11 plan. The Debtors are engaging with regulators regarding pending investigations and also providing extensive information to the Examiner and the Committee for their investigations.[12] The Debtors' advisors regularly communicate directly with *pro se* creditors—including Mr. Herrmann—and will continue to do so. The Court commended the professionals' efforts to progress these chapter 11 cases and to engage with *pro se* creditors.[13] The process is working.

10. To the extent the Court determines to appoint a mediator, the Debtors request that the Court decline to include *pro se* or individually represented creditors (who can only represent their own interests), which would be inequitable in light of the hundreds of thousands of account holders who would ***not*** be present at the mediation. Under the SDNY Mediation Protocol—and

---

[12] The Debtors have not specifically addressed the baseless accusation that they are not engaging with regulators. In the Debtors' silence, parties seem to have accepted such assertions as true. *See* Motion p. 6 ("There has been a lack of communication and active negotiation with creditors throughout these cases, and–as we learned in open court on December 5–there has been no communication regarding Celsius' plans with regulators."); *id.* p. 7, n.5 ("Now, we have learned in open court that the Debtor is not communicating with key regulators at all about their restructuring plans, confirming some of our worst fears."). The Debtors are engaging with regulators as appropriate but are not publicly discussing such efforts to ensure that the process is not jeopardized.

[13] *See* Dec. 5, 2022 Hr'g Tr., 218:7–219:6 ("The industry as a whole is in turmoil. I think the professionals are doing a commendable job in keeping this case from being a total freefall and keeping this case moving forward. . . . Pro se Creditors may not always appreciate the response they get, but they've been responded to.").

7

out of practical necessity—any mediation would be confidential.[14] *See* SDNY Mediation Protocol § 5. As such, inclusion of only certain individual creditors would create a perception that certain creditors are of elevated importance and result in inequitable information disparities, placing all involved in an uncomfortable position. The only equitable approach (with respect to creditors) would be to include the Committee as the representative of all unsecured creditors.

11. The Debtors do not suggest that a mediator will never be appropriate. Perhaps, after a chapter 11 plan is filed, there will be disputes that could be efficiently resolved through mediation. At this time, however, mediation is plainly premature and supported only by Mr. Herrmann and a few other individual creditors. As noted above, the Debtors are sensitive to certain of the concerns raised in the Motion and the various joinders and are working to open additional channels of communication in the next phase of these chapter 11 cases. The relief requested in the Motion, however, is a bridge too far. Therefore, the Motion should be denied.

## Reservation of Rights

12. The Debtors expressly reserve all further substantive or procedural objections to the Motion at or prior to any hearing on the Motion. Nothing contained herein or any actions taken pursuant to such relief is intended or should be construed as: (a) an admission as to the validity of any prepetition claim against a Debtor entity; (b) a waiver of the Debtors' right to dispute any prepetition claim on any grounds; (c) a promise or requirement to pay any prepetition claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Objection or any order granting the relief requested by this Objection; (e) a request or authorization to assume

---

[14] Maintaining confidentiality would further entrench the notion of a "lack of transparency." *See, e.g.*, Motion p. 11 ("I do not want to find myself objecting to a sale in open court to a Chapter 11 plan because of the same old issues that have followed these cases since the beginning: lack of transparency, lack of communication, and lack of trust.").

any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or

(f) a waiver of the Debtors' rights under the Bankruptcy Code or any other applicable law.

[*Remainder of page intentionally left blank*]

| | |
|---|---|
| New York, New York<br>Dated:  December 17, 2022 | */s/ Joshua A. Sussberg*<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>Joshua A. Sussberg, P.C.<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone:    (212) 446-4800<br>Facsimile:     (212) 446-4900<br>Email:            jsussberg@kirkland.com<br><br> - and -<br><br>Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)<br>Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)<br>Christopher S. Koenig<br>Dan Latona (admitted *pro hac vice*)<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Telephone:    (312) 862-2000<br>Facsimile:     (312) 862-2200<br>Email:            patrick.nash@kirkland.com<br>                      ross.kwasteniet@kirkland.com<br>                      chris.koenig@kirkland.com<br>                      dan.latona@kirkland.com<br><br>*Counsel to the Initial Debtors and Debtors in Possession*<br><br>*Proposed Counsel to the GK8 Debtors and Debtors in Possession* |