Immanuel Herrmann
*Pro se Celsius creditor*
Admin of the worldwide Celsius
Earn Customer Telegram group
immanuelherrmann@gmail.com
**https://t.me/celsiusearn**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.,*[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered.) |

**REPLY IN SUPPORT OF IMMANUEL HERRMANN'S MOTION FOR THE ENTRY OF AN ORDER (I) APPOINTING A CHAPTER ELEVEN MEDIATOR (II) DIRECTING MANDATORY MEDIATION AND (III) GRANTING RELATED RELIEF**

I hereby submit this reply in support of my *Motion for the Entry of an Order (i)*
*Appointing a Chapter Eleven Mediator (ii) Directing Mandatory Mediation and (iii)*
*Granting Related Relief* [D.R. 1630].

For the reasons set forth in this reply, I respectfully request that the objections of the
UCC and the Debtor be overruled and that they be directed to attend mandatory
mediation, along with other mediation parties.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

After reviewing the responses of the regulators, I agree with their arguments that they do not need to attend mediation *yet*. I do, however, believe their presence could be important soon. Any plan, especially a reorganization plan, but even a sale, will need input from regulators.

Accordingly, while there is no need to mandate regulator involvement now, I do hope regulators will voluntarily join in the future, particularly if requested by the mediator. (That said, I have no objection to making such mediation voluntary for regulators–and I am perfectly willing to leave them off for the time being.)

## MEDIATION WILL HELP RESOLVE THESE CASES FASTER AND MORE INEXPENSIVELY, AND NOT INTERFERE WITH EXISTING PROCESSES

The mediation I propose is not intended to shorten exclusivity which, the UCC notes, I agreed to extend (but neglects to mention that I only agreed to extend it "***provided*** that all fiduciary parties openly and regularly communicate with Borrowers, Earn Customers, and other community representatives.")[2] [Emphasis from original]

I have no intention of using this motion to away the Debtors' exclusivity. Notably, the extension expires on February 15, however. It will take time to agree upon a mediator; having a mediator in place by the time the Examiner report is released on January 17 or soon after seems optimal, giving the parties about a month to use the results of the report to mediate issues before exclusivity ends.

---

[2] See D.R. 1553, page 2

I also would hope that mediating key legal issues that would otherwise go to litigation would help save on legal fees. So far, Celsius' Lawyers and Advisors have sought $52 million in fees.[3] The UCC alone has sought $10.2 million in fees.[4]

**MEDIATION IS TIMELY; THERE ARE NUMEROUS LEGAL ISSUES TO RESOLVE**

One way to improve communication is mediation. Another is public communications like Town Halls (not just coming and giving a presentation in court, especially if there won't be questions from creditors.)

The most important reason to have a mediator is to resolve legal issues out of the courtroom. The UCC asserts that I have "no framework from which to mediate." I would counter that to say that these cases have had no framework for resolving issues on *any* reasonable timeframe except painstakingly protracted litigation. And, notably, resolving issues via litigation requires brushing many issues under the rug and, perhaps, trying to run out the clock and then push through a sale, which is increasingly looking like the only path out (yet, nonetheless, the Debtors continue to spend huge amounts on a standalone reorganization.)

As Mr. Tuganov, through counsel notes, there are "complex and unique legal and factual issues, accusations of securities fraud, Ponzi scheme activity, and common law fraud, and the conflicting interests of a number of different groups of stakeholders" in these cases. There are also suspended accounts, pending accounts, and other issues that apply to multiple depositors but are not properly reflected on the Debtor's schedules.

---

[3]https://www.bloomberg.com/news/articles/2022-12-16/bankrupt-celsius-advisers-lawyers-seek-52-million-in-fees
[4] https://cases.stretto.com/public/x191/11749/PLEADINGS/1174912162280000000024.pdf

Those issues remain unaddressed, and will remain at least partly unaddressed even if

the Debtor gets all of its requested relief in its Amended Stablecoin Motion.[5] Notably,

many issues will not be resolved *equitably* if resolved via the claims process because

people who don't make certain type of claims by January 3 will be forever barred from

doing so *unless* there is another process to address these issues.

