

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 22-10964-mg

4    Adv. Case No. 22-01139-mg

5    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

6    In the Matter of:

7

8    CELSIUS NETWORK LLC,

9

10           Debtor.

11   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12   CELSIUS NETWORK LIMITED et al.,

13                 Plaintiffs,

14           v.

15   STONE et al.,

16                 Defendants.

17   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

18                 United States Bankruptcy Court

19                 One Bowling Green

20                 New York, NY  10004

21

22                 December 20, 2022

23                 8:58 AM

24

25

1    B E F O R E :

2    HON MARTIN GLENN

3    U.S. BANKRUPTCY JUDGE

4

5    ECRO:   F. FERGUSON

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    HEARING re Adversary proceeding: 22-01139-mg Celsius Network

 2    Limited et al v. Stone et al

 3    Hearing Using Zoom for Government

 4

 5    HEARING re Adversary proceeding: 22-01139-mg Celsius Network

 6    Limited et al v. Stone et al

 7    Hearing Using Zoom for Government RE: Objection to Notice of

 8    Presentment RE: Application to Employ Ernest & Young LLP as

 9    Tax Compliance and Tax Advisory Services Provider. (Doc ##

10    1404, 1585)

11

12    Hearing Using Zoom for Government RE: Motion for the

13    Appointment of a Chapter 11 Mediator Filed by Immanuel Mr.

14    Herrmann. (Doc## 1630, 1680, 1722, 1723, 1726, 1730, 1738,

15    1739, 1742, 1743, 1750)

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde
```

Page 4

```
 1    A P P E A R A N C E S :

 2

 3    AKIN GUMP STRAUSS HAUER & FELD

 4         Attorneys for the Plaintiffs

 5         One Bryant Street

 6         New York, NY 10036

 7

 8    BY:  MITCHEL HURLEY

 9         DEAN CHAPMAN

10         MICHAEL STANLEY

11

12    KYLE ROCHE P.A.

13         Attorneys for KeyFi, Jason Stone

14         260 Madison Avenue, 8th Avenue

15         New York, NY 10016

16

17    BY:  KYLE WILLIAM ROCHE

18

19    TROUTMAN PEPPER HAMILTON SANDERS LLP

20         Attorneys for Ad Hoc Group of Withhold Account Holders

21         4000 Town Center, Suite 1800

22         Southfield, MI 48075

23

24    BY:  DEVORAH KOVSKY-APAP

25
```

Page 5

1    KIRKLAND & ELLIS LLP

2         Attorneys for Celsius Network, LLC

3         300 N. LaSalle

4         Chicago, IL 60654

5

6    BY:  CHRISTOPHER KOENIG

7         PAT NASH

8         ROSS KWASTENIET

9

10   WHITE & CASE LLP

11        Attorneys for Official Committee of Unsecured Creditors

12        111 South Wacker Drive, Suite 5100

13        Chicago, IL 60606

14

15   BY:  GREGORY F. PESCE

16

17   WHITE CASE LLP

18        Attorneys for Official Committee of Unsecured Creditors

19        555 South Flower Street, Suite 2700

20        Los Angeles, CA 90071

21

22   BY:  AARON COLODNY

23

24

25

1   UNITED STATES DEPARTMENT OF JUSTICE

2        Attorneys for the U.S. Trustee

3        201 Varick Street, Suite 1006

4        New York, NY 10014

5

6   BY:  SHARA CLAIRE CORNELL

7

8   MCCARTER ENGLISH, LLP

9        Attorneys for Ad Hoc Group of Borrowers

10       245 Park Avenue

11       New York, NY 10167

12

13  BY:  DAVID ADLER

14

15  VENABLE LLP

16       Attorneys for Ignat Tuganov

17       Rockefeller Center

18       1270 Avenue of the Americas

19       New York, NY 10020

20

21  BY:  JEFFREY S. SABIN

22

23

24

25

1    JENNER BLOCK LLP

2         Attorneys for the Examiner

3         1155 Avenue of the Americas

4         New York, NY 10036

5

6    BY:  VINCENT LAZAR

7

8    JENNER BLOCK LLP

9         Attorneys for the Examiner

10        353 N. Clark Street

11        Chicago, IL 60654

12

13   BY:  SHOBA PILLAY

14

15   MILBANK LLP

16        Attorneys for Series B Preferred Shares

17        55 Hudson Yards

18        New York, NY 10001

19

20   BY:  NELLY ALMEIDA

21

22

23

24

25

```
 1   NATL ASSN OF ATTORNEYS GENERAL

 2        Attorneys for Coordinating States

 3        1850 M Street NW

 4        Washington, DC 20036

 5

 6   BY:  KAREN CORDRY

 7

 8   TOGUT, SEGAL & SEGAL LLP

 9        Attorney for Ad Hoc Group of Custodial Account Holders

10        One Penn Plaza, Suite 3335

11        New York, NY 10119

12

13   BY:  BRIAN KOTLIAR

14

15   MCELROY DEUTSCH MULVANEY CARPENTER LLP

16        Attorneys for NJ Bureau of Securities

17        570 Broad Street

18        Newark, NJ 07102

19

20   BY:  JEFFREY BERNSTEIN

21

22

23

24

25
```

Page 9

1   STATE OF VERMONT

2        Attorneys for Department of Financial Regulation

3        89 Main Street, Third Floor

4        Montpelier, VT 05620

5

6   BY:  JENNIFER ROOD

7

8   TEXAS OFFICE OF ATTORNEY GENERAL

9        Attorneys for TX State Securities Board

10        PO Box 12548

11        Austin, TX 78711-2548

12

13   BY:  LAYLA MILLIGAN

14

15   IMMANUEL HERRMANN

16        Pro Se Creditor

17

18   VICTOR L. UBIERNA DE LAS HERAS

19        Pro Se Creditor

20

21   SIMON DIXON

22        Pro Se Creditor

23

24   DANIEL FRISHBERG

25        Pro Se Creditor

Page 10

1

2   CHASE MARSH

3        Pro Se Creditor

4

5   JASON LU

6        Pro Se Creditor

7

8   EZRA SERRUR

9        Pro Se Creditor

10

11  JASON IOVINE

12       Pro Se Creditor

13

14  KULPREET S. KHANUJA

15       Pro Se Creditor

16

17  ALSO PRESENT TELEPHONICALLY:

18

19  CHRIS FERRARO, CEO

20  LUCKY L. THOMSON, Consumer Privacy Ombudsman

21  JASON LU

22  EZRA SERRUR

23  JASON IOVINE

24  KULPREET S. KHANUJA

25

1                      P R O C E E D I N G S

2                CLERK:  All right.  Good morning.  Starting the

3      recording for December 20, 2022 at 9:00 AM.  Calling Celsius

4      Network Limited v. Stone et al, Case Number 22-1139.

5                Mr. Roche, maybe we could start with you?

6                MR. ROCHE:  Yes, this is Kyle Roche on behalf of

7      Defendants Jason Stone and KeyFi Inc.

8                CLERK:  Okay, thank you.  And then Mr. Stanley, I

9      have you as listen only.  Is that correct?

10               MR. STANLEY:  That's correct.

11               CLERK:  Okay.  Thank you.  Mr. Chapman, if you

12     could unmute and give your appearance, please?

13               MR. CHAPMAN:  Good morning.  Dean Chapman, Akin

14     Gump Strauss Hauer Feld, for the Plaintiffs, the Celsius

15     Plaintiffs.

16               CLERK:  Okay.  Is Mr. Hurley going to be joining

17     as well?

18               MR. CHAPMAN:  Yes, he will be.

19               CLERK:  Okay.  Thank you.  Everyone in the waiting

20     room looks like they're here for the 10:00, so...  Unless,

21     (indiscernible), are you saying something -- am I missing

22     anyone?

23               MAN 1:  No, other than Mr. Hurley, I don't believe

24     so.

25               CLERK:  All right.  Please pause the recording.

Page 12

```
 1   All right.  Mr. Hurley, if you could unmute and give your

 2   appearance please?

 3            MR. HURLEY:  Good morning.  Mitchel Hurley, with

 4   Akin Gump Strauss Hauer & Feld, special litigation counsel

 5   for the Plaintiffs -- the Plaintiff Celsius Defendants,

 6   Debtors.

 7            CLERK:  Thank you.  Is Mr. Schneider -- I have him

 8   on my list.  Is he supposed to be joining?  I see a David

 9   Schneider with a speaking role.

10            MR. HURLEY:  I don't recognize that name.

11            CLERK:  Okay.  All right.  I also have -- and

12   everyone else is listen only.  Judge, would you like to get

13   started?

14            THE COURT:  Yes, I would, Deanna.  All right.

15   Good morning.  This is Judge Glenn.  Mr. Hurley, are you

16   going to begin?

17            MR. HURLEY:  Yes, Your Honor.  First of all,

18   thanks for the time this morning on short notice.  We

19   appreciate it.  I was thinking I should begin with a brief

20   update on the status of the preliminary injunction motion

21   and discovery.

22            So, during the November 23rd status conference,

23   Your Honor set a hearing date of January 11th and 12th, if

24   necessary, and a cutoff for preliminary injunction discovery

25   of December 22.
```

Page 13

1              Connor Nolan, who is the witness that was

2      identified by Mr. Roche during the November 23rd conference

3      is going to be deposed tomorrow, December 20th.  Jason Stone

4      is going to be deposed on December 21st.

5              After the conference on the 23rd, the parties met

6      and conferred and we also agreed to exchange some expedited

7      document discovery in advance of the depositions.  So, five

8      days ago, Celsius produced documents returned by search

9      terms that we negotiated with the Defendants.  Again, it's

10     documents that were then in our possession, custody or

11     control and of which Connor Nolan is the custodian.  Stone

12     produced certain documents over the weekend.

13             We agreed on two stipulations, which the Court

14     entered last week, and thank you again for that.

15             THE COURT:  I have them in front of me in case we

16     needed them.  Go ahead.

17             MR. HURLEY:  Sorry.  One of them governing the PI

18     definitions themselves and the other providing some of the

19     relief requested in the motion, but leaving other relief for

20     determination by the Court in January.

21             Okay.  So that pretty much brings us up-to-date.

22     Let me come to the issue that we wanted to raise with Your

23     Honor, and there's another issue we really kind of wanted to

24     preview.

25             So we asked for your time this morning to resolve

Page 14

1    the dispute we are having about whether a particular witness

2    should be allowed to be called at the hearing.  So, in

3    particular, Celsius is asking the Court to preclude the

4    Defendants from calling at the hearing a witness named

5    Richard Ma, whom the Defendants first identified on Friday,

6    December 14, 2022.

7                Richard Ma is the owner and manufacturer of a

8    company called Quantstamp.  It's a company that Celsius paid

9    to create a so-called wormhole program that was supposed to

10   track the Defendants' deployment activities, but that wasn't

11   delivered.

12               When the Defendant's identified Mr. Ma on December

13   14th, they said that they wanted to call him supposedly to

14   rebut the Alex Mashinsky declaration that was submitted with

15   Celsius' December 2nd reply.  We think there are a number of

16   reasons, though, why it would be unfair and inappropriate to

17   allow the Defendants to introduce this new witness at this

18   late stage.

19               So, first, it isn't true rebuttal testimony.  The

20   only thing that Mashinsky did in his December 2nd

21   declaration was deny a claim that was made by Stone for the

22   first time in the Defendants' November 28th opposition

23   papers.  So, specifically, in his November 28th declaration,

24   Stone claimed that Mashinsky authorized him to buy NFTs with

25   Celsius assets and transfer them to Defendants as an advance

Page 15

1    on profit share.

2             In his December 2nd declaration, which contains

3    just two very short substantive paragraphs, Mashinsky just

4    denies Stone's November 28th claim.  So any Ma testimony to

5    rebut Mashinsky would just consist of cumulative testimony

6    supporting the claim that Stone already made on November

7    28th.

8             And we submit if Defendants wish to include

9    additional evidence in support of what we understand to be

10   their primary and maybe only defense, this authorization

11   defense, they should've done so in connection with the

12   November 28th opposition.  They didn't.  And in fact, they

13   didn't so much as mention Richard Ma or his company

14   Quantstamp anywhere in their opposition papers.

15            We also think it's just too late.  So, even if

16   this were actual rebuttal testimony, Defendants have had the

17   very short Mashinsky declaration for more than two weeks

18   now, since December 2nd.  Again, they didn't identify Ma as

19   a potential witness until last Friday morning.  That just

20   left four business days before the end of the discovery

21   period that the Court set on November 23rd.  And two of

22   those days are already consumed with prescheduled

23   depositions.

24            Defendants' interest in Ma was also unknown to

25   Celsius at the time that we negotiated the expedited

Page 16

1    document discovery I mentioned before.  Had we known he

2    would be a witness, Celsius certainly would've sought

3    related documents on an expedited basis from the Defendants

4    in advance of the depositions.

5         And that brings us to another issue I think is

6    important for the Court to be aware of, Your Honor, which is

7    that Richard Ma and his company Quantstamp have been ducking

8    Celsius discovery for over a month now.  So Celsius actually

9    served a subpoena on Quantstamp more than a month ago that

10    was returnable weeks ago, and Quantstamp just ignored the

11    subpoena.

12         We then emailed to executives of Quantstamp,

13    including Mr. Ma, and directly asked if and when we could

14    expect a response to our subpoena.  And they ignored our

15    emails as well.  And so now, out of nowhere, the Defendants

16    want Ma to act as a witness at an important stage of the

17    proceedings, and we think it just isn't fair and shouldn't

18    be allowed.  If --

19         THE COURT:  May I ask, Mr. Hurley, was Mr. Ma

20    served with a subpoena by you?  Was the subpoena served?

21         MR. HURLEY:  The subpoena was served on

22    Quantstamp, his company.  And this was -- I think Mr.

23    Chapman may have the date in front of him.  I actually do

24    not.  Dean, when did we serve that subpoena?

25         MR. CHAPMAN:  November 2nd.

Page 17

```
 1              MR. HURLEY:  November 2nd.  We followed up with an

 2    email directly to Mr. Ma, because no one responded to the

 3    Quantstamp subpoena, and he ignored our email.

 4              THE COURT:  Where is he located?

 5              MR. HURLEY:  Well, that's another issue is that

 6    when we got the identification of Ma on Friday, we said,

 7    look, we object to this, but give us some information.

