Dennis F. Dunne
Nelly Almeida
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Tel: (212) 530-5000
Fax: (212) 660-5219

Andrew M. Leblanc
Melanie Westover Yanez
**MILBANK LLP**
1850 K Street, NW, Suite 1100
Washington, DC 20006
Tel: (202) 835-7500
Fax: (202) 263-7586

*Counsel to Community First Partners, LLC,
Celsius SPV Investors, LP, and
Celsius New SPV Investors, LP*

Joshua M. Mester (admitted *pro hac vice*)
**JONES DAY**
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071
Tel: (213) 489-3939
Fax: (213) 243-2539

*Counsel to CDP Investissements Inc.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### SERIES B PREFERRED HOLDERS' OPENING BRIEF ON THE ISSUE OF WHICH DEBTORS ARE LIABLE TO CUSTOMERS UNDER THE TERMS OF USE

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

**Table of Contents**

**Page(s)**

Table of Authorities ................................................................................................ ii

Preliminary Statement ............................................................................................1

Factual Background ................................................................................................4

    I.   The Terms of Use ...........................................................................................4

        A.     Terms of Use Versions 1 Through 5 ..................................................5

        B.     Terms of Use Versions 6 Through 8 ..................................................5

    II.  Celsius Mining LLC ....................................................................................10

    III. Chapter 11 Cases .......................................................................................12

Argument ..............................................................................................................13

    I.   The Terms of Use Unambiguously Limit Customer Liabilities to LLC. ........................13

        A.     Version 8 of the Terms of Use Is the Relevant Version for the Determination of the Briefed Legal Issue. ................................................................13

        B.     The Limitation of Liability Provision in the Terms of Use Unambiguously Excludes LLC's Affiliates From Liability to Customers. ................................14

    II.  Extrinsic Evidence Indicates That the Parties Intended to Exclude LLC's Affiliates From Liability on Customer Claims. ................................17

        A.     The Debtors' Statements and Actions Indicate Their Intent to Limit Customer Liability to LLC. ................................18

        B.     The Customers' Conduct Demonstrates That LLC's Affiliates Are Not Liable to Customers. ................................26

    III. Customers Released CNL From Liability by Agreeing to Terms of Use Version 6 .........27

Conclusion ............................................................................................................28

## Table of Authorities

**Cases**                                                                                                                    **Page(s)**

*Ally Fin. Inc. v. Wells Fargo Bank, N.A.* (*In re Residential Cap., LLC*),
   531 B.R. 25 (Bankr. S.D.N.Y. 2015) ............................................................ 15

*Arici v. Poma*,
   202 A.D.3d 584 (N.Y. App. Div. 1st Dept. 2022) .................................... 28

*Bank of N.Y. Mellon Tr. Co., Nat'l Ass'n v. Solstice ABS CBO II, Ltd.*,
   910 F. Supp. 2d 629 (S.D.N.Y. 2012) ........................................................ 15

*Bank of New York v. Amoco Oil Co.*,
   35 F.3d 643 (2d Cir. 1994) ............................................................................ 17

*Citigifts, Inc. v. Pechnik*,
   67 N.Y.2d 774 (N.Y. 1986) .......................................................................... 27

*Corhill Corp. v. S.D. Plants, Inc.*,
   9 N.Y.2d 595, 217 N.Y.S.2d 1, 176 N.E.2d 37 (1961) ............................ 15

*DBT GmbH v. J.L. Mining. Co.*,
   544 F. Supp. 2d 364 (S.D.N.Y. 2008) ........................................................ 15

*Faulkner v. Nat'l Geographic Soc'y.*,
   452 F. Supp. 2d 369 (S.D.N.Y. 2006) ........................................................ 17

*Fed. Ins. Co. v. Am. Home Assur. Co.*,
   639 F.3d 557 (2d Cir. 2011) .......................................................................... 17

*Freedberg v. Landman*,
   930 F. Supp. 851 (E.D.N.Y. 1996) .............................................................. 17

*Grimaldi v. Sangi*,
   177 A.D.3d 1208 (N.Y. App. Div. 3rd Dept. 2019) ................................ 28

*Health-Chem Corp. v. Baker*,
   915 F.2d 805 (2d Cir. 1990) .......................................................................... 27

*In re Menorah Congregation & Religious Ctr.*,
   554 B.R. 675 (Bankr. S.D.N.Y. 2016) ........................................................ 23

*In re Sears Holding, Corp.*,
   No. 21-CV-5437-NSR, 2022 WL 4482375 (S.D.N.Y. Sept. 27, 2022) ................. 16

*In re Stade*,
   90 B.R. 29 (Bankr. D. Conn. 1988) ............................................................ 28

*In Time Prods., Ltd. v. Toy Biz, Inc.*,
   38 F.3d 660 (2d Cir. 1994) ............................................................................ 17

*India.com, Inc. v. Dalal*,
   412 F.3d 315 (2d Cir. 2005) .......................................................................... 14

*JA Apparel Corp. v. Abboud*,
  568 F.3d 390 (2d Cir. 2009) .......................................................................... 17

*Krumme v. Westpoint Stevens Inc.*,
  238 F.3d 133 (2d Cir. 2000) .......................................................................... 14

*Leeward Isles Resorts, Ltd. v. Hickox*,
  49 A.D.3d 277 (N.Y. App. Div. 1st Dept. 2008).......................................... 27

*Northville Indus. Corp. v. Fort Neck Oil Terminals Corp.*,
  100 A.D.2d 865, 474 N.Y.S.2d 122 (N.Y. App. Div. 2nd Dept. 1984)...........13, 27

*Parasram* (*In re Parasram*),
  No. 16-42657-JMM, 2022 WL 16824751 (Bankr. E.D.N.Y. Nov. 8, 2022).......... 23

*Revonate Mfg., LLC v. Acer Am. Corp.*,
  No. 12-CV-6017-KBF, 2013 WL 342922 (S.D.N.Y. Jan. 18, 2013) .................... 27

*Roberts v. Weight Watchers Int'l, Inc.*,
  712 F. App'x 57 (2d Cir. 2017) ..................................................................... 17

*Seiden Assocs. v. ANC Holdings, Inc.*,
  959 F.2d 425 (2d Cir. 1992) .......................................................................... 17

*Trudeau v. Google LLC*,
  349 F. Supp. 3d 869 (N.D. Cal. 2018) ......................................................... 27

*U.S. Bank Trust Nat'l Ass'n v. AMR Corp.* (*In re AMR Corp.*),
  730 F.3d 88 (2d Cir. 2013) ............................................................................ 15

Community First Partners, LLC, Celsius SPV Investors, LP, Celsius New SPV

Investors, LP, and CDP Investissements Inc. (collectively, the "Series B Preferred Holders"), as

beneficial holders, or investment advisors or managers of beneficial holders, of Series B

Preferred Shares issued by Celsius Network Limited ("CNL" and, together with its above-

captioned affiliates, the "Debtors"), by and through their undersigned counsel, and in accordance

with the *Order (I) Setting a Briefing Schedule and (II) Granting Related Relief* [Dkt. No. 1747]

(the "Scheduling Order")[2], submit this Opening Brief on the Briefed Legal Issue and respectfully

state as follows:

## **Preliminary Statement**

1.      Pursuant to the Scheduling Order, the threshold legal issue for briefing (the

"Briefed Legal Issue") is: "which Debtor entities are liable to the account holders [(each a

"Customer" and collectively, the "Customers")] under the global contract (the "Terms of Use")

between Celsius Network LLC [("LLC")] and its [Customers]."[3]

2.      The Terms of Use[4] unequivocally answer that question in the "Indemnification

and Limitation of Liability" provision (the "Limitation of Liability") thereof, which states:

> ***in no event*** shall you [(the Customer)] have any recourse, whether by
> setoff or otherwise, with respect to our obligations, to or against any assets
> of any person or entity other than Celsius, including, without limitation,

---

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Scheduling Order.

[3]    Scheduling Order ¶ 3.

[4]    The eight versions of the Terms of Use are attached as Exhibits A-1–A-8 to the *Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, Providing Terms of Use Dating Back to February 18, 2018* [Dkt. No. 393] (the "TOU Decl." or "TOU Declaration"). "Terms of Use Version [__]" is as enumerated and defined in the TOU Declaration.

Unless noted otherwise, all references to the "Terms of Use" refer to Terms of Use Version 8, which was in effect on the Petition Date. For ease of reference, a copy of the Terms of Use Version 8 is attached as Exhibit A to the *Declaration of Melanie Westover Yanez in Support of Series B Preferred Holders' Opening Brief on the Issue of Which Debtors are Liable to Customers Under the Terms of Use* (the "Yanez Decl." or "Yanez Declaration"), filed contemporaneously herewith.

