Dennis F. Dunne
Nelly Almeida
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Tel:  (212) 530-5000
Fax: (212) 660-5219

Andrew M. Leblanc
Melanie Westover Yanez
**MILBANK LLP**
1850 K Street, NW, Suite 1100
Washington, DC 20006
Tel:  (202) 835-7500
Fax: (202) 263-7586

*Counsel to Community First Partners, LLC,
Celsius SPV Investors, LP, and Celsius
New SPV Investors, LP*

Joshua M. Mester (admitted *pro hac vice*)
**JONES DAY**
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071
Tel:  (213) 489-3939
Fax: (213) 243-2539

*Counsel to CDP Investissements Inc.*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DECLARATION OF MELANIE WESTOVER YANEZ IN SUPPORT OF
SERIES B PREFERRED HOLDERS' OPENING BRIEF ON THE ISSUE OF
WHICH DEBTORS ARE LIABLE TO CUSTOMERS UNDER THE TERMS OF USE**

I, Melanie Westover Yanez, hereby declare as follows under penalty of perjury:

1.      I am an attorney with the law firm of Milbank LLP, counsel for Community First

Partners, LLC, Celsius SPV Investors, LP, and Celsius New SPV Investors, LP, as beneficial

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F,  Hoboken, New Jersey 07030.

holders, or investment advisors or managers of beneficial holders, of Series B Preferred Shares issued by Celsius Network Limited.

2.      I respectfully submit this declaration in support of the *Series B Preferred Holders' Opening Brief on the Issue of Which Debtors Are Liable to Customers Under the Terms of Use* (the "Opening Brief"), submitted concurrently herewith.

3.      Attached hereto as **Exhibit A**, for ease of reference, is a true and correct copy of version eight of the general Terms of Use, as it was attached as Exhibit A-8 to the *Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, Providing Terms of Use Dating Back to February 18, 2018* [Dkt. No. 393].[2]

4.      Attached hereto as **Exhibit B**, for ease of reference, is a true and correct copy of the templates and mock-ups of communications that the Debtors published to Customers in connection with the publication of version 6 of the Terms of Use, as they were attached as Exhibit A to the *Declaration of Oren Blonstein, Head of Innovation and Chief Compliance Officer of the Debtors, in Support of the Debtors' Motion Regarding Ownership of Earn Assets and the Sale of Stablecoin* [Dkt. No. 1327].

5.      Attached hereto as **Exhibit C** is a true and correct copy of an unexecuted Novation Agreement, between Debtor Celsius Network Limited and Debtor Celsius Network LLC, as it was provided to certain of the Series B Preferred Holders by Debtors prior to the Petition Date.

6.      Attached hereto as **Exhibit D** is a true and correct copy of the relevant portions of a Celsius Mining Executive Summary, Fall 2021 Presentation, as it was provided to certain of the Series B Preferred Holders prior to the Petition Date.[3]

---

[2]    Capitalized terms not defined herein shall have the meaning ascribed to them in the Opening Brief.

[3]    At the request of Debtors' counsel and for ease of review, only excerpts of larger documents are attached hereto. The Series B Preferred Holders reserve all rights, however, to use any portion of the Exhibits in later filings or argument.

7.      Attached hereto as **Exhibit E** is a true and correct copy of a Celsius Mining January 2022 Transaction & Business Update Presentation, as it was provided to certain of the Series B Preferred Holders prior to the Petition Date.

8.      Attached hereto as **Exhibit F** is a true and correct copy of the relevant portions of Celsius Network Limited's Annual Report and Financial Statements for the Period Ended December 31, 2020, as it was provided to certain of the Series B Preferred Holders prior to the Petition Date.

9.      Attached hereto as **Exhibit G** is a true and correct copy of the relevant portions of a Celsius Board Discussion Presentation, May 2022, as it was provided to certain of the Series B Preferred Holders prior to the Petition Date.

10.      Attached hereto as **Exhibit H** is a true and correct copy of the relevant portions of an IPO Kick-Off Materials Presentation, October 20, 2021, as it was provided to certain of the Series B Preferred Holders prior to the Petition Date.

11.      Attached hereto as **Exhibit I** is a true and correct copy of the relevant portions of the Form S-1 Registration Statement filed with the United States Securities and Exchange Commission by Celsius Mining Inc. on February 14, 2022, as it was provided to certain of the Series B Preferred Holders prior to the Petition Date.

12.      Attached hereto as **Exhibit J** is a true and correct copy of a chart entitled "Celsius Network — Organizational Chart as of 7/15/2021," as it was provided to certain of the Series B Preferred Holders prior to the Petition Date.

13.      Attached hereto as **Exhibit K** is a true and correct copy of the relevant portions of the transcript of the deposition of Oren Blonstein, Head of Innovation and Chief Compliance Officer of the Debtors, taken in these chapter 11 cases on November 22, 2022.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on: December 28, 2022                    By: /s/    *Melanie Westover Yanez*
                                                       Melanie Westover Yanez

# EXHIBIT A

**<u>Exhibit A-8</u>**

**Terms of Use Version 8**

# Terms of Use

## Last Revised: April 14, 2022

## 1. Introduction

Celsius Network LLC and its Affiliates (collectively, **"we," "our," "us",** or **"Celsius"** ) provide the following Terms of Use that, as they may be modified from time to time by Celsius in its sole discretion (the **"Terms"**) apply to our users (**"you"** or **"User(s)"**) and govern each User's access to, and use of, Celsius' products and services as well as our mobile and web-based application(s), our website(s), any software, programs, documentation, tools, hardware, internet-based services, components, and any updates (including software maintenance, service information, help content, bug fixes or maintenance releases) provided to you by Celsius, directly or indirectly, through our mobile application, our website, or any other online services we provide (each a "Service," and collectively the **"Services"**).

**PLEASE CAREFULLY REVIEW THESE TERMS BEFORE USING, OR CONTINUING TO USE, ANY OF CELSIUS' SERVICES. THE TERMS INCLUDE IMPORTANT INFORMATION ABOUT YOUR RELATIONSHIP WITH CELSIUS, INCLUDING MANDATORY ARBITRATION OF DISPUTES BETWEEN YOU AND CELSIUS INSTEAD OF CLASS ACTIONS OR JURY TRIALS THE SERVICES ARE PROVIDED SOLELY FOR USE BY YOU, AND YOUR USE OF THE SERVICES IS EXPRESSLY CONDITIONED ON YOUR CONSENT TO, AND COMPLIANCE WITH, THE TERMS. BY ACCESSING OR USING OUR SERVICES, YOU AGREE TO BE BOUND BY**

**THE TERMS. IF YOU DO NOT AGREE TO ANY OF THE PROVISIONS OF THESE TERMS YOU SHOULD IMMEDIATELY STOP USING THE SERVICES. IN ADDITION, OUR** <u>PRIVACY POLICY</u> **IS INCORPORATED INTO THE TERMS IN ITS ENTIRETY. WE ENCOURAGE YOU TO READ THE TERMS CAREFULLY AND USE THEM TO MAKE INFORMED DECISIONS.**

<u>**IMPORTANT NOTICE REGARDING THE TREATMENT OF DIGITAL ASSETS**</u>

**THE TREATMENT OF DIGITAL ASSETS IN YOUR CELSIUS ACCOUNT MAY HAVE CHANGED DEPENDING ON THE JURISDICTION IN WHICH YOU RESIDE AND WHETHER CELSIUS' CUSTODY SERVICE (SEE SECTION 4(B) BELOW) IS AVAILABLE TO YOU. PLEASE READ THE FOLLOWING TERMS CAREFULLY SO THAT YOU UNDERSTAND THESE CHANGES AND CAN MAKE INFORMED FINANCIAL DECISIONS.**

**BEGINNING** <u>APRIL 15, 2022</u> **(THE "MODIFICATION DATE"), THE FOLLOWING TERMS SHALL APPLY:**

<u>**TERMS APPLICABLE TO ALL USERS RESIDING IN THE UNITED STATES**</u>

- **IF YOU RESIDE IN THE UNITED STATES AND HAVE ACCESS TO CELSIUS' CUSTODY SERVICE VIA YOUR CELSIUS ACCOUNT, ANY ELIGIBLE DIGITAL ASSET TRANSFERRED TO YOUR CELSIUS ACCOUNT ON OR AFTER THE MODIFICATION DATE WILL BE INITIALLY TRANSFERRED TO A CUSTODY WALLET AS PART OF THE CUSTODY SERVICE.**

- **DIGITAL ASSETS HELD IN A CUSTODY WALLET WILL NOT EARN REWARDS THROUGH CELSIUS' EARN SERVICE (SEE SECTION 4(D) BELOW).**

- **ANY ELIGIBLE DIGITAL ASSET THAT YOU LOANED TO CELSIUS THROUGH THE EARN SERVICE PRIOR TO THE MODIFICATION DATE WILL CONTINUE TO EARN REWARDS PURSUANT TO THE TERMS HEREIN, UNTIL SUCH TIME AS ANY SUCH ELIGIBLE DIGITAL ASSET IS THEREAFTER USED IN A SERVICE OTHER THAN THE EARN SERVICE (E.G., THE SWAP SERVICE, CELPAY SERVICE, BORROW SERVICE, OR VOLUNTARILY MOVED TO THE CUSTODY SERVICE) OR OTHERWISE WITHDRAWN FROM YOUR CELSIUS ACCOUNT (EACH AN "EARN SERVICE TERMINATION EVENT").**

**TERMS APPLICABLE TO NON-ACCREDITED U.S. USERS**

- **IF YOU RESIDE IN THE UNITED STATES AND ARE NOT REGISTERED WITH CELSIUS AS ACCREDITED INVESTORS (A "NON-ACCREDITED U.S. USER") ANY ELIGIBLE DIGITAL ASSET THAT IS SUBJECT TO AN EARN SERVICE TERMINATION EVENT WILL NOT HAVE ACCESS TO THE EARN SERVICE THEREAFTER; SUCH ELIGIBLE DIGITAL ASSET, HOWEVER, MAY BE USED IN CELSIUS' OTHER SERVICES SUBJECT TO THE TERMS HEREIN.**

- **IF YOU ARE A NON-ACCREDITED U.S. USER, ANY DIGITAL ASSET TRANSFERRED TO CELSIUS ON OR AFTER THE**

**MODIFICATION DATE WILL <u>NOT</u> EARN REWARDS AND <u>NOT</u> HAVE ACCESS TO THE EARN SERVICE.**

<u>**TERMS APPLICABLE TO ACCREDITED U.S. USERS**</u>

- **IF YOU RESIDE IN THE UNITED STATES AND ARE REGISTERED WITH CELSIUS AS AN ACCREDITED INVESTOR (AN "ACCREDITED U.S. USER"), YOU SHALL HAVE ACCESS TO THE EARN SERVICE SUBJECT TO THE TERMS HEREIN.**

- **IF YOU ARE AN ACCREDITED U.S. USER AND AND HAVE ACCESS TO THE CUSTODY SERVICE VIA YOUR CELSIUS ACCOUNT, ANY ELIGIBLE DIGITAL ASSET TRANSFERRED TO CELSIUS ON OR AFTER THE MODIFICATION DATE WILL INITIALLY BE TRANSFERRED TO A CUSTODY WALLET, BUT MAY THEREAFTER BY USED IN THE EARN SERVICE AT YOUR DISCRETION.**

- **IF YOU ARE AN ACCREDITED U.S. USER AND DO <u>NOT</u> HAVE ACCESS TO THE CUSTODY SERVICE VIA YOUR CELSIUS ACCOUNT, ANY ELIGIBLE DIGITAL ASSET TRANSFERRED TO CELSIUS ON OR AFTER THE MODIFICATION DATE WILL BE INITIALLY TRANSFERRED TO THE EARN SERVICE AND CONSTITUTE A LOAN TO CELSIUS.**

- **PROVIDED THAT YOU CONTINUE TO MAINTAIN YOUR STATUS WITH CELSIUS AS AN ACCREDITED U.S. USER, YOUR ABILITY TO USE THE EARN SERVICE SHALL CONTINUE WITH RESPECT TO ALL ELIGIBLE DIGITAL ASSETS IN YOUR CELSIUS ACCOUNT.**

## TERMS APPLICABLE TO USERS RESIDING OUTSIDE THE UNITED STATES

- **IF YOU RESIDE OUTSIDE THE UNITED STATES, YOU SHALL HAVE ACCESS TO THE EARN SERVICE SUBJECT TO THE TERMS HEREIN.**

- **ANY ELIGIBLE DIGITAL ASSET THAT YOU LOANED TO CELSIUS THROUGH THE EARN SERVICE PRIOR TO THE MODIFICATION DATE, WILL CONTINUE TO EARN REWARDS.**

- **ANY ELIGIBLE DIGITAL ASSET TRANSFERRED TO CELSIUS WILL BE INITIALLY TRANSFERRED TO THE EARN SERVICE AND CONSTITUTE A LOAN FROM YOU TO CELSIUS.**

Please take further notice that Celsius may modify the Terms at any time and in its sole discretion by posting the revised Terms on the Celsius website. You shall be bound by such modifications effective immediately upon posting. It is your responsibility to review these Terms prior to each use of the Services.

Celsius reserves the right to implement, change, modify, or increase any fee, rates or other related cost in connection with your Celsius Account or the use of any of the Services at any time. In the event a fee applies to you, we will notify you of the pricing of the fee prior to your providing authorization to complete the subject transaction or transfer. By accepting the Terms you hereby agree to pay all fees associated with or incurred by your use of the Celsius Account or any of the Services.

The Services provided in connection with specific Eligible Digital Assets listed on Appendix A are provided by the Affiliate **Celsius EU UAB**, a limited liability company incorporated in Lithuania.

## 2. Definitions

Capitalized terms shall have the meanings assigned to them in these Terms, unless the context requires otherwise.

**"Account" or "Celsius Account"** means a User's designated user account on the Celsius website or mobile application, allowing a User to access and use the Services, view the User's balance of Eligible Digital Assets held in custody on the User's behalf or loaned by the User to Celsius, and any rewards gained on loaned Eligible Digital Assets, and manage the User's personal information and profile. **YOUR CELSIUS ACCOUNT IS NOT A BANK ACCOUNT, DEPOSIT ACCOUNT, SAVINGS ACCOUNTS, CHECKING ACCOUNT, OR ANY OTHER TYPE OF ASSET ACCOUNT AND SHOULD NOT BE CHARACTERIZED AS A BANKING PRODUCT OR SERVICE. THE USE OF TERMS SUCH AS "ACCOUNT," "ACCOUNT BALANCE," "WITHDRAW" AND SIMILAR LANGUAGE IN CONNECTION WITH THE EARN SERVICE AND THE BORROW SERVICE (SEE FURTHER SECTIONS 4(D) AND 4(E) BELOW, RESPECTIVELY) DOES NOT IMPLY OR ESTABLISH, AND SHALL NOT BE TAKEN TO SUGGEST, ANY FORM OF CUSTODY RELATIONSHIP, AND SUCH LANGUAGE IS USED HEREIN AS TERMS OF CONVENIENCE ONLY IN REFERRING TO USERS' BORROWING OR LENDING OF DIGITAL ASSETS TO OR FROM CELSIUS AS PART OF THE EARN SERVICE AND BORROW SERVICE, AND CELSIUS' OBLIGATION TO TRANSFER DIGITAL ASSETS TO USERS UPON THE TERMINATION OF SUCH LOANS OR REPAYMENT OF SUCH BORROWING IN CONNECTION WITH THESE SERVICES.**

**"Affiliate"** means an entity that owns or controls, is owned or controlled by, or is or under common control or ownership with a party, where control is defined as the direct or indirect power to direct or cause the direction of the management and policies of such party, whether through ownership of voting securities, by contract, or otherwise.

**"AML"** stands for Anti-Money Laundering, which means a set of procedures, laws, and regulations that are intended to stop the practice of generating income through illegal actions.

**"Blockchain"** means a system in which records of transactions made in Digital Assets are maintained across several computers that are linked in a peer-to-peer network.

**"CEL Token"** means Celsius' native token.

**"Custody Wallet"** means a Virtual Wallet where all Eligible Digital Assets held therein are custodial assets maintained either by us or by a third party institution or other entity selected by Celsius (a "**Third Party Custodian**").

**"Digital Asset"** means a digital representation of value in which encryption techniques are used to regulate the generation of digital units and verify the transfer of assets, operating independently from a central bank.

**"Eligible Digital Assets"** means the types of Digital Assets we may choose to designate for inclusion under one or more of the Services from time to time, which are subject to change and/or limitation in our sole discretion, based on business, regulatory and/or other considerations.

**"Fiat,"** when used in reference to money or currency, means the coin and paper money of a country that is designated as legal tender, circulates, and is customarily used and accepted as a medium of exchange in the country of issuance.

**"KYC"** stands for Know Your Customer (or Client), which means the process of a business verifying the identity of its customers or clients and assessing potential risks of illegal intentions for the business relationship.

**"Pegging"** is the practice of fixing the exchange rate of one currency to the value of another currency or asset.

**"Stablecoin"** means a Digital Asset that is Pegged to a Fiat currency.

**"Virtual Wallet"** or **"Virtual Wallet Address"** means an on-Blockchain virtual address in which Digital Assets can be held and transferred.

# 3. Eligibility and Proof of Identity

In order to use the Services you must first register for a Celsius Account.

In order to be eligible to access and use the Services, you must (i) be eighteen (18) years of age or older, (ii) have the legal ability to enter into and be bound by these Terms, (iii) comply with these Terms, and (iv) register for and maintain an active and valid Celsius Account. Celsius is not obligated to accept any application from any applicant and has sole and absolute discretion to accept or reject applications to create Celsius Accounts.

The Services are not available where prohibited by law or by Celsius policy, as updated from time to time; currently, such places include, but are not necessarily limited to, the countries of Iran, North Korea, Sudan, South Sudan, Syria, Cuba, or any other country against which the United States, the United Kingdom or the European Union imposes financial sanctions or embargoes.

Be advised that in some jurisdictions, due to regulatory considerations, Celsius may not provide part or all of the Services, which may include support for some Eligible Digital Assets or the CEL Token.

Due to changing regulatory requirements and interpretations in the Digital Assets markets, Celsius may use its sole and absolute discretion to, among other things, reject specific applications to open Celsius Accounts, prohibit use of part or all of the Services and/or close, freeze or suspend Celsius Accounts, where Celsius, in its sole and absolute discretion, has determined that regulatory or policy reasons prevent Celsius from being able to offer its Services.

Celsius is subject to AML, KYC, and U.S. sanction requirements under the Bank Secrecy Act (**"BSA"**), Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (**"USA PATRIOT Act"**), and the Office of Foreign Assets Control (**"OFAC"**). Under applicable AML and OFAC rules, Celsius is obligated to maintain certain information about you, including User records and transaction history, for five years (seven years for Users residing in the state of New York), or a longer period as may be required under applicable laws. Under certain circumstances, Celsius is required to report to the competent authorities of any unusual transactions, or of any suspicion it may have that any User might be involved in any financial crime or illicit activity.

Celsius is required to comply with applicable AML and KYC requirements before and after you register for a Celsius Account. When you register for a Celsius Account, we will ask for documentation and information, including but not limited to copies of your government-issued identification document (e.g. Passport, driver's license). For corporate Celsius Accounts, we may require identification information related to the directors, officers, authorized representatives, or equity owners of the business. We may also gather and use information about you from third parties, to help us confirm your identity, perform our AML/KYC checks and/or determine your access to the Services

You represent and warrant at all times that any and all information provided by you to us is true, accurate, and not misleading in any respect. If any such information changes, it is your obligation to provide the new information to us as soon as practicable following such change.

## 4. Services

### A. Celsius Account

Your Celsius Account allows you to view your balances in connection with the Services provided to you by Celsius and access the Services and conduct certain transactions online. You are solely responsible for the activities under your Celsius Account and for securing your Celsius Account IDs, passwords, hints, or any other codes that you use to access your Celsius Account and the Services. Celsius is not responsible for any loss or compromise of your access information and/or your personal information, or for any loss that you may sustain due to compromise of your access information and/or personal information.

**CELSIUS MAY RESTRICT SERVICES IN CERTAIN JURISDICTIONS DUE TO APPLICABLE LAWS, REGULATIONS, AND BUSINESS CONSIDERATIONS, AT ITS SOLE DISCRETION. ANY SERVICES AVAILABLE TO YOU WILL BE THOSE ACCESSIBLE VIA YOUR CELSIUS ACCOUNT. IF YOU RESIDE IN THE UNITED STATES, THE SERVICES AVAILABLE TO YOU MAY DEPEND ON YOUR STATUS AS AN ACCREDITED INVESTOR. CELSIUS MAY REQUEST FROM YOU PROOF OF ACCREDITED INVESTOR STATUS PERIODICALLY OR AT ANY TIME, IN CELSIUS' SOLE DISCRETION. THE FAILURE OF A USER TO TIMELY RESPOND TO SUCH A REQUEST MAY RESULT IN THE TEMPORARY OR**

**PERMANENT LOSS OF THAT USER'S ABILITY TO USE A SERVICE. CELSIUS IS NOT LIABLE TO ANY LOSS OR DAMAGE RESULTING FROM SUCH TEMPORARY OR PERMANENT LOSS OF USE TO ANY SERVICE.**

We will not be liable for following any instruction we receive through your Celsius Account, even if it was not authorized by you, or if it was entered by mistake or is otherwise inaccurate. To verify the authenticity of any instruction we receive through your Celsius Account, at our sole discretion we may require your signature or identification in any form we deem necessary, and we may accept digital images and electronic signatures for documents that need to be signed. You agree to reimburse us (and we may charge you or deduct from the balance of your Celsius Account) for all claims, costs, losses, and damages, including reasonable attorneys' fees, that result from our following instructions we receive through your Celsius Account to take any action related to your Celsius Account.

Your Celsius Account is not a bank account, deposit account, savings accounts, checking account, or any other type of asset account and should not be characterized as a banking product or service. All Eligible Digital Asset balances on your Celsius Account represent Digital Assets that are either (1) held in your Custody Wallet by Celsius or a Third Party Custodian, (2) loaned by you to Celsius, or (3) posted to Celsius as collateral and, therefore, owned, held and/or controlled by Celsius (under the applicable Service, as further detailed herein), and subject to Celsius' obligation to deliver such Digital Assets back to you upon the termination of the applicable Service.

Celsius may freeze, suspend or terminate your Celsius Account at any time in its sole discretion, in addition to taking any action and seeking any remedy it may be entitled to in law or in equity, including if Celsius suspects your involvement in any fraudulent activity of any kind or other misuse of the Services, provision by you of inaccurate or misleading information, or your involvement in any money laundering or other financial crime related to you or your Celsius Account.

## B. Custody

Our custody (**"Custody"**) Service allows you to store Eligible Digital Assets in a Custody Wallet accessible through your Celsius Account. **PLEASE NOTE THAT WHEN YOU USE OUR CUSTODY SERVICE TO STORE ELIGIBLE DIGITAL ASSETS YOU WILL NOT RECEIVE A FINANCING FEE, REWARDS OR FINANCIAL COMPENSATION OF ANY KIND ON ELIGIBLE DIGITAL ASSETS SO STORED.**

When you use the Custody Service, you understand and agree that Celsius may act as the custodian or we may use a Third Party Custodian to provide the Custody Service. Celsius will inform, update, and/or obtain your consent in advance, as applicable, in the event that a Third Party Custodian is used to provide the Custody Service to you. Celsius will use reasonable skill in the selection, appointment, and periodic review of Third Party Custodians. By using the Custody Service, you understand and agree to appoint Celsius or a Third Party Custodian selected by Celsius as your agent to store and secure Eligible Digital Assets in a Custody Wallet, and perform other duties customarily performed by a custodian. You understand that the Custody Service may be performed by a custodian in a jurisdiction other than where you are domiciled. By using the Custody Service, you authorize Celsius to transfer your Eligible Digital Assets to a Third Party Custodian or Custodians as may be selected by Celsius, and to instruct and cause any such Third

Party Custodian to transfer your Eligible Digital Assets to another Third Party
Custodian or Custodians as may be selected by Celsius, or to Celsius, in each
case without the need for any further notice to or consent from you, and
consistent with providing the Custody Services as set forth herein.

Title to any of your Eligible Digital Assets in a Custody Wallet shall at all times
remain with you and not transfer to Celsius. Celsius will not transfer, sell, loan
or otherwise rehypothecate Eligible Digital Assets held in a Custody Wallet
unless specifically instructed by you, except as required by valid court order,
competent regulatory agency, government agency or applicable law. As title
owner of assets, you bear all risk of loss. Celsius shall have no liability for any
Digital Asset price fluctuations or any or all loss of Digital Assets.
Notwithstanding the foregoing, Celsius may suspend your access to Services,
including the Custody Service and your access to a Custody Wallet, in the
event of market disruptions or periods of volatility. Celsius or a Third Party
Custodian controls the private keys to the Blockchain addresses of all
Custody Wallets. Celsius will use reasonable care and commercially
reasonable efforts in connection with the Custody Service to store and secure
Eligible Digital Assets in a Custody Wallet. You understand that your use of
the Custody Service, whether provided by Celsius or a Third Party Custodian,
does not create a fiduciary relationship between you and Celsius or any Third
Party Custodian. Neither Celsius nor any Third Party Custodian has any
fiduciary duty to you. Celsius has no duty to inquire into, supervise, or
determine the suitability of any transaction you initiate involving Eligible Digital
Assets in a Custody Wallet. Eligible Digital Assets in a Custody Wallet may be
comingled with the Eligible Digital Assets of other Users, and Celsius is under
no obligation to return the actual Eligible Digital Assets initially transferred by
you to a Custody Wallet, but will return Eligible Digital Assets of the identical
type reflected in your Celsius Account at the time you request such a return.

Celsius may provide information regarding the Eligible Digital Assets in a Custody Wallet to comply with any applicable law, regulation, rule, or request by law enforcement or government agencies.

Eligible Digital Assets held in a Custody Wallet are subject to the other provisions of these Terms, unless where expressly stated otherwise. Celsius retains the right to set-off any Eligible Digital Assets in a Custody Wallet against any obligations you may have to us. You understand and acknowledge that the legal treatment of Digital Assets remains unsettled and may vary depending on the jurisdiction in which you reside. In the event that you, Celsius or any Third Party Custodian becomes subject to an insolvency proceeding, it is unclear how your Digital Assets would be treated and what rights you would have to such Digital Assets. Celsius does not make any representation as to the likely treatment of Digital Assets in your Celsius Account, including those in a Custody Wallet, in the event that you, Celsius or any Third Party Custodian becomes subject to an insolvency proceeding whether in the U.S. or in any other jurisdiction. You explicitly understand and acknowledge that the treatment of Digital Assets in the event of such an insolvency proceeding is unsettled, not guaranteed, and may result in a number of outcomes that are impossible to predict reliably, including but not limited to you being treated as an unsecured creditor and/or the total loss of any and all Digital Assets reflected in your Celsius Account, including those in a Custody Wallet.

Upon your instruction to Celsius to use one of the other Services detailed in this Section (such as, but not limited to, Swap, CelPay, and Borrow), or otherwise offered by Celsius, where such Services are available to you through your Account, the Eligible Digital Assets being used in such other Service may involve transferring your assets out of a Custody Wallet. Eligible

Digital Assets that are transferred out of, or not held in, a Custody Wallet are not subject to the custody functions set forth in this Section.

Until further notice, the Custody Service will only be available in certain jurisdictions.

## C. Swap
## i. Introduction to Swap Service

Our Swap Service, if available to you, allows you to exchange one type of Eligible Digital Asset for another type of Eligible Digital Asset in your Celsius Account, provided that the exchange is of a Digital Asset pair supported by Celsius (**"Supported Pair"**). Celsius may choose to add, remove, change, or impose any additional limits on Supported Pairs from time to time, in its sole discretion and without providing prior notice.

By using Celsius' Swap Service, you will allow Celsius to exchange the type and amount of the Digital Asset in your Celsius Account that you choose to swap (the **"Swapped Assets"**) into the type of Digital Asset you choose to receive (the **"New Assets"**). The amount of New Assets to be received in exchange for the Swapped Assets is determined by the amount of Swapped Assets multiplied by the applicable conversion rate of the relevant Digital Asset pair (the **"Exchange Rate"**).

## ii. Exchange Rates

Celsius will use reasonable efforts to source the best rate for a Supported Pair across multiple venues. However, we cannot guarantee that the Exchange Rates offered on our platform would always be optimal, and you understand and acknowledge that Celsius is not under any obligation to provide the best

rate for a Supported Pair. You further acknowledge that it is your responsibility to check if a better rate is available on another platform. In line with Celsius' commitment to transparency, the Exchange Rates quoted may include an offset from the prevailing market rate (also known as "spread") to mitigate both Celsius' exposure to price volatility between the time the Exchange Rate is confirmed and the time the transaction is executed. The spread may be set by Celsius and/or third party vendors working with Celsius to complete the Swap transaction.

Exchange Rates available on our platform are moment-in-time specific, and due to the volatility in crypto markets, change constantly and rapidly. An Exchange Rate is only final when you approve the transaction and it has been accepted and confirmed.

### iii. Swap Transactions are Final

All Swap transactions are final and irreversible once approved by you.

You should therefore carefully review the terms of each transaction before you approve it. Celsius will not be liable for any errors in your order. If you believe a transaction was not executed in accordance with your instructions, please contact support@celsius.network.
We may reject or cancel a Swap transaction where we deem it reasonably necessary, e.g., where there was an error in the Exchange Rate or in the execution of the transaction, or where the quoted Exchange Rate is no longer available.

### iv. Execution

Each Swap transaction is entered into between you and Celsius (as buyer or seller, as applicable), and Celsius does not act as your broker, agent, or intermediary.

By entering into any Swap transaction, you hereby appoint Celsius or a Third Party Custodian to act as the custodian of the Swapped Assets for the purpose of exchanging those assets, and for the duration necessary to complete the exchange.

During periods of high volume, illiquidity, or volatility in the marketplace for any Digital Asset, the actual market rate at which trade is executed may be different from the prevailing rate indicated at the time of your order or trade. You acknowledge and agree that Celsius is not liable for any such price fluctuations. In the event of periods of high volume, illiquidity, or volatility in the marketplace for any Digital Asset or other market disruption of any kind or Force Majeure event (see further Section 34 below, "Force Majeure"), Celsius may suspend access to the Swap Service and/or prevent you from completing any actions via the Swap Service. Following any such event, you understand that prevailing market rates when trading resumes may differ significantly from the rates available prior to such event.

**v. Representations and Warranties**

By using the Swap Service, you represent and warrant to Celsius that:

1. the information provided by you to Celsius, including, but not limited to, regarding your place of residency, is accurate and up-to-date;

2. you are using Celsius' Swap Service solely for your own personal purposes, and not on behalf of any other person or for business purposes;

3. you are aware of, and can withstand, the risks involved in holding, using and trading digital assets, and you have read and understood our Risk Disclosure;

4. you will NOT use borrowed funds for the purpose of using our Swap Service, and particularly you shall NOT use funds borrowed from Celsius for such purpose;

5. you will be solely responsible for all tax reporting and payment obligations which may apply to you as a result of using the Swap Service;

6. your use of the Swap Service shall be at all times in full compliance with all laws and regulations applicable to you, and you shall not use it for any illegal purposes, including, but not limited to, activities involving financial crime, money laundering or terrorism financing, or the proceeds thereof.

Any breach of these representations and warranties by you shall constitute a breach of these Terms, and may result in, among other legal action, the termination of your Celsius Account.

## D. Earn Rewards

Our Earn Service allows you to earn a financing fee from Celsius, referred to as "Rewards," in the form of Digital Assets (either in-kind, i.e., in the same Digital Asset you transfer, or in CEL Tokens, where permitted) in exchange for entering into open-ended loans of your Eligible Digital Assets to Celsius under the terms hereof. **If our Earn Service is available to you, upon your election, you will lend your Eligible Digital Assets to Celsius and grant Celsius all**

**rights and title to such Digital Assets, for Celsius to use in its sole discretion while using the Earn Service.**

The balance of Eligible Digital Assets loaned by you to Celsius, and any Rewards gained thereon (see further Section 12 below, "How Rewards are Calculated and Earned") are visible via your Celsius Account. Once such Eligible Digital Assets are received by Celsius into your Earn balance, they shall be Celsius' property, in every sense and for all purposes, and you will immediately start accruing Rewards on such Digital Assets in accordance with the terms hereof (unless explicitly provided for the purpose of being utilized for any other Service), and the corresponding amount (and kind) of Eligible Digital Assets shall be reflected in your Celsius Account balance. We reserve the right to reject entry into any loan transaction, and/or the right to repay any loan of Digital Asset already made, each at your expense.

You may terminate any loan to Celsius at any time, and request that Celsius return the borrowed Eligible Digital Assets and deliver any Rewards accrued from the Earn Service, by transferring such Eligible Digital Assets and Rewards to your external Virtual Wallet (in accordance with Section 11 below, "Withdrawals") or to the Custody Service, if available.

The Earn Service is not an investment program nor a speculative tool. Rather, you are earning Rewards as a financing fee on the loan of Eligible Digital Assets you have transferred to Celsius in connection with the Earn Service, and in accordance with the rates published by Celsius from time to time, pursuant to these Terms.

**AS FURTHER EXPLAINED IN SECTION 1 ABOVE, BEGINNING APRIL 15, 2022, THE EARN SERVICE WILL NOT BE AVAILABLE FOR ANY DIGITAL ASSET**

**TRANSFERRED TO CELSIUS OR USED IN A SERVICE OTHER THAN THE EARN SERVICE AFTER THAT DATE BY A NON-ACCREDITED U.S. USER. ANY ELIGIBLE DIGITAL ASSET LOANED TO CELSIUS THROUGH THE EARN SERVICE PRIOR TO APRIL 15, 2022, INCLUDING SUCH ELIGIBLE DIGITAL ASSETS OF NON-ACCREDITED U.S. USERS, WILL CONTINUE TO EARN REWARDS THROUGH THE EARN SERVICE PURSUANT TO THE TERMS HEREIN, UNTIL SUCH TIME AS SUCH ELIGIBLE DIGITAL ASSET IS THEREAFTER USED IN A SERVICE OTHER THAN THE EARN SERVICE (E.G., THE SWAP SERVICE, CELPAY SERVICE, BORROW SERVICE, OR VOLUNTARILY MOVED TO THE CUSTODY SERVICE) OR OTHERWISE WITHDRAWN FROM THE APPLICABLE USER'S CELSIUS ACCOUNT. THE EARN SERVICE WILL REMAIN FULLY AVAILABLE TO ACCREDITED U.S. USERS OR USERS RESIDING OUTSIDE THE UNITED STATES.**

**E. Borrow**

You may apply to borrow certain Fiat currencies or Stablecoins from an Affiliate of Celsius, as will be agreed between you and Celsius or its Affiliates in writing, against Eligible Digital Assets in your Celsius Account (each, a **"Loan"**). If approved, such application shall be subject to a separate agreement to be entered into between you and the Celsius Affiliate (the **"Loan Agreement"**), and Celsius or its Affiliates shall hold the Digital Assets provided as collateral under the Loan Agreement for the benefit of the Lender subject to the terms hereof, including without limitation Sections 9, 10 and 13. In no circumstances shall it be permissible for you to use the proceeds of such Loans to purchase additional Digital Assets through any third party fiat "on-ramp" service providers that may be integrated in or connected with the Celsius platform from time to time, and you represent and warrant that you will not do so. Celsius further does not recommend or encourage any use of borrowed funds for purchasing Digital Assets or making any financial investment. You represent that any use by you of the proceeds of Loans shall

be in full compliance with all applicable laws and regulations, these Terms, and the applicable Loan Agreement, and you shall be solely responsible and liable for any breach of any of the foregoing.

Any Eligible Digital Assets you provide as collateral under a Loan Agreement shall not be eligible for another Service provided by Celsius at the same time, including the Earn Service, as set out above, and by entering into any Loan Agreement you explicitly authorize Celsius to deduct the amount of Eligible Digital Assets corresponding to the collateral amount from the applicable Service in your Celsius Account.

Celsius may in its sole discretion offer other forms of commercial arrangement under the Borrow Service, such as a sale and repurchase arrangement, based on its regulatory, business, or other considerations.

## F. CelPay

CelPay is Celsius' proprietary Digital Asset tool for Celsius Users, which allows you to transfer ownership or assign your rights with Celsius, as applicable, in connection with selected Eligible Digital Assets to other registered Celsius Users (see further Section 15 below, "CelPay").

By entering into any CelPay transaction you explicitly authorize Celsius or its Affiliates to deduct such amounts of Eligible Digital Asset as you instruct us to transfer to another user from your Celsius Account, and to be added to the balance of the Celsius Account of such other User. Conversely, by accepting any CelPay transaction from another User you agree that the amounts of Eligible Digital Asset sent to you shall be added to the balance of your Celsius Account.

# 5. Celsius Account Types

## A. Individual Celsius Account

This Celsius Account is owned by only one natural person who is and will continue to be the only person authorized to take any action in the Celsius Account. By opening an Individual Celsius Account, you represent and warrant that you are and shall at all times continue to be the sole beneficial owner of the Celsius Account and user of all Services facilitated or generated therefrom.

## B. Corporate Celsius Account

This Celsius Account is owned by a corporation, unincorporated association, a company, a partnership, fiduciary, sole proprietorship, or other legally recognized group (interchangeably defined as an **"Entity"**) holding a Celsius Account in any capacity other than an individual capacity. An Entity can apply to open a Celsius Account through any natural person(s) who is duly authorized by the Entity to do so (an **"Authorized Representative"**). Such Authorized Representative represents and agrees, on behalf of the Entity, as well as on his or her own behalf, that he or she:

1. is fully authorized to execute all documents or otherwise complete our requirements in his or her stated capacity;
2. has provided us all documents or other information necessary to demonstrate that authority; and
3. will provide other documents and complete other requirements as we may request from time to time.

We may refuse to recognize any such authorization if, in our reasonable judgment, it appears to be incomplete or improperly executed.

By opening a Corporate Celsius Account, the Authorized Representative represents and warrants on behalf of the Entity that the Entity is and shall at all times continue to be the sole beneficial owner of the Celsius Account and user of all Services facilitated or generated therefrom and that the ultimate beneficial owners of all assets and assets belonging to the Entity are as represented during the establishment of the Corporate Celsius Account. The Entity registered as holder of a Corporate Celsius Account, the ultimate beneficial owner(s) of such Entity and any Authorized Representative(s) shall each be responsible for updating Celsius immediately of any change in the details of the Entity, ultimate beneficial owner(s) and/or Authorized Representative(s), including any appointment or termination of the same, change of control in the Entity or change in the registration details of the Entity, and such persons shall be jointly and severally liable to Celsius for any breach of these Terms in connection with the Corporate Celsius Account.

### C. Maximum Number of Accounts

Each User is authorized to have a maximum of **one** Individual Celsius Account and **one** Corporate Account (such as in the case of a sole proprietorship) at any given time. Requests for additional accounts must be sent via email to app@celsius.network. Celsius may deny a request for an additional account in its sole discretion and for any reason. Celsius may merge, freeze, suspend, or terminate any Account(s) in its sole discretion and for any reason, including to the extent Celsius reasonably believes any such Account(s) to be in breach of this policy.

# 6. Authorized Users

For both Individual and Corporate Celsius Accounts, we may follow any instructions regarding your Celsius Accounts provided that we reasonably believe such instructions are authorized by the Celsius Account holder, and we will not be held liable for following any instructions provided by a person designated or identified as an authorized User or Authorized Representative.

# 7. Account Balance

Your Celsius Account balance visible through the platform shall indicate, the balance of Eligible Digital Assets attributed to each Service, to the extent applicable and available. You can transfer additional Eligible Digital Assets to Celsius by transferring the same to the Virtual Wallet Address(es) provided in your Celsius Account (or as otherwise notified by us to you). Any Eligible Digital Asset received will be treated by us as being transferred to your Celsius Account beginning on the date and at the time stamped on the Blockchain confirmation.

If Celsius chooses to designate "wrapped" Digital Assets (i.e., Digital Assets Pegged to the value of the corresponding Digital Asset on its "native" Blockchain) for inclusion under one or more of the Services, any such Eligible Digital Assets that you transfer to Celsius may be repaid to you in, and reflected in your Celsius Account balance as, the corresponding native Eligible Digital Asset. In the event Celsius incurs any loss or damage as a result of the Digital Assets that you transfer to Celsius being wrapped, such as, but not limited to, from the wrapped Digital Asset becoming De-Pegged from the value of the native Digital Asset, Celsius may recover such losses or damages from the Eligible Digital Assets in your Celsius Account pursuant to Section 9 of these Terms. Nothing herein shall oblige Celsius to accept

"wrapped" Digital Assets, and it is your sole responsibility to make sure such "wrapped" Digital Assets are Supported Digital Assets prior to transferring them to your Celsius Account.

**It is your sole responsibility to make sure that Digital Assets you wish to transfer to Celsius are Eligible Digital Assets, and that your transfer of Eligible Digital Assets on the Blockchain is directed over the correct Blockchain and to the correct Virtual Wallet Address as provided to you by Celsius (which may differ from time to time and between different Digital Assets).**

**If you do not carefully follow these instructions, your Digital Assets may be irrevocably lost, and Celsius may not be able to assist you in retrieving them. Celsius will not be liable to you for any such loss and shall not be under any obligation to retrieve such Digital Assets.**

## 8. Ownership of Digital Assets

You hereby represent and warrant to us that any Eligible Digital Asset transferred by you for the purpose of utilizing Celsius' Services is owned by you or that you are fully permitted to carry out transactions using such Eligible Digital Assets without restriction or limitation, and that your use of the Services is solely for your own account and benefit, and not on behalf of any other person or entity. You further represent and warrant that all such Eligible Digital Assets are free from any claims, indebtedness, liens, or third party interests.

# 9. Setoff and Security Interest Rights

You grant us a security interest in any and all Eligible Digital Assets using the Earn Service for debts, amounts owed, or liabilities incurred to us or any of our Affiliates by you or any of your Authorized Representatives, if any ("**Obligations**"). Obligations may include both secured and unsecured debts, and Obligations you owe individually or together with someone else, including Obligations under other transactions or agreements between you and us or any of our Affiliates.

We also may take or set off from any Digital Asset in your Celsius Account, including any of your Digital Assets using the Custody Service (i.e., in a Custody Wallet), or deduct from any obligations Celsius may have to you, any direct, indirect, and acquired Obligations that you owe us or our Affiliates. These rights are in addition to other rights we may have to take, transfer, or charge from any assets or balance in your Celsius Account for Obligations you owe us or our Affiliates pursuant to these Terms.

Your acceptance of these Terms serves as your consent to Celsius' asserting its security interest or exercising its right of setoff should any laws governing your Celsius Account require your consent. If the law restricts our ability to take, transfer, or setoff from any obligations to you, or if your Celsius Account balance is protected from attachment, levy, or legal process, you waive those conditions and limits to the full extent that you may do so by contract, and you authorize us to take any actions to offset your Obligations in your Celsius Account being used in the Earn Service.

We hereby agree that, to the extent permitted by applicable law, in the event that Celsius breaches its obligation under these Terms, you may set off assets

or amounts we owe you with respect to your Celsius Account, against your Obligations. If the law restricts your ability to take, transfer, or setoff our obligations to you, or if they are protected from attachment, levy, or legal process, we waive those conditions and limits to the full extent that we may do so by contract, and we authorize you to apply our obligations to you to your Obligations.

## 10. Risk Disclosure

Before using any of Celsius' Services, you should ensure that you fully understand and can afford to undertake the risks involved. You should carefully read and make sure you understand our Risk Disclosure page, which lists some, but not all of the risks involved in holding, trading and using crypto assets generally, and using Celsius' services specifically. The risks listed below and in our Risk Disclosure page are intended to provide you with a general outline of the risks involved, but cannot capture all such risks. These Terms and your use of any of our Services do not create a fiduciary relationship between us and you; your Celsius Account is not a checking or savings account, and it is not covered by insurance against losses. Celsius has no duty to inquire into, supervise, or determine the suitability of any transaction you initiate involving Eligible Digital Assets in your Celsius Account. We may lend, sell, pledge, hypothecate, assign, invest, use, commingle or otherwise dispose of assets and Eligible Digital Assets that are not held in a Custody Wallet (if available to you) to counterparties or hold the Eligible Digital Assets with counterparties, and we will use our best commercial and operational efforts to prevent losses. By transferring Digital Assets to Celsius, or lending Eligible Digital Assets to Celsius while using the Earn Service, or otherwise using the Services, you will not be entitled to any

profits or income Celsius may generate from any subsequent use of any Digital Assets (or otherwise), nor will you be exposed to any losses which Celsius may suffer as a result thereof. You agree and acknowledge that you are exposed to the possibility that Celsius may become unable to repay its obligations to you in part or in full, in which case any Digital Assets in your Celsius Account that are not using the Custody Service may be at risk of partial or total loss.

**ELIGIBLE DIGITAL ASSETS ARE NOT LEGAL TENDER. CELSIUS IS NOT A BANK OR DEPOSITORY INSTITUTION, AND YOUR CELSIUS ACCOUNT IS NOT A DEPOSIT ACCOUNT. ELIGIBLE DIGITAL ASSETS REPRESENTED IN YOUR CELSIUS ACCOUNT ARE NOT HELD BY CELSIUS AS A FIDUCIARY, ARE NOT INSURED BY ANY PRIVATE OR GOVERNMENTAL INSURANCE PLAN (INCLUDING THE FEDERAL DEPOSIT INSURANCE CORPORATION (FDIC) OR THE SECURITIES INVESTOR PROTECTION CORPORATION (SIPC)), AND ARE NOT COVERED BY ANY COMPENSATION SCHEME. YOUR CELSIUS ACCOUNT DOES NOT CONSTITUTE AN INVESTMENT CONTRACT OR A SECURITY, IS NOT TRANSFERABLE AND MAY NOT BE TRADED, EXCHANGED OR SOLD TO ANY THIRD PARTY UNDER ANY CIRCUMSTANCES.**

Celsius does not provide any legal, tax or financial advice and you are strongly advised to obtain independent legal, tax or financial advice prior to making any financial decision, including buying, trading, holding, or using Digital Assets. There are significant risks associated with Digital Assets, and you are solely responsible to make sure you understand such risks and assess whether such risks are appropriate for you. Celsius does not make any offers, recommendations, or invitations for you to deal in Digital Assets or use

any Services, and does not take into account your personal circumstances, financial situation, needs or goals. Before making any financial decision, you should carefully assess your financial situation and capacity, and only use funds that you can afford to lose. Before entering into any transaction or using any of the Services you should ensure that you understand and have made an independent assessment of the suitability and appropriateness of a transaction into which you are entering and the nature and extent of your exposure to risk of loss in light of your own objectives, financial and operational resources, and other relevant circumstances. Past performance is no guarantee of future results.

Legislative and regulatory changes or actions at the state, federal, or international level may adversely affect the use, transfer, exchange, and value of Digital Assets. Transactions in Digital Assets may be irreversible, and, accordingly, losses due to fraudulent or accidental transactions may not be recoverable.

The value of Digital Assets may be derived from the continued willingness of market participants to exchange Digital Assets for Fiat currencies or other Digital Assets. If such willingness is abolished for any reason, this may result in the potential for a permanent and total loss of value of a particular Digital Asset.

The volatility and unpredictability of the price of Digital Assets may result in significant loss over a short period of time. The nature of Digital Assets may lead to an increased risk of fraud or cyber-attack, including rollback attacks or Blockchain reorganizations. The nature of Digital Assets means that any technological difficulties experienced by Celsius or third parties may limit,

delay or prevent the access or use of Digital Assets and/or cause losses of Digital Assets. Although Celsius takes precautionary measures to protect against cyber threats, circumstances may arise where losses or damages are incurred.

In light of these risks, which are only some of the risks involved in using the Services and holding or trading in Digital Assets, and do not constitute an exhaustive list of such risks, you should carefully consider whether holding or trading Digital Assets in general and/or using our Services is suitable for you in light of your financial condition.

## 11. Withdrawals

Subject to these Terms, for any of your Eligible Digital Assets that you elect to utilize in the Earn Service (if available to you), you have a call option on all loans made to Celsius to demand immediate, complete or partial repayment of any loan at any time through (i) transfer to a Custody Wallet, if available to you, or (ii) a complete or partial withdrawal of Eligible Digital Assets at any time. Such repayment will terminate in whole or in part your loan to Celsius and you shall no longer accrue Rewards on the amount of loans as of the time of your exercise of the call option. Celsius initiates the withdrawal process immediately following a withdrawal request when possible; however, we may require up to three (3) days after you submit your withdrawal request to process the withdrawal.

For every withdrawal request, you will be required to provide the details of the Virtual Wallet to which you wish to receive your repayment of Digital Assets. For the avoidance of doubt, any repayment shall be in-kind (i.e., in the same

type of Eligible Digital Assets loaned by you, but not the actual same Digital
Assets originally transferred by you). In the event that the details you provide
are inaccurate, incomplete, or misleading, your Digital Assets may be
permanently lost. We will not be liable for any loss that results from
inaccurate, incomplete, or misleading details that you may provide for such
transfer. If the transfer address you specify is one to which we are unable to
process transfers, we will have no liability for any resulting failure or delay in
processing your requested withdrawal.

Celsius and our third-party partners may experience cyber-attacks, extreme
market conditions, or other operational or technical difficulties which could
result in the immediate halt of transactions either temporarily or permanently.
Provided that Celsius has taken reasonable commercial and operational
measures to prevent such events in technical systems controlled by Celsius,
Celsius is not and will not be responsible or liable for any loss or damage of
any sort incurred by you as a result of such cyber-attacks, operational or
technical difficulties or suspensions of transactions. Withdrawal limits based
on amounts and/or frequency may apply from time to time, based on legal,
regulatory, AML and/or security considerations. Our policies and procedures
may require additional security and/or compliance checks that require
additional time to complete. Any individual request to exceed withdrawal limits
set by Celsius must be sent via email to app@celsius.network.

Every transmission request shall be deemed pending until accepted by us.
We may refuse to accept such request, or delay the processing of an
approved request for any reasonable reason, including but not limited to
inaccurate or misleading information provided by you, or any doubt or
suspicion of fraud, misrepresentation, a sanctioned transaction, money

laundering, terrorism financing or other financial crime related to your Celsius
Account.

# 12. How Rewards Are Calculated and Earned

All Eligible Digital Assets that you elect to utilize in the Earn Service (if
available to you) and thus are loaned to Celsius (1) are not being used as
collateral for Loans, (2) have not had all rights in connection with them
assigned to another Celsius user using CelPay, and (3) were not requested
for external transmission or withdrawal (Eligible Digital Assets meeting each of
these three criteria, **"Loaned Digital Assets"**) entitle you to Rewards while
credited to your Celsius Account.
We periodically update our rates and the rate changes are made in our sole
discretion. Rewards will be payable in arrears and added to the principal
loaned by you to Celsius, as part of the Earn Service, and reflected in your
Celsius Account balance weekly.

We calculate the Rewards on Loaned Digital Assets based on market demand
for each Eligible Digital Asset. **Reward rates are not determined based on
Celsius' income or profit, generated directly or indirectly as a result of the
use by Celsius of a particular Digital Asset, a type of Digital Assets, or
otherwise.**
Rewards are payable based on a daily periodic rate applicable to the Loaned
Digital Assets. The daily periodic rate is calculated by dividing the then-
applicable annual reward rate by three hundred sixty-four (364) days; then it is
further divided down to the hour, minute, and second of that day. Loaned
Digital Assets, including those received as Rewards from previous weeks, will
begin gaining Rewards according to the hour, minute, and second on the

timestamp verifying the completion of the applicable transaction and shall cease and/or decrease the amount paid as Rewards at the moment when the User has entered an external transmission, withdrawal or transfer of rights (via CelPay) request, or posted any Loaned Digital Assets as collateral for a Loan. Therefore, any Loaned Digital Asset that you elect to utilize in the Earn Service (if available to you) mid-week will receive Rewards with no distinction, based on the rates calculated for the relative time within the allocation period.

We will reflect the Rewards earned for the previous week on or around the first business day of each week, through our platform. Your Celsius Account must be active on the date the Rewards are payable for you to receive the applicable Rewards. All Rewards will be added to your Celsius Account balance in-kind (in the same Eligible Digital Asset that is reflected in your Celsius Account) or, subject to your in-app choice and regulatory and business considerations, in CEL. Once Rewards are added to your Celsius Account balance, they shall be treated as an integral part of your Eligible Digital Assets, you shall be deemed to have elected to utilize in the Earn Service (if available to you), including with respect to such Rewards, which shall thus be loaned to Celsius, for all purposes. To make such in-kind Reward payments as accurate as possible, Celsius rounds non-integer, rational numbers to the sub-cent, which is the smallest possible decimal available for the applicable Eligible Digital Asset.

For users who are citizens or legal residents of the United States, Celsius requires your Taxpayer ID (TIN) or Social Security Number (SSN) to be updated in your Celsius Account in order to gain Rewards. Celsius is not obligated to reflect credits in your Celsius Account retroactively with Rewards that would have been gained if you had otherwise updated your profile with your TIN or SSN.

If Celsius has determined, in its sole and absolute discretion, that for any regulatory or legal reason we are limited in the Rewards rate we may offer you on your Eligible Digital Assets loaned to Celsius (or if we are completely restricted from paying any Rewards to you whatsoever), the Rewards to which you shall be entitled will be limited accordingly. Based on our reasonable interpretation of legal requirements, without prior notice, we may limit the Rewards to which you will be entitled.

If, at any time, for legal or other reasons, a Celsius Account is suspended or frozen by Celsius, Loaned Digital Assets connected to such Celsius Account shall not be eligible to earn Rewards.

## 13. Consent to Celsius' Use of Digital Assets

In consideration for the Rewards payable to you on the Eligible Digital Assets using the Earn Service, for us entering into any Loan Agreement, and the use of our Services, you grant Celsius, subject to applicable law and for the duration of the period during which you elect to utilize the Eligible Digital Assets in the Earn Service (if available to you) and thus loan such Eligible Digital Assets to us through your Celsius Account, or as collateral under the Borrow Service (if available to you), all right and title to such Eligible Digital Assets, including ownership rights, and the right, without further notice to you, to hold such Digital Assets in Celsius' own Virtual Wallet or elsewhere, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such

Digital Assets in Celsius' full discretion. You acknowledge that with respect to Digital Assets used by Celsius pursuant to this paragraph:

1. You will not be able to exercise rights of ownership;
2. Celsius may receive compensation in connection with lending or otherwise using Digital Assets in its business to which you have no claim or entitlement; and
3. In the event that Celsius becomes bankrupt, enters liquidation or is otherwise unable to repay its obligations, any Eligible Digital Assets used in the Earn Service or as collateral under the Borrow Service may not be recoverable, and you may not have any legal remedies or rights in connection with Celsius' obligations to you other than your rights as a creditor of Celsius under any applicable laws.

## 14. Hard Forks and Airdrops

Any Blockchain may undergo software updates from time to time, which will result in a permanent divergence in the Blockchain (a **"Hard Fork"**). The result is that such Blockchain will split into two separate and distinct Blockchains, and any Digital Asset on that original Blockchain may entitle its holders to a new type of Digital Asset (the **"Forked Asset"**). You agree and understand that the support of any Forked Asset in your Celsius Account is solely at the discretion of Celsius. If we do not make a public announcement confirming our support of a Forked Asset ahead of an anticipated Hard Fork, we will not support the Forked Asset and such Forked Asset will be an unsupported Digital Asset (**"Unsupported Assets"**), in which case all Celsius Accounts will be denominated in the legacy Digital Asset and all Rewards will

accrue and be payable in the legacy Digital Asset. You agree that Celsius assumes no responsibility whatsoever with respect to those Unsupported Assets and you will not be able to recover the Unsupported Assets from Celsius. Celsius assumes absolutely no responsibility whatsoever with respect to Unsupported Assets.

In the event that a Hard Fork achieves the required consensus, it is possible that we will only support the Forked Asset and will discontinue our support of the legacy Digital Asset. In the event of a Hard Fork that entitles you to a Forked Asset, you are advised to withdraw the applicable Digital Assets from your Celsius Account prior to the relevant date for the Hard Fork. Celsius is not obligated in any way to monitor or maintain balances of Forked Asset issued to holders of the applicable Digital Assets upon a Hard Fork, or to credit you for the value of such Forked Asset. In the event you wish to receive Forked Asset issued upon a Hard Fork, you are advised to withdraw the applicable Digital Asset from your Celsius Account prior to the relevant date for the Hard Fork. All determinations regarding Hard Forks shall be made by Celsius in its sole and absolute discretion and in accordance with applicable law.


In the event that a Digital Asset network attempts to or does distribute Digital Assets to Blockchain addresses pertaining to an Eligible Digital Asset via airdrop or bootstrapping (collectively, an "Airdrop"), the support of any such new Digital Assets in your Celsius Account is solely at the discretion of Celsius. If we do not make a public announcement confirming our support of such new Digital Assets, we will not support such new Digital Assets and such new Digital Assets will be treated as Unsupported Assets. To the extent you wish to receive the new Digital Assets to be delivered via Airdrop, you are advised to withdraw the applicable Digital Assets from your Celsius Account prior to the relevant date for the Airdrop. You further agree and understand

that Digital Assets delivered via Airdrop do not create or represent any relationship between us and the sender and/or the related Digital Asset network and do not subject us to any obligations whatsoever as they relate to the sender and/or the related Digital Asset network.

All determinations regarding the Forked Assets and/or Digital Assets delivered via Airdrop will be made by Celsius in its sole and absolute discretion and in accordance with applicable law.

## 15. CelPay

CelPay is Celsius' proprietary Digital Asset tool for Celsius Users, which allows you to transfer ownership or assign your rights with Celsius, as applicable, in connection with selected Eligible Digital Assets to other registered Celsius Users.

By using our CelPay feature, you understand and acknowledge that:

1. you are transferring your ownership to, or assigning your rights in, the Eligible Digital Assets you select when using CelPay, and that such transfers of ownership or assignment of rights may not be recorded on any Blockchain, but rather on Celsius' ledger;
2. by making any CelPay transaction, you are authorizing Celsius to deduct the corresponding amount of Eligible Digital Assets from your Celsius Account balance, and to transfer or credit such amount to the balance of the receiving User's Celsius Account;

3. Celsius is not responsible, and will not interfere in any way in, any dispute between you and the User involved in the CelPay transaction;

4. if you initiate a CelPay transaction to an unintended or incorrect User, you may irrevocably lose your rights in connection with the said Eligible Digital Assets, and it is your sole responsibility to make sure you provide the correct details when initiating a CelPay transaction;

5. the completion of a CelPay transaction may not be immediate, and it may take some time before such transaction is processed and the relevant Celsius Account balances are updated;

6. use of the CelPay feature is subject to limitations on amounts transacted, as determined in Celsius' sole discretion from time to time;

7. all transactions made through CelPay are final and irreversible;

8. by making any CelPay transaction you represent to Celsius that you are familiar with the person to whom the transaction is made, and that such transaction is not made for any illicit or illegal purpose. You acknowledge that Celsius would hold you responsible for any damages it may incur by any unlawful use of the CelPay feature; and

9. Celsius shall not be a party to, and shall not be obligated to take an active part in the resolution of, any dispute between a transferor or transferee when using CelPay.

Celsius does not accept any liability for CelPay transactions or attempted transactions that would violate any law or regulation, including without limitation, KYC requirements, embargoed or restricted persons or locations, prohibitions against money laundering and/or anti-bribery laws, and structured

transactions or tax evasion, the responsibility for which shall lie solely with the participating User(s). Celsius may refuse to perform, block, or otherwise void any CelPay transaction that Celsius reasonably believes could violate any law or regulation.

## 16. Taxes

Within Celsius' platform, you will be able to see a record of the transactions related to your use of the Services which you may wish to use for the purposes of making any required tax filings or payments. It is your responsibility to determine what, if any, taxes apply to your use of the Services, and to collect, report, and remit the correct tax to the appropriate tax authority. We may deduct or make any tax withholdings or filings that we are required by law to make, but we are not responsible for determining whether and which taxes apply to your transaction, or for collecting, reporting, or remitting any taxes arising from any transaction or in connection with your Celsius Account. You are responsible for complying with applicable law. You agree that Celsius is not responsible for determining whether or which laws may apply to your transactions, including tax law. You are solely responsible for reporting and paying any taxes arising from your use of the Services.

## 17. Service Activity Statements

We will make all logs and records of activities concerning your use of the Services available to you through our platform only. We do not generate periodic statements showing the activity conducted through your use of the Services. You must examine these logs and records and notify us of any

unauthorized use of your Celsius Account or credentials, or any error or irregularity with respect to the records of your use of the Services, within fourteen (14) calendar days after the error occurs. If notice is not received within the fourteen (14) calendar-day period, you will not be able to raise any further claim in this respect.

## 18. Conversion Rates

Any conversion between a Digital Asset and another Digital Asset or Fiat currency shall be made by us in accordance with the rates and prices applicable at the actual time of conversion. Applicable rates are indexed to those used by industry-leading platforms, as we may choose to use from time to time, in our sole discretion. We currently use rates provided by CMC Markets, Coinpaprika, and our own rates as determined by our liquidity providers. We may change these rate sources at any time and without giving notice or updating these Terms, and you shall not have any claims regarding our choice of rate sources or rates used by Celsius or made available by any third party.

## 19. Closing a Celsius Account

A. Celsius' Right to Celsius Account Closure
We have the right to suspend, freeze or close your Celsius Account at any time for any reason without advance notice, including by blocking your access to the Celsius Account or the Services. If your Celsius Account has a balance when we close it, we will repay and return the remaining Digital Assets to you, including accrued Rewards earned (if applicable) until the close date, less any applicable Obligations, withholding tax and other applicable deductions, unless prohibited by applicable law. In the event of irregular activity, we may

hold assets until we close your Celsius Account. Any Digital Assets that Celsius returns to you will be sent to the designated withdrawal addresses in your user profile on the Celsius platform for each respective Digital Asset you hold. Celsius Accounts are not transferable or assignable in whole or in part. Celsius may be required by law to turn over any Digital Assets related to abandoned or unclaimed Celsius Accounts to the state of your last known residence (**"Escheatment"**). Escheatment periods vary by jurisdiction, and you are responsible to determine the applicability of such laws in your place of residence. Celsius reserves the right to recover any administrative charges, payments, or fees which it may incur in connection with such unclaimed or abandoned Celsius Accounts, as permitted by applicable law.

B. Your Right to Close Your Celsius Account

If you want to terminate your Celsius Account with Celsius, you may do so by notifying Celsius at support@celsius.network. Once your Celsius Account is closed, you agree: (a) to continue to be bound by these Terms, as required by Section 35 below (Survival) (b) to immediately stop using the Services, (c) that we reserve the right (but have no obligation) to delete all of your information and Celsius Account data stored on our servers, and (d) that we shall not be liable to you or any third party for termination of access to the Services or for deletion of your information or Celsius Account data. You acknowledge that any legal obligations you may have under any other agreement with Celsius or its Affiliates (including any Loan Agreement or agreement governing lending or investing in Celsius or its Affiliates) will not be affected in any way by the termination of these Terms and any such other agreement between you and Celsius will continue to be in effect in accordance with its terms.

# 20. Liability for Unauthorized Transfers from Your Celsius Account

If you believe that your Celsius Account has been used by an unauthorized party, or if your Service Activity Statements reflect activity or transactions that you did not conduct or authorize, you must notify us IMMEDIATELY via email to security@celsius.network. **YOU ARE SOLELY RESPONSIBLE FOR MAINTAINING THE SECURITY AND CONFIDENTIALITY OF YOUR LOGIN DATA, AND YOU ACCEPT ALL RISKS OF UNAUTHORIZED ACCESS AND USE OF YOUR CELSIUS ACCOUNT.**

## 21. Eligible Digital Assets

We may, from time to time and in our sole discretion, add and/or remove certain Digital Assets from our list of Eligible Digital Assets. If a Digital Asset is removed, it will no longer be available to be used in connection with our Services. We will seek in good faith to notify our Users of our intention to add and/or remove Digital Assets in connection with any of our Services as soon as commercially reasonable. However, under certain circumstances (e.g., for regulatory reasons) such changes may be required to be made immediately and without prior notice. In the event any Digital Asset ceases to be an Eligible Digital Asset, you will no longer be entitled to receive any Rewards in connection with our Earn Service (if available to you), or otherwise make any other use of it via our Services. We may choose to disallow the use of any Eligible Digital Asset for certain Services, or treat any Digital Asset as an Eligible Digital Asset for certain Users or groups of Users for certain Services, in our sole discretion. We may, from time to time, provide certain Services in connection with certain Eligible Digital Assets by different entities within the Celsius group, and any change in and/or assignment by the contracting entity shall not be considered an amendment of these Terms.

## 22. Disclosure of Celsius Account Information

We may disclose information to third parties about you, your Celsius Account,
or the transactions you make:

1. where it is necessary for the provision of our Services under
   these Terms;
2. in order to verify the existence and condition of your Celsius
   Account for a third party, such as a referral partner;
3. for the purpose of conducting our AML and KYC checks and
   compliance with applicable laws;
4. If you give us written authorization;
5. In order to comply with any request or order by any government
   agency or competent court; or
6. As described in our Privacy
   Policy (https://celsius.network/privacy-policy/)

## 23. Conflict/Disputes Involving Your Celsius Account

We are not liable to you for errors that may result in a financial loss to you. We
may take any action that is authorized or permitted by these Terms or
applicable laws without liability to you, even if such action causes you to incur
fees, expenses or damages. If third parties make claims on your Celsius
Account, or if we receive conflicting instructions from you, or if we become
involved in or concerned about a dispute between you and any third party, we
reserve the right to react in ways that we believe in good faith to be
appropriate, including by closing, suspending or freezing your Celsius
Account, delivering the Digital Assets available therein to you or to any third
party, or interpleading assets to court, all as we reasonably deem appropriate
under the circumstances. You are liable for all expenses and fees we incur for

such conflicts or disputes, including internal costs and attorneys' fees, and we may charge or deduct them directly from your Celsius Account balance.

We are not responsible for delays or losses incurred as a result of an error in the initiation of any transaction and have no obligation to assist in the remediation of such transactions. By initiating any transfer or using Celsius' Services in any way, you attest that you are transacting in an Eligible Digital Asset which conforms to the particular Virtual Wallet into which assets are directed. For example, if you select an Ethereum Virtual Wallet Address to receive assets, you shall be solely responsible to assure that you are initiating a transfer of Ethereum alone, and not any other currency such as Bitcoin or Ethereum Classic. Celsius incurs no obligation whatsoever with regard to non-Eligible Digital Assets sent to Celsius, or for Eligible Digital Assets sent to an incompatible Virtual Wallet Address. Erroneously transmitted assets will be lost. We recommend users send a small amount of Digital Asset as a test prior to initiating a transfer of a significant amount of Digital Assets.

**We reserve the right to limit access to your Celsius Account, which can include temporarily or permanently removing your Celsius Account access via the internet, and/or restricting your Celsius Account, and/or closing your Celsius Account without prior notice to you (unless prior notice is required by law), and we shall have no liability for such actions. In addition, Celsius reserves the right to withhold or delay the transmission of assets to you if you fail to comply with these Terms. Our total aggregate liability to you for any claim is limited to the face value of the applicable item or transaction, or the actual value of any assets not properly credited or debited by us.**

## 24. Legal Process Affecting Celsius Account

If any legal action, such as an attachment, garnishment, levy, seizure, third party claim or enforcement action by any competent authority in any jurisdiction (**"Legal Process"**) is brought against or in connection with your Celsius Account, we may refuse to permit (or may limit) withdrawals or transfers from your Celsius Account until the Legal Process is satisfied or dismissed. Regardless of the terms of such Legal Process, we have first claim to any and all assets in your Celsius Account. We will not contest any Legal Process on your behalf, and we may take actions to comply with Legal Process without liability to you, provided that we reasonably believe any such action is appropriate under the circumstances. If we incur any expenses in connection with any Legal Process, including without limitation reasonable attorneys' fees, we may charge such expenses and fees to any of your Celsius Accounts without prior notice to you, or we may bill you directly for such expenses and fees. Any garnishment or levy against your Celsius Account is subject to our right of setoff and security interest.

## 25. Indemnification and Limitation of Liability; Legal Fees and Costs for Lawsuits

You agree to indemnify and hold harmless Celsius and its Affiliates, and their respective employees, managers, officers, directors, partners and shareholders from any losses, damages, suits and expenses, of whatever kind, including reasonable legal fees, that we incur in connection with or arising out of your access to or use of the Services, or our activities in connection with such Services, and for your breach of these Terms or violation of any law, regulation, order or other legal mandate, or the rights of a third party, or any act or omission by you or any person acting on your behalf

while using your Celsius Account, regardless of whether the specific use was expressly authorized by you. You agree to comply with all applicable laws, regulations, or rules, and to not use your Celsius Account or the Services for any transaction or activity that is illegal or violates applicable laws, regulations or rules. Please note, your agreement to comply includes any and all applicable laws and regulations of the United States, as well as of your place of residency, citizenship, business, locality and any law applicable to you.

We are not liable to you for claims, costs, losses or damages caused by an event that is beyond our reasonable control (e.g. the acts or omissions of third parties, natural disaster, emergency conditions, government action, equipment or communications malfunction). We are not liable for special, incidental, exemplary, punitive or consequential losses or damages of any kind. Except for any setoff permitted by applicable law and Section 9 of these Terms, any obligations of ours may be satisfied solely from the assets of Celsius. Without limiting the generality of the foregoing, in no event shall you have any recourse, whether by setoff or otherwise, with respect to our obligations, to or against any assets of any person or entity other than Celsius, including, without limitation, any member, shareholder, Affiliate, investor, employee, officer, director, agent or advisor of Celsius. For the avoidance of doubt, the foregoing shall not limit any setoff permitted by applicable law and Section 9 of these Terms.

## 26. Disclaimer of Warranty

**THE CELSIUS SERVICES ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS WITHOUT ANY WARRANTY UNDER THESE TERMS AND TO THE EXTENT ALLOWED BY APPLICABLE LAW ALL EXPRESS**

OR IMPLIED CONDITIONS, REPRESENTATIONS, AND WARRANTIES INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, SATISFACTORY QUALITY, OR ARISING FROM A COURSE OF DEALING, USAGE, OR TRADE PRACTICE, OR WARRANTY OF NON-INFRINGEMENT ARE DISCLAIMED. IN NO EVENT SHALL CELSIUS, ITS AFFILIATES AND SERVICE PROVIDERS, OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, AGENTS, JOINT VENTURERS, EMPLOYEES OR REPRESENTATIVES, BE LIABLE (A) FOR ANY AMOUNT GREATER THAN THE VALUE OF THE BALANCE OF YOUR CELSIUS ACCOUNT(S) OR (B) FOR ANY LOST PROFITS, DIMINUTION IN VALUE OR BUSINESS OPPORTUNITY, ANY LOSS, DAMAGE, CORRUPTION OR BREACH OF DATA OR ANY OTHER INTANGIBLE PROPERTY OR ANY SPECIAL, INCIDENTAL, INDIRECT, INTANGIBLE, OR CONSEQUENTIAL DAMAGES, WHETHER BASED IN CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY, OR OTHERWISE, ARISING OUT OF OR IN CONNECTION WITH AUTHORIZED OR UNAUTHORIZED USE OF THE CELSIUS SERVICES OR THE CELSIUS ACCOUNT, OR THESE TERMS, EVEN IF AN AUTHORIZED REPRESENTATIVE OF CELSIUS HAS BEEN ADVISED OF OR KNEW OR SHOULD HAVE KNOWN OF THE POSSIBILITY OF SUCH DAMAGES.

CELSIUS MAKES NO REPRESENTATIONS ABOUT THE ACCURACY, ORDER, TIMELINESS OR COMPLETENESS OF HISTORICAL OR CURRENT ELIGIBLE DIGITAL ASSETS PRICE DATA AVAILABLE THROUGH THE CELSIUS SERVICES. CELSIUS WILL MAKE REASONABLE EFFORTS TO ENSURE THAT REQUESTS FOR TRANSACTIONS ARE PROCESSED IN A TIMELY MANNER BUT CELSIUS MAKES NO REPRESENTATIONS OR WARRANTIES

**REGARDING THE AMOUNT OF TIME NEEDED TO COMPLETE PROCESSING (WHICH IS DEPENDENT UPON MANY FACTORS, INCLUDING THOSE OUTSIDE OF OUR CONTROL), AND CELSIUS SHALL NOT BE LIABLE FOR ANY LOSSES OR DAMAGES WHICH YOU MAY INCUR AS A RESULT OF ANY DELAY IN THE PROVISION OF THE SERVICES.**

## 27. Disputes, Binding Individual Arbitration, and Class Actions and Class Arbitrations Waiver

**A. Disputes. The terms of this Section shall apply to all Disputes between you and Celsius. For the purposes of this Section, "Dispute" shall mean any dispute, claim, or action between you and Celsius arising under or relating to your Celsius Account, the Celsius platform, these Terms, or any other transaction involving you and Celsius, whether in contract, warranty, misrepresentation, fraud, tort, intentional tort, statute, regulation, ordinance, or any other legal or equitable basis, and shall be interpreted to be given the broadest meaning allowable under law.**

**B. Binding Arbitration**: You and Celsius further agree: (i) to arbitrate all Disputes between the parties pursuant to the provisions in these Terms; (ii) these Terms memorialize a transaction in interstate commerce; (iii) the Federal Arbitration Act (9 U.S.C. § 1, et seq.) governs the interpretation and enforcement of this Section; and (iv) this Section shall survive termination of these Terms. ARBITRATION MEANS THAT YOU WAIVE YOUR RIGHT TO A JUDGE OR JURY IN A COURT PROCEEDING AND YOUR GROUNDS FOR APPEALS ARE LIMITED. The arbitrator may award you the same damages and relief as a court sitting in proper jurisdiction could, and may award declaratory or injunctive relief. In addition, in some

instances, the costs of arbitration could exceed the costs of litigation and the right to discovery may be more limited in arbitration than in court. The decision of the arbitrator shall be final and enforceable by any court with jurisdiction over the parties.

**C. Small Claims Court**. Notwithstanding the foregoing, you may bring an individual action in the small claims court of your state or municipality if the action is within that court's jurisdiction and is pending only in that court.

**D. Dispute Notice**. In the event of a Dispute, you or Celsius must first send to the other party a notice of the Dispute that shall include a written statement that sets forth the name, address and contact information of the party giving it, the facts giving rise to the Dispute, and the relief requested (the **"Dispute Notice"**). The Dispute Notice to Celsius must be addressed to: Celsius Network LLC, 121 River Street, PH05, Hoboken, NJ 07030 USA, with a copy to legal@celsius.network, or to the most recent email or mailing address we have on file or otherwise in our records for you (the **"Celsius Notice Addresses"**). Any Dispute Notice to you shall be delivered by one of the communication channels you have provided Celsius, which may include email or other electronic transmission, and you agree that such a delivery of a Dispute Notice to you shall be sufficient. Should you require to obtain a Dispute Notice by any other communication channel, you must inform Celsius of such a requirement in writing. Following submission and receipt of the Dispute Notice, you and Celsius each agree to act in good faith to seek to resolve the Dispute before commencing arbitration. If Celsius and you do not reach an agreement to resolve the Dispute within sixty (60) days after the Dispute Notice is received, you or Celsius may commence an arbitration proceeding pursuant to this Section.

**E. WAIVER OF CLASS ACTIONS AND CLASS ARBITRATIONS. YOU AND CELSIUS AGREE THAT EACH PARTY MAY BRING DISPUTES AGAINST THE OTHER PARTY ONLY IN AN INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR**

CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE
PROCEEDING, INCLUDING WITHOUT LIMITATION FEDERAL OR STATE CLASS
ACTIONS, OR CLASS ARBITRATIONS. ACCORDINGLY, UNDER THE
ARBITRATION PROCEDURES OUTLINED IN THIS SECTION, AN ARBITRATOR
SHALL NOT COMBINE OR CONSOLIDATE MORE THAN ONE PARTY'S CLAIMS
WITHOUT THE WRITTEN CONSENT OF ALL AFFECTED PARTIES TO AN
ARBITRATION PROCEEDING. WITHOUT LIMITING THE GENERALITY OF THE
FOREGOING, YOU AND CELSIUS AGREE THAT NO DISPUTE SHALL PROCEED
BY WAY OF CLASS ARBITRATION WITHOUT THE WRITTEN CONSENT OF ALL
AFFECTED PARTIES.

**F. Arbitration Procedure**. If a party elects to commence arbitration, the
arbitration shall be governed by the rules of the American Arbitration Association
("**AAA**") that are in effect at the time the arbitration is initiated (the "**AAA Rules**"),
available at https://www.adr.org/Rules or by calling 1-800-778-7879, and under
the rules set forth in these Terms, except that AAA may not administer any multiple
claimant or class arbitration, as the parties agree that the arbitration shall be
limited to the resolution only of individual claims. If there is a conflict between the
AAA Rules and the rules set forth in these Terms, the rules set forth in these Terms
shall govern. You may, in arbitration, seek any and all remedies otherwise available
to you pursuant to federal, state, or local laws. All Disputes shall be resolved by a
single neutral arbitrator, and both parties shall have a reasonable opportunity to
participate in the selection of the arbitrator as provided in the AAA Rules. The
arbitrator is bound by these Terms. The arbitrator, and not any federal, state or
local court or agency, shall have exclusive authority to resolve all disputes arising
out of or relating to the interpretation, applicability, enforceability or formation of
these Terms, including, but not limited to, any claim that all or any part of these
Terms is void or voidable. The arbitrator shall be empowered to grant whatever
relief would be available in a court under law or in equity. The arbitrator's award

shall be binding on the parties and may be entered as a judgment in any court of competent jurisdiction. You may choose to engage in arbitration hearings by telephone or by video conference. Hearings in any arbitration commenced by you that are not conducted by telephone or videoconference shall take place in New York, New York, unless there is a location in the continental United States more convenient to you, in which case the arbitration shall take place either in New York, New York, or such other location in the continental United States, at your option.

**G. Initiation of Arbitration Proceeding. If either you or Celsius decide to arbitrate a Dispute, we agree to the following procedure:**

1. Write a Demand for Arbitration. The demand must include a description of the Dispute and the amount of damages sought to be recovered. You can find a copy of a Demand for Arbitration at https://www.adr.org/Forms?practice=all (**"Demand for Arbitration"**).

2. Send one copy of the Demand for Arbitration, plus the appropriate filing fee, to
   American Arbitration Association
   Case Filing Services
   1101 Laurel Oak Road, Suite 100
   Voorhees, NJ 08043
   OR
   File online using AAA WebFile at https://www.adr.org
   OR
   File at any of the AAA's offices.

3. Send one copy of the Demand for Arbitration to the other party at the same address as the Dispute Notice, or as otherwise agreed to by the parties.

Hearing Format. In all hearing formats, the arbitrator shall issue a written decision that explains the essential findings and conclusions on which an award, if any, is based. During the arbitration, the amount of any settlement offer made by Celsius or you shall not be disclosed to the arbitrator.

1. The discovery or exchange of non-privileged information relevant to the Dispute may be allowed during the arbitration as determined by the Arbitrator in accordance with AAA Rules.

2. Arbitration Fees. With respect to any Dispute where the amount claimed is $20,000 U.S. or less (or the equivalent amount in a different currency, whether fiat or otherwise), Celsius shall pay, or (if applicable) reimburse you for, all fees paid or payable to AAA, including filing, administration, and arbitrator fees ("**Arbitration Fees**") for any arbitration commenced between Celsius and you (and whether initiated by Celsius or by you) pursuant to provisions of these Terms. You are responsible for all costs that you incur in connection with the arbitration other than Arbitration Fees, including without limitation, fees for attorneys or expert witnesses. You must reimburse Celsius any Arbitration Fees if (i) Celsius is the prevailing party in the arbitration or (ii) you withdraw the arbitration.

3. Opt-out . You may elect to opt-out (exclude yourself) from the final, binding individual arbitration procedure and waiver of class and representative proceedings specified in these Terms by sending a written letter to the Celsius Notice Address within thirty (30) days of your initial assent to these Terms (including your first use of your Celsius Account or the Celsius platform) that specifies: (i) your name; (ii) your mailing address; and (iii) your request to be excluded from the final, binding individual arbitration procedure and waiver of class and representative proceedings specified in

this Section. In the event that you opt-out consistent with the procedure set forth above, all other terms shall continue to apply.

4. Amendments to this Section . Notwithstanding any provision in these Terms to the contrary, you and Celsius agree that if Celsius makes any future amendments to the dispute resolution procedure and class action waiver provisions (other than a change to Celsius' address) in these Terms, Celsius will notify you and you will have thirty (30) days from the date of notice to affirmatively opt-out of any such amendments by sending a written letter to the Celsius Notice Address within thirty (30) days of Celsius' notification that specifies: (i) your name; (ii) your mailing address; and (iii) your request to opt-out of such amendments. If you affirmatively opt-out of any future amendments, you are agreeing that you will arbitrate any Dispute between us in accordance with the language of this Section as stated in these current Terms, without any of the proposed amendments governing. If you do not affirmatively opt-out of any future amendments, you will be deemed to have consented to any such future amendments.

5. Severability . If any provision in this Section is found to be unenforceable, that provision shall be severed with the remainder of these Terms remaining in full force and effect. The foregoing shall not apply to the prohibition against class or representative actions; if the prohibition against class or representative actions is found to be unenforceable, this entire Section shall be null and void. The terms of this Section shall otherwise survive any termination of these Terms.

6. Exclusive Venue for Proceedings in Connection with Arbitration . Celsius and you agree that any proceeding to compel arbitration,

confirm an award, or to seek interim or other relief in aid of arbitration, may be filed only in the competent state or federal courts located in New York County, New York.

## 28. Our Ownership of the Services and Celsius' Intellectual Property (IP)

**You agree and acknowledge that we own all right, title and interest to and in the Services, the associated software, technology tools and content, the Celsius Network website, any logos, identifying marks, images, illustrations, designs, icons, photographs, videos, text and other written and multimedia materials, the content displayed on the website or platform, and other materials produced by and related to Celsius (collectively, the "Celsius IP"). You acknowledge and agree that no proprietary rights are being transferred to you in such materials or information, and that you have no intention of using such materials or information inappropriately or to in any way harm Celsius or any of its affiliates, directors, officers or employees. You shall not prepare any derivative work based on the Celsius IP, nor shall you translate, reverse engineer, decompile or disassemble the Celsius IP.**

## 29. Communications

**We may record and monitor our telephone conversations with you and your electronic communications with us (chat, email, and other forms of electronic exchange). Unless the law requires otherwise, you consent in advance to such recording and monitoring and we do not need to remind you of these activities. You must promptly notify us of any change in your contact information, including residential post and email address. Failure to notify us in a timely fashion may result in delay or non-receipt of notices or correspondence.**

## 30. Waiver

We may delay the exercise of any rights we have under these Terms, and any such delay shall not result in a waiver, relinquishment or modification of any of our rights. If we delay in any exercise of our rights, or if notwithstanding the foregoing Celsius somehow is deemed to have waived any of our rights, you are still obligated to pay us Obligations you may owe us, remove any violation of these Terms and/or otherwise follow our instructions (as applicable). Any delay or waiver of our rights applies only to the specific instance in which we decide to delay or waive the provision and does not affect our other or subsequent rights in any way.

## 31. Changes in Terms

Please be aware that the terms and conditions governing the Services can change over time. We reserve the right to discontinue or make changes to any of the Services. We may change these Terms, and we may add to or delete from these Terms, and the updated version will supersede all prior versions. We will provide notice of changes, additions, and deletions, as required by law. If we have provided advance notice and you do not agree with a change, you may close your Celsius Account(s) and demand repayment of outstanding loans before the effective date of the change, which shall be your sole remedy. The continued maintenance of your Celsius Account following the effective date of any change will constitute your acceptance of such change and subject your Celsius Account to the modified Terms.

## 32. Assignment

These Terms, or any of the rights and/or obligations provided hereunder, may not be assigned or otherwise transferred by you to any other person or Entity, whether by operation of law or otherwise, without Celsius' express written consent, and any attempted assignment in violation of this prohibition shall be void ab initio and of no effect. Celsius may assign or transfer these Terms and/or any or all of its rights and/or obligations

hereunder at any time to any Affiliate of Celsius, with or without providing you with prior notice of the same. Celsius may assign or transfer these Terms and/or any or all of its rights and/or obligations hereunder at any time to any third party by providing prior notice. Any permitted assignment or transfer of or under these Terms shall be binding upon, and inure to the benefit of the successors, executors, heirs, representatives, administrators and permitted assigns of the parties hereto.

## 33. Governing Law and Venue

The relationship between you and Celsius is governed exclusively by the laws of the state of New York, without regard to its conflict of law provisions (other than Sections 5-1401 and 5-1402 of the New York General Obligations Law). Any dispute arising out of, or related to, your Celsius Account or relationship with Celsius must be brought exclusively in the competent courts located in New York, NY and the US District Court located in the Borough of Manhattan; however, Celsius may bring equitable relief or collections actions in any applicable jurisdiction.

## 34. Force Majeure

We will not be liable for delays in processing or other non-performance caused by such events as fires, telecommunications, utility, or power failures, equipment failures, labor strife, riots, war, nonperformance of our vendors or suppliers, acts of God, pandemic or epidemic events, or other causes over which we have no reasonable control.

## 35. Survival

The provisions of Sections 16 (Taxes), 25 (Indemnification), 26 (Disclaimer of Warranty), 27 (Disputes, Binding Individual Arbitration, and Class Actions and Class Arbitrations Waiver), 28 (Our Ownership of the Services and Celsius IP), 30 (Waiver) and 33 (Governing Law and Venue) shall survive the termination of these Terms.

****

Appendix A

Binance Coin (BNB)

Ripple (XRP)

Tether Gold (XAUT)

WDGLD

# **EXHIBIT B**

## Exhibit A

### Phase 1 Communications

**External E-mail**

Hi first name,

As a valued Celsius customer, we are writing to inform you about updates to our Terms of Use and Privacy Policy which require your attention.

**The main changes to our Terms of Use include:**

- Your engagement will be with Celsius Network LLC, A Delaware company;

- Your relationship with us will be subject to the governing laws of New York;

- Disputes will be settled by arbitration;

**To review and accept these updates, log in to your Celsius account on mobile or desktop.** These are not all of the changes in the updated documents, and you are requested to carefully read and make sure you understand the new terms.

 If you do not accept our updated Terms of Use and Privacy Policy by **August 5, 2021**, you will lose access to the services provided in the Celsius app, and withdrawals will only be processed by reaching out to our customer support team. You will continue to earn rewards as before, and any active loans will not be affected.

If you do not accept by **August 19, 2021**, your account will no longer be eligible to earn rewards.

You can always withdraw your funds at any time and without any fees, and you will still be able to accept the updates and regain normal access to your Celsius account.

If you do not agree to the updated Terms of Use or Privacy Policy, please contact our support team at app@celsius.network to withdraw your funds and close your account.

A-2

 **Reminder:** Celsius will never ask you for confidential information such as passwords, private keys, seed phrases, or secret codes. You should store this information privately and securely and report any suspicious activity.

Button: Go to your account

---

**Internal E-mail**

Hi team,

We have initiated a Terms of Use and Privacy Policy update for all Celsius customers that reflect the migration from Celsius' UK entity (Celsius Network Limited) to the US entity (Celsius Network LLC). These changes have been communicated to customers via email and are now available to review and accept through the Celsius app on mobile and desktop.

**All active Celsius users - including employees - must review and accept these changes at the earliest convenience.**

If you do not accept our updated Terms of Use and Privacy Policy by **August 5, 2021**, you will lose access to the services provided in the Celsius app, and withdrawals will only be processed by reaching out to our customer support team. You will continue to earn rewards as before, and any active loans will not be affected.

If you do not accept by **August 19, 2021**, your account will no longer be eligible to earn rewards.

These dates apply to all customers and employees with a Celsius account.

For more information, you can read our blog post here. If you get questions from clients, partners, friends, or any external contacts that can't be answered by copying and pasting information from the blog, please reach out to communications@celsius.network and you will be provided with additional guidance.

Thank you!
Ashley

---

**Blog**

Title: **Celsius Community Update — July 22, 2021**
Subheading: *An overview of the updates to our Terms of Use and Privacy Policy for Celsius customers*

A-3

Last month, Celsius announced its plans to migrate its core business operations from Celsius' UK entity (Celsius Network Limited) to the US entity (Celsius Network LLC). As of July 22, 2021, we have updated our Terms of Use and Privacy Policy for all Celsius customers to reflect this migration.

The main changes to our Terms of Use include:

- Your engagement will be with Celsius Network LLC, A Delaware company;

- Your relationship with us will be subject to the governing laws of New York;

- Disputes will be settled by arbitration;

To review and accept these updates, log in to your Celsius account on mobile or desktop. These are not all of the changes in the updated documents, and you are requested to carefully read and make sure you understand the new terms.

If you do not accept our updated Terms of Use and Privacy Policy by **August 5, 2021**, you will lose access to the services provided in the Celsius app, and withdrawals will only be processed by reaching out to our customer support team. You will continue to earn rewards as before, and any active loans will not be affected.

If you do not accept by **August 19, 2021**, your account will no longer be eligible to earn rewards.

You can always withdraw your funds at any time and without any fees, and you will still be able to accept the updates and regain normal access to your Celsius account.

If you do not agree to the updated Terms of Use or Privacy Policy, please contact our support team at app@celsius.network to withdraw your funds and close your account.

Reminder: Celsius will never ask you for confidential information such as passwords, private keys, seed phrases, or secret codes. You should store this information privately and securely and report any suspicious activity.

Click here to go to your Celsius account →

--

Blog footer

**Push notification (July 29)**

**Title - Action Required**

**Body - Open your Celsius app to review and accept our updated Terms of Use and Privacy Policy today.**

**Monday Rewards E-mail Reminder (August 2)**

We've updated our Terms of Use and Privacy Policy. Please review and **accept these updates by August 5, 2021** to continue accessing Celsius services as normal. Read more →

**Reminder E-mail (August 3)**

Subject: IMPORTANT -- 2 days to go. Please accept Celsius's Terms of Use by August 5, 2021.

Hi first name,

This is a reminder to please review and accept our updated Terms of Use and Privacy Policy at your earliest convenience. **To review and accept these updates, log in to your Celsius account on mobile or desktop and follow the in-app prompts.**

If you do not accept our updated Terms of Use and Privacy Policy by **August 5, 2021**, you will lose access to the services provided in the Celsius app, and withdrawals will only be processed by reaching out to our customer support team. You will continue to earn rewards as before, and any active loans will not be affected.

If you do not accept by **August 19, 2021**, your account will no longer be eligible to earn rewards.

You can always withdraw your funds at any time and without any fees, and you will still be able to accept the updates and regain normal access to your Celsius account.

**The main changes to our Terms of Use include:**

A-5

- Your engagement will be with Celsius Network LLC, A Delaware company;

- Your relationship with us will be subject to the governing laws of New York;

- Disputes will be settled by arbitration;

These are not all of the changes in the updated documents, and you are requested to carefully read and make sure you understand the new terms.

If you do not agree to the updated Terms of Use or Privacy Policy, please contact our support team at app@celsius.network to withdraw your funds and close your account.

**Reminder:** Celsius will never ask you for confidential information such as passwords, private keys, seed phrases, or secret codes. You should store this information privately and securely and report any suspicious activity.

## BETA POP-UP COMMUNICATIONS

### IN-APP





# WEB BROWSER





# EXHIBIT C

# NOVATION AGREEMENT

THIS NOVATION AGREEMENT (this "**Agreement**") is entered into as of August 19, 2021 (the "**Effective Date**"), by and between Celsius Network Limited, a company organized under the laws of England and Wales with Company No. 11198050 and registered address at The Harley Building 77 - 79 New Cavendish Street London, W1W 6XB, United Kingdom ("**Transferor**"), and Celsius Network LLC, a company organized under the laws of Delaware with principal address at 221 River Street, 9th Floor, Hoboken, New Jersey 07030, United States ("**Transferee**").

## RECITALS

WHEREAS, as of the Effective Date, Transferor maintained a democratized reward payment and lending activity which is accessible via a mobile app owned by the Transferor's affiliate (the "**Celsius App**"), where membership provides access to financial services enabling crypto holders to earn rewards by transferring their coins to their Celsius accounts and borrow USD against their crypto collateral at low interest rates (the "**Business**");

WHEREAS, Transferor was notified during June 2021 on certain regulatory limitations and requirements applies on its Business as they relate to the operation of the Business by Transferor with respect to the provision of services to retail users of the Celsius App (the "**Users**");

WHEREAS, Transferor offered its Users the ability to transfer their respective services from Transferor to Transferee in order to address such regulatory limitations and requirements through the period of July 22, 2021 to August 23, 2021 (each User that agreed, a "**Consenting User**" and collectively, the "**Consenting Users**");

WHEREAS, Transferor has, based on input received from the applicable regulatory bodies in the United Kingdom, and following input and advice of counsel, determined to stop providing services to or contracting with the Consenting Users;

WHEREAS, Transferor, in order to no longer provide services to or contract with the Consenting Users, transferred the assets and liabilities of the Business that relate specifically to the Consenting Users and which are the subject of regulatory limitations and requirements;

WHEREAS, Transferee is able to operate certain aspects of the Business as they relate to the provision of services to the

Consenting Users and Transferee is willing to contract with the Consenting Users in connection with the operation of the Business;

WHEREAS, Transferor will continue to hold and deploy crypto assets relating to the Consenting Users and will provide an obligation to transfer such assets to Transferee immediately upon its request. Transferor will execute a separate agreement with Transferee to contemplate the terms and conditions of this obligation including the arm's length fee paid from Transferor to Transferee;

WHEREAS, in light of the foregoing, Transferor wishes to assign to Transferee, and Transferee agrees to assume from Transferor, certain assets and liabilities of the Business listed on Exhibit 1 hereto (collectively, the "**Transferred Assets and Liabilities**"), subject to the terms and conditions set forth herein.

**AGREEMENT**

NOW, THEREFORE, in consideration of the mutual and dependent promises set forth herein, the sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

**ARTICLE I**
**THE TRANSACTION**

1.1     Transfer and Assumption.  Upon the terms and subject to the conditions set forth in this Agreement and effective upon the execution hereof, Transferee shall accept and assume from Transferor, and Transferor shall transfer and assign to Transferee, the Transferred Assets and Liabilities.

1.2     The Consideration. The consideration for the Transferred Assets and Liabilities shall be determined according to the arm's length standard as stated in the U.S. Transfer Pricing rules pursuant to Internal Revenue Code §482 and the regulations promulgated thereunder, the 2017 Organization of Economic Cooperation and Development ("OECD") Transfer Pricing Guidelines, and any equivalent local tax laws, regulations, and guidelines. Any consideration shall be paid or reflected in intercompany accounts within thirty (30) days of the Effective Date. Transfer Period.

1.3     The Closing. The transfer and assumption of the Transferred Assets and Liabilities (the "Closing") was initiated on July 22, 2021 and completed on August 23, 2021.

1.4     Beneficial Ownership.  The parties hereto agree that, to the extent that legal title and registered ownership of the Transferred Assets and Liabilities are not transferred to Transferee solely by this instrument under applicable law, the parties hereto shall nonetheless treat Transferee as the beneficial owner of the Transferred Assets and Liabilities, as of the Effective Date, for all purposes.

1.5     Further Assurances.  Transferor hereby undertakes to promptly, or as soon as reasonably practicable, transfer the title and registered ownership of the Transferred Assets and Liabilities to Transferee or its nominee(s), as directed by Transferee.  Each of the parties hereto shall execute and deliver such additional documents, instruments, conveyances, and assurances and take such further actions as may be required to carry out the provisions hereof and give effect to the transactions contemplated hereby.

1.6     Fees and Expenses.  Transferee and Transferor shall each be responsible for its own respective fees and expenses incurred in connection with this Agreement and the transactions contemplated hereby.

1.7    <u>Tax Matters</u>.

(a)    Transfer, sales, use, registration, documentary, stamp, value-added and similar taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the other related document, if any, shall be borne and paid by Transferee when due, excluding taxes on Transferor's income, gross receipts, capital, property or employees.

## ARTICLE II
## <u>REPRESENTATIONS AND WARRANTIES OF TRANSFEREE</u>

Transferee represents and warrants to Transferor as follows:

2.1    <u>Authorization of Agreement</u>.    Transferee has all requisite power, authority and legal capacity to execute and deliver this Agreement and Transferee has all requisite power, authority and legal capacity to perform Transferee's obligations hereunder and to consummate the transactions contemplated hereby.  This Agreement has been duly and validly executed and delivered by Transferee and, assuming the due authorization, execution and delivery by Transferor, this Agreement constitutes a legal, valid and binding obligation of Transferee, enforceable against Transferee in accordance with its terms, subject to applicable bankruptcy, insolvency, moratorium, reorganization or similar laws affecting creditors' rights generally and subject to general equitable principles (regardless of whether such enforceability is considered in a proceeding in equity or at law).

## ARTICLE III
## <u>REPRESENTATIONS AND WARRANTIES OF TRANSFEROR</u>

Transferor represents and warrants to Transferee as follows:

3.1    <u>Authorization of Agreement</u>.    Transferor has all requisite power, authority and legal capacity to execute and deliver this Agreement and Transferor has all requisite power, authority and legal capacity to perform Transferor's obligations hereunder and to consummate the transactions contemplated hereby.  This Agreement has been duly and validly executed and delivered by Transferor and, assuming the due authorization, execution and delivery by Transferee, this Agreement constitutes a legal, valid and binding obligation of Transferor, enforceable against Transferor in accordance with its terms, subject to applicable bankruptcy, insolvency, moratorium, reorganization or similar laws affecting creditors' rights generally and subject to general equitable principles (regardless of whether such enforceability is considered in a proceeding in equity or at law).

3.2    <u>Title to Transferred Assets and Liabilities</u>.    Transferor has good, valid and marketable title to the Transferred Assets and Liabilities, free and clear of any and all security interests, liens, claims, pledges, encumbrances or other rights or claims of any other person of any kind or any preemptive or similar rights (collectively, "**Encumbrances**").    Upon the execution hereof, Transferee will acquire all of Transferor's right, title and interest in and to, and will have good, valid and marketable title to, the Transferred Assets and Liabilities Transferred from Transferor hereunder, free and clear of any and all Encumbrances other than permitted Encumbrances.

# ARTICLE IV
# MISCELLANEOUS

4.1 <u>Notices</u>. All notices and other communications given or made in connection with this Agreement shall be in writing and shall be deemed to have been given or made when given or made if such notice or communication is in writing and delivered personally, sent by commercial carrier or registered or certified mail (postage prepaid) or transmitted by facsimile or electronic mail to the parties at the following addresses and numbers (or at such other addresses as shall be furnished by the parties by like notice):

**If to Transferor:**       The Harley Building
                            77 - 79 New Cavendish Street
                            London, W1W 6XB
                            United Kingdom


**If to Transferee:**       221 River Street, 9th Floor
                            Hoboken, New Jersey 07030
                            United States


4.2 <u>Indemnification</u>.

(a) Transferee agrees to indemnify and hold harmless Transferor, and any of Transferor's representatives and agents, from and against any demands, claims, actions, suits, proceedings, fees and expenses, including reasonable attorneys' fees and expenses, and any other obligations directly or indirectly arising from or related to (i) any breach of any representation or warranty made by Transferee in this Agreement or (ii) any breach by Transferee of any covenant or obligation of Transferee under this Agreement.

(b) Transferor agrees to indemnify and hold harmless Transferee, and any of Transferee's representatives and agents, from and against any demands, claims, actions, suits, proceedings, fees and expenses, including reasonable attorneys' fees and expenses, and any other obligations directly or indirectly arising from or related to (i) any breach of any representation or warranty made by Transferor in this Agreement; or (ii) any breach by Transferor of any covenant or obligation of Transferor under this Agreement.

*Tax Treatment of Indemnification Payments*. All indemnification payments made under this Agreement shall be treated by the parties as an adjustment to the Purchase Price for tax purposes, unless otherwise required by law.

(c)

4.3    <u>Headings; Entire Agreement; Counterparts; Amendments; Third Party Beneficiaries</u>.  The headings contained in this Agreement are inserted for convenience only and do not constitute a part of this Agreement.  This Agreement constitutes the entire agreement among the parties hereto and supersedes all other prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the United States federal ESIGN Act of 2000, *e.g.*, www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.  This Agreement may not be amended except by an instrument in writing duly executed by each of the parties hereto.  This Agreement is not intended to confer upon any other person other than the parties hereto any rights or remedies hereunder.

4.4    <u>Waivers</u>.  Neither any failure nor any delay by any party hereto in exercising any right, power or privilege under this Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege.

4.5    <u>Assignment; Successors and Assigns</u>.  No party hereto may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other party hereto.  Subject to the preceding sentence, all of the terms, agreements, covenants, representations, warranties, and conditions of this Agreement are binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns (whether by operation of law or otherwise).  Any assignment in violation of this section shall be null and void.

4.6    <u>Governing Law</u>.  The validity and interpretation of this Agreement shall be governed by the laws of the State of Delaware, United States, without reference to the conflict of laws principles thereof.

4.7    <u>Submission to Jurisdiction; Process</u>.  Each party hereto submits to the exclusive jurisdiction of any state or federal court located in the State of New York, in any action, suit or proceeding ("**Action**") arising out of or relating to this Agreement and agrees that all claims in respect of the Action may be heard and determined in any such court.  Each party hereto also agrees not to bring any Action arising out of or relating to this Agreement in any other court.  Each party hereto agrees that a final judgment in any Action so brought will be conclusive and may be enforced by Action on the judgment or in any other manner provided at law or in equity.  Each party hereto waives any defense of inconvenient forum to the maintenance of any Action so brought and waives any bond, surety, or other security that might be required of any other party with respect thereto.  Process in any such Action may be served on any party hereto anywhere in the world, whether within or without the jurisdiction of any such court.

4.8     Waiver of Jury Trial.   TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW, THE PARTIES HERETO HEREBY WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY ACTION, SUIT OR OTHER PROCEEDING BROUGHT TO RESOLVE ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATING TO THIS AGREEMENT, REGARDLESS OF WHICH PARTY INITIATES SUCH ACTION, SUIT OR OTHER PROCEEDING.

4.9     Drafting.   The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

4.10    Specific Performance.   The parties hereto shall acknowledge that, in view of the uniqueness of the parties hereto, the parties hereto would not have an adequate remedy at law for money damages in the event that this Agreement were not performed in accordance with its terms, and therefore agree that the parties shall be entitled to specific enforcement of the terms hereof in addition to any other remedy to which the parties hereto may be entitled at law or in equity.

4.11    Severability.   The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision.

*[Signature Page Follows]*

IN WITNESS WHEREOF, Transferee and Transferor have executed this Agreement as of the date first set forth above.

**TRANSFEROR:**

Celsius Network Limited

By: _____
   Name: [NAME]
   Title: [TITLE]

**TRANSFEREE:**

Celsius Network LLC

By: _____
   Name: [NAME]
   Title: [TITLE]

**Exhibit 1 – Transferred Assets and Liabilities**

Except as otherwise provided, the Transferred Assets and Liabilities are as follows:

1.        All of Transferor's obligations related to or resulting from the Consenting Users' use of the Celsius App, including any obligation of Transferor to return collateral following repayment of a loan made to a Consenting User, all obligations to repay loans of digital assets made by Consenting Users to Transferor prior to the Effective Date and obligations to pay financing fees (known as "Rewards" on the Celsius App) to Consenting Users in respect of loans made by Consenting Users through the Celsius App.

2.        The business relationship with the Consenting Users.

3.        All of Transferor's rights related to or resulting from the balances of the Consenting Users in the Celsius App, including the right to use any collateral used to secure loans to Consenting Users and all digital assets loaned by the Consenting Users to Transferor prior to the Effective Date.

4.        A copy of the list of Consenting Users and their information.

Notwithstanding the foregoing, the following shall not form a part of the Transferred Assets and Liabilities:

1.        All rights and obligations of Transferor related to or resulting from the transfer and use of (i) Binance Coin (BNB); (ii) Terra (LUNA); (iii) Ripple (XRP); (iv) Tether Gold (XAUT); or (v) WDGLD by Consenting Users outside of the United States of America.

2.        Goodwill of Transferor and ownership of and rights related any trademarks, copyrights, patents, applications for any of the foregoing, trade secrets, or similar intellectual property of Transferor.

# EXHIBIT D

# Celsius Mining

**Executive Summary**
*Fall 2021*





# Celsius

# Introduction to Bitcoin & Mining

**Executive Summary | Fall 2021**



# Popularity of Digital Assets is on the Rise

*DeFi is in its nascent stages with massive upside opportunity*

Unbounded Potential For Digital Assets…

…and Enjoying Secular Tailwinds

**1** Increasing Institutional Demand

Institutional Investors are driving higher exposure to digital assets[7].

**2** Corporates are Increasing their Digital Asset Holdings

Marquee organizations are increasing their crypto exposure to their balance sheet.

**3** Consumers Are Increasingly Using Crypto for Every-Day Transactions

As consumer preferences shift, marquee financial services firms have evolved to accept cryptocurrencies.

Gold [3] **$11tn**

GLOBAL PAYMENTS [2] **$34tn**

Total Global Bank Assets [4] **$155tn**

GLOBAL BROAD MONEY (M3) SUPPLY [1] **$162tn**

*Today*
CRYPTOCURRENCY [5]
~**$2.6tn**

DeFi [6]
**$169bn**

*1 year ago*
CRYPTOCURRENCY [5]
~**$400bn**

**Executive Summary | Fall 2021**

1) Source: OECD M3 Data for Jul. 2021.
2) Source: Juniper Research B2B Payments Research. Data as of Aug. 31 2021. Based on 2021 B2B cross-border payments market size.
3) Source: 8marketcap, Data as of Oct. 25 2021. Represents market cap. of gold.
4) Source: Institute of International Finance. Data as of Jan. 20, 2020.
5) Source: CoinMarketCap. Data for Oct. 25 2020 and 2021, respectively. Represents total cryptocurrency market cap.
6) Source: CoinMarketCap. Data as of Oct. 25 2021. Represents total market cap of DeFi tokens.
7) Source: 2021 Fidelity Institutional Investor Surveys. Represents % of US Inst'l Investors with investments in digital assets.



# Mining is Essential to the Bitcoin Network

## Bitcoin Mining Basics

- Bitcoin miners process and authenticate transactions on the blockchain by mathematically solving a puzzle and are given newly created Bitcoins as a fee for their services

## The Importance of Mining

- Miners are a critical piece of the infrastructure, as they underpin the ecosystem

- The blockchain acts as a general ledger of past Bitcoin transactions in the form of sequentially added blocks

- The mining process is essential to creating these blocks, providing security for the validity of Bitcoin transactions

## Mining Outlook

- As demand for Bitcoin increases, the outlook for mining Bitcoin becomes more attractive

### Network Hashrate Correlates to Bitcoin Price



- Because miners are rewarded in Bitcoin, total mining activity is influenced by Bitcoin's price. When Bitcoin price increases, miners are more incentivized to increase their investments in mining.

*Source: Nasdaq Data Link as of 10/8/2021*

# Mining - The Business Model and Value Drivers

## What is the business model?

- Successful industrial-scale mining is initially capital-intensive and requires both technical mining expertise and knowledge of running large-scale operations

- To be competitive demands an understanding of controlling the inputs, minimizing costs, and maximizing operational efficiencies

- Controlling the cost of creation directly impacts the margin

- Controlling cost requires effectively managing the supply chain (power contracts, hosting, rig manufacturing and logistics)



COST OF CREATION

**Minimize cost of creation**

**Maximize profit margins**

ASSET TO SELL ON OPEN MARKET

Infrastructure

Power

Mining hardware

**How Bitcoin Mining Works**

Machines (miners) work to solve a puzzle

Once solved, a new block is added to the blockchain

The miner is rewarded with Bitcoin for solving the puzzle

**Executive Summary | Fall 2021**



Celsius

# Business and Transaction Overview

**Executive Summary | Fall 2021**

# Overview of Celsius Mining



*Celsius Mining (the "Company") is a wholly owned subsidiary of Celsius Network. The Company is one of the largest and among the most profitable bitcoin miners in North America.[1]*

- Celsius Mining is one of the largest Bitcoin miners in North America, with **21,151 machines** currently operating (representing **~2.1 Exahash**), and capital deployed towards owning and operating **126k mining machines** (representing **~12.6 Exahash**)

- The Company has recently **executed a purchase order for 60k rigs** to be **delivered in Q2–Q3 of FY22** and expects to make additional purchase orders in Q1–Q2 of FY22 towards **40k additional rigs** to be **delivered in Q3–Q4 of FY22** along with investments in hosting and power

- Celsius is currently generating **~13.7 Bitcoin per day** and has generated **1,825 BTC this year through 9-30-21**

## Celsius Network Highlights

- Founded in 2018, Celsius Network is a leading global yield earning platform
- Celsius Network has over $20bn in assets and has multiple sources of revenue including retail and institutional lending, trading (CeFi, DeFi, Staking) as well as 100% ownership of Celsius Mining

**Celsius Network has invested more than $300mm[4] in Celsius Mining**

**Experienced and profitable operation with strong deal generation and execution capabilities**

**Committed towards carbon neutrality**

## Already profitable, and highly-visible future EBITDA growth

*Quarterly ($ in millions)[2]*

| | 2Q21A | 3Q21A | 4Q21E | 1Q22E | 2Q22E | 3Q22E | 4Q22E |
|---|---|---|---|---|---|---|---|
| | $16 | $45 | $60 | $101 | $151 | $198 | $241 |

*Annualized[3]*

| $64 | $179 | $241 | $403 | $603 | $792 | $962 |
|---|---|---|---|---|---|---|

1) Based on publicly available information.
2) See slide 21 for projection assumptions.
3) Annualized based on quarterly results from unaudited financials and management projections.
4) Gross amount



# Key Differentiating Factors

*Celsius has overcome the multiple challenges that exist to achieving scale and profitability in the mining industry*

## Challenges to Entry & Profitability

Access to large amounts of capital to purchase mining rigs

Key supply chain relationships – power and rigs

Achieving scale

Cryptocurrency deployment expertise for enhancing on-balance sheet asset yield

## Celsius Advantage[1]

Celsius Network has invested over **$300mm into Celsius Mining**; this capital raise and subsequent IPO is expected to drive Celsius Mining's ability to continue to **capture market share and on-balance sheet BTC growth**

**Affiliation with Celsius Network** and previous management experience enables the Company to **access relationships and opportunities available to few other mining companies.** Celsius Network is a known lender to the industry and has a breath of relationships.

With ~69MWs of power output, **~21k mining rigs deployed, ~126k rigs ordered** and scheduled and **~40k additional rigs** expected to be ordered in Q1-Q2 of 2022 and delivered by the end of FY22, Celsius Mining is a Top 5 miner with the potential to quickly outpace the industry

Advisory and portfolio management **agreements with Celsius Network** to enable institutional grade risk management and foster yield generation

*Source: Celsius Management*
*1)   As of 9/30/21*

**Executive Summary | Fall 2021**



# Investment Highlights and Rationale

*A sophisticated alternative to entering the BTC asset class*

## Investment Rationale – Arbitrage Play

- **Strong underlying unit economics** – Market value of mined coin is generating **7x profit** on cost of mining 1 BTC[1]
- **Self-funding** of all ongoing operating costs through cash flow from coins mined
- 3 year Capex investment (3 year funding needs) of ~$1.5B anticipated to **drive ~$3.1B of cumulative EBITDA**
- Accumulated EBITDA, if held in BTC, has a potential to increase to ~$3.8B of BTC on balance sheet by 2024[2], a **2.6x return on invested capital**
- **Potential for additional annual yield** derived from investment in curated portfolios or financial instruments

## Downside Protection

- Structured investment **senior** to Celsius Network's equity/debt
- Expected **$648mm**[3] in EBITDA for FY2022 assuming no incremental rig investments beyond those operating and on order

## Company Highlights

**Well Capitalized**

**Profitable Operation**

**Broad Industry Reach**

**Positioned for Growth**







1) *Assumed market price of $50k/BTC, current cost of mining of $6.9k (includes cost of mining plus G&A, excludes depreciation)*
2) *See page 21 for BTC value reconciliation*
3) *Assumes BTC prices per page 21*



# Collaboration with Celsius Network to Generate Value

*Significant value through the Celsius Network relationship*



### Hedging Strategies

- Collars to lower quarterly volatility in earnings (see example on slide 28)
- Downside protection of on-balance sheet coins



### Generation of Yield for On-Balance Sheet Coins

- Deposit in Celsius Network yield accounts
- Directional use of derivatives to generate yield on-balance sheet coins (example: selling out-of-the-money call options)
- Directional exposure to proprietary investment strategies (institutional coin lending, Cefi and DeFi)



### Risk and Treasury Management

- Collaboration with Celsius Network on diversified risk management and treasury management tools benefiting from the breadth of the platform

# Pre and Post-Transaction Corporate Structure

○ Celsius

## Pre-Transaction

**Celsius Network**

100%

All corporate functions provided by parent in a matrix organizational format

**Celsius Mining**

Rigs & Contracted Backlog

Hosting Contracts

Wallets

*Celsius Mining Owns All the Contracts and Wallets*

## Post-Transaction

**Preferred Investors**

**Celsius Network**

Third-Party Services Including:
- Portfolio Management
- Hedging Strategies
- Tech Support

100%

**Celsius Mining**

Rigs & Contracted Backlog

Hosting Contracts

Wallets

*Celsius Mining Owns All the Contracts and Wallets*

Service Agreement Relationship

Ownership

Executive Summary | Fall 2021

# Celsius Mining Strategic Roadmap - Full Vertical Integration



**Short-Term: taking market share & consolidating supply chain**

**Long-Term: building recurring sustainable business**

| Area | Short-Term | Long-Term |
|---|---|---|
| **Energy** | • Focus is finding the cheapest renewable energy available in so-called "Energy Islands" in North America, which for lack of demand, transmission infrastructure and/or federal subsidies have created pockets of stranded energy<br>• Contract **long-term supply agreement** | • Investing in **energy efficient** technologies<br>• Evaluating **investments** in the space |
| **Hardware** | • Evaluating investments / partnerships with start-up rig manufacturers for **future vertical integration** of the Company's supply chain<br>• Fostering strategic alliances | • Investing in Western manufacturers to consolidate supply chain and eliminate dependency |
| **Hosting** | • Securing 3rd party **hosting capacity**<br>• Partnerships and joint ventures to **own facilities** | • Evaluating **investments** in facilities that support **high performance computing** (HPC), enabling versatile use and down side protection<br>• Data center design<br>• Immersion technologies |
| **Other** | • **Operational Expertise:** Deepen in-house capabilities to consolidate supply chain<br>• **Potential bolt-on acquisitions:** Acquisition of hosting & mining companies to accelerate Celsius market share and strengthen control of cost structure | • Mining of **alternative coins**<br>• Utilize mining infrastructure to develop other technology offerings such as **high performance computing / private cloud** |



# Compelling Long-Term Strategic Roadmap

*Experienced operators in digital assets, financial services, and asset-intensive businesses position Celsius Mining to be agile and efficient in expanding into adjacent markets*

**A** — Bitcoin Mining
Core proprietary mining operations

In model

**B** — Alternative Coins
Procurement of rigs to mine alternative coins with potential to leverage Celsius Network's expertise in over 45 cryptocurrencies

**C** — Mining Financial Services
Ability to sell hashrate wholesale to companies

**D** — HPC Infrastructure
Ability to leverage low-cost power and infrastructure to provide cloud and co-location services

Executive Summary | Fall 2021

Celsius



# Being Carbon Neutral Isn't Good Enough

*Celsius Mining is driving a greener and more prosperous future with underserved communities in mind*

### Today

- Carbon emissions are a criteria in site screening
- Excess carbon is offset with credits

✓ 100% Net Carbon Neutral

### Celsius Plan

**Base-Load Demand Provision**

- Celsius Mining is focused on driving **renewable energy innovation** and plans to participate in **on-call load curtailment programs** across North America to lower its annual net energy costs, encourage **renewable energy production, and drive a greener and more prosperous future with underserved communities in mind**

✓ Net energy costs can be cut by **50% or more** due to demand response program participation resulting in **$2c/kWh power costs or lower**[1]

✓ On-call energy load turns Celsius Mining into a **resource node** for the energy grid to call on during periods of grid volatility

✓ Directly support local communities with **creation of high-skill jobs, tax revenue, and a higher renewable energy mix** for the local grid

**Strategy**

**Target Impact**

Executive Summary | Fall 2021

1)  *Preliminary management estimate of opportunity*

# Key Partners and Relationships




## Energy

- Power agreements are based on a fixed kWh rate on a 3-5 year term with hosting and power providers






## Hardware Acquisition

- Celsius has preferred purchasing power in this space




## Capital Markets Infrastructure

- Connections to liquidity, investors and capital through a reputable industry-leading brand name

celsius network

## Hosting

- Rigs are hosted at facilities that secure an annual uptime and plug-in and regular maintenance services






# Financial Overview

Executive Summary | Fall 2021



# Financial Highlights & Key Assumptions

| | Quarter ended | | | Fiscal year ending | | | Notes |
|---|---|---|---|---|---|---|---|
| | Q3'21A | Q4'21E | 2021E | 2022E | 2023E | 2024E | |
| **Income Statement Highlights ($ in millions)** | | | | | | | |
| Mining Revenue | $53 | $71 | $149 | $843 | $1,596 | $1,515[1] | # of Bitcoin mined x Avg. BTC price during period |
| Mining Operations | (7) | (10) | (20) | (118) | (233) | (313) | $USD hosting, power, maintenance expenses |
| Gross Profit | $46 | $61 | $129 | $725 | $1,363 | $1,202 | |
| % Margin | 87% | 86% | 86% | 86% | 85% | 79% | |
| G&A | (0.8) | (0.9) | (3.0) | (35.3) | (52.7) | (54.0) | $USD corporate G&A expenses |
| **EBITDA (Net BTC to Balance Sheet)** | $45 | $60 | $126 | $690 | $1,310 | $1,148 | Effective $USD value of BTC retained to BS |
| % Margin | 85% | 85% | 84% | 82% | 82% | 76% | |
| **Balance Sheet Highlights** | | | | | | | |
| BTC on Balance Sheet, BoP Balance | | | - | 822 | 13,189 | 34,161 | |
| BTC Mined | | | 3,231 | 15,104 | 25,554 | 21,752 | |
| BTC Realized | | | (2,408) | (2,737) | (4,582) | (5,222) | BTC sold to cover opex and G&A |
| BTC on Balance Sheet, EoP Balance | | 822 | 822 | 13,189 | 34,161 | 50,692 | |
| EoP Pre-Tax Value of BTC on BS ($ in millions) | | $43 | $43 | $773 | $2,257 | $3,773 | # of BTC on balance sheet x EoP BTC price |
| Capex | 116 | 299 | 469 | 641 | 442 | 388 | $USD rig and infrastructure investment |
| **Unit Economics ($)** | | | | | | | |
| Avg Annual Cost of Mining 1 Bitcoin - Direct | $5,554 | $7,209 | $6,162 | $7,756 | $9,139 | $14,555 | Includes mining operations only |
| Avg Annual Cost of Mining 1 Bitcoin - All In | $6,211 | $7,826 | $7,060 | $10,079 | $11,208 | $17,069 | Includes mining operations and G&A |
| **Key Assumptions** | | | | | | | |
| **Market** | | | | | | | |
| BTC Price, End of Period ($) | $46,000 | $52,025 | $52,025 | $58,623 | $66,058 | $74,436 | |
| Average BTC/USD Price over Period | $42,043 | $51,512 | $45,097 | $55,534 | $62,577 | $70,513 | |
| Estimated Market Hashrate (Exahash) EoP | 137 | 160 | 160 | 257 | 325 | 413 | |
| **Company** | | | | | | | |
| Total Rigs Deployed | 21,151 | 28,784 | 28,784 | 166,036 | 250,714 | 338,464 | |
| Total Megawatts | 69 | 93 | 93 | 509 | 763 | 1,026 | |
| Total Celsius Hashrate (Exahash) EOP | 2.1 | 2.8 | 2.8 | 16.5 | 27.9 | 45.5 | |
| Estimated % of Network Hashrate EOP | 1.5% | 1.7% | 1.7% | 6.4% | 8.6% | 11.0% | |
| Average BTC Mined Daily | 13.7 | 15.4 | NM | 41.4 | 70.0 | 59.6 | |

Note: Reflects unaudited 2021 financials and management projections
1) Decrease in projected revenue due to halving of block rewards in 2024

Executive Summary | Fall 2021



# Rig Deployments Underpin Future Revenue & EBITDA Visibility

*2021 investments in mining rigs to drive strong, self-sustaining cash flows in 2022*

*December 2021 EBITDA is expected at $22mm, implying over $200mm in contribution to FY2022 EBITDA*

*Current and already scheduled rigs estimated to generate $648mm of EBITDA in FY22 assuming no additional orders*

*Projections assume conservative assumptions with regards to key operational drivers*

*While the number of projected rigs grow by 12x from FY2021 - FY2024, the Company's projected % of the total network Hashrate only grows by 6.4x*

## Financial



- Mining Revenue
- EBITDA (Net BTC to Balance Sheet)

| | 2021E | 2022E | 2023E | 2024E |
|---|---|---|---|---|
| Margin | 84% | 82% | 82% | 76% |

$149 $126 · $843 $690 · $1,596 $1,310 · $1,515 $1,148

## Operating



- Total Rigs Deployed
- Estimated % of Network Hashrate EOP

28,784 1.7% (2021E) · 166,036 6.4% (2022E) · 250,714 8.6% (2023E) · 338,464 11.0% (2024E)

*Note: Reflects unaudited 2021 financials and management projections.*

**Executive Summary | Fall 2021**



# Mining Rig Deployment and Hosting Site Overview

*The Company's mining equipment is deployed across multiple external hosting facilities with an increase on proprietary site deployments in 2022*

## Increased Mix of Proprietary Hosting

- Celsius Mining currently hosts all of its mining rigs with 3rd party hosting providers and pays a variable monthly fee based on a fixed hosting rate applied to the power usage

- During 2022, Celsius plans to begin hosting mining rigs at its own proprietary sites where they have greater control of costs and potential to achieve greater economies of scale

## Advantages of Proprietary Hosting

- At proprietary hosting sites, Celsius has greater control over ongoing costs such as electricity, operating and maintenance and can achieve scale savings after fixed investments in infrastructure

- Other cost-saving strategies such as **power supply agreements** and use of **demand response systems** can be employed at proprietary hosting sites

**Planned Hosting Deployment**

- 3Q21A: 100%
- 2022E: Externally Hosted 63%, Proprietary 37%
- 2023E: Externally Hosted 76%, Proprietary 24%

Legend: ■ Externally Hosted   ■ Proprietary

Executive Summary | Fall 2021

# Near-Term Rig Purchase Orders

*The Company has recently executed a contract to purchase 60,000 Bitmain mining machines to be delivered in 2022, locking-in preferred pricing and the majority of rigs necessary to hit near-term financial plans*



*High Correlation between BTC Price and Mining Rig Price*

— S19 Rig Price ($USD) - Left Axis
— BTC Price, Trailing 1 Week Average ($USD) - Right Axis

## October Purchase Order

- Celsius Mining has recently purchased an order of 60,000 rigs to be delivered in several batches starting in May of 2022
  - ▶ The rigs are S19j Pro miners from Bitmain
- The purchase order required a prepayment of $116.5 million, and an overall spend of $160 million by the end of December, which Celsius Mining intends to finance with a bridge loan from Celsius Network

## Preferred Pricing

- Order timing was important as the Company expects Bitcoin prices to continue to increase, driving further increases in mining rig prices
  - ▶ The Company was able to lock-in order allocation and pricing before any future spikes and receive further discounts due to a preferred pricing relationship with Bitmain
- Celsius is able to receive preferred pricing due to the strength of its relationship and the importance of its ongoing order flow with Bitmain

*Source: Hashrate Index*

**Executive Summary | Fall 2021**

C° Celsius

# Mining Costs Overview

## *Operating cost breakdown*

| Category | Description | Indicative Amount |
|---|---|---|
| Electricity | Low cost electricity protects the business from BTC price volatility | $25 - $35[1] / MWh average |
| Operating Expense and Maintenance | Ongoing staffing and maintenance for mining equipment and electrical infrastructure | $10 / MWh average[1] |

| Category | Description | Indicative Amount | FY22E - Capex | FY23E - Capex |
|---|---|---|---|---|
| Mining Equipment | Purchase of next generation ASIC-powered Bitcoin miners | $1mm - $1.6mm / MW | $516mm | $315mm |
| Infrastructure | Site infrastructure buildout including substations, transformers and buildings | $400k - $500k / MW | $125mm | $127mm |

1) *Based on management estimates for YE 23, assuming estimated mix of proprietary hosting as in slide 23, inclusive of estimated demand response incentives*

# 3-Year Cumulative EBITDA, Net of Capex Sensitivity Analysis

## Sensitivity Analysis Overview

- Stress test approach to find estimated 3-year cumulative EBITDA, Net of Capex for FY22E-24E
- Model sensitizes the following:
  - ▶ BTC Price Growth (Monthly through projection period)
  - ▶ Network Hash Rate Growth (Monthly through FY2022)
- Base case model assumes BTC price will reach $74.4k by end of FY24 while Network Hashrate climbs to 413 from a monthly average of 137 in September 2021

## Key Assumptions

- Cost structure and capital expenditure kept constant
- Assumes BTC price is not hedged

### 3-Year Cumulative EBITDA, Net of Capital Expenditures (FY22E-24E)

Table Output: $ in millions

|  |  | Implied BTC @ Dec 2024 | | | | | |
|---|---|---|---|---|---|---|---|
|  |  | Monthly BTC Growth % | | | | | |
|  |  | $16,029 | $42,155 | $51,000 | $61,643 | $74,436 | $81,768 |
|  |  | -3.00% | -0.50% | 0.00% | 0.50% | 1.00% | 1.25% |
| Implied Network EHS @ Dec 24 | FY 22 Monthly Hashrate Growth | | | | | | |
| 290 | 1% | $ 81 | $ 1,634 | $ 2,074 | $ 2,573 | $ 3,138 | $ 3,448 |
| 327 | 2% | (136) | 1,249 | 1,642 | 2,086 | 2,589 | 2,866 |
| 368 | 3% | (329) | 909 | 1,259 | 1,656 | 2,105 | 2,351 |
| 413 | 4% | (500) | 607 | 921 | 1,275 | 1,676 | 1,896 |
| 463 | 5% | (652) | 340 | 620 | 937 | 1,296 | 1,493 |
| 519 | 6% | (788) | 102 | 353 | 637 | 958 | 1,135 |
| 581 | 7% | (909) | (110) | 116 | 371 | 659 | 816 |
| 649 | 8% | (1,017) | (298) | (95) | 133 | 392 | 533 |
| 725 | 9% | (1,113) | (466) | (284) | (78) | 154 | 281 |
| 809 | 10% | (1,200) | (616) | (452) | (267) | (58) | 56 |

*Network Hashrate generally decreases with BTC price as there is less incentive for miners to be online. This makes a scenario wherein strong growth in Network Hashrate that is simultaneous with a marked reduction in BTC price highly unlikely.*

Note: Reflects management projections

# Well Capitalized, Clean Balance Sheet

*Prior to IPO transaction, Celsius Network will convert intercompany loan to equity for a debt-free, self-sustaining balance sheet*



## Commentary

1) Coins minted are used to cover operational expenses as well as reduce ParentCo loan outstanding

2) The Company has executed a contract to purchase 60,000 Bitmain mining machines to be delivered in 2022, as well as deployed capital towards construction of hosting facilities, with an estimated completion date of October/November 2022. The advance payments on the contract will be financed until December with a bridge loan from Celsius Network. This loan will be repaid with private raise proceeds.

3) Investments will be transferred to ParentCo to decrease ParentCo operating loan amount

4) ParentCo operating loan set up at inception of Celsius Mining as a mechanism to pay for operating expenses. Loan is amortized each month by the amount of swept bitcoin. Before IPO transaction, the remaining balance of ParentCo operating loan will be converted to equity.

5) Convertible preferred security issued in proposed transaction will be senior to Parent Company debt (in case the Company stays private) and all debt and equity will convert to the same class of securities upon IPO transaction.

| $ in millions | 9/30/21 Estimate | Financial Investments Transfer | Investments in Rigs & Facilities | Pro Forma Pre-Raise | Private Raise | ParentCo Loan Conversion | Pro Forma Pre IPO |
|---|---|---|---|---|---|---|---|
| **Assets:** | | | | | | | |
| Cash ① | $ - | | | $ | $ 250.0 | | $ 250.0 |
| Bitcoin ① | 3.5 | | | 3.5 | | | 3.5 |
| Prepaid hosting services | 2.3 | | | 2.3 | | | 2.3 |
| Advance pmts for mining equipment/infra ② | 138.0 | | 225.0 | 363.0 | | | 363.0 |
| Mining equipment, net | 49.7 | | | 49.7 | | | 49.7 |
| Investment in Rhodium Enterprises ③ | 50.0 | (50.0) | | - | | | - |
| Note in Core Scientific ③ | 55.5 | (55.5) | | - | | | - |
| Other assets | 7.5 | | | 7.5 | | | 7.5 |
| **Total assets** | $ 306.5 | $ (105.5) | $ 225.0 | $ 426.0 | $ 250.0 | $ - | $ 676.0 |
| **Liabilities:** | | | | | | | |
| Accounts payable & accrued expenses | 1.1 | | | 1.1 | | | 1.1 |
| ParentCo loan (Operating) ④ | 233.0 | (105.5) | | 127.5 | | (127.5) | - |
| ParentCo loan (Bridge) ② | | | 225.0 | 225.0 | (150.0) | | 75.0 |
| Other liabilities | 23.9 | | | 23.9 | | | 23.9 |
| Total liabilities | $ 258.0 | $ (105.5) | $ 225.0 | $ 377.5 | $ (150.0) | $ (127.5) | $ 99.9 |
| New investor equity ⑤ | | | | | 400.0 | | 400.0 |
| ParentCo equity ④ | 48.5 | | | 48.5 | | 127.5 | 176.1 |
| Total equity | $ 48.5 | $ - | $ - | $ 48.5 | $ 400.0 | $ 127.5 | $ 576.1 |
| **Total liabilities and equity** | $ 306.5 | $ (105.5) | $ 225.0 | $ 426.0 | $ 250.0 | $ - | $ 676.0 |

### Illustrative Private Raise Sources & Uses ($ in millions)

| Sources | | Uses | |
|---|---|---|---|
| New Investor Equity | $ 400.0 | Repay Parent Company Bridge Loan | $ 150.0 |
| | | Cash to Balance Sheet | 250.0 |
| **Total Sources** | **$ 400.0** | **Total Uses** | **$ 400.0** |

*Note: Reflects estimated, unaudited financials. Ignores any transaction fees and expenses. Pro forma adjustments are estimated and may not include all potential future adjustments.*

# Potential Earnings Stabilization Strategy

*Example – Estimated Q4 2021 Impact:*

| Q4 2021 Zero Cost Hedge/Collar (BTC at $47.5) | Revenue Floor | Projected Q4 Revenue |
|---|---|---|
| 15% downside @ $40; Cap at $64 | $56mm | $71mm |
| 20% downside @ $38; Cap at $70 | $53mm | $71mm |
| 25% downside @ $36; Cap at $80 | $51mm | $71mm |

## Hedging Strategy

- Collar - Buying out of the money put options and selling out of the money call options

- Zero cost impact on P&L

## P&L Strategy

- Establishing a floor and downside protection to quarterly revenue reported in $, at zero cost, while considering the potential upside profit that Celsius may give up

- Smoothing out of earnings

- Short-term consideration - looking at 1-2 quarters of production of BTC

## Balance Sheet Strategy

- Depending on capital requirement needs and strategy around dividend payout, the Company can structure a collar to protect the $ value of coins on the balance sheet

*Note: Reflects unaudited 2021 financials and management projections*

**Executive Summary | Fall 2021**



# Appendix

# Coin Mining - Operational Benchmarking





| Company | Location | Current Rigs Deployed (000s) | Current Total Hashrate (EH/s) | 2022E EBITDA ($mm) |
|---|---|---|---|---|
| Celsius [1] | United States | 21.2 | 2.1 | $690.0 |
| MARATHON [2] | United States | 25.3 | 2.7 | $665.2 |
| IOT [3] | United States | 25.6 | 2.6 | $346.0 |
| HUT 8 | Canada | 20.5 [4] | 1.4 [5] | $202.8 |
| Bitfarms | Canada | 23.0 [6] | 1.5 [7] | N/A |
| GREENIDGE GENERATION [8] | United States | 15.3 | 1.2 | $150.7 |

2022E EBITDA: Analyst Projections [9]

Sources:
1) Source: Management-provided information. As of 9.30.21.
2) Source: 10.4.21 September Production & Operations Update Press Release. As of 9.30.21.
3) Source: 10.5.21 September Production & Operations Update Press Release. As of 9.30.21.
4) Source: 9.24.21 Investor Presentation. As of 8.31.21.
5) Source: 9.2.21 August Production & Operations Update Press Release. As of 8.31.21.
6) Source: 10.5.21 Investor Presentation. As of 9.30.21.
7) Source: 10.1.21 September Production & Operations Update Press Release. As of 9.29.21.
8) Source: 10.4.21 Q3 Operating Results Press Release. As of 9.30.21.
9) Source: CapitalIQ; reflects median calendar year estimates as of 10/25/2021

Executive Summary | Fall 2021



# Coin Mining - Valuation Benchmarking

| | Market Cap. ($mm) | 2022E EV / Revenue | 2022E EV / EBITDA | 2022E YoY Revenue Growth | 2022E EBITDA Margin |
|---|---|---|---|---|---|
| Celsius | N/A | N/A | N/A | 464.7% | 81.8% |
| MARATHON | $5,449 | 6.3x | 7.7x | 268.7% | 82.6% |
| IOT | $2,839 | 5.9x | 7.7x | 112.3% | 76.8% |
| HUT 8 | $2,141 | 6.8x | 10.2x | 114.4% | 66.9% |
| Bitfarms | $974 | 4.3x | N/A | 36.9% | N/A |
| GREENIDGE GENERATION | $783 | 3.1x | 5.1x | 109.9% | 61.3% |
| | | Median: 5.9x | Median: 7.7x | Median: 112.3% | Median: 71.8% |

Analyst Projections[1]

1)  Source: Capital IQ as of 10/25/2021. Reflects median calendar year estimates.

Executive Summary | Fall 2021



# Industry Value Drivers

*Over long periods of time, only institutional miners with low-cost structures can operate profitably. During times that prices for Bitcoin are relatively low, high-cost miners cannot generate positive returns on capital, and shut down.*

## Managing equipment costs is critical

- It is important to be able to generate a high return on capital for an equipment portfolio through different market cycles of low and high Bitcoin prices. This requires a disciplined approach to procuring equipment at sensible prices and avoid overpaying at peaks.

## Economies of scale are necessary

- Economies of scale are important to achieve volume discounts on equipment prices, as well as on hosting and energy costs

## Access to capital is needed

- Successfully operating an institutional mining business requires committing large amounts of capital for equipment and infrastructure. Access to considerable amounts of public or private equity and debt capital is needed.

## Strategic partnerships are useful

- For achieving economies of scale and gaining access to new technologies and deal flow

 Celsius

# Mining Market Overview

*The global Bitcoin mining market is undergoing a seismic shift due to the Chinese government's recent ban on all Bitcoin Mining*

## Historically, China had dominated the network

- 60-80% market share of global Hashrate
- China's Central Bank declared all crypto-related transactions illegal, driving value for miners housed in the U.S. market

## North America is quickly becoming a top destination

- Due to large quantities of excess renewable power capacity, a stable political/legal system and access to robust capital markets, miners are flocking to North America with new installations and public/private investment offerings.

## Most public mining companies lack discipline

- Despite a lack of historical positive free-cash-flow, the current crop of US and Canadian listed public miners have been able to scale their operations through large fund raises and capital deployments.

## Bitcoin mines are now consuming power at a density beyond the most advanced Tier 1 Data centers

- Power consumed per square foot on the latest immersion-cooled mines has now surpassed what the major cloud providers (Amazon, Microsoft, Google etc.) are building.

*Source: Celsius Management, Cambridge Mining Map*

**Executive Summary | Fall 2021**



# Mining Market Overview (Cont'd)

**Foundry capacity constraints due to COVID-19 created a mining hardware bottleneck over the last twelve months**

- Mining manufacturers are now competing with much larger players for foundry capacity as the latest mining hardware now uses 7-8nm chips. These foundry constraints are expected to exist into 2022, however large quantities of secondary hardware are now hitting the mining market due to the China ban in addition to a number of new mining hardware manufacturers releasing their first products in 2022.

**The industry has shifted from being semiconductor constrained to being power constrained**

- Electrical infrastructure for new mines has a 3-6+ month lead time depending on jurisdiction, while raw material prices required for electrical transformers continue to rise

**US hosting companies are seeing historic demand for their power capacity from both Chinese miners and new US-based entrants**

- Prior to the China ban, large scale U.S. hosts were already mostly sold out of new power capacity until Q2 2022. Locking up e electrical infrastructure and power is the tightest area of the market with electrical prices rising across the board.

*Source: Celsius Management, Blockchain.com*

**Executive Summary | Fall 2021**

Celsius

# High Performance Computing Data Center Optionality

*Future Opportunity to Leverage Low Cost On-Site Infrastructure for High Performance Computing as a Service (HPCaaS)*

### High-Growth Market

- The HPC market was estimated to be a $38bn market in 2020 growing at ~6% CAGR through 2025, with the cloud computing HPC segment forecasted to grow at a ~10% CAGR. The server market continues to make up the largest share of the HPC market for on-premise and colocation enterprise customers

### Vertical Integration

- A bottom up approach to operational costs would uniquely position the firm to provide competitively priced cloud computing power or colocation services to a variety of new and existing enterprise relationships, with power and operational costs far below the average enterprise-grade data center

### Focus on non-mission critical compute loads offered at a fraction of the cost of existing providers

*Control of the energy is the endgame, enabling diversification of revenue channels*

*Source: Celsius Management, Market and Markets*

**Executive Summary | Fall 2021**



# Glossary of Key Cryptocurrency Terms

**Bitcoin Network:** a peer-to-peer payment network that operates on a cryptographic protocol. Users send and receive bitcoins, the units of currency, by broadcasting digitally signed messages to the network using bitcoin cryptocurrency wallet software. Transactions are recorded into a distributed, replicated public database known as the blockchain, with consensus achieved by a proof-of-work system called *mining*.

**Bitcoin (BTC):** a decentralized digital currency in which a record of transactions is maintained and new units of currency are generated by the computational solution of mathematical problems; a unit of Bitcoin.

**Blockchain:** the system in which a record of transactions made in Bitcoin are maintained across computers linked in the peer-to-peer network. It is in chronological order, shared between all Bitcoin users and used to both verify the permanence of Bitcoin transactions and prevent double spending.

**Block:** a record in the Blockchain that contains a "permanent" record of transactions and confirms many waiting transactions. Roughly every 10 minutes, on average, a new block including transactions is added to the Blockchain through mining.

**Bitcoin Mining:** the decentralized processing of transactions, in which the records of current Bitcoin transactions, known as blocks, are added to the record of past transactions (the Blockchain). Computer hardware is utilized to perform complex mathematical calculations for the Bitcoin Network to confirm transactions and increase security. As a reward for their services, Bitcoin miners can collect fees for the transactions they confirm, along with newly created Bitcoins at the current block reward.

**Block Reward:** the amount of new Bitcoin released with each mined block.

**Proof-of-Work:** the method used by the Bitcoin network to ensure that the new block added was difficult (costly, time-consuming) to be made. This provides high levels of security and makes it near impossible for someone to spend funds from another user's wallet without a private key or signature or damage the blockchain.

**Hash:** a mathematical function that converts an input of arbitrary length into an encrypted output of a fixed length, called a nonce. Bitcoin uses the SHA-256 hash algorithm, meaning hashing outputs must be 256 characters in length.

**Mining Difficulty:** a measure of how difficult it is to produce a hash equal to or below the "target value" (a 256-bit number shared by all Bitcoin miners on the network) during Proof-of-Work. Mining a block requires the miner to produce a value (a nonce) that, after being hashed (cryptographically encoded), is less than or equal to the one used in the most recent block accepted by the Bitcoin network. The lower the target is, the more difficult it is to generate a block. The target is adjusted periodically (every 2 weeks) to stabilize the rate at which blocks are added to the blockchain (approx. one block every 10 minutes) and the rate at which BTC is awarded to miners / disseminated.

**Hashrate:** a measure of computational power per second used when mining, measured in units of hash / second.

**Exahash / Second (EH/s):** 1 quintillion (1,000,000,000,000,000,000) hashes per second. Commonly abbreviated and referred to simply as "Exahash."

**Hosting:** a process wherein a miner pays a third-party data center provider to operate the miner's equipment in the provider's facility.





# Thank You



# **EXHIBIT E**

# Celsius Mining

## January 2022 Transaction & Business Update





# Celsius

# Transaction Update

**January 2022 Update**

**Celsius**

# Process Overview

*Celsius Mining Term Sheet reflecting finalized terms with lead investor has been posted to the data room*

- **Transaction Update:**
  - ▸ **The Company has finalized terms with a lead investor for approximately $150 million of $450 million raise of senior secured** convertible promissory notes. **A copy of the term sheet has been uploaded to the data room.**

**Transaction Timing:**
  - ▸ We request that you submit your **indication of interest on or before 5:00pm ET on January 28th.** Please email your order indication to your KBW / Stifel sales person or directly to the deal team at: ib-projectfahrenheit@stifel.com. **Expect final legal documentation shortly after the deadline for execution.**

- **Due Diligence Requests:**
  - ▸ The KBW/Stifel deal team continues to be available for calls and requests for due diligence items. The management team is also available for meetings and requests.
  - ▸ Please view the following presentation as a latest update on the Celsius Mining business. An updated financial model has also been uploaded to the data room.

# Illustrative Sources and Uses & Pro Forma Closing Balance Sheet  [C Celsius]

## Commentary

*Note: Reflect terms in Celsius Mining Term Sheet*

1) Following closing, and until an IPO, all Bitcoin will be sold for USD within 60 days of being mined.

2) Senior Secured Convertible Notes (the "Notes") issued in proposed transaction will be senior secured obligations of the Company and will rank senior to any of the Company's existing funded debt and equity.

3) At closing, $150 million of the ParentCo loan will be converted to notes at substantially the same terms as the Notes, either pari passu as a silent lien and no voting rights, or junior in seniority.

4) The remaining ParentCo loan (Operating) will be junior to the Notes with ~$130.0 million converting to equity upon an IPO and the rest to remain outstanding as junior debt as long as the Notes remain outstanding.

| Sources | |
|---|---|
| Senior Secured Convertible Notes | $450.0 |
| **Total Sources** | **$450.0** |

| Uses | |
|---|---|
| Cash to Balance Sheet | $450.0 |
| **Total Uses** | **$450.0** |

| $ in millions | 12/31/21 Actual | Private Raise | 12/31/21 Pro Forma |
|---|---|---|---|
| **Assets:** | | | |
| Cash | $ 11.1 | $ 450.0 | $ 461.1 |
| Bitcoin (1) | 7.9 | | 7.9 |
| Prepaid hosting services | 16.1 | | 16.1 |
| Advance payments for mining equipment | 352.6 | | 352.6 |
| Mining equipment, net | 64.3 | | 64.3 |
| Other assets | 6.4 | | 6.4 |
| **Total assets** | **$ 458.4** | **$ 450.0** | **$ 908.4** |
| | | | |
| **Liabilities:** | | | |
| Accounts payable & accrued expenses | 0.5 | | 0.5 |
| Senior Secured Convertible Notes (2) | - | 450.0 | 450.0 |
| ParentCo loan (Notes) (3) | - | 150.0 | 150.0 |
| ParentCo loan (Operating) (4) | 381.3 | (150.0) | 231.3 |
| Other liabilities | 13.0 | | 13.0 |
| **Total liabilities** | **$ 394.9** | **$ 450.0** | **$ 844.9** |
| | | | |
| Total equity | 63.5 | | 63.5 |
| **Total liabilities and equity** | **$ 458.4** | **$ 450.0** | **$ 908.4** |

*Note: Reflects estimated, unaudited financials. Ignores any transaction fees and expenses. Pro forma adjustments are estimated and may not include all potential future adjustments.*



**Celsius**

# Business Overview

**January 2022 Update**

C° Celsius

# Overview of Celsius Mining

*Celsius Mining ("Celsius" or the "Company") is a wholly owned subsidiary of Celsius Network.  The Company is one of the largest and among the most profitable bitcoin miners in North America.[1]*

- Celsius Mining is one of the largest Bitcoin miners in North America, with **27,560 machines** currently operating (representing **~2.7 Exahash**)

- Celsius is currently generating **~14.8 Bitcoin per day** and generated **3,172 BTC during 2021**

- The Company's rigs are currently hosted with **Core Scientific**, but rigs to be delivered throughout 2022 will also be hosted with **EZ Blockchain** and at the Company's **proprietary sites that the Company will construct in partnership with Bitmain, Priority Power and Calpine**

- EOY 2022 projected operating rig count is **165,907** (28,931 deployed today + 101,000 ordered + 36,000 to be ordered)

## Celsius Network Highlights

- Founded in 2018, Celsius Network is a leading global yield earning platform

- Celsius Network has over $20bn in assets and has multiple sources of revenue including retail and institutional lending, trading (CeFi, DeFi, Staking) as well as 100% ownership of Celsius Mining

**Celsius Network has invested more than $400mm[4] in Celsius Mining**



**Committed towards carbon neutrality**

**Experienced and profitable operation with strong deal generation and execution capabilities**

### Already profitable, and highly-visible future EBITDA growth

*Quarterly ($ in millions)[2]*

$14   $43   $58   $64   $126   $180   $233

| 2Q21A | 3Q21A | 4Q21A | 1Q22E | 2Q22E | 3Q22E | 4Q22E |
|---|---|---|---|---|---|---|

*Annualized[3]*

| $57 | $172 | $232 | $255 | $503 | $720 | $931 |
|---|---|---|---|---|---|---|

**January 2022 Update**

1)  Based on publicly available information.
2)  See slide 11 for projection assumptions.
3)  Annualized based on quarterly results from unaudited financials and management projections.
4)  Gross amount

# Pre and Post-Transaction Corporate Structure



**Post-Transaction**

Celsius Network — 100% → Celsius Mining

Convertible Investors

Third-Party Services Including:
- Portfolio Management
- Hedging Strategies
- Tech Support
- Legal Support

Rigs & Contracted Backlog

Hosting Contracts

Wallets

*Celsius Mining Owns All the Contracts and Wallets*

Service Agreement Relationship

Ownership

**Pre-Transaction**

Celsius Network — 100% → Celsius Mining

All corporate functions provided by parent in a matrix organizational format

Rigs & Contracted Backlog

Hosting Contracts

Wallets

*Celsius Mining Owns All the Contracts and Wallets*

January 2022 Update

Celsius

# Mining Rig Deployment and Hosting Site Overview

*The Company has diversified its hosting capabilities with another 3rd party hosting provider and multiple proprietary sites under construction in partnership with Bitmain, Priority Power, and Calpine.*

### 3rd Party Hosting

- Celsius Mining currently hosts all of its mining rigs with **Core Scientific**. A portion of rigs to be delivered in 2022 will also be hosted at **Core Scientific**.

- During Q1 of 2022, the Company will begin deploying new rigs to hosting sites managed by **EZ Blockchain**

### Proprietary

- The Company has set up a joint venture with **Bitmain** to construct multiple proprietary hosting sites with up to 160MW of capacity

  ▸ Construction is expected to be completed by the end of May/early June

- The Company is under contract with **Priority Power** to construct multiple hosting sites of capacity ranging from 75MW to 90MW

  ▸ Land is currently being acquired and construction is anticipated to start in the next month

  ▸ Sites have an additional 25-50MW of possible substation expansion capacity over the next twelve months

- **The Company is also in discussions with Calpine** to develop site capacity of 40MW in 2Q2022 and 200MW in 1Q2023

January 2022 Update



*Planned Hosting Deployment*

- Proprietary - Generic
- Calpine
- Bitmain JV
- Priority Power
- EZ Blockchain
- Core Scientific

2023E: 30% | 5% | 20% | 10% | 9% | 25%
66% Proprietary Sites

2022E: 4% | 31% | 15% | 14% | 37%
49% Proprietary Sites

2021A: 100%



# Financial Overview

**January 2022 Update**



# Financial Model Updates

***Note I: Financial Overview section reflects updated financial model I uploaded to the data room***

***Note II: Below notes reflect material changes made to model against "Celsius Mining_OperatingModel (Base Case)_vF 12.21.21"***

- Increase to network hashrate to reflect latest network data

- Starting Bitcoin price and 2022 monthly growth rate assumption changed to keep 2022 average Bitcoin price at $55k

- Further granularity added to Deployment Detail and Capex tabs to reflect latest hosting plans

- Changed Sources and Uses for Senior Secured Convertible Notes and IPO that flow through the Cashflow – BS tab to reflect the latest terms term sheet

January 2022 Update



# Financial Highlights & Key Assumptions

| | Quarter ended, | | Fiscal year ending, | | | | Notes |
|---|---|---|---|---|---|---|---|
| | Q3 '21A | Q4 '21A | 2021E | 2022E | 2023E | 2024E | |
| **Income Statement Highlights ($ in millions)** | | | | | | | |
| Mining Revenue | $53 | $72 | $150 | $773 | $1,580 | $1,496[1] | # of Bitcoin mined x Avg. BTC price during period |
| Mining Operations | (7) | (10) | (20) | (138) | (261) | (341) | $USD hosting, power , maintenance expenses |
| Gross Profit | $46 | $62 | $130 | $634 | $1,319 | $1,155 | |
| % Margin | 87% | 86% | 87% | 82% | 83% | 77% | |
| G&A | (2.7) | (4.1) | (10.0) | (32.4) | (52.7) | (54.0) | $USD corporate G&A expenses |
| **EBITDA (Net BTC to Balance Sheet Before Capex)** | $43 | $58 | $120 | $602 | $1,266 | $1,101 | Effective $USD value of BTC retained to BS |
| % Margin | 82% | 81% | 80% | 78% | 80% | 74% | |
| **Unit Economics ($)** | | | | | | | |
| Avg Annual Cost of Mining 1 Bitcoin - Direct | $5,554 | $7,561 | $6,208 | $10,038 | $10,999 | $17,094 | Includes mining operations only |
| Avg Annual Cost of Mining 1 Bitcoin - All In | $7,733 | $10,738 | $9,299 | $12,390 | $13,219 | $19,801 | Includes mining operations and G&A |
| **Key Assumptions** | | | | | | | |
| **Market** | | | | | | | |
| BTC Price, End of Period ($) | $46,000 | $49,180 | $49,180 | $62,372 | $70,282 | $79,196 | |
| Average BTC/USD Price over Period | $42,043 | $55,955 | $46,207 | $56,067 | $66,579 | $75,023 | |
| Estimated Market Hashrate (Exahash) EoP | 137 | 174 | 174 | 279 | 354 | 449 | |
| **Company** | | | | | | | |
| Total Rigs Deployed | 21,175 | 27,560 | 27,560 | 165,907 | 250,520 | 338,201 | |
| Total Megawatts | 69 | 89 | 89 | 509 | 763 | 1,026 | |
| Total Celsius Hashrate (Exahash) EOP | 2.1 | 2.7 | 2.7 | 16.6 | 28.1 | 45.6 | |
| Estimated % of Network Hashrate EOP | 1.5% | 1.5% | 1.5% | 6.0% | 7.9% | 10.2% | |
| Average BTC Mined Daily | 13.7 | 14.8 | NM | 36.9 | 64.8 | 55.0 | |

*Note: Reflects unaudited 2021 financials and management projections*
*1)  Reduction in projected revenue due to halving of block rewards in 2024*

**January 2022 Update**

# Cash Flow and Balance Sheet Highlights

| | Month ended, | | | | | | | | | | | |
| | Jan-22 | Feb-22 | Mar-22 | Apr-22 | May-22 | Jun-22 | Jul-22 | Aug-22 | Sep-22 | Oct-22 | Nov-22 | Dec-22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Flow Highlights ($ in millions)** | | | | | | | | | | | | |
| Total Operating Cash Flows | $17 | $20 | $26 | $35 | $43 | $48 | $54 | $59 | $67 | $74 | $78 | $81 |
| Investing Cash Flows (Capex) | (47) | (63) | (93) | (74) | (102) | (76) | (71) | (61) | (25) | (25) | (25) | 0 |
| Financing Cash Flows | 430 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 500 | 0 | 0 | 0 |
| Beginning Cash | 0 | 400 | 357 | 291 | 252 | 192 | 165 | 148 | 146 | 687 | 736 | 789 |
| Net Change in Cash | 400 | (43) | (66) | (39) | (60) | (27) | (17) | (2) | 541 | 49 | 52 | 81 |
| Ending Cash | $400 | $357 | $291 | $252 | $192 | $165 | $148 | $146 | $687 | $736 | $789 | $869 |
| **Balance Sheet Highlights** | | | | | | | | | | | | |
| Cash | $400 | $357 | $291 | $252 | $192 | $165 | $148 | $146 | $687 | | | |
| Bitcoin (Assumes All BTC Sold for Cash) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | |
| Parent Loan Outstanding | 389 | 389 | 389 | 389 | 389 | 389 | 389 | 389 | 259 | | | |
| Senior Secured Convertible Notes | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | | | |

*Note: Reflects unaudited 2021 financials and management projections*

**January 2022 Update**



# Rig Deployments Underpin Future Revenue & EBITDA Visibility

*2021 investments in mining rigs to drive strong, self-sustaining cash flows in 2022*

*December 2021 actual EBITDA of ~$18mm, implying over $200mm in contribution to FY2022 EBITDA*

*Projections assume conservative assumptions with regards to key operational drivers*

*While the number of projected rigs grow by 12x from FY2021 - FY2024, the Company's projected % of the total network Hashrate only grows by 6.6x*

## Financial



| | 2021E | 2022E | 2023E | 2024E |
|---|---|---|---|---|
| Mining Revenue | $150 | $773 | $1,580 | $1,496 |
| EBITDA | $118 | $602 | $1,266 | $1,101 |
| Margin | 80% | 78% | 80% | 74% |

Mining Revenue ■ EBITDA (Net BTC to Balance Sheet before Capex)

## Operating




| | 2021E | 2022E | 2023E | 2024E |
|---|---|---|---|---|
| Total Rigs Deployed | 27,560 | 165,907 | 250,520 | 338,201 |
| Estimated % of Network Hashrate EOP | 1.5% | 6.0% | 7.9% | 10.2% |

Total Rigs Deployed — Estimated % of Network Hashrate EOP

*Note: Reflects unaudited 2021 financials and management projections.*

**January 2022 Update**



# 3-Year Cumulative EBITDA, Net of Capex Sensitivity Analysis

### 3-Year Cumulative EBITDA, Net of Capital Expenditures (FY22E-24E)

Table Output : $ in millions

| | Implied BTC @ Dec 2024 | | | | | |
| | $30,027 | $55,302 | $62,372 | $70,303 | $79,196 | $84,037 |
| FY 22 Monthly Hashrate Growth / Implied Network EHS @ Dec 24 | Monthly BTC Growth % | | | | | |
| | -3.00% | -0.50% | 0.00% | 0.50% | 1.00% | 1.25% |
| 1% — 316 | $ 1,316 | $ 2,215 | $ 2,436 | $ 2,673 | $ 2,929 | $ 3,063 |
| 2% — 356 | 956 | 1,754 | 1,950 | 2,161 | 2,388 | 2,508 |
| 3% — 400 | 637 | 1,347 | 1,521 | 1,709 | 1,911 | 2,018 |
| 4% — 449 | 354 | 986 | 1,142 | 1,309 | 1,489 | 1,584 |
| 5% — 504 | 103 | 666 | 805 | 954 | 1,114 | 1,199 |
| 6% — 564 | (121) | 383 | 506 | 639 | 782 | 858 |
| 7% — 632 | (319) | 130 | 241 | 360 | 487 | 555 |
| 8% — 706 | (497) | (95) | 4 | 111 | 225 | 285 |
| 9% — 789 | (655) | (295) | (206) | (111) | (9) | 45 |
| 10% — 880 | (796) | (474) | (394) | (309) | (217) | (169) |

*Network Hashrate generally decreases with BTC price as there is less incentive for miners to be online. This makes a scenario wherein strong growth in Network Hashrate that is simultaneous with a marked reduction in BTC price highly unlikely.*

## Sensitivity Analysis Overview

- Stress test approach to find estimated 3-year cumulative EBITDA, Net of Capex for FY22E-24E
- Model sensitizes the following:
  - ▶ BTC Price Growth (Monthly through FY2023 and FY2024); constant of 1% in base case
  - ▶ Network Hash Rate Growth (Monthly through FY2022); constant of 4% in base case
- Base case model assumes BTC price will reach $79.2k by end of FY24 while Network Hashrate climbs to 449 from a monthly average of 174 in December 2021

## Key Assumptions

- Cost structure and capital expenditure kept constant
- Assumes BTC price is not hedged

*Note: Reflects management projections*

January 2022 Update

Celsius

January 2022 Update

# **EXHIBIT F**

**Registered number: 11198050**

## CELSIUS NETWORK LIMITED

**ANNUAL REPORT AND FINANCIAL STATEMENTS**

**FOR THE PERIOD ENDED 31 DECEMBER 2020**

## CELSIUS NETWORK LIMITED

### COMPANY INFORMATION

**Directors**

A Mashinsky
S D Leon
MF Partners Limited (appointed 7 April 2020, resigned 23 March 2021)

**Registered number**

11198050

**Registered office**

The Harley Building
77 - 79 New Cavendish Street
London
England
 W1W 6XB

**Independent auditors**

Nyman Libson Paul LLP
Chartered Accountants & Statutory Auditors
124 Finchley Road
London
England
NW3 5JS

**CELSIUS NETWORK LIMITED**

## CONTENTS

| | Page |
|---|---|
| **Group Strategic Report** | 1 - 2 |
| **Directors' Report** | 3 - 5 |
| **Independent Auditors' Report** | 6 - 13 |
| **Consolidated Statement of Comprehensive Income** | 14 |
| **Consolidated Statement of Financial Position** | 15 - 16 |
| **Company Statement of Financial Position** | 17 - 18 |
| **Consolidated Statement of Changes in Equity** | 19 |
| **Company Statement of Changes in Equity** | 20 |
| **Consolidated Statement of Cash Flows** | 21 - 22 |
| **Analysis of Net Debt** | 23 |
| **Notes to the Financial Statements** | 24 - 51 |

**CELSIUS NETWORK LIMITED**

**DIRECTORS' REPORT**
**FOR THE PERIOD ENDED 31 DECEMBER 2020**

The directors present their report and the financial statements for the period from 1 March to 31 December 2020.

**Directors' responsibilities statement**

The directors are responsible for preparing the Group Strategic Report, the Directors' Report and the consolidated financial statements in accordance with applicable law and regulations.

Company law requires the directors to prepare financial statements for each financial year. Under that law the directors have elected to prepare the financial statements in accordance with applicable law and United Kingdom Accounting Standards (United Kingdom Generally Accepted Accounting Practice), including Financial Reporting Standard 102 'The Financial Reporting Standard applicable in the UK and Republic of Ireland'. Under company law the directors must not approve the financial statements unless they are satisfied that they give a true and fair view of the state of affairs of the Company and the Group and of the profit or loss of the Group for that period.

 In preparing these financial statements, the directors are required to:

! select suitable accounting policies for the Group's financial statements and then apply them consistently;

! make judgments and accounting estimates that are reasonable and prudent;

! prepare the financial statements on the going concern basis unless it is inappropriate to presume that the Group will continue in business.

The directors are responsible for keeping adequate accounting records that are sufficient to show and explain the Company's transactions and disclose with reasonable accuracy at any time the financial position of the Company and the Group and to enable them to ensure that the financial statements comply with the Companies Act 2006. They are also responsible for safeguarding the assets of the Company and the Group and hence for taking reasonable steps for the prevention and detection of fraud and other irregularities.

**Results and dividends**

The loss for the period, after taxation, amounted to $1,396,407,660 (2020 - loss $34,223,598).

The directors do not propose the payment of a dividend.

**Directors**

The directors who served during the period were:

A Mashinsky
S D Leon
MF Partners Limited (appointed 7 April 2020, resigned 23 March 2021)

**Future developments**

The Group's plan is to continue to serve the wider community by offering additional services and expanding its operation into new markets to scale to over 100 million users worldwide. This may be achieved, among others, by enhancing marketing efforts to new jurisdictions, listing CEL token in leading digital exchanges and providing more utility to the CEL tokens to increase market reach and demand, and adding more functionalities to the Platform (all subject to legal, regulatory and tax considerations).

**CELSIUS NETWORK LIMITED**

**DIRECTORS' REPORT (CONTINUED)
FOR THE PERIOD ENDED 31 DECEMBER 2020**

**Qualifying third party indemnity provisions**

The ultimate parent company on behalf of the group maintains liability insurance for its directors and officers against liabilities which directors or officers may incur personally as a consequence of claims made against them alleging breach of duty or unlawful acts of or omissions in their capacity as a director or officer.

**Disclosure of information to auditors**

Each of the persons who are directors at the time when this Directors' Report is approved has confirmed that:

!    so far as the director is aware, there is no relevant audit information of which the Company and the Group's auditors are unaware, and

!    the director has taken all the steps that ought to have been taken as a director in order to be aware of any relevant audit information and to establish that the Company and the Group's auditors are aware of that information.

**Post balance sheet events**

The Group's management continues to have faith in its business model and believes it will continue to be a going concern for the next 12 months. However, it must be acknowledged that there are potential risks, including but not limited, to the unfolding economic crisis due to the COVID 19 virus, which may have an impact on the Group's profitability and ultimate viability. The management team will endeavour to mitigate these inherent risks (where possible) but remain cautious and cannot make any guarantees, in light of this unprecedented event and future unknown developments that may arise.

Subsequent to the reporting date:

*    The Group continues to expand its Mining activity through significant investment in equipment purchases and equity investments in other Mining-related companies as follows:
     (i) On 7 May 2021 the Group signed a Stock Purchase Agreement with Luxor Technology Corporation for Series A-1 Preferred Stock for $ 0.2 million and Series A Shares for $ 0.225 million.
     (ii) On 2 June 2021 the Group signed a Simple Agreement for Future Equity (SAFE) with Rhodium Enterprises Inc. of $50 million.
     (iii) On 19 April 2021 the Group signed a Secured Convertible Note Purchase Agreement with Core Scientific Holding Co. ("Scientific"), where Scientific has agreed to sell Initial and Additional Notes and the Group agreed to buy Initial Notes in the amount of $50 million on 19 April 2021 and Additional Note of $4 million on 23 April 2021 out of total Notes of $215 million.
     (iv) On 31 July 2021 the Group signed two Agreements with Bitmain Technologies Limited for purchasing a total of 24,250 Rigs for BTC Mining for a total of $125 million. The equipment will be delivered to the Group from 31 December 2021 until the end of Q1 2022.

*    The Group is expanding its operations by establishing new subsidiaries in Australia, Serbia, Cyprus, Gibraltar & Lithuania.

*    On 22 July 2021, the Company filed to withdraw its temporary registration regime application for crypto asset firms from the UK Financial Conduct Authority (FCA). Subsequent to the withdrawal, the Company concluded a migration of its users transfers as well as certain business activities (mainly user transfers earning reward and decentralised finance lending and trading activities) from the United Kingdom to the United States, and where applicable, to several other jurisdictions.

*    The Company issued a Senior Secured Convertible Promissory Note (the "Note") of $93.75 million with the option to issue a further $56.25 million. In the event that the conversion option of the Note is not exercised, the loan and accrued interest is due for repayment on 1 September 2022. The Note is secured over the assets of the Group.

**CELSIUS NETWORK LIMITED**

**DIRECTORS' REPORT (CONTINUED)**
**FOR THE PERIOD ENDED 31 DECEMBER 2020**

**Auditors**

The auditors, Nyman Libson Paul LLP, will be proposed for reappointment in accordance with section 485 of the Companies Act 2006.

This report was approved by the board on 8 October 2021 and signed on its behalf.

**A Mashinsky**                                    **S D Leon**
Director                                           Director

# **EXHIBIT G**



Celsius

Board Discussion

May 2022

Private and Confidential for Internal Use Only



Control + clicking this button will bring you back to this page >>>

4

# ⟳ Table of Contents [Use Ctrl + Click to Jump to Page]

| Section | Pg # |
|---|---|
| Introduction: Governance | 6 |
| Introduction: Vision | 10 |
| Market Overview | 25 |
| Strategy & KPIs | 73 |
| Financials | 82 |
| Product | 105 |
| Marketing | 120 |
| Regulatory & Compliance | 131 |

| Section | Pg # |
|---|---|
| Celsius Mining | 147 |
| GK8 | 172 |
| CWS & CelsiusX | 185 |
| COO / Transformation | 207 |
| Governance | 234 |
| Risk | 245 |
| Security & IT | 264 |
| Human Resources | 286 |



# Capital

**Although our capital currently sits near zero - we have a clear path to build up our capital position**

1. A high level view of our balance sheet suggests that we need at least $1.5bn to be considered "well capitalized" in a TradFi environment (see next page).
2. We are building more detailed capital modeling that will fine-tune that estimate.
3. Although we are not currently regulated, we hope to be and anticipate running our business to be well capitalized.
4. This will improve our cost of capital (ability to raise capital) and cost of funding (will enable us to become S&P/Moody's/Fitch rated).
5. This will also enable us to more rapidly onboard counterparties/partners who expect an institution with >$20bn of client placements to be well capitalized.
6. The path toward that capitalization is as follows:
   a. Preserve capital by significantly reducing all new investments and other uses of capital to core Celsius activities
   b. Return business to profitability - expected by end of 3Q22 at the latest.
   c. Build ~$1bn of capital through Mining IPO (~$300mm) and business merger (~$500mm to $1bn opportunity)
   d. Once capital base restored and we have returned to consistent profitability by 2H/22, embark on $500mm to $1bn Series C fundraising.
7. By early- to mid-2023, we should be able to boast IFRS capital levels of $1.5-2.0 billion
8. Project Zest (can be discussed at Board in camera session) could add another $500mm to improve capital position to $2-2.5bn and could be achieved in 2022.

## Financial Conduct Authority (UK)

- On June 30, 2020 **Celsius applied for a crypto asset business registration with the FCA, and was granted a temporary registration**; throughout the following year, the Company had provided the FCA with all information and documentation requested by the FCA in a timely manner.

- On June 11, 2021 the FCA advised the Company that it should withdraw its MLRs application and cease operations in the UK, following the FCA's concerns that Celsius' Earn product constitutes a Collective Investment Scheme (CIS).

- Following discussions, **Celsius and the FCA entered into a "Voluntary Application for Imposition of Direction", agreeing to a migration plan, following which the Company will no longer be providing its customer-facing services from the UK, and the Company withdrew its application**. The migration was successfully completed in August 2021, and withdrew its application.

- **The FCA further expressed its intention to commence enforcement action for alleged violations by Celsius of the Financial Services and Markets Act, 2010 ("FSMA")**, and that it maintains the position that Celsius' activities constituted unauthorized CIS operations.

- Celsius is in the process of obtaining a legal opinion from a Queen's Counsel in the UK supporting its legal position.



# Celsius Mining

Amir Ayalon

# Mining - Introduction

## Bitcoin Mining Basics

- Bitcoin miners process and authenticate transactions on the blockchain by mathematically solving a puzzle and are given newly created Bitcoins as a fee for their services.

## The Importance of Mining

- Miners are a critical piece of the infrastructure, as they underpin the ecosystem

- The blockchain acts as a general ledger of past Bitcoin transactions in the form of sequentially added blocks

- The mining process is essential to creating these blocks, providing security for the validity of Bitcoin transactions

## Mining Outlook

- As demand for Bitcoin increases due to institutional adoption, BTC price is expected to grow, but increased network difficulty, supply chain challenges, 2024 halving and potential ESG requirements, are all headwinds that will temper the upside

### Network Hashrate Correlates to Bitcoin Price-Albeit Lagging



Mar-22

- Because miners are rewarded in Bitcoin, total mining activity is influenced by Bitcoin's price. When Bitcoin price increases, miners are more incentivized to increase their investments in mining.



| Bitcoin Price Increases | | Bitcoin Price Decreases | |
|---|---|---|---|
| Total Miners | Total Network EH/s | Total Miners | Total Network EH/s |

*Source: Nasdaq Data Link as of 10/8/2021. Market data as of March 21, 2022.*

149



# Mining - Business Model and Value Drivers

**What is the business model?**

- Successful industrial-scale mining is initially capital-intensive and requires both technical mining expertise and knowledge of running large-scale operations

- To be competitive demands an understanding of controlling the inputs, minimizing costs, and maximizing operational efficiencies

- Controlling the cost of creation directly impacts the margin

- Controlling cost requires effectively managing the supply chain (power contracts, hosting, rig manufacturing and logistics)

**How Bitcoin Mining Works**

Mining hardware    Power    Infrastructure

Machines (miners) work to solve a puzzle

Once solved, a new block is added to the blockchain

The miner is rewarded with Bitcoin for solving the puzzle

COST OF CREATION → **Minimize cost of creation**

**Maximize profit margins** ← ASSET TO SELL ON OPEN MARKET

# Executive Summary

- Mining was established in 2020 by CN as an investment venue that eliminates basis risk when BTC coins mind are used to repay CN investment in rigs

- Operations began in 2021 using a simple operating model of acquiring rigs and hosting with Core Scientific (ticker CORZ), all outsourced solution, with one partner

- During the H2/2021 capital markets were pricing public miners at roughly $1.2bl / 1EH of mining power (roughly 10K rigs)
  - Initial rig orders were for 28k, and during H2/21 we have ordered 103k additional rigs that would be delivered through October 22, for an all in 13EH mining power (130k rigs)

- Financing of mining is done through interco loans as opposed to equity investment, allowing for partial loan payback, even in case of going public

- **CN related corporate strategy**
  - <u>Capitalizing</u> -on market valuation of miners as a means to generate excessive return on investment, beyond the inherent IRR on the FCF of the mining business
  - <u>De Risk-</u> Tapping into capital market financing to augment internal financing given the cyclical nature of the business and heavy capex required
  - <u>Synergies</u>- Taking the mining business public as means to establish capital market financing sources for CN though interco lending
  - <u>Halo effect</u> for the overall group

# Executive Summary

**Evolution of the Mining industry in the past 3 quarters**
- the appreciation of the BTC price in combination of capital market valuation, drew increased investments in the space

- Price of rigs doubled from $44/TH in June 21 to $81/TH in October 21

- Difficulty of mining increase, from 150 in May 21 to 205 in April 22, with expectation of close to 300 at year end, as well as continued future growth on account of external financing fueling increase in rig capex

- 3 party hosted solutions shut down in Q3/21 as providers maxed out hosting infrastructure and decided to mine for their own, further decreasing availability of hosting solutions for rigs acquired

- Increased demand and competition for direct power contracts, straining infrastructure supply chain of transformers and cabling, and creating long lead time to building of hosting solutions

- Proliferation of mining SPACs going public enabled the formation of a new iindustry vertical, with the ensuing research that is still in initial stages of coverage initiation and its understanding of the business- with one apparent theme which is enhanced value to integrated operations as a means to deliver on projections

- Enhanced ESG requirements and outlook



# The Industry in Graphs



# ◎ The New Industry Norm

**Operations** -

on account of the above fast changing dynamics of an industry in formation, a successful miner needs to have the following capabilities - *our strategy- reduce dependencies and be able to grow on demand*

- Establish source of rigs- for pricing and timely delivery. Relations with manufacturers as well as market intel for distressed sales and excess inventories

- Establish access to diverse 3rd party hosting solutions, for quick solutions

- Establish self building capabilities, including opportunity sourcing of real estate and excess power locations, design, planning, and sourcing of quick to build data centers as well as its ensuing supply chain of building materials, and electrical components which is a lead time bottleneck.

- Establish dedicated hosting providers to manage owned data centers at the right cost without revenue share

- Have a geographically diverse portfolio of hosting solutions to eliminate risk of regulation, grid dependency, power cost and mix of renewables

- Establish direct access to renewable sources of energy to augment use of carbon credit offsets, as a means to address future SEC disclosure requirements and potential regulation

# The New Industry Norm

**Financing and capital markets**

- Valuation of miners dropped from 8x NTM Ebitda to 3x
  - operational delays of public miners is part of the cause- as they were not able to deliver on growth given market dynamics. Analysts are now looking for enhanced capabilities to deliver on projections, ie, control of supply chain in accessing hosting solutions
  - BTC price drop. There is high correlation of trading stock to BTC price
  - Ukraine overhang is still challenging the markets although Citi is becoming more optimistic that the IPO market is showing signs of coming back

- Pre IPO financing is predominantly for collateralized debt as opposed to equity/forced conversion, given IPO market

- SPAC market is challenged with new regulation and it is still not a safe route to market. Tbd

- Proliferation of small miners that are not able to access capital markets, and lack financing capabilities- are increasingly looking for mergers and or selling of bundled rig orders with hosting.
  - This will provide strategic opportunities during the coming year to merge/buy rigs
  - Inability of some miners to pay for rigs and come online will potentially reduce network difficulty expectations
  - CN is fielding financing requests from large players such as Core, allowing for generation of synergy in the mining business

# ⊙ CELM - Adapting to the New Norm

**Operational activities & Strategy -**

*Aim- reduce dependencies and be able to grow on demand -* Given the need to pivot the business immediately, deliver on envisioned growth, and augment capabilities we don't have, avoiding the long lead time to build in-house capabilities, we have taken the following main actions:

- Created a network of dedicated service providers to source, build and manage our own data centers including enhanced access to supply chain
- Diversified 3rd party hosting solutions beyond just Core
- Established ongoing communication with industry players to access opportunities ranging from merger, to hosing collaboration, to rig procurement
- Created a relationship with Bitmain including a JV and Collaboration agreement
- Collaborate with CN VIP team to tap into the wider network of relationships to source opportunities
- Established relations with brokers and investment banks
- The end result- in the 5 months since November 21, we have sourced and executed on:
  - 212MW of hosting solutions, combo of 3rd party and own buildup of hosting, to be all delivered by July 22 timeframe
  - in process - negotiations with Mawson for additional 100MW for September 22 timeframe
  - secured a 300MW site to build and energize by May 23 with a RoFR on another 500MW for Q4/23
  - Diversification of geography (Texas, Georgia, North Carolina, Pennsylvania, Arkansas), and of renewable sources (nuclear in PA)
- Outstanding gaps- the above was achieved with a small team and heavy CN financing. Moving forward we would need to acquire operational capabilities and find external sources of financing to secure continued growth.

# CELM - Adapting to the New Norm

**Profile of our strategic partners** - *Enabling nimble operations and consolidated supply chain*

| Outsourced Hosting | • **Core Scientific** (Ticker CORZ)- 3rd party hosting, 190mw<br>• **EZ Blockchain**- 3rd party hosting 35mw- integrated provider of mobile data centers with own design and supply chain of mobile data centers and components, providing small scale solutions based on municipalities across the US looking to generate revenue from excess grid power. Once power contract is signed, they build a 10-15MW site in 6wks.<br>• **Mawson** (ticker MIGI)- 3rd party hosting 90mw- origins in the construction space, institutional grade operational capabilities of rapid buildout, with own design and supply chain of mobile data centers and components, a portfolio of locations that can be expanded to 1GW of power, a healthy nuclear mix as well as expected 4.8EH of mining power by YE22. *Discussing a merger of potentially 20/80 split (CELM in control) as well as additional 100mw hosting in Q3-4.* |
| --- | --- |
| Proprietary | • **PriorityPower**- over 400mw contracted for buildout- established industrial scale energy broker providing bundled solutions of power contracts, demand response program, and adjacent real estate to under utilized sub stations across Texas- for rapid buildup of data centers. Deep relations with ERCOT and Oncore as well as a network of infrastructure contractors to deliver rapid buildup.<br>• **S56**- the McKinsey of crypto mining, ex SAS veterans, a start up managing 1GW of projects globally, delivering end to end data center buildout management including risk reduction, secured supply chain, construction oversight, design, planning, operational management as well as lead generation for available power and projects across the US. *Potential investment target to enhance Mawson merger*<br>• **Frontier**- dedicated hosting as a service provider, strong track record, flexibility to meet our own requirements and service the equipment we source, with contract priced at cost plus, leading to cira 0.5c/KW cost on top of direct energy cost, implying significant savings. *Potential investment target to enhance Mawson merger* |

# ⦿ CELM - Financing Activities

**Financing <> going public strategy**

- IPO path with Citi- first round of comments form SEC received. Working towards submission by may 14th
  - Audited financials- EY pubco audit for FYE21 is in last stages, and is the bottleneck to timely submission
  - In case of delay in submission, we plan to launch review of Q1'22 unaudited financials next week, to enable submission by end of May
  - Analyst meetings and roadshow- expected mid June
  - If markets open, we could be able to float in July

- SPACs - we are in parallel discussions with two parties that Citi believes are qualified and may be an alternative in case of defunct IPO market – Betsy Cohen, and Blackrock sponsored

- Reverse Merger- ongoing discussions with Mawson on a $25m PIPE as a milestone towards a merger. Beyond the inherent synergies and upside of this merger, it will allow us the flexibility to (i) IPO and than merge stock for stock, or, (ii) reverse into Mawson if IPO markets are not open

- Pre IPO financing- decision made to abort raising debt from Whitehawk (22% IRR to maturity) due to parent considerations, and we're now exploring convertible preferred raise of $200m (10% IRR)



# CELM - IPO Structure

**Financing <> IPO Structure- UP C Structure**

- *TRA benefits expected to reach circa $150m to pre IPO SHs - from intangible value generated in IPO and to be paid to CN over 15yrs*

Index for economic/voting interests issued

Equity owned by Celsius Holdings and Celsius UK

- Celsius Mining units (partnership interests): (i) not publicly traded; (ii) economic rights; and (iii) exchangeable on a 1:1 basis for Class A shares.

- Class B common stock: (i) not publicly traded; (ii) voting rights which vary based on Celsius Mining units held and supermajority voting rights; and (iii) consider any economic rights.

Public shareholders

- Class A common stock: (i) publicly traded; (ii) voting and economic rights; (iii) one vote per share in PubCo (no supermajority); and (iv) predominant economic interest in PubCo.

PubCo's membership in Celsius Mining

- GP and managing member: (i) number of Celsius Mining units held equals number of Class A common stock; and (ii) hold [100%] voting rights in Celsius Mining.



# CELM - Organization

- SLA agreement b/w parent and sub – to govern arms length relationship - to be executed shortly

- IT environment and systems- complete and ready to activate

- BOD hire, and governance policies- to be completed prior to IPO

- Human capital- additional hires required
  - CAO
  - GC
  - CTO
  - FP&A analyst



# Financial Highlights - Base Case

| Assumptions ($ in mm) | Q3 '21 | Q4 '21 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|
| **Income Statement** | | | | | | |
| Mining Revenue | 53 | 72 | 150 | 522 | 1,305 | 1,507 |
| Mining Operations | (7) | (10) | (23) | (117) | (261) | (354) |
| **Gross Profit** | **$45** | **$62** | **$127** | **$405** | **$1,044** | **$1,153** |
| *% Margin* | *86%* | *86%* | *85%* | *78%* | *80%* | *76%* |
| G&A | (2.7) | (4.2) | (10.2) | (23.9) | (42.0) | (43.7) |
| **EBITDA** | **$42** | **$58** | **$117** | **$381** | **$1,001** | **$1,109** |
| *% Margin* | *81%* | *81%* | *78%* | *73%* | *77%* | *74%* |
| Capex | 115 | 277 | 446 | 542 | 408 | 514 |
| | | | | | | |
| Average BTC Mined Daily | 13.7 | 15 | 9 | 30 | 61 | 57 |
| Total Rigs Deployed | 21,175 | 27,560 | 27,560 | 165,905 | 250,517 | 378,280 |
| YE BTC Price | | | 49,543 | 50,967 | 64,639 | 81,978 |
| Average BTC/USD Price over Period | $42,061 | $56,076 | $46,242 | $45,623 | $58,104 | $73,690 |
| Total Hashrate (Exahash) EOP | 2.1 | 2.7 | 2.7 | 16.6 | 28.1 | 53.6 |
| Total Megawatts | 68.9 | 89.2 | 89 | 509 | 763 | 1,146 |
| Total Bitcoin Produced | 1,254 | 1,346 | 3,172 | 11,047 | 22,327 | 20,678 |
| Gross Mining Margin | 85.9% | 86.4% | 84.9% | 77.5% | 80.0% | 76.5% |
| *Estimated % of Network Hashrate EOP* | *1.5%* | *1.5%* | *1.5%* | *5.8%* | *7.7%* | *11.6%* |
| Network Hashrate EOP | | | 174 | 287 | 364 | 461 |
| Avg Annual Cost of Mining 1 Bitcoin - Direct | $5,899 | $7,267 | $7,126 | $10,627 | $11,711 | $17,139 |
| Avg Annual Cost of Mining 1 Bitcoin - All In | $8,071 | $10,393 | $10,331 | $12,788 | $13,594 | $19,251 |

*2021 & 2022 investments in mining rigs and growth of EH to drive strong, self-sustaining cash flows for growth in 2023 and on*

*Projections assume conservative assumptions with regards to BTC and Network HR*

*While the number of projected rigs grow by 14x from FY2021 - FY2024, the Company's projected % of the total network Hashrate only grows by 7.4x*

*Note: Reflects unaudited 2021 financials and management projections*
*1) Reduction in projected revenue due to halving of block rewards in 2024*

# FY22 by Month – Rig Deployment of 130k Rigs Contracted

**Deployment Options**

| MWs | 2/28 | 3/31 | 4/30 | 5/31 | 6/30 | 7/31 | 8/31 | 9/30 | 10/31 | 11/30 | 12/31 | Total | All-in $/kwH | Duration | Roll-Off/Renewal |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Confirmed** | | | | | | | | | | | | | | | |
| EZ - Georgia | | | | | | | | | | | | 35.0 | $ 0.080 | 18mo | Aug/Sept 2023 |
| Core | 94 | 10 | 5 | 20 | 44 | 8 | 8 | 8 | 8 | 8 | 8 | 185.4 | $ 0.062 | 24mo Rnwl | Jan 23 - Dec 24 |
| Mawson - PA | | 4 | 11 | 23 | 27 | 26 | | | | 25 | | 90.0 | $ 0.059 | Ann Rnwl | Feb 23 |
| Priority - Texas | | | | 12 | 75 | 75 | | | | | | 112.0 | $ 0.030 | 5-10yr | N/A |
| **Total** | 94 | 14 | 16 | 55 | 71 | 109 | 8 | 8 | 8 | 33 | 8 | 422.4 | | | |
| | | | | | | | | | | | | | | | |
| Rigs Delivered (MWs) | 162.6 | 29.4 | 5.7 | 35.7 | 35.8 | 30.0 | 31.5 | 34.5 | 36.0 | 0.0 | 0.0 | | | | |
| Cumulative Rigs Delivered (MWs) | 162.6 | 192.1 | 197.8 | 233.5 | 269.3 | 299.3 | 330.8 | 365.3 | 401.4 | 401.4 | 401.4 | | | | |
| Excess / (Gap) (MWs) | (69) | (85) | (75) | (56) | (21) | 58 | 35 | 8 | (20) | 13 | 21 | | | | |
| Estimated Idle / (Excess Slots) [Rigs] | 22,589 | 27,800 | 24,563 | 18,261 | 6,773 | (19,104) | (11,388) | (2,685) | 6,512 | (4,298) | (6,911) | | | | |
| Rigs Plugged In | 28,905 | 33,905 | 38,885 | 57,045 | 80,705 | 95,905 | 106,405 | 117,905 | 129,905 | 129,905 | 129,905 | | | | |
| | | | | | | | | | | | | | | | |
| Active Blended Rate | $ 0.055 | $ 0.057 | $ 0.058 | $ 0.059 | $ 0.059 | $ 0.053 | $ 0.054 | $ 0.054 | $ 0.053 | $ 0.053 | $ 0.053 | | | | |

## Key Delay Factors:

- **Core**- delay in construction and permits, expecting to make whole and accelerate in June/July
- **EZ**- delays in land acquisition
- **Priority**- ERCOT announcement of grid review has pushed the schedule of utility co energization to July timeframe / negotiations of contracts with multiple vendors

## Our Strategy to Mitigating Execution Risks

- using hybrid approach combining 3rd party hosting and proprietary build
- using multiple 3rd party hosting providers that have integrated supply chain to avoid dependency
- building own facilities with partners that have integrated supply chain or have access to rapid supply
- potential delays not covered are mainly high voltage power infrastructure, real estate lease, and permits

163

# FY22 by Month - PNL Base Case

| BTC/USD | $41,795 | $43,500 | $44,370 | $45,257 | $46,163 | $47,086 | $48,028 | $48,988 | $49,968 | $50,967 | Ann |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 31-Mar | 30-Apr | 31-May | 30-Jun | 31-Jul | 31-Aug | 30-Sep | 31-Oct | 30-Nov | 31-Dec | |
| Idle Rigs (Excess Avail Hosting) | 27,800 | 24,563 | 18,261 | 6,773 | | | | | | | |
| Rigs Deployed | 33,905 | 38,885 | 57,045 | 80,705 | 95,905 | 106,405 | 126,905 | 147,905 | 156,905 | 165,905 | |
| Exa Online | 3.3 | 3.8 | 5.6 | 8.0 | 9.5 | 10.6 | 12.7 | 14.8 | 15.7 | 16.6 | |
| **$ in mm** | | | | | | | | | | | |
| Revenue | 17 | 20 | 27 | 37 | 48 | 54 | 59 | 71 | 75 | 81 | 381 |
| EBITDA | 11 | 14 | 20 | 27 | 35 | 39 | 43 | 53 | 55 | 60 | 381 |
| Capex | (69) | (35) | (77) | (67) | (69) | (62) | (28) | (26) | (26) | – | |
| **Net CF** | -57 | -21 | -57 | -40 | -34 | -23 | 15 | 27 | 29 | 60 | |
| Cumulative CF | -57 | -78 | -135 | -175 | -209 | -232 | -217 | -191 | -162 | -102 | |
| **Annualized EBITDA** | | | | 422 | 422 | 474 | 516 | 635 | 664 | 718 | |
| **NTM EBITDA** | | | | 758 | | | | | | 1,001 | |
| *Implied Mkt Cap at 3x NTM EBITDA* | | | | 2,274 | | | | | | 3,004 | |
| | | | | | | | | | | | |
| **Parent Loan Support** | | | | | | | | | | | |
| Beginning Balance | 512 | 574 | 581 | 644 | 690 | 731 | 761 | 769 | 777 | 784 | |
| Funding Needs | 57 | 1 | 57 | 40 | 34 | 23 | 0 | 0 | 0 | 0 | |
| PIK Interest | 5 | 6 | 6 | 6 | 7 | 7 | 8 | 8 | 8 | 8 | |
| **Ending Balance** | 574 | 581 | 644 | 690 | 731 | 761 | 769 | 777 | 784 | 792 | |

- CapEx for fy22 assumes expansion of additional 3.5EH in Q3-4 with an overall target cost of $220m including rigs at $48/TH instead of $65, as well as $30m hosting capex
- This allows for potential of $600m in additional EV
- Not factored in the above, additional $50m-70m of capex during the year towards buildout of the 300mw site for May23
- Without expansion capex, parent support would be capped at circa $600m
- Upon IPO, $300-400m of parent loan should be converted to equity and the remainder to be refinanced with high yield



# ⓒ 3-Year Cumulative EBITDA, Net of Capex - Sensitivity Analysis

**164**

## Sensitivity Analysis Overview- Base Business

- **Stress testing 3-year cumulative EBITDA, Net of Capex for FY22E-24E- with no additional capex investments post 2022, ie, only 165k rigs operating**

- Looking at no additional growth in the business beyond 2022- and we only harvest coins produced

- IRR calculation assumes initial parent investment of $390m (Dec 31, 2021 balance) and FY25 EBITDA at 40% discount to FY24

- **Takeaway:** The base business IRR (calculated through fy25) will be used as a threshold analyzing additional rig investments going into fy 23&24 to assess viability given lack of clarity on evolution of rig pricing. In those years financing growth is done through FCF and or public financing.

### Implied BTC @ Dec 2024

| | | | | Monthly BTC Growth % | | | | |
|---|---|---|---|---|---|---|---|---|
| | $22,789 | $26,819 | $34,187 | $43,500 | $59,810 | $70,049 | $81,978 | |
| | -2.00% | -1.50% | -0.75% | 0.00% | 1.00% | 1.50% | 2.00% | |
| 296 (1%) | 561 | 683 | 889 | 1,125 | 1,494 | 1,707 | 1,940 | |
| 310 (0.5%) | 497 | 614 | 811 | 1,036 | 1,390 | 1,599 | 1,816 | |
| 355 1% | 322 | 425 | 598 | 795 | 1,105 | 1,283 | 1,479 | |
| 387 2% | 219 | 313 | 471 | 653 | 937 | 1,100 | 1,279 | |
| 423 3% | 125 | 211 | 356 | 523 | 783 | 933 | 1,097 | |
| 461 4% | 39 | 118 | 252 | 405 | 644 | 781 | 932 | |
| 503 5% | (40) | 33 | 156 | 297 | 517 | 643 | 782 | |
| 548 6% | (112) | (44) | 69 | 198 | 401 | 517 | 644 | |

Implied Network EH/s @ Dec 24 / Monthly Hashrate Growth

### Implied BTC @ Dec 2024

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | $22,789 | $26,819 | $34,187 | $43,500 | $59,810 | $70,049 | $81,978 | |
| | -2.00% | -1.50% | -0.75% | 0.00% | 1.00% | 1.50% | 2.00% | |
| 296 (1%) | 20% | 31% | 46% | 62% | 84% | 95% | 106% | |
| 310 (0.5%) | 14% | 25% | 40% | 56% | 77% | 88% | 99% | |
| 355 1% | -4% | 8% | 24% | 39% | 59% | 70% | 80% | |
| 387 2% | -16% | -4% | 13% | 28% | 48% | 58% | 68% | |
| 423 3% | -29% | -15% | 2% | 18% | 37% | 47% | 57% | |
| 461 4% | -47% | -27% | -8% | 8% | 27% | 37% | 47% | |
| 503 5% | | -42% | -19% | -2% | 18% | 27% | 37% | |
| 548 6% | | | -30% | -12% | 8% | 18% | 27% | |

Implied Network EH/s @ Dec 24 / Monthly Hashrate Growth

### Assumptions ($ in mm)

| Income Statement | Q3 '21 | Q4 '21 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|
| Mining Revenue | 53 | 72 | 150 | 522 | 971 | 648 |
| Mining Operations | (7) | (10) | (23) | (117) | (224) | (218) |
| Gross Profit | $45 | $62 | $127 | $405 | $747 | $429 |
| % Margin | 86% | 86% | 85% | 78% | 77% | 66% |
| G&A | (2.7) | (4.2) | (10.2) | (23.9) | (41.4) | (41.4) |
| EBITDA | $42 | $58 | $117 | $381 | $706 | $388 |
| % Margin | 81% | 81% | 81% | 73% | 73% | 60% |
| Capex | 115 | 277 | 446 | 542 | — | — |
| | | | | | | |
| Average BTC Mined Daily | 13.7 | 15 | 9 | 50 | 46 | 25 |
| Total Rigs Deployed | 21,175 | 27,560 | 27,560 | 165,905 | 165,905 | 165,905 |
| YE BTC Price | | | $49,543 | 50,967 | 64,639 | 81,978 |
| Average BTC (USD) Price over Period | $42,991 | $56,076 | $46,242 | $45,625 | $58,104 | $73,600 |
| Total Hashrate (Exahash) EOP | 2.1 | 2.7 | 2.7 | 16.6 | 16.6 | 16.6 |
| Total Storerooms | 68.9 | 89.2 | 89 | 509 | 509 | 509 |

*Note: Reflects management projections. Figures based on FY22 parameters.*

# 3-Year Cumulative EBITDA, Net of Capex - Sensitivity Analysis

**Sensitivity Analysis Overview- with rig expansion in fy 23&24**

- **Stress testing 3-year cumulative EBITDA, Net of Capex for FY22E-24E**

- Model sensitizes the following:
  - ▸ BTC Price Growth (Monthly through FY2023 and FY2024)
  - ▸ Network Hash Rate Growth (Monthly through FY2022)

- Base case model assumes BTC price will reach $80.7k by end of FY24 while Network Hashrate climbs to 461 from a monthly average of 174 in December 2021

**Key Assumptions**

- Cost structure and capital expenditure kept constant- which in reality will not happen if BTC price does not pick up

- assuming rig prices decline in fy 23&24 beyond what we are seeing today at $35/TH. If that does not change, implied IRR in callouts is inferior, and we will have to balance growth with financing sources

- Assumes BTC price is not hedged

- IRR calculation assumes initial parent investment of $390m (Dec 31, 2021 balance) and FY25 EBITDA at 40% discount to FY24 to account for FY24 CapEx



**3Yr Net Cash Flow Sensitivity (FY22-24)**

| Implied Network EHs @ Dec 24 | Monthly Hashrate Growth | | Implied BTC @ Dec 2024 | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | $22,789 | $26,819 | $34,187 | $43,500 | $59,810 | $70,049 | $81,978 |
| | | **Monthly BTC Growth %** | | | | | | |
| | | -2.00% | -1.50% | -0.75% | 0.00% | 1.00% | 1.50% | 2.00% |
| 296 | (1%) | 198 | 410 | 772 | 1,194 | 1,869 | 2,263 | 2,702 |
| 310 | (0.5%) | 101 | 304 | 650 | 1,053 | 1,699 | 2,076 | 2,495 |
| 355 | 1% | (162) | 16 | 319 | 672 | 1,237 | 1,567 | 1,934 |
| 387 | 2% | (317) | (154) | 123 | 446 | 964 | 1,266 | 1,602 |
| 423 | 3% | (459) | (309) | (55) | 242 | 716 | 993 | 1,301 |
| 461 | 4% | (588) | (451) | (217) | 55 | 491 | 745 | 1,028 |
| 503 | 5% | (705) | (579) | (365) | (114) | 285 | 519 | 778 |
| 548 | 6% | (812) | (696) | (499) | (269) | 98 | 313 | 551 |

**IRR Sensitivity**

| Implied Network EHs @ Dec 24 | Monthly Hashrate Growth | | Implied BTC @ Dec 2024 | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | $22,789 | $26,819 | $34,187 | $43,500 | $59,810 | $70,049 | $81,978 |
| | | -2.00% | -1.50% | -0.75% | 0.00% | 1.00% | 1.50% | 2.00% |
| 296 | (1%) | 5% | 23% | 48% | 71% | 101% | 116% | 132% |
| 310 | (0.5%) | -4% | 15% | 40% | 64% | 94% | 108% | 123% |
| 355 | 1% | -32% | -10% | 17% | 41% | 71% | 86% | 100% |
| 387 | 2% | -44% | -27% | 2% | 26% | 57% | 71% | 86% |
| 423 | 3% | | | -14% | 12% | 43% | 57% | 72% |
| 461 | 4% | | | -29% | -2% | 29% | 44% | 58% |
| 503 | 5% | | | -44% | -16% | 16% | 31% | 46% |
| 548 | 6% | | | | -30% | 4% | 19% | 33% |

31%

-8%

*Note: Reflects management projections. Figures based on FY22 parameters.*




# Potential Earnings Stabilization Strategy

**Hedging Strategy**

- Collar - Buying out of the money put options and selling out of the money call options
- Minor cost impact on P&L

**P&L Strategy**

- Establishing a floor and downside protection to quarterly revenue reported in $, at zero cost, while considering the potential upside profit that Celsius may give up
- Smoothing out of earnings
- Short-term consideration - looking at 1-2 quarters of production of BTC
- This strategy may add volatility to the PNL as we cannot use hedge accounting

*Note: Reflects unaudited 2021 financials and management projections*

**Executive Summary | Spring 2022**





# Mawson - Transaction Rational

## Illustrative Transaction with Mawson: Value Creation

- **Undervalued Asset** - trading below peers @ roughly $270m with expected 4.8EH this year of miners, and a portfolio of roughly 1.2GW of predominantly nuclear sites
- **Operational capabilities** - 30 people, construction and power background, has integrated supply chain through investments in transformer companies as well as own design and investment in mobile data center companies
- lack of US investor base impacts low market multiples hence lack of financing, leading to inability to tap into the potential of own power pipeline.
- **synergies** are not in cost cutting, but rather in merging for a combined 20EH of mining by end of fy22, and ability to grow combined business to 2.2GW of power. This is doubling the buildup we project for the next 3 years, and we get 80% of it.
- We also expect uplift in market multiples for the combined business



# Illustrative Transaction with Mawson: Analysis at Various Prices

*($ in millions, except per share figures)*

| | Metric | Market | Illustrative Transaction with Mawson Infrastructure | | | | | Metric | Canyon | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | $3.73 | $6.00 | $7.00 | $8.00 | $9.00 | $10.00 | | $2,300 | $2,500 | $2,700 |
| **Premium / (Discount)** | | | | | | | | | | | |
| Current (April 23, 2022) | $3.73 | -- | 60.9% | 87.7% | 114.5% | 141.5% | 168.1% | | -- | -- | -- |
| 52-Week High (Intraday – September 3, 2021) | 17.25 | (78.4) | (65.2) | (59.4) | (53.6) | (47.8) | (42.0) | | -- | -- | -- |
| (x) Shares Outstanding | | 73.845 | 73.845 | 73.845 | 73.845 | 73.935 | 74.278 | | | | |
| Implied Equity Value | | $275 | $443 | $517 | $591 | $665 | $743 | | $2,168 | $2,368 | $2,568 |
| (+) Debt[1] | | 11 | 11 | 11 | 11 | 11 | 11 | | 464 | 464 | 464 |
| (-) Cash and Cash Equivalents[2] | | (5) | (5) | (5) | (5) | (5) | (5) | | (331) | (331) | (331) |
| Firm Value | | $281 | $449 | $522 | $596 | $671 | $748 | | $2,300 | $2,500 | $2,700 |
| Implied Multiples | Metric | | | | | | | Metric | | | |
| 22E EBITDA | $105 | 2.7x | 4.3x | 5.0x | 5.7x | 6.4x | 7.1x | $380 | 6.0x | 6.6x | 7.1x |
| 23E EBITDA | 198 | 1.4 | 2.3 | 2.6 | 3.0 | 3.4 | 3.8 | 1,001 | 2.3 | 2.5 | 2.7 |
| Contracted Hashrate | 4.0 | 0.7 | 1.1 | 1.3 | 1.5 | 1.7 | 1.9 | 13.0 | 1.8 | 1.9 | 2.1 |
| **Mawson Pro Forma Ownership:** | Assumed Celsius Equity Value: | | | | | | | | | | |
| 2,168 | | 11.3% | 17.0% | 19.3% | 21.4% | 23.5% | 25.5% | | | | |
| 2,368 | | 10.4% | 15.8% | 17.9% | 20.0% | 21.9% | 23.9% | | | | |
| 2,568 | | 9.7% | 14.7% | 16.8% | 18.7% | 20.6% | 22.4% | | | | |



# Sept 30, 2021 Audited PNL

**STATEMENTS OF OPERATIONS**

U.S. dollars in thousands, except unit and per unit data

| | Nine months ended September 30, 2021 (Unaudited) | For the period from October 5, 2020 (inception) to December 31, 2020 |
|---|---|---|
| Mining revenue | $ 78,240 | $ - |
| Cost of revenues: | | |
| Depreciation | 10,526 | - |
| Mining management services | 3,084 | - |
| Mining setup fees | 286 | - |
| Hosting services | 10,801 | - |
| Total cost of revenues | 24,697 | - |
| Gross profit | 53,543 | - |
| Operating expenses: | | |
| Administrative services fees | 2,236 | 450 |
| Subcontractors | 130 | 20 |
| Professional fees | 729 | - |
| Marketing expenses | 10 | - |
| Total operating expenses | 3,105 | 470 |
| Operating income (loss) | 50,438 | (470) |
| Interest expense | 11,927 | 304 |
| Interest income | (5,263) | (330) |
| Unrealized gain on investment in convertible debt | (833) | - |
| Realized loss from BTC loan repayment | 3,337 | - |
| Unrealized gain from revaluation of BTC loan | (2,560) | - |
| Other expenses, net | 8,608 | (26) |
| Net income (loss) before taxes | 41,830 | (444) |
| Current income tax expense | 2,071 | - |
| Deferred income tax expense (income) | 8,385 | (93) |
| Total income taxes | 10,456 | (93) |
| Net income (loss) | $ 31,374 | $ (351) |

# Q1 2022
## Unaudited PNL

| CELSIUS MINING - P&L 2022 | JAN - ACTUAL | FEB - ACTUAL | MARCH - PRELIM. | 1Q22 |
|---|---|---|---|---|
| Mining Revenue | $ 17,331,433 | $ 14,521,759 | $ 17,462,933 | $ 49,316,125 |
| **Cost of Revenues:** | | | | |
| Depreciation - Mining Equipment* | $ 3,518,951 | $ 3,720,109 | $ 4,348,913 | $ 11,587,973 |
| Repair, Maintenance, Transportation | $ - | $ 22,896 | $ 116,799 | $ 139,695 |
| Hosting & Proprietary Sites | $ 4,050,029 | $ 3,384,846 | $ 4,009,611 | $ 11,444,486 |
| Total Cost of Revenues | $ 7,568,979 | $ 7,127,851 | $ 8,475,323 | $ 23,172,154 |
| | | | | |
| **Gross Profit** | $ 9,762,453 | $ 7,393,908 | $ 8,987,610 | $ 26,143,971 |
| | | | | |
| **Operating Expenses:** | | | | |
| G&A | $ 417,464 | $ 1,542,840 | $ 1,670,320 | $ 3,630,624 |
| Total Operating Expenses | $ 417,464 | $ 1,542,840 | $ 1,670,320 | $ 3,630,624 |
| | | | | |
| Operating Income (Loss) | $ 9,344,989 | $ 5,851,068 | $ 7,317,290 | $ 22,513,347 |
| | | | | |
| **Other Expenses** | | | | |
| Interest Expense | $ 4,105,893 | $ 4,135,485 | $ 5,175,064 | $ 13,416,443 |
| Trading Transaction Fee | $ - | $ - | $ 39,201 | $ 39,201 |
| Unrealized Loss/(Gain) - BTC | $ - | $ - | $ 1,090,652 | $ 1,090,652 |
| Realized Loss/(Gain) - BTC | $ 2,573,144 | $ - | $ 617,399 | $ 3,190,543 |
| Total Other Expenses | $ 6,679,037 | $ 4,135,485 | $ 6,922,317 | $ 17,736,839 |
| | | | | |
| **Net Income** | $ 2,665,952 | $ 1,715,583 | $ 394,973 | $ 4,776,508 |
| Interest Expense | $ 4,105,893 | $ 4,135,485 | $ 5,175,064 | $ 13,416,443 |
| Depreciation - Mining Equipment* | $ 3,518,951 | $ 3,720,109 | $ 4,348,913 | $ 11,587,973 |
| Realized Loss/(Gain) - BTC | $ 2,573,144 | $ - | $ 617,399 | $ 3,190,543 |
| **EBITDA** | $ 12,863,940 | $ 9,571,177 | $ 10,536,350 | $ 32,971,466 |
| | | | | |
| **EBITDA Margin** | 74% | 66% | 60% | 67% |

*Excludes depreciation for proprietary sites; NM 2022



# EXHIBIT H



Citi Banking, Capital Markets & Advisory

IPO Kick-Off Materials

Project Kelvin

October 20, 2021

Strictly Private and Confidential

citi

## Agenda

| 1 | Transaction Overview and Timing Considerations |
| 2 | Detailed Timeline Through Pricing |
| 3 | WGL |



# 1. Transaction Overview and Timing Considerations

citi

# Transaction Overview

| | |
|---|---|
| **Issuer / Listing** | • Celsius / Ticker & Exchange TBD |
| **Offering Format** | • Common Shares – SEC Registered |
| **Marketing Format** | • [~7 day virtual roadshow] |
| **Base Offering Size** | • [$300 - $400 million] – Primary / Secondary TBD |
| **Over-Allotment Option** | • 15% Greenshoe – Primary / Secondary TBD |
| **Use of Proceeds** | • [General Corporate Purposes] |
| **Lock-Up** | • 180 Days – Potential to Tailor (*Price & Time Based*) |
| **Lead Active Bookrunners** | • Citi |
| **Other Underwriters** | • TBD |
| **Company Counsel** | • Latham & Watkins |
| **Underwriter's Counsel** | • Davis Polk & Wardell |
| **Company Auditor** | • Ernst & Young |



# Key Transaction Documents

| Document | Responsibilities |
|---|---|
| S-1 Registration Statement | • ALL |
| Audited Financial Statements | • C, A |
| Underwriting Agreement | • C, UW, CC, UC |
| Research Analyst Presentation | • C, UW, CC |
| Roadshow Presentation | • C, UW, CC |
| Lock-Up Agreement | • C, UW, CC, UC |
| FINRA Filing | • UC |
| Comfort Letters | • A, UC |
| Legal Opinions / 10b-5 Letters | • CC, UC |
| Listing Application | • C, CC |
| Press Releases | • C, UW, CC, UC |

**C:** Celsius    **UW:** Underwriters    **CC:** Company Counsel    **UC:** Underwriters Counsel    **A:** Auditors

3



# Proposed IPO Process Timeline

| Key Milestones | |
|---|---|
| Org Meeting | October 20 |
| Confidential S-1 Filing | December 13 |
| Roadshow Dry Runs | January 6 – January 7 |
| Analyst Day Dry Run | January 25 |
| Analyst Day | January 26 |
| TTW #1 | Weeks of January 10 / 17 |
| Q3 '21 Financial Staleness | February 14 |
| Incorporate FY '21 Financials | Weeks of February 14 / 21 |
| TTW #2 (Optional) | Weeks of February 14 / 21 |
| Public S-1 Filing | February 28 |
| 15-Day Window | March 1 – March 15 |
| IPO Roadshow | March 16 – March 23 |
| Pricing | March 23 |

**Legend:**
- Org Meeting
- Confidential Filing of S-1
- Roadshow Dry Run
- Public Filing
- Analyst Day
- Market Holiday
- TTW Windows
- 15-Day Window
- Financial Staleness
- IPO Roadshow
- FOMC Meeting
- Pricing

**October 2021**
| M | T | W | Thu | F |
|---|---|---|---|---|
| | | | | 1 |
| 4 | 5 | 6 | 7 | 8 |
| 11 | 12 | 13 | 14 | 15 |
| 18 | 19 | 20 | 21 | 22 |
| 25 | 26 | 27 | 28 | 29 |

**November 2021**
| M | T | W | Thu | F |
|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 |
| 8 | 9 | 10 | 11 | 12 |
| 15 | 16 | 17 | 18 | 19 |
| 22 | 23 | 24 | 25 | 26 |
| 29 | 30 | | | |

**December 2021**
| M | T | W | Thu | F |
|---|---|---|---|---|
| | | 1 | 2 | 3 |
| 6 | 7 | 8 | 9 | 10 |
| 13 | 14 | 15 | 16 | 17 |
| 20 | 21 | 22 | 23 | 24 |
| 27 | 28 | 29 | 30 | 31 |

**January 2022**
| M | T | W | Thu | F |
|---|---|---|---|---|
| 3 | 4 | 5 | 6 | 7 |
| 10 | 11 | 12 | 13 | 14 |
| 17 | 18 | 19 | 20 | 21 |
| 24 | 25 | 26 | 27 | 28 |
| 31 | | | | |

**February 2022**
| M | T | W | Thu | F |
|---|---|---|---|---|
| | 1 | 2 | 3 | 4 |
| 7 | 8 | 9 | 10 | 11 |
| 14 | 15 | 16 | 17 | 18 |
| 21 | 22 | 23 | 24 | 25 |
| 28 | | | | |

**March 2022**
| M | T | W | Thu | F |
|---|---|---|---|---|
| | 1 | 2 | 3 | 4 |
| 7 | 8 | 9 | 10 | 11 |
| 14 | 15 | 16 | 17 | 18 |
| 21 | 22 | 23 | 24 | 25 |
| 28 | 29 | 30 | 31 | |

4



# Overview of Key Workstreams and Timing

| Workstream | Key Tasks | Timing | Lead |
|---|---|---|---|
| S-1 Drafting | • Box<br>• Business<br>• MD&A<br>• Risk Factors | • First confidential filing week of Dec. 13th<br>• Public filing by late February | • C, UW, CC, UC |
| Testing-the-Waters | • Presentation<br>• Script<br>• Q&A | • Dry runs the week before meetings<br>• First round: January<br>• Second round: February | • UW |
| Analyst Day Presentation | • Presentation<br>• Script<br>• Q&A | • Invite analysts minimum of 2 weeks before session | • UW |
| Analyst Day Model | • Beat & Raise Model | • Analyst Day in January | • C, UW |
| Roadshow Presentation | • Presentation<br>• Script<br>• Q&A | • Dry runs the week before meetings<br>• Roadshow meetings in March | • UW |
| Roadshow Video | • Script<br>• Dry Runs<br>• Video Production | • Engage video production company and begin planning<br>• Finalize video by end of December | • C, UW |

**C:** Celsius    **UW:** Underwriters    **CC:** Company Counsel    **UC:** Underwriters Counsel    **A:** Auditors

# Building Blocks of a Summary Box

**1** Company Overview
- Company Overview
- Mission and vision
- Description of business model

**2** Industry Overview
- Target / addressable market
- Key market trends
- Bitcoin and Bitcoin mining
- Mining pool

**3** Competitive Strengths
- Key selling points of equity story to investors
- To be discussed in depth in drafting sessions

**4** Growth Strategy
- Avenues of growth for the company
- Strategy to capture growth opps

**5** Financial Highlights & Recent Developments
- Key financial figures/summary of MD&A
- Recent developments
- KPIs
- Capital raise disclosure

**6** Summary of Risk Factors

**7** Corporate Information
- Corporate structure
- Main office address
- Contact information

**8** ESG
- Strategy and sources
- Environmentally beneficial operations
- Regional and community strategy

citi

9



# Private Placement Execution Alternatives

| | 2021 Projections & Cleansing | Capital Providers Only | Full Projections & Delayed IPO |
|---|---|---|---|
| **Description** | • Broad outreach to investors utilizing projections only through 2021<br><br>• Inclusion of 2021 FY financials in the public prospectus serves as a cleansing event for investors engaged in the private offer for additional years of information upon request, with the understanding that this will preclude the investor from the IPO process | • Conduct private process exclusively amongst capital provider firms (private equity, special situations) with full projections available | • Outreach to all investors with full projections<br><br>• Delay IPO process by length of staleness required to allow investors to participate without restriction – likely 2 quarters |
| **Key Rationale** | ◄ Broadest marketing outreach potential<br><br>◄ Ability for all engaged investors to ultimately participate in the IPO without restriction given cleansing event (except those who elect for additional projections) | ◄ Ability to share full projection details<br><br>◄ Investors unlikely to take issue with projections limiting participation in IPO given differentiated investing strategies | ◄ Provides full projections and most broad marketing outreach potential |
| **Key Focus Areas** | ► Limits forecasts to 2021 – some investors may want or even require further estimates for diligence or model building | ► Decreases investor pool available for outreach | ► Delays IPO process significantly |

citi

# Next Steps

| High-Level Initial Action Items | Responsibility |
|---|---|
| **Initiate due diligence with management / overview of equity story** | |
| — Prepare and deliver Q&A for in-person diligence session | • UW |
| — Discuss contents of equity story | • C, UW |
| — Begin preparing comments on investment highlights | • UW |
| — Send a list of key DD documents underwriters and company counsel will need to review | • UW, UC |
| — Continue populating/reviewing VDR | • UW, UC |
| **S-1 box drafting sessions** | |
| — Prepare and circulate KPI/financials disclosure benchmarking and recommendation for disclosure | • UW |
| — Begin drafting sessions/outline for S-1 | • C, UW, CC |
| — Prepare detailed drafting timetable including date for circulation of first drafts of each section/first draft of the document | • CC |
| **Research analyst model (historical and projected)** | |
| — Circulate 1st draft of financial projections & budget | • C |
| **Analyst day presentation** | • UW |
| **Weekly update calls to be scheduled** | • UW |

**C:** Celsius    **UW:** Underwriters    **CC:** Company Counsel    **UC:** Underwriters Counsel    **A:** Auditors

8



# 2. Detailed Timeline to Pricing

# Detailed Execution Timetable

**October 2021**

| M | T | W | Thu | F |
|---|---|---|-----|---|
|  |  |  |  | 1 |
| 4 | 5 | 6 | 7 | 8 |
| 11 | 12 | 13 | 14 | 15 |
| 18 | 19 | 20 | 21 | 22 |
| 25 | 26 | 27 | 28 | 29 |

**November 2021**

| M | T | W | Thu | F |
|---|---|---|-----|---|
| 1 | 2 | 3 | 4 | 5 |
| 8 | 9 | 10 | 11 | 12 |
| 15 | 16 | 17 | 18 | 19 |
| 22 | 23 | 24 | 25 | 26 |
| 29 | 30 |  |  |  |

**December 2021**

| M | T | W | Thu | F |
|---|---|---|-----|---|
|  |  | 1 | 2 | 3 |
| 6 | 7 | 8 | 9 | 10 |
| 13 | 14 | 15 | 16 | 17 |
| 20 | 21 | 22 | 23 | 24 |
| 27 | 28 | 29 | 30 | 31 |

**January 2022**

| M | T | W | Thu | F |
|---|---|---|-----|---|
| 3 | 4 | 5 | 6 | 7 |
| 10 | 11 | 12 | 13 | 14 |
| 17 | 18 | 19 | 20 | 21 |
| 24 | 25 | 26 | 27 | 28 |
| 31 |  |  |  |  |

**February 2022**

| M | T | W | Thu | F |
|---|---|---|-----|---|
|  | 1 | 2 | 3 | 4 |
| 7 | 8 | 9 | 10 | 11 |
| 14 | 15 | 16 | 17 | 18 |
| 21 | 22 | 23 | 24 | 25 |
| 28 |  |  |  |  |

**March 2022**

| M | T | W | Thu | F |
|---|---|---|-----|---|
|  | 1 | 2 | 3 | 4 |
| 7 | 8 | 9 | 10 | 11 |
| 14 | 15 | 16 | 17 | 18 |
| 21 | 22 | 23 | 24 | 25 |
| 28 | 29 | 30 | 31 |  |

■ Market Holiday

| Week(s) of | Action Items | Responsibilities |
|---|---|---|
| October 18 | • Organizational meeting | • C, UW, CC, UC |
| Oct 25 - Dec 6 | • Begin weekly update calls | • C, UW, CC, UC |
|  | • In-person S-1 drafting/diligence session | • C, UW, CC, UC |
|  | • Discuss timeline for audited financials | • C, UW, CC, UC |
|  | • Circulate underwriting and lock-up agreements, draft legal opinions | • CC, UC |
|  | • Circulate D&O and FINRA Questionnaires | • UC |
|  | • Select customers and partners for due diligence | • C, UW |
|  | • Open up and populate data room | • C, CC |
|  | • Circulate draft comfort letter | • A, UC |
|  | • Financial model due diligence including research analyst model | • C, UW, CC, UC |
| Dec 6 | • Continue weekly update calls | • C, UW, CC, UC |
|  | • 30 minute business overview call between management and analysts | • C, CC, RA |
|  | • In-person S-1 drafting sessions | • C, UW, CC, UC |
|  | • Customer/partners due diligence calls | • UW, UC, RA |
|  | • Legal/regulatory/OFAC/tax/IP/ cyber and auditor due diligence | • C, UW, UC, UC |
|  | • Continue financial model diligence | • C, UW, CC, UC |
|  | • Begin drafting analyst day presentation & TTW / IPO roadshow presentation | • C, UW |
|  | • Receive Board approval | • C |

**C:** Celsius    **UW:** Underwriters    **CC:** Company Counsel    **RA:** Research Analysts    **A:** Auditors    **UW:** Underwriters' Counsel

citi

# Detailed Execution Timetable

## October 2021

| M | T | W | Thu | F |
|---|---|---|---|---|
| | | | | 1 |
| 4 | 5 | 6 | 7 | 8 |
| 11 | 12 | 13 | 14 | 15 |
| 18 | 19 | 20 | 21 | 22 |
| 25 | 26 | 27 | 28 | 29 |

## November 2021

| M | T | W | Thu | F |
|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 |
| 8 | 9 | 10 | 11 | 12 |
| 15 | 16 | 17 | 18 | 19 |
| 22 | 23 | 24 | 25 | 26 |
| 29 | 30 | | | |

## December 2021

| M | T | W | Thu | F |
|---|---|---|---|---|
| | | 1 | 2 | 3 |
| 6 | 7 | 8 | 9 | 10 |
| 13 | 14 | 15 | 16 | 17 |
| 20 | 21 | 22 | 23 | 24 |
| 27 | 28 | 29 | 30 | 31 |

## January 2022

| M | T | W | Thu | F |
|---|---|---|---|---|
| 3 | 4 | 5 | 6 | 7 |
| 10 | 11 | 12 | 13 | 14 |
| 17 | 18 | 19 | 20 | 21 |
| 24 | 25 | 26 | 27 | 28 |
| 31 | | | | |

## February 2022

| M | T | W | Thu | F |
|---|---|---|---|---|
| | 1 | 2 | 3 | 4 |
| 7 | 8 | 9 | 10 | 11 |
| 14 | 15 | 16 | 17 | 18 |
| 21 | 22 | 23 | 24 | 25 |
| 28 | | | | |

## March 2022

| M | T | W | Thu | F |
|---|---|---|---|---|
| | 1 | 2 | 3 | 4 |
| 7 | 8 | 9 | 10 | 11 |
| 14 | 15 | 16 | 17 | 18 |
| 21 | 22 | 23 | 24 | 25 |
| 28 | 29 | 30 | 31 | |

■ Market Holiday

| Week(s) of | Action Items | Responsibilities |
|---|---|---|
| Dec 13 | Continue weekly update calls | C, UW, CC, UC |
| | Bookrunners go to committee | UW |
| | Finalize documentary due diligence and complete factual back-up support on initial Form S-1 | UC |
| | Receive all executed lock-up agreements | CC, UC |
| | Finalize terms of underwriting agreement, legal opinions and form of comfort letter | C, UW, CC, UC, A |
| | Pre-filing bring-down due diligence conference call | C, UW, CC, UC, A |
| | Initial FINRA filing | UC |
| | Confidentially file Form S-1 | C, CC |
| Dec 20 - Dec 27 | Continue drafting analyst day presentation & TTW / IPO roadshow presentation | C, UW |
| | Finalize financial model | C, UW, CC, UC |
| Jan 3 - Jan 17 | Finalize TTW roadshow presentation | C, UW, CC, UC |
| | Finalize analyst day presentation | C, UW |
| | Begin dialogue with exchanges (NYSE/Nasdaq) | C |
| | Interview exchanges | C |
| | First round of TTW Meetings | C, CC |
| | Invite remaining underwriters into syndicate | C, UW, CC, UC |
| Jan 24 | Receive first round of SEC comments and prepare response | C, UW, CC, UC |
| | Continue drafting IPO roadshow presentation | C, UW, CC, UC |
| | Analyst Day Presentation | C, RA |

**C:** Celsius    **UW:** Underwriters    **CC:** Company Counsel    **RA:** Research Analysts    **A:** Auditors    **UW:** Underwriters' Counsel

10

citi

# Detailed Execution Timetable (*Cont'd*)

### October 2021
| M | T | W | Thu | F |
|---|---|---|---|---|
| | | | | 1 |
| 4 | 5 | 6 | 7 | 8 |
| 11 | 12 | 13 | 14 | 15 |
| 18 | 19 | 20 | 21 | 22 |
| 25 | 26 | 27 | 28 | 29 |

### November 2021
| M | T | W | Thu | F |
|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 |
| 8 | 9 | 10 | 11 | 12 |
| 15 | 16 | 17 | 18 | 19 |
| 22 | 23 | 24 | 25 | 26 |
| 29 | 30 | | | |

### December 2021
| M | T | W | Thu | F |
|---|---|---|---|---|
| | | 1 | 2 | 3 |
| 6 | 7 | 8 | 9 | 10 |
| 13 | 14 | 15 | 16 | 17 |
| 20 | 21 | 22 | 23 | 24 |
| 27 | 28 | 29 | 30 | 31 |

### January 2022
| M | T | W | Thu | F |
|---|---|---|---|---|
| 3 | 4 | 5 | 6 | 7 |
| 10 | 11 | 12 | 13 | 14 |
| 17 | 18 | 19 | 20 | 21 |
| 24 | 25 | 26 | 27 | 28 |
| 31 | | | | |

### February 2022
| M | T | W | Thu | F |
|---|---|---|---|---|
| | 1 | 2 | 3 | 4 |
| 7 | 8 | 9 | 10 | 11 |
| 14 | 15 | 16 | 17 | 18 |
| 21 | 22 | 23 | 24 | 25 |
| 28 | | | | |

### March 2022
| M | T | W | Thu | F |
|---|---|---|---|---|
| | 1 | 2 | 3 | 4 |
| 7 | 8 | 9 | 10 | 11 |
| 14 | 15 | 16 | 17 | 18 |
| 21 | 22 | 23 | 24 | 25 |
| 28 | 29 | 30 | 31 | |

■ Market Holiday

| Week(s) of | Action Items | Responsibilities |
|---|---|---|
| Jan 31 | • File Amendment #1 to Form S-1<br>• Finalize stock exchange selection and prepare listing application<br>• Continue drafting IPO roadshow presentation | • C, CC<br>• C, CC<br>• C, UW, CC, UC |
| Feb 7 | • Receive SEC comments on Amendment #1 filing and prepare responses<br>• Continue drafting IPO roadshow presentation | • C, UW, CC, UC<br>• C, UW, CC, UC |
| Feb 14 | • File Amendment #2 to Form S-1<br>• Continue drafting IPO roadshow presentation<br>• Finalize analyst models and preliminary valuation feedback<br>• Second window for TTW | • C, UW, CC, UC<br>• C, UW, CC, UC<br>• UW, RA<br>• C, CC |
| Feb 21 | • Receive SEC comments on Amendment #2 filing and prepare responses<br>• Continue drafting IPO roadshow presentation<br>• Second window for TTW | • C, UW, CC, UC<br>• C, UW, CC, UC<br>• C, CC |
| Feb 28 | • Clear any outstanding SEC comments<br>• Publicly file Amendment #3 to Form S-1<br>• Continue drafting IPO roadshow presentation<br>• Valuation discussion | • C, CC<br>• C, UW, CC, UC<br>• C, UW, CC, UC<br>• C, UW, CC, UC |

**C:** Celsius   **UW:** Underwriters   **CC:** Company Counsel   **RA:** Research Analysts   **A:** Auditors   **UW:** Underwriters' Counsel

# Detailed Execution Timetable (*Cont'd*)



### October 2021

| M | T | W | Thu | F |
|---|---|---|---|---|
| | | | | 1 |
| 4 | 5 | 6 | 7 | 8 |
| 11 | 12 | 13 | 14 | 15 |
| 18 | 19 | 20 | 21 | 22 |
| 25 | 26 | 27 | 28 | 29 |

### November 2021

| M | T | W | Thu | F |
|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 |
| 8 | 9 | 10 | 11 | 12 |
| 15 | 16 | 17 | 18 | 19 |
| 22 | 23 | 24 | 25 | 26 |
| 29 | 30 | | | |

### December 2021

| M | T | W | Thu | F |
|---|---|---|---|---|
| | | 1 | 2 | 3 |
| 6 | 7 | 8 | 9 | 10 |
| 13 | 14 | 15 | 16 | 17 |
| 20 | 21 | 22 | 23 | 24 |
| 27 | 28 | 29 | 30 | 31 |

### January 2022

| M | T | W | Thu | F |
|---|---|---|---|---|
| 3 | 4 | 5 | 6 | 7 |
| 10 | 11 | 12 | 13 | 14 |
| 17 | 18 | 19 | 20 | 21 |
| 24 | 25 | 26 | 27 | 28 |
| 31 | | | | |

### February 2022

| M | T | W | Thu | F |
|---|---|---|---|---|
| | 1 | 2 | 3 | 4 |
| 7 | 8 | 9 | 10 | 11 |
| 14 | 15 | 16 | 17 | 18 |
| 21 | 22 | 23 | 24 | 25 |
| 28 | | | | |

### March 2022

| M | T | W | Thu | F |
|---|---|---|---|---|
| | 1 | 2 | 3 | 4 |
| 7 | 8 | 9 | 10 | 11 |
| 14 | 15 | 16 | 17 | 18 |
| 21 | 22 | 23 | 24 | 25 |
| 28 | 29 | 30 | 31 | |

■ Market Holiday

| Week(s) of | Action Items | Responsibilities |
|---|---|---|
| Mar 7 | • Finalize roadshow presentation | • C, UW, CC, UC |
| | • Roadshow in-person dry-runs with Q&A/record NetRoadshow presentation | • C, UW |
| | • Receive Board approval | • C |
| | • Passive bookrunners /co-managers go to committee | • BK |
| | • Confidential cheap stock valuation filing | • C, CC |
| Mar 14 | • Receive final sign-off from SEC | • C, CC |
| | • Finalize underwriting agreement and roadshow  presentation | • ALL |
| | • Market update/valuation review/finalize IPO terms/go-no go decision | • C, UW, UW |
| | • Pre-launch bring-down  due diligence conference  call | • ALL |
| | • File Amendment #4 to Form S-1 registration statement with SEC (including price range and potential recent developments pending outcome of diligence) | • C, CC |
| | • Print / circulate "Red Herring" preliminary prospectus and issue launch press release | • C, CC |
| | • Launch roadshow | • C, UW |
| | • Research analyst presentation to underwriters' salesforces | • RA, UW |
| | • Management presentation to underwriters' salesforces | • C, UW |
| | • Market update calls | • ALL |

**C:** Celsius     **UW:** Underwriters     **CC:** Company Counsel     **RA:** Research Analysts     **A:** Auditors     **UW:** Underwriters' Counsel



# Detailed Execution Timetable (*Cont'd*)

**October 2021**

| M | T | W | Thu | F |
|---|---|---|---|---|
|  |  |  |  | 1 |
| 4 | 5 | 6 | 7 | 8 |
| 11 | 12 | 13 | 14 | 15 |
| 18 | 19 | 20 | 21 | 22 |
| 25 | 26 | 27 | 28 | 29 |

**November 2021**

| M | T | W | Thu | F |
|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 |
| 8 | 9 | 10 | 11 | 12 |
| 15 | 16 | 17 | 18 | 19 |
| 22 | 23 | 24 | 25 | 26 |
| 29 | 30 |  |  |  |

**December 2021**

| M | T | W | Thu | F |
|---|---|---|---|---|
|  |  | 1 | 2 | 3 |
| 6 | 7 | 8 | 9 | 10 |
| 13 | 14 | 15 | 16 | 17 |
| 20 | 21 | 22 | 23 | 24 |
| 27 | 28 | 29 | 30 | 31 |

**January 2022**

| M | T | W | Thu | F |
|---|---|---|---|---|
| 3 | 4 | 5 | 6 | 7 |
| 10 | 11 | 12 | 13 | 14 |
| 17 | 18 | 19 | 20 | 21 |
| 24 | 25 | 26 | 27 | 28 |
| 31 |  |  |  |  |

**February 2022**

| M | T | W | Thu | F |
|---|---|---|---|---|
|  | 1 | 2 | 3 | 4 |
| 7 | 8 | 9 | 10 | 11 |
| 14 | 15 | 16 | 17 | 18 |
| 21 | 22 | 23 | 24 | 25 |
| 28 |  |  |  |  |

**March 2022**

| M | T | W | Thu | F |
|---|---|---|---|---|
|  | 1 | 2 | 3 | 4 |
| 7 | 8 | 9 | 10 | 11 |
| 14 | 15 | 16 | 17 | 18 |
| 21 | 22 | 23 | 24 | 25 |
| 28 | 29 | 30 | 31 |  |

■ Market Holiday

| Week(s) of | Action Items | Responsibilities |
|---|---|---|
| Mar 21 | • Roadshow continues | C, UW |
|  | • Market update calls ongoing | ALL |
|  | • Pricing Date (Mar 23) | ALL |
|  | – Bring-down due diligence conference call, pricing call | ALL |
|  | – Comfort letter delivered | A |
|  | – Underwriting agreement executed | ALL |
|  | – Pricing press release issued | C, CC |
| Mar 24 | • First Trade Date (T) - Stock opens for trading on stock exchange. File and print final prospectus | ALL |
| Mar 28 | • Closing (T+2) | ALL |
|  | – Pre-closing bring-down due diligence conference call | ALL |
|  | – Issue closing press release | C, CC |
|  | – Deliver closing documents | CC |
|  | – Settlement with net proceeds delivered to company | C, UW |

**C:** Celsius   **UW:** Underwriters   **CC:** Company Counsel   **RA:** Research Analysts   **A:** Auditors   **UW:** Underwriters' Counsel

# EXHIBIT I

As confidentially submitted to the Securities and Exchange Commission on February 14, 2022.
**This draft registration statement has not been publicly filed with the Securities and Exchange Commission and all information herein remains strictly confidential.**

Registration No. 333-

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM S-1
## REGISTRATION STATEMENT
### *UNDER*
### *THE SECURITIES ACT OF 1933*

# Celsius Mining Inc.
### (Exact Name of Registrant as Specified in Its Charter)

| **Delaware** | **7374** | **(I.R.S. Employer** |
|---|---|---|
| **(State or Other Jurisdiction of Incorporation or Organization)** | **(Primary Standard Industrial Classification Code Number)** | **Identification Number)** |

**221 River Street, 9th Floor**
**Hoboken, NJ 07730**
**Telephone: (201) 824-2888**
(Address, Including Zip Code, and Telephone Number, Including Area Code, of Registrant's Principal Executive Offices)

**Amir Ayalon**
**Chief Executive Officer**
**221 River Street, 9th Floor**
**Hoboken, NJ 07730**
**United States of America**
**Telephone: (201) 824-2888**
(Name, Address, Including Zip Code, and Telephone Number, Including Area Code, of Agent for Service)

*Copies to:*

| | |
|---|---|
| **Shagufa Hossain** | **Michael Kaplan** |
| **Latham & Watkins LLP** | **Roshni Banker Cariello** |
| **555 Eleventh Street, NW** | **Davis Polk & Wardwell LLP** |
| **Washington, D.C. 20004** | **450 Lexington Avenue** |
| **Telephone: (202) 637-2200** | **New York, NY 10017** |
| **Fax: (202) 637-2201** | **Telephone: (212) 450-4000** |

Approximate date of commencement of proposed sale to the public: As soon as practicable after this registration statement becomes effective.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, check the following box.  ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act.  ☐

**The registrant hereby amends this registration statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this registration statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933, as amended, or until the registration statement shall become effective on such date as the Securities and Exchange Commission, acting pursuant to said Section 8(a), may determine.**

The information in this preliminary prospectus is not complete and may be changed. The securities may not be sold until the registration statement filed with the Securities and Exchange Commission is effective. This preliminary prospectus is not an offer to sell these securities and is not soliciting an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.

**SUBJECT TO COMPLETION, DATED FEBRUARY 14, 2022**

PRELIMINARY PROSPECTUS

# Shares



# Celsius Mining Inc.

### Class A Common Stock

This is an initial public offering of shares of Class A common stock of Celsius Mining Inc. We are selling          shares of Class A common stock.

Prior to this offering, there has been no public market for the Class A common stock. It is currently estimated that the initial public offering price per share of Class A common stock will be between $     and $     . We have applied to list our Class A common stock on the Nasdaq Global Market ("Nasdaq") under the symbol "CELM."

We will have two classes of common stock outstanding after this offering: Class A common stock and Class B common stock. Each share of our Class A common stock and each share of our Class B common stock entitles the holder to one vote per share on all matters presented to our stockholders generally. Immediately following the consummation of this offering, all of the outstanding shares of our Class B common stock will be held by the Celsius Members (as defined below), which will represent in the aggregate approximately     % of the voting power of our outstanding common stock after this offering (or approximately     % if the underwriters exercise in full their option to purchase additional shares).

This offering being conducted through what is commonly referred to as an umbrella partnership-C-corporation ("Up-C") structure, which is often used by partnerships and limited liability companies undertaking an initial public offering. The Up-C approach provides the existing owners of such partnership or limited liability company with the tax treatment of continuing to own interests in a pass-through structure and provides potential future tax benefits for both the public company and such existing owners when they ultimately exchange their pass-through interests for shares of Class A common stock. In connection with the Up-C structure, we will be a holding company, and upon consummation of this offering and the application of proceeds therefrom, our principal asset will consist of LLC Interests (as defined below) that we acquire directly from Celsius Mining LLC with the proceeds from this offering, collectively representing an aggregate     % economic interest in Celsius Mining LLC. Of the remaining     % economic interest in Celsius Mining LLC,     % will be owned by the Celsius Members through their ownership of LLC Interests.

Celsius Mining Inc. will be the sole managing member of Celsius Mining LLC. We will operate and control all of the business and affairs of Celsius Mining LLC and its direct and indirect subsidiaries and, through Celsius Mining LLC and its direct and indirect subsidiaries, conduct our business.

After the consummation of the Transactions (as defined below), including this offering, we will be considered a "controlled company" within the meaning of the Nasdaq rules. See "*Our Organizational Structure*" and "*Management—Controlled Company Exception.*"

We are an "emerging growth company" and "smaller reporting company" as defined under the federal securities laws and, under applicable Securities and Exchange Commission ("SEC") rules, we have elected to comply with certain reduced public company reporting and disclosure requirements.

**Investing in our Class A common stock involves risks. See "*Risk Factors*" beginning on page 21 to read about factors you should consider before buying shares of our Class A common stock.**

**Neither the SEC nor any state securities commission or other regulatory body has approved or disapproved of these securities or passed upon the accuracy or adequacy of this prospectus. Any representation to the contrary is a criminal offense.**

|  | Per Share | Total |
|---|---|---|
| Initial public offering price | $ | $ |
| Underwriting discounts and commissions(1) | $ | $ |
| Proceeds to us, before expenses | $ | $ |

(1)    See "Underwriting" for a description of compensation to be paid to the underwriters.

The underwriters have the option to purchase up to an additional          shares of Class A common stock from us at the initial public offering price less the underwriting discounts within 30 days of the date of this prospectus solely to cover over-allotments, if any.

The underwriters expect to deliver the shares of Class A common stock against payment in New York, New York on or about          , 2022.

# Citigroup

**Prospectus dated          , 2022.**

**TABLE OF CONTENTS**

| | |
|---|---|
| Basis of Presentation | iii |
| Market, Industry and Other Data | v |
| Trademarks and Trade Names | vi |
| Prospectus Summary | 1 |
| Summary Historical and Pro Forma Condensed Consolidated Financial and Other Data | 17 |
| Risk Factors | 21 |
| Special Note Regarding Forward-Looking Statements | 86 |
| Our Organizational Structure | 88 |
| Use of Proceeds | 92 |
| Dividend Policy | 93 |
| Capitalization | 94 |
| Dilution | 96 |
| Unaudited Pro Forma Condensed Consolidated Financial Information | 99 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 105 |
| Business | 125 |
| Management | 143 |
| Executive Compensation | 149 |
| Certain Relationships and Related Person Transactions | 151 |
| Principal Stockholders | 164 |
| Description of Capital Stock | 166 |
| Description of Indebtedness | 172 |
| Shares Eligible For Future Sale | 175 |
| Material U.S. Federal Income Tax Consequences For Non-U.S. Holders of Our Class A Common Stock | 178 |
| Underwriting | 182 |
| Legal Matters | 187 |
| Experts | 187 |
| Where You Can Find Additional Information | 187 |
| Index to Consolidated Financial Statements | F-1 |

Neither we nor the underwriters have authorized anyone to provide any information or to make any representations other than those contained in this prospectus or in any free writing prospectuses prepared by us or on our behalf. We and the underwriters do not take any responsibility for, and can provide no assurance as to the reliability of, any information other than the information in this prospectus, any amendment or supplement to this prospectus or any free writing prospectus prepared by us or on our behalf. We are offering to sell, and seeking offers to buy, shares of our Class A common stock only in jurisdictions where offers and sales are permitted. The information in this prospectus is current only as of the date of this prospectus, regardless of the time of delivery of this prospectus or any sale of shares of our Class A common stock. Our business, financial condition, results of operations, and prospects may have and are likely to have changed since that date.

i

**Through and including            , 2022 (the 25th day after the date of this prospectus), all dealers effecting transactions in these securities, whether or not participating in this offering, may be required to deliver a prospectus. This delivery requirement is in addition to the obligation of dealers to deliver a prospectus when acting as underwriters and with respect to their unsold allotments or subscriptions.**

For investors outside the United States: Neither we nor the underwriters have done anything that would permit this offering or possession or distribution of this prospectus or any free writing prospectus we may provide to you in connection with this offering in any jurisdiction where action for that purpose is required, other than in the United States. Persons outside the United States who come into possession of this prospectus must inform themselves about, and observe any restrictions relating to, the offering of the shares of our Class A common stock and the distribution of this prospectus outside of the United States.

## BASIS OF PRESENTATION

### Organizational Structure

In connection with the closing of this offering, we will undertake certain transactions to reorganize our corporate structure. Unless otherwise stated or the context otherwise requires, all information in this prospectus reflects the consummation of the transactions described in the section titled "*Our Organizational Structure*" and this offering, and the application of the proceeds therefrom, to which we refer collectively as the "Transactions."

See "*Our Organizational Structure*" for a diagram depicting our organizational structure after giving effect to the Transactions, including this offering.

### Certain Definitions

As used in this prospectus, unless the context otherwise requires, references to:

- "*we,*" "*us,*" "*our,*" the "*Company,*" "*Celsius Mining*" and similar references refer: (1) following the consummation of the Transactions, including this offering, to Celsius Mining Inc., and, unless otherwise stated, all of its direct and indirect subsidiaries, including Celsius Mining LLC, and (2) prior to the completion of the Transactions, including this offering, to Celsius Mining LLC.

- "*Celsius Network*" refers to Celsius Network Limited, a private limited company incorporated and registered in England and Wales, and other entities over which Celsius Network Limited has voting control.

- "*Celsius Members*" refer collectively to Celsius Network and their permitted transferees who hold LLC Interests and our Class B common stock immediately following consummation of the Transactions.

- "*LLC Interests*" refer to the common units of Celsius Mining LLC, including those that we purchase with a portion of the net proceeds from this offering.

Celsius Mining Inc. will be a holding company and the sole managing member of Celsius Mining LLC, and upon consummation of the Transactions, including this offering, its principal asset will consist of LLC Interests.

### Presentation of Financial Information

Celsius Mining LLC is the accounting predecessor of the issuer, Celsius Mining Inc., for financial reporting purposes. Celsius Mining Inc. will be the audited financial reporting entity following this offering. Accordingly, this prospectus contains the following historical financial statements:

- *Celsius Mining Inc.* Other than the inception balance sheet, dated as of            , 2022, the historical financial information of Celsius Mining Inc. has not been included in this prospectus as it is a newly incorporated entity, has no business transactions or activities to date, and had no assets or liabilities during the periods presented in this prospectus.

- *Celsius Mining LLC* Because Celsius Mining Inc. will have no interest in any operations, other than those of Celsius Mining LLC, the historical financial information included in this prospectus is that of Celsius Mining LLC.

Except as noted in this prospectus, the unaudited pro forma financial information of Celsius Mining Inc. presented in this prospectus has been derived by the application of pro forma adjustments to the historical financial statements of Celsius Mining LLC included elsewhere in this prospectus. These pro forma adjustments give effect to the Transactions as described in "*Our Organizational Structure,*" including the consummation of this offering, as if all such transactions had occurred on October 5, 2020 (the date of our inception) in the case of the unaudited pro forma condensed consolidated statements of operations data, and as of            , 2022, in the case of the unaudited pro forma condensed consolidated balance sheet data. See "*Unaudited Pro Forma Condensed Consolidated Financial Information*" for a complete description of the adjustments and assumptions underlying the pro forma financial information included in this prospectus.

iii

Certain monetary amounts, percentages, and other figures included in this prospectus have been subject to rounding adjustments. Percentage amounts included in this prospectus have not in all cases been calculated on the basis of such rounded figures, but on the basis of such amounts prior to rounding. For this reason, percentage amounts in this prospectus may vary from those obtained by performing the same calculations using the figures in our consolidated financial statements included elsewhere in this prospectus. Certain other amounts that appear in this prospectus may not sum due to rounding.

**Glossary of Industry Terms and Concepts**

Throughout this prospectus, we use a number of industry terms and concepts which are defined as follows:

- "*ASIC*" represents the acronym for Application-Specific Integrated Circuit, which is a custom-designed chip designed specifically to maximize the rate of hashing operations within the Bitcoin network.

- "*Bitcoin*" refers to a system of global, decentralized, scarce, digital money as initially introduced in a white paper titled Bitcoin: A Peer-to-Peer Electronic Cash System by Satoshi Nakamoto.

- "*Bitcoin network*" refers to the collection of all nodes running the Bitcoin protocol. This includes miners that use computing power to maintain the ledger and add new blocks to the blockchain.

- "*block*" refers to a bundle of transactions analogous with digital pages in a ledger. Transactions are bundled into blocks, which are then added to the ledger. Miners are rewarded for "mining" a new block.

- "*blockchain*" refers to a software program containing a cryptographically secure digital ledger that maintains a record of all transactions that occur on the network, that enables peer-to-peer transmission of transaction information, and that follows a consensus protocol for confirming new blocks to be added to the blockchain.

- "*cryptocurrency*" or "*digital asset*" refers to Bitcoin and alternative coins, or "altcoins," launched after the success of Bitcoin. This category is designed to serve functions including a medium of exchange, store of value, and/or to power applications.

- "*difficulty*" refers to, in the context of Bitcoin mining, a measure of the relative complexity of the algorithmic solution required for a miner to mine a block and receive the Bitcoin reward. An increase in network hashrate will temporarily result in faster block times as the mining algorithm is solved quicker – and vice versa if the network hashrate decreases. The Bitcoin network protocol adjusts the network difficulty every 2,016 blocks (approximately every two weeks) to maintain a target block time of approximately 10 minutes.

- "*EH/s*" represents exahash per second. 1 EH/s equals one quintillion hashes per second (1,000,000,000,000,000,000 h/s).

- "*fork*" refers to a fundamental change to the software underlying a blockchain which may result in two different blockchains, the original, and the new version, each with their own token.

- "*hash*" refers to a mathematical function that converts an input of variable length into an encrypted output of a fixed length alphanumeric string known as the "hash value."

- "*hashrate*" refers to the speed at which a miner can produce computations (hashes) using the Bitcoin network's algorithm, expressed in hashes per second. The hashrate of all miners on a particular network is referred to as the hashrate of the network.

- "*miner*" refers to individuals or entities who operate a computer or group of computers that compete to mine blocks. Bitcoin miners who successfully mine blocks are rewarded with new Bitcoin as well as any transaction fees.

- "*mining*" refers to the process by which new blocks are created, and thus new transactions are added to the blockchain.

iv

- "*mining pools*" refer to platforms for miners to contribute their hashrate in exchange for digital assets, including Bitcoin, and in some cases regardless of whether the pool effectively mines any block. Miners tend to join pools to increase payout frequency, with pools generally offering daily payouts, and to externalize to the pool the risk of a block taking longer than statistically expected from the network difficulty. Mining pools offers these services in exchange for a fee.

- "*MW*" represents megawatts. 1 MW equals 1,000 kilowatts.

- "*proof-of-work*" refers to a protocol for establishing consensus across a system that ties mining capability to computational power. Hashing a block, which is in itself an easy computational process, now requires each miner to solve for a certain difficulty variable periodically adjusted by the Bitcoin network protocol. In effect, the process of hashing each block becomes a competition and, as a result, the overall process of hashing requires time and computational effort.

- "*proof-of-stake*" refers to an alternative consensus protocol, in which a "validator" typically may use their own digital assets to validate transactions or blocks. Validators may "stake" their digital assets on whichever transactions they choose to validate. If a validator validates a block (group of transactions) correctly, it will receive a reward. Typically, if a validator verifies an incorrect transaction, it may lose the digital assets that it staked. Proof-of-stake generally requires a negligible amount of computing power compared to Proof-of-work.

- "*protocol*" refers to the software that governs how a blockchain operates.

- "*public key*" or "*private key*" refers to the cryptographically generated public key or private key, respectively, corresponding to each public address on a blockchain network. A private key allows the recipient to access any digital assets associated with the address, similar to a bank account password. A public key helps validate transactions that are broadcasted to and from the address. Public keys are derived from private keys.

- "*rigs*" or "*mining rigs*" refer to an arrangement of hardware elements arranged to perform cryptocurrency mining, including central processing units (CPU), graphics processing units (GPU), field programmable gate arrays (FPGA) and ASICs.

- "*TH/s*" represents terahash per second. 1 TH/s equals one trillion hashes per second (1,000,000,000,000 h/s).

- "*wallet*" refers to a place to store public and private keys for blockchains (similar to storage applications for usernames and passwords). Wallets are typically software, hardware or paper-based.

## MARKET, INDUSTRY AND OTHER DATA

This prospectus includes estimates regarding market and industry data. Unless otherwise indicated, information concerning our industry and the markets in which we operate, including our general expectations, market position, market opportunity and market size, are based on our management's knowledge and experience in the markets in which we operate, together with currently available information obtained from various sources, including publicly available information, industry reports and publications, surveys, trade and business organizations and other contacts in the markets in which we operate. Certain information is based on management estimates, which have been derived from third-party sources, as well as data from our internal research, and are based on certain assumptions that we believe to be reasonable.

In presenting this information, we have made certain assumptions that we believe to be reasonable based on such data and other similar sources and on our knowledge of, and our experience to date in, the markets in which we operate. While we believe the estimated market and industry data included in this prospectus are generally reliable, such information, which is derived in part from management's estimates and beliefs, is inherently uncertain and imprecise. Market and industry data are subject to change and may be limited by the availability of

v

raw data, the voluntary nature of the data gathering process and other limitations inherent in any statistical survey of such data. In addition, projections, assumptions and estimates of the future performance of the markets in which we operate and our future performance are necessarily subject to uncertainty and risk due to a variety of factors, including those described in "*Risk Factors*" and "*Special Note Regarding Forward-Looking Statements*." These and other factors could cause results to differ materially from those expressed in the estimates made by third parties and by us. Accordingly, you are cautioned not to place undue reliance on such market and industry data or any other such estimates. Neither we nor the underwriters have independently verified any third-party information and data from our internal research has not been verified by any independent source.

## TRADEMARKS AND TRADE NAMES

We or our affiliates own or have rights to certain trademarks that we use in conjunction with the operations of our business, including and            . Each trademark, trade name or service mark of any other company appearing or incorporated by reference in this prospectus belongs to its holder. Solely for convenience, trademarks and service marks referred to in this prospectus may appear with or without the "®" or "™" symbols, but the inclusion, or not, of such references are not intended to indicate, in any way, that we will not assert, to the fullest extent possible under applicable law, our rights to these trademarks and service marks. We do not intend our use or display of other companies' trademarks, trade names or service marks to imply a relationship with, or endorsement or sponsorship of us by, such other companies.

vi

## PROSPECTUS SUMMARY

*The following summary highlights information contained in greater details elsewhere in this prospectus. This summary is not complete and does not contain all of the information you should consider in making your investment decision. Before investing in our Class A common stock, you should carefully read this entire prospectus, including our consolidated financial statements and related notes and the information set forth in "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" included elsewhere in this prospectus.*

### Overview

We are a leading Bitcoin mining company in the United States based on total hashrate, with secured access to next-generation mining hardware and a strategy focused on integrated mining operations while striving to employ sustainable energy sources and maintain net carbon neutrality.

Our business was started as part of the operations of Celsius Network, a leading global cryptocurrency earning and borrowing platform. Our specific mining operations were initially conceived as a platform to be used to mine for and reward Bitcoin as part of Celsius Network's focus on offering curated yield accounts that were unavailable through traditional financial institutions. Our operations were segregated into a new company formed in 2020 and since then, we have grown to be differentiated within the industry through our strategic relationships as well as our vertical integration. Today, we believe we have an attractive financial profile and trajectory that, as a standalone entity, can propel us to our full potential.

We earn revenue through our mining operations in the form of both block rewards and transaction fees paid in Bitcoin. To maximize our top-line growth, our mining operations use mining hardware powered by Application-Specific Integrated Circuits ("ASICs"). After receiving Bitcoin through block rewards or as transaction fees, we generally liquidate them to fund our operating expenses, but may elect to hold a portion of the newly mined Bitcoin on our balance sheet. Going forward, we plan to employ risk management and hedging strategies based on our balance sheet to alleviate Bitcoin market risk.

For the nine months ended September 30, 2021, we generated revenue of $78.2 million, gross profit of $53.5 million, net income of $31.4 million, and Adjusted EBITDA of $61.3 million.

We have an expansive portfolio of operating mining hardware ("rigs"), which are the computers used to authenticate blockchain transactions and generate block rewards, and have strategically partnered with both third party hosting providers to provide hosting services for our rigs as well as energy solutions providers to develop our own hosting facilities. We currently have an agreement with Core Scientific, Inc. ("Core Scientific"), a crypto miner and hosting provider, with data centers across Georgia, Kentucky, North Carolina and North Dakota to provide hosting facilities for our mining rigs. In total, as of September 30, 2021, we had 21,034 rigs deployed, equating to a hashrate of 2 exahash per second ("EH/s"). By December 31, 2022, we expect to deploy approximately 130,000 rigs, equating to 13 EH/s based on the number and hashing power of the mining rigs we have secured under purchase agreements with our hardware suppliers. We have existing hosting arrangements with (i) Core Scientific currently contracted to support a total of 194.3 megawatts ("MW") of online capacity upon delivery of our rigs, and (ii) EZ Blockchain Services, LLC ("EZ Blockchain") for 15 MW of capacity for rigs to be deployed in March 2022. We have also entered into agreements with Priority Power Management, LLC ("Priority Power") to secure 75 MW to develop our own mining facilities across three sites in Texas. At the Priority Power sites, we anticipate initially deploying rigs in the first half of 2022. Altogether, we have secured access to 284.3 MW of power available for deployment by the end of 2022. In addition, we are working with Calpine Energy Solutions, LLC ("Calpine") to identify sources of land and power within their resources to develop mining facilities. We are also seeking to expand into additional hosting arrangements and develop additional mining facilities.

1



Kost Forer Gabbay & Kasierer
144 Menachem Begin Road, Building A
Tel-Aviv 6492102, Israel

Tel: +972 3 6232525
Fax: +972-3-5622555
ey.com

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

**To the board of directors and members of**

**CELSIUS MINING LLC**

We have audited the accompanying balance sheet of Celsius Mining LLC ("the Company") as of December 31, 2020, the related statements of operations, changes in equity (deficiency) and cash flows for the period from October 5, 2020 (date of inception) to December 31, 2020, and the related notes ("collectively referred to as the financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2020, and the results of its operations and its cash flows for the period from October 5, 2020 (date of inception) to December 31, 2020, in conformity with U.S. generally accepted accounting principles.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audit. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audit we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audit included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audit provides a reasonable basis for our opinion.

KOST FORER GABBAY & KASIERER
A Member of Ernst & Young Global

We have served as the Company's auditor since 2020
Tel-Aviv, Israel
February 11, 2022

F-3

CELSIUS MINING LLC

## BALANCE SHEETS

**U.S. dollars in thousands, except unit and per unit data**

| | September 30, 2021 (Unaudited) | December 31, 2020 |
|---|---|---|
| **ASSETS** | | |
| **CURRENT ASSETS** | | |
| Cryptocurrencies | $ 3,503 | $ — |
| Other receivables - short term | 3,185 | 127 |
| Net investment in financing lease - current portion | 5,201 | 4,873 |
| Investment in convertible debt | 56,307 | — |
| Investment in equity securities | 50,425 | — |
| Total current assets | 118,621 | 5,000 |
| **NON-CURRENT ASSETS** | | |
| Other receivables | — | 6,842 |
| Advance payments for mining equipment | 137,996 | 20,579 |
| Equipment, net | 49,737 | — |
| Net investment in financing lease | 1,400 | 5,240 |
| Deferred tax assets | — | 93 |
| Total non-current assets | 189,133 | 32,754 |
| TOTAL ASSETS | $ 307,754 | $ 37,754 |
| **LIABILITIES AND EQUITY (DEFICIENCY)** | | |
| **CURRENT LIABILITIES** | | |
| Other payables | 3,877 | — |
| Loans payable to related parties - current portion | 29,910 | — |
| Other payables to related parties | 24,033 | 10,380 |
| Total current liabilities | 57,820 | 10,380 |
| **NON-CURRENT LIABILITIES** | | |
| Loans payable to related parties | 210,619 | 27,725 |
| Deferred income liabilities, net | 8,292 | — |
| Total non-current liabilities | 218,911 | 27,725 |
| TOTAL LIABILITIES | $ 276,731 | $ 38,105 |
| Commitments and contingencies (Note 11) | | |
| **EQUITY (DEFICIENCY)** | | |
| Units of no par value - Outstanding - 100 Units | — | — |
| Retained earnings (accumulated deficit) | 31,023 | (351) |
| Total equity (deficiency) | 31,023 | (351) |
| TOTAL LIABILITIES AND EQUITY (DEFICIENCY) | $ 307,754 | $ 37,754 |

The accompanying notes are an integral part of the financial statements.

| February 11, 2022 | Chief Financial Officer | Chief Executive Officer |
|---|---|---|
| Date of approval of the financial statements | Christy Barwick | Amir Ayalon |

F-4

CELSIUS MINING LLC

## STATEMENTS OF OPERATIONS

**U.S. dollars in thousands, except unit and per unit data**

| | Nine months ended September 30, 2021 (Unaudited) | For the period from October 5, 2020 (inception) to December 31, 2020 |
|---|---|---|
| Mining revenue | $ 78,240 | $ — |
| Cost of revenues: | | |
| Depreciation | 10,526 | — |
| Mining management services | 3,084 | — |
| Mining setup fees | 286 | — |
| Hosting services | 10,801 | — |
| Total cost of revenues | 24,697 | — |
| Gross profit | 53,543 | — |
| Operating expenses: | | |
| Administrative services fees | 2,236 | 450 |
| Subcontractors | 130 | 20 |
| Professional fees | 729 | — |
| Marketing expenses | 10 | — |
| Total operating expenses | 3,105 | 470 |
| Operating income (loss) | 50,438 | (470) |
| Interest expense | 11,927 | 304 |
| Interest income | (3,263) | (330) |
| Unrealized gain on investment in convertible debt | (833) | — |
| Realized loss from BTC loan repayment | 3,337 | — |
| Unrealized gain from revaluation of BTC loan | (2,560) | — |
| Other expenses, net | 8,608 | (26) |
| Net income (loss) before taxes | 41,830 | (444) |
| Current income tax expense | 2,071 | — |
| Deferred income tax expense (income) | 8,385 | (93) |
| Total income taxes | 10,456 | (93) |
| Net income (loss) | $ 31,374 | $ (351) |
| Basic and diluted net income (loss) per unit | $ 313,740 | $ (3,510) |
| Weighted-average units used in computing net income (loss) per unit, basic and diluted | 100 | 100 |

The accompanying notes are an integral part of the financial statements.

F-5

**CELSIUS MINING LLC**

**STATEMENTS OF CHANGES IN EQUITY (DEFICIENCY)**

**U.S. dollars in thousands**

|  | Retained earnings (accumulated deficit) | Total equity (deficiency) |
|---|---|---|
| Nine months ended September 30, 2021 (unaudited): | | |
| Balance on January 1, 2021 | (351) | (351) |
| Net income | 31,374 | 31,374 |
| Balance on September 30, 2021 (unaudited) | $ 31,023 | $ 31,023 |
| For the period from inception (October 5, 2020) to December 31, 2020: | | |
| Balance on October 5, 2020 | — | — |
| Net loss | (351) | (351) |
| Balance on December 31, 2020 | $ (351) | $ (351) |

The accompanying notes are an integral part of the financial statements.

F-6

CELSIUS MINING LLC

## STATEMENTS OF CASH FLOWS

**U.S. dollars in thousands**

| | Nine months ended September 30, 2021 (Unaudited) | For the period from October 5, 2020 (inception) to December 31, 2020 |
|---|---|---|
| Cash flows from operating activities: | | |
| Net income (loss) | $ 31,374 | $ (351) |
| Adjustments required to reconcile net income (loss) to net cash provided by (used in) operating activities: | | |
| Mining revenue received in cryptocurrencies | (78,240) | — |
| Depreciation | 10,526 | — |
| Unrealized gain on investment in convertible debt | (833) | — |
| Accrued interest income on investment in convertible debt | (1,474) | — |
| Accrued interest expense on loans from related parties | 11,927 | — |
| Realized loss from BTC loan repayment | 3,337 | — |
| Unrealized gain from revaluation of BTC loan | (2,560) | |
| Income taxes | 10,456 | (93) |
| Changes in operating assets and liabilities: | | |
| Increase in prepaid expenses and other receivables | (3,043) | (127) |
| Increase in other payables | 1,805 | — |
| Net cash used in operating activities | (16,725) | (571) |
| Cash flows from investing activities: | | |
| Increase in advance payments for mining equipment | (110,575) | (27,421) |
| Purchases of mining equipment | (60,263) | |
| Purchase of mining equipment for sale under finance lease | — | (10,113) |
| Collections of finance lease receivables | 3,513 | — |
| Investment in convertible debt | (54,000) | — |
| Investment in equity securities | (50,425) | — |
| Net cash provided by (used in) investing activities | (271,750) | (37,534) |
| Cash flows from financing activities: | | |
| Funding from related parties | 288,475 | 38,105 |
| Net cash provided by financing activities | $ 288,475 | $ 38,105 |
| Change in cash and cash equivalents | — | — |
| Cash and cash equivalents at the beginning of the period | — | — |
| Cash and cash equivalents at the end of the period | $ — | $ — |
| Supplemental schedule of non-cash financing activities: | | |
| Repayment of BTC loan | $ 74,737 | $ — |

The accompanying notes are an integral part of the financial statements.

F-7

**CELSIUS MINING LLC**

**NOTES TO FINANCIAL STATEMENTS**

**U.S. dollars in thousands**

**NOTE 1:-**    **GENERAL**

a.    Celsius Mining LLC ("the Company") was incorporated on October 5, 2020, in Delaware, USA, with a registered address at 221 River Street, Hoboken NJ 07030, USA. The Company is a wholly-owned subsidiary of Celsius US Holding LLC (the "parent company"). In November 2021, the Company changed its name from Celsius Core LLC to Celsius Mining LLC.

The Company was established to facilitate Bitcoin ("BTC") activities in the form of purchasing mining equipment producing BTC and investing in other mining companies.

b.    Cryptocurrency Mining

The Company operates a cryptocurrency mining operation using specialized computers equipped with application-specific integrated circuit ("ASIC") chips (known as "miners") to solve complex cryptographic algorithms in support of the Bitcoin blockchain (in a process known as "solving a block") in exchange for Bitcoin.

The Company is mainly focusing its efforts on mining Bitcoin. The Company participates in "mining pools" organized by "mining pool operators" in which its mining power (known as "hashrate") is combined with the hashrate generated by other miners participating in the pool to earn cryptocurrency rewards. The mining pool operator provides a service that coordinates the computing power of the independent mining enterprises participating in the mining pool. Fees are paid to the mining pool operator to cover the costs of maintaining the pool. The pool uses software that coordinates the pool members' mining power, identifies new block rewards, records how much hashrate each participant contributes to the pool, and assigns cryptocurrency rewards earned by the pool among its participants in proportion to the hashrate each participant contributed to the pool in connection with solving a block.

As of September 30, 2021 (unaudited), the Company operated various models of the AntMiner S19 & S19 PRO, a series of miners manufactured by Bitmain Technologies Limited ("Bitmain"), which use ASIC chips designed around the 256-bit secure hashing algorithm (SHA-256) used by the Bitcoin blockchain and, therefore, all of the cryptocurrency the Company seeks to mine is Bitcoin.

c.    Financial Position of the Company

These financial statements have been prepared assuming that the Company will continue as a going concern, which contemplates continuity of operations, realization of assets, and liquidation of liabilities in the normal course of business.

As reflected in the financial statements, the Company had working capital of $60,801 on September 30, 2021 (unaudited), and net cash used by operating activities for the nine months ended September 30, 2021 (unaudited) amounted to $16,725. To date, the Company's operations, including capital expenditures, have been substantially funded by loans from related parties.

For the nine months ended September 30, 2021 (unaudited) revenues generated from mining of cryptocurrency amounted to $78,240. The cryptocurrency mining industry is a highly volatile market with significant inherent risk. A significant decline in the market prices of cryptocurrencies, an increase in the difficulty of cryptocurrency mining, changes in the

F-8

**CELSIUS MINING LLC**

**NOTES TO FINANCIAL STATEMENTS**

**U.S. dollars in thousands**

**NOTE 1:-    GENERAL (CON.)**

regulatory environment and adverse changes in other inherent risks can significantly negatively impact the Company's operations. Based on internally prepared forecasted cash flows that take into consideration what management of the Company considers reasonably possible scenarios, management believes the Company will be able to achieve positive cash flows from operations.

In addition, in order to assist the Company in funding its operations, Celsius Network Ltd, the ultimate parent company ("Network"), has undertaken not to demand repayment prior to March 1, 2023, of the loans provided by Network to the Company in the aggregate amount of $425,681 including loans provided, and net of loans repaid, subsequent to balance sheet date – see Notes 9 and 12(f).

Based on the forecasted cash flows and the undertaking of Network not to demand repayment of the aforementioned loans, the Company's management and board of directors believe that the Company will have sufficient funds to continue its operations and meet its obligations as they come due at least for a period of twelve months from the date these financial statements were available to be issued.

d.    Risks associated with cryptocurrency

Acceptance or widespread use of cryptocurrency is uncertain. There is still a relatively limited use of any cryptocurrency in the retail and commercial marketplace, thus contributing to price volatility that could adversely affect an investment in the securities of the Company. Banks and other established financial institutions may refuse to process funds for cryptocurrency transactions, process wire transfers to or from cryptocurrency exchanges, cryptocurrency-related companies or service providers, or maintain accounts for persons or entities transacting in cryptocurrency. Conversely, a significant portion of cryptocurrency demand is generated by investors seeking a long-term store of value or speculators seeking to profit from the short or long-term holding of the asset. Price volatility undermines any cryptocurrency's role as a medium of exchange, as retailers are less likely to accept it as a direct form of payment. Market capitalization for a cryptocurrency as a medium of exchange and payment method may always be low.

The relative lack of acceptance of cryptocurrencies in the retail and commercial marketplace, or a reduction of such use, limits the ability of end users to use them to pay for goods and services. Such lack of acceptance or decline in acceptance could have a material adverse effect on the value of Bitcoin or any other cryptocurrencies, and consequently the business, prospects, financial condition and operating results of the Company.

e.    Risk concentration with mining equipment

The Company's business is highly dependent upon digital asset mining equipment suppliers, such as Bitmain and MicroBT, providing an adequate supply of new generation digital asset mining machines at economical prices to the Company. The market price and availability of new mining machines fluctuates with the price of Bitcoin and can be volatile. Higher Bitcoin prices increase the demand, and thus the cost, for mining equipment.

Accordingly, the market price of new mining equipment is also influenced by the "difficulty" of the algorithmic solution necessary to mine a block. In addition, as more companies seek to

F-9

**CELSIUS MINING LLC**

**NOTES TO FINANCIAL STATEMENTS**

**U.S. dollars in thousands**

**NOTE 1:-**    **GENERAL (CON.)**

enter the mining industry, the demand for machines may outpace supply and create mining machine equipment shortages. There are no assurances that digital asset mining equipment suppliers, such as Bitmain and MicroBT, will be able to keep pace with any surge in demand for mining equipment. Further, mining machine purchase contracts are not favorable to purchasers and the Company may have little or no recourse in the event a mining machine manufacturer defaults on its mining machine delivery commitments. If the Company is not able to obtain a sufficient number of digital asset mining machines at favorable prices, the growth expectations, liquidity, financial condition and results of operations will be negatively impacted.

Additionally, if the third-party manufacturers and suppliers are late in delivery, cancel or default on their supply obligations or deliver underperforming or faulty equipment it could cause material delays or affect the performance of the Company's operations. Some of the supply contracts may contain equipment warranties and protections with respect to late delivery; however, these warranties may not be able to be successfully claimed against or may be inadequate to compensate for the impact on the Company's operating results and financial condition.

The Company generally makes advance payments on its orders for mining equipment which eliminates or reduces the Company's exposure to increases in market prices and also ensures that the Company has priority in the delivery of the mining equipment when available.

**NOTE 2:-**    **BASIS OF PRESENTATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

The accompanying financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP").

### *Use of Estimates*

The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates, judgments, and assumptions that affect the amounts reported in the financial statements and accompanying notes. Significant items subject to such estimates and assumptions include, but are not limited to, the fair value of the investment in the convertible debt, the useful lives of the mining equipment as well as the depreciation method, deferred tax liabilities and assets.

The Company evaluates on an ongoing basis its assumptions. The Company bases these estimates on anticipated results, trends and various other assumptions that it believes are reasonable under the circumstances, including assumptions as to future events. Actual results could differ from those estimates.

Due to the Coronavirus pandemic ("COVID-19"), there has been uncertainty and disruption in the global economy and financial markets. The Company is not aware of any specific event or circumstance that would require a material update to its estimates or judgments or an adjustment of the carrying value of its assets or liabilities as of September 30, 2021 (unaudited). While there was not a material impact on the Company's financial statements for the period from October 5, 2020 (inception) to December 31, 2020 and the nine months ended September 30, 2021 (unaudited),

F-10

**CELSIUS MINING LLC**

## NOTES TO FINANCIAL STATEMENTS

**U.S. dollars in thousands**

**NOTE 2:-    BASIS OF PRESENTATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CON.)**

these estimates may change, as new events occur and additional information is obtained, as well as other factors related to COVID-19 and its variants that could result in material impacts to the Company's financial statements in future reporting periods.

### Financial statements in U.S. dollars

All of the Company's mining revenues are generated in Bitcoin. There is no specific currency that mainly influences the fair value of Bitcoin during the mining period. In addition, there is not a single or a main country whose competitive forces and regulations mainly determine Bitcoin's fair value and respect the Company's revenues. However, the currency that mainly influences labor, material, and other costs of generating mining revenues is the U.S. dollar, since the vast majority of the Company's costs are paid in U.S. dollars (while the rest of those costs are paid in Bitcoin). In addition, the Company's financing is received principally in U.S. dollars. As the Company is a US-based entity with all of its operations in the U.S., and based on the other factors discussed above, the Company's management believes that the U.S. dollar is the currency of the primary economic environment in which the Company operates. Thus, the functional and reporting currency of the Company is the U.S dollar.

Accordingly, monetary accounts maintained in currencies other than the U.S. dollar are remeasured into U.S. dollars in accordance with Accounting Standard Codification ("ASC") No. 830 "Foreign Currency Matters". All transaction gains and losses of the remeasured monetary balance sheet items are reflected in the statement of operations as financial income or expenses, as appropriate.

### Unaudited Interim Financial Information

The accompanying interim balance sheet as of September 30, 2021 (unaudited), the interim statements of operations, changes in equity (deficiency), and cash flows for the nine months ended September 30, 2021 (unaudited) and the related notes to such interim financial statements are unaudited. These unaudited interim financial statements have been prepared in accordance with U.S. GAAP and are presented in accordance with the rules and regulations of the U.S. Securities and Exchange Commission ("SEC") and do not include all disclosures normally required in annual financial statements prepared in accordance with U.S. GAAP. In management's opinion, the unaudited interim financial statements have been prepared on the same basis as the annual financial statements and reflect all adjustments, which include only normal recurring adjustments necessary for the fair presentation of the Company's financial position as of September 30, 2021 (unaudited) and the Company's results of operations and cash flows for the nine months ended September 30, 2021 (unaudited). The results for the nine months ended September 30, 2021 (unaudited) are not necessarily indicative of the results to be expected for the full year ending December 31, 2021 or any other future interim or annual period.

### Cryptocurrencies

Cryptocurrencies (Bitcoin) are included in current assets in the accompanying balance sheets. The classification of cryptocurrencies as a current asset has been made after the Company's consideration of the significant consistent daily trading volume of Bitcoin on readily available cryptocurrency exchanges, there are no limitations or restrictions on Company's ability to sell Bitcoin and the pattern of actual sales of Bitcoin by the Company.

**CELSIUS MINING LLC**

**NOTES TO FINANCIAL STATEMENTS**

**U.S. dollars in thousands**

**NOTE 2:-    BASIS OF PRESENTATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CON.)**

Cryptocurrencies awarded to the Company through its mining activities are accounted for as intangible assets with indefinite useful lives. An intangible asset with an indefinite useful life is not amortized but assessed for impairment annually, or more frequently, when events or changes in circumstances occur indicating that it is more likely than not that the indefinite-lived asset is impaired. Impairment exists when the carrying amount exceeds its fair value, which is measured using the quoted price of the cryptocurrency at the time its fair value is being measured.

The Company performs an analysis periodically to identify whether events or changes in circumstances, principally decreases in the quoted (unadjusted) prices on the active exchange, indicate that it is more likely than not that any of its Bitcoin assets is impaired. In determining if an impairment has occurred, the Company will consider the lowest price of one Bitcoin quoted on the active exchange at any time since acquiring the specific Bitcoin held. If the carrying value of a Bitcoin exceeds that lowest price at any time during the period, an impairment loss is deemed to have occurred with respect to that Bitcoin in the amount equal to the difference between its carrying value and such lowest price, and subsequent increases in the price of Bitcoin will not affect the carrying value of the Bitcoin. Gains (if any) are not recorded until realized upon realization or sale, at which point they would be presented net of any impairment losses.

The Company did not recognize any material impairment on its cryptocurrencies during the period ended September 30, 2021 (unaudited).

*Equipment*

Equipment is carried at cost, net of accumulated depreciation.

Equipment is depreciated over the estimated useful life as follows:

| Description | Useful life |
|---|---|
| Mining equipment | Declining percentage over 3 years* |

\*    The declining depreciation percentage for mining equipment is as follows:

| | Year 1 | Year 2 | Year 3 |
|---|---|---|---|
| Percentage | 50% | 35% | 15% |

Down payments for equipment are recorded at cost and included in advance payments for mining equipment in the balance sheet. Once the corresponding equipment item has been received, it is reclassified to equipment and depreciated.

*Long-lived assets*

The long-lived assets of the Company are reviewed for impairment in accordance with ASC 360, "Property, Plant and Equipment" ("ASC 360"), whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. The recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to the future undiscounted cash flows expected to be generated by the assets. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying

F-12

**NOTES TO FINANCIAL STATEMENTS**

**U.S. dollars in thousands**

**NOTE 2:-    BASIS OF PRESENTATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CON.)**

amount of the assets exceeds the fair value of the assets. During the periods ended December 31, 2020 and September 30, 2021 (unaudited), no impairment losses were identified.

### *Revenue Recognition*

The Company recognizes revenue under Accounting Standards Codification ("ASC") 606, Revenue from Contracts with Customers, ("ASC 606"). The core principle of the revenue standard is that the Company should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the Company expects to be entitled in exchange for those goods or services.

The following five steps are applied to achieve that core principle:

- Step 1: Identify the contract with the customer

- Step 2: Identify the performance obligations in the contract

- Step 3: Determine the transaction price

- Step 4: Allocate the transaction price to the performance obligations in the contract

- Step 5: Recognize revenue when the Company satisfies a performance obligation

To identify the performance obligations in a contract with a customer, an entity must assess the promised goods or services in the contract and identify each promised good or service that is distinct. A performance obligation meets ASC 606's definition of a "distinct" good or service (or bundle of goods or services) if both of the following criteria are met: The customer can benefit from the good or service either on its own or together with other resources that are readily available to the customer (i.e., the good or service is capable of being distinct), and the entity's promise to transfer the good or service to the customer is separately identifiable from other promises in the contract (i.e., the promise to transfer the good or service is distinct within the context of the contract). If a good or service is not distinct, the good or service is combined with other promised goods or services until a bundle of goods or services is identified that is distinct. The transaction price is the amount of consideration to which an entity expects to be entitled in exchange for transferring promised goods or services to a customer. The consideration promised in a contract with a customer may include fixed amounts, variable amounts, or both. When determining the transaction price, an entity must consider the effects of all of the following:

- Variable consideration

- Constraining estimates of variable consideration

- The existence of a significant financing component in the contract

- Noncash consideration

- Consideration payable to a customer

Variable consideration is included in the transaction price only to the extent that it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur when the uncertainty associated with the variable consideration is subsequently resolved. The transaction price is allocated to each performance obligation on a relative standalone selling price basis. The

**CELSIUS MINING LLC**

**NOTES TO FINANCIAL STATEMENTS**

**U.S. dollars in thousands**

**NOTE 2:-    BASIS OF PRESENTATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CON.)**

transaction price allocated to each performance obligation is recognized when that performance obligation is satisfied, at a point in time, or overtime as appropriate.

The Company has entered into an arrangement with digital asset mining pool operators, as amended from time to time, to provide computing power to the mining pool. The arrangement can be terminable at any time by either party and the Company's enforceable right to compensation only begins when the Company provides computing power to the mining pool operator. In exchange for providing computing power, the Company is entitled to a fractional share of the fixed cryptocurrency award the mining pool operator receives (less digital asset transaction fees to the mining pool operator), for successfully adding a block to the blockchain. The Company's fractional share is based on the proportion of computing power the Company contributed to the mining pool operator of the total computing power contributed by all mining pool participants in solving the current algorithm.

Providing computing power to solve complex cryptographic algorithms in support of the Bitcoin blockchain (in a process known as "solving a block") is an output of the Company's ordinary activities. The provision of providing such computing power is the only performance obligation in the Company's arrangements with mining pool operators. The transaction consideration the Company receives, if any, is non-cash consideration, which the Company measures at fair value on the date received.

The consideration is all variable. Because, it is not probable a significant reversal of cumulative revenue will not occur, the consideration is constrained until the mining pool operator successfully places a block (by being the first to solve an algorithm) and the Company receives confirmation of the consideration it will receive, at which time revenue is recognized. There is no significant financing component in these transactions.

The fair value of the cryptocurrency award received is determined using the quoted price of the related cryptocurrency at the time of receipt.

There is currently no specific definitive guidance under GAAP or alternative accounting framework for the accounting for cryptocurrencies recognized as revenue or held, and management has exercised significant judgment in determining the appropriate accounting treatment. In the event authoritative guidance is enacted by the Financial Accounting Standards Board ("FASB"), the Company may be required to change its policies, which could have an effect on the Company's financial position and results from operations.

*Cost of revenue*

The Company's cost of revenue consists primarily of direct costs of earning Bitcoin related to mining operations, including electric power costs, other utilities, labor, insurance, mining management services, and depreciation.

*Income taxes*

The Company accounts for income taxes under the asset and liability method, in which deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their

F-14

**CELSIUS MINING LLC**

**NOTES TO FINANCIAL STATEMENTS**

**U.S. dollars in thousands**

**NOTE 2:-    BASIS OF PRESENTATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CON.)**

respective tax bases, as well as operating loss and tax credit carryforwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in operations in the period that includes the enactment date. A valuation allowance is required to the extent any deferred tax assets may not be realizable.

ASC Topic 740, Income Taxes, ("ASC 740"), also clarifies the accounting for uncertainty in income taxes recognized in an enterprise's financial statements and prescribes a recognition threshold and measurement process for financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. For those benefits to be recognized, a tax position must be more likely than not to be sustained upon examination by taxing authorities. ASC 740 also provides guidance on derecognition, classification, interest, and penalties, accounting in the interim period, disclosure and transition.

Based on the Company's evaluation, it has been concluded that there are no significant uncertain tax positions requiring recognition in the Company's financial statements. The Company believes that its income tax positions and deductions would be sustained on audit and does not anticipate any adjustments that would result in material changes to its financial position.

The Company's financial statements recognize the current and deferred income tax consequences that result from the Company's activities during the current and preceding periods under the provisions of ASC 740 (Note 10-a Income Taxes).

The Company is a single-member limited liability company that is disregarded for income tax purposes and therefore is not subject to income tax. The Company's financial statements recognize the current and deferred income tax consequences that result from the Company's activities during the current and preceding periods under the provisions of ASC 740 as if the Company were a separate taxpayer rather than a member of the parent company's consolidated income tax return group.

***Investment in financing leases***

The Company accounts for its leases under ASC 840, Leases ("ASC 840"). Accordingly, the Company determines whether an arrangement contains a lease at the inception of the arrangement. If a lease is determined to exist, the term of such lease is assessed based on the date on which the underlying asset is made available for the lessee's uses. The Company's assessment of the lease term reflects the non-cancelable term of the lease, inclusive of any rent-free periods and/or periods covered by early-termination options which are reasonably certain of not being exercised, as well as periods covered by renewal options which are reasonably certain of being exercised.

The Company determines if an arrangement is a lease and the classification of that lease at inception based on: (1) whether the contract involves the use of a distinct identified asset, (2) whether the lessee obtains the right to substantially all the economic benefits from the use of the asset throughout the period, and (3) whether the lessee has a right to direct the use of the asset.

**NOTES TO FINANCIAL STATEMENTS**

**U.S. dollars in thousands**

**NOTE 2:-**     **BASIS OF PRESENTATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CON.)**

If the lease at inception meets any of the following four criteria: (i) transfer of ownership, (ii) bargain purchase option, (iii) lease term is equal to 75% or more of the estimated economic life of the leased asset, or (iv) the present value of the minimum lease payments equals or exceeds 90% of the fair value of the property, and collectability is reasonably assured and the lease does not give rise to a dealer's profit, then the lease is accounted for as a direct financing lease.

A direct financing lease is accounted for by recording the gross investment (minimum lease payments) less unearned income (the carrying amount of the leased asset) to arrive at the net investment in the lease. The unearned income is amortized to interest income in the statement of operations using a rate that produces a constant periodic rate of return on the remaining net investment.

*Investments in convertible debt and simple agreement for future equity*

The Company classified under ASC 320, "Investments – Debt Securities" and Accounting Standards Update ("ASU") 2016-01, "Recognition and Measurement of Financial Assets and Financial Liabilities" the investment in convertible debt as trading securities which are measured subsequent to acquisition at fair value. Unrealized holding gains and losses are included in the statement of operations.

For the Company's investment in equity securities in privately-held companies whose fair values are not readily determinable, the Company elected under ASC 321, "Investments – Equity Securities" to measure its equity securities at cost, less any impairment, plus or minus changes resulting from observable price changes.

*Fair value measurements*

ASC 820, "Fair Value Measurements and Disclosures", defines fair value as the price that would be received to sell an asset or paid to transfer a liability (i.e., the "exit price") in an orderly transaction between market participants at the measurement date.

In determining fair value, the Company uses various valuation approaches. ASC 820 establishes a hierarchy for inputs used in measuring fair value that maximizes the use of observable inputs and minimizes the use of unobservable inputs by requiring that the most observable inputs be used when available. Observable inputs are inputs that market participants would use in pricing the asset or liability developed based on market data obtained from sources independent of the Company.

Unobservable inputs are inputs that reflect the Company's assumptions about the assumptions market participants would use in pricing the asset or liability developed based on the best information available in the circumstances.

As a basis for considering such assumptions, ASC 820 establishes a three-tier value hierarchy, which prioritizes the inputs used in the valuation methodologies in measuring fair value:

Level 1 - Valuations based on quoted prices in active markets for identical assets or liabilities that the Company can access. Valuation adjustments and block discounts are not applied to Level 1 instruments. Since valuations are based on quoted prices that are readily and regularly available in an active market, the valuation of these products does not entail a significant degree of judgment.

**CELSIUS MINING LLC**

**NOTES TO FINANCIAL STATEMENTS**

U.S. dollars in thousands

**NOTE 2:-    BASIS OF PRESENTATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CON.)**

Level 2 - Valuations based on one or more quoted prices in markets that are not active or for which all significant inputs are observable, either directly or indirectly.

Level 3 - Valuations based on inputs that are unobservable and significant to the overall fair value measurement.

*Loans Payable in BTC*

On July 1, 2021, the Company entered into a revolving credit agreement with Celsius Network Limited ("Related party"), under which Celsius Network Limited, has agreed to provide a BTC loan to the Company in an aggregate principal amount of up to 2,500 BTC with an annual interest of 10%.

The BTC loans are accounted for as hybrid instruments, with a liability host contract that contains an embedded derivative based on the changes in the fair value of the underlying cryptocurrency asset (BTC). The host contract, which is not accounted for as a debt instrument because it is not a financial liability, is carried at the fair value of the BTC and reported in loans payable to related parties in the balance sheets. The embedded derivative is accounted for at fair value, with changes in fair value recognized as changes in fair value of derivative instrument in the gain and loss from revaluation of BTC loan in the statement of operations. The embedded derivative is included in the loans payable to related parties in the balance sheets and measured at level 2 of the fair value hierarchy.

*Segment Information*

The Company operates in one operating and reportable segment. Operating segments are defined as components of an enterprise about which separate financial information is evaluated regularly by the chief operating decision maker, who is the Company's chief executive officer ("CEO"), in deciding how to allocate resources and assessing performance. The Company currently operates in one segment surrounding its digital asset mining operation.

*Recently Issued Accounting Pronouncements*

As an "emerging growth company", the Jumpstart Our Business Startups Act ("JOBS Act") allows the Company to delay adoption of new or revised accounting pronouncements applicable to public companies until such pronouncements are made applicable to private companies. The Company has elected to use this extended transition period under the JOBS Act. The adoption dates discussed below reflect this election.

In February 2016, the FASB issued ASU No. 2016-02, Leases (Topic 842), as amended, which supersedes the guidance in former ASC 840, Leases. The new standard requires lessees to apply a dual approach, classifying leases as either finance or operating leases based on the principle of whether the lease is effectively a financed purchase by the lessee. This classification will determine whether lease expense is recognized based on an effective interest method or a straight-line basis over the term of the lease. A lessee is also required to record a right-of-use asset and a lease liability for all leases with a term of greater than 12 months regardless of their classification.

F-17

CELSIUS MINING LLC

**NOTES TO FINANCIAL STATEMENTS**

**U.S. dollars in thousands**

**NOTE 2:-    BASIS OF PRESENTATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CON.)**

Leases with a term of 12 months or less will be accounted for similar to the current guidance for operating leases. In June 2020, the FASB issued ASU 2020-05, which defers the effective date of ASU 2016-02 for private entities to fiscal years beginning after December 15, 2021, and interim periods within fiscal years beginning after December 15, 2022. The Company is currently evaluating the impact of the new guidance on its financial statements.

In June 2016, the FASB issued ASU No. 2016-13, Financial Instruments – Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments, and has since issued various amendments including ASU No. 2018-19, ASU No. 2019-04, ASU No. 2019-05, ASU No. 2019-11, and ASU 2020-02. The guidance and the related amendments modify the accounting for credit losses for most financial assets and require the use of an expected credit loss model replacing the currently used incurred loss method. Under this model, entities will be required to estimate the expected lifetime credit loss on such instruments and record an allowance to offset the amortized cost basis of the financial asset, resulting in a net presentation of the amount expected to be collected on the financial asset. The ASU is effective for fiscal years and interim periods within those fiscal years beginning after December 15, 2022, with early adoption, permitted. The Company is currently evaluating the impact of the new guidance on its financial statements.

In December 2019, the FASB issued ASU No. 2019-12, Simplifying the Accounting for Income Taxes (Topic 740). The amendments in the updated guidance simplify the accounting for income taxes by removing certain exceptions and improving the consistent application of other areas of the topic by clarifying the guidance. The new guidance is effective for fiscal years beginning after December 15, 2021, and interim periods within fiscal years beginning after December 15, 2022.Early adoption is permitted. The Company does not expect the adoption of this guidance to have a material impact on the financial statements and related disclosures.

**NOTE 3:-    OTHER RECEIVABLES**

|  | September 30, 2021 (Unaudited) | December 31, 2020 |
|---|---|---|
| Prepaid expenses | $    2,620 | $        — |
| Interest receivable on convertible debt | 551 | — |
| Others | 14 | 127 |
| Total other receivables – current | $    3,185 | $      127 |
| Total other receivables – non-current (*) | $        — | $    6,842 |

(*)   Loan to supplier of mining equipment converted in 2021 to advance payment for equipment.

F-18

**CELSIUS MINING LLC**

**NOTES TO FINANCIAL STATEMENTS**

**U.S. dollars in thousands**

**NOTE 4:-    EQUIPMENT, NET**

| | September 30, 2021 (Unaudited) | December 31, 2020 |
|---|---|---|
| Cost: | | |
| Mining equipment | $    60,263 | $    — |
| Accumulated depreciation: | | |
| Mining equipment | 10,526 | — |
| Depreciated cost | $    49,737 | $    — |

The Company operates in an emerging industry for which limited data is available to make estimates of the useful economic lives of specialized equipment. Management has assessed the basis of depreciation of the Company's cryptocurrency machines used to generate digital currencies. Based on the rate at which the Company generates digital assets and, therefore, consumes the economic benefits of its transaction verification servers, management believes the equipment should be depreciated using a declining percentage over 3 years.

This assessment takes into consideration the availability of historical data and management's expectations regarding the direction of the industry including potential changes in technology.

The depreciation rate is influenced by several factors including the following:

- The complexity of the transaction verification process which is driven by the algorithms contained within the Bitcoin open-source software;

- The general availability of appropriate computer processing capacity on a global basis (commonly referred to in the industry as hashing capacity which is measured in Terahash units).

- Technological obsolescence reflecting rapid development in the transaction verification server industry such that more recently developed hardware is more economically efficient to run in terms of digital assets generated as a function of operating costs, primarily power costs i.e., the speed of hardware evolution in the industry is such that later hardware models generally have faster processing capacity combined with lower operating costs and a lower cost of purchase.

Management will review this estimate annually and will revise such estimates as and when data becomes available.

**NOTE 5:-    NET INVESTMENT IN FINANCING LEASE**

| | September 30, 2021 (Unaudited) | December 31, 2020 |
|---|---|---|
| Opening balance | $    10,113 | $    10,113 |
| Principal payments | (3,512) | — |
| Ending balance | 6,601 | 10,113 |
| Less - current portion | 5,201 | 4,873 |
| Non - current portion | $    1,400 | $    5,240 |

F-19

**CELSIUS MINING LLC**

**NOTES TO FINANCIAL STATEMENTS**

**U.S. dollars in thousands**

**NOTE 5:-    NET INVESTMENT IN FINANCING LEASE (CON.)**

On November 2, 2020 the Company leased to Argo Innovation Labs Inc. ("Argo") mining equipment under a direct financing lease. The lease term commenced on that date and ends on December 31, 2022 (first payment on January 31, 2021) with annual interest rate at 12%. As rent for the equipment during the lease term, Argo shall pay to the Company a fixed amount of $476 monthly in arrears that includes a principal repayment and interest. If Argo elects the purchase option no later than 10 days prior to the expiration date of the lease term, Argo shall pay an amount equal to the end of the term purchase prices plus any other amounts then due under the lease to purchase the equipment. See Note 12(d) regarding termination of the lease subsequent to balance sheet date.

|  | September 30, 2021 (Unaudited) | For the period from October 5, 2020 (inception) to December 31, 2020 |
|---|---|---|
| Gross lease payments | $    7,141 | $    11,426 |
| Unearned interest income | (540) | (1,313) |
| Net investment in financing lease | $    6,601 | $    10,113 |

**NOTE 6:-INVESTMENT IN CONVERTIBLE DEBT**

|  | September 30, 2021 (Unaudited) | December 31, 2020 |
|---|---|---|
| Principal | $    54,000 | $    — |
| Pay in kind interest | 1,474 | — |
| Adjustment for change in fair value | 833 | |
| Total Investment in convertible debt | $    56,307 | $    — |

On April 19, 2021, the Company signed a Secured Convertible Debt Purchase Agreement ("Note Agreement") with Core Scientific Holding Co. ("Scientific") where Scientific has agreed to sell initial and additional notes and the Company agreed to buy initial notes for $50,000 on April 19, 2021, and additional note of $4,000 on April 23, 2021, out of total notes of $215,000.

For the Secured Convertible Promissory Notes ("Notes") Scientific promises to pay the Company the principal amount with interest to accrue on such outstanding principal amount at a rate of 10%
per annum, 4% of which shall be payable in cash and 6% of which shall be payable in kind by capitalizing such interest payment and increasing the outstanding principal amount of these Notes.

Interest shall accrue on the outstanding principal amount of these Notes commencing on (and including) the date of original issuance and continuing until the earlier of the date these Notes are repaid or prepaid in full or the date these Notes are converted in full by the Company. The maturity date of the Notes is April 19, 2025. In the nine months ended September 30, 2021 (unaudited), interest income received in cash amounted to $430.

F-20

**CELSIUS MINING LLC**

**NOTES TO FINANCIAL STATEMENTS**

**U.S. dollars in thousands**

**NOTE 6:-INVESTMENT IN CONVERTIBLE DEBT (CON.)**

If Scientific issues and sells its equity securities to investors in a private offering or placement with total gross proceeds of at least $50,000 or issues and sells equity securities to investors or lists its common stock other than stock for resale – the Company shall have the right at any time and from time to time during the period to convert, in whole or in part, the outstanding principal amount (including all accrued interest) of the Notes, together with all unpaid accrued cash interest into equity securities of Scientific at a conversion price equal to the applicable conversion price
specified in the Note Agreement.

In the event Scientific consummates a Change of Control (as defined in the Note Agreement) while the Notes remain outstanding, Scientific shall repay the outstanding principal amount of the Notes in an amount equal to the repayment amount.

The Company engaged an independent specialist to assist in determining the fair value of the convertible debt. The fair value of the conversion feature was based on the Monte Carlo method, under probability weighted scenarios for the expected conversion date and discounting the expected returns at a risk-free rate. An appropriate discount rate was solved for the debt portion of the convertible debt to reach a total fair value for the combined debt and conversion feature.

Significant assumptions used in determining the fair value were estimated dates of conversion for various scenarios and the related probabilities, volatility (123% - calculated as the median volatility of guideline public companies over a term commensurate with the remaining term until maturity) and annual risk-free interest rate (0.65%).

The valuation is mainly based on inputs that are unobservable in determining fair value, or Level 3 of the fair value hierarchy.

**NOTE 7:-    INVESTMENTS IN EQUITY SECURITIES**

|  | September 30, 2021 (Unaudited) | December 31, 2020 |
|---|---|---|
| Rhodium | $    50,000 | $    — |
| Luxor | 425 | — |
| Total Investment in equity securities | $    50,425 | $    — |

On May 7, 2021, the Company signed a Stock Purchase Agreement with Luxor Technology Corporation for Series A-1 Preferred Stock for $200 and Series A Preferred Stock for $225.

On June 2, 2021, the Company signed a Simple Agreement for Future Equity ("SAFE") with Rhodium Enterprises Inc. ("Rhodium") for $50,000 ("Purchase Amount"). Rhodium issues to the Company the right to certain shares of Rhodium's Common Stock by applying a pre-agreed valuation cap and discount rate.

If there is an equity financing or a listing event, as defined in the SAFE Agreement, before the
termination of the SAFE, this SAFE will automatically convert into shares of Common Stock equal to the Purchase Amount divided by the applicable conversion price.

If there is a liquidity event, as defined in the SAFE Agreement, before the termination of this SAFE, this SAFE will automatically be entitled to receive a portion of proceeds due and payable to

F-21

**CELSIUS MINING LLC**

**NOTES TO FINANCIAL STATEMENTS**

**U.S. dollars in thousands**

**NOTE 7:-    INVESTMENTS IN EQUITY SECURITIES (CON.)**

the Company equal to the greater of the Purchase Amount or the amount payable on the number of shares of Common Stock equal to the Purchase Amount divided by the liquidity price.

If there is a dissolution event before the termination of this Safe, the Investor will automatically be entitled to receive a portion of Proceeds equal to the Cash-Out Amount, due and payable to the Investor immediately prior to the consummation of the Dissolution Event.

This SAFE will automatically terminate immediately following the earliest to occur of the issuance of shares of Common Stock to the Company under the automatic conversion of this SAFE or the payment, or set aside for payment, of amounts only when Rhodium is in final liquidity or dissolution event.

The number of shares to be issued pursuant to the SAFE is based on a 15% discount from the Common Stock price in the triggering equity financing and includes a valuation cap for the overall enterprise value. In a liquidity or dissolution event, the Company's right to receive cash is subordinate to the payment of outstanding indebtedness and creditor claims and on par for other SAFEs and Common Stock. The SAFE Agreements bears no interest and has no maturity date.

During the period ended September 30, 2021 (unaudited), no impairment loss was recorded.

**NOTE 8:-    MINING REVENUE**

The following table presents the Company's revenue from mining:

|  | Nine months ended September 30, 2021 (Unaudited) | |
| --- | --- | --- |
|  | Number of Bitcoin | Total revenue |
| Cryptocurrency mining | 1,825.63 | $    78,240 |

**NOTE 9:-    TRANSACTIONS AND BALANCES WITH RELATED PARTIES**

a.    Loans payable to related parties (see also Note 1):

Pursuant to three revolving credit agreements, effective as of November 1, 2020, April 1, 2021 and July 1, 2021, respectively, Celsius Network Ltd, the ultimate parent company ("Network"), has agreed to provide the Company loans in an aggregate principal amount of up to $750,000, $150,000, and 2,500 BTC, respectively. The loans are repayable on demand. Interest accrues on the loans based on an arms-length rate between unrelated parties to be determined from time to time. The Company has an option to either pay the interest quarterly or add the accrued interest to the principal of the loans. Amounts due in BTC may also be repaid in U.S. dollars equal to the value of the BTC at the date of repayment.

In the event of a change in control or a public offering, as defined in the agreements, the balance of the $150,000 loan and the BTC loan at the time of the event will be converted to equity of the Company. In respect of the $750,000 loan, the balance of the loan as of September 30, 2021 (unaudited) ($101,883) will be converted to equity at the time of the event and any additional loan balance will become payable immediately. The conversion to equity will be based on the fair value of the Company at the time of the event.

F-22

**CELSIUS MINING LLC**

**NOTES TO FINANCIAL STATEMENTS**

**U.S. dollars in thousands**

**NOTE 9:-    TRANSACTIONS AND BALANCES WITH RELATED PARTIES (CON.)**

During the nine month period ended September 30, 2021 (unaudited), the Company received funds totaling approximately $172,000, with an annual interest of 12% (compounded monthly), and approximately $103,000 in the form of a loan of BTC with an annual interest of 10% (compounded monthly based on number of BTC). These funds were used for mining equipment purchases, funding mining activity operational costs and investments in securities of other mining-related companies. Accrued interest on these loans has been added to the principal amount of the loans. The Company has repaid $74,737 for its BTC loan during the nine month period ended September 30, 2021 (unaudited).

See Note 12(f) for information on repayment of loans and additional loans received subsequent to balance sheet date.

| | September 30, 2021 (Unaudited) | December 31, 2020 |
|---|---|---|
| Loans payable – revolving line of credit: | | |
| Loan for mining equipment purchases – up to $750,000 | $  101,883 | $  27,725 |
| Loan for investment in mining companies – up to $150,000 | 108,736 | — |
| Loan for mining equipment purchases – up to 2,500 BTC – Number of BTC on September 30 – 656 BTC | 29,910 | — |
| Total loans payable | $  240,529 | $  27,725 |
| Less – non-current portion (1) | 210,619 | 27,725 |
| Balance – current portion | 29,910 | — |

(1)  Subsequent to balance sheet date, in January 2022, Network undertook not to demand repayment of these loans prior to March 1, 2023 - see Note 1(c). Accordingly, these loans have been classified as non-current.

b.  Other payables to related parties:

Other payables to related parties from current transactions are as follows:

| | | |
|---|---|---|
| Other payables: | | |
| Celsius Network UK payable | $ 23,234 | $  9,910 |
| Celsius US Holding payable | 799 | 470 |
| Total other payables | $ 24,033 | $ 10,380 |

F-23

**CELSIUS MINING LLC**

**NOTES TO FINANCIAL STATEMENTS**

**U.S. dollars in thousands**

**NOTE 9:-**      **TRANSACTIONS AND BALANCES WITH RELATED PARTIES (CON.)**

     c.     Transactions with related parties:

        Transactions with related parties included in statements of operations are as follows:

| | Nine months ended September 30, 2021 (Unaudited) | For the period from inception (October 5, 2020) to December 31, 2020 |
|---|---|---|
| Interest expense | $ 11,927 | $ — |
| Unrealized gain from revaluation of BTC loan | (2,560) | — |
| Realize loss from BTC loan repayment | 3,337 | — |
| Administrative services fees | $ 2,236 | $ 450 |

**NOTE 10:-**     **INCOME TAXES**

     a.     Separate Return Method:

        The Company is a single-member limited liability company that is disregarded for income tax purposes and therefore is not subject to income tax. The Company's financial statements recognize the current and deferred income tax consequences that result from the Company's activities during the current and preceding periods under the provisions of Accounting Standards Codification Topic 740, Income Taxes (ASC 740) as if the Company were a separate taxpayer rather than a member of the parent company's consolidated income tax return group.

     b.     The Tax Cuts and Jobs Act:

        On December 22, 2017, the U.S. enacted the Tax Cuts and Jobs Act, a comprehensive tax law that includes significant changes to the taxation of business entities. These changes include several key tax provisions, among others: (i) a permanent reduction to the statutory federal corporate income tax rate from 35% to 21% effective for tax years beginning after December 31, 2017; (ii) a partial limitation on the tax-deductibility of business interest expenses; (iii) a shift of the U.S. taxation of multinational corporations from a tax on worldwide income to a territorial system (along with certain rules designed to prevent erosion of the U.S. income tax base) and (iv) a one-time deemed repatriation tax on accumulated offshore earnings held in cash and illiquid assets, with the latter taxed at a lower rate.

F-24

**CELSIUS MINING LLC**

**NOTES TO FINANCIAL STATEMENTS**

U.S. dollars in thousands

**NOTE 10:-    INCOME TAXES (CON.)**

c.    Deferred income taxes:

The tax effects of temporary differences and tax loss and credit carryforwards that give rise to significant portions of deferred tax assets and liabilities at September 30, 2021 (unaudited) are comprised of the following:

|  | Nine months ended September 30, 2021 (Unaudited) | For the period from October 5, 2020 (inception) to December 31, 2020 |
|---|---|---|
| **Deferred income tax assets:** | | |
| Carryforward loss | $        (649) | $        (64) |
| Interest payables to related parties | (2,253) | (29) |
| Total deferred tax assets | $      (2,902) | $        (93) |
| Valuation allowance | — | — |
| Net deferred tax assets | $      (2,902) | $        (93) |
| **Deferred income tax liabilities:** | | |
| Depreciation | $      10,481 | $        — |
| Adjustment for change in fair value | 713 | — |
| Total deferred tax liabilities | $      11,194 | $        — |
| Net non-current deferred tax liability (asset) | $        8,292 | $        (93) |

**NOTE 11:-    COMMITMENTS AND CONTINGENCIES**

*Non-cancelable Purchase Commitments*

In the normal course of business, the Company enters into non-cancelable purchase commitments with various parties for mainly purchases of mining equipment. As of December 31, 2020, the Company had no purchase commitments.

As of September 30, 2021 (unaudited), the Company had outstanding non-cancelable purchase commitments in the amount of $106,805 payable in installments through June 2022.

*Contingencies*

From time to time, the Company is a party to or can be threatened with litigation in the ordinary course of business. The Company regularly analyzes current information, including, as applicable, the Company's defenses and insurance coverage and, as necessary, provides accruals for probable and estimable liabilities for the eventual disposition of any matters. The Company was not a party to any material legal proceedings as of September 30, 2021 (unaudited) or December 31, 2020.

CELSIUS MINING LLC

**NOTES TO FINANCIAL STATEMENTS**

**U.S. dollars in thousands**

**NOTE 12:-**    **SUBSEQUENT EVENTS**

The Company has evaluated subsequent events from the balance sheet date through February 11, 2022, the date at which the financial statements were available to be issued. The Company identified the following subsequent events:

a.   On October 1, 2021, the Company assigned the SAFE and convertible debt investments as well as the equity investment in Luxor totaling approximately $106,000 to its parent company, Celsius Holding US, as well as the corresponding inter-company loan payable with Celsius Network Limited.

b.   On October 22, 2021, the Company signed a new agreement with Bitmain Technologies Limited ("Bitmain") for the purchase of 60,000 rigs for BTC mining in the total amount of $375,000. The equipment is expected to be delivered to the Company during the second and third quarters of 2022. As of February 11, 2022, the Company has made a total of $183,000 in advance payments.

c.   On November 15, 2021, the Company signed a new agreement with Bitmain for the purchase of 4,000 rigs for BTC mining in the total amount of $45,400. The equipment is expected to be delivered to the Company during the third quarter of 2022. As of February 11, 2022, the Company has made a total of $13,324 in advance payments.

d.   In March 2021, Celsius began discussions with Argo Innovation Labs, Inc. ("Argo") concerning the possible termination of that certain Managed Cryptocurrency Mining Services Agreement entered into on November 2, 2020 (the "Managed Services Agreement") pursuant to which Argo agreed to provide certain cryptocurrency mining services to Celsius, including in relation to the installation and activation of rigs upon delivery to the relevant hosting facility. Celsius argued that Celsius had the right to terminate the Managed Services Agreement. On April 20, 2021, Argo filed a claim against Celsius (through its affiliate, Celsius Networks Lending LLC) in the federal court for the District of New Jersey seeking declaratory relief confirming Celsius was obligated to continue to honor its obligations pursuant to the Managed Services Agreement. On June 29, 2021, Celsius filed a response and counterclaim, alleging, among other things, that Argo had failed to provide the contracted services under the Managed Services Agreement, and sought declaratory relief voiding the Managed Services Agreement ab initio. On November 22, 2021, Argo and Celsius reached an agreement, pursuant to which, (i) the parties terminated their lease agreement dated November 2, 2020, under which Celsius leased to Argo certain rigs located in the relevant hosting facility, with Argo paying Celsius $6,300 in satisfaction of its remaining financial obligations to Celsius, and Celsius conveying title to Argo for the rigs covered by the lease, and (ii) Argo agreed to terminate all future services under the Managed Services Agreement with Celsius in return for a payment in the amount of $3,600 from Celsius to Argo in the form of Bitcoin. On December 7, 2021, the respective payments were completed. As part of the parties agreement to terminate the Managed Services Agreement, Argo and Celsius mutually agreed to stipulate to the dismissal with prejudice of pending litigation between the parties which had been rendered moot by such termination of the Managed Services Agreement. Prior to the termination of the Managed Services Agreement, the parties continued to honor their respective obligations under the Managed Services Agreement.

e.   On December 23, 2021, the Company entered into an agreement with Priority Power to secure 75 MW to develop the Company's own mining facilities in Texas. The agreement included

F-26

CELSIUS MINING LLC

**NOTES TO FINANCIAL STATEMENTS**

**U.S. dollars in thousands**

**NOTE 12:-    SUBSEQUENT EVENTS (CON.)**

paying Priority Power a non-refundable development fee of $6,175 and a refundable payment of $2,265 for land acquisition, distribution lines, and reimbursement for amounts previously paid by Priority Power to the utility. At the Priority Power sites, the Company anticipates initially deploying rigs in April 2022.

f.    As of February 11, 2022, the Company has repaid to Celsius Network its BTC loan in the amount of $29,910 on September 30, 2021 (unaudited) and increased its USD loans from Celsius Network to a total of $425,681.

g.    On January 27, 2022, the Company signed an agreement with EZ Blockchain to host 15 MW of the Company's miners with an initial term of 18 months, starting in March 2022. Pursuant to the agreement, the Company paid EZ Blockchain a deposit of $1,752 and a prepayment of $779 (net of a $97 deposit discount) to be applied to the first month's hosting invoice.

- - - - - - - - - - -

F-27

# **<u>EXHIBIT J</u>**



Privileged and Confidential

Celsius Network – Organizational Chart as of 7/15/2021

Ownership:
Alex M. - 73.66%
Daniel L. - 14.77%
Legacy ESOP - 11.57%

Celsius Network Inc.[1]

82.91%

Celsius Networks Lending LLC[3]

Celsius Network Ltd. (IL)

Celsius Network Limited[2] (UK)

100%

100%

Celsius US Holding LLC (CTB as C-Corp)

Celsius (AUS) Pty Ltd.

Celsius EU UAB[4]

Celsius Services CY LTD

Celsius Network Europe d.o.o

Celsius US LLC (Formerly Celsius Money LLC 6-9-21)

Celsius Core LLC[5]

Celsius Network LLC[6]

Celsius KeyFi LLC

Celsius Operations LLC

Celsius Lending LLC[7]

Privileged and Confidential

Notes

The following notes provide some context for the roles and functions of certain key entities in the Celsius Network structure. These notes are not meant to be exhaustive or to in any way limit what activities these entities can and do engage in.

1. Celsius Network Inc. is a holding entity, through which the founders are invested in the structure. It is a party to certain early agreements and engagements on behalf of the group, all to be gradually assigned to the appropriate subsidiaries.

2. Celsius Network Limited is currently the primary operational and contracting entity in the structure. Currently, this entity is the one engaging with all customers world-wide, but as part of the planned migration of certain functions to its subsidiaries (see 4 and 7 below), this will cease to be the case and Celsius Network Limited will no longer be providing customer facing services following the migration. Third party investments, deployment and yield generating activities and any new employee equity incentive plan are or are expected to be at this level. Round A investment was done into this entity and same for Round B.

3. Celsius Networks Lending LLC is a legacy lending entity. It is no longer a party to any new lending agreements, and is only the creditor of legacy loans. All new loans are entered into by Celsius Lending LLC. Upon the expiration of all such legacy loans, this entity will be dissolved. It is currently subject to an intercompany agreement with Celsius Network Limited.

4. Celsius EU UAB is a newly formed entity in Lithuania which, post-migration, will provide certain services to Celsius' international (non-US) users, with respect to certain specific digital assets.

5. Celsius Core LLC is the primary entity responsible for Celsius Network's mining business and operations.

6. Celsius Lending LLC is the retail lending entity.

7. Celsius Network LLC is a newly formed entity in the U.S. which will be the primary operational and contracting entity post-migration for retail user-facing activities.

# EXHIBIT K

**In the Matter Of:**

*In Re - Celsius Network LLC*

---

*OREN BLONSTEIN*

*November 22, 2022*

---



1

1          UNITED STATES BANKRUPTCY COURT

2           SOUTHERN DISTRICT OF NEW YORK

3

4    In re                    )
                              )
5    CELSIUS NETWORK LLC,     )
     et al.,                  )   Case No.
6                             )   22-10964 (MG)
              Debtor.         )
7                             )

8

9

10
                    ** CONFIDENTIAL **
11
         _____
12

13      VIDEO RECORDED EXAMINATION OF

14            OREN BLONSTEIN

15      _____

16                 TAKEN ON

17
           TUESDAY, NOVEMBER 22, 2022
18

19

20

21

22
     CERTIFIED STENOGRAPHER:
23    JESSIE WAACK, RDR, CRR, CCRR, NYRCR, NYACR,
      CCR-NJ (No. 30XI008238700) CSR-TX (No. 11958)
24    CCR-WA (No. 21007264), CSR-CA (No. 14420),
      REALTIME SYSTEMS ADMINISTRATOR
25    JOB NO.:  872582

2

1

2              VIDEO RECORDED EXAMINATION of OREN

3   BLONSTEIN, taken before JESSICA R. WAACK,

4   Registered Professional Reporter, Registered

5   Merit Reporter, Certified Realtime Reporter,

6   Registered Diplomate Reporter, California

7   Certified Realtime Reporter, New Jersey

8   Certified Court Reporter (License No.

9   30XI008238700); Texas Certified Shorthand

10  Reporter (License No. 11958); Washington

11  State Certified Court Reporter (License No.

12  21007264); California Certified Shorthand

13  Reporter (License No. 14420); New York

14  Association Certified Reporter, New York

15  Realtime Court Reporter and Notary Public of

16  Washington, D.C. and the States of New York,

17  Pennsylvania, Delaware, Maryland and

18  Virginia, at Kirkland & Ellis, LLP, 601

19  Lexington Avenue, New York, New York, on

20  Tuesday, November 22, 2022, commencing at

21  9:51 a.m. and concluding at 7:04 p.m.

22

23

24

25

22-10964-mg   Doc 1796   Filed 12/28/22   Entered 12/28/22 20:08:00   Main Document
In Re - Celsius Network LLC
Pg 229 of 250
Confidential
Oren Blonstein
November 22, 2022

3

1              A P P E A R A N C E S

2

3  ON BEHALF OF THE DEBTORS:

4       KIRKLAND & ELLIS LLP

5       BY:  GRACE C. BRIER, ESQ.

6       BY:  JOSEPH D'ANTONIO, ESQ.

7       BY:  ELIZABETH JONES, ESQ.

8       BY:  T.J. McCARRICK, ESQ.

9       BY:  AMILA GOLIC, ESQ. (Remotely)

10      BY:  GABRIELA ZAMFIR HENSLEY, ESQ.

11      (Remotely)

12      BY:  JOSHUA RAPHAEL, ESQ. (Remotely)

13      BY:  DANIEL LATONA, ESQ. (Remotely)

14      BY:  ASHTON WILLIAMS, ESQ. (Remotely)

15      1301 Pennsylvania Avenue, N.W.

16      Washington, D.C.  20004

17      PHONE:  202-389-5082

18      EMAIL:  Grace.brier@kirkland.com

19

20

21

22

23

24

25

4

```
 1              A P P E A R A N C E S

 2

 3   REMOTELY ON BEHALF OF AD HOC GROUP OF CUSTODY

 4   HOLDERS:

 5        TOGUT, SEGAL & SEGAL LLP

 6        BY:  JARED C. BORRIELLO, ESQ.

 7        One Pennsylvania Plaza, Suite 3335

 8        New York, New York  10119

 9        PHONE:  212-201-6571

10        EMAIL:  Jborriello@teamtogut.com

11

12   ON BEHALF OF THE OFFICIAL COMMITTEE OF

13   UNSECURED CREDITORS:

14        WHITE & CASE LLP

15        BY:  AARON COLODNY, ESQ.

16        BY:  MICHAEL A. JAOUDE, ESQ.

17        BY:  KEITH H. WOFFORD, ESQ. (Remotely)

18        BY:  ANDREA AMULIC, ESQ. (Remotely)

19        BY:  DAVID TURETSKY, ESQ. (Remotely)

20        BY:  SAMUEL HERSHEY, ESQ. (Remotely)

21        555 South Flower Street, Suite 2700

22        Los Angeles, California  90071-2433

23        PHONE:  213-620-7706

24        EMAIL:  Acolodny@whitecase.com

25
```

5

```
 1              A P P E A R A N C E S

 2

 3   REMOTELY ON BEHALF OF CELSIUS NETWORK:

 4        AKIN GUMP STRAUSS HAUER & FELD LLP

 5        BY:  MITCHELL P. HURLEY, ESQ.

 6        BY:  JESSICA MANNON, ESQ.

 7        One Bryant Park

 8        Bank of America Tower

 9        New York, New York  10036-6745

10        PHONE:  212-872-1011

11        EMAIL:  Mhurley@akingump.com

12

13   ON BEHALF OF THE OFFICE OF THE UNITED STATES

14   TRUSTEE:

15        BY:  SHARA CORNELL, ESQ.

16        BY:  MARK BRUH, ESQ. (Remotely)

17        201 Varick Street

18        New York, New York  10014

19        EMAIL:  Shara.cornell@usdoj.gov

20

21

22

23

24

25
```

6

```
1              A P P E A R A N C E S

2

3    REMOTELY AS SPECIAL COUNSEL TO THE DEBTOR:

4          LATHAM & WATKINS LLP

5          BY:  JACK MITCHELL MCNEILY, ESQ.

6          330 North Wabash Avenue, Suite 2800

7          Chicago, Illinois  60611

8          PHONE:  312-876-6520

9          EMAIL:  Jack.mcneily@lw.com

10

11   ON BEHALF OF THE SERIES B PREFERRED HOLDERS:

12         MILBANK

13         BY:  MELANIE WESTOVER YANEZ, ESQ.

14         1850 K Street, NW, Suite 1100

15         Washington, DC  20006

16         PHONE:  202-835-7560

17         EMAIL:  Mwyanez@milbank.com

18

19

20

21

22

23

24

25
```

7

```
1              A P P E A R A N C E S

2

3  REMOTELY ON BEHALF OF THE TEXAS STATE

4  SECURITY BOARD AND THE TEXAS DEPARTMENT OF

5  BANKING:

6       TEXAS OFFICE OF ATTORNEY GENERAL

7       BY:  LAYLA MILLIGAN, ESQ.

8       BY:  ROMA N. DESAI, ESQ.

9       BY:  ABIGAIL RYAN, ESQ.

10      300 West 15th Street

11      Austin, Texas  78701

12      PHONE:  512-463-2100

13

14  REMOTELY ON BEHALF OF THE NATIONAL

15  ASSOCIATION OF ATTORNEY GENERALS:

16      BANKRUPTCY AND STATE DEFENSIVE

17      LITIGATION CHIEF COUNSEL

18      BY:  KAREN CORDRY, ESQ.

19      1850 M Street NW, 12th floor

20      Washington, DC  20036

21      PHONE:  202-326-6000

22

23

24

25
```

8

1              A P P E A R A N C E S

2

3    REMOTELY ON BEHALF OF THE FEDERAL TRADE

4    COMMISSION:

5         BY:  KATHERINE MARIE AIZPURU, ESQ.

6         600 Pennsylvania Avenue NW

7         Washington, DC  20580

8         PHONE:  202-326-2870

9         EMAIL:  Kaizpuru@tzlegal.com

10

11   REMOTELY ON BEHALF OF CREDITOR IGNAT TUGANOV:

12        VENABLE LLP

13        BY:  CAROL WEINER LEVY, ESQ.

14        Rockefeller Center

15        1270 Avenue of the Americas

16        New York, New York   10020

17        PHONE:  212-503-0675

18        EMAIL:  Cwlevy@Venable.com

19

20            A L S O   P R E S E N T

21

22   JOSEPH GOLDING-SCHSNER, Celsius counsel

23   KEVIN-SCOTT VAN VLIGMEN, videographer

24   CAMERON CREWS, pro se creditor

25

9

```
 1              A L S O   P R E S E N T

 2                    (remotely)

 3

 4    JUAN TORRES, Zoom tech

 5    AYDALINE GARCIA, Zoom tech

 6    DAVID ADLER, did not provide appearance

 7    MICHAEL MORRIS, did not provide appearance

 8    CEZARY BORODZIUK, did not provide appearance

 9    DEB KOVSKY, did not provide appearance

10    BRYAN KOTLIAR, did not provide appearance

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

22-10964-mg   Doc 1796   Filed 12/28/22   Entered 12/28/22 20:08:00   Main Document
In Re - Celsius Network LLC
Pg 236 of 250
Confidential
Oren Blonstein
November 22, 2022

10

1                 A L S O   P R E S E N T

2             (pro se creditors - remotely)

3

4   JARNO ÖBERG

5   IMMANUEL HERMANN

6   VICTOR UBIERNA DE LAS HERAS

7   JEREMY COHEN HOFFIG

8   JARED BORRIELLO

9   KULPREET KHANUJA

10   DAVID SCHNEIDER

11   GREGORY A. KIESER

12   DANIEL FRISHBERG

13   CHRIS KOENIG

14

15                     --o0o--

16

17

18

19

20

21

22

23

24

25

11

```
 1              INDEX TO EXAMINATION

 2           WITNESS:  OREN BLONSTEIN

 3

 4              EXAMINATION              PAGE

 5  BY MR. COLODNY                        16

 6  BY MS. CORNELL                       186

 7  BY MS. RYAN                          227

 8  BY MS. CORDRY                        262

 9  BY MR. CREWS                         281

10  BY MR. HERMANN                       325

11  BY MR. KHANUJA                       372

12  BY MR. KIESER                        407

13

14              INDEXED PAGES

15                                       PAGE

16  OREN BLONSTEIN, sworn                 14

17  REPORTER CERTIFICATE                 425

18  INSTRUCTIONS TO WITNESS              426

19  DECLARATION UNDER PENALTY OF PERJURY 427

20  ERRATA SHEET                         428

21

22

23

24

25
```

12

1              INDEX TO EXHIBITS

2           WITNESS:  OREN BLONSTEIN

3             Tuesday, November 22, 2022

4   MARKED            DESCRIPTION            PAGE

5   Exhibit 4  Notice of deposition          19

6   Exhibit 5  Official committee of

7              unsecured creditors' written

8              deposition questions for the

9              debtors                       23

10  Exhibit 6  Debtors' responses and

11             objections to official

12             committee of unsecured

13             creditors' written deposition

14             questions                     26

15  Exhibit 7  Declaration of Oren Blonstein  97

16  Exhibit 8  Exhibit A-5 to A-6 redline    138

17  Exhibit 9  Screenshot from May 8, 2022   296

18  Exhibit 10 Flow chart created by

19             Mr. Crews                     316

20  Exhibit 11 Version 8 of the terms of use 351

21

22      ** All exhibits were attached to the

23             original transcript **

24

25                --o0o--

22-10964-mg   Doc 1796   Filed 12/28/22   Entered 12/28/22 20:08:00   Main Document
In Re - Celsius Network LLC          Pg 239 of 250          Oren Blonstein
Confidential          November 22, 2022

13

1              ******

2              PROCEEDINGS

3        November 22, 2022, 9:51 a.m.

4            New York, New York

5              ******

6        THE VIDEOGRAPHER:  Good morning,

7    everyone.  We are now on the record.

8    My name is Kevin-Scott van Vlijmen.

9    I'm the videographer retained by

10   Lexitas.

11       This is a video deposition for

12   the United States Bankruptcy Court,

13   Southern District of New York.

14       Today's date is November 22 of

15   2022, and the video time is 9:51 a.m.

16       This deposition is being held

17   both remotely via Zoom as well as in

18   person at Kirkland & Ellis LLP, at

19   601 Lexington Avenue, New York,

20   New York, 10022, in the matter of In

21   Re: Celsius Network LLC, et al., Case

22   No. 22-10964 (MG).

23       The deponent is Oren Blonstein.

24       All counsel will be noted on the

25   stenographic record.

14

1          Our court reporter is Jessica

2      Waack and will now swear in the

3      witness.

4                    *****

5          OREN BLONSTEIN, sworn

6      on oath and/or affirmed, called as a

7    witness herein, was examined and testified

8              as follows:

9                    *****

10          THE VIDEOGRAPHER:  You may

11      proceed.

12          MS. BRIER:  At the outset, I'm

13      just going to designate this transcript

14      as confidential -- the entire

15      transcript as confidential.

16          ZOOM PARTICIPANT:  On Zoom, you

17      can't [inaudible] do that?

18          MS. BRIER:  You can't hear us?

19          THE STENOGRAPHER:  I think

20      someone just wasn't muted.

21          ZOOM PARTICIPANT:  You are

22      currently muted.

23          THE STENOGRAPHER:  Can we go off

24      the record?

25          THE VIDEOGRAPHER:  Yes.  All

119

1           THE WITNESS:  Not to my

2      knowledge.  And I think it would.

3      There are, like, some technical

4      challenges -- there would be technical

5      challenges of being able to have it

6      available in different languages.

7  BY MR. COLODNY:

8      Q.   So Celsius never provided the

9  terms of use in Spanish, for example?

10     A.   Not to my knowledge.

11     Q.   Any other language than English?

12     A.   Not to my knowledge -- yeah, not

13  to my knowledge.

14     Q.   Did Celsius ever send emails to

15  people in any language other than English?

16          MS. BRIER:  Objection to form.

17     Outside the scope.

18          THE WITNESS:  Yeah, not to my

19     knowledge.

20  BY MR. COLODNY:

21     Q.   Okay.  Let's go to the

22  resolicitation.

23          Why did Celsius resolicit

24  acceptances to the terms of use for

25  Version 6?

120

1      A.    Why did -- why did Celsius follow

2  up with customers about accepting the terms

3  of use Version 6?

4           Because it was a material change

5  in -- customers had previously been

6  customers of Celsius, the UK entity, and

7  that was being transferred to the U.S.

8  entity.

9      Q.    Did Celsius resolicit acceptances

10  of any other prior version of the terms of

11  use?

12      A.    Not to my -- not to my knowledge.

13  And I -- I did -- other than what's

14  represented in the declaration, which is

15  that we tracked acceptance of terms of use

16  by customer, so we knew when a customer

17  accepted or did not.

18           But Version 6 was -- you know,

19  like, as we've kind of outlined in the

20  declaration, it was a pretty material

21  change being that customers were becoming

22  customers of a new entity.

23           That was -- that was, to my

24  knowledge, the main -- really the only time

25  the company really tracked or proactively

121

 1   reached out to customers -- sorry.  That

 2   was the first time that the company

 3   proactively reached out to customers to

 4   track that.

 5        Q.   So how did it notify customers of

 6   the previous changes to the terms of use,

 7   terms of use 1 through 5?

 8        A.   Through in-app notifications

 9   and -- in-app notifications and -- and

10   email.

11        Q.   And what did those in-app

12   notifications say?

13        A.   Something along the lines of, you

14   know, our terms of use are changing.  You

15   must accept -- you know, largely similar to

16   what's -- what's shown in these exhibits.

17        Q.   But --

18        A.   That the terms are changing.  If

19   you want to continue to use the app and

20   get, you know, the benefits of being a

21   customer, you need to accept the terms.

22        Q.   And did it -- did customers

23   actively have to click "accept" to continue

24   to use the Celsius app for changes in

25   Versions 1 through 5?

180

1  funds, they would need to work with our

2  customer support team to do that.

3      Q.   And that's for the period between

4  July 22 on, or was that after July 22?

5      A.   That was starting on August 5.

6  So basically people were notified they had

7  a period of time to accept.  Then they were

8  suspended starting August 5, if they had

9  not accepted.

10          And then on August 19, we

11  discontinued the payout of rewards to those

12  accounts.

13     Q.   So between July 22 and August 5,

14  if you clicked "continue anyway," could you

15  access your app and withdraw your funds?

16     A.   That's my understanding, yes.

17     Q.   And then why did the company

18  suspend accounts after August 5?

19     A.   Because of the -- I'm just trying

20  to think of this -- the reasons for making

21  the change in the Celsius entity that we

22  were -- that the customers -- sorry.

23          Let me say that more efficiently.

24          The whole purpose of -- or one of

25  the main purposes of the Version 6 terms of

181

1   use was changing the company that the

2   customers were engaging with from the UK

3   entity to the U.S. entity.

4            It was important that we

5   stopped -- if customers were not accepting

6   the new terms of use, it was important that

7   we stop providing services to them from

8   the -- you know, as a UK company.

9        Q.   And why did you stop users -- or

10  suspend users' accounts?  Why did Celsius

11  suspend users' accounts before they stopped

12  them from earning rewards?

13           MS. BRIER:  Object to form.

14           THE WITNESS:  Yeah.  I think

15       definitely, like, someone with, you

16       know, more of the legal and regulatory

17       background may be better to answer that

18       question.

19           But generally, we were -- I think

20       that there was -- there's generally a

21       lag between when we -- when we would

22       suspend a user's account and when we

23       would stop paying them rewards.  But I

24       don't -- I don't know the background

25       for why that decision was being made.

253

1          to the company.  So that is my

2          impression based on my review of the

3          terms of use.

4    BY MS. RYAN:

5          Q.   So were users allowed to remain

6    on the system if they didn't agree to

7    subsequent versions of the terms of use?

8          A.   Yeah, starting with, you know,

9    Version 6 and 7 of the terms of use, we

10   implemented and we -- this is detailed in

11   the -- in my declaration -- implemented --

12   or sorry.  We followed up with user --

13   sorry.

14          In the notification to customers,

15   we explained to them that, you know, if

16   they did not accept the terms of use or if

17   they did not agree to the terms of use,

18   they would need to close their account and

19   would no longer earn rewards through the

20   program.

21          Q.   And how would they close their

22   account if they didn't agree to the terms

23   of use?

24          A.   Yeah, there was a -- there was

25   a -- in the text of the -- in this -- in

254

1   the user interface for where we presented

2   the terms of use to customers, we said --

3   I'm just reading from that -- from page 17

4   of my declaration, A-8.

5          It says, "If you do not agree to

6   our updated terms of use and privacy

7   policy, please contact Celsius support to

8   close your account."

9       Q.   And would that be the same

10  whether they were closing a custody account

11  or an earn account?

12          MS. BRIER:  Objection to form.

13          You can answer.

14          THE WITNESS:  From my

15      understanding, yeah, there shouldn't --

16      there shouldn't have been a difference.

17      Because this was -- this was more a

18      matter of whether they -- of the status

19      of their account.

20          So if they had been suspended for

21      not accepting -- you know, basically

22      passing the deadline that we had set

23      for them to accept the terms of use,

24      then just, you know -- if your account

25      is suspended, you can't withdraw assets

255

1         without assistance from customer care.

2    BY MS. RYAN:

3         Q.   So timing wise, they click no, I

4    don't agree to the terms of use, and their

5    ability to access their money, whether it's

6    in a custody account or an earn account, is

7    suspended, so they can't touch their money,

8    and they would have to then contact

9    customer care; is that the process?

10            MS. BRIER:  Objection to form.

11        Outside the scope.

12            And I think there might be some

13        confusion.

14            Were you reading from the

15        declaration as it relates to the

16        Version 6?

17            THE WITNESS:  Yeah, Version 6 and

18        7, yep.

19            MS. BRIER:  Just for clarity --

20        purpose of clarity of timing, Ms. Ryan,

21        I think he was looking at Version 6

22        screenshots in his -- in his

23        declaration.  Just wanted to make the

24        record clear there for your

25        questioning.

256

```
 1    BY MS. RYAN:

 2         Q.   Thank you.

 3              But this process changes for

 4    Version 7 and 8?

 5         A.   We didn't have -- yeah.  So on --

 6    on Version 6 and 7, which were largely, you

 7    know -- from my understanding, were largely

 8    centered around the change in relationship

 9    from -- for the change in the terms of use

10    from the Celsius UK entity to the U.S.

11    entity.

12              There was a -- you know, there

13    was this multiphase process, and there were

14    specific deadlines for customers.  You're

15    asking subsequent to that, whether we had

16    deadlines upon which we suspended accounts?

17              I don't think that we --

18         Q.   Yeah, just -- just if the

19    customer didn't agree to the new terms of

20    use.

21              MS. BRIER:  Object to form.

22              THE WITNESS:  I would need to go

23         back and just refresh my memory on

24         that.  I don't remember -- I was

25         focusing -- I focused my time, like, on
```

257

1        this -- in this Version 6 and 7.

2              So I'm not sure -- yeah, yeah.

3        I'd have to go back and refresh my

4        memory on that, whether we implemented,

5        like, a deadline for subsequent updates

6        to the terms of use and whether we

7        suspended accounts based on that.

8              I think it was a pretty -- it was

9        a fairly unique situation with

10       Version 6 and 7, because the

11       relationship was changing from the UK

12       and the U.S., and, you know, we were

13       not supposed to be conducting --

14       we were not supposed to be offering

15       services from the UK entity, you know,

16       going forward.

17   BY MS. RYAN:

18       Q.   Okay.   Thank you.

19       A.   Sure.

20       Q.   So from day one, has Celsius kept

21   the coins in a main wallet as opposed to

22   individual wallets?

23            MS. BRIER:   Objection to form.

24       Outside the scope.

25            But you can answer.