**WHITE & CASE LLP**
David M. Turetsky
Kimberly A. Havlin
Samuel P. Hershey
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: david.turetsky@whitecase.com
       kim.havlin@whitecase.com
       sam.hershey@whitecase.com

– and –

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
Email: mandolina@whitecase.com
       gregory.pesce@whitecase.com

**WHITE & CASE LLP**
Keith H. Wofford
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Email: kwofford@whitecase.com

– and –

**WHITE & CASE LLP**
Aaron E. Colodny (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone: (213) 620-7700
Facsimile: (213) 452-2329
Email: aaron.colodny@whitecase.com

*Counsel to the Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OPENING BRIEF REGARDING DEBTORS THAT ARE LIABLE TO ACCOUNT HOLDERS UNDER THE GLOBAL CONTRACT (THE "TERMS OF USE") BETWEEN CELSIUS AND ACCOUNT HOLDERS**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

# **TABLE OF CONTENTS**

**Page**

Preliminary Statement ............................................................................................................. 1

Background ............................................................................................................................. 3

    I.   Account Holders' Initial Contract with Celsius Network Limited ......................... 3

    II.  Summer 2021 – Facing Regulatory Scrutiny in the United Kingdom, CNL
        Creates Celsius Network, LLC ............................................................................ 4

    III. Winter 2021 - The Preferred Equity Investment ..................................................... 8

Argument ................................................................................................................................. 9

    I.   The Plain Language of the Terms of Use Unambiguously Provides Account
        Holders With Claims Against Each Debtor Entity. ............................................... 9

    II.  Any Ambiguity In The Terms of Use Must Be Construed In Favor Of Account
        Holders. ................................................................................................................ 13

    III. Extrinsic Evidence of the Drafter's Intent Is Not Admissible But, Even If
        Considered, It Supports The Account Holders. ................................................... 13

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ally Fin. Inc. v. Wells Fargo Bank, N.A.* (*In re Residential Cap., LLC*),
   531 B.R. 25 (Bankr. S.D.N.Y. 2015) ..................................................................................10

*Breed v. Ins. Co. of N. Am.*,
   385 N.E.2d 1280 (N.Y 1978) ............................................................................................9

*Joao v. Cenuco, Inc.*,
   376 F. Supp. 2d 380 (S.D.N.Y. 2005) ...............................................................................12

*KLS Diversified Master Fund, L.P. v. McDevitt*,
   507 F. Supp. 3d 508 (S.D.N.Y. 2020), *aff'd*, No. 21-1263, 2022 WL 2759055 (2d Cir. July
   13, 2022) ............................................................................................................................12

*MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*,
   950 F. Supp. 2d 568 (S.D.N.Y. 2013) ...............................................................................14

*Metro. Life Ins. Co. v. RJR Nabisco, Inc.*,
   906 F.2d 884 (2d Cir. 1990) ..............................................................................................9

*Nicosia v. Amazon.com, Inc.*,
   384 F.Supp.3d 254 (E.D.N.Y. 2019) .................................................................................13

*Quadrant Structured Prod. Co. v. Vertin*,
   16 N.E.3d 1165 (N.Y. 2014) .............................................................................................12

*R/S Assocs. v. N.Y. Job Dev. Auth.*,
   771 N.E.2d 240 (N.Y. 2002) .........................................................................................9, 10

*Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.*,
   769 F.3d 807 (2d Cir. 2014) .............................................................................................14

*W.W.W. Assocs., Inc. v. Giancontieri*,
   566 N.E.2d 639 (N.Y. 1990) ........................................................................................10, 14

*Ward v. TheLadders.com, Inc.*,
   3 F. Supp. 3d 151 (S.D.N.Y. 2014) ...................................................................................13

*Westchester Resco Co. v. New England Reinsurance Corp.*,
   818 F.2d 2 (2d Cir. 1987) .................................................................................................13

Pursuant to the *Order (I) Setting a Briefing Schedule and (II) Granting Related Relief* [Docket No. 1747], the Official Committee of Unsecured Creditors (the "**Committee**"), appointed in the chapter 11 cases (the "**Chapter 11 Cases**") of the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**" and, together with their non-Debtor affiliates, "**Celsius**"), by and through its undersigned counsel, hereby files this opening brief (this "**Brief**") regarding, which Debtors are liable to account holders under the Terms of Use[2] between Celsius Network LLC and its Affiliates, on the one hand, and the account holders, on the other.

