**Hearing Date:  February 6, 2023, at 2:00 p.m. (prevailing Eastern Time)**
**Opening Brief Deadline:  December 28, 2022, at 11:59 p.m. (prevailing Eastern Time)**

| | |
|---|---|
| Joshua A. Sussberg, P.C.<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone:     (212) 446-4800<br>Facsimile:      (212) 446-4900 | Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)<br>Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)<br>Christopher S. Koenig<br>Dan Latona (admitted *pro hac vice*)<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Telephone:     (312) 862-2000<br>Facsimile:      (312) 862-2200 |

*Counsel to the Initial Debtors and Debtors in Possession*

*Proposed Counsel to the GK8 Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DEBTORS' OPENING BRIEF**
**REGARDING ACCOUNT HOLDERS' CLAIMS ISSUES**

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

**TABLE OF CONTENTS**

Page

**Preliminary Statement**......................................................................................................1

**Background** .........................................................................................................................5

    I.    Factual Background ...................................................................................5

        A.    The Series B Investment ................................................................5

        B.    The Terms of Use...........................................................................6

    II.    Case Background and Procedural History .....................................................7

**Legal Argument** .................................................................................................................9

    I.    Each Debtor Entity Is Liable to Account Holders Based on the Plain Language of the Terms of Use..................................................................9

        A.    Each Debtor Entity Is an "Affiliate" of Celsius Network LLC. ....10

        B.    Each Debtor Entity is Liable to Account Holders Under the Clear and Unambiguous Language of the Terms of Use..........................11

    II.    Reservation of Rights...............................................................................13

# TABLE OF AUTHORITIES

**Cases**

Page(s)

*Ardestani v. INS*,
    502 U.S. 129 (1991)............................................................................................................9

*Caminetti v. United States*,
    242 U.S. 470 (1917)............................................................................................................9

*In re Condado Plaza Acquisition LLC*,
    620 B.R. 820 (Bankr. S.D.N.Y. 2020)................................................................................9

*Consedine v. Portville Cent. Sch. Dist.*,
    907 N.E.2d 684 (2009).......................................................................................................9

*In re Enron Corp.*,
    292 B.R. 752 (Bankr. S.D.N.Y. 2003)................................................................................9

*Intercontinental Plan., Ltd. v Daystrom, Inc.*,
    24 N.Y.2d 372 (1969)........................................................................................................9

*Investors Ins. Co. of Am. v. Dorinco Reinsurance Co.*,
    917 F.2d 100 (2d Cir. 1990)...............................................................................................9

*RJE Corp. v. Northville Indus. Corp.*,
    329 F.3d 310 (2d Cir. 2003)...............................................................................................9

*United States v. Ron Pair Enters., Inc.*,
    489 U.S. 235 (1989)............................................................................................................9

*W.W.W. Assocs., Inc. v. Giancontieri*,
    77 N.Y.2d 157 (1990).........................................................................................................9

The above-captioned debtors and debtors in possession (collectively, the "Debtors" and, together with their non-Debtor affiliates, the "Company") submit this opening brief (this "Brief") pursuant to the *Order (I) Setting a Briefing Schedule and (II) Granting Related Relief* [Docket No. 1747] (the "Scheduling Order").[2] This Brief addresses the "Briefed Legal Issue"—which Debtors are liable to account holders under the Terms of Use,[3] including whether the Terms of Use are clear and unambiguous on the Briefed Legal Issue. In support of this Brief, the Debtors state the following:

**Preliminary Statement**

1.  In the last two months, the Debtors have made significant progress in these chapter 11 cases and are on track to file a plan and disclosure statement before exclusivity expires in February 2023. Importantly, in December alone, the Debtors briefed and argued key issues related to the Company's "Custody Program," "Earn Program," and "Withhold Accounts," achieved approval of the sale of the GK8 Debtors' assets, and continued to engage in a full-scale marketing process while also evaluating standalone reorganization options.

