Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Initial Debtors and Debtors in Possession*

*Proposed Counsel to the GK8 Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## NOTICE OF FILING OF REJECTION MOTION BY CORE SCIENTIFIC, INC. AND DEBTORS' PRELIMINARY OBJECTION THERETO

**PLEASE TAKE NOTICE** that on December 28, 2022, in the Bankruptcy Court for the

Southern District of Texas, in the chapter 11 cases captioned *In re Core Scientific Inc., et al.*, Case

No. 22-90341 (the "Core Chapter 11 Cases"), Core Scientific, Inc. filed the *Debtors' Emergency*

*Motion for Entry of an Order Authorizing Rejection of Executory Contracts With Celsius*

---

[1]    The Debtors in these chapter 11 cases (the "Celsius Chapter 11 Cases"), along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

*Mining LLC* (the "Rejection Motion") at Core Docket No. 189, attached hereto as **Exhibit A**.

**PLEASE TAKE FURTHER NOTICE** that on the date hereof, the Debtors filed *Celsius Mining LLC's* Ex Parte *Motion for Entry of an Order Authorizing Celsius Mining LLC to File Under Seal the Preliminary Objection to the Debtors' Emergency Motion for Entry of an Order Authorizing Rejection of Executory Contracts with Celsius Mining LLC* (the "Sealing Motion") in the Core Chapter 11 Cases at Core Docket No. 215, seeking authority to redact and file under seal portions of the *Celsius Mining LLC's Preliminary Objection to the Debtors' Emergency Motion for Entry of an Order Authorizing Rejection of Executory Contracts with Celsius Mining LLC* (the "Preliminary Objection") which included materials designated by Core Scientific, Inc. as Confidential or Highly Confidential pursuant to the *Confidentiality Agreement and Stipulated Protective Order* (the "Stipulated Protective Order") and the *Addendum to Confidentiality Agreement and Stipulated Protective Order* (the "Addendum") filed in the Celsius Chapter 11 Cases at Docket No. 790 and Docket No. 1088.

**PLEASE TAKE FURTHER NOTICE** that on the date hereof, the Debtors filed a redacted version of the Preliminary Objection in the Core Chapter 11 Cases at Core Docket No. 211, attached hereto as **Exhibit B**, and provided an unredacted copy of the Preliminary Objection to counsel to Core Scientific, Inc. and to the Bankruptcy Court for the Southern District of Texas, which is attached hereto as **Exhibit C** and filed under seal consistent with the Stipulated Protective Order and Addendum.

**PLEASE TAKE FURTHER NOTICE** that copies of the Preliminary Objection and other pleadings filed in the Core Chapter 11 Cases may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/corescientific/.  You may also obtain copies of any pleadings

by visiting the Bankruptcy Court for the Southern District of Texas's website at https://www.txs.uscourts.gov/ in accordance with the procedures and fees set forth therein.

PLEASE TAKE FURTHER NOTICE that copies of the Stipulated Protective Order and Addendum and other pleadings filed in the Celsius Chapter 11 Cases may be obtained free of charge by visiting the website of Stretto at http://www.cases.stretto.com/celsius.  You may also obtain copies of any pleadings by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

*[Remainder of page intentionally left blank]*

New York, New York          /s/ Joshua A. Sussberg
Dated:  January 2, 2023     **KIRKLAND & ELLIS LLP**
                            **KIRKLAND & ELLIS INTERNATIONAL LLP**
                            Joshua A. Sussberg, P.C.
                            601 Lexington Avenue
                            New York, New York 10022
                            Telephone:    (212) 446-4800
                            Facsimile:    (212) 446-4900
                            Email:        jsussberg@kirkland.com

                             - and -

                            Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
                            Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
                            Christopher S. Koenig
                            Dan Latona (admitted *pro hac vice*)
                            300 North LaSalle Street
                            Chicago, Illinois 60654
                            Telephone:    (312) 862-2000
                            Facsimile:    (312) 862-2200
                            Email:        patrick.nash@kirkland.com
                                          ross.kwasteniet@kirkland.com
                                          chris.koenig@kirkland.com
                                          dan.latona@kirkland.com


                            *Counsel to the Initial Debtors and Debtors in Possession*
                            *Proposed Counsel to the GK8 Debtors and Debtors in Possession*

4

**<u>Exhibit A</u>**

**Rejection Motion**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § § | **Chapter 11** |
| **CORE SCIENTIFIC, INC.,** *et al.,* | § § | **Case No. 22-90341 (DRJ)** |
| | § § | **(Jointly Administered)** |
| **Debtors.**[1] | § § | **(Emergency Hearing Requested)** |
| | § | |
| | § | |

**DEBTORS' EMERGENCY MOTION FOR ENTRY**
**OF AN ORDER AUTHORIZING REJECTION OF EXECUTORY CONTRACTS**
**WITH CELSIUS MINING, LLC**

---

**EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN 11:00 A.M. (PREVAILING CENTRAL TIME) ON TUESDAY, JANUARY 3, 2023.**

**IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**A HEARING WILL BE CONDUCTED ON THIS MATTER ON TUESDAY, JANUARY 3, 2023 AT 11:00 A.M. (PREVAILING CENTRAL TIME) IN COURTROOM 400, 4TH FLOOR, 515 RUSK AVENUE, HOUSTON, TEXAS 77002.**

**YOU MAY PARTICIPATE IN THE HEARING EITHER IN PERSON OR BY AN AUDIO AND VIDEO CONNECTION.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

> **AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT 832-917-1510. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE JONES'S CONFERENCE ROOM NUMBER IS 205691. VIDEO COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM. CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK ON JUDGE JONES'S HOME PAGE. THE MEETING CODE IS "JUDGEJONES". CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**
>
> **HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF BOTH ELECTRONIC AND IN-PERSON HEARINGS. TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE JONE'S HOME PAGE. SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

The Debtors, respectfully represent as follows in support of this motion (the "**Motion**"):

### Background

1. On December 21, 2022 (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases. The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**").

2. The Debtors, together with their non-debtor affiliates (collectively, the "**Company**"), are one of the largest blockchain infrastructure, hosting provider, and digital asset mining companies in North America, with fully operational data centers in Texas, Kentucky,

2

North Carolina, North Dakota, and Georgia. The Debtors provide hosting solutions for third parties, including Celsius Mining, LLC, f/k/a Celsius Core, LLC ("**Celsius**"), and also operate their own digital asset mining machines.

3.     Additional information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Michael Bros in Support of the Debtors' Chapter 11 Petitions and First Day Relief*, (the "**First Day Declaration**") (Docket No. 5), which is incorporated by reference herein.

4.     In support of the Motion, the Debtors submit the *Declaration of Michael Bros in Support of Debtors' Emergency Motion for Entry of an Order Authorizing Rejection of Executory Contracts with Celsius Mining, LLC* (the "**Bros Rejection Declaration**"), attached hereto as **Exhibit B**.

5.     In connection with the Debtors' efforts to re-evaluate their business plan based on current economic conditions and develop a chapter 11 plan, the Debtors and their advisors are undertaking an analysis of all of the Debtors' unexpired executory contracts. For the reasons set forth below and in the Bros Rejection Declaration, the Debtors have determined, in their business judgment, to reject the Celsius Contracts.

**Relief Requested**

6.     Pursuant to sections 365(a) and 105(a) of title 11 of the Bankruptcy Code and Bankruptcy Rules 6004 and 6006, the Debtors request entry of an order, substantially in the form annexed hereto as **Exhibit A** (the "**Proposed Order**"), approving the Debtors' rejection of all contracts between the Debtors and Celsius relating to hosting, including the following agreements effective upon entry of the Proposed Order: (i) the 2020 Master Services Agreement (the "**2020 MSA**") by and between Debtor Core Scientific Operating Company (formerly known as Core Scientific, Inc.) ("**Core**") and Celsius, (ii) the 2021 MSA between Core and Celsius (the

3

"**2021 MSA**"), and (iii) Order Nos. 1–10 to the 2020 MSA[2] and Order No. 1A to the 2021 MSA
(the "**Orders**" and, together with the 2020 MSA and 2021 MSA, and any other contracts between
the Debtors and Celsius relating to hosting, the "**Celsius Contracts**").

      7.     For the reasons set forth in more detail below, the Debtors request that the
Court hear this motion on an emergency basis. For each day that the Debtors continue performing
under the Celsius Contracts, the Debtors anticipate losing a projected $28,840 in power costs that
Celsius improperly refuses to pay. Compounding this loss, the Celsius Contracts also prevent the
Debtors from using the hosting capacity currently allocated to the Celsius machines—which is at
a premium given that the Debtors do not have enough hosting capacity to cover demand—for other
profitable opportunities that are immediately available to the Debtors and would generate an
estimated $2 million per month in incremental revenue for the Debtors' estates. As a result,
rejecting the Celsius Contracts will also have a positive impact on the Debtors' liquidity.

**Jurisdiction**

      8.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.
§ 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this
Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**The Celsius Contracts**

      9.     In December 2020, the Debtors and Celsius entered into the 2020 MSA, a
hosting services agreement whereby the Debtors agreed to provide certain services to Celsius in
connection with hosting Celsius' cryptocurrency data mining machines. Bros Rejection Decl. ¶ 5.
In December 2021, the Debtors entered into the 2021 MSA, another hosting services agreement
with Celsius. Bros Rejection Decl. ¶ 5. Pursuant to the 2020 MSA, the Debtors and Celsius also

---

[2] Order Nos. 5 and 8 have already terminated. The Debtors move to reject them only to the extent that Celsius disputes
that they have terminated.

