**Original Hearing Date and Time: December 20th, 2022 at 10amET**
**Amended Hearing Date and Time Deadline: January 24th, 2023 at 10amET**

Michael Benzaken
*Pro se Celsius creditor*
michael.benzaken@gmail.com

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*, [1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered.) |

**AMENDED NOTICE OF HEARING ON MICHAEL BENZAKEN'S MOTION SEEKING A RULING FROM THIS COURT THAT THE STABLECOINS ARE NOT PROPERTY OF THE ESATE, THAT THE ASSETS AND COLLATERAL IN HIS EARN ACCOUNT ARE NOT PROPERTY OF THE ESTATE, AND THAT ALL OF THE ASSETS HELD WITHIN HIS EARN ACCOUNT OUGHT NOT BE  TREATED DIFFERENTLY THAN THOSE ASSETS HELD WITHIN CUSTODY ACCOUNTS UNDER 11 USC § 541.**

I, Michael Benzaken, a Pro se unsecured Celsius Network LLC *et al.* creditor, an unaccredited investor, with residence in the State of New Jersey, USA, hereby humbly submit this motion (the "Motion") for the entry of an order, substantially in the form attached hereto per **Exhibit A** (the "Proposed Order"), that the ownership of the stablecoins (Doc 1325) are not property of the Estate, that the assets and collateral in Earn (and those in my Earn wallet) are not property of the estate (Doc 1325), that I am the sole owner and beneficiary of those assets and collateral in both my Earn and Custody wallets, and that all the assets in my Celsius Earn wallet ought not be treated differently than those assets in my or any others Celsius creditors' Custody account, and to further conclude that at no time were the assets I deposited into either of my wallets the unconditional property, title and ownership of the estate under 11 USC § 541.

**PLEASE TAKE NOTICE** that a Hearing on Michael Benzaken's Motion Seeking a Ruling From This

Court That Stablecoins in Question Are Not Property of the Estate and Michael Benzaken's Assets and

Collateral in Both His Earn and Custody Wallets Within His Celsius User Account Are Also Not Property

of the Estate Under 11 USC § 541. Further, Celsius Account Holders Should Not Be Treated

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

Differentially in Regard to the % of Their Assets To Be Returned To Them (the "Motion") will be held

on January 24, 2023, at 10:00am (prevailing Eastern Time) (the "Hearing").

**PLEASE TAKE FURTHER NOTICE** that in accordance with General Order M-543 dated March 20,

2020, the Hearing will be conducted remotely using Zoom for Government. Parties wishing to appear at

the Hearing, whether making a "live" or "listen only" appearance before the Court, need to make an

electronic appearance through the Court's website at https://ecf.nysb.uscourts.gov/cgi-

bin/nysbAppearances.pl. Electronic appearances (eCourtAppearances) need to be made by 4:00 p.m.

(prevailing Eastern Time), the business day prior to the Hearing.

**PLEASE TAKE FURTHER NOTICE** that due to the large number of expected participants in the

Hearing and the Court's security requirements for participating in a Zoom for Government audio and

video hearing, all persons seeking to attend the Hearing at 10am (prevailing Eastern Time) on January 24,

2023, must connect to the Hearing beginning at 9am (prevailing Eastern Time). When parties sign in to

Zoom for Government and add their names, they must type in the first and last name that will be used to

identify them at the Hearing. Parties that type in only their first name, a nickname or initials will not be

admitted into the Hearing. When seeking to connect for either audio or video participation in a Zoom for

Government Hearing, you will first enter a "Waiting Room," in the order in which you seek to connect.

Court personnel will admit each person to the Hearing from the Waiting Room after confirming the

person's name (and telephone number, if a telephone is used to connect) with their eCourtAppearance.

Because of the large number of expected participants, you may experience a delay in the Waiting Room

before you are admitted to the Hearing.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections to the relief requested in the

Motion shall: (i) be in writing; (ii) conform to the Federal Rules of Bankruptcy Procedure, the Local

Bankruptcy Rules for the Southern District of New York, and all General Orders applicable to chapter 11

cases in the United States Bankruptcy Court for the Southern District of New York; (iii) be filed

electronically with the Court on the docket of In re Celsius Network LLC, No. 22-10964 (MG) by

registered users of the Court's electronic filing system and in accordance with all General Orders

applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York (which are available on the Court's website at http://www.nysb.uscourts.gov); and (iv) be served so as to be actually received by January 21, 2023, at 10am (prevailing Eastern Time), by (a) Michael Benzaken, the undersigned unaccredited investor and *pro se* creditor, (b) the entities on the Master Service List available on the case website of the above-captioned debtors at https://cases.stretto.com/celsius, and (c) any person or entity with a particularized interest in the subject matter of the Motion.

