**Hearing Date:  January 24, 2023, at 10:00 a.m. (prevailing Eastern Time)**
**Objection Deadline:  January 17, 2023, at 4:00 p.m. (prevailing Eastern Time)**

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Counsel to the Initial Debtors and Debtors in Possession*

*Proposed Counsel to the GK8 Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*, [1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF HEARING ON**
**DEBTORS' MOTION FOR ENTRY OF AN**
**ORDER AUTHORIZING THE DEBTORS TO**
**CREDIT FLARE TOKENS TO ELIGIBLE ACCOUNT HOLDERS**

**PLEASE TAKE NOTICE** that a hearing on the *Debtors' Motion for Entry of an Order Authorizing the Debtors to Credit Flare Tokens to Eligible Account Holders* (the "Motion") will be held on **January 24, 2023, at 10:00 a.m., prevailing Eastern Time** (the "Hearing") before the Honorable Martin Glenn, Chief United States Bankruptcy Judge.  In accordance with General

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

Order M-543 dated March 20, 2020, the Hearing will be conducted remotely using Zoom for Government. Parties wishing to appear at the Hearing, whether making a "live" or "listen only" appearance before the Court, need to make an electronic appearance (an "eCourtAppearance") through the Court's website at https://ecf.nysb.uscourts.gov/cgi-bin/nysbAppearances.pl. Electronic appearances (eCourtAppearances) need to be made by 4:00 p.m., prevailing Eastern Time, the business day before the hearing (*i.e.*, on **January 23, 2023**.)

**PLEASE TAKE FURTHER NOTICE** that due to the large number of expected participants in the Hearing and the Court's security requirements for participating in a Zoom for Government audio and video hearing, all persons seeking to attend the Hearing at 10:00 a.m., prevailing Eastern Time on January 24, 2023, must connect to the Hearing beginning at 9:00 a.m., prevailing Eastern Time on January 24, 2023. When parties sign in to Zoom for Government and add their names, they must type in the first and last name that will be used to identify them at the Hearing. Parties that type in only their first name, a nickname, or initials will not be admitted into the Hearing. When seeking to connect for either audio or video participation in a Zoom for Government Hearing, you will first enter a "Waiting Room" in the order in which you seek to connect. Court personnel will admit each person to the Hearing from the Waiting Room after confirming the person's name (and telephone number, if a telephone is used to connect) with their eCourtAppearance. Because of the large number of expected participants, you may experience a delay in the Waiting Room before you are admitted to the Hearing.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections to the relief requested in the Motion shall: (a) be in writing; (b) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern

District of New York; (c) be filed electronically with the Court on the docket of *In re Celsius Network LLC*, No. 22-10964 (MG) by registered users of the Court's electronic filing system and in accordance with all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York (which are available on the Court's website at http://www.nysb.uscourts.gov); and (d) be served in accordance with the *Amended Final Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief* [Docket No. 1181] (the "Case Management Order") by **January 17, 2023, at 4:00 p.m., prevailing Eastern Time**, to (i) the entities on the Master Service List (as defined in the Case Management Order) available on the case website of the Debtors at https://cases.stretto.com/celsius and (ii) any person or entity with a particularized interest in the subject matter of the Motion.

**PLEASE TAKE FURTHER NOTICE** that only those responses or objections that are timely filed, served, and received will be considered at the Hearing. Failure to file a timely objection may result in entry of a final order granting the Motion as requested by the Debtors.

