Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
*Counsel to the Initial Debtors and Debtors in Possession*
*Proposed Counsel to the GK8 Debtors and Debtors in Possession*

Judson Brown, P.C. (admitted *pro hac vice*)
T.J. McCarrick (admitted *pro hac vice*)
Benjamin L. Wallace (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone:    (202) 389-5000
Facsimile:    (202) 839-5200

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | Jointly Administered |
| CELSIUS NETWORK LIMITED, | |
| Plaintiff, | |
| v. | Adv. Pro. No. 22-[●] |
| FABRIC VENTURES GROUP SARL, | |
| Defendant. | |

## COMPLAINT

Celsius Network Limited ("CNL") as one of the debtors and debtors in possession

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification

(collectively, "Debtors") in the above-captioned jointly administered Chapter 11 cases, and as Plaintiff in the above-captioned adversary proceeding, hereby alleges as follows:

## Introduction and Nature of Action

1.      This is a breach-of-contract action.  Debtors and certain non-Debtor affiliates (collectively, "Celsius") are a crypto-based financial platform.  Defendant Fabric Ventures Group Sarl ("Fabric") is a venture-capital firm that contractually committed to purchase Series B preferred shares of CNL.  Fabric agreed to pay $8,003,379 in three installments: $2,000,000 in May 2022, $2,000,000 in June 2022, and $4,003,379 in July 2022.  Fabric made the first scheduled payment but refused to make the other two.  This action seeks damages in the amount of the two outstanding payments, $6,003,379, plus interest, fees, and other relief specified below.

## Jurisdiction and Venue

2.      This Court has subject-matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York, entered February 1, 2012.

3.      This matter is a non-core proceeding under 28 U.S.C. § 157.

4.      Pursuant to 28 U.S.C. § 157(c)(2) and Bankruptcy Rule 7008, the Debtors consent to the entry of a final order or judgment by this Court.

5.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      This adversary proceeding is commenced pursuant to Bankruptcy Rule 7001(1), which authorizes certain adversary proceedings "to recover money or property."

---

number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

## Parties

7. Plaintiff in this adversary proceeding is CNL, a Debtor in the Chapter 11 cases.

8. Defendant in this adversary proceeding is Fabric Ventures Group Sarl.

## General Allegations

*I.    The Celsius Bankruptcy*

9. Celsius is a crypto-based financial platform that provides financial services to institutional, corporate, and retail customers across more than 100 countries. Created in 2017, Celsius was one of the first crypto platforms that allowed customers to transfer their crypto assets and (i) earn rewards on those assets and/or (ii) take out loans using those assets as collateral. A detailed description of Celsius' business operations, capital and debt structure, and the facts and circumstances leading to the Chapter 11 cases is set forth in the *Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 23].

10. On July 13, 2022, each Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Debtors are operating their businesses and managing their properties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

11. On July 19, 2022, the Court entered an order authorizing the joint administration and procedural consolidation of the Chapter 11 cases. *Order Directing (I) Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 53].

*II.    The Series B Agreement*

12. On December 3, 2021, CNL, its existing shareholders, and four lead investors entered into an Amended and Restated Subscription and Shareholders' Agreement (the "Series B Agreement"), which is attached to this Complaint as **Exhibit A**.

13.    The Series B Agreement created Series B preferred shares in CNL and allocated those shares to the lead investors.  *Id.* §§ 3.1, 3.3.

14.    Each lead investor expressly undertook to "pay the sum set out against its name" in the Series B Agreement, which the Agreement characterized as a payment "obligation[.]"  *Id.* § 4.2(a).

15.    At any time after the initial issuance of Series B preferred shares, the Series B Agreement permitted CNL to issue approximately 5,000 additional Series B preferred shares.  *Id.* § 3.6(a).

16.    There were three conditions on CNL's ability to issue such additional shares to third parties.  First, any such third party needed to be "approved by the Board."  *Id.*  Second, additional shares needed to be sold at $20,469 per share.  *Id.*  And third, any such third party needed to "execut[e] and deliver[] a Deed of Adherence in the form attached [to the Series B Agreement] with any additions or amendments as the Company may determine from case to case."  *Id.* § 11.

III.    *The CNL-Fabric Negotiations*

17.    CNL and Fabric began discussing a potential sale of Series B preferred shares in or around March 2022.  Emails reflecting the parties' negotiations are attached to this Complaint as **Exhibit B**.

18.    In late March, Fabric General Partner Anil Hansjee wrote to Celsius stating that, although Fabric was "happy to sign to commit" to purchase shares, Fabric was "realistically . . . 1 month away" from being able to pull together the necessary funds.  *Id.* at 12.

19.    Celsius responded that it would "accommodate [Fabric] for another week," which would mean "clos[ing] by next Tuesday, April 12."  *Id.*

20.     Hansjee replied that "the 12th ends up being too tight for us." *Id.* at 11.  Hansjee reiterated that Fabric "can of course sign" before collecting all the necessary funds.  Hansjee stated that, in Fabric's view, it "*would clearly be legally committed from signature date*." *Id.* (emphasis added).

21.     When pressed on how much Fabric could pull together by the end of April, Hansjee offered $2 million. *Id.* at 10.  Hansjee said that Fabric "can sign and commit to 8mUSD if we had much more time . . . closer to 90 days." *Id.*

22.     Celsius responded by offering Fabric a "commitment with delayed funding." *Id.* at 9–10.  Celsius emphasized, however, that it would "need[] to obviously be a hard commitment as we are allocating it to you." *Id.*

23.     Hansjee confirmed that "*what ever [sic] we sign for we are making a HARD commitment for as professionals in this industry.  So if we sign for 8m now , [sic] even if you were to allow a delayed funding, we would be good for this 8m.  I just want to make sure there is no misunderstanding here and we dont [sic] treat it as an option*." *Id.* at 9 (emphasis added).

24.     Celsius responded by proposing "one document" with "3 funding dates"—"$2m after 30 days, another $2m no later than 60 days from signing and the final $4m . . . no later than 90." *Id.* at 8.

25.     Hansjee replied, "[t]hat construct works for us." *Id.*

26.     On or about April 12, 2022, Celsius said that it would "follow up with an amended subscription letter that reflects the agreed upon construct." *Id.* at 7.

*IV.*     *The CNL-Fabric Agreement*

27.     On or about April 12, 2022, CNL sent Fabric a Subscription Letter consistent with the parties' prior negotiations.  *Id.*  The signed version of that Subscription Letter is attached to

this Complaint as **Exhibit C**.

28.     The Subscription Letter states that Fabric "irrevocably applies to subscribe for 391

Preferred B Shares" of CNL "for cash at a price of $20,469 per share."

29.     The Subscription Letter also contains the following paragraph:

The Subscriber hereby undertakes to pay the Company the sum of $2,000,000 on
or before 10 May 2022, $2,000,000 on or before June 10, 2022, and $4,003,379 on
or before July 10, 2022 for a total of $8,003,379 in respect of such application by
electronic funds transfer to the Company's bank account and payment made in
accordance with this paragraph shall constitute a good discharge for the
Subscriber's obligations under this paragraph.

30.     On or about April 14, 2022, Fabric Director Richard Muirhead signed the

Subscription Letter.

31.     Shortly thereafter, CNL sent Fabric a Deed of Adherence as required by the Series

B Agreement.  The signed version of that Deed of Adherence is attached to this Complaint as

**Exhibit D**.

32.     The Deed of Adherence states that, "[b]y a subscription for shares dated 14 April

2022, [Fabric] subscribed for 391 Preferred B shares" of CNL.  *Id.* Intro. ¶ (A).

33.     The Deed of Adherence also states that Fabric "hereby agrees to assume the benefit

of the rights under the [Series B] Agreement in respect of the Subscribed Shares and hereby agrees

to assume and assumes the burden of the obligations under the Agreement to be performed after

the date hereof in respect of the Subscribed Shares."  *Id.* § 2.

34.     The Deed of Adherence further states that Fabric "hereby agrees to be bound by the

[Series B] Agreement in all respects as if [Fabric] were a party to the Agreement as one of the

Participating Investors and to . . . perform all the obligations expressed to be imposed on such a

party to the Agreement."  *Id.* § 3.

35.     To reiterate, in the Series B Agreement, each investor expressly undertook to "pay the sum set out against its name," which the Agreement characterized as a payment "obligation[]." **Exhibit A** § 4.2(a).

36.     On or about May 15, 2022, Fabric Director Richard Muirhead signed the Deed of Adherence.

37.     Together, the Subscription Letter and Deed of Adherence form an enforceable agreement between CNL and Fabric.

38.      That agreement comports with the three conditions on the issuance of Series B preferred shares imposed by the Series B Agreement: the CNL Board approved Fabric as a shareholder; the shares were sold for $20,469 per share; and Fabric signed a Deed of Adherence.

*V.    Fabric's Post-Agreement Conduct*

39.     On or about May 10, 2022, Fabric made the first scheduled payment of $2,000,000.

40.     On or about June 6, 2022, approximately four days before the second scheduled payment was due, Hansjee asked to "delay the payment by a few weeks." **Exhibit E** at 7.  Hansjee told Celsius that there had been a "delay in our paper work and kyc for onboarding our LPs to our new growth fund." *Id.*

41.     Celsius agreed to "provide an additional week for the payment but note[d] that the final $4M tranche will remain due on the originally scheduled date"—that is, July 10, 2022. *Id.* at 6.

42.     Fabric never made the second or third scheduled payments.

43.     Instead, on or about July 8, 2022, approximately two days before the third scheduled payment was due, Fabric emailed Celsius purporting to revoke its "previous *offer* of investment." *Id.* at 2 (emphasis added).  Fabric requested the return of its initial $2,000,000

payment, which Fabric characterized as an "initial advance . . . which was sent pending closure of our fundraising and allotment of equity." *Id.*

44.    Fabric's assertion that it had only ever made a revocable "offer of investment" is inconsistent with the plain terms of the Subscription Letter—which states that Fabric "irrevocably applies" to buy shares from Celsius and "undertakes" the "obligation[]" to make a series of payments for those shares. **Exhibit C**.

45.    Fabric's assertion that it had only ever made an offer of investment is also inconsistent with the plain terms of the Deed of Adherence—which states that Fabric "hereby agrees to assume and assumes the burden of the obligations under the [Series B] Agreement," **Exhibit D** § 2, one of which is to "pay the sum set out against its name," **Exhibit A** § 4.2(a).

46.    Finally, Fabric's assertion that it had only ever made an offer of investment is inconsistent with Fabric's statements during the parties' negotiations.  During negotiations, Hansjee stated that, if Celsius agreed to a delayed funding schedule, Fabric would nevertheless "clearly be legally committed from signature date." **Exhibit B** at 11.  Hansjee also told Celsisus: "what ever [sic] we sign for we are making a HARD commitment for as professionals in this industry.  So if we sign for 8m now , [sic] even if you were to allow a delayed funding, we would be good for this 8m.  I just want to make sure there is no misunderstanding here and we dont [sic] treat it as an option." *Id.* at 9.

## Count I: Breach of Contract

47.    Debtors repeat and reallege the allegations contained in paragraphs 1–46 of this Complaint as if fully set forth herein.

48.    There is a valid and enforceable contract between CNL and Fabric, under which CNL was obligated to issue Series B Preferred Shares to Fabric, and Fabric was obligated to make a series of three payments to CNL.

49.    CNL tendered performance in that it stood ready to issue Series B Preferred Shares to Fabric upon Fabric's satisfaction of its payment obligation.

50.    Fabric breached the contract by refusing to make the final two scheduled payments.

51.    CNL was damaged by Fabric's refusal to make those payments, which would have totaled $6,003,379.

### Prayer for Relief

WHEREFORE, CNL as Plaintiff demands judgment against Defendant and respectfully requests relief as follows:

i.    compensatory damages of $6,003,379;

ii.    punitive damages;

iii.    pre-judgment interest, attorney fees, costs, and post-judgment interest;

iv.    such other relief as this Court deems just and proper under the circumstances.

*[Remainder of page left intentionally blank.]*

New York, New York
Dated: January 17, 2023

/s/ Joshua A. Sussberg
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        jsussberg@kirkland.com

-and-

Judson Brown, P.C. (admitted *pro hac vice*)
T.J. McCarrick (admitted *pro hac vice*)
Benjamin L. Wallace (admitted *pro hac vice*)
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone:    (202) 389-5000
Facsimile:    (202) 839-5200
Email:        jdbrown@kirkland.com
              tj.mccarrick@kirkland.com
              ben.wallace@kirkland.com

-and-

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        patrick.nash@kirkland.com
              ross.kwasteniet@kirkland.com

*Counsel to the Initial Debtors and Debtors in Possession*

*Proposed Counsel to the GK8 Debtors and Debtors in Possession*

# Exhibit A

**DATED 3 December, 2021**

---

### AMENDED AND RESTATED SUBSCRIPTION AND SHAREHOLDERS' AGREEMENT

---

**by and between**

**THE LEAD INVESTORS**

**THE PARTICIPATING INVESTORS**

**THE EXISTING SHAREHOLDERS**

**and**

**THE COMPANY**

**The Harley Building, 77 - 79 New Cavendish Street**
**London, England, W1W 6XB**
**REF: 11198050**

**INDEX**

1.    Interpretation.................................................................................................................2
2.    Business of the Company ...........................................................................................10
3.    Conversion of Notes and Subscriptions .....................................................................11
4.    First Completion, Second Completion and Third Completion ....................................13
5.    Directors and management .........................................................................................16
6.    Matters requiring special consent ..............................................................................19
7.    Restrictions on parties ...............................................................................................21
8.    Anti-corruption.............................................................................................................23
9.    Accounting and other information ...............................................................................23
10.   Transfer of shares ......................................................................................................24
11.   Issue of further shares ...............................................................................................25
12.   Liquidation Event or IPO ............................................................................................25
13.   Termination and liquidation.........................................................................................26
14.   Status of agreement....................................................................................................27
15.   Confidentiality..............................................................................................................27
16.   Announcements ..........................................................................................................30
17.   Warranties...................................................................................................................31
18.   Further assurance .......................................................................................................31
19.   Assignment and other dealings...................................................................................31
20.   Entire agreement .........................................................................................................32
21.   Variation and waiver ...................................................................................................32
22.   Costs ...........................................................................................................................32
23.   No partnership or agency............................................................................................33
24.   Notices ........................................................................................................................33
25.   Severance ...................................................................................................................34
26.   Agreement survives the Completions .........................................................................34
27.   Third party rights.........................................................................................................34
28.   Counterparts ...............................................................................................................35
29.   Rights and remedies....................................................................................................35
30.   Inadequacy of damages ..............................................................................................35
31.   Governing law and jurisdiction ...................................................................................35
Exhibit A Schedule of Existing Shareholders and Lead Investors.....................................43
Exhibit B Company and Celsius Holding Capitalization......................................................46
Exhibit C Deed of Adherence .............................................................................................47
Exhibit D1  Warranties .......................................................................................................49
Exhibit D2  Lead Investor and Participating Investor Warranties .......................................51

EU-DOCS\34747841.8

**THIS AMENDED AND RESTATED AGREEMENT** is made as of the 3rd day of December, 2021

**BETWEEN:**

(1)    **CELSIUS NETWORK LIMITED** incorporated and registered in England and Wales with company number 11198050 with address at The Harley Building 77 - 79 New Cavendish Street London W1W 6XB (the "**Company**");

(2)    **THE EXISTING SHAREHOLDERS** as listed in <u>Part 1</u> of <u>Exhibit A</u> attached hereto;

(3)    **THE LEAD INVESTORS** as listed in <u>Part 2</u> of <u>Exhibit A</u> attached hereto; and

(4)    Any persons who adhere to this Agreement as **PARTICIPATING INVESTORS** on or after the date hereof.

**BACKGROUND:**

The Company is incorporated in England and Wales with company number 11198050 whose registered office is at The Harley Building, 77 - 79 New Cavendish Street London, England, W1W 6XB and carries out such actions in connection with the Business (defined below).

The Company shall carry on business in accordance with the terms and conditions of this Agreement.

The Shareholders (as defined below) shall exercise their rights in relation to the Company in accordance with the terms of this Agreement.

