Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Initial Debtors and Debtors in Possession*

*Proposed Counsel to the GK8 Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DEBTORS' REPLY IN SUPPORT
OF DEBTORS' SALE OF CERTAIN DE MINIMIS ASSETS**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") submit this reply ("Reply") in response to *Víctor Ubierna de Las Heras Objection to Debtors' Sale of Certain De Minimis Assets* [Docket No. 1855] (the "Objection") and in support of the sale of certain de minimis assets as described in the *Notice of Sale of Certain De Minimis Assets* [Docket No. 1853] (the "Sale," and the "Sale Notice," respectively). Contemporaneously

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

herewith, the Debtors filed the *Declaration of Patrick Holert, Chief Operating Officer of Celsius Mining LLC, in Support of the Sale of Certain De Minimis Assets* (the "Holert Declaration"). In support of the Reply, the Debtors state the following.[2]

### Preliminary Statement

1. The Objection makes several arguments. **First**, Mr. Ubierna de Las Heras argues that the Sale Notice was deficient because the Debtors did not adequately describe the intended use of the proceeds from the Sale. *See* Objection ¶ 2. **Second**, Mr. Ubierna de Las Heras objects to the Sale on the basis that it is not a sound exercise of the Debtors' reasonable business judgement. *See* Objection ¶ 3. **Finally**, Mr. Ubierna de Las Heras argues that approval of the Sale should be denied on the basis that the Debtors did not affirmatively provide information showing that the buyer is an "unaffiliated third part[y] outside of the ordinary course of business." *See* Objection ¶ 6. None of these arguments are persuasive, and the Objection should therefore be overruled.

2. Prior to the Petition Date, the Debtors purchased 2,687 "MicroBT M30S ASIC" rigs (the "Mining Rigs"), which the Debtors agreed to purchase in June 2021 with deliveries scheduled over the first half of 2022 in anticipation that hosting facilities would be available for the Mining Rigs. The Mining Rigs are a slightly older model, less profitable to operate, and less energy efficient than newer top-of-the-line mining rigs. The Debtors have yet to utilize the Mining Rigs in their mining operations—indeed, the Mining Rigs remain unopened from their original packaging and remain idle in the Debtors' Texas warehouses. At the time the Mining Rigs were purchased, Bitcoin prices were higher and domestic energy rates were much lower than they

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Order Establishing Procedures for De Minimis Asset Sales* [Docket No. 692] (the "De Minimis Asset Sale Procedures").

presently are, making margins on mining activities more attractive. Under these different market conditions, the Debtors believed they could profitably operate less efficient but less expensive mining rigs. Unfortunately, as a consequence of a major shift in energy prices and volatility in the cryptocurrency market, the profitability and value of less-efficient mining rigs dropped, which is now reflected by the Sale price of the Mining Rigs.

3. Moreover, the Sale is unrelated to the Debtors' relationship with Core Scientific—the Debtors seek to execute the Sale because the Mining Rigs are less efficient and less profitable to operate than 90 percent of rigs currently deployed in the Debtors' mining business. In addition to their deployed rigs, the Debtors have approximately 60,000 more efficient rigs ready for deployment. Even under the most favorable market conditions, the Debtors have more efficient rigs that they can reasonably deploy. As such, holding the Mining Rigs in storage serves no utility to the Debtors' go-forward mining operations, and it would be highly unlikely for the Mining Rigs to have a positive impact on the operational performance or profitability of the mining business.

4. Furthermore, the Debtors intend to use the proceeds of the Sale to fund their ongoing operations. As the Debtors' liquidity runway shortens, the Debtors must generate liquidity to sustain their business and fund these chapter 11 cases. Mr. Ubierna de Las Heras suggests that the intended use of the proceeds can be described with greater specificity; however, due to the inherit fungibility of money, the Debtors cannot provide a more precise description of the expenses to be paid for with the Sale proceeds.

