**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) NOT FOR PUBLICATION |
| | ) |
| | ) Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*, | ) Case No. 22-10964 (MG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**MEMORANDUM OPINION GRANTING DEBTORS' MOTION REQUESTING**
**RELIEF WITH RESPECT TO CERTAIN INSTITUTION LOANS**

*A P P E A R A N C E S :*

KIRKLAND & ELLIS LLP
*Attorneys for the Debtor*
601 Lexington Avenue
New York, NY 10022
By: Joshua Sussberg, Esq.
Patrick J. Nash, Jr., Esq.
Ross M. Kwasteniet, Esq.
Christopher S. Koenig, Esq.
Dan Latona, Esq.

McCARTER & ENGLISH, LLP
*Attorneys for the Ad Hoc Group of Borrowers*
825 8th Avenue Worldwide Plaza
New York, New York 10019
By: David J. Adler, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the *Debtors' Motion Seeking Entry of an Order (I) Authorizing (A) the Transfer of Cryptocurrency Assets Serving as Collateral on Account of Institutional Loans in the Ordinary Course of Business and (B) the Exercise of the Debtors' Rights and Remedies Provided Under Each Master Lending Agreement and (II) Granting Related Relief* (the "Motion," ECF Doc. # 1818). Attached to the Motion is a proposed order. The Ad Hoc Group of Borrowers (the "Borrower Group") filed an objection (the "Borrower

Objection," ECF Doc. # 1874[1]). The Debtors then filed a reply (the "Reply," ECF Doc. # 1923). The Debtors also filed a revised proposed order (the "Revised Order," ECF Doc. # 1924), which incorporated comments from the Official Committee of Unsecured Creditors (the "Committee").

For the reasons discussed below, the Borrower Objection is **OVERRULED,** and the Motion is **GRANTED**.

## I.   BACKGROUND

### A.  Institutional Lending Background

Prior to the Petition Date,[2] Celsius engaged in bespoke lending and borrowing relationships with institutional clients arranged on an "over the counter," or "OTC," basis and governed by master loan agreements and term sheets setting forth the detailed terms of any specific transaction. (Motion ¶ 9.) In exchange for furnishing the loan, institutional customers provided Celsius with various forms of cryptocurrency assets as collateral for each transaction. These assets would then be returned to the customer upon the repayment in full of each loan. (*Id.*) In the months before the Petition Date, the Debtors closed out the majority of their institutional loan portfolio, reducing total outstanding loan obligations by more than $800 million and the total number of outstanding loans by more than two hundred. (*Id.*)

The Debtors still have approximately fourteen institutional borrowers with approximately $115 million of aggregate outstanding obligations collateralized by approximately $16 million in cryptocurrency assets. (*Id.*) In light of recent events in the cryptocurrency industry, the Debtors state that they have determined, as an exercise of their reasonable business judgment, that they

---

[1] The Borrower Group filed an initial objection (the "Initial Objection, ECF Doc. # 1871), which is substantially identical to the Borrower Objection. The Borrower Objection appears to correct certain errors in the Initial Objection.
[2] Capitalized terms not otherwise defined shall have the meanings ascribed to them in the Motion.

require the flexibility to take all actions necessary to maximize the value of their institutional loan portfolio. (*Id.*) The Debtors request such relief only with respect to their institutional loan portfolio; retail loans provided to Borrow program customers will be unaffected. (*Id.*)

### B. The Motion

The Motion seeks an order granting the following relief: (a) authorizing the Debtors, consistent with past practice and in the ordinary course of business, to (i) transfer cryptocurrency assets serving as collateral on account of loans to institutional customers upon repayment of each loan, (ii) exercise their rights provided under each Master Lending Agreement (each a "MLA") to apply cryptocurrency assets serving as collateral on account of institutional loans at the prevailing market price to the balance of such outstanding loans, including principal and any accrued interest, or, in the alternative, to sell such collateral and retain the proceeds, and close out such loans, (iii) exercise other rights and remedies provided for under the MLAs, including, but not limited to, netting, setoff, and amending terms through the mutual assent of the parties, and (iv) engage in other ordinary course of business transactions necessary to manage the Debtors' lending positions, including, but not limited to, entry into workout agreements and acceptance of partial repayment in the form of digital assets, cash, or equity; and (b) granting related relief. (Motion ¶ 1.) Though the Debtors contend these transactions are all ordinary course, pursuant to the cash management order (the "Cash Management Order," ECF Doc. # 1152), the Debtors are not permitted to transfer any cryptocurrency assets to a loan counterparty or to engage in "the buying, selling, trading, or withdrawal of Cryptocurrency" in connection with their institutional lending program absent further order of the Court. (Motion ¶ 10). Accordingly, the Debtors require an order from the Court to engage in this activity. For the time being, the Debtors note

3

that they only plan to sell collateral and retain the proceeds for undercollateralized loans but seek authority to act more broadly to protect estate property on a go-forward basis. (*Id.* ¶ 11.)

