Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 22-10964-mg

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

5    In the Matter of:

6

7    CELSIUS NETWORK LLC,

8

9             Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

11

12                     United States Bankruptcy Court

13                     One Bowling Green

14                     New York, NY  10004

15

16                     January 24, 2023

17                     10:00 AM

18

19

20

21   B E F O R E :

22   HON MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  KAREN

Page 2

1    HEARING re (I) Authorizing the GK8 Debtors to (A) Continue

2    to Operate the GK8 Cash Management System, (B) Honor Certain

3    Prepetition Obligations Related Thereto, (C) Maintain

4    Existing GK8 Business Forms, and (D) Continue to Perform GK8

5    Intercompany Transactions, (II) Granting Superpriority

6    Administrative Expense Status to Postpetition GK8

7    Intercompany Balances, and (III) Granting Related Relief

8    (Related Doc ## 1627, 1653, 1784, 1902, 1917).

9

10   HEARING re Debtor's Motion Seeking Entry of an Order (I)

11   Authorizing the Debtors to Return Postpetition

12   Cryptocurrency Transfers to Account Holders and (II)

13   Granting Related Relief. (Doc#

14   1817, 1867, 1902, 1918, 1925).

15

16   HEARING re Debtors Motion for Entry of an Order Authorizing

17   the Debtors to Credit Flare Tokens to Eligible Account

18   Holders. (Doc# 1819, 1867, 1902, 1913).

19

20   HEARING re Notice to sell certain diminis assets (ECF Doc.

21   ## 1853, 1855, 1879, 1902, 1919, 1921).

22

23   HEARING re Debtor's Motion Seeking Entry of an Order (I)

24   Authorizing (A) the Transfer of Cryptocurrency Assets

25   Serving as Collateral on Account of Institutional Loans in

Page 3

1    the Ordinary Course of Business and (B) the Exercise of the

2    Debtors Rights and Remedies Provided Under Each Master

3    Lending Agreement and (II) Granting Related Relief. (Doc#

4    1818, 1867, 1871, 1874, 1902, 1923, 1924, 1925).

5

6    HEARING re Motion for Reconsideration of GK8 Sale and Other

7    Requested Relief Filed by Dan Frishberg. (Doc# 1794, 1806,

8    1824, 1826, 1828, 1852, 1866, 1869, 1870, 1902, 1911, 1925).

9

10   HEARING re Motion to Allow Digital Assets to be Deemed

11   Filer's Property filed by Kulpreet Khanuja. (ECF Doc. 1346,

12   1816, 1872, 1902, 1909, 1925).

13

14   HEARING re Motion for entry of an order that ownership of

15   ALL the coins deposited into the Celsius Earn platform by

16   Ms. Gallagher belong to Rebecca Gallagher, etc. (related

17   document(s)1325, 901, 1416, 136, ECF Doc. # 1508, 1872,

18   1902, 1908, 1925).

19

20   HEARING re Motion to Approve a ruling that the stablecoins

21   and assets in earned accounts are not property of the

22   estate, etcetera filed by Michael Benzaken. (ECF Doc. #

23   1512, 1814, 1872, 1902).

24

25   Transcribed by:  Sonya Ledanski Hyde

Page 4

1    A P P E A R A N C E S :

2

3    KIRKLAND & ELLIS LLP

4        Attorneys for the Debtor

5        300 N. LaSalle

6        Chicago, IL 60654

7

8    BY:  ROSS KWASTENIET

9        DAN LATONA

10       GABRIELA ZAMFIR HENSLEY

11       GRACE BRIER

12       LEAH HAMLIN

13

14   WHITE & CASE LLP

15       Attorneys for Official Committee of Unsecured Creditors

16       1221 Avenue of the Americas

17       New York, NY 10020

18

19   BY:  DAVID TURETSKY

20

21

22

23

24

25

Page 5

```
 1   WHITE CASE LLP

 2        Attorneys for Official Committee of Unsecured Creditors

 3        555 South Flower Street, Suite 2700

 4        Los Angeles, CA 90071

 5

 6   BY:  AARON COLODNY

 7

 8   WHITE CASE LLP

 9        Attorneys for Official Committee of Unsecured Creditors

10        111 South Wacker Drive, Suite 5100

11        Chicago, IL 60606

12

13   BY:  GREG PESCE

14

15   MCCARTER ENGLISH, LLP

16        Attorneys for Ad Hoc Group of Borrowers

17        245 Park Avenue

18        New York, NY 10167

19

20   BY:  DAVID ADLER

21

22

23

24

25
```

1    UNITED STATES DEPARTMENT OF JUSTICE

2          Attorneys for the U.S. Trustee

3          One Bowling Green

4          New York, NY 10004

5

6    BY:  SHARA CLAIRE CORNELL

7

8    NATIONAL ASSOCIATION OF ATTORNEYS GENERAL

9          Attorneys for States

10         1850 M Street, NW, 12th Floor

11         Washington, DC 20036

12

13   BY:  KAREN R. CORDRY

14

15   MILBANK, TWEED, HADLEY & MCCLOY LLP

16         Attorneys for Series B Preferred Holders

17         1850 K Street NW

18         Washington, DC, DC 20006

19

20   BY:  ANDREW LEBLANC

21

22

23

24

25

Page 7

```
 1   JENNER & BLOCK

 2        Attorneys for the Examiner

 3        353 N. Clark Street

 4        Chicago, IL 60654

 5

 6   BY:  VINCENT LAZAR

 7        SHOBA PILLAY

 8

 9   TROUTMAN PEPPER HAMILTON SANDERS LLP

10        Attorneys for Ad Hoc Group of Withhold Account Holders

11        4000 Town Center, Suite 1800

12        Southfield, MI 48075

13

14   BY:  DEBORAH KOVSKY

15

16   UNITED STATES DEPARTMENT OF JUSTICE

17        Attorneys for the U.S. Trustee

18        Alexander Hamilton Custom House

19        New York, NY 10004

20

21   BY:  MARK BRUH

22

23

24

25
```

Page 8

```
1    TOGUT, SEGAL & SEGAL

2        Attorneys for Ad Hoc Group of Custodial Accountholders

3        One Penn Plaza, Suite 3335

4        New York, NY 10119

5

6    BY:  KYLE ORTIZ

7        BRIAN KOTLIAR

8

9    MICHAEL BENZAKEN, Pro Se Creditor

10   ADAM JETER, Pro Se Creditor

11   SIMON DIXON, Pro Se Creditor

12   REBECCA GALLAGHER, Pro Se Creditor

13   VICTOR UBIERNA DE LAS HERAS, Pro Se Creditor

14   IMMANUEL HERMANN, Pro Se Creditor

15   MICHAEL BENZAKEN, Pro Se Creditor

16   DANIEL FRISHBERG, Pro Se Creditor

17

18   CHRIS FERRARO, Celsius

19   LISSA WORKMAN, Celsius

20

21

22

23

24

25
```

Page 9

1                    P R O C E E D I N G S

2              CLERK:  All right.  Starting the recording for

3    January 24th, 2023 at 10:00 a.m.  Calling Celsius Network

4    LLC, Case Number 22-10964.

5              Admitting the parties for Kirkland.  Who is going

6    to be in each room?

7              MR. LATONA:  Deanna, can you hear us?

8              CLERK:  Yes, I can.

9              MR. LATONA:  So this is Dan Latona of Kirkland &

10   Ellis.  This is the presentation room.  Today appearing will

11   be Ross Kwasteniet, Chris Koenig, Gabriela Hensley, and Dan

12   Latona.  There is another room, Chicago Conference.  That's

13   our viewing room.  And we have a listen-in-only line.

14             CLERK:  Okay, perfect.

15             MR. LATONA:  Thank you.

16             CLERK:  Thank you.  Dan, is any other counsel

17   going to be appearing separately that's speaking on the

18   record?

19             MR. LATONA:  Yes.  We may have Grace Brier and

20   Leah Hamlin in our Washington, D.C. office.  I don't know if

21   they've joined yet.

22             CLERK:  Let me check.  I don't believe so.

23             MR. LATONA:  Okay.

24             CLERK:  I'll look out for them.  Thank you.

25             MR. LATONA:  Thank you.

```
 1              CLERK:  All right.  Could we have the appearances
 2    of counsel from White & Case?
 3              MR. TURETSKY:  Good morning, Deanna.  It's David
 4    Turetsky of White & Case on behalf of the Committee.  I
 5    believe my partner, Aaron Colodny is on, who will be
 6    speaking.  As well Greg Pesce.  I'm not sure if he has
 7    joined yet.
 8              CLERK:  Yeah, Aaron Colodny has joined.  Mr. Pesce
 9    has not joined yet.  All right.
10              All right.  I'm going to ask for the parties that
11    have joined if they could raise their hands one at a time
12    and I'll take their appearances.  If you could just use the
13    raised hand function.
14              Mr. Adler?
15              MR. ADLER:  Good morning, Deann.  It's David Adler
16    from McCarter and English on behalf of the Ad Hoc Group of
17    Borrowers.
18              CLERK:  Thank you.  All right.  Anyone else that
19    is going to be speaking on the record this morning?
20              Yes, Rebecca Gallagher.  Ms. Gallagher?  If you
21    could just unmute and give your appearance, please.  I just
22    want to make sure you have no issues speaking.  Okay, I can
23    see -- go ahead.
24              MS. GALLAGHER:  Can you hear me and see me?
25              CLERK:  Yes, I can.
```

1           MS. GALLAGHER:  Okay, thank you.

2           CLERK:  All right.  So, Ms. Gallagher, your

3    appearance is noted.

4           All right.  Leah Hamlin?

5           MS. HAMLIN:  Good morning.  Leah Hamlin on behalf

6    of the Debtors.

7           CLERK:  All right, thank you.  And if you could

8    just specify which -- are you with Kirkland?

9           MS. HAMLIN:  With Kirkland & Ellis, yes.

10          CLERK:  Okay, thank you.  All right.  Victor de

11   las Heras?

12          MR. DE LAS HERAS:  Good morning, Deanna.  Victor

13   Ubierna de las Heras, pro se creditor.

14          CLERK:  Thank you.

15          Are there any additional parties that have joined

16   and are speaking on the record this morning?  If you could

17   just raise your hands and unmute one at a time, and I'll

18   take your appearance.

19          All right.  For the parties that have joined, if

20   you are speaking on the record this morning and have not

21   given your appearance, please raise your hands and I'll ask

22   you to unmute and give your appearance for the record.

23          Yes, Grace Brier.

24          MS. BRIER:  Hi.  Grace Brier, Kirkland & Ellis,

25   for Debtors.

Page 12

 1                    CLERK:  Thank you.

 2                    All right, for the parties that have joined, if

 3      anyone is speaking on the record this morning, please raise

 4      your hands and I will ask you to unmute and give your

 5      appearance for the record.

 6                    MR. PESCE:  Hi, this is Gregory Pesce at White &

 7      Case on behalf of the Committee.  I believe my partner,

 8      David Turetsky, mentioned I am going to speak.  But I am now

 9      on and making my appearance, too.

10                    CLERK:  Thank you.

11                    Yes, Mr. Hermann.

12                    MR. HERMANN:  This is Immanuel Hermann, pro se

13      creditor.  I am not sure if I'll speak, but making my

14      appearance.

15                    CLERK:  All right.  Thank you for noting your

16      appearance.  Appreciate it.

17                    Yes, Ms. Cordry?

18                    MR. CORDRY:  Yes, Karen Cordry from the National

19      Association of Attorneys General representing a number of

20      states.  I don't anticipate speaking, but just in case

21      something comes up, you have my appearance.

22                    CLERK:  Thank you.  All right.  Are there any

23      additional parties that have joined and that are speaking on

24      the record this morning?  And are there any additional

25      parties that have joined that are speaking on the record

Page 13

 1    this morning?

 2              MR. LEBLANC:  Hi, Deanna.  This is Andrew Leblanc

 3    of Milbank on behalf of certain preferred B shareholders.  I

 4    don't anticipate speaking, but just in case, I will put my

 5    name on the record.

 6              CLERK:  Thank you.  Mr. Lazar?

 7              MR. LAZAR:  Good morning, Deanna.  Vincent Lazar,

 8    Jenner &  Block, on behalf of the examiner.

 9              CLERK:  Thank you.

10              Good morning, Ms. Cornell.  Are you going to be

11    speaking on the record this morning, or is another --

12    someone else from the U.S. Trustee's Office going to be

13    doing so?

14              MS. CORNELL:  Good morning, Deanna.  It's Shara

15    Cornell at the Office of the United States Trustee.  I will

16    be speaking this morning.  Thank you.

17              CLERK:  Thank you.

18              Yes, Mr. Adler?

19              MR. ADLER:  Deanna, I can't start the video.  It

20    says the host has disabled it.

21              CLERK:  Not to my knowledge, but that's very odd.

22              MR. ADLER:  Okay.

23              CLERK:  I haven't disabled anyone's video to my

24    knowledge.

25              MR. ADLER:  Okay.  I'm going to drop off and then

1   come back on.  Maybe it's something with the link.

2              CLERK:  Okay.  All right, perfect.  I'll readmit

3   you.

4              All right.  Are there any additional parties that

5   are speaking on the record this morning?  If you could

6   unmute and give your appearance, please?

7              MR. COLODNY:  Hi, this is Aaron Colodny from White

8   & Case on behalf of the Official Creditors' Committee.

9              CLERK:  All right.  Thank you, Aaron.

10             MR. COLODNY:  Thank you.

11             CLERK:  All right.  I see you, Mr. Adler.

12             MR. ADLER:  Okay.  It's working.  Thank you.

13             CLERK:  You're welcome.  Thank you.

14             All right, are there any additional participants

15   that are speaking on the record this morning and have not

16   given their appearance.  If so --

17             MR. FERRARO:  Hi, Deanna.  I'm giving an opening

18   statement.

19             CLERK:  Thank you, Mr. Ferraro.  Yeah.  All right.

20   So Christopher Ferraro.  Thank you.

21             Are there any additional parties that are speaking

22   on the record this morning that have not given their

23   appearance?  If so, please unmute one at a time and give

24   your appearance for the record.

25             CLERK:  Okay.  Any additional parties that are

1   speaking on the record this morning and have not given their

2   appearance?  If so, please unmute and give your appearance

3   at this time.

4           MR. SHANKS:  Fred M. Shanks.

5           CLERK:  All right.  Thank you, Mr. Shanks.  And if

6   you could just specify how you are involved in the case.

7           MR. SHANKS:  Pending motion for Celsius.

8           CLERK:  Okay.  Are you here for the -- were you

9   here for the adversary proceeding?

10          MR. SHANKS:  Yes.

11          CLERK:  That actually was moved.  If you give me

12   one moment, I'll tell you what date and time.

13          MR. SHANKS:  Yeah.  Is it moved to February 15th?

14          CLERK:  Yes, at 10:00 a.m.  Yes.

15          MR. SHANKS:  Okay.  Then I will drop at this time.

16          CLERK:  Okay.  Have a good day, sir.

17          MR. SHANKS:  Thank you.  You too.

18          CLERK:  All right.  For the parties that have

19   joined, if anyone is speaking on the record this morning and

20   has not given their appearance, please unmute one at a time

21   and give your appearance.

22          All right.  Please pause the recording.

23          (Recess)

24          All right, for the parties that have joined, if

25   anyone is speaking on the record this morning and has not

1    given their appearance, please do so.  Mr. Benz, Mike Benz?

2    Yes, I see your hand is raised.  You could unmute and give

3    your appearance.

4               MR. BENZAKEN:  Yes, okay, you would like me to

5    speak now.

6               THE COURT:  Yes, go ahead, please.

7               MR. BENZAKEN:  Okay, thank you very much.  Okay,

8    yes.  My name is Mike Benzaken.  I am here representing my

9    brother's pro se motion relative to Earn and the coins in

10   his account.  I've read all of the supplementary documents,

11   Blonstein supplementary document and the recent Earn

12   opinion.  And it looked like everyone wanted to focus on

13   contract law.  So my focus was purely on what in the

14   contract --

15              CLERK:  So, Mr. Benzaken, I am just taking

16   appearances for the hearing.  So you can definitely state

17   that on the record when the matter is called.

18              MR. BENZAKEN:  Oh, okay.  I thought you were

19   asking --

20              CLERK:  I'm just taking your appearance.  Yeah,

21   not a problem.  Not a problem.  Sorry to interrupt the flow.

22              MR. BENZAKEN:  That's all right.

23              CLERK:  Yeah.  So your appearance is noted.  Thank

24   you so much.

25              MR. BENZAKEN:  Thank you.

1          CLERK:  All right.  For the parties that have

2     joined, if anyone is speaking on the record this morning and

3     has not given their appearance yet, please do so at this

4     time.

5          MS. PILLAY:  Good morning, Deanna.  Shoba Pillay

6     from Jenner & Block as the examiner.

7          MS. KOVSKY:  Good morning, Deanna.  Deb Kovsky,

8     Troutman Pepper, for the Ad Hoc Committee of Withhold

9     Accountholders.  I'm not sure I'm going to be speaking on

10    the record unless the Judge has any questions in terms of a

11    status update.

12         CLERK:  All right.  Thank you, Deborah.

13         MR. BRUH:  Hi, Deanna, it's Mark Bruh from the

14    United States Trustee.  I'll just note my appearance for the

15    record.

16         CLERK:  Thank you, Mark.

17         All right.  Are there any additional parties that

18    are giving their appearance on the record this morning?

19    Okay.

20         I have been reminded -- I am asked to remind

21    parties to turn off their videos if you are not speaking.

22    So I am just passing that along.  Thank you.

23         All right.  For the parties that have joined, if

24    anyone is speaking on the record this morning and has not

25    given their appearance yet, please raise your hand one at a

Page 18

1    time to give your appearance.

2            Yes, Mr. Frishberg.

3            MR. FRISHBERG:  Daniel Frishberg, pro se.

4            CLERK:  Thank you.  All right.  Are there any

5    additional parties that have joined that are speaking on the

6    record this morning and have not given their appearance?

7            MR. ORTIZ:  Good morning, Deanna.  It's Kyle Ortiz

8    of Togut, Segal & Segal for the Ad Hoc Group of Custodial

9    Accountholders.

10           CLERK:  All right.  Thank you.

11           Yes, Lissa Workman.

12           MS. WORKMAN:  Lissa Workman, employee of the

13   Debtor.

14           CLERK:  All right, thank you.

15           All right.  Are there any additional parties that

16   are speaking on the record this morning and have not given

17   their appearances yet?

18           Again, any additional parties that have not given

19   their appearances that are speaking on the record this

20   morning?

21           Are there any additional parties that are speaking

22   on the record this morning and have not given their

23   appearance?  Please do at this time.

24           MR. KOTLIAR:  Bryan Kotliar of Togut, Segal &

25   Segal, counsel for the Ad Hoc Group of Custodial

Page 19

1   Accountholders.  I am unlikely to speak.  My colleague, Mr.

2   Ortiz, should be on and will note his appearance if he

3   hasn't done so already.

4           CLERK:  He has.  Thank you.

5           All right.  Any additional parties that are

6   speaking on the record this morning and have not given their

7   appearance?  If there are any parties that have not given

8   their appearance and are speaking on the record, please

9   unmute and give your appearance.

10          All right.  Are there any additional parties that

11   have not given their appearance and are speaking on the

12   record this morning?  If so, please unmute and give your

13   appearance.

14          All right.  For the parties that have joined, if

15   anyone has not given their appearance and is speaking on the

16   record this morning, please do so.

17          All right.  Judge, would you like me to read the

18   announcement in the record and would you like to get

19   started?

20          THE COURT:  Yes, Deanna, please.

21          CLERK:  All right.  All persons are strictly

22   prohibited from making any recording of court proceedings,

23   whether by video, audio, screenshot, or otherwise.

24   Violation of this prohibition may result in the imposition

25   of monetary and non-monetary sanctions.  The clerk of the

Page 20

1    court maintains an audio recording of all proceedings, which

2    constitutes the official record.

3            Also, parties must state their name each time they

4    speak on the court record.  A party must join with a full

5    first and last name to be admitted from the waiting room.

6    Parties that join with initials, a partial name, a

7    designation such as iPhone, et cetera, will not be admitted.

8            Judge, would you like to start?

9            THE COURT:  Yes, I would.  Thank you very much.

10           Good morning, everybody.

11           Mr. Kwasteniet, are you going to begin for the

12    Debtor?

13           MR. KWASTENIET:  I am, Your Honor.  Can you hear

14    me and see me okay?

15           THE COURT:  Yes, I can.

16           MR. KWASTENIET:  Great.  I also see on the screen

17    our CEO, Mr. Christopher Ferraro, who we have met at several

18    prior hearings.  And if it's okay with Your Honor, we would

19    like to start with a brief update on the situation regarding

20    the Debtor's mining operations.

21           Your Honor, we had a somewhat novel situation late

22    last year when one of the Debtor's key mining

23    counterparties, a company called Core Scientific -- they run

24    effectively data centers that host mining equipment.  Core

25    filed for its own bankruptcy.  We were not surprised by

Page 21

1    this.  We knew that Core was in some financial distress, and

2    we had been in negotiations.  And Your Honor will recall

3    that we previously commenced litigation against Core

4    regarding the terms of our contract.

5            In any event, Core filed for bankruptcy.  And we

6    endeavored to file notices on the docket in this case of the

7    activity that was happening in the Core case because we

8    thought it was an important development and we wanted to

9    make sure Your Honor and our constituents were aware of

10   those developments.

11           Anyway, Core filed an emergency motion shortly

12   before the New Year's holiday.  We responded to it.  There

13   was a hearing right after the new year, and Judge Jones in

14   the court, who is overseeing the Core case, authorized

15   rejection.

16           So one of the topics I would like to get into with

17   Mr. Ferraro is just an update on the mining business

18   generally and then specifically with respect to the

19   transition and sort of what the impact has been of that core

20   scientific rejection of our hosting contract.  So if it's

21   all right with Your Honor --

22           THE COURT:  Yeah, one of the motions today is to

23   sell de minimis assets, which I believe are mining rigs.

24   And it certainly ties to what's happening with the mining

25   business, the core bankruptcy.  Are these rigs that Core was

Page 22

1    using?  If not, why do you have surplus rigs?  Is the mining

2    business -- at the last hearing when Mr. Ferraro spoke, I

3    asked the questions I usually do; is the mining business

4    cashflow-positive?  He indicated it was.  So those are all

5    questions that not only I, but I think the creditors as a

6    whole are quite interested in hearing the answers.

7            MR. KWASTENIET:  Absolutely, Your Honor.  So I

8    would like to start with some questions for Mr. Ferraro.

9    And we completely agree, which is why we sort of went out of

10   our way to make sure we were filing on our docket, you know,

11   copies of some of the important pleadings from the Core

12   docket.  It's a lot of dockets for even us to keep track of,

13   let alone, you know, all of our constituents.  So we have

14   endeavored to keep people posted.

15           But with Your Honor's permission, maybe I'll just

16   jump into a dialogue with Mr. Ferraro.

17           And I'll just ask Mr. Ferraro, can you please

18   provide the Court and the parties on the line with an update

19   on the Debtor's current mining operations?

20           MR. FERRARO:  Yes.  Good morning, Your Honor.

21           THE COURT:  Good morning.

22           MR. FERRARO:  Thanks.  We are continuing to build

23   out the mining operation and improve operational efficiency.

24   Right now we have over 27,500 rigs hashing with

25   approximately 17,500 rigs at our proprietary sites and

1    nearly 10,000 rigs hosted at Mawson.  The recent uptime at

2    our proprietary sites has averaged 80 to 90 percent and

3    Mawson has recently been trending between 70 to 80 percent

4    uptime.

5           Overall currently we are mining around seven to

6    eight bitcoin per day at a margin of 25 to 30 percent.

7           For comparison, in the prior month, we were mining

8    about half of that, around 14 to 16 bitcoin per day.  Our

9    EBITDA compressed in December to slightly below zero.  Given

10   pressure from BTC price and year-end accrual.  Adjusting for

11   the year-end accruals -- and this is in our monthly

12   operating reports -- the EBITDA would have been positive in

13   December.

14          Our margin and EBITDA have rebounded nicely in

15   January, and we expect a margin of approximately 25 percent

16   and an EBITDA of around $1 million for the full month of

17   January depending on the market.

18          Following the most recent contract rejection by

19   Core Scientific, we began efforts to secure the return of

20   the mining rigs.  To date, we have moved over 2,150 rigs

21   from Core.  We expect just over 3,750 rigs to be picked up

22   this week and nearly 2,700 rigs the following week.  Of the

23   37,500 rigs that were at Core, we expect nearly 6,000 rigs

24   will be headed to our (indiscernible) site in Big Lake,

25   Texas.  Approximately 10,000 rigs to the Mawson site in

Page 24

1    Midland, Pennsylvania, and we expect that slightly over

2    20,000 rigs will be sent to temporary storage at our site in

3    Texas as we look for new hosting opportunities.  Overall, we

4    are confident that all rigs will leave the Core sites by

5    March 17th.

6              We have also started talking with a handful of

7    providers to host the rigs that were at Core.  Given the

8    favorable market trends and energy prices and the improving

9    price of bitcoin, we believe that there are options for

10   hosting in the market that will allow us to continue mining

11   with positive operating cashflows and significant upside.

12             THE COURT:  Can you estimate, Mr. Ferraro, are you

13   able to estimate what the decline in energy prices has been

14   for use in the rigs?  Obviously there's been a lot of public

15   attention on the amount of electricity that's used in

16   mining.  And with the spike in energy prices, it obviously

17   created great stress.  What approximately has been the

18   decline?

19             MR. FERRARO:  We have seen a tremendous decline in

20   the price of energy from its peaks kind of in the early

21   fall.  It's gone down 50 percent.  So that's provided

22   support for margin as cashflows as well as the increased

23   price of BTC, which has gone up 35 percent in the last

24   month.

25             THE COURT:  Okay.  Go ahead.

Page 25

1          MR. FERRARO:  Okay.

2          MR. KWASTENIET:  Mr. Ferraro, I did -- one more

3     question for you.  The Debtor has recently filed an updated

4     budget and coin report.  It was filed at Docket Number 1905.

5     Are you familiar with that report and can you please give an

6     update to the Court on the latest liquidity forecast and how

7     that compares to prior liquidity forecasts?

8          MR. FERRARO:  Yes.  Thanks for --

9          THE COURT:  Let me just say that I have a copy of

10    that report in front of me.  So tell me which page and what

11    you're looking at as you're reporting, okay?

12         MR. FERRARO:  Yeah.  I'm going to get to that in

13    one second, Your Honor.  I'm going to be looking at the --

14    I'm going to be talking to the 13-week cashflow forecast,

15    which is a single-page document in the report.

16         THE COURT:  All right.

17         MR. FERRARO:  But before I do that, I wanted to

18    touch on Your Honor's question around selling surplus --

19    selling rigs.

20         We decided when bitcoin kind of had bottomed,

21    around 16,000 to 17,000 that we wanted to test the market

22    and do a small sale of rigs.  I think in this case it's

23    around 2,000 rigs.  These are some of our oldest and least-

24    efficient rigs.  To your point, Your Honor, about the cost

25    of energy, these rigs, you know, are not as energy-efficient

Page 26

```
1     as the most recent generation.  Rigs were not at Core.  They

2     are new, in the box.  And honestly right now we don't have a

3     line of sight to plug in these 2,000 rigs.  We expect that

4     north of a million dollars will help fund the case.  And we

5     are still left with 120,000 rigs approximately to plug in

6     and enjoy the upside to BTC prices hopefully in the near

7     future.

8               THE COURT:  Okay.

9               MR. FERRARO:  And just one last thing before I get

10    into the liquidity.  You know, Ross talked at the top about

11    the Core Scientific, kind of what we've been through.  I

12    think it's important that as we think about the path forward

13    that we ensure that anybody who picks up the hosting

14    operations is a good fit for the company today and for the

15    future.  And we take this aspect very seriously.

16              Okay, now on to liquidity.

17              THE COURT:  But let me ask one more question.  In

18    the company's filings in Texas in connection with Core's

19    expedited hearing on its motion to reject the contract, did

20    Celsius estimate what it believed its rejection damages

21    might be?

22              MR. KWASTENIET:  Your Honor, we -- it's Ross

23    Kwasteniet from Kirkland.  We did not estimate the rejection

24    damages.  We're still calculating that.  We did, however,

25    note in the hearing, the emergency hearing in Texas, that we
```

Page 27

1    believe we have a significant administrative claim.

2          The way that we pay the rent for the hosting is we

3    pay monthly in advance.  And we made a payment towards the

4    end of December that was for January hosting.  And --

5          THE COURT:  Approximately how much was paid?

6          MR. KWASTENIET:  It was approximately $4.7

7    million, Your Honor.  Just under $5 million.

8          Our rigs, per agreement with  Core -- and it was

9    included in the rejection stipulation -- were unplugged

10   approximately, you know, on or around January 3rd, give or

11   take.  Meaning that there may have been a few days of

12   hosting in January, but the vast majority of the month of

13   January we did not receive hosting services.  And so we're

14   going to expect -- and if we can't reach consensual

15   agreement, we'll be shortly filing pleadings in the Texas

16   case to recover the prepaid rent for January, if you will,

17   that we didn't receive the benefit of.  So that I did want

18   to note, Your Honor.

19         THE COURT:  Okay.

20         MR. FERRARO:  Okay, on to liquidity.  With respect

21   to the latest forecast, the Debtor's liquidity has improved

22   compared to the previous forecast.  This is as a result of

23   the increase in the price of bitcoin and the pending sale of

24   stable coins.  The latest 13-week forecast projects

25   approximately $88 million of cash and $68 million of

Page 28

1    baseline liquidity in the middle of April.

2          The price of bitcoin, which has gained more than

3    35 percent in the last month, increases the value of the

4    mined bitcoin and makes the mining operations that much more

5    attractive and productive, even without Core Scientific.

6          Additionally, now that the Court has authorized

7    the Debtors to sell stable coins, the Debtors have access to

8    much-needed liquidity that improves the cashflow forecast

9          THE COURT:  Have stable coins been sold since the

10   Court's ruling?

11         MR. FERRARO:  No, but it's -- it will be this

12   week.

13         THE COURT:  Okay.

14         MR. KWASTENIET:  Your Honor, I don't have anything

15   further for Mr. Ferraro.

16         THE COURT:  I do.  I do.  So, Mr. Ferraro, during

17   the hearing on November 15th, 2022 -- let me -- I have the

18   transcript if you'll just bear with me a second.

19         Okay.  I ask questions about the -- let me -- I

20   ask a question about Celsius' exposure with respect to FTX.

21   And at Pages 27 and 28 of the transcript, your answer is

22   there.  And I won't read it verbatim, but I believe that you

23   estimates Celsius' exposure to FTX and Alameda at

24   approximately $12 million.

25         I read some reports over the last week or two that

Page 29

1    questioned whether Celsius had exposure to FTX and Alameda

2    in the hundreds of millions of dollars.  Are you -- I just

3    want to ask, not for you to comment on a report you haven't

4    seen, but I just want to see whether you have any update on

5    what Celsius' exposure to FTX or any of its affiliates are

6    at this time.

7                MR. FERRARO:  Yes, Your Honor.  My update -- I

8    don't have it in front of me, so I apologize.  But to my

9    understanding, our exposure remains at the $12 million.  I

10   think there was transactions between Celsius and Alameda,

11   you know, leading up to our filing.  We did have

12   relationships with them, as I discussed I believe in

13   November when I gave the update to the report.  So I haven't

14   read the report that you're speaking to.  But, you know, our

15   exposures from the standpoint of what's on the balance sheet

16   are really limited to some coins on FTX and then the Alameda

17   loan.

18               THE COURT:  Okay.  Let me make -- when I saw I saw

19   a report, it wasn't from FTX.  I mean, you know, there are

20   some wild things on the internet, and I don't -- I'm not

21   putting credence in them.  But because I saw some report

22   that suggested that the Celsius exposure was in the hundreds

23   of millions, I thought I would ask about -- we went back and

24   we looked at the transcript from November.  And I just

25   wanted to be sure to ask it again today.  So thank you very

Page 30

1    much.

2            MR. KWASTENIET:  Great.  So if you don't have

3    anything further for Mr. Ferraro, I think that we can

4    release him with Your Honor's permission.

5            THE COURT:  Yes, we can.  Thank you again, Mr.

6    Ferraro.

7            MR. FERRARO:  Thank you, Your Honor.

8            THE COURT:  But before we get to the agenda, Mr.

9    Kwasteniet, I would like to ask -- and I see that Vince

10   Lazar from Jenner & Block has appeared.  And I would just

11   like to ask him for an update on the work of the examiner.

12   I had already granted one extension to the examiner's next

13   report.

14           Mr. Lazar, if you're there, I would appreciate it

15   if you could just update everyone on where things stand with

16   the examiner.

