Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Initial Debtors and Debtors in Possession*

*Proposed Counsel to the GK8 Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

## NOTICE OF FILING OF TRANSCRIPT
## FROM OMNIBUS HEARING HELD ON JANUARY 24, 2023

**PLEASE TAKE NOTICE** that an omnibus hearing was held on January 24, 2023, that included status updates on the Debtors' mining business and the status of the Debtors' ongoing sale process, an update regarding the withdrawal of certain assets in the Debtors' custody program and withhold accounts, and other requested relief (the "Omnibus Hearing") as set forth in the amended agenda filed at Docket No. 1925.

**PLEASE TAKE FURTHER NOTICE** that the Court requested that the Debtors make available for the public the full Omnibus Hearing transcript.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

**PLEASE TAKE FURTHER NOTICE** that attached hereto as <u>**Exhibit A**</u> is a true and correct copy of the Omnibus Hearing transcript.


[*Remainder of page intentionally left blank*]

New York, New York                  /s/ Joshua A. Sussberg
Dated:  January 27, 2023            **KIRKLAND & ELLIS LLP**
                                    **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                    Joshua A. Sussberg, P.C.
                                    601 Lexington Avenue
                                    New York, New York 10022
                                    Telephone:      (212) 446-4800
                                    Facsimile:      (212) 446-4900
                                    Email:          joshua.sussberg@kirkland.com

                                     - and -

                                    Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
                                    Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
                                    Christopher S. Koenig
                                    Dan Latona (admitted *pro hac vice*)
                                    300 North LaSalle Street
                                    Chicago, Illinois 60654
                                    Telephone:      (312) 862-2000
                                    Facsimile:      (312) 862-2200
                                    Email:          patrick.nash@kirkland.com
                                                    ross.kwasteniet@kirkland.com
                                                    chris.koenig@kirkland.com
                                                    dan.latona@kirkland.com

                                    *Counsel to the Initial Debtors and Debtors in
                                    Possession*

                                    *Proposed Counsel to the GK8 Debtors and Debtors in
                                    Possession*

## <u>Exhibit A</u>

*In re Celsius Network LLC et. al.* **Hearing Transcript – January 24, 2023**

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 22-10964-mg

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   CELSIUS NETWORK LLC,

8

9          Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                  United States Bankruptcy Court

13                  One Bowling Green

14                  New York, NY  10004

15

16                  January 24, 2023

17                  10:00 AM

18

19

20

21   B E F O R E :

22   HON MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  KAREN

Page 2

1    HEARING re (I) Authorizing the GK8 Debtors to (A) Continue

2    to Operate the GK8 Cash Management System, (B) Honor Certain

3    Prepetition Obligations Related Thereto, (C) Maintain

4    Existing GK8 Business Forms, and (D) Continue to Perform GK8

5    Intercompany Transactions, (II) Granting Superpriority

6    Administrative Expense Status to Postpetition GK8

7    Intercompany Balances, and (III) Granting Related Relief

8    (Related Doc ## 1627, 1653, 1784, 1902, 1917).

9

10   HEARING re Debtor's Motion Seeking Entry of an Order (I)

11   Authorizing the Debtors to Return Postpetition

12   Cryptocurrency Transfers to Account Holders and (II)

13   Granting Related Relief. (Doc#

14   1817, 1867, 1902, 1918, 1925).

15

16   HEARING re Debtors Motion for Entry of an Order Authorizing

17   the Debtors to Credit Flare Tokens to Eligible Account

18   Holders. (Doc# 1819, 1867, 1902, 1913).

19

20   HEARING re Notice to sell certain diminis assets (ECF Doc.

21   ## 1853, 1855, 1879, 1902, 1919, 1921).

22

23   HEARING re Debtor's Motion Seeking Entry of an Order (I)

24   Authorizing (A) the Transfer of Cryptocurrency Assets

25   Serving as Collateral on Account of Institutional Loans in

Page 3

1   the Ordinary Course of Business and (B) the Exercise of the

2   Debtors Rights and Remedies Provided Under Each Master

3   Lending Agreement and (II) Granting Related Relief. (Doc#

4   1818, 1867, 1871, 1874, 1902, 1923, 1924, 1925).

5

6   HEARING re Motion for Reconsideration of GK8 Sale and Other

7   Requested Relief Filed by Dan Frishberg. (Doc# 1794, 1806,

8   1824, 1826, 1828, 1852, 1866, 1869, 1870, 1902, 1911, 1925).

9

10   HEARING re Motion to Allow Digital Assets to be Deemed

11   Filer's Property filed by Kulpreet Khanuja. (ECF Doc. 1346,

12   1816, 1872, 1902, 1909, 1925).

13

14   HEARING re Motion for entry of an order that ownership of

15   ALL the coins deposited into the Celsius Earn platform by

16   Ms. Gallagher belong to Rebecca Gallagher, etc. (related

17   document(s)1325, 901, 1416, 136, ECF Doc. # 1508, 1872,

18   1902, 1908, 1925).

19

20   HEARING re Motion to Approve a ruling that the stablecoins

21   and assets in earned accounts are not property of the

22   estate, etcetera filed by Michael Benzaken. (ECF Doc. #

23   1512, 1814, 1872, 1902).

24

25   Transcribed by:  Sonya Ledanski Hyde

Page 4

1    A P P E A R A N C E S :

2

3    KIRKLAND & ELLIS LLP

4         Attorneys for the Debtor

5         300 N. LaSalle

6         Chicago, IL 60654

7

8    BY:  ROSS KWASTENIET

9         DAN LATONA

10        GABRIELA ZAMFIR HENSLEY

11        GRACE BRIER

12        LEAH HAMLIN

13

14   WHITE & CASE LLP

15        Attorneys for Official Committee of Unsecured Creditors

16        1221 Avenue of the Americas

17        New York, NY 10020

18

19   BY:  DAVID TURETSKY

20

21

22

23

24

25

1    WHITE CASE LLP

2        Attorneys for Official Committee of Unsecured Creditors

3        555 South Flower Street, Suite 2700

4        Los Angeles, CA 90071

5

6    BY:  AARON COLODNY

7

8    WHITE CASE LLP

9        Attorneys for Official Committee of Unsecured Creditors

10       111 South Wacker Drive, Suite 5100

11       Chicago, IL 60606

12

13   BY:  GREG PESCE

14

15   MCCARTER ENGLISH, LLP

16       Attorneys for Ad Hoc Group of Borrowers

17       245 Park Avenue

18       New York, NY 10167

19

20   BY:  DAVID ADLER

21

22

23

24

25

Page 6

1   UNITED STATES DEPARTMENT OF JUSTICE

2        Attorneys for the U.S. Trustee

3        One Bowling Green

4        New York, NY 10004

5

6   BY:  SHARA CLAIRE CORNELL

7

8   NATIONAL ASSOCIATION OF ATTORNEYS GENERAL

9        Attorneys for States

10       1850 M Street, NW, 12th Floor

11       Washington, DC 20036

12

13  BY:  KAREN R. CORDRY

14

15  MILBANK, TWEED, HADLEY & MCCLOY LLP

16       Attorneys for Series B Preferred Holders

17       1850 K Street NW

18       Washington, DC, DC 20006

19

20  BY:  ANDREW LEBLANC

21

22

23

24

25

Page 7

1    JENNER & BLOCK

2        Attorneys for the Examiner

3        353 N. Clark Street

4        Chicago, IL 60654

5

6    BY:  VINCENT LAZAR

7        SHOBA PILLAY

8

9    TROUTMAN PEPPER HAMILTON SANDERS LLP

10        Attorneys for Ad Hoc Group of Withhold Account Holders

11        4000 Town Center, Suite 1800

12        Southfield, MI 48075

13

14   BY:  DEBORAH KOVSKY

15

16   UNITED STATES DEPARTMENT OF JUSTICE

17        Attorneys for the U.S. Trustee

18        Alexander Hamilton Custom House

19        New York, NY 10004

20

21   BY:  MARK BRUH

22

23

24

25

1    TOGUT, SEGAL & SEGAL

2        Attorneys for Ad Hoc Group of Custodial Accountholders

3        One Penn Plaza, Suite 3335

4        New York, NY 10119

5

6    BY:  KYLE ORTIZ

7        BRIAN KOTLIAR

8

9    MICHAEL BENZAKEN, Pro Se Creditor

10    ADAM JETER, Pro Se Creditor

11    SIMON DIXON, Pro Se Creditor

12    REBECCA GALLAGHER, Pro Se Creditor

13    VICTOR UBIERNA DE LAS HERAS, Pro Se Creditor

14    IMMANUEL HERMANN, Pro Se Creditor

15    MICHAEL BENZAKEN, Pro Se Creditor

16    DANIEL FRISHBERG, Pro Se Creditor

17

18    CHRIS FERRARO, Celsius

19    LISSA WORKMAN, Celsius

20

21

22

23

24

25

Page 9

```
 1                    P R O C E E D I N G S
 2            CLERK:  All right.  Starting the recording for
 3   January 24th, 2023 at 10:00 a.m.  Calling Celsius Network
 4   LLC, Case Number 22-10964.
 5            Admitting the parties for Kirkland.  Who is going
 6   to be in each room?
 7            MR. LATONA:  Deanna, can you hear us?
 8            CLERK:  Yes, I can.
 9            MR. LATONA:  So this is Dan Latona of Kirkland &
10   Ellis.  This is the presentation room.  Today appearing will
11   be Ross Kwasteniet, Chris Koenig, Gabriela Hensley, and Dan
12   Latona.  There is another room, Chicago Conference.  That's
13   our viewing room.  And we have a listen-in-only line.
14            CLERK:  Okay, perfect.
15            MR. LATONA:  Thank you.
16            CLERK:  Thank you.  Dan, is any other counsel
17   going to be appearing separately that's speaking on the
18   record?
19            MR. LATONA:  Yes.  We may have Grace Brier and
20   Leah Hamlin in our Washington, D.C. office.  I don't know if
21   they've joined yet.
22            CLERK:  Let me check.  I don't believe so.
23            MR. LATONA:  Okay.
24            CLERK:  I'll look out for them.  Thank you.
25            MR. LATONA:  Thank you.
```

1           CLERK:  All right.  Could we have the appearances

2    of counsel from White & Case?

3           MR. TURETSKY:  Good morning, Deanna.  It's David

4    Turetsky of White & Case on behalf of the Committee.  I

5    believe my partner, Aaron Colodny is on, who will be

6    speaking.  As well Greg Pesce.  I'm not sure if he has

7    joined yet.

8           CLERK:  Yeah, Aaron Colodny has joined.  Mr. Pesce

9    has not joined yet.  All right.

10           All right.  I'm going to ask for the parties that

11   have joined if they could raise their hands one at a time

12   and I'll take their appearances.  If you could just use the

13   raised hand function.

14           Mr. Adler?

15           MR. ADLER:  Good morning, Deann.  It's David Adler

16   from McCarter and English on behalf of the Ad Hoc Group of

17   Borrowers.

18           CLERK:  Thank you.  All right.  Anyone else that

19   is going to be speaking on the record this morning?

20           Yes, Rebecca Gallagher.  Ms. Gallagher?  If you

21   could just unmute and give your appearance, please.  I just

22   want to make sure you have no issues speaking.  Okay, I can

23   see -- go ahead.

24           MS. GALLAGHER:  Can you hear me and see me?

25           CLERK:  Yes, I can.

1          MS. GALLAGHER:  Okay, thank you.

2          CLERK:  All right.  So, Ms. Gallagher, your

3    appearance is noted.

4          All right.  Leah Hamlin?

5          MS. HAMLIN:  Good morning.  Leah Hamlin on behalf

6    of the Debtors.

7          CLERK:  All right, thank you.  And if you could

8    just specify which -- are you with Kirkland?

9          MS. HAMLIN:  With Kirkland & Ellis, yes.

10          CLERK:  Okay, thank you.  All right.  Victor de

11    las Heras?

12          MR. DE LAS HERAS:  Good morning, Deanna.  Victor

13    Ubierna de las Heras, pro se creditor.

14          CLERK:  Thank you.

15          Are there any additional parties that have joined

16    and are speaking on the record this morning?  If you could

17    just raise your hands and unmute one at a time, and I'll

18    take your appearance.

19          All right.  For the parties that have joined, if

20    you are speaking on the record this morning and have not

21    given your appearance, please raise your hands and I'll ask

22    you to unmute and give your appearance for the record.

23          Yes, Grace Brier.

24          MS. BRIER:  Hi.  Grace Brier, Kirkland & Ellis,

25    for Debtors.

Page 12

1          CLERK:  Thank you.

2          All right, for the parties that have joined, if

3     anyone is speaking on the record this morning, please raise

4     your hands and I will ask you to unmute and give your

5     appearance for the record.

6          MR. PESCE:  Hi, this is Gregory Pesce at White &

7     Case on behalf of the Committee.  I believe my partner,

8     David Turetsky, mentioned I am going to speak.  But I am now

9     on and making my appearance, too.

10          CLERK:  Thank you.

11          Yes, Mr. Hermann.

12          MR. HERMANN:  This is Immanuel Hermann, pro se

13     creditor.  I am not sure if I'll speak, but making my

14     appearance.

15          CLERK:  All right.  Thank you for noting your

16     appearance.  Appreciate it.

17          Yes, Ms. Cordry?

18          MR. CORDRY:  Yes, Karen Cordry from the National

19     Association of Attorneys General representing a number of

20     states.  I don't anticipate speaking, but just in case

21     something comes up, you have my appearance.

22          CLERK:  Thank you.  All right.  Are there any

23     additional parties that have joined and that are speaking on

24     the record this morning?  And are there any additional

25     parties that have joined that are speaking on the record

Page 13

1    this morning?

2            MR. LEBLANC:  Hi, Deanna.  This is Andrew Leblanc

3    of Milbank on behalf of certain preferred B shareholders.  I

4    don't anticipate speaking, but just in case, I will put my

5    name on the record.

6            CLERK:  Thank you.  Mr. Lazar?

7            MR. LAZAR:  Good morning, Deanna.  Vincent Lazar,

8    Jenner & Block, on behalf of the examiner.

9            CLERK:  Thank you.

10           Good morning, Ms. Cornell.  Are you going to be

11   speaking on the record this morning, or is another --

12   someone else from the U.S. Trustee's Office going to be

13   doing so?

14           MS. CORNELL:  Good morning, Deanna.  It's Shara

15   Cornell at the Office of the United States Trustee.  I will

16   be speaking this morning.  Thank you.

17           CLERK:  Thank you.

18           Yes, Mr. Adler?

19           MR. ADLER:  Deanna, I can't start the video.  It

20   says the host has disabled it.

21           CLERK:  Not to my knowledge, but that's very odd.

22           MR. ADLER:  Okay.

23           CLERK:  I haven't disabled anyone's video to my

24   knowledge.

25           MR. ADLER:  Okay.  I'm going to drop off and then

Page 14

1    come back on.  Maybe it's something with the link.

2              CLERK:  Okay.  All right, perfect.  I'll readmit

3    you.

4              All right.  Are there any additional parties that

5    are speaking on the record this morning?  If you could

6    unmute and give your appearance, please?

7              MR. COLODNY:  Hi, this is Aaron Colodny from White

8    & Case on behalf of the Official Creditors' Committee.

9              CLERK:  All right.  Thank you, Aaron.

10             MR. COLODNY:  Thank you.

11             CLERK:  All right.  I see you, Mr. Adler.

12             MR. ADLER:  Okay.  It's working.  Thank you.

13             CLERK:  You're welcome.  Thank you.

14             All right, are there any additional participants

15   that are speaking on the record this morning and have not

16   given their appearance.  If so --

17             MR. FERRARO:  Hi, Deanna.  I'm giving an opening

18   statement.

19             CLERK:  Thank you, Mr. Ferraro.  Yeah.  All right.

20   So Christopher Ferraro.  Thank you.

21             Are there any additional parties that are speaking

22   on the record this morning that have not given their

23   appearance?  If so, please unmute one at a time and give

24   your appearance for the record.

25             CLERK:  Okay.  Any additional parties that are

Page 15

1    speaking on the record this morning and have not given their

2    appearance?  If so, please unmute and give your appearance

3    at this time.

4            MR. SHANKS:  Fred M. Shanks.

5            CLERK:  All right.  Thank you, Mr. Shanks.  And if

6    you could just specify how you are involved in the case.

7            MR. SHANKS:  Pending motion for Celsius.

8            CLERK:  Okay.  Are you here for the -- were you

9    here for the adversary proceeding?

10            MR. SHANKS:  Yes.

11            CLERK:  That actually was moved.  If you give me

12    one moment, I'll tell you what date and time.

13            MR. SHANKS:  Yeah.  Is it moved to February 15th?

14            CLERK:  Yes, at 10:00 a.m.  Yes.

15            MR. SHANKS:  Okay.  Then I will drop at this time.

16            CLERK:  Okay.  Have a good day, sir.

17            MR. SHANKS:  Thank you.  You too.

18            CLERK:  All right.  For the parties that have

19    joined, if anyone is speaking on the record this morning and

20    has not given their appearance, please unmute one at a time

21    and give your appearance.

22            All right.  Please pause the recording.

23            (Recess)

24            All right, for the parties that have joined, if

25    anyone is speaking on the record this morning and has not

1  given their appearance, please do so.  Mr. Benz, Mike Benz?

2  Yes, I see your hand is raised.  You could unmute and give

3  your appearance.

4          MR. BENZAKEN:  Yes, okay, you would like me to

5  speak now.

6          THE COURT:  Yes, go ahead, please.

7          MR. BENZAKEN:  Okay, thank you very much.  Okay,

8  yes.  My name is Mike Benzaken.  I am here representing my

9  brother's pro se motion relative to Earn and the coins in

10  his account.  I've read all of the supplementary documents,

11  Blonstein supplementary document and the recent Earn

12  opinion.  And it looked like everyone wanted to focus on

13  contract law.  So my focus was purely on what in the

14  contract --

15          CLERK:  So, Mr. Benzaken, I am just taking

16  appearances for the hearing.  So you can definitely state

17  that on the record when the matter is called.

18          MR. BENZAKEN:  Oh, okay.  I thought you were

19  asking --

20          CLERK:  I'm just taking your appearance.  Yeah,

21  not a problem.  Not a problem.  Sorry to interrupt the flow.

22          MR. BENZAKEN:  That's all right.

23          CLERK:  Yeah.  So your appearance is noted.  Thank

24  you so much.

25          MR. BENZAKEN:  Thank you.

Page 17

1           CLERK:  All right.  For the parties that have

2     joined, if anyone is speaking on the record this morning and

3     has not given their appearance yet, please do so at this

4     time.

5           MS. PILLAY:  Good morning, Deanna.  Shoba Pillay

6     from Jenner & Block as the examiner.

7           MS. KOVSKY:  Good morning, Deanna.  Deb Kovsky,

8     Troutman Pepper, for the Ad Hoc Committee of Withhold

9     Accountholders.  I'm not sure I'm going to be speaking on

10    the record unless the Judge has any questions in terms of a

11    status update.

12          CLERK:  All right.  Thank you, Deborah.

13          MR. BRUH:  Hi, Deanna, it's Mark Bruh from the

14    United States Trustee.  I'll just note my appearance for the

15    record.

16          CLERK:  Thank you, Mark.

17          All right.  Are there any additional parties that

18    are giving their appearance on the record this morning?

19    Okay.

20          I have been reminded -- I am asked to remind

21    parties to turn off their videos if you are not speaking.

22    So I am just passing that along.  Thank you.

23          All right.  For the parties that have joined, if

24    anyone is speaking on the record this morning and has not

25    given their appearance yet, please raise your hand one at a

Page 18

1    time to give your appearance.

2            Yes, Mr. Frishberg.

3            MR. FRISHBERG:  Daniel Frishberg, pro se.

4            CLERK:  Thank you.  All right.  Are there any

5    additional parties that have joined that are speaking on the

6    record this morning and have not given their appearance?

7            MR. ORTIZ:  Good morning, Deanna.  It's Kyle Ortiz

8    of Togut, Segal & Segal for the Ad Hoc Group of Custodial

9    Accountholders.

10            CLERK:  All right.  Thank you.

11            Yes, Lissa Workman.

12            MS. WORKMAN:  Lissa Workman, employee of the

13    Debtor.

14            CLERK:  All right, thank you.

15            All right.  Are there any additional parties that

16    are speaking on the record this morning and have not given

17    their appearances yet?

18            Again, any additional parties that have not given

19    their appearances that are speaking on the record this

20    morning?

21            Are there any additional parties that are speaking

22    on the record this morning and have not given their

23    appearance?  Please do at this time.

24            MR. KOTLIAR:  Bryan Kotliar of Togut, Segal &

25    Segal, counsel for the Ad Hoc Group of Custodial

1    Accountholders.  I am unlikely to speak.  My colleague, Mr.

2    Ortiz, should be on and will note his appearance if he

3    hasn't done so already.

4              CLERK:  He has.  Thank you.

5              All right.  Any additional parties that are

6    speaking on the record this morning and have not given their

7    appearance?  If there are any parties that have not given

8    their appearance and are speaking on the record, please

9    unmute and give your appearance.

10             All right.  Are there any additional parties that

11   have not given their appearance and are speaking on the

12   record this morning?  If so, please unmute and give your

13   appearance.

14             All right.  For the parties that have joined, if

15   anyone has not given their appearance and is speaking on the

16   record this morning, please do so.

17             All right.  Judge, would you like me to read the

18   announcement in the record and would you like to get

19   started?

20             THE COURT:  Yes, Deanna, please.

21             CLERK:  All right.  All persons are strictly

22   prohibited from making any recording of court proceedings,

23   whether by video, audio, screenshot, or otherwise.

24   Violation of this prohibition may result in the imposition

25   of monetary and non-monetary sanctions.  The clerk of the

Page 20

1    court maintains an audio recording of all proceedings, which

2    constitutes the official record.

3            Also, parties must state their name each time they

4    speak on the court record.  A party must join with a full

5    first and last name to be admitted from the waiting room.

6    Parties that join with initials, a partial name, a

7    designation such as iPhone, et cetera, will not be admitted.

8            Judge, would you like to start?

9            THE COURT:  Yes, I would.  Thank you very much.

10           Good morning, everybody.

11           Mr. Kwasteniet, are you going to begin for the

12   Debtor?

13           MR. KWASTENIET:  I am, Your Honor.  Can you hear

14   me and see me okay?

15           THE COURT:  Yes, I can.

16           MR. KWASTENIET:  Great.  I also see on the screen

17   our CEO, Mr. Christopher Ferraro, who we have met at several

18   prior hearings.  And if it's okay with Your Honor, we would

19   like to start with a brief update on the situation regarding

20   the Debtor's mining operations.

21           Your Honor, we had a somewhat novel situation late

22   last year when one of the Debtor's key mining

23   counterparties, a company called Core Scientific -- they run

24   effectively data centers that host mining equipment.  Core

25   filed for its own bankruptcy.  We were not surprised by

Page 21

1    this.  We knew that Core was in some financial distress, and

2    we had been in negotiations.  And Your Honor will recall

3    that we previously commenced litigation against Core

4    regarding the terms of our contract.

5         In any event, Core filed for bankruptcy.  And we

6    endeavored to file notices on the docket in this case of the

7    activity that was happening in the Core case because we

8    thought it was an important development and we wanted to

9    make sure Your Honor and our constituents were aware of

10   those developments.

11        Anyway, Core filed an emergency motion shortly

12   before the New Year's holiday.  We responded to it.  There

13   was a hearing right after the new year, and Judge Jones in

14   the court, who is overseeing the Core case, authorized

15   rejection.

16        So one of the topics I would like to get into with

17   Mr. Ferraro is just an update on the mining business

18   generally and then specifically with respect to the

19   transition and sort of what the impact has been of that core

20   scientific rejection of our hosting contract.  So if it's

21   all right with Your Honor --

22        THE COURT:  Yeah, one of the motions today is to

23   sell de minimis assets, which I believe are mining rigs.

24   And it certainly ties to what's happening with the mining

25   business, the core bankruptcy.  Are these rigs that Core was

Page 22

1   using?  If not, why do you have surplus rigs?  Is the mining

2   business -- at the last hearing when Mr. Ferraro spoke, I

3   asked the questions I usually do; is the mining business

4   cashflow-positive?  He indicated it was.  So those are all

5   questions that not only I, but I think the creditors as a

6   whole are quite interested in hearing the answers.

7           MR. KWASTENIET:  Absolutely, Your Honor.  So I

8   would like to start with some questions for Mr. Ferraro.

9   And we completely agree, which is why we sort of went out of

10  our way to make sure we were filing on our docket, you know,

11  copies of some of the important pleadings from the Core

12  docket.  It's a lot of dockets for even us to keep track of,

13  let alone, you know, all of our constituents.  So we have

14  endeavored to keep people posted.

15          But with Your Honor's permission, maybe I'll just

16  jump into a dialogue with Mr. Ferraro.

17          And I'll just ask Mr. Ferraro, can you please

18  provide the Court and the parties on the line with an update

19  on the Debtor's current mining operations?

20          MR. FERRARO:  Yes.  Good morning, Your Honor.

21          THE COURT:  Good morning.

22          MR. FERRARO:  Thanks.  We are continuing to build

23  out the mining operation and improve operational efficiency.

24  Right now we have over 27,500 rigs hashing with

25  approximately 17,500 rigs at our proprietary sites and

Page 23

1    nearly 10,000 rigs hosted at Mawson.  The recent uptime at

2    our proprietary sites has averaged 80 to 90 percent and

3    Mawson has recently been trending between 70 to 80 percent

4    uptime.

5            Overall currently we are mining around seven to

6    eight bitcoin per day at a margin of 25 to 30 percent.

7            For comparison, in the prior month, we were mining

8    about half of that, around 14 to 16 bitcoin per day.  Our

9    EBITDA compressed in December to slightly below zero.  Given

10   pressure from BTC price and year-end accrual.  Adjusting for

11   the year-end accruals -- and this is in our monthly

12   operating reports -- the EBITDA would have been positive in

13   December.

14           Our margin and EBITDA have rebounded nicely in

15   January, and we expect a margin of approximately 25 percent

16   and an EBITDA of around $1 million for the full month of

17   January depending on the market.

18           Following the most recent contract rejection by

19   Core Scientific, we began efforts to secure the return of

20   the mining rigs.  To date, we have moved over 2,150 rigs

21   from Core.  We expect just over 3,750 rigs to be picked up

22   this week and nearly 2,700 rigs the following week.  Of the

23   37,500 rigs that were at Core, we expect nearly 6,000 rigs

24   will be headed to our (indiscernible) site in Big Lake,

25   Texas.  Approximately 10,000 rigs to the Mawson site in

Page 24

1    Midland, Pennsylvania, and we expect that slightly over

2    20,000 rigs will be sent to temporary storage at our site in

3    Texas as we look for new hosting opportunities.  Overall, we

4    are confident that all rigs will leave the Core sites by

5    March 17th.

6            We have also started talking with a handful of

7    providers to host the rigs that were at Core.  Given the

8    favorable market trends and energy prices and the improving

9    price of bitcoin, we believe that there are options for

10   hosting in the market that will allow us to continue mining

11   with positive operating cashflows and significant upside.

12           THE COURT:  Can you estimate, Mr. Ferraro, are you

13   able to estimate what the decline in energy prices has been

14   for use in the rigs?  Obviously there's been a lot of public

15   attention on the amount of electricity that's used in

16   mining.  And with the spike in energy prices, it obviously

17   created great stress.  What approximately has been the

18   decline?

19           MR. FERRARO:  We have seen a tremendous decline in

20   the price of energy from its peaks kind of in the early

21   fall.  It's gone down 50 percent.  So that's provided

22   support for margin as cashflows as well as the increased

23   price of BTC, which has gone up 35 percent in the last

24   month.

25           THE COURT:  Okay.  Go ahead.

Page 25

1         MR. FERRARO:  Okay.

2         MR. KWASTENIET:  Mr. Ferraro, I did -- one more

3    question for you.  The Debtor has recently filed an updated

4    budget and coin report.  It was filed at Docket Number 1905.

5    Are you familiar with that report and can you please give an

6    update to the Court on the latest liquidity forecast and how

7    that compares to prior liquidity forecasts?

8         MR. FERRARO:  Yes.  Thanks for --

9         THE COURT:  Let me just say that I have a copy of

10   that report in front of me.  So tell me which page and what

11   you're looking at as you're reporting, okay?

12        MR. FERRARO:  Yeah.  I'm going to get to that in

13   one second, Your Honor.  I'm going to be looking at the --

14   I'm going to be talking to the 13-week cashflow forecast,

15   which is a single-page document in the report.

16        THE COURT:  All right.

17        MR. FERRARO:  But before I do that, I wanted to

18   touch on Your Honor's question around selling surplus --

19   selling rigs.

20        We decided when bitcoin kind of had bottomed,

21   around 16,000 to 17,000 that we wanted to test the market

22   and do a small sale of rigs.  I think in this case it's

23   around 2,000 rigs.  These are some of our oldest and least-

24   efficient rigs.  To your point, Your Honor, about the cost

25   of energy, these rigs, you know, are not as energy-efficient

1  as the most recent generation.  Rigs were not at Core.  They

2  are new, in the box.  And honestly right now we don't have a

3  line of sight to plug in these 2,000 rigs.  We expect that

4  north of a million dollars will help fund the case.  And we

5  are still left with 120,000 rigs approximately to plug in

6  and enjoy the upside to BTC prices hopefully in the near

7  future.

8              THE COURT:  Okay.

9              MR. FERRARO:  And just one last thing before I get

10  into the liquidity.  You know, Ross talked at the top about

11  the Core Scientific, kind of what we've been through.  I

12  think it's important that as we think about the path forward

13  that we ensure that anybody who picks up the hosting

14  operations is a good fit for the company today and for the

15  future.  And we take this aspect very seriously.

16              Okay, now on to liquidity.

17              THE COURT:  But let me ask one more question.  In

18  the company's filings in Texas in connection with Core's

19  expedited hearing on its motion to reject the contract, did

20  Celsius estimate what it believed its rejection damages

21  might be?

22              MR. KWASTENIET:  Your Honor, we -- it's Ross

23  Kwasteniet from Kirkland.  We did not estimate the rejection

24  damages.  We're still calculating that.  We did, however,

25  note in the hearing, the emergency hearing in Texas, that we

Page 27

1    believe we have a significant administrative claim.

2            The way that we pay the rent for the hosting is we

3    pay monthly in advance.  And we made a payment towards the

4    end of December that was for January hosting.  And --

5            THE COURT:  Approximately how much was paid?

6            MR. KWASTENIET:  It was approximately $4.7

7    million, Your Honor.  Just under $5 million.

8            Our rigs, per agreement with  Core -- and it was

9    included in the rejection stipulation -- were unplugged

10   approximately, you know, on or around January 3rd, give or

11   take.  Meaning that there may have been a few days of

12   hosting in January, but the vast majority of the month of

13   January we did not receive hosting services.  And so we're

14   going to expect -- and if we can't reach consensual

15   agreement, we'll be shortly filing pleadings in the Texas

16   case to recover the prepaid rent for January, if you will,

17   that we didn't receive the benefit of.  So that I did want

18   to note, Your Honor.

19           THE COURT:  Okay.

20           MR. FERRARO:  Okay, on to liquidity.  With respect

21   to the latest forecast, the Debtor's liquidity has improved

22   compared to the previous forecast.  This is as a result of

23   the increase in the price of bitcoin and the pending sale of

24   stable coins.  The latest 13-week forecast projects

25   approximately $88 million of cash and $68 million of

Page 28

1    baseline liquidity in the middle of April.

2            The price of bitcoin, which has gained more than

3    35 percent in the last month, increases the value of the

4    mined bitcoin and makes the mining operations that much more

5    attractive and productive, even without Core Scientific.

6            Additionally, now that the Court has authorized

7    the Debtors to sell stable coins, the Debtors have access to

8    much-needed liquidity that improves the cashflow forecast

9            THE COURT:  Have stable coins been sold since the

10   Court's ruling?

11           MR. FERRARO:  No, but it's -- it will be this

12   week.

13           THE COURT:  Okay.

14           MR. KWASTENIET:  Your Honor, I don't have anything

15   further for Mr. Ferraro.

16           THE COURT:  I do.  I do.  So, Mr. Ferraro, during

17   the hearing on November 15th, 2022 -- let me -- I have the

18   transcript if you'll just bear with me a second.

19           Okay.  I ask questions about the -- let me -- I

20   ask a question about Celsius' exposure with respect to FTX.

21   And at Pages 27 and 28 of the transcript, your answer is

22   there.  And I won't read it verbatim, but I believe that you

23   estimates Celsius' exposure to FTX and Alameda at

24   approximately $12 million.

25           I read some reports over the last week or two that

Page 29

1  questioned whether Celsius had exposure to FTX and Alameda

2  in the hundreds of millions of dollars.  Are you -- I just

3  want to ask, not for you to comment on a report you haven't

4  seen, but I just want to see whether you have any update on

5  what Celsius' exposure to FTX or any of its affiliates are

6  at this time.

