Dennis F. Dunne
Nelly Almeida
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Tel:  (212) 530-5000
Fax: (212) 660-5219

Andrew M. Leblanc
Melanie Westover Yanez
**MILBANK LLP**
1850 K Street, NW, Suite 1100
Washington, DC 20006
Tel:  (202) 835-7500
Fax: (202) 263-7586

*Counsel to Community First Partners, LLC,*
*Celsius SPV Investors, LP, and*
*Celsius New SPV Investors, LP*

Joshua M. Mester (admitted *pro hac vice*)
**JONES DAY**
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071
Tel:  (213) 489-3939
Fax: (213) 243-2539

*Counsel to CDP Investissements Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

## SERIES B PREFERRED HOLDERS' RESPONSE BRIEF ON THE ISSUE OF WHICH DEBTORS ARE LIABLE TO CUSTOMERS UNDER THE TERMS OF USE

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

# TABLE OF CONTENTS

Preliminary Statement ............................................................................................................1

Argument ...............................................................................................................................5

    I.     The Terms of Use Unambiguously Limit Customer Liability to LLC. .................5

          A.     The Series B Preferred Holders Offer the Only Plausible Reading of the Terms of Use. ..................................................................................5

          B.     The Debtors' Offered Interpretation Is Implausible. ...................................7

                 1.     Celsius Cannot Be Read to Include Every Entity in the Corporate Structure. .......................................................................9

                 2.     Debtors' Interpretation Requires Modifying the Operative Provision in the Terms of Use. ....................................................11

          C.     The Committee's Assertions Miss the Mark. ...........................................13

    II.     If the Court Finds the Limitation of Liability to Be Ambiguous, Overwhelming Extrinsic Evidence Demonstrates the Unequivocal Intention to Migrate CNL's Liabilities to LLC. ..................................................................15

          A.     The Migration Plan and Other Documents Show that the Debtors Intended to Transfer Customer Liabilities from CNL to LLC. ................19

          B.     No Evidence Has Been Offered to the Contrary. ......................................23

          C.     Evidence Supports the Interpretation that Certain Debtors Are Not Included in the Definition of Celsius. ......................................................25

    III.    The *Contra Proferentem* Principle Should Not be Applied. ...............................26

Conclusion ...........................................................................................................................27

**Cases**

*Alantra LLC v. Apex Indus. Techs. LLC*,
    No. 20-CV-10852-FDS, 2022 WL 11218101 (D. Mass. Oct. 19, 2022) ...............................11

*Alexander & Alexander Servs. Inc. v. These Certain Underwriters at Lloyd's, London*,
    136 F.3d 82 (2d Cir. 1998) ...........................................................................................17

*Cacace v. Meyer Mktg. (Macau Com. Offshore) Co.*,
    589 F. Supp. 2d 314 (S.D.N.Y. 2008) ..........................................................................18

*In re Cajun Elec. Power Co-op., Inc.*,
    791 F.2d 353 (5th Cir. 1986) .........................................................................................14

*Castillo v. GM, LLC (In re Motors Liquidation Co.)*,
    500 B.R. 333 (S.D.N.Y. 2013), *aff'd*, 578 F. App'x 43 (2d Cir. 2014) .....................18

*Catlin Specialty Ins. Co. v. QA3 Fin. Corp.*,
    36 F. Supp. 3d 336 (S.D.N.Y. 2014), *aff'd*, 629 F. App'x 127 (2d Cir. 2015).......18

*Cnty. of Suffolk v. Alcorn*,
    266 F.3d 131 (2d Cir. 2001) ...........................................................................................8

*Columbus Park Corp. v. Dep't of Hous. Pres. & Dev.*,
    80 N.Y.2d 19, 598 N.E.2d 702 (N.Y. 1992).................................................................8

*Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
    232 F.3d 153 (2d Cir. 2000) ...........................................................................................18

*Daniel v. Hawkins*,
    No. 184, 2022, 2023 Del. LEXIS 5 (Del. Nov. 2, 2022)........................................14

*DBT GmbH v. J.L. Mining Co.*,
    544 F. Supp. 2d 364 (S.D.N.Y. 2008)...........................................................................8

*DK Joint Venture 1 v. Weyand*,
    649 F.3d 310 (5th Cir. 2011) .........................................................................................24

*Dreni v. PrinterOn Am. Corp.*,
    2021 WL 4066635 (S.D.N.Y. Sept. 3, 2021).............................................................18

*Electra v. 59 Murray Enters.*,
   987 F.3d 233 (2d Cir. 2021), *cert. denied*, 211 L. Ed.2d 352, 142 S. Ct. 563
   (2021) ................................................................................................................27

*Ellington v. EMI Music, Inc.*,
   24 N.Y.3d 239 (N.Y. 2014) .................................................................................25

*General Elec. Co. v. Compagnie Euralair, S.A.*,
   945 F. Supp. 527 (S.D.N.Y. 1996).......................................................................8

*Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*,
   22 F.4th 83 (2d Cir. 2021) ..................................................................................11

*Greene v. Transform Holdco, LLC (In re Sears Holding Corp.)*,
   No. 21-CV-5437-NSR, 2022 WL 4482375 (S.D.N.Y. Sept. 27, 2022)..................8

*Hartford Accident & Indem. Co. v. Wesolowski*,
   33 N.Y.2d 169, 305 N.E.2d 907 (N.Y. 1973) .....................................................18

*Hawes Office Sys., Inc. v. Wang Lab'ys., Inc.*,
   537 F. Supp. 939 (E.D.N.Y. 1982).....................................................................24

*Hester v. Navigators Ins. Co.*,
   917 F. Supp. 2d 290 (S.D.N.Y. 2013) ..................................................................7

*India.Com, Inc. v. Dalal*,
   412 F.3d 315 (2d Cir. 2005) ...........................................................................7, 11

*In re AMR Corp.*,
   730 F.3d 88 (2d Cir. 2013) ..............................................................................8, 13

*Israel v. Chabra*,
   601 F.3d 57 (2d Cir. 2010) .................................................................................23

*JA Apparel Corp. v. Abboud*,
   568 F.3d 390 (2d Cir. 2009) ...............................................................................18

*Joao v. Cenuco, Inc.*,
   376 F. Supp. 2d 380 (S.D.N.Y. 2005) ................................................................13

*LM Ins. Corp. v. Fed. Ins. Co.*,
   585 F. Supp. 3d 493 (S.D.N.Y. 2022) ..................................................................7

*Newman Myers Kreines Gross Harris, P.C. v. Great N. Ins.*,
   17 F. Supp. 3d 323 (S.D.N.Y. 2014).....................................................................8

*Nicosia v. Amazon.com, Inc.*,
   834 F.3d 220 (2d Cir. 2016) ...............................................................................14

*Oldcastle Precast, Inc. v. U.S. Fid. & Guar. Co.*,
  458 F. Supp. 2d 131 (S.D.N.Y. 2006) ...............................................................8

*Penades v. Republic of Ecuador*,
  No. 15-CV-725 (RJS), 2016 WL 5793412 (S.D.N.Y. Sept. 30, 2016) ...................7

*Sheridan Broad. Corp. v. Small*,
  19 A.D.3d 331 (N.Y. App. Div. 2005) ..............................................................24

*Shred-It USA Inc. v. Mobile Data Shred*,
  222 F. Supp. 2d 376 (S.D.N.Y. 2002), *aff'd sub nom. Shred-It USA, Inc. v.*
  *Mobile Data Shred, Inc.*, 92 F. App'x 812 (2d Cir. 2004) ...................................14

*Starke v. Squaretrade, Inc.*,
  913 F.3d 279 (2d Cir. 2019) ............................................................................14

*Terwilliger v. Terwilliger*,
  206 F.3d 240 (2d Cir. 2000) ..............................................................................9

*Thomson-CSF, S.A. v. Am. Arb. Ass'n*,
  64 F.3d 773 (2d Cir. 1995) ..............................................................................24

*Two Farms Inc. v. Greenwich Ins. Co.*,
  993 F. Supp. 2d 353 (S.D.N.Y. 2014), *aff'd*, 628 F. App'x 802 (2d Cir. 2015).....................8

*U.S. Bank Nat'l Ass'n v. T.D. Bank, N.A.*,
  569 B.R. 12 (S.D.N.Y. 2017) ............................................................................8

*U.S. Naval Inst. v. Charter Commc'ns, Inc.*,
  875 F.2d 1044 (2d Cir. 1989) ..........................................................................27

*Vermont Teddy Bear Co. v. 538 Madison Realty Co.*,
  1 N.Y.3d 470, 807 N.E.2d 876 (N.Y. 2004) ......................................................8

*VKK Corp. v. Nat'l Football League*,
  244 F.3d 114 (2d Cir. 2001) ............................................................................25

*In re Voyager Digit. Holdings Inc.*,
  No. 22-10943-MEW (Bankr. S.D.N.Y. July 5, 2022) ..........................................22

*Ward v. TheLadders.com, Inc.*,
  3 F. Supp. 3d 151 (S.D.N.Y. 2014) ...................................................................27

