Dennis F. Dunne
Nelly Almeida
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Tel: (212) 530-5000
Fax: (212) 660-5219

Andrew M. Leblanc
Melanie Westover Yanez
**MILBANK LLP**
1850 K Street, NW, Suite 1100
Washington, DC 20006
Tel: (202) 835-7500
Fax: (202) 263-7586

*Counsel to Community First Partners, LLC,
Celsius SPV Investors, LP, and Celsius
New SPV Investors, LP*

Joshua M. Mester (admitted *pro hac vice*)
**JONES DAY**
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071
Tel: (213) 489-3939
Fax: (213) 243-2539

*Counsel to CDP Investissements Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF MELANIE WESTOVER YANEZ IN SUPPORT OF
SERIES B PREFERRED HOLDERS' RESPONSE BRIEF ON THE ISSUE OF
WHICH DEBTORS ARE LIABLE TO CUSTOMERS UNDER THE TERMS OF USE**

I, Melanie Westover Yanez, hereby declare as follows under penalty of perjury:

1.     I am an attorney with the law firm of Milbank LLP, counsel for Community First

Partners, LLC, Celsius SPV Investors, LP, and Celsius New SPV Investors, LP, as beneficial

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius
Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending
LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC
(9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service
address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

holders, or investment advisors or managers of beneficial holders, of Series B Preferred Shares issued by Celsius Network Limited.

2.      I respectfully submit this declaration in support of the *Series B Preferred Holders' Response Brief on the Issue of Which Debtors Are Liable to Customers Under the Terms of Use* (the "Response Brief"), submitted concurrently herewith.

3.      Attached hereto as **Exhibit A**, for ease of reference, is a true and correct copy of the redline between version five and version six of the general Terms of Use, as it was attached to the *Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, Providing Terms of Use Dating Back to February 18, 2018* [Dkt. No. 393].

4.      Attached hereto as **Exhibit B** is a true and correct copy of a document titled "Voluntary Application for Imposition of Direction," dated July 21, 2021, as produced to the Series B Preferred Holders by the Debtors as CEL_CUST-00002757 through CEL_CUST-00002762 in response to the Series B Preferred Holders' document requests in this proceeding.

5.      Attached hereto as **Exhibit C** is a true and correct copy of an email chain among Yarden Noy and Roni Cohen Pavon, of Celsius Network Limited, to Lauren Pittas and Ele Vasina, of the Financial Conduct Authority, dated June 17, 2021 through July 1, 2021 regarding "FCA – confirming next steps" and attaching a document titled "Celsius Network Limited - Migration Plan," as produced to the Series B Preferred Holders by the Debtors as CEL_CUST-00002659 through CEL_CUST-00002674 in response to the Series B Preferred Holders' document requests in this proceeding.

6.      Attached hereto as **Exhibit D** is a true and correct copy of a letter from Gregory F. Pesce, of White & Case LLP, to Ross M. Kwasteniet, of Kirkland & Ellis LLP, dated September 12, 2022 regarding "*In re Celsius Network, LLC, et al.*, No. 22-10964 (MG) (Bankr. S.D.N.Y.)," as produced to the Series B Preferred Holders by the Official Committee of

Unsecured Creditors (the "<u>Committee</u>") as UCC_00000001 through UCC_00000003 in response to the Series B Preferred Holders' document requests in this proceeding.

7.      Attached hereto as **<u>Exhibit E</u>** is a true and correct copy of an email chain among Tommy Scheffer and Christopher S. Koenig, of Kirkland & Ellis LLP, and Gregory F. Pesce, of White & Case LLP, dated October 4 through 5, 2022 regarding "CEL - Global Notes," as produced to the Series B Preferred Holders by the Committee as UCC_00000011 through UCC_00000014 in response to the Series B Preferred Holders' document requests in this proceeding.

8.      Attached hereto as **<u>Exhibit F</u>** is a true and correct copy of the Asset Transfer Agreement by and between Celsius Network Limited and Celsius Network LLC, effective August 19, 2021, as produced to the Series B Preferred Holders by the Debtors as CEL_CUST-00006345 through CEL_CUST-00006353 in response to the Series B Preferred Holders' document requests in this proceeding.

9.      Attached hereto as **<u>Exhibit G</u>** is a true and correct copy of the Intercompany Operation and Loan Agreement by and between Celsius Network Limited and Celsius Network LLC, effective August 19, 2021, as produced to the Series B Preferred Holders by the Debtors as CEL_CUST-00006333 through CEL_CUST-00006338 in response to the Series B Preferred Holders' document requests in this proceeding.

10.     Attached hereto as **<u>Exhibit H</u>** is a true and correct copy of the Omnibus Wallet Service Agreement by and between Celsius Network Limited and Voyager Digital LLC, dated June 12, 2021, as produced to the Series B Preferred Holders by the Debtors as CEL_SBPH_000001 through CEL_SBPH_000011 in response to the Series B Preferred Holders' document requests in this proceeding.

11.     Attached hereto as **<u>Exhibit I</u>** is a true and correct copy of the Assignment and Amendment to Omnibus Wallet Service Agreement by and between Celsius Network Limited, Celsius Network LLC, Celsius EU UAB, and Voyager Digital LLC, dated August 19, 2021, as produced to the Series B Preferred Holders by the Debtors as CEL_SBPH_000012 through CEL_SBPH_000015 in response to the Series B Preferred Holders' document requests in this proceeding.

12.     Attached hereto as **<u>Exhibit J</u>** is a true and correct copy of the *Declaration of Christopher Ferraro in Support of Motion of Celsius Network LLC for Order (I) Lifting the Automatic Stay Pursuant to 11 U.S.C. 362(d)(1) and Bankruptcy Rule 4001 and (II) Granting Leave to File Late Proof of Claim Pursuant to Bankruptcy Rules 3003(c) and 9006(b)(1)*, Case No. 22-10943 (MEW) [Dkt. No. 729], filed December 14, 2022.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on: January 31, 2023          By: /s/    *Melanie Westover Yanez*
                                                          Melanie Westover Yanez

# **EXHIBIT A**

**Exhibit A-5 to A-6 Redline**

# ~~Celsius~~ Terms of Use

TERMS UPDATED ON September 30, 2020

## 1. Introduction

Celsius Network LLC and its Affiliates ~~Celsius Network Limited (~~(collectively: "we"~~,~~" "our"~~,~~" "us"~~,~~" "Celsius"~~,~~" or the "Company") provide~~s~~ the following Terms of Use (the "Terms") that apply to our users ("you" or "User (s)") ~~when using or purchasing~~ and govern each User's access to, and use of, Celsius' products and services as well as our mobile and web-based application(s), our website(s), any software, programs, documentation, tools, hardware, internet-based services, components, and any updates (including software maintenance, service information, help content, bug fixes or maintenance releases) provided to you by Celsius, directly or indirectly, through our mobile application, our website, or any other online services we provide (collectively, the "Services").
Services provided in connection with specific Eligible Digital Assets listed on Appendix A are provided by the Affiliate Celsius EU UAB, a limited liability company incorporated in Lithuania.

The Services are provided solely for use by you, and your use of the Services is expressly conditioned on your consent to, and compliance with, these Terms. By accessing or using our Services, you agree to be bound by these Terms. If you do not agree to any of the provisions of these Terms you should immediately stop using the Services. In addition, our Privacy Policy is set forth here:https~~here: https~~://web.archive.org/web/2021~~0930014~~9722164416/https://celsius.network/priv~~v~~acy-policy/ and is incorporated into these Terms in its entirety. We encourage you to read these Terms carefully and use them to make informed decisions. ~~Celsius Network is the next generation of Digital Assets-related services, serving as a value-driven lending and borrowing platform for all members of the Celsius Network community. Celsius Network allows Users to take advantage of a variety of services, all in accordance with applicable law and regulation, including:~~

By accepting these Terms you hereby agree and acknowledge that the Services described herein are being provided by multiple Celsius entities incorporated and existing in various jurisdictions, based on the scope and nature of the Services, your jurisdiction and applicable laws. We may, from time to time, provide certain Services by different entities within the Celsius group, and any change in and/or assignment of the contracting entity shall not be consider an amendment of these Terms.

**CELSIUS IS A LENDING AND BORROWING PLATFORM. WHEN YOU TRANSFER DIGITAL ASSETS TO CELSIUS, THOSE DIGITAL ASSETS ARE A LOAN FROM YOU TO CELSIUS, IN ACCORDANCE WITH THE TERMS HEREOF. UNDER NO CIRCUMSTANCES DOES CELSIUS HOLD DIGITAL ASSETS IN CUSTODY ON YOUR BEHALF AS PART OF THE SERVICES GOVERNED BY THESE TERMS.**

**ALL DIGITAL ASSETS TRANSFERRED TO CELSIUS AS PART OF THE SERVICES ARE OWNED AND HELD BY CELSIUS FOR ITS OWN ACCOUNT. THE USE OF TERMS SUCH AS "ACCOUNT," "ACCOUNT BALANCE," "WITHDRAW" AND SIMILAR DOES NOT IMPLY OR ESTABLISH, AND SHALL NOT BE TAKEN TO SUGGEST, ANY FORM OF CUSTODY RELATIONSHIP, AND SUCH LANGUAGE IS USED HEREIN AS TERMS OF CONVENIENCE ONLY IN REFERRING TO USERS' BORROWING OR LENDING OF DIGITAL ASSETS TO OR FROM CELSIUS AS PART OF THE SERVICES AND CELSIUS' OBLIGATION TO TRANSFER DIGITAL ASSETS TO USERS UPON THE TERMINATION OF SUCH LOANS OR REPAYMENT OF SUCH BORROWING.**

- ~~Become members in the Celsius platform and community;~~
- ~~Hold your Digital Assets in the Celsius wallet and gain rewards;~~
- ~~Apply for Fiat loans with Digital Assets~~

as collateral; and

- Instantly transfer Digital Assets to other Users through our innovative CelPay feature.

Celsius Network is built around the Celsius Token ("CEL") that allows Users to take advantage of different utilities, primarily to gain better terms and opportunities when using Celsius' Services.

## 2. Definitions

Capitalized terms shall have the meanings assigned to them in these Terms, unless the context requires otherwise.

"Account" or "Celsius Account" means a User's designated user account on the Celsius website or mobile application, allowing a User to access and use the Services, and view and manage his or her personal information and profile. Your Account is not a bank account, deposit account, savings accounts, checking account, or any other type of asset account and should not be characterized as a banking product or service.

"Affiliate" means an entity that owns or controls, is owned or controlled by, or is or under common control or ownership with a party, where control is defined as the direct or indirect power to direct or cause the direction of the management and policies of such party, whether through ownership of voting securities, by contract, or otherwise.

"AML" stands for Anti-Money Laundering, which means a set of procedures, laws, and regulations that are intended to stop the practice of generating income through illegal actions.

"Blockchain" means a system in which records of transactions made in Digital Assets are maintained across several computers that are linked in a peer-to-peer network.

"CEL Token" means Celsius' native token.

"Digital Asset" means a digital representation of value in which encryption techniques are used to regulate the generation of digital units and verify the transfer of assets, operating independently from a central bank.

"Eligible Digital Assets" means the types of Digital Assets we may choose to ~~accept and support~~ designate for inclusion under one or more of the Services from time to time, which are subject to change and/or limitation in our sole discretion, based on business ~~and~~, regulatory and/or other considerations.

"Fiat"," when used in reference to money or currency, means ~~any money that a recognized government declares as legal tender, and has value only because such government maintains its value~~ the coin and paper money of a country that is designated as legal tender, circulates, and is customarily used and accepted as a medium of exchange in the country of issuance.

"KYC" stands for Know Your Customer (or Client), which means the process of a business verifying the identity of its customers or clients and assessing potential risks of illegal intentions for the business relationship.

"Pegging" is the practice of fixing the exchange rate of one currency to the value of another currency or asset.

"Stablecoin" means a Digital Asset that is Pegged to a distinct asset. "Virtual Wallet" or "Virtual Wallet Address" means an on-Blockchain virtual address in which Digital Assets can be held and transferred.

~~"Wallet" or "Celsius Wallet" mean a User's designated personal account on the Celsius website or mobile application, allowing User to use the Services, transact with Celsius, manage his or her balance with Celsius and view and manage his or her personal information and profile.~~

## 3. Eligibility and Proof of Identity

In order to use the Services you must first ~~set up~~register for a Celsius ~~Wallet~~Account.

~~You must be at least eighteen (18) years old to open a Celsius Wallet. Celsius is not obligated to accept any application from any applicant and has sole and absolute discretion to accept or reject applications to open Celsius Wallets. Celsius has no responsibility or liability towards any applicant unless and until Celsius provides written confirmation that a Celsius Wallet has been opened for such an applicant.~~

In order to be eligible to access and use the Services, you must (i) be eighteen (18) years of age or older, (ii) have the legal ability to enter into and be bound by these Terms, (iii) comply with these Terms, and (iv) register for and maintain an active and valid Celsius Account. Celsius is not obligated to accept any application from any applicant and has sole and absolute discretion to accept or reject applications to create Celsius Accounts.

~~Celsius Wallets~~The Services are not available where prohibited by law or by Celsius policy, as updated from time to time; currently, such places include the countries of Iran, North Korea, Sudan, South Sudan, Syria, Cuba, or any other country against which the United States, the United Kingdom or the European Union imposes financial sanctions or embargoes.

Be advised that in some jurisdictions, due to regulatory considerations, Celsius may not provide part or all of the Services, which may include support for some Eligible Digital ~~Currencies~~Assets or the CEL ~~t~~Token.

Due to changing regulatory requirements and interpretations in the Digital Assets markets, Celsius will use its sole and absolute discretion to revise the list of prohibited jurisdictions ~~and/or~~, reject specific applications to open Celsius ~~Wallets and/or~~Accounts, use part or all of the Services and/or close, freeze or suspend Celsius Accounts, where Celsius, at its sole and absolute discretion, has determine~~d~~s that regulatory or policy reasons prevent Celsius from being able to offer its Services.

Celsius is subject to ~~Anti Money~~Anti-Money Laundering ("AML") ~~and~~, Know Your Client ("KYC"), and U.S. sanction requirements under the ~~UK Money Laundering, Terrorist Financing and Transfer of Funds (Information on the Payer) Regulations 2017 ("MLRs") as a crypto asset business.~~Bank Secrecy Act ("BSA"), Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act ("USA PATRIOT Act"), and the Office of Foreign Assets Control ("OFAC").

Celsius also registered as a Money Service Business ("MSB") on April 15, 2018 with FinCEN registration number 31000170534951. As an MSB, Celsius is required to comply with the U.S. Federal Bank Secrecy Act ("BSA").

Under ~~both MLRs~~applicable AML and ~~BSA~~OFAC rules, Celsius is obligated to maintain certain information about you, including User records and transaction history, for ~~several years~~five years (seven years for Users reside in the state of New York), or a longer period as may be required under applicable laws. Under certain circumstances, Celsius is required to report to the competent authorities of any unusual transactions, or of any suspicion it may have that any User might be involved in any financial crime or illicit activity.

Celsius is required to comply with applicable AML and KYC requirements before and after you ~~open~~register for a Celsius ~~Wallet~~Account. When you ~~apply to open~~register for a

Celsius ~~Wallet~~Account, we will ask for documentation and information, including but not limited to copies of your government-issued identification document (e.g. Passport, driver's license). For corporate Celsius ~~Wallets~~Accounts, we may require identification information related to the directors, officers, authorized representatives, or equity owners of the business. We may also gather and use information about you from third parties, to help us confirm your identity, perform our AML/KYC checks and/or determine ~~if we should open or maintain your Celsius Wallet.~~your access to the Services You represent and warrant at all times that any and all information provided by you to us is true, accurate, and not misleading in any respect. If any such information changes, it is your obligation to provide the new information to us as soon as practicable following such change.


## 4. ~~Nature of e-~~Services


### A. Celsius ~~Wallet~~**Account**


Your Celsius~~' Services~~ Account allows you to ~~re~~view your balances in connection with the Services procided to you by Celsius ~~Wallet~~and access the Services and conduct certain transactions online. You are solely responsible for the activities under your

Celsius ~~Wallet~~ Account and for securing your Celsius ~~Wallet~~ Account IDs, passwords, hints, or any other codes that you use to access your Celsius ~~Wallet~~ Account and the Services. Celsius is not responsible for any loss or compromise of your access information and/or your personal information, or for any loss that you may sustain due to compromise of your access information and/or personal information.

We will not be liable for following any instruction we receive through your Celsius ~~Wallet~~ Account, even if it was not authorized by you, or if it was entered by mistake or is otherwise inaccurate. To verify the authenticity of any instruction

we receive through your Celsius ~~Wallet~~Account, we may require your signature or identification in any form we deem necessary~~;~~, at our sole discretion, and we may accept digital images and electronic signatures for documents that need to be signed. You agree to reimburse us (and we may charge you or deduct from the balance of your Celsius ~~Wallet~~Account) for all claims, costs, losses and damages, including reasonable attorneys' fees, that result from our following your instructions to take any action related to your Celsius ~~Wallet~~Account.

Your Celsius Account is not a deposit or checking account, and Celsius does not hold any Digital Assets on your behalf. All Eligible Digital Asset balances on your Account represent Digital Assets are either loaned from you to Celsius or held by it as collateral, and therefore, owned, held and/or controlled by Celsius (under the applicable Service, as further detailed herein), and Celsius' obligation to deliver such Digital Assets back to you upon the termination of the applicable Service.

Celsius may freeze, suspend or terminate your Account at any time in its sole discretion, in addition to taking any action and seeking any remedy it may be entitled to in law or in equity, in any event it may have any suspicion of your involvement in any fraudulent activity of any kind, misuse of the Services, inaccurate or misleading information provided by you, or any money laundering or other financial crime related to you or your Celsius Account.

**B.** ~~Loans~~**Earn Rewards**
Our Earn Rewards service allows you to earn a financing fee from Celsius, referred to as "Rewards", in the form of Digital Assets (either in-kind, i.e. in the same Digital Asset you deliver, or in CEL Tokens, where permitted) in exchange for entering into open-ended loans of your Eligible Digital Assets to

Celsius under the terms hereof. By lending your Eligible Digital Assets to Celsius you grant Celsius all rights and title to such Digital Assets, for Celsius to use in its sole discretion.

The balance of Eligible Digital Assets loaned by you to Celsius, and any Rewards gained thereon (see further Section 12 below, "How Rewards are Calculated and Earned") are visible via your Celsius Account. You may terminate any loan to Celsius at any time, and request that Celsius return the borrowed Eligible Digital Assets and deliver any Rewards accrued from the Earn Rewards service, in each case by transferring such Eligible Digital Assets and Rewards to your external Virtual Wallet (in accordance with Section 11 below, "Withdrawals").

Earn Rewards is not an investment program nor a speculative tool. Rather, you are earning Rewards as a financing fee on the loan of Digital Assets you have transferred to Celsius, in accordance with the rates published by Celsius from time to time, in accordance with these Terms.

By virtue of agreeing to these Terms and transferring any Eligible Digital Assets to the Virtual Wallet provided by Celsius via our platform (which, for the avoidance of doubt, shall be seen as completed only upon the receipt of such Eligible Digital Assets in the applicable Virtual Wallet controlled by Celsius), you agree to lend such Digital Assets to Celsius in accordance with the terms hereof.

**C. Borrow**

You may apply to borrow certain Fiat currencies or Stablecoins from an

You may apply to borrow Fiat from Celsius Networks Lending LLC (the "CNL"), a Celsius Affiliate, or from another affiliate of Celsius, as will be agreed between you and Celsius or its Affiliates

in writing, against **Eligible** Digital Assets in your Celsius ~~Wallet~~**Account (each, a "Fiat Loan")**. If approved, such application shall be subject to a separate ~~loan~~ agreement to be entered into between you and ~~CNL~~**the Celsius Affiliate** (the "**Fiat Loan Agreement**"), and Celsius **or its Affiliates** shall hold the Digital Assets provided as collateral under the **Fiat** Loan Agreement for the benefit of the Lender~~.~~ ~~Any~~ **subject to the terms hereof, including without limitation Sections 9, 10 and 13.**

**In no circumstances shall it be permissible to use the proceeds of such Fiat Loans to purchase additional Digital Assets through any third-party fiat "on-ramp" service providers that may be integrated in or connected with the Celsius platform from time to time, and you represent and warrant that you will not do so. Celsius further does not recommend or encourage any use of borrowed funds for purchasing Digital Assets or making any financial investment. Any use of the proceeds of Fiat loans must be in full compliance with the terms of all applicable laws and regulations, these Terms and the applicable Fiat Loan Agreement, and you shall be solely responsible and liable for any breach of any of the foregoing.**

**Any Eligible** Digital Assets you provide as collateral under a **Fiat** Loan Agreement shall not generate ~~revenue~~**Rewards** for your benefit~~, save~~ **under the Earn Rewards service,** as set out below~~.~~**, and you explicitly authorize Celsius or its Affiliates to temporarily deduct such amounts of Eligible Digital Asset from the balance of your loan to Celsius under the Earn Rewards Service, until such time that your Fiat Loan is repaid in full and your Eligible Digital Assets cease to act as collateral for your Fiat Loan under the applicable Fiat Loan Agreement, at which point such Digital Assets shall be added to the balance of your loan to Celsius and resume being regarded as a loan to Celsius and entitle you to accrue Rewards under the Earn Rewards Service.**

~~In this clause 4B, notwithstanding the use of expressions such as "borrow", "loan", and "collateral" etc., which are used to reflect terminology adopted in the market for transactions of the kind provided for pursuant to the Loan Agreement, title to the Digital Assets shall pass from you to CNL on the basis of an outright sale, subject to your right to request at a later date the delivery of equivalent (but not identical) Digital Assets to those sold to CNL. As consideration for the sale of the Digital Assets to Celsius you will receive an agreed Fiat amount from CNL, which shall act as the purchase price for the sale, along with a fee that shall be calculated by reference to such matters as the Digital Assets sold and the length of time prior to the exercise of your right to request delivery of equivalent Digital Assets. In order to exercise your right to delivery of equivalent Digital Assets to those originally sold to CNL, you must pay an agreed Fiat amount to CNL. In each case the matters expressed above shall be set out in the Loan Agreement and nothing in this clause 4B shall be taken to modify, supplement or otherwise impact the Loan Agreement between you and CNL.~~

Celsius may offer other forms of commercial arrangement under the Borrow service, such as a sale and repurchase arrangement, based on its regulatory, business or other considerations.

**D. CelPay**

CelPay is Celsius' proprietary Digital Asset tool for Celsius Users, which allows you to assign your rights with Celsius in connection with selected Eligible Digital Assets to other registered Users (see further Section 15 below, "CelPay").

By entering into any CelPay transaction you explicitly authorize Celsius or its Affiliates to deduct such amounts of Eligible Digital Asset as you instruct us to transfer to another user from the balance of your loan to Celsius under the Earn Rewards Service, and to be added to the balance of the loan to Celsius of such other User. Conversely, by accepting any CelPay transaction from another User you agree that the amounts of Eligible Digital Asset sent to you shall be added to the balance of your loan to Celsius under the Earn Rewards Service.

# 5. Celsius ~~Wallet~~Account Types

## ~~C~~A. Individual ~~Wallet~~Account

This Celsius ~~Wallet~~Account is owned by only one natural person who is and will continue to be the only person authorized to take any action in the Celsius ~~Wallet~~Account. By opening an Individual Celsius ~~Wallet~~Account, you represent

and warrant that you are and shall at all times continue to be the sole beneficial owner of the Celsius ~~Wallet~~ Account and user of all Services facilitated or generated therefrom.

**~~D~~B. Corporate Celsius ~~Wallet~~Account**

This Celsius ~~Wallet~~<u>Account</u> is owned by a corporation, unincorporated association, a company, a partnership, fiduciary, sole proprietorship or other legally recognized group (interchangeably defined as an "Entity") holding ~~an~~<u>a</u> Celsius ~~Wallet~~<u>Account</u> in any capacity other than an individual capacity. An Entity can apply to open a Celsius ~~Wallet~~<u>Account</u> through any natural person(s) who is duly authorized by the Entity to do so (an "Authorized Representative<u>"</u>").

Such Authorized Representative represents and agrees, on behalf of the Entity, as well as on his or her own behalf, that he or she:

(i) is fully authorized to execute all documents or otherwise complete our requirements in his or her stated capacity;

(ii) has provided us all documents or other information necessary to demonstrate that authority; and

(iii) will provide other documents and complete other requirements as we may request from time to time.

We may refuse to recognize any such authorization if, in our reasonable judgment, it appears to be incomplete or improperly executed.

