Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Counsel to the Initial Debtors and Debtors in Possession*

*Proposed Counsel to the GK8 Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DEBTORS' RESPONSE BRIEF**
**REGARDING ACCOUNT HOLDERS' CLAIMS ISSUES**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

# TABLE OF CONTENTS

      **Page**

**Preliminary Statement**......................................................................................1

**Background** ........................................................................................................6

    I.     Factual Background .........................................................................6

    II.    Case Background and Procedural History ......................................7

**Response** ............................................................................................................8

    I.     Each Debtor Entity is Liable to Account Holders Based on the
          Plain Language of the Terms of Use...............................................8

        A.    The Debtors, the Committee, and the Series B Preferred
             Holders Agree that the Terms of Use Unambiguously
             Provide Which Debtor Entities have Liability for Customer
             Claims. ...............................................................................8

        B.    The Limitation of Liability Provision in the Terms of Use
             Does Not Limit Liability to Celsius Network......................9

    II.    Extrinsic Evidence Does Not Demonstrate that Only Celsius
          Network is Liable to Account Holders. ..........................................14

        A.    The Series B Preferred Holders' Extrinsic Evidence Does
             Not Resolve Any Ambiguity in the Terms of Use.............15

            1.    The Mere Transfer of Customer Accounts to
                 Celsius Network Does Not Relieve All Other
                 Debtor Entities of Liability. ...................................15

            2.    Reports and Presentations Listing Customer
                 Liabilities at Celsius Network Are Not Indicative of
                 Sole Liability..........................................................16

            3.    The Debtors' Statements in These Chapter 11 Cases
                 Do Not Demonstrate Their Intent to Limit Liability
                 to Celsius Network.................................................16

            4.    Customer Conduct and the Signing of the Terms of
                 Use Do Not Determine Which Debtors are Liable to
                 Account Holders. ...................................................20

B.    There is Extrinsic Evidence that Supports the Debtors'
View that Account Holders have Recourse Against Every
Debtor Entity.....................................................................22

III.    The Court Should Construe Any Ambiguity in the Terms of Use in
Favor of the Account Holders........................................................24

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's,
London, England*,
    136 F.3d 82 (2d Cir. 1998)...................................................................................14

*Ardestani v. INS*,
    502 U.S. 129 (1991)........................................................................................5

*Bank of N.Y. Mellon Tr. Co., Nat'l Ass'n v. Solstice ABS CBO II, Ltd.*,
    910 F. Supp. 2d 629 (S.D.N.Y. 2012) ...........................................................12

*Caminetti v. United States*,
    242 U.S. 470 (1917).......................................................................................5

*Catlin Speciality Ins. Co. v. QA3 Fin. Corp.*,
    36 F. Supp. 3d 336 (S.D.N.Y. 2014), *aff'd sub nom. Catlin Specialty Ins. Co.
    v. QA3 Fin. Corp.*, 629 F. App'x 127 (2d Cir. 2015) ...............................................24

*Coliseum Towers Assocs. v. Cnty. of Nassau*,
    2 A.D.3d 562 (2003) .......................................................................................24

*In re Condado Plaza Acquisition LLC*,
    620 B.R. 820 (Bankr. S.D.N.Y. 2020)............................................................5

*Consedine v. Portville Cent. Sch. Dist.*,
    907 N.E.2d 684 (2009)..................................................................................10

*D'Amato v. Five Star Reporting, Inc.*,
    80 F. Supp. 3d 395 (E.D.N.Y. 2015) ............................................................24

*In re Enron Corp.*,
    292 B.R. 752 (Bankr. S.D.N.Y. 2003) ...........................................................5

*KLS Diversified Master Fund, L.P. v. McDevitt*,
    507 F. Supp. 3d 508 (S.D.N.Y. 2020), *aff'd*, No. 21-1263, 2022 WL 2759055
    (2d Cir. July 13, 2022) .................................................................................13

*Krumme v. Westpoint Stevens Inc.*,
    238 F.3d 133 (2d Cir. 2000)...........................................................................10

*Madeleine, L.L.C. v. Casden*,
    950 F. Supp. 2d 685 (S.D.N.Y. 2013) ............................................................14

*Quadrant Structured Prod. Co. v. Vertin*,
  16 N.E.3d 1165 (N.Y. 2014)................................................................................................13

*In re Sears Holding, Corp.*,
  No. 21-CV-5437-NSR, 2022 WL 4482375 (S.D.N.Y. Sept. 27, 2022) ..................................12

*Seiden Associates v. ANC Holdings, Inc.*,
  959 F.2d 425 (2d Cir. 1992)...............................................................................................14

*Topps Co., Inc. v. Cadbury Stani S.A.I.C.*,
  526 F.3d 63 (2d Cir. 2008)................................................................................................14

*United States v. Ron Pair Enters., Inc.*,
  489 U.S. 235 (1989)..............................................................................................................5

*Ward v. TheLadders.com, Inc.*,
  3 F. Supp. 3d 151 (S.D.N.Y. 2014) ................................................................................6, 24

*Westchester Resco Co. v. New England Reinsurance Corp.*,
  818 F.2d 2 (2d Cir. 1987)................................................................................................6, 24

The above-captioned debtors and debtors in possession (collectively, the "Debtors" and, together with their non-Debtor affiliates, the "Company") submit this responsive brief (this "Response Brief") in response to the *Series B Preferred Holders' Opening Brief on the Issue of Which Debtors are Liable to Customers Under the Terms of Use* [Docket No. 1795] (the "Series B Brief") and *The Official Committee of Unsecured Creditors' Opening Brief Regarding Debtors that are Liable to Account Holders Under the Global Contract (the "Terms of Use") Between Celsius and Account Holders* [Docket No. 1797] (the "UCC Brief"), and in further support of the *Debtors' Opening Brief Regarding Account Holders' Claims Issues* [Docket No. 1799] (the "Opening Brief," and together with the Series B Brief and the UCC Brief, the "Briefs")² pursuant to the *Order (I) Setting a Briefing Schedule and (II) Granting Related Relief* [Docket No. 1747] (the "Scheduling Order").³  In support of this Response Brief, the Debtors state the following:

### **Preliminary Statement**

1.     The Debtors, the Committee, and the Series B Preferred Holders all agree that the answer to the Briefed Legal Issue is found within the four corners of the Terms of Use.⁴  The Debtors and the Committee agree that the Terms of Use⁵ unambiguously provide account holders

---

²    The Series B Preferred Holders also filed the *Declaration of Melanie Westover Yanez in Support of Series B Preferred Holders' Opening Brief on the Issue of Which Debtors are Liable to Customers Under the Terms of Use* [Docket No. 1796] (the "Yanez Declaration").

³    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms elsewhere in this Response Brief, the Opening Brief, or in the Scheduling Order, as applicable.

