**WHITE & CASE LLP**
David M. Turetsky
Kimberly A. Havlin
Samuel P. Hershey
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113
Email:  david.turetsky@whitecase.com
        kim.havlin@whitecase.com
        sam.hershey@whitecase.com

– and –

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile:  (312) 881-5450
Email:  mandolina@whitecase.com
        gregory.pesce@whitecase.com

**WHITE & CASE LLP**
Keith H. Wofford
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile:  (305) 358-5744
Email:  kwofford@whitecase.com

– and –

**WHITE & CASE LLP**
Aaron E. Colodny (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone: (213) 620-7700
Facsimile:  (213) 452-2329
Email:  aaron.colodny@whitecase.com

*Counsel to the Official Committee of Unsecured Creditors*

**SELENDY GAY ELSBERG PLLC**
Jennifer M. Selendy
Faith E. Gay
Claire O'Brien
1290 Avenue of the Americas
New York, NY  10104
Tel: 212-390-9000
Email: jselendy@selendygay.com
        fgay@selendygay.com
        cobrien@selendygay.com

*Proposed Co-Counsel to the Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

|  | ) | |
|---|---|---|
|  | ) | |
| Debtors. | ) | (Jointly Administered) |
| _____ | ) | |

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' RESPONSE BRIEF
REGARDING DEBTORS THAT ARE LIABLE TO ACCOUNT HOLDERS UNDER
THE GLOBAL CONTRACT (THE "TERMS OF USE") BETWEEN
CELSIUS AND ACCOUNT HOLDERS**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

Preliminary Statement.................................................................................................................1

Argument ......................................................................................................................................5

    I.      The Plain Language of the Terms of Use Provides That Account Holders
             Can Assert Claims Against All Debtor Entities........................................................5

    II.     The Debtors' and Committee's Reading of the Limitation of Liability
             Provision Does Not Render That Provision Superfluous.  Rather, It Makes
             Sense and Harmonizes It with the Rest of the Agreement......................................6

    III.    The Extrinsic Evidence That the Series B Preferred Holders Identify in
             Their Opening Brief Should Not Be Considered, and in Any Case Does Not
             Change the Plain Meaning of the Terms of Use. .....................................................8

         A.      The Account Holders' Acceptance of Version 6 of the Terms of Use
                  Did Not Extinguish the Account Holders' Claims. ....................................9

         B.      The Account Holders' Acknowledgement of the Terms of Use Does
                  Not Change the Terms of Use.....................................................................9

         C.      The Other Extrinsic Evidence on Which the Series B Preferred
                  Holders Purport to Rely Does Not Contradict the Plain Language of
                  the Terms of Use .......................................................................................13

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### CASES

*Alpha Capital Anstalt v. Real Goods Solar, Inc.*,
   311 F. Supp. 3d 623 (S.D.N.Y. 2018).......................................................................8

*Elbit Sys. v. Credit Suisse Grp.*,
   842 F. Supp. 2d 733 (S.D.N.Y. 2012).......................................................................9

*Gessin Elec. Contractors, Inc. v. 95 Wall Assocs., LLC*,
   903 N.Y.S.2d 26 (App. Div. 1st Dept. 2010).............................................................8

*Gillis v. Respond Power, LLC*,
   677 F. App'x 752 (3d Cir. 2017) ......................................................................14, 15

*Herr v. Herr*,
   949 N.Y.S.2d 786 (App. Div. 3rd Dept. 2012) .........................................................5

*Oritani Sav. & Loan Ass'n v. Fid. & Deposit Co.*,
   744 F. Supp. 1311 (D.N.J. 1990) ...........................................................................14

*Pioneer Valley Concrete Serv. V. Jag I, LLC*,
   No. 1:10-CV-1311, 2013 U.S. Dist. LEXIS 169361 (N.D.N.Y. Dec. 2, 2013).......................12

*Ross v. Thomas*,
   728 F. Supp. 2d 274 (S.D.N.Y. 2010).......................................................................8

*Soto v. DRT Aero., LLC*,
   No. 3:19-cv-1968, 2022 WL 4448891 (D. Conn. Sept. 23, 2022)...........................................6

*Ward v. TheLadders.com, Inc.*,
   3 F. Supp. 3d 151 (S.D.N.Y. 2014) .......................................................................16

