

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 22-10964-mg

4    Adv. Case No. 22-01139-mg

5    - - - - - - - - - - - - - - - - - - - - - - - - - - x

6    In the Matter of:

7

8    CELSIUS NETWORK, LLC,

9

10              Debtor.

11   - - - - - - - - - - - - - - - - - - - - - - - - - - x

12   CELSIUS NETWORK LIMITED, et al.,

13                  Plaintiff,

14          v.

15   STONE, et al.,

16                  Defendants.

17   - - - - - - - - - - - - - - - - - - - - - - - - - - x

18                  United States Bankruptcy Court

19                  One Bowling Green

20                  New York, NY  10004

21

22                  January 12, 2023

23                  8:58 AM

24

25

1    B E F O R E :

2    HON MARTIN GLENN

3    U.S. BANKRUPTCY JUDGE

4

5    ECRO:   KAREN

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1    HEARING re Adversary Proceeding: 22-01139-mg Celsius Network

2    Limited et al v. Stone et al Hybrid Evidentiary Hearing RE:

3    Motion of Plaintiffs for Preliminary Injunction Pursuant to

4    Rule 7065 of the Federal Rules of Bankruptcy Procedure. (Doc

5    # 20 to 25, 27 to 29, 32 to 34, 42 to 45, 51 to 53, 57, 58)

6    Hybrid Evidentiary Hearing Scheduled for 1/11/22 at 9 AM &

7    1/12/22 at 9 AM.

8

9    HEARING re Hearing Using Zoom for Government RE:  Motion of

10   Plaintiffs for Preliminary Injunction Pursuant to Rule 7065

11   of the Federal Rules of Bankruptcy Procedure (Doc# 1353 to

12   1358, 1361) Going Forward on 01/11/2023 at 9:00 am and

13   01/12/2023 at 9:00 am

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    AKIN GUMP STRAUSS HAUER & FELD, LLP

4        Attorneys for the Plaintiffs Celsius Network Limited

5        One Bryant Park

6        Bank of America Tower

7        New York, NY 10036

8

9    BY:  MITCH HURLEY

10       DEAN CHAPMAN

11       ELIZABETH SCOTT

12       JESSICA MANNON

13

14   KYLE ROCHE P.A.

15       Attorneys for KeyFi, Stone

16       260 Madison Avenue, 8th Floor

17       New York, NY 10016

18

19   BY:  KYLE WILLIAM ROCHE

20       VEL FREEDMAN

21

22

23

24

25

Page 5

```
 1                      P R O C E E D I N G S
 2               BAILIFF:  All set.
 3               THE COURT:  Thank you.
 4               CLERK:  All right.  Go ahead and pause.
 5               THE COURT:  All right, let me ask you, is everyone
 6       ready to proceed (indiscernible)?
 7               MR. HURLEY:  Yes, Your Honor, for plaintiffs.
 8               MR. FREEDMAN:  Yes, Your Honor, for defendants.
 9               THE COURT:  All right.  Okay.  We had a long day
10       yes -- let me start by saying I appreciated everybody's
11       efforts yesterday.  It was a long day, and I'm glad we
12       finished the evidence yesterday.  Let me just repeat a
13       little of what I said yesterday, because we have a number of
14       people, creditors or others, who were appearing by Zoom
15       again today if you were here yesterday during the
16       evidentiary phase.
17               I'll only recognize the lawyers who were counsel
18       of record in this case during the hearing today.  Everyone
19       else should remain mute.  If anyone interferes with the
20       proceeding, they will be cut off.  I think everything from
21       my standpoint went smoothly yesterday.
22               So, let's proceed.  Mr. Hurley, do you want to
23       begin?
24               CLERK:  Judge, I think we need everyone to make
25       appearances at the (indiscernible).
```

Page 6

1          THE COURT:  We do.  You're right, Jen.  Thank you.

2   Go ahead.  Let me get the appearances of counsel first for

3   the plaintiff.

4          MR. HURLEY:  Mitch Hurley with Akin Gump Strauss

5   Hauer & Feld on behalf of the plaintiffs, and with me at

6   counsel table are Dean Chapman and Lizzy Scott.

7          THE COURT:  Okay.  Mr. Roche?

8          MR. FREEDMAN:  Good morning, Your Honor.  Vel

9   Freedman and with me is co-counsel Kyle Roche

10  (indiscernible) --

11          THE COURT:  All right.

12          MR. FREEDMAN:  -- for defendants.

13          THE COURT:  Thank you very much.  Okay.  Go ahead,

14  Mr. Hurley.

15          MR. HURLEY:  Thank you, Your Honor.  Again for the

16  record it's Mitch Hurley with Akin Gump Strauss Hauer & Feld

17  for the plaintiffs.  Your Honor, Celsius submits that the

18  status quo injunction it seeks should be granted.  Celsius

19  again is asking only for an injunction that will preserve

20  assets that the defendants admit they took out of Celsius'

21  wallets and transferred to their own temporarily for the

22  period of time that it takes to resolve this action so that

23  those assets are available to satisfy a judgment in the

24  event one is entered.

25          THE COURT:  Let me ask you this question, Mr.

Page 7

1    Hurley, and I hope you'll talk more about this during your

2    closing.  When you say the assets they took from Celsius'

3    wallets, are you talking about those assets that were

4    removed from Celsius' wallets after Mr. Stone resigned from

5    this (indiscernible)?

6            MR. HURLEY:  No, Your Honor.  I'm talking about

7    the -- all of the transactions that were unauthorized that

8    they engaged in in Celsius' wallets, which we submit are --

9    include substantial numbers of transactions that long

10   predate the March 9th resignation.

11           And I will talk about this more, Your Honor, but

12   what the defendants have to do respectfully is establish

13   some evidence for their affirmative defense, which is that

14   those transfers were actually authorized, and there is no

15   evidence for that at all, certainly not the contracts.  I

16   mean, that's why they have to come up with this story about

17   Alex Mashinsky --

18           THE COURT:  Oh, you can't -- it's a question for

19   the Court to evaluate the evidence, but you say no evidence,

20   but the evidence is Mr. Stone's testimony, disputed yes, but

21   Mr. Stone's testimony that Mr. Mashinsky authorized him to

22   take an advance on his profit share.  You may not agree with

23   the -- with his testimony.  You certainly challenged it in

24   cross-examination, but do you agree that that is the

25   evidence that the defendants are relying on for the

Page 8

1    withdrawals from the Celsius wallet before Mr. Stone

2    resigned?

3            MR. HURLEY:  We are, and I think that's a great

4    question and great point, because as far as I know, they're

5    relying on that evidence for both the pre-March 9th

6    transfers and the post-March 9th transfers.

7            They continue to say that the property they took

8    after he resigned, the property that he took after March

9    26th and our demand letter, was still authorized, okay?

10   That is an incredible assertion, and what does it tell you

11   about the credibility --

12           THE COURT:  Okay, you can -- I'll give you a

13   chance to argue about it being incredible.  That's why I

14   want to separate out -- let -- okay, let's deal first with

15   respect to the withdrawals that were made while Mr. Stone

16   was still with Celsius KeyFi.

17           You're -- do you agree that the only evidence they

18   offered yesterday to support those withdrawal -- I guess

19   it's two things.  One would be alleged oral authorization

20   from Mr. Mashinsky, that they were relying on that early,

21   right?

22           MR. HURLEY:  Correct.

23           RON CUCCHIARO:  All right.  They also pointed to

24   provisions in the agreement that gave them authority to pay

25   expenses, I think up to $50,000, without further authority.

Page 9

1    Am I correct in that?

2            MR. HURLEY:  They did point to that provision,

3    Your Honor.  They did not identify in the spreadsheet, the

4    sworn statement they provided, which of the transactions

5    they believed fall into that category.  So, I think some

6    more work is going to be required to understand what they

7    claim was authorized by that part of the agreement as

8    opposed to what was authorized by Mashinsky.  But so far

9    they haven't -- they actually haven't specific -- sorry, go

10   ahead.

11           THE COURT:  No, I  -- do you agree that they --

12   that Stone did have authority to pay expenses up to $50,000

13   without further authority -- without further authorization

14   from Celsius, at least during the time before he resigned?

15           MR. HURLEY:  Well, it wouldn't be the whole time

16   before he resigned, right?  Because that agreement only came

17   into place on January 11th.  So, if there -- if that

18   authority existed, it was for a very limited period of time.

19           Again, the specific transactions they claim fall

20   into this category haven't been identified for us to study,

21   and I think some more work is going to have to be done to

22   understand exactly what claim they're making in that regard.

23           THE COURT:  The evidence -- the evidence is

24   closed.  So, the issue is any of the spreadsheets that were

25   introduced.  I don't know whether anybody has tried to look

Page 10

1      to see how many -- you know, what expenses were less than

2      50,000 -- fell within the time period that the agreement

3      gave them authority to pay expenses without further

4      authorization up to $50,000.

5            No one -- certainly no one yesterday specifically

6      pointed to it, but there are spreadsheets that are in

7      evidence and I don't -- I didn't try and separate out last

8      night which items were less than $50,000, et cetera.

9            MR. HURLEY:  I mean, there are spreadsheets in

10     evidence, Your Honor, but I guess I would remind the Court

11     that Mr. Stone put in a sworn affidavit describing what

12     those spreadsheets provide, and what he said was merely

13     those are transfers in Celsius wallets to the defendant's

14     wallets, and he did not take the further step of trying to

15     identify, hey, here's some that don't fall in the category

16     that should be subject to this injunction.

17           THE COURT:  Well, I don't remember the dates that

18     they -- but there were some things -- there were some

19     entries in a column.  It was somewhat ambiguous, perhaps,

20     but that, you know, rent.

21           MR. HURLEY:  Right.  He would have some things

22     that indicated spent on expenses and then when we dug

23     further, we found out that the expense was the repayment of

24     a personal loan for Jason Stone or it was his rent, right,

25     and the original spreadsheet didn't even tell us the rent

Page 11

1    part.

2                  THE COURT:  Let me ask you.  Did -- have you

3    broken down the totals of what was with -- what you say was

4    drawn -- withdrawn without authorization pre-resignation and

5    post-resignation?  Because I am -- I'm very -- look, and you

6    can -- I'm open -- I'm playing devil's advocate to some

7    extent on this.

8                  They've made at least a colorable showing that

9    there was an agreement between the parties that provided for

10   profit share for Stone.  I heard a lot of evidence and

11   argument yesterday about, well, they've never really put in

12   evidence of what the prophets were.  Celsius now disputes

13   that there were any profits, but that's what typically is

14   involved, you know, in an accounting.

15                 And certainly their state court lawsuit, you know,

16   I heard evidence yesterday that they demanded an accounting.

17   Celsius never responded, and you know, that strikes me

18   (indiscernible) you know, that seems like the garden variety

19   breach of contract accounting issue between Stone and

20   Celsius that would -- you know, in my mind would cover

21   perhaps the -- would cover the period before he resigned.

22                 But before you -- let me -- let me finish my

23   thought.  The one thing, and certainly I don't know whether

24   Mr. Freedman or Mr. Roche is the one who's going to make the

25   closing argument here, but I sure don't see any self -- what

Page 12

1    I would describe as a self-help provisions in any agreement

2    that say, well, I think I got a claim against Celsius, I'll

3    just take the money.

4            You know, there's nothing in there.  There may be

5    a contract dispute as we think we're entitled to profits --

6    the profit share of X.  They know.  But there's nothing in

7    there other than the alleged authorization from Mashinsky to

8    take an advance on it.  There's a credibility issue on that.

9            If I were to conclude there was no authorization,

10    they used self-help -- they basically took the money, and

11    I'm trying to understand how much did they take before the

12    resignation, how much did they take after the resignation.

13    Let me stop there.

14            Go ahead, Mr. Hurley.

15            MR. HURLEY:  We can certainly get that information

16    to you.  I don't have the exact amount at my fingertips

17    right now.  But if I could respond to a couple of the points

18    that you asked about, sir?

19            Okay.  So, maybe I'll start with where you left

20    off which is the question of self-help.  Okay?  And you're

21    100 percent right.  You have a services agreement that was

22    entered into on January 11, 2021 that contemplates the

23    possibility of profits, right?  That doesn't mean a profit

24    share will be paid.

25            Of course, first you have to generate profits and

Page 13

1    there's a dispute about whether profits were generated, and

2    I'll come back to that in my -- later in my presentation.

3    But more importantly, Your Honor, and I think you're hitting

4    the nail right on the head, even if they could show, and we

5    submit they can't and didn't, but even if they could show

6    that they had actually earned profits, that doesn't mean

7    they get to exercise self-help.

8           I mean, think about the CFO of a corporation who

9    has an employment agreement that calls for them to get a

10   million dollar bonus if they meet certain targets at the end

11   of the year.  That doesn't mean the CFO gets to go at the

12   end of the year and use their signing authority over the

13   corporate bank account to take a million dollars out of the

14   account and pay themselves, and that's effectively what they

15   did here, right?

16          And they know that the contract doesn't authorize

17   them to do that.  How do we know that they know that?

18   Because they come to you with this story about Alex

19   Mashinsky having orally authorized it.  If the contracts

20   authorize it, they wouldn't need the Mashinsky story.  But

21   of course the contract doesn't authorize that.  Contracts

22   don't work that way and this contract doesn't work that way.

23   Specifically, it provides that if there are profits, they

24   will be paid by Celsius Network to Celsius KeyFi and

25   distributed from there, and that's the way it works.

Page 14

1          Okay, so that's on the profit share.  I think it's

2     also important when you're talking about these transfers to

3     think about the time frames we're talking about.  So, any

4     transfer before January 11, 2021 for instance, Your Honor,

5     would have been during the period of time that the October

6     7th service agreement was in place, and we went through the

7     compensation provisions in that agreement, which was between

8     Celsius and KeyFi, Inc., and they said specifically there

9     are going to be some cash payments for the services and

10    those are the only compensation that KeyFi is entitled to

11    for services provided during that period of time.

12         And you heard Mr. Stone testify yesterday Celsius

13    made those payments.  So, during that period of time

14    payments have been made, and that agreement and the service

15    agreement both are integrated.  They both have clauses that

16    say there's no oral modifications.

17         So, yeah, we submit that the agreements certainly

18    don't allow for it, and you know, the evidence of an oral

19    modification we think is weak, and even if it was there, it

20    would be contrary to those agreements.  With respect to --

21         THE COURT:  Well, I don't (indiscernible) matter

22    of corporate governance given the amounts that were

23    involved.  Does one person, even the CEO, have the authority

24    to authorize -- I don't know whether it would have required

25    board approval or -- you know, in most --

1               MR. HURLEY:  I -- that's --

2               THE COURT:  -- cases, the CEO can't just decide

3       I'm going to pay millions of dollars to somebody, another

4       executive.

5               MR. HURLEY:  Also true.

6               Regarding the accounting, I mean, there's a couple

7       of points on this, Your Honor.  First of all, how is Celsius

8       going to do an accounting of the defendant's activities?  I

9       mean, you heard the testimony from Mr. Holert and Mr. Nolan

10      and others that we couldn't follow what the defendants were

11      doing in part because he never delivered the software, the

12      wormhole, that he described was going to be necessary for

13      Celsius to understand the P&L, and he never delivered it to

14      us.  So, it wouldn't be possible for us to do that.

15              THE COURT:  Well, but I -- there's a contract that

16      said profit share.  It doesn't say who calculates it, how

17      it's calculated, who's got the burden.  Am I right about

18      that?

19              MR. HURLEY:  It's I think actually --

20      respectfully, I think it's a little different than that.

21      So, what they're pointing you to, Your Honor, is the asset

22      purchase agreement.  The terms related to the services and

23      compensation were supplanted by the services agreement, and

24      the services agreement provides specifically that's -- that

25      the company that Mr. Stone was the CEO of would be

1    responsible for maintaining the P&L, which of course makes

2    sense because it's his activities.

3              THE COURT:  Where -- point me to the specific --

4    can somebody --

5              MR. HURLEY:  Sure.

6              THE COURT:  Get one of your team to point to the

7    specific paragraph you rely on.

8              MR. HURLEY:  Yeah, it's in Schedule A of the

9    services agreement.

10             THE COURT:  I got all the exhibits here, so just -

11   -

12             MR. HURLEY:  This is (indiscernible).

13             Yeah.  So, it's Schedule A and it is --

14             THE COURT:  Which exhibit are we talking about,

15   20?

16             MR. HURLEY:  Oh, sorry.

17             THE COURT:  (Indiscernible).

18             MR. HURLEY:  What exhibit?

19             MAN 1:  Forty-one.

20             MR. HURLEY:  It's Exhibit 41.

21             THE COURT:  Forty-one.  Okay.

22             MR. HURLEY:  Mm-hmm.  And Schedule A appears on PX

23   41-6.  Okay?

24             THE COURT:  You're going by the Bates number or

25   no?

Page 17

1          MR. HURLEY:  Well, it's PX -- the exhibit number.

2          THE COURT:  What page?  I'm sorry?

3          MR. HURLEY:  It's PX-41 -- if you look at the

4   bottom right corner, there's an exhibit paging.  So, PX-41,

5   Page 6.

6          THE COURT:  Yes, okay.  All right.

7          MR. HURLEY:  And if you look at the third bullet

8   point, so again in this agreement, Celsius is defined as

9   Celsius Network and KeyFi is defined as Celsius KeyFi, the

10  company Mr. Stone was the CEO of.

11         THE COURT:  Yes.

12         MR. HURLEY:  And the third bullet point, Celsius

13  KeyFi shall retain control of its internal budget and profit

14  and loss determination in good faith.  And again, of course

15  that --

16         THE COURT:  (Indiscernible).

17         MR. HURLEY:  What's that?

18         THE COURT:  They never did it.

19         MR. HURLEY:  Correct.  And of course it makes

20  sense that it would be the obligation of Mr. Stone, since it

21  was Mr. Stone who was putting on the risks and engaging in

22  the investment activities to engage in that process.

23         You know, the APA provision with respect to the

24  audit, I actually think in their papers the defendants say

25  that the first time they requested an audit was in September

1    after Mr. Roche's firm came along, and that obviously would

2    be long past the deadline to request such an audit.

3              But again, the services agreement supplants the

4    APA in terms of -- yeah okay.

5              Any other questions, Your Honor, before I go back

6    to my presentation or anything else?

7              THE COURT:  Well, you know, I tend to interrupt a

8    lot, Mr. Hurley, but go ahead.

9              MR. HURLEY:  Please.  I appreciate it so I know

10   what you're interested in.

11             Okay, so I'm going to go through the factors for a

12   preliminary injunction.  I'm going to try and do it briefly.

13   I know your --

14             THE COURT:  I know the facts for preliminary --

15   you can do it if you want.

16             MR. HURLEY:  Okay.

17             THE COURT:  Go ahead.  Please.

18             MR. HURLEY:  I'll be efficient, I promise.

19             THE COURT:  It's okay.  Go ahead.

20             MR. HURLEY:  Okay.  So, starting with the merits.

21   All Celsius needed to show on its motion is that there are

22   serious questions going to the merits of Celsius' claims to

23   make them fair grounds for litigation.  That's the Dom case,

24   and Celsius didn't need to make that showing with respect to

25   all of its claim.  Just one will do.  That's 725 Eatery.

Page 19

```
 1              The facts adduced in the proceeding we submit
 2    support all of Celsius' claims and a much higher standard
 3    than one we're required to meet including for turnover,
 4    conversion, unjust enrichment, (indiscernible) accounting.
 5              Celsius has demonstrated and the defendants admit
 6    that they have taken and have refused to return millions of
 7    coins and other digital assets worth millions of dollars,
 8    and their only defense is that -- depends on convincing Your
 9    Honor that Mr. Mashinsky gave oral authorization for those
10    transfers, and as Your Honor pointed out that he was even
11    authorized to give oral authorization to make those
12    transfers.  And in support of that, the only evidence
13    they've offered, again as Your Honor pointed out, is the
14    self-serving and unsupported assertion of Mr. Stone himself.
15              You heard Mashinsky emphatically deny that claim.
16    Stone claims that Patrick Holert and Connor Nolan were
17    witnesses to Mashinsky's authorization.  You saw Mr. Holert
18    and Mr. Nolan testify under oath yesterday and they offered
19    zero support for that assertion.
20              Mr. Stone hasn't pointed to a scrap of written
21    evidence that supports the claim, which is an extraordinary
22    claim, that a CEO orally authorized him to take $20 million
23    off of the Celsius platform.
24              THE COURT:  Let me just -- I -- let me come back
25    to what I asked before, and I know you said -- well, just so
```

Page 20

1   we'll be clear, can you tell me how much you contend was

2   improperly withdrawn from Celsius' wallet before Stone

3   resigned and how much after?

4              MR. HURLEY:  I mean, I can get you that, Your

5   Honor.  I --

6              THE COURT:  I know, but just -- and can you even

7   give me an estimate of what the before and after was?  I am

8   -- look, I'm going to --

9              MR. HURLEY:  Yes.

10             THE COURT:  -- just so we're clear for the record,

11  yes, I am going to want a submission on how much was

12  withdrawn before and how much after with record citations

13  for that, okay?  But do you have a -- I don't want to be

14  unfair --

15             MR. HURLEY:  I do, actually.

16             THE COURT:  You don't, you don't.

17             MR. HURLEY:  I do, Your Honor.

18             THE COURT:  Go ahead.

19             MR. HURLEY:  I actually do.  I actually do.  Hold

20  on a second.  I have it in here, I think.  Yeah, okay.  So,

21  I'm not finding it right now, but it was with respect to the

22  ERC 20 token spreadsheet, the amount that was after --

23             THE COURT:  That had so many tabs on it.  You

24  know, you went through ERC 20.  You went through Ethereum --

25             MR. HURLEY:  Yes.  Let me -- let me try and -- let

Page 21

1    me try and make it a little easier.  So, there are really

2    three categories in the defendant's spreadsheet of

3    transfers.  There was one of them transferring ETH from

4    Celsius' wallets to defendant's wallets and then doing

5    whatever they did with it with the ETH, okay?

6              THE COURT:  Sure, and I remember, you know, some

7    of the columns were -- some of the rows were in yellow or --

8              MR. HURLEY:  Right.

9              THE COURT:  And we were looking for net figures,

10   but go ahead.  Okay.

11             MR. HURLEY:  And then the second category was they

12   transferred so-called ERC 20 tokens out of the wallet which

13   are things like USDC and Di, and then the third category is

14   their purchases of NFTs directly into the Celsius wallet.

15   Do you understand that distinction?

16             THE COURT:  I do.

17             MR. HURLEY:  Okay.

18             THE COURT:  I know.  I have to be careful about

19   saying what I understand and not but I think --

20             MR. HURLEY:  Same here.  And so, I know with the

21   ERC 20 transfers that -- post March 9th the value of those

22   transfers.  I think deducting the yellow highlighted

23   transactions was $5.25 million, and my recollection for the

24   ETH transfers post March 9th, and again it's obviously

25   important to have -- to have this understood in coin terms,

Page 22

1    I think, but from the post March 9th period I want to say it

2    was maybe 300 change ETH, which was worth something like a

3    half a million dollars at the time of the transactions.  And

4    I -- and I think the post March 9th ETH spend on NFTs

5    purchased into the wallet was in that same sort of range.

6            But I guess I want to come back to a point on

7    credibility, Your Honor, which is that, you know, if the

8    plaintiffs are willing to sit here and argue having -- you

9    looked at the March 26th demand letter and then admitting

10   they resigned on March 9th and claim that all those

11   transactions they made after March 9th are still authorized

12   in the face of that evidence, what does it say about the

13   credibility of their claim that any of these transactions

14   were authorized?

15           THE COURT:  You humor me about this, okay, for a

16   minute.  So, it sounds like you're -- rough numbers, you're

17   talking approximately about $6 million of post March 9th

18   transfers you say were unauthorized, round number.

19           MR. HURLEY:  Of post March 9th transfers we say

20   are unauthorized, correct.

21           THE COURT:  Okay.

22           MR. HURLEY:  I mean, we'd want to confirm that

23   because I'm going from memory from yesterday.

24           THE COURT:  I know, and I'm going to -- and I want

25   you to confirm.  During the discovery --

Page 23

```
 1              MR. HURLEY:  Can --

 2              THE COURT:  No, wait, let me get my question out.

 3              MR. HURLEY:  Okay.

 4              THE COURT:  During the discovery, how much have

 5    you identified remains in the possession of the defendants?

 6    Look, I mean, here's why I'm saying it.  You know, if you're

 7    able to show that they have $3 million in value that they're

 8    still holding directly or indirectly, and your allegation is

 9    they transferred 6 million post March 9th unauthorized, it

10    gets a lot easier for you to convince me that all of the

11    transfers he made before he resigned were unauthorized.  I

12    may not even have to reach that issue at this stage of the

13    case.  Do you understand what I'm getting at?

14              MR. HURLEY:  I do understand what you're saying,

15    Your Honor, but I think I want to push back a little bit on

16    it because --

17              THE COURT:  (Indiscernible) go ahead.

18              MR. HURLEY:  -- because where we are now, I have

19    to remind you, we're still just relying on information that

20    we've gotten from the defendants themselves about these

21    transfers, and it's incomplete information.  I don't know if

22    Your Honor had a chance to look through the spreadsheet at

23    all.  Probably not.  There wasn't much to between yesterday

24    and today, but if you do, you'll see that there is this very

25    substantial amount of information about, like, the fate of
```

Page 24

1    the -- of the property that was taken and the proceeds of

2    that property that's not included in the spreadsheet.

3           So, it's really hard to be confident now that we

4    even have all of the relevant transfers identified, and then

5    we're still at a phase because it's, you know, expedited

6    discovery, we haven't had that much time, where we kind of

7    have to rely on the defendants to say what they still have,

8    and that makes me pretty uncomfortable under the

9    circumstances.

10          THE COURT:  What is it that you're asking me to --

11   what is it that you're asking me to freeze?  What do you

12   know --

13          MR. HURLEY:  So --

14          THE COURT:  What do you know as of -- I

15   understand, discovery is early, all that.  What do you know

16   that they have that you believe should be frozen?

17          MR. HURLEY:  So, let me ask -- answer the first

18   question first, because it's a little bit different than the

19   answer to the second.  The first -- answer to the first

20   question is we're asking for an injunction that is

21   categorical, precisely because we think their work remains

22   to be done to make sure that the parties have identified the

23   property that comes within the category, and the categories

24   that we're seeking or the category that we're seeking to

25   have enjoined is as described in our proposed order.  It is

Page 25

1    all of the Stone utilized assets and the proceeds of those

2    assets, which means the assets that we contend were taken

3    without authority from the Celsius wallets and whatever

4    property was obtained with those assets.

5              And I know it is an injunction that is

6    categorical, but I don't know that there is a way other than

7    entering a categorical injunction to avoid a situation

8    where, you know, the defendants haven't identified

9    everything that they took and all the proceeds of that and

10   they kind of wind up being able to, if you will, ride off

11   into the sunset with those proceeds just because of this --

12             THE COURT:  So, the law as I understand it,

13   because I've had this issue come up before, is it has to be

14   (indiscernible) unambiguous from the four corners of the

15   injunction, what it is -- please don't do that.  When I'm

16   talking --

17             MR. HURLEY:  I apologize, Your Honor.

18             THE COURT:  -- don't (indiscernible) conversation.

19   Okay?

20             MR. HURLEY:  I'm sorry.  I was -- I was asking for

21   an authority that goes to this point.

22             THE COURT:  It has to be clear from the four

23   corners of the injunction what the defendants are prohibited

24   from doing, okay?  And that's what troubles me a little bit

25   about your so-called categorical injunction, because then

Page 26

1    you get into a dispute, well, yes, we were, no, we weren't.

2    It has to be -- in order to be enforceable, an injunction,

3    you enforce it by contempt if they violate it, and you know,

4    the standards for contempt, the order has to be clear and

5    unambiguous.  The evidence of noncompliance has to be clear

6    as well.

7            And so, I'm concerned.  I understand that you say

8    discovery is at an early stage.  We haven't identified

9    everything.  But if I grant you the relief that you're

10   asking for, I need -- I need to know exactly what the

11   defendants are prohibited from doing.  They have to know

12   precisely what they're prohibited from doing.

13           MR. HURLEY:  Mm-hmm.

14           THE COURT:  You know, it may well be that further

15   -- if you get the relief you're asking for and further

16   discovery shows -- you know, because you want to be able to

17   trace what -- if you say $10 million in improper transfers

18   and we've now seen that the defendants have dissipated

19   another 5 million of that 10 million, okay, and you think

20   you're able to trace the -- those assets into whoever's

21   hands they are now, that's a problem.  That's an issue for

22   you, okay?

23           So, you know, I hope you're understanding what my

24   discomfort -- if -- I haven't decided to grant you the

25   relief yet, but I want to know if I grant you the relief,

Page 27

1    precisely what it is they're prohibited from doing.  And it

2    may be that you'll take more discovery and you'll find that,

3    you know, the number instead of 10 million is 15 million or

4    they'll say no, 5 million or whatever.  Go ahead.

5              MR. HURLEY:  I do understand the exact issue

6    you're describing, Your Honor, and I've actually thought

7    about it a lot, especially in the last, you know, few days,

8    and my concern is really that if we -- if we identify the

9    scope of the injunction based on the property that's

10   identified in the spreadsheet, then again, we're really

11   confining the injunction in a way that's been defined by the

12   defendants before we've really had adequate time to ensure

13   that it's complete and comprehensive.

14             And my concern is that while we may discover in

15   the future that there are additional assets taken off the

16   platform, if that happens two months from now, they could

17   have transferred it if the injunction doesn't cover

18   categorically that property in the meantime.

19             And so, what we are proposing is that there is a

20   categorical injunction, and we did find -- and I apologize

21   for not paying attention fully before.  I was asking my team

22   for the citation to one of the cases we found last night

23   that provided that in fact it is proper under some

24   circumstances to enter a categorical injunction with work

25   remaining to be done to fill out the precise sort of scope

Page 28

1    and contours of what property the injunction covers.  And

2    that's what we're proposing to do here.

3              And know it's a -- you know, it's maybe not a

4    perfect solution, but I think if we don't do it that way,

5    there's just an enormous risk that property that hasn't been

6    identified is going to be dissipated forever, and we're

7    never going to be able to get it back within the

8    jurisdiction of the Court.  So, that's the response, Your

9    Honor, and I think I can't -- here we go.  In the --

10             THE COURT:  You know, (indiscernible) one of the -

11   - look, I -- whether you ever -- you and your team looked at

12   it or not earlier in the Celsius case, you know, I posted

13   the English Wealth Commission Report.  It's like 500 pages

14   long.  This has been a problem identified all around the

15   world.  It's the problem with crypto assets, and tracing it

16   can become nearly impossible at some point.

17             And certainly, you know, I think that's -- that

18   was the issue with the software that the treasury has

19   banned, you know, or prohibited its use because stuff just -

20   - you can't track the stuff, but it is what it is.  So, I

21   will be interested in what authority you have for this more

22   categorical injunction you're looking for.

23             MR. HURLEY:  I can give you a cite now.  So, this

24   is FTC v. IAB Marketing, LP, and it's 2013 W.L. 12038955.

25             THE COURT:  What court?

Page 29

1            MR. HURLEY:  Southern District of Florida, and

2     there are two cases related to freezing crypto assets that

3     we cite as well.  There are papers, but I can give them to

4     you if you'd be interested.

5            One of them is Jacobo v. Doe, which is Eastern

6     District of California, and it's 2022 W.L. 2052637.

7            THE COURT:  Give me the Westlaw cite again, 2022

8     WL --

9            MR. HURLEY:  2052637, and then the other crypto

10    case is Astrove v. Doe, 2002 W.L. 2 -- sorry, 8805345, and

11    that's Southern District of Florida as well.  What?  Oh,

12    it's -- I'm sorry, Your Honor.

13            MAN 1:  2022 W.L. 280 --

14            THE COURT:  Hold on.  I --

15            MR. HURLEY:  Okay.

16            THE COURT:  Give it to me.

17            MR. HURLEY:  That one wasn't my fault.  So, the

18    Astrove Cite, Your Honor, is 2022 --

19            THE COURT:  Yeah.

20            MR. HURLEY:  -- W.L. 28 --

21            MAN 1:  280 --

22            MR. HURLEY:  53 --

23            MAN 1:  -- 5345.

24            THE COURT:  All right.  You can't -- one -- I --

25            MR. HURLEY:  Sorry, Your Honor.  Okay.  I'll do

Page 30

1   it.

2          THE COURT:  With two voices speaking, I don't have

3   a clear record.  Give it to me again.  2022 WL --

4          MR. HURLEY:  Yeah, 2805345, and that's Southern

5   District of Florida.

6          THE COURT:  Okay.

7          MR. HURLEY:  I mean, I suppose one possibility,

8   Your Honor, and again, I don't want to assume how this is

9   going to go, but if an order was to be entered could be a --

10  potentially a settle order where the parties try to

11  negotiate and under -- like something to present to Your

12  Honor that would cover -- try to cover these problems,

13  because I -- we obviously have thought about them, too, and

14  I think there's something serious that needs to be

15  confronted, so.

16         THE COURT:  Look, the last thing -- look, I

17  haven't made up my mind about this, so the defendant's

18  counsel shouldn't be -- you know, they'll make all their

19  arguments and I -- the last thing you want to find out is

20  that I've entered an order that you can't enforce.

21         MR. HURLEY:  Yeah, that is part of what we've been

22  thinking about as well, Your Honor, certainly.  And we just

23  -- I think just have to balance it with the concern that the

24  order is not broad enough to capture everything that's been

25  taken, and it's a -- it's a problem for sure that needs to

Page 31

1    be confronted, so.

2            THE COURT:  All right.  Go ahead with your

3    argument.

4            MR. HURLEY:  Okay.  So, coming back to the

5    authorization affirmative defense that Stone has asserted, I

6    pointed out that Mr. Stone's only evidence is his own

7    testimony.  He hasn't come forward with any written

8    evidence.  He testified that he had between 4 and 10

9    communications with Mashinsky in which Mashinsky authorized

10   him to take property as an advance on profit share.  He said

11   that one or two of those communications were by e-mail, but

12   when we asked him to identify those e-mails, he couldn't do

13   it.

14           At his deposition, he actually complained that it

15   was because he didn't have access to all of his Celsius e-

16   mails, but we found out yesterday that Mr. Stone actually

17   downloaded his Celsius e-mail inbox and took it with him

18   before he left.

19           Now, he says there was some gap.  Did we lose you,

20   Your Honor?

21           BAILIFF:  (Indiscernible) rejoin.

22           MR. HURLEY:  Are you -- we can't hear you.

23           THE COURT:  Yeah, can you hear me now?

24           MR. HURLEY:  Yes.

25           THE COURT:  Okay.

1                  MR. HURLEY:  Yes.

2                  THE COURT:  I'm sure it was at my end, but

3      everything completely froze up, disconnected.  I'm

4      reconnected now.  We sort of -- the last thing I heard was

5      the discussion about the possibility if I grant the relief

6      to require you to try and settle an order with the other

7      side, and I apologize, but that's where --

8                  MR. HURLEY:  Oh, okay.  Okay, so I had just

9      resumed my argument.

10                 THE COURT:  I know that.

11                 MR. HURLEY:  But if you have any more questions

12     about that --

13                 THE COURT:  I -- well, I didn't hear it.

14                 MR. HURLEY:  Okay.  All right, so I'll --

15                 THE COURT:  It was brilliant, but -- I'm sure it

16     was brilliant, but I just didn't hear it.

17                 MR. HURLEY:  Okay.  So, I will come back to that.

18     So, I was -- I was starting to talk about the authorization

19     claim.  And as you pointed out, the only evidence offered is

20     Mr. Stone's own testimony that Alex Mashinsky authorized him

21     to take the property.

22                 He hasn't come up -- forward with any written

23     evidence of any kind.  He testified that he had between 4

24     and 10 communications with Mashinsky in which Mashinsky

25     supposedly authorized him to take property as an advance on

Page 33

1    profit share.  He testified that one or two of those

2    communications were by e-mail, but when we asked him to

3    identify those e-mails, he couldn't do it.

4          At his deposition, he actually complained he

5    couldn't produce either of those alleged e-mails because

6    supposedly he didn't have access to all of his e-mails in

7    discovery in this case.  What we found out yesterday --

8          THE COURT:  Let me ask you -- let me ask you this.

9    Did the defendants serve a document request on Celsius that

10   required it to search its e-mail to see whether any such

11   existed in Celsius' system?

12         MR. HURLEY:  They did serve a document request,

13   and during the course of expedited discovery, they asked us

14   to turn over the entirety of Jason Stone's e-mails like as

15   one group, and we said, well, we're not going to do that.

16   But if you have search terms you want us to run, give us the

17   search terms.  Even on a non-expedited basis, turning over

18   an entire collection of e-mails isn't how discovery is

19   conducted, but -- so, but I think the important point, Your

20   Honor, here --

21         THE COURT:  Did they give you search terms to

22   search?

23         MR. HURLEY:  They have since, but I think it's for

24   the plenary discovery rather than the expedited discovery,

25   although I have to admit, I'm not the expert on exactly

Page 34

1    where we are on that.  But anyway, I think the important

2    point here, Your Honor, is -- let me back up.  In terms of

3    the expedited discovery, we had a conversation early on

4    about what they wanted and they asked us to search for e-

5    mails for Connor Nolan, and we took their search terms and

6    we had some negotiations, and we agreed on what they would

7    be and then we started the production.

8           And then after that, they came to us with this

9    request, give us all of Jason Stone's e-mails and we said

10   that's not practical on an expedited basis and it wouldn't

11   really be called for even in a plenary basis, though if you

12   give us the search terms, of course we'll run the search

13   terms against Jason's e-mails just like everybody else's.

14   And my understanding is that is underway and probably some

15   of it has been produced.

16          But I think it's important to remember this, Your

17   Honor, that we found out yesterday that Mr. Stone actually

18   downloaded his Celsius e-mail inbox before he left and took

19   it with him.

20          THE COURT:  I know this.  I know that --

21          MR. HURLEY:  Yeah, and he said he searched those

22   e-mails, can't come forward with anything.  He also

23   testified that he believed some of these writings might have

24   been in text messages or WhatsApp communications, and he

25   acknowledged that those messages, the texts and the

Page 35

1    WhatsApp, they would be on his own phone, right?  Because

2    those are - those are applications on your personal phone.

3    And he admitted, yeah, I still have all those text messages

4    and WhatsApps.

5            We asked him if he'd look for it.  He did.  He

6    didn't come forward with anything.  He testified Holert and

7    Nolan may have been copied on some of those communications.

8    He heard them say we don't have a recollection of that.

9            He certainly was on notice that this exact point

10   was going to be a central issue on the motion.  Our

11   expedited discovery, all we asked for in our letter was send

12   us anything that supports this claim that's in writing.

13   That was on November 29th, two months ago.  They've had two

14   months to try and find that communication.  He's got his e-

15   mails from Celsius.  He's got all his WhatsApp and text

16   messages.  Nothing.

17           So, you know, under the circumstances I think we

18   can submit -- we submit that the Court can infer that the e-

19   mail and text message just doesn't exist.  I mean, consider

20   if such a document existed, doesn't it stand to reason that

21   he would have kept a copy?  We're talking about a document

22   that he's saying authorized him to take property which

23   ultimately amounted at least to over $10 million.  Wouldn't

24   he have e-mailed it to himself, printed out a copy and put

25   it in a desk drawer?

Page 36

1          We're talking about a person that downloaded every

2    single one of his e-mails in his inbox before he left and

3    took it with him.  That story doesn't add up, we submit.

4    The truth is, we submit, he didn't find any evidence of that

5    authorization because he wasn't authorized to take the

6    property.

7          And the actual documentary record in this case,

8    Your Honor, points in the exact opposite direction of what

9    Mr. Stone claims.  As we've been talking about this morning,

10   first, many of the transfers occurred long after Celsius

11   demanded the return of its coins and after he quit.

12         We went through some of the numbers before.

13   Here's the part of my outline that has some of the numbers,

14   Your Honor, you asked for before I couldn't find.  I'm going

15   to give you them.

16         He listed 71 ETH transfers between September 9th,

17   2020 and September 13, 2022, and 27 of those supposedly

18   authorized transfers he as compensation for services

19   rendered were after he quit his job.  Twenty-five of those

20   transfers were after Celsius sent the March 26, 2021 letter

21   and board resolutions instructing him to return all digital

22   assets and return the (indiscernible) and private keys.

23         His (indiscernible) token spreadsheet tells a

24   similar story.  After he resigned from Celsius on March 9th,

25   he asked Celsius -- he transferred ERC tokens 17 times.

Page 37

```
 1      Here's the number.  The post March 9th tokens were worth

 2      more than $5.25 million.

 3              Eleven of those transfers were after the March

 4      26th letter.  And of the NFTs he purchased into Celsius

 5      wallets and later transferred to himself, he used Celsius

 6      coins to buy 88 of those NFTs after he resigned from

 7      Celsius.  Fifty-three of those purchases were after --

 8              THE COURT:  Remind -- I may be confusing two

 9      points, but I thought he testified that he shared some of

10      those transfer to him with the co-founder.

11              MR. HURLEY:  So, I believe -- well, let's see.

12      Some of those transfers -- a number of those transfers on

13      the spreadsheet do appear to have ultimately been paid to

14      some of the folks that he associated with.  I think Your

15      Honor probably is remembering the specific story about the

16      1.4 million DAI which he took from the Celsius wallet in

17      September of 2021 and then converted into ETH and sent to

18      Tornado Cash.

19              And what he said is that he withdrew -- because

20      the way Tornado Cash works is you send Tornado Cash and then

21      you have effectively a code that allows you to withdraw the

22      Tornado Cash.  Nobody knows where it's going to go, okay?

23              So, he transferred the cash -- transferred it to

24      Tornado Cash and then he testified he withdrew half of it,

25      and I think I understood his testimony to be that his co-
```

Page 38

1      founders withdrew the other half.  Okay?

2             And then with respect to --

3             THE COURT:  (Indiscernible).

4             MR. HURLEY:  No, he said he didn't know -- he

5      knows he spent it, but he doesn't know -- he can't be

6      specific about what he spent the six or $700,000 on.

7             THE COURT:  Are you going to bring a fraudulent

8      conveyance action against his co-founder?

9             MR. HURLEY:  We are very much considering that,

10     Your Honor, at least and maybe other claims.  I think there

11     would be other claims that would be warranted by those --

12     that set of facts.

13            Okay.  And then, so the NFTs he purchased, I

14     already gave you that.  So, collectively just based on the

15     spreadsheet, and again this is the defendants that we're

16     relying on to give us this information and there may be much

17     more, just on the spreadsheet, the property that was taken

18     was more than $11 million in U.S. dollar value at the times

19     of the transfers so very substantial.

20            And a majority of that property, a majority, he

21     took after he quit his job.  And again, at the risk of

22     testing your patience, Your Honor, I'm going to make this

23     point again.

24            If he's willing to argue that after he quit his

25     job he was still authorized to take property, what does that

Page 39

1    say about the credibility of his claim that he was ever

2    authorized to take property in the face of the absence of

3    any written evidence to support it or any evidence other

4    than his say-so, when his say-so is telling you right now

5    that despite you having looked at the March 26th letter and

6    his March 9th resignation letter, he was entitled to and he

7    was authorized to keep paying himself millions of dollars of

8    Celsius property.

9              Okay, come back to the agreements quickly, and

10   I'll do this very quickly because we already talked about

11   them.  Talked about the October 7th agreement which was the

12   service agreement between KeyFi and Celsius that was in

13   place until January 11th.  You heard him admit that the

14   amounts -- the only amounts due during that period of time

15   were paid.  It was cash payment.

16             Let's see.  I think I covered this.  Okay, so I

17   talked about why it is that we think that even if he could

18   show that he had created a profit, it wouldn't allow -- it

19   wouldn't entitle him to seize Celsius assets to pay himself

20   profit share.

21             I do want to make sure, though, that I -- and I'm

22   -- I suspect Your Honor picked up on the way in which Mr.

23   Stone is trying to tell you he made a profit.  He does it by

24   taking credit for market appreciation of Celsius coins.

25             THE COURT:  Yeah.  Let me -- let me stop you

Page 40

```
 1    there.

 2              MR. HURLEY:  Okay.

 3              THE COURT:  And I -- is there -- and I think

 4    through your witnesses you tried to show that under the

 5    agreements if, for example, Ether or Bitcoin increased in

 6    value 20 percent, that that would not be part of a profit

 7    calculation.  He had to show that the number of coins had

 8    actually increased.  Did I have that correct?

 9              MR. HURLEY:  Yeah, that's exactly right, Your

10    Honor, and of course --

11              THE COURT:  Where in the agreements does it

12    essentially say that?

13              MR. HURLEY:  There's a calculate -- there's a

14    whole schedule that provides how profit is calculated and --

15              THE COURT:  Point me to where -- point me to where

16    that is.

17              MR. HURLEY:  Okay.  Let's see.  Okay.

18              THE COURT:  I consider this to be -- Mr. Hurley, I

19    consider this to be an important point that --

20              MR. HURLEY:  Okay.

21              THE COURT:  -- he -- I take it though he also --

22    if Bitcoin or Ether had declined 20 percent in value, what

23    would be the effect on a profit calculation of that?

24              MR. HURLEY:  He absolutely still could have earned

25    a profit for himself notwithstanding the decline in the
```

Page 41

1    dollar value ETH.

2            THE COURT:  So --

3            MR. HURLEY:  The way that it works --

4            THE COURT:  -- the profit calculation was not --

5    did not hinge on the prevailing price of particular coins?

6            MR. HURLEY:  No.  And Your Honor, I mean, honestly

7    it's sort of just common sense, right?  Like if we give him

8    100 ETH and he just holds it for a year --

9            THE COURT:  Right, but I don't usually cite just

10   the common sense.

11           MR. HURLEY:  Fair enough.

12           THE COURT:  I like to see where you're pointing to

13   in the agreement.

14           MR. HURLEY:  Fair enough.  So, the -- right, so

15   the way the agreement worked was, to answer your question,

16   if he was holding ETH and he put it into yield farming, for

17   example, or he put it into an automated market maker, and

18   the price of ETH went down but his activities nevertheless

19   in the automated market-making platform resulted in fee

20   revenue, for instance -- I mean, that's what he was supposed

21   to be doing is taking the coins and earning more coins,

22   whether governance tokens or other kinds of revenue based on

23   his investment activities, right?  That's what he was trying

24   -- that's what he was hired to create is revenue from

25   investment activities, not just holding coins while they

Page 42

1    appreciate.

2            THE COURT:  That was said yesterday.  But I don't

3    remember somebody actually pointing to the language in an

4    agreement, but I -- that is what you just said.

5            MR. HURLEY:  So, it is Exhibit B.  It's a very

6    complex like series of provisions in Exhibit B to the

7    agreement.  And --

8            THE COURT:  Wait a minute.  Which agreement?

9            MR. HURLEY:  Sorry, the services agreement.

10           THE COURT:  Okay.

11           MR. HURLEY:  It is, sorry, Schedule B.  Services

12   agreement key terms.  And I guess because they are pretty

13   complex, Your Honor, if you think this is a particularly

14   important point, I would actually ask for some briefing on

15   it, because it's there.  It is not easy to digest in -- on

16   first glance I would say.  It was written by people that --

17           THE COURT:  Okay, so the service agreement is

18   Exhibit 41.  I have it open in front of me.

19           MR. HURLEY:  Yeah.

20           THE COURT:  Where am I -- I do want -- see,

21   because this is important.  Where am I looking at this

22   complex explanation?

23           MR. HURLEY:  Sure.  So, it basically begins at

24   seven, weekly and monthly performance calculation for

25   activities, and there are formulas that define, you know,

1    revenue for activity and coins, costs for --

2            THE COURT:  Hang on.  I want to be sure --

3            MR. HURLEY:  Sure.

4            THE COURT:  You're referring to Exhibit 41.

5            MR. HURLEY:  I believe so.

6            THE COURT:  Which Bates page?  Give me the Bates

7    page.  (Indiscernible).

8            MR. HURLEY:  Bates -- yeah.  Bates Page PX 41-7.

9            THE COURT:  Okay, in which definition -- which

10   section?

11           MR. HURLEY:  Oh, sorry.  Actually, you should go

12   to dash 9, and it's Section 7.

13           THE COURT:  Okay, weekly and monthly performance

14   calculations for activities.

15           MR. HURLEY:  Correct, yeah.  And there's

16   definitions of revenue for activity and coins, cost for

17   activity and coins, gross profit for activity and coins,

18   gross profits for activities in U.S. dollars, which the

19   understanding was that when -- if a profit was generated in

20   coins, it would be converted into U.S. dollars strictly for

21   payment to the defendants.

22           THE COURT:  Which of the subsections in Section 7

23   are you referring to as explaining how to -- you don't look

24   in the rise or fall in the value of the particular coin but

25   whether they've generated additional coins.

```
1              MR. HURLEY:  You really have to look at the

2      provision kind of holistically, Your Honor, and I confess I

3      have not -- I didn't come here today prepared to go through

4      sort of point by point by point, and it is a complex

5      agreement.

6              And if -- again, if Your Honor is -- this is an

7      important issue for the motion, we would be very happy to

8      submit briefing on it.  I mean, our position again from the

9      beginning has been that even if he could show that there's

10     profits, he doesn't get to seize the money.  So, you know,

11     hold onto the money and then we can argue later about what

12     this contract means.

13             THE COURT:  No, that was the point about --

14     there's nothing in any of the agreements that I've seen that

15     supports self-help.

16             MR. HURLEY:  Right, exactly.  So, we were more

17     focused on those issues, but again if there's -- if you'd

18     like us to do that, we would be happy to provide that

19     information.

20             THE COURT:  We'll -- I'll try and come up with

21     what I want to see after we finish -- when we're finishing

22     today.  Go ahead.

23             MR. HURLEY:  Okay.  Okay.  All right.  I'm now at

24     the self-help portion of my outline.  I think we've covered

25     that.  Okay.  The claim that Mr. Stone is making we submit
```

Page 45

```
 1    also makes no sense by its own terms.

 2            I mean, they're claiming that Mashinsky authorized

 3    them to take a percentage as an advance on profit share

 4    between late October and late February or early March 2021.

 5    That's when the authorization supposedly happened, but they

 6    admit that no one ever prepared a P&L at any time.  They

 7    admit that Celsius was relying on the defendants to create

 8    this wormhole program so that Celsius could even understand

 9    what the nature of the activities were to track them and to

10    understand the performance of those activities.

11            You look like you have a question, Your Honor?

12            THE COURT:  Well, I'm just -- you know, the part

13    of your argument that I have some problem with, if the

14    relationship hadn't fallen apart and Celsius hadn't

15    collapsed, does that mean that Celsius would never have --

16    you know, there would never be any profit share unless what

17    happens?  I mean, I don't think -- I don't think Stone

18    signed up for a deal that would say ha, ha, ha, you don't

19    get any profit share until you can put together a P&L to our

20    satisfaction, you know, that shows you had a profit.

21            MR. HURLEY:  But Your Honor, the services

22    agreement that Mr. Stone actually signed on behalf of

23    Celsius KeyFi as its DEO provides that Celsius KeyFi is

24    responsible for the P&L.  Like, so he would get paid

25    provided he could prove he made profits.
```

Page 46

```
1              THE COURT:  Okay.

2              MR. HURLEY:  And that's the way the agreement was

3     organized.  So --

4              THE COURT:  So, you're saying the burden was on

5     him to produce a P&L that would pass a laugh test and show a

6     profit?

7              MR. HURLEY:  Absolutely.  I mean, as you heard

8     from the testimony, Celsius had no way of doing it itself,

9     and you don't have to depend on Celsius.  Mr. Stone admitted

10     that he understood that if he didn't deliver that wormhole,

11     Celsius was never going to be able to prepare a P&L on its

12     own.  That's why the responsibility was on Mr. Stone.

13              THE COURT:  Whoa, whoa, whoa.  You just said that

14     he was responsible for preparing the P&L, not Celsius.

15              MR. HURLEY:  No, I'm just -- right.  Precisely,

16     but he testified that it would not have been possible for --

17     because he has been suggesting the contrary, and he admitted

18     it wouldn't have been possible for Celsius to prepare a P&L

19     without the wormhole.  I mean --

20              THE COURT:  Well, let me just -- just so we're

21     clear on that.  Your position is that under the service

22     agreement, Celsius KeyFi was responsible for preparing the

23     P&L.

24              MR. HURLEY:  Correct.  Correct.  And from Celsius'

25     perspective the wormhole --
```

Page 47

```
 1              THE COURT:  Hold on.  And they never did that.

 2              MR. HURLEY:  Sure.

 3              THE COURT:  Celsius KeyFi --

 4              MR. HURLEY:  Correct.

 5              THE COURT:  -- never --

 6              MR. HURLEY:  Correct, that's admitted.

 7              THE COURT:  I have no evidence in the record that

 8    Celsius KeyFi, of which Stone was the chairman, ever

 9    prepared a P&L, correct?

10              MR. HURLEY:  Exactly.  That's correct.

11              THE COURT:  All right.

12              MR. HURLEY:  Okay.  Let me turn to irreparable

13    harm, and I'll wrap up.  So, I cited this case at the

14    outset, Dom v. Miller.  There are many others.  Where a non-

15    movant's assets may be dissipated before final relief can be

16    granted or where the non-movant threatens to remove its

17    assets from the Court's jurisdiction, irreparable harm

18    exists.

19              Celsius has shown that the defendants can and will

20    dissipate and secrete assets absent an injunction.  They

21    transferred hundreds -- they made hundreds of transfers of

22    millions of coins.  That's on the record.  They used Tornado

23    Cash to conceal the destination on many, many occasions.

24    That's on the record, and past examples of asset secretion

25    or strong evidence that it will be repeated if it's not
```

Page 48

1   enjoined.  The speed and anonymity of crypto transactions

2   makes it particularly easy, absent an injunction, for assets

3   to be removed from the Court's reach.  That's the Heisenberg

4   case, 2021 W.L. 8154531, also Southern District of Florida.

5          But we don't have to guess here, Your Honor.

6   Plaintiffs have said they're going to dissipate assets

7   absent an injunction including legal fees.

8          THE COURT:  What about -- I -- maybe I

9   misunderstood.  I was a little surprised to hear that

10   yesterday or the day before he transferred another $100,000

11   to a law firm.

12          MR. HURLEY:  I was quite surprised too, Your

13   Honor.

14          THE COURT:  I'm sorry?

15          MR. HURLEY:  I was quite surprised to hear that,

16   too, Your Honor.  Did you have a question or --

17          THE COURT:  So -- yeah, I -- and maybe I

18   misunderstood.  I thought that the stipulation and order

19   that had been entered would have prevented that, but --

20   either that or -- did it?  Did it prevent what they did?

21          MR. HURLEY:  We did not.  There was not an

22   agreement to cease transfers in the interim, so.

23          THE COURT:  Okay.

24          MR. HURLEY:  While it was not contrary to this --

25   to the order that was entered by Your Honor, we certainly

Page 49

1    would argue and likely will argue in the future that it was

2    a stay violation.

3              THE COURT:  Okay, go ahead.

4              MR. HURLEY:  So, as you just mentioned, you heard

5    testimony yesterday that literally the day before a hearing

6    on a preliminary injunction motion, Mr. Stone sent $100,000

7    to his lawyers, presumably knowing that if he waited one

8    more day, there was at least a possibility that Your Honor

9    would have imposed an injunction that would have prevented

10   it.

11             They even argue that their need supposedly to use

12   more Celsius assets to pay their lawyers is a reason to deny

13   the injunction.  I want to note, Your Honor, in that section

14   of their brief where they make this argument, they don't

15   cite a single case in support of that assertion, and that is

16   because the law provides just the opposite.

17             Where funds are traceable to alleged wrongdoing as

18   here, it doesn't matter whether those funds are the only

19   source that the non-movant has to pay their legal fees.  I'm

20   going to cite Your Honor to In re: Marketxt, 376 B.R. 390,

21   that's Bankruptcy S.D.N.Y. 2007.

22             That principle is certainly true in civil cases

23   like here.  It's even true in criminal cases, Your Honor.

24   For example, in the Monsanto case, the United States Supreme

25   Court upheld an order freezing a criminal defendant's assets

Page 50

1    based on cause to believe that the assets were illicitly

2    obtained, even though those assets were the only way the

3    criminal defendant had to pay his lawyers.

4           In civil actions, where the funds subject to

5    restraint are the proceeds of transactions challenged in the

6    case, Courts will enjoy the funds even if necessary to pay

7    legal fees, and I have two more cites.  SEC V. Quinn, 997

8    F.2d 287 (7th Circuit 1993), SEC v. Bremont, 954 F. Supp

9    726, and that's S.D.N.Y 1997.

10          Defendants already have dissipated enormous funds.

11   We talked a moment ago about the 6 or $700,000 that Mr.

12   Stone took out of Tornado Cash at the end of 2021, and he

13   has no idea what happened to it other than he spent it.

14          Their sworn statement identifying the property,

15   and I touched on this before, Your Honor, is missing

16   information on the whereabouts of vast amounts of property

17   that was taken from Celsius and what happened to it.

18          If you look at that spreadsheet, you'll see

19   they'll say like, you know, took 350 ETH.  You know, either

20   it was used to buy NFTs or it was sent to Tornado Cash, you

21   know, or a series of options, and they don't say which one

22   it is.

23          And Celsius suspects it's going to need further

24   relief from this Court and swiftly in the event it gets an

25   order to bring defendants in compliance with that December

Page 51

```
 1     16th order to make sure that we have all of the property

 2     identified in the way that it should be and to ensure that

 3     as much of that property can be brought in the Court's

 4     jurisdiction and preserved for the benefit of creditors.

 5             But it also appears with at least some

 6     transactions they have made transfers in a way, at least

 7     according to them, that they are never going to be traced.

 8     And if an injunction isn't entered, Your Honor, the risk

 9     that they're going to do that again is overwhelming, and

10     that's part of why we're so focused on making sure the

11     injunction is sufficiently broad.

12             This is exactly the type of harm that the case law

13     says justifies the type of status quo freezing injunction

14     that we're seeking.  They argue that this is a case where

15     money damages are sufficient.  They cite Jackson Dairy from

16     1979.

17             THE COURT:  Forget the money damages are

18     sufficient.

19             MR. HURLEY:  Okay.

20             THE COURT:  Money damages are not sufficient.

21             MR. HURLEY:  Okay, balance of the harms, Your

22     Honor.  Again, case after case that provides where the

23     movant faces the risk of not being able to satisfy a

24     judgment at the end of the case if the injunction isn't

25     entered, but the non-movant is merely restricted temporarily
```

Page 52

1    from making further transfers of the property at issue, the

2    balance weighs in favor of the movement.  We submit that is

3    clearly the case here.  We cite In re: Calpine and the

4    Jacobo case that I cited to Your Honor before stand for that

5    proposition.

6            So, in conclusion, Your Honor, we submit that the

7    elements for entering preliminary junction have been met and

8    that, again, we submit and respectfully there's no question

9    Your Honor has the discretion to enter the injunction, and

10   we urge you to do so because for all the reasons that we've

11   described, including related to issues with cryptocurrency

12   and how quickly it can be transferred out of the reach of

13   the Court and the past conduct of the defendants, which has

14   been established, that the injunction is entered so that as

15   much property as possible can be preserved.

16           We know he's already squandered some.  Let's face

17   it.  Some of that property is never coming back for the

18   benefit of creditors, but to the extent he still has

19   property and the proceeds of it, it should be enjoined now

20   so he can't squander any more and at least that part that he

21   hasn't taken and spent on who knows what will be -- will

22   remain to satisfy creditors.

23           And in the absence of an injunction, we submit

24   they're just going to be further emboldened in this case and

25   we think that not productive for the balance.

1          At the end of the day, they took Celsius property

2     or at least we've made a very strong case, Your Honor,

3     certainly a strong enough case that it was an unauthorized

4     taking of property to satisfy the standard requirement for

5     getting a preliminary injunction, and we submit they should

6     be required to maintain the status quo through the balance

7     of the case.  Thank you, Your Honor.

8          THE COURT:  Thank you, Mr. Hurley.

9          MR. FREEDMAN:  Your Honor, would it be all right

10    if we took just a five-minute comfort break before I

11    started?

12         THE COURT:  Let's take a 10-minute break.  We'll

13    resume at 10:15.

14         MR. FREEDMAN:  Thank you, Your Honor.

15         (Recess)

16         THE COURT:  All right.  Mr. FREEDMAN, are you

17    making the argument for the defendants?

18         MR. FREEDMAN:  I am, Your Honor, except I just ask

19    if it would be possible for I believe her name is Deanna to

20    make Mr. Stone a co-host so he can share some exhibits that

21    have been entered into evidence?

22         THE COURT:  Sure.

23         CLERK:  He's a co-host.

24         MR. FREEDMAN:  Thank you.  Are you ready, Your

25    Honor?

Page 54

1           THE COURT:  Yes, I am.

2           MR. FREEDMAN:  Good morning, Your Honor.  Vel

3    Freedman, Freedman Normand Friedland firm representing the

4    defendants.

5           Judge, there's a couple things that I want to --

6    before I launch into the actual argument that I prepared

7    that I want to address from the back and forth between you

8    and Mr. Hurley, which is -- and I think Mr. Hurley said this

9    numerous times, and so I just want to correct the record on

10   this.

11          The defendants concede that there are some

12   transfers that were made at a time that were made without

13   the authorization of Celsius.  We understand that, and while

14   the Court is correct that there isn't a provision for self-

15   help in the contracts, that just happens to be what the

16   situation was.

17          You have a situation where Mr. Stone had left

18   Celsius.  Celsius was refusing to do an audit.  He was owed

19   a significant amount of money.  Some of these assets, and I

20   want to -- this is a very important point, which is when

21   that time occurred, but some of those assets were taken

22   without authorization.

23          Now, I want to say we believe he's entitled to

24   those assets and we believe there's a proper set-off defense

25   and I'll get to that in a moment, and I think it's important

Page 55

1    to recognize, Your Honor, that at this moment in time you're

2    not deciding the merits of this case --

3            THE COURT:  Mr. Freedman, set-off defense is

4    relevant to a breach a contract action.  It's not taking --

5    it's not relevant to if you'll excuse me stealing assets,

6    okay?  There's no -- there is no self-help set-off,

7    particularly now that Celsius is in bankruptcy, but -- and I

8    want to make that in the clearest terms.

9            You know, this is not a breach of contract action.

10   He made unauthorized transfers.  You dispute how much of

11   those were unauthorized.  He doesn't get to make

12   unauthorized transfers and then argue that he's got a, you

13   know, somehow self-help should be permissible here because

14   he'd have a set-off claim.

15           You know, in the bankruptcy case he may have, you

16   know, claims for unsecured -- unsecured claims, but don't

17   tell me that he could exercise -- could take whatever he

18   wanted to take without authorization.  The issue is what was

19   unauthorized.  Go ahead.

20           MR. FREEDMAN:  So, let me address that, Judge.

21   You heard from Mr. Hurley four or five times today about

22   this resignation letter, which is PX 42, and that was the

23   date by which Mr. Hurley said authorization ends.

24           I'd like to -- I'd like to pull up PX 42 because,

25   Judge, we don't believe that that is the time when

Page 56

1    authorization ended.  So, Your Honor, if you want to turn to

2    PX 42, but I've -- we've tried to excerpt the relevant

3    portions of it, and that is this is not a resignation letter

4    which says Mr. Mashinsky, I'm resigning from my position as

5    CEO of Celsius KeyFi effective immediately.

6            In fact, what he talks about is transitioning out

7    of the role of CEO of Celsius KeyFi, and if you look at the

8    bottom paragraph, he says my hope is that one month from now

9    we will have worked out a strong and lasting structure.

10           And Your Honor, this is very important, because if

11   you go to PX 37 -- Mr. Stone, can you bring that up, please?

12   Forty-seven, rather.  You have a letter -- this is in

13   evidence, Judge.  This is a letter from Mr. Hurley dated May

14   17, 2021 where Mr. Hurley said -- denies that Jason Stone

15   had resigned as the CEO of Celsius KeyFi and still was

16   acting in that capacity.

17           And if I may, Judge, finally regarding Jason's

18   employment status, you asked for proof that he was ever

19   employed by Celsius.  We have pointed out in the past,

20   including by e-mail dated March 31, 2021, the limited

21   liability company agreement with Celsius KeyFi, which Jason

22   Stone executed, expressly identifies Celsius KeyFi officers

23   as follows.  Chief Executive Officer:  Jason Stone.  Jason

24   also held himself out as CEO of Celsius KeyFi including to

25   Celsius and third parties.

1          And if you go down, it says regarding Jason's

2    claim that he resigned from that position, Celsius has no

3    record of him ever having done so, and Jason recently has

4    indicated that the date of any resignation remains

5    undetermined.

6          So, I'm a little shocked to hear Akin Gump come in

7    here today and say he resigned on the 9th, when on May 17,

8    2021 they're denying there was ever a resignation.  The fact

9    is, there was a twilight period when there was a winding up

10   of this relationship when he still was the CEO of Celsius

11   KeyFi and had authority to do this.

12          And so, Judge, what I'd say is a potential better

13   --

14          THE COURT:  Let me -- let me stop you to ask a

15   question.  Whoa, whoa, whoa.  Stop, stop, stop.  So, let's -

16   - assuming you're saying there was this twilight period that

17   he still had authority.  Does that authority extend to

18   transferring assets from Celsius to Celsius KeyFi or to

19   Stone or KeyFi?  So --

20          MR. FREEDMAN:  Yes, Your Honor.

21          THE COURT:  Okay.  What's the basis for that?

22          MR. FREEDMAN:  And let me explain -- yeah, well

23   let me explain that, because I think that's another issue I

24   need to correct with Mr. Hurley's characterization of our

25   arguments.  He says our entire argument hinges on Alex

Page 58

1    Mashinsky having approved the transactions.  That is only

2    half of our argument.

3            So, our argument is that the transactions were

4    authorized, and there are two ways these transactions were

5    authorized.  The first is Alex Mashinsky expressly

6    authorized them, and I'll cover that in a moment.  I do

7    think it goes beyond just a Mr. Stone say-so and Mr.

8    Mashinsky say-so, and -- but we'll cover that in a minute.

9            The second way that these transactions were

10   authorized is because Jason Stone was the CEO of Celsius

11   Key-Fi who was entitled to determine their own profits and

12   make distributions, and I'm going to walk the Court through

13   that in a minute.  But what I would -- what I would say on

14   that regard, Judge, is it is important I think -- we've

15   talked a lot about the services agreement, the asset

16   purchases agreement --

17           THE COURT:  Take that down from the

18   (indiscernible) please.

19           MR. FREEDMAN:  Yeah.  Can you take it down, Mr.

20   Stone?  Judge, we've talked about -- a lot about the asset

21   purchase agreement and the services agreement, but I think

22   it's important to take a step back and understand kind of

23   what was going on here.

24           So, Mr. Stone owns this company called KeyFi, and

25   he's doing decentralized finance activities on that with

1    that corporation.  Celsius wants to bring Jason Stone and

2    KeyFi into the Celsius group of companies to start working

3    on these decentralized finance activities for Celsius.

4             And so, what Celsius does is they say we're going

5    to contract with you, Mr. Stone, KeyFi.  To do so, we're

6    going to create a wholly owned subsidiary called Celsius

7    KeyFi, and they call it Celsius KeyFi because it's the

8    intermediary company between Celsius and KeyFi.

9             And so, what they say is Celsius KeyFi, our

10   Celsius company, is going to buy the assets of KeyFi, and

11   that's the asset purchase agreement.  As part of that asset

12   purchase agreement, Celsius KeyFi, meaning Celsius, is

13   obligated to pay KeyFi, Jason Stone's own company, three

14   things:  about $60,000 in payments, 300,000-something sell

15   tokens which was like about $2 million at the time, and a

16   profit share.

17            And so, as part of the purchase agreement, Celsius

18   KeyFi, meaning Celsius, is promising a portion of profit

19   share to KeyFi.  Now, simultaneously with that, Celsius says

20   now what we're going to do is KeyFi --

21            THE COURT:  But tell me where, Mr. Freedman,

22   where's the P&L for Celsius KeyFi?  There is --

23            MR. FREEDMAN:  It wasn't created -- it wasn't

24   created --

25            THE COURT:  No, where is it -- point it to me.  I

Page 60

1    want to see -- there is none, right?

2            MR. FREEDMAN:  There isn't, Judge, because it

3    couldn't be created without information from Celsius on the

4    cost of hedging, which they refused to provide.  Judge, I

5    think it's important -- I think it's important to understand

6    there's one more step to this structure of companies, which

7    is you've got Celsius KeyFi is now this intermediary company

8    which is the company that's going to now be doing the

9    decentralized finance activities for Celsius, and as part of

10   that agreement, Celsius KeyFi enters into a services

11   agreement with Celsius, because now Jason Stone instead of

12   providing (indiscernible) activities through KeyFi, he's

13   doing it through Celsius KeyFi.

14           And as part of this deal, Jason Stone gets made

15   the CEO of Celsius KeyFi and gets given a lot of powers, and

16   I'm going to walk the Court through why there was

17   authorization.

18           However, Judge, this is the important point.

19   There needs to be a time for when this authorization ends,

20   because if it ends -- and I would submit to you that

21   potentially an early place for Celsius to claim it should

22   end would be when they issued their board letter to Jason

23   Stone saying return all Celsius assets, and that was March

24   26th.

25           And if you look at the transfers that occurred

Page 61

1   after March 26th, Judge, you're looking at a total of

2   $530,000.  If you do it as of May 17th, Judge, the date that

3   Mr. Hurley denied that Mr. Stone had even resigned yet, the

4   total transfers are $139,000.

5             And if you do it as of March 31st, the date of the

6   -- in the letter from Mr. Hurley saying we told you on March

7   31st you were still the CEO of Celsius KeyFi, the total is

8   $238,000.

9             So, Judge, I want to circle back to where I

10  started.  We don't disagree that there are some transfers

11  here, that there are some transfers that were unauthorized

12  but that amount is not in the millions of dollars.  That

13  amount is either 139,000, 238,000 or 530,000.

14            I want to say, though, that does not include the

15  DAI transfer which is something completely different that I

16  want to get to separately, because that is not Celsius'

17  assets.  They were not its property.  It's our position that

18  that -- this was an airdrop that had nothing to do with

19  Celsius.  And so, that is separate and apart we'll get to

20  that in a minute.  But obviously that makes a huge

21  difference.

22            So, with that, Judge, I'd like to jump into the

23  merits of this conversation.  To succeed on these claims,

24  Celsius is going to have to eventually convince a fact

25  finder and potentially a jury, Judge, I know that you know

Page 62

1    there's a -- there's a stipulation to delay a motion to

2    withdraw the reference, see if we can stipulate to proceed

3    in front of you on this, but that Stone and KeyFi wrongfully

4    took assets.

5              And Judge, in order to do that, in order to

6    convince you that they wrongfully took assets, they must

7    convince this eventual fact-finder and now you sitting in a

8    preliminary injunction posture that they have a likelihood

9    of success on the merits, that Mr. Mashinsky did not

10   authorize those transactions and that Mr. Stone did not have

11   the authority to make those transfers as CEO of Celsius

12   KeyFi.

13             So, if we -- if we analyze the merits of these

14   claims, it requires a look at the evidence, not a look at

15   just bluster or talk about, you know, stealing or theft.

16   And so, we start -- I want to start with the Mashinsky

17   approval story, right, with that prong of the authorization,

18   Judge.

19             So, we're saying that these transactions are

20   authorized.  I want to start with the -- Mr. Mashinsky

21   approved these transactions and approved these transfers,

22   because everyone believed Celsius KeyFi was profitable and

23   that it was therefore owed money and KeyFi was owed money

24   under the asset purchase agreement.

25             The evidence shows, Judge, that the parties

Page 63

1    entered into an asset purchase agreement.  The evidence

2    shows that under that asset purchase agreement, KeyFi would

3    be owed money if it made a profit, okay, however that term

4    is defined.

5            I'll note for you, Judge, that despite the fact

6    that Mr. Hurley has had possession of this asset purchase

7    agreement and services agreement for a year and a half, his

8    presentation yesterday included nothing in the language of

9    the contract which says that there should be a coin-based

10   accounting, and when this Court asked him to show language

11   in the contract showing there's a coin-based accounting, we

12   heard that it's very complicated and he'd like to make

13   submissions afterwards.

14           It's really not that complicated.  The contract

15   defines the amount that gets paid to KeyFi as net profits.

16   And the definition of net profits specifically says in U.S.

17   dollars.  It's just not -- it's not --

18           THE COURT:  Is it your position that Mr. Stone

19   would be entitled to profits attributable to the rise in

20   value of coins?

21            MR. FREEDMAN:  Judge, yes, that is the deal that

22   Celsius struck by virtue of hedging requirements.

23           THE COURT:  All right.  And at the same time would

24   he also -- would the decline in the value of coins diminish

25   the profit he'd be entitled to?

1            MR. FREEDMAN:  I believe the answer to that is yes

2    unless the cost of hedging or the interaction of hedging

3    with the agreements change that.

4            THE COURT:  All right.  Go ahead.

5            MR. FREEDMAN:  So, judge, the evidence in the case

6    shows that asset purchase agreement is entered into, profit

7    is --

8            THE COURT:  One second, and I'll let you go on,

9    but is that addressed in your brief?  I don't see that

10   really addressed in the plaintiff's brief.

11           MR. FREEDMAN:  I think we talk about a U.S.

12   dollars-based accounting, Judge, and under a U.S. dollars-

13   based accounting, the price of the assets is what governs

14   what was returned.

15           THE COURT:  It's not -- it certainly isn't clear

16   to me that either side has really addressed the issue of

17   what, if any -- how a profit calculation would be affected

18   by the rise or fall in the value of crypto coins.  And so,

19   I'm going to want supplemental submissions from both sides

20   on that, but go ahead.

21           MR. FREEDMAN:  So, Judge, understood and we'll

22   include that in post-hearing briefing, Judge.

23           So, you've got an asset purchase agreement.

24   You've got, it's clear and undisputed that profit -- net

25   profit is owed.  Obviously nobody's expecting KeyFi to work

Page 65

1    for free, although Mr. Mashinsky seemed to have a problem

2    with that yesterday.

3              The evidence shows that Celsius, month after

4    month, sent tens of millions of dollars, hundreds of

5    millions of dollars, to Celsius KeyFi to be managed by Mr.

6    Stone to the point where it was holding over $1.4 billion of

7    Celsius digital assets.

8              And Judge, we saw that in the digital -- in the

9    general ledger that Mr. Mashinsky claimed he never looked

10   at.  That was DX 35.  And we saw that in the e-mail from Mr.

11   Mashinsky on the right, which is DX 40, saying the wallet

12   now shows $1.4 billion in assets.  And we heard that from

13   Mr. Nolan in the -- you can take that down.  Thank you, Mr.

14   Stone.  You heard that from Mr. Nolan who yesterday

15   testified that they transferred -- he was the man

16   responsible for deploying coins.  They just continued month

17   after month transferring these assets.

18             That is not the behavior of a company that does

19   not believe the actions are profitable.  And the evidence

20   shows, Judge, that Celsius KeyFi through Mr. Stone managed

21   these eye popping amounts of Celsius assets for over seven

22   months.

23             And the evidence shows that during that

24   relationship, Celsius considered KeyFi to be a very

25   profitable trading strategy and pushed hard for continued

Page 66

1    deployment through Celsius KeyFi.  Mr. Mashinsky testified -

2    -

3            THE COURT:  All well and good, but nobody has

4    provided an actual P&L for that period.

5            MR. FREEDMAN:  But Judge, we've demanded an

6    accounting and they refused to do it.  We demanded an

7    accounting.  There's a clear contractual right to an

8    accounting.  It's black and white.  We've --

9            THE COURT:  But there also was a contractual -- I

10   -- you know, Mr. Hurley pointed to the language in the

11   services agreement that required Celsius KeyFi to prepare

12   the P&L, correct?

13           MR. FREEDMAN:  Yes, Judge, but --

14           THE COURT:  You don't disagree with it?

15           MR. FREEDMAN:  I don't disagree with that, but

16   what I disagree with, Judge, is that there was --

17           THE COURT:  And none was ever prepared, correct?

18           MR. FREEDMAN:  But they could -- that's correct,

19   Judge, but they could not prepare it, and that's not fair,

20   right?  It's not fair for Celsius to say to Celsius KeyFi --

21           THE COURT:  But it was Mr. Stone's company for

22   which he was CEO that had the responsibility for preparing

23   the P&L, correct?

24           MR. FREEDMAN:  But he couldn't -- yeah, but he

25   couldn't do it.  He couldn't do it.  That's like saying --

Page 67

```
 1                THE COURT:  All right.  I understand that.

 2                MR. FREEDMAN:  But -- and the reason he couldn't

 3      do it is (indiscernible).

 4                THE COURT:  But it don't say -- I don't see

 5      anything in the agreement that says oh, this is too

 6      complicated.  Mr. Stone's company --

 7                MR. FREEDMAN:  That's not what I mean.

 8                THE COURT:  -- can't -- wait - can't do it.  It

 9      says that's who's supposed to do it.  It doesn't say that

10      Celsius is supposed to do it.

11                MR. FREEDMAN:  Your Honor --

12                THE COURT:  It says Celsius KeyFi is supposed to

13      do it.  You agree with that much at least?

14                MR. FREEDMAN:  I agree with that much, but I think

15      I'm talking past you unfortunately.  And I'm going to try to

16      clarify what I'm saying, because no disagreement Jason Stone

17      as Celsius KeyFi had to prepare the P&L.  No disagreement.

18                But you know, there's an impossibility defense,

19      and it's not because it's complicated.  It's not because the

20      transactions were complicated.  Mr. Stone could create that

21      P&L because the transactions aren't all that complicated.

22                What he couldn't do is he couldn't create a P&L

23      because Celsius refused to give the information needed to

24      create the P&L.  So, it's Celsius that frustrated --

25                THE COURT:  Well --
```

Page 68

1           MR. FREEDMAN:  -- Mr. Stone's ability to create

2     the --

3           THE COURT:  -- the evidence is contested -- the

4     evidence is --

5           MR. FREEDMAN:  I understand that.  I understand

6     that, Judge.

7           THE COURT:  Stop.  Stop until I ask my question.

8     The evidence is controverted as to who was responsible for

9     hedging, Celsius or Celsius KeyFi.  Do you agree with that?

10    It's -- your position is it was Celsius.  Their position is

11    it was Celsius KeyFi, correct.

12          MR. FREEDMAN:  I do, Judge.

13          THE COURT:  Okay, go ahead.

14          MR. FREEDMAN:  But my point is, and I don't

15    dispute that it's disputed, it is disputed, right, Judge?

16    That's not in dispute.  But what is in dispute is we,

17    Celsius KeyFi, had to prepare the P&L.  And what we're

18    saying is we could not produce that P&L because we did not

19    have the inputs we needed to create that P&L, i.e. the cost

20    of hedging.  And so there was no ability to create the P&L.

21    Then --

22          THE COURT:  Wait.  Stop for a second.  Do you -- I

23    know you say that it was Celsius responsible for hedging.

24    They say it was Celsius KeyFi.  If the trier of fact

25    concludes that it was Celsius KeyFi who was responsible for

Page 69

1    hedging, then your argument goes away, doesn't it?  Because

2    if they were responsible for hedging and they didn't do it,

3    you needed to know the cost of hedge in order to calculate

4    the P&L, then it's at Mr. Stone's feet for not having done

5    it, correct?

6            I know you dispute who had the responsibility but

7    I'm saying the trier of fact concludes that it was Celsius

8    KeyFi that was responsible for hedging, it's back in Mr.

9    Stone's corner for not having a P&L.

10           MR. FREEDMAN:  To some extent that's true, Judge.

11   I would dispute that any trier of fact could come to that

12   position now with an expedited discovery schedule and based

13   on limited evidence we have, but -- to some extent.  But I

14   also think that even if Mr. Stone failed to deliver the P&L

15   while he was CEO of Celsius KeyFi, even if that's true that

16   he failed and it's his problem and he was wrong for not

17   producing that P&L, that doesn't know how Celsius to say too

18   bad, so sad, you're not owed any money for seven months of

19   work.

20           THE COURT:  Okay.  That's what's called a breach

21   of contract lawsuit, and what I'm saying is I've seen no --

22   nothing in any written agreement that would authorize Stone

23   to just take it with self-help --

24           MR. FREEDMAN:  So, I think the authorization Stone

25   being able to take it comes either through Mr. Mashinsky's

Page 70

```
 1    oral authorization, I'd like to get to why I believe in a --

 2    in a review of the evidence and credibility it appears Mr.

 3    Mashinsky authorized it, or at least it is a significantly

 4    disputed issue of whether or not he authorized it, or that

 5    Mr. Stone had the ability to make these transfers as CEO of

 6    Celsius KeyFi, and I'll get to that in a minute.

 7              So, I agree with you, Judge.  But I -- what I --

 8    what my point is that --

 9              THE COURT:  He didn't make the transfers from

10    Celsius KeyFi.  He made the transfers from Celsius.  It was

11    --

12              MR. FREEDMAN:  No, Judge, he made --

13              THE COURT:  -- coming out of Celsius' wallets that

14    he had -- he had the private keys for.

15              MR. FREEDMAN:  Well, I mean, Judge, I think that

16    that's not how I understand what happened.  What I

17    understand the evidence shows is that Celsius funded --

18              THE COURT:  Point me to the specific evidence.

19    Point me to the specific evidence then, because I --

20              MR. FREEDMAN:  So, Judge --

21              THE COURT:  My understanding of the evidence was

22    we're talking about transfers that came from Celsius, and he

23    was not the CEO of Celsius.

24              MR. FREEDMAN:  So, what happens, Judge, is Celsius

25    transfers money into the OXB-1 wallet.  You'll recall that's
```

Page 71

1        the wallet that -- okay.  That wallet, the OXB-1 wallet, is

2        a wallet that Celsius created and then handed to Celsius

3        KeyFi for use as its custody.

4                So, digital assets that went into the OXB-1 wallet

5        became within the custody, control, and -- custody and

6        control of the OXB-1 wallet, which was a Celsius KeyFi

7        wallet, and the transfers were made from that OXB-1 wallet

8        into other wallets.  And as the CEO of Celsius KeyFi, we

9        maintain Mr. Stone had the authority to make these

10       transfers.  That's argument two on -- in the authorization

11       prong.

12               So, Judge, I mean, but let's get back for a minute

13       to the Mashinsky authorization, right?  And it's important

14       to understand the mindset of the individuals, because what

15       we're trying to figure out is was Mr. Mashinsky in a

16       position where he said to Mr. Stone absolutely, go ahead and

17       take some profit share?  And to do that, you need to put

18       yourself into the mindset of these individuals.

19               Mr. Mashinsky testified yesterday that he

20       authorized transfers from Celsius to Celsius KeyFi because

21       he thought Celsius KeyFi was profitably deploying assets.

22       Mr. Mashinsky testified that he praised Mr. Stone, that he

23       told Celsius employees that KeyFi -- Celsius KeyFi was

24       profitable, and that he thought Celsius KeyFi was at the

25       forefront of decentralized finance.  Clearly, he thinks this

Page 72

1    man, meaning Mr. Stone, is successfully implementing wallets

2    and making a significant profit.

3         Mr. Nolan testified that the belief at Celsius was

4    that KeyFi was profitable, that Celsius CFO Ms. Harumi

5    Thompson, told him that KeyFi was profitable in 2020 and

6    2021, that Alex Mashinsky told Mr. Nolan that KeyFi was

7    profitable in 2020 and 2021, and shared details of how the

8    profitability was working with him, that Mr. Stone told Mr.

9    Nolan that KeyFi -- Celsius KeyFi was profitable, and that

10   Mr. Nolan had personally formed the belief that KeyFi --

11   Celsius KeyFi was highly profitable.  All right?

12        And Mr. Nolan also provided good insight into Mr.

13   Mashinsky's state of mind.  He said Mr. Mashinsky was pretty

14   forceful, and that's a quote, in demanding Mr. Nolan deploy

15   more assets with KeyFi because it was profitable.  He was

16   impeached from his deposition, which showed that Mr.

17   Mashinsky pressured him to work with KeyFi, and on the

18   stand, he said that pressure lasted up until the day KeyFi

19   resigned.

20        Mr. Mashinsky was pushing for deployment with

21   Celsius KeyFi until the very, very end.  Mr. Nolan testified

22   Mr. Mashinsky would praise Mr. Stone, and Mr. Mashinsky

23   would badmouth other employees to prop up Mr. Stone.  And

24   so, we see a company that believes Mr. Stone and Celsius

25   KeyFi, regardless of this Court will eventually -- or jury

Page 73

1    or -- will have to determine whether or not it actually was

2    profitable at some point, but at the time -- we're looking

3    at was the authorization.  At the time, everyone thought

4    this was profitable, highly profitable.  So did Mr. Stone.

5             Mr. Nolan told him that at the time, Mr. Stone

6    said he was entitled to profits, discussed that, the amounts

7    of those profits, and discussed it openly with Mr. Nolan.

8    And Mr. Mashinsky, we saw an e-mail in DX 41 -- can you

9    bring that up, Mr. Stone?  We saw an e-mail from Mr.

10   Mashinsky in DX 41 where he admitted that Mr. Stone had made

11   gains.  It's in writing.

12            Mr. Stone, can we -- there we go, right?  And this

13   is an e-mail on January 18th from Alex Mashinsky to do a

14   coin count and audit to make sure all client assets are

15   returned and book the gains Jason created.

16            So, we already have -- you're looking at Mr.

17   Mashinsky's state of mind on January 18th.  He's right --

18   everybody knows Mr. Stone is creating gains and profits.

19   And then we saw -- thank you, Mr. Stone.  You can take that

20   down.

21            We saw that Celsius' behavior over a seven-month

22   period -- we looked at the general ledger and this behavior

23   is the behavior of a company that believes its strategy is

24   working.  They send 22 million in August, 54 million in

25   September, 81 million in October, 108 million in November,

Page 74

1       36 million in December.

2               So, Judge, the evidence gets us to a place where

3       in January 2021, KeyFi has deployed hundreds of millions of

4       dollars in assets for Celsius.  KeyFi has performed DeFi --

5       Celsius KeyFi has performed DeFi services for over six

6       months for Celsius.

7               Celsius, the company's actions, their writings and

8       their statements all confirmed that KeyFi is profitable and

9       everyone is operating under the theory that KeyFi is

10      profitable.  The APA clearly contemplates that KeyFi is

11      entitled, not Celsius KeyFi but KeyFi, is entitled to a

12      percent of those profits and contemplated payments to be

13      made on December 31, 2020.

14              But come January and Celsius hasn't made a single

15      profit-sharing payment to KeyFi despite the fact that

16      Celsius KeyFi has been profitably managing these services

17      for a very long time.

18              THE COURT:  Show me the P&L that it was

19      profitable.

20              MR. FREEDMAN:  Judge, there isn't a P&L.  We know

21      that, but what I'm telling you is the question today for

22      this Court is were the transactions authorized, and I'm

23      telling you those transactions were authorized because Mr.

24      Mashinsky thought this was the most profitable deployment

25      that he had, and he was sure Mr. Stone was generating

Page 75

1    profits.  And so, when Mr. Stone came to him and said, hey,

2    we don't have this P&L yet, but I'm clearly extraordinarily

3    profitable, can I take some money out, Mr. Mashinsky said

4    yes, because everyone was like this guy is really in money.

5                THE COURT:  He says Mashinsky says yes, and

6    Mashinsky says no.

7                MR. FREEDMAN:  Well, but Judge, to be fair, Mr.

8    Mashinsky said no to a lot of things that I don't think this

9    Court was believing yesterday either.  I mean, we can go

10   through those, but at some point yesterday, the judge told

11   me I was beating a dead horse.

12               I mean, Mr. Mashinsky lied to the public on

13   multiple occasions about Celsius' strength.  He lied to the

14   public about the -- getting a thumbs up from the regulators.

15   He literally -- two days before he froze withdrawals he

16   looked at the public in the eye and was like we've got no

17   problems.  We've got billions of liquidity.  This is not a

18   trustworthy individual.

19               THE COURT:  You know, Mr. Freedman, I don't think

20   either of you want to be resting this case on the

21   credibility of either Mashinsky or Stone, but go ahead.

22               MR. FREEDMAN:  Well, Judge, I understand that

23   although I would submit to you that if it is a question of

24   the credibility of Mr. Mashinsky and Mr. Stone, Mr. Stone is

25   going to win that fight, although --

Page 76

1          THE COURT:  You think so.  You think so?

2          MR. FREEDMAN:  That's what I think the -- and

3     Judge, it's not just -- but the important thing is, I mean,

4     I do.  Mr. Mashinsky was the CEO of a massive company that

5     defrauded thousand -- millions of investors, hundreds of

6     thousands of investors.  Mr. Stone didn't do that.  We --

7          THE COURT:  And Mr. Stone, you know, is alleged to

8     have taken $10 million dollars that wasn't authorized.

9          MR. FREEDMAN:  He's alleged to have taken it that

10    wasn't authorized, and we've shown Your Honor under

11    expedited discovery schedule numerous pieces of evidence

12    that show that everyone at this company believed that this

13    was profitable and that these transactions were authorized.

14          And Judge, there's another thing.  You got to see

15    yesterday Mr. Mashinsky on the stand and you got to see

16    yesterday Mr. Stone on the stand.  All right?  Mr. Mashinsky

17    on the stand yesterday was evasive.  He pretended not to

18    understand simple questions.  He claimed he'd never seen the

19    general ledger of the company he was the CEO of.  He claimed

20    not to be able to click a few buttons on Etherscan to see

21    where the NFTs were being purchased.

22          Judge, I'd tell you to compare that to the

23    behavior of Mr. Stone on the stand.  Mr. -- and even before

24    he got on the stand, he spent dozens of hours creating a

25    detailed spreadsheet tracking every single transaction, sat

Page 77

1    for numerous depositions, answered every single question.

2    He hasn't hidden transactions.  He gave direct answers to

3    the questions Mr. Hurley was asking for him yesterday, and

4    while he hasn't yet been able to locate written

5    communications he thinks exist, quite frankly discovery has

6    just begun.

7              And I take issue with the idea that under an

8    expedited discovery schedule it's tough to produce an entire

9    e-mail inbox.  It's actually the easiest thing to do.  You

10   just take the e-mail inbox and you give it to us.

11             We didn't get it.  We have some of those e-mails,

12   yes, not all of them.  But Judge, it's not -- this is not an

13   exercise of is Mr. Mashinsky the truth teller or Mr. Stone

14   the truth teller.  That's not what this is, because there's

15   much more than that.  The allegation that KeyFi was stealing

16   NFTs, it doesn't add up.  It doesn't make common sense.

17             The facts show that everyone thought KeyFi was

18   wildly profitable, owed money, and had not been paid.  OXB-

19   1's purchases of NFTs, Celsius KeyFi's purchases of NFTs

20   were made on a public blockchain.  The facts show that a few

21   clicks -- Mr. Stone showed the court Etherscan.  A few

22   clicks on the screen will show you that these NFT purchases,

23   you literally enter the address into Etherscan, click ERC-

24   721 tokens, and the purchases come up in a long list on

25   their dates.

Page 78

1          KeyFi -- also Mr. Stone, he wasn't secretive about

2    these purchases.  He opened a highly visible Twitter account

3    and tweeted about these purchases.  The OXB-1 Twitter

4    account was one of the largest twitter followings in DeFi

5    activities at the time when it was opened.  It had tens of

6    thousands of followers.

7          And if you're tweeting about the -- and not only

8    was he tweeting about these purchases that they're claiming

9    were theft, he tweeted about them five days after Mr.

10   Mashinsky scolded him for tweeting.  I mean, that's not the

11   behavior of a thief.  That's not the behavior of somebody

12   who thinks he's not authorized to take these -- to take the

13   -- make these transfers.  You don't go around broadcasting

14   it on Twitter.  You don't go around making these public

15   purchases.

16         And Mr. Nolan made the same testimony.  His

17   testimony also demonstrates that Mr. Stone was not acting

18   like a thief.  Mr. Nolan testified that he knew about the

19   Twitter account, too, and that it was a popular Twitter

20   account.  He talked about the Twitter account with both Mr.

21   Stone and with Celsius' CFO and that he knew Stone had

22   purchased NFTs prior to his departure and that

23   contemporaneous --

24         THE COURT:  Look, Mr. Stone's self-promotion on

25   Twitter is not going to carry this case for him.

1          MR. FREEDMAN:  But Judge, my point is it shows the

2     state of mind were the transactions authorized or not.  This

3     Court has to make a determination of likelihood of success

4     on the merits.  Were these transactions authorized?  And I

5     would submit to you that Mr. Stone may be a lot of things.

6     He's not an idiot, and only an idiot would steal NFTs and

7     tweet about them to thousands of followers when your boss

8     has just told you to stop tweeting and when you've got

9     literally Mr. -- your boss is following your Twitter

10    account.  I mean, that's just not the behavior of a thief.

11         So, when this Court has to say were these

12    transactions authorized, I think you have to say it's -- Mr.

13    Stone's either a complete idiot or these transactions were

14    authorized.  And I know Mr. Stone, and I think you saw Mr.

15    Stone on the stand.  He's not an idiot.

16         So, finally, Judge, we know that there's another

17    piece to this puzzle.  Mr. Mashinsky has authorized payment

18    in the form of NFTs before.  He had Celsius pay his wife two

19    NFTs for work.  This is not like it's never happened before.

20    This has happened before.

21         So, Judge, when you are asked to look at the

22    global picture of were these transactions authorized by Mr.

23    Mashinsky, I'd submit to you and I understand the Court

24    pushed back, that if you're weighing the credibility of

25    these two witnesses, Mr. Stone wins.

1           But I'm not asking you to just do that.  I'm

2   asking you to look at the totality of the circumstances and

3   I'm telling you it doesn't make sense that Mr. Stone is a

4   thief.  The facts don't line up.  He was open and

5   transparent about what he was doing.  That's not what a

6   thief does.

7           When you embezzle money from a company, you don't

8   do it in broad daylight and tell everybody you're doing it,

9   and if you do, the company slams you, cuts you off, fires

10  you, gets you indicted.  None of that happened.

11          THE COURT:  Well, he may have believed --

12          MR. FREEDMAN:  It wasn't until months later that

13  Mr. Hurley walks in and --

14          THE COURT:  Stop.  He may have believed that he

15  was entitled to money, but that doesn't entitle him to self-

16  help.

17          MR. FREEDMAN:  Well, but Judge, the self-help is

18  what happened after the authorization ended, and we've

19  conceded that there --

20          THE COURT:  There was no -- wait a second.

21  There's disputed issue of fact whether there was

22  authorization, okay?  Even if I credit Mr. Stone that he was

23  authorized to do it, it's one thing to do it while you're --

24  while he's still with the company and another thing after,

25  and that's why I asked for a breakdown of transfers before

Page 81

1    and after that.

2          I know you've argued that it wasn't a firm

3    resignation as of the date of the letter, that it was a

4    transition period.  I'll have to consider that.  You gave a

5    breakdown for transfers as of particular dates, March 26th

6    $530,000 after that date, and you argued the number goes

7    down from there depending on what data you use, and I'm

8    going to require additional submissions where you make that

9    point quite clear.  That -- I didn't see that breakdown in

10   the brief that was filed on behalf of Mr. Stone

11   (indiscernible).  Go ahead.

12          MR. FREEDMAN:  Understood, Judge, and I'm happy to

13   include that.  I want to address the DAI transfer, Judge,

14   because there's $1.4 million worth of DAI that's transferred

15   afterwards, and I said earlier that I was excluding that

16   from my calculations, and I excluded it for a reason.

17          I think the Court understands what happened here,

18   which is there was a malicious attack and as a result of

19   that malicious attack, there was a liquidation on the

20   compound protocol, which resulted in certain ETH being

21   forcibly sold at certain prices.

22          Mr. Stone's testimony yesterday, and it's

23   undisputed, is that actually didn't result in a loss for

24   Celsius because while the --

25          THE COURT:  Well, that was not -- it was -- it

Page 82

1    definitely was disputed yesterday.

2           MR. FREEDMAN:  I'm not -- well, the --

3           THE COURT:  Mr. Hurley presented evidence from

4    Stone himself about people having suffered loss.  So, don't

5    tell me it was undisputed that there was no loss.

6           MR. FREEDMAN:  Well, it was my understanding that

7    Mr. Stone testified that because the ETH was purposed back

8    that day or shortly thereafter at a much less expensive

9    price, there actually wasn't a loss to Celsius.

10          That's how I recall the evidence, Judge.  I don't

11   have a transcript in front of me.  You're the fact-finder.

12   If you remember it differently, you remember it differently.

13   But what I will say is under that understanding of the

14   evidence, even if there was some small loss to Celsius, that

15   $1.4 million worth of DAI was not Celsius assets.  That $1.4

16   million worth of DAI was literally dropped into a wallet by

17   the compound protocol.  And the reason it was dropped into

18   that wallet was the result of months-long lobbying effort by

19   Mr. Stone to get that accomplished.

20          And so, he lobbied the compound community to make

21   that airdrop.  They literally just dropped it in.  That

22   happened to be the address they dropped it into because

23   that's the address he was using as his identity to lobby for

24   it.  And so, then he did --

25          THE COURT:  Where did the value go?

1              MR. FREEDMAN:  And so, then he did -- he took

2     those -- Mr. Stone took them and distributed I think to some

3     of his friends, who as you said, one of them purchased a

4     house -- down payment on a house and he took some of it

5     himself.

6              But my point is it's different in character and in

7     kind, because it's not -- in our view it's not a Celsius

8     asset.  It was airdropped by the compound protocol.

9              THE COURT:  I don't understand that.  That I do

10    not understand at all.

11             MR. FREEDMAN:  Well, Judge, let's say you -- you

12    know, me and Mr. Roche started a business together and we

13    use a bank account and both of our names are on that bank

14    account, and then I go out and lobby for there to be some

15    sort of payment to me for -- and I spend months doing that

16    and then they say, you know what, fine, and they dropped the

17    money into -- they transfer the -- wire transfer the money

18    into our joint account and then I take those funds.  That's

19    our --

20             THE COURT:  Why wasn't it Celsius' property?  Why

21    shouldn't it have been dropped into a Celsius wallet?

22             MR. FREEDMAN:  Well, it was dropped into this

23    wallet that would belong to Celsius KeyFi, and that --

24    because Mr. Stone has since left the company, but at the

25    same time it was the result of his efforts and the fruits of

Page 84

1    his labor.  It wasn't Celsius (indiscernible) --

2              THE COURT:  And he didn't have to ask -- he didn't

3    have to ask Celsius, oh, it's okay if I keep it and if I

4    give half of it to my co-founder or anything like that,

5    right?

6              MR. FREEDMAN:  I mean, would that have been a best

7    practice?

8              THE COURT:  That's your position?  That's your

9    position.

10             MR. FREEDMAN:  No, no, no, I -- that -- our

11   position is as a legal matter he didn't have to.  Now, to be

12   clear, if the judge -- if the judge or a jury or whoever

13   ends up finding that he wasn't entitled to take it, he'll

14   return it.  But my point is, it's not an unauthorized

15   transfer.

16             THE COURT:  Where is the money now?  Where is the

17   money now?  Where's the value --

18             MR. FREEDMAN:  I think Mr. Stone testified to that

19   on the stand yesterday, but I don't have the transcript in

20   front of me, Judge.

21             THE COURT:  What did he -- what's your

22   recollection of what he said?

23             MR. FREEDMAN:  My recollection is that half of it

24   went to -- or a third of it went to his co-founders who one

25   of them got a car, one of them put a down payment on a

1    house, and that he --

2              THE COURT:  And he didn't remember what he did

3    with his share?

4              MR. FREEDMAN:  Honestly, Judge, I don't remember

5    what he said on the stand yesterday.  If that's your

6    recollection, I'm not going to dispute it.

7              THE COURT:  You seem to remember everything else

8    about the transcript except what Mr. Stone did with the

9    assets that he received.

10              MR. FREEDMAN:  I spent a lot of -- Judge, I spent

11    a lot of time yesterday --

12              THE COURT:  (Indiscernible) look, you're showing a

13    very clear recall of facts other than what Mr. Stone got and

14    what he did with hit.

15              MR. FREEDMAN:  I'm not sure what the Court's

16    insinuating, but I -- Judge, I -- the facts I recall are the

17    facts that I recall as a result of my efforts with my team

18    yesterday from last night.  I can assure you there's nothing

19    going on here.  I'm not hiding anything from the Court.

20    There's a transcript.  If the Court wants post-hearing

21    submissions, we will (indiscernible) that transcript.

22              THE COURT:  Tell me -- I want to know -- it may be

23    unflattering to your client.  What's your recollection of

24    what the testimony in the record is with respect to what Mr.

25    Stone did with that -- the value of those assets that came

Page 86

1    back into the wallet.

2              MR. FREEDMAN:  Which assets?

3              THE COURT:  Yes, what did he do with it?

4              MR. FREEDMAN:  Which specific --

5              THE COURT:  What's your recollection of the

6    testimony?  You have a very clear recollection of things

7    that you like but somehow you don't really remember things

8    that may not be very flattering for Mr. Stone.

9              MR. FREEDMAN:  Judge, which specific assets are we

10   talking about?  The DAI?

11             THE COURT:  Yes.

12             MR. FREEDMAN:  Again, Judge, I think I told you

13   that half -- I think a third of it or some portion went to

14   his co-founders and he doesn't know where that is, and then

15   he kept --

16             THE COURT:  And what happened to the portion that

17   came to him?

18             MR. FREEDMAN:  Can I have a minute, Judge?

19             THE COURT:  Yes.

20             MR. FREEDMAN:  Judge, now I -- what I recall now

21   and having conferred is he said some of it got transferred

22   into his bank account and co-mingled with his other funds

23   and he can't tell -- he can't tell what happened to it.

24             THE COURT:  Go ahead.

25             MR. FREEDMAN:  Okay.  So, Judge, I want to -- I

Page 87

1    want to pivot from here, from the -- under the authorization

2    argument, and Mr. Mashinsky authorized it.  I want to pivot

3    to -- it was authorized because Mr. Stone was the CEO of

4    Celsius KeyFi.

5           Before I do that, though, I want to point out that

6    this Court is sitting in a preliminary injunction posture.

7    I know the Court's familiar with the standard of a

8    preliminary injunction, but I would like to point out one

9    portion, because I think Mr. Hurley misstated the exact

10   standard.

11          Under the 2nd Circuit, you have to show likelihood

12   of success on the merits or you have to show sufficiently

13   serious questions have been raised and -- and this is the

14   part that was missing from the presentation -- and that the

15   balance of hardships tips decidedly in their favor.

16          So, if you go -- if you go under the likelihood of

17   success prong, you don't need to do that necessarily, but if

18   you go under the sufficiently serious questions, you need to

19   show the hardships, and I'm going to return to the hardships

20   in a minute, because Judge, the hardships aren't anywhere

21   close here.  But let me transition -- under our

22   authorization argument, let me transition from Mr. Mashinsky

23   authorized it to Mr. Stone had the authority.

24          So, we went through the structure of how this

25   company works and how KeyFi became -- you know, KeyFI got

Page 88

```
 1    bought out for a percentage of profits.  Mr. Stone became
 2    the CEO of Celsius KeyFi and was providing services under
 3    those agreements.
 4            So, I'd like to, Judge, pick up the asset purchase
 5    agreement.  Mr. Stone, could you share the relevant portion?
 6    This is DX 40, Judge, and I'm on the first page of that --
 7    of that exhibit.
 8            THE COURT:  I have it open in front of me.
 9            MR. FREEDMAN:  Thank you.  Judge, I need it just
10    to see it if you don't mind.  I'm sorry.
11            THE COURT:  That's fine.  Put it up on the screen.
12            MR. FREEDMAN:  That's tough to see, but okay.  You
13    know what?  I have a little bit of it here.  All right.
14            So, Judge, under the asset purchase agreement, the
15    KeyFi, meaning the company Stone owns, majority, is the
16    seller because it's selling its assets.  Celsius KeyFi, the
17    wholly owned subsidiary of Celsius, is the buyer, and
18    Celsius Network Limited is the parent.
19            So, now if we go -- and that that definition is
20    important to keep in mind.  Let's jump to Section 3 of that
21    asset purchase agreement.  Mr. Stone, can you bring up that
22    portion?
23            And so, now I'm at DX 40.  I'm at Page 7 of DX 40,
24    Judge.
25            THE COURT:  Okay, I'm there.
```

Page 89

1           MR. FREEDMAN:  PX 40.  PX 40.  I'm sorry.

2           THE COURT:  I'm there.

3           MR. FREEDMAN:  All right.  So, under Section 3 of

4    the asset purchase agreement, Celsius KeyFi is the party

5    responsible for paying KeyFi.  So, let's go through this.

6    As the sole and exclusive consideration for the seller,

7    that's KeyFi, Stone's company, commitments under this

8    agreement, the buyer, that's Celsius KeyFi, the company

9    Stone is the CEO of, shall pay or cause to be paid to the

10   seller, to KeyFi, Stone's company, in immediately available

11   funds by wire transfer any earn-out payment.

12           So, under the asset purchase agreement, the

13   company that Mr. Stone is the CEO of is responsible for

14   paying Mr. Stone's company, and it's this -- this is the

15   power in the clear black and white terms of the contract

16   that authorized Mr. Stone, while he was the CEO of Celsius

17   KeyFi -- in fact, he was obligated as the CEO of Celsius

18   KeyFi a portion of the earn-out payment.

19           And Judge, the services agreement, that confirms

20   this relationship as well.  So, Mr. Stone, can you pull up -

21   - is it DX or PX 41?  PX -- PX 41, Judge.  Can we pull up

22   the services agreement in PX 41?

23           So, here -- is that -- yeah, PX 41.  Here, Judge,

24   the services agreement confirms the same -- the same

25   relationship because the service agreement refers to Celsius

Page 90

1    KeyFi, the entity that Stone was the CEO of, as KeyFi,

2    confusingly, and Celsius Network Limited as Celsius.

3            And under Schedule A of the services agreement

4    titled Material Service and Relationship Terms, it was

5    Celsius KeyFi that -- and I'm going to quote, Mr. Hurley

6    showed you this, too, KeyFi, which means Celsius KeyFi, the

7    company that Stone was the CEO of, shall retain control of

8    its internal budget and profit and loss determination in

9    good faith.

10           So, KeyFi had to make a good faith profit and loss

11   determination and KeyFi, Celsius KeyFi, the company Stone

12   was the chief executive officer of, had to determine profit

13   and had to pay profit.

14           Now, the Court has said, well, where's the profit

15   and loss statement --

16           THE COURT:  And you agree -- just a second, Mr.

17   Freedman.  You agree, and I think we sort of fenced about

18   this point before, that Celsius KeyFi never produced a

19   profit and loss statement that would be used for determining

20   what distribution is required, correct?

21           MR. FREEDMAN:  I do agree with that, Judge.  But I

22   will tell the Court that there is no requirement to produce

23   a profit and loss statement in the contract.  The contract

24   says KeyFi shall retain control of its internal budget and

25   profit and loss determination, and I --

Page 91

1                THE COURT:  So, where -- show me a piece of paper.

2                MR. FREEDMAN:  Well, but Judge, I have to --

3                THE COURT:  Wait, stop.  Let me ask my question.

4                MR. FREEDMAN:  Okay.

5                THE COURT:  Show me a piece of paper that has that

6      profit and loss determination, because I don't think there

7      is one.  Is there?

8                MR. FREEDMAN:  As far as I know, Judge, there's

9      one document that showed one -- Judge, can I have one

10     moment?

11               THE COURT:  Yes, you can.

12               MR. FREEDMAN:  Judge, a couple things.  There is

13     one document we're going to pull up on the screen for you

14     now showing a small percentage of profit that was in the

15     general ledger from KeyFi.

16               However, I think, Judge, that it's fair to say

17     that what was going on was Stone was having conversations

18     with Mashinsky and others about profitability and KeyFi was

19     providing not a full comprehensive review but screenshots of

20     this company -- you heard a lot about this website called

21     De-Bank which showed profitability and was showing these two

22     people and then in good faith made a determination that he

23     was -- he had earned so much profit, he was able to take

24     some, the final amount to be determined when a full profit

25     and loss statement had been created.

Page 92

1           But again, Judge, there doesn't need to be a

2    written P&L.  It's a little short, Judge, but if you go to

3    DX 34 -- Mr. Stone, what's the line -- what's that line?

4    This is the huge spreadsheet, Judge.  We'll find the line

5    for you, but if you look at the bottom one, it says 10

6    percent accrual for KeyFi revenue share and it shows a $1.2

7    million number.

8           So, this is in the general ledger of Celsius.  So,

9    you do see a written confirmation from Celsius that some

10   profit share was owed.  Again, Judge, stepping back into our

11   argument here, Celsius KeyFi, who Mr. Stone was the CEO of,

12   had the ability and in fact indeed the obligation to pay

13   KeyFi, the company Stone was the owner of, a profit share

14   and one that he had to determine in good faith, not one that

15   required a full-blown written profit and loss statement.

16          And Judge, this is why the audit right exists,

17   right, in the asset purchase agreement which allows KeyFi,

18   Stone's company, to invoke the audit right against Celsius

19   KeyFi, the company that Stone was the CEO of, the one that

20   was obligated to make the earn-out payment, right?  This all

21   lines up.  The agreements all line up.

22          So, Mr. Stone, can you pull up PX 40 at 16, the

23   audit right?  And I'm at Page 16 of that -- of that

24   document, Judge.

25          THE COURT:  I see it.

Page 93

1          MR. FREEDMAN:  You see it?  So, it says within the

2    later to occur, 14 calendar days -- I'm in Romanette I,

3    right, after any payment by buyer, okay, that is -- buyer is

4    Celsius KeyFi, the company Stone is the CEO of, due under

5    this agreement or 30 calendar days after such agreement, if

6    seller, that's KeyFi, the defendant, if seller is

7    dissatisfied with the payment or if non-payment occurs, non-

8    payment occurred, seller, that's defendant, may invoke an

9    audit of buyer, that Celsius KeyFi, plaintiff, relevant

10   records using seller's chosen auditor who shall be

11   nationally licensed CPA.

12          So, Judge, all of these agreements line up.

13   Celsius KeyFi, the company Stone was the CEO of, had a

14   contractual obligation to pay the defendant a profit share,

15   and Celsius KeyFi, the company that Stone was the CEO of,

16   had the right to determine profits in good faith, not

17   subject to the creation of a formal P&L.

18          Now, should a formal P&L be created?  Yes.  And

19   when no payment occurred from the plaintiff to the

20   defendant, the defendant invoked the audit right and the

21   plaintiff ignored it.

22          MR. FREEDMAN:  Okay, I started out with Mr. Hurley

23   by saying that I think that you have presented a good faith,

24   colorable claim for breach of contract and that Stone was

25   entitled the audit.  Where I part company is that there is

Page 94

```
 1    no justification for self-help, okay?  It may well be that

 2    you had a good claim that they -- that Celsius breached the

 3    contract.  You sought to trigger the audit provisions; they

 4    didn't respond and that would justify, you know, when you

 5    filed a state court action, for example, that KeyFi was

 6    entitled to an audit -- to trigger the audit and may well

 7    have been entitled to a profit share.  Okay?

 8              I separate that out, and in my mind that's quite

 9    different from saying the heck with you, I'll just take the

10    money.  You come and get me.

11              MR. FREEDMAN:  I -- Judge, I don't disagree.

12    Here's -- we don't disagree, and I -- Judge, I opened this

13    this argument saying that there is certain transfers that

14    are -- were unauthorized.  I conceded that off the bat.  I

15    got up here and that's the first thing I said.

16              I said it matters the date, and now you know,

17    Judge, after I've walked you through this argument why the

18    date matters, because so long as Stone was CEO of the

19    company that was required to make the payment to the

20    defendant, he was authorized to make those transfers.

21              THE COURT:  Yeah, we -- I -- well, look, I -- the

22    fact that he was CEO would not authorize him -- would not in

23    my view, unless you've got some authority for this, that he

24    unilaterally could decide I'm just going to take the $10

25    million.  The heck with them.  They either will do the
```

Page 95

1    accounting or -- you can't because you're CEO, you just

2    can't decide the heck with you, I'm just going to take it.

3            MR. FREEDMAN:  But I don't -- Judge, I don't think

4    that's what happened.  He had -- he had to make a good faith

5    determination.  So, if we go to PX 41 --

6            THE COURT:  There's not a single document -- I --

7    look, you're pointing to DX 34 and the line that shows 10

8    percent accrual of KeyFi revenue share you say is --

9            MR. FREEDMAN:  Which is Line 67.

10           THE COURT:  I'm sorry?

11           MR. FREEDMAN:  It's Line 67, Judge.  I promised

12   you I'd give you that number.

13           THE COURT:  Okay.  Let me -- I'm making a note of

14   that.  Okay.  And that to me is far from an authorization to

15   show an authorization to just do it.

16           MR. FREEDMAN:  But Judge, he was the chief

17   executive officer -- chief executive officer of the company

18   and pursuant to the contract --

19           THE COURT:  You think a chief executive officer

20   can just without any authority from anybody else, without

21   board authority, no matter what the dollar amount is, they

22   can just do it?  Take it for themselves?  I don't know of

23   any law that says that.

24           MR. FREEDMAN:  No, Judge, he's acting pursuant --

25   he's acting pursuant to --

1          THE COURT:  (Indiscernible) prosecuted all the

2    time for just taking the money and it's not a defense to say

3    oh, I'm the CEO.  I can take what I wanted.  That's not the

4    law.

5          MR. FREEDMAN:  But Judge, this isn't a situation

6    where Mr. Stone just walked in as CEO of the company and

7    just took money, right?  I mean the company that he's the

8    CEO of had a contractual obligation to pay the defendant.

9          THE COURT:  And if they didn't do it, he's got a

10   breach of contract, and you just can't do it yourself.

11         MR. FREEDMAN:  No, no, no.  But Judge, he was the

12   CEO of the company.

13         THE COURT:  Let me stop.  Stop, stop.  You're

14   going to have to brief why his being CEO would give him the

15   authority to just take $10 million.  I'm using that number.

16   That may not be the right number, okay?

17         MR. FREEDMAN:  I understand.

18         THE COURT:  That he can just do it without -- it's

19   an affiliate.  It -- you know, I have never -- I have never

20   -- look, I've never seen a case that says, you know, unless

21   there are board resolutions and all sorts of authority, CEO

22   just can't decide to take $10 million and say, well, of

23   course, I'm the CEO.  I can do what I want.  That's

24   nonsense.  If you've got authority that says he can, I want

25   to see it.

```
 1              MR. FREEDMAN:  And judge, I don't think -- I think
 2    -- we're not disagreeing.  I'm not saying the CEO can just
 3    transfer willy nilly whatever he wants, and we will brief
 4    this, but my point is that Jason Stone was the CEO of a
 5    company that had a contractual obligation to make that $10
 6    million payment.  And we'll brief it.  It's in the -- it's
 7    in the contracts.  And my statement to you is he was well
 8    within his authority as CEO of fulfilling his company's
 9    contractual obligations.  We will brief it, Judge.  But I'm
10    telling you it's there in the contracts.  We walked through
11    some of it now.  We'll put it very clearly, but that company
12    had a contractual obligation to pay it and he was well
13    within his authority as CEO of the company to fulfill that
14    contractual obligation.  Now, it's $10 million.
15              THE COURT:  That's where I disagree.  That's where
16    you've got to persuade me on that and Mr. Hurley's --
17              MR. FREEDMAN:  Okay.
18              THE COURT:  -- going to get a chance to respond to
19    that.
20              MR. FREEDMAN:  We will do our best, Judge.  I
21    understand.  So, Judge, you know, I think that's the two
22    prongs of the authorization argument, right?  So, these
23    transfers, I think you and I, Judge, have talked about this
24    and I think we've agreed, not that it matters what I agreed
25    to, but we've agreed nonetheless that there's a certain
```

Page 98

```
 1    point in time at which that the transactions, the transfers,

 2    were without authorization.  And the question is, what is

 3    that date?

 4            And so, now I'm talking about, well, when was that

 5    authorization -- when do you find that line, and what was

 6    the authority to transfer?  And prong one is, well, Mr.

 7    Mashinsky approved them and we've gone through that.

 8            THE COURT:  Look, I'm not sure that -- you know,

 9    what is it that you think gives Mr. Mashinsky without, you

10    know, a board resolution to just do what he wants, say go

11    ahead, take the $10 million?  And I'm using that number as a

12    hypothetical.  I'm just -- you know?

13            MR. FREEDMAN:  I mean, Judge, I don't --

14            THE COURT:  I don't think he would have the

15    authority to do that either.

16            MR. FREEDMAN:  I'd have --

17            THE COURT:  Without a piece of paper that

18    documents that it was done, without a board resolution that

19    says go ahead and do it, that -- you know, without a scrap

20    of paper -- I understand (indiscernible) early stages.  The

21    fact of the matter is Mr. Stone took a back-up of his e-mail

22    files.  He hasn't produced an e-mail.  He hasn't produced a

23    WhatsApp from his phone or a text message from his phone.

24    There's no document that supports his having the authority

25    to -- having been given the authority.
```

1              Even -- you know, if there was a text message from

2      Mr. Mashinsky who said go ahead and do it, I'm not -- at

3      least he would have an argument perhaps that, well, I acted

4      in good faith on the statement from the CEO of the parent

5      company.

6              He doesn't -- he doesn't have that, okay?  I don't

7      -- I don't know what the bylaws of Celsius, whether they --

8      you know, what was the extent of the authority, and the CEO

9      just said go ahead and take it, go ahead and take the

10     million dollars.

11             MR. FREEDMAN:  I mean, Judge, neither do I, and

12     neither did Mr. Stone.  And I don't think that's his

13     obligation.  If the CEO of a company tells you you are

14     permitted to take this, you can rely on that in good faith.

15     I mean, that -- I think that's non-controversial.

16             THE COURT:  You think so?  You really think --

17             MR. FREEDMAN:  I think so.  If you -- if you have

18     a contract with a company, a company that's managing assets

19     over $20 billion, to which you've deployed $1.4 billion

20     worth of assets to under the authority of Mr. Mashinsky, and

21     you say to him, hey, I've made all this profit.  Can I take,

22     you know, X amount of dollars, and he says yes, I mean,

23     that's a -- look, $10 million is a lot of money, Judge, but

24     for Celsius at the time it was nothing.  It was nothing, and

25     probably the board wouldn't have wanted to be even bothered

Page 100

1    with it.  I don't know.  We'd have to check that the

2    documents, but I don't think it'd be fair to fault Mr. Stone

3    for relying on the CEO's authorization.

4              Also Judge, you know, there's one more thing.

5    This is a preliminary injunction.  We're not here on the

6    merits, right?  Like every conversion claim -- every

7    conversion claim doesn't get accompanied with a preliminary

8    injunction.  Like, maybe they have a good claim.

9              THE COURT:  Mr. Freedman, my concern is I was --

10   just put it this way.  I was distressed to hear that

11   $100,000 or so was transferred out yesterday or the day

12   before.

13             MR. FREEDMAN:  Well, let --

14             THE COURT:  Okay?  One thing --

15             MR. FREEDMAN:  -- I've been waiting to address

16   that.

17             THE COURT:  Hold on.  I'm going to say it now,

18   okay?  And Mr. Hurley -- you and Mr. Hurley can work on the

19   terms of the written order, but I'm so ordering the

20   transcript that Stone and KeyFi are not authorized absent

21   further court approval to make any further transfers, okay?

22             I don't want to find out, but oh, Judge, you know,

23   there was nothing in place while you were considering it.

24   We're doing some further briefing.  I don't want to find out

25   that he's transferred beyond the reach of the Court because

Page 101

1    it can't be traced, however much money, okay?

2          I believe -- I'm not deciding the -- call it a

3    TRO, okay?  I believe that at this stage pending a decision

4    on the preliminary injunction that the plaintiffs have shown

5    a substantial likelihood of prevailing on the merits and are

6    entitled to a temporary restraining order restraining the

7    defendants from transferring any other assets away.

8          I don't want to find out, you know, your -- I'm

9    going to ask you -- both of you when you're going to submit

10   your additional briefs, fine, and I'll allow you

11   (indiscernible) agree on that.  Okay?  These are important

12   issues, but I don't want to find out that, you know, more

13   money was siphoned away while you were all doing your

14   briefing.

15         So, I'm making it crystal clear now what I want

16   you and Mr. Hurley to do is agree on the terms of the

17   written order.  It's a temporary restraining order.  It will

18   remain in place until the Court has decided the preliminary

19   injunction motion, and it's to prevent exactly what I just

20   said.  I don't want -- maybe you're ultimately going to --

21   you'll prevail in the preliminary injunction, but I don't

22   want to find out that while I'm waiting for these additional

23   briefs, Mr. Stone has, you know, transferred additional

24   funds away.  It's just -- I don't want that to happen.

25               MR. FREEDMAN:  So, understood, Judge.  A couple of

Page 102

1    things.  To the extent it's required, I don't have the law

2    on my fingertips.  Obviously, the order is the order and we

3    will abide by it, but we object to it.  But I understand

4    your order, and we will abide by it.

5            THE COURT:  Well, fine, you can object to it.  You

6    can -- if you think you can appeal, you can do what you

7    want.  But I don't --

8            MR. FREEDMAN:  Judge, I don't --

9            THE COURT:  -- want to see more money bleeding

10   away while you get to submit additional briefs, okay?

11   That's what I'm making crystal clear.

12           MR. FREEDMAN:  I understand, Judge.  I don't know

13   what our rights are.  I just don't ever want to be accused

14   of waiving it by not saying something, and that's why I'm

15   just preserving.

16           Judge, I do want to say that it was -- it is very

17   clear Mr. Hurley admitted there was no such restriction,

18   there was no order violated, and to be very clear, and I

19   just want to say, Judge, to be very clear, my law firm has

20   custody of that -- of those tokens, the stable tokens, and

21   we have not touched them pending a decision on this motion,

22   and if the Court orders then returned, they will be returned

23   immediately.

24           THE COURT:  I'm not --

25           MR. FREEDMAN:  So, I don't want -- that shouldn't

Page 103

1    --

2            THE COURT:  Mr. Hurley very upfront that there was

3    no restriction in place.  I understand that, but I don't

4    want to find out --

5            MR. FREEDMAN:  Understood.

6            THE COURT:  -- while I'm deciding this, a

7    substantial amount of value funds have been bled away and

8    can't be recovered.  I just -- that's not going to happen.

9            MR. FREEDMAN:  Understood, Judge.  So, we will

10   work with Mr. Hurley to get that in place.

11           Judge, with that, I would like to turn to the

12   balance of the hardships because they need to -- they need

13   to show the balance of the hardships.

14           So, look, I think we've covered that we don't

15   believe they've fulfilled their burden, although I would not

16   contest that they have raised sufficiently serious questions

17   going to the merits to make them a fair ground for

18   litigation.

19           I think we concede they've made that showing,

20   Judge, but that's not enough.  To get the injunction, they

21   also have to show that the balance of hardships falls

22   decidedly in their favor, not in their favor, decidedly in

23   the favor.

24           Judge, they cannot do that.  Celsius has no

25   argument that absent an injunction it's going to suffer any

Page 104

1   significant hardship.  It can afford to pursue its claims.

2   The estate is sitting on billions of dollars in assets.  If

3   it prevails, it --

4           THE COURT:  How about to the unsecured creditors?

5           MR. FREEDMAN:  Okay, Judge, I know that Celsius

6   has already paid Mr. Hurley's firm over $1.5 million worth

7   of legal fees, so clearly they're not having an issue

8   affording this case.  So -- and if it does prevail, it can

9   enforce the judgment against defendants like all plaintiffs

10   can enforce it against defendants.

11           So, defendants have to show that there's a real

12   reason to suspect that there will be some kind of

13   dissipation of assets or that the assets will be dissipated

14   beyond the expenditure of attorney fees.  We'll discuss with

15   the Court.  And quite frankly, Judge, that claim is absurd.

16           First of all, to be clear, the addresses and

17   assets that Celsius is desperately seeking to enjoin are a

18   few million dollars in assets with certain tokens and NFTs.

19   To preserve a few million dollars' worth of assets, Celsius

20   has expended likely more than those assets are even worth,

21   because there's -- $1.5 million has been spent on this

22   litigation before the preliminary injunction has been filed

23   by Mr. Hurley's firm, the expedited discovery was

24   undertaken, this hearing was prepared for and attended.

25   You've got to imagine if they're at 1.5 then, they're way

1      over that now.

2              Celsius could have preserved these assets by

3      simply agreeing to some kind of limited injunction.  The

4      assets haven't moved from that account for 10 months with

5      the exception of this $100,000 in attorney's fees.  Mr. --

6      the defendant has cooperated with an accounting and prepared

7      an audit and a spreadsheet and sat for deposition.  This is

8      insanity, right?  Like, in terms of a -- the benefit of the

9      hardships -- the balance of the hardships here, Celsius is

10     sitting on an insane amount of money and expending an absurd

11     amount of money more than the assets are worth to enjoin

12     them.

13             It's -- it doesn't -- we haven't even gotten to

14     the merits.  So, in terms of the balance of hardships, this

15     is -- this is the 2,000 pound gorilla.  This is the true

16     David and Goliath, right?  I mean, there's no -- there's no

17     comparison, and defendants will face substantial harm if

18     this injunction is entered.  The Court's TRO is already

19     going to create substantial harm because these are the sole

20     assets of the defendant KeyFi.

21             And in its opening -- in his opening -- and sorry,

22     and an injunction will prevent KeyFi from defending itself

23     while Celsius continues to exert the full force of a

24     veritable army of lawyers.  That's not fair, right?

25             The defendant will not be able to defend himself

Page 106

1    and the plaintiffs have a nearly unlimited source of

2    resources to burn an insane amount disproportionate to

3    what's at stake in the case.

4         Now, Judge, in opening Mr. Hurley stated that he's

5    aware of no case where a defendant accused of wrongfully

6    taking assets can use those assets to defend himself.  We

7    found them.

8         Adelphia Communications Corp. v. Rigas.  The Court

9    noted in passing that the TRO previously entered contained

10   an exclusion for legal fees, 2003 W.L. 21297258.

11        THE COURT:  Yeah, but that was by agreement.

12        MR. FREEDMAN:  I'd have to look it up, Judge.  In

13   Trepel v. Dippold, the Court directed the parties to craft

14   an order that would restrain assets other than those

15   necessary for legal fees, 2006 W.L. 3054336.

16        You know, we did this research quickly, but we're

17   happy to do more for post --

18        THE COURT:  (Indiscernible) context often.  Yes,

19   Mr. Hurley is correct.  In some of the cases, Courts have

20   ruled no, no money for the defense, and in other cases there

21   have been agreements worked out, carve-outs, dollar limits,

22   et cetera.  I am familiar with that.

23        MR. FREEDMAN:  Okay.  So, Judge, the other thing

24   is that in addition to the fact that enjoining these assets

25   will prevent the defendant from defending himself, and it's

Page 107

```
 1    truly disproportionate what would then happen, there's also

 2    the fact that these assets haven't moved for 10 months

 3    within this wallet and they are profitably deployed, meaning

 4    Mr. Stone is managing these funds within this wallet,

 5    earning profit every single day on that wallet.

 6            That income on those assets will stop if this

 7    Court enjoins all those assets and that's not fair to the

 8    defendants either.

 9            THE COURT:  Which wallet is it in?

10            MR. FREEDMAN:  And to be --

11            THE COURT:  What's the --

12            MR. FREEDMAN:  Judge, one second.  I don't

13    remember.  It's the wallet ending in OX-50, Judge --

14    beginning in OX-50 rather.

15            So, Judge, given that Celsius faces almost no

16    hardship from the lack of an injunction than any other

17    litigant would face, the fact that they can't really show

18    irreparable harm -- I'm going to get to that in a minute,

19    which is because they can't show an intent to dissipate the

20    assets, and that the defendant and the rest at issue would

21    both be harmed by the injunction, the factor of the balance

22    of hardships tips decidedly in the defendant's favor,

23    decidedly.

24            And Judge, that brings me to the last prong, which

25    is irreparable harm.  The undisputed testimony is that these
```

Page 108

1    assets have been primarily segregated by defendants into the

2    OX-50 wallet.  It's in my notes, Judge.  I should have seen

3    it, and related addresses to OX-50.  There might be a few.

4    We've identified them to Mr. Hurley where they continue to

5    be put at work within the cryptocurrency sphere generating

6    income.  Indeed --

7              THE COURT:  Are you -- let me ask this.  Are you

8    able to give me the approximate current value, you know,

9    within the last week or something like that of the assets

10   that were in the wallet?

11             MR. FREEDMAN:  Can I have one moment, Judge?

12             THE COURT:  Please.  Go ahead.

13             MR. FREEDMAN:  Judge, I'm told that it's about

14   $3.5 million, and then there's one particular NFT that is

15   very difficult to determine its value but may be very

16   valuable.  It's unclear what that value is.  It could be

17   millions.  It could be hundreds of thousands, and so I don't

18   want to try to put a value on it.

19             THE COURT:  And those are the only places where

20   the -- where assets are found now is the OX-50 wallet and

21   this one FT?

22             MR. FREEDMAN:  One second, Judge.  Judge,

23   obviously we've talked about the fact that my law firm has

24   custody over that $100,000 and my firm also has custody over

25   that NFT.

Page 109

1          THE COURT:  Okay.

2          MR. FREEDMAN:  Judge, when I say the OX-50 wallet,

3   I think we had discussions about like, you know, parent

4   wallets or I forgot exactly what they're called and related

5   wallets, so there are related wallets to the OX-50 wallet

6   but they've been identified to Mr. Hurley, and I think the

7   total -- it's about $3-and-a-half million in those assets

8   plus the NFT.

9          THE COURT:  Okay.

10          MR. FREEDMAN:  Judge, the plaintiffs have failed

11   to demonstrate any evidence of a dissipation of assets from

12   those addresses over the last 10 months, and the only

13   testimony for Mr. Stone was that the first time he sent

14   assets out of that account was recently to pay for counsel

15   fees.

16          I think we've addressed that, Judge.  We're

17   holding it.  We'll return it if the Court orders it,

18   although again, it will put the defendants at a major

19   disadvantage.

20          Now, Judge, defendant -- I want to -- I want to

21   keep going on this irreparable harm point.  The defendants

22   voluntarily provided a substantial accounting of these

23   assets and their originating transactions, all while

24   preparing for this hearing.  It would make no sense for the

25   defendants to engage in all of this accounting work and to

Page 110

1    do so much of the plaintiff's job for them if defendants

2    intended to abscond with these assets, all of which can be

3    seen on the blockchain.

4            And while there's talk about Tornado Cash, Judge,

5    obviously that has not been touched since OFAC sanctioned

6    it, but even before then you have to understand that, you

7    know, it's very easy to say oh, Tornado Cash, it's nefarious

8    because a lot of bad people use it, but there's a perfectly

9    legitimate purpose to using Tornado Cash.

10           When you're in a highly visible wallet like the

11   OXB-1 wallet where everybody was watching, they track all

12   transfers out of there, and as the Court knows, the

13   blockchain is fully public.  So, if you're using

14   cryptocurrency the way Mr. Stone does because he lives in

15   this world, that's kind of like your bank account in some

16   ways, and if they can trace those funds, they're going to

17   know what you're doing with them.

18           The only way to get privacy back is to go through

19   something like Tornado Cash.  So, you know, Mr. Hurley

20   screams up one side and down the other Tornado Cash, Tornado

21   Cash, Tornado Cash, OFAC sanction, well, that doesn't mean

22   it was used for an improper purpose.

23           You know, there's a lot of things that can be used

24   for good and bad, and so the fact that Tornado Cash was

25   utilized isn't really a problem, but to be clear, it hasn't

Page 111

```
 1    been used in, I don't know, more than 10 months because

 2    nothing has been dissipated.

 3            So, Judge, moreover, the defendants have indicated

 4    that they -- the sole use they plan to use these assets for

 5    during the next few months is to defend themselves, and

 6    plaintiffs who have spent millions of dollars and likely

 7    more than those assets are worth pursuing these claims can't

 8    be heard to complain that the defendants also want to spend

 9    some assets that the estate might have a claim to, to defend

10    themselves when it's in their property.

11            And finally, Judge, I want to address something.

12    You said yesterday you rejected the idea that the injunction

13    was brought too late.  I understand as a legal matter, no

14    problem, that is not going to be the basis to deny it.  But

15    it is telling, right?  It's telling as to Celsius' true

16    belief are these assets really at issue of fleeing the

17    jurisdiction, because they waited a year and a half to bring

18    this injunction, and also Judge, if that's the case, you

19    know, if they believe that this actor is so bad, then an

20    injunction is not going to matter anyways, right?

21            Like, obviously this is an actor who's going to

22    respect the authority of the Court, has respected the

23    authority of the Court, has been up in that stand answering

24    questions truthfully about his conduct, has not dissipated

25    assets for 10 months, has cooperated in tracing all the
```

Page 112

1    assets so that a Court can adjudicate who gets to keep them.

2    This is not someone who's going to dissipate assets.

3            And they need to show irreparable harm, right?

4    This is a preliminary injunction.  They don't get to throw a

5    lot of, you know, stuff at the wall, say Mr. Stone's a bad

6    person, and then enjoin his assets.  That's not how

7    preliminary injunctions work in this country.  This is not

8    the United Kingdom.  We don't believe in Mareva injunctions.

9    We don't allow pre-judgment attachments, and you have to

10   make a very significant showing to freeze assets, and they

11   haven't done it.  They can't show an irreparable harm.

12           And Judge, I want to close on one thing.  The fact

13   is we -- the defendants would not have a problem consenting

14   to an order that while the defendant can manage the funds

15   within the OX-50-related wallets to deploy them profitably

16   and continue earning yield, they -- and use those funds to

17   pay for defense counsel, and we can talk to the Court and

18   defense counsel about, you know, how much those fees are.

19   Obviously the more that -- the more that the plaintiffs

20   push, the more defendants have to defend, but we would not

21   have a problem -- defendants don't have a problem consenting

22   to an order that while the defendants are allowed to manage

23   the funds within the OX-50 wallet and pay for counsel fees

24   with it, they won't otherwise transfer the assets out of the

25   OX-50-related wallet, so they will keep them in that

Page 113

1    universe until the Court resolves this dispute.  We just

2    want to be able to continue earning -- putting those funds

3    to good use while it's happening and to pay counsel fees

4    from them.

5          And otherwise, look, I think the Court was able to

6    observe Mr. Stone yesterday at one point, you know, told Mr.

7    Hurley no, he's answering your questions.  He is here, he is

8    present, he is cooperating with this process.  He's being

9    transparent and open about it.  He's not fleeing this

10   jurisdiction.  He's not utilizing Tornado Cash.  He's not

11   dissipating assets and he's happy to consent to that sort of

12   an injunction, which says keep all the assets here.  You can

13   manage them so you can move them into different protocols

14   and try to earn yield on them, but you can't take them out

15   of your wallet, out of your control and authority of your

16   wallet, except to pay for counsel.

17         And so, Judge, on that I would conclude that they

18   can't show likelihood of success on the merits because Mr.

19   Mashinsky approved it, or alternate -- at least they can't

20   show a sufficient -- sorry, they can't show a likelihood of

21   success on the merits because there's a real disputed issue

22   over whether Mr. Mashinsky approved it.

23         They can't show likelihood of success on the

24   merits because, as I just -- we will brief this, Judge.  The

25   contracts vested Mr. Stone with the obligation to make the

Page 114

1    payments that he actually made.

2            And Judge, when you look at the fact that yes,

3    they did raise sufficiently serious questions, the balance

4    of hardships tips decidedly in our favor.  Quite frankly,

5    this frolic is insanity.  I mean, the assets of the estate

6    are being squandered to go after a tiny amount of money.

7    It's absurd, and frankly, Judge, irreparable harm can't be

8    shown because there's been no indication to abscond with the

9    assets.  There's been no indication to dissipate the assets.

10   And in fact, the defendants were sitting here offering to

11   enter into an injunction voluntarily that keeps the assets

12   within those wallets and allows them to pay for attorneys'

13   fees and otherwise deploy capital.

14           So, with that, Judge, we'd ask that that you enter

15   that form of order that we can work with Mr. Hurley on and

16   otherwise deny the preliminary injunction order.

17           THE COURT:  Mr. Freedman, I've got so many

18   documents sitting in front of me.  Where is that audit

19   provision?  Which agreement is the audit provision in?

20           MR. FREEDMAN:  The audit provision is --

21           THE COURT:  The APA or the (indiscernible)

22   agreement?

23           MR. FREEDMAN:  It's in the APA, Judge.

24           THE COURT:  What section?

25           MR. FREEDMAN:  And it is -- it's PX 40, Judge, at

Page 115

1    Page 16.

2             THE COURT:  Yeah, I have PX 40 open.  What

3    paragraph is that in?

4             MR. FREEDMAN:  It's Page 16.  I've got the

5    Romanette I, but is it -- do you have it in front of you,

6    Mr. Stone?  It's like -- if I remember, Judge, it's like the

7    bottom of the page.

8             THE COURT:  I got it.  It is Page 16.  It's

9    Romanette 5, 7.4, Romanette 5.

10            MR. FREEDMAN:  Sorry, Judge.

11            THE COURT:  7.4B, Romanette 5 on Page 16.  Just

12   bear -- I just want to look at it again.

13            It's actually -- it's 7.4B.  It covers more than

14   just Romanette 5, 7 point -- Pages 15 and 16.

15            MR. FREEDMAN:  Yeah, I think the specific portion

16   we point to, Judge, is the one that says within the later to

17   occur of 14 calendar days --

18            THE COURT:  Yeah, that's Romanette I, 7.4

19   (indiscernible).

20            MR. FREEDMAN:  Judge, I don't have the agreement

21   in front of me.  I'm being told it's obviously much more

22   detailed than that and it goes -- it goes on, and you have

23   it in front of you.

24            THE COURT:  Yeah, it goes on.  There's five

25   Romanettes under 7.4B.

Page 116

1               All right, thank you, Mr. Freedman.

2               MR. FREEDMAN:  Thank you, Judge.

3               THE COURT:  Mr. Hurley?

4               MR. HURLEY:  Again for the record, Your Honor,

5    Mitch Hurley with Akin Gump Strauss Hauer and Feld on behalf

6    of the plaintiffs.  I'm not going to spend a lot of time

7    here, Your Honor.  I know there's going to be some

8    additional briefing.  I just want to make sure I go through

9    and correct some of the comments that you heard just a

10   moment ago.

11              So, I'm going to start with -- and I'm sure this

12   is clear to Your Honor, but just because Mr. Freedman

13   misstated what I said, I want to make it crystal clear

14   again.  He said Mr. Hurley claims the authorization ended on

15   March 9th.  The plaintiff's argument is there never was any

16   authorization.  I want to make that crystal clear for the

17   record.

18              He pointed Your Honor to a letter that I sent to

19   former counsel for Mr. Stone, and in fact early in the case

20   Mr. Stone had identified -- he had claimed that he had

21   terminated his employment in March.  We asked for any

22   evidence of that, and at first they didn't provide us with

23   that March 9th e-mail.  They later did.

24              In Mr. Stone's affidavit in this case, Your Honor,

25   he identifies March as the time when he indicated he was

Page 117

1    going to resign.  He didn't say anything about a twilight

2    period in the affidavit.

3           Throughout this case, his position has always been

4    that he resigned on March 9th.  He specifically argued he

5    wasn't required to follow board resolutions because he

6    resigned on March 9th, but you don't have to take my word

7    for it, Your Honor.  I want to direct you to the PTO, pre-

8    trial order.  Can you pull that up, please?

9           MAN 2:  Sure.  Deanna, could you put Frank as a

10   co-host, please?

11          MR. HURLEY:  And this is from the stipulated facts

12   that the parties agreed to in advance of this case, Your

13   Honor.

14          CLERK:  Sorry, what's the name of the person that

15   needs co-host?

16          MAN 2:  Frank (indiscernible).

17          MR. HURLEY:  Just give me the PTO.  I'll just read

18   it.  Put it on her computer.  This is from Paragraph 34 of

19   the stipulated facts.

20          CLERK:  All right.  He's co-host.

21          THE COURT:  He's now the co-host so he can put it

22   up there if he wants, but go ahead, Mr. Hurley.

23          MR. HURLEY:  Stipulated facts, Your Honor,

24   Paragraph 34.  By e-mail dated March 9, 2021, Stone notified

25   Celsius that he was planning to start his own investment

Page 118

1   management company, which he said he had named OX

2   Management.  Stone contends that the March 9th e-mail

3   constituted notice to Celsius of his resignation of CEO of

4   Celsius KeyFi.

5              THE COURT:  Okay.

6              MR. HURLEY:  You'll recall I showed Mr. Stone that

7   letter and he acknowledged it as his -- the letter that he

8   was referring to in his affidavit and he --

9              THE COURT:  Take down the share screen so I can

10  see Mr. Hurley.

11             MR. HURLEY:  And I believe the transfer was going

12  to -- is going to show that he continually acknowledged it

13  and recognized March 9th as his resignation date, just as he

14  contends -- it says he contends in the agreed, stipulated

15  facts in this case.  Okay.

16             THE COURT:  Well, let me just -- I'm going to stop

17  you there while you're looking for your next point.  I want

18  -- and I know you say all of the transfers were unauthorized

19  but I want in a supplement filing a breakdown of the pre-

20  March 9, post March 9 transfers, okay?

21             MR. HURLEY:  We'll provide details.

22             THE COURT:  Okay.  Go ahead.

23             MR. HURLEY:  I mean, I should say we'll provide

24  the details we can based on the information that's been

25  provided to us by the defendants.  Okay.  There was a

Page 119

1    question about the OXB-1 wallet, Your Honor, and Mr.

2    Freedman said that's a Celsius KeyFi wallet.

3            Your Honor, Celsius KeyFi was formed pursuant to a

4    document that was signed by Mr. Stone himself on January 11,

5    2021.  Mr. Stone testified that Celsius gave him access to

6    the OXB-1 wallet I think he said the day after he started,

7    which would have been August 18, 2020.  The OXB-1 wallet,

8    sir, was created by Celsius.  Celsius had the pass keys.  It

9    was a Celsius wallet and we know that because Celsius KeyFi

10   didn't even exist when that wallet was created.

11           THE COURT:  (Indiscernible) to me is an important

12   thing.  I'm going back -- I'm looking at my notes from Mr.

13   Freedman's presentation.  (Indiscernible).  What is the

14   evidence that shows the OXB-1 wallet was a Celsius wallet

15   and not a Celsius KeyFi wallet?

16           MR. HURLEY:  Piece of evidence number one, Your

17   Honor, is that it was created and it's undisputed it was

18   created before Celsius KeyFi existed.  It was created by the

19   Celsius -- by Celsius Network.

20           In Mr. Stone's sworn affidavit, he has an initial

21   cap defined terms Celsius Wallets, and I asked him what he

22   meant by that, and in his deposition he testified, and I

23   believe we did this actually at the trial yesterday as well,

24   that he was referring to wallets created by Celsius using

25   the OXB-1 seed and a 43D seed.  So, wallets created by

Page 120

```
 1    Celsius.  He himself defines the OXB-1 wallet as a Celsius

 2    wallet.

 3              THE COURT:  Put that in a -- in a post-hearing --

 4              MR. HURLEY:  Absolutely, Your Honor.  Okay.  And

 5    that brings me to this claim that's being made about the

 6    airdrop in the OXB-1 wallet in September of 2021.  You were

 7    correct in your recollection of the testimony yesterday,

 8    Your Honor.  In fact, Mr. Stone testified at his deposition

 9    and again we refreshed him yesterday very clearly that it

10    was the OXB-1 wallet that suffered harm as a result of the

11    hack that occurred in November of 2020.

12              He then claims that he did some work to try to get

13    compensation for that hack, which he says was deposited in

14    the OXB-1 wallet, and he then went in and took the

15    compensation that was being provided, and this was very

16    clear in his deposition, we'll definitely cite this in our

17    post-trial briefing, Your Honor, he was very clear in his

18    deposition that that was meant to compensate OXB-1 for the

19    harm that it suffered and that he went in and took it.

20              I just want to very quickly -- it's a small point

21    but in terms of turning over the e-mails to Mr. Stone, what

22    we said to them was even if we had all the time in the

23    world, you don't just turn over an entire e-mail file.  We'd

24    have to do a review for privilege, other things, and you

25    know, so -- and we said we'll do that in plenary discovery.
```

Page 121

1    We just can't do it in a week, because they didn't ask us

2    for that until after our expedited discovery process was far

3    underway.

4             You heard some comments about -- well, you know

5    what?  I'm going to skip that.

6             THE COURT:  I do want you to --

7             MR. HURLEY:  I want to come right to the APA.

8             THE COURT:  Hold on.  I want you to address the

9    point that Mr. Freedman made that general ledger DX 34, Line

10   67, which showed the 10 percent accrual for KeyFi revenue

11   share.  Could you address that?

12            MR. HURLEY:  I can, and the main way I'm going to

13   address it, Your Honor, is that no foundation was ever laid

14   for that document.  No witness that was on the stand today -

15   -

16            THE COURT:  It's in evidence.  It's in evidence.

17   I overruled your objection.

18            MR. HURLEY:  It is in evidence.  It's in evidence.

19   I'm not arguing it's not, but no witness that was on the

20   stand was able to even identify it as the general ledger.

21   And I told you honest -- you asked me if it is.  I don't

22   know whether it's the general ledger, and the defendants had

23   that document through the expedited discovery since December

24   15th or whatever, and they had time to say hey, we need a

25   custodian of records because this is a really important

Page 122

1    document and we need to find out what it is so we can have a

2    competent witness tell the judge what it is.  But they

3    didn't do that.

4             THE COURT:  Okay.  Go ahead.

5             MR. HURLEY:  Instead, they put it in front of two

6    witnesses that said I don't know what this document is.

7             THE COURT:  Go ahead.

8             MR. HURLEY:  Okay.  Let me talk about the APA for

9    a minute, because you heard a lot from Mr. Freedman about

10   the APA and I want to make sure that we're understanding

11   what that document actually says and doesn't say.

12            So, first he pointed you to Section 3.1 of the

13   APA, and I want to look at that again with Your Honor, and

14   he pointed you specifically --

15            THE COURT:  Right, I have it open in front of me.

16   Go ahead.

17            MR. HURLEY:  Sure.

18            THE COURT:  The paragraph on purchase price and

19   payment.

20            MR. HURLEY:  Correct, 3.1C.

21            THE COURT:  Right.

22            MR. HURLEY:  And he refers to the earn-out

23   payment.  There's a few things you should be aware of about

24   this provision, Your Honor.  First of all, earn-out payment

25   is initial caps, looks like it's a defined term.  Do you see

Page 123

1    that?

2              THE COURT:  Yes.

3              MR. HURLEY:  But that term is not actually defined

4    anywhere in the document, and it's not defined anywhere in

5    the services agreement.  There is a reference to the service

6    agreement with respect to how a profit share would be

7    calculated.  Of course, we acknowledge that.  But as I said

8    before, Your Honor, just because a document contemplates

9    that there could be a profit payment doesn't mean there will

10   be.  You actually have to demonstrate that profits were

11   earned.

12             And if you can demonstrate that profits were

13   earned then you have a calculation, and that never happened.

14   I mean, that's undisputed.  There was never a P&L that was

15   created, and --

16             THE COURT:  Let me ask you this.  Do you agree

17   that Mr. Stone had the right under the APA to demand an

18   accounting?

19             MR. HURLEY:  The APA provides that KeyFi can

20   demand an accounting, but I want to make really clear

21   exactly what it provides, and if I could just start with a

22   couple other provisions?  I think we'll lead straight to

23   that point, Your Honor.

24             So, first, you heard Mr. Freedman saying that

25   Jason Stone had the right as the CEO of Celsius KeyFi to

Page 124

```
1    just start paying himself money if he wanted to.  I think

2    Your Honor's right.  There's absolutely zero support for

3    that anywhere in the law, but it's also contrary to what the

4    contract actually says.

5              So, if you'd look at the services agreement -- I

6    got it.  If you look at the services agreement, and that is

7    plaintiff's Exhibit 41.

8              THE COURT:  I have it open in front of me.  It's

9    41.  (Indiscernible).

10             MR. HURLEY:  So, I want to direct your attention

11   to Paragraphs 3 and 4, which are actually about services and

12   compensation for services.

13             THE COURT:  Yes, I'm there.

14             MR. HURLEY:  So -- and again, it's really

15   important to remember that here, KeyFi means Celsius KeyFi

16   and Celsius is Celsius Network.

17             Okay.  So, in Paragraph 3, this provides very

18   clearly with respect to such services, all coins deployed by

19   KeyFi, Celsius KeyFi, and revenues generated and/or received

20   from the third parties shall be owned by and paid to Celsius

21   or an affiliate of Celsius as determined by Celsius

22   excluding KeyFi.

23             Okay.  And then under compensation, it provides as

24   a sole and exclusive compensation for the services, Celsius

25   not the company his client was the CEO of but Celsius
```

Page 125

1    Network, shall pay Celsius KeyFi the consideration set forth

2    in Schedule B.  Celsius KeyFi didn't even have the right to

3    pay the compensation, much less the CEO acting on his own.

4         Okay.  Concerning the audit provisions in the APA,

5    and this I think is important.

6         THE COURT:  That's an important point.  I want you

7    to make sure that you include it in the supplemental filing,

8    okay?

9         MR. HURLEY:  I will, Your Honor.

10         THE COURT:  It doesn't have to be lengthy, but I -

11    - go ahead.

12         MR. HURLEY:  So, let's look at 7.4B, the audit

13    provision again, and just remembering, Your Honor, as I know

14    you do, that the service agreement required Mr. Stone as CEO

15    of Celsius KeyFi to do the P&L and I argued, yeah, that

16    makes sense because who else is going to do the P&L?  He's

17    the one who's doing the investing.

18         If you look at 7.4 -- it's B and then there's a

19    second Romanette I, right, and it provides this audit

20    obligation, and it says that if seller is dissatisfied with

21    the payment or if non-payment occurs, seller may invoke the

22    audit.

23         And you'll see that the party that's supposed to

24    respond to the audit is buyer.  Buyer is Celsius KeyFi.

25    That's the company that Mr. Stone was the CEO of.  And

Page 126

1      again, it makes sense under the circumstances that if there

2      was going to be an audit, it would be carried out by the

3      parties that actually were doing the investing, which was

4      Mr. Stone as the CEO of Celsius KeyFi.

5              So, for him to come to us after he's walked away,

6      and we're saying, hey, we don't have enough information to

7      know what you did, you never delivered the wormhole that we

8      needed as you admit to build the P&L.  We need information

9      from you to understand what you did, and his response to us

10     is we want an audit from you.  It doesn't make any sense,

11     Your Honor.

12             THE COURT:  Well, it doesn't -- the obligation

13     would survive his resignment as chair -- CEO of Celsius

14     KeyFi.

15             MR. HURLEY:  Well, Celsius KeyFi effectively was

16     Jason Stone and the five or six people that he split that

17     money up with in September.  So, as a practical matter for

18     him to tell us that he wants an audit done of the activities

19     of the company he ran with respect to a P&L that he never

20     created with respect to activities, by the way, that he

21     undertook while he was there, it's -- I don't -- how are we

22     supposed to do that?

23             And Your Honor, I would also add that the audit

24     request --

25             THE COURT:  Look, I'm sorry, Mr. Hurley.  Mr.

Page 127

```
1    Hurley, if the contract included a profit share, you can't
2    tell me that that right went away because he resigned.
3              MR. HURLEY:  I'm not saying that.  I'm absolutely
4    to saying that.
5              THE COURT:  He was still owed it by Celsius, and
6    if he wanted to demand it -- an accounting, there should
7    have been an accounting.  Why didn't -- why wasn't that
8    contract provision breached when he asked for an accounting
9    and none was done?
10             MR. HURLEY:  We're absolutely not suggesting that
11   if there were profits, they would be shared.  We are
12   suggesting there absolutely were not profit from the massive
13   losses.  And to answer your question, they asked --
14             THE COURT:  Well, but nobody -- you -- Mr. Stone's
15   lawyers put on evidence yesterday without ever quantifying
16   what the profits were that Mashinsky believed and others at
17   the company believed there were profits, okay?  And you take
18   the position that there never were profits.  I don't know
19   whether there were or there weren't.  If there were and the
20   contract said there was a right to an accounting and it's
21   not been provided, why hasn't there been a breach?  Why
22   shouldn't there be -- I mean, I raised this question at a --
23   you know, one of the conferences we had.  Have you tried to
24   agree on an accountant to do an accounting, figure out
25   whether --
```

Page 128

```
 1                MR. HURLEY:  So --

 2                THE COURT:  You say it's hard.  Figure out whether

 3      there were profits or not.

 4                MR. HURLEY:  Let me unpack that one thing at a

 5      time.

 6                THE COURT:  I feel strongly he had no right to

 7      self-help, but that's a separate issue.

 8                MR. HURLEY:  Right.  Yeah.  Let me unpack that one

 9      thing at a time.  First of all, to be fair, what the

10      testimony was is that Mashinsky believed at a period of time

11      that there were profits, and I think it came out very

12      clearly that all of that was based on exactly what you're

13      asking to be -- to believe now, which is Mr. Stone claiming

14      there were profits.  No proof was ever provided, P&L never

15      produced.  Okay.

16                THE COURT:  Well, Mr. Nolan thought there were

17      profits, too.  Never quantified it.

18                MR. HURLEY:  He said -- Mr. Nolan was crystal

19      clear that his only basis for ever believing that was Mr.

20      Stone, and he was crystal clear he never got any evidence

21      for Mr. Stone that it was true, so.

22                THE COURT:  So, you're saying Mashinsky acted

23      improperly in transferring hundreds of millions of dollars,

24      maybe a billion dollars, in assets to Celsius KeyFi to

25      deploy without knowing whether they were making any money or
```

Page 129

```
1    not?

2              MR. HURLEY:  Look, I'm sure I think in hindsight

3    no one would deny that it turned out not to be a good idea

4    to give Mr. Stone the assets that he was given.  That's

5    certainly true.  About --

6              THE COURT:  Well, I don't know whether that's true

7    or not.  Until somebody has actually shown me were there

8    profits, were there not profits.  I don't know.

9              MR. HURLEY:  Sure.  Yeah.  But about your specific

10   audit question and why it's not a breach, I mean, the

11   defendants took the position in their papers, and I will

12   definitely point this out to you in our briefing, Your

13   Honor, that they made their first request for an audit in

14   September of 2021.

15             The audit was supposed to be requested I think

16   within 14 days of the date that they claim the profit was

17   due.  They say the profit was due on December 20, 2021.  So,

18   I mean, technically I don't actually think it's a breach of

19   contract, but I will tell you when they said we want to do

20   an audit, our response effectively was we need you to do the

21   audit.  You're the ones that were doing the investing.

22   Let's try and share some information.  It never -- it was

23   not a successful approach, because they kept just saying the

24   same thing back to us.

25             THE COURT:  Okay.  Go ahead.
```

Page 130

```
 1            MR. HURLEY:  But again, I do think and I want to
 2   come back to this, because I think it's really important.  I
 3   know Your Honor knows it, so if I'm trying your patience, I
 4   apologize, but at the end of the day whether or not they
 5   were -- whether or not they made a profit, and we think
 6   we're going to be able to prove there was absolutely a
 7   massive loss, but set that aside, they can't just go in and
 8   take the money, and that's what they did.
 9            And so, what we're saying is freeze it until Your
10   Honor has time to consider all these arguments that you've
11   heard.  If they have merit, okay, all that's happened is for
12   a period of time they weren't able to keep spending the
13   money on who knows what?  Mr. Stone does not know what he
14   spent the money on for, you know, many of these
15   transactions.  So, that's really all that we're asking for,
16   Your Honor, and we think it is critical that that relief be
17   provided.
18            Okay.  I think there were -- there was really one
19   other primary -- oh, I wanted to come back because you had
20   asked a specific question about transfers under $50,000 and
21   my team took a look at that.
22            THE COURT:  Right.
23            MR. HURLEY:  And so, my understanding is that the
24   under $50,000 individual transactions for the period January
25   11, '21 to March 9th, which is the period that the asset
```

Page 131

1    purchase agreement was in effect, sums on a dollar value

2    basis, and again you have to remember dollar value is not

3    necessarily the relevant value, but on a dollar value basis

4    sums to $390,000 total if you use the exchange rates that

5    were in effect as of the time of the actual transfers.

6              And oh, I also wanted to point one other thing

7    out, is that even those $50,000 transfers, those are

8    actually -- it's clearer in the APA -- sorry, in the service

9    agreement itself that those are only paid by -- they are

10   deductions from profit sharing, so they actually get paid by

11   KeyFi ultimately if there's profit.  If there's no profit,

12   then they're really not entitled to it at all.

13             Okay, and then finally on the TRO, we appreciate

14   that Your Honor brought this forward yourself.  We certainly

15   were going to raise it.  If there's going to be briefing,

16   we're going to make sure that the assets all stay in place

17   during the time of the briefing, and I'm sure we'll be able

18   to agree on some kind of reasonable briefing schedule.

19             But I just want to make crystal clear that I'm

20   understanding.  The TRO was going to apply to transfers --

21   we'll address the property in a second but transfers for all

22   purposes, right?  Because it seemed like I heard Mr.

23   Freedman sort of suggesting maybe they wanted to carve out

24   to pay their fees during the meantime.  But --

25             THE COURT:  No, it applies to all transfers.

Page 132

1          MR. HURLEY:  Applies to everything, okay.

2          THE COURT:  And this is not going to be -- let me

3     make clear, this is only for the period it's going to take

4     me to get -- for me to decide, so both sides are going to

5     submit additional briefs.  I don't -- it doesn't resolve the

6     issue, but I don't believe that the defendant's lawyers

7     should have to work without any expectation of being paid.

8     I'm very sensitive to -- and --

9          MR. HURLEY:  Okay.

10          THE COURT:  And I know -- I was getting some

11     feedback.  I'm not sure where it's coming from.  I know even

12     in the criminal context, you know, I've seen some of the

13     orders that -- years ago, I had seen some of the orders that

14     had been crafted in criminal cases where there was a budget

15     allowed for defense counsel, et cetera.  So, I --

16          MR. HURLEY:  Well, I think in criminal cases it's

17     more likely to be allowed.  In civil cases it's less likely.

18          THE COURT:  I understand (indiscernible).  Yeah.

19     Okay.

20          MR. HURLEY:  Right.  And I would just point one

21     other thing out, Your Honor.  I mean, there was evidence Mr.

22     Stone says he made 500,000 to a million-and-a-half dollars

23     on trading activities.  There's no evidence that Mr. Stone

24     doesn't have money to pay his fees.  He hasn't put any

25     evidence forward that he can't personally afford to do that.

Page 133

1    The only claim was made with respect to KeyFi, Inc., which I

2    guess is sort of a shell company, but it's his company.  So,

3    there's no evidence that he can't pay for it or that

4    Celsius' assets which we claim, and if we win we'll prove

5    were stolen, that he gets to use them to pay his fees, so.

6    But we'll So save that for the briefing, I suppose.

7              THE COURT:  Let me ask you this.

8              MR. HURLEY:  Mm-hmm.

9              THE COURT:  It's -- one of the -- one of the

10   questions that's mulling around in my mind is what coins did

11   Celsius give to Stone and what coins did Stone return

12   Celsius?

13             I think I've seen somewhere that Celsius cited

14   that they've given them about $2 billion and that 1.3

15   billion were returned.  I think that comes from the

16   defendant's brief, which suggested there was no profit.  I

17   gave them 2 billion and I got 1.3 billion back.  There's

18   $700 million dollars that evaporated.

19             And I don't remember testimony during the hearing

20   that anybody put in that's dealt with that.

21             MR. HURLEY:  So, we can -- we can work on

22   providing you our best understanding of coins out and coins

23   in.  I do think that characterizing it as dollars is

24   actually not the right way to characterize it, because in

25   our view, as I said, even if they returned dollar -- coins

Page 134

1    worth less, they still could have earned a profit provided

2    that their investment activities were generating more coins.

3                THE COURT:  So, look, you --

4                MR. HURLEY:  Because --

5                THE COURT:  -- you and Mr. Freedman obviously

6    disagreed today about whether Stone would get a profit share

7    based on appreciation and value of cryptocurrency.  You say

8    no.  They say yes.

9                MR. HURLEY:  That is true, and we'll make our

10   contractual arguments on that point.  Your Honor, in terms

11   of the property that's going to be subject to this temporary

12   order, I mean, from our perspective, it has to include at

13   least the property that's identified in the defendant's

14   spreadsheets.  And again, it's temporary, but I don't think

15   it should be limited.  I think --

16               THE COURT:  Isn't it property in the OXB-1 walled?

17               MR. HURLEY:  I'm sorry, can you ask that again?

18               THE COURT:  Is that property in the OXB-1 wallet?

19               MR. HURLEY:  No, no, it's -- the OXB-1 wallet is a

20   Celsius wallet.

21               THE COURT:  Okay, I'm sorry.  The OX-50 wallet,

22   OX-50 wallet.

23               MR. HURLEY:  Based on their spreadsheets, there

24   are several defendant wallets that have received transfers.

25   There's some question about where they went.  What we're

Page 135

```
1    asking is that the injunction cover at least all the

2    property that they identify as being transferred from

3    Celsius wallets temporarily.

4             Now, there may be some of that property that they

5    say, well, we don't have it anymore.  If that's the case,

6    Your Honor, then there is no risk that they will be

7    violating the TRO because they can't transfer it any

8    further.

9             So, what we're looking for really is entry of the

10   order that we submitted, which is categorical, which at

11   least includes what they've identified.  Now, it's possible

12   -- I'm not accusing them this -- of this necessarily, but

13   it's certainly possible that there's property that's within

14   the category that hasn't yet been identified, and we submit

15   that that property should also be subject to the order

16   temporarily until we can get through the briefing and get a

17   final decision from Your Honor.

18            THE COURT:  All right.  Try and -- I'm going to

19   want you to try and settle an order within the next few days

20   that deals with this period.  I just -- look, I made it

21   clear I'm not accusing the defendants of doing this or their

22   counsel of doing this.  I think Mr. Freedman was very clear

23   in -- you know, he said there's approximately $3-and-a-half

24   million in the OX-50 wallet and there's one FT which is

25   difficult to value, 100,000.
```

Page 136

1          The -- his firm has custody of the NFT and the

2     $100,000 that he received in fees.  So, I don't know whether

3     -- let me put it colloquially.  I don't want to have egg on

4     my face because between today and when there's a decision

5     millions of dollars somehow disappeared.

6          MR. HURLEY:  And my concern, Your Honor, with all

7     due respect to the defendants, is about confining the scope

8     of the injunction just to what they say they still have when

9     there's a lot of work that needs to be done to figure out

10    exactly what they took and exactly where it is.

11         And so, that's why I'm suggesting that for the

12    temporary injunction, at least, we ought to have the

13    categorical definition, because only they really know, and

14    it includes at least the material in the spreadsheet that

15    they've identified in the spreadsheet.

16         MR. FREEDMAN:  Judge, may I be heard on this

17    issue?

18         THE COURT:  You will in a minute after he's

19    finished.

20         MR. FREEDMAN:  Thank you, Your Honor.

21         MR. HURLEY:  Oh, actually that raises one other

22    issue.  So, Mr. Freedman said that there was no evidence of

23    any transfers in the past 10 months by Mr. Stone, and

24    actually the Stone spreadsheet includes at least one

25    transfer that was made according to the spreadsheet in 2022.

Page 137

1    There was some testimony about it.  I think Mr. Stone looked

2    at it, and he wasn't quite sure whether it was a transfer

3    that he had made from the Celsius wallet to himself or if it

4    was some other kind of transfer, but there certainly was a

5    transfer on their spreadsheets, not just in the last 10

6    months but I think in the last two or three months.  I can't

7    remember if it was September of December, but it was

8    definitely late 2022.

9             Anyway, with that, Your Honor, I will yield the

10   podium unless you have any questions.

11            THE COURT:  Let me -- give me a second.  Hold on.

12   Stay up there.

13            MR. HURLEY:  Sure.  Sure.

14            THE COURT:  I think I tried to make this clear

15   that I need the coin-by-coin information rather than value

16   because of the fluctuations in value, price fluctuations at

17   the time of various valuations.

18            I really want to know how many -- which coins were

19   given, what dates, et cetera, what did you get back?

20            MR. HURLEY:  Yeah, we can do that.  Well, there's

21   a bit of a staffing shortage at Celsius these days, but we

22   will be able to put -- bring some information forward, Your

23   Honor, and we'll do our best to make it as complete as we

24   can.

25            THE COURT:  Okay.  I think you -- so, I did have

Page 138

```
 1    questions on the DAI -- you know, on the DAI.  I think
 2    you've addressed that.
 3              MR. HURLEY:  And so, just on the -- I'm looking at
 4    the ETH transfer spreadsheet for instance, and it actually
 5    looks like there are one, two, three, four, five, six,
 6    seven, eight transfers that were made in August of 2022, one
 7    made in September of -- and two made in September of 2022,
 8    so within that 10-month time period that Mr. Freedman had
 9    indicated he didn't think there were any transfers.  Yeah,
10    that was ETH transfers.  Yeah.
11              THE COURT:  Okay.  I think that's all I have for
12    now.
13              MR. HURLEY:  Did you have other questions, Your
14    Honor?
15              THE COURT:  No, I don't think so.
16              MR. HURLEY:  Okay, thank you very much.
17              MR. FREEDMAN:  Your Honor, we will look into --
18    we'll include the date of the last transfer from the OBX-1
19    wallet.  My understanding is there was nothing in the last
20    10 months.  We just looked at it now.  There were some
21    transfers it appears for like $100 or something like that or
22    $200.  I don't know sitting here today who they are.  I
23    think the evidence came in as it came in.  We will address
24    that.  I just don't want to make any misrepresentations to
25    the Court.  If I'm wrong, I was wrong, but certainly nothing
```

1    substantial has left the accounts.

2              THE COURT:  Okay.

3              MR. FREEDMAN:  That being said, Judge, there's

4    just two points I really want to make, which is Mr. Hurley

5    has spent an incredible amount of time on the likelihood of

6    success on the merits and serious questions prongs of the

7    preliminary injunction standard, and those are important

8    portions but that is not all that is required.

9              I came up here.  I said the --

10             THE COURT:  (Indiscernible) argument about that

11   while there's serious questions, the balance of hardships is

12   critical.

13             MR. FREEDMAN:  Judge, what I would point out is I

14   came up here and told Mr. Hurley and told you in front of

15   Mr. Hurley that he could not show irreparable harm, and he

16   could not show the balance of hardship tips in his favor,

17   both of which are required elements of preliminary

18   injunction, and on rebuttal he came back up and said nothing

19   about it.

20             So, Judge, while we're here, I would say show

21   irreparable harm.  He's still here.  Give him an

22   opportunity.  Argue irreparable harm.  Argue the balance of

23   hardships because I heard nothing on it, and quite frankly I

24   don't think we'll hear anything persuasive on it.

25             He's a good lawyer.  I know he's going to come up

Page 140

1    and say something, but I know --

2            THE COURT:  If he -- do you agree that if the

3    Court concludes that he has shown a substantial likelihood

4    of success on the merits, by your own argument if Stone --

5    if the money, if it's the OXB-1 wallet or the OX-50 wallet,

6    if that's all he's got, if it's gone, they can't collect?

7            MR. FREEDMAN:  First of all, Judge, we just heard

8    them say that's not all he's got, and they said maybe there

9    are other assets.

10           THE COURT:  They said they didn't know what he's

11   got.

12           MR. FREEDMAN:  Right, so then how are they saying

13   that's all he's got?  It's their burden.  They got to prove

14   it.  But more importantly, Judge, much more importantly,

15   even if this Court were to conclude that they have a

16   likelihood of success on the merits, okay, and I don't think

17   it should, but if it does they still have to show

18   irreparable harm.  This is not a common law jurisdiction

19   from the United Kingdom.  They need to show irreparable

20   harm.  We don't give Mareva injunctions.

21           THE COURT:  Yeah.  I understand your argument on

22   that.

23           MR. FREEDMAN:  And they can't do it, Judge.  They

24   can't show irreparable harm.

25           THE COURT:  I understand your argument on that

Page 141

1    point.

2              MR. FREEDMAN:  And the other point being, Judge,

3    it is unclear to me why there would be any prejudice to

4    anyone if the order that we offered to voluntarily enter

5    into would be entered where the assets would be frozen

6    within -- not frozen but rather confined within the OX-50

7    wallet and cannot leave that wallet absent court order, I

8    see no -- then there's zero risk of dissipation of assets.

9    And then Mr. Stone can continue to --

10             THE COURT:  That's the only place where assets

11   are, you know?

12             MR. FREEDMAN:  That's what it appears to be, and

13   that -- but I don't know.  Based on the -- based on my

14   review of the evidence, that's the way I understand it,

15   although obviously some was expended.  I know Mr. Stone

16   talked about that.  I don't think those still exist, but I

17   don't really know.

18             But my point being, Judge, they haven't shown that

19   there are no other assets.  And in fact, even if these are

20   the only assets, they haven't shown irreparable harm.  And

21   to the extent the Court is at all concerned, we will

22   voluntarily enter into an order which makes it -- there's a

23   zero percent chance of dissipation of assets and that should

24   end this inquiry without further expenditure to the estate.

25             THE COURT:  Okay, thank you.  All right.  When --

Page 142

1   look, file a letter on the docket by 3:00 tomorrow with an

2   agreed schedule for submitting additional submissions from

3   each side, okay?

4           MR. FREEDMAN:  Thank you, Your Honor.

5           THE COURT:  But I want -- I want to make clear I'm

6   so ordering the record subject to any written order that

7   gets entered is there better not be -- you know, Mr.

8   Freedman, it's a disaster for your clients if I find out

9   later that money flowed out while I was deciding this

10  matter.

11          MR. FREEDMAN:  Judge, I think it's crystal clear

12  on that.  And my only comment on that, and I'm not my

13  client, Judge, but I will tell you on the record that we

14  will tell him not to move any assets out of those wallets.

15          My concern is Mr. Hurley is up here asking you for

16  this blanket injunction to stop all transfers of all assets,

17  and Mr. Stone has already talked about the fact that there

18  may have been commingling of funds at some point like 12

19  months ago.  Does that mean Mr. Stone can't buy himself a

20  sandwich for lunch because the TRO will enjoin him from

21  expenditure of any assets?

22          And so, Judge, I will talk to Mr. Hurley.  But my

23  point is you've got 3-and-a-half million or so of assets

24  within that OX-50 wallet.  We've told you we have that NFT

25  and that $100,000.  Happy to include that subject to TRO.

Page 143

1    Happy to enter into that.

2            Any broader than that and how's my client going to

3    live?  Like, there's been no showing of other assets.  So,

4    we will -- we will work it out with Mr. Hurley, Judge.

5            THE COURT:  All right, we are adjourned for the

6    day.  Thank you very much, everybody.

7            MR. HURLEY:  Your Honor, I'm sorry.  Can I just --

8    I need to respond to that briefly.  I apologize, but we're

9    talking about a situation where we have to depend on the

10   person that's accused of this theft identifying the assets

11   in question, and I don't want to sit down after Mr. Freedman

12   just said that and have him say oh, you heard me just say

13   it's only those two wallets that matter.

14           THE COURT:  Look.  Insist on part of an agreement

15   that you have a declaration under oath from Mr. Stone that

16   that's -- those are the only assets, okay?  And then if it

17   turns out that that wasn't true, we'll -- somebody will have

18   to deal with that after.  We're adjourned.

19           MR. FREEDMAN:  Judge, those are the only --

20           THE COURT:  I think you can work this out.

21           MR. FREEDMAN:  Judge, those are the only assets

22   that what, that he has to his name or that he believes trace

23   to Celsius?  I --

24           THE COURT:  Try and work this out.  We're

25   adjourned.

Page 144

1             MR. FREEDMAN:  We'll try, Judge.

2             (Whereupon these proceedings were concluded.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 145

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7    *Sonya M. Ledanski Hyde*

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  January 16, 2023

[& - 3]                                                                 Page 1

**&**

**&**   3:6 4:3 6:5
6:16

**0**

**01/11/2023**
3:12
**01/12/2023**
3:13

**1**

**1**   16:19 29:13
29:21,23 70:25
71:1,4,6,7 78:3
110:11 119:1,6
119:7,14,25
120:1,6,10,14
120:18 134:16
134:18,19
138:18 140:5
**1's**   77:19
**1.2**   92:6
**1.3**   133:14,17
**1.4**   37:16 65:6
65:12 81:14
82:15,15 99:19
**1.5**   104:6,21,25
**1/11/22**   3:6
**1/12/22**   3:7
**10**   26:17,19
27:3 31:8
32:24 35:23
53:12 76:8
92:5 94:24
95:7 96:15,22
97:5,14 98:11
99:23 105:4
107:2 109:12

111:1,25
121:10 136:23
137:5 138:8,20
**100**   12:21 41:8
138:21
**100,000**   48:10
49:6 100:11
105:5 108:24
135:25 136:2
142:25
**10004**   1:20
**10016**   4:17
**10036**   4:7
**108**   73:25
**10:15**   53:13
**11**   12:22 14:4
38:18 119:4
130:25
**11501**   145:23
**11th**   9:17
39:13
**12**   1:22 142:18
**12038955**
28:24
**12151**   145:7
**13**   36:17
**1353**   3:11
**1358**   3:12
**1361**   3:12
**139,000**   61:4
61:13
**14**   93:2 115:17
129:16
**15**   27:3 115:14
**15th**   121:24
**16**   92:22,23
115:1,4,8,11

115:14 145:25
**16th**   51:1
**17**   36:25 56:14
57:7
**17th**   61:2
**18**   119:7
**18th**   73:13,17
**1979**   51:16
**1993**   50:8
**1997**   50:9

**2**

**2**   29:10 59:15
117:9,16
133:14,17
**2,000**   105:15
**20**   3:5 16:15
19:22 20:22,24
21:12,21 40:6
40:22 99:19
129:17
**200**   138:22
**2002**   29:10
**2003**   106:10
**2006**   106:15
**2007**   49:21
**2013**   28:24
**2020**   36:17
72:5,7 74:13
119:7 120:11
**2021**   12:22
14:4 36:20
37:17 45:4
48:4 50:12
56:14,20 57:8
72:6,7 74:3
117:24 119:5
120:6 129:14

**129:17**
**2022**   29:6,7,13
29:18 30:3
36:17 136:25
137:8 138:6,7
**2023**   1:22
145:25
**2052637**   29:6,9
**21**   130:25
**21297258**
106:10
**22**   73:24
**22-01139**   1:4
3:1
**22-10964**   1:3
**238,000**   61:8
61:13
**25**   3:5
**26**   36:20
**260**   4:16
**26th**   8:9 22:9
37:4 39:5
60:24 61:1
81:5
**27**   3:5 36:17
**28**   29:20
**280**   29:13,21
**2805345**   30:4
**287**   50:8
**29**   3:5
**29th**   35:13
**2nd**   87:11

**3**

**3**   23:7 88:20
89:3 109:7
124:11,17
135:23 142:23

**[3.1 - access]**                                                                 Page 2

**3.1**  122:12
**3.1c.**  122:20
**3.5**  108:14
**30**  93:5
**300**  22:2
 145:22
**300,000**  59:14
**3054336**
 106:15
**31**  56:20 74:13
**31st**  61:5,7
**32**  3:5
**330**  145:21
**34**  3:5 92:3
 95:7 117:18,24
 121:9
**35**  65:10
**350**  50:19
**36**  74:1
**37**  56:11
**376**  49:20
**390**  49:20
**390,000**  131:4
**3:00**  142:1

---
**4**

**4**  31:8 32:23
 124:11
**40**  65:11 88:6
 88:23,23 89:1
 89:1 92:22
 114:25 115:2
**41**  16:20 17:3,4
 42:18 43:4
 73:8,10 89:21
 89:21,22,23
 95:5 124:7,9

**41-6**  16:23
**41-7**  43:8
**42**  3:5 55:22,24
 56:2
**43d**  119:25
**45**  3:5

---
**5**

**5**  26:19 27:4
 115:9,9,11,14
**5.25**  21:23 37:2
**50**  107:13,14
 108:2,3,20
 109:2,5 112:15
 112:23,25
 134:21,22
 135:24 140:5
 141:6 142:24
**50,000**  8:25
 9:12 10:2,4,8
 130:20,24
 131:7
**500**  28:13
**500,000**  132:22
**51**  3:5
**53**  3:5 29:22
**530,000**  61:2
 61:13 81:6
**5345**  29:23
**54**  73:24
**57**  3:5
**58**  3:5

---
**6**

**6**  17:5 22:17
 23:9 50:11
**60,000**  59:14

**67**  95:9,11
 121:10

---
**7**

**7**  43:12,22
 88:23 115:14
**7.4**  115:9,18
 125:18
**7.4b**  115:11
 125:12
**7.4b.**  115:13,25
**700**  133:18
**700,000**  38:6
 50:11
**7065**  3:4,10
**71**  36:16
**721**  77:24
**725**  18:25
**726**  50:9
**7th**  14:6 39:11
 50:8

---
**8**

**81**  73:25
**8154531**  48:4
**88**  37:6
**8805345**  29:10
**8:58**  1:23
**8th**  4:16

---
**9**

**9**  3:6,7 43:12
 117:24 118:20
 118:20
**954**  50:8
**997**  50:7
**9:00**  3:12,13
**9th**  7:10 8:5,6
 21:21,24 22:1

 22:4,10,11,17
 22:19 23:9
 36:16,24 37:1
 39:6 57:7
 116:15,23
 117:4,6 118:2
 118:13 130:25

---
**a**

**abide**  102:3,4
**ability**  68:1,20
 70:5 92:12
**able**  23:7 25:10
 26:16,20 28:7
 46:11 51:23
 69:25 76:20
 77:4 91:23
 105:25 108:8
 113:2,5 121:20
 130:6,12
 131:17 137:22
**abscond**  110:2
 114:8
**absence**  39:2
 52:23
**absent**  47:20
 48:2,7 100:20
 103:25 141:7
**absolutely**
 40:24 46:7
 71:16 120:4
 124:2 127:3,10
 127:12 130:6
**absurd**  104:15
 105:10 114:7
**access**  31:15
 33:6 119:5

accompanied 100:7
accomplished 82:19
account 13:13 13:14 78:2,4 78:19,20,20 79:10 83:13,14 83:18 86:22 105:4 109:14 110:15
accountant 127:24
accounting 11:14,16,19 15:6,8 19:4 63:10,11 64:12 64:13 66:6,7,8 95:1 105:6 109:22,25 123:18,20 127:6,7,8,20 127:24
accounts 139:1
accrual 92:6 95:8 121:10
accurate 145:4
accused 102:13 106:5 143:10
accusing 135:12,21
acknowledge 123:7
acknowledged 34:25 118:7,12
acted 99:3 128:22

acting 56:16 78:17 95:24,25 125:3
action 6:22 38:8 55:4,9 94:5
actions 50:4 65:19 74:7
activities 15:8 16:2 17:22 41:18,23,25 42:25 43:14,18 45:9,10 58:25 59:3 60:9,12 78:5 126:18,20 132:23 134:2
activity 43:1 43:16,17,17
actor 111:19 111:21
actual 36:7 54:6 66:4 131:5
actually 7:14 9:9 13:6 15:19 17:24 20:15,19 20:19 27:6 31:14,16 33:4 34:17 40:8 42:3,14 43:11 45:22 73:1 77:9 81:23 82:9 114:1 115:13 119:23 122:11 123:3 123:10 124:4 124:11 126:3

129:7,18 131:8 131:10 133:24 136:21,24 138:4
add 36:3 77:16 126:23
addition 106:24
additional 27:15 43:25 81:8 101:10,22 101:23 102:10 116:8 132:5 142:2
address 54:7 55:20 77:23 81:13 82:22,23 100:15 111:11 121:8,11,13 131:21 138:23
addressed 64:9 64:10,16 109:16 138:2
addresses 104:16 108:3 109:12
adduced 19:1
adelphia 106:8
adequate 27:12
adjourned 143:5,18,25
adjudicate 112:1
admit 6:20 19:5 33:25 39:13 45:6,7

126:8
admitted 35:3 46:9,17 47:6 73:10 102:17
admitting 22:9
adv 1:4
advance 7:22 12:8 31:10 32:25 45:3 117:12
adversary 3:1
advocate 11:6
affected 64:17
affidavit 10:11 116:24 117:2 118:8 119:20
affiliate 96:19 124:21
affirmative 7:13 31:5
afford 104:1 132:25
affording 104:8
ago 35:13 50:11 116:10 132:13 142:19
agree 7:22,24 8:17 9:11 67:13,14 68:9 70:7 90:16,17 90:21 101:11 101:16 123:16 127:24 131:18 140:2
agreed 34:6 97:24,24,25

117:12 118:14
142:2
**agreeing**  105:3
**agreement**
  8:24 9:7,16
  10:2 11:9 12:1
  12:21 13:9
  14:6,7,14,15
  15:22,23,24
  16:9 17:8 18:3
  39:11,12 41:13
  41:15 42:4,7,8
  42:9,12,17
  44:5 45:22
  46:2,22 48:22
  56:21 58:15,16
  58:21,21 59:11
  59:12,17 60:10
  60:11 62:24
  63:1,2,7,7 64:6
  64:23 66:11
  67:5 69:22
  88:5,14,21
  89:4,8,12,19
  89:22,24,25
  90:3 92:17
  93:5,5 106:11
  114:19,22
  115:20 123:5,6
  124:5,6 125:14
  131:1,9 143:14
**agreements**
  14:17,20 39:9
  40:5,11 44:14
  64:3 88:3
  92:21 93:12
  106:21

**ahead**  5:4 6:2
  6:13 9:10
  12:14 18:8,17
  18:19 20:18
  21:10 23:17
  27:4 31:2
  44:22 49:3
  55:19 64:4,20
  68:13 71:16
  75:21 81:11
  86:24 98:11,19
  99:2,9,9
  108:12 117:22
  118:22 122:4,7
  122:16 125:11
  129:25
**airdrop**  61:18
  82:21 120:6
**airdropped**
  83:8
**akin**  4:3 6:4,16
  57:6 116:5
**al**  1:12,15 3:2,2
**alex**  7:17 13:18
  32:20 57:25
  58:5 72:6
  73:13
**allegation**  23:8
  77:15
**alleged**  8:19
  12:7 33:5
  49:17 76:7,9
**allow**  14:18
  39:18 101:10
  112:9
**allowed**  112:22
  132:15,17

**allows**  37:21
  92:17 114:12
**alternate**
  113:19
**ambiguous**
  10:19
**america**  4:6
**amount**  12:16
  20:22 23:25
  54:19 61:12,13
  63:15 91:24
  95:21 99:22
  103:7 105:10
  105:11 106:2
  114:6 139:5
**amounted**
  35:23
**amounts**  14:22
  39:14,14 50:16
  65:21 73:6
**analyze**  62:13
**anonymity**
  48:1
**answer**  24:17
  24:19,19 41:15
  64:1 127:13
**answered**  77:1
**answering**
  111:23 113:7
**answers**  77:2
**anybody**  9:25
  95:20 133:20
**anymore**  135:5
**anyway**  34:1
  137:9
**anyways**
  111:20

**apa**  17:23 18:4
  74:10 114:21
  114:23 121:7
  122:8,10,13
  123:17,19
  125:4 131:8
**apart**  45:14
  61:19
**apologize**
  25:17 27:20
  32:7 130:4
  143:8
**appeal**  102:6
**appear**  37:13
**appearances**
  5:25 6:2
**appearing**  5:14
**appears**  16:22
  51:5 70:2
  138:21 141:12
**applications**
  35:2
**applies**  131:25
  132:1
**apply**  131:20
**appreciate**
  18:9 42:1
  131:13
**appreciated**
  5:10
**appreciation**
  39:24 134:7
**approach**
  129:23
**approval**  14:25
  62:17 100:21

[approved - authority]

approved 58:1
62:21,21 98:7
113:19,22
approximate
108:8
approximately
22:17 135:23
argue 8:13
22:8 38:24
44:11 49:1,1
49:11 51:14
55:12 139:22
139:22
argued 81:2,6
117:4 125:15
arguing 121:19
argument
11:11,25 31:3
32:9 45:13
49:14 53:17
54:6 57:25
58:2,3 69:1
71:10 87:2,22
92:11 94:13,17
97:22 99:3
103:25 116:15
139:10 140:4
140:21,25
arguments
30:19 57:25
130:10 134:10
army 105:24
aside 130:7
asked 12:18
19:25 31:12
33:2,13 34:4
35:5,11 36:14

36:25 56:18
63:10 79:21
80:25 116:21
119:21 121:21
127:8,13
130:20
asking 6:19
24:10,11,20
25:20 26:10,15
27:21 77:3
80:1,2 128:13
130:15 135:1
142:15
asserted 31:5
assertion 8:10
19:14,19 49:15
asset 15:21
47:24 58:15,20
59:11,11 62:24
63:1,2,6 64:6
64:23 83:8
88:4,14,21
89:4,12 92:17
130:25
assets 6:20,23
7:2,3 19:7 25:1
25:2,2,4 26:20
27:15 28:15
29:2 36:22
39:19 47:15,17
47:20 48:2,6
49:12,25 50:1
50:2 54:19,21
54:24 55:5
57:18 59:10
60:23 61:17
62:4,6 64:13

65:7,12,17,21
71:4,21 72:15
73:14 74:4
82:15 85:9,25
86:2,9 88:16
99:18,20 101:7
104:2,13,13,17
104:18,19,20
105:2,4,11,20
106:6,6,14,24
107:2,6,7,20
108:1,9,20
109:7,11,14,23
110:2 111:4,7
111:9,16,25
112:1,2,6,10
112:24 113:11
113:12 114:5,9
114:9,11
128:24 129:4
131:16 133:4
140:9 141:5,8
141:10,19,20
141:23 142:14
142:16,21,23
143:3,10,16,21
associated
37:14
assume 30:8
assuming
57:16
assure 85:18
astrove 29:10
29:18
attachments
112:9

attack 81:18
81:19
attended
104:24
attention 27:21
124:10
attorney
104:14
attorney's
105:5
attorneys 4:4
4:15 114:12
attributable
63:19
audit 17:24,25
18:2 54:18
73:14 92:16,18
92:23 93:9,20
93:25 94:3,6,6
105:7 114:18
114:19,20
125:4,12,19,22
125:24 126:2
126:10,18,23
129:10,13,15
129:20,21
auditor 93:10
august 73:24
119:7 138:6
authority 8:24
8:25 9:12,13
9:18 10:3
13:12 14:23
25:3,21 28:21
57:11,17,17
62:11 71:9
87:23 94:23

95:20,21 96:15
96:21,24 97:8
97:13 98:6,15
98:24,25 99:8
99:20 111:22
111:23 113:15
**authorization**
8:19 9:13 10:4
11:4 12:7,9
19:9,11,17
31:5 32:18
36:5 45:5
54:13,22 55:18
55:23 56:1
60:17,19 62:17
69:24 70:1
71:10,13 73:3
80:18,22 87:1
87:22 95:14,15
97:22 98:2,5
100:3 116:14
116:16
**authorize**
13:16,20,21
14:24 62:10
69:22 94:22
**authorized**
7:14,21 8:9 9:7
9:8 13:19
19:11,22 22:11
22:14 31:9
32:20,25 35:22
36:5,18 38:25
39:2,7 45:2
58:4,5,6,10
62:20 70:3,4
71:20 74:22,23

76:8,10,13
78:12 79:2,4
79:12,14,17,22
80:23 87:2,3
87:23 89:16
94:20 100:20
**automated**
41:17,19
**available**   6:23
89:10
**avenue**   4:16
**avoid**   25:7
**aware**   106:5
122:23

**b**

**b**   2:1 42:5,6,11
125:2,18
**b.r.**   49:20
**back**   13:2 18:5
19:24 22:6
23:15 28:7
31:4 32:17
34:2 39:9
52:17 54:7
58:22 61:9
69:8 71:12
79:24 82:7
86:1 92:10
98:21 110:18
119:12 129:24
130:2,19
133:17 137:19
139:18
**bad**   69:18
110:8,24
111:19 112:5

**badmouth**
72:23
**bailiff**   5:2
31:21
**balance**   30:23
51:21 52:2,25
53:6 87:15
103:12,13,21
105:9,14
107:21 114:3
139:11,16,22
**bank**   4:6 13:13
83:13,13 86:22
91:21 110:15
**bankruptcy**
1:1,18 2:3 3:4
3:11 49:21
55:7,15
**banned**   28:19
**based**   27:9
38:14 41:22
50:1 63:9,11
64:12,13 69:12
118:24 128:12
134:7,23
141:13,13
**basically**   12:10
42:23
**basis**   33:17
34:10,11 57:21
111:14 128:19
131:2,3
**bat**   94:14
**bates**   16:24
43:6,6,8,8
**bear**   115:12

**beating**   75:11
**beginning**   44:9
107:14
**begins**   42:23
**begun**   77:6
**behalf**   6:5
45:22 81:10
116:5
**behavior**   65:18
73:21,22,23
76:23 78:11,11
79:10
**belief**   72:3,10
111:16
**believe**   24:16
37:11 43:5
50:1 53:19
54:23,24 55:25
64:1 65:19
70:1 101:2,3
103:15 111:19
112:8 118:11
119:23 128:13
132:6
**believed**   9:5
34:23 62:22
76:12 80:11,14
127:16,17
128:10
**believes**   72:24
73:23 143:22
**believing**   75:9
128:19
**belong**   83:23
**benefit**   51:4
52:18 105:8

**best** 84:6 97:20 133:22 137:23
**better** 57:12 142:7
**beyond** 58:7 100:25 104:14
**billion** 65:6,12 99:19,19 128:24 133:14 133:15,17,17
**billions** 75:17 104:2
**bit** 23:15 24:18 25:24 88:13 137:21
**bitcoin** 40:5,22
**black** 66:8 89:15
**blanket** 142:16
**bled** 103:7
**bleeding** 102:9
**blockchain** 77:20 110:3,13
**blown** 92:15
**bluster** 62:15
**board** 14:25 36:21 60:22 95:21 96:21 98:10,18 99:25 117:5
**bonus** 13:10
**book** 73:15
**boss** 79:7,9
**bothered** 99:25
**bottom** 17:4 56:8 92:5 115:7

**bought** 88:1
**bowling** 1:19
**breach** 11:19 55:4,9 69:20 93:24 96:10 127:21 129:10 129:18
**breached** 94:2 127:8
**break** 53:10,12
**breakdown** 80:25 81:5,9 118:19
**bremont** 50:8
**brief** 49:14 64:9,10 81:10 96:14 97:3,6,9 113:24 133:16
**briefing** 42:14 44:8 64:22 100:24 101:14 116:8 120:17 129:12 131:15 131:17,18 133:6 135:16
**briefly** 18:12 143:8
**briefs** 101:10 101:23 102:10 132:5
**brilliant** 32:15 32:16
**bring** 38:7 50:25 56:11 59:1 73:9 88:21 111:17 137:22

**brings** 107:24 120:5
**broad** 30:24 51:11 80:8
**broadcasting** 78:13
**broader** 143:2
**broken** 11:3
**brought** 51:3 111:13 131:14
**bryant** 4:5
**budget** 17:13 90:8,24 132:14
**build** 126:8
**bullet** 17:7,12
**burden** 15:17 46:4 103:15 140:13
**burn** 106:2
**business** 83:12
**buttons** 76:20
**buy** 37:6 50:20 59:10 142:19
**buyer** 88:17 89:8 93:3,3,9 125:24,24
**bylaws** 99:7

**c**

**c** 4:1 5:1 145:1 145:1
**calculate** 40:13 69:3
**calculated** 15:17 40:14 123:7
**calculates** 15:16

**calculation** 40:7,23 41:4 42:24 64:17 123:13
**calculations** 43:14 81:16
**calendar** 93:2 93:5 115:17
**california** 29:6
**call** 59:7 101:2
**called** 21:12 25:25 34:11 58:24 59:6 69:20 91:20 109:4
**calls** 13:9
**calpine** 52:3
**cap** 119:21
**capacity** 56:16
**capital** 114:13
**caps** 122:25
**capture** 30:24
**car** 84:25
**careful** 21:18
**carried** 126:2
**carry** 78:25
**carve** 106:21 131:23
**case** 1:3,4 5:18 18:23 23:13 28:12 29:10 33:7 36:7 47:13 48:4 49:15,24 50:6 51:12,14,22,22 51:24 52:3,4 52:24 53:2,3,7

55:2,15 64:5
75:20 78:25
96:20 104:8
106:3,5 111:18
116:19,24
117:3,12
118:15 135:5
**cases** 15:2
27:22 29:2
49:22,23
106:19,20
132:14,16,17
**cash** 14:9
37:18,20,20,22
37:23,24 39:15
47:23 50:12,20
110:4,7,9,19
110:20,21,21
110:24 113:10
**categorical**
24:21 25:6,7
25:25 27:20,24
28:22 135:10
136:13
**categorically**
27:18
**categories** 21:2
24:23
**category** 9:5
9:20 10:15
21:11,13 24:23
24:24 135:14
**cause** 50:1 89:9
**cease** 48:22
**celsius** 1:8,12
3:1 4:4 6:17,18
6:20 7:2,4,8

8:1,16 9:14
10:13 11:12,17
11:20 12:2
13:24,24 14:8
14:12 15:7,13
17:8,9,9,12
18:21,22,24
19:2,5,23 20:2
21:4,14 25:3
28:12 31:15,17
33:9,11 34:18
35:15 36:10,20
36:24,25 37:4
37:5,7,16 39:8
39:12,19,24
45:7,8,14,15
45:23,23 46:8
46:9,11,14,18
46:22,24 47:3
47:8,19 49:12
50:17,23 53:1
54:13,18,18
55:7 56:5,7,15
56:19,21,22,24
56:25 57:2,10
57:18,18 58:10
59:1,2,3,4,6,7
59:8,9,10,12
59:12,17,18,19
59:22 60:3,7,9
60:10,11,13,15
60:21,23 61:7
61:16,19,24
62:11,22 63:22
65:3,5,7,20,21
65:24 66:1,11
66:20,20 67:10

67:12,17,23,24
68:9,9,10,11
68:17,23,24,25
69:7,15,17
70:6,10,10,13
70:17,22,23,24
71:2,2,6,8,20
71:20,21,23,23
71:24 72:3,4,9
72:11,21,24
73:21 74:4,5,6
74:7,11,14,16
75:13 77:19
78:21 79:18
81:24 82:9,14
82:15 83:7,20
83:21,23 84:1
84:3 87:4 88:2
88:16,17,18
89:4,8,16,17
89:25 90:2,2,5
90:6,11,18
92:8,9,11,18
93:4,9,13,15
94:2 99:7,24
103:24 104:5
104:17,19
105:2,9,23
107:15 111:15
117:25 118:3,4
119:2,3,5,8,8,9
119:9,14,15,18
119:19,19,21
119:24 120:1,1
123:25 124:15
124:16,16,19
124:20,21,21

124:24,25
125:1,2,15,24
126:4,13,15
127:5 128:24
133:4,11,12,13
134:20 135:3
137:3,21
143:23
**central** 35:10
**ceo** 14:23 15:2
15:25 17:10
19:22 56:5,7
56:15,24 57:10
58:10 60:15
61:7 62:11
66:22 69:15
70:5,23 71:8
76:4,19 87:3
88:2 89:9,13
89:16,17 90:1
90:7 92:11,19
93:4,13,15
94:18,22 95:1
96:3,6,8,12,14
96:21,23 97:2
97:4,8,13 99:4
99:8,13 118:3
123:25 124:25
125:3,14,25
126:4,13
**ceo's** 100:3
**certain** 13:10
81:20,21 94:13
97:25 104:18
**certainly** 7:15
7:23 10:5
11:15,23 12:15

[certainly - colorable]                                                Page 9

14:17 28:17
30:22 35:9
48:25 49:22
53:3 64:15
129:5 131:14
135:13 137:4
138:25
**certified** 145:3
**cetera** 10:8
106:22 132:15
137:19
**cfo** 13:8,11
72:4 78:21
**chair** 126:13
**chairman** 47:8
**challenged**
7:23 50:5
**chance** 8:13
23:22 97:18
141:23
**change** 22:2
64:3
**chapman** 4:10
6:6
**character** 83:6
**characterizat...**
57:24
**characterize**
133:24
**characterizing**
133:23
**check** 100:1
**chief** 56:23
90:12 95:16,17
95:19
**chosen** 93:10

**circle** 61:9
**circuit** 50:8
87:11
**circumstances**
24:9 27:24
35:17 80:2
126:1
**citation** 27:22
**citations** 20:12
**cite** 28:23 29:3
29:7,18 41:9
49:15,20 51:15
52:3 120:16
**cited** 47:13
52:4 133:13
**cites** 50:7
**civil** 49:22 50:4
132:17
**claim** 9:7,19,22
12:2 18:25
19:15,21,22
22:10,13 32:19
35:12 39:1
44:25 55:14
57:2 60:21
93:24 94:2
100:6,7,8
104:15 111:9
120:5 129:16
133:1,4
**claimed** 65:9
76:18,19
116:20
**claiming** 45:2
78:8 128:13
**claims** 18:22
19:2,16 36:9

38:10,11 55:16
55:16 61:23
62:14 104:1
111:7 116:14
120:12
**clarify** 67:16
**clauses** 14:15
**clear** 20:1,10
25:22 26:4,5
30:3 46:21
64:15,24 66:7
81:9 84:12
85:13 86:6
89:15 101:15
102:11,17,18
102:19 104:16
110:25 116:12
116:13,16
120:16,17
123:20 128:19
128:20 131:19
132:3 135:21
135:22 137:14
142:5,11
**clearer** 131:8
**clearest** 55:8
**clearly** 52:3
71:25 74:10
75:2 97:11
104:7 120:9
124:18 128:12
**clerk** 5:4,24
53:23 117:14
117:20
**click** 76:20
77:23

**clicks** 77:21,22
**client** 73:14
85:23 124:25
142:13 143:2
**clients** 142:8
**close** 87:21
112:12
**closed** 9:24
**closing** 7:2
11:25
**code** 37:21
**coin** 21:25
43:24 63:9,11
73:14 137:15
137:15
**coins** 19:7
36:11 37:6
39:24 40:7
41:5,21,21,25
43:1,16,17,17
43:20,25 47:22
63:20,24 64:18
65:16 124:18
133:10,11,22
133:22,25
134:2 137:18
**collapsed**
45:15
**collect** 140:6
**collection**
33:18
**collectively**
38:14
**colloquially**
136:3
**colorable** 11:8
93:24

| | | | |
|---|---|---|---|
| **column** 10:19 | 35:7 77:5 | 36:18 120:13 | **concerned** 26:7 |
| **columns** 21:7 | 106:8 | 120:15 124:12 | 141:21 |
| **come** 7:16 13:2 | **community** | 124:23,24 | **concerning** |
| 13:18 19:24 | 82:20 | 125:3 | 125:4 |
| 22:6 25:13 | **companies** | **competent** | **conclude** 12:9 |
| 31:7 32:17,22 | 59:2 60:6 | 122:2 | 113:17 140:15 |
| 34:22 35:6 | **company** 15:25 | **complain** | **concluded** |
| 39:9 44:3,20 | 17:10 56:21 | 111:8 | 144:2 |
| 57:6 69:11 | 58:24 59:8,10 | **complained** | **concludes** |
| 74:14 77:24 | 59:13 60:7,8 | 31:14 33:4 | 68:25 69:7 |
| 94:10 121:7 | 65:18 66:21 | **complete** 27:13 | 140:3 |
| 126:5 130:2,19 | 67:6 72:24 | 79:13 137:23 | **conclusion** |
| 139:25 | 73:23 76:4,12 | **completely** | 52:6 |
| **comes** 24:23 | 76:19 80:7,9 | 32:3 61:15 | **conduct** 52:13 |
| 69:25 133:15 | 80:24 83:24 | **complex** 42:6 | 111:24 |
| **comfort** 53:10 | 87:25 88:15 | 42:13,22 44:4 | **conducted** |
| **coming** 31:4 | 89:7,8,10,13 | **compliance** | 33:19 |
| 52:17 70:13 | 89:14 90:7,11 | 50:25 | **conferences** |
| 132:11 | 91:20 92:13,18 | **complicated** | 127:23 |
| **comment** | 92:19 93:4,13 | 63:12,14 67:6 | **conferred** |
| 142:12 | 93:15,25 94:19 | 67:19,20,21 | 86:21 |
| **comments** | 95:17 96:6,7 | **compound** | **confess** 44:2 |
| 116:9 121:4 | 96:12 97:5,11 | 81:20 82:17,20 | **confident** 24:3 |
| **commingling** | 97:13 99:5,13 | 83:8 | **confined** 141:6 |
| 142:18 | 99:18,18 118:1 | **comprehensive** | **confining** |
| **commission** | 124:25 125:25 | 27:13 91:19 | 27:11 136:7 |
| 28:13 | 126:19 127:17 | **computer** | **confirm** 22:22 |
| **commitments** | 133:2,2 | 117:18 | 22:25 |
| 89:7 | **company's** | **conceal** 47:23 | **confirmation** |
| **common** 41:7 | 74:7 97:8 | **concede** 54:11 | 92:9 |
| 41:10 77:16 | **compare** 76:22 | 103:19 | **confirmed** 74:8 |
| 140:18 | **comparison** | **conceded** | **confirms** 89:19 |
| **communicati...** | 105:17 | 80:19 94:14 | 89:24 |
| 35:14 | **compensate** | **concern** 27:8 | **confronted** |
| **communicati...** | 120:18 | 27:14 30:23 | 30:15 31:1 |
| 31:9,11 32:24 | **compensation** | 100:9 136:6 | **confusing** 37:8 |
| 33:2 34:24 | 14:7,10 15:23 | 142:15 | |

confusingly
90:2
connor 19:16
34:5
consent 113:11
consenting
112:13,21
consider 35:19
40:18,19 81:4
130:10
consideration
89:6 125:1
considered
65:24
considering
38:9 100:23
constituted
118:3
contained
106:9
contemplated
74:12
contemplates
12:22 74:10
123:8
contemporan...
78:23
contempt 26:3
26:4
contend 20:1
25:2
contends 118:2
118:14,14
contest 103:16
contested 68:3
context 106:18
132:12

continually
118:12
continue 8:7
108:4 112:16
113:2 141:9
continued
65:16,25
continues
105:23
contours 28:1
contract 11:19
12:5 13:16,21
13:22 15:15
44:12 55:4,9
59:5 63:9,11
63:14 69:21
89:15 90:23,23
93:24 94:3
95:18 96:10
99:18 124:4
127:1,8,20
129:19
contracts 7:15
13:19,21 54:15
97:7,10 113:25
contractual
66:7,9 93:14
96:8 97:5,9,12
97:14 134:10
contrary 14:20
46:17 48:24
124:3
control 17:13
71:5,6 90:7,24
113:15
controversial
99:15

controverted
68:8
conversation
25:18 34:3
61:23
conversations
91:17
conversion
19:4 100:6,7
converted
37:17 43:20
conveyance
38:8
convince 23:10
61:24 62:6,7
convincing
19:8
cooperated
105:6 111:25
cooperating
113:8
copied 35:7
copy 35:21,24
corner 17:4
69:9
corners 25:14
25:23
corp 106:8
corporate
13:13 14:22
corporation
13:8 59:1
correct 8:22
9:1 17:19
22:20 40:8
43:15 46:24,24
47:4,6,9,10

54:9,14 57:24
66:12,17,18,23
68:11 69:5
90:20 106:19
116:9 120:7
122:20
cost 43:16 60:4
64:2 68:19
69:3
costs 43:1
counsel 5:17
6:2,6,9 30:18
109:14 112:17
112:18,23
113:3,16
116:19 132:15
135:22
count 73:14
country 112:7
145:21
couple 12:17
15:6 54:5
91:12 101:25
123:22
course 12:25
13:21 16:1
17:14,19 33:13
34:12 40:10
96:23 123:7
court 1:1,18
5:3,5,9 6:1,7
6:11,13,25
7:18,19 8:12
9:11,23 10:10
10:17 11:2,15
14:21 15:2,15
16:3,6,10,14

[court - creditors]                                                    Page 12

| | | | |
|---|---|---|---|
| 16:17,21,24 | 63:23 64:4,8 | 110:12 111:22 | **courts** 50:6 |
| 17:2,6,11,16 | 64:15 66:3,9 | 111:23 112:1 | 106:19 |
| 17:18 18:7,14 | 66:14,17,21 | 112:17 113:1,5 | **cover** 11:20,21 |
| 18:17,19 19:24 | 67:1,4,8,12,25 | 114:17,21,24 | 27:17 30:12,12 |
| 20:6,10,16,18 | 68:3,7,13,22 | 115:2,8,11,18 | 58:6,8 135:1 |
| 20:23 21:6,9 | 69:20 70:9,13 | 115:24 116:3 | **covered** 39:16 |
| 21:16,18 22:15 | 70:18,21 72:25 | 117:21 118:5,9 | 44:24 103:14 |
| 22:21,24 23:2 | 74:18,22 75:5 | 118:16,22 | **covers** 28:1 |
| 23:4,17 24:10 | 75:9,19 76:1,7 | 119:11 120:3 | 115:13 |
| 24:14 25:12,18 | 77:21 78:24 | 121:6,8,16 | **cpa** 93:11 |
| 25:22 26:14 | 79:3,11,23 | 122:4,7,15,18 | **craft** 106:13 |
| 28:8,10,25,25 | 80:11,14,20 | 122:21 123:2 | **crafted** 132:14 |
| 29:7,14,16,19 | 81:17,25 82:3 | 123:16 124:8 | **create** 41:24 |
| 29:24 30:2,6 | 82:25 83:9,20 | 124:13 125:6 | 45:7 59:6 |
| 30:16 31:2,23 | 84:2,8,16,21 | 125:10 126:12 | 67:20,22,24 |
| 31:25 32:2,10 | 85:2,7,12,19 | 126:25 127:5 | 68:1,19,20 |
| 32:13,15 33:8 | 85:20,22 86:3 | 127:14 128:2,6 | 105:19 |
| 33:21 34:20 | 86:5,11,16,19 | 128:16,22 | **created** 39:18 |
| 35:18 37:8 | 86:24 87:6 | 129:6,25 | 59:23,24 60:3 |
| 38:3,7 39:25 | 88:8,11,25 | 130:22 131:25 | 71:2 73:15 |
| 40:3,11,15,18 | 89:2 90:14,16 | 132:2,10,18 | 91:25 93:18 |
| 40:21 41:2,4,9 | 90:22 91:1,3,5 | 133:7,9 134:3 | 119:8,10,17,18 |
| 41:12 42:2,8 | 91:11 92:25 | 134:5,16,18,21 | 119:18,24,25 |
| 42:10,17,20 | 94:5,21 95:6 | 135:18 136:18 | 123:15 126:20 |
| 43:2,4,6,9,13 | 95:10,13,19 | 137:11,14,25 | **creating** 73:18 |
| 43:22 44:13,20 | 96:1,9,13,18 | 138:11,15,25 | 76:24 |
| 45:12 46:1,4 | 97:15,18 98:8 | 139:2,10 140:2 | **creation** 93:17 |
| 46:13,20 47:1 | 98:14,17 99:16 | 140:3,10,15,21 | **credibility** |
| 47:3,5,7,11 | 100:9,14,17,21 | 140:25 141:7 | 8:11 12:8 22:7 |
| 48:8,14,17,23 | 100:25 101:18 | 141:10,21,25 | 22:13 39:1 |
| 49:3,25 50:24 | 102:5,9,22,24 | 142:5 143:5,14 | 70:2 75:21,24 |
| 51:17,20 52:13 | 103:2,6 104:4 | 143:20,24 | 79:24 |
| 53:8,12,16,22 | 104:15 106:8 | **court's** 47:17 | **credit** 39:24 |
| 54:1,14 55:3 | 106:11,13,18 | 48:3 51:3 | 80:22 |
| 57:14,21 58:12 | 107:7,9,11 | 85:15 87:7 | **creditors** 5:14 |
| 58:17 59:21,25 | 108:7,12,19 | 105:18 | 51:4 52:18,22 |
| 60:16 63:10,18 | 109:1,9,17 | | 104:4 |

[criminal - defending]                                                                      Page 13

**criminal**  49:23
  49:25 50:3
  132:12,14,16
**critical**  130:16
  139:12
**cross**  7:24
**crypto**  28:15
  29:2,9 48:1
  64:18
**cryptocurrency**
  52:11 108:5
  110:14 134:7
**crystal**  101:15
  102:11 116:13
  116:16 128:18
  128:20 131:19
  142:11
**cucchiaro**  8:23
**current**  108:8
**custodian**
  121:25
**custody**  71:3,5
  71:5 102:20
  108:24,24
  136:1
**cut**  5:20
**cuts**  80:9

          **d**

**d**  5:1
**dai**  37:16 61:15
  81:13,14 82:15
  82:16 86:10
  138:1,1
**dairy**  51:15
**damages**  51:15
  51:17,20

**dash**  43:12
**data**  81:7
**date**  55:23 57:4
  61:2,5 81:3,6
  94:16,18 98:3
  118:13 129:16
  138:18 145:25
**dated**  56:13,20
  117:24
**dates**  10:17
  77:25 81:5
  137:19
**david**  105:16
**day**  5:9,11
  48:10 49:5,8
  53:1 72:18
  82:8 100:11
  107:5 119:6
  130:4 143:6
**daylight**  80:8
**days**  27:7
  75:15 78:9
  93:2,5 115:17
  129:16 135:19
  137:21
**de**  91:21
**dead**  75:11
**deadline**  18:2
**deal**  8:14 45:18
  60:14 63:21
  143:18
**deals**  135:20
**dealt**  133:20
**dean**  4:10 6:6
**deanna**  53:19
  117:9

**debtor**  1:10
**december**
  50:25 74:1,13
  121:23 129:17
  137:7
**decentralized**
  58:25 59:3
  60:9 71:25
**decide**  15:2
  94:24 95:2
  96:22 132:4
**decided**  26:24
  101:18
**decidedly**
  87:15 103:22
  103:22 107:22
  107:23 114:4
**deciding**  55:2
  101:2 103:6
  142:9
**decision**  101:3
  102:21 135:17
  136:4
**declaration**
  143:15
**decline**  40:25
  63:24
**declined**  40:22
**deducting**
  21:22
**deductions**
  131:10
**defend**  105:25
  106:6 111:5,9
  112:20
**defendant**  50:3
  93:6,8,14,20

**93:20 94:20
  96:8 105:6,20
  105:25 106:5
  106:25 107:20
  109:20 112:14
  134:24
**defendant's**
  10:13 15:8
  21:2,4 30:17
  49:25 107:22
  132:6 133:16
  134:13
**defendants**
  1:16 5:8 6:12
  6:20 7:12,25
  15:10 17:24
  19:5 23:5,20
  24:7 25:8,23
  26:11,18 27:12
  33:9 38:15
  43:21 45:7
  47:19 50:10,25
  52:13 53:17
  54:4,11 101:7
  104:9,10,11
  105:17 107:8
  108:1 109:18
  109:21,25
  110:1 111:3,8
  112:13,20,21
  112:22 114:10
  118:25 121:22
  129:11 135:21
  136:7
**defending**
  105:22 106:25

[defense - disagreement] Page 14

defense 7:13
19:8 31:5
54:24 55:3
67:18 96:2
106:20 112:17
112:18 132:15
defi 74:4,5
78:4
define 42:25
defined 17:8,9
27:11 63:4
119:21 122:25
123:3,4
defines 63:15
120:1
definitely 82:1
120:16 129:12
137:8
definition 43:9
63:16 88:19
136:13
definitions
43:16
defrauded
76:5
delay 62:1
deliver 46:10
69:14
delivered
15:11,13 126:7
demand 8:9
22:9 123:17,20
127:6
demanded
11:16 36:11
66:5,6

demanding
72:14
demonstrate
109:11 123:10
123:12
demonstrated
19:5
demonstrates
78:17
denied 61:3
denies 56:14
deny 19:15
49:12 111:14
114:16 129:3
denying 57:8
deo 45:23
departure
78:22
depend 46:9
143:9
depending
81:7
depends 19:8
deploy 72:14
112:15 114:13
128:25
deployed 74:3
99:19 107:3
124:18
deploying
65:16 71:21
deployment
66:1 72:20
74:24
deposited
120:13

deposition
31:14 33:4
72:16 105:7
119:22 120:8
120:16,18
depositions
77:1
describe 12:1
described
15:12 24:25
52:11
describing
10:11 27:6
desk 35:25
desperately
104:17
despite 39:5
63:5 74:15
destination
47:23
detailed 76:25
115:22
details 72:7
118:21,24
determination
17:14 79:3
90:8,11,25
91:6,22 95:5
determine
58:11 73:1
90:12 92:14
93:16 108:15
determined
91:24 124:21
determining
90:19

devil's 11:6
di 21:13
difference
61:21
different 15:20
24:18 61:15
83:6 94:9
113:13
differently
82:12,12
difficult
108:15 135:25
digest 42:15
digital 19:7
36:21 65:7,8
71:4
diminish 63:24
dippold 106:13
direct 77:2
117:7 124:10
directed
106:13
direction 36:8
directly 21:14
23:8
disadvantage
109:19
disagree 61:10
66:14,15,16
94:11,12 97:15
disagreed
134:6
disagreeing
97:2
disagreement
67:16,17

disappeared 136:5

disaster 142:8

discomfort 26:24

disconnected 32:3

discover 27:14

discovery 22:25 23:4 24:6,15 26:8 26:16 27:2 33:7,13,18,24 33:24 34:3 35:11 69:12 76:11 77:5,8 104:23 120:25 121:2,23

discretion 52:9

discuss 104:14

discussed 73:6 73:7

discussion 32:5

discussions 109:3

disproportio... 106:2 107:1

dispute 12:5 13:1 26:1 55:10 68:15,16 68:16 69:6,11 85:6 113:1

disputed 7:20 68:15,15 70:4 80:21 82:1 113:21

disputes 11:12

dissatisfied 93:7 125:20

dissipate 47:20 48:6 107:19 112:2 114:9

dissipated 26:18 28:6 47:15 50:10 104:13 111:2 111:24

dissipating 113:11

dissipation 104:13 109:11 141:8,23

distinction 21:15

distressed 100:10

distributed 13:25 83:2

distribution 90:20

distributions 58:12

district 1:2 29:1,6,11 30:5 48:4

doc 3:4,11

docket 142:1

document 33:9 33:12 35:20,21 91:9,13 92:24 95:6 98:24 119:4 121:14 121:23 122:1,6

122:11 123:4,8

documentary 36:7

documents 98:18 100:2 114:18

doe 29:5,10

doing 15:11 21:4 25:24 26:11,12 27:1 41:21 46:8 58:25 60:8,13 80:5,8 83:15 100:24 101:13 110:17 125:17 126:3 129:21 135:21,22

dollar 13:10 38:18 41:1 95:21 106:21 131:1,2,3 133:25

dollars 13:13 15:3 19:7 22:3 39:7 43:18,20 61:12 63:17 64:12,12 65:4 65:5 74:4 76:8 99:10,22 104:2 104:18,19 111:6 128:23 128:24 132:22 133:18,23 136:5

dom 18:23 47:14

don't 112:21

downloaded 31:17 34:18 36:1

dozens 76:24

drawer 35:25

drawn 11:4

dropped 82:16 82:17,21,22 83:16,21,22

due 39:14 93:4 129:17,17 136:7

dug 10:22

dx 65:10,11 73:8,10 88:6 88:23,23 89:21 92:3 95:7 121:9

**e**

e 2:1,1 4:1,1 5:1,1 31:11,12 31:15,17 33:2 33:3,5,6,10,14 33:18 34:4,9 34:13,18,22 35:14,18,24 36:2 56:20 65:10 73:8,9 73:13 77:9,10 77:11 98:21,22 116:23 117:24 118:2 120:21 120:23 145:1

earlier 28:12 81:15

**early**  8:20 24:15 26:8 34:3 45:4 60:21 98:20 116:19

**earn**  89:11,18 92:20 113:14 122:22,24

**earned**  13:6 40:24 91:23 123:11,13 134:1

**earning**  41:21 107:5 112:16 113:2

**easier**  21:1 23:10

**easiest**  77:9

**eastern**  29:5

**easy**  42:15 48:2 110:7

**eatery**  18:25

**ecro**  2:5

**effect**  40:23 131:1,5

**effective**  56:5

**effectively** 13:14 37:21 126:15 129:20

**efficient**  18:18

**effort**  82:18

**efforts**  5:11 83:25 85:17

**egg**  136:3

**eight**  138:6

**either**  33:5 48:20 50:19

61:13 64:16 69:25 75:9,20 75:21 79:13 94:25 98:15 107:8

**elements**  52:7 139:17

**eleven**  37:3

**elizabeth**  4:11

**else's**  34:13

**embezzle**  80:7

**emboldened** 52:24

**emphatically** 19:15

**employed** 56:19

**employees** 71:23 72:23

**employment** 13:9 56:18 116:21

**ended**  56:1 80:18 116:14

**ends**  55:23 60:19,20 84:13

**enforce**  26:3 30:20 104:9,10

**enforceable** 26:2

**engage**  17:22 109:25

**engaged**  7:8

**engaging**  17:21

**english**  28:13

**enjoin**  104:17 105:11 112:6

142:20

**enjoined**  24:25 48:1 52:19

**enjoining** 106:24

**enjoins**  107:7

**enjoy**  50:6

**enormous**  28:5 50:10

**enrichment** 19:4

**ensure**  27:12 51:2

**enter**  27:24 52:9 77:23 114:11,14 141:4,22 143:1

**entered**  6:24 12:22 30:9,20 48:19,25 51:8 51:25 52:14 53:21 63:1 64:6 105:18 106:9 141:5 142:7

**entering**  25:7 52:7

**enters**  60:10

**entire**  33:18 57:25 77:8 120:23

**entirety**  33:14

**entitle**  39:19 80:15

**entitled**  12:5 14:10 39:6 54:23 58:11

63:19,25 73:6 74:11,11 80:15 84:13 93:25 94:6,7 101:6 131:12

**entity**  90:1

**entries**  10:19

**entry**  135:9

**erc**  20:22,24 21:12,21 36:25 77:23

**especially**  27:7

**essentially** 40:12

**establish**  7:12

**established** 52:14

**estate**  104:2 111:9 114:5 141:24

**estimate**  20:7

**et**  1:12,15 3:2,2 10:8 106:22 132:15 137:19

**eth**  21:3,5,24 22:2,4 36:16 37:17 41:1,8 41:16,18 50:19 81:20 82:7 138:4,10

**ether**  40:5,22

**ethereum** 20:24

**etherscan** 76:20 77:21,23

**evaluate**  7:19

evaporated
133:18
evasive  76:17
event  6:24
50:24
eventual  62:7
eventually
61:24 72:25
everybody
34:13 73:18
80:8 110:11
143:6
everybody's
5:10
evidence  5:12
7:13,15,19,19
7:20,25 8:5,17
9:23,23 10:7
10:10 11:10,12
11:16 14:18
19:12,21 22:12
26:5 31:6,8
32:19,23 36:4
39:3,3 47:7,25
53:21 56:13
62:14,25 63:1
64:5 65:3,19
65:23 68:3,4,8
69:13 70:2,17
70:18,19,21
74:2 76:11
82:3,10,14
109:11 116:22
119:14,16
121:16,16,18
121:18 127:15
128:20 132:21

132:23,25
133:3 136:22
138:23 141:14
evidentiary  3:2
3:6 5:16
exact  12:16
27:5 35:9 36:8
87:9
exactly  9:22
26:10 33:25
40:9 44:16
47:10 51:12
101:19 109:4
123:21 128:12
136:10,10
examination
7:24
example  40:5
41:17 49:24
94:5
examples
47:24
except  53:18
85:8 113:16
exception
105:5
excerpt  56:2
exchange
131:4
excluded  81:16
excluding
81:15 124:22
exclusion
106:10
exclusive  89:6
124:24

excuse  55:5
executed  56:22
executive  15:4
56:23 90:12
95:17,17,19
exercise  13:7
55:17 77:13
exert  105:23
exhibit  16:14
16:18,20 17:1
17:4 42:5,6,18
43:4 88:7
124:7
exhibits  16:10
53:20
exist  35:19
77:5 119:10
141:16
existed  9:18
33:11 35:20
119:18
exists  47:18
92:16
expectation
132:7
expecting
64:25
expedited  24:5
33:13,17,24
34:3,10 35:11
69:12 76:11
77:8 104:23
121:2,23
expended
104:20 141:15
expending
105:10

expenditure
104:14 141:24
142:21
expense  10:23
9:12 10:1,3,22
expensive  82:8
expert  33:25
explain  57:22
57:23
explaining
43:23
explanation
42:22
expressly
56:22 58:5
extend  57:17
extent  11:7
52:18 69:10,13
99:8 102:1
141:21
extraordinarily
75:2
extraordinary
19:21
eye  65:21
75:16

## f

f  2:1 50:8
145:1
f.2d  50:8
face  22:12 39:2
52:16 105:17
107:17 136:4
faces  51:23
107:15

fact  27:23 56:6
  57:8 61:24
  62:7 63:5
  68:24 69:7,11
  74:15 80:21
  82:11 89:17
  92:12 94:22
  98:21 106:24
  107:2,17
  108:23 110:24
  112:12 114:2
  114:10 116:19
  120:8 141:19
  142:17
factor  107:21
factors  18:11
facts  18:14
  19:1 38:12
  77:17,20 80:4
  85:13,16,17
  117:11,19,23
  118:15
failed  69:14,16
  109:10
fair  18:23
  41:11,14 66:19
  66:20 75:7
  91:16 100:2
  103:17 105:24
  107:7 128:9
faith  17:14
  90:9,10 91:22
  92:14 93:16,23
  95:4 99:4,14
fall  9:5,19
  10:15 43:24
  64:18

fallen  45:14
falls  103:21
familiar  87:7
  106:22
far  8:4 9:8 91:8
  95:14 121:2
farming  41:16
fate  23:25
fault  29:17
  100:2
favor  52:2
  87:15 103:22
  103:22,23
  107:22 114:4
  139:16
february  45:4
federal  3:4,11
fee  41:19
feedback
  132:11
feel  128:6
fees  48:7 49:19
  50:7 104:7,14
  105:5 106:10
  106:15 109:15
  112:18,23
  113:3 114:13
  131:24 132:24
  133:5 136:2
feet  69:4
feld  4:3 6:5,16
  116:5
fell  10:2
fenced  90:17
fi  58:11
fifty  37:7

fight  75:25
figure  71:15
  127:24 128:2
  136:9
figures  21:9
file  120:23
  142:1
filed  81:10
  94:5 104:22
files  98:22
filing  118:19
  125:7
fill  27:25
final  47:15
  91:24 135:17
finally  56:17
  79:16 111:11
  131:13
finance  58:25
  59:3 60:9
  71:25
find  27:2,20
  30:19 35:14
  36:4,14 92:4
  98:5 100:22,24
  101:8,12,22
  103:4 122:1
  142:8
finder  61:25
  62:7 82:11
finding  20:21
  84:13
fine  83:16
  88:11 101:10
  102:5
fingertips
  12:16 102:2

finish  11:22
  44:21
finished  5:12
  136:19
finishing  44:21
fires  80:9
firm  18:1
  48:11 54:3
  81:2 102:19
  104:6,23
  108:23,24
  136:1
first  6:2 8:14
  12:25 15:7
  17:25 24:17,18
  24:19,19 36:10
  42:16 58:5
  88:6 94:15
  104:16 109:13
  116:22 122:12
  122:24 123:24
  128:9 129:13
  140:7
five  36:19
  53:10 55:21
  78:9 115:24
  126:16 138:5
flattering  86:8
fleeing  111:16
  113:9
floor  4:16
florida  29:1,11
  30:5 48:4
flowed  142:9
fluctuations
  137:16,16

focused  44:17 51:10
folks  37:14
follow  15:10 117:5
followers  78:6 79:7
following  79:9
followings  78:4
follows  56:23
force  105:23
forceful  72:14
forcibly  81:21
forefront  71:25
foregoing  145:3
forever  28:6
forget  51:17
forgot  109:4
form  79:18 114:15
formal  93:17 93:18
formed  72:10 119:3
former  116:19
formulas  42:25
forth  54:7 125:1
forty  16:19,21 56:12
forward  3:12 31:7 32:22 34:22 35:6 131:14 132:25 137:22

found  10:23 27:22 31:16 33:7 34:17 106:7 108:20
foundation  121:13
founder  37:10 38:8 84:4
founders  38:1 84:24 86:14
four  25:14,22 55:21 138:5
frames  14:3
frank  117:9,16
frankly  77:5 104:15 114:4,7 139:23
fraudulent  38:7
free  65:1
freedman  4:20 5:8 6:8,9,12 11:24 53:9,14 53:16,18,24 54:2,3,3 55:3 55:20 57:20,22 58:19 59:21,23 60:2 63:21 64:1,5,11,21 66:5,13,15,18 66:24 67:2,7 67:11,14 68:1 68:5,12,14 69:10,24 70:12 70:15,20,24 74:20 75:7,19 75:22 76:2,9

79:1 80:12,17 81:12 82:2,6 83:1,11,22 84:6,10,18,23 85:4,10,15 86:2,4,9,12,18 86:20,25 88:9 88:12 89:1,3 90:17,21 91:2 91:4,8,12 93:1 93:22 94:11 95:3,9,11,16 95:24 96:5,11 96:17 97:1,17 97:20 98:13,16 99:11,17 100:9 100:13,15 101:25 102:8 102:12,25 103:5,9 104:5 106:12,23 107:10,12 108:11,13,22 109:2,10 114:17,20,23 114:25 115:4 115:10,15,20 116:1,2,12 119:2 121:9 122:9 123:24 131:23 134:5 135:22 136:16 136:20,22 138:8,17 139:3 139:13 140:7 140:12,23 141:2,12 142:4

142:8,11 143:11,19,21 144:1
freedman's  119:13
freeze  24:11 112:10 130:9
freezing  29:2 49:25 51:13
friedland  54:3
friends  83:3
frolic  114:5
front  42:18 62:3 82:11 84:20 88:8 114:18 115:5 115:21,23 122:5,15 124:8 139:14
froze  32:3 75:15
frozen  24:16 141:5,6
fruits  83:25
frustrated  67:24
ft  108:21 135:24
ftc  28:24
fulfill  97:13
fulfilled  103:15
fulfilling  97:8
full  91:19,24 92:15 105:23
fully  27:21 110:13

**funded**  70:17
**funds**  49:17,18
  50:4,6,10
  83:18 86:22
  89:11 101:24
  103:7 107:4
  110:16 112:14
  112:16,23
  113:2 142:18
**further**  8:25
  9:13,13 10:3
  10:14,23 26:14
  26:15 50:23
  52:1,24 100:21
  100:21,24
  135:8 141:24
**future**  27:15
  49:1

---

**g**

**g**  5:1
**gains**  73:11,15
  73:18
**gap**  31:19
**garden**  11:18
**general**  65:9
  73:22 76:19
  91:15 92:8
  121:9,20,22
**generate**  12:25
**generated**  13:1
  43:19,25
  124:19
**generating**
  74:25 108:5
  134:2
**getting**  23:13
  53:5 75:14

132:10
**give**  8:12 19:11
  20:7 28:23
  29:3,7,16 30:3
  33:16,21 34:9
  34:12 36:15
  38:16 41:7
  43:6 67:23
  77:10 84:4
  95:12 96:14
  108:8 117:17
  129:4 133:11
  137:11 139:21
  140:20
**given**  14:22
  60:15 98:25
  107:15 129:4
  133:14 137:19
**gives**  98:9
**glad**  5:11
**glance**  42:16
**glenn**  2:2
**global**  79:22
**go**  5:4 6:2,13
  9:9 12:14
  13:11 18:5,8
  18:11,17,19
  20:18 21:10
  23:17 27:4
  28:9 30:9 31:2
  37:22 43:11
  44:3,22 49:3
  55:19 56:11
  57:1 64:4,8,20
  68:13 71:16
  73:12 75:9,21
  78:13,14 81:11

82:25 83:14
  86:24 87:16,16
  87:18 88:19
  89:5 92:2 95:5
  98:10,19 99:2
  99:9,9 108:12
  110:18 114:6
  116:8 117:22
  118:22 122:4,7
  122:16 125:11
  129:25 130:7
**goes**  25:21 58:7
  69:1 81:6
  115:22,22,24
**going**  3:12 9:6
  9:21 11:24
  14:9 15:3,8,12
  16:24 18:11,12
  18:22 20:8,11
  22:23,24 28:6
  28:7 30:9
  33:15 35:10
  36:14 37:22
  38:7,22 46:11
  48:6 49:20
  50:23 51:7,9
  52:24 58:12,23
  59:4,6,10,20
  60:8,16 61:24
  64:19 67:15
  75:25 78:25
  81:8 85:6,19
  87:19 90:5
  91:13,17 94:24
  95:2 96:14
  97:18 100:17
  101:9,9,20

103:8,17,25
  105:19 107:18
  109:21 110:16
  111:14,20,21
  112:2 116:6,7
  116:11 117:1
  118:11,12,16
  119:12 121:5
  121:12 125:16
  126:2 130:6
  131:15,15,16
  131:20 132:2,3
  132:4 134:11
  135:18 139:25
  143:2
**goliath**  105:16
**good**  6:8 17:14
  54:2 66:3
  72:12 90:9,10
  91:22 92:14
  93:16,23 94:2
  95:4 99:4,14
  100:8 110:24
  113:3 129:3
  139:25
**gorilla**  105:15
**gotten**  23:20
  105:13
**governance**
  14:22 41:22
**government**
  3:9
**governs**  64:13
**grant**  26:9,24
  26:25 32:5
**granted**  6:18
  47:16

great  8:3,4
green  1:19
gross  43:17,18
ground  103:17
grounds  18:23
group  33:15
  59:2
guess  8:18
  10:10 22:6
  42:12 48:5
  133:2
gump  4:3 6:4
  6:16 57:6
  116:5
guy  75:4

**h**

ha  45:18,18,18
hack  120:11,13
half  22:3 37:24
  38:1 58:2 63:7
  84:4,23 86:13
  109:7 111:17
  132:22 135:23
  142:23
handed  71:2
hands  26:21
hang  43:2
happen  101:24
  103:8 107:1
happened  45:5
  50:13,17 70:16
  79:19,20 80:10
  80:18 81:17
  82:22 86:16,23
  95:4 123:13
  130:11

happening
  113:3
happens  27:16
  45:17 54:15
  70:24
happy  44:7,18
  81:12 106:17
  113:11 142:25
  143:1
hard  24:3
  65:25 128:2
hardship  104:1
  107:16 139:16
hardships
  87:15,19,19,20
  103:12,13,21
  105:9,9,14
  107:22 114:4
  139:11,23
harm  47:13,17
  51:12 105:17
  105:19 107:18
  107:25 109:21
  112:3,11 114:7
  120:10,19
  139:15,21,22
  140:18,20,24
  141:20
harmed  107:21
harms  51:21
harumi  72:4
hauer  4:3 6:5
  6:16 116:5
he'll  84:13
head  13:4
hear  31:22,23
  32:13,16 48:9

48:15 57:6
  100:10 139:24
heard  11:10,16
  14:12 15:9
  19:15 32:4
  35:8 39:13
  46:7 49:4
  55:21 63:12
  65:12,14 91:20
  111:8 116:9
  121:4 122:9
  123:24 130:11
  131:22 136:16
  139:23 140:7
  143:12
hearing  3:1,2,6
  3:9,9 5:18 49:5
  64:22 85:20
  104:24 109:24
  120:3 133:19
heck  94:9,25
  95:2
hedge  69:3
hedging  60:4
  63:22 64:2,2
  68:9,20,23
  69:1,2,8
heisenberg
  48:3
held  56:24
help  12:1,10,20
  13:7 44:15,24
  54:15 55:6,13
  69:23 80:16,17
  94:1 128:7
hey  10:15 75:1
  99:21 121:24

126:6
hidden  77:2
hiding  85:19
higher  19:2
highlighted
  21:22
highly  72:11
  73:4 78:2
  110:10
hindsight
  129:2
hinge  41:5
hinges  57:25
hired  41:24
hit  85:14
hitting  13:3
hmm  16:22
  26:13 133:8
hold  20:19
  29:14 44:11
  47:1 100:17
  121:8 137:11
holding  23:8
  41:16,25 65:6
  109:17
holds  41:8
holert  15:9
  19:16,17 35:6
holistically
  44:2
hon  2:2
honest  121:21
honestly  41:6
  85:4
honor  5:7,8 6:8
  6:15,17 7:6,11
  9:3 10:10 13:3

| | | | |
|---|---|---|---|
| 14:4 15:7,21 | 137:23 138:14 | 24:13,17 25:17 | 118:10,11,21 |
| 18:5 19:9,10 | 138:17 142:4 | 25:20 26:13 | 118:23 119:16 |
| 19:13 20:5,17 | 143:7 | 27:5 28:23 | 120:4 121:7,12 |
| 22:7 23:15,22 | **honor's**  124:2 | 29:1,9,15,17 | 121:18 122:5,8 |
| 25:17 27:6 | **hope**  7:1 26:23 | 29:20,22,25 | 122:17,20,22 |
| 28:9 29:12,18 | 56:8 | 30:4,7,21 31:4 | 123:3,19 |
| 29:25 30:8,12 | **horse**  75:11 | 31:22,24 32:1 | 124:10,14 |
| 30:22 31:20 | **host**  53:20,23 | 32:8,11,14,17 | 125:9,12 |
| 33:20 34:2,17 | 117:10,15,20 | 33:12,23 34:21 | 126:15,25 |
| 36:8,14 37:15 | 117:21 | 37:11 38:4,9 | 127:1,3,10 |
| 38:10,22 39:22 | **hours**  76:24 | 40:2,9,13,17 | 128:1,4,8,18 |
| 40:10 41:6 | **house**  83:4,4 | 40:18,20,24 | 129:2,9 130:1 |
| 42:13 44:2,6 | 85:1 | 41:3,6,11,14 | 130:23 132:1,9 |
| 45:11,21 48:5 | **how's**  143:2 | 42:5,9,11,19 | 132:16,20 |
| 48:13,16,25 | **huge**  61:20 | 42:23 43:3,5,8 | 133:8,21 134:4 |
| 49:8,13,20,23 | 92:4 | 43:11,15 44:1 | 134:9,17,19,23 |
| 50:15 51:8,22 | **humor**  22:15 | 44:16,23 45:21 | 136:6,21 |
| 52:4,6,9 53:2,7 | **hundreds** | 46:2,7,15,24 | 137:13,20 |
| 53:9,14,18,25 | 47:21,21 65:4 | 47:2,4,6,10,12 | 138:3,13,16 |
| 54:2 55:1 56:1 | 74:3 76:5 | 48:12,15,21,24 | 139:4,14,15 |
| 56:10 57:20 | 108:17 128:23 | 49:4 51:19,21 | 142:15,22 |
| 67:11 76:10 | **hurley**  4:9 5:7 | 53:8 54:8,8 | 143:4,7 |
| 116:4,7,12,18 | 5:22 6:4,4,14 | 55:21,23 56:13 | **hurley's**  57:24 |
| 116:24 117:7 | 6:15,16 7:1,6 | 56:14 61:3,6 | 97:16 104:6,23 |
| 117:13,23 | 8:3,22 9:2,15 | 63:6 66:10 | **hybrid**  3:2,6 |
| 119:1,3,17 | 10:9,21 12:14 | 77:3 80:13 | **hyde**  3:25 |
| 120:4,8,17 | 12:15 15:1,5 | 82:3 87:9 90:5 | 145:3,8 |
| 121:13 122:13 | 15:19 16:5,8 | 93:22 100:18 | **hypothetical** |
| 122:24 123:8 | 16:12,16,18,20 | 100:18 101:16 | 98:12 |
| 123:23 125:9 | 16:22 17:1,3,7 | 102:17 103:2 | **i** |
| 125:13 126:11 | 17:12,17,19 | 103:10 106:4 | **i.e.**  68:19 |
| 126:23 129:13 | 18:8,9,16,18 | 106:19 108:4 | **iab**  28:24 |
| 130:3,10,16 | 18:20 20:4,9 | 109:6 110:19 | **idea**  50:13 77:7 |
| 131:14 132:21 | 20:15,17,19,25 | 113:7 114:15 | 111:12 129:3 |
| 134:10 135:6 | 21:8,11,17,20 | 116:3,4,5,14 | **identified**  9:20 |
| 135:17 136:6 | 22:19,22 23:1 | 117:11,17,22 | 23:5 24:4,22 |
| 136:20 137:9 | 23:3,14,18 | 117:23 118:6 | 25:8 26:8 |

27:10 28:6,14
51:2 108:4
109:6 116:20
134:13 135:11
135:14 136:15
**identifies**
56:22 116:25
**identify** 9:3
10:15 27:8
31:12 33:3
121:20 135:2
**identifying**
50:14 143:10
**identity** 82:23
**idiot** 79:6,6,13
79:15
**ignored** 93:21
**illicitly** 50:1
**imagine** 104:25
**immediately**
56:5 89:10
102:23
**impeached**
72:16
**implementing**
72:1
**important** 14:2
21:25 33:19
34:1,16 40:19
42:14,21 44:7
54:20,25 56:10
58:14,22 60:5
60:5,18 71:13
76:3 88:20
101:11 119:11
121:25 124:15
125:5,6 130:2

139:7
**importantly**
13:3 140:14,14
**imposed** 49:9
**impossibility**
67:18
**impossible**
28:16
**improper**
26:17 110:22
**improperly**
20:2 128:23
**inbox** 31:17
34:18 36:2
77:9,10
**include** 7:9
61:14 64:22
81:13 125:7
134:12 138:18
142:25
**included** 24:2
63:8 127:1
**includes**
135:11 136:14
136:24
**including** 19:3
48:7 52:11
56:20,24
**income** 107:6
108:6
**incomplete**
23:21
**increased** 40:5
40:8
**incredible** 8:10
8:13 139:5

**indicated**
10:22 57:4
111:3 116:25
138:9
**indication**
114:8,9
**indicted** 80:10
**indirectly** 23:8
**indiscernible**
5:6,25 6:10 7:5
11:18 14:21
16:12,17 17:16
19:4 23:17
25:14,18 28:10
31:21 36:22,23
38:3 43:7
58:18 60:12
67:3 81:11
84:1 85:12,21
96:1 98:20
101:11 106:18
114:21 115:19
117:16 119:11
119:13 124:9
132:18 139:10
**individual**
75:18 130:24
**individuals**
71:14,18
**infer** 35:18
**information**
12:15 23:19,21
23:25 38:16
44:19 50:16
60:3 67:23
118:24 126:6,8
129:22 137:15

137:22
**initial** 119:20
122:25
**injunction** 3:3
3:10 6:18,19
10:16 18:12
24:20 25:5,7
25:15,23,25
26:2 27:9,11
27:17,20,24
28:1,22 47:20
48:2,7 49:6,9
49:13 51:8,11
51:13,24 52:9
52:14,23 53:5
62:8 87:6,8
100:5,8 101:4
101:19,21
103:20,25
104:22 105:3
105:18,22
107:16,21
111:12,18,20
112:4 113:12
114:11,16
135:1 136:8,12
139:7,18
142:16
**injunctions**
112:7,8 140:20
**inputs** 68:19
**inquiry** 141:24
**insane** 105:10
106:2
**insanity** 105:8
114:5

| | | | |
|---|---|---|---|
| **insight** 72:12 | **invoked** 93:20 | 14:4 39:13 | 79:21 80:17 |
| **insinuating** | **involved** 11:14 | 73:13,17 74:3 | 81:12,13 82:10 |
| 85:16 | 14:23 | 74:14 119:4 | 83:11 84:12,12 |
| **insist** 143:14 | **irreparable** | 130:24 145:25 | 84:20 85:4,10 |
| **instance** 14:4 | 47:12,17 | **jason** 10:24 | 85:16 86:9,12 |
| 41:20 138:4 | 107:18,25 | 33:14 34:9 | 86:18,20,25 |
| **instructing** | 109:21 112:3 | 56:14,21,23,23 | 87:20 88:4,6,9 |
| 36:21 | 112:11 114:7 | 57:3 58:10 | 88:14,24 89:19 |
| **integrated** | 139:15,21,22 | 59:1,13 60:11 | 89:21,23 90:21 |
| 14:15 | 140:18,19,24 | 60:14,22 67:16 | 91:2,8,9,12,16 |
| **intended** 110:2 | 141:20 | 73:15 97:4 | 92:1,2,4,10,16 |
| **intent** 107:19 | **issue** 9:24 | 123:25 126:16 | 92:24 93:12 |
| **interaction** | 11:19 12:8 | **jason's** 34:13 | 94:11,12,17 |
| 64:2 | 23:12 25:13 | 56:17 57:1 | 95:3,11,16,24 |
| **interested** | 26:21 27:5 | **jen** 6:1 | 96:5,11 97:1,9 |
| 18:10 28:21 | 28:18 35:10 | **jessica** 4:12 | 97:20,21,23 |
| 29:4 | 44:7 52:1 | **job** 36:19 | 98:13 99:11,23 |
| **interferes** 5:19 | 55:18 57:23 | 38:21,25 110:1 | 100:4,22 |
| **interim** 48:22 | 64:16 70:4 | **joint** 83:18 | 101:25 102:8 |
| **intermediary** | 77:7 80:21 | **judge** 2:3 5:24 | 102:12,16,19 |
| 59:8 60:7 | 104:7 107:20 | 54:5 55:20,25 | 103:9,11,20,24 |
| **internal** 17:13 | 111:16 113:21 | 56:13,17 57:12 | 104:5,15 106:4 |
| 90:8,24 | 128:7 132:6 | 58:14,20 60:2 | 106:12,23 |
| **interrupt** 18:7 | 136:17,22 | 60:4,18 61:1,2 | 107:12,13,15 |
| **introduced** | **issued** 60:22 | 61:9,22,25 | 107:24 108:2 |
| 9:25 | **issues** 44:17 | 62:5,18,25 | 108:11,13,22 |
| **investing** | 52:11 101:12 | 63:5,21 64:5 | 108:22 109:2 |
| 125:17 126:3 | **it'd** 100:2 | 64:12,21,22 | 109:10,16,20 |
| 129:21 | **items** 10:8 | 65:8,20 66:5 | 110:4 111:3,11 |
| **investment** | **i'm** 85:15 89:2 | 66:13,16,19 | 111:18 112:12 |
| 17:22 41:23,25 | 102:24 132:11 | 68:6,12,15 | 113:17,24 |
| 117:25 134:2 | | 69:10 70:7,12 | 114:2,7,14,23 |
| **investors** 76:5 | **j** | 70:15,20,24 | 114:25 115:6 |
| 76:6 | | 71:12 74:2,20 | 115:10,16,20 |
| **invoke** 92:18 | **jackson** 51:15 | 75:7,10,22 | 116:2 122:2 |
| 93:8 125:21 | **jacobo** 29:5 | 76:3,14,22 | 136:16 139:3 |
| | 52:4 | 77:12 79:1,16 | 139:13,20 |
| | **january** 1:22 | | |
| | 9:17 12:22 | | |

| | | | |
|---|---|---|---|
| 140:7,14,23 | 56:5,7,15,21 | 119:18 121:10 | 28:12,17,19 |
| 141:2,18 | 56:22,24 57:11 | 123:19,25 | 30:18 32:10 |
| 142:11,13,22 | 57:18,19 58:24 | 124:15,15,19 | 34:20,20 35:17 |
| 143:4,19,21 | 59:2,5,7,7,8,9 | 124:19,22 | 38:4,5 42:25 |
| 144:1 | 59:10,12,13,18 | 125:1,2,15,24 | 44:10 45:12,16 |
| **judgment**  6:23 | 59:19,20,22 | 126:4,14,15 | 45:20 50:19,19 |
| 51:24 104:9 | 60:7,10,12,13 | 128:24 131:11 | 50:21 52:16 |
| 112:9 | 60:15 61:7 | 133:1 | 55:9,13,15,16 |
| **jump**  61:22 | 62:3,12,22,23 | **keyfi's**  77:19 | 61:25,25 62:15 |
| 88:20 | 63:2,15 64:25 | **keys**  36:22 | 66:10 67:18 |
| **junction**  52:7 | 65:5,20,24 | 70:14 119:8 | 68:23 69:3,6 |
| **jurisdiction** | 66:1,11,20 | **kind**  24:6 | 69:17 74:20 |
| 28:8 47:17 | 67:12,17 68:9 | 25:10 32:23 | 75:19 76:7 |
| 51:4 111:17 | 68:11,17,24,25 | 44:2 58:22 | 79:14,16 81:2 |
| 113:10 140:18 | 69:8,15 70:6 | 83:7 104:12 | 83:12,16 85:22 |
| **jury**  61:25 | 70:10 71:3,6,8 | 105:3 110:15 | 86:14 87:7,25 |
| 72:25 84:12 | 71:20,21,23,23 | 131:18 137:4 | 88:13 91:8 |
| **justification** | 71:24 72:4,5,6 | **kinds**  41:22 | 94:4,16 95:22 |
| 94:1 | 72:9,9,10,11 | **kingdom**  112:8 | 96:19,20 97:21 |
| **justifies**  51:13 | 72:15,17,18,21 | 140:19 | 98:8,10,12,19 |
| **justify**  94:4 | 72:25 74:3,4,5 | **knew**  78:18,21 | 99:1,7,8,22 |
| **k** | 74:8,9,10,11 | **know**  8:4 9:25 | 100:1,4,22 |
| | 74:11,15,16 | 10:1,20 11:14 | 101:8,12,23 |
| **karen**  2:5 | 77:15,17 78:1 | 11:15,17,18,20 | 102:12 104:5 |
| **keep**  39:7 84:3 | 83:23 87:4,25 | 11:23 12:4,6 | 106:16 108:8 |
| 88:20 109:21 | 87:25 88:2,15 | 13:16,17,17 | 109:3 110:7,17 |
| 112:1,25 | 88:16 89:4,5,7 | 14:18,24,25 | 110:19,23 |
| 113:12 130:12 | 89:8,10,17,18 | 17:23 18:7,9 | 111:1,19 112:5 |
| **keeps**  114:11 | 90:1,1,5,6,6,10 | 18:13,14 19:25 | 112:18 113:6 |
| **kept**  35:21 | 90:11,11,18,24 | 20:6,24 21:6 | 116:7 118:18 |
| 86:15 129:23 | 91:15,18 92:6 | 21:18,20 22:7 | 119:9 120:25 |
| **key**  42:12 | 92:11,13,17,19 | 22:24 23:6,21 | 121:4,22 122:6 |
| 58:11 | 93:4,6,9,13,15 | 24:5,12,14,15 | 125:13 126:7 |
| **keyfi**  4:15 8:16 | 94:5 95:8 | 25:5,6,8 26:3 | 127:18,23 |
| 13:24 14:8,10 | 100:20 105:20 | 26:10,11,14,16 | 129:6,8 130:3 |
| 17:9,9,13 | 105:22 118:4 | 26:23,25 27:3 | 130:13,14 |
| 39:12 45:23,23 | 119:2,3,9,15 | 27:7 28:3,3,10 | 132:10,11,12 |
| 46:22 47:3,8 | | | |

135:23 136:2
136:13 137:18
138:1,22
139:25 140:1
140:10 141:11
141:13,15,17
142:7
**knowing** 49:7
128:25
**knows** 37:22
38:5 52:21
73:18 110:12
130:3,13
**kyle** 4:14,19
6:9

**l**

**labor** 84:1
**lack** 107:16
**laid** 121:13
**language** 42:3
63:8,10 66:10
**largest** 78:4
**lasted** 72:18
**lasting** 56:9
**late** 45:4,4
111:13 137:8
**laugh** 46:5
**launch** 54:6
**law** 25:12
48:11 49:16
51:12 95:23
96:4 102:1,19
108:23 124:3
140:18
**lawsuit** 11:15
69:21

**lawyer** 139:25
**lawyers** 5:17
49:7,12 50:3
105:24 127:15
132:6
**lead** 123:22
**leave** 141:7
**ledanski** 3:25
145:3,8
**ledger** 65:9
73:22 76:19
91:15 92:8
121:9,20,22
**left** 12:19
31:18 34:18
36:2 54:17
83:24 139:1
**legal** 48:7
49:19 50:7
84:11 104:7
106:10,15
111:13 145:20
**legitimate**
110:9
**lengthy** 125:10
**letter** 8:9 22:9
35:11 36:20
37:4 39:5,6
55:22 56:3,12
56:13 60:22
61:6 81:3
116:18 118:7,7
142:1
**liability** 56:21
**licensed** 93:11
**lied** 75:12,13

**likelihood** 62:8
79:3 87:11,16
101:5 113:18
113:20,23
139:5 140:3,16
**likely** 49:1
104:20 111:6
132:17,17
**limited** 1:12
3:2 4:4 9:18
56:20 69:13
88:18 90:2
105:3 134:15
**limits** 106:21
**line** 80:4 92:3,3
92:4,21 93:12
95:7,9,11 98:5
121:9
**lines** 92:21
**liquidation**
81:19
**liquidity** 75:17
**list** 77:24
**listed** 36:16
**literally** 49:5
75:15 77:23
79:9 82:16,21
**litigant** 107:17
**litigation** 18:23
103:18 104:22
**little** 5:13
15:20 21:1
23:15 24:18
25:24 48:9
57:6 88:13
92:2

**live** 143:3
**lives** 110:14
**lizzy** 6:6
**llc** 1:8
**llp** 4:3
**loan** 10:24
**lobbied** 82:20
**lobby** 82:23
83:14
**lobbying** 82:18
**locate** 77:4
**long** 5:9,11 7:9
18:2 28:14
36:10 74:17
77:24 82:18
94:18
**look** 9:25 11:5
17:3,7 20:8
23:6,22 28:11
30:16,16 35:5
43:23 44:1
45:11 50:18
56:7 60:25
62:14,14 78:24
79:21 80:2
85:12 92:5
94:21 95:7
96:20 98:8
99:23 103:14
106:12 113:5
114:2 115:12
122:13 124:5,6
125:12,18
126:25 129:2
130:21 134:3
135:20 138:17
142:1 143:14

| | | | |
|---|---|---|---|
| **looked**  22:9 | 55:10 60:14 | 19:11 21:1 | **malicious** |
| 28:11 39:5 | 63:3 70:10,12 | 24:22 30:18 | 81:18,19 |
| 65:9 73:22 | 71:7 73:10 | 38:22 39:21 | **man**  16:19 |
| 75:16 137:1 | 74:13,14 77:20 | 49:14 51:1 | 29:13,21,23 |
| 138:20 | 78:16 91:22 | 53:20 55:8,11 | 65:15 72:1 |
| **looking**  21:9 | 99:21 103:19 | 58:12 62:11 | 117:9,16 |
| 28:22 42:21 | 114:1 120:5 | 63:12 70:5,9 | **manage**  112:14 |
| 61:1 73:2,16 | 121:9 129:13 | 71:9 73:14 | 112:22 113:13 |
| 118:17 119:12 | 130:5 132:22 | 77:16 78:13 | **managed**  65:5 |
| 135:9 138:3 | 133:1 135:20 | 79:3 80:3 81:8 | 65:20 |
| **looks**  122:25 | 136:25 137:3 | 82:20 90:10 | **management** |
| 138:5 | 138:6,7,7 | 92:20 94:19,20 | 118:1,2 |
| **lose**  31:19 | **madison**  4:16 | 95:4 97:5 | **managing** |
| **loss**  17:14 | **mail**  31:11,17 | 100:21 103:17 | 74:16 99:18 |
| 81:23 82:4,5,9 | 33:2,10 34:18 | 109:24 112:10 | 107:4 |
| 82:14 90:8,10 | 35:19 56:20 | 113:25 116:8 | **mannon**  4:12 |
| 90:15,19,23,25 | 65:10 73:8,9 | 116:13,16 | **march**  7:10 8:5 |
| 91:6,25 92:15 | 73:13 77:9,10 | 122:10 123:20 | 8:6,8 21:21,24 |
| 130:7 | 98:21,22 | 125:7 126:10 | 22:1,4,9,10,11 |
| **losses**  127:13 | 116:23 117:24 | 131:16,19 | 22:17,19 23:9 |
| **lot**  11:10 18:8 | 118:2 120:23 | 132:3 134:9 | 36:20,24 37:1 |
| 23:10 27:7 | **mailed**  35:24 | 137:14,23 | 37:3 39:5,6 |
| 58:15,20 60:15 | **mails**  31:12,16 | 138:24 139:4 | 45:4 56:20 |
| 75:8 79:5 | 33:3,5,6,14,18 | 142:5 | 60:23 61:1,5,6 |
| 85:10,11 91:20 | 34:5,9,13,22 | **maker**  41:17 | 81:5 116:15,21 |
| 99:23 110:8,23 | 35:15 36:2 | **makes**  16:1 | 116:23,25 |
| 112:5 116:6 | 77:11 120:21 | 17:19 24:8 | 117:4,6,24 |
| 122:9 136:9 | **main**  121:12 | 45:1 48:2 | 118:2,13,20,20 |
| **lp**  28:24 | **maintain**  53:6 | 61:20 125:16 | 130:25 |
| **lunch**  142:20 | 71:9 | 126:1 141:22 | **mareva**  112:8 |
| **m** | **maintaining** | **making**  9:22 | 140:20 |
| **made**  8:15 11:8 | 16:1 | 41:19 44:25 | **market**  39:24 |
| 14:13,14 22:11 | **major**  109:18 | 51:10 52:1 | 41:17,19 |
| 23:11 30:17 | **majority**  38:20 | 53:17 72:2 | **marketing** |
| 39:23 45:25 | 38:20 88:15 | 78:14 95:13 | 28:24 |
| 47:21 51:6 | **make**  5:24 | 101:15 102:11 | **marketxt** |
| 53:2 54:12,12 | 11:24 18:23,24 | 128:25 | 49:20 |

martin  2:2
mashinsky
  7:17,21 8:20
  9:8 12:7 13:19
  13:20 19:9,15
  31:9,9 32:20
  32:24,24 45:2
  56:4 58:1,5,8
  62:9,16,20
  65:1,9,11 66:1
  70:3 71:13,15
  71:19,22 72:6
  72:13,17,20,22
  72:22 73:8,10
  73:13 74:24
  75:3,5,6,8,12
  75:21,24 76:4
  76:15,16 77:13
  78:10 79:17,23
  87:2,22 91:18
  98:7,9 99:2,20
  113:19,22
  127:16 128:10
  128:22
mashinsky's
  19:17 69:25
  72:13 73:17
massive  76:4
  127:12 130:7
material  90:4
  136:14
matter  1:6
  14:21 49:18
  84:11 95:21
  98:21 111:13
  111:20 126:17
  142:10 143:13

matters  94:16
  94:18 97:24
mean  7:16 10:9
  12:23 13:6,8
  13:11 15:6,9
  20:4 22:22
  23:6 30:7
  35:19 41:6,20
  44:8 45:2,15
  45:17 46:7,19
  67:7 70:15
  71:12 75:9,12
  76:3 78:10
  79:10 84:6
  96:7 98:13
  99:11,15,22
  105:16 110:21
  114:5 118:23
  123:9,14
  127:22 129:10
  129:18 132:21
  134:12 142:19
meaning  59:12
  59:18 72:1
  88:15 107:3
means  25:2
  44:12 90:6
  124:15
meant  119:22
  120:18
meet  13:10
  19:3
memory  22:23
mentioned
  49:4
merely  10:12
  51:25

merit  130:11
merits  18:20
  18:22 55:2
  61:23 62:9,13
  79:4 87:12
  100:6 101:5
  103:17 105:14
  113:18,21,24
  139:6 140:4,16
message  35:19
  98:23 99:1
messages  34:24
  34:25 35:3,16
met  52:7
mg  1:3,4 3:1
miller  47:14
million  13:10
  13:13 19:22
  21:23 22:3,17
  23:7,9 26:17
  26:19,19 27:3
  27:3,4 35:23
  37:2,16 38:18
  59:15 73:24,24
  73:25,25 74:1
  76:8 81:14
  82:15,16 92:7
  94:25 96:15,22
  97:6,14 98:11
  99:10,23 104:6
  104:18,19,21
  108:14 109:7
  132:22 133:18
  135:24 142:23
millions  15:3
  19:6,7 39:7
  47:22 61:12

65:4,5 74:3
  76:5 108:17
  111:6 128:23
  136:5
mind  11:20
  30:17 72:13
  73:17 79:2
  88:10,20 94:8
  133:10
mindset  71:14
  71:18
mineola  145:23
mingled  86:22
minute  22:16
  42:8 53:10,12
  58:8,13 61:20
  70:6 71:12
  86:18 87:20
  107:18 122:9
  136:18
misrepresent...
  138:24
missing  50:15
  87:14
misstated  87:9
  116:13
misunderstood
  48:9,18
mitch  4:9 6:4
  6:16 116:5
mm  16:22
  26:13 133:8
modification
  14:19
modifications
  14:16

**moment** 50:11
54:25 55:1
58:6 91:10
108:11 116:10
**money** 12:3,10
44:10,11 51:15
51:17,20 54:19
62:23,23 63:3
69:18 70:25
75:3,4 77:18
80:7,15 83:17
83:17 84:16,17
94:10 96:2,7
99:23 101:1,13
102:9 105:10
105:11 106:20
114:6 124:1
126:17 128:25
130:8,13,14
132:24 140:5
142:9
**monsanto**
49:24
**month** 56:8
65:3,4,16,17
73:21 138:8
**monthly** 42:24
43:13
**months** 27:16
35:13,14 65:22
69:18 74:6
80:12 82:18
83:15 105:4
107:2 109:12
111:1,5,25
136:23 137:6,6
138:20 142:19

**morning** 6:8
36:9 54:2
**motion** 3:3,9
18:21 35:10
44:7 49:6 62:1
101:19 102:21
**movant** 47:16
49:19 51:23,25
**movant's**
47:15
**move** 113:13
142:14
**moved** 105:4
107:2
**movement**
52:2
**mulling** 133:10
**multiple** 75:13
**mute** 5:19

**n**

**n** 4:1 5:1 145:1
**nail** 13:4
**name** 53:19
117:14 143:22
**named** 118:1
**names** 83:13
**nationally**
93:11
**nature** 45:9
**nearly** 28:16
106:1
**necessarily**
87:17 131:3
135:12
**necessary**
15:12 50:6
106:15

**need** 5:24
13:20 18:24
26:10,10 49:11
50:23 57:24
71:17 87:17,18
88:9 92:1
103:12,12
112:3 121:24
122:1 126:8
129:20 137:15
140:19 143:8
**needed** 18:21
67:23 68:19
69:3 126:8
**needs** 30:14,25
60:19 117:15
136:9
**nefarious**
110:7
**negotiate**
30:11
**negotiations**
34:6
**neither** 99:11
99:12
**net** 21:9 63:15
63:16 64:24
**network** 1:8,12
3:1 4:4 13:24
17:9 88:18
90:2 119:19
124:16 125:1
**never** 11:11,17
15:11,13 17:18
28:7 45:15,16
46:11 47:1,5
51:7 52:17

65:9 76:18
79:19 90:18
96:19,19,20
116:15 123:13
123:14 126:7
126:19 127:18
128:14,17,20
129:22
**nevertheless**
41:18
**new** 1:2,20 4:7
4:17
**nft** 77:22
108:14,25
109:8 136:1
142:24
**nfts** 21:14 22:4
37:4,6 38:13
50:20 76:21
77:16,19,19
78:22 79:6,18
79:19 104:18
**night** 10:8
27:22 85:18
**nilly** 97:3
**nobody's** 64:25
**nolan** 15:9
19:16,18 34:1
35:7 65:13,14
72:3,6,9,10,12
72:14,21 73:5
73:7 78:16,18
128:16,18
**non** 33:17
47:14,16 49:19
51:25 93:7,7
99:15 125:21

noncomplian...
  26:5
nonsense  96:24
normand  54:3
note  49:13 63:5
  95:13
noted  106:9
notes  108:2
  119:12
notice  35:9
  118:3
notified  117:24
notwithstand...
  40:25
november
  35:13 73:25
  120:11
number  5:13
  16:24 17:1
  22:18 27:3
  37:1,12 40:7
  81:6 92:7
  95:12 96:15,16
  98:11 119:16
numbers  7:9
  22:16 36:12,13
numerous  54:9
  76:11 77:1
ny  1:20 4:7,17
  145:23

           o

o  2:1 5:1 145:1
oath  19:18
  143:15
object  102:3,5
objection
  121:17

obligated
  59:13 89:17
  92:20
obligation
  17:20 92:12
  93:14 96:8
  97:5,12,14
  99:13 113:25
  125:20 126:12
obligations
  97:9
observe  113:6
obtained  25:4
  50:2
obviously  18:1
  21:24 30:13
  61:20 64:25
  102:2 108:23
  110:5 111:21
  112:19 115:21
  134:5 141:15
obx  138:18
occasions
  47:23 75:13
occur  93:2
  115:17
occurred  36:10
  54:21 60:25
  93:8,19 120:11
occurs  93:7
  125:21
october  14:5
  39:11 45:4
  73:25
ofac  110:5,21
offered  8:18
  19:13,18 32:19

141:4
offering
  114:10
officer  56:23
  90:12 95:17,17
  95:19
officers  56:22
oh  7:18 16:16
  29:11 32:8
  43:11 67:5
  84:3 96:3
  100:22 110:7
  130:19 131:6
  136:21 143:12
okay  5:9 6:7,13
  8:9,12,14
  12:19,20 14:1
  16:21,23 17:6
  18:4,11,16,19
  18:20 20:13,20
  21:5,10,17
  22:15,21 23:3
  25:19,24 26:19
  26:22 29:15,25
  30:6 31:4,25
  32:8,8,14,17
  37:22 38:1,13
  39:9,16 40:2
  40:17,17,20
  42:10,17 43:9
  43:13 44:23,23
  44:25 46:1
  47:12 48:23
  49:3 51:19,21
  55:6 57:21
  63:3 68:13
  69:20 71:1

80:22 84:3
  86:25 88:12,25
  91:4 93:3,22
  94:1,7 95:13
  95:14 96:16
  97:17 99:6
  100:14,18,21
  101:1,3,11
  102:10 104:5
  106:23 109:1,9
  118:5,15,20,22
  118:25 120:4
  122:4,8 124:17
  124:23 125:4,8
  127:17 128:15
  129:25 130:11
  130:18 131:13
  132:1,9,19
  134:21 137:25
  138:11,16
  139:2 140:16
  141:25 142:3
  143:16
old  145:21
ones  129:21
open  11:6
  42:18 80:4
  88:8 113:9
  115:2 122:15
  124:8
opened  78:2,5
  94:12
opening
  105:21,21
  106:4
openly  73:7

operating 74:9
opportunity
  139:22
opposed 9:8
opposite 36:8
  49:16
options 50:21
oral 8:19 14:16
  14:18 19:9,11
  70:1
orally 13:19
  19:22
order 24:25
  26:2,4 30:9,10
  30:20,24 32:6
  48:18,25 49:25
  50:25 51:1
  62:5,5 69:3
  100:19 101:6
  101:17,17
  102:2,2,4,18
  106:14 112:14
  112:22 114:15
  114:16 117:8
  134:12 135:10
  135:15,19
  141:4,7,22
  142:6
ordering
  100:19 142:6
orders 102:22
  109:17 132:13
  132:13
organized 46:3
original 10:25
originating
  109:23

ought 136:12
outline 36:13
  44:24
outs 106:21
outset 47:14
overruled
  121:17
overwhelming
  51:9
owed 54:18
  62:23,23 63:3
  64:25 69:18
  77:18 92:10
  127:5
own 6:21 31:6
  32:20 35:1
  45:1 46:12
  58:11 59:13
  117:25 125:3
  140:4
owned 59:6
  88:17 124:20
owner 92:13
owns 58:24
  88:15
ox 107:13,14
  108:2,3,20
  109:2,5 112:15
  112:23,25
  118:1 134:21
  134:22 135:24
  140:5 141:6
  142:24
oxb 70:25 71:1
  71:4,6,7 77:18
  78:3 110:11
  119:1,6,7,14

119:25 120:1,6
120:10,14,18
134:16,18,19
140:5

                p

p 4:1,1 5:1
p&l 15:13 16:1
  45:6,19,24
  46:5,11,14,18
  46:23 47:9
  59:22 66:4,12
  66:23 67:17,21
  67:22,24 68:17
  68:18,19,20
  69:4,9,14,17
  74:18,20 75:2
  92:2 93:17,18
  123:14 125:15
  125:16 126:8
  126:19 128:14
p.a. 4:14
page 17:2,5
  43:6,7,8 88:6
  88:23 92:23
  115:1,4,7,8,11
pages 28:13
  115:14
paging 17:4
paid 12:24
  13:24 37:13
  39:15 45:24
  63:15 77:18
  89:9 104:6
  124:20 131:9
  131:10 132:7
paper 91:1,5
  98:17,20

papers 17:24
  29:3 129:11
paragraph
  16:7 56:8
  115:3 117:18
  117:24 122:18
  124:17
paragraphs
  124:11
parent 88:18
  99:4 109:3
park 4:5
part 9:7 11:1
  15:11 30:21
  36:13 40:6
  45:12 51:10
  52:20 59:11,17
  60:9,14 87:14
  93:25 143:14
particular 41:5
  43:24 81:5
  108:14
particularly
  42:13 48:2
  55:7
parties 11:9
  24:22 30:10
  56:25 62:25
  106:13 117:12
  124:20 126:3
party 89:4
  125:23
pass 46:5 119:8
passing 106:9
past 18:2 47:24
  52:13 56:19
  67:15 136:23

**patience** 38:22
  130:3
**patrick** 19:16
**pause** 5:4
**pay** 8:24 9:12
  10:3 13:14
  15:3 39:19
  49:12,19 50:3
  50:6 59:13
  79:18 89:9
  90:13 92:12
  93:14 96:8
  97:12 109:14
  112:17,23
  113:3,16
  114:12 125:1,3
  131:24 132:24
  133:3,5
**paying** 27:21
  39:7 89:5,14
  124:1
**payment** 39:15
  43:21 74:15
  79:17 83:4,15
  84:25 89:11,18
  92:20 93:3,7,7
  93:8,19 94:19
  97:6 122:19,23
  122:24 123:9
  125:21,21
**payments** 14:9
  14:13,14 59:14
  74:12 114:1
**pending** 101:3
  102:21
**people** 5:14
  42:16 82:4

  91:22 110:8
  126:16
**percent** 12:21
  40:6,22 74:12
  92:6 95:8
  121:10 141:23
**percentage**
  45:3 88:1
  91:14
**perfect** 28:4
**perfectly** 110:8
**performance**
  42:24 43:13
  45:10
**performed**
  74:4,5
**period** 6:22
  9:18 10:2
  11:21 14:5,11
  14:13 22:1
  39:14 57:9,16
  66:4 73:22
  81:4 117:2
  128:10 130:12
  130:24,25
  132:3 135:20
  138:8
**permissible**
  55:13
**permitted**
  99:14
**person** 14:23
  36:1 112:6
  117:14 143:10
**personal** 10:24
  35:2

**personally**
  72:10 132:25
**perspective**
  46:25 134:12
**persuade**
  97:16
**persuasive**
  139:24
**phase** 5:16
  24:5
**phone** 35:1,2
  98:23,23
**pick** 88:4
**picked** 39:22
**picture** 79:22
**piece** 79:17
  91:1,5 98:17
  119:16
**pieces** 76:11
**pivot** 87:1,2
**place** 9:17 14:6
  39:13 60:21
  74:2 100:23
  101:18 103:3
  103:10 131:16
  141:10
**places** 108:19
**plaintiff** 1:13
  6:3 93:9,19,21
**plaintiff's**
  64:10 110:1
  116:15 124:7
**plaintiffs** 3:3
  3:10 4:4 5:7
  6:5,17 22:8
  48:6 101:4
  104:9 106:1

  109:10 111:6
  112:19 116:6
**plan** 111:4
**planning**
  117:25
**platform** 19:23
  27:16 41:19
**playing** 11:6
**please** 18:9,17
  25:15 56:11
  58:18 108:12
  117:8,10
**plenary** 33:24
  34:11 120:25
**plus** 109:8
**podium** 137:10
**point** 8:4 9:2
  16:3,6 17:8,12
  22:6 25:21
  28:16 33:19
  34:2 35:9
  38:23 40:15,15
  40:19 42:14
  44:4,4,4,13
  54:20 59:25
  60:18 65:6
  68:14 70:8,18
  70:19 73:2
  75:10 79:1
  81:9 83:6
  84:14 87:5,8
  90:18 97:4
  98:1 109:21
  113:6 115:14
  115:16 118:17
  120:20 121:9
  123:23 125:6

129:12 131:6
132:20 134:10
139:13 141:1,2
141:18 142:18
142:23
**pointed**  8:23
10:6 19:10,13
19:20 31:6
32:19 56:19
66:10 116:18
122:12,14
**pointing**  15:21
41:12 42:3
95:7
**points**  12:17
15:7 36:8 37:9
139:4
**popping**  65:21
**popular**  78:19
**portion**  44:24
59:18 86:13,16
87:9 88:5,22
89:18 115:15
**portions**  56:3
139:8
**position**  44:8
46:21 56:4
57:2 61:17
63:18 68:10,10
69:12 71:16
84:8,9,11
117:3 127:18
129:11
**possession**
23:5 63:6
**possibility**
12:23 30:7

32:5 49:8
**possible**  15:14
46:16,18 52:15
53:19 135:11
135:13
**post**  8:6 11:5
21:21,24 22:1
22:4,17,19
23:9 37:1
64:22 85:20
106:17 118:20
120:3,17
**posted**  28:12
**posture**  62:8
87:6
**potential**  57:12
**potentially**
30:10 60:21
61:25
**pound**  105:15
**power**  89:15
**powers**  60:15
**practical**  34:10
126:17
**practice**  84:7
**praise**  72:22
**praised**  71:22
**pre**  8:5 11:4
112:9 117:7
118:19
**precise**  27:25
**precisely**  24:21
26:12 27:1
46:15
**predate**  7:10
**prejudice**
141:3

**preliminary**
3:3,10 18:12
18:14 49:6
52:7 53:5 62:8
87:6,8 100:5,7
101:4,18,21
104:22 112:4,7
114:16 139:7
139:17
**prepare**  46:11
46:18 66:11,19
67:17 68:17
**prepared**  44:3
45:6 47:9 54:6
66:17 104:24
105:6
**preparing**
46:14,22 66:22
109:24
**present**  30:11
113:8
**presentation**
13:2 18:6 63:8
87:14 119:13
**presented**  82:3
93:23
**preserve**  6:19
104:19
**preserved**  51:4
52:15 105:2
**preserving**
102:15
**pressure**  72:18
**pressured**
72:17
**presumably**
49:7

**pretended**
76:17
**pretty**  24:8
42:12 72:13
**prevail**  101:21
104:8
**prevailing**  41:5
101:5
**prevails**  104:3
**prevent**  48:20
101:19 105:22
106:25
**prevented**
48:19 49:9
**previously**
106:9
**price**  41:5,18
64:13 82:9
122:18 137:16
**prices**  81:21
**primarily**
108:1
**primary**
130:19
**principle**  49:22
**printed**  35:24
**prior**  78:22
**privacy**  110:18
**private**  36:22
70:14
**privilege**
120:24
**probably**
23:23 34:14
37:15 99:25
**problem**  26:21
28:14,15 30:25

45:13 65:1
69:16 110:25
111:14 112:13
112:21,21
**problems**
30:12 75:17
**procedure**  3:4
3:11
**proceed**  5:6,22
62:2
**proceeding**  3:1
5:20 19:1
**proceedings**
144:2 145:4
**proceeds**  24:1
25:1,9,11 50:5
52:19
**process**  17:22
113:8 121:2
**produce**  33:5
46:5 68:18
77:8 90:22
**produced**
34:15 90:18
98:22,22
128:15
**producing**
69:17
**production**
34:7
**productive**
52:25
**profit**  7:22
11:10 12:6,23
14:1 15:16
17:13 31:10
33:1 39:18,20

39:23 40:6,14
40:23,25 41:4
43:17,19 45:3
45:16,19,20
46:6 59:16,18
63:3,25 64:6
64:17,24,25
71:17 72:2
74:15 90:8,10
90:12,13,14,19
90:23,25 91:6
91:14,23,24
92:10,13,15
93:14 94:7
99:21 107:5
123:6,9 127:1
127:12 129:16
129:17 130:5
131:10,11,11
133:16 134:1,6
**profitability**
72:8 91:18,21
**profitable**
62:22 65:19,25
71:24 72:4,5,7
72:9,11,15
73:2,4,4 74:8
74:10,19,24
75:3 76:13
77:18
**profitably**
71:21 74:16
107:3 112:15
**profits**  11:13
12:5,23,25
13:1,6,23
43:18 44:10

45:25 58:11
63:15,16,19
73:6,7,18
74:12 75:1
88:1 93:16
123:10,12
127:11,16,17
127:18 128:3
128:11,14,17
129:8,8
**program**  45:8
**prohibited**
25:23 26:11,12
27:1 28:19
**promise**  18:18
**promised**
95:11
**promising**
59:18
**promotion**
78:24
**prong**  62:17
71:11 87:17
98:6 107:24
**prongs**  97:22
139:6
**proof**  56:18
128:14
**prop**  72:23
**proper**  27:23
54:24
**property**  8:7,8
24:1,2,23 25:4
27:9,18 28:1,5
31:10 32:21,25
35:22 36:6
38:17,20,25

39:2,8 50:14
50:16 51:1,3
52:1,15,17,19
53:1,4 61:17
83:20 111:10
131:21 134:11
134:13,16,18
135:2,4,13,15
**prophets**  11:12
**proposed**
24:25
**proposing**
27:19 28:2
**proposition**
52:5
**prosecuted**
96:1
**protocol**  81:20
82:17 83:8
**protocols**
113:13
**prove**  45:25
130:6 133:4
140:13
**provide**  10:12
44:18 60:4
116:22 118:21
118:23
**provided**  9:4
11:9 14:11
27:23 45:25
66:4 72:12
109:22 118:25
120:15 127:21
128:14 130:17
134:1

provides  13:23
  15:24 40:14
  45:23 49:16
  51:22 123:19
  123:21 124:17
  124:23 125:19
providing
  60:12 88:2
  91:19 133:22
provision  9:2
  17:23 44:2
  54:14 114:19
  114:19,20
  122:24 125:13
  127:8
provisions
  8:24 12:1 14:7
  42:6 94:3
  123:22 125:4
pto  117:7,17
public  75:12
  75:14,16 77:20
  78:14 110:13
pull  55:24
  89:20,21 91:13
  92:22 117:8
purchase
  15:22 58:21
  59:11,12,17
  62:24 63:1,2,6
  64:6,23 88:4
  88:14,21 89:4
  89:12 92:17
  122:18 131:1
purchased
  22:5 37:4
  38:13 76:21

78:22 83:3
purchases
  21:14 37:7
  58:16 77:19,19
  77:22,24 78:2
  78:3,8,15
purpose  110:9
  110:22
purposed  82:7
purposes
  131:22
pursuant  3:3
  3:10 95:18,24
  95:25 119:3
pursue  104:1
pursuing  111:7
push  23:15
  112:20
pushed  65:25
  79:24
pushing  72:20
put  10:11
  11:11 35:24
  41:16,17 45:19
  71:17 84:25
  88:11 97:11
  100:10 108:5
  108:18 109:18
  117:9,18,21
  120:3 122:5
  127:15 132:24
  133:20 136:3
  137:22
putting  17:21
  113:2
puzzle  79:17

px  16:22 17:1,3
  17:4 43:8
  55:22,24 56:2
  56:11 89:1,1
  89:21,21,21,22
  89:23 92:22
  95:5 114:25
  115:2

**q**

quantified
  128:17
quantifying
  127:15
question  6:25
  7:18 8:4 12:20
  23:2 24:18,20
  41:15 45:11
  48:16 52:8
  57:15 68:7
  74:21 75:23
  77:1 91:3 98:2
  119:1 127:13
  127:22 129:10
  130:20 134:25
  143:11
questions  18:5
  18:22 32:11
  76:18 77:3
  87:13,18
  103:16 111:24
  113:7 114:3
  133:10 137:10
  138:1,13 139:6
  139:11
quickly  39:9
  39:10 52:12
  106:16 120:20

quinn  50:7
quit  36:11,19
  38:21,24
quite  48:12,15
  77:5 81:9 94:8
  104:15 114:4
  137:2 139:23
quo  6:18 51:13
  53:6
quote  72:14
  90:5

**r**

r  2:1 4:1 5:1
  145:1
raise  114:3
  131:15
raised  87:13
  103:16 127:22
raises  136:21
ran  126:19
range  22:5
rates  131:4
rather  33:24
  56:12 107:14
  137:15 141:6
reach  23:12
  48:3 52:12
  100:25
read  117:17
ready  5:6
  53:24
real  104:11
  113:21
really  11:11
  21:1 24:3 27:8
  27:10,12 34:11
  44:1 63:14

64:10,16 75:4
86:7 99:16
107:17 110:25
111:16 121:25
123:20 124:14
130:2,15,18
131:12 135:9
136:13 137:18
139:4 141:17
**reason** 35:20
49:12 67:2
81:16 82:17
104:12
**reasonable**
131:18
**reasons** 52:10
**rebuttal**
139:18
**recall** 70:25
82:10 85:13,16
85:17 86:20
118:6
**received** 85:9
124:19 134:24
136:2
**recently** 57:3
109:14
**recess** 53:15
**recognize** 5:17
55:1
**recognized**
118:13
**recollection**
21:23 35:8
84:22,23 85:6
85:23 86:5,6
120:7

**reconnected**
32:4
**record** 5:18
6:16 20:10,12
30:3 36:7 47:7
47:22,24 54:9
57:3 85:24
116:4,17 142:6
142:13 145:4
**records** 93:10
121:25
**recovered**
103:8
**reference** 62:2
123:5
**referring** 43:4
43:23 118:8
119:24
**refers** 89:25
122:22
**refreshed**
120:9
**refused** 19:6
60:4 66:6
67:23
**refusing** 54:18
**regard** 9:22
58:14
**regarding** 15:6
56:17 57:1
**regardless**
72:25
**regulators**
75:14
**rejected**
111:12

**rejoin** 31:21
**related** 15:22
29:2 52:11
108:3 109:4,5
112:15,25
**relationship**
45:14 57:10
65:24 89:20,25
90:4
**relevant** 24:4
55:4,5 56:2
88:5 93:9
131:3
**relief** 26:9,15
26:25,25 32:5
47:15 50:24
130:16
**rely** 16:7 24:7
99:14
**relying** 7:25
8:5,20 23:19
38:16 45:7
100:3
**remain** 5:19
52:22 101:18
**remaining**
27:25
**remains** 23:5
24:21 57:4
**remember**
10:17 21:6
34:16 42:3
82:12,12 85:2
85:4,7 86:7
107:13 115:6
124:15 131:2
133:19 137:7

**remembering**
37:15 125:13
**remind** 10:10
23:19 37:8
**remove** 47:16
**removed** 7:4
48:3
**rendered** 36:19
**rent** 10:20,24
10:25
**repayment**
10:23
**repeat** 5:12
**repeated** 47:25
**report** 28:13
**representing**
54:3
**request** 18:2
33:9,12 34:9
126:24 129:13
**requested**
17:25 129:15
**require** 32:6
81:8
**required** 9:6
14:24 19:3
33:10 53:6
66:11 90:20
92:15 94:19
102:1 117:5
125:14 139:8
139:17
**requirement**
53:4 90:22
**requirements**
63:22

requires 62:14
research
  106:16
resign 117:1
resignation
  7:10 11:4,5
  12:12,12 39:6
  55:22 56:3
  57:4,8 81:3
  118:3,13
resigned 7:4
  8:2,8 9:14,16
  11:21 20:3
  22:10 23:11
  36:24 37:6
  56:15 57:2,7
  61:3 72:19
  117:4,6 127:2
resigning 56:4
resignment
  126:13
resolution
  98:10,18
resolutions
  36:21 96:21
  117:5
resolve 6:22
  132:5
resolves 113:1
resources
  106:2
respect 8:15
  14:20 17:23
  18:24 20:21
  38:2 85:24
  111:22 123:6
  124:18 126:19

126:20 133:1
  136:7
respected
  111:22
respectfully
  7:12 15:20
  52:8
respond 12:17
  94:4 97:18
  125:24 143:8
responded
  11:17
response 28:8
  126:9 129:20
responsibility
  46:12 66:22
  69:6
responsible
  16:1 45:24
  46:14,22 65:16
  68:8,23,25
  69:2,8 89:5,13
rest 107:20
resting 75:20
restrain
  106:14
restraining
  101:6,6,17
restraint 50:5
restricted
  51:25
restriction
  102:17 103:3
result 81:18,23
  82:18 83:25
  85:17 120:10

resulted 41:19
  81:20
resume 53:13
resumed 32:9
retain 17:13
  90:7,24
return 19:6
  36:11,21,22
  60:23 84:14
  87:19 109:17
  133:11
returned 64:14
  73:15 102:22
  102:22 133:15
  133:25
revenue 41:20
  41:22,24 43:1
  43:16 92:6
  95:8 121:10
revenues
  124:19
review 70:2
  91:19 120:24
  141:14
ride 25:10
rigas 106:8
right 5:4,5,9
  6:1,11 8:21,23
  9:16 10:21,24
  12:17,21,23
  13:4,15 15:17
  17:4,6 20:21
  21:8 29:24
  31:2 32:14
  35:1 39:4 40:9
  41:7,9,14,23
  44:16,23 46:15

47:11 53:9,16
  60:1 62:17
  63:23 64:4
  65:11 66:7,20
  67:1 68:15
  71:13 72:11
  73:12,17 76:16
  84:5 88:13
  89:3 92:16,17
  92:18,20,23
  93:3,16,20
  96:7,16 97:22
  100:6 105:8,16
  105:24 111:15
  111:20 112:3
  116:1 117:20
  121:7 122:15
  122:21 123:17
  123:25 124:2
  125:2,19 127:2
  127:20 128:6,8
  130:22 131:22
  132:20 133:24
  135:18 140:12
  141:25 143:5
rights 102:13
rise 43:24
  63:19 64:18
risk 28:5 38:21
  51:8,23 135:6
  141:8
risks 17:21
road 145:21
roche 4:14,19
  6:7,9 11:24
  83:12

roche's 18:1
role 56:7
romanette 93:2
115:5,9,9,11
115:14,18
125:19
romanettes
115:25
ron 8:23
rough 22:16
round 22:18
rows 21:7
rule 3:4,10
ruled 106:20
rules 3:4,11
run 33:16
34:12

**s**

s 4:1 5:1
s.d.n.y 50:9
s.d.n.y. 49:21
sad 69:18
sanction
110:21
sanctioned
110:5
sandwich
142:20
sat 76:25 105:7
satisfaction
45:20
satisfy 6:23
51:23 52:22
53:4
save 133:6
saw 19:17 65:8
65:10 73:8,9

73:19,21 79:14
saying 5:10
21:19 23:6,14
35:22 46:4
57:16 60:23
61:6 62:19
65:11 66:25
67:16 68:18
69:7,21 93:23
94:9,13 97:2
102:14 123:24
126:6 127:3,4
128:22 129:23
130:9 140:12
says 31:19
51:13 56:4,8
57:1,25 59:19
63:9,16 67:5,9
67:12 75:5,5,6
90:24 92:5
93:1 95:23
96:20,24 98:19
99:22 113:12
115:16 118:14
120:13 122:11
124:4 125:20
132:22
schedule 16:8
16:13,22 40:14
42:11 69:12
76:11 77:8
90:3 125:2
131:18 142:2
scheduled 3:6
scolded 78:10
scope 27:9,25
136:7

scott 4:11 6:6
scrap 19:20
98:19
screams
110:20
screen 77:22
88:11 91:13
118:9
screenshots
91:19
search 33:10
33:16,17,21,22
34:4,5,12,12
searched 34:21
sec 50:7,8
second 20:20
21:11 24:19
58:9 64:8
68:22 80:20
90:16 107:12
108:22 125:19
131:21 137:11
secrete 47:20
secretion 47:24
secretive 78:1
section 43:10
43:12,22 49:13
88:20 89:3
114:24 122:12
see 10:1 11:25
23:24 33:10
37:11 39:16
40:17 41:12
42:20 44:21
50:18 60:1
62:2 64:9 67:4
72:24 76:14,15

76:20 81:9
88:10,12 92:9
92:25 93:1
96:25 102:9
118:10 122:25
125:23 141:8
seed 119:25,25
seeking 24:24
24:24 51:14
104:17
seeks 6:18
seem 85:7
seemed 65:1
131:22
seems 11:18
seen 26:18
44:14 69:21
76:18 96:20
108:2 110:3
132:12,13
133:13
segregated
108:1
seize 39:19
44:10
self 11:25 12:1
12:10,20 13:7
19:14 44:15,24
54:14 55:6,13
69:23 78:24
80:15,17 94:1
128:7
sell 59:14
seller 88:16
89:6,10 93:6,6
93:8 125:20,21

seller's 93:10
selling 88:16
send 35:11
  37:20 73:24
sense 16:2
  17:20 41:7,10
  45:1 77:16
  80:3 109:24
  125:16 126:1
  126:10
sensitive 132:8
sent 36:20
  37:17 49:6
  50:20 65:4
  109:13 116:18
separate 8:14
  10:7 61:19
  94:8 128:7
separately
  61:16
september
  17:25 36:16,17
  37:17 73:25
  120:6 126:17
  129:14 137:7
  138:7,7
series 42:6
  50:21
serious 18:22
  30:14 87:13,18
  103:16 114:3
  139:6,11
serve 33:9,12
service 14:6,14
  39:12 42:17
  46:21 89:25
  90:4 123:5

125:14 131:8
services 12:21
  14:9,11 15:22
  15:23,24 16:9
  18:3 36:18
  42:9,11 45:21
  58:15,21 60:10
  63:7 66:11
  74:5,16 88:2
  89:19,22,24
  90:3 123:5
  124:5,6,11,12
  124:18,24
serving 19:14
set 5:2 38:12
  54:24 55:3,6
  55:14 125:1
  130:7
settle 30:10
  32:6 135:19
seven 42:24
  56:12 65:21
  69:18 73:21
  138:6
several 134:24
share 7:22
  11:10 12:6,24
  14:1 15:16
  31:10 33:1
  39:20 45:3,16
  45:19 53:20
  59:16,19 71:17
  85:3 88:5 92:6
  92:10,13 93:14
  94:7 95:8
  118:9 121:11
  123:6 127:1

129:22 134:6
shared 37:9
  72:7 127:11
sharing 74:15
  131:10
shell 133:2
shocked 57:6
short 92:2
shortage
  137:21
shortly 82:8
show 13:4,5
  18:21 23:7
  39:18 40:4,7
  44:9 46:5
  63:10 74:18
  76:12 77:17,20
  77:22 87:11,12
  87:19 91:1,5
  95:15 103:13
  103:21 104:11
  107:17,19
  112:3,11
  113:18,20,20
  113:23 118:12
  139:15,16,20
  140:17,19,24
showed 72:16
  77:21 90:6
  91:9,21 118:6
  121:10
showing 11:8
  18:24 63:11
  85:12 91:14,21
  103:19 112:10
  143:3

shown 47:19
  76:10 101:4
  114:8 129:7
  140:3 141:18
  141:20
shows 26:16
  45:20 62:25
  63:2 64:6 65:3
  65:12,20,23
  70:17 79:1
  92:6 95:7
  119:14
side 32:7 64:16
  110:20 142:3
sides 64:19
  132:4
signature
  145:7
signed 45:18
  45:22 119:4
significant
  54:19 72:2
  104:1 112:10
significantly
  70:3
signing 13:12
similar 36:24
simple 76:18
simply 105:3
simultaneously
  59:19
single 36:2
  49:15 74:14
  76:25 77:1
  95:6 107:5
siphoned
  101:13

sir 12:18 119:8
sit 22:8 143:11
sitting 62:7
  87:6 104:2
  105:10 114:10
  114:18 138:22
situation 25:7
  54:16,17 96:5
  143:9
six 38:6 74:5
  126:16 138:5
skip 121:5
slams 80:9
small 82:14
  91:14 120:20
smoothly 5:21
software 15:11
  28:18
sold 81:21
sole 89:6
  105:19 111:4
  124:24
solution 28:4
solutions
  145:20
somebody 15:3
  16:4 42:3
  78:11 129:7
  143:17
somewhat
  10:19
sonya 3:25
  145:3,8
sorry 9:9 16:16
  17:2 25:20
  29:10,12,25
  42:9,11 43:11

48:14 88:10
89:1 95:10
105:21 113:20
115:10 117:14
126:25 131:8
134:17,21
143:7
sort 22:5 27:25
  32:4 41:7 44:4
  83:15 90:17
  113:11 131:23
  133:2
sorts 96:21
sought 94:3
sounds 22:16
source 49:19
  106:1
southern 1:2
  29:1,11 30:4
  48:4
speaking 30:2
specific 9:9,19
  16:3,7 37:15
  38:6 70:18,19
  86:4,9 115:15
  129:9 130:20
specifically
  10:5 13:23
  14:8 15:24
  63:16 117:4
  122:14
speed 48:1
spend 22:4
  83:15 111:8
  116:6
spending
  130:12

spent 10:22
  38:5,6 50:13
  52:21 76:24
  85:10,10
  104:21 111:6
  130:14 139:5
sphere 108:5
split 126:16
spreadsheet
  9:3 10:25
  20:22 21:2
  23:22 24:2
  27:10 36:23
  37:13 38:15,17
  50:18 76:25
  92:4 105:7
  136:14,15,24
  136:25 138:4
spreadsheets
  9:24 10:6,9,12
  134:14,23
  137:5
squander
  52:20
squandered
  52:16 114:6
stable 102:20
staffing 137:21
stage 23:12
  26:8 101:3
stages 98:20
stake 106:3
stand 35:20
  52:4 72:18
  76:15,16,17,23
  76:24 79:15
  84:19 85:5

111:23 121:14
121:20
standard 19:2
  53:4 87:7,10
  139:7
standards 26:4
standpoint
  5:21
start 5:10
  12:19 59:2
  62:16,16,20
  116:11 117:25
  123:21 124:1
started 34:7
  53:11 61:10
  83:12 93:22
  119:6
starting 18:20
  32:18
state 11:15
  72:13 73:17
  79:2 94:5
stated 106:4
statement 9:4
  50:14 90:15,19
  90:23 91:25
  92:15 97:7
  99:4
statements
  74:8
states 1:1,18
  49:24
status 6:18
  51:13 53:6
  56:18
stay 49:2
  131:16 137:12

| | | | |
|---|---|---|---|
| **steal** 79:6 | 72:1,8,22,23 | 134:6 136:23 | **strong** 47:25 |
| **stealing** 55:5 | 72:24 73:4,5,9 | 136:24 137:1 | 53:2,3 56:9 |
| 62:15 77:15 | 73:10,12,18,19 | 140:4 141:9,15 | **strongly** 128:6 |
| **step** 10:14 | 74:25 75:1,21 | 142:17,19 | **struck** 63:22 |
| 58:22 60:6 | 75:24,24 76:6 | 143:15 | **structure** 56:9 |
| **stepping** 92:10 | 76:7,16,23 | **stone's** 7:20,21 | 60:6 87:24 |
| **stipulate** 62:2 | 77:13,21 78:1 | 31:6 32:20 | **study** 9:20 |
| **stipulated** | 78:17,21,21 | 33:14 34:9 | **stuff** 28:19,20 |
| 117:11,19,23 | 79:5,14,15,25 | 59:13 66:21 | 112:5 |
| 118:14 | 80:3,22 81:10 | 67:6 68:1 69:4 | **subject** 10:16 |
| **stipulation** | 82:4,7,19 83:2 | 69:9 78:24 | 50:4 93:17 |
| 48:18 62:1 | 83:24 84:18 | 79:13 81:22 | 134:11 135:15 |
| **stolen** 133:5 | 85:8,13,25 | 89:7,10,14 | 142:6,25 |
| **stone** 1:15 3:2 | 86:8 87:3,23 | 92:18 112:5 | **submission** |
| 4:15 7:4 8:1,15 | 88:1,5,15,21 | 116:24 119:20 | 20:11 |
| 9:12 10:11,24 | 89:9,13,16,20 | 127:14 | **submissions** |
| 11:10,19 14:12 | 90:1,7,11 | **stop** 12:13 | 63:13 64:19 |
| 15:25 17:10,20 | 91:17 92:3,11 | 39:25 57:14,15 | 81:8 85:21 |
| 17:21 19:14,16 | 92:13,19,22 | 57:15,15 68:7 | 142:2 |
| 19:20 20:2 | 93:4,13,15,24 | 68:7,22 79:8 | **submit** 7:8 |
| 25:1 31:5,16 | 94:18 96:6 | 80:14 91:3 | 13:5 14:17 |
| 34:17 36:9 | 97:4 98:21 | 96:13,13,13 | 19:1 35:18,18 |
| 39:23 44:25 | 99:12 100:2,20 | 107:6 118:16 | 36:3,4 44:8,25 |
| 45:17,22 46:9 | 101:23 107:4 | 142:16 | 52:2,6,8,23 |
| 46:12 47:8 | 109:13 110:14 | **story** 7:16 | 53:5 60:20 |
| 49:6 50:12 | 113:6,25 115:6 | 13:18,20 36:3 | 75:23 79:5,23 |
| 53:20 54:17 | 116:19,20 | 36:24 37:15 | 101:9 102:10 |
| 56:11,14,22,23 | 117:24 118:2,6 | 62:17 | 132:5 135:14 |
| 57:19 58:7,10 | 119:4,5 120:8 | **straight** 123:22 | **submits** 6:17 |
| 58:20,24 59:1 | 120:21 123:17 | **strategy** 65:25 | **submitted** |
| 59:5 60:11,14 | 123:25 125:14 | 73:23 | 135:10 |
| 60:23 61:3 | 125:25 126:4 | **strauss** 4:3 6:4 | **submitting** |
| 62:3,10 63:18 | 126:16 128:13 | 6:16 116:5 | 142:2 |
| 65:6,14,20 | 128:20,21 | **strength** 75:13 | **subsections** |
| 67:16,20 69:14 | 129:4 130:13 | **strictly** 43:20 | 43:22 |
| 69:22,24 70:5 | 132:22,23 | **strikes** 11:17 | **subsidiary** |
| 71:9,16,22 | 133:11,11 | | 59:6 88:17 |

**substantial** 7:9
23:25 38:19
101:5 103:7
105:17,19
109:22 139:1
140:3
**succeed** 61:23
**success** 62:9
79:3 87:12,17
113:18,21,23
139:6 140:4,16
**successful**
129:23
**successfully**
72:1
**suffer** 103:25
**suffered** 82:4
120:10,19
**sufficient**
51:15,18,20
113:20
**sufficiently**
51:11 87:12,18
103:16 114:3
**suggested**
133:16
**suggesting**
46:17 127:10
127:12 131:23
136:11
**suite** 145:22
**sums** 131:1,4
**sunset** 25:11
**supp** 50:8
**supplanted**
15:23

**supplants** 18:3
**supplement**
118:19
**supplemental**
64:19 125:7
**support** 8:18
19:2,12,19
39:3 49:15
124:2
**supports** 19:21
35:12 44:15
98:24
**suppose** 30:7
133:6
**supposed**
41:20 67:9,10
67:12 125:23
126:22 129:15
**supposedly**
32:25 33:6
36:17 45:5
49:11
**supreme** 49:24
**sure** 11:25 16:5
21:6 24:22
30:25 32:2,15
39:21 42:23
43:2,3 47:2
51:1,10 53:22
73:14 74:25
85:15 98:8
116:8,11 117:9
122:10,17
125:7 129:2,9
131:16,17
132:11 137:2
137:13,13

**surprised** 48:9
48:12,15
**survive** 126:13
**suspect** 39:22
104:12
**suspects** 50:23
**swiftly** 50:24
**sworn** 9:4
10:11 50:14
119:20
**system** 33:11

**t**

**t** 145:1,1
**table** 6:6
**tabs** 20:23
**take** 7:22 10:14
12:3,8,11,12
13:13 19:22
27:2 31:10
32:21,25 35:22
36:5 38:25
39:2 40:21
45:3 53:12
55:17,18 58:17
58:19,22 65:13
69:23,25 71:17
73:19 75:3
77:7,10 78:12
78:12 83:18
84:13 91:23
94:9,24 95:2
95:22 96:3,15
96:22 98:11
99:9,9,14,21
113:14 117:6
118:9 127:17
130:8 132:3

**taken** 19:6
24:1 25:2
27:15 30:25
38:17 50:17
52:21 54:21
76:8,9
**takes** 6:22
**talk** 7:1,11
32:18 62:15
64:11 110:4
112:17 122:8
142:22
**talked** 39:10
39:11,17 50:11
58:15,20 78:20
97:23 108:23
141:16 142:17
**talking** 7:3,6
14:2,3 16:14
22:17 25:16
35:21 36:1,9
67:15 70:22
86:10 98:4
143:9
**talks** 56:6
**targets** 13:10
**team** 16:6
27:21 28:11
85:17 130:21
**technically**
129:18
**tell** 8:10 10:25
20:1 39:23
55:17 59:21
76:22 80:8
82:5 85:22
86:23,23 90:22

[tell - thought]                                    Page 43

| | | | |
|---|---|---|---|
| 122:2 126:18 | 37:9,24 46:16 | 76:3,14 77:9 | 84:18 86:12,13 |
| 127:2 129:19 | 65:15 66:1 | 80:23,24 94:15 | 87:9 90:17 |
| 142:13,14 | 71:19,22 72:3 | 100:4,14 | 91:6,16 93:23 |
| **teller** 77:13,14 | 72:21 78:18 | 106:23 112:12 | 95:3,19 97:1,1 |
| **telling** 39:4 | 82:7 84:18 | 119:12 128:4,9 | 97:21,23,24 |
| 74:21,23 80:3 | 119:5,22 120:8 | 129:24 131:6 | 98:9,14 99:12 |
| 97:10 111:15 | **testify** 14:12 | 132:21 | 99:15,16,16,17 |
| 111:15 | 19:18 | **things** 8:19 | 100:2 102:6 |
| **tells** 36:23 | **testimony** 7:20 | 10:18,21 21:13 | 103:14,19 |
| 99:13 | 7:21,23 15:9 | 54:5 59:14 | 109:3,6,16 |
| **temporarily** | 31:7 32:20 | 75:8 79:5 86:6 | 113:5 115:15 |
| 6:21 51:25 | 37:25 46:8 | 86:7 91:12 | 119:6 123:22 |
| 135:3,16 | 49:5 78:16,17 | 102:1 110:23 | 124:1 125:5 |
| **temporary** | 81:22 85:24 | 120:24 122:23 | 128:11 129:2 |
| 101:6,17 | 86:6 107:25 | **think** 5:20,24 | 129:15,18 |
| 134:11,14 | 109:13 120:7 | 8:3,25 9:5,21 | 130:1,2,5,16 |
| 136:12 | 128:10 133:19 | 12:2,5 13:3,8 | 130:18 132:16 |
| **tend** 18:7 | 137:1 | 14:1,3,19 | 133:13,15,23 |
| **tens** 65:4 78:5 | **testing** 38:22 | 15:19,20 17:24 | 134:14,15 |
| **term** 63:3 | **text** 34:24 35:3 | 20:20 21:19,22 | 135:22 137:1,6 |
| 122:25 123:3 | 35:15,19 98:23 | 22:1,4 23:15 | 137:14,25 |
| **terminated** | 99:1 | 24:21 26:19 | 138:1,9,11,15 |
| 116:21 | **texts** 34:25 | 28:4,9,17 | 138:23 139:24 |
| **terms** 15:22 | **thank** 5:3 6:1 | 30:14,23 33:19 | 140:16 141:16 |
| 18:4 21:25 | 6:13,15 53:7,8 | 33:23 34:1,16 | 142:11 143:20 |
| 33:16,17,21 | 53:14,24 65:13 | 35:17 37:14,25 | **thinking** 30:22 |
| 34:2,5,12,13 | 73:19 88:9 | 38:10 39:16,17 | **thinks** 71:25 |
| 42:12 45:1 | 116:1,2 136:20 | 40:3 42:13 | 77:5 78:12 |
| 55:8 89:15 | 138:16 141:25 | 44:24 45:17,17 | **third** 17:7,12 |
| 90:4 100:19 | 142:4 143:6 | 52:25 54:8,25 | 21:13 56:25 |
| 101:16 105:8 | **theft** 62:15 | 57:23 58:7,14 | 84:24 86:13 |
| 105:14 119:21 | 78:9 143:10 | 58:21 60:5,5 | 124:20 |
| 120:21 134:10 | **theory** 74:9 | 64:11 67:14 | **thompson** 72:5 |
| **test** 46:5 | **thief** 78:11,18 | 69:14,24 70:15 | **thought** 11:23 |
| **testified** 31:8 | 79:10 80:4,6 | 75:8,19 76:1,1 | 27:6 30:13 |
| 32:23 33:1 | **thing** 11:23 | 76:2 79:12,14 | 37:9 48:18 |
| 34:23 35:6 | 30:16,19 32:4 | 81:17 83:2 | 71:21,24 73:3 |

74:24 77:17
128:16
**thousand**   76:5
**thousands**   76:6
78:6 79:7
108:17
**threatens**
47:16
**three**   21:2 37:7
59:13 137:6
138:5
**throw**   112:4
**thumbs**   75:14
**time**   6:22 9:14
9:15,18 10:2
14:3,5,11,13
17:25 22:3
24:6 27:12
39:14 45:6
54:12,21 55:1
55:25 59:15
60:19 63:23
73:2,3,5 74:17
78:5 83:25
85:11 96:2
98:1 99:24
109:13 116:6
116:25 120:22
121:24 128:5,9
128:10 130:10
130:12 131:5
131:17 137:17
138:8 139:5
**times**   36:25
38:18 54:9
55:21

**tiny**   114:6
**tips**   87:15
107:22 114:4
139:16
**titled**   90:4
**today**   5:15,18
23:24 44:3,22
55:21 57:7
74:21 121:14
134:6 136:4
138:22
**together**   45:19
83:12
**token**   20:22
36:23
**tokens**   21:12
36:25 37:1
41:22 59:15
77:24 102:20
102:20 104:18
**told**   61:6 71:23
72:5,6,8 73:5
75:10 79:8
86:12 108:13
113:6 115:21
121:21 139:14
139:14 142:24
**tomorrow**
142:1
**took**   6:20 7:2
8:7,8 12:10
25:9 31:17
34:5,18 36:3
37:16 38:21
50:12,19 53:1
53:10 62:4,6
83:1,2,4 96:7

98:21 120:14
120:19 129:11
130:21 136:10
**tornado**   37:18
37:20,20,22,24
47:22 50:12,20
110:4,7,9,19
110:20,20,21
110:24 113:10
**total**   61:1,4,7
109:7 131:4
**totality**   80:2
**totals**   11:3
**touched**   50:15
102:21 110:5
**tough**   77:8
88:12
**tower**   4:6
**trace**   26:17,20
110:16 143:22
**traceable**
49:17
**traced**   51:7
101:1
**tracing**   28:15
111:25
**track**   28:20
45:9 110:11
**tracking**   76:25
**trading**   65:25
132:23
**transaction**
76:25
**transactions**
7:7,9 9:4,19
21:23 22:3,11
22:13 48:1

50:5 51:6 58:1
58:3,4,9 62:10
62:19,21 67:20
67:21 74:22,23
76:13 77:2
79:2,4,12,13
79:22 98:1
109:23 130:15
130:24
**transcribed**
3:25
**transcript**
82:11 84:19
85:8,20,21
100:20 145:4
**transfer**   14:4
37:10 61:15
81:13 83:17,17
84:15 89:11
97:3 98:6
112:24 118:11
135:7 136:25
137:2,4,5
138:4,18
**transferred**
6:21 21:12
23:9 27:17
36:25 37:5,23
37:23 47:21
48:10 52:12
65:15 81:14
86:21 100:11
100:25 101:23
135:2
**transferring**
21:3 57:18
65:17 101:7

128:23
**transfers** 7:14
  8:6,6 10:13
  14:2 19:10,12
  21:3,21,22,24
  22:18,19 23:11
  23:21 24:4
  26:17 36:10,16
  36:18,20 37:3
  37:12,12 38:19
  47:21 48:22
  51:6 52:1
  54:12 55:10,12
  60:25 61:4,10
  61:11 62:11,21
  70:5,9,10,22
  70:25 71:7,10
  71:20 78:13
  80:25 81:5
  94:13,20 97:23
  98:1 100:21
  110:12 118:18
  118:20 130:20
  131:5,7,20,21
  131:25 134:24
  136:23 138:6,9
  138:10,21
  142:16
**transition** 81:4
  87:21,22
**transitioning**
  56:6
**transparent**
  80:5 113:9
**treasury** 28:18
**trepel** 106:13

**trial** 117:8
  119:23 120:17
**tried** 9:25 40:4
  56:2 127:23
  137:14
**trier** 68:24
  69:7,11
**trigger** 94:3,6
**tro** 101:3
  105:18 106:9
  131:13,20
  135:7 142:20
  142:25
**troubles** 25:24
**true** 15:5 49:22
  49:23 69:10,15
  105:15 111:15
  128:21 129:5,6
  134:9 143:17
  145:4
**truly** 107:1
**trustworthy**
  75:18
**truth** 36:4
  77:13,14
**truthfully**
  111:24
**try** 10:7 18:12
  20:25 21:1
  30:10,12 32:6
  35:14 44:20
  67:15 108:18
  113:14 120:12
  129:22 135:18
  135:19 143:24
  144:1

**trying** 10:14
  12:11 39:23
  41:23 71:15
  130:3
**turn** 33:14
  47:12 56:1
  103:11 120:23
**turned** 129:3
**turning** 33:17
  120:21
**turnover** 19:3
**turns** 143:17
**tweet** 79:7
**tweeted** 78:3,9
**tweeting** 78:7,8
  78:10 79:8
**twenty** 36:19
**twilight** 57:9
  57:16 117:1
**twitter** 78:2,3
  78:4,14,19,19
  78:20,25 79:9
**two** 8:19 27:16
  29:2 30:2
  31:11 33:1
  35:13,13 37:8
  50:7 58:4
  71:10 75:15
  79:18,25 91:21
  97:21 122:5
  137:6 138:5,7
  139:4 143:13
**type** 51:12,13
**typically** 11:13

**u**

**u.s.** 2:3 38:18
  43:18,20 63:16
  64:11,12
**ultimately**
  35:23 37:13
  101:20 131:11
**unambiguous**
  25:14 26:5
**unauthorized**
  7:7 22:18,20
  23:9,11 53:3
  55:10,11,12,19
  61:11 84:14
  94:14 118:18
**unclear** 108:16
  141:3
**uncomfortable**
  24:8
**under** 19:18
  24:8 27:23
  30:11 35:17
  40:4 46:21
  62:24 63:2
  64:12 74:9
  76:10 77:7
  82:13 87:1,11
  87:16,18,21
  88:2,14 89:3,7
  89:12 90:3
  93:4 99:20
  115:25 123:17
  124:23 126:1
  130:20,24
  143:15
**understand**
  9:6,22 12:11

15:13 21:15,19
23:13,14 24:15
25:12 26:7
27:5 45:8,10
54:13 58:22
60:5 67:1 68:5
68:5 70:16,17
71:14 75:22
76:18 79:23
83:9,10 96:17
97:21 98:20
102:3,12 103:3
110:6 111:13
126:9 132:18
140:21,25
141:14
**understanding**
26:23 34:14
43:19 70:21
82:6,13 122:10
130:23 131:20
133:22 138:19
**understands**
81:17
**understood**
21:25 37:25
46:10 64:21
81:12 101:25
103:5,9
**undertaken**
104:24
**undertook**
126:21
**underway**
34:14 121:3
**undetermined**
57:5

**undisputed**
64:24 81:23
82:5 107:25
119:17 123:14
**unfair** 20:14
**unflattering**
85:23
**unfortunately**
67:15
**unilaterally**
94:24
**united** 1:1,18
49:24 112:8
140:19
**universe** 113:1
**unjust** 19:4
**unlimited**
106:1
**unpack** 128:4
128:8
**unsecured**
55:16,16 104:4
**unsupported**
19:14
**upfront** 103:2
**upheld** 49:25
**urge** 52:10
**usdc** 21:13
**use** 13:12
28:19 49:11
71:3 81:7
83:13 106:6
110:8 111:4,4
112:16 113:3
131:4 133:5
**used** 12:10
37:5 47:22

50:20 90:19
110:22,23
111:1
**using** 3:9 82:23
93:10 96:15
98:11 110:9,13
119:24
**usually** 41:9
**utilized** 25:1
110:25
**utilizing**
113:10

**v**

**v** 1:14 3:2
28:24 29:5,10
47:14 50:7,8
106:8,13
**valuable**
108:16
**valuations**
137:17
**value** 21:21
23:7 38:18
40:6,22 41:1
43:24 63:20,24
64:18 82:25
84:17 85:25
103:7 108:8,15
108:16,18
131:1,2,3,3
134:7 135:25
137:15,16
**variety** 11:18
**various** 137:17
**vast** 50:16
**vel** 4:20 6:8
54:2

**veritable**
105:24
**veritext** 145:20
**vested** 113:25
**view** 83:7
94:23 133:25
**violate** 26:3
**violated**
102:18
**violating** 135:7
**violation** 49:2
**virtue** 63:22
**visible** 78:2
110:10
**voices** 30:2
**voluntarily**
109:22 114:11
141:4,22

**w**

**w.l.** 28:24 29:6
29:10,13,20
48:4 106:10,15
**wait** 23:2 42:8
67:8 68:22
80:20 91:3
**waited** 49:7
111:17
**waiting** 100:15
101:22
**waiving** 102:14
**walk** 58:12
60:16
**walked** 94:17
96:6 97:10
126:5
**walks** 80:13

| | | | |
|---|---|---|---|
| **wall** 112:5 | 23:15 26:16,25 | 99:25 124:1 | **weak** 14:19 |
| **walled** 134:16 | 30:8,19 33:16 | 127:6 130:19 | **wealth** 28:13 |
| **wallet** 8:1 20:2 | 39:21 42:20 | 131:6,23 | **website** 91:20 |
| 21:12,14 22:5 | 43:2 44:21 | **wants** 59:1 | **week** 108:9 |
| 37:16 65:11 | 49:13 54:5,7,9 | 85:20 97:3 | 121:1 |
| 70:25 71:1,1,1 | 54:20,23 55:8 | 98:10 117:22 | **weekly** 42:24 |
| 71:2,4,6,7,7 | 56:1 60:1 61:9 | 126:18 | 43:13 |
| 82:16,18 83:21 | 61:14,16 62:16 | **warranted** | **weighing** 79:24 |
| 83:23 86:1 | 62:20 64:19 | 38:11 | **weighs** 52:2 |
| 107:3,4,5,9,13 | 75:20 81:13 | **watching** | **went** 5:21 14:6 |
| 108:2,10,20 | 85:22 86:25 | 110:11 | 20:24,24 36:12 |
| 109:2,5 110:10 | 87:1,2,5 96:23 | **way** 13:22,22 | 41:18 71:4 |
| 110:11 112:23 | 96:24 100:22 | 13:25 25:6 | 84:24,24 86:13 |
| 112:25 113:15 | 100:24 101:8 | 27:11 28:4 | 87:24 120:14 |
| 113:16 119:1,2 | 101:12,15,20 | 37:20 39:22 | 120:19 127:2 |
| 119:6,7,9,10 | 101:22,24 | 41:3,15 46:2,8 | 134:25 |
| 119:14,14,15 | 102:7,9,13,16 | 50:2 51:2,6 | **westlaw** 29:7 |
| 120:1,2,6,10 | 102:19,25 | 58:9 100:10 | **whatsapp** |
| 120:14 134:18 | 103:4 108:18 | 104:25 110:14 | 34:24 35:1,15 |
| 134:19,20,21 | 109:20,20 | 110:18 121:12 | 98:23 |
| 134:22 135:24 | 111:8,11 | 126:20 133:24 | **whatsapps** |
| 137:3 138:19 | 112:12 113:2 | 141:14 | 35:4 |
| 140:5,5 141:7 | 115:12 116:8 | **ways** 58:4 | **whereabouts** |
| 141:7 142:24 | 116:13,16 | 110:16 | 50:16 |
| **wallets** 6:21 | 117:7 118:17 | **we've** 23:20 | **white** 66:8 |
| 7:3,4,8 10:13 | 118:19 120:20 | 26:18 27:12 | 89:15 |
| 10:14 21:4,4 | 121:6,7,8 | 30:21 36:9 | **whoa** 46:13,13 |
| 25:3 37:5 | 122:10,13 | 44:24 52:10 | 46:13 57:15,15 |
| 70:13 71:8 | 123:20 124:10 | 53:2 56:2 | 57:15 |
| 72:1 109:4,5,5 | 125:6 126:10 | 58:14,20 66:5 | **whoever's** |
| 112:15 114:12 | 129:19 130:1 | 66:8 75:16,17 | 26:20 |
| 119:21,24,25 | 131:19 135:19 | 76:10 80:18 | **wholly** 59:6 |
| 134:24 135:3 | 136:3 137:18 | 97:24,25 98:7 | 88:17 |
| 142:14 143:13 | 138:24 139:4 | 103:14 108:4 | **wife** 79:18 |
| **want** 5:22 8:14 | 142:5,5 143:11 | 108:23 109:16 | **wildly** 77:18 |
| 18:15 20:11,13 | **wanted** 34:4 | 142:24 | **william** 4:19 |
| 22:1,6,22,24 | 55:18 96:3 | | |

| | | | |
|---|---|---|---|
| **willing** 22:8 | 143:24 | **wrongfully** | 65:14 71:19 |
| 38:24 | **worked** 41:15 | 62:3,6 106:5 | 75:9,10 76:15 |
| **willy** 97:3 | 56:9 106:21 | **x** | 76:16,17 77:3 |
| **win** 75:25 | **working** 59:2 | **x** 1:5,11,17 | 81:22 82:1 |
| 133:4 | 72:8 73:24 | 12:6 99:22 | 84:19 85:5,11 |
| **wind** 25:10 | **works** 13:25 | **y** | 85:18 100:11 |
| **winding** 57:9 | 37:20 41:3 | **yeah** 14:17 | 111:12 113:6 |
| **wins** 79:25 | 87:25 | 16:8,13 18:4 | 119:23 120:7,9 |
| **wire** 83:17 | **world** 28:15 | 20:20 29:19 | 127:15 |
| 89:11 | 110:15 120:23 | 30:4,21 31:23 | **yield** 41:16 |
| **withdraw** | **wormhole** | 34:21 35:3 | 112:16 113:14 |
| 37:21 62:2 | 15:12 45:8 | 39:25 40:9 | 137:9 |
| **withdrawal** | 46:10,19,25 | 42:19 43:8,15 | **york** 1:2,20 4:7 |
| 8:18 | 126:7 | 48:17 57:22 | 4:17 |
| **withdrawals** | **worth** 19:7 | 58:19 66:24 | **z** |
| 8:1,15 75:15 | 22:2 37:1 | 89:23 94:21 | **zero** 19:19 |
| **withdrawn** | 81:14 82:15,16 | 106:11 115:2 | 124:2 141:8,23 |
| 11:4 20:2,12 | 99:20 104:6,19 | 115:15,18,24 | **zoom** 3:9 5:14 |
| **withdrew** | 104:20 105:11 | 125:15 128:8 | |
| 37:19,24 38:1 | 111:7 134:1 | 129:9 132:18 | |
| **witness** 121:14 | **wrap** 47:13 | 137:20 138:9 | |
| 121:19 122:2 | **writing** 35:12 | 138:10 140:21 | |
| **witnesses** | 73:11 | **year** 13:11,12 | |
| 19:17 40:4 | **writings** 34:23 | 41:8 63:7 | |
| 79:25 122:6 | 74:7 | 111:17 | |
| **wl** 29:8 30:3 | **written** 19:20 | **years** 132:13 | |
| **word** 117:6 | 31:7 32:22 | **yellow** 21:7,22 | |
| **work** 9:6,21 | 39:3 42:16 | **yesterday** 5:11 | |
| 13:22,22 24:21 | 69:22 77:4 | 5:12,13,15,21 | |
| 27:24 64:25 | 92:2,9,15 | 8:18 10:5 | |
| 69:19 72:17 | 100:19 101:17 | 11:11,16 14:12 | |
| 79:19 100:18 | 142:6 | 19:18 22:23 | |
| 103:10 108:5 | **wrong** 69:16 | 23:23 31:16 | |
| 109:25 112:7 | 138:25,25 | 33:7 34:17 | |
| 114:15 120:12 | **wrongdoing** | 42:2 48:10 | |
| 132:7 133:21 | 49:17 | 49:5 63:8 65:2 | |
| 136:9 143:4,20 | | | |