**WHITE & CASE LLP**
David M. Turetsky
Samuel P. Hershey
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: david.turetsky@whitecase.com
      sam.hershey@whitecase.com

– and –

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
Email: mandolina@whitecase.com
      gregory.pesce@whitecase.com

**WHITE & CASE LLP**
Keith H. Wofford
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Email: kwofford@whitecase.com

– and –

**WHITE & CASE LLP**
Aaron E. Colodny (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone: (213) 620-7700
Facsimile: (213) 452-2329
Email: aaron.colodny@whitecase.com

*Counsel to the Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OBJECTION TO THE DEBTORS' SECOND EXCLUSIVITY MOTION

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 USA LLC (9450); GK8 Ltd. (1209); and GK8 UK Limited (0893). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ...................................................................................................... 5

    I.      The Exclusivity Motions .................................................................. 5

    II.     Developments in the Chapter 11 Cases ........................................... 6

          A.      The Bidding Procedures ........................................................... 6

          B.      Resolution of Pending Litigation ............................................. 8

          C.      The Debtors' Liquidity ............................................................ 9

OBJECTION ........................................................................................................ 10

    I.      The Standard For Extending Exclusive Periods ............................. 10

    II.     If No Plan Is Filed, Terminating Exclusivity Solely For the Committee Will Be Necessary To Move These Chapter 11 Cases Forward ....................... 12

    III.    If No Plan Is Filed, the Remaining *Adelphia* Factors Favor Terminating Exclusivity Solely For the Committee ............................... 14

          A.      While the Debtors are Paying Bills When They Fall Due, Customer Assets Are Being Eroded ..................................... 14

          B.      The Amount of Time That Has Elapsed In These Cases ....................... 15

          C.      Whether An Unresolved Contingency Exists ........................ 15

          D.      The Debtors Have Offered No Evidence to Support Extending Exclusivity, and the Available Evidence Indicates That Extending Exclusivity Will Jeopardize, Rather Than Support, the Filing of a Viable Plan ........................... 17

RESERVATION OF RIGHTS ................................................................................. 17

CONCLUSION ...................................................................................................... 18

## <u>TABLE OF AUTHORITIES</u>

<u>**Page(s)**</u>

### CASES

*In re Adelphia Commc'ns Corp.*,
   352 B.R. 578 (Bankr. S.D.N.Y. 2006) .................................................................4, 11

*In re Borders Grp., Inc.*,
   460 B.R. 818 (Bankr. S.D.N.Y. 2011) ...............................................................10, 11

*In re Curry Corp.*,
   148 B.R. 754 (Bankr. S.D.N.Y. 1992) ...............................................................10, 11

*In re Dow Corning Corp.*,
   208 B.R. 661 (Bankr. E.D. Mich. 1997) ...........................................................10, 12

*In re Excel Mar. Carriers Ltd.*,
   2013 Bankr. LEXIS 3920 (Bankr. S.D.N.Y. Sep. 13, 2013) ....................................11

*In re Gen. Bearing Corp.*,
   136 B.R. 361 (Bankr. S.D.N.Y. 1992) .......................................................................16

*In re Gibson & Cushman Dredging Corp.*,
   101 B.R. 405 (E.D.N.Y. 1989) ..................................................................................14

*In re GMG Cap. Partners III, L.P.*,
   503 B.R. 596 (Bankr. S.D.N.Y. 2014) ................................................................10, 14

*In re McLean Indus., Inc.*,
   87 B.R. 830 (Bankr. S.D.N.Y. 1987) .........................................................................17

*In re New Meatco Provisions, LLC*,
   2014 WL 917335 (Bankr. C.D. Cal. Mar. 10, 2014) .................................................13

*In re Pub. Serv. Co. of New Hampshire*,
   88 B.R. 521 (Bankr. D.N.H. 1988) ............................................................................13

*In re R.G. Pharm., Inc.*,
   374 B.R. 484 (Bankr. D. Conn. 2007) .......................................................................16

*In re Sharon Steel Corp.*,
   78 B.R. 762 (Bankr. W.D. Pa. 1987) ...................................................................11, 14

*In re SW Oil Co. of Jourdanton, Inc.*,
   84 B.R. 448 (Bankr. W.D. Tex. 1987) .......................................................................14

*In re Texaco Inc.*,
    76 B.R. 322 (Bankr. S.D.N.Y. 1987) ........................................................................17

*In re United Press Int'l, Inc.*,
    60 B.R. 265 (Bankr. D.D.C. 1986) .................................................................13, 14

**STATUTES AND RULES**

11 U.S.C. § 1121(b) ........................................................................................................10

11 U.S.C. § 1121(c) ........................................................................................................10

