| | |
|---|---|
| Joshua A. Sussberg, P.C. | Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*) |
| **KIRKLAND & ELLIS LLP** | Ross M. Kwasteniet, P.C. (admitted *pro hac vice*) |
| **KIRKLAND & ELLIS INTERNATIONAL LLP** | Christopher S. Koenig |
| 601 Lexington Avenue | Dan Latona (admitted *pro hac vice*) |
| New York, New York 10022 | **KIRKLAND & ELLIS LLP** |
| Telephone: (212) 446-4800 | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Facsimile: (212) 446-4900 | 300 North LaSalle Street |
| | Chicago, Illinois 60654 |
| | Telephone: (312) 862-2000 |
| | Facsimile: (312) 862-2200 |

*Counsel to the Initial Debtors and Debtors in Possession*

*Proposed Counsel to the GK8 Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) Case No. 22-10964 (MG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**DEBTORS' OBJECTION
TO VINCENT J. BURNISKE'S MOTION TO RELEASE
LOAN REPAYMENT OR COLLATERAL DUE UPON LOAN COMPLETION**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this objection (this "Objection") in response to Vincent J. Burniske's ("Mr. Burniske") *Motion to Release Loan Repayment or Collateral Due Upon Loan Completion* [Docket No. 1649] (the "Motion"). In support of this Objection, the Debtors state as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

**Preliminary Statement**[2]

1.  As litigation regarding the Debtors' custody service (the "Custody Program," and the associated accounts, "Custody Accounts") and the Debtors' "Earn" program (the "Earn Program," and the associated accounts, "Earn Accounts") has progressed (and it has become increasingly apparent that Custody Program participants may receive greater recoveries than Earn Program participants), more and more account holders have (understandably) made arguments that they should not be classified as Earn Account creditors. Account holders who utilized the Debtors' borrow service (the "Borrow Program" and such account holders, "Borrowers") have been amongst the most persistent in these efforts.[3]

2.  The movant, Mr. Burniske, contends that he received a margin call on his Borrow Program loan prepetition, during "the pause," and that he responded to the margin call by transferring approximately $32,000 of cryptocurrency to the Debtors' platform to pay off his loan. He further asserts that, following this repayment, the Debtors improperly returned the associated collateral to his Earn Account in violation of the terms of use governing the Borrow Program (the "Loan Terms of Use"). As a result, he requests an order that the Debtors must either (a) return

---

[2] For purposes of this Objection, the Debtors treat the factual allegations regarding Mr. Burniske's account transactions as true. For the avoidance of doubt, the Debtors do not concede any facts in Mr. Burniske's Motion as true.

[3] *See Georges Georgiou's Objection to the Debtors' Amended Motion for Entry of an Order (I) Establishing Ownership of Assets in the Debtors' Earn Program, (II) Permitting the Sale of Stablecoin in the Ordinary Course and (III) Granting Related Relief* [Docket No. 1517] at 23 (arguing that an ambiguity in the Debtors' general terms of use exists as a result of a conflict between the Borrow Program's terms of use and the Debtors' general terms of use); *id*. at 3 (arguing that account holders are the owners of digital assets posted as Borrow Program collateral based on a representation Borrowers were required to make to participate in the Borrow Program); *see also* Immanuel Herrmann's *Omnibus Objection to Court Filings Taking Positions on Which Coins Are Customer Property, D.R. Nos. 855, 737, 760, and 662* [Docket No. 954] at 4–5 (arguing that account holders are the owners of digital assets posted as Borrow Program collateral based on a representation Borrowers were required to make to participate in the Borrow Program).

the cryptocurrency he transferred after the pause to him or (b) return the cryptocurrency that was released to his Earn Account to him.

