Dear Chief Judge Glenn:

As you are aware, we have filed an Application for the Appointment of a Chapter 11 Trustee to be heard at the February 15 hearing (See ECF Doc #1975.) Our understanding is that under Bankruptcy Rules 2007.1 and 9014, this Motion is a contested matter.

It is still early in the case. According to XClaim, "While the average length of a Chapter 11 Bankruptcy case can last 17 months, larger and more complex cases can take up to five years. And following the conclusion of the bankruptcy case, it can still take months for Debtors to begin distributing payouts to the highest priority class of Creditors."[1] With another exclusivity extension just being filed now, and a proposed plan that is likely dead on arrival with customers and regulators, there is ample time to right this ship and appoint an independent, neutral trustee who can steer these cases to a just conclusion–and a better-than-even chance that a neutral trustee will not cause any worse delays that the Debtor has already. (For further arguments regarding the lack of progress in these cases, see *inter alia* our ECF Doc #1975, *Application for the Appointment of a Chapter 11 Trustee*, and ECF Doc #2008, *Objection of the Ad Hoc Group of Withhold Account Holders and Other Transferees to the Debtors' Second Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* and )

After filing our application for the appointment of a trustee, we conferred with the Debtors and entered good-faith negotiations under Federal Evidence Rule 408. We were ultimately unable to reach a settlement to resolve the motion or to obtain any discovery whatsoever; the discussions ended with a request from Mr. Latona that we "file whatever you believe is necessary, and the Debtors will respond accordingly."

We are therefore writing to request that this Court compel discovery from the Debtors with respect to our motion (our request for depositions is below), and to inform the Court that we intend to enter evidence into the record in support of our motion, including portions of the Examiner's report. Because of the Debtor's request that we "file" everything, The Movants propose that we file an Exhibit List by February 13 at 11:59pm; that the Debtors may then respond on the 14th by 11:59pm, with any unresolved evidence disputes to be adjudicated at the hearing. (We reserve the right to supplement or amend our Exhibit List and to identify additional exhibits, including but not limited to rebuttal and impeachment exhibits, prior to the conclusion of the Hearing, with such disputes for amendments heard at the February 15 hearing.)

As a core part of our evidence, we intend to rely on the Examiner's report. We understand that the examiner's interviews were not under oath. However, much of the Examiner's report is

---

[1] https://www.x-claim.com/blog/5-reasons-why-it-takes-so-long-for-payout-recovery-in-ch-11-bankruptcy

based on documents, investigations, Slack chat logs, filings on the docket (such as financial disclosures) and other primary source evidence obtained by the examiner.

We ask that the entire Examiner's report be entered into evidence for consideration with regards to this motion; we will agree that any evidence solely from interviews not under oath be disregarded or considered as hearsay (which may be grounds for additional discovery and questioning under oath and/or document requests but is not admissible, on its own, for determining whether there are grounds for a trustee.)

The Debtors are taking the position (in a separate communication not under Rule 408 regarding their exclusivity Motion) that "Judge Glenn stated on the record at the hearing on Feb. 6 that the examiner's report is hearsay and not evidence. The Debtors reserve all rights to object on that basis." If that is indeed true for the entire report, then we request an alternative mechanism to enter this evidence into the record, such as an order turning over to us the primary source documents that were used in preparation of the report, materials including: Slack chat logs, internal emails, etc. that were used to prepare the report.

The below list consists of just a few select examples the type of *primary source* evidence from the Examiner's report we intend to reference and enter into the record, evidence which does not originate from interviews with employees:

- Starting on p. 323 of the Examiner's report, the Examiner references an internal Slack conversation between Mr. Tappen and Mr. Ferraro, stating that "Internal documents reflect that Celsius purchased CEL from top employees in exchange for millions of dollars. In an April 13, 2022 Slack channel discussion between Mr. Tappen and Mr. Ferraro, Mr. Tappen wrote, 'we have paid USD out to top employees totaling $40,154,760.87 due to CEL buybacks . . . top employees being Alex, Daniel, **nuke**, etc . . . .' Mr. Ferraro clarified, 'so we pay in CEL then we buy back what they sell?' Mr. Tappen agreed, 'Correct we let them sell it back to us via the OTC desk.' Mr. Tappen noted that 'if anyone ever found out our position and how much founders took in USD could be a very very bad look . . . We are using users USDC to pay for employees worthless CEL . . . All because the company is the one inflating the price to get the valuations to be able to sell back to the company.'" (Notably, Nuke Goldstein is still in current management as of today, according to the Celsius website, with the job title "President of Labs.")[2]

- Also on p. 323 of the report, the Examiner points out "schedules reflect that Mr. Mashinsky withdrew assets from the platform in mid-May 2022." (Referencing Debtors'

---

[2] https://celsius.network/our-team, accessed 2/8/2023

schedules filed on the docket.)

- On p. 327, referencing internal Slack messages and depositions (rather than interviews), the Examiner reports that "Slack messages between Mr. Ferraro and Mr. Sunada-Wong explained that negative NIM, large investment losses, and lack of other funding 'forced Celsius to post user coins as collateral to borrow stablecoins.' Mr. Ferraro acknowledged that Celsius used its stablecoin holdings 'to buy back coins that were actual losses' and that the amount of those purchases 'was in [the] range' of $300 million. He also confirmed that Celsius used stablecoin as its primary means of funding general business operations (estimated at $500 million) and 'the entire mining asset' (estimated at $600 million), among other things."

