Immanuel Herrmann, *Pro Se*
Daniel A. Frishberg, *Pro Se*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**PROPOSED WITNESS LIST AND EXHIBIT LIST FOR THE 2/15/23 HEARING ON MOVANTS' APPLICATION FOR THE APPOINTMENT OF A TRUSTEE AND DEBTORS' SECOND MOTION FOR ENTRY OF AN ORDER (I) EXTENDING THE DEBTORS' EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF PURSUANT TO SECTION 1121 OF THE BANKRUPTCY CODE AND (II) GRANTING RELATED RELIEF**

Immanuel Herrmann and Daniel A. Frishberg hereby file their Proposed Exhibit List for the

hearing[2] commencing on February 15, 2023, at 10:00 a.m. (prevailing Eastern Time) (the

"Hearing") as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2] It appears the Debtors have scheduled the hearing as a status conference to help resolve evidence disputes, as we requested. Therefore, we are filing this as a proposed starting point for evidence to enter into the record, and for the types of documents we would like to request discovery of. We also reserve the right to enter evidence below in support of our objections to extending exclusivity, if the doing so is permitted by the Court.

**WITNESSES**

If we are unable to resolve our discovery requests another way, schedule depositions, or

otherwise find a mutually-agreeable resolution to our Motion,[3] we may call the following

witnesses at a future hearing, pending approval by the Court:

David Barse, Alan Carr, Christopher Ferraro

Notably, the Debtors submitted a declaration by Alan Carr in response to our Motion, even

though the concerns we have raised are primarily about David Barse–the Special Committee

member who had a long relationship with Mr. Mashinsky before the bankruptcy (See No. 9 /

Exhibit B).

**EXHIBITS**

| No. | Description | Mark | Offer | Object | Admit | W/D | Docket No. |
|---|---|---|---|---|---|---|---|
| 1 | Final Report of Shoba Pillay, Examiner, 1956 | | | | | | |
| 2 | Interim Report of Shoba Pillay, Examiner, D.R. 1411 | | | | | | |
| 3 | Motion for Order to Show Cause Why the Debtors Should Not Retain Willis Towers Watson, D.R. 2042 | | | | | | |

---

[3] We do not believe this to be an evidentiary hearing or that there will be any witnesses. It appears that the Debtors have consented to a status conference. (See D.R. 2048, p.8.) We reserve the right to cross-examine any witness called by the Debtors or any other party, and to cross-examine any of the Debtors' declarants.

| | | | | | |
|---|---|---|---|---|---|
| 4 | Video Transcript of Celsius Network AMA, July 24, 2020, D.R. 1559 Exhibit A (p. 43) | | | | |
| 5 | Final Report of Shoba Pillay, Examiner, APPENDIX 5, TABLE OF SERIES A AND SERIES B INVESTORS (from D.R. 1956) | | | | |
| 6 | Final Report of Shoba Pillay, Examiner, APPENDIX 2, CELSIUS EXECUTIVE DIRECTORS, EXECUTIVE LEADERSHIP AND OTHER KEY EMPLOYEES (from D.R. 1956) | | | | |
| 7 | Transcript from Celsius Network Limited et al v. Stone et al, 22-01139, D.R. 73 | | | | |
| 8 | "What goes into protecting Assets? - CEL Bites," attached below as Exhibit A | | | | |
| 9 | Transcript - "MOIP Interview with David Barse CEO XOUT Capital, June 17, 2020," attached below as Exhibit B | | | | |
| 10 | Transcript of HEARING re Motion by Celsius Network LLC lifting the automatic stay and granting leave to file late proof of claim, attached below as Exhibit C | | | | |
| 11 | In Re Voyager - Motion to File Proof of Claim After Claims Bar Date / Updated Motion of Celsius Network LLC for Order (I) Lifting the Automatic Stay Pursuant to 11 U.S.C. 362(d)(1) and Bankruptcy Rule 4001 and (II) Granting Leave to File Late Proof of Claim Pursuant to Bankruptcy Rules 3003(c) and 9006(b)(1), D.R. 789, attached below as Exhibit D | | | | |
| 12 | In Re Voyager - Objection to Motion // Objection of the Official Committee of Unsecured to Celsius Network LLCs Motion Seeking an Order (I) Lifting the Automatic Stay Pursuant to 11 U.S.C. § 362(D)(1) and Bankruptcy Rule 4001 and (II) Granting Leave to File Late Proof of Claim Pursuant to Bankruptcy Rule 3003(C) and 9006(B)(1), D.R. 866, attached below as Exhibit E | | | | |
| 13 | In Re Voyager - Objection Debtors' Objection to Motion of Celsius Network LLC for Order (I) Lifting the Automatic Stay Pursuant to 11 U.S.C. 362(d)(1) and Bankruptcy Rule 4001 and (II) Granting Leave to File Late Proof of Claim Pursuant to Bankruptcy Rules 3003(c) and 9006(b)(1), D.R. 867, attached below as Exhibit F | | | | |
| 14 | Declaration of Michael C. Whalen in Support of Debtors' Objection to Motion of Celsius Network LLC for Order (i) Lifting the Automatic Stay Pursuant to 11 U.S.C. 362(d)(10 and bankruptcy rule 4001 and (ii) | | | | |

| | | | | | |
|---|---|---|---|---|---|
| | Granting Leave to file Late Proof of Claim Pursuant to Bankruptcy Rules 3003(c) and 9006(b)(1), attached below as Exhibit G | | | | |
| 15 | Transcript of Christopher Ferraro deposition, November 21, 2022, attached below as Exhibit H | | | | |
| 15 | "Third Avenue Management CEO David Barse Departs," Wall Street Journal, December 14, 2015, attached below as Exhibit I | | | | |
| 16 | "How the Third Avenue Fund Melted Down," Wall Street Journal, December 23, 2015, attached below as Exhibit J | | | | |
| 17 | February 24, 2021 Tweet by Nuke Goldstein: "We give every tool and opportunity to the user to avoid liquidation. We liquidate as a very last resort. Unfortunately there are companies who see this as an opportunity to take profits on the back of their customers. This is bank mentality," attached below as Exhibit K | | | | |
| 18 | April 23, 2021 Tweet by Nuke Goldstein: "@CelsiusNetwork is the only company in the industry that is fighting hard NOT to liquidate it's customers," attached as Exhibit L | | | | |
| 19 | In The Matter Of Determining Whether There Has Been A Violation Of The Uniform Money Services Act Of Washington And Consumer Loan Act Of Washington By: Celsius Network, Inc, No. C-19-2750-19-CO01. Consent Order entered on September 16, 2019 by the State of Washington, Department of Financial Institutions, Division of Consumer Services, attached as exhibit M | | | | |
| 20 | In the Matter of Celsius Network, LLC, Summary Cease And Desist Order entered on September 17, 2021 by the New Jersey Bureau of Securities against Celsius Network LLC , attached as Exhibit N | | | | |
| 21 | Emergency Order to Cease and Desist Order entered on September 23, 2021 by the Commonwealth of Kentucky, Public Protection Cabinet, Department of Financial Institutions, Division of Securities, Exhibit O | | | | |
| 22 | Statement Of Charges And Notice Of Intent To Enter Order To Cease And Desist, To Impose A Fine, And To Charge Costs entered on October 20, 2021 by the State of Washington, Department Of Financial Institutions Securities Division, Exhibit P | | | | |
| 23 | Notice of Hearing seeking entry of Cease and Desist Order dated September 17, 2021, Exhibit Q | | | | |
| 24 | The People of the State of New York vs. Alex Mashinsky dated January 5, 2023, Exhibit R | | | | |
| 25 | Goines v. Celsius Network, LLC, Celsius Lending, LLC, Celsius KeyFi, LLC, Alexander Mashinsky, Shlomi "Daniel" Leon, David Barse, and Alan Jeffrey Carr. Class Action Complaint and Demand for | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | Jury Trial, dated July 13, 2022, Exhibit S | | | | | |
| 26 | Graham, Peter, Topics, Email (March 15, 2022), CEL-UCC-00208695, Document from Examiner Report Footnote 1022* | | | | | |
| 27 | Graham, Peter, May 27 YouTube AMA – Needed Edits, Email (May 27, 2022), CELUCC-00207086*, Document from Examiner Report Footnote 1037* | | | | | |
| 28 | Sunada-Wong, Rodney, Communication Risk, (January 28, 2022) CEL-UCC00208957; Cohen-Pavon, Roni, Re: AMA YouTube Dec 10 -needed edits, Email (January 1, 2022) CEL-UCC-00207526; McCarthy, Tom, Fwd: April 22 YouTube AMA – Needed Edits, Email (June 21, 2022) CEL-UCC-00207932* | | | | | |
| 29 | Celsius, Slack between Tappen, Dean and Ferraro, Chris (April 13, 2022), CEL-UCC0008309 (In an April 13, 2022 Slack channel discussion between Mr. Tappen and Mr. Ferraro, Mr. Tappen wrote, "we have paid USD out to top employees totaling $40,154,760.87 due to CEL buybacks . . . top employees being Alex, Daniel, nuke, etc . . . ." )* | | | | | |
| 30 | Corporate records regarding who appointed Mr. Barse, Mr. Carr, and Mr. Ferraro to their current roles, and who appointed them to all former roles at Celsius (including, but not limited to, who appointed Mr. Ferraro to the CFO role.)* | | | | | |

Documents with a * are requested by the Movants. We reserve the right to ask for more of these documents not in our possession but contained in the Examiner's report, and have requested a status conference at the February 15 hearing to get more discovery, including items included in the Examiner's report, such as Nos. 26-29 above, and discovery about who appointed Mr. Ferraro, Mr. Barse, and Mr. Carr (No. 30 above).

**RESERVATION OF RIGHTS**

The purpose of this proposed witness and exhibit list is to inform the parties of types of materials that we intend to enter into evidence. The Movants reserve the right to supplement or amend this Witness and Exhibit List and to identify additional exhibits and witnesses in the future.

Respectfully submitted,

_s/ Daniel A. Frishberg_                    _s/ Immanuel Herrmann_
Daniel A. Frishberg                         Immanuel Herrmann
February 13, 2023                           February 13, 2023

**Exhibit A: Transcript - What goes into protecting Assets? - CEL Bites**

Accessed at https://www.youtube.com/watch?v=x-X0xmzO8Vg&t=2s on 2/13/2023

Zach Wildes: Alright, everyone's always asking about insurance. But it's not just about having insurance, right? There's a lot that goes into that there, protecting assets.

Alex Mashinsky: Right, so again, people tell you "we have insurance, we have insurance." Well, what does the insurance cover, right? Oh, it covers if we get hacked. If the insurance covers when you get hacked and you have all of the assets sitting in your cold storage, then how are you earning yield, right? Earning yield means you lent out the coins to somebody… to an institution, to a retail user, to an exchange, to DeFi, right? So, so, it's all about managing the risk and managing the deployment. Like Nuke needs to worry about multi-sig and how do I manage keys on exchanges or on DeFi on or wherever else to make sure that the coins come back to us, right? And that's all that matters. If, if you see that our wallets have $5 billion in assets, 5 out of 6 are sitting in our wallets and we keep paying you interest, you should be super worried.

Nuke Goldstein: And by the way one of the benefits of moving to MPC is that insurers actually are willing to insure hot wallets.

Alex Mashinsky: That's right.

Nuke Goldstein: So we have, uh, I think a 30…

Alex Mashinsky: 30 million dollar insurance

Nuke Golstein: and we're increasing it to 100…

Alex Mashinsky: The only ones, the only ones with a hot wallet insurance…

Nuke Goldstein: Yes.

Alex Mashinsky: Because like Nuke said we have MPC

Nuke Goldstean: Yeah.

Alex Mashinsky: So again so the point is is you want to see deployment, you want to see no hacks, you want to see, uh MPC and all that stuff coming in, you want to see full transparency like proof of community and so on and so on and, and, and otherwise what kind of business is this? Again, BlockFi loses money on every transaction they're just trying to make it up in volume when they go public.

Nuke Goldstein: It's very Silicon Valley-esque.

Alex Mashinsky: Exactly.

DECLARATION WITH RESPECT TO THE ABOVE TRANSCRIPT

I, Immanuel Hermann, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the transcript appearing above is a true and correct transcript of the video at https://www.youtube.com/watch?v=x-X0xmzO8Vg&t=2s, accessed by me and transcribed by me on February 13, 2023.


*s/ Immanuel Herrmann*
Immanuel Herrmann
February 13, 2023

**Exhibit B: Transcript - MOIP Interview with David Barse CEO XOUT Capital, June 17, 2020**

Intro

Alex Mashinsky: Welcome everybody to another episode of MOIP or money over Internet Protocol, and today I have a special guest somebody I've known for a very long time, David Barse, who spent most of his career on Wall Street and can tell us a lot of the things that you guys want to know, so I'll be asking him a bunch of questions and hopefully he'll give us all the all the inside knowledge that he collected in 30-something years being on Wall Street. Thank you David for joining.

David Barse: It's my pleasure to be here, especially for you Alex.

DECLARATION WITH RESPECT TO THE ABOVE TRANSCRIPT

I, Immanuel Hermann, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the transcript appearing above is a true and correct transcript of the video at https://www.youtube.com/watch?v=x-X0xmzO8Vg&t=2s, accessed by me and transcribed by me on February 13, 2023

*s/ Immanuel Herrmann*
Immanuel Herrmann
February 13, 2023

**Exhibit C**

<div align="right">Page 1</div>

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 22-10943-mew

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    VOYAGER DIGITAL HOLDINGS, INC.,

8

9         Debtor.

10    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12              United States Bankruptcy Court

13              One Bowling Green

14              New York, NY  10004

15

16              January 24, 2023

17              11:03 AM

18

19

20

21    B E F O R E :

22    HON MICHAEL E. WILES

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO:  KB

Page 2

1    HEARING re Motion by Celsius Network LLC lifting the

2    automatic stay and granting leave to file late proof of

3    claim Objections filed

4

5    HEARING re Second motion extending the Debtors' exclusive

6    periods to file a chapter 11 plan and solicit acceptances

7    thereof and granting related relief

8    ***CERTIFICATE OF NO OBJECTION FILED***

9

10   HEARING re Application authorizing the retention and

11   employment of Katten Muchin Rosenman LLP as special counsel

12   for Debtor on behalf of and at the sole direction of the

13   independent director, effective as of November 11, 2022

14   ***CERTIFICATE OF NO OBJECTION FILED***

15

16   HEARING re Application authorizing the retention and

17   employment of ArentFox Schiff LLP as special counsel

18   effective as of November 10, 2022

19   ***CERTIFICATE OF NO OBJECTION FILED***

20

21   HEARING re Application authorizing the retention and

22   employment of Potter Anderson & Corroon LLP as Delaware

23   counsel effective as of November 30, 2022

24   ***CERTIFICATE OF NO OBJECTION FILED***

25

Page 3

1   HEARING re Final hearing RE: motion authorizing the Debtors

2   to continue to operate their cash management system, honor

3   certain prepetition obligations related thereto, maintain

4   existing business forms, and continue to perform

5   intercompany transactions, granting superpriority

6   administrative expense status to postpetition

7   intercompany balances, and granting related relief

8   Limited objection filed

9   Adjourned Reset for 02/07/2023 at 10:00 am

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

Page 4

```
 1    A P P E A R A N C E S :

 2

 3    KIRKLAND & ELLIS LLP

 4          Attorneys for the Debtor

 5          601 Lexington Avenue

 6          New York, NY 10022

 7

 8    BY:  ALLYSON SMITH

 9

10    KATTEN MUCHIN ROSENMAN LLP

11          Attorneys for the Debtor

12          575 Madison Avenue

13          New York, NY, 10022

14

15    BY:  SHAYA ROCHESTER

16

17    UNITED STATES DEPARTMENT OF JUSTICE

18          Attorneys for the U.S. Trustee

19          201 Varick Street, Suite 1006

20          New York, NY 10014

21

22    BY:  RICHARD MORRISSEY

23

24

25
```

**Page 5**

```
 1    ARENT FOX SCHIFF

 2         Attorneys for Scott Vogel, as the Independent Director

 3         of Voyager Digital Holdings, Inc.

 4         1301 Avenue of the Americas

 5         New York, NY, 10019

 6

 7    BY:  JEFFREY GLEIT

 8

 9    PAUL HASTINGS

10         Attorneys for Voyager Digital Holdings, Inc., et al.

11         71 South Wacker Drive

12         Chicago, IL, 60010

13

14    BY:  MATTHEW MURPHY

15         MICHAEL C. WHALEN

16

17    AKIN GUMP STRAUSS HAUER & FELD LLP

18         Attorneys for Celsius Network LLC

19         One Bryant Park

20         New York, NY 10036

21

22    BY:  MITCHELL P. HURLEY

23         DEAN CHAPMAN

24

25
```

Page 6

1    MCDERMOTT WILL & EMERY LLP

2         Attorneys for Official Committee of Unsecured Creditors

3         of Voyager Digital Holdings, Inc., et al.

4         340 Madison Avenue

5         New York, NY 10173

6

7    BY:  DARREN AZMAN

8

9    ALVAREZ AND MARSAL

10        Attorneys for Celsius Network LLC

11        540 West Madison Street

12        Chicago, IL, 60661

13

14   BY:  HOLDEN BIXLER

15

16   CHRIS FERRARO, Celsius

17

18   ALSO PRESENT TELEPHONICALLY:

19   DANIEL M. EGGERMANN

20   ETHAN TROTZ

21   ERIC REUBEL

22   LAUREN KELLY GREENBACKER

23   RICHARD COCHRANE

24   ANGELA HERRING

25   BENJAMIN NICKERSON

Page 7

```
 1    GREGORY PESCE

 2    TOM ST. HENRY

 3    ADAM SWINGLE

 4    BENJAMIN BELLER

 5    DAVID TURETSKY

 6    RICK ARCHER

 7    STEVEN REISMAN

 8    MARTIN ALLOCATI

 9    LETICIA SANCHEZ

10    JEFF STAPLETON

11    COURTNEY STEADMAN

12    VICTOR UBIERNA DE LAS HERAS

13    JASON DIBATTISTA

14    CATHY TA

15    TAYLOR HARRISON

16    RANDALL PULMAN

17    ERIK HANNER

18    LUKE PORCARI

19    DUSTIN PETERSON

20    SUSAN GOLDEN

21    CHRISTINE OKIKE

22    CHRISTOPHER SAMIS

23    KATHERINE SCHERLING

24    JASON ROSELL

25    NACIF TAOUSSE
```

1   JONATHAN WEICHSELBAUM

2   MICHAEL SLADE

3   NATALIE THOMPSON

4   MARCIO FERREIRA

5   MATTHEW CHERRY

6   LISA PROVINO

7   TRACY HENDERSHOTT

8   JACOB BALTAYTIS

9   KELLY MOYNIHAN

10   PAUL ROSENBLATT

11   JAMES NANI

12   CAROLINE ELLIS

13   JOSEPH EVANS

14   CHARLES GIBBS

15   GREGG STEINMAN

16   GRAYSON WILLIAMS

17   CRAIG RASILE

18

19

20

21

22

23

24

25

1                  P R O C E E D I N G S

2            THE COURT:  Good morning, everybody.  Are the

3      parties ready on the Voyager matter?

4            MS. SMITH:  Good morning.  Yes, Your Honor.

5            THE COURT:  (Indiscernible) --

6            MS. SMITH:  For the record -- I apologize.  For

7      the record, Allyson Smith from Kirkland and Ellis, counsel

8      to the Debtors.  We only have a handful of matters on the

9      agenda today, most of which are uncontested and for which we

10     filed certificates of no objection.  So unless Your Honor

11     prefers to proceed differently, I propose addressing those

12     first and then turning to the Celsius matter.

13           THE COURT:  Yes, I think that makes sense.

14           MS. SMITH:  Okay.  Great.  Thank you, Your Honor.

15     Skipping down then to Agenda Item Number 2, Debtor Voyager

16     Digital LTD's application to retain Katten as special

17     counsel on behalf of its independent director.  In support

18     of the application, three declarations were filed, the

19     original by Mr. Steve Reisman, one supplemental by him

20     disclosing rate changes, and one by Mr. Matt Ray.  We'd ask

21     that those three declarations be moved into evidence absent

22     objection.

23           THE COURT:  Are there any objections to the

24     admission of the declarations into evidence?  Does anyone

25     wish to cross-examine the declarants?  All right.  The

1      objections are -- excuse me, the declarations are admitted.

2              MS. SMITH:  Thank you.  We received no formal or

3      informal objections.  And as I noted, we did file the CNO on

4      Friday.  Unless the Court has any questions or concerns to

5      address, we would ask that this application be granted.

6              THE COURT:  As to the Katten Muchin application,

7      if I recall correctly, there were some Creditors of TopCo

8      who raised some issues in connection with the plan that was

9      previously proposed about how some of the arrangements would

10     be treated, and whether it was fair to TopCo.  Who were

11     those Creditors?  Can you remind me?

12             MS. SMITH:  I believe it may -- you may be

13     referred to the equity holders and --

14             THE COURT:  (Indiscernible).

15             MS. SMITH:  -- referencing the intercompany

16     obligations?

17             THE COURT:  Yeah, maybe it was equity holders.  I

18     can't remember.

19             MS. SMITH:  Yeah, and that's actually precisely

20     what Katten is being retained to assist in that analysis as

21     to whether certain intercompany obligations are more

22     properly categorized as capital contributions or loans.

23             THE COURT:  But the declaration says that Katten

24     also represents some people who hold debt of TopCo and may

25     continue to represent them in connection with trading

Page 11

1    activities involving such debt.  Is that right?

2            MS. SMITH:  I believe the declaration states they

3    just represent a trade Creditor that has a pre-petition

4    claim of less than 75,000, and they've implemented screening

5    measures to wall off those representations.

6            THE COURT:  Hang on.  I'm not sure that's exactly

7    -- was that Otter Anderson or was that Katten Muchin?

8    Katten Muchin just says that they have represented certain

9    holders of TopCo debt in connection -- and will -- may

10   represent them in connection with trading activity involving

11   such debt.  Is Katten on the phone?  They can tell us what

12   that is.

13           MR. ROCHESTER:  Yes, Your Honor.  For the record,

14   Shaya Rochester from Katten Muchin.  In the recent

15   declaration that was filed at Docket 718, there are specific

16   disclosures in Paragraph 25A.  And there's a reference to

17   representing a trade Creditor of TopCo that has a pre-

18   petition (indiscernible) as Ms. Smith said, and screening

19   procedures are put in place.  That is the only connection

20   other than that and then what was in B in terms of

21   representation of trade Creditors.

22           THE COURT:  And is there any matter other than

23   these intercompany matters for which Katten would be

24   retained?

25           MS. SMITH:  No, Your Honor.

Page 12

```
 1              THE COURT:  Does TopCo have separate assets that
 2    would enable it to pay counsel here?
 3              MS. SMITH:  I believe they do have a limited
 4    number of assets.
 5              THE COURT:  Okay.  And it's only TopCo that would
 6    be obligated on this obviously, correct?
 7              MS. SMITH:  Correct.
 8              THE COURT:  All right.  Does the U.S. Trustee have
 9    any issue with this?
10              MR. MORRISSEY:  Your Honor, Richard Morrissey for
11    the U.S. Trustee.  The U.S. Trustee has reviewed all the
12    declarations and has no objection.  Thank you.
13              THE COURT:  Okay.  I think I would like the order
14    to be a little more specific as to just what Katten Muchin
15    is going to be doing because it's not at all clear.  It's a
16    rather vague description in the papers.  If it's going to be
17    looking at the intercompany claims, then it should
18    correspond to the more specific order that you had for
19    ArentFox in that regard.  Okay?
20              MS. SMITH:  Of course.  We can certainly revise
21    the order, Your Honor, and resubmit.
22              THE COURT:  As to ArentFox, that affidavit says
23    that ArentFox represents the National Women's Soccer League
24    in these --
25              MS. SMITH:  Yes.
```

Page 13

1           THE COURT:  -- cases.  Is that correct?

2           MS. SMITH:  Yes, but my understanding is that they

3   obtained a conflict waiver from the Women's Soccer League.

4           THE COURT:  Does the U.S. Trustee have any issue

5   in that regard?  Mr. Morrissey?

6           MR. MORRISSEY:  I'm sorry, Your Honor.  I was on

7   mute.  The U.S. Trustee has no objection to that, and

8   accepts the fact that ArentFox did receive a waiver.

9           MR. GLEIT:  And Your Honor, it's Jeff Gleit from

10  ArentFox.  May I be heard?

11          THE COURT:  Yes.

12          MR. GLEIT:  Okay.  Your Honor, just in addition to

13  the waiver, we also have an ethical law.  So the attorneys

14  working on the Voyager matter on behalf of the independent

15  director are not involved with anything to do with the

16  National Women's Soccer League.

17          THE COURT:  All right.  Very good.  I'll approve

18  those two retentions, and I don't have any issue as to

19  Potter Anderson.  (Indiscernible) case, obviously you need

20  to have counsel there.

21          MS. SMITH:  Thank you, Your Honor.  We'll get the

22  revised Katten order submitted to you shortly after this

23  hearing.

24          THE COURT:  Okay.

25          MS. SMITH:  Moving then to the last item prior to

Page 14

1   turning it over to Celsius is our exclusivity extension

2   motion.  The Debtors are seeking to extend the exclusivity

3   period another 60 days to March 3rd, which as you know is

4   right after our scheduled confirmation hearing on the 2nd.

5   We did negotiate this with the Committee prior to filing it

6   in December, and the filed document incorporated their

7   comments.  Otherwise, no objections or comments were

8   received, and a CNO was also filed on Friday.  So unless

9   Your Honor has any additional questions, we would ask that

10  this order be entered.

11          THE COURT:  Okay.  Is there anybody on the phone

12  that wishes to be heard on this?  Okay.  I'll enter the

13  order.  Just submit it to chambers.

14          MS. SMITH:  Thank you, Your Honor.  Will do.  With

15  that then, I am going to cede the podium to the Paul

16  Hastings team, who will be handling the remaining matter.

17          THE COURT:  Okay.

18          Thank you, Allyson.  Good morning, Your Honor.  My

19  name is Matt Murphy from Paul Hastings.  Before turning it

20  over to my colleague Mike Whelan, I just wanted to address

21  with the Court and the Office of the United States Trustee

22  it was my expectation to get our retention application on

23  file last week.  That obviously did not happen, and my

24  apologies to both Mr. Morrissey and the Court.  My

25  expectation is that that will be on file today.

Page 15

```
 1              It is -- as Your Honor may recall, we were
 2      operating or have been operating as ordinary course
 3      professional counsel.  Given the scope of our involvement,
 4      we must at this point file a retention application to be
 5      separately retained.  And the scope is as it relates to
 6      special regulatory counsel and then conflicts counsel as it
 7      relates to this discrete issue with Celsius.  I just wanted
 8      the Court to be aware that -- and Mr. Morrissey to be aware
 9      that that is forthcoming.
10              THE COURT:  All right.
11              MR. MURPHY:  Mike, I'll turn it over to you.
12              THE COURT:  I assume nobody on the phone has any
13      objection to Mr. Murphy speaking on behalf of Voyager.
14              MR. MORRISSEY:  Your Honor, Richard Morrissey for
15      the U.S. Trustee.  I have no particular objection, but I
16      think it would be helpful for the Court to know, and I don't
17      know one way or another right now not having seen a
18      retention application, whether Paul Hastings has represented
19      any entity or individual in connection with Celsius.  I just
20      want to make sure that there's conflict issue going in
21      before we hear the argument.  Thank you.
22              MR. MURPHY:  Yeah.  The retention application will
23      show that Paul Hastings represents certain individuals in
24      the C Suite I guess is how I'll say it as it relates to
25      ongoing investigations and civil litigation matters
```

Page 16

1    unrelated to this matter.

2           MR. MORRISSEY:  Now, just to be clear, and I mean

3    to address Your Honor but addressing Mr. Murphy, the C --

4    this is the C Suite of Celsius?

5           MR. MURPHY:  That's right.

6           MR. MORRISSEY:  Okay.  The U.S. Trustee can't take

7    a position on that, you know, not having seen the

8    explanation, but it certainly is a concern.

9           MR. MURPHY:  Understood and happy to discuss

10   further once we get the application on file.

11          THE COURT:  Mr. Hurley, were you about to say

12   something?

13          MR. HURLEY:  Good morning, Your Honor.  Mitch

14   Hurley with Akin Gump Strauss Hauer and Feld.  I wasn't -- I

15   guess I was going to wait until Your Honor was ready for me,

16   but I am ready to proceed whenever you want me to.

17          THE COURT:  Let me just ask as a preliminary

18   matter.  Do you both agree that any preference claims

19   against Voyager here would relate to transfers that pre-

20   dated Voyager's bankruptcy case and therefore would be

21   unsecured claims in the Voyager case?

22          MR. HURLEY:  So Celsius filed its bankruptcy case

23   about a week after Voyager's bankruptcy petition was filed.

24   It's -- I guess it's at least conceivable that a withdrawal

25   could've happened during the period after Voyager's petition

Page 17

1    was filed and before Celsius' was filed.  I confess I don't

2    have that information at my fingertips.  But to the extent

3    the withdrawals and the transfers were prior to Voyager

4    petition being filed, I would agree, Your Honor.

5              THE COURT:  Thank you.  I looked at your -- the

6    declarations you submitted in that regard and I think they

7    were all before the Voyager filing date, but I could be

8    wrong.

9              MR. WHALEN:  Yes, Your Honor.  Michael Whalen from

10   Paul Hastings on behalf of Voyager.  We would take that

11   position, and that's our understanding of the timing as

12   well.

13             THE COURT:  So we're talking about a potential

14   $5.9 million unsecured claim as well as I guess under 502(d)

15   an issue as to about -- potential issue as to about 1.1

16   million or so of items that remain with Celsius.  Is that

17   correct?

18             MR. WHALEN:  The total amount of the claim in the

19   90-day preference period, Your Honor, we understand is 7.7

20   million, but your numbers are obviously approximately right.

21             THE COURT:  Can somebody from Paul Hastings help

22   me out?  I thought I saw it was 5.9 that was withdrawn

23   because the total account was more like $7 million if I got

24   the numbers wrong.

25             MR. MURPHY:  Your Honor, we have a somewhat

Page 18

1    different accounting internally, and it's our view on the

2    Voyager side that we would have to, you know, rectify that

3    if a claim is filed, but those numbers are approximately

4    right in the realm of 7.7.  There's some uncertainty as to

5    how Celsius is treating those figures from our end, which is

6    understandable.  We haven't seen their books and records,

7    they haven't seen ours, but we do contend that there's about

8    1.1 million still caught, for lack of a better word, on

9    Celsius' platform.

10          The remainder of any assets have made it into

11   Voyager's possession.  That 1.1 million is in what's called

12   a withhold account, and it's our understanding that it's

13   Celsius' position that we have right and title over those

14   funds, but there is 1.1 million that's sort of in a little

15   bit of a limbo.

16          THE COURT:  All right.  And in your papers on

17   behalf of Voyager, Mr. Murphy, you've argued that any such

18   claim would be a huge portion of Class 4A, but aren't the

19   recoveries for Class 4A under the pending plan calculated by

20   reference to the larger pool that includes other types of

21   customer claims?

22          MR. WHALEN:  This is Michael Whalen again, Your

23   Honor.  Yes, and that is a point that we would like to

24   clarify.  It is true we believe, and we don't believe that

25   Celsius has contested this, that their claim would fall into

1   Class 4A.  And yes, they will be treated in the aggregate

2   with Class 3, the account holder claims.  But the point that

3   we were trying to make is that they will constitute a large

4   portion of a class that could be subject to disparate

5   treatment.  They are not under the plan.  We don't

6   anticipate that that will be the case.

7           And we certainly don't think that will happen, but

8   it -- based on the negotiations and the understanding of the

9   relative creditor classes when this plan was formed, it was

10   a Class 4A that had about $14 million in claims, and now

11   that's going to go up to 21 and change.  So that was the

12   point that we were trying to make.  I think our overriding

13   point is that while that is a huge portion of Class 4A and

14   should be considered, there are other factors that go into

15   the prejudice equation as well.  So that's one piece of the

16   pie on prejudice.

17           THE COURT:  But in terms of what you need to do to

18   make distributions and things like that, that's a drop in

19   the bucket, isn't it?

20           MR. WHALEN:  It is a small amount relative to the

21   Class 3 size, but we think a law in the Southern District

22   and cases from Your Honor as well express the notion that

23   prejudice is not reduceable merely to the size of the claim,

24   and that there are other considerations, such as the

25   expectations of Creditors that did file by the bar date

Page 20

1     that's also relevant.  But yes, Your Honor.

2              THE COURT:  Is there any other evidence on the

3     issues here that the parties think they need to gather and

4     to present to me, or that they would like to gather and

5     present to me?

6              MR. AZMAN:  Your Honor, it's Darren Azman from

7     McDermott Will and Emery from the Committee.  We would like

8     to cross all three of the declarants that submitted

9     declarations in support of the motion, but that's the only

10    additional evidence that we would like to introduce.

11             THE COURT:  Okay.  How about on behalf of the

12    Debtors or on behalf of Celsius?

13             MR. HURLEY:  Not on behalf of Celsius, Your Honor.

14             MR. MURPHY:  The Debtor -- Your Honor, with

15    respect to the Debtors, I think it's our position that

16    Celsius did not carry their burden to establish either form

17    of relief, but we'll be attentive to the cross and would

18    reserve our rights to participate in the cross, but we'll

19    allow the Committee to take the lead there.

20             THE COURT:  All right.  Well before I ask my own

21    questions about the underlying issues, maybe we should get

22    the evidentiary record set.  And so is it your intent to

23    offer the declarations into evidence, Mr. Hurley?

24             MR. HURLEY:  It is, Your Honor.

25             THE COURT:  All right.  Then maybe we should do

Page 21

1    that one by one, and we should hear the cross-examinations.

2              MR. HURLEY:  Okay.  So there are two fact witness

3    declarations, Mr. Bixler and Mr. Ferraro.  I also put in a

4    declaration.  I'm not sure if I correctly understood that

5    McDermott -- that the UCC counsel also wants to cross-

6    examine me, but why don't we start with the fact witnesses?

7    So Chris Ferraro is the acting CEO of Celsius and submitted

8    a declaration, and Mr. Ferraro is available and on this case

9    for cross-examination.  And Your Honor, we would offer his

10   declaration into evidence.

11             THE COURT:  Let's start with does anybody object

12   to the admission of the declaration into evidence?  All

13   right.  The declaration is admitted into evidence.  Is there

14   anybody other than the Committee who wishes to cross-examine

15   Mr. Ferraro?  All right.  Mr. Ferraro, I'm going to let the

16   Committee cross-examine you.  Do you understand that the

17   answers that you give to their questions are to be given by

18   you under oath.  And do you swear that the testimony you're

19   about to give is the truth, the whole truth, and nothing but

20   the truth?  Mr. Ferraro, are you there?  Is he on a speaking

21   line?  Is he muted?

22             MR. FERRARO:  -- mute.  Can you hear me, Your

23   Honor?

24             THE COURT:  I can now, yes.  I couldn't before.

25             MR. FERRARO:  Sorry.  I'm learning the Court

Page 22

1    Solutions site.  I apologize.

2              THE COURT:  No problem.  Do you swear that the

3    answers to the questions you're about to give will be the

4    truth, the whole truth, and nothing but the truth, so help

5    you God?

6              MR. FERRARO:  Yes, I do, Your Honor.

7              THE COURT:  All right.

8              MR. HURLEY:  Your Honor, before we begin, it's

9    Mitch Hurley again.  My partner Dean Chapman is on the line,

10   and Mr. Chapman is going to handle the cross, objections,

11   and any redirect if necessary with the Court's permission.

12             THE COURT:  Very good.

13             MR. CHAPMAN:  Good morning, Mr. --

14             THE COURT:  Go ahead.

15             MR. CHAPMAN:  Thank you, Your Honor.

16             CROSS-EXAMINATION OF CHRIS FERRARO

17   BY MR. CHAPMAN:

18   Q    Good morning, Mr. Ferraro.

19   A    Good morning.

20   Q    In Paragraph 8 of your declaration, you make a

21   conclusion that the bar date notice should've been provided

22   to Celsius US and Celsius EU instead of Celsius UK  Is that

23   right?

24   A    Yes, sir.

25   Q    And in Paragraphs 6 and 7, you acknowledge that the bar

Page 23

1    date notice was sent to Celsius UK, but you say that it was

2    an out-of-date address.  That's right?

3    A    Yes, sir.

4    Q    When did Celsius UK move out of that address?

5    A    On March 20, 2020 we filed the change of registered

6    address to 1 Bartholomew Lane, London.

7    Q    And is that when -- sorry, was there more there, Mr.

8    Ferraro?

9    A    No.

10   Q    When did Celsius completely vacate that property?

11   A    To my understanding right around that time.  I wasn't

12   with the company at that time.

13   Q    Okay.  Can you tell me about the relationship between

14   Celsius US, Celsius EU, and Celsius UK?

15   A    Yeah.  The parent company would be UK and subsidiaries

16   US and EU.

17   Q    And at the time that the bar date notice was sent to

18   what you described as the wrong address, and that was around

19   September 23, 2022, did Celsius US have any employees or

20   agents or any contractors who also performed functions for

21   either Celsius EU or Celsius UK?

22   A    I don't know the answer to that, sir.  I mean, we work

23   across -- we have a pool of employees that work across the

24   EU entities.

25   Q    Okay.  So it wouldn't surprise you if there were a

Page 24

1   number of employees at Celsius, you know, the global

2   organization, that worked across Celsius U.S., Celsius EU,

3   and UK?  That wouldn't surprise you?

4   A    No, sir.

5   Q    Okay.

6   A    That wouldn't.

7   Q    Do you know if there are any shared officers or

8   directors between those three entities?

9   A    I don't have that in front of me.  I apologize.

10  Q    Okay, but that's possible?

11  A    Yes, it's possible.

12  Q    Okay.  What do you believe is the correct address that

13  Voyager should've mailed the bar date notice to?

14  A    Our address in Hoboken, sir.

15  Q    And how would Voyager have known that this was the

16  correct address?

17  A    Well, as part of the addendum, you know, part of that

18  was assigning the rights to Celsius US from Celsius UK.  So

19  I would say disclosure and execution of the addendum would

20  raise that kind of knowledge.  Our address is listed on the

21  website.

22  Q    Okay.

23  A    Our Hoboken address.

24  Q    You are referring to the assignment agreement.  Is that

25  correct?

1   A     Yes, sir.

2   Q     Is there any address that's -- to your knowledge that's

3   -- do you have that assignment agreement in front of you, by

4   the way?

5   A     I do not have it in front of me.  I did read through

6   it, but it's not in front of me.

7   Q     Okay.  Is there an address anywhere in that agreement?

8   A     Not that I remember offhand.

9   Q     Okay.  I'll represent to you and the Court that there

10   is no address in the assignment agreement.

11          MR. CHAPMAN:  And I believe that the Debtor has

12   uploaded a revised declaration shortly before the hearing

13   that has the unredacted versions of those agreements, Your

14   Honor.  So you should have those in full in front of you.

15          THE COURT:  Let me just ask Celsius' counsel do

16   you agree that the assignment agreement doesn't have a

17   revised address in it?

18          MR. HURLEY:  Your Honor, this is Mitch Hurley.

19   The assignment agreement references the terms of use, and

20   the terms of use include the address that was just

21   referenced by the witness.  But the assignment agreement

22   does not expressly state that address within the text of the

23   assignment agreement.

24          THE COURT:  Okay.

25   BY MR. CHAPMAN:

Page 26

1   Q    Mr. Ferraro, by referencing the terms of the use in the

2   assignment agreements --

3            MR. CHAPMAN:   You know what, Your Honor?  I'll

4   save this for argument later.   I don't think it's

5   appropriate for the witness right now.

6   BY MR. CHAPMAN:

7   Q    Mr. Ferraro, in Paragraph 9 of your declaration, you

8   say that to the best of your knowledge no Celsius agent or

9   employee ever received the notice of the bar date in

10  Voyager's bankruptcy.  How did you make that determination?

11  A    I checked in with the senior operations director who

12  handles kind of overseas mail and confirmed that there is no

13  record of any employee receiving such notice.

14  Q    Okay.  And did that individual speak with every

15  employee?

16  A    That individual did not speak with every employee of

17  the company, no.

18  Q    Do you know how many individuals that person spoke to?

19  A    No, I didn't -- no, sir.

20  Q    And do you know which individuals -- you know, who --

21  anyone that that person spoke to?

22  A    Usually that person monitors the mailboxes.  And there

23  is individuals that go and check the mail, and screen the

24  mail, and then kind of delegate the mail across the

25  organization.  So this would've been caught in the normal

Page 27

1    processes, sir.

2    Q    Okay.  Who is responsible for preparing the list of 90-

3    day transfers in the schedules that Celsius filed?

4    A    In our statements and schedules, sir?

5    Q    Yes.  Who was responsible for preparing specifically

6    the 90-day transfers that were in the schedules and

7    statements?

8    A    I can't speak -- yeah, sorry for talking over.  I can't

9    speak specifically to who's responsible for that.  It was a

10   collaboration between the internal team at Celsius and

11   Alvarez and Marsal led by Holden Bixler on that side with A

12   and M.  This was --

13   Q    Do you -- at --

14   A    -- quite a big activity for us.  We really had to

15   leverage across the entire organization starting really

16   before the petition and going all the way through when we

17   filed in October.

18   Q    Oh, I imagine it was quite an undertaking.  Did outside

19   counsel to Celsius have any involvement in preparing or

20   viewing the schedules?

21   A    They were part of the review discussions.

22   Q    And when you say they, what law firm are you referring

23   to?

24   A    At -- it would've been Kirkland and Ellis.

25   Q    Okay.  So Kirkland was responsible for reviewing the

Page 28

1    list of the 90-day transfers?

2    A    I'm not sure, sir, the (indiscernible) responsibility.

3    We worked predominantly with A and M on the exercise.   I

4    know that they were present in discussions.

5    Q    Okay.  But to the extent that outside counsel would've

6    been involved, it would've been Kirkland it sounds like.   Is

7    that right?

8    A    I don't want to speculate.   They're involved in kind of

9    the (indiscernible) on all legal items in the case.

10   Obviously this one's a little bit different as we identified

11   and engaged with Akin.   So...

12   Q    Okay.  And you're aware that the list of 90-day

13   transfers included all the Voyager withdrawals that are at

14   issue in this dispute?  Is that right?

15   A    Yeah.  To my understanding, yes.  When we filed the

16   statements and schedules, it was identified, yes.

17   Q    Okay.  So any of the professionals, whether Kirkland, A

18   and M, any of the professionals that would've been involved

19   in reviewing the schedules and statements would've been

20   aware that those transactions with Voyager were included on

21   the 90-day transfer schedule.  Is that right?

22              MAN:  Objection, foundation.

23              THE COURT:  Overruled.  Go ahead.

24   BY MR. CHAPMAN:

25   A    I don't want to speculate on what they did or did not

1   know.  I will say this.  There's over 30,000 pages that we

2   produced and 3 million lines of data, and we have 600,000

3   Creditors.

4   Q    Do you know what the purpose of the 90-day transfer

5   schedule is?

6   A    My understanding is to look at withdrawals within 90

7   days and transfers within 90 days to look at preferential

8   claims, preferential transfers and claims.

9   Q    So if you see a particular person on that 90-day

10  transfer schedule, what does that mean to you?

11  A    I'm not the person -- I have many jobs in the company.

12  Looking at the 90-day transfers line by line is not one of

13  them, sir.

14  Q    Oh, I'm asking more generically.  If you were to see

15  somebody on the 90-day transfer schedule -- I think you

16  actually already answered it.  You indicated previously that

17  it would -- the purpose of the 90-day transfer schedule is

18  to identify potential preference actions.  Am I getting your

19  testimony correct on that?

20  A    That's my understanding, sir.

21  Q    Okay.  So if you saw a particular person that 90-day

22  transfer schedule, wouldn't -- would that indicate to you

23  that there's a potential preference claim against that

24  person?

25  A    I -- it would indicate to me that it should be

Page 30

1     reviewed, yes.

2     Q    Okay.  Did someone at Celsius review the schedules and

3     statements, and in particular the 90-day transfer schedule

4     before it was filed?

5     A    I can't speak to the review of individual statements.

6     As I mentioned, these are very voluminous.  I don't think

7     that it would be reasonable to think that all 3 million

8     lines of data were reviewed and analyzed one by one.  I

9     think there's processes and controls we have in place to

10    make sure that the statement schedules overall are

11    reasonable.

12    Q    Okay.  So even though they are signed under penalty of

13    perjury, you're saying that it's possible that no one had

14    reviewed the 90-day transfer schedule line by line.

15    A    I don't think that --

16           MAN:  Objection.

17    BY MR. CHAPMAN:

18    A    -- we're assigning -- sorry.  I don't believe that

19    individuals reviewed every line, every text of every single

20    statement and schedule.  They were produced and reviewed as

21    I mentioned.

22    Q    Okay.  If Celsius wanted to further investigate the 90-

23    day transfers, would the company have been able to do that

24    before the Voyager bar date?

25    A    Well, sir, we filed the statements and schedules on

Page 31

1    October 5th.  My understanding is the bar date was on

2    October 3rd.

3    Q    Yes, but I -- when did you begin -- when did the

4    company AM begin preparing the schedules?

5    A    As I mentioned, we started kind of mobilizing for the

6    effort shortly before the petition date knowing it was a big

7    lift.

8    Q    Right.  So is it fair to say that most if not all of

9    the work was completed before the bar date in this case?

10   A    No, sir.  We had a lot of transfers, including from

11   insiders, that were being reviewed and rereviewed and

12   checked along with other items of statements and schedules.

13   We asked for two extensions and received two extensions from

14   the court.  We continued to work on populating really all

15   the way through kind of the timeline.

16   Q    Okay.  So again I'll ask if Celsius had wanted to

17   further investigate the 90-day transfers, would the company

18   have been able to do that before the Voyager bar date?

19   A    We were still working on our statements and schedules,

20   sir, and reviewing those.  So I think it would be hard to

21   identify this before we actually finalized the statements

22   and schedules.  It's a little bit of a chicken-before-the-

23   egg problem.

24   Q    Okay.  So was anyone at either Celsius or any of

25   Celsius' professionals aware of the Voyager withdrawals from

Page 32

1    Celsius before the bar date?

2              MAN:   Objection, foundation.

3              THE COURT:   Overruled.

4    BY MR. CHAPMAN:

5    A    I don't know specifically, but to my understanding this

6    wasn't really identified until early November with regards

7    to the bar date and the claim.

8    Q    Well, just to be clear, you're aware that the schedules

9    were filed on October 5th and the bar date in this case was

10   October 3rd.  Are you saying that in that 48-hour period

11   that's when the Voyager transactions were discovered?

12   A    No, I said in early November, sir.

13   Q    But they were included in the schedules that were

14   filed, right?

15   A    Yeah.  I'm talking with relation to the bar date.

16   Q    Okay.  So I think what I'm hearing is that although

17   technically possible, it would've been difficult for Celsius

18   to have further investigated the Voyager withdrawals before

19   the Voyager bar date.  Is that right?

20   A    It's truly a needle in a haystack.  You know, 3 million

21   rows of data, 600,000 creditors.

22   Q    So -- oh, please continue.

23   A    No, that's it.

24   Q    So even if Celsius had received a bar date notice from

25   Voyager at what you believe is the correct address, we

1   would've been in the same position we are today.  Celsius

2   still would not have been able to get a proof of claim on

3   file.  Is that right?

4   A    No, that would've connected the dots for us receiving

5   the notice in my opinion.

6   Q    Were you aware of Voyager's bankruptcy filing prior to

7   the bar date?

8   A    Yes, I was, sir.

9   Q    When did you first become aware that Voyager had filed

10  for bankruptcy?

11  A    Right around when we were filing.  You know, I

12  remember, you know, hearing and reading about the case in

13  the run-up to our petition.

14  Q    Have you ever been involved in a bankruptcy filing

15  before Celsius?

16  A    No, sir.

17  Q    And in your discussions with professionals, did you

18  come to learn that there are bar dates that are established

19  in bankruptcy cases?

20  A    I have come to learn that, sir.

21  Q    Okay.

22          MR. CHAPMAN:  Your Honor, I have no more

23  questions.

24          THE COURT:  All right.  Anybody else wish -- does

25  anyone else wish to cross-examine?

Page 34

1          MR. WHALEN:  Nothing from Voyager, Your Honor.

2          THE COURT:  I'm sorry.  You do or you don't, Mr.

3     --

4          MR. WHALEN:  Nothing from Voyager, Your Honor.

5     Thank you.  We do not.

6          THE COURT:  I have some follow-up questions for

7     the witness of my own.  Mr. Ferraro, in response to the

8     questions about whether Celsius could have identified the

9     Voyager information before October 3rd, you on several

10    occasions talked about how long it took to do the overall

11    schedules, but you didn't actually have to do the overall

12    schedules just to get the Voyager information, did you?

13         THE WITNESS:  No, we didn't.  But we were not on

14    the lookout for anything that was specific of Voyager, Your

15    Honor.

16         THE COURT:  But in terms of identifying just the

17    Voyager information, I presume that meant only looking at

18    the Voyager accounts.  It probably took no more than five

19    minutes, did it?

20         THE WITNESS:  Right, but we would've needed to

21    know to look at the Voyager account specifically in relation

22    to the bar date.  And that's what we didn't connect.

23         THE COURT:  In the Celsius case when Kirkland and

24    Ellis moved -- or excuse me, when Celsius moved for

25    permission to retain Kirkland and Ellis, there was an

Page 35

1    objection by a customer that was filed on July 28th that

2    alleged that there was a conflict because Kirkland and Ellis

3    also represented Voyager, and that Voyager had had dealings

4    with Celsius and was a customer of Celsius.  Were you aware

5    of that objection?

6              THE WITNESS:  I had just been the CFO of the

7    company.  I'm aware broadly of the conflict or the

8    perception of a conflict.  I did not read the objection,

9    Your Honor.

10             THE COURT:  All right.  I presume somebody at

11   Celsius had to make the decision as to whether that did or

12   did not constitute a conflict on behalf of Kirkland and

13   Ellis.  Who made that decision?

14             THE WITNESS:  I wasn't party to that discussion,

15   Your Honor.  I do not know.

16             THE COURT:  You don't know who made that decision.

17             THE WITNESS:  No, sir.

18             THE COURT:  So you don't also know what

19   information that person or persons might have had about

20   Voyager's dealings with Celsius.

21             THE WITNESS:  No, sir.  I was not in this role at

22   that time.  I do not have that information.

23             THE COURT:  Kirkland and Ellis filed a declaration

24   at the end of August in response to this objection that said

25   that Voyager had been a customer of Celsius, and that

Page 36

1    Voyager had withdrawn most of what had been in its accounts.

2    Do you have any knowledge of where Kirkland got that

3    information?

4              THE WITNESS:  I do not, sir.  Kirkland and Alvarez

5    had access to voluminous amounts of data obviously in the

6    case.  I think it's important to note that, you know, we did

7    not connect the dots, but our advisors did not connect the

8    dots either, Your Honor.

9              THE COURT:  Well, do you know who at Celsius, if

10   anybody, provided that information to Kirkland?

11             THE WITNESS:  I do not know on that specific

12   declaration.  I do not know who provided that information,

13   Your Honor.

14             THE COURT:  Well, if you don't even know who

15   provided the information or who made the decision about

16   whether this constituted a conflict, how do you know whether

17   or anybody at Celsius connected the dots?

18             THE WITNESS:  Well, because it wasn't until early

19   November when this was kind of brought up to my attention as

20   well as to the special committee's attention.  So I'm basing

21   my understanding on that, Your Honor.

22             THE COURT:  Who brought it to your attention?

23             THE WITNESS:  I can't remember specifically.  I

24   remember having a conversation with -- I think it was our

25   general counsel who brought it to my attention.  I might've

Page 37

1   been also listening in on meetings with the special

2   committee.  I can't remember.  It was likely one of those

3   two.

4           THE COURT:  It was either the general counsel or

5   who?

6           THE WITNESS:  Or me listening into the special

7   committee meetings of the board.  And this would've been

8   likely discussed there.  I can't remember where I first

9   heard this.

10          THE COURT:  Okay.  How did they say that the issue

11  had come to their attention?

12          THE WITNESS:  Your Honor, I do not have that

13  information.  I do not recall.

14          THE COURT:  You don't actually know when -- if

15  somebody asked you to look at it or brought it up to you,

16  you don't actually know when that person learned of the

17  issue or how that person learned of the issue.  Is that

18  correct?

19          THE WITNESS:  No.  I only remember that it was,

20  you know, early November.

21          THE COURT:  Okay.  That's when they mentioned it

22  to you, but when they actually learned of the issue, you

23  have no idea.  Is that correct?

24          THE WITNESS:  Yeah, I don't know, Your Honor.

25          THE COURT:  All right.  Celsius filed papers on

Page 38

1    September 16th in its case asking for an additional

2    extension of time to file its schedules, but indicated in

3    that motion that it had compiled the schedules.  It just

4    couldn't put them in final form until Judge Glenn had ruled

5    on the issue of what information would be disclosed.  Was

6    that your understanding at the time, that the schedules had

7    --

8            THE WITNESS:  Yes.

9            THE COURT:  -- otherwise been compiled by

10   September 16th?

11           THE WITNESS:  Compiled but not finalized, Your

12   Honor.  We were still working on items, you know, especially

13   reviewing insider transactions.

14           THE COURT:  So the final formatting was done, and

15   documents were filed on the 5th, but the information was

16   compiled sometime before that, right?

17           THE WITNESS:  We started pulling the information,

18   yeah, a month before the filing date on October 5th.

19           THE COURT:  When Celsius filed and the Voyager

20   case had filed, was somebody -- was anybody -- to your

21   knowledge, was anybody at Celsius tasked with monitoring the

22   Voyager docket or developments that might also be relevant

23   to Celsius?

24           THE WITNESS:  No one that I know of, Your Honor.

25           THE COURT:  Do you know if the general counsel of

Page 39

1   Celsius did so?

2           THE WITNESS:  Not that I know of, Your Honor.

3           THE COURT:  Who is the general counsel of Celsius?

4           THE WITNESS:  Ron Deutsch.

5           THE COURT:  And how big a staff is there in the

6   general counsel's office?

7           THE WITNESS:  I think there's around five in-house

8   lawyers on the team.

9           THE COURT:  Okay.  Have you yourself asked the

10  general counsel if the general counsel knew of these issues

11  prior to the Voyager bar date?

12          THE WITNESS:  In my conversations leading up to my

13  declaration as well as preparing for today, I did talk with

14  the general counsel.  And I also heard that he kind of

15  became aware of this in early November.  I don't know

16  specifically the date or how he was made aware.

17          THE COURT:  Okay.  And your counsel has said that

18  -- has cited to your declaration and others, which say that

19  you didn't receive the -- or you don't have record of

20  receiving the bar date notice.  I didn't actually see any

21  statement in your declaration that you personally were

22  actually unaware of the Voyager bar date.  Were you unaware

23  of it?

24          THE WITNESS:  Yeah, I was unaware of the Voyager

25  bar date.

Page 40

1          THE COURT:  And you testified about what you did

2     to check with the mail departments about whether the

3     remembered the bar date notice having been received.  What

4     did you do by way of canvassing people within Celsius, if

5     you did anything, to determine whether people inside Celsius

6     knew of the bar date?

7          THE WITNESS:  In talking with the general counsel

8     and in talking with the operations lead as I discussed

9     before.  I can't remember specifically who else I canvassed

10    to understand, but if the operations lead didn't have record

11    of the mail, that's kind of where it starts and stops, Your

12    Honor.  We were obviously busy compiling our statements and

13    schedules.  We've had a lot of reduction in staffing.

14    People are doing multiple jobs, so I don't think that there

15    was internal knowledge in following of the Voyager case.

16         THE COURT:  As to the mail department records,

17    does the mail -- do the people there actually keep logs of

18    mail that's coming in?

19         THE WITNESS:  I don't know of any formal logs that

20    are kept, Your Honor.

21         THE COURT:  Do you know what the volume of mail

22    that comes in on a given day is?

23         THE WITNESS:  No, I do not.

24         THE COURT:  Do you have any rough sense of it?  Is

25    it more than 1,000 items?

1           THE WITNESS:  No, Your Honor, I do not.

2           THE COURT:  So it could be more than 1,000 items?

3           THE WITNESS:  It could be one, it could be 1,000.

4    I do not know.

5           THE COURT:  It could be 10,000 so far as you

6    know?'

7           THE WITNESS:  I wouldn't want to venture to guess,

8    Your Honor.  I could look into this, but I do not know.

9           THE COURT:  So when you talked to the people in

10   the -- who oversee the mail, essentially what you're asking

11   them is whether they remembered seeing something from --

12   seeing an envelope from Voyager out of however many thousand

13   pieces of mail Celsius receives.  Is that what it comes down

14   to?

15          THE WITNESS:  I don't know how they track the

16   mail, Your Honor, so I was just asking whether or not they

17   knew of any bar date received.

18          THE COURT:  Okay.  And when Celsius changed its

19   address in March, did it send a change of address notice to

20   Voyager?

21          THE WITNESS:  I do not know that -- the answer to

22   that, Your Honor.

23          THE COURT:  The assignment agreement, the initial

24   contract before the assignment agreement, the initial

25   contract with Voyager had a notice address in it, didn't it?

Page 42

```
 1              THE WITNESS:  It did, Your Honor, yeah.  35 Gray

 2    Street.

 3              THE COURT:  Did the assignment agreement amend

 4    that notice address?

 5              THE WITNESS:  To my knowledge it did not

 6    explicitly state the notice address.  It referred to terms

 7    and service which had the address for the U.S. entity is my

 8    understanding, Your Honor.

 9              THE COURT:  Okay.  When Celsius changed its

10    address in the UK, did it do something in the UK that's the

11    equivalent of what we would do here by way of giving the

12    post office a forwarding address?

13              THE WITNESS:  Absolutely, Your Honor.  There's a

14    thing called in the UK the company's house, which is a

15    public record about companies', including Celsius, address.

16    It is there for the enjoyment of anybody who wants to go and

17    look it up.

18              THE COURT:  Well, my -- I'm not sure that answered

19    my question.  My question was more with the postal

20    authorities, whether they're given notice of your new

21    address so that if any mail comes in at the old address they

22    will forward it to the new address.

23              THE WITNESS:  We have mail forwarding at the 1

24    Bartholomew address.  I do not know of any mail forwarding

25    at the 35 Gray Street address.
```

Page 43

1          THE COURT:  And why wouldn't Celsius have put in a

2    mail forwarding address at the -- from the old address to

3    make sure that it continued to receive any mail that might

4    be sent there?

5          THE WITNESS:  I don't know, Your Honor.  That was

6    over two years ago.  I don't have an answer to that.

7          THE COURT:  Okay.  Do you know one way or the

8    other whether there was a forwarding address given to the

9    postal authorities?

10         THE WITNESS:  I do not, Your Honor.

11         THE COURT:  Okay.  All right.  Is there any other

12   questions that anybody wishes to ask of Mr. Ferraro?

13         MR. CHAPMAN:  Your Honor, this is Dean Chapman.

14   Can I ask just a quick redirect question of the witness?

15         THE COURT:  Yep.  Yes.

16   BY MR. CHAPMAN:

17   Q    And again, good morning, Mr. Ferraro.  Dean Chapman,

18   Akin Gump Strauss Hauer and Feld.  On this question of mail

19   forwarding, can you just explain to the Court the different

20   addresses associated with Celsius in the UK?

21   A    Yeah.  The address and the dates?

22   Q    Sure.

23   A    Okay.  On February 9, 2018, we incorporated the entity,

24   and the registered address was 35 Gray Street in London.  On

25   March 20, 2020, we filed a change of registered address for

Page 44

1 Bartholomew Lane, London.  On May 11, 2021, we changed --

filed a change of register.  Again on May 11, 2021, we filed

a change of the registered address to 77-79 New Cavendish

Street, London, which is our current address.

Q    Got it.  So the address to which Voyager prefers to

have sent notice was the address that Celsius occupied in

London two addresses ago.  Is that correct?

A    That's correct.

Q    Okay.  One other question, Mr. Ferraro.  You testified

that you didn't become aware of the potential claim against

Voyager until early November of 2022.  Is that right?

A    Yes.  That's what I recall.

Q    And can you explain to the Court what steps you took

upon becoming aware of the potential claim?

A    Well, we engaged Akin Gump to handle this matter.

Q    Anything else?

A    Nothing else off of memory.  I remember having that

conversation and talking about the conflict that Kirkland

has and talking with the GC Ron Deutsch about effectively

engaging with Akin Gump to handle this matter.

Q    Do you remember how much time passed between becoming

aware of the potential claim (indiscernible) of Akin Gump?

A    I recall a very little amount of time.  I don't know

exactly how much.  I think this all happened pretty quick in

early to mid-November.

Page 45

1    Q    Okay.  Nothing further.  Thank you.

2              THE COURT:  Okay.  Thank you, Mr. Ferraro.  You

3    are excused.  Do you have another witness, Mr. Hurley?

4              MR. HURLEY:  I do, Your Honor.  Thank you.  Again,

5    Mitch Hurley with Akin Gump for the record.  The Celsius'

6    next witness is Holden Bixler, the managing director at

7    Alvarez and Marsal.  And I believe Mr. Bixler is on the line

8    and available for cross-examination, and we would therefore

9    offer his declaration into evidence.

10             THE COURT:  Any objections to the admission of Mr.

11   Bixler's declaration into evidence?  All right.  It's

12   admitted into evidence.  I understand that the Committee

13   wishes to cross-examine?

14             MR. AZMAN:  Yes, Your Honor.  It's Darren Azman

15   again from McDermott for the Committee.  Did you need to

16   swear Mr. Bixler?  Maybe I missed it.  Sorry.

17             THE COURT:  Hang on one second.  Just making a

18   note to myself.  Thank you.  I'm so absorbed.  How could I

19   have forgotten that.

20             Mr. Bixler, do you swear that the testimony you

21   are about to give will be the truth, the whole truth, and

22   nothing but the truth, so help you God?

23             MR. BIXLER:  I do.

24                  CROSS-EXAMINATION OF HOLDEN BIXLER

25   BY MR. AZMAN:

Page 46

```
 1   Q    Good almost afternoon, Mr. Bixler.  In Paragraph 13 of
 2   your declaration, you see that four weeks -- and I'm just
 3   quoting here, four weeks after the filing of the schedules
 4   and statements, A and M was asked about Voyager's
 5   withdrawals of crypto assets in the 90 days prior to the
 6   filing of Celsius' Chapter 11 bankruptcy petition.  I want
 7   to focus on the three words that I emphasized, "A and M was
 8   asked."  Who specifically asked A and M about this?
 9   A    Kirkland and Ellis sent an email to us on November 2nd
10   I believe asking for a summary of the various places in
11   which Voyager appeared in the statements and schedules.
12   Q    When was the first time that anyone at A and M
13   discussed Voyager's withdrawals either internally among A
14   and M personnel or externally with anyone else?
15   A    It would've been --
16           MR. HURLEY:  Objection.
17           THE COURT:  I'm sorry.  What was the objection?
18           MR. HURLEY:  Foundation.
19           THE COURT:  Overruled.
20   BY MR. AZMAN:
21   A    It would've been right around that time, around
22   November 2nd.
23   Q    So no one ever at Celsius that you're aware of or at A
24   and M ever discussed Voyager's withdrawals before November.
25   A    Not that I'm aware of.
```

Page 47

1    Q     Okay.  But you're aware of the supplemental declaration

2    from Kirkland and Ellis that references the Voyager

3    withdrawals, right?

4    A     I am not.

5    Q     Okay.  Was A and M generally aware of the Voyager

6    bankruptcy filing at any time prior to the Voyager bar date?

7    A     Yeah, we were.  We were aware of the Voyager filing

8    coming into our engagement in the case.

9    Q     Okay.  It sounds like it took quite a lot of time for

10   your team to put together the schedules from Celsius.  Is

11   that right?

12   A     That is absolutely correct, yeah.

13   Q     When exactly did you start preparing the schedules?

14   A     So some of our initial data requests would've gone out

15   pre-petition.  So you know, maybe early July.

16   Q     And are you familiar with the 90-day transfer section

17   the schedules?

18   A     Yes, I am.

19   Q     And that identifies a number of withdrawals that were

20   made by Voyager during the 90-day pre-petition period.  Is

21   that right?

22   A     Correct.

23   Q     Can you help me understand how exactly your team

24   compiled the list of 90-day transfers?

25   A     I'll do my best.  So Celsius maintains an internal log

Page 48

1   of transfers, and we requested the data that would be

2   responsive to that question in the Statement of Financial

3   Affairs, SOFA 3, from the company.  They provided us

4   initially with files containing approximately 25 and a half

5   million rows of transaction data within that period.  And

6   then A and M kind of cleaned and formatted and aggregated

7   that information into what was ultimately reported in the

8   SOFA through a sort of iterative process.  We got multiple

9   pools of the information, and then you know, ultimately

10  filed what's on the docket today.

11  Q    Okay.  How many different people at Celsius and A and M

12  would you say were involved in preparing the Celsius

13  schedules?  Just roughly.

14  A    It was a substantial team.  On the A and M side, we

15  probably had four or five folks involved in the statements

16  and schedules workstream.  On the company's side, it

17  would've exceeded 10 or 15 in some capacity.  Not all

18  directly related to the 90-day payments, but that's the, you

19  know, kind of broad statement schedule workstream team.

20  Q    And you're aware that the Voyager bar date was October

21  3rd, right?

22  A    Yes.

23  Q    So several months before the bar date in this case,

24  your team prepared a schedule that identified the

25  withdrawals by Voyager that are issue in this dispute.  Is

Page 49

1    that right?

2    A    I don't know.  I can tell you that we got our initial

3    provision of this transaction history data on August 31st,

4    and then we subsequently received additional iterations of

5    this data all the way up through October 4th just before we

6    filed the statements and schedules.

7    Q    Okay.  When would you think that the Voyager

8    withdrawals first showed up in some form on the schedules

9    that were being prepared?

10   A    I don't know.  We had parties coming on and off of

11   those data sets through that.  One of the reasons for the

12   iteration is, you know, sort of an ongoing cleaning and QC

13   process.  So we -- the data sets were in flux throughout

14   that process.  And I wouldn't know specifically with respect

15   to Voyager.

16   Q    Okay.  So you knew about the Voyager bankruptcy filing,

17   and -- strike that.  Would you agree that at least weeks

18   before the bar date the Voyager withdrawals were in some

19   form included in the draft schedules that were being

20   prepared?

21   A    Again, I don't know.  It wasn't something that I looked

22   for specifically then, so I don't know at what point those

23   appeared in our data set.

24   Q    Okay.

25   A    They may have been in the very first data set, but I

1    just don't know the answer to that.

2    Q    Okay.  And so notwithstanding that these withdrawals

3    appeared at some point in the schedules that you were

4    preparing before the bar date in this case, and

5    notwithstanding that the A and M and Celsius teams were

6    aware of the Voyager bankruptcy filing, did anyone

7    prioritize looking at whether there might be preference

8    claims against Voyager?

9    A    Not on the A and M team.

10   Q    Why not?

11   A    Well, at the time we -- our mandate was to prepare the

12   statements and schedules, which was sort an all-consuming

13   process.  And we were solely focused on aggregating,

14   cleaning, and processing the data that the company was

15   providing in order to, you know, report as accurately as

16   possible.  We didn't engage any analysis of the data at that

17   time.  Leading up to the deadline for filing the statements

18   and schedules, the focus was solely on ensuring that we

19   prepared those in the most accurate form possible.  Analysis

20   would typically follow.

21   Q    In Paragraph 12 of your declaration, you say that other

22   than in GKA preference actions, Celsius had not undertaken

23   any generalized effort to identify potential preference

24   actions.  Is that right?

25   A    That's right.

1   Q    What do you mean by generalized effort?

2   A    I mean that at that point there'd been no workstream

3   stood up to conduct a preference analysis and evaluate, you

4   know, potential claims that may be -- potential preference

5   claims that may be contained within that 90-day payment

6   file.

7   Q    Okay.  If Celsius wanted to further investigate the 90-

8   day transfers, would A and M or Celsius have been able to do

9   that before the Voyager bar date?

10   A    So I can tell you that the teams that were tasked with

11   preparing the statements and schedules during that time did

12   not have additional bandwidth.  We were pretty maxed out

13   across the boards.  So I don't really know what would've

14   happened had that request come across.

15   Q    Okay.  So even if Celsius had received a bar date

16   notice from Voyager at the correct address and A and M had

17   been asked to do this, it sounds like you guys wouldn't have

18   had the bandwidth to do it.  Is that right?

19   A    Again, I don't know.  Maybe we could've brought

20   additional people on to address that issue.  It's hard for

21   me to say what could've happened at that time.

22   Q    Okay.

23            MR. AZMAN:  Your Honor, I have no additional

24   questions.

25            THE COURT:  Does anyone else wish to cross-examine

Page 52

1      Mr. Bixler?  I have some questions.  Mr. Bixler, you said

2      that Kirkland and Ellis asked you to look at the Voyager

3      issues in November.  Is that correct?

4                  THE WITNESS:  They sent an email on November 2nd

5      asking for detail on the places in which Voyager appeared in

6      Celsius' Statement of Financial Affairs and schedules of

7      assets and liabilities.

8                  THE COURT:  And who from Kirkland made that

9      request?

10                 THE WITNESS:  I don't recall offhand, though I

11     could check my email now if you'd like me to.

12                 THE COURT:  But you don't recall as you sit here

13     right now?

14                 THE WITNESS:  I don't, no.

15                 THE COURT:  All right.  And to whom was the

16     request made?  Just you or a broader group?

17                 THE WITNESS:  It would've come to the team, but

18     probably me.  You know, me with a CC to my team.

19                 THE COURT:  Did Kirkland explain what had prompted

20     the request?

21                 THE WITNESS:  No.  As I recall, it would've been a

22     very simple -- it was a very simple sort of one-liner email

23     saying can you please send a summary of, you know, the

24     places in which Voyager appears in statements and schedules.

25                 THE COURT:  What was it about that that alerted

1   you to the possibility that Celsius might have a preference

2   claim?

3           THE WITNESS:  I don't know that that necessarily

4   did alert me to that fact.  I think that when I saw the

5   summary, I did see that Voyager appeared in the section

6   where we were detailing the SOFA 3 information, the negative

7   payment information.  So that probably would've signaled to

8   me, ah, there might be a preference claim here.

9           THE COURT:  So knowing that voyager had received

10  withdrawals was enough to signal to you that there was a

11  possible preference claim?

12          THE WITNESS:  A possible preference claim, yes,

13  though, you know, I haven't done a preference action in a

14  crypto case and don't have a full understanding of, you

15  know, what the kind of rules of the road are for those

16  withdrawals.  But certainly potential seeing their -- that

17  summary of those payments in that -- you know, in that

18  document we provided to Kirkland would've signaled to me

19  that there was a potential preference claim.

20          THE COURT:  When did you first learn that Voyager

21  had had accounts at Celsius?

22          THE WITNESS:  I don't recall when I first -- I

23  certainly became aware in response to the email in November

24  when we sent the summary to Kirkland.  I don't recall prior

25  to that when I became aware.

1           THE COURT:  But do you know whether you had been

2      aware before that time that Voyager had accounts at Celsius?

3           THE WITNESS:  I suspect I was aware before that

4      time Voyager had accounts at Celsius.

5           THE COURT:  And why do you suspect that you knew

6      that?

7           THE WITNESS:  I think I knew that there were

8      conflicts issues with Voyager and Celsius.  And so that

9      probably signaled to me that there was a connection there,

10     but I don't really have a very specific recollection of

11     that.

12          THE COURT:  How did you know that there were

13     conflicts issues?

14          THE WITNESS:  I don't recall.

15          THE COURT:  Do you recall when you knew that there

16     were conflicts issues?

17          THE WITNESS:  No, I don't, Your Honor.

18          THE COURT:  Do you know who was involved in

19     assessing those conflicts issues from the perspective of

20     Celsius?

21          THE WITNESS:  No, I don't, Your Honor.

22          THE COURT:  Do you have any knowledge as to what

23     information or issues were addressed by anybody on behalf of

24     Celsius in deciding whether there were conflicts issues that

25     -- and how they needed to be addressed?

Page 55

1             THE WITNESS:  No, I don't, Your Honor.

2             THE COURT:  I had asked Mr. Ferraro, I assume you

3      were on the line, about the objection that was filed in July

4      and about the K and E declaration that was filed in August.

5      Do you have any knowledge of where Kirkland and Ellis got

6      the information that was disclosed in that objection

7      regarding the fact that Voyager had accounts at Celsius and

8      that Voyager had made withdrawals from those accounts?

9             THE WITNESS:  Yeah, I heard your transaction with

10     Mr. Ferraro.  I do not know where Kirkland got that detail,

11     Your Honor.

12             THE COURT:  Were you aware of that declaration?

13             THE WITNESS:  No, I was not.

14             THE COURT:  And when you say you knew that there

15     were conflicts issues, do you know if that was at the time

16     of this declaration, or if it was later, or if it was

17     earlier?  Do you know one way or the other?

18             THE WITNESS:  No, I don't recall.  I was sort of

19     vaguely aware of conflicts issues, you know, at some point

20     in the matter, but it wasn't something that was directly

21     related to any workstream I was on.

22             THE COURT:  All right.  You said Kirkland and

23     Ellis raised the issue in November about Voyager's accounts.

24     Did you think it was their responsibility to alert people at

25     Celsius if there was a potential preference claim?

Page 56

1              THE WITNESS:  I think that counsel would typically

2    take the lead on pursuing that sort of claim.

3              THE COURT:  Okay.  And is there any question in

4    your mind but that Kirkland and Ellis knew at the end of

5    August that Voyager had made withdrawals and that in the

6    Voyager case there was a bar date?

7              THE WITNESS:  At the end of August?

8              THE COURT:  Yeah.

9              THE WITNESS:  I don't know.  I don't know when

10   Kirkland and Ellis would've become aware of that

11   information.

12             THE COURT:  Well, they're the same counsel for

13   Voyager and Celsius, so they knew about the Voyager bar

14   date, right?

15             THE WITNESS:  I would assume so.  As counsel for

16   those Debtors, I would assume they're aware of the bar date.

17             THE COURT:  Okay.  Have you spoken to anybody at

18   Celsius about communications they had with Kirkland and

19   Ellis about the Voyager accounts?

20             THE WITNESS:  I have not.

21             THE COURT:  So you don't know what information

22   other people at Celsius may have had from talking to

23   Kirkland and Ellis about potential claims against Voyager.

24             THE WITNESS:  No, I don't.

25             THE COURT:  Okay.  All right.  Thank you.  That's

Page 57

1    all I have.

2              MR. CHAPMAN:  Briefly on redirect.  Dean Chapman,

3    Akin Gump Strauss Hauer and Feld.

4                   REDIRECT EXAMINATION OF HOLDEN BIXLER

5    BY MR. CHAPMAN:

6    Q    Mr. Bixler, how many rows of data were in the

7    spreadsheet evidencing transfers in the 90 days prior to

8    Celsius' petition?

9    A    So the filed 90-day payment schedule contained about 3

10   million rows.  The source information for that, you know,

11   prior to aggregation was in excess of 25 million rows.

12   Q    Got it.  And of the 3 million rows that were included,

13   how many of those rows approximately involved transfers to

14   Voyager?

15   A    I don't know offhand, but I can say it's, you know,

16   comfortably under 50 rows.

17   Q    Under 50 rows out of approximately 3 million total?

18   A    Yeah.  I think that's right.

19   Q    And how many different customers, individual customers,

20   would've been reflected in those 3 million rows?

21   A    I don't know offhand.

22   Q    Would the number be greater than 100,000?

23   A    I don't know offhand.  You know, the company has

24   600,000 customers, and I suspect many or most of them were

25   transacting in that window.

Page 58

1   Q    Okay.  You were also asked at one point that you were

2   aware of the October 3rd bar date, correct?

3   A    Yes.

4   Q    And when did you become aware of that bar date?

5   A    I don't know specifically.  I think I became aware of

6   it certainly by, you know, early November when this issue

7   was raised.  I don't know that I was aware of it in advance

8   of that.

9   Q    Okay.  Nothing further.  Thank you.

10           THE COURT:  Okay.  Anything else?

11           MR. HURLEY:  So Your Honor, the final declaration

12   that Celsius submitted in support of the motion is from me,

13   and we would offer that into evidence as well.

14           THE COURT:  And I'll excuse Mr. Bixler and thank

15   him for his testimony.  You're offering your declaration,

16   Mr. Hurley?

17           MR. HURLEY:  Yes, Your Honor.

18           THE COURT:  Is there any objection to the

19   admission of Mr. Hurley's declaration?  Does anybody wish to

20   cross-examine?

21           MR. AZMAN:  Yes, Your Honor.  Darren Azman for the

22   Committee.

23           THE COURT:  Okay.  Please proceed.

24           MR. AZMAN:  Your Honor, I'm mindful that Mr.

25   Hurley is counsel for Celsius, so I'm going to keep this

Page 59

1    short and try to keep this narrow.

2              CROSS-EXAMINATION OF MITCH HURLEY

3    BY MR. AZMAN:

4    Q    Mr. Hurley, in Paragraph 4 of your declaration, you

5    state that Akin was retained as conflicts counsel.  Is that

6    right?

7    A    That's correct.

8    Q    When is the first time that someone at Celsius or

9    Kirkland mentioned anything to Akin about potentially

10   handling issues related to Voyager?

11   A    I believe it was November 5th.  It certainly was early

12   November.

13   Q    Hmm.  In Paragraph 4 of your declaration, you also say

14   that Akin investigated the Voyager transactions and

15   considered Celsius' potential claims.  Is that right?

16   A    Correct.

17   Q    And you're aware that the 90-day transfer schedule that

18   was prepared well in advance of the Voyager bar date listed

19   these very transactions that are at issue, right?

20   A    You're asking me if I'm aware of that now?

21   Q    Yes.

22   A    Certainly.

23   Q    Okay.  What additional investigation did you determine

24   -- strike that.  What additional investigation did you do to

25   determine that Celsius had potential preference claims

1   against Voyager?

2   A    I mean, I'm going to approach this very generally

3   mindful as you pointed out that I want to be careful around

4   attorney-client privilege.  We coordinated with A and M with

5   respect to identifying timing of transfers and considered

6   what kinds of legal arguments would exist with respect to

7   potential claims, including based on the information that we

8   received about the timing of transfers.

9   Q    Is the very existence of the 90-day transfers

10  sufficient to know that there is a potential preference

11  claim against someone who received transfers during that

12  period of time?

13  A    Well, as the objectors point out in their papers,

14  there's a legal issue that has to be confronted as well, and

15  that had not been determined at that time by Judge Glenn.

16  So I don't think it is as simple as that, but certainly the

17  timing of the transfers is an important component.

18  Q    And in your experience as a bankruptcy practitioner,

19  have you ever filed a -- what is referred to as a

20  placeholder proof of claim where you're not sure whether

21  your client in fact has a claim but they might and you want

22  to preserve their rights?  Are you familiar with that

23  concept?

24  A    So I confess that I'm not.  I am primarily a litigator.

25  Though I appear pretty regularly in bankruptcy court, I have

Page 61

1    not been involved in a process of the kind you just

2    described.

3    Q    All right.  Well, you had me fooled.

4              MR. AZMAN:  Your Honor, that's all the questions I

5    have for Mr. Hurley.

6              THE COURT:  All right there any other parties that

7    wish to question Mr. Hurley?  Mr. Hurley, when did Akin Gump

8    first become conflicts counsel in general to Celsius?

9              MR. HURLEY:  So -- and this is actually something

10   I was going to address in my argument.  Akin Gump is acting

11   as conflicts counsel currently with respect to two matters.

12   One is the Voyager matter, and another is a matter related

13   to a company called Rhodium.  And there was a retention

14   application that was filed that relates to both of those

15   matters.

16              And as one of the objecting parties correctly

17   points out, that retention application was effective as of

18   October 14, 2022, but that's because it related to both

19   Rhodium and Voyager.  Akin Gump's work as conflict counsel

20   with respect to Rhodium did in fact begin in October, but

21   Akin Gump did not bill any time or -- and was not involved

22   as conflicts counsel with respect to Rhodium after November

23   5th.

24              THE COURT:  Were you doing any work for Celsius in

25   August of 2022?

1          MR. HURLEY:  Yes, but not related to Voyager.

2          THE COURT:  All right, but you were conflicts

3    counsel of some kind in August of 2022?

4          MR. HURLEY:  Your Honor, we were retained

5    originally as special litigation counsel because Akin Gump

6    had been representing Celsius in some litigation matters

7    pre-petition.  So we were specifically retained to handle

8    those two litigation matters.  We were then later asked to

9    take on the conflict role when first the Rhodium matter

10   arose and then the Voyager matter arose.  But in August, we

11   were not retained as conflicts counsel per se.

12         THE COURT:  Okay.  So when Kirkland and Ellis

13   filed a supplemental declaration saying that it would not be

14   involved in any issues between Celsius and Voyager that was

15   filed in August of 2022, had anybody approached you at that

16   point to ask you to be involved in issues between Celsius

17   and Voyager?

18         MR. HURLEY:  Not at that point, Your Honor.

19         THE COURT:  It wasn't until November that somebody

20   did so?

21         MR. HURLEY:  It was not until November that we

22   were asked to handle the Voyager matters, correct.

23         THE COURT:  Okay.  I have nothing further.

24         MR. HURLEY:  Okay.  So Your Honor, I guess that

25   brings us to the argument unless there's any other business

1    you want to take care of first or questions you have before

2    we move onto that.

3              THE COURT:  Is there any other evidence that any

4    of the parties wish to introduce?

5              MR. AZMAN:  Your Honor, I thought that the Debtors

6    would move into evidence the omnibus wallet agreement and

7    the assignment agreement.  I don't believe they've been

8    entered yet, have they?

9              THE COURT:  No.

10             MR. AZMAN:  I guess I will move to admit them into

11   evidence.

12             THE COURT:  Any objections?

13             MR. HURLEY:  No objection from Celsius, Your

14   Honor.

15             MAN:  No objection from the Debtors, and we agree

16   with moving them in evidence.

17             THE COURT:  All right.  They're admitted into

18   evidence.  I don't have an explanation anywhere as to why

19   notice was sent to Celsius UK as late as it was on September

20   23rd.  What's the reason for that?

21             MR. WHALEN:  Your Honor, Michael Whalen from Paul

22   Hastings.  Celsius was identified by Voyager on an amended

23   Schedule G, which is the disclosure of executory contract.

24   So we were identifying the wallet agreement with Celsius as

25   a potential asset of the estate.  They were not identified

Page 64

1   as a Creditor, and we still took the step of sending notice

2   of the bar date to Celsius.  We did not believe then,

3   frankly we don't believe now that they're properly a

4   creditor, though that is an issue for later.

5           So you know, it accords with our view as Debtors

6   and as Debtor counsel as we do in most cases that more

7   notice is better.  But our view here, you know, we think the

8   issue of actual notice is secondary because, particularly in

9   light of the testimony we just received, it seems abundantly

10  clear to the Debtors that Celsius, with respect to this

11  preference claim, was an unknown Creditor, and thus did not

12  need and was not entitled to actual notice.

13          THE COURT:  We'll get to argument in a second.  My

14  question was why notice wasn't sent until September 23rd.

15          MR. WHALEN:  Yes, Your Honor.  And that was just a

16  function of when we identified those contracts and we

17  amended the schedules shortly before that, I believe

18  September 15th, and then we got notice packets together as

19  promptly as possible and sent them out thereafter after

20  identifying those contract counterparties so that we could

21  get notice to them.

22          THE COURT:  And do I know one way or the other

23  whether the notice was returned as undeliverable?

24          MR. WHALEN:  No, Your Honor.  We can identify

25  that.  I don't believe -- well, I won't say anymore, but we

1    can identify that.

2              THE COURT:  Well, we've got the evidentiary record

3    today, so we don't know is basically what the answer is.

4              MR. WHALEN:  Yes, Your Honor.

5              THE COURT:  Anything else for the evidentiary

6    record?  All right.  We'll close the evidentiary record

7    then.  We'll have argument, but first we'll take a five-

8    minute recess, okay?

9              MR. WHALEN:  Yes, Your Honor.

10             (Recess)

11             THE COURT:  All right.  I have returned.  I

12   thought I put my phone on mute, but somehow my entire

13   connection was divert, but I'm back.  Are the parties ready

14   to proceed?

15             MR. HURLEY:  Yes, Your Honor.

16             THE COURT:  All right.  Mr. Hurley, I have to tell

17   you that much of your argument is that it would've been

18   unreasonable for Voyager to -- or excuse me, for Celsius to

19   have stumbled upon this claim on its own by the process of

20   preparing its schedules because there was such voluminous

21   information, and it's just not reasonable to say that

22   anybody could've filtered out and found this particular

23   claim just based on the preparation of the schedules.

24             But that all assumes, I think, that Celsius --

25   that nobody at Celsius knew or should've known about the

Page 66

1    Voyager bar date.  Because isn't it the whole point of a bar

2    date that you're supposed to separately figure out whether

3    you have a claim against that particular Debtor?  You know,

4    we don't ordinarily, for example, let people come in and get

5    relief from the bar date just by saying that, well, that's

6    not information I would've ordinarily come across in the

7    ordinary course of my business, or I didn't look at it

8    because the statute of limitations wasn't imminent, or

9    things like that.

10          The whole point is if you know or should've known

11   about the bar date, you're supposed to accelerate your quest

12   to find out if you have a claim against the particular

13   Debtor.  Isn't that right?

14          MR. HURLEY:  If you know or should've known about

15   the bar date?  I think that certainly makes sense to me,

16   Your Honor.  You know, obviously here Celsius has said, you

17   know, uniformly that it was not aware of the bar date until

18   after the bar date passed.

19          THE COURT:  Well, that's not -- you know, you keep

20   saying that, but your declarations fall far short of that

21   mark.  You have one witness who says he didn't know.  That's

22   Mr. Ferraro.  You have another witness who says that, well,

23   he knew about it in November.  He might've known about it

24   before then.  He's not sure.  And you don't have any

25   testimony as to whether anybody else knew about it.  You

Page 67

1    keep saying that you have testimony that nobody knew, but

2    all your real testimony is, is that one of those guys didn't

3    know and that the mailroom didn't remember seeing the

4    notice.

5              MR. HURLEY:  It'd be fair that there are limits to

6    our ability to prove the negative, but certainly based on

7    the inquiries that we made and that the remaining Celsius

8    personnel made, the answer that we've gotten back is that no

9    one was aware of the bar date.  I certainly --

10             THE COURT:  I have no evidence that any such

11   inquiries were made.  Mr. Ferraro said he asked about the

12   mail, and that was the sum and substance of what he did.

13   Mr. -- the other witness said he didn't speak to general

14   counsel about what they knew and when they knew it, for

15   example.

16             MR. HURLEY:  Mm-hmm.

17             THE COURT:  Which is the place where I definitely

18   would've gone to ask these questions.

19             MR. HURLEY:  Mm-hmm.

20             THE COURT:  You haven't put in any information

21   about that.  I have no declarations from the general

22   counsel.  So --

23             MR. HURLEY:  That --

24             THE COURT:  -- there's a gigantic hole in your

25   showing, isn't it?

Page 68

1          MR. HURLEY:  It certainly is a case you don't have

2     a declaration from the general counsel.  We could provide

3     one.  We did communicate with the general counsel's office

4     about this issue.  I acknowledge we didn't put it in a

5     declaration.  If that would be helpful, Your Honor, we can

6     certainly prepare one and provide it.  Then --

7          THE COURT:  No, I'm not asking to reopen the

8     hearing.  We've just had our evidentiary hearing.  And look,

9     you know, the Committee raised in its opposition the entire

10    fact that there was an objection in the Celsius case to the

11    retention of Kirkland and Ellis on the theory that it had a

12    conflict because of its representation of Voyager, and that

13    there would be conflicts between Voyager and Celsius.

14         Quite clear from Kirkland's response in August

15    that got from somebody the information that Voyager had had

16    an account and had withdrawn most of what was in that

17    account.  And the committee said that, look, this means that

18    Kirkland, which obviously knew of the bar date, also knew

19    about the withdrawals.  Your own witnesses have said that

20    just knowing that there were withdrawals was enough to alert

21    a sophisticated bankruptcy party that there are potential

22    preference issues.

23         The whole point of this in the context of the

24    Kirkland retention was whether there are -- were conflicts

25    between Celsius and Voyager, and your own witness says that

1    Kirkland should've told -- probably had an obligation to

2    tell Celsius if there was a bar date and if there was a

3    potential claim.  So how do I -- and in response to all

4    that, in response to that issue being surfaced, you put in

5    no further information about who worked on the Kirkland and

6    Ellis retention issues, who at Celsius made the decision

7    about whether there was a conflict, what information they

8    looked at to determine whether there was a conflict, whether

9    they actually had communications with Kirkland about the

10   issue and about what kinds of claims Celsius might have

11   against Voyager, and who would pursue them, and when they

12   should be pursued.

13            You didn't respond to any of those obvious points.

14   And why shouldn't I just infer that the reason you didn't is

15   that the answers are all bad for you?

16            MR. HURLEY:  So, two things, Your Honor.  First,

17   the August 30th submission you're referring to, that

18   submission did not state that there were withdrawals made

19   during the preference period.  It only said that Voyager had

20   -- that had an account balance at Celsius and had drawn down

21   pre-petition substantially on its accounts, but that same

22   thing could be said about literally hundreds of thousands of

23   other customers.

24            So, I don't think any of the Witnesses suggested

25   that just the information in the August 30th submission

1    would have been enough for anyone to conclude that there

2    was, or likely would be a preference claim against Voyager,

3    any more than with respect to any of those many thousands of

4    other creditors that you could say exactly the same thing

5    about.

6            THE COURT:  But the whole point of the

7    supplemental declaration was to address the question of

8    whether there were conflicts, (indiscernible) being

9    conflicting interests between Celsius and Voyager.  So, I --

10   isn't that something that ought to have been looked at at

11   the time, and discussed at the time?

12           MR. HURLEY:  Well, so -- Kirkland made clear in

13   that document and in other statements to the Court that it

14   did not then perceive there to be any actual conflict

15   between Celsius and Voyager.

16           THE COURT:  (overlapping conversation) No, no, no,

17   it said that there -- Kirkland wasn't going to handle any

18   issues between Celsius and Voyager.  That's what it said.

19           MR. HURLEY:  Kirkland also indicated at the

20   hearing in connection with that matter that it believed

21   there were no conflicts between Celsius and Voyager, which,

22   I think that hearing was in September.

23           THE COURT:  If Voyager had a customer claim, how

24   could that possibly be the case?  And you know, you might

25   quibble about what was said in the Kirkland declaration, but

1    you offered nothing.  You offered -- you didn't respond to

2    that entire allegation at all.  You didn't come forward with

3    where did the information come from, any information as to

4    whether there was anybody at Celsius who was involved in the

5    decision, so who at Celsius made the decision about whether

6    there was a conflict or not, 'cause that had to be made by

7    Celsius.  I have to believe that somebody in the Director's

8    offices probably advised by General Counsel had to have been

9    involved.

10            I've heard from none of those people.  This entire

11   -- this -- the entire question of what did that tell

12   Celsius, and when did it tell it was just raised by the

13   Committee, but ignored by you in your papers.

14            MR. HURLEY:  So, Your Honor, the information that,

15   to this day I understand to be the only information

16   suggesting that there is a conflict is the 90-day preference

17   withdrawals, and the evidence we put forward was that

18   Celsius wasn't aware, and I understand Your Honor's concern

19   about the limits of what our evidence shows in that regard,

20   but that Celsius wasn't aware of those transfers until

21   November.

22            And so, the -- it -- so, the issue wasn't being

23   viewed as an active conflict, but rather there was awareness

24   obviously, because of the objection and for other reasons

25   that Kirkland was representing both companies, but there

Page 72

```
 1   wasn't, to our knowledge, any actually issue that had become

 2   concrete and arisen that caused anybody at Celsius to

 3   consider okay, we have a conflict that has to be addressed

 4   now.  That didn't happen until November.

 5               THE COURT:  (indiscernible) so you think Kirkland

 6   might have known that there were withdrawals, but not when

 7   they occurred?  If --

 8               MR. HURLEY:  (overlapping conversation)

 9               THE COURT:  If that's your answer, wasn't it your

10   obligation to come forward with some evidence on the point?

11               MR. HURLEY:  I -- so Your Honor, I -- obviously I

12   don't know exactly what Kirkland knew, but in the document

13   that we're talking about, the August 3rd submission, they

14   provided information only related to -- sorry, that

15   disclosed only that Voyager was a customer and had made

16   withdrawals, not that there were withdrawals during the

17   period that would cause Celsius to believe that it should

18   investigate those withdrawals as (indiscernible).

19               THE COURT:  But you're the one who has the burden

20   of showing that there is an excuse for the delay here.  You

21   don't do that just by saying well, that evidence isn't 100

22   percent an answer as to when Kirkland knew.  All you're

23   doing is raising a question.  You didn't go to Kirkland, you

24   didn't ask them what they knew, you didn't find out if they

25   knew about the timing, you didn't find out if they actually
```

1    appreciated that there was a preference issue, you didn't

2    ask them did you tell that to anybody.

3         You didn't ask them why -- if so why -- if you

4    didn't, why didn't you tell that to anybody.  And your own

5    Witnesses have said that Kirkland should have told people.

6    So, whether the -- it seems to me you've got the burden

7    here.  You don't satisfy it just by raising questions as to

8    whether the evidence is open and shut, dead set proof

9    against you.  You've ignored the issue and given me nothing

10   on it.

11        MR. HURLEY:  So, Kirkland is obviously in an

12   awkward position here, because it represents Celsius and

13   Voyager.  And it -- we -- you're right, we did not get a

14   declaration from Kirkland with respect to exactly what they

15   knew.  But it is certainly our understanding that they did

16   not become aware of the preference transfers until November,

17   and maybe I can provide a little color on that, Your Honor,

18   because what I understand did happen is that in early

19   November, a Celsius creditor flagged an issue related to

20   Voyager for Kirkland, and I believe that's what caused

21   Kirkland to ask A&M to look at the schedules and find out

22   hey, are there Voyager transfers we should be concerned

23   about?

24        And then -- and when the information came back

25   from an A&M, that's when they referred it to Akin Gump.

Page 74

1           THE COURT:  Who was the creditor, and why don't I

2    have any evidence of this?

3           MR. HURLEY:  I -- Your Honor I don't have an

4    excuse, I would be happy to provide it to you, I understand

5    the evidence is closed, but if Your Honor would like to see,

6    we certainly can provide it.  The creditor is a gentleman

7    named Mr. (Frishburg), I believe is his name.  But that

8    happened, as I said, in early November and I -- my

9    understanding is that is what spurred the communication from

10   Kirkland to A&M.

11          THE COURT:  On the excuse of (indiscernible)

12   neglect factors on the notice issue, you never actually --

13   you did give Voyager an address and never actually sent

14   notice to Voyager to change that address for notice

15   purposes, isn't that correct?

16          MR. HURLEY:  So, the address was included in the

17   2020 original (indiscernible) agreement, and then in 2021,

18   it was amended.  The amendment assigned all the rights from

19   Celsius U.K. to Celsius U.S. and E.U.  And in that

20   agreement, it doesn't actually repeat the Celsius U.K.

21   address, which I think there was some confusion about in

22   some of the objections.  What it provides is that the

23   services to be provided by Celsius U.S. are going to be

24   rendered subject to the terms of use.

25              And it includes a link to the terms of use, and

1    then that --

2             THE COURT:  Is there a provision in the wallet

3    agreement, the original one, that says that communications

4    and notices between the parties are to be sent to the

5    following addresses?

6             MR. HURLEY:  In the original wallet agreement,

7    yes.

8             THE COURT:  Yes.  And does that have the address

9    that Voyager used?

10            MR. HURLEY:  It does, though the notice that was

11   provided by Voyager actually is not consistent with that

12   agreement.  So, that agreement requires, let me just get

13   this for you so I get it right.  That notices have to be in

14   writing and given in person by registered mail, by an

15   overnight courier service which obtains a receipt to

16   evidence delivery, or by facsimile or email transmission,

17   with written confirmation of receipt.

18            So, the method of notice here of course was just

19   ordinary U.S. mail, and as Your Honor pointed out, I don't

20   think there was any information provided by the Debtor about

21   whether, either it was any receipt or other information from

22   the required methods of delivery.

23            THE COURT:  Well that's -- (indiscernible) let's

24   break that down.  The bar date notice is sent by mail,

25   because that's what my order authorized.  It's not

1    ineffective just because it failed to comply with con --

2    extra contractual requirements about notice, right?

3              MR. HURLEY:  That's fair, Your Honor.  I was just

4    pointing out that the contractual provision we were

5    referring to is -- does require a different method of

6    delivery.

7              THE COURT:  So, the agreement said send notices to

8    this address, and when the -- you talked about the terms of

9    use, but there's no provision in the addendum, in the

10   assignment agreement that alters what the provision of the

11   agreement that says where notices are to be sent.  Right?

12             MR. HURLEY:  Certainly not expressly, Your Honor.

13   There is a link to the terms of use, which includes the

14   address for the new counterparty, but it's not expressly

15   described in the amendment.

16             THE COURT:  And you don't have any evidence or you

17   haven't given me any that anybody gave or ever gave Voyager

18   notice of a change in the address?

19             MR. HURLEY:  That is correct, Your Honor.

20             THE COURT:  And how do -- we usually presume that

21   when mailings are sent that they're received, at least if

22   they're correctly addressed.  I don't really know how long a

23   change of address lasts on the U.K. system.  Do you -- I

24   haven't been given any evidence of that.  But, as to actual

25   receipt, all I have is hearsay testimony that somebody in

1    the mail department didn't remember seeing it.  But, I don't

2    -- it's not like any human being possibly remembers the

3    details of every single piece of mail that comes through for

4    a big enterprise, is it?

5              MR. HURLEY:  That's certainly fair, Your Honor.

6    And again, there's limits to our ability to prove the

7    negative, here.

8              THE COURT:  Yeah, I know that.

9              MR. HURLEY:  Yeah.

10             THE COURT:  I understand.  But even so, I mean,

11   the mail department was asked, but I don't know how wide a

12   canvassing -- it doesn't sound like much canvassing was done

13   to anybody else.  Who would the mailroom normally have sent

14   it to?  Were those people canvassed to see if they actually

15   saw it?  Didn't sound like that was done.

16             MR. HURLEY:  You know, I have -- with respect to

17   the communications of the mail room, only the testimony that

18   was elicited moments ago by Mr. Ferraro.  I certainly had

19   separate conversations with the general counsel's office

20   about the issue, but again, as you pointed out, that isn't

21   in evidence, but that -- we did what we thought we

22   reasonably could to confirm what we believed to be true,

23   which is that this notice, which was sent to an address in

24   London that hasn't been in use by Celsius for like, I guess

25   well over a year, didn't actually wind up being received by

1    anyone at Celsius.  And that is our understanding.

2              THE COURT:  Okay.  And I don't really have any

3    testimony as to whether people did or didn't see the

4    publication notice.  Right?

5              MR. HURLEY:  You are correct.

6              THE COURT:  Then, usually -- it's odd --

7              MR. HURLEY:  (overlapping conversation) back up

8    actually, Your Honor, on that answer?

9              THE COURT:  Yeah.

10             MR. HURLEY:  I guess we do have evidence that Mr.

11   Ferraro didn't, at least not until after the bar date,

12   because Mr. Ferraro said, very clearly, I think, that he

13   didn't know about the bar date until November.

14             THE COURT:  You know, we had two different

15   cryptocurrency cases filed within a short period in the

16   Southern District of New York.  There hadn't been very many

17   filings in that industry, everybody was interested.  It's

18   hard for me to believe that there weren't people at Celsius

19   who were charged with monitoring the docket in the Voyager

20   case, just to see what was happening, because that obviously

21   might shed light on what was going to happen in the Celsius

22   case.  Wasn't anybody tasked with that responsibility?

23             MR. HURLEY:  Not to my knowledge, Your Honor.

24             THE COURT:  Okay.  Again though, I don't have any

25   evidence of that, do I?

1          MR. HURLEY:  I -- maybe I'm not remembering

2    clearly, and I'm sure I'm not, but I thought that Mr.

3    Ferraro had indicated that he also didn't believe anyone was

4    tasked with that role.

5          THE COURT:  All right, on the Debtor's side I have

6    arguments about whether Celsius was a known or an unknown

7    creditor.  Aren't your own arguments about why Celsius

8    should have known that it had a claim kind of undercutting

9    your own position as to whether Voyager should have known

10   that Celsius had a claim?

11         MR. HURLEY:  I certainly understand the point.

12   One of the focuses that we provide in our reply is on the

13   fact that, unlike the cases that the objectors rely on,

14   Celsius was not a truly unknown entity, like a tort claimant

15   or an employment discrimination claimant would be and was in

16   some of the cases they cited.  There was an ongoing

17   commercial relationship, and we are on their schedules.  And

18   then the Debtors I think argued, paragraph 21, that there

19   was no way they could have predicted that there would be a

20   preference claim, because they all -- they couldn't have

21   predicted that Celsius would take the position that

22   deposited assets are a state property.

23         And we point out that Voyager, I understand, took

24   a similar position in its own case.  And presumably had

25   records of its withdrawals during the period, and it's

Page 80

1    certainly putting that information together.  We think that

2    it's plausible to argue that these are -- that Celsius was

3    ascertainable as a creditor of wager.

4         THE COURT:  Yeah, let me ask the same question of

5    Mr. Murphy or whoever's going to speak for the Debtor on

6    this.  It seems to me all of your arguments about why

7    Celsius should have known that it had a claim undercut your

8    position that Voyager didn't know that Celsius had a claim.

9    So, you can't have it both ways, can you?

10        MR. WHALEN:  Yes, Your Honor, Michael Whalen on

11   behalf of Voyager.  I think that there's a key distinction

12   here, which is that as is evident from Celsius' filings and

13   declarations, there was an ongoing commercial relationship

14   between Voyager and Celsius, and the very nature of the

15   preference claim is that Celsius has taken a position that

16   assets that they believe are assets of the estate have

17   exited the estate.  But, in the course of their commercial

18   relationship prior to Celsius making the preference claim,

19   we were engaged in ordinary course transactions, which

20   included withdrawing those funds.

21        So, the fact that they existed in our commercial

22   relationship would give Voyager every reason to believe that

23   Celsius viewed those assets to be property of Voyager, that

24   Voyager could withdraw, indeed did withdraw.  Celsius also

25   has taken a slightly different position than Voyager.  While

1    it is true that Voy --

2              THE COURT:  Let me stop you.  Let me stop you.

3    While you -- while the Voyager assets were in the earned

4    accounts, right?  (overlapping conversation) Saying that

5    they belong to Celsius and not to Voyager, and that

6    Voyager's claim was an unsecured creditor claim is exactly

7    akin to the same position that Voyager itself took with

8    respect to its own equivalent of the earn accounts, isn't

9    it?

10             MR. WHALEN:  Yes, Your Honor, but we think that

11   the added distinction of Celsius' position as to title in

12   the withhold accounts is relevant and also the, again,

13   ordinary course of the commercial relationship, these are

14   defenses that we would obviously raise if and when we get to

15   a preference action, but it was entirely reasonable for

16   Voyager to believe that, unless asserted, or at least even

17   noticed, that there was no claim from Celsius with respect

18   to these amounts.

19             THE COURT:  Well, isn't there a claim of

20   preference based on the dates of transfers from the earn

21   accounts to the withhold accounts, rather than the dates of

22   withdrawals from the withhold accounts?

23             MR. WHALEN:  I -- yes, Your Honor, but there was

24   even some uncertainty in Celsius' own papers initially when

25   they filed, that they at least raised the possibility in one

Page 82

1   of their first-day motions that they could assert ownership

2   over withhold account amounts as well.  That has since come

3   out differently, after some litigation in front of Judge

4   Glenn, but at least initially they had even taken that

5   position.

6           So, there was a lot of uncertainty around the

7   position that they were ultimately going to assert.

8           THE COURT:  Well, the withhold accounts didn't

9   exist before the preference period, is that right?

10          MR. WHALEN:  To be candid, Your Honor, we are not

11  entirely sure of the date at which the withhold accounts

12  came into effect.  We, on our end, had a long period of

13  engaging with the platforms where there was only one

14  account, and then at some point we noticed that there was an

15  additional account, an additional step involved in

16  withdrawing them, but we did in fact observe that and use

17  that pathway to take our funds off, and some did, in fact,

18  come off during the preference period that's alleged by

19  Celsius.

20          THE COURT:  Okay.  You know, on many of the -- let

21  me ask the Debtors and the Committee.  On many of the

22  factors here, it seems to me, whether there would be a

23  significant impact on the proceedings, whether there would

24  be significant prejudice, whether there is good faith, I

25  don't see that there's really much to say for the Debtors

Page 83

1    and the Committee's position.  The argument about prejudice

2    is built on cases that have said well, even if this is a

3    small one, I might get a gigantic influx of other claims

4    from other people.  Given the nature of this claim and the

5    circumstances, how could that possibly be a worry?

6            MR. AZMAN:  Your Honor, it's Darren Azman from

7    McDermott for the Committee.  We now have several additional

8    crypto Chapter 11 cases that have been filed since Voyager.

9    I don't think it's without -- outside the realm of

10   possibility that other of these estates that are out there

11   could take a similar position here.  I actually am very

12   concerned about it.

13           And you -- Your Honor's aware of certain arguments

14   that FTX and its affiliates have raised about claims that

15   they may have in these cases.  They may very well be coming

16   to Your Honor shortly to ask for inexcusable neglect to file

17   a crypto claim.

18           THE COURT:  FTX didn't even have any right to

19   recover preferences until it filed its own case, which was

20   after the Voyager bar date, right?

21           MR. AZMAN:  Your Honor, I'm hesitant to speak on

22   that issue, because it's under investigation, but that's --

23   doesn't sound wrong.

24           THE COURT:  Yeah, I'm not -- you know, the idea of

25   whether I would get a claim from another cryptocurrency or

Page 84

1    other Debtor that might have a preference claim, it just

2    seems ludicrous to suggest that that's going to open the

3    floodgates and raise a lot of issues.  I might have claims

4    from later filing cryptocurrency cases that might raise bar

5    date issues about whether they should be fairly held to the

6    bar date when they didn't -- weren't in bankruptcy, and

7    therefore didn't have a preference claim at the time, those

8    to me seem entirely different issues.

9            MR. AZMAN:  That's fair, Your Honor.  I mean, the

10   other thing I'd mention is that if you look at the Second

11   Circuit case law on this, it's not just whether there's a

12   significant impact on creditor recoveries or comparing the

13   size of the claim to the total creditor pool, but if you

14   look at cases like Northwest Airlines, Northwest Airlines

15   says that the argument that a claim is de minimis, when

16   viewed in the context of an entire case, was rejected by the

17   Second Circuit in the Enron case.

18           So, that -- just because it's a small drop in the

19   bucket, and nobody can (indiscernible) that, right,

20   $7,000,000 here is a small drop in the bucket in their

21   creditor's claims pool, but that's not the test.  The test

22   is that de minimis doesn't make it not important.  And

23   $7,000,0000 --

24           THE COURT:  Let me push back on that.  If the rule

25   were as you say, then every single motion for relief from

1   the bar date would be deemed to be prejudicial, and it

2   wouldn't even be a factor for the Court to consider.

3              MR. AZMAN:  Oh, I don't agree.  So, I guess I --

4   let me finish my point, so my point was Court should and do

5   look at the aggregate dollar amount as a whole number,

6   whether it's a lot.  I think we all agree that $7,000,000 is

7   a big number.  $50,000, not so much.  $100,000, not so much

8   in a complex Chapter 11 case, but by any measurement,

9   $7,000,000 is a lot of money.  I think most of the creditors

10  who lost their life savings in this case would agree that

11  $7,000,000 is a lot of money.

12             THE COURT:  By the way, I actually don't think

13  that prejudice is supposed to be measured by the size of the

14  claim.  It seems to me prejudice is supposed to be measured

15  by whether the late filing, as opposed to a timely filing,

16  is prejudicial to you.  And I don't see how a late filing of

17  this particular claim would make any difference to you in

18  terms of whether it's filed now or whether it had been filed

19  on October 1st.  Tell me where I'm wrong.

20             MR. AZMAN:  Well, I guess I would go back to the

21  fact that that is not the most important factor that Courts

22  consider in determining whether excusable neglect has been

23  satisfied.  It's the reason -- I know that's not answering

24  your question directly, but I take Your Honor's point.

25             THE COURT:  Okay.

1           MR. WHALEN:  And Your Honor, Michael Whalen for

2     the Debtors.  We would agree.  You know, we would highlight,

3     as Mr. Azman did, that the predominant point is the excuse,

4     and that if there's no sufficient excuse that can overcome

5     even favorable factors elsewhere, but we do agree with Your

6     Honor's reading, but we think that it's a bit of a balance

7     between timing and amount and it's something inequitable

8     between (indiscernible), but this does relate somewhat back

9     to the plan negotiation point, and that we are approaching,

10    you know, we're closing in on a month from the confirmation

11    hearing.

12          So, there would be some administrative burden, but

13    even if we were to agree with Your Honor, we would go back

14    to the point that we think excuse is the main -- the key

15    issue here.

16          THE COURT:  Okay.  Anything else anybody wishes to

17    argue or to raise on the excusable neglect issue?

18          MR. HURLEY:  Your Honor, it's Mitch Hurley.  If I

19    could just make a couple of points on excusable neglect.

20    And I think what I really want to do is kind of zoom out and

21    make a bigger picture point, which is that the kind of

22    timeframe that we're talking about, in terms of the delay

23    from the bar date until when this motion is filed, in the

24    spectrum of cases that have been cited by all the parties,

25    is really very brief.

1          So, the bar date was October 3rd, we filed our

2    motion on December 13th.  And if you measure the delay from

3    the date of discovery of the claim in early November, the

4    period shorter, and then this, I just want to make sure this

5    is clear to Your Honor, that much of the time between when

6    Akin Gump was retained in November until we filed in

7    December was because we were working with the Debtors to see

8    if we could come to a resolution that wouldn't require this

9    motion practice.

10          So, we actually contacted them, basically to

11   request the relief we're seeking on the motion now,

12   consensually, on November 15th, and then they -- we

13   contacted Kirkland, and Kirkland told us on that call that

14   Quinn Emanuel was going to handle the conflict issue.  Took

15   some time for us to be able to get on the phone with Quinn,

16   they weren't available right away.  They then asked us, I

17   think it was -- our call was on November 28th, I believe,

18   our first one.  Sorry, on December 1st.

19          They asked us to put our request in writing, which

20   we did and sent over on December 2nd.  And then on December

21   6th, Quinn actually told us that Paul Hastings was going to

22   be handling the matter for Voyager, and so we then spoke to

23   Paul Hastings on December 8th, and again on the 12th, and

24   they indicated that they were -- had to discuss it with UCC

25   counsel, and at that point, we hadn't given up hope on a

Page 88

1   negotiated resolution.

2          But that's when we filed, the next day.  So, the

3   period of time is brief, even I think if you include that

4   settlement period, and even shorter if you don't.  And from

5   our perspective, if you look at the cases cited by the

6   parties, and there were dozens, there really aren't any

7   cases where the period of delay is as short as what I just

8   described.  And where you have a situation here, like here,

9   where the Claimant has not said -- you can almost -- all

10  those other cases, the Claimants actually expressly admitted

11  that it was aware it had the claim before the bar date

12  passed, and that it was aware of the bar date.  In almost

13  all of those cases.

14         So, a situation like this one, where we've put in

15  evidence, I know Your Honor has questions about whether more

16  evidence could have been supplied, but we put in evidence

17  that Celsius wasn't aware of the claim before the bar date

18  passed and wasn't aware of the bar date itself until after

19  it passed, and then couple that with the relatively short

20  delay, and I really do submit, this case is just different

21  than all of the other cases that are relied on by the

22  Objectors in those particular regards.

23         And in addition, in the se -- because the motion

24  obviously was filed before there was a confirmed plan, as

25  you were just discussing.  So -- but that's, I guess kind of

1    the big picture point I would want to make with respect to

2    excusable neglect.  I really do think this is, in terms of

3    sort of the spectrum of use kinds of cases, is very far on

4    the side of a comparatively short delay where you have this

5    circumstance of the actual lack of knowledge of the claim

6    and of the bar date before the bar date passed, which is, in

7    their cases, in almost every one, there's not even a dispute

8    about whether the Claimant knew about the existence of the

9    claim, and in many cases knew about the existence of the bar

10   date.  So, I do think it's a very different case, and more

11   favorable for Celsius on excusable neglect.

12            THE COURT:  Is there anything else?

13            MR. AZMAN:  Your Honor, I apologize, I just --

14   it's Darren Azman again, I just wanted to make two brief

15   points, but I'm not sure if Mr. Hurley was done.

16            MR. HURLEY:  Go.  Go ahead.

17            MR. AZMAN:  Okay.  Your Honor, on the excusable

18   neglect standard, I take Mr. Hurley's point on this not

19   being a year delay and there not being significant prejudice

20   in terms of the overall creditor body here.  I get all that,

21   but if you read all of the case law collectively, what you

22   come away with is that those are elements that can taint

23   your excusable neglect claim, if you waited two years or if

24   there's significant prejudice.

25            But they aren't elements that can satisfy the test

Page 90

1   alone.  Those are elements that Courts look to to

2   (indiscernible) the claim, if you otherwise satisfied the

3   remaining elements, including the most important one, which

4   is the reason for the delay.  And so, I think it's a bit of

5   a distraction to say well, it's not as bad as it could have

6   been.  Because I agree, it's not as bad as it could have

7   been.  They did act relatively quickly within a couple of

8   months, that's undisputed.  But that doesn't solve the

9   shortcomings that we've brought out through testimony today,

10  through all of the Witnesses.

11          And so, on excusable neglect, I just -- I don't

12  think those el -- other elements, they carry the day.  They

13  cannot carry the day for satisfying excusable neglect

14  standard when the most important element here is not

15  satisfied.  The other point I want to make, which we've

16  touched on a little bit, is that Celsius was not a known

17  creditor.  Celsius has tried to distinguish the XO

18  Communications case on a number of grounds in their

19  briefing, and I agree, there are differences in the facts,

20  but none of those distinctions alter the conclusion.

21          A preference claim, particularly under these

22  unique and novel circumstances, is not a known claim.  Judge

23  Gonzalez stated in the World Comm case, which is cited by

24  Celsius, this Court found in in re: XO Communications that

25  an entity that holds a preference claim is not generally

Page 91

1   considered to be a known creditor of a Debtor based solely

2   on the preference.

3          And this is continuing to quote, in that case,

4   meaning XO Communications, it was the -- it was determined

5   that constructive notice through newspaper publication, as

6   was provided here, would be proper.  Your Honor, Celsius can

7   distinguish the XO case all it wants, but the holding's

8   clear.  A Debtor with a preference claim is not a known

9   creditor, and as such, Voyager's notice by publication alone

10  was sufficient.  Your Honor, that's all I have to add.

11          MR. WHALEN:  Your Honor, Michael Whalen for the

12  Debtors.  I would just echo the points that Mr. Azman made,

13  particularly with respect to the differences between the

14  time of the delay and the reasons for the delay, which are

15  distinct pioneer factors, and it's certainly a -- not news

16  to Your Honor as you have referred to these points multiple

17  times, but a Second Circuit has repeatedly taken a hard line

18  approach to the pioneer factors and held that the Second

19  Circuit itself continues to expect that a party claiming

20  excusable neglect will, in the ordinary course, lose under

21  the pioneer test.

22          So, while it may be seemingly a harsh result or a

23  unique case, this is exactly how the pioneer test was

24  crafted, and we have nothing else from our end.

25          MR. AZMAN:  May I respond very briefly, Your

Page 92

1    Honor?

2              THE COURT:  Go ahead.

3              MR. AZMAN:  Okay.  So, the cases though, and the

4    facts of the cases that the objectives rely on, and again I

5    mentioned this before, but their cases were, usually the

6    delay is measured in years, sometimes in decades.  Not in

7    every case.  There's a couple they cited where the delay is

8    shorter, and I guess arguably more comparable to the period

9    of time we're talking about here, but they're otherwise

10   distinguishable.  So, XO for instance, in that case the

11   motion for lead to file the lay claim was made about seven

12   months after the bar date.

13             So, obviously that period's longer than the one

14   here, but the facts are also different for really the

15   reasons I just identified, Your Honor.  So, in that case,

16   the Claimant, Trilegiant, appears to have been aware it had

17   a preference claim against XO before the bar date ran.

18   Trilegiant had filed for bankruptcy more than a year before

19   the XO bar date, which means of course, that its preference

20   claim arose more than a year before the bar date.

21             According to the Court, the record, and this is a

22   quote, the record reflected that Trilegiant was aware that

23   it had preference claims, and not only that, that it was

24   aware of the amount of the preference claim against XO,

25   because the Court said it was large enough that the size of

Page 93

1    that preference claim should have caused Trilegiant to make

2    further inquiries that would have led to discovering the

3    time of the bar date.  But not only did Trilegiant not make

4    those inquiries, it chose to wait.  It made what the Court

5    described as an informed decision, notwithstanding knowing

6    about its claim, not to pursue preference claims until after

7    Trilegiant's own bankruptcy was finished.

8           In contrast here, Celsius is only just a little

9    bit more than two and a half months into its bankruptcy

10   proceeding by the time the Voyager bar date passed.  We put

11   in evidence that in fact, it's not typical on a complex case

12   for there to be a preference analysis, in that period of

13   time, at the beginning of a case, and to their credit,

14   Voyager doesn't dispute that.  They acknowledge that that's

15   right.  And I think that raises another important

16   distinction.  On -- in (indiscernible), it at least appeared

17   that the preference claim against XO was one of like, a

18   comparative handful, but as you heard from the testimony

19   here, just based on the nature of Celsius' business, there

20   were literally hundreds of thousands of potential preference

21   Defendants.

22          600,000 mo -- or more customers with balances on

23   the platform.  Most of whom probably made withdrawals at

24   various times, and certainly thousands of them, as -- would

25   have done so during the preference period.  So, there's

1   really -- there's no reason to think, unlike in the XO case,

2   that the wager information should have stood out to Celsius

3   the way the large amount of the XO claim did in

4   (indiscernible).  And the other sort of short timeframe case

5   they cite, Your Honor, is Eagle-Picher, that's a 1993 case

6   from the Southern District of Ohio.

7           And it's really the same grounds that can

8   distinguish them and most of the other cases from ours.  In

9   that case, the Claimant admitted it received actual notice

10  of the bar date a full three months before the bar date

11  expired, and the Claimant did not dispute that it was fully

12  aware that whole time of the existence of its claim against

13  the Debtor.  Instead, it just tried to justify its failure

14  to file by the known bar date because its other duties and

15  priorities took precedence.  The Court read that and said

16  that specifically in the opinion, it's expressing

17  indifference to the requirement to comply with known Court

18  ordered -- a known Court ordered bar date.

19          And that the Claimant had just flouted the bar

20  date, even though the Claimant knew about its claim and knew

21  about the bar date.  And that is another factor that we

22  submit just distinguishes this case from all the ones that

23  are relied on by the objectors, and we haven't seen a case

24  with similar circumstances that result in a request for a

25  leave to file a late claim being denied.  Thank you, Your

Page 95

1   Honor.

2          THE COURT:  All right, I think we're starting to

3   get repetitive, so I'm ready to make a ruling unless there's

4   something new that anybody wishes to add.  All right.  The

5   parties have argued as to whether relief from the bar date

6   should be granted in favor of Celsius to file a preference

7   claim against Voyager.  The Voyager debtors and the

8   Committee have made arguments about whether or not, for

9   example, Celsius was a known creditor or not, and what kind

10  of notice it was entitled to, and there have been arguments

11  about the notice that was sent.

12          I do not think those really are decisive at all in

13  regard to the excusable neglect inquiry.  They might have

14  been decisive if we had a due process contention here, but I

15  don't believe we do.  Celsius admittedly had signed an

16  agreement with Voyager that had a contractual provision in

17  it as to where notice was to be sent, and while Celsius

18  argues that Voyager maybe could have figured out that a

19  different address was appropriate, there is no evidence that

20  Celsius ever notified Voyager of a new address, or that the

21  subsequent agreement that they entered into made any change

22  to the contractual provision, which said that notices were

23  to be sent to that address.

24          I therefore don't think there's any due process

25  issue as to the addressing of the notice, and where it was

Page 96

1    sent, and it was supplemented by publication notice.  I'm

2    not at all convinced by Voyager's arguments about whether

3    Celsius was or was not a known creditor, because as I said

4    during the argument, so much of what Voyager and the

5    Committee are arguing as to why Celsius allegedly should

6    have known that it had a preference claim against Voyager

7    kind of cuts the other way as well, in terms of whether

8    Voyager ought to have known that Celsius had a claim against

9    Voyager.

10         The argument that it's an unknown claim just

11   because sometimes people don't pursue preferences, I realize

12   that's in one reported decision, I don't find that

13   persuasive at all.  The arguments that the Celsius parties

14   have made about how gosh, they couldn't have been expected

15   to find this needle in a haystack regarding Voyager because

16   they were putting together such huge schedules might have

17   some effect if there was no reason to think that Celsius

18   actually knew, or should have known about the bar date

19   itself, and the theory there would be that the only thing

20   that alerted them they had a claim was their own review of

21   their own business records in their own bankruptcy case.

22         I understand that argument, but it's all premised

23   on something that the evidence failed to establish, which

24   was the notion that Celsius did not know, and had no reason

25   to know of the bar date.  And of the need to find out

Page 97

1   whether it had a claim against Voyager, and to pursue that

2   within the time that had been -- that -- the deadline that

3   had been set by the Court.  One of the Witnesses, Mr.

4   Ferraro, said that he wasn't aware of the bar date, but it

5   doesn't appear that he made any inquiry of others, he didn't

6   testify as to any inquiry of others.

7           His inquiry was focused on whether he could find

8   anybody who remembered receiving a notice that had been

9   mailed to Celsius U.K.  He didn't find anybody in the mail

10  room, mail department who remembered seeing the notice,

11  which is not particularly strong evidence, in my regard,

12  even on the issue of whether Celsius U.K. actually received

13  the notice that might have been forwarded to it.  But beyond

14  that, in terms of whether anybody actually knew at Celsius

15  U.K. or anywhere else within Celsius, I only have Mr.

16  Ferraro's testimony that he didn't know, and I have

17  equivocal testimony, quite frankly, by the other Witness,

18  Mr. Bixler, who says that well, he certainly knew about it

19  in November.

20          Might have known about it before then, but he

21  isn't sure.  In terms of an enterprise claiming that it

22  didn't know about the bar date, that's a pretty thin

23  (indiscernible), to say the least.  But, of greater concern

24  to me is the fact that Celsius' counsel, Kirkland & Ellis,

25  are the same attorneys, not just the same law firm, but for

Page 98

```
 1    heaven's sake, the same attorneys who represent Voyager, and
 2    who made the bar date motion in the Voyager case.
 3            The idea that Celsius' own counsel wasn't aware of
 4    the Voyager bar date is a non-starter.  Of course they knew
 5    about it.  Celsius argued in its papers that somehow that
 6    wasn't within the scope of Kirkland & Ellis' employment for
 7    Celsius, but its own Witnesses agreed during testimony today
 8    that Kirkland & Ellis, if it knew about a bar date and knew
 9    about preference issue, had an obligation to tell that to
10    Celsius.
11            Furthermore, what is particularly troubling to me
12    is that these issues should have been looked at when a
13    customer of Celsius objected to the retention of Kirkland &
14    Ellis, specifically on the ground that there were potential
15    conflicts between Voyager and Celsius, and therefore that
16    Kirkland & Ellis was in a conflict position, because it
17    represented Voyager and was proposed to represent Celsius.
18    Any bankruptcy professional knows that one source of
19    potential conflict is a preference claim, and it appears
20    that some review of the Voyager records with Celsius was
21    done, and that Kirkland & Ellis then filed a supplemental
22    declaration on August 30th, more than a month before the
23    Voyager bar date, that acknowledged that Voyager had been a
24    customer of Celsius, and that Voyager had made withdrawals.
25            Doesn't explicitly say when the re -- withdrawals
```

1    occurred, but I have no reason to think that Kirkland &

2    Ellis wasn't aware of those dates.  More importantly, I

3    can't -- I will not assume that only Kirkland & Ellis was

4    making the decisions as to whether it was conflicted.

5    Somebody at Celsius had to make a decision as to whether

6    there was a conflict, and whether Kirkland & Ellis should be

7    retained in light of whatever the Voyager issues were.

8    Somebody had to be providing the information, should have

9    been, at least, looking at it from the point of view of

10   Celsius.

11            I would assume somebody, some Director or some

12   higher level officer who was working with Kirkland and

13   making the hiring decisions, perhaps the general counsel,

14   perhaps both.  Somebody, when that objection was made on

15   behalf of Celsius, should have been looking at it and

16   asking, well, what are the potential issues?  And again, the

17   testimony was that Kirkland & Ellis, if it saw a potential

18   preference issue, should have told Celsius.

19            Well, I find it hard to understand in August, once

20   Kirkland & Ellis knew that there were -- had been

21   withdrawals and knew obviously, of the Voyager bar date, why

22   under Celsius' own testimony, that doesn't mean that

23   Kirkland -- that seems to me that means under Celsius' own

24   testimony that Kirkland should have explicitly said Celsius,

25   here it is.  You know, I'm your counsel, and here's

1    something you need to look at, because there's a bar date

2    out there.

3           There can't be any question that Kirkland & Ellis

4    itself knew about the bar date.  I am especially troubled

5    that after the Committee and the Debtor raised the issue

6    about Kirkland's statements and about how somebody had

7    obviously looked at some aspect of this in August, Celsius

8    ignored the issue completely, made no further declarations,

9    offered no further evidence as to who at Celsius might have

10   worked with Kirkland on that issue, might have been aware of

11   the issue, what communications they had with Kirkland about

12   the issue.

13          Absolutely nothing on that point.  And while the

14   two Witnesses who were proposed, Mr. Bixler and Mr. Ferraro

15   said that they weren't asked until November to look into

16   these issues, and one of them, Mr. Bixler said it was

17   Kirkland that asked him, there's no indication that anybody

18   tracked backwards to see who else at -- in the counsel

19   department at Celsius or any of their Directors of any of

20   the other people who'd communicated with Kirkland, what

21   questions they had had, and what discussions they had had

22   about the -- these issues.

23          If, as Mr. Hurley agreed during argument the test

24   is whether Celsius knew or should have known about the bar

25   date, should have had actual knowledge, no question that its

1    counsel had actual knowledge.  And there's no question under

2    the circumstances in my mind that it should have been

3    discussed.  So, in the absence of any reason -- any evidence

4    as to whether it was discussed, or any explanation as to why

5    -- if it wasn't discussed, why it wasn't and why that should

6    excuse Celsius, I'm required, I think, to find on the

7    evidence that there's insufficient showing that there was a

8    valid reason for the delay.

9           I think on the other factors, if I were -- on the

10   length of time on the delay, it seems to me that there was a

11   one-month delay before the issue was raised with Voyager,

12   and a two-month delay before the motion was actually filed.

13   That's not a particularly long period of time.  If I were

14   completely convinced that Celsius had had no prior reason

15   even to know that there was a preference claim or a bar date

16   in the Voyager case, that might be persuasive.

17          But, in the context here, it's not enough, it

18   seems to me, if Celsius should have known, for Celsius to

19   say well, you know, we shouldn't be required to do anything

20   earlier than we -- then it took us to compile the full

21   schedule.  The whole point of a bar date notice, whether

22   it's delivered to a Debtor or to anybody else, is that

23   you're supposed to prioritize in your efforts to figure out

24   whether you have a claim, and to get it filed before the

25   deadline.

1          So, the fact that it didn't surface in the

2    ordinary course of the Celsius proceedings would only be an

3    excuse if there was no other reason, and no other actual

4    knowledge of the bar date.  But I am -- as I said, Celsius'

5    primary bankruptcy counsel obviously knew about the bar

6    date, so the argument that there was no actual knowledge

7    that was or should have been com -- submitted to Celsius

8    itself seems to be missing here.

9          So, I am going to deny the motion, but without

10   prejudice.  It's tempting to say we've had our factual

11   hearing today, but I want to be perfectly fair to all the

12   parties, if Celsius wants to renew the motion because it

13   thinks it can actually excuse what happened or that there's

14   actually explanations for what happened with Kirkland or

15   better reasons why I should find that the issues that were

16   clearly surfaced in connection with the Kirkland retention

17   somehow didn't and shouldn't have alerted Celsius to the

18   existence of the claim and the need to take action, then

19   they can try to convince me today of that.

20          But, based on the record that I have so far, they

21   have not done so.  And so, the primary factor that I have to

22   consider is whether there is a valid reason for the delay

23   they have failed to meet.  And there is some delay, there is

24   some prejudice, they're not particularly onerous to the

25   point where they would overcome and -- other factors, but I

Page 103

1     think the primary factor of the Second Circuit

2     (indiscernible) to look at is not satisfied here.

3            And you can't, if you have failed to satisfy that

4     factor, you can't get relief just by saying that it's only a

5     short period of time, or just by saying that it's not

6     particularly prejudicial.  Those are factors to be weighed,

7     but we're the primary factor.  So, plainly, it's not met.  I

8     think on this record it isn't, here.  And I think I have to

9     deny the request for relief of the party.

10           Let me make another point.  This is not a

11    particularly huge claim or a huge amount at issue.  I worry

12    about how much effort has already gone into it, and how much

13    money that the parties are spending on it.  How much, in

14    light of the amount that's at stake, that really makes sense

15    in the grand scheme of things.  Perhaps the parties ought to

16    sit down with Kirkland & Ellis and find out what it knew and

17    what it said and if it didn't say anything, why it didn't

18    say anything.  And make some reasonable judgements among

19    themselves as to what it's fair to do under these

20    circumstances.

21           I am not going to get to the question of whether

22    stay relief should be granted, because since there's no

23    claim that can be pursued, there's no reason for stay

24    relief.  But, I will say to alert the parties on this point

25    that, to the extent that the Debtors have implied that they

Page 104

1    wish to make arguments about the withhold accounts and

2    whether they were or were not property and whether prior

3    transfers to the withhold accounts should be treated as

4    preferences, those are issues Judge Glenn is going to be

5    deciding as to many customers, and if it -- if those are

6    going to be issues, or were to be issues in opposition to a

7    claim, and if I were to allow a late claim, then there is no

8    way I would entertain a separate litigation of those issues

9    in my Court.

10            If there are other defenses, then I'm not 100

11   percent convinced that the -- they would need to be decided

12   by Judge Glenn as opposed to by me, or that it would be

13   appropriate to do so, but we'll deal with that if and when

14   we ever get up to a point where submitting a late claim

15   should (indiscernible).  All right?  Is there anything else

16   I need to rule on?  Did I forget anything?

17            MR. HURLEY:  Not from Celsius' perspective, Your

18   Honor.

19            THE COURT:  Okay.  All right, and you agree on the

20   form of an order, please, and submit it?

21            MR. HURLEY:  Certainly.

22            MR. AZMAN:  Yes, Your Honor.

23            THE COURT:  Is there anything else to be done

24   today?  Okay.  Thank you very much.  In that case, we are

25   adjourned.  Thank you.

Page 105

1          MR. HURLEY:  Thank you, Your Honor.

2          MR. AZMAN:  Thank you, Your Honor.

3          (Whereupon these proceedings were concluded at

4     1:36 PM)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **I N D E X**

2

3                          **RULINGS**

4                                              **Page**        **Line**

5

6  **Motion denied without prejudice**        102          9

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 107

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  January 27, 2023

| & |
| --- |
| **&**  2:22 4:3 5:17 6:1 97:24 98:6 98:8,13,16,21 99:1,3,6,17,20 100:3 103:16 |

| 0 |
| --- |
| **02/07/2023**  3:9 |

| 1 |
| --- |
| **1**  23:6 42:23 44:1 |
| **1,000**  40:25 41:2,3 |
| **1.1**  17:15 18:8 18:11,14 |
| **10**  2:18 48:17 |
| **10,000**  41:5 |
| **100**  72:21 104:10 |
| **100,000**  57:22 85:7 |
| **10004**  1:14 |
| **10014**  4:20 |
| **10019**  5:5 |
| **10022**  4:6,13 |
| **10036**  5:20 |
| **1006**  4:19 |
| **10173**  6:5 |
| **102**  106:6 |
| **10:00**  3:9 |
| **11**  2:6,13 44:1 44:2 46:6 83:8 85:8 |
| **11501**  107:23 |
| **11:03**  1:17 |

| 2 (continued) |
| --- |
| **12**  50:21 |
| **12151**  107:6 |
| **12th**  87:23 |
| **13**  46:1 |
| **1301**  5:4 |
| **13th**  87:2 |
| **14**  19:10 61:18 |
| **15**  48:17 |
| **15th**  64:18 87:12 |
| **16th**  38:1,10 |
| **1993**  94:5 |
| **1:36**  105:4 |
| **1st**  85:19 87:18 |

| 2 |
| --- |
| **2**  9:15 |
| **20**  23:5 43:25 |
| **201**  4:19 |
| **2018**  43:23 |
| **2020**  23:5 43:25 74:17 |
| **2021**  44:1,2 74:17 |
| **2022**  2:13,18 2:23 23:19 44:11 61:18,25 62:3,15 |
| **2023**  1:16 107:25 |
| **21**  19:11 79:18 |
| **22-10943**  1:3 |
| **23**  23:19 |
| **23rd**  63:20 64:14 |
| **24**  1:16 |
| **25**  48:4 57:11 |

| 3 (continued) |
| --- |
| **25a**  11:16 |
| **27**  107:25 |
| **28th**  35:1 87:17 |
| **2nd**  14:4 46:9 46:22 52:4 87:20 |

| 3 |
| --- |
| **3**  19:2,21 29:2 30:7 32:20 48:3 53:6 57:9 57:12,17,20 |
| **30**  2:23 |
| **30,000**  29:1 |
| **300**  107:22 |
| **30th**  69:17,25 98:22 |
| **31st**  49:3 |
| **330**  107:21 |
| **340**  6:4 |
| **35**  42:1,25 43:24 |
| **3rd**  14:3 31:2 32:10 34:9 48:21 58:2 72:13 87:1 |

| 4 |
| --- |
| **4**  59:4,13 |
| **48**  32:10 |
| **4a**  18:18,19 19:1,10,13 |
| **4th**  49:5 |

| 5 |
| --- |
| **5.9**  17:14,22 |
| **50**  57:16,17 |

| 6 (continued) |
| --- |
| **50,000**  85:7 |
| **502**  17:14 |
| **540**  6:11 |
| **575**  4:12 |
| **5th**  31:1 32:9 38:15,18 59:11 61:23 |

| 6 |
| --- |
| **6**  22:25 |
| **60**  14:3 |
| **600,000**  29:2 32:21 57:24 93:22 |
| **60010**  5:12 |
| **601**  4:5 |
| **60661**  6:12 |
| **6th**  87:21 |

| 7 |
| --- |
| **7**  17:23 22:25 |
| **7,000,000**  84:20 85:6,9 85:11 |
| **7,000,0000**  84:23 |
| **7.7**  17:19 |
| **7.7.**  18:4 |
| **71**  5:11 |
| **718**  11:15 |
| **75,000**  11:4 |
| **77-79**  44:3 |

| 8 |
| --- |
| **8**  22:20 |
| **8th**  87:23 |

| 9 | access 36:5 | actual 64:8,12 | 32:25 41:19,19 |
|---|---|---|---|
| **9** 26:7 43:23 | accords 64:5 | 70:14 76:24 | 41:25 42:4,6,7 |
| 106:6 | account 17:23 | 89:5 94:9 | 42:10,12,15,21 |
| **90** 17:19 27:2,6 | 18:12 19:2 | 100:25 101:1 | 42:21,22,24,25 |
| 28:1,12,21 | 34:21 68:16,17 | 102:3,6 | 43:2,2,8,21,24 |
| 29:4,6,7,9,12 | 69:20 82:2,14 | **actually** 10:19 | 43:25 44:3,4,5 |
| 29:15,17,21 | 82:15 | 29:16 31:21 | 44:6 51:16,20 |
| 30:3,14,22 | accounting | 34:11 37:14,16 | 61:10 70:7 |
| 31:17 46:5 | 18:1 | 37:22 39:20,22 | 74:13,14,16,21 |
| 47:16,20,24 | accounts 34:18 | 40:17 61:9 | 75:8 76:8,14 |
| 48:18 51:5,7 | 36:1 53:21 | 69:9 72:1,25 | 76:18,23 77:23 |
| 57:7,9 59:17 | 54:2,4 55:7,8 | 74:12,13,20 | 95:19,20,23 |
| 60:9 71:16 | 55:23 56:19 | 75:11 77:14,25 | **addressed** |

| a | 69:21 81:4,8 | 78:8 83:11 | 54:23,25 72:3 |
|---|---|---|---|
| **a&m** 73:21,25 | 81:12,21,21,22 | 85:12 87:10,21 | 76:22 |
| 74:10 | 82:8,11 104:1 | 88:10 96:18 | **addresses** |
| **ability** 67:6 | 104:3 | 97:12,14 | 43:20 44:7 |
| 77:6 | accurate 50:19 | 101:12 102:13 | 75:5 |
| **able** 30:23 | 107:4 | 102:14 | **addressing** |
| 31:18 33:2 | accurately | **adam** 7:3 | 9:11 16:3 |
| 51:8 87:15 | 50:15 | **add** 91:10 95:4 | 95:25 |
| **absence** 101:3 | acknowledge | **added** 81:11 | **adjourned** 3:9 |
| **absent** 9:21 | 22:25 68:4 | **addendum** | 104:25 |
| **absolutely** | 93:14 | 24:17,19 76:9 | **administrative** |
| 42:13 47:12 | acknowledged | **addition** 13:12 | 3:6 86:12 |
| 100:13 | 98:23 | 88:23 | **admission** 9:24 |
| **absorbed** | **act** 90:7 | **additional** 14:9 | 21:12 45:10 |
| 45:18 | acting 21:7 | 20:10 38:1 | 58:19 |
| **abundantly** | 61:10 | 49:4 51:12,20 | **admit** 63:10 |
| 64:9 | action 53:13 | 51:23 59:23,24 | **admitted** 10:1 |
| **accelerate** | 81:15 102:18 | 82:15,15 83:7 | 21:13 45:12 |
| 66:11 | actions 29:18 | **address** 10:5 | 63:17 88:10 |
| **acceptances** | 50:22,24 | 14:20 16:3 | 94:9 |
| 2:6 | active 71:23 | 23:2,4,6,18 | **admittedly** |
| **accepts** 13:8 | activities 11:1 | 24:12,14,16,20 | 95:15 |
| | activity 11:10 | 24:23 25:2,7 | **advance** 58:7 |
| | 27:14 | 25:10,17,20,22 | 59:18 |

[advised - appropriate]                                                    Page 3

advised  71:8
advisors  36:7
affairs  48:3
  52:6
affidavit  12:22
affiliates  83:14
afternoon  46:1
agenda  9:9,15
agent  26:8
agents  23:20
aggregate  19:1
  85:5
aggregated
  48:6
aggregating
  50:13
aggregation
  57:11
ago  43:6 44:7
  77:18
agree  16:18
  17:4 25:16
  49:17 63:15
  85:3,6,10 86:2
  86:5,13 90:6
  90:19 104:19
agreed  98:7
  100:23
agreement
  24:24 25:3,7
  25:10,16,19,21
  25:23 41:23,24
  42:3 63:6,7,24
  74:17,20 75:3
  75:6,12,12
  76:7,10,11
  95:16,21

agreements
  25:13 26:2
ah  53:8
ahead  22:14
  28:23 89:16
  92:2
airlines  84:14
  84:14
akin  5:17
  16:14 28:11
  43:18 44:15,20
  44:22 45:5
  57:3 59:5,9,14
  61:7,10,19,21
  62:5 73:25
  81:7 87:6
al  5:10 6:3
alert  53:4
  55:24 68:20
  103:24
alerted  52:25
  96:20 102:17
allegation  71:2
alleged  35:2
  82:18
allegedly  96:5
allocati  7:8
allow  20:19
  104:7
allyson  4:8 9:7
  14:18
alter  90:20
alters  76:10
alvarez  6:9
  27:11 36:4
  45:7

amend  42:3
amended  63:22
  64:17 74:18
amendment
  74:18 76:15
americas  5:4
amount  17:18
  19:20 44:23
  85:5 86:7
  92:24 94:3
  103:11,14
amounts  36:5
  81:18 82:2
analysis  10:20
  50:16,19 51:3
  93:12
analyzed  30:8
anderson  2:22
  11:7 13:19
angela  6:24
answer  23:22
  41:21 43:6
  50:1 65:3 67:8
  72:9,22 78:8
answered
  29:16 42:18
answering
  85:23
answers  21:17
  22:3 69:15
anticipate  19:6
anybody  14:11
  21:11,14 33:24
  36:10,17 38:20
  38:21 42:16
  43:12 54:23
  56:17 58:19

  62:15 65:22
  66:25 71:4
  72:2 73:2,4
  76:17 77:13
  78:22 86:16
  95:4 97:8,9,14
  100:17 101:22
anymore  64:25
apologies
  14:24
apologize  9:6
  22:1 24:9
  89:13
appear  60:25
  97:5
appeared
  46:11 49:23
  50:3 52:5 53:5
  93:16
appears  52:24
  92:16 98:19
application
  2:10,16,21
  9:16,18 10:5,6
  14:22 15:4,18
  15:22 16:10
  61:14,17
appreciated
  73:1
approach  60:2
  91:18
approached
  62:15
approaching
  86:9
appropriate
  26:5 95:19

104:13

**approve** 13:17

**approximately**
17:20 18:3
48:4 57:13,17

**archer** 7:6

**arentfox** 2:17
12:19,22,23
13:8,10

**aren't** 18:18
79:7 88:6
89:25

**arguably** 92:8

**argue** 80:2
86:17

**argued** 18:17
79:18 95:5
98:5

**argues** 95:18

**arguing** 96:5

**argument**
15:21 26:4
61:10 62:25
64:13 65:7,17
83:1 84:15
96:4,10,22
100:23 102:6

**arguments**
60:6 79:6,7
80:6 83:13
95:8,10 96:2
96:13 104:1

**arisen** 72:2

**arose** 62:10,10
92:20

**arrangements**
10:9

**ascertainable**
80:3

**asked** 31:13
37:15 39:9
46:4,8,8 51:17
52:2 55:2 58:1
62:8,22 67:11
77:11 87:16,19
100:15,17

**asking** 29:14
38:1 41:10,16
46:10 52:5
59:20 68:7
99:16

**aspect** 100:7

**assert** 82:1,7

**asserted** 81:16

**assessing** 54:19

**asset** 63:25

**assets** 12:1,4
18:10 46:5
52:7 79:22
80:16,16,23
81:3

**assigned** 74:18

**assigning**
24:18 30:18

**assignment**
24:24 25:3,10
25:16,19,21,23
26:2 41:23,24
42:3 63:7
76:10

**assist** 10:20

**associated**
43:20

**assume** 15:12
55:2 56:15,16
99:3,11

**assumes** 65:24

**attention** 36:19
36:20,22,25
37:11

**attentive** 20:17

**attorney** 60:4

**attorneys** 4:4
4:11,18 5:2,10
5:18 6:2,10
13:13 97:25
98:1

**august** 35:24
49:3 55:4 56:5
56:7 61:25
62:3,10,15
68:14 69:17,25
72:13 98:22
99:19 100:7

**authorities**
42:20 43:9

**authorized**
75:25

**authorizing**
2:10,16,21 3:1

**automatic** 2:2

**available** 21:8
45:8 87:16

**avenue** 4:5,12
5:4 6:4

**aware** 15:8,8
28:12,20 31:25
32:8 33:6,9
35:4,7 39:15
39:16 44:10,14

44:22 46:23,25
47:1,5,7 48:20
50:6 53:23,25
54:2,3 55:12
55:19 56:10,16
58:2,4,5,7
59:17,20 66:17
67:9 71:18,20
73:16 83:13
88:11,12,17,18
92:16,22,24
94:12 97:4
98:3 99:2
100:10

**awareness**
71:23

**awkward**
73:12

**azman** 6:7 20:6
20:6 45:14,14
45:25 46:20
51:23 58:21,21
58:24 59:3
61:4 63:5,10
83:6,6,21 84:9
85:3,20 86:3
89:13,14,17
91:12,25 92:3
104:22 105:2

|       b       |

**b** 1:21 11:20

**back** 65:13
67:8 73:24
78:7 84:24
85:20 86:8,13

**backwards**
100:18

**bad** 69:15 90:5
90:6
**balance** 69:20
86:6
**balances** 3:7
93:22
**baltaytis** 8:8
**bandwidth**
51:12,18
**bankruptcy**
1:1,12,23
16:20,22,23
26:10 33:6,10
33:14,19 46:6
47:6 49:16
50:6 60:18,25
68:21 84:6
92:18 93:7,9
96:21 98:18
102:5
**bar** 19:25
22:21,25 23:17
24:13 26:9
30:24 31:1,9
31:18 32:1,7,9
32:15,19,24
33:7,18 34:22
39:11,20,22,25
40:3,6 41:17
47:6 48:20,23
49:18 50:4
51:9,15 56:6
56:13,16 58:2
58:4 59:18
64:2 66:1,1,5
66:11,15,17,18
67:9 68:18

69:2 75:24
78:11,13 83:20
84:4,6 85:1
86:23 87:1
88:11,12,17,18
89:6,6,9 92:12
92:17,19,20
93:3,10 94:10
94:10,14,18,19
94:21 95:5
96:18,25 97:4
97:22 98:2,4,8
98:23 99:21
100:1,4,24
101:15,21
102:4,5
**bartholomew**
23:6 42:24
44:1
**based** 19:8
60:7 65:23
67:6 81:20
91:1 93:19
102:20
**basically** 65:3
87:10
**basing** 36:20
**becoming**
44:14,21
**beginning**
93:13
**behalf** 2:12
9:17 13:14
15:13 17:10
18:17 20:11,12
20:13 35:12
54:23 80:11

99:15
**believe** 10:12
11:2 12:3
18:24,24 24:12
25:11 30:18
32:25 45:7
46:10 59:11
63:7 64:2,3,17
64:25 71:7
72:17 73:20
74:7 78:18
79:3 80:16,22
81:16 87:17
95:15
**believed** 70:20
77:22
**beller** 7:4
**belong** 81:5
**benjamin** 6:25
7:4
**best** 26:8 47:25
**better** 18:8
64:7 102:15
**beyond** 97:13
**big** 27:14 31:6
39:5 77:4 85:7
89:1
**bigger** 86:21
**bill** 61:21
**bit** 18:15 28:10
31:22 86:6
90:4,16 93:9
**bixler** 6:14
21:3 27:11
45:6,7,16,20
45:23,24 46:1
52:1,1 57:4,6

58:14 97:18
100:14,16
**bixler's** 45:11
**board** 37:7
**boards** 51:13
**body** 89:20
**books** 18:6
**bowling** 1:13
**break** 75:24
**brief** 86:25
88:3 89:14
**briefing** 90:19
**briefly** 57:2
91:25
**brings** 62:25
**broad** 48:19
**broader** 52:16
**broadly** 35:7
**brought** 36:19
36:22,25 37:15
51:19 90:9
**bryant** 5:19
**bucket** 19:19
84:19,20
**built** 83:2
**burden** 20:16
72:19 73:6
86:12
**business** 3:4
62:25 66:7
93:19 96:21
**busy** 40:12

| c |
| --- |

**c** 4:1 5:15 9:1
15:24 16:3,4
107:1,1

calculated
  18:19
call  87:13,17
called  18:11
  42:14 61:13
candid  82:10
canvassed  40:9
  77:14
canvassing
  40:4 77:12,12
can't  10:18
  16:6 27:8,8
  30:5 36:23
  37:2,8 40:9
  80:9 99:3
  100:3 103:3,4
capacity  48:17
capital  10:22
care  63:1
careful  60:3
caroline  8:12
carry  20:16
  90:12,13
case  1:3 13:19
  16:20,21,22
  19:6 21:8 28:9
  31:9 32:9
  33:12 34:23
  36:6 38:1,20
  40:15 47:8
  48:23 50:4
  53:14 56:6
  68:1,10 70:24
  78:20,22 79:24
  83:19 84:11,16
  84:17 85:8,10
  88:20 89:10,21

90:18,23 91:3
91:7,23 92:7
92:10,15 93:11
93:13 94:1,4,5
94:9,22,23
96:21 98:2
101:16 104:24
cases  13:1
  19:22 33:19
  64:6 78:15
  79:13,16 83:2
  83:8,15 84:4
  84:14 86:24
  88:5,7,10,13
  88:21 89:3,7,9
  92:3,4,5 94:8
cash  3:2
categorized
  10:22
cathy  7:14
caught  18:8
  26:25
cause  71:6
  72:17
caused  72:2
  73:20 93:1
cavendish  44:3
cc  52:18
cede  14:15
celsius  2:1 5:18
  6:10,16 9:12
  14:1 15:7,19
  16:4,22 17:16
  18:5,9,25
  20:12,13,16
  21:7 22:22,22
  22:22 23:1,4

23:10,14,14,14
23:19,21,21
24:1,2,2,18,18
26:8 27:3,10
27:19 30:2,22
31:16,24 32:1
32:17,24 33:1
33:15 34:8,23
34:24 35:4,4
35:11,20,25
36:9,17 37:25
38:19,21,23
39:1,3 40:4,5
41:13,18 42:9
42:15 43:1,20
44:6 46:23
47:10,25 48:11
48:12 50:5,22
51:7,8,15 53:1
53:21 54:2,4,8
54:20,24 55:7
55:25 56:13,18
56:22 58:12,25
59:8,15,25
61:8,24 62:6
62:14,16 63:13
63:19,22,24
64:2,10 65:18
65:24,25 66:16
67:7 68:10,13
68:25 69:2,6
69:10,20 70:9
70:15,18,21
71:4,5,7,12,18
71:20 72:2,17
73:12,19 74:19
74:19,20,23

77:24 78:1,18
78:21 79:6,7
79:10,14,21
80:2,7,8,14,15
80:18,23,24
81:5,17 82:19
88:17 89:11
90:16,17,24
91:6 93:8 94:2
95:6,9,15,17
95:20 96:3,5,8
96:13,17,24
97:9,12,14,15
98:5,7,10,13
98:15,17,20,24
99:5,10,15,18
99:24 100:7,9
100:19,24
101:6,14,18,18
102:2,7,12,17
celsius'  17:1
  18:13 25:15
  31:25 45:5
  46:6 52:6 57:8
  80:12 81:11,24
  93:19 97:24
  98:3 99:22,23
  102:4 104:17
ceo  21:7
certain  3:3
  10:21 11:8
  15:23 83:13
certainly  12:20
  16:8 19:7
  53:16,23 58:6
  59:11,22 60:16
  66:15 67:6,9

68:1,6 73:15
74:6 76:12
77:5,18 79:11
80:1 91:15
93:24 97:18
104:21
**certificate** 2:8
2:14,19,24
**certificates**
9:10
**certified** 107:3
**cfo** 35:6
**chambers**
14:13
**change** 19:11
23:5 41:19
43:25 44:2,3
74:14 76:18,23
95:21
**changed** 41:18
42:9 44:1
**changes** 9:20
**chapman** 5:23
22:9,10,13,15
22:17 25:11,25
26:3,6 28:24
30:17 32:4
33:22 43:13,13
43:16,17 57:2
57:2,5
**chapter** 2:6
46:6 83:8 85:8
**charged** 78:19
**charles** 8:14
**check** 26:23
40:2 52:11

**checked** 26:11
31:12
**cherry** 8:5
**chicago** 5:12
6:12
**chicken** 31:22
**chose** 93:4
**chris** 6:16 21:7
22:16
**christine** 7:21
**christopher**
7:22
**circuit** 84:11
84:17 91:17,19
103:1
**circumstance**
89:5
**circumstances**
83:5 90:22
94:24 101:2
103:20
**cite** 94:5
**cited** 39:18
79:16 86:24
88:5 90:23
92:7
**civil** 15:25
**claim** 2:3 11:4
17:14,18 18:3
18:18,25 19:23
29:23 32:7
33:2 44:10,14
44:22 53:2,8
53:11,12,19
55:25 56:2
60:11,20,21
64:11 65:19,23

66:3,12 69:3
70:2,23 79:8
79:10,20 80:7
80:8,15,18
81:6,6,17,19
83:4,17,25
84:1,7,13,15
85:14,17 87:3
88:11,17 89:5
89:9,23 90:2
90:21,22,25
91:8 92:11,17
92:20,24 93:1
93:6,17 94:3
94:12,20,25
95:7 96:6,8,10
96:20 97:1
98:19 101:15
101:24 102:18
103:11,23
104:7,7,14
**claimant** 79:14
79:15 88:9
89:8 92:16
94:9,11,19,20
**claimants**
88:10
**claiming** 91:19
97:21
**claims** 12:17
16:18,21 18:21
19:2,10 29:8,8
50:8 51:4,5
56:23 59:15,25
60:7 69:10
83:3,14 84:3
84:21 92:23

93:6
**clarify** 18:24
**class** 18:18,19
19:1,2,4,10,13
19:21
**classes** 19:9
**cleaned** 48:6
**cleaning** 49:12
50:14
**clear** 12:15
16:2 32:8
64:10 68:14
70:12 87:5
91:8
**clearly** 78:12
79:2 102:16
**client** 60:4,21
**close** 65:6
**closed** 74:5
**closing** 86:10
**cno** 10:3 14:8
**cochrane** 6:23
**collaboration**
27:10
**colleague**
14:20
**collectively**
89:21
**color** 73:17
**com** 102:7
**come** 33:18,20
37:11 51:14
52:17 66:4,6
71:2,3 72:10
82:2,18 87:8
89:22

comes 40:22
41:13 42:21
77:3
comfortably
57:16
coming 40:18
47:8 49:10
83:15
comm 90:23
comments 14:7
14:7
commercial
79:17 80:13,17
80:21 81:13
committee 6:2
14:5 20:7,19
21:14,16 37:2
37:7 45:12,15
58:22 68:9,17
71:13 82:21
83:7 95:8 96:5
100:5
committee's
36:20 83:1
communicate
68:3
communicated
100:20
communicati...
74:9
communicati...
56:18 69:9
75:3 77:17
90:18,24 91:4
100:11
companies
71:25

companies'
42:15
company 23:12
23:15 26:17
29:11 30:23
31:4,17 35:7
48:3 50:14
57:23 61:13
company's
42:14 48:16
comparable
92:8
comparative
93:18
comparatively
89:4
comparing
84:12
compile 101:20
compiled 38:3
38:9,11,16
47:24
compiling
40:12
completed 31:9
completely
23:10 100:8
101:14
complex 85:8
93:11
comply 76:1
94:17
component
60:17
con 76:1
conceivable
16:24

concept 60:23
concern 16:8
71:18 97:23
concerned
73:22 83:12
concerns 10:4
conclude 70:1
concluded
105:3
conclusion
22:21 90:20
concrete 72:2
conduct 51:3
confess 17:1
60:24
confirm 77:22
confirmation
14:4 75:17
86:10
confirmed
26:12 88:24
conflict 13:3
15:20 35:2,7,8
35:12 36:16
44:18 61:19
62:9 68:12
69:7,8 70:14
71:6,16,23
72:3 87:14
98:16,19 99:6
conflicted 99:4
conflicting
70:9
conflicts 15:6
54:8,13,16,19
54:24 55:15,19
59:5 61:8,11

61:22 62:2,11
68:13,24 70:8
70:21 98:15
confronted
60:14
confusion
74:21
connect 34:22
36:7,7
connected 33:4
36:17
connection
10:8,25 11:9
11:10,19 15:19
54:9 65:13
70:20 102:16
consensually
87:12
consider 72:3
85:2,22 102:22
considerations
19:24
considered
19:14 59:15
60:5 91:1
consistent
75:11
constitute 19:3
35:12
constituted
36:16
constructive
91:5
consuming
50:12
contacted
87:10,13

**contained** 51:5
57:9
**containing**
48:4
**contend** 18:7
**contention**
95:14
**contested**
18:25
**context** 68:23
84:16 101:17
**continue** 3:2,4
10:25 32:22
**continued**
31:14 43:3
**continues**
91:19
**continuing**
91:3
**contract** 41:24
41:25 63:23
64:20
**contractors**
23:20
**contracts**
64:16
**contractual**
76:2,4 95:16
95:22
**contrast** 93:8
**contributions**
10:22
**controls** 30:9
**conversation**
36:24 44:18
70:16 72:8
78:7 81:4

**conversations**
39:12 77:19
**convince**
102:19
**convinced** 96:2
101:14 104:11
**coordinated**
60:4
**correct** 12:6,7
13:1 17:17
24:12,16,25
29:19 32:25
37:18,23 44:7
44:8 47:12,22
51:16 52:3
58:2 59:7,16
62:22 74:15
76:19 78:5
**correctly** 10:7
21:4 61:16
76:22
**correspond**
12:18
**corroon** 2:22
**couldn't** 21:24
38:4 79:20
96:14
**could've** 16:25
51:19,21 65:22
**counsel** 2:11
2:17,23 9:7,17
12:2 13:20
15:3,6,6 21:5
25:15 27:19
28:5 36:25
37:4 38:25
39:3,10,10,14

39:17 40:7
56:1,12,15
58:25 59:5
61:8,11,19,22
62:3,5,11 64:6
67:14,22 68:2
71:8 87:25
97:24 98:3
99:13,25
100:18 101:1
102:5
**counsel's** 39:6
68:3 77:19
**counterparties**
64:20
**counterparty**
76:14
**country** 107:21
**couple** 86:19
88:19 90:7
92:7
**courier** 75:15
**course** 12:20
15:2 66:7
75:18 80:17,19
81:13 91:20
92:19 98:4
102:2
**court** 1:1,12
9:2,5,13,23
10:4,6,14,17
10:23 11:6,22
12:1,5,8,13,22
13:1,4,11,17
13:24 14:11,17
14:21,24 15:8
15:10,12,16

16:11,17 17:5
17:13,21 18:16
19:17 20:2,11
20:20,25 21:11
21:24,25 22:2
22:7,12,14
25:9,15,24
28:23 31:14
32:3 33:24
34:2,6,16,23
35:10,16,18,23
36:9,14,22
37:4,10,14,21
37:25 38:9,14
38:19,25 39:3
39:5,9,17 40:1
40:16,21,24
41:2,5,9,18,23
42:3,9,18 43:1
43:7,11,15,19
44:13 45:2,10
45:17 46:17,19
51:25 52:8,12
52:15,19,25
53:9,20 54:1,5
54:12,15,18,22
55:2,12,14,22
56:3,8,12,17
56:21,25 58:10
58:14,18,23
60:25 61:6,24
62:2,12,19,23
63:3,9,12,17
64:13,22 65:2
65:5,11,16
66:19 67:10,17
67:20,24 68:7

[court - debtor]                                                        Page 10

70:6,13,16,23
72:5,9,19 74:1
74:11 75:2,8
75:23 76:7,16
76:20 77:8,10
78:2,6,9,14,24
79:5 80:4 81:2
81:19 82:8,20
83:18,24 84:24
85:2,4,12,25
86:16 89:12
90:24 92:2,21
92:25 93:4
94:15,17,18
95:2 97:3
104:9,19,23
**courtney** 7:11
**courts** 85:21
90:1
**court's** 22:11
**crafted** 91:24
**craig** 8:17
**credit** 93:13
**creditor** 11:3
11:17 19:9
64:1,4,11
73:19 74:1,6
79:7 80:3 81:6
84:12,13 89:20
90:17 91:1,9
95:9 96:3
**creditors** 6:2
10:7,11 11:21
19:25 29:3
32:21 70:4
85:9

**creditor's**
84:21
**cross** 9:25 20:8
20:17,18 21:1
21:5,9,14,16
22:10,16 33:25
45:8,13,24
51:25 58:20
59:2
**crypto** 46:5
53:14 83:8,17
**cryptocurrency**
78:15 83:25
84:4
**current** 44:4
**currently**
61:11
**customer**
18:21 35:1,4
35:25 70:23
72:15 98:13,24
**customers**
57:19,19,24
69:23 93:22
104:5
**cuts** 96:7

**d**

**d** 9:1 17:14
106:1
**daniel** 6:19
**darren** 6:7
20:6 45:14
58:21 83:6
89:14
**data** 29:2 30:8
32:21 36:5
47:14 48:1,5

49:3,5,11,13
49:23,25 50:14
50:16 57:6
**date** 17:7 19:25
22:21 23:1,2
23:17 24:13
26:9 30:24
31:1,6,9,18
32:1,7,9,15,19
32:24 33:7
34:22 38:18
39:11,16,20,22
39:25 40:3,6
41:17 47:6
48:20,23 49:18
50:4 51:9,15
56:6,14,16
58:2,4 59:18
64:2 66:1,2,5
66:11,15,17,18
67:9 68:18
69:2 75:24
78:11,13 82:11
83:20 84:5,6
85:1 86:23
87:1,3 88:11
88:12,17,18
89:6,6,10
92:12,17,19,20
93:3,10 94:10
94:10,14,18,20
94:21 95:5
96:18,25 97:4
97:22 98:2,4,8
98:23 99:21
100:1,4,25
101:15,21

102:4,6 107:25
**dated** 16:20
**dates** 33:18
43:21 81:20,21
99:2
**david** 7:5
**day** 17:19 27:3
27:6 28:1,12
28:21 29:4,9
29:12,15,17,21
30:3,14,23
31:17 40:22
47:16,20,24
48:18 51:5,8
57:9 59:17
60:9 71:15,16
82:1 88:2
90:12,13
**days** 14:3 29:7
29:7 46:5 57:7
**de** 7:12 84:15
84:22
**dead** 73:8
**deadline** 50:17
97:2 101:25
**deal** 104:13
**dealings** 35:3
35:20
**dean** 5:23 22:9
43:13,17 57:2
**debt** 10:24
11:1,9,11
**debtor** 1:9 2:12
4:4,11 9:15
20:14 25:11
64:6 66:3,13
75:20 80:5

[debtor - director]                                                    Page 11

84:1 91:1,8
94:13 100:5
101:22
**debtors** 2:5 3:1
9:8 14:2 20:12
20:15 56:16
63:5,15 64:5
64:10 79:18
82:21,25 86:2
87:7 91:12
95:7 103:25
**debtor's** 79:5
**decades** 92:6
**december** 14:6
87:2,7,18,20
87:20,23
**decided** 104:11
**deciding** 54:24
104:5
**decision** 35:11
35:13,16 36:15
69:6 71:5,5
93:5 96:12
99:5
**decisions** 99:4
99:13
**decisive** 95:12
95:14
**declarants**
9:25 20:8
**declaration**
10:23 11:2,15
21:4,8,10,12
21:13 22:20
25:12 26:7
35:23 36:12
39:13,18,21

45:9,11 46:2
47:1 50:21
55:4,12,16
58:11,15,19
59:4,13 62:13
68:2,5 70:7,25
73:14 98:22
**declarations**
9:18,21,24
10:1 12:12
17:6 20:9,23
21:3 66:20
67:21 80:13
100:8
**deemed** 85:1
**defendants**
93:21
**defenses** 81:14
104:10
**definitely**
67:17
**delaware** 2:22
**delay** 72:20
86:22 87:2
88:7,20 89:4
89:19 90:4
91:14,14 92:6
92:7 101:8,10
101:11,12
102:22,23
**delegate** 26:24
**delivered**
101:22
**delivery** 75:16
75:22 76:6
**denied** 94:25
106:6

**deny** 102:9
103:9
**department**
4:17 40:16
77:1,11 97:10
100:19
**departments**
40:2
**deposited**
79:22
**described**
23:18 61:2
76:15 88:8
93:5
**description**
12:16
**detail** 52:5
55:10
**detailing** 53:6
**details** 77:3
**determination**
26:10
**determine** 40:5
59:23,25 69:8
**determined**
60:15 91:4
**determining**
85:22
**deutsch** 39:4
44:19
**developments**
38:22
**dibattista** 7:13
**didn't** 26:19
34:11,13,22
39:19,20 40:10
41:25 44:10

50:16 66:7,21
67:2,3,13 68:4
69:13,14 71:1
71:2 72:4,23
72:24,24,25
73:1,3,4,4 77:1
77:15,25 78:3
78:11,13 79:3
80:8 82:8
83:18 84:6,7
97:5,9,16,22
102:1,17
103:17,17
**difference**
85:17
**differences**
90:19 91:13
**different** 18:1
28:10 43:19
48:11 57:19
76:5 78:14
80:25 84:8
88:20 89:10
92:14 95:19
**differently**
9:11 82:3
**difficult** 32:17
**digital** 1:7 5:3
5:10 6:3 9:16
**direction** 2:12
**directly** 48:18
55:20 85:24
**director** 2:13
5:2 9:17 13:15
26:11 45:6
99:11

directors 24:8
100:19
director's 71:7
disclosed 38:5
55:6 72:15
disclosing 9:20
disclosure
24:19 63:23
disclosures
11:16
discovered
32:11
discovering
93:2
discovery 87:3
discrete 15:7
discrimination
79:15
discuss 16:9
87:24
discussed 37:8
40:8 46:13,24
70:11 101:3,4
101:5
discussing
88:25
discussion
35:14
discussions
27:21 28:4
33:17 100:21
disparate 19:4
dispute 28:14
48:25 89:7
93:14 94:11
distinct 91:15

distinction
80:11 81:11
93:16
distinctions
90:20
distinguish
90:17 91:7
94:8
distinguishable
92:10
distinguishes
94:22
distraction
90:5
distributions
19:18
district 1:2
19:21 78:16
94:6
divert 65:13
docket 11:15
38:22 48:10
78:19
document 14:6
53:18 70:13
72:12
documents
38:15
doesn't 25:16
74:20 77:12
83:23 84:22
90:8 93:14
97:5 98:25
99:22
doing 12:15
40:14 61:24
72:23

dollar 85:5
don't 13:18
17:1 18:24
19:5,7 21:6
24:9 26:4 28:8
28:25 30:6,15
30:18 34:2
35:18 36:14
37:14,16 39:19
40:14 43:6
51:13 52:10,12
52:14 53:14,22
53:24 54:10,14
54:17,21 55:1
55:18 56:24
60:16 63:7,18
64:3,25 66:4
66:24 68:1
69:24 72:12,21
73:7 74:1,3
75:19 76:16,22
77:1,11 78:2
78:24 82:25
83:9 85:3,12
85:16 88:4
90:11 95:15,24
96:11,12
dots 33:4 36:7
36:8,17
dozens 88:6
draft 49:19
drawn 69:20
drive 5:11
drop 19:18
84:18,20
due 95:14,24

dustin 7:19
duties 94:14

e

e 1:21,21,22
4:1,1 9:1,1
55:4 106:1
107:1
e.u. 74:19
eagle 94:5
earlier 55:17
101:20
early 32:6,12
36:18 37:20
39:15 44:11,25
47:15 58:6
59:11 73:18
74:8 87:3
earn 81:8,20
earned 81:3
echo 91:12
ecro 1:25
effect 82:12
96:17
effective 2:13
2:18,23 61:17
effectively
44:19
effort 31:6
50:23 51:1
103:12
efforts 101:23
egg 31:23
eggermann
6:19
either 20:16
23:21 31:24
36:8 37:4

46:13 75:21

**el** 90:12

**element** 90:14

**elements** 89:22
89:25 90:1,3
90:12

**elicited** 77:18

**ellis** 4:3 8:12
9:7 27:24
34:24,25 35:2
35:13,23 46:9
47:2 52:2 55:5
55:23 56:4,10
56:19,23 62:12
68:11 69:6
97:24 98:8,14
98:16,21 99:2
99:3,6,17,20
100:3 103:16

**ellis'** 98:6

**email** 46:9 52:4
52:11,22 53:23
75:16

**emanuel** 87:14

**emery** 6:1 20:7

**emphasized**
46:7

**employee** 26:9
26:13,15,16

**employees**
23:19,23 24:1

**employment**
2:11,17,22
79:15 98:6

**enable** 12:2

**engage** 50:16

**engaged** 28:11
44:15 80:19

**engagement**
47:8

**engaging** 44:20
82:13

**enjoyment**
42:16

**enron** 84:17

**ensuring** 50:18

**enter** 14:12

**entered** 14:10
63:8 95:21

**enterprise** 77:4
97:21

**entertain** 104:8

**entire** 27:15
65:12 68:9
71:2,10,11
84:16

**entirely** 81:15
82:11 84:8

**entities** 23:24
24:8

**entitled** 64:12
95:10

**entity** 15:19
42:7 43:23
79:14 90:25

**envelope** 41:12

**equation** 19:15

**equity** 10:13
10:17

**equivalent**
42:11 81:8

**equivocal**
97:17

**eric** 6:21

**erik** 7:17

**especially**
38:12 100:4

**essentially**
41:10

**establish** 20:16
96:23

**established**
33:18

**estate** 63:25
80:16,17

**estates** 83:10

**et** 5:10 6:3

**ethan** 6:20

**ethical** 13:13

**eu** 22:22 23:14
23:16,21,24
24:2

**evaluate** 51:3

**evans** 8:13

**everybody** 9:2
78:17

**evidence** 9:21
9:24 20:2,10
20:23 21:10,12
21:13 45:9,11
45:12 58:13
63:3,6,11,16
63:18 67:10
71:17,19 72:10
72:21 73:8
74:2,5 75:16
76:16,24 77:21
78:10,25 88:15
88:16,16 93:11
95:19 96:23

97:11 100:9
101:3,7

**evidencing**
57:7

**evident** 80:12

**evidentiary**
20:22 65:2,5,6
68:8

**exactly** 11:6
44:24 47:13,23
70:4 72:12
73:14 81:6
91:23

**examination**
21:9 22:16
45:8,24 57:4
59:2

**examinations**
21:1

**examine** 9:25
21:6,14,16
33:25 45:13
51:25 58:20

**example** 66:4
67:15 95:9

**exceeded** 48:17

**excess** 57:11

**exclusive** 2:5

**exclusivity**
14:1,2

**excusable**
85:22 86:17,19
89:2,11,17,23
90:11,13 91:20
95:13

**excuse** 10:1
34:24 58:14

65:18 72:20
74:4,11 86:3,4
86:14 101:6
102:3,13
**excused** 45:3
**execution**
24:19
**executory**
63:23
**exercise** 28:3
**exist** 60:6 82:9
**existed** 80:21
**existence** 60:9
89:8,9 94:12
102:18
**existing** 3:4
**exited** 80:17
**expect** 91:19
**expectation**
14:22,25
**expectations**
19:25
**expected** 96:14
**expense** 3:6
**experience**
60:18
**expired** 94:11
**explain** 43:19
44:13 52:19
**explanation**
16:8 63:18
101:4
**explanations**
102:14
**explicitly** 42:6
98:25 99:24

**express** 19:22
**expressing**
94:16
**expressly**
25:22 76:12,14
88:10
**extend** 14:2
**extending** 2:5
**extension** 14:1
38:2
**extensions**
31:13,13
**extent** 17:2
28:5 103:25
**externally**
46:14
**extra** 76:2

**f**

**f** 1:21 107:1
**facsimile** 75:16
**fact** 13:8 21:2,6
53:4 55:7
60:21 61:20
68:10 79:13
80:21 82:16,17
85:21 93:11
97:24 102:1
**factor** 85:2,21
94:21 102:21
103:1,4,7
**factors** 19:14
74:12 82:22
86:5 91:15,18
101:9 102:25
103:6
**facts** 90:19
92:4,14

**factual** 102:10
**failed** 76:1
96:23 102:23
103:3
**failure** 94:13
**fair** 10:10 31:8
67:5 76:3 77:5
84:9 102:11
103:19
**fairly** 84:5
**faith** 82:24
**fall** 18:25
66:20
**familiar** 47:16
60:22
**far** 41:5 66:20
89:3 102:20
**favor** 95:6
**favorable** 86:5
89:11
**february** 43:23
**feld** 5:17 16:14
43:18 57:3
**ferraro** 6:16
21:3,7,8,15,15
21:20,22,25
22:6,16,18
23:8 26:1,7
34:7 43:12,17
44:9 45:2 55:2
55:10 66:22
67:11 77:18
78:11,12 79:3
97:4 100:14
**ferraro's** 97:16
**ferreira** 8:4

**figure** 66:2
101:23
**figured** 95:18
**figures** 18:5
**file** 2:2,6 10:3
14:23,25 15:4
16:10 19:25
33:3 38:2 51:6
83:16 92:11
94:14,25 95:6
**filed** 2:3,8,14
2:19,24 3:8
9:10,18 11:15
14:6,8 16:22
16:23 17:1,1,4
18:3 23:5 27:3
27:17 28:15
30:4,25 32:9
32:14 33:9
35:1,23 37:25
38:15,19,20
43:25 44:2,2
48:10 49:6
55:3,4 57:9
60:19 61:14
62:13,15 78:15
81:25 83:8,19
85:18,18 86:23
87:1,6 88:2,24
92:18 98:21
101:12,24
**files** 48:4
**filing** 14:5 17:7
33:6,11,14
38:18 46:3,6
47:6,7 49:16
50:6,17 84:4

85:15,15,16
**filings** 78:17
80:12
**filtered** 65:22
**final** 3:1 38:4
38:14 58:11
**finalized** 31:21
38:11
**financial** 48:2
52:6
**find** 66:12
72:24,25 73:21
96:12,15,25
97:7,9 99:19
101:6 102:15
103:16
**fingertips** 17:2
**finish** 85:4
**finished** 93:7
**firm** 27:22
97:25
**first** 9:12 33:9
37:8 46:12
49:8,25 53:20
53:22 59:8
61:8 62:9 63:1
65:7 69:16
82:1 87:18
**five** 34:18 39:7
48:15 65:7
**flagged** 73:19
**floodgates** 84:3
**flouted** 94:19
**flux** 49:13
**focus** 46:7
50:18

**focused** 50:13
97:7
**focuses** 79:12
**folks** 48:15
**follow** 34:6
50:20
**following**
40:15 75:5
**fooled** 61:3
**foregoing**
107:3
**forget** 104:16
**forgotten**
45:19
**form** 20:16
38:4 49:8,19
50:19 104:20
**formal** 10:2
40:19
**formatted** 48:6
**formatting**
38:14
**formed** 19:9
**forms** 3:4
**forthcoming**
15:9
**forward** 42:22
71:2,17 72:10
**forwarded**
97:13
**forwarding**
42:12,23,24
43:2,8,19
**found** 65:22
90:24
**foundation**
28:22 32:2

46:18
**four** 46:2,3
48:15
**fox** 5:1
**frankly** 64:3
97:17
**friday** 10:4
14:8
**frishburg** 74:7
**front** 24:9 25:3
25:5,6,14 82:3
**ftx** 83:14,18
**full** 25:14
53:14 94:10
101:20
**fully** 94:11
**function** 64:16
**functions**
23:20
**funds** 18:14
80:20 82:17
**further** 16:10
30:22 31:17
32:18 45:1
51:7 58:9
62:23 69:5
93:2 100:8,9
**furthermore**
98:11

**g**

**g** 9:1 63:23
**gather** 20:3,4
**gc** 44:19
**general** 36:25
37:4 38:25
39:3,6,10,10
39:14 40:7

61:8 67:13,21
68:2,3 71:8
77:19 99:13
**generalized**
50:23 51:1
**generally** 47:5
60:2 90:25
**generically**
29:14
**gentleman**
74:6
**getting** 29:18
**gibbs** 8:14
**gigantic** 67:24
83:3
**give** 21:17,19
22:3 45:21
74:13 80:22
**given** 15:3
21:17 40:22
42:20 43:8
73:9 75:14
76:17,24 83:4
87:25
**giving** 42:11
**gka** 50:22
**gleit** 5:7 13:9,9
13:12
**glenn** 38:4
60:15 82:4
104:4,12
**global** 24:1
**go** 19:11,14
22:14 26:23
28:23 42:16
72:23 85:20
86:13 89:16,16

[go - holder]                                                                    Page 16

92:2

**god** 22:5 45:22

**going** 12:15,16
14:15 15:20
16:15 19:11
21:15 22:10
27:16 58:25
60:2 61:10
70:17 74:23
78:21 80:5
82:7 84:2
87:14,21 102:9
103:21 104:4,6

**golden** 7:20

**gonzalez** 90:23

**good** 9:2,4
13:17 14:18
16:13 22:12,13
22:18,19 43:17
46:1 82:24

**gosh** 96:14

**gotten** 67:8

**grand** 103:15

**granted** 10:5
95:6 103:22

**granting** 2:2,7
3:5,7

**gray** 42:1,25
43:24

**grayson** 8:16

**great** 9:14

**greater** 57:22
97:23

**green** 1:13

**greenbacker**
6:22

**gregg** 8:15

**gregory** 7:1

**ground** 98:14

**grounds** 90:18
94:7

**group** 52:16

**guess** 15:24
16:15,24 17:14
41:7 62:24
63:10 77:24
78:10 85:3,20
88:25 92:8

**gump** 5:17
16:14 43:18
44:15,20,22
45:5 57:3 61:7
61:10,21 62:5
73:25 87:6

**gump's** 61:19

**guys** 51:17
67:2

**h**

**hadn't** 78:16
87:25

**half** 48:4 93:9

**handful** 9:8
93:18

**handle** 22:10
44:15,20 62:7
62:22 70:17
87:14

**handles** 26:12

**handling** 14:16
59:10 87:22

**hang** 11:6
45:17

**hanner** 7:17

**happen** 14:23
19:7 72:4
73:18 78:21

**happened**
16:25 44:24
51:14,21 74:8
102:13,14

**happening**
78:20

**happy** 16:9
74:4

**hard** 31:20
51:20 78:18
91:17 99:19

**harrison** 7:15

**harsh** 91:22

**hasn't** 77:24

**hastings** 5:9
14:16,19 15:18
15:23 17:10,21
63:22 87:21,23

**hauer** 5:17
16:14 43:18
57:3

**haven't** 18:6,7
53:13 67:20
76:17,24 94:23

**haystack** 32:20
96:15

**hear** 15:21
21:1,22

**heard** 13:10
14:12 37:9
39:14 55:9
71:10 93:18

**hearing** 2:1,5
2:10,16,21 3:1
3:1 13:23 14:4
25:12 32:16
33:12 68:8,8
70:20,22 86:11
102:11

**hearsay** 76:25

**heaven's** 98:1

**held** 84:5 91:18

**help** 17:21 22:4
45:22 47:23

**helpful** 15:16
68:5

**hendershott**
8:7

**henry** 7:2

**heras** 7:12

**here's** 99:25

**herring** 6:24

**hesitant** 83:21

**hey** 73:22

**he's** 66:24

**higher** 99:12

**highlight** 86:2

**hiring** 99:13

**history** 49:3

**hmm** 59:13
67:16,19

**hoboken** 24:14
24:23

**hold** 10:24

**holden** 6:14
27:11 45:6,24
57:4

**holder** 19:2

**holders** 10:13
10:17 11:9
**holdings** 1:7
5:3,10 6:3
**holding's** 91:7
**holds** 90:25
**hole** 67:24
**hon** 1:22
**honor** 3:2 9:4
9:10,14 11:13
11:25 12:10,21
13:6,9,12,21
14:9,14,18
15:1,14 16:3
16:13,15 17:4
17:9,19,25
18:23 19:22
20:1,6,13,14
20:24 21:9,23
22:6,8,15
25:14,18 26:3
33:22 34:1,4
34:15 35:9,15
36:8,13,21
37:12,24 38:12
38:24 39:2
40:12,20 41:1
41:8,16,22
42:1,8,13 43:5
43:10,13 45:4
45:14 51:23
54:17,21 55:1
55:11 58:11,17
58:21,24 61:4
62:4,18,24
63:5,14,21
64:15,24 65:4

65:9,15 66:16
68:5 69:16
71:14 72:11
73:17 74:3,5
75:19 76:3,12
76:19 77:5
78:8,23 80:10
81:10,23 82:10
83:6,16,21
84:9 86:1,13
86:18 87:5
88:15 89:13,17
91:6,10,11,16
92:1,15 94:5
95:1 104:18,22
105:1,2
**honor's** 71:18
83:13 85:24
86:6
**hope** 87:25
**hour** 32:10
**house** 39:7
42:14
**huge** 18:18
19:13 96:16
103:11,11
**human** 77:2
**hundreds**
69:22 93:20
**hurley** 5:22
16:11,13,14,22
20:13,23,24
21:2 22:8,9
25:18,18 45:3
45:4,5 46:16
46:18 58:11,16
58:17,25 59:2

59:4 61:5,7,7,9
62:1,4,18,21
62:24 63:13
65:15,16 66:14
67:5,16,19,23
68:1 69:16
70:12,19 71:14
72:8,11 73:11
74:3,16 75:6
75:10 76:3,12
76:19 77:5,9
77:16 78:5,7
78:10,23 79:1
79:11 86:18,18
89:15,16
100:23 104:17
104:21 105:1
**hurley's** 58:19
89:18
**hyde** 3:25
107:3,8

**i**

**idea** 37:23
83:24 98:3
**identified**
28:10,16 32:6
34:8 48:24
63:22,25 64:16
92:15
**identifies** 47:19
**identify** 29:18
31:21 50:23
64:24 65:1
**identifying**
34:16 60:5
63:24 64:20

**ignored** 71:13
73:9 100:8
**il** 5:12 6:12
**imagine** 27:18
**imminent** 66:8
**impact** 82:23
84:12
**implemented**
11:4
**implied** 103:25
**important** 36:6
60:17 84:22
85:21 90:3,14
93:15
**importantly**
99:2
**include** 25:20
88:3
**included** 28:13
28:20 32:13
49:19 57:12
74:16 80:20
**includes** 18:20
74:25 76:13
**including**
31:10 42:15
60:7 90:3
**incorporated**
14:6 43:23
**independent**
2:13 5:2 9:17
13:14
**indicate** 29:22
29:25
**indicated**
29:16 38:2
70:19 79:3

87:24

**indication**
100:17

**indifference**
94:17

**indiscernible**
9:5 10:14
11:18 13:19
28:2,9 44:22
70:8 72:5,18
74:11,17 75:23
84:19 86:8
90:2 93:16
94:4 97:23
103:2 104:15

**individual**
15:19 26:14,16
30:5 57:19

**individuals**
15:23 26:18,20
26:23 30:19

**industry** 78:17

**ineffective** 76:1

**inequitable**
86:7

**inexcusable**
83:16

**infer** 69:14

**influx** 83:3

**informal** 10:3

**information**
17:2 34:9,12
34:17 35:19,22
36:3,10,12,15
37:13 38:5,15
38:17 48:7,9
53:6,7 54:23

55:6 56:11,21
57:10 60:7
65:21 66:6
67:20 68:15
69:5,7,25 71:3
71:3,14,15
72:14 73:24
75:20,21 80:1
94:2 99:8

**informed** 93:5

**initial** 41:23,24
47:14 49:2

**initially** 48:4
81:24 82:4

**inquiries** 67:7
67:11 93:2,4

**inquiry** 95:13
97:5,6,7

**inside** 40:5

**insider** 38:13

**insiders** 31:11

**instance** 92:10

**insufficient**
101:7

**intent** 20:22

**intercompany**
3:5,7 10:15,21
11:23 12:17

**interested**
78:17

**interests** 70:9

**internal** 27:10
40:15 47:25

**internally** 18:1
46:13

**introduce**
20:10 63:4

**investigate**
30:22 31:17
51:7 72:18

**investigated**
32:18 59:14

**investigation**
59:23,24 83:22

**investigations**
15:25

**involved** 13:15
28:6,8,18
33:14 48:12,15
54:18 57:13
61:1,21 62:14
62:16 71:4,9
82:15

**involvement**
15:3 27:19

**involving** 11:1
11:10

**isn't** 19:19
66:1,13 67:25
70:10 72:21
74:15 77:20
81:8,19 97:21
103:8

**issue** 12:9 13:4
13:18 15:7,20
17:15,15 28:14
37:10,17,17,22
38:5 48:25
51:20 55:23
58:6 59:19
60:14 64:4,8
68:4 69:4,10
71:22 72:1
73:1,9,19

74:12 77:20
83:22 86:15,17
87:14 95:25
97:12 98:9
99:18 100:5,8
100:10,11,12
101:11 103:11

**issues** 10:8
20:3,21 39:10
52:3 54:8,13
54:16,19,23,24
55:15,19 59:10
62:14,16 68:22
69:6 70:18
84:3,5,8 98:12
99:7,16 100:16
100:22 102:15
104:4,6,6,8

**item** 9:15
13:25

**items** 17:16
28:9 31:12
38:12 40:25
41:2

**iteration** 49:12

**iterations** 49:4

**iterative** 48:8

**it'd** 67:5

**it's** 12:5,15,15
12:16 13:9
16:24,24 18:12
18:12 20:6,15
22:8 24:11
25:6 26:4
30:13 31:22
32:20 36:6
45:11,14 51:20

57:15 65:21
75:25 76:14
77:2 78:6,17
79:25 80:2
83:6,9,22
84:11,18 85:6
85:18,23 86:6
86:7,18 89:10
89:14 90:4,5,6
91:15 93:11
94:7,16 96:10
96:22 101:17
101:22 102:10
103:4,5,7,19
**i'd** 84:10
**i'll** 13:17 14:12
15:11,24 25:9
26:3 31:16
47:25 58:14
**i'm** 11:6 13:6
21:4,15,25
29:11,14 32:15
32:16 34:2
35:7 36:20
42:18 45:18
46:2,17,25
58:24,25 59:20
60:2,24 65:13
68:7 79:1,2,2
83:21,24 85:19
89:15 95:3
96:1 99:25
101:6 104:10
**i've** 71:10

**j**

**jacob** 8:8
**james** 8:11
**january** 1:16
107:25
**jason** 7:13,24
**jeff** 7:10 13:9
**jeffrey** 5:7
**jobs** 29:11
40:14
**jonathan** 8:1
**joseph** 8:13
**judge** 1:23
38:4 60:15
82:3 90:22
104:4,12
**judgements**
103:18
**july** 35:1 47:15
55:3
**justice** 4:17
**justify** 94:13

**k**

**k** 55:4
**katherine** 7:23
**katten** 2:11
4:10 9:16 10:6
10:20,23 11:7
11:8,11,14,23
12:14 13:22
**kb** 1:25
**keep** 40:17
58:25 59:1
66:19 67:1
**kelly** 6:22 8:9

**kept** 40:20
**key** 80:11
86:14
**kind** 24:20
26:12,24 28:8
31:5,15 36:19
39:14 40:11
48:6,19 53:15
61:1 62:3 79:8
86:20,21 88:25
95:9 96:7
**kinds** 60:6
69:10 89:3
**kirkland** 4:3
9:7 27:24,25
28:6,17 34:23
34:25 35:2,12
35:23 36:2,4
36:10 44:18
46:9 47:2 52:2
52:8,19 53:18
53:24 55:5,10
55:22 56:4,10
56:18,23 59:9
62:12 68:11,18
68:24 69:1,5,9
70:12,17,19,25
71:25 72:5,12
72:22,23 73:5
73:11,14,20,21
74:10 87:13,13
97:24 98:6,8
98:13,16,21
99:1,3,6,12,17
99:20,23,24
100:3,10,11,17
100:20 102:14

102:16 103:16
**kirkland's**
68:14 100:6
**knew** 39:10
40:6 41:17
49:16 54:5,7
54:15 55:14
56:4,13 65:25
66:23,25 67:1
67:14,14 68:18
68:18 72:12,22
72:24,25 73:15
89:8,9 94:20
94:20 96:18
97:14,18 98:4
98:8,8 99:20
99:21 100:4,24
102:5 103:16
**know** 14:3
15:16,17 16:7
18:2 23:22
24:1,7,17 26:7
26:18,20,20
28:4 29:1,4
32:5,20 33:11
33:12 34:21
35:15,16,18
36:6,9,11,12
36:14,16 37:14
37:16,20,24
38:12,24,25
39:2,15 40:19
40:21 41:4,6,8
41:15,21 42:24
43:5,7 44:23
47:15 48:9,19
49:2,10,12,14

49:21,22 50:1
50:15 51:4,13
51:19 52:18,23
53:3,13,15,17
54:1,12,18
55:10,15,17,19
56:9,9,21
57:10,15,15,21
57:23,23 58:5
58:6,7 60:10
64:5,7,22 65:3
66:3,10,14,16
66:17,19,21
67:3 68:9
70:24 72:12
76:22 77:8,11
77:16 78:13,14
80:8 82:20
83:24 85:23
86:2,10 88:15
96:24,25 97:16
97:22 99:25
101:15,19
**knowing**  31:6
53:9 68:20
93:5
**knowledge**
24:20 25:2
26:8 36:2
38:21 40:15
42:5 54:22
55:5 72:1
78:23 89:5
100:25 101:1
102:4,6
**known**  24:15
65:25 66:10,14

66:23 72:6
79:6,8,9 80:7
90:16,22 91:1
91:8 94:14,17
94:18 95:9
96:3,6,8,18
97:20 100:24
101:18
**knows**  98:18

**l**

**lack**  18:8 89:5
**lane**  23:6 44:1
**large**  19:3
92:25 94:3
**larger**  18:20
**las**  7:12
**lasts**  76:23
**late**  2:2 63:19
85:15,16 94:25
104:7,14
**lauren**  6:22
**law**  13:13
19:21 27:22
84:11 89:21
97:25
**lawyers**  39:8
**lay**  92:11
**lead**  20:19 40:8
40:10 56:2
92:11
**leading**  39:12
50:17
**league**  12:23
13:3,16
**learn**  33:18,20
53:20

**learned**  37:16
37:17,22
**learning**  21:25
**leave**  2:2 94:25
**led**  27:11 93:2
**ledanski**  3:25
107:3,8
**legal**  28:9 60:6
60:14 107:20
**length**  101:10
**leticia**  7:9
**let's**  21:11
75:23
**level**  99:12
**leverage**  27:15
**lexington**  4:5
**liabilities**  52:7
**life**  85:10
**lift**  31:7
**lifting**  2:1
**light**  64:9
78:21 99:7
103:14
**likely**  37:2,8
70:2
**limbo**  18:15
**limitations**
66:8
**limited**  3:8
12:3
**limits**  67:5
71:19 77:6
**line**  21:21 22:9
29:12,12 30:14
30:14,19 45:7
55:3 91:17
106:4

**liner**  52:22
**lines**  29:2 30:8
**link**  74:25
76:13
**lisa**  8:6
**list**  27:2 28:1
28:12 47:24
**listed**  24:20
59:18
**listening**  37:1,6
**literally**  69:22
93:20
**litigation**  15:25
62:5,6,8 82:3
104:8
**litigator**  60:24
**little**  12:14
18:14 28:10
31:22 44:23
73:17 90:16
93:8
**llc**  2:1 5:18
6:10
**llp**  2:11,17,22
4:3,10 5:17 6:1
**loans**  10:22
**log**  47:25
**logs**  40:17,19
**london**  23:6
43:24 44:1,4,7
77:24
**long**  34:10
76:22 82:12
101:13
**longer**  92:13
**look**  29:6,7
34:21 37:15

41:8 42:17
52:2 66:7 68:8
68:17 73:21
84:10,14 85:5
88:5 90:1
100:1,15 103:2

**looked**  17:5
49:21 69:8
70:10 98:12
100:7

**looking**  12:17
29:12 34:17
50:7 99:9,15

**lookout**  34:14

**lose**  91:20

**lost**  85:10

**lot**  31:10 40:13
47:9 82:6 84:3
85:6,9,11

**ltd's**  9:16

**ludicrous**  84:2

**luke**  7:18

---

**m**

---

**m**  6:19 27:12
28:3,18 46:4,7
46:8,12,14,24
47:5 48:6,11
48:14 50:5,9
51:8,16 60:4

**made**  18:10
35:13,16 36:15
39:16 47:20
52:8,16 55:8
56:5 67:7,8,11
69:6,18 70:12
71:5,6 72:15
91:12 92:11

93:4,23 95:8
95:21 96:14
97:5 98:2,24
99:14 100:8

**madison**  4:12
6:4,11

**mail**  26:12,23
26:24,24 40:2
40:11,16,17,18
40:21 41:10,13
41:16 42:21,23
42:24 43:2,3
43:18 67:12
75:14,19,24
77:1,3,11,17
97:9,10

**mailboxes**
26:22

**mailed**  24:13
97:9

**mailings**  76:21

**mailroom**  67:3
77:13

**main**  86:14

**maintain**  3:3

**maintains**
47:25

**make**  15:20
19:3,12,18
22:20 26:10
30:10 35:11
43:3 84:22
85:17 86:19,21
87:4 89:1,14
90:15 93:1,3
95:3 99:5
103:10,18

104:1

**makes**  9:13
66:15 103:14

**making**  45:17
80:18 99:4,13

**man**  28:22
30:16 32:2
63:15

**management**
3:2

**managing**  45:6

**mandate**  50:11

**march**  14:3
23:5 41:19
43:25

**marcio**  8:4

**mark**  66:21

**marsal**  6:9
27:11 45:7

**martin**  7:8

**matt**  9:20
14:19

**matter**  1:5 9:3
9:12 11:22
13:14 14:16
16:1,18 44:15
44:20 55:20
61:12,12 62:9
62:10 70:20
87:22

**matters**  9:8
11:23 15:25
61:11,15 62:6
62:8,22

**matthew**  5:14
8:5

**maxed**  51:12

**mcdermott**  6:1
20:7 21:5
45:15 83:7

**mean**  16:2
23:22 29:10
51:1,2 60:2
77:10 84:9
99:22

**meaning**  91:4

**means**  68:17
92:19 99:23

**meant**  34:17

**measure**  87:2

**measured**
85:13,14 92:6

**measurement**
85:8

**measures**  11:5

**meet**  102:23

**meetings**  37:1
37:7

**memory**  44:17

**mention**  84:10

**mentioned**
30:6,21 31:5
37:21 59:9
92:5

**merely**  19:23

**met**  103:7

**method**  75:18
76:5

**methods**  75:22

**mew**  1:3

**michael**  1:22
5:15 8:2 17:9
18:22 63:21

80:10 86:1
91:11
**mid** 44:25
**might've** 36:25
66:23
**mike** 14:20
15:11
**million** 17:14
17:16,20,23
18:8,11,14
19:10 29:2
30:7 32:20
48:5 57:10,11
57:12,17,20
**mind** 56:4
101:2
**mindful** 58:24
60:3
**mineola** 107:23
**minimis** 84:15
84:22
**minute** 65:8
**minutes** 34:19
**missed** 45:16
**missing** 102:8
**mitch** 16:13
22:9 25:18
45:5 59:2
86:18
**mitchell** 5:22
**mm** 67:16,19
**mo** 93:22
**mobilizing**
31:5
**moments** 77:18
**money** 85:9,11
103:13

**monitoring**
38:21 78:19
**monitors** 26:22
**month** 38:18
86:10 98:22
101:11,12
**months** 48:23
90:8 92:12
93:9 94:10
**morning** 9:2,4
14:18 16:13
22:13,18,19
43:17
**morrissey** 4:22
12:10,10 13:5
13:6 14:24
15:8,14,14
16:2,6
**motion** 2:1,5
3:1 14:2 20:9
38:3 58:12
84:25 86:23
87:2,9,11
88:23 92:11
98:2 101:12
102:9,12 106:6
**motions** 82:1
**move** 23:4 63:2
63:6,10
**moved** 9:21
34:24,24
**moving** 13:25
63:16
**moynihan** 8:9
**muchin** 2:11
4:10 10:6 11:7
11:8,14 12:14

**multiple** 40:14
48:8 91:16
**murphy** 5:14
14:19 15:11,13
15:22 16:3,5,9
17:25 18:17
20:14 80:5
**mute** 13:7
21:22 65:12
**muted** 21:21

**n**

**n** 4:1 9:1 106:1
107:1
**nacif** 7:25
**name** 14:19
74:7
**named** 74:7
**nani** 8:11
**narrow** 59:1
**natalie** 8:3
**national** 12:23
13:16
**nature** 80:14
83:4 93:19
**necessarily**
53:3
**necessary**
22:11
**need** 13:19
19:17 20:3
45:15 64:12
96:25 100:1
102:18 104:11
104:16
**needed** 34:20
54:25

**needle** 32:20
96:15
**negative** 53:6
67:6 77:7
**neglect** 74:12
83:16 85:22
86:17,19 89:2
89:11,18,23
90:11,13 91:20
95:13
**negotiate** 14:5
**negotiated**
88:1
**negotiation**
86:9
**negotiations**
19:8
**network** 2:1
5:18 6:10
**never** 74:12,13
**new** 1:2,14 4:6
4:13,20 5:5,20
6:5 42:20,22
44:3 76:14
78:16 95:4,20
**news** 91:15
**newspaper**
91:5
**nickerson** 6:25
**non** 98:4
**normal** 26:25
**normally** 77:13
**northwest**
84:14,14
**note** 36:6 45:18
**noted** 10:3

**notice** 22:21
23:1,17 24:13
26:9,13 32:24
33:5 39:20
40:3 41:19,25
42:4,6,20 44:6
51:16 63:19
64:1,7,8,12,14
64:18,21,23
67:4 74:12,14
74:14 75:10,18
75:24 76:2,18
77:23 78:4
91:5,9 94:9
95:10,11,17,25
96:1 97:8,10
97:13 101:21
**noticed** 81:17
82:14
**notices** 75:4,13
76:7,11 95:22
**notified** 95:20
**notion** 19:22
96:24
**notwithstand...**
50:2,5 93:5
**novel** 90:22
**november** 2:13
2:18,23 32:6
32:12 36:19
37:20 39:15
44:11,25 46:9
46:22,24 52:3
52:4 53:23
55:23 58:6
59:11,12 61:22
62:19,21 66:23

71:21 72:4
73:16,19 74:8
78:13 87:3,6
87:12,17 97:19
100:15
**number** 9:15
12:4 24:1
47:19 57:22
85:5,7 90:18
**numbers** 17:20
17:24 18:3
**ny** 1:14 4:6,13
4:20 5:5,20 6:5
107:23

**o**

**o** 1:21 9:1
107:1
**oath** 21:18
**object** 21:11
**objected** 98:13
**objecting**
61:16
**objection** 2:8
2:14,19,24 3:8
9:10,22 12:12
13:7 15:13,15
28:22 30:16
32:2 35:1,5,8
35:24 46:16,17
55:3,6 58:18
63:13,15 68:10
71:24 99:14
**objections** 2:3
9:23 10:1,3
14:7 22:10
45:10 63:12
74:22

**objectives** 92:4
**objectors**
60:13 79:13
88:22 94:23
**obligated** 12:6
**obligation** 69:1
72:10 98:9
**obligations** 3:3
10:16,21
**observe** 82:16
**obtained** 13:3
**obtains** 75:15
**obvious** 69:13
**obviously** 12:6
13:19 14:23
17:20 28:10
36:5 40:12
66:16 68:18
71:24 72:11
73:11 78:20
81:14 88:24
92:13 99:21
100:7 102:5
**occasions**
34:10
**occupied** 44:6
**occurred** 72:7
99:1
**october** 27:17
31:1,2 32:9,10
34:9 38:18
48:20 49:5
58:2 61:18,20
85:19 87:1
**odd** 78:6
**offer** 20:23
21:9 45:9

58:13
**offered** 71:1,1
100:9
**offering** 58:15
**offhand** 25:8
52:10 57:15,21
57:23
**office** 14:21
39:6 42:12
68:3 77:19
**officer** 99:12
**officers** 24:7
**offices** 71:8
**official** 6:2
**oh** 27:18 29:14
32:22 85:3
**ohio** 94:6
**okay** 9:14 12:5
12:13,19 13:12
13:24 14:11,12
14:17 16:6
20:11 21:2
23:13,25 24:5
24:10,12,22
25:7,9,24
26:14 27:2,25
28:5,12,17
29:21 30:2,12
30:22 31:16,24
32:16 33:21
37:10,21 39:9
39:17 41:18
42:9 43:7,11
43:23 44:9
45:1,2 47:1,5,9
48:11 49:7,16
49:24 50:2

51:7,15,22
56:3,17,25
58:1,9,10,23
59:23 62:12,23
62:24 65:8
72:3 78:2,24
82:20 85:25
86:16 89:17
92:3 104:19,24
**okike** 7:21
**old** 42:21 43:2
107:21
**omnibus** 63:6
**once** 16:10
99:19
**onerous** 102:24
**ones** 94:22
**one's** 28:10
**ongoing** 15:25
49:12 79:16
80:13
**open** 73:8 84:2
**operate** 3:2
**operating** 15:2
15:2
**operations**
26:11 40:8,10
**opinion** 33:5
94:16
**opposed** 85:15
104:12
**opposition**
68:9 104:6
**order** 12:13,18
12:21 13:22
14:10,13 50:15
75:25 104:20

**ordered** 94:18
94:18
**ordinarily** 66:4
66:6
**ordinary** 15:2
66:7 75:19
80:19 81:13
91:20 102:2
**organization**
24:2 26:25
27:15
**original** 9:19
74:17 75:3,6
**originally** 62:5
**otter** 11:7
**ought** 70:10
96:8 103:15
**outside** 27:18
28:5 83:9
**overall** 30:10
34:10,11 89:20
**overcome** 86:4
102:25
**overlapping**
70:16 72:8
78:7 81:4
**overnight**
75:15
**overriding**
19:12
**overruled**
28:23 32:3
46:19
**overseas** 26:12
**oversee** 41:10
**own** 20:20 34:7
65:19 68:19,25

73:4 79:7,9,24
81:8,24 83:19
93:7 96:20,21
96:21 98:3,7
99:22,23
**ownership**
82:1

**p**

**p** 4:1,1 5:22 9:1
**packets** 64:18
**page** 106:4
**pages** 29:1
**papers** 12:16
18:16 37:25
60:13 71:13
81:24 98:5
**paragraph**
11:16 22:20
26:7 46:1
50:21 59:4,13
79:18
**paragraphs**
22:25
**parent** 23:15
**park** 5:19
**part** 24:17,17
27:21
**participate**
20:18
**particular**
15:15 29:9,21
30:3 65:22
66:3,12 85:17
88:22
**particularly**
64:8 90:21
91:13 97:11

98:11 101:13
102:24 103:6
103:11
**parties** 9:3
20:3 49:10
61:6,16 63:4
65:13 75:4
86:24 88:6
95:5 96:13
102:12 103:13
103:15,24
**partner** 22:9
**party** 35:14
68:21 91:19
103:9
**passed** 44:21
66:18 88:12,18
88:19 89:6
93:10
**pathway** 82:17
**paul** 5:9 8:10
14:15,19 15:18
15:23 17:10,21
63:21 87:21,23
**pay** 12:2
**payment** 51:5
53:7 57:9
**payments**
48:18 53:17
**penalty** 30:12
**pending** 18:19
**people** 10:24
40:4,5,14,17
41:9 48:11
51:20 55:24
56:22 66:4
71:10 73:5

| | | | |
|---|---|---|---|
| 77:14 78:3,18 83:4 96:11 100:20 | **persons** 35:19 | **platform** 18:9 93:23 | **porcari** 7:18 |
| **perceive** 70:14 | **perspective** 54:19 88:5 104:17 | **platforms** 82:13 | **portion** 18:18 19:4,13 |
| **percent** 72:22 104:11 | **persuasive** 96:13 101:16 | **plausible** 80:2 | **position** 16:7 17:11 18:13 20:15 33:1 73:12 79:9,21 79:24 80:8,15 80:25 81:7,11 82:5,7 83:1,11 98:16 |
| **perception** 35:8 | **pesce** 7:1 | **please** 32:22 52:23 58:23 104:20 | |
| **perfectly** 102:11 | **peterson** 7:19 | **pm** 105:4 | |
| **perform** 3:4 | **petition** 11:3 11:18 16:23,25 17:4 27:16 31:6 33:13 46:6 47:15,20 57:8 62:7 69:21 | **podium** 14:15 | |
| **performed** 23:20 | | **point** 15:4 18:23 19:2,12 19:13 49:22 50:3 51:2 55:19 58:1 60:13 62:16,18 66:1,10 68:23 70:6 72:10 79:11,23 82:14 85:4,4,24 86:3 86:9,14,21 87:25 89:1,18 90:15 99:9 100:13 101:21 102:25 103:10 103:24 104:14 | **possession** 18:11 |
| **period** 14:3 16:25 17:19 32:10 47:20 48:5 60:12 69:19 72:17 78:15 79:25 82:9,12,18 87:4 88:3,4,7 92:8 93:12,25 101:13 103:5 | | | **possibility** 53:1 81:25 83:10 |
| | **phone** 11:11 14:11 15:12 65:12 87:15 | | **possible** 24:10 24:11 30:13 32:17 50:16,19 53:11,12 64:19 |
| | **picher** 94:5 | | |
| | **picture** 86:21 89:1 | | **possibly** 70:24 77:2 83:5 |
| | **pie** 19:16 | | **post** 42:12 |
| **periods** 2:6 | **piece** 19:15 77:3 | **pointed** 60:3 75:19 77:20 | **postal** 42:19 43:9 |
| **period's** 92:13 | **pieces** 41:13 | **pointing** 76:4 | **postpetition** 3:6 |
| **perjury** 30:13 | **pioneer** 91:15 91:18,21,23 | **points** 61:17 69:13 86:19 89:15 91:12,16 | |
| **permission** 22:11 34:25 | **place** 11:19 30:9 67:17 | | **potential** 17:13 17:15 29:18,23 44:10,14,22 50:23 51:4,4 53:16,19 55:25 56:23 59:15,25 60:7,10 63:25 68:21 69:3 93:20 98:14,19 99:16,17 |
| **person** 26:18 26:21,22 29:9 29:11,21,24 35:19 37:16,17 75:14 | **placeholder** 60:20 | **pool** 18:20 23:23 84:13,21 | |
| | **places** 46:10 52:5,24 | **pools** 48:9 | |
| **personally** 39:21 | **plainly** 103:7 | **populating** 31:14 | |
| **personnel** 46:14 67:8 | **plan** 2:6 10:8 18:19 19:5,9 86:9 88:24 | | |

**potentially**
59:9
**potter** 2:22
13:19
**practice** 87:9
**practitioner**
60:18
**pre** 11:3,17
16:19 47:15,20
62:7 69:21
**precedence**
94:15
**precisely** 10:19
**predicted**
79:19,21
**predominant**
86:3
**predominantly**
28:3
**preference**
16:18 17:19
29:18,23 50:7
50:22,23 51:3
51:4 53:1,8,11
53:12,13,19
55:25 59:25
60:10 64:11
68:22 69:19
70:2 71:16
73:1,16 79:20
80:15,18 81:15
81:20 82:9,18
84:1,7 90:21
90:25 91:2,8
92:17,19,23,24
93:1,6,12,17
93:20,25 95:6

96:6 98:9,19
99:18 101:15
**preferences**
83:19 96:11
104:4
**preferential**
29:7,8
**prefers** 9:11
44:5
**prejudice**
19:15,16,23
82:24 83:1
85:13,14 89:19
89:24 102:10
102:24 106:6
**prejudicial**
85:1,16 103:6
**preliminary**
16:17
**premised**
96:22
**preparation**
65:23
**prepare** 50:11
68:6
**prepared**
48:24 49:9,20
50:19 59:18
**preparing** 27:2
27:5,19 31:4
39:13 47:13
48:12 50:4
51:11 65:20
**prepetition** 3:3
**present** 6:18
20:4,5 28:4

**preserve** 60:22
**presumably**
79:24
**presume** 34:17
35:10 76:20
**pretty** 44:24
51:12 60:25
97:22
**previously**
10:9 29:16
**primarily**
60:24
**primary** 102:5
102:21 103:1,7
**prior** 13:25
14:5 17:3 33:6
39:11 46:5
47:6 53:24
57:7,11 80:18
101:14 104:2
**priorities**
94:15
**prioritize** 50:7
101:23
**privilege** 60:4
**probably** 34:18
48:15 52:18
53:7 54:9 69:1
71:8 93:23
**problem** 22:2
31:23
**procedures**
11:19
**proceed** 9:11
16:16 58:23
65:14

**proceeding**
93:10
**proceedings**
82:23 102:2
105:3 107:4
**process** 48:8
49:13,14 50:13
61:1 65:19
95:14,24
**processes** 27:1
30:9
**processing**
50:14
**produced** 29:2
30:20
**professional**
15:3 98:18
**professionals**
28:17,18 31:25
33:17
**prompted**
52:19
**promptly**
64:19
**proof** 2:2 33:2
60:20 73:8
**proper** 91:6
**properly** 10:22
64:3
**property** 23:10
79:22 80:23
104:2
**propose** 9:11
**proposed** 10:9
98:17 100:14
**prove** 67:6
77:6

**provide** 68:2,6
73:17 74:4,6
79:12
**provided** 22:21
36:10,12,15
48:3 53:18
72:14 74:23
75:11,20 91:6
**provides** 74:22
**providing**
50:15 99:8
**provino** 8:6
**provision** 49:3
75:2 76:4,9,10
95:16,22
**public** 42:15
**publication**
78:4 91:5,9
96:1
**pulling** 38:17
**pulman** 7:16
**purpose** 29:4
29:17
**purposes** 74:15
**pursue** 69:11
93:6 96:11
97:1
**pursued** 69:12
103:23
**pursuing** 56:2
**push** 84:24
**put** 11:19 21:3
38:4 43:1
47:10 65:12
67:20 68:4
69:4 71:17
87:19 88:14,16

93:10
**putting** 80:1
96:16

**q**

**qc** 49:12
**quest** 66:11
**question** 42:19
42:19 43:14,18
44:9 48:2 56:3
61:7 64:14
70:7 71:11
72:23 80:4
85:24 100:3,25
101:1 103:21
**questions** 10:4
14:9 20:21
21:17 22:3
33:23 34:6,8
43:12 51:24
52:1 61:4 63:1
67:18 73:7
88:15 100:21
**quibble** 70:25
**quick** 43:14
44:24
**quickly** 90:7
**quinn** 87:14,15
87:21
**quite** 27:14,18
47:9 68:14
97:17
**quote** 91:3
92:22
**quoting** 46:3

**r**

**r** 1:21 4:1 9:1
107:1
**raise** 24:20
81:14 84:3,4
86:17
**raised** 10:8
55:23 58:7
68:9 71:12
81:25 83:14
100:5 101:11
**raises** 93:15
**raising** 72:23
73:7
**ran** 92:17
**randall** 7:16
**rasile** 8:17
**rate** 9:20
**rather** 12:16
71:23 81:21
**ray** 9:20
**read** 25:5 35:8
89:21 94:15
**reading** 33:12
86:6
**ready** 9:3
16:15,16 65:13
95:3
**real** 67:2
**realize** 96:11
**really** 27:14,15
31:14 32:6
51:13 54:10
76:22 78:2
82:25 86:20,25
88:6,20 89:2
92:14 94:1,7

95:12 103:14
**realm** 18:4
83:9
**reason** 63:20
69:14 80:22
85:23 90:4
94:1 96:17,24
99:1 101:3,8
101:14 102:3
102:22 103:23
**reasonable**
30:7,11 65:21
81:15 103:18
**reasonably**
77:22
**reasons** 49:11
71:24 91:14
92:15 102:15
**recall** 10:7
15:1 37:13
44:12,23 52:10
52:12,21 53:22
53:24 54:14,15
55:18
**receipt** 75:15
75:17,21 76:25
**receive** 13:8
39:19 43:3
**received** 10:2
14:8 26:9
31:13 32:24
40:3 41:17
49:4 51:15
53:9 60:8,11
64:9 76:21
77:25 94:9
97:12

| | | | |
|---|---|---|---|
| **receives** 41:13 | **referred** 10:13 | **relation** 32:15 | **remembers** |
| **receiving** 26:13 | 42:6 60:19 | 34:21 | 77:2 |
| 33:4 39:20 | 73:25 91:16 | **relationship** | **remind** 10:11 |
| 97:8 | **referring** 24:24 | 23:13 79:17 | **rendered** 74:24 |
| **recent** 11:14 | 27:22 69:17 | 80:13,18,22 | **renew** 102:12 |
| **recess** 65:8,10 | 76:5 | 81:13 | **reopen** 68:7 |
| **recollection** | **reflected** 57:20 | **relative** 19:9 | **repeat** 74:20 |
| 54:10 | 92:22 | 19:20 | **repeatedly** |
| **record** 9:6,7 | **regard** 12:19 | **relatively** | 91:17 |
| 11:13 20:22 | 13:5 17:6 | 88:19 90:7 | **repetitive** 95:3 |
| 26:13 39:19 | 71:19 95:13 | **relevant** 20:1 | **reply** 79:12 |
| 40:10 42:15 | 97:11 | 38:22 81:12 | **report** 50:15 |
| 45:5 65:2,6,6 | **regarding** 55:7 | **relied** 88:21 | **reported** 48:7 |
| 92:21,22 | 96:15 | 94:23 | 96:12 |
| 102:20 103:8 | **regards** 32:6 | **relief** 2:7 3:7 | **represent** |
| 107:4 | 88:22 | 20:17 66:5 | 10:25 11:3,10 |
| **records** 18:6 | **register** 44:2 | 84:25 87:11 | 25:9 98:1,17 |
| 40:16 79:25 | **registered** 23:5 | 95:5 103:4,9 | **representation** |
| 96:21 98:20 | 43:24,25 44:3 | 103:22,24 | 11:21 68:12 |
| **recover** 83:19 | 75:14 | **rely** 79:13 92:4 | **representations** |
| **recoveries** | **regularly** | **remain** 17:16 | 11:5 |
| 18:19 84:12 | 60:25 | **remainder** | **represented** |
| **rectify** 18:2 | **regulatory** | 18:10 | 11:8 15:18 |
| **redirect** 22:11 | 15:6 | **remaining** | 35:3 98:17 |
| 43:14 57:2,4 | **reisman** 7:7 | 14:16 67:7 | **representing** |
| **reduceable** | 9:19 | 90:3 | 11:17 62:6 |
| 19:23 | **rejected** 84:16 | **remember** | 71:25 |
| **reduction** | **relate** 16:19 | 10:18 25:8 | **represents** |
| 40:13 | 86:8 | 33:12 36:23,24 | 10:24 12:23 |
| **reference** | **related** 2:7 3:3 | 37:2,8,19 40:9 | 15:23 73:12 |
| 11:16 18:20 | 3:7 48:18 | 44:17,21 67:3 | **request** 51:14 |
| **referenced** | 55:21 59:10 | 77:1 | 52:9,16,20 |
| 25:21 | 61:12,18 62:1 | **remembered** | 87:11,19 94:24 |
| **references** | 72:14 73:19 | 40:3 41:11 | 103:9 |
| 25:19 47:2 | **relates** 15:5,7 | 97:8,10 | **requested** 48:1 |
| **referencing** | 15:24 61:14 | **remembering** | **requests** 47:14 |
| 10:15 26:1 | | 79:1 | |

require  76:5
  87:8
required  75:22
  101:6,19
requirement
  94:17
requirements
  76:2
requires  75:12
rereviewed
  31:11
reserve  20:18
reset  3:9
resolution  87:8
  88:1
respect  20:15
  49:14 60:5,6
  61:11,20,22
  64:10 70:3
  73:14 77:16
  81:8,17 89:1
  91:13
respond  69:13
  71:1 91:25
response  34:7
  35:24 53:23
  68:14 69:3,4
responsibility
  28:2 55:24
  78:22
responsible
  27:2,5,9,25
responsive
  48:2
resubmit  12:21
result  91:22
  94:24

retain  9:16
  34:25
retained  10:20
  11:24 15:5
  59:5 62:4,7,11
  87:6 99:7
retention  2:10
  2:16,21 14:22
  15:4,18,22
  61:13,17 68:11
  68:24 69:6
  98:13 102:16
retentions
  13:18
returned  64:23
  65:11
reubel  6:21
review  27:21
  30:2,5 96:20
  98:20
reviewed  12:11
  30:1,8,14,19
  30:20 31:11
reviewing
  27:25 28:19
  31:20 38:13
revise  12:20
revised  13:22
  25:12,17
rhodium  61:13
  61:19,20,22
  62:9
richard  4:22
  6:23 12:10
  15:14
rick  7:6

right  9:25 11:1
  12:8 13:17
  14:4 15:10,17
  16:5 17:20
  18:4,13,16
  20:20,25 21:13
  21:15 22:7,23
  23:2,11 26:5
  28:7,14,21
  31:8 32:14,19
  33:3,11,24
  34:20 35:10
  37:25 38:16
  43:11 44:11
  45:11 46:21
  47:3,11,21
  48:21 49:1
  50:24,25 51:18
  52:13,15 55:22
  56:14,25 57:18
  59:6,15,19
  61:3,6 62:2
  63:17 65:6,11
  65:16 66:13
  73:13 75:13
  76:2,11 78:4
  79:5 81:4 82:9
  83:18,20 84:19
  87:16 93:15
  95:2,4 104:15
  104:19
rights  20:18
  24:18 60:22
  74:18
road  53:15
  107:21

rochester  4:15
  11:13,14
role  35:21 62:9
  79:4
ron  39:4 44:19
room  77:17
  97:10
rosell  7:24
rosenblatt  8:10
rosenman  2:11
  4:10
rough  40:24
roughly  48:13
rows  32:21
  48:5 57:6,10
  57:11,12,13,16
  57:17,20
rule  84:24
  104:16
ruled  38:4
rules  53:15
ruling  95:3
rulings  106:3
run  33:13

s

s  4:1 9:1
sake  98:1
samis  7:22
sanchez  7:9
satisfied  85:23
  90:2,15 103:2
satisfy  73:7
  89:25 103:3
satisfying
  90:13
save  26:4

savings 85:10
saw 17:22
  29:21 53:4
  77:15 99:17
saying 30:13
  32:10 52:23
  62:13 66:5,20
  67:1 72:21
  81:4 103:4,5
says 10:23 11:8
  12:22 66:21,22
  68:25 75:3
  76:11 84:15
  97:18
schedule 28:21
  29:5,10,15,17
  29:22 30:3,14
  30:20 48:19,24
  57:9 59:17
  63:23 101:21
scheduled 14:4
schedules 27:3
  27:4,6,20
  28:16,19 30:2
  30:10,25 31:4
  31:12,19,22
  32:8,13 34:11
  34:12 38:2,3,6
  40:13 46:3,11
  47:10,13,17
  48:13,16 49:6
  49:8,19 50:3
  50:12,18 51:11
  52:6,24 64:17
  65:20,23 73:21
  79:17 96:16

scheme 103:15
scherling 7:23
schiff 2:17 5:1
scope 15:3,5
  98:6
scott 5:2
screen 26:23
screening 11:4
  11:18
se 62:11 88:23
second 2:5
  45:17 64:13
  84:10,17 91:17
  91:18 103:1
secondary 64:8
section 47:16
  53:5
see 29:9,14
  39:20 46:2
  53:5 74:5
  77:14 78:3,20
  82:25 85:16
  87:7 100:18
seeing 41:11,12
  53:16 67:3
  77:1 97:10
seeking 14:2
  87:11
seem 84:8
seemingly
  91:22
seems 64:9
  73:6 80:6
  82:22 84:2
  85:14 99:23
  101:10,18
  102:8

seen 15:17 16:7
  18:6,7 94:23
send 41:19
  52:23 76:7
sending 64:1
senior 26:11
sense 9:13
  40:24 66:15
  103:14
sent 23:1,17
  43:4 44:6 46:9
  52:4 53:24
  63:19 64:14,19
  74:13 75:4,24
  76:11,21 77:13
  77:23 87:20
  95:11,17,23
  96:1
separate 12:1
  77:19 104:8
separately 15:5
  66:2
september
  23:19 38:1,10
  63:19 64:14,18
  70:22
service 42:7
  75:15
services 74:23
set 20:22 49:23
  49:25 73:8
  97:3
sets 49:11,13
settlement 88:4
seven 92:11
several 34:9
  48:23 83:7

shared 24:7
shaya 4:15
  11:14
shed 78:21
short 59:1
  66:20 78:15
  88:7,19 89:4
  94:4 103:5
shortcomings
  90:9
shorter 87:4
  88:4 92:8
shortly 13:22
  25:12 31:6
  64:17 83:16
shouldn't
  69:14 101:19
  102:17
should've
  22:21 24:13
  65:25 66:10,14
  69:1
show 15:23
showed 49:8
showing 67:25
  72:20 101:7
shows 71:19
shut 73:8
side 18:2 27:11
  48:14,16 79:5
  89:4
signal 53:10
signaled 53:7
  53:18 54:9
signature
  107:6

signed 30:12
95:15
significant
82:23,24 84:12
89:19,24
similar 79:24
83:11 94:24
simple 52:22
52:22 60:16
single 30:19
77:3 84:25
sir 22:24 23:3
23:22 24:4,14
25:1 26:19
27:1,4 28:2
29:13,20 30:25
31:10,20 32:12
33:8,16,20
35:17,21 36:4
sit 52:12
103:16
site 22:1
situation 88:8
88:14
size 19:21,23
84:13 85:13
92:25
skipping 9:15
slade 8:2
slightly 80:25
small 19:20
83:3 84:18,20
smith 4:8 9:4,6
9:7,14 10:2,12
10:15,19 11:2
11:18,25 12:3
12:7,20,25

13:2,21,25
14:14
soccer 12:23
13:3,16
sofa 48:3,8
53:6
sole 2:12
solely 50:13,18
91:1
solicit 2:6
solutions 22:1
107:20
solve 90:8
somebody
17:21 29:15
35:10 37:15
38:20 62:19
68:15 71:7
76:25 99:5,8
99:11,14 100:6
somewhat
17:25 86:8
sonya 3:25
107:3,8
sophisticated
68:21
sorry 13:6
21:25 23:7
27:8 30:18
34:2 45:16
46:17 72:14
87:18
sort 18:14 48:8
49:12 50:12
52:22 55:18
56:2 89:3 94:4

sound 77:12,15
83:23
sounds 28:6
47:9 51:17
source 57:10
98:18
south 5:11
southern 1:2
19:21 78:16
94:6
speak 26:14,16
27:8,9 30:5
67:13 80:5
83:21
speaking 15:13
21:20
special 2:11,17
9:16 15:6
36:20 37:1,6
62:5
specific 11:15
12:14,18 34:14
36:11 54:10
specifically
27:5,9 32:5
34:21 36:23
39:16 40:9
46:8 49:14,22
58:5 62:7
94:16 98:14
spectrum
86:24 89:3
speculate 28:8
28:25
spending
103:13

spoke 26:18,21
87:22
spoken 56:17
spreadsheet
57:7
spurred 74:9
st 7:2
staff 39:5
staffing 40:13
stake 103:14
standard 89:18
90:14
stapleton 7:10
start 21:6,11
47:13
started 31:5
38:17
starter 98:4
starting 27:15
95:2
starts 40:11
state 25:22
42:6 59:5
69:18 79:22
stated 90:23
statement
30:10,20 39:21
48:2,19 52:6
statements
27:4,7 28:16
28:19 30:3,5
30:25 31:12,19
31:21 40:12
46:4,11 48:15
49:6 50:12,17
51:11 52:24
70:13 100:6

states  1:1,12
  4:17 11:2
  14:21
status  3:6
statute  66:8
stay  2:2 103:22
  103:23
steadman  7:11
steinman  8:15
step  64:1 82:15
steps  44:13
steve  9:19
steven  7:7
stood  51:3 94:2
stop  81:2,2
stops  40:11
strauss  5:17
  16:14 43:18
  57:3
street  4:19
  6:11 42:2,25
  43:24 44:4
strike  49:17
  59:24
strong  97:11
stumbled
  65:19
subject  19:4
  74:24
submission
  69:17,18,25
  72:13
submit  14:13
  88:20 94:22
  104:20
submitted
  13:22 17:6

20:8 21:7
  58:12 102:7
submitting
  104:14
subsequent
  95:21
subsequently
  49:4
subsidiaries
  23:15
substance
  67:12
substantial
  48:14
substantially
  69:21
sufficient
  60:10 86:4
  91:10
suggest  84:2
suggested
  69:24
suggesting
  71:16
suite  4:19
  15:24 16:4
  107:22
sum  67:12
summary
  46:10 52:23
  53:5,17,24
superpriority
  3:5
supplemental
  9:19 47:1
  62:13 70:7
  98:21

supplemented
  96:1
supplied  88:16
support  9:17
  20:9 58:12
supposed  66:2
  66:11 85:13,14
  101:23
sure  11:6 15:20
  21:4 28:2
  30:10 42:18
  43:3,22 60:20
  66:24 79:2
  82:11 87:4
  89:15 97:21
surface  102:1
surfaced  69:4
  102:16
surprise  23:25
  24:3
susan  7:20
suspect  54:3,5
  57:24
swear  21:18
  22:2 45:16,20
swingle  7:3
system  3:2
  76:23

t

t  107:1,1
ta  7:14
taint  89:22
take  16:6 17:10
  20:19 56:2
  62:9 63:1 65:7
  79:21 82:17
  83:11 85:24

89:18 102:18
taken  80:15,25
  82:4 91:17
talk  39:13
talked  34:10
  41:9 76:8
talking  17:13
  27:8 32:15
  40:7,8 44:18
  44:19 56:22
  72:13 86:22
  92:9
taousse  7:25
tasked  38:21
  51:10 78:22
  79:4
taylor  7:15
team  14:16
  27:10 39:8
  47:10,23 48:14
  48:19,24 50:9
  52:17,18
teams  50:5
  51:10
technically
  32:17
telephonically
  6:18
tell  11:11 23:13
  49:2 51:10
  65:16 69:2
  71:11,12 73:2
  73:4 85:19
  98:9
tempting
  102:10

**terms** 11:20
19:17 25:19,20
26:1 34:16
42:6 74:24,25
76:8,13 85:18
86:22 89:2,20
96:7 97:14,21

**test** 84:21,21
89:25 91:21,23
100:23

**testified** 40:1
44:9

**testify** 97:6

**testimony**
21:18 29:19
45:20 58:15
64:9 66:25
67:1,2 76:25
77:17 78:3
90:9 93:18
97:16,17 98:7
99:17,22,24

**text** 25:22
30:19

**thank** 9:14
10:2 12:12
13:21 14:14,18
15:21 17:5
22:15 34:5
45:1,2,4,18
56:25 58:9,14
94:25 104:24
104:25 105:1,2

**that's** 10:19
11:6 16:5
17:11 18:14
19:11,15,18

20:9 23:2
24:10 25:2,2
29:20 32:11,23
34:22 37:21
40:11,18 42:10
44:12 48:18
50:25 56:25
57:18 61:4,18
66:5,19,21
70:18 72:9
73:20,25 75:23
75:25 76:3
77:5 82:18
83:22 84:2,9
84:21 85:23
88:2,25 90:8
91:10 93:14
94:5 96:12
97:22 101:13
103:14

**theory** 68:11
96:19

**thereof** 2:7

**thereto** 3:3

**there'd** 51:2

**there's** 11:16
15:20 18:4,7
29:1,23 30:9
39:7 42:13
60:14 62:25
67:24 76:9
77:6 80:11
82:25 84:11
86:4 89:7,24
92:7 93:25
94:1 95:3,24
100:1,17 101:1

101:7 102:13
103:22,23

**they're** 28:8
42:20 56:12,16
63:17 64:3
76:21,22 92:9
102:24

**they've** 11:4
63:7

**thin** 97:22

**thing** 42:14
69:22 70:4
84:10 96:19

**things** 19:18
66:9 69:16
103:15

**think** 9:13
12:13 15:16
17:6 19:7,12
19:21 20:3,15
26:4 29:15
30:6,7,9,15
31:20 32:16
36:6,24 39:7
40:14 44:24
49:7 53:4 54:7
55:24 56:1
57:18 58:5
60:16 64:7
65:24 66:15
69:24 70:22
72:5 74:21
75:20 78:12
79:18 80:1,11
81:10 83:9
85:6,9,12 86:6
86:14,20 87:17

88:3 89:2,10
90:4,12 93:15
94:1 95:2,12
95:24 96:17
99:1 101:6,9
103:1,8,8

**thinks** 102:13

**thompson** 8:3

**thought** 17:22
63:5 65:12
77:21 79:2

**thousand**
41:12

**thousands**
69:22 70:3
93:20,24

**three** 9:18,21
20:8 24:8 46:7
94:10

**time** 23:11,12
23:17 35:22
38:2,6 44:21
44:23 46:12,21
47:6,9 50:11
50:17 51:11,21
54:2,4 55:15
59:8 60:12,15
61:21 70:11,11
84:7 87:5,15
88:3 91:14
92:9 93:3,10
93:13 94:12
97:2 101:10,13
103:5

**timeframe**
86:22 94:4

timeline  31:15
timely  85:15
times  91:17
  93:24
timing  17:11
  60:5,8,17
  72:25 86:7
title  18:13
  81:11
today  9:9
  14:25 33:1
  39:13 48:10
  65:3 90:9 98:7
  102:11,19
  104:24
together  47:10
  64:18 80:1
  96:16
told  69:1 73:5
  87:13,21 99:18
tom  7:2
took  34:10,18
  44:13 47:9
  64:1 79:23
  81:7 87:14
  94:15 101:20
topco  10:7,10
  10:24 11:9,17
  12:1,5
tort  79:14
total  17:18,23
  57:17 84:13
touched  90:16
track  41:15
tracked  100:18
tracy  8:7

trade  11:3,17
  11:21
trading  10:25
  11:10
transacting
  57:25
transaction
  48:5 49:3 55:9
transactions
  3:5 28:20
  32:11 38:13
  59:14,19 80:19
transcribed
  3:25
transcript
  107:4
transfer  28:21
  29:4,10,15,17
  29:22 30:3,14
  47:16 59:17
transfers  16:19
  17:3 27:3,6
  28:1,13 29:7,8
  29:12 30:23
  31:10,17 47:24
  48:1 51:8 57:7
  57:13 60:5,8,9
  60:11,17 71:20
  73:16,22 81:20
  104:3
transmission
  75:16
treated  10:10
  19:1 104:3
treating  18:5
treatment  19:5

tried  90:17
  94:13
trilegiant
  92:16,18,22
  93:1,3
trilegiant's
  93:7
trotz  6:20
troubled  100:4
troubling
  98:11
true  18:24
  77:22 81:1
  107:4
truly  32:20
  79:14
trustee  4:18
  12:8,11,11
  13:4,7 14:21
  15:15 16:6
truth  21:19,19
  21:20 22:4,4,4
  45:21,21,22
try  59:1 102:19
trying  19:3,12
turetsky  7:5
turn  15:11
turning  9:12
  14:1,19
two  13:18 21:2
  31:13,13 37:3
  43:6 44:7
  61:11 62:8
  69:16 78:14
  89:14,23 93:9
  100:14 101:12

types  18:20
typical  93:11
typically  50:20
  56:1

**u**

u.k.  74:19,20
  76:23 97:9,12
  97:15
u.s.  1:23 4:18
  12:8,11,11
  13:4,7 15:15
  16:6 24:2 42:7
  74:19,23 75:19
ubierna  7:12
ucc  21:5 87:24
uk  22:22 23:1,4
  23:14,15,21
  24:3,18 42:10
  42:10,14 43:20
  63:19
ultimately  48:7
  48:9 82:7
unaware  39:22
  39:22,24
uncertainty
  18:4 81:24
  82:6
uncontested
  9:9
undeliverable
  64:23
under  17:14
  18:19 19:5
  21:18 30:12
  57:16,17 83:22
  90:21 91:20
  99:22,23 101:2

| | | | |
|---|---|---|---|
| 103:19 | united 1:1,12 | view 18:1 64:5 | 59:10,14,18 |
| undercut 80:7 | 4:17 14:21 | 64:7 99:9 | 60:1 61:12,19 |
| undercutting | unknown | viewed 71:23 | 62:1,10,14,17 |
| 79:8 | 64:11 79:6,14 | 80:23 84:16 | 62:22 63:22 |
| underlying | 96:10 | viewing 27:20 | 65:18 66:1 |
| 20:21 | unreasonable | vogel 5:2 | 68:12,13,15,25 |
| understand | 65:18 | volume 40:21 | 69:11,19 70:2 |
| 17:19 21:16 | unredacted | voluminous | 70:9,15,18,21 |
| 40:10 45:12 | 25:13 | 30:6 36:5 | 70:23 72:15 |
| 47:23 71:15,18 | unrelated 16:1 | 65:20 | 73:13,20,22 |
| 73:18 74:4 | unsecured 6:2 | voy 81:1 | 74:13,14 75:9 |
| 77:10 79:11,23 | 16:21 17:14 | voyager 1:7 | 75:11 76:17 |
| 96:22 99:19 | 81:6 | 5:3,10 6:3 9:3 | 78:19 79:9,23 |
| understandable | uploaded | 9:15 13:14 | 80:8,11,14,22 |
| 18:6 | 25:12 | 15:13 16:19,21 | 80:23,24,25 |
| understanding | use 25:19,20 | 17:3,7,10 18:2 | 81:3,5,7,16 |
| 13:2 17:11 | 26:1 74:24,25 | 18:17 24:13,15 | 83:8,20 87:22 |
| 18:12 19:8 | 76:9,13 77:24 | 28:13,20 30:24 | 93:10,14 95:7 |
| 23:11 28:15 | 82:16 89:3 | 31:18,25 32:11 | 95:7,16,18,20 |
| 29:6,20 31:1 | used 75:9 | 32:18,19,25 | 96:4,6,8,9,15 |
| 32:5 36:21 | usually 26:22 | 33:9 34:1,4,9 | 97:1 98:1,2,4 |
| 38:6 42:8 | 76:20 78:6 | 34:12,14,17,18 | 98:15,17,20,23 |
| 53:14 73:15 | 92:5 | 34:21 35:3,3 | 98:23,24 99:7 |
| 74:9 78:1 | | 35:25 36:1 | 99:21 101:11 |
| understood | **v** | 38:19,22 39:11 | 101:16 |
| 16:9 21:4 | | 39:22,24 40:15 | voyager's |
| undertaken | vacate 23:10 | 41:12,20,25 | 16:20,23,25 |
| 50:22 | vague 12:16 | 44:5,11 46:11 | 18:11 26:10 |
| undertaking | vaguely 55:19 | 47:2,5,6,7,20 | 33:6 35:20 |
| 27:18 | valid 101:8 | 48:20,25 49:7 | 46:4,13,24 |
| undisputed | 102:22 | 49:15,16,18 | 55:23 81:6 |
| 90:8 | varick 4:19 | 50:6,8 51:9,16 | 91:9 96:2 |
| uniformly | various 46:10 | 52:2,5,24 53:5 | |
| 66:17 | 93:24 | 53:9,20 54:2,4 | **w** |
| unique 90:22 | venture 41:7 | 54:8 55:7,8 | wacker 5:11 |
| 91:23 | veritext 107:20 | 56:5,6,13,13 | wager 80:3 |
| | versions 25:13 | 56:19,23 57:14 | 94:2 |
| | victor 7:12 | | |

**wait** 16:15 93:4
**waited** 89:23
**waiver** 13:3,8
   13:13
**wall** 11:5
**wallet** 63:6,24
   75:2,6
**want** 15:20
   16:16 28:8,25
   41:7 46:6 60:3
   60:21 63:1
   86:20 87:4
   89:1 90:15
   102:11
**wanted** 14:20
   15:7 30:22
   31:16 51:7
   89:14
**wants** 21:5
   42:16 91:7
   102:12
**wasn't** 16:14
   23:11 32:6
   35:14 36:18
   49:21 55:20
   62:19 64:14
   66:8 70:17
   71:18,20,22
   72:1,9 78:22
   88:17,18 97:4
   98:3,6 99:2
   101:5,5
**way** 15:17 25:4
   27:16 31:15
   40:4 42:11
   43:7 49:5
   55:17 64:22

79:19 85:12
   94:3 96:7
   104:8
**ways** 80:9
**website** 24:21
**week** 14:23
   16:23
**weeks** 46:2,3
   49:17
**weichselbaum**
   8:1
**weighed** 103:6
**weren't** 78:18
   84:6 87:16
   100:15
**west** 6:11
**we'd** 9:20
**we'll** 13:21
   20:17,18 64:13
   65:6,7,7
   104:13
**we're** 17:13
   30:18 72:13
   86:10,22 87:11
   92:9 95:2
   103:7
**we've** 40:13
   65:2 67:8 68:8
   88:14 90:9,15
   102:10
**whalen** 5:15
   17:9,9,18
   18:22,22 19:20
   34:1,4 63:21
   63:21 64:15,24
   65:4,9 80:10
   80:10 81:10,23

82:10 86:1,1
   91:11,11
**what's** 18:11
   48:10 63:20
**whelan** 14:20
**whoever's** 80:5
**who'd** 100:20
**who's** 27:9
**wide** 77:11
**wiles** 1:22
**williams** 8:16
**wind** 77:25
**window** 57:25
**wish** 9:25
   33:24,25 51:25
   58:19 61:7
   63:4 104:1
**wishes** 14:12
   21:14 43:12
   45:13 86:16
   95:4
**withdraw**
   80:24,24
**withdrawal**
   16:24
**withdrawals**
   17:3 28:13
   29:6 31:25
   32:18 46:5,13
   46:24 47:3,19
   48:25 49:8,18
   50:2 53:10,16
   55:8 56:5
   68:19,20 69:18
   71:17 72:6,16
   72:16,18 79:25
   81:22 93:23

98:24,25 99:21
**withdrawing**
   80:20 82:16
**withdrawn**
   17:22 36:1
   68:16
**withhold** 18:12
   81:12,21,22
   82:2,8,11
   104:1,3
**witness** 21:2
   25:21 26:5
   34:7,13,20
   35:6,14,17,21
   36:4,11,18,23
   37:6,12,19,24
   38:8,11,17,24
   39:2,4,7,12,24
   40:7,19,23
   41:1,3,7,15,21
   42:1,5,13,23
   43:5,10,14
   45:3,6 52:4,10
   52:14,17,21
   53:3,12,22
   54:3,7,14,17
   54:21 55:1,9
   55:13,18 56:1
   56:7,9,15,20
   56:24 66:21,22
   67:13 68:25
   97:17
**witnesses** 21:6
   68:19 69:24
   73:5 90:10
   97:3 98:7
   100:14

**women's** 12:23
13:3,16
**won't** 64:25
**word** 18:8
**words** 46:7
**work** 23:22,23
31:9,14 61:19
61:24
**worked** 24:2
28:3 69:5
100:10
**working** 13:14
31:19 38:12
87:7 99:12
**workstream**
48:16,19 51:2
55:21
**world** 90:23
**worry** 83:5
103:11
**wouldn't** 23:25
24:3,6 29:22
41:7 43:1
49:14 51:17
85:2 87:8
**would've** 26:25
27:24 28:5,6
28:18,19 32:17
33:1,4 34:20
37:7 46:15,21
47:14 48:17
51:13 52:17,21
53:7,18 56:10
57:20 65:17
66:6 67:18
**writing** 75:14
87:19

**written** 75:17
**wrong** 17:8,24
23:18 83:23
85:19

**x**

**x** 1:4,10 106:1
**xo** 90:17,24
91:4,7 92:10
92:17,19,24
93:17 94:1,3

**y**

**yeah** 10:17,19
15:22 23:15
27:8 28:15
32:15 37:24
38:18 39:24
42:1 43:21
47:7,12 55:9
56:8 57:18
77:8,9 78:9
80:4 83:24
**year** 77:25
89:19 92:18,20
**years** 43:6
89:23 92:6
**yep** 43:15
**york** 1:2,14 4:6
4:13,20 5:5,20
6:5 78:16
**you'd** 52:11
**you're** 21:18
22:3 28:12
30:13 32:8
41:10 46:23
47:1 48:20
58:15 59:17,20

60:20 66:2,11
69:17 72:19,22
73:13 101:23
**you've** 18:17
73:6,9

**z**

**zoom** 86:20

**'**

**'** 41:6

**Exhibit D**

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
(212) 872-1000
Mitchell P. Hurley
Dean L. Chapman Jr.
mhurley@akingump.com
dchapman@akingump.com

*Attorneys for Celsius Network LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X
                                              :
In re:                                        :        Chapter 11
                                              :
VOYAGER DIGITAL HOLDINGS, INC., *et al.*,     :        Case No. 22-10943 (MEW)
                                              :
                                              :        Jointly Administered
                           Debtors.           :
                                              :
------------------------------------------------------------------X

**UPDATED MOTION OF CELSIUS NETWORK LLC FOR ORDER (I) LIFTING THE
AUTOMATIC STAY PURSUANT TO 11 U.S.C. 362(d)(1) AND BANKRUPTCY RULE
4001 AND (II) GRANTING LEAVE TO FILE LATE PROOF OF CLAIM PURSUANT TO
BANKRUPTCY RULES 3003(c) AND 9006(b)(1)[1]**

---

[1] Out of an abundance of caution, this motion has been updated and re-filed to reflect the Court's amended objection deadline of January 17, 2023. *See* So Ordered Joint Stipulation [Docket No. 781]. This updated motion remains unchanged from the motion filed on December 14, 2022 [Docket No. 727] in all other respects.

# <u>TABLE OF CONTENTS</u>

                                                                                          Page

**PRELIMINARY STATEMENT** ........................................................................................1

**JURISDICTION** .................................................................................................................2

**BACKGROUND** .................................................................................................................2
    A.    The Voyager Bankruptcy Cases ........................................................................2
    B.    The Celsius Bankruptcy Cases...........................................................................3
    C.    The Voyager Bar Date Passed While Celsius Was Still Gathering and
         Organizing Information Necessary for its Own Bankruptcy ..................................4
    D.    Celsius Identifies Potential Claim, Meets and Confers with Voyager ...................6

**RELIEF REQUESTED AND BASIS FOR RELIEF** ....................................................8
    I.    The Automatic Stay Should Be Lifted to Allow Celsius to Bring an Action
        for Recovery of Preferential Transfers Against Voyager Pursuant to
        Section 547 of the Bankruptcy Code ..................................................................9
        A.    The *Sonnax* Factors for Granting a Motion to Lift the Automatic
             Stay ...................................................................................................10
        B.    The Applicable *Sonnax* Factors Justify Lifting the Automatic Stay ..........11
    II.    The Court Should Extend Celsius' Time to File a Claim Under Bankruptcy
        Rules 3003(c) and 9006(b)(1) ..........................................................................14
        A.    The "Excusable Neglect" Standard.........................................................15
        B.    An Extension of Celsius' Deadline to File Proof of Claims is
             Warranted ..........................................................................................16

**NOTICE**............................................................................................................................20

**NO PRIOR REQUEST**....................................................................................................21

**CONCLUSION** ................................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Chemetron Corp. v. Jones*, 72 F.3d 341, 346 (3d. Cir. 1995)....................................................... 18

*City of New York v. N.Y., N.H. & H.R. Co.*, 344 U.S. 293, 296–97 (1953 .................................. 18

*Eastern Refractories Co. v. Forty Eight Insulations*, 157 F.3d 169, 172 (2d Cir. 1998) ............... 9

*In re AMR Corp.*, 492 B.R. 660, 666 (Bankr. S.D.N.Y. 2013)............................................... 15, 18

*In re AWMC, Inc.*, 109 B.R. 210, 212 (Bankr. N.D. Tex. 1989) ................................................ 16

*In re Brown*, 311 B.R. 409, 412–13 (E.D. Pa. 2004) .................................................................. 9

*In re Enron Corp.*, 419 F.3d 115, 128 (2d Cir. 2005)................................................................ 17

*In re Herman's Sporting Goods, Inc.*, 166 B.R. 581, 584 (Bankr. D.N.J. 1994 .......................... 16

*In re Keene Corp.*, 188 B.R. 903, 913 (Bankr. S.D.N.Y. 1995)................................................. 16

*In re Lehman Bros. Holdings Inc.*, 433 B.R. 113, 121 (Bankr. S.D.N.Y. 2010), aff'd sub nom.
   *CVI GVF (Lux) Master S.a.r.l. v. Lehman Bros. Holdings Inc.*, 445 B.R. 137 (S.D.N.Y. 2011)
   ....................................................................................................................................... 17

*In re Pittsford Polo Club, Inc.*, 188 B.R. 339, 344 (Bankr. W.D.N.Y. 1995)................................ 9

*In re Project Orange Assocs., LLC*, 432 B.R. 89, 103 (Bankr. S.D.N.Y. 2010) .................. 9, 10, 11

*In re R.H. Macy & Co., Inc.*, 161 B.R. 355, 359 (Bankr. S.D.N.Y. 1993) .................................. 19

*In re Rochester Drug Coop., Inc.*, 620 B.R. 699, 705 (Bankr. W.D.N.Y. 2020).................... 12, 14

*In re Shared Techs. Cellular, Inc.*, 293 B.R. 89 (D. Conn. 2003) ............................................... 10

*In re Sonnax Indus.*, 907 F.2d 1280 (2d Cir. 1990)................................................................. 10

*In re Sukhu*, Case No. 17-11890 (CGM), 2022 WL 610310, at *7 (S.D.N.Y. Mar. 1, 2022) ........11

*In re Thomson McKinnon Securities, Inc.*, 159 B.R. 146, 148 (Bankr. S.D. N.Y. 1993)............. 19

*In re Wiley*, 288 B.R. 818, 822 (B.A.P. 8th Cir. 2003)............................................................. 13

*In re Xenon Anesthesia of Texas, PLLC*, 510 B.R. 106, 112 (S.D. Tex. 2014) ............................ 9

*In the Matter of: Sterling United, Inc.*, 674 F. App'x 19, 20 (2d Cir. 2016) .............................. 13

*Krichevsky v. U.S. Bank, N.A.*, 20-CV-2343 (AMD), 2021 WL 9244084 at n.5 (E.D.N.Y. Mar. 22,
   2021) ............................................................................................................................... 13

*Matter of Papp Int'l, Inc.*, 189 B.R. 944 (Bankr. D. Neb. 1995) .............................................. 16

*Pioneer Investment Services Company v. Brunswick Associates Limited Partnership, et al.*, 507
   U.S. 380 (1993).................................................................................................. 15, 16, 18

## STATUTES

11 U.S.C. § 362(a)(1)................................................................................................................ 9

11 U.S.C. § 362(d)(1)........................................................................................................ 1, 2, 9

1334....................................................................................................................................... 2

1409....................................................................................................................................... 2

28 U.S.C. § § 1408 ................................................................................................................... 2

28 U.S.C. § § 157 ..................................................................................................................... 2

28 U.S.C. § 157(b)................................................................................................................... 2

Section 547 of the Bankruptcy Code ......................................................................................... 1

**RULES**

4001 .................................................................................................................................. 1, 2
9006(b)(1) ................................................................................................... 1, 2, 15
Rules 3003(c)(3) ....................................................................................................... 1, 2

1.  Celsius Network LLC ("Celsius") hereby submits this motion (the "Motion") pursuant to section 362(d)(1) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 3003(c)(3), 9006(b)(1) and 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for entry of an order (i) lifting the automatic stay to permit commencement of an adversary proceeding against Voyager Digital LLC ("Voyager") to recover preferential transfers and (ii) extending, nunc pro tunc, Celsius' time to file a proof of claim in this action despite passage of the bar date.  The Motion is updated solely to reflect the new objection deadline pursuant to the Court's So Ordered Joint Stipulation and Agreed Order signed on December 22, 2022 [Docket No. 781].  In support of this Motion, Celsius respectfully represents as follows:

## PRELIMINARY STATEMENT

2.  Both Voyager and Celsius are currently in Chapter 11 reorganization proceedings. They also had a business relationship.  Relevant here, Voyager maintained Earn accounts with Celsius, which earned significant rewards for its users.  After the Voyager bar date passed, Celsius became aware that Voyager transferred approximately $7.7 million worth of cryptocurrency from its Celsius "Earn" program accounts to so-called "Withhold" program accounts during the 90 days prior to Celsius filing for chapter 11 bankruptcy, and withdrew approximately $5.9 million worth of cryptocurrency from its Withhold accounts.  Section 547 of the Bankruptcy Code allows Celsius to claw back that cryptocurrency, and Celsius seeks an order lifting the automatic stay in order to assert such a preference action in its own bankruptcy case.  Further, Celsius seeks a nunc pro tunc extension of its time to file a proof of claim.  Because Celsius did not receive notice of the Voyager bar date and was otherwise busy processing a massive amount of information for its own bankruptcy, the bar date passed before Celsius became aware of its claim against Voyager.

1

Accordingly, Celsius asks that this Court grant the limited relief it seeks so that it may pursue its preference action against Voyager and assert a corresponding claim against Voyager in this action. Celsius respectfully submits that such an order would be consistent with the goals and purposes of the Bankruptcy Code and would not interfere with Voyager's bankruptcy action or the rights of any stakeholder therein.[2]

## JURISDICTION

3.       The Court has jurisdiction over this Motion pursuant to 28 U.S.C. § § 157 and 1334. Venue of these proceedings and this Motion is proper in this district pursuant to 28 U.S.C. § § 1408 and 1409.  This is a core proceeding under 28 U.S.C. § 157(b).

4.       The statutory predicates for the relief sought herein include section 362(d)(1) of the Bankruptcy Code and Rules 3003(c)(3), 9006(b)(1) and 4001 of the Bankruptcy Rules.

## BACKGROUND

**A.       The Voyager Bankruptcy Cases**

5.       On July 5, 2022 (the "Petition Date"), Voyager and each of its affiliated debtors (the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Voyager Bankruptcy").  The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  These chapter 11 cases have been consolidated for procedural purposes only and are jointly administered pursuant to Bankruptcy Rule 1015(b).  On July 19, 2022, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed an official committee of unsecured creditors

---

[2]      Celsius noticed the Motion to be heard on January 24, 2023, the next available omnibus hearing date, in accordance with Paragraphs 1 and 48 of the Case Management Order [No. 22-10943, Docket No. 240] (the "CMO").  For the avoidance of doubt, Celsius acknowledges that it is deemed pursuant to Paragraph 49 of the CMO to have consented to the continuation of the automatic stay pending the conclusion of a final hearing and determination under Bankruptcy Code 362(d) and will not assert the termination of the automatic stay based on Bankruptcy Code section 362(e).

(the "<u>Committee</u>").  No request for the appointment of a trustee or examiner has been made in

these chapter 11 cases.

6.      On August 3, 2022, this Court set a bar date of October 3, 2022 for filing unsecured

claims in Voyager.  *See Order (I) Setting Deadlines for Submitting Proofs of Claim, (II) Approving*

*Procedures for Submitting Proofs of Claim, and (III) Approving Notice Thereof* [No. 22-10943,

Docket No. 218].  Notice of the bar date for Celsius (the "Notice") apparently was sent by Voyager

to an incorrect mailing address and, on information and belief, Celsius never received the Notice.

*See Affidavit of Service re: Notice of Deadline Requiring Submission of Proofs of Claim, Ex. A*

[No. 22-10943, Docket No. 459];  *Declaration of Christopher Ferraro in Support of Motion of*

*Celsius Network LLC for an Order (i) Lifting the Automatic Stay Pursuant to 11 U.S.C. 362(d)(1)*

*and Bankruptcy Rule 4001 and (ii) Granting Leave to File Late Proof of Claim Pursuant to*

*Bankruptcy Rules 3003(c) and 9006(b)(1)* (hereinafter the "<u>Ferraro Decl.</u>") at ¶¶ 6–9 (explaining

that: (a) approximately one week before the bar date, Voyager claims to have mailed notice of the

bar date to Celsius UK—the wrong entity—instead of Celsius; (b) Voyager mailed that notice to

an out of date address in London that Celsius UK no longer occupies; and (c) no Celsius agent or

employee ever received the notice).

7.      On November 18, 2022, Voyager filed an amendment to its schedule of assets and

liabilities, and gave notice of an extension of the bar date to December 23, 2022 for creditors with

a claim arising from that amendment.  *See Amended Schedules* [No. 22-10945, Docket No. 18].

**B.      The Celsius Bankruptcy Cases**

8.      Celsius, together with its affiliates, is one of the largest and most sophisticated

cryptocurrency-based finance platforms in the world and provides financial services to

institutional, corporate, and retail clients across more than 100 countries.  Celsius was created in

2017 to be one of the first cryptocurrency platforms to allow users to transfer their crypto assets

3

(such transferring customers, the "Users") and (a) earn rewards on such crypto assets and/or (b) take out loans using such transferred crypto assets as collateral.

9.      On July 13, 2022, Celsius and certain of its affiliates and subsidiaries (the "Celsius Debtors") filed voluntary petitions seeking relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Southern District of New York (the "Celsius Bankruptcy").  *See Declaration of Holden Bixler in Support of Motion of Celsius Network LLC Lifting the Automatic Stay Pursuant to 11 U.S.C. 362(d)(1) and Bankruptcy Rule 4001 and (ii) and Granting Relief to File Late Proof of Claims Pursuant to Bankruptcy Rules 3003(c) and 9006(b)(1)* (hereinafter the "Bixler Decl.") at ¶ 6.  The Celsius Bankruptcy cases are being jointly administered for procedural purposes only.  The Celsius Debtors continue to operate their businesses and manage their property as debtors and debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Celsius Bankruptcy cases have been consolidated for procedural purposes only and are jointly administered pursuant to Bankruptcy Rule 1015(b).  Celsius retained Alvarez & Marsal North America, LLC ("A&M") to serve as its financial advisor in connection with its chapter 11 case.  *Id*. at ¶¶ 1–2.

**C.      The Voyager Bar Date Passed While Celsius Was Still Gathering and Organizing Information Necessary for its Own Bankruptcy**

10.      In connection with its chapter 11 proceedings, Celsius prepared its requisite schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases (collectively, the "Schedules") and statements of financial affairs (the "Statements").  Bixler Decl. at ¶ 6.  To do so, Celsius was required to compile information from books, records, and documents relating to hundreds of thousands of claims, assets, and contracts.  *Id*.  The collection of this necessary information required a significant expenditure of time and effort on the part of Celsius, its employees, and its advisors including

4

A&M. *Id*. The preparation of the Schedules and Statements in the Celsius case was uniquely challenging, including because Celsius filed one of the first crypto bankruptcies, and there is a lack of precedent. *Id*.

11. The work done to gather the information began prior to the Petition Date and continued until the ultimate filing of the Schedules and Statements. *Id*. at ¶ 7.

12. On July 14, 2022, Celsius sought an extension of time to file its Schedules and Statements. *Id*. at ¶ 8. The bankruptcy court granted that motion. *Id*. Thereafter, Celsius and A&M continued to identify, gather, analyze, and organize the information required to prepare the Schedules and Statements. *Id*. This was an iterative process during which Celsius repeatedly produced revised data sets for A&M to review and analyze. *Id*.

13. During this time, Celsius compiled information from books, records, and documents relating to the claims of hundreds of thousands of creditors, many of whom were Celsius customers, as well as Celsius' many assets and contracts. *Id*. at ¶ 9. That voluminous information was spread across various locations within Celsius' international organization. *Id*. Celsius personnel devoted considerable time to locating and gathering the materials, a task made even more challenging by the substantial number of other important activities required by the commencement of the chapter 11 cases, the limited number of employees available to collect the necessary information, the competing demands upon such employees, and the time and attention that Celsius had to devote to the restructuring process. Ferraro Decl. at ¶ 10.

14. Because of the complexity of the records and the outstanding motions related to the sealing of personally identifiable information, Celsius requested two additional extensions for filing its Schedules and Statements, the first on August 11, 2022 and the second on September 16,

2022.  Bixler Decl.  at ¶ 10.  The bankruptcy court overseeing Celsius' bankruptcy granted both

extensions.  *Id.*

15.     On October 5, 2022, two days after the Voyager bar date passed, Celsius filed its

Schedules and Statements totaling over 30,000 pages.  *Id.* at ¶ 11.  Celsius' statement of transfers

occurring in the 90 days prior to the Petition Date alone contained more than ***three million rows***

of data.  *Id.*

### D.      Celsius Identifies Potential Claim, Meets and Confers with Voyager

16.     On November 2, 2022, four weeks after the filing of the Schedules and Statements,

A&M was asked about Voyager's withdrawals of crypto assets in the 90 days prior to the filing of

Celsius' chapter 11 bankruptcy petition.  *Id.* at ¶ 13.  The Schedules and Statements indicated that

Voyager Digital maintained two accounts with Celsius, both of which included an account in the

earn ("Earn") program and a withhold account ("Withhold"), to which Voyager had transferred a

significant amount of crypto currencies.  *Id.*

17.     Through the Earn program, Celsius offers rewards to its Users who transfer their

crypto assets to Celsius.  *Declaration of Christopher Ferraro, Interim Chief Executive Officer,*

*Chief Restructuring Officer, and Chief Financial Officer of the Debtors, in Support of the Debtors'*

*Motion Regarding Ownership of Earn Assets and the Sale of Stablecoin* [No. 22-10964, Docket

No. 1326] at ¶ 11.  Users in the Earn program grant Celsius all rights and title to the crypto assets

transferred into the program.  *Id.* at ¶ 21.  Over time, the User's rewards are credited in the User's

Celsius accounts.  *Id.* at ¶ 13.  A Withhold account, on the other hand, is an account that keeps

transfers of assets not supported by the Celsius platform distinct from supported digital asset

transfers.  *Declaration of Oren Blonstein, Head of Innovation and Chief Compliance Officer of*

*Celsius Network Limited, With Respect to Certain Phase I Issues Pursuant to the Joint Stipulation*

*and Agreed Scheduling Order by and Among the Debtors, the Committee, and the Ad Hoc Groups*

*with Respect to the Custody and Withhold Issues* [No. 22-10964, Docket No. 1192] at ¶¶ 5–7.
Assets in Withhold accounts are not eligible for the Earn program. *Id*. at ¶ 6.  Critically, parties to
the Celsius bankruptcy proceedings dispute whether assets held in various Celsius accounts and
programs, including Earn program accounts and Withhold accounts, are property of the Celsius
Debtors' estate. *See Debtors' Responsive Brief on Phase I Custody and Withhold Issues* [No. 22-
10964, Docket No. 1567].  Judge Martin Glenn has already been asked to determine whether
Withhold assets transferred from the Earn program are estate property. *Id*.

18.     Relevant to this case, in the 90 days prior to Celsius' bankruptcy, Voyager made
multiple transfers of crypto assets from its Earn program accounts to its Withhold accounts and
then withdrew most of those crypto assets from its Withhold accounts.  Bixler Decl. at ¶¶ 14–15.
Specifically, on May 5, 2022, Voyager transferred $474,160.69 worth of cryptocurrency from Earn
program accounts to Withhold accounts.  *Id*.  Later, on May 11, 2022, Voyager transferred
$3,774,632.91 worth of cryptocurrency from Earn program accounts to Withhold accounts.  *Id*.
On May 25, 2022, Voyager transferred $3,451,881.41 worth of cryptocurrency from Earn program
accounts to Withhold accounts.  *Id*.  And between May 11, 2022 and June 6, 2022, Voyager
withdrew $5,897,922.02 worth of cryptocurrency from Withhold accounts.  *Id*.

19.     Celsius believes that the $7,700,675.01 worth of transfers from Voyager's accounts
in the Earn program to the accounts in the Withhold program are likely subject to preference claims
by Celsius under section 547 of the Bankruptcy Code.  Other withdrawals and transfers may also
be subject to challenge.

20.      Because Celsius' bankruptcy case is still at a relatively early stage, Celsius has not
yet engaged in a process to identify all potential preferential transactions that occurred in the
relevant period.  *Id*. at ¶ 12.  This is consistent with the normal cadence of complex traditional

chapter 11 cases in which a fulsome analysis to identify preference claims does not typically commence until longer after the filing of the Schedules and Statements. *Id.*

21.     On or around November 5, 2022, Celsius asked Akin Gump to address the potential Voyager preferences as conflicts counsel. *Declaration of Mitchell Hurley in Support of Motion of Celsius Network LLC Lifting the Automatic Stay Pursuant to 11 U.S.C. 362(d)(1) and Bankruptcy Rule 4001 and (ii) and Granting Relief to File Late Proof of Claims Pursuant to Bankruptcy Rules 3003(c) and 9006(b)(1)* (hereinafter the "Hurley Decl.") at ¶ 4.  Thereafter, Akin Gump performed a preliminary investigation on an expedited basis into the relationship between Voyager and Celsius and discovered a potential preference claim that is the basis of the Motion. *Id.*

22.     On November 15, 2022 Akin Gump contacted counsel to Voyager concerning certain of the relief requested in this Motion. *Id.* at ¶ 5.  After additional conversations with Celsius' counsel, Akin Gump provided a formal letter requesting that Voyager consent to the relief Celsius now seeks, but without the time or expense associated with formal motion practice. *Id.* Celsius continued to meet and confer with Voyager's counsel after providing the letter, but to date the parties have been unable to reach agreement concerning the relief Celsius seeks. *Id.*  In the interests of time, Celsius has therefore filed the Motion, though Celsius remains hopeful that a consensual resolution is possible. *Id.*

## RELIEF REQUESTED AND BASIS FOR RELIEF

23.     Celsius respectfully requests that the Court enter an Order (i) lifting the automatic stay in this chapter 11 case to permit Celsius to commence an adversary proceeding in the Celsius chapter 11 case in order to pursue a preference action against Voyager and (ii) extending, *nunc pro tunc*, Celsius' time to file a proof of claim in this action despite passage of the bar date.

I.  **The Automatic Stay Should Be Lifted to Allow Celsius to Bring an Action for Recovery of Preferential Transfers Against Voyager Pursuant to Section 547 of the Bankruptcy Code**

24.     Under the Bankruptcy Code, the filing of a bankruptcy petition automatically stays "the commencement or continuation . . . of a judicial . . . action or proceeding against the debtor that was or could have been commenced before the commencement of the [bankruptcy]."  11 U.S.C. § 362(a)(1).  The Bankruptcy Code also provides for the automatic stay to be lifted under certain circumstances.  Section 362(d)(1) provides that "[o]n request of a party in interest . . . the court shall grant relief from the automatic stay . . . by terminating, annulling, modifying, or conditioning such stay . . . (1) for cause, including the lack of adequate protection of an interest in property of such party in interest."  11 U.S.C. § 362(d)(1).

25.     The Bankruptcy Code does not define the phrase "for cause," but courts recognize it as "a broad and flexible concept that must be determined on a case-by-case basis."  *In re Project Orange Assocs., LLC*, 432 B.R. 89, 103 (Bankr. S.D.N.Y. 2010) (quoting *In re Brown*, 311 B.R. 409, 412–13 (E.D. Pa. 2004)); *see also Eastern Refractories Co. v. Forty Eight Insulations*, 157 F.3d 169, 172 (2d Cir. 1998) ("[B]ankruptcy courts have the plastic powers to modify or condition an automatic stay so as to fashion the appropriate scope of relief."); *In re Pittsford Polo Club, Inc.*, 188 B.R. 339, 344 (Bankr. W.D.N.Y. 1995) (bankruptcy courts are empowered with "broad discretion to fashion relief from the automatic stay").  Indeed, "[a]llowing a matter to proceed in another forum may constitute cause."  *In re Xenon Anesthesia of Texas, PLLC*, 510 B.R. 106, 112 (S.D. Tex. 2014).

26.     And notably, at least one court in this Circuit has used those broad, elastic powers to allow modification of an automatic stay *in order to allow prosecution of an adversary proceeding between two debtors from two different bankruptcies*—which is exactly the fact pattern that gives rise to this motion.  *See, e.g.*, *In re Shared Techs. Cellular, Inc.*, 293 B.R. 89 (D.

9

Conn. 2003) (finding bankruptcy court's modification of automatic stay to permit debtor in
separate bankruptcy to prosecute preference claims in its own bankruptcy case an appropriate
exercise of the court's broad powers under section 362).

### A.    The *Sonnax* Factors for Granting a Motion to Lift the Automatic Stay

27.    In determining whether to modify or lift an automatic stay to allow litigation against
a debtor to proceed in another forum, courts in this Circuit typically consider the twelve factors set
out by the Second Circuit in *In re Sonnax Indus.*, 907 F.2d 1280 (2d Cir. 1990).  Those factors are:

> (1) whether relief would result in a partial or complete resolution of the issues; (2)
> lack of any connection with or interference with the bankruptcy case; (3) whether
> the other proceeding involves the debtor as a fiduciary; (4) whether a specialized
> tribunal with the necessary expertise has been established to hear the cause of
> action; (5) whether the debtor's insurer has assumed full responsibility for
> defending it; (6) whether the action primarily involves third parties; (7) whether
> litigation in another forum would prejudice the interests of other creditors; (8)
> whether the judgment claim arising from the other action is subject to equitable
> subordination; (9) whether movant's success in the other proceeding would result
> in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and
> the expeditious and economical resolution of litigation; (11) whether the parties are
> ready for trial in the other proceeding; and (12) impact of the stay on the parties
> and the balance of harms.

*Id.* at 1286.  A court need only apply the factors that are relevant to the particular case, and does
not need to give each factor equal weight.  *In re Project Orange Assocs., LLC*, 432 B.R. at 104.

28.    In *In re Shared Techs*, the United States Bankruptcy Court for the District of
Connecticut analyzed whether the stay should be lifted in order to allow prosecution of an
adversary proceeding between two debtors from two different bankruptcies.  The court explained
that lifting the stay was justified because "[w]ithout a stay modification, no further action on the
pending litigation is possible," and then lifted the stay for the limited purpose of allowing the
movant to proceed in seeking a judgment to recover preferential transfers in an adversary
proceeding filed in its own bankruptcy action—which is exactly what Celsius seeks here.  *In re
Shared Techs,* 293 B.R at 94..

10

**B.    The Applicable *Sonnax* Factors Justify Lifting the Automatic Stay**

29.    Here, the Court should grant Celsius' motion because the applicable *Sonnax* factors
weigh in favor of lifting the automatic stay and none of the factors militate against it.  Specifically,
(i) Celsius' preference claims against Voyager are most efficiently litigated in the Celsius action,
where legal and factual issues materially similar or identical to issues that will be raised in
connection with the Voyager already must be considered and resolved (Factor 10); (ii) the balance
of harms favors lifting the stay because Celsius has a preference claim against Voyager, the
resolution of which is necessary for the proper adjudication of both Voyager and Celsius'
bankruptcy cases (Factor 12); and (iii) because these are discrete claims not connected to a larger
issue in Voyager's bankruptcy, there will be no prejudice to other creditors or the broader Voyager
restructuring (Factor 7)—whereas leaving the stay in place will continually prejudice Celsius.

Factor 10. Litigation in the Celsius Bankruptcy Serves the Interests of Judicial
Economy and the Expeditious and Economical Resolution of Litigation:

30.    First, resolving the preference claim in the Celsius Bankruptcy rather than the
Voyager Bankruptcy will serve the interests of judicial economy and the expeditious resolution of
litigation because one court will remain the expert tasked with resolving critical issues arising in
Celsius preference claims, including issues based on substantially similar facts.  *In re Project
Orange Assocs., LLC*, 432 B.R. at 109 (explaining that factor 10 weighed in favor of lifting the
stay and allowing litigation to proceed in a different court because the agreements at issue were
"complicated, long-term arrangements" that the other court was "quite familiar" with); *see also In
re Sukhu*, Case No. 17-11890, 2022 WL 610310, at *7 (S.D.N.Y. Mar. 1, 2022) ("Reviewing the
relevant *Sonnax* factors, Judicial Economy suggests that this matter is best settled by the Court in
which the litigation was initiated.").

31.    Transfers by Voyager made from Earn accounts to Withhold accounts in the 90 days before Celsius' petition date, or alternatively, based on Voyager's withdrawals from Withhold Accounts in the 90 days before Celsius' petition date may constitute avoidable preferences.  The answer to that question will turn in part on the Celsius bankruptcy court's determination as to whether assets held in the Earn and Withhold accounts are estate property, subjects the Celsius court will soon consider and determine.  The Celsius bankruptcy court will then have to consider whether transfers out of certain kinds of Celsius account(s) constitute preferential transfers.  Not only will it be more *efficient* for one court to familiarize itself sufficiently with issues concerning the Celsius platform to determine these questions, it also will reduce the risk of inconsistency for one court to make determinations about hundreds or perhaps thousands of arguably similar preference claims relating to transfers on and out of the Celsius platform.

32.    Additionally, Voyager may seek to assert a claim in the Celsius Bankruptcy with respect to crypto assets in Earn and/or Withhold accounts.  That in turn may result in disputes such as disallowance litigation under section 502(d), and thus the questions discussed above, including whether Voyager is in receipt of an avoidable preference under section 547 may have to be determined in the Celsius Bankruptcy in any event.  *See In re Rochester Drug Coop., Inc.*, 620 B.R. 699, 705 (Bankr. W.D.N.Y. 2020) ("Judicial economy is served by allowing Echo to resolve its setoff claim for returned goods credit . . . in a single proceeding.").

33.    Allowing the preference action against the Debtor to proceed in the Celsius Bankruptcy, therefore, will avoid multiple courts having to adjudicate the same issues and promote judicial economy.

Factor 12. The Stay Prejudices Celsius and the Balance of Harms Favors Lifting it:

34.     Second, the balance of harms favors lifting the stay because Celsius has a preference claim that must be resolved.  The stay will continue to prejudice Celsius if it remains in place because it will prevent Celsius from pursuing preference claims against Voyager totaling at least approximately $7.7 million in its own bankruptcy case.  *See In re Wiley*, 288 B.R. 818, 822 (B.A.P. 8th Cir. 2003) ("The mere filing of a petition in bankruptcy cannot, in and of itself, erase a plaintiff's claim, its opportunity to litigate, or the fact that the debtor may be liable to the plaintiff in some amount.").

35.     Under section 547(b)(4)(A) of the Bankruptcy Code, a "trustee may, based on reasonable due diligence in the circumstances of the case and taking into account a party's known or reasonably knowable affirmative defenses . . . avoid any transfer of an interest of the debtor in property. . . (4) made—(A) on or within 90 days before the date of the filing of the petition," as long as "those interests are not perfected security interests."  *In the Matter of: Sterling United, Inc.*, 674 F. App'x 19, 20 (2d Cir. 2016) (citing 11 U.S.C §§ 547(b)(4)(a), 547(c)(3)).

36.     Here, Voyager transferred coins from Earn accounts to Withhold accounts within 90 days of Celsius filing its petition and then withdrew many of those coins from Withhold accounts within 90 days of Celsius filing its petition.  Celsius seeks to avoid certain of those transfers as preferential under section 547.  Celsius clearly will be prejudiced if it is not permitted to pursue its preference claims against Voyager in its own bankruptcy.  *See Krichevsky v. U.S. Bank, N.A.*, 20-CV-2343 (AMD), 2021 WL 9244084 at n.5 (E.D.N.Y. Mar. 22, 2021) ("I find that these factors favor modification of the automatic stay…. In particular, 'lifting the stay on this limited basis enables [U.S. Bank] to proceed . . . to resolve issues with the property—in which the [other court] has expertise—and furthers the interests of judicial economy.'").

13

37.     By contrast, Voyager will not experience harm if Celsius is allowed to pursue the preference action in the Celsius Bankruptcy.  The alternative would be proceeding by way of proof of claim in the Voyager Bankruptcy, which would be an inefficient way of resolving the merits of the underlying preference action.  Indeed, Voyager might even gain an advantage if the preference action proceeds alongside actions brought by Celsius against other preference defendants facing arguably similar claims arising out of arguably similar circumstances.

Factor 7. Litigation in the Celsius Bankruptcy Will Not Prejudice Other Creditors:

38.     Finally, Celsius' contemplated preference action against Voyager is a discrete claim that lacks connection to any larger issue in the Voyager Bankruptcy.  The preference litigation in the Celsius Bankruptcy does not prejudice the interests of Debtor's other creditors because Celsius' preference claims are unique to Celsius and not available to all unsecured creditors.  *See In re Rochester Drug Cooperative, Inc.*, 620 B.R. 699, 705 (Bankr. W.D.N.Y. 2020) (finding that factors 7, 10, and 12, weigh most heavily in favor of granting stay relief for party to assert a counterclaim for setoff against the debtor because the alleged setoff claim was not a claim available to all unsecured creditors).  No other Voyager creditor can claw back Celsius coins stored on the Celsius platform.  And whether Voyager or Celsius has a right to these coins is a matter to be resolved solely between Celsius and Voyager and should be resolved in the Celsius Bankruptcy, for all the reasons stated herein.

39.     Thus, there is cause for the automatic stay to be lifted or modified to permit Celsius to assert a preference action against Voyager in the Celsius Bankruptcy.

## II.     The Court Should Extend Celsius' Time to File a Claim Under Bankruptcy Rules 3003(c) and 9006(b)(1)

40.     To ensure that Celsius can recover in the Voyager Bankruptcy any judgment received based on a preference action in the Celsius Bankruptcy, Celsius also asks the Court for

14

an extension of time to file a proof of claim. Celsius is entitled to such relief primarily because it (i) did not receive notice of the bar date in the Voyager Bankruptcy and (ii) was in the midst of its own massive bankruptcy proceeding when the bar date passed, both of which justify a finding of "excusable neglect" to allow late-filed proof of claims.

### A. The "Excusable Neglect" Standard

41.     Bankruptcy Rule 9006(b)(1) authorizes a bankruptcy court to accept late-filed claims where the failure to act is a result of "excusable neglect," and contemplates that courts are permitted, where appropriate, to accept late filings. Fed. R. Bankr. Proc. 9006(b)(1).

42.     The leading case addressing the "excusable neglect" standard is *Pioneer Investment Services Company v. Brunswick Associates Limited Partnership, et al.*, 507 U.S. 380 (1993). According to the Supreme Court, "excusable neglect" is an elastic concept and includes inadvertence, mistake, or carelessness, as well as intervening circumstances beyond the party's control. *Pioneer*, 507 U.S. at 388, 391. A determination of "excusable neglect" is an equitable consideration where the Court must take into account all relevant circumstances. *Id.* at 395; *see also In re AMR Corp.*, 492 B.R. 660, 666 (Bankr. S.D.N.Y. 2013).

43.     The Supreme Court, noting that one of the aims of chapter 11 of the Bankruptcy Code is to "avoid forfeiture by creditors," determined that there were four key factors to analyze when evaluating whether a claim may be accepted after the bar date as a result of "excusable neglect":

(i)      whether granting the delay will prejudice the debtor;

(ii)     the length of the delay and its impact on efficient court administration;

(iii)    whether the delay was beyond the reasonable control of the person whose duty it was to perform; and

(iii)    whether the creditor acted in good faith.

15

*Pioneer*, 507 U.S. at 385

44.     Importantly, the determination of whether "excusable neglect" is present is factual in nature and falls within the discretion of the bankruptcy court. *See In re AWMC, Inc.*, 109 B.R. 210, 212 (Bankr. N.D. Tex. 1989) (determination is "fact specific").

**B.     An Extension of Celsius' Deadline to File Proof of Claims is Warranted**

45.     Each of the four key factors set forth by the Supreme Court for permitting late-filed claims is present here.   First, the Debtors would not be prejudiced by the claim being deemed timely filed or the granting of an extension of the bar date.   Second, the delay in the filing of the claim was reasonable under the circumstances and will not have a detrimental effect on the efficiency of court administration.   Third, the reason for the delay was based on excusable neglect. And fourth, Celsius acted in good faith to file proof of its claim as soon as possible.

(i)     *Prejudice to the Debtors*

46.     First, allowing a late-filed claim will not prejudice the Debtors because Voyager is still in the preliminary stages of its bankruptcy and no plan has been confirmed.   *See In re Herman's Sporting Goods, Inc.*, 166 B.R. 581, 584 (Bankr. D.N.J. 1994) ("The absence of a confirmed plan of reorganization indicates a lack of prejudice to the debtor."); *Matter of Papp Int'l, Inc.*, 189 B.R. 944 (Bankr. D. Neb. 1995) ("Several courts have concluded the lack of a confirmed plan indicates a lack of prejudice to the debtor . . . ."); *see also In re Keene Corp.*, 188 B.R. 903, 913 (Bankr. S.D.N.Y. 1995) (stating in connection with finding excusable neglect, "although the principal constituents have negotiated and published a plan, it has not been confirmed.").

47.     Second, the claim itself would be *de minimus* relative to a total unsecured claims pool of $1.85 billion.   *See Notice of Filing of First Amended Disclosure Statement Relating to the Second Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant*

16

to Chapter 11 of the Bankruptcy Code [No. 22-10943, Docket No. 591]. Allowing an additional

claim for approximately $7.7 million relative to an estimated total claims pool of that size will

have very little, if any, effect on this proceeding.

48.     Moreover, on November 18, 2022, Voyager gave notice of an extension of the bar

date to December 23, 2022, for creditors with a claim arising from an amendment to the schedule

of assets and liabilities for Debtor Voyager Digital, LLC. *See Notice of (I) Filing of Amendment

to Schedule of Assets and Liabilities for Voyager Digital, LLC and (II) Deadline Requiring

Submission of Proofs of Claim on or Before December 23, 2022 and Related Procedures for

Submitting Proofs of Claim in the Above-Captioned Chapter 11 Cases* [No. 22-10943, Docket No.

666]. In light of the new deadline for a significant number of parties, it is unlikely that allowing

one additional party (Celsius) to file proof of claims after the original October 3 bar date would

prejudice the Debtors in any meaningful way.

49.     Finally, the preference claim Celsius seeks to file and the circumstances

surrounding it are unique. It is highly unlikely that another Voyager creditor will discover a

preference claim based on its own large bankruptcy action being filed at essentially the same time

as the Voyager bar date. Therefore, it is unlikely that granting Celsius the relief it seeks will result

in a cascade of similar such claims, thereby prejudicing the Debtors.

(ii)     *Length of Delay*

50.     "There is no bright-line rule governing when the lateness of a claim renders it too

late." *In re Lehman Bros. Holdings Inc.*, 433 B.R. 113, 121 (Bankr. S.D.N.Y. 2010), aff'd sub

nom. *CVI GVF (Lux) Master S.a.r.l. v. Lehman Bros. Holdings Inc.*, 445 B.R. 137 (S.D.N.Y.

2011). "[T]he lateness of a claim must be considered in the context of the proceeding as a whole."

*In re Enron Corp.*, 419 F.3d 115, 128 (2d Cir. 2005). And, notably, "a claim filed six months late

17

will not be disruptive at all—if, for example, the proceeding has come to a temporary halt for other

reasons." *Id*.

51.     Here, Celsius worked diligently to gather and organize the information required in

its statements upon filing its bankruptcy petition and that work continued until the morning of

October 5, 2022, when Celsius filed its Schedules and Statements.  Bixler Decl. at ¶¶ 5–14.  As

soon as Celsius became aware of its claim on November 5, 2022, it began the process of preparing

to file a claim, including the retention of conflicts counsel and preparation of this Motion.  Hurley

Decl. at ¶¶ 4–12.  This delay is therefore reasonable.

52.     Furthermore, any claim in respect of the preference action will not have any

meaningful effect on the administration of Voyager's chapter 11 case.

         (iii)     *Reason for Delay*

53.     Any delay on the part of Celsius in not timely filing a preference claim is excusable.

Excusable neglect is "not limited strictly to omissions caused by circumstances beyond the control

of the movant."  *Pioneer*, 507 U.S. at 392.  "Congress plainly contemplated that the courts would

be permitted, where appropriate, to accept late filings caused by inadvertence, mistake, or

carelessness, as well as by intervening circumstances beyond the party's control."  *Id*. at 388.

Further, when "a creditor is not given reasonable notice of the bankruptcy proceeding and the

relevant bar dates, its claim cannot be constitutionally discharged."  *In re AMR Corp*., 492 B.R. at

663 (quoting *Grant v. U.S. Home Corp.* (*In re U.S. Home Corp.*), 223 B.R. 654, 658 (Bankr.

S.D.N.Y. 1998)).  Likewise, "[i]nadequate notice is a defect which precludes discharge of a claim

in bankruptcy."  *Chemetron Corp. v. Jones*, 72 F.3d 341, 346 (3d. Cir. 1995).  This is because

"[t]he constitutional standard for due process requires that known creditors in a bankruptcy case

receive actual notice of the bar date."  *In re AMR Corp*., 492 B.R. at 663 (citing *City of New York

v. N.Y., N.H. & H.R. Co.*, 344 U.S. 293, 296–97 (1953)).  "In Chapter 11, therefore, a known

18

creditor must receive proper, adequate notice before its claim is barred forever." *Id.* (citing *Best Prods. Co., Inc.*, 140 B.R. at 357); *see also In re R.H. Macy & Co., Inc.*, 161 B.R. 355, 359 (Bankr. S.D.N.Y. 1993) ("Known creditors . . . must be afforded notice 'reasonably calculated, under all the circumstances, to apprise' them of the pendency of the bar date."). And a creditor who does *not receive* actual notice of the bar date may establish excusable neglect on that ground. *In re Thomson McKinnon Securities, Inc.*, 159 B.R. 146, 148 (Bankr. S.D. N.Y. 1993).

54. The fact that Celsius never received notice of the Voyager bar date, therefore, is sufficient to establish excusable neglect. Ferraro Decl. at ¶¶ 4–9. But even if Celsius *had* received notice, it would still have a strong claim for excusable neglect because its delay also was the result of being consumed with its own bankruptcy case and in traditional complex chapter 11 filings, preference claims are often not analyzed before filing Schedules and Statements. *See* Bixler Decl. at ¶¶ 5–14. As explained *supra* at ¶ 13, Celsius worked diligently with limited resources to gather and organize the information required for its Schedules and Statements and did not have the resources to undertake an extensive analysis of all potential preference claims before filing its Schedules and Statements—indeed, records of the transactions on the Celsius platform in the 90 days before filing of the bankruptcy petition *alone* accounted for millions of rows of data. *Id.* at ¶ 11. Celsius has not yet conducted a comprehensive preference analysis and only recently began a limited, preliminary review of potential preference claims associated with only the GK8 entities in mid-December 2022, *Id.* at ¶ 12, but has nevertheless already identified its particular preference claim against Voyager. Thus, under the circumstances, it has established excusable neglect.

**(iv)    *Good Faith***

55. Finally, Celsius acted in good faith. Celsius began exploring its claims against Voyager as soon as it was made aware of the transfers—referring the matter to conflicts counsel, investigating the relevant transactions, consulting with counsel for Voyager in an effort to save

19

both estates the expense of motion practice, and ultimately filing this motion promptly—and prioritized the preference claims against Voyager long before any others. *Id.* at ¶¶ 13–18. Through no fault of its own, Celsius did not receive notice of the Voyager bar date. *Id.*

56.    Without receiving notice of the bar date, Celsius could not have been expected to prioritize that date above deadlines in its own bankruptcy. As explained in detail above, Celsius' own bankruptcy required it to process a massive amount of information in a short amount of time. *See supra* at ¶ 13. Because (i) preference claims are usually analyzed after Schedules and Statements are filed in traditional chapter 11 cases and (ii) Celsius did not receive notice of the Voyager bar date, Celsius focused its resources on more pressing deadlines and ultimately filed its Schedules and Statements on October 5, 2022—two days after the Voyager bar date of October 3, 2022. *See supra* at ¶¶ 13–15.

57.    The decision to focus on preparing Schedules and Statements was made in good faith based on the need to comply with the relevant bankruptcy rules.

58.    Accordingly, by virtue of Celsius' good-faith efforts to timely file the claims, the relatively short delay in seeking Court permission to file the claim, the absence of prejudice to the Debtors' estates and the absence of a negative impact on the efficiency of court administration, Celsius respectively submits that, pursuant to Bankruptcy Rules 3003(c) and 9006(b)(1), the Court should conclude that excusable neglect is present and extend, nunc pro tunc, Celsius' time to file a proof of claim to within 14 days of a decision granting such relief.

## NOTICE

59.    Notice of this Motion has been provided to the Debtors, the Office of the U.S. Trustee, and all other parties entitled to notice pursuant to Bankruptcy Rule 2002. Celsius submits that such notice is sufficient and no other or further notice need be provided.

## NO PRIOR REQUEST

60.     No prior request for the relief sought in this Motion has been made by Celsius to

this or any other court.

## CONCLUSION

**WHEREFORE**, Celsius respectfully request that the Court (i) enter an Order (a) lifting

the automatic stay in this chapter 11 case to permit Celsius to commence an adversary proceeding

in Celsius' chapter 11 case in order to pursue a preference action against Voyager and (b) granting

leave under Bankruptcy Rules 3003(c) and 9006(b)(1) extending, *nunc pro tunc*, Celsius' time to

file a proof of claim to within 14 days of a decision granting such relief and (ii) grant Celsius such

other and further relief as the Court deems just, equitable, and proper.


Dated: New York, New York
       December 23, 2022


                          AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P.
                          Attorneys for Celsius Network LLC
                          By:

                               /s/ *Mitchell P. Hurley*
                               Mitchell P. Hurley
                               Dean L. Chapman Jr.
                               One Bryant Park
                               New York, New York 10036
                               (212) 872-1000
                               mhurley@akingump.com
                               dchapman@akingump.com

21

**Exhibit E**

Darren Azman
Joseph B. Evans
**MCDERMOTT WILL & EMERY LLP**
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
Facsimile: (212) 547-5444

Charles R. Gibbs (admitted *pro hac vice*)
Grayson Williams (admitted *pro hac vice*)
**MCDERMOTT WILL & EMERY LLP**
2501 North Harwood Street, Suite 1900
Dallas, Texas 75201-1664
Telephone: (214) 295-8000
Facsimile: (972) 232-3098

*Counsel to the Official Committee of Unsecured
Creditors*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*, | ) | Case No. 22-10943 (MEW) |
|  | ) |  |
| Debtors.[1] | ) | (Jointly Administered) |
|  | ) |  |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
TO CELSIUS NETWORK LLC'S MOTION SEEKING AN ORDER (I) LIFTING
THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(D)(1) AND
BANKRUPTCY RULE 4001 AND (II) GRANTING LEAVE TO FILE LATE PROOF
OF CLAIM PURSUANT TO BANKRUPTCY RULES 3003(C) AND 9006(B)(1)[2]**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the

chapter 11 cases of the above-captioned debtors (collectively, the "Debtors" or "Voyager")

hereby objects (the "Objection") to the Motion[3] filed by Celsius Network LLC ("Celsius")

seeking an order (1) lifting the automatic stay to allow commencement of an adversary

proceeding to recover alleged preferential transfers and (2) extending the time to file a proof of

claim. In support of the Objection, the Committee respectfully states as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Voyager Digital Holdings, Inc.'s and Voyager Digital Ltd.'s principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003. Voyager Digital, LLC's principal place of business is 701 S. Miami Ave, 8th Floor, Miami, FL 33131.

[2] Celsius's motion was originally filed at Docket No. 727 (the "Motion"). Celsius subsequently filed an "updated" motion at Docket No. 789, but the only change was to include the new objection deadline of January 17, 2023.

[3] Unless otherwise defined herein, capitalized terms have the same meanings as in the Motion.

## PRELIMINARY STATEMENT

1.      Celsius's request for special treatment should be denied. The bar date applies to all creditors, and Celsius has no excuse for filing a late proof of claim. Celsius also provides no compelling reason for why it should be able to front-run other creditors by lifting the automatic stay. Put simply, the Motion provides no basis to depart from the applicable bar dates and Bankruptcy Rules. The Motion should be denied in its entirety.

2.      Voyager and Celsius are both chapter 11 debtors in the Southern District of New York. On July 5, 2022, Voyager commenced its chapter 11 case (the "Voyager Case"),[4] and on July 13, 2022, Celsius commenced its chapter 11 case (the "Celsius Case").[5] Voyager filed bankruptcy amidst extreme turmoil in the cryptocurrency industry. Indeed, the June 2022 beginning of "crypto winter" saw many market participants struggle and ultimately, fail. This "cryptopocalypse" spread rapidly through the mainstream news, as many retail customers found themselves unable to access their cryptocurrency because of withdrawal "freezes" on crypto platforms. Voyager was the first of these companies to commence chapter 11 proceedings, and Celsius filed only eight days later. The details of this sudden collapse across the industry, including Voyager's Case, are set forth in detail in the first day declaration (the "Celsius First Day Declaration") filed by Celsius's former Chief Executive Officer, Alex Mashinsky.[6]

3.      On August 3, 2022, this Court established October 3, 2022 as the bar date (the "Bar Date") in the Voyager Case.[7] On September 23, 2022, Voyager mailed the notice of Bar

---

[4]  The Voyager Case is jointly administered under the case captioned *In re Voyager Digital Holdings, Inc.,* et al., Case No. 22-10943 (MEW) (Bankr. S.D.N.Y.).

[5]  The Celsius Case is jointly administered under the case captioned *In re Celsius Network LLC,* et al., Case No. 22-10964 (MG) (Bankr. S.D.N.Y.). Filings in the Celsius case are cited as "CN Docket No. #."

[6]  CN Docket No. 23.

[7]  *See* Docket No. 218 (the "Bar Date Order").

2

Date to Celsius,[8] and on August 11, 2022 published the notice of Bar Date in the *New York Times* and the *Financial Times*.[9] The notice of Bar Date, like many of the filings in the Voyager Case, was widely publicized by media reports and on social media.[10] Voyager even provided notice on its own website describing the "claims process for your crypto" and making clear that "you will need to submit [a] proof of claim on or before the Bar Date of October 3, 2022, at 5:00 PM (EST)."[11] The Committee also published the Bar Date and clear instructions on its own Twitter account.[12]

4.      Celsius has also been represented by sophisticated bankruptcy counsel and advisors (many of which also represent Voyager). Despite all of this, Celsius failed to file a timely proof of claim.

5.      Celsius is now seeking authority to file a $7.7 million preference claim months after the Bar Date has passed. However, Celsius has not proffered any compelling excuse for missing the Bar Date. That is because no excuse exists. Celsius not only had actual and

---

[8]   Exhibit A to Docket No. 459 (averring that notice was sent to "Celsius" at "35 Great St. Helen's, London, UK EC3A 6AP"). Celsius concedes this fact. Ferraro Decl. at ¶ 6 ("Voyager attempted to provide notice of the bar date in its chapter 11 case to Celsius UK"). Celsius alleges, however, that the address is out of date. *Id.* at ¶ 7 ("35 Great St. Helen's, London, United Kingdom" is "an out of date address for a space that Celsius UK no longer occupies").

[9]   Docket Nos. 271 and 272.

[10]  Voyager (@investvoyager), Twitter (Aug. 26, 2022, 6:19 PM), https://twitter.com/investvoyager/status/1563290000187219969 (providing a link to additional information about the claims process, including the Bar Date); JD Supra, *Voyager Creditors—Deadline Set for Filing Bankruptcy Proofs of Claim*, Aug. 11, 2022, https://www.jdsupra.com/legalnews/voyager-creditors-deadline-set-for-2824111/ (stating that the proof of claim "deadline is 5:00 p.m. ET on October 3, 2022); Emily Tonelli, *Crypto Exchange FTX Wins Bid to Buy Out Bankruptcy Voyager for $1.4B*, Sept. 27, 2022, https://decrypt.co/110601/crypto-exchange-ftx-wins-bid-buy-out-bankrupt-voyager-1-4b (stating that the proof of claim deadline is October 3); Christian Nwobodo, *Bankrupt Crypto Lender Voyager Set to Auction Off its Assets on Sept. 13*, Sept. 7, 2022, https://cryptoslate.com/bankrupt-crypto-lender-voyager-set-to-auction-off-its-assets-on-sept-13/ (same).

[11]  The Voyager Team, *Claims Process for Your Crypto: Next Steps*, Aug. 24, 2022, https://www.investvoyager.com/blog/claims-process-crypto-next-steps/.

[12]  Voyager Official Committee of Unsecured Creditors (@VoyagerUCC), Twitter (August 31, 2022, 5:07 PM), https://twitter.com/VoyagerUCC/status/1565083929413140480.

constructive notice of the Bar Date, but it also knew about the allegedly preferential transfers

well in advance of the deadline. In August, more than one month before the Bar Date, Celsius

made public statements about Voyager withdrawing funds from Celsius's platform prepetition,

but failed to take any action to preserve its claim.

6. Celsius admits it filed a late proof of claim, but argues that its neglect should be

excused. Celsius's neglect is not excusable. And, because Celsius's claim is time-barred, its

request to obtain relief from the automatic stay is futile.[13] *See, e.g., In re GGC, LLC*, 329 B.R.

36, 39 (Bankr. W.D. Pa. 2005) ("stay relief should not be granted to accomplish a futile act, the

Court is constrained to deny [the] instant motion for relief from the automatic stay."); *In re*

*Denman*, 513 B.R. 720, 727 (Bankr. W.D. Tenn. 2014) (denying stay relief when the underlying

act—exercising invalid option rights—is futile). For these reasons and the reasons below, the

Motion should be denied.

## **OBJECTION**

## I. **Celsius Fails to Establish Excusable Neglect**

7. "Dates matter in bankruptcy" and, "[f]or creditors, none is more important than

the 'bar date.'" *Ellis v. Westinghouse Elec. Co., LLC*, 11 F.4th 221, 226 (3d Cir. 2021). "It not

only allows the trustee or debtor-in-possession to estimate the debtor's potential liabilities, it is

also essential in formulating a viable reorganization plan. Without a final claims deadline,

participants in the reorganization process would be hindered by undue caution in their

negotiations and in voting on the plan." *Id.* at 232 (quoting *In re Energy Future Holdings Corp.*,

619 B.R. 99, 118 n.109 (Bankr. D. Del. 2020)). "Thus, a bar [date] does not function merely as a

---

[13] Paragraph 6 of the Bar Date Order provides that any holder of a claim that fails to timely submit a proof of claim shall not be treated as a creditor with respect to such claim for purposes of participating in any distribution on account of such claim.

procedural gauntlet, but as an integral part of the reorganization process." *In re Hooker Invs.,
Inc.*, 937 F.2d 833, 840 (2d Cir. 1991) (quotations and citation omitted).

8.      Courts will only permit late proofs of claims in extraordinary circumstances.
"[Bankruptcy Rule] 9006(b)(1) governs the filing of proofs of claim after a bar date." *In re
Motors Liquidation Co.*, 600 B.R. 482, 487–88 (Bankr. S.D.N.Y. 2019), *aff'd*, No. 19-CV-5666
(JMF), 2020 WL 3120379 (S.D.N.Y. June 12, 2020) (citing *In re Enron Corp.*, 419 F.3d 115,
121 (2d Cir. 2005)). The rule allows enlargement of the time to take an action *only* where
"failure to act was the result of excusable neglect." Fed. R. Bankr. P. 9006(b)(1); *see Motors
Liquidation*, 600 B.R. at 488 (quotations omitted) ("Accordingly, a proof of claim filed after the
bar date will only be permitted if the failure to file before the bar date was the result of excusable
neglect.").

9.      Courts evaluate whether neglect is "excusable" by applying the *Pioneer* factors,
which are as follows: (1) "the danger of prejudice to others"; (2) "the length of the delay and its
potential impact on proceedings"; (3) "the reason for the delay, including whether it was in the
reasonable control of the movant"; and (4) "whether the movant acted in good faith." *Pioneer
Investment Services Company v. Brunswick Associates Limited Partnership*, 507 U.S. 380, 396
(1993); s*ee In re Tronox Inc.*, 626 B.R. 688, 698 (Bankr. S.D.N.Y. 2021) ("'excusable neglect'
requires consideration of four factors").

10.     Courts are reluctant to allow late claims. "The Second Circuit strictly observes bar
dates and has adopted what has been characterized as a 'hard line' in applying the *Pioneer* test."
*In re Motors Liquidation Co.*, 619 B.R. 63, 74 (Bankr. S.D.N.Y. 2020) (quoting *In re Lehman
Bros. Holdings Inc.*, 433 B.R. 113, 119 (Bankr. S.D.N.Y. 2010)); *In re AMR Corp.*, 492 B.R.
660, 666 (Bankr. S.D.N.Y. 2013) ("The Second Circuit has adopted a strict standard on

5

excusable neglect.").[14] "Critically, in the Second Circuit, 'the equities will rarely if ever favor a

party who fails to follow the clear dictates of a court rule, and . . . where the rule is entirely

clear . . . a party claiming excusable neglect will, in the ordinary course, lose under the *Pioneer*

test." *Lehman Bros. Holdings*, 433 B.R. at 119 (quoting *Enron*, 419 F.3d at 123) (alterations in

original).

### A.      The Reason for the Delay Does Not Establish Excusable Neglect.

11.     The "reason for the delay" is the key *Pioneer* factor. *See Williams v. KFC Nat'l*

*Mgmt. Co.*, 391 F.3d 411, 415–16 (2d Cir. 2004) ("it is the third factor—the reason for delay—

that predominates, and the other three are significant only in close cases.") In addressing this

factor, Celsius provides two excuses: (1) "not receiv[ing] notice of the bar date"; and (2) being

unaware of its claim because of "its own massive bankruptcy proceeding." Motion at ¶ 40.

Neither of these reasons supports a ruling that Celsius's neglect was "excusable."

### (1)      Celsius Received Notice and Had Actual Knowledge of the Bar Date

12.     Celsius claims that "[t]he fact that Celsius never received notice of the Voyager

bar date [] is sufficient to establish excusable neglect." Motion at ¶ 54. That's wrong for many

reasons.

13.     ***First***, and most critically, Celsius had ***actual knowledge*** of the Bar Date. When a

creditor "receive[s] actual knowledge of the Bar Date despite the fact that the notice was sent to

the wrong address, or acquired actual knowledge of the Bar Date in some other manner, [the

creditor] [is] not free to ignore it." *In re Avaya Inc.*, No. 17-10089 (SMB), 2018 WL 4381524, at

---

[14] This "strict" approach is consistent amongst courts. *See, e.g.*, *Nicholson v. City of Warren*, 467 F.3d 525, 526 (6th
Cir. 2006) ("Excusable neglect has been held to be a strict standard which is met only in extraordinary cases."); 10
Collier on Bankruptcy ¶ 9006.06[3] (16th ed. 2022) (explaining that cases "demonstrate a reluctance on the part of
the courts to be generous in determining whether the situation is one resulting from neglect that is excusable.").

*5 (Bankr. S.D.N.Y. Sept. 12, 2018); *see also In re Queen Elizabeth Realty Corp.*, No. 13-12335 (SMB), 2017 WL 1102865, at *5 (Bankr. S.D.N.Y. Mar. 24, 2017), *aff'd*, 586 B.R. 95 (S.D.N.Y. 2018) ("a creditor who has actual knowledge of the bar date ignores it at its peril"); *In re Fairchild Aircraft Corp.*, 128 B.R. 976, 985 (Bankr. W.D. Tex. 1991) (a "creditor, like the Plaintiffs in this case, who has actual knowledge of the bar date, be it by formal notice or otherwise, certainly has the reasonable notice required"); *In re Sunland, Inc.*, 534 B.R. 793, 799 (Bankr. D.N.M. 2015) ("actual knowledge of the bar date" is "more than enough to provide due process").

14.     For example, in Kmart's bankruptcy, a creditor (Simmons) "was not listed on any of Kmart's schedules and never physically received notice of the Bar Date from the debtor." *In re Kmart Corp.*, 381 F.3d 709, 717 (7th Cir. 2004). However, "it [was] undisputed that Simmons's **attorney** had ***actual knowledge*** of the Original Bar Date." *Id.* at 711 (emphasis added). The Seventh Circuit affirmed the bankruptcy court's denial of the tardy claim because "Simmons's counsel had actual knowledge of the Original Bar Date. And the attorney's knowledge is chargeable to the client." *Id.* at 717; *see also In re Linzer*, 264 B.R. 243, 248 (Bankr. E.D.N.Y. 2001) ("notice to or actual knowledge acquired by an agent is imputed to the principal" and the rule applies "to the relation of attorney and client" and "to bankruptcy cases").

15.     Kirkland & Ellis ("Kirkland") is the lead law firm representing Celsius and Voyager. Kirkland filed the motion establishing the Bar Date in the Voyager Case.[15] Celsius's

---

[15] Compare the lead lawyer on the bar date motion in the Voyager Case [Docket No. 98] with the lead lawyer on the application to retain Kirkland in the Celsius Case [CN Docket No. 360], the motions for extension of time to file schedules and statements of financial affairs in the Celsius Case [CN Docket Nos. 8, 431, 833], and Celsius' *Global Notes and Statement of Limitations, Methodology and Disclaimers Regarding the Debtors' Schedules of Assets and Liabilities and Statement of Financial Affairs* [CN Docket No. 973], which includes a schedule of alleged preferential transfers.

and Voyager's Claims and Noticing Agent and Administrative Advisor is Stretto, Inc.

("Stretto"). Stretto served the notice of Bar Date on Celsius and published the notice of Bar Date

in the *New York Times* and the *Financial Times* for Voyager, and assisted Celsius in preparing its

Schedules and Statements of Financial Affairs.[16]

16.     Moreover, the Voyager Case also has been highly publicized on both social media

and media reports, including with respect to the Bar Date.[17] Voyager was the largest

cryptocurrency bankruptcy ever filed in the United States when the case was commenced, and

the case presides in the same court as the Celsius Case. There is no question that Celsius had

actual knowledge of the Voyager Case and the accompanying Bar Date. Celsius is a

sophisticated party whose own advisors requested the Bar Date at issue – they cannot now cry

foul for their failure to comply.[18]

17.     ***Second***, Celsius received actual notice by mail of the Bar Date. Celsius believes

its neglect is excusable because it did not "***receive*** notice of the bar date." Motion at ¶ 40

(emphasis added). But "due process does not require that the interested party actually receive the

---

[16] *See* Docket Nos. 67 and 241 (authorizing the retention of Stretto as Claims and Noticing Agent and
Administrative Advisor); *see* CN Docket Nos. 54 and 841 (same).

[17] *See* Voyager (@investvoyager), Twitter (Aug. 26, 2022, 6:19 PM),
https://twitter.com/investvoyager/status/1563290000187219969 (providing a link to additional information about
the claims process, including the Bar Date); JD Supra, *Voyager Creditors—Deadline Set for Filing Bankruptcy
Proofs of Claim*, Aug. 11, 2022, https://www.jdsupra.com/legalnews/voyager-creditors-deadline-set-for-2824111/
(stating that the proof of claim "deadline is 5:00 p.m. ET on October 3, 2022); Emily Tonelli, *Crypto Exchange
FTX Wins Bid to Buy Out Bankruptcy Voyager for $1.4B*, Sept. 27, 2022, https://decrypt.co/110601/crypto-
exchange-ftx-wins-bid-buy-out-bankrupt-voyager-1-4b (stating that the proof of claim deadline is October 3);
Christian Nwobodo, *Bankrupt Crypto Lender Voyager Set to Auction Off its Assets on Sept. 13*, Sept. 7, 2022,
https://cryptoslate.com/bankrupt-crypto-lender-voyager-set-to-auction-off-its-assets-on-sept-13/ (same).

[18] In fact, the Second Circuit confirmed (in another context) that actual knowledge satisfies due process. *See In re
Medaglia*, 52 F.3d 451 (2d Cir. 1995). *Medaglia* dealt with section 523(a)(3)(B) in dischargeability actions. The
issue was "whether [the creditors'] actual knowledge of the bankruptcy petition was a constitutionally permissible
substitute for formal notice of the [bar date], satisfying the requirements of due process." *Id.* at 453. The court
held that "section 523(a)(3)(B)], which permits general knowledge of a case to substitute for particular knowledge
of the bar date, [does not] violate[] constitutional due process." *Id.* at 454. If general knowledge of the case is
constitutionally sufficient, then actual knowledge of the bar date is beyond sufficient.

notice." *In re Lehman Bros. Inc.*, 493 B.R. 437, 445 (Bankr. S.D.N.Y. 2013) (quoting *SIPC v. Stellatos (In re Blinder, Robinson & Co., Inc.)*, 124 F.3d 1238, 1243 (10th Cir. 1997)).[19] Due process merely requires that notice be "reasonably calculated under all the circumstances" to "apprise interested parties of the pendency of the action." *Id.* (quoting *Mullane*, 339 U.S. at 314).

18. "Mailing a notice by First Class U.S. Mail to the **last known address** of a creditor satisfies due process because it is **reasonably calculated** to inform the creditor of the bar date for filing proofs of claim." *Thornton v. Seadrill Ltd.*, 626 B.R. 422, 427 (S.D. Tex. 2021) (quoting *In re Eagle Bus Mfg., Inc.*, 62 F.3d 730, 736 (5th Cir. 1995)) (emphasis added); *In re Agway, Inc.*, 313 B.R. 31, 39 (Bankr. N.D.N.Y. 2004) (same); *In re La Sierra Fin. Servs., Inc.*, 290 B.R. 718, 733 (B.A.P. 9th Cir. 2002) (same). "Importantly, '[t]he **creditor is responsible** for notifying the debtor, trustee, or the court of any changes in [its] mailing address to guarantee that [it] be given reasonable notice.'" *Seadrill*, 626 B.R. at 427 (quoting *Eagle Bus*, 62 F.3d at 736) (emphasis in original). That's because "notice to a known creditor is sufficient if provided to the address shown in the debtor's books and records." *In re The Brooklyn Hosp. Ctr.*, 513 B.R. 810, 820 (Bankr. E.D.N.Y. 2014); *Lehman Bros.*, 493 B.R. at 445 ("notice of the Bar Date [was] still adequate regardless of actual receipt by the Respondents because the Trustee properly relied upon addresses taken directly from [the debtor's] records").

19. Celsius contends that notice was sent to the wrong entity—Celsius Network Limited ("Celsius UK") instead of Celsius Network LLC ("Celsius US"). Celsius provides

---

[19] Likewise, in approving publication notice, the Supreme Court recognized "that publication notices often are not read and often do not actually come to the attention of all of the desired recipients." *Tronox*, 626 B.R. at 719 (citing *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950) ("It would be idle to pretend that publication alone as prescribed here, is a reliable means of acquainting interested parties of the fact that their rights are before the courts.")). Nevertheless, publication notice satisfies due process even if it never reaches the intended recipients.

9

absolutely no support for the view that sending notice to a parent company, which is also a debtor in the Celsius Case, instead of its subsidiary, makes the notice ineffective. In any event, that position has no merit here.

20. Celsius UK scheduled an Omnibus Wallet Service Agreement with Voyager on its Schedule G.[20] Celsius US's schedules do not include any agreements with Voyager. Celsius UK's address in the Omnibus Wallet Service Agreement is 35 Great St Helen's, London, EC63A 6AP, United Kingdom—the same address at which Voyager served the notice of Bar Date. Thus, it is reasonable that Voyager would serve the notice at that address. At bottom, "[i]f the creditor fails to update [its] address and as a consequence does not receive a notice of the bar date that was properly mailed, [the creditor] cannot later argue that [its] due process rights were violated."[21] *Seadrill*, 626 B.R. at 427 (quoting *Eagle Bus*, 62 F.3d at 736). Consequently, mailing notice to Celsius's last known address satisfied due process.

21. ***Third***, Celsius is an "unknown" creditor because it has unasserted litigation claims. *See DePippo v. Kmart Corp.*, 335 B.R. 290, 297 (S.D.N.Y. 2005) (Creditors are "unknown" when their "interests are either conjectural or future or, although they could be discovered upon investigation, do not in due course of business come to knowledge [of the debtor]."). Constructive notice is sufficient for "unknown" creditors and thus, Voyager's publication of the Bar Date was adequate due process. *Id.* at 295–96. "Typically, a known creditor may have engaged in some communication with a debtor concerning the existence of the creditor's claim." *In re Drexel Burnham Lambert Grp. Inc.*, 151 B.R. 674, 681 (Bankr. S.D.N.Y.

---

[20] *See* Case No. 22-10966-MG, [Docket No. 7], p. 232. A true and correct copy of page 232 of Celsius UK's Schedule G is attached hereto as **Exhibit A**.

[21] Celsius states incorrectly that, "[t]hrough ***no fault of its own***, Celsius did not receive notice of the Voyager bar date." Motion at ¶ 55. But failure to keep a debtor apprised of address changes ***is the creditor's fault***.

10

1993), *aff'd*, 157 B.R. 532 (S.D.N.Y. 1993). Accordingly, courts repeatedly hold that creditors

with undiscovered or unasserted litigation claims (like Celsius) are unknown.[22]

22. The facts in *In re XO Communications* are similar to those present here. 301 B.R.

782 (Bankr. S.D.N.Y. 2003). The debtor ("XO") and the party seeking authority to file a late

claim, Teligent, Inc. ("Teligent"), were both chapter 11 debtors. XO and Teligent had a long-

standing business relationship. *Id*. at 786. Although it was unclear whether Teligent was a

creditor of XO, XO included Teligent on its service list. *Id*. However, Teligent's address was

incorrect and the notice of bar date was returned to XO as undeliverable, and XO took no further

action to remedy the incorrect address. *Id*. XO also published notice of the bar date in the *Wall

Street Journal*. *Id*. at 787. Six weeks after XO's bar date, Teligent's chapter 11 plan was

confirmed and a representative was appointed to investigate and pursue avoidance actions. *Id*. A

few months later, the representative filed a claim against XO asserting preference claims, and a

motion to allow the claim as timely. *Id*. Based on these facts, the court determined that Teligent

was an "unknown" creditor of XO because a preference claim is merely "conceivable,

conjectural or speculative" and depends on "whether a claimant will 'opt' to pursue the claim."

*Id*. at 794. Because Teligent was an "unknown" creditor, the court concluded that XO's notice by

publication was sufficient. *Id*. at 801.

---

[22] *See, e.g.*, *DePippo*, 335 B.R. at 297 (litigation claimant was "clearly an 'unknown' creditor" where "prior to the
institution of the present lawsuit . . . plaintiff never communicated any intention of making a claim against [the
debtors] and [the debtors] were unaware plaintiff intended making such a claim"); *In re Victory Mem'l Hosp.*, 435
B.R. 1, 6 (Bankr. E.D.N.Y. 2010) (litigation claimant "was an unknown creditor" where "[s]he did not commence
an action against the Debtor until" after the bar date); *In re Chateaugay Corp. Reomar, Inc.*, No. 86 B 11270
BRL, 2009 WL 367490, at *5 (Bankr. S.D.N.Y. Jan. 14, 2009) ("[Debtor] did not become aware of Plaintiffs'
claims until the [] receipt of the Complaints" and, "[a]s such, the Plaintiffs were unknown creditors."); *In re Best
Prod. Co., Inc.*, 140 B.R. 353, 356 (Bankr. S.D.N.Y. 1992) (litigation claimants were unknown because, "until
their complaint was served," the debtor "had no notice of the existence of their claims").

23.     Accordingly, Voyager's publication of the Bar Date is sufficient notice for Voyager's "unknown" creditors, which includes Celsius's alleged preference claim. Celsius received the same notice that all holders of undiscovered and unasserted litigation claims normally receive. *See Tronox*, 626 B.R. at 719 (noting that "for **unknown** parties, reasonable publication notice is sufficient") (citing *Mullane*, 339 U.S. at 314–18) (emphasis in original).

24.     **Fourth**, it is "well established" that lack of knowledge regarding the bar date or a due process violation does not automatically excuse a dilatory creditor.[23] Thus, even if Celsius lacked notice and knowledge, it would not be "entitled" to file a late proof of claim. Motion at ¶ 40. Celsius would still need to satisfy *Pioneer*, which it cannot do.

### (2)     Celsius's Ignorance of Its Claim Precludes Relief.

25.     Celsius's only other explanation is that it was unaware of its claim due to being "consumed with its own bankruptcy case." Motion at ¶¶ 54, 2 (noting that "the bar date passed before Celsius **became aware** of its claim") (emphasis added). That statement, however, is false. As early as August 30, 2022, more than one month before the Bar Date, Celsius acknowledged that the alleged preferential transfers occurred. Specifically, Celsius stated:

> Voyager has been a customer with deposits held by [Celsius] and has maintained two deposit accounts on the Celsius platform—one that was opened in 2019 and another that was opened in 2020. Both accounts were substantially withdrawn upon prior to the Petition Date and the current value of the accounts is now approximately $11,300.[24]

---

[23] *See, e.g.*, *In re Roman Cath. Diocese of Syracuse*, 638 B.R. 33, 40 (Bankr. N.D.N.Y. 2022) ("concur[ing] with **well established precedent** that lack of knowledge alone does not suffice to establish a right to relief from the bar date based on excusable neglect") (emphasis added) (citing *Tronox*, 626 B.R. at 731 ("movant's lack of actual knowledge of the bar date" is "not enough, by itself, to show that a movant's delays were beyond the movant's reasonable control"); *Motors Liquidation*, 619 B.R. at 74 (applying the "*Pioneer* [test] when denying certain creditors' motion for leave to file late claims . . . despite the alleged due process violation" based on lack of notice); *Drexel Burnham*, 151 B.R. 674, 681 n.3 (Bankr. S.D.N.Y.) (noting that "the debtor's obligation to give actual notice to known creditors does not completely absolve a creditor of its duty to file a proof of claim").

[24] CN Docket No. 637, ¶ 5.

Additionally, Celsius filed its Schedules and Statements on October 5—two days after the

Voyager Bar Date. Motion at ¶ 15. Statements must identify all "transfers to creditors within 90

days before filing [the] case."[25] Celsius began preparing its Schedules and Statements **before** its

case was filed on July 13, 2022. Motion at ¶ 11. When the Schedules and Statements were

ultimately filed two days after the Bar Date, they included a detailed transaction history with

Voyager.[26] Clearly, this transaction history was developed during Celsius's preparations of its

Schedules and Statements, which occurred in advance of the Bar Date.

26.    Putting aside the fact that Celsius was aware of its potential claim in advance of

the Bar Date, "ignorance of one's own claim does not constitute excusable neglect." *Jones v.*

*Chemetron Corp.*, 212 F.3d 199, 205 (3d Cir. 2000); *Motors Liquidation*, 598 B.R. at 758

(denying late claim motion where the "excuse essentially boil[ed] down to ignorance" because

"[i]gnorance of one's own claim does not constitute excusable neglect" (quoting *Best Prod.*, 140

B.R. at 359)); *Energy Future Holdings*, 619 B.R. at 113 (same); *In re Charter Co.*, 113 B.R. 725,

729 (M.D. Fla. 1990) (same).

27.    In *XO Communications*, the court dismissed an analogous situation as lacking

merit to establish excusable neglect. The court found that Teligent was aware that preference

actions existed in advance of XO's bar date, but "made an informed decision to get its plan

confirmed first" and afterwards complete its investigation and pursuit of avoidance actions. *XO*

*Communications, Inc.*, 301 B.R. at 799. "Accordingly, it was within the reasonable control of

Teligent to file a timely claim, but it opted to forego such a filing until after confirmation of its

plan and thereby assumed the reasonably foreseeable consequences of such a determination." *Id.*

---

[25] The official form is available at https://www.uscourts.gov/sites/default/files/form_b_207.pdf.

[26] CN Docket No. 973, p. 13815. A true and correct copy of page 13815 of Celsius US's Statements of Financial
Affairs is attached hereto as **Exhibit B**.

28.     Celsius had knowledge of the alleged claim and the bar date, but seemingly
prioritized other aspects of its case.[27] That is not a basis for excusable neglect. *See id.* ("There is
nothing in the record that would support a finding that Teligent could not have made an inquiry
regarding any particular preference claim, the collection of which may have been negatively
impacted with the passage of time, and not simultaneously pursued its primary goal of getting its
plan confirmed."); *see Motors Liquidation*, 599 B.R. at 716 ("Appellant, however, offers no
authority, and the Court's own research has disclosed none, to support the proposition that a
claimant who was otherwise able to file a proof of claim should be excused from timely doing so
because [it] was focused on more pressing priorities."). Indeed, allowing late claims whenever a
creditor is focused on matters it subjectively deemed more pressing would nullify bar dates. *Id.*
("A bar date rule that would yield to undisclosed subjective priorities of creditors would effect
no viable gatekeeping function at all."). Being "too busy" is not a basis for excusable neglect.[28]

29.     The district court's opinion in *Motors Liquidation* also makes clear that
preoccupation with other matters does not establish excusable neglect. 599 B.R. 706. A creditor
who missed the bar date in *General Motors* argued "his failure to file [a claim] was excusable
because, as of the bar date, he was incarcerated and concentrating on pursuing his freedom from

---

[27] Any difficulty identifying Voyager as a possible preference target due to poor recordkeeping is no excuse. A
company has exclusive control over the quality of its own records. Requiring several months to uncover a claim
from its own books and records was therefore undeniably within Celsius's own control. To reiterate, "creditors
themselves have the 'responsibility to diligently investigate what claims they may have against the debtor.'"
*Motors Liquidation*, 598 B.R. at 753 (quoting *DPWN Holdings*, 871 F.Supp.2d at 158).

[28] *See, e.g.*, *Tronox*, 626 B.R. at 734 ("As a general rule, 'excusable neglect requires something more than a simple
failure to meet the deadline due to a busy schedule.'" (quoting *United States v. Dumas*, 94 F.3d 286, 289 (7th Cir.
1996), *cert. denied*, 520 U.S. 1105 (1997))); *In re Frontier Commc'ns Corp.*, 641 B.R. 64, 74 (Bankr. S.D.N.Y.
2022) ("The Second Circuit has noted that the following reasons for delay do not weigh in favor of finding a
mistake excusable: ... 'preoccupation or an excessive workload.'" (quoting *Enron*, 419 F.3d at 126)); *In re Eagle–
Picher Indus., Inc.*, 158 B.R. 713, 715–16 (Bankr. S.D. Ohio 1993) (rejecting excuse of "overworked and
underfunded" staff); *In re Peninsular Oil Corp.*, 399 B.R. 532, 537 (Bankr. M.D. Fla. 2008) (noting
"preoccupation will never be recognized as excusable neglect.").

14

a wrongful conviction." *Id*. at 716. The court was "mindful that it is indeed difficult to diligently

supervise one's legal affairs while incarcerated" and accepted "that his priority was to secure his

own freedom before turning his attention to collecting civil damages for the harm he suffered."

*Id*. Nevertheless, the district court affirmed that the bankruptcy court had appropriately denied

the creditor's late claim motion stating that "[a] bar date rule that would yield to undisclosed

subjective priorities of creditors would effect no viable gatekeeping function at all." *Id*. at 716–

17.

30.    If an innocent prisoner focused on overturning his conviction is not a valid excuse

for filing a late claim, Celsius's claim that it was too busy should not be valid either. Particularly

given: (i) the lack of complexity in filing a claim, *see Ellis*, 11 F.4th at 237 (stating that the

burden to "comply with a bar date is low" and "[a] creditor does not even have to know the

amount or validity of the claim"); and (ii) that Celsius is a sophisticated company represented by

competent counsel. *See Motors Liquidation*, 598 B.R. at 758 (quoting *In re Hills Stores Co.*, 167

B.R. 348, 351 (Bankr. S.D.N.Y. 1994)) (when "analyzing the reason for the delay, courts also

'take[] into account the movant's sophistication.").

31.    Celsius, in its words, "is one of the largest and most sophisticated cryptocurrency-

based finance platforms in the world." Motion at ¶ 8. On top of that, it is represented by not one,

but ***three***, of the largest and most sophisticated law firms in the world.[29] Celsius's status as a

"sophisticated party holding a substantial claim" that "is [extremely well] represented by

counsel" undoubtedly "weighs heavily against a finding of excusable [neglect] under the

applicable standards in this Circuit." *AMR Corp.*, 492 B.R. at 666.

---

[29] See CN Docket Nos. 838; 843; 845, authorizing Celsius's retention of Latham & Watkins, Akin Gump, and
Kirkland & Ellis, respectively.

15

32.     To be sure, Celsius *easily* could have asked one of the many lawyers at its

disposal to file a protective claim.[30] It decided not to, and that decision forecloses relief. *In re*

*Pac. Drilling S.A.*, 616 B.R. 634, 645 (Bankr. S.D.N.Y. 2020) ("A decision not to file a claim,

even if that decision turns out to be unwise, is not 'neglect' of a kind that Rule 9006 excuses."

(citing *United States v. Darling*, 706 F. App'x 34, 36 (2d Cir. 2017))).

33.     In sum, Celsius has no legitimate excuse for missing the Bar Date. Celsius, like

all creditors, must comply with the Bar Date. There is no reason for special treatment. Because

the legitimacy of Celsius's reason for missing the Bar Date is not a "close case," the Motion

should be denied. *See Williams*, 391 F.3d at 416 ("the other three [*Pioneer* factors] are

significant only in close cases").

## B.     None of the Other Factors Justify Extending the Bar Date.

34.     The remaining factors—"prejudice," "length of delay," and "good faith"—do not

support a finding of excusable neglect.

35.     ***First***, as to factor one (prejudice), the Debtors (and their creditors) would be

significantly prejudiced. Arguing to the contrary, Celsius makes three points: (1) Voyager is "in

the preliminary stages of its bankruptcy and no plan has been confirmed"; (2) Celsius's claim is

"*de minimus* relative to [the] total unsecured claims pool"; and (3) the "circumstances

surrounding [Celsius's preference claim] are unique." Motion at ¶¶ 46–49. Each argument fails.

36.     Initially, arguments "that the judicial administration of the cases would not be

impacted because the Debtors [have] not yet filed a plan and disclosure statement at the time

movant filed the [late claim] Motion" are "not enough for movant to prevail." *AMR Corp.*, 492

---

[30] The notion that Celsius was working "with limited resources" is nonsense. Motion at ¶ 54. How many creditors in this (and every other) bankruptcy have an army of restructuring professionals representing them? If Celsius couldn't fill out a protective proof of claim—a simple 3-page standardized form—then no creditor can.

B.R. at 667. "Indeed, if a late claim was permitted so long as it was filed before the plan, the bar

date would serve little purpose." *Id.*; *see also Ellis*, 11 F.4th at 232 (bar dates are "essential in

***formulating*** a viable reorganization plan") (emphasis added); *see also XO Communications, Inc.*,

301 B.R. 782, 799 ("the Bar Date Order was meant to function as a statute of limitations and

effectively exclude such late claims in order to provide the Debtor and its creditors with finality

to the claims process."). Plus, the Voyager Case is hardly in its infancy. The Voyager Case,

which filed more than six months ago, has been highly publicized. After a two-week auction in

September, Voyager filed its first chapter 11 plan, which contemplated a sale to West Realm

Shires Inc. d/b/a FTX US ("FTX"). That plan was upended in the middle of solicitation by

FTX's unexpected collapse. Since then, Voyager has filed a new plan with solicitation having

already begun.

37.     Additionally, the fact that a claim is supposedly "*de minimis*" in size is

immaterial. "The argument that a claim is *de minimis* when viewed in the context of an entire

case was rejected [by the Second Circuit] in the *Enron* case." *In re Northwest Airlines Corp.*, No.

05-17930 ALG, 2010 WL 502837, at *3 (Bankr. S.D.N.Y. Feb. 9, 2010) (citing *Enron*, 419 F.3d

at 129.[31] Also, "considered in absolute terms, $12.5 million [or $7.7 million] is no small amount"

and "[i]f it were, [the creditor] would likely not invest the time or resources it has in pursuing the

claim." *Enron*, 419 F.3d at 131.

38.     Most importantly, by focusing on the claim's size and uniqueness, Celsius misses

the bigger picture. "The prejudice to the Debtors is not traceable to the filing of any single

additional claim but to the impact of permitting exceptions that will encourage others to seek

---

[31] *See also AMR Corp.*, 492 B.R. at 667 (denying late claim "represent[ing] only 0.01% of the total claims filed against the Debtors' estate"); *Kmart*, 381 F.3d at 714 (denying late claim "represent[ing] only a small fraction of the approximately $6 billion total of unsecured claims").

similar leniency." *Lehman Bros. Holdings*, 433 B.R. at 121. "Allowing even a single late claim

risks inspiring similar efforts from creditors who also missed the bar date." *Motors Liquidation*,

598 B.R. at 758.

39.     "[C]oncerns about opening the floodgates to potential claimants" are "pronounced

in a very large bankruptcy case such as this one." *Roman Cath. Diocese of Syracuse, N.Y.*, 638

B.R. at 39. "The mere prospect of litigating additional motions to file post-bar-date proofs of

claim is enough to prejudice the debtor." *Motors Liquidation*, 598 B.R. at 759 (explaining that

the "fear of rampant late-claims litigation is especially germane in a case like this one where the

universe of potential creditors is practically limitless").[32] Ultimately, "every late-filed claim that

is allowed would reduce the already-low percentage recoveries" to creditors and "therefore

would be prejudicial to those other claimants." *Tronox*, 626 B.R. at 699.

40.     The Second Circuit explained in *Enron* that "[e]ven if [a] claim is negligible

relative to the total size of [the debtor's] bankruptcy," the "more relevant question" is whether

allowing the claim would lead to additional claims that "the bankruptcy court, having admitted

the first claim, would be hard pressed to reject." 419 F.3d at 131–32. The overwhelming majority

of Voyager creditors are unrepresented individuals. If a sophisticated institutional creditor with a

---

[32] The first-day declaration notes that Voyager's platform has 3.5 million active users. Docket No. 15 at ¶ 2. Any one of those users could potentially have a claim. Significantly, "[t]he burden of establishing lack of prejudice lies with the party seeking relief under Bankruptcy Rule 9006, and [Celsius] 'introduced no evidence concerning the number of **potential** claimants who might [be] prompted to file late claims in the wake of a ruling' in its favor." *In re Caritas Health Care, Inc.*, 435 B.R. 111, 117 (Bankr. E.D.N.Y. 2010) (quoting *Enron*, 419 F.3d at 132) (emphasis in original). Celsius's speculation that "it is unlikely that granting Celsius the relief it seeks will result in a cascade [of additional claims]" counts for nothing. Motion at ¶ 49.

legion of lawyers can flout the Bar Date, the Court will certainly be "hard pressed" not to excuse ordinary individuals with late claims. That is reason enough to deny relief.[33]

41.     **Second**, as to factor two (length of delay), Celsius's delay weighs against finding excusable neglect. The bar date lapsed on October 3, and Celsius did not attempt to assert its claim until December 14 (when the Motion was filed). A multi-month delay, in absolute terms, is not insignificant. More importantly, though, **any** delay is too long when the reason is inadequate. *See Enron*, 419 F.3d at 128–29 (noting that courts "have rejected claims filed just one day late" and stating that "where an explanation is nonexistent, or not credible," the delay may "weigh in favor of the debtor, even if the delay is, in absolute terms, quite short"); *Kmart*, 381 F.3d at 714 (affirming denial of a late claim even though the "claim was only one day late" where the reason was "a poor one"). Celsius's proffered reasons for the delay are inadequate, so even a "quite short" delay would support denying relief.

42.     Assuming Celsius's ignorance was a valid reason (it is not), ignorance does not fully explain the delay. Celsius filed its Schedules and Statements, which included the alleged preferential transfers on October 5. Motion at ¶ 15. In August, Celsius stated publicly that Voyager withdrew the majority of its funds from Celsius's platform. However, Celsius alleges that it did not discover the claim until November 5, and Celsius did not file the Motion until December 14. There is no excuse for these delays, and the delays alone justify denial of the Motion.

---

[33] Celsius makes much of the fact that the bar date was extended due to an amendment to the Debtors' schedules. Motion at ¶ 48. Once more, that misses the point. The question is not whether a bar date can be extended. The question, rather, is what effect excusing a creditor's compliance with the bar date would have when other creditors learn they, too, missed the bar date.

43.    ***Third***, as to the last factor (good faith), Celsius contends it "acted in good faith." Motion at ¶ 55. Regardless of whether that's true, "good faith cannot singlehandedly overcome the fact that it has failed to meet the other requirements of excusable neglect." *Motors Liquidation*, 598 B.R. at 759; *Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d 355, 366 (2d Cir. 2003) ("And rarely in the decided cases is the absence of good faith at issue").

44.    Putting that aside, it is not clear from the record that Celsius acted in good faith. "[T]here is no formal presumption of good faith" when applying the *Pioneer* factors. *In re Lyondell Chemical Company*, 543 B.R. 400, 410 (Bankr. S.D.N.Y. 2016). Celsius states that it began exploring its claims against Voyager as soon as it was made aware of the transfers. Motion at ¶ 55. If that is the case, then a timely claim should have been filed because Celsius was made aware of the transfers as early as August 30, 2022. Celsius also states that as soon as it was made aware of the transfers, Celsius began referring the matter to conflicts counsel. However, Celsius's conflicts counsel, Akin Gump Strauss Hauer & Feld LLP, did not file a notice of retention to handle this matter until November 11, 2022.[34] And the retention is effective as of October 14, 2022—six weeks after Celsius stated publicly that Voyager withdrew crypto prepetition and nine days after Celsius filed Schedules and Statements that included the transfers.

45.    Celsius also relies heavily on its position that it did not receive notice of the Bar Date "[t]hrough no fault of its own" in support of good faith. Motion at ¶ 55. This statement is troubling. Celsius was aware of Voyager's Case—it is referenced in Celsius's First Day Declaration—and Celsius was aware of Voyager's withdrawals in advance of the Bar Date. Relying on a purported incorrect service address as a defense when notice was provided by other means (publication) and Celsius had knowledge of the bankruptcy does not constitute good faith.

---

[34] CN Docket No. 1330.

*See In re J.S. II, L.L.C.*, 397 B.R. 383, 389 (Bankr. N.D. Ill. 2008) ("inaction during the pendency of the timeline for filing a claim against the Debtors does not constitute good faith.").

46.     Moreover, in the Ferraro Declaration filed in support of the Motion, Mr. Ferraro states that the Omnibus Wallet Agreement between Voyager and Celsius UK was amended and Celsius UK assigned its rights under the agreement to Celsius US and Celsius EU UAB. Ferraro Dec. at ¶ 5. Thus, according to Ferraro, Voyager should have served the notice of Bar Date on Celsius US and Celsius EU UAB, not Celsius UK. However, the Omnibus Wallet Agreement is reflected on Celsius UK's schedules, not Celsius US.[35]

47.     Celsius's public filings and statements conflict with certain of its arguments in support of good faith. *See XO Communications, Inc.*, 301 B.R. at 800 (finding that the movant failed to establish good faith when it proffered conflicting statements regarding notice of the bar date). For that reason, Celsius has not met its burden of establishing good faith.

48.     As this Court has stated, courts do not "enjoy the job of enforcing the foregoing standards" but they are "bound to apply strict due process and excusable neglect standards" even when "the results are harsh." *Tronox*, 626 B.R. at 699. A bar date's "essential function" in "ensuring the sound administration of the bankruptcy estate" demands this result. *See Enron*, 419 F.3d at 127–28. In view of that, the Bar Date must be enforced and the Motion denied.

## II.     No Cause Exists to Lift the Automatic Stay.

49.     Because there's no basis for extending the bar date, there's also no reason to grant relief from the automatic stay. Celsius requests stay relief for "cause" under Bankruptcy Code section 362(d)(1). Cause, in this context, "is an intentionally broad and flexible concept which must be determined on a case-by-case basis." *In re Celsius Network LLC*, 642 B.R. 497, 501

---

[35] Celsius EU UAB is not a debtor in the Celsius Case.

(Bankr. S.D.N.Y. 2022) (citing *In re Project Orange Assocs., LLC*, 432 B.R. 89, 101 (Bankr.

S.D.N.Y. 2010)). Courts consider various factors,[36] but, ultimately, the "decision whether to

grant relief from the automatic stay falls within the discretion of the bankruptcy court." *Id.* at 502

(citing *Burger Boys, Inc. v. S. St. Seaport Ltd. P'ship (In re Burger Boys, Inc.)*, 183 B.R. 682,

687–88 (S.D.N.Y. 1994)). Here, relief from the stay is not warranted because (1) granting relief

would be futile and (2) the relevant *Sonnax* factors do not support the relief.

### A.  Granting Relief From the Stay Would Be Futile.

50.  Without the ability to file a proof of claim, Celsius's pursuit of its claim is futile.

Courts consistently refuse to modify the automatic stay when the movant will ultimately be

unable to assert a claim against the estate.

51.  For example, in *Wright v. Placid Oil Co.*, 107 B.R. 104 (Bankr. N.D. Tex. 1989),

a creditor moved to modify the automatic stay to pursue a tort claim in state court. "However, the

bar date for filing proofs of claims . . . had already passed." *Id.* at 105. The district court affirmed

the lower court's refusal to modify the stay because the creditor would "not [have been] allowed

to file a proof of claim as a result of any judgment in that case; therefore, allowing that litigation

to go forward would serve no purpose." *Id.* at 108.

---

[36] The "*Sonnax* factors" are: (1) whether relief would result in a partial or complete resolution of the issues; (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action;(5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) impact of the stay on the parties and the balance of harms. *Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280, 1286 (2d Cir. 1990) (citing *In re Curtis*, 40 B.R. 795, 799–800 (Bankr. D. Utah 1984)).

52.     Likewise, in *In re Holland*, 562 B.R. 305 (Bankr. E.D. Va. 2016), the debtor filed for bankruptcy in the midst of a divorce. His non-filing spouse (Ms. Holland) moved for stay relief to continue the divorce proceeding and, hopefully, obtain an equitable distribution award. She had not, however, filed a proof of claim. As a consequence, the court refused to lift the stay, explaining that the "deciding factor in this case is that the bar date to file proofs of claims expired without Ms. Holland having filed a proof of claim." *Id*. at 308. "Without a timely-filed proof of claim, she [could] not receive a distribution." *Id*. The requested relief would have caused "additional litigation, expense and delay for something that would have no significance." *Id*. Because an "award by the [other] court would [have been] futile," the court denied relief. *Id*.

53.     Similarly, in *In re Elias*, No. 13-CV-01269 CBA, 2014 WL 1248042 (E.D.N.Y. Mar. 25, 2014), a creditor sought to pursue claims in state court. In affirming the bankruptcy court, the district court noted that the "relief [the creditor] sought from the automatic stay would have been to allow her to continue pursuing her state court actions against [the debtor,]" but those actions "were brought to collect the very debts that [the debtor] sought to have discharged in bankruptcy." *Id*. at *8. Thus, "attempts to pursue those claims in state court—were the automatic stay to be lifted—would be futile," so there was "no cause" to lift the stay. *Id*.

23

54.     Celsius's failure to file a proof of claim renders stay relief futile. Because "stay

relief should not be granted to accomplish a futile act," *GGC, LLC*, 329 B.R. at 39,[37] lifting the

stay would serve only to create "additional litigation, expense and delay for something that

would have no significance," *Holland*, 562 B.R. at 308. "It would be absurd to allow the [] action

to go ahead and require the estate to spend money litigating a debt that might [or, in this case,

***will***] ultimately be uncollectible." *Benedor Corp. v. Conejo Enter., Inc. (In re Conejo Enter.,*

*Inc.)*, 96 F.3d 346, 352–53 (9th Cir. 1996). Denying stay relief is therefore appropriate.

**B.     The *Sonnax* Factors Do Not Demonstrate Cause to Lift the Stay.**

55.     Assuming that lifting the stay would not be an exercise in futility, the relief

remains unwarranted under the factors articulated in *Sonnax*.[38]

56.     ***Factor (1)***: whether relief would result in a partial or complete resolution of the

issues. Lifting the stay is only a partial resolution. If the stay is lifted, Celsius will commence

preference litigation against Voyager in the Celsius Case. Depending on the outcome of that

proceeding, Celsius would need to return to this Court to seek to have its claim allowed and

determine the claim's treatment. Factor (1) therefore supports denying relief. *In re Residential*

*Capital*, No. 12-12020 (MG), 2012 WL 3249641, at *4 (Bankr. S.D.N.Y. Aug. 7, 2012) (first

---

[37] Numerous other cases reinforce this conclusion. *See, e.g.*, *In re Denman*, 513 B.R. 720, 727 (Bankr. W.D. Tenn. 2014) (because purchase option was not enforceable, "relief from the automatic stay [to exercise option] would be futile" and movant therefore could not "establish sufficient cause under a totality of the existing facts and circumstances to warrant a termination of the automatic stay"); *Ivester v. Miller*, 398 B.R. 408, 428 (M.D.N.C. 2008) (lower court was "within its discretion to deny relief from stay" where doing so "could result in a futile exercise"); *In re United Imports, Inc.*, 203 B.R. 162, 168 (Bankr. D. Neb. 1996) ("[Creditor] is not eligible to share in the distribution of any estate assets. It therefore does not stand to reason that the debtor should be forced to defend a lawsuit in which any monetary judgment obtained in the suit could not be enforced against assets of the estate."); *Fedders North America, Inc. v. Branded Products, Inc. (In re Branded Products, Inc.)*, 154 B.R. 936, 952 (Bankr. W.D. Tex. 1993) (denying stay relief where "[movant] ha[d] not filed a claim in this bankruptcy case" and "was not currently entitled to share in any distribution of assets of this estate").

[38] The third (whether the other proceeding involves the debtor as a fiduciary), eighth (whether the judgment claim arising from the other action is subject to equitable subordination), and ninth (whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor) *Sonnax* factors are not applicable.

24

factor weighed against lifting the stay because movants would need to go through the bankruptcy

court claims process to collect on any judgment).

57.     **Factor (2)**: lack of connection or interference with the bankruptcy case. Lifting

the stay would subject the Debtors to litigation in another forum, directly contradicting the stay's

purpose. *In re Atreus Enterprises, Ltd.*, 120 B.R. 341, 346 (Bankr. S.D.N.Y. 1990) (explaining

that the "stay is intended as an umbrella to protect a debtor temporarily from the shower of law

suits and collection efforts by creditors ***outside the bankruptcy court administering the debtor's

case***") (emphasis added). "[E]ven slight interference with the administration [of the estate] may

be enough to preclude relief [from the stay]." *In re U.S. Brass Corp.*, 173 B.R. 1000, 1006

(Bankr. E.D. Tex. 1994). Factor (2) therefore supports denying relief.

58.     **Factor (4)**: whether a specialized tribunal with the necessary expertise has been

established to hear the claim. Preference claims arise under the Bankruptcy Code, and all

bankruptcy judges are adept at applying preference law. No "specialized tribunal" is required.

Factor (4) therefore supports denying relief.

59.     **Factor (5)**: whether the debtor's insurer has assumed responsibility for defending

the claim. Celsius seeks to recover directly from the Debtors' estates and litigation costs will be

paid by the estates. Factor (5) therefore supports denying relief.

60.     **Factor (6)**: whether the action primarily involves third parties. The claim involves

just two parties: Voyager and one of its unsecured creditors. Factor (6) therefore supports

denying relief.

61.     **Factor (7)**: whether litigation in another forum would prejudice the interests of

other creditors. Permitting one creditor to proceed in its preferred forum encourages others to

seek the same relief. *In re SunEdison, Inc.*, 557 B.R. 303, 308–09 (Bankr. S.D.N.Y. 2016)

25

(recognizing the risk of "encourag[ing] other claimants to file their own stay relief motions").

The costs of litigating additional stay relief motions would prejudice creditors. Factor (7)

therefore supports denying relief.

62.      ***Factor (10)***: the interests of judicial economy and the expeditious and economical

resolution of litigation. Again, lifting the stay would result in one court (the Celsius court)

addressing the claim's merits and another court (this Court) determining the claim's allowability

and treatment. Consequently, ***refusing*** to lift the stay would promote judicial economy by

allowing all issues to be resolved in one forum. Factor (10) therefore supports denying relief.

63.      ***Factor (11)***: whether the parties are ready for trial in the other proceeding. Unlike

many cases, where litigants have already expended time and energy in another proceeding, no

complaint has even been filed. Celsius is not seeking to continue a proceeding that's well

underway—it's seeking to commence a brand-new proceeding. Factor (11) therefore supports

denying relief.

64.      ***Factor (12)***: impact of the stay on the parties and the balance of harms.

"Unsecured creditors like [Celsius] bear a heavy burden in proving that the balance of hardships

favors lifting the stay." *Celsius Network*, 642 B.R. at 504 (citing *In re W.R. Grace & Co.*, 2007

WL 1129170, at *3 (Bankr. D. Del. Apr. 13, 2007) (describing "the heavy and possibly

insurmountable burden of proving that the balance of hardships tips significantly in favor of

granting relief")). Celsius will not suffer any unique harm by having to pursue its claim in this

Court, as it is in the exact same boat as every other creditor. In fact, the stay creates no hardship

whatsoever for Celsius because an action "which would otherwise be enjoined by [the automatic

stay] if initiated in any other context, is not subject to the automatic stay if commenced in the

bankruptcy court where the debtor's bankruptcy case is pending." *Atreus Enterprises*, 120 B.R.

26

at 346. Creditors like Celsius remain entirely free to pursue their claims; what they cannot do,

however, is pursue their claims in another venue.

65.     Thus, as it relates to the stay, the only question is whether Celsius will need to

resolve its claim in Voyager's bankruptcy (like everyone else) or whether it will receive special

treatment. Celsius "is merely one more creditor trying to recover from the limited assets of a

bankruptcy estate, and its claim has no greater dignity than that of any other unsecured creditor."

*See Branded Products*, 154 B.R. at 952. Celsius should therefore be denied special treatment,

and its claim, like every other claim, should be resolved in this proceeding.

**CONCLUSION**

WHEREFORE, the Committee requests that the Court deny the Motion.

Dated:  New York, New York
       January 17, 2023

**MCDERMOTT WILL & EMERY LLP**

*/s/ Darren Azman*
Darren Azman
Joseph B. Evans
One Vanderbilt Avenue
New York, NY 10017-3852
Telephone: (212) 547-5400
Facsimile: (212) 547-5444
E-mail: dazman@mwe.com
E-mail: jbevans@mwe.com

*- and -*

Charles R. Gibbs (admitted *pro hac vice*)
Grayson Williams (admitted *pro hac vice*)
2501 North Harwood Street, Suite 1900
Dallas, TX 75201
Telephone: (214) 295-8000
Facsimile: (972) 232-3098
E-mail: cgribbs@mwe.com
E-mail: gwilliams@mwe.com

*- and -*

Gregg Steinman (admitted *pro hac vice*)
333 SE 2nd Avenue, Suite 4500
Miami, FL 33131-2184
Telephone: (305) 329-4473
Facsimile: (305) 503-8805
E-mail: gsteinman@mwe.com

*Counsel to the Official Committee of*
*Unsecured Creditors*

28

**CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of January 2023, I caused a true and correct copy of the foregoing *Objection of the Official Committee of Unsecured to Celsius Network LLC's Motion Seeking an Order (I) Lifting the Automatic Stay Pursuant to 11 U.S.C. § 362(D)(1) and Bankruptcy Rule 4001 and (II) Granting Leave to File Late Proof of Claim Pursuant to Bankruptcy Rule 3003(C) and 9006(B)(1)* to be served via (i) electronic notification pursuant to the CM/ECF system for the United States Bankruptcy Court for the Southern District of New York or (ii) e-mail, as indicated in the service list attached hereto.

*/s/ Darren Azman_____*
Darren Azman

## SERVICE LIST

| Name | Attention | Address 1 | Address 2 | City | State | Zip | Country | Email | Method of Service |
|---|---|---|---|---|---|---|---|---|---|
| DISTRICT OF COLUMBIA | OFFICE OF THE ATTORNEY GENERAL | 400 6TH STREET NW | | WASHINGTON | DC | 20001 | | OAG@DC.GOV | VIA E-MAIL |
| FRANCINE DE SOUSA | C/O SISKINDS LLP | ATTN: ANTHONY O'BRIEN | 100 LOMBARD STREET SUITE 302 | TORONTO | ON | M5C1M3 | | ANTHONY.OBRIEN@SISKINDS.COM | VIA E-MAIL |
| FRANCINE DE SOUSA | C/O SISKINDS LLP | ATTN: MICHAEL G. ROBB & GARETT M. HUNTER | 275 DUNDAS STREET UNIT 1 | LONDON | ON | N6B3L1 | | MICHAEL.ROBB@SISKINDS.COM GARETT.HUNTER@SISKINDS.COM | VIA E-MAIL |
| GOOGLE, LLC | | 1600 AMPHITHEATRE PKWY | | MOUNTAIN VIEW | CA | 94043 | | COLLECTIONS@GOOGLE.COM | VIA E-MAIL |
| INTERNAL REVENUE SERVICE | | PO BOX 7346 | | PHILADELPHIA | PA | 19101-7346 | | | VIA FIRST CLASS MAIL |
| OFFICE OF THE UNITED STATES TRUSTEE | FOR THE SOUTHERN DIST OF NEW YORK | ATTN: RICHARD C. MORRISSEY, ESQ. AND MARK BRUH, ESQ. | 201 VARICK STREET, ROOM 1006 | NEW YORK | NY | 10014 | | RICHARD.MORRISSEY@USDOJ.GOV MARK.BRUH@USDOJ.GOV | VIA E-MAIL |
| SECURITIES & EXCHANGE COMMISSION | | 100 F STREET NE | | WASHINGTON | DC | 20549 | | SECBANKRUPTCY-OGC-ADO@SEC.GOV | VIA E-MAIL |
| SECURITIES & EXCHANGE COMMISSION | NEW YORK REGIONAL OFFICE | 100 PEARL STREET SUITE 20-100 | | NEW YORK | NY | 10004-2616 | | NYROBANKRUPTCY@SEC.GOV | VIA E-MAIL |
| SECURITIES & EXCHANGE COMMISSION | NEW YORK REGIONAL OFFICE | ATTN: ANDREW CALAMARI REGIONAL DIRECTOR | 200 VESEY STREET SUITE 400 | NEW YORK | NY | 10281-1022 | | BANKRUPTCYNOTICESCHR@SEC.GOV | VIA E-MAIL |
| STATE OF ALABAMA | OFFICE OF THE ATTORNEY GENERAL | 501 WASHINGTON AVE | | MONTGOMERY | AL | 36104 | | CONSUMERINTEREST@ALABAMAAG.GOV | VIA E-MAIL |
| STATE OF ALASKA | OFFICE OF THE ATTORNEY GENERAL | 1031 W 4TH AVE, STE 200 | | ANCHORAGE | AK | 99501 | | ATTORNEY.GENERAL@ALASKA.GOV | VIA E-MAIL |
| STATE OF ARIZONA | OFFICE OF THE ATTORNEY GENERAL | 2005 N CENTRAL AVE | | PHOENIX | AZ | 85004 | | AGINFO@AZAG.GOV | VIA E-MAIL |
| STATE OF ARKANSAS | OFFICE OF THE ATTORNEY GENERAL | 323 CENTER ST, STE 200 | | LITTLE ROCK | AR | 72201 | | OAG@ARKANSASAG.GOV | VIA E-MAIL |
| STATE OF CALIFORNIA | OFFICE OF THE ATTORNEY GENERAL | PO BOX 944255 | | SACRAMENTO | CA | 94244-2550 | | XAVIER.BECERRA@DOJ.CA.GOV | VIA E-MAIL |
| STATE OF COLORADO | OFFICE OF THE ATTORNEY GENERAL | RALPH L. CARR JUDICIAL BUILDING | 1300 BROADWAY, 10TH FL | DENVER | CO | 80203 | | CORA.REQUEST@COAG.GOV | VIA E-MAIL |
| STATE OF CONNECTICUT | OFFICE OF THE ATTORNEY GENERAL | 165 CAPITOL AVENUE | | HARTFORD | CT | 06106 | | ATTORNEY.GENERAL@CT.GOV | VIA E-MAIL |
| STATE OF FLORIDA | OFFICE OF THE ATTORNEY GENERAL | THE CAPITOL PL01 | | TALLHASSEE | FL | 32399 | | ASHLEY.MOODY@MYFLORIDALEGAL.CO | VIA E-MAIL |
| STATE OF GEORGIA | OFFICE OF THE ATTORNEY GENERAL | 40 CAPITOL SQ SW | | ATLANTA | GA | 30334 | | | VIA FIRST CLASS MAIL |
| STATE OF HAWAII | OFFICE OF THE ATTORNEY GENERAL | 425 QUEEN STREET | | HONOLULU | HI | 96813 | | HAWAIIAG@HAWAII.GOV | VIA E-MAIL |
| STATE OF IDAHO | OFFICE OF THE ATTORNEY GENERAL | 700 W. JEFFERSON ST, SUITE 210 | PO BOX 83720 | BOISE | ID | 83720 | | LAWRENCE.WASDEN@AG.IDAHO.GOV AGWASDEN@AG.IDAHO.GOV | VIA E-MAIL |
| STATE OF ILLINOIS | OFFICE OF THE ATTORNEY GENERAL | JAMES R. THOMPSON CENTER | 100 W. RANDOLPH ST | CHICAGO | IL | 60601 | | INFO@LISAMADIGAN.ORG | VIA E-MAIL |
| STATE OF INDIANA | OFFICE OF THE INDIANA ATTORNEY GENERAL | INDIANA GOVERNMENT CENTER SOUTH | 302 W WASHINGTON ST, 5TH FLOOR | INDIANAPOLIS | IN | 46204 | | | VIA FIRST CLASS MAIL |
| STATE OF IOWA | OFFICE OF THE ATTORNEY GENERAL | HOOVER STATE OFFICE BUILDING | 1305 E. WALNUT STREET | DES MOINES | IA | 50319 | | CONSUMER@AG.IOWA.GOV | VIA E-MAIL |
| STATE OF KANSAS | ATTN: ATTORNEY GENERAL DEREK SCHMIDT | 120 SW 10TH AVE, 2ND FLOOR | | TOPEKA | KS | 66612 | | DEREK.SCHMIDT@AG.KS.GOV | VIA E-MAIL |
| STATE OF KENTUCKY | ATTORNEY GENERAL - DANIEL CAMERON | 700 CAPITAL AVENUE, SUITE 118 | | FRANKFORT | KY | 40601 | | | VIA FIRST CLASS MAIL |
| STATE OF LOUISIANA | DEPT. OF JUSTICE - ATTORNEY GENERAL'S OFFICE | 300 CAPITAL DRIVE | | BATON ROUGE | LA | 70802 | | ADMININFO@AG.STATE.LA.US | VIA E-MAIL |
| STATE OF MAINE | OFFICE OF THE ATTORNEY GENERAL | 6 STATE HOUSE STATION | | AUGUSTA | ME | 04333 | | ATTORNEY.GENERAL@MAINE.GOV | VIA E-MAIL |
| STATE OF MARYLAND | OFFICE OF THE ATTORNEY GENERAL | 200 ST. PAUL PLACE | | BALTIMORE | MD | 21202 | | OAG@OAG.STATE.MD.US | VIA E-MAIL |
| STATE OF MASSACHUSETTS | ATTORNEY GENERAL'S OFFICE | 1 ASHBURTON PLACE, 20TH FLOOR | | BOSTON | MA | 02108 | | | VIA FIRST CLASS MAIL |
| STATE OF MICHIGAN | DEPARTMENT OF ATTORNEY GENERAL | 525 W OTTAWA ST | | LANSING | MI | 48906 | | | VIA FIRST CLASS MAIL |
| STATE OF MINNESOTA | OFFICE OF THE ATTORNEY GENERAL | 445 MINNESOTA ST, STE 1400 | | ST. PAUL | MN | 55101 | | ATTORNEY.GENERAL@AG.STATE.MN.US | VIA E-MAIL |
| STATE OF MISSISSIPPI | OFFICE OF THE ATTORNEY GENERAL | WALTER SILLERS BUILDING | 550 HIGH ST, PO BOX 220 | JACKSON | MS | 39201 | | | VIA FIRST CLASS MAIL |
| STATE OF MISSOURI | OFFICE OF THE ATTORNEY GENERAL | SUPREME COURT BUILDING | 207 W HIGH ST | JEFFERSON CITY | MO | 65101 | | CONSUMER.HELP@AGO.MO.GOV | VIA E-MAIL |
| STATE OF MONTANA | OFFICE OF THE ATTORNEY GENERAL | JUSTICE BUILDING, 3RD FLOOR | 215 N SANDERS, PO BOX 201401 | HELENA | MT | 59602 | | CONTACTDOJ@MT.GOV | VIA E-MAIL |
| STATE OF NEBRASKA | OFFICE OF THE ATTORNEY GENERAL | 2115 STATE CAPITOL | | LINCOLN | NE | 68509 | | | VIA FIRST CLASS MAIL |
| STATE OF NEVADA | OFFICE OF THE ATTORNEY GENERAL | OLD SUPREME COURT BUILDING | 100 N CARSON ST | CARSON CITY | NV | 89701 | | | VIA FIRST CLASS MAIL |
| STATE OF NEW HAMPSHIRE | OFFICE OF THE ATTORNEY GENERAL | NH DEPARTMENT OF JUSTICE | 33 CAPITOL ST. | CONCORD | NH | 03301 | | ATTORNEYGENERAL@DOJ.NH.GOV | VIA E-MAIL |
| STATE OF NEW JERSEY | OFFICE OF THE ATTORNEY GENERAL | RICHARD J. HUGHES JUSTICE COMPLEX | 25 MARKET ST 8TH FL, WEST WING BOX 080 | TRENTON | NJ | 08611 | | | VIA FIRST CLASS MAIL |
| STATE OF NEW MEXICO | OFFICE OF THE ATTORNEY GENERAL | 408 GALISTEO STREET | VILLAGRA BUILDING | SANTA FE | NM | 87501 | | HBALDERAS@NMAG.GOV | VIA E-MAIL |
| STATE OF NEW YORK | OFFICE OF THE ATTORNEY GENERAL | THE CAPITOL | 2ND FLOOR | ALBANY | NY | 12224 | | | VIA FIRST CLASS MAIL |
| STATE OF NORTH CAROLINA | OFFICE OF THE ATTORNEY GENERAL | 114 W EDENTON ST | | RALEIGH | NC | 27603 | | | VIA FIRST CLASS MAIL |
| STATE OF NORTH DAKOTA | OFFICE OF THE ATTORNEY GENERAL | STATE CAPITOL, 600 E | DEPT. 125 | BISMARCK | ND | 58505 | | NDAG@ND.GOV | VIA E-MAIL |
| STATE OF OHIO | OFFICE OF THE ATTORNEY GENERAL | STATE OFFICE TOWER | 30 E BROAD ST 14TH FL | COLUMBUS | OH | 43215 | | | VIA FIRST CLASS MAIL |
| STATE OF OKLAHOMA | OFFICE OF THE ATTORNEY GENERAL | 313 NE 21ST ST | | OKLAHOMA CITY | OK | 73105 | | QUESTIONS@OAG.OK.GOV | VIA E-MAIL |
| STATE OF OREGON | OFFICE OF THE ATTORNEY GENERAL | 1162 COURT ST NE | | SALEM | OR | 97301-4096 | | ELLEN.ROSENBLUM@DOJ.STATE.OR.US ATTORNEYGENERAL@DOJ.STATE.OR.U | VIA E-MAIL |
| STATE OF PENNSYLVANIA | OFFICE OF THE ATTORNEY GENERAL | STRAWBERRY SQUARE 16TH FL | | HARRISBURG | PA | 17120 | | | VIA FIRST CLASS MAIL |
| STATE OF RHODE ISLAND | OFFICE OF THE ATTORNEY GENERAL | 150 S MAIN ST | | PROVIDENCE | RI | 02903 | | AG@RIAG.RI.GOV | VIA E-MAIL |
| STATE OF SOUTH CAROLINA | OFFICE OF THE ATTORNEY GENERAL | PO BOX 11549 | | COLUMBIA | SC | 29211 | | | VIA FIRST CLASS MAIL |
| STATE OF SOUTH CAROLINA | OFFICE OF THE ATTORNEY GENERAL | REMBERT C. DENNIS BLDG | 1000 ASSEMBLY ST RM 519 | COLUMBIA | SC | 29201 | | | VIA FIRST CLASS MAIL |
| STATE OF SOUTH DAKOTA | OFFICE OF THE ATTORNEY GENERAL | 1302 E HIGHWAY 14, STE 1 | | PIERRE | SD | 57501-8501 | | | VIA FIRST CLASS MAIL |

| Name | Office/Firm | Address 1 | Address 2 | City | State | Zip | Email | Method |
|---|---|---|---|---|---|---|---|---|
| STATE OF TENNESSEE | OFFICE OF THE ATTORNEY GENERAL | PO BOX 20207 | | NASHVILLE | TN | 37202-0207 | | VIA FIRST CLASS MAIL |
| STATE OF TEXAS | OFFICE OF THE ATTORNEY GENERAL | 300 W. 15TH ST | | AUSTIN | TX | 78701 | | VIA FIRST CLASS MAIL |
| STATE OF UTAH | OFFICE OF THE ATTORNEY GENERAL | UTAH STATE CAPITOL COMPLEX | 350 NORTH STATE ST STE 230 | SALT LAKE CITY | UT | 84114 | UAG.UTAH.GOV | VIA E-MAIL |
| STATE OF VERMONT | OFFICE OF THE ATTORNEY GENERAL | 109 STATE ST. | | MONTPELIER | VT | 05609 | AGO.INFO@VERMONT.GOV | VIA E-MAIL |
| STATE OF VIRGINIA | OFFICE OF THE ATTORNEY GENERAL | 202 N. NINTH ST. | | RICHMOND | VA | 23219 | MAIL@OAG.STATE.VA.US | VIA E-MAIL |
| STATE OF WASHINGTON | OFFICE OF THE ATTORNEY GENERAL | 1125 WASHINGTON ST SE | | OLYMPIA | WA | 98501 | | VIA FIRST CLASS MAIL |
| STATE OF WASHINGTON | OFFICE OF THE ATTORNEY GENERAL | PO BOX 40100 | | OLYMPIA | WA | 98504-00 | | VIA FIRST CLASS MAIL |
| STATE OF WEST VIRGINIA | OFFICE OF THE ATTORNEY GENERAL | STATE CAPITOL, 1900 KANAWHA | BUILDING 1 RM E-26 | CHARLESTON | WV | 25305 | CONSUMER@WVAGO.GOV | VIA E-MAIL |
| STATE OF WISCONSIN | OFFICE OF THE ATTORNEY GENERAL | 17 WEST MAIN STREET, ROOM 114 EAST P | | MADISON | WI | 53702 | | VIA FIRST CLASS MAIL |
| STATE OF WYOMING | OFFICE OF THE ATTORNEY GENERAL | 109 STATE CAPITOL | | CHEYENNE | WY | 82002 | | VIA FIRST CLASS MAIL |
| TORONTO STOCK EXCHANGE | | 300 - 100 ADELAIDE ST. | | WEST TORONTO | ON | M5H 1S3 | WEBMASTER@TMX.COM | VIA E-MAIL |
| UNITED STATES ATTORNEY'S OFFICE | SOUTHERN DISTRICT OF NEW YORK | ONE ST. ANDREWS PLAZA | | NEW YORK | NY | 10007 | | VIA FIRST CLASS MAIL |
| UNITED STATES DEPARTMENT OF | ATTORNEY GENERAL OF THE U.S. | 950 PENNSYLVANIA AVE, NW | | WASHINGTON | DC | 20530-0001 | | VIA FIRST CLASS MAIL |
| KELLEHER PLACE MANAGEMENT, LLC | HORWOOD MARCUS & BERK CHARTERED | 500 W. MADISON ST. | SUITE 3700 | CHICAGO | IL | 60661 | AHAMMER@HMBLAW.COM; NDELMAN@HMBLAW.COM | VIA ECF |
| METROPOLITAN COMMERCIAL BANK | BALLARD SPAHR LLP | 200 IDS CENTER | 80 SOUTH 8TH STREET | MINNEAPOLIS | MN | 55402-2119 | SINGERG@BALLARDSPAHR.COM | VIA E-MAIL |
| METROPOLITAN COMMERCIAL BANK | WACHTELL, LIPTON, ROSEN & KATZ | 51 WEST 52ND STREET | | NEW YORK | NY | 10019-6150 | RGMASON@WLRK.COM; ARWOLF@WLRK.COM; AKHERRING@WLRK.COM | VIA E-MAIL |
| JASON RAZNICK | JAFFE RAITT HEUER & WEISS, P.C. | 27777 FRANKLIN ROAD | SUITE 2500 | SOUTHFIELD | MI | 48034 | PHAGE@JAFFELAW.COM | VIA ECF |
| STEVE LAIRD | FORSHEY & PROSTOK LLP | 777 MAIN STREET | SUITE 1550 | FORT WORTH | TX | 76102 | BFORSHEY@FORSHEYPROSTOK.COM | VIA ECF |
| ORACLE AMERICA, INC. | BUCHALTER, A PROFESSIONAL CORPORA | 425 MARKET ST. | SUITE 2900 | SAN FRANCISCO | CA | 94105 | SCHRISTIANSON@BUCHALTER.COM | VIA ECF |
| ALAMEDA RESEARCH LLC & AFFILIATES | SULLIVAN & CROMWELL LLP | 125 BROAD STREET | | NEW YORK | NY | 10004 | DIETDERICHA@SULLCROM.COM; GLUECKSTEINB@SULLCROM.COM; BELLERBB@SULLCROM.COM | VIA ECF VIA ECF VIA E-MAIL |
| VOYAGER DIGITAL HOLDINGS, INC., ET AL | KIRKLAND & ELLIS LLP; KIRKLAND & ELLIS INTERNATIONAL LLP | 601 LEXINGTON AVENUE | | NEW YORK | NY | 10022 | JSUSSBERG@KIRKLAND.COM; CMARCUS@KIRKLAND.COM; CHRISTINE.OKIKE@KIRKLAND.COM; ALLYSON.SMITH@KIRKLAND.COM | VIA ECF VIA E-MAIL VIA E-MAIL VIA E-MAIL |
| EMERALD OCEAN ISLE, LLC, AMANO GLOBAL HOLDINGS, INC., SHINGO LAVINE, AND ADAM LAVINE | C/O GOLDSTEIN & MCCLINKOCK LLLP | ATTN: MATTHEW E. MCCLINTOCK, HARLEY GOLDSTEIN, AND STEVE YACHIK | 111 W WASHINGTON STREET SUITE 1221 | CHICAGO | IL | 60602 | MATTM@GOLDMCLAW.COM HARLEYG@RESTRUCTURINGSHOP.COM STEVENY@GOLDMCLAW.COM | VIA E-MAIL VIA E-MAIL VIA E-MAIL |
| EMERALD OCEAN ISLE, LLC, AMANO GLOBAL HOLDINGS, INC., SHINGO LAVINE, AND ADAM LAVINE | C/O LAW OFFICES OF DOUGLAS T. TABACHNIK, P.C. | ATTN: DOUGLAS T. TABACHNIK | 63 WEST MAIN STREET SUITE C | FREEHOLD | NJ | 07728-2141 | DTABACHNIK@DTTLAW.COM | VIA ECF |
| MATTHEW EDWARDS | C/O LIZ GEORGE AND ASSOCIATES | ATTN: LYSBETH GEORGE | 8101 S. WALKER SUITE F | OKLAHOMA CITY | OK | 73139 | GEORGELAWOK@GMAIL.COM | VIA ECF |
| TEXAS STATE SECURITIES BOARD | OFFICE OF THE ATTORNEY GENERAL OF TEXAS | ATTN: ABIGAIL R RYAN, LAYLA D MILLIGAN & JASON B BINFORD | BANKRUPTCY & COLLECTIONS DIVISION PO BOX 12548 | AUSTIN | TX | 78711-2548 | ABIGAIL.RYAN@OAG.TEXAS.GOV LAYLA.MILLIGAN@OAG.TEXAS.GOV JASON.BINFORD@OAG.TEXAS.GOV | VIA E-MAIL VIA E-MAIL VIA E-MAIL |
| OFFICE OF THE ATTORNEY GENERAL OF TEXAS | | ATTN: ROMA N. DESAI | BANKRUPTCY & COLLECTIONS DIVISION PO BOX 12548 | AUSTIN | TX | 78711-2548 | ROMA.DESAI@OAG.TEXAS.GOV | VIA ECF |
| OFFICE OF THE ATTORNEY GENERAL | BANKRUPTCY DIVISION | ATTN: MARVIN E. CLEMENTS, JR. | BANKRUPTCY DIVISION P O BOX 20207 | NASHVILLE | TN | 37202-0207 | AGBANKNEWYORK@AG.TN.GOV | VIA ECF |
| VERMONT DEPARTMENT OF FINANCIAL REGULATION | ASSISTANT GENERAL COUNSEL | ATTN: JENNIFER ROOD | 89 MAIN STREET THIRD FLOOR | MONTPELIER | VT | 05620 | JENNIFER.ROOD@VERMONT.GOV | VIA ECF |
| ROBERT SNYDERS & LISA SNYDERS | C/O JOHNSON, POPE, BOKOR, RUPPEL & BURNS, LLP | ATTN: ANGELINA E. LIM | 401 E JACKSON STREET SUITE 3100 | TAMPA | FL | 33602 | ANGELINAL@JPFIRM.COM | VIA ECF |
| MICHAEL LEGG | C/O MCCARTHY, LEBIT, CRYSTAL & LIFFMAN CO. | ATTN: ROBERT R. KRACHT & NICHOLAS R. OLESKI | 1111 SUPERIOR AVENUE EAST SUITE 2700 | CLEVELAND | OH | 44114 | RRK@MCCARTHYLEBIT.COM NRO@MCCARTHYLEBIT.COM | VIA E-MAIL VIA ECF |
| MICHAEL GENTSCH | C/O BARSKI LAW PLC | ATTN: CHRIS D. BARSKI | 9375 E. SHEA BLVD. STE 100 | SCOTTSDALE | AZ | 85260 | CBARSKI@BARSKILAW.COM | VIA ECF |
| ILLINOIS SECRETARY OF STATE | C/O OFFICE OF THE ATTORNEY GENERAL | ATTN: JOHN P. REDING | 100 W. RANDOLPH ST FLOOR 13 | CHICAGO | IL | 60601 | JOHN.REDING@ILAG.GOV | VIA ECF |
| GEORGIA DEPARTMENT OF BANKING AND FINANCE | | ATTN: NATHAN HOVEY, ASSISTANT ATTORNEY GENERAL | DEPARTMENT OF LAW 40 CAPITOL SQUARE SW | ATLANTA | GA | 30334 | NHOVEY@LAW.GA.GOV | VIA ECF |
| MARK CUBAN AND DALLAS BASKETBALL LIMITED, D/B/A DALLAS MAVERICKS | C/O BROWN RUDNICK LLP | ATTN: SIGMUND S. WISSNER-GROSS ESQ. & KENNETH J. AULET | SEVEN TIMES SQUARE | NEW YORK | NY | 10036 | SWISSNER-GROSS@BROWNRUDNICK.COM KAULET@BROWNRUDNICK.COM | VIA ECF VIA E-MAIL |
| MARK CUBAN AND DALLAS BASKETBALL LIMITED D/B/A DALLAS MAVERICKS | C/O BROWN RUDNICK LLP | ATTN: STEPHEN A. BEST ESQ & RACHEL O. WOLKINSON, ESQ. | 601 THIRTEENTH STREET NW SUITE 600 | WASHINGTON | DC | 2005 | SBEST@BROWNRUDNICK.COM RWOLKINSON@BROWNRUDNICK.COM | VIA E-MAIL VIA E-MAIL |
| ED BOLTON | C/O AKERMAN LLP | ATTN: R. ADAM SWICK, JOHN H. THOMPSON, JOANNE GELFAND | 1251 AVENUE OF THE AMERICAS, 37TH FL | NEW YORK | NY | 10020 | ADAM.SWICK@AKERMAN.COM; JOHN.THOMPSON@AKERMAN.COM; JOANNE.GELFAND@AKERMAN.COM | VIA ECF VIA ECF VIA ECF |
| JON GIACOBBE | | ATTN: A. MANNY ALICANDRO | 11 BROADWAY, SUITE 615 | NEW YORK | NY | 10004 | MANNY@ALICANDROLAWOFFICE.COM | VIA ECF |
| WELLS FARGO BANK, N.A. | C/O ALDRIDGE PITE, LLP | ATTN: GREGORY WALLACE | FIFTEEN PIEDMONT CENTER 3575 PIEDMONT ROAD, N.E. | ATLANTA | GA | 30305 | GWALLACH@ALDRIDGEPITE.COM | VIA ECF |
| AD HOC GROUP OF EQUITY INTEREST HOLDERS | C/O KILPATRICK TOWNSEND & STOCKTON LLP | ATTN: DAVID M. POSNER & KELLY E. MOYNIHAN | THE GRACE BUILDING 1114 AVENUE OF THE | NEW YORK | NY | 10036 | DPOSNER@KILPATRICKTOWNSEND.COM KMOYNIHAN@KILPATRICKTOWNSEND.C | VIA E-MAIL |
| AD HOC GROUP OF EQUITY INTEREST HOLDERS | C/O KILPATRICK TOWNSEND & STOCKTON LLP | ATTN: PAUL M. ROSENBLATT | 1100 PEACHTREE STREET NE SUITE 2800 | ATLANTA | GA | 30309 | PROSENBLATT@KILPATRICKTOWNSEND.COM | VIA E-MAIL |
| PIERCE ROBERTSON | C/O PACHULSKI STANG ZIEHL & JONES LLP | ATTN: RICHARD M. PACHULSKI, ALAN J. KORNFELD, DEBRA I. GRASSGREEN, AND JASON H. ROSELL | 10100 SANTA MONICA BLVD 13TH FLOOR | LOS ANGELES | CA | 90067 | RPACHULSKI@PSZJLAW.COM AKORNFELD@PSZJLAW.COM DGRASSGREEN@PSZJLAW.COM JROSELL@PSZJLAW.COM | VIA E-MAIL VIA E-MAIL VIA E-MAIL VIA ECF |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| STATE OF WASHINGTON | OFFICE OF ATTORNEY GENERAL | ATTN: STEPHEN MANNING, ASSISTANT ATTORNEY GENERAL | GOVERNMENT COMPLIANCE AND ENFORCEMENT DIVISION P.O. BOX 40100 | OLYMPIA | WA | 98504-4010 | | STEPHEN.MANNING@ATG.WA.GOV | VIA ECF |
| MARCUM LLP | MINTZ & GOLD LLP | ATTN: ANDREW R. GOTTESMAN | 600 THIRD AVENUE, 25TH | NEW YORK | NY | 10016 | | GOTTESMAN@MINTZANDGOLD.COM | VIA ECF |
| U.S. SECURITIES & EXCHANGE COMMISSION | | ATTN: THERESE A. SCHEUER | 100 F STREET, NE | WASHINGTON | DC | 20549 | | SCHEUERT@SEC.GOV | VIA E-MAIL |
| NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES | CONSUMER PROTECTION AND FINANCIAL ENFORCEMENT | ATTN: KEVIN R. PUVALOWSKI, LINDA DONAHUE, JASON D. ST. JOHN | ONE STATE STREET | NEW YORK | NY | 10004 | | KEVIN.PUVALOWSKI@DFS.NY.GOV LINDA.DONAHUE@DFS.NY.GOV JASON.STJOHN@DFS.NY.GOV | VIA E-MAIL VIA E-MAIL VIA ECF |
| NEW JERSEY BUREAU OF SECURITIES | C/O MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP | ATTN: VIRGINIA T. SHEA | 1300 MT KEMBLE AVENUE PO BOX 2075 | MORRISTOWN | NJ | 02075 | | VSHEA@MDMC-LAW.COM | VIA ECF |
| NEW JERSEY BUREAU OF SECURITIES | C/O MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP | ATTN: NICOLE LEONARD | 225 LIBERTY STREET, 36TH FLOOR | NEW YORK | NY | 10281 | | NLEONARD@MDMC-LAW.COM | VIA ECF |
| USIO, INC. | PULMAN, CAPPUCCIO & PULLEN, LLP | ATTN: RANDALL A. PULMAN | 2161 NW MILITARY HIGHWAY SUITE 400 | SAN ANTONIO | TX | 78213 | | RPULMAN@PULMANLAW.COM | E-MAIL |
| BAM TRADING SERVICES INC. D/B/A BINANCE.US | LATHAM & WATKINS LLP | ATTN: ADAM J. GOLDBERG, NACIF TAOUSSE, JONATHAN J. WEICHSELBAUM | 1271 AVENUE OF THE AMERICAS | NEW YORK | NY | 10020 | | ADAM.GOLDBERG@LW.COM NACIF.TAOUSSE@LW.COM JON.WEICHSELBAUM@LW.COM | VIA ECF VIA E-MAIL VIA E-MAIL |
| BAM TRADING SERVICES INC. D/B/A BINANCE.US | LATHAM & WATKINS LLP | ATTN: ANDREW D. SORKIN | 555 ELEVENTH STREET, NW SUITE 1000 | WASHINGTON | DC | 20004 | | ANDREW.SORKIN@LW.COM | VIA E-MAIL |
| ATTORNEY FOR THE STATES OF ALABAMA, ARKANSAS, CALIFORNIA, DISTRICT OF COLUMBIA, HAWAII, MAINE, NORTH DAKOTA, OKLAHOMA, AND SOUTH | C/O NATIONAL ASSOCIATION OF ATTORNEYS GENERAL | ATTN: KAREN CORDRY BANKRUPTCY COUNSEL | 1850 M ST. NW 12TH FLOOR | WASHINGTON | DC | 20036 | | KCORDRY@NAAG.ORG | VIA ECF |
| USIO, INC. & FICENTIVE, INC. | RUSKIN MOSCOU FALTISCHEK, P.C. | ATTN: SHERYL P. GUIGLIANO | 1425 RXR PLAZA, 15TH FLOOR | UNIONDALE | NY | 11556 | | SGUIGLIANO@RMFPC.COM | VIA ECF |

## EXHIBIT A

**Celsius UK Schedule G Excerpt**

**Additional Page if Debtor Has More Executory Contracts or Unexpired Leases**

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page.

| List all contracts and unexpired leases | | | State the name and mailing address for all other parties with whom the debtor has an executory contract or unexpired lease |
|---|---|---|---|
| 2.1616 | State what the contract or lease is for and the nature of the debtor's interest | OMNIBUS WALLET SERVICE AGREEMENT -- EFFECTIVE DATE: 06/12/2020 | VOYAGER 33 IRVING PLACE 3060 NEW YORK, NY 10003 |
| | State the term remaining | | |
| | List the contract number of any government contract | | |
| 2.1617 | State what the contract or lease is for and the nature of the debtor's interest | MUTUAL NONDISCLOSURE AGREEMENT -- EFFECTIVE DATE: 02/10/2021 | VOYAGER DIGITAL, LLC 33 IRVING PLACE NEW YORK, NY 10003 |
| | State the term remaining | | |
| | List the contract number of any government contract | | |
| 2.1618 | State what the contract or lease is for and the nature of the debtor's interest | MUTUAL NON DISCLOSURE AGREEMENT -- EFFECTIVE DATE: 07/20/2021 | W3BCLOUD LIMITED 48 RINGSEND ROAD DUBLIN, 4 IRELAND (EIRE) |
| | State the term remaining | | |
| | List the contract number of any government contract | | |
| 2.1619 | State what the contract or lease is for and the nature of the debtor's interest | MUTUAL NONDISCLOSURE AGREEMENT -- EFFECTIVE DATE: 05/26/2022 | WALLBROOK ADVISORY LIMITED 1 KING STREET LONDON, ENGLAND, EC2V 8AU UNITED KINGDOM |
| | State the term remaining | | |
| | List the contract number of any government contract | | |
| 2.1620 | State what the contract or lease is for and the nature of the debtor's interest | MUTUAL NONDISCLOSURE AGREEMENT -- EFFECTIVE DATE: 03/24/2022 | WALNUT, INC. 454 MANHATTAN AVENUE NEW YORK, NY 10026 |
| | State the term remaining | | |
| | List the contract number of any government contract | | |
| 2.1621 | State what the contract or lease is for and the nature of the debtor's interest | MUTUAL NONDISCLOSURE AGREEMENT -- EFFECTIVE DATE: 05/21/2022 | WANG XINXI ADDRESS REDACTED |
| | State the term remaining | | |
| | List the contract number of any government contract | | |
| 2.1622 | State what the contract or lease is for and the nature of the debtor's interest | RESTRICTED TOKEN AGREEMENT -- EFFECTIVE DATE: 01/28/2021 | WASEEM SHABOUT ADDRESS REDACTED |
| | State the term remaining | | |
| | List the contract number of any government contract | | |

**EXHIBIT B**

**Celsius US Transfer Schedule Excerpt**

| USERNAME | ADDRESS | DATE | ACCOUNT | TYPE | Descriptive Purpose | COIN | COIN QUANTITY | COIN USD |
|---|---|---|---|---|---|---|---|---|
| VOWANI KUMAR | ADDRESS REDACTED | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | USDC | 172.694969765 | $172.69 |
| VOYAGER DIGITAL | ADDRESS REDACTED | 5/4/2022 | Withheld | Incoming | Deposit | BTC | 0.00067755 | $27.03 |
| VOYAGER DIGITAL | ADDRESS REDACTED | 5/5/2022 | Earn | Outgoing | Internal Account Transfer | KNC | (152,371.300610005) | ($474,160.69) |
| VOYAGER DIGITAL | ADDRESS REDACTED | 5/5/2022 | Withheld | Incoming | Internal Account Transfer | KNC | 152,371.300610005 | $474,160.69 |
| VOYAGER DIGITAL | ADDRESS REDACTED | 5/11/2022 | Earn | Outgoing | Internal Account Transfer | DASH | (14,456.532120292) | ($959,190.91) |
| VOYAGER DIGITAL | ADDRESS REDACTED | 5/11/2022 | Withheld | Incoming | Internal Account Transfer | DASH | 14,456.532120292 | $959,190.91 |
| VOYAGER DIGITAL | ADDRESS REDACTED | 5/11/2022 | Earn | Outgoing | Internal Account Transfer | XLM | (8,760,325.72705237) | ($1,208,403.33) |
| VOYAGER DIGITAL | ADDRESS REDACTED | 5/11/2022 | Withheld | Incoming | Internal Account Transfer | XLM | 8,760,325.72705237 | $1,208,403.33 |
| VOYAGER DIGITAL | ADDRESS REDACTED | 5/11/2022 | Earn | Outgoing | Internal Account Transfer | AAVE | (6,338.614841893) | ($587,002.77) |
| VOYAGER DIGITAL | ADDRESS REDACTED | 5/11/2022 | Withheld | Incoming | Internal Account Transfer | AAVE | 6,338.614841893 | $587,002.77 |
| VOYAGER DIGITAL | ADDRESS REDACTED | 5/11/2022 | Earn | Outgoing | Internal Account Transfer | ZRX | (831,066.97294943) | ($355,087.49) |
| VOYAGER DIGITAL | ADDRESS REDACTED | 5/11/2022 | Withheld | Incoming | Internal Account Transfer | ZRX | 831,066.97294943 | $355,087.49 |
| VOYAGER DIGITAL | ADDRESS REDACTED | 5/11/2022 | Earn | Outgoing | Internal Account Transfer | LTC | (3,601.813181522) | ($277,824.27) |
| VOYAGER DIGITAL | ADDRESS REDACTED | 5/11/2022 | Withheld | Incoming | Internal Account Transfer | LTC | 3,601.813181522 | $277,824.27 |
| VOYAGER DIGITAL | ADDRESS REDACTED | 5/11/2022 | Earn | Outgoing | Internal Account Transfer | EOS | (76,646.328600705) | ($122,619.42) |
| VOYAGER DIGITAL | ADDRESS REDACTED | 5/11/2022 | Withheld | Incoming | Internal Account Transfer | EOS | 76,646.328600705 | $122,619.42 |
| VOYAGER DIGITAL | ADDRESS REDACTED | 5/11/2022 | Earn | Outgoing | Internal Account Transfer | USDC | (104,163.77574563) | ($104,163.78) |
| VOYAGER DIGITAL | ADDRESS REDACTED | 5/11/2022 | Withheld | Incoming | Internal Account Transfer | USDC | 104,163.77574563 | $104,163.78 |
| VOYAGER DIGITAL | ADDRESS REDACTED | 5/11/2022 | Earn | Outgoing | Internal Account Transfer | ETH | (36.386063847) | ($84,203.13) |
| VOYAGER DIGITAL | ADDRESS REDACTED | 5/11/2022 | Withheld | Incoming | Internal Account Transfer | ETH | 36.386063847 | $84,203.13 |
| VOYAGER DIGITAL | ADDRESS REDACTED | 5/11/2022 | Earn | Outgoing | Internal Account Transfer | BCH | (164.730101117) | ($36,206.03) |
| VOYAGER DIGITAL | ADDRESS REDACTED | 5/11/2022 | Withheld | Incoming | Internal Account Transfer | BCH | 164.730101117 | $36,206.03 |
| VOYAGER DIGITAL | ADDRESS REDACTED | 5/11/2022 | Earn | Outgoing | Internal Account Transfer | MATIC | (37,002.590334137) | ($28,747.72) |
| VOYAGER DIGITAL | ADDRESS REDACTED | 5/11/2022 | Withheld | Incoming | Internal Account Transfer | MATIC | 37,002.590334137 | $28,747.72 |
| VOYAGER DIGITAL | ADDRESS REDACTED | 5/11/2022 | Earn | Outgoing | Internal Account Transfer | BTC | (0.3568480349) | ($11,084.06) |
| VOYAGER DIGITAL | ADDRESS REDACTED | 5/11/2022 | Withheld | Incoming | Internal Account Transfer | BTC | 0.3568480349 | $11,084.06 |
| VOYAGER DIGITAL | ADDRESS REDACTED | 5/11/2022 | Withheld | Outgoing | Withdrawal | BTC | (0.357525) | ($11,254.47) |
| VOYAGER DIGITAL | ADDRESS REDACTED | 5/11/2022 | Earn | Outgoing | Internal Account Transfer | USDC | (100.0) | ($100.00) |
| VOYAGER DIGITAL | ADDRESS REDACTED | 5/11/2022 | Withheld | Incoming | Internal Account Transfer | USDC | 100.0 | $100.00 |
| VOYAGER DIGITAL | ADDRESS REDACTED | 5/11/2022 | Withheld | Outgoing | Withdrawal | LTC | (123.45) | ($9,075.02) |
| VOYAGER DIGITAL | ADDRESS REDACTED | 5/11/2022 | Withheld | Outgoing | Withdrawal | USDC | (104,163.775) | ($104,163.78) |
| VOYAGER DIGITAL | ADDRESS REDACTED | 5/11/2022 | Withheld | Outgoing | Withdrawal | ETH | (36.386) | ($82,225.20) |
| VOYAGER DIGITAL | ADDRESS REDACTED | 5/12/2022 | Withheld | Incoming | Deposit | USDC | 123.45 | $123.45 |
| VOYAGER DIGITAL | ADDRESS REDACTED | 5/25/2022 | Withheld | Outgoing | Withdrawal | AAVE | (6,338.614) | ($663,887.55) |
| VOYAGER DIGITAL | ADDRESS REDACTED | 5/25/2022 | Withheld | Outgoing | Withdrawal | ZRX | (831,066.97) | ($345,555.15) |
| VOYAGER DIGITAL | ADDRESS REDACTED | 5/25/2022 | Earn | Outgoing | Internal Account Transfer | USDC | (3,451,881.40915071) | ($3,451,881.41) |
| VOYAGER DIGITAL | ADDRESS REDACTED | 5/25/2022 | Withheld | Incoming | Internal Account Transfer | USDC | 3,451,881.40915071 | $3,451,881.41 |
| VOYAGER DIGITAL | ADDRESS REDACTED | 5/25/2022 | Withheld | Outgoing | Withdrawal | EOS | (76,646.3286) | ($101,930.46) |
| VOYAGER DIGITAL | ADDRESS REDACTED | 5/25/2022 | Withheld | Outgoing | Withdrawal | USDC | (3,451,981.4091) | ($3,451,981.41) |
| VOYAGER DIGITAL | ADDRESS REDACTED | 5/27/2022 | Withheld | Outgoing | Withdrawal | XLM | (8,760,325.727) | ($1,067,842.16) |
| VOYAGER DIGITAL | ADDRESS REDACTED | 6/2/2022 | Withheld | Outgoing | Withdrawal | DASH | (123.0) | ($7,290.14) |
| VOYAGER DIGITAL | ADDRESS REDACTED | 6/2/2022 | Withheld | Outgoing | Withdrawal | MATIC | (37,002.590334) | ($22,281.60) |
| VOYAGER DIGITAL | ADDRESS REDACTED | 6/2/2022 | Withheld | Outgoing | Withdrawal | BCH | (164.730101) | ($30,435.08) |
| VOYAGER DIGITAL | ADDRESS REDACTED | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | BTC | 0.00134303126057049 | $51.20 |
| VOYAGER DIGITAL | ADDRESS REDACTED | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | CEL | 0.015626344329 | $0.02 |
| VOYAGER DIGITAL | ADDRESS REDACTED | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | ETH | 0.15097461478246 | $425.60 |
| VOYAGER DIGITAL | ADDRESS REDACTED | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | USDC | 30,809.6618726489 | $30,809.66 |
| VOYAGER DIGITAL | ADDRESS REDACTED | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | USDC | 654.818027228099 | $654.82 |
| VOYAGER DIGITAL | ADDRESS REDACTED | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | MATIC | 237.361991300159 | $279.75 |
| VOYAGER DIGITAL | ADDRESS REDACTED | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | LTC | 5.7475182713466 | $567.90 |
| VOYAGER DIGITAL | ADDRESS REDACTED | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | XLM | 8,034.53319981229 | $1,454.74 |
| VOYAGER DIGITAL | ADDRESS REDACTED | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | AAVE | 27.595338124478 | $4,194.07 |
| VOYAGER DIGITAL | ADDRESS REDACTED | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | BCH | 0.287591442410952 | $90.06 |
| VOYAGER DIGITAL | ADDRESS REDACTED | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | LUNC | 6.312894215 | $359.37 |
| VOYAGER DIGITAL | ADDRESS REDACTED | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | SGB | 2,727.87765117 | $111.22 |
| VOYAGER DIGITAL | ADDRESS REDACTED | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | EOS | 306.30374917029 | $663.15 |
| VOYAGER DIGITAL | ADDRESS REDACTED | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | COMP | 0.0267405013019999 | $2.02 |
| VOYAGER DIGITAL | ADDRESS REDACTED | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | DASH | 30.723461393558 | $2,978.51 |
| VOYAGER DIGITAL | ADDRESS REDACTED | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | ETC | 0.110366893293 | $2.59 |
| VOYAGER DIGITAL | ADDRESS REDACTED | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | ZRX | 580.781309093843 | $428.14 |
| VOYAGER DIGITAL | ADDRESS REDACTED | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | OMG | 0.00217527639259999 | $0.01 |
| VOYAGER DIGITAL | ADDRESS REDACTED | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | BSV | 0.0013188954422 | $0.08 |
| VOYAGER DIGITAL | ADDRESS REDACTED | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | KNC | 57.926039525068 | $254.36 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/14/2022 | Earn | Outgoing | Withdrawal | ETH | (3.0) | ($9,152.71) |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/14/2022 | Earn | Incoming | Deposit | BTC | 0.0015585 | $62.40 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/15/2022 | Custody | Incoming | Deposit | BTC | 0.00163378 | $66.06 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/16/2022 | Custody | Incoming | Deposit | BTC | 0.00266937 | $108.58 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/17/2022 | Custody | Incoming | Deposit | BTC | 0.00256564 | $103.36 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/18/2022 | Custody | Incoming | Deposit | BTC | 0.00247878 | $101.23 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/19/2022 | Custody | Incoming | Deposit | BTC | 0.00197585 | $81.71 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/20/2022 | Custody | Outgoing | Loan Interest Payment | BTC | (0.0005023513807) | ($20.83) |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/20/2022 | Custody | Incoming | Deposit | BTC | 0.00175537 | $72.86 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/21/2022 | Custody | Outgoing | Loan Interest Payment | BTC | (0.001002646776) | ($41.67) |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/21/2022 | Custody | Incoming | Deposit | BTC | 0.00122135 | $49.76 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/22/2022 | Custody | Incoming | Deposit | BTC | 0.0035883 | $142.53 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/23/2022 | Custody | Incoming | Deposit | BTC | 0.00250247 | $99.89 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/24/2022 | Custody | Incoming | Deposit | BTC | 0.00248488 | $98.57 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/25/2022 | Custody | Incoming | Deposit | BTC | 0.00236028 | $95.07 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/26/2022 | Custody | Incoming | Deposit | BTC | 0.00355807 | $136.46 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/27/2022 | Custody | Incoming | Deposit | BTC | 0.00294934 | $115.31 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/28/2022 | Custody | Incoming | Deposit | BTC | 0.00266599 | $106.25 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/29/2022 | Custody | Incoming | Deposit | BTC | 0.00291778 | $112.77 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/30/2022 | Custody | Incoming | Deposit | BTC | 0.00257882 | $98.81 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/1/2022 | Custody | Outgoing | Swap Out | BTC | (0.026114) | ($999.41) |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/1/2022 | Custody | Incoming | Swap In | SOL | 11.25953 | $999.41 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/1/2022 | Custody | Incoming | Deposit | BTC | 0.00252677 | $97.16 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/2/2022 | Custody | Incoming | Deposit | BTC | 0.00207959 | $80.44 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/3/2022 | Custody | Incoming | Deposit | BTC | 0.00218741 | $82.77 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/4/2022 | Custody | Incoming | Deposit | BTC | 0.00241368 | $96.05 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/5/2022 | Custody | Incoming | Deposit | BTC | 0.00234239 | $85.47 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/6/2022 | Custody | Incoming | Deposit | BTC | 0.00170459 | $61.31 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/7/2022 | Custody | Incoming | Deposit | BTC | 0.00169314 | $59.69 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/8/2022 | Custody | Incoming | Deposit | BTC | 0.00168763 | $57.89 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/9/2022 | Custody | Outgoing | Loan Interest Payment | BTC | (0.001515810905) | ($51.04) |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/9/2022 | Custody | Incoming | Deposit | BTC | 0.00169127 | $52.48 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/10/2022 | Earn | Outgoing | Internal Account Transfer | ETH | (0.516261761) | ($1,200.00) |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/10/2022 | Custody | Incoming | Internal Account Transfer | ETH | 0.516261761 | $1,200.00 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/10/2022 | Custody | Outgoing | Withdrawal | ETH | (0.516261761) | ($1,191.78) |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/10/2022 | Custody | Incoming | Deposit | BTC | 0.00198777 | $60.95 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/11/2022 | Custody | Incoming | Deposit | BTC | 0.00237407 | $68.72 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/12/2022 | Earn | Outgoing | Internal Account Transfer | ETH | (6.363209844) | ($12,346.92) |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/12/2022 | Custody | Incoming | Internal Account Transfer | ETH | 6.363209844 | $12,346.92 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/12/2022 | Custody | Outgoing | Withdrawal | ETH | (6.363209844) | ($12,397.95) |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/12/2022 | Custody | Incoming | Deposit | MCDAI | 12,108.05848484 | $12,108.06 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/12/2022 | Custody | Incoming | Deposit | MCDAI | 24,675.97281747 | $24,675.97 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/12/2022 | Custody | Outgoing | Loan Interest Payment | MCDAI | (41.66) | ($41.66) |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/12/2022 | Custody | Outgoing | Loan Principal Payment | MCDAI | (25,000.0) | ($25,000.00) |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/12/2022 | Earn | Incoming | Collateral | ETH | 25.169027655 | $48,440.56 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/12/2022 | Earn | Outgoing | Internal Account Transfer | ETH | (25.169027655) | ($48,374.37) |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/12/2022 | Custody | Incoming | Internal Account Transfer | ETH | 25.169027655 | $48,374.37 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/12/2022 | Custody | Outgoing | Withdrawal | ETH | (25.169027655) | ($48,387.96) |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/12/2022 | Earn | Outgoing | Internal Account Transfer | BTC | (0.06610618524) | ($1,887.27) |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/12/2022 | Custody | Incoming | Internal Account Transfer | BTC | 0.06610618524 | $1,887.27 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/12/2022 | Custody | Outgoing | Swap Out | BTC | (0.099565) | ($2,838.20) |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/12/2022 | Custody | Incoming | Swap In | ETH | 1.47299 | $2,838.20 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/12/2022 | Custody | Outgoing | Withdrawal | ETH | (1.041192153) | ($1,997.02) |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/12/2022 | Custody | Outgoing | Withdrawal | ETH | (0.4317978469) | ($822.07) |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/12/2022 | Custody | Incoming | Deposit | MCDAI | 49,766.88717532 | $49,766.89 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/12/2022 | Custody | Outgoing | Loan Interest Payment | MCDAI | (51.04) | ($51.04) |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/12/2022 | Custody | Outgoing | Loan Principal Payment | MCDAI | (61,250.0) | ($61,250.00) |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/12/2022 | Earn | Incoming | Collateral | ETH | 51.435716503 | $96,967.13 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/12/2022 | Earn | Outgoing | Internal Account Transfer | ETH | (38.48) | ($72,977.99) |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/12/2022 | Custody | Incoming | Internal Account Transfer | ETH | 38.48 | $72,977.99 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/12/2022 | Custody | Incoming | Deposit | BTC | 0.00162408 | $47.12 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/13/2022 | Custody | Outgoing | Collateral | ETH | (38.48) | ($78,885.94) |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/13/2022 | Custody | Incoming | Deposit | BTC | 0.00191758 | $57.71 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/14/2022 | Earn | Outgoing | Internal Account Transfer | ETH | (12.955369) | ($25,526.12) |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/14/2022 | Custody | Incoming | Internal Account Transfer | ETH | 12.955369 | $25,526.12 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/14/2022 | Custody | Outgoing | Withdrawal | ETH | (12.955369) | ($25,459.76) |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/14/2022 | Custody | Incoming | Deposit | BTC | 0.00204917 | $61.03 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/15/2022 | Custody | Incoming | Deposit | BTC | 0.00262683 | $81.94 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/16/2022 | Custody | Incoming | Deposit | BTC | 0.00247557 | $74.59 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/17/2022 | Custody | Incoming | Deposit | BTC | 0.00261225 | $79.69 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/18/2022 | Custody | Incoming | Deposit | BTC | 0.00253156 | $74.31 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/19/2022 | Custody | Incoming | Deposit | BTC | 0.00251123 | $75.78 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/20/2022 | Custody | Incoming | Deposit | BTC | 0.00241091 | $70.59 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/21/2022 | Custody | Outgoing | Loan Interest Payment | BTC | (0.001420150894) | ($41.67) |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/21/2022 | Custody | Incoming | Deposit | BTC | 0.00221527 | $65.06 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/22/2022 | Custody | Incoming | Deposit | BTC | 0.00119929 | $36.14 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/23/2022 | Custody | Incoming | Deposit | BTC | 0.00214816 | $62.90 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/25/2022 | Custody | Incoming | Deposit | BTC | 0.00209411 | $62.00 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/25/2022 | Custody | Incoming | Deposit | BTC | 0.00272496 | $81.12 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/26/2022 | Custody | Incoming | Deposit | BTC | 0.00264871 | $78.47 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/27/2022 | Custody | Incoming | Deposit | BTC | 0.00277267 | $80.04 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/29/2022 | Custody | Incoming | Deposit | BTC | 0.00238923 | $69.34 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/29/2022 | Custody | Incoming | Deposit | BTC | 0.00243318 | $71.71 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/30/2022 | Custody | Incoming | Deposit | BTC | 0.00224245 | $71.06 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 5/31/2022 | Custody | Incoming | Deposit | BTC | 0.0022254 | $70.90 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 6/1/2022 | Custody | Incoming | Deposit | BTC | 0.0010829 | $32.11 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 6/2/2022 | Custody | Incoming | Deposit | BTC | 0.00199487 | $60.86 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 6/3/2022 | Custody | Incoming | Deposit | BTC | 0.00159047 | $47.43 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 6/4/2022 | Custody | Incoming | Deposit | BTC | 0.00215537 | $64.44 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 6/5/2022 | Custody | Incoming | Deposit | BTC | 0.00380779 | $114.22 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 6/6/2022 | Custody | Incoming | Deposit | BTC | 0.00367425 | $115.47 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 6/7/2022 | Custody | Incoming | Deposit | BTC | 0.00308793 | $97.03 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 6/8/2022 | Custody | Incoming | Deposit | BTC | 0.00395934 | $120.16 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 6/9/2022 | Custody | Incoming | Deposit | BTC | 0.00330282 | $99.56 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 6/10/2022 | Custody | Incoming | Deposit | BTC | 0.00365266 | $106.60 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 6/11/2022 | Custody | Incoming | Deposit | ETH | 15.28591108 | $24,023.33 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 6/11/2022 | Custody | Outgoing | Collateral | ETH | (15.28) | ($23,458.74) |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 6/11/2022 | Custody | Incoming | Deposit | BTC | 0.00375508 | $107.42 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 6/12/2022 | Custody | Outgoing | Swap Out | BTC | (0.076496) | ($2,106.01) |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 6/12/2022 | Custody | Incoming | Swap In | ETH | 1.443615 | $2,106.01 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 6/12/2022 | Custody | Incoming | Deposit | BTC | 0.00368312 | $100.40 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 6/21/2022 | Custody | Outgoing | Loan Interest Payment | ETH | (0.03600481314) | ($41.67) |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | BTC | 0.000353905375226959 | $13.15 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | CEL | 9.5606456122 | $11.15 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | ETH | 0.037413878260226 | $103.01 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | ADA | 10.9497554235 | $6.88 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | MATIC | 77.215279622 | $61.21 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | DOT | 4.4545932756 | $49.50 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | LINK | 1.3307024972 | $11.75 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | LTC | 0.0000098184399395 | $0.00 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | XLM | 14.125983574 | $2.06 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | SNX | 39.667683576 | $135.52 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | MCDAI | 0.102195244255 | $0.10 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | AVAX | 0.33378040573 | $13.21 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | AAVE | 0.139697118164 | $15.34 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | UNI | 3.4093522786 | $20.98 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | BCH | 0.0000064519186238 | $0.00 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | COMP | 0.04487958523 | $3.40 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | DASH | 0.108154021126 | $7.71 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | BAT | 4.7517939097 | $2.29 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | MANA | 0.39797703403 | $0.52 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | ZRX | 12.4871198798 | $6.65 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | ZEC | 0.029230751668 | $3.17 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | OMG | 0.000042917904465 | $0.00 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | KNC | 0.000104617505642999 | $0.00 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | XTZ | 3.955539458 | $8.22 |
| VP INVESTMENTS & ASSETS LLC | 4141 FRISCO GREEN AVENUE, FRISCO, TEXAS 75034 | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | 1INCH | 0.0034983648886 | $0.00 |
| VRAID SYSTEMS LIMITED | WADSWORTH BLVD #127, LAKEWOOD, COLORADO 80226-1550 | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | BTC | 0.0031659268666 | $96.59 |
| VRAID SYSTEMS LIMITED | WADSWORTH BLVD #127, LAKEWOOD, COLORADO 80226-1550 | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | CEL | 0.015529175638 | $0.02 |
| VRAID SYSTEMS LIMITED | WADSWORTH BLVD #127, LAKEWOOD, COLORADO 80226-1550 | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | ETH | 0.100272648488 | $202.67 |
| VRAID SYSTEMS LIMITED | WADSWORTH BLVD #127, LAKEWOOD, COLORADO 80226-1550 | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | USDC | 964.266443065 | $964.27 |
| VRAID SYSTEMS LIMITED | WADSWORTH BLVD #127, LAKEWOOD, COLORADO 80226-1550 | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | SNX | 1.15869585247 | $3.96 |
| VRAID SYSTEMS LIMITED | WADSWORTH BLVD #127, LAKEWOOD, COLORADO 80226-1550 | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | MCDAI | 0.27505640107 | $0.28 |
| VRAID SYSTEMS LIMITED | WADSWORTH BLVD #127, LAKEWOOD, COLORADO 80226-1550 | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | PAXG | 0.17692785569 | $329.60 |
| VRAID SYSTEMS LIMITED | WADSWORTH BLVD #127, LAKEWOOD, COLORADO 80226-1550 | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | PAX | 0.000113761635350999 | $0.00 |
| VRAID SYSTEMS LIMITED | WADSWORTH BLVD #127, LAKEWOOD, COLORADO 80226-1550 | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | TAUD | 0.00002182123207 | $0.00 |
| VRAID SYSTEMS LIMITED | WADSWORTH BLVD #127, LAKEWOOD, COLORADO 80226-1550 | 4/14/2022 - 7/13/2022 | Earn - Interest; Earn, Custody or Withheld - Rewards | Incoming | Interest and Rewards | TCAD | 0.000063396070663 | $0.00 |
| VRAJ PATEL | ADDRESS REDACTED | 5/9/2022 | Earn | Outgoing | Internal Account Transfer | BTC | (0.00142898618) | ($44.31) |
| VRAJ PATEL | ADDRESS REDACTED | 5/9/2022 | Custody | Incoming | Internal Account Transfer | BTC | 0.00142898618 | $44.31 |
| VRAJ PATEL | ADDRESS REDACTED | 5/9/2022 | Earn | Outgoing | Internal Account Transfer | ETH | (0.003372992133) | ($7.73) |
| VRAJ PATEL | ADDRESS REDACTED | 5/9/2022 | Custody | Incoming | Internal Account Transfer | ETH | 0.003372992133 | $7.73 |
| VRAJ PATEL | ADDRESS REDACTED | 5/9/2022 | Custody | Outgoing | Swap Out | ETH | (0.003368) | ($7.72) |
| VRAJ PATEL | ADDRESS REDACTED | 5/9/2022 | Custody | Incoming | Swap In | BTC | 0.0002483 | $7.72 |
| VRAJ PATEL | ADDRESS REDACTED | 5/9/2022 | Custody | Outgoing | Swap Out | BTC | (0.001677) | ($52.00) |
| VRAJ PATEL | ADDRESS REDACTED | 5/9/2022 | Custody | Incoming | Swap In | ETH | 0.022643 | $52.00 |
| VRAJ PATEL | ADDRESS REDACTED | 5/9/2022 | Custody | Outgoing | Withdrawal | ETH | (0.02264799213) | ($51.70) |
| VRAJ PATEL | ADDRESS REDACTED | 5/9/2022 | Custody | Incoming | Deposit | ETH | 0.008384906097 | $19.12 |
| VRAJ PATEL | ADDRESS REDACTED | 5/31/2022 | Earn | Outgoing | Internal Account Transfer | BCH | (0.0002573456506) | ($0.05) |
| VRAJ PATEL | ADDRESS REDACTED | 5/31/2022 | Custody | Incoming | Internal Account Transfer | BCH | 0.0002573456506 | $0.05 |
| VRAJ PATEL | ADDRESS REDACTED | 5/31/2022 | Earn | Outgoing | Internal Account Transfer | BTC | (0.0000005955712431) | ($0.02) |
| VRAJ PATEL | ADDRESS REDACTED | 5/31/2022 | Custody | Incoming | Internal Account Transfer | BTC | 0.0000005955712431 | $0.02 |
| VRAJ PATEL | ADDRESS REDACTED | 5/31/2022 | Earn | Outgoing | Internal Account Transfer | CEL | (0.1118896525) | ($0.09) |
| VRAJ PATEL | ADDRESS REDACTED | 5/31/2022 | Custody | Incoming | Internal Account Transfer | CEL | 0.1118896525 | $0.09 |
| VRAJ PATEL | ADDRESS REDACTED | 5/31/2022 | Earn | Outgoing | Internal Account Transfer | DASH | (0.0005513245629) | ($0.03) |
| VRAJ PATEL | ADDRESS REDACTED | 5/31/2022 | Custody | Incoming | Internal Account Transfer | DASH | 0.0005513245629 | $0.03 |
| VRAJ PATEL | ADDRESS REDACTED | 5/31/2022 | Earn | Outgoing | Internal Account Transfer | EOS | (0.0007653204916) | $0.00 |
| VRAJ PATEL | ADDRESS REDACTED | 5/31/2022 | Custody | Incoming | Internal Account Transfer | EOS | 0.0007653204916 | $0.00 |
| VRAJ PATEL | ADDRESS REDACTED | 5/31/2022 | Earn | Outgoing | Internal Account Transfer | ETH | (0.000002038227503) | $0.00 |

# Exhibit F

Jonathan D. Canfield
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000

Matthew M. Murphy
Michael C. Whalen
PAUL HASTINGS LLP
71 S. Wacker Drive
Forty-Fifth Floor
Chicago, Illinois 60606
Telephone: (312) 499-6000

*Proposed Special Regulatory and Conflicts Counsel*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | **Re: Docket Nos. 727 and 789** |

**DEBTORS' OBJECTION TO MOTION OF CELSIUS NETWORK LLC FOR ORDER
(I) LIFTING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. 362(d)(1) AND
BANKRUPTCY RULE 4001 AND (II) GRANTING LEAVE TO FILE LATE PROOF OF
CLAIM PURSUANT TO  BANKRUPTCY RULES 3003(c) AND 9006(b)(1)**

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>" or

"<u>Voyager</u>") respectfully submit this objection (this "<u>Objection</u>") to the *Motion of Celsius Network*

*LLC for Order (I) Lifting the Automatic Stay Pursuant to 11 U.S.C. 362(d)(1) and Bankruptcy Rule*

*4001 and (II) Granting Leave to File Late Proof of Claim Pursuant to Bankruptcy Rules 3003(c)*

*and 9006(b)(1)* (ECF Nos. 727 and 789) ("<u>Motion</u>").

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

### Preliminary Statement

1.     The Debtors' bar date has passed and has delivered "finality to a process that will ultimately lead to the rehabilitation of the [Debtors] and the payment of claims under a plan of reorganization." *In re Drexel Burnham Lambert Grp. Inc.*, 151 B.R. 674, 679 (Bankr. S.D.N.Y.). Celsius Network LLC ("Celsius"), itself a reorganizing debtor in bankruptcy proceedings before this Court, has now come forward and threatened to upend that finality by plunging the Debtors into costly and uncertain litigation all without having timely filed a claim in the Debtors' chapter 11 cases. Celsius, by its Motion, seeks extraordinary relief from this Court, in the form of (i) an extension of the Debtors' bar date so that it may file an out-of-time claim *and* (ii) relief from the automatic stay so that it may pursue novel legal theories against the Debtors' in order to substantiate that claim, *and upon which its claim is wholly contingent*. Celsius is entitled to no such relief.

2.     The burden of obtaining an extension of the bar date to file a late claim lies squarely with the late creditor. Celsius cannot demonstrate to the Court that its failure to comply with the well-publicized bar date (which was also sent by notice to the address on file for Celsius in the Debtors' books and records) was the result of "excusable neglect." In fact, Celsius's only justification for its tardiness is that it was busy with its own bankruptcy proceeding around the time of the October 3, 2022 bar date in the Debtors' chapter 11 cases. *See Order (I) Setting Deadlines for Submitting Proofs of Claim, (II) Approving Procedures for Submitting Proofs of Claim, and (III) Approving Notice Thereof* ("Bar Date Order") (ECF No. 218).[2] While this may be neglect, it certainly is not excusable.

---

[2]     References to docket entries in this case are denoted by "(ECF No. ___)." References to docket entries in Celsius's bankruptcy case, *In re Celsius Network LLC, et al.*, Case No. 22-10964 (MG) (Bankr. S.D.N.Y.), are denoted by "(Celsius ECF No. ___)."

3.      Celsius tacitly admits the weakness of its excuse by inverting the logical order of the relief it seeks.   That is, in its Motion Celsius seeks relief from the automatic stay so that it may pursue legal claims against the Debtors ***before*** asking this Court to permit it to actually file a claim against the Debtors.   This is, of course, completely backwards, as the Court would not reach the question of whether to grant any relief from the automatic stay until after determining whether Celsius filed a timely claim in the first place.   Tactics aside, the simple fact of the matter is that Celsius cannot carry its burden to show that its failure to file a timely claim was excusable.  Moreover, Celsius admits that its claim (if allowed) would be a general unsecured claim against debtor Voyager Digital LLC, which currently has a claim pool of only $14 million.   Thus, Celsius's claim, if ultimately allowed, would represent approximately 35% of the claims in that class and significantly reduce recoveries to the extreme prejudice to the creditors of Voyager Digital LLC.  At best, distributions to creditors in Class 4A will be delayed and/or minimized pending the resolution of the Celsius claim.

4.      Finally, even if Celsius could establish excusable neglect for its failure to file a timely claim (and it cannot), Celsius still cannot carry its burden to demonstrate cause to lift the automatic stay.   As explained at length herein, Celsius is not entitled to the extraordinary relief from the automatic stay that it seeks so that it may assert speculative, novel arguments against the Debtors in some other forum that will take an untold amount of time, energy, and resources to resolve.   This is particularly the case where it is primarily the Debtors' creditors who will be significantly prejudiced due to the late and reduced recoveries that they will receive if Celsius is permitted to effectively divert the Debtors' time and resources to defend against potentially futile claims by an entity that is alleging entitlement to such a large percentage of the unsecured creditors' claim pool.   Celsius's Motion should be denied in its entirety.

## **Background**

5.      The Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on July 5, 2022.   The Debtors were the first major cryptocurrency exchange to file bankruptcy cases in the United States.  The Court set a bar date of October 3, 2022 for the filing of claims against the Debtors.  *See* Bar Date Order (ECF No. 218).

**I.      Celsius Files Chapter 11 Cases Shortly After the Debtors and Asserts Ownership Over Certain Assets on Celsius's Platforms, Including Assets of the Debtors.**

6.      Celsius and certain affiliated debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court on July 13, 2022.   At the time of Celsius's voluntary petitions, Celsius offered two different platforms through which customers could invest cryptocurrency and other funds with Celsius: an "Earn" platform, which Celsius claimed provided a return on any amounts placed thereon by customers, and a "Withhold" platform, which did not provide any return.  *See generally Debtors' Amended Motion for Entry of an Order (I) Establishing Ownership of Assets in the Debtors' Earn Program, (II) Permitting the Sale of Stablecoin in the Ordinary Course and (III) Granting Related Relief* (Celsius ECF No. 1325) (explaining Celsius's view of the two platforms).

7.      The Debtors were a customer of Celsius and held significant funds on Celsius's Earn and Withhold platforms.   The Debtors' placement of assets on Celsius's various cryptocurrency platforms, including the "Earn" platform, was governed by an Omnibus Wallet Services Agreement (the "Wallet Agreement") entered into as of June 12, 2020 between the Debtors and a Celsius affiliate.  *See* Wallet Agreement (attached as **Exhibit A** to the Whalen Decl.[3]).   The Debtors entered into an amended Wallet Agreement (the "Amended Wallet

---

[3]      "Whalen Decl." means the *Declaration of Michael C. Whalen in Support of Debtors' Objection to Motion of Celsius Network LLC for Order (I) Lifting the Automatic Stay Pursuant to 11 U.S.C. 362(d)(1) and Bankruptcy*

Agreement") on August 19, 2021 with certain Celsius affiliates, including the Celsius affiliate that was party to the Wallet Agreement. *See* Amended Wallet Agreement (attached as **Exhibit B** to the Whalen Decl.).

8.      The amount of funds that the Debtors held on Celsius's platforms varied over time, and the Debtors actively managed any funds that they held on Celsius's platforms.

9.      As of the filing of Celsius's chapter 11 cases, Celsius took the position, contrary to the views of its customers, including the Debtors, that it held title to all assets placed on Celsius's "Earn" platform by customers.  Subsequently, Celsius has argued that any assets placed on its "Earn" platform by customers which were transferred off of that platform by customers in the ninety days prior to the commencement of Celsius's chapter 11 cases "are likely subject to preference claims by Celsius under section 547 of the Bankruptcy Code."  Motion ¶ 19.

10.      Celsius claims that the Debtors transferred $7,700,675.01 worth of cryptocurrency off of the "Earn" platform in the ninety days prior to the commencement of Celsius's chapter 11 cases.

## II.      **Celsius's Claim Would Fall into a Class of Claims that Currently Has $14 Million in Projected Claims.**

11.      On January 13, 2023, the Debtors Filed their *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan Of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "<u>Disclosure Statement</u>") (ECF No. 863).  The Court approved the Disclosure Statement on the same day. *See Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Adequacy of the Debtors' Disclosure Statement, (III) Approving (A)*

---

*Rule 4001 and (II) Granting Leave to File Late Proof of Claim Pursuant to Bankruptcy Rules 3003(c) and 9006(b)(1),* filed simultaneous herewith.

*Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation Of Votes and (D) Procedures for Objections* (ECF No. 861)

12.     Under the terms of the Debtors' proposed plan of reorganization, as explained in the Disclosure Statement, Celsius's claim—if granted permission to file late—would fall into Class 4A OpCo General Unsecured Claims.  In its Motion, Celsius asserts that its claim would be unsecured and that Voyager Digital, LLC is the entity against which Celsius would bring such claim, as it was the counterparty to the Wallet Agreement, and thus the accountholder for purposes of placing assets on Celsius's platforms.

13.     Voyager Digital, LLC is the "OpCo" entity for purposes of determining claims that fall into Class 4A under the Debtors' proposed plan of reorganization, and so holders of general unsecured claims against Voyager Digital, LLC are members of Class 4A.  *See* Disclosure Statement at 56 (defining Voyager Digital, LLC as "OpCo").  The current projected amount of allowed claims in Class 4A OpCo General Unsecured Claims is $14 million.  *See* Disclosure Statement Order, Ex. 4 at 2 (ECF No. 861-1).  Based on the $14 million in claim amounts projected for Class 4A, the Debtors project recoveries of between 35% and 50% based on projected outcomes in the Debtors' chapter 11 cases.  *Id*.  Celsius's claim for approximately $7.7 million would likely (i) fall into Class 4A, (ii) represent approximately 35% of the ***entire*** Class 4A claim pool, and (iii) diminish customer recoveries accordingly.

## Objection

**III.     Celsius Has Not Carried Its Burden of Demonstrating Excusable Neglect in Failing to Timely File a Claim by the Court's Bar Date.**

14.     The Federal Rules of Bankruptcy Procedure require bankruptcy courts to set a bar date for filing claims against a debtor.  *See* Fed. R. Bankr. P. 3003(c)(3) ("The court shall fix and for cause shown may extend the time within which proofs of claim or interest may be filed.").  "A

bar order serves the important purpose of enabling the parties to a bankruptcy case to identify with reasonable promptness the identity of those making claims against the bankruptcy estate and the general amount of the claims, a necessary step in achieving the goal of a successful reorganization." *In re Hooker Invs., Inc.*, 937 F.2d 833, 840 (2d Cir. 1991). The bar date set by the Court is critical in "provid[ing] a date certain after which a plan can be negotiated, formulated, and eventually confirmed." *In re Drexel Burnham Lambert Grp. Inc.*, 151 B.R. 674, 679 (Bankr. S.D.N.Y.). "Thus, a bar order does not 'function merely as a procedural gauntlet,' but as an integral part of the reorganization process." *Hooker*, 937 F.2d at 840 (quoting *In re Kolstad*, 928 F.2d 171, 173 (5th Cir. 1991)).

15.    Federal Rule of Bankruptcy Procedure 9006(b)(1) provides a limited exception to creditors who miss the bar date "where the failure [of the creditor] to act was the result of excusable neglect." Fed. R. Bankr. P. 9006(b)(1). "A creditor seeking to extend the bar date bears the burden of proving 'excusable neglect.'" *In re Houbigant, Inc.*, 188 B.R. 347, 354 (Bankr. S.D.N.Y. 1995), *corrected* (Nov. 8, 1995) (quoting *In re R.H. Macy & Co., Inc.,* 161 B.R. 355, 360 (Bankr. S.D.N.Y.1993)).

16.    In evaluating whether a creditor has demonstrated "excusable neglect," Courts in this Circuit apply the so-called *Pioneer* test, and consider "the danger of prejudice to the [non-movant], the length of the delay and its potential impact upon judicial proceedings, the reason for the delay, including whether it was in the reasonable control of the movant, and whether the movant acted in good faith." *United States v. Hooper*, 9 F.3d 257, 259 (2d Cir. 1993) (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993)); *See In re Lyondell Chem. Co.*, 543 B.R. 400, 409 (Bankr. S.D.N.Y. 2016) ("Courts have consistently applied the *Pioneer* test in this Circuit." (collecting cases)).

7

17.     Critically, the *Pioneer* factors are not afforded equal weight.  The third factor—the reason for the creditor's delay—is "the predominant factor."  *Lyondell*, 543 B.R. at 409 (Bankr. S.D.N.Y. 2016) (quoting *In re Musicland Holding Corp.*, 356 B.R. 603, 607 (Bankr. S.D.N.Y. 2006)).  "Indeed, the other factors are relevant 'only in close cases.'"  *In re Victory Mem'l Hosp.*, 435 B.R. 1, 5 (Bankr. E.D.N.Y. 2010) (quoting *Williams v. KFC Nat'l Mgmt. Co.,* 391 F.3d 411, 416 (2d Cir. 2004)).  "Notwithstanding increased emphasis on the reason for delay, 'the slightest indication of bad faith, prejudice, or adverse impact on the administration of the case' is a reason to find the neglect inexcusable."  *Id*. at 409 n. 37 (quoting *In re Keene Corp.*, 188 B.R. 903, 908 (Bankr. S.D.N.Y. 1995)).

18.     Here, each of the four *Pioneer* factors weighs against granting Celsius relief from its failure to file a claim by the bar date.

## A.     Celsius Has Not Established and Cannot Establish a Valid Reason for Delay.

19.     Celsius does not offer a valid reason for its failure to timely file a claim.  In its Motion, Celsius provides two entirely baseless justifications for its delay:  (i) that it did not receive notice of the bar date, and (ii) that it was justifiably occupied with its own bankruptcy case such that it could not comply with the Court's bar date in the Debtors' cases.

20.     ***First,*** Celsius unquestionably received adequate notice of the bar date.   In bankruptcy law, there are two categories of creditors:  known and unknown creditors.  Debtors are only required to provide actual notice of the bar date to 'known' creditors.  *In re XO Commc'ns, Inc.*, 301 B.R. 782, 792 (Bankr. S.D.N.Y. 2003).  By contrast, constructive notice suffices if a creditor is 'unknown' to the debtor.  *Id*.  "An 'unknown' creditor is a claimant whose identity or claim is not 'reasonably ascertainable' or is merely 'conceivable, conjectural or speculative.'"  *Id*. at 793 (quoting *In re Thomson McKinnon Sec., Inc., 130 B.R. 717, 720 (Bankr. S.D.N.Y. 1991).

"[A] debtor is not obligated to try to find and serve notice on any individual who could potentially be a creditor." *In re BGI, Inc.*, 476 B.R. 812, 823 (Bankr. S.D.N.Y. 2012). For unknown creditors, notice by publication satisfies a debtor's bar date notice requirement. *Id*. at 820.

21.     In its Motion, Celsius assumes it is a "known" creditor entitled to actual notice of the bar date, which it argues it did not receive. However, in reality, Celsius is an ***unknown*** creditor and was not entitled to anything more than constructive notice of the bar date. As explained, Celsius's purported claim rests on a novel legal theory regarding the ownership of funds placed on Celsius's "Earn" platform by the Debtors and other Celsius customers. Celsius articulated this theory in its own bankruptcy proceedings ***after*** the Debtors filed their chapter 11 cases and their schedules and statements therein. Even at this point, Celsius' claim is nothing more than "conjectural" because it remains subject to adjudication between Celsius and its customers. *In re Chemtura Corp.*, No. 09-11233 (JLG), 2016 WL 11651714, at *12 (Bankr. S.D.N.Y. Nov. 23, 2016) ("An 'unknown' creditor is one whose interests are either conjectural or future[.]" (internal quotations and citations omitted)). Indeed, this is Celsius's very reason for wanting to file a claim in the Debtors' bankruptcy cases: to litigate its theory of ownership over certain assets that the Debtors had placed on Celsius's "Earn" platform. Put simply, there is no way that the Debtors could have foreseen that Celsius would come up with this novel argument and therefore consider itself a creditor here. Celsius is clearly an unknown creditor.

22.     The Debtors published notice of the bar date in the New York Times on August 10, 2022, and the Financial Times on August 11, 2022. *See Proof of Publication in the New York Times* (ECF No. 272) & *Proof of Publication in the Financial Times* (ECF No. 271). As an unknown creditor, Celsius, was on notice of the deadline through Voyager's publication in these

nationally renowned papers.[4]  Celsius's arguments that it did not receive the actual notice of the
bar date are irrelevant because it was not entitled to such notice.

23.      Further, Celsius received actual notice of the bar date even though it was not
technically entitled to it.  The Debtors sent Celsius notice of the bar date to an address provided
by Celsius in both the Wallet Agreement and the Amended Wallet Agreement.  In its Motion,
Celsius argues that that address is "an out of date address for a space that Celsius UK no longer
occupies."  Ferraro Decl. ¶ 7 (ECF No. 729).  But there was no other logical place for the Debtors
to send a notice related to that agreement, and that address was the only address that the Debtors
were legally required to notice.  *See In re Best Prod. Co., Inc.*, 140 B.R. 353, 358 (Bankr. S.D.N.Y.
1992) ("Whereas a debtor must review its own books and records to ascertain the identity of
creditors, a debtor is not required to search elsewhere for those who might have been injured.").

24.      **Second,** Celsius's argument that it can still demonstrate a valid reason for its delay
even if it received adequate notice also fails.  As a matter of law, Celsius's contemporaneous
preoccupation with its own bankruptcy filing is not a compelling reason for delay.  *See Ragguette
v. Premier Wines & Spirits*, 691 F.3d 315, 330 (3d Cir. 2012) ("It is well established that a busy
caseload generally does not constitute a basis for a finding of excusable neglect.").  It is also belied
by the facts here.  In its own bankruptcy case, Celsius filed three motions to extend the deadline

---

[4]     In addition, the Debtors' bankruptcy filing was widely reported.  *See, e.g.*, Crypto Broker
Voyager Digital Files for Bankruptcy Protection, Wall St. J. (July 6, 2022, 7:18 PM),
https://www.wsj.com/articles/crypto-broker-voyager-digital-files-for-bankruptcy-protection-11657098630; Crypto Broker Voyager Digital Files For Chapter 11 Bankruptcy, Forbes (July
6, 2022, 1:12 AM), https://www.forbes.com/sites/ninabambysheva/2022/07/06/crypto-broker-voyager-digital-files-for-chapter-11-bankruptcy/?sh=53a068d13845;  Crypto  brokerage
Voyager Digital files for Chapter 11 bankruptcy protection, CNBC (July 6, 2022, 4:43 AM),
https://www.cnbc.com/2022/07/06/crypto-firm-voyager-digital-files-for-chapter-11-bankruptcy-protection.html.

to file its schedules and statements, the first of which was filed on July 14, 2022,[5] and the last of

which was filed on September 16, 2022.[6]   While the Court apparently never ruled on that motion,[7]

Celsius ultimately filed its schedules and statements in its own bankruptcy case on October 5,

2022, a mere two days after the Debtors' bar date.   Thus, the record reflects that Celsius was

working on compiling its schedules and statements for at least more than two months prior to the

Debtors' bar date.   Celsius would necessarily have identified Voyager as a potential creditor well

in advance of the Debtors' bar date.   Interestingly, while Celsius argues that its focus on its own

bankruptcy caused it to miss the bar date in the Debtors' proceedings, it is actually Celsius's very

preparation of schedules and statements in its own bankruptcy that should have highlighted its

potential claim against Voyager and put it on notice that it should file a claim in the Debtors'

proceedings.   This argument also fails.

25.     Finally, Celsius's argument that preference claims are generally identified by

debtors later in chapter 11 cases does not justify Celsius's delay here.   The Debtors' chapter 11

cases are the first US-based bankruptcy proceedings for a cryptocurrency brokerage, a relatively

nascent industry that includes Celsius.   It is implausible that Celsius was not actively aware of the

Debtors' bankruptcy, and Celsius makes no such assertion.   Further, Celsius and the Debtors had

been in business together since at least June of 2020.   *See* Wallet Agr't (**Ex. A**).   Celsius would

necessarily have known that the Debtors—either presently or historically—had placed significant

---

[5] *See Motion Seeking Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs, (II) Extending Time to File Rule 2015.3 Financial Reports and (III) Granting Related Relief* (Celsius ECF No. 8).

[6] *See Motion Seeking Entry of an Order Granting a Third Extension of Time to File Schedules and Statements of Financial Affairs* (Celsius ECF No. 833).

[7] *See Notice of Withdrawal of Debtors' Motion Seeking Entry of an Order Granting a Third Extension of Time to File Schedules And Statements of Financial Affairs* (Celsius ECF No. 1064).

cryptocurrency deposits onto Celsius's platform. Thus, upon learning of the Debtors' bankruptcy, which made national and international news, Celsius should reasonably have known that it might have claims to assert in the Debtors' chapter 11 proceedings, whether preference-based or otherwise. In fact, Celsius first raised questions regarding the ownership of assets on its platforms "[o]n the first day of [Celsius's] chapter 11 cases," *months before the Debtors' bar date*. *See Debtors' Amended Motion for Entry of an Order (I) Establishing Ownership of Assets in the Debtors' Earn Program, (II) Permitting the Sale of Stablecoin in the Ordinary Course and (III) Granting Related Relief* at 2 (Celsius ECF No. 1325). Thus it is implausible that Celsius would not have been aware that the Debtors' bankruptcy likely had significant ramifications for Celsius's own accounts and its position regarding funds on the "Earn" platform, and its failure to timely assert a claim, whether a preference claim or otherwise, is anything but excusable.

26. Celsius does not establish a valid reason for its delay, and the Court should deny the Motion on this basis alone. *See Victory Mem'l Hosp.*, 435 B.R. at 5 (other factors irrelevant where movant has inadequate reason for delay). Celsius received adequate notice of the bar date as an unknown creditor, received actual notice of the bar date even though it was not entitled to the same, and cannot establish excusable neglect based solely on its occupation with its own bankruptcy case, which would have led to the discovery of its claim against the Debtors not distracted it from the same. Even if Celsius did have a valid reason for its delay (it does not), the remaining *Pioneer* factors also counsel in favor of denying Celsius's motion to file a late claim.

### B. The Debtors and Their Creditors Will Be Prejudiced by Celsius's Late Claim.

27. The Debtors and their constituents, namely the unsecured creditors, will be significantly prejudiced by Celsius's late claim. Celsius minimizes the likely impact of its late claim by focusing solely on the potential ramifications of the relief it seeks vis-a-vis other

preference claims filed by creditors of the Debtors who are themselves reorganizing. The ramifications of Celsius's late claim would strike far further, however. If Celsius is allowed to file a late claim based only on its having been too occupied with its own bankruptcy to have noticed the bar date in this case, any other unknown creditor (and there could be many, hence why they are "unknown") could come forward seek to file a late claim on the same or a similar basis. This would undermine the very logic behind the bar date and threaten to upend the Debtors' chapter 11 cases.

28.     For the same reason, Celsius's argument regarding the limited extension of the Debtors' bar date is unavailing. That extension was for known creditors placed on the Debtors' amended schedules and statements, not unknown creditors—like Celsius—with speculative claims that are altogether unknown to the Debtors. *See In re Keene Corp.*, 188 B.R. 903, 913 (Bankr. S.D.N.Y. 1995) ("[A]llowing Fibreboard's claim could adversely affect the administration of the case by possibly opening the floodgates to many similar claims.").

29.     Moreover, the only stated basis for Celsius's claim is a novel legal issue that will require lengthy and time-consuming litigation at the expense of the resources of the Debtors' estates. Allowing Celsius to file a late claim to permit it to potentially pursue untested claims would significantly prejudice Debtors and their constituencies.

30.     Finally, the size of Celsius's claim—$7.7 million—is material and risks appreciably decreasing the recovery for unsecured creditors. *See Black v. Diamond*, 163 Fed. App'x 58, 60-61 (2d Cir. 2006) (holding that the impact on other constituents by allowing an untimely claim to collect from a "discrete fund" is a relevant consideration under *Pioneer*). This is particularly so where Celsius's claim will almost certainly fall into Class 4A OpCo General Unsecured Claims, which has a limited claim pool of $14 million. Allowing Celsius to file its late

13

claim would expand the current Class 4A claim pool by more than 50%, with Celsius's claim
ultimately representing approximately 35% of the entire class of claims.  Celsius's attempt to
deflect the size of its potential claim by reference to the Debtors' entire claim pool is misleading.
*See In re Tronox Inc.*, 626 B.R. 688, 725 (Bankr. S.D.N.Y. 2021) (holding that if the late claims
"would have a large impact on the recoveries of other creditors, then permitting the late-
filed claims would be a form of prejudice that weighs against a finding of excusable neglect."
(internal quotations and citations omitted)).  Celsius's proposed claim is significant and prejudicial
when appropriately viewed in terms of the relative size of claims in Class 4A.[8]

31.     All of these factors prejudice the Debtors and their restructuring constituencies and
require enforcement of the bar date.

### C.     The Late Claim Will Have a Significant Impact on the Administration of the Debtors' Estates in the Form of Significant Administrative Costs.

32.     Allowing Celsius to file its claim late will adversely impact the progression of the
Debtors chapter 11 cases.  As explained above (*supra* ¶ 21), Celsius's claim is entirely speculative
and based solely on novel legal arguments.  As a result, allowing Celsius to file a late claim is not
simply a matter of permitting access to the Debtors' claim pool.  Celsius's claim and the novel
underlying legal issues will require significant litigation from all Celsius customers, including the
Debtors, that had assets on Celsius's "Earn" platform and withdrew those assets during Celsius's
preference period.

33.     Litigation over the ownership of assets placed on Celsius's platforms will
necessarily, and negatively impact creditor distributions.  At the moment, the Court has set March

---

[8] Celsius has also indicated that its purported claim of $7.7 million claim may be not be all that it
is seeking.  "Other withdrawals and transfers [by the Debtors] may also be subject to challenge."
Celsius Mot. ¶ 19.

2, 2023 as the date of the Debtors' confirmation hearing. *See* Disclosure Statement Order at 10 (ECF No. 861). Were this Court to grant Celsius relief from the automatic stay, it is unlikely that such litigation could even commence before the Debtors' confirmation hearing, with any resolution as to the ownership issues suspended in the distant future. This means that the Debtors would need to set aside a reserve for amounts potentially due to Celsius following the resolution of litigation between Celsius and the Debtors at some point in the future. **Such a reserve would delay millions of dollars in distributions to the Debtors' creditors by months or even years.**

34. Celsius points only to the fact that the Debtors do not yet have a confirmed plan to support its argument that Celsius's late claim will not adversely impact the Debtors' bankruptcy cases. In so doing, Celsius incorrectly cites *In re Keene*, wherein the Court held that the fact that the debtor's plan had not yet been confirmed was insufficient to overcome the fact that the movant failed to establish excusable neglect. *See Keene*, 188 B.R. at 913 (holding that lack of confirmed plan does not overcome lack of excusable neglect). Likewise, here, the lack of a confirmed plan does nothing to mitigate the prejudice and impact to the Debtors' chapter 11 cases that would result from allowing Celsius to file a speculative, late claim.

**D. Celsius Fails to Establish Its Good Faith in Missing the Bar Date**

35. While the Debtors do not contend that Celsius acted in bad faith, it is Celsius's affirmative duty to establish its good faith. Because Celsius still needs to provide an adequate explanation for its delay, Celsius fails to establish its good faith. And, to be clear, even if Celsius could establish good faith in missing the bar date, that would not be enough to overcome its inability to demonstrate excusable neglect, or otherwise carry its burden to file a late claim. *See In re Lehman Bros.*, 433 B.R. at 121 (holding that although there was no evidence of movants' having acted in bad faith, movants' good faith was insufficient to overcome their inability to demonstrate excusable neglect). As a result, this factor does not favor relief from the bar date. *In re BGI, Inc.*,

476 B.R. 812, 826 (Bankr. S.D.N.Y. 2012) (good faith factor does not support finding of excusable

neglect where movant fails to carry burden to show good faith).

**IV.    Celsius Does Not Carry Its Burden to Show the Stay Should Be Lifted, and the *Sonnax* Factors Favor Continuing the Stay.**

36.    The Court need not, and should not, entertain Celsius's request to lift the stay

because Celsius has failed to establish excusable neglect for missing the bar date.  Absent a timely

claim against the Debtors, Celsius has nothing to litigate and there is no justification for granting

relief from the automatic stay.

37.    But even if this Court somehow determined that Celsius met the excusable neglect

standard (it should not), the Court should still deny Celsius's request to lift the automatic stay to

pursue its novel arguments against the Debtors.  In order to obtain relief from the automatic stay,

Celsius bears the burden of demonstrating "cause" for such relief under Section 362(d)(1) of the

Bankruptcy Code.  *See In re Residential Cap., LLC*, 501 B.R. 624, 643 (Bankr. S.D.N.Y. 2013).

In assessing a request for relief from the automatic stay, courts analyze the following factors from

*In re Sonnax Indus., Inc.* (the "*Sonnax* Factors"):

> (1) whether relief would result in a partial or complete resolution of the issues,
>
> (2) the lack of any connection with or interference with the bankruptcy case,
>
> (3) whether the other proceeding involves the debtor as a fiduciary,
>
> (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action,
>
> (5) whether the debtor's insurer has assumed full responsibility for defending the action,
>
> (6) whether the action primarily involves third parties,
>
> (7) whether litigation in another forum would prejudice the interests of other creditors,

16

(8) whether the judgment claim arising from the other action is subject to equitable subordination,

(9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor,

(10) the interests of judicial economy and the expeditious and economical resolution of litigation,

(11) whether the parties are ready for trial in the other proceeding and

(12) the impact of the stay on the parties and the balance of harms.

907 F.2d 1280, 1286 (2d Cir. 1990).  "Not all of the *Sonnax* Factors are relevant in every case, and 'cause' is a broad and flexible concept that must be determined on a case-by-case basis."  *In re Residential Cap., LLC*, 501 B.R. 624, 643 (Bankr. S.D.N.Y. 2013).

38.     In total, seven *Sonnax* Factors are relevant here,[9] and all weigh in favor of maintaining the stay.

39.     *Balance of the harms*.  There would be significant harm to the Debtors' estates and creditors in the form of significant legal fees and procedural delay if the stay is lifted and Celsius's entirely speculative preference action is allowed to proceed.  *See, e.g.*, *In re Motors Liquidation Co.*, 2010 WL 4630327, at *4, *7 (S.D.N.Y. Nov. 8, 2010) (affirming denial of lift-stay motion and noting that "allowing Appellant to proceed with the ERISA suit would force MLC to expend estate resources to defend that action" and "increased costs associated with litigation in a separate forum would prejudice the Reorganized Debtors").  Any amount that Celsius could potentially recover—to the extent that the same quantifies the harm Celsius might experience by denial of its motion—is likely far less than the amount of its claim.  This is because as an unsecured creditor,

---

[9] Celsius has selectively addressed a limited number of *Sonnax* Factors, and tellingly ignores many that are relevant here.  Celsius also improperly analyzes the few *Sonnax* Factors it does address, all of which support denying Celsius's request to lift the stay.  The other relevant *Sonnax* Factors that go unaddressed by Celsius further support denying the Motion.

Celsius is likely to recover only a fraction of its claim, and an amount that may be subsumed by Celsius's own litigation expense in pursuing its theory regarding assets on the "Earn" platform. Conversely, the Debtors would be significantly harmed by the litigation costs they would incur in defending the action, with the potential that such expenditures exceed any dollar recovery Celsius receives, should Celsius succeed. *See In re General Oil Distributors, Inc.*, 33 B.R. 717 (Bankr. E.D.N.Y. 1983) (denying motion to lift stay where, among other things, "the potential harm to the debtor of greater legal fees and other expenses defending [the action] is a strong countervailing factor").

40. The Court cannot dissociate its analysis of the relative harm to the Debtors from Celsius's concurrent request to extend the bar date. As it stands now, Celsius has **no** litigation claim to commence unless it also is allowed to file a late claim against the Debtors in these chapter 11 cases, which alone would disturb the Debtors' and creditors' reliance on the finality of the bar date, in addition to forcing the Debtors to expend resources litigating the claim. The harm to the Debtors is not thus limited to legal fees expended in defense of Celsius's purported preference claim and supporting legal theories but also those fees and resources expended in addressing Celsius's claim, dealing with an altered claim pool, and potentially defending additional requests to file late claims.

41. *Prejudice to creditors of another forum*. Lifting the stay and allowing the action to proceed in another forum would diminish resources that would otherwise go to other creditors. *See In re Residential Cap., LLC*, 501 B.R. 624, 644 (Bankr. S.D.N.Y. 2013) (holding that allowing litigation to proceed in a different forum would prejudice the interest of other creditors because, among other things, "[a]ny litigation costs would diminish the bankruptcy estate"). The Debtors' attorneys and the attorneys for other constituents would have to file appearances in another forum

18

and potentially research applicable procedural and substantive law governing any proceeding between the Debtors and Celsius outside of these cases.

42.     Celsius attempts to gloss over this concern by repeating the refrain that issues relating to the Debtors' assets on the Celsius platforms will be resolved in Celsius's bankruptcy case before another judge of this Court. *See* Mot. ¶ 31. This is misleading, however, because the Wallet Agreement and Amended Wallet Agreement between the Debtors and Celsius contain a mandatory arbitration clause that requires arbitration of "[a]ny civil action or legal proceeding arising out of or relating to" those agreements. *See* Amended Wallet Agreement § 4 (Ex. B) (requiring arbitration under New York law and the rules of the American Arbitration Association). As a result, Celsius's assertion that the Debtors' assets on the "Earn" platform are assets of Celsius's estate must be litigated in arbitration prior to the resolution of Celsius's preference claim. *Id.*; *see also Collins & Aikman Prod. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 19 (2d Cir. 1995) (explaining that arbitration clauses must be broadly construed in light of federal policy).

43.     *Judicial economy*. Judicial economy is not served here, where the Debtors and Celsius face a circuitous procedural path to resolve the many overlapping issues between them. First, Celsius and the Debtors would need to participate in a private arbitration over the ownership of the Debtors' digital assets on Celsius's platform. Once complete, a judge of this Court would need to invest time to understand the arbitrated claims to determine whether Celsius can meet all of the elements of a preference under Section 547 of the Bankruptcy Code and whether the Debtors possess defenses under that section. From there, potentially yet another judge of this Court would need to adjudicate any objections to the claim the Debtors filed in Celsius's bankruptcy cases and the impact of all prior rulings on that claim. This is the opposite of economical and would

significantly tax judicial resources. *See In re Lehman Bros. Holdings Inc.*, 594 B.R. 33, 53 (Bankr. S.D.N.Y. 2018) (holding that judicial economy is not served by litigation across multiple forums).

44.    *Readiness for trial*.  This factor weighs against lifting the stay first and foremost because Celsius needed to, but did not, timely file a claim.  Courts have denied lifting the automatic stay for litigation that was significantly further along than Celsius's unfiled claim here, including where actions had already been briefed and pending before the stay came into effect. *See, e.g.*, *Motors Liquidation*, 2010 WL 4630327, at *4 ("the dispositive motions filed in the ERISA suit were pending for over a year before the automatic stay came into effect."); *In re SquareTwo Fin. Servs. Corp.*, 2017 WL 4012818, at *2 (Bankr. S.D.N.Y. Sept. 11, 2017) (appeal pending when debtors filed for bankruptcy).  Here, Celsius admits that any litigation relating to the ownership of the Debtors' assets on Celsius's "Earn" platform has not been initiated; in fact, its claim leaves open the possibility that it would seek to pursue additional amounts that have not been identified to date.  *See* Mot. ¶ 19 ("Other withdrawals and transfers [by the Debtors] may also be subject to challenge.").  Put simply, both parties would be starting from scratch in any litigation that Celsius were to bring.

45.    *Lack of connection with or interference with Voyager's bankruptcy cases*.  Here, there is a clear connection to and interference with the Debtors' chapter 11 cases should the stay be lifted.  The Debtors would need to divert time and resources from the chapter 11 cases to engage in a wholly new proceeding in arbitration and potentially further litigate Celsius's preference claim in yet another forum.  The substance of Celsius's claim also relates directly to the Debtors' assets and, if Celsius prevails, would diminish the pool of assets from which creditors may recover— clearly impacting the Debtors' cases. *Cf. In re Robles*, No. 22-10828 (MG), 2022 WL 3384638, at *5 (Bankr. S.D.N.Y. Aug. 16, 2022) (no interference with bankruptcy case where debtor had no

interest in property at issue in litigation).  At the very least, the Debtors would have to hold aside a large reserve pending the outcome of some future litigation between the parties, thereby significantly reducing distributions to other creditors.

46.     *Involvement of third parties*.  This factor does not support lifting the stay.  This factor does not favor lifting the stay the debtor has a direct interest in the underlying dispute, and only favors stay relief where the debtor simply possesses "goods or proceeds" related to the dispute without a substantive interest therein.  *Musso v. Hirsch*, 2011 WL 4543225, at *12 (E.D.N.Y. Sept. 29, 2011) (internal quotations omitted).  Here, the action is against the Debtors and directly impacts the Debtors' chapter 11 cases and recoveries to other creditors, as explained previously.

47.     *Debtor as fiduciary*.  This factor weighs against lifting the stay.  Voyager was a customer of Celsius and did not owe them a fiduciary duty.  *Cf. In re Robles*, 2022 WL 3384638, at *5 (factor favors lifting stay where debtor is a fiduciary).

48.     In total, seven *Sonnax* Factors weigh against lifting the stay, and none justify the relief Celsius seeks.  Celsius's request for relief from the automatic stay should be denied.

## Conclusion

49.     For the reasons set forth herein, the Debtors respectfully request that the Court enter an order denying the Motion.

*[Remainder of page intentionally left blank.]*

**PAUL HASTINGS LLP**

Dated: January 17, 2023
    New York, New York

/s/ Jonathan D. Canfield
Jonathan D. Canfield
200 Park Avenue
New York, New York 10166
Telephone:  (212) 318-6000
Email: joncanfield@paulhastings.com

-and-

Matthew M. Murphy (*pro hac vice* admission pending)
Michael C. Whalen (*pro hac vice* admission pending)
71 South Wacker Drive, Suite 4500
Chicago, Illinois 60606
Telephone:  (312) 499-6000
Email:  mattmurphy@paulhastings.com
        michaelcwhalen@paulhastings.com

*Proposed Special Regulatory and Conflicts Counsel*

## Exhibit G

Jonathan D. Canfield
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000

Matthew M. Murphy
Michael C. Whalen
PAUL HASTINGS LLP
71 S. Wacker Drive
Forty-Fifth Floor
Chicago, Illinois 60606
Telephone: (312) 499-6000

*Proposed Special Regulatory and Conflicts Counsel*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DECLARATION OF MICHAEL C. WHALEN IN SUPPORT OF
DEBTORS' OBJECTION TO MOTION OF CELSIUS NETWORK LLC FOR ORDER (I)
LIFTING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. 362(D)(1) AND
BANKRUPTCY RULE 4001 AND (II) GRANTING LEAVE TO FILE LATE PROOF OF
CLAIM PURSUANT TO BANKRUPTCY RULES 3003(C) AND 9006(B)(1)**

I, Michael C. Whalen, hereby declare pursuant to section 1746 of title 28 of the United

States Code:

1.      I am an associate attorney at Paul Hastings LLP.  I am attorney in good standing of

the bar in the State of Illinois and the bars of the United States District Courts of the Northern

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

District of Illinois and Eastern District of Michigan as well as the United States Courts of Appeals

for the 6th and 7th Circuits.  My application for admission to practice *pro hac vice* before this

Court is being filed simultaneous herewith.

2.    I submit this declaration (the "Declaration")[2] in support of the Debtors' objection

(the "Objection") to the Motion of Celsius Network LLC for Order (I) Lifting the Automatic Stay

Pursuant to 11 U.S.C. 362(d)(1) and Bankruptcy Rule 4001 and (II) Granting Leave to File Late

Proof of Claim Pursuant to Bankruptcy Rules 3003(c) and 9006(b)(1) (the "Motion").

3.    Attached as Exhibit A hereto is a true and correct copy of the Omnibus Wallet

Service Agreement among Celsius Network Limited and Voyager, dated June 12, 2020, and which

is referred to in the Objection as the Wallet Agreement.

4.    Attached as Exhibit B hereto is a true and correct copy of the Assignment and

Amendment to the Omnibus Wallet Service Agreement, dated August 19, 2021, and which is

referred to in the Objection as the Amended Wallet Agreement.


Dated: January 17, 2023
       Chicago, Illinois

                                        /s/ Michael C. Whalen
                                        Michael C. Whalen

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Objection.

# EXHIBIT  A

DocuSign Envelope ID: 3229DDDB-64BD-44E5-BE15-D3B1F5339079

**OMNIBUS WALLET SERVICE AGREEMENT**

**THIS OMNIBUS WALLET SERVICE AGREEMENT** (this "**Agreement**") dated as of 6/12/2020], 2020 (the "**Effective Date**"), is entered into by and between **CELSIUS NETWORK LIMITED**, registered number **11-98-050**, with its registered address at 35 Great St Helen's, London, EC3A 6AP, United Kingdom ("**Celsius**"), and _____Voyager_____, with its registered address at _33 Irving Place 3060 New York, NY 10003_ ("**Partner**").

**WHEREAS,** Celsius owns and operates a proprietary platform which allows Partner's **Users** (as defined below) to gain rewards on the cryptocurrencies in their Wallets (as defined below), or borrow cryptocurrency from Celsius (the "**Services**"), all in accordance with the Terms of Service; and

**WHEREAS**, Partner is the owner and operator of a secure digital online platform (the "**Platform**") available on the domain: _investvoyager.com_ (the "**Domain**"), which allows _Voyager_ Users to open and manage _cryptocurrency brokerage accounts_ which can hold, transfer and exchange certain kinds of cryptocurrency; and

**WHEREAS**, the Partner wishes to obtain and Celsius wishes to grant Partner a limited, revocable, non-exclusive, non-transferable, non-assignable right and license to use Celsius' proprietary application program interface (the "**API**") to access the Services and the Partner shall provide Partner's Users (as defined below) with the ability to gain rewards on the cryptocurrencies in their wallet (as defined below) ("**Partner's Services**").

**NOW THEREFORE**, in consideration of the mutual covenants and undertakings hereinafter contained, each of Celsius and Partner (each, a "**Party**" and collectively, the "**Parties**") hereby agree as follows:

**Definitions**

1.1.  "**Partner's Users**" refers to users engaged with the Partner and wish to use the Partner's Services through Partner's Platform, including users referred to the Platform by Partner's affiliates and partners. For the avoidance of doubt, such Partner's Users are not and shall not be deemed as Celsius' users and shall not have any commercial arrangement with Celsius solely based on the terms of this Agreement. "Partner's **Wallet**" refers to secure digital cryptocurrency wallets, hosted on Partner's Platform.

1.2.  "**Terms of Service**" refers to the terms governing the use of the Services, available at https://celsius.network/terms-of-use/. The existing terms are to be adjusted by Celsius at its own discretion.

2.  **Licence**

    During the period commencing on the Effective Date and for the remainder of the Term (as defined in 5.1 below), and subject to Partner's compliance with the terms and conditions of this Agreement, Celsius agrees to grant Partner a non-exclusive, non-transferable, non-sublicensable, limited, revocable license to use the API to access the Services.

3.  **Referral Awards**

3.1.  Partner shall be entitled to receive referral awards ("**Referral Awards**") equal to 10% of the rewards generated (also known as a 50/50 revenue split with Celsius) of the average quarterly cryptocurrency amount held by Celsius as result of the Partner depositing cryptocurrency in its Wallet with Celsius (the "**Deposit**"). For this purpose, a cryptocurrency amount shall be calculated as part of the average only in case it was held by Celsius for a period longer than seven (7) days.

3.2.  The Referral Awards, with respect to each coin type, is calculated quarterly and distributed to the Partner by Celsius , either (i) in the same currency type provided ; or (ii) in the form of CEL Tokens at an increased rewards rate (non-US companies only)IM, per the Partner's election, in the first week of each calendar quarter, with respect to the previous quarter's activity, provided such Referral Awards, in the aggregate, are equal to no less than $2,000 USD (calculated on the first business day of each

calendar quarter) (the "**Minimum Referral Awards**"). If the Referral Awards are equal to or less than the Minimum Referral Awards, such amounts shall be accrued and deferred until such month in which the Awards are equal to or exceed the Minimum Referral Awards. Once the Minimum Referral Awards are met, the payout will occur at the end of the next quarterly pay period.

3.3.    Following the Effective Date, Celsius shall in accordance with 3.2 above, provide to Partner a statement giving particulars of the transactions completed (if any) by the Partner during the preceding quarter, the amount of the Referral Awards payable to Partner and the calculation or evidence supporting the calculation of such Referral Awards (including a copy of the invoice for the payment of its own fees). If any dispute arises as to the amount of Referral Awards payable by the Celsius to Partner, the same shall be referred to Partner's auditors for settlement and their decision, save in the case of manifest error, shall be final and binding on both Parties.

3.4.    Transaction costs related to the payment of Referral Awards shall be borne by Partner, i.e. the amounts actually received by it shall consist of the full amount calculated under Section 3.1 above, minus transaction fees on the blockchain. Celsius shall provide Partner with a breakdown showing any transaction fees incurred by Partner.

3.5.    Partner will pay all sales, use, withholding and other taxes, duties, or fees imposed by any applicable laws and regulations as a result of the Referral Awards it receives under this Agreement.

**Responsibilities of the Parties**

4.    Each Party shall maintain records and books of accounts in accordance with International Financial Reporting Standards.

4.1.    Partner acknowledges that Celsius will have no direct interaction with Partner's Users, and as such Celsius accepts no liability whatsoever with respect to any Partner's User, other than where such liability is as a result of fraud, willful misconduct or gross negligence of Celsius or its affiliates, resellers, employees or agents.

4.2.    Partner will comply with any Celsius policies or rules relating to marketing of the Services which Celsius may adopt and inform Partner in writing reasonable time in advance during the Term. Additionally, Partner agrees to the following:

4.2.1.    Customer facing product screens must include 'powered by Celsius' branding.

4.2.2.    All use of Celsius' logo and name must be in accordance with Celsius' brand kit.

4.2.3.    All press, including any blog posts or affiliated content must be pre-approved by the Celsius marketing team.

4.3.    In the event the Partner does not launch the product in ninety (90) days from Effective date, Celsius may terminate the agreement at their discretion subject to section 4.6.

4.4.    Partner will be fully and sole responsible for performing (or having a third party perform on behalf of the Partner) any and all necessary "know-your-customer", anti-money laundering and/or any other compliance checks Partner reasonably requires, regarding Partner's Users, including verification of any incoming documentation regarding Partner's Users and their respective source of funds. The Partner acknowledges that Celsius will be relying on the successful completion of all compliance checks to be done in accordance with the Partner's KYC/AML policy to be approved by Celsius as part of the opening of the Partner's omnibus account with Celsius, while the KYC/AML policy may be revisited by Celsius from time to time, based on its sole discretion upon any amendments thereto.

4.5.    The Parties agree that in the event that the Partner's Users are deemed or claimed to be deemed Celsius' users by any competent authority, the Partner undertakes to provide Celsius with the respected Partner's Users' documentation and information upon request.

4.6.    Each Party will comply with all applicable laws and regulations in performing under this Agreement, including, without limitation, relating to "know-your-customer", anti-money laundering, anti-bribery

and corruption, sanctions, and will acquire and maintain any required licenses thereof. Partner will not refer to the Partner's Services any Partner's User that involves high risk of money laundering, terror financing or otherwise involvement in any illegal activities. Partner shall ensure no Partner's User is subject to any sanctions regime or is listed on any 'black list' of any government or international body, or in any way engages in any adult, obscene, pornographic, defamatory, libelous, infringing, abusive, or illegal activity, or any activity that promotes hate or discrimination, facilitates the sale of firearms or illegal drugs, or that participates or encourages participation in, illegal activities. Partner shall provide Celsius with any and all documents, policies, procedures, etc. as Celsius may require, demonstrating Partner's ongoing compliance with the aforementioned.

4.7. Each Party represents and warrants that neither it nor any of its affiliates or officers, directors, brokers or agents (i) has violated any applicable anti-terrorism laws, (ii) is publicly identified on the most current list of "Specially Designated Nationals and Blocked Persons" published by the Office of Foreign Assets Control of the U.S. Department of the Treasury ("**OFAC**") or resides, is organized or chartered, or has a place of business in a country or territory subject to OFAC sanctions or embargo programs, (iii) conducts any business or engages in making or receiving any contribution of goods, services or money to or for the benefit of any person described in clauses (ii) above, (iv) deals in, or otherwise engages in any transaction related to, any property or interests in property blocked pursuant to any anti-terrorism law, or (v) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any anti-terrorism law. To the extent Partner or any of its affiliates or officers, directors, brokers or agents violates (i) through (vii) or becomes aware of any Partner's User having violated or potentially violated (i) through (vii), Partner will immediately notify Celsius in writing as soon as it becomes aware of such violations. Each Party reserves the right to research and investigate the other Party and its activities and, at their own discretion, determine whether or not any of the aforementioned practices are being employed. Without limiting any other remedy available to Celsius hereunder or pursuant to any applicable law, either Party may immediately terminate this Agreement at any time for any violation by the other Party of the foregoing representations, warranties and covenants and all Referral Awards will be cancelled and forfeited.

4.8. Partner acknowledges that Celsius reserves the right to update the API infrastructure for security and scalability purposes and the Partner consents to updates without prior notice.

## 5.   **Term and Termination**

5.1. This Agreement will continue for one (1) year (the "**Initial Term**") and may be renewed subject to the mutual agreement of both Parties (the "**Term**"), which may contain new terms and conditions.

5.2. Either Party may terminate this Agreement for convenience at any time, upon thirty (30) days' prior written notice to the other Party.

5.3. Each Party may terminate this Agreement with immediate effect by delivering notice of the termination to the other Party, if the other Party fails to perform, has made or makes any inaccuracy in, or otherwise materially breaches, any of its obligations, covenants, or representations, and the failure, inaccuracy, or breach continues for a period of fifteen (15) days after the injured Party delivers notice to the breaching Party reasonably detailing the breach.

5.4. If either Party becomes insolvent, bankrupt, or enters receivership, dissolution, or liquidation, the other Party may terminate this Agreement with immediate effect.

5.5. Subject to clause 5.6 below, on termination or expiration of this Agreement, each Party's rights and obligations under this agreement will cease immediately.

5.6. Sections 6, 7, 8, 9 and 10 will survive termination or expiration of this Agreement for any reason.

5.7. Upon termination of this Agreement, the Parties undertake all to use all reasonable best endeavours to agree upon and set up a migration plan for the Users.

6.  **Intellectual Property Rights**

The Parties acknowledge and agree that neither Party will hold any intellectual property rights in the other Party's products including, but not limited to, copyright and trademark rights. Each Party agrees not to claim any such ownership in the other Party's intellectual property at any time prior to, during, or after termination or expiration of this Agreement.

7.  **Disclaimer Of Warranty.**

CELSIUS OFFERS NO WARRANTY UNDER THIS AGREEMENT AND TO THE EXTENT ALLOWED BY APPLICABLE LAW ALL EXPRESS OR IMPLIED CONDITIONS, REPRESENTATIONS, AND WARRANTIES INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, SATISFACTORY QUALITY, OR ARISING FROM A COURSE OF DEALING, USAGE, OR TRADE PRACTICE, OR WARRANTY OF NON-INFRINGEMENT ARE DISCLAIMED.

8.  **Indemnification**

8.1.  Subject to 8.2 below, Partner will indemnify, defend, and hold harmless Celsius, its affiliates, resellers, employees and agents from and against all liabilities, damages, and costs (including reasonable attorneys' fees) arising out of any claim, demand, suit or proceeding by a third party resulting from (i) Partner's breach of this Agreement, (ii) any act or omission of Partner on anyone on Partner's behalf, or (iii) Partner's breach of applicable law, other than where such liabilities, damages or costs are as a result of fraud, willful misconduct or negligence of Celsius or its affiliates, resellers, employees or agents.

8.2.  In the event of breach of contractual obligations by one Party, its affiliates, resellers, employees and agents, the Party shall only be liable towards the other Party for typically foreseeable and occurring damages within this Agreement.

8.3.  Neither Party shall under any circumstances whatever to be liable to the other, whether in contract, tort (including negligence), breach of statutory duty, or otherwise, for (i) any loss of profit, sales, revenue, or business, (ii) loss of anticipated savings, (iii) loss of or damage to goodwill, (iv) loss of agreements or contracts, (v) loss of use or corruption of software, data or information, (vi) any loss that is an indirect or secondary consequences of any act or omission of the Party in question.

9.  **Confidential Information**

9.1.  "**Confidential Information**" shall mean any and all information disclosed by one Party ("**Disclosing Party**") to the other ("**Receiving Party**") regarding past, present, or future marketing and business plans, customer lists, lists of prospective customers, technical, financial or other proprietary or confidential information of the Disclosing Party, formulae, concepts, discoveries, data, designs, ideas, inventions, methods, models, research plans, procedures, designs, formulations, processes, specifications and techniques, prototypes, samples, analyses, computer programs, trade secrets, data, methodologies, techniques, non-published patent applications (together with its attached documents and that such application has been submitted) and any other data or information, as well as improvements and know-how related thereto. Confidential Information includes all tangible materials which contain the information described above, including without limitation, written or printed documents and electronic media. Confidential Information does not include information which as shown by written records, (i) is or becomes generally known or available through no act or failure to act by the Receiving Party; (ii) is already known by the Receiving Party without breaching any confidentiality obligation; (iii) is rightfully furnished to the Receiving Party by a third party without restriction or disclosure; (iv) is independently developed by the Receiving Party without reference to Confidential Information of the Disclosing Party; (v) is released pursuant to a binding order of a government agency or a court so long as prior to any such release the Receiving Party provides the Disclosing Party with a notice so that the Disclosing Party may seek a protective order or other appropriate remedy. In any such event described in clause (v) above, the Receiving Party will

4

disclose only such Confidential Information as is legally required and will exercise reasonable efforts to obtain confidential treatment for any Confidential Information being disclosed. Any disclosure pursuant to the provisions of clause (v) above shall not permit the Receiving Party to issue any press release or otherwise discuss or further disseminate the information required to be disclosed.

9.2. The Receiving Party understands that the Disclosing Party has disclosed or may disclose Confidential Information during the Term of this Agreement or in connection thereto. The Receiving Party agrees: (i) to take commercially reasonable precautions to protect such Confidential Information; (ii) not to use (except as expressly permitted herein) or divulge to any third party any such Confidential Information; (iii) protect and safeguard the Confidential Information against any unauthorized use, disclosure, transfer or publication with at least the same degree of care as it uses for its own confidential or proprietary information, but in no event with less than reasonable care; (iv) to take appropriate measures with all persons acting on its behalf to ensure that such persons are bound by a like covenant of confidentiality, and informing such persons that such Confidential Information shall not be disclosed except as provided herein; and (v) notify Disclosing Party upon discovery of any unauthorized use or disclosure of the Confidential Information and take reasonable steps to regain possession of the Confidential Information and prevent further unauthorized actions or other breach of this Agreement. Whenever requested by the Disclosing Party or upon the expiration or termination of this Agreement, each Party will immediately either return to the other or, at Disclosing Party's request, destroy all manifestations of Disclosing Party's Confidential Information.

## 10.  **Modification**

10.1. Celsius reserves the right, in its sole discretion, to modify any of the terms and conditions contained in this Agreement or any related document upon notice to Partner. If a material modification is unacceptable to Partner, Partner's sole and exclusive recourse will be to terminate this Agreement within seven (7) days following receipt of such notice. Partner's continued performance of any duties under this Agreement beyond the seven (7) days following Company' change notice will be deemed Partner's binding acceptance of the change.

10.2. Without derogating from the generality of Section 10.1 above, Celsius may, at its sole discretion and with no prior notice, cease or suspend the provision of the Services.

## 11.  **Miscellaneous**

11.1. Either Party may enforce any provision of this Agreement by obtaining equitable relief in addition to all other remedies at law or under this Agreement. The non-breaching Party's remedies at law for a breach of any provision of this Agreement may be inadequate and such Party may suffer irreparable harm from any such breach. The rights and remedies of the non-breaching Party under this Agreement are cumulative and not alternative and are in addition to any other right or remedy set forth in any other agreement between the Parties, or which may now or subsequently exist at law or in equity, by statute or otherwise.

11.2. All notices or other communications hereunder shall be in writing and given in person, by registered mail, by an overnight courier service which obtains a receipt to evidence delivery, or by facsimile or email transmission with written confirmation of receipt, addressed to the address set forth in the preamble to this Agreement or to such other address as any Party hereto may designate to the other in accordance with the aforesaid procedure. All notices and other communications delivered in person or by courier service shall be deemed to have been given upon delivery, those given by facsimile or email transmission shall be deemed given on the business day following transmission, and those sent by registered mail shall be deemed given three calendar days after posting.

11.3. Each Party to this Agreement will be excused for delays in performing or from its failure to perform hereunder (other than payment delays) to the extent that the delays or failures result from causes beyond the reasonable control of such Party; provided that, in order to be excused from delay or failure to perform, such Party must act diligently to remedy the cause of the delay or failure.

11.4. Except as provided herein, neither Party may assign or otherwise transfer any of its rights under this Agreement, or delegate any of its obligations or duties under this Agreement, without the other Party's express prior written consent. Notwithstanding anything to the contrary having provided the other party with at least 60 days' notice, either Party may assign this Agreement (i) to any affiliate of that Party (each, an "**Affiliate**") or (ii) to any third party in connection with the sale of all or substantially all of that Party's business or assets, whether by merger, sale of assets, sale of stock, or otherwise without the other Party's prior consent. Subject to the foregoing, this Agreement will be binding upon each Party and its successors and permitted assigns.

11.5. This Agreement shall be interpreted, construed and enforced in accordance with the laws of England and Wales without regard to principles of conflict of laws. Any civil action or legal proceeding arising out of or relating to this Agreement will be brought under the Rules of Arbitration of the International Chamber of Commerce by one arbitrator appointed in accordance with the said Rules. The arbitration shall be held in the English language and the place of arbitration shall be London, England. The arbitrator's decision will be final and binding upon the Parties. All arbitration costs and expenses, including the arbitrator's fees, will be borne equally by the Parties, unless otherwise awarded by the arbitrator in his discretion. Each Party hereby waives any forum non convenience claim in connection with said arbitration or any similar objection or any claims against the enforcement of the arbitrator's ruling in any applicable jurisdiction. If a court of competent jurisdiction should find any part of this Agreement invalid, that provision will be omitted and the remainder of this Agreement remains in effect and be construed so as to best effectuate the original intent and purpose of this Agreement.

11.6. No waiver by either Party of any breach of this Agreement will constitute a waiver of any other breach of the same or other provisions of this Agreement. No waiver by either Party will be effective unless made in writing and signed by an authorized representative of that Party.

11.7. If any provision in this Agreement is invalid or unenforceable in any circumstance, its application in any other circumstances and the remaining provisions of this Agreement will not be affected thereby.

11.8. This Agreement constitutes the entire agreement and understanding of the Parties relating to the subject matter hereof. This Agreement supersedes all prior written and oral agreements and all other communications between Celsius and Partner. Amendments to this Agreement will be effective only if written and signed by Celsius and Partner.

11.9. Each Party shall act only as an independent contractor and not as an employee, agent, servant, or representative of the other. The Parties' relationship will not be construed to be one of employment, joint venture, agency or similar relationship. Neither Party will have, nor will it represent that it has, any power, right or authority to bind the other, or to assume or create any obligation or responsibility, express or implied, on behalf of the other Party or in its name, except as expressly provided otherwise herein. Neither Party shall have any authority to transact business or make any commitments on behalf of the other unless expressly authorized in writing by an officer of such other Party.

11.10. This Agreement may be executed and delivered by the Parties in counterparts (each of which will be considered for all purposes an original) and by facsimile or by e-mail transmission in PDF format, and when a counterpart has been executed and delivered by each of the Parties, by facsimile, e-mail in PDF format or otherwise, all such counterparts and facsimiles will together constitute one agreement.

*[REMAINDER OF PAGE INTENTIONALLY BLANK]*

DocuSign Envelope ID: 2229DDDB-6A5D-441E-BE15-D3B1F5389072

**IN WITNESS WHEREOF**, the Parties have signed this Agreement effective as of the Effective Date:

DocuSign by:

*Camilla Churcher*

A7E625D241DA4DE...

**Celsius Network Limited**

Name:    Camilla Churcher

Title:    Head of Business Development

DocuSign by:

*Ryan Whooley*

5CFBF52B044D42C...

Name:    Ryan Whooley

Title:    Head of Trading & Treasury

*[SIGNATURE PAGE OF SERVICES AGREEMENT]*

7

**Attachment A**

**Third-Party Reliance Terms and Conditions**

These Terms and Conditions are to be read in conjunction with the Service Agreement, which, by its terms, incorporates these by reference or have them printed on the back or attached to them.

1. **Definitions**:

    1.1. In these Terms and Conditions, the following terms shall have the meanings ascribed to them below:

    "**AML**" means anti-money laundering and counter-terrorism financing;

    "**Celsius**" means Celsius Network LTD. (UK), whose address is at 35 Great St. Helen's, London, United Kingdom, EC3A 6AP;

    "**Identifying Information**" means the customer's full name, date of birth, citizenship, address and ID number.

    "**Partner's Users**" means users engaged with the Partner and wish to use the Services through Partner's Platform, including users referred to the Platform by Partner's affiliates and partners. For the avoidance of doubt, such Partner's Users are not and shall not be deemed as Celsius' users and shall not have any commercial arrangement with Celsius solely based on the terms of this Agreement. Partner's Users are customers of Partner who have been approved by Partner following KYC and AML procedures for use of the Partner' services.

    "**Partner**" means _____, whose address is at _____.

    "**KYC**" means Know-your-Customer;

    "**KYC Documents**" are all KYC and AML due diligence documents and information collected by Partner for each Partner's Users, and maintained by Partner, as required under applicable AML laws and/or by any competent authority;

    "**Parties**" means Celsius and Partner;

2. **Terms and Conditions**:

    2.1. Partner hereby agrees and confirms, in relation to each Partner's User that:

        2.1.1. Partner has concluded KYC and AML due diligence measures in relation to this Partner's User, and has obtained and maintained all the information and documents in a manner and form that complies with its AML Policy and applicable law, including but not limited to, the Identifying Information, one form of government-issued photographic identification and proof of verification of the Partner's User's residential address by a document that satisfies Partner's own regulatory requirements.

8

DocuSign Envelope ID: 3329DDDB-64BD-44E5-BE15-F3B1F539907A

2.1.2. Partner confirms that it has in place a system of identifying whether a Partner's User is a politically exposed person ("PEP") or an immediate family member or close associate of a PEP. Partner shall promptly notify Celsius, in writing, when it identifies a Partner's User as a PEP (or being connected to a PEP) and acknowledges that such customers must be deemed to present high risk and subject to additional KYC due diligence documents and requirements.

2.1.3. Partner confirms it checks, on acceptance of a customer and regularly from time to time thereafter, all persons associated with any Partner's User against international sanction lists as issued (and updated) including, but not limited to, by the United Nations Security Council and the United States Office of Foreign Assets Control (a/k/a OFAC"). In case of any Partner's User or related person appearing on a sanction list, Partner shall inform Celsius with immediate effect.

2.1.4. Partner confirms that it has a business relationship with the Partner's User and that it has no knowledge or suspicion that any Partner's User is involved in money laundering, terrorism financing or proliferation financing. If this should change at any time, Partner shall immediately notify Celsius of such knowledge and or suspicions, in writing.

2.1.5. Partner consents to Celsius relying on the performance of Partner's identification and record-keeping measures in relation to each Partner's User.

2.1.6. Immediately upon introducing any Partner's Users, Partner shall provide Celsius with such Partner's User's Identifying Information through the API.

2.1.7. Partner undertakes to maintain the KYC Documents for at least five years after the termination of the Service Agreement or the termination of Partner's relationship with the Partner's User for any reason (whichever is later) or for such longer period as is required pursuant to applicable laws.

2.1.8. Partner undertakes to provide Celsius with all KYC Documents without delay and, in any case, within forty-eight (48) hours of Celsius requesting the same. This undertaking to provide documents on request will extend for a period of five years from the termination of the Service Agreement or the termination of Partner's relationship with the Partner's User for any reason (whichever is later) or for such longer period as is required pursuant to applicable laws.

2.1.9. In the event of the termination of Partner's relationship with Celsius as established pursuant to the Service Agreement, Partner undertakes to provide to Celsius all the KYC Documents maintained by Partner in respect of each Partner's User within seven (7) days of such termination.

2.1.10.  Partner confirms that it is permitted to provide Celsius with the KYC Documents within the timeframes specified in paragraphs 2.1.6 and 2.1.8 above under applicable laws and regulations.

2.2.  Partner represents and warrants to Celsius that:

2.2.1. All information provided by Partner in respect of the Partner's Users at any time, shall be true and accurate, and Celsius will rely on the accuracy of this information in providing its services;

DocuSign Envelope ID: 3329DDB-6A5D-44E5-BE15-E2B15533972

2.2.2. Partner is not bound by any data protection, secrecy or other laws which would restrict or prohibit its ability to provide Celsius with the KYC Documents, the Identifying Information and any other relevant information as provided herein;

2.2.3. Partner has obtained from the Partner's User full consent to provide the KYC Documents, the Identifying Information and any other relevant information to Celsius pursuant to paragraphs 2.1.6 and 2.1.8 above; and

2.2.4. To the extent that Partner uses any third-party service providers for any KYC/AML related purpose, Partner has full authority to require from such third-party providers any and all information and documentation to be provided to Celsius hereunder.

2.3. Partner undertakes to provide Celsius, each year for the duration of Partner's relationship with Celsius, with a letter confirming Partner's representations and warranties herein.

2.4. Partner undertakes to immediately inform Celsius in writing of any change in applicable laws or practices which may prohibit or restrict its ability to provide Celsius with the KYC Documents, the Identifying Information and any other relevant information as provided herein.

2.5. Partner acknowledges that these Terms and Conditions shall be valid in respect of every Partner's User until the lapse of five years from the latter of: (1) the termination of the Service Agreement; or (2) the termination of Partner's relationship with the Partner's User for any reason.

2.6. Partner undertakes to immediately notify Celsius (in writing) of any legal, criminal or regulatory action taken against any Partner's User or against Partner by any professional body or authorized body that regulates, supervises and monitors Partner, whether the license, authorization, approval or membership has been suspended, canceled, revoked or withdrawn or in any other way restricted.

2.7. Partner shall notify Celsius immediately if any evidence of the verification of the identity of a Partner's User in Partner records proves unsatisfactory.

2.8. In the event of the termination of Partner's business relationship with a Partner's User, for whatever reason, Partner shall within seven (7) days:
2.8.1. Provide Celsius with the KYC Documents maintained by Partner in respect of the Partner's User; or
2.8.2. Notify Celsius in writing of the arrangements, satisfactory to Celsius that Partner will put in place to ensure that Celsius will be able to access the KYC Documents of such Partner's User whenever requested.

2.9. Partner shall indemnify Celsius against all actions, claims, costs (including all legal costs), demands, expenses, liabilities and proceedings which may be taken or made or incurred by Celsius directly pursuant to or in connection with its reliance on the representations and warranties contained in these Terms and Conditions.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

IN WITNESS WHEREOF, the Parties have signed these Terms and Conditions effective and thereby incorporated in the Service Agreement on the Service Agreement's effective date:

_____          _____

Celsius Network Limited                   _____

Name:                                     Name:

Title:                                    Title:

# EXHIBIT  B

DocuSign Envelope ID: BB1FCC5C-3954-4E57-A85D-6FDB354E4584

## ASSIGNMENT AND AMENDMENT TO OMNIBUS WALLET SERVICE AGREEMENT

THIS ASSIGNMENT AND AMENDMENT TO OMNIBUS WALLET SERVICE AGREEMENT (this "**Amendment**") dated August 19, 2021 is made by and between Celsius Network Limited ("**Celsius UK**"), Celsius Network LLC ("**Celsius US**"), Celsius EU UAB ("**Celsius EU**") and Voyager Digital LLC, ("**Partner**") (each, a "**Party**" and collectively, the "**Parties**" and Partner and Celsius UK, the "**Original Parties**"). Any capitalized terms used but not defined herein shall have the meanings given to them in the Agreement.

**WHEREAS**, the Original Parties hereto entered into that certain Omnibus Wallet Service Agreement dated as of 06/12/2020 (the "**Agreement**");

**WHEREAS,** in connection with Celsius UK, Celsius US and Celsius EU migrating the provision of certain services from Celsius UK to Celsius US and Celsius EU (the "**Migration**"), Celsius UK wishes to assign to Celsius US and Celsius EU all of its rights, title and interest under the Agreement and Celsius US and Celsius EU wish to assume all of Celsius UK's duties and obligations under the Agreement;

**WHEREAS**, in connection with the Migration, the Parties now desire to amend the Agreement regarding contractual modifications as further set forth herein.

**NOW, THEREFORE**, for and in consideration of the mutual promises, covenants and obligations contained herein, the Parties hereto agree as follows:

1. Assignment and Assumption. Pursuant to Section 11.4 of the Agreement, Celsius UK hereby assigns, grants, conveys and transfers to Celsius US and Celsius EU all of Celsius UK's right, title and interest in and to the Agreement. Celsius US and Celsius EU hereby accept such assignment and assume all of Celsius UK's duties and obligations under the Agreement and agree to pay, perform and discharge, as and when due, all of the obligations of Celsius UK under the Agreement accruing on and after the date hereof. Partner hereby consent to the foregoing assignment and assumption and waive, in this instance, their rights to receive 60 days notice of the foregoing assignment from Celsius UK to its affiliates, Celsius US and Celsius EU.

2. Terms of Use. Partner understands and acknowledges that, in connection with the Migration, the Services will be subject to updated terms of use with Celsius US and Celsius EU, and that Celsius US and Celsius EU may, at any time and in their sole discretion, modify their terms of use as available at their website (http://celsius.network). Celsius US and Celsius EU shall endeavor, but shall not be obligated, to provide Partner advance notice of any updates or changes to Celsius US' and Celsius EU's terms of use.

3. Extension of Term: The Parties agree to extend the Term for an additional period of two (2) years from the date of this Amendment. All provisions of the Agreement that relate to the Term and termination of the Agreement remain in full force and effect.

4. Amendment to Section 11.5: Section 11.5 of the Agreement is hereby amended by deleting the present section in its entirety and substituting the following in lieu thereof:

"This Agreement shall be interpreted, construed and enforced in accordance with the laws of state of New York without regard to principles of conflict of laws. Any civil action or legal proceeding arising out of or relating to this Agreement will be brought under the Rules of the American Arbitration Association by one arbitrator appointed in accordance with the said Rules. The arbitration shall be held in the English language and the place of arbitration shall be Manhattan, New York. The arbitrator's decision will be final and binding upon the Parties. All arbitration costs and expenses, including the arbitrator's fees, will be borne equally by the Parties, unless otherwise awarded by the arbitrator in his discretion. Each Party hereby waives any forum nonconvenience claim in connection with said arbitration or any similar objection or any claims against the enforcement of the arbitrator's ruling in any applicable jurisdiction. If a court of competent jurisdiction should find any part of this Agreement invalid, that provision will be omitted and the remainder of this Agreement remains in effect and be construed so as to best effectuate the original intent and purpose of this Agreement."

This Amendment to the Agreement shall be effective as of the date of this Amendment. Except as hereby modified, the Agreement shall remain in full force and effect.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, each party to this Amendment has caused it to be executed on the date first written above.

**CELSIUS NETWORK LIMITED**

By: 
(Signature)

Name: Roni Cohen Pavon
Title: Chief Revenue Officer
Email: Roni@celsius.network

**CELSIUS NETWORK LLC**

By: 
(Signature)

Name: Roni Cohen Pavon
Title: Chief Revenue Officer
Email: Roni@celsius.network

**CELSIUS EU UAB**

By: 
(Signature)

Name: Roni Cohen Pavon
Title: Chief Revenue Officer
Email: Roni@celsius.network

**Voyager Digital LLC**

By: _Evan Psaropoulos_

(Signature)


Name: Evan Psaropoulos_

Title: CFO

Email: epsaropoulos@investvoyager.com

**In the Matter Of:**

*Re CELSIUS NETWORK LLC, et al.*

*CHRISTOPHER FERRARO*

*November 21, 2022*



Confidential        Christopher Ferraro - November 21, 2022

1

1

2                    UNITED STATES BANKRUPTCY COURT

3                    SOUTHERN DISTRICT OF NEW YORK

4
     In re:                          )
5                                    )  Chapter 11
                                     )
6    CELSIUS NETWORK LLC, et al.     )  Case No. 22-10964
                                     )  (MG)
7                                    )
     _____ )
8

9

10

11

12

13                        CONFIDENTIAL

14      VIDEOCONFERENCE VIDEO-RECORDED DEPOSITION OF

15              CHRISTOPHER JAMES FERRARO

16                 New York, New York

17              Monday, November 21, 2022

18

19

20

21

22

23   Reported Stenographically By:
     PATRICIA A. BIDONDE
24   Registered Professional Reporter
     Realtime Certified Reporter
25   JOB#:  2022-872581

2

1

2

3

4                           November 21, 2022
                            9:09 a.m.
5

6

7          Confidential Videoconference

8   Video-Recorded Deposition of

9   CHRISTOPHER JAMES FERRARO, held at

10   the offices of Kirkland & Ellis LLP,

11   601 Lexington Avenue, New York, New

12   York, before Patricia A. Bidonde,

13   Stenographer, Registered

14   Professional Reporter, Realtime

15   Certified Reporter, Certified

16   eDepoze Court Reporter, Notary

17   Public of the States of New York,

18   New Jersey, and Connecticut.

19

20

21

22

23

24

25

3

1

2               A P P E A R A N C E S

3

4    KIRKLAND & ELLIS LLP

5    Attorneys for Debtors Celsius Network LLC

6          1301 Pennsylvania Avenue, N.W.

7          Washington, D.C. 20004

8    BY:    T.J. MCCARRICK, ESQ.

9          202-389-3136

10         tj.mccarrick@kirkland.com

11

12   BY:    JOSEPH D' ANTONIO, ESQ.

13         202-389-3370

14         joseph.dantonio@kirkland.com

15         (Via Videoconference)

16

17         601 Lexington Avenue

18         New York, New York 10022

19   BY:    ELIZABETH JONES, ESQ.

20         212-390-6935

21         elizabeth.jones@kirkland.com

22

23

24

25

Confidential        Christopher Ferraro - November 21, 2022

```
                                                              4
 1

 2          A P P E A R A N C E S   (CONTINUED)

 3

 4   KIRKLAND & ELLIS LLP

 5   Via Videoconference:

 6          300 North LaSalle

 7          Chicago, Illinois 60654

 8   BY:    GABRIELA ZAMFIR HENSLEY, ESQ.

 9          312-862-4007

10          gabriela.zamfir@kirkland.com

11   BY:    AMILA GOLIC, ESQ.

12          312-862-4488

13          amila.golic@kirkland.com

14   BY:    CHRISTOPHER S. KOENIG, ESQ.

15          312-862-2372

16          chris.koenig@kirkland.com

17   BY:    ROSS KWASTENIET, ESQ.

18          312-862-2069

19          ross.kwasteniet@kirkland.com

20   BY:    DAN LATONA, ESQ.

21          312-862-3445

22          dan.latona@kirkland.com

23

24

25
```

Confidential        Christopher Ferraro - November 21, 2022

```
                                                              5
 1

 2          A P P E A R A N C E S   (CONTINUED)

 3   WHITE & CASE LLP

 4   Attorneys for Official Committee of Unsecured

 5   Creditors

 6          1221 Avenue of the Americas

 7          New York, New York 10020-1095

 8   BY:    KATHRYN SUTHERLAND-SMITH, ESQ.

 9          212-819-8437

10          kathryn.sutherland.smith@whitecase.com

11

12   Via Videoconference:

13          1221 Avenue of the Americas

14          New York, New York 10020-1095

15   BY:    SAMUEL P. HERSHEY, ESQ.

16          212-819-2699

17          sam.hershey@whitecase.com

18   BY:    ANDREA AMULIC, ESQ.

19          212-819-7061

20          andrea.amulic@whitecase.com

21          Southeast Financial Center

22          Miami, Florida 33131-2352

23   BY:    KEITH H. WOFFORD, ESQ.

24          212-819-7595

25          kwofford@whitecase.com
```

6

1

2          A P P E A R A N C E S   (CONTINUED)

3

4   U.S. DEPARTMENT OF JUSTICE

5   Attorneys for Office of the United States

6   Trustee

7          950 Pennsylvania Avenue, NW

8          Washington, D.C. 20530-0001

9   BY:    SHARA CORNELL, ESQ.

10         shara.cornell@usdoj.gov

11  BY:    MARK BRUH, ESQ.

12         mark.bruh@usdoj.gov

13

14  NATIONAL ASSOCIATION OF ATTORNEYS GENERAL

15  Attorneys for Coordinating States

16         1850 M Street NW

17         12th floor.

18         Washington, D.C. 20036

19  BY:    KAREN CORDRY, ESQ.

20         202-326-6000

21         (Via Videoconference)

22

23

24

25

7

1

2       A P P E A R A N C E S   (CONTINUED)

3

4   TEXAS ATTORNEY GENERAL'S OFFICE

5   Office of the Attorney General

6          300 West 15th Street

7          Austin, Texas 78701

8   Via Videoconference:

9   BY:    ABIGAIL R. RYAN, ESQ.

10         abigail.Ryan@oag.texas.gov

11  BY:    LAYLA D. MILLIGAN, ESQ.

12         layla.Milligan@oag.texas.gov

13  BY:    ROMA N. DESAI, ESQ.

14         roma.Desai@oag.texas.gov

15

16

17

18

19

20

21

22

23

24

25

8

1

2       A P P E A R A N C E S   (CONTINUED)

3

4   STATE OF VERMONT DEPARTMENT OF FINANCIAL

5   REGULATION

6        Consumer Services

7        89 Main Street

8        Montpelier, Vermont 05620

9   BY:    JENNIFER ROOD, ESQ.

10        (Via Videoconference)

11

12   FEDERAL TRADE COMMISSION

13        600 Pennsylvania Avenue, NW

14        Washington, D.C. 20580

15   BY:    KATHERINE M. AIZPURU, ESQ.

16        202-326-2222

17        (Via Videoconference)

18

19

20

21

22

23

24

25

9

1

2          A P P E A R A N C E S   (CONTINUED)

3

4    MILBANK LLP

5    Attorneys for Series B Preferred Holders

6          1850 K Street, NW

7          Suite 1100

8          Washington, D.C. 20006

9    BY:    MELANIE WESTOVER YANEZ, ESQ.

10          202-835-7560

11          mwyanez@milbank.com

12   BY:    TRUMAN WHITNEY, ESQ.

13          202-835-7553

14          twhitney@milbank.com

15

16   TOGUT, SEGAL & SEGAL LLP

17   Attorneys for Ad Hoc Group of Custodial

18   Account Holders

19          One Penn Plaza

20          Suite 3335

21          New York, New York 10119

22   BY:    JARED C. BORRIELLO, ESQ.

23          212-201-6571

24          jborriello@teamtogut.com

25          (Via Videoconference)

10

1

2          A P P E A R A N C E S    (CONTINUED)

3

4    VENABLE LLP

5    Attorneys for Igmat Tuganuv

6          1290 Avenue of the Americas

7          20th Floor

8          New York, New York 10104

9    BY:    ARIE PELED, ESQ.

10          212-503-0896

11          apeled@venable.com

12          (Via Videoconference)

13

14    WEIR GREENBLATT PIERCE LLP

15    Attorneys for Matthew Pinto

16          The Widener Building

17          1339 Chestnut Street

18          Suite 500

19          Philadelphia, Pennsylvania 19107

20    BY:    CAROLINE BOJARSKI, ESQ.

21          cbojarski@wgpllp.com

22          (Via Videoconference)

23

24

25

11

1

2          A P P E A R A N C E S   (CONTINUED)

3

4    AKIN GUMP STRAUSS HAUER & FELD LLP

5    Via Videoconference:

6          2300 North Field Street

7          Suite 1800

8          Dallas, Texas 75201-2481

9    BY:    MICHAEL STANLEY, ESQ.

10         214-969-4752

11         mstanley@akingump.com

12

13         One Bryant Park

14         Bank of America Tower

15         New York, New York 10036-6745

16   BY:    MITCHELL P. HURLEY, ESQ.

17         212-872-1011

18         mhurley@akingump.com

19

20

21

22

23

24

25

12

A P P E A R A N C E S   (CONTINUED)

MCCARTER & ENGLISH, LLP

Attorneys for Certain Borrowers

     Worldwide Plaza

     825 Eighth Avenue

     31st Floor

     New York, New York 10019

BY:    DAVID ADLER, ESQ.

     212-609-6847

     dadler@mccarter.com

     (Via Videoconference)

THE GORDON LAW FIRM LLP

Pro se creditor

     57 River Street

     Suite 206

     Wellesley, Massachusetts 02481

BY:    TODD GORDON, ESQ.

     617-261-0100

     tgordon@gordonfirm.com

     (Via Videoconference)

13

1

2          A P P E A R A N C E S   (CONTINUED)

3

4    PRO SE CREDITORS VIA VIDEOCONFERENCE:

5    CAMERON CREWS

6    KULPREET KHANUJA

7    IMMANUEL HERRMANN

8    NICOLE BARSTOW

9    JARNO OBERG

10   JEREMY COHEN HOFFING

11   VICTOR UBIERNA DE LAS HERAS

12   DANIEL FRISHBERG

13

14   THOMAS DIFIORE, UCC Co-Chair

15   MICHAEL MORRIS

16   MIKE G

17

18   ALSO PRESENT:

19   CHRISTIAN BIDONDE, Legal Video Specialist

20

21   Via Videoconference:

22   AYDALINE GARCIA, Zoom Tech

23

24                    - - -

25

14

1

2        IT IS HEREBY STIPULATED AND

3   AGREED, by and between the attorneys

4   for the respective parties, that all

5   objections, except as to the form of

6   the questions, shall be reserved to

7   the time of the trial.

8        IT IS FURTHER STIPULATED AND

9   AGREED that the within examination

10   may be signed and sworn to before

11   any Notary Public with the same

12   force and effect as if signed and

13   sworn to before the court.

14        IT IS FURTHER STIPULATED AND

15   AGREED that the filing of the

16   original transcript of the

17   examination is waived.

18

19

20

21

22

23

24

25

15

```
 1
 2                    - - -
 3          P R O C E E D I N G S
 4                    - - -
 5          THE VIDEOGRAPHER:  We are now
 6   on the record.  The time is
 7   9:09 a.m. on November 21, 2022.
 8   Audio and video recording will
 9   continue to take place until all
10   parties agree to go off the record.
11   Please note that microphones are
12   sensitive and may pick up whispering
13   and private conversations.
14          This is the video-recorded
15   deposition of Christopher Ferraro in
16   the matter of In re Celsius Network,
17   et al.  This deposition is being
18   held at Kirkland & Ellis, New York,
19   New York.
20          My name is Christian Bidonde.
21   I am the legal video specialist.  On
22   behalf of Lexitas.  The certified
23   stenographer is Patricia Bidonde on
24   behalf of Lexitas.
25          Counsel will state their
```

16

```
 1
 2   appearances for the record and all
 3   those parties on Zoom, except for
 4   those speaking, will be noted for
 5   the record.  Then the certified
 6   stenographer will swear in the
 7   witness.
 8        MR. HERSHEY:  Sam Hershey from
 9   White & Case on behalf of the
10   official committee of unsecured
11   creditors.
12        MR. WOFFORD:  You also have
13   Keith Wofford from White & Case on
14   behalf of the official committee.
15        MR. McCARRICK:  T.J.
16   McCarrick, Kirkland & Ellis, on
17   behalf of the debtors.
18        MS. CORNELL:  You have Shara
19   Cornell on behalf of the office of
20   the United States Trustee and Mark
21   Bruh.
22        MR. CREWS:  Cameron Crews, pro
23   se creditor.
24        MR. HERRMANN:  Immanual
25   Herrmann, pro se creditor.
```

Confidential        Christopher Ferraro - November 21, 2022

17

1

2            MR. ADLER:  David Adler from
3        McCarter English on behalf of
4        certain borrowers.  Can everyone
5        hear me?
6            THE VIDEOGRAPHER:  Yes.
7            MR. ADLER:  Thank you.
8            MS. WESTOVER YANEZ:  Melanie
9        Westover Yanez from Milbank for
10        Series B Preferred Holders.
11            MS. SUTHERLAND-SMITH:  Kathryn
12        Sutherland-Smith of White & Case for
13        the Official Committee of Unsecured
14        Creditors.
15            MS. JONES:  Elizabeth Jones of
16        Kirkland & Ellis on behalf of the
17        debtors.
18    C H R I S T O P H E R   F E R R A R O, called
19         as a witness, having been duly sworn by
20         a Notary Public, was examined and
21         testified as follows:
22    EXAMINATION BY
23    MR. HERSHEY:
24        Q.   Okay.  Good morning, Mr. Ferraro.
25    My name is --

18

```
1              C. Ferraro - Confidential

2         A.    Good morning.

3         Q.    Morning.  My name is Sam Hershey.

4    As I said, I'm an attorney at White & Case.  I

5    represent the official committee of unsecured

6    creditors in the Celsius bankruptcy

7    proceeding.

8              I'll be asking you some questions

9    this morning, and I will not be the only party

10   asking questions.  As you're likely aware, we,

11   sort of, divided the deposition off where I'll

12   start and then I'll pass it off, I believe, to

13   the United States Trustee.  And then other

14   parties as well will get to ask you questions.

15             I've been allotted three of the

16   seven hours to ask you questions.  I don't

17   think I'm going to use all that time.  I'd

18   rather have you out there trying to reorganize

19   this company and return value to customers,

20   but I do have some questions for you.

21             And before I start, I'm not in the

22   room with you, so I just want to be sure, is

23   there an attorney with you who will be

24   defending you during this deposition?

25        A.    Yes.
```

Confidential        Christopher Ferraro - November 21, 2022

                                                                    19
1                   C. Ferraro - Confidential

2        Q.     And who is that attorney?

3        A.     T.J., right to the left of me.

4        Q.     T.J. McCarrick?

5        A.     Yes, sir.

6        Q.     Okay.

7               MR. HERSHEY:  Good morning,

8        Mr. McCarrick.

9               MR. McCARRICK:  Good morning,

10       Mr. Hershey.

11       Q.     So before I start, Mr. Ferraro,

12  I'll just ask you a few preliminary questions.

13              MR. McCARRICK:  Actually --

14       Q.     Have you ever --

15              MR. McCARRICK:  Mr. Hershey --

16       Q.     Oh, okay.

17              MR. McCARRICK:  Yeah,

18       Mr. Hershey, just before we start,

19       I'd like to designate the entire

20       transcript confidential under the

21       terms of the protective order.  No

22       information discussed during the

23       deposition can be recorded and/or

24       publicly disclosed, whether orally,

25       on Twitter, by podcast, or other

20

```
 1        C. Ferraro - Confidential
 2    means.
 3         The only individuals,
 4    entities, agencies, et cetera, that
 5    are entitled to participate in this
 6    deposition or have knowledge of its
 7    contents are those who provided
 8    prior notice that they would attend
 9    or participate and who are bound by
10    the terms of the protective order.
11         So if there's anyone present
12    virtually or in person who that's
13    not the case for, they should log
14    off now.  We don't want an issue
15    with folks live-streaming today's
16    deposition, commenting about the
17    testimony, or holding a public
18    discussion about it with anyone who
19    hasn't signed the protective order.
20         We're happy to meet and confer
21    on the back end, I should say, about
22    dedesignating parts of the
23    transcript.  We expect there's going
24    to be plenty that's not
25    confidential, but the only way for
```

Confidential        Christopher Ferraro - November 21, 2022

```
                                                        21
 1              C. Ferraro - Confidential

 2         us to protect our rights in the

 3         first instance is to designate it

 4         all at the outset.

 5              And with that, all you, Sam.

 6              MR. HERSHEY:  Thank you,

 7         Mr. McCarrick.

 8    BY MR. HERSHEY:

 9         Q.    Before I start, Mr. Ferraro, I'm

10    going to ask you a few preliminary questions,

11    the first of which is:  Have you ever been

12    deposed before?

13         A.    No, sir.

14         Q.    Okay.  So I'm just going to go

15    over some ground rules on the assumption that,

16    having never been deposed, you may not be

17    completely familiar with how depositions work.

18              So the first is:  You understand

19    that you're testifying under oath today.

20    Right?

21         A.    Yes, sir.

22         Q.    And that means that by your oath,

23    you're going to tell the full truth today.

24    Right?

25         A.    Yes.
```

Confidential        Christopher Ferraro - November 21, 2022

22

```
 1                    C. Ferraro - Confidential
 2         Q.     Is there any reason why you would
 3    not be able to testify truthfully today?
 4         A.     No.
 5         Q.     Okay.  A few more ground rules.
 6    If you don't understand any of the questions I
 7    ask you, please feel free to ask me to clarify
 8    it.  I won't be offended.
 9              Sometimes in depositions questions
10    are made up on the fly, and it may be that the
11    question I pose to you is not comprehensible.
12              Does that make sense?
13         A.     Yes.
14         Q.     Okay.  And if you don't ask me to
15    clarify a question, I'm going to assume that
16    you understand.  Is that fair?
17         A.     Yes.
18         Q.     Okay.  We can take as many breaks
19    as you want to take during the deposition.  It
20    is not my goal to trap you here.  The only
21    thing I ask is that if there's a question
22    pending -- in other words, if I ask you a
23    question and you haven't answered it -- that
24    you answer that pending question, then we can
25    take a break.  Is that fair?
```

23

```
 1              C. Ferraro - Confidential

 2        A.    Yes.

 3        Q.    Okay.  All of your answers have to

 4   be verbal.  There's a court reporter in the

 5   room, and so if you nod or make some other

 6   nonverbal cue, it won't get picked up by the

 7   transcript.  So please make sure always to say

 8   "yes" or "no" or any other verbal response the

 9   court reporter can record.

10              Does that make sense?

11        A.    Yes.

12        Q.    And then the last thing -- and

13   this is especially important given that I'm

14   questioning you by Zoom -- let's do our best

15   not to talk over each other.  So please make

16   sure to let me answer my question -- I mean,

17   ask my question, and I will make sure to let

18   you answer my question before I start talking.

19              Does that work?

20        A.    Yes.

21        Q.    Okay.  So tell me --

22              MR. McCARRICK:  Mister --

23         Mr. Hershey, just one more thing.  I

24         just wanted to inform you, since

25         you're not in the room, Mr. Ferraro
```

24

```
 1             C. Ferraro - Confidential

 2        has a clean copy of his declaration

 3        in front of him.

 4             MR. HERSHEY:  Perfect.

 5             MR. McCARRICK:  Just wanted to

 6        let you know that.

 7             MR. HERSHEY:  Great.  Thank

 8        you very much.  And soon enough,

 9        I'll be offering that as

10        Exhibit Number 1.  So I appreciate

11        that.

12   BY MR. HERSHEY:

13        Q.   Mr. Ferraro, how did you prepare

14   for this deposition?

15        A.   I prepped with my legal advisors,

16   I read the related motions and declarations on

17   this specific item.

18        Q.   Okay.  So you say you "prepped"

19   with your advisors."  Who are the advisors

20   you're referring to?

21        A.   Kirkland & Ellis, my legal

22   advisors --

23        Q.   And who at Kirkland -- sorry.  I

24   didn't mean to cut you off.  Go ahead.

25        A.   My legal advisors.
```

25

```
1              C. Ferraro - Confidential

2       Q.    Okay.  Who at Kirkland & Ellis?

3       A.    Predominantly T.J.

4       Q.    Anyone else?

5       A.    There was a handful of associates.

6  I don't remember their names off the top of my

7  head.

8       Q.    Okay.  And how many times did you

9  and Mr. McCarrick conduct a prep session for

10 this deposition?

11      A.    We did two, two prep sessions.

12      Q.    And when -- and when were those?

13      A.    One was on Friday, I believe, and

14 the other was Saturday of this week.

15      Q.    And how long was each of those

16 sessions?

17      A.    One hour, I believe, was the first

18 session and about three hours was the second

19 session.

20      Q.    Got it.  Were there any other

21 phone calls or any other prep sessions with

22 Mr. McCarrick besides those two that you

23 mentioned?

24      A.    Not that I recall.

25      Q.    And you said that you reviewed the
```

26

```
 1              C. Ferraro - Confidential
 2    declarations and the motion relevant to this
 3    present dispute.  Is that correct?
 4         A.    Yes.
 5         Q.    Okay.  And so when you say "the
 6    declarations," what documents specifically are
 7    you referring to?
 8         A.    So my declaration, Oren
 9    Blonstein's declaration, the motion to sell
10    stablecoins, and Alex Mashinsky's declaration
11    where the terms of use were listed out.
12         Q.    Got it.  Did you review any other
13    documents in preparation for today's
14    deposition?
15         A.    Not off the top of my head.
16         Q.    Okay.  I want to talk a bit about
17    your background.  Can you describe your
18    educational background for me, starting with
19    he college.
20         A.    Yeah.  I went to the University of
21    Washington in Seattle.  I studied at two
22    different schools:  One, the school of
23    economics, I got a bachelor of arts in
24    economics; and I also got a bachelor of arts
25    in the business school with concentrations in
```

27

```
 1              C. Ferraro - Confidential
 2   accounting and finance.
 3         Q.    Okay.  How about after that?
 4         A.    No.  I went straight into work.
 5         Q.    Got it.  So you had no graduate
 6   degree?
 7         A.    No graduate degree.
 8         Q.    Any professional certification of
 9   any kind?
10         A.    I did pass the certified public
11   accountant's exam back in 1999.
12         Q.    And so are you a CPA?
13         A.    I was but I have not fulfilled my
14   credits because I am not in that field.
15         Q.    Got it.
16         A.    So I am not in good standing, yup.
17         Q.    Okay.  Thank you.  And so you say
18   that after college you went right to work.
19   Where did you go to work after college?
20         A.    I went to work for Arthur Andersen
21   in their audit and insurance practice in
22   Seattle.  I audited not-for-profit healthcare
23   providers.
24         Q.    Okay.  And how about after that?
25         A.    I was there for about two and a
```

28

1              C. Ferraro - Confidential

2    half to three years.  And after that, I went

3    to Bank One in Phoenix, Arizona.

4         Q.    Okay.  You can continue.

5         A.    Yeah, and I was at Bank One, which

6    got acquired by JPMorgan Chase.  And I was

7    there for almost 18 years.

8         Q.    And what was your last position at

9    JPMorgan Chase before you left?

10        A.    Head of financial analysis, which

11   included, effectively, financial planning and

12   analysis for global -- so for the entire firm,

13   as well as I had numerous, kind of, roles

14   within the finance organization and projects,

15   including automation, you know, creating new

16   models, developing -- stress-testing was big

17   at the point in time when I was at JPMorgan.

18   So we were doing a lot of CCAR and capital

19   stress-testing work.

20        Q.    And how long did you hold the

21   position of head of financial analysis at

22   JPMorgan Chase?

23        A.    Five-plus years.

24        Q.    Is that the last job you had

25   before you joined Celsius?

29

```
 1                  C. Ferraro - Confidential

 2          A.    No.  I was at Cerberus Advisory

 3    and -- Advisory Company, yeah.

 4          Q.    How long were you at Cerberus?

 5          A.    Under a year.  Just a little bit

 6    over six months.

 7          Q.    And what was your position there?

 8          A.    Senior managing director.

 9          Q.    And so you left Cerberus then for

10    Celsius.  Is that right?

11          A.    No, no.  Then I -- I own a couple

12    farms in Ecuador.  My wife is Ecuadorian.  We

13    moved there with our children a couple years

14    back.  So I took almost three years off

15    developing my farms in Ecuador.

16          Q.    So you left the world of finance

17    to pursue the life of a farmer.  Is that safe

18    to say?

19          A.    Exactly correct.  Yes, sir.

20          Q.    Okay.  So after that time off, did

21    you then go to Celsius?

22          A.    Yes, I did.

23          Q.    Okay.  And when did you join

24    Celsius?

25          A.    March 21, 2022.
```

30

```
 1                C. Ferraro - Confidential
 2           Q.    And what role did you have when
 3    you joined Celsius?
 4           A.    Head of financial planning and
 5    analysis and head of investor relations.
 6           Q.    And please take me through your
 7    career development during your time at
 8    Celsius.
 9                Are you still in that role or has
10    your role changed?
11                MR. McCARRICK:  Object to
12           form.
13           A.    My role --
14                MR. McCARRICK:  You can
15           answer.
16           A.    Yeah, my role has changed.
17    Shortly before petition, middle of July, I was
18    promoted to the CFO, chief financial officer
19    of Celsius.  And then on, I believe,
20    September 27 of this year, I was appointed as
21    chief restructuring officer and interim chief
22    executive officer, still retaining the chief
23    financial officer title.
24           Q.    What motivated you to join
25    Celsius?
```

31

1                    C. Ferraro - Confidential

2          A.    Well, for one, I wanted the

3    flexibility of having different locations --

4    right? -- my family is in Ecuador.  Celsius

5    provided me with that benefit of being able to

6    work part of the time in Seattle, part of the

7    time in Ecuador.

8               I also found crypto to be quite

9    fascinating.  At that point in time, you know,

10   my farms are in very rural areas of Ecuador

11   where there is zero opp- -- very little

12   opportunity and extreme poverty.

13              And I, you know, drove by many

14   times the banks on Fridays with the lines

15   going all the way down the street.  And

16   something about crypto, I believe, is a great

17   use case for, kind of, banking the unbanked in

18   the long term.

19         Q.    Did you have experience with

20   cryptocurrency before joining Celsius?

21         A.    No, sir.

22         Q.    Now, at the time you joined

23   Celsius in March of 2022, the crypto winter

24   had already started.  Is that safe to say?

25              MR. McCARRICK:  Object to

32

```
 1              C. Ferraro - Confidential

 2        form.

 3              You can answer.

 4        A.    Yeah, there was a downturn at that

 5   point in time.  I'm not sure if it was winter

 6   or not, but there was definitely a severe

 7   downturn in crypto.

 8        Q.    Did -- did that fact at all

 9   influence your decision to join Celsius?

10        A.    No.  I'm not -- I'm not -- being

11   at JPMorgan Chase for almost two decades

12   taught me about risk and how to manage risk,

13   and I'm not af- -- you know, I don't avoid

14   risk; I try to manage risk.  So, no, it didn't

15   scare me.

16        Q.    Well, did it incentivize you?

17   Were you attracted to working for a company at

18   a time when it was going through financial

19   difficulties?

20              MR. McCARRICK:  Object to

21        form.

22              You can answer.

23        A.    I -- the position of the industry

24   and where crypto prices were at that point in

25   time, to me, was not part of my decision.  I
```

33

1              C. Ferraro - Confidential

2    believed in and I still do believe in the

3    long-term potential of crypto.

4              Q.    Okay.   So my colleague Kathryn

5    Sutherland-Smith is in the room with you.   And

6    I'm going to ask her to pass a copy of your

7    declaration to the court reporter.   I know you

8    already have one.

9              MR. HERSHEY:   But I'd like the

10             court reporter to mark it as Ferraro

11             Exhibit Number 1.   And then

12             Ms. Sutherland-Smith can also give

13             copies to anyone else who is there

14             in person.

15             I'll note that, for those

16             joining by Zoom, we are not going to

17             bring this document up on the

18             screen.   The reason for that is it's

19             publicly available on the docket in

20             this case, Docket Number 1326.

21             And so I'd rather not have to

22             deal with the logistical issue of

23             going back and forth to a document

24             on Zoom when everyone who wants to

25             see the document can find it and

34

```
 1              C. Ferraro - Confidential

 2        follow along.

 3              CERTIFIED STENOGRAPHER:  You

 4        have to give me a moment to mark the

 5        exhibit, please.

 6              MR. HERSHEY:  Oh, sure, take

 7        your time.

 8              (Ferraro Exhibit 1,

 9        Declaration of Christopher Ferraro,

10        marked for identification, as of

11        this date.)

12   BY MR. HERSHEY:

13        Q.    Mr. Ferraro, to ask a silly

14   question, you recognize this document, don't

15   you?

16        A.    Yes, sir.

17        Q.    Okay.  Who drafted this document?

18        A.    It was Kirkland & Ellis, my legal

19   advisors.

20        Q.    It was Kirkland & Ellis who

21   drafted your declaration?

22        A.    Yes.

23        Q.    What role did you play in drafting

24   the declaration, if any?

25        A.    I'm the declarant.  So, you know,
```

35

```
 1            C. Ferraro - Confidential
 2    I was -- I was there, kind of, hand in glove
 3    in drafting the declaration.
 4         Q.    What do you mean by that when you
 5    say you were there "hand in glove"?
 6         A.    Well, there are certain aspects in
 7    here that cross over into the business side.
 8    You know, I was able to review and help
 9    narrate some of that, give feedback,
10    et cetera.
11         Q.    But the primary role for drafting
12    the declaration was with Kirkland & Ellis?
13              MR. McCARRICK:  Object to
14         form.
15              You can answer.
16         A.    Yes.
17         Q.    Are there paragraphs that you can
18    identify that you did not review in the
19    declaration?
20         A.    No.
21         Q.    So you reviewed the entire
22    declaration?
23         A.    Yes, sir.
24         Q.    Okay.  Are there paragraphs that
25    you can identify as being written entirely by
```

36

```
 1              C. Ferraro - Confidential
 2    Kirkland & Ellis?
 3         A.    I don't -- I don't recall.
 4         Q.    Okay.  There may be paragraphs
 5    drafted entirely by Kirkland & Ellis, you just
 6    don't recall?
 7              MR. McCARRICK:  Object to
 8         form.
 9              You can answer.
10         A.    Yes.  There may be.
11         Q.    Okay.  Are there any subject
12    matters covered in the declaration that you
13    recall Kirkland & Ellis doing the drafting
14    for?
15         A.    Not specifically.  They were the
16    main -- the key people drafting it.
17         Q.    And was a completed draft
18    presented to you for review before you
19    provided input?
20         A.    A working draft was provided to me
21    when I provided input, yeah.
22         Q.    So in other words, just to be
23    clear, Kirkland & Ellis made a draft of the
24    declaration and then presented it to you for
25    your input?
```

37

1              C. Ferraro - Confidential

2        A.     And then I would comment -- yes.

3        Q.     Let's turn -- actually, I'm going

4   to ask -- just to get the exhibits out of the

5   way, I'm going to ask Ms. Sutherland-Smith to

6   pass the court reporter and to you a copy of

7   the debtors' responses and objections to the

8   written deposition questions posed by the

9   committee, which we marked as Ferraro Exhibit

10  Number 2.

11              MR. HERSHEY:  And I'll take a

12         pause to let the court reporter do

13         that.

14              (Ferraro Exhibit 2, Debtors'

15         responses and objections to the

16         written deposition questions posed

17         by the committee, marked for

18         identification, as of this date.)

19              CERTIFIED STENOGRAPHER:  You

20         can continue, thank you.

21              MR. HERSHEY:  Thank you.

22              Okay.  Just for reference for

23         everyone on Zoom, again, we're not

24         going to pull this up on the screen.

25         But this document is available on

38

```
 1              C. Ferraro - Confidential
 2         the public docket as Docket Number
 3         1406.
 4              And I'll also note that,
 5         unless something unexpected happens,
 6         this is the only -- these two are
 7         the only documents that I intend to
 8         introduce as exhibits during this
 9         deposition today.
10    BY MR. HERSHEY:
11         Q.    Mr. Ferraro, do you recognize this
12    document?
13         A.    Yes, I do.
14         Q.    And what is it?
15         A.    (Reading):
16              "Debtors' responses and
17         objections to the official committee
18         of unsecured creditors' written
19         deposition questions for the debtors
20         in connection with the debtors'
21         amended motion for entry of an order
22         establishing ownership of assets in
23         the debtors' earn program,
24         permitting the sale of stablecoins
25         in the ordinary course, and granting
```

Confidential        Christopher Ferraro - November 21, 2022

                                                                    39

```
 1              C. Ferraro - Confidential
 2         related relief."
 3         Q.    Thank you.  When did you first see
 4    this document?
 5         A.    I cannot remember whether it was
 6    Friday or Saturday, to tell you the truth.
 7    The days are blurry.
 8         Q.    But it was in the course of your
 9    preparation for this deposition?
10         A.    It was in connection with this
11    topic, this legal topic, and, yes, I was --
12    during of which I was prepping for my
13    deposition.  But I wouldn't say I saw this in
14    preparation of my deposition.
15         Q.    Can you explain a little more what
16    you mean.  I found that answer a bit
17    confusing.
18              So it was in connection with this
19    topic but not preparation for your deposition?
20         A.    It was done in the same time.
21    This document was not for my preparation of my
22    deposition.  This document was done
23    separately.  And I was brought into the
24    discussion Friday or Saturday around this
25    document.  It was not part of my deposition
```

40

C. Ferraro - Confidential

1

2  prep, this document.

3        Q.    Okay.  Understood.

4        A.    Yeah.

5        Q.    So when you say you were "brought

6  into the discussion" regarding this document,

7  what discussion are you referring to?

8        A.    There was a --

9              MR. McCARRICK:  Let me just

10       caution you to exclude any

11       communications -- Sam, I'm not quite

12       sure what discussions -- I mean, are

13       you asking for his discussions with

14       counsel about the document?

15             MR. HERSHEY:  I'm not sure,

16       T.J. He referenced a discussion.

17       I'm wondering what he's referring

18       to.

19             MR. McCARRICK:  Okay.  So --

20             THE WITNESS:  Yeah, my counsel

21       from Kirkland & Ellis was there.

22             MR. McCARRICK:  Okay.  So to

23       the extent that you had any

24       discussions with people other than

25       counsel, you should feel free to

41

```
 1            C. Ferraro - Confidential

 2        disclose those.  But don't disclose

 3        any discussions with counsel.

 4        A.    Yeah, the only --

 5   BY MR. HERSHEY:

 6        Q.    Yeah, so I think -- go ahead.

 7   Sorry.

 8        A.    The only discussions that I had on

 9   this document was with counsel.

10        Q.    Understood.  Okay.  Well, I

11   certainly won't ask you to describe the

12   content of those discussions.  But let me ask

13   you:  Was that discussion in the context of

14   answering the questions in the document?

15        A.    Yes.

16        Q.    Okay.  Do you recall which

17   questions specifically you discussed answers

18   to?

19        A.    I don't remember myself

20   specifically discussing answers to any of the

21   questions.  I was actively working on my prep

22   while the meeting was happening.

23        Q.    So I just want to hone in on that.

24   So in other words, let me -- let me take a

25   step back and ask a broader question.
```

Confidential        Christopher Ferraro - November 21, 2022

42

```
 1                  C. Ferraro - Confidential

 2                  Did you contribute to the answers

 3     in this document?

 4          A.    Not in any meaningful way, no,

 5     sir.

 6          Q.    Okay.  And so to be clear, is it

 7     your testimony that, while you were preparing

 8     for your deposition, there happened to be a

 9     conversation about this document taking place

10     in your vicinity?

11          A.    There was a separate meeting.  I

12     was part of that meeting but I was

13     multitasking.  These -- the questions in this

14     document weren't rel- -- in my opinion, at

15     least in my practice or prep sessions, was not

16     relevant to my testimony or my deposition.

17                  So I was, sort of, paying

18     attention to the discussion, but I was not the

19     key player in these -- answering these

20     questions.  Like I said, I did not provide any

21     significant input into these answers.

22          Q.    Nor were you asked to provide

23     input into the answers?

24                  MR. McCARRICK:  Object to

25          form.
```

43

```
 1                 C. Ferraro - Confidential
 2                 You -- calls for privileged
 3          information.  Instruct you not to
 4          answer.
 5          Q.    Your statement that you didn't
 6    view these questions as relevant to your
 7    testimony today, why do you say that?
 8          A.    Well, my testimony is more related
 9    to, at least the way that I was preparing for
10    it and was thinking about it, was more related
11    to, number one, kind of, how we manage the
12    business and how we would deploy coins within
13    the terms of use, as well as, kind of, the
14    cash flow budget and the liquidity needs
15    that's facing the debtors.
16          Q.    Have you reviewed all of the
17    questions in this document?
18          A.    I reviewed -- I reviewed -- I
19    cursory reviewed the document.  And I was part
20    of the discussion of listening, not actively,
21    but as part of the discussion for probably the
22    first ten to 15.
23          Q.    So is the answer then that you
24    have not reviewed all of the questions in this
25    document?
```

44

```
1                    C. Ferraro - Confidential

2          A.    I've read it.  I haven't studied

3    it.

4          Q.    Okay.  But it's your opinion that

5    these questions -- none of these questions is

6    relevant -- let me start over with a clean

7    question.

8                It's your view that none of these

9    questions is relevant to your testimony today?

10               MR. McCARRICK:  Object to

11         form.

12               You can answer.

13         A.    I need to -- let me review the

14   questions real quick, if you could give me a

15   moment.

16         Q.    Well, before you do that, I just

17   want to understand your views coming into the

18   deposition --

19         A.    I do not --

20         Q.    -- yeah, go ahead.

21         A.    I do not -- yeah, I do not

22   remember a -- multiple questions being

23   directly the point of my deposition today.  I

24   think the questions were more around specific

25   terms of use, how people accepted, you know,
```

45

```
 1                C. Ferraro - Confidential

 2    the double-click of the terms in use and some

 3    of those related things.

 4                I do not -- off of memory, I do

 5    not remember anything in here about the cash

 6    flow budget -- right? -- the 13-week or the

 7    professional-eyes-only cash flow budget that

 8    goes through March.  And I also don't remember

 9    anything about, kind of, how we deployed

10    assets in the past.

11         Q.    Okay.  That's helpful.  Thank you.

12                And so just to be clear, what in

13    your opinion, are the topics for which you are

14    being offered today to testify?

15                MR. McCARRICK:  Object to

16         form.

17                You can answer.

18         A.    Yeah, largely around the need for

19    liquidity and, second, any related, kind of,

20    ordinary, prepause ordinary course of how we

21    used Celsius coins to deploy assets.

22         Q.    Anything else?

23         A.    Not off of memory -- not off of

24    the top of my mind, but I'm here to support

25    the process, so ...
```

Confidential        Christopher Ferraro - November 21, 2022

                                                                    46
 1                    C. Ferraro - Confidential

 2          Q.    Okay.  Now, to be clear, though,

 3    your declaration does cover more than just

 4    those two topics.  Right?

 5          A.    Yeah, it probably does.  Again, I

 6    mean, I prepped for this for two days, so I

 7    focused on my areas, and those are the ones

 8    that are most top of mind.  There could be

 9    more stuff that's related to the depositions,

10    of course, yes, in this declaration.

11          Q.    Okay.  Do you know who contributed

12    to answering the questions in this document?

13          A.    There was business folks that were

14    on the discussion as well as legal advisors

15    from Kirkland & Ellis.

16          Q.    Who were the business folks?

17          A.    There was the general counsel, Ron

18    Deutsch.  There was another lawyer, internal

19    lawyer, Joseph Golding.  I'm losing his last

20    name, I apologize.

21          Q.    Okay.  Well, what do you

22    understand his last name to be, sitting here

23    today?

24          A.    I can't remember.  It's Golding,

25    Golding.  Joseph Golding.

47

```
 1              C. Ferraro - Confidential

 2        Q.    Okay.  Anyone else?

 3        A.    I think Oren Blonstein might be on

 4   the -- might have been on there, but I'm

 5   honestly having trouble remembering everybody

 6   who was on the call.

 7        Q.    Okay.

 8        A.    I think Oren was on the call.

 9   Yeah.

10        Q.    Is that all you can recall?

11        A.    That's all I can recall.

12        Q.    Okay.  Let's turn back to

13   Exhibit 1, which is your declaration.

14        A.    Yes.

15        Q.    And let me know.  Then turn to

16   page 11, please.

17              All right.  Do you see --

18              MR. McCARRICK:  Page or --

19        page or paragraph 11, Mr. Hershey?

20              MR. HERSHEY:  Oh, I'm sorry.

21        I'm sorry, paragraph 11.  Thank you.

22        A.    Okay.  Good.  Okay.  Perfect.

23        Q.    Yeah.

24        A.    If you get -- yeah.

25        Q.    All right.  And do you see just
```

48

```
 1              C. Ferraro - Confidential

 2      above paragraph 11 the header that says "The

 3      earn program"?

 4           A.   Yes, sir.

 5           Q.   Okay.  What was the earn program?

 6           A.   The earn program was a program in

 7      which users could put cryptocurrency on the

 8      platform.  And in consideration for putting

 9      the cryptocurrency on the platform, users

10      would earn rewards.  And the rewards were set,

11      kind of, weekly and were different based upon

12      the different types of cryptocurrency.

13           Q.   Before April 15, 2022, did Celsius

14      offer any other program to its customers

15      besides the earn program?

16           A.   We have lending programs.

17           Q.   Okay.

18           A.   I think they referred to it as the

19      borrow program.  That was for retail and

20      institutional.  Before April, I cannot -- I

21      don't remember exactly when we started rolling

22      out the swap program.  It was, sort of,

23      beta-tested early on.  I'm not sure if it was

24      out in April.  It might have been, if not

25      shortly after that.  That's --
```

49

```
 1                   C. Ferraro - Confidential

 2          Q.     What is the swap program?

 3          A.     That's the ability to effectively

 4   swap.  Let's say you own Bitcoin and you want

 5   ETH, you can swap Bitcoin for ETH.  It's

 6   effectively like a trade.

 7          Q.     Got it.  But you're not sure when

 8   that program was rolled out?

 9          A.     It was sometime around April, May.

10          Q.     Was the prime rate program offered

11   by Celsius before April 13, 2022, the earn

12   program?

13                 MR. McCARRICK:  Objection

14          to -- object to form.

15                 You can answer.

16          A.     The earn program was the biggest

17   product offering with the biggest uptake, for

18   sure.

19          Q.     And as of -- if you know, as of

20   April 15, 2022, approximately how many users

21   participated in the earn program?

22          A.     I was prep- -- creating a budget

23   for the company, so I'm going off of numbers

24   that are, kind of -- they should be

25   directionally accurate and in magnitude, but
```

50

1                C. Ferraro - Confidential

2    around, I believe, 600,000 customers-ish were

3    in the earn program.  Some of those --

4         Q.    And do you know -- oh, sorry.  Go

5    ahead.

6         A.    Some of those could have small

7    balances; some of them could have large

8    balances, yeah.

9         Q.    Right.  And do you know how

10   they -- let me start that over.

11            Do you know, as of April 15, 2022,

12   what percentage of the users participating in

13   the earn program were unaccredited investors?

14            MR. McCARRICK:  Object to

15        form.

16            You can answer.

17        A.    I do not know.  Off the top of my

18   head, I do not know.

19        Q.    Okay.  Did Celsius conduct any

20   marketing in connection with the earn program?

21        A.    Any what?  I'm sorry.

22        Q.    Marketing.

23        A.    Marketing.  As I stated earlier, I

24   started March 21.  So my, kind of, knowledge

25   of events that occurred before then are

Confidential        Christopher Ferraro - November 21, 2022

51

```
 1              C. Ferraro - Confidential

 2    limited.  But from -- we had different

 3    versions of marketing that I remember,

 4    referral bonuses, if you brought additional

 5    funds on the platform, you might get a coupon

 6    for, you know, $50 or $100 of some

 7    cryptocurrency.

 8              There was also blog posts and

 9    Twitter channels and YouTube channels and

10    ask-me-anything that occurred weekly, I

11    believe, yeah.  I believe those are

12    predominantly the channels in which they would

13    market.

14        Q.    So it sounds like there was

15    significant marketing conducted by Celsius in

16    connection with the earn program?

17              MR. McCARRICK:  Objection to

18        form.  Mischaracterizes.

19              You can answer.

20        A.    I mean, there was marketing

21    activities.  Right?  Like, whether -- I'm used

22    to a world in which you, kind of, measure

23    those, the significance in dollars.  So I

24    don't know how much of the total -- what the

25    total budget was for marketing historically,
```

52

1                   C. Ferraro - Confidential

2        but I think there -- I think it's safe to say

3        there was a considerable amount -- amount of

4        attention paid to marketing, yeah.

5             Q.    And did Celsius have a target

6        demographic for the earn program marketing?

7             A.    Not that I'm aware of.

8             Q.    Would you expect the marketing

9        that you just described generally to reach

10       accredited investors or not accredited

11       investors?

12                  MR. McCARRICK:  Objection.

13            Calls for speculation.

14                  You can answer to the extent

15            you know.

16            A.    I -- honestly, I don't know.  I

17       wasn't very close to the marketing program.

18       We had shut it down by the time I became CFO

19       and acting CEO.  So -- yeah.

20            Q.    Well, let me ask it a different

21       way.  You mentioned blog posts as one form of

22       marketing.  Right?

23            A.    From my understanding, though I

24       have -- I've read two blog posts from Celsius,

25       so my amount of time that I've spent on any of

53

1                    C. Ferraro - Confidential

2    these channels is limited.  But, yes, my

3    understanding is there was blog posts.

4         Q.    So just to be clear, your

5    understanding is there were blog posts in

6    connection with marketing the earn program?

7                    MR. McCARRICK:  Object to

8         form.

9                    You can answer.

10        A.    I don't know if it was direct to

11   the earn program, but I know that Celsius was

12   writing on the -- posting blogs.  That's what

13   I know.

14        Q.    Okay.  And would you expect blog

15   posts to predominantly reach accredited

16   investors or nonaccredited investors?

17                   MR. McCARRICK:  Objection.

18        Calls for speculation.

19                   You can answer.

20        A.    I -- honestly, I don't know

21   because I'm not involved in looking at the web

22   traffic and where it was coming from.  I would

23   assume it was probably a pretty consistent,

24   kind of, slice of the customer base.

25        Q.    Okay.  What about ask-me-anything

```
                                                    54
1              C. Ferraro - Confidential
2    videos?  Would you expect those predominantly
3    to be viewed by accredited investors or
4    nonaccredited investors?
5         A.    I --
6              MR. McCARRICK:  Object to --
7         object to form.
8              You can answer.
9              THE WITNESS:  Okay.
10        A.    I wouldn't know -- right? -- I
11   think it would be consistent with, kind of,
12   the customer makeup.  So there would be some
13   accredited, some nonaccredited.
14        Q.    And you have no opinion regarding
15   the proportion of accredited versus
16   nonaccredited that's likely to view an
17   ask-me-anything video on YouTube?
18             MR. McCARRICK:  Object to
19        form.
20             You can answer.
21        A.    Other than when I was interviewing
22   with Celsius, I've probably spent total time
23   of one or two hours watching AMAs.
24             So I have a job to do.  Watching
25   AMAs was not one of them.  So I have very
```

                                                              55
```
 1            C. Ferraro - Confidential
 2    limited knowledge on this topic.
 3         Q.   And just to be clear, I'm asking
 4    more for your opinion on this than your
 5    personal experience watching AMA videos.  So
 6    I'll give one more example based on your
 7    testimony.
 8              Referral bonuses.  Do you think
 9    that referral bonuses would more attract
10    accredited investors or nonaccredited
11    investors to Celsius' products?
12              MR. McCARRICK:  Objection to
13         form.
14              You can answer.
15         A.   I would think that both
16    nonaccredited and accredited investors would
17    be interested in the referral bonuses.
18         Q.   Okay.
19         A.   So ...
20         Q.   Now, at some point, Celsius
21    started offering other products in addition to
22    the earn program.  Right?
23         A.   Yes.
24         Q.   And, in particular, Celsius
25    started offering a custody program.  Right?
```

56

1                    C. Ferraro - Confidential

2          A.    Yes.

3          Q.    And that product was first offered

4     April 15, 2022.  Right?

5          A.    That's my understanding, yes.

6          Q.    Okay.  What is your understanding

7     as to why Celsius created the custody product?

8                    MR. McCARRICK:  Object to

9               form.

10                   Sam, could you explain how

11              this is relevant to this motion?

12                   MR. HERSHEY:  T.J., I'm not

13              here to answer questions.  You can

14              preserve your objection if you want

15              to.

16                   MR. McCARRICK:  Okay.  I mean,

17              I'm just trying to understand how

18              questions about custody, which we

19              all carved out, you know, of the

20              requested findings in this case are

21              relevant.

22                   But I'll object to form.  It's

23              outside of the scope.

24                   You can answer.

25          A.    Mr. Hershey, can you give me the

57

1            C. Ferraro - Confidential

2    question again.  I want to make sure I heard

3    it right.

4    BY MR. HERSHEY:

5        Q.    Sure.  Why did Celsius create the

6    custody program?

7        A.    It is my understanding, again, I

8    was -- maybe two weeks when it got launched, I

9    was with Celsius.  That's the total amount of

10   my tenure at that point in time.

11            But from my understanding, there

12   was a project that had been going on for some

13   time related to looking into launching a

14   custody product.  Some of this was due to --

15   my understanding, some of this was due to,

16   kind of, our understanding of what the

17   regulatory backdrop was and changes in that,

18   as well as customer preference -- right? --

19   some might want custody over earn and hold

20   title to their assets under the custody -- and

21   retain title of their assets under the custody

22   program.

23       Q.    You made a reference just now to

24   the regulatory backdrop.  What do you mean by

25   that?

58

1        C. Ferraro - Confidential

2            MR. McCARRICK:   Object to

3    form.

4            Sam, this is so far outside

5    the scope.  I mean ...

6            MR. HERSHEY:  T.J., I --

7    you've preserved your objection.  He

8    said "regulatory backdrop."  I'm

9    asking him to clarify his testimony.

10           MR. McCARRICK:  Yeah.  And a

11   question that was also outside the

12   scope.

13           I mean, you can answer to

14   the -- you know, to the extent you

15   know.  But, I mean, if we -- if, you

16   know -- I'll give you a little leash

17   here, Sam, but I'd rather focus on

18   the, you know, ownership under the

19   earn program, not custody.

20           MR. HERSHEY:  Yeah, I think

21   there is a connection between earn

22   and custody here, and I promise,

23   T.J., we're going to get there.  But

24   I want to understand his

25   understanding and his testimony.

59

```
1              C. Ferraro - Confidential
2    BY MR. HERSHEY:
3         Q.    So I'd like to ask again:  You
4    referred to a regulatory backdrop.  What did
5    you mean by that?
6         A.    Yeah, so it's important to know,
7    when I was at JPMorgan, I was not a -- I was
8    not on the institutional or the custody side,
9    I was a retail person and then I was in
10   corporate.  So my understanding of the custody
11   offering is largely what I've learned really
12   since I've joined Celsius, just as a backdrop
13   to that.
14              You know, the earn program carries
15   with it certain risks -- right? -- the
16   customer is transferring title to Celsius.
17   Celsius can lend, rehypothecate, et cetera.
18   So making sure that that product was -- my
19   understanding is making sure that that product
20   was, kind of, aligned with regulatory
21   securities laws, et cetera.
22              And I think given that it was a
23   marquee product, we needed to have a backup
24   plan or a secondary product in case there
25   was -- you know, we wanted to, kind of,
```

60

```
 1              C. Ferraro - Confidential
 2    de-risk.  Right?  We're in the business --
 3    when you have one product that's your primary
 4    product, you have a lot of eggs in one basket.
 5              So my understanding was the
 6    custody solution was to diversify against any
 7    sort of, you know, changes, either in the
 8    regulatory landscape, customer preference,
 9    risk in the marketplace, et cetera.
10        Q.    Was there a change in the
11    regulatory landscape that contributed to the
12    creation of custody?
13              MR. McCARRICK:  Object to
14         form.
15              Exclude from your answer any
16         information that you solely know
17         from counsel.  To the extent you
18         have any other knowledge or
19         information, you can answer.
20        A.    Sam, could you repeat the question
21    one more time.  I'm sorry.
22        Q.    Yeah.  You mentioned in your
23    testimony a change in the regulatory
24    landscape.  Was there a change in the
25    regulatory landscape that contributed to
```

61

```
1              C. Ferraro - Confidential
2    Celsius' creation of the custody program?
3         A.    I wasn't with the company at that
4    point in time.  So I do not know.  I'm only --
5         Q.    You don't know whether there was a
6    change in the regulatory landscape that
7    contributed to the custody --
8         A.    I was working on my farm in
9    Ecuador at this time, Mr. Hershey.
10        Q.    Okay.
11        A.    Yeah.
12        Q.    So you're not aware whether
13   regulatory issues regarding nonaccredited
14   investors keeping funds in the earn program
15   contributed to the creation of the custody
16   program?
17             MR. McCARRICK:  Object to
18        form.
19             You can answer.
20        A.    I've heard those concerns.  I was
21   not aware at the time of the launch or any of
22   those.  My understanding of this is largely in
23   my capacity as CFO, some of it -- some of it
24   on the product launch -- right? -- the back
25   end, planning, analysis, we had to deal with
```

62

```
1                  C. Ferraro - Confidential
2     some reporting and things like that.
3                  But, in general, I was not
4     involved with this, not close to it.  I didn't
5     have an understanding.  I wasn't privy to
6     those conversations.
7          Q.    So I just want to be crystal
8     clear, Mr. Ferraro, that every question I'm
9     asking you today I'm asking for your
10    understanding sitting here today.  I'm not
11    asking for your understanding when you joined
12    the company.  I'm not asking you the basis for
13    that understanding, though you're free to
14    clarify that.
15                 I'm just asking you:  Sitting here
16    today, you have an awareness that there was a
17    change in the regulatory landscape that led to
18    the creation of the custody program?
19         A.    I --
20                 MR. McCARRICK:  Object --
21         Q.    It sounds like sitting here
22    today -- let me just finish.  It sounds like
23    sitting here today, you do have that
24    understanding.  So if that is the case, I'd
25    like you to expand on that.
```

```
                                                    63
 1              C. Ferraro - Confidential
 2              MR. McCARRICK:  So objection
 3         to form.
 4              And exclude from your answer
 5         anything that you learned solely
 6         through counsel.  Otherwise, feel
 7         free to answer.
 8         A.    Most of my understanding,
 9   Mr. Hershey, related to this is privileged,
10   has to do with communication that I've had
11   with legal advisors, internal and external.
12              And my knowledge of this is also
13   not that fulsome.  Right?  I'm dealing with
14   what's facing this company today, not what
15   happened in April or before.  So I have very
16   little to provide here.
17              I know there was -- I'll say, kind
18   of, at a high level, I know there was
19   discussion about, kind of, concerns about the
20   earn product.  There was regulators that were
21   asking -- my understanding is that there was
22   some pressure -- right? -- around it.  And
23   that's about all I can say on this topic.
24         Q.    What do you mean "there was some
25   pressure around it"?
```

64

1              C. Ferraro - Confidential

2         A.    Well, this goes back to privileged

3    communication that I've had.

4         Q.    Okay.  You can't say more because

5    that would require you to divulge privileged

6    communications?

7         A.    Yes.

8         Q.    Okay.  After Celsius created the

9    custody program, it allowed nonaccredited

10   investors to continue to keep assets that were

11   already in the earn program in that program.

12   Is that right?

13        A.    Yeah.  Grandfathered, yes.

14        Q.    Why did Celsius choose to do that?

15             MR. McCARRICK:  Objection to

16        form.  Outside the scope.

17             You can answer.

18        A.    I do not know.

19        Q.    How was that decision made?

20             MR. McCARRICK:  Object to

21        form.  Outside the scope.

22             You can answer.

23        A.    I was -- I was two weeks into the

24   company at that point in time and in a very

25   different facility.  I do not know,

65

```
 1              C. Ferraro - Confidential
 2    Mr. Hershey.
 3         Q.   Okay.  After April 15, 2022, if a
 4    nonaccredited investor had assets in the earn
 5    program, would those assets remain -- sorry --
 6    would those assets remaining in the earn
 7    program by fault -- excuse me.  Let me start
 8    that question over.  It's a bit of a long
 9    question.
10              After April 15, 2022, if a
11    nonaccredited investor had assets in the earn
12    program, would those assets remain in the earn
13    program by default unless that customer chose
14    to remove them?
15              MR. McCARRICK:  Objection to
16         form.  Outside the scope.
17              You can answer.
18         A.   My understanding is they would
19    remain in the earn program.
20         Q.   And the customer would continue to
21    earn rewards on those assets until the
22    petition date.  Is that right?
23              MR. McCARRICK:  Objection to
24         form.  Outside the scope.
25         Foundation.
```

Confidential         Christopher Ferraro - November 21, 2022

                                                                    66
1                    C. Ferraro - Confidential

2                    You can answer.

3          A.    That's my understanding, yes.

4          Q.    Okay.  Do you think that allowing

5    nonaccredited investors to continue to accrue

6    awards may have incentivized them to keep

7    their assets in the earn program?

8                    MR. McCARRICK:  Objection to

9          form.  Calls for speculation.

10                   You can answer.

11         A.    I do not know.

12         Q.    You have -- you have no view on

13   whether allowing a customer to accrue awards

14   would incentivize them to keep their assets in

15   that award-accruing program?

16         A.    Well --

17                   MR. McCARRICK:  Object to

18         form.

19                   You can answer to the extent

20         you know.

21         A.    I mean, as a us- -- let me think

22   about it from a user standpoint -- right? --

23   I'm giving my cryptocurrency, basically

24   changing title, to Celsius, putting it on

25   their platform.  What I get in return is

Confidential        Christopher Ferraro - November 21, 2022

67

```
 1              C. Ferraro - Confidential

 2   rewards.  So I think there is a linkage

 3   between, kind of, what each individual gets.

 4   I think that's a reasonable assumption.

 5        Q.   So I take it the answer to that

 6   is, yes, you do think that allowing

 7   individuals to accrue awards would incentivize

 8   them to keep the assets on the earn program?

 9              MR. McCARRICK:   Object to

10        form.  Mischaracterizes.

11              You can answer.

12        A.    What I'm saying is people put --

13   people opted in -- people chose to go into the

14   earn program, I would think, predominantly to

15   earn rewards.

16        Q.   And so the awards incentivized

17   them to join the earn program?

18              MR. McCARRICK:   Objection to

19        form.  Same objection.

20              You can answer.

21        A.    I mean, it's a consideration they

22   got for being part of the earn program.  That

23   was the value proposition to the customer, was

24   to earn, yeah, rewards.

25        Q.    So the answer to my question is
```

68

```
 1              C. Ferraro - Confidential

 2   yes?

 3              MR. McCARRICK:  Object to

 4         form.  Asked and answered four times

 5         now.

 6              You can answer again.

 7         A.    I mean, yes, people put assets

 8   onto the Celsius platform so Celsius could pay

 9   them rewards.  Whether that incented them to

10   stay or there was other things going on, I

11   don't know.  It's a case-by-case basis.  But

12   they were there to earn rewards.

13         Q.    When the custody program was

14   created, did Celsius consider moving all

15   assets belonging to nonaccredited investors

16   from earn to custody?

17              MR. McCARRICK:  Objection.

18         Outside the scope.

19              You can answer.

20         A.    I have -- I was not part of those

21   discussions.  I was not with the company

22   probably when the majority of those

23   discussions occurred.  I do not know the

24   answer to that.

25         Q.    Okay.  Did Celsius take any steps
```

69

```
1                C. Ferraro - Confidential

2    to determine whether there were potential

3    legal issues with allowing nonaccredited

4    investors to continue to keep assets in the

5    earn program?

6              MR. McCARRICK:  Objection.

7         Calls for privileged information.

8         Instruct you not to answer.

9         Q.    Okay.  Was Celsius in discussion

10   with regulatory authorities around the time

11   that it created the custody program?

12             MR. McCARRICK:  Object to

13        form.  Well outside the scope.

14             You can answer.

15        A.    I wouldn't know.  I wasn't part of

16   the company at that point in time.

17        Q.    Okay.  I'm going to change gears,

18   and I want to talk about the formative assets,

19   which I think is one of the subjects that you

20   said you view it as your role here today to

21   testify about.

22             What was the debtors' process for

23   determining how to deploy assets transferred

24   by account holders into the earn program?

25             MR. McCARRICK:  Object to
```

70

```
1              C. Ferraro - Confidential
2        form.
3              You can answer.
4        A.    What was the method of deploying
5    assets?
6        Q.    Yeah, I'll ask it again.
7              What was the debtors' process for
8    determining how to deploy assets transferred
9    by account holders into the earn program?
10       A.    Okay.  I'll speak to it from my
11   understanding where I sit today, joining the
12   company in March 21st.
13             You know, we pay rewards to
14   customers to transfer title, become part of
15   the earn program.  And with those
16   cryptocurrencies, Celsius would then deploy
17   into different type of deployment activities.
18             Could be your regular lending, so
19   retail lending.  You know, usually those were
20   loans that were collateralized by
21   cryptocurrencies up to 50 percent.  It was
22   lower for certain cryptocurrencies, and the
23   higher the LTV, up to 50 -- I think there was
24   three price points, 25, 33, and 50 percent
25   LTV -- the rate would change.
```

71

```
 1                    C. Ferraro - Confidential

 2                    And those would usually be either

 3    dollars or stablecoins that we would lend to

 4    the customer; so backed by other

 5    cryptocurrencies, and we would give them

 6    dollars or stablecoins.  Those two -- those

 7    two are really fungible and interchangeable in

 8    the space that we operate in.

 9                    The other program was the

10    Institutional Lending Program.  Obviously, it

11    was for institutions.  These would be a little

12    bit higher.  These could be unsecured.  They

13    could be higher, above 100 percent LTV.  Some

14    of them were below 100 percent LTV.  And

15    typically, like a bank rate, any lending type

16    of protocol, the higher the risk, the higher

17    the rate.  Right?  So those were the two, kind

18    of, key lending programs.

19                    We also staked assets.  So we

20    would stake -- predominantly it was ETH.  We

21    would deploy into DeFi protocols.  And we

22    would also use the cryptocurrencies to

23    borrow -- to pledge and borrow against for

24    operational purposes.

25         Q.    So I appreciate the answer, but I
```

72

```
 1              C. Ferraro - Confidential
 2    actually don't think it's responsive to the
 3    question that I asked.  So I'm going to ask my
 4    question again.  I'd like you to try to answer
 5    my question.
 6              What was the debtors' process for
 7    determining how to deploy assets transferred
 8    by account holders into the earn program?
 9              MR. McCARRICK:  Objection to
10         form.
11              You can answer to the extent
12         you know.
13         A.    Are you talking about internal
14    deployment, risk management, liquidity, that
15    type of stuff?
16         Q.    Yes.
17         A.    Okay.  I'm sorry.  I thought you
18    were asking for a description of the programs.
19         Q.    Okay.
20         A.    Okay.  None of these were in my --
21    I didn't -- I wasn't owner of these policies.
22    So I'm, kind of, speaking to my understanding,
23    just to give that as a backdrop.
24              There was a liquidity framework,
25    so if we -- and it would go coin by coin.  So
```

73

1              C. Ferraro - Confidential

2     if we had excess liquidity, there would be a

3     signal to the deployment team that you could

4     deploy XYZ coin.

5              So maybe if we had excess Bitcoin,

6     Bitcoin would be sitting there as a deployable

7     coin, and that would be on a

8     cryptocurrency-by-cryptocurrency basis.  And

9     then there was also --

10         Q.   Okay.  Any other -- sorry.  Go

11    ahead.

12         A.   Yeah.

13         Q.   Please go ahead.

14         A.   Yeah.  To my understanding -- and

15    I do not know all the specifics to it -- but

16    then there was also, kind of -- kind of, hard

17    limits that risk management would put in

18    place.  So you can't stake above X percent of

19    the total coins.  You know, maybe deploying

20    into liquidity pools, you can't be above X

21    percent of the pool, things like that.  So we

22    didn't get too -- you know, own too much of

23    the trade, and it would be very hard to get

24    out of.

25         Q.   Okay.  And who is involved in

74

1                    C. Ferraro - Confidential

2      making those sorts of risk assessment

3      decisions?

4                    MR. McCARRICK:  Objection to

5           form.  Outside the scope.

6                    You can answer.

7           A.     Risk management.  And there was a

8      risk committee.  I didn't join the risk

9      committee until I took the CFO title, so it's

10     hard for me to speak about before.  But these

11     things would be discussed at the risk

12     committee.

13                   There was also daily, kind of,

14     deployment meetings where the deployment team,

15     risk, and the executives would meet.  And

16     there was also a weekly, kind of, investment

17     meeting.  It wasn't a committee but it was --

18     it acted almost like a discussion of where we

19     should be investing and where we might want to

20     pull back on.

21          Q.     And who, if anyone, was required

22     to sign off on those deployment decisions?

23          A.     The limits or the deployment

24     decisions?

25          Q.     Let's do both.

Confidential          Christopher Ferraro - November 21, 2022

75

1                    C. Ferraro - Confidential

2          A.    Well, I'm only -- my understanding

3     would be risk would be responsible for the

4     limits and any of those policies and that the

5     deployment team's responsibility was to be

6     within those limits -- right? -- so that was,

7     kind of, the way that the -- that -- you know,

8     risk set the rules and the deployment team had

9     to follow those rules.

10         Q.    So who was involved in setting the

11    rules?

12                MR. McCARRICK:   Object to

13         form.   Outside the scope.

14                You can answer.

15         A.    Again, I think it was risk

16    management.   I wasn't here for the vast

17    majority of the history of Celsius, but my

18    understanding would be risk would be setting

19    those limits and the policies and procedures

20    in place to make sure that folks stayed within

21    those limits.   And then there was reporting

22    that was done.

23         Q.    So -- okay.   So you refer to risk

24    management.   So who was on the risk management

25    team?

76

```
 1              C. Ferraro - Confidential
 2              MR. McCARRICK:   Object to
 3         form.   Outside the scope.
 4              You can answer.
 5         A.    It was ran -- it was led by an
 6    individual named Rodney Wong.   And then, you
 7    know, there was probably five or six risk
 8    professionals in addition to Rodney that made
 9    up the team.
10         Q.    Did the debtors take any steps to
11    make customers with assets in the earn program
12    aware of the risks from the debtors' asset
13    deployment strategies?
14              MR. McCARRICK:   Object to
15         form.   It escapes me what this has
16         to do with the terms of use and
17         their plain and unambiguous meaning.
18              But you can answer.
19         A.    In just reviewing the terms of
20    use, I think there was a risk disclosure in
21    the terms of use, at least in the latter ones.
22              As I mentioned before, I didn't --
23    I didn't watch the AMAs.   And I don't
24    typically read blog posts.   You know, I -- so
25    limited, kind of -- I'm not the right -- the
```

77

```
 1              C. Ferraro - Confidential
 2   best person to answer that.  But I know I did
 3   come across it in the terms and uses in one of
 4   the risk disclosures.
 5        Q.    Okay.  So outside of the risk
 6   disclosure and the terms of use, are you aware
 7   of any other risk disclosures shared with
 8   customers with assets in the earn program?
 9              MR. McCARRICK:  Object to
10        form.  Outside the scope.
11              You can answer.
12        A.    Off of memory, I believe there was
13   disclosures on the AMA.  But I could be wrong.
14   I believe there was disclosures on the screen.
15        Q.    So you recall viewing a risk
16   disclosure on the screen during --
17        A.    No -- like, "this is not
18   investment advice," all that type of stuff.  I
19   believe.  You should verify.  But I believe
20   there was.
21        Q.    And do you view that as the same
22   thing as a risk disclosure regarding Celsius'
23   deployment of assets in the earn program?
24              MR. McCARRICK:  Object to
25        form.  Outside the scope.
```

78

```
 1                C. Ferraro - Confidential

 2                You can answer.

 3        A.    I don't know the details of what

 4    the disclosure was.  But I think it was a

 5    disclosure that said, you know, "this is not

 6    investment advice" and some other stuff on

 7    there.

 8        Q.    Okay.

 9        A.    I don't know about the blog posts.

10    I can't remember anything specific on whether

11    or not there was disclosures there.  So I'd go

12    back to the terms of use.

13        Q.    Okay.  Let's talk with the terms

14    of use.  Let's actually turn to paragraph 23

15    of your declaration, which, again, is marked

16    as Exhibit 1.  Let me know when you're there.

17        A.    Yeah, I'm there.  I'm just reading

18    it, if that's okay.

19        Q.    Yeah.  Take your time.

20        A.    Okay.  Thank you.

21        Q.    In fact, yeah, read that

22    paragraph.  When you're done, let me know.

23        A.    (Document review.)

24              Yeah.

25        Q.    You're done?
```

79

```
 1              C. Ferraro - Confidential

 2       A.    Yeah, I'm done.  Thank you.

 3       Q.    So in the first sentence, you

 4  state:

 5            "It is my understanding that

 6       every version of the terms of use

 7       includes one or more provisions

 8       authorizing the debtors to make

 9       unilateral updates to the terms of

10       use."

11            Do you see that?

12       A.    Yes, sir.

13       Q.    Okay.  So you say "it is my

14  understanding."

15            What is that understanding based

16  on?

17       A.    Reading the terms of use.

18       Q.    Which terms of use?

19       A.    Well, I -- in the Alex Mashinsky

20  declaration, I believe he included all terms

21  of use, 1 through 8, if I'm correct.  They're

22  not in front of me, so -- but, yeah, in

23  reviewing them for my declaration and also for

24  preparation of this deposition, that's my

25  understanding --
```

Confidential          Christopher Ferraro - November 21, 2022

80

```
 1                  C. Ferraro - Confidential

 2         Q.     You --

 3         A.     -- is --

 4         Q.     So just to be clear, you're

 5    stating that you've read each version of the

 6    terms of use, 1 through 8?

 7         A.     I've gone through the terms of

 8    use.  I've read them and I've seen some

 9    reversions of them.  I'm not an expert in the

10    terms of use or a lawyer, but yes.

11         Q.     Okay.  So your understanding is

12    based on your own review of the terms of use?

13         A.     Yes, sir.  And discussions I've

14    had about the terms of use, but predominantly

15    me reading them, yes.

16         Q.     Okay.  And so just to be clear,

17    each sentence in this paragraph -- I believe

18    there are three sentences total -- starts with

19    "It is my understanding," or "It is also my

20    understanding."

21                 And so in each case, your

22    understanding that you're representing is

23    based on your review of the terms of use and

24    other discussions you've had regarding the

25    terms of use?
```

81

```
 1                  C. Ferraro - Confidential
 2                  MR. McCARRICK:  Object to
 3        form.
 4                  You can answer.
 5        A.    Yes, sir.
 6        Q.    Okay.  Celsius has customers who
 7   are located all around the world.  Right?
 8        A.    Yes, sir.
 9        Q.    And some of those customers speak
10   languages other than English.  Right?
11                  MR. McCARRICK:  Object to the
12        form.
13                  You can answer.
14        A.    I would think so, yes.
15        Q.    Were there versions of Celsius'
16   website or app in languages other than
17   English?
18                  MR. McCARRICK:  Object to
19        form.
20                  You can answer.
21        A.    Honestly, I don't know the answer
22   to that.  I've never seen any other version
23   other than English.
24        Q.    Or terms of use provided to users
25   in any language other than English?
```

82

```
 1                C. Ferraro - Confidential
 2                MR. McCARRICK:  Object to
 3        form.
 4                You can answer.
 5        A.    Not to my knowledge.
 6        Q.    And when you say not to your
 7   knowledge, do you mean you don't believe
 8   that --
 9        A.    I've only --
10        Q.    -- terms of use were offered in a
11   language other than English, or you're just
12   not aware --
13        A.    I've only seen --
14        Q.    -- that the terms of use are
15   offered in a language other than English?
16        A.    Sorry -- sorry for not letting you
17   finish.
18        Q.    That's okay.
19        A.    I've only seen the English --
20   English versions.  My understanding -- I don't
21   know of any other terms of use that were in
22   other languages.
23        Q.    Okay.
24                MR. HERSHEY:  T.J., I'm about,
25        I'd say, halfway through my
```

83

```
 1              C. Ferraro - Confidential

 2       questions.  We've been going for an

 3       hour.  I don't know if you want to

 4       take a break now.  I'm happy to keep

 5       going.

 6              Or I should really ask you,

 7       Mr. Ferraro, if you want to take a

 8       break or if you want to keep going.

 9              THE WITNESS:  Let's keep on

10       going.  I don't need a break right

11       now.  Thank you for asking.

12              MR. HERSHEY:  Okay.

13              THE WITNESS:  Yeah.

14  BY MR. HERSHEY:

15       Q.   I want to turn to paragraph 26 of

16  your declaration now.

17       A.   Yeah.

18       Q.   Let me know when you're there.

19              MR. McCARRICK:  I'm sorry,

20       Mr. Hershey, did you say paragraph

21       26?

22              MR. HERSHEY:  Yeah, I did.

23              MR. McCARRICK:  Okay.

24              MR. HERSHEY:  Does that not

25       exist?
```

Confidential        Christopher Ferraro - November 21, 2022

84

```
 1              C. Ferraro - Confidential
 2              MR. McCARRICK:  No, I just
 3         didn't hear you.
 4
 5         MR. HERSHEY:  Okay.  I was having
 6         a --
 7              MR. McCARRICK:  Yeah, no,
 8         unlike page 11, paragraph 26 is
 9         there, yes.
10              MR. HERSHEY:  Okay.  Good.
11    BY MR. HERSHEY:
12         Q.    Are you there, Mr. Ferraro?
13         A.    Yes, Mr. Hershey, I am.  Thank
14    you.
15         Q.    Okay.  Do you see the header "Sale
16    of the Earn Stablecoin" above paragraph 26?
17         A.    Yes.
18         Q.    Okay.  What is stablecoin?
19         A.    Stablecoin is a cryptocurrency
20    that is pegged to a specific fiat.  So in the
21    case of stablecoins that are a USDC, USDT,
22    these are pegged to the US dollar nearly one
23    for one.  They really don't trade above $1,
24    but they could trade slightly below $1.
25         Q.    Got it.  Okay.  Let's turn
```

85

```
1              C. Ferraro - Confidential
2    actually now to Exhibit 2, which is your
3    responses and objections.  And when you are
4    there, please turn to page 17, and
5    specifically on page 17, if you could look at
6    Question Number 23.
7         A.    (Document review.)
8         Q.    So whenever you're there, just let
9    me know.
10         A.    I see Question Number 23, yes,
11   sir.
12         Q.    Okay.  So you see Question
13   Number 23, and I'll read it for the record:
14              "Provide the amount of
15         obligations related to each type of
16         proposed sale stablecoin associated
17         with earn accounts by amount and
18         number of account holders as of the
19         petition date."
20              Do you see that question?
21         A.    Yes, sir.
22         Q.    Okay.  Now, you testified earlier
23   that you were not consulted regarding the
24   answers to any of the questions in this
25   document.  Correct?
```

86

```
 1              C. Ferraro - Confidential

 2       A.    Yeah, off of memory that's

 3  correct.

 4       Q.    And so I take it, then, you were

 5  not consulted specifically regarding this

 6  question either?

 7       A.    That's correct.

 8       Q.    Okay.  Let's look at where it says

 9  "Response to Question Number 23."

10              And the second sentence reads:

11              "Subject to those general

12         objections, Celsius states that, as

13         of petition date, Celsius earn

14         obligations related to each type of

15         proposed sale stablecoin were as

16         follows."

17              Do you see that?

18       A.    Yes.

19       Q.    And there's a chart underneath.

20  Right?

21       A.    Yes.

22       Q.    Okay.  And you see the column on

23  the left says "Coin Type"?

24       A.    Yes.

25       Q.    Just take a minute and look
```

87

                    C. Ferraro - Confidential

2   through the entries in that column.  Are these

3   all types of stablecoins?

4                    MR. McCARRICK:  Object to

5           form.

6                    You can answer.

7           A.    Are these all -- I believe there's

8   more stablecoins than just this in

9   existence --

10          Q.    Right.  Let me -- let me -- yeah,

11  just to be clear, my question is:  Are these

12  types of coin listed in this column all

13  stablecoin?  In other words, is each of these

14  a type of stablecoin?

15          A.    Yeah.  Yes, it looks that way to

16  me.

17          Q.    Okay.  And you see the second

18  column says "Number of Coins"?

19          A.    Yes.

20          Q.    Okay.  So looking at the first row

21  which says "USDC," you agree with me that, as

22  of the petition date, Celsius earn obligations

23  with respect to USDC was over 800 million

24  coins.  Is that right?

25          A.    Yes.

Confidential        Christopher Ferraro - November 21, 2022

```
                                                            88
 1              C. Ferraro - Confidential

 2        Q.    And going to the next row, USDT

 3   ERC20, you agree with me that Celsius

 4   obligations or earn obligations as of the

 5   petition date was approximately, say, 100

 6   million coins.  Is that right?

 7              MR. McCARRICK:  Object to

 8        form.  Foundation.

 9              You can answer.

10        A.    Yes.

11        Q.    Okay.  And to be clear, do you

12   have -- did you know these numbers before

13   seeing them in this document?

14        A.    These are numbers that my finance

15   team would have put together.  I've seen

16   reports of existing, kind of, coins in the

17   freeze report that we run.  But I don't know

18   them off of memory.

19        Q.    Okay.  And just to finish off with

20   this document, the GUSD, approximately 80

21   million coins as of the petition date.  Right?

22        A.    Yes, sir.

23        Q.    And BUSD, approximately 30 million

24   coins as of the petition date.  Right?

25        A.    Yes.
```

89

```
1              C. Ferraro - Confidential

2        Q.    And so if you can do some quick

3   math with me, we add up the number of coins in

4   those first four rows, that's over 1 billion

5   in stablecoins.  Is that right?

6        A.    About 1 -- 1. -- 1 billion and 50

7   million-ish, yeah.

8        Q.    Your math is better than mine.

9              Are you familiar with an entity

10  known as Tether?

11             MR. McCARRICK:  Object to

12        form.

13       A.    I've heard of Tether, yes.

14       Q.    And what is Tether?

15             MR. McCARRICK:  Object to

16        form.

17       A.    To my understanding, Tether is a

18  player in the cryptocurrency industry.  They

19  lend.  They borrow.

20       Q.    All right.  Well, speaking of

21  lending, are you aware that before the

22  petition date, Celsius received a loan from

23  Tether?

24             MR. McCARRICK:  Objection to

25        form.  Outside the scope.
```

Confidential        Christopher Ferraro - November 21, 2022

```
                                                          90
 1              C. Ferraro - Confidential
 2              You can answer.
 3       A.    We had a loan from Tether, yes.  I
 4  understand that --
 5       Q.    Oh, sorry.  Did not mean to cut
 6  you off.  Please finish.
 7       A.    I understood it to be that Celsius
 8  did borrow money from Tether and that that was
 9  collateralized with different types of
10  cryptocurrencies.
11       Q.    Do you understand or do you have
12  an understanding regarding the amount of the
13  loan that Celsius received from Tether?
14              MR. McCARRICK:  Object to
15         form.  Outside the scope.
16              You can answer.
17       A.    I don't know the exact amount, but
18  it was south of a billion dollars, maybe 800
19  million, 7- to 800 million, I believe.
20       Q.    And are you aware of the
21  denomination of that loan?
22              MR. McCARRICK:  Object to
23         form.  Outside the scope.
24       A.    My understanding was that the loan
25  was probably stablecoins was what we got,
```

Confidential        Christopher Ferraro - November 21, 2022

91

1                    C. Ferraro - Confidential

2     yeah.

3          Q.    So your recollection is roughly

4     800 million in stablecoin from Tether?

5          A.    -ish, yeah, around that zip, yup.

6          Q.    Okay.  So before the petition

7     date, the debtors had borrowed roughly 800

8     million in stablecoin from Tether and

9     according to this chart we just looked at had

10    received stablecoin deposits from customers in

11    connection with the earn program totaling more

12    than $1 billion.  Right?

13              MR. McCARRICK:  Object to

14         form.  Outside the scope.

15              You can answer.

16         A.    Yeah, that's my understanding.

17         Q.    So again, doing the math, between

18    Tether and earn, that's approximately or

19    almost $2 billion worth of stablecoin as of

20    the petition date.  Right?

21              MR. McCARRICK:  Object to

22         form.  Outside the scope.

23         A.    Yeah 1 -- let's say 1.8, yeah.

24         Q.    Okay.  Between 1.8 and 2 billion.

25         A.    That's fair --

```
                                                        92
 1              C. Ferraro - Confidential

 2        Q.    Is that safe to say?

 3        A.    Yeah.

 4        Q.    Okay.  What amount of stablecoin

 5   are the debtors currently seeking authority to

 6   sell?

 7        A.    About 18 million of stablecoin.

 8        Q.    And is that 18 million of

 9   stablecoin the total amount of stablecoin

10   currently in the debtors' possession?

11        A.    That's not related to custody,

12   withheld, or lending collateral, yes.

13        Q.    So given that before the petition

14   date the debtors possessed nearly 2 billion in

15   stablecoin, why do the debtors have only 18

16   million of stablecoin available to sell today?

17              MR. McCARRICK:  Object to

18        form.

19              You can answer.

20        A.    Well, the Tether loan was

21   liquidated.

22        Q.    Okay.

23        A.    So, you know, unfortunately they

24   liquidated BTC and I believe some E to pay

25   down that loan.
```

93

1                C. Ferraro - Confidential

2                The 1.8 to $2 billion of

3    stablecoin, as an ongoing, kind of, business

4    prepetition was used in normal course to pay

5    for expenses.  You know, there was lending

6    that it used.  Like I said, the retail lending

7    program was largely stablecoins or dollars.

8    So we would fund loans that way.  The mining

9    asset was stablecoins and dollars.  So we'd

10   have to fund it that way.

11               There was a lot of stablecoins

12   that went into illiquid deployments.  That's

13   part of the issue.

14        Q.   So I want to return your testimony

15   to the liquidation of the Tether loan.  So you

16   said that that loan was paid back with

17   Bitcoin.  Is that right?

18               MR. McCARRICK:  Object to

19        form.

20               You can answer.

21        A.   It wasn't paid back, it was

22   liquidated.

23        Q.   Excuse me, liquidated with

24   Bitcoin.

25        A.   Yeah.

Confidential        Christopher Ferraro - November 21, 2022

94

```
 1                  C. Ferraro - Confidential
 2         Q.      But in that case, what happened to
 3    the stablecoin that Celsius had borrowed?
 4                  MR. McCARRICK:   Object to
 5         form.
 6                  You can answer if you know.
 7         A.      Nothing would have happened to
 8    stablecoin.  What would have happened was the
 9    Bitcoin was liquidated.  I believe might have
10    been some E too, but ...
11                  (Stenographer clarification.)
12         Q.      So Celsius remained in possession
13    of --
14         A.      Might have been some ETH.
15         Q.      So Celsius remained in possession
16    of the stablecoin following the liquidation of
17    the Tether loan?
18         A.      The liquidation of the Tether loan
19    had no impact on the stablecoins of Celsius.
20         Q.      Okay.  Just wanted to confirm
21    that.
22                  And so returning to your testimony
23    after that statement.  So Celsius just spent
24    the stablecoin in the ordinary course?
25         A.      Yes, and invested --
```

95

        C. Ferraro - Confidential

1

2        Q.    Approx- --

3        A.    -- specs -- invested.

4        Q.    Approximately 1.8 billion of it?

5        A.    Yeah.  I -- there was uses of the

6    stablecoin, and clearly most of it got used to

7    pay for operations, for lending, for the

8    mining asset, certain -- certain losses that

9    we had to take that we took.  We had to go

10   back and buy cryptocurrencies -- right? --

11   with stablecoins.

12            So, yeah, there was many purposes

13   that stablecoins were used for.  Some were

14   operations, some were to buy back coins that

15   were actual losses, and some was mining

16   assets, lending programs, et cetera.

17       Q.    So you listed a few things that

18   the stablecoin went to.  Do you know the

19   amount of stablecoin that was dedicated to

20   each of those things?

21       A.    Well, I think it's pretty safe to

22   say that predominantly the entire mining

23   asset, so call it almost 600 million.

24   Predominantly the entire retail lending book,

25   call it another 400-and-something million.

96

```
 1              C. Ferraro - Confidential
 2     You're at a billion.
 3              There was operating expenses for
 4     2021 and 2022 that totaled, off of memory,
 5     about a half a billion.
 6              And then you had certain
 7     currency -- cryptocurrencies that we had to go
 8     back and buy because there was losses.  Think
 9     EFH.  So that's how you get to the 1.8 to 2
10     billion.
11         Q.   Okay.  So just -- so sticking with
12     your math.  So mining, lending, and
13     operations, you said 600 for mining, 400 for
14     lending, 500 for operations.  That totals
15     1.5 billion.  Right?
16         A.   Yeah.
17         Q.   So would the loss that you just
18     described be 300 million in your estimation?
19         A.   Losses in which we had to go back
20     and purchase cryptocurrencies for the accounts
21     so we didn't have a directional position.  I
22     don't have that number off the top of my head,
23     but, yeah, it was in that range.
24         Q.   Can you explain that a little more
25     of losses for which you had to go back and --
```

Confidential        Christopher Ferraro - November 21, 2022

97

                    C. Ferraro - Confidential

1

2          A.    Well, let's say --

3          Q.    -- purchase cryptocurrency?

4          A.    Yeah.  Let's say, for example,

5   EFH.  We -- we borrowed money from EFH, and I

6   believe this dates back to 2020.  Right?  We

7   lent money -- we borrowed money from EFH, and

8   we posted Bitcoin and ETH as collateral.

9               When we went to pay down the loan

10  with EFH, they said, We don't have your

11  collateral.  So now we thought we had an asset

12  of Bitcoin -- right? -- and now we don't.  So

13  we had to use stablecoins to go out and buy

14  Bitcoin so that our risk positions would be

15  neutralized.

16         Q.    Understood.  Okay.  All right.

17  This may retread some of the ground we've just

18  gone over.  Let's turn to paragraph 26 of your

19  declaration.

20         A.    Of my declaration.  Okay.

21               Yes, sir.  I'm there.

22         Q.    And, actually, before we get

23  there, just one quick question:  Is Celsius

24  able to trace stablecoins in its possession to

25  specific transfers made by account holders?

98

                    C. Ferraro - Confidential

1

2          A.    The coins go into, like, an

3    omnibus account -- I always struggle to say

4    that word, I'm sorry -- omnibus account.  So

5    kind of -- we don't link a specific stablecoin

6    to a customer.  We think of them more as

7    fungible.

8          Q.    And there's no way to, let's say,

9    analyze the blockchains to determine where it

10   came from before it went to the omnibus

11   account?

12              MR. McCARRICK:  Object to

13         form.

14              You can answer.

15         A.    To my understanding, it all gets

16   mixed in the omnibus account.  So we --

17         Q.    Are you now aware -- go ahead.

18   Sorry.

19         A.    I was going to say, we can look

20   and say 100 stablecoins were sent from 100

21   different wallets and we have 100 in the

22   omnibus account, but we -- and then when we

23   deploy them, we don't go back in time to say

24   which ones were deployed for -- related to

25   which cryptocurrency obligations that Celsius

Confidential        Christopher Ferraro - November 21, 2022

99

1                   C. Ferraro - Confidential

2       has to the customers.

3                   Obviously the stablecoins are

4       Celsius', the transfer.  The title has been

5       transferred to Celsius in the terms of use.

6       Celsius has the right, which we're describing

7       right here, to pledge, deploy, otherwise

8       rehypothecate, et cetera.  So ...

9           Q.    But just to be clear, putting

10      aside what Celsius may or may not do in terms

11      of trying to trace stablecoin to their source,

12      my question is could it do so?

13                  MR. McCARRICK:  Object to

14          form.

15                  You can -- you can answer.

16          A.    I'm sure in a massive data

17      exercise, you could probably track and trace

18      things.  It's all public blockchain.  We, kind

19      of, mix it all together in the omnibus wallet

20      and then deploy it from there.  So it gets --

21      we didn't in an active managing trace because

22      it wasn't important.  We just had the

23      obligation to the customer, the liability to

24      the customer.  That's what we tracked.

25          Q.    Right.  And I just want to be

100

1                    C. Ferraro - Confidential

2      clear, I'm not trying to pass judgment on

3      whether Celsius should have or did or did not.

4      But it -- so basically your answer, it sounds

5      like your testimony is it may be possible to

6      trace the stablecoin, but it would be -- I

7      think the word you used is "a massive

8      undertaking."  Is that right?

9            A.    I'm not a blockchain expert.  So

10     my understanding is it's possible.  We weren't

11     set up that way to do it.

12                 If it were to be done, I would

13     think there's a lot of data out there, but it

14     would be a big exercise.

15           Q.    Okay.  And now we can go to

16     paragraph 26.  I apologize we didn't do it

17     before.

18                 In the first sentence of that

19     paragraph, you state:

20                 "It is my understanding that,

21            prior to the petition date, the

22            debtors monetized stablecoin as

23            needed to meet their fiat

24            obligations in the ordinary course."

25                 So you state "it is my

101

1             C. Ferraro - Confidential

2    understanding."  What is that understanding

3    based on?

4         A.     General understanding of how the

5    business operated by, you know, being here for

6    six to nine months, by looking at reports, by

7    having conversations.

8         Q.     Okay.  What does "monetize" mean?

9         A.     They use them -- could either use

10   them as payment or liquidate them to cash, to

11   fiat.

12        Q.     And can you explain the process

13   the debtors use for monetizing stablecoin

14   prior to the petition date?

15        A.     There's multiple ways in which you

16   could do it.  You could go on an exchange and

17   sell it on the exchange, have it wired to your

18   fiat bank account.  You could go to a provider

19   like Circle and for effectively no cost, just

20   convert stablecoin to fiat and have it put in

21   your bank account.

22             So the industry works in a way in

23   which fiat and stablecoins are very

24   interchangeable.

25        Q.     Okay.  How frequently do the

102

```
 1              C. Ferraro - Confidential

 2   debtors monetize stablecoin prepetition?

 3        A.    How what, sorry?

 4        Q.    How frequently do the debtors

 5   monetize stablecoin before the petition date?

 6        A.    I would -- I would -- my

 7   understanding would be multiple, multiple,

 8   multiple times per day.

 9        Q.    And you mentioned "fiat

10   obligations."  What fiat obligations are you

11   referring to in this sentence?

12        A.    Payroll, vendor expense,

13   professional fees.

14        Q.    Anything else?

15        A.    All ordinary course business, any

16   expenditures related to the activities that

17   Celsius was doing.  The vast majority of them

18   were paid in fiat.

19        Q.    Is there any reason the debtors

20   would choose to monetize stablecoin as opposed

21   to other types of cryptocurrency?

22        A.    Well, stablecoins don't really --

23   you know, if -- you know, you're --

24   stablecoins don't have a risk position next to

25   them, meaning they're not sensitive to prices
```

103

1                   C. Ferraro - Confidential

2    because everything is one-for-one for the

3    dollar.

4                   So stablecoins act as though, in

5    crypto, that they're almost like fiat.  If you

6    were to -- if you were to sell other coins,

7    then you could open up risk position.  So if I

8    had customer obligations of 100 Bitcoin and I

9    had 101 Bitcoin in my asset account, I could

10   sell one Bitcoin.

11                  But in general, what we would do

12   would be sell Bitcoin.  You'd probably earn --

13   you'd probably sell Bitcoin for stables, and

14   then you would have stables that would fund

15   operations.

16                  But usually what would happen is

17   you'd manage risk so you were neutral from a

18   asset liability net position; so stablecoin

19   would be effectively the cryptocurrency that

20   you would use for payments, converting to

21   fiat, et cetera.

22        Q.   Do you know what fraction of the

23   cryptocurrency monetized by the debtors to

24   meet their fiat obligations prepetition was

25   stablecoin?

104

```
 1              C. Ferraro - Confidential

 2              MR. McCARRICK:  Object to

 3       form.

 4              You can answer.

 5       A.    I do not know.  I would guess that

 6  the vast majority of it was stablecoins that

 7  were put into fiat.  So liquidated into fiat.

 8       Q.    And do you know what fraction of

 9  those stablecoins were deposited by customers

10  into earn accounts?

11              MR. McCARRICK:  Object to

12       form.

13              You can answer if you know.

14       A.    What portion of the stablecoins

15  that we used to fund?  I would -- I would

16  venture to guess all of them.

17       Q.    So all of the stablecoin that the

18  debtors monetized prepetition was associated

19  with customer accounts?

20              MR. McCARRICK:  Object to

21       form.

22              You can answer.

23       A.    Yeah, to my understanding.  We

24  didn't have a perfect process on custody, but

25  we would exclude custody from it.  So, yeah, I
```

105

```
 1              C. Ferraro - Confidential
 2   mean, the vast, vast, vast majority of them
 3   would be related to earn accounts.
 4       Q.    Okay.  Do you know when the last
 5   time was before the petition date that the
 6   debtors monetized stablecoin?
 7       A.    I would assume we did it right
 8   before the -- right leading up to the petition
 9   date, to the filing.  I mean, any payments
10   across cryptocurrency, gas fees, things like
11   that, you pay a lot in stablecoins.  So
12   you're -- in reality, you're using stablecoins
13   multiple times.
14       Q.    Okay.  And do you have a sense of
15   how much stablecoin was monetized?
16       A.    I don't know off the top of my
17   head.  That was -- I was not the CFO, and this
18   was handled largely with the CFO and the
19   treasury team.  I wasn't part of those
20   conversations.
21       Q.    Do you know whether the debtors
22   have continued to monetize stablecoin after
23   the petition date?
24       A.    Well, we're not able to sell,
25   trade cryptocurrency.
```

106

1              C. Ferraro - Confidential

2         Q.    So the answer is no, they haven't?

3         A.    So the answer is no.  Yeah.

4         Q.    Okay.  Let's turn to paragraph 24

5    of your declaration.  And let me know when

6    you're there.

7         A.    Yes, sir.

8         Q.    Okay.  In the first sentence of

9    that paragraph, you state:  "Post-petition,

10   the debtors have faced continued liquidity

11   challenges."

12              Do you see that?

13        A.    Yes.

14        Q.    Okay.  When do the debtors project

15   they will run out of liquidity?

16        A.    On a consolidated basis of the

17   debtors, in the first quarter of 2023.

18        Q.    Is there any more specific

19   projection for when the liquidity runs out

20   beyond the first quarter of 2023?

21        A.    It's really -- it gets very tight

22   at the end of February, and we go negative in

23   the beginning of March.

24        Q.    Okay.

25        A.    That's on a consolidated basis.  I

107

1                 C. Ferraro - Confidential

2   think the mining -- the mining entity, I

3   believe, runs out of cash in January, late

4   January.

5         Q.    And when do the debtors project

6   they will run out of liquidity if they're

7   permitted to sell stablecoin?

8         A.    Stablecoin sale would at least

9   give us another month of runway, if not a

10  little bit more.

11        Q.    So -- I'm sorry.

12        A.    If not a little bit more.  So that

13  should get us into probably April.

14        Q.    Okay.  Do the debtors intend to be

15  out of bankruptcy before that time?

16        A.    It's highly unlikely.  We would

17  love to be, but --

18        Q.    Why -- I'm sorry, I feel like I

19  keep cutting you off, and that's my fault.

20  You said, "It's highly unlikely, we'd like to

21  be."  Was there anything you wanted to say?

22        A.    Of course we would like to be, but

23  it's doubtful that we'll be out in early

24  second quarter.  It's probably a few months

25  later if we do everything properly.

Confidential       Christopher Ferraro - November 21, 2022

108

```
 1                 C. Ferraro - Confidential
 2          Q.    So let's break that answer down.
 3    So why do you say it's highly unlikely?
 4          A.    Well, we have to -- I mean, we're
 5    in a dual-track process right now where we're
 6    going through sales and marketing of the
 7    assets.  We're also working on a standalone
 8    reorganization plan working with the committee
 9    and their professionals as well.
10                 You know, we're just in a world in
11    which we're trying to maximize value for the
12    estate.  I think there's also key legal
13    questions, to my understanding, that still
14    need to be answered, investigations that need
15    to be finished.
16                 But most importantly for me, I'm
17    working on the reorganization plan, and my
18    understanding of the timelines and, kind of,
19    how the plan gets approved -- gets commented
20    on, gets approved and -- right? -- is early
21    second quarter of 2023 is a stretch to get out
22    of bankruptcy.
23          Q.    What happens -- what happens if
24    the debtors run out of liquidity before
25    they're able to exit from bankruptcy?
```

109

```
 1              C. Ferraro - Confidential
 2        A.    Well, that would be administrative
 3   bankruptcy, and you'd effectively cease to
 4   operate in this Chapter 11 proceeding, is my
 5   understanding.
 6        Q.    Are the debtors trying to avoid
 7   that outcome?
 8        A.    Absolutely.
 9        Q.    Well, so I'd like you to, then,
10   kind of, reconcile those two things for me
11   because the debtors are running out of money.
12   Right now, even with the sale of stablecoin,
13   they're going to run out, let's say, by April,
14   but you say it's highly unlikely that the
15   debtors will be out of bankruptcy by April.
16              So what's the plan?
17              MR. McCARRICK:  Object to
18        form.
19              You can answer.
20        A.    Well, I think we have to raise
21   liquidity.  Stablecoins, in my opinion, is the
22   cheapest and easiest way to fund the case.
23   That does not mean that the case is completely
24   funded.  We'd have to go -- we'd have to go
25   out and either raise financing, debt
```

110

1                    C. Ferraro - Confidential

2      financing, which is incredibly expensive.

3      This comes at a major cost to the estate, and

4      the value that we'll be able to provide to

5      borrowers.  Debt financing is incredibly

6      expensive.  Stablecoin, effectively no cost to

7      liquidate.

8                    We also have the ability -- right?

9      -- to, if -- if so is approved, if said is

10     approved, we have the ability to use coins to

11     borrow, and we can fund that way, either

12     through DeFi protocols or centralized

13     counterparty.  That's going to be cheaper than

14     DIP financing.  And then, of course, you could

15     sell other coins to fund the case.  I think --

16          Q.    Are those are all --

17          A.    I think --

18          Q.    Sorry.  Go ahead.

19          A.    Yeah, sorry.  I think we've pulled

20     the expense management lever really hard.

21     We've gone from 920 employees to about 167

22     employees as of, really, last week.

23                    So I think that we're in a world

24     in which, you know, we've cut expenses, we've

25     cut vendor costs.  We've gotten rid of -- out

111

                    C. Ferraro - Confidential

1   of all of our debtors' real estate offices.

2   So we've tried to reduce the cost of this case

3   as much as we can.

4

5             I think that lever, albeit, we can

6   still optimize a little but, but that's been

7   pulled about as hard as we can without

8   jeopardizing our ability to furnish diligence

9   questions, help out with the sales process, or

10  come up with the reorg plan.

11            So I don't think cutting expenses

12  is going to be a significant benefit at this

13  point.  So I think it really comes down to

14  financing vis-à-vis the coins, DIP financing,

15  and other protocols that we can borrow

16  against.

17       Q.    Okay.  Yeah.  So you mentioned

18  three possible ways to increase liquidity:

19  DIP financing, borrowing, or selling coins.

20  Right?

21       A.    Yeah.

22       Q.    Okay.  So are those all options

23  the debtors are considering pursuing?

24       A.    We've analyzed all options.

25       Q.    Have the debtors taken any steps

112

1              C. Ferraro - Confidential

2     towards actually achieving any of those three

3     things?

4          A.    Yeah, the sale of stablecoins.

5     That's what we're here discussing today.  This

6     is the cheapest and the first step.  We

7     also --

8          Q.    Okay.  Anything else?

9          A.    Well, we did do -- working with

10    Centerview Partners, there was a DIP process

11    early on in the case, and I believe the

12    decision was to pause that given its cost.  So

13    we're hoping we don't have to go to the DIP

14    financing.

15         Q.    All right.  But sitting here

16    today, is the -- besides the sale of

17    stablecoins, is the debtor doing anything else

18    to decrease liquidity?

19         A.    We need approval to be able to

20    deploy coins into DeFi protocols or to use

21    them as collateral to borrow against.  We've

22    analyzed the costs and the risks.  We have not

23    done anything that would require approval, to

24    my understanding.

25         Q.    So sitting here today, these are

113

1              C. Ferraro - Confidential

2    all hypothetical ways of bringing in

3    liquidity, but there is no certainty that any

4    one of them will actually bring in liquidity?

5          A.    The --

6                MR. McCARRICK:   Object to

7          form.

8                You can answer.

9          A.    The most certain one is the sale

10   of stablecoins.

11         Q.    Okay.  But that by itself is not

12   sufficient to fund these cases as long as you

13   think that --

14         A.    I anticipate that the case -- the

15   case will go past April.  That's just -- first

16   time I'm in Chapter 11.  So it's my, you know,

17   kind of, semi-educated take on this.  We'll

18   need some other ways of financing.

19              But, first, stablecoins is the

20   cheapest.  It's what we use in our ordinary

21   course.  It's how we operate.  It's how the

22   industry operates.  So that's the relief we're

23   asking for right now.

24         Q.    Okay.  And you mentioned, part of

25   your answer before, was that in order to exit

114

                    C. Ferraro - Confidential

1    bankruptcy responsibly, I think was the words

2    you used, you're going to need more time than

3    you would have just to be read.  Is that

4    right?

5         A.    Again, with my, kind of,

6    uneducated, nonexperienced eye, and looking at

7    the, kind of, legal calendar and how things

8    progress, it's probably going to be a little

9    bit more than April.  That's my guess.

10        Q.    And you mentioned in your

11   testimony what I think you called "key legal

12   questions" that need to be resolved before the

13   company can exit from bankruptcy.

14            Do you remember that testimony?

15        A.    Yeah, I believe they called --

16        Q.    What are those -- go ahead.

17        A.    -- you know, key questions of

18   first impression or key, you know, gating

19   legal questions.

20        Q.    What are those key legal

21   questions?

22        A.    I'm probably not the right person

23   to ask that, you know.  I can give you --

24        Q.    Well, I mean -- go ahead.  I

115

                    C. Ferraro - Confidential

1
2    didn't mean to cut you off.  Go ahead.

3         A.    Yeah.  I said I'm probably not the

4    right person to ask that.  The key legal

5    questions are the ones that are being brought

6    up for the judge to decide through the

7    procedure and process.

8         Q.    Are there other legal questions or

9    key legal questions that you're referring to?

10              MR. McCARRICK:   Object to

11         form.

12         A.    Yeah.  I think -- I mean, I think

13   the key -- one of the key legal questions is

14   the title of the -- of -- you know, for us,

15   terms and use is clear, crystal career.  But I

16   don't think that the judge has ruled on that

17   yet.

18        Q.    But the judge is going to rule on

19   that next month.  Right?

20        A.    I don't know the legal calendar.

21   I don't have it in front of me.

22        Q.    Okay.  Well, let me ask you:  Are

23   there any other key legal questions besides

24   the question of title over the earn assets

25   that you were referring to when you said there

116

```
 1                C. Ferraro - Confidential
 2   are key legal questions that need to be
 3   resolved before we can exit bankruptcy?
 4                MR. McCARRICK:  Object to
 5        form.
 6                You can answer.
 7        A.    Custody.  Is custody separate from
 8   earn, and does the customer retain title?  I
 9   think that's a big one.
10        Q.    Okay.
11        A.    Obviously in our stablecoin
12   motion, we're not -- we're excluding custody
13   coins, withheld coins, and lending coins.  I
14   think the lending program and how you deal
15   with both the collateral as well as the
16   outstanding balance that the customers owe is
17   also a key gating legal question.  I think
18   those are three of them that come to my mind.
19        Q.    Okay.  And it's your understanding
20   those questions aren't likely to be resolved
21   before April?
22        A.    Oh, I don't know that answer.  I
23   mean, we also have to do a reorganization plan
24   and get through the sales process.  There's
25   investigations going on.  So my April comment
```

117

1              C. Ferraro - Confidential

2   was not just about the legal questions, it was

3   about the entire case.

4         Q.    Got it.  Okay.

5              CERTIFIED STENOGRAPHER:

6         Counsel, can we take a break?

7              MR. HERSHEY:  Absolutely.

8         Mr. Ferraro, are you okay with

9         taking a break?

10             THE WITNESS:  I am.  Thank

11        you.

12             MR. HERSHEY:  Let's go off the

13        record and we can talk about a time.

14             THE VIDEOGRAPHER:  Stand by.

15        The time now is 10:38 a.m.  This

16        concludes Media 1.  Off the record.

17             (Recess taken from 10:38 a.m.

18        to 10:59 a.m.)

19             THE VIDEOGRAPHER:  The time

20        now is 10:59 a.m.  This begins Media

21        2.  On the record.

22   BY MR. HERSHEY:

23        Q.    Okay.  Welcome back, Mr. Ferraro.

24   Can you hear me okay?

25        A.    Yes.  Yes, I can, Mr. Hershey.

Confidential        Christopher Ferraro - November 21, 2022

118

                    C. Ferraro - Confidential

 1

 2    Thank you.

 3        Q.    Okay.  I don't have too many more

 4    questions.  I actually wanted to return to a

 5    few of your answers.  I think that will be

 6    easier before I continue through, so I'd ask

 7    just to, sort of, return to a few things we

 8    discussed.

 9            The first thing I want to return

10    to is your testimony regarding whether Celsius

11    can trace the stablecoins it intends to sell.

12            I want to distinguish between

13    tracing things on the blockchain and tracing

14    things within Celsius' platform.

15            Just to be clear, once the

16    stablecoins are deposited onto Celsius'

17    platform and moved around within Celsius, at

18    that point can Celsius trace them, their

19    movements within Celsius' platform?

20        A.    We do not trace cryptocurrencies

21    specifically across the platform.  We look at

22    it where it is within our frameworks of, like,

23    liquidity, where it's deployed, et cetera.

24            So honestly I'm not a blockchain

25    expert, so -- but I do know that the way that

Confidential        Christopher Ferraro - November 21, 2022

119

```
 1              C. Ferraro - Confidential
 2   we run it is not to, kind of, trace from one
 3   point -- spot to the next because the coins
 4   are fungible.
 5        Q.    Right.  Right.  Okay.  That makes
 6   sense.  And you say you're not a blockchain
 7   expert.  Is there someone at Celsius you're
 8   aware of with more knowledge of these subjects
 9   who might be able to discuss more
10   authoritatively whether the coins are
11   traceable?
12              MR. McCARRICK:  Object to
13        form.
14              You can answer.
15        A.    Yeah, I think you -- you know,
16   Oren Blonstein would be -- he runs product.
17   He would be, you know -- and he's been with
18   Celsius for a longer period of time.
19   Obviously in product, you have to understand
20   the systems very tightly.  So he would
21   probably be a good person to ask.
22        Q.    Okay.  Anyone else you can think
23   of?
24        A.    Probably some of the folks within
25   the technology team.
```

Confidential        Christopher Ferraro - November 21, 2022

                                                                      120
 1                    C. Ferraro - Confidential

 2          Q.      So is that, like, Nuke Goldstein?

 3          A.      Nuke or Guillermo, the head of

 4     technology.

 5          Q.      Okay.  Let me ask you one more

 6     question before I return to what we were

 7     talking about.  And this is, again, so I

 8     understand the mechanics.

 9               Let's say I'm an earn customer.

10     This is before the petition date, before even,

11     let's say, April 15 of 2022.  I'm an earn

12     customer and I take out a loan, and I want to

13     pledge my coins that are associated with my

14     earn account as collateral for that money.

15               Would those coins then be moved

16     out of the earn account into a separate

17     collateral wallet somewhere?  Or how would

18     they travel, if at all, across Celsius'

19     platform once I pledge those assets as

20     collateral?

21               MR. McCARRICK:  Object to the

22          form and the characterization.

23               You can answer.

24          A.      It would be marked no longer as

25     earn, it would move to the collateral account,

121

```
 1                   C. Ferraro - Confidential
 2      and it would not accrue rewards.
 3           Q.    So just to be clear, when you say
 4      it would still be marked no longer as earned.
 5      So would the change only be on a ledger, or
 6      would there actually be movement of the coins?
 7           A.    I don't know the specific answer
 8      to whether it was moved or not, but I do know
 9      that the -- that we would code it no longer an
10      earn.  It would now be coded as part of the
11      collateral for the lending program.
12           Q.    Got it.  So there, at least, was a
13      ledger total, whether there was a
14      corresponding movement of coins, you don't
15      know?
16                   MR. McCARRICK:  Object to
17            form.
18                   You can answer.
19           A.    Yeah.  I mean, in the -- in our
20      back office system -- right? -- there's some
21      sort of a ledger entry.  I'm not sure that the
22      coin is moved or not.  I don't know.
23           Q.    And who -- who would know whether
24      the coin is moved or not?
25                   MR. McCARRICK:  Object to
```

122

```
 1                C. Ferraro - Confidential

 2         form.

 3                You can answer.

 4         A.    The deployment team, the product

 5    team.  I think Oren would be a good one to

 6    ask.

 7         Q.    All right.  But now we can return

 8    to what we were talking about before.  I

 9    appreciate your indulgence.

10                So I asked you before how the

11    debtors intend to get out of bankruptcy, and

12    you said right now there are two potential

13    paths that are being considered.  There's a

14    sale process that's being pursued, and also a

15    standalone plan option that's being pursued.

16                Is that an accurate representation

17    of your testimony?

18         A.    Yes.

19         Q.    Okay.  Had the debtors

20    communicated with any potential bidders

21    regarding their preference between a sale or a

22    standalone plan?

23                MR. McCARRICK:  Object to

24         form.

25                You can answer.
```

Confidential        Christopher Ferraro - November 21, 2022

123

1               C. Ferraro - Confidential

2          A.     Our preference is to maximize

3     value for the estate, not to do one or the

4     other.  We work closely with the committee on

5     the reorganization plan, and we make sure that

6     we're aligned there.  But the goal is single,

7     single purpose under dual-track process to

8     maximize value for the estate for the benefit

9     of our creditors.

10         Q.     So just to be clear, the debtors

11    have no preference between a sale or a

12    standalone plan?

13         A.     Only to maximize value would be

14    the preference.

15         Q.     Got it.  And then either one of

16    those could potentially maximize value?

17              MR. McCARRICK:  Object to

18         form.

19              You can answer.

20         A.     Yeah, I -- that's the goal.  Yes.

21         Q.     Okay.

22         A.     Those are the two --

23         Q.     And -- sorry.  Go ahead.

24         A.     Those are the two -- those are the

25    two types of transactions that we're focused

124

```
 1              C. Ferraro - Confidential
 2    on.  Right?  The sale process is tricky in a
 3    downturn.  Right?  It's hard selling assets.
 4    There's very little capital out there.  But,
 5    you know, we're actively doing it.  I've sat
 6    on hours of diligence calls related to
 7    potential bidders asking questions and
 8    providing documentation.
 9         Q.    And just to be clear, the debtors
10    have not formed any conclusion regarding which
11    process is more likely to maximize value?
12         A.    We haven't received the bids.  We
13    can't conclude until we see what people are
14    willing to pay.  So no.
15         Q.    Okay.  And I take it, therefore,
16    just to go back to my original question, the
17    debtors have not communicated with any
18    potential bidders regarding their preference
19    for a sale process or a standalone plan
20    process?
21              MR. McCARRICK:  Object to
22         form.
23              You can answer.
24         A.    I mean, no.  Our goal is to
25    maximize value.  We have to go through both
```

125

                    C. Ferraro - Confidential

1

2    processes.

3        Q.    Okay.  Again, returning to some of

4    your prior testimony, you testified that --

5    well, let me -- sorry, I take that back.  Let

6    me just ask you a fresh question.

7              When do the debtors anticipate

8    proposing a plan?

9        A.    We're currently actively working

10   with the committee on this today.  We were

11   supposed to -- we are having a meeting.  I

12   wasn't able to participate because I'm here.

13   But the internal team, our advisors, the

14   committee, and the committee's advisors are

15   discussing the current thinking around a

16   reorganization plan that's led by the product

17   team, Oren's team.  I sit on those.  I'm

18   incredibly involved in those -- in that

19   process.

20             This is -- we take this as a very

21   serious process.  This is how we're going to

22   return value back to the estate and to the

23   creditors, this and the sale process.  So,

24   yeah, and we work with the committee

25   hand-in-hand with this.

126

C. Ferraro - Confidential

1

2    Q.    So I appreciate the answer.  But I

3    just want to hone in on my specific question.

4    I understand the debtors are -- sorry, I

5    thought someone said something.

6              I understand the debtors are

7    working on proposing a plan.  My question is:

8    When do the debtors intend to propose a plan?

9              MR. McCARRICK:  Object to

10        form.

11        A.    I mean, we have to -- we have

12   questions we're working through with the

13   committee.  If you're asking when do I hope?

14   Okay.

15        Q.    Sure.

16        A.    When do I hope?  I hope that we

17   can lock down on what a reorganized entity

18   looks like by year end and then we can start

19   working on the disclosure statement.

20        Q.    Is it safe to say the debtors are

21   trying to propose a plan as soon as reasonably

22   possible?

23              MR. McCARRICK:  Object to

24        form.  Beyond the scope.

25              You can answer.

127

```
 1              C. Ferraro - Confidential

 2         A.    Tirelessly, seven days a week,

 3    nonstop, yes, sir.

 4         Q.    And the debtors wouldn't

 5    potentially do anything to delay its proposal

 6    of a plan.  Right?

 7              MR. McCARRICK:  Object to

 8         form.

 9              You can answer.

10         A.    There's nothing more that we want

11    to do than to get out of Chapter 11 the right

12    way.

13         Q.    So the answer is yes, the debtors

14    would not intentionally delay the proposal of

15    a plan.  Right?

16              MR. McCARRICK:  Objection.

17         Asked and very much answered.

18              THE WITNESS:  Can I answer?

19         Q.    You can answer again.

20              MR. McCARRICK:  Answer again.

21              THE WITNESS:  Oh, sorry.

22         A.    We are doing everything we can to

23    get out as fast as possible.  Delays hurt us,

24    hurt the estate, hurt our customers, hurt our

25    stakeholders.  We want to get out of this
```

128

1                  C. Ferraro - Confidential

2    process and do it the right way.

3        Q.    Thank you.  All right.  This is

4    actually my last line of questions, so we're

5    almost done.  And I will pass you on to

6    someone else who wants to ask questions.

7        A.    Okay.

8        Q.    Are you aware, Mr. Ferraro, that

9    since Celsius filed for bankruptcy, individual

10   account holders have filed letters and

11   statements on the bankruptcy court docket

12   regarding this bankruptcy?

13            MR. McCARRICK:  Objection to

14       form.

15            You can answer.

16       A.    Yes, I'm aware.  The judge has

17   also spoke about the letters.

18       Q.    Have you read any of those

19   letters?

20       A.    I have read some of the letters,

21   yes.

22       Q.    Do you remember which ones?

23       A.    There's too many to remember.

24   I -- I went through over 50 letters.  There

25   was a lot of letters.

129

```
 1              C. Ferraro - Confidential

 2        Q.    Sorry.  Keep going.

 3        A.    Yeah, the letters that are on

 4   Stretto?

 5        Q.    Yeah.

 6        A.    I was able to read letters, yes.

 7        Q.    Did you just testify that you've

 8   read over 50 of them?

 9        A.    Yeah.  I've read numerous letters,

10   lots of letters, yeah.  And they're all

11   heartbreaking -- heartbreaking letters.  It's

12   a very difficult read.  People are in a very

13   difficult position.

14        Q.    So, again, tell me -- tell me more

15   about that, because I am curious to hear the

16   reaction to the letters since you just

17   described them as "heartbreaking."

18              Is there anything more you would

19   like to say?

20              MR. McCARRICK:  This is well

21         outside the scope, but I want to

22         hear Mr. Ferraro's answer.

23              So you can answer.

24        A.    I mean, I think we're aligned --

25   right? -- the creditors want their coins back.
```

130

```
 1                C. Ferraro - Confidential
 2    And the company, its advisors, the committee,
 3    its advisors are working tirelessly to do
 4    that.
 5                There is nothing -- there is
 6    nothing out there that is, like, keep on, you
 7    know -- stay in bankruptcy, keep on processing
 8    the Chapter 11.  No.  We want to get coins in
 9    kind back to customers as soon as possible,
10    and I think that's consistent with the message
11    in the letters.
12         Q.    Are you aware whether anyone else
13    at Celsius has read those letters?
14         A.    I don't --
15                MR. McCARRICK:  Object to
16         form.
17                You can answer.
18         A.    I don't -- I'm not aware.  I don't
19    track the reading of letters.
20         Q.    Have you discussed the letters
21    with anyone else at Celsius?
22         A.    Likely, but not off of memory.  I
23    can't -- you know.  I'm sure it's come up.
24         Q.    Okay.  So it seems from your
25    testimony that you do think it's important
```

131

1              C. Ferraro - Confidential

2      that Celsius listen to the concerns of its

3      customers.

4          A.    The customer --

5              MR. McCARRICK:  Object.

6          Q.    Is that right?

7              THE WITNESS:  Sorry.

8              MR. McCARRICK:  Object to

9          form.  Well outside the scope.

10         Vague.  Not really sure what's going

11         on here.

12             But you can answer.

13         A.    I think our stakeholders with the

14     customers -- right? -- kind of at the center

15     of this plan, it's important to understand

16     where they're coming from, right?  We work for

17     the benefit of the estate.  So, yes, I think

18     it's important.

19         Q.    Have you spoken with any of the

20     debtor/stakeholders regarding a potential plan

21     of reorganization?

22         A.    Any of the debtors what?

23             MR. McCARRICK:  Ob- --

24             THE WITNESS:  Oh, sorry.

25             MR. McCARRICK:  I'm sorry, I'm

132

1            C. Ferraro - Confidential

2        just going to object -

3            MR. HERSHEY:  Let me re-ask

4        the question and then you can

5        object, T.J. --

6            MR. McCARRICK:  Yup.

7            MR. HERSHEY:  -- so he hears

8        it and I'll speak a little more

9        clearly.

10        Q.    Have you spoken -- you personally,

11    have you spoken with any of the

12    debtor/stakeholders regarding a potential plan

13    of reorganization?

14            MR. McCARRICK:  Object to

15        form.  Outside the scope.

16            You can answer.

17        A.    I speak with the committee,

18    they're stakeholders.  We have -- we have

19    regular conversations.

20        Q.    Anyone else?

21        A.    I've discussed it in my 341

22    testimony about the dual-track process.  I

23    have not asked specifically to the employees

24    that are working on the plan if they are also

25    a customer.  Yeah.

Confidential       Christopher Ferraro - November 21, 2022

                                                                    133
1                    C. Ferraro - Confidential

2          Q.    Okay.  So just to be clear, you

3    mentioned speaking with members of committee

4    about the potential plan of organization.

5                 Is there any other stakeholders or

6    debtors with whom you've had conversations

7    regarding a potential plan of reorganization?

8                 MR. McCARRICK:  Objection.

9          Outside the scope.

10                You can answer.

11         A.    I told you the 341 testimony is

12   with stakeholders; creditors ask questions at

13   the end.  Some of it was about maximizing

14   value for the estate.  I would have discussed

15   the dual-track process.

16                And then, you know, in

17   conversations with potential buyers, every now

18   and then the reorganization, standalone

19   reorganization comes up, and my discussion

20   with them is the same as I'm having here; it's

21   a dual-track process, we have to execute

22   across both to maximize value for the estate.

23         Q.    Right.  Okay.  I just want to be

24   crystal clear.  I'm including advisors of

25   stakeholders as well in this question.

134

1              C. Ferraro - Confidential

2                   Are there any other stakeholders

3      or their advisors with whom you have discussed

4      plan of reorganization?

5                   MR. McCARRICK:   Object to

6          form.

7                   You can answer to the extent

8          you understand.

9      ███████████████████████████████

10     ████████████████████████████████████

11     ███████████████████████████████████

12     ██████████████████████████████

13     ██████████████████████████████████████

14     ████████████████████████████████████

15     ██████████████████████████████████████

16          ████████████████████████████████

17     ██████████████████████████████████████

18     ██████████████████████████████████████

19     ██████████████████████████████

20     █████████████████████████████████

21     ██████████████

22          Q.    And those are the only

23     conversations I'm asking about.

24          A.    Yeah.

25          Q.    So I appreciate the answer.

Confidential        Christopher Ferraro - November 21, 2022

135

```
1              C. Ferraro - Confidential

2                    Have you spoken with any

3    individual account holders since becoming CEO?

4                    MR. McCARRICK:   Object to

5          form.

6                    You can answer.

7          A.    The committee are account holders.

8    I've spoken with them.

9          Q.    Anyone -- any account holders

10   besides the members of the committee?

11                   MR. McCARRICK:   Object to

12         form.   Outside the scope.   Don't

13         know where this is going.   Let's

14         move it along, Sam.

15         A.    I think I've, you know --

16         Q.    You can answer.

17         A.    On the 341 hearing, there was

18   creditors on the 341 hearing.

19         Q.    Okay.   So other than the 341

20   hearing and other than conversations with the

21   committee members, have you had -- since

22   becoming CEO, have you had any conversations

23   with Celsius account holders?

24                   MR. McCARRICK:   Object to

25         form.
```

136

C. Ferraro - Confidential

1

2      A.      Employees.  But I don't know if

3 they're account holders because I don't ask

4 them.  Oh, and I --

5      Q.      So is it --

6      A.      -- I did --

7      Q.      Do you agree -- sorry.  Go ahead.

8      A.      And I did have -- thank you.  My

9 memory is now jogged.  I did have a

10 conversation with one account holder, yes.

11      Q.      Can you describe that

12 conversation?

13 ████████████████████████████████

14 ████████████████████████████████████

15 ████████████████████████████████████

16 ████████████████████████████████

17 ███████████████████████████████████

18      Q.      Okay.

19      A.      So that's the only -- that's the

20 only person that I can think of outside the

21 committee, the committee's advisors, internal,

22 and our advisors.

23      Q.      Okay.  Great.

24              MR. HERSHEY:  That is actually

25         the end of my questions,

137

```
 1        C. Ferraro - Confidential
 2   Mr. Ferraro.  I'm just going to
 3   reserve the right if your attorney
 4   asks you questions at the end of the
 5   deposition, to then do some further
 6   questioning of you.  But other than
 7   that, I'm finished.  Thank you very
 8   much for your time.  I appreciate
 9   it.
10        And I will pass the witness.
11        THE WITNESS:  Thank you, Sam
12   Hershey.  Thank you.
13        MR. McCARRICK:  I think the US
14   Trustee is on -- on deck.
15        MS. CORNELL:  You want to take
16   a break?
17        THE WITNESS:  I'm okay.
18        MS. CORNELL:  Yeah?  You sure?
19        THE WITNESS:  Yeah.  Thank
20   you.
21        MR. McCARRICK:  Let's go off
22   the record.
23        THE VIDEOGRAPHER:  The time
24   now is 11:15 a.m.  This concludes
25   Media 2.  Off the record.
```

138

                    C. Ferraro - Confidential

1                        (Recess taken from 11:15 a.m.

2          to 11:17 a.m.)

3                        THE VIDEOGRAPHER:  The time

4          now is 11:17 a.m.  This begins Media

5          3.  On the record.

6  EXAMINATION BY

7  MS. CORNELL:

8          Q.    This is Shara Cornell, S-h-a-r-a

9  C-o-r-n-e-l-l, on behalf of the office of the

10  United States Trustee.

11                   Okay.  So I had a couple of

12  follow-up questions and some additional

13  questions also.

14                   Previously, at the beginning of

15  your deposition, you discussed your

16  background, and specifically your different

17  appointments while at Celsius.



139

1                      C. Ferraro - Confidential

140



17    Q.    Thank you.  Also earlier in your

18   testimony, you discussed a little bit about

19   your educational background and your

20   employment background.

21            As part of that testimony, as I

22   understand it, you did not have any specific

23   experience with cryptocurrency or related.

24            Can you please explain just a

25   little bit about how you educated yourself

141

C. Ferraro - Confidential

1

2    prior to joining Celsius?

3         A.    Yeah.  You know, spending almost

4    two decades at JPMorgan, I tend to view the

5    world as a bank.  I tend to see things as a

6    risk/return type of lens, risk management.

7              So when I joined Celsius, I think,

8    in the negotiations I was able to study --

9    right? -- that's what I do.  I like to read up

10   and study things.

11             And in my mind, I, kind of, look

12   at cryptocurrency as another set of assets

13   that fits into the shelf of my mental model of

14   how to think about risk.

15        Q.    Okay.

16        A.    So for me it wasn't that different

17   to think about a fiat or a stablecoin or about

18   a cryptocurrency token versus a loan position

19   or something like that.  It comes with risk

20   and reward and balance sheet -- right?  And

21   that's what I did for two decades was balance

22   sheet management.

23        Q.    What about the blockchain itself

24   and how it worked and how assets are

25   transferred on the blockchain?

142

1                    C. Ferraro - Confidential

2                    Was there any specific ways that

3       you educated yourself on the workings of that?

4            A.    Well, there's a lot of stuff out

5       there to read, right?  I mean, it's nothing

6       more than a super-sized ledger where multiple

7       copies and people have -- it's all public,

8       people have access to it.

9                    So if you think about it in a

10      world of it's just recording transactions, it

11      makes it pretty simple.

12           Q.    Did you own any cryptocurrency

13      prior to joining Celsius?

14           A.    No.  I bought my first Bitcoin

15      yesterday.

16           Q.    It's a good time a buy.

17           A.    Yeah.  I wasn't able to buy that

18      much.  It was only about probably 1/20 of a

19      Bitcoin.  But I did want to see the

20      experience, so ...

21           Q.    At times during your earlier

22      testimony, you referred to Kirkland & Ellis as

23      your "advisors."

24                    For the record, can you just

25      clarify in what capacity Kirkland & Ellis

143

```
 1              C. Ferraro - Confidential

 2    represents you and whether or not you have

 3    your own personal counsel with respect to

 4    Celsius?

 5         A.    Yeah.  So Kirkland & Ellis is

 6    legal advisors to the debtors, to the company.

 7    I have my own legal representative, Paul

 8    Hastings --

 9         Q.    Okay.

10         A.    -- is my pool coverage.

11         Q.    Thank you.  I'm going to try not

12    to repeat questions that were asked or

13    answered earlier, but sometimes I just need to

14    re-ask them to make sure that it flows a

15    little bit and it's not coming out of nowhere.

16    So I apologize.

17              The interrogatory responses that

18    were released earlier, did you provide any of

19    the responses to the interrogatories?

20              MR. McCARRICK:  Object to

21         form.

22              You mean the written

23         deposition questions?

24              MS. CORNELL:  The written

25         depo- -- yeah.  Is that --
```

144

```
 1            C. Ferraro - Confidential

 2            MR. McCARRICK:  I think that's

 3        what he would probably refer to them

 4        as.

 5        Q.    The written deposition questions.

 6        A.    I didn't craft any of them.

 7        Q.    Do you know who from Celsius did

 8   or was a part of those answers?

 9        A.    I only know the single meeting

10   that I was on.

11        Q.    Okay.

12        A.    And, like I said, I was

13   multitasking.  Unfortunately, in my job I'm in

14   meetings all day.  So what I do is multitask

15   all day long.  And I was prepping, reading the

16   declarations, reading the motion on

17   stablecoins.  I honestly -- I think Oren

18   Blonstein was on the call.  But I can't even

19   recall.

20        Q.    Uh-huh.  You testified earlier

21   that today's testimony is in connection with

22   the deployment of coins and the terms of use.

23            Just for the record, are you

24   familiar with the terms of use?

25        A.    I'm not an expert.  I didn't craft
```

145

```
1              C. Ferraro - Confidential
2     them.  But I've read through them so I'm
3     familiar with them in general.
4          Q.    Were you employed at Celsius when
5     they were drafted?
6          A.    I started working at Celsius
7     March 21, 2022.  So that probably is somewhere
8     around when the custody was launched.  So they
9     would have been drafting, but I wasn't part of
10    those conversations or the drafting.  So ...
11         Q.    Do you --
12         A.    I would assume that that was going
13    on while I was at Celsius but in a different
14    capacity.
15         Q.    In a different capacity.
16               Under -- we've been discussing
17    drafts, like 1, 2, 3, 4, 5, 6, 7, 8.  Around
18    the time that you started, are you aware of
19    which draft number would have been employed by
20    Celsius?
21         A.    It would have been between 6 and
22    8, is my understanding.  And I say that
23    because I believe 8 is when the custody was
24    launched.  And I joined March.  And I believe
25    custody was launched in mid-April.  So we
```

146

```
 1                    C. Ferraro - Confidential

 2      were, kind of, right between those two

 3      versions.

 4           Q.    After you were immediately

 5      employed by Celsius until today's date, were

 6      there any amendments to the terms of use that

 7      you're aware of?

 8           A.    I think that was the Version 8

 9      that came out, I believe.  I think when I

10      joined it would have been 6 and then 8.

11           Q.    Were there any suggestions to

12      further revise or amend the terms of use since

13      you've been employed at Celsius?

14           A.    I --

15                 MR. McCARRICK:  Object to

16           form.

17                 Just exclude anything that you

18           know solely from legal counsel.

19           Otherwise you can answer based on

20           anything --

21           A.    I'm not part of those

22      conversations.  I have not been.

23           Q.    If there were to be an amendment,

24      are you familiar with what the process would

25      be for there to be an amendment ratified or
```

Confidential        Christopher Ferraro - November 21, 2022

147

                    C. Ferraro - Confidential

 1

 2    instituted by Celsius?

 3        A.    No.   Because in bankruptcy we're

 4    not talking about amending the terms of use,

 5    and that's my focus.

 6        Q.    So you wouldn't be familiar with

 7    the amendment process outside of bankruptcy if

 8    Celsius was still operating in its regular

 9    course?

10        A.    I would only -- from what I've

11    heard, I would expect that that would

12    continue.  Between legal and regulatory, you

13    know, they would, with product, draft the

14    terms of use, make any changes, broadcast

15    that, et cetera.  I think in these materials

16    it's been explained, kind of, how we

17    communicated with customers and how that was

18    done.

19        Q.    I understand.  I just want to try

20    to get a little bit more information about how

21    the process for approving or ratifying the

22    amendments would have occurred at Celsius

23    itself, not with respect to customers.

24             Would it have been approved by the

25    board?  Would it have been approved by

148

1                    C. Ferraro - Confidential

2    separate division heads?  What would the

3    process have been with respect to Celsius

4    exclusively?

5                    MR. McCARRICK:  Object to

6         form.

7                    You can answer.

8         A.    I do not know.  All I know is that

9    in listening and being a part of this, that

10   legal and regulatory teams were the primary

11   drafters of this, and that they would have had

12   approvals to go through.

13                  In today's world that I operate

14   in, any cha- -- I mean, we wouldn't make

15   changes to the terms of use; it would make no

16   sense.  But if we did, it would go through the

17   special committee, right?  But in ordinary

18   course before?  I don't know the process.  I'm

19   sorry.

20        Q.    Okay.  Other than Kirkland &

21   Ellis, who are outside counsel for Celsius?

22        A.    I know Akin Gump represents us on

23   certain matters.  We have local counsel in

24   Israel and Serbia.  I cannot remember their

25   names.  I apologize.

149

```
 1                  C. Ferraro - Confidential
 2          Q.     Sure.  As part of the
 3   interrogatory responses -- I believe it was
 4   Interrogatory Number 1 -- there were
 5   references made to outside counsel that may
 6   have assisted with the drafting of the terms
 7   of use.
 8                  Are you familiar with which law
 9   firm that would be?
10          A.     I do not know.  This was before my
11   time.
12          Q.     So is it your understanding that
13   it would be a law firm that is not currently
14   employed by Celsius?
15          A.     I do not know.
16          Q.     Are you familiar with the firm
17   Latham & Watkins?
18          A.     Yes.
19          Q.     Are Latham & Watkins regulatory
20   counsel for Celsius?
21          A.     Thank you, yes.  Sometimes I need
22   a memory.  Sorry, Latham is our regulatory
23   counsel.  I was thinking in the Chapter 11
24   construct.  I'm sorry.
25          Q.     Oh, don't worry about it.  There's
```

150

1                    C. Ferraro - Confidential

2       a lot of -- there's a lot of firms involved so

3       it's understandable.

4              A.    They would have been involved, I

5       would think, working with regulatory and legal

6       on the terms of use.

7              Q.    Have they been employed by Celsius

8       during your entire tenure?

9              A.    My -- yes.  During my tenure and,

10      I believe, before.  I don't know when it

11      started, but I know the relationship is

12      pre- -- has been going on for a while.

13             Q.    So would it be fair to say that if

14      there were outside regulatory counsel that

15      assisted in the drafting of the terms of use,

16      it would have been Latham & Watkins?

17                   MR. McCARRICK:  Object to

18             form.

19                   You can answer to the extent

20             you know.

21             A.    I would -- I would assume they

22      would have been involved, yes.

23             Q.    Okay.  Do you know who Ron Deutsch

24      is?

25             A.    He's the general counsel for the

151

```
 1              C. Ferraro - Confidential
 2    company, Celsius, yeah.
 3         Q.    How long has he been employed by
 4    Celsius?  Your knowledge.
 5         A.    Over a year.  I don't know if he
 6    started in 2020 or 2021.  I believe it was
 7    2021.  Mid/early 2021.
 8         Q.    So he's been general counsel since
 9    you've been employed by Celsius?
10         A.    Yes.
11         Q.    Are you familiar with his
12    background?
13         A.    Generally.  Not -- not the firms
14    he worked for.  I know he did represent
15    financial services clients.
16         Q.    Okay.  A little bit earlier you
17    made reference to Joseph Golding-Ochsner.  Are
18    you familiar with him?
19         A.    Yes.
20         Q.    Do you know what his position is
21    at Celsius?
22         A.    He's on the legal team, on the
23    internal legal team.
24         Q.    And what about Yarden Noy?
25         A.    He's on the regulatory team.
```

152

```
 1              C. Ferraro - Confidential
 2         Q.    And what about Roni Cohen-Pavon?
 3         A.    He's on the regulatory team as
 4    well.  He leads the regulatory team.
 5         Q.    He leads the regulatory.  I just
 6    listed four different attorneys that are
 7    employed by Celsius.
 8              Were all four of those attorneys
 9    employed -- strike that.
10              Since you were employed at
11    Celsius, have all four employees -- have all
12    four of those employees been employed by the
13    legal department at Celsius?
14         A.    And the reg department, yes.  They
15    were all -- all four of them have been here
16    since my tenure.
17         Q.    Can you explain a little bit about
18    the legal and the regulatory teams.  Are they
19    two separate and distinct teams?
20         A.    Yeah, two separate and distinct
21    teams.  The regulatory team is lead by Roni
22    Pavon, he's on -- is also an ExCo member.  And
23    the legal team is ran by Ron Deutsch, the
24    general counsel, and he's also on the ExCo
25    leadership team, executive committee
```

153

```
 1              C. Ferraro - Confidential
 2    leadership team.
 3              (Stenographer clarification.)
 4        Q.    Since you've been employed at
 5    Celsius, were there or have there been other
 6    attorneys employed by Celsius?
 7        A.    Yeah.  There's a legal team, yeah.
 8        Q.    But the folks that I just
 9    mentioned, would you consider them the
10    leadership?
11        A.    Yeah.  I mean, you have the two
12    heads of the group, and I think Joseph and
13    Yarden are, kind of -- I don't know that
14    they're officially called "deputies," but they
15    are definitely the more senior folks within
16    the team.
17        Q.    And all four of them still work at
18    Celsius?
19        A.    Yes.  In the update I gave to the
20    Court, I believe there was six on the legal
21    team currently and three on the reg team
22    currently, off of memory.
23        Q.    And if you know, are you familiar
24    with who would have hired any of those
25    individuals?  My understanding is they may
```

154

1                    C. Ferraro - Confidential

2     have all started before your tenure.

3           A.    Yeah, yeah.

4           Q.    Okay.

5           A.    I mean, it was a small company

6     then so, you know, I would think that most --

7     the leadership team would have been involved

8     in hiring them, but I'm only guessing.

9           Q.    Okay.  Are you familiar with the

10    budget that was filed at ECF Docket 1111 on

11    October 17, 2022?

12          A.    The cash flow budget?

13          Q.    Yup.

14          A.    Not the specific one but, yes,

15    with the processing and the -- yeah.

16          Q.    I'm not going to ask specific

17    questions, but I just wanted to know if you

18    were generally familiar with --

19          A.    I approve each one of those that

20    gets filed.

21          Q.    To your knowledge, has there been

22    an updated 13-week forecast?

23          A.    Yes.  We update it -- we update it

24    regularly.

25          Q.    When do you anticipate that an

155

C. Ferraro - Confidential

1

2    updated would be filed with the Court?

3        A.   We're probably getting to -- it's

4    either this week or next.  It's usually --

5    it's usually towards the middle of the month

6    when we file a new report, so...

7        Q.   So you expect it probably to be

8    filed with your monthly operating reports or

9    about that?

10       A.   Yeah, very soon.

11       Q.   So obviously it hasn't been filed

12   yet, but perhaps you've reviewed some of the

13   first drafts.

14            Are there any stark differences

15   between the 13-week forecast that you are

16   aware of?

17            MR. McCARRICK:  Object to

18       form.

19            You can answer.

20       A.   I'm just -- I'm just thinking.

21       Q.   Yeah.

22       A.   Because we do regular versions and

23   we walk them, effectively, explain the

24   variances.  I'm just trying to think

25   through -- I don't know of anything that was

156

```
1               C. Ferraro - Confidential
2   significant.  I mean, there's always a handful
3   of millions that, kind of, in the launch point
4   that impacts our forecast.  And then we
5   obviously have a lot of people looking at,
6   kind of, expected inflows and outflows.
7        Q.   Sure.
8        A.   But I don't know of anything
9   meaningful that's changed.
10        Q.   Okay.  At the last hearing last
11   week, do you remember a discussion about
12   whether or not Celsius was currently cash flow
13   positive?
14        A.   Yeah, in the mining company,
15   operational cash flow positive.
16        Q.   As of today's date, is that still
17   accurate?
18        A.   Operationally cash flow positive,
19   yes.  Because we curtail and it's neg- -- so
20   we have only six people in mining.
21        Q.   Okay.
22        A.   And if the energy cost is more
23   expensive than what we can produce in new
24   Bitcoin, we just shut off the machines.
25               So, you know, our operational cash
```

157

1                C. Ferraro - Confidential

2    flows are positive.  There is some remaining

3    CapEx as we build out the midland proprietary

4    sites and some power deposits, and things like

5    that.

6         Q.   Have you or anyone at Celsius that

7    you're aware of, or Alvarez & Marsal who is

8    the financial advisors for the debtors,

9    prepared a liquidation analysis to date for

10   Celsius?

11        A.   We did a very high-level

12   liquidation analysis, and we shared it with

13   the committee.

14        Q.   As of today's date -- and

15   obviously you don't have the numbers in front

16   of you -- can you estimate offhand how much

17   general cryptocurrency Celsius has as of

18   today's date?

19        A.   Versus the obligations?

20        Q.   Yes.

21        A.   I'm working off of memory.  It's

22   probably around 50 cents on the dollar

23   liquidation value.

24        Q.   What about cash on hand?

25        A.   Cash on hand is in the 150-60

                                                              158
1                    C. Ferraro - Confidential

2     million range.  Cash has been pretty steady.

3     I think it's right around 170.  We topped up

4     around 190 and we've drawn down a little bit,

5     but it's hanging in there.  Now the

6     professional fees are starting to come.

7          Q.    Yeah.  A little bit earlier, we

8     touched just -- we touched a little bit on a

9     potential debtor in possession or DIP

10    financing.  Just for the record, are you still

11    planning to procure DIP financing as of

12    today's date?

13         A.    It's, kind of, the option of last

14    resort.

15         Q.    Sure.

16         A.    So we're not -- we're hoping that

17    we don't have to do DIP financing.

18         Q.    Have the debtors met with any

19    potential financer -- financiers or --

20         A.    Centerview ran a process early on

21    in the case.

22         Q.    Okay.

23         A.    And we -- I did see some of the,

24    kind of, proposals, and they were very

25    expensive.

Confidential        Christopher Ferraro - November 21, 2022

159

1                    C. Ferraro - Confidential

2        Q.    Based on your understanding of the

3    ledgers and liquidation analysis at Celsius,

4    would the sale of stablecoin affect any future

5    positioning if you were to seek a debtor in

6    possession finance loan later on down the

7    line?

8                  MR. McCARRICK:  Object to

9          form.

10                 You can answer.

11       A.    Not that I know of.

12       Q.    Are you familiar with the de

13   minimis asset motion, an order that was

14   previously requested and granted in this case?

15       A.    Yes, I am.

16                 MR. McCARRICK:  Objection to

17         form.

18                 THE WITNESS:  Oh, sorry.

19                 MR. McCARRICK:  You can

20         answer.  It's fine.

21       Q.    In it, the debtors sought to sell

22   certain share stocks and other de minimis

23   assets.

24                 To your knowledge, has there been

25   any flow of cash or liquidity from those

Confidential       Christopher Ferraro - November 21, 2022

160

                    C. Ferraro - Confidential

1

2    sales?

3         A.    Unfortunately, no.  The items in

4    which we hold are marketed, not actively

5    marketed, but there is very little interest.

6    We hold notes on mining companies in the

7    marketplace.  Mining companies are crushed.

8              We also hold some stock

9    certificates in a few companies.  Typically

10   the flow of daily volume is pretty light in

11   those, and we would move the markets, although

12   we did get nonobjections to sell one.  It was

13   under a million dollars.  But in general,

14   these are very illiquid and not much in

15   demand.

16        Q.    Are you familiar with the status

17   of the sale of the GK8 entity?

18        A.    Generally familiar, yes.

19        Q.    Would the sale of the GK8 entity

20   or the interest in it affect the liquidity

21   position of Celsius?

22        A.    If we were to sell it, it would be

23   a help, yeah.  We would have positive net cash

24   proceeds.

25        Q.    Do you have an estimate for --

161

1              C. Ferraro - Confidential

2   earlier we -- you discussed that you might be

3   able to extend through March without any

4   additional infusion of cash, and with the sale

5   of stablecoin, potentially April.  If the GK8

6   entity was sold, do you have an estimation

7   for --

8         A.    I -- I estimate that would get us

9   through the second quarter.

10        Q.    Through the second quarter.

11        A.    So with the stablecoin sale and

12  the GK8 sale, I think that would give us ample

13  liquidity, albeit it would be tight, to

14  probably fund this case.

15        Q.    And I know you -- this was asked

16  earlier, but I just want to confirm.  How much

17  stablecoin are you currently seeking to sell?

18              MR. McCARRICK:  Object to

19        form.

20        A.    18 million.

21        Q.    I think the previous request may

22  have been for 23 million.  Could you just

23  explain the change from 23 to 18 million for

24  the record?

25        A.    Yeah.  We wanted to be sure

162

1                    C. Ferraro - Confidential

2    that -- make sure that we didn't sell anything

3    that had to do with custody or withheld,

4    because those are key outstanding legal items,

5    as well as the loan program.

6                    So I think when we looked at the

7    total stablecoin in all the wallets, all the

8    assets that we have, and then we effectively

9    subtract at a coin level, custody, withheld in

10   the lending programs, you get to 18.

11        Q.    Are there any costs associated

12   with the sale of stablecoins?

13        A.    Very little.  Near zero.

14        Q.    Just for clarification, where or

15   what wallets are the stablecoins that you're

16   seeking to sell located in?

17                    MR. McCARRICK:  Object to

18        form.

19                    You can answer.

20        A.    I believe these are in the main

21   Fireblock accounts.

22        Q.    Is it correct that on that main

23   Fireblock account that the coins may be

24   sitting in are commingled accounts?

25                    MR. McCARRICK:  Object to

163

1                    C. Ferraro - Confidential

2          form.

3                    You can answer.

4          A.    Yeah, it's an omnibus structure.

5    So multiple -- multiple coins are in there,

6    right?  We have customer obligations.  And

7    then we, on our asset side of the balance

8    sheet, we put them into Fireblocks workspaces

9    for deployment.

10                   Right now, obviously, we're

11   preserving the estate, so everything is locked

12   down in the Fireblocks workspaces.

13         Q.    Are the coins you're seeking to

14   sell held by a debtor, or are any coins held

15   by a nondebtor entity?

16                   MR. McCARRICK:   Object --

17         object to form.

18                   You can answer.

19         A.    All are held by the debtor.

20         Q.    Do any nondebtor entities hold

21   stablecoins?

22         A.    Not that I'm aware of.  There

23   could be a few small amount in, like, the

24   Lithuanian entity, but not that I know of.

25         Q.    Would those be in the same

164

1                    C. Ferraro - Confidential

2      account, the same commingled Fireblocks

3      account, or would they be held separately?

4           A.    They would be held with other

5      coins in the main account.  Coins are pooled

6      to coin types, and then they're held within a

7      certain workspace.  So you would have multiple

8      coins in that workspace.

9           Q.    Are the debtors paying any

10     expenses for any nondebtors?

11                MR. McCARRICK:  Object to

12          form.

13                You can answer.

14          A.    Within the limits granted by the

15     Court.  So there's the Israeli entity,

16     including the GK8 entity, and the Serbian

17     entity that are nondebtors.  They were funded

18     in the normal course.  And then I believe

19     we've also pushed down regular funding to the

20     Israeli and GK8 entity since the case started.

21          Q.    Do any nondebtors have any assets

22     that could be used to fund their own

23     operations?

24          A.    I can't remember specifically

25     where the GK8 asset sits.

Confidential       Christopher Ferraro - November 21, 2022

165

1              C. Ferraro - Confidential

2          Q.    I think it's a -- I think it's a

3      nondebtor entity.

4          A.    Yeah.  So -- but I believe that's

5      a nondebtor entity owes the debtors.  There's

6      a loan extended.  But, yeah, my understanding

7      is other than GK8 and certain IP in the

8      Israeli entity, there's not much to sell.

9          Q.    So turning a little bit to your

10     declaration, is it fair to say that the

11     debtors have been primarily relying on

12     proceeds generated from the debtors' Bitcoin

13     mining activities in order to fund these cases

14     and its operating expenses?

15         A.    I would say that in general, the

16     mining activities fund mining.

17         Q.    Solely mining?

18         A.    Yeah.  Those -- the production of

19     mined -- of new mined coins is for the sole

20     benefit of the mining company.  What the other

21     debtor entities have is loan collection.

22     There was significant loans that we called,

23     including Bitfinex maturities, as well as well

24     as the funding that we had as of the petition

25     date.

Confidential       Christopher Ferraro - November 21, 2022

166

1                C. Ferraro - Confidential

2           Q.    Is it fair to say that Bitcoin

3    mining is, as of today's date, a primary

4    operation of the debtor?

5           A.    No.  There's -- I mean, we have

6    167-ish employees, this is as of last week,

7    and the mining organization makes up a total

8    of six.  So you can imagine that the folks in

9    legal, the folks in finance were doing cash

10   flow budgets for mining in what we would call

11   "network."  So there's a lot of activity in

12   the nonmining debtors.

13          Q.    Are you familiar with when the

14   mining activities and mining operations began

15   at Celsius?

16               MR. McCARRICK:  Object to

17          form.

18               You can answer if you know.

19          A.    My understanding is that it

20   started at scale in 2021.

21          Q.    Are you familiar with the

22   purchasing of the mining rigs since you were

23   an employee at Celsius?

24          A.    Most of those purchases predate my

25   employment.

167

1                   C. Ferraro - Confidential

2          Q.     Okay.

3          A.     But I'm familiar with the process.

4     Most of them were Bitmains, machines that were

5     purchased, some of which are still waiting to

6     be shipped.  A lot of them are already in our

7     center or in third-party hosting.

8          Q.     At the last hearing, I think there

9     were some comments made that mining is cash

10    flow positive right now.  Are you familiar

11    with the more specifics about the mining

12    operation?

13                 MR. McCARRICK:  Object to

14         form.

15                 You can answer.

16         A.     Yeah, I manage -- I mean, I

17    supervise the mining business.  So I'm

18    familiar with the strategy and the result.

19         Q.     Do you know -- strike that.

20                 Can you provide an estimate of how

21    many Bitcoin are currently mined per day by

22    Celsius?

23         A.     It ranges between 15 and 18

24    Bitcoin per day.

25         Q.     Can you provide an estimate of

Confidential       Christopher Ferraro - November 21, 2022

168

1                 C. Ferraro - Confidential

2    ongoing mining expenses?  I know you don't

3    have the figures in front of you.

4         A.    I don't have my calculator either.

5    We have about a 20 percent margin.

6         Q.    Okay.

7         A.    So our expenses make up about

8    80 percent of that Bitcoin that's mined.  So

9    if you were to take the, let's say, 16

10   Bitcoin, multiply it by 30 times the price,

11   you know, and then take times 80 percent, that

12   would give you, effectively, the cost base.

13              The vast majority of the costs of

14   mining are to pay for hosting charges, which

15   are predominantly electricity.

16        Q.    Now that we're going into the

17   cooler months, is it your anticipation that

18   possibly those expenses will increase or

19   decrease?

20              MR. McCARRICK:  Object to

21        form.

22              You can answer.

23        A.    Yeah.  I mean, I'm not an energy

24   guy.  I was more of a rates guy --

25        Q.    Okay.

169

```
1                    C. Ferraro - Confidential

2          A.     -- in my -- in my background, but

3    energy and rates are both traded instruments

4    that depend on market sentiment.  I think the

5    Federal Reserve, with removing accommodation

6    and increasing the funds rate, is slowing

7    demand.  But we have the wildcard of the

8    unfortunate war.

9               So it's hard to, kind of, make a

10   bet on one way or the other.  Traditionally I

11   like to be neutral on these things.

12              My understanding is there's

13   probably more downward pressure than upward

14   pressure, just given where we are in the

15   cycle.  So hopefully things ease a little bit

16   due to demand going down, as well as the hot

17   months or, you know, the air conditioning

18   months in the peak summer.

19         Q.     Are you familiar with how ongoing

20   mining expenses are funded?

21         A.     Largely with the production of

22   Bitcoin and the cash they have on hand.

23         Q.     What about the build-out in -- was

24   it west Texas?  Was that where you --

25         A.     Yeah, west Texas.  Midland, Texas,
```

170

                    C. Ferraro - Confidential

1

2    yeah.

3        Q.    Are you familiar with how that

4    buildout is being funded?

5        A.    Yeah.  That's funded with both the

6    cash on hand -- there was a -- there was a

7    loan that came down to mining at the petition

8    date that gave them cash, as well as the mined

9    Bitcoin is what's used to fund the mining

10   operations, including the CapEx.

11       Q.    The loan for the buildout, do

12   you -- are you familiar with whether or not

13   Celsius is currently making payments on that

14   loan?

15            MR. McCARRICK:  Object to

16       form.  Outside the scope.

17            You can answer.

18       A.    I'm not familiar with that.  I

19   don't believe they are.

20       Q.    Are you familiar with the critical

21   vendor payments in this case?

22       A.    More familiar in the beginning

23   than I am now, but yes.

24       Q.    Is it your understanding that the

25   debtors are making ongoing payments on behalf

Confidential       Christopher Ferraro - November 21, 2022

171

```
 1                  C. Ferraro - Confidential
 2      of or for GK8?
 3                  MR. McCARRICK:  Object to
 4           form.
 5                  You can answer.
 6           A.    I know -- I know that GK8 has
 7      funding.  The debtors have provided funding to
 8      GK8.  And GK8 also has revenue coming in.  I
 9      believe the net of the two is around $500,000
10      per month that they effectively need for
11      funding.
12                  But GK8 has been ran and continues
13      to be ran semi-independently, so we don't have
14      too much involved in the operations.  My
15      understanding is they're trying to get new
16      clients, they're building the technology, and
17      they're paying their engineers.
18           Q.    Has there been any discussion of
19      moving the assets of Celsius from Fireblocks
20      to GK8?
21                  MR. McCARRICK:  Object to --
22           A.    We did --
23                  MR. McCARRICK:  Object to
24           form.
25                  You can answer.
```

172

```
 1              C. Ferraro - Confidential
 2         A.    We did have discussions early on
 3   about moving significant amount of coins to
 4   Fireblocks, and we decided not to do that for
 5   a few reasons:  One, the sale process.  We
 6   didn't want to move assets then to have to
 7   potentially bring them back.
 8              And, two, GK8 is a cold storage,
 9   physical security type of play, and the
10   thought of having billions of dollars in a GK8
11   suitcase with armed guards around it doesn't
12   seem to be the best idea.
13         Q.    Okay.  Is it your understanding
14   that the debtors are making ongoing payments
15   on or behalf of for Celsius mining?
16              MR. McCARRICK:  Object to
17         form.
18              You can answer.
19         A.    Mining is funding their own with
20   the cash that they have on hand as well as the
21   mined Bitcoin.
22         Q.    Okay.  Are there any employees
23   exclusively working on mining operations that
24   are not being funded exclusively by mining
25   revenues?
```

```
                                                          173
 1              C. Ferraro - Confidential

 2              MR. McCARRICK:  Object to

 3         form.  Outside the scope.

 4              You can answer.

 5         A.    Not that I know of.

 6         Q.    Are you familiar with the

 7    preferred equity holders and the allegations

 8    that they're making regarding GK8?

 9              MR. McCARRICK:  Object to

10         form.  Outside the scope.

11              You can answer.

12         A.    Not in detail, but I've had --

13    I've had discussions around it.  Yeah.

14         Q.    All right.  If successful, based

15    on your knowledge, would it be fair to say

16    that it is possible that certain value from

17    either GK8 or mining might inure to those

18    preferred shareholders and not to the debtors'

19    bankruptcy estate?

20         A.    I understand that's a risk, and I

21    believe this is a key legal question for the

22    judge to rule upon.

23         Q.    To the best of your knowledge, if

24    successful -- and when I say "if successful,"

25    I mean if the preferred shareholders are
```

174

        C. Ferraro - Confidential

1   successful in obtaining that value -- what

2   does the debtor intend to do, if anything, to

3   recoup any of those ongoing expenses that are

4   paid for by the estate, and specifically with

5   respect to this motion and the sale of

6   stablecoins that have benefited a different

7   constituency?

8            MR. McCARRICK:  Object to

9       form.

10            You can answer.

11       A.   We track the outstanding loans

12   that we've given to GK8.  So every time we

13   push down funding, there's a related, you

14   know, entry to record.  If the Series B were

15   to get assets, that would come at a great,

16   great cost to the estate and to the creditors.

17            We understand the cash that has

18   moved from debtor to nondebtor.  We track it

19   and we can size it.

20       Q.   So to confirm, will the stablecoin

21   sale be used to fund the mining operations?

22            MR. McCARRICK:  Object to

23       form.

24            You can answer.

175

```
1                    C. Ferraro - Confidential

2          A.    The mining company has cash flows

3    through January.  A lot of that depends on the

4    price of Bitcoin at these levels.  Right?

5    It's difficult.

6               The mining company could take out

7    a loan, and it's possible that we would

8    provide funding to them.  It's also possible

9    that the mining company would sell mining

10   rigs.

11              So, you know, I think mining is

12   something that we're working on.  It's tough

13   to sell rigs in the middle of a sale process.

14   But, you know, that's a possibility.  We do

15   have people that are interested in buying

16   thousands of our rigs.  So ...

17         Q.    So the instant sale of stablecoin,

18   the $18 million worth, will any of that sale

19   or funding be used to fund the mining

20   operations?

21              MR. McCARRICK:  Objection to

22         form.

23         Q.    As of -- as of today's date?

24         A.    No.  No, the money will sit in

25   network.  It will not go to mining.  Like I
```

176

1              C. Ferraro - Confidential

2     said, mining in January does have a cash flow

3     issue.  You know, they'll need to --

4     they'll -- we'll need to figure out a way to

5     fund that.  It could be selling rigs.  It

6     could be an additional loan.  I don't know.

7              I think it depends -- and we'll be

8     close with -- we'll work with the committee on

9     determining what's the best -- what's the best

10    execution for the estate.

11         Q.    To that end, are you aware of the

12    debtors marketing or selling the mining

13    company separately?

14         A.    Yeah, that process has kicked off.

15         Q.    As of today's date, in your

16    knowledge, will the stablecoin sale that

17    you're seeking be used to fund the continued

18    mining buildout in west Texas?

19         A.    No, mining has enough on hand to

20    fund the buildout.  That's --

21         Q.    To the completion?

22         A.    To its completion.  But in

23    January, late January, they'll need money for

24    operational expenses.

25         Q.    If the buildout is not completed,

177

```
 1                 C. Ferraro - Confidential
 2     or if the buildout is -- if the buildout is in
 3     some way paused, what impact would that have
 4     on the liquidity of Celsius?
 5          A.    Well, we're at the tail end of the
 6     buildout, so probably the biggest expense has
 7     to do with the sales and use taxes when we
 8     deploy the rigs.
 9                 So if we were to not -- if we were
10     to slow down production and not deploy the
11     rigs, that would save on sales and use taxes,
12     but we would forego the 20 to 30 percent
13     margin that we have in Midland, Texas.
14                 So assuming that we're going to
15     deploy those rigs, you're going to pay the
16     sales and use tax, we should start producing
17     Bitcoin at a positive margin as early as we
18     can.  That's the strategy.
19                 Now, the actual buildout and the
20     electrification, kind of, does go into the
21     first quarter, early first quarter, but that
22     should all be basically done in earnest by
23     January.
24          Q.    As of today's date and your
25     knowledge, will the sale of the current
```

178

                    C. Ferraro - Confidential

1   stablecoin be used to fund GK8?

2        A.    Not directly.  GK8, like I said,

3   has a little bit of a cash burn, about a half

4   a million per month.  If the sale goes

5   through, obviously the proceeds will come back

6   to the estate.  If it continues, there could

7   be subsequent funding that might be needed to

8   preserve the value in GK8.

9              But there's nothing on the table

10  expecting that.  We're expecting the sales

11  process to be successful.  But if it's not for

12  whatever reason, GK8 may need more funding

13  next year.

14       Q.    Are any assets of GK8 -- and when

15  I say "assets," I'm specifically talking about

16  either stablecoin or other forms of

17  cryptocurrency -- held in that commingled

18  Fireblocks account we were discussing earlier?

19             MR. McCARRICK:  Object to

20       form.

21             You can answer.

22       A.    Are any of the assets of GK8?  Not

23  that I know of, no.  We hold about

24  $1.5 million worth of cryptocurrency in GK8,

179

```
1                C. Ferraro - Confidential

2      but I don't know of GK8 holding anything with

3      Celsius.

4           Q.    Are you familiar with the Prime

5      Trust settlement?

6           A.    Not very --

7                MR. McCARRICK:   Object to

8           form.  Outside the scope.

9                You can answer.

10          A.    Not very familiar.

11          Q.    To the best of your knowledge,

12     does the Prime Trust settlement adjust when

13     liquidity will change for Celsius?

14                MR. McCARRICK:   Object to

15          form.

16                You can answer.

17          A.    I don't know the specific coins in

18     Prime Trust.  We have -- we include them in

19     our positions.  So, of course, if the

20     settlement with Prime Trust brings the coins

21     back, I'm assuming the vast majority of them

22     are Bitcoin and ETH, so they won't change the

23     liquidity.

24          Q.    It's based on my understanding of

25     the Prime Trust settlement that it's an
```

180

1               C. Ferraro - Confidential

2    estimated somewhere around $15 million, and

3    you're seeking to sell about $18 million worth

4    of stablecoin.  If you were to receive that

5    $15 million from the Prime Trust, would that

6    reduce or eliminate your need to immediately

7    sell the stablecoin?

8          A.    No, but my under- -- I don't think

9    so.  My understanding is the Prime Trust

10   settlement will return coins, not fiat.

11         Q.    Okay.

12         A.    So there could be other coins that

13   we're not asking to sell that's part of that

14   settlement.

15         Q.    So it won't immediately impact

16   your liquidity position?

17         A.    Not -- to my understanding, it

18   will not.

19         Q.    And if you know, and I understand

20   you're not intimately familiar with the Prime

21   Trust settlement, the proceeds from the Prime

22   Trust settlement, will those be put in the

23   same commingled Fireblocks account?

24              MR. McCARRICK:  Object to

25         form.  Outside the scope.

181

```
 1                   C. Ferraro - Confidential
 2                   You can answer.
 3          A.    I would think that we would put
 4    all the keys under lock and key the way the
 5    security stip requires.  So we'll follow the
 6    Court's rules, which likely means bringing it
 7    back to Fireblocks in a locked network space.
 8          Q.    I only have a few more questions.
 9          A.    Okay.
10          Q.    Throughout the case, there's been
11    some discussion about in-kind distribution.
12                   As of today's date, is that
13    something that you're still contemplating?
14          A.    We hope to distribute back to our
15    customers in kind.  They clearly want in-kind
16    distribution.  So we're fighting for that,
17    yes.
18          Q.    Does the sale of stablecoin in any
19    way impact an in-kind distribution?
20          A.     No, because stablecoins are
21    effectively one-for-one with dollars.  So if
22    you were to say, Let's sell Bitcoin, that, I
23    think, people could argue the price might go
24    up, so you're impacting the estate, where
25    stablecoins is a dollar-for-dollar.  I don't
```

Confidential        Christopher Ferraro - November 21, 2022

182

```
 1                  C. Ferraro - Confidential
 2   see it as impacting returning in kind.
 3        Q.    What if the customer either loaned
 4   or has on deposit with Celsius stablecoins?
 5                  MR. McCARRICK:   Object to
 6        form.
 7                  You can answer.
 8        A.    My understanding of the bankruptcy
 9   code is that they have a IOU to Celsius, not
10   the coin specifically.  So we owe them
11   consideration of that, and we hope to return
12   it in kind.  But I don't know that, if you had
13   a stablecoin, you're going to get a stablecoin
14   back.  You might get back BTC and ETH.
15        Q.    Just one second.
16                  Is it your understanding or do you
17   have any knowledge about what has been, I
18   guess, referred to as the custody shortfall?
19                  MR. McCARRICK:   Object to
20        form.  Outside the scope.
21                  You can answer.
22        A.    Yes, I do have a general
23   understanding of that, yeah.
24        Q.    It's -- and is it fair to say that
25   there's a custody shortfall of about
```

183

```
 1              C. Ferraro - Confidential
 2     $16 million?
 3          A.    That's my understanding, yes.
 4          Q.    Does the sale of stablecoin at
 5     this time impact those custody accounts or a
 6     return of those custody assets?
 7          A.    No.  Not at all because we're
 8     not -- we're not asking for relief to sell any
 9     of the stablecoin related to custody.  So we
10     will not be increasing the shortfall.
11          Q.    To the best of your knowledge, how
12     do you plan to make up for that shortfall?
13              MR. McCARRICK:  Object to
14          form.  Outside the scope.
15              You can answer.
16          A.    So most of the coins we can source
17     from our main Fireblocks.  We just need to
18     move them over to the custody workspace.
19              I think there is -- if you assume
20     all custody and all withheld get paid out,
21     there might be a few million dollars of coins
22     that we have to source.  But, in general, we
23     have the coins.
24          Q.    A little earlier there was some
25     discussions about whether coins may be
```

Confidential        Christopher Ferraro - November 21, 2022

184

```
1              C. Ferraro - Confidential
2    actually moved or if they're just redesignated
3    on the ledger.
4              Just for clarification, and maybe
5    this is -- maybe I should know this, do they
6    pass through a main or aggregator wallet at
7    that point, or how does -- what's your
8    understanding of how those coins move?
9              MR. McCARRICK:  Object to
10        form.  Outside the scope.
11             You can answer.
12        A.    Yeah, and I think it's consistent
13   with the examiner report that things move into
14   the main wallet omnibus structure.
15        Q.    Okay.  Also, earlier in your
16   testimony, there was just a little discussion
17   about marketing.
18        A.    Yeah.
19        Q.    So I just wanted to ask a few
20   follow-up questions.
21             So earlier in your testimony, you
22   stated that the marketing program had been
23   shut down by the time you were CFO.  Is that
24   correct?
25             MR. McCARRICK:  Object to
```

185

```
 1              C. Ferraro - Confidential
 2         form.  Outside the scope.
 3              You can answer.
 4         A.    Yeah.  We stopped soliciting new
 5    customers and new funds when I became CFO.
 6    Effectively, all new customer activities is
 7    not ongoing.  So we're not actively marketing.
 8    We do not have a marketing team.  That does
 9    not mean that customers can still, via the
10    blockchain, send coins to our wallets.  We
11    can't stop that from happening.
12         Q.    Do you know when that marketing --
13    when those marketing efforts would have
14    ceased --
15              MR. McCARRICK:  Object to
16         form.  Outside --
17         Q.    -- approximately?
18              MR. McCARRICK:  Oh, I'm sorry.
19         A.    I think right around the pause.
20    Now, we were looking in May at reducing
21    marketing expense as part of our program to,
22    kind of, restructure the company, but we ran
23    out of time with the pause, so ...
24         Q.    Who was previously in charge of
25    marketing at Celsius?
```

Confidential        Christopher Ferraro - November 21, 2022

186

```
 1              C. Ferraro - Confidential

 2              MR. McCARRICK:  Object to

 3         form.  Outside the scope.

 4              You can answer.

 5      A.    I'm very bad with names, so I'm

 6   only going to be able to say the first name.

 7   Or I'll say, I believe there was Tushar who

 8   ran product and marketing.  But -- and I

 9   wasn't in these discussions.  I saw it

10   firsthand, seldomly, and also heard about it.

11              Alex Mashinsky also had a heavy

12   hand in marketing.  Alex ran marketing before

13   Tushar, and then around the petition date,

14   Tushar was let go of and Alex started thinking

15   about the communication side as well.

16              I think even right before the

17   pause, I believe Alex may have taken marketing

18   back.  I could be wrong but I believe he may

19   have.

20      Q.    Okay.  At any point during your

21   time at Celsius, did Celsius engage with an

22   outside marketing or public relations or

23   advertising firm?

24              MR. McCARRICK:  Objection to

25         form.  Outside the scope.
```

187

```
 1              C. Ferraro - Confidential

 2                   You can answer.

 3         A.    We're engaged with C Street on

 4    communications right now.  I know we did paid

 5    marketing through, like, Google and Facebook.

 6    I don't know if there was agencies, but I

 7    would venture to guess there was some.  But I

 8    don't think that was a significant amount of

 9    spend.

10         Q.    It's possible that they may have

11    had some kind of contractual relationship with

12    a traditional marketing or advertising firm

13    that may have assisted Celsius in its

14    outreach?

15              MR. McCARRICK:  Objection.

16         Calls for speculation.

17                   You can answer.

18         A.    I would assume but do not know for

19    sure.

20         Q.    And during your tenure, you're

21    unaware of that?

22         A.    Other than C Street handling

23    communications internal and external, I'm not

24    aware of marketing.

25                   Now, I know through going through
```

188

1                  C. Ferraro - Confidential

2    the budget process, there was significant

3    amounts that were, kind of, earmarked for,

4    like, Google leads, Facebook leads, and stuff

5    like that.  But that's really, to my

6    knowledge -- I never went line by line by

7    agencies.

8          Q.    And just for clarification, those

9    type of efforts are not analytical, they're

10   just actual advertisements?

11              MR. McCARRICK:  Object to

12        form.  Outside the scope.

13              You can answer.

14         Q.    If you know?

15         A.    It's always hard to determine the

16   actual capture rate when you're doing, kind

17   of, brand impression.  But you can't measure

18   it.  I don't know how well it was measured

19   here.

20              I know at JPMorgan Chase, we spent

21   a lot of time and effort tracking the success

22   of our marketing programs.  I just haven't

23   been able to do the forensics to understand

24   what was done in the past.  I haven't had time

25   for that.

189

```
 1              C. Ferraro - Confidential
 2         Q.    And so I just have, like, one --
 3    one more question.  And maybe it's the coup de
 4    grace question.  What -- in your
 5    understanding, what exactly is the sale of
 6    stablecoin going to fund?
 7         A.    Oh, operations, payroll,
 8    professionals, all the people around this
 9    table, the US Trustee's office.  So we
10    actually -- yeah, it's true.  We have normal,
11    kind of, payroll, vendor costs, and
12    professional fees related to the case.  We
13    have some money coming in, but we do have a
14    burn rate.  So the burn rate will fund core
15    operations.
16              MS. CORNELL:  I think that's
17         all that I have.
18              MR. McCARRICK:  Thank you.
19              MS. CORNELL:  Thank you.
20              MR. McCARRICK:  Yeah, let's
21         take a five-minute.
22              THE VIDEOGRAPHER:  The time
23         now is 12:06 p.m.  This concludes
24         Media 3.  Off the record.
25              (Recess taken from 12:06 p.m.
```

190

1          C. Ferraro - Confidential

2          to 12:18 p.m.)

3              THE VIDEOGRAPHER:  The time

4          now is 12:18 p.m.  This begins Media

5          4.  On the record.

6    EXAMINATION BY

7    MS. MILLIGAN:

8          Q.    Hello, my name Layla Milligan.

9    It's L-a-y-l-a, Milligan, M-i-l-l-i-g-a-n.

10   I'm with the Texas Attorney General's office.

11   We represent the Texas State Securities Board

12   and the Texas Department of Banking.

13              I'm going to have just a few

14   questions for you, Mr. Ferraro, just to follow

15   up and maybe a couple of clarifying questions.

16   If you -- again, if you don't understand my

17   question or it's unclear, I'm 100 percent sure

18   it's my fault, so please just let me know, and

19   I'll do my best to rephrase.

20         A.    Okay.

21         Q.    When you took your job, which I

22   understand was in March of 2022, with Celsius,

23   what did you review or research to get an

24   understanding of the operations of Celsius

25   itself?

Confidential        Christopher Ferraro - November 21, 2022

191

1                    C. Ferraro - Confidential

2        A.     Before or after I started?

3        Q.     At any time.

4        A.     Okay.

5        Q.     Either before or after you

6   started, what did you do to understand --

7        A.     Yeah.

8        Q.     -- how Celsius itself works, not

9   necessarily cryptocurrency in general?

10       A.     Yeah, so I had a -- I'd started

11  talking with folks at the company probably in

12  January.  So I had a couple months of

13  discussions with a handful of individuals, but

14  nothing really specific about the operations.

15             I would say I hit the ground

16  running March 21, working on the first budget

17  for Celsius.  So, you know, you already, as a

18  guy who did this for a living, you're already

19  really late in May, April-May to deliver a

20  budget to the board.  It was -- there was a

21  board meeting on May 2.

22             So I, kind of, dove head first

23  into understanding, kind of, the financial

24  architecture of the company and, kind of, how

25  they made money, where they lost money,

192

```
 1                 C. Ferraro - Confidential

 2    et cetera.

 3         Q.    Okay.  And since your role at the

 4    company has changed over time, have you done

 5    additional research or tried to learn how the

 6    operational functions worked at Celsius --

 7         A.    I mean, since --

 8         Q.    -- as --

 9         A.    -- since my role changed, we went

10    into petition.  So the operational aspects

11    that Celsius did prepetition and prepause to

12    when I became CFO or CEO are very different.

13               So my efforts are today and in the

14    future, not looking in the past, because I'm

15    trying to maximize value for the estate and

16    for all of stakeholders.

17         Q.    You -- just to follow up on some

18    questions that you testified about before, one

19    of the issues is that you've been asked, I

20    think, by the committee and by the US Trustee

21    is regarding the ability to trace stablecoin

22    when it was added to the platform.

23               And I just want to make sure,

24    because I don't want to repeat the question,

25    that my understanding from your testimony was
```

193

```
                    C. Ferraro - Confidential
 1
 2   that they do not trace stablecoin.  But I
 3   thought I heard you say that they can, it
 4   would just take a huge amount of effort.
 5           Is that an accurate statement?  I
 6   don't want to misstate what you said --
 7       A.   Yeah, I mean --
 8       Q.   -- I just want to clarify.
 9       A.   Yeah, we have an omnibus account
10   structure, meaning when customers lend us
11   their coins and we take title to it, we don't
12   trace it back to the customer because it's
13   Celsius' property at that point in time.  It's
14   pooled with other like cryptocurrencies
15   typically on Fireblocks.  Now --
16       Q.   And I understand -- I'm sorry to
17   interrupt.
18       A.   I was just going to say that my
19   understanding of the blockchain is that
20   there's lots of data and every transaction is
21   recorded.
22           But in the ledger, what it would
23   say is we owe X, we have X obligation to this
24   person or this individual or this entity.
25       Q.   Okay.  And you said Mr. Blonstein
```

Confidential        Christopher Ferraro - November 21, 2022

194

```
 1                  C. Ferraro - Confidential
 2      would be the person who would be able to --
 3           A.    I think, yeah --
 4           Q.    -- accurately testify?
 5           A.    As the head of product -- as the
 6      head of product, and he's also been with the
 7      company longer than I have, he would probably
 8      be a great resource for you guys to -- for
 9      that question.
10           Q.    Thank you.
11                 You testified about the terms of
12      use generally including a transfer of
13      ownership or lending provisions.  That -- did
14      you testify that it was all that you're
15      interested in, was all terms being used
16      included that type of agreement, or just the
17      more recent terms of use?  And I'm only asking
18      to -- as to your knowledge?
19           A.    Yeah, my knowledge is really --
20      I've gone through the previous terms of use.
21      My understanding is that in all of them,
22      Celsius had the right to rehypothecate,
23      pledge, et cetera.  In Terms of Use 6, I think
24      that there was a double-click that needed to
25      happen, both to accept the terms and to click
```

195

```
 1                C. Ferraro - Confidential

 2     "accept."  And those were, you know, very

 3     robust in explaining title, transfer,

 4     et cetera.

 5                But I believe that that provision

 6     of ownership and transfer of ownership was

 7     throughout all the terms of use.

 8          Q.    So I -- in reviewing, I -- I will

 9     say I'm certainly not debating you about this,

10     but as far as -- let me, sort of, clarify my

11     question.

12                When a person was signed up with

13     Celsius and they would initially agree to the

14     terms of use, say, someone who joined in June

15     of 2018, did Celsius maintain which terms of

16     use they initially had signed up for?  So say

17     Bob Smith signed up for an account on

18     January of '18, does Celsius maintain

19     information and records as far as the initial

20     date --

21          A.    Well, because --

22          Q.    -- and the terms of use that was

23     agreed to?

24          A.    Because you --

25                MR. McCARRICK:  Object to
```

Confidential        Christopher Ferraro - November 21, 2022

196

          C. Ferraro - Confidential

1

2      form.

3             You can answer.

4             THE WITNESS:  Okay.  Sorry

5      about that.

6      A.   We know when the customer came,

7  you know, when the customer opened the

8  account.  I don't -- and we know that in order

9  to have opened an account, you have to accept

10  the terms of use.  So I think, one, it would

11  be very reasonable just to go back to the

12  timing of when the account was opened.

13      Q.   Okay.  And Celsius maintains that

14  information, the --

15      A.   The timing of -- my understanding

16  is yes.

17      Q.   Okay.  Do you know how they

18  maintain that information?  Like, is it in a

19  spreadsheet?  Is it in a system somewhere?

20      A.   It's -- it would be in the back

21  office system -- right? -- where you track the

22  obligations, the customer information,

23  et cetera.  I haven't -- I haven't seen the

24  screens.  I think Oren would also be a great

25  place to ask the detailed questions on that.

197

1              C. Ferraro - Confidential

2         Q.    Okay.  And just to clarify,

3    Celsius still has that information, it's

4    just --

5         A.    Oh, yeah, we protect all the

6    data --

7              CERTIFIED STENOGRAPHER:  I'm

8         sorry, you have to let her ask the

9         question.

10             Can you start the question

11        over again, please.

12             MS. MILLIGAN:  Yes.  Sorry.

13        Q.    So -- and just to clarify, Celsius

14   still maintains that information somewhere in

15   its system currently?

16        A.    All data is preserved and

17   protected, yes.

18        Q.    Okay.  The terms of use did change

19   after you joined Celsius.  Understanding that

20   you joined in a different capacity, did you

21   have any involvement in that process, the

22   change of terms of use, after you joined the

23   company?

24        A.    No.

25        Q.    Okay.  Regarding the omnibus or

Confidential        Christopher Ferraro - November 21, 2022

198

1                    C. Ferraro - Confidential

2    main account, I'm going to, kind of, refer to

3    "omnibus" because that's the word you've been

4    using during your testimony.

5              To your knowledge, were customers

6    informed that their coins were going to be

7    placed in an omnibus or main account and not

8    held in individual wallets?

9              MR. McCARRICK:  Object to

10         form.  Outside the scope.

11              You can answer.

12         A.    To my knowledge, in the terms of

13    use, it's stated clearly that the customers

14    were transferring ownership to Celsius, and it

15    didn't go into exactly -- there was a risk

16    disclosure, but it didn't go into how the

17    account structures worked, at least off of

18    memory.  It wouldn't --

19         Q.    Right.  So there wasn't specific

20    information provided as --

21         A.    I don't know why --

22              CERTIFIED STENOGRAPHER:  You

23         have -- I'm sorry, repeat your

24         question again.

25         Q.    To your knowledge, there was not

199

```
 1              C. Ferraro - Confidential
 2    specific information provided to customers
 3    that they -- their funds were going into an
 4    overall main wallet versus individual wallets?
 5              MR. McCARRICK:  Object to
 6         form.  Outside the scope.
 7              You can answer.
 8         A.    I don't know why we wouldn't
 9    disclose that.  I don't know.  I don't
10    remember reading it.  And I don't know the
11    purpose of it.
12         Q.    But to your knowledge, the answer
13    is, no, they weren't informed of that?
14              MR. McCARRICK:  Object to
15         form.  Outside the scope.
16              You can answer.
17         A.    I don't remember.
18         Q.    Okay.
19         A.    I don't remember reading it
20    through.  So I don't want to confirm one way
21    or another.
22         Q.    Okay.  All right.  I certainly
23    don't want to put words in your mouth.  So if
24    you don't know, that's fine.
25              To your knowledge, did Celsius
```

200

```
 1              C. Ferraro - Confidential
 2    ever use funds from these omnibus or main
 3    wallets to pay interest or rewards to earn
 4    program participants?
 5              MR. McCARRICK:  Object to
 6         form.
 7              You can answer.
 8         A.    It's fungible.  So coins in the
 9    main account, property of Celsius, were used
10    to fund operations, to pledge and borrow, or
11    to pay rewards along with the other funds from
12    capital contributions, et cetera, that are in
13    the main account and in the fiat accounts.
14         Q.    Were stablecoins used to pay
15    interest or rewards to earn program
16    participants?
17         A.    In kind, stablecoin rewards, yes.
18         Q.    To your knowledge -- okay.  So I
19    guess, the frictional wallets, as described,
20    would be the same as the main or omnibus
21    wallets.  Is that right?
22              MR. McCARRICK:  Object to
23         form.
24              You can answer.
25         A.    My understanding is the frictional
```

201

                    C. Ferraro - Confidential

1

2    wallets are wallets to process withdrawals and

3    are not the main.  Because that way, if

4    anything happened to the frictional wallet,

5    they wouldn't have access to all of the coins;

6    it's just the frictional wallet.  So they

7    would be replenished based on the expectation

8    of withdrawals.  That's my understanding.

9         Q.    Do you know if any information was

10   specifically given to customers about the

11   frictional wallets?

12             MR. McCARRICK:  Objection to

13        form.  Outside the scope.

14             You can answer.

15        A.    I don't know off the top of my

16   head.

17        Q.    Do you know who would know that?

18             MR. McCARRICK:  Same

19        objection.

20             You can answer.

21        A.    Probably talk to Oren about that.

22        Q.    Oren?  Okay.  Part of that may be

23   marketing.  So I think you testified that

24   Mashinsky himself did the marketing, or there

25   was somebody else named Tushar.  Is that --

Confidential        Christopher Ferraro - November 21, 2022

202

```
 1              C. Ferraro - Confidential
 2        A.    Yeah.  And Oren would probably
 3   have better details on the handoffs.  I even
 4   think Oren was responsible for marketing for a
 5   short period of time.
 6        Q.    Okay.  Thank you.  Regarding the
 7   questions -- let's see.  I guess, would Oren
 8   have information about any sort of outside
 9   communications, like content videos, Twitter,
10   YouTube, that kind of involvement, that kind
11   of information provided to the public as well?
12              MR. McCARRICK:  Objection.
13        Outside the scope.  Contract
14        information issues are outside the
15        scope.
16              But you can answer.
17        A.    He would be in a better position
18   to talk about it than I would be because I had
19   no involvement in that.
20        Q.    Okay.  You came on as, I guess,
21   CFO -- and if I'm wrong, please correct me --
22   you came on as CFO in March of 2022.
23              Do you know when the Celsius board
24   first became aware that Celsius was insolvent?
25              MR. McCARRICK:  Objection.
```

203

1              C. Ferraro - Confidential

2        Well beyond the scope.

3              You can answer if you know.

4        A.    I did not come on as CFO.

5        Q.    I'm sorry.  Okay.

6        A.    I came on as -- yeah.  I came on

7    as head of financial planning and analysis and

8    investor relations.  I was not at the -- I was

9    not at the board meeting.

10       Q.    Okay.  So you don't know the

11   answer as to when the board knew the company

12   was insolvent?

13       A.    I've never met with the acting

14   board.  I've only met with the special

15   committee board.  I did not review the

16   minutes.  I do not know the answer to that.

17       Q.    Okay.  Thank you.

18             You mentioned the focus on

19   reorganization or sale of the company.  I

20   think you testified here and at the last

21   hearing that, out of your 170 employees on

22   staff, you have three focused on regulatory

23   compliance.

24             And I think it's clear that before

25   the case was filed, there were over 40

204

```
 1              C. Ferraro - Confidential
 2    regulatory bodies by states, including the
 3    federal governmental entities in the US, and I
 4    don't know what's going on internationally.
 5              Is that correct, that you have
 6    three employees that are focused on regulatory
 7    compliance going forward -- I mean currently,
 8    I guess?
 9              MR. McCARRICK:   Object to
10        form.   Compound.
11              You can answer.
12        A.    One clarification, I didn't
13    testify.  I gave an opening statement.
14        Q.    My apologies.
15        A.    I just -- for the record, I just
16    want to make sure that the record is accurate.
17    Second, yes, three people in regulatory.   We
18    work very close with Latham & Watkins as a
19    regulatory legal counsel.
20    ██████████████████████████████████████
21    ██████████████████████████████████████
22    ██████████████████████████████████████
23    ██████████████████████████████████████
24    ██████████████████████████████████████████
25    ██████████████████████████████████████████
```

205

1              C. Ferraro - Confidential



20        Q.    I think my last question -- and I

21   apologize for the delay -- regarding the

22   actual movement of the digital assets on the

23   platform and entries on the debtors' ledger,

24   who at the company currently -- or in the

25   past, is no longer there -- would have the

206

```
 1              C. Ferraro - Confidential
 2    most information or be the most knowledgeable
 3    as far as that movement and ledger activity?
 4              MR. McCARRICK:  Object to
 5          form.  Outside the scope.
 6              You can answer.
 7          A.    I -- I'm processing.  I apologize.
 8    It's probably going to be the best -- the best
 9    discussion would either be with Oren, who I
10    believe is being deposed tomorrow, or the head
11    of technology, Guillermo.
12          Q.    And I apology -- I apologize, do
13    you know Guillermo's last name --
14          A.    Starts --
15          Q.    -- or could you find it out for
16    us?  I apologize.
17          A.    We can find it out and get right
18    back to you.  I apologize, I'm a
19    first-name-basis guy.  You know, nowadays with
20    e-mail, you just type in G-u and boom, it up
21    pops.  I think it starts with a b.
22          Q.    Completely understand.  If you're
23    able to figure it out and provide that
24    information, that would really be helpful.
25          A.    Okay.  Yeah, we'll get it to you.
```

207

```
 1              C. Ferraro - Confidential
 2   Sorry about that.
 3              MS. MILLIGAN:  Thank you, sir.
 4              That's all the questions I
 5         have.  I'll turn it over to any
 6         other state regulator.
 7              And I appreciate your time
 8         today, sir.
 9              THE WITNESS:  Thank you.
10              MS. CORDRY:  I guess that
11         might make me next up.
12   EXAMINATION BY
13   MS. CORDRY:
14         Q.   I only have a few very simplistic
15   questions, I think, going back to this whole
16   motion of what you're spending and then your
17   stablecoins and so forth.
18              I think you've specified in here
19   that you have -- the debtor has regular
20   operating accounts, and those have real dollar
21   deposits in them, I would assume, at this
22   point?
23              CERTIFIED STENOGRAPHER:  Could
24         you state your name and spell it for
25         me, please.
```

208

```
 1              C. Ferraro - Confidential
 2              MS. CORDRY:  Oh, I'm sorry,
 3         I'm sorry.  It's Karen Cordry.  And
 4         that's K-a-r-e-n and last name is
 5         Cordry, C-o-r-d-r-y.  And I'm with
 6         the National Association of
 7         Attorneys General.  I'm the
 8         bankruptcy counsel there, and I'm
 9         working with a group of about ten
10         states that are also participating
11         in this case that we filed an
12         appearance fee for.
13              CERTIFIED STENOGRAPHER:  Thank
14         you.
15    BY MS. CORDRY:
16         Q.    Okay.  So going back to the
17    company, its ordinary course operating
18    expenses, are those primarily funded at this
19    point with normal, sort of, dollar deposits,
20    which, I guess, you call fiat currency?
21         A.    Yeah.  Most of the expenses are
22    paid in fiat currency.  There are some
23    expenses historically where vendors took
24    stablecoins as payments.  We would send it to
25    their wallet.
```

209

```
 1              C. Ferraro - Confidential
 2              Largely interchangeable native
 3    crypto companies might take stablecoins,
 4    payroll, you know, fiat.  Most vendors --
 5         Q.    Yes.
 6         A.    -- fiat, yeah.
 7         Q.    And then currently you had I think
 8    you said something in the range of about 160
 9    to $180 million in those accounts?
10         A.    That's correct, yeah.
11         Q.    Okay.  And that you're currently
12    holding about $18 million in stablecoin.  Is
13    that in those same accounts as well?
14         A.    The stablecoins are in the
15    Fireblocks wallets, not in the fiat accounts.
16    And the 18 million is not all of our
17    stablecoin, it's the stablecoin related to the
18    earn accounts.
19         Q.    Okay.  All right.  So I was
20    thinking I was hearing you saying that this
21    $18 million is not associated with any of the
22    earn, custody, or withhold accounts.  But
23    you're saying it's not associated with custody
24    or withhold, but it does relate to the earn
25    accounts.
```

210

```
 1                  C. Ferraro - Confidential

 2         A.    This --

 3         Q.    Is that correct?

 4         A.    The stables relates to obligations

 5   of earn, because what we've done is we've

 6   excluded the custody holdings of stables, the

 7   withheld amount in stables, and any of the

 8   lending collateral that's stables.

 9              Now, the lending collateral in

10   stables, there's very little because it would

11   be silly to borrow stables and provide

12   collaterals stables and then pay an interest

13   rate for it.  So, in general, it's mostly the

14   custody program and the withheld program.

15         Q.    Okay.  So I was mishearing

16   earlier.  So one of my questions was going to

17   be, if it wasn't associated with any of the

18   customer accounts, where did it come from?

19   But you're saying it does still associate back

20   to the earn accounts at this point?

21         A.    There's obligations in earn but

22   these stablecoins are not associated with the

23   earn accounts.  What I'm saying is we're

24   taking the total amount of stablecoins and

25   we're subtracting what relates to withheld and
```

211

```
 1              C. Ferraro - Confidential
 2    what relates to custody and lending.
 3              So the remaining stablecoins are
 4    due to operations and converting
 5    cryptocurrency, as well as any obligations
 6    that came in from earn.  It could be -- it
 7    could be dollars, stable -- excuse me -- it
 8    could be stables that we borrowed from Tether.
 9    Right?
10              These stables are fungible, so
11    it's -- we can't directly link them to
12    anything.  But we know they're not related to
13    custody, withheld, or the lending program.
14         Q.    Okay.  And at this point, if I
15    understand what your view is that these are
16    essentially equivalent to fiat currency, they
17    can be converted to the same price, and what
18    you want to do is simply convert them into
19    dollars and then spend them in the same way
20    that you would spend any of your other funds.
21              Is that what I'm hearing you say?
22              MR. McCARRICK:  Objection to
23         form.
24              You can answer.
25         A.    Basically, yes.
```

212

1        C. Ferraro - Confidential

2           MS. CORDRY:  I think that's

3    really all the questions I have.

4    Thank you.

5           THE WITNESS:  Thank you.

6           MR. McCARRICK:  Thanks.

7           Are there any other state

8    regulators who have any questions?

9           Well, hearing nothing, is this

10   a good time for a lunch break, then

11   we can come back and do the last

12   session?  Does that work for

13   everyone?

14          MR. HERSHEY:  Yeah, I think

15   that's a good idea.

16          MR. McCARRICK:  Okay.  Great.

17   Well, why don't we come back at

18   1:45.

19          MR. HERSHEY:  Perfect.

20          MR. McCARRICK:  Actually, you

21   know what, let's do 1:15.

22          THE VIDEOGRAPHER:  The time is

23   12:38 p.m.  This concludes Media 4.

24   Off the record.

25          (Continued on the next page.)

213

```
 1              C. Ferraro - Confidential

 2              (Lunch recess taken from

 3         12:38 p.m. to 1:43 p.m.)

 4                   - - -

 5       A F T E R N O O N   S E S S I O N

 6                   - - -

 7         (Time noted:  1:43 p.m.)

 8                   - - -

 9              THE VIDEOGRAPHER:  The time

10         now is 1:43 p.m.  This begins Media

11         5.  On the record.

12

13   C H R I S T O P H E R   F E R R A R O, resumed

14         and testified further as follows:

15   EXAMINATION BY

16   MR. CREWS:

17         Q.    Okay.  Hey, there.

18         A.    Hi.

19         Q.    So I figured I'd just start

20   introducing myself.  My name is Cameron Crews.

21   I'm a pro se creditor.  I opened my Celsius

22   account in August of last year.  And

23   initially, I started with a small deposit of

24   3.5 ETH, and as of today, I have $27,000 worth

25   of stablecoins, a little under 1 Bitcoin, and
```

214

```
 1              C. Ferraro - Confidential
 2   21 Ethereum and then some related assets.  So
 3   at one point it was worth up to $120,000, but
 4   now it's a little under 70,000.
 5              I, kind of, wanted to start, you
 6   mentioned you began with Celsius in March of
 7   this year.  Correct?
 8        A.    Yes, yeah, March 21.
 9        Q.    And then do you yourself have a
10   Celsius account?
11        A.    No.  I am employed out of
12   Washington State, and I was not able to open
13   one.
14        Q.    Okay.  Are you -- would you have
15   been able to open one in Ecuador, though,
16   or ...
17        A.    I don't know.
18        Q.    I was wondering, in terms of the
19   terms of service, could you describe material
20   differences that were introduced in July
21   of 2021?
22              MR. McCARRICK:  Objection to
23        form.
24              You can answer.
25        A.    I don't have -- I don't have the
```

215

1                    C. Ferraro - Confidential

2      details.  I'm not an expert in it.  So it

3      would be hard for me to describe the deltas

4      between one version and another other than,

5      kind of, 6 and 8.  I know that that was the

6      big -- that was the launch of custody and the

7      terms of the exchange for that.

8            Q.   Okay.  So would you say -- would

9      you agree that at some point, when the assets

10     were custodied by -- it was Prime Trust, when

11     the company was headquartered in the UK or

12     England, those assets were considered customer

13     assets?

14              MR. McCARRICK:  Objection.

15          Objection to form.

16              You can answer.

17          A.   I think they were Celsius assets

18     with obligations to the customer.  I don't --

19     I don't know that that was a custody

20     relationship.  Like I said earlier, I'm not an

21     expert in the Prime Trust.

22          Q.   Okay.  So you would say at that

23     point that the title would still remain with

24     Celsius even at that point of the contract?

25              MR. McCARRICK:  Object to

216

```
 1              C. Ferraro - Confidential

 2       form.

 3       A.    I'm not --

 4              THE WITNESS:  Sorry.

 5              MR. McCARRICK:  You can

 6       answer.

 7       A.    I'm not an expert in the Prime

 8  Trust, so I don't know exactly what was going

 9  on.

10       Q.    Okay.  Are you familiar with a

11  change to Clause 8 titled "Ownership of

12  Digital Assets" that was made in July of 2001?

13       A.    Not specifically, no.

14       Q.    Okay.  Let me share my screen.  So

15  I have up here a highlighted version of a

16  prior to July 2001 and subsequent.  And you

17  can see in the prior version, it says that

18  you:

19              "Hereby represent a warrant at

20       all times to us during which you

21       hold digital assets in your Celsius

22       wallet, that any digital asset used

23       by you in connection with your

24       Celsius wallet is owned by you."

25              Is that what it says?
```

Confidential        Christopher Ferraro - November 21, 2022

217

1          C. Ferraro - Confidential

2              MR. McCARRICK:   Could -- could

3    I just ask, is this -- are these

4    excerpts from -- I -- could you

5    just --

6              MR. CREWS:  Yes.

7              MR. McCARRICK:  -- lay a

8    little bit of foundation for what

9    you're asking about.  I'm happy to

10   --

11             MR. CREWS:  Certainly.

12             MR. McCARRICK:  -- your

13   question.

14             MR. CREWS:  Yeah.  So I have a

15   GitHub repository here which looked

16   using the Internet archive Wayback

17   Machine at the different versions of

18   the terms of service at different

19   points in time.

20             So what you see here is a DIF

21   between the prior version and the

22   one that was introduced in July

23   of 2021.

24             So I've zoomed in on the

25   specific changes to this clause.  So

218

```
1              C. Ferraro - Confidential

2         you can see the one that was

3         removed, this is -- the prior

4         version is here.  And it's

5         highlighted in red.  And I can send

6         the link to this.

7              MR. McCARRICK:  We may ask for

8         it after.

9              MR. CREWS:  Yeah.

10             MR. McCARRICK:  I would

11        just -- Mr. Ferraro, if you don't

12        know what this is, what it comes

13        from, or what different kind of

14        versions it's, you know, dealing

15        with, just make sure you're

16        testifying as to your, kind of, own

17        personal knowledge.

18             But feel free to inquire.

19             MR. CREWS:  Yeah.  Okay.

20             THE WITNESS:  I should have

21        brought my glasses.

22             MR. CREWS:  Yeah.  Sorry.

23   BY MR. CREWS:

24        Q.   So then subsequently, the language

25   changes to say that:
```

219

```
1              C. Ferraro - Confidential

2                  "Any digital asset delivered

3         by you for the purpose of utilizing

4         Celsius services."

5                  So it's -- you're delivering it,

6    and then it added this clause here that:

7                  "All digital assets transfer

8         to Celsius as part of the services

9         are owned and held by Celsius for

10        its own account."

11                 So that didn't exist in the prior

12   terms of service?

13                 MR. McCARRICK:  Objection to

14        form.

15                 You can answer to the extent

16        you know.

17        A.    I don't know -- I don't know the

18   details of each terms of use.  Like I said,

19   I've read through them, but I was not part of

20   drafting them, reviewing them, approving them,

21   so it's hard for me to give insight on the

22   specific changes.

23        Q.    Yeah.  Would you be surprised if

24   customers such as myself weren't aware that we

25   were transferring title of our assets?
```

220

```
1                    C. Ferraro - Confidential

2                    MR. McCARRICK:   Objection to

3         form.

4         A.    From my understanding, not a

5    customer, but in looking through the

6    materials, to me it is crystal clear in

7    Version 6 with a double-click necessary in

8    order to say the terms in use is transferring

9    the title to the Celsius.

10        Q.    Yeah.  Now, I happened to join in

11   August of that year, and I didn't get the

12   notifications that Oren Blonstein had sent --

13   there was all those e-mails.  So because I had

14   joined subsequent to that, I wasn't made

15   aware of those -- I didn't receive any of

16   those e-mails.

17        A.    But you would have clicked on the

18   terms of use when you opened your account.

19        Q.    Presumably.  I don't have

20   recollection of that.

21        A.    Well, we know systematically that

22   everybody clicked on it, double-clicked on it,

23   Version 6, and it was crystal clear that the

24   ownership was transferring to Celsius --

25        Q.    So --
```

221

```
 1              C. Ferraro - Confidential
 2         A.    -- in order to pledge,
 3    rehypothecate, lend, et cetera, sell.
 4         Q.    And did you have a digital
 5    signature?
 6         A.    The system -- we -- Oren is
 7    probably going to be the best way of going
 8    through this, but the system does not process
 9    new accounts without accepting.
10         Q.    Yeah.  Now, would you say that the
11    marketing efforts have been consistent with
12    the terms of service?
13              MR. McCARRICK:  Objection to
14         form.  Outside the scope.
15              You can answer.
16         A.    I wasn't part of the company at
17    this point in time.  I've read the risk
18    disclosure.  I personally think it's clear.
19    Like I said, I focused on 6 and 8.
20              I did not -- like I said earlier,
21    I watched the sum total of about two or three
22    AMAs.  So I was not following the marketing,
23    especially when you were coming on board as a
24    customer.
25         Q.    Great.
```

222

```
 1                  C. Ferraro - Confidential
 2                  Yeah, I wanted to bring up Exhibit
 3    E from my filing, 914.  And it's just a
 4    snapshot of one of the marketing things on the
 5    home page that was from May 8 of this year.
 6    And it says "Access your coins whenever, keep
 7    them safe forever?"
 8                  Does that seem consistent with the
 9    terms of service?
10                  MR. McCARRICK:  Just one
11         second.
12                  First, object to form.
13         Outside the scope.  Second, is the
14         bolding of "your" --
15                  MR. CREWS:  That was added by
16         me.
17                  MR. McCARRICK:  Okay.
18                  You can answer.
19         A.    My understanding is that users in
20    ordinary course prepause could take their
21    coins off the platform.  So, you know, once
22    they took the coins off the platform, title
23    transferred back to the customer.
24         Q.    Okay.  And could customers
25    unilaterally take coins off the platform?
```

223

```
 1                   C. Ferraro - Confidential
 2                   MR. McCARRICK:  Object to
 3        form.  Outside the scope.
 4                   You can answer.
 5        A.    My understanding is in ordinary
 6   course, if the customer wanted a withdrawal,
 7   the customer would have a withdrawal.
 8        Q.    Okay.
 9        A.    Prepause.
10        Q.    And let's say a customer deposited
11   USDC.  What asset would they then be able to
12   withdraw?
13        A.    They have an obligation to be
14   returned USDC in normal course.
15        Q.    Okay.  So if a customer has
16   deposited USDC in normal course, they'd be
17   able to withdraw the USDC.  Did I get that
18   right?
19                   MR. McCARRICK:  Object to --
20        A.    Prepause.
21                   MR. McCARRICK:  Object to
22        form.
23                   You can answer.
24        A.    Prepause, yes.
25        Q.    Okay.  Now, are you familiar with
```

224

```
 1                 C. Ferraro - Confidential
 2    the swap feature?
 3         A.    Yes.
 4         Q.    Would a customer be able to swap
 5    their USTC for another asset?
 6                MR. McCARRICK:  Object to
 7           form.
 8                You can answer.
 9         A.    If it was rolled out in their
10    location prepause.
11         Q.    Okay.  Now, could you help -- I'm
12    a little confused by that because, if the
13    asset -- the USDC is Celsius and the title
14    belongs to Celsius, how is a customer able to
15    direct the changing of that asset into another
16    cryptocurrency?
17                MR. McCARRICK:  Object to
18           form.
19                You can answer.
20         A.    They're changing the obligation in
21    the ledger.  So the Celsius owes you a USDC,
22    you swap it, we now owe you a Bitcoin.  It's
23    in the obligation.
24                Celsius assets, we didn't
25    necessarily go out and swap USDC for anything.
```

Confidential        Christopher Ferraro - November 21, 2022

225

1                    C. Ferraro - Confidential

2    This is a ledger back-office transaction.

3    It's your obligation that was updated on the

4    swap.

5         Q.    So if -- typically, as far as I'm

6    aware, if you have title to something, you

7    control what happens to that thing.

8              For instance, I can't -- if I had

9    a relation- -- like, if somebody had title to

10   a house, I'm not able to just change it to

11   something else, to a car.  So the title holder

12   has the ability to determine what happens to

13   that asset.

14             So you help -- do you understand,

15   then, how the customer is able to direct this

16   change that Celsius holds title to?

17        A.    Yes.

18             MR. McCARRICK:  Objection --

19        to the form.

20             But you can answer.

21             THE WITNESS:  Sorry.

22        A.    Yeah, a little bit different than

23   the house.  If you choose to sell your house,

24   the house actually sells.  When you choose to

25   swap USDC for, let's say, Bitcoin, there's not

226

```
1                  C. Ferraro - Confidential
2    necessarily an action on the side of Celsius.
3    We are not necessarily changing the coin
4    buying and selling Bitcoin for USDC.
5              Your obligation changes.  So you
6    telling Celsius to swap this for that does not
7    necessarily change what we do with the actual
8    coin.  That is under our control and under our
9    ownership.  We're just changing the
10   back-office obligation to you.  Now we owe you
11   a Bitcoin and not USDC.
12       Q.    And the fact that it -- a swap
13   would not actuate, like, a blockchain
14   transaction would be how you were able to
15   provide that service free of charge?
16              MR. McCARRICK:  Object to
17         form.
18              You can answer.
19       A.    I don't -- I don't think it has --
20   the transfer title has anything to do with
21   free of charge.  Free of charge was a pricing
22   decision, a marketing positioning place.  We
23   wanted to roll out swap and make it have a
24   high uptake by the customers.
25              In May we were starting to think
```

227

```
 1              C. Ferraro - Confidential

 2    about charging swap fees, and those were being

 3    rolled out until the pause happened.

 4         Q.    Okay.  Let's see.  Now, you

 5    mentioned earlier that you'd read 50 letters

 6    from customers.  Is that correct?

 7         A.    Yeah.  Over 50.

 8         Q.    Do you happen to recall a letter

 9    from Rebecca Gallagher?

10         A.    I wouldn't remember any names at

11    this point in time.

12         Q.    Okay.  Well, I can tell you a bit

13    about her situation.  She's a fellow pro se

14    creditor.  And she had sold her house and put

15    the proceeds into Celsius and has in her

16    account about $350,000 in USDC stablecoins and

17    4 Bitcoin, among other assets.  And she was

18    not aware that she was, you know, literally

19    giving her house away.  We talked about house

20    titles a little while ago.

21              Can you -- do you think that, just

22    as a human, do you think that's fair, that she

23    now stands to potentially lose her life's

24    savings?

25              MR. McCARRICK:  Object to the
```

228

```
1                 C. Ferraro - Confidential

2          form.

3                 You can answer.

4          A.    So I grew up in a regulated

5    company.  I worked for JPMorgan right down the

6    street.  Okay?  I joined Celsius March 21,

7    2022.  I'm heartbroken.  I'm sitting here in

8    front of you, and I'm heartbroken at this

9    situation.

10                And what I'm -- kind of, come from

11   a background where things were regulated and

12   stuff, this didn't happen -- right? -- the

13   FDIC would close down the company.

14                So Celsius and the customers

15   are -- it's a horrible situation.

16                THE VIDEOGRAPHER:  Your

17         microphone.

18                THE WITNESS:  Sorry.

19         A.    It's a horrible situation.  And

20   I -- every single day I wake up trying to get

21   value back.  I can't control the previous

22   mistakes.  I think this situation with Rebecca

23   is awful.  And I want to help the situation.

24   That's why I'm here.  That's why I sit in this

25   chair right now.
```

229

```
 1                    C. Ferraro - Confidential
 2          Q.    That's good to hear.  Just, I
 3   guess, switching to a somewhat related topic.
 4   Are you familiar with promotional codes that
 5   users were offered to deposit?
 6          A.    I've seen some of the, lack of a
 7   better word, coupons of them.  Right?  Yeah.
 8          Q.    Yeah.  One of them was offered in
 9   the spring of this year, was labeled
10   B22SATS20000, where users could receive $500
11   worth of Bitcoin if they were to deposit
12   $20,000 worth of Bitcoin and then hold them on
13   the platform for, I believe, six months.
14              Now, I think part of the terms
15   would be, like, your deposit would be voided
16   if you were to withdraw any of the assets from
17   the platform.
18              Would that potentially encourage
19   users to keep their assets on the platform, do
20   you think?
21              MR. McCARRICK:  Object to
22        form.
23              You can answer.
24          A.    I mean, I think customers who
25   bring additional balances onto the platform
```

Confidential        Christopher Ferraro - November 21, 2022

230

                    C. Ferraro - Confidential

 1

 2   because they're getting rewarded with Bitcoin,

 3   $500 of Bitcoin or whatever it is, there's

 4   a -- there is a marketing program to try to

 5   get people to come onto the platform and grow

 6   balances.  And yes.

 7              So I think people probably added

 8   additional funds, just like they would open a

 9   checking account across the street if they

10   gave them $250.  Right?

11              So there was an incentive there

12   for people to bring on and to keep it there

13   for six months under your example.

14       Q.    Yeah.  Now, that particular promo

15   code had a clause where if the value of your

16   deposit declined, you would also forfeit the

17   rewards.

18              Are you aware of any notice that

19   was provided to customers if their account

20   balance dropped below that threshold?

21       A.    I --

22              MR. McCARRICK:  Object to

23       form.

24              Are you summarizing or reading

25       from something?  Just want to make

231

```
1              C. Ferraro - Confidential

2         sure the record's clear.

3              MR. CREWS:  I'm summarizing,

4         yeah.

5              MR. McCARRICK:  Okay.  Object

6         to form.

7              You can answer.

8         A.   I don't know the details.

9         Q.   Okay.  I suppose, just to share a

10   bit of my situation, I had claimed that

11   deposit code in addition to a few others and

12   deposited $26,000 worth of Bitcoin on around

13   March 9, I believe.  And the promotion code

14   was voided because market price declined.

15             But I wasn't provided notice, in

16   which case there wasn't going to be a reason

17   to keep assets on the platform.  So I just

18   wanted to fill you in on that.

19        A.   We can -- we can look into --

20             MR. McCARRICK:  Object --

21        yeah, object to form.

22             But I don't think there was a

23        question, so no call for a response.

24             THE WITNESS:  Yeah.

25             MR. CREWS:  Yeah.
```

232

```
 1                C. Ferraro - Confidential
 2          Q.    Are you familiar with Aliza
 3    Landes, who is or was the VP of retail lending
 4    at Celsius?
 5          A.    I've heard the name.  I believe
 6    she is the wife of Daniel Leon and used to run
 7    retail lending.  This is way before my time,
 8    and I've never met Aliza -- Aliza.  Yeah.
 9          Q.    Okay.  There was a statement she
10    made in 2020 about ownership of USDC and fiat
11    that customers would receive when taking out a
12    collateralized loan at Celsius.  And I wanted
13    to just share that.
14                MR. CREWS:  Share my screen
15          again.
16          Q.    So in an AMA she hosted with
17    Celsius, she said -- this is in relation to
18    avoidance of default of loans.  She said:
19                "Those are their funds and
20          their crypto, and they get to decide
21          what to do with it."
22                And there is a Twitter link here
23    where -- well, I don't think this is going to
24    play, but she's, you know, saying those words.
25                And do you think that this is
```

233

1                C. Ferraro - Confidential

2     consistent with the terms of service, as you

3     understand them?

4                MR. McCARRICK:  Object to

5          form.  Outside the scope.

6          Incomplete information.

7                But answer to the best of your

8          ability.

9          A.    I'm not quite sure the context,

10    what she said around it.  I go back to the

11    contract, the terms of use, and what it

12    explicitly states.

13               Like I said, I don't -- I have a

14    job.  I don't watch YouTube.  I -- I didn't

15    watch the AMAs.  I definitely have not seen

16    Aliza.  So I can't remark on what she may or

17    may have not said in 2020.

18         Q.    Do you think Celsius has an

19    obligation to correctly inform their customers

20    of the obligations and risks when opening a

21    Celsius account?

22               MR. McCARRICK:  Object to

23         form.

24               You can answer.

25         A.    I would think -- again, I come

Confidential        Christopher Ferraro - November 21, 2022

234

```
 1              C. Ferraro - Confidential
 2    from two decades in banking where -- highly
 3    regulated.  So I tend to look at the world
 4    through that lens.  Crypto is completely
 5    different.  But I generally think that
 6    customers, you know -- or, sorry -- companies
 7    that want to have customers for the long run
 8    speak truth to them.
 9         Q.    I agree to that.  There was one
10    other quote from that same AMA when she was
11    addressing customers who would be leery about
12    taking out a loan.  And the way she explained
13    it was:
14              "You're not going into debt,
15         you're just borrowing against
16         something that you own."
17              And again, does that seem
18    consistent with the terms of service?
19              MR. McCARRICK:  Objection.
20         Outside the scope.  Incomplete
21         information.
22              Answer to the best of your
23         ability.
24         A.    I don't know the context of what
25    she's saying, but this statement --
```

Confidential          Christopher Ferraro - November 21, 2022

235

1             C. Ferraro - Confidential

2             THE WITNESS:  Can you hold it

3        for one second --

4             MR. CREWS:  Yeah.

5             THE WITNESS:  -- just

6        because -- can you scroll up --

7             MR. CREWS:  Oh, sorry.

8             THE WITNESS:  -- because that

9        camera is in the way.  I'm sorry.

10        Sorry about that.

11        A.    Her -- the statement she makes --

12   says makes no sense to me.  You're not going

13   into debt, you're borrowing.  So I don't --

14   I'm not quite understanding what the sentence

15   even means.  It's contradicting itself.

16        Q.    I'd agree with that.  And when I

17   went to withdraw stablecoins on June 13, I

18   wasn't able to.  Could you explain why?

19             MR. McCARRICK:  Object to

20        form.  Outside the scope.

21             You can answer.

22        A.    I believe that was under the

23   pause.

24        Q.    Correct.  So could you explain why

25   the pause was enacted.

236

```
 1              C. Ferraro - Confidential

 2              MR. McCARRICK:  Object to

 3      form.

 4              You can answer.

 5      A.    I think most of this is noted in

 6   the first-day declaration where it gives the

 7   reasons for it.  Right?  Backdrop, difficult

 8   marketplace; backdrop, have taken significant

 9   legacy losses; backdrop, a lot of customer

10   withdrawals.

11              All of those things gave rise to

12   the pause, so we can take a breather, get

13   bankruptcy protection -- right, well, not at

14   that point in time -- take a breather.  Then

15   when we filed, decided to get bankruptcy

16   protection, that way we can treat the estate

17   fairly.  So ...

18      Q.    So would part of that be that the

19   funds were not available to pay out more

20   withdrawals beyond that?

21              MR. McCARRICK:  Objection to

22      form.  Outside the scope.

23              You can answer.

24      A.    I think we paused because

25   liquidity was getting short.  And we didn't
```

Confidential        Christopher Ferraro - November 21, 2022

237

              C. Ferraro - Confidential

1

2    want to give benefit to the first person in

3    line to the detriment of the last person in

4    line.

5         Q.    Now, would you say that somebody

6    who withdrew on June 12 benefited to the

7    detriment of somebody who tried to withdraw on

8    June 13?

9              MR. McCARRICK:   Object --

10        object to form.   Outside the scope.

11             You can answer.

12        A.    I think that's a leg- -- like,

13   kind of, a bankruptcy question about our

14   withdrawals before the bankruptcy date

15   preferential.   I don't know.   I'm not an

16   expert in this space.   I'm probably not the

17   right one to answer that question.

18        Q.    Okay.   But you estimated that

19   potentially there would be, if we were to go

20   to liquidation, customers might receive 50

21   cents on the dollar.

22             So do -- did the customer who

23   tried to withdraw on June 13 do anything

24   themselves differently, materially different

25   than the customer who withdrew 100 percent on

Confidential       Christopher Ferraro - November 21, 2022

238

1                C. Ferraro - Confidential

2     the dollar plus rewards on June 12?

3                MR. McCARRICK:  Objection to

4          form.  Outside the scope.

5                You can answer.

6          A.    I think that distinction is pre

7     and post pause.  If you were pre, the -- you

8     know, you got a withdrawal.  And if you were

9     post, the accounts were frozen.

10         Q.    But the customer themselves wasn't

11    responsible for that, were they?

12               MR. McCARRICK:  Object --

13         object to form.  Outside the scope

14         and vague.

15               You can answer.

16         A.    Not quite sure of the question.

17    I'm sorry.

18         Q.    The question was:  Did the

19    customer do anything to potentially get half

20    as much, in the event of a liquidation, if

21    they missed withdrawing before the pause?

22               MR. McCARRICK:  Objection to

23         form.  Outside the scope.

24               You can answer.

25         A.    I mean, I don't think the customer

239

```
 1                C. Ferraro - Confidential
 2   would just withdraw before the pause, so they
 3   were able to get their funds.  Post pause, you
 4   can't withdraw.  Now it's handled by a
 5   bankruptcy estate.  So I think that's the
 6   marker, is just pre and post pause.
 7                I'm not going to cast, like, was
 8   that customer hurting the other customer.
 9   What I can say is we thought the pause was
10   right because we wanted to protect the people
11   that were on the platform.
12        Q.    Okay.  Maybe I'll put it just one
13   more way:  Would you say that it's, like, a
14   customer -- the customer's fault for not
15   withdrawing it prior to the pause?
16        A.    I don't think the fault is with
17   the customer at all.  I mean, I think -- I
18   think it's -- again, go back to the backdrop
19   that I stated, bad marketplace, legacy losses,
20   there are significant withdrawals.  It's a bad
21   situation.
22                The customer is not at fault.
23   Celsius -- Celsius had title to the assets.
24   Celsius took some -- did some bad
25   investments -- right? -- looking back.  It's,
```

240

```
 1              C. Ferraro - Confidential
 2    kind of, a risk -- risk deployment.  So
 3    sometimes you win; sometimes you lose.
 4    Celsius lost too many times.
 5         Q.    And you testified -- or -- this is
 6    a testimony, I think.  Right?  That's the
 7    correct term?  You testified earlier today
 8    that the return for what you deem
 9    "surrendering of title" to our assets to
10    Celsius, that we received yield in return.  Is
11    that right?
12              MR. McCARRICK:  Object to
13         form.
14              You can answer.
15         A.    And the ability to be on the
16    platform.  Yield was the main consideration
17    but also, you know, safeguarding your crypto,
18    being able to see your account balance, stuff
19    like that, that was all listed in the terms of
20    use as well.
21         Q.    Okay.  Would you say that for
22    somebody such as myself who has only deposited
23    onto the platform, never withdrawn, that I've
24    not realized a benefit to this supposed
25    interest rate or return, whatever we want to
```

241

```
 1                   C. Ferraro - Confidential
 2    call it?
 3                   MR. McCARRICK:   Object to
 4          form.   Outside the scope.
 5                   You can answer.
 6          A.    Can you -- can you restate it, I'm
 7    sorry.
 8          Q.    Yeah.  Having deposited into
 9    Celsius without withdrawing, I suppose, like,
10    in what real sense have I benefited from the
11    earn program?
12                   MR. McCARRICK:   Same
13          objections.
14                   You can answer.
15          A.    Your obligations have accrued
16    rewards.  The problem is is we paused so you
17    couldn't get your funds out and now we're in
18    bankruptcy.  That's the issue.  The intent was
19    that you would earn your rewards and that you
20    would be able to quietly enjoy them.
21          Q.    Yeah.  So in order to realize that
22    benefit, the company needs to be able to have
23    the resources in order to pay those rewards
24    or -- and the principal?
25                   MR. McCARRICK:   Objection to
```

242

```
 1              C. Ferraro - Confidential

 2         form.

 3              You can answer.

 4         A.    Yeah, in order to realize the

 5    benefit, to monetize the benefit, there's some

 6    benefit in just accruing -- right? -- you

 7    stayed on the platform while you were

 8    accruing.  My understanding you didn't

 9    withdraw.  So there was some benefit as you

10    looked at your balance and the balance was

11    increasing over time.

12              The problem was we paused and now

13    we're in bankruptcy.  So, yeah, I mean, the

14    issue is now we're an estate and we're trying

15    to maximize value to give back to yourself and

16    the other creditors.

17              So it's, kind of, like -- all of

18    your balance -- your balance includes all the

19    rewards, your obligation -- right? -- the

20    claim.  So that's what we're fighting for is

21    to get you as much back on that claim amount

22    as possible.

23         Q.    Okay.  And was Celsius solvent

24    when it paused on June 12?

25              MR. McCARRICK:  Object.
```

243

```
 1              C. Ferraro - Confidential
 2         Outside the scope.  Form.
 3              You can answer.
 4         A.    I think at the point when we
 5   paused, when I think back, I think that's,
 6   kind of, the point where Celsius said, We have
 7   a solvency problem.
 8              I was not part of that decision.
 9   I was not with the board.  I did not have
10   knowledge of that decision.  I'm only saying
11   from where I sit today thinking back probably
12   that's the event where they said, We have an
13   issue with solvency.
14         Q.   Yeah.  And in the Mashinsky
15   declaration I believe he listed a $1.2 billion
16   deficit which included assets with sell tokens
17   valued at hundreds of millions of dollars.
18              So that would seem to be
19   insolvency.  Right?
20              MR. McCARRICK:  Object to
21         form.  Outside the scope.
22              You can answer.
23         A.    I mean, that was at the bankruptcy
24   filing.
25         Q.   Okay.
```

244

1                    C. Ferraro - Confidential

2          A.      So that was post the pause.

3          Q.      Yeah.  Sure.

4          A.      And we filed for bankruptcy.  So I

5     would assume that, kind of, says, yeah, we're

6     not solvent.

7          Q.      And this insolvency would have

8     occurred over time, presumably.  Correct?

9                    MR. McCARRICK:  Objection to

10         form.  Outside the scope.

11                    You can answer.

12         A.      No.  The balance sheet, the

13    balance sheet accrues and that takes losses

14    over time.  But solvency is not a, you know,

15    sort of thing -- right? -- you at some point

16    in time become insolvent.

17                    Now, I haven't studied -- studied

18    the definitions and all that type of stuff.

19    But, you know, there was ample liquidity, the

20    balance sheet, to my knowledge back then with

21    the value -- the accounting, following

22    accounting principles was, you know, had

23    equity.

24                    The mining company, we had people

25    who wanted to invest that would have made the

245

1               C. Ferraro - Confidential

2   mining asset worth literally over $1 billion.

3               So with the balance sheet, there

4   was a lot of value in that balance sheet.  And

5   what happened was when the crypto prices and

6   the crypto market, kind of, went into this ice

7   age, the value of those assets decreased

8   massively, and our ability to monetize those

9   assets and get liquidity went away, and that's

10  what let up to the pause and then the filing.

11       Q.    And just for clarity, when we're

12  talking insolvency, my understanding is it

13  would be when your liabilities exceed your

14  assets.

15              Is that a reasonable definition?

16              MR. McCARRICK:   Object to

17        form.  Outside the scope.

18              You can answer.

19       A.    I think of it as, well, accounting

20  is like a -- not a practicing CPA anymore, but

21  from thinking back to my school days 25 years

22  ago, I think it's when you can no -- when you

23  believe that you cannot pay your obligations.

24              So it's a little bit of, you know,

25  your balance sheet is following specific

246

1                    C. Ferraro - Confidential

2    things but, if you have a mining asset that

3    you think is going to be worth $2 billion and

4    that you're going to monetize, you're probably

5    still solvent.

6              But again, I'm not a lawyer.  I'm

7    not looking at the definition.  That's my

8    understanding.

9         Q.    Yeah.  I mean, I would think that

10   liquidity would be your ability to pay your

11   obligations because you might have, you know,

12   hundreds of millions locked in mining that you

13   can't get access to today, so you can't pay

14   depositors who necessarily want their funds

15   back today, but you would be solvent, just

16   illiquid.  So that would be a distinction

17   between those two terms.

18             But then insolvency would be you

19   have obligations that exceed even those

20   illiquid assets.

21             MR. McCARRICK:  Are you asking

22        him to agree or disagree?

23             MR. CREWS:  Just in terms of

24        clarifying the terms, yeah.

25             MR. McCARRICK:  Okay.

247

```
 1                 C. Ferraro - Confidential
 2           Objection to form.  Outside the
 3           scope.
 4                 You can respond.
 5           A.    I mean, I think insolvency is when
 6      you can no longer pay your bills to some
 7      extent, and your idea of a going concern goes
 8      away.  That means that the value of your
 9      franchise is worth less than the liabilities
10      that you have.
11           Q.    Yeah.
12           A.    Crypto was booming.  And the
13      balance sheet was, you know, recorded largely
14      at cost.  Some of the investments were
15      mark-to-market.
16                 Again, we thought the mining asset
17      was going to be worth billions.  I don't -- I
18      wasn't with the company at that time.  But
19      looking back, I think it's easy to think why
20      there was a going concern.
21           Q.    Mm-hmm.
22           A.    Right?  And I think at the pause,
23      we were in the middle of this crypto winter.
24      We didn't think that there was a way out.  I
25      think that's when they said, you know, that's
```

Confidential        Christopher Ferraro - November 21, 2022

248

1                 C. Ferraro - Confidential

2      triggered insolvency, pause, don't let people

3      go out anymore.  And then we got to a point

4      where we decided that we have to file.

5          Q.    Just for -- as clarity, I'll just

6      propose my definition of insolvency being when

7      all your assets, including liquid assets, are

8      subsumed by a greater -- your liabilities

9      essentially are larger than those -- all those

10     assets combined.  So you have more liabilities

11     than your assets.

12                And under that definition, with

13     the bankruptcy filing there was a deficit of

14     1.2 billion?

15         A.    1.2 approximately, yeah.

16         Q.    So you don't go from zero to 1.2.

17     It would have occurred over a period of time.

18     Correct?

19                MR. McCARRICK:  Objection to

20           form.  Outside the scope.

21                You can answer.

22         A.    Yeah.  It's what I said at the

23     beginning is that it just -- it doesn't

24     happen, but there's a tipping point where you

25     say, We're not a going concern anymore.

249

```
1                  C. Ferraro - Confidential

2                  It's important to note the

3     accounting includes the sell token on the

4     balance sheet, and when the sell token started

5     to decrease in value -- right? -- this, kind

6     of, hit the perfect storm.

7                  So it wasn't just sell token, it

8     was other crypto assets were going down, the

9     mining company on -- in reality the bids went

10    dry, there was really no way to monetize that

11    asset.  You see what's happening right now in

12    the space, we need a turnaround, and I think

13    that's when they, kind of, came to the

14    conclusion, Yeah, we need to pause.

15         Q.    And you mentioned that you were

16    aware of a May board meeting that happened,

17    really, a couple of months after you joined?

18         A.    Yeah.  It was, I think, May 2.  I

19    think it was one day, I could be wrong, but I

20    believe it was May 2.

21         Q.    And were you present at that board

22    meeting?

23         A.    No.  I was in Quito, Ecuador.

24         Q.    Did you have a chance to review

25    the examiner's interim report in reference to
```

250

```
 1              C. Ferraro - Confidential
 2    that meeting?
 3         A.    I read the examiner's report, yes.
 4         Q.    Yeah.   There was a quote on page
 5    78 that referenced the board meeting minutes
 6    where it was acknowledged that Celsius'
 7    capital "sits at near zero."
 8              Would this have been May 2?
 9              MR. McCARRICK:   Objection to
10         form.   No foundation.   Calls for
11         speculation.
12              You can answer to the extent
13         that you're able.
14         A.    My understanding the board
15    meeting -- my understanding is the board
16    meeting was on May 2.   I was not at the board
17    meeting.   I have not reviewed the minutes.   I
18    reviewed the examiner's report just like you
19    did.
20         Q.    Okay.   I suppose the last on this
21    topic before changing would be:   Would you
22    agree that the inability to withdraw assets
23    impairs their utility to your customers?
24              MR. McCARRICK:   Objection to
25         form.   Outside the scope.
```

251

1              C. Ferraro - Confidential

2              You can answer.

3        A.   Yeah, I mean, clearly if the

4    customer is trying to withdraw, they want

5    their -- they want to get their title back to

6    the digital currency.  And post pause that

7    wasn't -- that wasn't available.  So obviously

8    that had a detriment to the overall customer.

9    And that's why we're here.

10       Q.   Yeah.

11       A.   We're here to maximize the value

12   and get as much as we possibly can back.  It's

13   unfortunate how we got here, but, you know,

14   from the pause to the filing, you know, we now

15   go into an estate, and we're trying to fight

16   to get you back as much of your obligations as

17   we possibly can.

18       Q.   And are you aware if rewards in

19   your Celsius account compound?

20            MR. McCARRICK:  Objection to

21       form.  Outside the scope.

22            You can answer.

23       A.   My understanding is they get

24   deposited into your account every Monday.  So

25   that would go into your balance, and then you

252

1              C. Ferraro - Confidential

2      would have a higher balance to earn off of.

3          Q.    Okay.  Is it fair, then, to say

4      that you're earning rewards on the rewards

5      that you're building?

6              MR. McCARRICK:  Objection to

7          form.  Outside the scope.

8              You can answer.

9          A.    My understanding is that the

10     rewards on every Monday go into the overall

11     balance, and you earn on that higher balance

12     the next week.  So you would be able to

13     compound or earn on your rewards or withdraw

14     it before the pause.

15         Q.    And would title of the rewards --

16     could you address the title of those rewards.

17         A.    Well, nothing's really happened.

18     Celsius is deploying assets, enjoying the

19     returns, and setting a reward rate that

20     increases your obligation.

21              There's nothing happening in the

22     marketplace for those rewards necessarily.

23     Yes, we're going to go out and we're going to

24     buy some sell tokens so we can pay them out in

25     rewards.  If we have Bitcoin, that's on the

253

```
 1                C. Ferraro - Confidential
 2   balance sheet, we can pay -- give that out,
 3   maybe we have to buy Bitcoin.
 4                But a lot of the times we actually
 5   didn't have to go into the marketplace to buy
 6   what we were paying in rewards.  It was just a
 7   book entry into your obligation, the
 8   liability, the back-office system.
 9        Q.    Okay.  So if I have .78 Bitcoin in
10   my account and I earn some fractional reward,
11   you're saying that the title of the Bitcoin is
12   Celsius'.  So I'm wondering what's the title
13   of the reward?
14        A.    It's the oblig- --
15                MR. McCARRICK:  Ob- --
16                THE WITNESS:  I'm sorry.
17                MR. McCARRICK:  No, you're
18        fine.  You're fine.
19        A.    No.
20                MR. McCARRICK:  Objection to
21        the form.
22                You can answer.
23        A.    It's the obligation that's
24   increasing, the IOU to the customer.
25        Q.    Okay.
```

Confidential        Christopher Ferraro - November 21, 2022

254

```
 1                C. Ferraro - Confidential
 2         A.     That's accruing weekly.  Every
 3    Monday the obligation to the customer
 4    increases.
 5         Q.     Okay.  So it's an IOU.
 6         A.     Yeah.  It's a loan from the
 7    customer to Celsius transferring title for the
 8    right to pledge or rehypothecate, sell,
 9    otherwise invest.
10              MR. CREWS:  Okay.  I just want
11         to share my screen again.  I have a
12         copy of this in paper.
13              MR. McCARRICK:  Mark it as
14         Exhibit 3?
15              MR. CREWS:  Sorry if it's a
16         bit small.  This is a copy of the
17         1099-MISC form that I received for
18         the prior tax year.
19         Q.     Could you explain why customers
20    were issued these tax forms?
21              MR. McCARRICK:  Objection to
22         form.  Well outside the scope.
23              But you can answer.
24         A.     Sorry.  You know, this is tax
25    code.  So my understanding is that you were
```

Confidential       Christopher Ferraro - November 21, 2022

255

1             C. Ferraro - Confidential

2    getting rewards which is counted as income.

3    Whether or not you actually pull, you know,

4    withdraw the coins or the rewards, the IRS

5    still recognizes that as income because your

6    obligation has increased.

7             In normal course you can withdraw,

8    get title back, and take your coins and put

9    them elsewhere.  Right?  In a world in which

10   you don't, the IRS is not interested in

11   whether or not you actually took it off or

12   kept it on.  You're accruing reward income

13   here.  Right?

14            So just like the liability, the

15   obligation in the back office, that's

16   increasing, and we're reporting that increase

17   as a taxable event for you.

18       Q.    So --

19       A.    That's my understanding, at least.

20       Q.    Yeah.  So you're saying because

21   the material amount of your account has

22   increased, the customers would then owe a tax

23   obligation based on that increase?

24            MR. McCARRICK:  Object to

25       form.  Outside the scope.

Confidential        Christopher Ferraro - November 21, 2022

256

```
 1              C. Ferraro - Confidential

 2              Answer.

 3       A.    You're earning a reward.  Whether

 4  or not you take that reward off the platform

 5  and turn it into fiat, the tax code, in my

 6  understanding, doesn't care.  They're saying

 7  you earned a consideration of the rewards for

 8  placing your coins on Celsius and transferring

 9  title.  You get a reward.  That's a taxable

10  event.  That's my understanding of the

11  situation.

12       Q.    Okay.  So rewards increase the

13  balance of your account, which you just said

14  was essentially an IOU?

15       A.    It's an obligation.  It's a loan

16  from the customer to Celsius, yeah, according

17  to the terms of use.

18       Q.    Do customers have a tax obligation

19  if the value of their account increases with

20  the crypto markets?

21              MR. McCARRICK:  Objection to

22       form.  Outside the scope.

23              You can answer if you know

24       about customers' tax obligations.

25       A.    I'm not a tax lawyer.  I did pass
```

257

```
 1                    C. Ferraro - Confidential

 2     the CPA exam 25 years ago.  It's been a long

 3     time.

 4                    My understanding is that price

 5     appreciation or depreciation doesn't change

 6     your tax.  It's not until you actually have a

 7     taxable kind of event where you sell your

 8     crypto or something like that.

 9                    Just earning a rewards against

10     your obligation is also you earning something

11     in the IRS's mind.  So if your price of your

12     coin is going up and down, your rewards will

13     go up and down.

14                    But I believe, I'm not giving tax

15     advice, but I believe the only taxable event

16     if you do not trade, sell, swap, whatever,

17     crypto would be the rewards that you're

18     accruing to the obligation.

19          Q.    So if I bought my Bitcoin at a

20     lower price prior to my depositing it with

21     Celsius, would I have a tax obligation upon

22     deposit?

23                    MR. McCARRICK:  Objection to

24          form.  Very far outside the scope.

25                    You can answer to the extent
```

Confidential       Christopher Ferraro - November 21, 2022

258

```
 1                 C. Ferraro - Confidential
 2          that you know about tax obligations.
 3          A.    I don't know.  I think your basis
 4   just goes up and down until you take it out.
 5   But I'm not a tax expert.  So --
 6          Q.    Yeah.
 7          A.     -- I'm not sure the answer to
 8   that.
 9          Q.    The reason I ask is because if
10   title is transferred, presumably this would be
11   a tax disposal event.
12                Would you know anybody if you're
13   not able answer who --
14          A.    I don't.
15          Q.    -- at Celsius could advise?
16          A.    I -- I don't know what the
17   question is.  I'm sorry.
18          Q.    The question is if we're saying
19   that title transfers from the customer to
20   Celsius upon deposit, would that be a tax
21   disposable --
22          A.    I'm not a tax accountant.  I can't
23   give you advice on tax.  I don't know the
24   answer to that.  What I do know is the terms
25   of use and what it says.  I'm not giving tax
```

Confidential       Christopher Ferraro - November 21, 2022

259

```
 1              C. Ferraro - Confidential
 2    advice.  I'm not qualified to do that.
 3         Q.   Is there somebody at Celsius who
 4    would be able to answer the tax obligation
 5    questions?
 6              MR. McCARRICK:  Objection to
 7         the form.  Still outside the scope.
 8              But you can answer if you know
 9         anyone.
10         A.   You would probably have to -- we
11    would probably have to have the conversation
12    with somebody in the tax department or the
13    legal department.
14         Q.   Okay.  Do you see how it could be
15    confusing for a customer to be paying taxes on
16    assets that Celsius holds title to?
17              MR. McCARRICK:  Objection to
18         form.
19              You can answer.
20         A.   What I know is we control the
21    terms of use.  We do not control tax law.  We
22    are not giving tax advice in the terms of use.
23              This is a contract between Celsius
24    and the customer that, in my opinion -- and
25    I've studied 6 and 8 -- is very clear.  I
```

260

1             C. Ferraro - Confidential

2     can't speak to the tax side of it, sir.  I'm

3     sorry, I can't.

4         Q.    And do you think, just to bring up

5     my situation where I paid taxes on my rewards

6     and yet I'm missing, say, like $100,000 worth

7     of crypto, does that feel like a fair

8     situation?

9             MR. McCARRICK:  Objection to

10        form.  Outside the scope.

11            You can answer to the extent

12        that you can.

13        A.    I mean, my -- again, I'm not a tax

14    advisor.  I'm not giving tax advice.  If for

15    some reason the estate were to give you

16    everything back -- right? -- there would

17    probably be no taxing event.  You'd get

18    everything back.  You're made whole.  If you

19    get back less, you might get a refund for the

20    rewards you accrued.  But, again, I'm not

21    giving tax advice.

22            But let's say that we were only be

23    able to pay you back 50 cents on the dollar,

24    hypothetical, I think that that would be a tax

25    impact, and you would get some of your reward

Confidential       Christopher Ferraro - November 21, 2022

261

1              C. Ferraro - Confidential

2     accrual back.

3              I'm not being an expert on tax

4     code.  I'm just giving you my, kind of, mental

5     model of how I understand it works.  So I

6     think it's timing.  That's my understanding.

7         Q.    Okay.  And are you familiar with

8     the fact that there have been insiders who

9     have withdrawn assets from the platform in the

10    last year?

11             MR. McCARRICK:  Objection to

12        form.  This has nothing to do with

13        the motion.

14             You can answer.

15        A.    I've seen the statements and

16    schedules, I signed off on them.  I spoke at

17    the 341 meetings where I took questions on

18    this, so I'm aware of the distributions.  And

19    I'm also aware that two of the founders, Alex

20    Mashinsky and Daniel Leon, are no longer with

21    this company.

22        Q.    And they both withdrew millions of

23    dollars worth of assets from the platform?

24             MR. McCARRICK:  Object to

25        form.  Well outside the scope.

Confidential       Christopher Ferraro - November 21, 2022

262

```
1              C. Ferraro - Confidential

2              You can answer.

3         A.    It was in the statements and

4    schedules, yes, sir.  Yeah, it was

5    disappointing to see one way or another --

6    right? -- It's ...

7         Q.    And are you familiar with Celsius

8    having relationships with crypto influencers,

9    partnerships?

10             MR. McCARRICK:  Object to

11        form.  Outside the scope.

12             You can answer.

13        A.    Not directly, not even loosely,

14   but from -- and, like, my Twitter account is

15   not very old.  I've never posted on Twitter.

16   I don't have Facebook or any of that type of

17   stuff.  So I'm not an active what you would

18   call a social media guy.  So I don't like the

19   influencer thing.  I've never really followed

20   it.

21             But my understanding is that there

22   was influencers that were, kind of, explaining

23   how Celsius worked, but that's the

24   knowledge -- that's the extent of the

25   knowledge that I have.
```

263

```
 1              C. Ferraro - Confidential
 2         Q.    Yeah, my understanding is from the
 3   court filings that there was some compensation
 4   that certain Celsius partners were provided.
 5              Would that be a reasonable guess?
 6              MR. McCARRICK:  Object to
 7         form.  Don't know the basis for
 8         that.
 9              You can answer to the extent
10         you know.
11         A.    I basically know what you just
12   said -- right? -- there was influencers, they
13   probably got some, sort of, consideration for
14   their efforts.  I'm not sure -- I don't know
15   how they were paid, I don't who was paid, I
16   don't know how much it was.
17              But I understand that there was
18   influencers that got consideration for
19   marketing Celsius.
20         Q.    Okay.  I wanted to bring up a few
21   of the most well-known influencers who
22   withdrew assets from the platform.
23              Are you familiar with one called
24   Lark Davis?
25              MR. McCARRICK:  Just before we
```

264

```
 1              C. Ferraro - Confidential

 2         get there, what court filings is

 3         this from, just for the record?

 4              MR. CREWS:  This is from the

 5         947-1.  So page 2,930.  It's a

 6         combination of the balances report,

 7         the 947 plus the SOFA 940 -- 973.

 8              MR. McCARRICK:  Okay.  So this

 9         is information from --

10              MR. CREWS:  Combined, yeah.

11              MR. McCARRICK:  -- separate?

12         Okay.  Understood.  I'm just going

13         to have a standing objection to

14         this, but -- I think it's outside

15         the scope but continue to ask

16         questions.

17   BY MR. CREWS:

18         Q.    So Lark Davis, aka CryptoLark, I

19   believe had a partnership with Celsius.  He

20   drew down his balance to virtually nothing and

21   withdrew 2.45 million over the course of May.

22              Were you aware of that?

23              MR. McCARRICK:  Objection to

24         the form.  Outside the scope.

25              You can answer.
```

265

```
 1              C. Ferraro - Confidential

 2         A.    I don't -- I don't know the

 3    individual.  I don't know the specifics of

 4    those withdrawals.

 5         Q.    Okay.  There's another individual

 6    known as Ben Armstrong, goes by the handle

 7    Bitboy.  This is on page 1,555 of

 8    Document 947.

 9              There are three different Ben

10    Armstrongs listed, two Ben Armstrongs and one

11    Benjamin Armstrong, both of which have

12    depleted accounts.  However, his -- Ben

13    Armstrongs, these two Ben Armstrongs are

14    missing from the 973 SOFA filing.

15              Would you be able to explain why

16    an entry might be missing from the SOFA

17    document?

18              MR. McCARRICK:  Objection to

19         form.  Outside the scope.  Not sure

20         it is an accurate rendering.

21              But you can answer to the

22         extent that you're able.

23         A.    We spent an immense amount of time

24    preparing the schedules, internally and with

25    the advisors; I reviewed them.  Obviously I
```

266

```
 1                C. Ferraro - Confidential

 2    don't review it, every line on them, it

 3    wouldn't be possible.  And it wouldn't be a

 4    good use of my time while I'm trying to work

 5    on the dual-track process.

 6                So I think that -- I can't speak

 7    to an individual transaction or whatnot.  But

 8    I can tell you that we spent a tremendous

 9    amount of effort on the schedules.  This was a

10    massive lift.  You're talking about a company

11    that, you know, venture to guess that none of

12    the employees have been through a Chapter 11

13    process and everything changes -- right? --

14    after that.

15                And you have to do these types of

16    reports, and these -- you got to really

17    mobilize the organization in order to do it.

18    And I think we did it.  We can follow up on

19    any specifics, but I can't speak to it.

20        Q.    In terms of following up, what's

21    the best mechanism for doing that?

22                MR. McCARRICK:  Objection to

23        form.  Outside the scope.

24        A.    We would have to analyze the

25    schedules and see what's happening.  I mean,
```

Confidential        Christopher Ferraro - November 21, 2022

267

                    C. Ferraro - Confidential

1

2    there's so many transactions embedded in the

3    schedules.  I think it was something like

4    10,000-plus pages.  So we just have to go

5    through it.  But there was quality checks and

6    reviews.  Anything's possible but there was a

7    lot of effort in checks that went into this.

8         Q.    And in terms of this specific case

9    where an entry I'm asserting is missing, is

10   there a mechanism by which I can raise that

11   with you?

12              MR. McCARRICK:  Object to

13         form.  This has absolutely nothing

14         to do with the current motion.

15              You can answer it to the

16         extent that you're able.

17         A.    I'd have to follow up internally

18   with the specifics.  Maybe you can provide it

19   to T.J. and Kirkland, and then we can follow

20   up.  I'm not sure of the channels and how I

21   can get back to you, if that's even allowed.

22              I know this is -- I don't believe

23   this is your account.  So this would be -- I

24   don't know if I can go in transaction history

25   and give you information about it.  But we can

268

```
 1              C. Ferraro - Confidential
 2    verify it and follow up and get back to you.
 3              MR. McCARRICK:  Can I just
 4         take a pause.  It's my understanding
 5         that someone on the Zoom is tweeting
 6         live.  Perhaps they weren't here at
 7         the beginning.  Anyone who's on the
 8         Zoom has signed the protective
 9         order.  The entire transcript has
10         been designated confidential, which
11         means that you can't live tweet it,
12         you can't disclose it outside of
13         those who have a right or bound by
14         the protective order.  So I'm going
15         to ask that individual to
16         discontinue that.
17              And as I said on the back end,
18         we're happy to work with the
19         designations as to confidentiality,
20         but the reason I designated the
21         entire transcript confidential was
22         exactly for this reason.  So I would
23         just ask that person to stop
24         tweeting.  And if it continues, we
25         will end the deposition.
```

269

```
 1              C. Ferraro - Confidential

 2              You can continue.

 3   BY MR. CREWS:

 4       Q.    So I think we just left off with

 5   the mechanism being to speak to T.J. about

 6   deficiencies, if there were anything missing.

 7              I'm going to switch to -- I have

 8   here a spreadsheet that I believe was

 9   extracted from the SOFA report or I think it

10   was the 947 document.  This is a listing of

11   merchandise purchases that Celsius made with

12   USA Strong.

13              Are you familiar with the company

14   USA Strong?

15              MR. McCARRICK:  Objection to

16         form.  Outside the scope.  I don't

17         know that we're able to review the

18         full document.

19              But you can answer to the

20         extent that you're able based on the

21         information that's displayed.

22       A.    I can't see the information on the

23   screen, but if you're asking me do I know what

24   USA Strong is, I believe it's a related party

25   to Alex Mashinsky, but his wife, Krissy
```

Confidential        Christopher Ferraro - November 21, 2022

270

```
 1              C. Ferraro - Confidential
 2   Mashinsky, I believe owns and runs USA Strong.
 3       Q.    Yes.  And last year -- or I guess
 4   over the last year, not calendar year, but in
 5   the filing they've made $118,000 worth of
 6   purchases with USA Strong -- Celsius has made
 7   those purchases with USA Strong.
 8              MR. McCARRICK:  Object to
 9        form.  Outside the scope of the
10        limited stablecoin motion.
11              You can answer to the extent
12        that you're able to understand or
13        able to verify the information
14        that's up there.
15       A.    Was there a question?  I'm sorry.
16       Q.    I'm wondering if you could maybe
17   just put into context this relationship with
18   USA Strong.
19       A.    Okay.
20              MR. McCARRICK:  Same
21        objections.
22              Go ahead and answer.
23       A.    So I'm not going to focus on the
24   numbers, I'm going to just explain -- answer
25   your question, my understanding of the
```

271

```
 1              C. Ferraro - Confidential
 2    relationship.
 3              So like I said, I believe it's
 4    Alex Mashinsky's wife, Krissy Mashinsky.  USA
 5    Strong, I believe these were for the purchases
 6    of merchandise largely for promotional
 7    giveaways.  I think Bitcoin conferenced they
 8    need to make 1,000 Celsius T-shirts.  This is,
 9    I believe, the merchandise that that would be
10    related to.  T-shirts, backpacks, you know,
11    things that you give away for promotional
12    events.
13         Q.    Okay.  And does this seem like a
14    reasonable purchase figure for the types of
15    events that you're talking about?
16              MR. McCARRICK:  Object to
17         form.  Outside the scope.
18              You can answer.
19         A.    I haven't studied and looked at
20    the price per item and shopped it to other
21    items -- right? -- because this has all
22    happened in the past, and I'm focused on the
23    estate.
24              My understanding is, you know,
25    there was a lot of Celsius T-shirts, there was
```

272

1                    C. Ferraro - Confidential

2    a lot of Celsius backpacks, and that this

3    would have been done in the ordinary course,

4    to my understanding.

5         Q.    And is it correct that Celsius'

6    headquarters is in Hoboken, New Jersey, at 221

7    River Street?

8         A.    Yes.

9         Q.    And are you aware or would you

10   know somebody who is aware --

11        A.    It was, sorry.  It was the

12   headquarters.  We rejected the lease and we're

13   no longer in that office space, yeah.

14        Q.    Would you know or be able to

15   confirm if USA Strong previously held a lease

16   in that building?

17             MR. McCARRICK:  Objection to

18        form.  Outside the scope.

19        A.    I do not know.  I've never heard

20   anything about that, so this would be the

21   first time I heard it.  I -- I visited the

22   office building on my first day of work on the

23   22nd, and I think I left the Wednesday.  So I

24   was at that building Monday, Tuesday,

25   Wednesday, and that was the last time I saw

273

             C. Ferraro - Confidential

1

2    it.

3            MR. CREWS:  Okay.  I think

4        that is the balance of the questions

5        that I have.  So I'll yield to the

6        other per ses.

7            THE WITNESS:  Thank you.

8            MR. McCARRICK:  Okay.  I think

9        we're now to the virtual pro ses.

10       I'm not sure if you all internally

11       worked out an order about who would

12       be next.  But next questioner up to

13       that, if you could announce yourself

14       and say and spell your name for the

15       court reporter's benefit.

16           And thank you, Mr. Crews.

17           MR. CREWS:  Thanks.

18           MR. KHANUJA:  This is Kulpreet

19       Khanuja.  I'm a pro se own creditor

20       K-u-l-p-r-e-e-t K-h-a-n-u-j-a.

21   EXAMINATION BY

22   MR. KHANUJA:

23       Q.   Mr. Ferraro, before I begin

24   specific questions, can I ask one generic one.

25   So when you became the current CEO, would you

274

1                C. Ferraro - Confidential

2    say in terms of doing your job, you would be

3    required to gather knowledge and background on

4    Celsius' business operations and decisions

5    taken before your time by Celsius business

6    executives?

7        A.    As it pertains to decisions I have

8    to make about the future, absolutely.

9        Q.    So I'm asking this because many

10   questions you mentioned, this was before your

11   time or you weren't aware what happened.

12            So my particular question is:  Was

13   there any formal knowledge transfer session,

14   and also if there was any obstruction or

15   pushback from Celsius to provide you

16   historical -- required historical knowledge to

17   answer questions?

18       A.    I -- I go to work every day

19   fighting to make -- create value, preserve

20   value for the estate.  If there was historical

21   things that impact my go-forward decisions, I

22   studied them, I asked about them.

23            If it's historical stuff for

24   historical purposes that don't change the

25   future, I don't think it would be a good use

275

                    C. Ferraro - Confidential

1

2    of my time to maximize value for the estate

3    going back, looking at every decision, every

4    thing.

5            I'm trying to understand where the

6    business is today, maximize value under a

7    dual-track process.  I'm doing my best to

8    answer every question I possibly can.  I've

9    been with this company since March 21.

10       Q.    Yeah.  That's fair.  One thing I

11   would recommend is to go through the terms of

12   service, prior versions, not just 6 and 8 as

13   well, because there were things in there, no

14   mention of rights of ownership and those kinds

15   of things, and people actually signed up

16   before Version 6 as well.

17           So that would probably give you

18   more idea about the other questions we're

19   going to pose as well.

20           MR. McCARRICK:  Object --

21       object --

22       Q.    No --

23           MR. McCARRICK:  Hold on.

24       Object to form.  That wasn't a

25       question, that was a statement.

276

```
1              C. Ferraro - Confidential
2              So just wait for the next
3       question, and then you can answer.
4              MR. KHANUJA:  Okay.
5       Q.    Mr. Ferraro, you mentioned to
6  Mr. Hershey that, per your knowledge,
7  customers deposited their assets and
8  transferred ownership of assets to Celsius in
9  exchange for rewards.  Say, if a customer
10 deposited, say, 100 Bitcoins and was paid 5
11 percent in rewards, would the customer expect
12 105 Bitcoins back or just 5 Bitcoins back?
13              MR. McCARRICK:  Object to
14       form.
15              You can answer.
16       A.    The obligation would be the
17 Bitcoin you deposited, plus your rewards.
18       Q.    105.  So you would say the
19 customers would not be happy exchanging their
20 100 Bitcoins for 5 Bitcoins in return?
21       A.    I don't know why --
22       Q.    They'd get 105.
23       A.    Yeah, I think that's how the back
24 office system works.  That's -- we would
25 accrue rewards to your obligation, and your
```

277

```
 1              C. Ferraro - Confidential

 2    obligation in this example would be 105 and

 3    the claim would be 105.

 4         Q.    Yes.   Okay.   So are there Celsius

 5    insiders or employees who transferred their

 6    assets from earn to custody after custody

 7    f- --

 8              MR. McCARRICK:   Objection to

 9         form.

10         Q.    -- say, from April 2022 --

11    April 2022 until, say, when the deposits were

12    warranted?

13              MR. McCARRICK:   Objection to

14         form.   Outside the scope.

15              You can answer.

16         A.    I have seen the statements and

17    schedules, as you probably have, yes.

18         Q.    Yes.   So they're -- so now they're

19    able to get 105 percent back while other

20    owning customers are not able to?

21         A.    I don't --

22              MR. McCARRICK:   Objection to

23         form.

24              You can answer.

25         A.    I'm not sure that's accurate.   I
```

278

```
 1              C. Ferraro - Confidential
 2    believe people in custody right now were
 3    trying -- you know, this is still an
 4    outstanding legal question, and the employees
 5    and transfers has not been decided.  And it's
 6    outside of my lane, sir.  It's outside of my
 7    lane.
 8         Q.    But -- okay.  Thank you.  But
 9    that's a relevant question with regards to
10    custody and earn and who gets what?
11              MR. McCARRICK:  Objection to
12         form.
13              You can respond.
14         Q.    Okay.
15         A.    I mean, I think it's a relevant
16    question that the judge will rule on.
17         Q.    Sure.  Yeah.  Now, in your
18    document or the statement you filed, I'm
19    looking at paragraph 21.  And I can quote.  It
20    says:
21              "The functioning of these
22         deployment activities depended upon
23         the debtors having unilateral
24         authority to effectuate these
25         methods and strategies in their
```

279

```
 1              C. Ferraro - Confidential
 2         discretion.  To accomplish this, the
 3         terms of use included a variety of
 4         provisions regarding the formal
 5         transfer of ownership rights for
 6         coins transferred into the earn
 7         program."
 8              Now, can you explain what
 9    constitutes a formal transfer of ownership?
10    No title transfer document, no sale agreement,
11    no price of sale, no tax liability, just
12    transferring assets into Celsius to earn
13    rewards, will that constitute a formal
14    transfer of ownership?
15              MR. McCARRICK:  Object to --
16         object to form.
17              You can answer.
18         A.   My understanding is in the terms
19    of use, there's a contract between the
20    customer and Celsius.  And the customer
21    clicked the box to accept and clicked
22    "accept."
23              That was the contract that
24    transferred title from the customer to
25    Celsius.  That was the action and the
```

280

```
 1              C. Ferraro - Confidential
 2    consideration that was done at that point in
 3    time in time.
 4         Q.   Can you point to me the specific
 5    language in the terms of service that states
 6    "formal transfer of ownership"?
 7              MR. McCARRICK:  Object to
 8         form.  The terms of service aren't
 9         in front of me.
10              But you can answer to the
11         extent that you know generally.
12         A.   I will tell you, sir, Oren
13    Blonstein tomorrow will be here to talk about
14    the terms and use.  I believe he is
15    knowledgeable in this space.
16         Q.   Okay.
17         A.   I have not been part of
18    discussions of terms of use with Oren in
19    detail so I don't -- I just don't know the
20    answer to what terms of use said in that.  But
21    to me in looking at the screenshots and in
22    reading the terms and use, to me it's clear,
23    it's crystal clear.
24         Q.   So to you it's crystal clear that
25    the customers transferred the ownership of the
```

281

```
 1              C. Ferraro - Confidential
 2   assets to Celsius.  Now, what about the
 3   customers who transferred assets to Celsius
 4   before this particular clause and section of
 5   paragraph was included in terms of service,
 6   the prior version's terms -- before terms 5 or
 7   6?  They didn't sign up for that, so they
 8   didn't transfer the ownership?
 9              MR. McCARRICK:  Objection to
10        form.  Mischaracterizes.
11              You can answer.
12        A.    I'm just going to read back what
13   you read to me, sir:
14              "It is my understanding that
15        every version of the terms and use
16        includes one or more provisions
17        authorizing the debtors to make
18        unilateral updates to the terms and
19        use."
20              I stand by that statement.
21        Q.    Okay.  Now, in the very first
22   terms of service for Celsius, there is the
23   Section 14 or paragraph 14, it's called
24   "Consent to Celsius' Use of Your Digital
25   Assets."  Now -- emphasis on "Your Digital
```

282

```
 1                  C. Ferraro - Confidential

 2       Assets."

 3                  Also the terms of use Version 1,

 4       paragraph 31, expressly it's stated that

 5       notice of changes to the terms of service

 6       would be provided with the specific additions,

 7       deletions, or subtractions to the terms of

 8       use.

 9                  Would you say additional losses

10       around transfer of ownership to Celsius from

11       customers in the July 2021 version is a

12       material change --

13                  MR. McCARRICK:  Object --

14            Q.    -- if that clause was not there

15       earlier?

16                  MR. McCARRICK:  Object --

17            objection to form.  Incomplete

18            hypothetical.

19                  You can answer.

20            Q.    Can you still answer?

21                  MR. McCARRICK:  Yeah, I'm

22            going to let him answer.

23            A.    Sorry, I just have to --

24            Q.    Do you -- do you think that was a

25       material change that was inserted in the new
```

283

1                   C. Ferraro - Confidential

2      versions?

3          A.    Sir, I do not have the terms and

4      use in front of me.  I have two different

5      documents in front of me, neither which is the

6      terms of use.  I don't off the top of my mind

7      know those details.  I apologize.

8          Q.    But in your statements --

9          A.    In this --

10         Q.    In your statements, you do mention

11     that, to your knowledge, and it's crystal

12     clear, all the terms of version -- all the

13     terms of use --

14         A.    Yes --

15         Q.    -- state that these --

16         A.    It is.

17         Q.    -- account transfer of ownership,

18     but you also claim you have not read the

19     initial versions?

20              MR. McCARRICK:  Objection to

21         form.  Mischaracterizes the

22         testimony.

23              You can -- you can answer as

24         to whether or not you've read all

25         the different versions.

284

1                    C. Ferraro - Confidential

2           A.     That's not what I said.  I said

3    I've read the versions.  I don't memorize

4    them.  I didn't draft them.  I'm not an expert

5    in it.  I've done my best to prep for this

6    session so that I could take questions from

7    creditors and try to give you guys as much

8    information as I possibly can.  But, sir, I

9    have not memorized the terms of use.

10          Q.     But --

11          A.     They're not -- they're not in --

12   let me just finish, I'm sorry -- they're not

13   in front of me.  What I've read is 6 and 8 is

14   very clear to me.  And what I've also read is

15   the unilateral updates to the terms of use is

16   also very clear to me.

17                 I've also seen in the filings

18   screenshots of what the customer would have

19   checked boxes twice, and I've seen the

20   e-mails, pop-ups, et cetera.

21                 We even had a period that I read

22   of two weeks where they would, kind of, lose

23   access to swap trade deploy, and they would

24   have to talk to a customer care person.  To

25   me, I read that as a pretty strong process to

285

|    |                                                    |
|----|----------------------------------------------------|
| 1  | C. Ferraro - Confidential                          |
| 2  | make sure that the customers knew that they        |
| 3  | were double-checking things.                       |
| 4  | MR. McCARRICK:  We've been                          |
| 5  | going for -- we've been going for                  |
| 6  | about an hour, maybe an hour and two               |
| 7  | minutes.  I've got it here.  Can we                 |
| 8  | take a ten-minute break, and then I               |
| 9  | think the balance of the hour that's               |
| 10 | remaining for the pro se creditors,               |
| 11 | if -- I know you all are, kind of,                |
| 12 | forming your own queue, but --                     |
| 13 | MR. KHANUJA:  Well, I have                          |
| 14 | just a few small portions if we                    |
| 15 | can stop after that.                               |
| 16 | MR. McCARRICK:  Sure.  Yeah,                        |
| 17 | if you want to finish your few                     |
| 18 | questions, then we can take a break               |
| 19 | and the queue can form.  Sure, thank              |
| 20 | you.                                               |
| 21 | MR. KHANUJA:  And I'll try to                       |
| 22 | be quick now, you know, so that I'm               |
| 23 | fair to other questioners, other                   |
| 24 | people as well.                                    |
| 25 | BY MR. KHANUJA:                                     |

286

C. Ferraro - Confidential

1

2       Q.    Now, Celsius' terms of use clearly

3   state that customers can withdraw their

4   digital assets at any time.  Now, this is from

5   all versions, including the versions you

6   reference, terms of use Versions 6 and 8.  It

7   says you can withdraw your digital assets at

8   any time.

9            Now, if these were Celsius' assets

10  and not our assets, why would you allow your

11  customers to withdraw them?

12      A.    We have --

13            MR. McCARRICK:  Object to

14       form.

15            You can answer.

16            THE WITNESS:  Sorry.

17      A.    We have an IOU to the customer.

18  The customer has loaned us the digital assets.

19  So upon withdrawal in normal, ordinary course,

20  the user can request the obligation to be

21  returned to them.

22      Q.    Yes.  Right.  So these were our

23  assets.  Now, you mentioned -- you use the

24  term "loan."  Can you define a loan?

25            You come from a rates background

287

```
 1                 C. Ferraro - Confidential

 2     in JPMC.  You cite a rates department.  You

 3     were probably an FP&A for them.  Correct?

 4           A.    No, sir, I was not.  I was not

 5     FP&A for rates.  I was --

 6           Q.    Okay.  Well, so in general, rates

 7     and loans, they're a fairly similar kind of

 8     product.  Would you be able to define a loan

 9     for me?

10                 MR. McCARRICK:  Object to

11           form.

12                 You can answer the definition

13           of loan.

14           A.    I think rates is also derivatives

15     of -- and futures and spot markets --

16           Q.    And --

17           A.    -- for interest rates --

18     whereas --

19                 CERTIFIED STENOGRAPHER:

20           Sorry.  One at a time.  One at a

21           time.

22           A.    -- whereas loans is a credit.  One

23     person is -- has net value to provide to the

24     other that wants to borrow that.

25                 So in reality, a loan is different
```

288

         C. Ferraro - Confidential

1   from a rate.  Lending demand does have

2   influence on overall rate at a macro level,

3   but I wouldn't say the two are one-for-one the

4   same.

5        Q.   No, not one-to-one the same.  But

6   rates do impact the loans, as you said.  And

7   you have decent understanding of that.

8             In loans have you ever seen

9   transfer of ownership?

10             MR. McCARRICK:  Objection to

11        form.

12             You can answer.

13        A.   I -- I've seen the loan between

14   Celsius and its customers in reading the terms

15   of use.

16        Q.   No, I'm talking others.  I'm

17   talking about in general.  Have you ever seen

18   a definition of loan saying transfer of

19   ownership?

20             MR. McCARRICK:  Objection to

21        form.

22             You can answer.

23        A.   Off the top of my memory, I was

24   in -- you've got to remember that I was in

289

```
 1                C. Ferraro - Confidential
 2   consumer lending.  So when somebody -- when
 3   somebody borrows against their house, the bank
 4   will put a lien on their house.
 5                When somebody borrows against --
 6   for a car, the bank will put a lien on a car.
 7   That's my understanding of --
 8        Q.    Is a lien the same as transfer of
 9   ownership?
10        A.    That's --
11                MR. McCARRICK:  Objection to
12           form.
13                You can answer.
14        A.    It's a different instrument.  It's
15   a different terms of use.
16        Q.    Yeah.  I'm from the same
17   background as you, so I don't think lien is
18   the same as transfer of ownership.  But we can
19   move on.
20                It also says, you know, that --
21   and I'm going to quote from the terms of use
22   Version 5.  It says:
23                "You may make a complete or
24           partial withdrawal of eligible
25           digital assets from your Celsius
```

290

```
 1              C. Ferraro - Confidential

 2         wallet at any time," and that

 3         "Celsius initiates the withdrawal

 4         process immediately."

 5              And then the latest version, which

 6    was from, I think, April 14, 2022, subject to

 7    these terms, per any of your eligible digital

 8    assets that you elect to utilize in the earn

 9    service, you have a call option on all loans

10    made to Celsius to demand immediate, complete,

11    or partial repayment of any loan.

12              You can, through a complete or

13    partial withdrawal of eligible digital assets

14    from your Celsius account balance at any time.

15              So for us it was always available

16    to, you know, based on this language, would

17    you say we would always have access to our

18    assets from Celsius?

19              MR. McCARRICK:  Objection to

20         form.  Incomplete.  The document is

21         not in front of him.

22              But answer to the best of your

23         ability.

24         A.   And my understanding in reading

25    through the terms of use is that in normal
```

Confidential        Christopher Ferraro - November 21, 2022

291

```
 1                 C. Ferraro - Confidential
 2     course, the customers can withdraw.  I think
 3     there was areas in the terms of use that
 4     allowed us to pause; market events, Celsius
 5     events, et cetera.
 6                 So I think in normal terms, yes,
 7     the customer should be able to demand
 8     withdrawal and get their cryptocurrencies.
 9          Q.    So again, my argument goes back
10     again that to you it's crystal clear that
11     these were Celsius assets, yet customers would
12     be able to withdraw all their assets at all
13     times?
14          A.    In normal course, yes, sir.
15          Q.    So these were our assets as well
16     as Celsius' assets?
17                 MR. McCARRICK:  Objection.
18          Mischaracterizes.
19                 You can answer.
20          A.    Celsius' assets with an obligation
21     to the customer, sir.
22          Q.    Okay.  Now, Mr. Ferraro, you
23     mentioned in a response to Mr. Hershey, and I
24     quote, your sole objective is to maximize the
25     value to the estate and the creditors.
```

292

```
 1              C. Ferraro - Confidential

 2              You also mentioned in another

 3   response, and I quote:

 4              "We are aligned with

 5        creditors, and the creditors want

 6        their coins back."

 7              So you want to maximize the value

 8   to the creditors, and creditors want their

 9   coins back, yet you are also arguing in your

10   prior statements that these are not creditor

11   assets.  Celsius controls ownership of the

12   assets.

13              What is the guarantee that if you

14   go ahead with the Celsius reorg, you end up

15   declaring all of these coins as Celsius assets

16   and then return nothing to depositors -- to

17   creditors?

18              MR. McCARRICK:  Objection to

19        form.

20              You can respond to that, I

21        suppose.

22        A.   My understanding of the Chapter 11

23   process is that there's maximizing value for

24   the estate in the claims process.  And through

25   the claims process, the value will be
```

293

```
 1              C. Ferraro - Confidential
 2   distributed back to the creditors.
 3        Q.    But technically, you can claim
 4   these as your assets, the way you -- the way
 5   Celsius is doing it right now.  So the claims
 6   will become invalid then, won't they?
 7              MR. McCARRICK:  Objection to
 8        form.
 9              You can answer.
10        A.    I'm a little bit confused about
11   where you're going.  My understanding --
12        Q.    We are -- we are confused as well
13   and exactly why our question, whether these
14   are our assets or your assets.
15        A.    Well, we -- sir, I'm sorry.  We
16   went through that.  I think your question was
17   about the bankruptcy process in maximizing
18   value for the estate and the claims process.
19   What I was --
20        Q.    My question is:  Beyond maximizing
21   value, you can still claim these as your
22   assets and then give nothing back to
23   creditors?
24              MR. McCARRICK:  Objection to
25        form.  Mischaracterizes.
```

294

```
 1                 C. Ferraro - Confidential
 2                 Mr. Ferraro, you can respond.
 3                 And I'd appreciate if you
 4         would allow him to finish his
 5         response.
 6                 THE WITNESS:  Thank you, sir.
 7         A.    My understanding is that's not the
 8    way the bankruptcy code works and that's not
 9    the way that the judge or any trustees will
10    protect and distribute value in the estate.
11         Q.    Okay.  Now, Mr. Ferraro, in
12    response to United States Trustee today, you
13    mentioned you joined sometime in March 2022, I
14    think it was --
15         A.    Yes, March 21, 2022.
16         Q.    Was it as the CFO?
17         A.    No.  It was the head of financial
18    planning and analysis and investor relations.
19    I became the CFO in the middle of July.  I
20    believe it was July 13.
21         Q.    Okay.  So until you became a CFO,
22    you were not responsible for asset liability
23    management or treasury or even payroll and
24    taxes.  Is that fair?
25         A.    I was not the treasurer.  I was
```

295

```
 1            C. Ferraro - Confidential
 2   not the controller.  I worked with those
 3   areas, but I was not responsible for them.
 4        Q.    Okay.  I'll -- I'll ask just one
 5   question from this track.  In any
 6   organization, for example, your previous
 7   employer, JPMC, any policy or policy
 8   documents, including, you know, smaller policy
 9   documents, even the terms of service, they
10   have to be typically reviewed, approved, and
11   signed off with certain sequelas, like legal,
12   finance, FP&A, CFO office, CEO office, head of
13   departments, you know, pertaining to that
14   policy.  Correct me if I'm wrong.
15              Now, to your knowledge, who were
16   the people signing off on these terms of
17   service at Celsius?  And if you do not have
18   that information, can you provide that
19   evidence to us?
20              MR. McCARRICK:  You can
21        answer.
22        A.    My understanding is that the legal
23   team and the regulatory team worked with the
24   product team to update terms of use.  I was
25   not part of the approval process.  I was not
```

296

                    C. Ferraro - Confidential

1

2    part of drafting it.  So my knowledge, kind

3    of, ends there.  I apologize, sir.  That's,

4    kind of, what I --

5         Q.    No, I appreciate you answering

6    that.  But would you know if the prior CFO was

7    signing off on these documents?

8              MR. McCARRICK:  Objection to

9         form.

10             You can answer.

11        A.    I do not know.

12        Q.    Sir, if the -- I'm asking this

13   because the assets being moved from one

14   account to another as it's being able to

15   withdraw, no commission being paid on custody,

16   and all of these things were happening.

17             So obviously there was a -- and

18   asset liability component, which would impact

19   the financial forecasting analysis and

20   whatever, whatnot.

21             So these will come under the

22   purview of at least the review of the CFO or

23   CFO office, and somebody from the CFO office

24   would have signed off on -- signed off on

25   this.

297

```
 1              C. Ferraro - Confidential

 2              You're saying you weren't there as

 3   a CFO then, you haven't signed it and

 4   reviewed -- or reviewed, approved, or signed

 5   off on any of these terms of uses?

 6              MR. McCARRICK:  Object to

 7        form.

 8              You can answer.

 9        A.    That's what I'm saying.

10   Absolutely.  I was not part of this.  I did

11   not sign off on it.  I do not know what the

12   sign-off process was.

13        Q.    Okay.  And the same for the taxes

14   as well.  Now, as Mr. Crews said as well, I

15   and he are in the same boat.  I paid taxes on

16   my assets for three years based on the

17   Celsius-generated 1099 forms.

18              Now, would you know who was

19   signing off on these -- on these taxes or the

20   forms that were generated for the customers?

21              MR. McCARRICK:  Object to

22        form.  Outside the scope.

23              You can answer.

24        A.    My understanding is it's tax

25   compliance reporting.  So there's
```

298

1              C. Ferraro - Confidential

2    professionals in the space who understand how

3    to report to the IRS.  Certain --

4          Q.    But they didn't -- I'm sorry.

5    Please go ahead.

6          A.    -- certain kind of activities.

7    And that's, I believe, the tax statements that

8    we went through earlier from Mr. Crews, yes.

9          Q.    Now, Mr. Ferraro, you -- one last

10   question.  You mentioned you spend majority of

11   your time -- actually, I think you answered

12   this one.

13              MR. KHANUJA:  So I'll concede

14         to the next.

15              THE WITNESS:  Thank you.

16              MR. KHANUJA:  Thank you so

17         much.

18              MR. McCARRICK:  All right.

19         Let's take a ten-minute break.

20         There's 47 minutes left on the

21         clock, for those keeping track at

22         home, for the remaining pro se

23         creditors, at which point the

24         deposition will end.  So we'll take

25         a ten-minute break.  Be back at

299

1       C. Ferraro - Confidential

2    3:07.

3         THE VIDEOGRAPHER:  The time is

4    2:57 p.m.  This concludes Media 5.

5    Off the record.

6         (Recess taken from 2:57 p.m.

7    to 3:15 p.m.)

8         THE VIDEOGRAPHER:  The time

9    now is 3:25 p.m.  This begins Media

10   6.  On the record.

11        MR. McCARRICK:  Okay.  Just a

12   quick logistical item.  Before we

13   return to the pro se creditor phase,

14   our friends from Milbank have one

15   question which won't be counted

16   against the pro se time, of course.

17        And just before we go any

18   further, could -- it looks like

19   there's someone on Zoom, RAR.  Could

20   that person just, kind of, identify

21   themselves or their affiliation.

22        MS. ANDERSON RYNDERS:

23   Certainly.  I'm Rachel Anderson

24   Rynders, and I'm with the Texas

25   State Securities Board.

300

```
 1              C. Ferraro - Confidential
 2              MR. McCARRICK:  Great.  Thanks
 3       very much.
 4              And with that, we'll turn it
 5       over to ...
 6   EXAMINATION BY
 7   MS. WESTOVER YANEZ:
 8       Q.   Good afternoon, Mr. Ferraro.  My
 9   name is Melanie Westover Yanez.  I'm an
10   attorney with Milbank and we represent the
11   Series B preferred holders.
12              Do you know what I mean by the
13   "Series B preferred holders"?
14       A.   Yes.
15       Q.   I just wanted to ask you something
16   to follow up on something you discussed with
17   Mr. Crews earlier.  I don't think the record
18   is clear.  So I just want to make sure it is.
19              Did you -- let me just ask a
20   background question first.  Did you
21   participate in preparing the debtor's amended
22   motion for the stablecoin sale?
23       A.   I read through it.  I was not an
24   active drafter.
25       Q.   Okay.  But you didn't object to or
```

301

1                    C. Ferraro - Confidential

2      find inaccurate anything that was presented in

3      the motion.  Right?

4            A.    Not that I'm aware of, no.

5            Q.    Is it the debtors' position that

6      under any version of the terms of use, that

7      assets deposited into the earned accounts, the

8      right, title, and interest to those assets

9      were transferred to Celsius?

10           A.    Yes.

11           Q.    And that's true at the time when

12     the customer-facing business was operating out

13     of the UK from Celsius Network Limited.  Is

14     that correct?

15           A.    To my understanding, yes.

16                 MS. WESTOVER YANEZ:  Okay.  No

17           further questions at this time.

18           Thank you.

19                 MR. McCARRICK:  Okay.  Great.

20           And now we'll return to the pro se

21           portion.  Could the next questioner

22           identify themselves and spell their

23           name.

24                 MS. BARSTOW:  Hi, I'm Nicole

25           Barstow.  N-i-c-o-l-e B-a-r-s-t-o-w,

302

```
 1              C. Ferraro - Confidential
 2        pro se creditor.
 3              MR. McCARRICK:  Thanks,
 4        Ms. Barstow.  You're a little bit
 5        fuzzy -- or at least it sounds a
 6        little bit like you're under water.
 7              If you could just speak very
 8        slowly so the court reporter can get
 9        it, I think that'd be good.
10              THE VIDEOGRAPHER:  Please move
11        closer -- please move closer to your
12        microphone, please.  This is the
13        videographer.
14              MS. BARSTOW:  Okay.  I'm
15        pretty close, so is that good?
16              CERTIFIED STENOGRAPHER:
17        That's good.
18              THE VIDEOGRAPHER:  That's
19        better.
20   EXAMINATION BY:
21   MS. BARSTOW:
22        Q.   Okay.  Does the debtor claim to
23   have full and exclusive, meaning 100 percent
24   ownership and 100 percent title to the earn
25   account assets?
```

303

```
 1                C. Ferraro - Confidential
 2                MR. McCARRICK:  Object to
 3        form.
 4                You can answer.
 5        A.    Yes.
 6        Q.    Okay.  Does the debtor claim to
 7   have full and exclusive 100 percent ownership
 8   and 100 percent title to the borrow account
 9   assets?
10        A.    The loan collateral, yes.  To my
11   understanding, yes.
12        Q.    Does the debtor claim to have a
13   security interest in the borrow program?
14                MR. McCARRICK:  Object to
15        form.  Outside the scope.
16                You can answer.
17        A.    The loan collateral -- the
18   collateral that is backed up by the loan,
19   Celsius holds the title to.  And in return for
20   that, they are giving the loan in either
21   stablecoins or dollars to the borrower.
22        Q.    Right.  But in the terms of use,
23   is there a claim that the debtor has a
24   security interest in the debtors' borrow -- in
25   the debtors' borrow program?
```

304

1              C. Ferraro - Confidential

2              MR. McCARRICK:  Same

3        objections.  Asked and answered.

4        A.     I don't have the loan terms of use

5   in front of me, so it's hard for me to point

6   to any specific thing.

7        Q.     Okay.  And you said you reviewed

8   Version 6 of the terms of use.  Is Version 6

9   the last terms of use that was agreed upon

10  with an actual electronic acceptance, an "I

11  agree" box to check and submit with the

12  amended terms of use?

13       A.     I know there was the click route

14  on Version 6.  I'm not sure, as Version 7 and

15  Version 8 came out, exactly, you know, what

16  the acceptance was.  Obviously in the terms of

17  use, it says clearly unilateral right to

18  change the terms of use.  So I think 6 was a

19  clickwrap, and I'm not quite sure about 7 and

20  8.

21              (Stenographer clarification.)

22       Q.     You're not sure about 7 and 8, but

23  you're sure that the terms of use 6 was agreed

24  by everybody and there was a "submit," and

25  everybody submitted to continue user?

Confidential       Christopher Ferraro - November 21, 2022

305

1               C. Ferraro - Confidential

2          A.     That's my understanding.  Yeah,

3     sorry.  That's my understanding.  And Oren

4     Blonstein will be here tomorrow to walk

5     through all of those details.

6          Q.     Okay.  Does the particular

7     mentioned, Version 6 terms of use, state your

8     Celsius account allows you to view your

9     balances in connection with the services

10    provided to you by Celsius and -- as the

11    services and conduct certain transactions

12    online?

13               MR. McCARRICK:  Object to

14         form.  The terms of use aren't in

15         front of him, but you can answer to

16         the best of your memory.

17         A.     I don't know specifically.  It's

18    not in front of me.  I apologize.

19         Q.     All these questions relate to

20    statements in the version of terms of use 6

21    that I have read, and all of these statements

22    are on there.  But I will just skip through

23    those questions anyway.

24               Did everyone who entered into a

25    contract via Celsius' terms of use have the

306

```
 1                  C. Ferraro - Confidential
 2    requisite financial standing to do so in
 3    accordance with the SEC public policy of
 4    accredited investor status?
 5                  MR. McCARRICK:  Objection.
 6           Outside the scope.  Form.
 7                  You can answer if you can.
 8           A.    I'm not an expert on securities
 9    laws and accreditation, so I don't know.
10           Q.    So you're not familiar with what
11    an accredited investor means as an accountant?
12           A.    I'm familiar with accredited
13    investor.  But I'm not familiar with the -- I
14    don't have the knowledge --
15           Q.    Are you familiar --
16                  MR. McCARRICK:  Hold on.
17           Let --
18           Q.    Are you familiar if there are
19    unaccredited investors on Celsius?
20                  MR. McCARRICK:  Okay.  Object
21           to form.  Outside the scope.
22                  Mr. Ferraro, answer.
23                  And if you could just let him
24           finish his answer before the next
25           question, that would be great.
```

307

```
 1              C. Ferraro - Confidential

 2          Thank you.

 3          A.    I understand there are customers

 4     that -- that have been accredited on the

 5     platform, and I understand there's also

 6     customers who were -- who have not been

 7     accredited on the platform.

 8          Q.    Okay.  So you're aware that there

 9     are unaccredited investors on the platform?

10              MR. McCARRICK:  Objection.

11          Outside the scope.

12              You can answer.

13          A.    Yes.

14          Q.    Okay.  Did any party to the

15     debtors propose the estate ever make any

16     statement verbally or in writing that

17     misrepresented the facts or omitted certain

18     information?

19              MR. McCARRICK:  Object to

20          form.  Contract formation is not at

21          issue here.  That was carved out.

22              But you can answer to the

23          extent you're able to.

24          A.    As I stated earlier, Ms. Barstow,

25     I am not an active viewer of the AMAs or the
```

308

1              C. Ferraro - Confidential

2    blog posts.  During the numerous ones, I was

3    probably out in the fields at my farms in

4    Ecuador.

5              More recently since I've come to

6    work for Celsius, I've had my head down

7    working on a day-to-day basis and I haven't

8    gone back to watch old AMAs or look at blog

9    posts.

10        Q.    What is Celsius US Holdings?

11              MR. McCARRICK:  Object to

12        form.  Outside the scope.

13              You can answer, although I'm

14        not sure I heard the question.

15        A.    Can you repeat, please.

16        Q.    What is Celsius US Holdings --

17              MR. McCARRICK:  Object to

18        form.

19        Q.    -- the company Celsius US

20    Holdings?

21              MR. McCARRICK:  Object to

22        form.  Outside the scope.

23              You can answer.

24        A.    I believe you're referring to a

25    legal entity in Celsius.

309

```
 1                  C. Ferraro - Confidential

 2        Q.    Yes.  What is that?  What is that

 3   company?  What does it do?

 4        A.    I think it's a --

 5              MR. McCARRICK:  Object to

 6        form.

 7              You can answer.

 8        A.    To my understanding, it's a, kind

 9   of, a roll-up that holds certain activities

10   that are done out of the US entities.  So it

11   could be lending.  It could be DeFi.

12   Different types of deployment activities.

13        Q.    So different deployment activities

14   are outside of the US?

15              MR. McCARRICK:  Object to

16        form.  Outside the scope.

17              You can answer.

18        A.    No, no, I said within the US

19   entities.  So it's -- so it's entities that

20   hold certain activities that are in the US

21   holding company including things like DeFi, I

22   believe, retail lending, I believe.

23        Q.    What is the current market value

24   of Celsius Network LLC, et al.?

25              MR. McCARRICK:  Object to
```

310

```
 1                 C. Ferraro - Confidential

 2          form.  Outside the scope.

 3                 You can answer.

 4          A.    I don't have that in front of me,

 5    and in theory, with the cryptocurrency

 6    holdings that Celsius has on its balance

 7    sheet, the value changes by the second.  But I

 8    don't have it in front of me.  I'm sorry.

 9          Q.    What are the investments, stock,

10    et cetera, held by Celsius US Holdings?

11                 MR. McCARRICK:  Object to

12          form.  Outside the scope.

13                 You can answer.  And then I'll

14          answer the time question that I just

15          saw posted.

16          A.    Okay.  So I -- sorry, Ms. Barstow.

17    Can you ask the question again.  I get

18    confused with all the -- it's been a long day.

19    I'm sorry.

20          Q.    What are the investments, stock,

21    et cetera, held by US -- Celsius US Holdings?

22          A.    Okay.  Thank you.  I'm not sure

23    exactly the investments that are in Holdings.

24    My understanding of the investments are there

25    are certain debt and equity type of
```

Confidential        Christopher Ferraro - November 21, 2022

311

          C. Ferraro - Confidential

 1

 2    investments.

 3          There's lending receivables.  I

 4    believe there's collateral DeFi activities, et

 5    cetera.  So, I mean, all -- most of -- a lot

 6    of the activity is out of the US entities.

 7          MR. McCARRICK:  And there's --

 8          just for the record, there's around

 9          30- -- between 37 and 38 minutes

10          left.

11          Q.   Okay.  Is all of the asset value

12    of Celsius US Holdings fully reported on the

13    debtors' asset liability schedules that is on

14    record with the bankruptcy court?

15          MR. McCARRICK:  Object to

16          form.  Outside the scope.

17          You can answer.

18          A.   Yes, to our best of our abilities,

19    it would include all of the assets and the

20    liabilities of the entity, of course.

21          Q.   Of Celsius US Holding as well?

22          A.   For --

23          MR. McCARRICK:  Same

24          objections.

25          You can answer.

Confidential        Christopher Ferraro - November 21, 2022

312

```
 1                C. Ferraro - Confidential

 2        A.    For any of the entities within

 3   Celsius.

 4        Q.    Is it true that Celsius Network

 5   only has 3 million of USDC assets and 25,000

 6   of GUSD assets in the different -- accounts

 7   receivable?

 8              MR. McCARRICK:  Same

 9        objections.

10              You can answer.

11        A.    I don't have it in front of me,

12   but it should be included in monthly operating

13   reports and other schedules that we file with

14   the court.

15        Q.    What date were the debtors

16   insolvent in regards to the nonalgorithm

17   stablecoin assets?

18              (Stenographer clarification.)

19              MR. McCARRICK:  Objection to

20        form.  Outside the scope.

21              You can answer to the extent

22        that you're able or no.

23        A.    I can't -- I'm sorry, I can't -- I

24   can't hear.  I couldn't make it out.

25        Q.    What date were the debtors
```

313

```
 1              C. Ferraro - Confidential

 2   insolvent in regards to the nonalgorithm

 3   stablecoin assets?

 4              MR. McCARRICK:  Same

 5        objections.

 6              You can answer to the extent

 7        that that you're able or no.

 8        A.    I'm sorry, I don't understand the

 9   question.

10        Q.    What dates were the debtors

11   insolvent that you're aware of?  When were the

12   debtors aware that they were insolvent?

13              MR. McCARRICK:  This question

14        has been asked at least two or three

15        times today.  But you can answer it

16        again, Mr. Ferraro.

17        A.    Yeah, I wasn't part of the

18   decisions for the pause that the board made,

19   but that's -- that's in my opinion, when we

20   stopped being a going concern.

21              We had paused operations, all

22   activities, and then about a month later we

23   filed for bankruptcy.  So I go back to the

24   pause date.

25        Q.    Was the debtor paying stablecoin
```

314

1              C. Ferraro - Confidential

2    customers' earn account withdrawals using new

3    funds that were deposited into the earn

4    program?

5         A.    I think, you know, the way we

6    managed the balance sheet is the coins are

7    fungible.  They're, you know, property of

8    Celsius so we try to manage the risk

9    positions, meaning we don't take directional,

10   kind of, positions with regards to any

11   cryptocurrencies.

12            So I think -- I think at the --

13   you know, we were always, in a fungible way,

14   using Bitcoin to pledge.  We were always using

15   stablecoins for operations.  If institutions

16   wanted to borrow ETH, we would lend them ETH.

17   Right?  So coins -- coins are fungible across

18   all deployment activities.

19        Q.    But back to my question:  Did the

20   debtors use earn withdrawals to fund -- I

21   mean, did the debtors honor earn account

22   withdrawals using the new funds deposited in

23   the earn program?

24            MR. McCARRICK:  Objection to

25        form.  Outside the scope.

Confidential        Christopher Ferraro - November 21, 2022

315

```
 1              C. Ferraro - Confidential
 2              You can answer.
 3      A.    We -- we -- like I said, the
 4  balance sheet, the way we operate the business
 5  is using fungibility -- right? -- we optimize
 6  across the balance sheet.
 7              We had raised Series A, we had
 8  raised Series B.  We had an ICO.  So at the
 9  end of the day, you know, we raised capital,
10  so there was lots of different sources in
11  which we could pay reward rates out, if I'm
12  understanding your question appropriately.
13              CERTIFIED STENOGRAPHER:
14          Somebody has to turn their audio
15          off.
16              THE VIDEOGRAPHER:  Somebody
17          has the mic open.
18              CERTIFIED STENOGRAPHER:
19          There's an echo.
20      A.    Coins are fungible.  We would --
21      Q.    -- that answer, but I'll move on.
22              Did the debtor ever have any
23  profits to pay its staff and executive
24  management team salaries from?
25      A.    I believe you said "did the
```

316

```
1              C. Ferraro - Confidential

2    debtors have profits to pay management

3    salaries?"  Was that the question?

4         Q.    Yes, did the debtors ever have any

5    profits to pay the salaries from --

6              MR. McCARRICK:  Objection.

7         Outside the --

8         Q.    -- rather than deposit --

9              MR. McCARRICK:  Objection.

10        Outside the scope.

11             You can answer.

12        A.    Like I said, the balance sheet was

13   fungible.  Through the equity raises, we did

14   have significant amount of yield and revenue

15   in order to pay out rewards -- rewards as well

16   as the operational cost.

17             So we had money -- we had revenue

18   come -- we had revenue coming in that was

19   allowing us -- as well as raises, capital

20   raises, that were allowing us to operate.

21             The company -- from my standpoint,

22   the company was positioned for growth really

23   up until when I joined.  So, you know, we were

24   growing and you know, we had done two equity

25   raises.
```

317

```
 1                  C. Ferraro - Confidential
 2                  So the resources were fungible
 3     across the balance sheet, whether it was
 4     stablecoins or whether it was BTC or whether
 5     it was capital infusion Series A and B.
 6          Q.    Did the debtors believe that
 7     having title and ownership of the loan within
 8     the Celsius account means that there are no
 9     Celsius customers, creditors that had secured
10     claims against Celsius security interest?
11                  (Stenographer clarification.)
12                  MR. McCARRICK:  Objection to
13         form.  Calls for a legal conclusion.
14                  You can answer.
15          A.    Not to my knowledge that there's
16     any secured claims.
17          Q.    Did Celsius ever refer to its
18     creditors as "customers" verbally or in
19     writing?  I know I heard you use the word
20     "customers" to refer to us, as a matter of
21     fact, a few times within this testimony.
22                  MR. McCARRICK:  Objection to
23         form.
24                  You can answer.
25          A.    I think of the customers as
```

318

```
1              C. Ferraro - Confidential

2     customers of Celsius.  And I also think of

3     the, largely, the customers as the creditors

4     of Celsius.

5              So they are slightly different but

6     also very similar.  Most of our customers are

7     also creditors and most of our creditors are

8     customers.

9              MR. McCARRICK:  Just a time

10         update, 30 minutes left on the pro

11         se portion.

12         Q.    Why is Celsius requesting to turn

13    Bitcoin and USD coin to cash after repaying

14    the DeFi loan and giving back the collateral?

15              MR. McCARRICK:  Objection to

16         form.

17              I couldn't understand the

18         question, if you could repeat it.

19         Q.    Why is Celsius requesting to turn

20    Bitcoin and USD coin to cash after repaying

21    the DeFi loan and getting back the collateral?

22    Celsius has a motion to repay a DeFi loan is

23    that the Bitcoin and USD coin --

24         A.    Yes.

25         Q.    -- and why turn that into cash --
```

319

1              C. Ferraro - Confidential

2      why do they want to turn the collateral into

3      cash?

4              MR. McCARRICK:  Objection to

5          form.

6              You can answer.

7          A.    I think I understand what you're

8      talking about.  I believe this is the notional

9      DeFi loan.  You know, we think that DeFi for a

10     very small amount of loan that is highly

11     over-collateralized, we think it's probably

12     better for the estate to pay off the loan and

13     bring the collateral back.

14             MR. McCARRICK:  Let's go off

15         the record.

16             THE VIDEOGRAPHER:  The time is

17         3:35 p.m.  This concludes Media 6.

18         Off the record.

19             (Recess taken from 3:35 p.m.

20         to a owe a 3:49 p.m.)

21             THE VIDEOGRAPHER:  The time

22         now is 3:49 p.m.  This begins Media

23         7.  On the record.

24             MR. McCARRICK:  Okay.  We are

25         going to go the full seven hours if

320

```
1          C. Ferraro - Confidential
2     that's what people feel the need to
3     do.  I would note that most of this
4     deposition has been outside of the
5     scope of what the committee agreed
6     to.
7          In their filing last night at
8     ECF 1412, paragraph 1, they stated:
9          "The debtors and the committee
10    made two agreements:  (1) defenses
11    to the formation of a contract with
12    respect to all account holders who
13    transferred cryptocurrency to the
14    debtors, such as fraud, mistake, and
15    misrepresentation, would be fully
16    reserved and would not be tried at
17    this time."
18          That's been the lion's share
19    of this deposition today.  I would
20    ask that people try to hew to that
21    agreement going forward.  We do
22    want, kind of, the pro se creditors
23    to be heard, particularly those who
24    have stayed here throughout the day.
25          But I would, I guess, commend
```

321

```
1              C. Ferraro - Confidential

2         or encourage you not to feel the

3         need to use every single second of

4         the deposition on issues that will

5         be tried at some point.  The

6         question isn't whether or not there

7         is going to be discovery into some

8         of these defenses or individualized

9         defenses, the question really is

10        just when.

11             So with that we can keep

12        rolling.  But it's up to you guys to

13        divide the rest of the, kind of,

14        allocation, all right, the kind of

15        time allocation.  You guys need to,

16        you know, kind of, do that

17        yourselves.  And when we're, kind

18        of, at seven, we're at seven.

19   BY MS. BARSTOW:

20        Q.   Okay.  I just have -- I'm just

21   going to wrap up a few more questions, a

22   couple more of the most important ones that I

23   want to ask and that is:  For the unaccredited

24   investors that were not in the custody states,

25   are those individuals considered in the
```

322

1                    C. Ferraro - Confidential

2     withhold account or still in the earn account?

3                    MR. McCARRICK:   Objection.

4          Outside the scope.

5                    You can answer.

6          A.    Are the customers -- can you,

7     Nicole, Ms. Barstow can you say it one more

8     time, I'm sorry.

9          Q.    The customer earn accounts that

10    are not in the states that allow custody

11    accounts, are those accounts still considered

12    earn accounts or are they withhold accounts?

13         A.    For new deposits after the --

14         Q.    Not new deposits, no.  Not new

15    deposits.  No, for deposits that are prior to

16    the Version 8 terms of use?

17                    MR. McCARRICK:   Object to

18         form.

19                    You can answer.

20         A.    I think I testified earlier that

21    they were in the earn account and that they

22    stayed in the earn account.  But if there was

23    new deposits that occurred in a noncustody

24    state, the new deposits would go to withheld.

25    That's my understanding.

323

```
 1                  C. Ferraro - Confidential
 2          Q.    My final question would be:  Did
 3     retail and institutional borrowers pledge
 4     collateral in order to get loans from Celsius?
 5          A.     In retail and most institutional,
 6     there was some institutional clients that took
 7     out unsecured loans.
 8          Q.    What about for retail?
 9          A.    Yeah, I said for retail and most
10     of institutional.
11          Q.    Okay.  And most of institutional
12     loans were also pledging collateral as well?
13               MR. McCARRICK:  Objection.
14               Outside the scope.
15          A.    Yeah, that's what I said, yes.
16               MS. BARSTOW:  Well, this is
17          related to the scope because it has
18          to do with whether or not those
19          assets belong to the estate,
20          because, yeah, for a specific
21          reason.  But -- okay.  That's all my
22          questions.  Thank you.
23               THE WITNESS:  Thank you.
24               MR. McCARRICK:  All right.
25          Next -- next up to bat, if you could
```

324

```
 1              C. Ferraro - Confidential

 2         state and spell your name before you

 3         start questioning.

 4              MR. HERRMANN:  Hello,

 5         Mr. Ferraro.  I am Immanuel

 6         Herrmann, pro se creditor.

 7         I-m-m-a-n-u-e-l H-e-r-r-m-a-n-n.

 8              MR. McCARRICK:  Great.

 9         Thanks, Mr. Herrmann.  I just want

10         to tell you, your connection seemed

11         a little bit shaky or choppy, so

12         there may come a point where you

13         need to, kind of, reconnect.  So

14         just make sure you're asking your

15         questions slowly so the connection,

16         kind of, stays stable or whatever.

17              MR. HERRMANN:  Okay.  Great.

18         I'll do my best to speak very

19         clearly.  Also, hello, this is my

20         first deposition, so I'll try my

21         best to do it in order and its not

22         just yours, so ...

23    EXAMINATION BY

24    MR. HERRMANN:

25         Q.    So actually, my first question,
```

325

                    C. Ferraro - Confidential

1

2    Mr. Ferraro, is actually about -- it is a

3    terms of service question, actually.

4              I'm wondering, are you familiar

5    with the September 29, 2022, terms of service

6    update that's posted on the Celsius website?

7         A.    Not specifically.

8         Q.    Are you aware that the terms of

9    use were updated post-petition on

10   September 29, 2022?

11             MR. McCARRICK:   Object to

12        form.

13             You can answer.

14        A.    I haven't studied those, no.

15        Q.    Okay.  I'm raising this issue

16   because some of us discovered -- I don't

17   believe we received any notice about it,

18   however, there have been -- I believe Cam

19   Crews, who spoke to you earlier, compared this

20   terms of use to others and that material

21   changes have been made.

22             So you're not aware of any changes

23   post-petition and you did not approve changes

24   post-petition?

25             MR. McCARRICK:   Object to

Confidential        Christopher Ferraro - November 21, 2022

326

```
 1              C. Ferraro - Confidential

 2        form.

 3              You can answer.

 4        A.    Yeah, I'm a little bit confused in

 5   the conversation, honestly, I'm not aware.

 6        Q.    Okay.  I mean, I could share, but

 7   I think in the interest of time, I'll just

 8   state here that if you go to the website and

 9   you just look at the current terms of use, it

10   says "September 29, 2022," and that they are

11   not the same as the last version that's filed

12   in the declaration of Alex Mashinsky.

13              And so I don't believe they're in

14   the docket, but I think we could just say this

15   is a matter for follow-up and I don't need to

16   ask you further questions on it, but I will

17   follow up with T.J. about it, if that's all

18   right.

19        A.    Yeah, like I said, I'm not quite

20   following, so I apologize, but yeah.

21        Q.    No, just to be clear, I mean, what

22   it really is, is there's a new terms of use,

23   if you just go to the website, that's not

24   identical to what was there before.

25        A.    Okay.
```

Confidential        Christopher Ferraro - November 21, 2022

327

```
 1                C. Ferraro - Confidential
 2                MR. McCARRICK:  Object to
 3          form.  You can -- yeah, I think you
 4          were just making a statement.  So
 5          okay got it.
 6                MR. HERRMANN:  I mean that was
 7          just a statement.  You don't need to
 8          answer.
 9          Q.    So I guess another question I have
10     is just related to your conversations with
11     creditors.
12                Earlier in the deposition, the UCC
13     had asked if you spoke with retail investors
14     yourself.  And you had said that you spoke
15     with members of the UCC, including the
16     co-chairs.  Is that correct?
17          A.    Yes, sir, yes.
18          Q.    Great.  So I'm told -- I, like
19     you, am not a bankruptcy lawyer, however, I am
20     told that in restructurings, it's often
21     typical to speak with creditor groups and to
22     resolve some of the types of problems we are
23     having with property issues, for example, by
24     working it out and making deals among the
25     groups.
```

328

```
 1                   C. Ferraro - Confidential

 2                   Is that something that would

 3       interest you, speaking with creditors from

 4       earn and loans and trying to mediate some of

 5       these groups to get us out of Chapter 11 more

 6       quickly?

 7                   MR. McCARRICK:  Object to

 8           form.  Outside the scope.

 9                   But you can answer.

10           A.    As long as it's within the code

11       and it maximizes value for the estate, no

12       stone is left unturned, absolutely.

13           Q.    As far as I understand, it's all

14       doable within the code, Mr. Ferraro.  There

15       may, however, be issues around some of the

16       agreements that require extreme secrecy that,

17       you know, with bidders, or just who's allowed,

18       what we're allowed to talk about.

19                   So, you know, I know that we --

20       Celsius in general has talked about

21       transparency.  But are you willing to consider

22       opening up conversations about the reorg with

23       more groups of customers?

24                   MR. McCARRICK:  Object to

25           form.  Well outside the scope.
```

Confidential        Christopher Ferraro - November 21, 2022

329

1                    C. Ferraro - Confidential

2                    You can answer.

3          A.    I would love to.  My understanding

4     is that we need to get to a disclosure

5     statement before we can market the plan.  We

6     are working actively on the reorganization

7     plan.  And I tremendously look forward to

8     being able to discuss it with all of the

9     stakeholders, absolutely, Mr. Herrmann.

10         Q.    All right.  Thank you.  Well, I

11    would just encourage you, you know, remind

12    you -- I mean, I guess, one question is:  Does

13    Kirkland work for you?  Like, who do they

14    actually report to?  Who's, like, the big boss

15    at ...

16             MR. McCARRICK:  Object to

17         form.  I don't think anyone knows

18         the answer to that question.

19             You can answer.

20         A.    Yeah, my understanding is that

21    Kirkland is legal advisors to the company

22    engaged through the special committee of the

23    board.  So I work -- I work closely with them.

24    They do not represent me personally.

25         Q.    Yeah, I wasn't actually implying

330

1                    C. Ferraro - Confidential

2    that.  I know you've gotten questions on that

3    line before.  I was more just stating that,

4    you know, I think that there may be certain

5    requirements, but that requirements can be

6    waived by the debtor.

7                    And so there's just questions

8    about, you know, I'm not actually sure -- for

9    example, let's talk about exclusivity for a

10   moment.

11                   I think part of the issue here is

12   that because of exclusivity, we can't talk

13   about -- you may have to put forward a plan

14   first.

15                   So who made the decision to extend

16   exclusivity?

17                   MR. McCARRICK:  Objection to

18       form.  Well outside the scope.

19                   You can answer.

20       A.    My understanding is that that's a

21   special committee decision, a decision in

22   which I support.  We're actively working on a

23   plan.  That would be very difficult to work on

24   multiple plans at the same time.

25                   We do listen to the community.

Confidential        Christopher Ferraro - November 21, 2022

331

                    C. Ferraro - Confidential

1

2    And we are trying to, kind of, take the best

3    ideas and bring them forth in a reorganization

4    plan that will, you know, provide as much

5    value back to the customers and the creditors

6    as we possibly can.

7        Q.    Okay.  Well, I would just

8    encourage you, again, to consider leaving no

9    stone unturned, as you said, and really

10   explore your options with the special

11   committee and with Kirkland.

12            And you know, one last question I

13   have for you in this area is:  Would you be

14   willing to meet with groups of creditors from

15   loans and earn -- you or a designee from

16   Celsius -- regularly?

17            MR. McCARRICK:  Object to

18        form.

19            You can answer.

20       A.    I would love to.  And I will

21   follow up with my legal advisors on what the

22   art of the possible is here.

23       Q.    Okay.  Thank you.  So now I'm

24   going to move on to some different kinds of

25   questions.  I'm sorry if I'm a bit out of

332

```
 1              C. Ferraro - Confidential
 2    order.  But I just had a lot of people ask
 3    things that I tried to get through.
 4              So one question is about the
 5    bidding, on how many viable bids would you say
 6    that you have right now?
 7              MR. McCARRICK:  Object to
 8         form.  Outside the scope.
 9              You can answer.
10         A.   I'm not going to discuss about the
11    sales and marketing process and the number of
12    bidders.  I don't think that would be helpful
13    to the estate.
14              MR. McCARRICK:  And can I
15         just -- are those subject to NDAs?
16              THE WITNESS:  In the overall
17         practice -- is NDA, yes, of course.
18              MR. McCARRICK:  Okay.  Then
19         I'm going to instruct you not to
20         breach any NDA or NDA, nondisclosure
21         agreement, in response to any of
22         these questions.
23              You can continue to ask.
24              MR. HERRMANN:  Okay.  So for
25         the record, you're directing your
```

333

1       C. Ferraro - Confidential

2          client not to answer?

3             MR. McCARRICK:  Correct.  I'm

4          not going to instruct him to violate

5          an NDA, no.

6     BY MR. HERRMANN:





334

1          C. Ferraro - Confidential

335

C. Ferraro - Confidential



24        Q.      Thank you.  So, yeah, I mean, one

25    reason I encourage you to talk to the

336

1                C. Ferraro - Confidential

2     different credit groups is, for example, earn

3     and loans have been in very close

4     conversation, and just as an example, you

5     know, the loans people -- I mean, look, this

6     is nothing binding here -- but you know,

7     they're willing to talk about increasing

8     interest rates and lengthening term.  We

9     haven't quite figured out how to deal with

10    haircuts, for example.

11               And then on the earn side, some

12    potential bidders that we've talked to have

13    been willing to do all sorts of things.  For

14    example, converting earn deposits into loans

15    or other creative ideas or, you know, giving

16    incentives to lock up funds, but that's more

17    complicated --

18               CERTIFIED STENOGRAPHER:  We

19         lost you there, Mr. Herrmann.

20               MR. HERRMANN:  What do I need

21         to repeat?

22               CERTIFIED STENOGRAPHER:  I'll

23         repeat the last thing.

24               (Record read.)

25         Q.    Okay.  Yeah, I kind of lost my

Confidential        Christopher Ferraro - November 21, 2022

337

            C. Ferraro - Confidential

1    train of thought.  I'm sorry.

2            I would just encourage you -- I'll

3    just restate it from the beginning.

4            I would just say that basically

5    loans, you know, the earn has been talking to

6    loans.  We talked about increasing interest

7    rates, lengthening terms, and then on the earn

8    side, we talked about could we convert them

9    into loans or something that increases the

10   value of the loan, these sorts of ideas.

11           These are the kinds of

12   conversations that are happening.  I'm sure

13   the UCC has brought some of these ideas to

14   you.  This is just one reason I was

15   encouraging you to talk to creditors.  And I

16   think I can just leave it at that.  Hopefully,

17   you got all of that, and I'll ask the next

18   question.

19           The next question is actually on

20   clawbacks.  Do you support insider clawbacks

21   for people who withdrew in the one-year period

22   prior to the petition date?

23           MR. McCARRICK:  Objection to

24       form.  Wildly outside the scope.

Confidential         Christopher Ferraro - November 21, 2022

338

1                    C. Ferraro - Confidential

2                    You can answer.

3          A.    The clawbacks are not in my lane.

4    I don't -- I don't have a say in the

5    clawbacks.  That's, you know, with the special

6    committee and through the bankruptcy process.

7    So I -- it's not -- it's not something that I

8    focus on.

9                    I'm a guy who believes in fairness

10   and following the rules of the law.  So

11   whatever the outcome of that is is the

12   outcome.  And if it brings money back to the

13   estate, it brings money back to the estate.

14   But that's something that's not on my agenda,

15   not in my lane, and not in my control.

16         Q.    All right.  Will you set an

17   example by not using estate resources to fight

18   against insider clawbacks and encourage other

19   executives to not fight, to not aggressively

20   fight back against clawbacks?

21                    MR. McCARRICK:  Object to

22              form.  I'm not sure what the

23              question there was.

24                    Could you rephrase?

25                    MR. HERRMANN:  Sure.

339

1                  C. Ferraro - Confidential

2        Q.    Will you set an example by not

3   using estate resources, i.e., not paying

4   Kirkland & Ellis to fight insider clawbacks?

5                  MR. McCARRICK:  Object to

6        form.  Outside the scope.

7                  You can answer.

8        A.    I'm not pushing against clawbacks

9   at all.  I'm not actively working against

10  clawbacks.  I can't promise you, Mr. Herrmann,

11  that the activities of the special committee

12  and other stakeholders won't look into this.

13  My belief is they will make the right

14  decision.

15                 But I can give you my word that I

16  will not be pushing back against clawing back

17  value for the estate in any means.  My job is

18  to maximize value for the estate and to bring

19  money into the estate.

20       Q.    All right.  So now I have some

21  questions about Alex Mashinsky.

22                 Can you describe Alex Mashinsky's

23  current role of the company as chairman of the

24  UK company?

25                 MR. McCARRICK:  Object to

340

```
 1                 C. Ferraro - Confidential

 2             form.  Outside the scope.

 3                 You can answer.

 4         A.    My understanding is he has no

 5    interaction with the company whatsoever.  I

 6    have not spoken to Alex Mashinsky since the

 7    resignation.  I have not engaged with him as

 8    the board.  To my understanding, the full

 9    board has not met, only the special committee

10    is holding session.

11                 So from my vantage point, Alex

12    Mashinsky is nowhere to be seen in any of the

13    business or governance of what's happening.

14    The only time I hear from Alex Mashinsky is

15    when I see a tweet.

16         Q.    Okay.  Is he receiving any

17    compensation currently from Celsius?

18         A.    To my knowledge, nothing.  He went

19    off of the payroll in September, and there is

20    no other compensation being paid.

21         Q.     All right.  Another terms of use

22    question that we will move on to:  Are you

23    familiar with the best commercial and

24    operational efforts language in the terms of

25    use?
```

341

```
 1            C. Ferraro - Confidential

 2        A.    Not specifically.

 3        Q.    The terms of use recent versions,

 4   including the ones that you reviewed

 5   carefully, I believe 7 and 8 -- 6, 7, and 8

 6   are the ones that you said that you reviewed.

 7   Yes?

 8        A.    Yeah.  But I didn't memorize every

 9   word, and I do not have it in front of me.  So

10   I need a little help.

11        Q.    Sure.  I can try to find the exact

12   clause.  It says "best commercial and

13   operational efforts."  Let me see if I can

14   find it.  Yes.  Okay.  So I can read it to you

15   here.  It says:

16            "We may lend, sell, pledge,

17        hypothecate, assign, invest, use,

18        commingle, or otherwise dispose of

19        assets and eligible digital assets

20        that are not held in a custody

21        wallet, if available to you, to

22        counterparties, or hold the eligible

23        digital assets with counterparties.

24        And we will use our best commercial

25        and operational efforts to prevent
```

342

```
 1              C. Ferraro - Confidential

 2       losses."

 3       A.    Yeah.  Yeah.

 4       Q.    When was the first time that you

 5  became familiar with this language?

 6       A.    In preparation for this, in

 7  signing the declarations, and reviewing

 8  things.  So -- and --

 9       Q.    Understood.  So as chief financial

10  officer, you were not aware that you were

11  required to use best commercial and

12  operational efforts to prevent losses?

13            MR. McCARRICK:  Object to

14       form.

15       Q.    And what that meant?  You were

16  never advised --

17       A.    From my --

18       Q.    You were never advised about that?

19            MR. McCARRICK:  Object to

20       form.  Outside the scope.

21            You can answer.

22       A.    From my understanding, that's what

23  we do.  We might have not been perfect, but

24  that is what we attempted to do, best business

25  operational, kind of, processes, strategic
```

343

1              C. Ferraro - Confidential

2    thinking, et cetera.

3              So I don't think that -- I don't

4    think that there's anything, since I joined

5    March 21, 2022, that I've done otherwise other

6    than what that clause states.

7         Q.   I mean, there's a lot of missing

8    Bitcoin.  So was that best commercial -- was

9    that -- was that best efforts to preserve

10   depositor property?

11             MR. McCARRICK:  Obj- --

12        Q.   Whatever happens --

13             MR. McCARRICK:  Okay.  Object

14        -- object to form.

15             You can answer.

16        A.   There's unfortunate events

17   occurred.  Some of them in 2020, some of them

18   in 2021, and some of them in 2022.  They're

19   unfortunate.

20             I would say the front-to-back,

21   kind of, understanding of risk in this

22   industry, it's a nascent industry, clearly was

23   not adequate, the measurement and

24   understanding of risk.  I think that's

25   industry-wide.  Did Celsius fail in its

344

```
 1              C. Ferraro - Confidential
 2   attempts?  Yes.  Did it attempt?  Absolutely.
 3        Q.    All right.  How is a signature
 4   recorded, an individual -- and this maybe is
 5   better for tomorrow if you are not the person
 6   for this.
 7              How is an individual signature
 8   recorded?
 9        A.    I think --
10        Q.    -- by --
11        A.    Yeah.  I think it's best for
12   tomorrow.
13        Q.    All right.  So I have some
14   tax -- following up on some of the tax
15   questions, we covered your users treatment of,
16   you know, the 1099s, Cam Crews covered that.
17              I have some follow-up questions
18   about how Celsius treated certain, you know,
19   whatever you want to call it, you know, when
20   you -- when you receive the funds from users,
21   let's say.
22              Did Celsius consider -- on
23   Celsius' tax returns, did it claim that it
24   owned earn deposits?
25        A.    I'm sorry.  Does -- on
```

345

```
 1              C. Ferraro - Confidential
 2   Celsius' -- any deployment?
 3        Q.    Audits -- let's just say --
 4   okay -- let's -- I'll restate.
 5              Did Celsius in its books and
 6   records -- let's start with the books and
 7   records.  Celsius in its books and records
 8   reflect earn deposits as its property?
 9        A.    Consistent with the terms in
10   use -- consistent with the terms in use, the
11   user coins that are put on the platform are --
12   not in the custody, in the earned product, are
13   a liability on the balance sheet.
14              We have a contractual IOU between
15   Celsius and the customer.  We represent that
16   as an asset of Celsius, the coin, and an
17   obligation or liability to the customer.
18              So, yes, earn deposits, earn
19   placements are considered to be a liability on
20   the balance sheet.
21        Q.    Okay.  And then when Celsius
22   would -- because you say that title was
23   transferred -- you were doing things like
24   discretionary trading -- although that was
25   never marketed, but we know that that was
```

Confidential        Christopher Ferraro - November 21, 2022

346

                    C. Ferraro - Confidential

1

2      happening.

3              So when those sort of events

4      happened, did Celsius record that as -- in

5      other words, you took possession of the coins

6      and then you had to pay taxes on it, you were

7      trading it.  It was your property?

8              MR. McCARRICK:  Mr. Herrmann,

9          you broke up in the middle of your

10         question there.  Could you re-ask

11         it?

12             MR. HERRMANN:  Yes.

13         Q.    When you traded coins, for

14     example, like you sold coins, was that treated

15     as Celsius' property?  You were paying taxes

16     on it?

17             MR. McCARRICK:  Object to

18         form.  Outside the scope.

19             You can answer.

20         A.    To my understanding, yes.  Those

21     are all taxable events for the company.  The

22     coins are on our balance sheet, we have title

23     to them.  If we trade them and take gains or

24     losses versus the basis, those flow through to

25     taxable income or loss.

Confidential        Christopher Ferraro - November 21, 2022

347

1                C. Ferraro - Confidential

2        Q.    Great.  And then for your taxes

3   themselves, did you record gains and losses

4   based on those trades?

5                MR. McCARRICK:  Object to

6        form.  Outside the scope.

7                You can answer if you know.

8        A.    I think that's what I just

9   answered -- right? -- was that --

10       Q.    Yeah, I think we were talking

11  about books and records.  So I was just

12  clarifying that that's what rooted to the

13  company's tax return.

14       A.    Yeah, that would flow through the

15  company's tax return.

16       Q.    Thank you.  What is -- what is

17  a lo- -- so earn deposits were loans to

18  Celsius.  Correct?

19               MR. McCARRICK:  Object to

20       form.

21               You can answer.

22       A.    Yes.

23       Q.    How can you loan something and

24  also give up all rights and title?

25               MR. McCARRICK:  Object to

348

                    C. Ferraro - Confidential

1

2          form.   Asked and answered.

3                  You can answer again.

4          A.    It's transferred title and we have

5   an obligation to return the coin to you in

6   normal course.

7          Q.    So it's something like an ETN or

8   something like that?

9          A.    I would say --

10                MR. McCARRICK:   Object to

11         form.

12                You can answer.

13         A.    I would say just very clearly, the

14  customers place the coins in the earn program.

15  They are transferring title and ownership to

16  Celsius.  Celsius has an obligation to return

17  that coin in kind back to the customer in

18  normal course.

19                That's the terms in use.  That's

20  the way we record it on the balance sheet.

21  That's the way we manage the business.

22         Q.    All right.  I guess, going back to

23  the commercial best efforts, you know,

24  reasonable best efforts, I guess that's where

25  people may beg to differ about whether those

349

```
 1              C. Ferraro - Confidential
 2   efforts were taken.
 3              In your view, was -- was -- you
 4   know, you talked about some unfortunate events
 5   that took place.  Do you think that those
 6   actions were appropriate within the industry?
 7              MR. McCARRICK:  Object to
 8        form.  Outside the scope.  Also just
 9        vague as to "actions."
10              But you can answer to the
11        extent you understand the question.
12        A.    I mean, we're in the lending
13   business, and in DeFi we did some centralized,
14   kind of, trading.  I think that's pretty
15   similar to what other similar platform players
16   were doing to Celsius.
17        Q.    All right.  Well, maybe the
18   industry needs to have better risk management
19   because it's pretty ...
20              CERTIFIED STENOGRAPHER:  We
21        lost you again, Mr. Herrmann.
22        Q.    -- but I think that might, given
23   the amount of missing funds.
24              Does Celsius have net operating
25   losses on its balance sheet?
```

350

```
1              C. Ferraro - Confidential

2                   MR. McCARRICK:  Object to

3          form.  Outside the scope.

4                   You can answer.

5          A.    There are net operating losses on

6      the balance sheet, yes.

7          Q.    Is there a way that those losses

8      can accrue to the benefit of creditors?

9                   MR. McCARRICK:  Object to

10         form.  Outside the scope.

11                  You can answer to the extent

12         you understand it.

13         A.    I'm not a tax advisor or an

14     expert.  I know we've had conversations around

15     this base.  I think it comes down to a legal

16     discussion about changing control and the

17     ability to carry forward NOLs.  But that's --

18     that's, kind of, the sum total of my knowledge

19     on the topic.

20                  I know we looked into it.  There's

21     a lot of value there, but I think it's

22     difficult according to the IRS code.  My

23     understanding would change in control.

24                  MR. HERRMANN:  Okay.  I just

25         need a minute to go through
```

351



1              C. Ferraro - Confidential

2          questions here to find some, but ...

3          Q.    How often would you say you speak

4     with the special committee?

5              MR. McCARRICK:   Object to

6          form.   Outside the scope.

7              You can answer.

8          A.    Regularly.

352



1    C. Ferraro - Confidential

17    Q.    Understood.  So just going back to

18    taxes for a second.  It sounds like the

19    company did treat digital assets corresponding

20    to balances and earn accounts differently from

21    digital aspects -- assets corresponding to

22    balances and custody accounts.

23            Is that correct?

24            MR. McCARRICK:  Objection.

25    Outside the scope in multiple ways.

353

1              C. Ferraro - Confidential

2                   You can answer to the extent

3          you know.

4          A.    Yeah, my understanding is that

5      it's different.  One is an asset of the

6      company vis-a-vis earn that can be deployed,

7      rehypothecated, lent out, otherwise invested,

8      or sold.  And the other is custody, title

9      remains with the customer, segregated in a

10     custody workspace, not to be deployed.

11         Q.    All right.  Can you tell me the

12     first time you talked about grandfathering in

13     nonaccredited US investors to earn?

14                   MR. McCARRICK:  Object to

15         form.  Outside the scope.

16                   You can answer.  And you may

17         have answered this actually already

18         today, but you can answer again.

19         A.    The first time I talked about

20     accredited and nonaccredited investors with

21     earn?

22         Q.    Grandfathering specifically.

23         A.    I wasn't part of --

24         Q.    Grandfathering them in.

25         A.    I wasn't part of those discussions

354

         C. Ferraro - Confidential

 1

 2    or decisions.

 3         Q.    Okay.  When -- in your opinion,

 4    are the terms of use clear and unambiguous?

 5         A.    In my opinion, 100 percent clear

 6    and -ambiguous.

 7         Q.    Are they clear and unambiguous

 8    about what happens when a nonaccredited US

 9    investor, after April 15, pays off a loan?

10    Are they clear and unambiguous about what

11    happens?

12              MR. McCARRICK:  Object to

13         form.

14              You can answer.

15         A.    Before the freeze or after the

16    freeze?  Are you talking normal course or --

17         Q.    Let's say before the freeze.  It's

18    May 15, 2022.  A nonaccredited US investor

19    pays off a loan.  Their collateral is placed

20    in earn.

21              Do you believe that the contract

22    is clear and unambiguous, the loan and the

23    earn contracts, and that the relationships

24    between the two contracts are clear and

25    unambiguous, and that if completely clear from

355

1                  C. Ferraro - Confidential

2      reading those contracts, that the collateral

3      should be placed in earn?

4                  MR. McCARRICK:   Object to

5            form.  You can answer to the extent

6            you understand or know.

7            A.    I think title has been transferred

8      to Celsius in the earn program.  If a customer

9      then wants to use that collateral in the

10     lending program, title is going to remain with

11     Celsius.

12                 And if it goes back to the earn

13     program and the customer chose to stay in the

14     earn program, the asset would be deployed.

15     Celsius would use its balance sheet to

16     maximize from a risk-based standpoint the

17     yield in order to pay rewards back to the

18     customers.

19           Q.    Have you read the loan agreements,

20     Mr. Ferraro?

21           A.    I believe I've cursory reviewed

22     them but not in detail.

23           Q.    I would encourage you to do so,

24     and in particular, the section that says,

25     coins that are deposited, that the customer

Confidential        Christopher Ferraro - November 21, 2022

356

1              C. Ferraro - Confidential

2    has sole title to the coins.

3              MR. McCARRICK:   Object to

4         form.

5         Q.    Are you familiar with that

6    language?  Are you familiar that the loan

7    agreement has language that coins deposited,

8    that the customer has sole title to the coins?

9              MR. McCARRICK:   Object to the

10        form.

11        A.    Sir, it's not in front of me.  So

12   I can't -- I'm under -- giving testimony under

13   oath.  I don't have it in front of me.  It

14   doesn't -- you know, we'd have to go through

15   the specifics.

16             MR. HERRMANN:   How much time

17        do we have left overall?  I just

18        want to be sensitive to not taking

19        up too much of the creditors' time

20        here.

21             MR. McCARRICK:   I'll defer to

22        the videographer.

23             MS. BARSTOW:   Object to form.

24             THE VIDEOGRAPHER:   About an

25        hour and 55.

357

```
 1              C. Ferraro - Confidential

 2              MR. McCARRICK:  About an hour

 3         55 left, it sounds like.

 4              And Ms. Barstow, could you go

 5         on mute.

 6              MS. BARSTOW:  Whoops.

 7              MR. HERRMANN:  All right.

 8         Then I think I will see if I can try

 9         to find this line of language.

10         Q.    But I think it may be hard,

11   Mr. Ferraro, in this deposition with me, sort

12   of, just reading it to you, if you're not

13   familiar with the contracts, it might take

14   quite a long time to have you read it through

15   and, sort of, figure out the re- -- I'll save

16   this for another day.

17         A.    Yeah.

18         Q.    But there is language.  I would

19   just state here that I would encourage you to

20   prepare for this, because there is language

21   that customers have sole title.

22              MR. HERRMANN:  So I would --

23         you know, I will state for the

24         record that I object to the

25         supposition that the contracts are
```

358

```
 1              C. Ferraro - Confidential
 2         plain and unambiguous, especially
 3         the relationship between the
 4         contracts, but the contracts in
 5         general.
 6         Q.    So I do have a follow-up question,
 7    actually, that you can answer.
 8              After April 14, when a loan
 9    extended under the borrow program was repaid
10    or liquidated, how did Celsius determine
11    whether the collateral securing such a loan
12    would be placed in an earn account or a
13    custody account?
14              MR. McCARRICK:   Object to
15         form.  Outside the scope.
16              You can answer.
17         A.    Tomorrow Oren Blonstein will be
18    here.  He's an expert in this space.  My
19    understanding is when the loan was paid off or
20    liquidated, any remaining collateral, post the
21    custody launch in the US, any of the remaining
22    collateral went back to the custody account
23    for the nonaccredited.
24              Obviously, if you were accredited,
25    there was no custody account and it would have
```

Confidential        Christopher Ferraro - November 21, 2022

                                                              359

1              C. Ferraro - Confidential

2    gone to earn.

3         Q.    Okay.  That's incorrect because

4    I'm a nonaccredited US customer whose

5    collateral was placed into earn after

6    April 15.  So I can talk tomorrow with Oren

7    about that.

8         A.    Perfect.  Thank you, sir.

9         Q.    So I'm not going to -- no need to

10   ask you another question about it, unless you

11   want to correct something.

12        A.    I don't have anything in front of

13   me to correct it with.  I apologize.

14        Q.    That's fine.  That's just -- so

15   you're aware, there are nonaccredited US

16   investors who had their collateral placed in

17   earn after April 15.

18              MR. McCARRICK:  Object to

19        form.

20        Q.    Okay.  I have a follow-up

21   question.  Now that you're aware of that, do

22   you believe the contracts are clear and

23   unambiguous for that specific situation?

24        A.    In my --

25              MR. McCARRICK:  No.  Object to

360

```
 1              C. Ferraro - Confidential
 2         form.  Mischaracterizes.
 3              You can answer.
 4         A.    In my preparation, I -- I studied
 5    the terms of use related to the earn product
 6    and the custody offering in 8.  That's
 7    consistent with my declaration and my
 8    deposition.
 9              Tomorrow, Oren will be here to
10    further discuss this, Mr. Herrmann.
11         Q.   All right.  Has Celsius removed,
12    edited, or altered content or videos on or
13    from its application, website, Twitter
14    account, YouTube account, Medium account, or
15    other Internet space since March 1, 2022?
16              MR. McCARRICK:  Objection to
17         the form.  This is specifically
18         carved out, these kind of formation
19         defenses, defenses related to fraud
20         and misrepresentation and the like.
21              You can respond to the extent
22         you know.  I think you've answered
23         the question about these kind of
24         statements multiple times today, but
25         please answer it again.
```

Confidential        Christopher Ferraro - November 21, 2022

1              C. Ferraro - Confidential

2         A.    Sir, I had no part in editing,

3    putting up videos.  I was never part of an

4    AMA.  I'm not in marketing.  I'm a, kind of,

5    finance guy who tries to, you know, run a

6    business effectively.  I can't speak to any of

7    these edits or anything like that.

8              I had no first-hand knowledge of

9    the process or what occurred, what was edited,

10   or if it was edited or not.

11   BY MR. HERRMANN:

12        Q.    Who at Celsius approved this,

13   noting that you were in a senior leadership

14   position while all these things were approved?

15             MR. McCARRICK:  Object to

16        form.  Outside the scope.

17        A.    I became the CFO on July 13, 2022,

18   and in my capacity as CFO and as my capacity

19   as acting chief executive officer and chief

20   restructuring officer, I have not been part of

21   editing videos or heard of editing videos

22   under my control or watch, sir.

23        Q.    Will you commit to ceasing any

24   more removal of videos, editing, that sort of

25   thing?

362

```
 1                C. Ferraro - Confidential

 2                     MR. McCARRICK:  Object to

 3           form.

 4           Q.    So to, like, restate it clearly

 5      because the form was poor, will you commit as

 6      the acting CEO to order the immediate

 7      cessation of going through all of Celsius'

 8      content using estate funds --

 9                     MR. McCARRICK:  Objection --

10           Q.    -- and editing it?

11                     MR. McCARRICK:  Object to the

12           form.

13           Q.    And removing it?

14                     MR. McCARRICK:  Object to the

15           form.  Mischaracterizes.  Outside

16           the scope.

17                You can answer.

18           A.    I am not a part of or will be part

19      of editing videos or making videos for

20      YouTube, sir.

21           Q.    Sir, to be clear, you are not

22      willing to -- you're not willing to basically

23      order people at the company to stop this

24      activity?

25                     MR. McCARRICK:  Object to the
```

363

1              C. Ferraro - Confidential

2          form.

3          Q.    But you're the CEO, you could

4    direct people not to do this activity anymore.

5              MR. McCARRICK:   Object --

6          Q.    You're not willing to make that

7    commitment?

8              MR. McCARRICK:   Okay.  Object

9          to the form.  Well outside the

10         scope.  Was specifically carved out

11         pursuant to the agreement.

12         Mischaracterizes.

13             And now you can answer.

14         A.    To -- to my -- best of my ability,

15   there will be no editing or production of

16   videos going to YouTube.  I run a very classic

17   business.  The idea of putting out

18   ask-me-anythings and, as you are describing,

19   potentially editing them, not on my watch,

20   sir.

21             I don't need to say it's not going

22   to happen.  It's not happening on my watch.  I

23   don't -- I don't partake in this stuff.  I

24   don't think it's valuable to the estate.  I

25   can't speak to what happened in the past, but

364

```
 1                 C. Ferraro - Confidential
 2     this is not an activity that I'm involved in
 3     or would condone.
 4                  If it's happening, I don't know
 5     about it and it will stop, sir.  Unless
 6     there's a good reason for it, it should not go
 7     on.  I do not know of any editing that's
 8     happening right now with videos.
 9                  MR. McCARRICK:  Object to --
10          Q.    Excellent.  I do not either, to be
11     clear, at the moment.  I know there's been a
12     lot of it, and maybe even including as you
13     transitioned into the role, which is not
14     saying you oversaw it or knew.
15                  But I think it has been going on
16     and it may still be going on.  I don't know.
17     But I'll leave it at that.  Thank you for
18     stating that you don't support that.
19                  So from the time you've been CFO
20     and just during your time at Celsius, in the
21     ordinary course of business, did Celsius pass
22     on 80 percent of its gross revenue to account
23     holders in the form of rewards?
24                  MR. McCARRICK:  Object --
25          Q.    There were definitely statements
```

365

1              C. Ferraro - Confidential

2    about that, so I just want to ask if that was

3    true.

4              MR. McCARRICK:  Okay.  Object

5         to form.  Again, this was carved

6         out.  We didn't respond to this

7         written deposition question.

8              We'll let you respond to it

9         here if you have personal knowledge.

10        If you don't, you should say so.

11        A.    Yeah, my understanding is that

12   they targeted a payout at 80 percent, but in

13   reality, because the deployment didn't return

14   the income that was expected, it was actually

15   above 80 percent.

16        Q.    It was above 80 percent, that's

17   your understanding?

18        A.    Yeah, the pay out ratio was above

19   80 percent.  I know this through the budgeting

20   exercise that I worked on.

21             I will say this:  I grew up in an

22   industry where you don't price to things like

23   80 percent.  You look at the risk-based return

24   on risk-based capital, and you accrete value

25   based on upon making the right decisions.

366

1                    C. Ferraro - Confidential

2                    So I would not support, nor would

3    I go out in a new company saying 80 percent or

4    anything like that.  I would -- I would do my

5    best to earn a reasonable market-based return

6    on the capital and manage the risk.

7         Q.    All right.  Do any retail or

8    institutional borrowers who had stablecoin

9    loans from Celsius still have these cash loans

10   in their possession?

11                   MR. McCARRICK:  Object to the

12        form.  Outside the scope.

13                   You can answer, Mr. Ferraro.

14        A.    If I understand the question

15   correctly, outstanding loans, do customers

16   still have the fiat or the stablecoins?

17        Q.    Yeah.

18        A.    I think that's based upon their

19   spending habits and what they wanted to do

20   with the money.  I don't know what customers

21   do with the money that we give them, whether

22   it's in stables or whether it's in fiat.

23                   They could have bought a car.

24   They could have paid off bills.  They could

25   have gone on a vacation.  Honestly, I don't

367

1                     C. Ferraro - Confidential

2    know what remains in their bank account, sir.

3        Q.    All right.  Is Celsius -- is the

4    parent company an LLP?  Is it a C Corp.?  What

5    is the corporate structure of the parent

6    company of Celsius?

7                MR. McCARRICK:  Objection.

8          Doesn't have any apparent relevance

9          to the current motion.  Outside the

10         scope.

11             You can answer.

12       A.    Not in front of me, and I don't --

13   honestly, I don't know the answer to that.

14   We're a corporation.  We have numerous LLCs,

15   but I don't know what the total rollup is.

16       Q.    I'm surprised you don't know, but

17   I'll leave it at that.

18       A.     I'm busy on a lot of stuff, sir.

19             MR. McCARRICK:  Objection.  No

20         need -- no need -- objection.  No

21         need to comment on the witness'

22         answer.

23             MR. HERRMANN:  Fair.

24       Q.    When did -- when did you -- when

25   did you first become aware that Celsius was

```
                                                              368
 1                C. Ferraro - Confidential

 2       insolvent?

 3                MR. McCARRICK:  Object to

 4           form.  I think he's answered this

 5           question now three or four times

 6           today.

 7                MR. HERRMANN:  All right.  We

 8           can move on then actually.  That's

 9           fine.

10                I think I'm pretty much -- I

11           think that's -- I think I'm good.  I

12           want to leave time for the other pro

13           se questioners.  So thank you.

14                THE WITNESS:  Thank you.

15                MR. HERRMANN:  And I'll pass

16           it

17           onto the next person.

18                MR. McCARRICK:  Thank you,

19           Mr. Herrmann.

20                Could the next questioner

21           announce their name, spell it for

22           the record.

23                MR. FRISHBERG:  Yes.  My name

24           is Daniel Frishberg, D-a-n-i-e-l,

25           Frishberg, F-r-i-s-h-b-e-r-g.  I've
```

369

1                    C. Ferraro - Confidential

2          got a couple of questions.

3     EXAMINATION BY

4     MR. FRISHBERG:

5          Q.    I'll start off with something

6     fairly easy.  I don't think this has been

7     covered yet.  Has Celsius modified any dates

8     in the app showing when the awards were paid

9     out and/or the amount of the awards paid out?

10               MR. McCARRICK:  Objection to

11          form.

12               You can answer.

13          A.    Not to my knowledge, sir.

14          Q.    Okay.  Because they were modified.

15    Also this is -- yeah, this is a big one that I

16    tried communicating -- when I was in

17    communication with Mr. Latona with Kirkland &

18    Ellis, he said:

19               "Prior to the petition date,

20          the company sold approximately

21          31,000 Bitcoin worth approximately

22          $750 million on the FTX platform to

23          repay DeFi borrowings, freeing up

24          approximately 41K of collateral."

25               I assume this is reference to the

370

```
 1            C. Ferraro - Confidential

 2   41K Bitcoin collateral:

 3            "In the form of WBTC worth

 4       approximately $950 million, which

 5       was returned to the company's

 6       treasury."

 7            My question is where did the --

 8   sorry, end quote at the "treasury."

 9            Where did that 41,000 W Bitcoin

10   go?  Because according to court filings,

11   Celsius only had approximately 24,000 W

12   Bitcoin and about 14,000 Bitcoin, which is

13   less than the amount withdrawn from FTX, and

14   blockchain data shows that Celsius pulled out

15   about 55,000 Bitcoin from DeFi petition.

16            MR. McCARRICK:  Okay.  First,

17       object to form.  Outside the scope.

18            You can answer to the extent

19       that you know.

20            And Mr. Frishberg, I can talk

21       at a pretty quick clip.  If you can

22       just slow it down a hair.

23            MR. FRISHBERG:  Sorry.  I'm

24       nervous.

25            MR. McCARRICK:  No, it's
```

371

1          C. Ferraro - Confidential

2    totally fine.  Just especially when

3    the questions are so long, it's

4    easier to break it down if you slow

5    down just a hair.

6          But you can answer.

7          THE VIDEOGRAPHER:  Hold on one

8    second.  I need to go off the

9    record.  The camera is dark in here

10   because of the lighting.  I need to

11   go off the record, reset, and go

12   back.  Take a quick minute.

13         MR. McCARRICK:  Mr. Frishberg,

14   re-ask the question.

15         (Discussion off the record.)

16         MR. McCARRICK:  Off the

17   record.

18         THE VIDEOGRAPHER:  The time

19   now is 4:40 p.m.  This concludes

20   Media 7.  Off the record.

21         (Recess taken from 4:40 p.m.

22   to a 4:49 p.m.)

23         THE VIDEOGRAPHER:  The time

24   now is 4:49 p.m.  This begins Media

25   8.  On the record.

372

```
 1                    C. Ferraro - Confidential
 2                    MR. FRISHBERG:  May I ask my
 3            question again, or are you guys
 4            ready?
 5                    THE VIDEOGRAPHER:  Yes.
 6                    MR. FRISHBERG:  Okay.  Cool.
 7      BY MR. FRISHBERG:
 8            Q.   Because I have a statement
 9      ventured in the question.  When I was in
10      communication with Mr. Latona, he said:
11                    "Prior to the petition date,
12            the company sold approximately
13            31,000 Bitcoin worth approximately
14            $750 million on the FTX platform to
15            repay DeFi borrowings, freeing
16            approximately 41,000 collateral in
17            the form of W Bitcoin worth
18            approximately $750 million, which
19            was returned to company's treasury."
20                    So my question is:  Where did that
21      41,000 W Bitcoin go according to Celsius --
22      according to court filings, Celsius has
23      approximately 24,000 W Bitcoin and about
24      14,000 Bitcoin, which is 3,000 less than the
25      central FTX.
```

Confidential        Christopher Ferraro - November 21, 2022

373

```
 1                    C. Ferraro - Confidential

 2                    Blockchain data also shows that

 3       Celsius ended up pulling out about 55,000

 4       Bitcoin from DeFi prepetition, but it's not

 5       showing up in the court filings, along

 6       with -coins, about half a billion dollars

 7       worth of ETH, Ethereum, Matic, and Chainlink

 8       Celsius all sent, FTX, along with a large

 9       amount of stablecoins, et cetera.

10            MR. McCARRICK:  Okay.  Object

11       to --

12       Q.    So --

13            MR. McCARRICK:  Object to

14       form.  Object.  Outside the scope.

15       Object.  Compound.  And not sure if

16       everything is being accurately

17       characterized.

18            But to the extent that you're

19       able to comment, please do.

20       A.    Yeah, I don't -- I don't have all

21       those numbers in front of me.  I was not the

22       CFO at that time.  So I'm going to do my best

23       to explain what I understood that happened.

24            You know, we did have DeFi

25       borrowers.  We thought that it would be a good
```

374

```
 1              C. Ferraro - Confidential
 2   thing to not have risk in DeFi, all of that
 3   collateral risk while we were going into the
 4   filing.  So my understanding is that the DeFi
 5   loans were paid down and the collateral was
 6   freed up.
 7              Now, the collateral was freed up
 8   and brought back into Fireblocks as quick as
 9   we possibly could, also my understanding.
10   And, you know, some of these -- some coins
11   were converted to dollars, which is why you
12   see the fiat bank account at the petition of
13   $170 million.
14              So there was a lot -- a flurry of
15   movement on the balance sheet leading up to
16   petition as the balance sheet was
17   restructured.  We paid down debt, we got fiat
18   cash on hand, and we brought coins home to
19   Fireblocks.
20       Q.    Okay.  Just moving on to the terms
21   of service.  If someone did not consent to the
22   terms of service such as via e-mail --
23              CERTIFIED STENOGRAPHER:  I'm
24         sorry, you're going to have to slow
25         down, please.
```

Confidential        Christopher Ferraro - November 21, 2022

375

1                    C. Ferraro - Confidential

2        Q.    When people were asked to consent

3    to the new terms of service, like they were

4    notified by e-mail or in the app or however,

5    and let's say someone did not agree to the

6    change for whatever reason, would them

7    e-mailing Celsius support be enough for them

8    to terminate the contract, or what would be

9    required for the contract to terminate or not

10   to take effect, I guess, the updated version?

11       A.    There was a period of time where

12   the customers could withdraw.  I think after a

13   couple of weeks, they needed to talk to

14   somebody in customer care.  But upon that

15   conversation, if they did not want to accept

16   the terms and use, they could withdraw their

17   coins from the platform.

18       Q.    Okay.  Thank you.

19             MR. FRISHBERG:  Sorry.  Just

20        give me a second.

21             THE WITNESS:  Take your time.

22        No problem.

23             MR. FRISHBERG:  That was my

24        cat.

25       Q.    Okay.  Could you describe the

376

1                   C. Ferraro - Confidential

2      general process, if you're aware, of how long

3      it took for someone's account to be closed

4      after it was requested to be closed?

5           A.    Related to not accepting the terms

6      of use?  I wasn't --

7           Q.    In general.  Generally, in

8      general.

9           A.    Yeah, I don't have a -- I don't

10     have an answer to that question.  We opened

11     and closed customer accounts as normal course

12     of business.  We process withdrawals as a

13     normal course of business.

14                I don't think that it would have

15     been outside of any normal service level in

16     the crypto industry for returning coins or

17     closing accounts.

18          Q.    Okay.  Could -- do you by chance

19     have Docket Number 393 in front of you?  It's

20     all the various terms of services.

21          A.    I couldn't -- you spoke too fast,

22     I'm sorry, sir.  Could you --

23          Q.    Do you have a declaration -- not

24     declaration -- Docket Number 393, it's the

25     various versions of the terms of service, in

377

          C. Ferraro - Confidential

1

2    front of you?

3        A.    No.

4        Q.    It's the document with the

5    April 15, 2022, terms of service.

6        A.    No, I have my declaration, and I

7    also have the responses to the questions, the

8    written deposition questions in front of me.

9        Q.    I guess, then, I can read it to

10   you and you can tell me which understanding of

11   it is -- this is the first section of -- the

12   first paragraph of Section 12, page 629 of

13   Docket 393:

14            "All eligible digital assets

15        that you elect to utilize in the

16        earn service, if available to you,

17        and thus are loaned to Celsius (1)

18        are not being used as collateral for

19        loans; (2) have not had all rights

20        in connection with them assigned to

21        another Celsius user using CelPay,

22        and (3) were not requested for

23        external transmission or withdrawal

24        (eligible digital assets meeting

25        each one of these three criterias,

378

1              C. Ferraro - Confidential

2         'loan digit assets') entitle you to

3         rewards while credited to your

4         account."

5              Is it your understanding of the

6    contract that the title is only being

7    transferred when the criterias are being met

8    and when interest is being paid in exchange

9    for a title?

10             MR. McCARRICK:  Object to

11        form.  Incomplete.  Document's not

12        in front of him.

13             But you can respond based on

14        the snippet that Mr. Frishberg read.

15        A.    I think, Mr. Frishberg, I believe

16   what you're reading is, kind of, how the

17   rewards worked.

18        Q.    Correct.

19        A.    If you are in the earn program and

20   you transfer title to Celsius, you earn

21   rewards.  But if you use that cryptocurrency

22   as collateral, obviously that is no longer

23   going to earn rewards.  It's set aside for --

24        Q.    And --

25        A.    -- collateral.

379

                    C. Ferraro - Confidential

1

2          Q.    And also the subsection said that

3    they were also not requested for external

4    transmission.   If they are requested for

5    external transmission, they are not earning

6    interest and not part of the rewards program.

7    Is that correct?

8              MR. McCARRICK:  Object to

9         form.  Were you reading that or

10         summarizing it just so the record is

11         clear?

12              MR. FRISHBERG:  Summarizing.

13         I was summarizing.

14              MR. McCARRICK:  Okay.  You can

15         answer.

16              I'll object to form.

17              And you can answer based on

18         your understanding.

19         A.    I mean, I think if somebody -- my

20    understanding would be if you wanted to

21    withdraw funds from the point of withdrawal,

22    you would not earn rewards.

23         Q.    Correct.  Thank you.  That's my

24    understanding as well.  Generally, your

25    understanding of the contract, what terms in

380

```
 1                C. Ferraro - Confidential
 2    the contract allowed Celsius to halt or limit
 3    withdrawals or prevent them, whatever -- in
 4    the pause and would they be in Sections 10,
 5    11, and 13?
 6                MR. McCARRICK:  Object to
 7         form.  Outside the scope.  The
 8         document is not in front of him.
 9                But you can answer to the best
10         of your ability.
11         A.    There was language around, kind
12    of, non-normal course.  I don't remember the
13    specific language.  Again, the document's not
14    in front of me, but I think it, you know, was
15    related to unforeseen market events and
16    idiosyncratic events that Celsius was going
17    under.
18         Q.    Makes sense.  This is again Docket
19    Number 393, page 644, Section 19:
20                "In the event of irregular
21         activity, we may hold assets until
22         we close your Celsius account.  Any
23         digital access that Celsius returns
24         to you will be sent to the
25         designated withdrawal addresses in
```

381

```
 1              C. Ferraro - Confidential
 2         the usual profile on the Celsius
 3         platform for each respective digital
 4         asset."
 5              Would this mean that, say, once an
 6    account has been closed, the withdrawal will
 7    be processed regardless of these
 8    circumstances?
 9              MR. McCARRICK:  Object to
10         form.
11         Q.    Other than, like, an attachment or
12    court-ordered lien, et cetera, generally
13    speaking to the designated withdrawal
14    addresses?
15              MR. McCARRICK:  Object to
16         form.  Outside the scope.
17         Incomplete documents not in front of
18         you.
19              You can answer based on your
20         understanding.
21         A.    My understanding is that's talking
22    about certain activity in which they would
23    freeze an account.  So I think what they're
24    saying is you've broken the terms of service,
25    your account is frozen, we're going to
```

382

```
 1              C. Ferraro - Confidential
 2    distribute it back to you, and close your
 3    account.
 4          Q.    So if the account is closed, the
 5    assets will be distributed back?
 6          A.    Under what you're reading, if I
 7    understand what you're summarizing, yes.  That
 8    would be for activities on the platform that
 9    were outside the terms and service, we would
10    then freeze the account and close the account
11    is what it's saying.
12              If the user doesn't, kind of,
13    fulfill the terms of service, their account
14    would be suspended.
15          Q.    Okay.  I'm going to read you a
16    quote from Docket Number 393, page 632:
17              "In consideration for the
18          rewards payable to you the eligible
19          digital assets used in the earn
20          service for us entering into any
21          loan agreement and the use of our
22          services, you grant Celsius subject
23          to applicable law and for the
24          duration of the period during which
25          you elect to utilize the eligible
```

Confidential        Christopher Ferraro - November 21, 2022

383

```
 1            C. Ferraro - Confidential

 2         digital stock assets in the earn

 3         service if available to you.  And

 4         thus loan such eligible digital

 5         assets to us through your Celsius

 6         account or as collateral under the

 7         borrow service, if available to you,

 8         all right and title to such eligible

 9         digital assets."

10            My question is:  The quote that I

11    just read to you, does it seem that a Celsius

12    customer's only lending the assets and

13    transferring title while they are earning

14    interest, and, if so, is it unambiguous?

15            MR. McCARRICK:  Objection to

16         the form.  Incomplete.  Document's

17         not in front of them.  If you're not

18         going to show him the document

19         you've got to read it slower.

20            MR. FRISHBERG:  I can send the

21         document over.

22            MR. McCARRICK:  Or you can

23         screen share it.  Long story short

24         is if -- you don't have to share the

25         document.  We just need you to read
```

384

1              C. Ferraro - Confidential

2        it slower.  There's no way for --

3              MR. FRISHBERG:  Okay.  I'll

4        read it slower.  And I can also

5        screen share it.

6              MR. McCARRICK:  Either one I

7        think will help keep all of the

8        language, which is long, in

9        everyone's head, and I think will

10       also help the court reporter.

11             MR. FRISHBERG:  Sorry.  This

12       is loading because it's 1,200 pages

13       long.

14             THE WITNESS:  Sir, I won't be

15       able to read it, because I don't

16       have my glasses.  And I'm quite far

17       away.  Maybe if you just read it

18       slower, I think we can get to the

19       right spot.

20             MR. FRISHBERG:  Fair enough.

21       There we are.

22    BY MR. FRISHBERG:

23       Q.    Can you see this now?

24       A.    I can't see that, no.

25       Q.    Is it showing on the screen?

385

1                    C. Ferraro - Confidential

2          A.    Is on the screen.  I just can't

3    read it.

4          Q.    Okay.  There we are.  This is the

5    Section 28.  Is it better?

6          A.    Yeah.  Thank you.  Maybe if you

7    could -- there we go.  Perfect.  Thank you.

8    Just give me a moment to read it.

9          Q.    No worries.

10         A.    (Document review.)

11               Yes, sir.

12         Q.    Does what you just read state that

13   Celsius' customers own lending their access to

14   Celsius and therefore the title once they have

15   earned interest and, if so, is it unambiguous?

16               MR. McCARRICK:  Objection.

17         Incomplete.  Full document is not

18         featured here.

19               You can answer to the extent

20         you're able to answer.

21         A.    My understanding is in normal

22   course, that as long as the customer was in

23   the earn program, they would earn rewards.  If

24   they would draw coins, obviously the rewards

25   would stop accruing when it was withdrawn.

386

```
 1              C. Ferraro - Confidential

 2              What we're living under since the

 3   pause is, kind of, nonordinary course.  We

 4   paused all swaps, transfers, withdrawals, et

 5   cetera.  And then in the bankruptcy

 6   proceedings, we stopped accruing rewards.  And

 7   I think that's consistent with, kind of, how

 8   you operate under bankruptcy.  It's not normal

 9   course.

10        Q.    Makes sense.  You state in your

11   declaration that having an earn account,

12   thereby having use of Celsius' services,

13   "services is expressly conditioned on consent

14   being bound."

15              Does this mean that somebody could

16   close their account at any time prepetition?

17        A.    At ordinary course prepause, yes,

18   sir.

19        Q.    Okay.  What do you mean by

20   "prepause"?  There's no exceptions in the

21   contract saying that after that, an account

22   closure means you cannot draw assets -- sorry.

23   That the pause -- that you cannot close your

24   account if limitations on withdrawals have

25   been instituted, such as the pause, there's
```

Confidential       Christopher Ferraro - November 21, 2022

387

1               C. Ferraro - Confidential

2    nothing in the contract that says you cannot

3    close your account.

4               MR. McCARRICK:  Object to

5          form.  Mischaracterizes.  Calls for

6          a legal conclusion.

7               You can answer to the extent

8          that you understand the question.

9          A.   It's not my understandings of the

10   agreement, sir.  I think under certain events,

11   we can pause withdrawals.  I don't have it in

12   front of me, but upon my mind -- recollection

13   of going through it, we had the right under

14   certain conditions to pause withdrawals.

15              Obviously if withdrawals are

16   paused, people have coins on the platform, we

17   can't close the account.

18        Q.   Where does that say that, that

19   accounts cannot be closed if withdrawals are

20   stopped?

21              MR. McCARRICK:  Object to

22         form.  Outside the scope.

23              You can answer.

24        A.   I don't understand the question.

25   Where does it say what?

388

```
 1                C. Ferraro - Confidential

 2        Q.     The question:  Where does it state

 3   that an account cannot be closed if

 4   withdrawals are paused?

 5        A.     Well, how could -- if withdrawals

 6   are paused and somebody has coins in their

 7   account, how can you close it?

 8        Q.     Closing an account, it terminates

 9   the terms that therefore allows for

10   withdrawals, as per the section -- let's

11   see -- Section 19, I'll make it bigger for

12   you.  Actually, I'll just skip straight to the

13   actual document so that that's not an issue

14   for an objection.

15             Right here, Section B.  If you

16   could read that into the record, please, up

17   until Subsection A, that's not relevant.

18        A.     Sir, I can't see it.

19        Q.     Okay.  That's fine.  Then I can

20   just -- I had it copied and pasted onto my

21   screen.  I can increase the font size a bunch.

22        A.     (Document review.)

23             Sorry.  So what's the question?

24        Q.     The question is:  Could you please

25   read this and after that, is -- have you read
```

389

                    C. Ferraro - Confidential

1

2    that?

3        A.    Yeah, this is talking about

4    closing an account in ordinary course.  We

5    went through this.  I think post --

6        Q.    There's -- nothing's been stated

7    in ordinary course to the subsection.  And

8    right here it says that after an account has

9    been requested to be closed, the terms

10   terminate.  So my understanding is if the

11   terms terminate, thereby anything that is not

12   in Section 35, which is these ones --

13              MR. McCARRICK:  Object --

14         object to form.  These are, like,

15         snippets of a contract that aren't

16         full sections.

17       Q.    I mean, the thing is, if you read

18   the contract fully, it is quite confusing and

19   ambiguous.  So is it unambiguous or is it

20   ambiguous?

21              MR. McCARRICK:  Well, I think

22         our position on that's clear, but --

23       Q.    -- that's your position?

24              MR. McCARRICK:  Just give me a

25         second.  I'm objecting to the form.

390

1              C. Ferraro - Confidential

2          I'm objecting to the incomplete

3          nature of the document that's being

4          displayed.  You can re-ask your

5          question to Mr. Ferraro.

6    BY MR. FRISHBERG:

7          Q.    Okay.  My question for Mr. Ferraro

8    is:  Did anywhere in the sections that

9    governed closing the account or limitations on

10   withdrawals, did anything mention an account

11   cannot be closed if withdrawals were

12   instituted?

13             MR. McCARRICK:  Object to

14          form.

15          A.    Sir, I do not have the contracts

16   in front of me.  There's eight different terms

17   of use that I understand.  They total over

18   1,000 pages.  In preparation, I did my best to

19   prepare for it.

20             My understanding is that in

21   ordinary course, we would process withdrawals

22   according to the customer wishes, including

23   closing the accounts, and that there's

24   language in the contract that gives us the

25   right to pause -- to pause withdrawals given,

391

1              C. Ferraro - Confidential

2    kind of, events that are occurring.

3              So in normal course, you're right.

4    We would -- we would return coins and close an

5    account.  Once we pause, we can't return

6    coins.  We've paused that activity.  We can't

7    close an account if there's coins in there.

8         Q.   So the sections that allow you to

9    not return the coins, AKA, the pause, would

10   they not terminate with the termination of the

11   entirety of the terms minus the survival

12   section?

13             MR. McCARRICK:  Objection to

14        the form.  Same objections as I've

15        been making.

16             You can answer this one again.

17        A.   I'm not a lawyer.  I didn't draft

18   the contract.  In my reading of it and

19   understanding of it, it's clear.  I'll restate

20   it.

21             In normal course, if a customer

22   wants to close their account, they would

23   withdraw their coins and close the account.

24             Post pause, it was -- no one had

25   the ability to withdraw coins.  We can't close

392

C. Ferraro - Confidential

1

2  your account if you have ten Bitcoin in there.

3         Q.    Where does it say that?

4         A.    Again, the contract is not in

5  front of me.  I'm not a lawyer.  I didn't

6  draft it.  I did my best to review it and

7  prepare for this.

8         Q.    So wouldn't that mean there is

9  some ambiguity and disagreement in there

10  because it doesn't specifically say anything

11  one way or the other clearly, therefore,

12  ambiguity?

13              MR. McCARRICK:  Object --

14        object to form.

15        A.    These are legal questions.  I

16  think the contract's clear.  I think it's

17  unambiguous.  Clearly you're in a different

18  position.  That's why we're under, you know, a

19  judge's supervision in these key gating legal

20  questions.  The judge will rule on them.

21        Q.    So the entirety of the contract,

22  in its entirety, including the various

23  subsections that I mentioned are unambiguous,

24  per your opinion?

25        A.    Sorry, there's a fly buzzing

393

```
 1              C. Ferraro - Confidential
 2   around me.  I don't know how it got to the
 3   50th floor but somehow the fly got up here.
 4              I apologize.
 5              Yeah, to me it's clear, title is
 6   transferred.  I've done through that in my six
 7   hours of testimony today.  Yes.
 8         Q.   I'm asking about the entirety of
 9   the contract.  Is the entirety of the contract
10   clear and unambiguous, not just the sections
11   about transferring title?
12              MR. McCARRICK:  Yeah,
13         object --
14              MS. WESTOVER YANEZ:
15         Objection.
16              MR. McCARRICK:  Object to
17         form.  It's not the relevant
18         question, it's also a legal
19         question.
20              You can answer.
21         A.   It's a legal question.  I'm not a
22   lawyer.  I'll leave that for the lawyers to
23   decide.  To me in reading through it, it was
24   clear, Mr. Frishberg.
25              MR. FRISHBERG:  Thank you.
```

Confidential        Christopher Ferraro - November 21, 2022

394

1              C. Ferraro - Confidential

2        That's it for today.  Thank you so

3        much.

4              THE WITNESS:  Thank you.

5              MR. McCARRICK:  Thanks,

6        Mr. Frishberg.

7              All right.  Next pro se

8        creditor up to bat, if you can state

9        your name and spell it for the court

10       reporter.

11             MR. COHEN HOFFING:  Hi, I am

12       Jeremy Cohen Hoffing, pro se

13       creditor.  And to spell my first

14       name, J-e-r-e-m-y, last name Cohen

15       Hoffing, C-o-h-e-n H-o-f-f-i-n-g.

16   EXAMINATION BY

17   MR. COHEN HOFFING:

18       Q.   Hi, Mr. Ferraro, I just have a

19   couple brief questions.  If I were to request

20   proof of acceptance of different versions of

21   the TOS for an individual user like myself,

22   would you be able to provide that proof?

23       A.   Me, not personally, but tomorrow

24   Oren Blonstein will be here to talk in detail

25   about these questions, sir.

Confidential        Christopher Ferraro - November 21, 2022

395

1                C. Ferraro - Confidential

2         Q.    Okay.   Thank you.

3         A.    My understanding is you had to

4    accept the terms of use in order to progress

5    with opening your account, full stop.

6         Q.    Right.   But if you -- but if I

7    were to request for proof of that, that that

8    actually took place, would I be able to

9    receive evidence?

10        A.    Again, to open your account and,

11   kind of, process-wise, you had to go through

12   those steps.   Oren tomorrow will have a more

13   fulsome discussion about those details,

14   including the aspects of his declaration.   So

15   I would probably save that for there.

16              To me, my understanding is in

17   order to open an account, you had to progress

18   through these screens and click acceptance.

19   Contract or Terms of Use 6, you had to

20   clickwrap.   You had to not only check it, you

21   also had to accept it.   That's my

22   understanding, sir.

23        Q.    Understood.   And while that may be

24   true, and your back office systems will have

25   recorded that.   So hopefully Oren Blonstein

Confidential        Christopher Ferraro - November 21, 2022

396

1              C. Ferraro - Confidential

2      can provide any proof if requested.

3              My next question:  Was the

4      creation of the custody account product, was

5      that to help protect nonaccredited investors?

6              MR. McCARRICK:  Objection.

7          Outside the scope.

8              You can answer.

9          A.    Yeah, I think we went through this

10     a little bit earlier.  The earn product was

11     our marquee product.  Pretty much all of the

12     customers came to Celsius for earn.  Given the

13     backdrop, you know, we felt that we needed to

14     launch a custody product in order to suit

15     certain customers.

16              Our belief was that we wanted to

17     be able to have the customers on the

18     platform -- right? -- we wanted to provide the

19     services to the customer.  And my

20     understanding was -- again, I was not part of

21     this.  I've done my best to try to understand

22     what happened and the decisions that were

23     made.

24              My understanding was the custody

25     product was launched in order to, kind of,

397

1                    C. Ferraro - Confidential

2      give a secondary product to the earn product.

3      And the earn product was starting to get --

4      you know, there was chatter about whether or

5      not it would be able to be offered --

6      right? -- regulatory inquiries, things like

7      that.

8                    So we needed -- you know, we had

9      600,000 customers with a balance with us.  So

10     we were trying to make sure that we had

11     products and services and not lose our

12     customers.

13          Q.    So do you think there was any

14     regulatory pressure that helped initiate the

15     offering of a custody product?

16          A.    I don't know if it was direct or

17     not.  I know that there was plenty of

18     regulatory scrutiny around these products.

19     That's my understanding, yes.

20          Q.    Do you think there's any relation

21     to those regulatory bodies considering, you

22     know, the offering of unregistered securities?

23                    MR. McCARRICK:  Objection to

24          form.  Outside the scope.  Calls for

25          speculation.

398

```
 1                C. Ferraro - Confidential
 2                You can answer.
 3        A.    I think what I've said is the earn
 4   was our marquee product.  We didn't want to
 5   risk losing customers because we couldn't
 6   offer them services anymore.
 7                So what we wanted to do was
 8   diversify and come up with a secondary product
 9   offer in custody.  I think regulatory scrutiny
10   might have been one thing.  Again, I wasn't
11   here.  There probably was others as well.
12                I think the custody product has
13   proven today, given the macro events with
14   other platforms, I think custody is the future
15   in this business.  So I think the custody
16   product offering is a good product.
17        Q.    What was the percentage of your
18   customers in earn versus custody?
19                MR. McCARRICK:  Object to
20        form.  I think you answered this
21        already, but you can answer it
22        again.
23        A.    Yeah, I mean, I think it's in the
24   first day declaration.  We had, you know,
25   north of about 200 million or so in custody
```

399

```
 1              C. Ferraro - Confidential
 2   balances, and the vast majority, rest was in
 3   earn.  So 90-plus percent was in earn.
 4        Q.    So it seems like earn is the
 5   product that enticed people to participate in
 6   your platform.  Is that correct?
 7              MR. McCARRICK:  Object --
 8         objection to form.
 9              You can answer.
10        A.    There's a customer, kind of,
11   adoption curve that occurs when you launch a
12   new product.  So it's not like you launch a
13   new product and everybody just goes there.
14   Earn was the product offering for probably
15   four-plus years.  So it would make sense that
16   the custody, kind of, offering would have an
17   adoption curve like any other product that
18   gets released.
19        Q.    Okay.  So after April 15, 2022, is
20   when you offered custody, and so if you were
21   to make new deposits to an earn account, did
22   you have to be an accredited investor?
23              MR. McCARRICK:  Objection.  I
24         think we covered this ground
25         earlier.
```

Confidential        Christopher Ferraro - November 21, 2022

400

```
 1              C. Ferraro - Confidential

 2              But you can answer it again to

 3         the best of your understanding.

 4         A.    Yeah, I'll try to echo what I said

 5    earlier.  I believe that if you were

 6    nonaccredited post the launch of custody in

 7    the US, any new deposits went to custody.  If

 8    you were accredited, you could continue to,

 9    you know, fulfill inbound transfers into earn

10    and internationally as well.  That's my

11    understanding in this situation.

12         Q.    Can you define the difference

13    between an unaccredited investor versus an

14    accredited one?

15              MR. McCARRICK:  Objection.

16         Calls for a legal conclusion.

17              THE WITNESS:  Yeah.

18              MR. McCARRICK:  But you can

19         answer based on your subjective

20         understandings.

21         A.    There's a process in which you're

22    trying to show that you have the, kind of,

23    capability for more complex offerings, et

24    cetera.  So that could be a level of

25    sophistication, kind of, the activities that
```

401

```
 1            C. Ferraro - Confidential
 2   you invest in, or your overall wealth is my
 3   understanding of the accreditation process.
 4            It's trying to make sure that for
 5   sophisticated products, it's for sophisticated
 6   or accredited investors.
 7       Q.    Okay.  So by that reasoning, why
 8   would I not be allowed to make new deposits to
 9   earn as an unaccredited investor?
10            MR. McCARRICK:  Object.
11       Outside the scope.
12            You can answer.
13       A.    I don't understand the question.
14   I'm sorry.
15       Q.    So after April 15, if I'm
16   unaccredited, what is the reasoning why I
17   wouldn't be able to make new deposits to earn?
18            MR. McCARRICK:  Object to
19       form.  Outside the scope.
20            You can answer to the extent
21       you understand.
22       A.    Yeah, I believe you can make
23   new --
24       Q.    I wouldn't be able to because I'm
25   not unaccredited.  Right?
```

402

```
 1            C. Ferraro - Confidential

 2            MR. McCARRICK:  Objection to

 3       form.  Mischaracterizes.  Outside

 4       the scope.

 5            You can finish your last

 6       answer.

 7       A.    I forgot what I was saying but --

 8  I lost my thought, I'm sorry.

 9       Q.    Okay.  Sorry.  Let me re-ask the

10  question.

11            By your reasoning that to be

12  defined as an accredited investor you have to

13  have a certain amount of wealth, is one of the

14  reasons you gave, and if you don't meet those

15  requirements, you are not allowed to be able

16  to make new deposits onto an earn account

17  because you didn't meet those -- that

18  accredited status.  Correct?

19            MR. McCARRICK:  Object to

20       form.

21            You can answer.

22       A.    Yeah, my understanding is after

23  the launch of custody, if you were in the US

24  and you were not accredited, new deposits

25  would go to your custody account.  That was
```

403

1                    C. Ferraro - Confidential

2       the product we were offering for that slice of

3       customers, nonaccredited customers after

4       April 15 went to custody.  That's correct.

5            Q.    Okay.  Thank you.  So my question

6       then is:  If you were an unaccredited investor

7       and you had already made deposits into earn

8       after the new products changed in an offering

9       of custody, why were users that were

10      unaccredited -- why did they remain -- why did

11      their deposits remain in earn instead of being

12      moved over to custody?

13                 MR. McCARRICK:  Objection to

14           form.  Outside the scope.

15                 You can answer.

16           A.    Yeah, I think I answered this

17      earlier.  Existing deposits post the launch

18      of -- pre the launch of custody for

19      nonaccredited were grandfathered, I'm using

20      the term "grandfathered," into the earn

21      product.

22                 The customers could have moved

23      their balances to custody, and if they moved

24      their balances from earn to custody, they

25      wouldn't have been able to move them back.

404

```
 1              C. Ferraro - Confidential
 2         Q.    Do you support the decision to
 3    keep them grandfathered into earn, especially
 4    for unaccredited investors that weren't aware
 5    of the differences between the custody and
 6    earn?
 7         A.    I --
 8              MR. McCARRICK:   Object to the
 9         form.
10              I think he's testified
11         multiple times that he wasn't
12         involved in any grandfathering
13         decision, that he wasn't there.
14              But you can repeat that
15         testimony.
16         A.    I think the custody product
17    offering is a key offering in crypto.  I think
18    it's a great idea to, kind of, have the
19    industry move to that space.  The users could
20    have transferred their balances from earn to
21    custody.
22              I believe I was not part of the
23    decision.  I was probably not even with the
24    company when a lot of these decisions were
25    occurring.
```

405

C. Ferraro - Confidential

1

2          Do I -- do I support that?  You

3     know, I haven't thought about it in that way.

4     I think the custody product is a great

5     offering.  And for people who want to be in

6     custody, you know, it's not a bad idea in this

7     industry and in this marketplace.

8          Do I think it was the right

9     decision?  I don't know.  I haven't thought

10    about it.

11         Q.    Do you believe in consumer

12    protections for, you know, unaccredited

13    investors?

14              MR. McCARRICK:  Object to the

15         form.  Outside the scope.  Vague.

16              You can answer to the extent

17         that you understand the question.

18         A.    I come from a very regulated

19    background where consumer protections were

20    very well understood, and I support those

21    protections and I support smart regulations.

22    That's my background.

23              I worked with regulators very

24    closely for a decade.  And I found them to

25    be -- they made -- they made me better at my

Confidential        Christopher Ferraro - November 21, 2022

406

```
 1              C. Ferraro - Confidential
 2   job, let's put it that way.  So I welcome
 3   regulation.  I welcome customer protections.
 4              I think for this industry to
 5   really get out and being nascent and to grow
 6   and to be widely adopted, we need those
 7   protections.  And as long as I'm involved with
 8   this company, you know, that will be the goal,
 9   is to, you know, think ahead to future
10   regulation and protections and be on the right
11   side of that.
12              MR. COHEN HOFFING:  Thank you.
13         That ends my questioning.
14              THE WITNESS:  Thank you, sir.
15              MR. McCARRICK:  Thanks,
16         Mr. Hoffing.
17              Okay.  Next creditor up, if
18         you could state your name for the
19         record, and spell it and just, yeah.
20              MR. DE LAS HERAS:  Okay.
21         Yeah.  I am Victor Ubierna De Las
22         Heras.  I am a pro se creditor.  I'm
23         from Spain so maybe if you don't
24         understand me, you can stop me.  So
25         I apologize that.
```

Confidential       Christopher Ferraro - November 21, 2022

407

```
 1            C. Ferraro - Confidential
 2    EXAMINATION BY
 3    MR. DE LAS HERAS:
 4        Q.    The first question is:  Are you
 5    familiar with the Slack channels of the
 6    company?
 7            MR. McCARRICK:  Object to
 8        form.  Sorry I could not understand.
 9            (Stenographer clarification.)
10            (Discussion off the record.)
11        A.    I couldn't understand.  Oh, Slack
12    channels.  Am I familiar with Slack channels.
13        Q.    Yeah.  The ones from Celsius?
14        A.    Yeah, yeah.  No, I use Slack.
15    That's the internal messaging system, the
16    software that we use to communicate, yes.
17        Q.    Are you familiar with a leaked
18    channel in which realtime, big withdrawals
19    were posted for approval or completion?
20            (Stenographer clarification.)
21            MR. McCARRICK:  Would it be
22        possible for you to type the
23        question into the chat?
24            MR. DE LAS HERAS:  I will
25        share my screen if that's okay with
```

408

```
 1            C. Ferraro - Confidential

 2       you.

 3            MR. McCARRICK:  Oh, I see.

 4            MR. DE LAS HERAS:  So this is

 5       the question asked.

 6            MR. McCARRICK:  Sir, can you,

 7       kind of, make it a little bit

 8       bigger, please?

 9            Okay.  All right.  So just for

10       the record, the question is:

11            "Are you familiar with a

12       leaked channel," I assume referring

13       to Slack channel, "in which

14       realtime, big withdrawals were

15       posted for approval or completion?"

16            And I'm going to object to

17       that question as outside the scope

18       on the basis of form, but you can

19       answer to the extent you understand

20       it.

21       A.    I'm not familiar with the

22  withdrawal Slack channel.  There could be --

23  there could have been one.  I just, to my

24  knowledge, was not part of it and didn't

25  follow it.
```

409

C. Ferraro - Confidential

1

2

3

4

5

6

7

8

9

10

11      Q.    Okay.  Thank you.  So now on

12  another topic, and in your declaration in

13  paragraph Number 23, you say that:

14          "Debtors typically advised

15      existing users of updates to the

16      terms of use via e-mail and other

17      official Celsius channels, such as

18      the Celsius app."

19          Is that correct?

20      A.    Yeah, that's my understanding that

21  any changes to the terms of use would be --

22  there would be a pop-up in the Celsius app.

23  There would be e-mail.

24      Q.    Do all Celsius users use the

25  Celsius app or are there users who don't use

410

```
 1              C. Ferraro - Confidential

 2   the app?

 3              MR. McCARRICK:  Object to

 4       form.

 5              You can answer.

 6       A.    My understanding is it went

 7   through the app.  So they would have seen the

 8   pop-ups.  They could have probably accessed

 9   their account online as well.  But it would've

10   seen the similar things.  I think Oren would

11   be a great resource to talk in specifics about

12   this tomorrow.

13       Q.    Okay.  So you don't know anything

14   about customers who don't have the Celsius app

15   and that access their Celsius account through

16   a third party?

17       A.    Oh, partnership channel.  You're

18   talking about an AP- -- the partner API so

19   folks --

20       Q.    Yeah --

21       A.    -- who came in through the

22   partnership channel?  Yeah, I think that's --

23   I think if you could that would be a best --

24   question best suited for Oren tomorrow.

25              MR. DE LAS HERAS:  Okay.  So
```

411

```
 1        C. Ferraro - Confidential

 2    with that, I don't have any more

 3    questions, thank you.

 4          THE WITNESS:  Thank you, sir.

 5          MR. McCARRICK:  Thank you,

 6    sir.

 7          Okay.  Are there any other pro

 8    se creditors with questions at this

 9    time?

10          Okay.  Hearing nothing, we

11    will close the deposition.  We'll

12    read and sign.

13          And thank you, Mr. Ferraro,

14    for your time.

15          And thank you to all the

16    participants for yours.

17          THE WITNESS:  Thank you.

18          (Continued on the next page.)

19

20

21

22

23

24

25
```

Confidential        Christopher Ferraro - November 21, 2022

412

```
 1         C. Ferraro - Confidential

 2           CERTIFIED STENOGRAPHER:  This

 3   is the stenographer.  If anyone

 4   wants to order a copy of the

 5   transcript, you must e-mail me.  My

 6   e-mail is going is in the chat right

 7   now.

 8         (Discussion off the record.)

 9           THE VIDEOGRAPHER:  The time

10   now is 5:28 p.m.  This concludes

11   Media 8 of 8 today's deposition.

12   Off the record.

13         (Time noted:  5:28 p.m.)

14                 - - -

15

16

17

18

19

20

21

22

23

24

25
```

413

1

2            A C K N O W L E D G M E N T

3

4    STATE OF              )

5                          : ss

6    COUNTY OF             )

7

8            I, CHRISTOPHER FERRARO, hereby

9        certify that I have read the transcript

10       of my testimony taken under oath in my

11       deposition of November 21, 2022; that

12       the transcript is a true, complete, and

13       correct record of my testimony, and that

14       the answers on the record as given by me

15       are true and correct.

16

17            _____

18                 CHRISTOPHER FERRARO

19

20   Signed and subscribed to

21   before me this _____

22   day of _____, 2022.

23   _____

24   Notary Public

25

Confidential        Christopher Ferraro - November 21, 2022

414

1

2                C E R T I F I C A T E

3    STATE OF NEW YORK    )

4                         : ss.

5    COUNTY OF NASSAU     )

6

7                I, PATRICIA A. BIDONDE, a Notary

8          Public within and for the State of New

9          York, do hereby certify:

10               That CHRISTOPHER FERRARO, the

11         witness whose deposition is hereinbefore

12         set forth, was duly sworn by me, and

13         that such deposition is a true record of

14         the testimony given by the witness.

15               I further certify that I am not

16         related to any of the parties to this

17         action by blood or marriage, and that I

18         am in no way interested in the outcome

19         of this matter.

20               IN WITNESS WHEREOF, I have

21         hereunto set my hand this day,

22         November 22, 2022.

                    *Patricia A Bidonde*
23         _____

           PATRICIA A. BIDONDE
24         Stenographer
           Registered Professional Reporter
25         Realtime Certified Reporter

Confidential        Christopher Ferraro - November 21, 2022

415

```
 1                        I N D E X

                                        Page      Line
 2    Examinations

      MR. HERSHEY                        17        23
 3    MS. CORNELL                        138       8

      MS. MILLIGAN                       190       7
 4    MS. CORDRY                         207       13

      MR. CREWS                          213       16
 5    MR. KHANUJA                        273       22

      MS. WESTOVER YANEZ                 300       7
 6    MS. BARSTOW                        302       21

      MR. HERRMANN                       324       24
 7    MR. FRISHBERG                      369       4

      MR. COHEN HOFFING                  394       17
 8    MR. DE LAS HERAS                   407       3


 9                      E X H I B I T S

10    Ferraro                           Page      Line

11    Exhibit 1       Declaration of
12                    Christopher Ferraro........34      9

13    Exhibit 2       Debtors' responses and
14                    objections to the

15                    written deposition
16                    questions posed by the

17                    committee.................37      14
18

19
20    DIRECTIONS:                        43        4

21    DIRECTIONS:                        69        8
22    DIRECTIONS:                        333       5

23
24                        - - -

25
```

416

1              E R R A T A

2           INSTRUCTIONS TO WITNESS

3

4           Please read your deposition over

5    carefully and make any necessary corrections.  You

6    should state the reason in the appropriate space

7    on the errata sheet for any corrections that are

8    made.

9           After doing so, please sign the errata

10   sheet and date it.

11          You are signing same subject to the

12   changes you have noted on the errata sheet, which

13   will be attached to your deposition.

14          It is imperative that you return the

15   original errata sheet to the deposing attorney

16   within thirty (30) days of receipt of the

17   deposition transcript by you.  If you fail to do

18   so, the deposition transcript may be deemed to be

19   accurate and may be used in court.

20

21

22

23

24

25

417

1                    E R R A T A

2    ERRATA SHEET FOR THE TRANSCRIPT OF:

3    Case Name:        In Re:  Celsius Network LLC

4    Dep Date:        November 21, 2022

5    Deponent:        Christopher Ferraro

6    Pg. Ln.  Now Reads        Should Read        Reason

7    ___  ____  _____  _____  _____

8    ___  ____  _____  _____  _____

9    ___  ____  _____  _____  _____
10   ___  ____  _____  _____  _____
11   ___  ____  _____  _____  _____
12   ___  ____  _____  _____  _____
13   ___  ____  _____  _____  _____
14   ___  ____  _____  _____  _____
15   ___  ____  _____  _____  _____
16   ___  ____  _____  _____  _____
17   ___  ____  _____  _____  _____
18   ___  ____  _____  _____  _____
19   ___  ____  _____  _____  _____
20   ___  ____  _____  _____  _____
21   ___  ____  _____  _____  _____
22   ___  ____  _____  _____  _____
23   ___  ____  _____  _____  _____
24   ___  ____  _____  _____  _____
25   ___  ____  _____  _____  _____

418

1        E R R A T A (Continued)

2    Pg. Ln.  Now Reads        Should Read         Reason

3    ___ ____ _____  _____ _____

4    ___ ____ _____  _____ _____

5    ___ ____ _____  _____ _____

6    ___ ____ _____  _____ _____

7    ___ ____ _____  _____ _____

8    ___ ____ _____  _____ _____

9    ___ ____ _____  _____ _____
10   ___ ____ _____  _____ _____
11   ___ ____ _____  _____ _____
12   ___ ____ _____  _____ _____
13   ___ ____ _____  _____ _____
14   ___ ____ _____  _____ _____
15   ___ ____ _____  _____ _____
16   ___ ____ _____  _____ _____
17   ___ ____ _____  _____ _____
18
19                   _____
20                   Christopher Ferraro
21   Signed and subscribed to before me
22   this _____ day of _____, 2022
23   _____
24   Notary Public
25

## $

**$1** 84:23,24 91:12 245:2

**$1.2** 243:15

**$1.5** 178:25

**$100** 51:6

**$100,000** 260:6

**$118,000** 270:5

**$120,000** 214:3

**$15** 180:2,5

**$16** 183:2

**$170** 374:13

**$18** 175:18 180:3 209:12,21

**$180** 209:9

**$2** 91:19 93:2 246:3

**$20,000** 229:12

**$250** 230:10

**$26,000** 231:12

**$27,000** 213:24

**$300,000** 138:24

**$350,000** 227:16

**$50** 51:6

**$500** 229:10 230:3

**$500,000** 171:9

**$750** 369:22 372:14,18

**$950** 370:4

## (

**(1)** 320:10 377:17

**(2)** 377:19

**(3)** 377:22

## -

**-ambiguous** 354:6

**-coins** 373:6

**-ish** 91:5

## 1

**1** 24:10 33:11 34:8 47:13 78:16 79:21
80:6 89:4,6 91:23 117:16 145:17
149:4 213:25 282:3 320:8 360:15

**1,000** 271:8 390:18

**1,200** 384:12

**1,555** 265:7

**1.2** 248:14,15,16

**1.5** 96:15

**1.8** 91:23,24 93:2 95:4 96:9

**1/20** 142:18

**10** 380:4

**10,000-plus** 267:4

**100** 71:13,14 88:5 98:20,21 103:8
190:17 237:25 276:10,20 302:23,24
303:7,8 335:4 354:5

**100,000** 139:4 140:8

**101** 103:9

**105** 276:12,18,22 277:2,3,19

**1099** 297:17

**1099-MISC** 254:17

**1099s** 344:16

**10:38** 117:15,17

**10:59** 117:18,20

**11** 47:16,19,21 48:2 84:8 109:4
113:16 127:11 130:8 149:23 266:12
292:22 328:5 351:24 380:5

**1111** 154:10

**11:15** 137:24 138:2

**11:17** 138:3,5

**12** 237:6 238:2 242:24 377:12

**125** 138:25

**12:06** 189:23,25

**12:18** 190:2,4

**12:38** 212:23 213:3

**13** 49:11 235:17 237:8,23 294:20
361:17 380:5

**13-week** 45:6 154:22 155:15

## 1326 33:20

**135** 138:25

**14** 281:23 290:6 358:8

**14,000** 370:12 372:24

**1406** 38:3

**1412** 320:8

**15** 43:22 48:13 49:20 50:11 56:4 65:3,
10 120:11 167:23 354:9,18 359:6,17
377:5 399:19 401:15 403:4

**150-60** 157:25

**16** 168:9

**160** 209:8

**167** 110:21

**167-ish** 166:6

**17** 85:4,5 154:11

**170** 158:3 203:21

**18** 28:7 92:7,8,15 161:20,23 162:10
167:23 195:18 209:16

**19** 380:19 388:11

**190** 158:4

**1999** 27:11

**1:15** 212:21

**1:43** 213:3,7,10

**1:45** 212:18

## 2

**2** 37:10,14 85:2 91:24 92:14 96:9
117:21 137:25 139:15,18 145:17
191:21 249:18,20 250:8,16

**2,930** 264:5

**2.45** 264:21

**20** 168:5 177:12

**200** 398:25

**2001** 216:12,16

**2018** 195:15

**2020** 97:6 151:6 232:10 233:17
343:17

**2021** 96:4 151:6,7 166:20 214:21
217:23 282:11 343:18

**2022** 29:25 31:23 48:13 49:11,20 50:11 56:4 65:3,10 96:4 120:11 145:7 154:11 190:22 202:22 228:7 277:10, 11 290:6 294:13,15 325:5,10 326:10 343:5,18 354:18 360:15 361:17 377:5 399:19

**2023** 106:17,20 108:21

**21** 29:25 50:24 145:7 191:16 214:2,8 228:6 275:9 278:19 294:15 343:5

**21st** 70:12

**221** 272:6

**22nd** 272:23

**23** 78:14 85:6,10,13 86:9 161:22,23 409:13

**24** 106:4

**24,000** 370:11 372:23

**25** 70:24 245:21 257:2

**25,000** 312:5

**26** 83:15,21 84:8,16 97:18 100:16

**27** 30:20

**28** 385:5

**29** 325:5,10 326:10

**2:57** 299:4,6

---

**3**

**3** 138:6 145:17 189:24 254:14 312:5

**3,000** 372:24

**3.5** 213:24

**30** 88:23 168:10 177:12 318:10

**30-** 311:9

**300** 96:18

**31** 282:4

**31,000** 369:21 372:13

**33** 70:24

**341** 132:21 133:11 135:17,18,19 261:17

**35** 389:12

**37** 311:9

**38** 311:9

**393** 376:19,24 377:13 380:19 382:16

---

**3:07** 299:2

**3:15** 299:7

**3:25** 299:9

**3:35** 319:17,19

**3:49** 319:20,22

---

**4**

**4** 145:17 190:5 212:23 227:17

**40** 203:25

**400** 96:13

**400-and-something** 95:25

**41,000** 370:9 372:16,21

**41K** 369:24 370:2

**47** 298:20

**4:40** 371:19,21

**4:49** 371:22,24

---

**5**

**5** 145:17 213:11 276:10,12,20 281:6 289:22 299:4

**50** 70:21,23,24 89:6 128:24 129:8 157:22 227:5,7 237:20 260:23

**500** 96:14

**50th** 393:3

**55** 356:25 357:3

**55,000** 370:15 373:3

**5:28** 412:10,13

---

**6**

**6** 145:17,21 146:10 194:23 215:5 220:7,23 221:19 259:25 275:12,16 281:7 284:13 286:6 299:10 304:8,14, 18,23 305:7,20 319:17 341:5 395:19

**600** 95:23 96:13

**600,000** 50:2 397:9

**600-** 139:8

**629** 377:12

**632** 382:16

**644** 380:19

---

**7**

**7** 145:17 304:14,19,22 319:23 341:5 371:20

**7-** 90:19

**70,000** 214:4

**700,000** 139:12

**78** 250:5 253:9

---

**8**

**8** 79:21 80:6 145:17,22,23 146:8,10 215:5 216:11 221:19 222:5 259:25 275:12 284:13 286:6 304:15,20,22 322:16 341:5 360:6 371:25 412:11

**80** 88:20 168:8,11 364:22 365:12,15, 16,19,23 366:3

**800** 87:23 90:18,19 91:4,7

---

**9**

**9** 205:17 231:13

**90-plus** 399:3

**914** 222:3

**920** 110:21

**940** 264:7

**947** 264:7 265:8 269:10

**947-1** 264:5

**973** 264:7 265:14

**9:00** 134:11

---

**A**

**a.m.** 117:15,17,18,20 137:24 138:2,3, 5

**abilities** 311:18

**ability** 49:3 110:8,10 111:8 192:21 225:12 233:8 234:23 240:15 245:8 246:10 290:23 350:17 363:14 380:10 391:25

**absolutely** 109:8 117:7 267:13 274:8 297:10 328:12 329:9 344:2

**accept** 194:25 195:2 196:9 279:21, 22 375:15 395:4,21

---

**acceptance** 304:10,16 394:20
395:18

**accepted** 44:25

**accepting** 221:9 376:5

**access** 142:8 201:5 222:6 246:13
284:23 290:17 380:23 385:13 410:15

**accessed** 410:8

**accommodation** 169:5

**accomplish** 279:2

**accordance** 306:3

**account** 69:24 70:9 72:8 85:18 97:25
98:3,4,11,16,22 101:18,21 103:9
120:14,16,25 128:10 135:3,7,9,23
136:3,10 162:23 164:2,3,5 178:19
180:23 193:9 195:17 196:8,9,12
198:2,7,17 200:9,13 213:22 214:10
219:10 220:18 227:16 230:9,19
233:21 240:18 251:19,24 253:10
255:21 256:13,19 262:14 267:23
283:17 290:14 296:14 302:25 303:8
305:8 314:2,21 317:8 320:12 322:2,
21,22 358:12,13,22,25 360:14 364:22
367:2 374:12 376:3 378:4 380:22
381:6,23,25 382:3,4,10,13 383:6
386:11,16,21,24 387:3,17 388:3,7,8
389:4,8 390:9,10 391:5,7,22,23 392:2
395:5,10,17 396:4 399:21 402:16,25
410:9,15

**accountant** 258:22 306:11

**accountant's** 27:11

**accounting** 27:2 244:21,22 245:19
249:3

**accounts** 85:17 96:20 104:10,19
105:3 162:21,24 183:5 200:13 207:20
209:9,13,15,18,22,25 210:18,20,23
221:9 238:9 265:12 301:7 312:6
322:9,11,12 352:20,22 376:11,17
387:19 390:23

**accreditation** 306:9 401:3

**accredited** 52:10 53:15 54:3,13,15
55:10,16 306:4,11,12 307:4,7 353:20
358:24 399:22 400:8,14 401:6
402:12,18,24

**accrete** 365:24

**accrual** 261:2

**accrue** 66:5,13 67:7 121:2 276:25
350:8

**accrued** 241:15 260:20

**accrues** 244:13

**accruing** 242:6,8 254:2 255:12
257:18 385:25 386:6

**accurate** 49:25 122:16 156:17 193:5
204:16 265:20 277:25

**accurately** 194:4 373:16

**achieving** 112:2

**acknowledged** 250:6

**acquired** 28:6

**act** 103:4

**acted** 74:18

**acting** 52:19 139:8 203:13 361:19
362:6

**action** 226:2 279:25

**actions** 349:6,9

**active** 99:21 262:17 300:24 307:25

**actively** 41:21 43:20 124:5 125:9
160:4 185:7 329:6 330:22 339:9

**activities** 51:21 70:17 102:16
165:13,16 166:14 185:6 278:22 298:6
309:9,12,13,20 311:4 313:22 314:18
339:11 382:8 400:25

**activity** 166:11 206:3 311:6 362:24
363:4 364:2 380:21 381:22 391:6

**actual** 95:15 177:19 188:10,16
205:22 226:7 304:10 388:13

**actuate** 226:13

**add** 89:3

**added** 192:22 219:6 222:15 230:7

**addition** 55:21 76:8 231:11

**additional** 51:4 138:13 161:4 176:6
192:5 229:25 230:8 282:9

**additions** 282:6

**address** 252:16

**addresses** 380:25 381:14

**addressing** 234:11

**adequate** 343:23

**adjust** 179:12

**administrative** 109:2

**adopted** 406:6

**adoption** 335:14 399:11,17

**advertisements** 188:10

**advertising** 186:23 187:12

**advice** 77:18 78:6 257:15 258:23
259:2,22 260:14,21

**advise** 258:15

**advised** 342:16,18 409:14

**advisor** 260:14 350:13

**advisors** 24:15,19,22,25 34:19 46:14
63:11 125:13,14 130:2,3 133:24
134:3,10 136:21,22 142:23 143:6
157:8 205:13 265:25 329:21 331:21

**Advisory** 29:2,3

**af-** 32:13

**affect** 159:4 160:20

**affiliation** 299:21

**afternoon** 300:8

**age** 245:7

**agencies** 20:4 187:6 188:7

**agenda** 338:14

**aggregator** 184:6

**aggressively** 338:19

**agree** 87:21 88:3 136:7 195:13 215:9
234:9 235:16 246:22 250:22 304:11
375:5

**agreed** 195:23 304:9,23 320:5

**agreement** 194:16 279:10 320:21
332:21 356:7 363:11 382:21 387:10

**agreements** 320:10 328:16 355:19

**ahead** 24:24 41:6 44:20 50:5 73:11,
13 98:17 110:18 114:17,25 115:2
123:23 136:7 270:22 292:14 298:5
406:9

**air** 169:17

**aka** 264:18 391:9

**Akin** 148:22

**albeit** 111:5 161:13

**Alex** 26:10 79:19 186:11,12,14,17
261:19 269:25 271:4 326:12 339:21,
22 340:6,11,14

**aligned** 59:20 123:6 129:24 292:4

**Aliza** 232:2,8 233:16

**allegations** 173:7

**allocation** 321:14,15

**allotted** 18:15

**allowed** 64:9 267:21 291:4 328:17, 18 380:2 401:8 402:15

**allowing** 66:4,13 67:6 69:3 316:19, 20

**altered** 360:12

**Alvarez** 134:14 157:7

**AMA** 55:5 77:13 232:16 234:10 361:4

**AMAS** 54:23,25 76:23 221:22 233:15 307:25 308:8

**ambiguity** 392:9,12

**ambiguous** 389:19,20

**amend** 146:12

**amended** 38:21 300:21 304:12

**amending** 147:4

**amendment** 146:23,25 147:7

**amendments** 146:6 147:22

**amount** 52:3,25 57:9 85:14,17 90:12, 17 92:4,9 95:19 163:23 172:3 187:8 193:4 210:7,24 242:21 255:21 265:23 266:9 316:14 319:10 349:23 352:4 369:9 370:13 373:9 402:13

**amounts** 188:3

**ample** 161:12 244:19

**analysis** 28:10,12,21 30:5 61:25 157:9,12 159:3 203:7 294:18 296:19

**analytical** 188:9

**analyze** 98:9 266:24

**analyzed** 111:24 112:22

**and/or** 19:23 369:9

**Andersen** 27:20

**Anderson** 299:22,23

**announce** 273:13 368:21

**answering** 41:14 42:19 46:12 296:5

**answers** 23:3 41:17,20 42:2,21,23 85:24 118:5 144:8

**anticipate** 113:14 125:7 154:25

**anticipation** 168:17

**anymore** 245:20 248:3,25 363:4 398:6

**Anything's** 267:6

**AP-** 410:18

**API** 410:18

**apologies** 204:14

**apologize** 46:20 100:16 143:16 148:25 205:21 206:7,12,16,18 283:7 296:3 305:18 326:20 351:20,25 352:4 359:13 393:4 406:25

**apology** 206:12

**app** 81:16 369:8 375:4 409:18,22,25 410:2,7,14

**apparent** 367:8

**appearance** 208:12

**applicable** 382:23

**application** 360:13

**appointed** 30:20 139:7

**appointments** 138:18,21

**appreciation** 257:5

**appropriately** 315:12

**approval** 112:19,23 295:25 407:19 408:15

**approvals** 148:12

**approve** 154:19 325:23

**approved** 108:19,20 110:9,10 147:24,25 295:10 297:4 361:12,14

**approving** 147:21 219:20

**Approx-** 95:2

**approximately** 49:20 88:5,20,23 91:18 95:4 185:17 248:15 369:20,21, 24 370:4,11 372:12,13,16,18,23

**April** 48:13,20,24 49:9,11,20 50:11 56:4 63:15 65:3,10 107:13 109:13,15 113:15 114:10 116:21,25 120:11 161:5 277:10,11 290:6 354:9 358:8 359:6,17 377:5 399:19 401:15 403:4

**April-may** 191:19

**architecture** 191:24

**archive** 217:16

**area** 331:13

**areas** 31:10 46:7 291:3 295:3

**argue** 181:23

**arguing** 292:9

**argument** 291:9

**Arizona** 28:3

**armed** 172:11

**Armstrong** 265:6,11

**Armstrongs** 265:10,13

**art** 331:22

**Arthur** 27:20

**arts** 26:23,24

**ask-me-anything** 51:10 53:25 54:17

**ask-me-anythings** 363:18

**asks** 137:4

**aspects** 35:6 192:10 352:21 395:14

**asserting** 267:9

**assessment** 74:2

**asset** 76:12 93:9 95:8,23 97:11 103:9,18 159:13 163:7 164:25 216:22 219:2 223:11 224:5,13,15 225:13 245:2 246:2 247:16 249:11 294:22 296:18 311:11,13 345:16 353:5 355:14 381:4

**assets** 38:22 45:10,21 57:20,21 64:10 65:4,5,6,11,12,21 66:7,14 67:8 68:7,15 69:4,18,23 70:5,8 71:19 72:7 76:11 77:8,23 95:16 108:7 115:24 120:19 124:3 141:12,24 159:23 162:8 164:21 171:19 172:6 174:16 178:15, 16,23 183:6 205:22 214:2 215:9,12, 13,17 216:12,21 219:7,25 224:24 227:17 229:16,19 231:17 239:23 240:9 243:16 245:7,9,14 246:20 248:7,10,11 249:8 250:22 252:18 259:16 261:9,23 263:22 276:7,8 277:6 279:12 281:2,3,25 282:2 286:4, 7,9,10,18,23 289:25 290:8,13,18 291:11,12,15,16,20 292:11,12,15 293:4,14,22 296:13 297:16 301:7,8 302:25 303:9 311:19 312:5,6,17 313:3 323:19 335:3 341:19,23 352:19,21 377:14,24 380:21 382:5,19 383:2,5,9,12 386:22

**assets'** 378:2

**assign** 341:17

**assigned** 377:20

**assisted** 149:6 150:15 187:13

**associate** 210:19

**associates** 25:5

**Association** 208:6

**assume** 22:15 53:23 105:7 145:12
150:21 183:19 187:18 207:21 244:5
369:25 408:12

**assuming** 177:14 179:21

**assumption** 21:15 67:4

**attachment** 381:11

**attempt** 344:2

**attempted** 342:24

**attempts** 344:2

**attend** 20:8

**attention** 42:18 52:4

**attorney** 18:4,23 19:2 137:3 190:10
300:10

**attorneys** 152:6,8 153:6 208:7

**attract** 55:9

**attracted** 32:17

**audio** 315:14

**audit** 27:21

**audited** 27:22

**Audits** 345:3

**August** 213:22 220:11

**authoritatively** 119:10

**authorities** 69:10

**authority** 92:5 278:24

**authorizing** 79:8 281:17

**automation** 28:15

**avoid** 32:13 109:6

**avoidance** 232:18

**award-accruing** 66:15

**awards** 66:6,13 67:7,16 369:8,9

**aware** 18:10 52:7 61:12,21 76:12
77:6 82:12 89:21 90:20 98:17 119:8
128:8,16 130:12,18 145:18 146:7
155:16 157:7 163:22 176:11 187:24
202:24 219:24 220:15 225:6 227:18

230:18 249:16 251:18 261:18,19
264:22 272:9,10 274:11 301:4 307:8
313:11,12 325:8,22 326:5 342:10
359:15,21 367:25 376:2 404:4

**awareness** 62:16

**awful** 228:23

## B

**B-A-R-S-T-O-W** 301:25

**B22sats20000** 229:10

**bachelor** 26:23,24

**back** 20:21 27:11 29:14 33:23 41:25
47:12 61:24 64:2 74:20 78:12 93:16,
21 95:10,14 96:8,19,25 97:6 98:23
117:23 121:20 124:16 125:5,22
129:25 130:9 138:19 139:20 172:7
178:6 179:21 181:7,14 182:14 186:18
193:12 196:11,20 206:18 207:15
208:16 210:19 212:11,17 222:23
228:21 233:10 239:18,25 242:15,21
243:5,11 244:20 245:21 246:15
247:19 251:5,12,16 255:8,15 260:16,
18,19,23 261:2 267:21 268:2,17
275:3 276:12,23 277:19 281:12 291:9
292:6,9 293:2,22 298:25 308:8
313:23 314:19 318:14,21 319:13
331:5 338:12,13,20 339:16 348:17,22
352:17 355:12,17 358:22 371:12
374:8 382:2,5 395:24 403:25

**back-office** 225:2 226:10 253:8

**backdrop** 57:17,24 58:8 59:4,12
72:23 236:7,8,9 239:18 396:13

**backed** 71:4 303:18

**background** 26:17,18 138:17
140:19,20 151:12 169:2 228:11 274:3
286:25 289:17 300:20 405:19,22

**backpacks** 271:10 272:2

**backup** 59:23

**bad** 186:5 239:19,20,24 405:6

**balance** 116:16 141:20,21 163:7
230:20 240:18 242:10,18 244:12,13,
20 245:3,4,25 247:13 249:4 251:25
252:2,11 253:2 256:13 264:20 273:4
285:9 290:14 310:6 314:6 315:4,6
316:12 317:3 345:13,20 346:22
348:20 349:25 350:6 355:15 374:15,
16 397:9

**balances** 50:7,8 229:25 230:6 264:6
305:9 352:20,22 399:2 403:23,24
404:20

**bank** 28:3,5 71:15 101:18,21 141:5
289:3,6 367:2 374:12

**banking** 31:17 190:12 234:2

**bankruptcy** 18:6 107:15 108:22,25
109:3,15 114:2,14 116:3 122:11
128:9,11,12 130:7 147:3,7 173:19
182:8 208:8 236:13,15 237:13,14
239:5 241:18 242:13 243:23 244:4
248:13 293:17 294:8 311:14 313:23
327:19 338:6 386:5,8

**banks** 31:14

**Barstow** 301:24,25 302:4,14,21
307:24 310:16 321:19 322:7 323:16
356:23 357:4,6

**base** 53:24 138:23,24 168:12 350:15

**based** 48:11 55:6 79:15 80:12,23
101:3 146:19 159:2 173:14 179:24
201:7 255:23 269:20 290:16 297:16
335:12 347:4 365:25 366:18 378:13
379:17 381:19 400:19

**basic** 335:21

**basically** 66:23 100:4 177:22 211:25
263:11 337:5 362:22

**basis** 62:12 68:11 73:8 106:16,25
258:3 263:7 308:7 346:24 408:18

**basket** 60:4

**bat** 323:25 394:8

**beg** 348:25

**began** 166:14 214:6

**begin** 273:23

**beginning** 106:23 138:15 170:22
248:23 268:7 337:4

**begins** 117:20 138:5 190:4 213:10
299:9 319:22 371:24

**behalf** 138:10 170:25 172:15

**belief** 339:13 396:16

**believed** 33:2

**believes** 338:9

**belong** 323:19

**belonging** 68:15

**belongs** 224:14

**Ben** 265:6,9,10,12,13

**benefit** 31:5 111:12 123:8 131:17 165:20 237:2 240:24 241:22 242:5,6, 9 273:15 350:8

**benefited** 174:7 237:6 241:10

**Benjamin** 265:11

**bet** 169:10

**beta-tested** 48:23

**bidders** 122:20 124:7,18 134:17 328:17 332:12 336:12

**bidding** 136:15 332:5 333:22

**bids** 124:12 249:9 332:5

**big** 28:16 100:14 116:9 215:6 329:14 369:15 407:18 408:14

**bigger** 388:11 408:8

**biggest** 49:16,17 177:6

**billion** 89:4,6 90:18 91:12,19,24 92:14 93:2 95:4 96:2,5,10,15 243:15 245:2 246:3 248:14 373:6

**billions** 172:10 247:17

**bills** 247:6 366:24

**binding** 336:6

**bit** 26:16 29:5 39:16 65:8 71:12 107:10,12 114:10 138:20 140:18,25 143:15 147:20 151:16 152:17 158:4, 7,8 165:9 169:15 178:4 217:8 225:22 227:12 231:10 245:24 254:16 293:10 302:4,6 324:11 326:4 331:25 396:10 408:7

**Bitboy** 265:7

**Bitcoin** 49:4,5 73:5,6 93:17,24 94:9 97:8,12,14 103:8,9,10,12,13 142:14, 19 156:24 165:12 166:2 167:21,24 168:8,10 169:22 170:9 172:21 175:4 177:17 179:22 181:22 213:25 224:22 225:25 226:4,11 227:17 229:11,12 230:2,3 231:12 252:25 253:3,9,11 257:19 271:7 276:17 314:14 318:13, 20,23 343:8 369:21 370:2,9,12,15 372:13,17,21,23,24 373:4 392:2

**Bitcoins** 276:10,12,20

**Bitfinex** 165:23

**Bitmains** 167:4

**blockchain** 99:18 100:9 118:13,24 119:6 141:23,25 185:10 193:19

226:13 370:14 373:2

**blockchains** 98:9

**blog** 51:8 52:21,24 53:3,5,14 76:24 78:9 308:2,8

**blogs** 53:12

**Blonstein** 47:3 119:16 144:18 193:25 220:12 280:13 305:4 358:17 394:24 395:25

**Blonstein's** 26:9

**blurry** 39:7

**board** 147:25 190:11 191:20,21 202:23 203:9,11,14,15 221:23 243:9 249:16,21 250:5,14,15,16 299:25 313:18 329:23 340:8,9

**boat** 297:15

**Bob** 195:17

**bodies** 204:2 397:21

**bolding** 222:14

**bonuses** 51:4 55:8,9,17

**book** 95:24 253:7

**books** 345:5,6,7 347:11

**boom** 206:20

**booming** 247:12

**borrow** 48:19 71:23 89:19 90:8 110:11 111:15 112:21 200:10 210:11 287:24 303:8,13,24,25 314:16 358:9 383:7

**borrowed** 91:7 94:3 97:5,7 211:8

**borrower** 303:21

**borrowers** 110:5 323:3 366:8 373:25

**borrowing** 111:19 234:15 235:13

**borrowings** 369:23 372:15

**borrows** 289:3,5

**boss** 329:14

**bought** 142:14 257:19 366:23

**bound** 20:9 268:13 386:14

**box** 279:21 304:11

**boxes** 284:19

**brand** 188:17

**breach** 332:20

**break** 22:25 83:4,8,10 108:2 117:6,9 137:16 212:10 285:8,18 298:19,25 371:4

**breaks** 22:18

**breather** 236:12,14

**bring** 33:17 113:4 172:7 222:2 229:25 230:12 260:4 263:20 319:13 331:3 339:18

**bringing** 113:2 181:6

**brings** 179:20 338:12,13

**broad** 333:7 335:17

**broadcast** 147:14

**broader** 41:25

**broke** 346:9

**broken** 381:24

**brought** 39:23 40:5 51:4 115:5 218:21 337:14 374:8,18

**brushes** 335:18

**BTC** 92:24 182:14 317:4

**budget** 43:14 45:6,7 49:22 51:25 154:10,12 188:2 191:16,20

**budgeting** 365:19

**budgets** 166:10

**build** 157:3

**build-out** 169:23

**building** 171:16 252:5 272:16,22,24

**buildout** 170:4,11 176:18,20,25 177:2,6,19

**bunch** 388:21

**burn** 178:4 189:14

**BUSD** 88:23

**business** 26:25 35:7 43:12 46:13,16 60:2 93:3 101:5 102:15 167:17 274:4, 5 275:6 301:12 315:4 335:5 340:13 342:24 348:21 349:13 361:6 363:17 364:21 376:12,13 398:15

**busy** 367:18

**buy** 95:10,14 96:8 97:13 142:16,17 252:24 253:3,5

**buyers** 133:17

**buying** 175:15 226:4

**buzzing** 392:25

---

**C**

---

**C-O-H-E-N** 394:15

**C-O-R-D-R-Y** 208:5

**C-O-R-N-E-L-L** 138:10

**calculator** 168:4

**calendar** 114:8 115:20 270:4

**call** 47:6,8 95:23,25 144:18 166:10
208:20 231:23 241:2 262:18 290:9
344:19

**called** 114:12,16 153:14 165:22
263:23 281:23

**calls** 25:21 43:2 52:13 53:18 66:9
69:7 124:6 187:16 250:10 317:13
387:5 397:24 400:16

**Cam** 325:18 344:16

**camera** 235:9 371:9

**Cameron** 213:20

**capability** 400:23

**capacity** 61:23 142:25 145:14,15
197:20 361:18

**Capex** 157:3 170:10

**capital** 28:18 124:4 200:12 250:7
315:9 316:19 317:5 365:24 366:6

**capture** 188:16

**car** 225:11 289:6 366:23

**care** 256:6 284:24 375:14

**career** 30:7 115:15

**careful** 333:17

**carefully** 341:5

**carries** 59:14

**carry** 350:17

**carved** 56:19 307:21 360:18 363:10
365:5

**case** 18:4 20:13 31:17 33:20 56:20
59:24 62:24 80:21 84:21 94:2 109:22,
23 110:15 111:3 112:11 113:14,15
117:3 134:10 158:21 159:14 161:14
164:20 170:21 181:10 189:12 203:25
205:13 208:11 231:16 267:8

**case-by-case** 68:11

**cases** 113:12 165:13

**cash** 43:14 45:5,7 101:10 107:3
139:18 154:12 156:12,15,18,25
157:24,25 158:2 159:25 160:23 161:4
166:9 167:9 169:22 170:6,8 172:20
174:18 175:2 176:2 178:4 318:13,20,
25 319:3 366:9 374:18

**cast** 239:7

**cat** 375:24

**caution** 40:10

**cautious** 351:24

**CCAR** 28:18

**cease** 109:3

**ceased** 185:14

**ceasing** 361:23

**Celpay** 377:21

**Celsius** 18:6 28:25 29:10,21,24 30:3,
8,19,25 31:4,20,23 32:9 45:21 48:13
49:11 50:19 51:15 52:5,24 53:11
54:22 55:20,24 56:7 57:5,9 59:12,16,
17 64:8,14 66:24 68:8,14,25 69:9
70:16 75:17 81:6 86:12,13 87:22 88:3
89:22 90:7,13 94:3,12,15,19,23 97:23
98:25 99:5,6,10 100:3 102:17 118:10,
17,18 119:7,18 128:9 130:13,21
131:2 135:23 138:18 139:19 141:2,7
142:13 143:4 144:7 145:4,6,13,20
146:5,13 147:2,8,22 148:3,21 149:14,
20 150:7 151:2,4,9,21 152:7,11,13
153:5,6,18 156:12 157:6,10,17 159:3
160:21 166:15,23 167:22 170:13
171:19 172:15 177:4 179:3,13 182:4,
9 185:25 186:21 187:13 190:22,24
191:8,17 192:6,11 194:22 195:13,15,
18 196:13 197:3,13,19 198:14 199:25
200:9 202:23,24 213:21 214:6,10
215:17,24 216:21,24 219:4,8,9 220:9,
24 224:13,14,21,24 225:16 226:2,6
227:15 228:6,14 232:4,12,17 233:18,
21 239:23,24 240:4,10 241:9 242:23
243:6 251:19 252:18 254:7 256:8,16
257:21 258:15,20 259:3,16,23 262:7,
23 263:4,19 264:19 269:11 270:6
271:8,25 272:2 274:5,15 276:8 277:4
279:12,20,25 281:2,3,22 282:10
288:15 289:25 290:3,10,14,18 291:4,
11 292:11,14,15 293:5 295:17 301:9,
13 303:19 305:8,10 306:19 308:6,10,
16,19,25 309:24 310:6,10,21 311:12,
21 312:3,4 314:8 317:8,9,10,17
318:2,4,12,19,22 323:4 325:6 328:20

331:16 333:9 335:2 340:17 343:25
344:18,22 345:5,7,15,16,21 346:4
347:18 348:16 349:16,24 355:8,11,15
358:10 360:11 361:12 364:20,21
366:9 367:3,6,25 369:7 370:11,14
372:21,22 373:3,8 375:7 377:17,21
378:20 380:2,16,22,23 381:2 382:22
383:5,11 385:14 396:12 407:13
409:17,18,22,24,25 410:14,15

**Celsius'** 55:11 61:2 77:22 81:15 99:4
118:14,16,19 120:18 193:13 250:6
253:12 272:5 274:4 281:24 286:2,9
291:16,20 305:25 344:23 345:2
346:15 362:7 385:13 386:12

**Celsius-generated** 297:17

**center** 131:14 167:7

**centered** 334:20,21

**Centerview** 112:10 158:20

**central** 372:25

**centralized** 110:12 349:13

**cents** 157:22 237:21 260:23

**CEO** 52:19 135:3,22 139:9 192:12
273:25 295:12 362:6 363:3

**Cerberus** 29:2,4,9 139:16

**certainty** 113:3

**certificates** 160:9

**certification** 27:8

**certified** 27:10 34:3 37:19 117:5
197:7 198:22 207:23 208:13 287:19
302:16 315:13,18 336:18,22 349:20
374:23 412:2

**cessation** 362:7

**cetera** 20:4 35:10 59:17,21 60:9
95:16 99:8 103:21 118:23 147:15
192:2 194:23 195:4 196:23 200:12
221:3 284:20 291:5 310:10,21 311:5
334:17 335:16 343:2 373:9 381:12
386:5 400:24

**CFO** 30:18 52:18 61:23 74:9 105:17,
18 139:7 140:4 184:23 185:5 192:12
202:21,22 203:4 294:16,19,21 295:12
296:6,22,23 297:3 361:17,18 364:19
373:22

**cha-** 148:14

**Chainlink** 373:7

**chair** 228:25

**chairman** 339:23

**chairs** 134:13

**challenges** 106:11

**chance** 249:24 376:18

**change** 60:10,23,24 61:6 62:17 69:17 70:25 121:5 161:23 179:13,22 197:18,22 216:11 225:10,16 226:7 257:5 274:24 282:12,25 304:18 350:23 375:6

**changed** 30:10,16 156:9 192:4,9 403:8

**changing** 66:24 224:15,20 226:3,9 250:21 350:16

**channel** 407:18 408:12,13,22 410:17,22

**channels** 51:9,12 53:2 267:20 407:5, 12 409:6,7,17

**Chapter** 109:4 113:16 127:11 130:8 149:23 266:12 292:22 328:5 351:24

**characterization** 120:22

**characterized** 373:17

**charge** 185:24 226:15,21

**charges** 168:14

**charging** 227:2

**chart** 86:19 91:9

**Chase** 28:6,9,22 32:11 188:20

**chat** 407:23 412:6

**chatter** 397:4

**cheaper** 110:13

**cheapest** 109:22 112:6 113:20

**check** 304:11 395:20

**checked** 284:19

**checking** 230:9

**checks** 267:5,7

**chief** 30:18,21,22 139:9 342:9 361:19

**children** 29:13

**choose** 64:14 102:20 225:23,24

**choppy** 324:11

**chose** 65:13 67:13 355:13

**Christopher** 34:9

**Circle** 101:19

**circumstances** 381:8

**cite** 287:2

**claim** 242:20,21 277:3 283:18 293:3, 21 302:22 303:6,12,23 344:23

**claimed** 231:10

**claims** 292:24,25 293:5,18 317:10,16

**clarification** 94:11 153:3 162:14 184:4 188:8 204:12 304:21 312:18 317:11 407:9,20

**clarify** 22:7,15 58:9 62:14 142:25 193:8 195:10 197:2,13

**clarifying** 190:15 246:24 347:12

**clarity** 245:11 248:5

**classic** 363:16

**clause** 216:11 217:25 219:6 230:15 281:4 282:14 341:12 343:6

**clawbacks** 337:21 338:3,5,18,20 339:4,8,10

**clawing** 339:16

**clean** 24:2 44:6

**clear** 36:23 42:6 45:12 46:2 53:4 55:3 62:8 80:4,16 87:11 88:11 99:9 100:2 115:15 118:15 121:3 123:10 124:9 133:2,24 203:24 220:6,23 221:18 231:2 259:25 280:22,23,24 283:12 284:14,16 291:10 300:18 326:21 335:4,5 354:4,5,7,10,22,24,25 359:22 362:21 364:11 379:11 389:22 391:19 392:16 393:5,10,24

**click** 194:25 304:13 395:18

**clicked** 220:17,22 279:21

**clickwrap** 304:19 395:20

**client** 333:2

**clients** 151:15 171:16 323:6

**clip** 370:21

**clock** 298:21

**close** 52:17 62:4 176:8 204:18 228:13 302:15 336:3 380:22 382:2,10 386:16,23 387:3,17 388:7 391:4,7,22, 23,25 411:11

**closed** 376:3,4,11 381:6 382:4 387:19 388:3 389:9 390:11

**closely** 123:4 205:19 329:23 405:4

**closer** 302:11

**closing** 376:17 388:8 389:4 390:9,23

**closure** 386:22

**co-chairs** 327:16

**code** 121:9 182:9 230:15 231:11,13 254:25 256:5 261:4 294:8 328:10,14 350:22

**coded** 121:10

**codes** 229:4

**Cohen** 394:11,12,14,17 406:12

**Cohen-pavon** 152:2

**coin** 72:25 73:4,7 86:23 87:12 121:22,24 162:9 164:6 182:10 226:3, 8 257:12 318:13,20,23 345:16 348:5, 17

**coins** 43:12 45:21 73:19 87:18,24 88:6,16,21,24 89:3 95:14 98:2 103:6 110:10,15 111:14,19 112:20 116:13 119:3,10 120:13,15 121:6,14 129:25 130:8 144:22 162:23 163:5,13,14 164:5,8 165:19 172:3 179:17,20 180:10,12 183:16,21,23,25 184:8 185:10 193:11 198:6 200:8 201:5 222:6,21,22,25 255:4,8 256:8 279:6 292:6,9,15 314:6,17 315:20 335:7 345:11 346:5,13,14,22 348:14 355:25 356:2,7,8 374:10,18 375:17 376:16 385:24 387:16 388:6 391:4,6,7,9,23, 25

**cold** 172:8

**collateral** 92:12 97:8,11 112:21 116:15 120:14,17,20,25 121:11 210:8,9 303:10,17,18 311:4 318:14, 21 319:2,13 323:4,12 334:22 354:19 355:2,9 358:11,20,22 359:5,16 369:24 370:2 372:16 374:3,5,7 377:18 378:22,25 383:6

**collateralized** 70:20 90:9 232:12

**collaterals** 210:12

**colleague** 33:4

**collection** 165:21

**college** 26:19 27:18,19

**column** 86:22 87:2,12,18

**combination** 264:6

combined 248:10 264:10

commend 320:25

comment 37:2 116:25 367:21
373:19

commented 108:19

commenting 20:16

comments 167:9

commercial 340:23 341:12,24
342:11 343:8 348:23

commingle 341:18

commingled 162:24 164:2 178:18
180:23

commission 296:15

commit 361:23 362:5

commitment 363:7

committee 18:5 37:9,17 38:17 74:8,
9,12,17 108:8 123:4 125:10,14,24
126:13 130:2 132:17 133:3 134:9,10,
13,14 135:7,10,21 136:21 148:17
152:25 157:13 176:8 192:20 203:15
205:12 320:5,9 329:22 330:21 331:11
338:6 339:11 340:9 351:4

committee's 125:14 136:21 205:12

common 139:2 140:16

communicate 407:16

communicated 122:20 124:17
147:17

communicating 369:16

communication 63:10 64:3 186:15
369:17 372:10

communications 40:11 64:6 187:4,
23 202:9

community 330:25

companies 160:6,7,9 209:3 234:6

company 18:19 29:3 32:17 49:23
61:3 62:12 63:14 64:24 68:21 69:16
70:12 114:14 130:2 143:6 151:2
154:5 156:14 165:20 175:2,6,9
176:13 185:22 191:11,24 192:4 194:7
197:23 203:11,19 204:25 205:24
208:17 215:11 221:16 228:5,13
241:22 244:24 247:18 249:9 261:21
266:10 269:13 275:9 308:19 309:3,21
316:21,22 329:21 334:6,8,10,11
339:23,24 340:5 346:21 352:19 353:6

362:23 366:3 367:4,6 369:20 372:12
404:24 406:8 407:6

company's 347:13,15 370:5 372:19

compared 325:19

compensation 138:23 139:4,25
263:3 340:17,20

complete 289:23 290:10,12

completed 36:17 176:25

completely 21:17 109:23 206:22
234:4 354:25

completion 176:21,22 407:19
408:15

complex 400:23

compliance 203:23 204:7 297:25

compliant 204:25

complicated 336:17

component 296:18

compound 204:10 251:19 252:13
373:15

comprehensible 22:11

concede 298:13

concentrations 26:25

concern 247:7,20 248:25 313:20

concerns 61:20 63:19 131:2

conclude 124:13

concludes 117:16 137:24 189:23
212:23 299:4 319:17 371:19 412:10

conclusion 124:10 249:14 317:13
387:6 400:16

conditioned 386:13

conditioning 169:17

conditions 387:14

condone 364:3

conduct 25:9 50:19 305:11

conducted 51:15

confer 20:20

conferenced 271:7

confidential 18:1 19:1,20 20:1,25
21:1 22:1 23:1 24:1 25:1 26:1 27:1
28:1 29:1 30:1 31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1 39:1 40:1 41:1

42:1 43:1 44:1 45:1 46:1 47:1 48:1
49:1 50:1 51:1 52:1 53:1 54:1 55:1
56:1 57:1 58:1 59:1 60:1 61:1 62:1
63:1 64:1 65:1 66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1 74:1 75:1 76:1
77:1 78:1 79:1 80:1 81:1 82:1 83:1
84:1 85:1 86:1 87:1 88:1 89:1 90:1
91:1 92:1 93:1 94:1 95:1 96:1 97:1
98:1 99:1 100:1 101:1 102:1 103:1
104:1 105:1 106:1 107:1 108:1 109:1
110:1 111:1 112:1 113:1 114:1 115:1
116:1 117:1 118:1 119:1 120:1 121:1
122:1 123:1 124:1 125:1 126:1 127:1
128:1 129:1 130:1 131:1 132:1 133:1
134:1 135:1 136:1 137:1 138:1 139:1
140:1 141:1 142:1 143:1 144:1 145:1
146:1 147:1 148:1 149:1 150:1 151:1
152:1 153:1 154:1 155:1 156:1 157:1
158:1 159:1 160:1 161:1 162:1 163:1
164:1 165:1 166:1 167:1 168:1 169:1
170:1 171:1 172:1 173:1 174:1 175:1
176:1 177:1 178:1 179:1 180:1 181:1
182:1 183:1 184:1 185:1 186:1 187:1
188:1 189:1 190:1 191:1 192:1 193:1
194:1 195:1 196:1 197:1 198:1 199:1
200:1 201:1 202:1 203:1 204:1 205:1
206:1 207:1 208:1 209:1 210:1 211:1
212:1 213:1 214:1 215:1 216:1 217:1
218:1 219:1 220:1 221:1 222:1 223:1
224:1 225:1 226:1 227:1 228:1 229:1
230:1 231:1 232:1 233:1 234:1 235:1
236:1 237:1 238:1 239:1 240:1 241:1
242:1 243:1 244:1 245:1 246:1 247:1
248:1 249:1 250:1 251:1 252:1 253:1
254:1 255:1 256:1 257:1 258:1 259:1
260:1 261:1 262:1 263:1 264:1 265:1
266:1 267:1 268:1,10,21 269:1 270:1
271:1 272:1 273:1 274:1 275:1 276:1
277:1 278:1 279:1 280:1 281:1 282:1
283:1 284:1 285:1 286:1 287:1 288:1
289:1 290:1 291:1 292:1 293:1 294:1
295:1 296:1 297:1 298:1 299:1 300:1
301:1 302:1 303:1 304:1 305:1 306:1
307:1 308:1 309:1 310:1 311:1 312:1
313:1 314:1 315:1 316:1 317:1 318:1
319:1 320:1 321:1 322:1 323:1 324:1
325:1 326:1 327:1 328:1 329:1 330:1
331:1 332:1 333:1 334:1 335:1 336:1
337:1 338:1 339:1 340:1 341:1 342:1
343:1 344:1 345:1 346:1 347:1 348:1
349:1 350:1 351:1 352:1 353:1 354:1
355:1 356:1 357:1 358:1 359:1 360:1
361:1 362:1 363:1 364:1 365:1 366:1
367:1 368:1 369:1 370:1 371:1 372:1
373:1 374:1 375:1 376:1 377:1 378:1
379:1 380:1 381:1 382:1 383:1 384:1
385:1 386:1 387:1 388:1 389:1 390:1

391:1 392:1 393:1 394:1 395:1 396:1
397:1 398:1 399:1 400:1 401:1 402:1
403:1 404:1 405:1 406:1 407:1 408:1
409:1 410:1 411:1 412:1

**confidentiality** 268:19

**confirm** 94:20 161:16 174:21 199:20
272:15

**confused** 224:12 293:10,12 310:18
326:4

**confusing** 39:17 259:15 389:18

**connection** 38:20 39:10,18 50:20
51:16 53:6 58:21 91:11 144:21
216:23 305:9 324:10,15 377:20

**consent** 281:24 374:21 375:2 386:13

**considerable** 52:3 352:3

**consideration** 48:8 67:21 182:11
240:16 256:7 263:13,18 280:2 382:17

**considered** 122:13 215:12 321:25
322:11 345:19

**consistent** 53:23 54:11 130:10
136:17 184:12 221:11 222:8 233:2
234:18 345:9,10 360:7 386:7

**consolidated** 106:16,25

**constituency** 174:8

**constitute** 279:13

**constitutes** 279:9

**construct** 149:24

**consulted** 85:23 86:5

**consumer** 289:2 405:11,19

**contemplating** 181:13 352:14

**content** 41:12 202:9 360:12 362:8

**contents** 20:7

**context** 41:13 233:9 234:24 270:17

**continue** 28:4 37:20 64:10 65:20
66:5 69:4 118:6 147:12 264:15 269:2
304:25 332:23 400:8

**continued** 105:22 106:10 176:17
212:25 411:18

**continues** 171:12 178:7 268:24

**contract** 139:10 140:3 202:13
215:24 233:11 259:23 279:19,23
305:25 307:20 320:11 354:21 375:8,9
378:6 379:25 380:2 386:21 387:2
389:15,18 390:24 391:18 392:4,21

393:9 395:19

**contract's** 392:16

**contracts** 354:23,24 355:2 357:13,
25 358:4 359:22 390:15

**contractual** 187:11 345:14

**contradicting** 235:15

**contribute** 42:2

**contributed** 46:11 60:11,25 61:7,15

**contributions** 200:12

**control** 225:7 226:8 228:21 259:20,
21 334:9 335:7 338:15 350:16,23
361:22

**controlled** 334:7

**controller** 295:2

**controls** 292:11

**conversation** 42:9 136:10,12,13,14
205:14 259:11 326:5 336:4 375:15

**conversations** 62:6 101:7 105:20
132:19 133:6,17 134:20,23 135:20,22
145:10 146:22 204:21 327:10 328:22
337:13 350:14

**convert** 101:20 211:18 337:9

**converted** 211:17 374:11

**converting** 103:20 211:4 336:14

**Cool** 372:6

**cooler** 168:17

**copied** 388:20

**copies** 33:13 142:7

**copy** 24:2 33:6 37:6 254:12,16 412:4

**Cordry** 207:10,13 208:2,3,5,15 212:2

**core** 189:14

**Cornell** 137:15,18 138:8,9 143:24
189:16,19

**Corp** 367:4

**corporate** 59:10 367:5

**corporation** 367:14

**correct** 26:3 29:19 79:21 85:25 86:3,
7 140:9 162:22 184:24 202:21 204:5
209:10 210:3 214:7 227:6 235:24
240:7 244:8 248:18 272:5 287:3
295:14 301:14 327:16 333:3 347:18
352:23 359:11,13 378:18 379:7,23

399:6 402:18 403:4 409:19

**correctly** 233:19 366:15

**cost** 101:19 110:3,6 111:3 112:12
156:22 168:12 174:17 247:14 316:16

**costs** 110:25 112:22 162:11 168:13
189:11

**counsel** 40:14,20,25 41:3,9 46:17
60:17 63:6 117:6 143:3 146:18
148:21,23 149:5,20,23 150:14,25
151:8 152:24 204:19 208:8

**counted** 255:2 299:15

**counterparties** 341:22,23

**counterparty** 110:13

**coup** 189:3

**couple** 29:11,13 138:12 190:15
191:12 249:17 321:22 369:2 375:13
394:19

**coupon** 51:5

**coupons** 229:7

**court** 23:4,9 33:7,10 37:6,12 128:11
153:20 155:2 164:15 263:3 264:2
273:15 302:8 311:14 312:14 370:10
372:22 373:5 384:10 394:9

**Court's** 181:6

**court-ordered** 381:12

**cover** 46:3

**coverage** 143:10

**covered** 36:12 344:15,16 369:7
399:24

**CPA** 27:12 245:20 257:2

**craft** 144:6,25

**create** 57:5 274:19

**created** 56:7 64:8 68:14 69:11

**creating** 28:15 49:22

**creation** 60:12 61:2,15 62:18 396:4

**creative** 336:15

**credit** 287:22 336:2

**credited** 378:3

**creditor** 213:21 227:14 273:19
292:10 299:13 302:2 324:6 327:21
394:8,13 406:17,22

**creditor-owned** 334:11

**creditors** 18:6 123:9 125:23 129:25
133:12 135:18 174:17 242:16 284:7
285:10 291:25 292:5,8,17 293:2,23
298:23 317:9,18 318:3,7 320:22
327:11 328:3 331:5,14 334:7 337:16
350:8 411:8

**creditors'** 38:18 356:19

**credits** 27:14

**Crews** 213:16,20 217:6,11,14 218:9,
19,22,23 222:15 231:3,25 232:14
235:4,7 246:23 254:10,15 264:4,10,
17 269:3 273:3,16,17 297:14 298:8
300:17 325:19 344:16

**criterias** 377:25 378:7

**critical** 170:20

**cross** 35:7

**crushed** 160:7

**crypto** 31:8,16,23 32:7,24 33:3 103:5
209:3 232:20 234:4 240:17 245:5,6
247:12,23 249:8 256:20 257:8,17
260:7 262:8 335:3,14 376:16 404:17

**cryptocurrencies** 70:16,21,22 71:5,
22 90:10 95:10 96:7,20 118:20
193:14 291:8 314:11

**cryptocurrency** 31:20 48:7,9,12
51:7 66:23 84:19 89:18 97:3 98:25
102:21 103:19,23 105:10,25 140:23
141:12,18 142:12 157:17 178:18,25
191:9 211:5 224:16 310:5 320:13
378:21

**cryptocurrency-by-
cryptocurrency** 73:8

**Cryptolark** 264:18

**crystal** 62:7 115:15 133:24 220:6,23
280:23,24 283:11 291:10 335:5

**cue** 23:6

**curious** 129:15

**currency** 96:7 208:20,22 211:16
251:6

**current** 125:15 177:25 267:14
273:25 309:23 326:9 333:8 339:23
367:9

**cursory** 43:19 355:21

**curtail** 156:19

**curve** 399:11,17

**custodian** 334:25 335:2,18,20

**custodied** 215:10

**custody** 55:25 56:7,18 57:6,14,19,
20,21 58:19,22 59:8,10 60:6,12 61:2,
7,15 62:18 64:9 68:13,16 69:11 92:11
104:24,25 116:7,12 145:8,23,25
162:3,9 182:18,25 183:5,6,9,18,20
209:22,23 210:6,14 211:2,13 215:6,
19 277:6 278:2,10 296:15 321:24
322:10 335:6,12 341:20 345:12
352:22 353:8,10 358:13,21,22,25
360:6 396:4,14,24 397:15 398:9,12,
14,15,18,25 399:16,20 400:6,7
402:23,25 403:4,9,12,18,23,24 404:5,
16,21 405:4,6

**customer** 53:24 54:12 57:18 59:16
60:8 65:13,20 66:13 67:23 71:4 98:6
99:23,24 103:8 104:19 116:8 120:9,
12 131:4 132:25 163:6 182:3 185:6
193:12 196:6,7,22 210:18 215:12,18
220:5 221:24 222:23 223:6,7,10,15
224:4,14 225:15 236:9 237:22,25
238:10,19,25 239:8,14,17,22 251:4,8
253:24 254:3,7 256:16 258:19
259:15,24 276:9,11 279:20,24
284:18,24 286:17,18 291:7,21 322:9
345:15,17 348:17 353:9 355:8,13,25
356:8 359:4 375:14 376:11 385:22
390:22 391:21 396:19 399:10 406:3

**customer's** 239:14 383:12

**customer-facing** 301:12

**customer-owned** 335:18

**customers** 18:19 48:14 70:14 76:11
77:8 81:6,9 91:10 99:2 104:9 116:16
127:24 130:9 131:3,14 147:17,23
181:15 185:5,9 193:10 198:5,13
199:2 201:10 219:24 222:24 226:24
227:6 228:14 229:24 230:19 232:11
233:19 234:6,7,11 237:20 250:23
254:19 255:22 256:18 276:7,19
277:20 280:25 281:3 282:11 285:2
286:3,11 288:15 291:2,11 297:20
307:3,6 317:9,18,20,25 318:2,3,6,8
322:6 328:23 331:5 334:16 335:7
348:14 355:18 357:21 366:15,20
375:12 385:13 396:12,15,17 397:9,12
398:5,18 403:3,22 410:14

**customers'** 256:24 314:2

**customers-ish** 50:2

**cut** 24:24 90:5 110:24,25 115:2

**cutting** 107:19 111:11

**cycle** 169:15

---

**D**

**D-A-N-I-E-L** 368:24

**daily** 74:13 160:10

**Daniel** 232:6 261:20 368:24

**dark** 371:9

**data** 99:16 100:13 193:20 197:6,16
370:14 373:2

**date** 34:11 37:18 65:22 85:19 86:13
87:22 88:5,21,24 89:22 91:7,20 92:14
100:21 101:14 102:5 105:5,9,23
120:10 140:7 146:5 156:16 157:9,14,
18 158:12 165:25 166:3 170:8 175:23
176:15 177:24 181:12 186:13 195:20
237:14 312:15,25 313:24 337:23
369:19 372:11

**dates** 97:6 313:10 369:7

**Davis** 263:24 264:18

**day** 102:8 144:14,15 167:21,24
228:20 249:19 272:22 274:18 310:18
315:9 320:24 352:5 357:16 398:24

**day-to-day** 308:7

**days** 39:7 46:6 127:2 245:21

**de** 159:12,22 189:3 406:20,21 407:3,
24 408:4 410:25

**de-risk** 60:2

**deal** 33:22 61:25 116:14 336:9

**dealing** 63:13 218:14

**deals** 327:24

**debating** 195:9

**debt** 109:25 110:5 234:14 235:13
310:25 374:17

**debtor** 112:17 158:9 159:5 163:14,19
165:21 166:4 174:3,19 207:19 302:22
303:6,12,23 313:25 315:22 330:6

**debtor's** 300:21

**debtor/stakeholders** 131:20
132:12

**debtors** 38:19 43:15 76:10 79:8 91:7
92:5,14,15 100:22 101:13 102:2,4,19
103:23 104:18 105:6,21 106:12,17
107:5,14 108:24 109:6,11,15 111:23,
25 122:11,19 123:10 124:9,17 125:7

126:4,6,8,20 127:4,13 131:22 133:6
143:6 157:8 158:18 159:21 164:9
165:5,11 166:12 170:25 171:7 172:14
176:12 278:23 281:17 307:15 312:15,
25 313:10,12 314:20,21 316:2,4
317:6 320:9,14 409:14

**debtors'** 37:7,14 38:16,20,23 69:22
70:7 72:6 76:12 92:10 111:2 165:12
173:18 205:23 301:5 303:24,25
311:13

**decade** 405:24

**decades** 32:11 141:4,21 234:2

**decent** 288:8

**decide** 115:6 232:20 393:23

**decided** 172:4 236:15 248:4 278:5

**decision** 32:9,25 64:19 112:12
226:22 243:8,10 275:3 330:15,21
339:14 404:2,13,23 405:9

**decisions** 74:3,22,24 274:4,7,21
313:18 354:2 365:25 396:22 404:24

**deck** 137:14

**declarant** 34:25

**declaration** 24:2 26:8,9,10 33:7
34:9,21,24 35:3,12,19,22 36:12,24
46:3,10 47:13 78:15 79:20,23 83:16
97:19,20 106:5 165:10 236:6 243:15
326:12 360:7 376:23,24 377:6 386:11
395:14 398:24 409:12

**declarations** 24:16 26:2,6 144:16
342:7

**declaring** 292:15

**declined** 230:16 231:14

**decrease** 112:18 168:19 249:5

**decreased** 245:7

**dedesignating** 20:22

**dedicated** 95:19

**deem** 240:8

**default** 65:13 232:18

**defending** 18:24

**defenses** 320:10 321:8,9 360:19

**defer** 356:21

**Defi** 71:21 110:12 112:20 309:11,21
311:4 318:14,21,22 319:9 349:13
369:23 370:15 372:15 373:4,24

**374:2,4**

**deficiencies** 269:6

**deficit** 243:16 248:13

**define** 286:24 287:8 400:12

**defined** 402:12

**definition** 245:15 246:7 248:6,12
287:12 288:19

**definitions** 244:18

**degree** 27:6,7

**delay** 127:5,14 205:21

**Delays** 127:23

**deletions** 282:7

**deliver** 191:19

**delivered** 219:2

**delivering** 219:5

**deltas** 215:3

**demand** 160:15 169:7,16 288:2
290:10 291:7

**demographic** 52:6

**denomination** 90:21

**department** 152:13,14 190:12
259:12,13 287:2

**departments** 295:13

**depend** 169:4

**depended** 278:22

**depends** 175:3 176:7

**depleted** 265:12

**deploy** 43:12 45:21 69:23 70:8,16
71:21 72:7 73:4 98:23 99:7,20 112:20
177:8,10,15 284:23

**deployable** 73:6

**deployed** 45:9 98:24 118:23 353:6,
10 355:14

**deploying** 70:4 73:19 252:18

**deployment** 70:17 72:14 73:3 74:14,
22,23 75:5,8 76:13 77:23 122:4
144:22 163:9 240:2 278:22 309:12,13
314:18 345:2 365:13

**deployments** 93:12

**depo-** 143:25

**deposed** 21:12,16 206:10

**deposit** 182:4 213:23 229:5,11,15
230:16 231:11 257:22 258:20 316:8

**deposited** 104:9 118:16 223:10,16
231:12 240:22 241:8 251:24 276:7,
10,17 301:7 314:3,22 355:25 356:7

**depositing** 257:20

**deposition** 18:11,24 19:23 20:6,16
22:19 24:14 25:10 26:14 37:8,16
38:9,19 39:9,13,14,19,22,25 42:8,16
44:18,23 79:24 134:12 137:5 138:16
143:23 144:5 205:16 268:25 298:24
320:4,19 321:4 324:20 327:12 357:11
360:8 365:7 377:8 411:11 412:11

**depositions** 21:17 22:9 46:9

**depositor** 343:10

**depositors** 246:14 292:16

**deposits** 91:10 157:4 207:21 208:19
277:11 322:13,14,15,23,24 336:14
344:24 345:8,18 347:17 399:21 400:7
401:8,17 402:16,24 403:7,11,17

**depreciation** 257:5

**deputies** 153:14

**derivatives** 287:14

**describe** 26:17 41:11 136:11 214:19
215:3 333:7 339:22 375:25

**describing** 99:6 363:18

**description** 72:18

**designate** 19:19 21:3

**designated** 268:10,20 380:25
381:13

**designations** 268:19

**designee** 331:15

**detail** 173:12 280:19 355:22 394:24

**detailed** 196:25

**details** 78:3 202:3 215:2 219:18
231:8 283:7 305:5 395:13

**determine** 69:2 98:9 188:15 225:12
333:23 358:10

**determining** 69:23 70:8 72:7 176:9

**detriment** 237:3,7 251:8

**Deutsch** 46:18 150:23 152:23

**developing** 28:16 29:15



23 412:5,6

**e-mailing** 375:7

**e-mails** 220:13,16 284:20

**earlier** 50:23 85:22 140:17 142:21 143:13,18 144:20 151:16 158:7 161:2,16 178:19 183:24 184:15,21 210:16 215:20 221:20 227:5 240:7 282:15 298:8 300:17 307:24 322:20 325:19 327:12 396:10 399:25 400:5 403:17

**early** 48:23 107:23 108:20 112:11 158:20 172:2 177:17,21

**earmarked** 188:3

**earn** 38:23 48:3,5,6,10,15 49:11,16, 21 50:3,13,20 51:16 52:6 53:6,11 55:22 57:19 58:19,21 59:14 61:14 63:20 64:11 65:4,6,11,12,19,21 66:7 67:8,14,15,17,22,24 68:12,16 69:5,24 70:9,15 72:8 76:11 77:8,23 84:16 85:17 86:13 87:22 88:4 91:11,18 103:12 104:10 105:3 115:24 116:8 120:9,11,14,16,25 121:10 200:3,15 209:18,22,24 210:5,20,21,23 211:6 241:11,19 252:2,11,13 253:10 277:6 278:10 279:6,12 290:8 302:24 314:2, 3,20,21,23 322:2,9,12,21,22 328:4 331:15 336:2,11,14 337:6,8 344:24 345:8,18 347:17 348:14 352:20 353:6,13,21 354:20,23 355:3,8,12,14 358:12 359:2,5,17 360:5 366:5 377:16 378:19,20,23 379:22 382:19 383:2 385:23 386:11 396:10,12 397:2,3 398:3,18 399:3,4,14,21 400:9 401:9,17 402:16 403:7,11,20,24 404:3,6,20

**earned** 121:4 256:7 301:7 345:12 385:15

**earnest** 177:22

**earning** 252:4 256:3 257:9,10 379:5 383:13

**ease** 169:15

**easier** 118:6 371:4

**easiest** 109:22

**easy** 247:19 369:6

**ECF** 154:10 320:8

**echo** 315:19 400:4

**economics** 26:23,24

**Ecuador** 29:12,15 31:4,7,10 61:9 214:15 249:23 308:4

**Ecuadorian** 29:12

**edited** 360:12 361:9,10

**editing** 361:2,21,24 362:10,19 363:15,19 364:7

**edits** 361:7

**educated** 140:25 142:3

**educational** 26:18 140:19

**effect** 375:10

**effectively** 28:11 49:3,6 101:19 103:19 109:3 110:6 155:23 162:8 168:12 171:10 181:21 185:6 361:6

**effectuate** 278:24

**effort** 188:21 193:4 266:9 267:7

**efforts** 185:13 188:9 192:13 221:11 263:14 340:24 341:13,25 342:12 343:9 348:23,24 349:2

**EFH** 96:9 97:5,7,10

**eggs** 60:4

**elect** 290:8 377:15 382:25

**electricity** 168:15

**electrification** 177:20

**electronic** 304:10

**eligible** 289:24 290:7,13 341:19,22 377:14,24 382:18,25 383:4,8

**eliminate** 180:6

**Ellis** 24:21 25:2 34:18,20 35:12 36:2, 5,13,23 40:21 46:15 142:22,25 143:5 148:21 205:6 339:4 369:18

**embedded** 267:2

**emphasis** 281:25

**employed** 145:4,19 146:5,13 149:14 150:7 151:3,9 152:7,9,10,12 153:4,6 214:11

**employee** 166:23

**employees** 110:21,22 132:23 136:2 152:11,12 166:6 172:22 203:21 204:6 266:12 277:5 278:4

**employer** 295:7

**employment** 140:20 166:25

**enacted** 235:25

**encourage** 229:18 321:2 329:11 331:8 335:25 337:3 338:18 355:23 357:19

**encouraging** 337:16

**end** 20:21 61:25 106:22 126:18 133:13 136:25 137:4 176:11 177:5 268:17,25 292:14 298:24 315:9 370:8

**ended** 373:3

**ends** 296:3 406:13

**energy** 156:22 168:23 169:3

**engage** 186:21

**engaged** 187:3 329:22 340:7

**engineers** 171:17

**England** 215:12

**English** 81:10,17,23,25 82:11,15,19, 20

**enjoy** 241:20

**enjoying** 252:18

**entered** 305:24

**entering** 382:20

**enticed** 399:5

**entire** 19:19 28:12 35:21 95:22,24 117:3 150:8 268:9,21

**entirety** 391:11 392:21,22 393:8,9

**entities** 20:4 163:20 165:21 204:3 309:10,19 311:6 312:2

**entitle** 378:2

**entitled** 20:5

**entity** 89:6 107:2 126:17 160:17,19 161:6 163:15,24 164:15,16,17,20 165:3,5,8 193:24 308:25 311:20

**entries** 87:2 205:23

**entry** 38:21 121:21 174:15 253:7 265:16 267:9

**equity** 139:2 173:7 244:23 310:25 316:13,24 352:12

**equivalent** 211:16

**ERC20** 88:3

**escapes** 76:15

**essentially** 211:16 248:9 256:14

**establishing** 38:22

**estate** 108:12 110:3 111:2 123:3,8 125:22 127:24 131:17 133:14,22 163:11 173:19 174:5,17 176:10 178:7 181:24 192:15 236:16 239:5 242:14 251:15 260:15 271:23 274:20 275:2 291:25 292:24 293:18 294:10 307:15 319:12 323:19 328:11 332:13 333:24 338:13,17 339:3,17,18,19 351:22 352:4 362:8 363:24

**estimate** 157:16 160:25 161:8 167:20,25

**estimated** 180:2 237:18

**estimation** 96:18 161:6

**et al** 309:24

**ETH** 49:5 71:20 94:14 97:8 179:22 182:14 213:24 314:16 373:7

**Ethereum** 214:2 373:7

**ETN** 348:7

**event** 238:20 243:12 255:17 256:10 257:7,15 258:11 260:17 380:20

**events** 50:25 271:12,15 291:4,5 343:16 346:3,21 349:4 380:15,16 387:10 391:2 398:13

**everyone's** 384:9

**evidence** 295:19 395:9

**exact** 90:17 341:11

**exam** 27:11 257:2

**EXAMINATION** 138:7 190:6 207:12 213:15 273:21 300:6 302:20 324:23 369:3 394:16 407:2

**examiner** 184:13

**examiner's** 249:25 250:3,18

**exceed** 245:13 246:19

**Excellent** 364:10

**exceptions** 386:20

**excerpts** 217:4

**excess** 73:2,5

**exchange** 101:16,17 215:7 276:9 378:8

**exchanging** 276:19

**exclude** 40:10 60:15 63:4 104:25 146:17

**excluded** 210:6

**excluding** 116:12

**exclusive** 302:23 303:7

**exclusively** 148:4 172:23,24

**exclusivity** 330:9,12,16

**Exco** 152:22,24

**excuse** 65:7 93:23 211:7

**execute** 133:21

**execution** 176:10

**executive** 30:22 152:25 315:23 361:19

**executives** 74:15 274:6 338:19

**exercise** 99:17 100:14 365:20

**exhibit** 24:10 33:11 34:5,8 37:9,14 47:13 78:16 85:2 222:2 254:14

**exhibits** 37:4 38:8

**exist** 83:25 219:11

**existence** 87:9

**existing** 88:16 403:17 409:15

**exit** 108:25 113:25 114:14 116:3

**expand** 62:25

**expect** 20:23 52:8 53:14 54:2 147:11 155:7 276:11

**expectation** 201:7

**expected** 156:6 365:14

**expecting** 178:11

**expenditures** 102:16

**expense** 102:12 110:20 177:6 185:21

**expenses** 93:5 96:3 110:24 111:11 164:10 165:14 168:2,7,18 169:20 174:4 176:24 208:18,21,23

**expensive** 110:2,6 156:23 158:25

**experience** 31:19 55:5 140:23 142:20

**expert** 80:9 100:9 118:25 119:7 144:25 215:2,21 216:7 237:16 258:5 261:3 284:4 306:8 350:14 358:18

**explain** 39:15 56:10 96:24 101:12 140:24 152:17 155:23 161:23 235:18, 24 254:19 265:15 270:24 279:8 373:23

**explained** 136:15 147:16 234:12

**explaining** 195:3 262:22

**explicitly** 233:12

**explore** 331:10

**exploring** 134:18

**expressly** 282:4 386:13

**extend** 161:3 330:15

**extended** 165:6 358:9

**extent** 40:23 52:14 58:14 60:17 66:19 72:11 134:7,15 150:19 219:15 247:7 250:12 257:25 260:11 262:24 263:9 265:22 267:16 269:20 270:11 280:11 307:23 312:21 313:6 349:11 350:11 353:2 355:5 360:21 370:18 373:18 385:19 387:7 401:20 405:16 408:19

**external** 63:11 187:23 377:23 379:3, 5

**externally** 136:17

**extracted** 269:9

**extreme** 31:12 328:16

**eye** 114:7

---

### F

**f-** 277:7

**F-R-I-S-H-B-E-R-G** 368:25

**Facebook** 187:5 188:4 262:16

**faced** 106:10

**facility** 64:25

**facing** 43:15 63:14

**fact** 32:8 78:21 226:12 261:8 317:21

**facts** 307:17

**fail** 343:25

**fair** 22:16,25 91:25 150:13 165:10 166:2 173:15 182:24 227:22 252:3 260:7 275:10 285:23 294:24 351:9 367:23 384:20

**fairly** 236:17 287:7 369:6

**fairness** 334:14 338:9

**familiar** 21:17 89:9 144:24 145:3 146:24 147:6 149:8,16 151:11,18 153:23 154:9,18 159:12 160:16,18

166:13,21 167:3,10,18 169:19 170:3,
12,18,20,22 173:6 179:4,10 180:20
216:10 223:25 229:4 232:2 261:7
262:7 263:23 269:13 306:10,12,13,
15,18 325:4 340:23 342:5 356:5,6
357:13 407:5,12,17 408:11,21

**family** 31:4

**farm** 61:8

**farmer** 29:17

**farms** 29:12,15 31:10 308:3

**fascinating** 31:9

**fast** 127:23 376:21

**fault** 65:7 107:19 190:18 239:14,16,
22

**FDIC** 228:13

**feature** 224:2

**featured** 385:18

**February** 106:22

**federal** 169:5 204:3,22

**fee** 208:12

**feedback** 35:9

**feel** 22:7 40:25 63:6 107:18 218:18
260:7 320:2 321:2 334:3

**fees** 102:13 105:10 158:6 189:12
227:2

**fellow** 227:13

**felt** 396:13

**ferraro** 18:1 19:1,11 20:1 21:1,9 22:1
23:1,25 24:1,13 25:1 26:1 27:1 28:1
29:1 30:1 31:1 32:1 33:1,10 34:1,8,9,
13 35:1 36:1 37:1,9,14 38:1,11 39:1
40:1 41:1 42:1 43:1 44:1 45:1 46:1
47:1 48:1 49:1 50:1 51:1 52:1 53:1
54:1 55:1 56:1 57:1 58:1 59:1 60:1
61:1 62:1,8 63:1 64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1 72:1 73:1 74:1
75:1 76:1 77:1 78:1 79:1 80:1 81:1
82:1 83:1,7 84:1,12 85:1 86:1 87:1
88:1 89:1 90:1 91:1 92:1 93:1 94:1
95:1 96:1 97:1 98:1 99:1 100:1 101:1
102:1 103:1 104:1 105:1 106:1 107:1
108:1 109:1 110:1 111:1 112:1 113:1
114:1 115:1 116:1 117:1,8,23 118:1
119:1 120:1 121:1 122:1 123:1 124:1
125:1 126:1 127:1 128:1,8 129:1
130:1 131:1 132:1 133:1 134:1 135:1
136:1 137:1,2 138:1 139:1 140:1

141:1 142:1 143:1 144:1 145:1 146:1
147:1 148:1 149:1 150:1 151:1 152:1
153:1 154:1 155:1 156:1 157:1 158:1
159:1 160:1 161:1 162:1 163:1 164:1
165:1 166:1 167:1 168:1 169:1 170:1
171:1 172:1 173:1 174:1 175:1 176:1
177:1 178:1 179:1 180:1 181:1 182:1
183:1 184:1 185:1 186:1 187:1 188:1
189:1 190:1,14 191:1 192:1 193:1
194:1 195:1 196:1 197:1 198:1 199:1
200:1 201:1 202:1 203:1 204:1 205:1
206:1 207:1 208:1 209:1 210:1 211:1
212:1 213:1 214:1 215:1 216:1 217:1
218:1,11 219:1 220:1 221:1 222:1
223:1 224:1 225:1 226:1 227:1 228:1
229:1 230:1 231:1 232:1 233:1 234:1
235:1 236:1 237:1 238:1 239:1 240:1
241:1 242:1 243:1 244:1 245:1 246:1
247:1 248:1 249:1 250:1 251:1 252:1
253:1 254:1 255:1 256:1 257:1 258:1
259:1 260:1 261:1 262:1 263:1 264:1
265:1 266:1 267:1 268:1 269:1 270:1
271:1 272:1 273:1,23 274:1 275:1
276:1,5 277:1 278:1 279:1 280:1
281:1 282:1 283:1 284:1 285:1 286:1
287:1 288:1 289:1 290:1 291:1,22
292:1 293:1 294:1,2,11 295:1 296:1
297:1 298:1,9 299:1 300:1,8 301:1
302:1 303:1 304:1 305:1 306:1,22
307:1 308:1 309:1 310:1 311:1 312:1
313:1,16 314:1 315:1 316:1 317:1
318:1 319:1 320:1 321:1 322:1 323:1
324:1,5 325:1,2 326:1 327:1 328:1,14
329:1 330:1 331:1 332:1 333:1,13
334:1 335:1 336:1 337:1 338:1 339:1
340:1 341:1 342:1 343:1 344:1 345:1
346:1 347:1 348:1 349:1 350:1 351:1
352:1 353:1 354:1 355:1,20 356:1
357:1,11 358:1 359:1 360:1 361:1
362:1 363:1 364:1 365:1 366:1,13
367:1 368:1 369:1 370:1 371:1 372:1
373:1 374:1 375:1 376:1 377:1 378:1
379:1 380:1 381:1 382:1 383:1 384:1
385:1 386:1 387:1 388:1 389:1 390:1,
5,7 391:1 392:1 393:1 394:1,18 395:1
396:1 397:1 398:1 399:1 400:1 401:1
402:1 403:1 404:1 405:1 406:1 407:1
408:1 409:1 410:1 411:1,13 412:1

**Ferraro's** 129:22

**fiat** 84:20 100:23 101:11,18,20,23
102:9,10,18 103:5,21,24 104:7
141:17 180:10 200:13 208:20,22
209:4,6,15 211:16 232:10 256:5
366:16,22 374:12,17

**field** 27:14

**fields** 308:3

**fight** 251:15 338:17,19,20 339:4

**fighting** 181:16 242:20 274:19

**figure** 176:4 206:23 271:14 357:15

**figured** 213:19 336:9

**figures** 168:3

**file** 155:6 248:4 312:13

**filed** 128:9,10 154:10,20 155:2,8,11
203:25 208:11 236:15 244:4 278:18
313:23 326:11

**filing** 105:9 222:3 243:24 245:10
248:13 251:14 265:14 270:5 320:7
374:4

**filings** 263:3 264:2 284:17 370:10
372:22 373:5

**fill** 231:18

**final** 323:2

**finance** 27:2 28:14 29:16 88:14
159:6 166:9 295:12 361:5

**financer** 158:19

**financial** 28:10,11,21 30:4,18,23
32:18 151:15 157:8 191:23 203:7
294:17 296:19 306:2 342:9

**financiers** 158:19

**financing** 109:25 110:2,5,14 111:14,
19 112:14 113:18 158:10,11,17

**find** 33:25 206:15,17 301:2 341:11,14
351:2 357:9

**findings** 56:20

**fine** 159:20 199:24 253:18 359:14
368:9 371:2 388:19

**finish** 62:22 82:17 88:19 90:6 284:12
285:17 294:4 306:24 402:5

**finished** 108:15 137:7

**Fireblock** 162:21,23

**Fireblocks** 163:8,12 164:2 171:19
172:4 178:19 180:23 181:7 183:17
193:15 209:15 374:8,19

**firm** 28:12 149:9,13,16 186:23
187:12

**firms** 150:2 151:13

**first-day** 236:6

**first-hand** 361:8

**first-name-basis** 206:19

**firsthand** 186:10

**fits** 141:13

**five-minute** 189:21

**Five-plus** 28:23

**flexibility** 31:3

**floor** 393:3

**flow** 43:14 45:6,7 154:12 156:12,15, 18 159:25 160:10 166:10 167:10 176:2 346:24 347:14

**flows** 143:14 157:2 175:2

**flurry** 374:14

**fly** 22:10 392:25 393:3

**focus** 58:17 147:5 203:18 270:23 338:8

**focused** 46:7 123:25 203:22 204:6 221:19 271:22

**folks** 20:15 46:13,16 75:20 119:24 153:8,15 166:8,9 191:11 410:19

**follow** 34:2 75:9 181:5 190:14 192:17 266:18 267:17,19 268:2 300:16 326:17 331:21 408:25

**follow-up** 138:13 184:20 326:15 344:17 358:6 359:20

**font** 388:21

**forecast** 154:22 155:15 156:4

**forecasting** 296:19

**forego** 177:12

**forensics** 188:23

**forever** 222:7

**forfeit** 230:16

**forgiven** 140:4

**forgot** 402:7

**form** 30:12 32:2,21 35:14 36:8 42:25 44:11 45:16 49:14 50:15 51:18 52:21 53:8 54:7,19 55:13 56:9,22 58:3 60:14 61:18 63:3 64:16,21 65:16,24 66:9,18 67:10,19 68:4 69:13 70:2 72:10 74:5 75:13 76:3,15 77:10,25 81:3,12,19 82:3 87:5 88:8 89:12,16, 25 90:15,23 91:14,22 92:18 93:19 94:5 98:13 99:14 104:3,12,21 109:18

113:7 115:11 116:5 119:13 120:22 121:17 122:2,24 123:18 124:22 126:10,24 127:8 128:14 130:16 131:9 132:15 134:6 135:5,12,25 143:21 146:16 148:6 150:18 155:18 159:9,17 161:19 162:18 163:2,17 164:12 166:17 167:14 168:21 170:16 171:4, 24 172:17 173:3,10 174:10,24 175:22 178:21 179:8,15 180:25 182:6,20 183:14 184:10 185:2,16 186:3,25 188:12 196:2 198:10 199:6,15 200:6, 23 201:13 204:10 205:3 206:5 211:23 214:23 215:15 216:2 219:14 220:3 221:14 222:12 223:3,22 224:7,18 225:19 226:17 228:2 229:22 230:23 231:6,21 233:5,23 235:20 236:3,22 237:10 238:4,13,23 240:13 241:4 242:2 243:2,21 244:10 245:17 247:2 248:20 250:10,25 251:21 252:7 253:21 254:17,22 255:25 256:22 257:24 259:7,18 260:10 261:12,25 262:11 263:7 264:24 265:19 266:23 267:13 269:16 270:9 271:17 272:18 275:24 276:14 277:9,14,23 278:12 279:16 280:8 281:10 282:17 283:21 285:19 286:14 287:11 288:12,22 289:12 290:20 292:19 293:8,25 296:9 297:7,22 303:3,15 305:14 306:6,21 307:20 308:12,18,22 309:6,16 310:2, 12 311:16 312:20 314:25 317:13,23 318:16 319:5 322:18 325:12 326:2 327:3 328:8,25 329:17 330:18 331:18 332:8 337:25 338:22 339:6 340:2 342:14,20 343:14 346:18 347:6,20 348:2,11 349:8 350:3,10 351:6,12 353:15 354:13 355:5 356:4,10,23 358:15 359:19 360:2,17 361:16 362:3,5,12,15 363:2,9 364:23 365:5 366:12 368:4 369:11 370:3,17 372:17 373:14 378:11 379:9,16 380:7 381:10,16 383:16 387:5,22 389:14,25 390:14 391:14 392:14 393:17 397:24 398:20 399:8 401:19 402:3,20 403:14 404:9 405:15 407:8 408:18 410:4

**formal** 274:13 279:4,9,13 280:6

**formation** 307:20 320:11 360:18

**formative** 69:18

**formed** 124:10

**forming** 285:12

**forms** 178:17 254:20 297:17,20

**forward** 204:7,25 205:14 320:21 329:7 330:13 333:10 335:21 350:17

**found** 31:8 39:16 405:24

**foundation** 65:25 88:8 217:8 250:10

**founders** 261:19

**four-plus** 399:15

**FP&A** 287:3,5 295:12

**fraction** 103:22 104:8

**fractional** 253:10

**framework** 72:24 333:14

**frameworks** 118:22

**franchise** 247:9

**fraud** 320:14 360:19

**free** 22:7 40:25 62:13 63:7 218:18 226:15,21

**freed** 374:6,7

**freeing** 369:23 372:15

**freeze** 88:17 354:15,16,17 381:23 382:10

**frequently** 101:25 102:4

**fresh** 125:6

**frictional** 200:19,25 201:4,6,11

**Friday** 25:13 39:6,24

**Fridays** 31:14

**friends** 299:14

**Frishberg** 368:23,24,25 369:4 370:20,23 371:13 372:2,6,7 375:19, 23 378:14,15 379:12 383:20 384:3, 11,20,22 390:6 393:24,25 394:6

**front** 24:3 79:22 115:21 157:15 168:3 228:8 280:9 283:4,5 284:13 290:21 304:5 305:15,18 310:4,8 312:11 341:9 356:11,13 359:12 367:12 373:21 376:19 377:2,8 378:12 380:8, 14 381:17 383:17 387:12 390:16 392:5

**front-to-back** 343:20

**frozen** 238:9 381:25

**fruits** 352:16

**FTX** 369:22 370:13 372:14,25 373:8

**fulfill** 382:13 400:9

**fulfilled** 27:13

**full** 21:23 269:18 302:23 303:7 319:25 340:8 385:17 389:16 395:5

**fully** 311:12 320:15 389:18

**fulsome** 63:13 395:13

**functioning** 204:24 278:21

**functions** 192:6

**fund** 93:8,10 103:14 104:15 109:22 110:11,15 113:12 161:14 164:22 165:13,16 170:9 174:22 175:19 176:5,17,20 178:2 189:6,14 200:10 314:20

**funded** 109:24 164:17 169:20 170:4,5 172:24 208:18

**funding** 164:19 165:24 171:7,11 172:19 174:14 175:8,19 178:8,13

**funds** 51:5 61:14 169:6 185:5 199:3 200:2,11 211:20 230:8 232:19 236:19 239:3 241:17 246:14 314:3,22 336:16 344:20 349:23 362:8 379:21

**fungibility** 315:5

**fungible** 71:7 98:7 119:4 200:8 211:10 314:7,13,17 315:20 316:13 317:2

**furnish** 111:8

**future** 159:4 192:14 274:8,25 335:14 398:14 406:9

**futures** 287:15

**fuzzy** 302:5

---

**G**

**G-U** 206:20

**gains** 346:23 347:3

**Gallagher** 227:9

**game** 334:9

**gas** 105:10

**gather** 274:3

**gating** 114:19 116:17 392:19

**gave** 153:19 170:8 204:13 230:10 236:11 402:14

**gears** 69:17

**general** 46:17 62:3 86:11 101:4 103:11 145:3 150:25 151:8 152:24 157:17 160:13 165:15 182:22 183:22 191:9 208:7 210:13 287:6 288:18 328:20 358:5 376:2,7,8

**General's** 190:10

**generally** 52:9 151:13 154:18 160:18 194:12 234:5 280:11 376:7 379:24 381:12

**generated** 165:12 297:20

**generic** 273:24

**Github** 217:15

**give** 33:12 34:4 35:9 44:14 55:6 56:25 58:16 71:5 72:23 107:9 114:24 138:20 161:12 168:12 219:21 237:2 242:15 253:2 258:23 260:15 267:25 271:11 275:17 284:7 293:22 339:15 347:24 351:17 366:21 375:20 385:8 389:24 397:2

**giveaways** 271:7

**giving** 66:23 227:19 257:14 258:25 259:22 260:14,21 261:4 303:20 318:14 336:15 356:12

**GK8** 160:17,19 161:5,12 164:16,20,25 165:7 171:2,6,8,12,20 172:8,10 173:8,17 174:13 178:2,3,9,13,15,23,25 179:2

**glasses** 218:21 384:16

**global** 28:12

**glove** 35:2,5

**go-forward** 274:21 334:14

**goal** 22:20 123:6,20 124:24 406:8

**Golding** 46:19,24,25

**Golding-ochsner** 151:17

**Goldstein** 120:2

**good** 18:2 19:7,9 27:16 47:22 84:10 119:21 122:5 142:16 212:10,15 229:2 266:4 274:25 300:8 302:9,15,17 335:10 364:6 368:11 373:25 398:16

**Google** 187:5 188:4

**governance** 340:13

**governed** 390:9

**governmental** 204:3

**grace** 189:4

**graduate** 27:5,7

**grandfathered** 64:13 403:19,20 404:3

**grandfathering** 353:12,22,24 404:12

**grant** 382:22

**granted** 159:14 164:14

**granting** 38:25

**great** 24:7 31:16 136:23 174:16,17 194:8 196:24 212:16 221:25 300:2 301:19 306:25 324:8,17 327:18 334:16 347:2 404:18 405:4 410:11

**greater** 248:8

**grew** 228:4 365:21

**gross** 364:22

**ground** 21:15 22:5 97:17 191:15 399:24

**group** 153:12 208:9

**groups** 327:21,25 328:5,23 331:14 336:2

**grow** 230:5 406:5

**growing** 316:24

**growth** 139:23 316:22

**guarantee** 292:13

**guaranteed** 139:16,18

**guards** 172:11

**guess** 104:5,16 114:10 182:18 187:7 200:19 202:7,20 204:8 207:10 208:20 229:3 263:5 266:11 270:3 320:25 327:9 329:12 348:22,24 375:10 377:9

**guessing** 154:8

**Guillermo** 120:3 206:11

**Guillermo's** 206:13

**Gump** 148:22

**GUSD** 88:20 312:6

**guy** 168:24 191:18 206:19 262:18 338:9 361:5

**guys** 134:17 194:8 284:7 321:12,15 372:3

---

**H**

**H-E-R-R-M-A-N-N** 324:7

**H-O-F-F-I-N-G** 394:15

**habits** 366:19

**hair** 370:22 371:5

**haircuts** 336:10

**half** 28:2 96:5 139:16,19 178:4 205:8 238:19 373:6

**halfway** 82:25

**halt** 380:2

**hand** 35:2,5 157:24,25 169:22 170:6 172:20 176:19 186:12 374:18

**hand-in-hand** 125:25

**handful** 25:5 156:2 191:13

**handle** 265:6

**handled** 105:18 239:4

**handling** 187:22

**handoffs** 202:3

**hanging** 158:5

**happen** 103:16 194:25 227:8 228:12 248:24 363:22

**happened** 42:8 63:15 94:2,7,8 201:4 220:10 227:3 245:5 249:16 252:17 271:22 274:11 346:4 363:25 373:23 396:22

**happening** 41:22 185:11 249:11 252:21 266:25 296:16 337:13 340:13 346:2 363:22 364:4,8

**happy** 20:20 83:4 217:9 268:18 276:19

**hard** 73:16,23 74:10 110:20 111:7 124:3 169:9 188:15 215:3 219:21 304:5 357:10

**Hastings** 143:8

**head** 25:7 26:15 28:10,21 30:4,5 50:18 96:22 105:17 120:3 191:22 194:5,6 201:16 203:7 206:10 294:17 295:12 308:6 384:9

**header** 48:2 84:15

**headquartered** 215:11

**headquarters** 272:6,12

**heads** 148:2 153:12

**healthcare** 27:22

**hear** 84:3 117:24 129:15,22 229:2 312:24 340:14

**heard** 57:2 61:20 89:13 147:11 186:10 193:3 232:5 272:19,21 308:14 317:19 320:23 361:21

**hearing** 135:17,18,20 156:10 167:8 203:21 209:20 211:21 212:9 411:10

**hears** 132:7

**heartbreaking** 129:11,17

**heartbroken** 228:7,8

**heavy** 186:11

**held** 163:14,19 164:3,4,6 178:18 198:8 219:9 272:15 310:10,21 341:20

**helped** 397:14

**helpful** 45:11 206:24 332:12

**Heras** 406:20,22 407:3,24 408:4 410:25

**Herrmann** 324:4,6,9,17,24 327:6 329:9 332:24 333:6 336:19,20 338:25 339:10 346:8,12 349:21 350:24 351:18 356:16 357:7,22 360:10 361:11 367:23 368:7,15,19

**Hershey** 18:3 19:7,10,15,18 21:6,8 23:23 24:4,7,12 33:9 34:6,12 37:11, 21 38:10 40:15 41:5 47:19,20 56:12, 25 57:4 58:6,20 59:2 61:9 63:9 65:2 82:24 83:12,14,20,22,24 84:5,10,11, 13 117:7,12,22,25 132:3,7 136:24 137:12 212:14,19 276:6 291:23

**hew** 320:20

**Hey** 213:17

**high** 63:18 226:24

**high-level** 157:11

**higher** 70:23 71:12,13,16 252:2,11

**highlighted** 216:15 218:5

**highly** 107:16,20 108:3 109:14 234:2 319:10

**hired** 153:24

**hiring** 154:8

**historical** 274:16,20,23,24

**historically** 51:25 208:23

**history** 75:17 267:24

**hit** 191:15 249:6

**Hoboken** 272:6

**Hoffing** 394:11,12,15,17 406:12,16

**hold** 28:20 57:19 160:4,6,8 163:20 178:24 216:21 229:12 235:2 275:23 306:16 309:20 341:22 371:7 380:21

**holder** 136:10 225:11

**holders** 69:24 70:9 72:8 85:18 97:25 128:10 135:3,7,9,23 136:3 173:7 300:11,13 320:12 364:23

**holding** 20:17 179:2 209:12 309:21 311:21 340:10

**holdings** 210:6 308:10,16,20 310:6, 10,21,23 311:12

**holds** 225:16 259:16 303:19 309:9 335:3

**home** 222:5 298:22 374:18

**hone** 41:23 126:3

**honestly** 47:5 52:16 53:20 81:21 118:24 144:17 326:5 366:25 367:13

**honor** 314:21

**hope** 126:13,16 181:14 182:11

**hoping** 112:13 158:16

**horrible** 228:15,19

**hosted** 232:16

**hosting** 167:7 168:14

**hot** 169:16

**hour** 25:17 83:3 285:6,9 356:25 357:2

**hours** 18:16 25:18 54:23 124:6 319:25 393:7

**house** 225:10,23,24 227:14,19 289:3,4

**huge** 193:4

**human** 227:22

**hundreds** 243:17 246:12

**hurt** 127:23,24

**hurting** 239:8

**hypothecate** 341:17

**hypothetical** 113:2 260:24 282:18

---

## I

**I-M-M-A-N-U-E-L** 324:7

**i.e.** 339:3

**ice** 245:6

**ICO** 315:8

**idea** 172:12 212:15 247:7 275:18 363:17 404:18 405:6

**ideas** 331:3 333:15 336:15 337:11,14

**identical** 326:24

**identification** 34:10 37:18

**identify** 35:18,25 299:20 301:22

**idiosyncratic** 380:16

**illiquid** 93:12 160:14 246:16,20

**imagine** 166:8

**Immanuel** 324:5

**immediately** 146:4 180:6,15 290:4

**immense** 265:23

**impact** 94:19 177:3 180:15 181:19 183:5 260:25 274:21 288:7 296:18

**impacting** 181:24 182:2

**impacts** 156:4

**impairs** 250:23

**implying** 329:25

**important** 23:13 59:6 99:22 130:25 131:15,18 249:2 321:22 334:6 335:4 351:19

**importantly** 108:16

**impression** 114:19 188:17

**in-kind** 181:11,15,19

**inability** 250:22

**inaccurate** 301:2

**inbound** 400:9

**incented** 68:9

**incentive** 230:11

**incentives** 336:16

**incentivize** 32:16 66:14 67:7

**incentivized** 66:6 67:16

**include** 179:18 311:19

**included** 28:11 79:20 194:16 243:16 279:3 281:5 312:12

**includes** 79:7 242:18 249:3 281:16

**including** 28:15 133:24 164:16 165:23 170:10 194:12 204:2 205:13 248:7 286:5 295:8 309:21 327:15 341:4 364:12 390:22 392:22 395:14

**income** 255:2,5,12 346:25 365:14

**incomplete** 233:6 234:20 282:17 290:20 378:11 381:17 383:16 385:17 390:2

**incorrect** 359:3

**increase** 111:18 139:12 168:18 255:16,23 256:12 388:21

**increased** 139:7 255:6,22

**increases** 252:20 254:4 256:19 337:10

**increasing** 169:6 183:10 242:11 253:24 255:16 336:7 337:7

**incredibly** 110:2,5 125:18

**independent** 335:2

**individual** 67:3 76:6 128:9 135:3 193:24 198:8 199:4 265:3,5 266:7 268:15 344:4,7 394:21

**individualized** 321:8

**individuals** 20:3 67:7 153:25 191:13 321:25

**indulgence** 122:9

**industry** 32:23 89:18 101:22 113:22 139:22 343:22 349:6,18 365:22 376:16 404:19 405:7 406:4

**industry-wide** 343:25

**inflows** 156:6

**influence** 32:9 288:3

**influencer** 262:19

**influencers** 262:8,22 263:12,18,21

**inform** 23:24 233:19

**information** 19:22 43:3 60:16,19 69:7 147:20 195:19 196:14,18,22 197:3,14 198:20 199:2 201:9 202:8, 11,14 206:2,24 233:6 234:21 264:9 267:25 269:21,22 270:13 284:8 295:18 307:18 351:14,17

**informed** 198:6 199:13

**infusion** 161:4 317:5

**initial** 195:19 283:19

**initially** 195:13,16 213:23

**initiate** 397:14

**initiates** 290:3

**innovating** 335:22

**input** 36:19,21,25 42:21,23

**inquire** 218:18

**inquiries** 397:6

**inserted** 282:25

**insider** 337:21 338:18 339:4

**insiders** 261:8 277:5

**insight** 219:21

**insolvency** 243:19 244:7 245:12 246:18 247:5 248:2,6

**insolvent** 202:24 203:12 244:16 312:16 313:2,11,12 368:2

**instance** 21:3 225:8

**instant** 175:17

**instituted** 147:2 386:25 390:12

**institutional** 48:20 59:8 71:10 323:3,5,6,10,11 366:8

**institutions** 71:11 314:15

**instruct** 43:3 69:8 332:19 333:4

**instrument** 289:14

**instruments** 169:3

**insurance** 27:21

**intend** 38:7 107:14 122:11 126:8 174:3

**intends** 118:11

**intent** 241:18

**intentionally** 127:14

**interaction** 340:5

**interchangeable** 71:7 101:24 209:2

**interest** 160:5,20 200:3,15 210:12 240:25 287:17 301:8 303:13,24 317:10 326:7 328:3 336:8 337:7 378:8 379:6 383:14 385:15

**interested** 55:17 175:15 194:15 255:10

**interim** 30:21 249:25

**internal** 46:18 63:11 72:13 125:13 136:21 151:23 187:23 351:10 407:15

**internally** 265:24 267:17 273:10

**international** 204:23

internationally 204:4 400:10

Internet 217:16 360:15

interrogatories 143:19

interrogatory 143:17 149:3,4

interrupt 193:17

interviewing 54:21

intimately 180:20

introduce 38:8

introduced 214:20 217:22

introducing 213:20

inure 173:17

invalid 293:6

invest 244:25 254:9 341:17 401:2

invested 94:25 95:3 353:7

investigations 108:14 116:25
409:5,9

investing 74:19

investment 74:16 77:18 78:6

investments 239:25 247:14 310:9,
20,23,24 311:2

investor 30:5 65:4,11 203:8 294:18
306:4,11,13 354:9,18 399:22 400:13
401:9 402:12 403:6

investors 50:13 52:10,11 53:16
54:3,4 55:10,11,16 61:14 64:10 66:5
68:15 69:4 306:19 307:9 321:24
327:13 353:13,20 359:16 396:5 401:6
404:4 405:13

involved 53:21 62:4 73:25 75:10
125:18 150:2,4,22 154:7 171:14
364:2 404:12 406:7

involvement 197:21 202:10,19

IOU 182:9 253:24 254:5 256:14
286:17 345:14

IP 165:7

irregular 380:20

IRS 255:4,10 298:3 350:22

IRS's 257:11

Israel 148:24

Israeli 164:15,20 165:8

issue 20:14 33:22 93:13 176:3
241:18 242:14 243:13 307:21 325:15

330:11 388:13

issued 254:20

issues 61:13 69:3 192:19 202:14
321:4 327:23 328:15

item 24:17 271:20 299:12

items 160:3 162:4 271:21

iteration 333:8

## J

J-E-R-E-M-Y 394:14

January 107:3,4 175:3 176:2,23
177:23 191:12 195:18

jeopardizing 111:8

Jeremy 394:12

Jersey 272:6

job 28:24 54:24 144:13 190:21
233:14 274:2 339:17 406:2

jogged 136:9

join 29:23 30:24 32:9 67:17 74:8
139:20 220:10

joined 28:25 30:3 31:22 59:12 62:11
138:22 139:20,21 141:7 145:24
146:10 195:14 197:19,20,22 220:14
228:6 249:17 294:13 316:23 343:4

joining 31:20 33:16 70:11 141:2
142:13

Joseph 46:19,25 151:17 153:12

JPMC 287:2 295:7

JPMORGAN 28:6,9,17,22 32:11
59:7 141:4 188:20 228:5

judge 115:6,16,18 128:16 173:22
278:16 294:9 392:20

judge's 392:19

judgment 100:2

July 30:17 214:20 216:12,16 217:22
282:11 294:19,20 361:17

June 195:14 235:17 237:6,8,23 238:2
242:24

## K

K-A-R-E-N 208:4

K-H-A-N-U-J-A 273:20

K-U-L-P-R-E-E-T 273:20

Karen 208:3

Kathryn 33:4

keeping 61:14 298:21

key 36:16 42:19 71:18 108:12
114:12,18,19,21 115:4,9,13,23 116:2,
17 162:4 173:21 181:4 392:19 404:17

keys 181:4

Khanuja 273:18,19,22 276:4 285:13,
21,25 298:13,16

kicked 176:14

kickoff 205:11

kind 27:9 28:13 31:17 35:2 43:11,13
45:9,19 48:11 49:24 50:24 51:22
53:24 54:11 57:16 59:20,25 63:17,19
67:3 71:17 72:22 73:16 74:13,16 75:7
76:25 88:16 93:3 98:5 99:18 108:18
109:10 113:17 114:6,8 119:2 130:9
131:14 141:11 146:2 147:16 153:13
156:3,6 158:13,24 169:9 177:20
181:15 182:2,12 185:22 187:11
188:3,16 189:11 191:22,23,24 198:2
200:17 202:10 214:5 215:5 218:13,16
228:10 237:13 240:2 242:17 243:6
244:5 245:6 249:5,13 257:7 261:4
262:22 284:22 285:11 287:7 296:2,4
298:6 299:20 309:8 314:10 320:22
321:13,14,16,17 324:13,16 331:2
333:15 334:4,10 335:9,15,22 336:25
342:25 343:21 348:17 349:14 350:18
360:18,23 361:4 378:16 380:11
382:12 386:3,7 391:2 395:11 396:25
399:10,16 400:22,25 404:18 408:7

kinds 275:14 331:24 337:12

Kirkland 24:21,23 25:2 34:18,20
35:12 36:2,5,13,23 40:21 46:15
134:14 142:22,25 143:5 148:20 205:6
267:19 329:13,21 331:11 339:4
369:17

knew 203:11 285:2 364:14

knowledge 20:6 50:24 55:2 60:18
63:12 82:5,7 119:8 140:3 151:4
154:21 159:24 173:15,23 176:16
177:25 179:11 182:17 183:11 188:6
194:18,19 198:5,12,25 199:12,25
200:18 204:21 218:17 243:10 244:20
262:24,25 274:3,13,16 276:6 283:11
295:15 296:2 306:14 317:15 340:18
350:18 361:8 365:9 369:13 408:24

**knowledgeable** 206:2 280:15 409:3

**Krissy** 269:25 271:4

**Kulpreet** 273:18

---

**L**

**L-A-Y-L-A** 190:9

**labeled** 229:9

**lack** 229:6

**Landes** 232:3

**landscape** 60:8,11,24,25 61:6 62:17

**lane** 278:6,7 338:3,15

**language** 81:25 82:11,15 218:24 280:5 290:16 340:24 342:5 356:6,7 357:9,18,20 380:11,13 384:8 390:24

**languages** 81:10,16 82:22

**large** 50:7 373:8

**largely** 45:18 59:11 61:22 93:7 105:18 169:21 209:2 247:13 271:6 318:3

**larger** 248:9

**Lark** 263:24 264:18

**Las** 406:20,21 407:3,24 408:4 410:25

**late** 107:3 176:23 191:19

**latest** 290:5

**Latham** 134:14 149:17,19,22 150:16 204:18 205:5

**Latona** 369:17 372:10

**launch** 61:21,24 156:3 215:6 358:21 396:14 399:11,12 400:6 402:23 403:17,18

**launched** 57:8 145:8,24,25 396:25

**launching** 57:13

**law** 149:8,13 259:21 338:10 382:23

**laws** 59:21 306:9

**lawyer** 46:18,19 80:10 246:6 256:25 327:19 391:17 392:5 393:22

**lawyers** 393:22

**lay** 217:7

**Layla** 190:8

**lead** 152:21

**leadership** 152:25 153:2,10 154:7 361:13

**leading** 105:8 374:15

**leads** 152:4,5 188:4

**leaked** 407:17 408:12

**leaning** 335:21

**learn** 192:5

**learned** 59:11 63:5

**lease** 272:12,15

**leash** 58:16

**leave** 337:17 364:17 367:17 368:12 393:22

**leaving** 331:8

**led** 62:17 76:5 125:16

**ledger** 121:5,13,21 142:6 184:3 193:22 205:23 206:3 224:21 225:2

**ledgers** 159:3

**leery** 234:11

**left** 19:3 28:9 29:9,16 86:23 269:4 272:23 298:20 311:10 318:10 328:12 356:17 357:3

**leg-** 237:12

**legacy** 236:9 239:19

**legal** 24:15,21,25 34:18 39:11 46:14 63:11 69:3 108:12 114:8,12,20,21 115:4,8,9,13,20,23 116:2,17 117:2 143:6,7 146:18 147:12 148:10 150:5 151:22,23 152:13,18,23 153:7,20 162:4 166:9 173:21 204:19 259:13 278:4 295:11,22 308:25 317:13 329:21 331:21 350:15 351:23 387:6 392:15,19 393:18,21 400:16

**lend** 59:17 71:3 89:19 193:10 221:3 314:16 341:16

**lending** 48:16 70:18,19 71:10,15,18 89:2 92:12 93:5,6 95:7,16,24 96:12,14 116:13,14 121:11 162:10 194:13 210:8,9 211:2,13 232:3,7 288:2 289:2 309:11,22 311:3 334:19 335:13 349:12 355:10 383:12 385:13

**lengthening** 336:8 337:8

**lens** 141:6 234:4

**lent** 97:7 353:7

**Leon** 232:6 261:20

**letter** 140:13 227:8

**letters** 128:10,17,19,20,24,25 129:3, 6,9,10,11,16 130:11,13,19,20 227:5

**letting** 82:16

**level** 63:18 162:9 288:3 376:15 400:24

**levels** 175:4

**lever** 110:20 111:5

**liabilities** 245:13 247:9 248:8,10 311:20

**liability** 99:23 103:18 253:8 255:14 279:11 294:22 296:18 311:13 345:13, 17,19

**licensed** 335:19

**lien** 289:4,6,8,17 381:12

**life** 29:17

**life's** 227:23

**lift** 266:10

**light** 160:10

**lighting** 371:10

**limit** 380:2

**limitations** 386:24 390:9

**limited** 51:2 53:2 55:2 76:25 270:10 301:13

**limits** 73:17 74:23 75:4,6,19,21 164:14

**lines** 31:14

**link** 98:5 211:11 218:6 232:22

**linkage** 67:2

**lion's** 320:18

**liquid** 248:7

**liquidate** 101:10 110:7

**liquidated** 92:21,24 93:22,23 94:9 104:7 358:10,20

**liquidation** 93:15 94:16,18 157:9,12, 23 159:3 237:20 238:20

**liquidity** 43:14 45:19 72:14,24 73:2, 20 106:10,15,19 107:6 108:24 109:21 111:18 112:18 113:3,4 118:23 159:25 160:20 161:13 177:4 179:13,23 180:16 236:25 244:19 245:9 246:10

**listed** 26:11 87:12 95:17 152:6

240:19 243:15 265:10

**listen** 131:2 330:25

**listening** 43:20 148:9

**listing** 269:10

**literally** 227:18 245:2

**Lithuanian** 163:24

**live** 268:6,11

**live-streaming** 20:15

**living** 191:18 386:2

**LLC** 309:24

**LLCS** 367:14

**LLP** 367:4

**lo-** 347:17

**loading** 384:12

**loan** 89:22 90:3,13,21,24 92:20,25
93:15,16 94:17,18 97:9 120:12
141:18 159:6 162:5 165:6,21 170:7,
11,14 175:7 176:6 232:12 234:12
254:6 256:15 286:24 287:8,13,25
288:14,19 290:11 303:10,17,18,20
304:4 317:7 318:14,21,22 319:9,10,
12 334:13 337:11 347:23 354:9,19,22
355:19 356:6 358:8,11,19 378:2
382:21 383:4

**loaned** 182:3 286:18 377:17

**loans** 70:20 93:8 165:22 174:12
232:18 287:7,22 288:7,9 290:9 323:4,
7,12 328:4 331:15 334:17 336:3,5,14
337:6,7,10 347:17 366:9,15 374:5
377:19

**local** 148:23

**located** 81:7 162:16

**location** 224:10

**locations** 31:3

**lock** 126:17 181:4 336:16

**locked** 163:11 181:7 246:12

**log** 20:13

**logistical** 33:22 299:12

**long** 25:15 28:20 29:4 31:18 65:8
113:12 144:15 151:3 234:7 257:2
310:18 328:10 352:5 357:14 371:3
376:2 383:23 384:8,13 385:22 406:7

**long-term** 33:3

**longer** 119:18 120:24 121:4,9 194:7
205:25 247:6 261:20 272:13 378:22

**looked** 91:9 162:6 217:15 242:10
271:19 350:20

**loosely** 262:13

**lose** 227:23 240:3 284:22 397:11

**losing** 46:19 398:5

**loss** 96:17 346:25

**losses** 95:8,15 96:8,19,25 236:9
239:19 244:13 282:9 342:2,12 346:24
347:3 349:25 350:5,7

**lost** 191:25 240:4 336:19,25 349:21
402:8

**lot** 28:18 60:4 93:11 100:13 105:11
128:25 142:4 150:2 156:5 166:11
167:6 175:3 188:21 236:9 245:4
253:4 267:7 271:25 272:2 311:5
332:2 343:7 350:21 364:12 367:18
374:14 404:24

**lots** 129:10 193:20 315:10

**love** 107:17 329:3 331:20

**lower** 70:22 257:20

**LTV** 70:23,25 71:13,14

**lunch** 212:10 213:2

---

**M**

**M-I-L-L-I-G-A-N** 190:9

**Machine** 217:17

**machines** 156:24 167:4

**macro** 288:3 398:13

**made** 22:10 36:23 57:23 64:19 76:8
97:25 149:5 151:17 167:9 191:25
216:12 220:14 232:10 244:25 260:18
269:11 270:5,6 290:10 313:18 320:10
325:21 330:15 396:23 403:7 405:25

**magnitude** 49:25

**main** 36:16 162:20,22 164:5 183:17
184:6,14 198:2,7 199:4 200:2,9,13,20
201:3 240:16

**maintain** 195:15,18 196:18

**maintains** 196:13 197:14

**major** 110:3

**majority** 68:22 75:17 102:17 104:6

105:2 168:13 179:21 298:10 399:2

**make** 22:12 23:5,7,10,15,17 57:2
75:20 76:11 79:8 123:5 143:14
147:14 148:14,15 162:2 168:7 169:9
183:12 192:23 204:16 205:16 207:11
218:15 226:23 230:25 271:8 274:8,19
281:17 285:2 289:23 300:18 307:15
312:24 324:14 339:13 363:6 388:11
397:10 399:15,21 401:4,8,17,22
402:16 408:7

**makes** 119:5 142:11 166:7 235:11,12
380:18 386:10

**makeup** 54:12

**making** 59:18,19 74:2 170:13,25
172:14 173:8 327:4,24 362:19 365:25
391:15

**manage** 32:12,14 43:11 103:17
167:16 314:8 348:21 366:6

**managed** 314:6

**management** 72:14 73:17 74:7
75:16,24 110:20 141:6,22 294:23
315:24 316:2 335:15,23 349:18

**managing** 29:8 99:21

**March** 29:25 31:23 45:8 50:24 70:12
106:23 145:7,24 161:3 190:22 191:16
202:22 214:6,8 228:6 231:13 275:9
294:13,15 343:5 360:15

**margin** 168:5 177:13,17

**mark** 33:10 34:4 254:13

**mark-to-market** 247:15

**marked** 34:10 37:9,17 78:15 120:24
121:4

**marker** 239:6

**market** 51:13 169:4 231:14 245:6
291:4 309:23 329:5 333:17 380:15

**market-based** 366:5

**marketed** 160:4,5 345:25

**marketing** 50:20,22,23 51:3,15,20,
25 52:4,6,8,17,22 53:6 108:6 176:12
184:17,22 185:7,8,12,13,21,25 186:8,
12,17,22 187:5,12,24 188:22 201:23,
24 202:4 221:11,22 222:4 226:22
230:4 263:19 332:11 333:18,22 361:4

**marketplace** 60:9 160:7 236:8
239:19 252:22 253:5 405:7

**markets** 160:11 256:20 287:15

**marquee** 59:23 396:11 398:4

**Marsal** 134:15 157:7

**Mashinsky** 79:19 186:11 201:24
243:14 261:20 269:25 270:2 271:4
326:12 339:21 340:6,12,14

**Mashinsky's** 26:10 271:4 339:22

**massive** 99:16 100:7 266:10

**massively** 245:8

**material** 214:19 255:21 282:12,25
325:20

**materially** 237:24

**materials** 147:15 220:6

**math** 89:3,8 91:17 96:12

**Matic** 373:7

**matter** 317:20 326:15

**matters** 36:12 148:23

**maturities** 165:23

**maximize** 108:11 123:2,8,13,16
124:11,25 133:22 192:15 242:15
251:11 275:2,6 291:24 292:7 339:18
355:16

**maximizes** 328:11

**maximizing** 133:13 292:23 293:17,
20

**Mccarrick** 19:4,8,9,13,15,17 21:7
23:22 24:5 25:9,22 30:11,14 31:25
32:20 35:13 36:7 40:9,19,22 42:24
44:10 45:15 47:18 49:13 50:14 51:7
52:12 53:7,17 54:6,18 55:12 56:8,16
58:2,10 60:13 61:17 62:20 63:2
64:15,20 65:15,23 66:8,17 67:9,18
68:3,17 69:6,12,25 72:9 74:4 75:12
76:2,14 77:9,24 81:2,11,18 82:2
83:19,23 84:2,7 87:4 88:7 89:11,15,
24 90:14,22 91:13,21 92:17 93:18
94:4 98:12 99:13 104:2,11,20 109:17
113:6 115:10 116:4 119:12 120:21
121:16,25 122:23 123:17 124:21
126:9,23 127:7,16,20 128:13 129:20
130:15 131:5,8,23,25 132:6,14 133:8
134:5 135:4,11,24 137:13,21 143:20
144:2 146:15 148:5 150:17 155:17
159:8,16,19 161:18 162:17,25 163:16
164:11 166:16 167:13 168:20 170:15
171:3,21,23 172:16 173:2,9 174:9,23
175:21 178:20 179:7,14 180:24
182:5,19 183:13 184:9,25 185:15,18
186:2,24 187:15 188:11 189:18,20

195:25 198:9 199:5,14 200:5,22
201:12,18 202:12,25 204:9 205:2
206:4 211:22 212:6,16,20 214:22
215:14,25 216:5 217:2,7,12 218:7,10
219:13 220:2 221:13 222:10,17
223:2,19,21 224:6,17 225:18 226:16
227:25 229:21 230:22 231:5,20
233:4,22 234:19 235:19 236:2,21
237:9 238:3,12,22 240:12 241:3,12,
25 242:25 243:20 244:9 245:16
246:21,25 248:19 250:9,24 251:20
252:6 253:15,17,20 254:13,21 255:24
256:21 257:23 259:6,17 260:9
261:11,24 262:10 263:6,25 264:8,11,
23 265:18 266:22 267:12 268:3
269:15 270:8,20 271:16 272:17 273:8
275:20,23 276:13 277:8,13,22 278:11
279:15 280:7 281:9 282:13,16,21
283:20 285:4,16 286:13 287:10
288:11,21 289:11 290:19 291:17
292:18 293:7,24 295:20 296:8 297:6,
21 298:18 299:11 300:2 301:19 302:3
303:2,14 304:2 305:13 306:5,16,20
307:10,19 308:11,17,21 309:5,15,25
310:11 311:7,15,23 312:8,19 313:4,
13 314:24 316:6,9 317:12,22 318:9,
15 319:4,14,24 322:3,17 323:13,24
324:8 325:11,25 327:2 328:7,24
329:16 330:17 331:17 332:7,14,18
333:3,11 337:24 338:21 339:5,25
342:13,19 343:11,13 346:8,17 347:5,
19,25 348:10 349:7 350:2,9 351:5,11
352:24 353:14 354:12 355:4 356:3,9,
21 357:2 358:14 359:18,25 360:16
361:15 362:2,9,11,14,25 363:5,8
364:9,24 365:4 366:11 367:7,19
368:3,18 369:10 370:16,25 371:13,16
373:10,13 378:10 379:8,14 380:6
381:9,15 383:15,22 384:6 385:16
387:4,21 389:13,21,24 390:13 391:13
392:13 393:12,16 394:5 396:6 397:23
398:19 399:7,23 400:15,18 401:10,18
402:2,19 403:13 404:8 405:14 406:15
407:7,21 408:3,6 410:3 411:5

**meaning** 76:17 102:25 193:10
302:23 314:9

**meaningful** 42:4 156:9

**means** 20:2 21:22 181:6 235:15
247:8 268:11 306:11 317:8 339:17
386:22

**meant** 342:15

**measure** 51:22 188:17

**measured** 188:18

**measurement** 343:23

**mechanics** 120:8

**mechanism** 266:21 267:10 269:5

**media** 117:16,20 137:25 138:5
189:24 190:4 212:23 213:10 262:18
299:4,9 319:17,22 371:20,24 412:11

**mediate** 328:4

**Medium** 360:14

**meet** 20:20 74:15 100:23 103:24
331:14 402:14,17

**meeting** 41:22 42:11,12 74:17
125:11 134:13 144:9 191:21 203:9
205:8,12 249:16,22 250:2,5,15,16,17
377:24

**meetings** 74:14 144:14 261:17

**Melanie** 300:9

**member** 152:22

**members** 133:3 135:10,21 327:15

**memorize** 284:3 341:8

**memorized** 284:9

**memory** 45:4,23 77:12 86:2 88:18
96:4 130:22 136:9 139:2,13 149:22
153:22 157:21 198:18 288:24 305:16

**mental** 141:13 261:4

**mention** 275:14 283:10 390:10

**mentioned** 25:23 52:21 60:22 76:22
102:9 111:17 113:24 114:11 133:3
153:9 203:18 214:6 227:5 249:15
274:10 276:5 286:23 291:23 292:2
294:13 298:10 305:7 392:23

**merchandise** 269:11 271:6,9

**message** 130:10

**messaging** 407:15

**met** 158:18 203:13,14 205:5 232:8
340:9 378:7

**method** 70:4

**methods** 278:25

**mic** 315:17

**microphone** 228:17 302:12

**mid-april** 145:25

**Mid/early** 151:7

**middle** 30:17 155:5 175:13 247:23

294:19 346:9

**midland** 157:3 169:25 177:13

**Milbank** 299:14 300:10

**Milligan** 190:7,8,9 197:12 207:3

**million** 87:23 88:6,21,23 90:19 91:4, 8 92:7,8,16 95:23,25 96:18 139:16 158:2 160:13 161:20,22,23 175:18 178:5,25 180:2,3,5 183:2,21 209:9, 12,16,21 264:21 312:5 369:22 370:4 372:14,18 374:13 398:25

**million-ish** 89:7

**millions** 156:3 243:17 246:12 261:22

**mind** 45:24 46:8 116:18 141:11 257:11 283:6 387:12

**mine** 89:8

**mined** 165:19 167:21 168:8 170:8 172:21

**minimis** 159:13,22

**mining** 93:8 95:8,15,22 96:12,13 107:2 156:14,20 160:6,7 165:13,16, 17,20 166:3,7,10,14,22 167:9,11,17 168:2,14 169:20 170:7,9 172:15,19, 23,24 173:17 174:22 175:2,6,9,11,19, 25 176:2,12,18,19 244:24 245:2 246:2,12 247:16 249:9

**minus** 391:11

**minute** 86:25 350:25 371:12

**minutes** 203:16 250:5,17 285:7 298:20 311:9 318:10

**Mischaracterizes** 51:18 67:10 281:10 283:21 291:18 293:25 360:2 362:15 363:12 387:5 402:3

**mishearing** 210:15

**misrepresentation** 320:15 360:20

**misrepresented** 307:17

**missed** 238:21

**missing** 260:6 265:14,16 267:9 269:6 343:7 349:23

**misstate** 193:6

**mistake** 320:14

**mistakes** 228:22

**Mister** 23:22

**mix** 99:19

**mixed** 98:16

**Mm-hmm** 247:21

**mobilize** 266:17

**model** 141:13 261:5

**models** 28:16

**modified** 369:7,14

**moment** 34:4 44:15 330:10 364:11 385:8

**Monday** 251:24 252:10 254:3 272:24

**monetize** 101:8 102:2,5,20 105:22 242:5 245:8 246:4 249:10

**monetized** 100:22 103:23 104:18 105:6,15

**monetizing** 101:13

**money** 90:8 97:5,7 109:11 120:14 175:24 176:23 189:13 191:25 316:17 338:12,13 339:19 366:20,21

**month** 107:9 115:19 155:5 171:10 178:5 313:22

**monthly** 155:8 312:12

**months** 29:6 101:6 107:24 168:17 169:17,18 191:12 229:13 230:13 249:17

**morning** 18:2,3,9 19:7,9 134:11 205:11

**motion** 26:2,9 38:21 56:11 116:12 144:16 159:13 174:6 207:16 261:13 267:14 270:10 300:22 301:3 318:22 367:9

**motions** 24:16

**motivated** 30:24

**mouth** 199:23

**move** 120:25 135:14 160:11 172:6 183:18 184:8,13 289:19 302:10,11 315:21 331:24 340:22 368:8 403:25 404:19

**moved** 29:13 118:17 120:15 121:8, 22,24 174:19 184:2 296:13 403:12, 22,23

**movement** 121:6,14 205:22 206:3 374:15

**movements** 118:19

**moving** 68:14 171:19 172:3 374:20

**multiple** 44:22 101:15 102:7,8 105:13 142:6 163:5 164:7 330:24 334:17 352:25 360:24 404:11

**multiply** 168:10

**multitask** 144:14

**multitasking** 42:13 144:13

**mute** 357:5

## N

**N-I-C-O-L-E** 301:25

**named** 76:6 201:25

**names** 25:6 148:25 186:5 227:10

**narrate** 35:9

**nascent** 139:22 343:22 406:5

**National** 208:6

**native** 209:2

**nature** 390:3

**NDA** 332:17,20 333:5,12 351:15

**NDAS** 332:15

**necessarily** 191:9 224:25 226:2,3,7 246:14 252:22

**needed** 59:23 100:23 178:8 194:24 375:13 396:13 397:8

**neg-** 156:19

**negative** 106:22

**negotiated** 139:14

**negotiations** 141:8

**nervous** 370:24

**net** 103:18 160:23 171:9 287:23 349:24 350:5

**network** 166:11 175:25 181:7 301:11 309:24 312:4

**neutral** 103:17 169:11

**neutralized** 97:15

**Nicole** 301:24 322:7

**night** 320:7

**nod** 23:5

**NOLS** 350:17

**non-normal** 380:12

**nonaccredited** 53:16 54:4,13,16 55:10,16 61:13 64:9 65:4,11 66:5 68:15 69:3 353:13,20 354:8,18 358:23 359:4,15 396:5 400:6 403:3, 19

**nonalgorithm** 312:16 313:2

**noncustody** 322:23

**nondebtor** 163:15,20 165:3,5 174:19

**nondebtors** 164:10,17,21

**nondisclosure** 332:20

**nonexperienced** 114:7

**nonmining** 166:12

**nonobjections** 160:12

**nonordinary** 386:3

**nonstop** 127:3

**nonverbal** 23:6

**normal** 93:4 164:18 189:10 208:19 223:14,16 255:7 286:19 290:25 291:6,14 348:6,18 354:16 376:11,13, 15 385:21 386:8 391:3,21

**north** 398:25

**not-for-profit** 27:22

**note** 33:15 38:4 249:2 320:3

**noted** 213:7 236:5 412:13

**notes** 160:6

**nothing's** 252:17 389:6

**notice** 20:8 230:18 231:15 282:5 325:17

**notifications** 220:12

**notified** 375:4

**noting** 361:13

**notional** 319:8

**nowadays** 206:19

**Noy** 151:24

**Nuke** 120:2,3

**number** 24:10 33:11,20 37:10 38:2 43:11 85:6,10,13,18 86:9 87:18 89:3 96:22 145:19 149:4 332:11 334:5 376:19,24 380:19 382:16 409:13

**numbers** 49:23 88:12,14 157:15 270:24 373:21

**numerous** 28:13 129:9 308:2 367:14

## O

**oath** 21:19,22 356:13

**Ob-** 131:23 253:15

**Obj-** 343:11

**object** 30:11 31:25 32:20 35:13 36:7 42:24 44:10 45:15 49:14 50:14 53:7 54:6,7,18 56:8,22 58:2 60:13 61:17 62:20 64:20 66:17 67:9 68:3 69:12,25 75:12 76:2,14 77:9,24 81:2,11,18 82:2 87:4 88:7 89:11,15 90:14,22 91:13,21 92:17 93:18 94:4 98:12 99:13 104:2,11,20 109:17 113:6 115:10 116:4 119:12 120:21 121:16, 25 122:23 123:17 124:21 126:9,23 127:7 130:15 131:5,8 132:2,5,14 134:5 135:4,11,24 143:20 146:15 148:5 150:17 155:17 159:8 161:18 162:17,25 163:16,17 164:11 166:16 167:13 168:20 170:15 171:3,21,23 172:16 173:2,9 174:9,23 178:20 179:7,14 180:24 182:5,19 183:13 184:9,25 185:15 186:2 188:11 195:25 198:9 199:5,14 200:5,22 204:9 205:2 206:4 215:25 222:12 223:2,19,21 224:6,17 226:16 227:25 229:21 230:22 231:5,20,21 233:4,22 235:19 236:2 237:9,10 238:12,13 240:12 241:3 242:25 243:20 245:16 255:24 261:24 262:10 263:6 267:12 270:8 271:16 275:20,21,24 276:13 279:15, 16 280:7 282:13,16 286:13 287:10 297:6,21 300:25 303:2,14 305:13 306:20 307:19 308:11,17,21 309:5, 15,25 310:11 311:15 322:17 325:11, 25 327:2 328:7,24 329:16 331:17 332:7 338:21 339:5,25 342:13,19 343:13,14 346:17 347:5,19,25 348:10 349:7 350:2,9 351:5,11,12 353:14 354:12 355:4 356:3,9,23 357:24 358:14 359:18,25 361:15 362:2,11, 14,25 363:5,8 364:9,24 365:4 366:11 368:3 370:17 373:10,13,14,15 378:10 379:8,16 380:6 381:9,15 387:4,21 389:13,14 390:13 392:13,14 393:13, 16 398:19 399:7 401:10,18 402:19 404:8 405:14 407:7 408:16 410:3

**objecting** 389:25 390:2

**objection** 49:13 51:17 52:12 53:17 55:12 56:14 58:7 63:2 64:15 65:15,23 66:8 67:18,19 68:17 69:6 72:9 74:4

**objections** 37:7,15 38:17 85:3 86:12 241:13 270:21 304:3 311:24 312:9 313:5 391:14

**objective** 291:24

**oblig-** 253:14

**obligation** 99:23 193:23 223:13 224:20,23 225:3 226:5,10 233:19 242:19 252:20 253:7,23 254:3 255:6, 15,23 256:15,18 257:10,18,21 259:4 276:16,25 277:2 286:20 291:20 345:17 348:5,16

**obligations** 85:15 86:14 87:22 88:4 98:25 100:24 102:10 103:8,24 157:19 163:6 196:22 210:4,21 211:5 215:18 233:20 241:15 245:23 246:11,19 251:16 256:24 258:2

**obstruction** 274:14

**obtaining** 174:2

**occurred** 50:25 51:10 68:23 147:22 244:8 248:17 322:23 343:17 361:9

**occurring** 205:18 391:2 404:25

**occurs** 399:11

**October** 154:11

**offended** 22:8

**offer** 48:14 140:13 205:10 398:6,9

**offered** 45:14 49:10 56:3 82:10,15 229:5,8 397:5 399:20

**offering** 24:9 49:17 55:21,25 59:11 360:6 397:15,22 398:16 399:14,16 403:2,8 404:17 405:5

**offerings** 400:23

**offhand** 157:16

**office** 121:20 138:10 189:9 190:10 196:21 255:15 272:13,22 276:24 295:12 296:23 395:24

**officer** 30:18,21,22,23 139:9 342:10 361:19,20

**offices** 111:2

**official** 18:5 38:17 409:17

**officially** 153:14

**omitted** 307:17

**omnibus** 98:3,4,10,16,22 99:19 163:4 184:14 193:9 197:25 198:3,7 200:2,20

**one-for-one** 103:2 181:21 288:4

**one-to-one** 288:6

**one-year** 337:22

**ongoing** 93:3 168:2 169:19 170:25 172:14 174:4 185:7

**online** 305:12 410:9

**open** 103:7 214:12,15 230:8 315:17 395:10,17

**opened** 196:7,9,12 213:21 220:18 376:10

**opening** 204:13 233:20 328:22 395:5

**operate** 71:8 109:4 113:21 148:13 315:4 316:20 386:8

**operated** 101:5

**operates** 113:22

**operating** 96:3 147:8 155:8 165:14 207:20 208:17 301:12 312:12 349:24 350:5

**operation** 166:4 167:12

**operational** 71:24 156:15,25 176:24 192:6,10 316:16 340:24 341:13,25 342:12,25

**Operationally** 156:18

**operations** 95:7,14 96:13,14 103:15 164:23 166:14 170:10 171:14 172:23 174:22 175:20 189:7,15 190:24 191:14 200:10 211:4 274:4 313:21 314:15

**opinion** 42:14 44:4 45:13 54:14 55:4 109:21 259:24 313:19 354:3,5 392:24

**opp-** 31:11

**opportunity** 31:12 333:20 334:18

**opposed** 102:20

**opted** 67:13

**optimize** 111:6 315:5

**option** 122:15 158:13 290:9

**options** 111:22,24 331:10

**orally** 19:24

**order** 19:21 20:10,19 38:21 113:25 159:13 165:13 196:8 220:8 221:2 241:21,23 242:4 266:17 268:9,14 273:11 316:15 323:4 324:21 332:2 355:17 362:6,23 395:4,17 396:14,25 412:4

**ordinary** 38:25 45:20 94:24 100:24 102:15 113:20 148:17 208:17 222:20 223:5 272:3 286:19 364:21 386:17 389:4,7 390:21

**Oren** 26:8 47:3,8 119:16 122:5 144:17 196:24 201:21,22 202:2,4,7 206:9 220:12 221:6 280:12,18 305:3 358:17 359:6 360:9 394:24 395:12,25 410:10,24

**Oren's** 125:17

**organization** 28:14 133:4 166:7 266:17 295:6

**original** 124:16

**outcome** 109:7 338:11,12

**outflows** 156:6

**outreach** 187:14

**outset** 21:4

**outstanding** 116:16 162:4 174:12 278:4 366:15

**over-collateralized** 319:11

**overcollateralized** 334:19

**oversaw** 364:14

**owe** 116:16 182:10 193:23 224:22 226:10 255:22 319:20

**owes** 165:5 224:21

**owned** 216:24 219:9 334:6 344:24

**owner** 72:21

**ownership** 38:22 58:18 194:13 195:6 198:14 216:11 220:24 226:9 232:10 275:14 276:8 279:5,9,14 280:6,25 281:8 282:10 283:17 288:10,20 289:9,18 292:11 302:24 303:7 317:7 348:15

**owning** 277:20

**owns** 270:2

---

**P**

**p.m.** 189:23,25 190:2,4 212:23 213:3, 7,10 299:4,6,7,9 319:17,19,20,22 371:19,21,22,24 412:10,13

**package** 138:24 139:5,15,25

**pages** 267:4 384:12 390:18

**paid** 52:4 93:16,21 102:18 174:5 183:20 187:4 208:22 260:5 263:15 276:10 296:15 297:15 340:20 358:19 366:24 369:8,9 374:5,17 378:8

**paper** 254:12

**paragraph** 47:19,21 48:2 78:14,22 80:17 83:15,20 84:8,16 97:18 100:16, 19 106:4,9 278:19 281:5,23 282:4 320:8 377:12 409:13

**paragraphs** 35:17,24 36:4

**parent** 367:4,5

**part** 31:6 32:25 39:25 42:12 43:19,21 67:22 68:20 69:15 70:14 93:13 105:19 113:24 121:10 134:16 139:14, 25 140:21 144:8 145:9 146:21 148:9 149:2 180:13 185:21 201:22 205:14 219:8,19 221:16 229:14 236:18 243:8 280:17 295:25 296:2 297:10 313:17 330:11 353:23,25 361:2,3,20 362:18 379:6 396:20 404:22 408:24

**partake** 363:23

**partial** 289:24 290:11,13

**participants** 200:4,16 411:16

**participate** 20:5,9 125:12 300:21 399:5

**participated** 49:21

**participating** 50:12 208:10

**parties** 18:14

**partner** 410:18

**partners** 112:10 263:4

**partnership** 264:19 410:17,22

**partnerships** 262:9

**parts** 20:22

**party** 18:9 269:24 307:14 410:16

**pass** 18:12 27:10 33:6 37:6 100:2 128:5 137:10 184:6 256:25 364:21 368:15

**past** 45:10 113:15 188:24 192:14 205:25 271:22 363:25

**pasted** 388:20

**paths** 122:13

**Paul** 143:7

**pause** 37:12 112:12 185:19,23 186:17 227:3 235:23,25 236:12 238:7,21 239:2,3,6,9,15 244:2 245:10 247:22 248:2 249:14 251:6,14 252:14 268:4 291:4 313:18,24 380:4 386:3, 23,25 387:11,14 390:25 391:5,9,24

**paused** 177:3 236:24 241:16 242:12, 24 243:5 313:21 386:4 387:16 388:4, 6 391:6

**Pavon** 152:22

**pay** 68:8 70:13 92:24 93:4 95:7 97:9 105:11 124:14 139:15 168:14 177:15 200:3,11,14 210:12 236:19 241:23 245:23 246:10,13 247:6 252:24 253:2 260:23 315:11,23 316:2,5,15 319:12 346:6 355:17 365:18

**payable** 382:18

**paying** 42:17 164:9 171:17 253:6 259:15 313:25 339:3 346:15

**payment** 101:10

**payments** 103:20 105:9 170:13,21, 25 172:14 208:24

**payout** 365:12

**payroll** 102:12 189:7,11 209:4 294:23 340:19

**pays** 354:9,19

**peak** 169:18

**pegged** 84:20,22

**pending** 22:22,24

**people** 36:16 40:24 44:25 67:12,13 68:7 124:13 129:12 142:7,8 156:5,20 175:15 181:23 189:8 204:17 230:5,7, 12 239:10 244:24 248:2 275:15 278:2

285:24 295:16 320:2,20 332:2 336:5 337:22 348:25 362:23 363:4 375:2 387:16 399:5 405:5

**percent** 70:21,24 71:13,14 73:18,21 168:5,8,11 177:12 190:17 237:25 276:11 277:19 302:23,24 303:7,8 335:4 354:5 364:22 365:12,15,16,19, 23 366:3 399:3

**percentage** 50:12 398:17

**Perella** 134:10

**perfect** 24:4 47:22 104:24 212:19 249:6 342:23 359:8 385:7

**period** 119:18 202:5 248:17 284:21 337:22 375:11 382:24

**permitted** 107:7

**permitting** 38:24

**person** 20:12 33:14 59:9 77:2 114:23 115:4 119:21 136:20 193:24 194:2 195:12 237:2,3 268:23 284:24 287:23 299:20 344:5 368:17 409:3

**personal** 55:5 143:3 218:17 365:9

**personally** 132:10 134:21 221:18 329:24 394:23

**pertaining** 295:13

**pertains** 274:7

**petition** 30:17 65:22 85:19 86:13 87:22 88:5,21,24 89:22 91:6,20 92:13 100:21 101:14 102:5 105:5,8,23 120:10 140:7 165:24 170:7 186:13 192:10 337:23 369:19 370:15 372:11 374:12,16

**phase** 299:13

**Phoenix** 28:3

**phone** 25:21

**physical** 172:9

**pick** 352:16

**picked** 23:6

**pickier** 334:22

**place** 42:9 73:18 75:20 196:25 204:25 226:22 348:14 349:5 395:8

**placements** 345:19

**placing** 256:8

**plain** 76:17 358:2

**plan** 59:24 108:8,17,19 109:16 111:10 116:23 122:15,22 123:5,12 124:19 125:8,16 126:7,8,21 127:6,15 131:15,20 132:12,24 133:4,7 134:4,9, 18 136:16 183:12 205:7 329:5,7 330:13,23 331:4 333:9,16,18,21 334:3 351:10 352:14

**planning** 28:11 30:4 61:25 158:11 203:7 294:18

**plans** 204:23 330:24

**platform** 48:8,9 51:5 66:25 68:8 118:14,17,19,21 120:19 192:22 205:23 222:21,22,25 229:13,17,19,25 230:5 231:17 239:11 240:16,23 242:7 256:4 261:9,23 263:22 307:5,7,9 345:11 349:15 369:22 372:14 375:17 381:3 382:8 387:16 396:18 399:6

**platforms** 352:10 398:14

**play** 34:23 172:9 232:24

**player** 42:19 89:18

**players** 349:15

**pledge** 71:23 99:7 120:13,19 194:23 200:10 221:2 254:8 314:14 323:3 341:16

**pledging** 323:12

**plenty** 20:24 397:17

**podcast** 19:25

**point** 28:17 31:9 32:5,24 44:23 55:20 57:10 61:4 64:24 69:16 111:13 118:18 119:3 156:3 184:7 186:20 193:13 207:22 208:19 210:20 211:14 214:3 215:9,23,24 221:17 227:11 236:14 243:4,6 244:15 248:3,24 280:2,4 298:23 304:5 321:5 324:12 340:11 379:21

**points** 70:24 217:19

**policies** 72:21 75:4,19

**policy** 295:7,8,14 306:3

**pool** 73:21 143:10

**pooled** 164:5 193:14

**pools** 73:20

**poor** 362:5

**pop-up** 409:22

**pop-ups** 284:20 410:8

**pops** 206:21

**portion** 104:14 301:21 318:11

**portions** 285:14

**pose** 22:11 275:19

**posed** 37:8,16

**position** 28:8,21 29:7 32:23 96:21 102:24 103:7,18 129:13 141:18 151:20 160:21 180:16 202:17 301:5 361:14 389:22,23 392:18

**positioned** 316:22

**positioning** 159:5 226:22

**positions** 97:14 179:19 314:9,10

**positive** 156:13,15,18 157:2 160:23 167:10 177:17

**possessed** 92:14

**possession** 92:10 94:12,15 97:24 158:9 159:6 346:5 366:10

**possibility** 175:14

**possibly** 168:18 251:12,17 275:8 284:8 331:6 374:9

**post** 238:7,9 239:3,6 244:2 251:6 358:20 389:5 391:24 400:6 403:17

**post-petition** 106:9 325:9,23,24

**posted** 97:8 262:15 310:15 325:6 407:19 408:15

**posting** 53:12

**posts** 51:8 52:21,24 53:3,5,15 76:24 78:9 308:2,9

**potential** 33:3 69:2 122:12,20 124:7, 18 131:20 132:12 133:4,7,17 134:17 158:9,19 205:7 336:12

**potentially** 123:16 127:5 161:5 172:7 227:23 229:18 237:19 238:19 335:19 363:19

**poverty** 31:12

**power** 157:4

**practice** 27:21 42:15 332:17

**practicing** 245:20

**pre** 238:6,7 239:6 403:18

**pre-** 150:12

**predate** 166:24

**predominantly** 25:3 51:12 53:15 54:2 67:14 71:20 80:14 95:22,24 168:15

**preference** 57:18 60:8 122:21 123:2, 11,14 124:18

**preferential** 237:15

**preferred** 173:7,18,25 300:11,13

**preliminary** 19:12 21:10

**prep** 25:9,11,21 40:2 41:21 42:15 284:5

**prep-** 49:22

**preparation** 26:13 39:9,14,19,21 79:24 342:6 360:4 390:18

**prepare** 24:13 357:20 390:19 392:7

**prepared** 157:9

**preparing** 42:7 43:9 265:24 300:21

**prepause** 45:20 192:11 222:20 223:9,20,24 224:10 386:17,20

**prepetition** 93:4 102:2 103:24 104:18 192:11 373:4 386:16

**prepped** 24:15,18 46:6

**prepping** 39:12 144:15

**present** 20:11 26:3 249:21

**presented** 36:18,24 301:2

**preserve** 56:14 178:9 274:19 343:9 352:7

**preserved** 58:7 197:16

**preserving** 163:11

**pressure** 63:22,25 169:13,14 397:14

**pretty** 53:23 95:21 142:11 158:2 160:10 284:25 302:15 349:14,19 368:10 370:21 396:11

**prevent** 341:25 342:12 380:3

**previous** 161:21 194:20 228:21 295:6

**previously** 138:15 159:14 185:24 272:15

**price** 70:24 168:10 175:4 181:23 211:17 231:14 257:4,11,20 271:20 279:11 365:22

**prices** 32:24 102:25 245:5

**pricing** 226:21

**primarily** 165:11 208:18

**primary** 35:11 60:3 148:10 166:3

**prime** 49:10 179:4,12,18,20,25 180:5,9,20,21 215:10,21 216:7

**principal** 241:24

**principles** 244:22

**prior** 20:8 100:21 101:14 125:4 140:7 141:2 142:13 216:16,17 217:21 218:3 219:11 239:15 254:18 257:20 275:12 281:6 292:10 296:6 322:15 337:23 369:19 372:11

**privileged** 43:2 63:9 64:2,5 69:7

**privy** 62:5

**pro** 213:21 227:13 273:9,19 285:10 298:22 299:13,16 301:20 302:2 318:10 320:22 324:6 368:12 394:7,12 406:22 411:7

**problem** 241:16 242:12 243:7 352:9 375:22

**problems** 327:22

**procedure** 115:7

**procedures** 75:19 333:22

**proceeding** 18:7 109:4

**proceedings** 351:23 386:6

**proceeds** 160:24 165:12 178:6 180:21 227:15

**process** 45:25 69:22 70:7 72:6 101:12 104:24 108:5 111:9 112:10 115:7 116:24 122:14 123:7 124:2,11, 19,20 125:19,21,23 128:2 132:22 133:15,21 134:16,19 136:15 146:24 147:7,21 148:3,18 158:20 167:3 172:5 175:13 176:14 178:12 188:2 197:21 201:2 221:8 266:5,13 275:7 284:25 290:4 292:23,24,25 293:17,18 295:25 297:12 332:11 333:23 338:6 351:22 361:9 376:2,12 390:21 400:21 401:3 409:10

**process-wise** 395:11

**processed** 381:7

**processes** 125:2 342:25

**processing** 130:7 154:15 206:7

**procure** 158:11

**produce** 156:23

**produced** 409:7,8

**producing** 177:16

**product** 49:17 56:3,7 57:14 59:18, 19,23,24 60:3,4 61:24 63:20 119:16, 19 122:4 125:16 147:13 186:8 194:5, 6 287:8 295:24 335:12 345:12 360:5 396:4,10,11,14,25 397:2,3,15 398:4, 8,12,16 399:5,12,13,14,17 403:2,21 404:16 405:4

**production** 165:18 169:21 177:10 363:15

**products** 55:11,21 205:9 335:21 397:11,18 401:5 403:8

**professional** 27:8 102:13 158:6 189:12

**professional-eyes-only** 45:7

**professionals** 76:8 108:9 189:8 298:2

**profile** 381:2

**profits** 315:23 316:2,5

**program** 38:23 48:3,5,6,14,15,19,22 49:2,8,10,12,16,21 50:3,13,20 51:16 52:6,17 53:6,11 55:22,25 57:6,22 58:19 59:14 61:2,14,16 62:18 64:9,11 65:5,7,12,13,19 66:7,15 67:8,14,17, 22 68:13 69:5,11,24 70:9,15 71:9,10 72:8 76:11 77:8,23 91:11 93:7 116:14 121:11 162:5 184:22 185:21 200:4,15 210:14 211:13 230:4 241:11 279:7 303:13,25 314:4,23 335:6 348:14 355:8,10,13,14 358:9 378:19 379:6 385:23

**programs** 48:16 71:18 72:18 95:16 162:10 188:22

**progress** 114:9 395:4,17

**project** 57:12 106:14 107:5

**projection** 106:19

**projects** 28:14

**promise** 58:22 339:10

**promo** 230:14

**promoted** 30:18

**promotion** 231:13

**promotional** 229:4 271:6,11

**proof** 335:9 394:20,22 395:7 396:2

**properly** 107:25

**property** 193:13 200:9 314:7 327:23 343:10 345:8 346:7,15

**proportion** 54:15

**proposal** 127:5,14

**proposals** 158:24

**propose** 126:8,21 248:6 307:15

**proposed** 85:16 86:15

**proposing** 125:8 126:7

**proposition** 67:23

**proprietary** 157:3

**protect** 21:2 197:5 239:10 294:10 351:21 396:5

**protected** 197:17

**protection** 236:13,16

**protections** 405:12,19,21 406:3,7, 10

**protective** 19:21 20:10,19 268:8,14

**protocol** 71:16

**protocols** 71:21 110:12 111:15 112:20

**proven** 398:13

**provide** 42:20,22 63:16 85:14 110:4 143:18 167:20,25 175:8 206:23 210:11 226:15 267:18 274:15 287:23 295:18 331:4 394:22 396:2,18

**provided** 20:7 31:5 36:19,20,21 81:24 171:7 198:20 199:2 202:11 230:19 231:15 263:4 282:6 305:10 409:4

**provider** 101:18

**providers** 27:23

**providing** 124:8

**provision** 195:5

**provisions** 79:7 194:13 279:4 281:16

**public** 20:17 27:10 38:2 99:18 142:7 186:22 202:11 306:3

**publicly** 19:24 33:19

**pull** 37:24 74:20 255:3

**pulled** 110:19 111:7 370:14

**pulling** 373:3

**purchase** 96:20 97:3 271:14

**purchased** 167:5

**purchases** 166:24 269:11 270:6,7 271:5

**purchasing** 166:22

**purpose** 123:7 199:11 219:3

**purposes** 71:24 95:12 274:24

**pursuant** 363:11

**pursue** 29:17

**pursued** 122:14,15

**pursuing** 111:23

**purview** 296:22

**push** 174:14

**pushback** 274:15

**pushed** 164:19

**pushing** 339:8,16

**put** 48:7 67:12 68:7 73:17 88:15 101:20 104:7 163:8 180:22 181:3 199:23 227:14 239:12 255:8 270:17 289:4,6 330:13 333:10 345:11 352:13 406:2

**putting** 48:8 66:24 99:9 361:3 363:17

---

## Q

**qualified** 259:2 335:19

**quality** 267:5

**quarter** 106:17,20 107:24 108:21 161:9,10 177:21

**question** 22:11,15,21,23,24 23:16, 17,18 34:14 41:25 44:7 57:2 58:11 60:20 62:8 65:8,9 67:25 72:3,4,5 85:6,10,12,20 86:6,9 87:11 97:23 99:12 115:24 116:17 120:6 124:16 125:6 126:3,7 132:4 133:25 173:21 189:3,4 190:17 192:24 194:9 195:11 197:9,10 198:24 205:20 217:13 231:23 237:13,17 238:16,18 258:17, 18 270:15,25 274:12 275:8,25 276:3 278:4,9,16 293:13,16,20 295:5 298:10 299:15 300:20 306:25 308:14 310:14,17 313:9,13 314:19 315:12 316:3 318:18 321:6,9 323:2 324:25 325:3 327:9 329:12,18 331:12 332:4 334:2 337:19,20 338:23 340:22 346:10 349:11 358:6 359:10,21 360:23 365:7 366:14 368:5 370:7 371:14 372:3,9,20 376:10 383:10

387:8,24 388:2,23,24 390:5,7 393:18, 19,21 396:3 401:13 402:10 403:5 405:17 407:4,23 408:5,10,17 410:24

**questioner** 273:12 301:21 368:20

**questioners** 285:23 368:13

**questioning** 23:14 137:6 324:3 406:13

**questions** 18:8,10,14,16,20 19:12 21:10 22:6,9 37:8,16 38:19 41:14,17, 21 42:13,20 43:6,17,24 44:5,9,14,22, 24 46:12 56:13,18 83:2 85:24 108:13 111:9 114:13,18,20,22 115:5,8,9,13, 23 116:2,20 117:2 118:4 124:7 126:12 128:4,6 133:12 136:25 137:4 138:13,14 143:12,23 144:5 154:17 181:8 184:20 190:14,15 192:18 196:25 202:7 207:4,15 210:16 212:3, 8 259:5 261:17 264:16 273:4,24 274:10,17 275:18 284:6 285:18 301:17 305:19,23 321:21 323:22 324:15 326:16 330:2,7 331:25 332:22 339:21 344:15,17 351:2 369:2 371:3 377:7,8 392:15,20 394:19,25 411:3,8

**queue** 285:12,19

**quick** 44:14 89:2 97:23 285:22 299:12 370:21 371:12 374:8

**quickly** 328:6

**quietly** 241:20

**Quito** 249:23

**quote** 234:10 250:4 278:19 289:21 291:24 292:3 370:8 382:16 383:10

---

**R**

**Rachel** 299:23

**raise** 109:20,25 267:10

**raised** 315:7,8,9

**raises** 316:13,19,20,25

**raising** 325:15

**ran** 76:5 152:23 158:20 171:12,13 185:22 186:8,12

**range** 96:23 158:2 209:8

**ranges** 167:23

**rapid** 139:22

**RAR** 299:19

**rate** 49:10 70:25 71:15,17 169:6 188:16 189:14 210:13 240:25 252:19 288:2,3

**rates** 168:24 169:3 286:25 287:2,5,6, 14,17 288:7 315:11 336:8 337:8

**ratified** 146:25

**ratifying** 147:21

**ratio** 365:18

**re-** 357:15

**re-ask** 132:3 143:14 346:10 371:14 390:4 402:9

**reach** 52:9 53:15

**reaction** 129:16

**read** 24:16 44:2 52:24 76:24 78:21 80:5,8 85:13 114:4 128:18,20 129:6, 8,9,12 130:13 141:9 142:5 145:2 219:19 221:17 227:5 250:3 281:12,13 283:18,24 284:3,13,14,21,25 300:23 305:21 336:24 341:14 355:19 357:14 377:9 378:14 382:15 383:11,19,25 384:4,15,17 385:3,8,12 388:16,25 389:17 411:12

**reading** 38:15 78:17 79:17 80:15 130:19 144:15,16 199:10,19 230:24 280:22 288:15 290:24 355:2 357:12 378:16 379:9 382:6 391:18 393:23

**reads** 86:10

**ready** 372:4

**real** 44:14 111:2 207:20 241:10

**reality** 105:12 249:9 287:25 365:13

**realize** 241:21 242:4

**realized** 240:24

**realtime** 407:18 408:14

**reason** 22:2 33:18 102:19 178:13 231:16 258:9 260:15 268:20,22 323:21 335:25 337:15 364:6 375:6

**reasonable** 67:4 196:11 245:15 263:5 271:14 348:24 366:5

**reasoning** 401:7,16 402:11

**reasons** 172:6 236:7 402:14

**Rebecca** 227:9 228:22

**recall** 25:24 36:3,6,13 41:16 47:10,11 77:15 144:19 227:8

**receivable** 312:7

**receivables** 311:3

**receive** 180:4 220:15 229:10 232:11 237:20 344:20 395:9

**received** 89:22 90:13 91:10 124:12 140:8,15 240:10 254:17 325:17

**receiving** 139:24 340:16

**recent** 194:17 341:3

**recently** 308:5

**recess** 117:17 138:2 189:25 213:2 299:6 319:19 371:21

**recognize** 34:14 38:11

**recognizes** 255:5

**recollection** 91:3 220:20 387:12

**recommend** 275:11

**reconcile** 109:10

**reconnect** 324:13

**record** 23:9 85:13 117:13,16,21 137:22,25 138:6 142:24 144:23 158:10 161:24 174:15 189:24 190:5 204:15,16 212:24 213:11 264:3 299:5,10 300:17 311:8,14 319:15,18, 23 332:25 336:24 346:4 347:3 348:20 357:24 368:22 371:9,11,15,17,20,25 379:10 388:16 406:19 407:10 408:10 412:8,12

**record's** 231:2

**recorded** 19:23 193:21 247:13 344:4,8 395:25

**recording** 142:10

**records** 195:19 345:6,7 347:11

**recoup** 174:4

**red** 218:5

**redesignated** 184:2

**reduce** 111:3 180:6

**reducing** 185:20

**refer** 75:23 144:3 198:2 317:17,20

**reference** 37:22 57:23 151:17 249:25 286:6 369:25

**referenced** 40:16 250:5

**references** 149:5

**referral** 51:4 55:8,9,17

**referred** 48:18 59:4 142:22 182:18

**referring** 24:20 26:7 40:7,17 102:11 115:9,25 308:24 408:12

**reflect** 345:8

**refund** 260:19

**reg** 152:14 153:21

**regular** 70:18 132:19 147:8 155:22 164:19 207:19

**regularly** 154:24 331:16 351:8

**regulated** 228:4,11 234:3 405:18

**regulation** 406:3,10

**regulations** 405:21

**regulator** 207:6

**regulatorally** 204:24

**regulators** 63:20 204:22 212:8 405:23

**regulatory** 57:17,24 58:8 59:4,20 60:8,11,23,25 61:6,13 62:17 69:10 147:12 148:10 149:19,22 150:5,14 151:25 152:3,4,5,18,21 203:22 204:2, 6,17,19 295:23 397:6,14,18,21 398:9

**rehypothecate** 59:17 99:8 194:22 221:3 254:8

**rehypothecated** 353:7

**rehypothecation** 334:20

**rejected** 272:12

**rel-** 42:14

**relate** 209:24 305:19

**related** 24:16 39:2 43:8,10 45:3,19 46:9 57:13 63:9 85:15 86:14 92:11 98:24 102:16 105:3 124:6 140:23 174:14 183:9 189:12 209:17 211:12 214:2 229:3 269:24 271:10 323:17 327:10 360:5,19 376:5 380:15

**relates** 210:4,25 211:2

**relation** 232:17 397:20

**relation-** 225:9

**relations** 30:5 186:22 203:8 294:18

**relationship** 150:11 187:11 215:20 270:17 271:2 358:3

**relationships** 262:8 354:23

**released** 143:18 399:18

**relevance** 367:8

**relevant** 26:2 42:16 43:6 44:6,9 56:11,21 278:9,15 388:17 393:17

**relief** 39:2 113:22 183:8

**relying** 165:11

**remain** 65:5,12,19 215:23 355:10 403:10,11

**remained** 94:12,15

**remaining** 65:6 157:2 211:3 285:10 298:22 358:20,21

**remains** 353:9 367:2

**remark** 233:16

**remember** 25:6 39:5 41:19 44:22 45:5,8 46:24 48:21 51:3 78:10 114:15 128:22,23 139:13 148:24 156:11 164:24 199:10,17,19 227:10 288:25 380:12

**remembering** 47:5

**remind** 329:11

**remote** 139:21

**removal** 361:24

**remove** 65:14

**removed** 218:3 360:11

**removing** 169:5 362:13

**rendering** 265:20

**reorg** 111:10 134:18 292:14 328:22 333:16 334:15

**reorganization** 108:8,17 116:23 123:5 125:16 131:21 132:13 133:7, 18,19 134:4 136:16 203:19 204:24 205:7 329:6 331:3 333:9,20 334:2 352:14

**reorganize** 18:18

**reorganized** 126:17 134:9

**repaid** 358:9

**repay** 318:22 369:23 372:15

**repaying** 318:13,20

**repayment** 290:11

**repeat** 60:20 143:12 192:24 198:23 308:15 318:18 336:21,23 404:14

**rephrase** 190:19 338:24

**replenished** 201:7

**report** 88:17 155:6 184:13 249:25

250:3,18 264:6 269:9 298:3 329:14

**reported** 311:12

**reporter** 23:4,9 33:7,10 37:6,12 302:8 384:10 394:10

**reporter's** 273:15

**reporting** 62:2 75:21 255:16 297:25

**reports** 88:16 101:6 155:8 266:16 312:13

**repository** 217:15

**represent** 18:5 151:14 190:11 216:19 300:10 329:24 345:15

**representation** 122:16

**representative** 143:7

**representing** 80:22

**represents** 143:2 148:22 352:2,3

**request** 161:21 286:20 394:19 395:7

**requested** 56:20 159:14 376:4 377:22 379:3,4 389:9 396:2

**requesting** 318:12,19

**require** 64:5 112:23 328:16

**required** 74:21 274:3,16 342:11 375:9

**requirements** 330:5 402:15

**requires** 181:5

**requisite** 306:2

**research** 190:23 192:5

**reserve** 137:3 169:5

**reserved** 320:16

**reserves** 335:9

**reset** 371:11

**resignation** 340:7

**resolve** 327:22 351:10

**resolved** 114:13 116:3,20

**resort** 158:14

**resource** 194:8 410:11

**resources** 241:23 317:2 338:17 339:3

**respect** 87:23 143:3 147:23 148:3 174:6 320:12

**respective** 381:3

**respond** 247:4 278:13 292:20 294:2 360:21 365:6,8 378:13

**response** 23:8 86:9 231:23 291:23 292:3 294:5,12 332:21

**responses** 37:7,15 38:16 85:3 143:17,19 149:3 377:7

**responsibility** 75:5

**responsible** 75:3 202:4 238:11 294:22 295:3

**responsibly** 114:2

**responsive** 72:2

**rest** 321:13 399:2

**restate** 241:6 337:4 345:4 362:4 391:19

**restructure** 185:22

**restructured** 374:17

**restructuring** 30:21 361:20

**restructurings** 327:20

**result** 167:18

**resumed** 213:13

**retail** 48:19 59:9 70:19 93:6 95:24 232:3,7 309:22 323:3,5,8,9 327:13 334:19 366:7

**retain** 57:21 116:8

**retaining** 30:22

**retirement** 335:16

**retread** 97:17

**return** 18:19 66:25 93:14 118:4,7,9 120:6 122:7 125:22 180:10 182:11 183:6 240:8,10,25 276:20 292:16 299:13 301:20 303:19 347:13,15 348:5,16 365:13,23 366:5 391:4,5,9

**returned** 223:14 286:21 370:5 372:19

**returning** 94:22 125:3 182:2 376:16

**returns** 252:19 344:23 380:23

**revenue** 171:8 316:14,17,18 364:22

**revenues** 172:25

**reversions** 80:9

**review** 26:12 35:8,18 36:18 44:13 78:23 80:12,23 85:7 190:23 203:15 249:24 266:2 269:17 296:22 385:10 388:22 392:6

**reviewed** 25:25 35:21 43:16,18,19, 24 155:12 250:17,18 265:25 295:10 297:4 304:7 341:4,6 355:21

**reviewing** 76:19 79:23 195:8 219:20 342:7

**reviews** 267:6

**revise** 146:12

**reward** 141:20 252:19 253:10,13 255:12 256:3,4,9 260:25 315:11

**rewarded** 230:2

**rewards** 48:10 65:21 67:2,15,24 68:9,12 70:13 121:2 200:3,11,15,17 230:17 238:2 241:16,19,23 242:19 251:18 252:4,10,13,15,16,22,25 253:6 255:2,4 256:7,12 257:9,12,17 260:5,20 276:9,11,17,25 279:13 316:15 355:17 364:23 378:3,17,21,23 379:6,22 382:18 385:23,24 386:6

**rid** 110:25

**rights** 21:2 275:14 279:5 347:24 377:19

**rigs** 166:22 175:10,13,16 176:5 177:8,11,15

**ripest** 352:15

**rise** 236:11

**risk** 32:12,14 60:9 71:16 72:14 73:17 74:2,7,8,11,15 75:3,8,15,18,23,24 76:7,20 77:4,5,7,15,22 97:14 102:24 103:7,17 141:6,14,19 173:20 198:15 221:17 240:2 314:8 343:21,24 349:18 366:6 374:2,3 398:5

**risk-based** 355:16 365:23,24

**risk/return** 141:6

**risks** 59:15 76:12 112:22 233:20

**River** 272:7

**robust** 195:3

**Rodney** 76:6,8

**role** 30:2,9,10,13,16 34:23 35:11 69:20 192:3,9 339:23 364:13

**roles** 28:13

**roll** 226:23

**roll-up** 309:9

**rolled** 49:8 224:9 227:3

**rolling** 48:21 321:12

**rollup** 367:15

**Ron** 46:17 150:23 152:23

**Roni** 152:2,21

**room** 18:22 23:5,25 33:5

**rooted** 347:12

**roughly** 91:3,7

**route** 304:13

**row** 87:20 88:2

**rows** 89:4

**rule** 115:18 173:22 278:16 392:20

**ruled** 115:16

**rules** 21:15 22:5 75:8,9,11 181:6 338:10

**run** 88:17 106:15 107:6 108:24 109:13 119:2 232:6 234:7 361:5 363:16

**running** 109:11 191:16

**runs** 106:19 107:3 119:16 270:2

**runway** 107:9

**rural** 31:10

**Rynders** 299:22,24

---

**S**

**S-H-A-R-A** 138:9

**safe** 29:17 31:24 52:2 92:2 95:21 126:20 222:7

**safeguarding** 240:17

**salaries** 138:20 315:24 316:3,5

**salary** 138:23,24 139:8

**sale** 38:24 84:15 85:16 86:15 107:8 109:12 112:4,16 113:9 122:14,21 123:11 124:2,19 125:23 134:16 159:4 160:17,19 161:4,11,12 162:12 172:5 174:6,22 175:13,17,18 176:16 177:25 178:5 181:18 183:4 189:5 203:19 279:10,11 300:22

**sales** 108:6 111:9 116:24 134:19 160:2 177:7,11,16 178:11 332:11 333:22

**Sam** 18:3 21:5 40:11 56:10 58:4,17 60:20 135:14 137:11

**sat** 124:5

**Saturday** 25:14 39:6,24

**save** 177:11 357:15 395:15

**savings** 227:24

**scale** 166:20

**scare** 32:15

**scheduled** 205:15

**schedules** 261:16 262:4 265:24 266:9,25 267:3 277:17 311:13 312:13

**school** 26:22,25 245:21

**schools** 26:22

**scope** 56:23 58:5,12 64:16,21 65:16, 24 68:18 69:13 74:5 75:13 76:3 77:10,25 89:25 90:15,23 91:14,22 126:24 129:21 131:9 132:15 133:9 135:12 170:16 173:3,10 179:8 180:25 182:20 183:14 184:10 185:2 186:3,25 188:12 198:10 199:6,15 201:13 202:13,15 203:2 206:5 221:14 222:13 223:3 233:5 234:20 235:20 236:22 237:10 238:4,13,23 241:4 243:2,21 244:10 245:17 247:3 248:20 250:25 251:21 252:7 254:22 255:25 256:22 257:24 259:7 260:10 261:25 262:11 264:15,24 265:19 266:23 269:16 270:9 271:17 272:18 277:14 297:22 303:15 306:6,21 307:11 308:12,22 309:16 310:2,12 311:16 312:20 314:25 316:10 320:5 322:4 323:14,17 328:8,25 330:18 332:8 337:25 339:6 340:2 342:20 346:18 347:6 349:8 350:3,10 351:6,12 352:25 353:15 358:15 361:16 362:16 363:10 366:12 367:10 371:10 373:14 380:7 381:16 387:22 396:7 397:24 401:11,19 402:4 403:14 405:15 408:17

**screen** 33:18 37:24 77:14,16 216:14 232:14 254:11 269:23 383:23 384:5, 25 385:2 388:21 407:25

**screens** 196:24 395:18

**screenshots** 280:21 284:18

**scroll** 235:6

**scrutiny** 397:18 398:9

**Seattle** 26:21 27:22 31:6

**SEC** 306:3

**secondary** 59:24 397:2 398:8

**secrecy** 328:16

**section** 281:4,23 355:24 377:11,12 380:19 385:5 388:10,11,15 389:12 391:12

**sections** 380:4 389:16 390:8 391:8 393:10

**secured** 317:9,16

**securing** 358:11

**securities** 59:21 190:11 299:25 306:8 397:22

**security** 172:9 181:5 303:13,24 317:10

**seek** 159:5

**seeking** 92:5 161:17 162:16 163:13 176:17 180:3

**segregated** 353:9

**seldomly** 186:10

**sell** 26:9 92:6,16 101:17 103:6,10,12, 13 105:24 107:7 110:15 118:11 139:4,24 140:5,8,15 159:21 160:12, 22 161:17 162:2,16 163:14 165:8 175:9,13 180:3,7,13 181:22 183:8 221:3 225:23 243:16 249:3,4,7 252:24 254:8 257:7,16 341:16 351:10 352:2,3,7,11

**selling** 111:19 124:3 176:5,12 226:4

**sells** 225:24

**semi-educated** 113:17

**semi-independently** 171:13

**send** 185:10 208:24 218:5 383:20

**senior** 29:8 153:15 361:13

**sense** 22:12 23:10 105:14 119:6 148:16 235:12 241:10 380:18 386:10 399:15

**sensitive** 102:25 356:18

**sentence** 79:3 80:17 86:10 100:18 102:11 106:8 235:14

**sentences** 80:18

**sentiment** 169:4

**separate** 42:11 116:7 120:16 148:2 152:19,20 264:11 334:25 335:18

**separately** 39:23 164:3 176:13

**September** 30:20 325:5,10 326:10 340:19

**sequelas** 295:11

**Serbia** 148:24

**Serbian** 164:16

**Series** 174:15 300:11,13 315:7,8 317:5

**service** 214:19 217:18 219:12 221:12 222:9 226:15 233:2 234:18 275:12 280:5,8 281:5,22 282:5 290:9 295:9,17 325:3,5 374:21,22 375:3 376:15,25 377:5,16 381:24 382:9,13, 20 383:3,7

**services** 151:15 219:4,8 305:9,11 376:20 382:22 386:12,13 396:19 397:11 398:6

**ses** 273:6,9

**session** 25:9,18,19 212:12 274:13 284:6 340:10

**sessions** 25:11,16,21 42:15

**set** 48:10 75:8 100:11 141:12 338:16 339:2 378:23

**setting** 75:10,18 252:19

**settlement** 179:5,12,20,25 180:10, 14,21,22

**severe** 32:6

**shaky** 324:11

**Shara** 138:9

**share** 159:22 216:14 231:9 232:13, 14 254:11 320:18 326:6 383:23,24 384:5 407:25

**shared** 77:7 157:12

**shareholders** 173:18,25

**shares** 138:25 139:2

**sheet** 141:20,22 163:8 244:12,13,20 245:3,4,25 247:13 249:4 253:2 310:7 314:6 315:4,6 316:12 317:3 345:13, 20 346:22 348:20 349:25 350:6 355:15 374:15,16

**shelf** 141:13

**shipped** 167:6

**shopped** 271:20

**short** 202:5 236:25 383:23

**shortfall** 182:18,25 183:10,12

**shortly** 30:17 48:25



340:6

**spot** 119:3 287:15 384:19

**spreadsheet** 196:19 269:8

**spring** 229:9

**stable** 211:7 324:16

**stablecoin** 84:16,18,19 85:16 86:15 87:13,14 91:4,8,10,19 92:4,7,9,15,16 93:3 94:3,8,16,24 95:6,18,19 98:5 99:11 100:6,22 101:13,20 102:2,5,20 103:18,25 104:17 105:6,15,22 107:7,8 109:12 110:6 116:11 141:17 159:4 161:5,11,17 162:7 174:21 175:17 176:16 178:2,17 180:4,7 181:18 182:13 183:4,9 189:6 192:21 193:2 200:17 209:12,17 270:10 300:22 312:17 313:3,25 366:8

**stablecoins** 26:10 38:24 71:3,6 84:21 87:3,8 89:5 90:25 93:7,9,11 94:19 95:11,13 97:13,24 98:20 99:3 101:23 102:22,24 103:4 104:6,9,14 105:11,12 109:21 112:4,17 113:10,19 118:11,16 144:17 162:12,15 163:21 174:7 181:20,25 182:4 200:14 207:17 208:24 209:3,14 210:22,24 211:3 213:25 227:16 235:17 303:21 314:15 317:4 366:16 373:9

**stables** 103:13,14 210:4,6,7,8,10,11, 12 211:8,10 366:22

**staff** 203:22 315:23

**stake** 71:20 73:18

**staked** 71:19 334:23

**stakeholders** 127:25 131:13 132:18 133:5,12,25 134:2 192:16 329:9 339:12

**stakes** 334:10

**stand** 117:14 281:20

**stand-alone** 333:9,20 334:2,15

**standalone** 108:7 122:15,22 123:12 124:19 133:18 136:16

**standing** 27:16 264:13 306:2

**standpoint** 66:22 316:21 355:16

**stands** 227:23

**stark** 155:14

**start** 18:12,21 19:11,18 21:9 23:18 44:6 50:10 65:7 126:18 177:16 197:10 213:19 214:5 324:3 335:10,15

345:6 351:24 369:5

**started** 31:24 48:21 50:24 55:21,25 145:6,18 150:11 151:6 154:2 164:20 166:20 186:14 191:2,6,10 205:7 213:23 249:4

**starting** 26:18 158:6 226:25 397:3

**starts** 80:18 206:14,21

**state** 79:4 100:19,25 106:9 190:11 204:22 207:6,24 212:7 214:12 283:15 286:3 299:25 305:7 322:24 324:2 326:8 357:19,23 385:12 386:10 388:2 394:8 406:18

**stated** 50:23 184:22 198:13 239:19 282:4 307:24 320:8 389:6

**statement** 43:5 94:23 126:19 193:5 204:13 232:9 234:25 235:11 275:25 278:18 281:20 307:16 327:4,7 329:5 372:8

**statements** 128:11 261:15 262:3 277:16 283:8,10 292:10 298:7 305:20,21 360:24 364:25

**states** 18:13 86:12 138:11 204:2 208:10 233:12 280:5 294:12 321:24 322:10 343:6

**stating** 80:5 330:3 364:18

**status** 160:16 306:4 402:18

**stay** 68:10 130:7 334:8 355:13

**stayed** 75:20 242:7 320:24 322:22

**stays** 324:16

**steady** 158:2

**stenographer** 34:3 37:19 94:11 117:5 153:3 197:7 198:22 207:23 208:13 287:19 302:16 304:21 312:18 315:13,18 317:11 336:18,22 349:20 374:23 407:9,20 412:2,3

**step** 41:25 112:6

**steps** 68:25 76:10 111:25 395:12

**sticking** 96:11

**stip** 181:5

**stock** 140:5,16 160:8 310:9,20 383:2

**stocks** 159:22

**stone** 328:12 331:9

**stop** 185:11 268:23 285:15 362:23 364:5 385:25 395:5 406:24

**stopped** 185:4 313:20 386:6 387:20

**storage** 172:8

**storm** 249:6

**story** 383:23

**straight** 27:4 388:12

**strategic** 342:25

**strategies** 76:13 278:25

**strategy** 139:9 167:18 177:18

**street** 31:15 187:3,22 228:6 230:9 272:7

**stress-testing** 28:16,19

**stretch** 108:21

**Stretto** 129:4

**strike** 152:9 167:19

**strokes** 333:8

**strong** 269:12,14,24 270:2,6,7,18 271:5 272:15 284:25

**structure** 163:4 184:14 193:10 367:5

**structures** 198:17

**struggle** 98:3

**studied** 26:21 44:2 244:17 259:25 271:19 274:22 325:14 360:4

**study** 141:8,10

**stuff** 46:9 72:15 77:18 78:6 142:4 188:4 228:12 240:18 244:18 262:17 274:23 363:23 367:18

**subject** 36:11 86:11 290:6 332:15 351:15 382:22

**subjective** 400:19

**subjects** 69:19 119:8

**submit** 304:11,24

**submitted** 304:25

**subsection** 379:2 388:17 389:7

**subsections** 392:23

**subsequent** 178:8 216:16 220:14

**subsequently** 218:24

**subsumed** 248:8

**subtract** 162:9

**subtracting** 210:25

**subtractions** 282:7

**success** 188:21 334:11

**successful** 173:14,24 174:2 178:12

**sufficient** 113:12

**suggestions** 146:11

**suit** 396:14

**suitcase** 172:11

**suited** 410:24

**sum** 221:21 350:18

**summarizing** 230:24 231:3 379:10, 12,13 382:7

**summer** 169:18

**super-sized** 142:6

**supervise** 167:17

**supervision** 392:19

**support** 45:24 330:22 337:21 364:18 366:2 375:7 404:2 405:2,20,21

**suppose** 231:9 241:9 250:20 292:21

**supposed** 125:11 240:24

**supposition** 357:25

**surprised** 219:23 367:16

**surrendering** 240:9

**survival** 391:11

**suspended** 382:14

**Sutherland-smith** 33:5,12 37:5

**swap** 48:22 49:2,4,5 224:2,4,22,25 225:4,25 226:6,12,23 227:2 257:16 284:23

**swaps** 335:12 386:4

**switch** 269:7

**switching** 229:3

**system** 121:20 196:19,21 197:15 221:6,8 253:8 276:24 407:15

**systematically** 220:21

**systems** 119:20 395:24

---

**T**

**T-SHIRTS** 271:8,10,25

**T.J.** 19:3,4 25:3 40:16 56:12 58:6,23

82:24 132:5 267:19 269:5 326:17

**table** 178:10 189:9 334:10

**tail** 177:5

**takes** 244:13

**taking** 42:9 117:9 210:24 232:11 234:12 356:18

**talk** 23:15 26:16 69:18 78:13 117:13 201:21 202:18 280:13 284:24 328:18 330:9,12 335:25 336:7 337:16 359:6 370:20 375:13 394:24 410:11

**talked** 227:19 328:20 336:12 337:7,9 349:4 353:12,19

**talking** 23:18 72:13 120:7 122:8 147:4 178:16 191:11 245:12 266:10 271:15 288:17,18 319:8 337:6 347:10 352:5 354:16 381:21 389:3 410:18

**talks** 205:18

**target** 52:5

**targeted** 365:12

**taught** 32:12

**tax** 177:16 254:18,20,24 255:22 256:5,18,24,25 257:6,14,21 258:2,5, 11,20,22,23,25 259:4,12,21,22 260:2, 13,14,21,24 261:3 279:11 297:24 298:7 344:14,23 347:13,15 350:13

**taxable** 255:17 256:9 257:7,15 346:21,25

**taxes** 177:7,11 259:15 260:5 294:24 297:13,15,19 346:6,15 347:2 352:18

**taxing** 260:17

**team** 73:3 74:14 75:8,25 76:9 88:15 105:19 119:25 122:4,5 125:13,17 151:22,23,25 152:3,4,21,23,25 153:2, 7,16,21 154:7 185:8 295:23,24 315:24

**team's** 75:5

**teams** 134:12 148:10 152:18,19,21

**technically** 293:3

**technology** 119:25 120:4 171:16 206:11

**telling** 226:6

**ten** 43:22 208:9 392:2

**ten-minute** 285:8 298:19,25

**tend** 141:4,5 234:3

**tenure** 57:10 150:8,9 152:16 154:2 187:20

**term** 31:18 240:7 286:24 336:8 403:20

**terminate** 375:8,9 389:10,11 391:10

**terminates** 388:8

**termination** 391:10

**terms** 19:21 20:10 26:11 43:13 44:25 45:2 76:16,19,21 77:3,6 78:12,13 79:6,9,17,18,20 80:6,7,10,12,14,23, 25 81:24 82:10,14,21 99:5,10 115:15 139:11 144:22,24 146:6,12 147:4,14 148:15 149:6 150:6,15 194:11,15,17, 20,23,25 195:7,14,15,22 196:10 197:18,22 198:12 214:18,19 215:7 217:18 219:12,18 220:8,18 221:12 222:9 229:14 233:2,11 234:18 240:19 246:17,23,24 256:17 258:24 259:21, 22 266:20 267:8 274:2 275:11 279:3, 18 280:5,8,14,18,20,22 281:5,6,15, 18,22 282:3,5,7 283:3,6,12,13 284:9, 15 286:2,6 288:15 289:15,21 290:7, 25 291:3,6 295:9,16,24 297:5 301:6 303:22 304:4,8,9,12,16,18,23 305:7, 14,20,25 322:16 325:3,5,8,20 326:9, 22 337:8 340:21,24 341:3 345:9,10 348:19 354:4 360:5 374:20,22 375:3, 16 376:5,20,25 377:5 379:25 381:24 382:9,13 388:9 389:9,11 390:16 391:11 395:4,19 409:16,21

**testified** 85:22 125:4 144:20 192:18 194:11 201:23 203:20 213:14 240:5,7 322:20 404:10

**testify** 22:3 45:14 69:21 129:7 194:4, 14 204:13

**testifying** 21:19 218:16

**testimony** 20:17 42:7,16 43:7,8 44:9 55:7 58:9,25 60:23 93:14 94:22 100:5 114:12,15 118:10 122:17 125:4 130:25 132:22 133:11 140:18,21 142:22 144:21 184:16,21 192:25 198:4 240:6 283:22 317:21 356:12 393:7 404:15

**Tether** 89:10,13,14,17,23 90:3,8,13 91:4,8,18 92:20 93:15 94:17,18 211:8

**Texas** 169:24,25 176:18 177:13 190:10,11,12 299:24

**that'd** 302:9

**theory** 310:5

**thing** 22:21 23:12,23 77:22 118:9 225:7 244:15 262:19 275:4,10 304:6 336:23 361:25 374:2 389:17 398:10

**things** 45:3 62:2 68:10 73:21 74:11 95:17,20 99:18 105:10 109:10 112:3 114:8 118:7,13,14 141:5,10 157:4 169:11,15 184:13 222:4 228:11 236:11 246:2 271:11 274:21 275:13, 15 285:3 296:16 309:21 332:3 334:3, 23 336:13 342:8 345:23 361:14 365:22 397:6 410:10

**thinking** 43:10 125:15 149:23 155:20 186:14 209:20 243:11 245:21 335:15 343:2

**third-party** 167:7

**thought** 72:17 97:11 126:5 172:10 193:3 239:9 247:16 337:2 352:11 373:25 402:8 405:3,9

**thousands** 175:16

**threshold** 230:20

**tight** 106:21 161:13

**tightly** 119:20

**time** 18:17 28:17 29:20 30:7 31:6,7,9, 22 32:5,18,25 34:7 39:20 52:18,25 54:22 57:10,13 60:21 61:4,9,21 64:24 69:10,16 78:19 98:23 105:5 107:15 113:16 114:3 117:13,15,19 119:18 137:8,23 138:4 142:16 145:18 149:11 174:13 183:5 184:23 185:23 186:21 188:21,24 189:22 190:3 191:3 192:4 193:13 202:5 207:7 212:10,22 213:7, 9 217:19 221:17 227:11 232:7 236:14 242:11 244:8,14,16 247:18 248:17 257:3 265:23 266:4 272:21,25 274:5, 11 275:2 280:3 286:4,8 287:20,21 290:2,14 298:11 299:3,8,16 301:11, 17 310:14 318:9 319:16,21 320:17 321:15 322:8 326:7 330:24 340:14 342:4 353:12,19 356:16,19 357:14 364:19,20 368:12 371:18,23 373:22 375:11,21 386:16 411:9,14 412:9,13

**timelines** 108:18

**times** 25:8 31:14 68:4 102:8 105:13 142:21 168:10,11 216:20 240:4 253:4 291:13 313:15 317:21 360:24 368:5 404:11

**timing** 196:12,15 261:6

**tipping** 248:24

**tired** 352:6

**tirelessly** 127:2 130:3

**title** 30:23 57:20,21 59:16 66:24 70:14 74:9 99:4 115:14,24 116:8 193:11 195:3 215:23 219:25 220:9 222:22 224:13 225:6,9,11,16 226:20 239:23 240:9 251:5 252:15,16 253:11,12 254:7 255:8 256:9 258:10, 19 259:16 279:10,24 301:8 302:24 303:8,19 317:7 345:22 346:22 347:24 348:4,15 353:8 355:7,10 356:2,8 357:21 378:6,9,20 383:8,13 385:14 393:5,11

**titled** 216:11

**titles** 227:20

**today** 21:19,23 22:3 38:9 43:7 44:9, 23 45:14 46:23 62:9,10,16,22,23 63:14 69:20 70:11 92:16 112:5,16,25 125:10 192:13 205:16 207:8 213:24 240:7 243:11 246:13,15 275:6 294:12 313:15 320:19 353:18 360:24 368:6 393:7 394:2 398:13

**today's** 20:15 26:13 144:21 146:5 148:13 156:16 157:14,18 158:12 166:3 175:23 176:15 177:24 181:12 412:11

**token** 140:16 141:18 249:3,4,7 351:10 352:3,12

**tokens** 139:4,25 140:5,8 243:16 252:24 352:10

**told** 133:11 327:18,20

**tomorrow** 206:10 280:13 305:4 344:5,12 358:17 359:6 360:9 394:23 395:12 410:12,24

**tongue** 352:6

**top** 25:6 26:15 45:24 46:8 50:17 96:22 105:16 201:15 283:6 288:24

**topic** 39:11,19 55:2 63:23 229:3 250:21 350:19 351:18 409:12

**topics** 45:13 46:4

**topped** 158:3

**TOS** 394:21

**total** 51:24,25 54:22 57:9 73:19 80:18 92:9 121:13 139:3 162:7 166:7 210:24 221:21 350:18 367:15 390:17

**totaled** 96:4

**totaling** 91:11

**totally** 371:2

**totals** 96:14

**touched** 158:8

**tough** 175:12

**trace** 97:24 99:11,17,21 100:6 118:11,18,20 119:2 192:21 193:2,12

**traceable** 119:11

**tracing** 118:13

**track** 99:17 130:19 174:12,19 196:21 295:5 298:21

**tracked** 99:24

**tracking** 188:21

**trade** 49:6 73:23 84:23,24 105:25 257:16 284:23 346:23

**traded** 169:3 346:13

**trades** 335:13 347:4

**trading** 345:24 346:7 349:14

**traditional** 187:12

**Traditionally** 169:10

**traffic** 53:22

**train** 337:2

**transaction** 193:20 225:2 226:14 266:7 267:24

**transactions** 123:25 142:10 267:2 305:11

**transcript** 19:20 20:23 23:7 268:9,21 412:5

**transfer** 70:14 99:4 194:12 195:3,6 219:7 226:20 274:13 279:5,9,10,14 280:6 281:8 282:10 283:17 288:10,19 289:8,18 378:20

**transferred** 69:23 70:8 72:7 99:5 141:25 222:23 258:10 276:8 277:5 279:6,24 280:25 281:3 301:9 320:13 345:23 348:4 355:7 378:7 393:6 404:20

**transferring** 59:16 198:14 219:25 220:8,24 254:7 256:8 279:12 348:15 383:13 393:11

**transfers** 97:25 258:19 278:5 386:4 400:9

**transitioned** 364:13

**transmission** 377:23 379:4,5

transparency 328:21

trap 22:20

travel 120:18

treasurer 294:25

treasury 105:19 294:23 370:6,8
372:19

treat 236:16 352:19

treated 344:18 346:14

treatment 344:15

tremendous 266:8

tremendously 329:7

tricky 124:2

triggered 248:2

trouble 47:5

true 189:10 301:11 312:4 365:3
395:24

Trust 179:5,12,18,20,25 180:5,9,21,
22 215:10,21 216:8

Trustee 18:13 137:14 138:11 192:20
294:12

Trustee's 189:9

trustees 294:9

truth 21:23 39:6 234:8

truthfully 22:3

Tuesday 272:24

turn 37:3 47:12,15 78:14 83:15 84:25
85:4 97:18 106:4 207:5 256:5 300:4
315:14 318:12,19,25 319:2

turnaround 249:12

turning 165:9

Tushar 186:7,13,14 201:25

tweet 268:11 340:15

tweeting 268:5,24

Twitter 19:25 51:9 202:9 232:22
262:14,15 360:13

type 70:17 71:15 72:15 77:18 85:15
86:14,23 87:14 141:6 172:9 188:9
194:16 206:20 244:18 262:16 310:25
407:22

types 48:12 87:3,12 90:9 102:21
123:25 164:6 266:15 271:14 309:12
327:22

typical 327:21

typically 71:15 76:24 160:9 193:15
225:5 295:10 409:14

---

**U**

Ubierna 406:21

UCC 327:12,15 337:14

Uh-huh 144:20

UK 215:11 301:13 339:24

unaccredited 50:13 306:19 307:9
321:23 400:13 401:9,16,25 403:6,10
404:4 405:12

unambiguous 76:17 354:4,7,10,22,
25 358:2 359:23 383:14 385:15
389:19 392:17,23 393:10

unaware 187:21

unbanked 31:17

unclear 190:17

under- 180:8

underneath 86:19

understand 21:18 22:6,16 44:17
46:22 56:17 58:24 90:4,11 119:19
120:8 126:4,6 131:15 134:8 140:22
147:19 173:20 174:18 180:19 188:23
190:16,22 191:6 193:16 206:22
211:15 225:14 233:3 261:5 263:17
270:12 275:5 298:2 307:3,5 313:8
318:17 319:7 328:13 349:11 350:12
355:6 366:14 382:7 387:8,24 390:17
396:21 401:13,21 405:17 406:24
407:8,11 408:19

understandable 150:3

understanding 52:23 53:3,5 56:5,6
57:7,11,15,16 58:25 59:10,19 60:5
61:22 62:5,10,11,13,24 63:8,21 65:18
66:3 70:11 72:22 73:14 75:2,18 79:5,
14,15,25 80:11,19,20,22 82:20 89:17
90:12,24 91:16 98:15 100:10,20
101:2,4 102:7 104:23 108:13,18
109:5 112:24 116:19 140:6 145:22
149:12 153:25 159:2 165:6 166:19
169:12 170:24 171:15 172:13 179:24
180:9,17 182:8,16,23 183:3 184:8
189:5 190:24 191:23 192:25 193:19
194:21 196:15 197:19 200:25 201:8
220:4 222:19 223:5 235:14 242:8
245:12 246:8 250:14,15 251:23 252:9
254:25 255:19 256:6,10 257:4 261:6

262:21 263:2 268:4 270:25 271:24
272:4 279:18 281:14 288:8 289:7
290:24 292:22 293:11 294:7 295:22
297:24 301:15 303:11 305:2,3 309:8
310:24 315:12 322:25 329:3,20
330:20 340:4,8 342:22 343:21,24
346:20 350:23 353:4 358:19 365:11,
17 374:4,9 377:10 378:5 379:18,20,
24,25 381:20,21 385:21 389:10
390:20 391:19 395:3,16,22 396:20,24
397:19 400:3,11 401:3 402:22 409:20
410:6

understandings 387:9 400:20

understood 40:3 41:10 90:7 97:16
264:12 342:9 352:17 373:23 395:23
405:20

undertaking 100:8

uneducated 114:7

unexpected 38:5

unforeseen 380:15

unfortunate 169:8 251:13 343:16,19
349:4

unilateral 79:9 278:23 281:18
284:15 304:17

unilaterally 222:25

United 18:13 138:11 294:12

University 26:20

unlike 84:8

unregistered 397:22

unsecured 18:5 38:18 71:12 323:7

unturned 328:12 331:9

update 153:19 154:23 295:24 318:10
325:6

updated 154:22 155:2 225:3 325:9
375:10

updates 79:9 281:18 284:15 409:15

uptake 49:17 226:24

upward 169:13

us- 66:21

US-BASED 335:20

USA 269:12,14,24 270:2,6,7,18 271:4
272:15

USD 318:13,20,23

**USDC** 84:21 87:21,23 223:11,14,16, 17 224:13,21,25 225:25 226:4,11 227:16 232:10 312:5

**USDT** 84:21 88:2

**user** 66:22 286:20 304:25 345:11 377:21 382:12 394:21

**users** 48:7,9 49:20 50:12 81:24 222:19 229:5,10,19 344:15,20 403:9 404:19 409:15,24,25

**USTC** 224:5

**usual** 381:2

**utility** 250:23 352:10

**utilize** 290:8 377:15 382:25

**utilizing** 219:3

---

**V**

**vacation** 366:25

**vague** 131:10 238:14 349:9 351:21 405:15

**valuable** 333:23 363:24

**valued** 243:17

**vanilla** 335:20

**vantage** 340:11

**variances** 155:24

**variety** 279:3

**vast** 75:16 102:17 104:6 105:2 168:13 179:21 399:2

**vendor** 102:12 110:25 170:21 189:11

**vendors** 208:23 209:4

**venture** 104:16 187:7 266:11

**ventured** 372:9

**verbal** 23:4,8

**verbally** 307:16 317:18

**verify** 77:19 268:2 270:13

**version** 79:6 80:5 81:22 146:8 215:4 216:15,17 217:21 218:4 220:7,23 275:16 281:15 282:3,11 283:12 289:22 290:5 301:6 304:8,14,15 305:7,20 322:16 326:11 375:10

**version's** 281:6

**versions** 51:3 81:15 82:20 146:3

**versus** 54:15 141:18 157:19 199:4 346:24 398:18 400:13

**ves-** 140:14

**vested** 140:12,16

**viable** 332:5

**vicinity** 42:10

**Victor** 406:21

**video** 54:17

**videos** 54:2 55:5 202:9 360:12 361:3,21,24 362:19 363:16 364:8

**view** 43:6 44:8 54:16 66:12 69:20 77:21 141:4 211:15 305:8 349:3

**viewed** 54:3

**viewer** 307:25

**viewing** 77:15

**views** 44:17

**violate** 333:4

**violating** 333:12

**virtual** 273:9

**virtually** 20:12 264:20

**vis-a-vis** 353:6

**vis-à-vis** 111:14

**visited** 272:21

**voided** 229:15 231:14

**volume** 160:10

**VP** 232:3

---

**W**

**wait** 276:2

**waiting** 167:5

**waived** 330:6

**wake** 228:20

**walk** 155:23 305:4 333:14

**wallet** 99:19 120:17 184:6,14 199:4 201:4,6 208:25 216:22,24 290:2 341:21

**wallets** 98:21 162:7,15 185:10 198:8 199:4 200:3,19,21 201:2,11 209:15

**wanted** 23:24 24:5 31:2 59:25 94:20 107:21 118:4 154:17 161:25 184:19 214:5 222:2 223:6 226:23 231:18 232:12 239:10 244:25 263:20 300:15 314:16 366:19 379:20 396:16,18 398:7

**war** 169:8

**warrant** 216:19

**warranted** 277:12

**Washington** 26:21 214:12

**watch** 76:23 233:14,15 308:8 361:22 363:19,22

**watched** 221:21

**watching** 54:23,24 55:5

**water** 302:6

**Watkins** 149:17,19 150:16 204:18 205:6

**Wayback** 217:16

**ways** 101:15 111:18 113:2,18 142:2 352:25

**WBTC** 370:3

**wealth** 335:15,22 401:2 402:13

**web** 53:21

**website** 81:16 325:6 326:8,23 360:13

**Wednesday** 272:23,25

**week** 25:14 110:22 127:2 155:4 156:11 166:6 205:8 252:12

**weekly** 48:11 51:10 74:16 254:2

**weeks** 57:8 64:23 284:22 375:13

**well-known** 263:21

**west** 169:24,25 176:18

**Westover** 300:7,9 301:16 393:14

**whatnot** 266:7 296:20

**whatsoever** 340:5

**White** 18:4 134:10 205:13

**Whoops** 357:6

**widely** 406:6

**wife** 29:12 232:6 269:25 271:4

---

**wildcard** 169:7

**Wildly** 337:25

**win** 240:3

**winter** 31:23 32:5 247:23

**wired** 101:17

**wishes** 390:22

**withdraw** 223:12,17 229:16 235:17
237:7,23 239:2,4 242:9 250:22 251:4
252:13 255:4,7 286:3,7,11 291:2,12
296:15 375:12,16 379:21 391:23,25

**withdrawal** 223:6,7 238:8 286:19
289:24 290:3,13 291:8 377:23 379:21
380:25 381:6,13 408:22

**withdrawals** 201:2,8 236:10,20
237:14 239:20 265:4 314:2,20,22
376:12 380:3 386:4,24 387:11,14,15,
19 388:4,5,10 390:10,11,21,25
407:18 408:14

**withdrawing** 238:21 239:15 241:9

**withdrawn** 240:23 261:9 370:13
385:25

**withdrew** 237:6,25 261:22 263:22
264:21 337:22

**withheld** 92:12 116:13 162:3,9
183:20 210:7,14,25 211:13 322:24

**withhold** 209:22,24 322:2,12

**witness'** 367:21

**wondering** 40:17 214:18 253:12
270:16 325:4

**Wong** 76:6

**word** 98:4 100:7 198:3 229:7 317:19
339:15 341:9

**words** 22:22 36:22 41:24 87:13
114:2 199:23 232:24 346:5

**work** 21:17 23:19 27:4,18,19,20
28:19 31:6 123:4 125:24 131:16
139:21 153:17 176:8 204:18 212:12
266:4 268:18 272:22 274:18 308:6
329:13,23 330:23

**worked** 141:24 151:14 192:6 198:17
228:5 262:23 273:11 295:2,23 365:20
378:17 405:23

**working** 32:17 36:20 41:21 61:8
108:7,8,17 112:9 125:9 126:7,12,19
130:3 132:24 139:10 145:6 150:5
157:21 172:23 175:12 191:16 205:18

208:9 308:7 327:24 329:6 330:22
339:9

**workings** 142:3

**works** 101:22 191:8 261:5 276:24
294:8

**workspace** 164:7,8 183:18 353:10

**workspaces** 163:8,12

**world** 29:16 51:22 81:7 108:10
110:23 141:5 142:10 148:13 234:3
255:9

**worries** 385:9

**worry** 149:25

**worth** 91:19 175:18 178:25 180:3
213:24 214:3 229:11,12 231:12 245:2
246:3 247:9,17 260:6 261:23 270:5
369:21 370:3 372:13,17 373:7

**would've** 410:9

**wrap** 321:21

**writing** 53:12 307:16 317:19

**written** 35:25 37:8,16 38:18 143:22,
24 144:5 365:7 377:8

**wrong** 77:13 186:18 202:21 249:19
295:14

---

**X**

**XYZ** 73:4

---

**Y**

**Yanez** 300:7,9 301:16 393:14

**Yarden** 151:24 153:13

**year** 29:5 30:20 126:18 151:5 178:14
213:22 214:7 220:11 222:5 229:9
254:18 261:10 270:3,4

**years** 28:2,7,23 29:13,14 245:21
257:2 297:16 399:15

**yesterday** 142:15

**yield** 240:10,16 273:5 316:14 355:17

**Youtube** 51:9 54:17 202:10 233:14
360:14 362:20 363:16

**yup** 27:16 91:5 132:6 154:13

---

**Z**

**zip** 91:5

**Zoom** 23:14 33:16,24 37:23 268:5,8
299:19

**zoomed** 217:24

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

http://www.wsj.com/articles/DJFDBR0120151214ebcei6hly    **Exhibit I**

PRO BANKRUPTCY PEOPLE

# Third Avenue Management CEO David Barse Departs

*By Gregory Zuckerman, Rob Copeland, Matt Wirz and Serena Ng*

Updated Dec. 14, 2015 5:34 pm ET

Third Avenue Management LLC has parted ways with Chief Executive David Barse, a move that comes just days after the firm rattled financial markets and the mutual-fund industry by barring withdrawals from its junk-bond fund.

The firm said in a news release on Monday announcing Mr. Barse's departure that its management committee---consisting of Chief Investment Officer David Resnick, Chief Financial Officer Vincent Dugan, General Counsel W. James Hall, portfolio managers Matthew Fine and Jason Wolf---would lead Third Avenue going forward.

The Wall Street Journal first reported Mr. Barse's departure Sunday.

A security guard at the firm's New York headquarters said Sunday that Mr. Barse had been let go and isn't allowed back in the building. On Saturday, emails to Mr. Barse were returned with a message of "undeliverable." A rival bond executive who spoke with Mr. Barse on Friday afternoon said he quickly got off the phone without sharing any details about his departure.

Mr. Barse had led Third Avenue since 1991, according to the company's website, and is a large shareholder. He was the public face of the firm's announcement Thursday that it was closing its six-year-old, $789 million Third Avenue Focused Credit Fund and would bottle up investors' money for months or more as it tries to liquidate its assets.

The move roiled credit markets Friday and sparked widespread concern about other mutual funds with large holdings of corporate junk bonds. The largest U.S. junk-bond exchange-traded fund closed at its lowest level since 2009 Friday on record trading volume.

Mr. Barse didn't respond to requests for comment.

On Dec. 10, the day the firm announced it was halting withdrawals, traders at Wall Street banks circulated a list of bonds offered for sale by a single seller that matched many of the largest holdings reported by Third Avenue, said several hedge-fund managers who saw the list. Most hedge funds passed on the portfolio, which contained deeply distressed bonds and private equity investments that are hard to trade.

But Barry Kupferberg, head of research at hedge fund Trilogy Capital, snapped up private equity in Longview Power LLC, a low-cost coal-burning power plant in West Virginia, at a more-than-40% discount to the $8 price at which the shares were quoted. Trilogy has cash on hand, Mr. Kupferberg says, because the fund has been bearish on high yield since the summer when it raised its cash allocation to about 40% of assets.

"We consider having cash as a real strategic weapon---the one thing you know about cash is it's completely liquid," he said.

Third Avenue used an unusual legal strategy to effectively halt redemptions without obtaining an order of authorization from the U.S. Securities and Exchange Commission, a person familiar with the matter said.

The firm paid out all redemption requests through Dec. 8, the night before it closed the fund, then transferred all of its investments to a liquidating trust, which issued interests to be distributed to shareholders in the now-defunct fund.

Third Avenue argued that the distribution of the shares in the trust would count as a full redemption, meaning the fund wouldn't legally have halted distributions, the person familiar with the matter said. Shareholders in the trust will have no redemption rights and will be repaid as-and-when Third Avenue decides to sell assets in the trust.

The firm presented the strategy to the SEC hours before announcing it publicly and didn't obtain the regulator's approval, the person said.

An attorney for Third Avenue discussed the terms of the proposed transaction, among other ideas, with the SEC starting Dec. 3 on a "no-names" basis but didn't disclose the identity of his client until around Dec. 9, an executive for Third Avenue said.

The Third Avenue Focused Credit Fund was set up in the summer of 2009, close to the end of the latest U.S. economic recession. It invested in high-yielding loans and securities issued by heavily indebted companies, loading up on junk bonds, subordinated bank loans and unrated securities of distressed companies that were at high risk of defaulting on their obligations.

Its strategy was to build a concentrated portfolio, making large bets on securities that typically traded at deep discounts to their face value.

Within a year, the fund had roughly $900 million in investments. Its assets under management topped $3 billion in 2014, as the fund reaped the benefits of an upward march in prices of junk bonds and other risky assets that surged in value as the U.S. economy recovered.

By its fifth anniversary in August 2014, the fund had chalked up a five-year annualized return of 11.9%, according to Third Avenue. But its performance swung wildly from year to year. In 2013, its return of 16.5% put it in the top 1% of high-yield funds tracked by Morningstar. By the end of 2014 it had slipped to the bottom 1% of the category following a minus-6.3% return.

The fund was managed by Thomas Lapointe, who joined Third Avenue in 2009 from Columbia Management, where he had worked for a decade and overseen high-yield investments.

The Focused Credit Fund's investment stance was significantly more aggressive than other junk bond mutual funds. More than half the bonds it held paid annual coupons of over 10%, while the average high-yield fund had less than 5% of its assets in that category, according to Morningstar.

As the Third Avenue fund scooped up large amounts of distressed debt and unrated securities, it also became the largest holder of certain loans and securities that traded infrequently, according to a person familiar with the matter.

When the fund's performance deteriorated this year and investor redemptions surged, it started liquidating some of its investments, but its outsized holdings enabled savvy traders to quickly figure out that a large investor was under pressure to sell, this person said.

The result was that Third Avenue received lowball bids for some of its assets, which would have caused it to absorb big losses if it sold at those prices.

The fund was down 27% for 2015 through Wednesday, according to Morningstar. For the year, high-yield funds as a category are down 3.8%, according to the data tracker's website.

Write to Gregory Zuckerman at gregory.zuckerman@wsj.com, Rob Copeland at rob.copeland@wsj.com, Matt Wirz at matthieu.wirz@wsj.com and Serena Ng at serena.ng@wsj.com

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

http://www.wsj.com/articles/how-the-third-avenue-fund-melted-down-1450903135          Exhibit J

MARKETS

# How the Third Avenue Fund Melted Down

## Years of discord ended in a final showdown, with CEO David Barse escorted from the building



David Barse had been with Third Avenue Management for 24 years.
PHOTO: CHRIS GOODNEY/BLOOMBERG NEWS

*By Gregory Zuckerman And Matt Wirz*

Dec. 23, 2015 3:38 pm ET

The end came quickly for David Barse.

For 24 years, Mr. Barse helped lead Third Avenue Management LLC, a mutual-fund company founded by legendary investor Marty Whitman known for profiting from beaten-down investments. At its peak in 2006, Third Avenue managed more than $26 billion.

But in the early afternoon of Dec. 11, Mr. Barse was trying to hold the firm together. Walking into a conference room at its midtown Manhattan offices, he presented a rescue plan for the company's high-profile Focused Credit mutual fund. The fund, packed with risky debt, was in free fall and had halted customer withdrawals—a nearly unprecedented step for mutual funds, which are required to promptly return investor money. Now, he wanted to sell the fund's assets to private-equity firm Fortress Investment Group LLC.

Mr. Barse's partners delivered a shocking response: No way.

Mr. Barse, 53 years old, grew agitated, said people familiar with the presentation.Meeting with the firm's management committee later that afternoon, Mr. Barse vowed to go ahead with the Fortress deal anyway, convinced it was the best move for the fund's investors.

Tensions grew, and Mr. Barse was told the group had come to a different decision. They were firing him, and he needed to vacate the building immediately, without stopping to collect his personal belongings.

Mr. Barse was escorted into an elevator, through the high-ceiling lobby and out the door. Guards in the lobby stared in surprise.

"It was a fiasco," a security guard said.

Back upstairs, some seemed stunned by the rapid-fire events.

Investors around the world took the Third Avenue meltdown as an ominous signal. Junk-bond markets tumbled, sparking worries about other mutual funds. Markets remain on edge and investors continue to ask how a mutual fund could unravel so rapidly and how a pedigreed firm could run into such deep problems.

"It's the unforgiving reality of the market, they really had to do what they did," said John Bogle, founder of mutual-fund giant Vanguard Group. "But it's very surprising they would allow themselves to be in this position."

An examination of the credit fund's collapse based on conversations with nearly 20 employees, former employees and others close to the situation points to a firm hobbled by prolonged dissension, with Mr. Barse often at the center, **criticizing Mr. Whitman** and prodding managers to improve disappointing performance. The discord sapped morale and prompted the departure of some senior talent at the firm, whose assets under management this year fell to $7.2 billion.

Mr. Barse is "a very tough-minded person and he wasn't running a kindergarten," said Jim Millstein, chairman and founder of restructuring firm Millstein & Co., in which Third Avenue invested a few years ago.

Attempts to reach Mr. Barse by telephone, text message and email were unsuccessful. A Third Avenue representative referred to an early statement by Mr. Whitman thanking Mr. Barse for his "years of devotion to the firm and contributions." A spokesman for Affiliated Managers Group, a public Boston company that owns 60% of Third Avenue, said, "We are confident in the firm's future path."

Attempts to speak with Mr. Whitman weren't successful. Fortress wouldn't comment.

Under Mr. Whitman's leadership, Third Avenue—which started in 1974 and scored early gains investing in mortgage bonds of the then-bankrupt Penn Central Railroad—became among the most respected mutual-fund firms, emphasizing "vulture" investments in the debt of struggling companies.

Senior corporate executives regularly made their way to the couch in Mr. Whitman's office for an audience with the famed investor.

"Marty was an academic at heart who approached every day as if the workplace were a laboratory to test his theory of deep-value investing," said Peter Lupoff, a former partner.

In 1991, Mr. Whitman hired Mr. Barse, then a 28-year-old corporate attorney who had been involved in the early development of the secondary market for distressed debt. Mr. Barse quickly gained favor with Mr. Whitman, handling the business operations of the growing company. That enabled Mr. Whitman to focus on investing, said people who worked there at the time.

After becoming CEO in 2002, Mr. Barse drove growth by helping to launch new funds. That year, Messrs. Whitman and Barse sold 60% of the company to AMG. Executives vowed to increase assets, then $4 billion, to $25 billion, a former employee recalls. They met their promise in 2006, when assets hit $26 billion, partly as investors piled into the flagship Third Avenue Value Fund run by Mr. Whitman, which focused on stocks.

But Third Avenue lost about half its assets during the 2008 credit crisis. The firm's highly concentrated style, inspired by Mr. Whitman's approach to value investing, backfired and his stock fund lost 45% in that year, exceeding the 37% decline in the S&P 500.

Mr. Barse became concerned about competition from low-cost index-tracking mutual funds, according to a former employee. Third Avenue attempted to launch "alternative" funds, or vehicles that resembled hedge funds, but most never clicked.

One winner: the credit fund, which was launched in 2009 and quickly raced past $1 billion in assets. The fund, which was Mr. Barse's brainchild, bought hard-to-trade distressed debt and other investments likely to rise as the economy rebounded.

Most distressed-debt investors operate private funds that can delay repaying investors if their holdings become hard to trade. By opting instead for a mutual fund, Third Avenue was able to sell to individual investors but increased its risk by promising them an easy exit.

As the performance of Mr. Whitman's own stock fund lagged after 2008, his relationship with Mr. Barse turnedtense, adding to strain within the firm. Mr. Barse criticized Mr. Whitman's concentration in Hong Kong real-estate shares, which the CEO argued was making it harder to market the fund, people familiar with the situation said.

Mr. Barse also harangued other fund managers who grew disgruntled. Mr. Whitman took no public steps to rein in the CEO, the people said, preferring to focus on investing.

"All Marty wanted to do was sit in his office and read 10-Ks and 10-Qs," one former executive said.

The dispute boiled over in the fall of 2011, when about 50 employees gathered in the firm's largest conference room after an annual meeting with investors. Mr. Barse screamed at Mr. Whitman, inches from his face, demanding better performance, according to people who were in the room.

"You can't tell me what to do," Mr. Whitman responded, one of the people said. "We analyze companies, that's what we do, we don't change that."

Mr. Whitman "was pounding the table so hard with his fist it was shaking," said another person at the meeting.

## [Mr. Whitman] was pounding the table so hard with his fist it was shaking.

— said a person at the meeting.

Mr. Whitman eventually withdrew money from the Value Fund and quit running it to focus on investing for himself, while remaining chairman of the firm.

As most of Third Avenue's funds underperformed relevant benchmarks—only its real-estate fund beat a comparable index over the past five years—Mr. Barse seemed to become more irritated, the people said.

Staff stopped using the conference room adjoining Mr. Barse's office because sometimes he could be heard shouting through the walls.

Over 2012 and 2013, a number of Third Avenue's senior fund managers, including international investor Amit Wadhwaney, complained to AMG about Mr. Barse's style and unwillingness to share profits, people familiar with the matter said.

Most employees received part of their pay on a deferred basis. After 2008, Mr. Barse began personally determining compensation for most personnel, often without explaining his decision, one of the people said. Someone close to Mr. Barse says "lead portfolio managers" could pay underlings from a pool of money determined by performance, among other things.

AMG told the executives it would encourage Mr. Barse to change, but it had a hands-off approach to its affiliates, a person familiar with the matter said. Eventually, senior employees, including Mr. Wadhwaney and Curtis Jensen, a former protégé of Mr. Whitman, left. Mr. Wadhwaney wasn't available for comment, while Mr. Jensen declined to comment.

While Third Avenue's stock funds were shrinking, the credit fund kept growing, led by portfolio manager Thomas Lapointe, who had formerly run a traditional high-yield bond fund at Columbia Management. Mr. Lapointe admired Mr. Whitman's strategy of making large, concentrated bets, a tack that can reap big returns but also amplifies risk.

Diversification "is a damn poor surrogate for knowledge, control and price consciousness," Mr. Whitman said in an interview with Barron's earlier this year.

The credit fund became the single-largest holder of certain hard-to-exit bonds. For example, it owned a fifth of a $250 million issue of low-rated bonds sold by New Enterprise Stone & Lime Co., a private construction-materials supplier.

As the fund grew, Mr. Barse and Mr. Lapointe sometimes argued over investments, former colleagues said.

Sometimes the differences spilled into the open.

In the spring of 2012, after Mr. Lapointe defended an employee Mr. Barse had publicly reprimanded, Mr. Barse threw a cellphone at Mr. Lapointe's chest, a stunned Mr. Lapointe told a colleague. Mr. Lapointe declined to comment. Someone close to Mr. Barse denies the incident.

About four years ago, while Mr. Lapointe was on vacation, Mr. Barse sold a position in the fund, according to three former employees, a move that is typically the domain of a portfolio manager, not the CEO. When Mr. Lapointe returned, he became furious, they said.

The credit fund scored gains of nearly 17% in 2013, putting it in the top 1% of all high-yield funds. But in the spring of 2014, as the fund approached a peak of $3.5 billion, Bradley Alford, who runs Atlanta's Alpha Capital Management and had clients in the fund, became nervous it was getting too big.

Mr. Lapointe told Mr. Alford that Third Avenue "was dealing" with the growth, Mr. Alford says. The credit fund never closed to investors and Mr. Alford's clients yanked their money, concerned about junk bonds.

Mr. Barse voiced some concern about the risk of holding hard-to-sell assets while allowing investors to sell out in a day, according to someone who worked with him.

"David was worried about the mismatch," said the ex-employee.

When the junk-bond rout began in July and the firm's assets slipped to $10 billion, Mr. Barse didn't seem especially nervous.

But by early December the credit fund was down about 27% on the year and assets fell to around $800 million. It had received so many withdrawal requests that Third Avenue informally reached out to the Securities and Exchange Commission to give regulators a sense of the mounting troubles, executives said. Third Avenue decided to freeze the fund's redemptions—a move approved by its board of trustees.

"It's extremely painful," Mr. Barse told The Wall Street Journal at the time.

A day later, his colleagues shot down his Fortress deal, concerned the SEC hadn't agreed to the idea, according to people close to the matter.

Today, a group of five executives runs Third Avenue. Mr. Whitman, 91, remains chairman.

On the morning of Dec. 11, after Mr. Barse addressed investors on a conference call, a friend called Mr. Barse to check in.

Mr. Barse sounded calm, the executive recalls.

"He seemed normal, like it was business as usual," the person said.

Hours later, Mr. Barse was out the door.

—*Serena Ng contributed to this article.*

*Appeared in the December 24, 2015, print edition.*

Tweet

**Exhibit K**

Search Twitter

**Nuke Goldstein** @NukeGold · Feb 23, 2021

Friendly reminder. When the markets are like that, and others a liquidation happy, that is when Celsians know that for a fact - @CelsiusNetwork is the best place to be. We take care of our community. #HODL

13 27 199

**Heisenberg** @GrafWohlan · Feb 23, 2021

Replying to @NukeGold and @CelsiusNetwork

Don't you liquidate? So I take a maximum loan instantly! Not good for our savings.

1

**Nuke Goldstein**
@NukeGold

Replying to @GrafWohlan and @CelsiusNetwork

We give every tool and opportunity to the user to avoid liquidation. We liquidate as a very last resort. Unfortunately there are companies who see this as an opportunity to take profits on the back of their customers. This is bank mentality.

7:33 AM · Feb 24, 2021

**1** Like

## New to Twitter?

Sign up now to get your own personalized timeline!

Sign up with Google

Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

## Relevant people

**Nuke Goldstein** @NukeGold Follow

Celsius co-founder & el presidente of innovation

**Heisenberg** @GrafWohlan Follow

## What's happening

NFL · Last night

**Chiefs win Super Bowl LVII**

Trending in United States

**#RIPDave**

6,939 Tweets

Trending in United States

**#BalloonShotDown**

3,432 Tweets

Family & relationships · Trending

**Valentine's Day**

577K Tweets

Sports · Trending

**Everton**

Trending with #LIVEVE, Gakpo

**Don't miss what's happening**

People on Twitter are the first to know.

Log in Sign up









2/13/23, 4:50 AM

© 2023 Twitter, Inc.

Don't miss what's happening

People on Twitter are the first to know.

Log in    Sign up

2/13/23, 4:5... 22-10964-mg Doc 2052 "@... Filed 02/14/23 "... only company Entered 02/14/23 1...26:03 NOT... Main Document...." / Twitter

Pg 732 of 891

Exhibit L

← **Tweet**

**Nuke Goldstein** ✔ 
@NukeGold

···

@CelsiusNetwork is the only company in the industry that is fighting
hard NOT to liquidate it's customers.

> 🐸 **Tal Bentov** @Theloansqueen · Apr 22, 2021
> Hey @CelsiusNetwork borrowers ! Some of you are now getting margin calls .
> Dont panic - add coins to your wallet and lock it in the app , if you have any
> issues just write to our lending team at loans@celsius.network



8:00 AM · Apr 23, 2021

**17** Retweets   **1** Quote Tweet   **147** Likes

💬        🔁        ❤️        📤

🐦 **KOTPTrader** @KOTPtrader · Apr 23, 2021
Replying to @NukeGold and @CelsiusNetwork
No. Ftx is.

💬        🔁        ❤️        📊        📤

> You're unable to view this Tweet because this account owner limits who can
> view their Tweets. Learn more

**Nuke Goldstein** ✔ @NukeGold · Apr 23, 2021
Replying to @BitcoinBreaker and @CelsiusNetwork
@Theloansqueen ?

💬 1        🔁        ❤️ 3        📊        📤

Show replies

🟩 **Cryptosazerac** 🧑 {313} 《TYR...   @Cryptosaz... · Apr 23, 2021
Replying to @NukeGold and @CelsiusNetwork
THE BEST in the industry!

💬        🔁        ❤️ 4        📊        📤

**Enbrightenment** @CasioWiser · Apr 23, 2021
Replying to @NukeGold and @CelsiusNetwork
Hey @NexoFinance

🔍 Search Twitter

**New to Twitter?**
Sign up now to get your own personalized timeline!

G  Sign up with Google

  Sign up with Apple

**Create account**

By signing up, you agree to the Terms of Service and
Privacy Policy, including Cookie Use.

**Relevant people**

**Nuke Goldstein** ✔
@NukeGold                                    **Follow**
Celsius co-founder & el presidente of
innovation 💸

**Tal Bentov**
@Theloansqueen                               **Follow**
VP Lending (Retail) at Celsius
Network! come HODL with us

**What's happening**

NFL · Last night
**Chiefs win Super Bowl LVII**

Trending in United States
**#RIPDave**
6,978 Tweets

Trending in United States
**#BalloonShotDown**
3,454 Tweets

K-pop · Trending
**namjoon**
123K Tweets

Family & relationships · Trending
**Valentine's Day**
603K Tweets

Show more

Terms of Service   Privacy Policy   Cookie Policy
Accessibility   Ads info   More ···
© 2023 Twitter, Inc.

**Don't miss what's happening**
People on Twitter are the first to know.            Log in   Sign up



Incentives aligned 💪

💬    🔁    ♡ 7    📊    ⬆

**Isra de Łeon** @isradeleon · Apr 23, 2021
Replying to @NukeGold and @CelsiusNetwork
Thanks for always thinking in the best interest of the community
@Mashinsky @NukeGold @Theloansqueen you guys are amazing people
👏👏👏🧡

💬    🔁    ♡ 1    📊    ⬆

**Mikel Roberts** @MikelRbrts · Apr 23, 2021
Replying to @NukeGold and @CelsiusNetwork
Lulz

💬    🔁    ♡    📊    ⬆

**Don't miss what's happening**
People on Twitter are the first to know.

Log in    Sign up

**Exhibit M**

Terms Completed

## ORDER SUMMARY – Case Number: C-19-2750

**Name**:      Celsius Network, Inc.

**Order Number**:      C-19-2750-19-CO01

**Effective Date**:      9/16/19

**License Number**:      NMLS ID 1905328
Or **NMLS Identifier** [U/L]

**License Effect**:      N/A

**Not Apply Until**:      N/A

**Not Eligible Until**:      N/A

**Prohibition/Ban Until**:      N/A

| **Investigation Costs** | $ 2,505.00 | | Paid ☒ Y ☐ N | Date 9/17/19 |
|---|---|---|---|---|
| | No. of Victims: | N/A | | |

Comments:

1

2

**STATE OF WASHINGTON
DEPARTMENT OF FINANCIAL INSTITUTIONS
DIVISION OF CONSUMER SERVICES**

3

4

5

6

7

8

IN THE MATTER OF DETERMINING
WHETHER THERE HAS BEEN A
VIOLATION OF THE UNIFORM MONEY
SERVICES ACT OF WASHINGTON AND
CONSUMER LOAN ACT OF WASHINGTON
BY:

CELSIUS NETWORK, INC.,

Respondent.

No. C-19-2750-19-CO01

CONSENT ORDER

9

10

11

12

13

14

15

COMES NOW the Director of the Department of Financial Institutions ("Director"), through his designee Richard St. Onge, Division of Consumer Services Acting Director, and Celsius Network, Inc., and finding that the issues raised in the above-captioned matter may be economically and efficiently settled, agree to the entry of this Consent Order. This Consent Order is entered pursuant to chapter 19.230 Revised Code of Washington ("RCW"), the Uniform Money Services Act ("UMSA"), and chapter 31.04 RCW, the Consumer Loan Act ("CLA"), (collectively referred to as "Acts"), and RCW 34.05.060 of the Administrative Procedure Act, based on the following:

16

**A.  FINDINGS OF FACT**

17

18

19

20

**1.      Respondent Celsius Network, Inc.** ("Respondent") is a Delaware corporation with its office at 221 River Street, 9th Floor, Suite 9129, Hoboken, New Jersey 07030.  Respondent has never obtained a license in accordance with the Acts from the State of Washington Department of Financial Institutions (Department) to provide money services or to make loans.

21

22

**2.      Unlicensed Activity.**  Beginning in at least June 2018, Respondent advertised, held itself out as providing money services, engaged in the business of money transmission, and offered to make

23

24

CONSENT ORDER
C-19-2750-19-CO01
Celsius Network, Inc.

1

DEPARTMENT OF FINANCIAL INSTITUTIONS
Division of Consumer Services
150 Israel Road SW
P.O. Box 41200
Olympia, WA  98504-1200
(360) 902-8703

loans in Washington State without being licensed as a money transmitter or consumer loan company.

Respondent advertised through at least one website: https://celsius.network.

## B.  CONCLUSION OF LAW

Based on the above Findings of Fact, Respondent violated RCW 19.230.030 and RCW

31.04.025 by engaging in the business of money services and a consumer loan company in

Washington State without first obtaining and maintaining a license in accordance with the Acts or

meeting an exclusion from the Acts under RCW 19.230.030 and RCW 31.04.025.

## C.  AGREEMENT AND ORDER

The Department and Respondent have agreed upon a basis for resolution of the Findings of

Fact and Conclusion of Law identified in this Consent Order.  Pursuant to RCW 19.230.233, RCW

31.04.093(7), and RCW 34.05.060, the Department and Respondent agree to entry of this Consent

Order and further agree that the matters alleged herein may be economically and efficiently settled by

the entry of this Consent Order.  Respondent hereby admits the Findings of Fact and Conclusion of

Law identified in this Consent Order.

Based upon the foregoing:

**1.      Jurisdiction.**  It is AGREED that the Department has jurisdiction over the subject matter of the

activities discussed herein.

**2.      Waiver of Hearing.**  It is AGREED that Respondent has been informed of the right to a hearing

before an administrative law judge and hereby waives any right it has to a hearing and any and all

administrative and judicial review of the issues raised in this matter or the resolution reached herein.

**3.      License Required.**  It is AGREED that Respondent understands that in order to engage in the

business of money services in Washington State, Respondent must first obtain a money transmitter

license in accordance with UMSA or qualify for an exemption from licensing as delineated in

CONSENT ORDER                                    2            DEPARTMENT OF FINANCIAL INSTITUTIONS
C-19-2750-19-CO01                                                        Division of Consumer Services
Celsius Network, Inc.                                                                150 Israel Road SW
                                                                                        P.O. Box 41200
                                                                                Olympia, WA  98504-1200
                                                                                        (360) 902-8703

1   UMSA.  It is further AGREED that Respondent understands that in order to make loans to

2   Washington State residents, Respondent must first obtain a consumer loan company license in

3   accordance with the CLA or qualify for an exemption from licensing as delineated in the CLA.

4   **4.**    **Cease and Desist.**  It is AGREED that Respondent shall cease and desist from holding itself

5   out being able to or providing money services to Washington State consumers until such time as

6   Respondent obtains a license in accordance with UMSA.  It is further AGREED that Respondent

7   shall cease and desist from making, facilitating, or assisting in making or financing any loans to

8   Washington State residents until such time as Respondent obtains a license in accordance with the

9   CLA.

10   **5.**    **Investigation Fee.**  It is AGREED that Respondent shall pay an investigation fee to the

11   Department in the amount of $2,505.00 in the form of a cashier's check made payable to the

12   "Washington State Treasurer" upon entry of this Consent Order.

13   **6.**    **Application for License.**  It is AGREED that the entry of this Consent Order will not

14   preclude Respondent from obtaining a license under either of the Acts.  It is further AGREED and

15   understood, however, that should Respondent submit a license application under either of the Acts,

16   Respondent must still meet all requirements under the Acts.

17   **7.**    **Non-Compliance with Order.**  It is AGREED that Respondent understands that failure to

18   abide by the terms and conditions of this Consent Order may result in further legal action by the

19   Director.  In the event of such legal action, Respondent may be responsible to reimburse the Director

20   for the cost incurred in pursuing such action, including but not limited to, attorney fees.

21   **8.**    **Records Retention.**  It is AGREED that Respondent, its officers, employees, and agents shall

22   maintain records in compliance with the Acts and provide the Director with the location of the books,

23   records and other information relating to Respondent's business conducted prior to licensure, and the

24

CONSENT ORDER
C-19-2750-19-CO01
Celsius Network, Inc.

3

DEPARTMENT OF FINANCIAL INSTITUTIONS
Division of Consumer Services
150 Israel Road SW
P.O. Box 41200
Olympia, WA  98504-1200
(360) 902-8703

name, address and telephone number of the individual responsible for maintenance of such records in compliance with the Acts.

**9.      Rights of Non-Parties.**  It is AGREED that the Department does not represent or have the consent of any person or entity not a party to this Consent Order to take any action concerning their personal legal rights.  It is further AGREED that for any person or entity not a party to this Consent Order, that this Consent Order does not limit or create any private rights or remedies against Respondent, limit or create liability of Respondent, or limit or create defenses of Respondent to any claims.

**10.      Authority to Execute Order.**  It is AGREED that the undersigned have represented and warranted that they have the full power and right to execute this Consent Order on behalf of Respondent.

**11.      Counterparts.**  This Consent Order may be executed by the parties in any number of counterparts, including e-mail of a PDF file, or other similar file, each of which shall be deemed to be an original, but all of which, taken together shall constitute one and the same Consent Order.

**12.      Effective Date.**  It is AGREED that this Consent Order shall be effective when signed by the Director's designee.

**13.      Voluntarily Entered.**  It is AGREED that Respondent has voluntarily entered into this Consent Order.

**14.      Completely Read, Understood, and Agreed.**  It is AGREED that Respondent has read this Consent Order in its entirety and fully understands and agrees to all of the same.

//

//

//

CONSENT ORDER                                                4                    DEPARTMENT OF FINANCIAL INSTITUTIONS
C-19-2750-19-CO01                                                                           Division of Consumer Services
Celsius Network, Inc.                                                                              150 Israel Road SW
P.O. Box 41200
Olympia, WA  98504-1200
(360) 902-8703

**RESPONDENT:**

Celsius Network

By:

/s/ _____            9-9-2019 _____

ALEX MASHINSKY                          Date

Chief Executive Officer


/s/ _____            9-9-2019 _____

JEREMIE BEAUDRY                         Date

Chief Compliance Officer and

General Counsel

---

DO NOT WRITE BELOW THIS LINE

THIS ORDER ENTERED THIS 16th DAY OF September, 2019.


/s/ _____

RICHARD ST. ONGE

Acting Director

Division of Consumer Services

Department of Financial Institutions


Presented by:

/s/ _____

JEANJU CHOI

Financial Legal Examiner


Approved by:

/s/ _____

STEVEN C. SHERMAN

Enforcement Chief


CONSENT ORDER                     5          DEPARTMENT OF FINANCIAL INSTITUTIONS
C-19-2750-19-CO01                                    Division of Consumer Services
Celsius Network, Inc.                                      150 Israel Road SW
                                                              P.O. Box 41200
                                                        Olympia, WA  98504-1200
                                                             (360) 902-8703

**Exhibit N**

STATE OF NEW JERSEY
BUREAU OF SECURITIES
P.O. Box 47029
Newark, New Jersey
07101 (973) 504-3600

**IN THE MATTER OF:**

Celsius Network, LLC,

Respondent.

**SUMMARY CEASE
AND DESIST ORDER**

Pursuant to the authority granted to Christopher W. Gerold, Chief of the New Jersey Bureau of Securities ("Bureau Chief"), under the Uniform Securities Law (1997), N.J.S.A. 49:3-47 to -89 ("Securities Law") and certain regulations thereunder, and based upon documents and information obtained during the investigation by the New Jersey Bureau of Securities ("Bureau"), the Bureau Chief hereby finds that there is good cause and it is in the public interest to enter this Summary Cease and Desist Order ("Order") against Celsius Network, LLC.

The Bureau Chief makes the following findings of fact and conclusions of law:

**FINDINGS OF FACT**

1.      Celsius Network, LLC ("Celsius") is a financial services company that generates revenue through cryptocurrency trading, lending, and borrowing, as well as by engaging in propriety trading.  Since June 2018, Celsius has been, at least in part, funding its lending operations and proprietary trading through the sale of unregistered securities in the form of cryptocurrency interest-earning accounts. Celsius refers to these unregistered securities as its "Earn Rewards" account.

2.      Celsius solicits investors to invest in the Earn Rewards accounts by depositing certain eligible cryptocurrencies into the investors' accounts at Celsius. Celsius then pools these cryptocurrencies together to fund its various income generating activities, including lending operations and proprietary trading. In exchange for investing in the Earn Rewards product, investors are promised an attractive interest rate that is paid weekly in the same type of cryptocurrency as originally invested, or, subject to certain conditions, in Celsius' native digital token CEL (which are not currently available for U.S.-based account holders).

3.      The Celsius Earn Rewards accounts are not registered with the Bureau or any other securities regulatory authority, or otherwise exempt from registration.  Celsius' Earn Rewards accounts are not protected by the Securities Investor Protection Corporation ("SIPC"), insured by the Federal Deposit Insurance Corporation ("FDIC"), or insured by the National Credit Union Administration ("NCUA").  This lack of a protective scheme or regulatory oversight subjects Celsius investors to additional risks not borne by investors who maintain assets with most SIPC member broker-dealers, banks and savings associations, or credit unions.

4.      Despite the lack of safeguards that SIPC, FDIC, and the NCUA would offer or the regulatory oversight of registration, Celsius held the equivalent of more than $14 billion from the sale of these unregistered securities in violation of the Securities Law as of August 18, 2021.

5.      The Bureau Chief enters this Order to protect the investing public by halting the offer and sale of these unregistered securities, and the contribution of additional assets to existing accounts.  Nothing in this order shall preclude Celsius, or any of its affiliates, from paying interest, also known as "Rewards" on the existing Celsius Earn Rewards accounts or refunding principal to the Earn Rewards investors consistent with Celsius' Terms of Use.

### A.    **The Respondent**

6.      Celsius is a Delaware limited liability company, registered on June 14, 2021, with

2

offices at 221 River Street, 9th Floor, Hoboken, New Jersey.  Celsius conducts its business on the internet, through a website accessible to the general public at https://www.celsius.network/ (the "Celsius Website"), which is also accessible through Celsius' own proprietary app via smartphone.

7.      Celsius is not presently registered, and has never been registered, in any capacity with the Bureau.  Nor have its Earn Rewards accounts ever been registered with the Bureau.

**B.      The Celsius Earn Rewards Securities**

**a.      Celsius Earn Rewards**

8.      Celsius offers and sells its Celsius Earn Rewards unregistered securities in the form of individual and corporate accounts.  Investors in these accounts ("Earn Rewards Investors") deposit certain popular cryptocurrencies with Celsius to earn "up to 17.78% APY."  The purported Earn Rewards rates advertised by Celsius are well in excess of the rates currently being offered by short-term investment grade fixed income securities or on bank savings accounts.

9.      Celsius offers its Earn Rewards accounts to anyone over the age of eighteen, except for residents of certain foreign jurisdictions subject to regulatory restrictions.

10.      When an investor signs up with Celsius, they verify their age, identity and address, provide an identification document, complete a user agreement and a KYC (Know Your Customer) protocol.  A link to the Celsius Terms of Use ("Celsius Terms") appears at the bottom of each of its web pages.

11.      The Celsius Website states that Celsius does not require a minimum amount of cryptocurrency for deposit in an Earn Rewards account.

12.      Celsius only accepts certain types of cryptocurrencies for deposit in the Earn Rewards accounts.  Although Celsius refers to its payments to Earn Rewards Investors as "Rewards," the term "Rewards" is a substitute for "interest" as is apparent from Celsius's API Partner disclosures from the Celsius Website:

3

API Portal / Guides

## Interest Calculations

This page describes how interest is calculated and disbursed. Celsius pays interest on the value of each asset in a user's wallet. Interest is paid using the same asset(s) that is held in the user's wallet. Obtain current interest rates for each token using the SDK getInterestRates() method or Get Interest Rates API operation.

13.     Earn Rewards Investors earn a variable interest rate on their investment and may withdraw their digital assets at any time, subject to a maximum three-day processing time specified by Celsius.

14.     The variable interest rates for the Earn Rewards Investors are posted on the Celsius Website.  Celsius' interest rates for deposits of certain cryptocurrencies in its Earn Rewards accounts are "tiered" depending upon the nature and amount of the cryptocurrency invested, as explained on the Celsius Website.  Currently, Earn Rewards Investors are entitled to 6.2% on their first Bitcoin deposited and 3.51% on additional deposits of Bitcoin. Rates on other cryptocurrencies range from 13.99% for the Synthetix Network Token (SNX) to 0.0% for Ripple (XRP):

4

## Cryptocurrencies

Celsius supports today's top cryptocurrencies including native blockchain coins such as Bitcoin and Ethereum, staking coins such as DASH, and utility tokens such as CEL.

| | | |
|---|---|---:|
| | Bitcoin (Up to 1 BTC) | 6.20% |
| | Bitcoin (After 1 BTC) | 3.61% |
| | Ethereum (Up to 100 ETH) | 5.35% |
| | Ethereum (After 100 ETH) | 5.05% |
| | CEL | 4.86% |
| | SNX | 13.99% |
| | MATIC | 10.61% |
| | DOT | 8.86% |
| | BNT | 5.50% |
| | AAVE | 4.86% |
| | DASH | 4.60% |
| | COMP | 4.60% |
| | BCH | 4.51% |
| | EOS | 4.45% |
| | LTC | 4.08% |
| | ADA | 4.06% |
| | ETC | 3.00% |
| | LINK | 3.00% |
| | XRP | 0.00% |
| | UNI | 2.50% |
| | BSV | 2.02% |
| | ZEC | 2.02% |
| | ZRX | 1.77% |
| | XLM | 1.00% |
| | BAT | 1.00% |
| | UMA | 1.00% |
| | OMG | 0.50% |
| | KNC | 0.50% |
| | MANA | 0.50% |

Reward rates are subject to change from time to time. Celsius does not endorse or recommend any digital asset listed above (or or all). The above is not financial advice and is not intended to provide comprehensive information about any specific digital asset or category. Do your own research.

15.    Celsius' also pays interest for deposits of certain stablecoins in its Earn Rewards accounts, as explained on the Celsius Website.

16.    The manner in which interest is calculated and credited to Earn Rewards Investors is illustrated on the Celsius Website and specified in the Celsius Terms:



Rewards are payable based on a daily periodic rate applicable to the Loaned Digital Assets. The daily periodic rate is calculated by dividing the then-applicable annual reward rate by three hundred sixty-four (364) days; then it is further divided down to the hour, minute, and second of that day. Loaned Digital Assets, including those received as Rewards from previous weeks, will begin gaining Rewards according to the hour, minute, and second on the timestamp verifying the completion of the applicable transaction and shall cease and/or decrease the amount paid as Rewards at the moment when the User has entered an external transmission, withdrawal or transfer of rights (via CelPay) request, or posted any Loaned Digital Assets as collateral for a Fiat Loan. Therefore, any Loaned Digital Asset transferred mid-week will receive Rewards with no distinction, based on the rates calculated for the relative time within the allocation period.

17.    Celsius advertises that interest on the Earn Rewards product is paid to investors in cryptocurrency (or CEL Tokens depending on certain factors) based on the "daily periodic rate," which is "calculated by dividing the then-applicable annual reward rate by three hundred and sixty-four days (364); then it is further divided in the hour, minute, and second of that day" and is credited to the Earn Rewards Investors' accounts weekly on the first business day of the week.

18.    Celsius describes its business model as one that returns 80% of its total revenue to Earn Rewards Investors: "The Celsius business model is structured to do the exact opposite of

what banks do — by giving 80% of total revenue back to our community each week in the form of earned interest. We earn profits by lending coins to hedge funds, exchanges, and institutional traders, and by issuing asset-backed loans at an average of 9% interest. We're taking the exact same 80% profit margin that banks have kept for themselves for centuries and returning it to our community of depositors."

b.    **Celsius's Promotion of Earn Rewards Accounts as Investment Products**

19.    Celsius encourages its Earn Rewards account holders to treat their Earn Rewards accounts as long-term investments as evidenced by the statement on Celsius's homepage: "Start earning top rates on any amount of crypto and get paid every paid every Monday to keep HODLing.  As explained on the Celsius Website "HODL started as a typo and has become a crypto rallying cry.  A misspelling of the word 'hold,' HODLers believe in the future of digital currencies and know it would be a mistake to sell at this early stage."

20.    Earn Rewards account holders can also manage their Earn Rewards accounts as long-term investments using the "HODL Mode" feature of their Celsius account.  Celsius describes HODL Mode on its Website as an account security feature "that gives [account holders] the ability to temporarily disable outgoing transactions from [their] Celsius account.  [Account holders] control when HODL Mode is activated and it is an ideal feature for those that do not plan on withdrawing or transferring funds from their account for an extended period of time."

21.    Celsius's corporate culture of promoting "HODLing," including its description of Celsius as a "HODLing platform," the premium interest rates Celsius pays on its Earn Rewards accounts, the weekly compounding of interest payments, and the availability of HODL Mode makes the Celsius Earn Rewards account an attractive long-term investment to Celsius Earn Rewards Investors.

7

c.      **Celsius' Use of the Earn Rewards Deposit Funds**

22.      The Celsius Terms provide that an Earn Rewards Investor relinquishes control over the deposited cryptocurrency to Celsius and that Celsius is free to use those assets as it sees fit, including commingling the Earn Rewards Investor's cryptocurrency with those of other Earn Rewards Investors, investing those pooled assets in the market, and lending them to institutional and corporate borrowers. Having relinquished control over the deposited cryptocurrency in their Earn Rewards accounts, the Earn Rewards Investors are passive investors.

23.      Specifically, Paragraph 4. B. "Earn Rewards" of the recently-amended Celsius Terms provides:

> Our Earn Rewards service allows you to earn a financing fee from Celsius, referred to as "Rewards", in the form of Digital Assets (either in-kind, i.e. in the same Digital Asset you deliver, or in CEL Tokens, where permitted) in exchange for entering into open-ended loans of your Eligible Digital Assets to Celsius under the terms hereof.  By lending your Eligible Digital Assets to Celsius you grant Celsius all rights and title to such Digital Assets, for Celsius to use in its sole discretion.

24.      Paragraph 13 of Celsius's recently-amended Terms, "Consent To Celsius's Use of Digital Assets," further details the status of cryptocurrency deposited with Celsius by Earn Rewards Investors:

> In consideration of the Rewards payable to you on your Celsius Account and the use of our Services, you grant Celsius, subject to applicable law and for the duration of the period during which the Eligible Digital Assets are loaned to us through your Celsius Account, all right and title to such Digital Assets, including ownership rights, and the right, without further notice to you, to hold such Digital Assets in Celsius' own Virtual Wallet or elsewhere, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets in Celsius' full discretion.      You

8

acknowledge that with respect to the Digital Assets used by Celsius pursuant to this paragraph:

(i)      You will not be able to exercise rights of ownership;

(ii)     Celsius may receive compensation in connection with lending or otherwise using Digital Assets in its business to which you have no claim or entitlement; and

(iii)    In the event that Celsius becomes bankrupt, enters liquidation or is otherwise unable to repay its obligations, you mayn't be able to recover or regain ownership of such Digital Assets, and other than your rights as a creditor of Celsius under any applicable laws, you may not have any legal remedies or rights in connection with Celsius' obligations to you.

25.    Celsius then pools the deposited cryptocurrencies together with Celsius's other assets, to, among other income-generating activities, collateralize Celsius' borrowings, purchase securities and digital assets for Celsius' own account, make loans to institutional and corporate borrowers, and mine for cryptocurrency.

26.    Celsius does not disclose to investors: (a) the amount of money devoted to each of these investment activities; (b) the nature and creditworthiness of the borrowers, as well as the identity of any borrowers to whom Celsius has lent material amounts of cryptocurrency; (c) the terms and duration of the loans; (d) the types of securities and digital assets it trades; or (e) the profits or losses derived from these activities.

27.    As Celsius's founder, Alex Mashinsky, stated in a March 7, 2021 article he authored for the DataDriveInvestors website, reposted in the "Media" tab on the Celsius Website, "[u]sers transfer assets with Celsius, Celsius lends funds to institutions and returns up to 80% of earnings to users."

**d.      The Earn Rewards Accounts are Unregistered Security**

28.    While certain of Celsius' loan products appear to be licensed under various state licensing requirements for money services businesses or money transmitters, the Celsius Earn

Rewards product is not currently registered with any federal or state securities regulator, nor exempt from registration – as required by law, even though the Earn Rewards product is a "security" and subject to such requirements.

29.     Celsius fails to disclose to Earn Rewards Investors that its Earn Rewards product is not currently registered by federal or state securities regulatory authorities, even though the Earn Rewards product is a "security" and required to be registered.

     e.     **Celsius's API Partners Program**

30.     Celsius offers an Application Programming Interface ("API") that allows certain institutional users, known as Celsius "API Partners," to integrate with the Celsius platform.

31.     Celsius affords its API Partners the ability to offer the Earn Rewards accounts to retail investors in two different ways.

32.     First, the Celsius "Segmented Accounts" platform allows API Partners to offer the API Partners' own customers the Celsius Earn Rewards accounts through the API Partners' own portal.  An API Partner availing itself of Celsius's Segmented Accounts structure offers the API Partner's own retail customers the opportunity to access the Celsius Earn Rewards account through the API Partner's own portal, as opposed to the API Partner's retail customers accessing the Celsius Earn Rewards account directly from Celsius's own website.  Apart from the difference in how the Earn Rewards account is accessed, individual retail customers of API Partners offering the Segmented Account option are subject to the same rights, benefits, terms, and conditions as Celsius's own Earn Rewards Investors.

33.     Second, Celsius's API Partners can choose to access the Celsius Earn Rewards accounts through what Celsius refers to as an "Omnibus Account."  In the Omnibus Account, the API Partner maintains a direct relationship with Celsius and invests in a Celsius Earn Rewards

account for the benefit of its individual customers, whose cryptocurrencies the API Partner has aggregated for the purpose of investing in the Celsius Earn Rewards account on behalf of, and for the benefit of, the API Partner's individual retail customers.

34.    Celsius incentivizes the API Partners by paying a fee to Segmented Account partners based on a percentage of rewards payable by Celsius to the end-user, and also pays fees to Omnibus Partners, in addition to the Earn Rewards payable.

35.    Celsius is selling unregistered securities in the form of Earn Rewards accounts to it API Partners' Segmented Account customers.

36.    Celsius is selling unregistered securities to its API Partners who choose to open API Partner Omnibus Accounts with Celsius.

## CONCLUSIONS OF LAW

### CELSIUS OFFERED AND SOLD UNREGISTERED  SECURITIES
### N.J.S.A. 49:3-60

37.    The preceding paragraphs are incorporated by reference as though set forth verbatim herein.

38.    The Earn Rewards product is a security as defined in N.J.S.A. 49:3-49(m).

39.    The Earn Rewards product was and is required to be registered with the Bureau pursuant to N.J.S.A. 49:3-60.

40.    The Earn Rewards product has not been registered with the Bureau, is not exempt from registration, and is not federally covered.

41.    Celsius has offered and sold unregistered securities in violation  of N.J.S.A. 49:3-60 and continues to do so.

42.    Each violation of N.J.S.A. 49:3-60 is a separate violation of the Securities Law and

is cause for the denial of certain exemptions.

43.     N.J.S.A. 49:3-69(a)(1) empowers the Bureau Chief to issue a cease and desist order against persons engaged in prohibited activities, directing them to cease and desist from further illegal activity or doing acts in furtherance thereof.

## **CONCLUSION**

**THEREFORE,** it is on this 17th day of September 2021, **ORDERED** that:

44.     Effective on November 1, 2021, Celsius and any person, agent, employee, broker, partner, officer, director, affiliate, successor, or stockholder thereof, under any of their direction or control shall CEASE AND DESIST from:

a.     offering for sale any security, including any Earn Rewards product, to or from New Jersey unless the security is registered with the Bureau, is a covered security, or is exempt from registration under the Securities Law;

b.     accepting any additional assets into an existing Earn Rewards account; and

c.     violating any other provisions of the Securities Law and any rules promulgated thereunder for the sale of any security in New Jersey.

45.     Nothing in this order shall preclude Celsius from paying interest, also known as "Rewards," on the existing Earn Rewards accounts or refunding principal to the Earn Rewards Investors consistent with the Celsius Terms.

46.     All exemptions contained in N.J.S.A. 49:3-50 subsection (a) paragraph 9, 10, and 11 and subsection (b) are hereby DENIED as to Celsius.

47.    All exemptions to the registration requirements provided by N.J.S.A. 49:3-56(b),

N.J.S.A. 49:3-56(c), and N.J.S.A. 49:3-56(g) are hereby DENIED as to Celsius.

_____
Christopher W. Gerold
Chief, New Jersey Bureau of Securities

## NOTICE OF RIGHT TO HEARING

Pursuant to N.J.S.A. 49:3-69(a)(1)(i), the Bureau Chief shall entertain on no less than three days' notice a written application to lift the Order to Cease and Desist on written application of the person subject thereto and in connection therewith may, but need not, hold a hearing and hear testimony, but shall provide to the person subject thereto a written statement of the reasons for the Order to Cease and Desist.

Pursuant to N.J.S.A. 49:3-69(a)(l)(ii), upon service of notice of the Order to Cease and Desist issued by the Bureau Chief, the person subject thereto shall have up to 15 days to respond to the Bureau in the form of a written answer and written request for a hearing. The Bureau Chief shall, within five days of receiving the answer and request for a hearing, either transmit the matter to the Office of Administrative Law for a hearing or schedule a hearing at the Bureau of Securities. Orders issued pursuant to N.J.S.A. 49:3-69 shall be subject to an application to vacate upon 10 days' notice, and a preliminary hearing on the Order shall be held in any event within 20 days after it is requested, and the filing of a motion to vacate the Order shall toll the time for filing an answer and written request for a hearing.

Pursuant to N.J.S.A. 49:3-69(a)(l)(iii), if any person subject to the Order fails to respond by filing a written answer and written request for a hearing with the Bureau or moving to vacate the order within the 15-day prescribed period, that person shall have waived the opportunity to be heard. The Order will be a Final Order and shall remain in effect until modified or vacated.

## NOTICE OF OTHER ENFORCEMENT REMEDIES

You are advised that the Uniform Securities Law provides several enforcement remedies, which are available to be exercised by the Bureau Chief, either alone or in combination. These remedies include, in addition to this action, the right to seek and obtain injunctive and ancillary relief in a civil enforcement action, N.J.S.A. 49:3-69, and the right to seek and obtain civil penalties in an administrative or civil action, N.J.S.A. 49:3-70.1.

You are further advised that the entry of the relief requested does not preclude the Bureau Chief from seeking and obtaining other enforcement remedies against you in connection with the claims made against you in this action.

**Exhibit O**



RECEIVED
SEP 2 3 2021
*my 11:30 am*
PPC/DFI/COMMISSIONERS OFFICE

## COMMONWEALTH OF KENTUCKY
### PUBLIC PROTECTION CABINET
### DEPARTMENT OF FINANCIAL INSTITUTIONS
### DIVISION OF SECURITIES
### ADMINISTRATIVE ACTION NO. 2021-AH-00024

DEPARTMENT OF FINANCIAL INSTITUTIONS                COMPLAINANT

v.                    <u>**EMERGENCY ORDER TO CEASE AND DESIST**</u>

CELSIUS NETWORK LLC                                      RESPONDENT

\* \* \* \* \* \* \* \* \*

Comes now the Department of Financial Institutions (hereinafter referenced as the "Department"), pursuant to Kentucky Revised Statute (KRS 292.470, KRS 292.500, and 808 Kentucky Administrative Regulation (KAR) 10:225, and hereby enters this **Emergency Order to Cease and Desist** against Celsius Network LLC, (hereinafter referenced as "Celsius", the "Company", or "Respondent"). In support thereof, the Department states as follows:

### <u>PARTIES</u>

1.      The Commissioner is responsible for administering the provisions of KRS Chapter 292, the Securities Act of Kentucky ("the Act"), as well as any applicable rules, regulations and orders entered pursuant to the Act.

2.      Celsius Network LLC is a Delaware limited liability company. Respondents have a principal office located at 221 River Street 9th Floor, Hoboken, New Jersey, 07030. Celsius Network LLC has a registered process agent at The Corporation Trust Company, located at Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801.



**STATEMENT OF FACTS**

3.       On January 11, 2021, the Department became aware that Celsius was engaging in securities-related activities. Subsequently, the Department conducted an investigation into Celsius, learning of the facts and circumstances described herein.

4.       On May 26, 2021, the Department searched Celsius's website, https://celsius.network/. The website states, among other things, "Meet Celsius: a community of over 1 million users that earn up to 17% yield on their crypto. Get paid new coins every week…", "Earn up to 17% APY paid every week", "Get Celsius. Unbank yourself. Earn high. Borrow low", "Your crypto earns more with Celsius", "Put your money to work", and "You don't need a bank to make bank".

5.       Celsius offers Earn Interest Accounts ("EIAs"), which are interest-bearing cryptocurrency accounts that are available on Celsius's website and proprietary smartphone application, as part of its Earn Interest Program. EIAs can be either individual or corporate accounts and are offered to anyone eighteen (18) years of age or older, except for residents of certain foreign jurisdictions. Registering for an EIA requires an investor to mark a box to indicate the investor has read and accepted Celsius's "Terms of Use" and "Privacy Policy". These documents are available on the website via hyperlink, although the investor is able to mark the box regardless of whether the hyperlinks are opened or the documents' contents reviewed.

6.       Celsius solicits investors to invest in EIAs by depositing certain eligible cryptocurrencies into the investors' accounts at Celsius. Celsius then pools these cryptocurrencies together to fund its various income-generating activities, including proprietary trading, collateralizing Celsius' borrowings, purchasing securities and digital assets for Celsius' own account, making loans to institutional and corporate borrowers, and mining cryptocurrency. In

exchange for investing in an EIA, Celsius promises to credit U.S. investors with weekly interest payments at an attractive rate and in the same type of cryptocurrency as originally invested.

7.    The interest Celsius pays to investors is referred to as "rewards" or a "financing fee" in the Terms of Use and appear to be the motivating factor for investors to choose an EIA. Celsius offers a variable, "daily periodic rate", which is "calculated by dividing the then-applicable annual reward rate by three hundred and sixty-four days (364); then it is further divided in the hour, minute, and second of that day." The rate is further tiered to the nature and amount of cryptocurrencies invested. Once calculated, the interest is then credited to the investors' accounts weekly on the first business day of the week. The rate adjustment appears to be based on the volatile exchange rate of each cryptocurrency, which can fluctuate based on circulation and popularity of the tokens. The rates currently advertised by Celsius are substantially above the rates offered by similar short-term investment securities or similar certificates of deposit offered by banking institutions.

8.    Celsius' Terms of Use demonstrate that EIA investors are passive investors. The Terms of Use grant the Company all right and title to the deposited assets, and the right to

> …pledge, re-pledge, hypothecate, re-hypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets in Celsius' full discretion.

A separate section of the Terms of Use features additional Celsius rights "to assign, invest, commingle or otherwise dispose of assets and Eligible Digital Assets to counterparties or hold the Eligible Digital Assets with counterparties."

9.     Celsius's founder, Alex Mashinsky, has stated "[u]sers transfer assets with Celsius, Celsius lends funds to institutions and returns up to 80% of earnings to users."[1] Additionally, Celsius's Terms of Use describe that EIA investors are "exposed to the possibility of Celsius becoming unable to repay its obligations in part or in full, in which case [the investor's] Digital Assets may be at risk." Celsius warns that account holders should "only use funds that [the investor] can afford to lose" though the Company represents to potential investors that it will "use [its] best commercial and operational efforts to prevent losses."

10.     At no time before or after investors agree to the EIA Terms of Use does Celsius disclose to investors the amount of money devoted to each of Celsius's investment activities; the identity, nature, or creditworthiness of the borrowers of material amounts of Celsius's pooled cryptocurrency assets; the terms and duration of Celsius's loans; the types of securities and digital assets Celsius trades; or the profits and losses derived from Celsius's use of pooled investor cryptocurrencies.

11.     Celsius also offers an Application Programming Interface ("API") that allows certain entities, known as Celsius "API Partners", to integrate with the Celsius platform. Celsius affords its API Partners the ability to offer the EIAs to retail investors either through a "Segmented Accounts" platform or an "Omnibus Account" Platform.  The Celsius "Segmented Accounts" platform allows API Partners to offer EIAs accounts to the API Partners' customers through the API Partners' own web portal instead of directly from Celsius's website. Alternatively, the Celsius "Omnibus Account" platform allows API Partners to maintain a direct relationship with Celsius and invest in an EIA for the benefit of the API Partners' customers, whose cryptocurrencies the

---

[1] Alex Mashinsky, *How Celsius creates prosperity for retail and institutional investors alike*, Data Driven Investor (March 7, 2021), https://medium.datadriveninvestor.com/how-celsius-creates-prosperity-for-retail-and-institutional-investors-alike-cc086084c6bd. This article was reposted in the "Media" tab on Celsius's Website.

API Partner aggregates for the purpose of investing. Celsius incentivizes the API Partners by paying a fee to Segmented Account partners based on a percentage of rewards payable by Celsius to the end-user, and also pays fees to Omnibus Partners, in addition to the "rewards" payable.

12.    A review of the Department's records revealed that neither Celsius nor the EIAs offered on its website are registered with the Department as required under the Act. Additionally, neither Celsius nor these EIAs appear to be entitled to any exemption from registration under the Act. The EIAs Celsius offers are not protected by the Securities Investor Protection Corporation ("SIPC"), insured by the Federal Deposit Insurance Corporation ("FDIC") or insured by the National Credit Union Administration ("NCUA"). As a result, Celsius investors are subject to additional risks compared to investors who maintain assets with most SIPC member broker-dealers, banks and savings associations, or credit unions.

13.    Respondent claims to currently hold approximately twenty-four billion dollars' ($24,000,000,000) worth of account balances. The Department's investigation of Celsius's consumer data found that over a period of three years and four months, 1,607 EIAs were opened among 1,571 Kentucky investors with Celsius and investors pledged $17,594,229.86 worth of digital assets to Celsius. Celsius in turn has paid these investors a total of $453,353.78.

## STATUTORY AUTHORITY

14.    KRS 292.310(19) defines a "security", in relevant part, as:

> ...any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, life settlement investment, voting-trust certificate, certificate of deposit for a security; fractional undivided interest in oil, gas, or other mineral rights; or, in general, any interest or instrument commonly known as a "security[.]"

15.     KRS 292.320 states, in pertinent part,

(1) It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly:
(a) To employ any device, scheme, or artifice to defraud;
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

16.     KRS 292.340 states,

It is unlawful for any person to offer or sell any security in this state, unless the security is registered under this chapter, or the security or transaction is exempt under this chapter, or the security is a covered security.

17.     KRS 292.470 states, in pertinent part,

Whenever it appears to the commissioner that any person has engaged or is about to engage in any act or practice constituting a violation of any provision of this chapter or any rule or order under this chapter, the commissioner may in his or her discretion bring any or all of the following remedies:

(1) Issue a cease and desist order, with or without a prior hearing, appealable to Franklin Circuit Court, against the person or persons engaged in the prohibited activities directing that person or persons to cease and desist from illegal activity. In order to issue an order without prior hearing, the commissioner must find that the delay in issuing a final cease and desist order will cause harm to the public.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

18.     The Department has become aware that the Company is offering securities in the form of investment contracts in exchange for the deposit of assets with the Company. These investment contracts allow passive investors to earn profit in the form of interest on the assets deposited with the Company, and qualify as securities under the Act.

Page **6** of **11**

19.     Based on the facts set forth above, Respondent offered unregistered securities in Kentucky through a publicly available website, in violation of the Act. These securities were not registered with the Department as required, and do not qualify for an exemption from registration.

20.     These EIAs amount to an investment contract because they are "an investment of money in a common enterprise with profits to come solely from the efforts of others." *See* S.E.C. v. W.J. Howey Co., 328 U.S. 293, 301 (1946).

21.     In addition to selling unregistered securities, Celsius's API Partners program does not disclose to API Partner customers that Celsius is the company that the customer is investing his or her cryptocurrencies with and misleads customers to believe it is the customer-facing API Partner's offering.

22.     By reason of the foregoing, Respondent has violated the Act and, unless enjoined, will continue to violate the law.

23.     Respondent's management of assets is completely unregulated, and is not subject to any government oversight or approval.

24.     Respondent is not currently subject to any disclosure requirements regarding the risks of investing with the Company, or the potential losses that an investor can suffer after opening an EIA.

25.     Accounts opened with Respondent are not insured by the Federal Deposit Insurance Corporation, or any other government entity.

26.     This lack of oversight coupled with the extremely volatile nature of the cryptocurrencies used to fund Respondent's EIAs has resulted in an unregulated market that represents an unprecedented risk to consumers.

27.     Delay in issuing a final cease and desist order in this case would cause direct harm to the public due to Respondent's current and foreseeable conduct. Failure of the Department to enter a cease and desist order in this case could result in extensive financial losses to the citizens of the Commonwealth, and consumers harmed in this way may have little to no recourse whatsoever. The emergency nature of this order is essential to protect the interests of the citizens of the Commonwealth due to the high volume of assets and volatile nature of cryptocurrency.

<u>Violation of KRS 292.320</u>

28.     Pursuant to KRS 292.320, it is unlawful for any person, in connection with the offer or sale of any security, directly or indirectly, to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person or to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading.

29.     Celsius' API Partners program deceives consumers by not disclosing to affected Kentucky consumers that the offered security is through Celsius and not the customer-facing API Partners in violation of KRS 292.320.

<u>Violation of KRS 292.340</u>

30.     Pursuant to KRS 292.340, it is unlawful for any person to solicit or sell securities in Kentucky without first being registered with the Department to do so.

31.     Through Celsius's publicly available website and smartphone application, Respondent has solicited securities in Kentucky.

32.     The Department's records show that Respondent has never been registered with the Department and have never sought registration.

33.    The Respondent and the securities Respondent offered do not qualify for an exemption from registration.

34.    Therefore, Respondent is in violation of KRS 292.340 by soliciting securities in Kentucky without being appropriately registered to do so.

### ORDER

In light of the foregoing, IT IS HEREBY ORDERED that:

1.    Respondent, Celsius Network LLC, shall **CEASE AND DESIST** from soliciting or selling any security in Kentucky unless that security is registered with the Department pursuant to KRS 292.340; and

2.    Respondent, Celsius Network LLC, shall **CEASE AND DESIST** from any and all activity which would otherwise violate the Act.

**SO ORDERED** on this the __23rd_ day of _September_, 2021.


___/s/ _Charles A. Vice_____
CHARLES A. VICE
COMMISSIONER

Charles
A. Vice

Digitally signed by: Charles A. Vice
DN: CN = Charles A. Vice email = charles.
vice@ky.gov C = US O = Dept. of
Financial Institutions OU = PPC/DFI/
Commissioner
Date: 2021.09.23 10:04:37 -05'00'


Page **9** of 11

## NOTICE TO RESPONDENT

You are hereby notified that you are entitled to request an emergency hearing.  If requested, an administrative hearing shall be held within ten (10) days pursuant to the provisions of KRS Chapter 13B.125. Please submit any request for hearing, in writing, to Brandon Adcock, Staff Attorney, Kentucky Department of Financial Institutions, 500 Mero Street 2 SW 19, Frankfort, Kentucky 40601. Alternatively, you may also have the right to the judicial review of this Order in Franklin Circuit Court pursuant to KRS 292.470(1).

## CERTIFICATE OF SERVICE

I, *Mary Johnson*                    , hereby certify that a copy of the foregoing Emergency Order to Cease and Desist was sent on this the **23**rd day of *September*         , 2021, by certified mail, return receipt requested, to the following:

Alex Mashinsky
CELSIUS NETWORK LLC
221 River Street 9th Floor
Hoboken, NJ 07030

Registered Agent for Service of Process
THE CORPORATION TRUST COMPANY
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

and by messenger mail or electronic delivery to:

Brandon Adcock, Staff Attorney III
DEPARTMENT OF FINANCIAL INSTITUTIONS
500 Mero Street, 2 SW 19
Frankfort, KY 40601
*Counsel for Department of Financial Institutions*

Kentucky Department of Financial Institutions

Name: *Mary Johnson*

Title: *Exec. Admin. Sec.*

**Exhibit P**

# STATE OF WASHINGTON
## DEPARTMENT OF FINANCIAL INSTITUTIONS
## SECURITIES DIVISION

| | |
|---|---|
| IN THE MATTER OF DETERMINING Whether there has been a violation of the Securities Act of Washington by: <br><br> **Celsius Network Inc.**; <br> **Celsius Network Limited**; <br> **Celsius US Holding LLC**, <br> **Celsius Network LLC**; <br> **Celsius Lending LLC**; <br>                         Respondents. | Order No. S-21-3212-21-SC01 <br><br> STATEMENT OF CHARGES AND NOTICE OF INTENT TO ENTER ORDER TO CEASE AND DESIST, TO IMPOSE A FINE, AND TO CHARGE COSTS |

**THE STATE OF WASHINGTON TO:**
                        Celsius Network Inc.,
                        Celsius Network Limited,
                        Celsius US Holding LLC,
                        Celsius Network LLC, and
                        Celsius Lending LLC

### STATEMENT OF CHARGES

      Please take notice that the Securities Administrator of the state of Washington has reason to believe that Respondents Celsius Network Inc., Celsius Network Limited, Celsius US Holding LLC, Celsius Network LLC, and Celsius Lending LLC have violated the Securities Act of Washington. The Securities Administrator believes these violations justify the entry of an order against Respondents Celsius Network Inc., Celsius Network Limited, Celsius US Holding LLC, Celsius Network LLC, and Celsius Lending LLC to cease and desist from such violations, to impose a fine, and to charge costs pursuant to RCW 21.20.390 and RCW 21.20.395. The Securities Administrator finds as follows:

### TENTATIVE FINDINGS OF FACT

#### Respondents

      1.     Celsius Network Inc. is a Delaware corporation formed on February 8, 2018 with its principal place of business in Hoboken, New Jersey. Celsius Network Inc. owns over 82% of Celsius Network

STATEMENT OF CHARGES

DEPARTMENT OF FINANCIAL INSTITUTIONS
Securities Division
PO Box 9033
Olympia, WA  98507-9033
360-902-8760

1

Limited. Celsius Network Inc. is not registered to do business in Washington and is not registered with the Securities Division in any capacity.

2.    Celsius Network Limited is an England and Wales private limited company formed on February 9, 2018 with its principal place of business in London, England. Celsius Network Limited wholly owns Celsius US Holding LLC. Celsius Network Limited is not registered to do business in Washington and is not registered with the Securities Division in any capacity.

3.    Celsius US Holding LLC is a Delaware limited liability company formed on October 5, 2020 with its principal place of business in Hoboken, New Jersey. Celsius US Holding LLC wholly owns Celsius Network LLC and Celsius Lending LLC. Celsius US Holding LLC is not registered to do business in Washington and is not registered with the Securities Division in any capacity.

4.    Celsius Network LLC is a Delaware limited liability company formed on June 14, 2021 with its principal place of business in Hoboken, New Jersey. Celsius Network LLC is not registered to do business in Washington and is not registered with the Securities Division in any capacity.

5.    Celsius Lending LLC is a Delaware limited liability company formed on October 5, 2020 with its principal place of business in Hoboken, New Jersey. Celsius Lending LLC is registered as a foreign limited liability company in Washington but is not registered with the Securities Division in any capacity.

6.    The above-named entities will be collectively referred to in this Statement of Charges as "Respondents" or "Celsius." Celsius provides various virtual currency-related financial services to retail and institutional customers in the United States, including trading, borrowing, and lending services. Celsius is also engaged in other income-generating virtual currency activities such as proprietary trading, staking, and mining.

//

//

STATEMENT OF CHARGES

**Nature of the Conduct**

**Overview**

7.      From approximately June 2018 until February 2019, and again from approximately January 2020 to July 2021, Celsius offered their Earned Interest Program ("EIP") to Washington customers. The EIP enabled customers to earn interest, called "rewards," on virtual currencies that the customer deposited with Celsius. Celsius offered the EIP through two methods: (1) Earned Interest Accounts ("EIAs") that customers can open directly with Celsius, or (2) the API Partners Program, where partner companies can utilize Celsius' platform to offer their customers the opportunity to participate in the EIP. To earn income to pay interest to EIP customers, Celsius engaged in numerous activities, including lending the customers' virtual currencies to retail and institutional borrowers. To date, Celsius has paid interest to at least 1,400 Washington residents through the EIP. As of August 29, 2021, Washington customers have a collective account value of over $137,000,000.

8.      Celsius promoted the EIP to Washington residents primarily online. Celsius maintained a website at https://celsius.network, through which it provided information about its EIP, a list of supported virtual currencies and their corresponding interest rates, and an updated total of Celsius users and "community assets" on deposit with Celsius. Celsius also promoted the EIP on social media and in numerous "Ask Mashinsky Anything" ("AMA") YouTube videos featuring its CEO, Alex Mashinsky.

9.      Celsius in particular marketed itself as a virtual currency financial solution for its "community" of retail customers called "Celsians." Celsius represented that it provided "fair and transparent services that have been abandoned by banks" to its retail customers. In an AMA and other online content, Celsius stated that it returns up to 80% of its earnings to customers.

10.     Celsius has advertised interest rates of up to 17% APY on particular virtual currencies, much higher than the rates currently being offered for short-term, investment grade, fixed income securities or for

STATEMENT OF CHARGES

DEPARTMENT OF FINANCIAL INSTITUTIONS
Securities Division
PO Box 9033
Olympia, WA  98507-9033
360-902-8760

3

bank savings accounts. Celsius does not insure EIAs against losses incurred by customers, nor are EIAs insured by the FDIC, SIPC, or NCUA.

### Earned Interest Accounts

11.    Celsius allows anyone 18 years and older and residing in a permissible jurisdiction to open EIAs on its website and mobile app. Celsius collects customer information, including photo identification, to verify the customer's identity for "Know Your Customer" (KYC) and anti-money laundering (AML) purposes.

12.    Celsius also requires customers to accept its Terms of Service upon signing up for an EIA, including the transfer of "all right and title" in the virtual currency from the customer to Celsius. Beginning around August 2021, Celsius began informing customers, through the Terms of Service, that their deposit of virtual currencies into the EIA constituted a loan from the customer to Celsius, and that the interest that Celsius paid to the customer was a finance fee.

13.     When an EIP customer funds their EIA with a supported virtual currency, Celsius then transfers the virtual currency into its own wallet, where it is pooled with virtual currency from other EIP customers and other Celsius assets.[1] Celsius then deploys the EIP virtual currency towards various income-generating activities (see Paragraph 19).

14.    Celsius credits the customer's EIA with interest on a weekly basis. The customer can choose between receiving interest in like-kind virtual currency or, where available, in CEL Tokens, Celsius' own virtual currency.[2] Celsius pays interest to the customer until the customer withdraws their virtual currencies

---

[1] However, beginning some time in 2020 until approximately July 2021, Celsius transferred Washington customers' EIP virtual currencies to a third-party custodian for holding.  Celsius maintains that the virtual currencies held by the custodian were not deployed in income-generating activities, though these Washington customers still earned interest on their virtual currencies like any other EIP customer.

[2] According to Celsius, CEL Tokens are only available to accredited investors in the United States. Celsius maintains a trading platform where customers can buy and sell CEL Tokens, though Celsius states that this service is not available to Washington residents.

STATEMENT OF CHARGES

DEPARTMENT OF FINANCIAL INSTITUTIONS
Securities Division
PO Box 9033
Olympia, WA  98507-9033
360-902-8760

or uses their virtual currencies as collateral against loans that the customer takes out from Celsius.[3] Celsius allows EIA customers to withdraw their virtual currencies at any time, subject to a maximum three-day processing period.

15.    Celsius revisits the interest rate also on a weekly basis. According to Celsius, it determines interest rates based largely on "market demand" for a particular virtual currency. For certain virtual currencies such as Bitcoin and Ether, Celsius further sets the interest rate using a tiered structure.

### API Partner Program

16.    Celsius offers other companies the opportunity to provide the EIP to their own customers by becoming an API Partner. Celsius conducts due diligence on a potential API Partner prior to the establishment of the relationship. An API Partner can provide Celsius' EIP to its own customers through two different types of accounts: Segmented and Omnibus. Both types of API accounts are subject to the same restrictions and conditions as those on Celsius' own platform.

17.    With Segmented Accounts, the API Partner's customers establish a direct relationship with Celsius. Celsius onboards those customers in the same way that it brings on its own customers, including verifying customer identities for KYC/AML purposes. The API Partner's customers must also open their own Celsius EIA and accept Celsius' Terms of Service, though the customer accesses their account through the Partner's platform. Celsius pays interest directly into the customer's account.

18.    Omnibus Accounts, on the other hand, require the API Partner to establish its own EIP account with Celsius. Celsius pays interest into that account, and the API Partner then distributes the interest to its own customers. Celsius does not maintain a relationship with the API Partner's customers and does not know their identities. However, Celsius conducts additional due diligence into the Partners' business

---

[3]  The retail borrowing program is not open to Washington residents, according to Celsius.

STATEMENT OF CHARGES

practices and reviews, among other things, the Partners' policies and procedures related to KYC/AML rules. Celsius establishes a direct contractual relationship with the API Partner and requires the API Partner to offer the same interest to its customers that Celsius offers to its own customers.

### Deployment and Income-Generating Activities

19.    Celsius uses the virtual currencies deposited by EIP customers in several income-generating activities. These activities include lending the virtual currencies to institutional and retail borrowers, posting it as collateral for its own stablecoin borrowing, and using the virtual currencies for market making, staking, mining, yield farming, and proprietary trading. Celsius also invests the EIP virtual currencies, at times through third party asset managers that are vetted by Celsius. Celsius regularly researches the market to identify other possible income-generating activities and has multiples teams tasked to review the potential of these activities.

20.    With regard to institutional and retail lending, Celsius manages most, if not all, aspects of the loan and lending process. Among other things, Celsius obtains borrower information, assesses their credit risks, tailors terms of the loans, including any required collateral, in accordance with the borrower's risk profile, monitors counterparty risk after the loan has been funded, liquidates posted collateral where needed, and services the loans.

21.    Celsius uses the income it receives from these activities to pay interest to EIP customers and for operating expenses, among other uses.

22.    Celsius requires EIP customers to agree to the commingling and deployment of their virtual currencies in this manner in Celsius' Terms of Service. Celsius customers agree to relinquish all rights and title to the virtual currency and to allow Celsius to "pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of [the virtual currency], separately or together with other

STATEMENT OF CHARGES

DEPARTMENT OF FINANCIAL INSTITUTIONS
Securities Division
PO Box 9033
Olympia, WA  98507-9033
360-902-8760

property,….and to use or invest such [virtual currency]." EIP customers have no control over how their virtual currencies are deployed by Celsius.

### Material Misleading Statements and Omissions in Offer and Sale of EIPs

23.    In offering the EIPs to Washington residents, Celsius failed to fully disclose material aspects of its business and the EIP including, but not limited to, the types of trading and investment activities that it engages in using EIP virtual currencies, the identities and creditworthiness of those who borrow EIP virtual currencies, the amount of virtual currencies used in each income-generating activity, and Celsius financial statements or other information reflecting its financial state.

24.    In addition, Celsius' statements that it provides 80% of its revenue to its customers is misleading, as EIP customers are only entitled to earning interest at set rates determined by Celsius.

### Need For Further Investigation

25.    The Securities Division is continuing to investigate the matter alleged herein to determine the full extent of the violations of the Securities Act that have occurred in this matter. The Securities Division may amend this Statement of Charges in the future to reflect any additional factual allegations and/or violations as a result of the continuing investigation.

### Registration Status

26.    Celsius Network Inc. is not currently registered to sell the Earned Interest Program in the state of Washington and has not previously been so registered, nor has it filed a claim of exemption from registration.

27.    Celsius Network Inc. is not currently registered as a broker-dealer in the state of Washington and has not previously been so registered.

28.    Celsius Network Limited is not currently registered to sell the Earned Interest Program in the state of Washington and has not previously been so registered, nor has it filed a claim of exemption from

STATEMENT OF CHARGES

DEPARTMENT OF FINANCIAL INSTITUTIONS
Securities Division
PO Box 9033
Olympia, WA  98507-9033
360-902-8760

7

registration.

29.   Celsius Network Limited is not currently registered as a broker-dealer in the state of Washington and has not previously been so registered.

30.   Celsius US Holding LLC is not currently registered to sell the Earned Interest Program in the state of Washington and has not previously been so registered, nor has it filed a claim of exemption from registration.

31.   Celsius US Holding LLC is not currently registered as a broker-dealer in the state of Washington and has not previously been so registered.

32.   Celsius Network LLC is not currently registered to sell the Earned Interest Program in the state of Washington and has not previously been so registered, nor has it filed a claim of exemption from registration.

33.   Celsius Network LLC is not currently registered as a broker-dealer in the state of Washington and has not previously been so registered.

34.   Celsius Lending LLC is not currently registered to sell the Earned Interest Program in the state of Washington and has not previously been so registered, nor has it filed a claim of exemption from registration.

35.   Celsius Lending LLC is not currently registered as a broker-dealer in the state of Washington and has not previously been so registered.

Based upon the above Tentative Findings of Fact, the following Conclusions of Law are made:

## CONCLUSIONS OF LAW

1.   The offer and/or sale of the Earned Interest Program described above constitutes the offer and/or sale of a security as defined in RCW 21.20.005(14) and (17).

STATEMENT OF CHARGES

DEPARTMENT OF FINANCIAL INSTITUTIONS
Securities Division
PO Box 9033
Olympia, WA  98507-9033
360-902-8760

2.     Celsius Network Inc., Celsius Network Limited, Celsius US Holding LLC, Celsius Network LLC, and Celsius Lending LLC violated RCW 21.20.140, the securities registration section of the Securities Act of Washington, by offering and/or selling securities for which no registration is on file with the Securities Administrator.

3.     Celsius Network Inc., Celsius Network Limited, Celsius US Holding LLC, Celsius Network LLC, and Celsius Lending LLC violated RCW 21.20.040, the licensee registration section of the Securities Act of Washington, by offering and/or selling said securities while not being registered as a broker-dealer in the state of Washington.

4.     Celsius Network Inc., Celsius Network Limited, Celsius US Holding LLC, Celsius Network LLC, and Celsius Lending LLC violated RCW 21.20.010, the anti-fraud section of the Securities Act of Washington, by making untrue statements of material fact or omitting to state material facts necessary to make the statements made, in light of the circumstances in which they were made, not misleading.

### NOTICE OF INTENT TO ORDER THE RESPONDENT TO CEASE AND DESIST

Pursuant to RCW 21.20.390(1), and based upon the Tentative Findings of Fact and Conclusions of Law, the Securities Administrator intends to order Celsius Network Inc., Celsius Network Limited, Celsius US Holding LLC, Celsius Network LLC, and Celsius Lending LLC, and their agents and employees, to each permanently cease and desist from violating RCW 21.20.010, RCW 21.20.040, and RCW 21.20.140.

### NOTICE OF INTENT TO IMPOSE FINES

Pursuant to RCW 21.20.395, and based upon the Tentative Findings of Fact and Conclusions of Law, the Securities Administrator intends to order that Celsius Network Inc., Celsius Network Limited, Celsius US Holding LLC, Celsius Network LLC, and Celsius Lending LLC shall be jointly and severally liable for and for and shall pay a fine of $100,000.

//

STATEMENT OF CHARGES

DEPARTMENT OF FINANCIAL INSTITUTIONS
Securities Division
PO Box 9033
Olympia, WA  98507-9033
360-902-8760

## NOTICE OF INTENT TO CHARGE COSTS

Pursuant to RCW 21.20.390, and based upon the Tentative Findings of Fact and Conclusions of Law, the Securities Administrator intends to order that Celsius Network Inc., Celsius Network Limited, Celsius US Holding LLC, Celsius Network LLC, and Celsius Lending LLC shall be jointly and severally liable for and for and for and shall pay the costs, fees, and other expenses incurred in the administrative investigation and hearing of this matter, in an amount not less than $6,500.

## AUTHORITY AND PROCEDURE

This Statement of Charges is entered pursuant to the provisions of Chapter 21.20 RCW and is subject to the provisions of Chapter 34.05 RCW. Celsius Network Inc., Celsius Network Limited, Celsius US Holding LLC, Celsius Network LLC, and Celsius Lending LLC may each make a written request for a hearing as set forth in the Notice of Opportunity for Hearing accompanying this Order. If a respondent does not make a hearing request in the time allowed, the Securities Administrator intends to adopt the above Tentative Findings of Fact and Conclusions of Law as final and to enter a permanent order to cease and desist as to that respondent, to impose any fines sought against that respondent, and to charge any costs sought against that respondent.

SIGNED and ENTERED this 20th day of October, 2021.


_____

William M. Beatty
Securities Administrator

STATEMENT OF CHARGES

DEPARTMENT OF FINANCIAL INSTITUTIONS
Securities Division
PO Box 9033
Olympia, WA  98507-9033
360-902-8760

10

1

2    Approved by:                                    Presented by:

3

4

5    _____            _____
     Suzanne Sarason                                 Huong Lam
     Chief of Enforcement                            Financial Legal Examiner

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

STATEMENT OF CHARGES                                    DEPARTMENT OF FINANCIAL INSTITUTIONS
                                                                 Securities Division
                                                                 PO Box 9033
                                                                 Olympia, WA  98507-9033
                                                                 360-902-8760

11

TRAVIS J. ILES
SECURITIES COMMISSIONER

CLINTON EDGAR
DEPUTY SECURITIES COMMISSIONER

Mail: P.O. BOX 13167
AUSTIN, TEXAS 78711-3167

Phone: (512) 305-8300
Facsimile: (512) 305-8310

**Exhibit Q**



*Texas State Securities Board*

208 E. 10th Street, 5th Floor
Austin, Texas 78701-2407
www.ssb.texas.gov

E. WALLY KINNEY
CHAIR

KENNY KONCABA
MEMBER

ROBERT BELT
MEMBER

MELISSA TYROCH
MEMBER

EJIKE E OKPA II
MEMBER

SOAH DOCKET NO. 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

| | |
|---|---|
| TEXAS STATE SECURITIES BOARD, Petitioner | § § § | BEFORE THE STATE OFFICE |
| v. | § § | |
| | § | OF |
| CELSIUS NETWORK, INC., CELSIUS NETWORK LIMITED, CELSIUS US HOLDING, LLC, CELSIUS NETWORK, LLC, AND CELSIUS LENDING, LLC Respondents | § § § § § § | ADMINISTRATIVE HEARINGS |

CELSIUS NETWORK INC.
Service by (1) certified mail, return receipt requested, addressed to 221 River Street, 9th Floor, Hoboken, New Jersey 07030; (2) certified mail, return receipt requested, addressed to The Harley Building, 77-79 New Cavendish Street, London W1W 6XB, United Kingdom; (3) certified mail, return receipt requested, addressed to its counsel John Sikora, Jr., Partner, Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611; and (4) electronic mail to its counsel, John Sikora, Jr., at john.sikora@lw.com.

CELSIUS NETWORK LIMITED
Service by (1) certified mail, return receipt requested, addressed to 221 River Street, 9th Floor, Hoboken, New Jersey 07030; (2) certified mail, return receipt requested, addressed to The Harley Building, 77-79 New Cavendish Street, London W1W 6XB, United Kingdom; (3) certified mail, return receipt requested, addressed to its counsel John Sikora, Jr., Partner, Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611; and (4) electronic mail to its counsel, John Sikora, Jr., at john.sikora@lw.com.

CELSIUS US HOLDING, LLC
Service by (1) certified mail, return receipt requested, addressed to 221 River Street, 9th Floor, Hoboken, New Jersey 07030; (2) certified mail, return receipt requested, addressed to The Harley Building, 77-79 New Cavendish Street, London W1W 6XB, United Kingdom; (3) certified mail, return receipt requested, addressed to its counsel John

Sikora, Jr., Partner, Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611; and (4) electronic mail to its counsel, John Sikora, Jr., at john.sikora@lw.com.

CELSIUS NETWORK, LLC
Service by (1) certified mail, return receipt requested, addressed to 221 River Street, 9th Floor, Hoboken, New Jersey 07030; (2) certified mail, return receipt requested, addressed to The Harley Building, 77-79 New Cavendish Street, London W1W 6XB, United Kingdom; (3) certified mail, return receipt requested, addressed to its counsel John Sikora, Jr., Partner, Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611; and (4) electronic mail to its counsel, John Sikora, Jr., at john.sikora@lw.com.

CELSIUS LENDING, LLC
Service by (1) certified mail, return receipt requested, addressed to 221 River Street, 9th Floor, Hoboken, New Jersey 07030; (2) certified mail, return receipt requested, addressed to The Harley Building, 77-79 New Cavendish Street, London W1W 6XB, United Kingdom; (3) certified mail, return receipt requested, addressed to its counsel John Sikora, Jr., Partner, Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611; and (4) electronic mail to its counsel, John Sikora, Jr., at john.sikora@lw.com.

## NOTICE OF HEARING

This is your OFFICIAL NOTICE that a hearing will commence at **9:00 AM on FEBRUARY 14, 2022,** before an Administrative Law Judge. The hearing is being held via videoconference for the purpose of determining whether to issue a proposal for decision for the entry of a CEASE AND DESIST ORDER against Celsius Network, Inc., Celsius Network Limited, Celsius US Holding, LLC, Celsius Network, LLC, and Celsius Lending, LLC (herein collectively referred to as the "Celsius Network" or as "Respondents").

This hearing will be held pursuant to the Securities Act, Tex. Rev. Civ. Stats. Ann. arts. 581-1-581-45 (the "Securities Act"), the Rules and Regulations of the State Securities Board, 7 Tex. Admin. Code §§101.1-139.27 (2019) (Tex. State Sec. Bd.) (the "Board Rules"), the Administrative Procedure Act, Tex. Gov't Code Ann. §§2001.001-2001.902 (the "Administrative Procedure Act"), and the Rules of Practice and Procedure of the State Office of Administrative Hearings, 1 Tex. Admin. Code Chapter 155 (2019) (State Ofc. of Admin. Hearings) (the "SOAH Rules").

## CELSIUS AND THE CRYPTO INTEREST ACCOUNTS

1. Celsius Network, Inc. is incorporated in Delaware and owns several subsidiaries including an approximately 82.81% interest in Celsius Network Limited.

2. Celsius Network Limited is incorporated in England and Wales and wholly owns many subsidiaries, including Celsius US Holding, LLC.

3.    Celsius US Holding, LLC is the holding company for Celsius Network's subsidiaries in the United States and two of its wholly owned subsidiaries are Celsius Network, LLC and Celsius Lending, LLC.

4.    Celsius Network, LLC is a Celsius Network company incorporated in Delaware and is the subsidiary providing Celsius Network's user-facing services and activities for customers in the United States.

5.    Celsius Lending, LLC is a Celsius Network company incorporated in Delaware and is the subsidiary providing consumer fiat and stablecoin loans secured by cryptocurrency deposits to Celsius Network's customers in the United States.

6.    The Celsius Network is a network of affiliated financial services companies that generate revenue through cryptocurrency trading, lending, and borrowing, as well as engaging in propriety trading, mining, and other types of transactions.

7.    Respondents are, in part, illegally funding their lending operations, proprietary trading, and other revenue generating activities through the sale of unregistered securities in the form of cryptocurrency interest-earning accounts.

8.    Respondents refer to the unregistered cryptocurrency interest-earning accounts as Celsius Network's "Earn Rewards" program ("Celsius Earn Interest-Bearing Account").

9.    Respondents permit Texans and other investors at least eighteen years old to apply to purchase the Celsius Earn Interest-Bearing Account through the Celsius Network's website or smartphone application.

10.    Investors open accounts by transferring eligible cryptocurrency to the Celsius Network to invest in Celsius Earn Interest-Bearing Accounts. Investors relinquish control over their cryptocurrency and the Celsius Network takes full legal and beneficial ownership of the investors' cryptocurrency.

11.    The Celsius Network is free to use investors' cryptocurrencies consistent with the terms of the Celsius Earn Interest-Bearing Accounts, including commingling cryptocurrencies with cryptocurrencies deposited by other investors, investing in traditional financial assets and cryptocurrency assets, lending those cryptocurrencies to institutional and corporate borrowers, and engaging in any other activities at the Celsius Network's discretion.

12.    In exchange for consideration received in the present, the Celsius Network is promising to pay lucrative interest rates in the future. The Celsius Network is currently promoting the interest rates through its website, which recently advertised an annual return of up to 17.78 percent on certain cryptocurrencies for retail

investors - well in excess of the rates currently being offered for short-term, investment grade, fixed income securities or for bank savings accounts.

13.    The Celsius Network sets the interest rates it pays on various cryptocurrencies in advance and on a periodic basis. The Celsius Network sets its interest rates based on various considerations and prioritizing the Celsius Network's need for particular types of cryptocurrencies.

14.    The Celsius Network incentivizes smaller investors to invest in the Celsius Earn Interest-Bearing Accounts by paying higher rates of interest on smaller investments of principal for certain cryptocurrencies. As an example, the Celsius Network has paid higher rates of interest on investments up to 1 Bitcoin and up to 100 Ethereum and lower rates of interest on investments of more than 1 Bitcoin and more than 100 Ethereum.

15.    The accrual of interest begins "as soon as any funds are credited to [an investor's] Celsius account." Investors transfer cryptocurrencies to the Celsius Network and the transaction is timestamped with the hour, minute, and second. Interest is payable on or around the first business day of each week.

16.    In the United States, interest payments are denominated in the same type of cryptocurrency originally invested. In other jurisdictions, subject to certain conditions, the Celsius Network may make interest payments denominated in its native digital token, CEL.

17.    Retail investors may withdraw their cryptocurrencies at any time, subject to certain processing times.

18.    As of September 3, 2021, the Celsius Network claims it has more than $24,000,000,000 in assets under management, more than 1,000,000 community members, and more than $8,200,000,000 in loans processed.

19.    As of August 18, 2021, the Celsius Network had 348,158 active users worldwide invested in Celsius Earn Interest-Bearing Accounts with global assets under management exceeding $12,500,000,000. As of the same date, the Celsius Network had 139,054 active users in the United States invested in Celsius Earn Interest-Bearing Accounts with United States-based assets under management exceeding $7,000,000,000.

20.    As of June 9, 2021, the Celsius Network has more than $344,000,000 in assets under management from more than 9,000 Texas residents and businesses.

### CELSIUS' API PARTNER PROGRAM

21.    The Celsius Network offers an Application Programming Interface ("API") that allows certain institutional users, known as Celsius "API Partners," ("Celsius API

<u>Partners</u>") to integrate with the Celsius Network's platform. Celsius API Partners can then offer and sell the unregistered Celsius Earn Interest-Bearing Accounts to their clients.

22. The Celsius Network provides two different types of accounts whereby Celsius API Partners' clients can access Celsius Earn Interest-Bearing Accounts called segmented accounts ("<u>Segmented API Accounts</u>") and omnibus accounts ("<u>Omnibus API Accounts</u>").

23. Investors who invest in Celsius Earn Interest-Bearing Accounts through a Celsius API Partner's Segmented API Account or Omnibus API Account are subject to the same rights, benefits, terms, and conditions as investors who invest in Celsius Earn Interest-Bearing Accounts directly from the Celsius Network.

24. Segmented API Accounts allow Celsius API Partners to offer Celsius Earn Interest-Bearing Accounts through their own platforms. For Segmented API Accounts:

   A. Investors create their own Celsius Network accounts through the Celsius API Partner's platform;

   B. The Celsius Network performs the onboarding and customer due diligence for investors from Celsius API Partners;

   C. Investors must accept the Celsius Network's terms and conditions; and

   D. The Celsius API Partners receive a fee based on the percentage of interest payable by the Celsius Network to the investor.

25. Omnibus API Accounts allow Celsius API Partners to offer and sell Celsius Earn Interest-Bearing Accounts to their investors on an aggregated basis. For Omnibus API Accounts:

   A. The Celsius API Partner maintains one account with the Celsius Network where it transfers the aggregated funds of its investors;

   B. The Celsius Network performs no customer due diligence on the Celsius API Partner's investors, has no relationship with the investors, and does not know their identities;

   C. The Celsius Network's only contractual relationship is with the Celsius API Partner; and

   D. The Celsius Network pays a fee to the Celsius API Partner which is in addition to the interested paid on investments in the Celsius Earn Interest-Bearing Accounts.

## THE LACK OF REGISTRATION AND PUBLIC PROTECTIONS

26.    Respondents are not licensed as a Money Service Business in Texas to conduct currency exchange or money transmission activities defined by Chapter 151 of the Texas Finance Code.

27.    Respondents are not licensed with the United States Securities and Exchange Commission. Additionally, they are not registered with the Texas State Securities Board to offer or sell securities in Texas, as required by Section 12 of the Securities Act, and the Celsius Earn Interest-Bearing Accounts are not registered or permitted for sale in Texas, as required by Section 7 of the Securities Act. Accordingly, Respondents are violating laws designed to protect Texans.

28.    The Celsius Earn Interest-Bearing Accounts are also not protected by Securities Investor Protection Corporation, otherwise known as the SIPC, a federally mandated, non-profit, member-funded United States corporation created under the Securities Investor Protection Act of 1970 that mandates membership of most US-registered broker-dealers.

29.    The Celsius Earn Interest-Bearing Accounts are also not insured by the Federal Deposit Insurance Corporation, otherwise known as the FDIC, an agency that provides deposit insurance to depositors in the United States, or the National Credit Union Administration, otherwise known as the NCUA, an agency that regulates and insures credit unions.

## THE UNDISCLOSED RISKS

30.    Respondents are not disclosing material information necessary for investors to make an informed decision, including critical material information about the risks associated with purchasing its unregistered securities.

31.    This material information includes, without limitation, the amount of money or cryptocurrency devoted to permissive uses, the identity, nature, and creditworthiness of borrowers, the type and nature of transactions involving digital assets, equities, options, and futures, the risks associated with individual digital assets, equities, options, and futures, the profits and/or losses derived from transactions, and financial information reflecting the assets and liabilities and cashflow.

## THE VIOLATIONS OF THE SECURITIES ACT

32.    The Securities Act regulates the offer and sale of securities in Texas.

33.    Section 4.A of the Securities Act defines the term securities to include traditional products such as stocks and bonds. The statute also broadly defines the term securities to include investment contracts, notes, and evidences of indebtedness

– broad categories of products that capture the endless number of unique and innovative investment schemes continuously introduced into the market.

34.     The mere fact an investment is tied to a cryptocurrency, blockchain technology, or some type of digital asset does not remove it from securities regulation if it constitutes an investment contract, note, evidence of indebtedness, or other type of security.

35.     Based on the information and allegations set forth herein, the Celsius Earn Interest-Bearing Accounts constitute investment contracts, notes, or evidences of indebtedness regulated as securities as that term is defined by Section 4.A of the Securities Act.

36.     Based on the information and allegations set forth herein, Respondents are violating Section 7 of the Securities Act by offering and selling securities in Texas that are not registered or permitted for sale in Texas.

37.     Based on the information and allegations set forth herein, Respondents are also violating Section 12 of the Securities Act by offering and selling securities in Texas without first being registered as dealers or agents.

## THE NOTIFICATION AND REQUEST FOR COMPLIANCE

38.     On or about May 14, 2021, the Enforcement Division of the State Securities Board (the "Enforcement Division") notified Respondents that Respondents may have offered securities in Texas that may not comply with the Securities Act.

39.     The Enforcement Division also explained the regulation of the securities market in Texas, including the identification of laws that require the registration of securities, the registration of dealers and agents, and the truthful disclosure of all known material facts.

40.     Nevertheless, Respondents have continued to offer the Celsius Earn Interest-Bearing Accounts to Texans in violation of Sections 7 and 12 of the Securities Act.

## REMEDIES

41.     The Enforcement Division is praying for a proposal for decision for the entry of an order that Respondents immediately cease and desist from violating Sections 7 and 12 of the Securities Act.

42.     Although this Notice of Hearing is praying for a proposal for decision for an order to cease and desist from violating Sections 7 and 12 of the Securities Act, nothing set forth herein shall preclude the Enforcement Division, consistent with applicable law and rule, from pursuing other enforcement remedies, such as filing an amended Notice of Hearing praying for a proposal for decision that orders the

assessment of an administrative fine or the payment of a refund/restitution to Texans.

## EXISTING CLIENT ACCOUNTS

43.     This Notice of Hearing, and the prayers contained herein, do not preclude Respondents from paying interest or returns to existing clients, refunding principal to investors consistent with the terms of the Celsius Earn Interest-Bearing Accounts, or otherwise lawfully dealing with existing clientele.

## THE HEARING

44.     The hearing will be held before the State Office of Administrative Hearings. It will commence at **9:00 AM on FEBRUARY 14, 2022**.

45.     The State Office of Administrative Hearings may conduct the hearing via Zoom. Zoom is a video conferencing platform for meetings held through the internet. The State Office of Administrative Hearings will provide instructions for accessing the hearing via Zoom.

46.     At the hearing, the Enforcement Division will present testimony and other admissible evidence in support of its prayer for a proposal for decision for the entry of a CEASE AND DESIST ORDER against Respondents. Respondents will be afforded the right to present such testimony and other evidence related thereto.

## LEGAL NOTIFICATIONS

47.     Legal authority and jurisdiction for this matter exist under Section 23 of the Securities Act, Section 2003.021(b) of the Texas Government Code and Rule 155.51 of the SOAH Rules.

48.     **IF YOU DO NOT FILE A WRITTEN ANSWER OR OTHER WRITTEN RESPONSIVE PLEADING TO THIS NOTICE OF HEARING ON OR BEFORE THE 20TH DAY AFTER THE DATE ON WHICH THIS NOTICE WAS MAILED TO YOU OR PERSONALLY SERVED ON YOU, THE FACTUAL ALLEGATIONS IN THIS NOTICE COULD BE DEEMED ADMITTED, AND THE SECURITIES COMMISSIONER MAY DISPOSE OF THIS CASE WITHOUT A HEARING AND MAY GRANT THE RELIEF SOUGHT IN THIS NOTICE. THE RESPONSE MUST BE FILED IN AUSTIN, TEXAS, WITH THE SECURITIES COMMISSIONER AND THE STATE OFFICE OF ADMINISTRATIVE HEARINGS, AND ALSO SERVED ON THE STAFF OF THE STATE SECURITIES BOARD. IF YOU FAIL TO ATTEND THE HEARING, EVEN IF A WRITTEN ANSWER OR OTHER RESPONSIVE PLEADING HAS BEEN FILED AND SERVED, THE FACTUAL ALLEGATIONS IN THIS NOTICE COULD BE DEEMED ADMITTED, AND THE SECURITIES COMMISSIONER MAY DISPOSE OF THIS CASE WITHOUT A HEARING AND MAY GRANT THE RELIEF SOUGHT IN THIS NOTICE.**

**49. PARTIES THAT ARE NOT REPRESENTED BY AN ATTORNEY MAY OBTAIN INFORMATION REGARDING CONTESTED CASE HEARINGS ON THE PUBLIC WEBSITE OF THE STATE OFFICE OF ADMINISTRATIVE HEARINGS AT WWW.SOAH.TEXAS.GOV, OR IN PRINTED FORMAT UPON REQUEST TO THE STATE OF ADMINISTRATIVE HEARINGS.**

50.   Respondents may access the Securities Act and the Board Rules through the website of the State Securities Board at www.ssb.texas.gov. Respondents may also access the SOAH Rules through the website of the State Office of Administrative Hearings at www.soah.texas.gov and the Administrative Procedure Act through Texas Legislature Online at statutes.capitol.texas.gov.

51.   The Securities Act authorizes the Texas State Securities Board to pursue administrative, civil, or criminal enforcement cases. The Securities Act and Board Rules also authorize the Texas State Securities Board to share information with and refer cases to other governmental agencies with administrative, civil, or criminal jurisdiction. These other governmental agencies include, without limitation, state and federal regulatory agencies, law enforcement agencies and prosecutors' offices. Therefore, any information provided, filed, or otherwise supplied by Respondents may be shared with these other government agencies and/or used in other cases. Whether the Texas State Securities Board makes its files available to other governmental agencies or refers cases to other government agencies is typically confidential pursuant to Section 28 of the Texas Securities Act.

52.   Pursuant to Board Rule 105.13, the Enforcement Division is now respectfully requesting and will continue to respectfully request the State Office of Administrative Hearings order all costs charged to the Texas Securities Board by any court reporting service be assessed against Respondents.

53.   Persons with disabilities who need special accommodations at the hearing, whether held at the State Office of Administrative Hearings or through an audio or video conferencing platform, should contact the Docketing Department of the State Office of Administrative Hearings at 512-475-4993 at least one week prior to the hearing.

<u>CONTACT AND FILING INFORMATION</u>

54.   The Enforcement Division is represented by Rachel Anderson Rynders, Attorney, Enforcement Division. Ms. Anderson Rynders' State Bar Card Number is 24103132, her work address 208 E. 10th Street, 5th Floor, Austin, Texas 78701, her telephone number is 512-305-8392, her facsimile number is 512-355-0404, and her email address is rrynders@ssb.texas.gov.

55.   The Docketing Office of the State Office of Administrative Hearings is located at 300 W. 15th Street, Austin, Texas 78701, and it may be contacted by telephone at 512-745-3445 and by facsimile at 512-475-4994.

56.   The State Office of Administrative Hearings may conduct the hearing via audio or video conferencing. The audio and video conferencing platforms are secure, free meetings held telephonically or through the internet. The State Office of Administrative Hearings will provide instructions for all hearings held telephonically or through a video conferencing platform.

57.   Persons with disabilities who need special accommodations at the hearing, whether held at the State Office of Administrative Hearings or through an audio or video conferencing platform, should contact the Docketing Department of the State Office of Administrative Hearings at 512-475-4993 at least one week prior to the hearing.

58.   Pursuant to Board Rule 105.8, all documents filed by any party, other than business records and transcripts, must be contemporaneously served upon Marlene Sparkman, General Counsel and Securities Commissioner's Representative. Ms. Sparkman's address is 208 E. 10th Street, 5th Floor, Austin, Texas 78701, her telephone number is 512-305-8300, her facsimile number is 512-305-8336, and her email address is msparkman@ssb.texas.gov.

Signed on this, the 17th day of September 2021

By: /s/ Joe Rotunda_____
       Joe Rotunda
       State Bar No. 24029808
       Division Director, Enforcement Division
       Texas State Securities Board
       208 E. 10th Street, 5th Floor
       Austin, Texas 78701
       T: 512-305-8392
       F: 512-355-0404
       E: jrotunda@ssb.texas.gov

## CERTIFICATE OF SERVICE

I hereby certify that on this, the 17th day of September 2021, true and correct copies of this Notice of Hearing are being served on the following parties through the means set forth below:

**MARLENE SPARKMAN**
General Counsel for the State Securities Board and the Securities Commissioner's Representative, is being served by electronic mail addressed to msparkman@ssb.texas.gov.

**CELSIUS NETWORK INC.**
Service by (1) certified mail, return receipt requested, addressed to 221 River Street, 9th Floor, Hoboken, New Jersey 07030; (2) certified mail, return receipt requested, addressed to The Harley Building, 77-79 New Cavendish Street, London W1W 6XB, United Kingdom; (3) certified mail, return receipt requested, addressed to its counsel John Sikora, Jr., Partner, Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611; and (4) electronic mail to its counsel, John Sikora, Jr., at john.sikora@lw.com.

**CELSIUS NETWORK LIMITED**
Service by (1) certified mail, return receipt requested, addressed to 221 River Street, 9th Floor, Hoboken, New Jersey 07030; (2) certified mail, return receipt requested, addressed to The Harley Building, 77-79 New Cavendish Street, London W1W 6XB, United Kingdom; (3) certified mail, return receipt requested, addressed to its counsel John Sikora, Jr., Partner, Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611; and (4) electronic mail to its counsel, John Sikora, Jr., at john.sikora@lw.com.

**CELSIUS US HOLDING, LLC**
Service by (1) certified mail, return receipt requested, addressed to 221 River Street, 9th Floor, Hoboken, New Jersey 07030; (2) certified mail, return receipt requested, addressed to The Harley Building, 77-79 New Cavendish Street, London W1W 6XB, United Kingdom; (3) certified mail, return receipt requested, addressed to its counsel John Sikora, Jr., Partner, Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611; and (4) electronic mail to its counsel, John Sikora, Jr., at john.sikora@lw.com.

**CELSIUS NETWORK, LLC**
Service by (1) certified mail, return receipt requested, addressed to 221 River Street, 9th Floor, Hoboken, New Jersey 07030; (2) certified mail, return receipt requested, addressed to The Harley Building, 77-79 New Cavendish Street, London W1W 6XB, United Kingdom; (3) certified mail, return receipt requested, addressed to its counsel John Sikora, Jr., Partner, Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611; and (4) electronic mail to its counsel, John Sikora, Jr., at john.sikora@lw.com.

**CELSIUS LENDING, LLC**
Service by (1) certified mail, return receipt requested, addressed to 221 River Street, 9th Floor, Hoboken, New Jersey 07030; (2) certified mail, return receipt requested, addressed to The Harley Building, 77-79 New Cavendish Street, London W1W 6XB, United

Kingdom; (3) certified mail, return receipt requested, addressed to its counsel John Sikora, Jr., Partner, Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611; and (4) electronic mail to its counsel, John Sikora, Jr., at john.sikora@lw.com.

By:    /s/ Joe Rotunda
Joe Rotunda
State Bar No. 24029808
Director, Enforcement Division
Texas State Securities Board
208 E. 10th Street, 5th Floor
Austin, Texas 78701
T: 512-305-8392
F: 512-355-0404
E: jrotunda@ssb.texas.gov

# Exhibit R

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

THE PEOPLE OF THE STATE OF NEW YORK    :
By LETITIA JAMES, Attorney General of the State of
New York,    :      Index No.:

        Plaintiff,    :      **COMPLAINT**

     -against-    :

ALEX MASHINSKY,    :

       Defendant.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Plaintiff, the People of the State of New York, by Letitia James, Attorney General of the State of New York ("OAG" or "Plaintiff"), alleges as follows:

## PRELIMINARY STATEMENT

1. Between 2018 and at least June 2022, Defendant Alex Mashinsky ("Mashinsky" or "Defendant") engaged in a scheme to defraud hundreds of thousands of investors, including more than 26,000 New Yorkers, by using false and misleading representations to induce them to deposit billions of dollars in digital assets with his cryptocurrency lending company Celsius Network LLC (together with its parent and related entities, "Celsius"), which he founded and led as chief executive officer. Mashinsky promoted Celsius as a safe alternative to banks while concealing that Celsius was actually engaged in risky investment strategies.

2. Mashinsky was the public face of Celsius. In hundreds of interviews, blog posts, and livestreams, Mashinsky promised investors high yield with minimal risk, assuring them that their digital assets would be as safe as money in a bank and that Celsius would always act in investors' best interest. Touting himself and his company as a modern-day Robin Hood, Mashinsky boasted that Celsius "deliver[s] yield…to the people who would never be able to do it

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

themselves, [and] we take it from the rich…." Mashinsky promised investors some of the highest yields in the industry, as high as 17%. He told investors that Celsius would generate sustainably high returns by making low-risk collateralized loans to first-tier institutions and cryptocurrency exchanges as well as overcollateralized loans to retail borrowers.

3.      These promises were false – but proved wildly popular. By early 2022, Mashinsky's promotional efforts had helped Celsius amass $20 billion in digital assets from investors all over the world. But as Celsius grew larger, it struggled to generate enough revenue to pay the promised yields on investors' deposits. In search of revenue, Celsius moved into significantly riskier investments, extending hundreds of millions of dollars in uncollateralized loans, and investing hundreds of millions of dollars in unregulated decentralized finance platforms.

4.      When Celsius suffered losses on risky investments, Mashinsky failed to disclose these losses to investors. Instead, he continued to promise and pay high yields to attract new deposits and to tell investors to keep their cryptocurrency with Celsius which, he continued to promise, would invest it safely and pay better returns than the banks. In one video Mashinsky claimed that: "All you need to do to become a millionaire… is to HODL," using a popular industry term that originated as a misspelling of the word "hold" and has come to mean "hold on for dear life." The term is often used to discourage investors from selling (or, in the case of Celsius, withdrawing their cryptocurrency from the platform) during market declines or volatility.

5.      But as cryptocurrency markets plummeted in the spring of 2022, Celsius's unsustainable business model began to unravel. By May 2022, Celsius's liabilities exceeded its diminishing assets by hundreds of millions of dollars, and investor withdrawals were

2

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

accelerating.  Rather than disclose Celsius's dire situation, Mashinsky doubled down.  He repeatedly and falsely assured investors that Celsius was stronger than ever, that investor assets were safe at Celsius, and that Celsius had billions of dollars in liquidity to cover anyone who wanted to withdraw their assets.  In late May 2022, Mashinsky was still actively recruiting new investors, urging them to disregard all criticism of Celsius from "naysayers and haters," to "ignore the FUD" (a popular crypto term that stands for fear, uncertainty, and doubt), and continued to encourage existing investors to HODL.

6.    On June 12, 2022, Celsius froze customer withdrawals.  A month later, on July 13, 2022, Celsius filed for bankruptcy, revealing that its liabilities exceeded its assets by more than one billion dollars.

7.    The collapse of Celsius left many individuals in a state of desperation and financial ruin, which they described in letters to the bankruptcy court and the OAG.  One New York resident mortgaged two properties to invest with Celsius.  A father of three lost his life savings of more than $375,000.  A disabled veteran lost his investment of $36,000, which had taken him nearly a decade to save up.  Another disabled citizen, who depended upon government assistance to supplement his $8 per hour income, lost his entire investment and was left feeling "humiliated and defeated."

8.    Many investors wrote that they were persuaded to invest in Celsius by Mashinsky's false promises that Celsius would keep their assets safe and generate high yields through low-risk investments.

9.    Mashinsky's scheme to defraud, including his misrepresentations and omissions, constitutes fraudulent practice in violation of New York General Business Law ("GBL") Article 23-A, §§ 352 *et seq.* (the "Martin Act"), as well as repeated fraudulent or illegal acts or persistent

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

fraud or illegality in the carrying on, conducting or transacting of business in violation of New York Executive Law § 63(12). Mashinsky also failed to register as a securities dealer and salesperson and as a commodities broker-dealer and commodities salesperson in violation of the registration provisions of the Martin Act, GBL § 359-e and attendant regulations.

10.     This action seeks, *inter alia*, an order permanently enjoining Mashinsky from engaging in fraudulent, deceptive, and illegal acts in violation of the Martin Act and Executive Law; from engaging in any business relating to the issuance, advertisement, or sale of securities or commodities in New York; from serving as director or officer of any company doing business in New York; and directing Mashinsky to pay damages, restitution, and disgorgement.

## **PARTIES**

11.     Plaintiff Letitia James, the Attorney General of the State of New York, is authorized to bring this action and to assert the causes of action set forth below in the name and on behalf of the People of the State of New York pursuant to the Martin Act and Executive Law § 63(12).

12.     The Martin Act authorizes the Attorney General to commence a civil action for restitution, damages and other relief in connection with fraudulent practices in the issuance, exchange, purchase, sale, promotion, negotiation, advertisement, investment advice, or distribution of securities or commodities within or from New York State. Executive Law § 63(12) authorizes the Attorney General to seek restitution, damages, injunctive relief, and costs when any person has engaged in repeated fraudulent or illegal acts or has otherwise demonstrated persistent fraud or illegality in the carrying on, conducting, or transacting of business.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

13.     Defendant Alex Mashinsky is a co-founder and the former Chief Executive

Officer ("CEO") of Celsius Network LLC, a Delaware limited liability company with its

principal office in Hoboken, New Jersey.  Mashinsky controls Celsius Network LLC through his

83.7% equity stake in Celsius Network Inc., a Delaware corporation, which is a majority

shareholder (65.32%) of Celsius Network Limited, which wholly owns Celsius US Holding

LLC, which is in turn the sole owner of Celsius Network LLC.  All these entities are debtors in

the Celsius Network LLC bankruptcy proceedings in the Southern District of New York, Case

No. 22-10964 (MG).  Mashinsky conducted business from and resides in New York, New York.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this action, personal

jurisdiction over the Defendant, and authority to grant the relief requested pursuant to the Martin

Act and Executive Law § 63(12).

15.     Pursuant to C.P.L.R. § 503, venue is proper in New York County because the

OAG's office is located in this county, Defendant resides in this county, and a substantial part of

the conduct giving rise to the claims occurred in this county.

## FACTUAL ALLEGATIONS

**I.     General Background on Celsius and Mashinsky's Role as Promoter and CEO of Celsius**

16.     Mashinsky launched Celsius in March 2017 in order to "radically disrupt a broken

system…to help everyday people all around the world attain their financial dreams" and engage

in the cryptocurrency "revolution."  Cryptocurrencies or virtual currencies, such as Bitcoin and

Ether, are digital assets that reside on an electronic ledger, called a blockchain.  Digital assets are

commodities under the Martin Act.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

17.     Celsius claimed it was different from traditional financial institutions because it was "democratized" and "[b]uilt on the belief that financial services should only do what is in the best interests of the community."  A page on Celsius's website titled "Why Trust Celsius" claimed that a "critical part" of the company's mission was to "provide fair and transparent services."

18.     As CEO and majority owner of Celsius Network LLC, Mashinsky had access to and control over Celsius's overall operations and corporate strategy.  He was familiar with the day-to-day operations, business and financial affairs, and books and records of Celsius.

**A. Celsius's Products and Services**

19.     Celsius offered its customers a variety of cryptocurrency-related products and services, which were accessible through Celsius's website and mobile application ("app").  To create a Celsius account, investors digitally signed Celsius's user agreement and acknowledged its terms of use.

20.     Investors could then transfer cryptocurrency from their own digital wallet into their Celsius account, purchase cryptocurrency through the Celsius app using dollars, or purchase cryptocurrency through Celsius using other cryptocurrencies.  After investors transferred cryptocurrency to Celsius, they could earn interest on that cryptocurrency or use it as collateral to borrow against.

21.     Celsius's flagship product was the "Earn" program, which allowed investors to earn interest on cryptocurrency deposited into an earned interest account ("EIA") at Celsius. Celsius promoted EIAs by advertising some of the highest yields in the market, up to 17% per year.  Mashinsky explained that the rates were "subject to change on a weekly basis as they are

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

calculated by the weekly demand for each coin combined with our promise that up to 80% of our profits are returned to the depositors."

22.     EIA investors transferred their cryptocurrency to Celsius, which then pooled the deposited digital assets and invested them in various revenue-generating activities.  Celsius had full control over its use of EIA assets, while investors had no discretion or control over Celsius's investment decisions.  EIAs constituted securities under the Martin Act.

23.     Mashinsky described the EIA model as "sleep to earn," where investors merely deposited their virtual currencies and let Celsius do all the work to generate returns.  As Mashinsky put it, "you don't have to do anything, you just go to sleep, and every Monday we pay you yield."

24.     At least 26,390 New York residents registered as users with Celsius and more than 4,000 of those investors enrolled in EIAs.  As of December 31, 2021, New Yorkers had deposited a total of approximately $440 million on the Celsius platform.

**B. Mashinsky Promoted Celsius and Solicited Investors**

25.     Mashinsky was Celsius's primary promoter and spokesman, appearing regularly in interviews, at cryptocurrency conferences, and on social media, including Twitter and YouTube.  Many of Mashinsky's YouTube and other interviews were and are accessible directly from the Celsius website.  From 2018 through June 2022, Mashinsky promoted Celsius during his weekly "Ask Mashinsky Anything" videos ("AMAs"), which he broadcast on Fridays, often from his New York City apartment, the self-described "Crypto Castle."  Investors used a chat function to submit questions and comments, which Mashinsky would answer live.

26.     By June 2022, Mashinsky had recorded 179 AMA episodes, most of which were about an hour long, and each of which was seen by thousands of viewers.  Many of the AMAs

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

were posted on Celsius's website, as well as on YouTube, and were accessible at least until June 12, 2022, when Celsius froze investor accounts.

27.    The videos often contained a picture and descriptions similar to the below:



28.    From 2018 through at least 2020, the online descriptions of Mashinsky's videos included his promise "to act in the best interest" of investors.

> Ask Mashinsky Anything!
>
> Our goal: to disrupt the financial industry and replace the current systems with a new model.
> Our mission: to act in the best interest of the community and provide financial freedom for all.
> Join the revolution, join Celsius and unbank yourself!
>
> Earn up to 15% APY on your digital assets and take out a loan starting at just 1% APR when using our Celsius wallet.

29.    AMAs were accompanied by a solicitation to invest with Celsius and included links that would take viewers directly from Mashinsky's video to Celsius's website and Celsius's app.

30.    Mashinsky cast himself as a visionary and developed a loyal following.  Many of his slogans, such as "unbank the banked and bank the unbanked" and "banks are not your friends," were well-known throughout the cryptocurrency community.  He often wore t-shirts branded with these slogans during his AMAs videos and in other public appearances.

31.    Mashinsky lured investors to Celsius by promising that Celsius would keep their cryptocurrency assets safe and would pay outsized yields by using those assets to make low-risk loans.  When critics claimed that it was impossible to generate the high returns Celsius promised

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

investors without taking "tremendous" risks with investors' assets, Mashinsky continued to falsely insist that investing with Celsius was safe. Mashinsky dismissed the criticism that Celsius was taking risks with investors' digital assets, asking his followers to ignore the "FUD" (fear, uncertainty, and doubt) and to unfollow critics on Twitter.

## II. Mashinsky Misrepresented that Investor Assets at Celsius Were as Safe as Money in a Bank

32.    Mashinsky drew investors to the Celsius platform by repeatedly and misleadingly stating that digital assets deposited with Celsius were as safe as – or even safer than – money deposited in a traditional bank.

33.    In a March 7, 2019, interview at the NASDAQ MarketSite in Times Square, Mashinsky claimed that money deposited with Celsius was "as safe as it is with the bank, which is the alternative, it's just that [Celsius] network is always acting in your best interest." In a December 3, 2020, YouTube interview, Mashinsky stated that Celsius generated revenue by lending assets in a way "similar to what banks do." On August 2, 2021, Mashinsky represented that Celsius was in fact safer than a bank, claiming in a YouTube interview that "we have less risk, we have much less risk [than banks]."

34.    Mashinsky's repeated statements presenting Celsius as safe as or safer than a bank were materially false and misleading. Banks are highly regulated by state and federal government agencies and undergo regular examinations. They are subject to capital requirements and are regularly tested for safety and soundness. State and federal regulators have robust systems in place to ensure orderly liquidations of failing institutions that minimize disruptions to customer services and limit customer losses. Many banks may access the Federal Reserve System for discounted liquidity to prevent potential failures. Bank customers are also protected by the Federal Deposit Insurance Corporation, which provides deposit insurance for

9

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

individual accounts up to $250,000 as protection from losses due to bank failure. Because Celsius was not a bank, neither Celsius nor its customers had any hope of availing themselves of any of these protections when Celsius in fact failed.

35.     Mashinsky also compared Celsius's lending of investor cryptocurrency to securities lending by securities broker-dealers, such as Schwab, Fidelity, Blackrock, or State Street. For example, on April 26, 2021, in a YouTube interview, Mashinsky stated that "the only difference between [securities] lending… and Celsius, which is digital asset lending, is that Celsius gives 80% of that to the depositor, to the user…."

36.     But that was not the only difference. Broker-dealers, like banks, are subject to regulatory scrutiny. They generally must be members of the Financial Industry Regulatory Authority and must be registered either with the United States Securities and Exchange Commission or with a state securities regulator. Celsius was not registered with any of these entities as a broker-dealer. Furthermore, assets held with broker-dealers benefit from insurance provided by the Securities Investor Protection Corporation, which covers investors for up to $500,000 in securities and up to $250,000 in uninvested cash against losses due to a broker-dealer's insolvency. In stark contrast, Celsius's investor deposits were not covered by any insurance.

37.     Mashinsky further misled investors by promising that Celsius would take full responsibility for safeguarding investor assets, including from any shortfalls or loss of value caused by Celsius's use or "deployment" of investors' cryptocurrency assets. In his December 10, 2021, AMA, Mashinsky declared that "Celsius takes full responsibility if anything goes bad" and claimed that if "something bad happens with the Celsius deployment … Celsius [is] standing behind it." At the same time, Mashinsky frightened investors into staying with Celsius by stating

10

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

that competitors' platforms could not be relied upon "when they … blow up… or when they don't perform or they don't deliver…." In the end, however, it was Celsius that fell quickly and neither performed nor delivered on its promises.

### III. Mashinsky Misled Investors About the Number of Active Users of Celsius

38. Both Mashinsky's scheme and Celsius's sustainability depended on wide public acceptance of Celsius's business model and the willingness of investors to entrust their digital assets to Celsius. In a blog post on March 12, 2019, Mashinsky explained: "The more people that deposit, the more profits there are to distribute to the community, and THAT is a sustainable and scalable promise." To increase assets available for investment and for liquidity, Celsius needed a continuous supply of new investors and new deposits. And the more losses Celsius sustained through risky investment of existing deposits, the more it needed the new deposits to plug holes in its balance sheet.

39. Mashinsky often exaggerated the number of Celsius's investors, making Celsius appear significantly more popular than it actually was. In a YouTube interview on November 17, 2021, for example, Mashinsky, stated "we have a million and a half customers…they hold over 25 billion dollars' worth of digital currencies…." In another YouTube interview on June 1, 2022, Mashinsky claimed: "we have a community of almost two million people…."

40. While Celsius had approximately 1.7 million registered users as of July 2022, most were not active customers. In fact, from 2019 through 2022, roughly two-thirds of registered U.S. Celsius users held less than *one dollar's worth* of cryptocurrency in their Celsius accounts. For example, by June 17, 2022, Celsius had 584,192 registered U.S. users; of those, 386,294 (66%) had an account balance of less than one dollar. Mashinsky's claim of nearly two

11

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

million users was materially misleading because Celsius was not as widely accepted – or used –
as Mashinsky led his investors to believe.

IV.    **Mashinsky Lured Investors to Celsius by Misrepresenting How Investor Assets
       Would be Deployed and Concealing the Risks of Those Deployments**

41.    Mashinsky solicited investors by promising to generate yield through low-risk
sustainable means, primarily by making collateralized loans to reputable institutions and
cryptocurrency exchanges and by making overcollateralized loans to retail investors.  In a post
on Celsius's website titled *Celsius Network is Nothing Like BlockFi*, dated March 12, 2019,
Mashinsky wrote that Celsius's team is "hard at work acting in [investors'] best interest" and that
Celsius's business model was "straightforward and transparent."  He outlined Celsius's
investment strategy: "We lend our community's assets to crypto exchanges and hedge funds
looking to borrow coins."

42.    In a YouTube interview on August 5, 2021, titled *How Crypto Yields Work*,
Mashinsky claimed that this strategy enabled Celsius to pay investors "almost 100 times more
than your bank pays you…and we do that without taking any risk…or taking minimal risk."  In a
December 10, 2021, AMA, Mashinsky yet again assured investors that Celsius "[doesn't] do it
by taking risk…"

43.    However, Celsius's business model was unsustainable.  As Celsius proved unable
to generate sufficient returns through safe loans and investments, it began to make
uncollateralized loans to institutional borrowers and engage in risky strategies on unregulated
decentralized finance protocols.  In his July 14, 2022, sworn declaration filed in Celsius's
bankruptcy proceeding, Mashinsky admitted that Celsius made "poor asset deployment
decisions" and that since at least 2021 Celsius's business model needed significant changes,
including reducing the yields paid to investors.  Mashinsky also knew, as Celsius outlined in a

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

presentation to a potential investor in June 2022, that Celsius's trading business was "volatile, risk based, capital intensive and unprofitable" and that Celsius needed to "de-risk the business" by "reducing high risk DeFi, CeFi [centralized finance] and Institutional loans deployments." As alleged in more detail below, Celsius began to incur losses from its investing strategies at least as early as February 2021, and through the rest of 2021 and into 2022. Yet Mashinsky continued to falsely represent to investors that Celsius was generating high yield through low-risk investments and that investors' assets were safe at Celsius.

### A. Mashinsky Falsely Claimed that Celsius Made No Uncollateralized Loans

44.     Mashinsky repeatedly told investors that Celsius only made loans that were collateralized. In a May 19, 2020, YouTube interview, for instance, Mashinsky stated that "we are only doing asset-backed lending…. We only lend against collateral…without exception…. We have over one hundred percent collateral." In a July 17, 2020, AMA, Mashinsky stated that "Celsius does not do non-collateralized loans" because "that would be taking too much risk on [customers'] behalf." In his November 6, 2020, AMA, Mashinsky reiterated that "We do not do…unsecured lending."

45.     Almost two years later, on April 13, 2022, in an interview with CNBC International, Mashinsky was asked to respond to a report that Celsius was offering uncollateralized loans that "could be incredibly risky." Mashinsky still maintained that "we don't offer any non-collateralized loans."

46.     Non-collateralized loans are risky because if the borrower is unwilling or unable to repay the loan, the lender has no collateral it can retain or liquidate to offset the loss on the loan. Celsius's own internal Risk Management Framework document, dated October 20, 2021, recognized the "higher risk" of uncollateralized loans.

13

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

47.    Mashinsky's statements that Celsius did not make non-collateralized loans were materially false and misleading.  Between 2020 and 2022 Celsius exponentially increased its exposure to risky uncollateralized loans.  In 2020, Celsius made almost $10 million in uncollateralized loans.  In 2021, that number ballooned to at least $203 million, and in the first half of 2022, Celsius made at least $394 million in uncollateralized loans.  From 2020 through June 2022, Celsius made over 100 uncollateralized loans to at least 19 different counterparties.

**B.  Mashinsky Misrepresented the Risk and Extent of Celsius's Exposure to Decentralized Finance**

48.    Unable to generate sufficient returns through collateralized loans to retail and institutional counterparties, Celsius turned to risky investments on decentralized finance platforms to generate yield.

49.    The phrase decentralized finance ("DeFi") refers to financial services, like cryptocurrency lending, that operate on a blockchain pursuant to certain predetermined rules ("protocols" and "smart contracts") without the involvement of an institutional intermediary such as a bank or a broker.  While transactions on DeFi are typically over-collateralized by cryptocurrency, if the market value of the collateral falls below a certain threshold, the DeFi protocol will automatically liquidate the collateral and close out the loan.  In a down market, such liquidations can result in significant loss of value for the borrower.  Transactions on DeFi are also risky because DeFi protocols are unregulated and vulnerable to hacking, manipulation, and insolvency.

50.    Celsius's risk management unit identified all DeFi investments as high-risk activity.  Mashinsky personally acknowledged that DeFi posed risks, but assured investors, including during a December 3, 2021, YouTube interview, that "Celsius… helps people navigate

14

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

in a safe way into [the DeFi] environment… because Celsius already did the homework and figured out what's safe."

51.     Mashinsky's statements about the safety of Celsius's DeFi investments were materially false and misleading because Celsius had not "figured out what's safe."  In fact, Celsius suffered numerous losses caused by known risks of DeFi.  For example, in August 2020, Mashinsky personally hired KeyFi Inc., for the purpose of handling Celsius's DeFi investments.  KeyFi Inc. then engaged in high-risk leveraged trading strategies with more than $500 million worth of Celsius's investor assets.  By February 2021, these investments resulted in losses of at least tens of millions of dollars, including when a drop in the value of Celsius's collateral on the DeFi protocol Compound triggered automatic liquidation of this collateral.

52.     Later that year, in June 2021, Celsius lost access to 35,000 Ether worth tens of millions of dollars on a third-party service called StakeHound.  Celsius never recovered those assets.  Mashinsky failed to disclose this loss when it occurred.

53.     Subsequently, in December 2021, Celsius lost Bitcoin then valued at approximately $50 million in a hack on the DeFi protocol BadgerDAO.

54.     As Celsius's losses on DeFi protocols mounted, Mashinsky told investors that Celsius's exposure to DeFi was minimal.  In a June 1, 2022, YouTube interview, Mashinsky stated: "Celsius continues to do what it did for the last five years.  Again, most of our business, I would say 90% of our business, has nothing to do with DeFi."

55.     This statement was false.  By the spring of 2022, Celsius had engaged far more than 10% of its assets in DeFi protocols; in fact, DeFi had grown into Celsius's single largest deployment category.  Documents produced by Celsius indicate that as of May 25, 2022, Celsius

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED
22-10964-mg    Doc 2052    Filed 02/14/23    Entered 02/14/23 11:26:03    Main Document
NYSCEF DOC. NO. 2                              RECEIVED NYSCEF: 01/05/2023
Pg 805 of 891

had deployed nearly 30% of investors' digital assets into DeFi activities, compared to only about

11% in retail lending and about 12% in institutional lending, as demonstrated in the chart below.



56.      Celsius's large investments in risky DeFi strategies and Celsius's use of investor

cryptocurrency as collateral for borrowing hundreds of millions from DeFi protocols were

contrary to Mashinsky's representations to investors that their assets were invested safely and

generated high yield at low risk.

### C. Mashinsky Concealed Celsius's Exposure to Risky Investment Strategies and Institutions

57.      Mashinsky was adamant that Celsius only lent assets to credible and reputable

counterparties and did so "without taking any risk…or taking minimal risk." In his November 6,

2020, AMA, Mashinsky stated that Celsius "only lend[s] to the first-tier institutions, first tier

exchanges…." On April 13, 2022, Mashinsky falsely and misleadingly claimed that Celsius

dealt only with "very credible" institutional counterparties. Yet Celsius routinely exposed

investors' assets to high-risk counterparties and strategies, and Celsius suffered multiple large

losses which Mashinsky concealed from investors, despite repeated promises of transparency.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

### 1. *Celsius Lost Half a Billion Dollars of Investor Collateral*

58.     From October 2019 to February 2021, Celsius took out loans from Equities First Holdings ("Equities First") that were collateralized by investor cryptocurrency. According to Mashinsky's bankruptcy declaration, these loans were used to finance Celsius's operations.

59.     However, after repaying the loans to Equities First in July 2021, Celsius was unable to get back its collateral worth approximately $500 million. This was a significant loss of investor assets, which Mashinsky concealed at the time. As of June 23, 2022, Equities First owed Celsius $441 million on an unsecured basis.

### 2. *Celsius Lent to Risky Companies of Dubious Valuation*

60.     Celsius made risky loans that were collateralized by illiquid collateral of highly speculative value in the form of proprietary tokens.

61.     Between 2020 and 2022, under Mashinsky's watch, Celsius made loans totaling roughly a billion dollars to Alameda Research Ltd. ("Alameda"), a cryptocurrency trading firm founded by the recently indicted Sam Bankman-Fried. A substantial portion of Alameda's assets were held in FTT, a proprietary crypto token created and issued by Alameda's sister company FTX Trading Ltd ("FTX"). FTX propped up the value of FTT by periodically re-purchasing FTT from the market. Celsius accepted FTT as collateral for many of its loans to Alameda. Those loans were risky because FTX was the largest holder of its proprietary token and therefore the valuation of those tokens was disconnected from market forces and subject to manipulation. Alameda filed for bankruptcy in November 2022 along with FTX. The value of FTT has since plummeted by roughly 95%, leaving Celsius holding nearly worthless collateral on any still outstanding loans to Alameda backed by FTT.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

### 3. *Celsius Deployed Investor Collateral on the Risky Anchor Protocol*

62.     Mashinsky misrepresented Celsius's large positions in Terra stablecoin ("Terra" or "UST").  Terra and Luna, its paired token, created by Terraform Labs, were particularly risky because they were an algorithmic stablecoin project, a type of cryptocurrency which, despite the inclusion of "stable" in its name, had in practice proven to be anything but.  Prior algorithmic stablecoin projects including Basis Cash, Iron Finance, and Empty Set Dollar had given way to bank runs and death spirals that left the tokens worthless.

63.     Terraform Labs also created the Anchor Protocol, a DeFi protocol which promised a 20% yield on deposits of Terra.  This high interest rate was heavily subsidized and created artificial demand for Terra and Luna.

64.     Mashinsky knew that the high yield promised by Anchor Protocol was too good to be true.  During a YouTube interview on December 3, 2021, Mashinsky himself told investors that because "not all yield is created equal," Celsius only used "safe protocols," was "very skeptical," and "careful and [worked] with very few companies."  He cautioned that "if somebody's offering you [a yield] of 20%, I would be very careful digging into why and how they're paying it."

65.     Moreover, Mashinsky stated that subsidizing interest rates on a lending platform was an "alarming" practice and criticized BlockFi, another cryptocurrency lending platform, for having its rates subsidized by venture investors.  He stated that "if BlockFi's VCs ever chose to stop funding the project, it's possible that those rates could crash and burn…."

66.     Celsius nevertheless deposited its investors' assets on Anchor Protocol, despite Mashinsky's public acknowledgement of the risks of investing in protocols that paid such unreasonably high yields subsidized by the protocol founder.  In the span of only six weeks, from

18

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

April 1 through May 6, 2022, Celsius invested approximately $468 million worth of digital assets "on high earning Terra strategies." This rapid deployment of funds brought Celsius's total assets invested on Terra strategies to $935 million.

67.     When the prices of Terra and Luna crashed in May 2022, Mashinsky repeatedly and misleadingly assured investors that Celsius had no exposure to the project, as alleged in more detail below, to perpetuate his false narrative that Celsius made only low-risk investments with investor assets.

## V.     During the Cryptocurrency Crash of May and June 2022, Mashinsky Continued to Mislead Investors, Including About Celsius's Financial Condition and Liquidity

68.     Beginning in May 2022, following the collapse of Luna and Terra, the cryptocurrency market came under stress and values of nearly all digital assets fell drastically, with tens of billions of dollars in cryptocurrency market capitalization erased over the course of just a few days.  Large players in the cryptocurrency industry publicly suffered substantial losses and some filed for bankruptcy.  To perpetuate his scheme of keeping Celsius afloat at any cost, even to the detriment of investors, Mashinsky continued to assure investors that their assets were safe at Celsius.

### A.   In May 2022 Mashinsky Falsely Stated that Celsius Was as Strong as Ever, and Actively Recruited New Investors

69.     In May 2022, investors began to withdraw hundreds of millions of dollars' worth of cryptocurrency daily from the Celsius platform.  Celsius saw its largest ever withdrawals on May 12, 2022, when investors withdrew over half a billion dollars from the platform in a single day.

70.     The following day, in his May 13, 2022, AMA, Mashinsky stated that "Celsius is stronger than ever, we have billions of dollars in liquidity… and we continue to do what Celsius

19

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

INDEX NO. UNASSIGNED

22-10964-mg   Doc 2052   Filed 02/14/23   Entered 02/14/23 11:26:03   Main Document

NYSCEF DOC. NO. 2

RECEIVED NYSCEF: 01/05/2023

Pg 809 of 891

does best – serve the community, protect the community, make sure your assets are there when you need them."

71.    A few days later, on May 16, 2022, in a YouTube interview titled *Luna/UST Aftermath on Crypto Markets & Stablecoins*, Mashinsky reiterated that "companies like Celsius… are standing strong…. At Celsius we are ready at all times… we were ready with the liquidity, we were providing everybody the option."

72.    Mashinsky's statements were materially false and misleading.  As a result of losses from risky investments and unsustainable payments of high yields to investors, by May 13, 2022, Celsius had total assets of less than $12 billion and total liabilities of more than $12.75 billion, resulting in net assets of negative $820 million.  Celsius was not "stronger than ever;" it was insolvent.

73.    Mashinsky also concealed that Celsius had begun to experience a liquidity crisis in May 2022.  According to the interim report of the examiner appointed in Celsius's bankruptcy proceeding, "[b]eginning in May 2022, Celsius faced liquidity challenges.  In its May 2022 Board Minutes, Celsius reported that its 'capital sits near zero.'  At the same time, between May 9, 2022, and May 24, 2022, customer withdrawals caused Celsius to experience a net loss of over $1.4 billion in assets."

74.    To ameliorate Celsius's liquidity crisis and to get new investors and new assets onto the platform, Mashinsky misrepresented and concealed Celsius's financial condition and liquidity, and actively solicited new investors.  In his May 27, 2022, AMA, Mashinsky played a pre-recorded solicitation video which offered new investors a bonus for joining Celsius: "Did you know you can earn crypto by referring a friend?  You'll get $50 in crypto for each completed referral.  Your friend will get a $50 referral reward too."

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

75.     Mashinsky ramped up his efforts to solicit new investors on May 29, 2022, when he sent the following message on Twitter: "These are hard times for many…. I will personally give one of the new @CelsiusNetwork users $1000 this week if you show you opened an account and started #HODLing to build your #FinancialFreedom." The tweet received hundreds of likes and retweets from the public.

76.     Mashinsky's efforts to solicit investors were effective, much to investors' detriment. Even in the middle of the crypto downturn, between May 13 and June 12, Celsius added almost $900 million worth of cryptocurrency, and between June 1 and June 17, 2022, it added almost two thousand new users.

### B. Mashinsky Misrepresented Celsius's Exposure to the Fallout from Terra and Luna

77.     To dissuade investors from leaving Celsius and withdrawing assets from the platform, Mashinsky made false and misleading statements that Celsius had not been exposed to or suffered losses from the collapse of Terra and Luna.

78.     During his June 1, 2022, YouTube interview, Mashinsky minimized Celsius's exposure to the Terra/Luna fiasco:

> I know people are concerned about the whole market and they were specifically concerned with the Terra/Luna situation and we've publicly stated many times that we didn't lend to them, we didn't buy Luna or UST, we were not like many others who invested in the project, we didn't have any exposure to that, we have very small losses when we withdrew from the Anchor Protocol but these were in a single millions [sic]….

79.     Later in the same interview Mashinsky dismissed concerns that Celsius "must have had huge damage from Luna," saying "No, we didn't have any, actually…. You should be worried about other people."

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

80.     Mashinsky's statements were materially false and misleading.  As set forth above, Celsius invested nearly $935 million worth of investors' assets into "high earning Terra strategies," which were highly speculative and risky and on which it lost almost $18 million (nearly double what Mashinsky was willing to admit even when asked repeatedly in this interview).

81.     In the same interview, Mashinsky was asked whether Celsius had any other exposure to the Terra-related turmoil.  Mashinsky replied: "No other exposure that I know of.... There are other market participants who had big investments in Luna and UST, and so we basically either reduced or eliminated any exposure to those parties."

82.     This statement was also false.  Just weeks after the Terra/Luna collapse and mere days before Mashinsky's June 1, 2022, interview, Celsius made two loans to Three Arrows Capital, Ltd. ("3AC"), a hedge fund that had just suffered large and very public losses as a result of its exposure to Luna.  On May 22, 2022, Celsius loaned 3AC $50 million in stablecoin, collateralized by $50 million in Bitcoin.  On May 31, 2022, Celsius made an additional $25 million loan to 3AC without requiring 3AC to post *any* collateral.  On June 17, 2022, Celsius liquidated 3AC's Bitcoin collateral, which by then was worth only approximately $35 million.

83.     3AC filed for bankruptcy on July 1, 2022, still owing Celsius a total of $41 million.  As an unsecured creditor, Celsius is unlikely to recover any significant portion of these debts.

**C.  As Celsius Neared Bankruptcy, Mashinsky Continued to Mislead Investors About Celsius's Available Liquidity and Financial Condition**

84.     Mashinsky's campaign to save Celsius by deceiving investors continued into June 2022.  In an interview on June 1, 2022, Mashinsky was asked about "the elephant in the room;" namely that, "after everything that's happened recently, the number one question from people is

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

'are our funds safe at Celsius?'" Mashinsky replied: "yes, so not just that they're safe… we provided [the opportunity for] anyone who wanted to withdraw partially or fully, there were no problems."

85.    In the same interview, Mashinsky was asked: "If there ever were any type of insolvency issues, it sounds like you've got the framework and infrastructure with your transparency to let the community know immediately if there is a problem…," to which Mashinsky replied "Yes." This response was false and misleading because on May 25, 2022, Celsius had less than $11 billion in total assets and approximately $11.9 billion in total liabilities, with a deficit of almost $900 million, which Mashinsky did not disclose.

86.    In his June 10, 2022, AMA – only two days before Celsius froze withdrawals from its platform – Mashinsky said: "Celsius has billions in liquidity…. [W]e provide the immediate access to everybody, anyone who needs access to it, to the liquidity." In the same AMA, Mashinsky stated "when you went through several bear markets, you know what to do… you need to have liquidity, which we have… that's why anyone who wants to withdraw has no problem...."

87.    The next day, on June 11, 2022, one Twitter user speculated about Celsius's ability to fulfill withdrawal requests: "I hope retail [investors] can get out. I've been hearing about accounts locked." Mashinsky immediately rejected the premise that Celsius investors were in any danger, replying on Twitter: "[D]o you know even one person who has a problem withdrawing from Celsius? Why spread FUD and misinformation."

88.    But the very next day, on June 12, 2022, Celsius paused investor withdrawals "in order to stabilize liquidity and operations while we take steps to preserve and protect assets...."

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

89.     Mashinsky's repeated statements in June of 2022 that Celsius had billions of dollars of liquidity, that anyone who wanted to withdraw could do so, and that investor assets were safe at Celsius were materially false and misleading.  By this time Celsius's liquid assets were far less than Celsius's liabilities to investors.

90.     Celsius had experienced losses from the deployment of investor assets, resulting in negative weekly gross revenue for four out of the six weeks prior to June 12, 2022.  That means that, for those weeks, Celsius paid more in interest to its EIA investors than it generated through investments of their cryptocurrency.  Celsius's Chief Financial Officer confirmed this during an August 19, 2022, meeting of creditors in Celsius's bankruptcy case, when he stated: "It does not look as though we had enough yield to support what we were paying out…. We paid out over a hundred percent of the yield that we took in from deployments…."

91.     As a result of losses from risky investments and unsustainably high yield payments to investors, Celsius's deficit (the difference between its assets and liabilities) had increased to over $1 billion by mid-June 2022.  Even then, Celsius's assets were inflated because they included the value of CEL, Celsius's proprietary token, held on Celsius's books.  Celsius was the largest CEL token holder and controlled its supply in the market, meaning that the token was largely illiquid and of very speculative value.  Celsius would never have been able to convert any significant proportion of its CEL holdings into dollars without crashing the token's market value, which would have caused further harm to Celsius's balance sheet.

92.     Despite mounting losses, Mashinsky continued to conceal Celsius's true financial condition.  While touting Celsius's liquidity and strength in his numerous YouTube interviews and weekly AMAs between May 1 and June 12, 2022, Mashinsky never disclosed that Celsius

24

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

had close to a billion-dollar deficit on its balance sheet and that it continued to experience a liquidity crisis. Rather he actively denied that there was any cause for concern.

93.     After investors withdrew over $672 million in cryptocurrency between June 10 and June 12, 2022, Celsius paused withdrawals in order to "stabilize liquidity" and was never able to restart them. Celsius filed for bankruptcy on July 13, 2022. By that point, Celsius had over $4.7 billion in user liabilities, only $1.75 billion in cryptocurrency assets. Furthermore, at least $467 million worth of investors' cryptocurrency was locked up in a decentralized application and unavailable for investor withdrawals, while additional investor assets were tied up in Celsius's other businesses.

## VI.    Mashinsky Misled Investors About Celsius's Compliance with Applicable Laws and Regulations

94.     Celsius's EIAs attracted the attention of state securities regulators in 2021. By the end of September 2021, the securities regulators of Alabama, New Jersey, Texas, and Kentucky had issued cease and desist orders to Celsius or notices of hearing seeking such orders, alleging that EIAs were unregistered securities or that Celsius was soliciting or selling securities while unregistered in violation of the respective states' securities laws.

95.     On October 18, 2021, the OAG sent a letter to Mashinsky and Celsius requesting information and documents concerning Celsius's EIAs and other business practices.

96.     On October 20, 2021, Washington State's Department of Financial Institutions issued a statement of charges and a notice of intent to enter a cease-and-desist order against Celsius for selling unregistered securities and for failing to register as a broker-dealer.

97.     Yet in a December 3, 2021, YouTube interview, Mashinsky blatantly misrepresented that "states and other regulators have looked into Celsius, they all came back thumbs up, there's no problem, we didn't find anything...." Mashinsky's statements were

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 2
22-10964-mg    Doc 2052    Filed 02/14/23    Entered 02/14/23 11:26:03    Main Document
RECEIVED NYSCEF: 01/05/2023
Pg 815 of 891

materially false and misleading because by that time at least five state securities regulators had alleged that Celsius was engaged in the offer or sale of unregistered securities or was itself an unregistered broker-dealer and had either directed Celsius to stop illegal activities in their states or had indicated their intention to seek such an order.  Likewise, the OAG certainly never gave Celsius or Mashinsky a "thumbs up" or indicated there was "no problem" with their conduct. Contrary to Mashinsky's December 3, 2021, statement, multiple regulators were then actively investigating – and continue to investigate – Celsius's conduct.

## VII.    Mashinsky Violated New York State Registration Laws

98.    By promoting EIAs through AMAs, YouTube interviews, and postings on Celsius's website, Mashinsky sold and offered for sale securities without registering with the OAG as a securities dealer or a securities salesperson.  Mashinsky also promoted and sold commodities in the form of cryptocurrencies without registering with the OAG as a commodities broker-dealer or a commodities salesperson.

99.    EIAs are securities under the Martin Act because investors deposited their cryptocurrency assets with Celsius with the expectation of receiving promised yields from Celsius's efforts in deploying investors' pooled assets.

100.    Under New York State law, a dealer is a person that is engaged in the business of selling securities to the public within or from New York for its own account and selling or offering for sale to the public securities issued by it.  GBL § 359-e(1)(a).

101.    As described above, Mashinsky offered, promoted, and sold EIAs, which he issued to the public from New York.  Mashinsky was the majority shareholder of Celsius, a private company, and had access to the private keys to Celsius's wallets, including to the wallet containing cryptocurrency pooled from customer EIA accounts.  Private keys grant access and

26

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 2

22-10964-mg   Doc 2052   Filed 02/14/23   Entered 02/14/23 11:26:03   Main Document

INDEX NO. UNASSIGNED
RECEIVED NYSCEF: 01/05/2023

Pg 816 of 891

determine ownership of the cryptocurrency.  Mashinsky was a dealer under New York law and promoted and sold securities for his own account within the meaning of GBL § 359-e(1)(a).

102.    A salesperson is a person employed by a broker or dealer for the purpose of representing them in the sale of securities to or from the public within or from New York.  GBL § 359-e(1)(c).  Mashinsky received a regular salary from Celsius and was employed by Celsius for, among other reasons, the purpose of selling and promoting its EIAs.  Mashinsky was a salesperson within the meaning of GBL § 359-e(1)(c).

103.    Mashinsky also acted as a salesperson without successfully completing the required examinations known as the "Series 63" or the "Series 66" that cover securities industry regulations and ethical practices and obligations.

104.    As a dealer and salesperson of securities under New York law, Mashinsky was required to file a registration statement with the OAG prior to engaging in such conduct.  GBL § 359-e(3).

105.    Mashinsky was not exempted from the filing requirements.

106.    Mashinsky failed to file a registration statement in connection with Celsius with the OAG prior to engaging in conduct that required such filing, in violation of GBL § 359-e(3).

107.    Mashinsky also offered for sale from New York various cryptocurrencies to investors worldwide.  Digital assets are commodities under the Martin Act.

108.    Under New York law, a commodity broker-dealer is a person engaged in the business of selling or offering for sale commodities through commodity contracts to the public from New York.  GBL § 359-e(14)(a)(iii).  A commodity salesperson is a person employed by or representing a commodity broker-dealer in selling or offering for sale commodities through commodity contracts to the public from New York.  GBL § 359-e(14)(a)(iv).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

109.    Mashinsky was engaged in the business of offering for sale and selling various cryptocurrencies through commodity contracts to the public from New York, and received a salary from Celsius, in part for promoting the sale of commodities, all through Celsius's app or website, Mashinsky was a commodity broker-dealer and a commodity salesperson under GBL § 359-e(14)(a). As a commodity broker-dealer and a commodity salesperson under New York law, Mashinsky was required to file a registration statement with the OAG prior to engaging in such conduct. GBL § 359-e(14)(b). Failure to register is a fraudulent practice under the Martin Act unless exempt. GBL § 359-e(14)(j, l).

110.    Mashinsky sold or offered for sale commodities primarily for speculation or investment purposes and not for use or consumption by the offeree or purchaser.

111.    Mashinsky was not exempted from the filing requirements, yet he failed to file a registration statement in connection with Celsius with the OAG as a commodity broker-dealer or commodity salesperson prior to engaging in conduct that required such filing, in violation of the Martin Act.

112.    Mashinsky's failures to register under GBL § 359-e prior to offering or selling securities and commodities to New York investors each constitute fraudulent practices under the Martin Act. Such repeated and persistent conduct also constitutes illegality under Executive Law § 63(12).

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Martin Act Securities Fraud – General Business Law §§ 352 and 353

113.    The Attorney General repeats and re-alleges the paragraphs above as if fully stated herein.

28

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.) INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 2

22-10964-mg    Doc 2052    Filed 02/14/23    Entered 02/14/23 11:26:03    Main Document

RECEIVED NYSCEF: 01/05/2023

Pg 818 of 891

114.    The acts and practices of the Defendant alleged herein violated Article 23-A of the General Business Law in that they consisted of materially false and misleading representations, statements, and omissions relating to the issuance, exchange, purchase, sale, promotion, negotiation, advertisement, investment advice or distribution of securities or commodities, and constituted fraudulent acts and fraudulent practices as defined in GBL § 352 *et seq*.

115.    The acts and practices of the Defendant alleged herein constituted a scheme to defraud and other fraudulent practices as defined in General Business Law §§ 352 *et seq*.

### SECOND CAUSE OF ACTION
### Martin Act Securities Fraud – General Business Law § 352-c(1)

116.    The Attorney General repeats and re-alleges the paragraphs above as if fully stated herein.

117.    The acts and practices of the Defendant alleged herein violated General Business Law § 352-c(1)(a), in that they involved illegal and prohibited acts or practices in the use or employment of a fraud, deception, concealment, suppression, or false pretense, where said uses or employments were engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation, or purchase within or from this State of any securities or commodities.

118.    The acts and practices of the Defendant alleged herein violated General Business Law § 352-c(1)(b), in that they involved illegal and prohibited acts or practices in the making of promises or representations as to the future which were beyond reasonable expectation or unwarranted by existing circumstances where said promises or representations were made to induce or promote the issuance, distribution, exchange, sale, negotiation, or purchase within or from this State of any securities or commodities.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

119.    The acts and practices of the Defendant alleged herein violated General Business Law § 352-c(1)(c), in that they involved illegal and prohibited acts or practices in the making of representations or statements which are false, where Defendant (i) knew the truth; or (ii) with reasonable effort could have known the truth; or (iii) made no reasonable effort to ascertain the truth; or (iv) did not have knowledge concerning the representation or statement made, where said representations were made to induce or promote the issuance, distribution, exchange, sale, negotiation, or purchase within or from this State of any securities or commodities.

### THIRD CAUSE OF ACTION
### Martin Act Failure to Register – General Business Law § 359-e and Regulations Promulgated Thereunder, 13 NYCRR §§ 10, 13

120.    The Attorney General repeats and re-alleges the paragraphs above as if fully stated herein.

121.    The acts and practices of the Defendant alleged above violated New York General Business Law § 359-e and regulations promulgated thereunder, including provisions of Official Compilation of Codes, Rules, and Regulations of the State of New York Title 13, Chapter II, Subchapter A, Parts 10 and 13, insofar as such acts and practices constitute the sale or purchase of, or offer to sell or purchase, securities or engaging in the business of selling or offering to sell commodities through commodity contracts, from or to the public within or from the state of New York without filing a registration statement with the OAG.

### FOURTH CAUSE OF ACTION
### Repeated and Persistent Fraud – Executive Law § 63(12)

122.    The Attorney General repeats and re-alleges the paragraphs above as if fully stated herein.

123.    The acts and practices of the Defendant alleged herein constitute conduct proscribed by § 63(12) of the New York Executive Law, in that Defendant engaged in repeated

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

fraudulent acts or otherwise demonstrated persistent fraud in the carrying on, conducting or

transaction of business in violation of Executive Law § 63(12).

## FIFTH CAUSE OF ACTION
### Repeated and Persistent Illegality – General Business Law §§ 352 and 353
### Executive Law § 63(12)

124.    The Attorney General repeats and re-alleges the paragraphs above as if fully

stated herein.

125.    The acts and practices of the Defendant alleged herein constitute conduct

proscribed by Executive Law § 63(12), in that the Defendant engaged in repeated illegal acts in

violation of New York General Business Law §§ 352 and 353.

126.    Accordingly, Defendant has engaged in repeated and persistent illegality in

violation of Executive Law § 63(12).


## SIXTH CAUSE OF ACTION
### Repeated and Persistent Illegality – General Business Law § 352-c(1)
### Executive Law § 63(12)

127.    The Attorney General repeats and re-alleges the paragraphs above as if fully

stated herein.

128.    The acts and practices of the Defendant alleged herein constitute conduct

proscribed by Executive Law § 63(12), in that the Defendant engaged in repeated illegal acts in

violation of New York General Business Law § 352-c(1).

129.    Accordingly, Defendant has engaged in repeated and persistent illegality in

violation of Executive Law § 63(12).

31

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

## SEVENTH CAUSE OF ACTION
### Repeated and Persistent Illegality – General Business Law § 359-e and Regulations Promulgated Thereunder, 13 NYCRR §§ 10, 13
### Executive Law § 63(12)

130.    The Attorney General repeats and re-alleges the paragraphs above as if fully stated herein.

131.    The acts and practices of the Defendant alleged herein constitute conduct proscribed by Executive Law § 63(12), in that the Defendant engaged in repeated illegal acts, in violation of New York General Business Law §359-e and regulations promulgated thereunder, including provisions of Official Compilation of Codes, Rules, and Regulations of the State of New York Title 13, Chapter II, Subchapter A, Parts 10 and 13, insofar as such acts and practices constitute the sale or purchase of, or offer to sell or purchase, securities or engaging in the business of selling or offering to sell commodities through commodity contracts, from or to the public within or from the state of New York without filing a registration statement with the OAG.

132.    Accordingly, Defendant has engaged in repeated and persistent illegality in violation of Executive Law § 63(12).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendant as follows:

A.      Permanently enjoining Defendant from violating the Martin Act, Article 23-A of the General Business Law, and Executive Law § 63(12) and from engaging in the fraudulent, deceptive and illegal acts alleged herein;

B.      Permanently enjoining Defendant from engaging in any business related to the issuance, offer, distribution, exchange, promotion, advertisement, negotiation, purchase, investment advice, or sale of securities or commodities, including any cryptocurrencies or digital assets, within or from this state;

C.      Permanently enjoining Defendant from serving as an officer or director of any company doing business in this state;

D.      Directing Defendant to pay damages caused, directly or indirectly, by the fraudulent and deceptive acts and repeated fraudulent acts and persistent illegality complained of herein plus applicable pre-judgment interest;

E.      Directing Defendant to disgorge all amounts or assets obtained in connection with or as a result of the fraudulent and deceptive acts and violations of law alleged herein;

F.      Directing Defendant to make restitution of all amounts or assets obtained from investors in connection with the fraudulent and deceptive acts and violations of law complained of herein;

G.      Directing that Defendant pay Plaintiff's costs and fees;

H.      Directing such other equitable relief as may be necessary to redress Defendant's violations of New York law; and

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)                    INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 2          22-10964-mg     Doc 2052    Filed 02/14/23    Entered 02/14/23 11:26:03     Main Document     RECEIVED NYSCEF: 01/05/2023
                                                      Pg 823 of 891

I.      Granting such other and further relief as may be just and proper.


Dated:  New York, New York        LETITIA JAMES
          January 5, 2023            Attorney General of the State of New York


By:  *[signature]*

      Tanya Trakht
      Jesse Devine
      Assistant Attorneys General

      Matthew Woodruff
      Senior Enforcement Counsel

      Kenneth Haim
      Acting Deputy Chief, Investor Protection
      Bureau

      Shamiso Maswoswe
      Chief, Investor Protection Bureau
      28 Liberty Street
      New York, New York 10005
      Tel.: (212) 416-8457

*Counsel for the People of the State of New York*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

# Exhibit S

**RADICE LAW FIRM**
John Radice (Bar No. 023612004)
475 Wall Street
Princeton, NJ 08540
Telephone: 646-245-8502
Facsimile:  609-385-0745
jradice@radicelawfirm.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Johnathan M. Zimmerman (Bar No. 204322016)
Sean T. Masson (*pro hac vice* forthcoming)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
jzimmerman@scott-scott.com
smasson@scott-scott.com

Attorneys for Plaintiffs

[Additional Counsel Appear on Signature Page.]

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| TAYLOR GOINES, Individually and on Behalf of Itself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CELSIUS NETWORK, LLC, CELSIUS LENDING, LLC, CELSIUS KEYFI LLC, ALEXANDER MASHINSKY, SHLOMI "DANIEL" LEON, DAVID BARSE, and ALAN JEFFREY CARR,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Taylor Goines ("Plaintiff" and/or "Goines") brings this action on behalf of himself and all others similarly situated against Defendants Celsius Network LLC ("Celsius"), Celsius Lending LLC, Celsius KeyFi LLC (collectively, the "Celsius Entities") and the company executives Individual Defendants Alexander Mashinsky, Shlomi "Daniel" Leon, David Barse, and Alan Jeffrey Carr.  Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

## NATURE OF THE ACTION

1.     This is a class action lawsuit on behalf of all people in the United States who purchased Celsius Financial Products by way of a Celsius Earn Rewards Account, the Company's so-called native "CEL Tokens," and/or the Celsius Loans (collectively referred to as the "Celsius Financial Products") from February 9, 2018 to the present (the "Relevant Period").

2.     Celsius is a financial services company that generates revenue through cryptocurrency trading, lending, and borrowing, the sale of its unregistered securities, as well as engaging in proprietary trading.

3.     In particular, Celsius has offered and sold Celsius Earn Rewards Accounts to investors, through which investors lend crypto assets to Celsius in exchange for Celsius' promise to provide a variable monthly interest payment.  Celsius generated the interest paid out to Earn Rewards Account investors by deploying its assets in various ways, including loans of crypto assets made to institutional and corporate borrowers, lending U.S. dollars and stablecoins to retail investors, and by investing in other highly speculative cryptocurrency ventures.  Celsius then pools these cryptocurrencies together to fund its lending operations and proprietary trading.

1

4.     Celsius investors are promised a better-than-market interest rate that is paid monthly in cryptocurrency in exchange for investing in the Earn Rewards Accounts. The Earn Rewards Accounts are not protected by the Securities Investor Protection Corporation (the "SIPC") nor are they insured by the Federal Deposit Insurance Corporation (the "FDIC"). Furthermore, the Earn Rewards Accounts are not registered with the United States Securities and Exchange Commission ("SEC"), the New Jersey Commissioner of Corporations ("Commissioner"), or any other securities regulatory authority, or exempt from registration. Despite the additional risk, and lack of safeguards and regulatory oversight, as of March 2021, Celsius held the equivalent of $10 billion from the sale of these unregistered securities in violation of federal and state securities laws, which peaked at over $25 billion later that year.

5.     Since February 9, 2018, Celsius, through its affiliates Celsius Lending LLC and Celsius KeyFi LLC, has been, at least in part, funding its lending operations and proprietary trading through the sale of unregistered securities in the form of Earn Rewards Accounts and CEL tokens, and through providing loans to investors that deposited CEL Tokens or other digital assets in exchange for a fiat cash loan (a "Celsius Loan").

6.     The Earn Rewards Accounts and Celsius Loans were securities under the securities test set forth in *Reves v. Ernst & Young*, 494 U.S. 56, 64-66 (1990) and its progeny. Additionally, all of the Celsius Financial Products are investment contracts under the four-prong test set forth in *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946) and its progeny, including the cases discussed by the SEC in its Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO.[1]

---

[1]     Securities and Exchange Commission, Release No. 81207, *Report of Investigation Pursuant to Section(a) of the Securities Exchange Act of 1934: The DAO,* (Jul. 25, 2017).

7.      Worse still, throughout the Relevant Period, Defendants made a series of misleading statements that induced unsuspecting investors to purchase the Celsius Financial Products at inflated rates.

8.      In June 2022, the cryptocurrency market in general faced a downtrend, with the prices of digital assets decreasing across the board.  This broader market downturn exposed the fragility of the Celsius ecosystem and, more importantly, that Celsius did not have enough assets on hand to meet its withdrawal obligations.  Much like a literal Ponzi scheme, Celsius could only maintain its yield rate promises by continually bringing in new investors whose new influx of money would be used to pay off the yield for old investors.

9.      Because of Defendants' unregistered offers and sales of securities, the New Jersey Bureau of Securities, on or around July 20, 2021, issued a cease-and-desist order to Celsius requiring the Company to "halt[] the offer and sale of these unregistered securities."[2]

## PARTIES

*Plaintiffs*

10.     Plaintiff Taylor Goines ("Goines") is a citizen of the State of Arkansas and resides in Rogers, Arkansas.  Plaintiff Goines purchased the Celsius Financial Products during the Relevant Period and suffered investment losses as a result of Defendants' conduct.

*Defendants*

11.     Celsius Network, LLC ("Celsius") is a Delaware limited liability company, registered on June 14, 2021, with offices at 221 River Street, 9th Floor, Hoboken, New Jersey.  Celsius conducts its business on the internet, through a website accessible to the general public at

---

[2]      State of New Jersey Bureau of Securities, *Summary Cease and Desist Order, In the Matter of Celsius Network, LLC*, (Sep. 17, 2021).

https://www.celsius.network (the "Celsius Website"), which is also accessible through Celsius' own proprietary app via smartphone/tablet.

12.    Celsius Lending LLC is a Delaware limited liability company, registered on December 29, 2020, with offices at 221 River Street, 9th Floor, Hoboken, New Jersey. Celsius Lending LLC conducts its business on the internet, through a website accessible to the general public at https://www.celsius.network (the "Celsius Website"), which is also accessible through Celsius' own proprietary app via smartphone/tablet.

13.    Celsius and Celsius Lending LLC are collectively referred to as the "Company."

14.    Celsius KeyFi LLC is a Delaware limited liability company formed on May 28, 2019, with its headquarters located in Hoboken, New Jersey. Celsius KeyFi is a wholly owned subsidiary of Celsius.

15.    Defendant Alexander Mashinsky ("Mashinsky") is a resident and citizen of New York, living in New York, New York. Mashinsky is the founder and Chief Executive Officer of Celsius, and he exercised control over Celsius and directed and/or authorized, directly or indirectly, the sale and/or solicitation of Celsius Financial Products to the public.

16.    David Barse ("Barse") is a resident and citizen of New York, living in Harrison, New York. Barse served as an executive director of Celsius, and he exercised control over Celsius and directed and/or authorized, directly or indirectly, the sale and/or solicitation of Celsius Financial Products to the public.

17.    Alan Jeffrey Carr ("Carr") is a resident and citizen of New York, living in East Quogue, New York. Carr served as an executive director of Celsius, and he exercised control over Celsius and directed and/or authorized, directly or indirectly, the sale and/or solicitation of Celsius Financial Products to the public.

18.     Shlomi Daniel Leon ("Leon") is a resident and citizen of New York, living in New York, New York.  Leon was the co-founder of Celsius and served as an executive director and the Chief Operating Officer, and he exercised control over Celsius and directed and/or authorized, directly or indirectly, the sale and/or solicitation of Celsius Financial Products to the public.

19.     Defendants Mashinsky, Barse, Carr, and Leon are collectively referred to as the "Executive Defendants."

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over claims under the Securities Act pursuant to 15 U.S.C. §78aa and 28 U.S.C. §1331, and supplemental jurisdiction over the entire action under 28 U.S.C. §1367.

21.     Venue is proper under 28 U.S.C. §1391 because Defendants have their principal place of business in this District and therefore reside in this District.  Venue is further proper pursuant to 15 U.S.C. §78aa.

22.     This Court has personal jurisdiction over Defendants because they are subject to general jurisdiction in this District because Defendants' principal place of business is in this District.

## FACTUAL ALLEGATIONS

### A.     Celsius Background

*There is no rules in this business.* – Alexander Mashinsky, CEO and Founder of Celsius

23.     Celsius began as Celsius Network Limited – a privately held company that was incorporated on February 9, 2018, with its registered office located at 77-79 New Cavendish Street, London, England and its headquarters at 35 Great St. Helen's, London, England, EC3A 6AP.

24.    On June 23, 2021, Celsius Network Limited announced that it was "migrating our main business activity and headquarters from the United Kingdom to the United States" and was withdrawing its "application from the UK Financial Conduct Authority's temporary registration regime for crypto assets."[3]  The Company stated that its "efforts will be focused on securing licenses and registrations in the US and other jurisdictions that will ensure the long-term viability of Celsius and its community."[4]

25.    In anticipation of this migration to the United States, Celsius formed a new corporate entity, Celsius Networks, LLC and opened its headquarters in Hoboken New Jersey.

26.    For its entire existence, Celsius was a financial services company, generating revenue through cryptocurrency trading, lending, and borrowing, as well as by engaging in propriety trading. Since June 2018, Celsius has been, at least in part, funding its lending operations and proprietary trading through the sale of unregistered securities in the form of cryptocurrency interest-earning accounts.  Celsius refers to these unregistered securities as its "Earn Rewards" account.

27.    Celsius solicits investors to invest in the Earn Rewards accounts by depositing certain eligible cryptocurrencies into the investors' accounts at Celsius.   Celsius then pools these cryptocurrencies together to fund its various income generating activities, including lending operations and proprietary trading.  In exchange for investing in the Earn Rewards product, investors are promised an attractive interest rate that is paid weekly in the same type of cryptocurrency as originally invested, or, subject to certain conditions, in Celsius' native digital token CEL.

---

[3]    https://blog.celsius.network/celsius-community-update-june-23-2021-a28fca899091  (last visited Jul. 12, 2022).

[4]    *Id.*

28.     The Celsius Earn Rewards Accounts, CEL Tokens, and the Celsius Loans are not registered with any state or federal securities regulatory authority, or are they otherwise exempt from registration.  Celsius' Earn Rewards accounts are not protected by the SIPC, insured by the FDIC, nor are they insured by the National Credit Union Administration ("NCUA").

29.     This lack of a protective scheme or regulatory oversight subject Celsius investors to additional risks not borne by investors who maintain assets with most SIPC member broker-dealers, banks and savings associations, or credit unions.

30.     Despite the lack of safeguards that SIPC, FDIC, and the NCUA would offer or the regulatory oversight of registration, Celsius held the equivalent of more than $14 billion from the sale of these unregistered securities in violation of the Securities Law as of August 18, 2021.

31.     On September 17, 2021, the New Jersey Bureau of Securities (the "Bureau") issued a Summary Cease and Desist Order against Celsius.  In this order, the Bureau made the following findings of fact: (1) the Earns Reward product was a security as defined in N.J. Stat. Ann. § 49:3-49(m) (West); (2) the "Earns Reward product had not been registered with the Bureau, is not exempt from registration, and is not federally covered"[5]; and (3) that Celsius had offered and sold unregistered securities in violation of N.J. Stat. Ann. § 49:3-60 (West) and continues to do so.

32.     In conclusion, the Bureau, pursuant to Uniform Securities Law (1997), N.J. Stat. Ann. § 49:3-47 to -89 (West), ordered Celsius to cease and desist from (1) offering for sale any security, including any Earn Rewards product, to or from New Jersey without first registering the security with the Bureau or qualifying for an exemption; (2) accepting any additional assets into an existing Earn Rewards account; and (3) violating any other provision of the Securities Law and any rules

---

[5]        *See* fn.2, *supra*.

7

promulgated thereunder for the sale of any security in New Jersey.[6]  The Bureau also denied that Celsius qualified for any exemptions to the New Jersey registration requirements for securities.

33.     Around the same time the Texas Bureau of Securities issued a similar cease and desist notice of hearing against Celsius.[7]

### B.     The Securities Offered and Sold by Celsius

34.     Celsius offers a suite of Financial Products to investors, including its Earn Rewards Accounts, CEL Tokens, and Celsius Loans.

### 1.     Earn Rewards Accounts

35.     Celsius offers and sells what it calls Earn Rewards Accounts, which are, in truth, unregistered securities in the form of individual and corporate accounts.  Investors in these accounts ("Earn Rewards Investors") deposit certain popular cryptocurrencies with Celsius to earn high interest rates of "up to 17.78% Annual Percentage Yield ("APY")."  The promoted interest rates advertised by Celsius are well in excess of the rates currently being offered by short-term investment grade fixed income securities or on bank savings accounts.

36.     Celsius offered its Earn Rewards Accounts to anyone over the age of 18, except for residents of certain foreign jurisdictions subject to regulatory restrictions.

37.     When an investor signs up with Celsius, they verify their age, identity, and address, provide an identification document, complete a user agreement and a KYC (Know Your Customer) protocol.  A link to the Celsius Terms of Use ("Celsius Terms") appears at the bottom of each of its web pages.

---

[6]     *Id.*

[7]     https://ssb.texas.gov/sites/default/files/2021-09/20210917_FINAL_Celsius_NOH_js_signed.pdf (last visited Jul. 12, 2022)

38.     The Celsius Website states that Celsius does not require a minimum amount of cryptocurrency for deposit in an Earn Rewards account.

39.     Celsius only accepts certain types of cryptocurrencies for deposit in the Earn Rewards accounts.  Although Celsius refers to its payments to Earn Rewards Investors as "Rewards," these "Rewards" are just another way to say "interest," which is clear from Celsius' API Partner disclosures from the Celsius Website.  For example, in the "Interest Calculations" section it states: "This pages describes how interest is calculated and disbursed.  Celsius pays interest on the value of each asset in a user's wallet.  Interest is paid using the same asst(s) that is held in the user's wallet.  Obtain current interest rates for each token using the SDK getinterestRates0 method or Get Interest Rates API operation."[8]

40.     Earn Rewards Investors earn a variable interest rate on their investment and may withdraw their digital assets at any time, subject to a maximum three-day processing time specified by Celsius.

41.     The variable interest rates for the Earn Rewards Investors are posted on the Celsius Website.  Celsius' interest rates for deposits of certain cryptocurrencies in its Earn Rewards accounts are "tiered" depending upon the nature and amount of the cryptocurrency invested, as explained on the Celsius Website.  Currently, Earn Rewards Investors are entitled to 6.2% on their first Bitcoin deposited and 3.51% on additional deposits of Bitcoin.  Rates on other cryptocurrencies range from 13.99% for the Synthetix Network Token (SNX) to 0.0% for Ripple.

42.     Celsius also pays interest for deposits of certain Stablecoins in its Earn Rewards accounts, as explained on the Celsius Website.

---

[8]      *See* fn.2, *supra*.

43.     The manner in which interest is calculated and credited to Earn Rewards Investors illustrated on the Celsius Website and specified in the Celsius Terms, states as follows:



Rewards are payable based on a daily periodic rate applicable to the Loaned Digital Assets. The daily periodic rate is calculated by dividing the then-applicable annual reward rate by three hundred sixty-four (364) days; then it is further divided down to the hour, minute, and second of that day. Loaned Digital Assets, including those received as Rewards from previous weeks, will begin gaining Rewards according to the hour, minute, and second on the timestamp verifying the completion of the applicable transaction and shall cease and/or decrease the amount paid as Rewards at the moment when the User has entered an external transmission, withdrawal or transfer of rights (via CelPay) request, or posted any Loaned Digital Assets as collateral for a Fiat Loan. Therefore, any Loaned Digital Asset transferred mid-week will receive Rewards with no distinction, based on the rates calculated for the relative time within the allocation period. [9]

44.     Celsius advertises that interest on the Earn Rewards product is paid to investors in cryptocurrency (or CEL Tokens depending on certain factors) based on the "daily periodic rate," which is "calculated by dividing the then-applicable annual reward rate by three hundred and sixty-four days (364); then it is further divided in the hour, minute, and second of that day" and is credited to the Earn Rewards Investors' accounts weekly on the first business day of the week.

45.     Celsius describes its business model in a now-deleted blog post as one that returns 80% of its total revenue to Earn Rewards Investors: "The Celsius business model is structured to do the exact opposite of what banks do – by giving 80% of total revenue back to our community each

---

[9]     https://celsius.network/ (last visited Jul. 12, 2022)

10

week in the form of earned interest.  We earn profits by lending coins to hedge funds, exchanges, and institutional traders, and by issuing asset-backed loans at an average of 9% interest.  We're taking the exact same 80% profit margin that banks have kept for themselves for centuries and returning it to our community of depositors."[10]

46.    Prior to the issuance of cease-and-desist orders from Texas and New Jersey, the Earn Rewards Accounts were available for purchase by anyone holding idle digital assets.  In the wake of the Bureau's findings of fact, however, Celsius limited the sale of Earn Rewards Accounts in the U.S. to accredited investors.

47.    Notably, a similar financial product (i.e. a high APR interest account on crytpo lending) offered by cryptocurrency firm BlockFi was investigated by the SEC in 2022. On February 25, 2022, the SEC announced a settlement with BlockFi for $100 million in penalties for offering unregistered BlockFi interest accounts (BIAs) that offer high APRs to customers to lend out digital tokens. Pursuant to that settlement, the BIAs (which are virtually identical in form and substance to the Celsius Loan products) must now be classified and registered as securities under applicable security laws, as BlockFi was determined not to qualify for an exemption from SEC registration. BlockFi agreed to cease offering or selling BIAs in the U.S. until it registers its crypto lending products.

### 2.    CEL Tokens

48.    Celsius provides investors that deposit their crypto assets within the Celsius Network with two choices for how they would like to receive their yield: "In-Kind" or "In-CEL."  Celsius pays users who select "In-Kind" in the same asset they deposited and users who choose "In-CEL" in CEL,

---

[10]    *See* https://www.nasdaq.com/articles/voyager-token-is-soaring-as-investors-search-for-yield-in-crypto-space-2021-04-13 (quoting Celsius blog post).  (last visited on Jul. 12, 2022).

Celsius' native token, at a higher APY.  For example, Celsius currently advertises a 6% APY on Ethereum ("ETH") deposits paid in ETH and 7.87% APY on ETH deposits paid in CEL.  Celsius explains this extra CEL in its whitepaper: CEL Tokens are a "platform utility token" that is rewarded to crypto holders in the Celsius Wallet as interest on their coins.  That interest is generated from fees, in CEL tokens, collected from institutional traders who use the assets pool.  Celsius uses the proceeds from the sale of CEL tokens to cover "all costs and membership growth" for the Celsius Earns Rewards Accounts.

49.    These CEL tokens then get distributed back to the users lending their crypto on Celsius' website.  In this model, the borrowers are the ones buying CEL.  Celsius is simply collecting payment in its native token and transferring the proceeds back to its users.

50.    In reality, it appears that, rather than redistributing in-CEL fees from lenders to users, Celsius was purchasing hundreds of millions of dollars of CEL Tokens to meet liabilities to users.

51.    On-chain analysis of Celsius' wallets and their CEL Token transactions show the scale of potential CEL repurchases.  As detailed in the Arkham Report on the Celsius Network (the "Arkham Report") "from July 2019 to March 2021 Suspected Celsius addresses withdrew over 76 million CEL from the exchange Liquid, worth $127 million at the time of withdrawal.  Since December 2021, suspected Celsius addresses have also withdrawn around 82 million CEL from FTX – equivalent to 12% of the total CEL supply and worth $226 million at time of withdrawal."[11]  The Arkham Report concluded that because those withdrawals were not "preceded by equivalent CEL

---

[11]    Arkham    Report    on    Celsius    Network,    Arkham,
https://www.arkhamintelligence.com/reports/celsius-report (last visited Jul. 12, 2022).

deposits by Celsius, and because Celsius does not appear to use these exchanges for CEL custody, these withdrawals likely indicate CEL purchases."[12]

52.     By purchasing its customers' in-CEL payments rather than collecting them through fees or distributing from the treasury, Celsius profit margins decreased as this added another cost. Additionally, Celsius was required to expend capital that could otherwise be used to meet withdrawal requests, risking a liquidity crisis like Celsius began experiencing in June 2022 (discussed further below).

### 3.     The Celsius Loans

53.     The Company also offered and sold various promissory notes to investors that deposited their digital assets within the Celsius Network (the "Celsius Loans").

54.     The Celsius Loans were available to eligible investors via the "Borrow" option available on the Celsius mobile app.

55.     Borrowers deposited their digital assets as collateral onto the Celsius mobile app in exchange for fiat or one of several stablecoins like USDC, USDT, and DAI. Celsius then would collect monthly interest payments on the Celsius Loans.

56.     Celsius marketed these particular Financial Products with the hashtag slogan "#UnbankYourself" on its various social media accounts.  For example, on March 22, 2021, the Celsius Twitter account posted the following message to investors: "We know time is money, so we've made it easier to have both by offering loans with interest rates as low as 1%, ZERO

---

[12]        *Id.*

13

origination fees, and same day approval. Get cash in hand today without giving up on your investment."[13]

### C.    Celsius Misleadingly Promoted Its Financial Products

#### 1.    Misleading Statements

57.    Celsius made a series of misleading and false statements in connection with the promotion of the Celsius Financial Products.  For example, Celsius and Mashinsky repeatedly promoted its Earn Rewards Accounts as "high-yield" and "low-risk" investments for investors. They also claimed the stability of the interest paid was primarily due to all of the institutional payments Celsius received from its Celsius Loan products.  Concurrently, Defendants also repeatedly touted the growth prospects for the Company and the CEL Token.  These misrepresentations painted a rosy picture for Celsius' future and lured unsuspecting investors into purchasing the Celsius Financial Products at inflated rates.

58.    At the outset, the Arkham Report describes the nature of Celsius' misrepresentations:

Celsius Network positions itself as a wallet that enables users to "Earn" on the assets they "deposit." The "deposit" could be described as an unsecured loan from the user to the organization, and "Earn," or accrual of value to the user over time, could be described as synthetic liability accrual, meaning it is not on-chain.

Celsius attracted users by offering exceptionally high yields on deposits, such as 5% APY for Bitcoin and up to 10% for USD-pegged stablecoins – 100x the average conventional savings account interest rate of 0.1%.  For Celsius to make good on its high yield promised to investors it needed to outperform those high returns through its lending and investing to make money and remain solvent.  This is impracticable through conventional lending in traditional finance, where interest rates aren't high enough.  *Through Celsius' public materials, they claim such high yields are sustainable by the nature of the cryptocurrency market*.

---

[13]

https://twitter.com/CelsiusNetwork/status/1374010096145952769?s=20&t=sQgj5D1x21gHw
OFPs4eLHg

On the "Why Trust Celsius" section of the website, Celsius directs users to its whitepaper from 2018. ***This whitepaper explains that "members will be able to easily earn interest on their crypto assets the same way they earn on the savings in the bank – but with much better rates."*** When describing where this yield comes from, the whitepaper states, "Hedge funds, family offices and crypto funds still want to play in the world of cryptocurrency. Fortunately for us, they are willing to pay high fees to do so."

In a video on the official Celsius Network YouTube channel titled "How Celsius earns yield," ***CEO Alex Mashinsky explains that Celsius earns its yield through institutional lending***. According to Mashinsky, when an institution needs fast access to crypto assets for arbitrage, market making, or shorting, they borrow those assets from Celsius at a high interest rate for a short period of time. Mashinsky claims that "the key is to get a high yield at a low risk."

Building a banking business on the model of high yield at low risk can be compared to building a business on the model of buying dollars for 50 cents. It's a perfect model, except it requires finding someone who will take the other side of the trade. If other lenders agreed that a loan was low risk then it wouldn't be high yield, so you have to rely on systematically beating the market. This is hard to do with billions of dollars of capital at rates many times those of conventional low-risk loans, which recently have been at zero or even negative interest. In reality, ***despite their public emphasis on institutional lending, Celsius was chasing yield in other places that many would not characterize as low-risk***.[14] (Emphasis added).

59.    The Celsius Website also touted the increased return on investment that investors could expect from buying and holding CEL Tokens. For example, according to the promotion on the "CEL Token Explained" page on the Celsius Website, "More CEL. More rewards. It's not rocket science." Celsius also provided the following chart to investors, which outlines the high yield rates that CEL Token investors would receive. Notably, the yields could take the form of "Bonus Rewards" (*i.e.*, extra interest) or a "Loan Interest Discount" (*i.e.*, a credit towards a Celsius Loan product):

---

[14]    *Id.*

15

| Reward Status | CEL Ratio | or CEL Balance | Bonus Rewards | Loan Interest Discount |
|---|---|---|---|---|
| NONE | 0%-5% | 0 CEL | 0% | 5% |
| BRONZE | 5%-10% | 1 CEL | 10% | 5% |
| SILVER | 10%-15% | 1,000 CEL | 15% | 10% |
| GOLD | 15%-25% | 10,000 CEL | 20% | 15% |
| PLATINUM | 25%-100% | 25,000 CEL | 30% | 25% |

60.    Celsius promoted the CEL Token as both an investment product that essentially paid dividends and a credit that could be used in the purchase of a Celsius Loan product.

61.    The whitepaper further promoted what it calls the "Tokenized Flywheel," which purports to show how the Celsius Financial Products interact with each other to create a perpetual wealth creation system.  The following diagram illustrates this notion:



62.     A similar version of the Tokenize Flywheel is currently posted on the Celsius Website:



63.     Celsius and its executives, including but not limited to Mashinsky, also held weekly podcasts on YouTube throughout the Relevant Period, using the "Ask Me Anything" ("AMA") format, whereby investors could ask questions directly to Mashinsky and other Celsius

representatives. During these podcasts, Mashinsky and Company insiders repeatedly made false and misleading statements regarding Celsius' operations and financial stability.

64. For example, on February 5, 2021, Celsius held an AMA session on YouTube,[15] wherein Mashinsky made several statements promoting the Celsius Loans to investors. In particular, response to a question about whether Celsius would allow borrows to use multiple sources of collateral for their Celsius Loans, Mashinsky proclaimed that crypto investors that held CEL Tokens or other cryptocurrencies should "borrow against it" because "it helps you earn [and] defer your taxes. That's what the rich guys do. That's how they stay rich and famous."[16]

65. Later during that AMA, an investor asked about the circumstances under which Celsius will liquidate a borrower's collateral. Tal Bentov, the VP Lending (Retail) at Celsius, replied:

> First of all, we hate the word 'liquidations.' We really want to avoid it at all costs. If you get a margin call and you don't know how to answer . . . You have different coins, you need some more time . . . You need to contact us and let us know that. We have a big enough team that we can handle all of this . . . *We liquidate only when someone is not answering our margin calls and he/she keeps being in default. We give a lot of time. A lot more than others. Trust me. Sometimes weeks to answer our margin calls*![17] (Emphasis added).

66. Near the end of the February 5th AMA, Mashinsky promoted the Earn Rewards Accounts' ability to "earn" investors various cryptocurrencies "for free."

67. On February 12, 2021, Mashinsky participated in the weekly Celsius AMA, discussing, among other things, the various future prospects for the Company. Notably, Mashinsky agreed that the purchase of CEL Tokens was "an investment in Celsius' future," and went on to stated that "Celsius has 2 components. Celsius has the CEL Token and also the equity. When you buy the CEL Token, you're basically voting 'yes' or 'no'. You're voting with the community on your need,

---

[15]     https://www.youtube.com/watch?v=2wqD78AnFaw (last visited Jul. 12, 2022).
[16]     *Id.*
[17]     *Id.*

or you're wanting to earn more interest. You're going to get that 25% bonus, or that 25% premium."[18]

68.     On February 26, 2021, Mashinsky participated in the weekly Celsius AMA on YouTube,[19] discussing, among other things, how Celsius would deal with "handling flash crashes." Mashinsky stated:

> We don't provide high LTV's. . . . Celsius doesn't make money by liquidating you. We don't charge any fees. We don't try to give you these gimmicks and special rates . . . Our goal, our mission is to make sure that we have you as a customer for life. What are the chances that you're going to stick with us if we liquidated you? Most of our loans are 25% or 33% LTV loans. We discourage you from taking 50% LTV loans because that is much higher risk. **_So Celsius did not have any liquidations, because we give you plenty of time_**. **_We give you advanced notice most of the time, then we tell you you can put more collateral or return some of the dollars or assets back._** We have almost 0 liquidations. That's not our business. It's the opposite of our business.[20] (Emphasis added.)

69.     On April 23, 2021, Mashinsky again made statements regarding Celsius' borrower-friendly stance on liquidations during a Celsius weekly AMA on YouTube.[21] In particular, Mashinsky stated a "margin call doesn't mean we sold your assets or stole your coins. That's what the other guys do. **_We always give you ample time_** to post more collateral, return some of the assets, or instruct us to sell your coins."[22] (Emphasis added.)

70.     On May 28, 2021, Mashinsky promoted the stability and wherewithal of the CEL Token: "Looking at coins, the CEL token was one of the most stable out there. It did better than Bitcoin or Ethereum. It did not drawdown as much. Obviously Celsians who held CEL did very

---

[18]     *Id.*
[19]     https://www.youtube.com/watch?v=cZPy7Pu6vxg&t=3s (last visited Jul. 12, 2022).
[20]     *Id.*
[21]     https://www.youtube.com/watch?v=bzEyHLgBY7Y&t=350s (last visited Jul. 12, 2022).
[22]     *Id.*

well as well."[23]  Mashinsky congratulated the investors that held onto their CEL Tokens during the brief market downturn and bragged that there were "only 20 liquidations" from the 10,000 margin calls that occurred during that time period because Celsius "does a better job than most. Accommodating, providing enough warning, giving you enough time for doing what's right.  We don't make any money from liquidating you."[24]  Mashinsky proclaimed that "during these drawdowns is when Celsius shines, both from the fact that it does not crash [CEL].  I think NEXO token was down about 75% from top to bottom just last week.  So those are examples of just a different community.  A HODL community versus a speculative community.  Same thing with Binance and other platforms.  Obviously, we only care about doing what's in the best interests of the HODLer."[25]

71.    On July 16, 2021, Mashinsky participated in the Celsius AMA on YouTube and asked investors "So, when are you building us a rocket?  We're going to the moon!  Everyone wants to know when CEL Token is going to the moon [Mashinsky pounds on the desk]! . . . I have to beat these billionaires!  I want to be in outer space . . . ."[26]  The phrase "going to the moon" in the crypto trading context refers to a drastic increase in the price of digital asset in question.  Here, Mashinsky was signaling to investors that the price of the CEL Token was going to increase exponentially in the future.

72.    Similarly, Mashinsky stated during a September 10, 2021 AMA on YouTube that "We are shooting to the moon.  We might get there before Elon Musk.  Because our numbers are just

---

[23]    https://www.youtube.com/watch?v=C7d7rZUEfGo (last visited Jul. 12, 2022).
[24]    *Id.*
[25]    *Id.*
[26]    https://www.youtube.com/watch?v=B9eNsTnpAxk (last visited Jul. 12, 2022).

getting better and better."[27]    Again, these promotions were meant to mislead investors into purchasing CEL Tokens on the prospect that the CEL Tokens' value would increase.

73.    On December 1, 2021, Celsius held an AMA session on YouTube where investors could ask questions of Celsius representatives.  One investor expressed concern about a "CEL token liquidation cascade" and asked whether Celsius was "worried at all," to which Celsius content manager Zachary Wildes replied "I'm personally not . . . I do think we need to bring a lot more time and attention and focus to CEL token and its utilities.  I'm not concerned about a cascading liquidation event where everyone gets destroyed."[28]  Wildes continued that "We're at a low-point for CEL sentiment and the future of the token" and asked Mashinsky if there was "any level of reassurance we can give . . . to the community to show our commitment to CEL token?"[29]  Mashinsky responded that "Earning in CEL allows you to earn twice as many CEL right now with the price lower.  If you believe in the viability of the company, then you would know you're getting a 50% discount.  If you don't believe in it, then you probably don't want these CELs anyway.  If you're not sure about it, how about some of the worlds best investors coughing up 750$ Million?  They bought into half of all the CEL tokens out there. Our Treasury, which is mostly CEL token.  They're part owners of that . . . ."[30]  Mashinsky's statements suggested to investors that the Company's successes would lead to a 50% increase in the CEL Token price in the future and that Celsius had the support of well-capitalized backers who would be able to continue to shore up Celsius' finances.

---

[27]    https://www.youtube.com/watch?v=lc8crMFnRgY (last visited Jul. 12, 2022).

[28]    https://www.youtube.com/watch?v=1v9zDkWbZJc&list=PL91_dMxDmGklKGDKCX_YFD
LeRk0ag2Koj&index=28 (last visited Jul. 12, 2022)

[29]    *Id.*

[30]    *Id.*

74.    On January 12, 2022, Mashinsky participated in the weekly Celsius YouTube AMA podcast, promoting the "huge demand for CEL Token" that the Company was creating.[31]  "We still have new users signing on every day and none of that changes.  But this is all new demand that never existed before."[32]  Mashinsky further stated that "We believe that the token has not shown its full potential yet.  A lot of it is on us.  Again, we were not focused on the token performance and all that in 2021.  As you can see, we're launching big things this year.  And obviously, these things are gonna have major major impact on the price of CEL."[33]

75.    Later during the AMA, Mashinsky was confronted by a popular commentator in the crypto sector, Dirty Bubble, who asked if Mashinsky or other Celsius insiders were selling their CEL Tokens.  Mashinsky became defensive, vaguely acknowledging that he and his wife "did a bunch of transfers.  We did sell some tokens.  It's not like we didn't sell any.  My wife hasn't sold anything."[34]  But then Mashinsky went on to challenge anyone listening "to go and find one project, just one, where the founders hold more tokens in their project than Celsius.  Just find one!"[35]  Mashinsky excused his selling activities saying "you know, there is no rules in this business.  It's not like somebody has to hold the tokens . . . I wouldn't measure what me or Nuke or Krissy or Daniel do as having anything to do with what the company does.  You guys should just watch if the company is working for you.  Does the company deliver things that are in your best interests?"[36]

76.    Dirty Bubble replied that "Celsius is going off of reputation" and asked about whether Celsius would be making the same kind of disclosures of CEL Token sales by Celsius executives as

---

[31]    https://www.youtube.com/watch?v=bPk7rKAXMvU&list=PL91_dMxDmGklKGDKCX_YFDLeRk0ag2Koj&index=22 (last visited Jul. 12, 2022).
[32]    *Id.*
[33]    *Id.*
[34]    *Id.*
[35]    *Id.*
[36]    *Id.*

would be required if Celsius was a public company.[37]  Mashinsky bluntly replied "We're not a public company!  So what the fuck are you talking about!?"[38]

77.     On January 19, 2022, Mashinsky participated in the weekly Celsius "Ask Me Anything" session on YouTube and made a series of statements regarding the CEL Token and how it was poised for future growth in use and, more importantly, price.[39]  For example, during this AMA, Mashinsky went on a rant about how everyone at Celsius did not "have to worry about humility" because they instead had "conviction."[40]  In a seemingly unintentional moment of honesty, Mashinsky essentially admitted that Celsius relied on con-man style tactics to instill confidence in a target: "Everybody from Celsius on this call has the same conviction.  They wouldn't be a part of CEL Team 6 if they didn't have that full conviction.  100%.  And they don't need humility.  They just need to share with you the conviction and CONVINCE you that it's the right thing."[41]  Mashinsky then quickly returned to promoting the CEL Token's future, acknowledging that the Company "took our hand off the wheel" with the CEL Token, but that they had a plan and a "super team" to "get the car back on the road."[42]

78.     For example, when asked about how Celsius generates revenue, Mashinsky responded that "***We always make all of our money from institutions*** . . . We don't charge fees, spreads, all of that stuff."[43] (Emphasis added).

---

[37]     *Id.*
[38]     *Id.*
[39]     https://www.youtube.com/watch?v=EE4k_WLqldc&list=PL91_dMxDmGklKGDKCX_YFDLeRk0ag2Koj&index=21 (last visited Jul. 12, 2022).
[40]     *Id.*
[41]     *Id.*
[42]     *Id.*
[43]     *Id.*

79.     Celsius' whitepaper also promoted the CEL Token as a necessity for the Company's future growth: "Our lending and borrowing model requires a blockchain and an open ledger technology, it also requires consensus and a global footprint of coin holder in order to really gain traction and complete our mission.  Any loan we issue may be collected from thousands of individual coin holders which may be switched at any time.  Only a smart contract capable of tracking and paying in micropayments can handle such complexity."[44]  In truth, Celsius does not operate a blockchain of its own and the CEL Token is a simply a standard ERC-20 token built on the Ethereum blockchain.  Moreover, Celsius' suggestion that managing a loan ownership profile requires a blockchain is not true.

80.     As noted in a blog post on January 18, 2022, entitled *Celsius Network: Financials proved it was a Ponzi scam* the "real purpose of this token was to create an Initial Coin Offering ("ICO") that netted them $50 million without strings to start financing their operations.  But there is one other valuable feature: they can pay investors with this token they minted out of thin air because non-US investors have the option to receive their returns in the CEL token for an extra 2% yield and it costs Celsius effectively nothing."[45]

81.     As such, this token really serves no purpose for investors.

82.     Celsius leads consumers to think that most of the yield Celsius offers its users comes from institutional securities lending.  When browsing the Celsius Network website, users find multiple explanations of how their return comes from lending assets to institutions on a short-term basis.  On the Celsius YouTube channel, customers find videos of the CEO of Celsius praising their institutional lending strategies and even berating the risk of DeFi yield strategies.

---

[44]     https://celsius.network/static/celsius-whitepaper.pdf (last visited Jul. 12, 2022).
[45]     https://wantfi.com/celsius-network-review.html (last visited Jul. 12, 2022).

83.   In a Celsius network video published on May 24th, 2022,[46] CEO Alexander Mashinsky offers his thoughts on the then-breaking Luna-Terra collapse. Mashinsky provided this advice regarding crypto yield-bearing products: "if you do not understand where the yield comes from, then you should not be in the project.  If you cannot prove how the yield is earned, do not invest in the project."[47]

84.   Notably, Celsius does not make it clear for an average user of Celsius to figure out all of the sources of their money's yield, and their associated risks.  Instead, what investors are told is that depositing crypto in Celsius is akin to depositing money in a savings account, and the profit comes from institutional lending.  But as noted, Celsius has purposefully refused to provide investors with all of the wallet addresses owned/controlled by Company insiders.  Without sophisticated wallet labeling to determine which anonymous addresses belong to Celsius Network and on-chain analysis of the movement and usage of these funds, it is extremely difficult to know Celsius is hunting yield with corporate funds via leveraged positions in DeFi protocols with liquidation risk.

85.   On June 4, 2022, Mashinsky posted a message on his official Twitter account, admitting to using risky decentralized finance investments after users accused his company of misleading customers on the source of yield and use of funds: "Celsius lends on DeFi when yields are high and borrows on DeFi when rates are low like now.  @CelsiusNetwork is earning income from these activities."[48]  Mashinsky then dismissed the criticism of the way Celsius promoted the source of yield and use of funds, calling them "baseless allegations" to make investors doubt the validity of the well-founded criticisms.

---

[46]   https://cryptonews.com/videos/bitcoin-has-never-done-this-before-alex-mashinsky-gives-price-outlook-talks-terra-collapse.htm (last visited Jul. 12, 2022).

[47]   *Id.*

[48]   https://twitter.com/Mashinsky/status/1533261237202599938?s=20&t=nHwUESvAsmWNp8dmmyy-dA (last visited Jul. 12, 2022).

86.     The Company also misled investors about the future growth potential for the Earn Rewards Accounts, encouraged Earn Rewards Investors to treat their Earn Rewards Accounts as long-term investments as evidenced by the statement on Celsius' homepage: "Start earning top rates on any amount of crypto and get paid every paid every Monday to keep HODLing."  According to Celsius,  "HODL started as a typo and has become a crypto rallying cry.  A misspelling of the word 'hold,' HODLers believe in the future of digital currencies and know it would be a mistake to sell at this early stage."[49]

87.     Celsius also touted the ability of Earn Rewards Investors to manage their Earn Rewards accounts as long-term investments using the "HODL Mode" feature of their Celsius account.  Celsius describes HODL Mode on its Website as an account security feature "that gives [account holders] the ability to temporarily disable outgoing transactions from [their] Celsius account. [Account holders] control when HODL Mode is activated and it is an ideal feature for those that do not plan on withdrawing or transferring funds from their account for an extended period of time."[50]

88.     Celsius' corporate culture of promoting "HODLing," including its description of Celsius as a "HODLing platform," the premium interest rates Celsius pays on its Earn Rewards accounts, the weekly compounding of interest payments, and the availability of HODL Mode makes the Celsius Earn Rewards account an attractive long-term investment to Celsius Earn Rewards Investors.

89.     At the same time Celsius and Mashinsky were promoting the Earn Rewards Accounts and the CEL Tokens, Mashinsky was secretly selling millions of dollars' worth of CEL Tokens.

---

[49]     https://support.celsius.network/hc/en-us/articles/360001716538-What-s-HODL- (last visited Jul. 12, 2022).
[50]     https://support.celsius.network/hc/en-us/articles/360007608077-What-is-the-HODL-Mode- (last visited Jul. 12, 2022).

90.     According to the Arkham Report, several Ethereum addresses have been identified as likely belonging to Celsius CEO Alexander Mashinsky (the "Mashinsky Wallets").[51]   The Mashinsky Wallets regularly sold large amounts of CEL Tokens on decentralized exchanges, totaling $44 million.  At the same time that he was promoting CEL Tokens to users and denying that he was selling the token, Mashinsky appears to have been quietly selling millions of dollars of CEL Tokens.

91.     The following is a list of the specific addresses comprising the Mashinsky Wallets, which are owned/controlled by Mashinsky and/or his wife Krissy Mashinsky, and were used to sell the CEL Tokens that Mashinsky had set aside for himself at the time of minting:

- 0xf716F34cb7FabfaA930169eC66278f525b6a1597 ($21M in sales)

- 0x34F30e5473fE5D2dcD9A930275Be30ACC1EEF12b ($100k in sales)

- 0x11729acCDA2dA02B453cB4AEA4EFCDeDc0E56bD9 ($1M in sales)

- 0xc33192B79AD149b05169516A8aF2adc6e1E08EF6 ($12M in sales)

- 0x6D27BA372b148A190F0806899e53a6D4009cf5af ($8M in sales)

- 0x23cE2180754AF6207Ee13e745BC903795661e7C9 ($300k in sales)

- 0xd50061dDC6E813F56dF865D450B3cC61973E881A ($2M in sales)

- 0x2a020312Dd646D81acBC81015Df532eAFC2D5257 ($530k in sales)

92.     Most of the CEL sales from the Mashinsky Wallets took place on the decentralized exchanges Uniswap and Airswap.  Typically, Mashinsky swapped CEL Tokens for the stablecoin USDC.  In other instances, Mashinsky opted to take ETH or wBTC.  Notably, one of the Mashinsky Wallets also deposited CEL Tokens to the centralized exchange Liquid at the same time that Celsius was purchasing large amounts of CEL Tokens on that same exchange.  As discussed in the Arkham

---

[51]     *See* fn.10, *supra*.

Report, this particular Mashinsky Wallet address deposited over 9.1 million CEL Tokens to Liquid from June 2019 to July 2020.[52] During the same time, Celsius appears to have purchased over 29 million CEL from Liquid, creating a situation where Celsius was using corporate funds on the same orderbook the CEO used to exit his CEL Token position.

93.     As all of this activity was occurring within the Mashinsky Wallets, Mashinsky publicly promoted CEL and denied that he or other founders were selling. He also gave the impression that he was increasing his CEL holdings by publicizing CEL purchases.

94.     For example, on October 9, 2021, Mashinsky tweeted, "Lots to CELebrate here in #London busy week with a lot of large deals and events. It pays to #HODL."[53] Nine hours later on the very same day, one of the Mashinsky Wallets sold 12K CEL on Airswap for $69k in USDC. Similarly, on December 9, 2021, Mashinsky posted a message on his Twitter account, promoting CEL Tokens as a long-term investment for Company insiders and stating: "All @CelsiusNetwork founders have made purchases of #CEL and are not sellers of the token."[54] But only five days earlier, on December 4, 2021, one of the Mashinsky Wallets was selling over 11,000 CEL Tokens for about $43,000 worth of WBTC.

95.     Since June 9, 2021, the Mashinsky Wallets sold approximately 2.8 million CEL Tokens valued at over $16 million at the time.

### 2.     Celsius Used the API Partners Program to Sell Earns Rewards Accounts

96.     Celsius offers an Application Programming Interface ("API") that allows certain institutional users, known as Celsius "API Partners," to integrate with the Celsius platform.

---

[52]     *Id.*
[53]     https://twitter.com/Mashinsky/status/1446846073713184772 (last visited Jul. 12, 2022).
[54]     https://twitter.com/Mashinsky/status/1468995783982825480 (last visited Jul. 12, 2022).

97.     Celsius affords its API Partners the ability to offer the Earn Rewards accounts to retail investors in two different ways.

98.     First, the Celsius "Segmented Accounts" platform allows API Partners to offer the API Partners' own customers the Celsius Earn Rewards accounts through the API Partners' own portal. An API Partner availing itself of Celsius' Segmented Accounts structure offers the API Partner's own retail customers the opportunity to access the Celsius Earn Rewards account through the API Partner's own portal, as opposed to the API Partner's retail customers accessing the Celsius Earn Rewards account directly from Celsius' own website.  Apart from the difference in how the Earn Rewards account is accessed, individual retail customers of API Partners offering the Segmented Account option are subject to the same rights, benefits, terms, and conditions as Celsius' own Earn Rewards Investors.

99.     Second, Celsius' API Partners can choose to access the Celsius Earn Rewards accounts through what Celsius refers to as an "Omnibus Account."  In the Omnibus Account, the API Partner maintains a direct relationship with Celsius and invests in a Celsius Earn Rewards account for the benefit of its individual customers, whose cryptocurrencies the API Partner has aggregated for the purpose of investing in the Celsius Earn Rewards account on behalf of, and for the benefit of, the API Partner's individual retail customers.

100.    Celsius incentivizes the API Partners by paying a fee to Segmented Account partners based on a percentage of rewards payable by Celsius to the end-user, and also pays fees to Omnibus Partners, in addition to the Earn Rewards payable.

101.    Celsius is selling unregistered securities in the form of Earn Rewards accounts to it API Partners' Segmented Account customers.

102.    Celsius is selling unregistered securities to its API Partners who choose to open API Partner Omnibus Accounts with Celsius.

**D.    The June 2022 Celsius Crisis**

103.    On-chain analysis of Celsius owned/controlled wallets indicates that Celsius had billions of dollars in leveraged positions on decentralized finance (DeFi) protocols that were threatened with liquidation when the broader crypto market was in decline.  In order to avoid liquidation, it appears Celsius was forced to deploy $750 million of liquid assets that could no longer be used to meet withdrawal obligations.

104.    Upon information and belief, it was Celsius taking of these risky, highly-leveraged positions that caused Celsius to pause user withdrawals, swaps and transfers.

105.    On July 8, 2022, a research company Arkham published the Arkham Report on Celsius Network, detailing the business practices of Celsius and company insiders like Defendant Mashinsky.  According to the Arkham report, "Celsius was one of the biggest players in DeFi, accounting for a huge portion of the funds deployed to the three largest DeFi protocols, Compound, Aave, and Maker."[55]

106.    The Arkham Report also provided the following breakdown of Celsius' DeFi positions as of June 21st, 2022, eight days after freezing user accounts:

---

[55]    *See* fn.10, *supra*.



- → **On AAVE** – 32% of stETH supplied; 17% of WBTC supplied; 6% of ETH supplied; 35% of LINK supplied; 78% of SNX supplied; 70% of xSUSHI supplied; 37% of USDC borrowed; 30% of DAI borrowed; 12% of REN borrowed.
  - ◆ Celsius' cumulative positions account for 12% of the total supply and 17% of the total amount borrowed in US dollar value on AAVE.
- → **On Compound** – 43% of WBTC supplied; 13% of ETH supplied; 57% of DAI borrowed.
  - ◆ Celsius' cumulative positions account for 11% of the total supply and 20% of the total amount borrowed in US dollar value on Compound.
- → **On Maker** – 38% of WBTC-A supply; 59% of DAI borrowed from WBTC-A pool.
  - ◆ Celsius' cumulative positions account for 6% of the total supply and 3% of the total amount borrowed in US dollar value on Maker.
- → **ETH2 staking** – 2.5% of all ETH staked.
- → **stETH** – 10% of stETH in circulation.

$671M Supplied

$492M Supplied

$396M Supplied

$273M Borrowed

$210M Borrowed

$178M Borrowed

Aave    Maker    Compound

*Celsius DeFi Positions on 21 June 2022*    56

107.    In early June 2022, the broader digital asset and cryptocurrency market saw a steep decline in price, which precipitated Celsius Network's crisis.  On June 10th, 2022, Bitcoin began the day trading at around $30,000.  Over the following eight days, Bitcoin's price fell over 40% to below $18,000.  Other crypto assets saw an even more dramatic crash during this time.

108.    The crypto market downturn forced Celsius to deploy significant capital to protect the Company's highly-leveraged DeFi positions from liquidation.  Maker allows users to borrow DAI (Maker's native stablecoin pegged to one US dollar), against various collateral options.  Each loan has a maximum collateral-to-debt ratio that triggers a liquidation of the posted collateral when

---

56    *Id.*

crossed.  On June 10, 2022, Celsius had 17.8k WBTC of collateral in Maker and $280 million in DAI borrowed against it.  The loan had a minimum collateralization ratio of 145%, meaning the position is liquidated when the collateral posted is worth less than 145% of the debt.  At the time, this WBTC was worth $530 million for a 190% collateralization ratio, seemingly a comfortable cushion.  But the combination of liability-asset denomination mismatch and volatility caused the strength of the position to deteriorate rapidly.

109.    In three days, the price of Bitcoin fell below Celsius' original liquidation price of $22.8k.  The fragility of Celsius' leveraged positions forced the company to use liquidity to pay down debt instead of honoring customer withdrawals.  Between June 11, 2022 and June 16, 2022, Celsius added 6.2k WBTC as collateral and paid back 53.8 million of its DAI debt, reducing its liquidation price to $13.6k per BTC.  Since July 1, 2022, they paid back another $220 million in DAI to close out the position.  AAVE rates every position on its platform with a health factor based on various risk parameters and liquidates any position with a health factor below 1.0.  At the start of the market downturn, around June 10, 2022, Celsius appears to have had $604 million of collateral against $303 million in debt on AAVE with a health factor of 1.6.  On Compound, Celsius appears to have had $421 million of collateral against a $218 million debt.  During the market crash, Celsius again gathered liquid capital to shore up these liabilities, adding tens of millions of dollars' worth of BTC, ETH, LINK, SNX, and BAT as collateral on AAVE and paying $30 million toward their debt.  On Compound, they paid $40 million towards their debt and added over $1 million UNI as collateral.  Since June 10, 2022, Celsius has deployed $546 million in stablecoins, 7.2k BTC, 16.3k ETH, and tens of millions of dollars of other tokens to its leveraged DeFi positions.  These deployments were worth roughly $750 million at the time of transactions.

110.   On June 13, 2022, Celsius froze all accounts.   According to their official announcement, this was done "due to extreme market conditions in order to stabilize liquidity and operations while we take steps to preserve and protect assets."[57]

**E.**     **The Celsius Financial Products Are Unregistered Securities**

**1.**     **Earns Rewards Accounts and Celsius Loans Are Securities Under *Reeves***

111.   As noted by the United States Supreme Court, "Congress' purpose in enacting the securities laws was to regulate ***investments***, in whatever form they are made and by whatever name they are called.  However, notes are used in a variety of settings, not all of which involve investments. Thus, they are not securities per se, but must be defined using the 'family resemblance' test." *Reves*, 494 U.S. 56, 67.

112.   Pursuant to the family resemblance test, a note is presumed to be a "security," and that presumption may be rebutted only by a showing that the note bears a strong resemblance (in terms of the four factors we have identified) to one of the enumerated categories of instrument.  *Id.*  These factors include: (1) investments in a business enterprise; (2) there was "common trading" of the notes, which offered and sold to a broad segment of the public; (3) the public reasonably perceived from advertisements for the notes that they were investments, and there were no countervailing factors that would have led a reasonable person to question this characterization; and (4) there was no risk-reducing factor that would make the application of the Securities Acts unnecessary, since the notes were uncollateralized and uninsured and would escape federal regulation entirely if the Acts were held not to apply.  *Id.*

113.   Here, the four enumerated factors do not militate in favor of rebutting the presumption that the Earn Rewards Accounts and Celsius Loans are securities.   First, Plaintiff and the class

---

[57]      https://blog.celsius.network/a-memo-to-the-celsius-community-59532a06ecc6

invested fiat and/or other digital assets and cryptocurrencies in a business enterprise, namely Celsius. There was common trading of the Earn Rewards Accounts insomuch as the digital assets deposited by investors were regularly offered and sold to both institutional and retail investors. All of the marketing materials promoted by Defendants led the public to believe that opening up an Earn Rewards Account with Celsius was a "high-yield, low-risk" investment.

<div align="center">

**2. The Celsius Financial Products Are All Securities Under the *Howey* Test**

</div>

114. Under Section 2(a)(1) of the Securities Act of 1933 ("Securities Act"), a "security" is defined to include an "investment contract." 15 U.S.C. §77b(a)(1). An investment contract is "an investment of money in a common enterprise with profits to come solely from the efforts of others." *W.J. Howey*, 328 U.S. at 299. Specifically, a transaction qualifies as an investment contract and, thus, a security if it is: (1) an investment; (2) in a common enterprise; (3) with a reasonable expectation of profits; and (4) to be derived from the entrepreneurial or managerial efforts of others. *See United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852-53 (1975). This definition embodies a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits," and thereby "permits the fulfillment of the statutory purpose of compelling full and fair disclosure relative to the issuance of 'the many types of instruments that in our commercial world fall within the ordinary concept of a security.'" *W.J. Howey*, 328 U.S. at 299. Accordingly, in analyzing whether something is a security, "form should be disregarded for substance," and the emphasis should be "on economic realities underlying a transaction, and not on the name appended thereto." *Forman*, 421 U.S. at 849.

115. Investors who bought Earn Rewards accounts invested money or other valuable consideration, in a common enterprise: namely Celsius. Investors had a reasonable expectation of profit based upon the efforts of the Defendants.

### i. Celsius Investors Invested Money

116. Plaintiff and the Class invested fiat, including U.S. dollars, and digital currencies, such as Bitcoin and Ethereum, to purchase Earn Rewards accounts.

117. The Earn Rewards accounts were available on the Company's website and mobile app, which allowed retail investors to purchase Earn Rewards accounts with traditional and other digital currencies.

118. Defendants sold Earn Rewards accounts to the general public through global, online cryptocurrency exchanges during its so-called launch.

119. Every purchase of Earn Rewards accounts by a member of the public is an investment contract.

### ii. Celsius Financial Product Investors Were Intertwined in a Common Enterprise with Defendants

120. Additionally, investors were passive participants in the Earn Rewards Accounts' launch and the profits of each Plaintiff, and the Class were intertwined with those of Defendants and of other investors. Celsius concedes that it uses the funds from the CEL tokens to also fund its operations.

121. Defendants also were responsible for supporting the Earn Rewards accounts, pooled investors' assets, and controlled those assets.

122. Further, Defendants held and/or hold a significant stake in the Earn Rewards accounts, and thus shared in the profits and risk of the project.

35

iii. **Investors Purchased the Celsius Financial Products with a Reasonable Expectation of Profit from Owning Them**

123.    Investors in the Earn Rewards Accounts, including Plaintiff and the Class, made their investment with a reasonable expectation of profits.  The Earn Rewards accounts were sold to investors prior to a network or "ecosystem" being fully developed on which they could be used.  For pre-functional tokens, such as the Earn Rewards accounts, the primary purpose for purchasing Earn Rewards accounts was to make a profit or accumulate additional "reflections" (*i.e.*, additional tokens of value), rather than to utilize the Earn Rewards accounts themselves for a task.

iv. **Investors Expected Profits from the Earn Rewards accounts to Be Derived from the Managerial Efforts of the Executive Defendants**

124.    Investors' profits in the Earn Rewards accounts were to be derived from the managerial efforts of others – specifically the Company and the Executive Defendant.  Earn Rewards Account Investors relied on the managerial and entrepreneurial efforts of the Executive Defendants to manage, oversee, and/or develop the projects funded by sale of the Earn Rewards accounts.

125.    Purchasers of pre-functional tokens necessarily rely on the managerial efforts of others to realize value from their investments.  The success of these managerial efforts in developing the networks on which these tokens will operate is the primary factor in their price, that is, until such tokens transition into being functional utility tokens.

126.    Each of the Earn Rewards accounts was a security at issuance because profit from the Earn Rewards accounts would be derived primarily from the managerial efforts of Celsius' teams developing the associated networks on which the Earn Rewards accounts would function, rather than having their profit derived from market forces of supply and demand, such as might affect the price of a commodity such as gold (or Bitcoin).

127.    Investors in Earn Rewards accounts relied on the managerial and entrepreneurial efforts of Celsius and the Executive Defendants to manage, market, and develop the so-called Celsius ecosystem.

128.    The Executive Defendants typically held themselves out to investors as experts in the blockchain and crypto field.  Investors in the Earn Rewards accounts reasonably expected the Celsius development teams to provide significant managerial efforts after the Earn Rewards accounts' launch.

129.    Investors in Earn Rewards accounts thus reasonably expected the Company and Executive Defendants to provide significant managerial efforts after the token launch.

130.    This dependency, however, on the managerial efforts of the Company and Executive Defendants was not apparent at issuance to a reasonable investor.  Considering the limited available information about how these Earn Rewards accounts were designed and intended to operate, if such an investor were even able to interpret the relevant law at the time, a reasonable investor lacked sufficient bases to conclude whether the Earn Rewards accounts were securities until the platform at issue, and its relevant "ecosystem," had been given time to develop.  In the interim, the investor lacked the facts necessary to conclude – let alone formally allege in court – that the tokens she had acquired were securities.  It was only after certain revelations that provided more information about Defendants' intent, Celsius' token economics, and how the Executive Defendants operated to hide their ownership in both the Company and the CEL Token, that an investor could reasonably determine that a token that was advertised as something other than a security was a security all along.

### 3. Investors Would Not Reasonably Have Understood that the Financial Products Sold by Celsius Were Securities

131.   In connection with the launch of the Celsius Financial Products, the Company and Executive Defendants made statements that reasonably led Plaintiff and Class members to conclude that the Celsius Financial Products were not securities.

132.   As a threshold matter, the Company refused to register any of the Celsius Financial Products with the SEC, which indicated to investors that these were not securities.  In fact, Celsius touts its application for an exemption from registrations as if it is an actual exemption, which it is not.  No such valid exemption from registration requirements exists for any of the Celsius Financial Products.

133.   At the time of the launch of the Celsius Financial Products, Defendants took advantage of the market's lack of understanding and awareness concerning how cryptocurrency projects – particularly decentralized finance projects – work.  Considering the new technology at issue and the Company's other statements, many investors were understandably unaware that Celsius Financial Products had fundamentally different features than other cryptocurrencies, which the SEC has determined are not securities.

134.   Moreover, the Celsius project was advertised as developing revolutionary and cutting edge blockchain technology that was "high yield" and "low risk" when compared with other existing products.

135.   In addition to claiming Celsius' technical superiority over other cryptocurrencies, the Company also indicated that it would benefit financially and use the funds raised through the sale of the Celsius Financial Products to continue to fund the Celsius-related products (*e.g.*, wallet and exchange) and support the growth of the project.

136.    At the time the Celsius Financial Products were publicly released, Defendants took advantage of the market's lack of understanding and awareness concerning how this investment contract worked.  With promises that Celsius would outperform other cryptocurrencies, many individuals were unaware that the Celsius Financial Products had fundamentally different features than other cryptocurrencies, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all CEL Tokens were issued by Mashinsky and the Company at creation at very little economic cost – and enormous potential upside – to them.

137.    The creation of the Celsius Financial Products occurred through a centralized process, in contrast to Bitcoin and Ethereum.  This however would not have been apparent at issuance to a reasonable investor.  Rather, it was only after the passage of time and disclosure of additional information about the issuer's intent and process of management that a reasonable purchaser could have known that he or she had acquired a security.  Purchasers were thereby misled into believing that the Celsius Financial Products were something other than a security, when it was a security.

138.    Accordingly, it was not apparent to a reasonable investor, at issuance, that the Celsius Financial Products were securities under the law, and a reasonable investor would not have believed they were securities.

### 4.    Guidance from the SEC

### i.    The SEC's 2019 Framework

139.    On April 3, 2019, the SEC published its "Framework for 'Investment Contract' Analysis of Digital Assets" (the "Framework") in which it provided "a framework for analyzing

whether a digital asset is an investment contract and whether offers and sales of a digital asset are securities transactions."[58]

140. The Framework described how to analyze the various facts surrounding an ICO in making the determination of whether a given digital asset is a security.

141. In particular, the Framework provides that the "inquiry into whether a purchaser is relying on the efforts of others focuses on two key issues: Does the purchaser reasonably expect to rely on the efforts of an [Active Participant or "AP"]? Are those efforts 'the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise,' as opposed to efforts that are more ministerial in nature?"[59]

142. The Framework further notes that the "stronger the[ ] presence" of the following factors, "the more likely it is that a purchaser of a digital asset is relying on the 'efforts of others.'"[60]

143. The first factor the SEC looked at was whether an AP is responsible for the development, improvement (or enhancement), operation, or promotion of the network, particularly if purchasers of the digital asset expect an AP to be performing or overseeing tasks that are necessary for the network or digital asset to achieve or retain its intended purpose or functionality.

144. At the time of the Celsius Token launch, Defendants actively marketed the token launch and the Celsius project, thereby necessitating the continued managerial efforts of the Company and Executive Defendants. Where the network or the digital asset is still in development and the network or digital asset is not fully functional at the time of the offer or sale, purchasers

---

[58] https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets (last visited Jul. 12, 2022).

[59] *Id.*

[60] *Id.*

would reasonably expect an AP to further develop the functionality of the network or digital asset (directly or indirectly).

145.     Another factor the Framework considers is whether the AP creates or supports a market for, or the price of, the digital asset.  This includes, *inter alia*, whether the AP "(1) controls the creation and issuance of the digital asset; or (2) takes other actions to support a market price of the digital asset, such as by limiting supply or ensuring scarcity, through, for example, buybacks, 'burning,' or other activities."[61]

146.     As noted above, all of the CEL Tokens in circulation were created at the direction of Mashinsky.

147.     The framework further states that "An AP has a continuing managerial role in making decisions about or exercising judgment concerning the network or the characteristics or rights the digital asset represents[.]"[62]

148.     Here, the Company and Executive Defendants have discussed the long-term prospects on years-long time frames, continually noting how the Celsius ecosystem will "evolve" in the future.

149.     The ability to determine whether and where the digital asset will trade is another factor discussed in the Framework.  For example, "purchasers may reasonably rely on an AP for liquidity, such as where the AP has arranged, or promised to arrange for, the trading of the digital asset on a secondary market or platform."[63]

150.     Here, the Company and Mashinsky are the liquidity providers for the CEL Tokens that are traded publicly.

---

[61]     *Id.*
[62]     *Id.*
[63]     *Id.*

151.    Another factor the Framework notes is whether the AP has the ability to determine who will receive additional digital assets and under what conditions.  This could be, for example, "[m]aking or contributing to managerial level business decisions, such as how to deploy funds raised from sales of the digital asset."[64]

152.    Here, the Company, along with the Controlling Defendants, are the arbiters over the use of the cryptocurrency deposited on Earn Rewards investors.

153.    The Celsius Terms provide that an Earn Rewards investor relinquishes control over the deposited cryptocurrency to Celsius and that Celsius is free to use those assets as it sees fit, including commingling the Earn Rewards investor's cryptocurrency with those of other Earn Rewards investors, investing those pooled assets in the market, and lending them to institutional and corporate borrowers.  Having relinquished control over the deposited cryptocurrency in their Earn Rewards accounts, the Earn Rewards Investors are passive investors.

154.    Specifically, Paragraph 4. D. "Earn Rewards" of the recently-amended Celsius Terms provides:

> Our Earn Rewards service allows you to earn a financing fee from Celsius, referred to as "Rewards," in the form of Digital Assets (either in-kind, i.e. in the same Digital Asset you transfer, or in CEL Tokens, where permitted) in exchange for entering into open-ended loans of your Eligible Digital Assets to Celsius under the terms hereof. If our Earn Service is available to you, upon your election, you will lend your Eligible Digital Assets to Celsius you grant Celsius all rights and title to such Digital Assets, for Celsius to use in its sole discretion while using the Earn Service.[65]

155.    Paragraph 13 of Celsius' recently-amended Terms, "Consent To Celsius' Use of Digital Assets," also describes the status of cryptocurrency deposited with Celsius by Earn Rewards Investors:

---

[64]    *Id.*
[65]    https://celsius.network/terms-of-use (last visited Jul. 12, 2022).

In consideration for the Rewards payable to you on the Eligible Digital Assets using the Earn Service, for us entering into any Loan Agreement, and the use of our Services, you grant Celsius, subject to applicable law and for the duration of the period during which you elect to utilize the Eligible Digital Assets in the Earn Service (if available to you), all right and title to such Eligible Digital Assets, including ownership rights, and the right, without further notice to you, to hold such Digital Assets in Celsius' own Virtual Wallet or elsewhere, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets in Celsius' full discretion. You acknowledge that with respect to the Digital Assets used by Celsius pursuant to this paragraph:

(i)        You will not be able to exercise rights of ownership;

(ii)       Celsius may receive compensation in connection with lending or otherwise using Digital Assets in its business to which you have no claim or entitlement; and

(iii)      In the event that Celsius becomes bankrupt, enters liquidation or is otherwise unable to repay its obligations, any Eligible Digital Assets used in the Earn Service or as collateral under the Borrow Service may not be recoverable, and you may not have any legal remedies or rights in connection with Celsius' obligations to you other than your rights as a creditor of Celsius unders any applicable laws.[66]

156.    Celsius then pools the deposited cryptocurrencies together with Celsius' other assets, to, among other income-generating activities, collateralize Celsius' borrowings, purchase securities and digital assets for Celsius' own account, make loans to institutional and corporate borrowers, and mine for cryptocurrency.

157.    Celsius does not disclose to investors: (a) the amount of money devoted to each of these investment activities; (b) the nature and creditworthiness of the borrowers, as well as the identity of any borrowers to whom Celsius has lent material amounts of cryptocurrency; (c) the

---

[66]        *Id.*

terms and duration of the loans; (d) the types of securities and digital assets it trades; or (e) the profits or losses derived from these activities.

158.    As Celsius' founder, Alexander Mashinsky, stated in an article he authored on March 7, 2021, for the DataDrivenInvestor's website, reposted in the "Media" tab on the Celsius Website, "[u]sers transfer assets with Celsius, Celsius lends funds to institutions and returns up to 80% of earnings to users."[67]

159.    Making other managerial judgements or decisions that will directly or indirectly impact the success of the network or the value of the digital asset generally.

160.    The Framework also remarks that purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset, including, but not limited to, the instances where the AP "has the ability to realize capital appreciation from the value of the digital asset.  This can be demonstrated, for example, if the AP retains a stake or interest in the digital asset."[68]  According to the SEC, in these instances, "purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset."[69]

161.    Here, Mashinsky and Company insiders retain a significant interest in the Celsius project even after selling off many CEL Tokens throughout the Relevant Period.

### ii.    SEC's Previous Statements and Findings

162.    On May 7, 2021, on CNBC's "Squawk Box" television program, chairman of the SEC Gary Gensler stated that "a lot of crypto tokens – I won't call them cryptocurrencies for this

---

[67]    Alex Mashinsky, *How Celsius creates prosperity for retail and institutional investors alike,* DataDrivenInvestor (Mar. 7, 2021), https://medium.datadriveninvestor.com/how-celsius-creates-prosperity-for-retail-and-institutional-investors-alike-cc086084c6bd
[68]    *See* fn.42, *supra.*
[69]    *Id.*

moment – ***are indeed securities***[.]"[70]  (Emphasis added).  In addition to being the Chairman of the SEC, Mr. Gensler is also a world-renowned expert on cryptocurrencies and blockchain technology, having taught the "Blockchain and Money" course at the Sloan School of Management at the Massachusetts Institute of Technology ("MIT").[71]

163.    In a June 14, 2018 speech entitled "Digital Asset Transactions: When Howey Met Gary (Plastic)" that is available on the SEC's website, the following observations were made on "when a digital transaction may no longer represent a security offering."[72]

164.    If the network on which the token or coin is to function is sufficiently decentralized – where purchasers would no longer reasonably expect a person or group to carry out essential managerial or entrepreneurial efforts – the assets may not represent an investment contract. Moreover, when the efforts of the third party are no longer a key factor for determining the enterprise's success, material information asymmetries recede.  As a network becomes truly decentralized, the ability to identify an issuer or promoter to make the requisite disclosures becomes difficult, and less meaningful.

165.    "And so, when I look at Bitcoin today, I do not see a central third party whose efforts are a key determining factor in the enterprise.  The network on which Bitcoin functions is operational and appears to have been decentralized for some time, perhaps from inception."[73]

---

[70]    Jesse Point, *SEC Chairman Gary Gensler says more investor protections are needed for bitcoin and crypto markets*, CNBC (May 7, 2021), https://www.cnbc.com /2021/05/07/sec-chairman-gary-gensler-says-more-investor-protections-are-needed-for-bitcoin-and-crypto-markets.html.

[71]    Lectures and Materials from Chairman Gensler's MIT course are available to the public for free at: https://ocw.mit.edu/courses/sloan-school-of-management/15-s12-blockchain-and-money-fall-2018/video-lectures/session-1-introduction/.

[72]    William Hinman, *Digital Asset Transactions: When Howey Met Gary (Plastic), Remarks at the Yahoo Finance All Markets Summit: Crypto*, SEC (Speech) (Jun. 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418.

166.    A key factor in determining whether a digital asset is a security or not is whether the there is a centralized entity behind the digital asset.[74]

167.    As discussed above, the circumstances surrounding the creation of the Celsius Token demonstrate that an exceedingly small number of centralized insiders maintained exclusive control over the Celsius project.

168.    Finally, the SEC also already concluded that another virtual currency (*i.e.*, DAO tokens) that is substantially similar to Earn Rewards accounts are "securities and therefore subject to the federal securities laws."  As stated by the SEC, "issuers of distributed ledger or blockchain technology-based securities must register offers and sales of such securities unless a valid exemption applies."[75]

169.    Stablecoins in particular have come under scrutiny by regulators recently given the rapid growth of the $130 billion market.

170.    For example, in June 2021 Representative Warren Davidson from Ohio, one of crypto's loudest advocates on Capitol Hill, said that in his view, not all stablecoins should be treated as securities, but stablecoins that specifically are backed by securities should fall under the same sort of regulatory regime: "if you've got a stablecoin that is essentially backed by securities, it gets hard to say that it's not a security."[76]

---

[73]    *Id.*

[74]    *Id.* (noting that the "decentralized structure" of Bitcoin and Ethereum placed these digital assets outside the "disclosure regime of the federal securities laws").

[75]    Press Release, *SEC Issues Investigative Report Concluding DAO Tokens, a Digital Asset, Were Securities*, SEC (July 25, 2017), https://www.sec.gov /news/press-release/2017-131.

[76]    Nikhilesh De, *Opinion – State of Crypto: Stablecoin Rules Are Coming,* CoinDesk.com (Jul. 20, 2021), https://www.coindesk.com/policy/2021/07/20/state-of-crypto-stablecoin-rules-are-coming/.

46

171.    While certain of Celsius' loan products appear to be licensed under various state licensing requirements for money services businesses or money transmitters, the Celsius Earn Rewards product is not currently registered with any federal or state securities regulator, nor is it exempt from registration – as required by law, even though the Earn Rewards product is a "security" and subject to such requirements.

## CLASS ALLEGATIONS

172.    Plaintiff brings this action, individually, and on behalf of a nationwide class, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3), defined as follows:

> All persons who, during the Class Period, purchased Celsius Financial Products and were subsequently damaged thereby.

173.    The Class Period is defined as the period between February 9, 2018 and the date of this filing.[77]

174.    Excluded from the Class are: (a) Defendants; (b) Defendants' affiliates, agents, employees, officers, and directors; (c) Plaintiff's counsel and Defendants' counsel; and (d) the judge assigned to this matter, the judge's staff, and any member of the judge's immediate family.  Plaintiff reserves the right to modify, change, or expand the various class definitions set forth above, based on discovery and further investigation.

175.    **Numerosity**: Upon information and belief, the Class is so numerous that joinder of all members is impracticable.  While the exact number and identity of individual members of the Class is currently unknown, such information being in the sole possession of Luna and/or third parties and obtainable by Plaintiff only through the discovery process, Plaintiff believes, and on that basis

---

[77]    Plaintiff reserves the right to expand or amend the Class Period based on discovery produced in this matter.

alleges, that the Class consists of at least hundreds of people. The number of Class members can be determined based on Luna's and other third party's records.

176. **Commonality**: Common questions of law and fact exist as to all members of the Class. These questions predominate over questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

        a.      whether the Celsius Financial Products are securities under the Securities Act;

        b.      whether the sale of Celsius Financial Products violates the registration of the Securities Act;

        c.      whether Defendants improperly and misleadingly marketed Celsius Financial Products;

        d.      whether Defendants' conduct violates the state consumer protection statutes asserted herein;

        e.      whether Individual Defendants conspired to artificially inflate the price of the Celsius Financial Products and then sell their Celsius Financial Products to unsuspecting investors;

        f.      whether Defendants have been unjustly and wrongfully enriched as a result of their conduct;

        g.      whether the proceeds that Defendants obtained as a result of the sale of Celsius Financial Products, rightfully belongs to Plaintiff and Class members;

        h.      whether Defendants should be required to return money they received as a result of the sale of Celsius Financial Products to Plaintiff and Class members;

        i.      whether Individual Defendants breached the implied covenant of good faith and fair dealing; and

j.    whether Plaintiff and Class members have suffered damages, and, if so, the

nature and extent of those damages.

177.    **Typicality**: Plaintiff has the same interest in this matter as all Class members, and

Plaintiff's claims arise out of the same set of facts and conduct as the claims of all Class members.

Plaintiff's and Class members' claims all arise out of Luna's uniform misrepresentations, omissions,

and unlawful, unfair, and deceptive acts and practices related to the sale of Celsius Financial

Products.

178.    **Adequacy**: Plaintiff has no interest that conflicts with the interests of the Class and

are committed to pursuing this action vigorously.  Plaintiff has retained counsel competent and

experienced in complex consumer class action litigation.  Accordingly, Plaintiff and his counsel will

fairly and adequately protect the interests of the Class.

179.    **Superiority**: A class action is superior to all other available means of fair and

efficient adjudication of the claims of Plaintiff and members of the Class.  The injury suffered by

each individual Class member is relatively small compared to the burden and expense of individual

prosecution of the complex and extensive litigation necessitated by the Company's conduct.  It

would be virtually impossible for individual Class members to effectively redress the wrongs done to

them.  Even if Class members could afford individualized litigation, the court system could not.

Individualized litigation would increase delay and expense to all parties, and to the court system,

because of the complex legal and factual issues of this case.  Individualized rulings and judgments

could result in inconsistent relief for similarly situated individuals.  By contrast, the class action

device presents far fewer management difficulties, and provides the benefits of single adjudication,

economy of scale, and comprehensive supervision by a single court.

180. Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class as a whole.

### FIRST CAUSE OF ACTION

**Unregistered Offering and Sale of Securities in
Violation of Sections 5 and 12(a)(1) of the Securities Act
(Against the Celsius Entities and Individual Defendant Mashinsky)**

181. Plaintiff restates and realleges all preceding allegations above as if fully set forth herein.

182. Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this complaint, and further alleges as follows:

183. Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interest commerce for the purpose of sale or for delivery after sale.

184. Celsius Financial Products are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1).

185. Plaintiff and members of the Class purchased Celsius Financial Product securities.

186. No registration statements have been filed with the SEC or have been in effect with respect to any of the offerings alleged herein. No exemption to the registration requirement applies.

187. SEC Rule 159A provides that, for purposes of Section 12(a)(2), an "issuer" in "a primary offering of securities" shall be considered a statutory seller. 17 C.F.R. §230.159A(a). The Securities Act in turn defines "issuer" to include every person who issues or proposes to issue any security. 15 U.S.C. §77b(a)(4). Celsius is an issuer of Celsius Financial Products.

188. The U.S. Supreme Court has held that statutory sellers under §12(a)(1) also include "the buyer's immediate seller" and any person who actively solicited the sale of the securities to plaintiff and did so for financial gain. *See Pinter v. Dahl*, 486 U.S. 622, 644 n.21, 647 (1988); *accord, e.g.*, *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, No. 00 Civ. 8058, 2001 WL 1111508, at *7 (S.D.N.Y. Sept. 20, 2001). That is, §12(a)(1) liability extends to sellers who actively solicit the sale of securities with a motivation to serve their own financial interest or those of the securities owner. *Pinter*, 486 U.S. at 647; *Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir. 1988). Celsius and the Defendants are all statutory sellers.

189. By reason of the foregoing, Defendants violated Sections 5(a), 5(c), and 12(a) of the Securities Act, 15 U.S.C. §§77e(a), 77e(c), and 77l(a).

190. As a direct and proximate result of Defendants' unregistered sale of securities, Plaintiff and the Class have suffered damages in connection with their Celsius Financial Product purchases.

## SECOND CAUSE OF ACTION

### Violation of Sections 10b of the Securities Act and Rule 10b-5
### (Against all Defendants)

191. Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference paragraphs 1-179, and further alleges as follows:

192. Plaintiff brings this claim for violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78j(b), and Rule 10b-5(b) promulgated thereunder, 17 C.F.R. §240.10b-5(b).

193. Plaintiff brings this claim on behalf of all Class members who purchased Celsius Financial Products from February 9, 2018 to the time of this filing.

194.     The Celsius Financial Products are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1).

195.     Section 10(b) and Rule 10b-5(b) make it illegal, in connection with the purchase or sale of any security, "for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange . . . to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Id.*

196.     Defendants carried out a plan, scheme, and course of conduct that Celsius intended to and did deceive the retail investors - Plaintiff and the other Class members - who acquired Celsius Financial Products pursuant to the March 2021 launch offering and thereby caused them to purchase Celsius Financial Products at artificially inflated prices.

197.     In connection with the March 2021 launch of Celsius Financial Products, Defendants disseminated, approved, and/or endorsed the false statements described herein, which these Defendants knew or recklessly should have known were materially misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not materially misleading.

198.     Defendants employed devices, schemes, and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading; and engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the Class members that resulted in artificially high market prices for Celsius Financial

Products in connection with the March 2021 launch, in violation of Section 10(b) of the Exchange

Act and Rule 10b-5 promulgated thereunder.

### Misrepresentations and Omissions

199.     Defendants' untrue statements and omissions of material facts in connection with the

sale of Celsius Financial Products include at least the following:

a.     On February 5, 2021, Mashinsky made several statements promoting the

Celsius Loans to investors.  In particular, when an investor asked about the circumstances under

which Celsius will liquidate a borrower's collateral, Tal Bentov, the VP Lending (Retail) at Celsius,

replied: "We liquidate only when someone is not answering our margin calls and he/she keeps being

in default.  We give a lot of time.  A lot more than others.  Trust me. Sometimes weeks to answer our

margin calls!"[78]  Near the end of the February 5th AMA, Mashinsky promoted the Earn Rewards

Accounts' ability to "earn" investors various cryptocurrencies "for free."[79]  In order to make those

statements not misleading, Defendants were obligated to disclose that (1) borrowers did not have

flexibility of options when receiving a margin call, but rather faced immediate liquidation without

proper notice, and (2) that the yield rate offered by Celsius was not "free" but rather was provided off

of highly risky, yet undisclosed, investments by Celsius.

b.     On February 26, 2021, Mashinsky participated in the weekly Celsius AMA on

YouTube, discussing, among other things, how Celsius would deal with "handling flash crashes."

Mashinsky stated:

> We don't provide high LTV's. . . .  Celsius doesn't make money by liquidating you.
> We don't charge any fees.  We don't try to give you these gimmicks and special
> rates… Our goal, our mission is to make sure that we have you as a customer for life.
> What are the chances that you're going to stick with us if we liquidated you? Most of

---

[78]     https://www.youtube.com/watch?v=2wqD78AnFaw (last visited Jul. 12, 2022).

[79]     *Id.*

our loans are 25% or 33% LTV loans.  We discourage you from taking 50% LTV loans because that is much higher risk.  ***So Celsius did not have any liquidations, because we give you plenty of time.  We give you advanced notice most of the time, then we tell you you can put more collateral or return some of the dollars or assets back.***  We have almost 0 liquidations.  That's not our business.  It's the opposite of our business.[80]

In order to make those statements not misleading, Defendants were obligated to disclose that borrowers did not have flexibility of options when receiving a margin call, but rather faced immediate liquidation without proper notice.

c.    On April 23, 2021, Mashinsky again made statements regarding Celsius' borrower-friendly stance on liquidations during a Celsius weekly AMA on YouTube.  In particular, Mashinsky stated a "margin call doesn't mean we sold your assets or stole your coins.  That's what the other guys do.  ***We always give you ample time*** to post more collateral, return some of the assets, or instruct us to sell your coins."[81]   (Emphasis added).   In order to make this statement not misleading, Defendants were obligated to disclose that borrowers did not have flexibility of options when receiving a margin call, but rather faced immediate liquidation without proper notice.

d.    On May 28, 2021, Mashinsky promoted the stability and wherewithal of the CEL Token: "Looking at coins, the CEL token was one of the most stable out there.  It did better than Bitcoin or Ethereum. It did not drawdown as much.  Obviously Celsians who held CEL did very well as well."[82]  Mashinsky congratulated the investors that held onto their CEL Tokens during the brief market downturn and bragged that there were "only 20 liquidations" from the 10,000 margin calls that occurred during that time period because Celsius "does a better job than most.  Accommodating, providing enough warning, giving you enough time for doing what's right.  We

---

[80]    https://www.youtube.com/watch?v=cZPy7Pu6vxg&t=3s (last visited Jul. 12, 2022).
[81]    https://www.youtube.com/watch?v=bzEyHLgBY7Y&t=350s (last visited Jul. 12, 2022).
[82]    https://www.youtube.com/watch?v=C7d7rZUEfGo (last visited Jul. 12, 2022).

don't make any money from liquidating you."[83]  Mashinsky proclaimed that "during these drawdowns is when Celsius shines, both from the fact that it does not crash [CEL].  I think NEXO token was down about 75% from top to bottom just last week.  So those are examples of just a different community.  A HODL community versus a speculative community.  Same thing with Binance and other platforms.  Obviously, we only care about doing what's in the best interests of the HODLer."[84]  In order to make those statements not misleading, Defendants were obligated to disclose that (1) borrowers did not have flexibility of options when receiving a margin call, but rather faced immediate liquidation without proper notice, and (2) that the CEL Token was far from stable but rather subject to severe volatility because of Company insider selling pressure.

    e.  On October 9, 2021, Mashinsky stated the following: "Lots to CELebrate here in #London busy week with a lot of large deals and events.  It pays to #HODL."[85]  In order to make those statements not misleading, Defendants were obligated to disclose that, when this statement was made, Mashinsky intended to (and later did) actually sell a portion of his CEL Tokens.

    f.  On December 1, 2021, Celsius held an AMA session on YouTube where investors could ask questions of Celsius representatives.  One investor expressed concern about a "CEL token liquidation cascade" and asked whether Celsius was "worried at all," to which Celsius content manager Zachary Wildes replied "I'm personally not . . . I do think we need to bring a lot more time and attention and focus to CEL token and its utilities.  I'm not concerned about a cascading liquidation event where everyone gets destroyed."[86]  Wildes continued that "We're at a low-point for CEL sentiment and the future of the token" and asked Mashinsky if there was "any level of

---

[83]  *Id.*
[84]  *Id.*

[85]  *See* fn.38, *supra.*
[86]  *See* fn.18, *supra.*

reassurance we can give . . . to the community to show our commitment to CEL token?"[87] Mashinsky responded that "Earning in CEL allows you to earn twice as many CEL right now with the price lower. If you believe in the viability of the company, then you would know you're getting a 50% discount. If you don't believe in it, then you probably don't want these CELs anyway. If you're not sure about it, how about some of the worlds best investors coughing up 750$ Million? They bought into half of all the CEL tokens out there. Our Treasury, which is mostly CEL token. They're part owners of that . . . ."[88] In order to make those statements not misleading, Defendants were obligated to disclose that (1) borrowers did not have flexibility of options when receiving a margin call, but rather faced immediate liquidation without proper notice; (2) that there was a significant risk that a CEL Token liquidation cascade not only could happen, but was likely to happen in the near future; (3) that the Company's successes would not automatically lead to a 50% increase in the CEL Token price in the future; and (4) that Celsius did not, in fact, have the support of well-capitalized backers or the ability to maintain the Company's operations in the event of a price collapse.

g. On December 9, 2021, Mashinsky posted a message on his Twitter account, promoting CEL Tokens as a long-term investment for Company insiders and stating: "All @CelsiusNetwork founders have made purchases of #CEL and are not sellers of the token."[89] In order to make those statements not misleading, Defendants were obligated to disclose that only five days earlier Mashinsky sold over 11,000 CEL Tokens for about $43,000 worth of WBTC.

h. On January 19, 2022, Mashinsky made a series of statements regarding the CEL Token and how it was poised for future growth in use and, more importantly, price. For

---

[87]     *Id.*

[88]     *Id.*
[89]     *See* fn.39, *supra*.

example, when asked about how Celsius generates revenue, Mashinsky responded that "***We always make all of our money from institutions*** . . . We don't charge fees, spreads, all of that stuff."[90]  In order to make that statement not misleading, Defendants were obligated to disclose that depositing digital assets into Earn Rewards Accounts was not akin to depositing money into a savings account and that the profit comes from the Company searching of yield with corporate funds via leveraged positions in DeFi protocols with severe liquidation risk.

**Materiality**

200.    The forgoing misrepresentations and omissions were each material.  These representations related to critical issues concerning the security of Celsius Financial Product holders' investments.

201.    These misrepresentations and omissions related to, among other things:  (i) the extent to which the Defendants and other insiders were restricted from selling substantial amounts of Celsius Financial Products on crypto-asset exchanges; (ii) the extent to which Defendants and its insiders intended to sell their Celsius Financial Product holdings over that same period; and (iii) the extent to which Defendants and its insiders did in fact sell substantial amounts of their Celsius Financial Products crypto-asset exchanges over that same period while simultaneously promoting the same securities as long-term investments.  If a reasonable investor knew that the Company and the Executive Defendants were engaging in highly speculative investments in a volatile crypto market to earn the yield necessary to make good on its promises to investors, then that investor would reasonably expect the price of Celsius Financial Products to be substantially lower, given that the investment would be much riskier.

202.    Accordingly, there is a substantial likelihood that the disclosure of the omitted facts would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

---

[90]    *See* fn.27, *supra.*

**Scienter**

203.    The Company and Executive Defendants acted with scienter in engaging in the forgoing misconduct, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

204.    Indeed, the Company and the Executive Defendants created and controlled the software that determined whether they would have the ability to retain control over funds staked in the Earn Rewards Accounts and CEL Token liquidity pool and whether they could draw on those funds.  They have likewise admitted that they intentionally decided to retain control over funds supposedly "locked" in liquidity pools because they wanted to provide themselves with flexibility to pay for expenses that could arise in the future.

205.    Defendants knew before the 2018 launch that any applicable vesting periods would not preclude the Executive Defendants or their friends and family dumping massive quantities of Celsius Financial Products on the market and Celsius intended to transfer millions of the newly issued Celsius Financial Products to project insiders, and that it, along with those insiders, intended to dump tens of millions of these tokens on crypto-asset exchanges, such that Celsius and its insiders intended to profit massively from the offering, while outside investors would be precluded from doing so.

206.    Indeed, Defendants necessarily knew what restrictions were imposed on their own CEL Tokens, as well as the tokens that they issued and allocated to current and former team members, and to outside investors.  These Defendants likewise knew that they, along with current and former team members, held a significant amount of the total CEL Token supply in circulation, and that if that portion of the Float were sold, the price of the CEL Tokens would plummet and likely cause the collapse of the other Celsius Financial Products.  It was thus highly unreasonable for Defendants to conceal information relating to selling restrictions imposed on them and their insiders' tokens.

207.    Defendants' failure to disclose such information, coupled with their constant promotion of the Celsius Financial Products as being "low risk," demonstrates that these Defendants intended that they and their insiders would sell substantial amounts of CEL Tokens at significant profits at a price that was artificially inflated on and during the weeks and months that followed the CEL Token launch.

208.    The Company and the Executive Defendants had the motive not to disclose these facts because such disclosure would have been self-defeating.  They controlled a significant proportion of Celsius Financial Products, and such a disclosure would decrease the value of those assets.  In other words, they had an incentive to ensure that the price of Celsius Financial Products remained inflated.

209.    These Defendants executed on that plan, too, by (along with current and former team members) selling billions of Celsius Financial Products on the market during that period.

210.    Defendants knew that they had sold Celsius Financial Products on the market on and in the months that followed the Company's launch.  They likewise know that their current and former team members sold Celsius Financial Products:  in addition to Mashinsky's admission of selling some of his CEL Token holdings, Defendants know which CEL Tokens they allocated to team members and can therefore track the transaction history of that CEL Token on the blockchain.

**Reliance, Economic Loss, and Loss Causation**

211.    As a result of the publication and dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the price of the Celsius Financial Products upon issuance on February 9, 2018, and for a period of time, thereafter, were artificially inflated.

212.    In ignorance of the fact that the price of Celsius Financial Products was artificially inflated, and relying directly or indirectly on the false, misleading, and materially incomplete statements that Defendants made and approved, or upon the integrity of the market in which the Celsius Financial Products were sold, or on the absence of material adverse information that these Defendants knew or recklessly should have known of but failed to disclose in public statements,

Plaintiff and the other Class members acquired Celsius Financial Products at artificially high prices and were damaged thereby.

213.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other Class members suffered damages in connection with the respective purchases of Celsius Financial Products and are entitled to an award compensating them for such damages.

214.    Indeed, the price of CEL Tokens dropped significantly as Defendants disclosed, and the market discovered, the truth concerning the CEL Tokens project and its prospects. For example, the price of CEL Tokens went from a high of $7.73 on June 3, 2021, to a low of $0.28 just over a year later on June 12, 2021, in the wake of the June Crisis and Celsius freezing its investors accounts.

215.    In addition, as a direct and proximate result of Defendants' wrongful conduct, Celsius has generated and retained ill-gotten gains in connection with the launch of Celsius Financial Products, such that Plaintiff and the other Class members are entitled to the disgorgement of Celsius' ill-gotten gains acquired from such misconduct.

216.    As a direct and proximate result of Defendants' unregistered sale of securities, Plaintiff and the Class have suffered damages in connection with their Celsius Financial Product purchases.

### THIRD CAUSE OF ACTION

**Violation of Sections 20(a) of the Securities Act
(Against the Celsius Entities and Defendant Mashinsky)**

217.    Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference paragraphs 1-217, and further alleges as follows:

218.    This Count is asserted against the Executive Defendants (collectively, the "Control Person Defendants") under Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a).

219.    The Control Person Defendants, by virtue of their offices, ownership, agency, agreements or understandings, and specific acts were, at the time of the wrongs alleged herein, and

as set forth herein, controlling persons within the meaning of Section 15 of the Securities Act. The Control Person Defendants, and each of them, had the power and influence and exercised the same to cause the unlawful scheme to artificially increase the interest in and price of the Celsius Financial Products, particularly the CEL Token.

220. The Control Person Defendants, separately or together, possess, directly or indirectly, the power to direct or cause the direction of the management and policies of Celsius, through ownership of voting securities, by contract, subscription agreement, or otherwise.

221. The Control Person Defendants also have the power to direct or cause the direction of the management and policies of Celsius.

222. The Control Person Defendants, separately or together, have sufficient influence to have caused the Company to engage in the fraudulent conduct described above.

223. The Control Person Defendants, separately or together, jointly participated in the Company's fraudulent conduct described above.

224. By virtue of the conduct alleged herein, the Control Person Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiff and the Class for rescission and/or damages suffered.

## FOURTH CAUSE OF ACTION

### Violation of Sections 20A of the Exchange Act
### (Against the Celsius Entities and Defendant Mashinsky)

225. Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference paragraphs 1-217, and further alleges as follows:

226. Plaintiff brings this claim under Section 20A of the Exchange Act, 15 U.S.C. §78t-1, against Defendants on behalf of Class members who transacted in CEL Tokens contemporaneously with Defendants' transactions in Celsius Financial Products.

227.    Plaintiff brings this claim on behalf of all Class members who purchased Celsius Financial Products from February 8, 2020, to the present.

228.    Since 2018, the Celsius Entities and Defendant Mashinsky (collectively referred to in this cause of action as the "Section 20A Defendants") have been in possession of material, non-public information about Celsius and its insiders, as set forth above with respect to the Section 20A Defendants' violation of Section 10(b) and Rule 10b-5, while the Section 20A Defendants have been transacting in CEL Tokens.  Section 20A Defendants have thus engaged in insider trading through which they have received at least millions of dollars in profits.

229.    The material, non-public information about Celsius and its insiders that the Section 20A Defendants have failed to disclose, during some or all of the time in which they have been transacting in CEL Tokens since 2018, includes the details of any applicable vesting schedules for Celsius and Celsius insiders; that Defendant Mashinsky was not subject to any vesting schedule; that any applicable vesting periods would allow the Section 20A Defendants to transfer tens of millions of the newly issued CEL Tokens to crypto-asset exchanges; that the Section 20A Defendants intended to deposit tens of millions of these tokens on crypto-asset exchanges; that the Section 20A Defendants intended to profit massively from the offering; that the Section 20A Defendants reserved the right to liquidate their tokens far more than necessary to pay expenses; and that the Section 20A Defendants dumped massive amounts of CEL tokens on the market beginning on 2018.

## FIFTH CAUSE OF ACTION

### Violation of Sections 15 of the Securities Act
### (Against all the Executive Defendants)

230.    Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference paragraphs 1-217, and further alleges as follows:

231.     This Count is asserted against the Executive Defendants (collectively referred to in this cause of action as the "Control Person Defendants") under Section 15 of the Securities Act, 15 U.S.C. §77o.

232.     The Control Person Defendants, by virtue of their offices, ownership, agency, agreements or understandings, and specific acts were, at the time of the wrongs alleged herein, and as set forth herein, controlling persons within the meaning of Section 15 of the Securities Act. The Control Person Defendants, and each of them, had the power and influence and exercised the same to cause the unlawful offer and sale of Celsius Financial Products securities as described herein.

233.     The Control Person Defendants, separately or together, possess, directly or indirectly, the power to direct or cause the direction of the management and policies of Celsius, through ownership of voting securities, by contract, subscription agreement, or otherwise.

234.     The Control Person Defendants also have the power to direct or cause the direction of the management and policies of the Company.

235.     The Control Person Defendants, separately or together, have sufficient influence to have caused Celsius Financial Products and/or the Company to submit a registration statement.

236.     The Control Person Defendants, separately or together, jointly participated in Celsius' failure to register Celsius Financial Products.

237.     By virtue of the conduct alleged herein, the Control Person Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiff and the Class for rescission and/or damages suffered.

### SIXTH CAUSE OF ACTION

**Unjust Enrichment/Restitution**
**(New Jersey Common Law, in the Alternative)**
**(Against the Celsius Entities)**

63

238.    Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference paragraphs 1-217, and further alleges as follows:

239.    Plaintiff and members of the Class conferred a monetary benefit on Defendants by raising the price and trading volume of the Celsius Financial Products, which allowed Defendants to sell their Celsius Financial Products to Plaintiff and Class members at inappropriately and artificially inflated prices.

240.    Defendants received a financial benefit from the sale of their Celsius Financial Products at inflated prices and are in possession of this monetary value that was intended to be used for the benefit of, and rightfully belong to Plaintiff and members of the Class.

241.    Plaintiff seeks restitution in the form of the monetary value of the difference between the purchase price of the Celsius Financial Products and the price those Celsius Financial Products sold for.

**SEVENTH CAUSE OF ACTION**

**Declaratory Judgment**
**(Declaratory Judgment Act, N. J. S. A. 2A:16-51 *et seq.*)**
**(Against the Celsius Entities)**

242.    Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference paragraphs 1-217, and further alleges as follows:

243.    This Count is asserted against the Celsius Entities under Section 2A:16-59 of the New Jersey Revised Statutes.

244.    The Declaratory Judgments Act, N.J. Stat. Ann. § 2A:16-51 *et seq.* (West), authorizes courts to declare rights, status and other legal relations so as to afford litigants relief from uncertainty and insecurity. *Chamber of Com. of U. S. v. State*, 89 N.J. 131, 140 (1982). To maintain such an action, there must be a "justiciable controversy" between adverse parties, and plaintiff must have an interest in the suit.

245.    Plaintiff and the members of the Class have an obvious and significant interest in this lawsuit.

246.    Upon information and belief, each class member who purchased a Celsius Loan product in exchange for a promissory note received a loan agreement that contained misrepresentations and/or omissions of material fact that were made negligently or with the intent to deceive investors about the risks underlying the Celsius Loans.

247.    Plaintiff and class members justifiably relied on the representations by the Celsius entities that the Celsius Loans were a "low risk" way to "earn" interest and that, in the event of a margin call, borrowers would have ample time and opportunity to address the underlying issue.

248.    If the true facts had been known, Plaintiff and the class would not have purchased a Celsius Loan from the Company and/or would have not purchased the Celsius Loan under the same terms.

249.    There is, thus, a justiciable controversy over the legality and enforceability of the Celsius Loan products offering.

250.    Plaintiff seeks an order from the Court declaring that all current and/or open Celsius Loans are (a) unauthorized; (b) wrongfully and fraudulently entered into; and as a result (c) void and unenforceable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually, and on behalf of all others similarly situated, respectfully requests that this Court:

A.    Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying one or more of the Classes defined above;

B.    Appoint Plaintiff as a representative of the Class and his counsel as Class counsel;

C.    Declare that the Company and Executive Defendants offered and sold unregistered securities in violation of Sections 5(a), 12(a), and 15 of the Securities Act;

D.    Declare that all Celsius Loans currently held by the Company are void and unenforceable, and issue an order directing Celsius to rescind any outstanding Celsius Loans;

E.    Award all actual, general, special, incidental, statutory, rescission, punitive, and consequential damages and restitution to which Plaintiff and the Class members are entitled;

F.    Award post-judgment interest on such monetary relief;

G.    Grant appropriate injunctive and/or declaratory relief;

H.    Award reasonable attorneys' fees and costs; and

I.    Grant such further relief that this Court deems appropriate.

## **JURY DEMAND**

Plaintiff, individually and on behalf of the putative Class, demands a trial by jury on all issues so triable.

DATED:  July 13, 2022              **RADICE LAW FIRM**

/s/ John Radice
John Radice (Bar No. 023612004)
475 Wall Street
Princeton, NJ 08540
Telephone: 646-245-8502
Facsimile:  609-385-0745
jradice@radicelawfirm.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Johnathan M. Zimmerman (204322016)
Sean T. Masson (*pro hac vice* forthcoming)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
jzimmerman@scott-scott.com

smasson@scott-scott.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
John T. Jasnoch (*pro hac vice* forthcoming)
jjasnoch@scott-scott.com
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile: 619-236-0508

*Attorneys for Plaintiff and the Proposed Class*