Meanwhile, Custody *ownership* may be resolved, but potentially millions of dollars in

clawback litigation (when you count the *ad hoc* money spent and triple or quadruple that

for the Debtors' and UCC's money to respond), looms large over the whole case and

goes far beyond just Custody.[6]

Loans and collateral issues, including active loans, liquidated loans, and returned

collateral cases remain unaddressed, but will likely be taken up some time in the new

year (likely *after* the proposed sale deadline), if nothing changes. Many of the

customers with collateral issues are not actually Loans customers but Earn customers,

who believe they are misclassified in some way (generally, some sort of pre-petition

breach of contract or misreading of the contract by the Debtor, which resulted in our

---

[5] See D.R. 1578, p. 4, footnote 10: "At least one Objector argues that certain defenses are generally applicable and that the Debtors are seeking to "force customers to file alternative claims, one at a time, to challenge their schedules. . . . [M]ost of these defenses apply to large groups of customers, they are not just corner cases that apply to a single individual." See Supplemental Herrmann Objection at 13. This is not the Debtors' intention. **To the extent that a fact-specific defense is established to be generally applicable, <u>the presumption could be widely rebutted.</u>** As the same Objection notes, "some cornercase defenses will be unique." Id at 14. **The Debtors' intent is to preserve such individuals' arguments.** The Debtors' approach to the schedules and bar date has always been to streamline the process and minimize the burden on Account Holders. See generally Debtors' Objection to Series B Preferred Holders' Motion Pursuant to Bankruptcy Rule 1009 for Entry of an Order Directing the Debtors to Amend Their Schedules [Docket No. 1304] (describing the consideration the Debtors have given to the challenges of running a claims process with over 600,000 creditors, many of whom are retail investors). That has not changed." [Emphasis added.]

[6] An anti-clawback *ad hoc* group is fundraising, and is aiming to raise $400,000 for litigation. See: "CELSIUS CREDITORS AGAINST CLAWBACKS -- IN SUPPORT OF PHASE II PREFERENCE DEFENSES"
https://docs.google.com/forms/d/e/1FAIpQLSd_Xq3O26DSwPMq73ed7TTQ_0ShoqjHGNK_gc3rf6PuSY2rwQ/viewform

coins being placed somewhere other than where the contracts required them to be placed.) These are not corner cases like "suspended" or "pending" but substantial groups of customers that could be larger than withhold and have different contracts claims than Earn.

In other words, these rulings do not fully resolve things enough to get out of Chapter 11 soon. They may move these cases forward, but progress is simply too slow, fees are simply too high, and there are simply too many issues to keep litigating every one.

Yet that seems to be the path so far. That, or else, abruptly ending litigation and resolving everything remaining through the individual claims process. Notably, resolving remaining issues through the claims process is likely inequitable because it privileges those who are loudest and fight the hardest, as the Debtor itself has pointed out.[7] I agree, but like others, I won't stop fighting for my self-interest, without a better process. It's a prisoners' dilemma. My hope is that mediation can break us out of the prisoners' dilemma.

We all know that not enough coins are there. We all want to get out of Chapter 11. The sooner we can get everything out on the table and resolve these issues, the sooner we can get this done.

---

[7]  The Debtors themselves acknowledge there are issues in this case that "are fact intensive and present equitable dilemmas, such as claims of illegality, fraud, and misrepresentation (e.g., many Objectors allege that they watched AMA videos and were misled—should the Court 'punish' more sophisticated users for researching the contract itself, rather than watching videos on YouTube? should the Court require each Account Holder to provide a sworn statement that they watched the videos and believed them (assuming they are shown to have been misleading)? do vocal participants jump the line?). Those are matters for another day, but one not far from now." These issues are ripe for mediation. At the same time, the Debtors also have yet to put forward a process to resolve claims for defenses to contract formation that could be widely rebutted for classes of users, such as loan collateral, suspended, and pending. These issues are also ripe for mediation.

It is, in my view, better that we get mediation going between the UCC, the Debtor, and creditor groups (including members of the Loans *ad hoc*, the Custody *ad hoc,* and some Earn customers not on the UCC) **before or as** bids and plans come out, rather than after, to help shape plans that will actually garner creditor support.

The overall questions before the Court today do not have to be the *precise* scope of any mediation or determining every single party, but some more general questions: Is a Chapter 11 Mediator helpful in these cases? And will mediation move these cases forward, help resolve key issues, increase trust, and save depositors money? If the mediation will accomplish these goals, this Court should move mediation forward in some form, as soon as possible.