 8    Provide us with a declaration that you want to submit from

 9    him.  We'll consider it.  And you need to give us his

10    address at a bare minimum so that we can serve a subpoena.

11    And the Defendants have not given us either the declaration

12    or his address.  So we don't know his physical mailing

13    address.

14              THE COURT:  Where did you serve the subpoena on

15    Quantstamp?

16              MR. HURLEY:  Dean?

17              MR. CHAPMAN:  We served a registered agent.  Let

18    me -- I can try to quickly pull the affidavit of service --

19              THE COURT:  You just have to identify yourself

20    every time you speak, Mr. Chapman.  Go ahead.

21              MR. CHAPMAN:  Yeah, Dean Chapman, Akin Gump.  Let

22    me check the affidavit of service.

23              THE COURT:  Okay.

24              MR. HURLEY:  So, just to sum up, Your Honor, our

25    view is he shouldn't be permitted at the hearing at all.
```

1    It's too late.  It's cumulative.  But if he is, at a

2    minimum, in our view anyway, this is really like trial by

3    ambush, and we'd need to have information in advance and an

4    opportunity to depose him and potentially take some document

5    discovery as well.

6            THE COURT:  Let me ask you a further question.

7    What did you ask for in the subpoena that you served?

8            MR. HURLEY:  The subpoena, I don't have at my

9    fingertips, but it was related to Quantstamp's role in

10   preparing this so-called wormhole that had been promised.

11   It was supposed to track the activities of Mr. Stone so that

12   Celsius would know basically what he was doing and would be

13   able to have a better idea on their own terms of his

14   performance.  But it wasn't delivered, so --

15           THE COURT:  You obviously thought that he might

16   have -- he and his company would have relevant information

17   in this adversary proceeding if you served a discovery

18   request, a subpoena for discovery.  Isn't that true?

19           MR. HURLEY:  We did.  Not necessarily with respect

20   to the preliminary injunction motion, Your Honor.  We didn't

21   speak expedition in connection with the motion or anything

22   like that.  But certainly, Mr. Maw and Quantstamp are

23   parties that were involved in the wormhole process, which we

24   think is ultimately going to be relevant.  But we had no --

25   we ourselves didn't think it was going to be particularly

Page 19

1    relevant to the preliminary injunction motion.  And of

2    course, the Defendants didn't say anything about it until

3    Friday.

4              THE COURT:  So, with respect to the subpoena, when

5    was the response to the subpoena due?

6              MR. CHAPMAN:  The response -- for the record, Dean

7    Chapman, Akin Gump.  The response to the subpoena was due

8    November 28th.  It was served on Quantstamp's registered

9    agent, Capital Services in Albay, New York.

10             THE COURT:  Where is the company based?  Do you

11   know?

12             MR. CHAPMAN:  We don't know.  I can say Richard

13   Ma's LinkedIn would indicate San Francisco.  But that's as

14   far as we know.

15             MR. ROCHE:  All right.  Your Honor, may I respond

16   to --

17             THE COURT:  Yeah, I just want to -- I want to make

18   sure -- anything else, Mr. Hurley, before I call on Mr.

19   Roche?

20             MR. HURLEY:  No, Your Honor.  There's another

21   issue we want to preview, but I'm happy to have Mr. Roche

22   respond, of course, to what we just presented.

23             THE COURT:  Go ahead, Mr. Roche.

24             MR. ROCHE:  Good morning, Your Honor.  Kyle Roche,

25   for Defendants KeyFi and Jason Stone.  I wanted to start by

1    just going to the relevant timeline quickly.  November 15th,

2    Plaintiffs filed their preliminary injunction.  In support

3    of that preliminary injunction they offered three

4    affidavits.  None of those three affidavits stated that the

5    transactions at issue here, particularly the NFTs, were

6    unauthorized transactions.

7           So, at the time we received the preliminary

8    injunction order and what we were responding on November

9    28th, we were responding to those three affidavits.  I don't

10   have them in front of me, but I believe by recollection it's

11   affidavits of Patrick Holert, Mr. Sabo and Kleiderman, Mr.

12   Kleiderman, were the three affidavits that supported the

13   initial motion for injunction.

14          So, when we submitted our affidavit from Mr. Stone

15   in response on November 28th, in that affidavit Mr. Stone

16   explained that the NFT purchases and the subsequent

17   transfers were authorized by Alex Mashinsky, Celsius' then

18   CEO.

19          Contrary to what Plaintiffs just stated, they've

20   known that that was our position for over a year now.  It

21   was -- in addition to it being our position from documents

22   and from discussions pre-litigation, it was asserted in the

23   New York Supreme action.  So they've known that it was our

24   position that those transactions were authorized by Mr.

25   Mashinsky himself prior to Mr. Stone and KeyFi's departure

Page 21

1    from Celsius.

2            And so at the time when we submitted our November

3    28th brief, we believed that that testimony was going to be

4    unrebutted because the three affidavits that were submitted

5    on November 15th did not rebut the position that those

6    transactions were authorized as an advance on the profit

7    share.

8            On December 5th -- so I believe Mr. Hurley said

9    the affidavit for Mr. Mashinsky was December 2nd -- I

10   believe it was December 5th.  Mr. Mashinsky submitted for

11   the first time in this litigation an affidavit claiming that

12   those -- with no supporting documents -- and I think it was

13   a two-paragraph declaration -- stating that those

14   transactions were not authorized and that they were not an

15   advance on the profit share.

16           At that point in time, we identified with working

17   with KeyFi and Mr. Stone other witnesses who could

18   cooperate, because at this point it was going to be a

19   contested fact for the preliminary injunction hearing, the

20   question of whether or not those transactions, the NFTs at

21   issue in this underlying litigation, were authorized at the

22   time that KeyFi and Mr. Stone made those purchases.

23           We worked with Mr. Stone to identify other third-

24   party disinterested witnesses who would have information

25   relevant to these transactions.  And at that point in time,

Page 22

```
 1    we identified Mr. Ma.  We contacted Mr. Ma last week.  I
 2    spoke with him last week and we -- and had a meet and
 3    confer, I believe, Friday morning.  I told Mr. Hurley that
 4    we at that point in time we intended to call Mr. Ma and that
 5    we would work with them to both provide a declaration to the
 6    extent we could facilitate it, and to the extent we could
 7    help facilitate a deposition, we would.
 8              Finally, I am not -- I don't control Mr. Ma.  I
 9    understand he's based in Toronto, Canada.  And I think
10    that's where he most of the time resides and runs his
11    company out of.  And they have employees all over the place.
12    I think they have over 70 employees.  But I understand that
13    Mr. Ma is headquartered, he himself, in Toronto.
14              While we don't have control over Quantstamp, we're
15    happy to try to facilitate whatever discovery we can ahead
16    of the January 11th hearing.  But Celsius' position that we
17    should be precluded from calling Mr. Ma, to rebut Mr.
18    Mashinsky, is patently unfair.  Celsius --
19              THE COURT:  Were you aware that Celsius previously
20    served a subpoena on Quantstamp?
21              MR. ROCHE:  I was aware, yes.
22              THE COURT:  And were you aware that Ma and
23    Quantstamp never responded?
24              MR. ROCHE:  I was not aware that.  And I
25    understand -- I understand from Mr. Ma that he's represented
```

Page 23

1    by Quinn Emanuel.  And my -- I understand that Quinn Emanuel

2    did respond.  I was not on those communications.  And if

3    Akin -- if Mr. Hurley and Dean say that they haven't

4    responded yet, I'd take them at their word.  But it was my

5    understanding that Quinn Emanuel did respond to the subpoena

6    from --

7              THE COURT:  Mr. Hurley, Mr. Chapman, did Quinn

8    Emanuel respond or communicate with you about the subpoena?

9              MR. HURLEY:  I certainly didn't receive any

10   communication from Quinn Emanuel about the subpoena.

11             THE COURT:  Mr. Chapman?

12             MR. CHAPMAN:  No, Your Honor.

13             THE COURT:  No communication whatsoever Quinn

14   Emanuel indicating it was representing Quantstamp?  Is that

15   correct?

16             MR. HURLEY:  Correct, Your Honor.

17             MR. CHAPMAN:  Correct, Your Honor.

18             THE COURT:  All right.

19             MR. ROCHE:  Then I --

20             THE COURT:  Mr. --

21             MR. ROCHE:  I understand from Mr. Ma he is

22   represented by Quinn Emmanuel.

23             THE COURT:  Mr. Roche --

24             MR. ROCHE:  Yes.

25             THE COURT:  I had previously asked who you

1    intended to call his witness at the hearing and Ma was not -

2    - was never mentioned.

3            MR. ROCHE:  Yes, Your Honor, because at that time

4    we did not believe we were responding to an affidavit that

5    was put in by Mr. Mashinsky on December 5th.  And at that --

6            THE COURT:  Were you planning to call Mr. Maw live

7    at the hearing?

8            MR. ROCHE:  Now we are.  As of today, we are

9    planning on calling Mr. Maw live at the hearing.

10           THE COURT:  And he --

11           MR. ROCHE:  And we understand from him, at least

12   what he represented to me last week, that he was willing to

13   fly to New York to testify live.

14           THE COURT:  Well, let me simplify this, okay?

15   Unless Mr. Maw makes himself available for a deposition by

16   noon on Thursday of this week, I'm precluding any testimony

17   from Ma at the trial, at the hearing.  I accept the

18   statements of the Akin Gump lawyers that they previously

19   served a subpoena on Quantstamp and that response was due on

20   November 28th.  They've gotten no response.  Unless he is

21   available for deposition by noon on Thursday of this week by

22   them, he will not be permitted to testify at the hearing.

23   If he submits to a four-hour deposition to be completed by

24   noon on Thursday, I will permit him to testify at the

25   preliminary injunction hearing.  Otherwise, I will not.

1          This has the characteristics of a sandbag and I'm

2    not going to initially preclude you from calling him as a

3    witness.  But I'm not going to have him lay in the weeds and

4    fail to respond to a subpoena that's been served that called

5    for a response last month and have you -- when you didn't

6    previously identify him as a witness for the hearing.

7          So that's going to be my order.  I'm so ordering

8    the transcript.  Ma will make himself available for

9    deposition in either New York or Toronto by -- a four-hour

10   deposition to be concluded by this Thursday at noon, New

11   York time.  If he fails to make himself available for that

12   deposition, he will not be permitted to testify at the

13   preliminary injunction hearing.

14          MR. ROCHE:  Your Honor, just want to understand,

15   Your Honor.  One point of clarification.  Do you mean start

16   by noon on Thursday or finish by noon --

17          THE COURT:  No.  I mean it has to finish by noon

18   on Thursday.

19          MR. ROCHE:  Understood.

20          THE COURT:  And not only to testify in deposition

21   but to produce documents responsive to the subpoena that's

22   been served so that Akin Gump has those documents before

23   they depose him.  So they'd better produce documents today

24   or tomorrow and, you know...  But to be clear, unless

25   documents are produced and he is available for a four-hour

Page 26

```
1    deposition in either New York or Toronto, he will be

2    precluded from testifying at the preliminary injunction

3    hearing.