> *any* member, shareholder, ***Affiliate***, investor, employee, officer, director, agent or advisor of Celsius.[5]

"Affiliate" is broadly defined as "an entity that . . . is under common control or ownership with . . . [LLC],"[6] which includes CNL.[7]  Accordingly, under a plain reading of the Terms of Use, Customers have **no recourse against CNL** or any other Affiliate of LLC.

3.    Although the specific Limitation of Liability provision of the Terms of Use unambiguously resolves the Briefed Legal Issue, the Debtors and the Official Committee of Unsecured Creditors (the "Committee") argue that every Debtor and non-Debtor entity in the Debtors' corporate structure is liable to the Customers.  The Debtors and the Committee rely on the fact that the introduction to the Terms of Use defines "Celsius" as LLC "and its Affiliates." Notwithstanding such broad definition, the Debtors' and the Committee's reading of the Terms of Use would render meaningless the aforementioned Limitation of Liability provision.  Indeed, such a reading is antithetical to fundamental principles of contract interpretation, which require, among other things, that (i) a contract be interpreted so as to give meaning to each provision and (ii) specific provisions govern in the face of more general provisions.  Accordingly, there is only one reasonable interpretation of the Terms of Use: the Limitation of Liability restricts Customer liability to LLC.  As such, there is no ambiguity with respect to the Briefed Legal Issue.

4.    Nevertheless, in the event that this Court determines that the Terms of Use are ambiguous as to the Briefed Legal Issue, there is overwhelming evidence that the intent of the

---

[5]    *See* Yanez Decl., Exhibit A (Terms of Use Version 8) § 25 (emphasis added).

[6]    Specifically, "Affiliate" is defined in the Terms of Use as any "entity that owns or controls, is owned or controlled by, or is or under common control or ownership with a party, where control is defined as the direct or indirect power to direct or cause the direction of the management and policies of such party, whether through ownership of voting securities, by contract, or otherwise." *Id.* § 2.  For purposes hereof, the term "Affiliate" has the meaning ascribed to it in the Terms of Use.

[7]    *See Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, in Support of Chapter 11 Petitions and First Day Motions* [Dkt. No. 23] (the "Mashinsky Decl." or "Mashinsky Declaration"), Exhibit A (Corporate Organizational Structure).

2

parties was that, following the migration of the Customer-facing business away from CNL to

LLC in August 2021 (the "Migration"), CNL would no longer have any liability to Customers

under the Terms of Use.  Indeed, contemporaneously with the Migration, the Debtors required

Customers to accept Terms of Use Version 6, which superseded their existing contract.

Specifically, as demonstrated in the screen capture below, existing Customers were expressly

informed, and required to affirmatively agree, that CNL was transferring to LLC "its rights ***and***

***obligations***" to Customers.[8]



As is relevant to the Briefed Legal Issue, versions 7 and 8 of the Terms of Use are unchanged

from version 6, including the terms of the Limitation of Liability.[9]

  5.  Indeed, since the Migration and contemporaneous implementation of Terms of

Use Version 6 – except when asserting their position on the Briefed Legal Issue – the Debtors'

statements and actions have been consistent with the intent to transfer of Customer liabilities

away from CNL to LLC.  These statements and actions include, without limitation: (i)

documents created at the time of the Migration; (ii) CNL's course of conduct following the

---

[8] The below screen capture is an excerpt of the communications and platform pop-ups published to Customers in connection with the implementation of Terms of Use Version 6 that are (i) attached as Exhibit A to the *Declaration of Oren Blonstein, Head of Innovation and Chief Compliance Officer of the Debtors, in Support of the Debtors' Motion Regarding Ownership of Earn Assets and the Sale of Stablecoin* [Dkt. No. 1327] (the "Blonstein Decl." or "Blonstein Declaration") and (ii) for convenience, re-attached as Exhibit B to the Yanez Declaration.

[9] *See e.g.*, TOU Decl. Exhibits A–6–A-7 § 25; Yanez Decl., Exhibit A (Terms of Use Version 8) § 25.

Migration; and (iii) post-petition statements and filings in these cases made by the Debtors,

through their representatives and advisors, including, without limitation, sworn declarations of

the Debtors' officers, periodic reporting, schedules of assets and liabilities, and pleadings related

to the sale of the assets of the GK8 Entities (as defined below) – none of which show any

significant Customer liabilities at any entity other than LLC.

6.      Accordingly, although the Limitation of Liability expressly and unambiguously

carves Affiliates of LLC ***out*** of Customer liability, even if the Terms of Use are determined to be

ambiguous as to the Briefed Legal Issue, substantial evidence supports the Series B Preferred

Holders' uniquely reasonable interpretation of the Terms of Use: that neither CNL nor LLC's

other Affiliates are liable to Customers thereunder.

### Factual Background

7.      While the Series B Preferred Holders assert that, under applicable law, the clear

and unambiguous text of the Terms of Use provides that only LLC is liable to Customers, the

Series B Preferred Holders nevertheless include a recitation of certain facts relevant to, and in

support of their interpretation of, the Briefed Legal Issue.

**I.      The Terms of Use**

8.      Prepetition, Customers accessed the Debtors' cryptocurrency services through its

web interface or mobile application (together, the "Platform").  There were eight iterations of the

Terms of Use from February 1, 2018 to the Petition Date.[10]  Customers' use of the Platform was

---

[10]    *See* TOU Decl. ¶¶ 4-13.  The Debtors set forth the effective period for versions 1 through 8 of the Terms of Use in paragraph 12 of the Blonstein Declaration.  A superseding version of the Terms of Use was adopted on September 29, 2022.  *See Terms of Use (Last Revised: September 29, 2022)*, Celsius, https://celsius.network/terms-of-use.

"expressly conditioned on consent to being bound by" the Terms of Use.[11]  Upon creating an

account, Customers were required to view, agree to, and digitally execute the then-current

version of the Terms of Use as a prerequisite to accessing the Platform.[12]

### A.    Terms of Use Versions 1 Through 5

9.      From February 1, 2018 through July 21, 2021, versions 1 through 5 of the Terms

of Use governed the Customers' use of the Platform.  In each of those versions, the Customers'

contract counterparty was CNL.[13]  Versions 1 through 5 expressly provided that: (i) the Debtors

could unilaterally update the Terms of Use; (ii) any such subsequent version would "supersede"

or "prevail" over all prior versions; (iii) the Customers' continued use of the Platform constituted

acceptance of the superseding Terms of Use; and (iv) if a Customer did not agree with a change

to the Terms of Use, they could close their account before the effective date of the change, which

would be their sole remedy.[14]

### B.    Terms of Use Versions 6 Through 8

10.     On January 10, 2020, the financial services regulator of the United Kingdom

("UK"), the Financial Conduct Authority (the "FCA"), began requiring certain cryptocurrency

---

[11]   *Declaration of Christopher Ferraro, Interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer of the Debtors, in Support of the Debtors' Motion Regarding Ownership of Earn Assets and the Sale of Stablecoin* [Dkt. No. 1326] (the "Ferraro Decl.") ¶ 23.

[12]   *Id.* ¶ 22; TOU Decl. ¶ 14.

[13]   *See* TOU Decl., Exhibits A-1 at 1, A-2–A-5 § 1 (stating, in substance, that CNL was providing the Terms of Use that apply to the Customers).

[14]   *See, e.g., id.*, Exhibits A-1 at 4, A-2 § 31, A-3–A-5 § 32; *see also Debtors' Amended Motion for Entry of an Order (I) Establishing Ownership of Assets in the Debtors' Earn Program, (II) Permitting the Sale of Stablecoin in the Ordinary Course and (III) Granting Related Relief* [Dkt. No. 1325] (the "Am. Stablecoin Motion"), Exhibit C (compiling modification provisions of versions 1-8 of the Terms of Use); Ferraro Decl. ¶ 23 ("[E]very version of the Terms of Use includes one or more provisions authorizing the Debtors to make unilateral updates [there]to."); Blonstein Decl. ¶ 15 ("The Terms of Use provide that [Customer]s' continued use of the Debtors' platform following the posting of revised Terms of Use will be treated as acceptance of any revisions to the Terms of Use.").

firms to register with the FCA by January 2021.[15]  In December 2020, cryptocurrency firms that

had applied for registration, including CNL, were granted temporary registration through July 9,

2021 to continue trading pending full authorization.[16]

11.    On June 23, 2021, however, CNL announced that, due to the "increased

regulatory uncertainty" in the UK, CNL was "migrating [its] main business activity and

headquarters from the [UK] to the United States and where applicable, to several other

jurisdictions" and withdrawing from the FCA registration process in the UK.[17]

12.    One month later, on July 22, 2021, the Debtors adopted Terms of Use Version 6,

changing the entity providing services to Customers from CNL to LLC to reflect the Migration.[18]

As explained by the Debtors, "[t]he Terms of Use Version 6 were implemented in response to,

among other things, significant changes that were made as a result of a change of the legal entity

---

[15]    *See* The Money Laundering and Terrorist Financing (Amendment) Regulations 2019 (UK),
https://www.legislation.gov.uk/uksi/2019/1511/made; FCA Press Release, *FCA becomes AML and CTF
supervisor of UK cryptoasset activities* (January 10, 2020), https://www.fca.org.uk/news/news-stories/fca-
becomes-aml-and-ctf-supervisor-uk-cryptoasset-activities.