### Preliminary Statement

1.      The dispute currently before the Court can and should be resolved by the plain and unambiguous text of the Terms of Use. All of the relevant obligations to account holders in the Terms of Use are those of "Celsius." The Terms of Use describe, for example, "Celsius'" obligation to transfer digital assets back to users, multiple times. The Terms of Use even specifically say that if there is a bankruptcy, account holders will be "creditors of 'Celsius.'" And the Terms of Use define "Celsius" as "Celsius Network LLC ***and its Affiliates***," which includes all Debtor entities.

2.      Nowhere do the Terms of Use say that only Celsius Network LLC has these obligations, or that account holders' claims would be limited to only certain Celsius entities in the

---

[2] Version 6 of the Terms of Use was when the defined term "Celsius" was changed to mean "Celsius Network LLC and its Affiliates." Version 7 of the Terms of Use was in force at the time of the preferred equity investment. Version 7 included only non-substantive changes from Version 6 and is not attached to this Brief. *See* Docket No. 393 ¶ 12; Ex. A-7. Version 8 was the version in effect on the Petition Date. Both Version 6 and Version 8 contain all material terms relied on in this Brief. Unless stated otherwise, all citations in this Brief to the "Terms of Use" are to the Terms of Use, generally, or Version 8. For ease of reference, Version 6 and Version 8 of the Terms of Use filed at Docket No. 393 are attached to the Declaration of Aaron Colodny in support of this Brief (the "**Colodny Declaration**") as **Exhibits 1** ("**Version 6**") & **2** ("**Version 8**"), respectively. For clarity, page numbers have been added to each of those versions. Cites to the corresponding section and page number of the relevant version of the Terms of Use are included throughout the Brief.

event of bankruptcy. The Terms of Use in fact say the opposite. If such a severe restraint on the rights of account holders had been intended, it should have been stated expressly, rather than not at all. Notably, in other provisions, the Terms of Use did designate particular Celsius entities (*see* Terms of Use § 1, at 6 (stating that "[s]ervices provided in connection with specific Eligible Digital Assets . . . are provided by the Affiliate Celsius EU UAB")), but the core obligations to account holders expressly belonged to all members of the Celsius enterprise. There is also no statement or suggestion anywhere in any version of the Terms of Use that the 55% of account holders that signed up before Version 6 was in effect released their claims against CNL (as defined below), which was the sole contract counterparty under each version of the Terms of Use issued prior to Version 6, *i.e.*, when those account holders transferred their digital assets to the Debtors.

3.  This contractual interpretation exercise should end there. Because the Terms of Use are unambiguous (as all parties agree[3]), the Terms of Use should be interpreted based on the plain language within the four corners of the agreement. That plain language states that the Terms of Use are binding on each of the Debtors and that account holders are "creditors of Celsius" with claims against each of the Debtors. Importantly, Celsius itself, the drafter of the Terms of Use, agrees with this plain language reading and asserts that each Celsius entity has an obligation to account holders.

4.  Even if there were any ambiguity in the Terms of Use, that ambiguity must be construed in favor of the account holders because the Terms of Use are a contract of adhesion, which was drafted by Celsius and was not negotiated by any account holder. The severe limitation

---

[3] *See* Dec. 8, 2022 Hr'g Tr. at 26:2-4 ("MR. LEBLANC: … we believe it is unambiguous in our favor."); *id.* at 26:23-24 ("MR. NASH: Our view is that it's unambiguous in our favor.").

2

on the rights of account holders proposed by the Preferred Equity investors cannot rest on ambiguous language.

5.      Because the Terms of Use are unambiguous, the Court need not (and should not) consider extrinsic evidence. But, even if extrinsic evidence were considered, the extrinsic evidence available to the Committee at this time, including the drafting history of the Terms of Use and the way that the Terms of Use were described publicly, further supports the Debtors' and the Committee's position. In the face of this evidence, the Preferred Equity investors appear to rely on descriptions that the Debtors made privately to potential investors and other third parties after the relevant versions of the Terms of Use were already effective. But post-hoc statements to third parties, and other materials that account holders never saw, cannot rewrite the contract to dramatically alter the account holders' rights by redirecting major sources of value from account holders to the Debtors' equity holders.