2.  Now, the Court must resolve an issue at the core of these chapter 11 cases—namely, determining against which Debtor entities account holders have claims. The Debtors believe that the answer to the Briefed Legal Issue rests squarely on black letter law of contract interpretation

---

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms elsewhere in this Brief or in the Scheduling Order, as applicable.

[3]   *See Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, Providing Terms of Use Dating Back to February 18, 2018* [Docket No. 393] (the "Terms of Use Declaration"). The current controlling Terms of Use, which went into effect on April 14, 2022, are attached as Exhibit A–8 to the Terms of Use Declaration. Version 7 of the Terms of Use was in effect at the time of the issuance of the Series B Preferred Shares (as defined herein).

of the Terms of Use, which unambiguously provide account holders with recourse at every Debtor entity.

3.      The Series B Preferred Holders,[4] however, will likely urge the Court to ignore the plain language of the Terms of Use and consider contradicting extrinsic evidence. They will likely argue, as they have before, that the Company is a conglomerate of different business lines and the Terms of Use (and account holder claims) only apply to "customer-facing entities" in the Debtors' capital structure, *i.e.*, Debtor Celsius Network LLC ("Celsius Network") and Debtor Celsius Lending LLC (the "Customer-Facing Entities").[5] While that outcome would certainly benefit the Series B Preferred Holders—who could recover from the non-Customer-Facing Entities while limiting account holders' recoveries to only the assets of the Customer-Facing Entities—that interpretation defies the plain language of the Terms of Use.[6]

4.      It is unsurprising that the Series B Preferred Holders would like to read outside the plain language of the Terms of Use given their approximately $600 million investment in Debtor Celsius Network Limited ("CNL") in late 2021. At the time of their investment, the crypto markets were soaring; Bitcoin reached its all-time high of over $68,000 per Bitcoin in November 2021. The Company's implied enterprise value from the Series B Preferred Shares was $3 billion, the Company's balance sheet reflected cryptocurrency balances of more than $15 billion, and the Company was planning an initial public offering for its mining business for the following year.

---

[4]  "Series B Preferred Holders" means Community First Partners, LLC, Celsius SPV Investors, LP, Celsius New SPV Investors, LP, and CDP Investissements Inc.

[5]  *See Motion of Community First Partners, LLC, Celsius SPV Investors, LP, Celsius New SPV Investors, LP, and CDP Investissements Inc. for Entry of an Order Directing the Appointment of an Official Preferred Equity Committee* [Docket No. 880] (the "Equity Committee Motion").

[6]  The Debtors reserve all rights with respect to arguments other than the Briefed Legal Issue that may affect the right of the Series B Preferred Holders to recover from the assets of the Debtors, including any intercompany claim or substantive consolidation.

2

5. Unfortunately, six months later, the collapse of Terra Luna, combined with other adverse developments within the Company and in the cryptocurrency markets, resulted in a "run on the bank" of customer withdrawals from the Company's platform that required the Company to pause withdrawals, and ultimately file for chapter 11 protection on July 13, 2022. In the wake of the Company's collapse, the Series B Preferred Holders, understandably desperate to salvage their investment, now argue that account holder claims do not attach to non-Customer-Facing Entities, particularly CNL, the GK8 Debtors, and Debtor Celsius Mining LLC. This argument fails based on the clear and unambiguous language of the Terms of Use.

6. When a contract's terms are clear and unambiguous, courts must apply the terms as written, and this case is no different. The Terms of Use are between account holders and "Celsius." The term "Celsius" is defined in section 1 of the Terms of Use as "Celsius Network LLC and its Affiliates,"[7] and "Affiliate" is defined as "an entity that owns or controls, is owned or controlled by, or is or under common control or ownership with a party, where control is defined as the direct or indirect power to direct or cause the direction of the management and policies of such party, whether through ownership of voting securities, by contract, or otherwise."[8] The term "Celsius" therefore includes every Debtor entity linked to Celsius Network in the Company's corporate structure—that is, every Debtor entity.[9]

7. The Terms of Use repeatedly refer to "Celsius" as the entities that owe obligations to account holders. For example, the Terms of Use provide that "Celsius" has the obligation to return cryptocurrency to account holders. The Terms of Use further provide that if Celsius

---

[7] Terms of Use § 1.