4

executed ten separate agreements—effectively purchase orders—that are generally governed by the MSA but also set forth specific terms applicable to each order, including the number of machines that the Debtors will host for Celsius. Bros Rejection Decl. ¶ 5. Similarly, pursuant to the 2021 MSA, the Debtors executed Order No. 1A. Bros Rejection Decl. ¶ 5. Pursuant to the Celsius Contracts, the Debtors are currently hosting approximately 37,536 of Celsius' mining machines at various of the Debtors' facilities. Bros Rejection Decl. ¶ 6.

10. Mining machines are powerful computers that solve complex equations associated with the use and creation of cryptocurrency coins. Bros Rejection Decl. ¶ 7. Hosting mining machines involves industrial-scale power delivery and cooling systems, trained personnel, specialized equipment, and a tremendous amount of power. *Id*. To host mining machines, the Debtors have sophisticated, purpose built data centers across several states, where the Debtors host mining machines for approximately fifteen customers and also operate their own machines. *Id*. Demand for hosting capacity far exceeds the Debtors' hosting capacity, meaning that the Debtors have a queue of machines—including the Debtors' own machines—waiting for hosting capacity to become available at the Debtors' facilities. *Id*.

11. Because power costs are variable and mining machines consume so much power, the Debtors' hosting agreements expressly allow the Debtors, in their discretion, to pass through increased power costs to their customers. Bros Rejection Decl. ¶ 8. This means that in addition to the hosting services rate that they pay, Celsius and the Debtors' other customers are all responsible for covering any increased power costs that the Debtors decide, in their sole discretion, to pass through to their customers. Bros Rejection Decl. ¶ 8. When power costs spiked dramatically around the second quarter of 2022, the Debtors began passing through these higher power costs to customers, including Celsius. *See* Bros Rejection Decl. ¶ 9.

5

12.     Celsius—which filed for bankruptcy on July 13, 2022—asserts it is not responsible for paying increased power costs and has refused to pay all power pass through costs that have been invoiced subsequent to its bankruptcy filing.  Bros Rejection Decl. ¶ 10.  On September 28, 2022, Celsius brought a motion to enforce its automatic stay in its bankruptcy case. Celsius sought an order holding the Debtors in contempt for violating the automatic stay, directing the Debtors to perform under the hosting services agreements, and requiring the Debtors to immediately return any "improperly" invoiced power pass through amounts and cease collections efforts for those charges.  In response, the Debtors cross-moved to lift the automatic stay to allow the Debtors to exercise their rights and remedies under the hosting services agreements, asserting that Celsius owed the Debtors the power pass through costs.  A hearing was scheduled to be held on November 18, 2022, but was postponed while the companies were negotiating a potential resolution to the dispute. The hearing was taken off calendar and, prior to the Debtors filing for chapter 11 protection, a status conference was scheduled for January 10, 2023.[3]

13.     Because the Debtors owe these amounts directly to the power utilities, the Debtors have had no choice but to cover Celsius' increased power costs, including during the pendency of these proceedings.  *Id*.  Covering Celsius' increased power costs has already cost the Debtors almost $7.8 million[4] to date.  Bros Rejection Decl. ¶ 11.  This amount excludes the December power pass through costs that are currently accruing daily.  *Id*.  The Debtors cannot afford to shoulder the burden of Celsius' unpaid power costs, which is one factor supporting the

---

[3] Celsius has also included those contracts in a motion to assume and assign to a yet-to-be named buyer it filed in its chapter 11 cases. The deadline for objections to that motion is January 18, 2023.

[4] This amount includes all power pass through charges to Celsius, prepetition and postpetition in their case, through November 31, 2022. This also includes interest on the overdue power pass through amounts (Core charged Celsius $97,890.38 interest in the November 2022 invoice and $74,637.20 in the December 2022 invoice).

Debtors' business judgment that rejecting the Celsius Contracts is in the best interests of the Debtors' estates.  Bros Rejection Decl. ¶ 12.[5]

14.    Another sound business reason for rejecting the Celsius Contracts is that continuing to host the Celsius machines prevents the Debtors from using that hosting space for (1) a customer that will pay a higher hosting fee and power costs that the Debtors pass through, or (2) their own mining activity.  Bros Rejection Decl. ¶ 13.  In the cryptocurrency industry, there is not enough capacity to meet the demand for hosting mining machines.  *Id*.  The capacity dedicated to hosting the Celsius machines is therefore valuable to the Debtors.  *Id*.  Without the obligation to continue hosting Celsius machines, the Debtors could immediately dedicate that premium hosting space to another customer and generate an estimated $2 million in incremental revenue per month. *Id*.  Alternatively, the Debtors could immediately use that capacity for its own mining machines and generate an estimated $2 million in incremental revenue per month.   *Id*.   This would immediately infuse cash into the Debtors' estates and thus preserve value.  *Id*.

### **Relief Requested Should Be Granted**

15.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 521 (1984); *Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co*., 83 F.3d 735, 741 (5th Cir. 1996) (citing *In re Murexco Petroleum, Inc.*, 15 F.3d 60, 62 (5th Cir. 1994)). "The purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession to use valuable property of the estate and to 'renounce title to and abandon burdensome property.'" *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures*

---

[5] This Motion does not resolve the issue of whether the power pass through charges are owed under the Celsius Contracts. That issue remains extant and will need to be separately resolved.

*Corp.*), 4 F.3d 1095, 1098 (2d Cir. 1993); *see also Bildisco & Bildisco*, 465 U.S. at 528 ("[T]he

authority to reject an executory contract is vital to the basic purpose to a Chapter 11 reorganization,

because rejection can release the debtor's estate from burdensome obligations that can impede a

successful reorganization."); *In re Murexco Petrol.*, 15 F.3d at 62 (noting that section 365 "allows

a trustee to relieve the bankruptcy estate of burdensome agreements which have not been

completely performed"); *In re Exide Techs.*, 607 F.3d 957, 967 (3d Cir. 2010) ("Courts may use

§ 365 to free a [debtor] from burdensome duties that hinder its reorganization.").[6]

16.     Bankruptcy courts apply the "business judgment" standard to determine

whether to authorize the rejection of an executory contract. *See Matter of J.C. Penney Direct

Marketing Servs., LLC*, 50 F.4th 532, 534 (5th Cir. 2022) ("A bankruptcy court reviews a debtor's

decision to . . . reject an executory contract under the deferential 'business judgment' standard.")

(citing *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, —U.S.—, 139 S. Ct. 1652, 1658

(2019)); *see also In re Pilgrim's Pride Corp.*, 403 B.R. 413, 422 (Bankr. N.D. Tex. 2009) ("The

general rule is that the decision to reject a given contract should be left to the trustee's (or debtor

in possession's) sound business judgment.").

17.     The "business judgment" standard requires only a showing that either

assumption or rejection of the executory contract or unexpired lease will benefit the debtor's estate.

*See In re Idearc Inc.*, 423 B.R. 138, 162 (Bankr. N.D. Tex. 2009) (stating that the business

---

[6] Courts have held that where both parties to an agreement are debtors, the automatic stay in one debtor's case does not prevent the other debtor from rejecting the contract between the two parties; also, rejection trumps assumption. *See In re Railroad Co., LLC*, 562 B.R. 481, 487 (Bankr. D.N.M. December 2, 2016)("A number of cases have held that a tenant debtor's attempt to assume a lease does not affect the landlord debtor's ability to reject the lease") (first citing *In re Noranda Aluminum, Inc.*, 549 B.R. 725 (Bankr. E.D. Mo. Mar. 31, 2016); and then citing *In re Old Carco*, 406 B.R. 180 (Bankr. S.D.N.Y June 19, 2009)).  Therefore, this Court's decision on the Debtors' motion to reject the Celsius Contracts takes priority over Celsius's motion to assume the same in its own bankruptcy.  Further, relief from Celsius's automatic stay is not necessary. *See In re Old Carco LLC*, 406 B.R. at 212 ("the Debtors were not required to seek relief from the automatic stay in another debtor's bankruptcy case before exercising their right to reject a contract with that debtor in this case").

judgment standard only "requires a showing that the proposed course of action will be advantageous to the estate." (citation omitted)). Further, under the business judgment standard, "[a] debtor's decision to reject an executory contract must be summarily affirmed unless it is the product of 'bad faith, or whim or caprice.'" *In re Pilgrim's Pride Corp.*, 403 B.R. at 422 (citing *Wheeling–Pittsburgh Steel Corp. v. W. Penn Power Co.* (*In re Wheeling–Pittsburgh Steel Corp.*), 72 B.R. 845, 849–50 (Bankr. W.D. Pa. 1987)).

18. In applying the business judgment standard, bankruptcy courts give deference to a debtor's decision to assume or reject executory contracts. *See, e.g., In re Pisces Energy, LLC*, Case No. 09-36591-H5-11, 2009 WL 7227880, at *6 (Bankr. S.D. Tex. Dec. 21, 2009) ("Courts apply the 'business judgment test,' which requires a showing that the proposed course of action will be advantageous to the estate and the decision be based on sound business judgment."); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39–40 (3d Cir. 1989) (affirming the rejection of a service agreement as a sound exercise of the debtor's business judgment when the bankruptcy court found that such rejection would benefit the debtors' estate); *In re Idearc Inc.*, 423 B.R. at 162 (stating that the business judgment standard only "requires a showing that the proposed course of action will be advantageous to the estate." (citation omitted)).