**PLEASE TAKE FURTHER NOTICE** that only those responses or objections that are timely filed, served, and received will be considered at the Hearing. Failure to file a timely objection may result in entry of a final order granting the Motion as requested by Michael Benzaken (as defined in the Motion).

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion and other pleadings filed in these chapter 11 cases may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/celsius. You may also obtain copies of the Motion and other pleadings filed in these chapter 11 cases by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

**Dated: January 2, 2023**
**Fort Lee, New Jersey**

**/s/ Michael Benzaken**
**Michael Benzaken**
**michael.benzaken@gmail.com**

**Your Honor,**

Kindly consider the following facts as to why I assert this Motion -

First, all stablecoins and assets in Earn accounts currently held by Celsius *et. al.* (herein, "Celsius") is not nor have they ever been the unconditional ownership of Celsius and ought never be considered property of the estate but rather the sole property of the creditors like myself. Those assets deposited into Earn and or grandfathered into the Earn account from the Earn program, as per the totality of the contracts, specfically, Celsius' General TOUs, Loan TOUs, and General TOU Representations, indicate that the transfer of tile, ownership, and rights into is purely conditional on the rendering of the services, done with the initial intent due to the logistical necessity in order for those assets to generate yield, with the customer retaining the write to withdraw the deposited assets, and, if such assets had been used as collateral for a loan, to pay off of those loans and withdraw the assets at any time.

I humbly request the following arguments be ruled on in the affirmative in favor of the creditors owning the assets they deposited and or were grandfathered into Celsius Earn due to the clear and unambiguous language given the totality of Celsius' Terms of Use (herein, the "TOU"), Terms of Use Representations, that is, the consumer-facing notifications alerting the user as to any material change to the conditions from prior TOUs (herein, the "TOU Representations"), as well as the associated Loan Agreements (herein, the "Loan Agreements"); specfically, the consistent clause across all Loan Agreements termed by Celsius *et al.* as the "Borrower's Representation," which expressly states the ownership of the assets and collateral in Earn is that of the depositor and that this specific clause would supersede any other language which may contradict such ownership claims in any other TOU.

I assert that there is definitive proof of asset ownership in Earn or any other Celsius account type to be the ownership of the creditors, that is, amongst other points I will argue, due to Celsius *et al.* omitting 1099 forms from their application. Had they intended the contract language to reflect a true transfer (that is, they are the beneficiary of the assets in Earn) would have indicated that a sale had taken place, thus transfer into and or Assets grandfathered into Earn would have constituted a sale thus triggering a tax event and need for a 1099 form. An easy way to determine asset ownership definitely is simply requesting from Celsius Leadership, in regard to their personal tax filings, and Celsius, in regard to their corporate tax filings, in the years subsequent to TOU changeover from V4-5. This would be extremely simple and definitive in my opinion and why such a request has yet to be made or demanded remains curious to myself and many creditors.

Secondly, I assert and will hereafter support that no ruling ought to be made on the basis of so-called Earn accounts (herein, "Earn") and so-called Custody accounts (herein, "Custody"), due to commingling of assets as demonstrated by Ms. Pillay per the Interim Examiner Report (Doc 1411). Further, as indicated by a Celsius Shareholder on Twitter,  Celsius, assets were moved without the consent or knowledge of the depositor, across Earn and Custody account type (Exhibit F), ostensibly in furtherance of maintain sufficient liquidity in what has been reported to be an ill-prepared so-called "Custody" feature. Lastly, due to TOUV5-8 Clause #15, which outlined the conditional state whereby title and ownership would be made in furtherance of rendering the services in Earn, and that such assets can be withdrawn at any time, that since we no longer have the optionality to withdraw from Earn and since Celsius has ceased to render the services, all customer assets ought to be treated no differently than those in Custody since the date Celsius Filed for Chapter 11 and thereafter, ceased the rewards program.

**Argument 1: User Stablecoins and assets in Earn are not part of the estate, all of Michael
Benzaken's stablecoins in across account types and assets in Earn and Custody are not property of
the estate, nor have they ever been the unconditional property of the estate, per the clear and
unambiguous contract language in the totality of the TOUS, TOU Representations, and Loan
Agreements (herein collectively referred to as "the Agreements").**

1. Per TOU Versions 5-8 (Doc 393, paged 217 - 577) as 1 component of the Agreements more
broadly, the contract language is clear and unambiguous that the digital asset transferred or
grandfathered into Earn, that the depositor remained the sole beneficiary of the assets. Per
**Exhibit B**, I present the language within the Agreements using TOUV5 to illustrate my point
since that is the TOU where both the court examiner believes the ownership was transferred
(without regard to true ownership i.e., the beneficiary of the assets in Earn).