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion and other pleadings filed in these chapter 11 cases may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/celsius. You may also obtain copies of the Motion and other pleadings filed in these chapter 11 cases by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

New York, New York
Dated: January 3, 2023

*/s/ Joshua A. Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:         jsussberg@kirkland.com

 - and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:         patrick.nash@kirkland.com
               ross.kwasteniet@kirkland.com
               chris.koenig@kirkland.com
               dan.latona@kirkland.com

*Counsel to the Initial Debtors and Debtors in Possession*

*Proposed Counsel to the GK8 Debtors and Debtors in Possession*

4

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Initial Debtors and Debtors in Possession*

*Proposed Counsel to the GK8 Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) ) ) ) ) ) ) | Chapter 11 |

In re:                                          )    Chapter 11
                                                )
CELSIUS NETWORK LLC, *et al.*,[1]               )    Case No. 22-10964 (MG)
                                                )
                              Debtors.          )    (Jointly Administered)
                                                )

## DEBTORS' MOTION FOR ENTRY OF AN
## ORDER AUTHORIZING THE DEBTORS TO
## CREDIT FLARE TOKENS TO ELIGIBLE ACCOUNT HOLDERS

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state as follows in support of this motion (this "Motion"):

### Relief Requested

1.      The Debtors seek entry of an order, substantially in the form attached hereto as

**Exhibit A** (the "Order"), authorizing the Debtors to credit Flare Tokens to Eligible Customers'

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 USA LLC (9450); and GK8 UK Limited (0893). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, PH05, Hoboken, New Jersey 07030.

accounts that held XRP tokens on the Debtors' platform as of the XRP Snapshot (as defined herein).

## Jurisdiction and Venue

2.      The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York, entered February 1, 2012.  The Debtors confirm their consent to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief requested herein are sections 105 and 363 of title 11 of the United States Code (the "Bankruptcy Code"), rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 9013-1 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules").

## Background

5.      The Debtors, together with their non-Debtor affiliates (collectively, "Celsius"), are one of the largest and most sophisticated cryptocurrency based finance platforms in the world and provide financial services to institutional, corporate, and retail clients across more than 100 countries.  Celsius was created in 2017 to be one of the first cryptocurrency platforms to which users could transfer their crypto assets and (a) earn rewards on crypto assets and/or (b) take loans using those transferred crypto assets as collateral.  Headquartered in Hoboken, New Jersey, Celsius has more than 1.7 million registered users and approximately 300,000 active users with account balances greater than $100.

2

6.     On July 13, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description of the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Robert Campagna, Managing Director of Alvarez & Marsal North America, LLC, in Support of Chapter 11 Petitions and First Day Motions* (the "Campagna Declaration") [Docket No. 22].[2]

7.     The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  These chapter 11 cases have been consolidated for procedural purposes only and are jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket No. 53].  On July 27, 2022, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed an official committee of unsecured creditors [Docket No. 241] (the "Committee").  On August 18, 2022, the U.S. Trustee filed a motion for the entry of an order directing the appointment of an examiner pursuant to 11 U.S.C. § 1104(c) [Docket No. 546].  On September 14, 2022, the Court entered an order directing the appointment of an examiner [Docket No. 820].  On September 29, 2022, the Court approved the appointment of the examiner [Docket No. 923].

**The Flare Token Distribution Event**

8.     Companies creating blockchain-based projects often "airdrop" newly minted tokens to existing cryptocurrency users as a means of encouraging the use and adoption of the new token.  Token creators use a variety of requirements to establish eligibility for an airdrop—some examples include (a) signing up for a newsletter, (b) re-tweeting from an official account, (c) holding affiliations with related cryptocurrency projects, and (d) holding certain existing

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the the Campagna Declaration.

tokens.  This is analogous to other industries where companies offer potential customers free samples or trials to encourage customers to adopt that product.  Given the variance in the success of new tokens, the values of these new tokens range from worthless to substantially valuable. Some examples of recent airdrops include OpenDAO's SOS tokens, Gas DAO's GAS tokens, and LooksRare's LOOKS tokens.