In accordance with clause 20.1 of the existing subscription and shareholders' agreement in relation to the Company dated June 7, 2020 (as amended on October 30, 2020, the **Prior Agreement**), the Prior Agreement may be varied in writing by the Company and the majority in interest of the Investors (as defined therein) (the **Requisite Parties**). The Requisite Parties wish to amend and restate the Prior Agreement and to accept the rights created pursuant hereto in lieu of the rights granted to them under the Prior Agreement.

Certain additional rights and obligations in relation to the Company are set out in the agreement to be entered into between the Lead Investors, Celsius Holding (as defined below) and the Company simultaneously with this agreement (the **Lead Investor Agreement**).

**IT IS AGREED** as follows:

1.    <u>**Interpretation**</u>

1.1    The definitions and rules of interpretation in this clause apply in this Agreement.

2

| | |
|---|---|
| **Adequate Procedures** | adequate procedures, as referred to in section 7(2) of the Bribery Act 2010 and any guidance issued by the Secretary of State under section 9 of the Bribery Act 2010 or as referred to in any other applicable anti-corruption laws or regulations of any other jurisdiction. |
| **Affiliate** | with respect to any specified person (or entity), any other person (or entity) who, directly or indirectly, controls, is controlled by, or is under common control with such person (or entity), including without limitation any general partner, managing member, officer, director or trustee of such person (or entity), or any venture capital fund or registered investment company now or hereafter existing that is controlled by one or more general partners, managing members or investment adviser of, or shares the same management company or investment adviser with, such person (or entity). |
| **Articles** | the new articles of association of the Company in agreed form to be adopted on or prior to First Completion as amended or superseded from time to time. |
| **Associated Person** | in relation to a company, a person (including an employee, agent or Subsidiary) who performs services for or on behalf of that company. |
| **Board** | the board of directors of the Company as constituted from time to time. |
| **Business** | has the meaning given in clause 2. |
| **Business Day** | a day other than a Saturday, Sunday or public holiday in England when banks in London and New York are open for business. |
| **CA 2006** | the Companies Act 2006. |
| **CDPQ** | CDP Investissements Inc. and/or any affiliate thereof that holds Shares from time to time. |
| **Celsius Group** | in relation to the Company, the Company, any direct or indirect Subsidiary from time to time of the company. Each |

3

company in the Celsius Group is a member of the Celsius Group.

**Celsius Holding**

Celsius Network, Inc., provided that further to the Celsius Holding Reorganisation, Celsius Holding shall be interpreted as to include any entity or person (other than the Company) to whom S. Daniel Leon or Alexander Mashinsky or their respective Permitted Transferees transfer any shares that they acquire in the Company pursuant to the Celsius Holding Reorganisation, to the extent such entity or person is a Permitted Transferee thereof.

**Celsius Holding Reorganisation**

(i) any exchange of shares in Celsius Holding for shares in the Company or conversion of shares in Celsius Holding into shares in the Company; or

(ii) any transaction involving the issue of shares in the capital of the Company to a shareholder of Celsius Holding, the object or intent of which is to interpose the Company as the sole owner of Celsius Holding,

provided in each case that such exchange or transaction does not result in a reduction in the percentage of issued share capital of the Company held by any Shareholder (including, without limitation, the Lead Investors) other than Celsius Holding.

**Completions**

First Completion, Second Completion and Third Completion.

**Confidential Information**

has the meaning given in clause 15.

**Deed of Adherence**

the deed of adherence in the form set out in Exhibit C, attached hereto.

**Director**

a director of the Company from time to time.

**Eligible Director**

any Director who would be entitled to vote on the matter at a meeting of the Board (but excluding any Director whose vote is not to be counted in respect of the particular matter).

**Encumbrance**

any interest or equity of any person, including but not limited to any right to acquire, option or right of pre-emption, or any

4

|  |  |
|---|---|
|  | mortgage, charge, pledge, lien, assignment, hypothecation, security interest, covenant, restriction, reservation, title retention or defect or any other security agreement or arrangement (whether or not perfected). |
| **First Completion** | the completion by the parties of their respective obligations in accordance with clause 4.2. |
| **First Completion Date** | 3 December 2021 (or such other date as is agreed in writing between the Company and the Lead Investors). |
| **First Completion New Shares** | has the meaning given in clause 3.3. |
| **Group** | in relation to a company, that company, any Subsidiary or holding company from time to time of that company, and any Subsidiary from time to time of a holding company of that company. Each company in a Group is a member of the Group. |
| **Holding company** | has the meaning given in clause 1.10. |
| **INED** | has the meaning given in clause 5.4(c). |
| **Investor Majority** | persons holding more than 50 per cent of the Preferred Shares from time to time, which shall include the Lead Investors. |
| **Investor Majority Consent** | the prior written consent of the Investor Majority. |
| **Loss or Losses** | any and all losses, liabilities, actions and claims, including charges, costs, damages, fines, penalties, interest and all legal and other professional fees and expenses including, in each case, all related Taxes. |
| **Note Purchase Agreement** | the note purchase agreement entered into by the Company and WestCap on 2 September 2021; as amended on 8 October 2021. |
| **Notes** | the senior secured convertible notes issued by the Company to WestCap on September, 2 2021; and to CDPQ on 8 October 2021. |

5

| | |
|---|---|
| **Ordinary B Shares** | shall have the meaning set out in the Articles. |
| **Permitted Transferee** | shall have the meaning set out in the Articles. |
| **Person** | any individual, corporation, partnership, trust, limited liability company, association or other entity. |
| **Preferred A Shares** | the Series A Preferred Shares of £0.00001 each in the capital of the Company. |
| **Preferred A1 Shares** | the Series A1 Preferred Shares of £0.00001 each in the capital of the Company. |
| **Preferred B Shares** | the Series B Preferred Shares of £0.00001 each in the capital of the Company. |
| **Preferred Shares** | the Preferred A Shares, the Preferred A1 Shares and the Preferred B Shares. |
| **Prior Agreement** | has the meaning given in recital (D). |
| **Related Person** | means a person connected with a Shareholder other than the Company and the Subsidiaries, whereby "connected" has the meaning given to it in Section 1122 of the CTA 2010. |
| **WestCap Director** | has the meaning given in clause 5.4(a)(i). |
| **Second Completion** | the completion by the parties of their respective obligations in accordance with clause 4.5. |
| **Second Completion Date** | 28 December 2021 (or such other date as agreed in writing between the Company and WestCap). |
| **Second Completion New Shares** | has the meaning given in clause 4.5(a). |
| **Series B Majority** | (i) CDPQ and WestCap, for as long as the Lead Investors and their Permitted Transferees collectively hold more than 50 per cent of the Preferred B Shares from time to time; or |
| | (ii) CDPQ, if the Lead Investors and their Permitted Transferees collectively hold 50 per cent. or less of the Preferred B Shares from time to time and CDPQ and its Permitted Transferees continue to hold all of the Preferred B |

6

Shares issued to CDPQ at First Completion pursuant to this Agreement,

provided that to the extent that the Lead Investors and their Permitted Transferees collectively hold 50 per cent or less of the Preferred B Shares from time to time and CDPQ and its Permitted Transferees no longer hold all of the Preferred B Shares issued to CDPQ at First Completion pursuant to this Agreement, any approval, waiver, consent or similar action of the Series B Majority required or able to be provided pursuant to this Agreement shall be deemed to have been obtained.

**Shareholders**          the holders of Shares in the Company.

**Shares**                shares of any class or designation in the capital of the Company, including the Preferred B Shares issued to the Lead Investors and the Participating Investors pursuant to this Agreement.

**SPAC**                  a special purpose acquisition company, blank check company or similar entity incorporated, formed or otherwise organised for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganisation, contribution, consolidation or similar business combination with one or more businesses or entities, and whose shares have been admitted to trading on any recognised stock exchange.

**SPAC Transaction**      any reorganisation, contribution, consolidation or similar business combination) with a SPAC or subsidiary of a SPAC which results in Shareholders of the Company holding, following completion of the relevant transaction herein, any of the publicly listed shares (or securities convertible or exchangeable into, or exercisable for, any such publicly listed shares) in the SPAC, any surviving entity in respect of such transaction, or in a Subsidiary.

**Subsidiary**            has the meaning given in clause 1.10.

**Tax Authority**         HMRC and any other governmental, state, federal, provincial, local governmental or municipal authority, body or official

7

| | whether of the United Kingdom or elsewhere in the world, which is competent to impose or collect Taxes. |
|---|---|
| **Taxes** | all forms of taxation, duties, rates, levies, contributions, withholdings, deductions, liabilities to account and charges whether imposed in the United Kingdom or elsewhere in the world. |
| **Third Completion** | the completion by the parties of their respective obligations in accordance with clause 4.7. |
| **Third Completion Date** | 19 January 2022 (or such other date as agreed in writing between the Company and WestCap). |
| **Third Completion New Shares** | has the meaning given in clause 4.7(a). |
| **Warranty** | a warranty set out in Exhibit D1. |
| **WestCap** | WestCap SOF II Celsius 2021 Aggregator, LP, WestCap Celsius Co-Invest 2021, LLC, WestCap SOF II IEQ 2021 Co-Invest, LP and any affiliate thereof that holds Shares from time to time. |
| **WestCap Second Completion Notice** | has the meaning given in clause 3.4. |
| **WestCap Second Completion Shortfall Shares** | such number of Preferred B Shares as equals the Maximum Second Completion Shares minus the number of Preferred B Shares that WestCap Celsius Co-Invest 2021, LLC subscribes for at Second Completion. |
| **WestCap Third Completion Shortfall Shares** | such number of Preferred B Shares as equals the Maximum Second Completion Shares minus the number of Preferred B Shares that WestCap Celsius Co-Invest 2021, LLC subscribes for at Second Completion and (if any) Third Completion (in aggregate). |

1.2 Clause, exhibit and paragraph headings shall not affect the interpretation of this Agreement.

1.3 The exhibits form part of this Agreement and shall have effect as if set out in full in the body of this Agreement. Any reference to this Agreement includes the exhibits.

EU-DOCS\34747841.8

1.4    A reference to this Agreement or to any other agreement or document referred to in this Agreement is a reference to this Agreement or such other agreement or document as varied or novated in accordance with its terms from time to time.

1.5    Unless the context otherwise requires, words in the singular shall include the plural and in the plural shall include the singular.

1.6    Unless the context otherwise requires, a reference to one gender shall include a reference to the other genders.

1.7    A person includes a natural person, corporate or unincorporated body and partnership (whether or not having separate legal personality).

1.8    A reference to a party shall include that party's successors and permitted assigns.

1.9    A reference to a company shall include any company, corporation or other body corporate, wherever and however incorporated or established.

1.10    A reference to a Holding company or a Subsidiary means a Holding company or a Subsidiary (as the case may be) as defined in section 1159 of the CA 2006 and for the purposes only of the membership requirement contained in sections 1159(1)(b) and (c), a company shall be treated as a member of another company even if its shares in that other company are registered in the name of:

(a)    another person (or its nominee), by way of security or in connection with the taking of security; or

(b)    its nominee.

1.11    Unless expressly provided otherwise in this Agreement, a reference to writing or written includes fax and email.

1.12    Any words following the terms including, include, in particular, for example or any similar expression shall be construed as illustrative and shall not limit the sense of the words, description, definition, phrase or term preceding those terms.

1.13    References to a document in agreed form are to that document in the form agreed by the Company and the Lead Investors (to the extent that the Lead Investors are parties hereto) and initialled by them or on their behalf for identification.

1.14    A reference to a statute or statutory provision is a reference to it as amended, extended or re-enacted from time to time provided that, as between the parties, no such amendment, extension or re-enactment made after the date of this Agreement shall apply for the purposes

9

of this Agreement to the extent that it would impose any new or extended obligation, liability or restriction on, or otherwise adversely affect the rights of, any party.

1.15    A reference to a statute or statutory provision shall include all subordinate legislation made from time to time under that statute or statutory provision.

1.16    Any reference to an English legal term for any action, remedy, method of judicial proceeding, legal document, legal status, court, official or any legal concept or thing shall, in respect of any jurisdiction other than England, be deemed to include a reference to that which most nearly approximates to the English legal term in that jurisdiction.

1.17    Any obligation on a party not to do something includes an obligation not to allow that thing to be done.

1.18    In this Agreement, "to the extent that" shall mean "to the extent that" and not solely "if", and similar expressions shall be construed in the same way.

1.19    Unless the context requires otherwise, words and expressions defined in the Articles shall have the same meaning when used in this Agreement.

## 2.    Business of the Company

2.1    The business of the Company is operating a proprietary platform owned by it which allows its clients, whether directly or through its affiliates, to gain interest on the cryptocurrencies transferred to a member of the Company's Group and/or to borrow cryptocurrencies against a collateral and/or to borrow fiat money against a collateral (the "**Business**").

2.2    The Company and Celsius Holding severally undertake to each Lead Investor, and each other Shareholder shall exercise its voting rights to procure, that all activities comprising the Business as currently conducted and as currently contemplated to be conducted by the Company's Group, will be undertaken solely by the Company and/or any of its wholly-owned Subsidiaries.  As soon as reasonably practicable after the date of this Agreement, Celsius Holding (and the other Shareholders, to the extent within their power and control) undertake to procure the migration of any part of the Business being carried by the Company's Group (or through sister or affiliate companies of the Company's Group) which is not currently conducted by the Celsius Group so that the Business will be conducted and contemplated to be conducted going forward exclusively by the Celsius Group. Notwithstanding the foregoing, this undertaking shall not limit the Company's right to engage service providers at arms' length terms for provision of back-office services to support the Business, or enter into any partnership, joint venture or collaboration with third parties reasonably aimed at promoting the Business, provided that any such partnership, joint venture or collaboration is entered into on behalf of the Group by the Company and/or its wholly-owned Subsidiaries.

10

2.3    In the event any provisions of the Articles conflict with the provisions of clause 2.2, the provisions of clause 2.2 shall govern.

2.4    The obligations of each Lead Investor and Participating Investor are independent of the obligations of any other Lead Investor or Participating Investor. Failure to execute this Agreement or perform any obligations hereunder by any of the Lead Investors or Participating Investors shall not prejudice, affect or impact the other Lead Investor or Participating Investor(s).

**3.**    **Conversion of Notes and Subscriptions**

*3.1*    Subject to the provisions of clauses 4.1 and 4.2, the principal amount outstanding in respect of the Notes together with any accrued interest thereon shall, at First Completion, convert into Preferred B Shares at the Conversion Price (as defined in the Note Purchase Agreement) pursuant to the terms thereof (the "**Conversion Shares**"), and each Lead Investor, for its own account, hereby irrevocably:

(a)    authorises and instruct the Company to apply the total amount outstanding in respect of the Notes held by such Lead Investor, together with any accrued interest thereon, in subscribing for such Preferred B Shares; and

(b)    apply for the allotment and issue to each of them of the Preferred B Shares resulting from the application of such terms,

and the Company hereby accepts such applications.

3.2    Upon issuance and allotment of the Conversion Shares in accordance with the terms of this Agreement, each of the Lead Investors hereby agrees that it irrevocably waives, releases and relinquishes all rights which such Lead Investor has under the Notes and any related interest and that, following First Completion, all of the Company's obligations under the Notes shall be satisfied in full, the Company shall stand released and discharged from all obligations arising thereunder or resulting from the Notes, the Notes will no longer remain outstanding and the Notes shall be of no further force and effect.