5. Finally, the Sale agreement was the product of good faith, arm's length negotiations. The Debtors have no affiliation with the proposed purchaser of the Mining Rigs,

Touzi Capital LLC ("Touzi Capital"). Indeed, the Debtors are not aware of any employee of Touzi Capital that previously was employed by the Debtors.

6. For these reasons as well as the reasons set forth below, the Objection should be overruled.

## Reply

**I. The Sale Notice Adequately Describes the Intended Use of the Sale Proceeds.**

7. Mr. Ubierna de Las Heras argues that the Sale Notice does not comply with the De Minimis Asset Sale Procedures because it fails to adequately specify the intended use of the Sale proceeds, the contention being that describing the intended use as "[g]eneral and corporate expenses," is "like saying nothing" and "can mean everything and nothing at the same time." *See* Objection ¶ 2. The Debtors disagree with this description. While Mr. Ubierna de Las Heras might disagree with the use of the proceeds or the Debtors' administration of the chapter 11 cases, he is not entitled to second-guess the Debtors' sound business judgment, as set forth below. *See* Objection ¶ 2 (discussing professional fees). The Debtors' description of the intended use of the sale proceeds makes clear what is and is not the intended use—the Debtors intend to use the proceeds for their general and corporate expenses relating to funding their estates—the Debtors do not intend to use the proceeds for activities unrelated to funding the administration of their chapter 11 cases. At a time when the Debtors are running out of liquidity, generating sufficient liquidity to fund ongoing operations is critical.

**II. The Sale Is an Exercise of the Debtors' Reasonable Business Judgement.**

8. The "business judgment rule" is not an unduly strict standard; it merely requires showing that a decision to sell the property outside the ordinary course of business was based on the debtor's sound business judgment. *See In re Chateaugay Corp.*, 973 F.2d 141, 145 (2d Cir. 1992) (holding that a judicial approval of a section 363(b) sale was appropriate if good business

4

reason existed to proceed with such sale); *see also Comm. Of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring "some articulated business justification" to approve the use, sale, or lease of property outside the ordinary course of business); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (noting that the standard for determining a section 363(b) motion is "good business reason"); *In re Glob. Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003).

9. The business judgment rule also shields a debtor's decisions from second guessing. *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) (noting a "presumption of reasonableness attaches to a debtor's management decisions" and courts will generally not entertain objections to a debtor's conduct after a reasonable basis is set forth); *see also Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (stating "the business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company," and has continued applicability in bankruptcy) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)) (internal quotation marks omitted).

10. The Debtors, in a sound exercise of their business judgement, determined that the Sale is in the best interest of their estates. As noted above, the Debtors purchased the Mining Rigs in June 2021 for delivery scheduled over the first half of 2022 in anticipation that hosting facilities would be available. *See* Holert Declaration ¶ 4. Nearly a year after the deliveries began, the Mining Rigs remain unopened and in their original packaging. *See* Holert Declaration ¶ 4. At the time the Debtors agreed to purchase the Mining Rigs, the operating margins on mining activities were more attractive. *See* Holert Declaration ¶ 4. As such, the Debtors decided to purchase

5

less-efficient rigs at lower prices per hashrate than more expensive and more efficient rigs. *See* Holert Declaration ¶ 4. As a consequence of a major shift in energy prices and the drop in bitcoin prices following the Debtors' purchase, however, the Mining Rigs were never deployed. *See* Holert Declaration ¶¶ 5–8. Despite the Objection's assertions about the Sale's impact on the profitability of the mining business, the Mining Rigs were never deployed in the Debtors' mining business. As a result, the Sale will have no impact on the Debtors' current mining operations but will generate liquidity when the Debtors need it the most. *See* Holert Declaration ¶¶ 5, 8.