### C. Borrower Objection

The Borrower Objection avers that the Motion should be denied largely because the Debtors have not provided sufficient information to determine whether the relief is in fact ordinary course. (Borrower Objection ¶ 1.) For example, the Borrower Group notes that while the Motion says the Debtors have approximately fourteen institutional borrowers with approximately $115 million of aggregate outstanding obligations, the Mashinsky first-day declaration indicated that as of July 11, 2022, Celsius Network Limited had approximately 47 institutional borrowers with approximately $93 million of aggregate outstanding loans. (Borrower Objection ¶ 4 (citing *Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, in Support of Chapter 11 Petitions and First Day Motions* ("Mashinsky Declaration"; ECF Doc. #23, ¶¶ 56-57)).) The Borrower Group avers that the Debtors need to explain the reason for the discrepancy.

Next, the Borrower Group argues that the Debtors should be required to file the MLAs with the Court. (Borrower Objection ¶ 7 n.3.) They contend that to the extent the terms of the MLAS are similar to the Loans Terms of Use, just as the Debtors plan to return collateral to institutional lenders, the Debtors should be able to return cryptocurrency assets serving as collateral for the 23,000 retail borrowers. (*Id.* ¶ 10.)

## II.    LEGAL STANDARD

Section 363(c)(1) of the Bankruptcy Code authorizes a debtor in possession to use, sell, or lease property of the estate in the ordinary course of its business providing, in relevant part:

> If the business of the debtor is authorized to be operated under
> section 721, 1108, 1203, 1204 or 1304 of this title and unless

4

> the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

Section 363 of the Bankruptcy Code is designed to strike a balance between allowing a business to continue its daily operations without excessive court or creditor oversight and protecting secured creditors and others from dissipation of the estate's assets. *See In re Lavigne*, 114 F.3d 379, 384 (2d Cir. 1997). Accordingly, a debtor in possession may use, sell, or lease property of the estate without need for prior court approval if the transaction is in the ordinary course. *See id.* at 384; *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 796–97 (Bankr. D. Del. 2007) ("Thus, whether notice and a hearing are required depends on whether a transaction is 'in the ordinary course of business.'"); *In re Chernicky Coal Co.*, 67 B.R. 828, 834 (Bankr. W.D. Pa. 1986) (holding that bankruptcy court approval was not required for a transaction in which the debtor "did nothing post-petition that it did not do pre-petition in the ordinary course of its regular business activities").

To determine whether a transaction is in the ordinary course of business under section 363 of the Bankruptcy Code, courts in the Second Circuit apply a two-part test—the objective horizontal test and the subjective vertical test. *See, e.g.*, *Lavigne*, 114 F.3d at 384–85 (citing *In re Roth Am., Inc.*, 975 F.2d 949, 952–53 (3d Cir. 1992)). The horizontal test is a factual analysis that requires a determination whether the transaction in question is of the sort commonly undertaken by companies in the relevant industry. *See Lavigne*, 114 F.3d at 384–85. The vertical test is an analysis conducted from the perspective of a hypothetical creditor to determine whether the transaction subjects such creditor to a level of economic risk of a nature

5

different from what it accepted when it entered into a contract with the debtors. *Id*. In making this determination, courts look to the debtor's prepetition business practices and conduct and compare them to the debtor's postpetition conduct. *See, e.g.*, *Nellson Nutraceutical*, 369 B.R. at 797.

### III.   DISCUSSION

The Debtors' requested relief satisfies the requirements for ordinary course transactions. While this Court has commented on the difficulty of determining whether a certain transaction is "ordinary course" given that Celsius "particularly, now . . . may not have any ordinary course of business," these transactions appear to clearly satisfy the horizontal and vertical tests. (*Memorandum Opinion and Order Regarding Ownership of Earn Account Assets*, the "Earn Opinion," ECF Doc. # 1822 at 44.) No party disputes that Celsius is a lending platform that provides institutional loans backed by collateral as part of its core business. (Motion ¶ 9.)[3]

First, the Debtors correctly note that transferring collateral to the loan counterparty upon repayment of the Debtors' outstanding loan satisfies both the horizontal and vertical tests. With respect to the horizontal test, the Debtors correctly note that it is common industry practice to return collateral once a loan has been paid off. (Motion ¶ 16.) As to the vertical test, the Debtors convincingly argue that returning the collateral would not expose counterparties to more economic risk than they bargained for at the time of the contract. (*Id.*) To the contrary, the Debtors correctly note that *not* returning the collateral to counterparties following repayment