17           MR. LAZAR:  I am.  Good morning, Your Honor.

18           Your Honor, we've completed the interview process

19   and we have gotten through the remainder of the documents

20   that we requested.  And so at this point we are, for lack of

21   a better way of describing it, (indiscernible) and drafting

22   that.  We expect to be in a position to deliver an examiner

23   (indiscernible) on Monday.

24           THE COURT:  One other question I have, Mr. Lazar.

25   And in the past, you've referred to the examiner interviews.

Page 31

```
 1    Are the interviews under oath?

 2            MR. LAZAR:  They are not, Your Honor.  And as you

 3    may know, it's common in this type of situation.  All

 4    examiners find that it is easier to get (indiscernible) than

 5    to take formal depositions.

 6            THE COURT:  Just stop for a second.  Whoever --

 7    you know, whoever has got a microphone open is rattling a

 8    lot of paper, and it's interfering with my ability to hear.

 9    So either mute your line or stop rattling papers.

10            Go ahead, Mr. Lazar.

11            MR. LAZAR:  Your Honor, I don't know if you could

12    hear me.  But as is relatively common in these examiner

13    situations, and we've done it again in this case, it is

14    generally considered a better way of getting information to

15    do it by way of interview rather than under oath, which

16    sometimes leads witnesses to be a little less open than they

17    might otherwise be.

18            THE COURT:  All right.  Thank you.  What's the

19    expected date now for delivering the examiner's report?

20            MR. LAZAR:  It is Monday, Your Honor.

21            THE COURT:  Okay, all right.  Thank you very much.

22            MR. LAZAR:  Thank you.

23            THE COURT:  Mr. Kwasteniet?

24            MR. KWASTENIET:  Yes.  Thank you, Your Honor.

25            THE COURT:  Let me -- before you go on, I see a
```

Page 32

1    hand raised.  I'm not going to call on anybody during this

2    general background section.  So I will -- when we get to the

3    docket, the calendar for today, I will, as I have in the

4    past, give people who are addressing a specific motion an

5    opportunity to speak.  But not in terms of the background

6    updates that we've received so far.

7              So go ahead.  Katerina, if you would put your hand

8    down, I would appreciate it.  Because I am not going to call

9    on you now.  Thank you.

10             All right.  Go ahead, Mr. Kwasteniet.

11             MR. KWASTENIET:  Thank you, Your Honor.  Before we

12   jump into the formal agenda for this morning, I thought it

13   might also be helpful for me to give Your Honor and the

14   parties on the line a brief update with respect to the

15   Debtor's sale and plan development process, if that's

16   acceptable.

17             THE COURT:  Please.

18             MR. KWASTENIET:  Great.  Your Honor, the final bid

19   deadline for the whole company sale process was December

20   12th.  The bids that we received generally fell into three

21   categories.  The first was bids for discrete assets.  The

22   second were bids for migration of customer accounts to a

23   competitor's platform.  And the third involved migration of

24   the Debtor's assets to a new, independently-managed recovery

25   platform with the idea being that we would be able to

1    harvest value over time as market conditions improved.

2            Your Honor, thus far, the bids we have received

3    for discrete assets and for the transfer of customer

4    accounts have not been compelling.  The Debtor's situation

5    is unique, Your Honor, compared to some of the other crypto

6    bankruptcies out there right now because we don't just have

7    a portfolio of liquid crypto assets.  We also have illiquid

8    crypto assets, things like staked Ethereum as well as other

9    illiquid assets such as the mining business, loan

10   portfolios, and investments in other crypto projects.

11           So the Debtors can't just simply distribute their

12   assets and move on, so to speak, because the bidding process

13   has revealed that this would require us to sell many

14   illiquid assets at what we believe are fire sale prices.

15           So given that, the Debtors are focused on placing

16   their assets into a newco, which we are referring to as a

17   recovery corporation, that would hold those assets and

18   manage them over time to maximize value as markets improve.

19           Your Honor, we are making plans to operate the

20   recovery corporation on a standalone basis.  But,

21   importantly, we are also in discussions with potential

22   third-party plan sponsors who may invest in and operate the

23   recovery corporation.  Any such third party would not be

24   affiliated with the Debtor's founders, equity holders, or

25   former management team.  These are true new third-party,

Page 34

1    arm's length managers.

2          The Debtors, with input from the Committee are

3    also still evaluating different potential transactions

4    related to the mining business.  As you heard from Mr.

5    Ferraro, the recent surge in bitcoin pricing and the mild

6    winter and lower power prices have sparked some new interest

7    in the mining business, and we are evaluating potential

8    sale, hosting, and partnership transactions with respect to

9    the mining company.

10         Your Honor, the Debtors anticipate that a recovery

11   management-type transaction would take place through a

12   Chapter 11 plan.  While the Debtor's Chapter 11 plan remains

13   subject to negotiation with both the Committee and any plan

14   sponsor who might be involved, discussions are starting to

15   crystallize around a framework with certain key features

16   that I think it's appropriate for me to highlight for Your

17   Honor and the parties today.

18         First, the value of the Debtor's assets is going

19   to inure to the benefit of accountholders.  And these assets

20   include the Debtor's liquid and illiquid cryptocurrency as

21   well as loan receivables, the mining asset, miscellaneous

22   crypto platform investments, and litigation claims.

23         Your Honor, I want to note that there's been some

24   confusion on social media, which is not surprising.  It

25   seems to be inherent in the nature of social media.  But

Page 35

1    there's been significant chatter and confusion about the

2    consequences of the court's Earn ruling.  And the fact is

3    that the mere fact that coins in the Earn program are

4    property of the estate does not mean that the Debtors intend

5    to hold onto them for all time.  And I just want to say for

6    the record and for the benefit of everybody listening that

7    the Debtors expect this bankruptcy process will end in a

8    plan whereby the value of the Debtor's assets, including the

9    coins in the Earn program, go to the benefit of

10   accountholders.

11          We've obviously had to work out some important

12   issues in the case about the relative rights of customers in

13   diff programs.  We've had hearings on the Custody program,

14   the Withheld customers, the Earn customers.  There's more to

15   come in the future about people who are in the Borrow

16   program.  So we have to sort out the relative rights and

17   priorities.

18          THE COURT:  Let me just stop you there.  Because

19   no doubt you've been receiving lots of communications about

20   this.  But I think that particularly one of the motions

21   that's on for today is for loans to be paid off and for

22   institutional parties and collateral to be returned.  And

23   that obviously raises the question for me and I think for

24   many of the loan program non-institutional buyers, why not

25   us?  So I think it's -- the Court views it as very important

1    that we move forward expeditiously to try and resolve those

2    issues.

3            One hopeful approach is that the Debtor and the

4    Committee and other interested parties will try and reach a

5    proposed consensual resolution to those issues that would

6    not require -- you know, might require a court decision on a

7    9019 motion, for example, but would not have to lead to a

8    protracted litigation and disputes about how to deal with

9    the non-institutional lenders, or borrowers rather.

10           MR. KWASTENIET:  Understand, Your Honor.  And it's

11   almost as though you've been listening in on the

12   conversations we've been having with the Creditors'

13   Committee and with other key stakeholders.

14           It's important for me to note right now -- and

15   we've put it in the papers, and I'm sure we'll cover it more

16   when we get to the Institutional Loan Motion, there are some

17   important differences between the programs.  So when we talk

18   about institutional loans, they are with arm's length third

19   parties, sophisticated financial institutions.  There's only

20   about a dozen of them, I think maybe 14 counterparties, 40-

21   some-odd loans spread across 14 counterparties.  And they

22   have their own sort of unique collateral posting

23   arrangements.  They have their own unique creditworthiness

24   considerations that we have been evaluating.

25           The retail borrower program is tens of thousands

1    of folks who operate under the same terms and conditions.

2    And so we are very hopeful that, whether it's a standalone

3    9019 or a compromise proposed treatment that's embedded in a

4    plan, that we will get to something that we think is

5    attractive and gives some options to the retail borrowers.

6    I know Mr. Adler represents a group of retail borrowers.

7    We've had discussions with him and will continue to going

8    forward in hopes of reaching a consensual resolution.  I

9    think I would be the first to acknowledge that any

10   significant litigation on a creditor-by-creditor basis here

11   is going to be massively destructive of value.  And we are

12   very focused on -- I'm not prepared as we stand here today

13   to roll out the specifics of it, but suffice it to say, Your

14   Honor, that issue is something that we are in advanced

15   discussions about and are very focused on as, you know,

16   we've made a lot of progress in a lot of the key gating

17   issues in the case.  That is an important issue that is yet

18   to come and is firmly on our radar, Your Honor.

19             THE COURT:  Can you give me an idea, an estimate

20   of the amount of loans outstanding, collateralized loans

21   outstanding to non-institutional borrowers?  So put in

22   context of this case, what's the range of numbers we're

23   talking about?

24             MR. KWASTENIET:  Your Honor, I'm going to give my

25   best.  And I have colleagues in the room who will kick me

Page 38

1    under the table or correct me if I get it wrong.  But the

2    way that I think about it, maybe too simplistically, is it's

3    approximately $40,000, and there is approximately $400

4    million or so of loans outstanding to the retail borrower

5    folks.  So put into context, Your Honor, you know, sort of

6    looking at a little over $4 billion of customer coin

7    obligations.  This is roughly a ten percent issue compared

8    to the overall magnitude.  Give or take might be, you know,

9    eight percent, 12 percent.  But, you know, for purposes of

10   an off the top of my head answer, it's about ten percent

11   relative to the broader customer claim universe.

12           THE COURT:  You've given a whole lot of soft

13   numbers for now, and I don't want to hold you to it because

14   I understand -- I've asked a question that wasn't thoroughly

15   prepared to answer.  Do you have an estimate of what the

16   value of the collateral that supports those outstanding

17   loans is?

18           MR. KWASTENIET:  The last I heard, I believe that

19   those loans are still -- that the portfolio as a whole is

20   overcollateralized.  Not to the same extent it was.  But I

21   believe that the general requirement in opening a retail

22   loan was 2X collateral coverage.  Now, obviously loans were

23   generally taken out in stable coins and then the collateral

24   could have been any number of -- you know, if it was a

25   stable coin collateral, then that's obviously pretty fixed

Page 39

1    because it's intended to be tied to a dollar, so less

2    volatile.  If it was a bitcoin collateral, then the value of

3    that collateral and your relative collateralization

4    percentage fluctuates as the market moves.

5             So my understanding, Your Honor, is that that

6    portfolio is less collateralized as a percentage relative to

7    the loans outstanding than it was maybe earlier in the case,

8    but is probably coming back up a little bit as crypto prices

9    seem to be rebounding.  But as a percentage, it sort of

10   fluctuates as the market moves, Your Honor.

11            THE COURT:  All right.  So when you've finished

12   this specific topic, I see Mr. Adler's hand raised.  Since

13   you mentioned him by name in your presentation, I'm going to

14   give him a chance to say something.  But you finish on this

15   topic and then I'll let Mr. Adler speak.  And then we'll go

16   back to other things that you want to talk about.

17            MR. KWASTENIET:  Very good, Your Honor.  I think

18   that I am finished on this topic unless you have anything

19   else or Mr. Adler raises any points that I want to respond

20   to.

21            THE COURT:  I don't.  But let's see what Mr. Adler

22   has to say.  Go ahead, Mr. Adler.

23            MR. ADLER:  Good morning, Judge Glenn.  David

24   Adler from McCarter & English on behalf of the Ad Hoc Group

25   of Borrowers.  I raised my hand just because I wanted to

Page 40

1   provide a little bit more clarity with respect to the retail

2   borrowing program.

3          As I understand it, there are about 23,000

4   different borrowers.  And this is from the Debtor's first

5   day declaration, and it is consistent with what I've seen in

6   the schedules.  23,000 borrowers who took out loans in the

7   amount of approximately $420 million, give or take.  And the

8   collateral as of July 13th that was backing those loans was

9   somewhere in the neighborhood of $800 million.

10          Just to add a little bit more color, Your Honor,

11  about 85 percent of the loans were given against crypto that

12  was either eth or bitcoin, bitcoin being the vast majority

13  of the collateral.  That's about 67, 70 percent as best I

14  can tell, with the remainder, 15, 17 percent being eth.

15  These borrowers did not take loans out in stable coin.  My

16  understanding is that most of these retail borrowers took

17  out loans in fiat currency.  So I just wanted to give Your

18  Honor a little bit more color around the borrowers.

19          I can tell you that of the -- I'm sorry, the

20  23,000 borrowers, approximately the top -- if you take the

21  top 2,500, those are borrowers above $100,000, and the

22  remainder are below $100,000.  I think the mean or the

23  median average loan is probably about $15,000 or $20,000 and

24  the top 20 percent or so of the loans are above $100,000.

25  And those parties represent about 80 percent of the

Page 41

1    collateral that is on the platform.

2         That's really all I wanted to add, Your Honor.

3         THE COURT:   Okay.   Thank you very much for the

4    report.   I think that's very helpful.

5         I view this -- you know, the Court has and the

6    parties have raised a number of what I consider to be

7    important gating issues.   I consider this, and always has

8    been identified as such, as one of those important issues,

9    particularly given the number of -- you say 23,000 different

10   borrowers.   It's a large number.   Maybe still only a

11   fraction of the number of Earn accountholders, but it's

12   still a very large and important number.

13        And so I urge you, Mr. Adler and the other counsel

14   to work with the Debtor's counsel and Committee's counsel in

15   seeing first is it possible to come up with an appropriate

16   consensual resolution that would avoid really protracted and

17   expensive litigation for everybody.   And to the extent that

18   that doesn't seem to be possible, to tee up for a court

19   determination.   Because I do consider this to be a very

20   important set of issues that arise.

21        I mean, Mr. Kwasteniet, one of the things -- my

22   uneducated view at this point, certainly if the collateral

23   was received by Celsius comingled, put into the rest of the

24   coins that the Debtor had in its portfolio, you know,

25   there's obviously a question whether the Debtor's interest

Page 42

```
1    is limited to a legal interest, but not the equitable

2    interest in the collateral.  That's certainly been an issue

3    in not crypto cases, but in other kinds of bankruptcy issues

4    (indiscernible) what was the Debtor's interest in the coins

5    that it received as collateral.  Obviously comingling raises

6    all sorts of complicated issues.  But I won't say anything

7    more about it now.  Nothing has been briefed at this point.

8    But I am very concerned and focused on wanting to move these

9    issues along.  Let me leave it at that.

10            Mr. Adler, thank you again.  Go ahead, Mr. Adler.

11            MR. ADLER:  I was just going to say, Your Honor,

12   we've been trying to work with the Committee and the Debtors

13   on a possible resolution of these issues, bearing in mind

14   that any reorganization, any emergence from this case has to

15   sort of keep the loans intact to avoid tax consequences.

16   And if you're going to do a haircut, if there's going to be

17   a haircut of X percent of collateral, many of those loans

18   might be in default or maybe above the margin call at that

19   point.

20            So we've been working with those issues.  We hope

21   to obviously go forward with that.  We've made a proposal to

22   the Committee.  I think we've made a proposal to the Debtor

23   as well.  And we are optimistic.  And obviously if it

24   doesn't -- if there is no resolution, we will litigate it.

25   But we have been trying to avoid it.
```

```
 1              THE COURT:  Thank you very much, Mr. Adler.

 2              Mr. Kwasteniet, anything else you want to say on

 3    this?  And, Mr. Pesce, on behalf of the Committee is there

 4    anything you want to say just on this topic?

 5              MR. PESCE:  I have some other things that I wanted

 6    to raise today.  But on the loan topic, Mr. Adler is

 7    definitely one of the outside parties we think is important

 8    to resolution here.  We've had a lot of dialogue with him.

 9    He has been very generous in providing some concepts that

10    might provide for a solution here on a consensual basis,

11    like you said.

12              Candidly, the ball is in my client's court at this

13    point to come to a view on some of the issues that you

14    raised.  We're hopeful that we can do that.  And it's a big

15    priority for us amidst all these other competing issues in

16    the case.  But Mr. Adler has not been shy about reaching out

17    to us and making -- giving us ideas and concepts to try to

18    respond to make this -- avoid having this become another

19    litigated matter.

20              THE COURT:  Thank you very much.  And I'll give

21    you a chance to address your other issues in a few minutes,

22    Mr. Pesce.

23              So, Mr. Kwasteniet, why don't you go on?  Do you

24    have other areas you want to cover?

25              MR. KWASTENIET:  I do, Your Honor.  And just the
```

Page 44

1    last comment on the retail loan topic.  My colleagues

2    confirmed for me that we agree with Mr. Adler's count.  I

3    think I said I thought it was tens of thousands, maybe

4    $40,000.  They informed me that I was right about the

5    approximate dollar amount outstanding, but we do think it is

6    about 23,000 borrowers.  And we've also come to the

7    conclusion through our analysis that many of the borrowers

8    hold very significant loans.  So they're among the larger

9    customers, the largest users of the Celsius platform.  So we

10   agree with that and echo the comments that Mr. Adler and Mr.

11   Pesce made about trying to work together on a resolution and

12   definitely a recognition that it's an important -- one of

13   the larger remaining items that we have not briefed or

14   otherwise resolved that we need to going forward.

15          So, Your Honor, just returning briefly -- and I'm

16   almost done -- to my comments about where we are and how

17   we're thinking about the plan process and the path forward.

18   We are cognizant that we have an exclusivity deadline coming

19   up the middle of next month that will undoubtedly need to be

20   extended to give us time to finalize and bring forward a

21   plan and solicit votes on the plan.  But we believe the plan

22   will focus on this recovery corporation concept which will

23   be used to harvest the value over time for the benefit of

24   account holders of the Debtor's various assets.

25          As we think about how to give ownership and how to

Page 45

1    translate that into an actual recovery for creditors, what

2    we're envisioning at this time is somewhat of a novel

3    approach where we think that we can tokenize and distribute

4    to account holders what we're referring to as an asset share

5    token that would reflect the value of the assets managed by

6    the recovery corporation and each accountholder's sort of

7    ratable share or interest in those or claim against those

8    assets.  And asset tokens would also entitle holders to

9    dividends from the recovery corporation over time as assets

10   may be monetized. And we think that these asset share tokens

11   would be provided to all account holders who have account

12   balances over a certain threshold.  And we're still

13   discussing with the Committee sort of where exactly that

14   threshold would be.

15        But one of the concepts here is that for customers

16   with claims below that threshold level, we would envision

17   what you've seen in other cases as more of a convenience

18   class, where rather than giving an asset share token in sort

19   of a longer-lived recovery corporation that's going to have

20   to manage the illiquid assets over time, that we would give

21   a one-time distribution in liquid crypto. It would be at a

22   discount.  We're not envisioning it's a full recovery, but

23   it's a meaningful recovery, Your Honor.  And it would be a

24   one-time distribution in liquid crypto.  Call it bitcoin,

25   Ethereum, stable coins, something that has, you know,

Page 46

1    readily tradable and readily ascertainable market value to

2    everybody who has claims below a certain threshold.

3           And, Your Honor, we've done some work with the

4    management team and the Alvarez Marsal team and the

5    Committee to sort of slice and dice the customer population

6    and stratify it and look at how many claims are below

7    different thresholds.  And we think that, you know, with a

8    threshold as low as a U.S. Dollar value claim of sort of

9    $2,500 to $5,000, you're picking up a substantial majority

10   of our customers.

11          To Mr. Adler's point, there are a relative handful

12   of customers who have very large claims and who make up -- a

13   smaller percentage makes up in the aggregate a much larger

14   percent of the assets on deposit and the claims.  And then

15   you've got a large number of smaller holders who have claims

16   in the sort of, you know, several hundred to several

17   thousand dollar range.  And I think that a convenience class

18   concept could easily pick up, you know, 60, 70 percent of

19   the total customers.  Right?  And we hope to be in a

20   position to offer them a one-time convenience recovery where

21   they can take their crypto and go home and be less concerned

22   about how do we value or how do we maximize the value of the

23   mining company over time and what does that look like.  I

24   think the larger customers sort of own that issue, right?

25   In order to get them their full recovery or their best

Page 47

1    recovery, we're going to have to be in this for a bit of a

2    longer process.  But we're hoping that we can give a one-

3    time convenience recovery that would satisfy actually a

4    significant majority of our customers here.

5              And so there's more to come on that.  We are still

6    working with the Committee on how best to structure it.  But

7    I expect that that will be a significant feature.  Because

8    we're really not looking to drag the smaller investors who

9    just -- you know, we've seen the letters, we'd like some

10   crypto back, even at a discount, and just kind of be done

11   with the Celsius case.  And we expect to be able to give

12   customers that option.

13             THE COURT:  Two questions that flow from that.

14   One, have you had any conversations with the regulators or

15   the U.S. Trustee about the concepts, even though the details

16   haven't been worked out, the concepts that you are

17   exploring?

18             MR. KWASTENIET:  I don't believe we've had a

19   significant conversation with that U.S. Trustee's office

20   yet, but we certainly will before we bring forward any plan,

21   as has been our practice.  Any material filing in the case

22   we'll preview and try to surface issues and address issues.

23             We have had -- just starting very recently, Your

24   Honor -- I won't say it's been for weeks and weeks, but

25   starting yesterday, we reached out and had some initial

Page 48

1    conversations with some of our key regulators.  Those

2    discussions are going to continue as our plans develop.  But

3    really up until this point, up until effectively now, the

4    plans were still on the drawing board, and we didn't think

5    that they were quite ready enough to surface conceptually

6    with the regulators and the U.S. Trustee.  But we are

7    getting to that point.  And we recognize there's been many

8    issues raised about compliance or a lack of compliance with

9    applicable regulations historically in the products that

10   Celsius offered, which brings me into the last point that I

11   want to cover with respect to how we're thinking about the

12   go-forward plan.  Because the Debtors and the Committee

13   really have been incredibly focused on how exactly this

14   recovery corporation is going to work.  How is it going to

15   be different than how Celsius operated historically?  What

16   can we learn from the challenges that Celsius had

17   historically?  What got us into this -- into the bankruptcy,

18   what were the regulatory problems that the company had?

19          And so I think there's a couple key features or

20   guideposts, if you will, that we have in mind as we're

21   developing the plans for this recovery corporation.

22          And the first one, Your Honor, is that the

23   recovery corporation will be a fully-licensed and registered

24   and compliant entity with respect to all applicable federal

25   and state regulations.

1          For example, crypto assets we envision will be

2     hosted by or a third-party licensed custodian.  Okay?

3     Celsius put together a custody program somewhat on the fly.

4     We are going to take the time to build a custody program

5     from the ground up that would use a third party who is

6     licensed to provide custody services.

7          The recovery corporation will have its own

8     dedicated management team.  And again, that management team

9     may be an arm's length third party.  We are negotiating with

10    potential third parties who we may be able to outsource that

11    function to, Your Honor.

12         The asset share tokens that I previously described

13    would be freely tradable by holders.  So if an accountholder

14    gets their token and they want to ride out the recovery and

15    try to see where we can get to in the future, they

16    definitely have the right to do it.  But for somebody who

17    says, you know what, I would rather just sell my token,

18    convert it into cash, other crypto, move on with life, they

19    would have the ability to do that.  And we're in discussions

20    with various licensed broker dealers to facilitate the

21    trading of the asset share token.

22         THE COURT:  So I have a somewhat related question.

23    And I haven't been monitoring the docket for this.  Do you

24    have any information on the extent to which claims trading

25    has been taking place?

Page 50

1          MR. KWASTENIET:  We do, Your Honor.  It's mostly

2    anecdotal at this point.  I think that A&M has been keeping

3    track of a register of claims.  And we can certainly provide

4    Your Honor with more of a summary of all the activity we're

5    aware of to date.  But we are aware of some claims trading

6    activity.

7          THE COURT:  Okay, all right.  Go ahead.

8          MR. KWASTENIET:  Your Honor, the recovery

9    corporation will also be a public company.  It's going to

10   have a large number of holders of the asset token.  And we

11   envision that this recovery corporation will be filing

12   reports, public reports going forward.  So your 10-Ks, your

13   10-Qs, et cetera.

14         And additionally,  Your Honor, as we had

15   previously noted, we're in advanced discussions with the

16   Committee, Mr. Adler's group, about how exactly the retail

17   loan portfolio will factor into all of this.  And that

18   remains an important consideration of ours.

19         So, Your Honor, unless you have further questions,

20   that's an update as to where we are today.  Suffice it to

21   say there has been a lot of work on the part of the company

22   and the Committee to come up with, you know, in light of

23   what we -- the data points we got from the sale process, how

24   do we come up with the best plan going forward that

25   addresses some of the problems that got us here and that

Page 51

1    also provides a vehicle for creditors to recover the most

2    value they can going forward.  Because, again,

3    unfortunately, the marketing process has indicated that

4    simply selling the illiquid assets now, especially, you

5    know, FTX collapsed since we started the marketing process.

6    So things have kind of gone from bad to worse.  This really

7    doesn't seem to be the right time to liquidate the illiquid

8    assets, and we need to come up with some structure to hold

9    the assets, manage them, grow them, harvest their value over

10   time.  And it's a challenging project.  It's one that we

11   welcome, and to do this in a way that overcomes some of the

12   problems that led us here in the first place, Your Honor.

13           So that is our focus.  And a lot of that is

14   happening behind the scenes, and I wanted to give Your Honor

15   an insight into what's happening.  And obviously a lot more

16   to come in the days and weeks ahead in terms of filing

17   plans, perhaps moving forward with a proposed plan sponsor,

18   Your Honor.  That is a definite possibility here.  And there

19   will be a lot more to come.

20           THE COURT:  One of the things -- and I'm going to

21   call on Mr. Pesce in a minute on behalf of the Committee.

22   But I want to be sure that you order a copy of the

23   transcript from today's hearing so that when it goes on ECF

24   -- and actually, you might file a single pleading that

25   points to the transcript so that anyone who hasn't tuned in

Page 52

1    today, who hasn't signed onto the hearing today would be

2    able to review this dialogue that we've been having today.

3    Okay?

4              MR. KWASTENIET:  Very good, Your Honor.

5              THE COURT:  I want to be sure that everyone has

6    the opportunity to know exactly what was said, et cetera.

7    Okay?

8              MR. KWASTENIET:  That's great, Your Honor.  I will

9    also note that as early as tomorrow I believe we would be

10   filing a motion to further extend exclusivity.  That motion

11   will also include a synopsis of some of the bullet points

12   that I went through today.  So that will be on the docket.

13   We will also -- and that will be on the docket sooner than

14   the transcript.  There's usually a several-day delay on the

15   transcripts.  But we will get the transcript on file with a

16   notice as well as soon as that's available.

17             THE COURT:  All right.  Mr. Pesce, do you want to

18   speak on behalf of the Committee?

19             MR. PESCE:  Thank you, Your Honor.  Gregory Pesce,

20   White & Case, counsel to the Committee.  I just want to make

21   a couple of points here about the sale process and some of

22   the other things that the Committee has been doing of late.

23             So the Committee throughout this case has been

24   open to any and all alternatives that maximize value for the

25   account holders.

1         That said, like Mr. Kwasteniet said, the Committee

2    believes that a plan that provides for a restructuring

3    versus just a straight liquidation and provides the value of

4    those assets, many of which are illiquid, is preferrable to

5    just liquidating things piecemeal or handing them over to a

6    competitor.  And that's why we've been spending so much time

7    on this today.  That's why this case has taken quite a bit

8    of time.

9         All that being said, Celsius has really just one

10    shot to get this reorganization right.  We also don't have a

11    ton of cash.  So we really want to make sure we measure

12    twice and cut once so to speak.  And in particular, I just

13    want to highlight there are no -- there is no agreement

14    today with any of the investors that we're speaking with.

15    And whatever is put out there is going to require a lot of

16    stakeholder buy-in and it's going to require a creditor

17    vote.  So this is a process that is closer to the end than

18    the beginning, but we still have a bit of a way to go here.

19         And I also just want to highlight something else,

20    which is that we are very focused, like I said, on having a

21    plan, particularly one with like a tokenized recovery.  But

22    that's going to require a lot of approvals.  It's going to

23    require approvals from Your Honor and then it will require

24    approvals from other parties probably.  But if that is

25    ultimately not feasible or we don't reach the final terms

1    that we need with outside parties, there are other options.

2    It's just that those are not the most value-maximizing that

3    are available we think today versus the tokenized recovery.

4    We could transfer the customer assets to another exchange.

5    I don't need to go into the risks that that would present in

6    the current environment.  Or we could self-liquidate the

7    company and just return some of the crypto to customers.

8    But again, even if self-liquidation is not self-

9    effectuating, self-liquidation probably requires new capital

10    or liquidating coins and it still requires, despite what

11    many people listening today might have read on social media,

12    it still requires us to resolve the gating issues with the

13    preferred equity, with the custody parties, and with Mr.

14    Adler and other intercreditor fights.  So it just changes

15    the format of the outcome, it doesn't actually change the

16    path necessarily that you get there.

17         So we're continuing to work with the Debtor on

18    this concept, but there is a bit of work to do.  And we are

19    focused on moving this case forward.  But I want to echo and

20    kind of amplify a few of those points for you, Your Honor,

21    and for those listening.

22         I think -- and the other quick topic that I would

23    just like to highlight, because it goes to the litigation

24    recoveries that are going to be -- we've said this since the

25    beginning of the case, litigation recoveries are going to be

1    a significant portion of what we provide under the plan here

2    probably.  The examiner's report is due in less than a week.

3    As Mr. Lazar said, we've been cooperating with the examiner

4    and we eagerly await her findings.  Like the user community,

5    we're not going to get a sneak preview.  We're going to read

6    it for the first time when it hits the docket.  As the

7    examiner has been doing her work, the committee is very

8    mindful of the Court's directive to minimize duplication and

9    we proceeded accordingly to make sure that the examiner has

10   -- or that we have the benefit of all the firsthand

11   testimony that the examiner is receiving so that we can

12   avoid, hopefully, reexamining witnesses at a later date.  So

13   the examiner's report is going to be an important input

14   here, particularly on what goes into the litigation trust

15   that we expect, under all circumstances, is going to be

16   established at the end of the case.

17          Though not directly related to the examination or

18   our own investigation, I also wanted to highlight something

19   that Your Honor may have read about in the media, which is

20   that the attorney general of the State of New York recently

21   filed a complaint against Alex Mashinsky.

22          THE COURT:  I've read it.

23          MR. PESCE:  Yeah.  I just want to make clear that

24   we believe it's absolutely vital for Mr. Mashinsky and his

25   coconspirators to be held account for what they've done to

Page 56

1   Celsius and the users.  That said, a critical theme that

2   we've hit on several times here is the need for a fair and

3   equitable allocations of all account holders.  The New York

4   Attorney General's complaint seeks damages from Mr.

5   Mashinsky that would be collected by the New York

6   government.  It's our position that all recoveries for Mr.

7   Mashinsky and other individuals and entities that are found

8   to be liable for wrongful conduct, be distributed to account

9   holders and we will continue to monitor the progress of that

10  proceeding as we work towards the outcome of this case

11  overall.

12         So those are a couple of points I wanted to

13  highlight.  I'm happy to address any questions that the

14  Court may have for the committee and otherwise we'll speak

15  later on some of the other matters that are up today.

16         THE COURT:  The last thing I wanted to ask you

17  about is, you know, after the Court's Earn opinion,

18  obviously, there are a lot of people who are very unhappy

19  with that result.  There's an appeal that has been filed.

20  It'll follow its own course.  But I've had some concern that

21  people, creditors, Earn account holders don't fully

22  understand the capital structure of Celsius.  You know in

23  many cases where there's substantial secured debt, there's

24  little or nothing that would flow down to unsecured

25  creditors.  But am I correct that I know there's the issue

Page 57

```
1    about the preferred holders and the claims against which

2    entities and that's being teed up for decision.  But this is

3    not a case with substantial secured debt ahead of the

4    unsecured creditors.  Essentially, what the Earn account,

5    the Earn ownership issue really addresses is are all Earn

6    account holder's going to receive equal, you know,

7    proportionate distributions of what's available?  Can you

8    address that, whether there are substantial senior claims

9    ahead of the Earn account holders, your constituency?

10             MR. PESCE:  Yes, I can.  So it's our understanding

11   that there is no meaningful secured debt save for maybe a

12   handful of trade vendors which are de minimis.  So at the

13   end of the day, it's our expectation, like I think Mr.

14   Kwasteniet said it well earlier on, as a result of the Earn

15   ruling, it just makes clear that customers have claims

16   against the company and then on account of those claims,

17   they are going to receive the value if not actual

18   cryptocurrency.  I think the issue, in our view, is one,

19   really two issues that are related.  It's the intercreditor

20   allocation of that value.  So you heard from Mr. Adler that

21   there could be a push and pull between the Earn holders and

22   the loan parties.  You're already aware of the custody

23   issues and withhold issues.

24             And then, you know, I think when the examiner's

25   report comes out, one of her mandates, which was added
```

Page 58

1    later, on was the treatment of Cel.  It'll be important to

2    review that report and understand what is found about how

3    Cel was created, marketed, used and burned so we can have an

4    understanding of any kind of subordination issues that may

5    exist relative to Cel holders versus other Earn holders.  So

6    it's really an intercreditor issue and a subordination issue

7    relative to the Earn holders, but there isn't going to be a

8    senior secured lender, bank lender that sucks up the value,

9    like in its traditional bankruptcy case, Your Honor.