7          MR. FERRARO:  Yes, Your Honor.  My update -- I

8  don't have it in front of me, so I apologize.  But to my

9  understanding, our exposure remains at the $12 million.  I

10 think there was transactions between Celsius and Alameda,

11 you know, leading up to our filing.  We did have

12 relationships with them, as I discussed I believe in

13 November when I gave the update to the report.  So I haven't

14 read the report that you're speaking to.  But, you know, our

15 exposures from the standpoint of what's on the balance sheet

16 are really limited to some coins on FTX and then the Alameda

17 loan.

18         THE COURT:  Okay.  Let me make -- when I saw I saw

19 a report, it wasn't from FTX.  I mean, you know, there are

20 some wild things on the internet, and I don't -- I'm not

21 putting credence in them.  But because I saw some report

22 that suggested that the Celsius exposure was in the hundreds

23 of millions, I thought I would ask about -- we went back and

24 we looked at the transcript from November.  And I just

25 wanted to be sure to ask it again today.  So thank you very

Page 30

1    much.

2            MR. KWASTENIET:  Great.  So if you don't have

3    anything further for Mr. Ferraro, I think that we can

4    release him with Your Honor's permission.

5            THE COURT:  Yes, we can.  Thank you again, Mr.

6    Ferraro.

7            MR. FERRARO:  Thank you, Your Honor.

8            THE COURT:  But before we get to the agenda, Mr.

9    Kwasteniet, I would like to ask -- and I see that Vince

10   Lazar from Jenner & Block has appeared.  And I would just

11   like to ask him for an update on the work of the examiner.

12   I had already granted one extension to the examiner's next

13   report.

14           Mr. Lazar, if you're there, I would appreciate it

15   if you could just update everyone on where things stand with

16   the examiner.

17           MR. LAZAR:  I am.  Good morning, Your Honor.

18           Your Honor, we've completed the interview process

19   and we have gotten through the remainder of the documents

20   that we requested.  And so at this point we are, for lack of

21   a better way of describing it, (indiscernible) and drafting

22   that.  We expect to be in a position to deliver an examiner

23   (indiscernible) on Monday.

24           THE COURT:  One other question I have, Mr. Lazar.

25   And in the past, you've referred to the examiner interviews.

Page 31

1    Are the interviews under oath?

2           MR. LAZAR:  They are not, Your Honor.  And as you

3    may know, it's common in this type of situation.  All

4    examiners find that it is easier to get (indiscernible) than

5    to take formal depositions.

6           THE COURT:  Just stop for a second.  Whoever --

7    you know, whoever has got a microphone open is rattling a

8    lot of paper, and it's interfering with my ability to hear.

9    So either mute your line or stop rattling papers.

10          Go ahead, Mr. Lazar.

11          MR. LAZAR:  Your Honor, I don't know if you could

12   hear me.  But as is relatively common in these examiner

13   situations, and we've done it again in this case, it is

14   generally considered a better way of getting information to

15   do it by way of interview rather than under oath, which

16   sometimes leads witnesses to be a little less open than they

17   might otherwise be.

18          THE COURT:  All right.  Thank you.  What's the

19   expected date now for delivering the examiner's report?

20          MR. LAZAR:  It is Monday, Your Honor.

21          THE COURT:  Okay, all right.  Thank you very much.

22          MR. LAZAR:  Thank you.

23          THE COURT:  Mr. Kwasteniet?

24          MR. KWASTENIET:  Yes.  Thank you, Your Honor.

25          THE COURT:  Let me -- before you go on, I see a

Page 32

1  hand raised.  I'm not going to call on anybody during this

2  general background section.  So I will -- when we get to the

3  docket, the calendar for today, I will, as I have in the

4  past, give people who are addressing a specific motion an

5  opportunity to speak.  But not in terms of the background

6  updates that we've received so far.

7          So go ahead.  Katerina, if you would put your hand

8  down, I would appreciate it.  Because I am not going to call

9  on you now.  Thank you.

10         All right.  Go ahead, Mr. Kwasteniet.

11         MR. KWASTENIET:  Thank you, Your Honor.  Before we

12  jump into the formal agenda for this morning, I thought it

13  might also be helpful for me to give Your Honor and the

14  parties on the line a brief update with respect to the

15  Debtor's sale and plan development process, if that's

16  acceptable.

17         THE COURT:  Please.

18         MR. KWASTENIET:  Great.  Your Honor, the final bid

19  deadline for the whole company sale process was December

20  12th.  The bids that we received generally fell into three

21  categories.  The first was bids for discrete assets.  The

22  second were bids for migration of customer accounts to a

23  competitor's platform.  And the third involved migration of

24  the Debtor's assets to a new, independently-managed recovery

25  platform with the idea being that we would be able to

Page 33

1    harvest value over time as market conditions improved.

2          Your Honor, thus far, the bids we have received

3    for discrete assets and for the transfer of customer

4    accounts have not been compelling.  The Debtor's situation

5    is unique, Your Honor, compared to some of the other crypto

6    bankruptcies out there right now because we don't just have

7    a portfolio of liquid crypto assets.  We also have illiquid

8    crypto assets, things like staked Ethereum as well as other

9    illiquid assets such as the mining business, loan

10   portfolios, and investments in other crypto projects.

11         So the Debtors can't just simply distribute their

12   assets and move on, so to speak, because the bidding process

13   has revealed that this would require us to sell many

14   illiquid assets at what we believe are fire sale prices.

15         So given that, the Debtors are focused on placing

16   their assets into a newco, which we are referring to as a

17   recovery corporation, that would hold those assets and

18   manage them over time to maximize value as markets improve.

19         Your Honor, we are making plans to operate the

20   recovery corporation on a standalone basis.  But,

21   importantly, we are also in discussions with potential

22   third-party plan sponsors who may invest in and operate the

23   recovery corporation.  Any such third party would not be

24   affiliated with the Debtor's founders, equity holders, or

25   former management team.  These are true new third-party,

Page 34

1    arm's length managers.

2             The Debtors, with input from the Committee are

3    also still evaluating different potential transactions

4    related to the mining business.  As you heard from Mr.

5    Ferraro, the recent surge in bitcoin pricing and the mild

6    winter and lower power prices have sparked some new interest

7    in the mining business, and we are evaluating potential

8    sale, hosting, and partnership transactions with respect to

9    the mining company.

10            Your Honor, the Debtors anticipate that a recovery

11   management-type transaction would take place through a

12   Chapter 11 plan.  While the Debtor's Chapter 11 plan remains

13   subject to negotiation with both the Committee and any plan

14   sponsor who might be involved, discussions are starting to

15   crystallize around a framework with certain key features

16   that I think it's appropriate for me to highlight for Your

17   Honor and the parties today.

18            First, the value of the Debtor's assets is going

19   to inure to the benefit of accountholders.  And these assets

20   include the Debtor's liquid and illiquid cryptocurrency as

21   well as loan receivables, the mining asset, miscellaneous

22   crypto platform investments, and litigation claims.

23            Your Honor, I want to note that there's been some

24   confusion on social media, which is not surprising.  It

25   seems to be inherent in the nature of social media.  But

Page 35

1    there's been significant chatter and confusion about the

2    consequences of the court's Earn ruling.  And the fact is

3    that the mere fact that coins in the Earn program are

4    property of the estate does not mean that the Debtors intend

5    to hold onto them for all time.  And I just want to say for

6    the record and for the benefit of everybody listening that

7    the Debtors expect this bankruptcy process will end in a

8    plan whereby the value of the Debtor's assets, including the

9    coins in the Earn program, go to the benefit of

10   accountholders.

11        We've obviously had to work out some important

12   issues in the case about the relative rights of customers in

13   diff programs.  We've had hearings on the Custody program,

14   the Withheld customers, the Earn customers.  There's more to

15   come in the future about people who are in the Borrow

16   program.  So we have to sort out the relative rights and

17   priorities.

18        THE COURT:  Let me just stop you there.  Because

19   no doubt you've been receiving lots of communications about

20   this.  But I think that particularly one of the motions

21   that's on for today is for loans to be paid off and for

22   institutional parties and collateral to be returned.  And

23   that obviously raises the question for me and I think for

24   many of the loan program non-institutional buyers, why not

25   us?  So I think it's -- the Court views it as very important

1    that we move forward expeditiously to try and resolve those

2    issues.

3            One hopeful approach is that the Debtor and the

4    Committee and other interested parties will try and reach a

5    proposed consensual resolution to those issues that would

6    not require -- you know, might require a court decision on a

7    9019 motion, for example, but would not have to lead to a

8    protracted litigation and disputes about how to deal with

9    the non-institutional lenders, or borrowers rather.

10           MR. KWASTENIET:  Understand, Your Honor.  And it's

11   almost as though you've been listening in on the

12   conversations we've been having with the Creditors'

13   Committee and with other key stakeholders.

14           It's important for me to note right now -- and

15   we've put it in the papers, and I'm sure we'll cover it more

16   when we get to the Institutional Loan Motion, there are some

17   important differences between the programs.  So when we talk

18   about institutional loans, they are with arm's length third

19   parties, sophisticated financial institutions.  There's only

20   about a dozen of them, I think maybe 14 counterparties, 40-

21   some-odd loans spread across 14 counterparties.  And they

22   have their own sort of unique collateral posting

23   arrangements.  They have their own unique creditworthiness

24   considerations that we have been evaluating.

25           The retail borrower program is tens of thousands

1   of folks who operate under the same terms and conditions.

2   And so we are very hopeful that, whether it's a standalone

3   9019 or a compromise proposed treatment that's embedded in a

4   plan, that we will get to something that we think is

5   attractive and gives some options to the retail borrowers.

6   I know Mr. Adler represents a group of retail borrowers.

7   We've had discussions with him and will continue to going

8   forward in hopes of reaching a consensual resolution.  I

9   think I would be the first to acknowledge that any

10  significant litigation on a creditor-by-creditor basis here

11  is going to be massively destructive of value.  And we are

12  very focused on -- I'm not prepared as we stand here today

13  to roll out the specifics of it, but suffice it to say, Your

14  Honor, that issue is something that we are in advanced

15  discussions about and are very focused on as, you know,

16  we've made a lot of progress in a lot of the key gating

17  issues in the case.  That is an important issue that is yet

18  to come and is firmly on our radar, Your Honor.

19              THE COURT:  Can you give me an idea, an estimate

20  of the amount of loans outstanding, collateralized loans

21  outstanding to non-institutional borrowers?  So put in

22  context of this case, what's the range of numbers we're

23  talking about?

24              MR. KWASTENIET:  Your Honor, I'm going to give my

25  best.  And I have colleagues in the room who will kick me

Page 38

1    under the table or correct me if I get it wrong.  But the

2    way that I think about it, maybe too simplistically, is it's

3    approximately $40,000, and there is approximately $400

4    million or so of loans outstanding to the retail borrower

5    folks.  So put into context, Your Honor, you know, sort of

6    looking at a little over $4 billion of customer coin

7    obligations.  This is roughly a ten percent issue compared

8    to the overall magnitude.  Give or take might be, you know,

9    eight percent, 12 percent.  But, you know, for purposes of

10   an off the top of my head answer, it's about ten percent

11   relative to the broader customer claim universe.

12          THE COURT:  You've given a whole lot of soft

13   numbers for now, and I don't want to hold you to it because

14   I understand -- I've asked a question that wasn't thoroughly

15   prepared to answer.  Do you have an estimate of what the

16   value of the collateral that supports those outstanding

17   loans is?

18          MR. KWASTENIET:  The last I heard, I believe that

19   those loans are still -- that the portfolio as a whole is

20   overcollateralized.  Not to the same extent it was.  But I

21   believe that the general requirement in opening a retail

22   loan was 2X collateral coverage.  Now, obviously loans were

23   generally taken out in stable coins and then the collateral

24   could have been any number of -- you know, if it was a

25   stable coin collateral, then that's obviously pretty fixed

Page 39

1   because it's intended to be tied to a dollar, so less

2   volatile.  If it was a bitcoin collateral, then the value of

3   that collateral and your relative collateralization

4   percentage fluctuates as the market moves.

5          So my understanding, Your Honor, is that that

6   portfolio is less collateralized as a percentage relative to

7   the loans outstanding than it was maybe earlier in the case,

8   but is probably coming back up a little bit as crypto prices

9   seem to be rebounding.  But as a percentage, it sort of

10  fluctuates as the market moves, Your Honor.

11         THE COURT:  All right.  So when you've finished

12  this specific topic, I see Mr. Adler's hand raised.  Since

13  you mentioned him by name in your presentation, I'm going to

14  give him a chance to say something.  But you finish on this

15  topic and then I'll let Mr. Adler speak.  And then we'll go

16  back to other things that you want to talk about.

17         MR. KWASTENIET:  Very good, Your Honor.  I think

18  that I am finished on this topic unless you have anything

19  else or Mr. Adler raises any points that I want to respond

20  to.

21         THE COURT:  I don't.  But let's see what Mr. Adler

22  has to say.  Go ahead, Mr. Adler.

23         MR. ADLER:  Good morning, Judge Glenn.  David

24  Adler from McCarter & English on behalf of the Ad Hoc Group

25  of Borrowers.  I raised my hand just because I wanted to

Page 40

1   provide a little bit more clarity with respect to the retail

2   borrowing program.

3           As I understand it, there are about 23,000

4   different borrowers.  And this is from the Debtor's first

5   day declaration, and it is consistent with what I've seen in

6   the schedules.  23,000 borrowers who took out loans in the

7   amount of approximately $420 million, give or take.  And the

8   collateral as of July 13th that was backing those loans was

9   somewhere in the neighborhood of $800 million.

10          Just to add a little bit more color, Your Honor,

11  about 85 percent of the loans were given against crypto that

12  was either eth or bitcoin, bitcoin being the vast majority

13  of the collateral.  That's about 67, 70 percent as best I

14  can tell, with the remainder, 15, 17 percent being eth.

15  These borrowers did not take loans out in stable coin.  My

16  understanding is that most of these retail borrowers took

17  out loans in fiat currency.  So I just wanted to give Your

18  Honor a little bit more color around the borrowers.

19          I can tell you that of the -- I'm sorry, the

20  23,000 borrowers, approximately the top -- if you take the

21  top 2,500, those are borrowers above $100,000, and the

22  remainder are below $100,000.  I think the mean or the

23  median average loan is probably about $15,000 or $20,000 and

24  the top 20 percent or so of the loans are above $100,000.

25  And those parties represent about 80 percent of the

Page 41

1      collateral that is on the platform.

2              That's really all I wanted to add, Your Honor.

3              THE COURT:  Okay.  Thank you very much for the

4      report.  I think that's very helpful.

5              I view this -- you know, the Court has and the

6      parties have raised a number of what I consider to be

7      important gating issues.  I consider this, and always has

8      been identified as such, as one of those important issues,

9      particularly given the number of -- you say 23,000 different

10     borrowers.  It's a large number.  Maybe still only a

11     fraction of the number of Earn accountholders, but it's

12     still a very large and important number.

13             And so I urge you, Mr. Adler and the other counsel

14     to work with the Debtor's counsel and Committee's counsel in

15     seeing first is it possible to come up with an appropriate

16     consensual resolution that would avoid really protracted and

17     expensive litigation for everybody.  And to the extent that

18     that doesn't seem to be possible, to tee up for a court

19     determination.  Because I do consider this to be a very

20     important set of issues that arise.

21             I mean, Mr. Kwasteniet, one of the things -- my

22     uneducated view at this point, certainly if the collateral

23     was received by Celsius comingled, put into the rest of the

24     coins that the Debtor had in its portfolio, you know,

25     there's obviously a question whether the Debtor's interest

Page 42

1     is limited to a legal interest, but not the equitable

2     interest in the collateral.  That's certainly been an issue

3     in not crypto cases, but in other kinds of bankruptcy issues

4     (indiscernible) what was the Debtor's interest in the coins

5     that it received as collateral.  Obviously comingling raises

6     all sorts of complicated issues.  But I won't say anything

7     more about it now.  Nothing has been briefed at this point.

8     But I am very concerned and focused on wanting to move these

9     issues along.  Let me leave it at that.

10            Mr. Adler, thank you again.  Go ahead, Mr. Adler.

11            MR. ADLER:  I was just going to say, Your Honor,

12    we've been trying to work with the Committee and the Debtors

13    on a possible resolution of these issues, bearing in mind

14    that any reorganization, any emergence from this case has to

15    sort of keep the loans intact to avoid tax consequences.

16    And if you're going to do a haircut, if there's going to be

17    a haircut of X percent of collateral, many of those loans

18    might be in default or maybe above the margin call at that

19    point.

20            So we've been working with those issues.  We hope

21    to obviously go forward with that.  We've made a proposal to

22    the Committee.  I think we've made a proposal to the Debtor

23    as well.  And we are optimistic.  And obviously if it

24    doesn't -- if there is no resolution, we will litigate it.

25    But we have been trying to avoid it.

Page 43

1           THE COURT:  Thank you very much, Mr. Adler.

2           Mr. Kwasteniet, anything else you want to say on

3    this?  And, Mr. Pesce, on behalf of the Committee is there

4    anything you want to say just on this topic?

5           MR. PESCE:  I have some other things that I wanted

6    to raise today.  But on the loan topic, Mr. Adler is

7    definitely one of the outside parties we think is important

8    to resolution here.  We've had a lot of dialogue with him.

9    He has been very generous in providing some concepts that

10   might provide for a solution here on a consensual basis,

11   like you said.

12          Candidly, the ball is in my client's court at this

13   point to come to a view on some of the issues that you

14   raised.  We're hopeful that we can do that.  And it's a big

15   priority for us amidst all these other competing issues in

16   the case.  But Mr. Adler has not been shy about reaching out

17   to us and making -- giving us ideas and concepts to try to

18   respond to make this -- avoid having this become another

19   litigated matter.

20          THE COURT:  Thank you very much.  And I'll give

21   you a chance to address your other issues in a few minutes,

22   Mr. Pesce.

23          So, Mr. Kwasteniet, why don't you go on?  Do you

24   have other areas you want to cover?

25          MR. KWASTENIET:  I do, Your Honor.  And just the

1    last comment on the retail loan topic.  My colleagues

2    confirmed for me that we agree with Mr. Adler's count.  I

3    think I said I thought it was tens of thousands, maybe

4    $40,000.  They informed me that I was right about the

5    approximate dollar amount outstanding, but we do think it is

6    about 23,000 borrowers.  And we've also come to the

7    conclusion through our analysis that many of the borrowers

8    hold very significant loans.  So they're among the larger

9    customers, the largest users of the Celsius platform.  So we

10   agree with that and echo the comments that Mr. Adler and Mr.

11   Pesce made about trying to work together on a resolution and

12   definitely a recognition that it's an important -- one of

13   the larger remaining items that we have not briefed or

14   otherwise resolved that we need to going forward.

15          So, Your Honor, just returning briefly -- and I'm

16   almost done -- to my comments about where we are and how

17   we're thinking about the plan process and the path forward.

18   We are cognizant that we have an exclusivity deadline coming

19   up the middle of next month that will undoubtedly need to be

20   extended to give us time to finalize and bring forward a

21   plan and solicit votes on the plan.  But we believe the plan

22   will focus on this recovery corporation concept which will

23   be used to harvest the value over time for the benefit of

24   account holders of the Debtor's various assets.

25          As we think about how to give ownership and how to

Page 45

1    translate that into an actual recovery for creditors, what

2    we're envisioning at this time is somewhat of a novel

3    approach where we think that we can tokenize and distribute

4    to account holders what we're referring to as an asset share

5    token that would reflect the value of the assets managed by

6    the recovery corporation and each accountholder's sort of

7    ratable share or interest in those or claim against those

8    assets.  And asset tokens would also entitle holders to

9    dividends from the recovery corporation over time as assets

10   may be monetized. And we think that these asset share tokens

11   would be provided to all account holders who have account

12   balances over a certain threshold.  And we're still

13   discussing with the Committee sort of where exactly that

14   threshold would be.

15          But one of the concepts here is that for customers

16   with claims below that threshold level, we would envision

17   what you've seen in other cases as more of a convenience

18   class, where rather than giving an asset share token in sort

19   of a longer-lived recovery corporation that's going to have

20   to manage the illiquid assets over time, that we would give

21   a one-time distribution in liquid crypto. It would be at a

22   discount.  We're not envisioning it's a full recovery, but

23   it's a meaningful recovery, Your Honor.  And it would be a

24   one-time distribution in liquid crypto.  Call it bitcoin,

25   Ethereum, stable coins, something that has, you know,

Page 46

```
 1    readily tradable and readily ascertainable market value to

 2    everybody who has claims below a certain threshold.

 3            And, Your Honor, we've done some work with the

 4    management team and the Alvarez Marsal team and the

 5    Committee to sort of slice and dice the customer population

 6    and stratify it and look at how many claims are below

 7    different thresholds.  And we think that, you know, with a

 8    threshold as low as a U.S. Dollar value claim of sort of

 9    $2,500 to $5,000, you're picking up a substantial majority

10    of our customers.

11            To Mr. Adler's point, there are a relative handful

12    of customers who have very large claims and who make up -- a

13    smaller percentage makes up in the aggregate a much larger

14    percent of the assets on deposit and the claims.  And then

15    you've got a large number of smaller holders who have claims

16    in the sort of, you know, several hundred to several

17    thousand dollar range.  And I think that a convenience class

18    concept could easily pick up, you know, 60, 70 percent of

19    the total customers.  Right?  And we hope to be in a

20    position to offer them a one-time convenience recovery where

21    they can take their crypto and go home and be less concerned

22    about how do we value or how do we maximize the value of the

23    mining company over time and what does that look like.  I

24    think the larger customers sort of own that issue, right?

25    In order to get them their full recovery or their best
```

Page 47

1    recovery, we're going to have to be in this for a bit of a

2    longer process.  But we're hoping that we can give a one-

3    time convenience recovery that would satisfy actually a

4    significant majority of our customers here.

5           And so there's more to come on that.  We are still

6    working with the Committee on how best to structure it.  But

7    I expect that that will be a significant feature.  Because

8    we're really not looking to drag the smaller investors who

9    just -- you know, we've seen the letters, we'd like some

10   crypto back, even at a discount, and just kind of be done

11   with the Celsius case.  And we expect to be able to give

12   customers that option.

13          THE COURT:  Two questions that flow from that.

14   One, have you had any conversations with the regulators or

15   the U.S. Trustee about the concepts, even though the details

16   haven't been worked out, the concepts that you are

17   exploring?

18          MR. KWASTENIET:  I don't believe we've had a

19   significant conversation with that U.S. Trustee's office

20   yet, but we certainly will before we bring forward any plan,

21   as has been our practice.  Any material filing in the case

22   we'll preview and try to surface issues and address issues.

23          We have had -- just starting very recently, Your

24   Honor -- I won't say it's been for weeks and weeks, but

25   starting yesterday, we reached out and had some initial

Page 48

1    conversations with some of our key regulators.  Those

2    discussions are going to continue as our plans develop.  But

3    really up until this point, up until effectively now, the

4    plans were still on the drawing board, and we didn't think

5    that they were quite ready enough to surface conceptually

6    with the regulators and the U.S. Trustee.  But we are

7    getting to that point.  And we recognize there's been many

8    issues raised about compliance or a lack of compliance with

9    applicable regulations historically in the products that

10   Celsius offered, which brings me into the last point that I

11   want to cover with respect to how we're thinking about the

12   go-forward plan.  Because the Debtors and the Committee

13   really have been incredibly focused on how exactly this

14   recovery corporation is going to work.  How is it going to

15   be different than how Celsius operated historically?  What

16   can we learn from the challenges that Celsius had

17   historically?  What got us into this -- into the bankruptcy,

18   what were the regulatory problems that the company had?

19          And so I think there's a couple key features or

20   guideposts, if you will, that we have in mind as we're

21   developing the plans for this recovery corporation.

22          And the first one, Your Honor, is that the

23   recovery corporation will be a fully-licensed and registered

24   and compliant entity with respect to all applicable federal

25   and state regulations.

1          For example, crypto assets we envision will be

2     hosted by or a third-party licensed custodian.  Okay?

3     Celsius put together a custody program somewhat on the fly.

4     We are going to take the time to build a custody program

5     from the ground up that would use a third party who is

6     licensed to provide custody services.

7          The recovery corporation will have its own

8     dedicated management team.  And again, that management team

9     may be an arm's length third party.  We are negotiating with

10    potential third parties who we may be able to outsource that

11    function to, Your Honor.

12         The asset share tokens that I previously described

13    would be freely tradable by holders.  So if an accountholder

14    gets their token and they want to ride out the recovery and

15    try to see where we can get to in the future, they

16    definitely have the right to do it.  But for somebody who

17    says, you know what, I would rather just sell my token,

18    convert it into cash, other crypto, move on with life, they

19    would have the ability to do that.  And we're in discussions

20    with various licensed broker dealers to facilitate the

21    trading of the asset share token.

22         THE COURT:  So I have a somewhat related question.

23    And I haven't been monitoring the docket for this.  Do you

24    have any information on the extent to which claims trading

25    has been taking place?

Page 50

1            MR. KWASTENIET:  We do, Your Honor.  It's mostly

2       anecdotal at this point.  I think that A&M has been keeping

3       track of a register of claims.  And we can certainly provide

4       Your Honor with more of a summary of all the activity we're

5       aware of to date.  But we are aware of some claims trading

6       activity.

7            THE COURT:  Okay, all right.  Go ahead.

8            MR. KWASTENIET:  Your Honor, the recovery

9       corporation will also be a public company.  It's going to

10      have a large number of holders of the asset token.  And we

11      envision that this recovery corporation will be filing

12      reports, public reports going forward.  So your 10-Ks, your

13      10-Qs, et cetera.

14           And additionally,  Your Honor, as we had

15      previously noted, we're in advanced discussions with the

16      Committee, Mr. Adler's group, about how exactly the retail

17      loan portfolio will factor into all of this.  And that

18      remains an important consideration of ours.

19           So, Your Honor, unless you have further questions,

20      that's an update as to where we are today.  Suffice it to

21      say there has been a lot of work on the part of the company

22      and the Committee to come up with, you know, in light of

23      what we -- the data points we got from the sale process, how

24      do we come up with the best plan going forward that

25      addresses some of the problems that got us here and that

1    also provides a vehicle for creditors to recover the most

2    value they can going forward.  Because, again,

3    unfortunately, the marketing process has indicated that

4    simply selling the illiquid assets now, especially, you

5    know, FTX collapsed since we started the marketing process.

6    So things have kind of gone from bad to worse.  This really

7    doesn't seem to be the right time to liquidate the illiquid

8    assets, and we need to come up with some structure to hold

9    the assets, manage them, grow them, harvest their value over

10   time.  And it's a challenging project.  It's one that we

11   welcome, and to do this in a way that overcomes some of the

12   problems that led us here in the first place, Your Honor.

13            So that is our focus.  And a lot of that is

14   happening behind the scenes, and I wanted to give Your Honor

15   an insight into what's happening.  And obviously a lot more

16   to come in the days and weeks ahead in terms of filing

17   plans, perhaps moving forward with a proposed plan sponsor,

18   Your Honor.  That is a definite possibility here.  And there

19   will be a lot more to come.

20            THE COURT:  One of the things -- and I'm going to

21   call on Mr. Pesce in a minute on behalf of the Committee.

22   But I want to be sure that you order a copy of the

23   transcript from today's hearing so that when it goes on ECF

24   -- and actually, you might file a single pleading that

25   points to the transcript so that anyone who hasn't tuned in

Page 52

1   today, who hasn't signed onto the hearing today would be

2   able to review this dialogue that we've been having today.

3   Okay?

4           MR. KWASTENIET:  Very good, Your Honor.

5           THE COURT:  I want to be sure that everyone has

6   the opportunity to know exactly what was said, et cetera.

7   Okay?

8           MR. KWASTENIET:  That's great, Your Honor.  I will

9   also note that as early as tomorrow I believe we would be

10  filing a motion to further extend exclusivity.  That motion

11  will also include a synopsis of some of the bullet points

12  that I went through today.  So that will be on the docket.

13  We will also -- and that will be on the docket sooner than

14  the transcript.  There's usually a several-day delay on the

15  transcripts.  But we will get the transcript on file with a

16  notice as well as soon as that's available.

17          THE COURT:  All right.  Mr. Pesce, do you want to

18  speak on behalf of the Committee?

19          MR. PESCE:  Thank you, Your Honor.  Gregory Pesce,

20  White & Case, counsel to the Committee.  I just want to make

21  a couple of points here about the sale process and some of

22  the other things that the Committee has been doing of late.

23          So the Committee throughout this case has been

24  open to any and all alternatives that maximize value for the

25  account holders.

1            That said, like Mr. Kwasteniet said, the Committee

2    believes that a plan that provides for a restructuring

3    versus just a straight liquidation and provides the value of

4    those assets, many of which are illiquid, is preferrable to

5    just liquidating things piecemeal or handing them over to a

6    competitor.  And that's why we've been spending so much time

7    on this today.  That's why this case has taken quite a bit

8    of time.

9            All that being said, Celsius has really just one

10   shot to get this reorganization right.  We also don't have a

11   ton of cash.  So we really want to make sure we measure

12   twice and cut once so to speak.  And in particular, I just

13   want to highlight there are no -- there is no agreement

14   today with any of the investors that we're speaking with.

15   And whatever is put out there is going to require a lot of

16   stakeholder buy-in and it's going to require a creditor

17   vote.  So this is a process that is closer to the end than

18   the beginning, but we still have a bit of a way to go here.

19           And I also just want to highlight something else,

20   which is that we are very focused, like I said, on having a

21   plan, particularly one with like a tokenized recovery.  But

22   that's going to require a lot of approvals.  It's going to

23   require approvals from Your Honor and then it will require

24   approvals from other parties probably.  But if that is

25   ultimately not feasible or we don't reach the final terms

1    that we need with outside parties, there are other options.

2    It's just that those are not the most value-maximizing that

3    are available we think today versus the tokenized recovery.

4    We could transfer the customer assets to another exchange.

5    I don't need to go into the risks that that would present in

6    the current environment.  Or we could self-liquidate the

7    company and just return some of the crypto to customers.

8    But again, even if self-liquidation is not self-

9    effectuating, self-liquidation probably requires new capital

10   or liquidating coins and it still requires, despite what

11   many people listening today might have read on social media,

12   it still requires us to resolve the gating issues with the

13   preferred equity, with the custody parties, and with Mr.

14   Adler and other intercreditor fights.  So it just changes

15   the format of the outcome, it doesn't actually change the

16   path necessarily that you get there.

17         So we're continuing to work with the Debtor on

18   this concept, but there is a bit of work to do.  And we are

19   focused on moving this case forward.  But I want to echo and

20   kind of amplify a few of those points for you, Your Honor,

21   and for those listening.

22         I think -- and the other quick topic that I would

23   just like to highlight, because it goes to the litigation

24   recoveries that are going to be -- we've said this since the

25   beginning of the case, litigation recoveries are going to be

Page 55

1   a significant portion of what we provide under the plan here

2   probably.  The examiner's report is due in less than a week.

3   As Mr. Lazar said, we've been cooperating with the examiner

4   and we eagerly await her findings.  Like the user community,

5   we're not going to get a sneak preview.  We're going to read

6   it for the first time when it hits the docket.  As the

7   examiner has been doing her work, the committee is very

8   mindful of the Court's directive to minimize duplication and

9   we proceeded accordingly to make sure that the examiner has

10  -- or that we have the benefit of all the firsthand

11  testimony that the examiner is receiving so that we can

12  avoid, hopefully, reexamining witnesses at a later date.  So

13  the examiner's report is going to be an important input

14  here, particularly on what goes into the litigation trust

15  that we expect, under all circumstances, is going to be

16  established at the end of the case.

17          Though not directly related to the examination or

18  our own investigation, I also wanted to highlight something

19  that Your Honor may have read about in the media, which is

20  that the attorney general of the State of New York recently

21  filed a complaint against Alex Mashinsky.

22          THE COURT:  I've read it.

23          MR. PESCE:  Yeah.  I just want to make clear that

24  we believe it's absolutely vital for Mr. Mashinsky and his

25  coconspirators to be held account for what they've done to

1   Celsius and the users.  That said, a critical theme that

2   we've hit on several times here is the need for a fair and

3   equitable allocations of all account holders.  The New York

4   Attorney General's complaint seeks damages from Mr.

5   Mashinsky that would be collected by the New York

6   government.  It's our position that all recoveries for Mr.

7   Mashinsky and other individuals and entities that are found

8   to be liable for wrongful conduct, be distributed to account

9   holders and we will continue to monitor the progress of that

10  proceeding as we work towards the outcome of this case

11  overall.

12          So those are a couple of points I wanted to

13  highlight.  I'm happy to address any questions that the

14  Court may have for the committee and otherwise we'll speak

15  later on some of the other matters that are up today.

16          THE COURT:  The last thing I wanted to ask you

17  about is, you know, after the Court's Earn opinion,

18  obviously, there are a lot of people who are very unhappy

19  with that result.  There's an appeal that has been filed.