*Westchester Resco Co., L.P. v. New England Reinsurance Corp.*,
   818 F.2d 2 (2d Cir. 1987) ...............................................................................27

*Woodward, Inc. v. ZHRO Sols., LLC*,
  No. 18-CV-01468-PAB-STV, 2019 WL 1438076 (D. Colo. Mar. 31, 2019) .......................24

*Zachman v. Hudson Valley Fed. Credit Union*,
    49 F.4th 95 (2d Cir. 2022) ................................................................................6

**Other Authorities**

11 WILLISTON ON CONTRACTS § 32:6 (4th ed.) ...........................................................8

Community First Partners, LLC, Celsius SPV Investors, LP, Celsius New SPV Investors, LP, and CDP Investissements Inc. (collectively, the "<u>Series B Preferred Holders</u>"), as beneficial holders, or investment advisors or managers of beneficial holders, of Series B Preferred Shares issued by Celsius Network Limited ("<u>CNL</u>" and, together with its above-captioned affiliates, the "<u>Debtors</u>"), by and through their undersigned counsel, in accordance with the "<u>Scheduling Order</u>",[2] in further support of the "<u>Series B Preferred Holders' Opening Brief</u>"[3] and in response to the "<u>Debtors' Opening Brief</u>"[4] and the "<u>Committee's Opening Brief</u>",[5] submit this "<u>Response Brief</u>" on the Briefed Legal Issue,[6] and respectfully state as follows:

### **Preliminary Statement**

1.     The legal issue before the Court is which Debtors are liable to Customers under the Terms of Use.  The answer is LLC, based on ***both*** the plain reading of the Terms of Use and the uncontroverted evidence before this Court.  The operative provision in the Terms of Use that addresses the Briefed Legal Issue—the Limitation of Liability—explicitly states that "***in no event shall [the Customer] have any recourse*** . . . ***to or against any*** . . . ***Affiliate*** . . . ***of Celsius***."[7]  In versions 6 through 8 of the Terms of Use, Celsius is defined as "[LLC] and its

---

[2]     *Order (I) Setting a Briefing Schedule and (II) Granting Related Relief* [Dkt. No. 1747].

[3]     *Series B Preferred Holders' Opening Brief on the Issue of Which Debtors Are Liable to Customers Under the Terms of Use* [Dkt. No. 1795].

[4]     *Debtors' Opening Brief Regarding Account Holders' Claims Issues* [Dkt. No. 1799].

[5]     *The Official Committee of Unsecured Creditors' Opening Brief Regarding Debtors That Are Liable to Account Holders Under the Global Contract (the "Terms of Use") between Celsius and Account Holders* [Dkt. No. 1797].

[6]     Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Series B Preferred Holders' Opening Brief.

[7]     Exhibit A to the *Declaration of Melanie Westover Yanez in Support of Series B Preferred Holders' Opening Brief on the Issue of Which Debtors are Liable to Customers Under the Terms of Use* [Dkt. No. 1796] (the "<u>Yanez Decl.</u>"), Terms of Use Version 8, § 25 (emphasis added).

Affiliates." But, regardless of which Affiliates may be included in that definition, those Affiliates are expressly carved out of liability to Customers, and LLC is the only Debtor entity remaining. In other words, LLC, alone, is liable to Customers (LLC + Affiliates – Affiliates = LLC). Such reading is the only one that complies with fundamental contract interpretation principles. The Debtors' and the Committee's obstinate reliance on the definition of Celsius is not only incorrect, but it ignores that the Terms of Use require giving appropriate meaning to defined terms where "context requires."[8] That is, where the Terms of Use makes a distinction between Affiliate(s) and Celsius—as when both terms appear in the same provision—context requires Celsius to be read as just LLC.

2.     The reading offered by the Series B Preferred Holders is also consistent with the full panoply of evidence, including, for example, the plan for Migration, an asset transfer agreement between CNL and LLC, an intercompany operation and loan agreement between CNL and LLC, representations made to regulators in the United Kingdom and United States, and numerous other documents and actions. The Debtors committed to migrating Customers' assets and liabilities out of CNL and removing CNL as the contract counterparty. The evidence— including documents signed or delivered by two of the drafters of the Terms of Use— demonstrates that the Debtors did just that and that LLC is the only Debtor liable to Customers.

3.     Notwithstanding the plain reading of the Terms of Use and the staggering amount of uncontroverted evidence, the Debtors and the Committee take the position that the Terms of Use unambiguously make every Debtor liable to Customers without offering a single relevant document or any witness testimony to support that assertion. That is the case notwithstanding

---

[8] *Id.* § 2.

that this Court made clear that now is the time for the parties to submit such evidence.[9]  The

Debtors have easy access to the drafters of the Terms of Use, but the Debtors have offered no

statement about the drafters' intent and no support for the otherwise unsubstantiated claim that

every entity in the Debtors' corporate structure was suddenly made liable to Customers under the

Terms of Use when version 6 was adopted.  Instead, they essentially argue that, notwithstanding

the overwhelming evidence that the intent of the Migration was to make sure that CNL was no

longer liable to Customers, the drafters removed CNL as the sole counterparty only to add it

right back in as a counterparty under the guise of an Affiliate.  That defies all logic.

4.      It is no wonder, then, that the Debtors and the Committee are forced to ignore the

words on the page (and in the case of the Debtors, add their own) to defend their untenable

interpretations.  The Committee's Opening Brief, for example, does not even mention the

Limitation of Liability provision.  Instead, the Committee brazenly asserts that "[n]owhere do the

Terms of Use say that only [LLC] has . . . obligations [to Customers], or that [liability] would be

limited to only certain Celsius entities . . ."[10]  But, as explained above, the Terms of Use say just

that:  Customers have no recourse against Affiliates, leaving only LLC with liability to

Customers.  What is more, upon the implementation of Terms of Use Version 6, Customers were

advised, and required to agree, that CNL was transferring to LLC all of its obligations to

Customers, an acknowledgment that the Committee pasted into its own prior briefing where it fit

its argument, but completely ignores here.[11]

---

[9]     Dec. 8, 2022 Hr'g Tr. at 38:5-9 ("THE COURT: . . . I want as part of the filings the . . . extrinsic evidence that each of you would rely on in the event that the Court concludes that the contract terms are ambiguous and it can't be resolved solely from the contract terms.").

[10]    Committee's Opening Brief ¶ 2.

[11]    *The Official Committee of Unsecured Creditors' Limited Objection With Respect to the Debtors' Amended Motion for Entry of an Order (I) Establishing Ownership of Assets in the Debtors' Earn Program, (II)*

5.     The Debtors go further to make the creative assertion that the term Affiliate, as used in the Limitation of Liability, refers only to "Affiliates of Affiliates of [LLC] that are outside the Company's capital structure."[12]  But this reading is neither based on the words on the page nor does it make any sense.  *First*, the Debtors' interpretation of the Limitation of Liability would essentially require the Court to insert additional language to the effect that the only Affiliates carved out are those outside the corporate structure.  Nowhere, however, do the Terms of Use define Celsius or Affiliate by reference to "corporate structure."  Moreover, reading Affiliates to reference only entities outside the corporate structure throughout the Terms of Use would render numerous of its terms and provisions meaningless or superfluous.  *Second*, the Debtors ask the Court to read Affiliate in the carveout as referring to *only half* of the composite defined term, the Affiliates of LLC, but not to LLC itself.  That is obviously not how every other group listed in the carveout, such as employees, directors, or officers is meant to be read.  *Third*, under the broad definition of Affiliates in the Terms of Use, there cannot be an Affiliate of LLC's Affiliates outside the corporate structure; every Affiliate of an LLC Affiliate is also an Affiliate of LLC.  In other words, the third ring in the chart included in the Debtors' Opening Brief is nonexistent.[13]

6.     The interpretation offered by the Series B Preferred Holders is the only reasonable interpretation that gives meaning to the Limitation of Liability provision and is consistent with the rest of the Terms of Use.  Nevertheless, to the extent the Court finds the Limitation of Liability ambiguous, overwhelming and uncontested extrinsic evidence demonstrates the parties'

---

*Permitting the Sale of Stablecoin in the Ordinary Course and (III) Granting Related Relief* [Dkt. No. 1502] (the "Committee's Earn Program Objection") ¶ 24.

[12]   Debtors' Opening Brief ¶ 27.

[13]   *See id.* ¶ 28.

4

clear intent to transfer all Customer liabilities (and corresponding assets) away from CNL and

that LLC is the only Debtor liable to Customers under the Terms of Use.

**Argument**

**I.     The Terms of Use Unambiguously Limit Customer Liability to LLC**.

> **A.     The Series B Preferred Holders Offer the Only Plausible Reading of the Terms of Use.**

7.     The Briefed Legal Issue is which Debtors are liable to Customers under the Terms

of Use.  The Limitation of Liability provision of the Terms of Use unambiguously answers this

question:  LLC.  Section 25 of the Terms of Use (the Limitation of Liability) explicitly states

that:

> ***in no event shall you [the Customer] have any recourse . . . to or
> against any assets of*** any person or entity other than Celsius,
> including, without limitation ***any . . . Affiliate . . . of Celsius***.[14]

Under the plain reading of that operative provision, Customers do not have any recourse against

any Affiliate, meaning that LLC is the only Debtor liable to Customers.