By opening a Corporate Celsius ~~Wallet~~<u>Account</u>, the Authorized Representative represents and warrants on behalf of the Entity that the Entity is and shall at all times continue to be the sole beneficial owner of the Celsius ~~Wallet~~<u>Account</u> and user of all Services facilitated or generated therefrom and that the ultimate ~~beneficial owners of all assets and assets belonging to the Entity are as represented during the establishment of the Celsius Wallet.~~

beneficial owners of all assets and assets belonging to the Entity are as represented during the establishment of the Corporate Celsius Account. The Entity registered as holder of a Corporate Celsius Account, the ultimate beneficial owner(s) of such Entity and any Authorized Representative(s) shall each be responsible for updating Celsius immediately of any change in the details of the Entity, ultimate beneficial owner(s) and/or Authorized Representative(s), including any appointment or termination of the same, change of control in the Entity or change in the registration details of the Entity, and such persons shall be jointly and severally liable to Celsius for any breach of these Terms in connection with the Corporate Celsius Account.

## 6. Authorized Users

For both Individual and Corporate Celsius ~~Wallets~~Accounts, we may follow any instructions regarding your Celsius ~~Wallets~~Accounts provided that we reasonably believe such instructions are authorized by the Celsius ~~Wallet holder~~Account holder, and we will not be held liable for following any instructions provided by a person designated or identified as an authorized User or Authorized Representative.

## 7. ~~Contributions~~Account Balance

~~All contributions to y~~Your Celsius ~~Wallet must consist~~Account balance visible through the platform shall indicate the amounts of Eligible Digital Assets ~~and must be~~owed to you by Celsius. You can lend additional Eligible Digital Assets to Celsius by transfer~~red~~ing the same to the ~~Virtual w~~Wallet ~~a~~Address(es) provided in your Celsius ~~Wallet~~Account (or as otherwise notified by us to you). We reserve the right to reject entry into any loan transaction, and/or the right to ~~return~~repay any loan of Digital Asset already made,

each at your expense. Any Digital Asset received will be treated by us as being ~~received at~~loaned to us beginning on the date and at the time stamped on the ~~b~~Blockchain confirmation.

Once such Eligible Digital Assets are received by Celsius, they shall be Celsius' property for all intents and purposes, and you will immediately start accruing Rewards on such Digital Assets in accordance with the terms hereof (unless explicitly provided for the purpose of being utilized for any other Service), and the corresponding amount (and kind) of Eligible Digital Assets shall be reflected in your Celsius Account balance.

It is your sole responsibility to make sure that Digital Assets you wish to lend to Celsius are Eligible Digital Assets, and that your transfer on the Blockchain is directed to the correct Virtual Wallet Address as provided to you by Celsius (which may differ from time to time and between different Digital Assets).

If you do not carefully follow these instructions, your Digital Assets may be irrevocably lost, and Celsius may not be able to assist you in retrieving them. Celsius will not be liable to you for any such loss.

## 8. Ownership of Digital Assets

You hereby represent and warrant to us ~~at all times during which you hold Digital Assets in your Celsius Wallet~~ that any Digital Asset ~~used~~delivered by you ~~in connection with your~~for the purpose of utilizing Celsius ~~Wallet'~~ Services is owned by you or that you are ~~validly authorized~~fully permitted to carry out transactions using such Digital Assets~~, and that all transactions initiated with your Celsius Wallet are~~ without restriction or limitation, and that your use of the Services is solely for your own ~~Celsius Wallet~~account and benefit, and not on behalf of any other person or entity. You

further represent and warrant that all such Digital Assets are free from any claims, indebtedness, liens, or third-party interests.

**ALL DIGITAL ASSETS TRANSFERRED TO CELSIUS AS PART OF THE SERVICES ARE OWNED AND HELD BY CELSIUS FOR ITS OWN ACCOUNT IN ACCORDANCE WITH THESE TERMS, AND UNDER NO CIRCUMSTANCES DOES CELSIUS HOLD DIGITAL ASSETS ON YOUR BEHALF AS PART OF THE SERVICES.**

# 9. Setoff and Security Interest Rights

You grant us a security interest in any and all ~~of~~Eligible Digital Assets loaned to Celsius or otherwise credited to your Celsius ~~Wallets~~Account for debts, amounts owed, or liabilities incurred ~~("Obligations")~~to us or any of our ~~a~~Affiliates by ~~any owner of~~you or any of your ~~Celsius Wallets~~Authorized Representatives, if any ("Obligations"). Obligations may include both secured and unsecured debts, and Obligations you owe individually or together with someone else, including Obligations under other transactions or agreements between you and us or any of our Affiliates.

We may take or set off ~~assets in any or all of~~from any Eligible Digital Asset balance in your Celsius ~~Wallets, or transfer assets between any or all of your~~Accounts, or deduct from any obligations Celsius ~~Wallets with us or any of our Affiliates for~~may have to you, any direct, indirect, and acquired Obligations that you owe us or our Affiliates~~, including any balances as a result of not having sufficient assets available, regardless of the source of assets in an Celsius Wallet~~. These rights are in addition to other rights we may have to take, transfer, or charge from any assets or balance in your Celsius ~~Wallet~~Account for Obligations you owe us or our Affiliates.

Your acceptance of these Terms serves as your consent to Celsius' asserting its security interest or exercising its right of setoff should any laws governing your Celsius ~~Wallet~~Account require your consent. If the law restricts our ability to take, transfer, or setoff ~~assets in your Celsius Wallet, or if some Digital Assets are~~from any obligations to you, or if your Celsius Account balance is protected from attachment, levy, or legal process, you waive those conditions and limits to the full extent that you may do so by contract, and you authorize us to ~~apply assets~~take any actions to offset your Obligations in any or all of your Celsius ~~Wallets to your Obligations~~Accounts.

We hereby agree that, to the extent permitted by applicable law, in the event that Celsius breaches its obligation under these Terms, you may ~~take or~~ set off assets ~~in your Celsius Wallet, or any~~or amounts we owe you with respect ~~thereto~~to your Celsius Account, against ~~the~~your Obligations. If the law restricts your ability to take, transfer, or setoff ~~assets in y~~our ~~Celsius Wallet~~obligations to you, or if ~~some Digital Assets~~they are protected from attachment, levy, or legal process, we waive those conditions and limits to the full extent that we may do so by contract, and we authorize you to apply ~~assets in any or all of y~~our ~~Celsius Wallets~~obligations to you to your Obligations.

## 10. Risk Disclosure

Before using any of Celsius' Services, you should ensure that you fully understand and can afford to undertake the risks involved. You should carefully read and make sure you understand our Risk Disclosure page, which lists some, but not all of the risks involved in holding, trading and using crypto assets generally, and using Celsius' services specifically. The risks listed below and in our Risk Disclosure page are intended to provide you with a general outline of the risks involved, but cannot capture all such risks.

## 10. Risk Disclosure

These Terms and ~~the holding of Digital Asset relationship does~~ your use of any of our Services do not create a fiduciary relationship between us and you; your Celsius ~~Wallet~~ Account is not a checking or savings account, and it is not covered by insurance against losses. We may lend, sell, pledge, hypothecate, assign, invest, use, commingle or otherwise dispose of assets and Eligible Digital Assets to counterparties or hold the Eligible Digital Assets with counterparties, and we will use our best commercial and operational efforts to prevent losses. By lending Eligible Digital Assets to Celsius or otherwise using the Services, you will not be entitled to any profits or income Celsius may generate from any subsequent use of any Digital Assets (or otherwise), nor will you be exposed to any losses which Celsius may suffer as a result thereof. You are, however, exposed to the possibility of Celsius becoming unable to repay its obligations in part or in full, in which case your Digital Assets may be at risk.

ELIGIBLE DIGITAL ASSETS ARE NOT LEGAL TENDER. CELSIUS IS NOT A BANK OR DEPOSITORY INSTITUTION, AND YOUR CELSIUS ~~WALLET~~ ACCOUNT IS NOT A DEPOSIT ACCOUNT. ELIGIBLE DIGITAL ASSETS REPRESENTED IN YOUR CELSIUS ~~WALLET~~ ACCOUNT ARE NOT HELD BY CELSIUS AS A CUSTODIAN OR FIDUCIARY, ARE NOT INSURED BY ANY PRIVATE OR GOVERNMENTAL INSURANCE PLAN (INCLUDING THE FEDERAL DEPOSIT INSURANCE CORPORATION (FDIC) OR THE SECURITIES INVESTOR PROTECTION CORPORATION (SIPC)), AND ARE NOT COVERED BY ANY COMPENSATION SCHEME ~~(INCLUDING THE FINANCIAL OMBUDSMAN AND FINANCIAL SERVICES COMPENSATION SCHEME (FSCS)).~~. YOUR CELSIUS ACCOUNT DOES NOT CONSTITUTE AN INVESTMENT CONTRACT OR A SECURITY, IS NOT TRANSFERRABLE AND MAY NOT BE TRADED, EXCHANGED OR SOLD TO ANY THIRD PARTY UNDER ANY CIRCUMSTANCES.

**Celsius does not provide any legal, tax or financial advice and you are strongly advised to obtain independent legal, tax or financial advice prior to making any financial decision, including buying, trading, holding or using Digital Assets. There are significant risks associated with Digital Assets, and you are solely responsible to make sure you understand such risks and assess whether such risks are appropriate for you. Celsius does not make any offers, recommendations or invitations for you to deal in Digital Assets or use any services, and does not take into account your personal circumstances, financial situation, needs or goals. Before making any financial decision, you should carefully assess your financial situation and capacity, and only use funds that you can afford to lose. Before entering into any transaction or using any of the Services you should ensure that you understand and have made an independent assessment of the suitability and appropriateness of a transaction into which you are entering and the nature and extent of your exposure to risk of loss in light of your own objectives, financial and operational resources and other relevant circumstances. Past performance is no guarantee of future results.**

Legislative and regulatory changes or actions at the state, federal, or international level may adversely affect the use, transfer, exchange, and value of Digital Assets. Transactions in Digital Assets may be irreversible, and, accordingly, losses due to fraudulent or accidental transactions may not be recoverable. ~~Any secured wallet maintained by Celsius for the benefit of its customers may not be sufficient to cover all losses incurred by customers.~~

The value of Digital Assets may be derived from the continued willingness of market participants to exchange Digital Assets for Fiat currencies or other Digital Assets. If such willingness is abolished for any reason, this may result **in the potential for a permanent and total loss of value of a particular Digital Asset.**

in the potential for a permanent and total loss of value of a particular Digital Asset.

The volatility and unpredictability of the price of Digital Assets may result in significant loss over a short period of time. The nature of Digital Assets may lead to an increased risk of fraud or cyber-attack, including rollback attacks or Blockchain reorganizations. The nature of Digital Assets means that any technological difficulties experienced by Celsius or third parties may limit, delay or prevent the access or use of your Digital Assets and/or cause losses of Digital Assets.

 Although Celsius takes precautionary measures to protect against cyber threats, circumstances may arise where losses or damages are incurred. In that event, you authorize Celsius to use Eligible Digital Assets to absorb the remaining losses..

In light of these risks, which are only some of the risks involved in using the Services and holding or trading in Digital Assets, and do not constitute an exhaustive list of such risks, you should carefully consider whether holding or trading Digital Assets in general and/or using our Services is suitable for you in light of your financial condition.

## 11. Holding Eligible Digital Assets

You can hold Eligible Digital Assets to your Celsius Wallet by transferring Eligible Digital Assets to the address provided by Celsius. The transfer of such Eligible Digital Assets to your Celsius Wallet will not be deemed settled and completed until the blockchain transaction is deemed confirmed to the relevant address.

# 1~~2~~1. Withdrawals

~~You may make~~Subject to these Terms, you have a call option on all loans made to Celsius to demand immediate complete or partial repayment of any loan at any time through a complete or partial withdrawal of Eligible Digital Assets from your Celsius ~~Wallet at any time~~Account balance at any time. Such repayment will terminate in whole or in part your loan to Celsius and you shall no longer accrue Rewards on the amount of loans as of the time of your exercise of the call option. Celsius initiates the withdrawal process immediately following a withdrawal request when possible; however, we may require up to three (3) days after you submit your withdrawal request to process the withdrawal.

For every withdrawal request, you will be required to provide the details of the Virtual ~~w~~Wallet to which you wish to ~~transfer~~receive your repayment of Digital Assets ~~from your Celsius Wallet~~. For the avoidance of doubt, any repayment shall be in-kind (i.e. in the same type of Eligible Digital Assets loaned by you, but not the actual same Digital Assets originally transferred by you). In the event that the details you provide are inaccurate, incomplete or misleading, your Digital Assets may be permanently lost. We will not be liable for any loss that results from inaccurate, incomplete or misleading details that you may provide for such transfer. If the transfer address you specify is one to which we are unable to process transfers, we will have no liability for any resulting failure or delay in processing your requested withdrawal.

Celsius and our third-party partners may experience cyber-attacks, extreme market conditions, or other operational or technical difficulties which could result in the immediate halt of transactions either temporarily or permanently. Provided that Celsius has taken reasonable commercial and operational measures to prevent such events in technical systems controlled by Celsius, Celsius is not and will not be responsible or liable for any loss or damage of any sort incurred by you as a result of such cyber-attacks, operational or technical difficulties or suspensions of transactions. Withdrawal limits based on amounts and/or frequency may apply from time to time ~~and will be described in your Celsius Wallet interface. Users can withdraw any amount at any time; however, our policies~~, based on legal, regulatory, AML and/or security considerations. Our policies and procedures may require additional security and/or compliance checks that require ~~up to 48 hours~~additional time to complete. Any individual request to exceed withdrawal limits set by Celsius must be sent via email to app@celsius.network.

Every transmission request shall be deemed pending until accepted by us. We may refuse to accept such request, or delay the processing of an approved request for any reasonable reason, including but not limited to insufficient assets in your Celsius Wallet,

inaccurate or misleading information provided by you, or any doubt or suspicion of fraud, misrepresentation, a sanctioned transaction, money laundering, terrorism financing or other financial crime related to your Celsius ~~Wallet~~Account.

~~Where you transmit only a part of the Eligible Digital Assets available in your Celsius Wallet, the transmitted Eligible Digital Assets will include first the principal amount (*i.e.*assets transmitted by you) and only after these are transmitted in full, any paid rewards may be transmitted.~~

# 1~~3~~2. How Rewards Are Calculated and Earned

All Eligible Digital Assets loaned to Celsius via your Celsius Account that (1) are not being used as collateral for Fiat Loans; (2) all rights in connection with them were not ~~transferred~~assigned to another Celsius user using CelPay, and (3) were not requested for external transmission or withdrawal (Eligible Digital Assets meeting each of these three criteria, "~~Held~~Loaned Digital Assets~~"~~") entitle you to ~~r~~Rewards while ~~held with~~credited to your Celsius Account.

We ~~occasionally~~periodically update our rates and the rate changes are based ~~on market conditions~~our sole discretion. Rewards will be payable in arrears and added to the principal loaned by you to Celsius, as part of the Earn Service, and reflected in your Celsius ~~Wallet~~Account balance weekly.

We calculate the ~~r~~Rewards on ~~your Held~~Loaned Digital Assets based on market demand for each Eligible Digital Asset. Reward rates are not determined based on Celsius' income or profit, generated directly or indirectly as a result of the use of Celsius in a particular Digital Asset, a type of Digital Assets, or otherwise.

Rewards are ~~gained~~payable based on a daily periodic rate applicable to the ~~Held~~Loaned Digital Assets ~~in the Celsius Wallet~~. The daily periodic rate is calculated by dividing the ~~then-~~applicable annual reward rate by three hundred sixty-four (364) days; then it is

further divided down to the hour, minute, and second of that day. ~~Held~~**Loaned Digital**

Assets, including those received as Rewards from previous weeks, will begin gaining Rewards according to the hour, minute, and second on the timestamp verifying the completion of the applicable transaction and shall cease and/or decrease the amount paid as Rewards at the moment when the User has entered an external transmission and/, withdrawal or transfer of rights (via CelPay) request, or posted any Loaned Digital Assets as collateral for a Fiat Loan. Therefore, any Eligible Loaned Digital Asset made transferred mid-week will receive Rewards with no distinction, based on the interest rates calculated for the relative time within the allocation period.

We will reflect the Rewards earned for the previous week on or around the first business day of each week in, through your Celsius Wallet platform. Your Celsius Wallet Account must be open active on the date the credit is earned Rewards are payable for you to receive the applicable Rewards. All Rewards will be paid added to your Account balance in-kind (in the same Eligible Digital Asset that is reflected in your Celsius Wallet Account) or, subject to your in-app choice and regulatory and business considerations, in CEL. Once Rewards are added to your Account balance, they shall be treated as integral part of your loan to Celsius, for all intents and purposes. To make such in-kind interest Reward payments as accurately as possible, Celsius rounds non-integer, rational numbers to the sub-cent, which is the smallest possible decimal available for the applicable Eligible Digital Asset.

For users who are citizens or legal residents of the United States, Celsius requires your Taxpayer ID (TIN) or Social Security Number (SSN) to be updated in your Celsius user profile Account in order to gain Rewards on your Held Digital Assets. Celsius is not obligated to reflect credits in your Celsius Wallet Account retroactively with Rewards that would have been gained if you had otherwise updated your profile with your TIN or SSN.

If Celsius has determined, based on its sole and absolute discretion, that for any regulatory or legal reason we are limited in the fRewards rate we may offer you on your Eligible Digital Assets loaned to Celsius (or if we are completely restricted from paying any fRewards to you whatsoever), the fRewards to which you shall be entitled will be limited accordingly. Based on our reasonable interpretation of legal requirements, without prior notice, we may limit the fRewards to which you will be entitled.

If, at any time, for legal or other reasons, a Celsius ~~Wallet~~Account is suspended or frozen by Celsius, ~~Eligible~~Loaned Digital Assets connected to such Celsius ~~Wallet~~Account shall not be eligible ~~for~~to earn ~~r~~Rewards.


# 1~~4~~3. Consent to Celsius' Use of ~~Your~~ Digital Assets


In consideration for the ~~r~~Rewards ~~earned~~payable to you on your Celsius ~~Wallet~~Account and the use of our Services, you grant Celsius, subject to applicable law and for the duration of the period during which the Eligible Digital Assets are ~~available~~loaned to us through your Celsius ~~Wallet~~Account, all right and title to such Digital Assets, including ownership rights, and the right, without further notice to you, to hold such Digital Assets in Celsius' own ~~v~~Virtual ~~w~~Wallet or elsewhere, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets in Celsius' full discretion. You acknowledge that with respect to Digital Assets used by Celsius pursuant to this paragraph:

(i) You ~~may~~ will not be able to exercise ~~certain~~ rights of ownership;

(ii) Celsius may receive compensation in connection with lending or otherwise using Digital Assets in its business to which you have no claim or entitlement; and

(iii) ~~Celsius borrowers may default partially or entirely, which can result in partial or total loss of your Digital Assets. In that event, you authorize Celsius to use Eligible Digital Assets to absorb the losses;~~ In the event that Celsius becomes bankrupt, enters liquidation or is otherwise unable to repay its obligations, you may not be able to recover or regain ownership of such Digital Assets, and other than your rights as a creditor of Celsius under any applicable laws, you may not have any legal remedies or rights in connection with Celsius' obligations to you.

(iv) Celsius may use your Eligible Digital Assets as collateral to borrow other digital or fiat assets in different jurisdictions around the world. While such borrowing are for the purpose of optimizing the returns to all members, Celsius may experience losses or partial recovery of such collateral in certain situations; and

(v) Celsius may lend your coins to exchanges, hedge and other counterparties, which may provide full or partial collateral for any coin or fiat loan.

# 154. Hard Forks

Any Blockchain may undergo software updates from time to time, which will result in a permanent divergence in the Blockchain (a "Hard Fork"). The result is such Blockchain will split into two separate and distinct Blockchains, and any Digital Asset on that original Blockchain may entitle its holders to a new type of Digital Asset (the "New Currency"). Due to the administrative complexity of being the repository for a hard-forked Digital Asset, the support of any New Currency in your Celsius WalletAccount is solely at the discretion of Celsius. If we do not make noa public announcement regardingconfirming our support of a New Currency ahead of an anticipated Hard Fork, we will not support the New Currency and such New Currency will be an unsupported currency ("Unsupported Currencies)"), in which case all Celsius WalletsAccounts will be denominated in the legacy Digital Asset and all rRewards will accrue and be payable in the legacy Digital Asset. You agree that Celsius assumes no responsibility whatsoever with respect to those Unsupported Currencies and You

you will not be able to recover the Unsupported Currencies from Celsius. Celsius assumes absolutely no responsibility whatsoever with respect to Unsupported Currencies.

In the event that a Hard Fork achieves the required consensus, it is possible that we will only support the New Currency and will discontinue our support of

the legacy Digital Asset. In the event of a Hard Fork that entitles you to a New Currency, you are advised to withdraw the applicable Digital Assets from your Celsius ~~Wallet~~Account prior to the date of the Hard Fork. Celsius is not obligated in any way to monitor or maintain balances of New Currency issued to holders of the applicable Digital Assets upon a Hard Fork, or to credit you for the value of such New Currency. In the event you wish to receive New Currency issued upon a Hard Fork, you are advised to withdraw the applicable Digital Assets from your Celsius ~~Wallet~~Account prior to the date of the Hard Fork. All determinations regarding Hard Forks shall be made by Celsius in its sole and absolute discretion and in accordance with applicable law.

## 1~~7~~5. CelPay

CelPay is Celsius' proprietary Digital Asset ~~payment~~ tool for ~~mobile applications. CelPay~~Celsius Users, which allows you to ~~send payments in supported~~assign your rights with Celsius in connection with selected Eligible Digital Assets ~~(currently BTC and ETH)~~ to other registered Users (see further Section 15 below, "CelPay").

By using our CelPay feature, you understand and acknowledge that:

~~(i) transfers of Eligible Digital Assets by CelPay are not recorded on any blockchain, but rather on Celsius' books;~~

**Assignment of rights in connection of Eligible Digital Assets by CelPay are not recorded on any Blockchain, but rather on Celsius' ledger. No Digital Assets are being transferred by using CelPay, and by making any CelPay transaction you are authorizing Celsius to deduct the corresponding amount of Eligible Digital Assets from your Account balance, to be credited to the balance of the receiving User's Account.**

**Celsius would not be responsible, and would not interfere in any way in, any dispute between you and the User to which your rights were assigned;**

(ii) **any** ~~payment sent~~**assignment to the wrong User may be irrevocably** ~~lost~~**end with losing your rights in connection with the Eligible Digital Assets assigned to the other User, and it is your sole responsibility to make sure you provide the correct** ~~address~~**details;**

(iii) **the completion of** ~~a transfer~~**the assignment of rights may not be immediate, and it may take some time before** ~~the transfer~~**it is processed and the** ~~payee's~~**relevant Celsius** ~~Wallet is credited~~**Account balances are updated;**

(iv) **use of the CelPay feature is subject to limitations on amounts** ~~transferred~~**assigned, as determined in Celsius' reasonable discretion from time to time;**

(v) **all assignments made through CelPay** ~~transfers~~ **are final and irreversible;**

~~(vi) you are familiar with the person to whom payment is made, and that such payment is not made for any illicit or illegal purpose.~~

**by making any CelPay assignment you represent to Celsius that you are familiar with the person to whom assignment is made, and that such assignment is not made for any illicit or illegal purpose. You acknowledge that**

Celsius would hold you responsible for any damages it may incur by any unlawful use of the CelPay feature.

Celsius does not accept any liability for ~~transfers~~assignment or attempted ~~transfers~~assigment that would violate any law or regulation, including without limitation, KYC requirements, embargoed or restricted persons or locations, prohibitions against money laundering and/or anti-bribery laws, and structured transactions or tax evasion, ~~and~~the responsibility for which shall lie solely with the participating User(s). Celsius may refuse to perform, block, or otherwise void any ~~transfers~~assignment that Celsius reasonably believes could violate any law or regulation.

# 1~~7~~6. Taxes

Within Celsius' platform, you will be able to see a record of the transactions related to your ~~Celsius Wallet~~use of the Services which you may wish to use for the purposes of making any required tax filings or payments. It is your responsibility to determine what, if any, taxes apply to your use of the ~~payments you make or receive~~Services, and to collect, report, and remit the correct tax to the appropriate tax authority. We may deduct or make any tax withholdings or filings that we are required by law to make, but we are not responsible for determining whether and which taxes apply to your transaction, or for collecting, reporting, or remitting any taxes arising from any transaction or in connection with your Celsius Account. You are responsible for complying with applicable law. You agree that Celsius is not responsible for determining whether or which laws may apply to your transactions, including tax law. You are solely responsible for reporting and paying any taxes arising from your ~~Celsius Wallet~~use of the Services.