⁴    *See, e.g.*, Opening Brief ¶¶ 18–19; UCC Brief ¶¶ 17, 24; Series B Brief ¶¶ 25–26.

⁵    For purposes of this Response Brief, unless otherwise specified, citations to the Terms of Use refer to versions 7 and 8 of the Terms of Use, as applicable.  "Affiliate" means "an entity that owns or controls, is owned or controlled by, or is or under common control or ownership with a party, where control is defined as the direct or indirect power to direct or cause the direction of the management and policies of such party, whether through ownership of voting securities, by contract, or otherwise."  Terms of Use § 2.

with recourse against each Debtor entity.  This conclusion is simple and straightforward given the plain language of the Terms of Use.  ***First***, each Debtor entity is a party to the Terms of Use: section 1 of the Terms of Use provides that the contract is between each account holder and "Celsius Network LLC and its Affiliates ('<u>Celsius</u>')"—"Celsius" being a defined term that includes the defined term "Affiliate."[6]

2.        ***Second***, the defined term "Celsius" (which includes each Debtor entity) is used throughout the Terms of Use to describe the Company's obligations to account holders:

- <u>General Provisions</u>:  The Terms of Use "govern each User's access to, and use of, ***Celsius'*** products and services";[7] "Your Celsius Account allows you to view your balances in connection with the Services provided to you ***by Celsius***. . . . ***Celsius*** may restrict services in certain jurisdictions due to applicable laws, regulations, and business considerations";[8]

- <u>Earn Services</u>:  "Our Earn Service allows you to earn a financing fee from ***Celsius***, referred to as "rewards . . . in exchange for entering into open-ended loans of your Eligible Digital Assets to ***Celsius*** under the terms hereof.  If our Earn service is available to you, upon your election, you will lend your Eligible Digital Assets to ***Celsius*** and grant ***Celsius*** all rights and title to such Digital Assets, for ***Celsius*** to use in its sole discretion while using the Earn Service";[9]

- <u>Custody Services</u>:  "When you use the Custody Service, you understand and agree that ***Celsius*** may act as the custodian . . .";[10]

- <u>Obligations to Honor Withdrawal Requests</u>:  "Subject to these Terms, for any of your Eligible Digital Assets that you elect to utilize in the Earn Service (if available to you), you have a call option on all loans made to Celsius to demand immediate, complete, or partial repayment of any loan at any time . . . .  Such repayment will terminate in whole or in part

---

[6]    Terms of Use § 1.

[7]    Terms of Use § 1 (emphasis added).

[8]    Terms of Use § 4.B (emphasis added).

[9]    Terms of Use § 4.D (emphasis added).

[10]   Terms of Use § 4.A (emphasis added).

your loan to ***Celsius*** and you shall no longer accrue Rewards . . . . ***Celsius*** initiates the withdrawal process immediately following a withdrawal request when possible . . .";[11]

- <u>Obligations in Bankruptcy</u>:  "In the event that Celsius becomes bankrupt, enters liquidation or is otherwise unable to repay its obligations, any Eligible Digital Assets used in the Earn Service or as collateral under the Borrow Service may not be recoverable, and you [i.e., an account holder] may not have any legal remedies or rights in connection with ***Celsius'*** obligations to you other than your rights as a creditor of ***Celsius*** under any applicable laws."[12]

3.     ***Third***, section 25 of the Terms of Use provides that account holders only have recourse against "Celsius."  That section provides that "[I]n no event shall you [*i.e.*, an account holder] have any recourse, whether by setoff or otherwise, with respect to our obligations, to or against any assets of any person or entity other than ***Celsius***, including, without limitation, any member, shareholder, Affiliate, investor, employee, officer, director, agent or advisor of ***Celsius***."[13]  The limitation of liability against parties other than "Celsius" is consistent with how that defined term is used in the rest of the contract—"Celsius" is the contract counterparty to the Terms of Use, and "Celsius" has certain obligations to account holders as set forth in the Terms of Use.  It would be peculiar for "Celsius" to be the contract counterparty that owes obligations to customers throughout the document (including to provide services and honor withdrawals), and then for section 25 to limit that liability to just one legal entity—Celsius Network LLC ("<u>Celsius Network</u>").

4.     But that is exactly the bizarre argument that the Series B Preferred Holders are making.  The Series B Preferred Holders myopically focus in their opening brief on the limitation of liability section, arguing that the use of the term "Affiliates" in section 25 must actually limit

---

[11]    Terms of Use § 11 (emphasis added).

[12]    Terms of Use § 13.3 (emphasis added).

[13]    Terms of Use § 25 (emphasis added).

liability to *just Celsius Network* and exclude any liability on the part of "Affiliates" of Celsius Network, even though the plain language of the provision provides that account holders have no recourse against Affiliates or other related parties of "*Celsius*."  Again, section 25 provides that "[account holders shall not have any recourse] to or against any assets of any person or entity other than *Celsius*, including, without limitation, any member, shareholder, Affiliate, investor, employee, director, officer, agent or advisor of *Celsius*."[14]  Despite quoting that language in section 25,  the Series B Preferred Holders inexplicably assert that "'Affiliate' is broadly defined as 'an entity that … is under common control or ownership with … [LLC],' which includes CNL."[15] To be clear, that is *not* the definition of Affiliate, which actually reads in its totality as follows:  "'Affiliate' means an entity that owns or controls, is owned or controlled by, or is or under common control or ownership with *a party*, where control is defined as the direct or indirect power to direct or cause the direction of the management and policies of *such party*, whether through ownership of voting securities, by contract, or otherwise."[16]  The Series B Preferred Holders use the bracketed [LLC] reference to suggest to the Court that the word Affiliate in section 25 refers to an Affiliate of "Celsius Network LLC," but the language that the provision actually uses is an Affiliate of "*Celsius.*"

5.    In addition to rewriting the actual words of the Terms of Use to support their argument, the Series B Preferred Holders also ignore the use of "Celsius" throughout the rest of the Terms of Use, arguing that their misinterpretation of section 25 should control over the references to "Celsius" throughout the rest of the document due to the contractual maxim that "the

---

[14]    Terms of Use § 25 (emphasis added).

[15]    Series B Brief ¶ 2 (footnotes omitted).

[16]    Terms of Use § 2 (emphasis added).

specific controls over the general."[17]  But as explained above, section 25 is entirely consistent with the rest of the Terms of Use, which routinely refer to "Celsius" as the entity that owes obligations to account holders.  The Series B Preferred Holders also argue that their interpretation is supported by the principle that a contract must be interpreted "so as to give meaning to each provision."[18] But it is the Series B Preferred Holders who ignore the references to "Celsius" throughout the document and focus merely on (their rewriting of) section 25.  For the Court to agree with the Series B Preferred Holders that the Terms of Use unambiguously provide for liability to be limited to Celsius Network, the Court would have to "red pencil" not only section 25, but dozens of other references to "Celsius" throughout the Terms of Use.   Instead, the Court should read the plain language of the Terms of Use and find that the contract unambiguously provides for liability to account holders by "Celsius"—*i.e.*, each Debtor entity.