*Westchester Resco Co. v. New England Reinsurance Corp.*,
   818 F.2d 2 (2d Cir. 1987).......................................................................................16

Pursuant to the *Order (I) Setting a Briefing Schedule and (II) Granting Related Relief* [Docket No. 1747], the Official Committee of Unsecured Creditors (the "**Committee**"), appointed in the chapter 11 cases (the "**Chapter 11 Cases**") of the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**" and, together with their non-Debtor affiliates, "**Celsius**"), by and through its undersigned counsel, hereby files this response brief (this "**Response Brief**")[2] regarding which Debtors are liable to account holders under the Terms of Use ("**TOU**") between Celsius Network LLC and its Affiliates, on the one hand, and the account holders, on the other.

## Preliminary Statement

1.      Celsius and its customers—the parties to the Terms of Use—agree that the Terms of Use unambiguously provide customers with claims against each Debtor. The Series B Preferred Holders, who are not parties to the Terms of Use, contend otherwise. In support of their position, the Series B Preferred Holders ask the Court to consider just one provision of the Terms of Use and ignore all the others. Moreover, the Series B Preferred Holders do not (and cannot) rely on the plain language of that one provision. Rather, they ask the Court to simply disregard the defined term "Celsius"—which includes Celsius Network LLC *and its Affiliates*—and substitute it with "Celsius Network LLC." The Series B Preferred Holders offer no basis for the Court to re-draft the Debtors' and their account holders' agreement in this way—because none exists. The Court should decline the Series B Preferred Holders' invitation to accept their "uniquely reasonable" re-write of an unambiguous agreement so that the Debtors' equity can recover ahead of their creditors.

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in *The Official Committee of Unsecured Creditors' Opening Brief Regarding Debtors that are Liable to Account Holders Under the Global Contract (the "Terms of Use") Between Celsius and Account Holders* [D.I. 1797] (the "**Opening Brief**").

2.      Although the Series B Preferred Holders originally sought to bolster their position with extrinsic evidence, they appear to have changed strategies.  The Series B Preferred Holders (along with the Debtors and the Committee) did not seek any depositions, and they have stated that they do not intend to call any witnesses.  Additionally, the Series B Preferred Holders refused to produce virtually any documents in response to the Debtors' and the Committee's requests for production, ultimately producing only ***one*** document that they had not already filed on the docket. It would be a convenient way to litigate if a party could rely only on the evidence that supports its position while preventing its adversaries from developing evidence that might undermine that position.  But that is not how it works.  The Series B Preferred Holders cannot rely on extrinsic evidence after refusing to develop that evidence—such as by declining to depose the Debtors to ascertain the Debtors' intent.  The Series B Preferred Holders also blocked the Committee from obtaining discovery into the Debtors' intent by refusing to produce any communications with the Debtors or to identify members of the Series B Preferred Holders with knowledge of that intent. The Court should disregard the Series B Preferred Holders' incomplete and one-sided version of the Debtors' intent and focus solely on the plain language of the Terms of Use.

3.      The language of the Terms of Use unambiguously supports the Debtors' and the Committee's position.  As the Committee showed in its Opening Brief:

- The Terms of Use unambiguously state that account holders that participate in the Earn program loan their digital assets to "Celsius"—defined to mean Celsius Network LLC and all of its Affiliates[3]—and that "Celsius" has obligations to each account holder. *See*, *e.g.*, Terms of Use § 2 (describing "**CELSIUS' OBLIGATION TO TRANSFER DIGITAL ASSETS TO USERS UPON THE TERMINATION OF SUCH LOANS**

---

[3] "Affiliate" is defined as "an entity that owns or controls, is owned or controlled by, or is or [*sic*] under common control or ownership with a party, where control is defined as the direct or indirect power to direct or cause the direction of the management and policies of such party, whether through ownership of voting securities, by contract, or otherwise."  Terms of Use § 2.

**OR REPAYMENT OF SUCH BORROWING IN CONNECTION WITH THESE SERVICES**" (emphasis in original)); *id.* § 4.A.[4]

- The Terms of Use also specifically provide that, in the event of a bankruptcy, each account holder will have claims "as a creditor of Celsius." *Id.* § 13.3.