11 U.S.C. § 1121(d)(1) ...................................................................................................10

Bankr. S.D.N.Y. L.R. 9006-2 ..........................................................................................5

The Official Committee of Unsecured Creditors (the "**Committee**") appointed in the cases of the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") states as follows in support of this objection (this "**Objection**") to the *Debtors' Second Motion For Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 1940] (the "**Second Exclusivity Motion**"):[2]

## Preliminary Statement

1.      In December 2022, the Committee—after requesting discovery from, and engaging in extensive negotiations with, the Debtors—determined not to object to the Debtors' first motion to extend their exclusive periods to file and solicit a plan on the condition that the Debtors' exclusivity would expire on February 15, 2023, a far shorter extension than the Debtors initially proposed.  The Committee and the Debtors each knew that it would be challenging for the Debtors to file a plan by that date.  Nonetheless, each party acknowledged that it was imperative that the Debtors file a plan as soon as possible given the delays in customer access to their account balances and the Debtors' dwindling liquidity, which the Debtors may exhaust by June 2023.  The Committee was therefore clear that it expected the Debtors to finalize the terms of a mutually agreeable plan by February 15.

2.      The Committee's position has not changed: these cases must proceed towards a resolution.  It has been approximately eight months since the Debtors paused withdrawals and denied customers access to their account balances.  During that time, many account holders' lives and finances have been upended because of the past conduct of the Debtors and certain of their former directors and officers.  Indeed, the Examiner found that Celsius misrepresented "in ***every***

---

[2]     Capitalized terms not defined herein shall have the meaning ascribed to such terms in the Second Exclusivity Motion.

*key respect*" how it operated and the "risks it took" with assets transferred by account holders. *Final Report of Shoba Pillay, Examiner* [Docket No. 1956] (the "**Final Examiner Report**") at 5, 22 (emphasis added). Nor has the Debtors' liquidity position changed. The Debtors' expense rate and accrued liabilities indicate they could run out of cash by June 2023 unless they sell crypto assets to meet administrative claims and expenses.

3.      Over the past several months, the Debtors and their advisors have been working in good faith, and in consultation with the Committee, to diligence and negotiate improved terms for various sale and plan sponsorship proposals submitted under the Court-approved bidding procedures. As disclosed at the January 24, 2023 hearing, the parties' recent efforts have focused on discussions with a third-party investor, who is unaffiliated with the Debtors' founders or current management, regarding a potential plan of reorganization that would, among other things, return liquid cryptocurrency to a large majority of the Debtors' smaller account holders (potentially in excess of 80% of all account holders). That potential plan of reorganization also contemplates the creation of a new company which would be owned by the Debtors' creditors and overseen by an experienced management team that is unaffiliated with the Debtors' founders and existing management. The new company would seek to maximize the value of the Debtors' undistributed liquid and illiquid assets over a period of time and projects to provide a superior recovery when compared to an orderly liquidation of those assets. Creditors would hold the new company's equity through a freely transferrable token. Account holders who wished to sell their token could do so immediately and receive liquidity. Those who wanted to wait and maximize their recovery could do so as well. The new company would be a public reporting company. The new company concept was a direct result of the bidding process.[3]

---

[3]      On January 26, 2023, the alleged terms of proposals received in the winter 2022 were leaked by a Celsius creditor.

4.      But as the Committee's counsel noted at that hearing, there remains substantial "work to do" to finalize that proposal before the Debtors and the Committee are prepared to proceed.  Jan. 24, 2023 Hr'g Tr. [Docket No. 1949] at 53:9-24.  More specifically, there is still no binding agreement with the Debtors or any potential plan sponsor regarding the potential transaction, and key elements remain under discussion.  Indeed, there was no agreement at the time of the hearing to contribute the mining business to the new company and, since that time, the Committee has engaged in discussions (in coordination with the Debtors' advisors) involving mining operators that may be interested in investing in the Debtors' mining business on potentially attractive terms.  Those terms may also include potentially distributing the equity of that business to creditors.  In addition, the Committee remains focused on ensuring that all account holders have an option to receive a distribution of liquid cryptocurrency.  Finally, the parties have also been working on a solution for the Debtors' retail loan portfolio.  Reaching an agreement on how the retail loan portfolio will be treated under any potential plan is critical because approximately $410 million in payments are owed to the Debtors under outstanding retail loans, which the borrowers assert are allegedly collateralized by digital assets with a current value of approximately $900 million (approximately 35% of the Debtors' total current digital assets).