3. Although he is the first account holder with a hearing on the matter, Mr. Burniske is not alone in his circumstances. Following receipt of Mr. Burniske's Motion, the Debtors consulted their records and determined that there are approximately 3,800 similarly situated account holders—approximately 2,300 account holders' loans (totaling approximately $73.7 million in principal) were closed in this period,[4] and approximately 1,500 users contributed additional collateral (approximately $36.9 million in the aggregate). The Debtors must treat all of these affected account holders similarly to avoid an unjust result, and must look to the Loan Terms of Use to do that. Mr. Burniske appears to agree, basing his Motion on an asserted breach of the Loan Terms of Use. Mr. Burniske, however, misinterprets the contract.[5]

4. Pursuant to the Loan Terms of Use, "[w]ithin ten (10) days of [the account holder's] full repayment of the Principal amount and all outstanding Obligations, Celsius shall release all remaining Collateral to [the account holder's] *Celsius Account*." Loan Terms of Use Version 7 (emphasis added). An account holder's "Celsius Account" was defined as their "account with Celsius set up and maintained pursuant to the [General Terms of Use]." Loan Terms of Use Version 7. As acknowledged in the Motion, the only type of "Celsius Account" available at the time Mr. Burniske took out his loan was a not-yet-named Earn Account (a reward-earning account

---

[4] It is difficult to determine how much additional currency account holders transferred onto the platform to satisfy loan obligations between the start of the pause and the Petition Date. The Debtors estimate, based on (i) the total amount of U.S.-dollar loan closures in the relevant period and (ii) the total number of stablecoins transferred onto the platform in the relevant period by account holders who closed loans in that period, that approximately $59.1 million was transferred onto the platform by users similarly situated to Mr. Burniske.

[5] Mr. Burniske entered his loan agreement with the Debtors on April 29, 2021. At the time, Version 7 of the Loan Terms of Use and Version 5 of the General Terms of Use were in effect. For the reasons described in Section I.A of this Objection, these versions of the Loan Terms of Use and General Terms of Use govern.

3

that later received the title "Earn Account" once the Debtors established the Custody Program). *See* Motion at 1 (describing loans initiated prior to April 12, 2022, as "issued from 'generic' Celsius accounts (*e.g.* only accounts available at time Loans originated)"). Notwithstanding this fact, Mr. Burniske characterizes the account he maintained at the time he took his loan from the Debtors as "one account comprised [of] both Earn and Custody holdings." *See* Motion at 2. Based on this interpretation of the term "Celsius Account," Mr. Burniske accuses the Debtors of improperly returning the excess loan collateral to his Earn Account upon the termination of his loan.

5. Because Mr. Burniske's "Celsius Account" at the time he opened his loan was necessarily an Earn Account, the allegations of a breach of contract in Mr. Burniske's Motion (and any similar arguments advanced by other Borrow Program participants) must fail. While Mr. Burniske's appeals to notions of equity are compelling, his position is inconsistent with his contract, and the Debtors are not in a position to rank relative hardships and grant exceptions at the expense of other account holders. For the same reason, the Debtors cannot acquiesce in the requested relief. Accordingly, the Debtors request that the Court deny the Motion.

**Objection**

**I. The Loan Terms of Use Unambiguously Required the Debtors to Release the Loan Collateral to Mr. Burniske's Earn Account upon the Termination of His Loan.**

6. The Debtors complied with the Loan Terms of Use, which, upon loan repayment, unambiguously required the Debtors to release the digital assets that Mr. Burniske posted as collateral to his "Celsius Account." When a contract's terms are unambiguous, courts generally will apply them as written. *In re Enron Corp.*, 292 B.R. 752, 762 (Bankr. S.D.N.Y. 2003) ("If the contract language is 'unambiguous,' this Court must enforce the plain, ordinary, and common meaning of those terms as a matter of law without reference to extrinsic evidence."); *see also*

4

*In re Allegiance Telecom, Inc.*, 356 B.R. 93, 98 (Bankr. S.D.N.Y. 2006) ("Under New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed.") (internal citations omitted).  When evaluating the parties' intent (and whether a contract is ambiguous), courts are required to consider the circumstances under which the parties entered the contract.  *Dreni v. PrinterOn Am. Corp.*, No. 1:18-cv-12017, 2021 WL 4066635, at *4 (S.D.N.Y. Sept. 3, 2021) ("[I]n deciding whether an agreement is ambiguous courts should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed.  Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby." (quoting *Kass v. Kass*, 91 N.Y.2d 554, 566 (1998))).