- The Examiner's report contains the fact that Mr. David Barse, a member of the Special Committee, is a Preferred Series B shareholder who owns 49 Preferred Series B Shares. (Examiner's Report, Appendix 5, Table of Series A and B Shareholders)

In addition, we intend to enter into the record other evidence under oath or from documents or other writings or videos (i.e. depositions, declarations, news reports, and other filings in the existing record or that we will file on the docket before the hearing).

As part of building an evidentiary record to support our motion, and more generally to inform parties in interest about progress by the Special Committee in these cases, we request, pursuant to FRCP Rule 37, that the Court order depositions of Mr. David Barse and Mr. Alan Carr, to take place no later than February 13. We propose 8 hours per deposition, as follows:
- 2 hours for the Movants
- 2 hours for other *pro se* parties
- 1 hour for the Debtors
- 1 hour for the UCC
- 1 hour for the United States Trustee
- 1 hour for other regulators (such as the state regulators)

We have important discovery to conduct to follow up regarding the examiner's report, the conditions leading up to the appointments of Mr. Barse and Mr. Carr and the activities that took place before and during "the Pause."

The failure of Celsius to pursue the *Voyager* matter in the case *In Re Voyager* is expressly the responsibility of the Special Committee, including Mr. Barse, and is expressly relevant to a finding of cause for the appointment of a trustee. In depositions, Mr. Ferraro made the division of labor crystal clear, stating that "The clawbacks are not in my lane. I don't -- I don't have a say in the clawbacks.· That's, you know, with the special committee and through the bankruptcy

process. So I -- it's not -- it's not something that I focus on."[3]

Mr. Barse, in particular, needs to answer questions about his relationship with Alex Mashinsky, the circumstances around his appointment, and his Preferred Series B Investments. In our view, Mr. Barse's Series B investments create a unique conflict of interest; in a normal bankruptcy, one might expect an executive acting as trustee to be a shareholder of *common stock*–which would largely or fully be wiped out. However, having a *preferred* shareholder representing the Debtors in bankruptcy negotiations uniquely prejudices all other classes of creditors, compared to a neutral *trustee*.

We also request that the Debtors provide us, and the United States Trustee's Office, with corporate records and any and all other records showing who appointed Mr. Barse and Mr. Carr to the Special Committee, and who appointed Mr. Chris Ferraro as Chief Restructuring Officer / Chief Financial Officer, and under what circumstances (noting also that Ferraro was appointed Chief Financial Officer before being appointed Chief Restructuring Officer, and still has the title CFO to this day[4].) If **the original** appointment to the CFO role was made by Mr. Mashinsky, and then Mr. Ferraro stayed on as Chief Financial Officer after Mashinsky stepped down, we need to know about that as well. Under 11 U.S.C § 1104(e) **"**The United States trustee shall move for the appointment of a trustee under subsection (a) if there are reasonable grounds to suspect that current members of the governing body of the debtor, the debtor's chief executive or chief financial officer, **or members of the governing body who selected the debtor's chief executive or chief financial officer, participated in actual fraud, dishonesty, or criminal conduct in the management of the debtor** or the debtor's public financial reporting." (Emphasis added.) If we learn that Mr. Mashinsky was responsible for selecting Mr. Barse, Mr. Carr, and/or Mr. Ferraro for any of their current roles, including for appointing Mr. Ferraro as CFO (a role he still hase), and Mr. Mashinsky participated in actual fraud, dishonesty, or criminal conduct in the management of the debtor, then Mr. Mashinsky is a "member of the governing body who selected the debtor's chief executive or **chief financial officer**" the U.S. Trustee may be required to file a motion for a trustee (or join ours) under 1104(e).

As you likely know, *pro se* claims are not supposed to be dismissed before discovery is able to be conducted, since a claim can "only be dismissed for failure to state a claim if it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' Id., at 520 521, quoting *Conley v. Gibson*, 355 U.S. 41,45 46 (1957)". We do not remember exactly where I read that a *pro se* claim cannot be dismissed before discovery, but it also said that a *pro se* claim was over 5 times more likely to be dismissed before discovery than a lawyer's. This may be why Kirkland felt comfortable simply denying us discovery out of the gate and opposing all of our requests. Not having all evidence collected in advance

---

[3] November 21 Deposition of Christopher Ferraro, p. 338.
[4] See: https://celsius.network/our-team, accessed February 8, 2023

(particularly when there is a very reasonable basis for these requests given the contents of examiner's report) is not grounds to dismiss a claim before discovery, or dismiss it out of hand, since discovery is how evidence is obtained.

Our proposed evidence, depositions, and discovery requests get right to the heart of critical questions in these cases, including:

- evenhandedness or lack of same in dealings with insiders or affiliated entities vis-a-vis other creditors or customers;
- the existence of prepetition voidable preferences or fraudulent transfers;
- unwillingness or inability of management to pursue estate causes of action;
- conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties to the debtor; and
- self-dealing by management or waste or squandering of corporate assets
- evenhandedness or lack of same in dealings with insiders or affiliated entities vis-a-vis other creditors or customers.

We therefore humbly ask that this Court approve our requests.

Respectfully submitted,

*/s/ Daniel A. Frishberg*  
Daniel A. Frishberg  
*Pro Se*  
February 8, 2023

*s/ Immanuel Herrmann*  
Immanuel Herrmann  
*Pro Se*  
February 8, 2023

Cc: Kirkland & Ellis, UCC, Office of the United States Trustee