## THE DEBTORS' MISCHARACTERIZE MY CONVERSATIONS WITH BIDDERS AND MY OTHER ACTIVITY IN THESE CASES

Many of the Debtors' assertions around my conversations with bidders and certain joinders are based on conjecture and assumptions. They are not relevant to, and should not be considered as, part of this motion. Nonetheless, I respond to them in Exhibits A and B.

## THE DEBTORS AND THE UCC SAY "NOT NOW." IF NOT NOW, WHEN?

In my view, with 20/20 hindsight, we should have been in mediation since this summer. But I believe creditors are now realizing that we just can't go on like this and it's time to make some deals so we can get out of Chapter 11.

Once plans come out, there will be a race to market, vote on, and confirm a plan. And

there will be minimal time to work out thorny legal issues that remain in the case.

Meanwhile, *until* there is a plan, we will spin our wheels litigating issues like clawbacks,

loans and collateral and other issues that have been raised in my motion and

responsive pleadings, when we could save time and money mediating those issues.

## CONCLUSION

For the reasons set forth herein, I respectfully request that the Court grant the Motion in

part, modify it to make mediation optional for regulators and delay their participation

until such time as the Mediator requests it, and grant such other relief as is just and

proper under the circumstances.


Dated: December 19, 2022
Silver Spring, Maryland

                                            /s/ Immanuel Herrmann
                                            Immanuel Herrmann

## EXHIBIT A: STATEMENT REGARDING SPEAKING TO BIDDERS

The Debtors seem concerned that I have spoken to bidders. These conversations are no secret. I told the court before *in my filings* about conversations with potential bidders, and they were considered in this Court's order to tweak the bidding procedures to make improvements.[8,9]

As the Debtors well know, many depositors regularly speak with industry leaders who are considering bidding. Nothing in these conversations has revealed confidential information, be it regarding the bidding process or the bids themselves. I have been very clear to the Debtor about this and that my conversations have been general in nature.

Merely having conversations with bidders or potential bidders does mean we are discussing confidential information about bids that are being put together, the bidding process, or asking anyone to violate their agreements when we speak.

I was very clear in my reply to the Debtors that I have been in receipt of no confidential bid-related information to the best of my knowledge. In fact, I don't have clear information on who is putting in a bid for sure. My conversations have been infrequent and general in nature and have focused primarily on the case in general, with an

---

[8] See D.R. 1056, *Limited Objection to the Debtors' Motion Approving Bidding Procedures, and For Related Relief,* p. 3 "I have spoken with multiple potential bidders who informed me that they are scared to bid while issues of property of the estate is unknown, while creditor groups are fighting, with 40 or more state investigations, and while questions of how far back Celsius was insolvent and what that might mean for clawbacks hang over the case."

[9] See D.R. 1167, *Memorandum Opinion and Order Granting Motion to Approve Bidding Procedures In Connection With the Sale of Substantially All of the Debtors' Assets* ¶ 5 "Specifically, the objection notes that Mr. Hermann has spoken to potential bidders and that they informed him 'they are scared to bid while issues of property of the estate [are] unknown.' (Id. at 3.)."

emphasis on the same types of legal and case issues that led to this motion and that I

previously raised in court.

As I told the Debtors in a December 11 email:

> *This is all based on publicly-available information. Bidders don't know what they're bidding on because key legal issues, in particular, property of the estate issues, aren't resolved with earn and loans—and won't be even after this week's rulings (even if earn is partly resolved which seems likely.) Not only that but they are aware there [are] other unlitigated issues coming down the pike such as CEL token, liquidated loans (a huge one if interest to bidders), clawbacks, etc.*
>
> *Resolving these sorts of key legal issues and issues with the bidding process are reasons why we need a mediator.*
>
> *And we all know that there are substantial financial commitments required to bid. That is no secret. It's well known on social media, and I do not need any bidders to tell me anything confidential to know that.*

Meanwhile, while the Debtors attack me for speaking with bidders, Alex Mashinsky

continues to publicly undermine the bidding process. Most recently, he attacked Simon

Dixon and Bank to the Future on Twitter, stating "Now you know why Simon and

@BankToTheFuture have been spreading lies about @CelsiusNetwork and me for the

past 6 month [sic]. When you bid on [sic] asset you want the value to be as low as

possible. Like I said from day one Simon has been misleading you for his personal

gain."[10]

Hopefully, the Debtors will present all bids that creditors want to consider. I do wonder:

Will they confront Alex with the same zealousness they've confronted me if and when

he speaks with bidders? I doubt it, since members of the Special Committee who they

report to were hand-picked by Alex.