4              MR. ROCHE:  Understood, Your Honor.

5              THE COURT:  Mr. Hurley?

6              MR. HURLEY:  Your Honor, may I ask one other

7    thing?  So, each of the other witnesses put in a declaration

8    that will comprise their direct testimony at the hearing.

9    And one of our requests was that we get that declaration

10   from Mr. Ma so we know what it is he's being offered for.

11             THE COURT:  You're going to -- you know, he is not

12   an employee of KeyFi.  And consequently, I don't believe

13   that Mr. Roche can force him to provide a declaration in

14   advance.  So, you'll get your deposition.

15             MR. HURLEY:  Understood, Your Honor.

16             THE COURT:  And certainly, since Roche is not

17   representing Ma, you can certainly ask during the deposition

18   what he's discussed with Mr. Roche.  There's no privilege

19   attached and you can cover what anticipated discovery did he

20   discuss with Roche.  So you'll find out what it was he's

21   prepared to testify and you can ask him whatever you want.

22   But a four-hour deposition.

23             MR. HURLEY:  Understand.  And Kyle, if you could

24   send me the name of the Quinn person you think is repping

25   him?
```

Page 27

1          MR. ROCHE:  Will do.  I will find that out this

2     morning and will respond to you immediately.

3          00:21:58  THE COURT:  All right.  We're adjourned.

4          (Recess)

5          CLERK:  All right.  Starting the recording for

6     December 20, 2022 at 10:00 AM.  All right.  Can counsel on

7     behalf of Kirkland's please unmute and just start giving

8     their appearance?

9          MR. KOENIG:  Good morning, Deanna.  It's Chris

10    Koenig, from Kirkland & Ellis, here for the Celsius Debtors.

11    I'm here with my partners, Pat Nash and Ross Kwasteniet.

12    Thank you.

13         CLERK:  Okay.  Thank you.  And I know we have also

14    a line for Elizabeth Jones from Kirkland's, and they checked

15    in before.  All right.  I'm going -- good morning, Mr.

16    Herrmann.  Can you hear me?

17         MR. HERRMANN:  I can.

18         CLERK:  You're coming in a little choppy.

19         MR. HERRMANN:  Is this better?

20         CLERK:  Yes.  Yes, it is.  If you could just give

21    your appearance this morning?

22         MR. HERRMANN:  Immanuel Herrmann, pro se Celsius

23    creditor.

24         CLERK:  Thank you.  And there's some of the

25    creditors (indiscernible) counsel.  For the parties that

Page 28

1   have joined, if anyone is speaking on the record this

2   morning and has not given their appearance, please raise

3   your hands one at a time and I will ask you to unmute and

4   give your appearance.  Yes, Ms. Milligan?

5           MS. MILLIGAN:  Good morning.  Can you hear me

6   okay?

7           CLERK:  Yes, I can.

8           MS. MILLIGAN:  Thank you.  Layla Milligan, with

9   the Texas Attorney General's Office, appearing on behalf of

10   the Texas State Securities Board and Texas Department of

11   Banking.

12           THE COURT:  Thank you.

13           MS. MILLIGAN:  Thank you.

14           CLERK:  And Shara?

15           MS. CORNELL:  Good morning.  Shara Cornell, on

16   behalf of the office the United States Trustee.

17           CLERK:  Thank you.

18           MS. CORNELL:  Thank you.

19           CLERK:  Are Mark Bruh or Brian Matsumoto going to

20   be joining?

21           MS. CORNELL:  Yes, I believe so, although I'm not

22   sure if they'll be speaking.

23           CLERK:  Okay.  So you're speaking this morning.

24   Perfect.

25           MS. CORNELL:  Thank you.

1           CLERK:  Thank you.  Victor?

2           MR. DE LAS HERAS:  Good morning, Deanna.  Victor

3    L. Ubierna de las Heras, pro se creditor.  I'll be speaking

4    this morning.

5           CLERK:  Thank you.  All right.  I see we have some

6    Committee counsel.  If you could unmute one at a time and

7    just give your appearance, please?

8           MR. PESCE:  Sure.  It's Gregory Pesce, White &

9    Case, on behalf of the Committee.  And I believe my partner,

10   Aaron Colodny, if he hasn't already appeared, is going to be

11   the other main speaker for today.

12          CLERK:  Okay.  So the both of you.  All right.

13   Perfect.

14          MR. PESCE:  Thank you.

15          CLERK:  Thank you.  Ms. Kovsky?

16          MS. KOVSKY:  Good morning, Deb Kovsky, Troutman

17   Pepper, for the Ad Hoc Group Withhold Account Holders.

18          CLERK:  Thank you.  All right.  Are there any

19   additional parties that have joined that will be speaking on

20   the record and have not given their appearance yet?

21          All right.  Good morning.  For the parties that

22   have joined, please use their raised hand function and I

23   will ask you to unmute if you are speaking on the record and

24   have not given your appearance yet.  All right.  Mr. Adler,

25   let's start with you.

1            MR. ADLER:  Good morning, Your Honor.  It's David

2    Adler, from McCarter & English, on behalf of the Ad Hoc

3    Group of Borrowers.  I probably will be speaking today.

4            CLERK:  All right.  Thank you.

5            MR. ADLER:  Thank you.

6            CLERK:  All right.  Mr. Marsh?

7            MR. MARSH:  Good morning.  This is Chase Marsh.

8    I'm an involuntary pro se creditor.  I sure hope I don't

9    have to speak today, but I probably will.

10            CLERK:  All right.  Thank you for giving your

11   appearance.

12            MR. MARSH:  Thank you.  Mr. Sabin.

13            MR. SABIN:  It's Jeff Sabin, from Venable LLP, on

14   behalf of Ignat Tuganov.  I expect to be speaking today.

15            CLERK:  All right.  Is Arie Peled also speaking?

16            MR. SABIN:  He is not.

17            CLERK:  Okay.  Thank you.

18            MR. SABIN:  Thank you very much.

19            CLERK:  All right.  Mr. Ferraro, if you could

20   unmute and give your appearance, please?

21            MR. FERRARO:  Hi.  Chris Ferraro, with the

22   Debtors, Interim CEO, Chief Restructuring Officer and Chief

23   Financial Officer.

24            CLERK:  Thank you.  For the other parties that

25   have joined, if you could raise your hands, use the raise

1  hand function, and if you are speaking on the record this

2  morning and have not given your appearance yet?  Yes.  Ms.

3  Pillay?

4           MS. PILLAY:  Good morning, Deanna.  Shoba Pillay

5  from Jenner & Block, as the Examiner.

6           CLERK:  Thank you.  And then is Mr. Lazar and Mr.

7  Wedoff should be joining as well?

8           MS. PILLAY:  Yes.

9           CLERK:  Thank you.  Any additional parties that

10  have joined and have not given their appearance yet?

11           MS. ALMEIDA:  Good morning.  Nelly Almeida, from

12  Milbank LLP, on behalf of Certain Holders of Series B

13  Preferred Shares.

14           CLERK:  Okay.  Thank you.  Are any other parties

15  from Milbank going to be speaking this morning?  Do you

16  know?

17           MS. ALMEIDA:  No.  I don't expect there to be.

18           CLERK:  Okay.  Thank you.  All right.  For the

19  parties that have joined, if you're going to be speaking on

20  the record and have not given your appearance yet, please

21  use the raise hand function to give your appearance.  All

22  right.  Mr. Lazar.

23           MR. LAZAR:  Good morning, Ms. Anderson.  Vincent

24  Lazar, Jenner & Block, on behalf of the Examiner.

25           CLERK:  Thank you.

1          THE COURT:  Hi, Deanna.

2          CLERK:  Good morning, Judge, again.

3          THE COURT:  Again.

4          CLERK:  For the parties that have joined, if

5    anyone is going to be speaking on the record this morning

6    and has not given their appearance yet, please use the

7    raised hand function to give your appearance.

8          All right.  For the parties that adjoined, if

9    anyone is speaking on the record this morning and has not

10   given their appearance, please use the raised hand function

11   and I will take your appearance one at a time.  Mr.

12   Frishberg?

13         MR. FRISHBERG:  Yes.  Daniel Frishberg, pro se.

14         CLERK:  Thank you.  All right.  Please pause the

15   recording for a moment.  All right.  For the parties that

16   have joined, if anyone is speaking on the record this

17   morning and has not given their appearance yet, please use

18   the raised hand function and I will ask for you to give your

19   appearance one at a time.  Aaron Colodny?

20         MR. COLODNY:  Hi, Deanna.  This is Aaron Colodny,

21   for the Official Committee of Unsecured Creditors, with

22   White & Case LLP.

23         CLERK:  All right.  Thank you.  All right.  Karen

24   Cordry?  Sorry, I can't hear you.

25         MS. CORDRY:  Yeah, sorry.

Page 33

```
 1              CLERK:  Oh, there you go.

 2              MS. CORDRY:  Karen Cordry, National Association of

 3    Attorneys General, representing the Coordinating States.

 4              CLERK:  All right.  Perfect.  Thank you.  And for

 5    those that have joined, if you're speaking on the record

 6    this morning and have not given your appearance and you'd

 7    like to speak, please use the raised hand function and I

 8    will ask you to give your appearance one at a time.

 9              Again, the parties that have joined, if anyone is

10    speaking on the record this morning and has not given your

11    appearance, if you could please use the raised hand function

12    and I will take your appearance one at a time.  Mr. Kotliar,

13    are you speaking on the record this morning?

14              MR. KOTLIAR:  Good morning.  Brian Kotliar, of

15    Togut, for the Ad Hoc Group of Custodial Account Holders.

16    It's possible that I will be speaking.

17              CLERK:  All right.  Is Kyle Ortiz going to be

18    joining as well?

19              MR. KOTLIAR:  No.

20              CLERK:  Okay.  Thank you.  All right.  Again, for

21    the parties that have joined, if anyone is speaking on the

22    record this morning and has not given your appearance,

23    please use the raised hand function and I will take your

24    appearance one at a time.  All right.  Mr. Bernstein?