[16]    *See* FCA Press Release, *FCA establishes Temporary Registration Regime for cryptoasset businesses* (December
16, 2020), https://www.fca.org.uk/news/press-releases/fca-establishes-temporary-registration-regime-
cryptoasset-businesses; *see also* @Mashinsky, TWITTER (Jan. 12, 2021 6:52PM),
https://twitter.com/mashinsky/status/1349142305689767936?s=46&t=3JF7_2d0lA0Tse6p1UER-g ("Good to be
on the FCA provisional list.").

[17]    *See Celsius Community Update — June 23, 2021*, CELSIUS, https://celsiusnetwork.medium.com/celsius-
community-update-june-23-2021-a28fca899091.  *See also infra* n.18; TOU Decl. ¶ 11 (describing the transfer
as "moving those cryptocurrencies from being held by [CNL] in the [UK] to being held by [LLC] in the United
States").

[18]    *See* "Celsius Community Update — July 22, 2021," attached as Exhibit A-3 to the Blonstein Declaration, which
states that "[l]ast month, Celsius announced its plans to migrate its core business from Celsius' UK entity
(C[NL]) to the US entity ([]LLC). As of July 22, 2021, we have updated our Terms of Use and Privacy Policy
for all Celsius customers to reflect this migration. The main changes to our Terms of Use include: Your
engagement will be with Celsius Network LLC, A Delaware company; Your relationship with us will be subject
to the governing laws of New York . . . ."  *See also* internal e-mail, attached as Exhibit A-3 to the Blonstein
Declaration, which states that "[w]e have initiated a Terms of Use and Privacy Policy update for all Celsius
customers that reflect the migration from Celsius' UK entity (C[NL]) to the US entity ([]LLC)."

where the majority of Debtors' cryptocurrencies were held—moving those cryptocurrencies from being held by [CNL] in the United Kingdom to being held by . . . LLC in the United States."[19]

13.    In addition to replacing CNL as the entity providing services to the Customers and changing the governing law, Terms of Use Version 6 provided, among other things, that: (i) any amended version of the Terms of Use superseded all prior versions; (ii) Customers' continued use of the Platform following any amendment to the Terms of Use constituted acceptance of the superseding version; and (iii) if notice of any change to the Terms of Use was given to the Customer and a Customer did not agree with such change, the Customer's "sole remedy" was to "close [their] Celsius Account."[20]  Finally, version 6 included the Limitation of Liability that expressly excluded LLC's Affiliates – *i.e.*, CNL and others – from any liability to Customers.

14.    Customers were informed of the significant changes effected by Terms of Use Version 6 in several ways.  Customers were advised *via* email that (i) their engagement from then on would be with LLC rather than with CNL and (ii) the relationship would be governed by New York, rather than UK, law.[21]  The email instructed Customers to "carefully read and make sure" they understood the new contractual arrangements, including the fact that ***their***

---

[19]   TOU Decl. ¶ 11; *see also* July 18, 2022 Hearing Tr. at 31:20-32:3 (Debtors explaining that "[u]p until August of 2021 . . . [CNL] was the customer-facing party for the retail depositors": and ever since "August of last year, [when] [CNL] transferred the existing customer accounts to . . . LLC[,] . . . any new accounts were open[ed] by . . . LLC"); Blonstein Decl. ¶ 6 ("Terms of Use Version 6 was implemented in response to, among other things, the transfer of certain assets and liabilities from [CNL] to . . . LLC.").  Specifically, the changes reflected in Terms of Use Version 6 include, without limitation, changing the introduction to refer to LLC and its Affiliates, rather than refer to CNL, and specifying that certain services provided in connection with specific "Eligible Digital Assets listed on Appendix A are provided by the Affiliate Celsius EU UAB, a limited liability company incorporated in Lithuania."  TOU Decl., Exhibit A-6 § 1.

[20]   *Id.* § 31.

[21]   *Id.*, Exhibit K (example email to Customers); *see also* Blonstein Decl., Exhibits A-2–A-4 (same); *id.* ¶ 17 (explaining Debtors' outreach to existing Customers in connection with the implementation of Terms of Use Version 6).

*"engagement will be with [LLC.]"*[22]  The email further informed Customers that if they did not

accept the superseding Terms of Use by August 5, 2021, they would lose access to the Platform

and, if they did not consent to the superseding Terms of Use by August 19, 2021, they would no

longer be eligible to earn rewards.[23]  The email further instructed Customers who did not agree

to the superseding Terms of Use that they could "withdraw [their] funds and close [their]

account."[24]

15.    The Debtors also announced Terms of Use Version 6 *via* pop-up communications

on both the web browser and mobile application that required Customers to accept Terms of Use

Version 6 on the Platform.[25]  These pop-up communications similarly informed Customers of the

significant changes to the Terms of Use, including the "[c]hange of legal entity [to LLC], a

Delaware Company," and included links to the superseding version of the Terms of Use.[26]

Customers were required to click a check-box to (i) "acknowledge that **under the new [Terms of**

**Use], the services will be provided to me by [LLC], and that [CNL] shall transfer to [LLC] my**

**data, account balance, and its rights and obligations to me**," and (ii) "Agree" to accept the

superseding Terms of Use.[27]

16.    As previously mentioned, if an existing Customer failed to accept the superseding

Terms of Use by August 5, 2022, the Customer's account was suspended and such Customer was

prevented from using the Platform.[28]  These Customers could view their account dashboards, but

---

[22]    TOU Decl., Exhibit K (emphasis added); *see also* Blonstein Decl., Exhibits A-2–A-4.

[23]    *Id.*

[24]    *Id.*

[25]    *See* Blonstein Decl. ¶ 18.

[26]    *Id.*, Exhibits A-7 and A-9; Yanez Decl., Exhibit B (same).

[27]    *Id.* (emphasis added).

[28]    *Supplemental Declaration of Oren Blonstein, Head of Innovation and Chief Compliance Officer of the Debtors, in Support of the Debtors' Motion Regarding Ownership of Earn Assets and the Sale of Stablecoin* [Dkt. No.

could not conduct any transactions.[29]  Customers were notified, *via* (i) e-mail; (ii) push

notification; and (iii) on-Platform pop-ups on the web browser and the mobile application, of the

account suspensions and, again, were reminded repeatedly throughout August 2021 to accept the

superseding Terms of Use to regain access.[30]  Finally, on August 19, 2021, the accounts of

Customers who had not accepted the superseding Terms of Use stopped earning rewards.[31]  As

discussed below, on or about that same day, the Customer-facing business (and its corresponding

obligations) was transferred from CNL to LLC.[32]  Following the Migration and implementation

of Terms of Use Version 6, on August 22, 2021, Celsius withdrew its application from the

FCA's registration regime.[33]

17.    Of all Customers listed on the Debtors' Schedules (defined below), 55% first

accepted a version of the Terms of Use earlier than version 6, and would therefore have seen

these pop-up notifications and been required to affirmatively accept the transfer of Customer

obligations from CNL to LLC when they logged into their accounts around July 22, 2021.[34]  The

remaining 44% of the scheduled Customers opened their accounts after Terms of Use Version 6

---

1584] (the "<u>Supp. Blonstein Decl.</u>") ¶ 11.  On August 3, 2021, Terms of Use Version 7 was published, which included "only minor updates to grammar and language that did not materially alter the Terms."  *Id.*,¶ 10. Customers who had not accepted Terms of Use Version 6 prior to the publication of Terms of Use Version 7 were required to accept Terms of Use Version 7 through the same process as the change from Terms of Use Version 5 to Terms of Use Version 6.  *Id.* ¶ 11.

[29]    Blonstein Decl. ¶ 19.

[30]    *Id.* ¶ 17.

[31]    *Id.* ¶ 19.

[32]    *Supra* n.17; *see also* Novation Agreement, attached as Exhibit C to the Yanez Declaration, at 1 (describing the Migration and novation to Terms of Use Version 6 and providing that CNL transfers Customer assets and liabilities to LLC).  Indeed, the Debtors describe the Migration in part as "the transfer of certain assets and liabilities from [CNL] to [LLC]."  Blonstein Decl. ¶ 16.

[33]    *Supra* n.17.