## Background

### I.    Account Holders' Initial Contract with Celsius Network Limited

6.      In 2017, Celsius Network Limited ("**CNL**") was incorporated under the laws of England and Wales. *Decl. in Support of Chapter 11 Petitions and First Day Mots.* [Docket No. 23] (the "**Mashinsky Declaration**") ¶ 1. Until August 2021, account holders contracted solely with CNL. *See, e.g.*, Docket No. 393 at 183 (defining "Celsius" in Version 5 of the Terms of Use as "Celsius Network Limited" and stating that it "provides the following Terms of Use (the "Terms") that apply to our users ("you" or "User") when using or purchasing Celsius' products and services. . .").[4] Fifty-five percent of account holders first transferred digital assets to Celsius

---

[4] Terms of Use Version 5 was in effect from September 30, 2020 to July 22, 2021. *See* Docket No. 393 ¶ 5. Each version of the Terms of Use prior to September 30, 2020 was also between CNL and the account holder. *See id.* at 15, 27, 76, 123.

3

under a version of the Terms of Use in which CNL was the sole contracting entity. *Decl. of Oren Blonstein, Head of Innovation and Chief Compliance Officer of the Debtors, in Support of the Debtors' Mot. Regarding Ownership of Earn Assets and the Sale of Stablecoin* [Docket No. 1327] (the "**Blonstein Declaration**") ¶ 14.

7.  CNL started its bitcoin mining business using an indirectly wholly-owned subsidiary, Celsius Mining, LLC, in the fall of 2020. Celsius repeatedly championed how its mining business was for the benefit of its account holders. *See, e.g.*, Celsius Network, *Celsius mining Bitcoin helps the company and the community*, Youtube (June 28, 2021), https://www.youtube.com/watch?v=nQ352qf1fzI&t=59s (last accessed on Dec. 22, 2022).

### II. Summer 2021 – Facing Regulatory Scrutiny in the United Kingdom, CNL Creates Celsius Network, LLC

8.  In the summer of 2021, in the face of regulatory scrutiny from the Financial Conduct Authority of the United Kingdom, Celsius formed Celsius Network LLC ("**Network**"). The relevant section of the organizational chart attached to the Mashinsky Declaration demonstrating the resulting corporate structure of the Celsius group (as it existed on the Petition Date) is included below:[5]

---

[5] A full chart of the corporate organizational structure for the Debtors and certain of their non-Debtor affiliates is attached to the Mashinsky Declaration as Exhibit A and, for the Court's convenience, to the Colodny Declaration as **Exhibit 3**. "Filing Entity" refers to entities that filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court on July 13, 2022. "Non-Filing Entity" refers to certain of the Debtors' non-debtor affiliates. On December 7, 2022, GK8 Ltd, GK8 UK Limited, and GK8 USA LLC filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court.

4



9.      Celsius announced the formation of Network in a Medium blog post where it stated that it was "migrating [its] main business activity and headquarters from the United Kingdom to the United States and where applicable, to several other jurisdictions." *See Celsius Community Update – June 23, 2021*, Medium (June 23, 2021), https://celsiusnetwork.medium.com/celsius-community-update-june-23-2021-a28fca899091 (last accessed on Dec. 21, 2022).[6] Celsius stressed that, "**[f]or the avoidance of doubt, all Celsius services for all existing customers remain unchanged**." *Id.* (emphasis in original). Celsius also announced that it had closed registration for new customers residing in the United Kingdom until further notice. *Id.* Celsius did not mention any other way in which its customers would be affected by the change. Rather, it

---

[6] The Celsius Network article titled *Celsius Community Update – June 23, 2021* is attached to the Colodny Declaration as **Exhibit 4**.

5

continued to trumpet its mining business, investments, and the financial freedom it provided to its account holders.