[8] *Id.* § 2.

[9] A corporate structure chart is attached hereto as **Exhibit A**.

3

"becomes bankrupt," account holders have "rights as a creditor of *Celsius*," and that "in no event shall [account holders] have any recourse, whether by setoff or otherwise, with respect to our obligations, to or against any assets of any person or entity *other than Celsius*, including, without limitation, any member, shareholder, Affiliate, investor, employee, officer, director, agent or advisor of Celsius."[10]  Accordingly, through plain and unambiguous language, the Terms of Use explicitly provide that account holders have recourse against "Celsius," which is defined as Celsius Network and its "Affiliates."  As such, the Court does not need to look beyond the four corners of the Terms of Use to discern which Debtor entities account holders have claims against—the Terms of Use unambiguously provide that account holders have recourse against each Debtor entity.[11]

8.  To the extent the Series B Preferred Holders attempt to point to extrinsic evidence in support of their argument that account holders only have claims against Customer-Facing Entities, that evidence is only relevant to the extent the Court determines that the Terms of Use are ambiguous on the Briefed Legal Issue, which it is not.  More importantly, if extrinsic evidence is relevant, it is only relevant for the sole purpose of resolving ambiguous contractual language in the Terms of Use, not for *creating* ambiguity.

9.  For these reasons, and as further set forth herein, the Court should interpret the Terms of Use according to its plain meaning and rule that account holders have claims against every Debtor entity.

---

[10]  Terms of Use §§ 13.3, 25 (emphasis added).

[11]  At first glance, the use of "Affiliate" in section 25 may initially appear to create ambiguity.  As set forth in Part I.B. of the Legal Argument, however, this argument fails.

4

**Background**

I.   **Factual Background**

   A.   **The Series B Investment**

   10.   Following its inception in 2017, like many rapidly growing businesses, the Company needed to raise funds to continue growing and building on its early successes. Accordingly, in the summer of 2021, the Company and WestCap Management, LLC ("WestCap") and certain of its funds and affiliates, commenced negotiations on a term sheet for senior secured convertible promissory notes (the "Notes"), while leaving the option for subsequent equity funding open.[12]  The negotiations ultimately culminated in an initial issuance of Notes by CNL to WestCap SOF II Celsius 2021 Aggregator, LP (the "WestCap Noteholder") on September 2, 2021. Specifically, the WestCap Noteholder acquired Notes for approximately $93.75 million. Shortly thereafter, CDP Investissements Inc. ("CDPQ") acquired convertible notes from CNL for approximately $56.25 million in a separate transaction.

   11.   Following the Notes issuances, the WestCap Noteholder and CDPQ agreed to convert their Notes despite the triggering events for conversion having not yet occurred. On December 3, 2021, the first round of equity funding closed, and the Notes were converted to Series B preferred shares of CNL (the "Series B Preferred Shares"). Simultaneously, the WestCap Investors and CDPQ invested an additional $303.5 million and $93.75 million, respectively, for additional Series B Preferred Shares. Following these issuances in December 2021 and January 2022, CNL continued to raise capital through two additional rounds of Series B funding. As of

---

[12]   The original WestCap entities that invested in CNL were WestCap SOF II Celsius 2021 Aggregator, LP, WestCap Celsius Co-Invest 2021, LLC, and WestCap SOF II IEQ 2021 Co-Invest, LP. These investors later changed their names to Community First Partners, LLC, Celsius SPV Investors, LP, and Celsius New SPV Investors, LP (collectively, the "WestCap Investors").