## I.    The Celsius Contracts Are Executory Contracts

19. A contract is executory if "performance remains due to some extent on both sides" and "at the time of the bankruptcy filing, the failure of either party to complete performance would constitute a material breach of the contract, thereby excusing the performance of the other party." *RPD Holdings, L.L.C. v. Tech Pharmacy Servs. (Matter of Provider Meds, L.L.C.)*, 907 F.3d 845, 851 (5th Cir. 2018), *cert. denied sub nom. RPD Holdings, L.L.C. v. Tech Pharmacy Servs.*, 139 S. Ct. 1347 (2019) (citation omitted); *see also Bonneville Power Admin. v. Mirant Corp. (In re Mirant Corp.)*, 440 F.3d 238, 246 n.13 (5th Cir. 2006) ("[T]he legislative history of

9

§ 365(a) indicates that Congress intended the term [executory contract] to mean a contract 'on which performance remains due to some extent on both sides.'") (citation omitted).

20.     Here, material performance remains due from both the Debtors and Celsius. Under the Celsius Contracts, the Debtors are obligated to deploy the Celsius machines, and Celsius must pay the Debtors for the Celsius machines the Debtors deployed and are hosting, including for power costs in connection therewith.

21.     Because both the Debtors and Celsius have ongoing obligations to maintain their business relationship pursuant to the Celsius Contracts, the contracts are executory.

## II.     Rejection of the Celsius Contracts Is a Sound Exercise of the Debtors' Reasonable Business Judgment

22.     The Debtors and their advisors have analyzed the Debtors' executory contracts and have determined, in their reasonable business judgment, to reject the Celsius Contracts.  Bros Rejection Decl. ¶¶ 11–14.  The Debtors have determined that continuing to incur expenses in connection with hosting the Celsius machines is draining estate resources with no benefit.  *Id*.  Based on projections for the December power costs, rejecting the Celsius Contracts will save the Debtors approximately $894,040 in December, approximately $28,840 per day.  Bros Rejection Decl. ¶ 11.  Continuing with the Celsius Contracts, on the other hand, does not benefit the estate, as the Debtors are losing money every day by covering the increased power costs that Celsius refuses to pay.  *See* Bros Rejection Decl. ¶¶ 11–14.  As it stands, Celsius already owes the Debtors approximately $7.8 million through November 31, 2022 for power costs that Celsius is obligated to cover but has refused to pay.  Bros Rejection Decl. ¶ 11.

23.     Additionally, rejecting the Celsius Contracts will allow the Debtors to profit from the hosting space currently dedicated to the Celsius machines.  Bros Rejection Decl. ¶ 13.  If the Debtors use the space currently occupied by Celsius' machines for other customers—which are willing to pay a higher hosting rate and any power cost increases that the Debtors pass

through—the Debtors will generate approximately $2 million per month in incremental revenue for the estates. *Id.* Alternatively, if the Debtors use that capacity for their own machines, assuming that those machines generate approximately 400 bitcoins per month at an assumed bitcoin price of $16,700, that will generate approximately $2 million per month in incremental revenue for the estates. *Id.* Either of these options, which are both realistic and possible for the Debtors to execute in short order, will generate approximately $65,000 in revenue a day for the Debtors' estates. *Id.* In short, rejecting the Celsius Contracts will not only protect the Debtors from losing money covering Celsius' power costs, but rejection will also allow the Debtors to also immediately generate additional value for the estates.[7]

24.     In light of the foregoing, the Debtors have determined, in their reasonable business judgment, to reject the Celsius Contracts. The Debtors respectfully request that the Court, on an emergency basis, approve the rejection of the Celsius Contracts effective immediately upon entry of the Proposed Order pursuant to sections 365 and 105(a) of the Bankruptcy Code and Rule 6006 of the Bankruptcy Rules in the manner requested herein.

## III.    Court Should Establish a Bar Date For Claims

25.     The Debtors request that the Court set a deadline for filing proofs of claims related to damages, if any, arising from the rejection of the Celsius Contracts. The Debtors request that such deadline be the later of the general bar date or thirty (30) days from the Court's decision on the motion.

## Emergency Consideration

26.     As demonstrated above, approval of this Motion on an emergency basis is necessary so that the Debtors can avoid the daily loss of $28,840 in power costs as a result of the

---

[7] Upon rejection, the Debtors intend to work with Celsius to coordinate the return of its mining equipment.

Celsius Contracts and use the resulting hosting capacity for other profitable opportunities that are immediately available to the Debtors and would generate an estimated $2 million per month in incremental revenue for the Debtors' estates.

## Reservation of Rights

27.     Nothing contained in this Motion or any actions taken by the Debtors pursuant to the relief granted is intended or should be construed as: (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law, (iii) a waiver or limitation of the Debtors' right to assert, at a later date, that the Celsius Contracts are not executory contracts, or (iv) a concession or evidence that the Celsius Contracts have not expired, been terminated, or is otherwise currently not in full force and effect.

## Request for Bankruptcy Rule 6004 Waivers

28.     The Debtors request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h). As explained above, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors. Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such stay applies.

## No Previous Request

29.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated:  December 28, 2022
       Houston, Texas

Respectfully submitted,

  /s/  Alfredo R. Perez
WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email: Alfredo.Perez @weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C. (*pro hac vice* pending)
Ronit J. Berkovich (*pro hac vice* pending)
Moshe A. Fink (*pro hac vice* pending)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:   Ray.Schrock@weil.com
          Ronit.Berkovich@weil.com
          Moshe.Fink@weil.com

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

13

## Certificate of Service

I hereby certify that on December 28, 2022, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.


    */s/ Alfredo R. Perez*
WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Email: Alfredo.Perez @weil.com

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| CORE SCIENTIFIC, INC., *et al.*, | § § | Case No. 22-90341 (DRJ) |
| | § § | (Jointly Administered) |
| Debtors.[1] | § § | |

## ORDER AUTHORIZING REJECTION
## OF EXECUTORY CONTRACTS WITH
## <u>CELSIUS MINING, LLC</u>

Upon the motion, dated December 28, 2022 (the "**Motion**"),[2] of Core Scientific, Inc., and its affiliated debtors in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), for entry of an order approving rejecting the Celsius Contracts, immediately effective and enforceable upon its entry, as more fully set forth in the Motion; and upon consideration of the Bros Rejection Declaration; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §1334; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and it appearing that venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided, and it appearing that no other or further notice need be provided; and the Court having reviewed the Motion; and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

all objections, if any, to the Motion having been withdrawn, resolved, or overruled; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interest of the Debtors and their respective estates and creditors; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1. Pursuant to sections 365 and 105(a) of the Bankruptcy Code and Bankruptcy Rules 6004 and 6006, the Celsius Contracts are deemed rejected effective immediately upon entry of this Order.

2. The deadline for filing proofs of claims related to damages, if any, arising from the rejection of the Celsius Contracts shall be the later of the general bar date or thirty (30) days from this Order.

3. Nothing contained in the Motion, this Order, or any actions taken by the Debtors pursuant to the relief granted in this Order shall be construed as: (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law, (iii) a waiver or limitation of the Debtors' right to assert, at a later date, that the Celsius Contracts are not executory contracts, or (v) a concession or evidence that the Celsius Contracts have not expired, been terminated, or are otherwise currently not in full force and effect.

4. The requirements of Bankruptcy Rule 6004(a) are waived.

5. Notwithstanding the provisions of Bankruptcy Rule 6004(h), this Order shall be immediately effective and enforceable upon its entry.

6.      The Debtors are authorized to take all steps necessary or appropriate to carry out the relief granted in this Order.

7.      This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

Dated: _____, 2022
        Houston, Texas

_____
UNITED STATES BANKRUPTCY JUDGE

**Exhibit B**

**Michael Bros Rejection Declaration**

Case 22-90341 Document

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | § | |
|---|---|---|
| In re | § | Chapter 11 |
| | § | |
| CORE SCIENTIFIC, INC., | § | Case No. 22-90341 (DRJ) |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |
| | § | (Emergency Hearing Requested) |
| | § | |

## DECLARATION OF MICHAEL BROS
## IN SUPPORT OF DEBTORS' EMERGENCY MOTION FOR ENTRY OF
## AN ORDER AUTHORIZING REJECTION OF EXECUTORY CONTRACTS WITH
## CELSIUS MINING LLC

I, Michael Bros, pursuant to section 1746 of title 28 of the United States Code,
hereby declare under penalty of perjury that the following is true to the best of my knowledge,
information, and belief:

### Background

1.      I am the Senior Vice President, Capital Markets & Acquisitions of the
Debtors.  I have served in this capacity since January 2022.  Before that, starting in December
2018, I was the Debtors' Vice President of Corporate Development. I am knowledgeable about,
and familiar with, the Debtors' business and financial affairs.

2.      I submit this Rejection Declaration in support of *Debtors' Emergency
Motion for Entry of an Order Authorizing Rejection of Executory Contracts with Celsius Mining
LLC.*[2]  I am authorized to submit this Declaration on behalf of the Debtors.

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are as follows: Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific
Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327);
American Property Acquisitions, LLC (0825); Starboard Capital LLC (6677); RADAR, LLC (5106); American
Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198).  The Debtors'
corporate headquarters [and service address] is [210 Barton Springs Road, Suite 300, Austin, Texas 78704].

[2]  Capitalized terms have the meanings ascribed to such terms in the Motion.