2. Per Celsius Loan Agreements (Doc 393, pages 789-965), I have provided a table that correlates
the TOUs with the Loan Agreements, showing that in the totality of the Agreements available
customers in Earn, contained a caluse that made it clear and unambiguous that the collateral and
returning owner of the assets was that of the creditor and that this clause superseded any potential
conflicting terms/language in the associated TOU. Your honor, I present to you that clause within
all Loan Agreements, which Celsius termed the "Borrower's Representation," per **Exhibit C**.
    a. Without reiterating the language, it is clear and unambiguous that: the User (regardless of
    the account type), could take out a loan against his/her digital asset, that the user owned
    the collateral, and that once the loan was paid, the returning collateral (now asset) was
    again, owned by the creditor.
    b. Finally, the Loan Agreements expressly states that loan collateral and underlying assets is
    owned by the creditors. Thus, the transfer of ownership, title, and right never occurred
    (even in furtherance of this particular service), and therefore follows, since loans were
    not restricted for Earn customers, that the true ownership (that is, the ultimate
    beneficiary) of all of digital assets within Earn were never transferred to Celsius at any
    point, only as required on a conditional basis out of logistical necessity in furtherance of
    the services to be rendered.

3. In furtherance of dispelling any claims regarding the beneficiary of the digital assets in Earn, I
draw your attention to clause #14 of TOUV5-8. The contract language which has been used to
illustrate by some that the contract terms were ambiguous, that when taking the Agreement in
their totality, contextualizes this term in favor of the creditors owning their assets in Earn, and
nullifies such ambiguity in favor of the creditor, ironically named, "*Consent to Celsius' Use of
Your Digital Assets*" (D.R. 393, pages 217). One we have taken a moment to enjoy the fact this
this is title of the clause at the very the crux of the ambiguity claim, we should follow by
definitively dispelling such ambiguity would even matter, given the "ambiguous language" within
the TOU would default to terms favorable to the creditors, as per the Eric Wohlmend Objection
(Doc 1430, Pg 12) under New York contract law[2].

---

[2] The Eric Wohlmend Objection (Doc 1430) - Under New York law, any ambiguity in a contract must be construed
against the drafter. See, Aron Sec., Inc. v Unkechaug Indian Nation, 151 A.D.3d 674, 676; 54 N.Y.S.3d 668, 671
(NY Supreme Court, Appellate Div., Second Dept. 2017). As stated above, the Debtors' EARN customers had no
role in actually negotiating the terms of the Terms of Use, EARN Terms, SWAP Terms, and Risk Disclosure. Those
agreements are wholly the product of the Debtors and the only role the EARN customers played in the process was
to have to click "accept" to continue being a customer of the Debtors. As such, the contract must be strictly
construed against the Debtors.

4. The clear and obvious Tax Argument that all customer assets deposited and or grandfathered in Earn are the sole beneficiaries of the assets and the True owners in all practical senses.

   a. TOU5-8:
      *"Within Celsius' platform, you will be able to see a record of the transactions related to your use of the Services which you may wish to use for the purposes of making any required tax filings or payments."*

   b. I assert Eric Wohlmend's Objection relative to any ambiguity relative to asset ownership in Earn. The Objection lays out that in the event there lies some amount of alleged "contract ambiguity" (in this case, relevant to my (and all Celsius creditors') Earn account, per TOUV5-8, Clause #14), that the conduct of the parties is relevant to determine the intent of the parties to a contract. See, In re Lehman Bros., 439 B.R. page 825[3]. As there was no 1099 form made available for customer download, this is further evidence that the debtors didn't so much as intend to consider true ownership at any point changed hands in respect to Earn customers' digital assets as in doing so, in furtherance of meeting minimum financial reporting requirements and regulatory compliance, Celsius would have had to provide their customers with a 1099 form noting the sale of asset, a taxable event, and Celsius itself would have had to file its own 1099 form noting the purchase, again, a taxable event. To clear up any ambiguity regarding asset ownership in Earn, all we would need to do is look at their own behavior, did Celsius file a 1099 form in 2020 and 2021 noting the taxable events or not? If the later, the ownership of assets in Earn ought no longer to remain a matter of dispute.