9.      Flare Networks Limited ("Flare") is utilizing an airdrop to distribute its initial batch of newly minted tokens (the "Flare Tokens").  While the Flare token distribution event (the "Token Distribution Event" or "TDE") was initially expected to occur in late 2022, Flare issued a statement explaining that the TDE was delayed to January 2023 because certain exchanges distributing the Flare Token required several-weeks' visibility of decentralized network validation before sanctioning the distribution.  Accordingly, the TDE is expected to occur on or around January 9, 2023.  The Flare statement is attached hereto as **Exhibit B**.  Fifteen percent of the total aggregate amount of Flare Tokens to be airdropped will be airdropped on the TDE.  The remainder will be airdropped over a minimum period of twenty-five months and a maximum of thirty-four months. All individuals holding XRP tokens on participating exchanges will be eligible for the airdrops.

10.     The Debtors are party to a grant agreement with Flare, attached hereto as **Exhibit C** (the "Flare Agreement"), whereby the Debtors are to credit approximately 250 million Flare Tokens to Celsius customers' accounts holding XRP tokens (the "Flare Airdrop") in exchange for a grant of 150 million Flare Tokens directly to the Debtors (the "Flare Token Grant").  Pursuant to the Flare Agreement, Flare will distribute the Flare Tokens based on a "snapshot" of all Celsius customers' XRP token holdings taken on December 12, 2020 (the "XRP Snapshot," and the distribution scheme as specified in Annex A of the Flare Agreement, the "Distribution Scheme").

4

Thus, those customers on the Celsius platform who held XRP tokens in their Earn accounts[3] as of

the XRP Snapshot are eligible to receive the Flare Tokens (collectively, the "Eligible Customers").

The Flare Token Grant is conditional: should the Debtors credit the Flare Tokens to Eligible

Customers' Earn accounts according to the Distribution Scheme, Flare will grant Celsius the Flare

Token Grant. Because the Flare Token is not yet released, it has no current market value. Thus,

the value of the Flare Token Grant is presently unknown.

11.    The Celsius general terms of use effective April 14, 2022 (the "Terms of Use")

explicitly address airdrops and allow the Debtors to support any airdropped tokens on the Celsius

platform. Section 14 of the Terms of Use provides the following:

> In the event that a Digital Asset network attempts to or does distribute Digital
> Assets to Blockchain addresses pertaining to an Eligible Digital Asset via airdrop
> or bootstrapping (collectively, an "Airdrop"), the support of any such new Digital
> Assets in your Celsius Account is solely at the discretion of Celsius. If we do not
> make a public announcement confirming our support of such new Digital Assets,
> we will not support such new Digital Assets and such new Digital Assets will be
> treated as [Unsupported Assets]. To the extent you wish to receive the new Digital
> Assets to be delivered via Airdrop, you are advised to withdraw the applicable
> Digital Assets from your Celsius Account prior to the relevant date for the Airdrop.
> You further agree and understand that Digital Assets delivered via Airdrop do not
> create or represent any relationship between us and the sender and/or the related
> Digital Asset network and do not subject us to any obligations whatsoever as they
> relate to the sender and/or the related Digital Asset network.[4]

12.    In addition, the terms of use applicable solely to customers using the Debtors'

borrowing services (the "Borrow" program and customers thereof, "Borrow Customers") effective

on or around October 19, 2021 (the "Lending Terms of Use") apply. However, the rights of

---

[3]    On the XRP Snapshot, the Debtors had not yet created the Custody program. Thus, the Debtors seek authority to
credit the Eligible Customers' Earn accounts that held XRP tokens as of the XRP Snapshot.

[4]    Capitalized terms are defined in Exhibit A-8 of *Declaration of Alex Mashinsky, Chief Executive Officer of Celsius
Network LLC, Providing Terms of Use Dating Back to February 18, 2018* [Docket No. 393].