3.3    Upon conversion of the Notes and issuance of the Conversion Shares in accordance with clause 3.1, and always subject to the provisions of clauses 4.1 and 4.2, each Lead Investor applies for the allotment and issue to each of them, at First Completion, of Preferred B Shares ("**First Completion New Shares**") as set out in the table below, for a price per Preferred B Share equal to the Conversion Price (as defined in the Note Purchase Agreement), and the Company hereby accepts such applications:

| Investor (1) | No. of Preferred B Shares (2) | Total subscription monies ($) (3) |
|---|---|---|
| WestCap SOF II Celsius 2021 Aggregator, LP | 2,748 | 56,250,000 |
| WestCap Celsius Co-Invest 2021, LLC | 11,364 | 232,616,000 |
| WestCap SOF II IEQ 2021 Co-Invest, LP | 722 | 14,775,000 |
| CDP Investissements Inc. | 4,580 | 93,750,000 |
| Total | 19,414 | 397,391,000 |

3.4     On or prior to 15 December 2021, WestCap Celsius Co-Invest 2021, LLC shall elect, by notice in writing to the Company (the "**WestCap Second Completion Notice**"), to apply for the allotment and issuance to it at Second Completion of no less than 3,419 Preferred B Shares and up to 5,013 Preferred B Shares (the "**Maximum Second Completion Shares**") for an aggregate subscription price of no less than $70,000,000 and up to $102,609,000 at a subscription price per Preferred B Share equal to the subscription price of each First Completion New Share.

3.5     On or prior to 7 January 2021, WestCap Celsius Co-Invest 2021, LLC shall elect, by notice in writing to the Company (the "**WestCap Third Completion Notice**"), to apply for the allotment and issuance to it at Third Completion of up to the WestCap Second Completion Shortfall Shares for a subscription price per Preferred B Share equal to the subscription price of each First Completion New Share.

3.6     At any time following First Completion, the Company may elect to issue:

(a)     up to 4,885 additional Preferred B Shares plus (once determined) the WestCap Third Completion Shortfall Shares (in aggregate) to such existing holders of Preferred A Shares or Preferred A1 Shares (or any of their respective Affiliates), or such other third parties, as approved by the Board, in each case for a price per Preferred B Share equal to $20,469; and

(b)     up to 290 additional Preferred B Shares (in aggregate) in accordance with the parent undertakings entered into between the Company and Shahar Shamai and Lior Lamesh respectively on 28 October 2021, in connection with the acquisition by a Group Company of GK8 Ltd.

EU-DOCS\34747841.8

3.7    Each of the Existing Shareholders agrees to vote in favour of any resolutions necessary to give effect to this Agreement, and each of the Lead Investors and Participating Investors agrees to vote in favour of any resolutions necessary to give effect to clauses 3.4, 3.5 and 3.6.

3.8    Each of the Existing Shareholders, Lead Investors and Participating Investors hereby irrevocably waives (or confirms that it has procured the waiver of) all and any pre-emption rights it or its nominees may have pursuant to the Company's articles of association or otherwise so as to enable the conversion or the issue and allotment of any shares or other securities in the capital of the Company contemplated by this clause 3 to proceed free of any such pre-emption rights or other restrictions. Whereby consent of a specific class of Shares or other consent or approval is needed, such consent is deemed to have been granted by the relevant party subscribing this Agreement.

4.    **First Completion, Second Completion and Third Completion**

    *First Completion*

4.1    First Completion shall take place on the First Completion Date, remotely, via the exchange of documents and signatures, once the events set out in clause 4.2 have occurred.

4.2    Prior to or at First Completion:

    (a)    each Lead Investor shall pay the sum set out against its name in column (3) of the table in clause 3.3 (being the subscription price for the First Completion New Shares) by electronic funds transfer to the Company's bank account and payment made in accordance with this clause 4.2(a) shall constitute a good discharge for the Lead Investor's obligations (as applicable) under clause 3.3;

    (b)    the parties shall procure that such shareholder and board meetings of the Company are held (or appropriate written resolutions have been passed) as may be necessary to:

        (i)    adopt the Articles in agreed form;

        (ii)    give the Directors the authority to allot the Conversion Shares and the First Completion New Shares in accordance with clause 4.2(c) to the extent such authority has not already been granted;

        (iii)    issue the Conversion Shares to the Lead Investors (as applicable) and the First Completion New Shares to each of the Lead Investors (as applicable);

EU-DOCS\34747841.8

(iv)      execute and deliver to each Lead Investor certificates in relation to the relevant Conversion Shares and the First Completion New Shares (as applicable);

(v)      appoint Laurence A. Tosi as WestCap Director;

(vi)      re-designate the Ordinary Shares in the Company held by Celsius Holding as Ordinary B Shares; and

(vii)      pass any other such resolutions as may be required to carry out the obligations of the Company under this Agreement; and

(c)      the Company shall issue and allot the Conversion Shares and the First Completion New Shares to each of the Lead Investors (as applicable) credited as fully paid and enter their respective names in the register of members of the Company as the holder of such Conversion Shares and the First Completion New Shares and issue a share certificate to each Lead Investor in respect of all such Conversion Shares and the First Completion New Shares (as applicable).

4.3      The number of Shares and proportion of shareholdings immediately following First Completion shall be as set out in Exhibit B, attached hereto.  Except as set forth in Exhibit B, attached hereto, no person or entity holds or is otherwise entitled to any equity securities in the Company or other instruments convertible into or exchangeable for equity securities of the Company.

*Second Completion*

4.4      Second Completion shall take place on the Second Completion Date, remotely, once the events set out in clause 4.5 have occurred.

4.5      Prior to or at the Second Completion Date:

(a)      WestCap Celsius Co-Invest 2021, LLC shall pay the aggregate subscription price for the Preferred B Shares it elects to subscribe for at Second Completion (the "**Second Completion New Shares**") pursuant to the WestCap Second Completion Notice, by electronic funds transfer to the Company's bank account and payment made in accordance with this clause 4.5(a) shall constitute a good discharge for WestCap Celsius Co-Invest 2021, LLC's obligations pursuant to clause 3.4 and the WestCap Second Completion Notice;

14

(b)    the parties shall procure that such shareholder and board meetings of the Company are held (or appropriate written resolutions have been passed) as may be necessary to:

    (i)    give the Directors the authority to allot the Second Completion New Shares to the extent such authority has not already been granted;

    (ii)    issue the Second Completion New Shares to WestCap Celsius Co-Invest 2021, LLC;

    (iii)    execute and deliver to WestCap Celsius Co-Invest 2021, LLC certificates in relation to the Second Completion New Shares (as applicable); and

    (iv)    pass any other such resolutions as may be required to carry out the obligations of the Company under this Agreement; and

(c)    the Company shall issue and allot the Second Completion New Shares to WestCap Celsius Co-Invest 2021, LLC credited as fully paid and enter its name in the register of members of the Company as the holder of such Second Completion New Shares and issue a share certificate to WestCap Celsius Co-Invest 2021, LLC in respect of all such Second Completion New Shares.

*Third Completion*

4.6    Third Completion shall take place on the Third Completion Date, remotely, once the events set out in clause 4.7 have occurred.

4.7    Prior to or at the Third Completion Date:

(a)    WestCap Celsius Co-Invest 2021, LLC shall pay the aggregate subscription price for the Preferred B Shares it elects to subscribe for at Third Completion (the "**Third Completion New Shares**") pursuant to the WestCap Third Completion Notice, by electronic funds transfer to the Company's bank account and payment made in accordance with this clause 4.7(a) shall constitute a good discharge for WestCap Celsius Co-Invest 2021, LLC's obligations pursuant to clause 3.5 and the WestCap Third Completion Notice;

(b)    the parties shall procure that such shareholder and board meetings of the Company are held (or appropriate written resolutions have been passed) as may be necessary to:

    (i)    give the Directors the authority to allot the Third Completion New Shares to the extent such authority has not already been granted;

15

(ii)     issue the Third Completion New Shares to WestCap Celsius Co-Invest 2021, LLC;

(iii)    execute and deliver to WestCap Celsius Co-Invest 2021, LLC certificates in relation to the Third Completion New Shares (as applicable); and

(iv)    pass any other such resolutions as may be required to carry out the obligations of the Company under this Agreement; and

(c)     the Company shall issue and allot the Third Completion New Shares to WestCap Celsius Co-Invest 2021, LLC credited as fully paid and enter its name in the register of members of the Company as the holder of such Third Completion New Shares and issue a share certificate to WestCap Celsius Co-Invest 2021, LLC in respect of all such Third Completion New Shares.

## 5.     Directors and management

5.1    The Board has responsibility for the supervision and management of the Company, the Company's Group and its Business.

5.2    The number of Directors on the Board shall be subject to a maximum of five and shall not be less than two.

5.3    Celsius Holding and/or any of its Permitted Transferees, as long as they hold together (i) a majority of the Ordinary B Shares in the Company from time to time, or (ii) to the extent such Ordinary B Shares are converted into Ordinary Shares in accordance with the Articles, a majority of those Shares that were formerly Ordinary B Shares, as applicable, (the **Majority Ordinary B Holder**) shall have the right to nominate three persons to act as Directors by notice in writing addressed to the Company from time to time and the other holders of Shares shall not vote their Shares so as to remove that Director from office. The Majority Ordinary B Holder shall be entitled to exercise such appointment rights at its sole and absolute discretion, after consultation with WestCap, provided that one Director nominated by the Majority Ordinary B Holder pursuant to the foregoing shall be the chief executive officer of the Company. The Majority Ordinary B Holder shall be entitled to remove any of its nominated Directors so appointed at any time by notice in writing to the Company served at its registered office and appoint another person to act in his place. Notwithstanding the foregoing, the Majority Ordinary B Holder shall, at the request of the Series B Majority, provide customary background checks on proposed nominees of the Majority Ordinary B Holder to serve as Directors.

5.4    For as long as WestCap and its Permitted Transferees hold (in aggregate) at least 25 per cent. of the Shares in the Company acquired at the Completions (and to the extent they are then converted into Ordinary Shares, at least 25 per cent of such Shares on an as converted basis),

16

in the case of sub-paragraph (a) and (c) below, and for as long as CDPQ and its Permitted Transferees hold (in aggregate) at least 25 per cent. of the Shares in the Company acquired at First Completion (and to the extent they are then converted into Ordinary Shares, at least 25 per cent of such Shares on an as converted basis), in the case of sub-paragraph (b) below, and in each case prior to an IPO of the Company:

(a)     WestCap shall have the right to nominate and remove, at their absolute discretion:

(i)     one person to act as a director ("**WestCap Director**") by notice in writing addressed to the Company from time to time and the other holders of Shares shall not vote their Shares so as to remove the WestCap Director from office; and

(ii)     one person to attend as a silent observer at each and any meeting of the Board and of each and any committee of the Board who will be entitled to speak at any such meetings but will not be entitled to vote;

(b)     CDPQ shall have the right to appoint one observer to the Board; and

(c)     the Majority Ordinary B Holder shall be entitled to appoint and remove one independent non-executive Director, subject to the reasonable approval of the Lead Investors (the "**INED**"),

provided that in each case, WestCap, CDPQ and the Majority Ordinary B Holder and WestCap (acting jointly) shall be entitled to remove their respective nominated Director or observer (as applicable) so appointed at any time by notice in writing to the Company served at its registered office and appoint another person to act in his place.

5.5     An appointment or removal of a Director under clauses 5.3 or 5.4 will take effect at and from the time when the notice is received at the registered office of the Company or produced to a meeting of the directors of the Company.

5.6     The post of chairperson shall be held by such person as the Directors shall appoint from time to time. The chairperson shall not have a casting vote. If the chairperson for the time being is unable to attend any meeting of the Board, the Board shall be entitled to appoint another of its number to act as chair at that meeting.

5.7     The parties intend there to be a meeting of Directors at least once a quarter held at the Company's offices, provided that such meetings may be held by conference call.

5.8     Any director may call a meeting of directors by giving not less than five Business Days' written notice of the meeting (or such shorter period of notice as agreed in writing by the majority of

EU-DOCS\34747841.8

Eligible Directors) to each director or by authorising the Company secretary (if any) to give such notice.

5.9     Notice of any directors' meeting must be accompanied by:

(a)     an agenda specifying in reasonable detail the matters to be raised at the meeting; and

(b)     copies of any papers to be discussed at the meeting.

5.10    A shorter period of written notice of a meeting of Directors may be given if a majority of the Directors agree in writing.

5.11    Matters not on the agenda, or business conducted in relation to those matters, may not be raised at a meeting of Directors.

5.12    The quorum at any meeting of Directors is any three Eligible Directors, or their alternates, including the WestCap Director or, if a WestCap Director is not an Eligible Director, the INED. If a quorum is not present within 30 minutes of the time specified for the relevant meeting in the notice of the meeting, then the meeting shall be adjourned for seven days at the same time and place. Each Director shall be notified in writing by the Company of the date, time and place of the adjourned meeting (the **Adjourned Meeting**). If a quorum is not present within 30 minutes from the time appointed for the Adjourned Meeting and such Adjourned Meeting would be quorate were a WestCap Director (or, if a WestCap Director is not an Eligible Director, the INED) in attendance, those Directors present shall constitute a quorum.

5.13    No business shall be conducted at any meeting of Directors unless a quorum is present at the beginning of the meeting and at the time when there is to be voting on any business.

5.14    If a quorum is not present within 30 minutes of the time specified for a Directors' meeting in the written notice of the meeting then it shall be adjourned for 5 Business Days at the same time and place.

5.15    A meeting of Directors shall be adjourned to another time or date at the request of all the Directors present at the meeting. No business may be conducted at a meeting after such a request has been made. No more than one such adjournment may be made in respect of a meeting.

5.16    Any decision of the directors must take the form of a resolution (i) to be taken at a meeting of directors in accordance with the Articles or (ii) in writing executed by the directors in accordance with the Articles. A resolution is passed if more votes are cast for it than against it.

5.17    At a meeting of Directors, each Director has one vote.

6.    **Matters requiring special consent**

*Investor Majority Consent*

6.1    Each of the Shareholders shall exercise all voting rights and powers of control available to it in relation to the Company to procure that save with Investor Majority Consent, the Company (and the Company shall procure that any member of the Company's Group (as applicable)) shall not approve, consent to or ratify any of the following actions (whether by amendment, merger, consolidation or otherwise):

(a)    making any material change to (i) the type of business undertaken by the Celsius Group, provided this is limited to a change which is totally different (rather than tangential) to the Business, or (ii) the jurisdiction where the Company is managed and controlled;

(b)    a change to the name of the Company;

(c)    propose, declare or pay any cash dividend;

(d)    the buy-back or redemption of any share or loan capital, in each case except from Employees (as defined in the Articles) in accordance with the Articles and CA 2006;

(e)    any issuance of New Securities (as defined in the Articles) without first complying with Article 29 (*Allotment of new shares or other securities: pre-emption*) of the Articles;

(f)    an increase or decrease in the number of minimum or maximum number of directors of the Company;

(g)    any changes to the Company's auditors (save to the extent the new auditor of the Company is an international accounting firm) or any material changes to the Company's accounting policies; or

(h)    any transaction (including any divestiture of any of the Company's and its Group's assets) with any Shareholder or any of their Related Persons, any affiliates of a Shareholder or the Company or any other related parties, unless such transaction is (i) on arm's length basis and (ii) approved by those Directors of the Company who are not Related Persons or otherwise affiliated with such persons prior to such transaction being entered into.

*Series B Majority Consent*

6.2    Each of the Shareholders shall exercise all voting rights and powers of control available to it in relation to the Company to procure that without the prior written Series B Majority Consent,

the Company (and the Company shall procure that any member of the Company's Group (as applicable)) shall not approve, consent to or ratify any of the following actions (whether by amendment, merger, consolidation or otherwise):

(a)     the issue or creation of any Shares ranking in priority to the Preferred B Shares or any amendment to the Company's Articles, including for the avoidance of doubt adoption of a new set of articles, that adversely affects the rights, powers, or preferences of the Lead Investors;

(b)     authorize, cause or permit any of the business activities related to the Company or its Subsidiaries, including, without limitation, crypto, exchanges and lending business activities, to not be operated or conducted exclusively through the Company or through wholly-owned Subsidiaries, provided that the foregoing shall not restrict the Company or its wholly-owned Subsidiaries from entering into any joint venture or partnership with an unaffiliated third party to the extent that such joint venture or partnership is conducted through the Company or its wholly-owned Subsidiaries;

(c)     voluntarily liquidate, dissolve or wind-up the business and affairs of the Company or any Subsidiary;

(d)     sell, transfer or otherwise dispose of any interest in Shares or capital stock of any direct or indirect subsidiary of the Company, or permit any direct or indirect Subsidiary to sell, lease, transfer, exclusively license or otherwise dispose (in a single transaction or series of related transactions) of all or substantially all of the assets of such Subsidiary, in each case other than on an arm's length basis;

(e)     the offer or grant of any superior registration rights to any future shareholder of the Company without offering substantially similar rights to each Lead Investor;

(f)     any amendment to the Articles that adversely affects the rights, powers, or preferences of the Preferred B Shares, provided that, in connection with any future fundraising of the Company after Completion, Celsius Holding shall have the right to maintain its ability to appoint a majority of the members of the Board;

(g)     any change to the rights of the WestCap Director;

(h)     dispose of the whole or part of the undertaking of the Company or any of the Subsidiaries to the extent such disposal would result in a price per Preferred B Share that is less than an amount equal to: (i) two times the Original Issue Price (as defined in the Articles) per Preferred B Share, minus (ii) the amount of any non-cash distribution of a capital nature (outside of the ordinary course of business, and

20

excluding a distribution by way of an issue of bonus shares in the Company) paid in respect of each Series B Preferred Shares (such amount to be equal to the fair market value of the non-cash distribution as at the date of the distribution) (such resulting amount being the **"Disposal Hurdle"**); or

(i)     the grant of any super voting rights in favour of any Shareholder.