11. Moreover, the Objection does not necessarily disagree with the business justification for the Sale, but instead argues that it serves to contradict the Debtors' prior statements with respect to Celsius Mining LLC. *See* Objection ¶ 3 ("[I]f Celsius Mining is cash-flow positive, how can selling the M30S be in the best interest of the estate?"). Given the Debtors' rationale behind the Sale, the operational performance of Celsius' mining business will not be impacted. *See* Holert Declaration ¶ 4. Indeed, the Debtors do not foresee any likely scenario where the Mining Rigs are deployed in the Debtors' go-forward mining business because the Mining Rigs are among the least efficient of the Debtors' rigs and make a small portion of Debtors' excess rig capacity. ¶¶ 5, 9.

12. The Objection also questions the prudence of selling the Mining Rigs at a "**massive discount**" to their original purchase prices. *See* Objection ¶ 4. The Sale constitutes the best and highest offer received throughout the marketing process, and is commensurate with the market price for similar rigs at the time of the Sale. *See* Holert Declaration ¶ 7. While the Objection points to the difference between the Sale price and mining rig prices around the time of the purchases, the Sale price reflects current market conditions, which is a function of the cost to profitably operate the rigs. *See* Holert Declaration ¶ 9. Because energy prices today are much

higher than they were at the time the Mining Rigs were purchased and Bitcoin prices remain much lower, the market price for the Mining Rigs has significantly dropped. *See* Holert Declaration ¶ 4. While the ability to profitably operate mining rigs is heavily dependent on the cycle nature of cryptocurrency and energy prices, all else equal, the Mining Rigs will continue to depreciate based on the typical depreciation schedule of rigs and the ever increasing sophistication of new mining rig models. *See* Holert Declaration ¶ 9. The Debtors therefore believe the Sale maximizes the value of their estates and is a sound exercise of their business judgement. *See* Holert Declaration ¶ 8.

13.     In light of the foregoing, the Sale is a sound exercise of the Debtors' business judgement and in the best interest of the estates and all interested parties. Mr. Ubierna de las Heras should not be permitted to substitute his business judgement for that of the Debtors. Accordingly, the Objection should be overruled.

### III.    The Debtors have Conducted a Conflicts Check and Determined the Purchaser Does Not Pose Any Conflicts.

14.     The Objection further argues that the Debtors have not provided sufficient evidence demonstrating the purchaser is an "unaffiliated third part[y] outside of the ordinary course," as required by the De Minimis Asset Sale Procedures. *See* Objection ¶ 6. The Sale is at arm's length to the Debtors, with no employee of Touzi Capital known to have previously been employed by the Debtors. *See* Holert Declaration ¶ 6.

### Conclusion

15.     For the reasons set forth herein, the Sale is a sound exercise of the Debtors' reasonable business judgment for the benefit of all creditors and their estates. The Mining Rigs are not useful to the Debtors' estates, and the Debtors believe the Sale price agreed to by Touzi Capital is reasonable given current energy prices and market opportunities. The Objection fails to

7

articulate a compelling reason to deny the Sale. Accordingly, the Court should overrule the Objection and approve the Sale.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors request that the Court enter the Order granting the Sale and such other relief as the Court deems appropriate under the circumstances.

| | |
|---|---|
| New York, New York<br>Dated: January 23, 2023 | */s/ Joshua A. Sussberg*<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>Joshua A. Sussberg, P.C.<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone:    (212) 446-4800<br>Facsimile:     (212) 446-4900<br>Email:            jsussberg@kirkland.com<br><br> - and -<br><br>Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)<br>Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)<br>Christopher S. Koenig<br>Dan Latona (admitted *pro hac vice*)<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Telephone:    (312) 862-2000<br>Facsimile:     (312) 862-2200<br>Email:            patrick.nash@kirkland.com<br>                      ross.kwasteniet@kirkland.com<br>                      chris.koenig@kirkland.com<br>                      dan.latona@kirkland.com<br><br>*Counsel to the Initial Debtors and Debtors in Possession*<br><br>*Proposed Counsel to the GK8 Debtors and Debtors in Possession* |