---

[3] The Court concludes that even if these transactions were not ordinary course, the requested relief is proper. A court may authorize non-ordinary course transactions using property of the estate pursuant to section 363(b) when "a sound business purpose dictates such action." *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986). Here, the Debtors have articulated a sound business justification as the requested relief will allow the Debtors to maximize the value of their estates by taking action on their institutional lending portfolio to recover value.

would expose counterparties to greater risk than they bargained for given the tumultuous state of the cryptocurrency market. (*Id.*)

Second, the Debtors argue that closing out a secured loan and either applying the value of that collateral or selling such collateral and retaining the proceeds of the transaction satisfies both ordinary course tests. (Motion ¶ 17.) The Court agrees. As to the horizontal test, the Debtors correctly note that these types of activities are "the linchpin of a secured transaction" and thus exceedingly common in the industry. (*Id.*) As to the vertical test, the Debtors convincingly argue that a hypothetical creditor would expect the Debtor to use such remedies to offset the potential loss accruing from uncollectable loans. (*Id.*)

Third, the Debtors convincingly argue that other transactions associated with institutional loans, such as utilizing workout agreements and accepting partial repayment from lenders, satisfy the horizontal and vertical tests. (Motion ¶ 18.) The Debtors correctly argue that such methods are frequently used by lenders in the Debtors' line of business, thus satisfying the horizontal test. (*Id.*) The Debtors also have established that the vertical test is satisfied because a hypothetical creditor would expect the Debtors to utilize these types of workouts. (*Id.*)

As noted above, the Borrower Objection does not contend that these transactions are outside of the ordinary course, but instead contends that there is not enough information in the Motion to determine whether they are ordinary course. (Borrower Objection ¶ 1.) The Court disagrees. The Debtors provide a detailed explanation for the types of transactions they are contemplating under the MLAs. (*See* Motion ¶¶ 1, 9, 11.) Further, while the Borrower Objection asks the Court to require the Debtors to file the MLAs, the objection does not articulate how requiring the Debtors to file the MLAs would shed any additional light on whether these transactions, which seem to be within the mainstream of what a lending platform

does in relation to institutional lenders, are ordinary course. (Borrower Objection ¶ 7 n.3.) The Borrower Group cites to the Earn Opinion and notes that if the MLAs provide that Celsius is permitted to pledge or repledge the collateral that would appear to be "highly relevant" in light of the Court's recent decision. (*Id.* ¶ 7.) But the inquiry here is whether the Debtors' loan transactions are ordinary course. The Earn Opinion made no findings regarding the Borrow Program or the Debtors' institutional lending, so it is unclear how such language would be "highly relevant." (*See* Earn Opinion at 31) ("Based on the limited scope of findings sought by the Amended Motion, the Court's decision does not determine the ownership of assets in the Debtors' Custody Program, Withhold or Borrow Program."). Finally with respect to the discrepancies the Borrower Objection identified between the descriptions of the institutional loan program in the Motion versus the Mashinsky Declaration, the Debtors provide a satisfactory explanation for this discrepancy in their Reply. (*See* Reply ¶ 12) (noting that "The First Day Declaration, on the one hand, sets forth the total aggregate number of performing and non-performing loans in the Debtors' institutional lending program (i.e., forty-seven) . . . . The Motion, on the other hand, describes the total aggregate number of unique lending counterparties (i.e., fourteen)".) Accordingly, the Borrower Objection is **OVERRULED**.

     Nevertheless, the Borrower Group's frustration that institutional lenders may have collateral returned, while the 23,000 retail borrowers of Celsius are unable to pay off their loans and redeem their collateral, is reasonable. As the Court indicated to the Debtors and other parties in interest at the January 24, 2023 hearing, there are remaining questions about the Debtors' Borrow Program and its relation to the Earn and Custody programs that need to be resolved before the Debtors can return collateral to retail borrowers. At the hearing, the Court directed the parties to confer and seek to resolve those issues as expeditiously as possible, subject to Court

approval, or seek to agree on a schedule for briefing and hearing by the Court for resolution of these important issues. The Court is committed to resolving the issues expeditiously.

## IV. CONCLUSION

The Debtors have established that these transactions are ordinary course. The Borrower Objection is **OVERRULED**, and the Motion is **GRANTED**. A separate order will be entered granting the requested relief.

Dated: January 26, 2023
      New York, New York

*Martin Glenn*
MARTIN GLENN
Chief United States Bankruptcy Judge