10           THE COURT:  All right, thank you.  Mr. Kwasteniet,

11   go ahead.

12           MR. KWASTENIET:  It's Ross Kwasteniet, again, from

13   Kirkland.  I want to echo Mr. Pesce's comments and then also

14   maybe add a few of my own.  We've been very clear from the

15   beginning, we filed capital structure charts and we've

16   described that we don't have bank debt.  We don't even have

17   competing bond debt.  There's not an issue of, you know, at

18   what level do the bondholders, you know, have claims versus

19   the customer?  We don't have traditional funded debt.  Okay.

20   The money that came in to fund the growth of the company

21   came in as equity and we're taking the position that the

22   customers, the account holders, are entitled to value first.

23           And so what that means is we do, to Mr. Pesce's

24   point and as I noted earlier, we have to figure out, you

25   know, we have different categories of customer claims.

Page 59

1    Okay.  We have held there's custody, Earn, borrow, and it's

2    important that we sort out their relative rights with

3    respect to each other.  The vast majority of our customers

4    are in the Earn program.  And for the vast majority, we

5    think of the value of the assets is going to go to the

6    customers of the Earn program, again, sorting out what the

7    other categories get.

8           The consequence of the Earn coins being property

9    of the estate, we have to do something with them.  The

10   estate's obligation, the debtor's obligation is to propound

11   a plan that returns value to the right people in the right

12   form, respecting their relative, you know, priorities and

13   rights and interests.  And that's what we're doing.  And

14   we're in the later stages of being ready to do that.

15          This goes back to customers and so arguments or

16   litigations, as between Earn customers, one customer says I

17   relied on this, you know, advertisement or I think I was

18   misled.  We think that all Earn customers could make those

19   similar arguments and we've already stipulated, we've

20   already put into our schedules and statements, Your Honor,

21   what we think everybody's precise claim is.  They have a

22   claim to the return of their crypto.  We're not disputing

23   that.  Okay.  And the problem is, we don't have enough

24   crypto to go around right now.  We've got some crypto.  We

25   have some illiquid assets that we're going to have to

Page 60

```
 1    realize over time; not everybody wants to stick around for
 2    that.  We have these different considerations, but bottom
 3    line, it's meaningless to have individual Earn customers
 4    say, well, I should have a, you know, constructive trust for
 5    this and I can have it for that, because we don't have
 6    enough to go, to go around.
 7              And one of the, one of the guiding principles in
 8    the Chapter 11 is that customers in the same class or group,
 9    right, who are similarly positioned, get treated equally.
10    And that's our objective, Your Honor.  And we think that the
11    plan that we put forward is going to provide an equal
12    distribution.  I mean, the fact that you were, you know,
13    feel like you were misled or that you may have been lied to,
14    that doesn't add to the value of your claim.  You still have
15    -- your claim is for the return of your crypto for whatever
16    reason.  Maybe you made an eyes-wide-open decision and you
17    understood the risks and it's a volatile industry.  Maybe
18    you didn't understand all that and you put the crypto on the
19    platform and, you know, you believed in advertisement or you
20    misunderstood something or you didn't read it.  The point is
21    it doesn't matter what was in your mind and we would waste
22    all of our money and years trying to do trials and figure
23    out what was in your mind and what was in your mind.  At the
24    end of the day, they all have something in common.  They all
25    deposited crypto and they all have a claim for the return of
```

Page 61

1    the crypto.  And we're focused on doing a plan that treats

2    them equally.  Again, respecting the rights of the different

3    categories of customers we have, but the Earn customers, we

4    think are going to be treated equally and are going to be

5    entitled to a significant return of value here.

6          The fact that it's property, Earn is property of

7    the estate, again, doesn't mean that Mr. Koenig and I go out

8    and we have a party with it and, you know, we spend it.  It

9    goes back to the customers.  Like that's, that is what the

10   estate has to do.  The estate has to make a return to the

11   customers.  And again, there's not bank creditors, bond

12   creditors who are going to, like, eat up that value.  It's

13   going to go back to the customers and we're going to propose

14   to do it in a way that's equal and ratable.  And we're going

15   to propose that we don't get into the, what was in my mind

16   and I what video did I see?  Because at the end of the day,

17   you're entitled to your crypto.  And that's the bottom line.

18          THE COURT:  Let me, it raises a question I meant

19   to ask earlier.  This has to do with custody account

20   holders,  The pure custody account holder where I believe

21   that the prior rulings and agreement was the crypto would be

22   returned to the pure custody account holders.  The issue

23   became that there's a shortfall, if you look at it on a

24   coin-by-coin basis.  And I thought I, obviously, I don't

25   believe there's been complete briefing on this.  I thought

Page 62

```
 1    that the issue had been consensually resolved with an

 2    agreement that it would be pro rata.  You know there was

 3    some briefing about the lowest intermediate balance, et

 4    cetera, but there was not complete.  I thought the issue had

 5    been resolved.  I guess it has not.  I want to be sure that

 6    if there is no consensual resolution of that issue, I think

 7    what we've concluded was at least as to any undisputed

 8    portions, get it out as soon as possible.  And if there has

 9    to be some remaining issue about how to allocate the

10    shortfall on a coin-by-coin basis, that the Court would do

11    that, could, could you just address that briefly where that

12    stands?

13              MR. KWASTENIET:  Absolutely, Your Honor, and we

14    can we you can do that right now.  I think we put it on the

15    agenda as a status conference at the end of the agenda, but

16    I'm happy to do it now.  I would ask, I'd like to cede the

17    podium to my colleague, Mr. Koenig, who is more familiar

18    with it and who has been in conversations with Miss Cornell

19    and the ad hoc committees on these custody issues.  So I'll

20    yield the podium.  And, Your Honor, I think after that we're

21    ready to jump into the agenda.  Unless Your Honor has other

22    questions for me.

23              THE COURT:  I don't.  That was the last thing.  I

24    meant to ask that earlier, but I didn't.

25              MR. KWASTENIET:  Very good.  I'll yield the podium
```

Page 63

1     to Mr. Koenig.  Thank you, Your Honor.

2              THE COURT:  Go ahead, Mr. Koenig.

3              MR. KOENIG:  Good morning, Your Honor.  For the

4     record, Chris Koenig, Kirkland and Ellis for the Celsius

5     debtors.  Pursuant to the order that Your Honor entered last

6     week, the parties: the debtors, the committee, and the

7     custody ad hoc group, met and conferred regarding the

8     shortfall issue.  Just as a reminder to everybody watching

9     the hearing, as disclosed as part of the prior custody

10    litigation, there's a shortfall of the assets in the custody

11    wallets versus the custody liabilities.  The shortfall is

12    approximately 6 percent.  That issue has not yet been

13    resolved by the Court.  So it's an open issue.

14             The parties have met and conferred and agreed as

15    Your Honor suggested, that in order to begin processing

16    withdrawals now, all parties have agreed that for the pure

17    custody and the custody balances that are below the 75-75

18    limit -- this is all disclosed in the prior litigation --

19    the debtors will open withdrawals now and permit eligible

20    customers to withdraw 94 percent of their eligible balance

21    regardless of which coin is being withdrawn.  So that's 94

22    percent whether you have Bitcoin, Ethereum, USDC, or any

23    other coin.  Again, that's only -- you have to be eligible

24    under the withdrawal order.  You have to be pure custody or

25    you have to be below the 75-75.  We think that that will

Page 64

1    allow us to get meaningful distributions out to our

2    customers now while reserving what happens later on the 6

3    percent.  Perhaps we'll be able to reach a more robust

4    agreement on that point at a later date or if not, Your

5    Honor will have to rule in the context of a Chapter 11 plan

6    or otherwise.

7              Following that meet and confer, the debtors

8    updated a withdrawal schedule.  It will list out all of the

9    eligible customers and the balance that is eligible to be

10   withdrawn.  That is accounting for the 94 percent and 6

11   percent haircut that everybody will have to take.  We intend

12   to file that schedule later this week.  We're finalizing the

13   schedule.  Now we're going to share with the committee and

14   the custody ad hoc group in the next day or so, make sure

15   that everybody's comfortable with it before we file it, but

16   we intend to file it this week and to reopen withdrawals as

17   early as next week.

18             Just to reiterate for folks, as discussed at prior

19   hearings, as reflected in the withdrawal order, the debtors

20   may charge customers for the gas and transaction fees

21   associated with the withdrawals off the platform.  There are

22   certain customers that have very minimal balances in the

23   custody program.  Accordingly, they will not be permitted to

24   withdraw because the fees to withdraw would exceed the

25   balance to be returned.  That doesn't make sense.  The

Page 65

1    schedule will note those customers who have very de minimis

2    balances and won't be allowed to withdraw.  We want to make

3    sure that those parties have adequate notice.  And as I

4    said, and just to reiterate to make sure everybody

5    understands, we expect this withdrawal schedule to be

6    finalized and filed this week and that the withdrawals can

7    commence next week.

8            It's also important to know, and we'll make sure

9    that notice goes out to everyone, in order to withdraw the

10   assets, there are certain actions that users will have to

11   take before withdrawals can commence.  This is not a normal

12   case where you can just mail a check to the address on

13   record.  Users will have to tell us a safe and white-listed

14   address to which we should send their crypto.  So what they

15   will have to do is they will have to log into the Celsius

16   app.  They will receive notice but they'll log into the app

17   designate new white-listed addresses further withdrawals to

18   be sent to and they'll provide certain KYC information as

19   well.  Users will not be able to withdraw assets without

20   providing us with these addresses and without providing us

21   with this KYC information.

22           I just want to be clear as well, in light of

23   recent phishing attempts and the debtors have filed a

24   variety of phishing attempts on the docket.  I want to be

25   very clear and we're going to be very clear in all of the

Page 66

1    notices that we file.  No eligible user has to pay any fees

2    directly to Celsius or any third party in order to receive

3    any distribution.  The fees will be netted on Celsius' end

4    and paid out of the distributions on our end.  Nobody has to

5    pay any amounts in order to receive any distribution and any

6    communication that any user receives to the contrary is

7    false.  You should report it to the debtors.  We have a

8    variety of email addresses that folks can write.  There's

9    CelsiusCreditorQuestions@Kirkland.com that you can report at

10   any time.  Our email addresses are also all over the

11   pleadings.  Please bring these phishing attempts to our

12   attention so that we can bring them to the attention of the

13   Court and to the larger creditor base as well.

14          I just want to be clear that we are obviously

15   making distributions now, but nobody has to pay directly to

16   access those distributions.  We will not ask for any fees to

17   be paid directly or for any personal identifiable

18   information to be provided outside of the Celsius app.

19   Everything that you have to do has to be in the app and

20   every notice that we provide to customers will be clear that

21   that is the only place you should provide us with that

22   information.

23          Finally, the withdrawal order also authorized the

24   withdrawal of the ineligible withhold assets.  That's those

25   assets that customers transferred to Celsius for which

Page 67

1    Celsius was not able to offer any services.  Unfortunately,

2    identifying all of the coins that the company holds that we

3    weren't offering services for has proven more challenging

4    than we initially expected.  We're still working on it.

5    We'll provide an update.  The ineligible withhold assets are

6    very de minimis.  It would certainly be the tail wagging the

7    dog.  So we want to start the custody withdrawals now.

8    We'll provide an update on the withhold, the ineligible

9    withhold assets as soon as possible.  So, Your Honor, I've

10   been speaking for a while.  I want to, you know, cede the

11   lectern to the committee and the ad hoc group and also

12   address any questions that Your Honor has.

13            THE COURT:  Well, I just want to be sure and I'm

14   sure you're taking the appropriate precautions to make sure

15   that the way in which the custody, pure custody account

16   holders provide information as to where the funds should be,

17   the custody should be transferred, is secure and, you know,

18   appropriate steps are taken to assure that.  I think the

19   last thing anybody wants is to find out that there's been a

20   hack or there's been any misdirection of any of the assets

21   that are being returned.  So and what I would suggest is

22   obviously you're conferring with the ad hoc, counsel for the

23   ad hoc committees.  I would encourage you also to make sure

24   you communicate with Miss Cornell, the U.S. Trustee's

25   Office.  I just want to be as certain as anybody can be in

1    the circumstances that it's -- whatever is going out is

2    going to the right places.

3              MR. KOENIG:  Agreed and understood, Your Honor.

4    And that's why we've taken care to make sure that the

5    information is going to be input into the Celsius app and

6    not via email.  We think that that will help to minimize the

7    phishing scams.  The company, you know, is working to, when

8    distributions go out, ensure that only the assets that need

9    to be sent out on a particular day are ever live or hot to

10   minimize the risk of anything.  Just to be clear, Celsius as

11   ever been the subject of a hacker or anything like that.

12   But, of course, we're going to take as many steps as we can

13   to ensure that that doesn't happen as we, as we proceed with

14   this withdrawal process.  And we've been communicating with

15   the committee and the ad hoc custodial account holders as

16   well to make sure that everybody understands exactly what

17   the process is.  And, obviously, I'm not going to get into

18   the ins and outs of in an open forum like this, but we've

19   certainly been, we've certainly been talking about it.

20             THE COURT:  Okay.  And I know you said you're

21   going to try and do this.  As to the 6 percent that's not

22   being distributed now and we're with the shortfall, I

23   certainly hope that the constituent parties will continue to

24   discuss whether the issue can be resolved consensually.

25             MR. KOENIG:  Understood and agreed, Your Honor.

1              THE COURT:  Don't let, don't let the good, you

2       know, overcome the absolute truth.  Okay.  Whatever that is.

3              MR. KOENIG:  Understood, Your Honor.

4              THE COURT:  Everybody's -- all right, thank you

5       very much.  Mr. Kwasteniet, do you want you want to move

6       ahead with the agenda?

7              MR. KWASTENIET:  We're going to move ahead with

8       the agenda.  I'm going to pass the lectern to my colleague

9       Miss Hensley.

10             THE COURT:  Okay.

11             MR. KWASTENIET:  Thank you.

12             MR. HENSLEY:  Good morning, Your Honor.  Can you

13      hear me?

14             THE COURT:  Yes, I can.

15             MR. HENSLEY:  Gabriela Hensley of Kirkland and

16      Ellis on behalf of the debtors and debtors-in-possession.  I

17      am presenting our motion to return post-petition transfers

18      to account holders which is filed at Docket 1817.

19             Your Honor, we, at the December 20th hearing, we

20      had a pro se creditor who spoke up on the record asking

21      about this issue.  At that time, we informed Your Honor that

22      we had a couple of letters come across or emails to our

23      inquiry inbox regarding post-petition transfers of

24      cryptocurrency that, you know, whether by mistake or some

25      sort of automatic recurring transfer that slipped the radar,

Page 70

1    had been received.  We let you know that we were looking

2    into it and, as promised, we did.  And we discovered that

3    there were actually a number of these transfers almost

4    11,000 coming from about 2800 unique users.  All in, these

5    transfers total approximately $1.4 million.  So it's a more

6    substantial amount than we might have originally thought.

7            We, as promised, filed a motion.  We did not

8    receive any objections to that motion.  It contains -- the

9    proposed order filed with the motion contained a number of

10   the protections that we discuss with parties in connection

11   with custody.  We'll file a notice saying the transfers we

12   intend to return.  You know we won't allow people to

13   transfer them between accounts.  All of that.

14           We did receive a few informal comments with the

15   committee which we incorporated in the revised order, which

16   is filed a Docket 1918, filed last night.  I'm happy to talk

17   Your Honor through those changes or address any questions

18   about the motion.  But if none, we would ask that the

19   revised order be entered.

20           THE COURT:  All right.  Does anybody else wish to

21   be heard?

22           MS. CORNELL:  Your Honor, this is Shara Cornell of

23   the Office of the United States Trustee.  How are you?

24   We've actually -- our office has been asking questions about

25   this issue actually since the case has been filed.  We're

1   happy that these funds are going to finally be returned.

2   And I just wanted to bring Your Honor's attention, you know,

3   that we are still concerned that a process will be put into

4   place to stop these types of payments on a go-forward basis.

5   It's our understanding that customers can still make

6   payments to Celsius.  And we just want to make sure that

7   this is fixed on a go-forward basis as well.  Thank you very

8   much, Your Honor.

9          THE COURT:  Thank you.  Anybody else wish to be

10  heard?  All right, the Court has reviewed the motion --

11         CLERK:  Judge, there's a hand.  Ezra.

12         THE COURT:  All right, Ezra Vazquez-D'Amico, I'm

13  probably mispronouncing your name.  Go ahead.

14         MR. VAZQUEZ-D'AMICO:  Thanks, Your Honor.  This is

15  a question related to the pure custody.  I just wanted to

16  make sure when, when they file a schedule with a list of

17  accounts that they're considered to be pure custody, will

18  there be an opportunity for account holders who believe

19  their account is pure custody to, you know, confer if they

20  feel it's not included?

21         THE COURT:  Well, what I would say is when you see

22  the schedule, and please I encourage everybody who believes

23  they're in this category to look at the schedule closely,

24  please reach out and contact the debtors' counsel and also

25  the committee's counsel and raise it with them.  So, and if

Page 72

1    necessary, the Court will have to deal with it.  But I

2    appreciate your concern.  And I expect that all pure custody

3    or those with amounts below that preference threshold will

4    look at those schedules closely if you believe you're

5    entitled to the distribution.  Okay?

6              MR. VAZQUEZ-D'AMICO:  Thank you.

7              THE COURT:  Thank you.  So with respect to this

8    motion to credit post-petition transfers, ECF Docket Number

9    1817 was the motion, no objections have been filed to the

10   motion.  The Court has reviewed it carefully and the motion

11   is granted.

12             MR. HENSLEY:  Thank you, Your Honor, we'll send it

13   out.

14             THE COURT:  The revised order that was entered,

15   submit it in Word format and it will be promptly entered.

16   Okay?  Thank you very much.

17             MR. HENSLEY:  Thank you, Your Honor.  I would

18   respectfully cede the podium to my colleague Mr. Latona.

19             THE COURT:  Okay.

20             MR. LATONA:  Good morning, Your Honor.  Dan Latona

21   of Kirkland and Ellis on behalf of the debtors.  The next

22   item on the agenda is the debtor's motion to authorize the

23   crediting of the Flare token to eligible customers who held

24   XRP in their eligible accounts as of the snapshot date.

25             Your Honor, Flare is a new Blockchain that has

Page 73

1    created its own coins similar to other proprietary

2    Blockchains.  And the purpose of this coin is to distribute

3    or airdrop this token to centralized exchanges in order to

4    drive adoption of the new token.  As of the snapshot date,

5    the debtors have about approximately 250 million in

6    obligations of Flare tokens to eligible account customers

7    based on the snapshot date.  And in connection, or as a

8    condition of distributing these tokens to eligible account

9    holders, the debtors and Flare entered into agreement that

10   also provides Celsius with a grant of approximately 150

11   million Flare tokens on account of the distribution.

12          Your Honor, the airdrop occurred on January 9th

13   and the logistics of the drop are that 15 percent of the

14   total aggregate number of Flare tokens to be distributed are

15   airdropped on the token distribution event with the

16   remainder to be distributed ratably over the next 36 months.

17   As a result, the result of the Debtor's Chapter 11, the

18   debtors are seeking authorization to credit these tokens to

19   the account holders.

20          Your Honor, airdrops are common in the

21   cryptocurrency industry.  As an example, the debtor's terms

22   of service anticipate and account for these particular

23   airdrops in Section 14.  And account holders will benefit by

24   receiving these tokens in their accounts.  These tokens will

25   increase the value of the debtor's claims.  And again, Your

Page 74

1    Honor, crediting these tokens to account holders is in the

2    sound business judgment of the debtors, they provide a grant

3    to Celsius, and they increase the value to these account

4    holders.

5         The debtors did not receive any formal objections.

6    The revised order at Docket Number 1913 incorporates certain

7    comments from the committee and unless Your Honor or anyone

8    has any questions, the debtors would cross the entry of that

9    order.

10        THE COURT:  All right, does anybody else wish to

11   be heard?  Mr. Benz.  Mr. Benz, you had your hand raised.

12   If you wish to address this, please go ahead.

13        MR. BENZAKEN:  I'm so sorry, Your Honor, I was on

14   mute.  So yes, just briefly, the airdrop constitutes a

15   taxable event and I'm wondering for the creditors, if this

16   is at a net loss given its current market price, if added to

17   their accounts at this moment?

18        THE COURT:  Mr. Latona, are you able to address

19   that?

20        MR. LATONA:  Your Honor, I'm not a tax attorney.

21   Nor am I familiar with any individual account holders

22   specific tax situation.  I would advise folks to discuss

23   with their own accountants or tax advisors.

24        MR. BENZAKEN:  Well, so simply, is the coin valued

25   more or less than it was when it was dropped?

1          MR. LATONA:  The coin currently is trading at

2     approximately .038 cents as of this morning.

3          MR. BENZAKEN:  Do we know what it was that as

4     they're dropped?

5          MR. LATONA:  I don't know what it was trading of

6     exactly at the date of the airdrop.

7          MR. BENZAKEN:  Okay, so I'd like to follow up with

8     you on that just because you said this has already decided,

9     I just want to know if it represents a net liability to the

10    creditors?  Thank you, sir.

11         THE COURT:  Mr. Jeter, Adam Jeter.

12         MR. JETER:  Can you hear me?

13         THE COURT:  Yes, I can.

14         MR. JETER:  Okay.  The one question I have is I

15    know the (indiscernible) took a long time to be distributed.

16    They did a snapshot in 2020 December and it got distributed

17    (indiscernible) with all of our accounts, the custody

18    accounts, in the middle of last year.  And they said any new

19    deposits would count as a custody deposit and go to a

20    custody account.  If these are distributed to us, will be in

21    the Earn account or will they be in the custody account?

22         MR. LATONA:  Your Honor, Dan Latona for Kirkland

23    and Ellis.  In order to treat all account holders across the

24    platform equitably, the token would be airdropped into the

25    account that held XRP as of the snapshot date.

1           MR. JETER:  Okay.  So it's going to count as based

2      on saying it was distributed back on day of 2020, I guess

3      when the snapshot was taken, but still when Celsius changed

4      and no longer were offering Earn accounts to anyone in the

5      middle of last year, any new deposit which spoke to the

6      custody issue.  So when Flare distributed January 9th to

7      Blockchain and deposited assets into the address, why

8      wouldn't it be considered a custody account?

9           MR. LATONA:  Because if you held XRP tokens in

10     your Earn account given the treatment that has already been

11     decided in these Chapter 11 cases, depositing Flare token

12     into a custody account would in effect place your claim with

13     respect to Flare token ahead of others who did not open

14     custody, open custody accounts after that date.  So in order

15     to treat every account holder equitably, the Flare token

16     will be distributed to the account that held XRP tokens as

17     of the snapshot date.

18           MR. JETER:  All right, I understand.

19           THE COURT:  That's okay, Mr. Jeter, you've had a

20     chance to ask your question.  Mr. Dixon.

21           MR. DIXON:  Yeah, Simon Dixon, per se creditor.

22     Just trying to understand because if it, if it belongs to

23     custody, then it would make sense to distribute to those

24     that hold XRP.  But if it's not held in custody, then surely

25     as property of the estate to be distributed equally among

1    everybody.  Just trying to, just trying to understand how to

2    square those together

3              MR. LATONA:  Your Honor, because we understand

4    that this was an airdrop that was a snapshot date prior to

5    the petition day, in order to credit these tokens to account

6    holders who are eligible to receive them, we are seeking

7    court authority to distribute and credit those Flare tokens

8    to the account holders who are entitled to receive them.

9    The debtors don't want to hang out to tokens or, instead,

10   keep them as property of the estate.  They want to credit

11   them to the eligible account holders to increase their

12   claims because their entitled to those Flare tokens.

13             THE COURT:  Thank you very much.  All right.  So

14   Mr. Latona has referred to Section 14 of the terms of use.

15   It reads as follows:  "In the event that a digital asset

16   network attempts to, or does distribute digital assets to

17   Blockchain addresses pertaining to an eligible digital asset

18   via airdrop or bootstrapping, collectively an airdrop, the

19   support of any such digital, new digital assets in your

20   Celsius account is solely at the discretion of Celsius.  If

21   we do not make a public announcement confirming our support

22   of such new digital assets, we will not support such new

23   digital assets, and such new digital assets will be treated

24   as unsupported assets.  To the extent you wish to receive

25   the new digital assets to be delivered via airdrop, you are

Page 78

1    advised to withdraw the applicable digital assets from your

2    Celsius account prior to the relevant date for the airdrop.

3    You further agree and understand that digital assets

4    delivered via airdrop do not create or represent any

5    relationship between us and the sender and/or the related

6    digital asset network and do not subject us to any

7    obligations whatsoever as they relate to the sender and/or

8    the related digital asset network."

9            So that's -- you can find that in the so-called

10   terms affidavit, the declaration of Mr. Mashinsky, which was

11   filed as ECF Docket Number 393, Exhibit A-8, Section 14.

12   That's where that lies.

13           The Court has reviewed the motion and believes it

14   is well taken.  The motion is granted.

15           MR. LATONA:  Thank you, Your Honor.

16           THE COURT:  Thank you, Mr. Latona.

17           MR. LATONA:  The next item on the agenda is the

18   GK8 cash management motion.  The debtors and the U.S Trustee

19   filed a joint stipulation at Docket Number 1912.  The only

20   remaining issue with respect to the GK cash management issue

21   is the 345 issue with respect to Bank of Hapoalim.  That

22   bank has a New York branch that is an authorized depository

23   under the U.S. Trustee guidelines.  However, the cash is

24   instead held in the Israeli branch of that bank.  We have

25   been working with Bank of Hapoalim to execute a uniform

1    depository agreement.  We have not reached that agreement

2    yet.  In discussions with the U.S. Trustee, they have agreed

3    to extend our deadline to comply with Section 345 through

4    February 7th.  We filed a revised order at Docket Number

5    1917 that reflects that agreement and sets the final hearing

6    on cash management for February 15th.

7            Your Honor, we did have these discussions with the

8    U.S. Trustee.  So unless Ms. Cornell has anything to add, we

9    would ask that the second interim order be entered as well.

10           THE COURT:  Ms. Cornell.

11           MS. CORNELL:  Shara Cornell on behalf of the

12   Office of United States Trustee.  That's correct, Your

13   Honor.  We've agreed to a final 15-day extension in order

14   for GK8 to come in compliance with 345.  Thank you.

15           THE COURT:  All right.  Anybody else wish to be

16   heard on this?  All right.  The motion is granted on an

17   interim basis with the order.

18           MR. LATONA:  Thank you, Your Honor.

19           THE COURT:  Thank you.

20           MR. LATONA:  Your Honor, the next item on the

21   agenda is the debtor's sale of certain de minimis assets

22   that you heard Mr. Ferraro mention at the beginning of the

23   hearing.  The initial notice was filed at Docket Number

24   1853.  In support of that sale, the debtors filed the

25   declaration of Mr. Patrick Holert, who is the chief

Page 80

1    financial officer of debtor, Celsius Mining LLC.

2         Your Honor, the debtors received one objection,

3    Docket Number 1855 from Victor Ubierna de las Heras and the

4    debtor has filed a reply at Docket Number 1919.  I know Mr.

5    Ferraro mentioned these specific rigs, so happy to walk

6    through again the rationale and put it into the record, but

7    otherwise the debtors would request that the objection

8    overruled and that the notice be entered.

9         THE COURT:  Mr. Ubierna, do you want to be heard?

10        MR. UBIERNA:  I have nothing more than what it is

11   in the Docket 1555.  Thank you, Your Honor.

12        THE COURT:  Thank you, Mr. Ubierna.  So the

13   questions that I had really have been addressed in the

14   preliminary comments by Mr. Ferraro and that was really is

15   mining still cash flow positive?  What's the status of the

16   current mining activities?  How does the selling of the rigs

17   relate to the genders reorganization plan?  So I'm satisfied

18   after hearing Mr. Ferraro, I think those were important

19   questions and so I'm satisfied.  So the motion to approve

20   the sale de minimis assets is granted.

21        MR. LATONA:  Thank you, Your Honor.  The next item

22   on the agenda, Your Honor, is the debtor's institutional

23   loan motion, again, filed at Docket Number 1818.  There was

24   a revised order filed at Docket Number 1924.  And again,

25   there was a lot of discussion earlier on about the debtor's

1    institutional loan program and the differences between the

2    retail loan program.  Again, happy to walk through anything

3    for the record, but I believe the debtors have determined,

4    or demonstrated that reinstating the -- authorizing the

5    debtors to take action on account of the individual MLAs is

6    a sound exercise of the business judgment because as we

7    heard, the retail lending book, as a whole, is substantially

8    over collateralized.  That is not the case for the

9    institutional loan book, which is also smaller in scale,

10   both in terms of unique individual borrowers and also total

11   aggregate number of obligations outstanding.

12          And importantly, Your Honor, this does not allow

13   or permit or direct the debtors to take any action.  It

14   authorizes the debtors to take action with respect to any

15   individual loan or series of loans to the extent that taking

16   action would be accretive to the debtor's estates.  So

17   unless Your Honor has any further questions, unless Mr.

18   Adler has anything else to add, we would respectfully

19   request entering the order at Docket Number 1924.

20          THE COURT:  I do have some questions.  Can the

21   debtors explain the discrepancy in the institutional lending

22   program as described in the motion compared to the

23   description in Mr. Mashinsky's First Day declaration?  The

24   motion indicates that there are approximately 14

25   institutional borrowers with approximately $115 million of

Page 82

1     aggregate outstanding balances.  Mr. Mashinsky's First Day

2     declaration indicated that as of July 11th, 2022, Celsius

3     had approximately 47 institutional borrowers with

4     approximately 93 million of aggregate outstanding loans.  I

5     tried looking for reconciliation of those differences.

6          MR. LATONA:  Of course, Your Honor, happy to

7     provide that.  So the First Day declaration lists the total

8     aggregate number of loans outstanding.  And the motion

9     references the number of unique individual borrowers.  So an

10    individual borrower may have multiple loans under one MLA.

11    The total number aggregates to 47.  The difference in the

12    number, or the total aggregate amount of obligations

13    outstanding and the value of the collateral relate to the

14    fluctuation in cryptocurrency values as of the petition date

15    to the current date.

16          THE COURT:  All right.  Next question is whether

17    any of the actions that the debtor is seeking to take would

18    involve the movement of any assets that are in custody

19    accounts?  Given the ongoing efforts to make distributions,

20    I want to be sure the debtors are not touching those assets.

21          MR. LATONA:  Absolutely, Your Honor.  My

22    understanding is that none of the collateral securing these

23    loans has ever been in either Earn or custody.  But we will

24    work with the committee and we will work with the debtors to

25    ensure that none of those assets are touched.

Page 83

1          THE COURT:  All right.  Lastly, Mr. Pesce or one

2    of your colleagues, the committee did not file an objection

3    but it would be helpful to the Court if you could confirm

4    whether the committee is comfortable with the relief that

5    the debtors are seeking?  Yeah, that's my question.

6          MR. PESCE:  Thank you.  For the record, Robert

7    Pesce, White and Case, on behalf of the committee.  Yes, we

8    are comfortable and as reflected in the red line, there were

9    a variety of changes that were made to the order to address

10   some of the feedback that we had to this motion.

11         THE COURT:  All right.  There's at least one hand

12   raised, Paul Breuder, B R E U D E R.  I may have

13   mispronounced it, but I will give you a chance to address

14   the Court if you wish.

15         MR. BREUDER:  Good morning, Your Honor.  My name

16   is Paul Breuder.  I just have one question regarding my

17   loans.  Can the debtors please outline what is going out in

18   terms of collateral value and what is being returned to the

19   debtor's estate?

20         MR. LATONA:  The total --

21         THE COURT:  Go ahead, Mr. Latona.  You need to

22   identify each time you speak, Mr. Latona.