20  It'll follow its own course.  But I've had some concern that

21  people, creditors, Earn account holders don't fully

22  understand the capital structure of Celsius.  You know in

23  many cases where there's substantial secured debt, there's

24  little or nothing that would flow down to unsecured

25  creditors.  But am I correct that I know there's the issue

1     about the preferred holders and the claims against which

2     entities and that's being teed up for decision.  But this is

3     not a case with substantial secured debt ahead of the

4     unsecured creditors.  Essentially, what the Earn account,

5     the Earn ownership issue really addresses is are all Earn

6     account holder's going to receive equal, you know,

7     proportionate distributions of what's available?  Can you

8     address that, whether there are substantial senior claims

9     ahead of the Earn account holders, your constituency?

10              MR. PESCE:  Yes, I can.  So it's our understanding

11    that there is no meaningful secured debt save for maybe a

12    handful of trade vendors which are de minimis.  So at the

13    end of the day, it's our expectation, like I think Mr.

14    Kwasteniet said it well earlier on, as a result of the Earn

15    ruling, it just makes clear that customers have claims

16    against the company and then on account of those claims,

17    they are going to receive the value if not actual

18    cryptocurrency.  I think the issue, in our view, is one,

19    really two issues that are related.  It's the intercreditor

20    allocation of that value.  So you heard from Mr. Adler that

21    there could be a push and pull between the Earn holders and

22    the loan parties.  You're already aware of the custody

23    issues and withhold issues.

24              And then, you know, I think when the examiner's

25    report comes out, one of her mandates, which was added

Page 58

1    later, on was the treatment of Cel.  It'll be important to

2    review that report and understand what is found about how

3    Cel was created, marketed, used and burned so we can have an

4    understanding of any kind of subordination issues that may

5    exist relative to Cel holders versus other Earn holders.  So

6    it's really an intercreditor issue and a subordination issue

7    relative to the Earn holders, but there isn't going to be a

8    senior secured lender, bank lender that sucks up the value,

9    like in its traditional bankruptcy case, Your Honor.

10             THE COURT:  All right, thank you.  Mr. Kwasteniet,

11   go ahead.

12             MR. KWASTENIET:  It's Ross Kwasteniet, again, from

13   Kirkland.  I want to echo Mr. Pesce's comments and then also

14   maybe add a few of my own.  We've been very clear from the

15   beginning, we filed capital structure charts and we've

16   described that we don't have bank debt.  We don't even have

17   competing bond debt.  There's not an issue of, you know, at

18   what level do the bondholders, you know, have claims versus

19   the customer?  We don't have traditional funded debt.  Okay.

20   The money that came in to fund the growth of the company

21   came in as equity and we're taking the position that the

22   customers, the account holders, are entitled to value first.

23             And so what that means is we do, to Mr. Pesce's

24   point and as I noted earlier, we have to figure out, you

25   know, we have different categories of customer claims.

Page 59

1    Okay.  We have held there's custody, Earn, borrow, and it's

2    important that we sort out their relative rights with

3    respect to each other.  The vast majority of our customers

4    are in the Earn program.  And for the vast majority, we

5    think of the value of the assets is going to go to the

6    customers of the Earn program, again, sorting out what the

7    other categories get.

8              The consequence of the Earn coins being property

9    of the estate, we have to do something with them.  The

10   estate's obligation, the debtor's obligation is to propound

11   a plan that returns value to the right people in the right

12   form, respecting their relative, you know, priorities and

13   rights and interests.  And that's what we're doing.  And

14   we're in the later stages of being ready to do that.

15             This goes back to customers and so arguments or

16   litigations, as between Earn customers, one customer says I

17   relied on this, you know, advertisement or I think I was

18   misled.  We think that all Earn customers could make those

19   similar arguments and we've already stipulated, we've

20   already put into our schedules and statements, Your Honor,

21   what we think everybody's precise claim is.  They have a

22   claim to the return of their crypto.  We're not disputing

23   that.  Okay.  And the problem is, we don't have enough

24   crypto to go around right now.  We've got some crypto.  We

25   have some illiquid assets that we're going to have to

Page 60

1   realize over time; not everybody wants to stick around for

2   that.  We have these different considerations, but bottom

3   line, it's meaningless to have individual Earn customers

4   say, well, I should have a, you know, constructive trust for

5   this and I can have it for that, because we don't have

6   enough to go, to go around.

7           And one of the, one of the guiding principles in

8   the Chapter 11 is that customers in the same class or group,

9   right, who are similarly positioned, get treated equally.

10  And that's our objective, Your Honor.  And we think that the

11  plan that we put forward is going to provide an equal

12  distribution.  I mean, the fact that you were, you know,

13  feel like you were misled or that you may have been lied to,

14  that doesn't add to the value of your claim.  You still have

15  -- your claim is for the return of your crypto for whatever

16  reason.  Maybe you made an eyes-wide-open decision and you

17  understood the risks and it's a volatile industry.  Maybe

18  you didn't understand all that and you put the crypto on the

19  platform and, you know, you believed in advertisement or you

20  misunderstood something or you didn't read it.  The point is

21  it doesn't matter what was in your mind and we would waste

22  all of our money and years trying to do trials and figure

23  out what was in your mind and what was in your mind.  At the

24  end of the day, they all have something in common.  They all

25  deposited crypto and they all have a claim for the return of

1    the crypto.  And we're focused on doing a plan that treats

2    them equally.  Again, respecting the rights of the different

3    categories of customers we have, but the Earn customers, we

4    think are going to be treated equally and are going to be

5    entitled to a significant return of value here.

6          The fact that it's property, Earn is property of

7    the estate, again, doesn't mean that Mr. Koenig and I go out

8    and we have a party with it and, you know, we spend it.  It

9    goes back to the customers.  Like that's, that is what the

10    estate has to do.  The estate has to make a return to the

11    customers.  And again, there's not bank creditors, bond

12    creditors who are going to, like, eat up that value.  It's

13    going to go back to the customers and we're going to propose

14    to do it in a way that's equal and ratable.  And we're going

15    to propose that we don't get into the, what was in my mind

16    and I what video did I see?  Because at the end of the day,

17    you're entitled to your crypto.  And that's the bottom line.

18          THE COURT:  Let me, it raises a question I meant

19    to ask earlier.  This has to do with custody account

20    holders,  The pure custody account holder where I believe

21    that the prior rulings and agreement was the crypto would be

22    returned to the pure custody account holders.  The issue

23    became that there's a shortfall, if you look at it on a

24    coin-by-coin basis.  And I thought I, obviously, I don't

25    believe there's been complete briefing on this.  I thought

Page 62

1   that the issue had been consensually resolved with an

2   agreement that it would be pro rata.  You know there was

3   some briefing about the lowest intermediate balance, et

4   cetera, but there was not complete.  I thought the issue had

5   been resolved.  I guess it has not.  I want to be sure that

6   if there is no consensual resolution of that issue, I think

7   what we've concluded was at least as to any undisputed

8   portions, get it out as soon as possible.  And if there has

9   to be some remaining issue about how to allocate the

10  shortfall on a coin-by-coin basis, that the Court would do

11  that, could, could you just address that briefly where that

12  stands?

13          MR. KWASTENIET:  Absolutely, Your Honor, and we

14  can we you can do that right now.  I think we put it on the

15  agenda as a status conference at the end of the agenda, but

16  I'm happy to do it now.  I would ask, I'd like to cede the

17  podium to my colleague, Mr. Koenig, who is more familiar

18  with it and who has been in conversations with Miss Cornell

19  and the ad hoc committees on these custody issues.  So I'll

20  yield the podium.  And, Your Honor, I think after that we're

21  ready to jump into the agenda.  Unless Your Honor has other

22  questions for me.

23          THE COURT:  I don't.  That was the last thing.  I

24  meant to ask that earlier, but I didn't.

25          MR. KWASTENIET:  Very good.  I'll yield the podium

Page 63

1      to Mr. Koenig.  Thank you, Your Honor.

2              THE COURT:  Go ahead, Mr. Koenig.

3              MR. KOENIG:  Good morning, Your Honor.  For the

4      record, Chris Koenig, Kirkland and Ellis for the Celsius

5      debtors.  Pursuant to the order that Your Honor entered last

6      week, the parties: the debtors, the committee, and the

7      custody ad hoc group, met and conferred regarding the

8      shortfall issue.  Just as a reminder to everybody watching

9      the hearing, as disclosed as part of the prior custody

10     litigation, there's a shortfall of the assets in the custody

11     wallets versus the custody liabilities.  The shortfall is

12     approximately 6 percent.  That issue has not yet been

13     resolved by the Court.  So it's an open issue.

14              The parties have met and conferred and agreed as

15     Your Honor suggested, that in order to begin processing

16     withdrawals now, all parties have agreed that for the pure

17     custody and the custody balances that are below the 75-75

18     limit -- this is all disclosed in the prior litigation --

19     the debtors will open withdrawals now and permit eligible

20     customers to withdraw 94 percent of their eligible balance

21     regardless of which coin is being withdrawn.  So that's 94

22     percent whether you have Bitcoin, Ethereum, USDC, or any

23     other coin.  Again, that's only -- you have to be eligible

24     under the withdrawal order.  You have to be pure custody or

25     you have to be below the 75-75.  We think that that will

Page 64

1    allow us to get meaningful distributions out to our

2    customers now while reserving what happens later on the 6

3    percent.  Perhaps we'll be able to reach a more robust

4    agreement on that point at a later date or if not, Your

5    Honor will have to rule in the context of a Chapter 11 plan

6    or otherwise.

7              Following that meet and confer, the debtors

8    updated a withdrawal schedule.  It will list out all of the

9    eligible customers and the balance that is eligible to be

10   withdrawn.  That is accounting for the 94 percent and 6

11   percent haircut that everybody will have to take.  We intend

12   to file that schedule later this week.  We're finalizing the

13   schedule.  Now we're going to share with the committee and

14   the custody ad hoc group in the next day or so, make sure

15   that everybody's comfortable with it before we file it, but

16   we intend to file it this week and to reopen withdrawals as

17   early as next week.

18             Just to reiterate for folks, as discussed at prior

19   hearings, as reflected in the withdrawal order, the debtors

20   may charge customers for the gas and transaction fees

21   associated with the withdrawals off the platform.  There are

22   certain customers that have very minimal balances in the

23   custody program.  Accordingly, they will not be permitted to

24   withdraw because the fees to withdraw would exceed the

25   balance to be returned.  That doesn't make sense.  The

Page 65

1    schedule will note those customers who have very de minimis

2    balances and won't be allowed to withdraw.  We want to make

3    sure that those parties have adequate notice.  And as I

4    said, and just to reiterate to make sure everybody

5    understands, we expect this withdrawal schedule to be

6    finalized and filed this week and that the withdrawals can

7    commence next week.

8              It's also important to know, and we'll make sure

9    that notice goes out to everyone, in order to withdraw the

10   assets, there are certain actions that users will have to

11   take before withdrawals can commence.  This is not a normal

12   case where you can just mail a check to the address on

13   record.  Users will have to tell us a safe and white-listed

14   address to which we should send their crypto.  So what they

15   will have to do is they will have to log into the Celsius

16   app.  They will receive notice but they'll log into the app

17   designate new white-listed addresses further withdrawals to

18   be sent to and they'll provide certain KYC information as

19   well.  Users will not be able to withdraw assets without

20   providing us with these addresses and without providing us

21   with this KYC information.

22             I just want to be clear as well, in light of

23   recent phishing attempts and the debtors have filed a

24   variety of phishing attempts on the docket.  I want to be

25   very clear and we're going to be very clear in all of the

Page 66

```
 1   notices that we file.  No eligible user has to pay any fees
 2   directly to Celsius or any third party in order to receive
 3   any distribution.  The fees will be netted on Celsius' end
 4   and paid out of the distributions on our end.  Nobody has to
 5   pay any amounts in order to receive any distribution and any
 6   communication that any user receives to the contrary is
 7   false.  You should report it to the debtors.  We have a
 8   variety of email addresses that folks can write.  There's
 9   CelsiusCreditorQuestions@Kirkland.com that you can report at
10   any time.  Our email addresses are also all over the
11   pleadings.  Please bring these phishing attempts to our
12   attention so that we can bring them to the attention of the
13   Court and to the larger creditor base as well.
14               I just want to be clear that we are obviously
15   making distributions now, but nobody has to pay directly to
16   access those distributions.  We will not ask for any fees to
17   be paid directly or for any personal identifiable
18   information to be provided outside of the Celsius app.
19   Everything that you have to do has to be in the app and
20   every notice that we provide to customers will be clear that
21   that is the only place you should provide us with that
22   information.
23               Finally, the withdrawal order also authorized the
24   withdrawal of the ineligible withhold assets.  That's those
25   assets that customers transferred to Celsius for which
```

Page 67

1    Celsius was not able to offer any services.  Unfortunately,

2    identifying all of the coins that the company holds that we

3    weren't offering services for has proven more challenging

4    than we initially expected.  We're still working on it.

5    We'll provide an update.  The ineligible withhold assets are

6    very de minimis.  It would certainly be the tail wagging the

7    dog.  So we want to start the custody withdrawals now.

8    We'll provide an update on the withhold, the ineligible

9    withhold assets as soon as possible.  So, Your Honor, I've

10   been speaking for a while.  I want to, you know, cede the

11   lectern to the committee and the ad hoc group and also

12   address any questions that Your Honor has.

13            THE COURT:  Well, I just want to be sure and I'm

14   sure you're taking the appropriate precautions to make sure

15   that the way in which the custody, pure custody account

16   holders provide information as to where the funds should be,

17   the custody should be transferred, is secure and, you know,

18   appropriate steps are taken to assure that.  I think the

19   last thing anybody wants is to find out that there's been a

20   hack or there's been any misdirection of any of the assets

21   that are being returned.  So and what I would suggest is

22   obviously you're conferring with the ad hoc, counsel for the

23   ad hoc committees.  I would encourage you also to make sure

24   you communicate with Miss Cornell, the U.S. Trustee's

25   Office.  I just want to be as certain as anybody can be in

Page 68

1     the circumstances that it's -- whatever is going out is

2     going to the right places.

3                MR. KOENIG:  Agreed and understood, Your Honor.

4     And that's why we've taken care to make sure that the

5     information is going to be input into the Celsius app and

6     not via email.  We think that that will help to minimize the

7     phishing scams.  The company, you know, is working to, when

8     distributions go out, ensure that only the assets that need

9     to be sent out on a particular day are ever live or hot to

10    minimize the risk of anything.  Just to be clear, Celsius as

11    ever been the subject of a hacker or anything like that.

12    But, of course, we're going to take as many steps as we can

13    to ensure that that doesn't happen as we, as we proceed with

14    this withdrawal process.  And we've been communicating with

15    the committee and the ad hoc custodial account holders as

16    well to make sure that everybody understands exactly what

17    the process is.  And, obviously, I'm not going to get into

18    the ins and outs of in an open forum like this, but we've

19    certainly been, we've certainly been talking about it.

20                THE COURT:  Okay.  And I know you said you're

21    going to try and do this.  As to the 6 percent that's not

22    being distributed now and we're with the shortfall, I

23    certainly hope that the constituent parties will continue to

24    discuss whether the issue can be resolved consensually.

25                MR. KOENIG:  Understood and agreed, Your Honor.

1           THE COURT:  Don't let, don't let the good, you

2     know, overcome the absolute truth.  Okay.  Whatever that is.

3           MR. KOENIG:  Understood, Your Honor.

4           THE COURT:  Everybody's -- all right, thank you

5     very much.  Mr. Kwasteniet, do you want you want to move

6     ahead with the agenda?

7           MR. KWASTENIET:  We're going to move ahead with

8     the agenda.  I'm going to pass the lectern to my colleague

9     Miss Hensley.

10          THE COURT:  Okay.

11          MR. KWASTENIET:  Thank you.

12          MR. HENSLEY:  Good morning, Your Honor.  Can you

13    hear me?

14          THE COURT:  Yes, I can.

15          MR. HENSLEY:  Gabriela Hensley of Kirkland and

16    Ellis on behalf of the debtors and debtors-in-possession.  I

17    am presenting our motion to return post-petition transfers

18    to account holders which is filed at Docket 1817.

19          Your Honor, we, at the December 20th hearing, we

20    had a pro se creditor who spoke up on the record asking

21    about this issue.  At that time, we informed Your Honor that

22    we had a couple of letters come across or emails to our

23    inquiry inbox regarding post-petition transfers of

24    cryptocurrency that, you know, whether by mistake or some

25    sort of automatic recurring transfer that slipped the radar,

1    had been received.  We let you know that we were looking

2    into it and, as promised, we did.  And we discovered that

3    there were actually a number of these transfers almost

4    11,000 coming from about 2800 unique users.  All in, these

5    transfers total approximately $1.4 million.  So it's a more

6    substantial amount than we might have originally thought.

7              We, as promised, filed a motion.  We did not

8    receive any objections to that motion.  It contains -- the

9    proposed order filed with the motion contained a number of

10   the protections that we discuss with parties in connection

11   with custody.  We'll file a notice saying the transfers we

12   intend to return.  You know we won't allow people to

13   transfer them between accounts.  All of that.

14             We did receive a few informal comments with the

15   committee which we incorporated in the revised order, which

16   is filed a Docket 1918, filed last night.  I'm happy to talk

17   Your Honor through those changes or address any questions

18   about the motion.  But if none, we would ask that the

19   revised order be entered.

20             THE COURT:  All right.  Does anybody else wish to

21   be heard?

22             MS. CORNELL:  Your Honor, this is Shara Cornell of

23   the Office of the United States Trustee.  How are you?

24   We've actually -- our office has been asking questions about

25   this issue actually since the case has been filed.  We're

Page 71

1    happy that these funds are going to finally be returned.

2    And I just wanted to bring Your Honor's attention, you know,

3    that we are still concerned that a process will be put into

4    place to stop these types of payments on a go-forward basis.

5    It's our understanding that customers can still make

6    payments to Celsius.  And we just want to make sure that

7    this is fixed on a go-forward basis as well.  Thank you very

8    much, Your Honor.

9            THE COURT:  Thank you.  Anybody else wish to be

10   heard?  All right, the Court has reviewed the motion --

11           CLERK:  Judge, there's a hand.  Ezra.

12           THE COURT:  All right, Ezra Vazquez-D'Amico, I'm

13   probably mispronouncing your name.  Go ahead.

14           MR. VAZQUEZ-D'AMICO:  Thanks, Your Honor.  This is

15   a question related to the pure custody.  I just wanted to

16   make sure when, when they file a schedule with a list of

17   accounts that they're considered to be pure custody, will

18   there be an opportunity for account holders who believe

19   their account is pure custody to, you know, confer if they

20   feel it's not included?

21           THE COURT:  Well, what I would say is when you see

22   the schedule, and please I encourage everybody who believes

23   they're in this category to look at the schedule closely,

24   please reach out and contact the debtors' counsel and also

25   the committee's counsel and raise it with them.  So, and if

Page 72

1   necessary, the Court will have to deal with it.  But I

2   appreciate your concern.  And I expect that all pure custody

3   or those with amounts below that preference threshold will

4   look at those schedules closely if you believe you're

5   entitled to the distribution.  Okay?

6          MR. VAZQUEZ-D'AMICO:  Thank you.

7          THE COURT:  Thank you.  So with respect to this

8   motion to credit post-petition transfers, ECF Docket Number

9   1817 was the motion, no objections have been filed to the

10  motion.  The Court has reviewed it carefully and the motion

11  is granted.

12         MR. HENSLEY:  Thank you, Your Honor, we'll send it

13  out.

14         THE COURT:  The revised order that was entered,

15  submit it in Word format and it will be promptly entered.

16  Okay?  Thank you very much.

17         MR. HENSLEY:  Thank you, Your Honor.  I would

18  respectfully cede the podium to my colleague Mr. Latona.

19         THE COURT:  Okay.

20         MR. LATONA:  Good morning, Your Honor.  Dan Latona

21  of Kirkland and Ellis on behalf of the debtors.  The next

22  item on the agenda is the debtor's motion to authorize the

23  crediting of the Flare token to eligible customers who held

24  XRP in their eligible accounts as of the snapshot date.

25         Your Honor, Flare is a new Blockchain that has

Page 73

1    created its own coins similar to other proprietary

2    Blockchains.  And the purpose of this coin is to distribute

3    or airdrop this token to centralized exchanges in order to

4    drive adoption of the new token.  As of the snapshot date,

5    the debtors have about approximately 250 million in

6    obligations of Flare tokens to eligible account customers

7    based on the snapshot date.  And in connection, or as a

8    condition of distributing these tokens to eligible account

9    holders, the debtors and Flare entered into agreement that

10   also provides Celsius with a grant of approximately 150

11   million Flare tokens on account of the distribution.

12        Your Honor, the airdrop occurred on January 9th

13   and the logistics of the drop are that 15 percent of the

14   total aggregate number of Flare tokens to be distributed are

15   airdropped on the token distribution event with the

16   remainder to be distributed ratably over the next 36 months.

17   As a result, the result of the Debtor's Chapter 11, the

18   debtors are seeking authorization to credit these tokens to

19   the account holders.

20        Your Honor, airdrops are common in the

21   cryptocurrency industry.  As an example, the debtor's terms

22   of service anticipate and account for these particular

23   airdrops in Section 14.  And account holders will benefit by

24   receiving these tokens in their accounts.  These tokens will

25   increase the value of the debtor's claims.  And again, Your

Page 74

1    Honor, crediting these tokens to account holders is in the

2    sound business judgment of the debtors, they provide a grant

3    to Celsius, and they increase the value to these account

4    holders.

5         The debtors did not receive any formal objections.

6    The revised order at Docket Number 1913 incorporates certain

7    comments from the committee and unless Your Honor or anyone

8    has any questions, the debtors would cross the entry of that

9    order.

10        THE COURT:  All right, does anybody else wish to

11   be heard?  Mr. Benz.  Mr. Benz, you had your hand raised.

12   If you wish to address this, please go ahead.

13        MR. BENZAKEN:  I'm so sorry, Your Honor, I was on

14   mute.  So yes, just briefly, the airdrop constitutes a

15   taxable event and I'm wondering for the creditors, if this

16   is at a net loss given its current market price, if added to

17   their accounts at this moment?

18        THE COURT:  Mr. Latona, are you able to address

19   that?

20        MR. LATONA:  Your Honor, I'm not a tax attorney.

21   Nor am I familiar with any individual account holders

22   specific tax situation.  I would advise folks to discuss

23   with their own accountants or tax advisors.

24        MR. BENZAKEN:  Well, so simply, is the coin valued

25   more or less than it was when it was dropped?

Page 75

1          MR. LATONA:  The coin currently is trading at

2     approximately .038 cents as of this morning.

3          MR. BENZAKEN:  Do we know what it was that as

4     they're dropped?

5          MR. LATONA:  I don't know what it was trading of

6     exactly at the date of the airdrop.

7          MR. BENZAKEN:  Okay, so I'd like to follow up with

8     you on that just because you said this has already decided,

9     I just want to know if it represents a net liability to the

10    creditors?  Thank you, sir.

11          THE COURT:  Mr. Jeter, Adam Jeter.

12          MR. JETER:  Can you hear me?

13          THE COURT:  Yes, I can.

14          MR. JETER:  Okay.  The one question I have is I

15    know the (indiscernible) took a long time to be distributed.

16    They did a snapshot in 2020 December and it got distributed

17    (indiscernible) with all of our accounts, the custody

18    accounts, in the middle of last year.  And they said any new

19    deposits would count as a custody deposit and go to a

20    custody account.  If these are distributed to us, will be in

21    the Earn account or will they be in the custody account?

22          MR. LATONA:  Your Honor, Dan Latona for Kirkland

23    and Ellis.  In order to treat all account holders across the

24    platform equitably, the token would be airdropped into the

25    account that held XRP as of the snapshot date.

Page 76

1          MR. JETER:  Okay.  So it's going to count as based

2     on saying it was distributed back on day of 2020, I guess

3     when the snapshot was taken, but still when Celsius changed

4     and no longer were offering Earn accounts to anyone in the

5     middle of last year, any new deposit which spoke to the

6     custody issue.  So when Flare distributed January 9th to

7     Blockchain and deposited assets into the address, why

8     wouldn't it be considered a custody account?

9          MR. LATONA:  Because if you held XRP tokens in

10    your Earn account given the treatment that has already been

11    decided in these Chapter 11 cases, depositing Flare token

12    into a custody account would in effect place your claim with

13    respect to Flare token ahead of others who did not open

14    custody, open custody accounts after that date.  So in order

15    to treat every account holder equitably, the Flare token

16    will be distributed to the account that held XRP tokens as

17    of the snapshot date.

18          MR. JETER:  All right, I understand.

19          THE COURT:  That's okay, Mr. Jeter, you've had a

20    chance to ask your question.  Mr. Dixon.

21          MR. DIXON:  Yeah, Simon Dixon, per se creditor.

22    Just trying to understand because if it, if it belongs to

23    custody, then it would make sense to distribute to those

24    that hold XRP.  But if it's not held in custody, then surely

25    as property of the estate to be distributed equally among

Page 77

1    everybody.  Just trying to, just trying to understand how to

2    square those together

3              MR. LATONA:  Your Honor, because we understand

4    that this was an airdrop that was a snapshot date prior to

5    the petition day, in order to credit these tokens to account

6    holders who are eligible to receive them, we are seeking

7    court authority to distribute and credit those Flare tokens

8    to the account holders who are entitled to receive them.

9    The debtors don't want to hang out to tokens or, instead,

10   keep them as property of the estate.  They want to credit

11   them to the eligible account holders to increase their

12   claims because their entitled to those Flare tokens.

13             THE COURT:  Thank you very much.  All right.  So

14   Mr. Latona has referred to Section 14 of the terms of use.

15   It reads as follows:  "In the event that a digital asset

16   network attempts to, or does distribute digital assets to

17   Blockchain addresses pertaining to an eligible digital asset

18   via airdrop or bootstrapping, collectively an airdrop, the

19   support of any such digital, new digital assets in your

20   Celsius account is solely at the discretion of Celsius.  If

21   we do not make a public announcement confirming our support

22   of such new digital assets, we will not support such new

23   digital assets, and such new digital assets will be treated

24   as unsupported assets.  To the extent you wish to receive

25   the new digital assets to be delivered via airdrop, you are

Page 78

```
 1    advised to withdraw the applicable digital assets from your
 2    Celsius account prior to the relevant date for the airdrop.
 3    You further agree and understand that digital assets
 4    delivered via airdrop do not create or represent any
 5    relationship between us and the sender and/or the related
 6    digital asset network and do not subject us to any
 7    obligations whatsoever as they relate to the sender and/or
 8    the related digital asset network."
 9              So that's -- you can find that in the so-called
10    terms affidavit, the declaration of Mr. Mashinsky, which was
11    filed as ECF Docket Number 393, Exhibit A-8, Section 14.
12    That's where that lies.
13              The Court has reviewed the motion and believes it
14    is well taken.  The motion is granted.
15              MR. LATONA:  Thank you, Your Honor.
16              THE COURT:  Thank you, Mr. Latona.
17              MR. LATONA:  The next item on the agenda is the
18    GK8 cash management motion.  The debtors and the U.S Trustee
19    filed a joint stipulation at Docket Number 1912.  The only
20    remaining issue with respect to the GK cash management issue
21    is the 345 issue with respect to Bank of Hapoalim.  That
22    bank has a New York branch that is an authorized depository
23    under the U.S. Trustee guidelines.  However, the cash is
24    instead held in the Israeli branch of that bank.  We have
25    been working with Bank of Hapoalim to execute a uniform
```

Page 79

1    depository agreement.  We have not reached that agreement

2    yet.  In discussions with the U.S. Trustee, they have agreed

3    to extend our deadline to comply with Section 345 through

4    February 7th.  We filed a revised order at Docket Number

5    1917 that reflects that agreement and sets the final hearing

6    on cash management for February 15th.

7           Your Honor, we did have these discussions with the

8    U.S. Trustee.  So unless Ms. Cornell has anything to add, we

9    would ask that the second interim order be entered as well.

10          THE COURT:  Ms. Cornell.

11          MS. CORNELL:  Shara Cornell on behalf of the

12   Office of United States Trustee.  That's correct, Your

13   Honor.  We've agreed to a final 15-day extension in order

14   for GK8 to come in compliance with 345.  Thank you.

15          THE COURT:  All right.  Anybody else wish to be

16   heard on this?  All right.  The motion is granted on an

17   interim basis with the order.

18          MR. LATONA:  Thank you, Your Honor.

19          THE COURT:  Thank you.

20          MR. LATONA:  Your Honor, the next item on the

21   agenda is the debtor's sale of certain de minimis assets

22   that you heard Mr. Ferraro mention at the beginning of the

23   hearing.  The initial notice was filed at Docket Number

24   1853.  In support of that sale, the debtors filed the

25   declaration of Mr. Patrick Holert, who is the chief

1    financial officer of debtor, Celsius Mining LLC.

2            Your Honor, the debtors received one objection,

3    Docket Number 1855 from Victor Ubierna de las Heras and the

4    debtor has filed a reply at Docket Number 1919.  I know Mr.

5    Ferraro mentioned these specific rigs, so happy to walk

6    through again the rationale and put it into the record, but

7    otherwise the debtors would request that the objection

8    overruled and that the notice be entered.

9            THE COURT:  Mr. Ubierna, do you want to be heard?

10           MR. UBIERNA:  I have nothing more than what it is

11   in the Docket 1555.  Thank you, Your Honor.

12           THE COURT:  Thank you, Mr. Ubierna.  So the

13   questions that I had really have been addressed in the

14   preliminary comments by Mr. Ferraro and that was really is

15   mining still cash flow positive?  What's the status of the

16   current mining activities?  How does the selling of the rigs

17   relate to the genders reorganization plan?  So I'm satisfied

18   after hearing Mr. Ferraro, I think those were important

19   questions and so I'm satisfied.  So the motion to approve

20   the sale de minimis assets is granted.

21           MR. LATONA:  Thank you, Your Honor.  The next item

22   on the agenda, Your Honor, is the debtor's institutional

23   loan motion, again, filed at Docket Number 1818.  There was

24   a revised order filed at Docket Number 1924.  And again,

25   there was a lot of discussion earlier on about the debtor's

Page 81

1    institutional loan program and the differences between the

2    retail loan program.  Again, happy to walk through anything

3    for the record, but I believe the debtors have determined,

4    or demonstrated that reinstating the -- authorizing the

5    debtors to take action on account of the individual MLAs is

6    a sound exercise of the business judgment because as we

7    heard, the retail lending book, as a whole, is substantially

8    over collateralized.  That is not the case for the

9    institutional loan book, which is also smaller in scale,

10   both in terms of unique individual borrowers and also total

11   aggregate number of obligations outstanding.

12           And importantly, Your Honor, this does not allow

13   or permit or direct the debtors to take any action.  It

14   authorizes the debtors to take action with respect to any

15   individual loan or series of loans to the extent that taking

16   action would be accretive to the debtor's estates.  So

17   unless Your Honor has any further questions, unless Mr.

18   Adler has anything else to add, we would respectfully

19   request entering the order at Docket Number 1924.

20           THE COURT:  I do have some questions.  Can the

21   debtors explain the discrepancy in the institutional lending

22   program as described in the motion compared to the

23   description in Mr. Mashinsky's First Day declaration?  The

24   motion indicates that there are approximately 14

25   institutional borrowers with approximately $115 million of

Page 82

1    aggregate outstanding balances.  Mr. Mashinsky's First Day

2    declaration indicated that as of July 11th, 2022, Celsius

3    had approximately 47 institutional borrowers with

4    approximately 93 million of aggregate outstanding loans.  I

5    tried looking for reconciliation of those differences.

6         MR. LATONA:  Of course, Your Honor, happy to

7    provide that.  So the First Day declaration lists the total

8    aggregate number of loans outstanding.  And the motion

9    references the number of unique individual borrowers.  So an

10   individual borrower may have multiple loans under one MLA.

11   The total number aggregates to 47.  The difference in the

12   number, or the total aggregate amount of obligations

13   outstanding and the value of the collateral relate to the

14   fluctuation in cryptocurrency values as of the petition date

15   to the current date.

16        THE COURT:  All right.  Next question is whether

17   any of the actions that the debtor is seeking to take would

18   involve the movement of any assets that are in custody

19   accounts?  Given the ongoing efforts to make distributions,

20   I want to be sure the debtors are not touching those assets.

21        MR. LATONA:  Absolutely, Your Honor.  My

22   understanding is that none of the collateral securing these

23   loans has ever been in either Earn or custody.  But we will

24   work with the committee and we will work with the debtors to

25   ensure that none of those assets are touched.

1          THE COURT:  All right.  Lastly, Mr. Pesce or one

2     of your colleagues, the committee did not file an objection

3     but it would be helpful to the Court if you could confirm

4     whether the committee is comfortable with the relief that

5     the debtors are seeking?  Yeah, that's my question.

6          MR. PESCE:  Thank you.  For the record, Robert

7     Pesce, White and Case, on behalf of the committee.  Yes, we

8     are comfortable and as reflected in the red line, there were

9     a variety of changes that were made to the order to address

10    some of the feedback that we had to this motion.

11         THE COURT:  All right.  There's at least one hand

12    raised, Paul Breuder, B R E U D E R.  I may have

13    mispronounced it, but I will give you a chance to address

14    the Court if you wish.