8.     Indeed, the Customer liability question only arises in connection with versions 6

through 8 of the Terms of Use; no party disputes that in versions 1 through 5, CNL was the only

contracting party and Affiliates of CNL were carved out under the Limitation of Liability

provision.  Terms of Use Version 6 was adopted to effectuate a plan for Migration approved by

the UK Financial Conduct Authority ("FCA") that required terminating CNL's contractual

relationship with Customers and migrating Customer assets and liabilities to LLC.  To

implement the plan, the Terms of Use redefined Celsius from CNL to "LLC and its Affiliates."

The Limitation of Liability provision, however, remained unchanged with regard to the Briefed

---

[14]     Yanez Decl., Exhibit A (Terms of Use Version 8) § 25 (emphasis added).

Legal Issue: it still carved out all Affiliates from Customer liability, like it had in every prior version of the Terms of Use. For some reason, the Debtors and the Committee assume that once Affiliates are included in the definition of Celsius, they cannot be carved out for a specific purpose. That is not so. What is more, the Terms of Use provide that "[c]apitalized terms shall have the meanings assigned to them in these Terms ***unless the context requires otherwise***."[15] A consistent reading of the Terms of Use makes plain that where Affiliate(s) is used in the same provision as Celsius, like in the Limitation of Liability, context requires Celsius to mean LLC.[16]

9.    There are many examples in the Terms of Use where Affiliate(s) and Celsius are both used in the same provision, begging the question as to the need for a specific reference to Affiliate(s) when each Affiliate allegedly is already subsumed in the definition of Celsius. By way of non-exhaustive examples, references to the term Affiliate or Affiliates would be superfluous or meaningless in the following provisions:

- **Section 4(E)** (Borrow) provides that Customers "may apply to borrow . . . from ***an Affiliate*** of Celsius ***[LLC and its Affiliates]***, as may be agreed between [the Customer] and Celsius ***[LLC and its Affiliates] or its Affiliates*** in writing" (emphasis added).

- **Section 4(F)** (CelPay) provides that by entering into any CelPay transaction, Customers "authorize Celsius ***[LLC and its Affiliates] or its Affiliates*** to deduct such amounts of Eligible Digital Asset as you instruct us to transfer" (emphasis added).

- **Section 9** (Setoff and Security Interest Rights) provides that the Customer "grant[s] us a security interest in any and all Eligible Digital Assets using the Earn Service for debts, amounts owed, or liabilities incurred to Celsius ***[LLC and its***

---

[15]    *Id.* § 2 (emphasis added).

[16]    Incidentally, LLC is the only counterparty to Customers in the Privacy Policy; there is no mention of any Affiliates. *See* TOU Decl., Exhibit H (Privacy Policy). The Privacy Policy is incorporated by reference into the Terms of Use. Yanez Decl., Exhibit A (Terms of Use Version 8) § 1; *see also Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 104 (2d Cir. 2022) ("[T]o the extent that a second agreement is clearly incorporated by reference into a scrollwrap or click-through agreement, ordinary principles of contract interpretation and incorporation by reference under New York law must still apply . . .[, and ]u]nder New York law, it is well established that contract terms and other agreements may be incorporated by cross-reference.") (internal citations omitted).

> **_Affiliates] or any of our Affiliates_** by you or any of your Authorized Representatives" (emphasis added).

- **Section 19** (Closing a Celsius Account) provides that "any legal obligations you may have under any other agreement with Celsius **_[LLC and its Affiliates] or its Affiliates_** (including any Loan Agreement or agreement governing lending or investing in Celsius **_[LLC and its Affiliates] or its Affiliates_** will not be affected in any way by the termination" of the Terms of Use (emphasis added).

But, when Celsius is understood as just LLC in these instances, the provisions make sense.

10.     The interpretation offered by the Series B Preferred Holders is not only consistent with the Terms of Use as a whole, including the intent of the parties, but it also gives effect to every word, phrase, and clause the parties agreed to, including the Limitation of Liability provision.  As discussed below, the Series B Preferred Holders' reading of the most relevant provision in the Terms of Use—the Limitation of Liability—is the only reading that both complies with universally accepted principles of contract interpretation and unambiguously answers the Briefed Legal Issue.

### B.     The Debtors' Offered Interpretation Is Implausible.

11.     In contrast, the Debtors' interpretation flies in the face of **_four_** fundamental rules of contract interpretation.  **_First_**, "it is a bedrock principle of contract interpretation that courts should not adopt an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless, but rather, to the extent possible, should seek to read contractual provisions in harmony."[17]  **_Second_**, "a word used by the parties in one sense will be given the

---

[17]     *See Memorandum Opinion and Order Regarding Ownership of Earn Account Assets* [Dkt. No. 1822], at 42 (quoting Committee's Earn Program Objection ¶ 6); *see also India.Com, Inc. v. Dalal*, 412 F.3d 315, 323 (2d Cir. 2005) ("[U]nder New York law, effect and meaning must be given to every term of the contract.") (internal quotation marks and citations omitted); *LM Ins. Corp. v. Fed. Ins. Co.*, 585 F. Supp. 3d 493, 502 (S.D.N.Y. 2022) ("We disfavor contract interpretations that render provisions of a contract superfluous.") (quoting *Int'l Multifoods Corp. v. Com. Union Ins.*, 309 F.3d 76, 86 (2d Cir. 2002)); *Hester v. Navigators Ins. Co.*, 917 F. Supp. 2d 290, 298 (S.D.N.Y. 2013) (rejecting proposed interpretation because it would "render[ ] many obligations mere surplusage—an unacceptable result under New York law") (internal quotation marks and citation omitted); *Penades v. Republic of Ecuador*, No. 15-CV-725 (RJS), 2016 WL 5793412, at *4 (S.D.N.Y.

same meaning throughout the contract in the absence of countervailing reasons." *Two Farms*

*Inc. v. Greenwich Ins. Co.*, 993 F. Supp. 2d 353, 362 (S.D.N.Y. 2014) (internal quotation marks

and citations omitted), *aff'd*, 628 F. App'x 802 (2d Cir. 2015).[18]  ***Third***, "if there [i]s an

inconsistency between a specific provision and a general provision of a contract . . . the specific

provision controls." *DBT GmbH v. J.L. Mining Co.*, 544 F. Supp. 2d 364, 377–78 (S.D.N.Y.

2008) (internal citation omitted).[19]  And ***fourth***, under New York law, "courts may not by

construction add or excise terms, nor distort the meaning of those used and thereby make a new

contract for the parties under the guise of interpreting the writing." *See Vermont Teddy Bear Co.*

---

Sept. 30, 2016) (rejecting party's interpretation of a term because it would render a phrase in another provision surplusage); *Columbus Park Corp. v. Dep't of Hous. Pres. & Dev.*, 80 N.Y.2d 19, 31, 598 N.E.2d 702, 708 (N.Y. 1992) (rejecting a party's interpretation because it "ma[de] a contract provision meaningless," noting that such an interpretation would be "contrary to basic principles of contract interpretation").

[18]  *See also Newman Myers Kreines Gross Harris, P.C. v. Great N. Ins. Co.*, 17 F. Supp. 3d 323, 332 n.6 (S.D.N.Y. 2014) (stating that contract terms "should be construed to have a consistent meaning throughout"); *Penades*, 2016 WL 5793412, at *4 (rejecting party's interpretation of a term as differing from both the ordinary meaning and the meaning it had in other provisions of the agreement); *U.S. Bank Nat'l Ass'n v. T.D. Bank, N.A.*, 569 B.R. 12, 23 (S.D.N.Y. 2017) ("[It is a] commonplace rule of construction that terms in a contract must be assumed to have the same meaning throughout . . . terms for which meanings are provided . . . carry the same meaning. . . ."); 11 WILLISTON ON CONTRACTS § 32:6 (4th ed.) ("Generally, a word used by the parties in one sense will be given the same meaning throughout the contract in the absence of countervailing reasons.").

[19]  *See also In re AMR Corp.*, 730 F.3d 88, 99 (2d Cir. 2013) (noting that a "specific provision . . . governs the circumstance to which it is directed, even in the face of a more general provision") (internal quotation marks and citation omitted); *Cnty. of Suffolk v. Alcorn*, 266 F.3d 131, 139 (2d Cir. 2001) ("It is axiomatic that courts construing contracts must give specific terms . . . greater weight than general language.") (internal quotation marks and citations omitted); *Oldcastle Precast, Inc. v. U.S. Fid. & Guar. Co.*, 458 F. Supp. 2d 131, 142 (S.D.N.Y. 2006) ("Under New York law, '[w]here there is an inconsistency between a specific provision and a general provision of a contract, the specific provision controls.'") (internal citation omitted); *General Elec. Co. v. Compagnie Euralair, S.A.*, 945 F. Supp. 527, 533 (S.D.N.Y. 1996) (noting that "where there are general and specific provision[s] relating to the same matter, the special provisions control, even if there is an inconsistency," and ultimately holding that "the contract in the instant case must be interpreted in favor of the specific provision . . . rather than the more general provision") (internal quotation marks and citation omitted); *Greene v. Transform Holdco, LLC (In re Sears Holding Corp.)*, No. 21-CV-5437-NSR, 2022 WL 4482375, at *4 (S.D.N.Y. Sept. 27, 2022) (holding that the broad, general definition of the term "Liability," which included every possible "claim" and action," was necessarily limited by the more specific provision that expressly listed certain excluded liabilities).