## 187. Service Activity Statements

We will make all logs and records of activities concerning your ~~Celsius Wallet~~use of the Services available to you through our ~~mobile application~~platform only. We do not generate periodic statements showing the activity ~~on~~conducted through your ~~Celsius Wallet~~use of the Services. You must examine these logs and records and notify us of any unauthorized use of your Celsius Account or credentials, or any error or irregularity ~~on your Celsius Wallet~~with respect to the records of your use of the Services, within fourteen (14) calendar days after the error occurs. If notice is not received within the fourteen (14) calendar-day period, you will not be able to raise any further claim in this respect.

## 198. Conversion Rates

Any conversion between a Digital Asset and another Digital Asset or Fiat currency shall be made by us in accordance with the rates and prices applicable at the actual time of conversion. Applicable rates are indexed to those used by industry-leading platforms, as we may choose to use from time to time, in our sole discretion. We currently use rates provided by CMC Markets, Coinpaprika, and our own rates as determined by our liquidity providers. We may change these rate sources at any time and without giving ~~prior~~ notice or updating these Terms, and you shall not have any claims regarding our choice of rate sources or rates used by Celsius or made available by any third party.

## 2019. Closing a Celsius ~~Wallet~~Account

**A. Celsius' Right to Celsius Account Closure**

We have the right to suspend, freeze or close your Celsius Account at any time for any reason without advance notice, including by blocking your access to the Account or the Services. If your Celsius Account has a balance when we close it, we will repay and return the remaining Digital Assets to you, including accrued Rewards earned until the close date, less any applicable Obligations, withholding tax and other applicable deductions, unless prohibited by applicable law. In the event of irregular activity, we may

hold ~~your~~ assets until we close your Celsius ~~Wallet~~Account. Any Digital Assets that Celsius returns to you will be sent to the designated withdrawal addresses in your user profile on the Celsius platform for each respective Digital Asset you hold. Celsius ~~Wallets~~Accounts are not transferable or assignable in whole or in part. Celsius may be required by law to turn over ~~the~~any Digital ~~a~~Assets ~~in~~related to abandoned or unclaimed ~~customer~~ Celsius ~~Wallets~~Accounts to the state of your last known residence ("Escheatment"). Escheatment periods vary by jurisdiction, and you are responsible to determine the applicability of such laws in your place of residence. Celsius reserves the right to ~~deduct a dormancy fee or other~~recover any administrative charges ~~from~~, payments or fees which it may incur in connection with such unclaimed or abandoned ~~Digital Assets~~Accounts, as permitted by applicable law.

~~(ii)~~B. Your Right to Close Your Celsius ~~Wallet~~ Account
If you want to terminate your ~~Wallet~~Account with Celsius, you may do so by notifying Celsius at support@celsius.network. Once your Celsius ~~Wallet~~Account is closed, you agree: (a) to continue to be bound by these Terms, as required by Section 3~~6~~5 (Survival) (b) to immediately stop using the Services, (c) that we reserve the right (but have no obligation) to delete all of your information and Celsius ~~Wallet~~Account data stored on our servers, and (d) that we shall not be liable to you or any third party for termination of access to the Services or for deletion of your information or Celsius ~~Wallet~~Account data. You acknowledge that any legal

obligations you may have under any other agreement with Celsius or its Affiliates (including any Fiat Loan Agreement or agreement governing lending or investing in Celsius or its Affiliates) will not be affected in any way by the termination of these Terms and any such other agreement between you and Celsius will continue to be in effect in accordance with its terms.

# 20. Liability for Unauthorized Transfers from Your Celsius Account

If you believe that your Celsius Account has been used by an unauthorized party, or if your Service Activity Statements reflect activity or transactions that you did not conduct or authorize, you must notify us IMMEDIATELY via email to security@celsius.network. YOU ARE SOLELY RESPONSIBLE FOR MAINTAINING THE SECURITY AND CONFIDENTIALITY OF YOUR LOGIN DATA, AND YOU ACCEPT ALL

 RISKS OF UNAUTHORIZED ACCESS AND USE OF YOUR CELSIUS
~~WALLET~~ACCOUNT.

## 2~~2~~1. Eligible Digital Assets

We may, from time to time and in our sole discretion, add and/or remove certain
Digital Assets from our list of Eligible Digital Assets. If a Digital Asset is removed,
it will no longer be available to be used ~~via~~in connection with our Services. We
will notify our Users of our intention to add and/or remove Digital Assets as soon
as commercially reasonable. However, under certain circumstances (e.g. for
legal reasons) such changes may be required to be made immediately and
without prior notice. In the event any Digital Asset ceases to be an Eligible Digital
Asset, you will no longer be entitled to receive ~~any rewards accrued on it~~ ~~or make
any other use of it via our Services.~~

any Rewards in connection therewith, or make any other use of it via our Services. We may choose to disallow the use of any Eligible Digital Asset for certain Services, or treat any Digital Asset as an Eligible Digital Asset for certain Users or groups of Users, in our sole discretion.

We may, from time to time, provide certain Services in connection with certain Eligible Digital Assets by different entities within the Celsius group, and any change in and/or assignment of the contracting entity shall not be consider an amendment of these Terms.

## 232. Disclosure of Celsius ~~Wallet~~Account Information

We may disclose information to third parties about you, your Celsius ~~Wallet~~Account, or the ~~transfers~~transactions you make:

(i) Where it is necessary for the provision of our Services under these Terms;

(ii) In order to verify the existence and condition of your Celsius ~~Wallet~~Account for a third party, such as a referral partner;

(iii) For the purpose of conducting our AML and KYC checks and compliance with applicable laws;

 (iv) If you give us written authorization;

(v) In order to comply with any request or order by any government agency or competent court; ~~and~~or

(vi) As described in our Privacy Policy

(https://web.archive.org/web/20210930014921/https://celsius.network/privacy-policy/).

## 2~~4~~3. Conflict/Disputes Involving Your Celsius ~~Wallet~~Account

We are not liable to you for errors that ~~do~~may result in a financial loss to you. We may take any action that is authorized or permitted by these Terms or applicable laws without liability to you, even if such action causes you to incur fees, expenses or damages. If third parties make claims on your Celsius ~~Wallet~~Account, or if we receive conflicting instructions from you, or if we become involved in or concerned about a dispute between you and any third party, we reserve the right to react in ways that we believe in good faith to be appropriate, including by closing, suspending or freezing your Celsius ~~Wallet and returning~~Account, delivering the Digital Assets available therein to you or to any third party, or interpleading assets to court, all as we reasonably deem appropriate under the circumstances. You are liable for all expenses and fees we incur for such conflicts or disputes, including internal costs and attorneys' fees, and we may charge or deduct them directly from your Celsius ~~Wallet~~Account balance.

We are not responsible for delays or loss~~es~~ incurred as a result of an error in the initiation of ~~the~~any transaction and have no obligation to assist in the remediation of such transactions. By initiating ~~a~~any transfer or using Celsius' Services in any way, you attest that you are transacting in an Eligible Digital ~~Currency~~Asset which conforms to the particular ~~Celsius~~Virtual Wallet into which assets are directed. For example, if you select an Ethereum Virtual ~~w~~Wallet ~~a~~Address to receive assets, you ~~attest~~shall be solely responsible to assure that you are initiating a transfer of Ethereum alone, and not any other currency such as Bitcoin or

Ethereum Classic. Celsius incurs no obligation whatsoever with regard to ~~Unsupported Currencies~~<u>non-Eligible Digital Assets</u> sent to ~~a~~ Celsius ~~Wallet~~<u>,</u> or <u>for</u> Eligible Digital ~~Currency~~<u>Assets</u> sent to an incompatible ~~Eligible Digital Currency Celsius~~<u>Virtual</u> Wallet<u> Address</u>. Erroneously transmitted assets will be lost. We recommend ~~customers~~<u>users</u> send a small amount of ~~Eligible~~ Digital ~~Currency~~<u>Asset</u> as a test prior to initiating a ~~send~~<u>transfer</u> of a significant amount of ~~Eligible~~ Digital ~~Currency~~<u>Assets</u>.

We reserve the right to limit access to your Celsius ~~Wallet~~Account, which can include temporarily or permanently removing your Celsius ~~Wallet~~Account access via the internet, and/or restricting your Celsius ~~Wallet~~Account, and/or closing your Celsius ~~Wallet~~Account without prior notice to you (unless prior notice is required by law), and we shall have no liability for such actions. In addition, Celsius reserves the right to withhold or delay the transmission of assets ~~belonging~~ to you if you fail to comply with these Terms. Our total aggregate liability to you for any claim is limited to the face value of the applicable item or transaction, or the actual value of any assets not properly credited or debited by us.

## 2~~5~~4. Legal Process Affecting Celsius ~~Wallets~~Account

If any legal action, such as an attachment, garnishment, levy, seizure, third party claim or enforcement action by any competent authority in any jurisdiction ("Legal Process") is brought against or in connection with your Celsius ~~Wallet~~Account, we may refuse to permit (or may limit) withdrawals or transfers from your Celsius ~~Wallet~~Account until the Legal Process is satisfied or dismissed. Regardless of the terms of such Legal Process, we have first claim to any and all assets in your Celsius ~~Wallet~~Account. We will not contest any Legal Process on your behalf, and we may take actions to comply with Legal Process without liability to you, provided that we reasonably believe any such action is appropriate under the circumstances. If we incur any expenses in

connection with any Legal Process, including without limitation reasonable attorneys' fees, we may charge such expenses and fees to any of your Celsius ~~Wallets with us~~Accounts without prior notice to you, or we may bill you directly for such expenses and fees. Any garnishment or levy against your Celsius ~~Wallet~~Account is subject to our right of setoff and security interest.

## 2~~6~~5. Indemnification and Limitation of Liability; Legal Fees and Costs for Lawsuits

You agree to indemnify and hold harmless Celsius and its Affiliates, and their respective employees, managers, officers, directors, partners and ~~Affiliates~~shareholders from any losses, damages, suits and expenses, of whatever kind, including reasonable legal fees, that we incur in connection with or arising out of your access to or use of ~~your Celsius Wallet and/or~~ the Services, or our activities in connection with such ~~Celsius Wallet~~Services, and for your breach of these Terms or violation of any law, regulation, order or other legal mandate, or the rights of a third party, or any act or omission by you or any person acting on your behalf while using your Celsius ~~Wallet~~Account, regardless of whether the specific use was expressly authorized by you. You agree to comply with all applicable laws, regulations, or rules, and to not use your Celsius ~~Wallet~~Account or the Services for any transaction or activity that is illegal or violates applicable laws, regulations or rules. Please note, your agreement to comply includes any and all applicable laws and regulations of the United States, as well as of your place of residency, citizenship, business, locality and any law applicable to you.

We are not liable to you for claims, costs, losses or damages caused by an event that is beyond our reasonable control (e.g. the acts or omissions of third parties, natural disaster, emergency conditions, government action,

equipment or communications malfunction). We are not liable for special, incidental, exemplary, punitive or consequential losses or damages of any kind. Except for any setoff permitted by applicable law and Section 9 of these Terms, any ~~O~~obligations of ours may be satisfied solely from the assets of Celsius. Without limiting the generality of the foregoing, in no event shall you have any recourse, whether by setoff or otherwise, with respect to our ~~O~~obligations, to or against any assets of any person or entity other than Celsius ~~for Celsius' Obligations~~, including, without limitation, any member, <u>shareholder,</u> Affiliate, investor, employee, officer<u>, director</u>, agent or advisor of Celsius. For the avoidance of doubt, the foregoing shall not limit any setoff permitted by applicable law and Section 9 of these Terms.

## 2~~7~~<u>6</u>. Disclaimer of Warranty

THE CELSIUS SERVICES ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS WITHOUT ANY WARRANTY UNDER THESE TERMS

 AND TO THE EXTENT ALLOWED BY APPLICABLE LAW ALL EXPRESS OR IMPLIED CONDITIONS, REPRESENTATIONS, AND WARRANTIES INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, SATISFACTORY QUALITY, OR ARISING FROM A COURSE OF DEALING, USAGE, OR TRADE PRACTICE, OR WARRANTY OF NON-INFRINGEMENT ARE DISCLAIMED. IN NO EVENT SHALL CELSIUS, ITS AFFILIATES AND SERVICE PROVIDERS, OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, AGENTS, JOINT VENTURERS, EMPLOYEES OR REPRESENTATIVES, BE LIABLE (A) FOR ANY AMOUNT GREATER THAN THE VALUE OF THE ~~ELIGIBLE DIGITAL CURRENCY IN~~**BALANCE OF** YOUR CELSIUS ~~WALLET~~**ACCOUNT**(S) OR (B) FOR ANY LOST PROFITS, DIMINUTION IN

**VALUE OR BUSINESS OPPORTUNITY, ANY LOSS, DAMAGE, CORRUPTION OR BREACH OF DATA OR ANY OTHER INTANGIBLE PROPERTY OR ANY SPECIAL, INCIDENTAL, INDIRECT, INTANGIBLE, OR CONSEQUENTIAL DAMAGES, WHETHER BASED IN CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY, OR OTHERWISE, ARISING OUT OF OR IN CONNECTION WITH AUTHORIZED OR UNAUTHORIZED USE OF THE CELSIUS SERVICES OR THE CELSIUS ~~SERVICES~~ACCOUNT, OR ~~THIS AGREEMENT~~THESE TERMS, EVEN IF AN AUTHORIZED REPRESENTATIVE OF CELSIUS HAS BEEN ADVISED OF OR KNEW OR SHOULD HAVE KNOWN OF THE POSSIBILITY OF SUCH DAMAGES.**

CELSIUS MAKES NO REPRESENTATIONS ABOUT THE ACCURACY, ORDER, TIMELINESS OR COMPLETENESS OF HISTORICAL OR CURRENT ELIGIBLE DIGITAL ~~CURRENCY~~ASSETS PRICE DATA AVAILABLE ~~IN~~THROUGH THE CELSIUS SERVICES. CELSIUS WILL MAKE REASONABLE EFFORTS TO ENSURE THAT REQUESTS FOR TRANSACTIONS ARE PROCESSED IN A TIMELY MANNER BUT CELSIUS MAKES NO REPRESENTATIONS OR WARRANTIES REGARDING THE AMOUNT OF TIME NEEDED TO COMPLETE PROCESSING (WHICH IS DEPENDENT UPON MANY FACTORS, INCLUDING THOSE OUTSIDE OF OUR CONTROL), AND CELSIUS SHALL NOT BE LIABLE FOR ANY LOSSES OR DAMAGES WHICH YOU MAY INCUR AS A RESULT OF ANY DELAY IN THE PROVISION OF THE SERVICES.

## 27. Disputes, Binding Individual Arbitration, and Class Actions and Class Arbitrations Waiver

Disputes. The terms of this Section shall apply to all Disputes between you and Celsius. For the purposes of this Section, "Dispute" shall mean any dispute, claim, or action between you and Celsius arising under or relating to your Celsius Account, the Celsius platform, these Terms, or any other transaction involving you and Celsius, whether in contract, warranty, misrepresentation, fraud, tort, intentional tort, statute, regulation, ordinance, or any other legal or equitable basis, and shall be interpreted to be given the broadest meaning allowable under law.

Binding Arbitration: You and Celsius further agree: (i) to arbitrate all Disputes between the parties pursuant to the provisions in these Terms; (ii) these Terms memorialize a transaction in interstate commerce; (iii) the Federal Arbitration Act (9 U.S.C. § 1, et seq.) governs the interpretation and enforcement of this Section; and (iv) this Section shall survive termination of these Terms. ARBITRATION MEANS THAT YOU WAIVE YOUR RIGHT TO A JUDGE OR JURY IN A COURT PROCEEDING AND YOUR GROUNDS FOR APPEAL ARE LIMITED. The arbitrator may award you the same damages and relief as a court sitting in proper jurisdiction could, and may award declaratory or injunctive relief. In addition, in some instances, the costs of arbitration could exceed the costs of litigation and the right to discovery may be more limited in arbitration than in court. The decision of the arbitrator shall be final and enforceable by any court with jurisdiction over the parties.

Small Claims Court. Notwithstanding the foregoing, you may bring an individual action in the small claims court of your state or municipality if the action is within that court's jurisdiction and is pending only in that court.

Dispute Notice. In the event of a Dispute, you or Celsius must first send to the other party a notice of the Dispute that shall include a written statement that sets forth the name, address and contact information of the party giving it, the facts giving rise to the Dispute, and the relief requested (the "Dispute Notice"). The Dispute Notice to Celsius must be addressed to: Celsius Network LLC, 221 River Street, 9th Floor, Hoboken, NJ 07030, United States, with a copy to Legal@celsius.network, or to the most recent email or mailing address we have on file or otherwise in our records for you (the "Celsius Notice Addresses"). Any Dispute Notice to you shall be delivered by one of the communication channels you have provided Celsius, which may include email or other electronic transmission, and you agree that such a delivery of a Dispute Notice to you shall be sufficient. Should you require to obtain a Dispute Notice by any other communication channel, you must inform Celsius of such a requirement in writing. Following submission and receipt of the Dispute Notice, you and Celsius each agree to act in good faith to seek to resolve the Dispute before commencing arbitration. If Celsius and you do not reach an agreement to resolve the Dispute within sixty (60) days after the Dispute Notice is received, you or Celsius may commence an arbitration proceeding pursuant to this Section.

**WAIVER OF CLASS ACTIONS AND CLASS ARBITRATIONS. YOU AND CELSIUS AGREE THAT EACH PARTY MAY BRING DISPUTES AGAINST THE OTHER PARTY ONLY IN AN INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING, INCLUDING WITHOUT LIMITATION FEDERAL OR STATE CLASS ACTIONS, OR CLASS ARBITRATIONS. ACCORDINGLY, UNDER THE ARBITRATION PROCEDURES OUTLINED IN THIS SECTION, AN ARBITRATOR SHALL NOT COMBINE OR CONSOLIDATE MORE THAN ONE PARTY'S CLAIMS WITHOUT THE**

**WRITTEN CONSENT OF ALL AFFECTED PARTIES TO AN ARBITRATION PROCEEDING. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, YOU AND CELSIUS AGREE THAT NO DISPUTE SHALL PROCEED BY WAY OF CLASS ARBITRATION WITHOUT THE WRITTEN CONSENT OF ALL AFFECTED PARTIES.**

Arbitration Procedure. If a party elects to commence arbitration, the arbitration shall be governed by the rules of the American Arbitration Association ("AAA") that are in effect at the time the arbitration is initiated (the "AAA Rules"), available at https://web.archive.org/web/20210722164416/https://www.adr.org/Rules or by calling 1-800-778-7879, and under the rules set forth in these Terms, except that AAA may not administer any multiple claimant or class arbitration, as the parties agree that the arbitration shall be limited to the resolution only of individual claims. If there is a conflict between the AAA Rules and the rules set forth in these Terms, the rules set forth in these Terms shall govern. You may, in arbitration, seek any and all remedies otherwise available to you pursuant to federal, state, or local laws. All Disputes shall be resolved by a single neutral arbitrator, and both parties shall have a reasonable opportunity to participate in the selection of the arbitrator as provided in the AAA Rules. The arbitrator is bound by these Terms. The arbitrator, and not any federal, state or local court or agency, shall have exclusive authority to resolve all disputes arising out of or relating to the interpretation, applicability, enforceability or formation of these Terms, including, but not limited to, any claim that all or any part of these Terms is void or voidable. The arbitrator shall be empowered to grant whatever relief would be available in a court under law or in equity. The arbitrator's award shall be binding on the parties and may be entered as a judgment in any court of competent jurisdiction. You may choose to engage in arbitration hearings by telephone or by

videoconference. Hearings in any arbitration commenced by you that are not conducted by telephone or videoconference shall take place in New York, New York, unless there is a location in the continental United States more convenient to you, in which case the arbitration shall take place either in New York, New York, or such other location in the continental United States, at your option.

Initiation of Arbitration Proceeding. If either you or Celsius decide to arbitrate a Dispute, we agree to the following procedure:

Write a Demand for Arbitration. The demand must include a description of the Dispute and the amount of damages sought to be recovered. You can find a copy of a Demand for Arbitration at https://www.adr.org/Forms?practice=all ("Demand for Arbitration").

Send one copy of the Demand for Arbitration, plus the appropriate filing fee, to:

American Arbitration Association
Case Filing Services
1101 Laurel Oak Road, Suite 100
Voorhees, NJ 08043

OR

File online using AAA WebFile at https://www.adr.org

OR

File at any of the AAA's offices.

Send one copy of the Demand for Arbitration to the other party at the same address as the Dispute Notice, or as otherwise agreed to by the parties.

Hearing Format. In all hearing formats, the arbitrator shall issue a written decision that explains the essential findings and conclusions on which an award, if any, is based. During the arbitration, the amount of any settlement offer made by Celsius or you shall not be disclosed to the arbitrator.

The discovery or exchange of non-privileged information relevant to the Dispute may be allowed during the arbitration as determined by the Arbitrator in accordance with AAA Rules.

Arbitration Fees. With respect to any Dispute where the amount claimed is $20,000 U.S. or less (or the equivalent amount in a different currency, whether fiat or otherwise), Celsius shall pay, or (if applicable) reimburse you for, all fees paid or payable to AAA, including filing, administration, and arbitrator fees ("Arbitration Fees") for any arbitration commenced between Celsius and you (and whether initiated by Celsius or by you) pursuant to provisions of these Terms. You are responsible for all costs that you incur in connection with the arbitration other than Arbitration Fees, including without limitation, fees for attorneys or expert witnesses. You must reimburse Celsius any Arbitration Fees if (i) Celsius is the prevailing party in the arbitration or (ii) you withdraw the arbitration.

Opt-out. You may elect to opt-out (exclude yourself) from the final, binding individual arbitration procedure and waiver of class and representative proceedings specified in these Terms by sending a written letter to the Celsius Notice Address within thirty (30) days of your initial assent to these Terms

(including your first use of your Celsius Account or the Celsius platform) that specifies: (i) your name; (ii) your mailing address; and (iii) your request to be excluded from the final, binding individual arbitration procedure and waiver of class and representative proceedings specified in this Section. In the event that you opt-out consistent with the procedure set forth above, all other terms shall continue to apply.

Amendments to this Section. Notwithstanding any provision in these Terms to the contrary, you and Celsius agree that if Celsius makes any future amendments to the dispute resolution procedure and class action waiver provisions (other than a change to Celsius' address) in these Terms, Celsius will notify you and you will have thirty (30) days from the date of notice to affirmatively opt-out of any such amendments by sending a written letter to the Celsius Notice Address within thirty (30) days of Celsius' notification that specifies: (i) your name; (ii) your mailing address; and (iii) your request to opt-out of such amendments. If you affirmatively opt-out of any future amendments, you are agreeing that you will arbitrate any Dispute between us in accordance with the language of this Section as stated in these current Terms, without any of the proposed amendments governing. If you do not affirmatively opt-out of any future amendments, you will be deemed to have consented to any such future amendments.

Severability. If any provision in this Section is found to be unenforceable, that provision shall be severed with the remainder of these Terms remaining in full force and effect. The foregoing shall not apply to the prohibition against class or representative actions; if the prohibition against class or representative actions is found to be unenforceable, this entire Section shall be null and void. The terms of this Section shall otherwise survive any termination of these Terms.

Exclusive Venue for Proceedings in Connection with Arbitration. Celsius and you agree that any proceeding to compel arbitration, confirm an award, or to seek interim or other relief in aid of arbitration, may be filed only in the competent state or federal courts located in New York County, New York.

## 28. Class Action Waiver

To the extent permissible by law, all claims must be brought in a party's individual capacity, and not as a plaintiff or class member in any purported class, collective action, or representative proceeding (collectively "class action waiver"). the arbitrator may not consolidate more than one person's claims or engage in any class arbitration. you acknowledge that, by agreeing to these terms, you and Celsius are each waiving the right to a trial by jury and the right to participate in a class action.

## 298. Our Ownership of the Services and Celsius' Intellectual Property (IP)

You agree and acknowledge that we own all right, title and interest to and in the Services, the associated software, technology tools and content, the Celsius Network website, any logos, identifying marks, images, illustrations, designs, icons, photographs, videos, text and other written and multimedia materials, the content displayed on the website or platform, and other materials produced by and related to Celsius (collectively, the "Celsius IP"). You acknowledge and agree that no proprietary rights are being transferred to you in such materials or information, and that you have no intention of using such materials or information inappropriately or to in any way harm Celsius or any of its affiliates, directors, officers or employees. You shall not prepare any derivative work based on the Celsius IP, nor shall you translate, reverse engineer, decompile or disassemble the Celsius IP.

## 3029. Communications

We may record and monitor our telephone conversations with you and your electronic communications with us (chat, email, and other forms of electronic exchange). Unless the law requires otherwise, you consent in advance to such recording and monitoring and we do not need to remind you of these

activities. You must promptly notify us of any change in your contact information, including residential post and email address. Failure to notify us in a timely fashion may result in delay or non-receipt of notices or correspondence.