6.    The Court should not need to consider extrinsic evidence because the terms of the Terms of Use are clear and unambiguous on this issue.  When a contract's terms are clear and unambiguous, courts must apply the terms as written without referring to extrinsic evidence.[19]  But if the Court determines that the Terms of Use are unambiguous, the evidence referred to by the

---

[17]    Series B Brief ¶ 3.

[18]    Series B Brief ¶ 3.

[19]    *In re Condado Plaza Acquisition LLC*, 620 B.R. 820, 831 (Bankr. S.D.N.Y. 2020) (finding that under New York Law, contracts are interpreted and enforced in accordance with their plain meaning and their clear and unambiguous terms); *see also, e.g., In re Enron Corp.*, 292 B.R. 752, 762 (Bankr. S.D.N.Y. 2003) ("If the contract language is 'unambiguous,' this Court must enforce the plain, ordinary, and common meaning of those terms as a matter of law without reference to extrinsic evidence."); *Caminetti v. United States*, 242 U.S. 470, 485 (1917) ("When an act provides that it shall be known and referred to by a designated name, the name cannot be made the means of overriding the plain meaning of its other provisions"); *Ardestani v. INS*, 502 U.S. 129, 135 (1991) ("The starting point in statutory interpretation is the language of the statute itself . . . .  The strong presumption that the plain language of the statute expresses congressional intent is rebutted only in rare and exceptional circumstances . . . .") (internal quotation marks omitted); *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989) ("The plain meaning of legislation should be conclusive, except in the rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.") (internal quotation marks omitted).

Series B Preferred Holders is not relevant to resolving any perceived ambiguity in the Terms of Use, and there is also contrary extrinsic evidence in certain of the Debtors' statements, petitions, and declarations.

7.    As a result, extrinsic evidence does not resolve any ambiguity (to the extent any ambiguity exists).  The Terms of Use constitute a contract between the Company and its account holders—the Series B Preferred Holders are neither a party nor a third-party beneficiary.  It is a fundamental principle of contract interpretation that solely to the extent a contract is ambiguous, the contract must be interpreted against the drafter,[20] which in this case is Celsius, and in favor of the non-drafting party:  here, the account holders.  If the Court finds there is ambiguity, the extrinsic evidence presented is not sufficient to resolve the issue, and the Court should instead construe the ambiguity in favor of the account holders.

8.    For these reasons, and as further set forth herein, each Debtor entity is liable to account holders under the unambiguous Terms of Use and any ambiguity should be construed in favor of account holders.

## Background

### I.    Factual Background

9.    The Factual Background set forth in the Opening Brief is incorporated herein by reference.[21]

---

[20]    *Westchester Resco Co. v. New England Reinsurance Corp.*, 818 F.2d 2, 3 (2d Cir. 1987) ("Where an ambiguity exists in a standard-form contract supplied by one of the parties, the well-established *contra proferentem* principle requires that the ambiguity be construed against that party."); *Ward v. TheLadders.com, Inc.*, 3 F. Supp. 3d 151, 161 (S.D.N.Y. 2014) ("Under the doctrine of *contra proferentem*, it is a basic principle of contract law that a written document is to be construed against the party who prepared it where there are contradictory provisions. The doctrine is particularly applicable in cases like this one, in which a consumer agreed to a form contract that the consumer neither drafted nor negotiated.") (internal citations and brackets omitted).

[21]    *See* Opening Brief ¶¶ 10–12.

10.      In addition, the Debtors, the Committee, and the Series B Preferred Holders have stipulated that:

- "No party disputes that the Terms of Use govern the relationship between Customers and the Debtors relevant to the Briefed Legal Issue";[22]

- "Each version of the Terms of Use in effect prior to the Petition Date are attached as Exhibits A-1–A-8 to the *Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, Providing Terms of Use Dating Back to February 18, 2018*" (the "Terms of Use Declaration") [Docket No. 393];[23]

- "Each version of the Terms of Use was published on the Debtors' website (https://celsius.network/)";[24]

- "Terms of Use Version 8 became effective on April 14, 2022 and was in effect on the Petition Date. No party disputes that Terms of Use Version 8 govern the determination of the Briefed Legal Issue";[25]

- "On December 7, 2022, [GK8 Ltd., GK8 USA LLC, and GK8 UK Limited (collectively, the "GK8 Debtors")] each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code."[26]

## II.      Case Background and Procedural History

11.      The Case Background and Procedural History set forth in the Opening Brief is incorporated herein by reference.[27]

---

[22]   *Joint Stipulation of Undisputed Facts* [Docket No. 1955] (the "Joint Stipulation") ¶ 1.

[23]   Joint Stipulation ¶ 5.

[24]   Joint Stipulation ¶ 7.

[25]   Joint Stipulation ¶ 11.

[26]   Joint Stipulation ¶ 24.

[27]   *See* Opening Brief ¶¶ 13–17.

## **Response**

I.    **Each Debtor Entity is Liable to Account Holders Based on the Plain Language of the Terms of Use.**

A.    **The Debtors, the Committee, and the Series B Preferred Holders Agree that the Terms of Use Unambiguously Provide Which Debtor Entities have Liability for Customer Claims.**

12.    The Debtors, the Committee, and the Series B Preferred Holders agree that the Terms of Use are unambiguous with respect to which Debtor entities are liable for customer claims.[28]  But while the Debtors and the Committee agree that the Terms of Use provide that all Debtor entities are liable for account holder claims, the Series B Preferred Holders (reading the same language) argue that the Terms of Use limit liability of account holder claims to only one Debtor entity:  Celsius Network.

13.    As set forth in both the Opening Brief and the UCC Brief, the plain language of the Terms of Use establishes that all Debtor entities are liable to account holders.[29]  Pursuant to section 1 of the Terms of Use, "Celsius" is defined as "Celsius Network LLC *and its Affiliates*."[30] Each Debtor entity is an "Affiliate" of Celsius Network because each Debtor entity is under the "common control [and] ownership" of Debtor Celsius Network, Inc.[31]  The Terms of Use consistently refer to "Celsius" as the entities that are providing services to account holders or are liable to account holders.[32]  Moreover, section 25 of the Terms of Use is clear that "in no event

---

[28]    *See*, *e.g.*, Opening Brief ¶¶ 18–19; UCC Brief ¶ 17; Series B Brief ¶¶ 25–26.

[29]    Opening Brief ¶ 25; UCC Brief ¶ 17.

[30]    Terms of Use § 1 (emphasis added).

[31]    *See* Opening Brief ¶ 21.