- The Terms of Use consistently impose obligations to return account holders' Digital Assets on the collectively-defined "Celsius," rather than any individual Celsius entity. For instance, Section 4.D of the Terms of Use, which concerns the Earn program, states that the account holder "may terminate any loan to Celsius at any time, and request that Celsius return the borrowed Eligible Digital Assets." *Id.* § 4.D.

- Section 11 of the Terms of Use, relating to the withdrawal process, states that the account holder has a "call option on all loans made to Celsius to demand immediate, complete or partial repayment of any loan at any time[.]" *Id.* § 11.

Opening Brief at ¶¶ 16-22.

4.       It is also clear that the inclusion of Celsius Network LLC's "Affiliates" in the defined term "Celsius" was intentional.  Versions 1 through 5 of the Terms of Use were between Celsius Networks Ltd.—defined in those versions as "Celsius"—and its customers.  Version 6 of the Terms of Use amended the defined term "Celsius" from "Celsius Networks Ltd."—a single entity—to "Celsius Networks LLC and its Affiliates."  Version 6 § 1.  Moreover, the Terms of Use at times refer to specific Celsius entities rather than the collective term "Celsius."  *See, e.g.*, Terms of Use § 1 ("Services provided in connection with specific Eligible Digital Assets . . . are provided by the Affiliate Celsius EU UAB.").

5.       The Series B Preferred Holders do not dispute that each Debtor is an Affiliate of Celsius Network LLC or that the defined term "Celsius" includes every Debtor entity in these Chapter 11 Cases.  Rather, they argue that it should be read differently in one provision— "Indemnification and Limitation of Liability"—which the Series B Preferred Holders contend is

---

[4] Versions 6 and 8 of the Terms of Use are attached as Exhibits 1 and 2, respectively, to the *Declaration of Aaron Colodny in Support of The Official Committee of Unsecured Creditors' Opening Brief Regarding Debtors that are Liable to Account Holders Under the Global Contract (the "Terms of Use") Between Celsius and Account Holders* [D.I. 1798].

rendered meaningless or superfluous if "Celsius" is read to include "Affiliates." That is not how contracts are read or interpreted. The Limitation of Liability explicitly provides account holders with recourse against "Celsius" including all of its Affiliates. It then provides that Affiliates of Celsius are excluded. The exclusion of "Affiliates" of Celsius in that provision does not conflict with the concept that account holders have recourse against each Debtor. Rather, it excludes Affiliates of "Celsius Networks LLC and its Affiliates." Such Affiliates of Celsius include funds, trusts and companies owned or controlled by Celsius' equity holders, and it is perfectly logical that Celsius would seek to shield those third parties from liability. Facing the choice between the Series B Preferred Holders' interpretation—which requires the Court to re-write the Terms of Use—and the Debtors' and the Committee's interpretation—which allows the Court to preserve the Terms of Use as written—the Court must adopt the Debtors' and the Committee's interpretation.

6.    Finally, despite choosing not to develop the factual record (and blocking the Debtors and the Committee from doing so), the Series B Preferred Holders' opening brief cites certain extrinsic evidence that they argue bolsters their position.[5] Although the Committee believes that the limited and undeveloped record relied on by the Series B Preferred Holders is irrelevant to the Court's consideration of this issue, as discussed below, that record fails to contradict the unambiguous language of the Terms of Use. Put simply, the Series B Preferred Holders rely on hand-picked evidence that was only knowable to the Debtors. The Series B Preferred Holders also point to a screenshot that was presented to a little more than half of the Debtors' customers. The Debtors' unexpressed subjective intent is not relevant to whether there was a meeting of the minds between the Debtors and its customers. Celsius always represented

---

[5] *Series B Preferred Holders' Opening Brief on the Issue of Which Debtors Are Liable to Customers under the Terms of Use* [D.I. 1795] (the "**Pref. Brief**").

that its diverse assets, including Celsius Mining and GK8, Ltd., would benefit its customers. The plain language of the Terms of Use implements that in an unambiguous manner. The extrinsic evidence cannot alter that common sense reading of the unambiguous language of the Terms of Use.

7.      The Terms of Use are a contract of adhesion which must be construed in favor of the account holders, who were presented with the take-it-or-leave-it form and not provided with any opportunity to negotiate. Extrinsic evidence not known or knowable to account holders should not and cannot be used to vary the plain language of the Terms of Use.