5.      But these negotiations cannot go on forever.  The Debtors' liquidity is rapidly depleting and customers have already been left without access to their accounts for too long.  The Debtors, the Committee, and the account holders must soon have some degree of certainty with respect to the path forward.  Absent sufficient agreement with any potential third-party plan sponsor, the Debtors may have to return liquid crypto to their creditors according to their relative

---

That leak led to allegations that all bids had been rejected and the new company would not be managed by parties independent from the Debtors.  Those allegations are wrong.

rights through a liquidating plan. The Debtors' other illiquid assets, including their mining operation, would then need to be financed or sold to fund an orderly wind down of the Debtors' estates.

6.     As of the date of this Objection, the parties have not agreed on the terms for any potential chapter 11 plan and the Committee has not reached an agreement with the Debtors regarding an acceptable exit strategy. Absent a change in circumstances prior to the hearing on the Second Exclusivity Motion, the Court should lift exclusivity to permit solely the Committee to move forward and prosecute its own liquidating chapter 11 plan, which would provide for the return of liquid digital assets to account holders and the creation of post-effective date trusts or similar entities (which will need to be appropriately capitalized) to monetize the Debtors' illiquid assets for account holders' benefit. The Committee cannot execute a plan on its own, however, and requires the ability to discuss restructuring proposals in earnest with third parties before it is too late.

7.     Consistent with its fiduciary duties to all account holders and general unsecured creditors, the Committee will continue working with the Debtors, bidders, and potential plan sponsors to finalize a restructuring transaction and chapter 11 plan in advance of the hearing on the Second Exclusivity Motion. But if no deal is reached, and the substantive terms of a proposed plan are not agreed to, by that date, the Committee will request that the Court deny the Second Exclusivity Motion and terminate exclusivity solely with respect to the Committee to permit the Committee to file its own plan, which it is prepared to do expeditiously following the February 15, 2023 hearing. Under those circumstances, cause will exist to terminate exclusivity solely for the Committee (rather than extend it) because "terminating exclusivity would move the case forward materially, to a degree that wouldn't otherwise be the case." *In re Adelphia Commc'ns Corp.*, 352

B.R. 578, 590 (Bankr. S.D.N.Y. 2006).

## Background

### I.    The Exclusivity Motions

8.      On November 9, 2022, the Debtors filed their *Motion For Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 1317] (the "**First Exclusivity Motion**").  Initially, the Debtors requested that the Court extend their exclusive filing period through and including March 31, 2023 and their exclusive solicitation period through and including May 31, 2023.  First Exclusivity Mot. ¶ 11.

9.      The Committee believed that these lengthy exclusivity extensions were inappropriate in light of the facts and circumstances of these chapter 11 cases and the Debtors' projected liquidity.  The Committee communicated that objection informally to the Debtors and began negotiating a potential consensual resolution of the First Exclusivity Motion.  Ultimately, the parties agreed to a targeted extension of exclusivity through February 15, 2023 for both of the Debtors' exclusive filing and solicitation periods.  The parties further agreed that the Debtors would waive the application of Local Rule 9006-2, which would otherwise automatically extend the Debtors' exclusive periods if they filed a new exclusivity motion by February 15, 2023.  *See* Bankr. S.D.N.Y. L.R. 9006-2.

10.     The Committee filed a statement explaining its decision not to object to the First Exclusivity Motion in light of the terms agreed to by the Debtors and the Committee.  *See* Docket No. 1536 (the "**Committee Statement**").  The Committee noted that the Debtors were making their first request to extend exclusivity, which is generally entitled to some deference; "some additional time" was needed to progress the chapter 11 cases; and certain material contingencies were outstanding that weighed against terminating exclusivity.  Comm. Statement at 3.  Those

contingencies included the submission of bids for sale and restructuring transactions as well as the

pending litigation concerning the ownership of digital assets in the Custody and Earn programs,

the ownership of assets allocated to Withhold accounts, and whether account holders possess

claims against all Debtor entities.  *Id.* at 2-3.  Finally, the Committee explained that it would work

to file its own plan if the Debtors did not file a plan by February 15, 2023.  *Id.* at 4.

11.    On December 8, 2022, the Court entered an order extending the Debtors' exclusive

periods through and including February 15, 2023.  Docket No. 1645 ¶ 2.

12.    On January 25, 2023, the Debtors filed their Second Exclusivity Motion.  By the

Second Exclusivity Motion, the Debtors request that the Court extend their exclusive filing period

through March 31, 2023 and their exclusive solicitation period through June 30, 2023.  Second

Exclusivity Mot. ¶ 12.  While the Debtors assert in the Second Exclusivity Motion that they "have

developed a viable plan framework following a thorough marketing process" that may be filed

"imminently," the Debtors have not filed any plan to date.  Second Exclusivity Mot. ¶ 26.