    **A.**    **Version 5 of the General Terms of Use Are Incorporated By Reference.**

7.    The General Terms of Use in existence as of the time a Borrower took a loan from the Debtors—which, in Mr. Burniske's case, was General Terms of Use Version 5—are the appropriate version to incorporate into the Loan Terms of Use.

8.    When separate contracts reference one another, the parties are bound by the terms of both contracts.  *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 104 (2d Cir. 2022) ("[I]t is well established that contract terms and other agreements may be incorporated by cross-reference."); *In re Residential Cap., LLC*, 533 B.R. 379, 396 (Bankr. S.D.N.Y. 2015) (MG) ("New York law recognizes that if separate contracts refer to one another, or one incorporates the other by reference, the parties would be bound by the promises in each contract.").  An agreement incorporates another agreement by reference when it describes the second agreement beyond any reasonable doubt.  *In re Lehman Bros. Holdings Inc.*, 970 F.3d 91, 100–01 (2d Cir. 2020) (holding one agreement incorporated a second agreement when the first agreement "specifically identifie[d] the referenced document").  The intent of requiring the parties to describe the incorporated

5

document "beyond a reasonable doubt" is to ensure it is clear that the parties "had knowledge of and assented to the incorporated terms." *Starr Indem. & Liab. Co. v. Brightstar Corp.*, 388 F.Supp.3d 304, 341 (S.D.N.Y. 2019). If a document does not yet exist, it cannot be incorporated into an agreement by reference. *Valley Stream Foreign Cars, Inc. v. Am. Honda Motor Co., Inc.*, 209 F.Supp.3d 547, 553 (E.D.N.Y. 2016) ("It is common sense that a document not yet in existence could not be identified in the [agreement] beyond all reasonable doubt.").

9.    Every version of the Loan Terms of Use incorporated the General Terms of Use by reference via hyperlink to a dynamic page containing the then-effective General Terms of Use. *See Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, Providing Terms of Use Dating Back to February 18, 2018* [Docket No. 393] (providing each version of the Loan Terms of Use, all of which contain links to the General Terms of Use page). Unlike the General Terms of Use, however, the Loan Terms of Use do not contain a provision allowing the Debtors to unilaterally update them and instead imply that the terms in effect at the time of a loan's origination control.[6]   *Compare* Loan Terms of Use Version 7 at 1 ("Celsius Networks Lending LLC . . . provides the following Loan Terms and Conditions . . . that apply to our borrowers . . . **when you seek to initiate a transaction** . . . .") (emphasis added) *with* General Terms of Use Version 5 at 28 ("We may change these Terms, and we may add to or delete from these Terms, and the updated version will supersede all prior versions.") *and* General Terms of Use Version 5 at 28–29 ("The continued maintenance of your Celsius Wallet following the effective date of any change will constitute your acceptance of such change and subject your

---

[6] In fact, later versions of the Loan Terms of Use expressly provide that they *may not* be unilaterally updated. *See*, *e.g.*, Loan Terms of Use Version 8 at 15 ("No alteration, amendment, modification, termination, discharge or waiver of any provision of these Loan Conditions or any other Related Document, or consent to any departure by either party therefrom, shall be effective unless given in writing and signed by both parties.").

6

Celsius Wallet to the modified Terms."). This difference between the Loan Terms of Use and the General Terms of Use addresses the fact that general account holders could exit the platform at any time, but Borrowers were committed to term relationships with the Debtors. *Compare* Loan Terms of Use Version 7 at 3 ("Celsius Loans are granted for a fixed period of time to be agreed upon between Celsius and you, and indicated in the Term sheet.") *and* Loan Terms of Use Version 7 at 4 ("Both you and/or Celsius may, for any or no reason, terminate the Loan with thirty (30) days prior notice in writing to the other party.") *with* General Terms of Use Version 5 at 21 ("If you want to terminate your Wallet with Celsius, you may do so by notifying Celsius at support@celsius.network."). This read of the Loan Terms of Use is consistent with applicable law. *Valley Stream*, 209 F.Supp.3d at 553 ("It is common sense that a document not yet in existence could not be identified in the [agreement] beyond all reasonable doubt."). Therefore, the General Terms of Use *in effect at the time* a Borrower took a loan from the Debtors must be the version incorporated into the Loan Terms of Use. For Mr. Burniske, the applicable version of the General Terms of Use is version 5.