---

[10] See copy of the tweet (which has since been deleted) at:
https://twitter.com/gluke_legend/status/1604435691588435973

## EXHIBIT B: STATEMENT ON CERTAIN JOINDERS

Kirkland, in its filing, raises, for the second time, issues regarding joinders I filed in response to the Debtor's Amended Stablecoin motion, D.R. 1325. So I will respond.

The Debtors claim, among other things, that "in advance of the December 5, 2022 hearing, Mr. Herrmann collected signatures for several joinders." That is correct.

Their assertion, however, that the forms were "unsecured (accessible by anyone)" is at best misleading. It is true that anyone could *fill out* these forms. However, they were secure forms, data collected was stored in a password-protected Google account, it was encrypted, and it was accessible only to me and one other party who helped me prepare the filings. Google has top-notch security, and all submitted data was protected. I have more than 20 years of experience in managing confidential data securely and everything here was done securely.

Furthermore, signers explicitly agreed that I would submit their signatures in a court filing, and that they were signing a public document. Signers agreed that: "By signing this filing, you authorize Immanuel Herrmann to submit your name, affixed as a digital signature, to this response, filed as a legal document, substantially containing the text above, along with the number of signers, in the U.S. Bankruptcy Court in the Southern District of New York" and that "You understand that legal filings are public documents that are in the court record, and that your signature on this form will be treated as a digital signature on the document." Finally, each signer agreed they were signing "on behalf of themselves," just as I signed on behalf of only myself. It is ironic that, in a case where terms of use are so vital to the outcome of the case, and where clickwrap is used

as acceptance of a contract, the Debtors are now trying to throw out electronic signatures on some kind of technicality.

The Debtors further assert that I filed these joinders "in [my] personal capacity (but purportedly on behalf of all signatories)." I filed these documents as they were written, nothing less and nothing more. They were documents that had hundreds of individual digital signatures on them. It's really that simple. Each signer was a single *pro se* signer, signing  the document only *on behalf of themselves* with *their own* individual digital signature. It is no different than if I had collected hundreds of pen-and-ink signatures on the documents.

In court, as I made clear, I spoke only on behalf of myself and I only *could* speak for myself. Just as each individual signer signed these documents only for themself.

In another filing, Kirkland has raised Rule 2019 issues related to these filings. To clarify, there is not any kind of committee organized under rule 2019 with respect to these filings, because the signers are not a "group or committee" who act in concert or  have any affiliation other than being several hundred individuals who have signed a single filing, in their personal capacity, as a one-time thing (noting that the signers on each specific filing change each time.)

The method of signature collection that Kirkland so strongly objects to was done in large part for judicial economy, administrative efficiency, and to not to clutter this Court's docket with 3,128 filings, consisting of: 1,564 individual filings to join in each filing individually, and 1,564 certificates of service. Additionally, submitting filings this way saved the Core/2002 Service list from receiving 1,564 service emails.

In any case, I would assume that any signer of such a joinder, who was *pro se,* could speak only on behalf of themselves in court, and that's how I interpreted Your Honor's statements in court. However, I will respectfully accept any clarifications on this issue.

If such filings are not procedurally correct, then I ask the Court to help clarify for myself and for creditors the best way to make our voices heard in large numbers. One possibility is a filing signed by one signer, such as myself, with an attached exhibit that has signers on it. This would be similar to D.R. 764, the *Supplemental Exhibit to Joinder*.

It is telling that attorneys such as Mr. Nash use arguments along the lines of "not many people objected to this motion" or "not many people supported this motion on a percentage basis" with increasing frequency, yet try to throw up hurdles to creditors making their voices heard and attack efforts to do so.

In the end, these Debtor's repeated mentions of this issue and their procedural objections meant to delegitimize these filings, put form over substance. Even if they were procedurally incorrect, these filings show just how many creditors do not have trust in the Debtor and the UCC, and why an alternative process like mediation would be so helpful.