25              MR. BERNSTEIN:  Good morning.  Jeffrey Bernstein,
```

Page 34

1    McElroy Deutsch Mulvaney & Carpenter, for the New Jersey

2    Bureau of Securities.  Just in case I speak, I wanted to

3    indicate my appearance.  Thank you.

4            CLERK:  Thank you.  I appreciate that.  Again, for

5    the parties that have joined, if anyone is speaking on the

6    record this morning and has not given your appearance yet,

7    please use the raised hand feature and I will ask you to

8    unmute and give your appearance.

9            All right.  Again, for the parties that have

10   joined, if anyone is speaking on the record this morning and

11   has not given your appearance, please raise your hands.  Use

12   the raised hand function.  I'll ask you to unmute and give

13   your appearance.  Yes, Jennifer?

14           MR. ROOD:  Jennifer Rood, from Department of

15   Financial Regulation.

16           CLERK:  Thank you.  All right.  Please pause the

17   recording for a minute.

18           We're recording.  All right.  We're going to get

19   started.  If everyone could please state their name each

20   time they speak on the court record.  Also, this is a court

21   proceeding.  Audio, video and any other recording or --

22   pardon me -- any other recording of this hearing shall not

23   take place, other than the official court version.  If it is

24   found out that there is other recording, audio, video, et

25   cetera, that takes place, sanctions may be imposed.

Page 35

1           Judge, would you like to begin?

2           THE COURT:  Yes, I would.  Thank you.  And good

3    morning, everybody.  The Debtors filed an amended agenda for

4    today's hearing.  We're follow that hearing agenda.  Let's

5    start with the status update.

6           MR. KOENIG:  Good morning, Your Honor.  For the

7    record, Chris Koenig, Kirkland & Ellis, for the Debtors.

8    Deanna, could you please give screen share privileges to the

9    Zoom account labeled "Chris Koenig", so that we can put the

10   slides that we filed last night up on the screen?

11          THE COURT:  Right.  And I believe the slides have

12   been filed as ECF Docket Number 1758 as an attachment to the

13   notice of filing.

14          MR. KOENIG:  Yes.  Thank you, Your Honor.  And

15   I'll introduce Mr. Christopher Ferraro, who provided a

16   status update to the Court on November 15th.  We thought it

17   would be beneficial for him to provide another update, now

18   that it's been about a month.  So, with the Court's

19   permission, we'll go ahead with Mr. Ferraro.

20          THE COURT:  I appreciate that.  Go ahead.

21          MR. KOENIG:  Thank you.  Mr. Ferraro, can you

22   please remind the Court of your current roles at Celsius and

23   your general qualifications and experience?

24          MR. FERRARO:  Yeah, thanks, Mr. Koenig, and good

25   morning, Your Honor.  I'll be brief in this answer, as I've

Page 36

1    provided my background before.  My name is Christopher

2    Ferraro.  I am the Interim Chief Executive Officer, Chief

3    Restructuring Officer, and Chief Financial Officer of

4    Celsius.  I was appointed Chief Financial Officer on July

5    11, 2022 and was appointed as Interim Chief Executive

6    Officer and Chief Restructuring Officer on September 27,

7    2022.

8              I have approximately two decades of experience in

9    financial planning and analysis, asset and liability

10   management, and product control.

11             MR. KOENIG:  Mr. Ferraro, can you please provide

12   an update on the current financial situation of Celsius?

13             MR. FERRARO:  Yes, based on the most recent cash

14   flow budget employment report that was filed on December

15   12th, the total cash receipts vary by week, ranging from

16   approximately $1.5 million to nearly $8 million.  Our

17   forecast shows that by the end of the year, we will have

18   baseline liquidity of around $95 million.

19             Before taking into account the proceeds from the

20   sale of GK8, the latest forecast shows that we will need a

21   liquidity infusion late in the first quarter of 2023.  We

22   will get quite tight in February, but the baseline liquidity

23   of approximately $30 million.

24             We expect to need additional liquidity in March.

25   However, once the recent GK8 sale closes and the Court

Page 37

1    resolves the issue of which party is entitled to the value

2    of the GK8 sales proceeds, we could extend another 1.5 to 2

3    months.  And if the Court approves the sale of stablecoins,

4    the total runway would extend to around May or June.

5            We filed for recognition of the GK8 sales

6    proceedings with the Israeli Court yesterday, December 19th,

7    and await the Court's decision.  Our best estimate on the

8    timing of the Israel recognition ruling is the end of

9    January, and we expect the sale to close shortly thereafter.

10           With respect to coins, our total coin value as of

11   the end of November was just above $2.6 billion.  We have

12   over $1 million in sETHs and approximately $630 million in

13   WBTC of ETC.  The current equity of all, with the coin and

14   non-coin assets is approximately $1.2 billion.

15           MR. KOENIG:  Thank you, Mr. Ferraro.  Can you

16   please tell the Court about the current status of the

17   custody account withdrawals that have been authorized

18   pursuant to the Debtors' withdrawal motion?

19           MR. FERRARO:  Yes.  Given that the Court recently

20   authorized us to open withdrawals of certain custody and

21   withhold accounts, we are working with our team to return

22   these assets to the eligible customers as soon as possible.

23   We are working through and implementation on our end and we

24   understand how important this is for our customers.  This is

25   a major priority for us, with an emphasis on security and

Page 38

1    ensuring the system, which has been off-line for months, is

2    brought back online safely and securely, to ensure that the

3    assets are protected and distributed in accordance with the

4    order of the Court.

5              MR. KOENIG:  Mr. Ferraro, can you please tell the

6    Court about the implementation of the recently approved key

7    employee retention plan?

8              MR. FERRARO:  Yes, absolutely, Mr. Koenig.  Since

9    my last update, we received a Court order authorizing the

10   company to make awards to a revised list of non-insider

11   employees.  In terms of numbers, the original employee

12   retention plan included around 59 employees, which

13   represents about 35 percent of the total current workforce,

14   not taking into account employees who have submitted

15   resignations or are in the notice period following the

16   recent RIF action.

17             In addition, we had discussed at the last hearing

18   since filing the initial KERP that we have continued to look

19   into a number of employees' withdrawals made before the

20   pause.  And as a result, working with our advisors, the

21   Committee and the Special Committee, we reduced the initial

22   list and expect to wrap up our investigation soon, so we can

23   propose having back a number of employees in the future.

24             Lastly, we set aside around $200,000 for employees

25   that are not among the 59 initially selected, but that

Page 39

1    depending on the circumstances, we may need to incentivize

2    to stay with the company down the line.

3           In addition to some of the critical efforts we

4    have discussed throughout the hearings, including asset and

5    data security and responding to information requests to

6    support our Chapter 11 process, our team members are focused

7    on a number of critical areas.  And I thought I would

8    highlight just a few of these today.

9           As I will discuss shortly, there is a great deal

10   of work underway in our product around the standalone

11   reorganization plan, which we are currently referring to as

12   a NewCo.  And our technology team prepares for the reopening

13   of withdrawals for certain custody and withhold accounts.

14   They are also working to architect the technology to support

15   the NewCo.

16          MR. KOENIG:  Thank you, Mr. Ferraro.  Switching

17   gears for a moment, can you please --

18          THE COURT:  I'd ask a question --

19          MR. KOENIG:  -- provide a high-level summary of

20   the status of the ongoing --

21          THE COURT:  Wait.

22          MR. KOENIG:  I'm sorry.

23          THE COURT:  Mr. Koenig, before you go on, at the

24   last hearing when we discussed the KERP, there were

25   resignations that had been submitted.  People had not yet

1   left.  Putting those aside, have there been any additional

2   resignations since the last hearing when I had an update

3   from Mr. Ferraro?

4           MR. FERRARO:  Yeah, great question, Your Honor.

5   I'm going to work off of -- since the last time we filed an

6   amended KERP quite recently.  We've had a total of 13

7   resignations since then.  One of the 59 on the KERP resigned

8   as well.  So 12 not the KERP; one on the KERP.

9           THE COURT:  Thank you.

10          MR. FERRARO:  Yep.

11          MR. KOENIG:  Thank you.  Mr. Ferraro, just to

12  repeat my question, can you please provide a high-level

13  summary of the status of the ongoing bid process?

14          MR. FERRARO:  Yes, Mr. Koenig.  Since September of

15  2022, we have been working with our advisors to conduct a

16  marketing process for our retail (indiscernible) business.

17  We've contacted over 125 parties with 30 potential bidders,

18  executing NDAs.  Interested parties under an NDA were given

19  access to a comprehensive virtual data room and the Celsius

20  management team, so that these potential bidders could

21  conduct a thorough due diligence process before they

22  submitted their bid proposals.

23          The qualified bid deadline was December 12th, and

24  we received multiple bids, complete with definitive

25  documentation.  Certain bidders provided good faith

Page 41

1    deposits, as required by the bidding procedures, proposing a

2    wide range of potential transactions and business

3    structures.  These bids contemplate, among others,

4    individual asset purchases, as well bids acquiring the

5    entire retail platform, and providing additional value to

6    the Debtors' estate through customer migration, asset

7    management platforms, and distribution services structures.

8           Not all of the bids meet all of the Court approved

9    criteria and some have other deficiencies.  Therefore, we're

10   going to use the upcoming weeks to work with our advisors

11   and engage with bidders to try to improve the bids, take the

12   more actionable, and ultimately into qualified bids.

13          At a high level, the customer migration structures

14   involve payment to the estates in exchange for migrating

15   customers and the company's cryptocurrency assets to the

16   buyers' platform.  Customers who migrate would then receive

17   access to a percentage of the company's cryptoassets on the

18   buyers' platform.

19          In the asset management platform structure, the

20   acquirer would buy a significant portion of the company's

21   assets, other than those for a class of smaller holders who

22   are proposed to receive crypto and other consideration, and

23   then transfer the assets to a newly formed asset management

24   entity managed by the buyer.  The company's creditors, whose

25   shares of assets are transferred to the acquirer, would then

1   receive tokens representing the value of the assets and

2   business operations in the newly formed entity, as well as

3   tokens representing a portion of the management fee paid to

4   the asset manager.  And these new tokens would trade on the

5   blockchain.

6           Finally, in the distribution services structure,

7   the acquirer would purchase the company's assets and

8   transform them -- or transfer them, to their own platform.

9   The company's creditors would then receive access to a

10  prorated portion of the company's crypto tokens through the

11  acquirer's platform.  Illiquid assets would be transferred

12  to special-purpose vehicles, with equity in the acquirer's

13  platform distributed to creditors.

14          Overall, I'm optimistic about the company's

15  options and look forward to working with the Debtors, the

16  community -- I'm sorry -- the Committee and other key

17  stakeholders to improve the bids as much as possible and

18  determine the best path forward.

19          And once we have a firmer idea of the path

20  forward, we intend to immediately engage with the regulators

21  to discuss our ideas and help address any questions or

22  concerns they may have.

23          At this point, there are still too many options

24  under consideration.  We want to narrow the options a bit

25  before we go to the regulators.

1           MR. KOENIG:  Thank you, Mr. Ferraro.  Could you

2    now please provide an update on the company's efforts for a

3    standalone reorganization plan, what you referred to as

4    NewCo?

5           MR. FERRARO:  Yes.  To be clear, the NewCo plan is

6    still being formulated, as we negotiate with all parties in

7    interest.  We are aiming to determine the best path forward,

8    be it in the NewCo plan or one of the sales options I just

9    mentioned.  We are continuing to work with all parties to

10   file a disclosure statement and plan in advance of

11   exclusivity expiring in mid-February.

12          With the disclaimer and the Court's permission, I

13   would like to preview a high-level summary of the current

14   thinking of the NewCo reorganization plan.

15          Today's cryptocurrency market is very different

16   from what it was a year ago.  The number of large

17   cryptocurrency platforms that are in distress or have filed

18   for Chapter 11 is significant.  As a result, today's market

19   is all about transparency and trust.

20          To be successful, a cryptocurrency platform

21   establishes trust by solving investment needs with

22   transparency and accountability.  Such a platform requires

23   proof of reserves, proof of liabilities, and onchain

24   investments.  With that in mind, the NewCo plan involves a

25   creditor-owned wealth management platform that offers access

Page 44

1    to independent crypto service providers, fund managers, and

2    an operating system that has onchain proof of reserves and

3    proof of liabilities.  This transparency will allow the

4    company to effectively be audited in real time by anyone

5    with an Internet connection.

6            To implement the NewCo plan, qualified custodians

7    will manage all user assets.  User deposits will be custody

8    and wrapped tokens will be minted and issued to the users.

9            Finally, virtual asset service providers such as

10   staking partners and liquidity partners will deploy assets

11   based upon the direction of the qualified custodian, via

12   direct requests and approvals from the users.

13           As with the asset management bid, we expect a

14   small class, or a class of smaller holders, less

15   sophisticated investors would not participate in this

16   venture and would instead receive a distribution of crypto

17   and other value.

18           While the platform will cater to a wide array of

19   customers, ranging from newcomers to high-volume leveraged