[34]    *See* Blonstein Decl. ¶ 14.

was implemented and accepted the version of the Terms of Use (including the Limitation of Liability) in effect at the time of creating their accounts.[35]

18.     The key dates of the Migration and the process for effectuating the implementation of Terms of Use Version 6 are summarized below:[36]



19.     Terms of Use Version 8 was adopted on April 14, 2022 and was in effect on the Petition Date,[37] making it the relevant version for the Briefed Legal Issue.[38]  Notably, as is relevant to the Briefed Legal Issue, there were no material changes, including to the Limitation of Liability provision, in the Terms of Use between versions 6, 7, and 8.

## II.    Celsius Mining LLC

20.     Following the Migration, in 2021 and early 2022, there were efforts to raise capital for CNL's wholly-owned subsidiary, Celsius Mining LLC ("Mining"), which reportedly

---

[35]    *Id.*  The Debtors were unable to locate records for which version of the Terms of Use 1% of Customers first accepted.  *Id.*

[36]    As an aside, the implementation of Terms of Use Version 6 predated the consummation of the equity investment in CNL by the Series B Preferred Holders by approximately five months.

[37]    TOU Decl. ¶ 13.

[38]    The Debtors conceded as much.  *See* Am. Stablecoin Motion ¶¶ 17 n.7, 39 ("[T]he version of the Terms of Use in effect as of the Petition Date is the relevant version for evaluating [the contract].").  *See also* § I.A. herein.

operates "one of the largest crypto mining enterprises in the United States"[39] and is not a part of retail Customer-facing activities. In connection with these fundraising efforts, CNL and its advisors made presentations to potential investors that disclosed, among other things, Mining's balance sheet and annual reports (approved by Mining's Board of Directors), which contained financial statements for Mining.[40] There was no report of Customer liabilities at Mining in any of these marketing materials.

21.    Then, in connection with a contemplated IPO for the mining business, CNL and its advisors prepared additional materials and submitted Mining's confidential Form S-1 Registration Statement (the "Mining S-1") to the United States Securities and Exchange Commission.[41] The Mining S-1 describes Mining as a "standalone entity" with operations that were "segregated into a new company formed in 2020."[42] Notably, none of the documents submitted in connection with the IPO reports any Customer liability or any potential contingent liability at Mining.[43]

---

[39]    Mashinsky Decl. ¶ 65; *see also* July 18, 2022 Hearing Tr. at 31:12-14.

[40]    *See* Mining Executive Summary, Fall 2021 Presentation, attached as Exhibit D to the Yanez Declaration; Mining Transaction & Business Update Presentation, dated January 2022, attached as Exhibit E to the Yanez Declaration.

[41]    *See, e.g.*, Board Discussion Presentation, dated May 2022, attached as Exhibit G to the Yanez Declaration, at 148-171 (providing an overview of the IPO and process updates related thereto); IPO Kick-Off Materials, dated October 20, 2021, attached as Exhibit H to the Yanez Declaration; *see also* Mining S-1, dated February 14, 2022, the relevant portions of which are attached as Exhibit I to the Yanez Declaration. Although Celsius Mining Inc. is the entity named on the cover of the Mining S-1, "[b]ecause Celsius Mining Inc. will have no interest in any operations, other than those of Celsius Mining LLC, the historical financial information included in [the Mining S-1] is that of Celsius Mining LLC." *Id.* (Mining S-1) at iii.

[42]    *See* Yanez Decl., Exhibit I (Mining S-1) at 1; *see also*, *Celsius Network Announces Confidential Submission of Draft Registration Statement by Bitcoin mining subsidiary, Celsius Mining LLC*, PRNEWSWIRE (May 16, 2022), https://www.prnewswire.com/news-releases/celsius-network-announces-confidential-submission-of-draft-registration-statement-by-bitcoin-mining-subsidiary-celsius-mining-llc-301547547.html.

[43]    Additionally, at the first-day hearing, the Debtors represented that, as of the Petition Date, "Mining owes approximately $576 million" to CNL. July 18, 2022 Hearing Tr. at 32:6-13. There was no mention of Mining also owing billions of dollars to Customers.

III.    **Chapter 11 Cases**

22.    The Debtors – through their representatives and advisors – have repeatedly made

statements and filed documents in these chapter 11 cases consistent with the Limitation of

Liability – *i.e.*, that indicate the absence of any Customer liability at any entity other than LLC –

including:

- Statements by the Debtors' counsel at the first day hearing, July 18, 2022, that LLC is the entity that does business with retail Customers;[44]

- The Mashinsky Declaration, indicating that Mining owed $576 million to CNL as of May 31, 2022, while not referencing any Customer liabilities at Mining;[45]

- The *Periodic Report Regarding Value, Operations, and Profitability of Entities in Which the Debtor's Estate Holds a Substantial or Controlling Interest* [Dkt. No. 850] (the "Non-Debtor Report"), listing liabilities of the Debtors' non-Debtor affiliates in amounts that are inconsistent with such affiliates having liability for Customer claims;[46]

- Monthly Operating Reports (each, a "MOR") for July and August 2022 [Dkt. Nos. 858–873] (the "July and August MORs"), listing liabilities of the Debtors other than LLC in amounts that are inconsistent with such Debtors having liability for Customer claims;[47]

- The Schedules of Assets and Liabilities (collectively, the "Schedules"),[48] including the "Global Notes and Overview of Methodology" attached to the Schedules (the "Global Notes"), noting that Customers should not rely on the scheduling of Customer claims at each Debtor (*see* Global Notes § 2) and

---

[44]    *See Id.* at 31:6-8.

[45]    *See* Mashinsky Decl. ¶ 68.

[46]    *See* Non-Debtor Report at 6.

[47]    *See* July and August MORs at 18.

[48]    The Schedules include the (i) Schedules for LLC [Dkt. No. 974] (the "LLC Schedules"), (ii) Schedules for CNL, Case No. 22-10966 [Dkt. No. 7] (the "CNL Schedules"), and (iii) Schedules for Celsius US Holding LLC, Case No. 22-10971 [Dkt. No. 5], Celsius Networks Lending LLC, Case No. 22-10969 [Dkt. No. 5], Celsius Network Inc., Case No. 22-10965 [Dkt. No. 6], Mining, Case No. 22-10968 [Dkt. No. 5], Celsius Lending LLC, Case No. 22-10970 [Dkt. No. 5], and Celsius KeyFi LLC, Case No. 22-10967 [Dkt. No. 5] (collectively with the CNL Schedules, the "Non-LLC Schedules").

failing to list versions 6 through 8 of the Terms of Use as executory contracts of any Debtor other than LLC;[49]

- An Asset Purchase Agreement, dated as of December 2, 2022, for the sale of the assets of GK8 Ltd. and the other sellers named therein (collectively, the "GK8 Entities") [Dkt. No. 1586] (the "GK8 APA"), which does not contain provisions that would be expected if there were a possibility that the GK8 Entities had liability for Customer claims, including, for example, listing Customer liabilities as "Excluded Liabilities"; and

- Voluntary petitions for chapter 11 relief for each of the GK8 Entities (collectively, the "GK8 Petitions") that do not list Customer claims as any of their top 20 unsecured claims.[50]

## Argument

## I. The Terms of Use Unambiguously Limit Customer Liabilities to LLC.

### A. Version 8 of the Terms of Use Is the Relevant Version for the Determination of the Briefed Legal Issue.

23. As acknowledged by the Debtors, Terms of Use Version 8 "govern[s] all customer claims in these chapter 11 cases."[51] As is relevant to this Briefed Legal Issue, however, Terms of Use Version 8 is no different than versions 6 and 7 – including the terms of the Limitation of Liability provision.

24. The Debtors have reported that 90.06% of their scheduled Customers, representing 99.86% of "Earn Program Liabilities," accepted Terms of Use Version 6 or a later version.[52] Customers who opened accounts prior to the adoption of Terms of Use Version 6 were required to "affirmatively accept" Terms of Use Version 6, which superseded their existing contract.[53] If Customers did not agree with any change, their "sole remedy" was to "close [their]

---

[49] *See* Non-LLC Schedules at Schedule G.

[50] *See* GK8 Petitions at 8.

[51] *Debtors' Reply in Support of [Am. Stablecoin Motion]* [Dkt. No.1578] ¶ 20; *see also supra* n.38.

[52] Blonstein Decl. ¶ 20.

[53] *Id.* ¶ 16; Am. Stablecoin Motion ¶ 25.

Celsius Account(s) and demand repayment of outstanding loans before the effective date of the change."[54]  Depending on the time they joined, Customers joining after the roll-out of Terms of Use Version 6 were required to accept either version 6, 7, or 8 to use the Platform.[55]  Indeed, the Committee has acknowledged that, at a minimum, Terms of Use Version 6 is binding on the 55% of Customers, who first accepted version 1, 2, 3, 4, or 5 of the Terms of Use, but agreed to Terms of Use Version 6 when it was implemented.[56]  The remaining 44% of Customers first accepted version 6, 7, or 8 of the Terms of Use (whichever was in effect when they created their respective accounts).[57]

### B.    The Limitation of Liability Provision in the Terms of Use Unambiguously Excludes LLC's Affiliates From Liability to Customers.