10. On July 22, 2021, Celsius issued Version 6 of the Terms of Use. *See* Colodny Decl., Ex. 1. Version 6 amended the contracting party, and the definition of "Celsius," from "Celsius Networks Ltd." to "Celsius Networks LLC and its Affiliates." Version 6 § 1, at 1. "Affiliate" is defined in Version 6 to include "an entity that owns or controls, is owned or controlled by, or is or [*sic*] under common control or ownership with a party, where control is defined as the direct or indirect power to direct or cause the direction of the management or policies of such party, whether through ownership of voting securities, by contract or otherwise." *Id.* § 2, at 3. In other words, the Celsius contracting parties included Network, CNL, and all entities under the common control of CNL or otherwise captured by the broad definition of "Affiliate."

11. Version 8 of the Terms of Use (which was in effect on the Petition Date) unambiguously states that account holders that participate in the Earn program loan their digital assets to "Celsius" and that "Celsius" has obligations to each account holder. *See*, *e.g.*, Terms of Use § 2, at 6 (describing "**CELSIUS' OBLIGATION TO TRANSFER DIGITAL ASSETS TO USERS UPON THE TERMINATION OF SUCH LOANS OR REPAYMENT OF SUCH BORROWING IN CONNECTION WITH THESE SERVICES**" (emphasis in original)), *id.* § 4.A, at 11. The Terms of Use also specifically provide that, in the event of a bankruptcy, each account holder will have claims "as a creditor of Celsius," which is defined to mean "Celsius Network LLC and all of its Affiliates." *Id.* § 13.3, at 35. The Terms of Use consistently impose obligations to return account holders' Digital Assets on the collectively-defined "Celsius," rather than any individual Celsius entity. For instance, Section 4.D of the Terms of Use, which concerns the Earn program, states that the account holder "may terminate any loan to Celsius at any time,

6

and request that *Celsius* return the borrowed Eligible Digital Assets." *Id.* § 4.D, at 19 (emphasis added). Section 11 of the Terms of Use, relating to the withdrawal process, states that the account holder has a "call option on all loans made to *Celsius* to demand immediate, complete or partial repayment of any loan at any time[.]" *Id.* § 11, at 30 (emphasis added). Each of these provisions are in both Version 6 and Version 8 of the Terms of Use.

12.     As of the Petition Date, notwithstanding the "migration" of Celsius' "main business activity," all digital asset investing and institutional lending activities were still conducted by CNL. Nov. 22, 2022 Blonstein Dep. Tr. at 180:17-182:11.[7] In other words, even though account holders may have initially transferred digital assets to Network after the "migration," the digital assets were subsequently transferred by Network to CNL to be lent or otherwise invested. CNL's schedules of assets and liabilities disclosed that it held approximately $1,150,496,943.64 in digital assets on the Petition Date. *Celsius Network Limited Schedules of Assets and Liabilities*, Case No. 22-10966-mg, Docket No. 7, at 36 ("**CNL Schedules**"). Christopher Ferraro, the Debtors' interim CEO, testified that those digital assets are predominantly coins that were transferred to Celsius by account holders. Oct. 13, 2022 Section 341(a) Meeting of Creditors Tr. at 65:18-21 ("MR. COLODNY: Okay, where did the liquid crypto that's currently held in Fireblocks by Celsius Network LTD come from? MR. FERRARO: It's predominantly customer coins.").[8]

13.     CNL and Network entered into an intercompany loan agreement which, upon information and belief, documents the purported movement of account holder assets between

---

[7] Relevant excerpts of the transcript of the deposition of Oren Blonstein taken on November 22, 2022 are attached to the Colodny Declaration as **Exhibit 5**.

[8] Relevant excerpts of the transcript of the Section 341(a) meeting held on October 13, 2022 are attached to the Colodny Declaration as **Exhibit 6**.