5

July 29, 2022, CDPQ held approximately 7,328 Series B Preferred Shares in CNL.[13]  As of August 12, 2022, Community First Partners, LLC, Celsius SPV Investors, LP, and Celsius New SPV Investors, LP held approximately 14,125, 7,328, and 722 Series B Preferred Shares in CNL, respectively.[14]

### B. The Terms of Use

12. On August 3, 2021, version 7 of the Terms of Use went into effect.[15]  The latest Terms of Use, version 8, became effective just prior to the launch of the Debtor's custody program, on April 14, 2022.[16]  While the Terms of Use have been updated periodically to reflect the growth of the Company and the cryptocurrency industry more broadly, many features of the Terms of Use have remained consistent.  Notably, version 7 and version 8 of the Terms of Use, attached as Exhibit A–7 and Exhibit A–8 to the Terms of Use Declaration, respectively, both define "Celsius" as "Celsius Network LLC and its Affiliates."[17]  When the WestCap Noteholder made its initial investment in the Notes, version 7 of the Terms of Use was in effect.[18]  Version 7 incorporates

---

[13] *See Declaration of Status as a Substantial Shareholder* [Docket No. 336].

[14] *See Declaration of Status as a Substantial Shareholder* [Docket No. 444].

[15] *See generally* version 7 of the Terms of Use.

[16] *See* Terms of Use Decl. ¶ 13.

[17] For purposes of this Brief, unless otherwise specified, citations to the Terms of Use refer to versions 7 and 8 of the Terms of Use, as applicable.  "Affiliate" means "an entity that owns or controls, is owned or controlled by, or is or under common control or ownership with a party, where control is defined as the direct or indirect power to direct or cause the direction of the management and policies of such party, whether through ownership of voting securities, by contract, or otherwise."  Terms of Use § 2.

[18] Version 6 of the Terms of Use was "implemented in response to, among other things, significant changes that were made as a result of a change of the legal entity where the majority of Debtors' cryptocurrencies were held— moving those cryptocurrencies from being held by Celsius Network Limited in the United Kingdom to being held by Celsius Network LLC in the United States."  Terms of Use Decl. ¶ 11.  It was in effect only from July 22, 2021, to August 2, 2021.  *Id*.  Version 7 of the Terms of Use was in effect when the Series B Preferred Holders made their investment, and thus, this Brief focuses on versions 7 and 8 of the Terms of Use.

6

similar language as version 8 with respect to the definition of "Celsius,"[19] and there were no changes between version 7 and version 8 with respect to the definition of "Affiliates," or the limitation of liability provision.[20] At the time the WestCap Noteholder made its investment, it had access to the then-current Terms of Use (*i.e.*, version 7), which were publicly available. As provided for in section 1 of the Terms of Use, the Company may modify the Terms of Use at any time and in its sole discretion by posting revised terms on its website, which become effective immediately. Moreover, the Series B Preferred Holders did not negotiate for any changes to the Terms of Use as part of their investment.[21]

## II.    Case Background and Procedural History

13.    On July 13, 2022 (the "Petition Date"), certain of the Debtors[22] filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors commenced these chapter 11 cases to stabilize their business and consummate a comprehensive restructuring transaction that maximizes value for stakeholders.

14.    On the December 7, 2022, Debtors GK8 Ltd., GK8 UK Limited, and GK8 USA LLC (collectively, the "GK8 Debtors") each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. A detailed description of the facts and circumstances of the GK8 Debtors'

---

[19] Version 7 defines "Celsius" as "Celsius Network LLC and its Affiliates (collectively: "we," "our," "us", "Celsius," or the "Company")"; version 8 defines "Celsius" as "Celsius Network LLC and its Affiliates (collectively, "we," "our," "us", or "Celsius")." Aside from replacing the semicolon after "collectively" in version 7 with a comma, version 8 removes the term "Company" from the definition of "Celsius Network and its Affiliates." Otherwise, the definition of "Celsius" is identical in both version 7 and version 8.