3.      The facts set forth in this Rejection Declaration are based on my personal
knowledge, my review of relevant documents (including the Debtors' books and records),
information provided to me by employees working under my supervision, my opinion based upon
experience, knowledge, and information concerning the Debtors' operations, financial condition,
and business plans. If called upon to testify, I would testify to the facts set forth in this Rejection
Declaration.

**Facts Relevant to Motion**

A.      **The Debtors' Business**

4.      The Debtors, together with their non-debtor affiliates, are one of the largest
blockchain infrastructure, hosting provider, and digital asset mining companies in North America,
with fully operational data centers in Georgia, Kentucky, North Carolina, North Dakota, and
Texas.  The Debtors regularly contract with third parties to provide hosting services for the third
parties' digital asset mining machines, in addition to operating their own digital asset mining
machines.  One of the third parties with whom the Debtors have contracted is Celsius.

A.      **The Celsius Contracts**

5.      In December 2020, the Debtors and Celsius entered into the 2020 MSA, a
hosting services agreement whereby the Debtors agreed to provide certain services to Celsius in
connection with hosting Celsius' cryptocurrency data mining machines.  In December 2021, the
Debtors entered into the 2021 MSA, another hosting services agreement with Celsius.  Pursuant
to the 2020 MSA, the Debtors and Celsius also executed ten separate agreements—effectively
individual purchase orders—that are generally governed by the MSA but also set forth specific
terms applicable to each order, including among other things, the number of machines that the
Debtors will host for Celsius.  Two of those orders, Nos. 5 and 8, have already terminated.
Pursuant to the 2021 MSA, the Debtors executed Order No. 1A.

6.     Pursuant to the Celsius Contracts, the Debtors are currently hosting 37,536 of Celsius' mining machines at various of Debtors' facilities.

7.     Mining machines are powerful computers that solve complex equations associated with the use and creation of cryptocurrency coins.  Hosting these machines involves industrial-scale power delivery and cooling systems, trained personnel, specialized equipment, and a tremendous amount of power.  To host mining machines, the Debtors have sophisticated, purpose built data centers across several states, where the Debtors host mining machines for approximately fifteen customers and also operate their own machines.  Demand for hosting capacity far exceeds the Debtors' hosting capacity, meaning that the Debtors always have a queue of machines—including the Debtors' own machines—waiting for hosting space to become available at the Debtors' facilities.

8.     Because power costs are variable and mining machines consume so much power, the Debtors' hosting agreements expressly allow the Debtors, in their sole discretion, to pass through increased power costs to their customers.  This means that in addition to the hosting services rate that they pay, Celsius and the Debtors' other customers are all responsible for covering any increased power costs that the Debtors decide to pass through to their customers.

9.     When power costs increased during the second quarter of 2022, the Debtors began passing through these higher power costs to their customers, including Celsius.

10.     Celsius—who filed for bankruptcy on July 13, 2022—claims it is not responsible for paying increased power costs and has refused to pay all power pass through costs that have been invoiced subsequent to its bankruptcy filing.  Because the Debtors owe these amounts directly to the power utilities, the Debtors have had no choice but to continue covering Celsius' increased power costs and then charge them to Celsius in their discretion.

11.     Covering Celsius' increased power costs has cost the Debtors approximately $7.8 million to date.  This includes interest on overdue power pass through amounts—Core charged Celsius $97,890.38 interest in a November 2022 invoice and $74,637.20 in a December 2022 invoice—but excludes the December power pass through costs that are currently accruing daily.  Based on projections for the December power costs, rejecting the Celsius Contracts will save the Debtors an estimated $894,040 in December, accruing at around $28,840 per day.

12.     The Debtors cannot afford to continue shouldering the burden of Celsius' unpaid power costs.  For this reason, the Debtors have concluded, in their business judgment, that rejecting the Celsius Contracts is in the best interests of the Debtors' estates.

13.     Another sound business reason for rejecting the Celsius Contracts is that continuing to host the Celsius machines prevents the Debtors from profiting on that hosting space that is currently allocated to Celsius.  In the cryptocurrency industry, there is not enough capacity to meet the demand for hosting mining machines.  The capacity dedicated to hosting the Celsius machines is therefore valuable to the Debtors.  Without the obligation to continue hosting Celsius machines, the Debtors could immediately dedicate that premium hosting space to another customer—who is willing to pay a higher hosting rate and any power cost increases that the Debtors pass through—and generate an estimated $2 million in incremental revenue per month. Alternatively, the Debtors could immediately use that hosting space for their own mining machines, assuming that those machines generate approximately 400 bitcoins per month at an assumed bitcoin price of $16,700, which will generate an estimated $2 million in incremental revenue per month.  This would immediately infuse cash into the Debtors' estates—approximately $65,000 in revenue a day—and thus preserve value.

5

22-10964-mg   Doc 22-1   Filed 01/03/23   Entered 01/03/23 20:04:43   Main Document
Pg 28 of 54

14.     The Debtors have determined, in the exercise of their business judgment, that it is in their best interest to reject the Celsius Contracts.  Because Celsius improperly refuses to pay certain power costs, the Debtors anticipate continued and substantial and continued loses to flow from the Celsius Contracts.  Compounding this loss, the Celsius Contracts also prevent the Debtors from using the premium capacity that is dedicated to the Celsius machines for other profitable opportunities, like hosting for other customers or self-mining with machines that the Debtors already own but cannot deploy due to current capacity limitations.

15.     Based on the foregoing, the Debtors have concluded that rejecting the Celsius Contracts is in the best interest of the Debtors' estate and is a sound exercise of the Debtors' business judgment.

16.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: December 28, 2022
       Bellevue, Washington

       /s/ Michael Bros
       Michael Bros
       Senior Vice President Capital Markets & Acquisitions
       Core Scientific, Inc.

**Exhibit B**

**Redacted Preliminary Objection**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| CORE SCIENTIFIC, INC., *et al.*,[1] | ) Case No. 22-90341 (DRJ) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) |

## CELSIUS MINING LLC'S PRELIMINARY OBJECTION TO THE DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER AUTHORIZING REJECTION OF EXECUTORY CONTRACTS WITH CELSIUS MINING LLC

Celsius Mining LLC and its debtor affiliates (collectively, "Celsius") hereby file this preliminary objection (this "Objection") in response to the *Debtors' Emergency Motion for Entry of an Order Authorizing Rejection of Executory Contracts With Celsius Mining LLC* [Docket No. 189] (the "Rejection Motion"). In support of this Objection, Celsius states as follows:

### Objection[2]

### I.  The Rejection Motion Should Not Go Forward on January 3rd

1. Celsius does not oppose the relief sought in the Rejection Motion—indeed, Celsius believes the Celsius Contracts are even worse for Core economically than what Core believes. Further, Celsius will agree that Core can power down all of the Celsius rigs on January 3rd to stop the losses that Core alleges it suffers from continuing to perform under the Celsius Contracts. That

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198).  The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Rejection Motion or the First Day Declaration, as applicable.

said, Celsius does not believe it is appropriate for the Rejection Motion to proceed at the requested "emergency" hearing on January 3rd. In absence of an agreement between Celsius and Core before the January 3rd hearing, Celsius requests that the motion be adjourned to Core's "second day hearing" on January 23rd.

2.        *First*, this purported "emergency" is entirely of Core's own making and does not warrant a hearing on just two business days' notice. On the Petition Date, Core was aware of all the facts underlying the Rejection Motion, but Core waited until two days before a holiday weekend before filing the Rejection Motion on an "emergency" basis. This shortened notice is particularly problematic for Celsius, which is a debtor in possession in its own chapter 11 case pending in the Bankruptcy Court for the Southern District of New York[3] (the "Celsius Chapter 11 Case"). Celsius has its own key stakeholders, including its own unsecured creditors' committee, that must be consulted before Celsius can proceed with fully responding to the Rejection Motion, and two business days' notice is not sufficient time for those discussions to occur.

3.        *Second*, Celsius believes that Core's act of filing the Rejection Motion is a technical violation of the automatic stay in Celsius' own chapter 11 case.[4] Celsius understands that Core will be able to demonstrate that rejection of the Celsius Contracts is appropriate, but Celsius

---

[3]    Hereinafter referred to as the "SDNY Bankruptcy Court."

[4]    In a similar situation in this District, in *Sherwin Alumina*, the first debtor (Sherwin) filed a motion to assume an executory contract, and the counterparty (Noranda Bauxite Limited) filed for chapter 11 in the Eastern District of Missouri, and Noranda filed a lift-stay motion in Sherwin's chapter 11 case in order to obtain authority for Noranda to reject the contract. *See Emergency Motion of Sherwin Alumina Company, LLC, et al., for Entry of an Order Authorizing the Debtors (I) to Assume the Noranda Agreement and (II) to Satisfy Obligations Under the Noranda Agreement and Enforce the Automatic Stay, In re Sherwin Alumina Co. LLC*, Case No. 16-20012, (Bankr. S.D. Tex. Jan. 11, 2016) (the "Sherwin Docket") [Sherwin Docket No. 21]; *Debtors' Motion for an Order Pursuant to Sections 105(A) and 365 of the Bankruptcy Code and Bankruptcy Rule 6004 Authorizing the Rejection of Certain Executory Contracts* Nunc Pro Tunc *to the Petition Date, In re Noranda Aluminum Inc*., Case No. 16-10083, (Bankr. E.D. Mo. February 8, 2016) (the "NBL Docket") [NBL Docket No. 52]; *Noranda Bauxite Limited's Expedited Motion for Relief from the Automatic Stay Pursuant to 11 U.S.C. §§ 105(A) and 362(D)* [Sherwin Docket No. 234].