**Argument 2: No Ruling ought to be made with Account Type as a legal determinate (Earn vs Custody) of how different creditors with assets held in either or both Earnings or Custody accounts. Due to the points hereafter, I argue all digital assets across Earn and Custody by reclassified as simply being in Celsius Creditor Accounts and that any ruling pertaining to these assets and the creditors who own them be treated equally and without prejudice.**

1. As the court examiner asserts in the Interim Examiner's Report and I believe has definitively proven, Celsius engaged in the rampant and ongoing comingling of user assets across different user accounts and account types (Earn and Custody). The consequence of this behavior and other behaviors, addressed below, is that no specific digital deposited into Celsius can be reliably traced back to its initial depositor, and that the assets across amount types as docketed, to confirm/reject such allocations is solely up to the memory of the depositor which is not a reliable source of verification. In the absence of the depositor using specialized tools that may be able to assist in this process, such means is not reasonable burden to bear for any creditor and thus we must accept the token allocation across account types as docketed because to demonstrate otherwise would be something that requires esoteric niche domain expertise as well as access to information we may not have (see below, off-chain transactions).

**Why this is important**: While one may think that one 1 $BTC is equal to another 1 $BTC, such assumption is not the case this. For example, it is not unusual for individuals, those generally of means, to pay a sizeable premium to ensure their $BTC is composed of all origination points that would be clear of

---

[3] In this instance, the Debtors' conduct leads to the conclusion that the EARN customers retained ownership of their digital assets. The Debtors' conduct includes the fact that they did not issue 1099 forms to the EARN customers upon the alleged conveyance of their digital assets to the Debtors. If the Debtors actually took title to the EARN customers' digital assets, one would believe that the Debtors would comply with the Internal Revenue Code and issue 1099 forms to their customers. The fact that they did not issue 1099 forms indicates that the Debtors did not even treat the transaction as a conveyance of EARN customers' digital assets.

any potential OFAC infraction or is in fact 1 real Bitcoin, an issue of current relevance given the activities that transpire on the FTX platform. In the wake of Ms. Pillay's report, how are we to know if the tokens in our Earn vs. Custody accounts are our own and if the allocation across account types are accurate without complete reliance on memory, an unreliable determinant of the accurately reporting on past events? Simply put, due to the aggregate process of asset transference by Celsius following the introduction of Custody, there is simply no longer a way we can verify an asset anymore with its depositor nor can anyone recall for certainty our token (in-kind) allocation across account types except for those being used as collateral at the time of imposed restriction of customer withdrawals. Without an audit trail, now virtually impossible due to those practices with which Celsius engaged as discussed below, there is no reasonable way with which we can recollect accurately the allocation of funds across account types. As such, Earn ought not be subordinated to Custody, as Celsius failed to preserve the ability to accurately track the allocation of assets across accounts.

Further movement across user account types (and perhaps across user accounts more broadly) is asserted by a Celsius Shareholder going by the name of Nuke Goldstein @NukeGold on Twitter, per **Exhibit D**. This reveals that Celsius's internal practices in no way reflected their external policies from TOU5 onward and had engaged in what we in the industry consider to be suspicious activity, having to take assets off-chain in order to transfer them across accounts to make up for liquidity shortfalls when they could have just as easily kept the assets on chain and therefore trackable. How do we know assets taken off-chain (off the books, so-to-speak), where then put back on chain or simply put somewhere else or how are we to know for certain the assets taken off-chain were then accurately allocated into the appropriate customer account type? The absence of a holistic and reliable on-chain audit regarding the impact of such practice,  in my view, nullifies the legal grounds with which it will be decided to subordinate assets in account kind to asset in another. All account types due to the inability to verify the allocation of assets across account types therefore ought not be treated differentially relative to the customer's receipt of their funds.

Per **Exhibit E**, as Protos Publication published on 11.21.22, in their article: Investigation finds Celsius Custody was ploy to remain relevant, due to Celsius' inability to maintain necessary liquidity to offer such an account, which offered no custody guarantees (insurance, that would constitute actual custody services, despite such insurance being in process and never having materialized as an option within the Celsius App). I consider the Custody account to be a fluke product with no legal standing and a differentiating factor from earn, and therefore assert the only valid account type is Earn and as such all Earn and Custody should be shifted into the User account of the asset holders and to no longer differentiate between a Custody account whose services never existed. As pe the author of this article and the conclusion of his investigation, "*Celsius didn't bother to develop a custody solution" and simply offered one to its customer to "buy time".'*

**EXHIBIT A:**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————      )
In re:                                                          )          Chapter 11
                                                                 )
CELSIUS NETWORK LLC, *et al.,*[4]            )          Case No. 22-10964 (MG)
                                                                 )
                            Debtors.                     )          (Jointly Administered)
———————————————————————      )

Upon the motion (the "Motion") of Michael Benzaken for entry of an order (this "Order"), granting relief and humbly requesting

that the all stablecoins and his stablecoins and the assets on his user account on the Celsius platform in particular are not property

of the estate, all as more fully set forth in the Motion; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§

157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the Southern District of

New York, entered February 1, 2012; and this Court having the power to enter a final order consistent with Article III of the

United States Constitution; and this Court having found that venue of these cases in this district is proper pursuant to 28 U.S.C.