Borrow Customers to participate in airdrops differ. The section entitled "Consent to Celsius' Use of Your Digital Assets" of the Lending Terms of Use provides the following:

> In consideration for the Loan, you grant Celsius and any of its Affiliates the right, subject to applicable laws, without further notice to you, to hold the Digital Assets provided as Collateral in Celsius' name or in another name, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets at Celsius' own risk. You acknowledge that, with respect to Digital Assets used by Celsius pursuant to this paragraph:
>
> . . .
>
> 3.    You will not be entitled to receive any benefits granted to the holder of any Digital Asset from time to time, including any airdrops . . .[5]

### Basis for Relief

**I.    The Debtors May Facilitate the Token Distribution Event in the Ordinary Course of Business Pursuant to Section 363(c)(1) of the Bankruptcy Code.**

13.    Section 363(c)(1) of the Bankruptcy Code authorizes a debtor in possession to use, sell, or lease property of the estate in the ordinary course of its business providing, in relevant part:

> If the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204 or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

14.    As threshold matters, the Debtors continue to operate their businesses as debtors in possession in accordance with sections 1107(a) and 1108 of the Bankruptcy Code, and the Debtors' Terms of Use explicitly contemplate the receipt of digital assets by means of airdrops.

---

[5]    Capitalized terms are defined in <u>Exhibit B-9</u> of *Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, Providing Terms of Use Dating Back to February 18, 2018* [Docket No. 393].

15.     Section 363 of the Bankruptcy Code is designed to strike a balance between allowing a business to continue its daily operations without excessive court or creditor oversight and protecting secured creditors and others from dissipation of the estate's assets. *See In re Lavigne*, 114 F.3d 379, 384 (2d Cir. 1997). The ordinary course of business standard is intended to allow a debtor in possession the flexibility required to run its business and respond quickly to changes in the business environment. *See In re Roth Am., Inc*., 975 F.2d 949, 952 (3d Cir. 1992). Accordingly, a debtor in possession may use, sell, or lease property of the estate without need for prior court approval if the transaction is in the ordinary course. *See Lavigne*, 114 F.3d at 384; *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 796–97 (Bankr. D. Del. 2007) ("Thus, whether notice and a hearing are required depends on whether a transaction is 'in the ordinary course of business.'"); *In re Chernicky Coal Co.*, 67 B.R. 828, 834 (Bankr. W.D. Penn. 1986) (holding that bankruptcy court approval was not required for a transaction in which the debtor "did nothing post-petition that it did not do pre-petition in the ordinary course of its regular business activities"). Stated differently, creditors are not entitled to the right to notice and a hearing when transactions are in the ordinary course of business "because their objections to such transactions are likely to relate to the [debtor's] chapter 11 status, not the particular transactions themselves." *See In re James A. Phillips, Inc.*, 29 B.R. 391, 394 (S.D.N.Y. 1983). Nevertheless, the Debtors file this Motion out of an abundance of caution to ensure their ability to credit Eligible Customers with Flare Tokens pursuant to the Distribution Scheme.

16.     The Bankruptcy Code does not define the "ordinary course of business." To determine whether a transaction is in the ordinary course of business under section 363 of the Bankruptcy Code, courts in the Second Circuit apply a two-part test: the objective horizontal test and the subjective vertical test. *See, e.g.*, *Lavigne*, 114 F.3d at 384–85 (citing *Roth Am.*, 975 F.2d

at 952–53).  The horizontal test is a factual analysis as to whether the transaction in question is of the sort commonly undertaken by companies in the relevant industry.  *See Lavigne*, 114 F.3d at 384–85.  The vertical test is an analysis conducted from the perspective of a hypothetical creditor to determine whether the transaction subjects such creditor to an economic risk of a nature different from those it accepted when it entered into a contract with the debtors.  *Id*.  In making this determination, courts look to the debtor's prepetition business practices and conduct and compare them to the debtor's postpetition conduct.  *See, e.g.*, *Nellson Nutraceutical*, 369 B.R. at 797.  Here, facilitating airdrops to receive the Flare Grant and generate customer goodwill satisfies both the horizontal and vertical tests.