6.3     As a separate obligation, severable from the obligations in clauses 6.1 and 6.2, the Company, on its own behalf and on behalf of the other members of its Group, agrees (and shall procure that any member of the Company's Group agrees), that, to the extent within their control and as permitted by laws:

(a)     save with Investor Majority Consent, it shall not effect any of the matters referred to in clause 6.1; and

(b)     save with Series B Majority Consent, the Company shall not effect any of the matters referred to in clause 6.2.

6.4     Notwithstanding clauses 6.1 and 6.2, no Investor Majority Consent or Series B Majority Consent shall be required in relation to the Permitted Activities (as defined in the Note Purchase Agreement).  Neither the operation of this clause 6.4 nor any of the Permitted Activities shall be construed or result in any additional restrictions on the Company or any Subsidiary by negative inference or otherwise.

## 7.     Restrictions on parties

7.1     None of the parties (excluding the Company, the Lead Investors, the Participating Investors and any of their Permitted Transferees) shall (unless otherwise agreed in writing by the other parties) (and shall procure that none of their Associated Persons or affiliated entities), during the times specified below, carry on or be employed, engaged or interested (whether directly or indirectly) in any business in the UK and the European Union which would be in competition with any part of the Business, including any developments in the Business after the date of this Agreement. The times during which the restrictions apply are:

(a)     any time when the party in question is a Shareholder; and

(b)     for a period of 24 months after the party in question ceases to be a Shareholder.

7.2     None of the parties (excluding the Lead Investors, the Participating Investors any of their Permitted Transferees) nor any members of their Group shall, in the same area of Business in which the Company operates and during the times specified below, directly or indirectly, deal with or seek the custom of any person that is, or was within the previous 12 months, a client

or customer of the Company or, where the party is no longer a Shareholder, any person that was a client or customer of the Company at any time during the period of 12 months immediately preceding the party in question ceasing to be a Shareholder. The times during which the restrictions apply are:

(a)     any time when the party in question is a Shareholder; and

(b)     for a period of 24 months after the party in question ceases to be a Shareholder.

7.3     None of the parties (excluding the Lead Investors, the Participating Investors and any of their Permitted Transferees) nor any members of their Group shall, during the times specified below, directly or indirectly, offer employment to, enter into a contract for the services of, or attempt to solicit or seek to entice away from the Company any individual who is at the time of the offer, or attempt, a director, officer or employee holding an executive or managerial position with the Company or procure or facilitate the making of any such offer or attempt by any other person. The times during which the restrictions apply are:

(a)     any time when the party in question is a Shareholder; and

(b)     for a period of 24 months after the party in question ceases to be a Shareholder.

7.4     None of the parties (excluding the Lead Investors, the Participating Investors and any of their Permitted Transferees) nor any of the members of their Group shall, during the times specified below, directly or indirectly, solicit or endeavour to entice away from the Company any supplier who supplies, or has supplied within the previous 12 months, goods or services to the Company or, where the party is no longer a Shareholder, any supplier who has supplied goods or services to the Company at any time during the period of 12 months immediately preceding the party in question ceasing to be a Shareholder if that solicitation or enticement causes or would cause such supplier to cease supplying, or materially reduce its supply of, those goods or services to the Company. The times during which the restrictions apply are:

(a)     any time when the party in question is a Shareholder; and

(b)     for a period of 24 months after the party in question ceases to be a Shareholder.

7.5     The undertakings in this clause are given by each relevant party (excluding the Lead Investors and the Participating Investors) to the others and to the Company and apply to actions carried out by each relevant party (or any of its Subsidiaries) (excluding the Lead Investors and the Participating Investors) in any capacity and whether directly or indirectly, on the party's (or Subsidiary's) own behalf, on behalf of any other person or jointly with any other person.

EU-DOCS\34747841.8

7.6     Nothing in this clause shall prevent a party or any of its Subsidiaries from holding for investment purposes only:

(a)     units of any authorised unit trust; or

(b)     shares or securities of any other company.

7.7     Each of the covenants in this clause is considered fair and reasonable by the parties.

7.8     Each party (excluding the Lead Investors and the Participating Investors) shall procure that its Subsidiaries comply with the terms of this clause.

7.9     If a party ceases to be a Shareholder as a result of a transfer of shares to a Permitted Transferee in accordance with the Articles, the restrictions in this clause 8 shall continue to apply to the party that has transferred its shares for so long as any of its Permitted Transferees is a Shareholder, and for the period of time specified in each of clause 7.1(b), clause 7.2, clause 7.3(b) and clause 7.4(b) after the Permitted Transferee ceases to be a Shareholder.

## 8.     Anti-corruption

8.1     The Company and each Existing Shareholder undertakes (and shall procure that all members of the Company's Group undertake) that:

(a)     it will not, and will procure that the Company and each of the Subsidiaries will not, engage in any activity, practice or conduct which would constitute an offence under sections 1, 2 or 6 of the Bribery Act 2010;

(b)     it has and will maintain in place, and will procure that the Company and each of the Subsidiaries has and will maintain in place, Adequate Procedures designed to prevent any Associated Person from undertaking any conduct that would give rise to an offence under section 7 of the Bribery Act 2010; and

(c)     from time to time, at the reasonable request from a party, it will confirm in writing that it has complied with its undertakings under clause (a) and clause (b) and will provide any information reasonably requested by the party in support of such compliance.

8.2     Breach of any of the undertakings in this clause 8, by the Company or any Existing Shareholder shall be deemed to be a material breach of the Agreement by the applicable person.

## 9.     Accounting and other information

9.1     The Company shall, and shall procure that the Group shall, at all times maintain accurate and complete accounting and other financial records including, without limitation, with respect to

23

all corporation tax computations and related documents and correspondence with HM Revenue & Customs in accordance with the requirements of all applicable laws and generally accepted accounting principles applicable in the United Kingdom and any other applicable jurisdiction.

9.2     Each holder of Preferred A Shares, Preferred A1 Shares and each of the Lead Investors and their respective authorised representatives shall be allowed access at all reasonable times to examine the books and records of the Company and its Group.

9.3     The Company shall, and shall procure that its Group shall, supply each holder of Preferred A Shares, Preferred A1 Shares and each of the Lead Investors with the financial and other information necessary to keep the Shareholder informed about how effectively the Business is performing and in particular shall supply each holder of Preferred A Shares, Preferred A1 Shares and each of the Lead Investors with:

(a)     a copy of the audited consolidated accounts of the Company and of any member of the Company's Group, prepared in accordance with the laws applicable in and the accounting standards, principles and practices generally accepted in the United Kingdom (or any other applicable jurisdiction), within five months of the end of FY 2021 and within four months of every subsequent financial year to which the audited accounts relate; and

(b)     unaudited consolidated quarterly management accounts of the Company and its Group to be supplied within 45 Business Days of the end of the quarter to which they relate, which shall include a profit and loss account, and a balance sheet.

## 10.    <u>Transfer of shares</u>

10.1    No party shall create any Encumbrance over, transfer, or otherwise dispose of or give any person any rights in or over any share or interest in any share in the Company unless it is permitted or required under this Agreement or the Articles and carried out in accordance with the terms of this Agreement or the Articles (as the case may be). If a party transfers (or purports to transfer), any share or interest in any share in the Company other than in accordance with this clause, it shall be deemed to have served a Transfer Notice (as such term is defined in the Articles).

10.2    Except as expressly provided in the Articles or this Agreement, the parties shall procure that no transfer of shares shall be registered by the Board unless the transferee or Permitted Transferee (as the case may be) of such shares has executed and delivered a Deed of Adherence, and in the case of a Permitted Transferee of a Lead Investor, a deed of adherence to the Lead Investor Agreement. For the avoidance of doubt, no transferee of shares or

Permitted Transferee (as the case may be) shall have any rights hereunder until such transferee or Permitted Transferee (as applicable) has executed and delivered a Deed of Adherence.

10.3    Except with respect to a transfer to a Permitted Transferee of a Lead Investor, each party undertakes (in respect of the shares that it holds) to give, and to use its reasonable efforts to procure that shareholders in its Group give, the approvals required for any transfer of shares made in accordance with the Articles or this Agreement (as the case may be).

10.4    On completion of a transfer of shares made in accordance with this Agreement or the Articles (other than a transfer of shares made to a Permitted Transferee) the party selling the shares shall deliver, or procure that there are delivered, to the Company the resignations of any Directors appointed by the selling party, in each case acknowledging that they have no claims against the Company, to take effect at completion of the sale of the shares.

## 11.    **Issue of further shares**

The parties shall procure that the Company shall not issue any shares or other equity securities (within the meaning of section 560(1) of the CA 2006) to any person, unless that person is an employee or former employee of the Company or a Subsidiary, a party to this Agreement, or has executed and delivered a Deed of Adherence in the form attached hereto as Exhibit C with any additions or amendments as the Company may determine from case to case.

## 12.    **Liquidation Event or IPO**

12.1    It is hereby agreed by the parties that, on an IPO or SPAC Transaction, the Shareholders shall:

(a)    to the extent required by the applicable rules of the relevant exchange, retain such number of their shares in the Company held at the time of the IPO or SPAC Transaction for such period after the IPO or SPAC Transaction as is required by the applicable rules of the relevant exchange, and such period shall, in respect of the Preferred B Shares held by WestCap and CDPQ, shall be the shorter of:

(i)    six months; and

(ii)    the shortest lock-up period or early release that applies to any other holder of more than 1% of the issued share capital of the Company; and

(b)    have regard to the recommendation of the Company's brokers on an IPO in determining their respective sale of shares upon the Company's IPO and shall make such determination with a view to ensuring the success of the IPO.

25

13.    **Termination and liquidation**

13.1    Subject to clause 13.2, this Agreement shall terminate:

(a)    when all parties cease to hold any shares in the Company;

(b)    when a resolution is passed by shareholders or creditors, or an order is made by a court or other competent body or person instituting a process that shall lead to the Company being wound up and its assets being distributed among the Company's creditors, shareholders or other contributors; and

(c)    upon an IPO or Liquidation Event (each as defined in the Articles).

13.2    On termination of this Agreement, the following clauses shall continue in force:

(a)    clause 1 (interpretation);

(b)    clause 7 (restrictions on parties);

(c)    this clause;

(d)    clause 15 (confidentiality);

(e)    clause 19 (assignment and other dealings);

(f)    clause 20 (entire agreement);

(g)    clause 21 (variation and waiver);

(h)    clause 22 (costs);

(i)    clause 23 (no partnership or agency);

(j)    clause 24 (notices);

(k)    clause 25 (severance);

(l)    clause 30 (inadequacy of damages);

(m)    clause 31 (governing law and jurisdiction).

13.3    Termination of this Agreement shall not affect any rights, remedies, obligations or liabilities of the parties that have accrued up to the date of termination, including the right to claim damages in respect of any breach of the Agreement which existed at or before the date of termination.

EU-DOCS\34747841.8

14. **Status of agreement**

14.1    Each party shall, to the extent that it is able to do so, exercise all its voting rights and other powers in relation to the Company to procure that the provisions of this Agreement are properly and promptly observed and given full force and effect according to the spirit and intention of the Agreement.

14.2    If there is an inconsistency between any of the provisions of this Agreement and the provisions of the Articles, the provisions of this Agreement shall prevail as between the parties.

14.3    The parties shall, when necessary, exercise their powers of voting and any other rights and powers they have to amend, waive or suspend a conflicting provision in the Articles to the extent necessary to permit the Company and its Business to be administered as provided in this Agreement.

14.4    Those Requisite Parties hereby agree, pursuant to clause 20.1 of the Prior Agreement, that upon due execution of this Agreement by the Requisite Parties, each of the parties:

(a)    irrevocably releases and discharges the other parties thereto from all claims, demands or obligations arising under or resulting from the Prior Agreement whether arising before or after the date of this Agreement, save in relation to any breaches of clauses 7 (*Restrictions on parties*) or 15 (*Confidentiality*) prior to the date of this Agreement; and

(b)    agrees that the Prior Agreement is amended and restated on the terms set out in this Agreement and the parties to the Prior Agreement shall accept the rights created pursuant hereto in lieu of the rights granted under the Prior Agreement.

14.5    This Agreement may be dated and shall then become valid, binding and effective and enforceable on the parties hereto, in accordance with its terms, with effect from the date on which it is executed by each of the Requisite Parties and the Lead Investors, and notwithstanding that other persons expressed to be parties to this Agreement may not have executed it.

15. **Confidentiality**

15.1    In this clause, **Confidential Information** means any information (however recorded or preserved) which:

(a)    any party may have or acquire (whether before, on or after the date of this Agreement) in relation to the customers, suppliers, business, assets or affairs or plans, intentions or market opportunities and the operations, processes, product information, know-how, designs, trade secrets or software of Celsius Holding, the

Company or any member of its Group (including, without limitation, any information provided pursuant to clause 7); or

(b)     any party or any member of its Group may have or acquire (whether before, on or after the date of this Agreement) in relation to the customers, suppliers, business, assets or affairs or plans, intentions or market opportunities and the operations, processes, product information, know-how, designs, trade secrets or software of a party or any member of the party's Group, as a consequence of the negotiations relating to this Agreement or any other agreement or document referred to in this Agreement or the performance of the agreement or any other agreement or document referred to in this Agreement; or

(c)     relates to the contents of this Agreement (or any agreement or document referred to in this Agreement or agreement or arrangement entered into pursuant to this Agreement),

but excludes the information in clause 15.2.

15.2    Information is not Confidential Information if:

(a)     it is or becomes generally available to the public (other than as a result of its disclosure in breach of this Agreement); or

(b)     a party can establish to the reasonable satisfaction of the Company that it found out the information from a person not connected with the Company or its Group and that such person is not under any obligation of confidence in respect of the information; or

(c)     a party can establish to the reasonable satisfaction of the Company that the information was known to such party before the date of this Agreement and that it was not under any obligation of confidence in respect of the information; or

(d)     the parties agree in writing that it is not confidential.

15.3    Each party shall at all times keep confidential (and use all reasonable endeavours to ensure that its employees, agents and subsidiaries, and the employees and agents of such subsidiaries, and the Company shall keep confidential) any Confidential Information and shall not use such Confidential Information except for the purpose of exercising or performing its rights and obligations under or in connection with this Agreement, and shall not disclose such Confidential Information except:

EU-DOCS\34747841.8

(a)     to a party's professional advisers where such disclosure is for a purpose related to the operation of this Agreement; or

(b)     with the written consent of such of the Company or the party or any member of its Group that the information relates to; or

(c)     as may be required by law or by the rules of any recognised stock exchange, or governmental or other regulatory authority or by a court or other authority of competent jurisdiction, provided that, to the extent it is legally permitted to do so, it gives the Company as much notice of such disclosure as possible and, where notice of disclosure is not prohibited and is given in accordance with this clause, it takes into account the reasonable requests of the Company in relation to the content of such disclosure; or

(d)     disclosure is made to a member of a Shareholder's Group or any Related Person and their respective investors;

(e)     a party may, provided it has reasonable grounds to believe that any other party is involved in activities that may constitute a criminal offence under the Bribery Act 2010, disclose Confidential Information to the Serious Fraud Office without first informing such other party of such disclosure; or

(f)     to any Tax Authority to the extent reasonably required for the purposes of the tax affairs of the party concerned or any member of its Group.