23         MR. LATONA:  Sure.  Again, Dan Latona for the

24   debtors from Kirkland and Ellis.  The total outstanding

25   obligations is approximately $115 million.  The collateral

Page 84

1    securing those obligations is approximately $16 million.  So

2    to the extent that the debtor has determined that bringing

3    in crypto or releasing crypto on account of payoff of the

4    institutional loan is accretive to the estate, the debtors

5    will take such action.  The collateral securing those loans

6    is made up of various cryptocurrency, mostly Bitcoin,

7    Stablecoin and Eth in most instances.  In certain instances,

8    the debtors are prevented from taking action.  For example,

9    Alameda Research and Three Arrows Capital, those entities

10   are in Chapter 11 under their own insolvency protection.  So

11   we cannot take action without court authority in those

12   proceedings.  But, again, notably that the committee has

13   certain consent and consult rights with respect to any

14   workouts in any cryptocurrency that leaves the debtor's

15   platform.

16            THE COURT:  Mr. Adler.

17            MR. ADLER:  Good morning, Your Honor.  David Adler

18   on behalf the ad hoc group.  We filed an amended objection

19   last Tuesday where we raised a number of points and issues

20   regarding this proposal.  The debtors were nice enough to

21   send me a list of the institutional borrowers, the number of

22   loans, the collateral, and other information.  And while

23   there's a confidentiality order in effect that I'm not going

24   to mention names, I do want to say that there are 15

25   borrowers in total that constitute 47 loans.  The gross

Page 85

```
 1   loans outstanding are 518 million.  And the collateral value

 2   is 16.6 million.  Now there are five of those 15 borrowers

 3   that have zero collateral that got loans from Celsius by

 4   providing no collateral.  The collateral column is listed as

 5   zero.  One of them was mentioned before, Alameda, which has

 6   a loan of which has some FTTs serving as collateral.  You

 7   take those six loans out of the picture, you are left with

 8   25.2 million in outstanding loans that is backed by 16.6

 9   million in collateral that consists of Bitcoin, Eth, and

10   Stablecoin.  And there's one borrower here, I won't mention

11   the borrower's name, but the borrower has Stablecoin of $1.7

12   million, gross loan of half a million dollars,

13   overcollateralized by $1.2 million.

14            I count five of the remaining borrowers as being

15   over collateralized and four of them being under

16   collateralized.  And my calculation, Your Honor, is based on

17   the fact that Bitcoin and Eth have both risen about 35, 37

18   percent since this report was prepared.  I am concerned,

19   Your Honor, because I don't think there's been a sufficient

20   factual record developed here to support the business

21   judgment rule.  The debtor's talk about these agreements

22   being bespoke.  It's a nice word to use, bespoke.  When I

23   looked at the agreement, Your Honor, they look like they're

24   you know more off the rack because they're all pretty much

25   the same thing.  There might be little tweaks here and there
```

Page 86

1    on the agreements, but they are substantially the same as a

2    retail borrower lending agreements.  There is a provision of

3    collateral.  There are remedies that are available.  There's

4    loan-to-value ratios that need to be maintained.  And I'm

5    concerned, Your Honor, because I don't think there's been a

6    sufficient factual record developed here.

7           All of this is being based on lawyer argument.

8    We're told in the reply that -- it's Paragraph 3, Paragraph

9    1 in the preliminary statement -- that says the risk that

10   the loans provided by the debtors will become uncollectable

11   has greatly increased and made prompt action with respect to

12   such loans necessary to maximize the value of the debtor's

13   estate.  Well, I just read to Your Honor that five of the

14   loans at this moment I believe are over collateralized.  Now

15   Your Honor doesn't know any of that because none of this

16   nation has been put before you in the form of a declaration

17   showing what these "bespoke MLAs" reflect.  But I've seen it

18   and I can say that it is substantially similar to the retail

19   borrowing program.

20          So we don't believe, number one, that a sufficient

21   factual record has been developed.  Number two, I think that

22   this type of relief should be granted pursuant to a plan or

23   some other type of process, not just merely saying we want -

24   - it's our business judgment, Judge.  We want to give back

25   the collateral to borrowers.  Take our word for it.  We need

Page 87

1    to do this.  I think that it is not in the ordinary course

2    of business.  I don't think this should be approved under

3    that standard.  And  I think that the debtors should be

4    required to put forth a declaration with the MLAs.  They can

5    obviously redact them if they need to so that we can have an

6    informed discussion about the differences between the

7    institutional program and the retail program.  And unless

8    Your Honor has any further questions, that's my response.

9           THE COURT:  Thank you.  Mr. Jeter, your hand is

10   raised.

11          MR. JETER:  Yeah, we'll be here.  So my other

12   question I have is I know the second person for Kirkland had

13   mentioned if we were doing withdrawals next week doing

14   custody to 94 percent.  And then I think I've read it

15   before, but are they going to allow a very small amount of

16   withdrawal for Earn customers, even $75?  It's only about

17   75-75 I believe.  I'm just wondering.  I thought I read

18   something of that being together in detail about it.

19          THE COURT:  Mr. Jeter, what I would say is what

20   you're not raising an issue that's really pertinent to the

21   specific motion that the Court is considering now.

22          MR. JETER:  It was a general question.  I'm sorry.

23          THE COURT:  All right.  Mr. Latona, can you

24   address Mr. Adler's issues that he's raised?

25          MR. LATONA:  Yes, happy to respond.  Again, Dan

Page 88

1    Latona of Kirkland Ellis on behalf of the debtors.  I'd like

2    to make one clarification and then respond to Mr. Adler.

3    Mr. Adler represented that there are approximately 500

4    million in outstanding obligations.  That's including a loan

5    that was worked out prepetition under which the debtors are

6    still operating with that counterparty.  The debtors do not

7    seek relief with respect to that counterparty in this

8    particular motion.  What I would say to Mr. Adler is that

9    the debtors are really seeking authorization, not direction,

10   to unwind any particular institutional loan to the extent

11   that the debtors find it is value accretive to the estate.

12   So even if, for example, we were to extend the same relief

13   to the retail lending book, it wouldn't entitle those retail

14   borrowers to the immediate return of their cryptocurrency.

15   It's still within sound exercise of the debtor's business

16   judgment to take action on any independent loan where the

17   debtors find its value accretive to the estate.

18           The second thing I would add is that there are

19   significant safeguards built into the order specifically

20   with respect to consent rights and consultation rights with

21   the UCC.  Debtors are not able to enter into any workouts or

22   release cryptocurrency from the platform without the express

23   consent of the UCC or, absent that consent, without further

24   order of the Court.  So the Court would not be writing the

25   debtors a blank check to unwind their loan portfolio.  There

1    are significant safeguards built in.  And because of that,

2    Your Honor, the debtors do believe it is a sound exercise of

3    their business judgment.  It lowers and reduces the risk of

4    the institutional loan book at a time when cryptocurrency

5    markets are in pretty severe fluctuation.

6            THE COURT:  All right.  The Court is going to take

7    -- I have one more hand.  Briefly, Mr. Bronge.  Mr. Bronge,

8    if you want to be heard, go ahead.  One last chance, your

9    hand is raised on my screen, Bronge.  If you want to be

10   heard, go ahead and do it now.

11           All right.  Having giving Mr. Bronge an

12   opportunity to be heard and he didn't speak up, I'm going to

13   take this motion under consideration and expect to issue an

14   order within a few days at most.  Let's move on to the next

15   agenda item.

16           MR. LATONA:  Thank you, Your Honor.  The next item

17   on the agenda is Mr. Frishberg's motion to reconsider the

18   GK8 sale.  Being that this is his motion, I will cede the

19   virtual lectern over to him.

20           THE COURT:  Okay.  Mr. Frishberg.

21           MR. FRISHBERG:  Thank you, Your Honor.  I'm not as

22   good at speaking as Kirkland is, but in this instance, the

23   facts speak for themselves.  First of all, the debtor did

24   not have $750 million of insurance as they claimed on the

25   Celsius website.  They claim they had it through GK8.  It

Page 90

1    was presented in a way that it made it appear that customer

2    deposits were insured, as you can see for yourself in my

3    declaration.  The debtors have not addressed the elephant in

4    the room, so to speak. and it's a very important one, which

5    is the seemingly false claims that are made approximately

6    three weeks prior to prior to the petition filing.

7           Secondly, I also believe that a similar, but

8    different issue is with GK8 itself.  GK8 has claimed at

9    various times that it has $500 to $750 million of insurance

10   which was addressed in the debtor's reply.  And now it's one

11   billion dollars of insurance available on their website to

12   their clients.  It seems that Celsius Network debtor at

13   least was a client of GK8 because of the I believe it's

14   Matic and Cardano cryptocurrencies which were recently

15   transferred from GK8 back to Celsius before the sale.  The

16   debtors have still not admitted their claim of insurance was

17   either false or misleading.  They seem to have been mostly

18   trying to avoid the subject entirely and focusing on the GK8

19   insurance policy on the GK8 website.

20          Third, Celsius has disclosed that it has an error

21   in emissions policy from Lloyd's (indiscernible) Syndicate.

22   It's only valued at roughly $750,000 I believe.  I'm not

23   sure the exact value of it.  But like the insurance policy

24   is for 750K.  I'm not sure how much it's valued, like if you

25   can sell it or whatever.  It came into effect August 2022,

```
1    which was after the misrepresentation.  So was there any

2    insurance before?  The main questions which are unanswered

3    that remain and should be answered are one, was there or was

4    there not errors and omissions insurance in June 2022 and

5    July 2022 naming any one of the various debtor entities

6    whether it's GK8 or Celsius and all of the subsidiaries, et

7    cetera, et cetera, as a beneficiary?  And what was the

8    relationship of Celsius to Aon PLC, which had previously

9    undisclosed marketing because it was represented that

10   Celsius had $700 million insurance, not it was some

11   hypothetical maybe marketing.  And what relation does GK8

12   have with the two Aon NDAs?  Did GK8 and Celsius engage in

13   some sort of -- and I'm saying this alleged -- alleged

14   insurance fraud in June and July 2022?

15             THE COURT:  Mr. Frishberg, you do you understand

16   this is a motion for reconsideration despite how you tried

17   to characterize it in your reply.

18             MR. FRISHBERG:  Yeah, and I --

19             THE COURT:  And there's a specific legal standard

20   that applies to motions for reconsideration.

21             MR. FRISHBERG:  Yes, Your Honor.  I'm getting to

22   that part.  I'll skip, skip to it real quick.  I do not, I'm

23   not an insurance expert, but before the GK8 sale is

24   consummated and liabilities discharged, we need some answers

25   and I believe that the, how you call it, new information
```

Page 92

1   came out after the GK8 sale was approved that the insurance

2   policy did not exist, but it was claimed at one point, I

3   believe up until July 5th, I'm not sure exactly what date it

4   was removed from the website, that the insurance policy,

5   $750 million insurance was through GK8.  So I believe they

6   may have held liability there and I do not believe that any,

7   how do you call it, it should not be discharged, the

8   liability.  Either an examiner or special insurance examiner

9   should be directed to look at this.  Thank you, Your Honor.

10  That is all.

11          THE COURT:  Okay.  Mr. Latona.

12          MR. LATONA:  Your Honor, Dan Latona of Kirkland

13  and Ellis on behalf of the debtors.  Your Honor, the debtors

14  did file an objection at Docket Number 1869 and in support

15  of that objection, filed the declaration of Ms. Melissa

16  Workman, Senior Director of Operations for Celsius, debtors,

17  at Docket Number 1870.  Ms. Workman is available to answer

18  questions to the extent anybody does.  I would like to admit

19  that declaration into the record without any questions.

20          THE COURT:  All right.  What's the ECF docket

21  number again?

22          MR. LATONA:  1870.

23          THE COURT:  All right.  Are there any objections?

24  All right, the declaration is admitted in evidence.

25          (Melissa Workman declaration admitted into

Page 93

1    evidence)

2          MR. LATONA:  Thank you, Your Honor.  Your Honor,

3    contrary to there being a number of unanswered questions,

4    the debtors have taken painstaking attempts to communicate

5    with Mr. Frishberg, as you can see from his various filings

6    on the docket.  The debtors have constantly communicated

7    with him, explained to him the arrangement between GK8, Aon,

8    and third-party insurers.  What that arrangement is, which

9    predates Celsius acquisition of GK8, is Aon, acting as

10   broker, would work with institutional customers who held

11   cryptocurrency on GK8's platform to obtain insurance for

12   those assets with third-party insurers.  GK8, nor Celsius,

13   were never part of any insurance policy with Aon or USI.

14   This is a fundamental misunderstanding of the arrangement

15   that the debtors have repeatedly articulated to Mr.

16   Frishberg, have provided both insurance policies that are

17   being sold in the sale.  Regarding the E&O policy, the only

18   insured is GK8 Limited and none of the proceeds of that

19   policy would be available for account holders.  Mr.

20   Frishberg continues to conflate Celsius and GK8.  He is

21   reconsidering or attempting to reconsider the sale of GK8.

22   On GK8's website at all times, did the debtor or the GK

23   debtors indicate that insurance was available to GK8

24   customers through Aon or through USI.  Mr. Frishberg cites

25   no new evidence, as his various declarations indicate this

Page 94

1    information was on the GK8 debtor's website well in advance

2    of the December 6th objection deadline to GK8 sale.  Nor has

3    he provided any clear and convincing evidence of any fraud

4    involved in the GK8 sale.  And as was demonstrated at the

5    sale hearing with the Kielty declaration and the order that

6    was entered, this is a value maximizing sale.  The sale with

7    Galaxy is the highest and best offer available.

8             And, Your Honor, the debtors have taken

9    significant steps toward closing that transaction.  After

10   the order was entered in the United States, the debtors

11   obtain recognition of the Chapter 11 proceeding in Israel

12   including enforcement of that sale order and the debtors are

13   weeks away from consummating this transaction.  This motion

14   is nothing more than a distraction to a value maximizing

15   transaction that presents no new evidence and continually,

16   continuously accuses the debtors of concealing assets and

17   committing bankruptcy fraud without any factual basis.

18             So on that, Your Honor --

19             THE COURT:  Mr. Latona, can you provide the Court

20   with the order of the Israeli court that recognized and

21   enforced the sale in both, obviously in Hebrew and also an

22   English translation of it?

23             MR. LATONA:  Absolutely, Your Honor, we'll provide

24   it.

25             THE COURT:  When did you obtain, when did the

1    debtor obtain that ruling in Israel?

2            MR. LATONA:  I believe it was approximately

3    January 9th.  I may have my dates off by a day or two.

4            THE COURT:  All right. And what is the anticipated

5    or expected closing date that you're shooting for?

6            MR. LATONA:  As of right now, we're targeting

7    February 3rd.

8            THE COURT:  All right.  All right.  Anything else

9    you want to add, Mr. Latona?

10            MR. LATONA:  No.  With that, Your Honor, we

11    request that the motion be overruled and the objection be

12    sustained.

13            THE COURT:  All right.  The Court is going to take

14    it under submission and will act promptly.  I understand

15    when you're trying to close the transaction.  I would, as I

16    said, I would like to see the order of the Israeli Court,

17    both the Hebrew and in English.  Thank you.

18            MR. LATONA:  For sure, Your Honor.  We'll send

19    that to chambers as soon as possible.

20            THE COURT:  All right, let's move on on the agenda

21    then.

22            MR. LATONA:  Thank you, Your Honor.  At this time,

23    I'm going to cede the lectern to my partner, Mr. Koenig.

24            MR. KOENIG:  Your Honor, again for the record,

25    Chris Koenig, Kirkland and Ellis, for the Celsius debtors.

Page 96

1    The next few motions are motions of pro se creditors

2    relating to their Earn accounts.  I'll cede the lectern to

3    them in whatever order Your Honor prefers.

4            THE COURT:  All right, Mr. Khanuja.

5            MR. KHANUJA:  Hello, Your Honor.  I'm just logging

6    in.  Thank you and good afternoon, good morning, Your Honor.

7    I wanted to, I've already filed a reply to the debtor's

8    objection.  My reply number is Docket Number 1909.  And the

9    debtor's objection being Docket Number 1872.  Earlier, I

10   filed an amended motion, Docket Number 1816 regarding on

11   account ownership and equal standing as custody.  Now I've

12   provided a lot of details in my response, in my reply, as

13   well as in my motion.  I don't wish to go through those in

14   detail in the interest of time.

15           Today I wish to make three different points.  Your

16   Honor, we have not had a full evidentiary hearing or

17   opportunity to present evidence as pro se.  For example, the

18   deposition testimonies or tax documents.  With regards to

19   the ambiguity caution, the Celsius executives declarations

20   clearly contradict the testimonies they provided in their

21   deposition.  As an example when a key Celsius executive says

22   he can understand how customers can create the terms of use

23   differently, similarly, another executive likens the

24   customer deposits, deposits to loans and customer assets to

25   a lien, these are all ambiguous terms.  Please refer to the

Page 97

1    transcript from the date number date, November 22 of Mr.

2    Orin ** blanching, Page Number 388, Line 14 and Page 391,

3    Line 7, also, Page Number 83, Line 3.  Also, we can refer to

4    the transcript from date November 21st of Mr. Chris Ferraro,

5    Page Number 286, Line 16 and Page 289, Line 14.

6            The deposition testimony of the executives

7    actually contradicts their deposition in support of the

8    motion.  They say people can disagree to the terms of use

9    interpretation and hundreds of people have already

10   disagreed.

11           With regards to the second point I want to make is

12   around ownership.  I have paid taxes as evidence of

13   ownership.  This is an evidence of ownership that the

14   debtors, themselves, provided to me.  In reliance of those

15   tax forms, 1099 forms, I pay taxes so the debtor's must ease

16   shop from asserting that I'm not the owner of the assets.

17           Now with regards to unconscionability, issues

18   related to contract formation including unconscionability,

19   will dictate the assets I get back.  So they must be heard

20   now as supposed to be heard through the claims process.

21   Your Honor, in conclusion, what I really asked for is an

22   opportunity to present the evidence in a meaningful way.

23           THE COURT:  Thank you, Mr. Khanuja.  Mr. Koenig.

24           MR. KOENIG:  Thank you, Your Honor.  Chris Koenig.

25   So first I want to -- before turning to Mr. Khanuja's

1    specific arguments, I just wanted to take a step back and

2    start with the Earn motion, the Earn opinion, why we

3    structured it in the way that we did, why we did the process

4    that we did.  The Earn motion sought a broad ruling about

5    the enforceability of the terms of use generally is a

6    contract between Celsius on the one hand, and its account

7    holders on the other hand.  And we saw the ruling that the

8    terms of use unambiguously provide that the Earn assets

9    belonged to Celsius.  The Earn opinion provided that

10   threshold ruling finding that the terms of use were an

11   enforceable contract and that the terms of use unambiguously

12   provided that Celsius owns the Earn coins.  That is the

13   first step of the process.  That makes sense because the

14   terms of use generally apply across the board to customers

15   and govern the relationship between Celsius and its

16   customers.

17          Both the motion and the Earn opinion each reserved

18   for the claims process the resolution of individualized

19   contract offences.  That's a later step of the process.

20   They are individualized arguments, facts and circumstances

21   that account holders can raise as part of the process.  But

22   importantly, and as the Earn opinion recognized, even many

23   of these contract offenses would only result in a general

24   unsecured claim.  It wouldn't result in the account holder's

25   having full ownership of the cryptocurrency.  That is, these

1    arguments would not change the ultimate outcome of the Earn

2    opinion, which is that account holders have general

3    unsecured claims against Celsius for their cryptocurrency

4    balances.

5           That brings us to the main issue in these Chapter

6    11 cases.  There simply is not enough cryptocurrency to

7    fully satisfy Celsius obligations to its account holders in

8    full.  There's a significant hole in the balance sheet and

9    as Mr. Kwasteniet explained at the beginning of the hearing,

10   we're working to maximize value and promptly distribute that

11   value to account holders.  And the fact that the Earn

12   opinion rules that Celsius owns the crypto does not mean

13   that account holders will not receive that value as part of

14   a Chapter 11 plan.  Pursuant to the bankruptcy code, Celsius

15   is obligated to return that value to its stakeholders who

16   here are the account holders.  These, the Earn opinion

17   expressly resolves many of the issues that that Mr. Khanuja

18   has raised.  And turning in a little bit more detail to what

19   he argued, he argued tax documents.  That issue was raised

20   at the Earn hearing.  Your Honor found that those tax

21   documents were not relevant because you know, black letter

22   contract law provides that where the contract is plain and

23   unambiguous on its face, extrinsic evidence is not needed.

24   So those tax documents, that tax argument is overruled by

25   the Earn ruling.  The Court also found that the contract

Page 100

```
1    itself was unambiguous.  Mr. Khanuja was pointing to some

2    testimony and depositions to what certain of the debtor's

3    witnesses, you know, may have said under oath, under

4    questioning during a seven-hour long deposition.  What the

5    witnesses think or doesn't don't think is not relevant to

6    the outcome here, which is that the Court, you know, found

7    that the language and the Earn terms of use were

8    unambiguous.

9              As for unconscionability, you know that is a

10   contract defense that's left, you know that's left for the

11   claims process.  But just to address it, you know, even if

12   Mr. Khanuja is right and the contract is unconscionable and

13   he somehow believes that means that he owns the

14   cryptocurrency assets in his account, it brings us back to

15   the elephant in the room that I already talked about, which

16   is, there simply isn't enough crypto to go around.  So it

17   would simply cause a race to the courthouse as claimants

18   rushed to try to bring their contract defenses

19   unconscionability, constructive trust, whatever else, with

20   claimants who successfully establish this defense,

21   potentially harming claimants who did not.  And that type of

22   race is exactly what bankruptcy is designed to avoid.  It's

23   designed to have the equitable treatment of all similarly

24   situated stakeholders like, you know, that Mr. Khanuja is

25   similarly situated to all other Earn account holders.
```

Page 101

1              So we are working to return value as quickly as

2       possible.  We're litigating -- we think that litigating each

3       and every account holders claims and contract defense

4       theories now, as Mr. Khanuja suggests, would be severely

5       inequitable, wasteful of estate resources, and ultimately is

6       not likely to change the outcome here because of the

7       practical problem of the hole in Celsius balance sheet.

8              So I'll rest there.

9              THE COURT:  All right, I'm going to, I'm going to

10      take it under submission and in due course, enter an opinion

11      or order.  We're going to move on next to the claim of

12      Rebecca Gallagher, a motion seeking a ruling that the coins

13      deposited to the Celsius Earn accounts of her property.  Ms.

14      Gallagher.

15             MS. GALLAGHER:  Yes, Your Honor.  Thank you for

16      hearing from me today.  It feels like it's almost redundant

17      given everything that's come out today, that this motion

18      should have been heard on December the fifth when it was

19      first attempted to be heard.  I think we have some extrinsic

20      evidence that's appeared since your ruling when the Attorney

21      General for New York, Leticia James, filed her petition.

22      Because now we know that Mashinsky has been charged with

23      various crimes.  He's been charged with repeated

24      misrepresentation and omission, aggravated fraud, repeated

25      and persistent illegality and failure to register.  So these

1    are pretty serious charges.

2              THE COURT:  Let me just, the only thing I would

3    say is it's not a criminal complaint, but you're largely

4    correct about the some of the allegations that are made

5    about Mr. Mashinsky, but it's not a criminal indictment.

6    It's a civil lawsuit that the attorney general has filed.

7    But go ahead.  I've read, I've read the complaint, so I

8    understand what's in there.

9              MS. GALLAGHER:  Yes, I mean the reason I brought

10   that up is because I was accused of not arguing to the

11   heightened pleading requirements that state that I should

12   have argued with particularity about the circumstances

13   construing fraud.  So I made lots of arguments about the

14   fraud and I believe I've given a lot of evidence.  In my

15   response to the objection, I've added a lot of exhibits with

16   timestamps so that everything is fully documented and the

17   fact remains --

18             THE COURT:  Ms. Gallagher, I think that you and

19   others other Earn account holders, may or may not, I'm not,

20   not ruling on it, have fraud claims against Mr. Mashinsky or

21   against Celsius, but that doesn't, they don't address the

22   issue of whether the contract provided ownership of those

23   assets to Celsius.  You may have, and I think Mr. Kwasteniet

24   really addressed this at the start.  I mean, whether you and

25   other Earn account holders have fraud claims, the basic

Page 103

1    point is you deposited assets, you want it back and the

2    debtor, a plan will hopefully return the maximum amount of

3    value that can be.  It's not whether -- the issue is not

4    whether you also have a fraud claim that you can assert.

5    The issue is the ownership of the assets that were deposited

6    under the terms of use.  But go ahead with your argument.

7             MS. GALLAGAHER:  Well I would say that if the

8    terms of use are unambiguous, how can there be a legal

9    contract when they were engaged in illegal operations?  They

10   did not have the license to offer legal securities, which is

11   the Earn program that I was in.  They did not have the

12   license to offer legal storage, which is custody.  That was

13   a fiction and a manufactured distinction.  They did not have

14   the legal licenses to offer rehypothecation, which is

15   banking, or legal trading, which is money transmission, or

16   legal collateralized loans, which is lending.  So how can

17   the contract be construed as being valid that we were all

18   under when the whole operation was illegal?

19             THE COURT:  Anything else you want to add?

20             MS. GALLAGHER:  I would also like to say that we

21   heard in December from one of the regulators that they had

22   not even been approached at that point by Celsius and the

23   reorganization plan and that that regulator said it usually

24   takes two years for these licenses to be put in place.  So

25   does that mean that if we go along with the go-forward plan,

Page 104

1    we'll be in this process for two years and drain the entire

2    estate of all of our assets before we can get these licenses

3    and move forward?  This is a very serious concern.

4            And then the other issue I wanted to address was

5    the unconscionability, because the unconscionability

6    standard states that something is so grossly unreasonable or

7    unconscionable in the light of the mores and business

8    practices of the time and place as to be unenforceable.  And

9    I would say that substantial substantive, unconscionability

10   has occurred in this situation.  That's when the contract

11   terms are so one sided as to shock the conscience.

12           So this contract that we're saying is unambiguous

13   is the epitome of substantive, unconscionability.  The idea

14   that somebody such as myself, an unaccredited investor,

15   would give hundreds and thousands of dollars to Celsius in

16   exchange for a fee and subject my life savings to complete

17   loss at any time is patently unconscionable.  Also to

18   defraud or put property out of the reach of a creditor in

19   anticipation of or during bankruptcy is a fraudulent

20   conveyance.

21           And I believe that the debtors set this up

22   deliberately.  They were being hounded out of the UK by

23   regulators.  They changed the terms of service before they

24   came to the states to make it very preferential for them to

25   be under Chapter 11 protection.  And they also gave

Page 105

1    themselves free rein to invest in things which we were never

2    told our assets were being used for, GK8 and mining

3    operations.

4         And so I just wonder how much faith we can have in

5    any reorganization plan?  And I certainly don't want to be

6    building a runway.  And I don't think any other creditor

7    wants their funds to be used to build a greater runway.  We

8    want to get off this plane right now and maximize our

9    returns.

10        THE COURT:  All right, thank you for your

11   argument, Ms. Gallagher.  Mr. Koenig.

12        MR. KOENIG:  Thank you, Your Honor.  Chris Koenig.

13   I'll incorporate my argument against Mr. Khanuja.  I don't

14   want to repeat myself, but I'll address just specifically

15   what Ms. Gallagher said.  She refers to a lot of extrinsic

16   evidence.  Extrinsic evidence, of course, is only relevant

17   to the extent the contract is ambiguous.  In the Earn

18   opinion, we sought a ruling and the Court gave that ruling

19   that the contract, there was a valid contract.  There was

20   offer, acceptance, consideration and that the terms of the

21   Earn -- that the terms of the terms of use were

22   unambiguously provided that Celsius owns the Earn coins.  To

23   her point of the regulators, I think Mr. Kwasteniet said at

24   the beginning of the hearing that we have been speaking to

25   regulators.  We certainly do not believe that it will take

Page 106

1    two years for us to get out of this bankruptcy.  We expect

2    that it will be, you know, in a matter of months, certainly

3    not a matter of years.

4             She focused on unconscionability.  The terms of

5    use provided that customers would transfer ownership of

6    their cryptocurrency to Celsius and in exchange for that

7    transfer, they would be paid a yield.  That was the risk

8    that they were taking.  That was the bargain that they were

9    entering into and they received that yield.  Certainly, the

10   circumstances that have befallen Celsius and the

11   cryptocurrency industry are very significant and the debtors

12   and their advisors, you know, are very cognizant of the

13   hardship that it has placed on Ms. Gallagher and other

14   Celsius customers.  The problem is, as I said earlier, we

15   simply can't give all, we can't give each customer all of

16   the crypto that was reflected in their account as a

17   liability.  It is not there.  So we are doing the best that

18   we can to equitably distribute value to customers under a

19   Chapter 11 plan or otherwise as fast as we possibly can.

20   But what Ms. Gallagher wants is a ruling that the assets in

21   her account should be her property.  There simply are not

22   enough of those assets in Celsius, on Celsius balance sheet

23   to do that.  If there were, we would not be in bankruptcy.

24   We would not be having this proceeding this morning.

25             So that, that's all, that's all I'd say.  I'll

Page 107

1    rest on my papers at this point, Judge.

2            THE COURT:  All right, I'm going to take it under

3    submission for both Mr. Khanuja and Mr. Cruz.  I'm not

4    recognizing anybody who is to speak who is not involved in

5    the pending motion.  Ms. Gallagher had her chance to address

6    the issue.  Mr. Koenig has responded and the matter of being

7    taken under submission.  So Mr. Khanuja, I will not

8    recognize you.  Alright, the next is Mr. Benzaken.  I

9    probably mispronouncing it, B E N Z A K E N.

10           MR. BENZAKEN:  Your Honor, that was excellent.

11   And thank you very much.  I've dived into four source

12   documents which is the debtor's omnibus objection to certain

13   motions regarding today's claim, your own ruling on

14   earnings, as well as the Oren Blonstein declaration and the

15   supplementary documentary declaration, which was very

16   revealing.  I've also heard that we don't want to get down

17   into issues that would otherwise be best handled during the

18   claims process.  And I also don't want to extend the time

19   whereby we continue to burn through cash when people, quite

20   frankly, are suffering and they could use a hopefully a good

21   return and equitable adjust return.  So, I wanted to say in

22   relative to my brother's claim, I've dived into a lot of

23   detail relative to login activity relative to the Blonstein

24   declaration, the supplementary declaration, your earning

25   ruling, as well as some of the objections by Kirkland, some

Page 108

1    of which I agree with, quite frankly.  And there's a level

2    of detail and in getting into that detail, I don't want to

3    open up a can of worms and waste anyone's time.

4           And so instead I would ask Your Honor's permission

5    maybe to have this case considered a fringe case.  It is the

6    0.14 percent as mentioned in Your Honor's ruling, unearned,

7    so that these details can be looked at and it not have

8    collateral damages that would potentially extend the

9    duration of which, you know, we'll be in these proceedings.

10          THE COURT:  All right, Mr. Koenig.

11          MR. KOENIG:  Chris Koenig, I apologize.  I don't

12   quite understand exactly what Mr. Benzaken is requesting.  I

13   didn't, I didn't exactly follow what he was suggesting we

14   do.

15          THE COURT:  Mr. Benzaken, your motion was seeking

16   a ruling that the Earn assets in the account are not

17   property of the debtor's estate.  So that's the motion that

18   I have before me.

19          MR. BENZAKEN:  Yes, sir.  Yes, sir.  Okay.  So if

20   you'd like I can get into the detail.  I was requesting not

21   to.  Essentially, it's akin to the post-petition funds that

22   were received with Ms. Connell on 1817 following the

23   petition.  I would state to claim that my brother's account

24   was in the same situation.  I can get into that detail and

25   I'm hoping maybe we can broaden that for accounts that

1    otherwise would have been shut down per the Blonstein

2    supplementary declaration per the notifications directly

3    from Celsius, but again this is the level of detail that

4    involves login history, communications, and the TOU.  So I

5    looked exactly at the contract language because that was

6    what we were encouraged to do for today.  I didn't want to

7    move outside of that.  And the contract language is in a

8    line specifically for the one that he would be bound,

9    arguably, before the date of the first transfer of funds,

10   which is, I can get into that if you wish.

11           THE COURT:  I understand your point.

12           MR. KOENIG:  I understand it a little better now.

13   Thank you so much.  I didn't understand what he meant by a

14   fringe case.  I'll address the motion.  I believe what Mr.

15   Benzaken is referring to, it's his brother's claims.  I'll

16   just, when I'm referring to Mr. Benzaken, I'm referring to

17   the claimant, not Michael Benzaken.

18           THE COURT:  I understand, one of them was

19   withdrawn.  I certainly gave Mr. Benzaken permission to

20   argue on behalf of his brother, who is unable to do so

21   today.  So go ahead.

22           MR. KOENIG:  Understood.  What the claimant argues

23   is that he argues that a version of the terms of use applies

24   to him specifically or his brother's account specifically.