15         MR. BREUDER:  Good morning, Your Honor.  My name

16    is Paul Breuder.  I just have one question regarding my

17    loans.  Can the debtors please outline what is going out in

18    terms of collateral value and what is being returned to the

19    debtor's estate?

20         MR. LATONA:  The total --

21         THE COURT:  Go ahead, Mr. Latona.  You need to

22    identify each time you speak, Mr. Latona.

23         MR. LATONA:  Sure.  Again, Dan Latona for the

24    debtors from Kirkland and Ellis.  The total outstanding

25    obligations is approximately $115 million.  The collateral

Page 84

1    securing those obligations is approximately $16 million.  So

2    to the extent that the debtor has determined that bringing

3    in crypto or releasing crypto on account of payoff of the

4    institutional loan is accretive to the estate, the debtors

5    will take such action.  The collateral securing those loans

6    is made up of various cryptocurrency, mostly Bitcoin,

7    Stablecoin and Eth in most instances.  In certain instances,

8    the debtors are prevented from taking action.  For example,

9    Alameda Research and Three Arrows Capital, those entities

10   are in Chapter 11 under their own insolvency protection.  So

11   we cannot take action without court authority in those

12   proceedings.  But, again, notably that the committee has

13   certain consent and consult rights with respect to any

14   workouts in any cryptocurrency that leaves the debtor's

15   platform.

16              THE COURT:  Mr. Adler.

17              MR. ADLER:  Good morning, Your Honor.  David Adler

18   on behalf the ad hoc group.  We filed an amended objection

19   last Tuesday where we raised a number of points and issues

20   regarding this proposal.  The debtors were nice enough to

21   send me a list of the institutional borrowers, the number of

22   loans, the collateral, and other information.  And while

23   there's a confidentiality order in effect that I'm not going

24   to mention names, I do want to say that there are 15

25   borrowers in total that constitute 47 loans.  The gross

1    loans outstanding are 518 million.  And the collateral value

2    is 16.6 million.  Now there are five of those 15 borrowers

3    that have zero collateral that got loans from Celsius by

4    providing no collateral.  The collateral column is listed as

5    zero.  One of them was mentioned before, Alameda, which has

6    a loan of which has some FTTs serving as collateral.  You

7    take those six loans out of the picture, you are left with

8    25.2 million in outstanding loans that is backed by 16.6

9    million in collateral that consists of Bitcoin, Eth, and

10   Stablecoin.  And there's one borrower here, I won't mention

11   the borrower's name, but the borrower has Stablecoin of $1.7

12   million, gross loan of half a million dollars,

13   overcollateralized by $1.2 million.

14           I count five of the remaining borrowers as being

15   over collateralized and four of them being under

16   collateralized.  And my calculation, Your Honor, is based on

17   the fact that Bitcoin and Eth have both risen about 35, 37

18   percent since this report was prepared.  I am concerned,

19   Your Honor, because I don't think there's been a sufficient

20   factual record developed here to support the business

21   judgment rule.  The debtor's talk about these agreements

22   being bespoke.  It's a nice word to use, bespoke.  When I

23   looked at the agreement, Your Honor, they look like they're

24   you know more off the rack because they're all pretty much

25   the same thing.  There might be little tweaks here and there

Page 86

1  on the agreements, but they are substantially the same as a

2  retail borrower lending agreements.  There is a provision of

3  collateral.  There are remedies that are available.  There's

4  loan-to-value ratios that need to be maintained.  And I'm

5  concerned, Your Honor, because I don't think there's been a

6  sufficient factual record developed here.

7          All of this is being based on lawyer argument.

8  We're told in the reply that -- it's Paragraph 3, Paragraph

9  1 in the preliminary statement -- that says the risk that

10  the loans provided by the debtors will become uncollectable

11  has greatly increased and made prompt action with respect to

12  such loans necessary to maximize the value of the debtor's

13  estate.  Well, I just read to Your Honor that five of the

14  loans at this moment I believe are over collateralized.  Now

15  Your Honor doesn't know any of that because none of this

16  nation has been put before you in the form of a declaration

17  showing what these "bespoke MLAs" reflect.  But I've seen it

18  and I can say that it is substantially similar to the retail

19  borrowing program.

20          So we don't believe, number one, that a sufficient

21  factual record has been developed.  Number two, I think that

22  this type of relief should be granted pursuant to a plan or

23  some other type of process, not just merely saying we want -

24  - it's our business judgment, Judge.  We want to give back

25  the collateral to borrowers.  Take our word for it.  We need

Page 87

```
 1    to do this.  I think that it is not in the ordinary course

 2    of business.  I don't think this should be approved under

 3    that standard.  And  I think that the debtors should be

 4    required to put forth a declaration with the MLAs.  They can

 5    obviously redact them if they need to so that we can have an

 6    informed discussion about the differences between the

 7    institutional program and the retail program.  And unless

 8    Your Honor has any further questions, that's my response.

 9              THE COURT:  Thank you.  Mr. Jeter, your hand is

10    raised.

11              MR. JETER:  Yeah, we'll be here.  So my other

12    question I have is I know the second person for Kirkland had

13    mentioned if we were doing withdrawals next week doing

14    custody to 94 percent.  And then I think I've read it

15    before, but are they going to allow a very small amount of

16    withdrawal for Earn customers, even $75?  It's only about

17    75-75 I believe.  I'm just wondering.  I thought I read

18    something of that being together in detail about it.

19              THE COURT:  Mr. Jeter, what I would say is what

20    you're not raising an issue that's really pertinent to the

21    specific motion that the Court is considering now.

22              MR. JETER:  It was a general question.  I'm sorry.

23              THE COURT:  All right.  Mr. Latona, can you

24    address Mr. Adler's issues that he's raised?

25              MR. LATONA:  Yes, happy to respond.  Again, Dan
```

Page 88

1    Latona of Kirkland Ellis on behalf of the debtors.  I'd like

2    to make one clarification and then respond to Mr. Adler.

3    Mr. Adler represented that there are approximately 500

4    million in outstanding obligations.  That's including a loan

5    that was worked out prepetition under which the debtors are

6    still operating with that counterparty.  The debtors do not

7    seek relief with respect to that counterparty in this

8    particular motion.  What I would say to Mr. Adler is that

9    the debtors are really seeking authorization, not direction,

10   to unwind any particular institutional loan to the extent

11   that the debtors find it is value accretive to the estate.

12   So even if, for example, we were to extend the same relief

13   to the retail lending book, it wouldn't entitle those retail

14   borrowers to the immediate return of their cryptocurrency.

15   It's still within sound exercise of the debtor's business

16   judgment to take action on any independent loan where the

17   debtors find its value accretive to the estate.

18            The second thing I would add is that there are

19   significant safeguards built into the order specifically

20   with respect to consent rights and consultation rights with

21   the UCC.  Debtors are not able to enter into any workouts or

22   release cryptocurrency from the platform without the express

23   consent of the UCC or, absent that consent, without further

24   order of the Court.  So the Court would not be writing the

25   debtors a blank check to unwind their loan portfolio.  There

1    are significant safeguards built in.  And because of that,

2    Your Honor, the debtors do believe it is a sound exercise of

3    their business judgment.  It lowers and reduces the risk of

4    the institutional loan book at a time when cryptocurrency

5    markets are in pretty severe fluctuation.

6            THE COURT:  All right.  The Court is going to take

7    -- I have one more hand.  Briefly, Mr. Bronge.  Mr. Bronge,

8    if you want to be heard, go ahead.  One last chance, your

9    hand is raised on my screen, Bronge.  If you want to be

10   heard, go ahead and do it now.

11           All right.  Having giving Mr. Bronge an

12   opportunity to be heard and he didn't speak up, I'm going to

13   take this motion under consideration and expect to issue an

14   order within a few days at most.  Let's move on to the next

15   agenda item.

16           MR. LATONA:  Thank you, Your Honor.  The next item

17   on the agenda is Mr. Frishberg's motion to reconsider the

18   GK8 sale.  Being that this is his motion, I will cede the

19   virtual lectern over to him.

20           THE COURT:  Okay.  Mr. Frishberg.

21           MR. FRISHBERG:  Thank you, Your Honor.  I'm not as

22   good at speaking as Kirkland is, but in this instance, the

23   facts speak for themselves.  First of all, the debtor did

24   not have $750 million of insurance as they claimed on the

25   Celsius website.  They claim they had it through GK8.  It

Page 90

1    was presented in a way that it made it appear that customer

2    deposits were insured, as you can see for yourself in my

3    declaration.  The debtors have not addressed the elephant in

4    the room, so to speak. and it's a very important one, which

5    is the seemingly false claims that are made approximately

6    three weeks prior to prior to the petition filing.

7             Secondly, I also believe that a similar, but

8    different issue is with GK8 itself.  GK8 has claimed at

9    various times that it has $500 to $750 million of insurance

10   which was addressed in the debtor's reply.  And now it's one

11   billion dollars of insurance available on their website to

12   their clients.  It seems that Celsius Network debtor at

13   least was a client of GK8 because of the I believe it's

14   Matic and Cardano cryptocurrencies which were recently

15   transferred from GK8 back to Celsius before the sale.  The

16   debtors have still not admitted their claim of insurance was

17   either false or misleading.  They seem to have been mostly

18   trying to avoid the subject entirely and focusing on the GK8

19   insurance policy on the GK8 website.

20            Third, Celsius has disclosed that it has an error

21   in emissions policy from Lloyd's (indiscernible) Syndicate.

22   It's only valued at roughly $750,000 I believe.  I'm not

23   sure the exact value of it.  But like the insurance policy

24   is for 750K.  I'm not sure how much it's valued, like if you

25   can sell it or whatever.  It came into effect August 2022,

1   which was after the misrepresentation.  So was there any

2   insurance before?  The main questions which are unanswered

3   that remain and should be answered are one, was there or was

4   there not errors and omissions insurance in June 2022 and

5   July 2022 naming any one of the various debtor entities

6   whether it's GK8 or Celsius and all of the subsidiaries, et

7   cetera, et cetera, as a beneficiary?  And what was the

8   relationship of Celsius to Aon PLC, which had previously

9   undisclosed marketing because it was represented that

10  Celsius had $700 million insurance, not it was some

11  hypothetical maybe marketing.  And what relation does GK8

12  have with the two Aon NDAs?  Did GK8 and Celsius engage in

13  some sort of -- and I'm saying this alleged -- alleged

14  insurance fraud in June and July 2022?

15          THE COURT:  Mr. Frishberg, you do you understand

16  this is a motion for reconsideration despite how you tried

17  to characterize it in your reply.

18          MR. FRISHBERG:  Yeah, and I --

19          THE COURT:  And there's a specific legal standard

20  that applies to motions for reconsideration.

21          MR. FRISHBERG:  Yes, Your Honor.  I'm getting to

22  that part.  I'll skip, skip to it real quick.  I do not, I'm

23  not an insurance expert, but before the GK8 sale is

24  consummated and liabilities discharged, we need some answers

25  and I believe that the, how you call it, new information

Page 92

1    came out after the GK8 sale was approved that the insurance

2    policy did not exist, but it was claimed at one point, I

3    believe up until July 5th, I'm not sure exactly what date it

4    was removed from the website, that the insurance policy,

5    $750 million insurance was through GK8.  So I believe they

6    may have held liability there and I do not believe that any,

7    how do you call it, it should not be discharged, the

8    liability.  Either an examiner or special insurance examiner

9    should be directed to look at this.  Thank you, Your Honor.

10   That is all.

11            THE COURT:  Okay.  Mr. Latona.

12            MR. LATONA:  Your Honor, Dan Latona of Kirkland

13   and Ellis on behalf of the debtors.  Your Honor, the debtors

14   did file an objection at Docket Number 1869 and in support

15   of that objection, filed the declaration of Ms. Melissa

16   Workman, Senior Director of Operations for Celsius, debtors,

17   at Docket Number 1870.  Ms. Workman is available to answer

18   questions to the extent anybody does.  I would like to admit

19   that declaration into the record without any questions.

20            THE COURT:  All right.  What's the ECF docket

21   number again?

22            MR. LATONA:  1870.

23            THE COURT:  All right.  Are there any objections?

24   All right, the declaration is admitted in evidence.

25            (Melissa Workman declaration admitted into

1    evidence)

2            MR. LATONA:  Thank you, Your Honor.  Your Honor,

3    contrary to there being a number of unanswered questions,

4    the debtors have taken painstaking attempts to communicate

5    with Mr. Frishberg, as you can see from his various filings

6    on the docket.  The debtors have constantly communicated

7    with him, explained to him the arrangement between GK8, Aon,

8    and third-party insurers.  What that arrangement is, which

9    predates Celsius acquisition of GK8, is Aon, acting as

10   broker, would work with institutional customers who held

11   cryptocurrency on GK8's platform to obtain insurance for

12   those assets with third-party insurers.  GK8, nor Celsius,

13   were never part of any insurance policy with Aon or USI.

14   This is a fundamental misunderstanding of the arrangement

15   that the debtors have repeatedly articulated to Mr.

16   Frishberg, have provided both insurance policies that are

17   being sold in the sale.  Regarding the E&O policy, the only

18   insured is GK8 Limited and none of the proceeds of that

19   policy would be available for account holders.  Mr.

20   Frishberg continues to conflate Celsius and GK8.  He is

21   reconsidering or attempting to reconsider the sale of GK8.

22   On GK8's website at all times, did the debtor or the GK

23   debtors indicate that insurance was available to GK8

24   customers through Aon or through USI.  Mr. Frishberg cites

25   no new evidence, as his various declarations indicate this

Page 94

```
 1    information was on the GK8 debtor's website well in advance
 2    of the December 6th objection deadline to GK8 sale.  Nor has
 3    he provided any clear and convincing evidence of any fraud
 4    involved in the GK8 sale.  And as was demonstrated at the
 5    sale hearing with the Kielty declaration and the order that
 6    was entered, this is a value maximizing sale.  The sale with
 7    Galaxy is the highest and best offer available.
 8              And, Your Honor, the debtors have taken
 9    significant steps toward closing that transaction.  After
10    the order was entered in the United States, the debtors
11    obtain recognition of the Chapter 11 proceeding in Israel
12    including enforcement of that sale order and the debtors are
13    weeks away from consummating this transaction.  This motion
14    is nothing more than a distraction to a value maximizing
15    transaction that presents no new evidence and continually,
16    continuously accuses the debtors of concealing assets and
17    committing bankruptcy fraud without any factual basis.
18              So on that, Your Honor --
19              THE COURT:  Mr. Latona, can you provide the Court
20    with the order of the Israeli court that recognized and
21    enforced the sale in both, obviously in Hebrew and also an
22    English translation of it?
23              MR. LATONA:  Absolutely, Your Honor, we'll provide
24    it.
25              THE COURT:  When did you obtain, when did the
```

1     debtor obtain that ruling in Israel?

2              MR. LATONA:  I believe it was approximately

3     January 9th.  I may have my dates off by a day or two.

4              THE COURT:  All right. And what is the anticipated

5     or expected closing date that you're shooting for?

6              MR. LATONA:  As of right now, we're targeting

7     February 3rd.

8              THE COURT:  All right.  All right.  Anything else

9     you want to add, Mr. Latona?

10             MR. LATONA:  No.  With that, Your Honor, we

11    request that the motion be overruled and the objection be

12    sustained.

13             THE COURT:  All right.  The Court is going to take

14    it under submission and will act promptly.  I understand

15    when you're trying to close the transaction.  I would, as I

16    said, I would like to see the order of the Israeli Court,

17    both the Hebrew and in English.  Thank you.

18             MR. LATONA:  For sure, Your Honor.  We'll send

19    that to chambers as soon as possible.

20             THE COURT:  All right, let's move on on the agenda

21    then.

22             MR. LATONA:  Thank you, Your Honor.  At this time,

23    I'm going to cede the lectern to my partner, Mr. Koenig.

24             MR. KOENIG:  Your Honor, again for the record,

25    Chris Koenig, Kirkland and Ellis, for the Celsius debtors.

Page 96

1    The next few motions are motions of pro se creditors

2    relating to their Earn accounts.  I'll cede the lectern to

3    them in whatever order Your Honor prefers.

4             THE COURT:  All right, Mr. Khanuja.

5             MR. KHANUJA:  Hello, Your Honor.  I'm just logging

6    in.  Thank you and good afternoon, good morning, Your Honor.

7    I wanted to, I've already filed a reply to the debtor's

8    objection.  My reply number is Docket Number 1909.  And the

9    debtor's objection being Docket Number 1872.  Earlier, I

10   filed an amended motion, Docket Number 1816 regarding on

11   account ownership and equal standing as custody.  Now I've

12   provided a lot of details in my response, in my reply, as

13   well as in my motion.  I don't wish to go through those in

14   detail in the interest of time.

15            Today I wish to make three different points.  Your

16   Honor, we have not had a full evidentiary hearing or

17   opportunity to present evidence as pro se.  For example, the

18   deposition testimonies or tax documents.  With regards to

19   the ambiguity caution, the Celsius executives declarations

20   clearly contradict the testimonies they provided in their

21   deposition.  As an example when a key Celsius executive says

22   he can understand how customers can create the terms of use

23   differently, similarly, another executive likens the

24   customer deposits, deposits to loans and customer assets to

25   a lien, these are all ambiguous terms.  Please refer to the

Page 97

1    transcript from the date number date, November 22 of Mr.

2    Orin ** blanching, Page Number 388, Line 14 and Page 391,

3    Line 7, also, Page Number 83, Line 3.  Also, we can refer to

4    the transcript from date November 21st of Mr. Chris Ferraro,

5    Page Number 286, Line 16 and Page 289, Line 14.

6              The deposition testimony of the executives

7    actually contradicts their deposition in support of the

8    motion.  They say people can disagree to the terms of use

9    interpretation and hundreds of people have already

10   disagreed.

11             With regards to the second point I want to make is

12   around ownership.  I have paid taxes as evidence of

13   ownership.  This is an evidence of ownership that the

14   debtors, themselves, provided to me.  In reliance of those

15   tax forms, 1099 forms, I pay taxes so the debtor's must ease

16   shop from asserting that I'm not the owner of the assets.

17             Now with regards to unconscionability, issues

18   related to contract formation including unconscionability,

19   will dictate the assets I get back.  So they must be heard

20   now as supposed to be heard through the claims process.

21   Your Honor, in conclusion, what I really asked for is an

22   opportunity to present the evidence in a meaningful way.

23             THE COURT:  Thank you, Mr. Khanuja.  Mr. Koenig.

24             MR. KOENIG:  Thank you, Your Honor.  Chris Koenig.

25   So first I want to -- before turning to Mr. Khanuja's

1    specific arguments, I just wanted to take a step back and

2    start with the Earn motion, the Earn opinion, why we

3    structured it in the way that we did, why we did the process

4    that we did.  The Earn motion sought a broad ruling about

5    the enforceability of the terms of use generally is a

6    contract between Celsius on the one hand, and its account

7    holders on the other hand.  And we saw the ruling that the

8    terms of use unambiguously provide that the Earn assets

9    belonged to Celsius.  The Earn opinion provided that

10   threshold ruling finding that the terms of use were an

11   enforceable contract and that the terms of use unambiguously

12   provided that Celsius owns the Earn coins.  That is the

13   first step of the process.  That makes sense because the

14   terms of use generally apply across the board to customers

15   and govern the relationship between Celsius and its

16   customers.

17        Both the motion and the Earn opinion each reserved

18   for the claims process the resolution of individualized

19   contract offences.  That's a later step of the process.

20   They are individualized arguments, facts and circumstances

21   that account holders can raise as part of the process.  But

22   importantly, and as the Earn opinion recognized, even many

23   of these contract offenses would only result in a general

24   unsecured claim.  It wouldn't result in the account holder's

25   having full ownership of the cryptocurrency.  That is, these

Page 99

1   arguments would not change the ultimate outcome of the Earn

2   opinion, which is that account holders have general

3   unsecured claims against Celsius for their cryptocurrency

4   balances.

5          That brings us to the main issue in these Chapter

6   11 cases.  There simply is not enough cryptocurrency to

7   fully satisfy Celsius obligations to its account holders in

8   full.  There's a significant hole in the balance sheet and

9   as Mr. Kwasteniet explained at the beginning of the hearing,

10  we're working to maximize value and promptly distribute that

11  value to account holders.  And the fact that the Earn

12  opinion rules that Celsius owns the crypto does not mean

13  that account holders will not receive that value as part of

14  a Chapter 11 plan.  Pursuant to the bankruptcy code, Celsius

15  is obligated to return that value to its stakeholders who

16  here are the account holders.  These, the Earn opinion

17  expressly resolves many of the issues that that Mr. Khanuja

18  has raised.  And turning in a little bit more detail to what

19  he argued, he argued tax documents.  That issue was raised

20  at the Earn hearing.  Your Honor found that those tax

21  documents were not relevant because you know, black letter

22  contract law provides that where the contract is plain and

23  unambiguous on its face, extrinsic evidence is not needed.

24  So those tax documents, that tax argument is overruled by

25  the Earn ruling.  The Court also found that the contract

Page 100

```
1    itself was unambiguous.  Mr. Khanuja was pointing to some

2    testimony and depositions to what certain of the debtor's

3    witnesses, you know, may have said under oath, under

4    questioning during a seven-hour long deposition.  What the

5    witnesses think or doesn't don't think is not relevant to

6    the outcome here, which is that the Court, you know, found

7    that the language and the Earn terms of use were

8    unambiguous.

9              As for unconscionability, you know that is a

10   contract defense that's left, you know that's left for the

11   claims process.  But just to address it, you know, even if

12   Mr. Khanuja is right and the contract is unconscionable and

13   he somehow believes that means that he owns the

14   cryptocurrency assets in his account, it brings us back to

15   the elephant in the room that I already talked about, which

16   is, there simply isn't enough crypto to go around.  So it

17   would simply cause a race to the courthouse as claimants

18   rushed to try to bring their contract defenses

19   unconscionability, constructive trust, whatever else, with

20   claimants who successfully establish this defense,

21   potentially harming claimants who did not.  And that type of

22   race is exactly what bankruptcy is designed to avoid.  It's

23   designed to have the equitable treatment of all similarly

24   situated stakeholders like, you know, that Mr. Khanuja is

25   similarly situated to all other Earn account holders.
```

Page 101

1          So we are working to return value as quickly as

2     possible.  We're litigating -- we think that litigating each

3     and every account holders claims and contract defense

4     theories now, as Mr. Khanuja suggests, would be severely

5     inequitable, wasteful of estate resources, and ultimately is

6     not likely to change the outcome here because of the

7     practical problem of the hole in Celsius balance sheet.

8          So I'll rest there.

9          THE COURT:  All right, I'm going to, I'm going to

10    take it under submission and in due course, enter an opinion

11    or order.  We're going to move on next to the claim of

12    Rebecca Gallagher, a motion seeking a ruling that the coins

13    deposited to the Celsius Earn accounts of her property.  Ms.

14    Gallagher.

15         MS. GALLAGHER:  Yes, Your Honor.  Thank you for

16    hearing from me today.  It feels like it's almost redundant

17    given everything that's come out today, that this motion

18    should have been heard on December the fifth when it was

19    first attempted to be heard.  I think we have some extrinsic

20    evidence that's appeared since your ruling when the Attorney

21    General for New York, Leticia James, filed her petition.

22    Because now we know that Mashinsky has been charged with

23    various crimes.  He's been charged with repeated

24    misrepresentation and omission, aggravated fraud, repeated

25    and persistent illegality and failure to register.  So these

Page 102

1    are pretty serious charges.

2           THE COURT:  Let me just, the only thing I would

3    say is it's not a criminal complaint, but you're largely

4    correct about the some of the allegations that are made

5    about Mr. Mashinsky, but it's not a criminal indictment.

6    It's a civil lawsuit that the attorney general has filed.

7    But go ahead.  I've read, I've read the complaint, so I

8    understand what's in there.

9           MS. GALLAGHER:  Yes, I mean the reason I brought

10   that up is because I was accused of not arguing to the

11   heightened pleading requirements that state that I should

12   have argued with particularity about the circumstances

13   construing fraud.  So I made lots of arguments about the

14   fraud and I believe I've given a lot of evidence.  In my

15   response to the objection, I've added a lot of exhibits with

16   timestamps so that everything is fully documented and the

17   fact remains --

18          THE COURT:  Ms. Gallagher, I think that you and

19   others other Earn account holders, may or may not, I'm not,

20   not ruling on it, have fraud claims against Mr. Mashinsky or

21   against Celsius, but that doesn't, they don't address the

22   issue of whether the contract provided ownership of those

23   assets to Celsius.  You may have, and I think Mr. Kwasteniet

24   really addressed this at the start.  I mean, whether you and

25   other Earn account holders have fraud claims, the basic

Page 103

1    point is you deposited assets, you want it back and the

2    debtor, a plan will hopefully return the maximum amount of

3    value that can be.  It's not whether -- the issue is not

4    whether you also have a fraud claim that you can assert.

5    The issue is the ownership of the assets that were deposited

6    under the terms of use.  But go ahead with your argument.

7              MS. GALLAGAHER:  Well I would say that if the

8    terms of use are unambiguous, how can there be a legal

9    contract when they were engaged in illegal operations?  They

10   did not have the license to offer legal securities, which is

11   the Earn program that I was in.  They did not have the

12   license to offer legal storage, which is custody.  That was

13   a fiction and a manufactured distinction.  They did not have

14   the legal licenses to offer rehypothecation, which is

15   banking, or legal trading, which is money transmission, or

16   legal collateralized loans, which is lending.  So how can

17   the contract be construed as being valid that we were all

18   under when the whole operation was illegal?

19             THE COURT:  Anything else you want to add?

20             MS. GALLAGHER:  I would also like to say that we

21   heard in December from one of the regulators that they had

22   not even been approached at that point by Celsius and the

23   reorganization plan and that that regulator said it usually

24   takes two years for these licenses to be put in place.  So

25   does that mean that if we go along with the go-forward plan,

Page 104

1      we'll be in this process for two years and drain the entire

2      estate of all of our assets before we can get these licenses

3      and move forward?  This is a very serious concern.

4              And then the other issue I wanted to address was

5      the unconscionability, because the unconscionability

6      standard states that something is so grossly unreasonable or

7      unconscionable in the light of the mores and business

8      practices of the time and place as to be unenforceable.  And

9      I would say that substantial substantive, unconscionability

10     has occurred in this situation.  That's when the contract

11     terms are so one sided as to shock the conscience.

12             So this contract that we're saying is unambiguous

13     is the epitome of substantive, unconscionability.  The idea

14     that somebody such as myself, an unaccredited investor,

15     would give hundreds and thousands of dollars to Celsius in

16     exchange for a fee and subject my life savings to complete

17     loss at any time is patently unconscionable.  Also to

18     defraud or put property out of the reach of a creditor in

19     anticipation of or during bankruptcy is a fraudulent

20     conveyance.

21             And I believe that the debtors set this up

22     deliberately.  They were being hounded out of the UK by

23     regulators.  They changed the terms of service before they

24     came to the states to make it very preferential for them to

25     be under Chapter 11 protection.  And they also gave

Page 105

1    themselves free rein to invest in things which we were never

2    told our assets were being used for, GK8 and mining

3    operations.

4            And so I just wonder how much faith we can have in

5    any reorganization plan?  And I certainly don't want to be

6    building a runway.  And I don't think any other creditor

7    wants their funds to be used to build a greater runway.  We

8    want to get off this plane right now and maximize our

9    returns.

10           THE COURT:  All right, thank you for your

11   argument, Ms. Gallagher.  Mr. Koenig.

12           MR. KOENIG:  Thank you, Your Honor.  Chris Koenig.

13   I'll incorporate my argument against Mr. Khanuja.  I don't

14   want to repeat myself, but I'll address just specifically

15   what Ms. Gallagher said.  She refers to a lot of extrinsic

16   evidence.  Extrinsic evidence, of course, is only relevant

17   to the extent the contract is ambiguous.  In the Earn

18   opinion, we sought a ruling and the Court gave that ruling

19   that the contract, there was a valid contract.  There was

20   offer, acceptance, consideration and that the terms of the

21   Earn -- that the terms of the terms of use were

22   unambiguously provided that Celsius owns the Earn coins.  To

23   her point of the regulators, I think Mr. Kwasteniet said at

24   the beginning of the hearing that we have been speaking to

25   regulators.  We certainly do not believe that it will take

Page 106

```
 1    two years for us to get out of this bankruptcy.  We expect
 2    that it will be, you know, in a matter of months, certainly
 3    not a matter of years.
 4             She focused on unconscionability.  The terms of
 5    use provided that customers would transfer ownership of
 6    their cryptocurrency to Celsius and in exchange for that
 7    transfer, they would be paid a yield.  That was the risk
 8    that they were taking.  That was the bargain that they were
 9    entering into and they received that yield.  Certainly, the
10    circumstances that have befallen Celsius and the
11    cryptocurrency industry are very significant and the debtors
12    and their advisors, you know, are very cognizant of the
13    hardship that it has placed on Ms. Gallagher and other
14    Celsius customers.  The problem is, as I said earlier, we
15    simply can't give all, we can't give each customer all of
16    the crypto that was reflected in their account as a
17    liability.  It is not there.  So we are doing the best that
18    we can to equitably distribute value to customers under a
19    Chapter 11 plan or otherwise as fast as we possibly can.
20    But what Ms. Gallagher wants is a ruling that the assets in
21    her account should be her property.  There simply are not
22    enough of those assets in Celsius, on Celsius balance sheet
23    to do that.  If there were, we would not be in bankruptcy.
24    We would not be having this proceeding this morning.
25             So that, that's all, that's all I'd say.  I'll
```

Page 107

1      rest on my papers at this point, Judge.

2              THE COURT:  All right, I'm going to take it under

3      submission for both Mr. Khanuja and Mr. Cruz.  I'm not

4      recognizing anybody who is to speak who is not involved in

5      the pending motion.  Ms. Gallagher had her chance to address

6      the issue.  Mr. Koenig has responded and the matter of being

7      taken under submission.  So Mr. Khanuja, I will not

8      recognize you.  Alright, the next is Mr. Benzaken.  I

9      probably mispronouncing it, B E N Z A K E N.

10             MR. BENZAKEN:  Your Honor, that was excellent.

11     And thank you very much.  I've dived into four source

12     documents which is the debtor's omnibus objection to certain

13     motions regarding today's claim, your own ruling on

14     earnings, as well as the Oren Blonstein declaration and the

15     supplementary documentary declaration, which was very

16     revealing.  I've also heard that we don't want to get down

17     into issues that would otherwise be best handled during the

18     claims process.  And I also don't want to extend the time

19     whereby we continue to burn through cash when people, quite

20     frankly, are suffering and they could use a hopefully a good

21     return and equitable adjust return.  So, I wanted to say in

22     relative to my brother's claim, I've dived into a lot of

23     detail relative to login activity relative to the Blonstein

24     declaration, the supplementary declaration, your earning

25     ruling, as well as some of the objections by Kirkland, some

1    of which I agree with, quite frankly.  And there's a level

2    of detail and in getting into that detail, I don't want to

3    open up a can of worms and waste anyone's time.

4            And so instead I would ask Your Honor's permission

5    maybe to have this case considered a fringe case.  It is the

6    0.14 percent as mentioned in Your Honor's ruling, unearned,

7    so that these details can be looked at and it not have

8    collateral damages that would potentially extend the

9    duration of which, you know, we'll be in these proceedings.

10           THE COURT:  All right, Mr. Koenig.

11           MR. KOENIG:  Chris Koenig, I apologize.  I don't

12   quite understand exactly what Mr. Benzaken is requesting.  I

13   didn't, I didn't exactly follow what he was suggesting we

14   do.

15           THE COURT:  Mr. Benzaken, your motion was seeking

16   a ruling that the Earn assets in the account are not

17   property of the debtor's estate.  So that's the motion that

18   I have before me.

19           MR. BENZAKEN:  Yes, sir.  Yes, sir.  Okay.  So if

20   you'd like I can get into the detail.  I was requesting not

21   to.  Essentially, it's akin to the post-petition funds that

22   were received with Ms. Connell on 1817 following the

23   petition.  I would state to claim that my brother's account

24   was in the same situation.  I can get into that detail and

25   I'm hoping maybe we can broaden that for accounts that

1    otherwise would have been shut down per the Blonstein

2    supplementary declaration per the notifications directly

3    from Celsius, but again this is the level of detail that

4    involves login history, communications, and the TOU.  So I

5    looked exactly at the contract language because that was

6    what we were encouraged to do for today.  I didn't want to

7    move outside of that.  And the contract language is in a

8    line specifically for the one that he would be bound,

9    arguably, before the date of the first transfer of funds,

10   which is, I can get into that if you wish.

11            THE COURT:  I understand your point.

12            MR. KOENIG:  I understand it a little better now.

13   Thank you so much.  I didn't understand what he meant by a

14   fringe case.  I'll address the motion.  I believe what Mr.

15   Benzaken is referring to, it's his brother's claims.  I'll

16   just, when I'm referring to Mr. Benzaken, I'm referring to

17   the claimant, not Michael Benzaken.

18            THE COURT:  I understand, one of them was

19   withdrawn.  I certainly gave Mr. Benzaken permission to

20   argue on behalf of his brother, who is unable to do so

21   today.  So go ahead.