*v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475, 807 N.E.2d 876, 879 (N.Y. 2004) (internal

quotation marks and citation omitted).[20]

>    1.    ***Celsius Cannot Be Read to Include Every Entity in the Corporate Structure.***

12.     To start, the Debtors argue that the Briefed Legal Issue is answered by the

definition of Celsius, which they argue includes all of the entities in the Debtors' corporate

structure.  When confronted with the Limitation of Liability provision, the Debtors assert that

Affiliate, as used in the Limitation of Liability carveout, means only entities outside the

corporate structure.  That reading, however, cannot be reconciled with other uses of the term

Affiliate(s) throughout the Terms of Use.  Indeed, in contrast to the interpretation offered by the

Series B Preferred Holders, the Debtors' interpretation would render certain key provisions or

terms in the Terms of Use superfluous or meaningless in contravention of settled contract

interpretation principles.

13.     Taking Section 4.E (Borrow) by way of example, the Terms of Use provide that

Customers "may apply to borrow . . . from an ***Affiliate of Celsius***, as may be agreed between [the

Customer] and ***Celsius or its Affiliates*** in writing."[21]  If, as the Debtors assert, Affiliate means an

entity outside the Debtors' corporate structure, the result would be that there is ***no*** Borrow

program because there is no entity outside of the corporate structure to provide borrowing

services to Customers.  But, in fact, there was a Borrow program at the time the Terms of Use

were adopted (and when Terms of Use Version 8 was put in place): Celsius Lending LLC (an

---

[20]   *See also Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir. 2000) ("A court may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous . . . nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case.") (internal quotation marks and citations omitted).

[21]   Yanez Decl., Exhibit A (Terms of Use Version 8) § 4.E (Borrow) (emphasis added).

Affiliate of LLC) offered retail loans under such program.[22]  In fact, the Terms of Use were modified in version 6 to replace "Celsius Networks Lending LLC" with "Affiliate of Celsius."[23] Accordingly, an Affiliate of Celsius cannot possibly mean only entities outside the Debtors' corporate structure in all provisions of the Terms of Use (nor do the words in the agreement support that interpretation).

14.     Similarly, Section 32 (Assignment) provides that "Celsius may assign or transfer these Terms and/or any or all of its rights and/or obligations hereunder at any time to any Affiliate of Celsius," with or without notice.[24]  Under the Debtors' interpretation, Celsius would be able to transfer Customers' rights and obligations to entities outside of the Debtors' corporate structure without any notice.  This does not make sense.

15.     For the same reasons, the provisions or terms discussed *supra* in paragraph 9 would also be superfluous or meaningless.  Yet, the Debtors do not even attempt to reconcile the recurrent and redundant references to Affiliate(s) in the same provisions as Celsius throughout

---

[22]     *See* Mashinsky Decl. ¶¶ 53-57 (describing the "Borrowing Services," which consists of retail lending, "as generally conducted through Celsius Lending LLC").  Each of Celsius Lending LLC and Celsius Networks Lending LLC (the legacy borrowing entity) lists "Retail Loans Receivable" as property in their schedules.  *See* Schedules for Celsius Networks Lending LLC, No. 22-10969 [Dkt. No. 5] and Celsius Lending LLC, No. 22-10970 [Dkt. No. 5].  Similarly, it is clear that the "Affiliate of Celsius" referenced in section 4(E) (Borrow) is Celsius Lending LLC.  *See* July 18, 2022 Hr'g Tr. 31:9-10 (Debtors stating that "Celsius Lending LLC . . .is the entity that conducts the retail lending business").

[23]     *See* TOU Decl. at 330 (Exhibit A-5 to A-6 Redline):

> You may apply to borrow certain Fiat currencies or Stablecoins from an ~~You may apply to borrow~~ ~~Fiat from Celsius Networks Lending LLC (the~~ ~~"CNL"), a Celsius~~ Affiliate~~, or from another affiliate~~ of Celsius, as will be agreed between you and Celsius or its Affiliates. . . .

For ease of reference, a copy of the Exhibits A-5 to A-6 Redline is attached as Exhibit A to the *Declaration of Melanie Westover Yanez in Support of Series B Preferred Holders' Response Brief on the Issue of Which Debtors are Liable to Customers Under the Terms of Use*, filed contemporaneously herewith (the "Yanez Response Decl." or "Yanez Response Declaration").

[24]     Yanez Decl., Exhibit A (Terms of Use Version 8) § 32.

the Terms of Use with their inflexible interpretation that purportedly already includes every

Affiliate in the corporate structure within the definition of Celsius.[25]

16.      Moreover, as a matter of logic, certain entities in the Debtors' corporate structure

simply cannot be included in the definition of "Celsius."[26]  The subject matter of the Terms of

Use is the provision of retail services to Customers.[27]  Yet, certain Debtors do not (*i.e.*, GK8 and

Mining)—and some, ***legally cannot*** (*i.e.*, CNL)—provide services to Customers.[28]

## 2.      *Debtors' Interpretation Requires Modifying the Operative Provision in the Terms of Use.*

17.      To explain away the Limitation of Liability provision, the Debtors assert that the

Limitation of Liability provision only carves out "Affiliates of Affiliates of [LLC] that are

outside the Company's capital structure."[29]  In other words, the Debtors effectively ask the Court

to modify the provision as follows:

> Without limiting the generality of the foregoing, in no event shall
> you have any recourse, whether by setoff or otherwise, with
> respect to our obligations, to or against any assets of any person or
> entity other than Celsius, including, without limitation, any
> member, shareholder, Affiliate **[that is outside the Company's**

---

25   When ascertaining the meaning of contract language, "it is important for the court to read the integrated agreement 'as a whole.'"  *Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*, 22 F.4th 83, 95 (2d Cir. 2021) (quoting *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011)); see *also India.Com, Inc.* 412 F.3d at 323 ("[R]easonable effort must be made to harmonize all of [the contract's] terms.") (internal quotation marks and citations omitted); *Alantra LLC v. Apex Indus. Techs. LLC*, No. 20-CV-10852-FDS, 2022 WL 11218101, at *8 (D. Mass. Oct. 19, 2022) (interpreting contract under New York law and noting that "[i]t is important for the court to read the integrated agreement 'as a whole'") (internal citation omitted).

26   *See* further discussion at section II.C.

27   Yanez Decl., Exhibit A (Terms of Use Version 8) § 1.

28   *See* Voluntary Application for Imposition of Direction (the "Direction Agreement"), dated July 21, 2021, executed by Roni Cohen Pavon on behalf of CNL and agreed to by the FCA, attached as Exhibit B to the Yanez Response Declaration, at CEL_CUST-00002758-59 (CNL will not provide any services that would violate the relevant UK regulations and will "ensure that its activities do not contravene the requirements to register with the [FCA]"); *see also* email chain between CNL and FCA, attached as Exhibit C to the Yanez Response Declaration.

29   Debtors' Opening Brief ¶ 27.

**capital structure**], investor, employee, officer, director, agent or advisor of Celsius.

Although convenient for the Debtors' current litigation stance, the proposed interpretation requires the Court to read words into the parties' agreement that are not there.

18.     This interpretation would also render other provisions and terms in the Terms of Use meaningless or superfluous (as described above), ***including the operative provision*** for the Briefed Legal Issue.

19.     Moreover, the Terms of Use defines Affiliate as "an entity that owns or controls, is owned or controlled by, or is or [*sic.*] under common control or ownership with a party . . . ."[30] Under this broad definition, there is not, and cannot be, an entity that is an Affiliate of any LLC Affiliate that is not also an Affiliate of LLC.  Indeed, the Debtors' own hypothetical—"an Affiliate of [LLC], such as [Mining], owned or controlled a different entity through a joint venture or contractual agreement"—illustrates this conundrum perfectly.[31]  All entities in the Debtors' corporate structure, including LLC and Mining, are owned directly or indirectly by, or are under common control of, Celsius Network Inc.[32]  Any entity that is "owned or controlled . . . through a joint venture or contractual agreement" by Mining would be an Affiliate of LLC because both LLC and such entity would be indirectly owned or controlled by Celsius Network Inc.  Predictably, the Debtors fail to name any actual entity (existing now or ever) that would satisfy their proposed interpretation.[33]

---

[30]     Yanez Decl., Exhibit A (Terms of Use Version 8) § 2.

[31]     Debtors' Opening Brief ¶ 27.

[32]     *Id.*, Exhibit A (Corporate Organizational Structure).

[33]     Indeed, the Debtors have produced no evidence to support the existence (now or ever) of any such entity.