## 310. Waiver

We may delay the exercise of, or entirely waive any rights we have under these Terms, and any such delay shall not result in a waiver, relinquishment or modification of any of our rights. If we delay or waivein any exercise of our rights, or if notwithstanding the foregoing Celsius somehow is deemed to have waived any of our rights, you are still obligated to pay us Obligations you may owe us, remove any violation of these Terms and/or otherwise follow our instructions (as applicable). Any delay or waiver of our rights applies only to the specific instance in which we decide to delay or waive the provision and does not affect our other or subsequent rights in any way.

## 321. Changes in Terms

Please be aware that the terms and conditions governing Celsius Wallets or the Services can change over time. We reserve the right to discontinue or make changes to any Celsius Wallets orof the Services. We may change these Terms, and we may add to or delete from these Terms, and the updated version will supersede all prior versions. We will provide notice of changes, additions, and deletions, as required by law. If we have provided advance notice and you do not agree with a change, you may close your Celsius WalletAccount(s) and demand repayment of outstanding loans before the effective date of the change, which shall be your sole

remedy. The continued maintenance of your Celsius ~~Wallet~~<u>Account</u> following the

effective date of any change will constitute your acceptance of such change and subject your Celsius ~~Wallet~~Account to the modified Terms.

## 3~~3~~2. Assignment

These Terms, or any of the rights and/or obligations provided hereunder, may not be assigned or otherwise transferred by you to any other person or Entity, whether by operation of law or otherwise, without Celsius' express written consent, and any attempted assignment in violation of this prohibition shall be void ab initio~~and~~ and of no effect. Celsius may assign or transfer these Terms and/or any or all of its rights and/or obligations hereunder at any time to any Affiliate of Celsius, with or without providing you with prior notice of the same. Celsius may assign or transfer these Terms and/or any or all of its rights and/or obligations hereunder at any time to any third party by providing prior notice. Any permitted assignment or transfer of or under these Terms shall be binding upon, and inure to the benefit of the successors, executors, heirs, representatives, administrators and permitted assigns of the parties hereto.

## 3~~4~~3. Governing Law and Venue

The relationship between you and Celsius is governed exclusively by the laws of ~~England and Wales~~the state of New York, without regard to its conflict of law provisions (other than Sections 5-1401 and 5-1402 of the New York General Obligations Law). Any dispute arising out of, or related to, your Celsius ~~Wallet~~Account or relationship with Celsius must be brought exclusively in the competent courts located in ~~London, England;~~ New York, NY and the US District Court located in the Borough of Manhattan;

however, Celsius may bring equitable relief or collections actions in any applicable jurisdiction.

## 354. Force Majeure

We will not be liable for delays in processing or other non-performance caused by such events as fires, telecommunications, utility, or power failures, equipment failures, labor strife, riots, war, nonperformance of our vendors or

suppliers, acts of God, pandemic or epidemic events, or other causes over which we have no reasonable control.

## 365. Survival

The provisions of Sections 176 (Taxes), 265 (Indemnification), 276 (Disclaimer of Warranty), 287 (Disputes, Binding Individual Arbitration, and Class Actions and Class Arbitrations Waiver), 3028 (Our Ownership of the Services and Celsius IP), 30 (Waiver) and 353 (Governing Law and Venue) shall survive the termination of these Terms.

## Appendix A
### Binance Coin (BNB)

### Terra (LUNA)

### Ripple (XRP)

****

## SPECIAL NOTICE FOR NEW YORK, TEXAS, AND WASHINGTON ACCOUNTS

Prime Trust, LLC

These additional or differing terms ("PT Terms") are only applicable for accounts opened or operated in New York, Texas, and Washington ("PT

Account") in relation to the third-party account operated by Prime Trust, LLC ("PT"), a Nevada trust company.

These PT Terms are incorporated into and must be read together with the Celsius Network Terms of Use. In the event of any inconsistency between the provisions in the Celsius Network Terms Terms of Use and the provisions of these PT Terms, the provisions of these PT Terms shall prevail.

These PT Terms apply to you immediately upon the opening of a PT Account and operate as a binding contract between Celsius and you. These PT Terms also operate in addition to the PT Custodial Account Agreement and PT Privacy Policy that you have or will enter into with PT. By using the Services, you are deemed to have accepted both Celsius Terms of Use and PT Terms.

The terms in these PT Terms may be amended, supplemented and/or replaced from time to time, in accordance with Clause 31 of the Celsius Network Terms of Use.

# 1. Held Assets

All Eligible Digital Assets in the/your PT Account are held by PT on your behalf at all times; Celsius will not be the holder of any Eligible Digital Asset(s) in the/your PT Account. You maintain a direct customer relationship with PT regarding the PT Account, and PT is responsible for establishing and maintaining balances in the PT Account, processing and settling all transfers and transactions through, to and from the PT Account, and exercising principal oversight and control over the PT Account.

# 2. User Authorizations

i. You hereby authorize Celsius and its employees and agents, in relation to your PT Account and your utilization of the Services, to, among other things:

a. access and view the balances and all other Transaction information (including Transaction history) relating to any of the PT Account for the purpose of reconciliation and computation of amounts due to or from you arising from Transactions using Celsius ;

b. instruct PT to affect a transfer of funds to/from the PT Account;

c. instruct PT to affect credit and debit of the PT Account balance in relation to transactions which have been executed on Celsius or for fees and charges arising from transactions conducted through Celsius, or in relation to transactions which have been unwound pursuant to the User Agreement;

d. freeze (or instruct PT to freeze) further credit or debit to or from the PT Account due to your breach of the User Agreement or breach of applicable law, or if there is a suspicion of money laundering/terrorism financing, or if there are breaches of anti-money laundering/countering the financing of terrorism policies and procedures;

e. use any of your data or information obtained through PT for purposes of effecting transactions using Celsius or otherwise and/or share any of your data or information with PT for purposes of operating and maintaining the PT Account and Accounts; and

f. in the event that you request a loan, instruct PT to effect the transfer of funds to/from the PT Account to a Celsius Network owned PT account. Subject to additional terms and conditions. Once the funds are transferred to PT, your Eligible Digital Assets will not be accessible until the loan has been paid off and will be transferred back to your PT account.

ii. Celsius does not own any of the transactions or other details related to your PT Account. Celsius's role is only as a facilitator that accesses your PT Account through the API integration made available through PT, such that Celsius can withdraw and transfer instructions on behalf of you in connection with your trading activities on the Celsius Platform.

iii. Celsius shall have the right to immediately terminate and/or cancel your Celsius Account pursuant to Clause 20 of the Terms of Use.

## 3. Transfer of funds to Linked Account

Your Account balance will only reflect the funds transferred upon notification by PT to us that such funds have been transferred to the PT Account.

## 4. Data Protection

In addition to agreeing and accepting Celsius's Privacy Policy on how your personal information will be collected, used, disclosed and transferred amongst other things, you also agree to and accept the PT Privacy Policy.

## 5. Representations and Warranties

i. You represent and warrant to Celsius that you expressly accept the PT Custodial Account Agreement in relation to the operation of the PT Account and you understand that PT is providing their products and services (including but not limited to all services relating to the Accounts) to you subject to the PT Custodial Account Agreement.

ii. You hereby represent and warrant to Celsius that at all times you will undertake the following:
 iii. comply with the PT Custodial Account Agreement;

Tether Gold (XAUT)


WDGLT

iv. not use the products or services provided by PT in violation of the PT Custodial

Account
Agreement; and

v. not use the
products or
services provided

by PT in a
manner that is
fraudulent,
unlawful,

deceptive, or
abusive.

Tether Gold (XAUT)


WDGLT

# EXHIBIT B

DocuSign Envelope ID: 4E3A7357-F3BA-4BBC-9F61-A8DD8106564D

## VOLUNTARY APPLICATION FOR IMPOSITION OF DIRECTION

### Celsius Network Limited

---

**To:**   **The Financial Conduct Authority, 12 Endeavour Square, London, E20 1JN**

**FAO:**  **Ele Vasina**

---

Following discussions between Celsius Network Limited ("Celsius") and the Financial Conduct Authority ("the Authority") with respect to the application for registration made by Celsius under the Money Laundering, Terrorist Financing and Transfer of Funds (Information on the Payer) Regulations 2017 ("the MLRs"), as amended by the Money Laundering and Terrorist Financing (Amendment) Regulations 2019, Celsius hereby applies, pursuant to section 74C (6) of the MLRs, for imposition by the Authority of the following directions as set out in the schedule below ("Schedule").

The directions in the Schedule ("the Directions") come into force with immediate effect from the date the Authority confirms its acceptance and notification of such to Celsius via email.

Celsius has confirmed to the Authority that Celsius has obtained legal advice with respect to the regulatory permissions required to be maintained by Celsius Network LLC and Celsius EU UAB from the relevant national authorities to conduct the planned business activities and has implemented that legal advice as appropriate.

The Authority may publish the details of the whole or part of the Directions in circumstances where Celsius is not in material compliance with the Directions.

Where the Directions refer to customers "withdrawing their cryptoassets" or equivalent, Celsius has stated to the Authority that this means that the customer is being repaid its debt entitlement against Celsius for equivalent cryptoassets under the terms and conditions between Celsius and the customer.

Where the Directions refer to the migration of contractual relationship with a customer this includes the change of legal and beneficial ownership of the cryptoasset from Celsius to Celsius Network LLC or Celsius EU UAB.

HIGHLY CONFIDENTIAL

DocuSign Envelope ID: 4E3A7857-F3BA-4BBC-9F61-A8BD81B6564D

**SCHEDULE**

Pursuant to regulation 74C (6) of the MLRs, Celsius applies for imposition by the Authority of the directions below.

**Restriction on new business**

1. Celsius will not, without the prior written consent of the FCA, provide any services that fall within the definition of a "cryptoasset exchange provider" or a "custodian wallet provider" in regulation 14A of the Money Laundering, Terrorist Financing and Transfer of Funds (Information on the Payer) Regulations 2017 to any new customers.

For the avoidance of doubt, the restriction on new business includes, but is not limited to, the registration or on-boarding of any new customers.

**Requirement to notify existing customers**

2. Celsius will notify all of its existing customers of the migration of their customer's contractual relationship to Celsius Network LLC or Celsius EU UAB, as appropriate, by 23:00 New York time on Thursday 22 July 2021 ("the Migration Date").

3. Celsius will ensure that customers that do not wish to migrate their customer's contractual relationship are provided with an option to withdraw their cryptoassets and to close their accounts and those customers will not migrate.

**Requirement to make arrangements with existing customers**

4. Subject to paragraph 3, Celsius will make arrangements with existing customers wishing to withdraw their cryptoassets to transfer all such cryptoassets to an external wallet address nominated by the customer which is not controlled by Celsius.

**Requirement to review existing and future business**

5. Celsius agrees to review its business model to ensure that its activities do not contravene the requirement to register with the Authority under the MLRs or any other UK regulatory requirements. This requirement includes any arrangements to deal with non-responsive customers, trading, staking, decentralised finance activities and the institutional lending of cryptoassets.

**Requirement to follow the migration plan**

6. Celsius will ensure that it complies with the migration plan in Annex 1 beginning from the Migration Date.

**Requirement to update the Authority**

7. Celsius will provide an update to the Authority every week beginning from the week this Schedule comes into force on the following matters:

a) The number of customers who agreed to migrate to Celsius Network LLC or Celsius EU UAB;

b) The number of customers who have chosen to withdraw their cryptoassets;

c) The number of customers who have opted to withdraw but their cryptoassets are yet to be transferred to an external wallet address nominated by the customer which is not controlled by Celsius;

HIGHLY CONFIDENTIAL

d) The remaining customers who have not yet responded to the option to either migrate to Celsius Network LLC, Celsius EU UAB or withdraw their cryptoasset(s); and

e) The total value of assets held by Celsius.

**Temporary Registration and registration application**

11. Celsius agrees that on 23 August 2021 at 23:59:59 New York time:

a) It will be removed from the Temporary Registration Regime; and

b) It will withdraw its application for registration as a Cryptoasset exchange provider and custodian wallet provider and will not conduct any of the services within regulation 14A (Cryptoasset exchange providers and custodian wallet providers) of the MLRs.

Signed by: ...*Roni Cohen Pavon*......... Position: ...**Chief Revenue Officer**.........
——C9BBF4BD9B5D482...
Name: .........**Roni Cohen Pavon**...

For and on behalf of Celsius Network Limited (Celsius)

Date: ...**July 21, 2021**........................

HIGHLY CONFIDENTIAL

**Annex**

# Imposition of Direction

**Restriction on new business**

1. Celsius will not, without the prior written consent of the FCA, provide any services that fall within the definition of a "cryptoasset exchange provider" or a "custodian wallet provider" in regulation 14A of the Money Laundering, Terrorist Financing and Transfer of Funds (Information on the Payer) Regulations 2017 to any new customers.

For the avoidance of doubt, the restriction on new business includes, but is not limited to, the registration or on-boarding of any new customers.

**Requirement to notify existing customers**

2. Celsius will notify all of its existing customers of the migration of their customer's contractual relationship to Celsius Network LLC or Celsius EU UAB, as appropriate, by 23:00 New York time on Thursday 22 July 2021 ("the Migration Date").

3. Celsius will ensure that customers that do not wish to migrate their customer's contractual relationship are provided with an option to withdraw their cryptoassets and to close their accounts and those customers will not migrate.

**Requirement to make arrangements with existing customers**

4. Subject to paragraph 3, Celsius will make arrangements with existing customers wishing to withdraw their cryptoassets to transfer all such cryptoassets to an external wallet address nominated by the customer which is not controlled by Celsius.

**Requirement to review existing and future business**

5. Celsius agrees to review its business model to ensure that its activities do not contravene the requirement to register with the Authority under the MLRs or any other UK regulatory requirements. This requirement includes any arrangements to deal with non-responsive customers, trading, staking, decentralised finance activities and the institutional lending of cryptoassets.

**Requirement to follow the migration plan**

6. Celsius will ensure that it complies with the migration plan in Annex 1 beginning from the Migration Date.

**Requirement to update the Authority**

7. Celsius will provide an update to the Authority every week beginning from the week this Schedule comes into force on the following matters:

a) The number of customers who agreed to migrate to Celsius Network LLC or Celsius EU UAB;

b) The number of customers who have chosen to withdraw their cryptoassets;

HIGHLY CONFIDENTIAL

c) The number of customers who have opted to withdraw but their cryptoassets are yet to be transferred to an external wallet address nominated by the customer which is not controlled by Celsius;

d) The remaining customers who have not yet responded to the option to either migrate to Celsius Network LLC, Celsius EU UAB or withdraw their cryptoasset(s); and

e) The total value of assets held by Celsius.

**Temporary Registration and registration application**

11. Celsius agrees that on 23 August 2021 at 23:59:59 New York time:

a) It will be removed from the Temporary Registration Regime; and

b) It will withdraw its application for registration as a Cryptoasset exchange provider and custodian wallet provider and will not conduct any of the services within regulation 14A (Cryptoasset exchange providers and custodian wallet providers) of the MLRs.

**Annex 1**

1. The agreed timeline is as follows:

This Schedule shall come into force on the Migration Date.

i. Weeks 0-2: On the Migration Date, all clients will receive an email explaining the migration process and will be invited either to accept new Terms of Use or close their accounts. All clients will be able to close their accounts and withdraw their cryptoassets, with no extra costs. In parallel, for a period of two weeks after the Migration Date, all clients who have not agreed to the migration, nor closed their accounts ("Remaining Users") will receive a pop-up each time they connect to the app, allowing them to accept new terms or terminate the relationship. In addition, during these first 2 weeks, the ignore button will also be available.

ii. Weeks 3-4:*

*Celsius will continue to pay interest to its users in accordance with Celsius' interest calculation cycle in line with Celsius' agreement with its customers until Friday 20 August 2021 ("the Interest Cutoff Time")

During this period, Remaining Users will not be able to access their accounts, unless they have taken their choice of action. The 'ignore' button will disappear from the pop-up within the app, which will hide the full screen, leaving customers the choice to either accept new terms or terminate the relationship.

Remaining Users will not be able to use any features of the app without choosing to either accept the new terms or terminate the relationship and will only see their total account balance and additional limited information. During this period, Remaining Users will not be able to generate or view digital wallet addresses to which cryptoassets can be delivered to Celsius; however they might still be able to deliver additional funds to Celsius if they have such digital wallet addresses saved or written down outside of the Celsius platform, as such transactions over the blockchain cannot be prevented or blocked by Celsius.

iii. Interest Cutoff Time onwards: On the Interest Cutoff Time, Remaining Users will stop earning interest on the assets transferred to Celsius, i.e. Celsius will stop calculating interest on such assets

HIGHLY CONFIDENTIAL

at that time. The interest for the last week up to the Interest Cutoff Time shall be added to the accounts of Remaining Users the following Monday. The pop-up notice and blocking of the services shall continue as in phase (ii).

Remaining users shall be informed of the changes between each of the phases described above via the pop-up notices and periodic emails to be sent to them.

HIGHLY CONFIDENTIAL

# **EXHIBIT C**

## yarden.noy@celsius.network

| | |
|---|---|
| **From:** | Yarden Noy <yarden.noy@celsius.network> |
| **Sent:** | Thursday, 1 July 23:50 2021 |
| **To:** | Ele Vasina; Lauren.Pittas@fca.org.uk |
| **Cc:** | Roni Pavon; Charles Roberts; Stuart Davis; Connect; Lucy.Castledine@fca.org.uk; Victoria.McLoughlin@fca.org.uk; Beatrice.Schady@fca.org.uk |
| **Subject:** | Fwd: FW: FCA - confirming next steps [ ref:_00Db0K8yP._5004G2AQNLK:ref ] |
| **Attachments:** | ~WRD0000.jpg; image004.png; image005.png; image006.png; image007.png; Celsius Migration Plan (23 June 2021).pdf |

Dear Lauren, Ele,

We thank you for your open communication with us. Roni had asked that I provide you with the update below in his stead. I apologize for the slight delay on this, going forward we will provide you with ongoing updates every 2 days (would business days be ok? We could really use any minute of rest we can get these days...)

Please see below a table summarizing the status and updated ETA for each item preceding the launch of our migration plan ('Date X') as provided to you.

As the table shows, the main obstacle remains the first item, being the incorporation of the Lithuanian company. The ETA there was approved by our local counsel on 29 June, but is dependent on the processing time by the Lithuanian registrar. Accordingly, we expect Date X to take place shortly after the completion of this item.

Please let us know should you have any questions or comments.

Regards,

Yarden

| Item | Status | ETA |
|---|---|---|
| **4. Pre-Migration steps** | | |
| a.   Prepare LIT entity | | |
| i)   Incorporation | **Completed** <br><br> -  Name reserved <br> -  apostilled docs received in Vilnius <br> -  Incorporation docs signed | Thursday 8 July / Friday 9 July |

1

HIGHLY CONFIDENTIAL

- accumulative bank account (prerequisite for a deposit of equity capital) opened, payment made.

**To be completed**:

- Signed incorporation docs to be notarized (appointment for 2 July) and delivered to registrar (ETA 3-4 business days from receipt)

As this process is cumbersome, we have initiated a parallel route of purchasing a shelf company. Such process too requires apostilled and notarized documents, as needs to follow strict formalities.
To make the process as efficient as possible, as the transfer of ownership to an individual is quicker for some reason, we have made the purchase of the company under's Roni's personal ownership (with a duly executed trust agreement, where he holds the company as a trustee for Celsius Network Limited), to be later transferred to the latter. While this is far from our 'ordinary' course of business and corporate management practices, we have taken this route in an attempt to comply with the FCA's instructions as swiftly as possible.
Currently, the purchase documents have been submitted to the registrar, which had approved satisfactory receipt, pending registration of the transfer and receipt of official confirmation within the next few days.

We would still need to complete the share transfer to Celsius Network Limited and changing the company's name (pending approval of the transfer), but these should not hold back this entity from becoming operational.
We suspect that this process should be completed a few days prior to the establishment of the new entity as above, but have less visibility on exact timeframes; we will update as this progresses.

2

HIGHLY CONFIDENTIAL

CEL_CUST-00002660

| | | | |
|---|---|---|---|
| ii) | finalize legal memo | In progress – Draft received from Sorainen law firm on Monday, currently reviewed by Celsius. | Week of 5 July |
| iii) | Solve tax issues | In progress with two international accounting firms in parallel | Week of 5 July |
| iv) | AMLD5 registration | Pending official incorporation/share transfer as abovedocuments being prepared for immediate submission | Week of 12 July (should not delay migration, as can be submitted within 5 business days of commencing operations) |
| v) | Operational bank account | Can only be done following incorporation. Should not delay migration plan. | |
| | b.  Prepare US entity | | |
| i) | FinCEN registration | Done | |
| ii) | Solve tax issues | In progress with two international accounting firms in parallel | Week of 5 July |
| iii) | Operational bank account | Done | |
| **5. Migration Prep** | | | |
| | a.  Documents | | |
| i) | new Terms of Use | Final review by Latham&Watkins US | Friday 2 July |
| ii) | new Privacy Policy | Final review by Akin & Gump US | Done, Saturday 1 July |
| iii) | New intercompany agreements: | | |
| | (1)  existing services companies (IL, CY, Lending, operations, INC, MVP) to sign new agreements\assign existing ones; | In progress with accounting firm | Week of 5 July |
| | (2)  Celsius UK to start providing services to Celsius Network LLC, Celsius EU UAB; | In progress with accounting firm | Week of 5 July |
| | (3)  Celsius EU UAB-Celsius Network LLC to have intcercompany agreement in place. | In progress with accounting firm | Week of 5 July |
| i) | GDPR analysis | Done with L&W, A&G | Done |
| ii) | User consents (1) Accept new Terms of Use (2) Agree to engage with new entity, transfer of balance, rights and obligations (3)Acknowledge new Privacy Policy (4)Acknowledge data transfer | In progress with Celsius legal & Product teams – implementation of migration plan, contents and delivery channels of all messages with Communications team. | Week of 5 July |

3

**From:** roni@celsius.network <roni@celsius.network>
**Sent:** Thursday, June 24, 2021 4:12 AM
**To:** 'Ele Vasina' <Ele.Vasina@fca.org.uk>
**Cc:** 'Charles Roberts' <charles.roberts@celsius.network>; 'Lucy Castledine' <Lucy.Castledine@fca.org.uk>; 'Victoria McLoughlin' <Victoria.McLoughlin@fca.org.uk>; 'Beatrice Schady' <Beatrice.Schady@fca.org.uk>; 'Stuart Davis' <Stuart.Davis@lw.com>; 'Lauren Pittas' <Lauren.Pittas@fca.org.uk>; 'Connect' <Connect@fca.org.uk>
**Subject:** RE: FCA - confirming next steps [ ref:_00Db0K8yP._5004G2AQNLK:ref ]


Dear Ele,


Further to the below, attached please find our migration plan, which includes a status update on some of the issues we discussed.


Regards,

Roni




**Roni Cohen Pavon**

**CRO | Celsius**

T: +972-504446020

E: roni@celsius.network


*Download the Celsius app today!*


**From:** Ele Vasina <Ele.Vasina@fca.org.uk>
**Sent:** Wednesday, June 23, 2021 2:23 PM
**To:** Roni Pavon <roni@celsius.network>
**Cc:** Charles Roberts <charles.roberts@celsius.network>; Lucy Castledine <Lucy.Castledine@fca.org.uk>; Victoria McLoughlin <Victoria.McLoughlin@fca.org.uk>; Beatrice Schady <Beatrice.Schady@fca.org.uk>; Stuart Davis <Stuart.Davis@lw.com>; Lauren Pittas <Lauren.Pittas@fca.org.uk>; Connect <Connect@fca.org.uk>
**Subject:** RE: FCA - confirming next steps [ ref:_00Db0K8yP._5004G2AQNLK:ref ]

4

Hello Roni

Thank you for your email. I note we should receive a follow-up email with more details today.

Thank you.

Kind regards,

**Ele Vasina**

Senior Associate – Cryptoassets Authorisations | Banking, Payments & Insurance Department

**FCA** FINANCIAL
CONDUCT
AUTHORITY

12 Endeavour Square

London

E20 1JN

Tel:   +44 (0)20 7066 5324

**Follow us:**

www.fca.org.uk

*Please consider the environment before printing this e-mail.*

HIGHLY CONFIDENTIAL                                                                    CEL_CUST-00002663

**From:** Roni Pavon <roni@celsius.network>
**Sent:** 22 June 2021 23:56
**To:** Lauren Pittas <Lauren.Pittas@fca.org.uk>
**Cc:** Charles Roberts <charles.roberts@celsius.network>; Lucy Castledine <Lucy.Castledine@fca.org.uk>; Victoria McLoughlin <Victoria.McLoughlin@fca.org.uk>; Ele Vasina <Ele.Vasina@fca.org.uk>; Beatrice Schady <Beatrice.Schady@fca.org.uk>; Stuart Davis <Stuart.Davis@lw.com>
**Subject:** Re: FCA - confirming next steps

**\*\*This email has come from an external source. BE CAREFUL of links and attachments and report suspicious emails\*\***

Dear Lauren,

Thank you again for the open and direct dialogue with us.