[32]    Terms of Use § 4.B ("Your Celsius Account allows you to view your balances in connection with the Services provided to you by *Celsius*. . . . *Celsius* may restrict services in certain jurisdictions due to applicable laws, regulations, and business considerations") (emphasis added); Terms of Use § 4.A ("When you use the Custody Service, you understand and agree that *Celsius* may act as the custodian . . . .") (emphasis added);

shall [account holders] have any recourse . . . to or against any assets of any person or entity other than *Celsius*"—which is the term defined in section 1 as "Celsius Network LLC **and its Affiliates**."[33]   Therefore, because account holders are entitled to recover from "Celsius," which includes every Debtor entity, account holders are entitled to recover from every Debtor entity.[34]

14.    The Committee agrees with the Debtors' interpretation of the Terms of Use:  "[t]he plain language of Version 8 of the Terms of Use unambiguously provides account holders with claims against all Debtor entities.  The opening sentence of the Terms of Use defines 'Celsius' as 'Celsius Network LLC and its Affiliates,' . . . [and] [t]here can be no dispute that each of the Debtors is an 'Affiliate' of the others."[35]

### B.    The Limitation of Liability Provision in the Terms of Use Does Not Limit Liability to Celsius Network.

15.    The Series B Preferred Holders argue that the same Terms of Use are unambiguously clear that account holders only hold claims at Celsius Network.  More specifically, the Series B Preferred Holders believe that the use of the term "Affiliate" in section 25 of the Terms of Use creates a conflict that can only be resolved by rewriting the reference to "Celsius"

---

Terms of Use § 13.3 ("you [*i.e.*, an account holder] may not have any legal remedies or rights in connection with *Celsius'* obligations to you other than your rights as a creditor of *Celsius* under any applicable laws.") (emphasis added).

[33]    Terms of Use § 25 ("in no event shall [account holders] have any recourse, whether by setoff or otherwise, with respect to our obligations, to or against any assets of any person or entity other than Celsius, including, without limitation, any member, shareholder, Affiliate, investor, employee, officer, director, agent or advisor of Celsius."); Terms of Use § 1.

[34]    Terms of Use § 1 ("Celsius Network LLC and its Affiliates (collectively, 'we,' 'our,' 'us,' or 'Celsius' ) provide the following Terms of Use that, as they may be modified from time to time by Celsius in its sole discretion (the 'Terms') apply to our users ('you' or 'User(s)') and govern each User's access to, and use of, Celsius' products and services . . . .").

[35]    UCC Brief ¶ 17 (citing Terms of Use §§ 1, 2); Joint Stipulation ¶ 11 ("No party disputes that Terms of Use Version 8 govern the determination of the Briefed Legal Issue.").

in section 25 to be "Celsius Network," which would lead to the Series B Preferred Holders' desired result of limiting account holder liability to that one entity.[36]

16.      As the Series B Preferred Holders acknowledge, however, "[u]nder New York law, when interpreting a contract, 'words and phrases are given their plain meaning.'"[37]  Importantly, "[a] contract should be read as a whole to ensure that undue emphasis is not placed upon particular words and phrases. . . .  Courts 'may not by construction add or excise terms, **_nor distort the meaning_** of those used and thereby make a new contract for the parties under the guise of interpreting the writing.'"[38]

17.      Despite emphasizing the importance of adhering to the rules of contract interpretation, the Series B Preferred Holders need to rewrite the words of section 25 of the Terms of Use to get to their result.  Specifically, they argue that the reference in section 25 to "Celsius"— which is defined in section 1 as "Celsius Network LLC **_and its Affiliates_**"—should actually reference only Celsius Network.  The Series B Preferred Holders therefore conclude that Celsius Network's "Affiliates" are not liable for account holder claims.[39]  Each of the Series B Preferred Holders' arguments fail for the following reasons.

18.      **_First_**, simply rewriting "Celsius" to mean only Celsius Network in section 25 of the Terms of Use would distort the plain and ordinary meaning of "Celsius," which would alter

---

[36]   Series B Brief ¶¶ 25–26.

[37]   *Krumme v. Westpoint Stevens Inc.*, 238 F.3d 133, 139 (2d Cir. 2000) (internal quotation marks and citation omitted).

[38]   *Consedine v. Portville Cent. Sch. Dist.*, 907 N.E.2d 684, 689 (2009) (internal citations omitted) (emphasis added).

[39]   Terms of Use ¶ 1; *see, e.g.*, Series B Brief ¶¶ 25–30.

account holders' rights under the Terms of Use.[40]   Section 25 of the Terms of Use actually provides that:

> [I]n no event shall you [the account holder] have any recourse, whether by setoff or otherwise, with respect to our obligations, to or against any assets of any person or entity other than ***Celsius***, including, without limitation, any member, shareholder, Affiliate, investor, employee, officer, director, agent, or advisor of ***Celsius***.[41]

Astonishingly, the Series B Preferred Holders claim that "language in section 25 of the Terms of Use is plain and should be given its ordinary meaning. . . .  The use of 'Celsius' in section 25 must be read to be limited to [Celsius Network] LLC. . . ."[42]  It is illogical for the Series B Preferred Holders to argue both that "Celsius" should be given its "plain meaning" and that the "plain meaning" of "Celsius" is actually a different definition used nowhere in the Terms of Use.  The language ***actually*** provides that account holders have recourse against "Celsius," which is defined in section 1 as "Celsius Network LLC ***and its Affiliates***."[43]  This rewriting of section 25 also ignores the Terms of Use's repeated references to "Celsius" as the entity that owes obligations to customers, as explained above.

19.    ***Second***, the Debtors' reading of section 25 providing for limitations of liability for "Affiliates" of "Affiliates" gives meaning to each term of the Terms of Use and does not "simply ignor[e] [the] carveout," as the Series B Preferred Holders assert.[44]  As explained in the Opening Brief, the "Affiliates" that are excluded from liability under section 25 are those "Affiliates" of

---

[40]    Series B Brief ¶ 25–26.

[41]    Terms of Use § 25 (emphasis added).

[42]    Series B Brief ¶ 26.

[43]    Terms of Use §§ 1, 25 (emphasis added).

[44]    Series B Brief ¶ 27; UCC Brief ¶ 17.

"Celsius"—*i.e.*, "Affiliates" of "Affiliates" of Celsius Network.  For example, if an "Affiliate" of Celsius Network, such as Debtor Celsius Mining LLC ("Celsius Mining"), owned or controlled a different entity through a joint venture or other contractual agreement, such entity would not necessarily be an "Affiliate" of Celsius Network.  The defined term "Affiliate" does not explicitly tie itself to Celsius Network or any other entity, and the Debtors' interpretation gives effect to every term using a plain reading and ordinary meanings, including "Celsius" and "Affiliate."  After all, "Celsius" and "Affiliates" are two separately defined terms.