<u>**Argument**</u>

**I.      The Plain Language of the Terms of Use Provides That Account Holders Can Assert Claims Against All Debtor Entities.**

8.      As the Debtors and Committee demonstrated in their Opening Briefs (Opening Brief ¶¶ 16-22; Debtors' Opening Brief ¶¶ 18-29), the Terms of Use unambiguously provide that account holders can assert claims against every Debtor entity. The defined term "Celsius," meaning "Celsius Network LLC ***and its Affiliates***," is used repeatedly throughout the Terms of Use to confer rights and obligation of account holders against "Celsius." *See* ¶ 2, *supra*. Indeed, the Terms of Use specifically provide that, in the event of a bankruptcy, account holders will be "creditors of Celsius." Terms of Use § 13.3. That specific provision controls and ends the inquiry. *Herr v. Herr*, 949 N.Y.S.2d 786, 789 (App. Div. 3rd Dept. 2012) ("[W]here a contract . . . employs contradictory language, specific provisions control over general provisions.").

9.      Nowhere do the Terms of Use state that account holders' claims would be limited to only certain Celsius entities in the event of bankruptcy. If such a severe restraint on the rights of account holders had been intended, it would have (and must have) been stated explicitly, rather than not at all. Additionally, in certain provisions, the Terms of Use designate particular Celsius

entities rather than the defined term "Celsius," showing that Celsius knew how to identify

individual Celsius entities if it wanted to.[6]

## II.    The Debtors' and Committee's Reading of the Limitation of Liability Provision Does Not Render That Provision Superfluous.  Rather, It Makes Sense and Harmonizes It with the Rest of the Agreement.

10.    In contrast to the many terms supporting the Debtors' and the Committee's position,

the Series B Preferred Holders identify just one provision—the "Indemnification and Limitation

of Liability" provision—on which to rest their case.  That provision provides, in pertinent part:

> [I]n no event shall you have any recourse, whether by setoff or otherwise, with respect to our obligations, to or against any assets of any person or entity ***other than Celsius***, including, without limitation, any member, shareholder, Affiliate, investor, employee, officer, director, agent or advisor of Celsius.

Terms of Use § 25 (emphasis added).  The Series B Preferred Holders argue that, because the terms

"Celsius" and "Affiliates" are both used in that provision, "Celsius" must be read to mean only

Celsius Network LLC, or the term "Affiliates" is rendered superfluous.  Pref. Br. ¶ 29.  That

argument lacks merit.

11.    As an initial matter, the Series B Preferred Holders cite nothing in the Terms of Use

that would support giving the word "Celsius" anything other than its defined meaning—Celsius

Network LLC and its Affiliates.  Nowhere do the Terms of Use state that "Celsius" can mean

anything other than its express definition, much less "Celsius Network LLC."  *See Soto v. DRT*

*Aero., LLC*, No. 3:19-cv-1968, 2022 WL 4448891, at *5 (D. Conn. Sept. 23, 2022) ("when parties

to a contract have given a word a specific meaning by expressly defining it in the contract, that

definition will generally override the ordinary definition.").  Indeed, the defined term "Celsius"

appears over 270 times in the Terms of Use.[7]  The Series B Preferred Holders do not argue that

---

[6] *See, e.g.*, Terms of Use § 1 (stating that "[s]ervices provided in connection with specific Eligible Digital Assets . . . are provided by the Affiliate Celsius EU UAB").

[7] This number excludes phrases like "Celsius Account" and "Celsius Services."  When counted, those uses

any of those uses of "Celsius" means "Celsius Network LLC," except for the one that they've cherry-picked in their attempt to recover ahead of the Debtors' creditors.

12.    The Series B Preferred Holders argue that "[t]he language in section 25 of the Terms of Use is plain and should be given its ordinary meaning." Pref. Brief at ¶ 26. The Debtors and Committee agree: "Celsius" is an expressly defined term in the opening sentence of the Terms of Use that should be given its plain meaning. Confusingly, after making a "plain meaning" argument, the Series B Preferred Holders argue the opposite: that the use of "'Celsius' in section 25 must be read to be limited to LLC, as that is the entity that has 'obligations' to Customers, leaving CNL and other Affiliates free from Customer liabilities." Pref. Brief at ¶ 26. But the Series B Preferred Holders cite nothing in the Terms of Use to support this interpretation. In fact, all provisions of the Terms of Use that concern obligations to Account Holders and their rights in bankruptcy refer to the collectively-defined "Celsius." The Series B Preferred Holders make no argument that those provisions apply only to Celsius Network LLC—because they plainly do not.