## II.    <u>Developments in the Chapter 11 Cases</u>

13.    Since the resolution of the First Exclusivity Motion, there have been material

developments in these chapter 11 cases that make it appropriate and necessary to immediately file

a chapter 11 plan.

### A.    <u>The Bidding Procedures</u>

14.    On November 2, 2022, the Court entered an order approving bidding procedures

providing for a two phase bidding and plan sponsorship process: first, for the Debtors' retail

platform, and, second, for the Debtors' remaining assets, including the mining business and the

retail platform if the retail platform was not sold in the first phase.  Docket No. 1272.  The bid

procedures provided for initial bids to acquire the Debtors' assets or to sponsor a chapter 11 plan

to be submitted by November 21, 2022, final bids by December 12, 2022, and an auction on

December 15, 2022, if necessary. *Id.* The auction was recently rescheduled to February 22, 2023 (if necessary) and the sale hearing was scheduled for March 8, 2023. Docket No. 2006.

15.    In accordance with the bidding procedures, the Debtors received multiple bids for substantially all or a portion of the Debtors' assets. Most importantly, the Debtors received a bid from a potential investor (unaffiliated with the Debtors' founders or existing management) regarding a plan structure under which that sponsor would fund the creation of a new company to harvest the value of the Debtors' cryptocurrency, mining business, illiquid investments, and other assets for the benefit of account holders. This new company construct would also contemplate issuing tokens to certain account holders on account of their prepetition claims and evidencing interests in the new company, with the expectation that the new company would be a public reporting company and that the tokens issued by that entity would be freely tradeable.

16.    Though the Debtors and the Committee have been engaged in vigorous negotiations with this potential plan sponsor, there remains substantial work to do to finalize the proposal and bridge the issues between the parties. While negotiations must remain confidential, the Committee notes that the outstanding issues are of critical importance to account holders and their recoveries in these chapter 11 cases. These issues have not been resolved as of the date of this Objection. And it is not assured that the parties will come to terms on a final deal in advance of February 15, 2023.

17.    The Committee believes that the path forward for these chapter 11 cases will be clear based on the status of these negotiations on February 15, 2023. If the parties have reached agreement by that date, the Debtors may file a consensual chapter 11 plan and seek its approval by account holders, other creditors, and the Court. If a final agreement is not reached, the Committee will be prepared to prosecute a different plan shortly thereafter. In either case, a plan can be

promptly filed and proceed to confirmation.

### B.    Resolution of Pending Litigation

18.    In addition, since the resolution of the First Exclusivity Motion, there have been material developments in the litigation that the Debtors previously identified as "gating items" to plan confirmation.  *See* First Exclusivity Mot. ¶ 22 (stating that plan confirmation could not proceed until certain "gating items" were resolved, including litigation over whether Custody, Withhold, and Earn assets are property of the estate and whether account holders can assert claims against every Debtor entity).

19.    *First*, the Bankruptcy Court conducted an evidentiary hearing with respect to issues regarding the Debtors' Custody and Withhold programs on December 7, 2022.  At the end of the hearing, the Court concluded that certain Custody assets are not property of the Debtors' estates and that a subset of digital assets not supported on the Debtors' platform and corresponding to balances associated with Withhold Accounts should be returned to account holders.  *See* Dec. 7, 2022 Hr'g Tr. [Docket No. 1684] at 215.  The Court entered an order providing for the return of Custody assets not subject to preference claims, Custody assets below $7,575, and Withhold assets covered by the Court's ruling [Docket No. 1767], and the Debtors have commenced the process of opening withdrawals for account holders.

20.    *Next*, on January 4, 2023, the Bankruptcy Court entered an opinion and order determining that assets allocated to the Debtors' Earn program are property of the Debtors' estates. *See* Docket No. 1822.  The Bankruptcy Court held that, based on the evidence in the record, the Debtors' terms of use formed a valid, enforceable contract between the Debtors and account holders, and that those terms of use unambiguously transferred title and ownership of the Earn assets to the Debtors prior to the petition date.  *Id.* at 30.  Because Earn assets are estate property, the Court permitted the Debtors to sell a portion of the Debtors' stablecoin holdings to fund the