### B. Under the Terms of Use, "Celsius Account" Unambiguously Refers to an Earn Account.

10. Under Version 7 of the Loan Terms of Use, the Debtors committed to return loan collateral to a Borrower's "Celsius Account" within ten days of the Borrower's full repayment of the principal of the loan and any applicable interest or late fees. *See* Loan Terms of Use Version 7 at 4. A Borrower's "Celsius Account" was defined as the "account with [the Debtors] set up and maintained pursuant to the [General Terms of Use]." Loan Terms of Use Version 7 at 1. At the time Mr. Burniske entered into his loan with the Debtors, there existed only one type of account— a reward-earning account that would later be called an Earn Account. *See* General Terms of Use Version 5 ("All Eligible Digital Assets that (1) are not being used as collateral for loans; (2) were

7

not transferred to another Celsius user using CelPay, and (3) were not requested for external transmission (Eligible Digital Assets meeting each of these three criteria, "Held Digital Assets") entitle you to rewards while held with Celsius.").

11.     As such, "Celsius Account" would unambiguously refer to the precursor to an Earn Account, and any Borrower who took a loan prior to the creation of the Custody Program on April 14, 2022—such as Mr. Burniske—could only have expected that collateral would be released back to a reward-earning account, even if the account did not yet have the name "Earn Account." Conversely, the Loan Terms of Use could not reasonably be expected to refer to any other type of account, and no Borrower who took a loan prior to the creation of the Custody Program would have had any such expectation. Therefore, the Debtors' actions comport with the plain language of the Loan Terms of Use, and the Motion should be denied.

## II.  Even If the Loan Terms of Use Were Found to Be Ambiguous, Mr. Burniske's Interpretation Should Be Rejected.

12.     Even if the Court finds that the Loan Terms of Use were ambiguous, the ultimate outcome should be the same. When a contract is ambiguous, interpreting it may require that words be supplied or rejected to clarify the meaning of the contract. *See World Trade Center*, 754 F.3d 114, 122–23 (2d. Cir. 2014) (holding the lower court may imply a term on remand if it found that the parties never considered a potential situation). A court may imply a term where it can be defined "fairly and reasonably" by the "surrounding circumstances and the parties' intent." *Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 784 F.3d 78, 95 (2d Cir. 2015). Where a contract is ambiguous, a court may also consider extrinsic evidence. *In re Lehman Bros. Holdings Inc.*, 445 B.R. 143, 191 (Bankr. S.D.N.Y. 2011) ("Where the Court finds the contractual language ambiguous, it may consider extrinsic evidence of the parties' intent.").

8

13. Here, if the Court finds that the Loan Terms of Use (including the General Terms of Use) are ambiguous as to the meaning of "Celsius Account" for loans originated prior to April 14, 2022, the Court can imply that the loan collateral is required to be returned to the Borrower's Earn Account for the reasons noted above. This interpretation—in addition to necessarily most closely approximating the parties' intent—is supported by extrinsic evidence.

14. Any potential ambiguity as to the meaning of "Celsius Account" was introduced only once the Debtors launched the Custody Program, thereby creating a second type of "Celsius Account." The Custody Program, however, was only implemented on a go-forward basis, meaning that any account holders who wished to maintain their Earn Account could do so. General Terms of Use Version 8 at 3 ("Any eligible digital asset that you loaned to Celsius through the Earn Service prior to the [April 15, 2022] will continue to earn rewards pursuant to the terms herein[.]"). The fact that Earn Program participants would be "grandfathered" into the program was clearly conveyed to account holders through a series of communications, including direct e-mails and a post on the Debtors' official blog. *Supplemental Declaration of Oren Blonstein, Head of Innovation and Chief Compliance Officer of the Debtors, in Support of the Debtors' Motion Regarding Ownership of Earn Assets and the Sale of Stablecoin*, Exhibit G [Docket No. 1584]. In addition to explaining the concept of grandfathering generally, the communications also specifically addressed the implications for outstanding loans: "For users in the United States, all coins posted as collateral against a loan that is opened prior to April 14, 2022, will be returned to their Earn Accounts when the loan is repaid." *Id.*; *Important Celsius Update for Our Users in the United States*, Celsius Network (Apr. 11, 2022), https://celsiusnetwork.medium.com/important-celsius-update-to-our-us-clients-6df471420cc7;