20   traders, we anticipate our key customers will be mass-

21   affluent to high net worth individuals, and customers that

22   have a long-term and optimistic view of the cryptocurrency

23   market.

24           MR. KOENIG:  Thank you, Mr. Ferraro.  Finally, can

25   you please provide an update regarding the company's current

1    mining operations?

2         MR. FERRARO:  Yeah.  We are continuing to build

3    out our mining operations and improve efficiencies.  Mining

4    has generated positive operating cashflows and positive

5    EBITDA every month this year in 2022.  It is important to

6    remember that we curtail our miners if the marginal cost of

7    mining pit is greater than the (indiscernible).  And this is

8    done at a site level.

9         We have completed construction, energization and

10   deployment of rigs at three of the four proprietary mining

11   sites.  All four of these sites are located in the state of

12   Texas.  Garden City, our first site to go online, has been

13   mining bitcoin since September.  And the site has high

14   uptime and current produces around 30 bitcoins per month.

15        The other two, Rebel and Stiles, both went online

16   in mid-December.  And the final site, East Stiles, we have

17   completed the transmission and distributional work, along

18   with the construction of two of the four buildings.  The

19   site is expected to go online in early to mid-first quarter,

20   completing the 87 megawatt proprietary sites.

21        To be clear, mining is an important asset in any

22   reorganization and restructuring option, including the sale

23   or (indiscernible) reorganization.

24        MR. KOENIG:  Thank you, Mr. Ferraro.  That

25   concludes the update, unless Mr. Ferraro has anything else

1    that he liked to add.

2              MR. FERRARO:  No, nothing more, Mr. Koenig.  Thank

3    you.  I would like to say thank you to Your Honor for giving

4    me the opportunity again to provide an update to the Court.

5    And unless Your Honor has any questions, this concludes my

6    update.

7              THE COURT:  Let me ask this.  Do any of the bids

8    include bids for the mining assets?

9              MR. KOENIG:  They do, Your Honor.  Yes.

10             THE COURT:  Are there separate bids for the mining

11   assets, or inclusive of the rest of the platform?

12             MR. KOENIG:  Both, Your Honor.  Both individually

13   and as part of a more holistic sale transaction.

14             THE COURT:  All right.  So, if you would, Mr.

15   Koenig, give me an estimate of the timing of going forward

16   with the sale process.  The original date has been put off.

17   The Debtors' and its advisors, the Committee and its

18   advisors, from reading the docket, have been conferring.

19   What is your estimate of when the marketing and also the

20   standalone process will go forward?  Obviously, exclusive --

21   you have a date when you've committed to submit a proposed

22   standalone plan.  But give everyone a sense of the timing

23   now.

24             MR. KOENIG:  No, of course, Your Honor.  What

25   we've been doing since receiving the bids, the final bid

Page 47

1    deadline, is continuing to work with the bidders to try to

2    improve the bids, make them into qualifying bids, and of

3    course the best bids possible.

4           We're going to continue to work with the bidders

5    and the Committee over the coming weeks to select a path

6    forward.  We currently expect that we will announce

7    something in early to mid-January as far as the path that

8    we're pursuing.  And then we'll take that announcement and

9    build it into the formal documentation, a Chapter 11 plan,

10   asset purchase agreements, whatever the case may be.  So we

11   expect that this process is going to come to a head in the

12   coming weeks, in the beginning to middle of January.

13          THE COURT:  All right.  Anything you want to add

14   at this point, Mr. Koenig?

15          MR. KOENIG:  No, thank you, Your Honor.  That

16   concludes the update.

17          THE COURT:  All right.  Let me ask for the

18   Committee, someone on behalf of the Committee, if you would

19   address the issues raised by Mr. Koenig and Mr. Ferraro and

20   the update, and where the Committee sees this case going.

21          MR. PESCE:  Sure.  For the record, Gregory Pesce,

22   White & Case, on behalf of the Committee.  Can you hear me,

23   Your Honor?

24          THE COURT:  I can very well.  Thank you.

25          MR. PESCE:  Yes.  So, prior to the bid expiration

1    date, the Committee had been speaking directly with some

2    bidders.  We've been speaking collectively with some bidders

3    on behalf of the company and steering other parties to them.

4            You know, as Mr. Koenig said, we received a number

5    of proposals.  They're all very -- the external proposals

6    are all very promising, and then we're in Ewing to do some

7    work with them on the internal reorganization concept.

8            After speaking with a number of the bidders, we

9    felt that some more time was needed, particularly given the

10   Christmas holiday and some other that work that we needed to

11   do there.  As Mr. Koenig said, we are spending a lot of time

12   over the holiday to try to figure out the path here.

13           You know, we've had a pretty long meeting.  We've

14   had pretty long meeting several days each of the last two

15   weeks to talk about potential plan structures.  We're going

16   to have another meeting today or tomorrow to talk about it

17   as well.  And it's our hope, like Mr. Koenig said, that we

18   can get something chosen by the beginning or middle of

19   January so that it could be socialized.  And then we can

20   include the feedback from the examiner's report, if any is

21   relevant, on January 17th.

22           But again, time is not our friend here.  We really

23   want to move fast.  So, if these external proposals or the

24   internal reorganization that's being contemplated don't

25   work, or they're inconsistent with our timeline or our

Page 49

1    budget here, the Committee is going to be ready to move

2    forward one way or the other in the middle of February with

3    an option that doesn't require an outside bidder or internal

4    reorganization.  Because people need to get their recoveries

5    here sooner than later.  Many people are very cognizant, or

6    really depending on the money, and the coins they put on

7    Celsius.

8              So, to date we've gotten a lot of cooperation from

9    the Debtor.  We're continuing to give them leads.  And as

10   you will come to us directly, we try to look them into that

11   process, get them under NDAs, et cetera.  And we'll talk

12   more about this in the mediation motion, I'm sure.  But from

13   our perspective, the process is working as intended.  You

14   know, regrettably, it's long and expensive, but we're making

15   -- everyone is moving as quickly as we can under these

16   circumstances.

17             THE COURT:  So let me -- this really goes for all

18   of you, but for the Debtors and the Committee, and that

19   really has to do with interacting with the regulators.  It's

20   been clear from the start of this case, and actually before

21   the start of the case, the Debtor had changed its business

22   model in light of regulatory concerns that had arisen.

23             And, you know, the sooner -- and I can understand

24   it may be premature, at least for over the next few weeks,

25   to really engage with the regulators.  But I really think

Page 50

1      that whether you're talking about a standalone plan or a

2      sale process, it isn't going to go anywhere unless there's

3      been a full exchange with the regulators to get their input.

4      And so I am concerned that that appears not to have happened

5      so far.

6                 MR. PESCE:  Your Honor, it's Greg Pesce, from

7      White & Case, if I may jump in there, just to give a little

8      bit of context on that.  And I was going to speak about this

9      at the mediation motion, but I'll move that forward.

10                So a group of people from my firm, M3 and

11     Elementus have been speaking with the regulators with some

12     regularity.  We had an hour-long meeting last Thursday the

13     15th, in fact, to talk about the process and to give a

14     preview of some of the bids that have -- you know, concepts

15     that have been received and what we're thinking about there.

16     And it's our expectation that we're going to have to talk to

17     them a lot more.

18                But your point's not lost on us.  We're urging

19     everyone to talk more and share information with the

20     regulators.  I understand some regulators were not part of

21     that call or may feel that they need to be more involved.

22     We're happy to meet with anyone and we'd urge the Debtor to

23     do the same with them as they develop what path they want to

24     do here.

25                MR. KOENIG:  And Your Honor, it's Chris Koenig for

Page 51

1    the Debtors, just to add on to what Mr. Pesce said.

2    Obviously, regulatory compliance is a top priority for

3    Celsius.  We're not going to get out of this case without

4    having the regulators onboard.  We're laser focused on it

5    and have been.  We have working groups that have worked with

6    the Committee professionals to try to narrow the issues so

7    that when we -- when we're ready to go to the regulators, it

8    can be efficient as possible

9              And as Mr. Ferraro explained in his update, we

10   intend to move quickly to speak to the regulators as soon as

11   we narrow the options a little bit.  There's obviously a lot

12   of different structures that are currently on the table.

13   And once we have a little bit more clarity about the path

14   forward, we're going to need to engage with the regulators

15   to make sure that we take care of this as soon as possible

16   and we address whatever questions and concerns they have.

17   So it's certainly not lost on us either, Your Honor.

18             THE COURT:  All right.  Two of the people on

19   behalf of the regulators who have appeared regularly, and I

20   want to ask them -- not intending to exclude any of the

21   other regulators' counsel -- but let me ask Ms. Milligan

22   first and then I'm going to call on Ms. Cordry.

23             MS. MILLIGAN:  Thank you, Your Honor.  Layla

24   Milligan with the Texas Attorney General's Office on behalf

25   of the Texas State Securities Board and Texas Department of

Page 52

1    Banking.  We have been in communication with the Committee

2    and have been given basically general updates as far as

3    possibilities.  We have not been in regular communication

4    with the Debtors.  I understand that they are planning to

5    communicate with us once they get a better footing of where

6    they're going.

7            We are concerned because the company is not

8    regulatorily compliant in Texas and our understanding is

9    they are not in compliance in a number of other states.  The

10   process of becoming regulatorily compliant is not an

11   immediate one.  So it is a process that takes time and

12   effort.  And we are not -- we do not have information about

13   how that process will work if there's a NewCo that intends

14   to have an investment vehicle associated with it.  That

15   would have to be regulatorily compliant.  If they sell to

16   another investment vehicle, they would have to be

17   regulatorily compliant.  And these things take time.

18           And so, if there is a limited runway and there's a

19   decision made and there's 30 to 60 days left to get

20   everything in alignment, it just may not be possible.  So we

21   certainly as much money to be returned to investors as

22   possible.  And we will work as quickly as we can on the side

23   of the regulatory bodies.

24           But we do have concerns about what the Debtor

25   intends to do.  And the sooner we can start those

Page 53

1    discussions, the better, as far as we're concerned.

2              THE COURT:  Thank you.  Ms. Cordry, do you want to

3    be heard?

4              MS. CORDRY:  Yes.  I would basically echo what Ms.

5    Milligan said.  We did ask for the call last week with the

6    Committee and I basically, when I was asking for it said,

7    look, is there someplace this company can go?  And is there

8    someplace that it can end up with in the kind of time period

9    it has?

10             The discussion we had with them was promising.

11   They were moving forward with these various bids and so

12   forth.  That's one of the reasons you'll hear, of course,

13   while he took the position we did on the mediator motion at

14   this moment.

15             I, again, would agree with what Ms. Milligan said,

16   which is saying you're going to become regulatorily

17   compliant is not a matter of just saying, okay, I'll go down

18   to the driver's license bureau and get my driver's license

19   today.  It is a licensing process that to the extent they

20   are selling securities, which in many respects most of the

21   time they may well have to do, it's a weeks to months-long

22   process, not a days process kind of thing.

23             So that's one reason why we do have a great deal

24   of concern.  The sooner they can talk to us, the sooner they

25   can start any of these processes, the better.  It may be

Page 54

1    possible they can set up some kind of investment vehicle

2    with accredited investors only that requires less regulatory

3    compliance issues with us.  We wait to see that.  We're

4    interested and were happy to see that there's some process

5    going forward.

6              We appreciate Your Honor's attention to keeping

7    their feet to the fire on these issues.  Thank you.

8              THE COURT:  Okay.  Any of the other regulators

9    want to be heard?  This is not intended as a full-blown

10   analysis of these issues.  I single out the issue with the

11   regulators.  I mean, Mr. Ferraro and Mr. Koenig raised it;

12   Mr. Pesce raised it.

13             But I'm keenly aware that an exit out of this

14   bankruptcy, either standalone or sale, is going to require

15   time for the regulators to evaluate what's proposed.  So the

16   sooner the Debtor and Committee can engage in real serious

17   discussions with the regulators, the more likely to have a

18   successful exit.  Okay.

19             Do any of the other regulators' counsel wish to be

20   heard?  Yes.  I see a hand raised.

21             MR. BERNSTEIN:  Good morning, Your Honor.  Jeffrey

22   Bernstein, McElroy Deutsch Mulvaney & Carpenter, for the New

23   Jersey Bureau of Securities.  I also was able to participate

24   in the call with the Committee last week, and I echo the

25   thoughts of Ms. Milligan and Ms. Cordry about the importance

Page 55

1     of the regulatory scheme.  And we appreciate the comments of

2     Your Honor, the Debtor and the Committee.  And it does take

3     time.  And we certainly intend to cooperate to the extent

4     that something can be facilitated.  But it does take work.

5               Thank you, Your Honor.

6               THE COURT:  Thanks, Mr. Bernstein.  Ms. Rood?

7               MS. ROOD:  I would just -- Jennifer Rood, for the

8     Vermont Department of Financial Regulation.  I'd echo the