25.    Under New York law,[58] when interpreting a contract, "words and phrases are given their plain meaning."  *Krumme v. Westpoint Stevens Inc.*, 238 F.3d 133, 139 (2d Cir. 2000) (internal quotation marks and citation omitted).  In addition "[e]ffect and meaning must be given to every term of the contract, and reasonable effort must be made to harmonize all of its terms." *India.com, Inc. v. Dalal*, 412 F.3d 315, 323 (2d Cir. 2005) (internal quotation marks and citations omitted).  Section 25 of the Terms of Use – the Limitation of Liability – specifically provides that Customers do ***not*** have recourse against LLC's Affiliates, including CNL, the GK8 Entities,

---

[54]    TOU Decl., Exhibit A-6.  Version 7 and 8 of the Terms of Use include the same language.  *Id.*, Exhibit A-7 § 31; Yanez Decl., Exhibit A (Terms of Use Version 8) § 31.

[55]    TOU Decl. ¶ 14.

[56]    *See The Official Committee of Unsecured Creditors' Limited Objection with Respect to the [Am. Stablecoin Motion]* [Dkt. No. 1502] ¶ 41 (noting that Terms of Use Version 6 is binding on Customers who had accounts prior to July 22, 2021 and accepted Terms of Use Version 6 because they had "adequate notice . . . of the revisions to [v]ersion 6 of the Terms or Use").

[57]    Blonstein Decl. ¶ 14.  There is no record located for which version of the terms of use 1% of Customers first accepted.  *Id.*

[58]    The Terms of Use are governed by New York law.  *See* Yanez Decl., Exhibit A (Terms of Use Version 8) § 33.

Mining, and Celsius Mining IL Ltd.[59]  That provision plainly states that "***in no event shall [the Customer] have any recourse***, whether by setoff or otherwise, with respect to our obligations, ***to or against any assets of any person or entity*** other than Celsius, ***including*** . . . ***any*** member, shareholder, ***Affiliate***, investor, employee, officer, director, agent or advisor of Celsius."[60]

26.     The language in section 25 of the Terms of Use is plain and should be given its ordinary meaning.  The use of "Celsius" in section 25 must be read to be limited to LLC, as that is the entity that has "obligations" to Customers, leaving CNL and other Affiliates free from Customer liabilities.

27.     The Debtors and the Committee argue that Customers have claims against every entity in the Debtors' corporate structure because the Terms of Use define "Celsius" in their opening line to encompass LLC "and its Affiliates."[61]  This interpretation nullifies the carve out from liability to Customers by the plain reading of the Limitation of Liability provision.  The Debtors and the Committee cannot simply ignore that carveout; it must have meaning.  *See Bank of N.Y. Mellon Tr. Co., Nat'l Ass'n v. Solstice ABS CBO II, Ltd.*, 910 F. Supp. 2d 629, 648-49 (S.D.N.Y. 2012) ("[A]n interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.") (internal quotation marks and citations omitted); *Corhill Corp. v. S.D. Plants, Inc.*, 9 N.Y.2d 595, 599, 217 N.Y.S.2d 1, 3, 176 N.E.2d 37, 38 (1961); *Ally Fin. Inc. v. Wells Fargo Bank, N.A.* (*In re Residential Cap., LLC*), 531 B.R. 25, 42–43 (Bankr. S.D.N.Y. 2015).

---

[59]   *Supra* n.5-6.

[60]   Yanez Decl., Exhibit A (Terms of Use Version 8) § 25 (emphasis added).

[61]   *The Official Committee Of Unsecured Creditors' Objection to the Motion Of Community First Partners, LLC, Celsius SPV Investors, LP, Celsius New SPV Investors, LP, and CDP Investissements Inc. for Entry of an Order Directing the Appointment of an Official Preferred Equity Committee* [Dkt. No. 1048] ¶ 27; *Debtors' Objection to Motion for Entry of an Order Directing the Appointment of an Official Preferred Equity Committee* [Dkt. No. 1045] ¶ 32.

28.    Moreover, the Debtors' and the Committee's interpretation fails to comply with
the well-settled principle of contract interpretation that "if there [i]s an inconsistency between a
specific provision and a general provision of a contract . . . , the[] specific provision controls."
*DBT GmbH v. J.L. Mining. Co.*, 544 F. Supp. 2d 364, 377–78 (S.D.N.Y. 2008) (internal citation
omitted); *U.S. Bank Trust Nat'l Ass'n v. AMR Corp.* (*In re AMR Corp.*), 730 F.3d 88, 99 (2d Cir.
2013) (noting that a "specific provision . . . governs the circumstance to which it is directed, even
in the face of a more general provision") (internal quotation and citation omitted).  Here, even
though LLC's Affiliates are purportedly included in the expansive definition of "Celsius," the
Limitation of Liability – which specifically addresses liability for the obligations owed to
Customers – unequivocally states that Customers have no recourse against Affiliates (among
others).  Thus, contrary to the Debtors' and the Committee's assertion, the general definition of
"Celsius" must be read to be only LLC in section 25 to give effect to this more specific provision
and, in any event, is limited thereby.  *See, e.g.*, *In re Sears Holding, Corp.*, No. 21-CV-5437-
NSR, 2022 WL 4482375, at *4 (S.D.N.Y. Sept. 27, 2022) (holding that the broad, general
definition of the term "Liability," which included every possible "claim" and "action," was
necessarily limited by the more specific provision that expressly listed certain excluded
liabilities).

29.    The Debtors' and the Committee's interpretation of the Terms and Use is
unreasonable because it would render certain provisions thereof, including the Limitation of
Liability provision, meaningless and/or superfluous and, thus, should not be adopted by the
Court.[62]  Unlike the Debtors' and the Committee's interpretation, the Series B Preferred Holders'

---

[62]    The Debtors' and the Committee's interpretation would also render other provisions meaningless or
superfluous.  For example, in discussing "CELSIUS' CUSTODY SERVICE," the Terms of Use refer to
"Eligible Digital Assets . . . loaned by the User to Celsius"; but CNL, GK8, Mining, and certain other Affiliates
do not provide the Custody Service nor receive loans from Customers.  In Section 4(f) ("CelPay"), the Terms of

interpretation of the Terms of Use gives meaning to the liability carveout and, as discussed

below, is consistent with the clear intention to exclude CNL and other Affiliates of LLC from

liability to Customers under the Terms of Use starting with version 6 thereof, as well as with the

Debtors' and Customers' actions to date.

30.    A contract is not ambiguous where one party's interpretation "strain[s] the

contract language beyond its reasonable and ordinary meaning." *Fed. Ins. Co. v. Am. Home

Assur. Co.*, 639 F.3d 557, 568 (2d Cir. 2011) (internal quotation marks and citations omitted).

The Debtors' and the Committee's interpretation strains the Limitation of Liability beyond its

"reasonable and ordinary meaning" and, therefore, does not create an ambiguity in the Terms of

Use.  Where another plausible interpretation is lacking, there is no ambiguity.  Consequently, the

plain language of the Limitation of Liability must be enforced.

**II.    Extrinsic Evidence Indicates That the Parties Intended to Exclude LLC's Affiliates
From Liability on Customer Claims**.

31.    "The question of whether a written contract is ambiguous is a question of law for

the court." *Roberts v. Weight Watchers Int'l, Inc.*, 712 F. App'x 57, 59 (2d Cir. 2017) (quoting

*JA Apparel Corp. v. Abboud*, 568 F.3d 390 (2d Cir. 2009)).  When a contract is found to be

ambiguous, "extrinsic evidence may properly be considered in the search for the contracting

parties' intent." *Seiden Assocs. v. ANC Holdings, Inc.*, 959 F.2d 425, 429 (2d Cir. 1992)*; see

also Faulkner v. Nat'l Geographic Soc'y.*, 452 F. Supp. 2d 369, 375, 377–79 (S.D.N.Y. 2006)

(finding the contract ambiguous and analyzing different types of evidence to ascertain intent); *In

Time Prods., Ltd. v. Toy Biz, Inc.*, 38 F.3d 660, 665 (2d Cir. 1994) (noting that a district court

---

Use provide that "Customers "authorize Celsius *or its Affiliates* to deduct such amounts of Eligible Digital
Asset as you instruct us to transfer," seemingly authorizing Affiliates of LLC's Affiliates to deduct from
Customer accounts; however, the Debtors have not shown (and cannot show) that there are any Affiliates of
LLC's Affiliates. *See* Yanez Decl., Exhibit A (Terms of Use Version 8) § 4(f) (emphasis added).

may consider extrinsic evidence to resolve an ambiguity in a contract); *Freedberg v. Landman*,

930 F. Supp. 851, 855 (E.D.N.Y. 1996) ("Where the meaning of a word or phrase is ambiguous,

a court may look beyond the 'four corners' of the agreement and 'examine the record as a whole

in an attempt to interpret the agreement so as to effectuate the intent of the parties.'" (quoting

*Bank of New York v. Amoco Oil Co.*, 35 F.3d 643, 661 (2d Cir. 1994))), *aff'd*, 112 F.3d 503 (2d

Cir. 1996).