7

Network and CNL. The Debtors scheduled the intercompany claim owed from CNL to Network in the amount of $9,093,663,742.78. CNL Schedules at 45.[9]

### III. Winter 2021 - The Preferred Equity Investment

14. In September 2021, the New Jersey Bureau of Securities issued a Cease and Desist Order preventing Celsius from offering its Earn product to unaccredited investors. *See* Summary Cease and Desist Order, New Jersey Bureau of Securities (Sept. 17, 2021), https://www.nj.gov/oag/newsreleases21/Celsius-Order-9.17.21.pdf (last accessed on Dec. 23, 2022).[10] Notwithstanding that Cease and Desist Order, on October 12, 2021, Celsius announced a $400,000,000 million investment led by WestCap Group LLC ("**WestCap**"), a growth equity firm with billions under management, and Caisse de dépôt et placement du Québec ("**CDPQ**"), one of Canada's largest pension funds. *Celsius Network Announces an Investment Led by WestCap and CDPQ at a Valuation More than US $3 Billion*, Cision: PR Newswire (Oct. 12, 2021), https://www.prnewswire.com/news-releases/celsius-network-announces-an-investment-led-by-westcap-and-cdpq-at-a-valuation-more-than-us-3-billion-301397834.html (last accessed Dec. 26, 2022).[11] Both Celsius and WestCap used the investment as evidence of Celsius' commitment to regulatory compliance. *See id.* (quoting Laurence Tosi of WestCap as stating "[w]hile the current regulatory attention is new, Alex Mashinsky and Celsius' ethos has long echoed the sentiment regulators are trying to put forth in terms of consumer protections."). Celsius announced that it:

> intend[ed] to use the proceeds from [the] investment to continue expanding its offering and products, as well as building bridges between the [*sic*] traditional

---

[9] As agreed by the parties, the intercompany claim owned from CNL to Network is not the subject of this litigation and any issues regarding that intercompany claim will be addressed at a later date.

[10] The New Jersey Bureau of Securities Cease and Desist Order, dated September 17, 2021 is attached to the Colodny Declaration as **Exhibit 7**.

[11] The PR Newswire article titled *Celsius Network Announces an Investment Led by WestCap and CDPQ at a Valuation More than US $3 Billion*, dated October 12, 2021 is attached to the Colodny Declaration as **Exhibit 8**.

8

>finance and cryptocurrencies, with specific emphasis on launching institutional grade products and offerings. Part of the proceeds would also be used to double its team from 486 employees to nearly 1,000 and expand globally through strategic acquisitions in order to continue fueling the exponential growth that it had experienced over the past year.

*Id.* The investment, which was reported to have subsequently increased to more than $750 million, was structured as a preferred equity investment in CNL. *See Celsius Network Series B Expands to $750M*, CoinDesk (Nov. 24, 2021), https://www.coindesk.com/business/2021/11/25/celsius-network-series-b-expands-to-750m-at-325b-valuation/ (last accessed on Dec. 22, 2022).[12]

15.     In response to the New Jersey order, Celsius again amended its Terms of Use, publishing Version 8 on April 14, 2022. Colodny Decl., Ex. 2. Among other material terms set forth above, Version 8 maintained the relationship and obligations under the Terms of Use were of "Celsius Network LLC and its Affiliates." *Id.* § 1, at 1. On July 13, 2022 (the "**Petition Date**"), Network, CNL, and several other "Affiliates" filed for bankruptcy.

## Argument

### I.    The Plain Language of the Terms of Use Unambiguously Provides Account Holders With Claims Against Each Debtor Entity.

16.     "[W]here the language is clear, unequivocal and unambiguous, the contract is to be interpreted by its own language." *R/S Assocs. v. N.Y. Job Dev. Auth.*, 771 N.E.2d 240, 242 (N.Y. 2002). "Contract language is unambiguous if it has a 'definite and precise meaning, unattended by danger of misconception in the purpose of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990) (quoting *Breed v. Ins. Co. of N. Am.*, 385 N.E.2d 1280, 1283 (N.Y 1978)). When the terms of a contract are unambiguous, extrinsic evidence may not be used to

---

[12] The CoinDesk article titled *Celsius Network Series B Expands to $750M*, dated November 24, 2021 is attached to the Colodny Declaration as **Exhibit 9**.

9

create an ambiguity. *R/S Assocs.*, 771 N.E.2d at 242 (citing *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990)).