[20] *See generally* Version 7 of Terms of Use.

[21] Version 7 of the Terms of Use was in effect from around August 3, 2021, to April 13, 2022.

[22] The Debtors that filed voluntary petitions on the Petition Date are: Celsius Network LLC; Celsius KeyFi LLC; Celsius Lending LLC; Celsius Mining LLC; Celsius Network Inc.; Celsius Network Limited; Celsius Networks Lending LLC; and Celsius US Holding LLC.

7

chapter 11 cases is set forth in the *Declaration of Christopher Ferraro, Director and Chief Financial Officer of GK8 Ltd., in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 1629].

15. The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. These chapter 11 cases have been consolidated for procedural purposes only and are jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket Nos. 53, 1648]. On July 27, 2022, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the Official Committee of Unsecured Creditors (the "Committee") [Docket No. 241]. On September 29, 2022, the Court entered an order approving the appointment of an examiner (the "Examiner") [Docket No. 923].

16. On September 22, 2022, the Series B Preferred Holders submitted their Equity Committee Motion, in which the Series B Preferred Holders discussed their argument that account holder claims should only apply to "customer-facing entities."[23]

17. On December 19, 2022, the Court entered the Scheduling Order, setting a schedule to resolve the Briefed Legal Issue. Accordingly, this Brief addresses the issue of which Debtors are liable to account holders under the Terms of Use, including whether the Terms of Use are unambiguous on such issue.

---

[23] *See* Equity Committee Motion ¶¶ 3, 30. The Series B Preferred Holders further supported their arguments in the *Reply in Further Support of the Requesting Holders' Motion for Entry of an Order Directing Appointment of an Official Preferred Equity Committee* [Docket No. 1120].

**Legal Argument**

I. **Each Debtor Entity Is Liable to Account Holders Based on the Plain Language of the Terms of Use.**

18. The Terms of Use is a contract governed by New York law,[24] and in New York, it is well settled that courts interpret contracts based on plain meaning of the terms of the contract.[25] When a contract's terms are unambiguous, courts apply them as written.[26] In addition, "[a] contract should be read as a whole to ensure that undue emphasis is not placed upon particular words and phrases. . . . Courts 'may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.'"[27] Finally, where a contract's terms are unambiguous, extrinsic and parol evidence should not be considered.[28]

---

[24] *See* Terms of Use § 33 (providing that the Terms of Use is "governed exclusively by the laws of the state of New York"). The Terms of Use have been governed by the laws of the state of New York since version 6.

[25] *In re Condado Plaza Acquisition LLC*, 620 B.R. 820, 831 (Bankr. S.D.N.Y. 2020) (finding that under New York Law, contracts are interpreted and enforced in accordance with their plain meaning and their clear and unambiguous terms); *see also*, *e.g.*, *In re Enron Corp.*, 292 B.R. 752, 762 (Bankr. S.D.N.Y. 2003) ("If the contract language is 'unambiguous,' this Court must enforce the plain, ordinary, and common meaning of those terms as a matter of law without reference to extrinsic evidence."); *Caminetti v. United States*, 242 U.S. 470, 485 (1917) ("When an act provides that it shall be known and referred to by a designated name, the name cannot be made the means of overriding the plain meaning of its other provisions"); *Ardestani v. INS*, 502 U.S. 129, 135 (1991) ("The starting point in statutory interpretation is the language of the statute itself . . . . The strong presumption that the plain language of the statute expresses congressional intent is rebutted only in rare and exceptional circumstances . . . .") (internal quotation marks omitted); *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989) ("The plain meaning of legislation should be conclusive, except in the rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.") (internal quotation marks omitted).

[26] *In re Enron Corp.*, 292 B.R. at 762.