22-10964 Case 22-90341 Document 4807 Filed 01/03/23 Entered 01/03/23 00:44:43 Main Document in TXSB on 01/03/23 Page 32 of 54

Pg 32 of 54

believes that, because the Celsius Contracts are property of the Celsius estate, its own automatic stay must be lifted pursuant to an order from the SDNY Bankruptcy Court before the Rejection Motion can be granted.[5] Furthermore, the over 37,000 rigs related to the Celsius Contracts are plainly property of Celsius' bankruptcy estate, with respect to which the SDNY Bankruptcy Court has exclusive jurisdiction. Celsius brought its own motion against Core in the Celsius Chapter 11 Case, seeking to compel Core to comply with the parties' executory contract.[6] As noted above, Celsius will agree that Core can power down the Celsius rigs immediately and is not looking to profit from any procedural delay. That said, Celsius respectfully submits that respect for the Celsius Chapter 11 Case requires a fair process by which Celsius' creditor constituents receive notice, and Judge Glenn can review and approve a stipulation that will have a significant effect on the Celsius Chapter 11 Case.

4. To be clear, Celsius does not dispute that Core could likely demonstrate "cause" for lifting the automatic stay, but Celsius cannot unilaterally waive or lift the automatic stay absent

---

[5] *See*, *In re Broadstripe, LLC*, 402 B.R. 646, 657 (Bankr. D. Del. 2009) ("[E]xecutory contracts and leases are considered a form of property of the estate.") (citation omitted). In the Rejection Motion, Core cites *In re Old Carco LLC*, 406 B.R. 180 (Bankr. S.D.N.Y. June 19, 2009) for the proposition that a debtor seeking to reject a contract of another debtor need not first obtain relief from the automatic stay. First, that court's ruling did not appear to consider the argument that the contractual rights were property of the second debtor's estate that could be enforced and are protected by the automatic stay. The court also noted that termination of a contract by one debtor *would* violate the automatic stay, but reasoned that rejection is breach, not termination, and therefore does not violate the automatic stay. While it is of course true that rejection is breach, not termination, a court-sanctioned breach would undoubtedly affect the second debtor's rights under the executory contract just as termination would; accordingly, Celsius respectfully submits that rejection of the Celsius Contracts would be a violation of the stay. Moreover, this situation is distinguishable from *Old Carco*, given Celsius' pending motion to enforce the same contracts that Core now seeks to reject, and that the rejection of the Celsius Contracts would create significant logistical issues relating to Celsius' recovery of its over 37,000 rigs in Core's possession, all as explained more fully below. Additionally, in *Old Carco*, a motion to enforce the automatic stay with respect to the attempted rejection had already been brought and denied, which further distinguishes *Old Carco* from the instant case.

[6] *Debtors' Motion to Enforce the Automatic Stay and for Civil Contempt, In re Celsius Network LLC*, No. 22-10964 (MG) [Celsius Docket No. 917].

3

an order from Judge Glenn.[7]  Celsius is willing to negotiate with Core regarding the terms of an agreed stipulation that could be filed in both this Court and in the Celsius Chapter 11 Case providing for (a) lifting the automatic stay, (b) consenting to rejection of the Celsius Contracts, and (c) the terms of rejection, including the logistics for the return of Celsius' rigs in an orderly, reasonable manner, as discussed further below.  But, respectfully, Celsius believes that the Rejection Motion cannot be granted at this time, particularly given the pending litigation before the SDNY Bankruptcy Court, and that Celsius' own stakeholders should have an opportunity to review and comment on any order granting rejection and setting the terms of the orderly return of Celsius' rigs.

## II.    Celsius Does Not Object to Rejection of Its Contracts at the Appropriate Time

5.    Putting the procedural defects of the Rejection Motion to the side, Celsius does not object to the rejection of its contracts with Core at the appropriate time.  Celsius has no desire to continue doing business with Core's existing management team, which has repeatedly proven to be uncommercial and even duplicitous.  In late September, Celsius filed a motion in its own chapter

---

[7]    See, In re Gullett, 230 B.R. 321, 330–31 (Bankr. S.D. Tex.), rev'd on other grounds sub nom. Cont'l Cas. Co. v. Gullett, 253 B.R. 796 (S.D. Tex. 1999), aff'd sub nom. In re Gullett, 220 F.3d 585 (5th Cir. 2000) ("[T]he automatic stay serves the interests of both debtors and creditors.  Consequently, the debtor may not waive the automatic stay or limit its scope.  'Only the bankruptcy court with jurisdiction over a debtor's case has the authority to grant relief from the stay of judicial proceedings against the debtor.'") (quoting Maritime Elec. Co., Inc. v. United Jersey Bank, 959 F.2d 1194, 1204–1205 (3d Cir. 1991)); In Re House2Home, Inc., No. 02-3322, 2002 WL 32129974, at *3 (Bankr. N.D. Tex. Sept. 9, 2002) ("Relief from the stay can be granted only by the bankruptcy court having jurisdiction over a debtor's case.") (quoting Constitution Bank v. Tubbs, 68 F.3d 685, 691 (3d Cir. 1995)).  It is well-established in the Second Circuit, where the Celsius Chapter 11 Case is pending, that a debtor may not waive the automatic stay.  See, Ostano Commerzanstalt v. Telewide Systems, Inc., 790 F.2d 206, 207 (2d Cir. 1986) ("Since the purpose of the stay is to protect creditors as well as the debtor, the debtor may not waive the automatic stay. . . Relief from the effect of the automatic stay provisions of section 362(a)(1) must be sought from the bankruptcy court pursuant to section 362(d)."); In re Fugazy Exp., Inc., 982 F.2d 769, 776 (2d Cir. 1992) ("Only the court may lift the stay."); In re Enron Corp., 300 B.R. 201, 213 (Bankr. S.D.N.Y. 2003) ("The automatic stay cannot be waived.  Relief from the stay can be granted only by the bankruptcy court having jurisdiction over a debtor's case.") (quoting Constitution Bank v. Tubbs, 68 F.3d 685, 691 (3d Cir.1995)); In re Cabrini Med. Ctr., 489 B.R. 7, 23 (S.D.N.Y. 2012) ("[T]he debtor may neither unilaterally waive, nor limit, the scope of the automatic stay.").

11 case[8] (the "Motion to Compel") to enforce the plain meaning of the Celsius Contracts and to compel Core to, among other things, (a) deploy Celsius' rigs in accordance with the agreed-upon contractual schedule, and (b) honor the fixed—not variable—hosting services rate provided for in the Celsius Contracts. The parties engaged in significant discovery in connection with Celsius' Motion to Compel. Core's internal documents confirmed that Core knew it had no legal basis for unilaterally imposing these so-called "pass-through" charges on Celsius, and that Core always has understood the Celsius Contracts to impose a "fixed" rate or "pass-through cap." Indeed, it was on the promise of a "flat" rate that Core induced Celsius to enter into hosting agreements with Core. Core devised a plan of passing through its increased power costs when its hosting business became unsustainable as energy costs rose and Core's equipment resale market deteriorated. Additionally, Core routinely and systematically breached its contractual obligations to timely deploy new Celsius rigs when it perceived an opportunity to deploy its own rigs or rigs of other customers on more favorable terms. Discovery revealed that Core's excuses for the delays in deploying Celsius' rigs are just that. Core's internal documents reveal it intentionally delayed Celsius' deployment to prioritize the expansion of its own mining fleet. Core deployed approximately 4,200 of Celsius' rigs the day after Celsius filed its Motion to Compel—quite the coincidence.

6.      Even aside from the substance of the pending contempt motion between Celsius and Core, Core's existing management team has continued to mislead Celsius. In November, when Celsius learned of Core's precarious financial position, Celsius agreed to pause litigation of its contempt motion—on the very day its opposition and reply brief was due to be filed—out of

---

[8]  *Debtors' Motion to Enforce the Automatic Stay and for Civil Contempt, In re Celsius Network LLC*, No. 22-10964 (MG) [Celsius Docket No. 917].

recognition that Celsius could not enforce the terms of the contracts if Core were to file for bankruptcy and reject the contracts, and based on Core's assurances that it would negotiate in good faith regarding revised contract terms and include Celsius in Core's restructuring negotiations. Following the commencement of that temporary détente, Celsius repeatedly tried to engage with Core in the hopes of having a constructive dialogue and reaching agreement on a revised hosting agreement that would benefit both sides. Celsius also repeatedly asked to participate in Core's restructuring discussions as Core's largest secured noteholder and largest customer. But Core avoided Celsius' repeated attempts to engage in discussions regarding revised contractual terms, and even blocked Celsius from joining the Ad Hoc Noteholder Group, citing the paused litigation between Celsius and Core.

7. On the Petition Date, counsel to Core told this Court and all other parties that Core "look[ed] forward to engaging with [Celsius] as we move forward" and wanted to "see if we can find a path forward that obviously minimizes expense."[9] Counsel to Celsius reciprocated in kind, explaining that "Celsius is focused on the long term future of Core. We remain ready to engage with Core, and now that they've filed for bankruptcy, see if there's a mutually agreeable path forward."[10] But between the Petition Date and the date the Rejection Motion was filed, Core did not engage in constructive discussions. Instead, just six days after its first day hearing, Core filed the Rejection Motion on a purportedly "emergency" basis, seeking a hearing on just five days' notice. This timing might be understandable if there were truly an emergency for which Core needed relief. But to be clear, this is an "emergency" entirely of Core's making: Core knew all

---

[9]   First Day Hr'g Tr. 17:3–8, December 22, 2022.