§§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors'

estates, their creditors, and other parties in interest; and this Court having found that Mr. Benzaken's notice of the Motion and the

Order and opportunity for a hearing thereon were appropriate under the circumstances and no other notice need be provided; and

this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing

before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at

the Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefore, it

is HEREBY ORDERED THAT:

1. The Motion is granted on a final basis as set forth herein.

2. The Debtors are authorized and directed to determine that Michael Benzaken's assets and collateral in Earn to be deemed not

property of the estate, and instead deemed the sole property of Michael Benzaken.

3. That due to the arguments set here forth in this Motion, that the assets on Michael Benzaken's user account on the Celsius

platform in Earn, ought to be treated no differently than those assets in Custody in the ultimate distribution of such assets, as the

Earn services are no longer being rendered and the optionality to withdrawal from Earn to custody was revoked by Celsius on

---

[4] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

June 12, 2022 prior to Chapter 11 and thus should have been automatically moved from Earn to Custody. If no default will be

honored, Michael requests to execute his right, per the Agreements, to transfer those assets to. Michael further asserts this action

ought to have been executed by default for all unaccredited investors upon the termination of the services.

4. Notice of the Motion satisfies the requirements of Bankruptcy Rule 6004(a).

5. Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable

upon its entry.

6. The Debtors are authorized and directed to take all actions necessary to effectuate the relief granted in this Order in accordance

with the Motion.

7. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation,

interpretation, and enforcement of this Order.

_____

**Your Honor,**

For the foregoing reasons, I, Michael Benzaken, humbly appeal to you, your honor, to rule on this Motion, that the
Stablecoins in question are not part of the estate, that the digital assets on my Celsius Earn and account is not Property of
the Estate, and the categorization of both Earn and Custody accounts in response to ultimate asset distribution to the
creditors ought to be eliminated as a differentiating factor.

I further kindly request that Celsius provide their 2020 and 2021 tax filings to determined true ownership of the assets
regardless of contract language some deem ambiguous.

Lastly, I request that a return be made equitably across Celsius holders in-kind (that is, not dollarized but the original
tokens themselves minus the haircut pulled proportionality off the token holdings as docketed and affirmed by each
individual claimant), that any and all capital loss credits arising from user activity in Celsius and from this process of
distribution back to the creditors be given to its rightful owners, the creditors, and that I am given the opportunity outside
of claims to factor in my qualified offsets so to redistribute the appropriate amount of my assets minus the haircut to me as
I refuse to forfeit my right to a jury trial and to forfeit the jurisdiction of new jersey in furtherance of filings the claim
form. My account, as docketed, has been provided in **Exhibit F**, will itemized dollarization thereof and qualified offsets to
be provided upon the point of redistribution.

**Michael Benzaken**

*Michael Benzaken*

**Nouveau Homeless**

**President & Founder**
**Citizen Warrior Foundation**
www.citizenwarrior.foundation
https://bit.ly/investigating_celsius

_____
THE HONORABLE MARTIN GLENN
CHIEF UNITED STATES BANKRUPTCY JUDGE

**Exhibit B: Contract Language**

Kindly consider the following:

1. The transference was purely conditional and in furtherance of the services
2. The assets within the Earn Program can be withdrawn by the depositors at any time
3. All customers in the Earn Program could collaterize their digital assets to take out loans.
   Per all Loan Agreements; specfically, those associated with TOUV5-8, contained the
   <u>Borrower's Representation</u> clause, which was clear and unambiguous as to the following:
   a. The asset/collateral was owned by the depositors.
   b. That this language reinforcing ownership would supersede any potentially conflicting
      language in a corresponding TOU.