17.    Facilitating the Token Distribution Event satisfies the horizontal test.  Airdrops are a common occurrence in the cryptocurrency industry, and exchanges such as Celsius often facilitate these airdrops.  Accordingly, a cryptocurrency exchange would be reasonably expected to facilitate airdrops and receive part of the airdrop.  Thus, the horizontal test is satisfied here.

18.    With regard to the vertical test, a hypothetical reasonable account holder would likely see no material change in its exposure to economic risk in connection with the Debtors' facilitating of the Token Distribution Event—rather, Eligible Customers would ***benefit*** by receiving Flare Tokens.  That is, a prepetition account holder would reasonably expect (and likely prefer) that the Debtors continue their prepetition practice in this regard on a postpetition basis.  Thus, it is likely that a reasonable account holder would negatively view the Debtors halting the facilitation of airdrops.  The Debtors would, in essence, be passing on a potentially valuable digital asset source that does not require any remuneration other than offering the Token Distribution Event to Eligible Customers.  Honoring the Flare Agreement and facilitating this airdrop aligns with the Debtors' prepetition business practices, as is reflected in the Debtors' Terms of Use.

8

19.     Section 363(c)(1) of the Bankruptcy Code provides sufficient authority for the Debtors to facilitate the Token Distribution Event and honor the Flare Agreement on grounds that such activity is squarely "ordinary course" under the binding precedent of this circuit. Accordingly, the Debtors respectfully request entry of the Order.

## II.     Facilitating the Flare Airdrop is a Sound Exercise of the Debtors' Business Judgment and is in the Best Interests of Their Estates.

20.     Facilitating the Flare Airdrop to Eligible Customers' accounts is a sound exercise of the Debtors' business judgment and is in the best interests of their estates and all stakeholders. In addition, the Debtors' execution of the Flare Airdrop will entitle the Debtors to 150 million Flare Tokens, bringing potentially valuable assets into the Debtors' estates and maximizing stakeholder recovery.  Accordingly, the Debtors seek to honor the Flare Airdrop under sections 363(b) and 105(a) of the Bankruptcy Code.

21.     Section 363(b) of the Bankruptcy Code provides that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  A court may authorize non-ordinary course transactions using property of the estate pursuant to section 363(b) when "a sound business purpose dictates such action." *Stephens Industries, Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) (approving a sale of assets pursuant to section 363(b)); *In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992) (requiring a "good business reason" to grant a section 363(b) application); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification).  Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R.

612, 616 (Bankr. S.D.N.Y. 1986); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005)

("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean

task.").

22.    Thus, if a debtor's actions satisfy the business judgment rule, then the transaction

in question should be approved under section 363(b) of the Bankruptcy Code.    Indeed, when

applying the "business judgment" standard, courts show great deference to a company's business

decisions.    *See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re*

*Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) ("Courts are loath to interfere with

corporate decisions absent a showing of bad faith, self-interest, or gross negligence.") (quoting

*Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also Granada Invs., Inc. v. DWG Corp.*,

823 F. Supp. 448, 454 (N.D. Ohio 1993) (observing that "courts employ the business judgment

rule because in order for a corporation to be managed properly and efficiently, latitude must be

given in the handling of corporate affairs") (internal quotation omitted).    The business judgment

rule asks whether the transaction at issue is "within the fair and reasonable business judgment of

the Debtors and thus within the zone of acceptability."    *In re Alpha Nat. Res., Inc.*,

546 B.R. 348, 356 (Bankr. E.D. Va. 2016).

23.    Furthermore, section 105(a) of the Bankruptcy Code provides that a court "may

issue any order, process, or judgment that is necessary or appropriate to carry out the provisions

of" the Bankruptcy Code.    11 U.S.C. § 105(a).    The general equitable powers granted under

section 105(a) of the Bankruptcy Code confer upon a court the power to "exercise equity in

carrying out the provisions of the Bankruptcy Code." *In re Dairy Mart Convenience Stores, Inc.*,

351 F.3d 86, 92 (2d Cir. 2003).    As explained by the Supreme Court, section 105(a) of the

Bankruptcy Code is a "statutory directive consistent with the traditional understanding that

bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships." *U.S. v. Energy Res. Co.*, 495 U.S. 545 (1990).