15.4    Each party shall inform (and shall use all reasonable endeavours to procure that any Subsidiary and the Company shall inform) any officer, employee or agent or any professional adviser advising it in relation to the matters referred to in this Agreement, or to whom it provides Confidential Information, that such information is confidential and shall require them:

(a)     to keep it confidential; and

(b)     not to disclose it to any third party (other than those persons to whom it has already been disclosed in accordance with the terms of this Agreement).

15.5    On termination of this Agreement, each party shall (and shall use all reasonable endeavours to procure that its Subsidiaries, and its officers and employees and those of its Subsidiaries and the Company shall):

(a)     return to the applicable parties all documents and materials (and any copies) containing, reflecting, incorporating or based on such party's Confidential Information; and

EU-DOCS\34747841.8

(b)    erase all the other parties' Confidential Information from computer and communications systems and devices used by it, including such systems and data storage services provided by third parties (to the extent technically and legally practicable),

provided that a recipient party (and/or the Company, as the case may be) may retain documents and materials containing, reflecting, incorporating or based on the parties' Confidential Information to the extent required by law or any applicable governmental or regulatory authority.

15.6    The provisions of this clause 15 shall continue to apply after termination of this Agreement for any cause.

**16.**    **Announcements**

16.1    Subject to clause 16.2, clause 16.3, clause 16.4 no party shall make, or permit any person to make, any public announcement, communication or circular (**announcement**) concerning the existence, subject matter or terms of this Agreement, the wider transactions contemplated by it, or the relationship between the parties, without the prior written consent of the Company (such consent not to be unreasonably withheld or delayed). The parties shall consult together on the timing, contents and manner of release of any announcement.

16.2    Where an announcement is required by law or any governmental or regulatory authority (including, without limitation, any relevant securities exchange), or by any court or other authority of competent jurisdiction, the party required to make the announcement shall, if permitted by applicable law, promptly notify the Company. The party concerned shall make all reasonable attempts to agree the contents of the announcement before making it.

16.3    On the signing of this Agreement, the parties may issue a joint announcement about the formation of the Company in agreed form.

16.4    Notwithstanding the foregoing, the Company shall not, and shall cause its representatives not to, issue or cause publication of any press release or other public announcement or make any other public statement or disclosure with respect to CDPQ's investment in the Company (including in social media profiles) without the prior written consent of CDPQ, which consent may be provided by CDPQ in its sole and absolute discretion, except (i) as may be required by applicable law, rule or regulation (in which case CDPQ shall be notified in advance and consulted with on the content of any such announcement, statement or disclosure), (ii) in information and documents submitted to the Company's Affiliates or the Company's or its Affiliates' shareholders seeking required consents or waivers to transactions or other actions that require such consent or waiver and (iii) other non-public communications with third

30

parties where disclosure of the capitalization of the Company, its Affiliates or financing documents is customary and such third parties are subject to customary confidentiality obligations (subsections (i)-(iii) each are a "**Permitted Disclosure**"). The Company agrees not to use the name or logo of CDPQ or any affiliate of CDPQ (collectively, the "**Names**") other than in connection with a Permitted Disclosure. In the event the Company wishes to make such use of a Name (other than a Permitted Disclosure), it shall first obtain CDPQ's prior written approval relating to any such use and, where appropriate, the text in which the Name is intended to be used. CDPQ may, at its sole discretion, accept or refuse to give its approval in respect of such usage.

## 17.    Warranties

17.1    The Company and Celsius Holding severally warrant to the Lead Investors and the Participating Investors that each warranty set out in Exhibit D1 (as applicable) is true and accurate as at the date of this Agreement subject only to any exceptions expressly provided for under this Agreement.

17.2    The Lead Investors and the Participating Investors severally and not jointly and in respect of itself only, warrant to the Company that each and every warranty set out in Exhibit D2 is true and accurate in all material respects at the date of this Agreement or, in the case of each Participating Investor, as at the date of its adherence to this Agreement.

## 18.    Further assurance

18.1    At its own expense, each party shall (and shall use all reasonable endeavours to procure that any relevant third party shall) promptly execute and deliver such documents and perform such acts as the parties may reasonably require from time to time for the purpose of giving full effect to this Agreement.

18.2    The Shareholders agree and acknowledge that the Company and the relevant member of the Group intends to obtain, or is in the process of obtaining, regulatory approvals for the Business in various jurisdictions (the "**Approvals**"). Each Shareholder hereby undertakes that it shall fully and promptly cooperate with any requests for information and take such other reasonable actions as may be required by the Company and the group in relation to such Approvals.

## 19.    Assignment and other dealings

19.1    No party shall assign, transfer, mortgage, charge, subcontract, delegate, declare a trust over or deal in any other manner with any or all of its rights and obligations under this Agreement (or any other document referred to in it) without the prior written consent of the Company (such consent not to be unreasonably withheld or delayed), except that the Shareholders may

EU-DOCS\34747841.8

transfer their Shares and assign their interests and rights in this Agreement to Permitted Transferees (as defined in the Articles) and otherwise in compliance with any transfer related obligations set forth in the Articles and this Agreement.

## 20.    Entire agreement

20.1    This Agreement (together with the documents referred to in it and the Exhibits attached hereto) constitute the entire agreement between the parties and supersede and extinguish all previous discussions, correspondence, negotiations, drafts, agreements, promises, assurances, warranties, representations, arrangements and understandings between them, whether written or oral, relating to their subject matter.

20.2    Each party acknowledges that in entering into this Agreement (and any documents referred to in it), it does not rely on, and shall have no remedies in respect of, any statement, representation, assurance or warranty (whether made innocently or negligently) that is not set out in this Agreement or those documents.

20.3    Nothing in this clause shall limit or exclude any liability for fraud.

## 21.    Variation and waiver

21.1    No variation of this Agreement shall be effective unless it is in writing and signed by the Company and persons comprising an Investor Majority and a Series B Majority, in which event such change shall be binding on all of the parties.

21.2    A waiver of any right or remedy under this Agreement or by law is only effective if given in writing and signed by the person waiving such right or remedy and shall not be deemed a waiver of any subsequent right or remedy.

21.3    A failure or delay by any person to exercise any right or remedy provided under this Agreement or by law shall not constitute a waiver of that or any other right or remedy, nor shall it prevent or restrict any further exercise of that or any other right or remedy. No single or partial exercise of any right or remedy provided under this Agreement or by law shall prevent or restrict the further exercise of that or any other right or remedy.

21.4    A person that waives a right or remedy provided under this Agreement or by law in relation to one person, or takes or fails to take any action against that person, does not affect its rights or remedies in relation to any other person.

## 22.    Costs

22.1    Each party shall pay its own costs and expenses incurred in connection with the negotiation, preparation, execution and performance of this Agreement (and any documents referred to

32

in it).  In no event shall the Company or any of its affiliates be liable for any Taxes, including withholding tax, incurred in connection with any transaction contemplated by this Agreement (or any documents referred to in it).

**23.    No partnership or agency**

23.1    Nothing in this Agreement is intended to, or shall be deemed to, establish any partnership between the parties or constitute any party the agent of another party.

23.2    Each party confirms that it is acting on its own behalf and not for the benefit of any other person.

**24.    Notices**

24.1    For the purposes of this clause 24, but subject to clause 24.7, notice includes any other communication.

24.2    A notice given to a party under or in connection with this Agreement:

(a)    shall be signed by or on behalf of the party giving it;

(b)    shall be sent to the party for the attention of the contact at the address specified in Exhibit A, or such other contact, address or email address as that party may notify in accordance with clause 24.3 (and if notice is given to the Company, a copy shall also be sent to Herzog Fox & Neeman, 4 Weizmann St., Tel Aviv, Israel, Attention: Yair Geva, email: gevay@hfn.co.il);

(c)    shall be sent by a method listed in clause 24.4; and

(d)    unless proved otherwise is deemed received as set out in clause 24.4 if prepared and sent in accordance with this clause.

24.3    A party may change its details for service of notices as specified in clause 24.3 by giving notice to the Company, the change taking effect for the party notified of the change at 9.00 am on the later of:

(a)    the date, if any, specified in the notice as the effective date for the change; and

(b)    the date five Business Days after deemed receipt of the notice.

24.4    This clause 24.4 sets out the delivery methods for sending a notice to a party under this Agreement and, for each delivery method, the date and time when the notice is deemed to have been received (provided that all other requirements of this clause have been satisfied and subject to the provisions in clause 24.5):

EU-DOCS\34747841.8

(a)    if delivered by hand, on signature of a delivery receipt or at the time the notice is left at the address;

(b)    if sent by pre-paid first class post or other next working day delivery service providing proof of postage, at 9.00 am on the second Business Day after posting or at the time recorded by the delivery service;

(c)    if sent by pre-paid airmail providing proof of postage, at 9.00 am on the fifth Business Day after posting or at the time recorded by the delivery service;

(d)    if sent by email, at the time of transmission, provided that a receipt of delivery is received.

24.5    If deemed receipt under clause 24.4 would occur outside Usual Business Hours, the notice shall be deemed to have been received when Usual Business Hours next recommence. For the purposes of this clause, **Usual Business Hours** means 9.00 am to 5.30 pm local time on any day which is not a Saturday, Sunday or public holiday in the place of receipt of the notice (which, in the case of service of a notice by or email shall be deemed to be the same place as is specified for service of notices on the relevant party by hand or post).

24.6    This clause 24 does not apply to the service of any proceedings or other documents in any legal action or, where applicable, any arbitration or other method of dispute resolution.

24.7    A notice given under or in connection with this Agreement is not valid if sent by fax.

**25.    <u>Severance</u>**

25.1    If any provision or part-provision of this Agreement is or becomes invalid, illegal or unenforceable, it shall be deemed deleted, but that shall not affect the validity and enforceability of the rest of this Agreement.

25.2    If any provision or part-provision of this Agreement is deemed deleted, the parties shall negotiate in good faith to agree a replacement provision that, to the greatest extent possible, achieves the intended commercial result of the original provision.

**26.    <u>Agreement survives the Completions</u>**

26.1    This Agreement (other than obligations that have already been fully performed) remains in full force after each of the Completions.

**27.    <u>Third party rights</u>**

27.1    Unless it expressly states otherwise, this Agreement does not give rise to rights under the Contracts (Rights of Third Parties) Act 1999 to enforce any term of this Agreement.

34

27.2    The rights of the parties to rescind or vary this Agreement are not subject to the consent of any other person.

**28.    Counterparts**

28.1    This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall constitute a duplicate original, but all the counterparts shall together constitute the one agreement.

28.2    No counterpart shall be effective until each party has executed and delivered at least one counterpart.

**29.    Rights and remedies**

29.1    The rights and remedies provided under this Agreement are in addition to, and not exclusive of, any rights or remedies provided by law.

**30.    Inadequacy of damages**

30.1    Without prejudice to any other rights or remedies that a party may have, each party acknowledges and agrees that damages alone may not be an adequate remedy for any breach of the terms of this Agreement. Accordingly, the parties shall be entitled to seek the remedies of injunction, specific performance or other equitable relief for any threatened or actual breach of the terms of this Agreement.

**31.    Governing law and jurisdiction**

31.1    This Agreement and any dispute or claim (including non-contractual disputes or claims) arising out of or in connection with it or its subject matter or formation shall be governed by and construed in accordance with the law of England and Wales.

31.2    Each party irrevocably agrees that the courts of England and Wales shall have exclusive jurisdiction to settle any dispute or claim (including non-contractual disputes or claims) arising out of or in connection with this Agreement or its subject matter or formation.

*    *    *    *

[*Signature Page to Follow*]

**AS WITNESS** the hands of the parties hereto or their duly authorised representatives the day and year first before written.


**CELSIUS NETWORK LIMITED**

By: _____

Name: ___Alex Mashinsky_____

Title: ____CEO_____


**CELSIUS NETWORK INC.**

By: _____

Name: ___Alex Mashinsky_____

Title: ____CEO_____

**LEAD INVESTORS:**

**CDP Investissements Inc.**
a Québec corporation.

By: _Mathieu Provost_____
Name: _Mathieu Provost_____
Title: _Managing Director, Québec_____

By: _Thomas Birch_____
Name: __Thomas Birch_____
Title: ___Global Managing Director, Venture Capital and Technology

**WestCap Celsius Co-Invest 2021, LLC,**
a Delaware limited liability company

By:  WestCap Management, LLC
    Its:  Manager

By: _____
    Laurence A. Tosi
    Its:  Managing Member


**WestCap SOF II Celsius 2021 Aggregator, LP,**
a Delaware limited partnership

By:  WestCap II GP, LLC
    Its:  General Partner

By: _____
    Laurence A. Tosi
    Its:  Managing Partner

**WestCap SOF II IEQ 2021 Co-Invest, LP**

By:   WestCap II GP, LLC

Its:   General Partner

By:

Laurence A. Tosi
Its:   Managing Member

**Exhibit A**

**Schedule of Existing Shareholders and Lead Investors**

**PART 1**

**Schedule of Existing Shareholders**

| Shareholder | Address | Ordinary Shares | Ordinary B Shares | Preferred A Shares | Preferred A1 Shares |
|---|---|---|---|---|---|
| Celsius Network, Inc. | 3500 S. Dupont Highway, Dover, Delaware 19901 | | 100,000 | | |
| Tether International Ltd. | c/o SHRM Trustees (BVI) Limited Trinity Chambers, PO Box 4301 VG1110, Road Town, Tortola British Virgin Islands | | | 4,167 | |
| Tether International Ltd. | c/o SHRM Trustees (BVI) Limited Trinity Chambers, PO Box 4301 VG1110, Road Town, Tortola British Virgin Islands | | | | 5,208 |
| Intership Ltd. | 1 Scotts Road, #16-06 Shaw Centre, Singapore 228208 | | | 416 | |
| Michael Mowry | 1367 S. Country Club Drive, Unit 1014 Mesa, AZ 85210 | | | 104 | 130 |
| Sandra Knuth Walsh | 2410 Muir Circle, Wellington, FL 33414 | | | 125 | 156 |

43

| Shareholder | Address | Ordinary Shares | Ordinary B Shares | Preferred A Shares | Preferred A1 Shares |
|---|---|---|---|---|---|
| James Kordomenos | 111 S. Delaware Ave, Apt 1, Tampa, FL 33606 | | | 125 | 156 |
| Thomas Connolly | 1025 Fifth Avenue, 3 EFS, New York, NY 10028 | | | 83 | 104 |
| Johannes Treutler | c/o Celsius Network Limited The Harley Building 77 - 79 New Cavendish Street London W1W 6XB | | | 104 | 130 |
| BNK to the Future Celsius SP | c/o P.O. Box 10008, Willow House, Cricket Square, KY1-1001, Cayman Islands | | | 5,780 | |
| Bnk to the Future Celsius US SP | c/o P.O. Box 10008, Willow House, Cricket Square, KY1-1001, Cayman Islands | | | 2,522 | |
| Gumi Cryptos Capital LLC | 795 Folsom St, San Francisco, California 94107, US | | | 208 | 260 |
| Artus Capital GmbH & Co. KGAA | Am Eulenhof 14, Kulmbach, DE-BY 95326, Germany | | | 542 | |
| Tokentus Investment AG | Taunusanlage 8 Frankfurt am Main, HE 60329 Germany | | | 292 | |
| European Media Finance Limited | Flat 1, 10 Collingham Gardens, London, England, SW5 0HS | | | 303 | |
| **Total** | | **0** | **100,000** | **14,771** | **6,144** |