25   And that that version does not transfer ownership to the

Page 110

1   debtors.  But if you look at the date that the claimant

2   opened the account, it appears that that's terms of use

3   version seven that would apply.  In the Earn opinion, I

4   believe that Your Honor indicated that version five was

5   really the key version where the language became crystal

6   clear.  So version seven is after version five.  So we think

7   that Your Honor's Earn ruling would apply to this, to this

8   account.  And you know, even if it didn't, there are other

9   methods, you know, where Your Honor's ruling indicated that

10  the debtors could amend the terms of use without further

11  consent of the user and that the continued use of the

12  service was proper consideration for the modification of the

13  contract.  But even on its face, it appears that version

14  seven applies.  And so that we believe that the Earn ruling

15  would apply in equal force to this claim.

16          THE COURT:  I understand, Mr. Benzaken, I

17  understand the arguments that are being made by both sides.

18  I'm going to take this one under submission as well.

19          MR. BENZAKEN:  Thank you.

20          THE COURT:  And I think that concludes the

21  specific agenda, the motions that were on for today.  Mr.

22  Koenig or Mr. Kwasteniet, is there anything you want to add?

23          MR. KOENIG:  No, thank you, Your Honor.  We'll

24  speak to you soon.

25          THE COURT:  All right, we are adjourned.  Thank

Page 111

1    you very much, everyone, for participating today.

2              (Whereupon these proceedings were concluded at

3    12:16 PM)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **I N D E X**

2

3                            RULINGS

4                                              Page        Line

5

6    Credit for post-petition transfers granted   72          18

7    Flare tokens granted                         78          14

8    Sale of de minimis assets granted            80          20

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3       I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

6

7

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  January 25, 2023

**[& - 2020]**                                                                 Page 1

| & | | | |
|---|---|---|---|

**&**   4:3,14 6:15
7:1 8:1 9:9
10:2,4 11:9,24
12:6 13:8 14:8
17:6 18:8,24
30:10 39:24
52:20

| 0 | | | |
|---|---|---|---|

**0.14**   108:6
**038**   75:2

| 1 | | | |
|---|---|---|---|

**1**   23:16 86:9
**1.2**   85:13
**1.4**   70:5
**1.7**   85:11
**10**   50:12,13
**10,000**   23:1,25
**100,000**   40:21
40:22,24
**10004**   1:14 6:4
7:19
**10020**   4:17
**10119**   8:4
**10167**   5:18
**1099**   97:15
**10:00**   1:17 9:3
15:14
**11**   34:12,12
60:8 64:5
73:17 76:11
84:10 94:11
99:6,14 104:25
106:19
**11,000**   70:4

**111**   5:10
**115**   81:25
83:25
**11501**   113:23
**11th**   82:2
**12**   28:24 29:9
38:9
**120,000**   26:5
**12151**   113:7
**1221**   4:16
**12:16**   111:3
**12th**   6:10
32:20
**13**   25:14 27:24
**1325**   3:17
**1346**   3:11
**136**   3:17
**13th**   40:8
**14**   23:8 36:20
36:21 73:23
77:14 78:11
81:24 97:2,5
112:7
**1416**   3:17
**15**   40:14 73:13
79:13 84:24
85:2
**15,000**   40:23
**150**   73:10
**1508**   3:17
**1512**   3:23
**1555**   80:11
**15th**   15:13
28:17 79:6
**16**   23:8 84:1
97:5

**16,000**   25:21
**16.6**   85:2,8
**1627**   2:8
**1653**   2:8
**17**   40:14
**17,000**   25:21
**17,500**   22:25
**1784**   2:8
**1794**   3:7
**17th**   24:5
**18**   112:6
**1800**   7:11
**1806**   3:7
**1814**   3:23
**1816**   3:12
96:10
**1817**   2:14
69:18 72:9
108:22
**1818**   3:4 80:23
**1819**   2:18
**1824**   3:8
**1826**   3:8
**1828**   3:8
**1850**   6:10,17
**1852**   3:8
**1853**   2:21
79:24
**1855**   2:21 80:3
**1866**   3:8
**1867**   2:14,18
3:4
**1869**   3:8 92:14
**1870**   3:8 92:17
92:22
**1871**   3:4

**1872**   3:12,17
3:23 96:9
**1874**   3:4
**1879**   2:21
**1902**   2:8,14,18
2:21 3:4,8,12
3:18,23
**1905**   25:4
**1908**   3:18
**1909**   3:12 96:8
**1911**   3:8
**1912**   78:19
**1913**   2:18 74:6
**1917**   2:8 79:5
**1918**   2:14
70:16
**1919**   2:21 80:4
**1921**   2:21
**1923**   3:4
**1924**   3:4 80:24
81:19
**1925**   2:14 3:4,8
3:12,18

| 2 | | | |
|---|---|---|---|

**2,000**   25:23
26:3
**2,150**   23:20
**2,500**   40:21
46:9
**2,700**   23:22
**20**   40:24 112:8
**20,000**   24:2
40:23
**20006**   6:18
**20036**   6:11
**2020**   75:16
76:2

**[2022 - account]**                                                                        Page 2

**2022**   28:17
  82:2 90:25
  91:4,5,14
**2023**   1:16 9:3
  113:25
**20th**   69:19
**21st**   97:4
**22**   97:1
**22-10964**   1:3
  9:4
**23,000**   40:3,6
  40:20 41:9
  44:6
**24**   1:16
**245**   5:17
**24th**   9:3
**25**   23:6,15
  113:25
**25.2**   85:8
**250**   73:5
**27**   28:21
**27,500**   22:24
**2700**   5:3
**28**   28:21
**2800**   70:4
**286**   97:5
**289**   97:5
**2x**   38:22

**3**

**3**   86:8 97:3
**3,750**   23:21
**30**   23:6
**300**   4:5 113:22
**330**   113:21
**3335**   8:3
**345**   78:21 79:3
  79:14

**35**   24:23 28:3
  85:17
**353**   7:3
**36**   73:16
**37**   85:17
**37,500**   23:23
**388**   97:2
**391**   97:2
**393**   78:11
**3rd**   27:10 95:7

**4**

**4**   38:6
**4.7**   27:6
**40**   36:20
**40,000**   38:3
  44:4
**400**   38:3
**4000**   7:11
**420**   40:7
**47**   82:3,11
  84:25
**48075**   7:12

**5**

**5**   27:7
**5,000**   46:9
**50**   24:21
**500**   88:3 90:9
**5100**   5:10
**518**   85:1
**555**   5:3
**5th**   92:3

**6**

**6**   63:12 64:2,10
  68:21
**6,000**   23:23

**60**   46:18
**60606**   5:11
**60654**   4:6 7:4
**67**   40:13
**68**   27:25
**6th**   94:2

**7**

**7**   97:3
**70**   23:3 40:13
  46:18
**700**   91:10
**72**   112:6
**75**   87:16
**75-75**   63:17,25
  87:17
**750**   89:24 90:9
  92:5
**750,000**   90:22
**750k**   90:24
**78**   112:7
**7th**   79:4

**8**

**8**   78:11
**80**   23:2,3 40:25
  112:8
**800**   40:9
**83**   97:3
**85**   40:11
**88**   27:25

**9**

**90**   23:2
**90071**   5:4
**901**   3:17
**9019**   36:7 37:3
**93**   82:4

**94**   63:20,21
  64:10 87:14
**9th**   73:12 76:6
  95:3

**a**

**a&m**   50:2
**a.m.**   9:3 15:14
**aaron**   5:6 10:5
  10:8 14:7,9
**ability**   31:8
  49:19
**able**   24:13
  32:25 47:11
  49:10 52:2
  64:3 65:19
  67:1 74:18
  88:21
**above**   40:21,24
  42:18
**absent**   88:23
**absolute**   69:2
**absolutely**   22:7
  55:24 62:13
  82:21 94:23
**acceptable**
  32:16
**acceptance**
  105:20
**access**   28:7
  66:16
**account**   2:12
  2:17,25 7:10
  16:10 44:24
  45:4,11,11
  52:25 55:25
  56:3,8,21 57:4
  57:6,9,16

58:22 61:19,20
61:22 67:15
68:15 69:18
71:18,19 73:6
73:8,11,19,22
73:23 74:1,3
74:21 75:20,21
75:21,23,25
76:8,10,12,15
76:16 77:5,8
77:11,20 78:2
81:5 84:3
93:19 96:11
98:6,21,24
99:2,7,11,13
99:16 100:14
100:25 101:3
102:19,25
106:16,21
108:16,23
109:24 110:2,8
**accountants**
74:23
**accountholder**
49:13
**accountholders**
8:2 17:9 18:9
19:1 34:19
35:10 41:11
**accounthold...**
45:6
**accounting**
64:10
**accounts**   3:21
32:22 33:4
70:13 71:17
72:24 73:24

74:17 75:17,18
76:4,14 82:19
96:2 101:13
108:25
**accretive**   81:16
84:4 88:11,17
**accrual**   23:10
**accruals**   23:11
**accurate**   113:4
**accused**   102:10
**accuses**   94:16
**acknowledge**
37:9
**acquisition**
93:9
**act**   95:14
**acting**   93:9
**action**   81:5,13
81:14,16 84:5
84:8,11 86:11
88:16
**actions**   65:10
82:17
**activities**   80:16
**activity**   21:7
50:4,6 107:23
**actual**   45:1
57:17
**actually**   15:11
47:3 51:24
54:15 70:3,24
70:25 97:7
**ad**   5:16 7:10
8:2 10:16 17:8
18:8,25 39:24
62:19 63:7
64:14 67:11,22

67:23 68:15
84:18
**adam**   8:10
75:11
**add**   40:10 41:2
58:14 60:14
79:8 81:18
88:18 95:9
103:19 110:22
**added**   57:25
74:16 102:15
**additional**
11:15 12:23,24
14:4,14,21,25
17:17 18:5,15
18:18,21 19:5
19:10
**additionally**
28:6 50:14
**address**   43:21
47:22 56:13
57:8 62:11
65:12,14 67:12
70:17 74:12,18
76:7 83:9,13
87:24 100:11
102:21 104:4
105:14 107:5
109:14
**addressed**
80:13 90:3,10
102:24
**addresses**
50:25 57:5
65:17,20 66:8
66:10 77:17

**addressing**
32:4
**adequate**   65:3
**adjourned**
110:25
**adjust**   107:21
**adjusting**
23:10
**adler**   5:20
10:14,15,15
13:18,19,22,25
14:11,12 37:6
39:15,19,21,22
39:23,24 41:13
42:10,10,11
43:1,6,16
44:10 54:14
57:20 81:18
84:16,17,17
88:2,3,8
**adler's**   87:24
**adler's**   39:12
44:2 46:11
50:16
**administrative**
2:6 27:1
**admit**   92:18
**admitted**   20:5
20:7 90:16
92:24,25
**admitting**   9:5
**adoption**   73:4
**advance**   27:3
94:1
**advanced**
37:14 50:15

adversary  15:9
advertisement
  59:17 60:19
advise  74:22
advised  78:1
advisors  74:23
  106:12
affidavit  78:10
affiliated  33:24
affiliates  29:5
afternoon  96:6
agenda  30:8
  32:12 62:15,15
  62:21 69:6,8
  72:22 78:17
  79:21 80:22
  89:15,17 95:20
  110:21
aggravated
  101:24
aggregate
  46:13 73:14
  81:11 82:1,4,8
  82:12
aggregates
  82:11
agree  22:9 44:2
  44:10 78:3
  108:1
agreed  63:14
  63:16 68:3,25
  79:2,13
agreement  3:3
  27:8,15 53:13
  61:21 62:2
  64:4 73:9 79:1
  79:1,5 85:23

agreements
  85:21 86:1,2
ahead  10:23
  16:6 24:25
  31:10 32:7,10
  39:22 42:10
  50:7 51:16
  57:3,9 58:11
  63:2 69:6,7
  71:13 74:12
  76:13 83:21
  89:8,10 102:7
  103:6 109:21
airdrop  73:3
  73:12 74:14
  75:6 77:4,18
  77:18,25 78:2
  78:4
airdropped
  73:15 75:24
airdrops  73:20
  73:23
akin  108:21
alameda  28:23
  29:1,10,16
  84:9 85:5
alex  55:21
alexander  7:18
allegations
  102:4
alleged  91:13
  91:13
allocate  62:9
allocation
  57:20
allocations
  56:3

allow  3:10
  24:10 64:1
  70:12 81:12
  87:15
allowed  65:2
alright  107:8
alternatives
  52:24
alvarez  46:4
ambiguity
  96:19
ambiguous
  96:25 105:17
amend  110:10
amended  84:18
  96:10
americas  4:16
amidst  43:15
amount  24:15
  37:20 40:7
  44:5 70:6
  82:12 87:15
  103:2
amounts  66:5
  72:3
amplify  54:20
analysis  44:7
andrew  6:20
  13:2
anecdotal  50:2
angeles  5:4
announcement
  19:18 77:21
answer  28:21
  38:10,15 92:17
answered  91:3

answers  22:6
  91:24
anticipate
  12:20 13:4
  34:10 73:22
anticipated
  95:4
anticipation
  104:19
anybody  26:13
  32:1 67:19,25
  70:20 71:9
  74:10 79:15
  92:18 107:4
anyone's  108:3
anyone's  13:23
anyway  21:11
aon  91:8,12
  93:7,9,13,24
apologize  29:8
  108:11
app  65:16,16
  66:18,19 68:5
appeal  56:19
appear  90:1
appearance
  10:21 11:3,18
  11:21,22 12:5
  12:9,14,16,21
  14:6,16,23,24
  15:2,2,20,21
  16:1,3,20,23
  17:3,14,18,25
  18:1,6,23 19:2
  19:7,8,9,11,13
  19:15

**appearances**
10:1,12 16:16
18:17,19
**appeared**
30:10 101:20
**appearing** 9:10
9:17
**appears** 110:2
110:13
**applicable**
48:9,24 78:1
**applies** 91:20
109:23 110:14
**apply** 98:14
110:3,7,15
**appreciate**
12:16 30:14
32:8 72:2
**approach** 36:3
45:3
**approached**
103:22
**appropriate**
34:16 41:15
67:14,18
**approvals**
53:22,23,24
**approve** 3:20
80:19
**approved** 87:2
92:1
**approximate**
44:5
**approximately**
22:25 23:15,25
24:17 26:5
27:5,6,10,25

28:24 38:3,3
40:7,20 63:12
70:5 73:5,10
75:2 81:24,25
82:3,4 83:25
84:1 88:3 90:5
95:2
**april** 28:1
**areas** 43:24
**arguably** 109:9
**argue** 109:20
**argued** 99:19
99:19 102:12
**argues** 109:22
109:23
**arguing** 102:10
**argument** 86:7
99:24 103:6
105:11,13
**arguments**
59:15,19 98:1
98:20 99:1
102:13 110:17
**arm's** 34:1
36:18 49:9
**arrangement**
93:7,8,14
**arrangements**
36:23
**arrows** 84:9
**articulated**
93:15
**ascertainable**
46:1
**asked** 17:20
22:3 38:14
97:21

**asking** 16:19
69:20 70:24
**aspect** 26:15
**assert** 103:4
**asserting** 97:16
**asset** 34:21
45:4,8,10,18
49:12,21 50:10
77:15,17 78:6
78:8
**assets** 2:20,24
3:10,21 21:23
32:21,24 33:3
33:7,8,9,12,14
33:16,17 34:18
34:19 35:8
44:24 45:5,8,9
45:20 46:14
49:1 51:4,8,9
53:4 54:4 59:5
59:25 63:10
65:10,19 66:24
66:25 67:5,9
67:20 68:8
76:7 77:16,19
77:22,23,23,24
77:25 78:1,3
79:21 80:20
82:18,20,25
93:12 94:16
96:24 97:16,19
98:8 100:14
102:23 103:1,5
104:2 105:2
106:20,22
108:16 112:8

**associated**
64:21
**association** 6:8
12:19
**assure** 67:18
**attempted**
101:19
**attempting**
93:21
**attempts** 65:23
65:24 66:11
77:16 93:4
**attention** 24:15
66:12,12 71:2
**attorney** 55:20
56:4 74:20
101:20 102:6
**attorneys** 4:4
4:15 5:2,9,16
6:2,8,9,16 7:2
7:10,17 8:2
12:19
**attractive** 28:5
37:5
**audio** 19:23
20:1
**august** 90:25
**authority** 77:7
84:11
**authorization**
73:18 88:9
**authorize**
72:22
**authorized**
21:14 28:6
66:23 78:22

**authorizes**
81:14
**authorizing**
2:1,11,16,24
81:4
**automatic**
69:25
**available**   52:16
54:3 57:7 86:3
90:11 92:17
93:19,23 94:7
**avenue**   4:16
5:17
**average**   40:23
**averaged**   23:2
**avoid**   41:16
42:15,25 43:18
55:12 90:18
100:22
**await**   55:4
**aware**   21:9
50:5,5 57:22

**b**

**b**   1:21 2:2 3:1
6:16 13:3
83:12 107:9
**back**   14:1
29:23 39:8,16
47:10 59:15
61:9,13 76:2
86:24 90:15
97:19 98:1
100:14 103:1
**backed**   85:8
**background**
32:2,5

**backing**   40:8
**bad**   51:6
**balance**   29:15
62:3 63:20
64:9,25 99:8
101:7 106:22
**balances**   2:7
45:12 63:17
64:22 65:2
82:1 99:4
**ball**   43:12
**bank**   58:8,16
61:11 78:21,22
78:24,25
**banking**
103:15
**bankruptcies**
33:6
**bankruptcy**
1:1,12,23
20:25 21:5,25
35:7 42:3
48:17 58:9
94:17 99:14
100:22 104:19
106:1,23
**bargain**   106:8
**base**   66:13
**based**   73:7
76:1 85:16
86:7
**baseline**   28:1
**basic**   102:25
**basis**   33:20
37:10 43:10
61:24 62:10
71:4,7 79:17

94:17
**bear**   28:18
**bearing**   42:13
**befallen**
106:10
**began**   23:19
**beginning**
53:18 54:25
58:15 79:22
99:9 105:24
**behalf**   10:4,16
11:5 12:7 13:3
13:8 14:8
39:24 43:3
51:21 52:18
69:16 72:21
79:11 83:7
84:18 88:1
92:13 109:20
**believe**   9:22
10:5 12:7
21:23 24:9
27:1 28:22
29:12 33:14
38:18,21 44:21
47:18 52:9
55:24 61:20,25
71:18 72:4
81:3 86:14,20
87:17 89:2
90:7,13,22
91:25 92:3,5,6
95:2 102:14
104:21 105:25
109:14 110:4
110:14

**believed**   26:20
60:19
**believes**   53:2
71:22 78:13
100:13
**belong**   3:16
**belonged**   98:9
**belongs**   76:22
**beneficiary**
91:7
**benefit**   27:17
34:19 35:6,9
44:23 55:10
73:23
**benz**   16:1,1
74:11,11
**benzaken**   3:22
8:9,15 16:4,7,8
16:15,18,22,25
74:13,24 75:3
75:7 107:8,10
108:12,15,19
109:15,16,17
109:19 110:16
110:19
**bespoke**   85:22
85:22 86:17
**best**   37:25
40:13 46:25
47:6 50:24
94:7 106:17
107:17
**better**   30:21
31:14 109:12
**bid**   32:18
**bidding**   33:12

bids 32:20,21
32:22 33:2
big 23:24 43:14
billion 38:6
90:11
bit 39:8 40:1
40:10,18 47:1
53:7,18 54:18
99:18
bitcoin 23:6,8
24:9 25:20
27:23 28:2,4
34:5 39:2
40:12,12 45:24
63:22 84:6
85:9,17
black 99:21
blanching 97:2
blank 88:25
block 7:1 13:8
17:6 30:10
blockchain
72:25 76:7
77:17
blockchains
73:2
blonstein
16:11 107:14
107:23 109:1
board 48:4
98:14
bond 58:17
61:11
bondholders
58:18
book 81:7,9
88:13 89:4

bootstrapping
77:18
borrow 35:15
59:1
borrower
36:25 38:4
82:10 85:10,11
86:2
borrower's
85:11
borrowers
5:16 10:17
36:9 37:5,6,21
39:25 40:4,6
40:15,16,18,20
40:21 41:10
44:6,7 81:10
81:25 82:3,9
84:21,25 85:2
85:14 86:25
88:14
borrowing
40:2 86:19
bottom 60:2
61:17
bottomed
25:20
bound 109:8
bowling 1:13
6:3
box 26:2
branch 78:22
78:24
breuder 83:12
83:15,16
brian 8:7

brief 20:19
32:14
briefed 42:7
44:13
briefing 61:25
62:3
briefly 44:15
62:11 74:14
89:7
brier 4:11 9:19
11:23,24,24
bring 44:20
47:20 66:11,12
71:2 100:18
bringing 84:2
brings 48:10
99:5 100:14
broad 98:4
broaden
108:25
broader 38:11
broker 49:20
93:10
bronge 89:7,7
89:9,11
brother 109:20
brother's
107:22 108:23
109:15,24
brother's 16:9
brought 102:9
bruh 7:21
17:13,13
bryan 18:24
btc 23:10 24:23
26:6

budget 25:4
build 22:22
49:4 105:7
building 105:6
built 88:19
89:1
bullet 52:11
burn 107:19
burned 58:3
business 2:4
3:1 21:17,25
22:2,3 33:9
34:4,7 74:2
81:6 85:20
86:24 87:2
88:15 89:3
104:7
buy 53:16
buyers 35:24

c

c 2:3 4:1 9:1
113:1,1
ca 5:4
calculating
26:24
calculation
85:16
calendar 32:3
call 32:1,8
42:18 45:24
51:21 91:25
92:7
called 16:17
20:23 78:9
calling 9:3
candidly 43:12

can't  13:19
  27:14 33:11
capital  54:9
  56:22 58:15
  84:9
cardano  90:14
care  68:4
carefully  72:10
case  1:3 4:14
  5:1,8 9:4 10:2
  10:4 12:7,20
  13:4 14:8 15:6
  21:6,7,14
  25:22 26:4
  27:16 31:13
  35:12 37:17,22
  39:7 42:14
  43:16 47:11,21
  52:20,23 53:7
  54:19,25 55:16
  56:10 57:3
  58:9 65:12
  70:25 81:8
  83:7 108:5,5
  109:14
cases  42:3
  45:17 56:23
  76:11 99:6
cash  2:2 27:25
  49:18 53:11
  78:18,20,23
  79:6 80:15
  107:19
cashflow  22:4
  25:14 28:8
cashflows
  24:11,22

categories
  32:21 58:25
  59:7 61:3
category  71:23
cause  100:17
caution  96:19
cede  62:16
  67:10 72:18
  89:18 95:23
  96:2
cel  58:1,3,5
celsius  1:7 3:15
  8:18,19 9:3
  15:7 26:20
  29:1,10,22
  41:23 44:9
  47:11 48:10,15
  48:16 49:3
  53:9 56:1,22
  63:4 65:15
  66:2,3,18,25
  67:1 68:5,10
  71:6 73:10
  74:3 76:3
  77:20,20 78:2
  80:1 82:2 85:3
  89:25 90:12,15
  90:20 91:6,8
  91:10,12 92:16
  93:9,12,20
  95:25 96:19,21
  98:6,9,12,15
  99:3,7,12,14
  101:7,13
  102:21,23
  103:22 104:15
  105:22 106:6

106:10,14,22
  106:22 109:3
celsiuscredit...
  66:9
celsius'  28:20
  28:23 29:5
center  7:11
centers  20:24
centralized
  73:3
cents  75:2
ceo  20:17
certain  2:2,20
  13:3 34:15
  45:12 46:2
  64:22 65:10,18
  67:25 74:6
  79:21 84:7,13
  100:2 107:12
certainly  21:24
  41:22 42:2
  47:20 50:3
  67:6 68:19,19
  68:23 105:5,25
  106:2,9 109:19
certified  113:3
cetera  20:7
  50:13 52:6
  62:4 91:7,7
challenges
  48:16
challenging
  51:10 67:3
chambers
  95:19
chance  39:14
  43:21 76:20

83:13 89:8
  107:5
change  54:15
  99:1 101:6
changed  76:3
  104:23
changes  54:14
  70:17 83:9
chapter  34:12
  34:12 60:8
  64:5 73:17
  76:11 84:10
  94:11 99:5,14
  104:25 106:19
characterize
  91:17
charge  64:20
charged
  101:22,23
charges  102:1
charts  58:15
chatter  35:1
check  9:22
  65:12 88:25
chicago  4:6
  5:11 7:4 9:12
chief  79:25
chris  8:18 9:11
  63:4 95:25
  97:4,24 105:12
  108:11
christopher
  14:20 20:17
circumstances
  55:15 68:1
  98:20 102:12
  106:10

cites  93:24
civil  102:6
claim  27:1
  38:11 45:7
  46:8 59:21,22
  60:14,15,25
  76:12 89:25
  90:16 98:24
  101:11 103:4
  107:13,22
  108:23 110:15
claimant
  109:17,22
  110:1
claimants
  100:17,20,21
claimed  89:24
  90:8 92:2
claims  34:22
  45:16 46:2,6
  46:12,14,15
  49:24 50:3,5
  57:1,8,15,16
  58:18,25 73:25
  77:12 90:5
  97:20 98:18
  99:3 100:11
  101:3 102:20
  102:25 107:18
  109:15
claire  6:6
clarification
  88:2
clarity  40:1
clark  7:3
class  45:18
  46:17 60:8

clear  55:23
  57:15 58:14
  65:22,25,25
  66:14,20 68:10
  94:3 110:6
clearly  96:20
clerk  9:2,8,14
  9:16,22,24
  10:1,8,18,25
  11:2,7,10,14
  12:1,10,15,22
  13:6,9,17,21
  13:23 14:2,9
  14:11,13,19,25
  15:5,8,11,14
  15:16,18 16:15
  16:20,23 17:1
  17:12,16 18:4
  18:10,14 19:4
  19:21,25 71:11
client  90:13
clients  90:12
client's  43:12
close  95:15
closely  71:23
  72:4
closer  53:17
closing  94:9
  95:5
coconspirators
  55:25
code  99:14
cognizant
  44:18 106:12
coin  25:4 38:6
  38:25 40:15
  61:24,24 62:10

  62:10 63:21,23
  73:2 74:24
  75:1
coins  3:15 16:9
  27:24 28:7,9
  29:16 35:3,9
  38:23 41:24
  42:4 45:25
  54:10 59:8
  67:2 73:1
  98:12 101:12
  105:22
collapsed  51:5
collateral  2:25
  35:22 36:22
  38:16,22,23,25
  39:2,3 40:8,13
  41:1,22 42:2,5
  42:17 82:13,22
  83:18,25 84:5
  84:22 85:1,3,4
  85:4,6,9 86:3
  86:25 108:8
collateralizat...
  39:3
collateralized
  37:20 39:6
  81:8 85:15,16
  86:14 103:16
colleague  19:1
  62:17 69:8
  72:18
colleagues
  37:25 44:1
  83:2
collected  56:5

collectively
  77:18
colodny  5:6
  10:5,8 14:7,7
  14:10
color  40:10,18
column  85:4
come  14:1
  35:15 37:18
  41:15 43:13
  44:6 47:5
  50:22,24 51:8
  51:16,19 69:22
  79:14 101:17
comes  12:21
  57:25
comfortable
  64:15 83:4,8
coming  39:8
  44:18 70:4
comingled
  41:23
comingling
  42:5
commence
  65:7,11
commenced
  21:3
comment  29:3
  44:1
comments
  44:10,16 58:13
  70:14 74:7
  80:14
committee
  4:15 5:2,9 10:4
  12:7 14:8 17:8

34:2,13 36:4
36:13 42:12,22
43:3 45:13
46:5 47:6
48:12 50:16,22
51:21 52:18,20
52:22,23 53:1
55:7 56:14
63:6 64:13
67:11 68:15
70:15 74:7
82:24 83:2,4,7
84:12
**committee's**
71:25
**committees**
62:19 67:23
**committee's**
41:14
**committing**
94:17
**common** 31:3
31:12 60:24
73:20
**communicate**
67:24 93:4
**communicated**
93:6
**communicati...**
68:14
**communicati...**
66:6
**communicati...**
35:19 109:4
**community**
55:4

**company** 20:23
26:14 32:19
34:9 46:23
48:18 50:9,21
54:7 57:16
58:20 67:2
68:7
**company's**
26:18
**compared**
27:22 33:5
38:7 81:22
**compares** 25:7
**comparison**
23:7
**compelling**
33:4
**competing**
43:15 58:17
**competitor**
53:6
**competitor's**
32:23
**complaint**
55:21 56:4
102:3,7
**complete** 61:25
62:4 104:16
**completed**
30:18
**completely**
22:9
**compliance**
48:8,8 79:14
**compliant**
48:24

**complicated**
42:6
**comply** 79:3
**compressed**
23:9
**compromise**
37:3
**concealing**
94:16
**concept** 44:22
46:18 54:18
**concepts** 43:9
43:17 45:15
47:15,16
**conceptually**
48:5
**concern** 56:20
72:2 104:3
**concerned** 42:8
46:21 71:3
85:18 86:5
**concluded** 62:7
111:2
**concludes**
110:20
**conclusion**
44:7 97:21
**condition** 73:8
**conditions**
33:1 37:1
**conduct** 56:8
**confer** 64:7
71:19
**conference**
9:12 62:15
**conferred** 63:7
63:14

**conferring**
67:22
**confident** 24:4
**confidentiality**
84:23
**confirm** 83:3
**confirmed** 44:2
**confirming**
77:21
**conflate** 93:20
**confusion**
34:24 35:1
**connection**
26:18 70:10
73:7
**connell** 108:22
**conscience**
104:11
**consensual**
27:14 36:5
37:8 41:16
43:10 62:6
**consensually**
62:1 68:24
**consent** 84:13
88:20,23,23
110:11
**consequence**
59:8
**consequences**
35:2 42:15
**consider** 41:6,7
41:19
**consideration**
50:18 89:13
105:20 110:12

**considerations**
36:24 60:2
**considered**
31:14 71:17
76:8 108:5
**considering**
87:21
**consistent** 40:5
**consists** 85:9
**constantly**
93:6
**constituency**
57:9
**constituent**
68:23
**constituents**
21:9 22:13
**constitute**
84:25
**constitutes**
20:2 74:14
**constructive**
60:4 100:19
**construed**
103:17
**construing**
102:13
**consult** 84:13
**consultation**
88:20
**consummated**
91:24
**consummating**
94:13
**contact** 71:24
**contained** 70:9

**contains** 70:8
**context** 37:22
38:5 64:5
**continually**
94:15
**continue** 2:1,4
24:10 37:7
48:2 56:9
68:23 107:19
**continued**
110:11
**continues**
93:20
**continuing**
22:22 54:17
**continuously**
94:16
**contract** 16:13
16:14 21:4,20
23:18 26:19
97:18 98:6,11
98:19,23 99:22
99:22,25
100:10,12,18
101:3 102:22
103:9,17
104:10,12
105:17,19,19
109:5,7 110:13
**contradict**
96:20
**contradicts**
97:7
**contrary** 66:6
93:3
**convenience**
45:17 46:17,20

47:3
**conversation**
47:19
**conversations**
36:12 47:14
48:1 62:18
**convert** 49:18
**conveyance**
104:20
**convincing**
94:3
**cooperating**
55:3
**copies** 22:11
**copy** 25:9
51:22
**cordry** 6:13
12:17,18,18
**core** 20:23,24
21:1,3,5,7,11
21:14,19,25,25
22:11 23:19,21
23:23 24:4,7
26:1,11 27:8
28:5
**core's** 26:18
**cornell** 6:6
13:10,14,15
62:18 67:24
70:22,22 79:8
79:10,11,11
**corporation**
33:17,20,23
44:22 45:6,9
45:19 48:14,21
48:23 49:7
50:9,11