22            MR. KOENIG:  Understood.  What the claimant argues

23   is that he argues that a version of the terms of use applies

24   to him specifically or his brother's account specifically.

25   And that that version does not transfer ownership to the

Page 110

1    debtors.  But if you look at the date that the claimant

2    opened the account, it appears that that's terms of use

3    version seven that would apply.  In the Earn opinion, I

4    believe that Your Honor indicated that version five was

5    really the key version where the language became crystal

6    clear.  So version seven is after version five.  So we think

7    that Your Honor's Earn ruling would apply to this, to this

8    account.  And you know, even if it didn't, there are other

9    methods, you know, where Your Honor's ruling indicated that

10   the debtors could amend the terms of use without further

11   consent of the user and that the continued use of the

12   service was proper consideration for the modification of the

13   contract.  But even on its face, it appears that version

14   seven applies.  And so that we believe that the Earn ruling

15   would apply in equal force to this claim.

16           THE COURT:  I understand, Mr. Benzaken, I

17   understand the arguments that are being made by both sides.

18   I'm going to take this one under submission as well.

19           MR. BENZAKEN:  Thank you.

20           THE COURT:  And I think that concludes the

21   specific agenda, the motions that were on for today.  Mr.

22   Koenig or Mr. Kwasteniet, is there anything you want to add?

23           MR. KOENIG:  No, thank you, Your Honor.  We'll

24   speak to you soon.

25           THE COURT:  All right, we are adjourned.  Thank

Page 111

1    you very much, everyone, for participating today.

2              (Whereupon these proceedings were concluded at

3    12:16 PM)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2

3                          RULINGS

4                                        Page        Line

5

6    Credit for post-petition transfers granted    72         18

7    Flare tokens granted                          78         14

8    Sale of de minimis assets granted             80         20

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 113

1                   C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  January 25, 2023

**[& - 2020]**                                                                              Page 1

| **&** | **111** 5:10 | **16,000** 25:21 | **1872** 3:12,17 |
|---|---|---|---|
| **&** 4:3,14 6:15 | **115** 81:25 | **16.6** 85:2,8 | 3:23 96:9 |
| 7:1 8:1 9:9 | 83:25 | **1627** 2:8 | **1874** 3:4 |
| 10:2,4 11:9,24 | **11501** 113:23 | **1653** 2:8 | **1879** 2:21 |
| 12:6 13:8 14:8 | **11th** 82:2 | **17** 40:14 | **1902** 2:8,14,18 |
| 17:6 18:8,24 | **12** 28:24 29:9 | **17,000** 25:21 | 2:21 3:4,8,12 |
| 30:10 39:24 | 38:9 | **17,500** 22:25 | 3:18,23 |
| 52:20 | **120,000** 26:5 | **1784** 2:8 | **1905** 25:4 |

| **0** | **12151** 113:7 | **1794** 3:7 | **1908** 3:18 |
|---|---|---|---|
| | **1221** 4:16 | **17th** 24:5 | **1909** 3:12 96:8 |
| **0.14** 108:6 | **12:16** 111:3 | **18** 112:6 | **1911** 3:8 |
| **038** 75:2 | **12th** 6:10 | **1800** 7:11 | **1912** 78:19 |

| **1** | 32:20 | **1806** 3:7 | **1913** 2:18 74:6 |
|---|---|---|---|
| | **13** 25:14 27:24 | **1814** 3:23 | **1917** 2:8 79:5 |
| **1** 23:16 86:9 | **1325** 3:17 | **1816** 3:12 | **1918** 2:14 |
| **1.2** 85:13 | **1346** 3:11 | 96:10 | 70:16 |
| **1.4** 70:5 | **136** 3:17 | **1817** 2:14 | **1919** 2:21 80:4 |
| **1.7** 85:11 | **13th** 40:8 | 69:18 72:9 | **1921** 2:21 |
| **10** 50:12,13 | **14** 23:8 36:20 | 108:22 | **1923** 3:4 |
| **10,000** 23:1,25 | 36:21 73:23 | **1818** 3:4 80:23 | **1924** 3:4 80:24 |
| **100,000** 40:21 | 77:14 78:11 | **1819** 2:18 | 81:19 |
| 40:22,24 | 81:24 97:2,5 | **1824** 3:8 | **1925** 2:14 3:4,8 |
| **10004** 1:14 6:4 | 112:7 | **1826** 3:8 | 3:12,18 |
| 7:19 | **1416** 3:17 | **1828** 3:8 | |

| **10020** 4:17 | **15** 40:14 73:13 | **1850** 6:10,17 | **2** |
|---|---|---|---|
| **10119** 8:4 | 79:13 84:24 | **1852** 3:8 | |
| **10167** 5:18 | 85:2 | **1853** 2:21 | **2,000** 25:23 |
| **1099** 97:15 | **15,000** 40:23 | 79:24 | 26:3 |
| **10:00** 1:17 9:3 | **150** 73:10 | **1855** 2:21 80:3 | **2,150** 23:20 |
| 15:14 | **1508** 3:17 | **1866** 3:8 | **2,500** 40:21 |
| **11** 34:12,12 | **1512** 3:23 | **1867** 2:14,18 | 46:9 |
| 60:8 64:5 | **1555** 80:11 | 3:4 | **2,700** 23:22 |
| 73:17 76:11 | **15th** 15:13 | **1869** 3:8 92:14 | **20** 40:24 112:8 |
| 84:10 94:11 | 28:17 79:6 | **1870** 3:8 92:17 | **20,000** 24:2 |
| 99:6,14 104:25 | **16** 23:8 84:1 | 92:22 | 40:23 |
| 106:19 | 97:5 | **1871** 3:4 | **20006** 6:18 |
| **11,000** 70:4 | | | **20036** 6:11 |
| | | | **2020** 75:16 |
| | | | 76:2 |

**2022**  28:17 82:2 90:25 91:4,5,14
**2023**  1:16 9:3 113:25
**20th**  69:19
**21st**  97:4
**22**  97:1
**22-10964**  1:3 9:4
**23,000**  40:3,6 40:20 41:9 44:6
**24**  1:16
**245**  5:17
**24th**  9:3
**25**  23:6,15 113:25
**25.2**  85:8
**250**  73:5
**27**  28:21
**27,500**  22:24
**2700**  5:3
**28**  28:21
**2800**  70:4
**286**  97:5
**289**  97:5
**2x**  38:22

**3**

**3**  86:8 97:3
**3,750**  23:21
**30**  23:6
**300**  4:5 113:22
**330**  113:21
**3335**  8:3
**345**  78:21 79:3 79:14

**35**  24:23 28:3 85:17
**353**  7:3
**36**  73:16
**37**  85:17
**37,500**  23:23
**388**  97:2
**391**  97:2
**393**  78:11
**3rd**  27:10 95:7

**4**

**4**  38:6
**4.7**  27:6
**40**  36:20
**40,000**  38:3 44:4
**400**  38:3
**4000**  7:11
**420**  40:7
**47**  82:3,11 84:25
**48075**  7:12

**5**

**5**  27:7
**5,000**  46:9
**50**  24:21
**500**  88:3 90:9
**5100**  5:10
**518**  85:1
**555**  5:3
**5th**  92:3

**6**

**6**  63:12 64:2,10 68:21
**6,000**  23:23

**60**  46:18
**60606**  5:11
**60654**  4:6 7:4
**67**  40:13
**68**  27:25
**6th**  94:2

**7**

**7**  97:3
**70**  23:3 40:13 46:18
**700**  91:10
**72**  112:6
**75**  87:16
**75-75**  63:17,25 87:17
**750**  89:24 90:9 92:5
**750,000**  90:22
**750k**  90:24
**78**  112:7
**7th**  79:4

**8**

**8**  78:11
**80**  23:2,3 40:25 112:8
**800**  40:9
**83**  97:3
**85**  40:11
**88**  27:25

**9**

**90**  23:2
**90071**  5:4
**901**  3:17
**9019**  36:7 37:3
**93**  82:4

**94**  63:20,21 64:10 87:14
**9th**  73:12 76:6 95:3

**a**

**a&m**  50:2
**a.m.**  9:3 15:14
**aaron**  5:6 10:5 10:8 14:7,9
**ability**  31:8 49:19
**able**  24:13 32:25 47:11 49:10 52:2 64:3 65:19 67:1 74:18 88:21
**above**  40:21,24 42:18
**absent**  88:23
**absolute**  69:2
**absolutely**  22:7 55:24 62:13 82:21 94:23
**acceptable**  32:16
**acceptance**  105:20
**access**  28:7 66:16
**account**  2:12 2:17,25 7:10 16:10 44:24 45:4,11,11 52:25 55:25 56:3,8,21 57:4 57:6,9,16

[account - advanced]                                                      Page 3

58:22 61:19,20
61:22 67:15
68:15 69:18
71:18,19 73:6
73:8,11,19,22
73:23 74:1,3
74:21 75:20,21
75:21,23,25
76:8,10,12,15
76:16 77:5,8
77:11,20 78:2
81:5 84:3
93:19 96:11
98:6,21,24
99:2,7,11,13
99:16 100:14
100:25 101:3
102:19,25
106:16,21
108:16,23
109:24 110:2,8
**accountants**
74:23
**accountholder**
49:13
**accountholders**
8:2 17:9 18:9
19:1 34:19
35:10 41:11
**accounthold...**
45:6
**accounting**
64:10
**accounts** 3:21
32:22 33:4
70:13 71:17
72:24 73:24

74:17 75:17,18
76:4,14 82:19
96:2 101:13
108:25
**accretive** 81:16
84:4 88:11,17
**accrual** 23:10
**accruals** 23:11
**accurate** 113:4
**accused** 102:10
**accuses** 94:16
**acknowledge**
37:9
**acquisition**
93:9
**act** 95:14
**acting** 93:9
**action** 81:5,13
81:14,16 84:5
84:8,11 86:11
88:16
**actions** 65:10
82:17
**activities** 80:16
**activity** 21:7
50:4,6 107:23
**actual** 45:1
57:17
**actually** 15:11
47:3 51:24
54:15 70:3,24
70:25 97:7
**ad** 5:16 7:10
8:2 10:16 17:8
18:8,25 39:24
62:19 63:7
64:14 67:11,22

67:23 68:15
84:18
**adam** 8:10
75:11
**add** 40:10 41:2
58:14 60:14
79:8 81:18
88:18 95:9
103:19 110:22
**added** 57:25
74:16 102:15
**additional**
11:15 12:23,24
14:4,14,21,25
17:17 18:5,15
18:18,21 19:5
19:10
**additionally**
28:6 50:14
**address** 43:21
47:22 56:13
57:8 62:11
65:12,14 67:12
70:17 74:12,18
76:7 83:9,13
87:24 100:11
102:21 104:4
105:14 107:5
109:14
**addressed**
80:13 90:3,10
102:24
**addresses**
50:25 57:5
65:17,20 66:8
66:10 77:17

**addressing**
32:4
**adequate** 65:3
**adjourned**
110:25
**adjust** 107:21
**adjusting**
23:10
**adler** 5:20
10:14,15,15
13:18,19,22,25
14:11,12 37:6
39:15,19,21,22
39:23,24 41:13
42:10,10,11
43:1,6,16
44:10 54:14
57:20 81:18
84:16,17,17
88:2,3,8
**adler's** 87:24
**adler's** 39:12
44:2 46:11
50:16
**administrative**
2:6 27:1
**admit** 92:18
**admitted** 20:5
20:7 90:16
92:24,25
**admitting** 9:5
**adoption** 73:4
**advance** 27:3
94:1
**advanced**
37:14 50:15

adversary  15:9
advertisement
  59:17 60:19
advise  74:22
advised  78:1
advisors  74:23
  106:12
affidavit  78:10
affiliated  33:24
affiliates  29:5
afternoon  96:6
agenda  30:8
  32:12 62:15,15
  62:21 69:6,8
  72:22 78:17
  79:21 80:22
  89:15,17 95:20
  110:21
aggravated
  101:24
aggregate
  46:13 73:14
  81:11 82:1,4,8
  82:12
aggregates
  82:11
agree  22:9 44:2
  44:10 78:3
  108:1
agreed  63:14
  63:16 68:3,25
  79:2,13
agreement  3:3
  27:8,15 53:13
  61:21 62:2
  64:4 73:9 79:1
  79:1,5 85:23

agreements
  85:21 86:1,2
ahead  10:23
  16:6 24:25
  31:10 32:7,10
  39:22 42:10
  50:7 51:16
  57:3,9 58:11
  63:2 69:6,7
  71:13 74:12
  76:13 83:21
  89:8,10 102:7
  103:6 109:21
airdrop  73:3
  73:12 74:14
  75:6 77:4,18
  77:18,25 78:2
  78:4
airdropped
  73:15 75:24
airdrops  73:20
  73:23
akin  108:21
alameda  28:23
  29:1,10,16
  84:9 85:5
alex  55:21
alexander  7:18
allegations
  102:4
alleged  91:13
  91:13
allocate  62:9
allocation
  57:20
allocations
  56:3

allow  3:10
  24:10 64:1
  70:12 81:12
  87:15
allowed  65:2
alright  107:8
alternatives
  52:24
alvarez  46:4
ambiguity
  96:19
ambiguous
  96:25 105:17
amend  110:10
amended  84:18
  96:10
americas  4:16
amidst  43:15
amount  24:15
  37:20 40:7
  44:5 70:6
  82:12 87:15
  103:2
amounts  66:5
  72:3
amplify  54:20
analysis  44:7
andrew  6:20
  13:2
anecdotal  50:2
angeles  5:4
announcement
  19:18 77:21
answer  28:21
  38:10,15 92:17
answered  91:3

answers  22:6
  91:24
anticipate
  12:20 13:4
  34:10 73:22
anticipated
  95:4
anticipation
  104:19
anybody  26:13
  32:1 67:19,25
  70:20 71:9
  74:10 79:15
  92:18 107:4
anyone's  108:3
anyone's  13:23
anyway  21:11
aon  91:8,12
  93:7,9,13,24
apologize  29:8
  108:11
app  65:16,16
  66:18,19 68:5
appeal  56:19
appear  90:1
appearance
  10:21 11:3,18
  11:21,22 12:5
  12:9,14,16,21
  14:6,16,23,24
  15:2,2,20,21
  16:1,3,20,23
  17:3,14,18,25
  18:1,6,23 19:2
  19:7,8,9,11,13
  19:15

appearances 10:1,12 16:16 18:17,19

appeared 30:10 101:20

appearing 9:10 9:17

appears 110:2 110:13

applicable 48:9,24 78:1

applies 91:20 109:23 110:14

apply 98:14 110:3,7,15

appreciate 12:16 30:14 32:8 72:2

approach 36:3 45:3

approached 103:22

appropriate 34:16 41:15 67:14,18

approvals 53:22,23,24

approve 3:20 80:19

approved 87:2 92:1

approximate 44:5

approximately 22:25 23:15,25 24:17 26:5 27:5,6,10,25

28:24 38:3,3 40:7,20 63:12 70:5 73:5,10 75:2 81:24,25 82:3,4 83:25 84:1 88:3 90:5 95:2

april 28:1

areas 43:24

arguably 109:9

argue 109:20

argued 99:19 99:19 102:12

argues 109:22 109:23

arguing 102:10

argument 86:7 99:24 103:6 105:11,13

arguments 59:15,19 98:1 98:20 99:1 102:13 110:17

arm's 34:1 36:18 49:9

arrangement 93:7,8,14

arrangements 36:23

arrows 84:9

articulated 93:15

ascertainable 46:1

asked 17:20 22:3 38:14 97:21

asking 16:19 69:20 70:24

aspect 26:15

assert 103:4

asserting 97:16

asset 34:21 45:4,8,10,18 49:12,21 50:10 77:15,17 78:6 78:8

assets 2:20,24 3:10,21 21:23 32:21,24 33:3 33:7,8,9,12,14 33:16,17 34:18 34:19 35:8 44:24 45:5,8,9 45:20 46:14 49:1 51:4,8,9 53:4 54:4 59:5 59:25 63:10 65:10,19 66:24 66:25 67:5,9 67:20 68:8 76:7 77:16,19 77:22,23,23,24 77:25 78:1,3 79:21 80:20 82:18,20,25 93:12 94:16 96:24 97:16,19 98:8 100:14 102:23 103:1,5 104:2 105:2 106:20,22 108:16 112:8

associated 64:21

association 6:8 12:19

assure 67:18

attempted 101:19

attempting 93:21

attempts 65:23 65:24 66:11 77:16 93:4

attention 24:15 66:12,12 71:2

attorney 55:20 56:4 74:20 101:20 102:6

attorneys 4:4 4:15 5:2,9,16 6:2,8,9,16 7:2 7:10,17 8:2 12:19

attractive 28:5 37:5

audio 19:23 20:1

august 90:25

authority 77:7 84:11

authorization 73:18 88:9

authorize 72:22

authorized 21:14 28:6 66:23 78:22

**authorizes**
  81:14
**authorizing**
  2:1,11,16,24
  81:4
**automatic**
  69:25
**available**   52:16
  54:3 57:7 86:3
  90:11 92:17
  93:19,23 94:7
**avenue**   4:16
  5:17
**average**   40:23
**averaged**   23:2
**avoid**   41:16
  42:15,25 43:18
  55:12 90:18
  100:22
**await**   55:4
**aware**   21:9
  50:5,5 57:22

**b**

**b**   1:21 2:2 3:1
  6:16 13:3
  83:12 107:9
**back**   14:1
  29:23 39:8,16
  47:10 59:15
  61:9,13 76:2
  86:24 90:15
  97:19 98:1
  100:14 103:1
**backed**   85:8
**background**
  32:2,5

**backing**   40:8
**bad**   51:6
**balance**   29:15
  62:3 63:20
  64:9,25 99:8
  101:7 106:22
**balances**   2:7
  45:12 63:17
  64:22 65:2
  82:1 99:4
**ball**   43:12
**bank**   58:8,16
  61:11 78:21,22
  78:24,25
**banking**
  103:15
**bankruptcies**
  33:6
**bankruptcy**
  1:1,12,23
  20:25 21:5,25
  35:7 42:3
  48:17 58:9
  94:17 99:14
  100:22 104:19
  106:1,23
**bargain**   106:8
**base**   66:13
**based**   73:7
  76:1 85:16
  86:7
**baseline**   28:1
**basic**   102:25
**basis**   33:20
  37:10 43:10
  61:24 62:10
  71:4,7 79:17

94:17
**bear**   28:18
**bearing**   42:13
**befallen**
  106:10
**began**   23:19
**beginning**
  53:18 54:25
  58:15 79:22
  99:9 105:24
**behalf**   10:4,16
  11:5 12:7 13:3
  13:8 14:8
  39:24 43:3
  51:21 52:18
  69:16 72:21
  79:11 83:7
  84:18 88:1
  92:13 109:20
**believe**   9:22
  10:5 12:7
  21:23 24:9
  27:1 28:22
  29:12 33:14
  38:18,21 44:21
  47:18 52:9
  55:24 61:20,25
  71:18 72:4
  81:3 86:14,20
  87:17 89:2
  90:7,13,22
  91:25 92:3,5,6
  95:2 102:14
  104:21 105:25
  109:14 110:4
  110:14

**believed**   26:20
  60:19
**believes**   53:2
  71:22 78:13
  100:13
**belong**   3:16
**belonged**   98:9
**belongs**   76:22
**beneficiary**
  91:7
**benefit**   27:17
  34:19 35:6,9
  44:23 55:10
  73:23
**benz**   16:1,1
  74:11,11
**benzaken**   3:22
  8:9,15 16:4,7,8
  16:15,18,22,25
  74:13,24 75:3
  75:7 107:8,10
  108:12,15,19
  109:15,16,17
  109:19 110:16
  110:19
**bespoke**   85:22
  85:22 86:17
**best**   37:25
  40:13 46:25
  47:6 50:24
  94:7 106:17
  107:17
**better**   30:21
  31:14 109:12
**bid**   32:18
**bidding**   33:12

**bids** 32:20,21
32:22 33:2
**big** 23:24 43:14
**billion** 38:6
90:11
**bit** 39:8 40:1
40:10,18 47:1
53:7,18 54:18
99:18
**bitcoin** 23:6,8
24:9 25:20
27:23 28:2,4
34:5 39:2
40:12,12 45:24
63:22 84:6
85:9,17
**black** 99:21
**blanching** 97:2
**blank** 88:25
**block** 7:1 13:8
17:6 30:10
**blockchain**
72:25 76:7
77:17
**blockchains**
73:2
**blonstein**
16:11 107:14
107:23 109:1
**board** 48:4
98:14
**bond** 58:17
61:11
**bondholders**
58:18
**book** 81:7,9
88:13 89:4

**bootstrapping**
77:18
**borrow** 35:15
59:1
**borrower**
36:25 38:4
82:10 85:10,11
86:2
**borrower's**
85:11
**borrowers**
5:16 10:17
36:9 37:5,6,21
39:25 40:4,6
40:15,16,18,20
40:21 41:10
44:6,7 81:10
81:25 82:3,9
84:21,25 85:2
85:14 86:25
88:14
**borrowing**
40:2 86:19
**bottom** 60:2
61:17
**bottomed**
25:20
**bound** 109:8
**bowling** 1:13
6:3
**box** 26:2
**branch** 78:22
78:24
**breuder** 83:12
83:15,16
**brian** 8:7

**brief** 20:19
32:14
**briefed** 42:7
44:13
**briefing** 61:25
62:3
**briefly** 44:15
62:11 74:14
89:7
**brier** 4:11 9:19
11:23,24,24
**bring** 44:20
47:20 66:11,12
71:2 100:18
**bringing** 84:2
**brings** 48:10
99:5 100:14
**broad** 98:4
**broaden**
108:25
**broader** 38:11
**broker** 49:20
93:10
**bronge** 89:7,7
89:9,11
**brother** 109:20
**brother's**
107:22 108:23
109:15,24
**brother's** 16:9
**brought** 102:9
**bruh** 7:21
17:13,13
**bryan** 18:24
**btc** 23:10 24:23
26:6

**budget** 25:4
**build** 22:22
49:4 105:7
**building** 105:6
**built** 88:19
89:1
**bullet** 52:11
**burn** 107:19
**burned** 58:3
**business** 2:4
3:1 21:17,25
22:2,3 33:9
34:4,7 74:2
81:6 85:20
86:24 87:2
88:15 89:3
104:7
**buy** 53:16
**buyers** 35:24

### c

**c** 2:3 4:1 9:1
113:1,1
**ca** 5:4
**calculating**
26:24
**calculation**
85:16
**calendar** 32:3
**call** 32:1,8
42:18 45:24
51:21 91:25
92:7
**called** 16:17
20:23 78:9
**calling** 9:3
**candidly** 43:12

[can't - circumstances]                                              Page 8

**can't** 13:19
27:14 33:11
**capital** 54:9
56:22 58:15
84:9
**cardano** 90:14
**care** 68:4
**carefully** 72:10
**case** 1:3 4:14
5:1,8 9:4 10:2
10:4 12:7,20
13:4 14:8 15:6
21:6,7,14
25:22 26:4
27:16 31:13
35:12 37:17,22
39:7 42:14
43:16 47:11,21
52:20,23 53:7
54:19,25 55:16
56:10 57:3
58:9 65:12
70:25 81:8
83:7 108:5,5
109:14
**cases** 42:3
45:17 56:23
76:11 99:6
**cash** 2:2 27:25
49:18 53:11
78:18,20,23
79:6 80:15
107:19
**cashflow** 22:4
25:14 28:8
**cashflows**
24:11,22

**categories**
32:21 58:25
59:7 61:3
**category** 71:23
**cause** 100:17
**caution** 96:19
**cede** 62:16
67:10 72:18
89:18 95:23
96:2
**cel** 58:1,3,5
**celsius** 1:7 3:15
8:18,19 9:3
15:7 26:20
29:1,10,22
41:23 44:9
47:11 48:10,15
48:16 49:3
53:9 56:1,22
63:4 65:15
66:2,3,18,25
67:1 68:5,10
71:6 73:10
74:3 76:3
77:20,20 78:2
80:1 82:2 85:3
89:25 90:12,15
90:20 91:6,8
91:10,12 92:16
93:9,12,20
95:25 96:19,21
98:6,9,12,15
99:3,7,12,14
101:7,13
102:21,23
103:22 104:15
105:22 106:6

106:10,14,22
106:22 109:3
**celsiuscredit...**
66:9
**celsius'** 28:20
28:23 29:5
**center** 7:11
**centers** 20:24
**centralized**
73:3
**cents** 75:2
**ceo** 20:17
**certain** 2:2,20
13:3 34:15
45:12 46:2
64:22 65:10,18
67:25 74:6
79:21 84:7,13
100:2 107:12
**certainly** 21:24
41:22 42:2
47:20 50:3
67:6 68:19,19
68:23 105:5,25
106:2,9 109:19
**certified** 113:3
**cetera** 20:7
50:13 52:6
62:4 91:7,7
**challenges**
48:16
**challenging**
51:10 67:3
**chambers**
95:19
**chance** 39:14
43:21 76:20

83:13 89:8
107:5
**change** 54:15
99:1 101:6
**changed** 76:3
104:23
**changes** 54:14
70:17 83:9
**chapter** 34:12
34:12 60:8
64:5 73:17
76:11 84:10
94:11 99:5,14
104:25 106:19
**characterize**
91:17
**charge** 64:20
**charged**
101:22,23
**charges** 102:1
**charts** 58:15
**chatter** 35:1
**check** 9:22
65:12 88:25
**chicago** 4:6
5:11 7:4 9:12
**chief** 79:25
**chris** 8:18 9:11
63:4 95:25
97:4,24 105:12
108:11
**christopher**
14:20 20:17
**circumstances**
55:15 68:1
98:20 102:12
106:10

cites 93:24
civil 102:6
claim 27:1
38:11 45:7
46:8 59:21,22
60:14,15,25
76:12 89:25
90:16 98:24
101:11 103:4
107:13,22
108:23 110:15
claimant
109:17,22
110:1
claimants
100:17,20,21
claimed 89:24
90:8 92:2
claims 34:22
45:16 46:2,6
46:12,14,15
49:24 50:3,5
57:1,8,15,16
58:18,25 73:25
77:12 90:5
97:20 98:18
99:3 100:11
101:3 102:20
102:25 107:18
109:15
claire 6:6
clarification
88:2
clarity 40:1
clark 7:3
class 45:18
46:17 60:8

clear 55:23
57:15 58:14
65:22,25,25
66:14,20 68:10
94:3 110:6
clearly 96:20
clerk 9:2,8,14
9:16,22,24
10:1,8,18,25
11:2,7,10,14
12:1,10,15,22
13:6,9,17,21
13:23 14:2,9
14:11,13,19,25
15:5,8,11,14
15:16,18 16:15
16:20,23 17:1
17:12,16 18:4
18:10,14 19:4
19:21,25 71:11
client 90:13
clients 90:12
client's 43:12
close 95:15
closely 71:23
72:4
closer 53:17
closing 94:9
95:5
coconspirators
55:25
code 99:14
cognizant
44:18 106:12
coin 25:4 38:6
38:25 40:15
61:24,24 62:10

62:10 63:21,23
73:2 74:24
75:1
coins 3:15 16:9
27:24 28:7,9
29:16 35:3,9
38:23 41:24
42:4 45:25
54:10 59:8
67:2 73:1
98:12 101:12
105:22
collapsed 51:5
collateral 2:25
35:22 36:22
38:16,22,23,25
39:2,3 40:8,13
41:1,22 42:2,5
42:17 82:13,22
83:18,25 84:5
84:22 85:1,3,4
85:4,6,9 86:3
86:25 108:8
collateralizat...
39:3
collateralized
37:20 39:6
81:8 85:15,16
86:14 103:16
colleague 19:1
62:17 69:8
72:18
colleagues
37:25 44:1
83:2
collected 56:5

collectively
77:18
colodny 5:6
10:5,8 14:7,7
14:10
color 40:10,18
column 85:4
come 14:1
35:15 37:18
41:15 43:13
44:6 47:5
50:22,24 51:8
51:16,19 69:22
79:14 101:17
comes 12:21
57:25
comfortable
64:15 83:4,8
coming 39:8
44:18 70:4
comingled
41:23
comingling
42:5
commence
65:7,11
commenced
21:3
comment 29:3
44:1
comments
44:10,16 58:13
70:14 74:7
80:14
committee
4:15 5:2,9 10:4
12:7 14:8 17:8

34:2,13 36:4
36:13 42:12,22
43:3 45:13
46:5 47:6
48:12 50:16,22
51:21 52:18,20
52:22,23 53:1
55:7 56:14
63:6 64:13
67:11 68:15
70:15 74:7
82:24 83:2,4,7
84:12
**committee's**
71:25
**committees**
62:19 67:23
**committee's**
41:14
**committing**
94:17
**common** 31:3
31:12 60:24
73:20
**communicate**
67:24 93:4
**communicated**
93:6
**communicati...**
68:14
**communicati...**
66:6
**communicati...**
35:19 109:4
**community**
55:4

**company** 20:23
26:14 32:19
34:9 46:23
48:18 50:9,21
54:7 57:16
58:20 67:2
68:7
**company's**
26:18
**compared**
27:22 33:5
38:7 81:22
**compares** 25:7
**comparison**
23:7
**compelling**
33:4
**competing**
43:15 58:17
**competitor**
53:6
**competitor's**
32:23
**complaint**
55:21 56:4
102:3,7
**complete** 61:25
62:4 104:16
**completed**
30:18
**completely**
22:9
**compliance**
48:8,8 79:14
**compliant**
48:24

**complicated**
42:6
**comply** 79:3
**compressed**
23:9
**compromise**
37:3
**concealing**
94:16
**concept** 44:22
46:18 54:18
**concepts** 43:9
43:17 45:15
47:15,16
**conceptually**
48:5
**concern** 56:20
72:2 104:3
**concerned** 42:8
46:21 71:3
85:18 86:5
**concluded** 62:7
111:2
**concludes**
110:20
**conclusion**
44:7 97:21
**condition** 73:8
**conditions**
33:1 37:1
**conduct** 56:8
**confer** 64:7
71:19
**conference**
9:12 62:15
**conferred** 63:7
63:14

**conferring**
67:22
**confident** 24:4
**confidentiality**
84:23
**confirm** 83:3
**confirmed** 44:2
**confirming**
77:21
**conflate** 93:20
**confusion**
34:24 35:1
**connection**
26:18 70:10
73:7
**connell** 108:22
**conscience**
104:11
**consensual**
27:14 36:5
37:8 41:16
43:10 62:6
**consensually**
62:1 68:24
**consent** 84:13
88:20,23,23
110:11
**consequence**
59:8
**consequences**
35:2 42:15
**consider** 41:6,7
41:19
**consideration**
50:18 89:13
105:20 110:12

considerations
36:24 60:2
considered
31:14 71:17
76:8 108:5
considering
87:21
consistent 40:5
consists 85:9
constantly
93:6
constituency
57:9
constituent
68:23
constituents
21:9 22:13
constitute
84:25
constitutes
20:2 74:14
constructive
60:4 100:19
construed
103:17
construing
102:13
consult 84:13
consultation
88:20
consummated
91:24
consummating
94:13
contact 71:24
contained 70:9

contains 70:8
context 37:22
38:5 64:5
continually
94:15
continue 2:1,4
24:10 37:7
48:2 56:9
68:23 107:19
continued
110:11
continues
93:20
continuing
22:22 54:17
continuously
94:16
contract 16:13
16:14 21:4,20
23:18 26:19
97:18 98:6,11
98:19,23 99:22
99:22,25
100:10,12,18
101:3 102:22
103:9,17
104:10,12
105:17,19,19
109:5,7 110:13
contradict
96:20
contradicts
97:7
contrary 66:6
93:3
convenience
45:17 46:17,20