C. **The Committee's Assertions Miss the Mark.**

20.    The Committee does not even attempt to address the Limitation of Liability

provision—the *crux* of the Briefed Legal issue—in its Opening Brief.  The Committee does not

offer any suggestion as to what Affiliate means in the Limitation of Liability carveout.  Instead,

the Committee leads with an assertion of its desired outcome:  "the Celsius contracting parties

included [LLC], CNL, and all entities under the common control of CNL . . . ."[34]  But the

Committee fails to articulate how this result follows from a plain reading of the Terms of Use.

21.    The Committee points to various inconsequential provisions in the Terms of Use

that are inapposite to the Briefed Legal Issue.[35]   Nevertheless, the law is clear: the ***specific***

language of the Limitation of Liability provision governs more ***general*** terms, like the definition

of Celsius.  *See In re AMR Corp.*, 730 F.3d at 99 (Second Circuit noting that a "specific

provision … governs the circumstance to which it is directed, even in the face of a more general

provision.") (internal quotation and citation omitted).[36]

22.    The Committee also ignores the pop-up message that Customers were required to

click through to signify their acceptance of, and agreement to, Terms of Use Version 6 (the

"Pop-up").[37]   That Pop-up, operating as the Customer's signature page, and thus forming part of

---

[34]    Committee's Opening Brief ¶ 10.

[35]    *See generally id.* ¶ 11.  The substance of any of these provisions would be exactly the same whether Celsius means just LLC or "LLC and all its Affiliates."  For example, Section 13 (Consent to Celsius' Use of Digital Assets), does not create Customer liabilities; it merely notes that Customers may be creditors of Celsius "under any applicable laws."  *See* Yanez Decl., Exhibit A (Terms of Use Version 8) § 13.3.

[36]    *See supra* n.19.

[37]    The Committee asserts that Customers who signed up to the Terms of Use under versions 1 through 5 did not release any claims against CNL.  *See* Committee's Opening Brief ¶ 22.  The sole case the Committee relies upon to support that argument is inapposite.  *See id.* (citing *Joao v. Cenuco, Inc.*, 376 F. Supp. 2d 380, 383 (S.D.N.Y. 2005)).  In *Joao*, there was no superseding agreement, which would have extinguished claims under the original agreement even in the absence of express language.  As addressed in the Series B Preferred Holders' Opening Brief, under New York law, any claims under a prior agreement are extinguished when the parties enter into a superseding agreement.  *See* Series B Preferred Holders' Opening Brief ¶ 52.  Each new

---

the agreement, required Customers to expressly acknowledge that LLC would be taking over the services previously provided by CNL.[38]  Specifically, the Pop-up required Customers to agree to the following:  "I acknowledge that under the new TOU, the services will be provided to me by [LLC], and that [CNL] shall transfer to [LLC] my data, account balance, and its rights and obligations to me."[39]  It is baffling that the Committee claims it "is unaware of any communications to account holders or other public statements made at the time that Version 6 was issued stating that Celsius was dramatically altering its obligations to its [C]ustomers" when the entire Pop-up was pasted into the Committee's Earn Program Objection.[40]  In sum, the Committee simply fails to address the Briefed Legal Issue.  Accordingly, the only reading of the provision of the Terms of Use that unambiguously addresses the Briefed Legal Issue is the clear and succinct reading offered by the Series B Preferred Holders.

---

version of the Terms of Use expressly superseded all prior versions, thus extinguishing all claims that may have existed under those prior versions.  *Id.*

[38]  The pop-up notifications informing Customers of changes to Terms of Use Version 6 form part of the Terms of Use and are within the "four corners" of the contract.  *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 234 (2d Cir. 2016) (applying Washington law and holding that the district court correctly determined that the Order Page linking to the Amazon Conditions of Use was "part of the contract incorporated . . . by reference" into plaintiff's complaint referring to the contract); *see also Starke v. Squaretrade, Inc.*, 913 F.3d 279, 290 n.7 (2d Cir. 2019) (holding that "Washington law is the same as New York law with respect to the issue of [clickwrap] contract formation"); *Shred-It USA Inc. v. Mobile Data Shred*, 222 F. Supp. 2d 376, 379 (S.D.N.Y. 2002), *aff'd sub nom. Shred-It USA, Inc. v. Mobile Data Shred, Inc.*, 92 F. App'x 812 (2d Cir. 2004) (applying New York law and giving effect to notes written on the signature page of an asset purchase agreement when considering the "unambiguous language" of the agreement) (internal citation omitted); *In re Cajun Elec. Power Co-op., Inc.*, 791 F.2d 353, 361 (5th Cir. 1986) (applying Louisiana law and rejecting a contract counterparty's theory that interpretation of an unambiguous contract should not give effect to an arbitration clause found on a signature page); *Daniel v. Hawkins*, No. 184, 2022, 2023 Del. LEXIS 5, at *57-58 (Del. Nov. 2, 2022) (holding that an addendum found on the signature page of a contract was on "the face of the contract" and "within its four corners") (internal quotation marks and citation omitted).

[39]  Blonstein Decl., Exhibit A.

[40]  *Compare* Committee's Opening Brief ¶ 27, *with* Committee's Earn Program Objection at ¶ 24.  The Committee also cites to a June 23, 2021 Celsius Community Update (*see* Committee's Opening Brief ¶ 9), which reports that Celsius will be "migrating [its] main business activity and headquarters from the United Kingdom to the United States."

23. For completeness, the remaining arguments in the Committee's Opening Brief are otherwise flawed. The Committee states that "[i]n September 2021, the New Jersey Bureau of Securities issued a Cease and Desist Order preventing **Celsius** from offering its Earn product to unaccredited investors."[41] But the Cease and Desist Order defines "Celsius" solely as "Celsius Network, LLC" and extensively describes **LLC's** products and services offered to Customers under the Terms of Use.[42] The Committee also emphasizes that CNL told the public that "[f]or the avoidance of doubt, all Celsius services for all existing customers remain unchanged."[43] Once again, the Committee's focus is off center: even if the services did not change the *entity providing those services* changed, as described herein. Likewise irrelevant is the Committee's assertion that "[a]s of the Petition Date, notwithstanding the 'migration' of Celsius' 'main business activity,' all digital asset investing and institutional lending activities were still conducted by CNL."[44] This assertion (which is likely incorrect) does not bear at all upon the question of Customer liability; even the Committee acknowledges that Customers post-Migration may transfer digital assets to LLC and the assets may be subsequently transferred.[45]

## II. If the Court Finds the Limitation of Liability to Be Ambiguous, Overwhelming Extrinsic Evidence Demonstrates the Unequivocal Intention to Migrate CNL's Liabilities to LLC.

24. Even if the Court were to find the Limitation of Liability provision to be ambiguous, the evidence is overwhelmingly consistent with the Series B Preferred Holders'

---

[41] Committee's Opening Brief ¶ 14 (emphasis added).

[42] *See* Summary Cease and Desist Order, New Jersey Bureau of Securities (Sept. 17, 2021), attached as Exhibit 7 to the *Declaration of Aaron Colodny in Support of the Official Committee of Unsecured Creditors' Opening Brief Regarding Debtors That Are Liable to Account Holders Under the Global Contract (the "Terms of Use") Between Celsius and Account Holders* [Dkt. No. 1798].

[43] Committee's Opening Brief ¶ 27 (emphasis omitted).

[44] *Id.* ¶ 12.

[45] *Id.*

answer to the Briefed Legal Issue: LLC is the only Debtor liable to Customers under the Terms of Use. The Debtors' and the Committee's failure to put forth anything to the contrary only further proves the point. Indeed, if the drafters of the Terms of Use intended a different reading, the Debtors should put forth that evidence. They have not, because they cannot.

25. To the contrary, the evidence put forth by the Series B Preferred Holders is clear: CNL transferred its contractual relationship with Customers, and all Customer liabilities (and assets) were transferred to LLC. As a result, the only Debtor liable to Customers under the Terms of Use is LLC.[46] It would be absurd if CNL was removed from the contract as a counterparty only to be thrown back in as an Affiliate.

26. In fact, the Debtors' current position is that upon the change in the Terms of Use from Version 5 to Version 6, liabilities to Customers were created at every entity within the Debtors' corporate structure (which entities did not previously have such liability in versions 1 through 5). Thus, according to Debtors, they created, billions of dollars of liabilities against all Affiliates of LLC the moment Version 6 was adopted. There is not a single document—financial statement, board minutes, internal email, or any other writing—that the Debtors have produced that is consistent with that view. The reason for that is simple. No one intended to create those liabilities at the time, and no one believed they did. Even now, no author of the Terms of Use has testified to the Debtors' interpretation. The Debtors' current position is nothing more than a

---

[46] *See* Series B Preferred Holders' Opening Brief ¶¶ 31-51 (discussing evidence of the Debtors' intention to limit liability to Customers to LLC, including: (i) the express language in Terms of Use Version 8 (§ 25) excluding Affiliates from liability to Customers; (ii) the Migration having been caused by the UK regulatory regime change; (iii) the Debtors' express statements that CNL will no longer be providing customer-facing services; (iv) statements made in the Debtors' annual reports; (v) the Debtors' representations to investors about the liabilities of certain Affiliates; and (vi) the Debtors' representations under penalty of perjury in these cases).

litigation stance, pushed by the Committee, in an effort to promote Customers' interests at the expense of other stakeholders.[47]

27.     Neither has any Customer come forward in this process to say that their intent in executing the Terms of Use was to have recourse against every entity in the Debtors' corporate structure.  Instead, when left to their own devices (*i.e.*, before the Debtors encouraged Customers to assert claims against every Debtor in Global Note 2 to the Schedules and in the proof of claim form), nearly all Customers filed proofs of claim against LLC alone.[48]  In the end, there is no evidence that there was any intent to make every Affiliate liable to Customers where they were not before.