Please find our reference to the issues raised in your email below:

1. Celsius has a total of 44,866 UK individual registered users (who have provided initial registration details), out of which 37,566 who successfully completed our KYC checks and provided all required information to use our services, and 18,711 are active (with a value of $10 or more lent to Celsius). Celsius has a total of 58 UK corporate registered users, out of which 40 are active.

2. Celsius has a total of $527,178,391.86 in 'UK assets', of which $505,746,794.86 are attributed to individual accounts and $21,431,597 to corporate accounts. All assets are crypto assets as Celsius does not support fiat in its Earn Interest service.

3. Upon withdrawal and completion of the migration plan, Celsius Network Ltd will have three main activities: (1) it will have control of assets that are attributable to the accounts of users that did not agree to be migrated to Celsius' non-UK affiliate(s), and will continue to have a debt relationship with those users with respect to equivalent assets (i.e., the "rump" of customers that have not transferred); (2) it will deal with proprietary deployment of crypto assets, acting on its own account (dealing on its own balance sheet and on an "on risk" basis), via trading, staking, decentralized finance activities, institutional lending of crypto assets, etc.; and (3) it will employ some back-office functions to support the operations of the entire group, acting as a service company to the other group entities. We appreciate the FCA's confirmation on our call that proprietary activities fall

6

outside the scope of the MLRs on the basis that they are not "services" provided to counterparties. It should be noted that the activities in (2) above relating to the proprietary deployment of crypto assets will not involve any non-institutional (i.e., retail) counterparties.

4. During our call, it was agreed that Celsius should not be removed from the TRR until migration is completed, on the basis that under the MLRs Celsius will need to remain in the TRR in order to carry out the services during the migration period. We had understood that you had accepted this position on our call. However, please let us know if there is another way in which the FCA believes that Celsius can continue to carry out the services during the migration period in compliance with the requirements under the MLRs and we are happy to discuss. Shall we discuss this point further on a call?

5. All clients will be able to close their account and/or terminate any loan they have given to Celsius and get cryptoassets back, with no cost (Celsius does not charge any fees for such transactions, and further subsidizes any blockchain transaction costs incurred in connection therewith, so that users would get the full amount of cryptoassets they previously had with Celsius). Our customer support team is ready to assist all clients who desire to take this route (while these options are also possible automatically, through the mobile or web app).

6. We apologize, but the detailed plan will only be available on Wednesday, 23 June as we are clarifying a number of legal issues, including GDPR compliance with respect to the data transfer, and, obviously, technical issues. Nevertheless, we would like to clarify in writing that the plan will be structured as follows:

    i.    **Weeks 0-3:** On the starting date, all clients will receive an **email** explaining the migration process and will be invited to accept the new Terms of Use with Celsius' affiliate. In parallel, for a period of three weeks after the starting date, all clients who have not agreed to the migration nor closed their account (each, a "Remaining User") will receive a **pop up each time they connect to the app**, allowing them to accept the new terms, terminate the relationship or to ignore.

    ii.    **Weeks 4 and 5:** Following this initial three weeks, **the 'ignore' option on the pop up will be switched off**, so Remaining Users will not be able to access their account, unless they have taken their choice of action. During these two weeks, Remaining Users will not be able to use any feature of the app without choosing to accept the new terms or terminate the relationship, and will only see their total account balance and additional limited information related thereto, to avoid giving them the wrong impression that anything should happen to their balance should they not agree to be migrated. During this period, Remaining Users will not be able to generate or view digital wallet addresses to which cryptoassets can be delivered to Celsius, however (as explained on our previous call) those Remaining Users who have such digital wallet addresses written down or saved elsewhere would still be able to lend additional cryptoassets to Celsius, as such transactions over the blockchain cannot be prevented or blocked by Celsius. Further, Remaining Users shall continue to earn interest on their cryptoasset loans to Celsius during this period, to provide them with sufficient prior notice and the opportunity to make informed decision.

    iii.    **Week 6 onwards:** From week 6, Celsius will **cease paying interest** for cryptoassets loaned from Remaining Users to disincentivise the Remaining Users to continue to loan

HIGHLY CONFIDENTIAL
CEL_CUST-00002665

assets to Celsius UK. The pop up notice and blocking of the services shall continue as in phase (ii).

Remaining users shall be informed of the changes between each of the phases described above via the **pop up notices**, and **periodic emails** to be sent to them.

7. As discussed on our call, we are forming entities in two jurisdictions to transact with our users worldwide – one in the United States and one in Lithuania (EU).

·   **US** – as discussed, we have formed a new Delaware limited liability company – Celsius Network LLC. We are in the final stages of completing the necessary operational arrangement for this entity to be fully operational, including opening a bank account, applying for the appropriate tax treatment and constructing the appropriate legal structure for the acceptance of users to this entity, including intercompany agreements and the creation of amended Terms of Use and Privacy Policy under applicable US laws.

·   **Lithuania** – as previously noted, the creation on a legal entity in civil law jurisdiction includes strict formalities, including the provision of apostilled and translated documents. We have received original copies of the incorporation documents of Celsius Network Limited (as sole shareholder of the to-be-formed entity) from Companies House to our London office on Wednesday the 16th of June, and following apostille they were received by our law firm in Lithuania on Monday the 21st of June. These need to be translated by a local notary prior to the submission to the companies registrar. We are working in parallel to open a bank account (which is a prerequisite for the deposit of initial capital required for the formation of the company) and comply with all other technical and operational requirements. Our Lithuanian lawyers estimate that the process should be finalized and the company established and operational in ~14 days following 21 June.

In an attempt to expedite the process, we have initiated a parallel process of purchasing an existing ('shelf') company from its current shareholders, however this process requires essentially the same operational and bureaucratic actions. In the event that this parallel process shall be completed sooner than the incorporation of the new entity, we will use this purchased company as our EU operational entity.

8. Upon the withdrawal of the application for registration, Celsius will cease performing activities within the scope of the MLRs and in compliance with any undertakings provided to the FCA. Subsequently, only the activities mentioned in no. 3 above will be performed by Celsius Network Limited, as reviewed during our call.

We will follow up with the last items by the close of Wednesday and will appreciate the FCA comments, if any, on the above.

HIGHLY CONFIDENTIAL

CEL_CUST-00002666

Thank you,

Roni

On Thu, Jun 17, 2021 at 1:40 PM Lauren Pittas <Lauren.Pittas@fca.org.uk> wrote:

Dear Roni,

Thank you for taking the time to speak again yesterday, regarding Celsius Network Limited planning to withdraw its application for registration as a cryptoasset business.

Please could we ask you to provide the following by close of business 21 June:

- Confirm the total number of UK customers and amount of UK assets (fiat and crypto) currently held by Celsius
- Confirm which activities Celsius Network Ltd (UK entity) plan to continue once the application has been withdrawn
- Agreement that Celsius have removed any reference to Celsius' position on the Temporary Registration Regime on Celsius' website/social media pages

In the best interest of your customers, we have discussed that you should consider and, where possible, return any money or cryptoassets that fall within the scope of the MLRs only to the customers to whom they rightfully belong, after:

- taking into account all relevant and appropriate regulations and laws, including but not limited to, the Proceeds of Crime Act 2002 (POCA); and
- where relevant have obtained all necessary and appropriate consents (e.g. from the National Crime Agency).

Celsius Network Ltd is responsible for understanding, and complying with, all relevant actions required by regulation or law.

During the call yesterday we agreed the following next steps:

- **Celsius will provide a plan to the FCA for the orderly migration of customers.** Please could we ask for this by close of business 21 June. This will be based on the projected date from which the companies are legally formed. As part of this plan, please indicate how you are going to monitor the progress of the contact exercise (for example read receipts on emails), the maximum withdrawals you can tolerate and the number of customer contacts you can service per day (and any other information you believe to be relevant).
- Please could you also include details of any withdrawal fees/notice period for any customers who wish to withdraw their cryptoassets from Celsius.
- During this interim period, Celsius will update via email every two days on progress with the formation of companies.
- Once the FCA have received the plan, we will draft a Direction to formalise the agreed date for withdrawal and the migration plan. We discussed that we may need another conversation about any 'rump' of customers that do not take action as a result of your contact exercise.
- When the migration process starts, Celsius will be removed from the TRR which will then be followed by an orderly wind down and migration of customers under the Direction. The Direction will specify the date when Celsius will formally withdraw its application, and the date that the withdrawal will take effect.

Once Celsius has withdrawn its application for registration, you will be required to cease trading.

If you have any questions, please do not hesitate to get in contact.

9

HIGHLY CONFIDENTIAL                                                                 CEL_CUST-00002667

Regards

Lauren

**Lauren Pittas**

Manager / 5MLD Cryptoassets / Banking, Payments & Insurance / Authorisations / 67154

*This email is FCA Official unless marked otherwise*

Please note that my working days are currently **Wednesday – Friday**

This communication and any attachments may contain personal information. For more information about how and why we use personal information and who to contact with any queries about this, please see our privacy notices: FCA Privacy Notice (https://www.fca.org.uk/data-protection) and PSR Privacy Notice (https://www.psr.org.uk/cookies-privacy-and-data-protection).

This communication and any attachments contain information which is confidential and may be subject to legal privilege. It is for intended recipients only. If you are not the intended recipient you must not copy, distribute, publish, rely on or otherwise use it without our consent. Some of our communications may contain confidential information which it could be a criminal offence for you to disclose or use without authority. If you have received this email in error please notify postmaster@fca.org.uk immediately and delete the email from your computer. Further information on the classification and handling of FCA information can be found on the FCA website (http://www.fca.org.uk/site-info/legal/fca-classified-information).

The FCA (or, if this email originates from the Payment Systems Regulator Limited, the FCA on behalf of the Payment Systems Regulator Limited / the Payment Systems Regulator Limited) reserves the right to monitor all email communications for compliance with legal, regulatory and professional standards.

This email is not intended to nor should it be taken to create any legal relations or contractual relationships. This email has originated from the Financial Conduct Authority (FCA), or the Payment Systems Regulator Limited.

The Financial Conduct Authority (FCA) is registered as a limited company in England and Wales No. 1920623. Registered office: 12 Endeavour Square, Stratford, London, E20 1JN, United Kingdom

The Payment Systems Regulator Limited is registered as a limited company in England and Wales No. 8970864. Registered office: 12 Endeavour Square, Stratford, London, E20 1JN, United Kingdom

Switchboard 020 7066 1000

Web Site http://www.fca.org.uk (FCA); http://www.psr.org.uk (the Payment Systems Regulator Limited)

--

HIGHLY CONFIDENTIAL

CEL_CUST-00002668

**Roni Cohen Pavon**

**CRO** | Celsius

phone: +972-50-444-6020

*Download the Celsius app today!*

Celsius Network Limited is a limited company registered in England and Wales with company number 11198050 and registered office at The Harley Building, 77 - 79 New Cavendish Street, London, W1W 6XB. Information in this email including any attachment ('email') is confidential, may be privileged, and is intended solely for the addressee. Unauthorised recipients are requested to preserve the confidentiality of this email, advise the sender immediately of any error in transmission, and then delete the email from the recipient's mailbox without making copies. Any disclosure, copying, distribution, or action taken or omitted to be taken, in reliance upon the contents of this email by unauthorised recipients is prohibited and may be unlawful. Please note that no contracts or commitments may be concluded on behalf of Celsius Network Limited or its group companies ('Celsius Network') by means of email, and no statement or representation made in this email is binding on behalf of Celsius Network. DISCLAIMER: Whilst this message has been scanned for viruses, Celsius Network disclaims any responsibility or liability for viruses contained therein. It is therefore recommended that all emails should be scanned for viruses.

This communication and any attachments may contain personal information. For more information about how and why we use personal information and who to contact with any queries about this, please see our privacy notices: FCA Privacy Notice (https://www.fca.org.uk/data-protection) and PSR Privacy Notice (https://www.psr.org.uk/cookies-privacy-and-data-protection).

This communication and any attachments contain information which is confidential and may be subject to legal privilege. It is for intended recipients only. If you are not the intended recipients you must not copy, distribute, publish, rely on or otherwise use it without our consent. Some of our communications may contain confidential information which it could be a criminal offence for you to disclose or use without authority. If you have received this email in error please notify postmaster@fca.org.uk immediately and delete the email from your computer. Further information on the classification and handling of FCA information can be found on the FCA website (http://www.fca.org.uk/site-info/legal/fca-classified-information).

The FCA (or, if this email originates from the Payment Systems Regulator Limited, the FCA on behalf of the Payment Systems Regulator Limited / the Payment Systems Regulator Limited) reserves the right to monitor all email communications for compliance with legal, regulatory and professional standards.

This email is not intended to nor should it be taken to create any legal relations or contractual relationships. This email has originated from the Financial Conduct Authority (FCA), or the Payment Systems Regulator Limited.

The Financial Conduct Authority (FCA) is registered as a limited company in England and Wales No. 1920623. Registered office: 12 Endeavour Square, Stratford, London, E20 1JN, United Kingdom

The Payment Systems Regulator Limited is registered as a limited company in England and Wales No. 8970864. Registered office: 12 Endeavour Square, Stratford, London, E20 1JN, United Kingdom

Switchboard 020 7066 1000

Web Site http://www.fca.org.uk (FCA); http://www.psr.org.uk (the Payment Systems Regulator Limited)

HIGHLY CONFIDENTIAL                                                                                          CEL_CUST-00002669



## Celsius Network Limited - Migration plan

1. **New structure**



2. **Clients**

   All clients will engage **Celsius Network LLC** (incorporated in Delaware, Headquartered in NJ) as main operational entity.

3. **Services**
   a. Earn:
      i) US clients will face only **Celsius Network LLC**
      ii) Non-US clients will face **Celsius Network LLC** for coins supported in the US, will engage **Celsius EU UAB** for coins not supported in the US (currently DOT, BNT, WDGLD, XAUT, XRP).
   b. Lending: like today, all users will engage a US entity (**Celsius Networks Lending LLC** and/or **Celsius Lending LLC**)
   c. Celpay: the same entity holding the coins as per the Earn service will be providing the service.
   d. OTC (exchanging CEL for fiat\crypto): **TBD**, pending legal analysis. Will not be done by Celsius Network Limited post migration.

4. **Pre-Migration steps**
   a. Prepare LIT entity
      i) Incorporation (name reserved; approved 22.6.21)
      ii) Finalize legal memo
      iii) Finalize tax analysis
      iv) AMLD5 registration
      v) Operational bank account
   b. Prepare US entity
      i) FinCEN registration
      ii) Finalize tax analysis
      iii) Operational bank account

5. **Migration Prep**
   a. Documents
      i) New Terms of Use
      ii) New Privacy Policy

                                                      CEL_CUST-00002670

    iii)  New intercompany agreements:
        1.  Existing services companies (IL, CY, Lending, operations, INC, MVP) to sign new agreements\assign existing ones;
        2.  Celsius UK to start providing services to Celsius Network LLC, Celsius EU UAB;
        3.  Celsius EU UAB-Celsius Network LLC to have intercompany agreement in place.
    iv)  GDPR analysis

b.  User consents
    i)  Accept new Terms of Use
    ii)  Agree to engage with new entity, transfer of rights and obligations
    iii)  Acknowledge new Privacy Policy
    iv)  Acknowledge data transfer

## 6.  Migration Steps

a.  Launch Migration (on date X):
    i)  **Phase I : Date X  until Date Y (X + 21 days)**
        A)  All users will get an email notification, and a pop-up on the app.
        B)  Users will have 3 options:
            i.  Accept all items in section 5(b) above and be migrated;
            ii.  'Snooze' the message; or
            iii.  Contact support to terminate their account and initiate manual withdrawal of their cryptoassets (alternatively, they may initiate standard withdrawals from their accounts prior to contacting support to close the account in a fully automated way).

    ii)  **Phase II : Date Y (X+21 days) until Date Z (Y+14 days)**
        A)  All users who did not accept all items in section 5(b) above (the **"Remaining Users"** will get an email notification, and a popup on the app.
        B)  Remaining Users will have **2** options:
            i.  Accept all items in section 5(b) above and be migrated; or
            ii.  Contact support to terminate their account and initiate manual withdrawal of their cryptoassets (in-app withdrawals will be unavailable, see D below).
        C)  Remaining Users will NOT be able to snooze the popup; the popup will block their sight of their account (save for the part showing the user's 'Total balance $ value', and 'Total rewards earned all-time $ value; this is to avoid creating unnecessary panic of Remaining Users not seeing their balance and fearing cryptoassets are gone).
        D)  Remaining Users will NOT be able to make any action in their accounts. This is to incentivize Remaining Users to take action and not linger further.
            i.  Remaining Users who have the applicable digital wallet addresses for transferring coins to Celsius (written down or saved on any device or platform) will still be able to lend additional coins to Celsius by using such addresses, as those cannot be blocked; otherwise, they will not be able to generate new addresses to transfer coins or view ones previously generated through the app.
            ii.  Open fiat loans and Sale and Repurchase arrangements will continue to be served, Remaining Users will not be able to open new fiat loans or Sale and Repurchase transactions, nor to refinance open ones.
            iii.  Remaining Users will not be able to use CelPay to send or receive coins;

CEL_CUST-00002671

iii) **Phase III : Date Z (X + 35 days) onwards**
  A) Remaining Users will get an email notification, and a popup on the app.
  B) Remaining Users will have 2 options:
      i. Accept all items in section 5(b) above and be migrated; or
      ii. Contact support to terminate their account and initiate manual withdrawal of their funds (in-app withdrawals will be unavailable, as in (ii)D above).
  C) Access to services continue to be limited as per (ii)(D) above.
  D) Remaining Users will NO LONGER earn rewards on remaining balances in their accounts. This is to incentivize Remaining Users to take action and not linger further.

b. **Notifications**

| No. | Phase | Content | Channel | Timing |
|---|---|---|---|---|
| 1 | Pre- Phase I | 'Heads up' regarding the upcoming migration, what is expected to happen, timeframes and user's alternatives. | Email | Few days prior to Date X |
| 2 | Phase I – commencement | Notification of the commencement of the migration period, what is the migration, what it would mean for users, details of new entities, timeframes, user's alternatives, and how to technically effectuate user's choice. [To agree to migration, need to login to the app, where they see notification (3)] | Email | Date X |
| 3 | Phase I | Brief summary of notification (2) [options to agree, snooze, or terminate] | Pop-up in the app | Each login |
| 4 | Phase I | 1st reminder – repeating notification (2) | Email | Date X + 7 days |
| 5 | Phase I + Pre-Phase II | 2nd reminder – repeating notification (2) + warning that by Date Y (in 7 days), access to services will be blocked. | Email | Date X + 14 days |
| 6 | Phase II – commencement | repeating notification (2) + information about the blockage of services. [To agree to migration, need to login to the app, where they see notification (7)] | Email | Date Y (X + 21 days) |
| 7 | Phase II | Brief summary of notification (6) [options to agree or terminate; Pop-up cannot be removed, will hide screen, save for balance and total rewards to date.] | Pop-up in the app | Each login |

HIGHLY CONFIDENTIAL

| 8 | Phase II | 1st reminder – repeating notification (7) | Email | Date Y + 7 days |
| 9 | Phase II | 2nd reminder – repeating notification (7) + warning that by Date Z (in 2/3 days), interest will no longer be payable on loaned assets. | Email | Date Y + 11/12 days |
| 10 | Phase III | repeating notification (7) + information about the cessation of interest. [To agree to migration, need to login to the app, where they see notification (11)]] | Email | Date Z (Y + 14 days) |
| 11 | Phase III | Brief summary of notification (10) [options to agree or terminate; Pop-up cannot be removed, will hide screen, save for balance and total rewards to date.] | Pop-up in the app | Each login |
| 12 | Phase III | Weekly reminders. | Email | Each week |
| 13 | Phase IV | TBD | TBD | TBD |

c. **Monitoring**

Throughout Phases I-III, Celsius will monitor:

i) **Acceptance\Termination Rates**
Out of all existing users, Celsius will monitor the number of those agreeing to the migration and of those declining it and terminating the relationship with Celsius, vs Remaining Users (not taking any action).

This will be done via Celsius' own back-end database.

ii) **Reaction to Email Notifications**
At each stage, Celsius will monitor Remaining Users' reactions to email notifications – those who have opened the email vs those who have not.

This would indicate awareness rates (Remaining Users reading the email notifications are most likely aware of the migration process and chose not to take action; those not reading the emails might be unaware, without internet connection, etc.)

Email notifications will be sent from a dedicated email address, using a third party provider (customer.io or another provider), allowing tracking of users opening the email, number of emails which were bounced or not delivered, and which users clicked which link in the email. The emails will contain deeplinks, allowing users to open the mobile or web app directly from the email body, view the updated documents via the website or contact support in the case the user wants to terminate the account.

HIGHLY CONFIDENTIAL

iii) **Logins and Reaction to Pop-Ups**

As is the case with monitoring the reactions to email notifications, Celsius will monitor the number of logins to the app of each Remaining User, and its reaction to the in-app pop-ups.

Login monitoring will teach Celsius whether (and how many times) a user logged into the app during each Phase, indicating the user's awareness to the migration.

Pop-up reaction monitoring will allow Celsius to:

- Ensure that all users who have chosen to be migrated were in fact migrated in Celsius' back-office;
- Ensure that all users who have chosen to terminate the relationship were indeed terminated, received their loaned cryptoassets back to their digital wallets and, later on, that they have received proper service from our support team;
- Identify users who have clicked on 'contact support to close your account' but whose accounts may yet be active, to monitor for any 'limbos'.
- During Phase I, where a 'snooze' option exists, identify those users who have chosen such option, as an indication of awareness, and to assess whether any behavioral patterns should be taken into account for updating this plan.

Tracking in-app behavior is done via Mixpanel.

7. **Post-Migration Issues**

a. **Remaining Users**

As noted above, depending on the progress of the migration plan, additional steps might need to be taken in connection with Remaining Users. Until such time, the Remaining Users' contractual relationship will continue to be with Celsius Network Limited, who will continue to hold the liability to Remaining Users on its balance sheet.

b. **CEL Token**

Celsius UK, as issuer, will continue to hold CEL treasury. No additional CEL tokens will ever be minted or created.

Intercompany arrangements between Celsius Network Limited and each of the subsidiaries (for the subsidiaries to obtain CEL tokens from the former) to be entered into from time to time as needed.

c. **Own Account Trading**

Celsius Network Limited will continue to deal with proprietary deployment of crypto assets, acting on its own account (dealing on its own balance sheet and on an "on risk" basis), via trading, staking, decentralized finance activities, institutional lending of crypto assets, etc.

d. **Intercompany Arrangements**

Celsius Network Limited will employ some back-office functions to support the operations of the entire group, acting as a service company to the other group entities.

e. **UK Employees**

Celsius Network Limited will continue to employ staff, hire, and hold offices in the UK.

HIGHLY CONFIDENTIAL

# **EXHIBIT D**

**WHITE & CASE**

September 12, 2022

White & Case LLP
111 South Wacker Drive
Suite 5100
Chicago, Illinois 60606-4302
**T** +1 312 881 5400

**whitecase.com**

***VIA EMAIL***
Ross M. Kwasteniet
Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654

Re: *In re Celsius Network, LLC, et al.*, No. 22-10964 (MG) (Bankr. S.D.N.Y.).

Dear Ross:

I am writing regarding an issue of paramount importance to the Official Committee of Unsecured Creditors (the "**Committee**") and all account holders in the cases of Celsius Network Ltd. ("**Celsius**") and its debtor affiliates (collectively, the "**Debtors**")—the allowance of account holder claims at each Debtor and non-Debtor entity.

The Terms of Use dated July 22, 2021, August 3, 2021, and April 14, 2022 [Docket No. 393] (the "**Terms of Use**") clearly and unambiguously state that each user was contracting with all Celsius-affiliated entities. More specifically, the Terms of Use state: "Celsius Network LLC and its Affiliates (collectively: 'we,' 'our,' 'us,' 'Celsius,' or the 'Company') provide the following Terms of Use (the 'Terms') that apply to our users ('you' or 'User(s)') . . . ." The Terms of Use define an "Affiliate" as "an entity that owns or controls, is owned or controlled by, or is or under common control or ownership with a party, where control is defined as the direct or indirect power to direct or cause the direction of the management and policies of such party, whether through ownership of voting securities, by contract, or otherwise." [1]

Consistent with the express terms of the Terms of Use, the Debtors have represented to the Committee's advisors on multiple occasions that the Debtors did not expect to disagree with the proposition that account holders have claims at each Debtor and non-Debtor entity, including the in-person meetings on August 10 and August 23, 2022 and an August 31, 2022 telephone conference regarding the claims allowance process. Finally, the Debtors have made similar representations regarding the status of account holder claims. For example, the August 10, 2022 correspondence to the United States Trustee regarding requests to appoint an official committee of equity security holders stated that the Debtors "believe that customers ***may assert claims against all Debtor and non-Debtor entities in the Debtors' capital structure*** given the language in Celsius' current [Terms of Use]. In the [Terms of Use], customers contract with Celsius Network, LLC 'and its Affiliates.'"