20.  ***Third***, the Debtors' interpretation of section 25 does not run afoul of fundamental principles of contract interpretation as there is no inconsistency between the specific and general provisions.[45]  In arguing to give effect to a more specific provision, the Series B Preferred Holders cite to *In re Sears Holding, Corp.*, No. 21-CV-5437-NSR, 2022 WL 4482375 (S.D.N.Y. Sept. 27, 2022).[46]  In *Sears*, however, the contract's general term "Liability," defined as "any liability, . . . claim . . . [or] [a]ction . . . of whatever kind or nature," was limited by "Excluded Liabilities," defined as "all Liabilities arising from . . . any claim, [a]ction, . . . or other proceeding . . . arising out of the Assumed Liabilities. . . ."[47]  The general term "Liability" was limited by a specific subset of excluded "Liabilities" arising under particular circumstances, but the Term "Celsius" (as "Celsius Network LLC and its Affiliates") is not limited by a subset of "Affiliates."  "Affiliates" is a referential term, defined as "an entity that owns or controls, is owned or controlled by, or is

---

[45]  *See Bank of N.Y. Mellon Tr. Co., Nat'l Ass'n v. Solstice ABS CBO II, Ltd.*, 910 F. Supp. 2d 629, 648–49 (S.D.N.Y. 2012) ("[A]n interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.") (internal quotation marks and citations omitted).

[46]  Series B Brief ¶ 28.

[47]  *In re Sears*, 2022 WL 4482375, at *4–5.

*[sic]* under common control or ownership with a ***party*. . . ."**[48]**  The term "Affiliate" must be used in reference to some "party" (*i.e.*, an "Affiliate" of *X*).  The term "Affiliate" in the specific modifying clause refers to "Affiliates" of "Celsius" (*i.e.*, "Affiliates" of "Affiliates" of Celsius Network), as described above.  In sum, whereas in *Sears* the "Liability" was limited by a specific subset of excluded "Liabilities," the term "Affiliate" in the specific modifying clause to "Celsius" in section 25 of the Terms of Use refers to different "Affiliates," making *Sears* inapplicable.

21.    ***Fourth,*** had the Company intended to identify Celsius Network as the sole entity liable to account holders, the Company would have done so.[49]  Notably, where the Company intended to refer to a specific entity, it did:

> The Services provided in connection with specific Eligible Digital Assets listed on Appendix A are provided by the Affiliate **Celsius EU UAB**, a limited liability company incorporated in Lithuania.[50]

Interpreting the use of "Celsius" in section 25 as "Celsius Network LLC and its Affiliates" is consistent with its usage across the entire Terms of Use.  Had the Company intended to simply refer to "Celsius Network LLC" in section 25, it would have done so, just as the Company referred to Celsius EU UAB in section 1.[51]

---

48    Terms of Use § 2 (emphasis added).

49    *See KLS Diversified Master Fund, L.P. v. McDevitt*, 507 F. Supp. 3d 508, 542 (S.D.N.Y. 2020), *aff'd*, No. 21-1263, 2022 WL 2759055 (2d Cir. July 13, 2022) ("Under the doctrine of *expressio unius est exclusio alterius*, when a term is expressly included in a contractual provision, its exclusion from other provisions within the same contract reflects the parties' intent that the omission was intentional[.]"); *Quadrant Structured Prod. Co. v. Vertin*, 16 N.E.3d 1165, 1172 (N.Y. 2014) ("[I]f parties to a contract omit terms—particularly, terms that are readily found in other, similar contracts—the inescapable conclusion is that the parties intended the omission.").

50    Terms of Use § 1 (emphasis in original).

51    Terms of Use §§ 1, 25.

13

## II.    Extrinsic Evidence Does Not Demonstrate that Only Celsius Network is Liable to Account Holders.

22.    As an initial matter, all parties agree that extrinsic evidence is unnecessary to resolve the Briefed Legal Issue.[52]  Nonetheless, in the event the Court finds that the Terms of Use is ambiguous with respect to the Briefed Legal Issue, extrinsic evidence should only be permitted to explain, not contradict, the meaning of the Terms of Use.[53]  If a court believes that the terms of a contract are ambiguous, *any* relevant extrinsic evidence is permissible to help the court interpret the actual intent of the parties.[54]

23.    Here, extrinsic evidence does not support the Series B Preferred Holders' assertions that the Company intended to limit liability to only Celsius Network.  Specifically, the Company's decision to not list account holder liabilities at the Company's mining subsidiaries in documents and financial statements provided to potential investors is not evidence of the Company's intent to limit account holder liability to Celsius Network.[55]  For example, if Celsius Network listed $6 billion of customer liabilities on its balance sheet, and then another entity, Celsius Mining, also listed $6 billion in customer liabilities on its balance sheet, one might assume that between the two

---

[52]    Opening Brief ¶¶ 18–19, 29–30; UCC Brief ¶ 24; Series B Brief ¶¶ 31–32.

[53]    Parol evidence is only admissible to explain, not contradict, a term's meaning.  *See, e.g.*, *Madeleine, L.L.C. v. Casden*, 950 F. Supp. 2d 685, 695 (S.D.N.Y. 2013) ("While extrinsic evidence generally may not vary or contradict the terms of a fully integrated document, it may be used to interpret facially ambiguous language in the contract.") (citing *Topps Co., Inc. v. Cadbury Stani S.A.I.C.,* 526 F.3d 63, 69 (2d Cir. 2008)).

[54]    *See, e.g., Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, England*, 136 F.3d 82, 86 (2d Cir. 1998) ("If the court finds that the terms, or the inferences readily drawn from the terms, are ambiguous, then the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract.  If the court must resort to extrinsic evidence to ascertain the correct and intended meaning of a term, material questions of fact necessarily exist.  If the language is susceptible to different reasonable interpretations, and 'where there is relevant extrinsic evidence of the parties' 'actual intent,' then the contract's meaning becomes an issue of fact precluding summary judgment.") (citing *Seiden Associates v. ANC Holdings, Inc.*, 959 F.2d 425, 428–29 (2d Cir. 1992)).

[55]    Series B Brief ¶ 37.

entities, $12 billion was owed (not that each entity was liable for the same $6 billion).  Moreover,

if there was an IPO of Celsius Mining, Celsius could have amended the Terms of Use to remove

liability from that entity as part of the IPO.  The Series B Preferred Holders' speculation as to the

Company's intent regarding a transaction that did not occur is just that.