13.    Nor does the Debtors' and Committee's interpretation of the "Indemnification and Limitation of Liability" provision render the term "Affiliates," as used in that sentence, superfluous. Affiliates, as used in that provision, means Affiliates of "Celsius." In other words, the "Indemnification and Limitation of Liability" provision prevents customers from asserting claims against Affiliates of Affiliates of Celsius Networks, LLC—a protection against liability that makes sense in the context of the agreement. Moreover, even if there were no existing Affiliates of Celsius, the Committee's and Debtors' interpretation would still be valid. Parties routinely draft contractual provisions regarding entities that do not exist at the time of drafting, such as a will that

---

increase the number to more than 450.

bequeaths assets to an unborn heir. It makes perfect sense that the Company would want to limit Affiliates of Celsius from direct contractual liability.

14.    Finally, even if the Series B Preferred Holders' reading of the Terms of Use had merit (and it does not), where a contract provision lends itself to two valid interpretations, a court must choose the construction that harmonizes the contract provisions. *Alpha Capital Anstalt v. Real Goods Solar, Inc.,* 311 F. Supp. 3d 623, 629 (S.D.N.Y. 2018) (citing *Gessin Elec. Contractors, Inc. v. 95 Wall Assocs., LLC*, 903 N.Y.S.2d 26 (App. Div. 1st Dept. 2010)) ("The courts should construe a contract in a manner that avoids inconsistencies and reasonably harmonizes its terms."); *see also Ross v. Thomas*, 728 F. Supp. 2d 274, 282 (S.D.N.Y. 2010) ("[W]here a contract provision lends itself to two interpretations, a court will not adopt [an] interpretation that leads to unreasonable results, but instead will adopt the construction that is reasonable and that harmonizes the affected contract provisions."). Here, the Debtors' and Committee's interpretation harmonizes all provisions of the Terms of Use and make logical sense. By contrast, the Series B Preferred Holders' interpretation requires the Court to alter the language of the contract to fit their argument. The Debtors' and Committee's interpretation must therefore prevail.

## III. The Extrinsic Evidence That the Series B Preferred Holders Identify in Their Opening Brief Should Not Be Considered, and in Any Case Does Not Change the Plain Meaning of the Terms of Use.

15.    As noted above, the parties all agree that the Terms of Use are unambiguous and have not sought to develop the evidentiary record—or in the case of the Series B Preferred Holders, blocked the Committee from developing the record. Extrinsic evidence is therefore irrelevant. Nonetheless, should the Court consider such evidence (and it should not), that evidence does not contradict the plain language of the Terms of Use providing that customers may assert claims against every Debtor entity.

8

**A.    The Account Holders' Acceptance of Version 6 of the Terms of Use Did Not Extinguish the Account Holders' Claims.**

16.    The Series B Preferred Holders argue that the account holders released Celsius Network Limited when they agreed to version 6 of the Terms of Use.  However, they do not point to any language in the Terms of Use or otherwise that effected that release.  If the Debtors' intended for account holders to release their claims, that release must have been stated explicitly, rather than not at all.  *Elbit Sys. v. Credit Suisse Grp.*, 842 F. Supp. 2d 733, 739 (S.D.N.Y. 2012) ("A release will not be given effect unless it contains an 'explicit, unequivocal statement of a present promise to release [a party] from liability.'")  Moreover, as discussed above, version 6 of the Terms of Use *preserves*, rather than releases, account holders' claims against Celsius Network Limited by providing that Celsius Network LLC *and its Affiliates*—including Celsius Network Limited—are liable to the account holders.  And this agreement was intentional.  Version 6 of the Terms of Use amended the definition of "Celsius" from "Celsius Network Ltd."—a single entity—to "Celsius Network LLC and its Affiliates."  Version 6 § 1.