administration of these chapter 11 cases.  *Id.*

21.    ***Finally***, on February 6, 2022, the Court heard argument with respect to whether the terms of use provide account holders with claims at each Debtor entity.  But resolution of that dispute does not change the fact that preferred equity is out of the money by billions of dollars. There is a multi-billion dollar claim owed by Celsius Network Limited ("**CNL**") (where certain Series B Preferred Equity Holders are equity investors) to Celsius Network LLC ("**LLC**") where account holders unquestionably have claims.  *See Celsius Network Limited Schedules of Assets and Liabilities* [Case No. 22-10966 (MG), Docket No. 7] at 45 (scheduling multi-billion dollar intercompany claim in favor of LLC).  The Examiner also found that LLC was "insolvent since inception," likely making the transfer of customer assets to CNL a constructive fraudulent transfer. Final Examiner Report at 370.  Moreover, the Examiner found that the Debtors did not observe corporate formalities and treated the Celsius group as one consolidated entity, which not only supports a finding of customer claims against every entity under the terms of use but also a finding of substantive consolidation should the issue be pressed.  *Id.* at 208-09 ("Celsius management rarely differentiated among different Celsius legal entities, instead evaluating its financial condition, liquidity needs, and risk on a consolidated basis"); 365-66 ("Celsius's management does not appear to have considered any corporate distinction in their decision-making processes and deliberations when it came to coin deployment or liquidity.  Rather, Celsius generally viewed coins available for deployment on a consolidated basis").

## C.    The Debtors' Liquidity

22.    The Debtors are also projected to hit a liquidity wall in the next few months which would impair their ability to administer these cases and confirm a chapter 11 plan without liquidating more cryptocurrency assets.  Based on the Debtors' cash burn rate and the rate at which professional fees are accruing in these cases, the Committee understands the Debtors' expense rate

and accrued liabilities indicate they could run out of cash by June 2023 unless they sell crypto

assets to meet administrative claims and expenses.[4]  As a result, if the Debtors file a plan and start

the confirmation process at the end of their proposed extended exclusive periods, absent selling

more coins, they likely will run out of cash before they can actually confirm a plan and emerge

from chapter 11.

23.    If a plan is to be successfully confirmed, it needs to be filed and solicited now.

<u>**Objection**</u>

**I.    <u>The Standard For Extending Exclusive Periods</u>**

24.    The Bankruptcy Code limits the period of time during which a debtor has the

exclusive right to file a plan of reorganization and solicit acceptances from creditors. 11 U.S.C.

§ 1121(b), (c).  While the exclusive periods may be extended for "cause," 11 U.S.C. § 1121(d)(1),

the Bankruptcy Code does not give a debtor the unfettered right to extend these periods.  *In re*

*Borders Grp., Inc.*, 460 B.R. 818, 821 (Bankr. S.D.N.Y. 2011) (Glenn, J.).  Instead, the "decision

to extend a debtor's exclusive periods is a serious matter; extensions are not granted routinely or

cavalierly." *Id.* (citing *In re McLean Indus., Inc.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987)).

25.    A debtor bears the "burden of proving cause" to extend exclusivity, and "must

produce affirmative evidence to support a finding of cause." *In re Borders Grp.*, 460 B.R. at 821

(citations omitted); *see also* 11 U.S.C. § 1121(d)(1); *In re GMG Cap. Partners III, L.P.*, 503 B.R.

596, 601 (Bankr. S.D.N.Y. 2014); *In re Dow Corning Corp.*, 208 B.R. 661, 663 (Bankr. E.D. Mich.

1997).  Even if cause is shown, the court retains broad discretion to refuse to extend exclusivity

(or to grant an extension that is shorter than requested by the debtor) since, ultimately, "[s]ection

---

[4]    The Debtors' latest *Public Coins and Budget Report* [Docket No. 1905] projects monthly "restructuring activity" expenses approximating $24 million on average per month.  If that trend continues, the Debtors' projected unrestricted cash balance of approximately $68 million as of the week ending April 14, 2023 could be exhausted by the end of June 2023.

1121 was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors." *In re Curry Corp.*, 148 B.R. 754 (Bankr. S.D.N.Y. 1992) (quoting *In re Timbers of Inwood Forest Assocs., Ltd.*, 808 F.2d 363, 372 (5th Cir.1987)); *see also In re Sharon Steel Corp.*, 78 B.R. 762, 763-65 (Bankr. W.D. Pa. 1987) (explaining that, because section 1121(d) provides that a court "may for cause reduce or increase" the exclusive periods, a court may decline to extend exclusivity notwithstanding a showing of "cause").

26.     "The decision whether to grant an extension of a chapter 11 debtor's exclusivity requires a court to engage in a careful balancing of competing factors" and "a 'consideration of the interest of the many parties involved.'" *In re Borders Grp.*, 460 B.R. at 821 (quoting *In re Ames Dep't Stores, Inc.*, 1991 WL 259036, at *2 (S.D.N.Y. Nov. 25, 1991)).  Courts typically consider the following "*Adelphia* factors":

    a.   the size and complexity of the case;

    b.   the necessity for sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information;

    c.   the existence of good faith progress toward reorganization;

    d.   the fact that the debtor is paying its bills as they come due;

    e.   whether the debtor has demonstrated reasonable prospects for filing a viable plan;

    f.   whether the debtor has made progress in negotiations with its creditors;

    g.   the amount of time which has elapsed in the case;

    h.   whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and

    i.   whether an unresolved contingency exists.