9

15.     Therefore, even if the Loan Terms of Use were ambiguous, Mr. Burniske's proposed interpretation should be rejected, and the Court should find that the collateral securing Mr. Burniske's loan was properly returned to his Earn Account and deny the Motion.

**III.  Even if Mr. Burniske Succeeds on the Merits, Mr. Burniske Is Not Entitled to the Return of Any Digital Assets.**

16.     Even if Mr. Burniske prevails on his argument that the Debtors breached the Loan Terms of Use, this breach would only give rise to a general unsecured claim. *See Memorandum Opinion and Order Regarding Ownership of Earn Account Assets* [Docket No. 1822] at 30 (holding that Earn account holders have "unsecured claims against the Debtors in dollars or in kind" and that such claims may include damages asserted for breach of contract claims). That is, even if the Loan Terms of Use read the way that Mr. Burniske believes, the Debtors breached that contract when they transferred cryptocurrency to his Earn Account instead of his Custody Account, which would be a mere breach of contract claim.

17.     Further, the Court held that allegations that the Debtors breached their contract with a creditor "are explicitly reserved for the claims resolution process." *Id*. at 43. Mr. Burniske has not articulated any basis for varying from this law of the case, which is consistent with applicable law. *See*, *e.g.*, *Order Denying Kulpreet Khanuja's Motion Seeking a Ruling that Personal Earn Assets Are Not Property of the Debtors' Estates* [Docket No. 1934] at 4 (holding that if the creditor "believes he has compensable claims against Celsius (beyond the amount on deposit in his accounts)" based upon the Debtors' alleged breach of contract, "he can file a proof of claim and assert such claims in the claims-allowance process"); *Order Denying Rebecca Gallagher's Motion Seeking a Ruling that All the Coins Deposited in Celsius Earn Are Her Property* [Docket No. 1933] at 2 (same); *Order Denying Kwok Mei Po's Motion Seeking A Ruling of Full Ownership of*

10

*Funds* [Docket No. 1833] at 4 (same). As such, even if Mr. Burniske prevails on the merits, the Motion should be denied.

## **Reservation of Rights**

18.     The Debtors expressly reserve all further substantive or procedural objections to the Motion, including any arguments (i) specific to Mr. Burniske's loan agreement, should he introduce it at a later date and (ii) regarding the appropriate remedy if the Court determines that the Debtors breached Mr. Burniske's contract. Nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or should be construed as (a) an admission as to the validity of any particular claim against the Debtors, (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds, (c) a promise or requirement to pay any particular claim, (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion, (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law, or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

| | |
|---|---|
| New York, New York<br>Dated: February 8, 2023 | */s/ Joshua A. Sussberg*<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>Joshua A. Sussberg, P.C.<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone:   (212) 446-4800<br>Facsimile:    (212) 446-4900<br>Email:           jsussberg@kirkland.com<br><br> - and -<br><br>Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)<br>Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)<br>Christopher S. Koenig<br>Dan Latona (admitted *pro hac vice*)<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Telephone:   (312) 862-2000<br>Facsimile:    (312) 862-2200<br>Email:           patrick.nash@kirkland.com<br>                      ross.kwasteniet@kirkland.com<br>                      chris.koenig@kirkland.com<br>                      dan.latona@kirkland.com<br><br>*Counsel to the Initial Debtors and Debtors in Possession*<br><br>*Proposed Counsel to the GK8 Debtors and Debtors in Possession* |