9     comments of Ms. Milligan and Ms. Cordry.  And the only other

10    thing I'd add is that in addition to time to become

11    regulatorily compliant, it takes robust financial

12    disclosure.  And we're concerned that not only does the

13    company have limited liquidity, but they haven't provided

14    even so much as a basic liquidation analysis, much less the

15    kind of robust financial disclosure that would be required

16    in connection with the securities offering.

17              So we are concerned about that.  We are concerned

18    about whether they have enough runway to get all this

19    completed.

20              THE COURT:  Thank you, Ms. Rood.  Ms. Thomson?

21              MS. THOMSON:  Good  morning, Your Honor.  This is

22    Lucy Thomson.  I'm the Consumer Privacy Ombudsman.  Thank

23    you for raising the question about regulatory involvement.

24    I've been waiting to hear more details from the Debtors

25    about the plan, and it's very helpful to hear what they plan

Page 56

1    today.

2            There are many issues on the privacy front about

3    which accounts will be sold, particularly with respect to

4    the closed accounts, and what kind of notice those investors

5    will receive, and how the vast amount of personal data will

6    be handled.  So I look forward to calls with the Debtors and

7    the Committee to address some of those issues.

8            THE COURT:  Thank you very much, Ms. Thomson.  All

9    right.  So let's move on on the agenda now to the contested

10   matters, Mr. Herrmann's motion to appoint a mediator.  Mr.

11   Herrmann, do you want to argue first?

12           MR. HERRMANN:  Yes.  Thank you, Your Honor.  For

13   the record, Immanuel Herrmann, pro se creditor.  Can you

14   hear me?

15           THE COURT:  Yes, I can.  Go ahead.

16           MR. HERRMANN:  Okay, great.  Thank you, Your

17   Honor.  I filed my motion for a Chapter 11 mediator because

18   I believe it would move these cases forward, address major

19   legal issues, and get key parties to the negotiating table,

20   such as earn customers, loans and custody, and that it would

21   get us out of Chapter 11 faster.

22           As of this morning's hearing, the largest

23   constituencies support mediation, including a number of our

24   own customers, the loans Ad Hoc and the custody Ad Hoc.

25   These are the biggest constituencies in the case and have

Page 57

1    the most legal issues pending before this Court.

2              The Debtor and the UCC say we aren't ripe for

3    mediation yet.  That mediation isn't yet useful and that it

4    will add more costs at this time, or that mediation should

5    just facilitate the existing parties who are already

6    talking; in other words, the Debtor and the UCC to continue

7    talking.

8              I disagree and custody and loans and several earn

9    customers disagree.  I believe it will resolve -- it will

10   help facilitate the resolution of key issues, save estate

11   dollars, and help get us out of Chapter 11 faster and for

12   less money.

13             The states do not want to be compelled to attend

14   mandatory mediation at this time.  I addressed this in my

15   reply.  I agree with their arguments that they do not need

16   to attend mediation yet.  I do, however, believe their

17   presence could be important soon for some of the issues that

18   came up earlier and some of the reasons that came up earlier

19   in this hearing.

20             Any plan, especially a reorganization plan, will

21   need -- a standalone reorganization plan will need input

22   from regulators.  My view, Your Honor, is that the major

23   parties in this case need to start resolving their issues

24   sooner rather than later, and that mediation is a more

25   efficient way to do it than litigation.

1            The process of selecting a mediator, onboarding

2     him or her, and all of that, will take some time, and

3     finalizing the issues as well.  I anticipated this time lag

4     with my motion, which is why I filed it when I did.

5     Specifically, key dates are coming.  January 3rd is the bar

6     date, but we have not yet resolved the key issue of which

7     entities customers have claims against, or if cryptocurrency

8     claims should be converted to dollars.

9            There will be a number of disputed claims types

10    coming, such as suspended accounts, pending, returns

11    collateral, and liquidated loans, and the fight with

12    preferred shareholders is still scheduled to take place and

13    is unresolved.

14            January 10th is now the line for an auction for

15    retail assets at the sale hearing on January 22nd.

16    Meanwhile, in between those two dates, on January 17th the

17    examiner's final report will come out.  And then the

18    Debtors' exclusive periods ends faster than we all imagined,

19    February 15th.

20            So, by the time the sale hearing happens on

21    January 22nd, in my view the parties should be in mediation.

22    Having a short period of mediation before the end of the

23    exclusivity period and while we have bids submitted, I

24    believe would help the mediation parties resolve key issues

25    while we evaluate whether there is a viable plan going

Page 59

1  forward, either through a bid or a standalone

2  reorganization.

3          To be clear, my mediation proposal is not intended

4  to interfere with any sales process or to shorten the

5  exclusivity period in any way, which I supported extending,

6  provided that there was a lot more communication with the

7  creditors.

8          After there is a bid or we organization plan,

9  maybe peace breaks out between the constituencies.  Maybe we

10  won't' need mediation.  I'm betting that we will, however.

11  And realistically, to make that happen, we need to get

12  started on putting it together now.

13          So, Your Honor, I urge you to order a mandatory

14  mediation at a minimum between the Debtors, the UCC, and the

15  representatives of the biggest creditor constituency groups,

16  which include earn, loans and custody, potentially including

17  the preferred shareholders as well, depending on the results

18  of the briefed legal issue.

19          I believe that other parties, including the

20  regulators, can join, if and when it makes sense, in

21  particular if the mediator encourages their attendance.

22          THE COURT:  All right.  Thank you, Mr. Herrmann.

23  All right.  So the Court, in addition to reviewing Mr.

24  Herrmann's motion, there have been numerous responses,

25  joinders, or limited objections that have been filed.

Page 60

1    Rather than hearing those who want to argue in support -- I

2    have their positions; I've read their position statements --

3    let me hear first from the Debtor and then form the

4    Committee.

5            MR. KOENIG:  Thank you, Your Honor.  Again, it's

6    Chris Koenig, Kirkland & Ellis, for the Debtors.  Your

7    Honor, as reflected in our objection that we filed at Docket

8    1738, the Debtors oppose the motion.  The Debtors generally

9    do not believe that mediation will move these cases forward

10   at this time.

11           On the contrary, as Mr. Ferraro just explained,

12   the Debtors are moving towards the conclusion of their dual

13   track sale and marketing process and standalone

14   reorganization efforts, and we expect to work with the

15   Committee to improve the bids and select a value-maximizing

16   option in the coming weeks.  We also expect to file a

17   Chapter 11 plan before exclusivity expires on February 15th.

18   For that reason, we believe that mediation is premature.

19   We believe that the Debtors, the Committee and the other

20   parties should be focused on selecting the path forward,

21   improving the bids, engaging with regulators and other

22   parties.

23           And then, at that time, if there are disputes that

24   remain, perhaps mediation would be more appropriate for

25   another day.  But that time is, plainly, not now, as is

Page 61

1    accurate in the objections of the Committee and the State

2    regulators.

3              I don't want to duplicate Mr. Ferrara's update on

4    the business, but just a few key points for the Court's

5    consideration.  We think the mediation would be duplicative

6    and premature.  There are a few unique circumstances at play

7    here, that would reduce the utility mediation, including,

8    number one, the examiner's report is coming out next month,

9    on January 17, that would likely shape the parties' views

10   and mediation, may narrow the issues; parties will need time

11   to process the mediator's report -- sorry, the examiner's

12   report, and evaluate their positions in light of her

13   findings.

14             Several of the matters under the proposed

15   mediation are already under advisement with the Court, have

16   been fully briefed and argued.  The parties will review the

17   Court's rulings in due course and assess their positions.

18   And briefing on other matters is already underway.  The

19   dispute with the preferred equity holders, Your Honor,

20   entered a schedule, I believe it was just yesterday, and

21   we're proceeding forward on that basis.

22             We also think that the scope of the mediation is

23   extremely broad and would not be productive.  Mr. Herrmann's

24   motion describes a non-exclusive list of ten proposed

25   mediation topics.  These topics include broad topics such as

Page 62

1    what happens with clawbacks?  What happens with CEL Token?

2    How do we get to a plan that will ultimately be popular with

3    creditors?  These topics, you know, may not be answerable in

4    mediation and certainly are not ripe at this time.  Even

5    assuming that Mr. Herrmann's motion is granted as he would

6    like, we wouldn't be able to resolve these issues with Mr.

7    Herrmann and a few other pro se creditors at the table.

8              Take clawbacks, for example.  These preference

9    issues are complex issues in first impression, in the crypto

10   currency area.  And each potential defendant would have its

11   own rights and arguments regarding clawbacks.  It's

12   impossible to think about how we could resolve clawbacks

13   generally in a mediation.

14             Lastly, Your Honor, we're mindful that nothing we

15   can say in the moment will erase the criticisms that are on

16   social media and elsewhere about the Debtors and their

17   advisors.  To be clear, the company, and its advisors are

18   doing its best to be as responsive as possible to

19   communicate directly with individual account holders.

20   Hopefully, Mr. Ferrara's presentation this morning provided

21   some additional color and transparency to account holders.

22   We're committed to continuing to provide this increased

23   information as we work through the process and select the

24   value maximizing path forward.

25             THE COURT:  Thank you.

Page 63

1           MR. HERRMANN:  Thank you.

2           THE COURT:  Let me hear from the Committee.

3           MR. PESCE:  Thank you, Your Honor.  Gregory Pesce,

4     White & Case, on behalf of the Committee.

5           The mediation motion is, no doubt, well

6     intentioned.  These cases have gone on a lot longer than we

7     all would have liked.  They cost a lot more money.  And, in

8     particular, the information that many users might have been

9     used to getting before the bankruptcy through social media

10    and otherwise, is very different than what we have here.

11          So, all that being said, we think that there's

12    always -- to the extent the motion is seeking more

13    information, the Committee is open to trying to facilitate

14    having more information.  You know, to date, we've done a

15    lot on this effort.  The Debtor, last week, filed a new

16    point report.  Mr. Ferraro is here today.  The Debtor filed

17    a somewhat unique bid update last week, and then more

18    information was provided today.  The Committee, for its

19    part, is doing town halls, and we've spent over 1,000 hours

20    talking to pro se creditors to contact us.

21          So, we've done a lot on the communication front,

22    but Mr. Herrmann's points are well taken, that we, and we

23    will urge the Debtor to try to make more communication

24    available to the users, and obviously, as mentioned earlier,

25    to do more with the regulators.

Page 64

1          Insofar as, you know, dealing with the case

2     itself, and mediation, in our view, the process, as

3     difficult and long and expensive as it may be, it's working

4     as Congress intended, if not as Mr. Herrmann had hoped.  The

5     UCC is the constituent for all account holders, and we're

6     doing everything we can to help account holders.  We

7     understand some positions he's taken are controversial.

8          That said, we hope the account holders don't scorn

9     is and the resources that we have here.  We are here and

10    available to help the account holders to get their position,

11    then try to use them to influence the process.

12         To that end, the process among the different

13    organized groups is also working as intended.  Litigating

14    issues are getting briefed.  I expect some of them will soon

15    start to get decided.  And the organized parties, the

16    Debtor, the Committee and various ad hoc groups are all

17    talking about different ways we might resolve different

18    aspects of the case.  I can't go into detail about what that

19    might involve, but we're all cognizant of the cost and time

20    associated here in trying to bring that to closure.

21         So, all that being said, we don't think mediation

22    is right today, but we do think it could be right in the

23    not-to-distant future.  But right now, what we're focused

24    on, rather than choosing a mediator and using the holiday

25    weeks and beginning of the new year, we want to focus, like

1    I said earlier on, working with the Debtor on its plan.  And

2    if that doesn't work, putting forward our own plan once we

3    have the input from the examiner's report and the other key

4    input that you mentioned today.  So, I thank you for your

5    time today, Your Honor.

6          THE COURT:  Thank you Mr. Pesce.  Mr. Herrmann, do

7    you want to respond?

8          MR. HERRMANN:  Yes, Your Honor.  A couple of

9    things:  One, as I said, I believe that between now and

10   January 17, that the mediation issues become more clear.  In

11   terms of whether earn customers, you know, some pro se earn

12   customers can represent earn in -- you know, obviously, we

13   can only represent ourselves.  I will say, there have been

14   some issues that have come up with the ad hocs and whether

15   they represent anyone more than their members.  But I think

16   that what we can do in mediation is work through some of the

17   key issues.  And I also think if it were critical to retain

18   counsel for mediation that we could talk about that or make

19   that happen.

20         So, I also believe that, you know, I don't think

21   that -- I didn't file this motion to say we will resolve

22   every issue that I listed in the motion in mediation.  I

23   filed it to start a conversation, more or less, about

24   mediation.  And, you know, I understand that the issues may

25   shift, but I think that, you know, by the time we actually

Page 66