32.    Here, although the plain reading of the Limitation of Liability provision

unambiguously limits Customer liability to LLC, and not CNL, if this Court determines that the

Terms of Use are ambiguous on this point, the extrinsic evidence also supports the Series B

Preferred Holders' reasonable interpretation.  In fact, it is only when addressing the Briefed

Legal Issue that the Debtors adopt the erroneous interpretation of the Terms of Use they

champion here; elsewhere, their documents, statements, and actions largely support the Series B

Preferred Holders' interpretation – and the plain meaning – of the Terms of Use.

**A.    The Debtors' Statements and Actions Indicate Their Intent to Limit
Customer Liability to LLC**.

**1.    The Debtors' Statements and Actions in Connection With the
Migration Indicate Intent to Transfer Customer Liabilities From
CNL to LLC**.

33.    As discussed above, the Debtors conceded on more than one occasion that the

Migration was completed in response to the changes in UK regulatory regime.[63]  One week

before the start of the Migration, CNL reported to potential investors that post-Migration, CNL

---

[63]    *See, e.g.*, *Celsius Community Update — June 23, 2021*, CELSIUS, https://celsiusnetwork.medium.com/celsius-community-update-june-23-2021-a28fca899091 ("Due to the increased regulatory uncertainty happening in the UK today. . . we will be migrating our main business activity and headquarters from the United Kingdom to the United States . . . [and] have chosen to withdraw our application from the UK Financial Conduct Authority's (FCA) temporary registration regime for crypto asset firms."); Yanez Decl., Exhibit C (Novation Agreement) at 1 ("[CNL] has, based on input received from the applicable regulatory bodies in the United Kingdom, and following input and advice of counsel, determined to stop providing services to or contracting with the [Customers].").

would no longer provide services to the Customers, and LLC would be the primary contracting counterparty for Customer-facing activities,[64] presumably to ensure that CNL would not be in violation of UK cryptocurrency regulations.  Indeed, CNL described the Migration to its Board of Directors as a way to comply with the FCA's requirements to stop "providing [its] customer-facing services from the UK."[65]

34.    Further, the simultaneous roll-out of Terms of Use Version 6 included a rigorous outreach effort "[b]ecause it was a material change in [that] customers had previously been customers of . . . the UK entity, and that was being transferred to the U.S. entity."[66] Accordingly, Customers were told repeatedly, and specifically required to accept, that:

- Customers' relationship will now be with LLC, *not CNL*, and subject to the governing laws of New York (not UK);

- "under the new T[erms of Use], the services will be provided to [Customers] by . . . LLC"; and

---

[64]    *See* Celsius Network – Organizational Chart as of 7/15/2021, attached as Exhibit J to the Yanez Declaration, at 2 ("[CNL] is currently the primary operational and contracting entity in the structure. Currently, [CNL] is the one engaging with all customers world-wide, but *as part of the planned migration . . . , this will cease to be the case* and *[CNL] will no longer be providing customer facing services following the migration*. . . . [LLC] is a newly formed entity in the U.S. which will be the primary operational and contracting entity post-migration for retail user-facing activities.") (emphasis added).  *See also id.*, Exhibit C (Novation Agreement) at 1.

[65]    *See* Yanez Decl., Exhibit G (Board Discussion Presentation) at 139.  On August 19, 2021, consistent with the implementation of Terms of Use Version 6,  CNL similarly amended its Omnibus Wallet Service Agreement with Voyager Digital LLC, a contract that gave Voyager users the ability to earn rewards on the cryptocurrencies in their wallets. *Declaration of Christopher Ferraro in Support of Motion of Celsius Network LLC for Order (I) Lifting the Automatic Stay Pursuant to 11 U.S.C. 362(d)(1) and Bankruptcy Rule 4001 and (II) Granting Leave to File Late Proof of Claim Pursuant to Bankruptcy Rules 3003(c) and 9006(b)(1)*, Case No. 22-10943 (MEW) [Dkt. No. 729] ¶¶ 4–5.  Through the amendment to the Omnibus Wallet Service Agreement, CNL assigned to LLC and Celsius EU UAB "all of its rights, title and interest under the [Omnibus Wallet Service] Agreement.  Thereafter, [LLC] and Celsius EU UAB assumed *all of [CNL]'s duties and obligations under the Agreement.*"  *Id.* ¶ 5 (emphasis added).

[66]    *See, e.g.*, Transcript of Blonstein Deposition ("Blonstein Depo. Tr."), relevant portions of which are attached as Exhibit K to the Yanez Declaration, at 120:1-8; *id.* 257:8-16 ("I think it was a pretty -- it was a fairly unique situation with Version 6 and 7, because the relationship was changing from the UK to the U.S., and . . . we were not supposed to be . . . offering services from the UK entity . . . going forward.").

- CNL "shall transfer to . . . LLC [Customers'] data, account balance, and [CNL's] rights *and obligations* to [the Customer]."[67]

35.    The communications with Customers regarding Terms of Use Version 6 are consistent with the Series B Preferred Shareholders' interpretation of section 25 of the Terms of Use.  The communications advise Customers that LLC will be providing services to Customers and will be taking on the obligations to Customers.  As noted above, section 25 is limiting liability for obligations to Customers.  The only entity that should not be carved out from liability to Customers is LLC, which took on the obligations to Customers.

      **2.    CNL's Course of Conduct Following the Migration Is Consistent With the Intent to Transfer Customer Obligations From CNL to LLC**.

36.    CNL's conduct following the Migration further evidences intent to relieve CNL of liability to Customers.  For example, an annual report, dated October 8, 2021, and approved for the period ended December 31, 2020, confirms that, beginning on July 22, 2021, the Customers' accounts and Platform activities were migrated from the UK to the U.S.[68]

37.    Further, as stated above, CNL and its advisors prepared and distributed numerous presentations and documents to hundreds of potential investors and/or Mining's Board of Directors in connection with the contemplated capital raise and IPO for the mining business, including presentations containing Mining's balance sheet and the Mining S-1.   None of those presentations and documents reported any Customer liability of Mining.  Moreover, the management presentation to the Board of Directors of their pre-IPO strategy to raise capital for or through Mining included discussions regarding a reverse merger transaction.[69]  This strategy

---

[67]    *See* TOU Decl., Exhibit K (emphasis added); Blonstein Decl., Exhibits A-2-7, A-9, B-2–B-5, C-2–C-4.

[68]    *See* Annual Report and Financial Statements for the Period Ended 31 December 2020, dated October 8, 2021, attached as Exhibit F to the Yanez Declaration, at 4.  Although for the period ended December 31, 2020, the Annual Report summarizes events subsequent to the reporting date.  *Id.*

[69]    *See* Yanez Decl., Exhibit G (Board Discussion Presentation) at 102 ("Build ~$1bn of capital through Mining IPO (~$300mm) and business merger (~$500mm to $1bn opportunity)."), *id.* at 158 ("Reverse Merger-ongoing

would not be feasible had there been any risk that Mining was liable for the billions of dollars of Customer claims.

38.     All of the foregoing statements and actions are consistent with the intent that the Terms of Use limit Customer liability to LLC – the new Customer-facing entity – and that CNL is ***not*** liable on the Customer claims.[70]

### 3.    The Debtors' Conduct in These Cases Indicates They Did Not Intend for LLC's Affiliates to Be Liable for Customer Claims.

39.     Not all entities in the Debtors' corporate structure, each of which would be an Affiliate of LLC, filed for bankruptcy protection.[71]  The failure to commence chapter 11 cases for such entities is also arguably inconsistent with the assertion that all Affiliates are liable for billions of dollars of Customer claims.

40.     Moreover, the Debtors' statements and filings, made under the penalty of perjury or where an officer otherwise had to formally attest to accuracy, indicate that Customers ***do not*** have claims against Debtors other than LLC.

### a.    First Day Hearing

41.     At the first day hearing on July 18, 2022, the Debtors told the Court that "[u]p until August of 2021 . . . [CNL] was the customer-facing party for the retail depositors . . . . In

---

discussions with Mawson on a $25m PIPE as a milestone towards a merger. Beyond the inherent synergies and upside of this merger, it will allow us the flexibility to (i) IPO and then merge stock for stock, or, (ii) reverse into Mawson if IPO markets are not open.").

[70]   Further, there may be additional evidence uncovered in discovery regarding the Debtors' post-Migration treatment of Customer liabilities, including: (i) each Debtor's tax treatment of Customer assets and attendant liabilities; (ii) the consideration provided (or not) to each Debtor for assuming Customer liabilities; (iii) the approval process for implementing any version of the Terms of Use; and (iv) representations made to regulators.