17.     The plain language of Version 8 of the Terms of Use unambiguously provides account holders with claims against all Debtor entities. The opening sentence of the Terms of Use defines "Celsius" as "Celsius Network LLC and its Affiliates," and states that those entities collectively "provide the following Terms of Use, that . . . apply to our users[.]" Terms of Use § 1, at 1. "Affiliate," in turn, is defined broadly to include "an entity that owns or controls, is owned or controlled by, or is or [*sic*] under common control or ownership with a party, where control is defined as the direct or indirect power to direct or cause the direction of the management and policies of such party, whether through ownership of voting securities, by contract, or otherwise." *Id.* § 2, at 7. There can be no dispute that each of the Debtors is an "Affiliate" of the others, since they are all under the common ownership and control of CNL. The defined term "Celsius" has a definite and precise meaning. To construe the defined term "Celsius" to only refer to Network would require the reader to strike "and its Affiliates" from the sentence. That is not how contracts are to be read or interpreted. *Ally Fin. Inc. v. Wells Fargo Bank, N.A.* (*In re Residential Cap., LLC*), 531 B.R. 25, 42–43 (Bankr. S.D.N.Y. 2015).

18.     The Terms of Use consistently impose obligations to return account holders' Digital Assets on the collectively-defined "Celsius," rather than any individual entity. Specifically, in describing an account holder's Celsius Account, the Terms of Use state that:

> All Eligible Digital Assets balances on your Celsius Account represent Digital Assets that are either (1) held in your Custody Wallet by Celsius or a Third Party Custodian, (2) loaned by you to Celsius, or (3) posted to Celsius as collateral and, therefore, owned, held and/or controlled by Celsius (under the applicable Service, as further detailed herein), ***and subject to Celsius' obligation to deliver such Digital Asset back to you upon the termination of the applicable Service***.

Terms of Use § 4.A, at 11 (emphasis added).  Section 4.D of the Terms of Use further provides that the:

> Earn Service allows [the account holder] to earn a financing fee from *Celsius* referred to as "Rewards" in the form of Digital Assets . . . in exchange for entering into open-ended loans of your Eligible Digital Assets *to Celsius* under the terms hereof.  If our Earn Service is available to you, upon your election, you will lend your eligible digital assets to *Celsius* and grant *Celsius* all rights and title to such Digital Assets, for Celsius to use in its sole discretion while using the Earn Service . . . . You may terminate any loan to *Celsius* at any time, and request that *Celsius* return the borrowed Eligible Digital Assets and deliver any Rewards accrued from the Earn Service, by transferring such Eligible Digital Assets and Rewards to your external Virtual Wallet . . . or the Custody Service, if available.

*Id.* § 4.D, at 18–19 (emphasis added); *see also id.* § 11, at 30 ("[Y]ou have a call option on all loans made to *Celsius* to demand immediate, complete or partial repayment of any loan at any time") (emphasis added)).

19. The Terms of Use also specifically address a Celsius bankruptcy and provide that Account Holders are creditors of Celsius—meaning Network and all of its Affiliates:

> In the event that Celsius becomes bankrupt, enters liquidation or is otherwise unable to repay its obligations, any Eligible Digital Assets used in the Earn Service or as collateral under the Borrow Service may not be recoverable, and you may not have any legal remedies or rights in connection with Celsius' obligations to you other than your rights **as a creditor of Celsius** under any applicable laws.

*Id.* § 13.3, at 35 (emphasis added).

20. The Terms of Use nowhere limit customers to asserting claims against only Network.  Indeed, the Terms of Use refer to "Celsius Network LLC" individually once: as part of the service address in a notice provision.  *See id.* § 27.D, at 49.

21. The Terms of Use also demonstrate that, to the extent Celsius wanted to refer to a specific entity, it knew how to do so.  In addition to the service address described above, the Terms of Use also refer specifically to Celsius EU UAB regarding services provided by that specific entity.  *See id.* § 1, at 6, 57 (referring to particular services to be provided by Celsius EU UAB