[27] *Consedine v. Portville Cent. Sch. Dist.*, 907 N.E.2d 684, 689 (2009) (internal citations omitted).

[28] *See, e.g.*, *RJE Corp. v. Northville Indus. Corp.*, 329 F.3d 310, 314 (2d Cir. 2003); *Investors Ins. Co. of Am. v. Dorinco Reinsurance Co.*, 917 F.2d 100, 104 (2d Cir. 1990) ("Parol evidence may be admitted to explain a writing only when the terms of the writing itself are ambiguous."); *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 163 (1990) (citing *Intercontinental Plan., Ltd. v Daystrom, Inc.*, 24 N.Y.2d 372, 379 (1969)) ("It is well settled that 'extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face.'").

19. Thus, to answer the Briefed Legal Issue, the parties and the Court should rely on the plain language of the Terms of Use. That language establishes that Debtor Celsius Network LLC and its Affiliates—*i.e.*, all of the Debtor entities—are liable to account holders.

### A. Each Debtor Entity Is an "Affiliate" of Celsius Network LLC.

20. The Terms of Use govern the contractual relationship between "Celsius" and its account holders.[29] Under Section 1, "Celsius" is defined as "Celsius Network LLC ***and its Affiliates***."[30] "Affiliate," in turn, is defined in section 2 as "an entity that owns or controls, is owned or controlled by, or is or [*sic*] under common control or ownership with a party, where control is defined as the direct or indirect power to direct or cause the direction of the management and policies of such party, whether through ownership of voting securities, by contract, or otherwise."[31] This definition of "Affiliate" has been unchanged since version 2 of the Terms of Use, dated March 5, 2020.[32]

21. Here, each Debtor entity is an "Affiliate" of Celsius Network LLC because each Debtor entity in the Company's corporate structure is under the "common control [and] ownership" of Debtor Celsius Network, Inc. Thus, "Celsius Network LLC and its Affiliates" includes each of the Debtors, as demonstrated by the corporate organizational chart attached hereto as **Exhibit A**.

---

[29] Terms of Use § 1 ("Celsius Network LLC and its Affiliates (collectively, 'we,' 'our,' 'us', or 'Celsius' ) provide the following Terms of Use that, as they may be modified from time to time by Celsius in its sole discretion (the 'Terms') apply to our users ('you' or 'User(s)') and govern each User's access to, and use of, Celsius' products and services . . . .").

[30] *Id.* (emphasis added). There is no alternative definition of Celsius used in the Terms of Use.

[31] Terms of Use §§ 1, 2.

[32] Terms of Use § 2.

**B.      Each Debtor Entity is Liable to Account Holders Under the Clear and Unambiguous Language of the Terms of Use.**

22.     The contractual relationship, and attendant liability, between account holders and the defined term "Celsius"—*i.e.*, each Debtor entity—is reiterated throughout the Terms of Use. For example, section 4 of the Terms of Use states that an account holder's "Celsius Account allows [them] to view [their] balances in connection with the Services provided to [them] by ***Celsius*** and access the Services and conduct certain transactions online."[33]  In addition, when an account holder wished to "withdraw" or cancel a loan, "[s]uch repayment . . . terminate[d] in whole or in part [such account holder's] loan to ***Celsius***[.]"[34]  Moreover, section 21 of the Terms of Use provides that Celsius "may, from time to time, provide Services in connection with certain Eligible Digital Assets by different entities within the ***Celsius group***, and any change in and/or assignment by the contracting entity shall not be considered an amendment of these Terms."[35]

23.     Importantly, the Terms of Use explicitly address Celsius' liability to account holders if "Celsius becomes bankrupt":

> In the event that Celsius becomes bankrupt, enters liquidation or is otherwise unable to repay its obligations, any Eligible Digital Assets used in the Earn Service or as collateral under the Borrow Service may not be recoverable, and you may not have any legal remedies or rights in connection with Celsius' obligations to you other than your rights as a creditor of Celsius under any applicable laws.[36]

---

[33]   *Id.* § 4.A. (emphasis added).