[10]   *Id*. at 41:18–21.

the relevant facts on the Petition Date and discussed them in some detail in the First Day Declaration.[11]

8.       Despite Celsius' frustrations with Core's existing management team, Celsius remains one of Core's largest secured noteholders and remains open to maximizing value of Core's estates and, if appropriate, doing business with a reorganized Core on terms that are mutually acceptable. Celsius wants to have constructive restructuring conversations with anyone who shares that goal. In the meantime, given that Celsius has agreed its rigs can be powered down now—mooting the alleged basis for emergency relief, Celsius respectfully submit that the parties should negotiate in good faith on the terms of rejection and the return of Celsius' rigs.

## III.     Any Order Granting the Rejection Motion Should Provide for Adequate Provisions Regarding the Return of Celsius' Rigs in Core's Possession

9.       Celsius recognizes that Core is likely to meet its burden to reject the Celsius Contracts, especially because Celsius believes that the contracts are much more favorable to Celsius than Core believes. But critically, if the Court approves the rejection of the Celsius Contracts, there are significant logistics that must be arranged to return Celsius' property currently in Core's possession, including over 37,000 mining rigs. Celsius estimates that transporting these rigs would take at least 70 semi-trucks upwards of 30 days just to make the deliveries alone, never mind the time to unplug the rigs, prepare them for pickup, and locate trucks and moving staff across the five states where the rigs are currently located. Celsius did not arrange the logistics necessary to recover its property because Celsius reasonably expected to have good faith discussions with Core given the comments made at Core's first day hearing. Celsius has a duty to

---

[11]     *See, Declaration of Michael Bros in Support of the Debtors' Chapter 11 Petitions and First Day Relief*, (the "First Day Declaration") [Docket No. 5], ¶¶ 74-75.

maximize the value of its own estate and accordingly, did not spend time or money unnecessarily incurring significant transition costs that may not have been necessary.

10.     Since Core filed the Rejection Motion, Celsius has had preliminary conversations with Core regarding the logistics and timing needed for Celsius to recover its property following rejection.  Celsius remains hopeful that an agreement can be reached with Core for the orderly pickup of its property, but Celsius submits that any order granting the Rejection Motion must include reasonable protections and procedures for the return of Celsius' rigs.  Celsius has made a proposal to Core that includes the following provisions: (a) Core will provide a reasonable transition period of at least seventy-five days; (b) all Celsius rigs will be powered down immediately and will not be restarted during the transition period; (c) Core will unrack and package the Celsius rigs using commercially reasonable industry standards, consistent with the Celsius Contracts, and will keep Celsius apprised as to expected availability for pickup at each location; (d) Core will allow a Celsius observer to monitor the unracking and packaging process; (e) Celsius will to pick up its rigs as soon as practicable and will consult with Core on the schedule for pickups, and, in any event, all Celsius rigs will be picked up within 75 days of January 3, 2023; (f) Core and Celsius are to negotiate an agreed stipulation to be filed for expedited consideration in the Celsius Chapter 11 Case providing for relief from the automatic stay to permit rejection on substantially the terms set forth in an agreed form of order to be filed in this Court providing for the rejection of the Celsius Contracts retroactive to January 3, 2023.  These protections are reasonable given the lack of notice, particularly as Celsius is protected by the automatic stay in its own chapter 11 case which, technically, Core is violating.  Celsius agrees that form should not be elevated over substance in this regard, but, absent reasonable protections from this Court, there could be significant costs to Celsius for not moving to enforce its automatic stay.  Specifically,

had Core filed a motion in the Celsius Chapter 11 Case seeking relief from the automatic stay, Celsius would have had ample time before rejection to (literally) put the wheels in motion necessary to recover its property. That is exactly what the automatic stay is intended to do—give a debtor a breathing spell and time to respond. Celsius is willing to cooperate with an orderly rejection and transition process, including presenting a joint stipulation to both Judge Glenn and this Court for approval. Again, Celsius will agree now that its rigs can be powered down so that Core shuts off the alleged ongoing losses under the Celsius Contracts, and Celsius would agree to participate in any further status conferences or hearings on the joint stipulation—including on shortened notice. Alternatively, absent cooperation and agreement, Celsius could file a turnover motion pursuant to section 542 of the Bankruptcy Code in the Celsius Chapter 11 Case to have an orderly process approved for the return of Celsius' property, as the SDNY Bankruptcy Court has exclusive jurisdiction over the property of the Celsius debtors. However, for efficiency's sake, and out of respect for both parties' chapter 11 cases, Celsius would like to resolve the transition process consensually and present it for approval in both cases. Given that Celsius was not provided advance notice of the filing of the Rejection Motion, nor was relief sought in the Celsius Chapter 11 Case, Celsius asks for this Court's assistance in helping to protect the Celsius debtors' property during the transition.

## IV. Core Has No Basis For Charging Celsius Any "Power Costs Pass-through"

11. Finally, Celsius needs to set the record straight with respect to the terms of the Celsius Contracts. Although the Celsius Contracts will likely soon be rejected, rendering the terms of the contracts moot on a go-forward basis, Core has asserted that Celsius owes Core for almost $8 million in pass-through energy costs that Core asserts are due under the terms of the Celsius

9

Contracts—and filed a motion in the Celsius Chapter 11 Case seeking payment of such costs.[12]

For the benefit of Core's and Celsius' stakeholders, Celsius sets forth below its position based on

the Celsius Contracts and the discovery taken in conjunction with Celsius' Motion to Compel:

Core does not have any valid claim to such amounts; instead, Celsius has a significant claim against

Core for Core's violations of the Celsius Contracts.[13]

### 1.    Order #10 Unambiguously Provides for A Fixed Hosting-Services Rate

12.      Core's primary basis for rejecting its hosting agreements with Celsius is the notion

that "Celsius improperly refuses to pay" power cost pass through charges assessed "[w]hen power

costs spiked dramatically around the second quarter of 2022."  Rejection Motion ¶¶ 7, 11.  But

that contention is flatly contradicted by the terms of the hosting agreements upon which Core

relies.  Order #10, together with the Master Services Agreement ("MSA"), between Celsius and

Core is clear and unambiguous: Core is obligated to provide Celsius with hosting services at a

fixed—not variable—hosting-services rate.  *See* Ex. 1, MSA; Ex. 2, Order #10.[14]

13.      Order #10 sets out fixed rates per deployment month for hosting services.  This

means that Celsius pays a fixed rate based upon its actual power usage, not variable rates based

upon the spot price of power charged to Core.  *See Cox Commc's., Inc. v. T-Mobile US, Inc.*,

27 A.3d 752, 760 (Del. 2022) ("[A] contract's construction should be that which would be

---

[12]    Rejection Motion ¶ 13; *Motion of Core Scientific, Inc. (I) to Compel Immediate Payment of Administrative Expenses and (II)(A) for Relief from Automatic Stay to Exercise Rights Under Master Services Agreement and Related Orders or (B) in the Alternative, to Compel Assumption or Rejection of Master Services Agreement and Related Orders, In re Celsius Network LLC*, No. 22-10964 (MG) [Celsius Docket No. 1144] (the "Core Administrative Claim Motion").

[13]    For the avoidance of doubt, Celsius reserves the right to file any claims against Core as the circumstances warrant, including secured (including resulting from setoff rights under Section 506(a) of the Bankruptcy Code), unsecured, and administrative claims.

[14]    All references to exhibits refer to exhibits to the *Affidavit of Judson Brown, P.C. in Support of Celsius Mining LLC's Preliminary Objection to the Debtors' Emergency Motion for Entry of an Order Authorizing Rejection of Executory Contracts with Celsius Mining, LLC* filed contemporaneously herewith.

10

understood by an objective, reasonable third party." (citation omitted)); *Bathla v. 913 Mkt., LLC*, 200 A.3d 754, 759-60 (Del. 2018).

14.     Core concedes that there is no express term in Order #10 that contemplates variability in the hosting-services rate. Ex. 3, 11/1/22 J. Pratt Dep. Tr. at 32:20–33:6 ("Q. Where do you see the word 'estimate' in that section of Order No. 10, Mr. Pratt? A. It's not stated explicitly in this."); *see also id.* at 33:9–13; Ex. 4, 11/8/22 M. Levitt Dep. Tr. at 99:20–25 ("Q. And there's no row here that shows that the hosting rate is subject to adjustment, correct? A. There is no verbiage on this page that says that, but of course, it's not necessary.").

15.     Instead, Core points to Section 4(f) of the MSA, which allows Core to impose on Celsius "any new taxes, levies, tariffs or governmental fees and charges with respect to the provision of Services." MSA § 4(f). Core contends it is "implicitly" permitted to pass-through its increased power costs as a "tariff" within the meaning of Section 4(f), thus increasing the hosting rate above the fixed rate set forth in Order #10. *Id.*

16.     The term "tariff" in Section 4(f), however, does not refer to power costs, explicitly or implicitly. The primary, common sense usage of tariff is a "schedule or system of duties imposed by a government on imported or exported goods." TARIFF, Black's Law Dictionary (11th ed. 2019); *Tariff*, Oxford English Dictionary (Online Ed.) ("[D]uties to be imposed on imports and exports"); *Tariff*, Collins Dictionary (Online Ed.) ("A tariff is a tax that a government collects on goods coming into a country."). That is precisely how the term is used in Section 4(f) of the MSA.