   Further, I was unable to identify any material changes regarding unconditional (read: to
   the elected, opt-out anytime Earn services) transfer of asset ownership in TOUV6-8,
   especially no such material changes as noted in the associated TOU Representations that
   have been made available by Celsius *et. al.* or that I have been able to come across. Further,
   that this demonstration ought to be sufficient evidence that the contract language for Earn
   relative to asset ownership is both clear and unambiguous and a reasonable person would
   read Clause #14 as being purely conditional on services rendered with such assets to be
   withdrawn at any time by the user and assets with which loans can be taken upon the election
   of the user.

   c. **8. Ownership of Digital Assets (D.R. 393, page 217) -** *You hereby represent and
      warrant to us at all times during which you hold Digital Assets in your
      <span style="color:red">Account</span>Celsius Wallet that any Digital Asset used by you in connection with your
      <span style="color:red">Account</span>Celsius Wallet is owned by you or that you are validly authorized to carry
      out transactions using such Digital Assets, and that all transactions initiated with
      your <span style="color:red">Account</span>Celsius Wallet are for your own <span style="color:red">Account</span>Celsius Wallet and not on
      behalf of any other person or entity. You further represent and warrant that all such
      Digital Assets are free from any claims, indebtedness, liens, or third-party interests.*
      i. Note: If Ms. Pillay was correct in her representation, and the assets ownership
         and title was transfer to the estate prior to account bifurcation in the standard
         user account, as is the case with TOUV5, then the Celsius TOU would have
         forced users to defraud themselves by agreeing to such terms, claiming
         ownership/title **at all times** when transacting within the creditors user
         account.
   d. **12. Withdrawals (D.R. 393, pg. 236) -** *You may make a complete or partial
      withdrawal of Eligible Digital Assets from your <span style="color:red">Account</span>Celsius Wallet at any time.
      Celsius initiates the withdrawal process immediately following a withdrawal request
      when possible; however, we may require up to three (3) days after you submit your
      withdrawal request to process the withdrawal.*
      i. Note: If Ms. Pillay is correct in her representation concerning Earn and asset
         ownership having been transferred to the estate, how could the user reclaim
         ownership at any time without there being language regarding transfer of
         ownership given the withdrawal language for eligible assets is clear and
         unambiguous would be returned within a maximum of 3 days following
         notification to Celsius by the asset owner (the creditor) and the subsequent
         processing of the request.

**Exhibit C:**

## Loan Agreement - "Borrower's Representation"

You hereby represent and warrant to us that, as of the Loan Effective Date and throughout the Loan Term:

(a) You are the sole owner of all Digital Assets used in connection with the Loan (including the Collateral and any Margin Call deposit);

(b) You are the sole beneficial owner of the digital wallet and/or bank account to which the principal is delivered;

(c) You are the sole beneficial owner of the Account;

(d) You represent and warrant that all Digital Assets are not owned, controlled, or received by any individual or entity subject to any sanctions administered or enforced by the United States.

(e) You are validly authorized to carry out transactions using such Digital Assets, and that all transactions initiated with your Account are for your own Account and not on behalf of any other person or entity;

(f) All Digital Assets used in connection with the Loan are, and will continue to be for the duration of the Term, free from any claims, indebtedness, liens, or third-party interests;

**Exhibit D:**

**Proof of Off-Chain Across Count Type Activity**



\* These steps are done off-chain within a few seconds

**Exhibit E:**

**Credibility of Celsius' so-called "Custody Accounts"**

# Investigation finds Celsius 'Custody' was ploy to remain relevant

6:14 PM • Nov 21, 2022
—Celsius, Crypto
—by Protos Staff
Share



Listen to this article.

An interim investigative report filed in the ongoing bankruptcy of Celsius Network provides more context about its business practices and shows a predictable pattern of irresponsibility.

The report lays out a timeline where, in response to state investigations by New Jersey, Texas, and Kentucky in May of 2021, Celsius attempted to appease regulators by preparing a 'Custody' product.

These initial three states were followed by Arkansas, Oklahoma, Pennsylvania, and Washington. The Securities and Exchange Commission (SEC) had also served requests or subpoenas by August 2021, and in September both New Jersey and Kentucky announced cease-and-desist letters against Celsius Network.

After this cease-and-desist, the firm received additional requests from the SEC, along with new requests from Alabama, Massachusetts, and New York; **Texas filed to enforce its own cease-and-desist and Washington filed charges**.

In short, Celsius was being pursued on all sides, with the controversy centering on the accusation that it offered unregistered securities to unaccredited investors.

Celsius was also paying close attention to the SEC's ongoing case against competitor BlockFi. When BlockFi settled with the SEC and 32 states on Valentine's Day in 2022, **the SEC turned its attention to Celsius, and Celsius begin seriously developing Custody**.

This was a decision described by chief revenue officer Roni Cohen-Pavon as "mostly about number and effect on growth" and was about remaining viable in the United States since it could no longer offer 'Earn' to unaccredited investors.