24.     The relief requested herein is appropriate and warranted under both sections 363(b) and 105(a) of the Bankruptcy Code.  Authorizing the Debtors to receive the Flare Tokens via airdrop from Flare and subsequently credit Eligible Customers is in the best interest of the Debtors' estates and their creditors and is a sound exercise of the Debtors' business judgment.  It maximizes the value of the Debtors' estates by causing the Flare Tokens to be available to the Debtors under the Flare Token Grant.  Furthermore, section 105(a) of the Bankruptcy Code provides this Court with authority to further provisions of the Bankruptcy Code, such as section 363(b) Bankruptcy Code.  The Debtors would receive the Flare Tokens under the Flare Token Grant free of charge, with the only costs being administrative and tax costs incurred as part of the ordinary course of business.  The ability of the Debtors to conduct these activities with this Court's approval falls squarely within the parameters of sections 363(b) and 105(a).

25.     The facts of these chapter 11 cases warrant approval of Flare Token crediting to to Eligible Customers.  ***First***, crediting requires no remuneration from the Debtors.  Employees of the Debtors are able to effectuate the Distribution Scheme.  Thus, the Debtors are exercising their reasonable business judgment in electing a low-cost avenue for receiving the Flare Token Grant.

26.     ***Second***, implementing the Distribution Scheme will provide the Debtors with potential additional sources of recovery for eligible account holders.  As the Token Distribution Event occurs in accordance with the Distribution Scheme, the Debtors will be credited with the Flare Token Grant.  Thus, the Debtors are exercising their reasonable business judgment to receive a substantial number of Flare Tokens, and those tokens may hold significant potential value.

11

27.     ***Third***, there is no unfair distribution among creditors to the Debtors.  Even prior to the Petition Date, Eligible Customers held balances in their Celsius accounts indicating the amount of Flare Tokens the Eligible Customers could expect to receive upon the Token Distribution Event.

28.     Accordingly, for the reasons set forth herein, crediting the Flare Tokens to Eligible Customers is within the Debtors' sound business judgment and will further maximize stakeholder recovery.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

29.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the fourteen-day stay period under Bankruptcy Rule 6004(h).

## Reservation of Rights

30.     Nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or should be construed as (a) an admission as to the validity of any particular claim against the Debtors, (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds, (c) a promise or requirement to pay any particular claim, (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion, (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law, or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be

12

construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## Motion Practice

31.     This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Motion. Accordingly, this Motion satisfies Local Rule 9013-1(a).

## Notice

32.     The Debtors will provide notice of this Motion to the following parties or their respective counsel:  (a) the U.S. Trustee; (b) counsel to the Committee; (c) the United States Attorney's Office for the Southern District of New York; (d) the Internal Revenue Service; (e) the offices of the attorneys general in the states in which the Debtors operate; (f) the Securities and Exchange Commission; (g) Flare Networks Limited; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

33.     No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtors request that the Court enter the Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

New York, New York
Dated: January 3, 2023

/s/ Joshua A. Sussberg

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          jsussberg@kirkland.com

 - and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          patrick.nash@kirkland.com
                ross.kwasteniet@kirkland.com
                chris.koenig@kirkland.com
                dan.latona@kirkland.com

*Counsel to the Initial Debtors and Debtors in Possession*

*Proposed Counsel to the GK8 Debtors and Debtors in Possession*

## Exhibit A

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**ORDER AUTHORIZING THE DEBTORS TO**
**CREDIT FLARE TOKENS TO ELIGIBLE ACCOUNT HOLDERS**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"), authorizing the Debtors to credit Flare Tokens to Eligible Customers' accounts that held XRP tokens on the Debtors' platform as of the XRP Snapshot in of the ordinary course of business, all as more fully set forth in the Motion; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York, entered February 1, 2012; and this Court having the power to enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of these cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing thereon were appropriate under the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted as set forth herein.