44

**PART B**

**Schedule of Lead Investors**

| Shareholder | Address |
|---|---|
| WestCap SOF II Celsius 2021 Aggregator, LP | c/o WestCap Management, LLC<br>590 Pacific Avenue<br>San Francisco, CA 94133 |
| WestCap Celsius Co-Invest 2021, LLC | c/o WestCap Management, LLC<br>590 Pacific Avenue<br>San Francisco, CA 94133 |
| WestCap SOF II IEQ 2021 Co-Invest, LP | c/o WestCap Management, LLC<br>590 Pacific Avenue<br>San Francisco, CA 94133 |
| CDP Investissements Inc. | 1000 place Jean-Paul-Riopelle,<br>Montréal, Québec H2Z 2B3 |

EU-DOCS\34747841.8

**Exhibit B**

**Company and Celsius Holding Capitalization**

**CELSIUS NETWORK LIMITED**

| Shareholder | Ordinary Shares | Ordinary B Shares | Preferred A Shares | Preferred A1 Shares | Nonconverted Ordinary Shares | Preferred B Shares | Total I/O + Nonconverted Equity (fully diluted basis) | Total I/O + nonconverted equity (fully diluted basis) % |
|---|---|---|---|---|---|---|---|---|
| Celsius Network Inc. | 100,000 | | | | | | 100,000 | 62.08% |
| Tether International Limited | | | 4,167 | 5,208 | | | 9,375 | 5.82% |
| Intership Ltd. | | | 416 | | | | 416 | 0.26% |
| Michael Mowry | | | 104 | 130 | | | 234 | 0.15% |
| Sandra Knuth Walsh | | | 125 | 156 | | | 281 | 0.17% |
| James Kordomenos | | | 125 | 156 | | | 281 | 0.17% |
| Thomas Connolly | | | 83 | 104 | | | 187 | 0.12% |
| Johannes Treutler | | | 104 | 130 | | | 234 | 0.15% |
| BNK to the Future Non-US Portfolio | | | 5,780 | | | | 5,780 | 3.59% |
| BNK to the Future US Portfolio | | | 2,522 | | | | 2,522 | 1.57% |
| Gumi Cryptos Capital LLC | | | 208 | 260 | | | 468 | 0.29% |
| Artus Capital GmbH & Co. KGaA | | | 542 | | | | 542 | 0.34% |
| tokentus Investment AG | | | 292 | | | | 292 | 0.18% |
| European Media Finance Limited | | | 303 | | | | 303 | 0.19% |
| WestCap SOF II Celsius 2021 Aggregator, LP | | | | | | 7,328 | 7,328 | 4.55% |
| WestCap Celsius Co-Invest 2021, LLC | | | | | | 11,364 | 11,364 | 7.05% |
| CDP Investissements Inc. | | | | | | 7,328 | 7,328 | 4.55% |
| WestCap SOF II IEQ 2021 Co-Invest, LP | | | | | | 722 | 722 | 0.45% |
| ESOP (granted and reserved) | | | | | 13,435 | | 13,435 | 8.34% |
| **TOTAL** | | | | 6,144 | 13,435 | 26,743 | 161,093 | 100.00% |

**Exhibit C**

**Deed of Adherence**

**THIS DEED** is made on          202[ ]

**BY** [              ]

**INTRODUCTION**

(A)    By a [transfer]/[subscription for shares] dated [of even date herewith] [          ]          [(the **Transferor**) transferred to the Transferee]/[[     ] (the **Subscriber**) subscribed for] [class] Shares of £[               ] each in the capital of Celsius Network Limited (the **Company**) (together the [**Transferred Shares**]/[**Subscribed Shares**]).

(B)    This deed is entered into in compliance with the terms of clause [   ] of a subscription and shareholders' agreement dated _____, as amended and restated from time to time, made between the Lead Investors, the Participating Investors, the Existing Shareholders and the Company (all such terms as are therein defined) (which agreement is herein referred to as the **Agreement**).

**AGREED TERMS**

1.    Words and expressions used in this deed shall have the same meaning as is given to them in the Agreement unless the context otherwise expressly requires.

2.    The [Transferee]/[Subscriber] hereby agrees to assume the benefit of the rights [of the Transferor] under the Agreement in respect of the [Transferred]/[Subscribed] Shares and hereby agrees to assume and assumes the burden of the [Transferor's] obligations under the Agreement to be performed after the date hereof in respect of the [Transferred]/[Subscribed] Shares.

3.    The [Transferee]/[Subscriber] hereby agrees to be bound by the Agreement in all respects as if the [Transferee]/[Subscriber] were a party to the Agreement as one of the [Lead Investors]/[Participating Investors]/[Existing Shareholders] and to perform[:]

      (a)    [all the obligations of the Transferor in that capacity thereunder; and]

      (b)    all the obligations expressed to be imposed on such a party to the Agreement[;]

      [in both cases], to be performed or on or after [the date hereof].

4.    This deed is made for the benefit of:

      (a)    the parties to the Agreement; and

      (b)    any other person or persons who may after the date of the Agreement (and whether or not prior to or after the date hereof) assume any rights or obligations under the Agreement and be permitted to do so by the terms thereof,

      and this deed shall be irrevocable without the consent of the Company acting on their behalf in each case only for so long as they hold [class] Shares in the capital of the Company.

5.    [Nothing in this deed shall release the Transferor from any liability in respect of any obligations under the Agreement due to be performed prior to [the date of this deed].]

47

6.      None of the Lead Investors, Participating Investors or Existing Shareholders:

(a)      makes any representation or warranty or assumes any responsibility with respect to the legality, validity, effectiveness, adequacy or enforceability of any of the Agreement (or any agreement entered into pursuant thereto);

(b)      makes any representation or warranty or assumes any responsibility with respect to the content of any information regarding the Company or any member of the group or otherwise relates to the [acquisition]/[subscription] of shares in the Company; or

(c)      assumes any responsibility for the financial condition of the Company or any other party to the Agreement or any other document or for the performance and observance by the Company or any other party to the Agreement or any other document (save as expressly provided therein),

and any and all conditions and warranties, whether express or implied by law or otherwise, are excluded.

7.      This deed shall be governed by and construed in accordance with the laws of England and Wales.

This deed of adherence has been executed and delivered as a deed on the date shown on the first page.

**EXECUTED** as **DEED** by                )

[Transferee/Subscriber]                )

48

**Exhibit D1**

**Warranties**

The Company and Celsius Holding hereby severally warrant (as applicable) to each Lead Investor and Participating Investor that:

(a)      The Company is a private limited company duly organized, validly existing and in good standing under the jurisdiction of its incorporation, and has the power and authority to own, lease and operate its properties and carry on the Business as now conducted.

(b)      Celsius Holding is a corporation duly organized, validly existing and in good standing under the jurisdiction of its incorporation and the execution, delivery and performance by Celsius Holdings of this Agreement is within the power of Celsius Holdings. This Agreement constitutes a legal, valid and binding obligation of Celsius Holdings, enforceable against Celsius Holdings in accordance with its terms.

(c)      The execution, delivery and performance by the Company of this Agreement is within the power of the Company and, other than with respect to the actions to be taken when Shares are to be issued to the Lead Investors and Participating Investors, has been duly authorized by all necessary actions on the part of the Company. This Agreement constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity. As far as the Company is aware, it is not in violation of (i) its current memorandum or articles of association, (ii) any material statute, rule or regulation applicable to the Company or (iii) any material indenture or contract to which the Company is a party or by which it is bound, where, in each case, such violation or default, individually, or together with all such violations or defaults, could reasonably be expected to have a material adverse effect on the Company.

(d)      The performance and consummation by the Company of the transactions contemplated by this Agreement do not and will not: (i) violate any material judgment, statute, rule or regulation applicable to the Company; (ii) result in the acceleration of any material indenture or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any lien upon any property, asset or revenue of the Company or the suspension, forfeiture, or nonrenewal of any material permit, license or authorization applicable to the Company, its business or operations.

EU-DOCS\34747841.8

(e)      No consents or approvals are required in connection with the performance of this Agreement, other than: (i) the Company's corporate approvals; (ii) any qualifications or filings under applicable securities laws; and (iii) necessary corporate approvals for the authorization of Shares issuable pursuant to this Agreement.

EU-DOCS\34747841.8

**Exhibit D2**

**Lead Investor and Participating Investor Warranties**

Each Lead Investor and Participating Investor hereby warrants to the Company and the Shareholders, severally and not jointly, that:

(a) it has full power and authority to enter into this Agreement and all agreements and documentation contemplated by it. This Agreement, when executed and delivered by the Lead Investor or Participating Investor (as applicable), will constitute valid and legally binding obligations of such person, enforceable in accordance with their terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b) The Shares to be acquired by it will be acquired for its own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and the Lead Investor or Participating Investor (as applicable) has no present intention of selling, granting any participation in, or otherwise distributing the same.

(c) it is either:

　(i) (x) a "qualified institutional buyer" (a "**Qualified Institutional Buyer**"), as defined in Rule 144A under the Securities Act of 1933 (the "**U.S. Securities Act**") or (y) an "accredited investor" (within the meaning of Rule 501 of Regulation D under the U.S. Securities Act); or

　(ii) is not in the United States and is not, and is not acting for the benefit or account of, "U.S. persons" (as defined in Regulation S under the U.S. Securities Act),

(each such person being a "**Qualifying Investor**");

(d) it has been given the opportunity to obtain any information or documents relating to, and to ask questions and receive answers about, the Shares and the Company and the business and prospects of the Company which it deems necessary to evaluate the merits and risks related to its subscription for the Shares and to verify the information received;

(e) in deciding to subscribe for any Shares, it is making such investment based on the results of its own due diligence investigation, has relied solely on its own independent

51

investigation of the Company and its affairs and acknowledges that, except as otherwise agreed herein and (in the case of the Lead Investors) the Lead Investor Agreement, it has not relied upon any representation made by the Company or any of its advisers, affiliates, representatives or agents. It understands that the information furnished by the Company does not constitute investment, accounting, legal, tax or other advice. In making this investment, it is relying solely upon the advice of its own tax advisers with respect to any and all tax aspects of a subscription for the Shares, and neither the Company nor any of its advisers, affiliates, representatives or agents has, except as otherwise agreed herein and (in the case of the Lead Investors) the Lead Investor Agreement, made any representation regarding the information furnished by the Company or the tax consequences of subscribing for the Shares;

(f)     its knowledge and experience in financial and business matters are such that it is capable of evaluating the merits and risks of its subscription for Shares. Its financial condition is such that it can afford to bear the economic risk of holding the Shares for an extended period of time and has adequate means for providing for its current needs and contingencies;

(g)     it understands that Shares have not been and will not be registered under the U.S. Securities Act and, therefore, can only be resold if such Shares are offered and sold by it (i) in an offshore transaction complying with Regulation S under the U.S. Securities Act, (ii) in a transaction exempt from registration under the U.S. Securities Act pursuant to Rule 144 thereunder (if available), (iii) to a person whom it reasonably believes is a Qualified Institutional Buyer that is purchasing for its own account or for the account of one or more persons each of whom is a Qualified Institutional Buyer in a transaction meeting the requirements of Rule 144A under the U.S. Securities Act or (iv) pursuant to an effective registration statement under the U.S. Securities Act, and in each of cases (i) through (iv) in accordance with any applicable securities laws of any state of the United States and any other jurisdiction. It understands that no one has any obligation to register the Shares under the U.S. Securities Act; and

(h)     it understands that the Shares will be acquired by it in transactions not involving any public offering within the meaning of the U.S. Securities Act, but in reliance on one or more exemptions therefrom. It understands that the Shares have not been, and will not be, approved or disapproved by the Securities and Exchange Commission or by any other federal or state agency, and that no such agency has passed on the accuracy or adequacy of disclosures made to it by the Company;

(i)     it understands that the information provided herein will be relied upon by the Company for the purpose of determining its eligibility to purchase Shares. It agrees to

EU-DOCS\34747841.8

provide, if requested, any additional information that may reasonably be required to determine its eligibility to purchase Shares;

(j)     it hereby acknowledges that the Company would be unable to rely on the exemption from the registration requirements under the U.S. Securities Act provided by Rule 506(c) of Regulation D under the U.S. Securities Act (the "**Exemption**") if any person that beneficially owns 20% or more of the Company's outstanding voting equity securities or any promotor for the Company has experienced a "Bad Actor" disqualification event (each such event, a "**Disqualifying Event**"), as listed in Rule 506(d)(1) of Regulation D under the U.S. Securities Act; and

(k)     neither it nor any of its directors, general partners, managing members, executive officers nor any other person affiliated with it, whose experience of a Disqualifying Event may prevent the Company from relying on the Exemption with respect to the offer and sale of the Shares, has experienced a Disqualifying Event.

EU-DOCS\34747841.8

# Exhibit B

---------- Forwarded message ---------
From: <michael.greenblatt@celsius.network>
Date: Wed, Apr 20, 2022, 4:25 PM
Subject: RE: Fabric Ventures / Celsius
To: Anil Hansjee <anil@fabric.vc>
Cc: Ron Deutsch <ron.deutsch@celsius.network>, Jalal Uddin
<jalal.uddin@celsius.network>, Julien Thevenard <julien@fabric.vc>, Thomas Crow
<tom.crow@fabric.vc>, Joseph Golding-Ochsner <joseph.golding-ochsner@celsius.network>,
Charlotte Ferris-Lawlor <charlotte.ferrislawlor@celsius.network>


Hi Anil,


The pro forma cap table and YE 2021 are attached.


Please note the following:


1. The pro forma cap table includes share allocations (as indicated) for a few investors of
   investors, including Fabric, which we expect will be filled over the next several weeks.
2. The FYE 2021 management numbers are unaudited, preliminary, subject to ongoing
   review, and remain subject to change


Best regards,

Michael

**From:** Anil Hansjee <anil@fabric.vc>
**Sent:** Friday, April 15, 2022 5:31 AM
**To:** Michael Greenblatt <michael.greenblatt@celsius.network>
**Cc:** Ron Deutsch <ron.deutsch@celsius.network>; Jalal Uddin
<jalal.uddin@celsius.network>; Julien Thevenard <julien@fabric.vc>; Thomas Crow
<tom.crow@fabric.vc>; Joseph Golding-Ochsner <joseph.golding-
ochsner@celsius.network>; Charlotte Ferris-Lawlor <charlotte.ferrislawlor@celsius.network>
**Subject:** Re: Fabric Ventures / Celsius

We also seem to be missing financial statements (even if management) for YE 2021 to
complete our files thanks

**Anil Hansjee**

General Partner, Fabric Ventures

*Backing the Founders of the Open Economy*

Fabric Twitter, Fabric LinkedIn, Fabric Medium

The Fabric Ventures Investment Thesis

UK: +447788445700, Twitter, LinkedIn

Terms that apply to this message: Email Disclaimer

On Fri, 15 Apr 2022 at 09:07, Anil Hansjee <anil@fabric.vc> wrote:

> Thanks Michael. Looking forward to it. We signed the subscription note in the interests of
> time but will need the cap table for formalities.
>
> BTW could you tell me what department functions/operations and approx number of people
> you have in the various country subsidiaries in each of Serbia, Lithuania, Israel and Cyprus

A


**Anil Hansjee**

General Partner, [Fabric Ventures](#)

*Backing the Founders of the Open Economy*


[Fabric Twitter](#), [Fabric LinkedIn](#), [Fabric Medium](#)

[The Fabric Ventures Investment Thesis](#)


UK: +447778445700, [Twitter](#), [LinkedIn](#)


Terms that apply to this message: [Email Disclaimer](#).



On Thu, 14 Apr 2022 at 16:56, <[michael.greenblatt@celsius.network](mailto:michael.greenblatt@celsius.network)> wrote:

Sure, Anil – please see attached. Will send an updated cap table later today.