**correct** 38:1
56:25 79:12
102:4
**cost** 25:24
**counsel** 9:16
10:2 18:25
41:13,14,14
52:20 67:22
71:24,25
**count** 44:2
75:19 76:1
85:14
**counterparties**
20:23 36:20,21
**counterparty**
88:6,7
**country** 113:21
**couple** 48:19
52:21 56:12
69:22
**course** 3:1
56:20 68:12
82:6 87:1
101:10 105:16
**court** 1:1,12
16:6 19:20,22
20:1,4,9,15
21:14,22 22:18
22:21 24:12,25
25:6,9,16 26:8
26:17 27:5,19
28:6,9,13,16
29:18 30:5,8
30:24 31:6,18
31:21,23,25
32:17 35:18,25
36:6 37:19

| | | | |
|---|---|---|---|
| 38:12 39:11,21 | 110:16,20,25 | creditworthi... | 80:16 82:15 |
| 41:3,5,18 43:1 | **court's**  55:8 | 36:23 | **currently**  23:5 |
| 43:12,20 47:13 | 56:17 | **crimes**  101:23 | 75:1 |
| 49:22 50:7 | **courthouse** | **criminal**  102:3 | **custodial**  8:2 |
| 51:20 52:5,17 | 100:17 | 102:5 | 18:8,25 68:15 |
| 55:22 56:14,16 | **court's**  28:10 | **critical**  56:1 | **custodian**  49:2 |
| 58:10 61:18 | 35:2 | **cross**  74:8 | **custody**  35:13 |
| 62:10,23 63:2 | **cover**  36:15 | **cruz**  107:3 | 49:3,4,6 54:13 |
| 63:13 66:13 | 43:24 48:11 | **crypto**  33:5,7,8 | 57:22 59:1 |
| 67:13 68:20 | **coverage**  38:22 | 33:10 34:22 | 61:19,20,22 |
| 69:1,4,10,14 | **create**  78:4 | 39:8 40:11 | 62:19 63:7,9 |
| 70:20 71:9,10 | 96:22 | 42:3 45:21,24 | 63:10,11,17,17 |
| 71:12,21 72:1 | **created**  24:17 | 46:21 47:10 | 63:24 64:14,23 |
| 72:7,10,14,19 | 58:3 73:1 | 49:1,18 54:7 | 67:7,15,15,17 |
| 74:10,18 75:11 | **credence**  29:21 | 59:22,24,24 | 70:11 71:15,17 |
| 75:13 76:19 | **credit**  2:17 | 60:15,18,25 | 71:19 72:2 |
| 77:7,13 78:13 | 72:8 73:18 | 61:1,17,21 | 75:17,19,20,21 |
| 78:16 79:10,15 | 77:5,7,10 | 65:14 84:3,3 | 76:6,8,12,14 |
| 79:19 80:9,12 | 112:6 | 99:12 100:16 | 76:14,23,24 |
| 81:20 82:16 | **crediting**  72:23 | 106:16 | 82:18,23 87:14 |
| 83:1,3,11,14 | 74:1 | **cryptocurren...** | 96:11 103:12 |
| 83:21 84:11,16 | **creditor**  8:9,10 | 90:14 | **custom**  7:18 |
| 87:9,19,21,23 | 8:11,12,13,14 | **cryptocurrency** | **customer** |
| 88:24,24 89:6 | 8:15,16 11:13 | 2:12,24 34:20 | 32:22 33:3 |
| 89:6,20 91:15 | 12:13 37:10,10 | 57:18 69:24 | 38:6,11 46:5 |
| 91:19 92:11,20 | 53:16 66:13 | 73:21 82:14 | 54:4 58:19,25 |
| 92:23 94:19,19 | 69:20 76:21 | 84:6,14 88:14 | 59:16 90:1 |
| 94:20,25 95:4 | 104:18 105:6 | 88:22 89:4 | 96:24,24 |
| 95:8,13,13,16 | **creditors**  4:15 | 93:11 98:25 | 106:15 |
| 95:20 96:4 | 5:2,9 22:5 45:1 | 99:3,6 100:14 | **customers** |
| 97:23 99:25 | 51:1 56:21,25 | 106:6,11 | 35:12,14,14 |
| 100:6 101:9 | 57:4 61:11,12 | **crystal**  110:5 | 44:9 45:15 |
| 102:2,18 | 74:15 75:10 | **crystallize** | 46:10,12,19,24 |
| 103:19 105:10 | 96:1 | 34:15 | 47:4,12 54:7 |
| 105:18 107:2 | **creditors'**  14:8 | **currency**  40:17 | 57:15 58:22 |
| 108:10,15 | 36:12 | **current**  22:19 | 59:3,6,15,16 |
| 109:11,18 | | 54:6 74:16 | 59:18 60:3,8 |

[customers - declaration] Page 13

61:3,3,9,11,13
63:20 64:2,9
64:20,22 65:1
66:20,25 71:5
72:23 73:6
87:16 93:10,24
96:22 98:14,16
106:5,14,18
**cut** 53:12

**d**

**d** 2:4 9:1 83:12
112:1
**d'amico** 71:12
71:14 72:6
**d.c.** 9:20
**damages** 26:20
26:24 56:4
108:8
**dan** 3:7 4:9 9:9
9:11,16 72:20
75:22 83:23
87:25 92:12
**daniel** 8:16
18:3
**data** 20:24
50:23
**date** 15:12
23:20 31:19
50:5 55:12
64:4 72:24
73:4,7 75:6,25
76:14,17 77:4
78:2 82:14,15
92:3 95:5 97:1
97:1,4 109:9
110:1 113:25

**dates** 95:3
**david** 4:19
5:20 10:3,15
12:8 39:23
84:17
**day** 15:16 23:6
23:8 40:5
52:14 57:13
60:24 61:16
64:14 68:9
76:2 77:5
79:13 81:23
82:1,7 95:3
**days** 27:11
51:16 89:14
**dc** 6:11,18,18
**de** 8:13 11:10
11:12,13 21:23
57:12 65:1
67:6 79:21
80:3,20 112:8
**deadline** 32:19
44:18 79:3
94:2
**deal** 36:8 72:1
**dealers** 49:20
**deann** 10:15
**deanna** 9:7
10:3 11:12
13:2,7,14,19
14:17 17:5,7
17:13 18:7
19:20
**deb** 17:7
**deborah** 7:14
17:12

**debt** 56:23
57:3,11 58:16
58:17,19
**debtor** 1:9 4:4
18:13 20:12
25:3 36:3
41:24 42:22
54:17 80:1,4
82:17 84:2
89:23 90:12
91:5 93:22
95:1 103:2
**debtor's** 2:10
2:23 59:10
72:22 73:17,21
73:25 79:21
80:22,25 81:16
83:19 84:14
85:21 86:12
88:15 90:10
94:1 96:7,9
97:15 100:2
107:12 108:17
**debtors** 2:1,11
2:16,17 3:2
11:6,25 28:7,7
33:11,15 34:2
34:10 35:4,7
42:12 48:12
63:5,6,19 64:7
64:19 65:23
66:7 69:16,16
71:24 72:21
73:5,9,18 74:2
74:5,8 77:9
78:18 79:24
80:2,7 81:3,5

81:13,14,21
82:20,24 83:5
83:17,24 84:4
84:8,20 86:10
87:3 88:1,5,6,9
88:11,17,21,25
89:2 90:3,16
92:13,13,16
93:4,6,15,23
94:8,10,12,16
95:25 97:14
104:21 106:11
110:1,10
**debtor's** 20:20
20:22 22:19
27:21 32:15,24
33:4,24 34:12
34:18,20 35:8
40:4 41:14,25
42:4 44:24
**december** 23:9
23:13 27:4
32:19 69:19
75:16 94:2
101:18 103:21
**decided** 25:20
75:8 76:11
**decision** 36:6
57:2 60:16
**declaration**
40:5 78:10
79:25 81:23
82:2,7 86:16
87:4 90:3
92:15,19,24,25
94:5 107:14,15
107:24,24

109:2
**declarations**
93:25 96:19
**decline** 24:13
24:18,19
**dedicated** 49:8
**deemed** 3:10
**default** 42:18
**defense** 100:10
100:20 101:3
**defenses**
100:18
**definite** 51:18
**definitely**
16:16 43:7
44:12 49:16
**defraud**
104:18
**delay** 52:14
**deliberately**
104:22
**deliver** 30:22
**delivered**
77:25 78:4
**delivering**
31:19
**demonstrated**
81:4 94:4
**department**
6:1 7:16
**depending**
23:17
**deposit** 46:14
75:19 76:5
**deposited** 3:15
60:25 76:7
101:13 103:1,5

**depositing**
76:11
**deposition**
96:18,21 97:6
97:7 100:4
**depositions**
31:5 100:2
**depository**
78:22 79:1
**deposits** 75:19
90:2 96:24,24
**described**
49:12 58:16
81:22
**describing**
30:21
**description**
81:23
**designate**
65:17
**designation**
20:7
**designed**
100:22,23
**despite** 54:10
91:16
**destructive**
37:11
**detail** 87:18
96:14 99:18
107:23 108:2,2
108:20,24
109:3
**details** 47:15
96:12 108:7
**determination**
41:19

**determined**
81:3 84:2
**develop** 48:2
**developed**
85:20 86:6,21
**developing**
48:21
**development**
21:8 32:15
**developments**
21:10
**dialogue** 22:16
43:8 52:2
**dice** 46:5
**dictate** 97:19
**didn't** 27:17
48:4
**diff** 35:13
**difference**
82:11
**differences**
36:17 81:1
82:5 87:6
**different** 34:3
40:4 41:9 46:7
48:15 58:25
60:2 61:2 90:8
96:15
**differently**
96:23
**digital** 3:10
77:15,16,17,19
77:19,22,23,23
77:25 78:1,3,6
78:8
**diminis** 2:20

**direct** 81:13
**directed** 92:9
**direction** 88:9
**directive** 55:8
**directly** 55:17
66:2,15,17
109:2
**director** 92:16
**disabled** 13:20
13:23
**disagree** 97:8
**disagreed**
97:10
**discharged**
91:24 92:7
**disclosed** 63:9
63:18 90:20
**discount** 45:22
47:10
**discovered**
70:2
**discrepancy**
81:21
**discrete** 32:21
33:3
**discretion**
77:20
**discuss** 68:24
70:10 74:22
**discussed**
29:12 64:18
**discussing**
45:13
**discussion**
80:25 87:6
**discussions**
33:21 34:14

37:7,15 48:2
49:19 50:15
79:2,7
**disputes** 36:8
**disputing**
59:22
**distinction**
103:13
**distraction**
94:14
**distress** 21:1
**distribute**
33:11 45:3
73:2 76:23
77:7,16 99:10
106:18
**distributed**
56:8 68:22
73:14,16 75:15
75:16,20 76:2
76:6,16,25
**distributing**
73:8
**distribution**
45:21,24 60:12
66:3,5 72:5
73:11,15
**distributions**
57:7 64:1 66:4
66:15,16 68:8
82:19
**district** 1:2
**dived** 107:11
107:22
**dividends** 45:9
**dixon** 8:11
76:20,21,21

**doc** 2:8,13,18
2:20 3:3,7,11
3:17,22
**docket** 21:6
22:10,12 25:4
32:3 49:23
52:12,13 55:6
65:24 69:18
70:16 72:8
74:6 78:11,19
79:4,23 80:3,4
80:11,23,24
81:19 92:14,17
92:20 93:6
96:8,9,10
**dockets** 22:12
**document** 3:17
16:11 25:15
**documentary**
107:15
**documented**
102:16
**documents**
16:10 30:19
96:18 99:19,21
99:24 107:12
**doesn't** 41:18
42:24 51:7
54:15
**dog** 67:7
**doing** 13:13
52:22 55:7
59:13 61:1
87:13,13
106:17
**dollar** 39:1
44:5 46:8,17

**dollars** 26:4
29:2 85:12
90:11 104:15
**don't** 9:20,22
12:20 13:4
26:2 28:14
29:8,20 30:2
31:11 33:6
38:13 39:21
43:23 47:18
53:10,25 54:5
**doubt** 35:19
**dozen** 36:20
**drafting** 30:21
**drag** 47:8
**drain** 104:1
**drawing** 48:4
**drive** 5:10 73:4
**drop** 13:25
15:15 73:13
**dropped** 74:25
75:4
**due** 55:2
101:10
**duplication**
55:8
**duration** 108:9

**e**

**e** 1:21,21 4:1,1
9:1,1 83:12,12
107:9,9 112:1
113:1
**e&o** 93:17
**eagerly** 55:4
**earlier** 39:7
57:14 58:24
61:19 62:24

80:25 96:9
106:14
**early** 24:20
52:9 64:17
**earn** 3:15 16:9
16:11 35:2,3,9
35:14 41:11
56:17,21 57:4
57:5,5,9,14,21
58:5,7 59:1,4,6
59:8,16,18
60:3 61:3,6
75:21 76:4,10
82:23 87:16
96:2 98:2,2,4,8
98:9,12,17,22
99:1,11,16,20
99:25 100:7,25
101:13 102:19
102:25 103:11
105:17,21,22
108:16 110:3,7
110:14
**earned** 3:21
**earning** 107:24
**earnings**
107:14
**ease** 97:15
**easier** 31:4
**easily** 46:18
**eat** 61:12
**ebitda** 23:9,12
23:14,16
**ecf** 2:20 3:11
3:17,22 51:23
72:8 78:11
92:20

echo 44:10
54:19 58:13
ecro 1:25
effect 76:12
84:23 90:25
effectively
20:24 48:3
effectuating
54:9
efficiency
22:23
efficient 25:24
25:25
efforts 23:19
82:19
eight 23:6 38:9
either 31:9
40:12 82:23
90:17 92:8
electricity
24:15
elephant 90:3
100:15
eligible 2:17
63:19,20,23
64:9,9 66:1
72:23,24 73:6
73:8 77:6,11
77:17
ellis 4:3 9:10
11:9,24 63:4
69:16 72:21
75:23 83:24
88:1 92:13
95:25
email 66:8,10
68:6

emails 69:22
embedded 37:3
emergence
42:14
emergency
21:11 26:25
emissions
90:21
employee
18:12
encourage
67:23 71:22
encouraged
109:6
endeavored
21:6 22:14
energy 24:8,13
24:16,20 25:25
25:25
enforceability
98:5
enforceable
98:11
enforced 94:21
enforcement
94:12
engage 91:12
engaged 103:9
english 5:15
10:16 39:24
94:22 95:17
enjoy 26:6
ensure 26:13
68:8,13 82:25
enter 88:21
101:10

entered 63:5
70:19 72:14,15
73:9 79:9 80:8
94:6,10
entering 81:19
106:9
entire 104:1
entirely 90:18
entities 56:7
57:2 84:9 91:5
entitle 45:8
88:13
entitled 58:22
61:5,17 72:5
77:8,12
entity 48:24
entry 2:10,16
2:23 3:14 74:8
environment
54:6
envision 45:16
49:1 50:11
envisioning
45:2,22
epitome 104:13
equal 57:6
60:11 61:14
96:11 110:15
equally 60:9
61:2,4 76:25
equipment
20:24
equitable 42:1
56:3 100:23
107:21
equitably
75:24 76:15

106:18
equity 33:24
54:13 58:21
error 90:20
errors 91:4
especially 51:4
essentially
57:4 108:21
establish
100:20
established
55:16
estate 3:22
35:4 59:9 61:7
61:10,10 76:25
77:10 83:19
84:4 86:13
88:11,17 101:5
104:2 108:17
estate's 59:10
estates 81:16
estimate 24:12
24:13 26:20,23
37:19 38:15
estimates
28:23
et 20:7 50:13
52:6 62:3 91:6
91:7
etcetera 3:22
eth 40:12,14
84:7 85:9,17
ethereum 33:8
45:25 63:22
evaluating
34:3,7 36:24

event  21:5
73:15 74:15
77:15
everybody
20:10 35:6
41:17 46:2
60:1 63:8
64:11 65:4
68:16 71:22
77:1
everybody's
59:21 64:15
69:4
evidence  92:24
93:1,25 94:3
94:15 96:17
97:12,13,22
99:23 101:20
102:14 105:16
105:16
evidentiary
96:16
exact  90:23
exactly  45:13
48:13 50:16
52:6 68:16
75:6 92:3
100:22 108:12
108:13 109:5
examination
55:17
examiner  7:2
13:8 17:6
30:11,16,22,25
31:12 55:3,7,9
55:11 92:8,8

examiner's
55:2,13 57:24
examiners  31:4
examiner's
30:12 31:19
example  36:7
49:1 73:21
84:8 88:12
96:17,21
exceed  64:24
excellent
107:10
exchange  54:4
104:16 106:6
exchanges  73:3
exclusivity
44:18 52:10
execute  78:25
executive
96:21,23
executives
96:19 97:6
exercise  3:1
81:6 88:15
89:2
exhibit  78:11
exhibits  102:15
exist  58:5 92:2
existing  2:4
expect  23:15
23:21,23 24:1
26:3 27:14
30:22 35:7
47:7,11 55:15
65:5 72:2
89:13 106:1

expectation
57:13
expected  31:19
67:4 95:5
expedited
26:19
expeditiously
36:1
expense  2:6
expensive
41:17
expert  91:23
explain  81:21
explained  93:7
99:9
exploring
47:17
exposure  28:20
28:23 29:1,5,9
29:22
exposures
29:15
express  88:22
expressly
99:17
extend  52:10
79:3 88:12
107:18 108:8
extended  44:20
extension
30:12 79:13
extent  38:20
41:17 49:24
77:24 81:15
84:2 88:10
92:18 105:17

extrinsic  99:23
101:19 105:15
105:16
eyes  60:16
ezra  71:11,12

f

f  1:21 113:1
face  99:23
110:13
facilitate  49:20
fact  35:2,3
60:12 61:6
85:17 99:11
102:17
factor  50:17
facts  89:23
98:20
factual  85:20
86:6,21 94:17
failure  101:25
fair  56:2
faith  105:4
fall  24:21
false  66:7 90:5
90:17
familiar  25:5
62:17 74:21
far  32:6 33:2
fast  106:19
favorable  24:8
feasible  53:25
feature  47:7
features  34:15
48:19
february  15:13
79:4,6 95:7

federal 48:24
fee 104:16
feedback 83:10
feel 60:13
71:20
feels 101:16
fees 64:20,24
66:1,3,16
fell 32:20
ferraro 8:18
14:17,19,20
20:17 21:17
22:2,8,16,17
22:20,22 24:12
24:19 25:1,2,8
25:12,17 26:9
27:20 28:11,15
28:16 29:7
30:3,6,7 34:5
79:22 80:5,14
80:18 97:4
fiat 40:17
fiction 103:13
fifth 101:18
fights 54:14
figure 58:24
60:22
file 21:6 51:24
52:15 64:12,15
64:16 66:1
70:11 71:16
83:2 92:14
filed 3:7,11,22
20:25 21:5,11
25:3,4 55:21
56:19 58:15
65:6,23 69:18

70:7,9,16,16
70:25 72:9
78:11,19 79:4
79:23,24 80:4
80:23,24 84:18
92:15 96:7,10
101:21 102:6
filer's 3:11
filing 22:10
27:15 29:11
47:21 50:11
51:16 52:10
90:6
filings 26:18
93:5
final 32:18
53:25 79:5,13
finalize 44:20
finalized 65:6
finalizing
64:12
finally 66:23
71:1
financial 21:1
36:19 80:1
find 31:4 67:19
78:9 88:11,17
finding 98:10
findings 55:4
finish 39:14
finished 39:11
39:18
fire 33:14
firmly 37:18
first 20:5 32:21
34:18 37:9
40:4 41:15

48:22 51:12
55:6 58:22
81:23 82:1,7
89:23 97:25
98:13 101:19
109:9
firsthand
55:10
fit 26:14
five 85:2,14
86:13 110:4,6
fixed 38:25
71:7
flare 2:17
72:23,25 73:6
73:9,11,14
76:6,11,13,15
77:7,12 112:7
floor 6:10
flow 16:21
47:13 56:24
80:15
flower 5:3
fluctuates 39:4
39:10
fluctuation
82:14 89:5
fly 49:3
focus 16:12,13
44:22 51:13
focused 33:15
37:12,15 42:8
48:13 53:20
54:19 61:1
106:4
focusing 90:18

folks 37:1 38:5
64:18 66:8
74:22
follow 56:20
75:7 108:13
following
23:18,22 64:7
108:22
follows 77:15
force 110:15
forecast 25:6
25:14 27:21,22
27:24 28:8
forecasts 25:7
foregoing
113:3
form 59:12
86:16
formal 31:5
32:12 74:5
format 54:15
72:15
formation
97:18
former 33:25
forms 2:4
97:15,15
forth 87:4
forum 68:18
forward 26:12
36:1 37:8
42:21 44:14,17
44:20 47:20
48:12 50:12,24
51:2,17 54:19
60:11 71:4,7
103:25 104:3

found  56:7
  58:2 99:20,25
  100:6
founders  33:24
four  85:15
  107:11
fraction  41:11
framework
  34:15
frankly  107:20
  108:1
fraud  91:14
  94:3,17 101:24
  102:13,14,20
  102:25 103:4
fraudulent
  104:19
fred  15:4
free  105:1
freely  49:13
fringe  108:5
  109:14
frishberg  3:7
  8:16 18:2,3,3
  89:20,21 91:15
  91:18,21 93:5
  93:16,20,24
frishberg's
  89:17
front  25:10
  29:8
ftts  85:6
ftx  28:20,23
  29:1,5,16,19
  51:5
full  20:4 23:16
  45:22 46:25

96:16 98:25
  99:8
fully  48:23
  56:21 99:7
  102:16
function  10:13
  49:11
fund  26:4
  58:20
fundamental
  93:14
funded  58:19
funds  67:16
  71:1 105:7
  108:21 109:9
further  28:15
  30:3 50:19
  52:10 65:17
  78:3 81:17
  87:8 88:23
  110:10
future  26:7,15
  35:15 49:15

**g**

g  9:1
gabriela  4:10
  9:11 69:15
gained  28:2
galaxy  94:7
gallagaher
  103:7
gallagher  3:16
  3:16 8:12
  10:20,20,24
  11:1,2 101:12
  101:14,15
  102:9,18

103:20 105:11
  105:15 106:13
  106:20 107:5
gas  64:20
gating  37:16
  41:7 54:12
genders  80:17
general  6:8
  12:19 32:2
  38:21 55:20
  87:22 98:23
  99:2 101:21
  102:6
general's  56:4
generally
  21:18 31:14
  32:20 38:23
  98:5,14
generation
  26:1
generous  43:9
getting  31:14
  48:7 91:21
  108:2
give  10:21
  11:22 12:4
  14:6,23 15:2
  15:11,21 16:2
  18:1 19:9,12
  25:5 27:10
  32:4,13 37:19
  37:24 38:8
  39:14 40:7,17
  43:20 44:20,25
  45:20 47:2,11
  51:14 83:13
  86:24 104:15

106:15,15
given  11:21
  14:16,22 15:1
  15:20 16:1
  17:3,25 18:6
  18:16,18,22
  19:6,7,11,15
  23:9 24:7
  33:15 38:12
  40:11 41:9
  74:16 76:10
  82:19 101:17
  102:14
gives  37:5
giving  14:17
  17:18 43:17
  45:18 89:11
gk  78:20 93:22
gk8  2:1,2,4,4,6
  3:6 78:18
  79:14 89:18,25
  90:8,8,13,15
  90:18,19 91:6
  91:11,12,23
  92:1,5 93:7,9
  93:12,18,20,21
  93:23 94:1,2,4
  105:2
gk8's  93:11,22
glenn  1:22
  39:23
go  10:23 16:6
  24:25 31:10,25
  32:7,10 35:9
  39:15,22 42:10
  42:21 43:23
  46:21 48:12

50:7 53:18
54:5 58:11
59:5,24 60:6,6
61:7,13 63:2
68:8 71:4,7,13
74:12 75:19
83:21 89:8,10
96:13 100:16
102:7 103:6,25
103:25 109:21
**goes** 51:23
54:23 55:14
59:15 61:9
65:9
**going** 9:5,17
10:10,19 12:8
13:10,12,25
17:9 20:11
25:12,13,14
27:14 32:1,8
34:18 37:7,11
37:24 39:13
42:11,16,16
44:14 45:19
47:1 48:2,14
48:14 49:4
50:9,12,24
51:2,20 53:15
53:16,22,22
54:24,25 55:5
55:5,13,15
57:6,17 58:7
59:5,25 60:11
61:4,4,12,13
61:13,14 64:13
65:25 68:1,2,5
68:12,17,21

69:7,8 71:1
76:1 83:17
84:23 87:15
89:6,12 95:13
95:23 101:9,9
101:11 107:2
110:18
**good** 10:3,15
11:5,12 13:7
13:10,14 15:16
17:5,7 18:7
20:10 22:20,21
26:14 30:17
39:17,23 52:4
62:25 63:3
69:1,12 72:20
83:15 84:17
89:22 96:6,6
107:20
**gotten** 30:19
**govern** 98:15
**government**
56:6
**grace** 4:11 9:19
11:23,24
**grant** 73:10
74:2
**granted** 30:12
72:11 78:14
79:16 80:20
86:22 112:6,7
112:8
**granting** 2:5,7
2:13 3:3
**great** 20:16
24:17 30:2
32:18 52:8

**greater** 105:7
**greatly** 86:11
**green** 1:13 6:3
**greg** 5:13 10:6
**gregory** 12:6
52:19
**gross** 84:25
85:12
**grossly** 104:6
**ground** 49:5
**group** 5:16
7:10 8:2 10:16
18:8,25 37:6
39:24 50:16
60:8 63:7
64:14 67:11
84:18
**grow** 51:9
**growth** 58:20
**guess** 62:5 76:2
**guidelines**
78:23
**guideposts**
48:20
**guiding** 60:7

**h**

**hack** 67:20
**hacker** 68:11
**hadley** 6:15
**haircut** 42:16
42:17 64:11
**half** 23:8 85:12
**hamilton** 7:9
7:18
**hamlin** 4:12
9:20 11:4,5,5,9

**hand** 10:13
16:2 17:25
32:1,7 39:12
39:25 71:11
74:11 83:11
87:9 89:7,9
98:6,7
**handful** 24:6
46:11 57:12
**handing** 53:5
**handled**
107:17
**hands** 10:11
11:17,21 12:4
**hang** 77:9
**hapoalim**
78:21,25
**happen** 68:13
**happening**
21:7,24 51:14
51:15
**happens** 64:2
**happy** 56:13
62:16 70:16
71:1 80:5 81:2
82:6 87:25
**hardship**
106:13
**harming**
100:21
**harvest** 33:1
44:23 51:9
**hashing** 22:24
**hasn't** 19:3
51:25 52:1
**haven't** 13:23
29:3,13 47:16

49:23
**head** 38:10
**headed** 23:24
**hear** 9:7 10:24
20:13 31:8,12
69:13 75:12
**heard** 34:4
38:18 57:20
70:21 71:10
74:11 79:16,22
80:9 81:7 89:8
89:10,12 97:19
97:20 101:18
101:19 103:21
107:16
**hearing** 2:1,10
2:16,20,23 3:6
3:10,14,20
16:16 21:13
22:2,6 26:19
26:25,25 28:17
51:23 52:1
63:9 69:19
79:5,23 80:18
94:5 96:16
99:9,20 101:16
105:24
**hearings** 20:18
35:13 64:19
**hebrew** 94:21
95:17
**heightened**
102:11
**held** 55:25 59:1
72:23 75:25
76:9,16,24
78:24 92:6

93:10
**hello** 96:5
**help** 26:4 68:6
**helpful** 32:13
41:4 83:3
**hensley** 4:10
9:11 69:9,12
69:15,15 72:12
72:17
**heras** 8:13
11:11,12,13
80:3
**hermann** 8:14
12:11,12,12
**hi** 11:24 12:6
13:2 14:7,17
17:13
**highest** 94:7
**highlight** 34:16
53:13,19 54:23
55:18 56:13
**historically**
48:9,15,17
**history** 109:4
**hit** 56:2
**hits** 55:6
**hoc** 5:16 7:10
8:2 10:16 17:8
18:8,25 39:24
62:19 63:7
64:14 67:11,22
67:23 68:15
84:18
**hold** 33:17
35:5 38:13
44:8 51:8
76:24

**holder** 61:20
76:15
**holder's** 57:6
98:24
**holders** 2:12
2:18 6:16 7:10
33:24 44:24
45:4,8,11
46:15 49:13
50:10 52:25
56:3,9,21 57:1
57:9,21 58:5,5
58:7,22 61:20
61:22 67:16
68:15 69:18
71:18 73:9,19
73:23 74:1,4
74:21 75:23
77:6,8,11
93:19 98:7,21
99:2,7,11,13
99:16 100:25
101:3 102:19
102:25
**holds** 67:2
**hole** 99:8 101:7
**holert** 79:25
**holiday** 21:12
**home** 46:21
**hon** 1:22
**honestly** 26:2
**honor** 2:2
20:13,18,21
21:2,9,21 22:7
22:20 25:13,24
26:22 27:7,18
28:14 29:7

30:7,17,18
31:2,11,20,24
32:11,13,18
33:2,5,19
34:10,17,23
36:10 37:14,18
37:24 38:5
39:5,10,17
40:10,18 41:2
42:11 43:25
44:15 45:23
46:3 47:24
48:22 49:11
50:1,4,8,14,19
51:12,14,18
52:4,8,19
53:23 54:20
55:19 58:9
59:20 60:10
62:13,20,21
63:1,3,5,15
64:5 67:9,12
68:3,25 69:3
69:12,19,21
70:17,22 71:8
71:14 72:12,17
72:20,25 73:12
73:20 74:1,7
74:13,20 75:22
77:3 78:15
79:7,13,18,20
80:2,11,21,22
81:12,17 82:6
82:21 83:15
84:17 85:16,19
85:23 86:5,13
86:15 87:8

89:2,16,21
91:21 92:9,12
92:13 93:2,2
94:8,18,23
95:10,18,22,24
96:3,5,6,16
97:21,24 99:20
101:15 105:12
107:10 110:4
110:23
**honor's** 71:2
108:4,6 110:7
110:9
**honor's** 22:15
25:18 30:4
**hope** 42:20
46:19 68:23
**hopeful** 36:3
37:2 43:14
**hopefully** 26:6
55:12 103:2
107:20
**hopes** 37:8
**hoping** 47:2
108:25
**host** 13:20
20:24 24:7
**hosted** 23:1
49:2
**hosting** 21:20
24:3,10 26:13
27:2,4,12,13
34:8
**hot** 68:9
**hounded**
104:22

**hour** 100:4
**house** 7:18
**hundred** 46:16
**hundreds** 29:2
29:22 97:9
104:15
**hyde** 3:25
113:3,8
**hypothetical**
91:11

**i**

**idea** 32:25
37:19 104:13
**ideas** 43:17
**identifiable**
66:17
**identified** 41:8
**identify** 83:22
**identifying**
67:2
**ii** 2:5,12 3:3
**iii** 2:7
**il** 4:6 5:11 7:4
**illegal** 103:9,18
**illegality**
101:25
**illiquid** 33:7,9
33:14 34:20
45:20 51:4,7
53:4 59:25
**immanuel** 8:14
12:12
**immediate**
88:14
**impact** 21:19
**important** 21:8
22:11 26:12

35:11,25 36:14
36:17 37:17
41:7,8,12,20
43:7 44:12
50:18 55:13
58:1 59:2 65:8
80:18 90:4
**importantly**
33:21 81:12
98:22
**imposition**
19:24
**improve** 22:23
33:18
**improved**
27:21 33:1
**improves** 28:8
**improving**
24:8
**inbox** 69:23
**include** 34:20
52:11
**included** 27:9
71:20
**including** 35:8
88:4 94:12
97:18
**incorporate**
105:13
**incorporated**
70:15
**incorporates**
74:6
**increase** 27:23
73:25 74:3
77:11

**increased**
24:22 86:11
**increases** 28:3
**incredibly**
48:13
**independent**
88:16
**independently**
32:24
**indicate** 93:23
93:25
**indicated** 22:4
51:3 82:2
110:4,9
**indicates** 81:24
**indictment**
102:5
**indiscernible**
23:24 30:21,23
31:4 42:4
75:15,17 90:21
**individual** 60:3
74:21 81:5,10
81:15 82:9,10
**individualized**
98:18,20
**individuals**
56:7
**industry** 60:17
73:21 106:11
**ineligible**
66:24 67:5,8
**inequitable**
101:5
**informal** 70:14
**information**
31:14 49:24

65:18,21 66:18
66:22 67:16
68:5 84:22
91:25 94:1
**informed** 44:4
69:21 87:6
**inherent** 34:25
**initial** 47:25
79:23
**initially** 67:4
**initials** 20:6
**input** 34:2
55:13 68:5
**inquiry** 69:23
**ins** 68:18
**insight** 51:15
**insolvency**
84:10
**instance** 89:22
**instances** 84:7
84:7
**institutional**
2:25 35:22,24
36:9,16,18
37:21 80:22
81:1,9,21,25
82:3 84:4,21
87:7 88:10
89:4 93:10
**institutions**
36:19
**insurance**
89:24 90:9,11
90:16,19,23
91:2,4,10,14
91:23 92:1,4,5
92:8 93:11,13

93:16,23
**insured** 90:2
93:18
**insurers** 93:8
93:12
**intact** 42:15
**intend** 35:4
64:11,16 70:12
**intended** 39:1
**intercompany**
2:5,7
**intercreditor**
54:14 57:19
58:6
**interest** 34:6
41:25 42:1,2,4
45:7 96:14
**interested** 22:6
36:4
**interests** 59:13
**interfering**
31:8
**interim** 79:9
79:17
**intermediate**
62:3
**internet** 29:20
**interpretation**
97:9
**interrupt**
16:21
**interview**
30:18 31:15
**interviews**
30:25 31:1
**inure** 34:19