47:3
conversation
47:19
conversations
36:12 47:14
48:1 62:18
convert 49:18
conveyance
104:20
convincing
94:3
cooperating
55:3
copies 22:11
copy 25:9
51:22
cordry 6:13
12:17,18,18
core 20:23,24
21:1,3,5,7,11
21:14,19,25,25
22:11 23:19,21
23:23 24:4,7
26:1,11 27:8
28:5
core's 26:18
cornell 6:6
13:10,14,15
62:18 67:24
70:22,22 79:8
79:10,11,11
corporation
33:17,20,23
44:22 45:6,9
45:19 48:14,21
48:23 49:7
50:9,11

correct 38:1
56:25 79:12
102:4
cost 25:24
counsel 9:16
10:2 18:25
41:13,14,14
52:20 67:22
71:24,25
count 44:2
75:19 76:1
85:14
counterparties
20:23 36:20,21
counterparty
88:6,7
country 113:21
couple 48:19
52:21 56:12
69:22
course 3:1
56:20 68:12
82:6 87:1
101:10 105:16
court 1:1,12
16:6 19:20,22
20:1,4,9,15
21:14,22 22:18
22:21 24:12,25
25:6,9,16 26:8
26:17 27:5,19
28:6,9,13,16
29:18 30:5,8
30:24 31:6,18
31:21,23,25
32:17 35:18,25
36:6 37:19

| | | | |
|---|---|---|---|
| 38:12 39:11,21 | 110:16,20,25 | creditworthi... | 80:16 82:15 |
| 41:3,5,18 43:1 | **court's** 55:8 | 36:23 | **currently** 23:5 |
| 43:12,20 47:13 | 56:17 | **crimes** 101:23 | 75:1 |
| 49:22 50:7 | **courthouse** | **criminal** 102:3 | **custodial** 8:2 |
| 51:20 52:5,17 | 100:17 | 102:5 | 18:8,25 68:15 |
| 55:22 56:14,16 | **court's** 28:10 | **critical** 56:1 | **custodian** 49:2 |
| 58:10 61:18 | 35:2 | **cross** 74:8 | **custody** 35:13 |
| 62:10,23 63:2 | **cover** 36:15 | **cruz** 107:3 | 49:3,4,6 54:13 |
| 63:13 66:13 | 43:24 48:11 | **crypto** 33:5,7,8 | 57:22 59:1 |
| 67:13 68:20 | **coverage** 38:22 | 33:10 34:22 | 61:19,20,22 |
| 69:1,4,10,14 | **create** 78:4 | 39:8 40:11 | 62:19 63:7,9 |
| 70:20 71:9,10 | 96:22 | 42:3 45:21,24 | 63:10,11,17,17 |
| 71:12,21 72:1 | **created** 24:17 | 46:21 47:10 | 63:24 64:14,23 |
| 72:7,10,14,19 | 58:3 73:1 | 49:1,18 54:7 | 67:7,15,15,17 |
| 74:10,18 75:11 | **credence** 29:21 | 59:22,24,24 | 70:11 71:15,17 |
| 75:13 76:19 | **credit** 2:17 | 60:15,18,25 | 71:19 72:2 |
| 77:7,13 78:13 | 72:8 73:18 | 61:1,17,21 | 75:17,19,20,21 |
| 78:16 79:10,15 | 77:5,7,10 | 65:14 84:3,3 | 76:6,8,12,14 |
| 79:19 80:9,12 | 112:6 | 99:12 100:16 | 76:14,23,24 |
| 81:20 82:16 | **crediting** 72:23 | 106:16 | 82:18,23 87:14 |
| 83:1,3,11,14 | 74:1 | **cryptocurren...** | 96:11 103:12 |
| 83:21 84:11,16 | **creditor** 8:9,10 | 90:14 | **custom** 7:18 |
| 87:9,19,21,23 | 8:11,12,13,14 | **cryptocurrency** | **customer** |
| 88:24,24 89:6 | 8:15,16 11:13 | 2:12,24 34:20 | 32:22 33:3 |
| 89:6,20 91:15 | 12:13 37:10,10 | 57:18 69:24 | 38:6,11 46:5 |
| 91:19 92:11,20 | 53:16 66:13 | 73:21 82:14 | 54:4 58:19,25 |
| 92:23 94:19,19 | 69:20 76:21 | 84:6,14 88:14 | 59:16 90:1 |
| 94:20,25 95:4 | 104:18 105:6 | 88:22 89:4 | 96:24,24 |
| 95:8,13,13,16 | **creditors** 4:15 | 93:11 98:25 | 106:15 |
| 95:20 96:4 | 5:2,9 22:5 45:1 | 99:3,6 100:14 | **customers** |
| 97:23 99:25 | 51:1 56:21,25 | 106:6,11 | 35:12,14,14 |
| 100:6 101:9 | 57:4 61:11,12 | **crystal** 110:5 | 44:9 45:15 |
| 102:2,18 | 74:15 75:10 | **crystallize** | 46:10,12,19,24 |
| 103:19 105:10 | 96:1 | 34:15 | 47:4,12 54:7 |
| 105:18 107:2 | **creditors'** 14:8 | **currency** 40:17 | 57:15 58:22 |
| 108:10,15 | 36:12 | **current** 22:19 | 59:3,6,15,16 |
| 109:11,18 | | 54:6 74:16 | 59:18 60:3,8 |

61:3,3,9,11,13
63:20 64:2,9
64:20,22 65:1
66:20,25 71:5
72:23 73:6
87:16 93:10,24
96:22 98:14,16
106:5,14,18

**cut** 53:12

**d**

**d** 2:4 9:1 83:12
112:1

**d'amico** 71:12
71:14 72:6

**d.c.** 9:20

**damages** 26:20
26:24 56:4
108:8

**dan** 3:7 4:9 9:9
9:11,16 72:20
75:22 83:23
87:25 92:12

**daniel** 8:16
18:3

**data** 20:24
50:23

**date** 15:12
23:20 31:19
50:5 55:12
64:4 72:24
73:4,7 75:6,25
76:14,17 77:4
78:2 82:14,15
92:3 95:5 97:1
97:1,4 109:9
110:1 113:25

**dates** 95:3

**david** 4:19
5:20 10:3,15
12:8 39:23
84:17

**day** 15:16 23:6
23:8 40:5
52:14 57:13
60:24 61:16
64:14 68:9
76:2 77:5
79:13 81:23
82:1,7 95:3

**days** 27:11
51:16 89:14

**dc** 6:11,18,18

**de** 8:13 11:10
11:12,13 21:23
57:12 65:1
67:6 79:21
80:3,20 112:8

**deadline** 32:19
44:18 79:3
94:2

**deal** 36:8 72:1

**dealers** 49:20

**deann** 10:15

**deanna** 9:7
10:3 11:12
13:2,7,14,19
14:17 17:5,7
17:13 18:7
19:20

**deb** 17:7

**deborah** 7:14
17:12

**debt** 56:23
57:3,11 58:16
58:17,19

**debtor** 1:9 4:4
18:13 20:12
25:3 36:3
41:24 42:22
54:17 80:1,4
82:17 84:2
89:23 90:12
91:5 93:22
95:1 103:2

**debtor's** 2:10
2:23 59:10
72:22 73:17,21
73:25 79:21
80:22,25 81:16
83:19 84:14
85:21 86:12
88:15 90:10
94:1 96:7,9
97:15 100:2
107:12 108:17

**debtors** 2:1,11
2:16,17 3:2
11:6,25 28:7,7
33:11,15 34:2
34:10 35:4,7
42:12 48:12
63:5,6,19 64:7
64:19 65:23
66:7 69:16,16
71:24 72:21
73:5,9,18 74:2
74:5,8 77:9
78:18 79:24
80:2,7 81:3,5

81:13,14,21
82:20,24 83:5
83:17,24 84:4
84:8,20 86:10
87:3 88:1,5,6,9
88:11,17,21,25
89:2 90:3,16
92:13,13,16
93:4,6,15,23
94:8,10,12,16
95:25 97:14
104:21 106:11
110:1,10

**debtor's** 20:20
20:22 22:19
27:21 32:15,24
33:4,24 34:12
34:18,20 35:8
40:4 41:14,25
42:4 44:24

**december** 23:9
23:13 27:4
32:19 69:19
75:16 94:2
101:18 103:21

**decided** 25:20
75:8 76:11

**decision** 36:6
57:2 60:16

**declaration**
40:5 78:10
79:25 81:23
82:2,7 86:16
87:4 90:3
92:15,19,24,25
94:5 107:14,15
107:24,24

109:2
**declarations**
93:25 96:19
**decline** 24:13
24:18,19
**dedicated** 49:8
**deemed** 3:10
**default** 42:18
**defense** 100:10
100:20 101:3
**defenses**
100:18
**definite** 51:18
**definitely**
16:16 43:7
44:12 49:16
**defraud**
104:18
**delay** 52:14
**deliberately**
104:22
**deliver** 30:22
**delivered**
77:25 78:4
**delivering**
31:19
**demonstrated**
81:4 94:4
**department**
6:1 7:16
**depending**
23:17
**deposit** 46:14
75:19 76:5
**deposited** 3:15
60:25 76:7
101:13 103:1,5

**depositing**
76:11
**deposition**
96:18,21 97:6
97:7 100:4
**depositions**
31:5 100:2
**depository**
78:22 79:1
**deposits** 75:19
90:2 96:24,24
**described**
49:12 58:16
81:22
**describing**
30:21
**description**
81:23
**designate**
65:17
**designation**
20:7
**designed**
100:22,23
**despite** 54:10
91:16
**destructive**
37:11
**detail** 87:18
96:14 99:18
107:23 108:2,2
108:20,24
109:3
**details** 47:15
96:12 108:7
**determination**
41:19

**determined**
81:3 84:2
**develop** 48:2
**developed**
85:20 86:6,21
**developing**
48:21
**development**
21:8 32:15
**developments**
21:10
**dialogue** 22:16
43:8 52:2
**dice** 46:5
**dictate** 97:19
**didn't** 27:17
48:4
**diff** 35:13
**difference**
82:11
**differences**
36:17 81:1
82:5 87:6
**different** 34:3
40:4 41:9 46:7
48:15 58:25
60:2 61:2 90:8
96:15
**differently**
96:23
**digital** 3:10
77:15,16,17,19
77:19,22,23,23
77:25 78:1,3,6
78:8
**diminis** 2:20

**direct** 81:13
**directed** 92:9
**direction** 88:9
**directive** 55:8
**directly** 55:17
66:2,15,17
109:2
**director** 92:16
**disabled** 13:20
13:23
**disagree** 97:8
**disagreed**
97:10
**discharged**
91:24 92:7
**disclosed** 63:9
63:18 90:20
**discount** 45:22
47:10
**discovered**
70:2
**discrepancy**
81:21
**discrete** 32:21
33:3
**discretion**
77:20
**discuss** 68:24
70:10 74:22
**discussed**
29:12 64:18
**discussing**
45:13
**discussion**
80:25 87:6
**discussions**
33:21 34:14

37:7,15 48:2
49:19 50:15
79:2,7
**disputes** 36:8
**disputing**
59:22
**distinction**
103:13
**distraction**
94:14
**distress** 21:1
**distribute**
33:11 45:3
73:2 76:23
77:7,16 99:10
106:18
**distributed**
56:8 68:22
73:14,16 75:15
75:16,20 76:2
76:6,16,25
**distributing**
73:8
**distribution**
45:21,24 60:12
66:3,5 72:5
73:11,15
**distributions**
57:7 64:1 66:4
66:15,16 68:8
82:19
**district** 1:2
**dived** 107:11
107:22
**dividends** 45:9
**dixon** 8:11
76:20,21,21

**doc** 2:8,13,18
2:20 3:3,7,11
3:17,22
**docket** 21:6
22:10,12 25:4
32:3 49:23
52:12,13 55:6
65:24 69:18
70:16 72:8
74:6 78:11,19
79:4,23 80:3,4
80:11,23,24
81:19 92:14,17
92:20 93:6
96:8,9,10
**dockets** 22:12
**document** 3:17
16:11 25:15
**documentary**
107:15
**documented**
102:16
**documents**
16:10 30:19
96:18 99:19,21
99:24 107:12
**doesn't** 41:18
42:24 51:7
54:15
**dog** 67:7
**doing** 13:13
52:22 55:7
59:13 61:1
87:13,13
106:17
**dollar** 39:1
44:5 46:8,17

**dollars** 26:4
29:2 85:12
90:11 104:15
**don't** 9:20,22
12:20 13:4
26:2 28:14
29:8,20 30:2
31:11 33:6
38:13 39:21
43:23 47:18
53:10,25 54:5
**doubt** 35:19
**dozen** 36:20
**drafting** 30:21
**drag** 47:8
**drain** 104:1
**drawing** 48:4
**drive** 5:10 73:4
**drop** 13:25
15:15 73:13
**dropped** 74:25
75:4
**due** 55:2
101:10
**duplication**
55:8
**duration** 108:9

**e**

**e** 1:21,21 4:1,1
9:1,1 83:12,12
107:9,9 112:1
113:1
**e&o** 93:17
**eagerly** 55:4
**earlier** 39:7
57:14 58:24
61:19 62:24

80:25 96:9
106:14
**early** 24:20
52:9 64:17
**earn** 3:15 16:9
16:11 35:2,3,9
35:14 41:11
56:17,21 57:4
57:5,5,9,14,21
58:5,7 59:1,4,6
59:8,16,18
60:3 61:3,6
75:21 76:4,10
82:23 87:16
96:2 98:2,2,4,8
98:9,12,17,22
99:1,11,16,20
99:25 100:7,25
101:13 102:19
102:25 103:11
105:17,21,22
108:16 110:3,7
110:14
**earned** 3:21
**earning** 107:24
**earnings**
107:14
**ease** 97:15
**easier** 31:1
**easily** 46:18
**eat** 61:12
**ebitda** 23:9,12
23:14,16
**ecf** 2:20 3:11
3:17,22 51:23
72:8 78:11
92:20

echo  44:10
  54:19 58:13
ecro  1:25
effect  76:12
  84:23 90:25
effectively
  20:24 48:3
effectuating
  54:9
efficiency
  22:23
efficient  25:24
  25:25
efforts  23:19
  82:19
eight  23:6 38:9
either  31:9
  40:12 82:23
  90:17 92:8
electricity
  24:15
elephant  90:3
  100:15
eligible  2:17
  63:19,20,23
  64:9,9 66:1
  72:23,24 73:6
  73:8 77:6,11
  77:17
ellis  4:3 9:10
  11:9,24 63:4
  69:16 72:21
  75:23 83:24
  88:1 92:13
  95:25
email  66:8,10
  68:6

emails  69:22
embedded  37:3
emergence
  42:14
emergency
  21:11 26:25
emissions
  90:21
employee
  18:12
encourage
  67:23 71:22
encouraged
  109:6
endeavored
  21:6 22:14
energy  24:8,13
  24:16,20 25:25
  25:25
enforceability
  98:5
enforceable
  98:11
enforced  94:21
enforcement
  94:12
engage  91:12
engaged  103:9
english  5:15
  10:16 39:24
  94:22 95:17
enjoy  26:6
ensure  26:13
  68:8,13 82:25
enter  88:21
  101:10

entered  63:5
  70:19 72:14,15
  73:9 79:9 80:8
  94:6,10
entering  81:19
  106:9
entire  104:1
entirely  90:18
entities  56:7
  57:2 84:9 91:5
entitle  45:8
  88:13
entitled  58:22
  61:5,17 72:5
  77:8,12
entity  48:24
entry  2:10,16
  2:23 3:14 74:8
environment
  54:6
envision  45:16
  49:1 50:11
envisioning
  45:2,22
epitome  104:13
equal  57:6
  60:11 61:14
  96:11 110:15
equally  60:9
  61:2,4 76:25
equipment
  20:24
equitable  42:1
  56:3 100:23
  107:21
equitably
  75:24 76:15

  106:18
equity  33:24
  54:13 58:21
error  90:20
errors  91:4
especially  51:4
essentially
  57:4 108:21
establish
  100:20
established
  55:16
estate  3:22
  35:4 59:9 61:7
  61:10,10 76:25
  77:10 83:19
  84:4 86:13
  88:11,17 101:5
  104:2 108:17
estate's  59:10
estates  81:16
estimate  24:12
  24:13 26:20,23
  37:19 38:15
estimates
  28:23
et  20:7 50:13
  52:6 62:3 91:6
  91:7
etcetera  3:22
eth  40:12,14
  84:7 85:9,17
ethereum  33:8
  45:25 63:22
evaluating
  34:3,7 36:24

| | | | |
|---|---|---|---|
| **event** 21:5 73:15 74:15 77:15 | **examiner's** 55:2,13 57:24 | **expectation** 57:13 | **extrinsic** 99:23 101:19 105:15 105:16 |
| **everybody** 20:10 35:6 41:17 46:2 60:1 63:8 64:11 65:4 68:16 71:22 77:1 | **examiners** 31:4 **examiner's** 30:12 31:19 **example** 36:7 49:1 73:21 84:8 88:12 96:17,21 | **expected** 31:19 67:4 95:5 **expedited** 26:19 **expeditiously** 36:1 **expense** 2:6 | **eyes** 60:16 **ezra** 71:11,12 |
| | | | **f** |
| **everybody's** 59:21 64:15 69:4 | **exceed** 64:24 **excellent** 107:10 | **expensive** 41:17 **expert** 91:23 | **f** 1:21 113:1 **face** 99:23 110:13 **facilitate** 49:20 |
| **evidence** 92:24 93:1,25 94:3 94:15 96:17 97:12,13,22 99:23 101:20 102:14 105:16 105:16 | **exchange** 54:4 104:16 106:6 **exchanges** 73:3 **exclusivity** 44:18 52:10 **execute** 78:25 **executive** 96:21,23 | **explain** 81:21 **explained** 93:7 99:9 **exploring** 47:17 **exposure** 28:20 28:23 29:1,5,9 29:22 | **fact** 35:2,3 60:12 61:6 85:17 99:11 102:17 **factor** 50:17 **facts** 89:23 98:20 **factual** 85:20 86:6,21 94:17 |
| **evidentiary** 96:16 **exact** 90:23 **exactly** 45:13 48:13 50:16 52:6 68:16 75:6 92:3 100:22 108:12 108:13 109:5 | **executives** 96:19 97:6 **exercise** 3:1 81:6 88:15 89:2 **exhibit** 78:11 **exhibits** 102:15 **exist** 58:5 92:2 **existing** 2:4 **expect** 23:15 | **exposures** 29:15 **express** 88:22 **expressly** 99:17 **extend** 52:10 79:3 88:12 107:18 108:8 **extended** 44:20 **extension** 30:12 79:13 | **failure** 101:25 **fair** 56:2 **faith** 105:4 **fall** 24:21 **false** 66:7 90:5 90:17 **familiar** 25:5 62:17 74:21 **far** 32:6 33:2 **fast** 106:19 **favorable** 24:8 |
| **examination** 55:17 **examiner** 7:2 13:8 17:6 30:11,16,22,25 31:12 55:3,7,9 55:11 92:8,8 | 23:21,23 24:1 26:3 27:14 30:22 35:7 47:7,11 55:15 65:5 72:2 89:13 106:1 | **extent** 38:20 41:17 49:24 77:24 81:15 84:2 88:10 92:18 105:17 | **feasible** 53:25 **feature** 47:7 **features** 34:15 48:19 **february** 15:13 79:4,6 95:7 |

federal 48:24
fee 104:16
feedback 83:10
feel 60:13
71:20
feels 101:16
fees 64:20,24
66:1,3,16
fell 32:20
ferraro 8:18
14:17,19,20
20:17 21:17
22:2,8,16,17
22:20,22 24:12
24:19 25:1,2,8
25:12,17 26:9
27:20 28:11,15
28:16 29:7
30:3,6,7 34:5
79:22 80:5,14
80:18 97:4
fiat 40:17
fiction 103:13
fifth 101:18
fights 54:14
figure 58:24
60:22
file 21:6 51:24
52:15 64:12,15
64:16 66:1
70:11 71:16
83:2 92:14
filed 3:7,11,22
20:25 21:5,11
25:3,4 55:21
56:19 58:15
65:6,23 69:18

70:7,9,16,16
70:25 72:9
78:11,19 79:4
79:23,24 80:4
80:23,24 84:18
92:15 96:7,10
101:21 102:6
filer's 3:11
filing 22:10
27:15 29:11
47:21 50:11
51:16 52:10
90:6
filings 26:18
93:5
final 32:18
53:25 79:5,13
finalize 44:20
finalized 65:6
finalizing
64:12
finally 66:23
71:1
financial 21:1
36:19 80:1
find 31:4 67:19
78:9 88:11,17
finding 98:10
findings 55:4
finish 39:14
finished 39:11
39:18
fire 33:14
firmly 37:18
first 20:5 32:21
34:18 37:9
40:4 41:15

48:22 51:12
55:6 58:22
81:23 82:1,7
89:23 97:25
98:13 101:19
109:9
firsthand
55:10
fit 26:14
five 85:2,14
86:13 110:4,6
fixed 38:25
71:7
flare 2:17
72:23,25 73:6
73:9,11,14
76:6,11,13,15
77:7,12 112:7
floor 6:10
flow 16:21
47:13 56:24
80:15
flower 5:3
fluctuates 39:4
39:10
fluctuation
82:14 89:5
fly 49:3
focus 16:12,13
44:22 51:13
focused 33:15
37:12,15 42:8
48:13 53:20
54:19 61:1
106:4
focusing 90:18

folks 37:1 38:5
64:18 66:8
74:22
follow 56:20
75:7 108:13
following
23:18,22 64:7
108:22
follows 77:15
force 110:15
forecast 25:6
25:14 27:21,22
27:24 28:8
forecasts 25:7
foregoing
113:3
form 59:12
86:16
formal 31:5
32:12 74:5
format 54:15
72:15
formation
97:18
former 33:25
forms 2:4
97:15,15
forth 87:4
forum 68:18
forward 26:12
36:1 37:8
42:21 44:14,17
44:20 47:20
48:12 50:12,24
51:2,17 54:19
60:11 71:4,7
103:25 104:3

**found** 56:7
58:2 99:20,25
100:6
**founders** 33:24
**four** 85:15
107:11
**fraction** 41:11
**framework**
34:15
**frankly** 107:20
108:1
**fraud** 91:14
94:3,17 101:24
102:13,14,20
102:25 103:4
**fraudulent**
104:19
**fred** 15:4
**free** 105:1
**freely** 49:13
**fringe** 108:5
109:14
**frishberg** 3:7
8:16 18:2,3,3
89:20,21 91:15
91:18,21 93:5
93:16,20,24
**frishberg's**
89:17
**front** 25:10
29:8
**ftts** 85:6
**ftx** 28:20,23
29:1,5,16,19
51:5
**full** 20:4 23:16
45:22 46:25

96:16 98:25
99:8
**fully** 48:23
56:21 99:7
102:16
**function** 10:13
49:11
**fund** 26:4
58:20
**fundamental**
93:14
**funded** 58:19
**funds** 67:16
71:1 105:7
108:21 109:9
**further** 28:15
30:3 50:19
52:10 65:17
78:3 81:17
87:8 88:23
110:10
**future** 26:7,15
35:15 49:15

**g**

**g** 9:1
**gabriela** 4:10
9:11 69:15
**gained** 28:2
**galaxy** 94:7
**gallagaher**
103:7
**gallagher** 3:16
3:16 8:12
10:20,20,24
11:1,2 101:12
101:14,15
102:9,18

103:20 105:11
105:15 106:13
106:20 107:5
**gas** 64:20
**gating** 37:16
41:7 54:12
**genders** 80:17
**general** 6:8
12:19 32:2
38:21 55:20
87:22 98:23
99:2 101:21
102:6
**general's** 56:4
**generally**
21:18 31:14
32:20 38:23
98:5,14
**generation**
26:1
**generous** 43:9
**getting** 31:14
48:7 91:21
108:2
**give** 10:21
11:22 12:4
14:6,23 15:2
15:11,21 16:2
18:1 19:9,12
25:5 27:10
32:4,13 37:19
37:24 38:8
39:14 40:7,17
43:20 44:20,25
45:20 47:2,11
51:14 83:13
86:24 104:15

106:15,15
**given** 11:21
14:16,22 15:1
15:20 16:1
17:3,25 18:6
18:16,18,22
19:6,7,11,15
23:9 24:7
33:15 38:12
40:11 41:9
74:16 76:10
82:19 101:17
102:14
**gives** 37:5
**giving** 14:17
17:18 43:17
45:18 89:11
**gk** 78:20 93:22
**gk8** 2:1,2,4,4,6
3:6 78:18
79:14 89:18,25
90:8,8,13,15
90:18,19 91:6
91:11,12,23
92:1,5 93:7,9
93:12,18,20,21
93:23 94:1,2,4
105:2
**gk8's** 93:11,22
**glenn** 1:22
39:23
**go** 10:23 16:6
24:25 31:10,25
32:7,10 35:9
39:15,22 42:10
42:21 43:23
46:21 48:12

50:7 53:18
54:5 58:11
59:5,24 60:6,6
61:7,13 63:2
68:8 71:4,7,13
74:12 75:19
83:21 89:8,10
96:13 100:16
102:7 103:6,25
103:25 109:21
**goes** 51:23
54:23 55:14
59:15 61:9
65:9
**going** 9:5,17
10:10,19 12:8
13:10,12,25
17:9 20:11
25:12,13,14
27:14 32:1,8
34:18 37:7,11
37:24 39:13
42:11,16,16
44:14 45:19
47:1 48:2,14
48:14 49:4
50:9,12,24
51:2,20 53:15
53:16,22,22
54:24,25 55:5
55:5,13,15
57:6,17 58:7
59:5,25 60:11
61:4,4,12,13
61:13,14 64:13
65:25 68:1,2,5
68:12,17,21

69:7,8 71:1
76:1 83:17
84:23 87:15
89:6,12 95:13
95:23 101:9,9
101:11 107:2
110:18
**good** 10:3,15
11:5,12 13:7
13:10,14 15:16
17:5,7 18:7
20:10 22:20,21
26:14 30:17
39:17,23 52:4
62:25 63:3
69:1,12 72:20
83:15 84:17
89:22 96:6,6
107:20
**gotten** 30:19
**govern** 98:15
**government**
56:6
**grace** 4:11 9:19
11:23,24
**grant** 73:10
74:2
**granted** 30:12
72:11 78:14
79:16 80:20
86:22 112:6,7
112:8
**granting** 2:5,7
2:13 3:3
**great** 20:16
24:17 30:2
32:18 52:8

**greater** 105:7
**greatly** 86:11
**green** 1:13 6:3
**greg** 5:13 10:6
**gregory** 12:6
52:19
**gross** 84:25
85:12
**grossly** 104:6
**ground** 49:5
**group** 5:16
7:10 8:2 10:16
18:8,25 37:6
39:24 50:16
60:8 63:7
64:14 67:11
84:18
**grow** 51:9
**growth** 58:20
**guess** 62:5 76:2
**guidelines**
78:23
**guideposts**
48:20
**guiding** 60:7

**h**

**hack** 67:20
**hacker** 68:11
**hadley** 6:15
**haircut** 42:16
42:17 64:11
**half** 23:8 85:12
**hamilton** 7:9
7:18
**hamlin** 4:12
9:20 11:4,5,5,9

**hand** 10:13
16:2 17:25
32:1,7 39:12
39:25 71:11
74:11 83:11
87:9 89:7,9
98:6,7
**handful** 24:6
46:11 57:12
**handing** 53:5
**handled**
107:17
**hands** 10:11
11:17,21 12:4
**hang** 77:9
**hapoalim**
78:21,25
**happen** 68:13
**happening**
21:7,24 51:14
51:15
**happens** 64:2
**happy** 56:13
62:16 70:16
71:1 80:5 81:2
82:6 87:25
**hardship**
106:13
**harming**
100:21
**harvest** 33:1
44:23 51:9
**hashing** 22:24
**hasn't** 19:3
51:25 52:1
**haven't** 13:23
29:3,13 47:16

| | | | |
|---|---|---|---|
| 49:23 | 93:10 | **holder**  61:20 | 30:7,17,18 |
| **head**  38:10 | **hello**  96:5 | 76:15 | 31:2,11,20,24 |
| **headed**  23:24 | **help**  26:4 68:6 | **holder's**  57:6 | 32:11,13,18 |
| **hear**  9:7 10:24 | **helpful**  32:13 | 98:24 | 33:2,5,19 |
| 20:13 31:8,12 | 41:4 83:3 | **holders**  2:12 | 34:10,17,23 |
| 69:13 75:12 | **hensley**  4:10 | 2:18 6:16 7:10 | 36:10 37:14,18 |
| **heard**  34:4 | 9:11 69:9,12 | 33:24 44:24 | 37:24 38:5 |
| 38:18 57:20 | 69:15,15 72:12 | 45:4,8,11 | 39:5,10,17 |
| 70:21 71:10 | 72:17 | 46:15 49:13 | 40:10,18 41:2 |
| 74:11 79:16,22 | **heras**  8:13 | 50:10 52:25 | 42:11 43:25 |
| 80:9 81:7 89:8 | 11:11,12,13 | 56:3,9,21 57:1 | 44:15 45:23 |
| 89:10,12 97:19 | 80:3 | 57:9,21 58:5,5 | 46:3 47:24 |
| 97:20 101:18 | **hermann**  8:14 | 58:7,22 61:20 | 48:22 49:11 |
| 101:19 103:21 | 12:11,12,12 | 61:22 67:16 | 50:1,4,8,14,19 |
| 107:16 | **hi**  11:24 12:6 | 68:15 69:18 | 51:12,14,18 |
| **hearing**  2:1,10 | 13:2 14:7,17 | 71:18 73:9,19 | 52:4,8,19 |
| 2:16,20,23 3:6 | 17:13 | 73:23 74:1,4 | 53:23 54:20 |
| 3:10,14,20 | **highest**  94:7 | 74:21 75:23 | 55:19 58:9 |
| 16:16 21:13 | **highlight**  34:16 | 77:6,8,11 | 59:20 60:10 |
| 22:2,6 26:19 | 53:13,19 54:23 | 93:19 98:7,21 | 62:13,20,21 |
| 26:25,25 28:17 | 55:18 56:13 | 99:2,7,11,13 | 63:1,3,5,15 |
| 51:23 52:1 | **historically** | 99:16 100:25 | 64:5 67:9,12 |
| 63:9 69:19 | 48:9,15,17 | 101:3 102:19 | 68:3,25 69:3 |
| 79:5,23 80:18 | **history**  109:4 | 102:25 | 69:12,19,21 |
| 94:5 96:16 | **hit**  56:2 | **holds**  67:2 | 70:17,22 71:8 |
| 99:9,20 101:16 | **hits**  55:6 | **hole**  99:8 101:7 | 71:14 72:12,17 |
| 105:24 | **hoc**  5:16 7:10 | **holert**  79:25 | 72:20,25 73:12 |
| **hearings**  20:18 | 8:2 10:16 17:8 | **holiday**  21:12 | 73:20 74:1,7 |
| 35:13 64:19 | 18:8,25 39:24 | **home**  46:21 | 74:13,20 75:22 |
| **hebrew**  94:21 | 62:19 63:7 | **hon**  1:22 | 77:3 78:15 |
| 95:17 | 64:14 67:11,22 | **honestly**  26:2 | 79:7,13,18,20 |
| **heightened** | 67:23 68:15 | **honor**  2:2 | 80:2,11,21,22 |
| 102:11 | 84:18 | 20:13,18,21 | 81:12,17 82:6 |
| **held**  55:25 59:1 | **hold**  33:17 | 21:2,9,21 22:7 | 82:21 83:15 |
| 72:23 75:25 | 35:5 38:13 | 22:20 25:13,24 | 84:17 85:16,19 |
| 76:9,16,24 | 44:8 51:8 | 26:22 27:7,18 | 85:23 86:5,13 |
| 78:24 92:6 | 76:24 | 28:14 29:7 | 86:15 87:8 |

89:2,16,21
91:21 92:9,12
92:13 93:2,2
94:8,18,23
95:10,18,22,24
96:3,5,6,16
97:21,24 99:20
101:15 105:12
107:10 110:4
110:23
**honor's** 71:2
108:4,6 110:7
110:9
**honor's** 22:15
25:18 30:4
**hope** 42:20
46:19 68:23
**hopeful** 36:3
37:2 43:14
**hopefully** 26:6
55:12 103:2
107:20
**hopes** 37:8
**hoping** 47:2
108:25
**host** 13:20
20:24 24:7
**hosted** 23:1
49:2
**hosting** 21:20
24:3,10 26:13
27:2,4,12,13
34:8
**hot** 68:9
**hounded**
104:22

**hour** 100:4
**house** 7:18
**hundred** 46:16
**hundreds** 29:2
29:22 97:9
104:15
**hyde** 3:25
113:3,8
**hypothetical**
91:11

**i**

**idea** 32:25
37:19 104:13
**ideas** 43:17
**identifiable**
66:17
**identified** 41:8
**identify** 83:22
**identifying**
67:2
**ii** 2:5,12 3:3
**iii** 2:7
**il** 4:6 5:11 7:4
**illegal** 103:9,18
**illegality**
101:25
**illiquid** 33:7,9
33:14 34:20
45:20 51:4,7
53:4 59:25
**immanuel** 8:14
12:12
**immediate**
88:14
**impact** 21:19
**important** 21:8
22:11 26:12

35:11,25 36:14
36:17 37:17
41:7,8,12,20
43:7 44:12
50:18 55:13
58:1 59:2 65:8
80:18 90:4
**importantly**
33:21 81:12
98:22
**imposition**
19:24
**improve** 22:23
33:18
**improved**
27:21 33:1
**improves** 28:8
**improving**
24:8
**inbox** 69:23
**include** 34:20
52:11
**included** 27:9
71:20
**including** 35:8
88:4 94:12
97:18
**incorporate**
105:13
**incorporated**
70:15
**incorporates**
74:6
**increase** 27:23
73:25 74:3
77:11

**increased**
24:22 86:11
**increases** 28:3
**incredibly**
48:13
**independent**
88:16
**independently**
32:24
**indicate** 93:23
93:25
**indicated** 22:4
51:3 82:2
110:4,9
**indicates** 81:24
**indictment**
102:5
**indiscernible**
23:24 30:21,23
31:4 42:4
75:15,17 90:21
**individual** 60:3
74:21 81:5,10
81:15 82:9,10
**individualized**
98:18,20
**individuals**
56:7
**industry** 60:17
73:21 106:11
**ineligible**
66:24 67:5,8
**inequitable**
101:5
**informal** 70:14
**information**
31:14 49:24