28.     Nevertheless, if the Court determines there is ambiguity, it can consider any available extrinsic evidence to determine the intent of the parties.  *See Alexander & Alexander Servs. Inc. v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir. 1998) ("[T]he court may accept any available extrinsic evidence to ascertain the meaning intended by

---

[47]    *See* letter from Gregory F. Pesce, of White & Case LLP, to Ross M. Kwasteniet, of Kirkland & Ellis LLP, dated September 12, 2022, attached as Exhibit D to the Yanez Response Declaration, at UCC_00000002 (stating that "[t]he Committee is concerned regarding the Debtors' position" on the topic of the allowance of Customer claims at each Debtor and "expects that the [Debtors' Schedules] as filed on September 16, 2022 will schedule account holder claims at each Debtor entity" and that "failure to schedule claims in this manner would require the Committee to commence litigation regarding this matter[.]"); *see also* email chain among Tommy Scheffer and Christopher S. Koenig, of Kirkland & Ellis LLP, and Gregory F. Pesce, of White & Case LLP, dated October 4-5, 2022, attached as Exhibit E to the Yanez Response Declaration,  at UCC_00000012 (stating that the Debtors are "trying to remain as agnostic as possible on the Customer Claims Ruling so we tried to keep it super down the middle of the fairway.").

[48]    *See* Series B Preferred Holders' Opening Brief ¶ 51.  As to the Customers' intent, the best gauge is the fact that—prior to entry of the *Order (I) Setting Bar Dates for Submitting Proofs of Claim, (II) Approving Procedures for Submitting Proofs of Claim, (III) Approving Notice Thereof, and (IV) Granting Related Relief* [Dkt. No. 1368], which directed Customers to file claims against all Debtors—approximately 95% of proofs of claim filed by Customers were filed against LLC and less than 1% were filed against CNL.  *See* Celsius Claims Register, https://cases.stretto.com/Celsius/claims/ (The Claims Register, accessed on January 30, 2023, denotes that as of November 15, 2022: 10,210 total proofs of claim were filed; 9,707 against LLC; 73 against CNL; 18 against Mining; and 11 against "All Debtors."  Taken conservatively, even assuming all 18 claims against Mining and the 11 All Debtor claims are Customer claims under the Terms of Use and are asserting claims against all Debtors, there can at most be 29 claims out of 10,210, or less than 0.3%, against all Debtors).

the parties . . . ."); s*ee also Catlin Specialty Ins. Co. v. QA3 Fin. Corp.*, 36 F. Supp. 3d 336, 339

(S.D.N.Y. 2014), *aff'd*, 629 F. App'x 127 (2d Cir. 2015) (considering extrinsic evidence such as

"emails, past versions of similar policies, and testimony from various witnesses"); *JA Apparel*

*Corp. v. Abboud*, 568 F.3d 390, 395 (2d Cir. 2009) (considering "fairly extensive extrinsic

evidence," which included correspondence between the parties, meeting minutes, testimony by

the negotiating attorneys, and documents from the drafting process) (internal quotation marks

and citation omitted); *Cacace v. Meyer Mktg. (Macau Com. Offshore) Co.*, 589 F. Supp. 2d 314,

321 (S.D.N.Y. 2008) (considering contextual evidence about what "products" mean in the

industry context); *Castillo v. GM, LLC (In re Motors Liquidation Co.)*, 500 B.R. 333, 344-47

(S.D.N.Y. 2013), *aff'd*, 578 F. App'x 43 (2d Cir. 2014) (considering such extrinsic evidence as,

internal documents, internal conversations, PowerPoint presentations, negotiations, context of

what was occurring during the bankruptcy filing, and payments GM made to fix the defective

transmissions after execution of the agreement).[49]   The extrinsic evidence submitted, which is

uncontroverted, overwhelmingly supports the only plausible interpretation of the Terms of Use—

LLC is the only Debtor liable to Customers.  *See Compagnie Financiere de CIC et de L'Union*

*Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 155 (2d Cir. 2000)

(ordering entry of judgment for plaintiff because "the overwhelming weight of the extrinsic

evidence . . . supports plaintiff's [interpretation]"); *Dreni v. PrinterOn Am. Corp.*, 2021 WL

4066635, at *8 (S.D.N.Y. Sept. 3, 2021) (ruling in favor of defendant because "overwhelming

---

[49]   If the determination of the parties' intent depends on the credibility of extrinsic evidence, such determination
should be made by the finder of fact and not excluded as a matter of law.  *See Hartford Accident & Indem. Co.
v. Wesolowski*, 33 N.Y.2d 169, 172, 305 N.E.2d 907, 909 (N.Y. 1973) ("If there is ambiguity in the terminology
used, however, and determination of the intent of the parties depends on the credibility of extrinsic evidence or
on a choice among reasonable inferences to be drawn from extrinsic evidence, then such determination is to be
made by the [finder of fact].").

extrinsic evidence makes clear" that the defendant's interpretation was what the parties intended).

A. **The Migration Plan and Other Documents Show that the Debtors Intended to Transfer Customer Liabilities from CNL to LLC.**

29.     In addition to the plethora of evidence offered by the Series B Preferred Holders in their Opening Brief, additional evidence sought and produced in discovery further supports the Series B Preferred Holders' interpretation of the Terms of Use.

30.     In connection with the Migration of the Customer-facing business from CNL to LLC, CNL and the FCA negotiated a detailed action plan for effecting CNL's withdrawal from any contractual relationship with Customers.[50]  During the course of those negotiations, among other things, CNL undertook not to engage in activities that involve any non-institutional (*i.e.*, retail) counterparties.[51]

31.     CNL agreed with the FCA on a plan for Migration (the "Migration Plan"), which contemplated the transfer of Customer assets and liabilities from CNL to LLC.[52]  The Migration Plan addressed, among other things, the steps to be taken in the Migration, including the plan for obtaining Customer consents.[53]  Two of the drafters of each version of the Terms of Use, Roni Cohen Pavon (Chief Revenue Officer) and Yarden Noy (Head of Regulation), routinely updated the FCA as to CNL's progress on the Migration Plan.[54]  The FCA also imposed a direction on

---

[50]   *See e.g.*, Yanez Response Decl., Exhibit C (emails between CNL and the FCA addressing the Migration).

[51]   *Id*.

[52]   *See id.* at CEL_CUST-00002670-71 (noting that all clients will engage with LLC and that Customers must "[a]gree to engage with the new entity, transfer of rights and obligations").

[53]   *Id.* at CEL_CUST-00002661, CEL_CUST-00002671-74.

[54]   *See, e.g., id.* at CEL_CUST-00002662 (Roni Cohen Pavon attaching the Migration Plan on June 24, 2021, "which includes a status update on some of the issues we discussed"); *id.* at CEL_CUST-00002659-61 (Yarden Noy sending a Migration update email to the FCA on July 1, 2021).  The Debtors have acknowledged in the

CNL, and CNL agreed to such direction through Roni Cohen Pavon's execution of a Direction Agreement on or around July 21, 2021.[55]  The Direction Agreement further reinforces that CNL would no longer provide any services as a cryptoasset exchange provider, would transfer Customers' assets, contractual relationship, and liabilities from CNL to LLC.[56]  Specifically, the Direction Agreement expressly provided, among other things, that CNL would "notify all of its existing customers of the ***migration of [CNL's] customer's contractual relationship to . . . LLC***" and that any references therein "to the ***migration of contractual relationship with a customer*** . . . includes the change of legal and beneficial ownership of the cryptoasset from [CNL] to . . . LLC." [57]

   32. Consistent with the Migration Plan and Direction Agreement:

- On July 22, 2021, Terms of Use Version 6 was implemented, removing CNL as the contracting entity and changing the governing law from the laws of England and Wales to New York law.[58]

---

deposition questions responses that "the terms of use were primarily drafted by its Legal and Regulatory departments, including, at or around July 2021 and later, Ron Deutsch, Joseph Golding-Ochsner, Yarden Noy, and Roni Cohen."  *See Debtors' Responses and Objections to Official Committee of Unsecured Creditors Written Deposition Questions for the Debtors in Connection with the Debtors Amended Motion for Entry of Order (I) Establishing Ownership Assets in the Debtors Earn Program, (II) Permitting the Sale of Stablecoin in the Ordinary Course and (III) Granting Related Relief* [Dkt. No. 1406] at 6.

[55] Yanez Response Decl., Exhibit B at CEL_CUST-00002759 (signature page).