---

[1]    The Terms of Use definition is consistent with how courts would interpret this term if it were undefined. Courts have interpreted affiliates to include companies that are related by shareholdings or other means of control, including, but not limited to, a subsidiary, parent, or sibling corporation. *See Schapp v. Mastec Servs. Co.*, No. 6:12-CV-0841, 2014 U.S. Dist. LEXIS 44584, at *1 (N.D.N.Y. Mar. 31, 2014) (finding that a subsidiary was covered under an agreement that referred to the parent company and its affiliates); *see also Affiliate*, Black's Law Dictionary (11th ed. 2019) ("A corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation.").

UCC_00000001
UCC_00000001

September 12, 2022

The plain terms of the Terms of Use and the expectation that the Debtors would not contradict those terms were material factors for the Committee as it has considered a host of critical issues in these cases. For example, in connection with entry of both the second interim cash management order, entered on August 17, 2022 [Docket No. 513], and the third interim cash management order, entered on September 2, 2022 [Docket No. 699], the Committee agreed to a reporting package premised on the Debtors providing reporting information on an aggregated basis other than with respect to Celsius Mining LLC. The Committee agreed to this arrangement based on several reasons, including the Debtors' representations regarding account holder claims. The Committee would not have agreed to this framework if there was a meaningful question as to whether account holders have claims at each Debtor entity and that the Debtors might take an adverse position on this important topic. The reason is simple: if account holders do not have claims at each Debtor entity, then intercompany transactions between Debtor entities, as well as spending at each Debtor entity, would ultimately impact creditor recoveries.

In a similar vein, since the day the Committee was formed, the Debtors have sought the Committee's support to disburse digital assets held in the Custody and Withhold accounts. Since that time, the Committee's professionals have spent significant time and effort analyzing this issue in an effort to reach a consensual agreement on the matter. At the September 1, 2022 hearing, the Committee's counsel stated that the Committee viewed the Debtors' proposal to release certain coins held in Custody and Withhold accounts as a positive step. That indicative position, however, was premised on the facts and circumstances of the cases to date, including that, "as has been said in these other hearings, the account holders have claims at every entity," which led the Committee to believe that the requested relief would not "affect overall account holder recoveries." Sept. 1, 2022 Hr'g Tr. 48:23-49:1. Moments later, however, the Debtors equivocated on the matter. *See* Sept. 1, 2022 Hr'g Tr. 53:17-54:13.

The Committee is concerned regarding the Debtors' position on this topic, particularly in light of the fact that the Debtors are required to file the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs on or before September 16. *See Order Granting a Second Extension of Time to File Schedules and Statements of Financial Affairs to and including September 16, 2022* [Docket No. 685].[2]

Simply put, the time has come for the Debtors to put this matter to rest. Therefore, the Committee expects that the Debtors' Schedules of Assets of Liabilities and Statements of Financial Affairs as filed on September 16, 2022 will schedule account holder claims at each Debtor entity (and, for the avoidance of any doubt, without any kind of designation that any such claim is disputed, contingent, or unliquidated—designations which would typically require an account holder to file a proof of claim against each Debtor entity).

Furthermore, the failure to schedule claims in this manner would require the Committee to commence litigation regarding this matter, including the need to conduct discovery on the rationale for any such decision. To that end, we expect that the Special Committee of Celsius Network Ltd. and the Debtors' professionals will retain any and all documents and other information (including text messages or any written correspondence, whatever its form) relating to the scheduling or allowance of account holder claims.

Please do not hesitate to contact me with any questions.

---

[2]    The Debtors' equivocations on this matter of fundamental importance are particularly disappointing in light of the fact that the Committee was asked to consent to a further extension—which the Committee agreed to—immediately before the September 1 hearing.

2

UCC_00000002
UCC_00000001

**WHITE & CASE**

September 12, 2022

 

 

To be clear, the Committee reserves all rights in connection with the Debtors' chapter 11 cases, including this matter.

Sincerely,

Gregory F. Pesce

3

UCC_00000003
UCC_00000001

# EXHIBIT E

**From:**      Koenig, Chris [chris.koenig@kirkland.com]
**Sent:**      10/5/2022 5:59:08 PM
**To:**        Pesce, Gregory [gregory.pesce@whitecase.com]; 'Scheffer, Tommy' [tommy.scheffer@kirkland.com]; Project Celsius
               UCC [TeamCelsiusUCC@whitecase.com]
**CC:**        'Latona, Dan' [dan.latona@kirkland.com]; 'Trevett, Kyle Nolan' [kyle.trevett@kirkland.com]
**Subject:**   RE: CEL - Global Notes


We will be sending something similar from our account.  Happy to coordinate as the night goes on.  Agree
that would be helpful for you to retweet / tweet similar messages.

Christopher S. Koenig
------------------------------------------------------
KIRKLAND & ELLIS LLP
300 North LaSalle, Chicago, IL 60654
T +1 312 862 2372  M +1 440 487 2207
F +1 312 862 2200
------------------------------------------------------
chris.koenig@kirkland.com<mailto:chris.koenig@kirkland.com>

From: Pesce, Gregory <gregory.pesce@whitecase.com>
Sent: Wednesday, October 5, 2022 12:58 PM
To: Scheffer, Tommy <tommy.scheffer@kirkland.com>; Project Celsius UCC
<TeamCelsiusUCC@whitecase.com>
Cc: Koenig, Chris <chris.koenig@kirkland.com>; Latona, Dan <dan.latona@kirkland.com>; Trevett, Kyle
Nolan <kyle.trevett@kirkland.com>
Subject: RE: CEL - Global Notes

Tommy, Thanks for the heads up. I heard some of the context from Chris. We'll review the full set when it
is filed (reserving all rights as to what the schedules and global note actually
says).
Tommy,

Thanks for the heads up.  I heard some of the context from Chris.  We'll review the full set when it is filed
(reserving all rights as to what the schedules and global note actually says).

As I mentioned to Chris, you should probably send out a PR communication through Twitter that this is
happening.

We are also willing to tweet at @CelsiusUCC that the "Celsius is filing its statements and schedules
tonight, and further details regarding the claims process will be forthcoming in the near future" or
something to similar effect.

I appreciate how lengthy the schedules are and the complexity of filing.  Why don't you let me know one
way or the other by 5pm ET or so if that type of message from our account is useful, and we can send it
out later tonight.

Thanks.

Gregory F. Pesce  |  Partner
T  +1 312 881 5360<tel:+13128815360>       M  +1 312 613 8501<tel:+13126138501>       E
gregory.pesce@whitecase.com<mailto:gregory.pesce@whitecase.com>
White & Case LLP  |  111 South Wacker Drive, Suite 5100  |  Chicago, IL 60606-4302
[cid:image001.png@01D8D8BA.3F6B6870]

From: Scheffer, Tommy <tommy.scheffer@kirkland.com<mailto:tommy.scheffer@kirkland.com>>
Sent: Wednesday, October 5, 2022 11:04 AM
To: Pesce, Gregory <gregory.pesce@whitecase.com<mailto:gregory.pesce@whitecase.com>>; Project

Confidential

Celsius UCC <TeamCelsiusUCC@whitecase.com<mailto:TeamCelsiusUCC@whitecase.com>>
Cc: Koenig, Chris <chris.koenig@kirkland.com<mailto:chris.koenig@kirkland.com>>; Latona, Dan
<dan.latona@kirkland.com<mailto:dan.latona@kirkland.com>>; Trevett, Kyle Nolan
<kyle.trevett@kirkland.com<mailto:kyle.trevett@kirkland.com>>
Subject: RE: CEL - Global Notes

Greg and all -- please see attached for an updated draft of the global notes redline against the version you
sent yesterday. I think you connected separately with some folks on our side, but we're trying to remain
as agnostic as possible on the Customer Claims Ruling so we tried to keep it super down the middle of the
fairway.

Know folks are out for the holiday but let us know if helpful to discuss. Looks like we're tracking towards a
mid/late-afternoon filing but we all know how that goes.

Thank you!

Tommy Scheffer
--------------------------------------------------------
KIRKLAND & ELLIS LLP
601 Lexington Avenue, New York, NY 10022
T +1 212 390 4238
M +1 917 900 2931
F +1 212 446 4900
--------------------------------------------------------
tommy.scheffer@kirkland.com<mailto:tommy.scheffer@kirkland.com>

From: Scheffer, Tommy
Sent: Tuesday, October 4, 2022 5:58 PM
To: 'Pesce, Gregory' <gregory.pesce@whitecase.com<mailto:gregory.pesce@whitecase.com>>; Project
Celsius UCC <TeamCelsiusUCC@whitecase.com<mailto:TeamCelsiusUCC@whitecase.com>>
Cc: Koenig, Chris <chris.koenig@kirkland.com<mailto:chris.koenig@kirkland.com>>; Latona, Dan
<dan.latona@kirkland.com<mailto:dan.latona@kirkland.com>>; Trevett, Kyle Nolan
<kyle.trevett@kirkland.com<mailto:kyle.trevett@kirkland.com>>
Subject: RE: CEL - Global Notes

Thanks Pesce -- we'll take a look

Tommy Scheffer
--------------------------------------------------------
KIRKLAND & ELLIS LLP
601 Lexington Avenue, New York, NY 10022
T +1 212 390 4238
M +1 917 900 2931
F +1 212 446 4900
--------------------------------------------------------
tommy.scheffer@kirkland.com<mailto:tommy.scheffer@kirkland.com>

From: Pesce, Gregory <gregory.pesce@whitecase.com<mailto:gregory.pesce@whitecase.com>>
Sent: Tuesday, October 4, 2022 5:47 PM
To: Scheffer, Tommy <tommy.scheffer@kirkland.com<mailto:tommy.scheffer@kirkland.com>>; Project
Celsius UCC <TeamCelsiusUCC@whitecase.com<mailto:TeamCelsiusUCC@whitecase.com>>
Cc: Koenig, Chris <chris.koenig@kirkland.com<mailto:chris.koenig@kirkland.com>>; Latona, Dan
<dan.latona@kirkland.com<mailto:dan.latona@kirkland.com>>; Trevett, Kyle Nolan
<kyle.trevett@kirkland.com<mailto:kyle.trevett@kirkland.com>>
Subject: RE: CEL - Global Notes

Tommy, Thank you for sharing this. We appreciate the preview. We have not gone through in detail. Given
the filing tomorrow, we wanted to send a few quick edits intended to clarify what I think you are trying to
say about the pref, as well

Tommy,

Thank you for sharing this.  We appreciate the preview.  We have not gone through in detail.  Given the filing tomorrow, we wanted to send a few quick edits intended to clarify what I think you are trying to say about the pref, as well as a few corrections and typographical fixes.

Please consider this before you finalize.

Thank you.

Gregory F. Pesce  |  Partner
T +1 312 881 5360<tel:+13128815360>     M +1 312 613 8501<tel:+13126138501>     E gregory.pesce@whitecase.com<mailto:gregory.pesce@whitecase.com>
White & Case LLP  |  111 South Wacker Drive, Suite 5100  |  Chicago, IL 60606-4302
[cid:image001.png@01D8D8BA.3F6B6870]

From: Scheffer, Tommy <tommy.scheffer@kirkland.com<mailto:tommy.scheffer@kirkland.com>>
Sent: Tuesday, October 4, 2022 3:31 PM
To: Pesce, Gregory <gregory.pesce@whitecase.com<mailto:gregory.pesce@whitecase.com>>; Project Celsius UCC <TeamCelsiusUCC@whitecase.com<mailto:TeamCelsiusUCC@whitecase.com>>
Cc: Koenig, Chris <chris.koenig@kirkland.com<mailto:chris.koenig@kirkland.com>>; Latona, Dan <dan.latona@kirkland.com<mailto:dan.latona@kirkland.com>>; Trevett, Kyle Nolan <kyle.trevett@kirkland.com<mailto:kyle.trevett@kirkland.com>>
Subject: CEL - Global Notes

[CONFIDENTIAL / FRE 408]

All -- please see attached for a draft of the global notes accompanying the Schedules and Statements. Please note that the attached remain subject to material revision and internal and client review.

Let us know of any questions or comments.

Thank you,

Tommy Scheffer
-----------------------------------------------------------
KIRKLAND & ELLIS LLP
601 Lexington Avenue, New York, NY 10022
T +1 212 390 4238
M +1 917 900 2931
F +1 212 446 4900
-----------------------------------------------------------
tommy.scheffer@kirkland.com<mailto:tommy.scheffer@kirkland.com>

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com<mailto:postmaster@kirkland.com>, and destroy this communication and all copies thereof, including all attachments.

=============================================================
=============

This email communication is confidential and is intended only for the individual(s) or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or disclose the contents of this communication to others. Please notify the sender that you have received this email in error by replying to the email or by telephoning +1 212 819 8200. Please then delete the email and any copies of it. Thank you.

Our external privacy policy is available here<https://urldefense.com/v3/__https://www.whitecase.com/privacy-policy__;!!MPAZj1r9Mghpww!AGd-Crn2oAmbcqlNlKSydIZxamtePW6MDtFSdOvXO3QoI1LpbEfFWhEExFMb2OcoXsFSVK0k8xIDysiyyorsFdgeUd-WnK5x$>.

============================================================
=============

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com<mailto:postmaster@kirkland.com>, and destroy this communication and all copies thereof, including all attachments.

============================================================
=============

This email communication is confidential and is intended only for the individual(s) or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or disclose the contents of this communication to others. Please notify the sender that you have received this email in error by replying to the email or by telephoning +1 212 819 8200. Please then delete the email and any copies of it. Thank you.

Our external privacy policy is available here<https://urldefense.com/v3/__https://www.whitecase.com/privacy-policy__;!!MPAZj1r9Mghpww!B-id0Oz9VyXqNWrxc6i8Z7EWgyCfw-8iAOjjm7OKrCXfyyz5d1_SBxzieOBjTvFaZ8Q63oIWbo3xKOPPSf6T4VEzyA4KAQ$>.

============================================================
=============

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com<mailto:postmaster@kirkland.com>, and destroy this communication and all copies thereof, including all attachments.

**Attachments:**

image001.png                                                                                    (4 KB)

# EXHIBIT F

DocuSign Envelope ID: 9B56A82A-F543-4E56-8155-683661E121C2

## ASSET TRANSFER AGREEMENT

THIS ASSET TRANSFER AGREEMENT (this "**Agreement**") is entered into on December 29, 2021, with an effective date of August 19, 2021 (the "**Effective Date**"), by and between Celsius Network Limited, a company organized under the laws of England and Wales with Company No. 11198050 and registered address at The Harley Building 77 - 79 New Cavendish Street London, W1W 6XB, United Kingdom ("**Transferor**"), and Celsius Network LLC, a company organized under the laws of Delaware with principal address at 221 River Street, 9th Floor, Hoboken, New Jersey 07030, United States ("**Transferee**").

## RECITALS

WHEREAS, as of the Effective Date, Transferor maintains a democratized reward payment and lending activity which is accessible via a mobile app owned by the Transferor's affiliate (the "**Celsius App**"), where membership provides access to financial services enabling cryptographic assets holders to earn rewards by transferring their cryptographic assets to their Celsius accounts and borrow USD against their cryptographic assets collateral at low interest rates (the "**Business**");

WHEREAS, in June 2021, Transferor learned of certain regulatory limitations and requirements as they relate to the operation of the Business by Transferor with respect to the provision of services to retail users of the Celsius App (the "**Users**");

WHEREAS, Between July 22, 2021 and August 23, 2021 (the "**Transfer Period**"), Transferor offered its Users the ability to transfer their respective services from Transferor to Transferee in order to address such regulatory limitations and requirements (each User that agreed to such transfer, a "**Consenting User**" and collectively, the "**Consenting Users**");

WHEREAS, Transferor has, based on input received from the applicable regulatory bodies in the United Kingdom, and following input and advice of counsel, determined to stop providing services to or contracting with the Consenting Users;

WHEREAS, Transferor, in order to no longer provide services to or contract with the Consenting Users, wishes to transfer the assets and liabilities of the Business that relate specifically to the Consenting Users and which are the subject of regulatory limitations and requirements;

WHEREAS, Transferee is able to operate certain aspects of the Business as they relate to the provision of services to the Consenting Users and Transferee is willing to contract with the Consenting Users in connection with the operation of such certain aspects the Business;

WHEREAS, the Parties hereto shall enter into that certain Loan Agreement substantially in the form attached hereto as Exhibit 2, addressing the lending of certain cryptographic assets related to the Consenting Users between Transferor and Transferee in accordance with the terms and conditions therein;

WHEREAS, in light of the foregoing, Transferor wishes to transfer, and Transferee wishes to accept and assume, certain assets and liabilities of the Business listed on Exhibit 1 hereto (collectively, the "**Transferred Assets and Liabilities**") subject to the terms and conditions set forth herein:

CEL_CUST-00006345

DocuSign Envelope ID: 08F5A82A-F543-4E56-8155-683861E121C2

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual and dependent promises set forth herein, the sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

## ARTICLE I
## THE TRANSACTION

I.1      Transfer and Assumption.  Upon the terms and subject to the conditions set forth in this Agreement and effective upon the execution hereof, Transferee shall accept and assume from Transferor, and Transferor shall transfer and assign to Transferee, the Transferred Assets and Liabilities.

I.2      The Consideration for Transferred Assets. The consideration for the Transferred Assets and Liabilities shall be determined according to the arm's length standard as stated in the U.S. Transfer Pricing rules pursuant to Internal Revenue Code §482 and the regulations promulgated thereunder, the 2017 Organization of Economic Cooperation and Development (OECD) Transfer Pricing Guidelines, and any equivalent local tax laws, regulations, and guidelines.

I.3      The Closing. The transfer and assumption of the Transferred Assets and Liabilities hereunder was initiated on July 22, 2021 and completed on August 23, 2021.

I.4      Beneficial Ownership.  The parties hereto agree that, to the extent that legal title and registered ownership of the Transferred Assets and Liabilities are not transferred to Transferee solely by this instrument under applicable law, the parties hereto shall nonetheless treat Transferee as the beneficial owner of the Transferred Assets and Liabilities, as of the Effective Date, for all purposes.

I.5      Further Assurances.  Transferor hereby undertakes to promptly, or as soon as reasonably practicable, transfer the title and registered ownership of the Transferred Assets and Liabilities to Transferee or its nominee(s), as directed by Transferee.  Each of the parties hereto shall execute and deliver such additional documents, instruments, conveyances, and assurances and take such further actions as may be required to carry out the provisions hereof and give effect to the transactions contemplated hereby.

I.6      Fees and Expenses.  Transferee and Transferor shall each be responsible for its own respective fees and expenses incurred in connection with this Agreement and the transactions contemplated hereby.

I.7      Tax Matters.  Transfer, sales, use, registration, documentary, stamp, value-added and similar taxes and fees (including any penalties and interest) incurred in connection with this Agreement and any other related document, if any, shall be borne and paid by Transferee when due, excluding taxes on Transferor's income, gross receipts, capital, property or employees.

2

CEL_CUST-00006346

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES OF TRANSFEREE

Transferee represents and warrants to Transferor as follows:

II.1    <u>Authorization of Agreement</u>.  Transferee has all requisite power, authority and legal capacity to execute and deliver this Agreement and Transferee has all requisite power, authority and legal capacity to perform Transferee's obligations hereunder and to consummate the transactions contemplated hereby.  This Agreement has been duly and validly executed and delivered by Transferee and, assuming the due authorization, execution and delivery by Transferor, this Agreement constitutes a legal, valid and binding obligation of Transferee, enforceable against Transferee in accordance with its terms, subject to applicable bankruptcy, insolvency, moratorium, reorganization or similar laws affecting creditors' rights generally and subject to general equitable principles (regardless of whether such enforceability is considered in a proceeding in equity or at law).

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF TRANSFEROR

Transferor represents and warrants to Transferee as follows:

III.1    <u>Authorization of Agreement</u>.  Transferor has all requisite power, authority and legal capacity to execute and deliver this Agreement and Transferor has all requisite power, authority and legal capacity to perform Transferor's obligations hereunder and to consummate the transactions contemplated hereby.  This Agreement has been duly and validly executed and delivered by Transferor and, assuming the due authorization, execution and delivery by Transferee, this Agreement constitutes a legal, valid and binding obligation of Transferor, enforceable against Transferor in accordance with its terms, subject to applicable bankruptcy, insolvency, moratorium, reorganization or similar laws affecting creditors' rights generally and subject to general equitable principles (regardless of whether such enforceability is considered in a proceeding in equity or at law).

III.2    <u>Title to Transferred Assets and Liabilities</u>.  Transferor has good, valid and marketable title to the Transferred Assets and Liabilities, free and clear of any and all security interests, liens, claims, pledges, encumbrances or other rights or claims of any other person of any kind or any preemptive or similar rights (collectively, "**Encumbrances**").  Upon the execution hereof, Transferee will acquire all of Transferor's right, title and interest in and to, and will have good, valid and marketable title to, the Transferred Assets and Liabilities transferred from Transferor hereunder, free and clear of any and all Encumbrances other than permitted Encumbrances.

## ARTICLE IV
## MISCELLANEOUS

IV.1    <u>Notices</u>.  All notices and other communications given or made in connection with this Agreement shall be in writing and shall be deemed to have been given or made when given or made if such notice or communication is in writing and delivered personally, sent by commercial carrier or registered or certified mail (postage prepaid) or transmitted by facsimile or electronic

3

CONFIDENTIAL

CEL_CUST-00006347

DocuSign Envelope ID: 0B56A82A-F543-4E56-8465-683861E121C2

mail to the parties at the following addresses and numbers (or at such other addresses as shall be furnished by the parties by like notice):

| | |
|---|---|
| **If to Transferor:** | The Harley Building |
| | 77 - 79 New Cavendish Street |
| | London, W1W 6XB |
| | United Kingdom |
| | |
| **If to Transferee:** | 221 River Street, 9th Floor |
| | Hoboken, New Jersey 07030 |
| | United States |

IV.2    <u>Indemnification</u>.

(a)    Transferee agrees to indemnify and hold harmless Transferor, and any of Transferor's representatives and agents, from and against any demands, claims, actions, suits, proceedings, fees and expenses, including reasonable attorneys' fees and expenses, and any other obligations directly or indirectly arising from or related to (i) any breach of any representation or warranty made by Transferee in this Agreement or (ii) any breach by Transferee of any covenant or obligation of Transferee under this Agreement.

(b)    Transferor agrees to indemnify and hold harmless Transferee, and any of Transferee's representatives and agents, from and against any demands, claims, actions, suits, proceedings, fees and expenses, including reasonable attorneys' fees and expenses, and any other obligations directly or indirectly arising from or related to (i) any breach of any representation or warranty made by Transferor in this Agreement; or (ii) any breach by Transferor of any covenant or obligation of Transferor under this Agreement.

(c)    All indemnification payments made under this Agreement shall be treated by the parties as an adjustment to the Purchase Price for tax purposes, unless otherwise required by law.

IV.3    <u>Headings; Entire Agreement; Counterparts; Amendments; Third Party Beneficiaries</u>.  The headings contained in this Agreement are inserted for convenience only and do not constitute a part of this Agreement.  This Agreement constitutes the entire agreement among the parties hereto and supersedes all other prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the United States federal ESIGN Act of 2000, *e.g.*, www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.  This Agreement may not be amended except by an instrument in writing duly executed by each of the parties hereto.  This Agreement is not intended to confer upon any other person other than the parties hereto any rights or remedies hereunder.

CONFIDENTIAL                                                                          CEL_CUST-00006348

IV.4    <u>Waivers</u>.  Neither any failure nor any delay by any party hereto in exercising any right, power or privilege under this Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege.

IV.5    <u>Assignment; Successors and Assigns</u>.  No party hereto may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other party hereto.  Subject to the preceding sentence, all of the terms, agreements, covenants, representations, warranties, and conditions of this Agreement are binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns (whether by operation of law or otherwise).  Any assignment in violation of this section shall be null and void.

IV.6    <u>Governing Law</u>.  The validity and interpretation of this Agreement shall be governed by the laws of the State of Delaware, United States, without reference to the conflict of laws principles thereof.