> **A.    The Series B Preferred Holders' Extrinsic Evidence Does Not Resolve Any Ambiguity in the Terms of Use.**

> **1.    The Mere Transfer of Customer Accounts to Celsius Network Does Not Relieve All Other Debtor Entities of Liability.**

24.    Prior to commencing these chapter 11 cases, the Company, like many complex

corporate organizations, routinely engaged in intercompany transactions, shifted resources across

entities, and adjusted business structures.   As the Series B Preferred Holders recognize, the

migration of customer accounts from Celsius Network Limited ("CNL") to Celsius Network was

done in response to uncertainty in the United Kingdom's regulatory regime.[56]   The Series B

Preferred Holders "presume" that this was done to isolate liability to Celsius Network, but do not

point to any evidence.[57]  Celsius Network is not the only Debtor entity liable to account holders

simply because CNL is no longer the customer-facing entity, and the Series B Preferred Holders'

mere speculation does not resolve any related ambiguity in the Terms of Use.

25.    Additionally, the Company's basic communications to customers regarding the

migration do not constitute evidence that claims are only held at the Customer Facing Entities.  To

the contrary, such communications merely informed account holders of changes to the Terms of

---

[56]   Series B Brief ¶ 33; *see also See Celsius Community Update — June 23, 2021*, CELSIUS, https://celsiusnetwork.medium.com/celsiuscommunity-update-june-23-2021-a28fca899091;  Terms of Use Decl. ¶ 11.

[57]   *See* Series B Brief ¶ 33.

Use and informed customers of which entities they would primarily interact with on a go-forward

basis, not which entities account holders may assert claims against.[58]

### 2.   Reports and Presentations Listing Customer Liabilities at Celsius Network Are Not Indicative of Sole Liability.

26.    As discussed above, the fact that Celsius Network became the primary customer-

facing entity does not alter other entities' liability to account holders under the Terms of Use.[59]

The Series B Preferred Holders' attempt to rely on surface-level presentations for a transaction

that was not pursued is irrelevant in determining the answer to the Briefed Legal Issue.[60]

### 3.   The Debtors' Statements in These Chapter 11 Cases Do Not Demonstrate Their Intent to Limit Liability to Celsius Network.

27.    Throughout these chapter 11 cases, the Debtors have made numerous statements

about their business operations and attendant assets and liabilities.  Now, the Series B Preferred

Holders seek to take the Debtors' statements out of context and contort the times where the Debtors

"failed" to explicitly proclaim which Debtor entities are liable to account holders as extrinsic

evidence in the Series B Preferred Holders' favor.  But postpetition statements and actions do not

alter the plain language of the Terms of Use nor assist in resolving any ambiguity in the Terms of

Use.

---

[58]   *See* Series B Brief ¶ 34.  The Series B Preferred Holders, rather than quoting the language provided:  "[Account holder] engagement will be with Celsius Network LLC," state "Customers' relationship will now be with LLC, ***not CNL***, and subject to the governing laws of New York . . . ." *Declaration of Oren Blonstein, Head of Innovation and Chief Compliance Officer of the Debtors, in Support of the Debtors' Motion Regarding Ownership of Earn Assets and the Sale of Stablecoin* [Docket No. 1327]; Series B Brief ¶ 34 (emphasis in original).

[59]   *See* Series B Brief ¶¶ 36–37.

[60]   *See* Series B Brief ¶ 37.

28.    ***The First Day Hearing***.  At the first day hearing, the Debtors stated that Celsius Network is the primary entity with which ***retail customers*** do business;[61] however, as explained above, the fact that Celsius Network is the primary customer-facing entity is irrelevant to the determination of which entities are liable under the Terms of Use.

29.    ***Sworn Statements***.  The Debtors' statement that Celsius Mining owes $576 million to CNL in the Mashinsky Declaration[62] does not mean that Celsius Mining is also not liable for account holder claims under the Terms of Use.   The same sentence from which the Series B Preferred Holders quote also states that mining operations will "generate Bitcoin that will provide revenue for the ***Company***."[63]   The language makes clear that the Debtors explicitly contemplated addressing the cryptocurrency deficit owed to account holders by utilizing the Company's mining operations.

30.    As previously discussed, "the main purposes of the Version 6 terms of use was changing the company that the customers were engaging with from the UK entity to the U.S. entity. It was important [to]. . . stop providing services to them . . . as a UK company."[64]   The Company's need to comply with a changing regulatory environment by shifting the customer-facing entity does not demonstrate an intention to limit account holder liability to only one entity.

---

61    *See* Series B Brief ¶ 41.

62    "<u>Mashinsky Declaration</u>" means the *Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 23].

63    Mashinsky Decl. ¶ 66 (emphasis added).  "To bridge th[e] gap in its balance sheet, the *Company* plans to engage with all constituencies, including the official committee of unsecured creditors (which will likely include *mostly users*), in a productive dialogue with the hope of building consensus around the Debtors' potential chapter 11 plan of reorganization and, ultimately, a transaction that will maximize the value of the Company's business for the benefit of the Company's creditors.  *One way the Debtors intend to achieve this goal is by using the Bitcoin "minted" by Mining to address its current cryptocurrency deficit.*"  Mashinsky Decl. ¶ 132 (emphasis added).

64    Blonstein Depo. at 120:1–8, 257:8–16, 180:24–181:3.

31.     ***Periodic Reporting***.    Relying on the amounts set forth in "Accrued Expenses and Other Long Term Liabilities" in Non-Debtor Reports and MORs as conclusory extrinsic evidence is shortsighted and intentionally misleading.    As explained above, if the Debtors listed the same liabilities at every corporate entity in the Company's structure, it would create inaccurate and confusing financial reports.    Additionally, in each of the Debtors' petitions, the respective Debtor has more than 100,000 creditors and $1–10 billion in liabilities on account of account holder liability.[65]

32.     Playing the game of which document can be used to indirectly determine whether account holders have claims at every Debtor entity is futile.    Postpetition statements and actions do not alter the plain language of the Terms of Use and no extrinsic evidence changes the fact that the Terms of Use unambiguously state the account holders have claims against "Celsius" and "Celsius" is defined as "Celsius Network LLC and its Affiliates."[66]

33.     ***Schedules of Assets and Liabilities***.    The Series B Preferred Holders argue that the omission of every Debtor except Celsius Network from Schedule G[67] regarding versions 6–8 of the Terms of Use as executory contracts supports their claim.[68]    This is an incomplete reading of

---

[65]  *See* Monthly Operating Report [Docket No. 1903] at 14 ("The Debtors previously scheduled account holder claims at each Debtor entity as part of the Debtors' Schedules of Assets and Liabilities . . . .").

[66]  Terms of Use §§ 1, 25.

[67]  "Schedule" means the respective schedules of assets and liabilities of Celsius Network [Docket. No. 974]; CNL, Case No. 22-10966 [Docket No. 7]; Celsius US Holding LLC, Case No. 22-10971 [Docket. No. 5]; Celsius Networks Lending LLC, Case No. 22-10969 [Docket. No. 5]; Celsius Network Inc., Case No. 22-10965 [Docket No. 6]; Celsius Mining, Case No. 22-10968 [Docket. No. 5]; Celsius Lending LLC, Case No. 22-10970 [Docket. No. 5]; and Celsius KeyFi LLC, Case No. 22-10967 [Docket. No. 5].