**B.    The Account Holders' Acknowledgement of the Terms of Use Does Not Change the Terms of Use.**

17.    Part of the extrinsic evidence submitted with the Series B Preferred Holders' opening brief is a checkbox that popped up when existing account holders were asked to accept version 6 of the Terms of Use in July and August 2021.  This checkbox provides, "I acknowledge that under the new TOU, the services will be provided to me by Celsius Network LLC, and that Celsius Network Limited shall transfer to Celsius Network LLC my data, account balance, and its rights and obligations to me."  This checkbox does not contradict the plain meaning of the Terms of Use.

18.    As an initial matter, the Series B Preferred Holders include a screen shot of only one of the checkboxes, and selectively omit the other two.  *See* Pref. Brief at 3.  That is because

9

those other checkboxes vitiate their argument.  The full image displayed to Celsius users on the

app after version 6 of the Terms of Use was adopted is as follows:



The same checkboxes appeared when users accessed Celsius from a web browser:



*See Declaration of Oren Blonstein, Head of Innovation and Chief Compliance Officer of the Debtors, in Support of the Debtors' Motion Regarding Ownership of Earn Asset and the Sale of Stablecoin* [Docket No. 1327] (the "**Blonstein Decl.**"), Ex. A.

19.     As shown above—and as omitted from the Series B Preferred Holders' opening brief—the first checkbox that account holders were required to accept confirms that they have

"read and agreed to the new Terms of Use" in their entirety. *See id.* Thus, far from altering the Terms of Use, these checkboxes confirm that the Terms of Use control the parties' agreement.

20.     Moreover, the third checkbox, on which the Series B Preferred Holders rely, does not say that customers have released or cancelled claims against Celsius Network Limited (or even that all obligations have been transferred, which in itself would be insufficient to release customer claims). A party to a contract may assign its obligations to a related party, but that does not mean that the contractual counterparty has released its claims against the original contract party. In that instance, if the assignee does not perform, the counterparty would look to the entity with the obligation—the assignor. That is particularly true, where, as here, the plain language of the underlying contract—the Terms of Use—provided that all Affiliates of Celsius Network, LLC would continue to be liable and that customers would have claims against each of those entities. Moreover, as the Series B Preferred Holders acknowledge, the checkbox was shown to only 55% of Account Holders who accepted the terms of use on or about July and August 2021. The other 44% of Account Holders who signed up after the release of version 6 of the Terms of Use never saw or checked that box.

21.     The third checkbox also does not say that it in any way modifies the full Terms of Use that the account holder just accepted. Indeed, it would be absurd for Celsius to require account holders to read and accept the full Terms of Use and then modify those Terms of Use with a one-sentence checkbox. The Court should reject that argument. *See Pioneer Valley Concrete Serv. V. Jag I, LLC*, No. 1:10-CV-1311, 2013 U.S. Dist. LEXIS 169361, at *35, 36 (N.D.N.Y. Dec. 2, 2013) ("even were the Court to consider such extrinsic evidence, it cannot be used to vary or contradict the plain language of the contract").

**C.    The Other Extrinsic Evidence on Which the Series B Preferred Holders
Purport to Rely Does Not Contradict the Plain Language of the Terms of Use.**

22.    Straining to overcome the plain language of the Terms of Use, the Series B
Preferred Holders cite various confidential documents that were shown to prospective investors
and government entities.  None of it supports their position.

23.    The Series B Preferred Holders argue that the Terms of Use were not intended to
allow customers to assert claims against each Debtor entity because "the intent of the parties" was
that there would be a "migration of the Customer-facing business away from CNL to LLC[.]"  Pref.
Brief ¶ 4.  The Series B Preferred Holders even create the defined term "Migration" to describe
this event.  *Id.*  But the Series B Preferred Holders do not cite any evidence that the "Migration"
actually happened.  Nor does such evidence exist.  The Committee requested that the Debtors
produce "[a]ll Documents relating to or evidencing the transfer of cryptocurrency assets or
cryptocurrency wallets from CNL to Celsius Network, LLC."  In response, the Debtors stated that
"there are no additional, non-privileged responsive documents beyond what is publicly available."
Debtors' R&Os to RFP No. 2, attached hereto as **Exhibit 1.**  In other words, the Debtors produced
zero records demonstrating the actual "migration" or movement of cryptocurrency assets from
CNL to Celsius Network LLC—because that "migration" never occurred.  The sole contractual
support the Series B Preferred Holders point to is a "Novation Agreement" that is unexecuted in
the form identified by the Series B Preferred Holders and appears to have never been executed.
*See* Pref. Brief ¶ 33.  The Series B Preferred Holders fail to explain why, if the parties intended to
limit customer claims by taking certain actions, they failed to take those actions.