*In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 586 (Bankr. S.D.N.Y. 2006).

27.     Even then, these factors are not determinative.  Instead, the "primary consideration" is whether extending exclusivity would "facilitate moving the case forward.  And that is a practical

call that can override a mere toting up of the factors." *In re Borders Grp.*, 460 B.R. at 827. Put differently, "the ultimate consideration for the Court [is] what will best move the case forward in the best interest of all parties." *In re Excel Mar. Carriers Ltd.*, 2013 Bankr. LEXIS 3920, at *6 (Bankr. S.D.N.Y. Sep. 13, 2013); *accord In re Dow Corning Corp.*, 208 B.R. at 670 (holding that "the primary consideration should be whether or not [terminating exclusivity] would facilitate moving the case forward").

## II. If No Plan Is Filed, Terminating Exclusivity Solely For the Committee Will Be Necessary To Move These Chapter 11 Cases Forward

28.     If the Debtors have not filed a plan or reached agreement with the Committee on the terms of a plan by the February 15, 2023 hearing, it would be inappropriate to extend the Debtors' exclusive filing period through March 31, 2023 and their exclusive solicitation period through June 30, 2023. In that circumstance, cause will exist to terminate the Debtors' exclusivity solely with respect to the Committee as of February 15, 2023. Permitting the Committee to file and prosecute its liquidating plan would help move these cases forward on an appropriate timeline. And limiting the termination of exclusivity to the Committee would ensure that the floodgates are not opened to the filing of plans by all of the Debtors' many creditors.

29.     Given the significant amount of time that has already passed in these chapter 11 cases, February 15, 2023 should be the deadline for the conclusion of the bidding process for the Debtors' assets. The Committee remains hopeful that a transaction with a potential sponsor may be finalized by the date. But extensive negotiations have already taken place. And while the Committee is not free to publicly disclose many details of these negotiations, there are still numerous open issues.

30.     The critical question, then, is whether the parties should continue to negotiate a plan sponsorship transaction or whether to immediately pivot to a liquidating plan. While the

Committee would prefer to achieve a restructuring transaction that distributes greater value than an orderly liquidation, it is not willing to force account holders to wait any longer for a potential restructuring transaction that may not materialize.  Moreover, if that transaction does result in a better recovery than a liquidation, terminating exclusivity solely for the Committee would not cause it to disappear completely.  Rather, it would simply provide another party with an opportunity to pursue a transaction that will bring these cases to a close.

31.    Immediately filing and prosecuting a plan is not only the Committee's preference— it is mandated by the economic circumstances of these cases.  As noted, the Debtors' expense rate and accrued liabilities indicate they could run out of cash by June 2023 unless they sell crypto assets to meet administrative claims and expenses.  If there is not consensus on a particular path forward by February 15, 2023, then, waiting to file any plan until March 31, 2023 is a recipe for administrative insolvency and conversion or dismissal—not the successful consummation of these chapter 11 cases.

32.    In addition, under similar circumstances, courts have determined that it is appropriate to terminate exclusivity solely for a limited set of specified parties to move the cases forward.  Courts have the discretion to limit the termination of exclusivity solely to the additional parties that have the information and wherewithal necessary to draft, file, and solicit a confirmable plan.  *See In re United Press Int'l, Inc.*, 60 B.R. 265, 271 n.12 (Bankr. D.D.C. 1986) (partially lifting exclusivity to allow a committee to file a plan and refusing to permit all creditors to file a plan, which would "open[] the floodgates completely"); *In re New Meatco Provisions, LLC*, 2014 WL 917335, at *4 (Bankr. C.D. Cal. Mar. 10, 2014) (terminating exclusivity and directing committee to file plan by specific date); *In re Pub. Serv. Co. of New Hampshire*, 88 B.R. 521, 539 (Bankr. D.N.H. 1988) (recognizing that, when terminating exclusivity, the court can "control th[e]

13

process in a sensible manner," such as by limiting who may file a plan). And, here, the only additional party that can do so is the Committee.

33.     Accordingly, if the Debtors are not poised to quickly start the clock for solicitation and confirmation by the hearing on the Second Exclusivity Motion, the Court should terminate exclusivity solely with respect to the Committee and permit the Committee to file and prosecute its liquidating plan to move these cases forward. *See, e.g., In re Sharon Steel*, 78 B.R. at 766 ("The leverage accorded to the debtor by the period of exclusivity must give way to the legitimate interests of other parties in interest so that progress toward an effective reorganization of the debtor may be enhanced before it is too late."); *In re GMG Cap. Partners III, L.P.*, 503 B.R. at 601-02 (denying exclusivity extension where, among other things, debtor was "hurtling deeper into insolvency"); *In re United Press Int'l*, 60 B.R. at 271 n.12 (noting that exclusivity was lifted for committee).