```
 1    get going with mediation which I think will take weeks.  And

 2    so, when the other parties are arguing that mediation, you

 3    know, may be later, what are we going to do?  File a motion

 4    for mediator on an expedited timeline after a plan comes out

 5    and then we're going to have to select the men?  I think it

 6    would be better, just in case, to have a candidate lined up,

 7    just like when you look at the strategies.  They have dual

 8    track strategies, right.  They're working on stand-alone

 9    reorg and a sales process at the same time.  So, this is

10    really similar to that.  I think we should have a mediator

11    as a potential strategy lined up and ready to go.  It seems

12    to me a quite low-cost thing to do.  And you know, I'll note

13    in the loans joinder that came in this morning, there are

14    some key issues, like issues between earn and borrow, the

15    two largest constituents in the case.  I know there's been

16    some talk in public even, of selling the loans book, for

17    example, and some claims that loan holders have.

18              I don't know what the proposal is by the parties

19    to work out those issues.  We don't have a schedule for

20    those.  But if they want to sell the loan book, for example,

21    separately, and they want earn customers, generally, to

22    support that, you know, conversations would be helpful, that

23    include legal and financial analysis of what that would look

24    like.

25              And then, with custody, it seems to me that it's
```

1    going to be quite a long time before the accounts above

2    $7,575 are released.  And then, you know, that there's

3    hundreds of thousands of dollars, or more, in potential

4    litigation coming on many issues.

5            And then, there's issues that, you know, that are

6    called corner-case issues, but actually could be larger than

7    withholds.  So, like for example, collateral that was

8    returned to earn accounts, I believe is probably larger than

9    withhold.  We haven't done discovery on it.  So, there's a

10   lot of issues that may not --

11           THE COURT:  I'm going to ... let me give you one

12   more minute.

13           MR. HERRMANN:  Okay.  I mean, actually -- thank

14   you.  I don't have a whole lot to say.  I mean, are there

15   any questions for me or anything else that would be helpful

16   to hear about --

17           THE COURT:  No.  I'm going to deny the motion

18   without prejudice.  I think there are already many issues

19   fully briefed and argued awaiting decision.  There are

20   schedules in place for other issues to be addressed that are

21   important issues.  I think the examiners, the filing of the

22   examiner's report, as well as more concrete information

23   about a stand-alone plan or sale, will help make the issues

24   much more concrete, and the Court could decide then, with or

25   without a motion, Mr. Herrmann, whether or not to appoint a

Page 68