[71]   *See e.g.*, Mashinsky Decl., Exhibit A (Corporate Structure).  The only Affiliates of LLC that have filed for bankruptcy since the Mashinsky Declaration was filed are the GK8 Entities.

21

August of last year, [CNL] transferred the existing customer accounts down to [LLC]."[72]  From

then on, LLC has been "the entity that the retail customers do business with[.]"[73]

### b.    Sworn Statements

42.    On July 14, 2022, the Debtors submitted the Mashinsky Declaration, in which the

Debtors' then-acting Chief Executive Officer, Alex Mashinsky, under penalty of perjury,

described Mining's business and noted that he believed Mining's operations would be able to

generate assets to provide revenue for the Debtors and "generate sufficient assets to repay" the

$576 million it owed to CNL.[74]  Mr. Mashinsky's description of Mining made no mention of any

Customer liabilities, which is incompatible with the Debtors' assertion today that all Debtors are

liable to Customers.

43.    Additionally, the Debtors' Head of Innovation and Chief Compliance Officer,

Oren Blonstein, declared under penalty of perjury that "Terms of Use Version 6 was

implemented in response to, among other things, the transfer of certain assets *and liabilities* from

[CNL] to [LLC]."[75]

### c.    Periodic Reporting

44.    On September 19, 2022, the Debtors filed the Non-Debtor Report, the accuracy of

which was verified by Christopher Ferraro, the Debtors' Chief Financial Officer,[76] to the best of

---

[72]    July 18, 2022 Hearing Tr. at 31:20-32:3.

[73]    *Id.* at 31:6-8.

[74]    *See* Mashinsky Decl. ¶¶ 66-68.

[75]    Blonstein Decl. ¶ 16  (emphasis added); *see also* Blonstein Depo. at 120:1-8, 257:8-16, 180:24-181:3 ("The whole purpose of -- or one of the main purposes of the Version 6 terms of use was changing the company that the customers were engaging with from the UK entity to the U.S. entity.  It was important that we . . . stop providing services to them . . . as a UK company.").

[76]    Christopher Ferraro is now also the Debtors' interim Chief Restructuring Officer and Chief Executive Officer; he is the Chief Financial Officer of GK8 Ltd. and Director of all GK8 Entities.  *See Declaration of Christopher Ferraro, Director and Chief Financial Officer Of GK8 Ltd. in Support of Chapter 11 Petitions and First Day Motions* [Dkt. No. 1629].

his knowledge and under penalty of perjury.[77]  The Non-Debtor Report lists "Accrued Expenses

and Other Long Term Liabilities" for each of the Debtors' non-Debtor Affiliates, which amounts

range from $0 to $221 million as of June 30, 2022.[78]  These amounts are inconsistent with the

assertion that such entities are liable for billions of dollars of Customer claims.  Instead, the Non-

Debtor Report corroborates that not every Affiliate of LLC is liable to Customers.

45.     One day later, on September 20, 2022, under penalty of perjury, the Debtors filed

their respective July and August MORs.[79]  Only the MORs filed for LLC show a multi-billion

dollar Customer liability.[80]  The MORs filed for the other Debtors do not report any such

liability.[81]

### d.     Schedules of Assets and Liabilities

46.     On October 5, 2022, the Debtors filed their Schedules, creating the present

confusion about where Customer claims lie.  Mr. Ferraro, the Debtors' acting Chief Executive

Officer, Chief Restructuring Officer, and Chief Financial Officer, declared under penalty of

perjury that he had a reasonable belief that the information in the Schedules was true and

---

[77]   *See* Non-Debtor Report at 2.

[78]   *Id.* at 6.

[79]   Monthly operating reports in chapter 11 cases are deemed signed under penalty of perjury.  *See Brisman v. Parasram (In re Parasram)*, No. 16-42657-JMM, 2022 WL 16824751, at *1, 15 (Bankr. E.D.N.Y. Nov. 8, 2022) (noting that in the chapter 11 proceeding, "[d]efendant's [s]chedules and monthly operating reports were signed by the Defendant under penalty of perjury"); *In re Menorah Congregation & Religious Ctr.*, 554 B.R. 675, 683 (Bankr. S.D.N.Y. 2016) (stating that monthly operating reports are "required to be filed under penalty of perjury").

[80]   LLC's July and August MORs [Dkt. Nos. 858, 871] at 18.

[81]   *See id.*; LLC's September MOR [Dkt. 1164] at 18; LLC's October MOR [Dkt. No. 1424] at 18; LLC's November MOR [Dkt. No. 1779] at 18.  *Only after* the Series B Preferred Holders pointed this out in their *Reply In Further Support Of The Requesting Holders' Motion For Entry Of An Order Directing Appointment Of An Official Preferred Equity Committee* [Dkt. No. 1120], the Debtors began filing monthly operating reports with a note that this inconsistency is explained by the Global Notes.  *See, e.g.*, LLC's September MOR [Dkt. 1164] at 14; LLC's October MOR [Dkt. No. 1424] at 14; LLC's November MOR [Dkt. No. 1779] at 14.

correct.[82]  While the Schedules listed Customer claims against every Debtor, the Global Notes included a disclaimer indicating that an officer of the Debtors could not declare under penalty of perjury a reasonable belief as to the accuracy of scheduling Customer liabilities at each Debtor.[83]

47.    The Schedules list the Terms of Use as the basis for scheduling Customers' claims at every Debtor.[84]  Yet, the Schedules themselves contradict this.  Significantly, only LLC (and no other Debtor) lists versions 6 through 8 of the Terms of Use as executory contracts to which it is party.[85]  Notably, Schedule G of the CNL Schedules lists the pre-Migration versions of the Terms of Use (*i.e.*, versions 1 through 5) as CNL's executory contracts; the CNL Schedules *do not* list *any* of the post-Migration versions of the Terms of Use, including version 8.  These portions of the Schedules are therefore consistent with LLC being the only Debtor bound by the post-Migration versions of the Terms of Use (*i.e.*, versions 6 through 8) and therefore liable to Customers.[86]

### e.    GK8 Sale

48.    On December 2, 2022, the Debtors filed a copy of the GK8 APA, dated as of December 2, 2022.  The GK8 APA was executed following a sale process during which potential

---

[82]    *See, e.g.*, CNL Schedules, Official Form 202 ("Declaration Under Penalty of Perjury for Non-Individual Debtors").

[83]    *See* Global Notes at 3 ("[I]t is not the intent of the Debtors to create any presumption that account holders have claims against each Debtor entity . . . and no creditor or other party should rely on the fact that the account holder claims are scheduled at each Debtor entity as dispositive as to this legal issue . . . .").

[84]    *See id.* ("The [Terms of Use] are between each [Custom]er, on the one hand, and [LLC] and its "Affiliates," on the other hand . . . This may mean that [Customer]s have claims against every Debtor and non-Debtor entity in the Debtors' corporate structure.").

[85]    LLC Schedules at Schedule G.

[86]    The Schedules also include an approximately $9 billion intercompany claim purportedly due from CNL to LLC as the result of the Migration.  *See id.*, Part 11, Question 77; CNL Schedules at Schedule E/F 3.18.  Had CNL (along with the other Affiliates) been directly liable to Customers, however, an intercompany claim on account of Customer claims would be duplicative.  Regardless of the merits of such intercompany claim, this is yet a further indication that the Debtors do not interpret the Terms of Use as creating (or retaining) CNL's liability to Customers.

buyers were provided with diligence regarding the GK8 Entities.[87]  Section 1.4 of the GK8 APA

provides that the GK8 Buyer (as defined therein) will only assume the "Assumed Liabilities" of

the GK8 Entities and sets forth a list of specifically "Excluded Liabilities."  The list of

"Excluded Liabilities" does not include liabilities to Customers on account of the Terms of Use,

which omission would be inexplicable had the GK8 Buyer determined, in the course of its

diligence, that there was any risk whatsoever that any of the GK8 Entities could have such

liabilities.[88]

49.    On December 7, 2022, to implement the sale of the GK8 Entities, the GK8

Petitions were filed.  Mr. Ferraro, as Director of all GK8 Entities, declared under penalty of

perjury that he had a reasonable belief that the information in the GK8 Petitions was true and

correct.[89]  The GK8 Petitions show no liability to Customers – Official Form 204 attached to the

GK8 Petitions, which lists the non-insider creditors holding 20 largest unsecured claims against

the GK8 Entities on a consolidated basis, does not include a single Customer claim.[90]  Given that

the largest unsecured claim against the GK8 Entities listed in the GK8 Petitions is $63,200 and

the Customer claims listed in the Official Form 204 attached to LLC's *Voluntary Chapter 11

Petition* [Dkt. No. 1] (the "LLC Petition") are in the millions and tens of millions of dollars,

there is no question that Customer claims, if the GK8 Entities were liable thereon, would have

been among the largest 20 unsecured claims against the GK8 Entities.[91]

---

[87]    *See Order (I) Approving Bidding Procedures for the Potential Sale of Certain of the Debtors' Assets, (II)
Scheduling Certain Dates with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV)
Approving Contract Assumption and Assignment Procedures, and (V) Granting Related Relief* [Dkt. No. 687]
§ V.