11

with respect to Binance Coin (BNB), Ripple (XRP), Tether Gold (XAUT), and WDGLD).  These terms leave no doubt that Celsius knew how to designate specific entities for specific obligations when it wanted to, and that every place in the Terms of Use that it used the defined term Celsius, it intended to impose obligations to account holders on each Debtor entity, not just one. *See KLS Diversified Master Fund, L.P. v. McDevitt*, 507 F. Supp. 3d 508, 542 (S.D.N.Y. 2020), *aff'd*, No. 21-1263, 2022 WL 2759055 (2d Cir. July 13, 2022) ("Under the doctrine of *expressio unius est exclusio alterius*, when a term is expressly included in a contractual provision, its exclusion from other provisions within the same contract reflects the parties' intent that the omission was intentional[.]"); *Quadrant Structured Prod. Co. v. Vertin*, 16 N.E.3d 1165, 1172 (N.Y. 2014) ("[I]f parties to a contract omit terms—particularly, terms that are readily found in other, similar contracts—the inescapable conclusion is that the parties intended the omission.").

22.    Finally, CNL was the sole contracting party in previous versions of the Terms of Use, which were initially accepted by 55% of account holders. *See* Docket No. 393 at 15, 27, 76, 123, 183; *see also* Blonstein Decl. ¶ 14.  CNL, as an "Affiliate" of Network, remains a party to the Terms of Use.  There is no release of any claims against CNL in the Terms of Use or any other document of which the Committee is aware.  *Joao v. Cenuco, Inc.*, 376 F. Supp. 2d 380, 383 (S.D.N.Y. 2005) ("For a document to constitute a release from liability, it must contain an explicit, unmistakable and unequivocal statement by one party that it intends to abandon its right to prosecute a present or future claim against the other party.").  Nor is there any other suggestion that the previously-existing claims against CNL were extinguished when the Terms of Use were amended in July 2021.

12

**II. Any Ambiguity In The Terms of Use Must Be Construed In Favor Of Account Holders.**

23. Even if the Terms of Use were found to be ambiguous, any conflict or ambiguity must be construed in favor of the account holders. The Terms of Use are a standard-form contracts of adhesion, in that it was presented as a take-it-or-leave-it contract that was not subject to negotiation by the account holder. *Nicosia v. Amazon.com, Inc.*, 384 F.Supp.3d 254, 264 (E.D.N.Y. 2019) (explaining that contracts of adhesion "contain preprinted terms offered on a take-it-or-leave-it basis, which, in light of the parties' respective bargaining positions, are not realistically susceptible to negotiation or customization"). New York courts have consistently held that ambiguous contracts of adhesion must be construed in favor of the customer and against the drafter. *Westchester Resco Co. v. New England Reinsurance Corp.*, 818 F.2d 2, 3 (2d Cir. 1987) ("where an ambiguity exists in a standard-form contract supplied by one of the parties, the well-established *contra proferentem* principle requires that the ambiguity be construed against that party."); *Ward v. TheLadders.com, Inc.*, 3 F. Supp. 3d 151, 161 (S.D.N.Y. 2014) ("Under the doctrine of *contra proferentem*, it is a basic principle of contract law that a written document is to be construed against the party who prepared it where there are contradictory provisions. The doctrine is particularly applicable in cases like this one, in which a consumer agreed to a form contract that the consumer neither drafted nor negotiated." (internal citations and brackets omitted)). Here, to the extent there is any doubt as to which Debtor entities are liable, it must be construed against the Debtors (and their equity owners) and in favor of preserving the rights of account holders.

**III. Extrinsic Evidence of the Drafter's Intent Is Not Admissible But, Even If Considered, It Supports The Account Holders.**

24. As noted under New York law, "'[i]t is well settled that extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and

13

unambiguous upon its face.'" *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.*, 769 F.3d 807, 815–16 (2d Cir. 2014) (quoting *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990)). Accordingly, because the Terms of Use are unambiguous with respect to the Celsius parties bound and obligated thereby—"Celsius Network LLC and its Affiliates"—extrinsic evidence regarding the Terms of Use is inadmissible and need not be considered by the Court.

25. Even if the Court were to consider extrinsic evidence, however, the evidence of which the Committee is presently aware demonstrates the Debtors' intent to bind all Debtor entities to the obligations set forth in the Terms of Use. *First*, both of the parties to the contract—the Debtors and the account holders—understand the contract provides account holders with claims at each Debtor entity. The Preferred Equity investors, who are not party to the agreement, argue otherwise and that the Terms of Use should be read to disadvantage the thousands of account holders and in favor of themselves and CNL's other equity holders. The Preferred Equity investors were well aware of the provisions of Version 6 of the Terms of Use, which was adopted prior to their investment in the Debtors and publicly available.