[34]   *Id*. § 11 (emphasis added).

[35]   *Id*. § 21 (emphasis added).

[36]   *Id*. § 13.3.

11

In other words, the Terms of Use clearly preserve any rights an account holder may have as a creditor of *Celsius* in bankruptcy, which, as explained above, refers to every Debtor entity.[37]

24. In addition, every Debtor entity is liable to account holders under the plain language of section 25 of the Terms of Use. Section 25, titled, "Indemnification and Limitation of Liability; Legal Fees and Costs for Lawsuits," provides as follows:

> [I]n no event shall you [the account holder] have any recourse . . . with respect to our obligations, to or against any assets of any person or entity other than *Celsius*, including, without limitation, any member, shareholder, Affiliate, investor, employee, officer, director, agent, or advisor of *Celsius*.[38]

25. Thus, section 25 establishes that account holders are entitled to recover from "Celsius," which is every Debtor entity, as explained above.[39]

26. In the Equity Committee Motion, the Series B Preferred Holders point out that section 25 excepts from liability "any . . . Affiliate . . . of Celsius," and therefore, they contend, only the Customer-Facing Entities are liable to account holders.[40] But that argument ignores the definition of "Celsius," which expressly includes the *Affiliates* of Celsius Network. The Series B Preferred Holders' proposed construction would contradict that definition, effectively rewriting section 25 to read "Celsius Network" instead of the defined term "Celsius."

---

[37] A nearly identical provision was included in version 7 of the Terms of Use: "In the event that Celsius becomes bankrupt, enters liquidation or is otherwise unable to repay its obligations, you may not be able to recover or regain ownership of such Digital Assets, and other than your rights as a creditor of Celsius under any applicable laws, you may not have any legal remedies or rights in connection with Celsius' obligations to you." *See* Terms of Use § 13.iii (version 7).

[38] Terms of Use § 25 (emphasis added).

[39] *Id*. § 1 ("Celsius Network LLC and its Affiliates (collectively, 'we,' 'our,' 'us', or 'Celsius' ) provide the following Terms of Use that, as they may be modified from time to time by Celsius in its sole discretion (the 'Terms') apply to our users ('you' or 'User(s)') and govern each User's access to, and use of, Celsius' products and services . . . .").

[40] Equity Committee Motion, Exhibit 1.

12

27. Affiliates that are excluded from liability under Section 25 are those Affiliates of Celsius Network's Affiliates—*i.e.*, Affiliates of Affiliates of Celsius Network that are outside the Company's capital structure. For example, if an Affiliate of Celsius Network, such as Debtor Celsius Mining LLC, owned or controlled a different entity through a joint venture or contractual agreement, such entity would not necessarily be an "Affiliate" of Celsius Network.

28. An illustrative explanation of how the relevant provisions of the Terms of Use apply to the Company's organizational structure is depicted below:



29. For these reasons, the Terms of Use provide a clear and unambiguous answer to the Briefed Legal Issue: each Debtor has liability to account holders.

**II.     Reservation of Rights**

30. Because the Terms of Use are clear and unambiguous with respect to the Briefed Legal Issue, the Court does not need to consider any extrinsic evidence. The Scheduling Order, however, contemplates a discovery process and opportunity for parties to introduce extrinsic

13

evidence. The Debtors believe that the Series B Preferred Holders intend to introduce extrinsic evidence in addressing the Briefed Legal Issue. In the event the Court finds that the Terms of Use are ambiguous with respect to the Briefed Legal Issue, however, extrinsic evidence should only be permitted to resolve the meaning of the Terms of Use to the extent the Court determines there is any ambiguity.[41]

31.     The Debtors intend to respond to any and all arguments based on extrinsic evidence and reserve all rights related thereto, including, for the avoidance of doubt, introducing extrinsic evidence following the completion of discovery in accordance with the Scheduling Order. For the avoidance of doubt, nothing contained in this Brief is intended or should be construed as a waiver of the Debtors' rights to introduce any extrinsic evidence with respect to the Briefed Legal Issue or to contest the relevance of any extrinsic evidence submitted by any other party.