17.     Section 4(f) permits Core to pass through a limited class of governmentally-assessed duties—namely, "taxes," "levies," "tariffs," and other "governmental fees and charges." Ex. 1, MSA, § 4(f). Both the plain meaning of the word "tariff," and the context in which it is

11

used, make clear that Section 4(f)'s "tariff" refers to import or export duties. The "tariff" pass through does not permit Core to unilaterally change the Hosting-Services Rate set forth in Order #10 by passing through increases in the variable aspects of Core's own costs to purchase power. *Rhone-Poulenc Basic Chems., Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992) ("Courts will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty."); *Coughlan v. NXP B.V.*, 2011 WL 5299491, at *11 (Del. Ch. Nov. 4, 2011) ("Though the Plaintiff jumps through many hoops and artfully twists seemingly reasonable interpretations out of various provisions of the JV Agreement, she ultimately fails to reconcile these interpretations with common sense and reason.").

18. Under Core's formulation of the contract, the hosting-services rate is a "floor" without a "ceiling," where Celsius bears all the risk of the power cost increases without benefitting from any decreases or credits. Ex. 5, 10/31/22 M. Xia Dep. Tr. at 39:3–5; Ex. 3, 11/1/22 J. Pratt Dep. Tr. at 34:12-14; Ex. 6, 11/7/22 R. Cann Dep. Tr. at 129:11–18. This arrangement makes little economic sense. *Cf. Viking Pump, Inc. v. Century Indem. Co.*, 2 A.3d 76, 98 n.70 (Del. Ch. 2009) ("[I]f one interpretation would lead to an absurd conclusion, then such interpretation should be abandoned and the one adopted which would accord with reason and probability." (citation omitted; alteration in original)). If Celsius intended to bear the risk of power-price fluctuations, the economically rational way to do so would be to structure the contract as a "direct pass-through" of power costs, where Celsius would directly pay for power and Core would be entitled to a fixed margin. *See* Ex. 7, 10/26/22 KC Mares Dep. Tr. at 134:10–20. That direct pass-through would allow Celsius to capture the upside in power-price declines, rather than just bearing the downside of price increases. In fact, a direct pass-through is the "most common" way to structure pricing

for hosting in this industry, as Core's own expert witness concedes. *Id.*; *see also* Ex. 6, 11/7/22 R. Cann Dep. Tr. at 37:12–38:16.

19.     Order #10 as it is actually structured makes the most economic sense for both parties. Celsius signed up for a fixed hosting-services rate, meaning it did not bear the risk of power increases or reap the benefit of power decreases. In exchange for this stability, Celsius agreed to pre-pay tens of millions of dollars to Core ahead of the deployment schedule and to pre-pay one month in advance for its hosting invoices. *See* Ex. 2 at 1–4. Core, on the other hand, received up-front cash and could negotiate power purchase agreements with knowledge of its hosting rates, while bearing the risk of power fluctuations and had resources it presumably could have used to hedge its power costs.

20.     Core's absorption of the risk of power fluctuations is a reasonable allocation of that risk: Core is the party that has the relationships with power providers—which are not shared with Core's customers—and therefore is in the best position to know when and how to hedge its power costs. Ex. 6, 11/7/22 R. Cann Dep. Tr. at 131:6–21. As one of Core's executives testified, one of the reasons that customers hire Core is for its expertise in managing power costs. *Id.* at 37:12–38:16. The fact that Core failed to use that expertise and actually manage its own power costs is not a risk that is allocated to *Celsius* under the contract. *See* Ex. 3, 11/1/22 J. Pratt Dep. Tr. at 26:25–27:7.

21.     The "Fees" provision of Order #10 is not to the contrary. Each month, Celsius pre-pays for hosting services an estimate of its anticipated hosting costs, which is calculated by Celsius' estimated power consumption per rig multiplied by the hosting-services rate. Ex. 2 at 4. Subsequent invoices are subject to a "true up," which is comprised of two components:

> [1] any additional charges incurred by Client and [2] adjustments
> resulting from any differences between the Fees for Services

13

> invoiced in the preceding month and the Fee for Services based on
> Provider's determination of power utilized by [Celsius] during that
> month, as well as any adjustments to Provider's estimate of power
> to be utilized by Client in the upcoming month.

Ex. 2 at 4.

22.     The first of these components, "additional charges incurred by Celsius," refers to other charges that appear on Celsius' invoices from time-to-time, such as repair services, sales taxes, technician charges, and shipping costs, among others. *See* Ex. 5, 10/31/22 M. Xia Dep. Tr. at 57:20–58:14. "[A]dditional charges incurred by [Celsius]" does not refer to additional charges incurred by Core under its power purchase agreements with utility providers.   The second component—"adjustments resulting from differences … based on [Core's] determination of power utilized by [Celsius]"—merely refers to adjustments for differences based on the Celsius' estimated versus actual power consumption.   Core knows this.   Its own accounting memo explained that Order #10 and Core's other hosting contracts were ████████████████████ ███████████     Ex. 8 at CORE-00009911 (emphasis added).  An adjustment for actual power usage in no way suggests that the rate for that usage is variable.

23.     In short, Core's interpretation of the word "tariff" is not reasonable. *Rhone-Poulenc Basic Chems., Co.*, 616 A.2d at 1196.  But even if "tariff" could be read to include Core's rising power costs, Order #10's fixed hosting-services rate would still control the contract pricing.  Order #10 provides: "If any terms of this Order conflict with the terms of the [MSA], the terms of this Order shall govern with respect to this Order." Ex. 2 at 1.  If Core could pass through increases in power costs to Celsius, then this would transform the fixed hosting-services rate in Order #10 into a variable rate, which directly contradicts the fixed price term in Order #10.  Thus, under the express terms of Order #10, the fixed price of the hosting-services rate controls.

14

**2.      Even If Order #10 Were Ambiguous, Extrinsic Evidence Supports Celsius'
Interpretation**

24.     Because the contract is unambiguous, extrinsic evidence is not necessary to
determine the parties' contractual relationship.  But the extrinsic evidence here is damning.  Core's
internal documents confirm it has no legal basis for charging Celsius a "power costs pass-through,"
and that Core always has understood the hosting-services rate in Order #10 to impose a "fixed"
rate or "pass-through cap."  It was on the promise of a "flat" rate that Core induced Celsius to enter
its hosting agreements.

25.     Core conceived the idea of routinely passing through its increased power costs only
*after* its hosting business became unsustainable as energy costs rose and Core had apparently not
adequately hedged against power price increases, and Core's equipment resale market deteriorated.
Even if the Court were to determine the hosting-services rate in Order #10 is ambiguous, there is
"compelling record evidence to divine [its] meaning," all of which supports Celsius' view.  *Cox
Commc'ns, Inc.*, 273 A.3d at 762 n.71.

26.     *First*, from the outset, Core marketed Order #10 to Celsius as a ▮▮▮▮▮▮▮▮▮▮
rate contract, in meetings, emails, and presentations to Celsius.  Ex. 9 at -CORE-00007612, -
00007615; Ex. 10; Ex. 11 at CORE-00007670; Ex. 12; *see, e.g., S'holder Representative Servs.
LLC v. Gilead Scis., Inc.*, 2017 WL 1015621, at *21-22 (Del. Ch. Mar. 15, 2017) (defining the
meaning of a term in part based on "other contemporaneous communications between [the parties]
. . . during their negotiations," including "presentations and regulatory materials"), *aff'd*, 177 A.3d
610 (Del. 2017).  Early on in negotiations for Order #10, Core offered Celsius a hosting package
of up to 36 months with a "***fixed price for hosting***" at 6.5 cents per kWh.  *See* Ex. 10 at CORE-
00000072 (emphasis added).  As discussions progressed, Core sent Celsius several proposals, each
one featuring a "***Flat*** Hosting Rate" for a period of up to 36 months.  Ex. 9 at CORE-

15

00007612, -00007615; Ex. 11 at CORE-00007670.  A "fixed-price contract" is "[a] contract in which the buyer agrees to pay the seller a definite and predetermined price *regardless of increases in the seller's cost* or the buyer's ability to acquire the same goods in the market at a lower price." CONTRACT, Black's Law Dictionary (11th ed. 2019) (emphasis added).  Similarly, a "flat rate" is "a charge that is the same in all cases, not varying in proportion with something."  Oxford English Dictionary (Online Ed.); Black's Law Dictionary (11th ed. 2019).