Another Celsius employee described it as a "defensive play" meant to "**retain some sort of relevance**."

The launch date for the Custody product was not determined based upon when the offering was complete, but the date on the New Jersey cease-and-desist. Celsius had an office in New Jersey, so enforcement of the cease-and-desist in the state could have ended the Celsius Earn product across the United States.

How did Celsius Network's Custody work?

The Celsius Network Custody product functioned very differently from most custody products in the crypto industry. Rather than creating segregated wallets for each client and keeping track of which assets were owed to customers, Celsius instead **decided to throw all of the custody wallets in one wallet, only check it occasionally, let it regularly have shortfalls**, and then occasionally refill it.

This isn't how custody offerings normally operate. Generally, separate wallets are created for each client and the assets they deposit. This allows the company to easily ensure that its assets in custody match the liabilities it owes customers.



Celsius Custody shortfall/surplus from filing

*Read more: [FTX and Tether were closer to Celsius than anyone realized](#)*

Celsius' legal team instructed employees to tell customers asking about the safety of their funds that "Celsius continues to safeguard customer assets," even when there were deficits in the Custody accounts.

Due to the haphazard setup of Celsius' custody offering, **all user assets were first passed through the main wallets before sometimes being sent over to Custody**. The practical import of this is that when Custody experienced a shortfall, those funds were being used by Celsius Network to fund its activities, despite the promise in the terms of service that it would "not transfer, sell, loan, or otherwise rehypothecate" those assets.

In the nine states where Celsius was unable to convince regulators to provide adequate licensing for its Custody offering, it created a new type of account described as a 'withhold' account. These accounts could still accept deposits but were ineligible for earning rewards. However, the funds deposited were still swept to the main wallets that Celsius was using for its activities.

Users with withhold accounts couldn't earn rewards, but **Celsius could still use its assets for deployment and other purposes**.

Many of these issues were, at least in part, a byproduct of Celsius' inadequate record-keeping systems. Prior to May 2021, it lacked a system to track assets and liabilities and instead would just check individual wallets. Starting in May of 2021, Celsius began tracking its assets and liabilities in a Google Sheets document that regularly failed to break out the different types of accounts. It wasn't until 24 days after the launch of Custody that this report started showing the Custody accounts broken out, and it was a shortfall when they finally added it.

As the investigator explains in the filing: "Celsius chose to rely on manual reconciliations and transfers of crypto assets without robust controls for the Custody program." **Celsius didn't bother to develop a custody solution**, preferring a Custody solution, to buy time.

*For more informed news, follow us on [Twitter](#) and [Google News](#) or listen to our investigative podcast [Innovated: Blockchain City](#).*