2.      The Debtors are authorized to credit Eligible Customers' accounts in the Earn program that held XRP tokens as of the XRP Snapshot with the Flare Tokens in accordance with the Distribution Scheme as set forth in the Flare Agreement, *provided* that if the Debtors credit such accounts in accordance with the Flare Agreement, Flare must comply with its obligations under the Flare Agreement, including the distribution of 150 million Flare Tokens directly to the Debtors.

3.      Notwithstanding anything to the contrary in the Motion, this Order, or any findings announced at the Hearing, nothing in the Motion, this Order, or announced at the Hearing constitutes a finding under the federal securities laws as to whether crypto tokens or transactions involving crypto tokens are securities, and the right of the United States Securities and Exchange Commission to challenge transactions involving crypto tokens on any basis are expressly reserved.

4.      Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed:  (a) an admission as to the validity of any particular claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365

of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens. Any payment made pursuant to this Order is not intended and should not be construed as an admission as the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

5.      Nothing in this Order authorizes the Debtors to accelerate any payments not otherwise due.

6.      Notice of the Motion satisfies the requirements of Bankruptcy Rule 6004(a).

7.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

8.      The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

9.      This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

New York, New York
Dated: _____, 2023f

_____
THE HONORABLE MARTIN GLENN
CHIEF UNITED STATES BANKRUPTCY JUDGE

## Exhibit B

**Flare Statement**



Home   Wallets   Team   Contact   Docs   Papers   Jobs   Blog   Sign Up

# Token Distribution Event Date

Dubai, 21 October 2022

A major milestone will be achieved next week, as Flare reaches the decentralization threshold set for token distribution and enters the 6-9 month Beta period.

Flare will have onboarded sufficient independent validators to render the network decentralized and secure. Once an appropriate date has been agreed collectively with the major exchanges, Flare will be ready to commence token distribution.

The public FLR token distribution allocation is dictated by a snapshot of pre-existing assets (XRP), with over 90% custodied on centralized exchanges. These exchanges will therefore receive a correspondingly high proportion of FLR.

Flare has been in constructive conversations with these exchanges to request they release FLR to their customers within days of the Token Distribution Event (TDE), and certainly within no more than two weeks. An orderly and simultaneous distribution is the fairest manner to provide FLR to our community and will be to the benefit of everyone involved.

The coordination of token distribution by over one hundred exchanges involves multiple security and compliance reviews. Some exchanges require visibility of decentralized network validation for several weeks before sanctioning the token distribution. With this factored in, Flare envisages all the exchanges being ready within the next month, but with international end of year celebrations, a TDE around 9th January '23 may be deemed the optimal path for the fairest and most inclusive distribution. If exchange feedback in one month's time means a December TDE is an option, then as previously stated, the network itself will be ready.

Flare would like to publicly thank all the exchange teams prioritizing the integration of FLR, who have been conducting code audits, security reviews, compliance checks, as well as finalizing the integration of the Flare blockchain. We are also very grateful for the continued support of the Flare Community and their belief in the potential of Flare's novel technology.

During this period, we would appreciate it if the community could avoid contacting the exchanges excessively. We estimate that 5-10 million individuals will receive FLR during the public token distribution, and the exchanges have a very important task in ensuring that all of their customers' funds are distributed safely.

Flare Network is one of the largest token distributions that blockchain has ever seen. For the best result for the community and the long term success of the network, we want to ensure that this distribution is as fair, orderly and seamless as it can be.