**Michael Greenblatt**

*Corporate Counsel |* **Celsius Network**

[michael.greenblatt@celsius.network](mailto:michael.greenblatt@celsius.network)

**From:** Anil Hansjee <[anil@fabric.vc](mailto:anil@fabric.vc)>
**Sent:** Thursday, April 14, 2022 9:38 AM
**To:** Michael Greenblatt <[michael.greenblatt@celsius.network](mailto:michael.greenblatt@celsius.network)>
**Cc:** Ron Deutsch <[ron.deutsch@celsius.network](mailto:ron.deutsch@celsius.network)>; Jalal Uddin
<[jalal.uddin@celsius.network](mailto:jalal.uddin@celsius.network)>; Julien Thevenard <[julien@fabric.vc](mailto:julien@fabric.vc)>; Thomas Crow
<[tom.crow@fabric.vc](mailto:tom.crow@fabric.vc)>; Joseph Golding-Ochsner <[joseph.golding-](mailto:joseph.golding-)

ochsner@celsius.network>; Charlotte Ferris-Lawlor
<charlotte.ferrislawlor@celsius.network>
**Subject:** Re: Fabric Ventures / Celsius

Please also send the bank account details for the transfer

**Anil Hansjee**

General Partner, Fabric Ventures

*Backing the Founders of the Open Economy*

Fabric Twitter, Fabric LinkedIn, Fabric Medium

The Fabric Ventures Investment Thesis

UK: +447788445700, Twitter, LinkedIn

Terms that apply to this message: Email Disclaimer.

On Thu, 14 Apr 2022 at 10:50, Anil Hansjee <anil@fabric.vc> wrote:

> Michael thanks. Docusign received. The cap table (or some proforma version where the
> anticipated investors may not be fully known in name yet or are redacted) will be
> required for submission to our board to sign, so i appreciate it if you can just send a
> relevant version where fabric is listed alongside the known//reserved for first close
> investors and showing some allocation for future closes of this round. However you can
> make it work to show our board a relevant cap table thx
>
>
> **Anil Hansjee**
>
> General Partner, Fabric Ventures
>
> *Backing the Founders of the Open Economy*
>
>
> Fabric Twitter, Fabric LinkedIn, Fabric Medium

[The Fabric Ventures Investment Thesis](#)

UK: +447788445700, [Twitter,](#) [LinkedIn](#)

Terms that apply to this message: [Email Disclaimer](#).

On Thu, 14 Apr 2022 at 08:19, <[michael.greenblatt@celsius.network](#)> wrote:

> Hi Anil,
>
> Should be in all 3 of your inboxes now. Will follow up with an updated cap table once we get closer to the first closing date. The deed will be sent under separate cover once the sub letter is signed.
>
> Many thanks,
>
> Michael
>
> ---
>
> **From:** Anil Hansjee <[anil@fabric.vc](#)>
> **Sent:** Thursday, April 14, 2022 2:07 AM
> **To:** Michael Greenblatt <[michael.greenblatt@celsius.network](#)>
> **Cc:** Ron Deutsch <[ron.deutsch@celsius.network](#)>; Jalal Uddin <[jalal.uddin@celsius.network](#)>; Julien Thevenard <[julien@fabric.vc](#)>; Thomas Crow <[tom.crow@fabric.vc](#)>; Joseph Golding-Ochsner <[joseph.golding-ochsner@celsius.network](#)>; Charlotte Ferris-Lawlor <[charlotte.ferrislawlor@celsius.network](#)>
> **Subject:** Re: Fabric Ventures / Celsius
>
> Hi guys. Just checking in on this to see where things stand . Maybe you sent it to Richard and did not c.c myself?
>
> Anil Hansjee
> General Partner, Fabric Ventures
>
> Backing the Founders of the Open Economy

Fabric.vc
+447788445700

On Wed, 13 Apr 2022, 09:50 Anil Hansjee, <anil@fabric.vc> wrote:

> Sorry also to add, can you send it for signature by docusign when ready to
> Richard@fabric.vc and cc myself and Julien pls
>
> Anil Hansjee
> General Partner, Fabric Ventures
>
> Backing the Founders of the Open Economy
>
> Fabric.vc
> +447788445700

On Wed, 13 Apr 2022, 02:09 Anil Hansjee, <anil@fabric.vc> wrote:

> Thanks ,
>
>
> 1) to be consistent with the entity we onboarded KYC with , pls change the
> signatory to the one (our top co) in the box below
>
> 2) I would also appreciate a pro forma cap table  sent for this final B closing for
> our internal board approval, thx ( i have an earlier B round closing cap table)
> 3) do i also need to sign a. separate deed of adherence?

| Full Company Name | Fabric Ventures Group Sarl |
|---|---|
| Full Registered Address | 11, rue Pierre d'Aspelt L–1142 Luxembourg |
| Company Signature Name | Director, Richard Muirhead, richard@fabric.vc and<br><br>cc Anil Hansjee (anil@fabric.vc) |

> Anil Hansjee
> General Partner, Fabric Ventures

Backing the Founders of the Open Economy

Fabric.vc
+447788445700


On Tue, 12 Apr 2022, 23:59 Michael Greenblatt,
<michael.greenblatt@celsius.network> wrote:

> Anil,
>
>
> Please find attached a revised subscription letter reflecting the 30/60/90 day
> payment schedule beginning the parties have agreed upon (2m/2m/4m).
>
>
> Let us know if you have any questions/comments - otherwise, please return a
> signed copy of the subscription letter so that we can reserve the $8m Series B
> allocation for Fabric.
>
>
> Thanks,
>
> Michael
>
>
> On Tue, Apr 12, 2022 at 1:45 AM <michael.greenblatt@celsius.network>
> wrote:
>
>> Thanks, Anil.
>>
>>
>> We'll follow up with an amended subscription letter that reflects the agreed
>> upon construct for your review/signoff and will plan to close on the initial
>> $2m in early May.
>>
>>
>> Best,
>>
>> Michael
>>
>> _____
>>
>> **From:** Anil Hansjee <anil@fabric.vc>

**Sent:** Monday, April 11, 2022 5:03 PM
**To:** Ron Deutsch <ron.deutsch@celsius.network>
**Cc:** Sarah Chen <sarah.chen@celsius.network>; Jalal Uddin
<jalal.uddin@celsius.network>; Julien Thevenard <julien@fabric.vc>;
Thomas Crow <tom.crow@fabric.vc>; Michael Greenblatt
<michael.greenblatt@celsius.network>; Joseph Golding-Ochsner
<joseph.golding-ochsner@celsius.network>; Charlotte Ferris-Lawlor
<charlotte.ferrislawlor@celsius.network>
**Subject:** Re: Fabric Ventures / Celsius

Sorry my message was in drafts. I thought I sent it. Yes thanks. That construct works for us and we appreciate it.

Anil

Anil Hansjee
General Partner, Fabric Ventures

Backing the Founders of the Open Economy

Fabric.vc
+447788445700

On Mon, 11 Apr 2022, 22:58 Ron Deutsch,
<ron.deutsch@celsius.network> wrote:

> Please let us know.
>
> Thanks
>
> On Fri, Apr 8, 2022, 8:02 AM Ron Deutsch
> <ron.deutsch@celsius.network> wrote:
>
>> Thanks Anil.
>>
>> I think we could do it all in one document. It will simply have 3 funding dates. $2m after 30 days, another $2m no later than 60 days from signing and the final $4m rest no later than 90.

We are confirming internally but would that construct work for you?

On Thu, Apr 7, 2022, 2:43 PM Anil Hansjee <anil@fabric.vc> wrote:

> Ron . Firstly thanks for your understanding. Highly appreciated.
> Second what ever we sign for we are making a HARD commitment
> for as professionals in this industry. So if we sign for 8m now , even
> if you were to allow a delayed funding, we would be good for this
> 8m. I just want to make sure there is no misunderstanding here and
> we dont treat it as an option. As such, if you were to see fit to enable
> a phased funding of the 8m we would love to stick to that and sign
> but if you are saying lets only sign for 2m now and then revisit the
> remaining later, I understand your position. Please let me know your
> thoughts here. Regardless we are happy to sign for 2mUSD now for
> a delayed 30day funding. Would this be 30 days extra from 12 April
> your closing date or 30 days from today 7 April (just to clarify).
> Naturally the former is better for us :-) In terms of moving forward, I
> believe we are just missing the document from an accountant or
> lawyer that we are an accredited investment firm for your
> onboarding. We have requested such letter.
>
>
> Anil Hansjee
> General Partner, Fabric Ventures
>
> Backing the Founders of the Open Economy
>
> Fabric.vc
> +447788445700
>
>
> On Wed, 6 Apr 2022, 20:45 Ron Deutsch,
> <ron.deutsch@celsius.network> wrote:
>
>> We will check.
>>
>>
>> I suggest we do a first subscription now for 2m this month.
>>
>>
>> Then, we can discuss internally and get back to you on a separate

commitment with delayed funding but it's needs to obviously be a hard commitment as we are allocating it to you.

Please let us know and we can document it accordingly.

Many thanks,

Ron

On Wed, Apr 6, 2022, 2:13 PM Anil Hansjee <anil@fabric.vc> wrote:

> Ron and Sarah
>
> Sorry for the delay.  Basically we can sign and commit to 8mUSD if we had much more time as this will enable us to onboard and draw down from these LPs for our new fund. Its hard to estimate but I would definitely say closer to 90 days. If we are talking about a shorter extension to fund , say 60 days, we would estimate some of these funds would be drawn down in this time frame, and could sign and commit for 4m USD safely. If it's 30days as Sarah indicated, then to be safe I would err at 2m USD. I'm really grateful for the ability to delay funding.
>
> **Anil Hansjee**
>
> General Partner, Fabric Ventures
>
> *Backing the Founders of the Open Economy*
>
> Fabric Twitter, Fabric LinkedIn, Fabric Medium
>
> The Fabric Ventures Investment Thesis
>
> UK: +447778445700, Twitter, LinkedIn

Terms that apply to this message: Email Disclaimer.

On Tue, 5 Apr 2022 at 19:50, Ron Deutsch <ron.deutsch@celsius.network> wrote:

> Anil,
>
> We need some clarity from you please on amounts and eta for closing.
>
> If we sign the subscription agreements, what's the amount that can be funded at signing next week and what can be committed for funding by the end of April?
>
> Many thanks,
>
> Ron
>
> On Tue, Apr 5, 2022, 11:28 AM Sarah Chen <sarah.chen@celsius.network> wrote:
>
>> Hi Anil - Thanks. For signing, how much will you be committing for closing in a month?
>>
>> On Tue, Apr 5, 2022 at 2:18 AM Anil Hansjee <anil@fabric.vc> wrote:
>>
>>> Hi Sarah. Thanks for the update and offer. We can of course sign but do you have flexibility on the funding date so that we can collect funds from our LPs . Ideally this would be a further month or more given kyc time. It would be most appreciated and we would clearly be legally committed from signature date. I'm afraid the 12th ends up being too tight for us. We were not really

away of timelines properly and have done all the DD and
kyc work between us and believe there is much to offer
as a focused web3 fund and in Europe out of proportion
to our cheque size.

Anil Hansjee
General Partner, Fabric Ventures

Backing the Founders of the Open Economy

Fabric.vc
+447788445700

On Mon, 4 Apr 2022, 22:38 Sarah Chen,
<sarah.chen@celsius.network> wrote:

> Hi Anil - Thanks for the update. We can
> accommodate for another week, so we need to
> close by next Tuesday, April 12.
>
>
>
> Thanks,
>
> Sarah
>
>
> On Tue, Mar 29, 2022 at 12:30 PM Anil Hansjee
> <anil@fabric.vc> wrote:
>
>> Thanks Ron. Probably not tbh for the amount we
>> had in mind at least. We are are now just starting
>> our outreach to these LPs who signalled interest
>> before in order to plug the gap from Patrick pulling
>> out. Based on the last time around, we spent a long
>> time with each of them going through
>> the investment thesis and then they had their own
>> investment process (thats the trouble with
>> warehousing investments vs drawing down from a
>> fund - our growth fund is not yet closed). I suspect
>> realistically we are 1 month away from back filling
>> the gap we thought we had from Patrick. As
>> mentioned, we are happy to sign to commit but
>> looking to see what the maximum time period you
>> can accommodate in terms of a delay to funding and
>> then i can assess what we can realistically do $
>> amount wise in that time frame and sign up for that.

**Anil Hansjee**

General Partner, Fabric Ventures

*Backing the Founders of the Open Economy*

Fabric Twitter, Fabric LinkedIn, Fabric Medium

The Fabric Ventures Investment Thesis

UK: +447788445700, Twitter, LinkedIn

Terms that apply to this message: Email Disclaimer.

On Tue, 29 Mar 2022 at 17:08, Ron Deutsch <ron.deutsch@celsius.network> wrote:

> Thank you Anil.
>
> As long as we sign the subscription documents /commitments soon we can provide more time for funding. We just need to finalize sub docs and allocated amounts. Would Thurs April 7 be sufficient time for funding?
>
> On Tue, Mar 29, 2022, 11:38 AM Anil Hansjee <anil@fabric.vc> wrote:
>
>> Hi Sarah and Ron/ Sorry for the delay
>>
>> All is good here . We have everything from you , thanks for that. We have everything on our side ready for onboarding as well except the w8 form (we have an application for the GINN number underway but i will chase our lawyers on this). We have not uploaded anything as your system prefers to receive the whole pack

13

at once

Unfortunately we had a disappointing discussion with Patrick . We were under the impression that he was bringing capital to the Fabric syndicate but he has decided to do his own SPV, which is his right. We have other LP interest to back fill this amount from Patrick but will need to kick this off with them. Ultimately the question to you is if we are happy to sign documents what would be the maximum time you would be able to give us  to fund so that we can properly draw this down from our LPs?

Anil Hansjee
General Partner, Fabric Ventures

Backing the Founders of the Open Economy

Fabric.vc
+447788445700

On Tue, 29 Mar 2022, 01:00 Sarah Chen, <sarah.chen@celsius.network> wrote:

> Hi Anil - Just following up here. Could you confirm how much you are investing and when you can complete our KYC onboarding? We can fill in the investment amount and number of shares in the sub docs and send to you via DocuSign.
>
>
> Thanks again,
>
> Sarah
>
>
> On Thu, Mar 24, 2022 at 7:03 PM Anil Hansjee <anil@fabric.vc> wrote:
>
>> Great. Speaking to him on Monday. Either way feels like the total of around 16m is the target to reserve (8 from us and 6 to 8

14

from Patrick). Will nail Patrick's final numbers and whether he does it directly or via us on Monday.

Anil Hansjee
General Partner, Fabric Ventures

Backing the Founders of the Open Economy

Fabric.vc
+447788445700

On Thu, 24 Mar 2022, 22:09 Ron Deutsch, <ron.deutsch@celsius.network> wrote:

> We can accommodate Patrick's allocation whether directly or through Fabric.
>
> I asked him about it separately. Please let us know as soon as possible. We are getting close to capacity.
>
> Thanks
>
> On Thu, Mar 24, 2022, 11:24 AM Anil Hansjee <anil@fabric.vc> wrote:
>
>> Thanks Sarah. Yes i know we have everything on our side (except the W8) so we are waiting for this before uploading because your system only will accept the full pack at once vs bit by bit. We are on it however. We had to apply for a US tax reference in order to fill in the W8 unfortunately.
>>
>> On your side , i have just downloaded the KYC pack - thanks for that. Would LT be able to send proof of address as well (3 months max)? His global entry doc does not have an address on it.

I also saw your question on $ investment amount by separate email, I will respond monday more definitely because im meeting Patrick Martin on monday to find out how much he wants to take himself. I think he was after something like 6m-8m for his own (unclear if he is investing directly or via fabric), so if we at fabric also wanted another 8m from our fund then the question would be if there was scope for both of us at 8m ie 16m total?

**Anil Hansjee**

General Partner, Fabric Ventures

*Backing the Founders of the Open Economy*

Fabric Twitter, Fabric LinkedIn, Fabric Medium

The Fabric Ventures Investment Thesis

UK: +447788445700, Twitter,

Reminder: Be aware of phishing sites and always make sure you are visiting the official https://celsius.network website and app. Celsius will never ask you for confidential information such as passwords, private keys, seed phrases, or secret codes. You should store this information privately and securely and report any suspicious activity.

©2022 Celsius Network

121 River Street,  Ste PH05
Hoboken, NJ 07030 USA
Registered as a Money Services Business (MSB) number 31000192265811 with the US Financial Crimes Enforcement Network (FinCEN).

Celsius is not a bank, depository institution, custodian or fiduciary and the assets in your Celsius account are not insured by any private or governmental insurance plan (including FDIC or SIPC), nor are they covered by any compensation scheme (including FSCS).