**invest** 33:22
105:1
**investigation**
55:18
**investments**
33:10 34:22
**investor**
104:14
**investors** 47:8
53:14
**involve** 82:18
**involved** 15:6
32:23 34:14
94:4 107:4
**involves** 109:4
**iphone** 20:7
**israel** 94:11
95:1
**israeli** 78:24
94:20 95:16
**issue** 37:14,17
38:7 42:2
46:24 56:25
57:5,18 58:6,6
58:17 61:22
62:1,4,6,9 63:8
63:12,13 68:24
69:21 70:25
76:6 78:20,20
78:21 87:20
89:13 90:8
99:5,19 102:22
103:3,5 104:4
107:6
**issues** 10:22
35:12 36:2,5
37:17 41:7,8

41:20 42:3,6,9
42:13,20 43:13
43:15,21 47:22
47:22 48:8
54:12 57:19,23
57:23 58:4
62:19 84:19
87:24 97:17
99:17 107:17
**it'll** 56:20 58:1
**item** 72:22
78:17 79:20
80:21 89:15,16
**items** 44:13
**it's** 10:3,15
13:14 14:1,12
17:13 18:7
20:18 21:20
22:12 24:21
25:22 26:12,22
28:11 31:3,8
34:16 35:25
36:10,14 37:2
38:2,10 41:10
41:11 43:14
44:12 45:22
47:24 50:1,9
51:10,10 53:16
53:22
**i'll** 9:24 10:12
11:17,21 12:13
14:2 15:12
17:14 22:15,17
39:15 43:20
**i'm** 10:6,10
13:25 14:17
16:20 17:9,9

25:12,13,14
29:20 32:1
36:15 37:12,24
39:13 40:19
44:15 51:20
**i've**  16:10
38:14 40:5

**j**

**james**  101:21
**january**  1:16
9:3 23:15,17
27:4,10,12,13
27:16 73:12
76:6 95:3
113:25
**jenner**  7:1 13:8
17:6 30:10
**jeter**  8:10
75:11,11,12,14
76:1,18,19
87:9,11,19,22
**join**  20:4,6
**joined**  9:21
10:7,8,9,11
11:15,19 12:2
12:23,25 15:19
15:24 17:2,23
18:5 19:14
**joint**  78:19
**jones**  21:13
**judge**  1:23
17:10 19:17
20:8 21:13
39:23 71:11
86:24 107:1
**judgment**  74:2
81:6 85:21

86:24 88:16
89:3
**july**  40:8 82:2
91:5,14 92:3
**jump**  22:16
32:12 62:21
**june**  91:4,14
**justice**  6:1 7:16

**k**

**k**  6:17 107:9
**karen**  1:25
6:13 12:18
**katerina**  32:7
**keep**  22:12,14
42:15 77:10
**keeping**  50:2
**key**  20:22
34:15 36:13
37:16 48:1,19
96:21 110:5
**khanuja**  3:11
96:4,5 97:23
99:17 100:1,12
100:24 101:4
105:13 107:3,7
**khanuja's**
97:25
**kick**  37:25
**kielty**  94:5
**kind**  24:20
25:20 26:11
47:10 51:6
54:20 58:4
**kinds**  42:3
**kirkland**  4:3
9:5,9 11:8,9,24
26:23 58:13

63:4 69:15
72:21 75:22
83:24 87:12
88:1 89:22
92:12 95:25
107:25
**kirkland.com**
66:9
**knew**  21:1
**know**  9:20
22:10,13 25:25
26:10 27:10
29:11,14,19
31:3,7,11 36:6
37:6,15 38:5,8
38:9,24 41:5
41:24 45:25
46:7,16,18
47:9 49:17
50:22 51:5
52:6 56:17,22
56:25 57:6,24
58:17,18,25
59:12,17 60:4
60:12,19 61:8
62:2 65:8
67:10,17 68:7
68:20 69:2,24
70:1,12 71:2
71:19 75:3,5,9
75:15 80:4
85:24 86:15
87:12 99:21
100:3,6,9,10
100:11,24
101:22 106:2
106:12 108:9

110:8,9
**knowledge**
13:21,24
**koenig**  9:11
61:7 62:17
63:1,2,3,4 68:3
68:25 69:3
95:23,24,25
97:23,24,24
105:11,12,12
107:6 108:10
108:11,11
109:12,22
110:22,23
**kotliar**  8:7
18:24,24
**kovsky**  7:14
17:7,7
**ks**  50:12
**kulpreet**  3:11
**kwasteniet**  4:8
9:11 20:11,13
20:16 22:7
25:2 26:22,23
27:6 28:14
30:2,9 31:23
31:24 32:10,11
32:18 36:10
37:24 38:18
39:17 41:21
43:2,23,25
47:18 50:1,8
52:4,8 53:1
57:14 58:10,12
58:12 62:13,25
69:5,7,11 99:9
102:23 105:23

110:22
**kyc** 65:18,21
**kyle** 8:6 18:7

**l**

**lack** 30:20 48:8
**lake** 23:24
**language** 100:7
109:5,7 110:5
**large** 41:10,12
46:12,15 50:10
**largely** 102:3
**larger** 44:8,13
46:13,24 66:13
**largest** 44:9
**las** 8:13 11:11
11:12,13 80:3
**lasalle** 4:5
**lastly** 83:1
**late** 20:21
52:22
**latest** 25:6
27:21,24
**latona** 4:9 9:7
9:9,9,12,15,19
9:23,25 72:18
72:20,20 74:18
74:20 75:1,5
75:22,22 76:9
77:3,14 78:15
78:16,17 79:18
79:20 80:21
82:6,21 83:20
83:21,22,23,23
87:23,25 88:1
89:16 92:11,12
92:12,22 93:2
94:19,23 95:2

95:6,9,10,18
95:22
**law** 16:13
99:22
**lawsuit** 102:6
**lawyer** 86:7
**lazar** 7:6 13:6
13:7,7 30:10
30:14,17,24
31:2,10,11,20
31:22 55:3
**lead** 36:7
**leading** 29:11
**leads** 31:16
**leah** 4:12 9:20
11:4,5
**learn** 48:16
**leave** 24:4 42:9
**leaves** 84:14
**leblanc** 6:20
13:2,2
**lectern** 67:11
69:8 89:19
95:23 96:2
**led** 51:12
**ledanski** 3:25
113:3,8
**left** 26:5 85:7
100:10,10
**legal** 42:1
91:19 103:8,10
103:12,14,15
103:16 113:20
**lender** 58:8,8
**lenders** 36:9
**lending** 3:3
81:7,21 86:2

88:13 103:16
**length** 34:1
36:18 49:9
**leticia** 101:21
**letter** 99:21
**letters** 47:9
69:22
**let's** 39:21
**level** 45:16
58:18 108:1
109:3
**liabilities**
63:11 91:24
**liability** 75:9
92:6,8 106:17
**liable** 56:8
**license** 103:10
103:12
**licensed** 48:23
49:2,6,20
**licenses** 103:14
103:24 104:2
**lied** 60:13
**lien** 96:25
**lies** 78:12
**life** 49:18
104:16
**light** 50:22
65:22 104:7
**likely** 101:6
**likens** 96:23
**limit** 63:18
**limited** 29:16
42:1 93:18
**line** 9:13 22:18
26:3 31:9
32:14 60:3

61:17 83:8
97:2,3,3,5,5
109:8 112:4
**link** 14:1
**liquid** 33:7
34:20 45:21,24
**liquidate** 51:7
54:6
**liquidating**
53:5 54:10
**liquidation**
53:3 54:8,9
**liquidity** 25:6,7
26:10,16 27:20
27:21 28:1,8
**lissa** 8:19 18:11
18:12
**list** 64:8 71:16
84:21
**listed** 65:13,17
85:4
**listen** 9:13
**listening** 35:6
36:11 54:11,21
**lists** 82:7
**litigate** 42:24
**litigated** 43:19
**litigating** 101:2
101:2
**litigation** 21:3
34:22 36:8
37:10 41:17
54:23,25 55:14
63:10,18
**litigations**
59:16

| | | m | |
|---|---|---|---|
| **little** 31:16 | **login** 107:23 | | **making** 12:9 |
| 38:6 39:8 40:1 | 109:4 | **m** 6:10 15:4 | 12:13 19:22 |
| 40:10,18 56:24 | **logistics** 73:13 | **made** 27:3 | 33:19 43:17 |
| 85:25 99:18 | **long** 75:15 | 37:16 42:21,22 | 66:15 |
| 109:12 | 100:4 | 44:11 60:16 | **manage** 33:18 |
| **live** 68:9 | **longer** 45:19 | 83:9 84:6 | 45:20 51:9 |
| **lived** 45:19 | 47:2 76:4 | 86:11 90:1,5 | **managed** 32:24 |
| **llc** 1:7 9:4 80:1 | **look** 9:24 24:3 | 102:4,13 | 45:5 |
| **lloyd's** 90:21 | 46:6,23 61:23 | 110:17 | **management** |
| **llp** 4:3,14 5:1,8 | 71:23 72:4 | **magnitude** | 2:2 33:25 |
| 5:15 6:15 7:9 | 85:23 92:9 | 38:8 | 34:11 46:4 |
| **loan** 29:17 33:9 | 110:1 | **mail** 65:12 | 49:8,8 78:18 |
| 34:21 35:24 | **looked** 16:12 | **main** 91:2 99:5 | 78:20 79:6 |
| 36:16 38:22 | 29:24 85:23 | **maintain** 2:3 | **managers** 34:1 |
| 40:23 43:6 | 108:7 109:5 | **maintained** | **mandates** |
| 44:1 50:17 | **looking** 25:11 | 86:4 | 57:25 |
| 57:22 80:23 | 25:13 38:6 | **maintains** 20:1 | **manufactured** |
| 81:1,2,9,15 | 47:8 70:1 82:5 | **majority** 27:12 | 103:13 |
| 84:4 85:6,12 | **los** 5:4 | 40:12 46:9 | **march** 24:5 |
| 86:4 88:4,10 | **loss** 74:16 | 47:4 59:3,4 | **margin** 23:6,14 |
| 88:16,25 89:4 | 104:17 | **make** 10:22 | 23:15 24:22 |
| **loans** 2:25 | **lot** 22:12 24:14 | 21:9 22:10 | 42:18 |
| 35:21 36:18,21 | 31:8 37:16,16 | 29:18 43:18 | **mark** 7:21 |
| 37:20,20 38:4 | 38:12 43:8 | 46:12 52:20 | 17:13,16 |
| 38:17,19,22 | 50:21 51:13,15 | 53:11 55:9,23 | **market** 23:17 |
| 39:7 40:6,8,11 | 51:19 53:15,22 | 59:18 61:10 | 24:8,10 25:21 |
| 40:15,17,24 | 56:18 80:25 | 64:14,25 65:2 | 33:1 39:4,10 |
| 42:15,17 44:8 | 96:12 102:14 | 65:4,8 67:14 | 46:1 74:16 |
| 81:15 82:4,8 | 102:15 105:15 | 67:23 68:4,16 | **marketed** 58:3 |
| 82:10,23 83:17 | 107:22 | 71:5,6,16 | **marketing** |
| 84:5,22,25 | **lots** 35:19 | 76:23 77:21 | 51:3,5 91:9,11 |
| 85:1,3,7,8 | 102:13 | 82:19 88:2 | **markets** 33:18 |
| 86:10,12,14 | **low** 46:8 | 96:15 97:11 | 89:5 |
| 96:24 103:16 | **lower** 34:6 | 104:24 | **marsal** 46:4 |
| **log** 65:15,16 | **lowers** 89:3 | **makes** 28:4 | **martin** 1:22 |
| **logging** 96:5 | **lowest** 62:3 | 46:13 57:15 | **mashinsky** |
| | | 98:13 | 55:21,24 56:5 |

56:7 78:10
101:22 102:5
102:20
**mashinsky's**
81:23 82:1
**massively**
37:11
**master** 3:2
**material** 47:21
**matic** 90:14
**matter** 1:5
16:17 43:19
60:21 106:2,3
107:6
**matters** 56:15
**mawson** 23:1,3
23:25
**maximize**
33:18 46:22
52:24 86:12
99:10 105:8
**maximizing**
54:2 94:6,14
**maximum**
103:2
**mccarter** 5:15
10:16 39:24
**mccloy** 6:15
**mean** 29:19
35:4 40:22
41:21 60:12
61:7 99:12
102:9,24
103:25
**meaning** 27:11
**meaningful**
45:23 57:11

64:1 97:22
**meaningless**
60:3
**means** 58:23
100:13
**meant** 61:18
62:24 109:13
**measure** 53:11
**media** 34:24,25
54:11 55:19
**median** 40:23
**meet** 64:7
**melissa** 92:15
92:25
**mention** 79:22
84:24 85:10
**mentioned**
12:8 39:13
80:5 85:5
87:13 108:6
**mere** 35:3
**merely** 86:23
**met** 20:17 63:7
63:14
**methods** 110:9
**mg** 1:3
**mi** 7:12
**michael** 3:22
8:9,15 109:17
**microphone**
31:7
**middle** 28:1
44:19 75:18
76:5
**midland** 24:1
**migration**
32:22,23

**mike** 16:1,8
**milbank** 6:15
13:3
**mild** 34:5
**million** 23:16
26:4 27:7,7,25
27:25 28:24
29:9 38:4 40:7
40:9 70:5 73:5
73:11 81:25
82:4 83:25
84:1 85:1,2,8,9
85:12,12,13
88:4 89:24
90:9 91:10
92:5
**millions** 29:2
29:23
**mind** 42:13
48:20 60:21,23
60:23 61:15
**mindful** 55:8
**mined** 28:4
**mineola** 113:23
**minimal** 64:22
**minimis** 21:23
57:12 65:1
67:6 79:21
80:20 112:8
**minimize** 55:8
68:6,10
**mining** 20:20
20:22,24 21:17
21:23,24 22:1
22:3,19,23
23:5,7,20
24:10,16 28:4

33:9 34:4,7,9
34:21 46:23
80:1,15,16
105:2
**minute** 51:21
**minutes** 43:21
**miscellaneous**
34:21
**misdirection**
67:20
**misleading**
90:17
**misled** 59:18
60:13
**mispronounc...**
83:13
**mispronounc...**
71:13 107:9
**misrepresent...**
91:1 101:24
**mistake** 69:24
**misundersta...**
93:14
**misunderstood**
60:20
**mla** 82:10
**mlas** 81:5
86:17 87:4
**modification**
110:12
**moment** 15:12
74:17 86:14
**monday** 30:23
31:20
**monetary**
19:25,25

monetized
45:10
money 58:20
60:22 103:15
monitor 56:9
monitoring
49:23
month 23:7,16
24:24 27:12
28:3 44:19
monthly 23:11
27:3
months 73:16
106:2
mores 104:7
morning 10:3
10:15,19 11:5
11:12,16,20
12:3,24 13:1,7
13:10,11,14,16
14:5,15,22
15:1,19,25
17:2,5,7,18,24
18:6,7,16,20
18:22 19:6,12
19:16 20:10
22:20,21 30:17
32:12 39:23
63:3 69:12
72:20 75:2
83:15 84:17
96:6 106:24
motion 2:10,16
2:23 3:6,10,14
3:20 15:7 16:9
21:11 26:19
32:4 36:7,16

52:10,10 69:17
70:7,8,9,18
71:10 72:8,9
72:10,10,22
78:13,14,18
79:16 80:19,23
81:22,24 82:8
83:10 87:21
88:8 89:13,17
89:18 91:16
94:13 95:11
96:10,13 97:8
98:2,4,17
101:12,17
107:5 108:15
108:17 109:14
motions 21:22
35:20 91:20
96:1,1 107:13
110:21
move 33:12
36:1 42:8
49:18 69:5,7
89:14 95:20
101:11 104:3
109:7
moved 15:11
15:13 23:20
movement
82:18
moves 39:4,10
moving 51:17
54:19
multiple 82:10
mute 31:9
74:14

**n**

n 4:1,5 7:3 9:1
107:9,9 112:1
113:1
name 13:5 16:8
20:3,5,6 39:13
71:13 83:15
85:11
names 84:24
naming 91:5
nation 86:16
national 6:8
12:18
nature 34:25
ndas 91:12
near 26:6
nearly 23:1,22
23:23
necessarily
54:16
necessary 72:1
86:12
need 44:14,19
51:8 54:1,5
56:2 68:8
83:21 86:4,25
87:5 91:24
needed 28:8
99:23
negotiating
49:9
negotiation
34:13
negotiations
21:2
neighborhood
40:9

net 74:16 75:9
netted 66:3
network 1:7
9:3 77:16 78:6
78:8 90:12
never 93:13
105:1
new 1:2,14
4:17 5:18 6:4
7:19 8:4 21:12
21:13 24:3
26:2 32:24
33:25 34:6
54:9 55:20
56:3,5 65:17
72:25 73:4
75:18 76:5
77:19,22,22,23
77:25 78:22
91:25 93:25
94:15 101:21
newco 33:16
nice 84:20
85:22
nicely 23:14
night 70:16
non 19:25
35:24 36:9
37:21
normal 65:11
north 26:4
notably 84:12
note 17:14 19:2
26:25 27:18
34:23 36:14
52:9 65:1

**noted** 11:3
16:23 50:15
58:24
**notice** 2:20
52:16 65:3,9
65:16 66:20
70:11 79:23
80:8
**notices** 21:6
66:1
**notifications**
109:2
**noting** 12:15
**novel** 20:21
45:2
**november**
28:17 29:13,24
97:1,4
**number** 9:4
12:19 25:4
38:24 41:6,9
41:10,11,12
46:15 50:10
70:3,9 72:8
73:14 74:6
78:11,19 79:4
79:23 80:3,4
80:23,24 81:11
81:19 82:8,9
82:11,12 84:19
84:21 86:20,21
92:14,17,21
93:3 96:8,8,9
96:10 97:1,2,3
97:5
**numbers** 37:22
38:13

**nw** 6:10,17
**ny** 1:14 4:17
5:18 6:4 7:19
8:4 113:23

**o**

**o** 1:21 9:1
113:1
**oath** 31:1,15
100:3
**objection** 80:2
80:7 83:2
84:18 92:14,15
94:2 95:11
96:8,9 102:15
107:12
**objections** 70:8
72:9 74:5
92:23 107:25
**objective** 60:10
**obligated**
99:15
**obligation**
59:10,10
**obligations** 2:3
38:7 73:6 78:7
81:11 82:12
83:25 84:1
88:4 99:7
**obtain** 93:11
94:11,25 95:1
**obviously**
24:14,16 35:11
35:23 38:22,25
41:25 42:5,21
42:23 51:15
56:18 61:24
66:14 67:22

68:17 87:5
94:21
**occurred** 73:12
104:10
**odd** 13:21
36:21
**offences** 98:19
**offenses** 98:23
**offer** 46:20
67:1 94:7
103:10,12,14
105:20
**offered** 48:10
**offering** 67:3
76:4
**office** 9:20
13:12,15 47:19
67:25 70:23,24
79:12
**officer** 80:1
**official** 4:15
5:2,9 14:8 20:2
**oh** 16:18
**okay** 9:14,23
10:22 11:1,10
13:22,25 14:2
14:12,25 15:8
15:15,16 16:4
16:7,7,18
17:19 20:14,18
24:25 25:1,11
26:8,16 27:19
27:20 28:13,19
29:18 31:21
41:3 49:2 50:7
52:3,7 58:19
59:1,23 68:20

69:2,10 72:5
72:16,19 75:7
75:14 76:1,19
89:20 92:11
108:19
**old** 113:21
**oldest** 25:23
**omission**
101:24
**omissions** 91:4
**omnibus**
107:12
**once** 53:12
**ongoing** 82:19
**open** 31:7,16
52:24 60:16
63:13,19 68:18
76:13,14 108:3
**opened** 110:2
**opening** 14:17
38:21
**operate** 2:2
33:19,22 37:1
**operated** 48:15
**operating**
23:12 24:11
88:6
**operation**
22:23 103:18
**operational**
22:23
**operations**
20:20 22:19
26:14 28:4
92:16 103:9
105:3

**opinion** 16:12
56:17 98:2,9
98:17,22 99:2
99:12,16
101:10 105:18
110:3
**opportunities**
24:3
**opportunity**
32:5 52:6
71:18 89:12
96:17 97:22
**optimistic**
42:23
**option** 47:12
**options** 24:9
37:5 54:1
**order** 2:10,16
2:23 3:14
46:25 51:22
63:5,15,24
64:19 65:9
66:2,5,23 70:9
70:15,19 72:14
73:3 74:6,9
75:23 76:14
77:5 79:4,9,13
79:17 80:24
81:19 83:9
84:23 88:19,24
89:14 94:5,10
94:12,20 95:16
96:3 101:11
**ordinary** 3:1
87:1
**oren** 107:14

**originally** 70:6
**orin** 97:2
**ortiz** 8:6 18:7,7
19:2
**outcome** 54:15
56:10 99:1
100:6 101:6
**outline** 83:17
**outs** 68:18
**outside** 43:7
54:1 66:18
109:7
**outsource**
49:10
**outstanding**
37:20,21 38:4
38:16 39:7
44:5 81:11
82:1,4,8,13
83:24 85:1,8
88:4
**overall** 23:5
24:3 38:8
56:11
**overcollatera...**
38:20 85:13
**overcome** 69:2
**overcomes**
51:11
**overruled** 80:8
95:11 99:24
**overseeing**
21:14
**own** 20:25
36:22,23 46:24
49:7 55:18
56:20 58:14

73:1 74:23
84:10 107:13
**owner** 97:16
**ownership**
3:14 44:25
57:5 96:11
97:12,13,13
98:25 102:22
103:5 106:5
109:25
**owns** 98:12
99:12 100:13
105:22

**p**

**p** 4:1,1 9:1
**page** 25:10,15
97:2,2,3,5,5
112:4
**pages** 28:21
**paid** 27:5
35:21 66:4,17
97:12 106:7
**painstaking**
93:4
**paper** 31:8
**papers** 31:9
36:15 107:1
**paragraph**
86:8,8
**park** 5:17
**part** 50:21 63:9
91:22 93:13
98:21 99:13
**partial** 20:6
**participants**
14:14

**participating**
111:1
**particular**
53:12 68:9
73:22 88:8,10
**particularity**
102:12
**particularly**
35:20 41:9
53:21 55:14
**parties** 9:5
10:10 11:15,19
12:2,23,25
14:4,21,25
15:18,24 17:1
17:17,21,23
18:5,15,18,21
19:5,7,10,14
20:3,6 22:18
32:14 34:17
35:22 36:4,19
40:25 41:6
43:7 49:10
53:24 54:1,13
57:22 63:6,14
63:16 65:3
68:23 70:10
**partner** 10:5
12:7 95:23
**partnership**
34:8
**party** 20:4
33:22,23,25
49:2,5,9 61:8
66:2 93:8,12
**pass** 69:8

passing  17:22
past  30:25 32:4
patently
  104:17
path  26:12
  44:17 54:16
patrick  79:25
paul  83:12,16
pause  15:22
pay  27:2,3 66:1
  66:5,15 97:15
payment  27:3
payments  71:4
  71:6
payoff  84:3
peaks  24:20
pending  15:7
  27:23 107:5
penn  8:3
pennsylvania
  24:1
people  22:14
  32:4 35:15
  54:11 56:18,21
  59:11 70:12
  97:8,9 107:19
pepper  7:9
  17:8
percent  23:2,3
  23:6,15 24:21
  24:23 28:3
  38:7,9,9,10
  40:11,13,14,24
  40:25 42:17
  46:14,18 63:12
  63:20,22 64:3
  64:10,11 68:21

73:13 85:18
  87:14 108:6
percentage
  39:4,6,9 46:13
perfect  9:14
  14:2
perform  2:4
permission
  22:15 30:4
  108:4 109:19
permit  63:19
  81:13
permitted
  64:23
persistent
  101:25
person  87:12
personal  66:17
persons  19:21
pertaining
  77:17
pertinent
  87:20
pesce  5:13 10:6
  10:8 12:6,6
  43:3,5,22
  44:11 51:21
  52:17,19,19
  55:23 57:10
  83:1,6,7
pesce's  58:13
  58:23
petition  69:17
  69:23 72:8
  77:5 82:14
  90:6 101:21
  108:21,23

112:6
phishing  65:23
  65:24 66:11
  68:7
pick  46:18
picked  23:21
picking  46:9
picks  26:13
picture  85:7
piecemeal  53:5
pillay  7:7 17:5
  17:5
place  34:11
  49:25 51:12
  66:21 71:4
  76:12 103:24
  104:8
placed  106:13
places  68:2
placing  33:15
plain  99:22
plan  32:15
  33:22 34:12,12
  34:13 35:8
  37:4 44:17,21
  44:21,21 47:20
  48:12 50:24
  51:17 53:2,21
  55:1 59:11
  60:11 61:1
  64:5 80:17
  86:22 99:14
  103:2,23,25
  105:5 106:19
plane  105:8
plans  33:19
  48:2,4,21

51:17
platform  3:15
  32:23,25 34:22
  41:1 44:9
  60:19 64:21
  75:24 84:15
  88:22 93:11
plaza  8:3
plc  91:8
pleading  51:24
  102:11
pleadings
  22:11 27:15
  66:11
please  10:21
  11:21 12:3
  14:6,23 15:2
  15:20,22 16:1
  16:6 17:3,25
  18:23 19:8,12
  19:16,20 22:17
  25:5 32:17
  66:11 71:22,24
  74:12 83:17
  96:25
plug  26:3,5
pm  111:3
podium  62:17
  62:20,25 72:18
point  25:24
  30:20 41:22
  42:7,19 43:13
  46:11 48:3,7
  48:10 50:2
  58:24 60:20
  64:4 92:2
  97:11 103:1,22

105:23 107:1
109:11
**pointing** 100:1
**points** 39:19
50:23 51:25
52:11,21 54:20
56:12 84:19
96:15
**policies** 93:16
**policy** 90:19,21
90:23 92:2,4
93:13,17,19
**population**
46:5
**portfolio** 33:7
38:19 39:6
41:24 50:17
88:25
**portfolios**
33:10
**portion** 55:1
**portions** 62:8
**position** 30:22
46:20 56:6
58:21
**positioned**
60:9
**positive** 22:4
23:12 24:11
80:15
**possession**
69:16
**possibility**
51:18
**possible** 41:15
41:18 42:13
62:8 67:9

95:19 101:2
**possibly**
106:19
**post** 69:17,23
72:8 108:21
112:6
**posted** 22:14
**posting** 36:22
**postpetition**
2:6,11
**potential** 33:21
34:3,7 49:10
**potentially**
100:21 108:8
**power** 34:6
**practical** 101:7
**practice** 47:21
**practices** 104:8
**precautions**
67:14
**precise** 59:21
**predates** 93:9
**preference**
72:3
**preferential**
104:24
**preferrable**
53:4
**preferred** 6:16
13:3 54:13
57:1
**prefers** 96:3
**preliminary**
80:14 86:9
**prepaid** 27:16
**prepared**
37:12 38:15

85:18
**prepetition** 2:3
88:5
**present** 54:5
96:17 97:22
**presentation**
9:10 39:13
**presented** 90:1
**presenting**
69:17
**presents** 94:15
**pressure** 23:10
**pretty** 38:25
85:24 89:5
102:1
**prevented** 84:8
**preview** 47:22
55:5
**previous** 27:22
**previously**
21:3 49:12
50:15 91:8
**price** 23:10
24:9,20,23
27:23 28:2
74:16
**prices** 24:8,13
24:16 26:6
33:14 34:6
39:8
**pricing** 34:5
**principles** 60:7
**prior** 20:18
23:7 25:7
61:21 63:9,18
64:18 77:4
78:2 90:6,6

**priorities**
35:17 59:12
**priority** 43:15
**pro** 8:9,10,11
8:12,13,14,15
8:16 11:13
12:12 16:9
18:3 62:2
69:20 96:1,17
**probably** 39:8
40:23 53:24
54:9 55:2
71:13 107:9
**problem** 16:21
16:21 59:23
101:7 106:14
**problems**
48:18 50:25
51:12
**proceed** 68:13
**proceeded** 55:9
**proceeding**
15:9 56:10
94:11 106:24
**proceedings**
19:22 20:1
84:12 108:9
111:2 113:4
**proceeds** 93:18
**process** 30:18
32:15,19 33:12
35:7 44:17
47:2 50:23
51:3,5 52:21
53:17 68:14,17
71:3 86:23
97:20 98:3,13

98:18,19,21
100:11 104:1
107:18
**processing**
63:15
**productive**
28:5
**products** 48:9
**program** 35:3
35:9,13,16,24
36:25 40:2
49:3,4 59:4,6
64:23 81:1,2
81:22 86:19
87:7,7 103:11
**programs**
35:13 36:17
**progress** 37:16
56:9
**prohibited**
19:22
**prohibition**
19:24
**project** 51:10
**projects** 27:24
33:10
**promised** 70:2
70:7
**prompt** 86:11
**promptly**
72:15 95:14
99:10
**proper** 110:12
**property** 3:11
3:21 35:4 59:8
61:6,6 76:25
77:10 101:13

104:18 106:21
108:17
**proportionate**
57:7
**proposal** 42:21
42:22 84:20
**propose** 61:13
61:15
**proposed** 36:5
37:3 51:17
70:9
**propound**
59:10
**proprietary**
22:25 23:2
73:1
**protection**
84:10 104:25
**protections**
70:10
**protracted**
36:8 41:16
**proven** 67:3
**provide** 22:18
40:1 43:10
49:6 50:3 55:1
60:11 65:18
66:20,21 67:5
67:8,16 74:2
82:7 94:19,23
98:8
**provided** 3:2
24:21 45:11
66:18 86:10
93:16 94:3
96:12,20 97:14
98:9,12 102:22

105:22 106:5
**providers** 24:7
**provides** 51:1
53:2,3 73:10
99:22
**providing** 43:9
65:20,20 85:4
**provision** 86:2
**public** 24:14
50:9,12 77:21
**pull** 57:21
**pure** 61:20,22
63:16,24 67:15
71:15,17,19
72:2
**purely** 16:13
**purpose** 73:2
**purposes** 38:9
**pursuant** 63:5
86:22 99:14
**push** 57:21
**put** 13:4 32:7
36:15 37:21
38:5 41:23
49:3 53:15
59:20 60:11,18
62:14 71:3
80:6 86:16
87:4 103:24
104:18
**putting** 29:21

**q**

**qs** 50:13
**question** 25:3
25:18 26:17
28:20 30:24
35:23 38:14

41:25 49:22
61:18 71:15
75:14 76:20
82:16 83:5,16
87:12,22
**questioned**
29:1
**questioning**
100:4
**questions**
17:10 22:3,5,8
28:19 47:13
50:19 56:13
62:22 67:12
70:17,24 74:8
80:13,19 81:17
81:20 87:8
91:2 92:18,19
93:3
**quick** 54:22
91:22
**quickly** 101:1
**quite** 22:6 48:5
53:7 107:19
108:1,12

**r**

**r** 1:21 4:1 6:13
9:1 83:12,12
113:1
**race** 100:17,22
**rack** 85:24
**radar** 37:18
69:25
**raise** 10:11
11:17,21 12:3
17:25 43:6
71:25 98:21

raised   10:13
   16:2 32:1
   39:12,25 41:6
   43:14 48:8
   74:11 83:12
   84:19 87:10,24
   89:9 99:18,19
raises   35:23
   39:19 42:5
   61:18
raising   87:20
range   37:22
   46:17
rata   62:2
ratable   45:7
   61:14
ratably   73:16
rather   31:15
   36:9 45:18
   49:17
rationale   80:6
ratios   86:4
rattling   31:7,9
reach   27:14
   36:4 53:25
   64:3 71:24
   104:18
reached   47:25
   79:1
reaching   37:8
   43:16
read   16:10
   19:17 28:22,25
   29:14 54:11
   55:5,19,22
   60:20 86:13
   87:14,17 102:7

102:7
readily   46:1,1
readmit   14:2
reads   77:15
ready   48:5
   59:14 62:21
real   91:22
realize   60:1
really   29:16
   41:2,16 47:8
   48:3,13 51:6
   53:9,11 57:5
   57:19 58:6
   80:13,14 87:20
   88:9 97:21
   102:24 110:5
reason   60:16
   102:9
rebecca   3:16
   8:12 10:20
   101:12
rebounded
   23:14
rebounding
   39:9
recall   21:2
receivables
   34:21
receive   27:13
   27:17 57:6,17
   65:16 66:2,5
   70:8,14 74:5
   77:6,8,24
   99:13
received   32:6
   32:20 33:2
   41:23 42:5