65:18,21 66:18
66:22 67:16
68:5 84:22
91:25 94:1
**informed** 44:4
69:21 87:6
**inherent** 34:25
**initial** 47:25
79:23
**initially** 67:4
**initials** 20:6
**input** 34:2
55:13 68:5
**inquiry** 69:23
**ins** 68:18
**insight** 51:15
**insolvency**
84:10
**instance** 89:22
**instances** 84:7
84:7
**institutional**
2:25 35:22,24
36:9,16,18
37:21 80:22
81:1,9,21,25
82:3 84:4,21
87:7 88:10
89:4 93:10
**institutions**
36:19
**insurance**
89:24 90:9,11
90:16,19,23
91:2,4,10,14
91:23 92:1,4,5
92:8 93:11,13

93:16,23
**insured** 90:2
93:18
**insurers** 93:8
93:12
**intact** 42:15
**intend** 35:4
64:11,16 70:12
**intended** 39:1
**intercompany**
2:5,7
**intercreditor**
54:14 57:19
58:6
**interest** 34:6
41:25 42:1,2,4
45:7 96:14
**interested** 22:6
36:4
**interests** 59:13
**interfering**
31:8
**interim** 79:9
79:17
**intermediate**
62:3
**internet** 29:20
**interpretation**
97:9
**interrupt**
16:21
**interview**
30:18 31:15
**interviews**
30:25 31:1
**inure** 34:19

**invest** 33:22
105:1
**investigation**
55:18
**investments**
33:10 34:22
**investor**
104:14
**investors** 47:8
53:14
**involve** 82:18
**involved** 15:6
32:23 34:14
94:4 107:4
**involves** 109:4
**iphone** 20:7
**israel** 94:11
95:1
**israeli** 78:24
94:20 95:16
**issue** 37:14,17
38:7 42:2
46:24 56:25
57:5,18 58:6,6
58:17 61:22
62:1,4,6,9 63:8
63:12,13 68:24
69:21 70:25
76:6 78:20,20
78:21 87:20
89:13 90:8
99:5,19 102:22
103:3,5 104:4
107:6
**issues** 10:22
35:12 36:2,5
37:17 41:7,8

41:20 42:3,6,9
42:13,20 43:13
43:15,21 47:22
47:22 48:8
54:12 57:19,23
57:23 58:4
62:19 84:19
87:24 97:17
99:17 107:17
**it'll** 56:20 58:1
**item** 72:22
78:17 79:20
80:21 89:15,16
**items** 44:13
**it's** 10:3,15
13:14 14:1,12
17:13 18:7
20:18 21:20
22:12 24:21
25:22 26:12,22
28:11 31:3,8
34:16 35:25
36:10,14 37:2
38:2,10 41:10
41:11 43:14
44:12 45:22
47:24 50:1,9
51:10,10 53:16
53:22
**i'll** 9:24 10:12
11:17,21 12:13
14:2 15:12
17:14 22:15,17
39:15 43:20
**i'm** 10:6,10
13:25 14:17
16:20 17:9,9

25:12,13,14
29:20 32:1
36:15 37:12,24
39:13 40:19
44:15 51:20
**i've** 16:10
38:14 40:5

**j**

**james** 101:21
**january** 1:16
9:3 23:15,17
27:4,10,12,13
27:16 73:12
76:6 95:3
113:25
**jenner** 7:1 13:8
17:6 30:10
**jeter** 8:10
75:11,11,12,14
76:1,18,19
87:9,11,19,22
**join** 20:4,6
**joined** 9:21
10:7,8,9,11
11:15,19 12:2
12:23,25 15:19
15:24 17:2,23
18:5 19:14
**joint** 78:19
**jones** 21:13
**judge** 1:23
17:10 19:17
20:8 21:13
39:23 71:11
86:24 107:1
**judgment** 74:2
81:6 85:21

86:24 88:16
89:3
**july** 40:8 82:2
91:5,14 92:3
**jump** 22:16
32:12 62:21
**june** 91:4,14
**justice** 6:1 7:16

**k**

**k** 6:17 107:9
**karen** 1:25
6:13 12:18
**katerina** 32:7
**keep** 22:12,14
42:15 77:10
**keeping** 50:2
**key** 20:22
34:15 36:13
37:16 48:1,19
96:21 110:5
**khanuja** 3:11
96:4,5 97:23
99:17 100:1,12
100:24 101:4
105:13 107:3,7
**khanuja's**
97:25
**kick** 37:25
**kielty** 94:5
**kind** 24:20
25:20 26:11
47:10 51:6
54:20 58:4
**kinds** 42:3
**kirkland** 4:3
9:5,9 11:8,9,24
26:23 58:13

63:4 69:15
72:21 75:22
83:24 87:12
88:1 89:22
92:12 95:25
107:25
**kirkland.com**
66:9
**knew** 21:1
**know** 9:20
22:10,13 25:25
26:10 27:10
29:11,14,19
31:3,7,11 36:6
37:6,15 38:5,8
38:9,24 41:5
41:24 45:25
46:7,16,18
47:9 49:17
50:22 51:5
52:6 56:17,22
56:25 57:6,24
58:17,18,25
59:12,17 60:4
60:12,19 61:8
62:2 65:8
67:10,17 68:7
68:20 69:2,24
70:1,12 71:2
71:19 75:3,5,9
75:15 80:4
85:24 86:15
87:12 99:21
100:3,6,9,10
100:11,24
101:22 106:2
106:12 108:9

110:8,9
**knowledge**
13:21,24
**koenig** 9:11
61:7 62:17
63:1,2,3,4 68:3
68:25 69:3
95:23,24,25
97:23,24,24
105:11,12,12
107:6 108:10
108:11,11
109:12,22
110:22,23
**kotliar** 8:7
18:24,24
**kovsky** 7:14
17:7,7
**ks** 50:12
**kulpreet** 3:11
**kwasteniet** 4:8
9:11 20:11,13
20:16 22:7
25:2 26:22,23
27:6 28:14
30:2,9 31:23
31:24 32:10,11
32:18 36:10
37:24 38:18
39:17 41:21
43:2,23,25
47:18 50:1,8
52:4,8 53:1
57:14 58:10,12
58:12 62:13,25
69:5,7,11 99:9
102:23 105:23

110:22
**kyc** 65:18,21
**kyle** 8:6 18:7

**l**

**lack** 30:20 48:8
**lake** 23:24
**language** 100:7
109:5,7 110:5
**large** 41:10,12
46:12,15 50:10
**largely** 102:3
**larger** 44:8,13
46:13,24 66:13
**largest** 44:9
**las** 8:13 11:11
11:12,13 80:3
**lasalle** 4:5
**lastly** 83:1
**late** 20:21
52:22
**latest** 25:6
27:21,24
**latona** 4:9 9:7
9:9,9,12,15,19
9:23,25 72:18
72:20,20 74:18
74:20 75:1,5
75:22,22 76:9
77:3,14 78:15
78:16,17 79:18
79:20 80:21
82:6,21 83:20
83:21,22,23,23
87:23,25 88:1
89:16 92:11,12
92:12,22 93:2
94:19,23 95:2

95:6,9,10,18
95:22
**law** 16:13
99:22
**lawsuit** 102:6
**lawyer** 86:7
**lazar** 7:6 13:6
13:7,7 30:10
30:14,17,24
31:2,10,11,20
31:22 55:3
**lead** 36:7
**leading** 29:11
**leads** 31:16
**leah** 4:12 9:20
11:4,5
**learn** 48:16
**leave** 24:4 42:9
**leaves** 84:14
**leblanc** 6:20
13:2,2
**lectern** 67:11
69:8 89:19
95:23 96:2
**led** 51:12
**ledanski** 3:25
113:3,8
**left** 26:5 85:7
100:10,10
**legal** 42:1
91:19 103:8,10
103:12,14,15
103:16 113:20
**lender** 58:8,8
**lenders** 36:9
**lending** 3:3
81:7,21 86:2

88:13 103:16
**length** 34:1
36:18 49:9
**leticia** 101:21
**letter** 99:21
**letters** 47:9
69:22
**let's** 39:21
**level** 45:16
58:18 108:1
109:3
**liabilities**
63:11 91:24
**liability** 75:9
92:6,8 106:17
**liable** 56:8
**license** 103:10
103:12
**licensed** 48:23
49:2,6,20
**licenses** 103:14
103:24 104:2
**lied** 60:13
**lien** 96:25
**lies** 78:12
**life** 49:18
104:16
**light** 50:22
65:22 104:7
**likely** 101:6
**likens** 96:23
**limit** 63:18
**limited** 29:16
42:1 93:18
**line** 9:13 22:18
26:3 31:9
32:14 60:3

61:17 83:8
97:2,3,3,5,5
109:8 112:4
**link** 14:1
**liquid** 33:7
34:20 45:21,24
**liquidate** 51:7
54:6
**liquidating**
53:5 54:10
**liquidation**
53:3 54:8,9
**liquidity** 25:6,7
26:10,16 27:20
27:21 28:1,8
**lissa** 8:19 18:11
18:12
**list** 64:8 71:16
84:21
**listed** 65:13,17
85:4
**listen** 9:13
**listening** 35:6
36:11 54:11,21
**lists** 82:7
**litigate** 42:24
**litigated** 43:19
**litigating** 101:2
101:2
**litigation** 21:3
34:22 36:8
37:10 41:17
54:23,25 55:14
63:10,18
**litigations**
59:16

**little** 31:16
38:6 39:8 40:1
40:10,18 56:24
85:25 99:18
109:12
**live** 68:9
**lived** 45:19
**llc** 1:7 9:4 80:1
**lloyd's** 90:21
**llp** 4:3,14 5:1,8
5:15 6:15 7:9
**loan** 29:17 33:9
34:21 35:24
36:16 38:22
40:23 43:6
44:1 50:17
57:22 80:23
81:1,2,9,15
84:4 85:6,12
86:4 88:4,10
88:16,25 89:4
**loans** 2:25
35:21 36:18,21
37:20,20 38:4
38:17,19,22
39:7 40:6,8,11
40:15,17,24
42:15,17 44:8
81:15 82:4,8
82:10,23 83:17
84:5,22,25
85:1,3,7,8
86:10,12,14
96:24 103:16
**log** 65:15,16
**logging** 96:5

**login** 107:23
109:4
**logistics** 73:13
**long** 75:15
100:4
**longer** 45:19
47:2 76:4
**look** 9:24 24:3
46:6,23 61:23
71:23 72:4
85:23 92:9
110:1
**looked** 16:12
29:24 85:23
108:7 109:5
**looking** 25:11
25:13 38:6
47:8 70:1 82:5
**los** 5:4
**loss** 74:16
104:17
**lot** 22:12 24:14
31:8 37:16,16
38:12 43:8
50:21 51:13,15
51:19 53:15,22
56:18 80:25
96:12 102:14
102:15 105:15
107:22
**lots** 35:19
102:13
**low** 46:8
**lower** 34:6
**lowers** 89:3
**lowest** 62:3

**m**

**m** 6:10 15:4
**made** 27:3
37:16 42:21,22
44:11 60:16
83:9 84:6
86:11 90:1,5
102:4,13
110:17
**magnitude**
38:8
**mail** 65:12
**main** 91:2 99:5
**maintain** 2:3
**maintained**
86:4
**maintains** 20:1
**majority** 27:12
40:12 46:9
47:4 59:3,4
**make** 10:22
21:9 22:10
29:18 43:18
46:12 52:20
53:11 55:9,23
59:18 61:10
64:14,25 65:2
65:4,8 67:14
67:23 68:4,16
71:5,6,16
76:23 77:21
82:19 88:2
96:15 97:11
104:24
**makes** 28:4
46:13 57:15
98:13

**making** 12:9
12:13 19:22
33:19 43:17
66:15
**manage** 33:18
45:20 51:9
**managed** 32:24
45:5
**management**
2:2 33:25
34:11 46:4
49:8,8 78:18
78:20 79:6
**managers** 34:1
**mandates**
57:25
**manufactured**
103:13
**march** 24:5
**margin** 23:6,14
23:15 24:22
42:18
**mark** 7:21
17:13,16
**market** 23:17
24:8,10 25:21
33:1 39:4,10
46:1 74:16
**marketed** 58:3
**marketing**
51:3,5 91:9,11
**markets** 33:18
89:5
**marsal** 46:4
**martin** 1:22
**mashinsky**
55:21,24 56:5

56:7 78:10
101:22 102:5
102:20
**mashinsky's**
81:23 82:1
**massively**
37:11
**master** 3:2
**material** 47:21
**matic** 90:14
**matter** 1:5
16:17 43:19
60:21 106:2,3
107:6
**matters** 56:15
**mawson** 23:1,3
23:25
**maximize**
33:18 46:22
52:24 86:12
99:10 105:8
**maximizing**
54:2 94:6,14
**maximum**
103:2
**mccarter** 5:15
10:16 39:24
**mccloy** 6:15
**mean** 29:19
35:4 40:22
41:21 60:12
61:7 99:12
102:9,24
103:25
**meaning** 27:11
**meaningful**
45:23 57:11

64:1 97:22
**meaningless**
60:3
**means** 58:23
100:13
**meant** 61:18
62:24 109:13
**measure** 53:11
**media** 34:24,25
54:11 55:19
**median** 40:23
**meet** 64:7
**melissa** 92:15
92:25
**mention** 79:22
84:24 85:10
**mentioned**
12:8 39:13
80:5 85:5
87:13 108:6
**mere** 35:3
**merely** 86:23
**met** 20:17 63:7
63:14
**methods** 110:9
**mg** 1:3
**mi** 7:12
**michael** 3:22
8:9,15 109:17
**microphone**
31:7
**middle** 28:1
44:19 75:18
76:5
**midland** 24:1
**migration**
32:22,23

**mike** 16:1,8
**milbank** 6:15
13:3
**mild** 34:5
**million** 23:16
26:4 27:7,7,25
27:25 28:24
29:9 38:4 40:7
40:9 70:5 73:5
73:11 81:25
82:4 83:25
84:1 85:1,2,8,9
85:12,12,13
88:4 89:24
90:9 91:10
92:5
**millions** 29:2
29:23
**mind** 42:13
48:20 60:21,23
60:23 61:15
**mindful** 55:8
**mined** 28:4
**mineola** 113:23
**minimal** 64:22
**minimis** 21:23
57:12 65:1
67:6 79:21
80:20 112:8
**minimize** 55:8
68:6,10
**mining** 20:20
20:22,24 21:17
21:23,24 22:1
22:3,19,23
23:5,7,20
24:10,16 28:4

33:9 34:4,7,9
34:21 46:23
80:1,15,16
105:2
**minute** 51:21
**minutes** 43:21
**miscellaneous**
34:21
**misdirection**
67:20
**misleading**
90:17
**misled** 59:18
60:13
**mispronounc...**
83:13
**mispronounc...**
71:13 107:9
**misrepresent...**
91:1 101:24
**mistake** 69:24
**misundersta...**
93:14
**misunderstood**
60:20
**mla** 82:10
**mlas** 81:5
86:17 87:4
**modification**
110:12
**moment** 15:12
74:17 86:14
**monday** 30:23
31:20
**monetary**
19:25,25

**monetized**
45:10
**money** 58:20
60:22 103:15
**monitor** 56:9
**monitoring**
49:23
**month** 23:7,16
24:24 27:12
28:3 44:19
**monthly** 23:11
27:3
**months** 73:16
106:2
**mores** 104:7
**morning** 10:3
10:15,19 11:5
11:12,16,20
12:3,24 13:1,7
13:10,11,14,16
14:5,15,22
15:1,19,25
17:2,5,7,18,24
18:6,7,16,20
18:22 19:6,12
19:16 20:10
22:20,21 30:17
32:12 39:23
63:3 69:12
72:20 75:2
83:15 84:17
96:6 106:24
**motion** 2:10,16
2:23 3:6,10,14
3:20 15:7 16:9
21:11 26:19
32:4 36:7,16

52:10,10 69:17
70:7,8,9,18
71:10 72:8,9
72:10,10,22
78:13,14,18
79:16 80:19,23
81:22,24 82:8
83:10 87:21
88:8 89:13,17
89:18 91:16
94:13 95:11
96:10,13 97:8
98:2,4,17
101:12,17
107:5 108:15
108:17 109:14
**motions** 21:22
35:20 91:20
96:1,1 107:13
110:21
**move** 33:12
36:1 42:8
49:18 69:5,7
89:14 95:20
101:11 104:3
109:7
**moved** 15:11
15:13 23:20
**movement**
82:18
**moves** 39:4,10
**moving** 51:17
54:19
**multiple** 82:10
**mute** 31:9
74:14

**n**

**n** 4:1,5 7:3 9:1
107:9,9 112:1
113:1
**name** 13:5 16:8
20:3,5,6 39:13
71:13 83:15
85:11
**names** 84:24
**naming** 91:5
**nation** 86:16
**national** 6:8
12:18
**nature** 34:25
**ndas** 91:12
**near** 26:6
**nearly** 23:1,22
23:23
**necessarily**
54:16
**necessary** 72:1
86:12
**need** 44:14,19
51:8 54:1,5
56:2 68:8
83:21 86:4,25
87:5 91:24
**needed** 28:8
99:23
**negotiating**
49:9
**negotiation**
34:13
**negotiations**
21:2
**neighborhood**
40:9

**net** 74:16 75:9
**netted** 66:3
**network** 1:7
9:3 77:16 78:6
78:8 90:12
**never** 93:13
105:1
**new** 1:2,14
4:17 5:18 6:4
7:19 8:4 21:12
21:13 24:3
26:2 32:24
33:25 34:6
54:9 55:20
56:3,5 65:17
72:25 73:4
75:18 76:5
77:19,22,22,23
77:25 78:22
91:25 93:25
94:15 101:21
**newco** 33:16
**nice** 84:20
85:22
**nicely** 23:14
**night** 70:16
**non** 19:25
35:24 36:9
37:21
**normal** 65:11
**north** 26:4
**notably** 84:12
**note** 17:14 19:2
26:25 27:18
34:23 36:14
52:9 65:1

**noted**  11:3
  16:23 50:15
  58:24
**notice**  2:20
  52:16 65:3,9
  65:16 66:20
  70:11 79:23
  80:8
**notices**  21:6
  66:1
**notifications**
  109:2
**noting**  12:15
**novel**  20:21
  45:2
**november**
  28:17 29:13,24
  97:1,4
**number**  9:4
  12:19 25:4
  38:24 41:6,9
  41:10,11,12
  46:15 50:10
  70:3,9 72:8
  73:14 74:6
  78:11,19 79:4
  79:23 80:3,4
  80:23,24 81:11
  81:19 82:8,9
  82:11,12 84:19
  84:21 86:20,21
  92:14,17,21
  93:3 96:8,8,9
  96:10 97:1,2,3
  97:5
**numbers**  37:22
  38:13

**nw**  6:10,17
**ny**  1:14 4:17
  5:18 6:4 7:19
  8:4 113:23

**o**

**o**  1:21 9:1
  113:1
**oath**  31:1,15
  100:3
**objection**  80:2
  80:7 83:2
  84:18 92:14,15
  94:2 95:11
  96:8,9 102:15
  107:12
**objections**  70:8
  72:9 74:5
  92:23 107:25
**objective**  60:10
**obligated**
  99:15
**obligation**
  59:10,10
**obligations**  2:3
  38:7 73:6 78:7
  81:11 82:12
  83:25 84:1
  88:4 99:7
**obtain**  93:11
  94:11,25 95:1
**obviously**
  24:14,16 35:11
  35:23 38:22,25
  41:25 42:5,21
  42:23 51:15
  56:18 61:24
  66:14 67:22

68:17 87:5
  94:21
**occurred**  73:12
  104:10
**odd**  13:21
  36:21
**offences**  98:19
**offenses**  98:23
**offer**  46:20
  67:1 94:7
  103:10,12,14
  105:20
**offered**  48:10
**offering**  67:3
  76:4
**office**  9:20
  13:12,15 47:19
  67:25 70:23,24
  79:12
**officer**  80:1
**official**  4:15
  5:2,9 14:8 20:2
**oh**  16:18
**okay**  9:14,23
  10:22 11:1,10
  13:22,25 14:2
  14:12,25 15:8
  15:15,16 16:4
  16:7,7,18
  17:19 20:14,18
  24:25 25:1,11
  26:8,16 27:19
  27:20 28:13,19
  29:18 31:21
  41:3 49:2 50:7
  52:3,7 58:19
  59:1,23 68:20

69:2,10 72:5
  72:16,19 75:7
  75:14 76:1,19
  89:20 92:11
  108:19
**old**  113:21
**oldest**  25:23
**omission**
  101:24
**omissions**  91:4
**omnibus**
  107:12
**once**  53:12
**ongoing**  82:19
**open**  31:7,16
  52:24 60:16
  63:13,19 68:18
  76:13,14 108:3
**opened**  110:2
**opening**  14:17
  38:21
**operate**  2:2
  33:19,22 37:1
**operated**  48:15
**operating**
  23:12 24:11
  88:6
**operation**
  22:23 103:18
**operational**
  22:23
**operations**
  20:20 22:19
  26:14 28:4
  92:16 103:9
  105:3

**opinion** 16:12
56:17 98:2,9
98:17,22 99:2
99:12,16
101:10 105:18
110:3
**opportunities**
24:3
**opportunity**
32:5 52:6
71:18 89:12
96:17 97:22
**optimistic**
42:23
**option** 47:12
**options** 24:9
37:5 54:1
**order** 2:10,16
2:23 3:14
46:25 51:22
63:5,15,24
64:19 65:9
66:2,5,23 70:9
70:15,19 72:14
73:3 74:6,9
75:23 76:14
77:5 79:4,9,13
79:17 80:24
81:19 83:9
84:23 88:19,24
89:14 94:5,10
94:12,20 95:16
96:3 101:11
**ordinary** 3:1
87:1
**oren** 107:14

**originally** 70:6
**orin** 97:2
**ortiz** 8:6 18:7,7
19:2
**outcome** 54:15
56:10 99:1
100:6 101:6
**outline** 83:17
**outs** 68:18
**outside** 43:7
54:1 66:18
109:7
**outsource**
49:10
**outstanding**
37:20,21 38:4
38:16 39:7
44:5 81:11
82:1,4,8,13
83:24 85:1,8
88:4
**overall** 23:5
24:3 38:8
56:11
**overcollatera...**
38:20 85:13
**overcome** 69:2
**overcomes**
51:11
**overruled** 80:8
95:11 99:24
**overseeing**
21:14
**own** 20:25
36:22,23 46:24
49:7 55:18
56:20 58:14

73:1 74:23
84:10 107:13
**owner** 97:16
**ownership**
3:14 44:25
57:5 96:11
97:12,13,13
98:25 102:22
103:5 106:5
109:25
**owns** 98:12
99:12 100:13
105:22

**p**

**p** 4:1,1 9:1
**page** 25:10,15
97:2,2,3,5,5
112:4
**pages** 28:21
**paid** 27:5
35:21 66:4,17
97:12 106:7
**painstaking**
93:4
**paper** 31:8
**papers** 31:9
36:15 107:1
**paragraph**
86:8,8
**park** 5:17
**part** 50:21 63:9
91:22 93:13
98:21 99:13
**partial** 20:6
**participants**
14:14

**participating**
111:1
**particular**
53:12 68:9
73:22 88:8,10
**particularity**
102:12
**particularly**
35:20 41:9
53:21 55:14
**parties** 9:5
10:10 11:15,19
12:2,23,25
14:4,21,25
15:18,24 17:1
17:17,21,23
18:5,15,18,21
19:5,7,10,14
20:3,6 22:18
32:14 34:17
35:22 36:4,19
40:25 41:6
43:7 49:10
53:24 54:1,13
57:22 63:6,14
63:16 65:3
68:23 70:10
**partner** 10:5
12:7 95:23
**partnership**
34:8
**party** 20:4
33:22,23,25
49:2,5,9 61:8
66:2 93:8,12
**pass** 69:8

passing 17:22
past 30:25 32:4
patently
104:17
path 26:12
44:17 54:16
patrick 79:25
paul 83:12,16
pause 15:22
pay 27:2,3 66:1
66:5,15 97:15
payment 27:3
payments 71:4
71:6
payoff 84:3
peaks 24:20
pending 15:7
27:23 107:5
penn 8:3
pennsylvania
24:1
people 22:14
32:4 35:15
54:11 56:18,21
59:11 70:12
97:8,9 107:19
pepper 7:9
17:8
percent 23:2,3
23:6,15 24:21
24:23 28:3
38:7,9,9,10
40:11,13,14,24
40:25 42:17
46:14,18 63:12
63:20,22 64:3
64:10,11 68:21

73:13 85:18
87:14 108:6
percentage
39:4,6,9 46:13
perfect 9:14
14:2
perform 2:4
permission
22:15 30:4
108:4 109:19
permit 63:19
81:13
permitted
64:23
persistent
101:25
person 87:12
personal 66:17
persons 19:21
pertaining
77:17
pertinent
87:20
pesce 5:13 10:6
10:8 12:6,6
43:3,5,22
44:11 51:21
52:17,19,19
55:23 57:10
83:1,6,7
pesce's 58:13
58:23
petition 69:17
69:23 72:8
77:5 82:14
90:6 101:21
108:21,23

112:6
phishing 65:23
65:24 66:11
68:7
pick 46:18
picked 23:21
picking 46:9
picks 26:13
picture 85:7
piecemeal 53:5
pillay 7:7 17:5
17:5
place 34:11
49:25 51:12
66:21 71:4
76:12 103:24
104:8
placed 106:13
places 68:2
placing 33:15
plain 99:22
plan 32:15
33:22 34:12,12
34:13 35:8
37:4 44:17,21
44:21,21 47:20
48:12 50:24
51:17 53:2,21
55:1 59:11
60:11 61:1
64:5 80:17
86:22 99:14
103:2,23,25
105:5 106:19
plane 105:8
plans 33:19
48:2,4,21

51:17
platform 3:15
32:23,25 34:22
41:1 44:9
60:19 64:21
75:24 84:15
88:22 93:11
plaza 8:3
plc 91:8
pleading 51:24
102:11
pleadings
22:11 27:15
66:11
please 10:21
11:21 12:3
14:6,23 15:2
15:20,22 16:1
16:6 17:3,25
18:23 19:8,12
19:16,20 22:17
25:5 32:17
66:11 71:22,24
74:12 83:17
96:25
plug 26:3,5
pm 111:3
podium 62:17
62:20,25 72:18
point 25:24
30:20 41:22
42:7,19 43:13
46:11 48:3,7
48:10 50:2
58:24 60:20
64:4 92:2
97:11 103:1,22

105:23 107:1
109:11
**pointing** 100:1
**points** 39:19
50:23 51:25
52:11,21 54:20
56:12 84:19
96:15
**policies** 93:16
**policy** 90:19,21
90:23 92:2,4
93:13,17,19
**population**
46:5
**portfolio** 33:7
38:19 39:6
41:24 50:17
88:25
**portfolios**
33:10
**portion** 55:1
**portions** 62:8
**position** 30:22
46:20 56:6
58:21
**positioned**
60:9
**positive** 22:4
23:12 24:11
80:15
**possession**
69:16
**possibility**
51:18
**possible** 41:15
41:18 42:13
62:8 67:9

95:19 101:2
**possibly**
106:19
**post** 69:17,23
72:8 108:21
112:6
**posted** 22:14
**posting** 36:22
**postpetition**
2:6,11
**potential** 33:21
34:3,7 49:10
**potentially**
100:21 108:8
**power** 34:6
**practical** 101:7
**practice** 47:21
**practices** 104:8
**precautions**
67:14
**precise** 59:21
**predates** 93:9
**preference**
72:3
**preferential**
104:24
**preferrable**
53:4
**preferred** 6:16
13:3 54:13
57:1
**prefers** 96:3
**preliminary**
80:14 86:9
**prepaid** 27:16
**prepared**
37:12 38:15

85:18
**prepetition** 2:3
88:5
**present** 54:5
96:17 97:22
**presentation**
9:10 39:13
**presented** 90:1
**presenting**
69:17
**presents** 94:15
**pressure** 23:10
**pretty** 38:25
85:24 89:5
102:1
**prevented** 84:8
**preview** 47:22
55:5
**previous** 27:22
**previously**
21:3 49:12
50:15 91:8
**price** 23:10
24:9,20,23
27:23 28:2
74:16
**prices** 24:8,13
24:16 26:6
33:14 34:6
39:8
**pricing** 34:5
**principles** 60:7
**prior** 20:18
23:7 25:7
61:21 63:9,18
64:18 77:4
78:2 90:6,6

**priorities**
35:17 59:12
**priority** 43:15
**pro** 8:9,10,11
8:12,13,14,15
8:16 11:13
12:12 16:9
18:3 62:2
69:20 96:1,17
**probably** 39:8
40:23 53:24
54:9 55:2
71:13 107:9
**problem** 16:21
16:21 59:23
101:7 106:14
**problems**
48:18 50:25
51:12
**proceed** 68:13
**proceeded** 55:9
**proceeding**
15:9 56:10
94:11 106:24
**proceedings**
19:22 20:1
84:12 108:9
111:2 113:4
**proceeds** 93:18
**process** 30:18
32:15,19 33:12
35:7 44:17
47:2 50:23
51:3,5 52:21
53:17 68:14,17
71:3 86:23
97:20 98:3,13

98:18,19,21
100:11 104:1
107:18
**processing**
63:15
**productive**
28:5
**products** 48:9
**program** 35:3
35:9,13,16,24
36:25 40:2
49:3,4 59:4,6
64:23 81:1,2
81:22 86:19
87:7,7 103:11
**programs**
35:13 36:17
**progress** 37:16
56:9
**prohibited**
19:22
**prohibition**
19:24
**project** 51:10
**projects** 27:24
33:10
**promised** 70:2
70:7
**prompt** 86:11
**promptly**
72:15 95:14
99:10
**proper** 110:12
**property** 3:11
3:21 35:4 59:8
61:6,6 76:25
77:10 101:13

104:18 106:21
108:17
**proportionate**
57:7
**proposal** 42:21
42:22 84:20
**propose** 61:13
61:15
**proposed** 36:5
37:3 51:17
70:9
**propound**
59:10
**proprietary**
22:25 23:2
73:1
**protection**
84:10 104:25
**protections**
70:10
**protracted**
36:8 41:16
**proven** 67:3
**provide** 22:18
40:1 43:10
49:6 50:3 55:1
60:11 65:18
66:20,21 67:5
67:8,16 74:2
82:7 94:19,23
98:8
**provided** 3:2
24:21 45:11
66:18 86:10
93:16 94:3
96:12,20 97:14
98:9,12 102:22

105:22 106:5
**providers** 24:7
**provides** 51:1
53:2,3 73:10
99:22
**providing** 43:9
65:20,20 85:4
**provision** 86:2
**public** 24:14
50:9,12 77:21
**pull** 57:21
**pure** 61:20,22
63:16,24 67:15
71:15,17,19
72:2
**purely** 16:13
**purpose** 73:2
**purposes** 38:9
**pursuant** 63:5
86:22 99:14
**push** 57:21
**put** 13:4 32:7
36:15 37:21
38:5 41:23
49:3 53:15
59:20 60:11,18
62:14 71:3
80:6 86:16
87:4 103:24
104:18
**putting** 29:21

**q**

**qs** 50:13
**question** 25:3
25:18 26:17
28:20 30:24
35:23 38:14

41:25 49:22
61:18 71:15
75:14 76:20
82:16 83:5,16
87:12,22
**questioned**
29:1
**questioning**
100:4
**questions**
17:10 22:3,5,8
28:19 47:13
50:19 56:13
62:22 67:12
70:17,24 74:8
80:13,19 81:17
81:20 87:8
91:2 92:18,19
93:3
**quick** 54:22
91:22
**quickly** 101:1
**quite** 22:6 48:5
53:7 107:19
108:1,12

**r**

**r** 1:21 4:1 6:13
9:1 83:12,12
113:1
**race** 100:17,22
**rack** 85:24
**radar** 37:18
69:25
**raise** 10:11
11:17,21 12:3
17:25 43:6
71:25 98:21

**raised** 10:13
16:2 32:1
39:12,25 41:6
43:14 48:8
74:11 83:12
84:19 87:10,24
89:9 99:18,19
**raises** 35:23
39:19 42:5
61:18
**raising** 87:20
**range** 37:22
46:17
**rata** 62:2
**ratable** 45:7
61:14
**ratably** 73:16
**rather** 31:15
36:9 45:18
49:17
**rationale** 80:6
**ratios** 86:4
**rattling** 31:7,9
**reach** 27:14
36:4 53:25
64:3 71:24
104:18
**reached** 47:25
79:1
**reaching** 37:8
43:16
**read** 16:10
19:17 28:22,25
29:14 54:11
55:5,19,22
60:20 86:13
87:14,17 102:7