[56] *Id.* at CEL-CUST-00002757-61.

[57] *Id*. at CEL_CUST-00002757-58 (emphasis added).  Although certain extrinsic evidence indicates that non-Debtor Celsius EU UAB assumed liability to Customers, that question is ultimately not before the Court, because Celsius EU UAB is a non-Debtor.

[58] Terms of Use Version 6 addressed the governing law change as follows:

   Celsius is subject to ~~Anti Money~~ Anti-Money Laundering ("AML") ~~and~~, Know Your Client ("KYC"), and U.S. sanction requirements under the ~~UK Money Laundering, Terrorist Financing and Transfer of Funds (Information on the Payer) Regulations 2017 ("MLRs") as a crypto asset business.~~ Bank Secrecy Act ("BSA"), Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act ("USA PATRIOT Act"), and the Office of Foreign Assets Control ("OFAC") . . . . The relationship between you and Celsius is governed exclusively by the laws of ~~England and Wales~~ the state of New York[.]

- Beginning on July 22, 2021, Customers were informed of the Migration and the changes in Terms of Use Version 6 *via* email and required to either agree to the Migration and accept Terms of Use Version 6 or close their account.[59]

- "In parallel, for a period of two weeks after [July 22, 2021]," all Customers that did not either agree to the Migration or close their accounts received "a pop-up each time they connect[ed] to the app, allowing them to accept [the] new [T]erms [of Use] or terminate the relationship" with CNL.[60]

- On August 23, 2021, CNL withdrew from the FCA registration process and ceased activity falling within the scope of the UK Money Laundering, Terrorist Financing and Transfer of Funds (Information on the Payer) Regulations 2017.[61]

33.    To effectuate the Migration, CNL and LLC entered into an Asset Transfer Agreement (the "Asset Transfer Agreement"), pursuant to which CNL transferred to LLC "***all of [its] obligations related to or resulting from the [Customers'] use of the Celsius App***[.]"[62]  The Asset Transfer Agreement further explains that "[CNL], in order to no longer provide services to or contract with the [Customers], wishes to ***transfer the assets and liabilities of the Business that relate specifically to the [Customers]***."[63]  LLC, in turn, agreed to "accept and assume" such assets and liabilities.[64]

---

*See* Yanez Response Decl., Exhibit A at 325, 384.  It would not have made any sense to delete all references to UK laws if CNL, a UK entity, remained party to the revised Terms of Use.

[59]    Yanez Response Decl., Exhibit B at CEL_CUST-00002761 (Annex 1 ¶ 1(i)).

[60]    *Id.*

[61]    *See id.* at CEL_CUST-00002759, CEL_CUST-00002761.

[62]    Asset Transfer Agreement by and between CNL and LLC, effective as of August 19, 2021, attached as Exhibit F to the Yanez Response Declaration, at CEL_CUST00006352 (Exhibit 1 – Transferred Assets and Liabilities) (emphasis added).  In addition, CNL and LLC entered into an Intercompany Operation and Loan Agreement, attached as Exhibit G to the Yanez Response Declaration.

[63]    Yanez Response Decl., Exhibit F at CEL_CUST00006345 (emphasis added).

[64]    *Id.*

34.     Moreover, consistent with the migration of CNL's obligations to LLC, certain ancillary agreements with so-called "omnibus partners" were also migrated from CNL to LLC. As detailed in the Debtors' recent filing in *In re Voyager Digit. Holdings Inc.*, No. 22-10943-MEW (Bankr. S.D.N.Y. July 5, 2022), pending before Judge Wiles in the S.D.N.Y. Bankruptcy Court (the "<u>Voyager Chapter 11 Cases</u>"), Voyager Digital LLC ("<u>Voyager</u>") historically contracted with CNL, as an omnibus partner, to ensure its customers direct access to the Earn program under the Omnibus Wallet Service Agreement.[65]  In conjunction with the Migration, the Omnibus Wallet Service Agreement was assigned by CNL to LLC and Celsius EU UAB.[66] Pursuant to the Assignment and Amendment of Omnibus Wallet Service Agreement, LLC assumed CNL's duties and obligations thereunder.[67]  Notably, that agreement—which is signed by Roni Cohen Pavon—states, in relevant part:

> <u>Terms of Use</u>.  In connection with the Migration, the Services will be ***subject to updated terms of use with [LLC]*** and Celsius EU [UAB], and that [LLC] and Celsius EU [UAB] may, at any time and in their sole discretion, modify their terms of use as available at their website (http://celsius.network).[68]

Just last month, the Debtors cited to this amendment to the Omnibus Wallet Service Agreement with Voyager in a motion filed in the Voyager Chapter 11 Cases to argue that LLC assumed all of

---

[65]  *See* Omnibus Wallet Service Agreement by and between CNL and Voyager, dated June 12, 2020, attached as Exhibit H to the Yanez Response Declaration.

[66]  *See* Assignment and Amendment to Omnibus Wallet Service Agreement by and between CNL, LLC, Celsius EU UAB, and Voyager, dated August 19, 2021, attached as Exhibit I to the Yanez Response Declaration.

[67]  *Id.* at CEL_SBPH_000012.

[68]  *Id*. (emphasis added).

CNL's rights and obligations under that agreement and that LLC ***and not CNL*** was the contract counterparty to Voyager.[69]

## B. No Evidence Has Been Offered to the Contrary.

35. It is especially compelling that the Debtors do not offer ***any*** extrinsic evidence in support of their position. The Debtors have sole access to the drafters of the Terms of Use, who could clearly speak to the intent behind Terms of Use Versions 6 through 8. The Debtors also control the drafting history of the Terms of Use, the internal communications with respect to the Terms of Use, and the documents effectuating the transfer of Customer assets and liabilities. But the Debtors have not offered any evidence that anyone intended or believed that every entity in the Debtors' corporate structure would become liable to Customers under Terms of Use Version 6. Indeed, the Debtors were in possession of the Asset Transfer Agreement when they inexplicably scheduled Customer claims at every Debtor without marking them as disputed.

36. The Committee, too, fails to offer any evidence that Affiliates were made liable in Version 6 of the Terms of Use. Instead, perhaps because it is so damning, the Committee attempts to dismiss the extrinsic evidence, but its efforts are unavailing for several reasons. ***First***, it is irrelevant that the Debtors and Committee now claim, in litigation, that all Debtors are liable to Customers; the only relevant inquiry is what the intent behind the Terms of Use was at the time of adoption of each relevant version. *See Israel v. Chabra*, 601 F.3d 57, 65 n.2 (2d Cir. 2010) ("[O]ur role in interpreting a contract is to give effect to the intent of the parties at the time

---

[69] *See Declaration of Christopher Ferraro in Support of Motion of Celsius Network LLC for Order (I) Lifting the Automatic Stay Pursuant to 11 U.S.C. 362(d)(1) and Bankruptcy Rule 4001 and (II) Granting Leave to File Late Proof of Claim Pursuant to Bankruptcy Rules 3003(c) and 9006(b)(1)*, Case No. 22-10943 (MEW) [Dkt. No. 729], attached as Exhibit J to the Yanez Response Declaration, ¶ 5 ("On or around August 19, 2021 that Agreement was amended and [CNL] assigned to [LLC] and [Celsius EU UAB] all of its rights, title and interest under the Agreement. Thereafter, [LLC] and Celsius EU [UAB] assumed all of [CNL's] duties ***and obligations*** under the Agreement.") (emphasis added).

of the contract's making, not the position they found it necessary to adopt during litigation.");

*Hawes Office Sys., Inc. v. Wang Lab'ys., Inc.*, 537 F. Supp. 939, 942 (E.D.N.Y. 1982)

("[C]onduct during litigation is ***wholly irrelevant*** to prior contractual intent.") (emphasis added).

37.    ***Second***, the Committee wrongly asserts that the drafting history of the Terms of

Use supports its position.  Specifically, the Committee points out that the contracting party

named in the introductory paragraph was changed from CNL in version 5 of the Terms of Use to

"[LLC] and its Affiliates" in version 6.[70]  The Committee would have the addition of Affiliates

to the definition of Celsius be considered dispositive—but that would completely ignore the

drafters' obvious intent to ***specifically change*** the Customers' contract counterparty through the

Migration.  As stated above, it defies logic to suggest that the drafters would, in response to the

changes in the UK's regulations, expressly remove CNL as the Terms of Use counterparty only

to add it right back as an Affiliate.  It is equally illogical that Affiliates were carved out from

liability to Customers in versions 1 through 5 of the Terms of Use to become liable, as Debtors

and the Committee assert, under version 6 for no discernable reason and without any record of it.

Nor has any party offered evidence that any Affiliate actually agreed to take on the massive

liability to Customers when version 6 was executed or received any consideration for doing so.[71]

---

[70]    Committee's Opening Brief ¶ 26.