IV.7    <u>Submission to Jurisdiction; Process</u>.  Each party hereto submits to the exclusive jurisdiction of any state or federal court located in the State of New York, in any action, suit or proceeding ("**Action**") arising out of or relating to this Agreement and agrees that all claims in respect of the Action may be heard and determined in any such court.  Each party hereto also agrees not to bring any Action arising out of or relating to this Agreement in any other court.  Each party hereto agrees that a final judgment in any Action so brought will be conclusive and may be enforced by Action on the judgment or in any other manner provided at law or in equity.  Each party hereto waives any defense of inconvenient forum to the maintenance of any Action so brought and waives any bond, surety, or other security that might be required of any other party with respect thereto.  Process in any such Action may be served on any party hereto anywhere in the world, whether within or without the jurisdiction of any such court.

IV.8    <u>Waiver of Jury Trial</u>.  TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW, THE PARTIES HERETO HEREBY WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY ACTION, SUIT OR OTHER PROCEEDING BROUGHT TO RESOLVE ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATING TO THIS AGREEMENT, REGARDLESS OF WHICH PARTY INITIATES SUCH ACTION, SUIT OR OTHER PROCEEDING.

IV.9    <u>Drafting</u>.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

IV.10    <u>Specific Performance</u>.  The parties hereto shall acknowledge that, in view of the uniqueness of the parties hereto, the parties hereto would not have an adequate remedy at law for money damages in the event that this Agreement were not performed in accordance with its terms,

CONFIDENTIAL                                                    CEL_CUST-00006349

DocuSign Envelope ID: 0B56A82A-F543-4E56-8155-683861E121C2

and therefore agree that the parties shall be entitled to specific enforcement of the terms hereof in addition to any other remedy to which the parties hereto may be entitled at law or in equity.

IV.11    <u>Severability</u>.  The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision.

*[Signature Page Follows]*

6

CONFIDENTIAL

CEL_CUST-00006350

IN WITNESS WHEREOF, Transferee and Transferor have executed this Agreement as of the date first set forth above.

**TRANSFEROR:**

Celsius Network Limited

By: _____

Name: Alex Mashinsky

Title: Ceo

**TRANSFEREE:**

Celsius Network LLC

By: _____

Name: Daniel Leon

Title: COO/President

CEL_CUST-00006351

## Exhibit 1 – Transferred Assets and Liabilities

Except as otherwise provided, the Transferred Assets and Liabilities are as follows:

1.      All of Transferor's obligations related to or resulting from the Consenting Users' use of the Celsius App, including any obligation of Transferor to return collateral following repayment of a loan made to a Consenting User, all obligations to repay loans of cryptographic assets made by Consenting Users to Transferor prior to the Effective Date and obligations to pay financing fees (known as "Rewards" on the Celsius App) to Consenting Users in respect of loans made by Consenting Users through the Celsius App.

2.      The business relationship with the Consenting Users.

3.      All of Transferor's rights related to or resulting from the balances of the Consenting Users in the Celsius App, including the right to use any collateral used to secure loans to Consenting Users and all cryptographic assets loaned by the Consenting Users to Transferor prior to the Effective Date.

4.      A copy of the list of Consenting Users and their information.

Notwithstanding the foregoing, the following shall not form a part of the Transferred Assets and Liabilities:

1.      All rights and obligations of Transferor related to or resulting from the transfer and use of (i) Binance Coin (BNB); (ii) Terra (LUNA); (iii) Ripple (XRP); (iv) Tether Gold (XAUT); or (v) WDGLD by Consenting Users outside of the United States of America.

2.      Goodwill of Transferor and ownership of and rights related any trademarks, copyrights, patents, applications for any of the foregoing, trade secrets, or similar intellectual property of Transferor.

CONFIDENTIAL                                                                                       CEL_CUST-00006352

**Exhibit 2 – Loan Agreement**

**[attached separately]**

CONFIDENTIAL

CEL_CUST-00006353

# **EXHIBIT G**

## INTERCOMPANY OPERATION and LOAN AGREEMENT

**THIS INTERCOMPANY LOAN AGREEMENT** ("**Agreement**") with an effective date of August 19, 2021, is executed;

**BY** and **BETWEEN**:

1. **Celsius Network LLC**, a limited liability company incorporated under the laws of the state of Delaware, U.S.A., with address at 221 River Street, 9th Floor, Hoboken, New Jersey 07030, U.S.A. (the "**Lender**"); and

2. **Celsius Network Limited**, a company incorporated under the laws of England and Wales, Company No. 11198050, with address at The Harley Building, 77 - 79 New Cavendish Street, London, England, W1W 6XB (the "**Borrower**", and together with Assignor, the "**Parties**" and each, a "**Party**").

**WHEREAS** the Lender operates a retail business whereby end-users transfer cryptographic assets to the Lender and receive a certain yield on such cryptographic assets;

**WHEREAS** in order to generate such Yield, the Lender wishes to assign ownership of certain cryptographic assets as stated in this Agreement to the Borrower, thereby allowing Borrower to carry out certain yield generating activities in cryptographic assets with third parties (the "**Purpose**");

**WHEREAS** it is intended that any cryptographic assets loaned by the Lender to the Borrower will be repayable to the Lender upon the Lender's first demand; and

**WHEREAS** the Parties agree to be bound by the terms and conditions of this Loan Agreement ("Agreement") which reflects the understanding and practice of the Parties from the Effective Date.

**NOW THEREFORE** in consideration of the mutual covenants and promises set forth herein, the Parties hereby agree as follows:

**1.**    **Introduction**

1.1.    The preamble to this Agreement constitutes an integral part hereof.

1.2.    The paragraph headings are for the sake of convenience only and shall not affect the interpretation of this Agreement.

1.3.    In this Agreement, words denoting the singular include the plural and vice versa; words denoting any gender include all genders.

**2.**    **The Loan**

2.1.    The Lender hereby loans to the Borrower the cryptographic assets (the "**Assets**") set out in **Schedule "A"** attached hereto (the "**Loan**"). The Parties acknowledge that the Assets also include certain cryptographic assets that belong to Lender's Users, as such term is defined in that certain Asset Transfer Agreement, dated August 19, 2021, by and between the Parties (the "**Asset Transfer Agreement**"), which were not transferred from Borrower to Lender in connection with the transfer of the Transferred Assets and Liabilities (as defined in the Asset Transfer Agreement), and that the Parties wish to include in the Assets covered by this Agreement.

2.2.    The Loan shall be repayable by the Borrower to the Lender upon the Lender's first demand.

2.3.    The Loan is provided by the Lender to the Borrower for the Purpose.

2.4.    The Loan is unsecured.

DocuSign Envelope ID: 93F5A82A-F543-4F56-8155-68366AF421C2

3.    **Interest and Spread**

3.1.    The Loan shall bear an Interest plus an Applicable Spread, both under Arm's Length Principle (as defined below), as determined by the parties from time to time reflecting market data and market conditions.

3.2.    For the purposes of this Agreement:

3.2.1.    "**Interest**" shall mean an annual interest on the unpaid balance of the Assets (which includes any unpaid accrued interest), compounded and calculated weekly based on a third-party transfer pricing benchmark and determined weekly as being the rate under Arm's Length Principle which would ordinarily be applied in a similar arrangement between unrelated parties, taking in to account the terms of this Agreement and the standing of the Parties.

3.2.2.    "**Applicable Spread**" shall mean a portion of the difference between the Yield of the borrower and Interest over a financial period, adequate to compensate for the functions performed, and risks assumed by the Lender in accordance with accepted Arm's Length Principle and supported where necessary by appropriate transfer pricing documentation.

3.2.3.    "**Arm's Length Principle**" shall mean the consideration which would be applied or proposed to be applied between unrelated parties in remunerating for the same or similar services as the Service.

4.    **Repayment**

4.1.    Borrower may make repayments under the Loan, in whole or in part, at any time by providing at least seven (7) days' prior notice of such repayment to Lender (or such shorter period as to which the Lender may consent). No premium or penalty is payable in respect of any repayment made in accordance with the terms of this Agreement. Any notice of repayment under this Agreement shall be irrevocable.

4.2.    Repayment Details

(a)    Any repayment under this Agreement shall be made by the Borrower to the Lender in the same cryptographic asset (or any other cryptographic asset or Fiat currency as the Parties may agree from time to time).

(b)    Any repayment under this Agreement which is in cryptographic assets shall be transferred to a digital wallet or means as determined by the Lender from time to time.

4.3.    All payments received by Lender under this Agreement shall be applied by Lender: first, to any payments incurred in collection of any unpaid debt from Borrower which has become due and payable; secondly, to the payment of the Interest; and finally, to the reduction of principal.

4.4.    All payments made by Borrower hereunder shall be made without set-off or counterclaim.

4.5.    If a payment hereunder is due on a day which is not a business day, the due date for that payment shall instead be the next business day in the same calendar month (if there is one) or the preceding business day (if there is not). During any extension of the due date for payment of any principal hereunder, the Interest is payable on such principal at the rate prevailing on the original due date.

5.    **Default**

5.1.    Each of the following events or circumstances is an event of default ("**Event of Default**"):

(a)    the Borrower fails to pay any amount due under this Agreement on demand, if so payable and such breach was not remedied within fifteen (15) days;

CEL_CUST-00006334

(b)    the Borrower fails to observe or perform any of its obligations under this Agreement or under any undertaking or arrangements entered into in connection herewith, other than an obligation of the type referred to in section 5.1(a) above and, in the case of failure that is capable of remedy, which has not been remedied within fifteen (15) days after the Lender becomes aware of such breach by the Borrower;

(c)    a resolution is passed or an order of a court of competent jurisdiction is made that the Borrower be wound up or dissolved (other than for the purposes of a reconstruction, merger or consolidation, the terms whereof having previously been approved by the Lender);

(d)    the Borrower stops payment of its creditors generally or (other than for the purposes of such reconstruction, merger or consolidation as referred to in article 5.1(c) hereof) ceases or admits its wish to cease to carry on business or is deemed unable to pay its debts under applicable law;

(e)    any material assets of the Borrower have been attached by a prejudgment attachment or an executory attachment or similar attachment and such attachment has not been lifted within twenty (20) business days;

(f)    any provision of this Agreement is or becomes, for any reason, invalid or unenforceable; or

(g)    the Borrower undergoes a change of control.

5.2.    On and at any time after the occurrence of an Event of Default, the Lender may serve an immediate notice of default and may simultaneously declare (and in the case of Events of Default occurring under articles 5.1(c) or 5.1(d) shall be deemed to have done so immediately prior to their occurrence) that: (i) any and all of the obligations of the Lender under this Agreement can be cancelled forthwith whereupon this Agreement shall be cancelled forthwith; and (ii) all amounts outstanding under this Agreement shall become immediately due and payable whereupon they shall become so due and payable together with accrued Interest thereon and any other amounts payable under this Agreement.

## 6.    **Representations and Warranties**

Borrower represents and warrants to Lender that Borrower has full power and authority to execute and deliver this Agreement, to borrow the Loan hereunder, and to incur the obligations provided for herein.  No consent or approval of any person or entity, including without limitation any of Borrower's creditors, or any governmental or administrative authority, instrumentality, or agency, is required as a condition to the validity of this Agreement.

## 7.    **Taxation**

7.1.    All sums payable under the terms of this Agreement will be paid free of any deductions, charges, withholding of taxes or similar unless such deduction or withholding is required by law. To the extent that amounts are so withheld by Borrower, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Lender. Any such deductions, charges, withholdings of taxes or similar will remain the sole responsibility of the incurring Party.

7.2.    The Parties intended to enter into this Agreement in line with arm's length terms. In the event that the agreed conditions nonetheless do not comply with the decisive assessment thereof by the applicable tax authorities or the highest tax court, the applicable terms of this Agreement shall be replaced by terms that are in compliance with the aforesaid assessment. Such amended terms will be applicable as of the incurrence of the legal relationship under this Agreement.

7.3.    All amounts payable hereunder including Interest are exclusive of any applicable indirect taxes, including value added taxes or sales taxes, to the extent applicable which will be borne by each party respectively.

DocuSign Envelope ID: 93F5A82A-F543-4F56-8155-683661F121C2

4

## 8.    <u>Miscellaneous</u>

8.1.    Neither Party hereto shall be entitled to assign any of its rights or obligations hereunder except with the prior written consent of the other Party.

8.2.    This Agreement constitutes the entire agreement between the Parties hereto with respect to its subject matter and supersedes all prior agreements with respect to the subject matter hereof between the Parties. No amendment to this Agreement shall be effective unless it is in writing and signed by both Parties.

8.3.    The failure of either Party hereto at any time to require the performance by the other Party of any provision of this Agreement shall not affect in any way the right to require such performance at any later time, nor shall the waiver by either Party of a breach of any provision hereof be taken or held to be an implied waiver of such provision. The rights of Lender hereunder: (i) may be exercised as often as necessary; (ii) are cumulative and not exclusive of its rights under the general law; and (iii) may be waived only in writing and specifically.

8.4.    This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same document.

8.5.    All notices or other communications under or in connection with this Agreement shall be given in writing to the applicable Party at its registered office as stated herein, and, unless otherwise state herein, may be made by post or facsimile. Any such notice will be deemed to be given as follows: (a) if by post, when delivered personally or on actual receipt; and (b) if by facsimile, when received in legible form. However, a notice given in accordance with the above but received on a non-working day or after business hours in the place of receipt will only be deemed to be given on the next working day in such place.

8.6.    This Agreement shall be construed and governed by the laws of England and Wales.

[Signature page follows]

*[Signature Page of  Intercompany Operation and Loan Agreement]*

**IN WITNESS WHEREOF**, this Agreement has been duly executed on the date first set forth above.


<u>**THE LENDER:**</u>

DocuSigned by:

40B7E44570FD4C6...
<u>Celsius Network LLC</u>

Name............................... Daniel Leon

Title............................... COO/President


<u>**THE BORROWER:**</u>

DocuSigned by:

2ADC7A9BFB844C0...
<u>Celsius Network Limited</u>

Name............................... Alex Mashinsky

Title............................... Ceo

Schedule "A"

**The Assets**

*[To be added]*

# **EXHIBIT H**

**OMNIBUS WALLET SERVICE AGREEMENT**

**THIS OMNIBUS WALLET SERVICE AGREEMENT** (this "**Agreement**") dated as of [6/12/2020], 2020 (the "**Effective Date**"), is entered into by and between **CELSIUS NETWORK LIMITED**, registered number **11-98-050**, with its registered address at 35 Great St Helen's, London, EC3A 6AP, United Kingdom ("**Celsius**"), and ___Voyager___, with its registered address at ___33 Irving Place 3060 New York, NY 10003___ ("**Partner**").

**WHEREAS**, Celsius owns and operates a proprietary platform which allows Partner's **Users** (as defined below) to gain rewards on the cryptocurrencies in their Wallets (as defined below), or borrow cryptocurrency from Celsius (the "**Services**"), all in accordance with the Terms of Service; and

**WHEREAS**, Partner is the owner and operator of a secure digital online platform (the "**Platform**") available on the domain: ___investvoyager.com___ (the "**Domain**"), which allows ___Voyager___ Users to open and manage ___cryptocurrency brokerage accounts___ that can hold, transfer and exchange certain kinds of cryptocurrency; and

**WHEREAS**, the Partner wishes to obtain and Celsius wishes to grant Partner a limited, revocable, non-exclusive, non-transferable, non-assignable right and license to use Celsius' proprietary application program interface (the "**API**") to access the Services and the Partner shall provide Partner's Users (as defined below) with the ability to gain rewards on the cryptocurrencies in their wallet (as defined below) ("**Partner's Services**").

**NOW THEREFORE**, in consideration of the mutual covenants and undertakings hereinafter contained, each of Celsius and Partner (each, a "**Party**" and collectively, the "**Parties**") hereby agree as follows:

**Definitions**

1.1. "**Partner's Users**" refers to users engaged with the Partner and wish to use the Partner's Services through Partner's Platform, including users referred to the Platform by Partner's affiliates and partners. For the avoidance of doubt, such Partner's Users are not and shall not be deemed as Celsius' users and shall not have any commercial arrangement with Celsius solely based on the terms of this Agreement. "Partner's **Wallet**" refers to secure digital cryptocurrency wallets, hosted on Partner's Platform.

1.2. "**Terms of Service**" refers to the terms governing the use of the Services, available at https://celsius.network/terms-of-use/. The existing terms are to be adjusted by Celsius at its own discretion.

2.     **Licence**

During the period commencing on the Effective Date and for the remainder of the Term (as defined in 5.1 below), and subject to Partner's compliance with the terms and conditions of this Agreement, Celsius agrees to grant Partner a non-exclusive, non-transferable, non-sublicensable, limited, revocable license to use the API to access the Services.

3.     **Referral Awards**

3.1. Partner shall be entitled to receive referral awards ("**Referral Awards**") equal to 10% of the rewards generated (also known as a 50/50 revenue split with Celsius) of the average quarterly cryptocurrency amount held by Celsius as result of the Partner depositing cryptocurrency in its Wallet with Celsius (the "**Deposit**"). For this purpose, a cryptocurrency amount shall be calculated as part of the average only in case it was held by Celsius for a period longer than seven (7) days.

3.2. The Referral Awards, with respect to each coin type, is calculated quarterly and distributed to the Partner by Celsius , either (i) in the same currency type provided ; or (ii) in the form of CEL Tokens at an increased rewards rate (non-US companies only)IM, per the Partner's election, in the first week of each calendar quarter, with respect to the previous quarter's activity, provided such Referral Awards, in the aggregate, are equal to no less than $2,000 USD (calculated on the first business day of each

calendar quarter) (the "**Minimum Referral Awards**"). If the Referral Awards are equal to or less than the Minimum Referral Awards, such amounts shall be accrued and deferred until such month in which the Awards are equal to or exceed the Minimum Referral Awards. Once the Minimum Referral Awards are met, the payout will occur at the end of the next quarterly pay period.

3.3. Following the Effective Date, Celsius shall in accordance with 3.2 above, provide to Partner a statement giving particulars of the transactions completed (if any) by the Partner during the preceding quarter, the amount of the Referral Awards payable to Partner and the calculation or evidence supporting the calculation of such Referral Awards (including a copy of the invoice for the payment of its own fees). If any dispute arises as to the amount of Referral Awards payable by the Celsius to Partner, the same shall be referred to Partner's auditors for settlement and their decision, save in the case of manifest error, shall be final and binding on both Parties.

3.4. Transaction costs related to the payment of Referral Awards shall be borne by Partner, i.e. the amounts actually received by it shall consist of the full amount calculated under Section 3.1 above, minus transaction fees on the blockchain. Celsius shall provide Partner with a breakdown showing any transaction fees incurred by Partner.

3.5. Partner will pay all sales, use, withholding and other taxes, duties, or fees imposed by any applicable laws and regulations as a result of the Referral Awards it receives under this Agreement.

### Responsibilities of the Parties

4. Each Party shall maintain records and books of accounts in accordance with International Financial Reporting Standards.

4.1. Partner acknowledges that Celsius will have no direct interaction with Partner's Users, and as such Celsius accepts no liability whatsoever with respect to any Partner's User, other than where such liability is as a result of fraud, willful misconduct or gross negligence of Celsius or its affiliates, resellers, employees or agents.

4.2. Partner will comply with any Celsius policies or rules relating to marketing of the Services which Celsius may adopt and inform Partner in writing reasonable time in advance during the Term. Additionally, Partner agrees to the following:

    4.2.1. Customer facing product screens must include 'powered by Celsius' branding.

    4.2.2. All use of Celsius' logo and name must be in accordance with Celsius' brand kit.

    4.2.3. All press, including any blog posts or affiliated content must be pre-approved by the Celsius marketing team.

4.3. In the event the Partner does not launch the product in ninety (90) days from Effective date, Celsius may terminate the agreement at their discretion subject to section 4.6.

4.4. Partner will be fully and sole responsible for performing (or having a third party perform on behalf of the Partner) any and all necessary "know-your-customer", anti-money laundering and/or any other compliance checks Partner reasonably requires, regarding Partner's Users, including verification of any incoming documentation regarding Partner's Users and their respective source of funds. The Partner acknowledges that Celsius will be relying on the successful completion of all compliance checks to be done in accordance with the Partner's KYC/AML policy to be approved by Celsius as part of the opening of the Partner's omnibus account with Celsius, while the KYC/AML policy may be revisited by Celsius from time to time, based on its sole discretion upon any amendments thereto.

4.5. The Parties agree that in the event that the Partner's Users are deemed or claimed to be deemed Celsius' users by any competent authority, the Partner undertakes to provide Celsius with the respected Partner's Users' documentation and information upon request.

4.6. Each Party will comply with all applicable laws and regulations in performing under this Agreement, including, without limitation, relating to "know-your-customer", anti-money laundering, anti-bribery

CEL_SBPH_000002

and corruption, sanctions, and will acquire and maintain any required licenses thereof. Partner will not refer to the Partner's Services any Partner's User that involves high risk of money laundering, terror financing or otherwise involvement in any illegal activities. Partner shall ensure no Partner's User is subject to any sanctions regime or is listed on any 'black list' of any government or international body, or in any way engages in any adult, obscene, pornographic, defamatory, libelous, infringing, abusive, or illegal activity, or any activity that promotes hate or discrimination, facilitates the sale of firearms or illegal drugs, or that participates or encourages participation in, illegal activities. Partner shall provide Celsius with any and all documents, policies, procedures, etc. as Celsius may require, demonstrating Partner's ongoing compliance with the aforementioned.

4.7.  Each Party represents and warrants that neither it nor any of its affiliates or officers, directors, brokers or agents (i) has violated any applicable anti-terrorism laws, (ii) is publicly identified on the most current list of "Specially Designated Nationals and Blocked Persons" published by the Office of Foreign Assets Control of the U.S. Department of the Treasury ("**OFAC**") or resides, is organized or chartered, or has a place of business in a country or territory subject to OFAC sanctions or embargo programs, (iii) conducts any business or engages in making or receiving any contribution of goods, services or money to or for the benefit of any person described in clauses (ii) above, (iv) deals in, or otherwise engages in any transaction related to, any property or interests in property blocked pursuant to any anti-terrorism law, or (v) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any anti-terrorism law. To the extent Partner or any of its affiliates or officers, directors, brokers or agents violates (i) through (vii) or becomes aware of any Partner's User having violated or potentially violated (i) through (vii), Partner will immediately notify Celsius in writing as soon as it becomes aware of such violations. Each Party reserves the right to research and investigate the other Party and its activities and, at their own discretion, determine whether or not any of the aforementioned practices are being employed. Without limiting any other remedy available to Celsius hereunder or pursuant to any applicable law, either Party may immediately terminate this Agreement at any time for any violation by the other Party of the foregoing representations, warranties and covenants and all Referral Awards will be cancelled and forfeited.

4.8.  Partner acknowledges that Celsius reserves the right to update the API infrastructure for security and scalability purposes and the Partner consents to updates without prior notice.

## 5.    **Term and Termination**

5.1.  This Agreement will continue for one (1) year (the "**Initial Term**") and may be renewed subject to the mutual agreement of both Parties (the "**Term**"), which may contain new terms and conditions.

5.2.  Either Party may terminate this Agreement for convenience at any time, upon thirty (30) days' prior written notice to the other Party.

5.3.  Each Party may terminate this Agreement with immediate effect by delivering notice of the termination to the other Party, if the other Party fails to perform, has made or makes any inaccuracy in, or otherwise materially breaches, any of its obligations, covenants, or representations, and the failure, inaccuracy, or breach continues for a period of fifteen (15) days after the injured Party delivers notice to the breaching Party reasonably detailing the breach.

5.4.  If either Party becomes insolvent, bankrupt, or enters receivership, dissolution, or liquidation, the other Party may terminate this Agreement with immediate effect.

5.5.  Subject to clause 5.6 below, on termination or expiration of this Agreement, each Party's rights and obligations under this agreement will cease immediately.

5.6.  Sections 6, 7, 8, 9 and 10 will survive termination or expiration of this Agreement for any reason.

5.7.  Upon termination of this Agreement, the Parties undertake all to use all reasonable best endeavours to agree upon and set up a migration plan for the Users.

3

CEL_SBPH_000003

DocuSign Envelope ID: 2329DDDB-6ABD-441E-BE15-D8B156208070

### 6.   Intellectual Property Rights

The Parties acknowledge and agree that neither Party will hold any intellectual property rights in the other Party's products including, but not limited to, copyright and trademark rights. Each Party agrees not to claim any such ownership in the other Party's intellectual property at any time prior to, during, or after termination or expiration of this Agreement.

### 7.    Disclaimer Of Warranty.

CELSIUS OFFERS NO WARRANTY UNDER THIS AGREEMENT AND TO THE EXTENT ALLOWED BY APPLICABLE LAW ALL EXPRESS OR IMPLIED CONDITIONS, REPRESENTATIONS, AND WARRANTIES INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, SATISFACTORY QUALITY, OR ARISING FROM A COURSE OF DEALING, USAGE, OR TRADE PRACTICE, OR WARRANTY OF NON-INFRINGEMENT ARE DISCLAIMED.