[68]  *See* Series B Brief ¶ 47.

the Global Notes.[69]    In the Global Notes, the Debtors explain that "[e]xcept as otherwise discussed

below, to the extent these disclosures would be duplicative, the Debtors have determined to only

list such assets, liabilities, and prepetition payments once" and that "the Debtors reserve all of their

rights with respect to the named parties of any and all executory contracts, *including the right to*

*amend Schedule G*."[70]

34.    In noting that the Debtors' Schedules list customer claims against every Debtor

based on the Terms of Use, the Series B Preferred Holders are quick to highlight that the Global

Notes explain that "it is not the intent of the Debtors to create any presumption that account holders

have claims against each Debtor entity, *as that issue is disputed by certain holders of the Series*

*B Preferred Shares issued by Celsius Network Limited*."[71]    The Series B Preferred Holders cannot

claim that the recognition of this dispute is at all relevant to resolving the Briefed Legal Issue.

35.    *GK8 Sale*.    The Series B Preferred Holders note that the GK8 APA, filed

December 2, 2022, does not list "liabilities to Customers on account of the Terms of Use" in a "list

of specifically 'Excluded Liabilities.'"[72]    'Excluded Liabilities' is *defined* as "any

Liabilities . . . that are not Assumed Liabilities."[73]    The contract interpretation here is

simple: "Excluded Liabilities" are all those not explicitly assumed, the list of "Assumed

---

[69]    "Global Notes" means the *Global Notes and Statement of Limitations, Methodology and Disclaimers Regarding the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs* [Docket No. 974], as applicable to each Debtor.

[70]    Global Notes at 8, 11 (emphasis added).

[71]    Global Notes at 3 (emphasis added).  The Series B Preferred Holders omitted the language referring to the fact that the caveat was provided *because* of their claims.

[72]    *See* Series B Brief ¶ 48; *Asset Purchase Agreement, dated as of December 2, 2022* [Docket No. 1586] (the "GK8 APA") § 1.4.

[73]    GK8 APA § 1.4; Series B Brief ¶ 48.

Liabilities" does not include account holder claims, therefore account holder claims are "Excluded Liabilities."

36.     In the GK8 Declaration,[74] the Debtors explained that "[t]he Debtors believe that registered users on their platform may be able to assert claims against each of their affiliates, which includes the GK8 Debtors" and that "[t]he GK8 Debtors filed these chapter 11 cases solely to pursue and implement a sale transaction . . . *free and clear of all liens, claims, encumbrances, and other interests*."[75]    Thus, the Series B Preferred Holders' reliance on the GK8 APA is misguided and has no bearing on whether account holders hold claims against every Debtor entity.

### 4.    Customer Conduct and the Signing of the Terms of Use Do Not Determine Which Debtors are Liable to Account Holders.

37.     The Series B Preferred Holders point to the percentages of account holders who signed versions 1-5 and 6-8 of the Terms of Use and erroneously conclude that "virtually all Customers consented to limit their recourse to [Celsius Network] by either (i) agreeing to Terms of Use Version 6, which superseded their prior contracts, or (ii) first accepting Terms of Use Version 6 or a later version."[76]    But that requires the Court to find that the Terms of Use limit liability to Celsius Network, which they do not.    None of the documents cited to by the Series B Preferred Holders state anything about "limiting recourse" beyond the Terms of Use, which limit account holder recourse to "Celsius."

38.     Relatedly, the Series B Preferred Holders incorrectly argue that CNL is relieved of all account holder liability because Version 6 of the Terms of Use substitutes "Celsius Network

---

[74]    "GK8 Declaration" means the *Declaration of Christopher Ferraro, Director and Chief Financial Officer of GK8 Ltd., in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 1629].

[75]    GK8 Declaration ¶¶ 8, 4 (emphasis added); Joint Stipulation ¶ 24 ("On December 7, 2022, [the GK8 Debtors] each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.").

[76]    Series B Brief ¶ 50.

and its Affiliates" for CNL as the foremost party.   The Terms of Use (versions 7 and 8,
specifically), as stated, provide that account holders have recourse against "Celsius," and "Celsius"
is defined as "Celsius Network LLC and its Affiliates."[77]   The Series B Preferred Holders
recognize that CNL is an "Affiliate" of Celsius Network.[78]   The fact that the Terms of Use is
superseded when an account holder consents to the latest version is completely irrelevant given
that CNL is still liable under the latest Terms of Use.

39.    The Series B Preferred Holders also note that "prior to entry of the *Order (I) Setting
Bar Dates for Submitting Proofs of Claim, (II) Approving Procedures for Submitting Proofs of
Claim, (III) Approving Notice Thereof, and (IV) Granting Related Relief* [[Docket] No. 1368],
which directed Customers to file claims against all Debtors, approximately 94% of proofs of claim
filed by Customers were filed solely against LLC and less than 1% were filed against CNL."[79]
There are many reasons why account holders may have filed one claim against only one entity,
including for the most likely reason:  Celsius Network is the first specific debtor box to check on
the claim form and an account holder does not understand that it must file multiple claims against
multiple entities to best protect its interests.   The fact that account holders are not entirely versed
in the nuances of bankruptcy proceedings is not a basis for imputing intent onto those same account
holders.

---

[77]    Terms of Use §§ 1, 25.

[78]    Series B Brief ¶¶ 25–26.

[79]    Series B Brief ¶ 51.

**B.     There is Extrinsic Evidence that Supports the Debtors' View that Account Holders have Recourse Against Every Debtor Entity.**

40.     To the extent extrinsic evidence is considered, there is also extrinsic evidence that demonstrates that account holders have recourse against every Debtor entity.

41.     As noted by the Committee, before the transfer of accounts from CNL to Celsius Network, "Celsius" was defined as "Celsius Network Limited."[80]   After the transfer and corresponding revision of the Terms of Use, at the time of the Series B Preferred Holders investment, "Celsius" was (and still is) defined as "Celsius Network LLC and its Affiliates."  Per section 25, account holders have recourse against "Celsius."[81]  Reviewing the evolution between each version of the Terms of Use illustrates that the Company made the effort to not simply transfer the Terms of Use from CNL to Celsius Network; rather, the Company intentionally included Celsius Network *and its Affiliates*.

42.     Moreover, as demonstrated in the Company organizational chart provided to the Series B Preferred Holders, in migrating customer accounts to Celsius Network, all new loans were to be entered into by Celsius Lending LLC, and Celsius EU UAB was formed to "provide certain services to Celsius' international . . . users."[82]  Furthermore, CNL contracted to hold and deploy crypto assets post-migration.[83]  Given that certain lending practices are conducted by Celsius Lending LLC (not Celsius Network), international customers receive certain services from Celsius EU UAB (not Celsius Network), and CNL (not Celsius Network) handles certain deployment

---

[80]    Version 5 of the Terms of Use § 1.