24.    The Series B Preferred Holders also cite "numerous presentations and documents
to hundreds of potential investors and/or Mining's Board of Directors in connection with the
contemplated capital raise and IPO for the mining business," which purportedly do not reflect any

customer liability at Mining.   Pref. Brief ¶ 37.  Not only is this evidence irrelevant,[8] but "extrinsic evidence of one party's undisclosed, subjective understanding, intent, or opinion about the meaning of ambiguous contract language cannot be used to substantiate a particular interpretation of that language."  *Gillis v. Respond Power, LLC*, 677 F. App'x 752, 756 (3d Cir. 2017) (cleaned up); *see also Oritani Sav. & Loan Ass'n v. Fid. & Deposit Co.*, 744 F. Supp. 1311, 1315 (D.N.J. 1990) ("the subjective intent of a person drafting a contract is not, by any means, determinative as to the meaning of the contract especially where, as here, the contract is one of adhesion.  This principle is so well-settled it does not require further citation of authority.").  Furthermore, there is no evidence showing that the presentations and documents that the Series B Preferred Holders rely on were ever shared with the account holders, and they therefore cannot be regarded as modifying the terms of the account holders' agreement with the Debtors.  In sum, these statements to third-parties are wholly irrelevant to the proper interpretation of a contract between Celsius and its account holders.

25.     By contrast, what *is* relevant is what Celsius told account holders, particularly when those statements are consistent with the language of the Terms of Use—which is the exact opposite of the meaning urged by the Series B Preferred Holders.  Specifically, in a public "Ask Mashinsky Anything" video published on the Celsius Network, Mr. Mashinsky explained that the mining business benefitted the community and stated that "it is another source of yield for us," and "it is

---

[8] Indeed, in response to the Committee's requests for the production of documents and interrogatories in connection with the Briefed Legal Issue, the Series B Preferred Holders have taken the position that documents and communications (i) regarding any investment in the Debtors by the Series B Preferred Holders, (ii) shared or exchanged between the Debtors and the Series B Preferred Holders in connection with any such investment, (iii) regarding diligence materials retained by the Series B Preferred Holders in connection with any such investment, or (iv) identifying individuals with knowledge of the same, are "wholly irrelevant to the Briefed Legal Issue," and were withheld on that basis.  Series B Preferred Holders' R&O to RFP Nos. 1-3; R&O to Interrogatory Nos. 8-9 (attached hereto as **Exhibit 2**).  As such, the Series B Preferred Holders' reliance on these Mining documents, and any other Celsius documents the Series B Preferred Holders obtained through or in connection with their investments in the Debtors, should be disregarded.

a factory that makes Bitcoin, we pay most of our interest in Bitcoin . . . it's just one-to-one exposure reduction for us."[9] In another such video, Mr. Mashinsky explained the rationale behind Celsius' increased investment and stated "for us to have sustainable ways to pay yield, we need also sustainable ways to earn yield."[10] Each of these statements are representations to customers that the mining assets would be available to support Celsius' customer obligations, consistent with the meaning of the Terms of Use being advanced by the Debtors and the Committee. To the extent the court considers extrinsic evidence, these statements to *customers* are relevant to interpreting Celsius' agreement with them. *See Gillis*, 677 F. App'x at 756.

26.  Finally, the Series B Preferred Holders purport to rely on various statements that the Debtors have made during these Chapter 11 Cases as allegedly evidencing the Debtors' belief that customer claims are not allowed against each Debtor. The Series B Preferred Holders rely on negative inferences and innuendo based on what they allege the Debtors *did not* say in these Chapter 11 Cases (*see* Pref. Brief ¶¶ 39-49). The Series B Preferred Holders ignore that the Debtors initially sought to be neutral on this issue in their Schedules of Assets and Liabilities and now, when the issue has been further developed and brought before the Court, have given a clear statement of their view: customer claims are allowable against every Debtor. *See generally Debtors' Opening Brief Regarding Account Holders' Claims Issues* [D.I. 1799]. The best evidence of the Debtors' position on this issue is their direct statements on it—which unequivocally support that customers have claims against each Debtor entity.