### III.     If No Plan Is Filed, the Remaining *Adelphia* Factors Favor Terminating Exclusivity Solely For the Committee

34.     The other *Adelphia* factors weigh towards terminating exclusivity solely for the Committee if the Debtors cannot file a plan by February 15, 2023.

### A.     While the Debtors are Paying Bills When They Fall Due, Customer Assets Are Being Eroded

35.     While, to the best of the Committee's knowledge, the Debtors are paying their unsecured creditors on time, they are depriving customers of access to account balances. Cryptocurrency is volatile. And while prices have risen in the last month, there is no assurance that market prices will continue to rise or maintain their current value, rather than decrease. Further delay has the potential to significantly erode the value of the Debtors' liquid cryptocurrency assets. Courts have held that this factor weighs against extending exclusivity in similar circumstances. *In re Gibson & Cushman Dredging Corp.*, 101 B.R. 405, 410 (E.D.N.Y. 1989) ("If the debtor's assets

are likely to be depleted during the requested extension, it is unlikely that an extension will be granted."); *In re Sharon Steel*, 78 B.R. at 765-66 (denying extension where debtor could not provide assurance that it would be able to continue its operations during the extended exclusive period and its assets were depreciating); *In re SW Oil Co. of Jourdanton, Inc.*, 84 B.R. 448, 454 (Bankr. W.D. Tex. 1987) (denying extension where debtor's financial position deteriorated during first 120-day period).

### B. <u>The Amount of Time That Has Elapsed In These Cases</u>

36.     The amount of time that has elapsed in these chapter 11 cases without any potential plan on file is unique among the many cryptocurrency cases that have filed for chapter 11 within the past year.  Each of Voyager Digital, BlockFi, and Genesis had chapter 11 plans filed on the first day of their cases, including toggle plans.  *In re Voyager Digital Holdings, Inc.*, No. 22-10943 (MEW) (Bankr. S.D.N.Y. July 6, 2022) [Docket No. 17]; *In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Nov. 28, 2022) [Docket No. 22]; *In re Genesis Global Holdco, LLC*, No. 23-10063 (SHL) (Bankr. S.D.N.Y. Jan. 20, 2023) [Docket No. 20].  Although all cases are different, account holders have already waited seven months since the petition date, and eight months since the pause on withdrawals from the Debtors' platform, without any viable restructuring proposal being identified and filed.  The unique issues of these cases including the Debtors' prepetition conduct, loan portfolio, Bitcoin mining company, and other illiquid assets, do not justify further and ongoing delay.  Legal, operating, and tax consequences simply may be too great to overcome.

### C. <u>Whether An Unresolved Contingency Exists</u>

37.     In the Second Exclusivity Objection, the Debtors do not identify any unresolved contingencies that exist, unlike the Debtors' arguments in the First Exclusivity Motion.  *Compare* First Exclusivity Motion ¶ 22, *with* Second Exclusivity Motion ¶ 9.  That is because all of the previous "gating items" to confirmation have now been resolved and do not stand in the way of

immediately filing a chapter 11 plan: (a) the Court determined on January 4, 2023 that Earn assets are property of the Debtors' estates; (b) the Court ruled that Custody assets generally may be returned to account holders, and although the parties are proceeding to Phase II of the Custody litigation, the issues in dispute in Phase II concern account holders' potential preference defenses, which are relevant to the claims resolution process and not to confirmation; (c) the Court also concluded that a subset of digital assets not supported on the Debtors' platform and corresponding to balances associated with Withhold accounts should be returned to account holders; (d) the Court held an evidentiary hearing in the customer claims litigation on February 6, 2023 (prior to the Second Exclusivity Hearing); and (e) the Examiner filed the Final Examiner Report, which exhaustively discusses the Debtors' prepetition operations and misconduct, and which will be of immense help to the post-effective date entity that will pursue litigation claims on behalf of the Debtors' estates under any potential chapter 11 plan.  And while the issue of the entities against which customers have claims remains undecided by the Court, that issue does not preclude the Debtors or the Committee from proposing a plan insofar as: (1) there remains a multi-billion dollar claim owed by CNL to LLC, (2) LLC appears to have been insolvent from inception and the transfer of customer assets to CNL was therefore a constructive fraudulent transfer, and (3) the Examiner found that Celsius did not observe corporate formalities and treated the Celsius group as one consolidated entity, which not only supports a finding of customer claims against every entity under the terms of use but also a finding of substantive consolidation should the issue be pressed.