```
 1    mediator to try and resolve additional issues.  I think it's
 2    premature until some of these additional issues become
 3    clear.
 4              I raised the issues today about the regulatory
 5    issues, either with a stand-alone plan or with a sale.  The
 6    regulatory issues are going to be extremely important, and
 7    it's going to require more discussion between the Debtors,
 8    the Committee and the regulators, to try and push forward on
 9    that.  So, I think it's premature, at this stage, to put a
10    mediator in place.
11              I'm also concerned, mediators can't deal, Mr.
12    Herrmann, with 300,000 account holders.  Ordinarily, a
13    mediation is with a relatively limited number of represented
14    parties.  A free-for-all in mediation simply is not going to
15    work.  But I think there are too many issues that have to
16    get addressed between now and the end of January, to make
17    mediation meaningful.
18              I would say this, Mr. Herrmann, that if a decision
19    is reached to push forward with mediation, yes, there will
20    have to be discussion about the selection of a mediator, but
21    I don't believe it's going to be a months-long process to
22    get it in place and started.
23              So, I respect you for filing the motion.  I think
24    negotiated consensus is the best way to resolve the issues
25    in this case.  There are a lot of issues, as I said already,
```

Page 69

1   that are already pending and awaiting decision by the Court,

2   and more that are scheduled.  So, that's how we're going to

3   proceed with that.  So, I don't want to hear anything more

4   today on the mediation issues.

5           Let's go forward with the agenda.  If we will, the

6   next matter on the agenda is the Ernst & Young retention.

7   Who is going to argue for the Debtor?

8           And here, I see, while the objection deadline had

9   been pushed, there have been no objections filed.  Mr.

10  Koenig or whoever else is going to argue for the Debtor, if

11  you could just update me on that.

12          MR. KOENIG:  Thank you, Your Honor.  Chris Koenig

13  and Kirkland & Ellis for the Debtors.  We're pleased to

14  report that we worked out the issues with Ms. Cornell in her

15  office.  We filed a revised proposed order that reflects her

16  input and her feedback.  I believe we're resolved, but

17  certainly, Ms. Cornell can speak for herself.  I believe

18  we're resolved on the Ernst & Young application.

19          THE COURT:  All right, anybody else want to be

20  heard?  As I said, there were no objections that were filed.

21  Ms. Cornell, do you want to be heard?

22          MS. CORNELL:  For the record, Shara Cornell on

23  behalf of the Office of the United States Trustee.  I just

24  want to say that, you know, both Kirkland and Ernst & Young,

25  you know, we worked really diligently to get this across the

Page 70

1    finish line, especially when dealing with an international

2    firm.  Sometimes, it can be difficult, so I just want to let

3    the Court know that everyone really worked hard on this one.

4    So, thank you.

5         THE COURT:  All right.  So, that's granted, the

6    order can be entered.  Next on the agenda is the retention

7    of Gornitzky& Co., the Israeli counsel.

8         CLERK:  Sorry, Judge.  The order was entered this

9    morning.

10        THE COURT:  Okay, then we don't have to deal with

11   that, okay.  I do have -- Mr. Koenig -- thank you, Deanna.

12   The Court is in receipt of the notice of filing of revised

13   proposed order authorizing the Debtors to reopen withdrawals

14   from certain customers with respect to certain assets held

15   in the custody program and withhold accounts and granting

16   related relief.  So, the revised proposed order was filed

17   yesterday as part of ECF 1755.

18        Mr. Koenig, could you address that, or one of your

19   colleagues?

20        MR. KOENIG:  Yeah, no, absolutely, Your Honor,

21   thank you.  So, we worked with the Committee and the two ad

22   hoc groups following the hearing that we had on December 7

23   in person before Your Honor, to revise the order per the

24   Court's comments at the hearing.  We've drafted the order to

25   be responsive and flexible to however Your Honor rules, on

Page 71

1    the issue of the custody wallets.  And in brief, that's

2    whether the 6 percent aggregate shortfall of what's actually

3    in the custody wallet, matters for purposes of whether the

4    custody assets are property of the estate or not.

5            We met and conferred with the other parties

6    extensively, to try to reach a resolution of this issue.

7    But given the differences in opinion on this issue between

8    the parties, and the importance of distributions in this

9    case, we were able to reach a consensual resolution.  But

10   the parties, of course, all committed to abide by whatever

11   Your Honor rules on that issue.  And the order is drafted in

12   a flexible manner so that however Your Honor rules, we will

13   abide by it, and the schedule that we file will take into

14   account Your Honor's ruling.

15           THE COURT:  Okay.  So, my chambers received an

16   email from a creditor, Chase Marsh.  And I don't know

17   whether your office received it as well or not.  And it --

18   I'll just read part of it:  ":I am an involuntary creditor

19   in the subject Celsius case.  Please forgive me for not

20   knowing the exact protocols to submit this request, who to

21   copy, or if my procedural understanding is not correct.  And

22   basically, it's asking more time to review the order, which

23   was just filed yesterday, the revised order."

24           Did you receive the Chase Marsh email?

25           MR. KOENIG:  Your Honor, I was copied on that

Page 72

1    email late last night.  Yes.

2          THE COURT:  So, I don't know whether, is Mr. Marsh

3    a custody or account holder who would receive a distribution

4    under this order?  Obviously, from the hearing, and what was

5    what I indicated would happen, this would only resolve those

6    against whom preference actions could not be brought,

7    because they were below the threshold amount.  And I don't

8    know where Mr. Marsh is in this mix.

9          MR. KOENIG:  No, that's right, Your Honor.  We

10   requested data from the company to confirm.  And as of this

11   morning, we hadn't received that back yet, so we were

12   checking back.  But I regret that I don't have the answer

13   for Your Honor, just given the time.

14         THE COURT:  All right, Mr. Marsh, you have your

15   hand raised.  I'll listen you now, please.

16         MR. MARSH:  Hi, good morning, Judge Glenn.  Chase

17   Marsh, I'm a pro se creditor, as you read.

18         My concern that this was not properly docketed

19   and, as Mr. Koenig had mentioned, there is a lot of sort of

20   wiggle room within the redlines, that we have not had a

21   chance to fully review.  I am an earn customer and a custody

22   customer.  I would not be subject to the preference issues.

23         However, there are several other items that were

24   introduced, such as paying gas fees, which were never part

25   of the Debtors' program to begin with.  In fact, their

1   stating was that, "Try us.  If you don't like it, you can

2   get your money off for free.  We won't charge you."  And

3   now, if you're going to charge me gas fees, you got to go

4   back and charge everyone else gas fees as well, that took

5   their money off the platform.

6           So, I know that's a side issue, but there's a lot

7   of side issues in these redlines that I hope can be

8   considered in due course.  That's all.

9           THE COURT:  Thank you, Mr. Marsh.  Mr. Koenig,

10  could you -- I did see that in the revised order.  It has

11  provisions relating to -- gas was among them.  And that was

12  not discussed at the hearing.

13          MR. KOENIG:  Yeah.  Thank you, Your Honor.  Again,

14  Chris Koenig.  So, that paragraph is paragraph 4 in the

15  revised proposed order.  So, gas fees are the transaction

16  costs that are associated with transferring cryptocurrency.

17  Mr. Marsh is right that prepetition in the ordinary course

18  of business, the Debtors didn't charge gas fees.  In the

19  motion, and in the original version of the order, we did

20  seek authority to charge gas fees.

21          The reason for that is we want to be as equitable

22  as possible.  Gas fees have to be paid.  The question is,

23  who pays for them?  So, does the customer who is receiving

24  cryptocurrency out of the estate, should they pay the

25  transaction cost to return them the funds, the

1     cryptocurrency?  Or should that cost be borne by the estate?

2     Because if it's borne by the estate, effectively, that's

3     less -- that's going to be less assets for the rest of the

4     customers to receive from the Debtors' estates.  And those

5     customers aren't receiving anything.

6             So, what we thought was the most equitable thing

7     to do, was to charge the gas fees against the customers that

8     are actually receiving the distribution, as opposed to

9     charging the customers that are not.

10            I'd submit that the changes in paragraph 4 are

11    more clarifying in nature than a total shift of position.

12    The motion was clear on this from day one.

13            THE COURT:  Can you tell me; can you estimate the

14    math?  Because paragraph 4 talks about gas fees or

15    transaction costs, or a fee approximating such cost.

16            MR. KOENIG:  Yeah.

17            THE COURT:  Is there an estimate of what those

18    costs would be?

19            MR. KOENIG:  Those costs are different on a coin-

20    by-coin basis, Your Honor.  Stable coins, for example, have

21    a very low transaction cost.  It's de minimis.  It's

22    probably a rounding error.  There are other coins for which

23    the gas fees are more significant, like bitcoin.  But the

24    gas fees, they actually vary over the course of the day.

25    It's not like the fee is, you know, a certain percentage or

Page 75

1    a certain dollar amount.  It varies depending on the amount

2    of transactions that are occurring on the network and so on

3    and so forth.

4            You know, the fees are certainly very small

5    compared to the distributions.  Some of them are very de

6    minimis, some of them are, you know, several percentage

7    points to be sure.  But I don't have a -- you know,

8    summarizing all of the gas fees would be impossible in this

9    setting, Your Honor.

10           THE COURT:  Let me hear from counsel for custody

11   and withhold, if they want to address what's in this revised

12   proposed order.

13           MR. KOTLIAR:  Good morning, Your Honor, Bryan

14   Kotliar, of Togut, Segal & Segal, counsel for the ad hoc

15   group of custodial account holders.  Can Your Honor hear me

16   okay?

17           THE COURT:  Yes, I can, go ahead.

18           MR. KOTLIAR:  So, we negotiated fairly extensively

19   with the Debtors and the Creditors Committee and withhold on

20   the form of this revised order.  Obviously, there's one big

21   change to it that we'd love to make so that it would apply

22   to all custody assets.  But we know that, as a result of the

23   last hearing, that's not going to happen.

24           So, taking into account the realities of where we

25   are in the case, it was really important to us to get an

Page 76

1   order on file that got coins back to people as soon as

2   possible.  The gas fees were in the original proposed order

3   with the motion.  I don't think that it was described in the

4   motion, but we understand, as Mr. Koenig explained, that gas

5   fees are just a function of what happens when you transfer

6   cryptocurrency.  And I think we were happy enough to get our

7   cryptocurrency assets back, if that was the case, that we

8   were okay with the gas fees.  We were okay with the

9   explanation that Mr. Koenig gave about the language that was

10  added about, or similar other transaction fees, because that

11  to us was a change.  But we became comfortable with it.

12          THE COURT:  Could you give an estimate of what

13  those fees would be?

14          MR. KOTLIAR:  I don't know what the fees would be

15  other than that they're often de minimis, but they vary on a

16  case-by-case basis throughout the day.

17          THE COURT:  All right.  Thank you.  Does counsel

18  for the Withhold Ad Hoc Committee want to be heard.

19          MS. KOVSKY:  Good morning, Your Honor, Deb Kovsky,

20  for the Withhold Group.  I'll just echo what Mr. Kotliar

21  said.  Unfortunately, the transaction fees have to come from

22  somewhere, and imposing those fees as an additional cost on

23  other customers didn't seem to be fair.  So, we agreed that

24  this was probably the most equitable outcome.

25          THE COURT:  All right.  I understand Mr. Marsh's

1    concern.  This was included in the original motion, although

2    not in -- it's been clarified in the order.  I think it is

3    extremely important, and I've thought so since day one, that

4    every -- I'll say dollar, but value -- that can be returned

5    to account holders sooner rather than later is important.

6    The issue about who bears the cost of these transaction fees

7    should the creditor body at large, who's not receiving

8    anything, in effect, bear a part of that cost.  I understand

9    the argument why it should be those who are getting the

10   funds back.

11           So, I'm going to approve the revised proposed

12   order submitted in Word format, Mr. Koenig, and it will

13   promptly be entered.  Please, I would like to receive a

14   status report when the distributions are made.  You don't --

15   well it should, there should be a report filed that

16   indicates the creditor names, no other identifying

17   information, but the creditor names and the amount or

18   amounts that have been distributed to them after the

19   distributions are made.

20           MR. KOENIG:  Thank you, we'll be sure to do so.

21   And just to provide an update for everybody listening and

22   what the process will be like, this is in the order, but it

23   contemplates that the Debtors and the committee and the ad

24   hoc groups will come together on a schedule of the actual

25   individuals and the coins to be distributed under the order.

Page 78

1    We'll file that, we'll file that as soon as it's ready.  Of

2    course, we're waiting for Your Honor's decision on the

3    custody wallets issue, but we're working on in it in the

4    background around the clock so that we're ready, we're ready

5    to file that schedule as promptly as possible and reopen

6    withdrawals.  And, of course, we'll file the reporting that

7    Your Honor has asked for.  Reopening withdrawals, people

8    will be able to request withdrawals and that'll be an

9    ongoing process.  It's not as though the distributions will

10   all be made on one day.  It'll be, it'll be over time as

11   people log into their app and give us their details and that

12   the transactions are completed.  But we're working closely

13   with the committee and the ad hoc groups to make sure that

14   folks get their coins back as soon as possible.

15            THE COURT:  Thank you very much.  All right

16   there's a hand raised, Jason Lu.

17            MR. LU:  I'm sorry, Your Honor.  I couldn't lower

18   my hand but to answer your question earlier about what the

19   fees are like, just to give a bit of background, I ran a

20   crypto currency trading firm, so I'm very familiar with

21   this.  And the good news is because cryptocurrency markets

22   and interest is so depressed right now, gas is super, super

23   cheap.  As previously mentioned, Bitcoin is probably the

24   most expensive one and over the last month, it's been about

25   a dollar or two to send Bitcoins and that's irrespective of

1      the amount that's being sent.

2              THE COURT:  Thank you very much.  All right

3      there's another hand, Ezra Serrur.  I'm probably

4      mispronouncing your last name.  Go ahead.

5              MR. SERRUR:  Hi, Your Honor.  Just had a quick

6      question.  So as the distribution schedule is put together,

7      if an individual creditor wants to, you know, make sure if

8      they, if they're, if they're understanding is that they have

9      a pure, you know, custody assets, if they want to, you know,

10     confirm that they're included in the distribution schedule,

11     who should they be communicating with?

12             THE COURT:  Mr. Koenig, who should they

13     communicate with?

14             MR. KOENIG:  If they reach out to me and my email

15     address is in the Debtor signature black.  It's Chris Koenig

16     at Kirkland.com, we'll get you to the right place.  And

17     we'll also, obviously, when we file the schedule, everybody

18     will have the opportunity to look, find your name on the

19     schedule, and reach out to us if you have any questions or

20     concerns.

21             MR. SERRUR:  Thank you.

22             THE COURT:  All right.  There's another hand

23     raised.  Jason Iovine, I'm probably mispronouncing it, but

24     go ahead.

25             MR. IOVINE:  Actually, pretty good.  Jason Iovine,

Page 80

1    creditor, question about the distribution.  What is the

2    determination about (indiscernible) that could have been

3    accidentally sent in after the petition date?

4              THE COURT:  I'm sorry.  I don't follow your

5    question.

6              MR. KOENIG:  I do, Your Honor.  Actually, yeah, I

7    do.

8              THE COURT:  Mr. Koenig, go ahead.

9              MR. KOENIG:  So, Your Honor, in your post-

10   petition, we become aware that there are certain customers

11   that have erroneously or accidentally submitted

12   cryptocurrency to the Debtors.  Our view is that that

13   property is not -- new transactions post-petition is not

14   property of the Debtors' estate under Section 541 of the

15   bankruptcy code, which is only that property and the

16   Debtors' rights as of the petition date.  So we are

17   preparing a motion for authority to return any

18   cryptocurrency that was erroneously, accidentally sent to us

19   post-petition because we don't believe that it's property of

20   the estate.  And we believe that if it was not returned,

21   creditors would likely have an administrative claim for the

22   return of that property.  So we're working to file that in

23   the next week or so and we'll have that heard at the January

24   24th hearing.  But we understand the concern.  We've

25   received some inquiries about it from similarly situated

1      creditors and we're working to address it in the near term.

2              THE COURT:  All right.  Mr. Iovine, does that

3      address your issue?

4              MR. IOVINE:  Yes, sir, thank you.

5              THE COURT:  Okay.  All right, thank you.  All

6      right.  Do we have anything else for today?

7              MR. KOENIG:  Nothing from the Debtors, Your Honor.

8      Thank you.

9              THE COURT:  All right.  Does anybody else wish to

10     be heard?  Mr. Iovine, your hand is still raised.  I don't

11     know whether you had something else you wanted to raise?

12             MR. IOVINE:  Yes, Your Honor.  I've been in

13     contact with Gregory Pesce and the UST,  Miss Shara Cornell.

14     I sent some emails to them about some of the pro se

15     creditors doxing other employees and former ambassadors,

16     ambassadors who were volunteers to Celsius.  And it has

17     become a detriment to some of us.  And we've gotten threats

18     and no, I've got nothing, no reply other than Mr. Greg

19     saying that he'll look into it.  But nothing since then.

20             THE COURT:  Let me just say the Court became aware

21     yesterday that this is an issue.  The Court has reached out

22     to the Office of the United States Marshal.  And I take

23     these matters seriously.  I have not seen anything in any

24     court filings that seemed problematic.  And everybody who

25     has appeared at any of the hearings and spoken has been

1    quite respectful and I'm aware of that as well.  So I guess

2    what I would say is I'm aware that this has become an issue

3    and I guess I would say is there's nothing I can do about it

4    now other than that having become aware of it, I've tried to

5    get the appropriate authorities to review what's been

6    happening.  It's it, it is to say the least unfortunate at a

7    minimum.  All right, Mr. Khanuja, again, I'm butchering

8    names, I'm sure, but go ahead.

9            MR. KHANUJA:  Thank you, Your Honor.  Your Honor,

10   I wanted to raise discussion to the Court as well as to the

11   regulators because I apparently, I see a clear conflict of

12   interest in the team who's organizing the bids and who are

13   also responsible for making decisions around the bids as

14   well.  The team themselves, they were either, they're either

15   representing or defending Celsius and Alex Mashinsky or they

16   were hired by Alex Mashinsky.  The motives and

17   qualifications of some of these leading the bid or bid

18   decisions is suspect as well.  For example, K&E, they are

19   representing and defending Celsius.  Chris Ferraro was

20   personally hired by Alex and was part of the problem that

21   led to these cases.  For example, as the head of FP&A, he

22   should have identified the mismatch in Celsius assets and

23   liabilities and monitored it far sooner and then taken

24   actions against any further misrepresentation to the

25   clients.

Page 83

1          Most importantly, Chris Ferraro's declaration is

2    counter to creditors claim around ownership of assets.  So

3    any solution he proposes will likely be bias towards Celsius

4    and creditors may appeal against it.  CCO, Mr. Blonstein, he

5    admitted to having no response, doing no responsibility

6    around consumer protection or even reviewing the policies

7    which would typically fall under CCO.

8          For the reasons I list all of these, list above, a

9    Celsius lead Newco should also be a complete no go.  So any

10   time and effort and money being spent on that, on Celsius

11   led reorg, that should be a complete no go, saving the

12   estate money.

13         And then finally, with regards to what K&E and

14   Chris Ferraro mentioned around the progress they've made,

15   there are so many important decisions still pending around

16   ownership, the tax implications of Celsius claiming

17   ownership of assets, and a bunch of other things.  All of

18   these have been pushed so many times.  So in parallel, we

19   understand they're saying the dual track.  But the dual

20   track is ineffective until a lot of these issues are

21   resolved.

22         THE COURT:  All right, thank you.  Mr. Frishberg?

23         MR. FRISHBERG:  Hi, thank you, Your Honor.  Some

24   of the threats were against me.  I just wanted to provide a

25   bit of context.  I got an offer from some former Celsius

1    employees, some of which were former Celsius employees.

2    They're part of the short squeeze, sell short squeeze group.

3    They're effectively trying to manipulate the price of the

4    cell token to short squeeze it.  They offered me 150 percent

5    of my claim if I accepted it on the condition that I would

6    not appear in court or file any motions and I would leave my

7    Twitter account.  I refused and I start getting harassment.

8    And the harassment started increasing.  I found information

9    on my family was posted publicly.  Most all of the

10   information posted publicly, was available about my family,

11   was publicly available.  Then Alex Mashinsky attacked me on

12   Twitter saying that I'm hurting the Celsius community and

13   its recovery, which increased the amount of threats and

14   harassment.  The one concerning the most was one that

15   mentioned an unspecified somebody would drop into the bottom

16   of the ocean like an anchor.  Yeah, it's fairly concerning

17   and there has been a lot of misinformation and harassment

18   online towards creditors and pro ses especially.  Thank you,

19   Your Honor.

20          THE COURT:  All right.  Mr. Iovine.

21          MR. IOVINE:  Mr. Frishberg statements were false.

22   There was a claim by --

23          THE COURT:  Stop, stop, stop.  I'm not going to

24   have a back and forth between creditors.  If there's

25   something you want to state about yourself, you can go ahead

Page 85

1    and do that.  But I'm not going to have this degenerate

2    into, he said, he said, that sort of thing.  Okay.  Is there

3    anything you wish to say for yourself?

4              MR. IOVINE:  Yes.  As one of the people offering

5    to buy out his claim, that's what it was, a buyout.

6              THE COURT:  Okay.  Mr. Herrmann.

7              MR. HERRMANN:  Yes, Your Honor, Immanuel Herrmann,

8    pro se creditor.  I just wanted to briefly comment on Mr.

9    Ferraro's presentation today and just say --

10             THE COURT:  Mr. Herrmann, we're past, we're past

11   that.  Ms. Cornell?

12             MS. CORNELL:  Good morning.  Again, it's Shara

13   Cornell on behalf of the Office of the United States

14   Trustee.  I just wanted to respond very briefly to some of

15   the comments from some of the pro se creditors this morning.

16   And I just wanted to reiterate that if there are any

17   concerning emails or threats that any creditor or employee

18   are currently receiving or have received in connection with

19   the Celsius bankruptcy case, that they are more than invited

20   to please email or contact me.  Our office takes these

21   threats very seriously.  We investigate all threats and

22   although you may not receive an immediate response from me

23   or from my office, please be sure that our office is in

24   receipt and investigating these claims and take them

25   seriously.  Thank you very much.

1              THE COURT:  Thank you, Ms. Cornell.  I appreciate

2    your having made that statement.  It is of great concern to

3    me.  It doesn't involve a pending motion, but I've seen the

4    flow of communications over the last few days.  It is a

5    great concern.  As I say, my chambers and the Court have

6    notified the US Marshals about it, but I appreciate your

7    indicating that people should be in touch with you, okay?

8              MS. CORNELL:  Absolutely.  Thank you.

9              THE COURT:  Thank you very much.  All right, we're

10   going to be adjourned for the day.  Thank you very much.

11             MR. KOENIG:  Thank you.  Happy holidays, Your

12   Honor.

13             THE COURT:  Happy holidays, everybody.

14             (Whereupon these proceedings were concluded at

15   11:13 AM)

16

17

18

19

20

21

22

23

24

25

Page 87

1                            **I N D E X**

2

3                              RULINGS

4                                              Page        Line

5    **Order Granted**                          70          5

6

7    **Revised Proposed Order Approved**        77          11

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 88

1                    C E R T I F I C A T I O N

2

3          I, Sonya Ledanski Hyde, certified that the foregoing

4     transcript is a true and accurate record of the proceedings.

5

6

7

8     Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  December 21, 2022