[88]    *See* GK8 APA § 1.4

[89]    *See* GK8 Petitions § 17.

[90]    *Id.* at 8.

[91]    *See* LLC Petition at 8-13.

**B.    The Customers' Conduct Demonstrates That LLC's Affiliates Are Not Liable to Customers**.

50.    The Customers' conduct to date shows that they expected to have recourse only against LLC.  As discussed above, the 55% of Customers who had accounts prior to the Migration and first accepted one of versions 1, 2, 3, 4, or 5 of the Terms of Use affirmatively agreed to the changes effectuated by Terms of Use Version 6, including, without limitation, LLC becoming their contract counterparty, providing services to the Customers, and assuming all of the obligations owed to Customers.[92]  Indeed, the Debtors and the Committee have acknowledged as much.[93]  The remaining 44%[94] of Customers who created accounts after the Migration and first accepted version 6, 7, or 8 of the Terms of Use (whichever was in effect when they created their accounts) – each of which unambiguously states that Customers shall not have recourse against LLC's Affiliates.[95]  Therefore, virtually all Customers consented to limit their recourse to LLC by either (i) agreeing to Terms of Use Version 6, which superseded their prior contracts, or (ii) first accepting Terms of Use Version 6 or a later version.

51.    Not surprisingly, proofs of claims filed in these cases by Customers and the lawsuits brought by Customers outside of bankruptcy confirm their belief that their sole recourse is against LLC.  For example, prior to entry of the *Order (I) Setting Bar Dates for Submitting Proofs of Claim, (II) Approving Procedures for Submitting Proofs of Claim, (III) Approving Notice Thereof, and (IV) Granting Related Relief* [Dkt. No. 1368], which directed Customers to file claims against all Debtors, approximately 94% of proofs of claim filed by Customers were

---

[92]    Blonstein Decl. ¶ 16.

[93]    Am. Stablecoin Motion ¶ 25 (noting that Customers were required to "affirmatively accept" Terms of Use Version 6, "thus replacing their existing contract"); *supra* n.13.

[94]    There is no record located for which version of the terms of use 1% of Customers first accepted.  Blonstein Decl. ¶ 14.

[95]    TOU Decl., Exhibits A-6–A-7 § 1; Yanez Decl., Exhibit A (Terms of Use Version 8) § 1.

filed solely against LLC and less than 1% were filed against CNL.[96]  Additionally, prepetition

lawsuits brought by certain Customers name only LLC as defendant.  *See, e.g.*, *Matthias Gallas*

*v. Celsius Network LLC*, No. CSM-22-865784 (Cal. Super. Ct. filed June 30, 2022); *Hanson*

*Wong v. Celsius Network, LLC*, No. 22-SCS-00431 (Cal. Super. Ct. filed June 27, 2022);

*Benjamin Guild v. Celsius Network LLC*, No. 22SC087505 (Cal. Super. Ct. filed June 22, 2022).

The Series B Preferred Holders are not aware of any such lawsuits brought against CNL.

III.    **Customers Released CNL From Liability by Agreeing to Terms of Use Version 6**.

52.    It is "well settled that where the parties have clearly expressed or manifested their

intention that a subsequent agreement supersede or substitute for an old agreement, the

subsequent agreement extinguishes the old one and the remedy for any breach thereof is to sue

on the superseding agreement."  *Northville Indus. Corp.*, 100 A.D.2d at 867 (internal quotation

and citation omitted); *see also Revonate Mfg., LLC v. Acer Am. Corp.*, 12-CV-6017-KBF, 2013

WL 342922, at *5 (S.D.N.Y. Jan. 18, 2013) (granting a motion to dismiss a claim related to a

prior contract that had been extinguished by superseding contract); *Health-Chem Corp. v. Baker*,

915 F.2d 805, 811 (2d Cir. 1990) ("When the parties to a contract enter into a new agreement

that expressly supersedes the previous agreement, the previous agreement is extinguished,

thereby reducing the remedy for breach to a suit on the new agreement."); *Trudeau v. Google*

*LLC*, 349 F. Supp. 3d 869, 879 (N.D. Cal. 2018), *aff'd Trudeau v. Google LLC*, 816 F. App'x 68

(9th Cir. 2020) (finding novation applied to superseding online terms of service).  "In such cases,

the superseding agreement is a novation[.]"  *Berkshire Bank v. Pioneer Bank*, Nos. 901358-20,

901359-20, slip op. at *18 (N.Y. Sup. Ct. July 1, 2021).[97]  A novation need not be express but

---

[96]    *See* Claims Register at https://cases.stretto.com/celsius/claims/.

[97]    *See also Citigifts, Inc. v. Pechnik*, 67 N.Y.2d 774, 775 (N.Y. 1986) (finding that "there was a novation which
extinguished the old agreement and relegated plaintiffs to an action for breach of the new agreement"); *Leeward
Isles Resorts, Ltd. v. Hickox*, 49 A.D.3d 277, 278 (N.Y. App. Div. 1st Dept. 2008) (holding that a 1989 loan

may be implied from all the facts and circumstances, including from the writings and the conduct

of the parties. *Arici v. Poma*, 202 A.D.3d 584, 585 (N.Y. App. Div. 1st Dept. 2022); *see also In

re Stade*, 90 B.R. 29, 32 (Bankr. D. Conn. 1988) (applying New York law, noting the "burden

does not require proof of an express novation" and "[a] novation may be implied or inferred from

all surrounding circumstances").  To be clear, an express waiver, discharge, or release of claims

is not necessary to extinguish claims upon novation; in general, when there is an express

superseding agreement, no claims may be made on the prior agreement unless the claims are

expressly or impliedly reserved. *Berkshire Bank*, Nos. 901358-20, 901359-20, slip op. at *19

(collecting cases).

53.     Here, each version of the Terms of Use, including version 5, which immediately

preceded the Migration, provides that the Terms of Use may be changed and the updated version

will "supersede all prior versions."  Further, as discussed herein, in connection with the

Migration, Customers were explicitly informed that (i) their counterparty was changing from

CNL to LLC, (ii) the governing law changed, and (iii) CNL would no longer have any

obligations to Customers.  Acceptance of Terms of Use Version 6 thereby extinguished all

claims the Customers could have under any prior versions.  Thus, CNL's obligations to the

Customers were discharged as a result of the Migration.

## Conclusion

54.     Based on all of the foregoing, the Series B Preferred Holders respectfully request

that the Court (i) find that (a) the Terms of Use unambiguously state that Affiliates of LLC,

---

agreement that "expressly 'supersede[d] and replace[d]' [a] 1986 loan agreement[] did not merely modify the
1986 loan agreement, as defendant argue[d], but constituted a novation thereof"); *Grimaldi v. Sangi*, 177
A.D.3d 1208, 1210-11 (N.Y. App. Div. 3rd Dept. 2019) (holding that "the weight of the evidence supports
Supreme Court's determination that the first promissory note was subsumed into the second, thereby creating a
novation and discharging the first promissory note").

including, without limitation, CNL, are ***not*** liable on Customer claims; or (b) in the alternative,

even if the Terms of Use are found to be ambiguous on this issue, voluminous evidence

conclusively demonstrates that the parties' intent was to exclude Affiliates of LLC, including,

without limitation, CNL, from any Customer claim liability, and (ii) grant related relief.

Dated:  December 28, 2022
       New York, New York

Respectfully submitted,

| | |
|---|---|
| /s/ *Dennis F. Dunne* | /s/ *Joshua M. Mester* |
| Dennis F. Dunne | Joshua M. Mester (admitted *pro hac vice*) |
| Nelly Almeida | **JONES DAY** |
| **MILBANK LLP** | 555 South Flower Street |
| 55 Hudson Yards | Fiftieth Floor |
| New York, NY 10001 | Los Angeles, CA 90071 |
| Tel: (212) 530-5000 | Tel: (213) 489-3939 |
| Fax: (212) 660-5219 | Fax: (213) 243-2539 |
| | |
| - and - | *Counsel to CDP Investissements Inc.* |
| | |
| Andrew M. Leblanc | |
| Melanie Westover Yanez | |
| **MILBANK LLP** | |
| 1850 K Street, NW, Suite 1100 | |
| Washington, DC 20006 | |
| Tel: (202) 835-7500 | |
| Fax: (202) 263-7586 | |

*Counsel to Community First Partners, LLC,*
*Celsius SPV Investors, LP, and*
*Celsius New SPV Investors, LP*