26. *Second*, the drafting history and evolution of the Terms of Use supports the same result. Courts may consider drafting history as a form of extrinsic evidence that demonstrates intent. *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 950 F. Supp. 2d 568, 613 (S.D.N.Y. 2013) (relying on "the extrinsic evidence presented on this issue at trial, namely, the drafting history of the Agreements" to determine the parties' objective intent where "the parties' intent cannot be discerned from the contractual language itself") (internal citations omitted). The first five versions of the Terms of Use were between just one Celsius entity—CNL—and its account holders. Docket No. 393 at 15, 27, 76, 123, 183. Version 6 deliberately changed the contracting party from a single entity to "Celsius Network LLC *and its Affiliates*." Version 6 § 1, at 1. That

change demonstrates an intent to bind all Celsius entities from Version 6 forward. In addition to the unambiguous terms discussed in Section I, *supra*, which are included in both Version 6 and Version 8, Version 6 contains other direct references to "*Celsius'*" obligations to account holders: "Your Celsius Account balance visible through the platform shall indicate the balance of Eligible Digital Assets *owed to you by Celsius*." *Id.* § 7, at 12 (emphasis added).[13]

27.    ***Third***, the Committee is unaware of any communications to account holders or other public statements made at the time that Version 6 was issued stating that Celsius was dramatically altering its obligations to its customers and moving such obligations away from the company's assets. In fact, the evidence is to the contrary. Celsius' blog post indicated that the move from the UK was "in the best interest of [its] ever-growing community," that it was "migrating [its] main business activity and headquarters from the United Kingdom to the United States," and that "**[f]or the avoidance of doubt, all Celsius services for all existing customers remain unchanged**." *See Celsius Community Update – June 23, 2021*, Medium (June 23, 2021), https://celsiusnetwork.medium.com/celsius-community-update-june-23-2021-a28fca899091 (last accessed on Dec. 21, 2022) (emphasis in original). No reasonable account holder would interpret those statements to indicate that they were being structurally subordinated to the benefit of equity. The Debtors' own statements at the time make clear that was never their intention.

28.    Finally, the Committee does not know what extrinsic evidence the Preferred Equity investors intend to present, but the Preferred Equity investors have referenced confidential communications between the Debtors and the Preferred Equity investors, or submitted confidentially to the United States government. The parties to the Terms of Use are (i) "Celsius

---

[13] That language was changed in Version 8 to account for the addition of the Custody service, as follows: "Your Celsius Account balance visible through the platform shall indicate, the ~~amounts~~ **balance** of Eligible Digital Assets ~~owed to you by Celsius~~ **attributed to each Service, to the extent applicable and available**." Docket No. 393 at 613. The obvious intent of the Debtors was not changed by that revision.

15

Network LLC and its Affiliates," on the one hand, and (ii) the account holders, on the other hand. *See* Terms of Use § 1, at 1. Confidential materials presented to third parties and not made available to account holders have no probative value in determining the meeting of the minds between Celsius and its account holders.

[*Remainder of Page Intentionally Left Blank*]

Dated: December 28, 2022
New York, New York

Respectfully submitted,

*/s/ Aaron E. Colodny*
**WHITE & CASE LLP**
David M. Turetsky
Kimberly A. Havlin
Samuel P. Hershey
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: david.turetsky@whitecase.com
  kim.havlin@whitecase.com
  sam.hershey@whitecase.com

– and –

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
Email: mandolina@whitecase.com
  gregory.pesce@whitecase.com

– and –

**WHITE & CASE LLP**
Keith H. Wofford
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Email: kwofford@whitecase.com

– and –

**WHITE & CASE LLP**
Aaron E. Colodny (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone: (213) 620-7700
Facsimile: (213) 452-2329
Email: aaron.colodny@whitecase.com

*Counsel to the Official Committee of Unsecured Creditors*

17