## Conclusion

32.     For the reasons set forth herein, the Court should find that each Debtor entity is liable to account holders pursuant to the Terms of Use.

---

[41] Parol evidence is only admissible to explain, not contradict, a term's meaning. *See, e.g.*, *Madeleine, L.L.C. v. Casden*, 950 F. Supp. 2d 685, 695 (S.D.N.Y. 2013) ("While extrinsic evidence generally may not vary or contradict the terms of a fully integrated document, it may be used to interpret facially ambiguous language in the contract.") (citing *Topps Co., Inc. v. Cadbury Stani S.A.I.C.,* 526 F.3d 63, 69 (2d Cir. 2008)).

| | |
|---|---|
| New York, New York<br>Dated: December 28, 2022 | /s/ Joshua A. Sussberg<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>Joshua A. Sussberg, P.C.<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone:  (212) 446-4800<br>Facsimile:  (212) 446-4900<br>Email:  jsussberg@kirkland.com<br><br> - and -<br><br>Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)<br>Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)<br>Christopher S. Koenig<br>Dan Latona (admitted *pro hac vice*)<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Telephone:  (312) 862-2000<br>Facsimile:  (312) 862-2200<br>Email:  patrick.nash@kirkland.com<br>ross.kwasteniet@kirkland.com<br>chris.koenig@kirkland.com<br>dan.latona@kirkland.com<br><br>*Counsel to the Initial Debtors and Debtors in Possession*<br><br>*Proposed Counsel to the GK8 Debtors and Debtors in Possession* |

**<u>Exhibit A</u>**

**Corporate Organizational Structure**

## *Organizational Structure*

**Legend:**
- Non-Filing Entity (light gray)
- Initial Filing Entity (dark blue)
- GK8 Filing Entity (light blue)

**Organizational hierarchy:**

- **Celsius Network Inc. (Del.)** [Initial Filing Entity]
  - **Celsius Networks Lending LLC (Del.)** [Initial Filing Entity]
  - **Celsius Network Limited (UK)** [Initial Filing Entity]
    - Celsius Network Europe d.o.o. Beograd (Serbia) [Non-Filing]
    - Celsius EU UAB (Lithuania) [Non-Filing]
    - Celsius Network IL Ltd (Israel) [Non-Filing]
      - Celsius Network IL Ltd. – Bulgaria Branch [Non-Filing]
      - **GK8 Ltd. (Israel)** [GK8 Filing Entity]
        - **GK8 USA LLC (Del.)** [GK8 Filing Entity]
        - **GK8 UK Limited (UK)** [GK8 Filing Entity]
    - **Celsius US Holding LLC (Del.)** [Initial Filing Entity]
      - **Celsius Mining LLC (Del.)** [Initial Filing Entity]
        - Celsius Mining IL Ltd (Israel) [Non-Filing]
      - **Celsius Network LLC (Del.)** [Initial Filing Entity]
      - **Celsius Lending LLC (Del.)** [Initial Filing Entity]
      - Celsius US LLC (Del.) [Non-Filing]
        - Celsius Management Corp (Del.) [Non-Filing]
      - Celsius Operations LLC (Del.) [Non-Filing]
      - **Celsius KeyFi LLC (Del.)** [Initial Filing Entity]
      - KN Media Manager, LLC (Del.) [Non-Filing]
    - Celsius Services CY Ltd (Cyprus) [Non-Filing]
    - Celsius (AUS) Pty Ltd. (Australia) [Non-Filing]
    - Celsius Network Limited (Gibraltar) [Non-Filing]