27.    *Second*, the parties' conduct shows that Core did not understand "tariff" to permit it to pass through increased power costs.  *ATT Corp. v. Lillis*, 970 A.2d 166, 172 (Del. 2009) ("It is hornbook law that the contracting parties' course of conduct may be considered as evidence of their intended meaning of an ambiguous term.").  After Order #10 was signed, Core initially honored its commitments.  When energy costs would increase, Core would "bear the costs" of that power variability, Ex. 3, 11/1/22 J. Pratt Dep. Tr. at 125:20–126:7, consistent with the fixed hosting-services rate it had sold to Celsius.  Core's internal accounting documents likewise referred to the hosting-services rate in all of Core's contracts as █████████████████████ █████████████ and explained that the contracts as a whole are ███████████████████ ██████████ Ex. 8 at CORE-0009903, -00009911 (emphasis added).[15]

---

[15]  Core elsewhere has pointed to Celsius' decision to voluntarily pay certain pre-petition utility cost increases at one specific site, Marble 2, as evidence that Core was contractually allowed to pass through increased power costs. Not so.  At that one site, in October 2021, Core expressly *asked* for and received Celsius' permission to pass through certain increased power costs at the Marble 2 site.  *See* Ex. 13, 11/1/22 Q. Lawlor Dep. Tr. at 95:21-96:14; Ex. 14 (Celsius email stating, "I authorize Core to turn our rigs back on in light of the unexpected economic power curtailment in Marble.").  Celsius granted such permission, despite understanding that it was contractually entitled to a fixed hosting services rate, on a pure cost-benefit basis to prevent Core from turning off Celsius' machines.  *See* Ex. 13, 11/1/22 Q. Lawlor Dep. Tr. at 88:5–21, 316:6–317:12; Ex. 6, 11/7/22 R. Cann Dep. Tr. 111:19–112:2 (describing the curtailment option as a "cost-benefit" analysis for customers).  From October 2021 through April 2022, Core continued passing through increased power costs just for the Marble 2 site, just for certain days each month, and just due to the unexpected curtailment. Ex. 5, 10/31/22 M. Xia Dep. Tr. at 75:22–76:11.  Even today, Core's own executives acknowledge there is a difference between the limited pass-through for Marble 2 and Core's widespread pass-through practices implemented in June 2022.  *See* Ex. 6, 11/7/22 R. Cann Dep. Tr. 119:16-24 ("Q. Would you agree with me that there's a difference between this Marble 2, 2021

28. In late 2021 and early 2022, however, Core began to face significant headwinds in its hosting business, including rising power costs. *See* Ex. 4, 11/8/22 M. Levitt Dep. Tr. at 34:8–35:3. Core's already-thin hosting margins evaporated when it faced increasing power costs to utilities on one side and a fixed hosting rate with customers on the other. *Id.* at 176:22–177:2 ("Q. And so what you're saying here effectively is over the last couple of years, the hosting business was break-even or losing money from a profit perspective, correct? A. Correct."); Ex. 6, 11/7/22 R. Cann Dep. Tr. at 112:21– 113:4 ("I mean, the margins on hosting are *de minimis*."); Ex. 15 at CEL_CS-00006978 ("Historically, the [hosting] business delivered low profitability."). As Core's Senior Vice President of Partnerships (and Rule 30(b)(6) witness) Jeff Pratt testified, it was becoming clear that Core's entire hosting business ████████████████████████ ████████████████████████████████ Ex. 3, 11/1/22 J. Pratt Dep. Tr. at 177:10–178:13.

29. Instead of accepting that it had made a bad business bet on power costs, Core's recently-appointed Chief Executive Officer, Mike Levitt, decided that Core simply would no longer bear the cost of power fluctuations; instead, Core would pass those costs on to its customers. *See* Ex. 3, 11/1/22 J. Pratt Dep. Tr. at 177:10–178:13 (████████████████████████ ████████████████████████████████ ██████ Ex. 5, 10/31/22 M. Xia Dep. Tr. at 102:18–103:16 ("Q. Core wanted to avoid losing money on its hosting contracts by passing through these power costs, right? A. Yes.").

30. To that end, towards the end of 2021, Mr. Levitt asked Core's team to "come up with a suggested plan" for reworking the fee structure of the hosting business. Ex. 16 at

---

specific event and the power cost that you passed through starting in June of 2022? . . . A. Yes, I will agree with that.").

17

CORE-00000006.  This included a "Power Surcharge Fee" that would be charged "in the event power costs to a specific facility at Core encounters material seasonal or economic increases." *Id.* at -00000005.

31.     Around the same time, Core decided to roll out a █████████████████

████████████████████████████████████████████████████████████

*Id.*; *see* Ex. 5, 10/31/22 M. Xia Dep. Tr. at 30:25–31:11. ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████     Ex. 17 at CORE-00017187 (emphasis added); *see also* Ex. 18 at CORE-00000720

████████████████████████████████████████████████████████████

(emphasis added).

32.     Core planned ██████████████████████████████████████████

Ex. 18 at CORE-00000720; Ex. 19 at CORE-0008415 ██████████████████████

████████████████████████████████████████████████.  Core successfully convinced some hosting customers ██████████████████████████

████████████████████████████████████████████ *See* Ex. 5, 10/31/22 M. Xia Dep. Tr. at 26:19–27:8.

33.     Of course, for customers like Celsius who █████████████████, Core nevertheless has contended that "'tariff' equals utility costs," Ex. 3, 11/1/2022 Pratt Tr. 12:18-19 ("Q. And so in your view tariff equals utility costs, correct?  A. Absolutely, yeah, without a doubt."), allowing it to pass through increased power costs. ██████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ This would, of course, "violate a

18

fundamental principle of contract interpretation" that parties do not include superfluous language unnecessarily. *See* Core Obj. ¶ 74 (citing *NAMA Holdings, LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007) ("Contractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court."), *aff'd*, 945 A.2d 594 (Del. 2008)). Core's conduct and efforts ████████████████████████████████████████████ contradict its contentions that "tariff" already covers the pass through of utility costs.

34. ***Third***, the evidence makes clear that Core did not believe the term "tariff" referred to power costs until the end of 2021—after entering Order #10 with Celsius—███████████ ████████████████████. *See* Ex. 20 at CORE-00015187. But to this day, Core does not have internal (or external) consensus on what power costs are included in "tariff." Monica Xia, Core's corporate representative for discussing the meaning of Section 4(f), testified that "tariff" does not include the base rate of power that Core pays to utility companies. Ex. 5, 10/31/22 M. Xia Dep. Tr. at 14:20–22. Jeff Pratt, Core's corporate representative on other topics including Core's pass throughs "to customers other than Celsius," believes tariff encompasses "every component of the bill or invoice received from a utility" without exclusion, including "the base rate of power." Ex. 3, 11/1/22 J. Pratt Dep. Tr. at 12:7–9, 51:25-52:2. Russell Cann, another Core executive, testified that "tariff" would not allow Core to pass through increased power costs on a "fleetwide" basis because "tariff" only narrowly describes utility costs at a particular site. Ex. 6, 11/7/22 R. Cann Dep. Tr. at 169:24–171:20. In all this time, Core still cannot get straight what sorts of utility costs the term "tariff" actually covers.

19

35.    ***Fourth***, despite Core's insistence that "tariff" equals utility costs or power costs, others did not share that ████████████████████████████████████████████ ██████████████████.

36.    ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████

37.    ██████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████ Core's

Vice President of Accounting Policy, Ed Hane y███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████ He punctuated his assessment by representing that Core's customers were accepting, and paying, the pass-through amounts: "***There is currently no challenge from any client on the legality of the pass-through charges.***" 10/31/22 M. Xia Dep. Tr. at 219:5-10 (emphasis added).

38.    That representation was not true. *See* Ex. 5, 10/31/22 M. Xia Dep. Tr. at 219:5-10

("This sentence is not as accurate as it's supposed to be."). ███████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████ Ex. 24 at CORE-00002521.[16]

39. ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████ Ex. 26 at CORE-00004157. ████████████████████

███████████████████████████████████████████████

████████████████████████████████ Ex. 27 at CORE-00004165. ████████████

█████████████████████████████████████████████████████ Ex. 28

at CORE-00009801.  *See, also, e.g.*, Ex. 29 at CORE-00004132.

40.     But that was not the end.  Core received more disputes after July 18, 2022, too. Altogether, Core lost between five to ten clients as a result of its new decision to pass through rising power costs.  Ex. 5, 10/31/22 M. Xia Dep. Tr. at 22:1–25.

41.     Core's baseless contentions that Celsius is the defaulting party is belied by the contractual language and by Core's own documents, testimony, and conduct.  It is Core who has improperly passed-through increased costs in an effort to rectify its own poor business decisions.

---

[16] Core has now fired EY, simultaneously disclosing that EY had found "material weaknesses" in Core's "internal control over financial reporting."  *See* Ex. 25, Core Scientific Form 8-K, dated Oct. 24, 2022.

## RESERVATION OF RIGHTS

42.     Nothing contained in this response is intended or should be construed as: (a) an admission as to the validity of any particular claim against the Celsius; (b) a waiver of any claim held by Celsius against Core, its directors or officers or any other party in interest on any grounds; (c) a promise or requirement to pay any particular claim; or (d) a waiver or limitation of Celsius' rights under the Bankruptcy Code or any other applicable law, including the right to seek related relief from this Court or the SDNY Bankruptcy Court in the Celsius Chapter 11 Case.

| | |
|---|---|
| Houston, Texas | */s/ Ross M. Kwasteniet* |
| January 2, 2023 | **KIRKLAND & ELLIS LLP** |

**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:          jsussberg@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig (admitted *pro hac vice*)
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:          patrick.nash@kirkland.com
                 ross.kwasteniet@kirkland.com
                 chris.koenig@kirkland.com
                 dan.latona@kirkland.com

- and -

Judson Brown, P.C. (admitted *pro hac vice*)
1301 Pennsylvania Avenue NW
Washington, D.C. 20004
Telephone:    (202) 389-5000
Facsimile:    (202) 389-5200
Email:          judson.brown@kirkland.com

*Counsel to Celsius Mining LLC*

## Certificate of Service

      I certify that on January 2, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Ross M. Kwasteniet*

Ross M. Kwasteniet

**<u>Exhibit C</u>**

**Unredacted Preliminary Objection**


**[FILED UNDER SEAL]**