**Exhibit F:**

## Michael Benzaken's Open/Closed Loan Transaction History Details

| Internal id | Loan ID | Date and time | Transaction type | Coin type | Coin amount | USD Value | TOU Version | Loan Agreement Ve | Active/Closed | Should have Return to Custody |
|---|---|---|---|---|---|---|---|---|---|---|
| 555c2ba6-88ec-4877-8b77-e6f6ef9e976d | 119246 | 6/11/22 18:46 | Collateral | ETH | 9.979501021 | 15,552.54 | TOUV* | Loan Agreement 9 | closed after tos change ETH | Yes |
| d99811d9-536a-4d2b-94d1-ca2fd91a456c | 119246 | 6/11/22 18:46 | Loan Principal Payment | USDC | -10000 | -10000 | TOUV8 | Loan Agreement 9 | closed after tos change ETH | Yes |
| 831fb9f8-e310-4962-a389-0b2921d7348e | 120554 | 5/9/22 21:51 | Collateral | DOT | 420.9049456 | 4,802.54 | TOUV8 | Loan Agreement 9 | closed after tos change DOT | Yes |
| c86c83f0-a117-4af4-860c-0d374e94eaa5 | 120554 | 5/9/22 21:51 | Loan Principal Payment | USDC | -3000 | -3000 | TOUV8 | Loan Agreement 9 | closed after tos change DOT | Yes |
| 84356823-1ddc-41d7-b23e-0d4181c31cf6 | 147795 | 3/29/22 14:25 | Loan Principal Payment | USDC | 11750 | 11750 | TOUV7 | Loan Agreement 9 | active BTC | |
| b9419557-2610-4260-8d3f-e823fb4eb074 | 147795 | 3/29/22 13:50 | Collateral | BTC | -0.983615555 | (47,000.00) | TOUV7 | Loan Agreement 9 | active BTC | |
| 81217a97-0ce9-4bca-b45a-a8e6a59da950 | | 12/25/21 17:03 | Collateral | DOT | -420.9049456 | (12,000.00) | | | | |
| ae8fa53f-6e80-4ae0-923a-c4e298f402b0 | | 12/21/21 9:03 | Loan Principal Payment | USDT ERC20 | 10000 | 10000 | | | | |
| 8cc92023-582c-41c8-a02e-6175aa82359a | | 12/21/21 7:41 | Collateral | ETH | -9.979501021 | (40,000.00) | | | | |
| 641e952c-bb04-4303-84cd-c15f47c472ff | 118445 | 12/20/21 9:53 | Loan Principal Payment | USDC | 30000 | 30000 | TOUV7 | Loan Agreement 9 | active BTC | |
| b759efb5-6b16-47af-a91c-ec17d2b64faa | | 12/19/21 4:16 | Collateral | BTC | -2.095463604 | (100,000.00) | | | | |
| 5ba003b2-5526-4fc5-8c8b-5e9a4abe07e6 | 118445 | 12/18/21 8:50 | Collateral | BTC | -2.585417662 | (120,000.00) | TOUV7 | Loan Agreement 9 | active BTC | |
| 8c69f052-23e8-491c-910d-4c5663a54590 | | 12/18/21 8:45 | Collateral | BTC | -0.859383392 | (40,000.00) | | | | |
| c343dacf-b691-4b92-b9a3-f5edc9c25a03 | | 9/5/21 16:54 | Collateral | MANA | 13176.3937 | 13,832.24 | | | | |
| 0647ac2e-2377-445c-9760-a9add06647e8 | | 9/5/21 16:54 | Loan Principal Payment | USDC | -2500 | -2500 | | | | |
| 51db463d-12fc-478a-b9c4-5d07f58b2a1c | | 9/4/21 3:49 | Collateral | MATIC | 48364.79989 | 71,579.90 | | | | |
| 933878df-cd76-4445-afb8-f6a3c9b7f25d | | 9/4/21 3:49 | Loan Principal Payment | USDC | -4500 | -4500 | | | | |
| fb295708-f2ba-4197-8935-5ac21a7d809a | | 8/9/21 14:41 | Collateral | USDT ERC20 | 6545.326205 | 7,396.22 | | | | |
| 0884b221-ec8e-4334-ad4e-baf9a1c27c05 | | 8/9/21 14:41 | Loan Principal Payment | USDT ERC20 | -2500 | -2500 | | | | |
| d431bae6-c3ac-45d9-b593-11c67c3b05a1 | | 8/9/21 14:36 | Loan Principal Payment | USDT ERC20 | 2500 | 2500 | | | | |
| 1805d706-23ab-4506-9cf7-7fa2c32d246f | | 8/7/21 20:07 | Collateral | MANA | -13176.3937 | (10,000.00) | | | | |
| 43c8fbcb-7d8f-4275-b4ce-3640d4f45f49 | | 6/22/21 15:33 | Collateral | MANA | 19960.34292 | 8,630.26 | | | | |
| 8309e355-29f0-41b5-9dbb-df6a56a25f05 | | 6/22/21 15:33 | Loan Principal Payment | USDT ERC20 | -5000 | -5000 | | | | |
| f4c63010-3ad1-4eb0-b453-96924f08eef1 | | 6/22/21 14:29 | Collateral | MANA | -82.74598013 | (32.59) | | | | |
| aee2669e-c7cf-4c80-bcef-2f7e4aef4bdf | | 6/14/21 20:45 | Loan Principal Payment | USDC | 2500 | 2500 | | | | |
| a880b41d-f8ec-4a16-aa6e-ba34355817a4 | | 6/14/21 20:36 | Collateral | MATIC | -6545.326205 | (10,000.00) | | | | |
| c8209ae8-c1d9-4a4e-8cf9-c789476ecb3d | | 4/11/21 8:14 | Loan Principal Payment | USDC | 4500 | 4500 | | | | |
| 0db045b6-0e1c-4f2b-b49b-e8ee9abb4773 | | 4/9/21 21:15 | Collateral | MATIC | -48364.79989 | (18,000.00) | | | | |
| f706a5dc-e71b-4b60-ad09-dbe62f7bd8de | | 4/9/21 19:19 | Loan Principal Payment | USDT ERC20 | 5000 | 5000 | | | | |
| ac24ddfa-c042-47c8-8974-2f8d1de482ea | | 4/9/21 21:14 | Collateral | MANA | -19877.59694 | (20,000.00) | | | | |