Author: Flare Team

**<u>Exhibit C</u>**

**Flare Agreement**

# Grant Agreement

The Parties to this Grant Agreement are:

Flare Networks Limited (FNL) of Mill Mall, Suite 6, Wickhams Cay 1, P.O. Box 3085, Road Town, Tortola, British Virgin Islands. Company registration no. 2017587

*and*  Celsius Network Limited, 1 Bartholomew Lane, London, EC2N 2AX United Kingdom Company Number 11198050

(**the Grantee**), referred to collectively as the **Parties** and each individually as a **Party**.

**I.   BACKGROUND and Information**

A.  FNL has agreed to pay the Grant to the Grantee to assist it in distributing the Spark token to its customers.

B.  This Grant Agreement sets out the terms and conditions on which the Grant is made by FNL to the Grantee.

C.  Snapshot date: The first validated ledger on XRP Ledger with a timestamp greater than or equal to 00:00 GMT on 12th December 2020.

D.  Spark token is the native token issued by the Flare Network.

**II.  Grant Offer**

A.  FNL offers to transfer to the Grantee the Grant (the amount of which is set out in clause IV of this Grant Agreement) on condition that the Grantee complies fully with the terms of this Grant Agreement.

B.  The Grantee acknowledges that FNL agrees to provide the grant only for the purposes set out in this Grant Agreement.

**III. Purpose of the Grant**

A.  FNL is providing the grant for the sole purpose of enabling the distribution of the Spark token to Celsius's XRP holding customers.

**IV. Amount of the Grant**

A.  100,000,000 Spark tokens.

**V.  Timing of Grant Transfer**

A.  Immediately upon Flare Network Main Net Initiation.

**VI. Grant terms**

    A. The grant is made directly to Celsius for the purpose of distributing the Spark token to their underlying XRP holding customers at the snapshot date. The distribution performed by Celsius must conform to distribution formula set out in Annexe A.

    B. Subsequent to the distribution any remaining grant amount is the free and unencumbered property of Celsius.

**VII. Publicity – Acknowledgement of Grant**

    A. The Grantee may acknowledge the Grant after the snapshot date.

**VIII. Spark Distribution incentives**

    A. Prior to 13th December 2020 the grantee may not offer a greater distribution of Spark tokens to XRP owning customers on their platform than is defined in clause 1.1.

    B. Prior to the 13th December 2020 any Spark token based incentives offered to platform customers are required to be agreed in writing with FNL.

**IX. Entire Agreement**

    A. This Grant Agreement constitutes the entire agreement between the Parties and supersedes all negotiations, representations or agreements either written or oral preceding it.

**X. Governing Law**

    A. This Grant Agreement will be governed by and construed in accordance with English law the Grantee hereby irrevocably submits to the non-exclusive jurisdiction of the English courts. The submission to such jurisdiction will not (and will not be construed so as to) limit the right of FNL to take proceedings against the Grantee in any other court of competent jurisdiction, nor will the taking of proceedings by FNL in any one or more jurisdictions preclude the taking of proceedings by FNL in any other jurisdiction, whether concurrently or not.


Signed on behalf of FNL:               Signed on behalf of the Grantee:

Signature:                           Signature:

Name: Hugo Philion               Name:  Harumi Urata-Thompson

Position: CEO                    Position:  CFO

Date: 22/09/2020                Date:  22/09/2020

**Annexe A:**

**Spark token distribution formula.**

**Spark_ received = XRP owned / (XRP total - XRP Ripple - XRP npe )) *45 Bn**

**Where:**

**Spark received = the amount of Spark received by a Celsius XRP customer.**

**XRP owned = the amount of XRP the Celsius XRP customer has lodged on the Celsius platform at the time of the snapshot**

**XRP total = The total amount of XRP in existence at the snapshot date.**

**XRP Ripple = The XRP held in Ripple related accounts at the time of the snapshot including escrowed balances and amounts known to belong to Jed McCaleb.**

**XRP npe = The XRP held by non participating exchanges at the snapshot date.**

**For the avoidance of confusion the following numbers will be published by Flare on or around 13th December:**

**XRP total**
**XRP Ripple**
**XRP npe**