Holding, trading or using crypto assets carry significant risks, please carefully read our Risk Disclosure page. Celsius does not provide any financial, legal or tax advice, nor should this email be viewed as an offer or inducement to make any financial decision.

Exhibit C

DocuSign Envelope ID: 48986DCB-2788-4425-B5F1-7GA83CE95FB9

**SUBSCRIPTION LETTER**

**PRIVATE & CONFIDENTIAL**

<u>14</u> April 2022

To:

The Directors of Celsius Network Limited
The Harley Building
77 - 79 New Cavendish Street
London
W1W 6XB

Dear Directors,

**Application for shares in Celsius Network Limited (the "Company")**

Capitalised terms used but not defined in this letter shall have the meaning given to them in the subscription and shareholders' agreement dated 3 December 2021, as amended and restated from time to time, made between the Lead Investors, the Participating Investors, the Existing Shareholders and the Company (all such terms as are therein defined).

Fabric Ventures Group Sarl with registered offices at 11, rue Pierre d'Aspelt L−1142 Luxembourg (the "**Subscriber**") hereby irrevocably applies to subscribe for 391 Preferred B Shares of £0.00001 each in the capital of the Company for cash at a price of $20,469 per share on the terms and subject to the conditions of the articles of association of the Company.

The Subscriber hereby undertakes to pay the Company the sum of $2,000,000 on or before 10 May 2022, $2,000,000 on or before June 10, 2022, and $4,003,379 on or before July 10, 2022 for a total of $8,003,379 in respect of such application by electronic funds transfer to the Company's bank account and payment made in accordance with this paragraph shall constitute a good discharge for the Subscriber's obligations under this paragraph.

The Subscriber hereby requests and authorises you to enter its name in the register of members of the Company as the holder of the shares allotted to it pursuant to this application and requests that you send to us a share certificate in respect of such shares.

Yours faithfully

DocuSigned by:

_Richard Muirhead_ .
62014D18EE6D420...

Signed by Richard Muirhead, Director

for and on behalf of Fabric Ventures Group Sarl

........................................

# Exhibit D

DocuSign Envelope ID: 72F5A8DE-8278-4C63-B951-E9D52FD0475

**Deed of Adherence**

**THIS DEED** is made on _5/15/2022_____

BETWEEN

**CELSIUS NETWORK LIMITED**, incorporated and registered in England and Wales with company number 11198050 with address at The Harley Building 77 - 79 New Cavendish Street London W1W 6XB (the **Company**); and

**Fabric Ventures Group Sarl,** with registered offices at 11, Rue Pierre d'Aspelt L-1142 Luxembourg (the **Subscriber**)

**INTRODUCTION**

(A)  By a subscription for shares dated 14 April 2022, the Subscriber subscribed for 391 Preferred B Shares of £ 0.00001 each in the capital of Celsius Network Limited (the **Company**) (together the **Subscribed Shares**).

(B)  This deed is entered into in compliance with the terms of clause 11 of a subscription and shareholders' agreement dated 3 December 2021, as amended and restated from time to time, made between the Lead Investors, the Participating Investors, the Existing Shareholders and the Company (all such terms as are therein defined) (which agreement is herein referred to as the **Agreement**).

**AGREED TERMS**

1.  Words and expressions used in this deed shall have the same meaning as is given to them in the Agreement unless the context otherwise expressly requires.

2.  The Subscriber hereby agrees to assume the benefit of the rights under the Agreement in respect of the Subscribed Shares and hereby agrees to assume and assumes the burden of the obligations under the Agreement to be performed after the date hereof in respect of the Subscribed Shares.

3.  The Subscriber hereby agrees to be bound by the Agreement in all respects as if the Subscriber were a party to the Agreement as one of the Participating Investors and to:

(a)  provide all of the warranties set out at Exhibit D2 of the Agreement as at the date of this deed; and

(b)  perform all the obligations expressed to be imposed on such a party to the Agreement;

in each case, to be done or on or after the date hereof.

4.  This deed is made for the benefit of:

(a)  the parties to the Agreement; and

(b)  any other person or persons who may after the date of the Agreement (and whether or not prior to or after the date hereof) assume any rights or obligations under the Agreement and be permitted to do so by the terms thereof,

and this deed shall be irrevocable without the consent of the Company acting on their behalf in each case only for so long as they hold Preferred B Shares in the capital of the Company.

5.    None of the Lead Investors or the Existing Shareholders:

(a)    makes any representation or warranty or assumes any responsibility with respect to the legality, validity, effectiveness, adequacy or enforceability of any of the Agreement (or any agreement entered into pursuant thereto);

(b)    makes any representation or warranty or assumes any responsibility with respect to the content of any information regarding the Company or any member of the group or otherwise relates to the subscription of shares in the Company; or

(c)    assumes any responsibility for the financial condition of the Company or any other party to the Agreement or any other document or for the performance and observance by the Company or any other party to the Agreement or any other document (save as expressly provided therein),

and any and all conditions and warranties, whether express or implied by law or otherwise, are excluded.

6.    This deed shall be governed by and construed in accordance with the laws of England and Wales.

This deed of adherence has been executed and delivered as a deed on the date shown on the first page.

**EXECUTED** as **DEED** by                        )
Richard Muirhead Director
**Fabric Ventures Group Sarl,**
11, Rue Pierre d'Aspelt L-1142 Luxembourg            )

Witness signature

Witness name            Max Mersch

Witness address        13 rue Marie-Adelaide, L-2128, Luxembourg

# Exhibit E



---------- Forwarded message ---------
From: **Julien Thevenard** <julien@fabric.vc>
Date: Fri, Jul 8, 2022 at 4:10 PM
Subject: RE: Planning for up and coming payment next week
To: <michael.greenblatt@celsius.network>, Anil Hansjee <anil@fabric.vc>, Sean Whitney
<sean.whitney@celsius.network>

Cc: Rod Bolger <rod.bolger@celsius.network>, Ron Deutsch <ron.deutsch@celsius.network>, Yaniv Tsur <yaniv.tsur@celsius.network>, Joseph Golding-Ochsner <joseph.golding-ochsner@celsius.network>

Hi Michael,

Naturally, Fabric is aware of the serious and widely-reported difficulties currently faced by Celsius. In these circumstances, regrettably we are not in a position to proceed with our previous offer of investment. Please can you therefore return the initial advance of 2m USDC sent on 10th May 2022, which was sent pending closure of our fundraising and allotment of equity.

We would also note significant concern that your commitment on 10th May 2022 to keep our USDC in your "segregated investment accounts" i.e. your "client investment vault", until we are closed has not been honoured.

The chain data shows that within 24 hrs of confirming receipt of our funds, these were then moved onto "Celsius Network: Wallet 5" (0x4f6742bADB049791CD9A37ea913f2BAC38d01279), an on-chain wallet controlled by Celsius with high volumes of transaction (several hundred thousand transactions), presumably a 'hot wallet' of Celsius and not a segregated investment account.

We note that the USDC balance on this Wallet ("Celsius Network: Wallet 5) is now only 31,367.734793 ; so the funds have been moved again.

We deem this to be a serious breach of the commitment to hold the funds effectively in escrow and would ask that it is rectified by return of our 2m USDC forthwith to our wallet: **0x7f1B6c8aE84157487A1aeaaBd2F2660C74A07EC7**

Kind regards,
Julien

_____

**Julien Thevenard**
Associate, Fabric Ventures
*Backing the Founders of the Open Economy*

Fabric Twitter - Fabric LinkedIn - Fabric Medium - Investment Thesis
Twitter: @JulienThevenard
Terms that apply to this message: Email Disclaimer

---------- Forwarded message ---------
From: **Anil Hansjee** <anil@fabric.vc>
Date: Fri, Jun 10, 2022, 12:42 PM
Subject: Re: Celsius investor update

To: Michael Greenblatt <michael.greenblatt@celsius.network>
Cc: Ron Deutsch <ron.deutsch@celsius.network>

Thanks guys. Our follow up questions are

What are the current short term assets (cash and cash equivalents) vs equivalent liabilities?
what are current withdrawals and what sort of withdrawal level will lead to a liquidity crisis?
What are the current ETH short term assets and liabilities (i.e. stETH vs ETH assets)
At what point of ETH withdrawals do Celcius need to liquidate stETH positions?

Anil Hansjee
General Partner, Fabric Ventures

Backing the Founders of the Open Economy

Fabric.vc
+447788445700

On Wed, 8 Jun 2022, 21:01 , <michael.greenblatt@celsius.network> wrote:

> Noon we have a conflict, proposed 11:30 Friday instead.
>
>
>
> ------------------------------------
>
> **From:** Anil Hansjee <anil@fabric.vc>
> **Sent:** Wednesday, June 8, 2022 12:39 PM
> **To:** Michael Greenblatt <michael.greenblatt@celsius.network>
> **Cc:** Ron Deutsch <ron.deutsch@celsius.network>
> **Subject:** Re: Celsius investor update
>
>
>
> Just checking in here Michael to see if we can move it?
>
> Anil Hansjee
> General Partner, Fabric Ventures
>
> Backing the Founders of the Open Economy
>
> Fabric.vc
> +447788445700
>
>
>
> On Wed, 8 Jun 2022, 00:05 Anil Hansjee, <anil@fabric.vc> wrote:
>
>> Sorry thats my bad , i got the time zones mixed up. I meant 11am or 12pm thur or fri ET.

If these dont work for you we can do thur 10.30am or friday 8am ET. Also maybe 45 mins would be appreciated if possible to allow for some Q&A. If not 30mins will suffice.

**Anil Hansjee**

General Partner, Fabric Ventures

*Backing the Founders of the Open Economy*

Fabric Twitter, Fabric LinkedIn, Fabric Medium

The Fabric Ventures Investment Thesis

UK: +447788445700, Twitter, LinkedIn

Terms that apply to this message: Email Disclaimer

On Tue, 7 Jun 2022 at 23:46, <michael.greenblatt@celsius.network> wrote:

> Sure – will send a calendar. Feel free to forward to your team.
>
> **From:** Anil Hansjee <anil@fabric.vc>
> **Sent:** Tuesday, June 7, 2022 6:46 PM
> **To:** Michael Greenblatt <michael.greenblatt@celsius.network>
> **Cc:** Ron Deutsch <ron.deutsch@celsius.network>
> **Subject:** Re: Celsius investor update
>
> Thanks there are a few from the team interested - could you do 8 or 9am thur or fri this week (eastern time US) ? We are london based as a reminder
>
> **Anil Hansjee**
>
> General Partner, Fabric Ventures

*Backing the Founders of the Open Economy*

[Fabric Twitter](), [Fabric LinkedIn](), [Fabric Medium]()

[The Fabric Ventures Investment Thesis]()

UK: +447788445700, [Twitter](), [LinkedIn]()

Terms that apply to this message: [Email Disclaimer]().

On Tue, 7 Jun 2022 at 23:28, <[michael.greenblatt@celsius.network]()> wrote:

> Hey Anil,
>
> Happy to set up a call for tomorrow or Thursday to provide some color on the items you've alluded to. Please let us know when you are available to discuss and I'll schedule the call accordingly.
>
> We can provide an additional week for the payment but note that the final $4M tranche will remain due on the originally scheduled date.
>
> Thanks,
>
> Michael
>
> ---
>
> **From:** Anil Hansjee <[anil@fabric.vc]()>
> **Sent:** Monday, June 6, 2022 7:07 AM
> **To:** Michael Greenblatt <[michael.greenblatt@celsius.network]()>; Ron Deutsch <[ron.deutsch@celsius.network]()>
> **Subject:** Celsius investor update

Michael and Ron how are you? Tough times i know!!

I would  like to ask for some investor reporting to be sent out way. Especially in times like this it's critical to share some insights so we don't get hung up on social media news which has been overwhelmingly negative to Celsius, unfortunately.

We have our investor LP meetings early next week and I will be expected to be able to comment at a high level in our portfolio companies and I'm afraid I have no real insights on key matters such Celsius wrt market impact to $ inflows and AUM, expected rev and user and AUM growth for the year, timing of the IPO of the mining business in this current market, the CEL token collapse and the UST story. It would be useful for me to also know what elements are for my ears only under NDA Vs shareable to our LPs under our own NDA with them.

On our payment schedule - we have our next $2m due end of this week. I would like to ask if we can delay this  to accommodate a slight delay in our paper work and kyc for onboarding our LPs to our new growth fund. Given market dynamics we have also had some further shuffling to do our end but are now gearing up for formalities. Your assistance would be appreciate if we can delay the payment by a few weeks to be sure we can finalise matters. On this point, can i ask you to recconfirm both the USDC wallet address and the fiat bank account details - we are not yet sure which we will use.

Anil Hansjee
General Partner, Fabric Ventures

Backing the Founders of the Open Economy

Fabric.vc
+447788445700

Reminder: Be aware of phishing sites and always make sure you are visiting the official https://celsius.network website and app. Celsius will never ask you for confidential information such as passwords, private keys, seed phrases, or secret codes. You should store this information privately and securely and report any suspicious activity.

©2022 Celsius Network

121 River Street,  Ste PH05
Hoboken, NJ 07030 USA
Registered as a Money Services Business (MSB) number 31000192265811 with the US Financial Crimes Enforcement Network (FinCEN).

Celsius is not a bank, depository institution, custodian or fiduciary and the assets in your Celsius account are not insured by any private or governmental insurance plan (including FDIC or SIPC), nor are they covered by any compensation scheme (including FSCS).

Holding, trading or using crypto assets carry significant risks, please carefully read our Risk Disclosure page. Celsius does not provide

any financial, legal or tax advice, nor should this email be viewed as an offer or inducement to make any financial decision.

Reminder: Be aware of phishing sites and always make sure you are visiting the official https://celsius.network website and app. Celsius will never ask you for confidential information such as passwords, private keys, seed phrases, or secret codes. You should store this information privately and securely and report any suspicious activity.

©2022 Celsius Network

121 River Street, Ste PH05
Hoboken, NJ 07030 USA
Registered as a Money Services Business (MSB) number 31000192265811 with the US Financial Crimes Enforcement Network (FinCEN).

Celsius is not a bank, depository institution, custodian or fiduciary and the assets in your Celsius account are not insured by any private or governmental insurance plan (including FDIC or SIPC), nor are they covered by any compensation scheme (including FSCS).

Holding, trading or using crypto assets carry significant risks, please carefully read our Risk Disclosure page. Celsius does not provide any financial, legal or tax advice, nor should this email be viewed as an offer or inducement to make any financial decision.

Reminder: Be aware of phishing sites and always make sure you are visiting the official https://celsius.network website and app. Celsius will never ask you for confidential information such as passwords, private keys, seed phrases, or secret codes. You should store this information privately and securely and report any suspicious activity.

©2022 Celsius Network

121 River Street, Ste PH05
Hoboken, NJ 07030 USA
Registered as a Money Services Business (MSB) number 31000192265811 with the US Financial Crimes Enforcement Network (FinCEN).

Celsius is not a bank, depository institution, custodian or fiduciary and the assets in your Celsius account are not insured by any private or governmental insurance plan (including FDIC or SIPC), nor are they covered by any compensation scheme (including FSCS).

Holding, trading or using crypto assets carry significant risks, please carefully read our Risk Disclosure page. Celsius does not provide any financial, legal or tax advice, nor should this email be viewed as an offer or inducement to make any financial decision.

Reminder: Be aware of phishing sites and always make sure you are visiting the official https://celsius.network website and app. Celsius will never ask you for confidential information such as passwords, private keys, seed phrases, or secret codes. You should store this information privately and securely and report any suspicious activity.

©2022 Celsius Network

121 River Street, Ste PH05
Hoboken, NJ 07030 USA
Registered as a Money Services Business (MSB) number 31000192265811 with the US Financial Crimes Enforcement Network (FinCEN).

Celsius is not a bank, depository institution, custodian or fiduciary and the assets in your Celsius account are not insured by any private or governmental insurance plan (including FDIC or SIPC), nor are they covered by any compensation scheme (including FSCS).

Holding, trading or using crypto assets carry significant risks, please carefully read our Risk Disclosure page. Celsius does not provide any financial, legal or tax advice, nor should this email be viewed as an offer or inducement to make any financial decision.