70:1 80:2
   106:9 108:22
receives   66:6
receiving   35:19
   55:11 73:24
recent   16:11
   23:1,18 26:1
   34:5 65:23
recently   23:3
   25:3 47:23
   55:20 90:14
recess   15:23
recognition
   44:12 94:11
recognize   48:7
   107:8
recognized
   94:20 98:22
recognizing
   107:4
reconciliation
   82:5
reconsider
   89:17 93:21
reconsiderati...
   3:6 91:16,20
reconsidering
   93:21
record   9:18
   10:19 11:16,20
   11:22 12:3,5
   12:24,25 13:5
   13:11 14:5,15
   14:22,24 15:1
   15:19,25 16:17
   17:2,10,15,18
   17:24 18:6,16

18:19,22 19:6
   19:8,12,16,18
   20:2,4 35:6
   63:4 65:13
   69:20 80:6
   81:3 83:6
   85:20 86:6,21
   92:19 95:24
   113:4
recording   9:2
   15:22 19:22
   20:1
recover   27:16
   51:1
recoveries
   54:24,25 56:6
recovery   32:24
   33:17,20,23
   34:10 44:22
   45:1,6,9,19,22
   45:23 46:20,25
   47:1,3 48:14
   48:21,23 49:7
   49:14 50:8,11
   53:21 54:3
recurring
   69:25
red   83:8
redact   87:5
reduces   89:3
redundant
   101:16
reexamining
   55:12
refer   96:25
   97:3

references  82:9
referred  30:25
    77:14
referring  33:16
    45:4 109:15,16
    109:16
refers  105:15
reflect  45:5
    86:17
reflected  64:19
    83:8 106:16
reflects  79:5
regarding
    20:19 21:4
    63:7 69:23
    83:16 84:20
    93:17 96:10
    107:13
regardless
    63:21
regards  96:18
    97:11,17
register  50:3
    101:25
registered
    48:23
regulations
    48:9,25
regulator
    103:23
regulators
    47:14 48:1,6
    103:21 104:23
    105:23,25
regulatory
    48:18

rehypothecat...
    103:14
rein  105:1
reinstating
    81:4
reiterate  64:18
    65:4
reject  26:19
rejection  21:15
    21:20 23:18
    26:20,23 27:9
relate  78:7
    80:17 82:13
related  2:3,7,8
    2:13 3:3,16
    34:4 49:22
    55:17 57:19
    71:15 78:5,8
    97:18
relating  96:2
relation  91:11
relationship
    78:5 91:8
    98:15
relationships
    29:12
relative  16:9
    35:12,16 38:11
    39:3,6 46:11
    58:5,7 59:2,12
    107:22,23,23
relatively
    31:12
release  30:4
    88:22
releasing  84:3

relevant  78:2
    99:21 100:5
    105:16
reliance  97:14
relied  59:17
relief  2:7,13
    3:3,7 83:4
    86:22 88:7,12
remain  91:3
remainder
    30:19 40:14,22
    73:16
remaining
    44:13 62:9
    78:20 85:14
remains  29:9
    34:12 50:18
    102:17
remedies  3:2
    86:3
remind  17:20
reminded
    17:20
reminder  63:8
removed  92:4
rent  27:2,16
reopen  64:16
reorganization
    42:14 53:10
    80:17 103:23
    105:5
repeat  105:14
repeated
    101:23,24
repeatedly
    93:15

reply  80:4 86:8
    90:10 91:17
    96:7,8,12
report  25:4,5
    25:10,15 29:3
    29:13,14,19,21
    30:13 31:19
    41:4 55:2,13
    57:25 58:2
    66:7,9 85:18
reporting
    25:11
reports  23:12
    28:25 50:12,12
represent
    40:25 78:4
represented
    88:3 91:9
representing
    12:19 16:8
represents
    37:6 75:9
request  80:7
    81:19 95:11
requested  3:7
    30:20
requesting
    108:12,20
require  33:13
    36:6,6 53:15
    53:16,22,23,23
required  87:4
requirement
    38:21
requirements
    102:11

**requires** 54:9
54:10,12
**research** 84:9
**reserved** 98:17
**reserving** 64:2
**resolution** 36:5
37:8 41:16
42:13,24 43:8
44:11 62:6
98:18
**resolve** 36:1
54:12
**resolved** 44:14
62:1,5 63:13
68:24
**resolves** 99:17
**resources**
101:5
**respect** 21:18
27:20 28:20
32:14 34:8
40:1 48:11,24
59:3 72:7
76:13 78:20,21
81:14 84:13
86:11 88:7,20
**respectfully**
72:18 81:18
**respecting**
59:12 61:2
**respond** 39:19
43:18 87:25
88:2
**responded**
21:12 107:6
**response** 87:8
96:12 102:15

**rest** 41:23
101:8 107:1
**restructuring**
53:2
**result** 19:24
27:22 56:19
57:14 73:17,17
98:23,24
**retail** 36:25
37:5,6 38:4,21
40:1,16 44:1
50:16 81:2,7
86:2,18 87:7
88:13,13
**return** 2:11
23:19 54:7
59:22 60:15,25
61:5,10 69:17
70:12 88:14
99:15 101:1
103:2 107:21
107:21
**returned** 35:22
61:22 64:25
67:21 71:1
83:18
**returning**
44:15
**returns** 59:11
105:9
**revealed** 33:13
**revealing**
107:16
**review** 52:2
58:2
**reviewed** 71:10
72:10 78:13

**revised** 70:15
70:19 72:14
74:6 79:4
80:24
**ride** 49:14
**right** 9:2 10:1
10:9,10,18
11:2,4,7,10,19
12:2,15,22
14:2,4,9,11,14
14:19 15:5,18
15:22,24 16:22
17:1,12,17,23
18:4,10,14,15
19:5,10,14,17
19:21 21:13,21
22:24 25:16
26:2 31:18,21
32:10 33:6
36:14 39:11
44:4 46:19,24
49:16 50:7
51:7 52:17
53:10 58:10
59:11,11,24
60:9 62:14
68:2 69:4
70:20 71:10,12
74:10 76:18
77:13 79:15,16
82:16 83:1,11
87:23 89:6,11
92:20,23,24
95:4,6,8,8,13
95:20 96:4
100:12 101:9
105:8,10 107:2

108:10 110:25
**rights** 3:2
35:12,16 59:2
59:13 61:2
84:13 88:20,20
**rigs** 21:23,25
22:1,24,25
23:1,20,20,21
23:22,23,23,25
24:2,4,7,14
25:19,22,23,24
25:25 26:1,3,5
27:8 80:5,16
**risen** 85:17
**risk** 68:10 86:9
89:3 106:7
**risks** 54:5
60:17
**road** 113:21
**robert** 83:6
**robust** 64:3
**roll** 37:13
**room** 9:6,10,12
9:13 20:5
37:25 90:4
100:15
**ross** 4:8 9:11
26:10,22 58:12
**roughly** 38:7
90:22
**rule** 64:5 85:21
**rules** 99:12
**ruling** 3:20
28:10 35:2
57:15 95:1
98:4,7,10
99:25 101:12

101:20 102:20
105:18,18
106:20 107:13
107:25 108:6
108:16 110:7,9
110:14
**rulings** 61:21
112:3
**run** 20:23
**runway** 105:6
105:7
**rushed** 100:18

**s**

**s** 3:17 4:1 9:1
**safe** 65:13
**safeguards**
88:19 89:1
**sale** 3:6 25:22
27:23 32:15,19
33:14 34:8
50:23 52:21
79:21,24 80:20
89:18 90:15
91:23 92:1
93:17,21 94:2
94:4,5,6,6,12
94:21 112:8
**sanctions**
19:25
**sanders** 7:9
**satisfied** 80:17
80:19
**satisfy** 47:3
99:7
**save** 57:11
**savings** 104:16

**saw** 29:18,18
29:21 98:7
**saying** 70:11
76:2 86:23
91:13 104:12
**says** 13:20
49:17 59:16
86:9 96:21
**scale** 81:9
**scams** 68:7
**scenes** 51:14
**schedule** 64:8
64:12,13 65:1
65:5 71:16,22
71:23
**schedules** 40:6
59:20 72:4
**scientific** 20:23
21:20 23:19
26:11 28:5
**screen** 20:16
89:9
**screenshot**
19:23
**se** 8:9,10,11,12
8:13,14,15,16
11:13 12:12
16:9 18:3
69:20 76:21
96:1,17
**second** 25:13
28:18 31:6
32:22 79:9
87:12 88:18
97:11
**secondly** 90:7

**section** 32:2
73:23 77:14
78:11 79:3
**secure** 23:19
67:17
**secured** 56:23
57:3,11 58:8
**securing** 82:22
84:1,5
**securities**
103:10
**see** 10:23,24
14:11 16:2
20:14,16 29:4
30:9 31:25
39:12,21 49:15
61:16 71:21
90:2 93:5
95:16
**seeing** 41:15
**seek** 88:7
**seeking** 2:10
2:23 73:18
77:6 82:17
83:5 88:9
101:12 108:15
**seeks** 56:4
**seem** 39:9
41:18 51:7
90:17
**seemingly** 90:5
**seems** 34:25
90:12
**seen** 24:19 29:4
40:5 45:17
47:9 86:17

**segal** 8:1,1
18:8,8,24,25
**self** 54:6,8,8,9
**sell** 2:20 21:23
28:7 33:13
49:17 90:25
**selling** 25:18
25:19 51:4
80:16
**send** 65:14
72:12 84:21
95:18
**sender** 78:5,7
**senior** 57:8
58:8 92:16
**sense** 64:25
76:23 98:13
**sent** 24:2 65:18
68:9
**separately**
9:17
**series** 6:16
81:15
**serious** 102:1
104:3
**seriously** 26:15
**service** 73:22
104:23 110:12
**services** 27:13
49:6 67:1,3
**serving** 2:25
85:6
**set** 41:20
104:21
**sets** 79:5
**seven** 23:5
100:4 110:3,6

110:14

**several**  20:17
  46:16,16 52:14
  56:2

**severe**  89:5

**severely**  101:4

**shanks**  15:4,4
  15:5,7,10,13
  15:15,17

**shara**  6:6
  13:14 70:22
  79:11

**share**  45:4,7,10
  45:18 49:12,21
  64:13

**shareholders**
  13:3

**sheet**  29:15
  99:8 101:7
  106:22

**shoba**  7:7 17:5

**shock**  104:11

**shooting**  95:5

**shop**  97:16

**shortfall**  61:23
  62:10 63:8,10
  63:11 68:22

**shortly**  21:11
  27:15

**shot**  53:10

**showing**  86:17

**shut**  109:1

**shy**  43:16

**sided**  104:11

**sides**  110:17

**sight**  26:3

**signature**
  113:7

**signed**  52:1

**significant**
  24:11 27:1
  35:1 37:10
  44:8 47:4,7,19
  55:1 61:5
  88:19 89:1
  94:9 99:8
  106:11

**similar**  59:19
  73:1 86:18
  90:7

**similarly**  60:9
  96:23 100:23
  100:25

**simon**  8:11
  76:21

**simplistically**
  38:2

**simply**  33:11
  51:4 74:24
  99:6 100:16,17
  106:15,21

**single**  25:15
  51:24

**sir**  15:16 75:10
  108:19,19

**site**  23:24,25
  24:2

**sites**  22:25 23:2
  24:4

**situated**
  100:24,25

**situation**  20:19
  20:21 31:3

33:4 74:22
  104:10 108:24

**situations**
  31:13

**six**  85:7

**skip**  91:22,22

**slice**  46:5

**slightly**  23:9
  24:1

**slipped**  69:25

**small**  25:22
  87:15

**smaller**  46:13
  46:15 47:8
  81:9

**snapshot**  72:24
  73:4,7 75:16
  75:25 76:3,17
  77:4

**sneak**  55:5

**social**  34:24,25
  54:11

**soft**  38:12

**sold**  28:9 93:17

**solely**  77:20

**solicit**  44:21

**solution**  43:10

**solutions**
  113:20

**somebody**
  49:16 104:14

**somewhat**
  20:21 45:2
  49:3,22

**sonya**  3:25
  113:3,8

**soon**  52:16
  62:8 67:9
  95:19 110:24

**sooner**  52:13

**sophisticated**
  36:19

**sorry**  16:21
  40:19 74:13
  87:22

**sort**  21:19 22:9
  35:16 36:22
  38:5 39:9
  42:15 45:6,13
  45:18 46:5,8
  46:16,24 59:2
  69:25 91:13

**sorting**  59:6

**sorts**  42:6

**sought**  98:4
  105:18

**sound**  74:2
  81:6 88:15
  89:2

**source**  107:11

**south**  5:3,10

**southern**  1:2

**southfield**  7:12

**sparked**  34:6

**speak**  12:8,13
  16:5 19:1 20:4
  32:5 33:12
  39:15 52:18
  53:12 56:14
  83:22 89:12,23
  90:4 107:4
  110:24

speaking  9:17
  10:6,19,22
  11:16,20 12:3
  12:20,23,25
  13:4,11,16
  14:5,15,21
  15:1,19,25
  17:2,9,21,24
  18:5,16,19,21
  19:6,8,11,15
  29:14 53:14
  67:10 89:22
  105:24
special  92:8
specific  32:4
  39:12 74:22
  80:5 87:21
  91:19 98:1
  110:21
specifically
  21:18 88:19
  105:14 109:8
  109:24,24
specifics  37:13
specify  11:8
  15:6
spend  61:8
spending  53:6
spike  24:16
spoke  22:2
  69:20 76:5
sponsor  34:14
  51:17
sponsors  33:22
spread  36:21
square  77:2

stable  27:24
  28:7,9 38:23
  38:25 40:15
  45:25
stablecoin  84:7
  85:10,11
stablecoins
  3:20
stages  59:14
staked  33:8
stakeholder
  53:16
stakeholders
  36:13 99:15
  100:24
stand  30:15
  37:12
standalone
  33:20 37:2
standard  87:3
  91:19 104:6
standing  96:11
standpoint
  29:15
stands  62:12
start  13:19
  20:8,19 22:8
  67:7 98:2
  102:24
started  19:19
  24:6 51:5
starting  9:2
  34:14 47:23,25
state  16:16
  20:3 48:25
  55:20 102:11
  108:23

statement
  14:18 86:9
statements
  59:20
states  1:1,12
  6:1,9 7:16
  12:20 13:15
  17:14 70:23
  79:12 94:10
  104:6,24
status  2:6
  17:11 62:15
  80:15
step  98:1,13,19
steps  67:18
  68:12 94:9
stick  60:1
stipulated
  59:19
stipulation
  27:9 78:19
stop  31:6,9
  35:18 71:4
storage  24:2
  103:12
straight  53:3
stratify  46:6
street  5:3 6:10
  6:17 7:3
stress  24:17
strictly  19:21
structure  47:6
  51:8 56:22
  58:15
structured
  98:3

subject  34:13
  68:11 78:6
  90:18 104:16
submission
  95:14 101:10
  107:3,7 110:18
submit  72:15
subordination
  58:4,6
subsidiaries
  91:6
substantial
  46:9 56:23
  57:3,8 70:6
  104:9
substantially
  81:7 86:1,18
substantive
  104:9,13
successfully
  100:20
sucks  58:8
suffering
  107:20
suffice  37:13
  50:20
sufficient
  85:19 86:6,20
suggest  67:21
suggested
  29:22 63:15
suggesting
  108:13
suggests  101:4
suite  5:3,10
  7:11 8:3
  113:22

| | | | |
|---|---|---|---|
| **summary** 50:4 | **sustained** | **talking** 24:6 | **testimony** |
| **superpriority** | 95:12 | 25:14 37:23 | 55:11 97:6 |
| 2:5 | **syndicate** | 68:19 | 100:2 |
| **supplementary** | 90:21 | **targeting** 95:6 | **texas** 23:25 |
| 16:10,11 | **synopsis** 52:11 | **tax** 42:15 74:20 | 24:3 26:18,25 |
| 107:15,24 | **system** 2:2 | 74:22,23 96:18 | 27:15 |
| 109:2 | **t** | 97:15 99:19,20 | **thank** 9:15,16 |
| **support** 24:22 | | 99:24,24 | 9:24,25 10:18 |
| 77:19,21,22 | **t** 113:1,1 | **taxable** 74:15 | 11:1,7,10,14 |
| 79:24 85:20 | **table** 38:1 | **taxes** 97:12,15 | 12:1,10,15,22 |
| 92:14 97:7 | **tail** 67:6 | **team** 33:25 | 13:6,9,16,17 |
| **supports** 38:16 | **take** 10:12 | 46:4,4 49:8,8 | 14:9,10,12,13 |
| **supposed** | 11:18 26:15 | **tee** 41:18 | 14:19,20 15:5 |
| 97:20 | 27:11 31:5 | **teed** 57:2 | 15:17 16:7,23 |
| **sure** 10:6,22 | 34:11 38:8 | **tell** 15:12 25:10 | 16:25 17:12,16 |
| 12:13 17:9 | 40:7,15,20 | 40:14,19 65:13 | 17:22 18:4,10 |
| 21:9 22:10 | 46:21 49:4 | **temporary** | 18:14 19:4 |
| 29:25 36:15 | 64:11 65:11 | 24:2 | 20:9 29:25 |
| 51:22 52:5 | 68:12 81:5,13 | **ten** 38:7,10 | 30:5,7 31:18 |
| 53:11 55:9 | 81:14 82:17 | **tens** 36:25 44:3 | 31:21,22,24 |
| 62:5 64:14 | 84:5,11 85:7 | **terms** 17:10 | 32:9,11 41:3 |
| 65:3,4,8 67:13 | 86:25 88:16 | 21:4 32:5 37:1 | 42:10 43:1,20 |
| 67:14,14,23 | 89:6,13 95:13 | 51:16 53:25 | 52:19 58:10 |
| 68:4,16 71:6 | 98:1 101:10 | 73:21 77:14 | 63:1 69:4,11 |
| 71:16 82:20 | 105:25 107:2 | 78:10 81:10 | 71:7,9 72:6,7 |
| 83:23 90:23,24 | 110:18 | 83:18 96:22,25 | 72:12,16,17 |
| 92:3 95:18 | **taken** 38:23 | 97:8 98:5,8,10 | 75:10 77:13 |
| **surely** 76:24 | 53:7 67:18 | 98:11,14 100:7 | 78:15,16 79:14 |
| **surface** 47:22 | 68:4 76:3 | 103:6,8 104:11 | 79:18,19 80:11 |
| 48:5 | 78:14 93:4 | 104:23 105:20 | 80:12,21 83:6 |
| **surge** 34:5 | 94:8 107:7 | 105:21,21 | 87:9 89:16,21 |
| **surplus** 22:1 | **takes** 103:24 | 106:4 109:23 | 92:9 93:2 |
| 25:18 | **talk** 36:17 | 110:2,10 | 95:17,22 96:6 |
| **surprised** | 39:16 70:16 | **test** 25:21 | 97:23,24 |
| 20:25 | 85:21 | **testimonies** | 101:15 105:10 |
| **surprising** | **talked** 26:10 | 96:18,20 | 105:12 107:11 |
| 34:24 | 100:15 | | 109:13 110:19 |

110:23,25

**thanks**  22:22
 25:8 71:14

**that's**  9:12,17
 13:21 16:22
 24:15,21 32:15
 35:21 37:3
 38:25 40:13
 41:2,4 42:2
 45:19 50:20
 52:8,16 53:6,7
 53:22

**theme**  56:1

**theories**  101:4

**thereto**  2:3

**there's**  24:14
 34:23 35:1,14
 36:19 41:25
 42:16 47:5
 48:7,19 52:14

**they're**  44:8

**they've**  9:21

**thing**  26:9
 56:16 62:23
 67:19 85:25
 88:18 102:2

**things**  29:20
 30:15 33:8
 39:16 41:21
 43:5 51:6,20
 52:22 53:5
 105:1

**think**  22:5
 25:22 26:12,12
 29:10 30:3
 34:16 35:20,23
 35:25 36:20

37:4,9 38:2
 39:17 40:22
 41:4 42:22
 43:7 44:3,5,25
 45:3,10 46:7
 46:17,24 48:4
 48:19 50:2
 54:3,22 57:13
 57:18,24 59:5
 59:17,18,21
 60:10 61:4
 62:6,14,20
 63:25 67:18
 68:6 80:18
 85:19 86:5,21
 87:1,2,3,14
 100:5,5 101:2
 101:19 102:18
 102:23 105:6
 105:23 110:6
 110:20

**thinking**  44:17
 48:11

**third**  32:23
 33:22,23,25
 36:18 49:2,5,9
 49:10 66:2
 90:20 93:8,12

**thoroughly**
 38:14

**thought**  16:18
 21:8 29:23
 32:12 44:3
 61:24,25 62:4
 70:6 87:17

**thousand**
 46:17

**thousands**
 36:25 44:3
 104:15

**three**  32:20
 84:9 90:6
 96:15

**threshold**
 45:12,14,16
 46:2,8 72:3
 98:10

**thresholds**
 46:7

**tied**  39:1

**ties**  21:24

**time**  10:11
 11:17 14:23
 15:3,12,15,20
 17:4 18:1,23
 20:3 29:6 33:1
 33:18 35:5
 44:20,23 45:2
 45:9,20,21,24
 46:20,23 47:3
 49:4 51:7,10
 53:6,8 55:6
 60:1 66:10
 69:21 75:15
 83:22 89:4
 95:22 96:14
 104:8,17
 107:18 108:3

**times**  56:2 90:9
 93:22

**timestamps**
 102:16

**today**  9:10
 21:22 26:14

29:25 32:3
 34:17 35:21
 37:12 43:6
 50:20 52:1,1,2
 52:12 53:7,14
 54:3,11 56:15
 96:15 101:16
 101:17 109:6
 109:21 110:21
 111:1

**today's**  107:13

**today's**  51:23

**together**  44:11
 49:3 77:2
 87:18

**togut**  8:1 18:8
 18:24

**token**  45:5,18
 49:14,17,21
 50:10 72:23
 73:3,4,15
 75:24 76:11,13
 76:15

**tokenize**  45:3

**tokenized**
 53:21 54:3

**tokens**  2:17
 45:8,10 49:12
 73:6,8,11,14
 73:18,24,24
 74:1 76:9,16
 77:5,7,9,12
 112:7

**told**  86:8 105:2

**tomorrow**  52:9

**ton**  53:11

took  40:6,16
  75:15
top  26:10
  38:10 40:20,21
  40:24
topic  39:12,15
  39:18 43:4,6
  44:1 54:22
topics  21:16
total  46:19
  70:5 73:14
  81:10 82:7,11
  82:12 83:20,24
  84:25
tou  109:4
touch  25:18
touched  82:25
touching  82:20
toward  94:9
towards  27:3
  56:10
town  7:11
track  22:12
  50:3
tradable  46:1
  49:13
trade  57:12
trading  49:21
  49:24 50:5
  75:1,5 103:15
traditional
  58:9,19
transaction
  34:11 64:20
  94:9,13,15
  95:15

transactions
  2:5 29:10 34:3
  34:8
transcribed
  3:25
transcript
  28:18,21 29:24
  51:23,25 52:14
  52:15 97:1,4
  113:4
transcripts
  52:15
transfer  2:24
  33:3 54:4
  69:25 70:13
  106:5,7 109:9
  109:25
transferred
  66:25 67:17
  90:15
transfers  2:12
  69:17,23 70:3
  70:5,11 72:8
  112:6
transition
  21:19
translate  45:1
translation
  94:22
transmission
  103:15
treat  75:23
  76:15
treated  60:9
  61:4 77:23
treatment  37:3
  58:1 76:10

100:23
treats  61:1
tremendous
  24:19
trending  23:3
trends  24:8
trials  60:22
tried  82:5
  91:16
troutman  7:9
  17:8
true  33:25
  113:4
trust  55:14
  60:4 100:19
trustee  6:2
  7:17 13:15
  17:14 47:15
  48:6 70:23
  78:18,23 79:2
  79:8,12
trustee's  67:24
trustee's  13:12
  47:19
truth  69:2
try  36:1,4
  43:17 47:22
  49:15 68:21
  100:18
trying  42:12,25
  44:11 60:22
  76:22 77:1,1
  90:18 95:15
tuesday  84:19
tuned  51:25
turetsky  4:19
  10:3,4 12:8

turn  17:21
turning  97:25
  99:18
tweaks  85:25
tweed  6:15
twice  53:12
two  28:25
  47:13 57:19
  86:21 91:12
  95:3 103:24
  104:1 106:1
type  31:3 34:11
  86:22,23
  100:21
types  71:4

**u**

u  83:12
u.s  78:18
u.s.  1:23 6:2
  7:17 13:12
  46:8 47:15,19
  48:6 67:24
  78:23 79:2,8
ubierna  8:13
  11:13 80:3,9
  80:10,12
ucc  88:21,23
uk  104:22
ultimate  99:1
ultimately
  53:25 101:5
unable  109:20
unaccredited
  104:14
unambiguous
  99:23 100:1,8
  103:8 104:12

**unambiguou...**
98:8,11 105:22
**unanswered**
91:2 93:3
**uncollectable**
86:10
**unconsciona...**
97:17,18 100:9
100:19 104:5,5
104:9,13 106:4
**unconsciona...**
100:12 104:7
104:17
**under** 3:2 27:7
31:1,15 37:1
38:1 55:1,15
63:24 78:23
82:10 84:10
85:15 87:2
88:5 89:13
95:14 100:3,3
101:10 103:6
103:18 104:25
106:18 107:2,7
110:18
**understand**
36:10 38:14
40:3 56:22
58:2 60:18
76:18,22 77:1
77:3 78:3
91:15 95:14
96:22 102:8
108:12 109:11
109:12,13,18
110:16,17

**understanding**
29:9 39:5
40:16 57:10
58:4 71:5
82:22
**understands**
65:5 68:16
**understood**
60:17 68:3,25
69:3 109:22
**undisclosed**
91:9
**undisputed**
62:7
**undoubtedly**
44:19
**unearned**
108:6
**uneducated**
41:22
**unenforceable**
104:8
**unfortunately**
51:3 67:1
**unhappy** 56:18
**uniform** 78:25
**unique** 33:5
36:22,23 70:4
81:10 82:9
**united** 1:1,12
6:1 7:16 13:15
17:14 70:23
79:12 94:10
**universe** 38:11
**unmute** 10:21
11:17,22 12:4
14:6,23 15:2

15:20 16:2
19:9,12
**unplugged**
27:9
**unreasonable**
104:6
**unsecured** 4:15
5:2,9 56:24
57:4 98:24
99:3
**unsupported**
77:24
**unwind** 88:10
88:25
**update** 17:11
20:19 21:17
22:18 25:6
29:4,7,13
30:11,15 32:14
50:20 67:5,8
**updated** 25:3
64:8
**updates** 32:6
**upside** 24:11
26:6
**uptime** 23:1,4
**urge** 41:13
**usdc** 63:22
**use** 10:12
24:14 49:5
77:14 85:22
96:22 97:8
98:5,8,10,11
98:14 100:7
103:6,8 105:21
106:5 107:20
109:23 110:2

110:10,11
**used** 24:15
44:23 58:3
105:2,7
**user** 55:4 66:1
66:6 110:11
**users** 44:9 56:1
65:10,13,19
70:4
**usi** 93:13,24
**using** 22:1
**usually** 22:3
52:14 103:23

|          **v**          |

**valid** 103:17
105:19
**value** 28:3 33:1
33:18 34:18
35:8 37:11
38:16 39:2
44:23 45:5
46:1,8,22,22
51:2,9 52:24
53:3 54:2
57:17,20 58:8
58:22 59:5,11
60:14 61:5,12
73:25 74:3
82:13 83:18
85:1 86:4,12
88:11,17 90:23
94:6,14 99:10
99:11,13,15
101:1 103:3
106:18
**valued** 74:24
90:22,24

values 82:14
variety 65:24
  66:8 83:9
various 44:24
  49:20 84:6
  90:9 91:5 93:5
  93:25 101:23
vast 27:12
  40:12 59:3,4
vazquez 71:12
  71:14 72:6
vehicle 51:1
vendors 57:12
verbatim 28:22
veritext 113:20
version 109:23
  109:25 110:3,4
  110:5,6,6,13
versus 53:3
  54:3 58:5,18
  63:11
victor 8:13
  11:10,12 80:3
video 13:19,23
  19:23 61:16
videos 17:21
view 41:5,22
  43:13 57:18
viewing 9:13
views 35:25
vince 30:9
vincent 7:6
  13:7
violation 19:24
virtual 89:19
vital 55:24

volatile 39:2
  60:17
vote 53:17
votes 44:21

**w**

wacker 5:10
wagging 67:6
waiting 20:5
walk 80:5 81:2
wallets 63:11
want 10:22
  27:17 29:3,4
  34:23 35:5
  38:13 39:16,19
  43:2,4,24
  48:11 49:14
  51:22 52:5,17
  52:20 53:11,13
  53:19 54:19
  55:23 58:13
  62:5 65:2,22
  65:24 66:14
  67:7,10,13,25
  69:5,5 71:6
  75:9 77:9,10
  80:9 82:20
  84:24 86:23,24
  89:8,9 95:9
  97:11,25 103:1
  103:19 105:5,8
  105:14 107:16
  107:18 108:2
  109:6 110:22
wanted 16:12
  21:8 25:17,21
  29:25 39:25
  40:17 41:2

43:5 51:14
  55:18 56:12,16
  71:2,15 96:7
  98:1 104:4
  107:21
wanting 42:8
wants 60:1
  67:19 105:7
  106:20
washington
  6:11,18 9:20
wasn't 29:19
  38:14
waste 60:21
  108:3
wasteful 101:5
watching 63:8
way 22:10 27:2
  30:21 31:14,15
  38:2 51:11
  53:18 61:14
  67:15 90:1
  97:22 98:3
we've 55:3
  56:2 58:14,15
  59:19,19,24
  62:7 68:4,14
  68:18,19 70:24
  79:13
website 89:25
  90:11,19 92:4
  93:22 94:1
week 23:22,22
  25:14 27:24
  28:12,25 55:2
  63:6 64:12,16
  64:17 65:6,7

87:13
weeks 47:24,24
  51:16 90:6
  94:13
welcome 14:13
  51:11
went 22:9
  29:23 52:12
we'd 47:9
we'll 27:15
  36:15 39:15
  47:22
we're 26:24
  27:13 37:22
  43:14 44:17
  45:2,4,12,22
  47:1,2,8 48:11
  48:20 49:19
  50:4,15 53:14
  54:17
we've 26:11
  30:18 31:13
  32:6 35:11,13
  36:12,15 37:7
  37:16 42:12,20
  42:21,22 43:8
  44:6 46:3 47:9
  47:18 52:2
  53:6 54:24
whatsoever
  78:7
what's 21:24
  29:15 31:18
  37:22 51:15
white 4:14 5:1
  5:8 10:2,4 12:6
  14:7 52:20

65:13,17 83:7
**wide**  60:16
**wild**  29:20
**winter**  34:6
**wish**  70:20
71:9 74:10,12
77:24 79:15
83:14 96:13,15
109:10
**withdraw**
63:20 64:24,24
65:2,9,19 78:1
**withdrawal**
63:24 64:8,19
65:5 66:23,24
68:14 87:16
**withdrawals**
63:16,19 64:16
64:21 65:6,11
65:17 67:7
87:13
**withdrawn**
63:21 64:10
109:19
**withheld**  35:14
**withhold**  7:10
17:8 57:23
66:24 67:5,8,9
**witnesses**
31:16 55:12
100:3,5
**wonder**  105:4
**wondering**
74:15 87:17
**won't**  28:22
42:6 47:24

**word**  72:15
85:22 86:25
**work**  30:11
35:11 41:14
42:12 44:11
46:3 48:14
50:21 54:17,18
55:7 56:10
82:24,24 93:10
**worked**  47:16
88:5
**working**  14:12
42:20 47:6
67:4 68:7
78:25 99:10
101:1
**workman**  8:19
18:11,12,12
92:16,17,25
**workouts**
84:14 88:21
**worms**  108:3
**worse**  51:6
**write**  66:8
**writing**  88:24
**wrong**  38:1
**wrongful**  56:8

| x |
| --- |

**x**  1:4,10 42:17
112:1
**xrp**  72:24
75:25 76:9,16
76:24

| y |
| --- |

**yeah**  10:8
14:19 15:13

16:20,23 21:22
25:12 55:23
76:21 83:5
87:11 91:18
**year**  20:22
21:13 23:10,11
75:18 76:5
**years**  60:22
103:24 104:1
106:1,3
**year's**  21:12
**yesterday**
47:25
**yield**  62:20,25
106:7,9
**york**  1:2,14
4:17 5:18 6:4
7:19 8:4 55:20
56:3,5 78:22
101:21
**you'll**  28:18
**you're**  14:13
25:11,11 29:14
30:14 42:16
46:9
**you've**  30:25
35:19 36:11
38:12 39:11
45:17 46:15

| z |
| --- |

**z**  107:9
**zamfir**  4:10
**zero**  23:9 85:3
85:5