102:7
**readily** 46:1,1
**readmit** 14:2
**reads** 77:15
**ready** 48:5
59:14 62:21
**real** 91:22
**realize** 60:1
**really** 29:16
41:2,16 47:8
48:3,13 51:6
53:9,11 57:5
57:19 58:6
80:13,14 87:20
88:9 97:21
102:24 110:5
**reason** 60:16
102:9
**rebecca** 3:16
8:12 10:20
101:12
**rebounded**
23:14
**rebounding**
39:9
**recall** 21:2
**receivables**
34:21
**receive** 27:13
27:17 57:6,17
65:16 66:2,5
70:8,14 74:5
77:6,8,24
99:13
**received** 32:6
32:20 33:2
41:23 42:5

70:1 80:2
106:9 108:22
**receives** 66:6
**receiving** 35:19
55:11 73:24
**recent** 16:11
23:1,18 26:1
34:5 65:23
**recently** 23:3
25:3 47:23
55:20 90:14
**recess** 15:23
**recognition**
44:12 94:11
**recognize** 48:7
107:8
**recognized**
94:20 98:22
**recognizing**
107:4
**reconciliation**
82:5
**reconsider**
89:17 93:21
**reconsiderati...**
3:6 91:16,20
**reconsidering**
93:21
**record** 9:18
10:19 11:16,20
11:22 12:3,5
12:24,25 13:5
13:11 14:5,15
14:22,24 15:1
15:19,25 16:17
17:2,10,15,18
17:24 18:6,16

18:19,22 19:6
19:8,12,16,18
20:2,4 35:6
63:4 65:13
69:20 80:6
81:3 83:6
85:20 86:6,21
92:19 95:24
113:4
**recording** 9:2
15:22 19:22
20:1
**recover** 27:16
51:1
**recoveries**
54:24,25 56:6
**recovery** 32:24
33:17,20,23
34:10 44:22
45:1,6,9,19,22
45:23 46:20,25
47:1,3 48:14
48:21,23 49:7
49:14 50:8,11
53:21 54:3
**recurring**
69:25
**red** 83:8
**redact** 87:5
**reduces** 89:3
**redundant**
101:16
**reexamining**
55:12
**refer** 96:25
97:3

references 82:9
referred 30:25
  77:14
referring 33:16
  45:4 109:15,16
  109:16
refers 105:15
reflect 45:5
  86:17
reflected 64:19
  83:8 106:16
reflects 79:5
regarding
  20:19 21:4
  63:7 69:23
  83:16 84:20
  93:17 96:10
  107:13
regardless
  63:21
regards 96:18
  97:11,17
register 50:3
  101:25
registered
  48:23
regulations
  48:9,25
regulator
  103:23
regulators
  47:14 48:1,6
  103:21 104:23
  105:23,25
regulatory
  48:18

rehypothecat...
  103:14
rein 105:1
reinstating
  81:4
reiterate 64:18
  65:4
reject 26:19
rejection 21:15
  21:20 23:18
  26:20,23 27:9
relate 78:7
  80:17 82:13
related 2:3,7,8
  2:13 3:3,16
  34:4 49:22
  55:17 57:19
  71:15 78:5,8
  97:18
relating 96:2
relation 91:11
relationship
  78:5 91:8
  98:15
relationships
  29:12
relative 16:9
  35:12,16 38:11
  39:3,6 46:11
  58:5,7 59:2,12
  107:22,23,23
relatively
  31:12
release 30:4
  88:22
releasing 84:3

relevant 78:2
  99:21 100:5
  105:16
reliance 97:14
relied 59:17
relief 2:7,13
  3:3,7 83:4
  86:22 88:7,12
remain 91:3
remainder
  30:19 40:14,22
  73:16
remaining
  44:13 62:9
  78:20 85:14
remains 29:9
  34:12 50:18
  102:17
remedies 3:2
  86:3
remind 17:20
reminded
  17:20
reminder 63:8
removed 92:4
rent 27:2,16
reopen 64:16
reorganization
  42:14 53:10
  80:17 103:23
  105:5
repeat 105:14
repeated
  101:23,24
repeatedly
  93:15

reply 80:4 86:8
  90:10 91:17
  96:7,8,12
report 25:4,5
  25:10,15 29:3
  29:13,14,19,21
  30:13 31:19
  41:4 55:2,13
  57:25 58:2
  66:7,9 85:18
reporting
  25:11
reports 23:12
  28:25 50:12,12
represent
  40:25 78:4
represented
  88:3 91:9
representing
  12:19 16:8
represents
  37:6 75:9
request 80:7
  81:19 95:11
requested 3:7
  30:20
requesting
  108:12,20
require 33:13
  36:6,6 53:15
  53:16,22,23,23
required 87:4
requirement
  38:21
requirements
  102:11

requires 54:9
54:10,12
research 84:9
reserved 98:17
reserving 64:2
resolution 36:5
37:8 41:16
42:13,24 43:8
44:11 62:6
98:18
resolve 36:1
54:12
resolved 44:14
62:1,5 63:13
68:24
resolves 99:17
resources
101:5
respect 21:18
27:20 28:20
32:14 34:8
40:1 48:11,24
59:3 72:7
76:13 78:20,21
81:14 84:13
86:11 88:7,20
respectfully
72:18 81:18
respecting
59:12 61:2
respond 39:19
43:18 87:25
88:2
responded
21:12 107:6
response 87:8
96:12 102:15

rest 41:23
101:8 107:1
restructuring
53:2
result 19:24
27:22 56:19
57:14 73:17,17
98:23,24
retail 36:25
37:5,6 38:4,21
40:1,16 44:1
50:16 81:2,7
86:2,18 87:7
88:13,13
return 2:11
23:19 54:7
59:22 60:15,25
61:5,10 69:17
70:12 88:14
99:15 101:1
103:2 107:21
107:21
returned 35:22
61:22 64:25
67:21 71:1
83:18
returning
44:15
returns 59:11
105:9
revealed 33:13
revealing
107:16
review 52:2
58:2
reviewed 71:10
72:10 78:13

revised 70:15
70:19 72:14
74:6 79:4
80:24
ride 49:14
right 9:2 10:1
10:9,10,18
11:2,4,7,10,19
12:2,15,22
14:2,4,9,11,14
14:19 15:5,18
15:22,24 16:22
17:1,12,17,23
18:4,10,14,15
19:5,10,14,17
19:21 21:13,21
22:24 25:16
26:2 31:18,21
32:10 33:6
36:14 39:11
44:4 46:19,24
49:16 50:7
51:7 52:17
53:10 58:10
59:11,11,24
60:9 62:14
68:2 69:4
70:20 71:10,12
74:10 76:18
77:13 79:15,16
82:16 83:1,11
87:23 89:6,11
92:20,23,24
95:4,6,8,8,13
95:20 96:4
100:12 101:9
105:8,10 107:2

108:10 110:25
rights 3:2
35:12,16 59:2
59:13 61:2
84:13 88:20,20
rigs 21:23,25
22:1,24,25
23:1,20,20,21
23:22,23,23,25
24:2,4,7,14
25:19,22,23,24
25:25 26:1,3,5
27:8 80:5,16
risen 85:17
risk 68:10 86:9
89:3 106:7
risks 54:5
60:17
road 113:21
robert 83:6
robust 64:3
roll 37:13
room 9:6,10,12
9:13 20:5
37:25 90:4
100:15
ross 4:8 9:11
26:10,22 58:12
roughly 38:7
90:22
rule 64:5 85:21
rules 99:12
ruling 3:20
28:10 35:2
57:15 95:1
98:4,7,10
99:25 101:12

101:20 102:20
105:18,18
106:20 107:13
107:25 108:6
108:16 110:7,9
110:14
**rulings** 61:21
112:3
**run** 20:23
**runway** 105:6
105:7
**rushed** 100:18

**s**

**s** 3:17 4:1 9:1
**safe** 65:13
**safeguards**
88:19 89:1
**sale** 3:6 25:22
27:23 32:15,19
33:14 34:8
50:23 52:21
79:21,24 80:20
89:18 90:15
91:23 92:1
93:17,21 94:2
94:4,5,6,6,12
94:21 112:8
**sanctions**
19:25
**sanders** 7:9
**satisfied** 80:17
80:19
**satisfy** 47:3
99:7
**save** 57:11
**savings** 104:16

**saw** 29:18,18
29:21 98:7
**saying** 70:11
76:2 86:23
91:13 104:12
**says** 13:20
49:17 59:16
86:9 96:21
**scale** 81:9
**scams** 68:7
**scenes** 51:14
**schedule** 64:8
64:12,13 65:1
65:5 71:16,22
71:23
**schedules** 40:6
59:20 72:4
**scientific** 20:23
21:20 23:19
26:11 28:5
**screen** 20:16
89:9
**screenshot**
19:23
**se** 8:9,10,11,12
8:13,14,15,16
11:13 12:12
16:9 18:3
69:20 76:21
96:1,17
**second** 25:13
28:18 31:6
32:22 79:9
87:12 88:18
97:11
**secondly** 90:7

**section** 32:2
73:23 77:14
78:11 79:3
**secure** 23:19
67:17
**secured** 56:23
57:3,11 58:8
**securing** 82:22
84:1,5
**securities**
103:10
**see** 10:23,24
14:11 16:2
20:14,16 29:4
30:9 31:25
39:12,21 49:15
61:16 71:21
90:2 93:5
95:16
**seeing** 41:15
**seek** 88:7
**seeking** 2:10
2:23 73:18
77:6 82:17
83:5 88:9
101:12 108:15
**seeks** 56:4
**seem** 39:9
41:18 51:7
90:17
**seemingly** 90:5
**seems** 34:25
90:12
**seen** 24:19 29:4
40:5 45:17
47:9 86:17

**segal** 8:1,1
18:8,8,24,25
**self** 54:6,8,8,9
**sell** 2:20 21:23
28:7 33:13
49:17 90:25
**selling** 25:18
25:19 51:4
80:16
**send** 65:14
72:12 84:21
95:18
**sender** 78:5,7
**senior** 57:8
58:8 92:16
**sense** 64:25
76:23 98:13
**sent** 24:2 65:18
68:9
**separately**
9:17
**series** 6:16
81:15
**serious** 102:1
104:3
**seriously** 26:15
**service** 73:22
104:23 110:12
**services** 27:13
49:6 67:1,3
**serving** 2:25
85:6
**set** 41:20
104:21
**sets** 79:5
**seven** 23:5
100:4 110:3,6

[seven - speak]                                                    Page 38

110:14
**several** 20:17
46:16,16 52:14
56:2
**severe** 89:5
**severely** 101:4
**shanks** 15:4,4
15:5,7,10,13
15:15,17
**shara** 6:6
13:14 70:22
79:11
**share** 45:4,7,10
45:18 49:12,21
64:13
**shareholders**
13:3
**sheet** 29:15
99:8 101:7
106:22
**shoba** 7:7 17:5
**shock** 104:11
**shooting** 95:5
**shop** 97:16
**shortfall** 61:23
62:10 63:8,10
63:11 68:22
**shortly** 21:11
27:15
**shot** 53:10
**showing** 86:17
**shut** 109:1
**shy** 43:16
**sided** 104:11
**sides** 110:17
**sight** 26:3

**signature**
113:7
**signed** 52:1
**significant**
24:11 27:1
35:1 37:10
44:8 47:4,7,19
55:1 61:5
88:19 89:1
94:9 99:8
106:11
**similar** 59:19
73:1 86:18
90:7
**similarly** 60:9
96:23 100:23
100:25
**simon** 8:11
76:21
**simplistically**
38:2
**simply** 33:11
51:4 74:24
99:6 100:16,17
106:15,21
**single** 25:15
51:24
**sir** 15:16 75:10
108:19,19
**site** 23:24,25
24:2
**sites** 22:25 23:2
24:4
**situated**
100:24,25
**situation** 20:19
20:21 31:3

33:4 74:22
104:10 108:24
**situations**
31:13
**six** 85:7
**skip** 91:22,22
**slice** 46:5
**slightly** 23:9
24:1
**slipped** 69:25
**small** 25:22
87:15
**smaller** 46:13
46:15 47:8
81:9
**snapshot** 72:24
73:4,7 75:16
75:25 76:3,17
77:4
**sneak** 55:5
**social** 34:24,25
54:11
**soft** 38:12
**sold** 28:9 93:17
**solely** 77:20
**solicit** 44:21
**solution** 43:10
**solutions**
113:20
**somebody**
49:16 104:14
**somewhat**
20:21 45:2
49:3,22
**sonya** 3:25
113:3,8

**soon** 52:16
62:8 67:9
95:19 110:24
**sooner** 52:13
**sophisticated**
36:19
**sorry** 16:21
40:19 74:13
87:22
**sort** 21:19 22:9
35:16 36:22
38:5 39:9
42:15 45:6,13
45:18 46:5,8
46:16,24 59:2
69:25 91:13
**sorting** 59:6
**sorts** 42:6
**sought** 98:4
105:18
**sound** 74:2
81:6 88:15
89:2
**source** 107:11
**south** 5:3,10
**southern** 1:2
**southfield** 7:12
**sparked** 34:6
**speak** 12:8,13
16:5 19:1 20:4
32:5 33:12
39:15 52:18
53:12 56:14
83:22 89:12,23
90:4 107:4
110:24

| | | | |
|---|---|---|---|
| **speaking** 9:17 | **stable** 27:24 | **statement** | **subject** 34:13 |
| 10:6,19,22 | 28:7,9 38:23 | 14:18 86:9 | 68:11 78:6 |
| 11:16,20 12:3 | 38:25 40:15 | **statements** | 90:18 104:16 |
| 12:20,23,25 | 45:25 | 59:20 | **submission** |
| 13:4,11,16 | **stablecoin** 84:7 | **states** 1:1,12 | 95:14 101:10 |
| 14:5,15,21 | 85:10,11 | 6:1,9 7:16 | 107:3,7 110:18 |
| 15:1,19,25 | **stablecoins** | 12:20 13:15 | **submit** 72:15 |
| 17:2,9,21,24 | 3:20 | 17:14 70:23 | **subordination** |
| 18:5,16,19,21 | **stages** 59:14 | 79:12 94:10 | 58:4,6 |
| 19:6,8,11,15 | **staked** 33:8 | 104:6,24 | **subsidiaries** |
| 29:14 53:14 | **stakeholder** | **status** 2:6 | 91:6 |
| 67:10 89:22 | 53:16 | 17:11 62:15 | **substantial** |
| 105:24 | **stakeholders** | 80:15 | 46:9 56:23 |
| **special** 92:8 | 36:13 99:15 | **step** 98:1,13,19 | 57:3,8 70:6 |
| **specific** 32:4 | 100:24 | **steps** 67:18 | 104:9 |
| 39:12 74:22 | **stand** 30:15 | 68:12 94:9 | **substantially** |
| 80:5 87:21 | 37:12 | **stick** 60:1 | 81:7 86:1,18 |
| 91:19 98:1 | **standalone** | **stipulated** | **substantive** |
| 110:21 | 33:20 37:2 | 59:19 | 104:9,13 |
| **specifically** | **standard** 87:3 | **stipulation** | **successfully** |
| 21:18 88:19 | 91:19 104:6 | 27:9 78:19 | 100:20 |
| 105:14 109:8 | **standing** 96:11 | **stop** 31:6,9 | **sucks** 58:8 |
| 109:24,24 | **standpoint** | 35:18 71:4 | **suffering** |
| **specifics** 37:13 | 29:15 | **storage** 24:2 | 107:20 |
| **specify** 11:8 | **stands** 62:12 | 103:12 | **suffice** 37:13 |
| 15:6 | **start** 13:19 | **straight** 53:3 | 50:20 |
| **spend** 61:8 | 20:8,19 22:8 | **stratify** 46:6 | **sufficient** |
| **spending** 53:6 | 67:7 98:2 | **street** 5:3 6:10 | 85:19 86:6,20 |
| **spike** 24:16 | 102:24 | 6:17 7:3 | **suggest** 67:21 |
| **spoke** 22:2 | **started** 19:19 | **stress** 24:17 | **suggested** |
| 69:20 76:5 | 24:6 51:5 | **strictly** 19:21 | 29:22 63:15 |
| **sponsor** 34:14 | **starting** 9:2 | **structure** 47:6 | **suggesting** |
| 51:17 | 34:14 47:23,25 | 51:8 56:22 | 108:13 |
| **sponsors** 33:22 | **state** 16:16 | 58:15 | **suggests** 101:4 |
| **spread** 36:21 | 20:3 48:25 | **structured** | **suite** 5:3,10 |
| **square** 77:2 | 55:20 102:11 | 98:3 | 7:11 8:3 |
| | 108:23 | | 113:22 |

**summary** 50:4
**superpriority**
  2:5
**supplementary**
  16:10,11
  107:15,24
  109:2
**support** 24:22
  77:19,21,22
  79:24 85:20
  92:14 97:7
**supports** 38:16
**supposed**
  97:20
**sure** 10:6,22
  12:13 17:9
  21:9 22:10
  29:25 36:15
  51:22 52:5
  53:11 55:9
  62:5 64:14
  65:3,4,8 67:13
  67:14,14,23
  68:4,16 71:6
  71:16 82:20
  83:23 90:23,24
  92:3 95:18
**surely** 76:24
**surface** 47:22
  48:5
**surge** 34:5
**surplus** 22:1
  25:18
**surprised**
  20:25
**surprising**
  34:24

**sustained**
  95:12
**syndicate**
  90:21
**synopsis** 52:11
**system** 2:2

**t**

**t** 113:1,1
**table** 38:1
**tail** 67:6
**take** 10:12
  11:18 26:15
  27:11 31:5
  34:11 38:8
  40:7,15,20
  46:21 49:4
  64:11 65:11
  68:12 81:5,13
  81:14 82:17
  84:5,11 85:7
  86:25 88:16
  89:6,13 95:13
  98:1 101:10
  105:25 107:2
  110:18
**taken** 38:23
  53:7 67:18
  68:4 76:3
  78:14 93:4
  94:8 107:7
**takes** 103:24
**talk** 36:17
  39:16 70:16
  85:21
**talked** 26:10
  100:15

**talking** 24:6
  25:14 37:23
  68:19
**targeting** 95:6
**tax** 42:15 74:20
  74:22,23 96:18
  97:15 99:19,20
  99:24,24
**taxable** 74:15
**taxes** 97:12,15
**team** 33:25
  46:4,4 49:8,8
**tee** 41:18
**teed** 57:2
**tell** 15:12 25:10
  40:14,19 65:13
**temporary**
  24:2
**ten** 38:7,10
**tens** 36:25 44:3
**terms** 17:10
  21:4 32:5 37:1
  51:16 53:25
  73:21 77:14
  78:10 81:10
  83:18 96:22,25
  97:8 98:5,8,10
  98:11,14 100:7
  103:6,8 104:11
  104:23 105:20
  105:21,21
  106:4 109:23
  110:2,10
**test** 25:21
**testimonies**
  96:18,20

**testimony**
  55:11 97:6
  100:2
**texas** 23:25
  24:3 26:18,25
  27:15
**thank** 9:15,16
  9:24,25 10:18
  11:1,7,10,14
  12:1,10,15,22
  13:6,9,16,17
  14:9,10,12,13
  14:19,20 15:5
  15:17 16:7,23
  16:25 17:12,16
  17:22 18:4,10
  18:14 19:4
  20:9 29:25
  30:5,7 31:18
  31:21,22,24
  32:9,11 41:3
  42:10 43:1,20
  52:19 58:10
  63:1 69:4,11
  71:7,9 72:6,7
  72:12,16,17
  75:10 77:13
  78:15,16 79:14
  79:18,19 80:11
  80:12,21 83:6
  87:9 89:16,21
  92:9 93:2
  95:17,22 96:6
  97:23,24
  101:15 105:10
  105:12 107:11
  109:13 110:19

110:23,25
**thanks**  22:22
  25:8 71:14
**that's**  9:12,17
  13:21 16:22
  24:15,21 32:15
  35:21 37:3
  38:25 40:13
  41:2,4 42:2
  45:19 50:20
  52:8,16 53:6,7
  53:22
**theme**  56:1
**theories**  101:4
**thereto**  2:3
**there's**  24:14
  34:23 35:1,14
  36:19 41:25
  42:16 47:5
  48:7,19 52:14
**they're**  44:8
**they've**  9:21
**thing**  26:9
  56:16 62:23
  67:19 85:25
  88:18 102:2
**things**  29:20
  30:15 33:8
  39:16 41:21
  43:5 51:6,20
  52:22 53:5
  105:1
**think**  22:5
  25:22 26:12,12
  29:10 30:3
  34:16 35:20,23
  35:25 36:20

37:4,9 38:2
39:17 40:22
41:4 42:22
43:7 44:3,5,25
45:3,10 46:7
46:17,24 48:4
48:19 50:2
54:3,22 57:13
57:18,24 59:5
59:17,18,21
60:10 61:4
62:6,14,20
63:25 67:18
68:6 80:18
85:19 86:5,21
87:1,2,3,14
100:5,5 101:2
101:19 102:18
102:23 105:6
105:23 110:6
110:20
**thinking**  44:17
  48:11
**third**  32:23
  33:22,23,25
  36:18 49:2,5,9
  49:10 66:2
  90:20 93:8,12
**thoroughly**
  38:14
**thought**  16:18
  21:8 29:23
  32:12 44:3
  61:24,25 62:4
  70:6 87:17
**thousand**
  46:17

**thousands**
  36:25 44:3
  104:15
**three**  32:20
  84:9 90:6
  96:15
**threshold**
  45:12,14,16
  46:2,8 72:3
  98:10
**thresholds**
  46:7
**tied**  39:1
**ties**  21:24
**time**  10:11
  11:17 14:23
  15:3,12,15,20
  17:4 18:1,23
  20:3 29:6 33:1
  33:18 35:5
  44:20,23 45:2
  45:9,20,21,24
  46:20,23 47:3
  49:4 51:7,10
  53:6,8 55:6
  60:1 66:10
  69:21 75:15
  83:22 89:4
  95:22 96:14
  104:8,17
  107:18 108:3
**times**  56:2 90:9
  93:22
**timestamps**
  102:16
**today**  9:10
  21:22 26:14

29:25 32:3
34:17 35:21
37:12 43:6
50:20 52:1,1,2
52:12 53:7,14
54:3,11 56:15
96:15 101:16
101:17 109:6
109:21 110:21
111:1
**today's**  107:13
**today's**  51:23
**together**  44:11
  49:3 77:2
  87:18
**togut**  8:1 18:8
  18:24
**token**  45:5,18
  49:14,17,21
  50:10 72:23
  73:3,4,15
  75:24 76:11,13
  76:15
**tokenize**  45:3
**tokenized**
  53:21 54:3
**tokens**  2:17
  45:8,10 49:12
  73:6,8,11,14
  73:18,24,24
  74:1 76:9,16
  77:5,7,9,12
  112:7
**told**  86:8 105:2
**tomorrow**  52:9
**ton**  53:11

took 40:6,16
75:15
top 26:10
38:10 40:20,21
40:24
topic 39:12,15
39:18 43:4,6
44:1 54:22
topics 21:16
total 46:19
70:5 73:14
81:10 82:7,11
82:12 83:20,24
84:25
tou 109:4
touch 25:18
touched 82:25
touching 82:20
toward 94:9
towards 27:3
56:10
town 7:11
track 22:12
50:3
tradable 46:1
49:13
trade 57:12
trading 49:21
49:24 50:5
75:1,5 103:15
traditional
58:9,19
transaction
34:11 64:20
94:9,13,15
95:15

transactions
2:5 29:10 34:3
34:8
transcribed
3:25
transcript
28:18,21 29:24
51:23,25 52:14
52:15 97:1,4
113:4
transcripts
52:15
transfer 2:24
33:3 54:4
69:25 70:13
106:5,7 109:9
109:25
transferred
66:25 67:17
90:15
transfers 2:12
69:17,23 70:3
70:5,11 72:8
112:6
transition
21:19
translate 45:1
translation
94:22
transmission
103:15
treat 75:23
76:15
treated 60:9
61:4 77:23
treatment 37:3
58:1 76:10

100:23
treats 61:1
tremendous
24:19
trending 23:3
trends 24:8
trials 60:22
tried 82:5
91:16
troutman 7:9
17:8
true 33:25
113:4
trust 55:14
60:4 100:19
trustee 6:2
7:17 13:15
17:14 47:15
48:6 70:23
78:18,23 79:2
79:8,12
trustee's 67:24
trustee's 13:12
47:19
truth 69:2
try 36:1,4
43:17 47:22
49:15 68:21
100:18
trying 42:12,25
44:11 60:22
76:22 77:1,1
90:18 95:15
tuesday 84:19
tuned 51:25
turetsky 4:19
10:3,4 12:8

turn 17:21
turning 97:25
99:18
tweaks 85:25
tweed 6:15
twice 53:12
two 28:25
47:13 57:19
86:21 91:12
95:3 103:24
104:1 106:1
type 31:3 34:11
86:22,23
100:21
types 71:4

**u**

u 83:12
u.s 78:18
u.s. 1:23 6:2
7:17 13:12
46:8 47:15,19
48:6 67:24
78:23 79:2,8
ubierna 8:13
11:13 80:3,9
80:10,12
ucc 88:21,23
uk 104:22
ultimate 99:1
ultimately
53:25 101:5
unable 109:20
unaccredited
104:14
unambiguous
99:23 100:1,8
103:8 104:12

**unambiguou...**
98:8,11 105:22
**unanswered**
91:2 93:3
**uncollectable**
86:10
**unconsciona...**
97:17,18 100:9
100:19 104:5,5
104:9,13 106:4
**unconsciona...**
100:12 104:7
104:17
**under** 3:2 27:7
31:1,15 37:1
38:1 55:1,15
63:24 78:23
82:10 84:10
85:15 87:2
88:5 89:13
95:14 100:3,3
101:10 103:6
103:18 104:25
106:18 107:2,7
110:18
**understand**
36:10 38:14
40:3 56:22
58:2 60:18
76:18,22 77:1
77:3 78:3
91:15 95:14
96:22 102:8
108:12 109:11
109:12,13,18
110:16,17

**understanding**
29:9 39:5
40:16 57:10
58:4 71:5
82:22
**understands**
65:5 68:16
**understood**
60:17 68:3,25
69:3 109:22
**undisclosed**
91:9
**undisputed**
62:7
**undoubtedly**
44:19
**unearned**
108:6
**uneducated**
41:22
**unenforceable**
104:8
**unfortunately**
51:3 67:1
**unhappy** 56:18
**uniform** 78:25
**unique** 33:5
36:22,23 70:4
81:10 82:9
**united** 1:1,12
6:1 7:16 13:15
17:14 70:23
79:12 94:10
**universe** 38:11
**unmute** 10:21
11:17,22 12:4
14:6,23 15:2

15:20 16:2
19:9,12
**unplugged**
27:9
**unreasonable**
104:6
**unsecured** 4:15
5:2,9 56:24
57:4 98:24
99:3
**unsupported**
77:24
**unwind** 88:10
88:25
**update** 17:11
20:19 21:17
22:18 25:6
29:4,7,13
30:11,15 32:14
50:20 67:5,8
**updated** 25:3
64:8
**updates** 32:6
**upside** 24:11
26:6
**uptime** 23:1,4
**urge** 41:13
**usdc** 63:22
**use** 10:12
24:14 49:5
77:14 85:22
96:22 97:8
98:5,8,10,11
98:14 100:7
103:6,8 105:21
106:5 107:20
109:23 110:2

110:10,11
**used** 24:15
44:23 58:3
105:2,7
**user** 55:4 66:1
66:6 110:11
**users** 44:9 56:1
65:10,13,19
70:4
**usi** 93:13,24
**using** 22:1
**usually** 22:3
52:14 103:23

---

**v**

**valid** 103:17
105:19
**value** 28:3 33:1
33:18 34:18
35:8 37:11
38:16 39:2
44:23 45:5
46:1,8,22,22
51:2,9 52:24
53:3 54:2
57:17,20 58:8
58:22 59:5,11
60:14 61:5,12
73:25 74:3
82:13 83:18
85:1 86:4,12
88:11,17 90:23
94:6,14 99:10
99:11,13,15
101:1 103:3
106:18
**valued** 74:24
90:22,24

[values - white]

**values** 82:14
**variety** 65:24
66:8 83:9
**various** 44:24
49:20 84:6
90:9 91:5 93:5
93:25 101:23
**vast** 27:12
40:12 59:3,4
**vazquez** 71:12
71:14 72:6
**vehicle** 51:1
**vendors** 57:12
**verbatim** 28:22
**veritext** 113:20
**version** 109:23
109:25 110:3,4
110:5,6,6,13
**versus** 53:3
54:3 58:5,18
63:11
**victor** 8:13
11:10,12 80:3
**video** 13:19,23
19:23 61:16
**videos** 17:21
**view** 41:5,22
43:13 57:18
**viewing** 9:13
**views** 35:25
**vince** 30:9
**vincent** 7:6
13:7
**violation** 19:24
**virtual** 89:19
**vital** 55:24

**volatile** 39:2
60:17
**vote** 53:17
**votes** 44:21

**w**

**wacker** 5:10
**wagging** 67:6
**waiting** 20:5
**walk** 80:5 81:2
**wallets** 63:11
**want** 10:22
27:17 29:3,4
34:23 35:5
38:13 39:16,19
43:2,4,24
48:11 49:14
51:22 52:5,17
52:20 53:11,13
53:19 54:19
55:23 58:13
62:5 65:2,22
65:24 66:14
67:7,10,13,25
69:5,5 71:6
75:9 77:9,10
80:9 82:20
84:24 86:23,24
89:8,9 95:9
97:11,25 103:1
103:19 105:5,8
105:14 107:16
107:18 108:2
109:6 110:22
**wanted** 16:12
21:8 25:17,21
29:25 39:25
40:17 41:2

43:5 51:14
55:18 56:12,16
71:2,15 96:7
98:1 104:4
107:21
**wanting** 42:8
**wants** 60:1
67:19 105:7
106:20
**washington**
6:11,18 9:20
**wasn't** 29:19
38:14
**waste** 60:21
108:3
**wasteful** 101:5
**watching** 63:8
**way** 22:10 27:2
30:21 31:14,15
38:2 51:11
53:18 61:14
67:15 90:1
97:22 98:3
**we've** 55:3
56:2 58:14,15
59:19,19,24
62:7 68:4,14
68:18,19 70:24
79:13
**website** 89:25
90:11,19 92:4
93:22 94:1
**week** 23:22,22
25:14 27:24
28:12,25 55:2
63:6 64:12,16
64:17 65:6,7

87:13
**weeks** 47:24,24
51:16 90:6
94:13
**welcome** 14:13
51:11
**went** 22:9
29:23 52:12
**we'd** 47:9
**we'll** 27:15
36:15 39:15
47:22
**we're** 26:24
27:13 37:22
43:14 44:17
45:2,4,12,22
47:1,2,8 48:11
48:20 49:19
50:4,15 53:14
54:17
**we've** 26:11
30:18 31:13
32:6 35:11,13
36:12,15 37:7
37:16 42:12,20
42:21,22 43:8
44:6 46:3 47:9
47:18 52:2
53:6 54:24
**whatsoever**
78:7
**what's** 21:24
29:15 31:18
37:22 51:15
**white** 4:14 5:1
5:8 10:2,4 12:6
14:7 52:20

65:13,17 83:7
**wide** 60:16
**wild** 29:20
**winter** 34:6
**wish** 70:20
71:9 74:10,12
77:24 79:15
83:14 96:13,15
109:10
**withdraw**
63:20 64:24,24
65:2,9,19 78:1
**withdrawal**
63:24 64:8,19
65:5 66:23,24
68:14 87:16
**withdrawals**
63:16,19 64:16
64:21 65:6,11
65:17 67:7
87:13
**withdrawn**
63:21 64:10
109:19
**withheld** 35:14
**withhold** 7:10
17:8 57:23
66:24 67:5,8,9
**witnesses**
31:16 55:12
100:3,5
**wonder** 105:4
**wondering**
74:15 87:17
**won't** 28:22
42:6 47:24

**word** 72:15
85:22 86:25
**work** 30:11
35:11 41:14
42:12 44:11
46:3 48:14
50:21 54:17,18
55:7 56:10
82:24,24 93:10
**worked** 47:16
88:5
**working** 14:12
42:20 47:6
67:4 68:7
78:25 99:10
101:1
**workman** 8:19
18:11,12,12
92:16,17,25
**workouts**
84:14 88:21
**worms** 108:3
**worse** 51:6
**write** 66:8
**writing** 88:24
**wrong** 38:1
**wrongful** 56:8

**x**

**x** 1:4,10 42:17
112:1
**xrp** 72:24
75:25 76:9,16
76:24

**y**

**yeah** 10:8
14:19 15:13

16:20,23 21:22
25:12 55:23
76:21 83:5
87:11 91:18
**year** 20:22
21:13 23:10,11
75:18 76:5
**years** 60:22
103:24 104:1
106:1,3
**year's** 21:12
**yesterday**
47:25
**yield** 62:20,25
106:7,9
**york** 1:2,14
4:17 5:18 6:4
7:19 8:4 55:20
56:3,5 78:22
101:21
**you'll** 28:18
**you're** 14:13
25:11,11 29:14
30:14 42:16
46:9
**you've** 30:25
35:19 36:11
38:12 39:11
45:17 46:15

**z**

**z** 107:9
**zamfir** 4:10
**zero** 23:9 85:3
85:5