[71]    *See Thomson-CSF, S.A. v. Am. Arb. Ass'n*, 64 F.3d 773, 775-80 (2d Cir. 1995) (declining to enforce agreement against non-signatory parent corporation notwithstanding language in contract that purported to bind "affiliates" of contracting subsidiary); *Sheridan Broad. Corp. v. Small*, 19 A.D.3d 331, 332 (N.Y. App. Div. 2005) ("Parent and subsidiary or affiliated corporations are, as a rule, treated separately and independently so that one will not be held liable for the contractual obligations of the other absent a demonstration that there was an exercise of complete dominion and control . . . .") (internal citation omitted); *see also DK Joint Venture 1 v. Weyand*, 649 F.3d 310, 319 (5th Cir. 2011) (relying on federal case law to hold that contract language purporting to bind "affiliates" was not sufficient basis to enforce agreement against non-signatories, absent evidence that contracting parties "had any type of authority to bind" non-signatories); *Woodward, Inc. v. ZHRO Sols., LLC*, No. 18-CV-01468-PAB-STV, 2019 WL 1438076, at *5 (D. Colo. Mar. 31, 2019) (holding that a non-signatory may not be bound to a contract "even when the non-signatory is a parent or other corporate affiliate of a contracting party") (internal citation omitted).  In any event, parties cannot bind future affiliates without

38.     Further, the Debtors' and Committee's interpretation of Celsius would include all of LLC's non-Debtor affiliates.[72]  None of them, however, sought bankruptcy protection nor does the automatic stay apply to them.

39.     **Third**, the Committee states that it is "unaware of any communications to account holders or other public statements made at the time that Version 6 was issued stating that Celsius was dramatically altering its obligations to its customers and moving such obligations away from the company's assets."[73]  This statement is truly baffling.  As discussed in detail in the Series B Preferred Holders' Opening Brief, as part of the implementation of version 6 of the Terms of Use, "the Debtors undertook significant outreach to existing [Customers]" *via* email, in-application pop-up windows, and blogposts, informing them of the key changes to the Terms of Use, including the change from CNL to LLC.[74]

## C.     Evidence Supports the Interpretation that Certain Debtors Are Not Included in the Definition of Celsius.

40.     The evidence logically supports the Series B Preferred Holders' interpretation. Affiliates were historically carved out from Customer liability and the Debtors have offered no evidence to support a change to such state of affairs.  Looking at the drafting history—as the Committee encourages the Court to do—Mining, for example, was explicitly carved out from

---

"forward looking language" or other express language to that effect. *Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239, 246 (N.Y. 2014); *see also VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 130 (2d Cir. 2001) ("The Release's reference to 'affiliates' and the definition of the word are stated in the present tense. Nothing in this definition indicates the inclusion of future rather than present members.").

[72]  Non-Debtor Affiliates are Celsius Network Europe d.o.o. Beograd (Serbia), Celsius EU UAB (Lithuania), Celsius Network IL Ltd. (Israel), Celsius Network IL Ltd. – Bulgaria Branch, Celsius Services CY Ltd. (Cyprus), Celsius (AUS) Pty Ltd. (Australia), Celsius Network Limited (Gibraltar), Celsius Mining IL Ltd. (Israel), Celsius US LLC (Del.), Celsius Management Corp. (Del.), Celsius Operation LLC (Del.), and KN Media Manager, LLC (Del.).  Until recently, non-Debtor Affiliates also included the GK8 Entities.

[73]  Committee's Opening Brief ¶ 27.

[74]  Blonstein Decl. ¶ 17; *see also id.*, Exhibit A; Series B Preferred Holders' Opening Brief ¶¶ 14-16, 34.

liability in versions 1 through 5 of the Terms of Use. It is inexplicable why, after the Migration, Mining would suddenly incur liability to Customers. Indeed, Mining operates a cryptocurrency mining enterprise and does not provide any products or services to Customers.[75] Even if the Committee is correct that Mining's business provided "benefit" to "account holders,"[76] such indirect benefit was not in the form of products or services received by Customers under the Terms of Use. As noted in the caption of the YouTube video cited by the Committee (which *predated* the Migration), Mining "offers a lifeline to the business model in case other legs of the business need support" and, as noted in the clip, Mining is "just one to one exposure reduction."[77] There is no indication that Mining was ever intended to provide any products, perform any services, or take on any liabilities under the Terms of Use.

41. Similarly, as to the GK8 Entities, their operations were never integrated into the rest of the Debtors' operations, and the Debtors have offered no evidence that the GK8 Entities agreed to take on liability to Customers.[78]

## III. The *Contra Proferentem* Principle Should Not be Applied.

42. The Committee argues that because the Terms of Use constitute a contract of adhesion, the *contra proferentem* principle should be applied to its interpretation, *i.e.*, that any

---

[75] *See* Mashinsky Decl. ¶ 65. The Mining S-1 described Mining as a "standalone entity" whose operations were "segregated into a new company formed in 2020." *See* Yanez Decl., Exhibit I (Mining S-1) at 1.

[76] *See* Committee's Opening Brief ¶ 7.

[77] *See id.* (citing Celsius Network, *Celsius mining Bitcoin helps the company and the community*, YouTube (June 28, 2021), https://www.youtube.com/watch?v=nQ352qf1fzI&t=59s (last accessed on Dec. 22, 2022)).

[78] *See Debtors' Statement in Support of Entry of the Order (I) Approving the Sale of the GK8 Debtors' Assets Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances, (II) Authorizing the GK8 Debtors to Enter into and Perform Their Obligations Under the Asset Purchase Agreement, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [Dkt. No. 1671] ¶ 10 ("the Initial Debtors operated as a cryptocurrency-based finance platform, while the GK8 Debtors operate a blockchain security company that was never integrated with the Initial Debtors' platform."). GK8 Ltd. was acquired by CNL in October 2021 to provide secure digital asset custody services. GK8 UK Limited and GK8 USA LLC were incorporated in conjunction with GK8 Ltd. (collectively, the "GK8 Entities"). *See* Mashinsky Decl. ¶¶ 8, 85-86.

potential ambiguity should be interpreted against the drafter.[79]  The *contra proferentem*

principle, however, is to be applied only (i) where more than one reasonable interpretation exists

and (ii) as ***a last resort***, after all other guides to interpretation have been exhausted.  *See Electra*

*v. 59 Murray Enters.*, 987 F.3d 233, 245 (2d Cir. 2021) ("[The] generally accepted purpose [of

*contra proferentem* is] as an interpretive tiebreaker of last resort."), *cert. denied*, 211 L. Ed.2d

352, 142 S. Ct. 563 (2021); *U.S. Naval Inst. v. Charter Commc'ns, Inc.*, 875 F.2d 1044, 1050 (2d

Cir. 1989) ("Finally, if, after all of the other guides to interpretation have been exhausted and the

court concludes that there remain two reasonable interpretations of the contract, with each party

knowing or having reason to know of the other party's understanding of the term, the court

should as a policy matter, assuming . . . the parties have indeed attempted to enter into a contract,

choose the interpretation that is adverse to the party that drafted the contract.").  As demonstrated

above, the reading championed by the Debtors and the Committee does not yield a "reasonable

interpretation" of numerous Terms of Use provisions, so the *contra proferentem* principle is not

applicable.  Alternatively, it may only be applicable ***after*** the Court considers all of the extrinsic

evidence and still remains in doubt as to the proper interpretation.

## Conclusion

43.    Based on all of the foregoing, the Series B Preferred Holders respectfully request

that the Court find that (i) LLC is the only Debtor liable to Customers under the Terms of Use

and (ii) grant any related relief.

---

[79] *See* Committee's Opening Brief ¶ 23 ("Even if the Terms of Use were found to be ambiguous, any conflict or ambiguity must be construed in favor of the account holders.").  In one of the two cases the Committee cites for this proposition, *Westchester Resco Co., L.P. v. New England Reinsurance Corp.*, the court affirmed the district court's grant of partial summary judgment "substantially on the basis of [the district court]'s opinion," which relies heavily on extrinsic evidence to interpret ambiguous contract terms and not on *contra proferentem* principle.  818 F.2d 2, 2 (2d Cir. 1987).  In the other, *Ward v. TheLadders.com, Inc.*, the court applied *contra proferentem* where two provisions in a contract of adhesion flatly contradicted each other.  *See* 3 F. Supp. 3d 151, 161 (S.D.N.Y. 2014).

Dated: January 31, 2023
       New York, New York

Respectfully submitted,

/s/ *Dennis Dunne*                           /s/ *Joshua Mester*
Dennis F. Dunne                           Joshua M. Mester (admitted *pro hac vice*)
Nelly Almeida                              **JONES DAY**
**MILBANK LLP**                      555 South Flower Street
55 Hudson Yards                      Fiftieth Floor
New York, NY 10001              Los Angeles, CA 90071
Tel: (212) 530-5000                Tel: (213) 489-3939
Fax: (212) 660-5219               Fax: (213) 243-2539

- and -                                     *Counsel to CDP Investissements Inc.*

Andrew M. Leblanc
Melanie Westover Yanez
**MILBANK LLP**
1850 K Street, NW, Suite 1100
Washington, DC 20006
Tel: (202) 835-7500
Fax: (202) 263-7586

*Counsel to Community First Partners, LLC,*
*Celsius SPV Investors, LP, and*
*Celsius New SPV Investors, LP*