### 8.   Indemnification

8.1.   Subject to 8.2 below, Partner will indemnify, defend, and hold harmless Celsius, its affiliates, resellers, employees and agents from and against all liabilities, damages, and costs (including reasonable attorneys' fees) arising out of any claim, demand, suit or proceeding by a third party resulting from (i) Partner's breach of this Agreement, (ii) any act or omission of Partner on anyone on Partner's behalf, or (iii) Partner's breach of applicable law, other than where such liabilities, damages or costs are as a result of fraud, willful misconduct or negligence of Celsius or its affiliates, resellers, employees or agents.

8.2.   In the event of breach of contractual obligations by one Party, its affiliates, resellers, employees and agents, the Party shall only be liable towards the other Party for typically foreseeable and occurring damages within this Agreement.

8.3.   Neither Party shall under any circumstances whatever to be liable to the other, whether in contract, tort (including negligence), breach of statutory duty, or otherwise, for (i) any loss of profit, sales, revenue, or business, (ii) loss of anticipated savings, (iii) loss of or damage to goodwill, (iv) loss of agreements or contracts, (v) loss of use or corruption of software, data or information, (vi) any loss that is an indirect or secondary consequences of any act or omission of the Party in question.

### 9.   Confidential Information

9.1.   "**Confidential Information**" shall mean any and all information disclosed by one Party ("**Disclosing Party**") to the other ("**Receiving Party**") regarding past, present, or future marketing and business plans, customer lists, lists of prospective customers, technical, financial or other proprietary or confidential information of the Disclosing Party, formulae, concepts, discoveries, data, designs, ideas, inventions, methods, models, research plans, procedures, designs, formulations, processes, specifications and techniques, prototypes, samples, analyses, computer programs, trade secrets, data, methodologies, techniques, non-published patent applications (together with its attached documents and that such application has been submitted) and any other data or information, as well as improvements and know-how related thereto. Confidential Information includes all tangible materials which contain the information described above, including without limitation, written or printed documents and electronic media. Confidential Information does not include information which as shown by written records, (i) is or becomes generally known or available through no act or failure to act by the Receiving Party; (ii) is already known by the Receiving Party without breaching any confidentiality obligation; (iii) is rightfully furnished to the Receiving Party by a third party without restriction or disclosure; (iv) is independently developed by the Receiving Party without reference to Confidential Information of the Disclosing Party; (v) is released pursuant to a binding order of a government agency or a court so long as prior to any such release the Receiving Party provides the Disclosing Party with a notice so that the Disclosing Party may seek a protective order or other appropriate remedy. In any such event described in clause (v) above, the Receiving Party will

4

disclose only such Confidential Information as is legally required and will exercise reasonable efforts to obtain confidential treatment for any Confidential Information being disclosed. Any disclosure pursuant to the provisions of clause (v) above shall not permit the Receiving Party to issue any press release or otherwise discuss or further disseminate the information required to be disclosed.

9.2.    The Receiving Party understands that the Disclosing Party has disclosed or may disclose Confidential Information during the Term of this Agreement or in connection thereto. The Receiving Party agrees: (i) to take commercially reasonable precautions to protect such Confidential Information; (ii) not to use (except as expressly permitted herein) or divulge to any third party any such Confidential Information; (iii) protect and safeguard the Confidential Information against any unauthorized use, disclosure, transfer or publication with at least the same degree of care as it uses for its own confidential or proprietary information, but in no event with less than reasonable care; (iv) to take appropriate measures with all persons acting on its behalf to ensure that such persons are bound by a like covenant of confidentiality, and informing such persons that such Confidential Information shall not be disclosed except as provided herein; and (v) notify Disclosing Party upon discovery of any unauthorized use or disclosure of the Confidential Information and take reasonable steps to regain possession of the Confidential Information and prevent further unauthorized actions or other breach of this Agreement. Whenever requested by the Disclosing Party or upon the expiration or termination of this Agreement, each Party will immediately either return to the other or, at Disclosing Party's request, destroy all manifestations of Disclosing Party's Confidential Information.

## 10.  **Modification**

10.1.    Celsius reserves the right, in its sole discretion, to modify any of the terms and conditions contained in this Agreement or any related document upon notice to Partner. If a material modification is unacceptable to Partner, Partner's sole and exclusive recourse will be to terminate this Agreement within seven (7) days following receipt of such notice. Partner's continued performance of any duties under this Agreement beyond the seven (7) days following Company' change notice will be deemed Partner's binding acceptance of the change.

10.2.    Without derogating from the generality of Section 10.1 above, Celsius may, at its sole discretion and with no prior notice, cease or suspend the provision of the Services.

## 11.  **Miscellaneous**

11.1.    Either Party may enforce any provision of this Agreement by obtaining equitable relief in addition to all other remedies at law or under this Agreement. The non-breaching Party's remedies at law for a breach of any provision of this Agreement may be inadequate and such Party may suffer irreparable harm from any such breach. The rights and remedies of the non-breaching Party under this Agreement are cumulative and not alternative and are in addition to any other right or remedy set forth in any other agreement between the Parties, or which may now or subsequently exist at law or in equity, by statute or otherwise.

11.2.    All notices or other communications hereunder shall be in writing and given in person, by registered mail, by an overnight courier service which obtains a receipt to evidence delivery, or by facsimile or email transmission with written confirmation of receipt, addressed to the address set forth in the preamble to this Agreement or to such other address as any Party hereto may designate to the other in accordance with the aforesaid procedure. All notices and other communications delivered in person or by courier service shall be deemed to have been given upon delivery, those given by facsimile or email transmission shall be deemed given on the business day following transmission, and those sent by registered mail shall be deemed given three calendar days after posting.

11.3.    Each Party to this Agreement will be excused for delays in performing or from its failure to perform hereunder (other than payment delays) to the extent that the delays or failures result from causes beyond the reasonable control of such Party; provided that, in order to be excused from delay or failure to perform, such Party must act diligently to remedy the cause of the delay or failure.

CEL_SBPH_000005

11.4.   Except as provided herein, neither Party may assign or otherwise transfer any of its rights under this Agreement, or delegate any of its obligations or duties under this Agreement, without the other Party's express prior written consent. Notwithstanding anything to the contrary having provided the other party with at least 60 days' notice, either Party may assign this Agreement (i) to any affiliate of that Party (each, an "**Affiliate**") or (ii) to any third party in connection with the sale of all or substantially all of that Party's business or assets, whether by merger, sale of assets, sale of stock, or otherwise without the other Party's prior consent. Subject to the foregoing, this Agreement will be binding upon each Party and its successors and permitted assigns.

11.5.   This Agreement shall be interpreted, construed and enforced in accordance with the laws of England and Wales without regard to principles of conflict of laws. Any civil action or legal proceeding arising out of or relating to this Agreement will be brought under the Rules of Arbitration of the International Chamber of Commerce by one arbitrator appointed in accordance with the said Rules. The arbitration shall be held in the English language and the place of arbitration shall be London, England.  The arbitrator's decision will be final and binding upon the Parties.  All arbitration costs and expenses, including the arbitrator's fees, will be borne equally by the Parties, unless otherwise awarded by the arbitrator in his discretion. Each Party hereby waives any forum non convenience claim in connection with said arbitration or any similar objection or any claims against the enforcement of the arbitrator's ruling in any applicable jurisdiction. If a court of competent jurisdiction should find any part of this Agreement invalid, that provision will be omitted and the remainder of this Agreement remains in effect and be construed so as to best effectuate the original intent and purpose of this Agreement.

11.6.   No waiver by either Party of any breach of this Agreement will constitute a waiver of any other breach of the same or other provisions of this Agreement. No waiver by either Party will be effective unless made in writing and signed by an authorized representative of that Party.

11.7.   If any provision in this Agreement is invalid or unenforceable in any circumstance, its application in any other circumstances and the remaining provisions of this Agreement will not be affected thereby.

11.8.   This Agreement constitutes the entire agreement and understanding of the Parties relating to the subject matter hereof. This Agreement supersedes all prior written and oral agreements and all other communications between Celsius and Partner. Amendments to this Agreement will be effective only if written and signed by Celsius and Partner.

11.9.   Each Party shall act only as an independent contractor and not as an employee, agent, servant, or representative of the other. The Parties' relationship will not be construed to be one of employment, joint venture, agency or similar relationship. Neither Party will have, nor will it represent that it has, any power, right or authority to bind the other, or to assume or create any obligation or responsibility, express or implied, on behalf of the other Party or in its name, except as expressly provided otherwise herein. Neither Party shall have any authority to transact business or make any commitments on behalf of the other unless expressly authorized in writing by an officer of such other Party.

11.10.   This Agreement may be executed and delivered by the Parties in counterparts (each of which will be considered for all purposes an original) and by facsimile or by e-mail transmission in PDF format, and when a counterpart has been executed and delivered by each of the Parties, by facsimile, e-mail in PDF format or otherwise, all such counterparts and facsimiles will together constitute one agreement.

*[REMAINDER OF PAGE INTENTIONALLY BLANK]*

CEL_SBPH_000006

**IN WITNESS WHEREOF**, the Parties have signed this Agreement effective as of the Effective Date:

Celsius Network Limited

Name:    Camilla Churcher

Title:    Head of Business Development

Name:    Ryan Whooley

Title:    Head of Trading & Treasury

*[SIGNATURE PAGE OF SERVICES AGREEMENT]*

7

CEL_SBPH_000007

**Attachment A**

**Third-Party Reliance Terms and Conditions**

These Terms and Conditions are to be read in conjunction with the Service Agreement, which, by its terms, incorporates these by reference or have them printed on the back or attached to them.

1. **Definitions**:

    1.1. In these Terms and Conditions, the following terms shall have the meanings ascribed to them below:

"**AML**" means anti-money laundering and counter-terrorism financing;

"**Celsius**" means Celsius Network LTD. (UK), whose address is at 35 Great St. Helen's, London, United Kingdom, EC3A 6AP;

"**Identifying Information**" means the customer's full name, date of birth, citizenship, address and ID number.

"**Partner's Users**" means users engaged with the Partner and wish to use the Services through Partner's Platform, including users referred to the Platform by Partner's affiliates and partners. For the avoidance of doubt, such Partner's Users are not and shall not be deemed as Celsius' users and shall not have any commercial arrangement with Celsius solely based on the terms of this Agreement. Partner's Users are customers of Partner who have been approved by Partner following KYC and AML procedures for use of the Partner' services.

"**Partner**" means _____, whose address is at _____.

"**KYC**" means Know-your-Customer;

"**KYC Documents**" are all KYC and AML due diligence documents and information collected by Partner for each Partner's Users, and maintained by Partner, as required under applicable AML laws and/or by any competent authority;

"**Parties**" means Celsius and Partner;

2. **Terms and Conditions:**

    2.1. Partner hereby agrees and confirms, in relation to each Partner's User that:

        2.1.1. Partner has concluded KYC and AML due diligence measures in relation to this Partner's User, and has obtained and maintained all the information and documents in a manner and form that complies with its AML Policy and applicable law, including but not limited to, the Identifying Information, one form of government-issued photographic identification and proof of verification of the Partner's User's residential address by a document that satisfies Partner's own regulatory requirements.

8

CEL_SBPH_000008

2.1.2. Partner confirms that it has in place a system of identifying whether a Partner's User is a politically exposed person ("PEP") or an immediate family member or close associate of a PEP. Partner shall promptly notify Celsius, in writing, when it identifies a Partner's User as a PEP (or being connected to a PEP) and acknowledges that such customers must be deemed to present high risk and subject to additional KYC due diligence documents and requirements.

2.1.3. Partner confirms it checks, on acceptance of a customer and regularly from time to time thereafter, all persons associated with any Partner's User against international sanction lists as issued (and updated) including, but not limited to, by the United Nations Security Council and the United States Office of Foreign Assets Control (a/k/a OFAC"). In case of any Partner's User or related person appearing on a sanction list, Partner shall inform Celsius with immediate effect.

2.1.4. Partner confirms that it has a business relationship with the Partner's User and that it has no knowledge or suspicion that any Partner's User is involved in money laundering, terrorism financing or proliferation financing. If this should change at any time, Partner shall immediately notify Celsius of such knowledge and or suspicions, in writing.

2.1.5. Partner consents to Celsius relying on the performance of Partner's identification and record-keeping measures in relation to each Partner's User.

2.1.6. Immediately upon introducing any Partner's Users, Partner shall provide Celsius with such Partner's User's Identifying Information through the API.

2.1.7. Partner undertakes to maintain the KYC Documents for at least five years after the termination of the Service Agreement or the termination of Partner's relationship with the Partner's User for any reason (whichever is later) or for such longer period as is required pursuant to applicable laws.

2.1.8. Partner undertakes to provide Celsius with all KYC Documents without delay and, in any case, within forty-eight (48) hours of Celsius requesting the same. This undertaking to provide documents on request will extend for a period of five years from the termination of the Service Agreement or the termination of Partner's relationship with the Partner's User for any reason (whichever is later) or for such longer period as is required pursuant to applicable laws.

2.1.9. In the event of the termination of Partner's relationship with Celsius as established pursuant to the Service Agreement, Partner undertakes to provide to Celsius all the KYC Documents maintained by Partner in respect of each Partner's User within seven (7) days of such termination.

2.1.10.  Partner confirms that it is permitted to provide Celsius with the KYC Documents within the timeframes specified in paragraphs 2.1.6 and 2.1.8 above under applicable laws and regulations.

2.2.  Partner represents and warrants to Celsius that:

2.2.1. All information provided by Partner in respect of the Partner's Users at any time, shall be true and accurate, and Celsius will rely on the accuracy of this information in providing its services;

9

2.2.2. Partner is not bound by any data protection, secrecy or other laws which would restrict or prohibit its ability to provide Celsius with the KYC Documents, the Identifying Information and any other relevant information as provided herein;

2.2.3. Partner has obtained from the Partner's User full consent to provide the KYC Documents, the Identifying Information and any other relevant information to Celsius pursuant to paragraphs 2.1.6 and 2.1.8 above; and

2.2.4. To the extent that Partner uses any third-party service providers for any KYC/AML related purpose, Partner has full authority to require from such third-party providers any and all information and documentation to be provided to Celsius hereund er.

2.3. Partner undertakes to provide Celsius, each year for the duration of Partner's relationship with Celsius, with a letter confirming Partner's representations and warranties herein.

2.4. Partner undertakes to immediately inform Celsius in writing of any change in applicable laws or practices which may prohibit or restrict its ability to provide Celsius with the KYC Documents, the Identifying Information and any other relevant information as p rovided herein.

2.5. Partner acknowledges that these Terms and Conditions shall be valid in respect of every Partner's User until the lapse of five years from the latter of: (1) the termination of the Service Agreement; or (2) the termination of Partner's relationship with the Partner's User for any reason.

2.6. Partner undertakes to immediately notify Celsius (in writing) of any legal, criminal or regulatory action taken against any Partner's User or against Partner by any professional body or authorized body that regulates, supervises and monitors Partner, whether the license, authorization, approval or membership has been suspended, canceled, revoked or withdrawn or in any other way restricted.

2.7. Partner shall notify Celsius immediately if any evidence of the verification of the identity of a Partner's User in Partner records proves unsatisfactory.

2.8. In the event of the termination of Partner's business relationship with a Partner's User, for whatever reason, Partner shall within seven (7) days:
2.8.1. Provide Celsius with the KYC Documents maintained by Partner in respect of the Partner's User; or
2.8.2. Notify Celsius in writing of the arrangements, satisfactory to Celsius that Partner will put in place to ensure that Celsius will be able to access the KYC Documents of such Partner's User whenever requested.

2.9. Partner shall indemnify Celsius against all actions, claims, costs (including all legal costs), demands, expenses, liabilities and proceedings which may be taken or made or incurred by Celsius directly pursuant to or in connection with its reliance on the representations and warranties contained in these Terms and Conditions.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

CEL_SBPH_000010

IN WITNESS WHEREOF, the Parties have signed these Terms and Conditions effective and thereby incorporated in the Service Agreement on the Service Agreement's effective date:

_____    _____

Celsius Network Limited

Name:                               Name:

Title:                              Title:

11

# EXHIBIT I

## ASSIGNMENT AND AMENDMENT TO OMNIBUS WALLET SERVICE AGREEMENT

THIS ASSIGNMENT AND AMENDMENT TO OMNIBUS WALLET SERVICE AGREEMENT (this "**Amendment**") dated August 19, 2021 is made by and between Celsius Network Limited ("**Celsius UK**"), Celsius Network LLC ("**Celsius US**"), Celsius EU UAB ("**Celsius EU**") and Voyager Digital LLC, ("**Partner**") (each, a "**Party**" and collectively, the "**Parties**" and Partner and Celsius UK, the "**Original Parties**"). Any capitalized terms used but not defined herein shall have the meanings given to them in the Agreement.

WHEREAS, the Original Parties hereto entered into that certain Omnibus Wallet Service Agreement dated as of 06/12/2020 (the "**Agreement**");

WHEREAS, in connection with Celsius UK, Celsius US and Celsius EU migrating the provision of certain services from Celsius UK to Celsius US and Celsius EU (the "**Migration**"), Celsius UK wishes to assign to Celsius US and Celsius EU all of its rights, title and interest under the Agreement and Celsius US and Celsius EU wish to assume all of Celsius UK's duties and obligations under the Agreement;

WHEREAS, in connection with the Migration, the Parties now desire to amend the Agreement regarding contractual modifications as further set forth herein.

NOW, THEREFORE, for and in consideration of the mutual promises, covenants and obligations contained herein, the Parties hereto agree as follows:

1. Assignment and Assumption. Pursuant to Section 11.4 of the Agreement, Celsius UK hereby assigns, grants, conveys and transfers to Celsius US and Celsius EU all of Celsius UK's right, title and interest in and to the Agreement. Celsius US and Celsius EU hereby accept such assignment and assume all of Celsius UK's duties and obligations under the Agreement and agree to pay, perform and discharge, as and when due, all of the obligations of Celsius UK under the Agreement accruing on and after the date hereof. Partner hereby consent to the foregoing assignment and assumption and waive, in this instance, their rights to receive 60 days notice of the foregoing assignment from Celsius UK to its affiliates, Celsius US and Celsius EU.

2. Terms of Use. Partner understands and acknowledges that, in connection with the Migration, the Services will be subject to updated terms of use with Celsius US and Celsius EU, and that Celsius US and Celsius EU may, at any time and in their sole discretion, modify their terms of use as available at their website (http://celsius.network). Celsius US and Celsius EU shall endeavor, but shall not be obligated, to provide Partner advance notice of any updates or changes to Celsius US' and Celsius EU's terms of use.

3. Extension of Term: The Parties agree to extend the Term for an additional period of two (2) years from the date of this Amendment. All provisions of the Agreement that relate to the Term and termination of the Agreement remain in full force and effect.

4. Amendment to Section 11.5: Section 11.5 of the Agreement is hereby amended by deleting the present section in its entirety and substituting the following in lieu thereof:

DocuSign Envelope ID: B85FCC6C-3051-4E57-A86D-6CD8354E1694

"This Agreement shall be interpreted, construed and enforced in accordance with the laws of state of New York without regard to principles of conflict of laws. Any civil action or legal proceeding arising out of or relating to this Agreement will be brought under the Rules of the American Arbitration Association by one arbitrator appointed in accordance with the said Rules. The arbitration shall be held in the English language and the place of arbitration shall be Manhattan, New York. The arbitrator's decision will be final and binding upon the Parties. All arbitration costs and expenses, including the arbitrator's fees, will be borne equally by the Parties, unless otherwise awarded by the arbitrator in his discretion. Each Party hereby waives any forum nonconvenience claim in connection with said arbitration or any similar objection or any claims against the enforcement of the arbitrator's ruling in any applicable jurisdiction. If a court of competent jurisdiction should find any part of this Agreement invalid, that provision will be omitted and the remainder of this Agreement remains in effect and be construed so as to best effectuate the original intent and purpose of this Agreement."

This Amendment to the Agreement shall be effective as of the date of this Amendment. Except as hereby modified, the Agreement shall remain in full force and effect.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, each party to this Amendment has caused it to be executed on the date first written above.

**CELSIUS NETWORK LIMITED**

By: _Roni Cohen Pavon_ _____
(Signature)

Name: Roni Cohen Pavon
Title: Chief Revenue Officer
Email: Roni@celsius.network

**CELSIUS NETWORK LLC**

By: _Roni Cohen Pavon_ _____
(Signature)

Name: Roni Cohen Pavon
Title: Chief Revenue Officer
Email: Roni@celsius.network

**CELSIUS EU UAB**

By: _Roni Cohen Pavon_ _____
(Signature)

Name: Roni Cohen Pavon
Title: Chief Revenue Officer
Email: Roni@celsius.network

**Voyager Digital LLC**

By: _____    _____

(Signature)


Name: Evan Psaropoulos_

Title: CFO

Email: epsaropoulos@investvoyager.com

# **EXHIBIT J**

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
(212) 872-1000
Mitchell P. Hurley
Dean L. Chapman Jr.
mhurley@akingump.com
dchapman@akingump.com

*Attorneys for Celsius Network LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------X
                                          :
In re:                                    :          Chapter 11
                                          :
VOYAGER DIGITAL HOLDINGS, INC., *et al.*, :          Case No. 22-10943 (MEW)
                                          :
                                          :          Jointly Administered
                        Debtors.          :
                                          :
---------------------------------------------------------------X

**DECLARATION OF CHRISTOPHER FERRARO IN SUPPORT OF MOTION OF**
**CELSIUS NETWORK LLC FOR ORDER (I) LIFTING THE AUTOMATIC STAY**
**PURSUANT TO 11 U.S.C. 362(d)(1) AND BANKRUPTCY RULE 4001 AND (II)**
**GRANTING LEAVE TO FILE LATE PROOF OF CLAIM PURSUANT TO**
**BANKRUPTCY RULES 3003(c) AND 9006(b)(1)**

I, Christopher Ferraro, hereby declare as follows under penalty of perjury that the following

is true and correct to the best of my knowledge, information, and belief:

1.      I am the Interim Chief Executive Officer, Chief Restructuring Officer, and Chief

Financial Officer of Celsius Network LLC (together with its affiliates, "Celsius").  I am familiar

with Celsius' day-to-day operations, businesses and financial affairs, and books and records,

including agreements entered into by Celsius.

2.      I submit this declaration in support of Celsius Network LLC's Motion for an Order

(I) Lifting the Automatic Stay Pursuant to 11 U.S.C. § 362(d)(1) and (II) Granting Leave to File

1

Late Proof of Claim Pursuant to Bankruptcy Rules 3003(c) and 9006(b)(1) (the "Motion"), filed contemporaneously herewith and am familiar with the information contained therein.

3.       Except as otherwise indicated, the statements set forth in this declaration are based upon my personal knowledge, my review of relevant documents and information concerning Celsius' operations, financial affairs, restructuring initiatives, and information obtained from other members of Celsius' management team and advisors. I am authorized to submit this declaration on behalf of Celsius. I am over the age of eighteen and, if called upon to testify, I could and would testify competently to the facts and opinions set forth in this declaration.

4.       On or around June 12, 2020, Voyager Digital LLC ("Voyager") entered into an Omnibus Wallet Service Agreement (the "Agreement") with Celsius Network Limited ("Celsius UK") to provide Voyager users the ability to gain rewards on the cryptocurrencies in their wallets.

5.       On or around August 19, 2021 that Agreement was amended and Celsius UK assigned to Celsius Network LLC ("Celsius US") and Celsius EU UAB ("Celsius EU") all of its rights, title and interest under the Agreement. Thereafter, Celsius US and Celsius EU assumed all of Celsius UK's duties and obligations under the Agreement.

6.       I understand that on September 23, 2022, Voyager attempted to provide notice of the bar date in its chapter 11 case to Celsius UK (hereinafter, the "Notice"). *Affidavit of Service, Ex. A* [Case No. 22-10943, Docket No. 459].

7.       But the address where the Notice was sent to Celsius UK—35 Great St. Helen's, London, United Kingdom—is an out of date address for a space that Celsius UK no longer occupies. *Id*.

8.       Furthermore, the Notice should have been provided to Celsius US and Celsius EU, not Celsius UK.

2

9.      To the best of my knowledge, no Celsius agent or employee ever received the Notice of the bar date in Voyager's bankruptcy.

10.     I understand that Holden Bixler of Alvarez and Marsal ("A&M"), has submitted a supporting declaration describing the substantial time and energy that went into preparing Celsius' schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases and statements of financial affairs. The Court should be aware that Celsius personnel devoted considerable time to assisting A&M in its efforts despite the substantial burden imposed by the commencement of the chapter 11 cases, the limited number of employees available to collect the necessary information, the competing demands upon such employees, and the time and attention that Celsius had to devote to the restructuring process.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Dated:  December 13, 2022

_____

Christopher Ferraro