[81]    Version 7 and 8 of the Terms of Use §§ 1, 25.

[82]    Celsius Network – Organizational Chart as of 7/15/2021, at 2.

[83]    Mashinsky Decl. ¶ 56.

activities, it would be illogical and inconsistent for the Company to intend to limit account holder recoveries to only Celsius Network.

43.    Furthermore, the Annual Report and Financial Statements for the period ended December 31, 2020 (the "Report")[84] states that the "*Group's*[85] business model relies on attracting users to utilize the *Group's* services."[86]  The Report mentions attracting users to the "Group's" services, not Celsius Network's services.  Additionally, the Report identifies principal risks, stating "[t]he Group is primarily exposed to credit risks related to its digital asset lending activities. . . . [i]n addition, the Group is exposed to risks from movements in exchange rates of fiat currencies and the volatility of prices in digital assets . . . ."[87]  If the Series B Preferred Holders' reading is correct, Celsius Network (which the Report separately terms "the Company") would be primarily at risk for lending activity, credit exposure, and volatility in the prices of digital assets.  The Report, however, says that such risks belong to the entire Group, which is includes entities other than Celsius Network.

44.    Finally, as noted above, the Debtors' petitions, the Mashinsky Declaration, the GK8 Declaration, and other statements made during these chapter 11 cases all demonstrate that account holders may have recourse against every Debtor entity, which is consistent with the Terms of Use.

---

[84]    Nyman Libson Paul LLP, Celsius Network Limited Annual Report and Financial Statements for the Period Ended 31 December 2020, dated October 8, 2021.

[85]    "Group" is defined as "Celsius Network Limited and the group now headed by it."  Report at 1.

[86]    Report at 1 (emphasis added).

[87]    Report at 1.

### III.    The Court Should Construe Any Ambiguity in the Terms of Use in Favor of the Account Holders.

45.    The Debtors and the Committee agree that the Terms of Use unambiguously provide that each Debtor entity is liable to account holders.  In the event the Court finds that the Terms of Use is ambiguous, however, it is clear the extrinsic evidence is inconclusive on the Briefed Legal Issue, and the Court should therefore construe any ambiguity in favor of the non-drafting party, here, the account holders.

46.    Under New York Law, if there is ambiguity in form contracts—such as the Terms of Use—must be interpreted against the drafter and in favor of the other party.[88]  Notably, the doctrine of *contra proferentem* applies "against the party who prepared it, and favorably to a party who had no voice in the selection of its language."[89]  Moreover, "*contra proferentem* does not apply where contracts are negotiated by sophisticated parties of equal bargaining power."[90] Therefore, it is clear that *contra proferentem* is intended to address an imbalance in bargaining power, interpreting contractual language "favorably to a party who had no voice."[91]  As such, given that account holders did not have a voice in drafting the Terms of Use as they are provided on a take-it-or-leave-it basis, any ambiguity in the Terms of Use must be interpreted in favor of

---

[88]    *Westchester Resco Co*, 818 F.2d at 3 ("Where an ambiguity exists in a standard-form contract supplied by one of the parties, the well-established *contra proferentem* principle requires that the ambiguity be construed against that party."); *Ward*, 3 F. Supp. 3d at 161 ("Under the doctrine of *contra proferentem*, it is a basic principle of contract law that a written document is to be construed against the party who prepared it where there are contradictory provisions. The doctrine is particularly applicable in cases like this one, in which a consumer agreed to a form contract that the consumer neither drafted nor negotiated.") (internal citations and brackets omitted); UCC Brief ¶ 23.

[89]    *Coliseum Towers Assocs. v. Cnty. of Nassau*, 2 A.D.3d 562, 565 (2003) (internal citation omitted).

[90]    *Catlin Speciality Ins. Co. v. QA3 Fin. Corp.*, 36 F. Supp. 3d 336, 342 (S.D.N.Y. 2014), *aff'd sub nom. Catlin Specialty Ins. Co. v. QA3 Fin. Corp.*, 629 F. App'x 127 (2d Cir. 2015); see *D'Amato v. Five Star Reporting, Inc.*, 80 F. Supp. 3d 395, 412 (E.D.N.Y. 2015) ("Moreover, *contra proferentem* does not apply in situations where . . . both parties are represented by counsel and have meaningful opportunities to negotiate contractual terms.").

[91]    *Coliseum Towers Assocs.*, 2 A.D.3d at 565.

the account holders.  A favorable reading for account holders, as put forth by the Committee, is for account holder recourse against every Debtor entity, which is also the Debtors' interpretation.

47.      Furthermore, the Terms of Use, governing the Briefed Legal Issue, are a contractual agreement between the Debtors and account holders (who are represented by the Committee), and the Series B Preferred Holders are neither parties to nor third-party beneficiaries of the Terms of Use.[92]  As the Committee explains in the UCC Brief, "[c]onfidential materials presented to third parties and not made available to account holders have no probative value in determining the meeting of the minds between Celsius and its account holders."[93]

## Conclusion

48.      For the reasons set forth herein, the Court should find that each Debtor entity is liable to account holders pursuant to the Terms of Use.

## Reservation of Rights

49.      Nothing contained in this Response Brief is intended or should be construed as an admission as to the validity of any particular claim against the Debtors, a promise or requirement to pay any particular claim, or an implication or admission that any particular claim is of a type specified or defined in this Response Brief.

---

[92]     Joint Stipulation ¶ 1; *see* Terms of Use.

[93]     UCC Brief ¶ 28.

New York, New York                    /s/ Joshua A. Sussberg
Dated: January 31, 2023               **KIRKLAND & ELLIS LLP**
                                      **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                      Joshua A. Sussberg, P.C.
                                      601 Lexington Avenue
                                      New York, New York 10022
                                      Telephone:    (212) 446-4800
                                      Facsimile:    (212) 446-4900
                                      Email:        jsussberg@kirkland.com

                                       - and -

                                      Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
                                      Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
                                      Christopher S. Koenig
                                      Dan Latona (admitted *pro hac vice*)
                                      300 North LaSalle Street
                                      Chicago, Illinois 60654
                                      Telephone:    (312) 862-2000
                                      Facsimile:    (312) 862-2200
                                      Email:        patrick.nash@kirkland.com
                                                    ross.kwasteniet@kirkland.com
                                                    chris.koenig@kirkland.com
                                                    dan.latona@kirkland.com

                                      *Counsel to the Initial Debtors and Debtors in*
                                      *Possession*

                                      *Proposed Counsel to the GK8 Debtors and*
                                      *Debtors in Possession*