---

[9] Celsius Network, uploaded June 28, 2021, *Celsius mining Bitcoin helps the company and the community* [video] (available at https://www.youtube.com/watch?app=desktop&v=nQ352qf1fzI)

[10] Celsius Network, uploaded Feb. 7, 2022, *What Does Investment in Bitcoin Mining Mean for Celsius?* [video] (available at https://www.youtube.com/watch?v=ymHIfpxXv04).

27.    Put simply, the extrinsic evidence presented by the Series B Preferred Holders is not probative.  What is probative is the deliberate choice to change the contracting entity from one party—Celsius Network Ltd.—to multiple parties—Celsius Network, LLC **and its Affiliates**.  What also is probative is Mr. Mashinsky's repeated comments that Celsius' mining assets were available to support its customers' claims.  To the extent there is any further ambiguity it must be construed in favor of the account holders.  *Westchester Resco Co. v. New England Reinsurance Corp.*, 818 F.2d 2, 3 (2d Cir. 1987) (where an ambiguity exists in a standard-form contract supplied by one of the parties, the ambiguity is to be construed in favor of the non-drafting party); *Ward v. TheLadders.com, Inc.*, 3 F. Supp. 3d 151, 161 (S.D.N.Y. 2014) ("Under the doctrine of *contra proferentem*, it is a basic principle of contract law that a written document is to be construed against the party who prepared it where there are contradictory provisions.  The doctrine is particularly applicable in cases like this one, in which a consumer agreed to a form contract that the consumer neither drafted nor negotiated." (internal citations and brackets omitted)).  The Series B Preferred Holders' argument would have the Debtors' attempt to avoid regulatory scrutiny silently and dramatically change customers' rights and separate those customers from the assets that their funds were used to purchase.  But that is not what the Terms of Use said or did, and the account holders—who had no ability to negotiate that contract—should not be held to an agreement they never made.

[*Remainder of This Page Intentionally Left Blank*]

16

Dated:   January 31, 2023                      Respectfully submitted,
         New York, New York


                                               /s/ Aaron E. Colodny
                                               **WHITE & CASE LLP**
                                               David M. Turetsky
                                               Kimberly A. Havlin
                                               Samuel P. Hershey
                                               1221 Avenue of the Americas
                                               New York, New York 10020
                                               Telephone: (212) 819-8200
                                               Facsimile:  (212) 354-8113
                                               Email:  david.turetsky@whitecase.com
                                                       kim.havlin@whitecase.com
                                                       sam.hershey@whitecase.com

                                               – and –

                                               **WHITE & CASE LLP**
                                               Michael C. Andolina (admitted *pro hac vice*)
                                               Gregory F. Pesce (admitted *pro hac vice*)
                                               111 South Wacker Drive, Suite 5100
                                               Chicago, Illinois 60606
                                               Telephone: (312) 881-5400
                                               Facsimile:  (312) 881-5450
                                               Email:  mandolina@whitecase.com
                                                       gregory.pesce@whitecase.com

                                               – and –

                                               **WHITE & CASE LLP**
                                               Keith H. Wofford
                                               Southeast Financial Center
                                               200 South Biscayne Blvd., Suite 4900
                                               Miami, Florida 33131
                                               Telephone: (305) 371-2700
                                               Facsimile:  (305) 358-5744
                                               Email: kwofford@whitecase.com

                                               – and –

                                               **WHITE & CASE LLP**
                                               Aaron E. Colodny (admitted *pro hac vice*)
                                               555 South Flower Street, Suite 2700
                                               Los Angeles, California 90071
                                               Telephone: (213) 620-7700
                                               Facsimile:  (213) 452-2329
                                               Email:  aaron.colodny@whitecase.com

                                               *Counsel to the Official Committee of Unsecured
                                               Creditors*

                                               **SELENDY GAY ELSBERG PLLC**
                                               Jennifer M. Selendy
                                               Faith E. Gay

17

Claire O'Brien
1290 Avenue of the Americas
New York, NY  10104
Tel: 212-390-9000
Email: jselendy@selendygay.com
      fgay@selendygay.com
      cobrien@selendygay.com

*Proposed Co-Counsel to the Official
Committee of Unsecured Creditors*