38.    In light of the foregoing, the time to file a plan is now.  *See, e.g., In re Gen. Bearing Corp.*, 136 B.R. 361, 367 (Bankr. S.D.N.Y. 1992) (terminating exclusivity and holding that "[t]he debtor has not demonstrated that . . . any further delay will enhance its prospects"); *In re R.G.*

*Pharm., Inc.*, 374 B.R. 484, 488 (Bankr. D. Conn. 2007) (terminating exclusivity and noting that

"'[l]itigation with creditors is not an unusual circumstance, and the fact that litigation is pending

with creditors is not in itself sufficient cause to justify an extension of the exclusivity period'").

> **D.    The Debtors Have Offered No Evidence to Support Extending Exclusivity, and the Available Evidence Indicates That Extending Exclusivity Will Jeopardize, Rather Than Support, the Filing of a Viable Plan**

39.    The Debtors have not met their burden that extending exclusivity as requested will

increase the prospects of their filing a viable plan.   That is because the available evidence

demonstrates the opposite.   As set forth above, the Debtors face a looming liquidity cliff in June.

*Supra* ¶ 22.   If the Debtors pursue their current schedule, they simply cannot emerge from

bankruptcy by that time.   The Debtors have not provided evidence that they will be able to raise

the liquidity needed to fund these chapter 11 cases long enough to confirm a plan based on their

current confirmation timetable.   This Court should not entertain the relief requested in these

circumstances as the requested extension undermines, rather than supports, the Debtors' ability to

file a feasible and confirmable plan.[5]

### Reservation of Rights

40.    The Committee reserves all of its rights to supplement or amend this Objection, to

---

[5]    The remaining *Adelphia* factors are either not relevant or have already been addressed by the Committee's argument that terminating (rather than extending) exclusivity solely for the Committee would best progress these chapter 11 cases.   First, while these chapter 11 cases are large and complex, that does not mean it would be "difficult" for the Debtors to "formulat[e] a plan of reorganization" at this time since many material issues in these chapter 11 cases have already been resolved.  *In re Texaco Inc.*, 76 B.R. 322, 326 (Bankr. S.D.N.Y. 1987); *see also supra* ¶¶ 13-21 (describing material developments in these chapter 11 cases following the filing of the First Exclusivity Motion).   Next, while the Committee is continuing to negotiate with the Debtors in good faith and does not believe, at this time, that the Debtors are using the extension of exclusivity to pressure creditors, an extension of exclusivity without a plan on file would unnecessarily lengthen these chapter 11 cases, increase administrative expenses, and therefore harm creditors.   Finally, given the state of negotiations with potential plan sponsors at this time, the remaining factors—the existence of good faith progress toward reorganization; whether the debtor has demonstrated reasonable prospects for filing a viable plan; and whether the debtor has made progress in negotiations with its creditors—do not favor extending exclusivity but instead favor terminating exclusivity solely for the Committee if a deal is not reached by February 15, 2023.   *See In re McLean Indus.*, 87 B.R. at 834 (noting that the "root consideration" when determining whether to extend or terminate exclusivity is whether the debtor has had "reasonable time" to propose its own plan).

raise additional issues with the Second Exclusivity Motion at the hearing, and to present evidence at the hearing.

## Conclusion

41.     For the reasons set forth herein, the Committee respectfully requests that, if the Debtors have not filed a chapter 11 plan supported by the Committee by the hearing on the Second Exclusivity Motion, the Court deny the relief requested in the Second Exclusivity Motion, terminate exclusivity solely with respect to the Committee as of February 15, 2023, authorize the Committee to file the Committee's liquidating plan and disclosure statement, and grant such other and further relief as may be just and proper.

*[Remainder of page intentionally left blank]*

Dated:   February 8, 2023            Respectfully submitted,
New York, New York

/s/ *Gregory F. Pesce*
**WHITE & CASE LLP**
David M. Turetsky
Samuel P. Hershey
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113
Email: david.turetsky@whitecase.com
         sam.hershey@whitecase.com

– and –

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile:  (312) 881-5450
Email:  mandolina@whitecase.com
         gregory.pesce@whitecase.com

– and –

**WHITE & CASE LLP**
Keith H. Wofford
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile:  (305) 358-5744
Email: kwofford@whitecase.com

– and –

**WHITE & CASE LLP**
Aaron E. Colodny (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone: (213) 620-7700
Facsimile:  (213) 452-2329
Email:  aaron.colodny@whitecase.com

*Counsel to the Official Committee of
Unsecured Creditors*