**Exhibit 2**

**WHITE & CASE LLP**
David M. Turetsky
Samuel P. Hershey
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113
Email:  david.turetsky@whitecase.com
           sam.hershey@whitecase.com
– and –

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile:  (312) 881-5450
Email:  mandolina@whitecase.com
           gregory.pesce@whitecase.com

**WHITE & CASE LLP**
Aaron Colodny (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone: (213) 620-7700
Facsimile:  (213) 452-2329
Email: aaron.colodny@whitecase.com

– and –

**WHITE & CASE LLP**
Keith H. Wofford
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile:  (305) 358-5744
Email: kwofford@whitecase.com

*Counsel to the Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>CELSIUS NETWORK LLC, *et al.*,[1]<br><br>           Debtors.<br><br><br>OFFICIAL COMMITTEE OF UNSECURED<br>CREDITORS OF CELSIUS NETWORK LLC, *et al*.,<br>on behalf of the Debtors' estates,<br><br>           Plaintiff,<br><br><br>           v. | ) Chapter 11<br>)<br>) Case No. 22-10964 (MG)<br>)<br>) (Jointly Administered)<br>)<br>) **JURY TRIAL DEMANDED**<br>)<br>)<br>) Adv. Proc. No. __ - _____<br>)<br>)<br>)<br>) |

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these Chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

ALEXANDER MASHINSKY, SHLOMI DANIEL ) LEON, HANOCH GOLDSTEIN, HARUMI ) URATA-THOMPSON, JEREMIE BEAUDRY, ) JOHANNES TREUTLER, KRISTINE MEEHAN ) MASHINSKY, ALIZA LANDES, AM VENTURES ) HOLDING, INC., KOALA1 LLC, ALCHEMY ) CAPITAL PARTNERS LP, BITS OF SUNSHINE ) LLC, and JOHN DOE 1-100. )
)
                    Defendants.    )

---

## COMPLAINT

The Official Committee of Unsecured Creditors (the "**Plaintiff**" or the "**Committee**") of the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**," and together with their non-Debtor affiliates "**Celsius**" or the "**Company**"), by and through its undersigned counsel, derivatively on behalf of and as the representative of the Debtors' estates, as Plaintiff in the above-captioned adversary proceeding, and based upon knowledge, information, belief, and the result of its investigation to date, alleges as follows:

## NATURE OF ACTION

1.      Celsius was founded on the idea that banks were broken.  It promised to provide financial freedom to its account holders by paying them 80% of the gross revenue it received from its investments.  Celsius repeatedly assured its account holders that it safeguarded their assets and advertised that it only invested in safe, market-neutral and well-collateralized investments with reputable counterparties.

2.      Celsius raised capital to fund its business through an initial coin offering, or "ICO," of its own cryptocurrency, the CEL token.  In the summer of 2018, Alexander Mashinsky, the co-founder, director, CEO, and public face of Celsius, announced that Celsius' $50 million ICO was fully funded.  It was off to the races.

3.      The ICO, however, was never fully funded.  Mr. Mashinsky agreed to purchase

$18 million of the CEL tokens that were not sold. But when the time came to pay, Mr. Mashinsky refused. Instead, at Mr. Mashinsky's direction, Shlomi Daniel Leon, another co-founder of Celsius, extended the time by which Mr. Mashinsky had to purchase the tokens and reduced the purchase price. Ultimately, two years later, Mr. Leon let Mr. Mashinsky off the hook, and the $18 million in CEL tokens Mr. Mashinsky promised to purchase were added back to Celsius' balance sheet.

4.      Through a combination of relentless promotion, rising public interest in cryptocurrency, and top-of-the-market interest rates, the number of account holders who transferred assets to Celsius and the total value of those assets grew rapidly. Mr. Mashinsky promoted Celsius' "success" each week on his live "Ask Mashinsky Anything" broadcasts ("**AMAs**") where he encouraged people to give Celsius their cryptocurrency, sit back, and earn weekly rewards.

5.      In contrast to Mr. Mashinsky's public messaging, on the inside Celsius was a mess. Far from being safer than a bank, Celsius repeatedly failed to responsibly hold or invest the assets transferred to its platform by its account holders. In 2020, investment decisions were primarily made by Mr. Mashinsky and Harumi Urata-Thompson, Celsius' Chief Investment and Financial Officer. Those investment decisions were made in an ad hoc manner, with hundreds of millions of dollars' worth of cryptocurrency transmitted to counterparties with little to no diligence.

6.      By the spring of 2021, account holders had transferred over $10 billion of cryptocurrency to Celsius. Celsius tasked two employees with overseeing risk and sorting through the ad hoc deployments made by Mr. Mashinsky, Ms. Urata-Thompson, and other Celsius employees. To the extent Celsius tracked its billions of dollars of investments and various positions across the firm, it did so using a spreadsheet.

7.     Celsius' lack of basic investment controls led to predictable results.  For example, in 2020, Mr. Mashinsky sent billions in assets to KeyFi, Inc. ("**KeyFi**")—an entity that Mr. Mashinsky and Hanoch "Nuke" Goldstein partially owned—to engage in staking and speculative investments.  Customer assets were sent to KeyFi before an agreement was finalized.  Celsius never created proper controls or oversight mechanisms to ensure KeyFi was using its assets as directed, and Celsius is now engaged in litigation with KeyFi to recover over $200 million of losses from that transaction.  Celsius also provided hundreds of millions of dollars of Bitcoin ("**BTC**") and Ethereum ("**ETH**") collateral to a separate entity, Equities First Holdings ("**EFH**"), without even receiving basic financial information from the company.  EFH refused to return Celsius' BTC and now owes Celsius over $395 million.

8.     During this same period, Celsius used BTC transferred by customers to strategically purchase CEL tokens to inflate the token's price.  In late 2020 and early 2021, the Defendants realized that they had not accurately tracked Celsius' assets and liabilities and, because the Defendants were using BTC to purchase CEL tokens, Celsius had significantly more BTC obligations than assets.  As BTC prices skyrocketed and everyone in the crypto industry was making money, Celsius lost ***over $250 million***—a fact that the Defendants did not realize until it was too late.  After that incident, the Defendants knew that Celsius had to better track its assets and obligations—yet, the Defendants ***again*** failed to invest the proper resources into Celsius' financial operations and instead turned to another ineffective, manually updated spreadsheet, which often misrepresented Celsius' position by hundreds of millions of dollars.

9.     The above-described loss was one of many large "poor asset deployment decisions" made by the Debtors in 2020 and 2021.  During that time, Celsius operated at a multiple hundred million dollar loss.  The returns from its investments were not sufficient to meet the bloated

operating expenses incurred by the Defendants and the above-market interest rates the Defendants refused to reduce. *All told, in 2021 alone, the Defendants lost over $1.2 billion*.

10.      As the losses mounted, Mr. Mashinsky, Mr. Leon, Ms. Urata-Thompson, and Mr. Treutler directed Celsius to continue spending *hundreds of millions of dollars* to buy CEL tokens on the open market to prop up the token's price.  Mr. Mashinsky, Ms. Urata-Thompson, and Mr. Johannes Treutler coordinated the timing, price, and size of purchases, each specifically intended to inflate the price of the token.  As the largest holders of CEL tokens, Mr. Mashinsky, Mr. Leon, Mr. Goldstein and the other Defendants profited from the rising price.  Mr. Mashinsky, Mr. Leon, and Mr. Goldstein also directly profited by secretly selling CEL tokens from their private wallets, often around the time when Celsius was purchasing CEL tokens.  Between 2019 and 2022, Mr. Mashinsky sold more than $51.4 million of CEL tokens, Mr. Leon sold more than $8.6 million, and Mr. Goldstein sold more than $2.2 million.  Those sales were often in direct violation of Celsius' policy on trading CEL tokens.

11.      Also in 2021, Celsius hired a new risk management team who immediately became concerned by Mr. Mashinsky's pattern of misrepresentations when promoting Celsius on his AMAs and other engagements.  Mr. Mashinsky's lies included statements about the risk of Celsius' investments, regulatory compliance, the strength of its financials, and non-existent insurance.  Each lie was intended to convince more retail investors to transfer their assets to Celsius.  Celsius' risk team raised concerns to Mr. Mashinsky about his repeated misrepresentations, informed him of the specific inaccuracies and misrepresentations, and asked him to record the AMAs so that the risk, compliance, and other teams could review the videos and remove misstatements before the videos were released to the public.  Mr. Mashinsky refused and continued to lie to the public.  Thereafter, each week Celsius employees would watch Mr.

Mashinsky's AMAs as they were broadcast live.  The employees would then send a list of Mr.

Mashinsky's lies to the media team who would remove the statements and repost the edited video

to the internet.  Each Defendant was aware of the cover up.  Neither the Defendants nor Celsius

ever retracted or corrected any of Mr. Mashinsky's misrepresentations.

12.     It all came to a head in January 2022.  The Defendants were operating a billion

dollar derivatives trading desk, but did not monitor its positions.  The desk was betting that markets

would continue to go up.  As the cryptocurrency market turned, and prices began to drop, the

derivatives desk experienced significant losses.  Mr. Mashinsky, Mr. Leon, and the other officers

were informed of the issue after significant losses had been incurred, but failed to take action for

days.  Finally, after days of additional losses, Mr. Mashinsky took matters into his own hands and

recklessly bet the markets would continue to drop, ordering Celsius' traders to sell ***hundreds of

millions of dollars in cryptocurrency***.  The market recovered before Celsius' employees could

convince Mr. Mashinsky to bring the position even.  Celsius suffered extreme losses as a result of

Mr. Mashinsky's reckless conduct.

13.     Celsius was further crippled in April 2022, when regulatory actions prohibited it

from accepting any further transfers to its Earn program from unaccredited retail investors in the

United States.

14.     In May 2022, the Terra Luna crisis and resulting drain on Celsius' liquidity brought

Celsius to its knees.  After Mr. Mashinsky and Mr. Leon were informed that Celsius would likely

not survive, they and their relatives withdrew substantially all of their non-CEL token

cryptocurrency from the Celsius platform.   In total, the Defendants withdrew more than

$20 million between April 1, 2022 and July 13, 2022 (the "**Petition Date**").

15.     Mr. Mashinsky would often preach that if account holders had questions about

whether they should trust Celsius, they only had to look at him—the largest account holder and CEL token holder—who was putting his money where his mouth was and standing alongside them. Like many other things Mr. Mashinsky said to entice customers to transfer their hard-earned assets to Celsius, those statements were not true. Mr. Mashinsky refused to invest at the beginning, skimmed millions off the top through his secret sales of CEL tokens, and was the first one to jump as the Celsius ship began to sink.

16.      From the beginning, Mr. Mashinsky and the other Defendants placed themselves ahead of Celsius and its account holders. Their reckless and self-interested conduct has left hundreds of thousands of account holders without access to the crypto assets they transferred to the Defendants to safeguard and manage. This lawsuit seeks damages for breaches of the Defendants' fiduciary duties to Celsius and avoidance of actual, preferential, and constructive transfers for the victims of the Defendants' negligent, reckless, and fraudulent conduct.

## JURISDICTION

17.      This adversary proceeding is brought pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

18.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Federal subject matter jurisdiction also exists under 28 U.S.C. § 1332(a) based on complete diversity of citizenship of the parties and because the amount in controversy, exclusive of interests and costs, exceeds $75,000, and under 28 U.S.C. § 1331.

19.      This Court has personal jurisdiction over all of the Defendants pursuant to Bankruptcy Rule 7004. All of the Defendants have maintained minimum contacts with the United States in connection with the claims asserted herein.

20.     Venue in the Southern District of New York is proper under 28 U.S.C. §§ 1408 and 1409 because this adversary proceeding arises under and in connection with cases commenced under the Bankruptcy Code.[2]

## PARTIES[3]

21.     Plaintiff is the Official Committee of Unsecured Creditors appointed on July 27, 2022 by the Office of the United States Trustee pursuant to section 1102(a)(1) of the Bankruptcy Code [Docket No. 148].

22.     The Committee brings this action derivatively on behalf of the Debtors' estates. The Debtors are: Celsius Network LLC; Celsius KeyFi LLC; Celsius Lending LLC; Celsius Mining LLC; Celsius Network, Inc.; Celsius Network Limited; Celsius Networks Lending LLC; Celsius US Holding LLC; GK8 Ltd; GK8 UK Limited; and GK8 USA LLC.  On July 13, 2022, (the "**Petition Date**"), the Debtors, other than GK8 Ltd, GK8 UK Limited, and GK8 USA LLC (collectively, the "**GK8 Debtors**"), filed voluntary petitions for relief in this Court under Chapter 11 of the Bankruptcy Code.  On December 7, 2022, the GK8 Debtors filed voluntary petitions in this Court under Chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code.

23.     Defendant Alexander Mashinsky is one of the founders of Celsius.  Mr. Mashinsky is a director of Celsius Network Limited and Celsius Network, Inc.  He served as the Chief

---

[2] Bankruptcy Rule 7008 requires the Committee to state whether it consents to the entry of final orders or judgments. The Committee has not yet determined its position on this issue but will do so promptly upon a grant of standing and prior to the filing of any final complaint.

[3] Plaintiff reserves the right to name additional defendants, either through the amendment of this complaint if standing is granted, and such defendants are related to the Defendants named herein, or through a subsequent motion for standing to bring claims against additional defendants.

Executive Officer ("**CEO**") of Celsius Network LLC and Celsius Network Limited on or around the time of their inceptions until September 27, 2022.  Mr. Mashinsky also served as CEO of Celsius US Holding LLC, Celsius Lending LLC, Celsius Networks Lending LLC, and Celsius Network, Inc., in addition to serving as Executive Chairman of the Board for Celsius Mining LLC and Secretary of Celsius Network, Inc.  Mr. Mashinsky was a director of Celsius KeyFi LLC, Celsius Mining LLC, Celsius Network LLC, Celsius Lending LLC, Celsius US Holding LLC, and Celsius Networks Lending LLC from their inception to September 27, 2022.  Upon information and belief, Mr. Mashinsky served on (1) the New Business Committee from its inception until it was disbanded in July 2021, (2) the Executive Committee ("**ExCO**") from its inception until the end of his tenure at Celsius, (3) the Assets and Liabilities Committee ("**ALCO**") from its inception in July 2021 until the end of his tenure at Celsius, (4) the Risk Committee from its inception in December 20, 2020 until on or around August 2021, (5) the Assets & Obligations Committee ("**A&O Committee**") from its inception on April 7, 2020, until it was disbanded, (6) the Deployment Committee as its chair from its inception on April 7, 2020 until it was disbanded, and (7) the Investment Committee in or around 2020.  Mr. Mashinsky regularly attended, participated in, and received materials from the New Business Committee, ExCO, ALCO, Risk Committee, A&O Committee, Deployment Committee, and Investment Committee meetings during his time at Celsius, even if he was not a member of the applicable committee at the time.  At all times relevant to this Complaint, Mr. Mashinsky controlled the Debtors through his 83.7% equity stake in Debtor Celsius Network Inc., a Delaware corporation, which is a majority owner of Celsius Network Limited, which wholly owns Celsius US Holding LLC, which is the sole owner of Celsius Network LLC.  Upon information and belief, Mr. Mashinsky maintains a residence and conducts or conducted business in or directed at New York for the time period relevant to this Complaint.

24.     Defendant Shlomi Daniel Leon is one of the founders of Celsius.  He is a director of Celsius Network, Inc. and Celsius Network Limited. He served as the Chief Strategy Officer ("**CSO**") of Celsius Network Limited and Celsius Network LLC on or around the time of each of their inception until September 27, 2022.  He served as Chief Operating Officer ("**COO**") of Celsius Network Limited and Celsius Network LLC from on or around each of their inception until January 3, 2022.  Mr. Leon was the CSO of Celsius Lending LLC, President of Celsius Mining LLC, and COO of Celsius Network, Inc. and of Celsius Networks Lending LLC.  He was a director of Celsius KeyFi LLC, Celsius Lending LLC, Celsius Mining LLC, Celsius Network LLC, Celsius Networks Lending LLC, Celsius US Holding LLC, and GK8 USA LLC.  Upon information and belief, Mr. Leon served on (1) the ExCO from its inception until the end of his tenure at Celsius, (2) the ALCO from its inception in July 2021 until the end of his tenure at Celsius, (3) the Risk Committee from December 20, 2020 until on or around December 2021, (4) the A&O Committee from its inception on April 7, 2020 until it was disbanded, the (5) the New Business Committee from its inception until it was disbanded in July 2021, and (6) the Investment Committee in or around 2020.  Upon information and belief, Mr. Leon regularly attended, participated in, and received materials from the ExCO, ALCO, Investment Committee, Risk Committee, New Business Committee, and A&O Committee meetings during his time at Celsius, even if he was not a member of that committee at the time.  Upon information and belief, Mr. Leon maintains a residence in New Hampshire and conducts or conducted business in or directed at New York.

25.     Defendant Hanoch "Nuke" Goldstein is one of the founders of Celsius.  Mr. Goldstein served as the Chief Technology Officer ("**CTO**") of Celsius Network LLC, Celsius Lending LLC, and Celsius Network Limited from on or around the time of their inceptions until

March 21, 2022.  Mr. Goldstein currently serves as the President of Labs at Celsius Network LLC and Celsius Network Limited.  Mr. Goldstein served on the ExCO from its inception until the end of his tenure at Celsius, and the Risk Committee from on or around September 2021 until March 2022.  Upon information and belief, Mr. Goldstein regularly attended, participated in, and received materials from the ExCO and Risk Committee meetings during his time at Celsius, even if he was not a member of that committee at the time.  Upon information and belief, Mr. Goldstein maintains a residence in Florida and conducts or conducted business in or directed at New York.

26.     Defendant Harumi Urata-Thompson served as the Chief Financial Officer ("**CFO**") of Celsius Network Limited and Celsius Network, Inc. from April 2020 to November 2021 and Chief Investments Officer ("**CIO**") of the same entities from February 2020 to November 2021.  Upon information and belief, Ms. Urata-Thompson served on (1) the ALCO from its inception in July 2021 until the end of her tenure at Celsius, (2) the New Business Committee from the beginning of her employment with Celsius until it was disbanded in July 2021, (3) the Risk Committee from its inception on December 20, 2020 until the end of her tenure at Celsius, (4) the Deployment Committee as its chair from its inception on April 7, 2020 until it was disbanded, (5) the A&O Committee from its inception on April 7, 2020 until it was disbanded, (6) the Investment Committee in or around 2020, and (7) the ExCO from the beginning of her employment with Celsius until the end of her tenure at Celsius.  Upon information and belief, Ms. Harumi Urata-Thompson regularly attended, participated in, and received materials from the ExCO, ALCO, New Business Committee, Investment Committee, Deployment Committee, A&O Committee, and Risk Committee meetings during her time at Celsius, even if she was not a member of the applicable committee at the time.  Upon information and belief, Ms. Urata-Thompson maintains a residence and conducts or conducted business in or directed at New York.

27.     Defendant Jeremie Beaudry served as General Counsel, Chief Compliance Officer ("**CCO**"), and Secretary to the Board of Celsius Network Limited from April 7, 2020 to September 2021.  Mr. Beaudry was CCO of Celsius Lending LLC and Celsius Networks Lending LLC from its inception until September 2021.  Upon information and belief, Mr. Beaudry served on the (1) Risk Committee from April 2021 to July 2021, (2) the A&O Committee as its chair from its inception on April 7, 2020 until it was disbanded, (3) the Regulatory Committee from its inception on April 7, 2020 until the end of his tenure at Celsius, and (4) the ExCO from the beginning of his employment with Celsius until the end of his tenure at Celsius.  Upon information and belief, Mr. Beaudry regularly attended, participated in, and received materials from the A&O Committee, ExCO, Regulatory Committee, and Risk Committee meetings during his time at Celsius, even if he was not a member of that committee at the time.  Upon information and belief, Mr. Beaudry maintains a residence in Georgia and conducts or conducted business in New York.

28.     Defendant Johannes Treutler was the Head of CeFi Trading of Celsius Network Limited from October 2019 to January 2022.  During that time, among other things, Mr. Treutler directed the purchase of CEL tokens on public markets and exchanges and oversaw the execution of Celsius' exchange traded strategies.  Upon information and belief, Mr. Treutler regularly attended, participated in, received materials from, and prepared information for the Investment Committee and ExCO during his time at Celsius, even if he was not a member of the applicable committee at the time.  Upon information and belief, Mr. Treutler lives in Berlin, Germany and conducted business in or directed at New York.

29.     Defendant Aliza Landes served as the Head of Business Development for EMEA at Celsius Network Limited from January 2018 to March 2019.  Ms. Landes served as the Vice President of Lending at Celsius Network Limited, Celsius Lending LLC, and Celsius Network

LLC from its inception until January 2022.  Ms. Landes served on the Risk Committee from on or around September 2021 until November 2021.  Upon information and belief, Ms. Landes regularly attended, participated in, and received materials from Risk Committee meetings during her time at Celsius, even if she was not a member of that committee at the time.  Ms. Landes is the spouse of Defendant Shlomi Daniel Leon.  Upon information and belief, Ms. Landes maintains a residence in Tel Aviv, Israel and conducts or conducted business in or directed at New York.

30.    Defendant Kristine Meehan Mashinsky is the spouse of Defendant Alexander Mashinsky.  Upon information and belief, Mrs. Mashinsky maintains a residence and conducts or conducted business in or directed at New York.

31.    Defendant AM Ventures Holding, Inc. ("**AMV**") is a corporation incorporated under the laws of the State of Delaware.  Upon information and belief, AMV is wholly-owned by Defendant Alexander Mashinsky.  AMV agreed to purchase CEL tokens in connection with the ICO of Celsius Network Limited and conducted business in New York.

32.    Defendant Koala1 LLC is a limited liability company incorporated under the laws of the State of Delaware.  Upon information and belief, Koala1 LLC is owned by Defendant Alexander Mashinsky.  Koala1 LLC maintained an account with Celsius.  At times relevant to the conduct complained of herein, Koala1 LLC conducted business in or directed at New York.

33.    Defendant Alchemy Capital Partners LP ("**Alchemy**") is a limited partnership incorporated under the laws of the State of Delaware.  Upon information and belief, Alchemy is controlled by Defendant Shlomi Daniel Leon.  At times relevant to this Complaint, Alchemy conducted business in or directed at New York.

34.    Defendant Bits of Sunshine LLC is a limited liability company incorporated under the laws of the State of Delaware. Upon information and belief, is controlled by Defendant Hanoch

Goldstein.  At times relevant to this Complaint, Bits of Sunshine LLC conducted business in New York.

35.    Collectively, Defendants Alexander Mashinsky, Shlomi Daniel Leon, Hanoch "Nuke" Goldstein, Harumi Urata-Thompson, and Jeremie Beaudry are referred to as the "**D&O Defendants**" throughout this Complaint.

36.    Defendants John Doe 1-100 ("**John Doe Defendants**") are the presently unknown persons or entities who received the transfers at issue in this Complaint for the benefit of the Defendants and/or are the immediate or mediate transferee(s) of the initial transfer(s) at issue in this Complaint.  Once the identity of the John Doe Defendants is known, Plaintiff will file an amended complaint.

## STATEMENT OF FACTS

### I.    The Launch of Celsius and Initial Coin Offering

37.    Celsius was started by Mr. Mashinsky and Mr. Leon in 2017.  The business idea was described in a whitepaper, which Celsius used to solicit capital through the public initial coin offering of the CEL token (the "**ICO**").  Celsius planned to offer two primary products.  First, customers could transfer their cryptocurrency assets to Celsius in exchange for weekly interest. Celsius said it would lend those cryptocurrency assets to hedge funds, family offices, and crypto funds to "make the most of their greed" and generate yield.  Second, Celsius would "allow its members to use their crypto holdings as collateral in order to secure low interest loans in dollars."

38.    Mr. Mashinsky and Mr. Leon advertised that "Banking is Broken" and that Celsius' product would be for "[t]he 99% not the 1%."  Mr. Mashinsky decried that banks take depositors' money to make large profits for their shareholders while only paying a fraction of interest to their depositors.  By contrast, Mr. Mashinsky's motto was that Celsius would pay 80% of its gross

revenue to customers.

39.     Celsius raised the money to launch its business by selling the CEL token.[4]   The whitepaper explained that the CEL token was necessary because Celsius' "lending and borrowing model requires a blockchain and open ledger," which would be key to transparency on the platform.

40.     The late 2010s were known as the "ICO boom."   Coins (and scams) were common, and a successful ICO was perceived as the key to a project's successful start.   Celsius said it would mint 650,000,000 CEL tokens.   It offered half of those tokens (325,000,000) for sale for $0.20-0.30 per token.   The Celsius team was scheduled to receive 123,500,000 CEL tokens (19%) and partners and advisors would receive 26,000,000 CEL tokens (4%).

41.     If all 325,000,000 CEL tokens were sold, Celsius would raise approximately $50,000,000.   The whitepaper provided that any of the 325,000,000 CEL tokens offered that went unsold would be "burned" or destroyed.   It provided how Celsius would use that $50,000,000 to fund its operations, loan reserves, research and development, sales and marketing, and an insurance pool.

42.     On March 28, 2018, Mr. Mashinsky executed a token sale agreement with Celsius Network Limited on behalf of his corporation AMV (the "**Token Sale Agreement**").   Mr. Leon signed the Token Sale Agreement on behalf of Celsius Network Limited.   Under the Token Sale Agreement, Mr. Mashinsky agreed to purchase up to 90,000,000 of the CEL tokens not sold in the ICO for $18 million.   Mr. Mashinsky would receive a bonus of 30% more CEL tokens (*i.e.*, a total of 117,000,000 CEL tokens or 36% of the total amount of CEL tokens to be sold).   The purchase

---

[4] The CEL token uses the ERC-20 standard.   The ERC-20 standard defines a common list of rules that ERC-20 tokens must adhere to, including how the tokens can be transferred, how transactions are approved, and the total supply of tokens.   Transactions of ERC-20 tokens are processed and documented on the Ethereum blockchain.

was to be settled 90 days after March 28, 2018.  The Token Sale Agreement provided that the purchase was "final, and there are no refunds or cancellations . . . ."

43.    On April 30, 2018, Celsius filed a Notice of Exempt Offering of Securities (Form D) with the United States Securities and Exchange Commission, disclosing that it had sold $24,527,033 of the $50,000,000 of CEL tokens offered, including to 1,343 unaccredited investors. That filing was never updated, but Celsius' records indicate that it ultimately sold $32 million or 203 million CEL tokens.

44.    On May 17, 2018, at the Blockchain Week NYC conference, Mr. Mashinsky told many reporters that the ICO was fully funded and Celsius had raised $50 million.  He repeated similar statements on multiple media outlets.

45.    Mr. Mashinsky, however, refused to purchase the 117,000,000 CEL tokens that he had promised to buy.  It is unclear whether he purchased *any* CEL tokens as part of the ICO.

46.    In early September 2018, Mr. Mashinsky instructed Mr. Leon to extend the Token Sale Agreement by 12 months and to change the price of the purchase obligation to the current market price ($0.06 vs. the $0.20 previously agreed sale price) to avoid a "tax hit."

47.    More than a year later, Mr. Mashinsky persisted in his refusal to purchase the 117,000,000 CEL tokens he promised to purchase.  To settle the unfulfilled obligations in the Token Sale Agreement, AMV entered into a loan agreement in which Celsius Network Limited "lent" AMV $7,020,000 collateralized with the 117,000,000 CEL tokens (which Mr. Mashinsky had not purchased) and common shares of Celsius (the "**AMV Loan**").  Mr. Mashinsky signed for AMV and Mr. Leon signed for Celsius.  Celsius employees, including Celsius' then CFO, struggled to understand how Mr. Mashinsky could take a loan collateralized by assets he did not own.  It is unclear whether any fiat currency changed hands under the AMV Loan.

48.      Between September 2018 to April 7, 2020, CEL token traded between $0.03 and $0.17.  On April 7, 2020, CEL token was trading at approximately $0.08, in contrast to the original $0.20 price Mr. Mashinsky had agreed to pay in the Token Sale Agreement.

49.      At Celsius' April 7, 2020 board meeting, the board appointed Defendant Jeremie Beaudry as General Counsel, Chief Compliance Officer, and Secretary, and Defendant Harumi Urata-Thompson as Chief Financial Officer.  Following these appointments, the board discussed issues regarding AMV's agreement to buy CEL tokens and noted that Celsius Network Limited and AMV had terminated the Token Sale Agreement at some point before the meeting.  The board resolved to keep the 117,000,000 CEL tokens that Mr. Mashinsky refused to purchase in a segregated account.  The board resolution was approved by Mr. Leon and Patrick Martin, a large holder of CEL tokens, whose company had been appointed to the board that day to consider the board resolution.  Despite Celsius' promise in the whitepaper to burn any of the 325,000,000 CEL tokens that were not sold, the 117,000,000 CEL tokens were not burned.  Instead, those CEL tokens were deposited in a segregated wallet at the direction of the Mr. Leon and Mr. Martin, to obscure their return from the public.

50.      The board eventually resolved to move the 117 million CEL tokens to Celsius' treasury.  In June 2020, Celsius employees, including Ms. Urata-Thompson, discussed whether Celsius' customers would react negatively to the return of the 117,000,000 CEL tokens to Celsius' treasury more than two years after the ICO.  Ms. Urata-Thompson determined that they would need to "find a good story" and "well-crafted information" to explain why the 117,000,000 CEL tokens were not purchased.  Defendant Johannes Treutler, who was in charge of the purchase of CEL tokens, told Ms. Urata-Thompson that he had told Mr. Leon about similar concerns.  Mr. Leon and Mr. Mashinsky subsequently voted to return the 117,000,000 CEL tokens to the treasury.

51.     Shortly after Mr. Leon and Celsius absolved Mr. Mashinsky of his commitment to purchase CEL tokens, Celsius raised equity from Celsius' customers through a crowd-sourced funding round arranged and sponsored by BNKtotheFuture.com, an online platform that primarily offers equity investments in cryptocurrency companies.

## II.    **The CEL Token**

52.     Mr. Mashinsky described the CEL token as the "backbone of Celsius." Celsius account holders could elect to receive weekly rewards payments (or interest) in CEL tokens. Interest in CEL tokens was paid at a higher rate than if the account holder elected to receive interest in the deposited cryptocurrency (*i.e.*, in-kind).

53.     As set forth in the table below, the Defendants were among the largest holders of CEL tokens.

| CEL Tokens Owned By Defendants[1] | 7/14/2021 | 7/12/2022 |
|---|---|---|
| Alexander Mashinsky | 70,056,514 | 70,096,767 |
| Shlomi Daniel Leon | 15,929,760 | 15,934,635 |
| Hanoch "Nuke" Goldstein | 9,595,765 | 9,705,806 |
| Kristine Meehan Mashinsky | 5,292,918 | 2,117,023 |
| Jeremie Beaudry | 1,052,342 | 274,249 |
| Harumi Urata-Thompson | 629,134 | 315,487 |
| Johannes Treutler | 537,484 | 535,928 |
| **Total Defendants CEL Balance** | **103,093,917** | **98,979,895** |
| **Treasury CEL Balance** | **281,595,547** | **284,568,835** |
| **Available CEL Supply[2]** | **695,658,161** | **692,753,441** |

*Notes:*
*1. Balances include related entities and collateral related loans. Balances include (i) on platform holdings as disclosed in the Debtors' Schedules and Statements of Financial Affairs, and (ii) Defendants' known wallets.*
*2. The total supply of CEL was fixed at 700 million. Celsius periodically destroyed or burned certain of those CEL token. As of the last CEL burn transaction, dated June 10, 2022, approximately 693 million CEL tokens existed, per Etherscan.*

Between September 30, 2021 to June 30, 2022, insiders, employees, and Celsius' treasury owned approximately 70% of all CEL tokens.

54.     Celsius used a flywheel diagram to demonstrate the benefits the CEL token was purported to provide to token holders and Celsius.



The flywheel evolved over time, but the general concept was that customers would deposit digital assets onto the Celsius platform. Celsius would lend the coins to third parties to earn yield. Celsius would use the return from its investments to buy CEL tokens on the market. Celsius would pay interest in CEL token to electing holders, whose balances would increase. Celsius would earn yield on the increased balances and pay its users more interest in CEL tokens.

### 1.    *CEL Token Utility*

55.    The CEL token had limited utility.[5]  Celsius provided that users could use CEL tokens to pay interest on their retail loans at a lower interest rate than if interest was paid in dollars or stablecoins.[6]  Celsius also created membership tiers, where users who held more CEL tokens would receive early access to future Celsius products.  CEL tokens were also provided to employees as part of their compensation.

---

[5] The CEL token was easily gamed by certain Celsius customers.  Certain account holders who elected to earn interest in CEL tokens would immediately sell the tokens (or swap it on Celsius) for BTC, ETH, or stablecoins.  The Company frequently bought those CEL tokens on the open market as part of its buybacks using BTC, ETH, and stablecoins.  In essence, the Company was paying the increased interest rate with in-kind assets (or stablecoins, which it borrowed at an additional cost to the Company).  The Defendants were aware that Celsius' customers were taking advantage of the Company and the resulting losses to the Company, but did not take any action to stop the bleeding.  Rather, they encouraged it by reducing the amount of CEL tokens account holders had to hold to swap CEL tokens for BTC, ETH, and stablecoins.

[6] Stablecoin is a term used to describe a cryptocurrency, such as USDC or USDT, whose value is tied or pegged to fiat currency through an algorithm or reserves.

56.     The Defendants hoped that the CEL token could be used as collateral to borrow other currency and generate yield from third parties.  That never happened.  In fact, Celsius was virtually the only entity that would accept CEL tokens as collateral.  Celsius offered fiat and stablecoin margin loans to employees and certain retail customers collateralized by their CEL tokens.  Mr. Leon and Mr. Goldstein both monetized their CEL token holdings by taking multi-million dollar loans from Celsius collateralized by CEL tokens.[7]  Both Mr. Leon and Mr. Goldstein posted substantially all of their CEL tokens on the platform as collateral for their CEL token backed loans.  As Celsius' Global Treasury Director put it, the loans allowed the insiders to "us[e] the company" as a "piggybank."  Both Mr. Goldstein and Mr. Leon have refused to repay their loans.

57.     The Company's strategy of accepting CEL tokens as collateral proved costly.  As the price of the CEL token dropped precipitously in the summer of 2022 and loans collateralized by CEL tokens hit margin calls and were liquidated, Celsius foreclosed on the CEL collateral.  At the end of the day, the borrowers kept the fiat or stablecoins loaned and Celsius was left with the CEL token collateral, whose continued value is far from certain.[8]

## 2.     Defendants Caused Celsius to Spend Hundreds of Millions to Inflate the Price of the CEL Token

58.     From 2018 through June 2022, Celsius used BTC, ETH, and stablecoins to purchase CEL tokens on public markets through exchanges or its over-the-counter trading desk.  At the direction of Mr. Mashinsky, Ms. Urata-Thompson, and Mr. Treutler, Celsius strategically sized

---

[7] Alchemy Capital Partners LP, an entity associated with Mr. Leon, received a $4 million loan in April 2022 that is collateralized by 15,027,916 CEL tokens.  Mr. Goldstein received a $4.2 million loan that is collateralized by 9,628,852 CEL tokens.  It appears that as CEL token prices declined rapidly in the summer of 2022, unlike other account holders, both Mr. Leon and Mr. Goldstein were allowed grace periods to provide additional collateral for their CEL-backed loans.  Mr. Beaudry also had a $200,000 loan that was collateralized by CEL tokens which he repaid on February 25, 2022.

[8] While CEL token has a market value of ~$0.51 (as of the date of this filing), that market price is based on a thinly-traded amount as the vast majority of CEL token is locked in the Celsius platform.

and timed its purchases of CEL tokens to prop-up the market price of the CEL token.  Celsius said

that it purchased CEL tokens weekly to pay rewards.  The amount of CEL tokens purchased,

however, was determined in an ad hoc manner by Mr. Mashinsky, Ms. Urata-Thompson, and Mr.

Treutler, who provided specific price targets to support (including resting buy orders at set prices)

and amounts to be purchased.  On certain occasions, they directed CEL tokens to be purchased

during Mr. Mashinsky's public AMAs to encourage retail investors to purchase CEL tokens.  As

described in further detail below, Ms. Urata-Thompson and Mr. Treutler also monitored large CEL

token sales by Mr. Mashinsky, Mr. Leon, and Mr. Goldstein on centralized and decentralized

exchanges and directed Celsius to purchase CEL tokens to support the falling price due to the

increase in supply resulting from the directors' and officers' sales.  While Ms. Urata-Thompson

and Mr. Treutler complained to one another about Mr. Mashinsky's large sales of his CEL tokens

at times when Celsius was purchasing CEL tokens, both continued to facilitate the purchases,

spending company assets to inflate the price of the CEL token after such sales.

59.    In July 2020, Celsius implemented a policy that restricted sales of CEL tokens by

executive officers and directors of Celsius.  The policy specifically prohibited, among other things,

officers and directors from buying and selling CEL tokens if they knew material non-public

information and any sale or purchases in an amount more than $20,000 per day or $50,000 per

week.

60.    Between December 25, 2020 and January 8, 2021, the CEL token increased in value

from $3.80 to $5.50.  Mr. Mashinsky, Mr. Leon, and Mr. Goldstein each sold significant amounts

of CEL tokens on each day during that period.  In total, during that period, Mr. Mashinsky sold

1,231,486 CEL tokens (with a market value of $6,161,533.53), Mr. Leon sold 529,013 CEL tokens

(with a market value of $2,540,508), and Mr. Goldstein sold 200,000 CEL tokens (with a market

value of $1,053,253) on Uniswap and several other exchanges.[9]  Each sale violated Celsius' trading

policy.  Many of the CEL tokens sold by the Defendants were purchased by Celsius through resting

buy orders Mr. Treutler had placed at specific price targets.

61.    Ms. Urata-Thompson and Mr. Treutler were aware of the Defendants' sales and

their downward effect on the price of the CEL token.   Ms. Urata-Thompson specifically

acknowledged that Mr. Mashinsky's sales violated Celsius' newly-enacted policy on CEL token

trading, but, nevertheless, she directed Mr. Treutler to "support the market" by purchasing more

CEL tokens.

62.    In the first four months of 2021, Mr. Treutler continued to purchase more CEL

tokens than Celsius paid out in interest, contrary to what Celsius was telling the public.  And, Mr.

Mashinsky and Mr. Leon continued to sell CEL tokens on the Uniswap protocol.  In a 14-day

period between March 14, 2021 and March 28, 2021, Mr. Mashinsky sold 346,243 CEL tokens

with a market value of $1,713,448.  On March 21, 2021, Mr. Mashinsky directed Ms. Urata-

Thompson to purchase CEL tokens on the public market and take half from treasury.  Ms. Urata-

Thompson relayed the message to Mr. Treutler and asked him to make sure "to keep a low profile

for now."

63.    Each of the D&O Defendants was aware that insiders were selling CEL tokens.  On

May 4, 2021, a presentation to the ExCO disclosed that more than 90% of the entities that sold

---

[9] Uniswap is a decentralized exchange that operates on the Ethereum blockchain.  Uniswap operates through an automated liquidity protocol.  Entities provide coins to liquidity pools on Uniswap that create a fund to execute trades. Each liquidity pool is specific to a certain pair of coins.  In return the liquidity providers receive a fee.  Users can execute coin swaps with the liquidity pools, selling one coin in exchange for the other.  The exchange rate of the coins is determined through an automated market maker system, which determines the exchange rate using an algorithm that takes into account the relative supply of coin currently held by the liquidity pool.  Mr. Mashinsky both sold CEL tokens on Uniswap and provided CEL tokens as a liquidity provider.  The figures cited above only include sales and not amounts staked as a liquidity provider.

CEL tokens on the over-the-counter market and more than half of the entities that sold CEL tokens in exchanges in the prior week were employees, family of employees, friends, or the top-five CEL holders.  Between 2019 to 2022, Mr. Mashinsky, Mr. Leon, and Mr. Goldstein sold the following net amounts of CEL tokens through centralized and decentralized exchanges:[10]

| Year | Net Sales From Known Mashinsky Wallets | | Net Sales From Known Leon Wallets | | Net Sales From Known Goldstein Wallets | |
|---|---|---|---|---|---|---|
| | Total USD Value | Number of CEL Tokens | Total USD Value | Number of CEL Tokens | Total USD Value | Number of CEL Tokens |
| 2019 | $204,760.00 | 2,631,204.69 | $0.00 | 0.00 | $0.00 | 0.00 |
| 2020 | $10,372,980.00 | 10,166,309.49 | $2,532,368.00 | 746,512.74 | $1,189,119.00 | 1,723,183.87 |
| 2021 | $36,136,299.00 | 6,473,502.90 | $5,711,963.00 | 1,009,001.62 | $402,634.00 | 58,387.60 |
| 2022 | $4,705,040.00 | 3,389,611.00 | $395,719.00 | 140,924.05 | $622,720.00 | 229,246.14 |
| **TOTAL**[11] | **$51,419,079.00** | **22,660,628.08** | **$8,640,050.00** | **1,896,438.41** | **$2,214,473.00** | **2,010,817.61** |

64.    From its inception to the Petition Date, Celsius spent ***hundreds of millions of dollars*** to purchase CEL tokens on the open market to inflate the price of the token at the direction of Mr. Mashinsky, Ms. Urata-Thompson, and Mr. Treutler.  No one at Celsius has been able to provide an estimate of the total amount Celsius spent purchasing CEL tokens.  Nor does it appear that the Company kept track of the expense on its financial statements.  In May 2022, hoping to halt the enormous expense of supporting the CEL token, concerned Celsius employees attempted

---

[10] Mr. Mashinsky repeatedly and falsely claimed in AMAs and on Twitter that he was not a seller of CEL token.  For example, in a November 5, 2021 AMA, Mr. Mashinsky addressed "rumors" that he had sold CEL tokens in recent weeks, stating that he had actually bought "something like 30,000 CEL token last few days.  If you think I'm selling, I'm not selling, I'm buying" but that it did not matter as "you have to make your own decisions."  In the month before that AMA, Mr. Mashinsky had sold a significant amount of CEL tokens.  He continued to sell CEL tokens after that AMA as well.  On December 9, 2021, Mr. Mashinsky posted to Twitter, "All @CelsiusNetwork founders have made purchases of #CEL and are not sellers of the token."

[11] The amounts in the table above are based on public blockchain data from cryptocurrency wallets which have been identified as being owned by Mr. Mashinsky, Mr. Leon, and Mr. Goldstein.  The report by the Examiner appointed in the Debtors' Chapter 11 cases also identified sales of CEL tokens from private wallets associated with Mr. Mashinsky, Mr. Leon, and Mr. Goldstein.  While the amounts identified by the Examiner and the Committee are slightly different, the Committee and the Examiner have come to the same conclusion; Mr. Mashinsky, Mr. Leon, and Mr. Goldstein each sold millions of dollars' worth of CEL tokens from 2019 through 2022.

to calculate the cost to the Company.  They estimated that Celsius had already spent **more than $50 million that year** purchasing CEL tokens.  The total amount of CEL tokens purchased by Celsius at the direction of Mr. Mashinsky, Ms. Urata-Thompson, Mr. Treutler and others from 2019 to 2022 **exceeds $500 million**.

65.    Celsius took assets from its general omnibus wallets (where all customer funds were accepted and commingled) to fund its purchases of CEL tokens.  Celsius operated at a multiple hundred million dollar loss in each of 2020, 2021, and 2022.  Even if Celsius' intent was to use its profits to purchase CEL tokens, it simply did not have the profits to do so.  Mr. Mashinsky, Ms. Urata-Thompson, and Mr. Treutler caused Celsius to use account holder assets to purchase CEL tokens.[12]  **Those purchases directly benefited Mr. Mashinsky, Mr. Leon, Mr. Goldstein, the other Defendants, and other Celsius employees who held the majority of the CEL token at the expense of Celsius' account holders.**  As Ms. Urata-Thompson described: "I think they [the founders of Celsius] always will have it on the back of their head what is best for their CELs, not best for the company and to me that is [a] conflict of interest."  Ms. Urata-Thompson also held a large amount of CEL tokens.

## III.    Ask Mashinsky Anything

66.    From the beginning, Mr. Mashinsky was the face of Celsius.  Celsius relied heavily on social media to market its platform, with Mr. Mashinsky at the forefront of weekly "Ask Mashinsky Anything" ("**AMA**") videos, many of which Mr. Mashinsky recorded from his apartment in New York and the Company's New Jersey offices.  During the videos, Mr. Mashinsky

---

[12] In an August 2020 conversation with Mr. Treutler via Slack, Ms. Urata-Thompson told him that, in order for Celsius to make CEL token buyback purchases, it used customer and investment funds, which made her feel "nervous" and "queasy" that a "large chunk of it [is] going into our wallet as founders earnings." She further explained that "[f]or a company that could lose, at this pace, 6 million before the end of year, I can't possibly justify this. And we are using equity money that should be used strategically to grow the company. Are we doing that? I don't think so."

answered questions submitted directly by the public.  By the middle of 2021, the AMAs were

available on the Celsius website and frequently featured guests, including many of the Defendants.

Mr. Mashinsky recorded 179 AMAs in total, which were broadcast live to the public each Friday.

The AMAs invited viewers to "[j]oin the revolution, join Celsius and unbank yourself!" and

contained links to Celsius' website and to download the Celsius app.

67.     In early spring 2020, during the beginning of the COVID-19 pandemic, Mr.

Mashinsky's AMAs were very popular and were regularly viewed by tens of thousands of people.

To entice consumers to deposit coins, Mr. Mashinsky promised account holders some of the

highest returns in the market.  Mr. Mashinsky regularly assured customers that Celsius funded its

above-market rates through low-risk, market-neutral investment strategies.[13]  He repeatedly

stressed the strength of Celsius' balance sheet compared to its competitors and provided

promotional codes, contests with cash rewards, and supported new and speculative coins (which

Celsius could not deploy) to attract more customers and more assets to Celsius.  Mr. Mashinsky

cast traditional banks as villains and championed that, unlike banks, Celsius' priority was making

money for its account holders.

68.     Throughout the AMAs, Mr. Mashinsky failed to disclose material facts and

Celsius' massive losses.  He repeatedly lied to account holders and the public about the legal status

of their deposits, the risk of Celsius' investments, and Celsius' financial condition.  For example,

in June 24, 2020, Mr. Mashinsky told the public that "when you give us Bitcoin it is not like it is

ours, right, it is yours.  Legally it is still your Bitcoin, the only thing we do is when you lend us

---

[13] A market-neutral investment strategy uses hedges and other investments to avoid exposure to the wider financial
market.  One way to accomplish market neutrality it to balance long positions and short positions. A long position is
the purchase of an asset with an expectation that it will increase in value.  A short position is the sale of an asset with
the expectation to repurchase it later at a lower price.  A properly executed market-neutral strategy will result in a
positive return if the market value of an asset or index increases or decreases.

your Bitcoin, we lend them to people who pay us interest, when they return them it goes back to the wallet and it is still yours from that wallet." Celsius' Terms of Use provided otherwise and the Company took the opposite position in these Chapter 11 proceedings: when account holders transferred assets to Celsius, they transferred ownership of their property to the Debtors.

69.    Mr. Mashinsky repeatedly told investors that Celsius only issued collateralized loans to well-capitalized institutions. Those statements were never true. For example, on July 17, 2020, Mr. Mashinsky, accompanied by Mr. Leon, stated that "Celsius does not do non-collateralized loans" because "that would be taking too much risk on [customers'] behalf." Mr. Leon did not correct Mr. Mashinsky. In fact, in July 2020, Celsius had approximately $200,000,000 in unsecured loans. Statements that Celsius Network Limited made to regulators also directly contradicted Mr. Mashinsky's public statements. For example, in an August 19, 2021 letter to the New Jersey Office of the Attorney General, Celsius Network Limited stated that 30% of Celsius' institutional lending book, or the equivalent of $747,948,734, was uncollateralized. Mr. Mashinsky, however, never changed his tune. On April 13, 2022, a CNBC reporter asked Mr. Mashinsky if Celsius offered uncollateralized loans. Mr. Mashinsky explicitly stated that "we do not offer any non-collateralized loans." On or about that time, Celsius had more than $1.3 billion in outstanding uncollateralized loans.

70.    Mr. Mashinsky also repeatedly advertised that Celsius only undertook low risk, delta neutral investing strategies and did not "bet the market." Mr. Mashinsky, however, has subsequently admitted that Celsius operated a swing trading strategy. Swing trading is not market neutral, as it attempts to profit off of predicting market movement. Mr. Mashinsky also directed Celsius to take large directional bets. As described in more detail in Section VII, *infra*, in January 2022, the price of BTC significantly dropped. At the bottom of the market, Mr. Mashinsky directed

traders to sell ***hundreds of millions of dollars of BTC***, betting the price would continue to plummet.  It did not, and Celsius incurred massive losses as a result.  In the April 13, 2022 CNBC interview, in response to allegations that Celsius pursued risky trading strategies, Mr. Mashinsky again assured the public that "Celsius is a delta neutral strategy [and] doesn't bet on the market going up and down."

71.    On November 12, 2021, Mr. Mashinsky boasted that, "[i]n four years we have not had a single institution default, either not pay the interest or not return the collateral, or the [] coins that we lend to them."  That statement was false.  By July of 2021, EFH had informed Celsius that it could not return over $500 million worth of BTC and ETH collateral that had been posted by Celsius.  Notwithstanding Celsius' financial issues, Mr. Mashinsky continued to represent that Celsius was secure and bragged about its balance sheet.

72.    Mr. Mashinsky's misrepresentations and lies were well-known within the company.[14]  On May 1, 2021, Celsius' Chief Risk Officer, Rodney Sunada-Wong, noted inaccuracies in the April 20, 2021 AMA regarding the risk of Celsius investments.  Mr. Sunada-Wong recommended that AMAs be taped rather than proceeding live so that false or misleading statements could be removed before the AMA was broadcast to the public "[t]o protect Celsius."  Mr. Mashinsky resisted and directed the Celsius team to broadcast the videos to the public "ASAP and then make the changes necessary."

73.    From that time forward, Celsius executives from its risk, regulatory, compliance, and legal teams watched the AMAs live, along with thousands of current and prospective customers, and documented inaccurate or materially misleading statements made by Mr.

---

[14] Prior to the Petition Date, Celsius hired a third party risk management and investigation firm to review Mr. Mashinsky's media statements and assess the damage that had been caused.

Mashinsky, co-hosts, and guests. The video would be immediately posted to YouTube. The executives would then send a list of false or misleading statements to the marketing department, which edited the videos, removed the live recording from YouTube, and then reposted the scrubbed version. Mr. Mashinsky, Mr. Goldstein, Mr. Leon, and Mr. Beaudry were each included on the emails noting the inaccuracies and were aware that Celsius was editing and removing false and misleading statements from the AMA videos. Notwithstanding the fact that each of these executives was aware that Mr. Mashinsky's false and misleading statements continued to be regularly broadcast to the public, none of the executives did more than engage in the after the fact clean-up of the AMAs.

74.     The statements by Mr. Mashinsky (and often his young co-hosts who acted as his echo chamber) that were deleted from the AMAs ranged from distasteful comments and exaggerations to material misstatements about Celsius' balance sheet and the risk undertaken by the Company. For example, Mr. Sunada-Wong called it "crucial" to delete a statement from the May 14, 2021 AMA that said "When you transfer your assets to your Celsius wallet you've instantly start[ed] generating rewards that are paid out every Monday. These rewards compound causing your returns to stack and snowball over time. Celsius is able to achieve this by lending out the community's assets to vetted financial institutions. These loans are collateralized. This means the institutions give Celsius assets or dollars to hold onto before we give out the digital assets. This protects the community and keeps them whole." This statement was misleading, given that many of Celsius's institutional loans were uncollateralized, and it was removed. As of the filing of this Complaint, the statement is not present in the version of the May 14, 2021 AMA posted on YouTube.

75.     The YouTube editing process occurred every week from May 2021 until around

June 12, 2022, when Celsius paused all withdrawals from the platform.  Instead of correcting Mr. Mashinsky's misrepresentations to the public, Celsius employees covered them up—pretending that taking the statements off YouTube after the fact would make them go away.  At no time did Mr. Mashinsky, Celsius, or the Defendants involved in the editing of AMAs retract or correct any of Mr. Mashinsky's misrepresentations.

## IV.    Celsius' Inability to Accurately Track its Assets and Liabilities Resulted in Massive Losses

76.    Since its inception, Mr. Mashinsky and Celsius focused on growing the number of Celsius customers and amount of assets those customers transferred to Celsius above all else.  To that end, Mr. Mashinsky and Celsius aggressively promoted Celsius' above-market interest rates. The D&O Defendants, including Mr. Goldstein, the CTO, also directed that Celsius devote almost all of its technological and development resources to its customer-facing application with the goal of attracting more users and assets.  Celsius' revenue, however, could not support its rewards rates. Celsius also did not appropriately invest in its financial technology or operations, or in developing the necessary processes and procedures to invest the billions of dollars of assets entrusted to it by its account holders in a remotely responsible manner.

77.    From early 2020 to March 2021, Mr. Mashinsky and Ms. Urata-Thompson made the ultimate decisions on Celsius' investment, growth, and deployment strategies.  To the extent the Company tracked its investments, it was done in an ad hoc manner using spreadsheets that were manually updated.  There were no clear or documented investment policies or decision-making processes or procedures.  From Celsius' inception until 2020, decisions about investments and the risk incurred by Celsius were managed solely by the trading team, who did not have experience evaluating financial risk and did not establish any system to evaluate or track Celsius' risk exposure.  In February 2020, a single employee was hired as a consultant to evaluate risk.

That consultant developed a rudimentary database to track Celsius' loan positions and set basic credit limits. But those limits were not followed. As of December 2020, Celsius' exposure exceeded its credit limits for a number of Celsius' significant institutional loans, including with Alameda Research (twice its credit limit), Tether (twice its credit limit), and Three Arrows Capital (three times its credit limit).

78.     Celsius' official Risk Committee was not created until December 2020, and only then, primarily because the United Kingdom Financial Conduct Authority (the "**FCA**") required Celsius to do so. The Risk Committee, however, lacked any real rigor. Up until the spring of 2021, Celsius' risk team was composed of *two employees* who were tasked with the overwhelming job of attempting to oversee the Company's efforts to deploy *over $10 billion* of digital assets. Celsius lacked any internal audit function to ensure its risk assessment procedures were functioning correctly.

79.     The Defendants' mismanagement cost Celsius dearly. Sometime around the end of 2020, Celsius realized that it was not keeping accurate track of its positions across the firm, that it had more BTC obligations than BTC assets, and thus had a short position on the rapidly appreciating asset. A substantial factor contributing to Celsius' short position was the Defendants' use of BTC transferred by account holders to buy CEL tokens to inflate the price of the token. When Celsius finally realized it was short BTC, it was too late. While others in the cryptocurrency industry were making money hand-over-fist as BTC rose from approximately $10,000 to $60,000, *Celsius lost approximately $250 million.*

80.     In response to that surprising loss, Mr. Mashinsky and other Celsius executives instructed several of its employees to "turn over the couch cushions" and locate all of its assets to assess the damage done. Those employees found millions of dollars of investments largely

unknown to anyone at Celsius.  To remedy these issues, Celsius began using a Google sheet it called the "Freeze Report" to track its billions of dollars in assets and investments.  Unsurprisingly, another manual spreadsheet did not fix the problem.

81.     The Google sheet was updated periodically with apparently no set schedule.  Many different Celsius employees across different departments and strategies were required to check their positions and (often times) manually input them into the Google sheet.  That meant that many employees had access to, and could alter, the Google sheet at any given point.

82.     The Google sheet was not closely monitored and contained frequent errors.  The reports could be off by hundreds of millions of dollars on any given day.  As a result, Celsius' officers and financial team had difficulties tracking the company's exposure and implementing coherent and appropriately hedged investments.  One coin deployment specialist noted that "Celsius [had] lost money selling coins that management believes to be long, only to buy them back shortly afterward when it realized Celsius needed to cover its short exposure."  According to Celsius' Head of Model Risk and Quantitative Analytics, the Google sheet was "one analyst's lonely guess of the firm's position," and it was a result of leadership not diverting the "proper resources and care" to its accounting procedures.

83.     Celsius' leadership, including many of the D&O Defendants, were acutely aware of Celsius' inability to track its positions and inadequate technological infrastructure.  An internal report that was issued in 2022—*over a year after Celsius had experienced the quarter of a billion dollar loss due to its unexpected short position*—noted that Celsius lacked fundamental technology and controls with respect to its financial positions.  The internal report was circulated to the D&O Defendants.  The report explained that Celsius had no order management systems, portfolio management system, pre-trade mandate or compliance controls, institutional grade

trading systems, risk systems, or systems to generate profit and loss statements. Ms. Aslihan Denizkurdu, who joined Celsius in 2022 after over 10 years at Citibank, noted that the technology "we [*i.e.*, Celsius] have is worse than what we had in 1993." Mr. Rod Bolger, who was formerly the CFO of the Royal Bank of Canada, noted that when he joined as the CFO in the spring of 2022, Celsius' leadership was using an incomplete profit and loss statement to assess its positions.

## V.    2020 - 2021 – Explosive User Growth and Exorbitant Losses

84.    Between 2019 and 2021, Celsius experienced rapid growth in both its registered users and assets under management. By December 2021, Celsius claimed that it had over one million registered users.[15]

85.    At all times relevant to this Complaint, Celsius operated at a loss and was insolvent. The D&O Defendants were aware of that fact. They, however, continued to pay out astronomical rewards rates and pursue a "growth at all costs" strategy chosen by the D&O Defendants. Mr. Mashinsky, Ms. Urata-Thompson, and other officers and directors took on riskier investments in an attempt to support their unsustainable business model.

### 1.    *The Self-Interested and Reckless KeyFi Transaction*

86.    Mr. Mashinsky and Mr. Goldstein were partial owners of an entity called KeyFi. In the summer of 2020, Mr. Mashinsky and Celsius' Chief Revenue Officer Roni Cohen-Pavon wanted Celsius to begin investing in staking and decentralized finance ("**DeFi**") protocols. Mr. Mashinsky and Mr. Cohen-Pavon chose to work with KeyFi, who would deploy Celsius' assets.

87.    Mr. Mashinsky and Mr. Goldstein promoted the transaction and did not recuse themselves from the negotiations or ultimate approval of the transaction between KeyFi and Celsius. On August 19, 2020, Mr. Mashinsky and Mr. Cohen-Pavon reached an "agreement in

---

[15] In actuality, only a portion of those users had transferred assets to the Celsius platform.

principal" with KeyFi and its principal, Jason Stone, to deploy assets transferred by Celsius account holders. Upon information and belief, before a written agreement was signed, and over the objection of other Celsius employees, Mr. Mashinsky and Mr. Cohen-Pavon directed Celsius to transfer cryptocurrency to KeyFi. Notwithstanding his equity interest in KeyFi, Mr. Mashinsky executed the final Asset Purchase Agreement between Celsius Network Limited and KeyFi on January 11, 2021. In February 2021, KeyFi held $1.4 billion of digital assets that had been transferred to it by Celsius. Upon information and belief, Celsius' decision to invest in KeyFi was never approved by an independent decision-maker.

88.     Celsius is now embroiled in litigation regarding KeyFi. Celsius has alleged that, among other things, Stone stole Celsius assets. Celsius' filings in the KeyFi litigation make clear that Celsius had limited means of monitoring or policing the investments KeyFi made. Mr. Mashinsky's actions to send customer assets to an entity in which he and Mr. Goldstein owned equity, before a contract was signed, and without the ability to police those assets, demonstrates an astonishing disregard for the security of customer funds. As a result of Mr. Mashinsky's and Mr. Goldstein's reckless conduct, Celsius lost approximately $200 million.

### 2.     *Mr. Mashinsky's Repeated Refusal to Rationally Set Interest Rates Led to Persistent Operating Losses*

89.     Until July 2021, Celsius did not have a formal method or policy to determine interest rates paid to its customers. Rather, rates were chosen on an ad hoc basis, largely based on Mr. Mashinsky's and other executives' fears that Celsius would lose customers if its rates were lower than its competitors. Celsius employees expressed that "[t]here is no evidence that has ever supported the rates we pay." For instance, Celsius had difficulty finding deployment opportunities for the massive amounts of BTC transferred to the Celsius platform. Mr. Mashinsky, however, consistently resisted efforts to reduce the rewards rates Celsius offered on BTC. In January 2022,

the ALCO was informed that even if Celsius was able to maximize BTC deployment across every available investment strategy, it would still lose money at its current rewards rates. Nevertheless, Mr. Mashinsky continued to resist lower interest rates and vetoed any suggestion to do so.

90.      In February 2022, Celsius' Treasury department prepared an analysis for the company's new CFO showing $100 million in potential cost savings to Celsius by reducing interest rates paid out on BTC and ETH deposits. The presentation also pointed out that at that time, Celsius' liabilities exceeded its assets by $1 billion and that Celsius was incurring financing costs of approximately $100 million per year. The presentation recommended that Celsius "should begin to shift its strategic direction to profitability rather than being a 'loss leader' for the sake of customer acquisition." Those suggestions were again refused by Mr. Mashinsky and Celsius' other executives.

91.      While some effort was made to decrease interest rates paid to customers in certain coins in May 2022, the efforts were too little too late.

### 3.      *Large Operating Losses and Staggering One-Off Losses*

92.      In a presentation that was given to the Board of Directors in May 2022, Celsius reported an $811 million pre-tax loss on its management profit and loss statement for the year ending 2021. Following the Petition Date, the Debtors informed the Committee that the figure was much higher and identified approximately $1.2 billion of losses in 2021, including a net operating loss of $320 million and the $250 million loss due to its short position in BTC described above. Mr. Mashinsky admits that Celsius' staggering losses were the result of "poor asset deployment decisions." Those large losses, which were never disclosed to Celsius' account holders until these Chapter 11 cases, include:

93.      **Equities First Holdings (~$509 million defaulted unsecured obligation)**: In 2019, Mr. Mashinsky determined to enter into the first of a series of loan agreements with EFH

under which EFH would loan Celsius U.S. dollars collateralized by BTC and ETH, which would be held by EFH. When Ms. Urata-Thompson joined the Company, she was in charge of Celsius' relationship with EFH, including subsequent multi-million dollar loans. Celsius did not require (and EFH did not provide Celsius with) financial statements in connection with entering into any of the loans.[16] Celsius also likely did not conduct a public records search before it executed the first loan agreement. If it had, it would have known that at that time, EFH had been sued at least four times in the United States for failing to return borrowers' collateral. Celsius' sole risk officer was not told about the loan until months after it had been executed. That risk officer immediately identified that Celsius was over-exposed to EFH.

94.    During the course of the EFH loan, Celsius' collateral appreciated significantly in value. However because Celsius had not negotiated for a reverse margin feature common in similar loans, Celsius had no recourse to recoup its collateral. When certain of Celsius' loans with EFH came due in July 2021, EFH informed Celsius that it would be unable to return Celsius' approximately $509 million of BTC and ETH collateral. It was only after EFH refused to return Celsius' collateral that the Risk Committee did background checks on EFH and its principles. Prior to the Petition Date, Celsius agreed to a long dated unsecured payment plan with EFH. On the Petition Date, EFH owed Celsius approximately $439 million, composed of $361 million and 3,765 BTC.[17]

95.    **Grayscale BTC Trust (~$120 million loss)**: In 2021, Celsius contributed BTC to the Grayscale BTC Trust in exchange for shares in the Trust, which were trading at a premium to the trust's Net Asset Value at the time. Celsius was required to hold the shares for six months

---

[16] EFH has never provided Celsius with financial statements.

[17] As of December 30, 2022, EFH owed Celsius $332,849,330 and 3,765 BTC (worth $62,372,147 as of December 30, 2022), for a total amount of $395,221,477.

before they could be sold.  Once the lock up period expired the shares were trading at a discount

to the BTC Celsius had contributed.  Mr. Mashinsky elected to hold the shares over the advice of

other Celsius employees, betting that the share price would rebound and trade at a premium again.

Instead, the discount increased, resulting in an approximately $120 million loss when the shares

were sold.

96.     **Stakehound Loss (~$110 million loss)**: Stakehound is an ETH staking service

provider that was utilized by Celsius.  In 2021, Stakehound announced that both it and its custody

provider had deleted the private key for the wallet that held 35,000 ETH that had been transferred

by Celsius.  Celsius did not disclose that loss to its customers until June 2022 and only after various

news outlets published stories on the loss.

97.     **BadgerDAO Hack (~$49 million loss)**:  On December 2, 2021, a phishing incident

occurred on BadgerDAO, a DeFi protocol where Celsius had stored 906 BTC.  BadgerDAO issued

a recovery token, remBadger, which guaranteed a full pay-out over two years if the tokens

remained deposited at BadgerDAO.  BadgerDAO made clear that the condition for receiving the

restitution pay-out was keeping the remBadger token deposited and that the holder of the

remBadger token could not re-deposit the token after its withdrawal.  A Celsius employee

withdrew their tokens, forfeiting the payment.  The mistake could have easily been avoided had

Celsius implemented proper corporate controls, including a multi-signature approval protocol.

98.     **Defaults on Under and Uncollateralized Loans (~$35 million loss)**:  Between

2020 to the end of 2021, Celsius began to increase its exposure to under and wholly-

uncollateralized loans which provided a higher interest rate, but also significantly more risk.  By

June 2021, it was routine for one-third or more of Celsius' institutional loan portfolio to consist of

unsecured loans.  In 2021, two counterparties defaulted on significant uncollateralized and under-

collateralized loans resulting in approximately $35 million losses.

99.     **Acquisition of GK8 and Subsequent Sale (~$71 million loss)**:  In October 2021, Celsius Network Limited purchased the GK8 Debtors, a digital asset custody business, for $115 million.  After the acquisition of GK8, Celsius made limited effort, and was never able, to integrate the GK8 Debtors' technology in the broader Celsius business.  On December 13, 2022, the Bankruptcy Court approved the Debtors' sale of the GK8 Debtors for approximately $44 million—a realized loss of approximately $71 million.

100.     *In all, Celsius suffered realized losses that exceeded $1.2 billion due to the reckless conduct and actions taken in 2021 by the D&O Defendants.  The Company also spent over $250 million purchasing CEL tokens on public markets in 2021.*

## VI.     Increased Regulatory Pressure

101.     At the same time Celsius was experiencing billions of dollars in losses, it faced increasing regulatory pressure from the United Kingdom and United States governments.  In July 2021, the Debtors were forced by regulators in the U.K. to "migrate" their retail business from Celsius Network Limited (a U.K. entity) to Celsius Network LLC (a Delaware entity).  Celsius did not actually move many, if any, crypto assets.  U.S. state regulators also began cracking down on Celsius.  On May 14, 2021, the Texas State Securities Board notified Celsius that it may have offered securities in Texas in violation of securities law.  Shortly thereafter, several state regulatory agencies, including New Jersey, Vermont, California, Alabama, Kentucky, and New York, took action against Celsius.  On September 17, 2021, the New Jersey Bureau of Securities found that Celsius was offering unregistered securities in violation of New Jersey law.  New Jersey ordered that Celsius cease and desist from offering its Earn investment account to unaccredited investors in the United States (the "**New Jersey Order**").

102.     Celsius' Chief Compliance Officer and General Counsel, Jeremie Beaudry, left

Celsius shortly thereafter in September 2021. Between December 2021 and May 2022, Mr. Beaudry withdrew coins with a market value of $2,143,502 (after accounting for several deposits during that period). Based on a review of public blockchain records, Mr. Beaudry made three large withdrawals of CEL tokens in January 2021 and immediately swapped the CEL tokens for ETH and stablecoins.

103.    Oren Blonstein was appointed the Chief Compliance Officer of Celsius Network Limited and Celsius Network LLC. According to Mr. Blonstein, he focused on compliance with anti-money laundering and bank secrecy laws, and not securities laws or compliance with other regulations. Celsius never hired anyone to oversee those areas after Mr. Beaudry left.

104.    In December 2021, certain affiliates of the WestCap Group ("**Westcap**") and Caisse de dépôt et placement du Québec ("**CDPQ**") converted certain convertible promissory notes to Series B preferred shares of Celsius Network Limited (the "**Series B Preferred Shares**"). Celsius received approximately $536 million from the Series B raise. Laurence Tosi, the head of Westcap, was appointed to the board of Celsius. Mr. Mashinsky championed the Series B equity raise as legitimizing Celsius. But it did not solve Celsius' problems, or even bring it above break-even.

## VII.    <u>January 2022 – The Jig Is Up</u>

105.    Celsius' derivatives (or CeFi) desk was led by Mr. Treutler and composed of approximately six traders who were dispersed between New York, Berlin, and Australia. Celsius told the Oklahoma Department of Securities that in October 2021 the total USD value in accounts used to support its trading strategies was approximately $1.3 billion. Celsius did not establish risk limits for its traders until sometime on or about December 2021. When those risk limits were finally imposed, they were not monitored or enforced. Indeed, the only information the investment and risk teams received on the status of Celsius' CeFi deployments was a weekly email that

contained a basic profit and loss statement that was manually generated. Celsius' risk and finance teams had no way to tell the positions of each strategy or whether the traders were within their limits.

106.    After the New Year, members of Celsius' risk and finance teams raised concerns regarding substantial losses incurred by the CeFi trading desk. A subsequent investigation found that the traders were intentionally placing only one side of the transaction and not properly hedging their trades by placing a second derivative. Mr. Treutler was informed that the desk was over its limits on January 9, 2022. Because Celsius and the D&O Defendants had not instituted proper oversight procedures for the trading desk, the issue was not identified until Celsius had already realized significant losses.

107.    On January 11, 2022, the limit breach was not remedied and was raised in an Executive Committee meeting that Mr. Mashinsky, Mr. Goldstein, and Mr. Leon attended. On January 11, 2022, Celsius' Chief Investment Officer ("**CIO**") directed the traders to get under the risk limit within 48 hours. The traders did not listen and, upon information and belief, other than asking nicely, neither the CIO nor the D&O Defendants took any actions to bring the traders within their limits. The limits were still breached when the price of BTC plummeted on January 20, 2022—*nine days after the CIO instructed the traders to get back within their limits*. Between January 20 to January 23, the price of BTC dropped precipitously from approximately $42,500 to $33,500.

108.    On January 21, 2022, the CEO of Celsius Mining, Amir Aylon, informed the risk department that he had been relying on January 1, 2022 Bitcoin prices and Celsius' future Bitcoin production was unhedged. Mr. Mashinsky was aware of the growing imbalance in the Company's BTC position, but told the finance department to not fix the issue and instead wait for Bitcoin

prices to rebound.

109.    On the evening of Sunday, January 24, 2022, Mr. Mashinsky held a chaotic call with Celsius' finance, risk, and trading teams in which he instructed traders to sell 2,785 BTC with a market value of approximately $100 million.  Celsius now had a large short position with respect to BTC.  Upon information and belief, the next day Mr. Mashinsky again instructed the traders to sell BTC and other coins worth more than $100 million.  The market turned against Celsius and began to rebound.  Certain Celsius executives pleaded with Mr. Mashinsky to bring the position even.  Mr. Mashinsky eventually relented and agreed to purchase half of the position back.  As BTC prices continued to rise, he purchased the second half of the position on January 26, 2022.  Upon information and belief, Celsius ultimately lost more than $60 million as a result of Mr. Mashinsky's, Mr. Treutler's, and the other executives' and traders' reckless conduct.

110.    Both the risk and audit departments conducted "post-mortem" analyses of the events.  Their reports included other recent, similar reckless and irresponsible events, including (1) delays implementing hedging strategies, (2) issues at Celsius Mining concerning a lack of communication and project plan, which led to rushed decisions on large rig purchases and power agreements, and (3) special situation investments made at the direction of Mr. Mashinsky that were unknown to the rest of the finance team or could not be hedged.  The post-mortem noted:

- The failure of existing controls (*e.g.*, trading limits) or a lack of controls;

- The failure of multiple communications channels to enable decision making; and

- The lack of governance and unclear roles and responsibilities.

In March 2022, Celsius was reeling and acknowledged in a presentation to the ALCO that it was not producing enough revenue to cover liabilities or additional operating expenses.  Subsequent presentations show that Celsius had a net capital of approximately negative $60 million at this time

(that negative figure included the CEL tokens held in treasury which Celsius valued at more than $700 million). Celsius was insolvent by nearly $800 million by its own account.

111.    On April 4, 2022, Celsius did not have enough liquid assets (*i.e.*, assets that Celsius could retrieve within seven days or less) to meet its expected obligations.

112.    On April 10, 2022, Mrs. Mashinsky withdrew approximately 1 million CEL tokens with a market value of $2,946,336.[18]  On April 13, Mr. Leon withdrew $2,200,000 of USDC.[19] Mr. Leon also transferred 8,000,000 CEL tokens to an account owned by Alchemy, a limited partnership that he controlled. That same day, Alchemy posted 7,373,272 CEL tokens as collateral and received a $4 million USD loan.

113.    On April 15, 2022, Celsius only had liquid assets sufficient to meet 54.5% of its total liabilities. Also on April 15, 2022, the New Jersey Order became effective, and Celsius was forced to close its Earn program to unaccredited investors. In an attempt to keep customers on the platform, Celsius launched its "Custody" product for customers in certain U.S. states. Funds that were already held in Celsius' Earn accounts were grandfathered into the Earn program regardless of accreditation status. But unaccredited users could not invest more money into the Earn program. A major source of assets—U.S. unaccredited customers—was closed.

114.    On April 26, 2022, Rod Bolger, Celsius' new CFO, informed Mr. Mashinsky that Celsius was "h[a]emorrhaging $7.5mm pre-tax losses each week" and if they did not correct their deployments, Celsius ran "a real risk of not returning to profitability quickly enough."

115.    On May 2 and 3, 2022, Celsius Network Limited held a two-day board meeting to discuss the Company's future. The presentation to the board stated that, notwithstanding the

---

[18] Mrs. Mashinsky then sold those tokens in a series of smaller, regular transactions that appear designed to conceal the sales and minimize their effect on the price of the CEL token.

[19] USDC is a stablecoin whose value is intended to be pegged to the U.S. Dollar.

Series B investment, Celsius' capital sat near zero.  It disclosed that Celsius **had already lost approximately $159 million in 2022**.

116.    On May 7, 2022, the cryptocurrency token, TerraUSD ("**UST**"), suffered a significant loss of value that sent shockwaves through the entire cryptocurrency market.  The UST token was a stablecoin whose value was pegged to USD through an algorithm and use of another cryptocurrency called Luna.  The UST coin value "de-pegged" and plummeted.  Celsius had approximately $940 million deployed on the Terra Chain.  It was able to escape the crash with an approximately $30 million loss.  Celsius also had lent $41 million to Three Arrows Capital, which entered liquidation as a result of Terra Luna.

117.    In the face of the Terra Luna crash, rumours swirled around Celsius and its stability.  Users withdrew over $1.4 billion worth of cryptocurrency assets from the Celsius platform the week after the Terra Luna event.  Mr. Mashinsky and Celsius desperately tried to hold the line.  In response to a May 11, 2022 inquiry from a CoinTelegraph reporter, Mr. Mashinsky responded that "we have ample liquidity and continue to issue loans . . . [we] have had no significant issues as we were ready for this downturn since end of 2021."  Mr. Mashinsky reiterated that comment to the public on May 11 when he tweeted "All funds are safe and we have robust risk management."  **That same day**, in response to the dramatic drop in liquidity, instead of restricting deployments, as was required by its liquidity risk policy, Celsius dramatically decreased its liquidity thresholds.  If it had not, it would have failed its liquidity test.  On May 12, 2022, Mr. Mashinsky lied to Celsius employees, assuring them in an internal email that "our liquidity position remains very strong and all client funds remain secure."

118.    Internally, Celsius faced a liquidity crisis.  It had billions of dollars invested in

illiquid investments, including approximately $800 million[20] in staked ETH (which was locked until an uncertain date in the future) and approximately $600 million in its BTC mining operation, but insufficient assets to address customer withdrawal requests. Celsius experienced an issue that has been faced by banks with on demand deposits for centuries, but the D&O Defendants had not taken any meaningful (let alone sufficient) steps to protect against the liquidity crisis it was facing. Instead, Celsius had more than one billion of loans that were collateralized by cryptocurrency that was dramatically decreasing in value and required additional collateral to avoid margin calls.

119.    On May 9, 2022, the price of the CEL token dropped precipitously. On May 12, 2022, with the price of CEL token crossing $1.00 and Celsius desperately trying to preserve liquidity, Mr. Mashinsky ordered the purchase of $5 million of CEL tokens to inflate the value of the CEL token. On May 13, 2022, Mr. Mashinsky also instructed Tal Bentov, the head of loans, to stop issuing CEL token-backed loans. He further instructed Ms. Bentov not to announce the change as he "did not want negative press."

120.    On May 14, 2022, members of the risk team described the liquidity crisis facing Celsius as "existential" and the measures they were taking to increase liquidity as "only buying [Celsius] time."

121.    On May 15, 2022, Mr. Mashinsky withdrew BTC, ETH, and USDC worth $1,089,137.

122.    On May 16, 2022, Celsius' liquidity had dropped by 40% due to customer withdrawals and steep price declines in BTC and ETH. That day Ms. Denizkurdu asked Mr. Bolger, "why aren't we talking about the elephant in the room. Survival? Liquidity. How many

---

[20] On the Petition Date, Celsius had 410,516 ETH staked with the Lido Finance DeFi protocol and 371,149 ETH staked directly on the Beacon Chain. The Beacon Chain is the original proof-of-stake blockchain that was launched in 2020. The Beacon Chain introduced proof-of-stake to Ethereum and formalized proof-of-stake as Ethereum's consensus mechanism with The Merge upgrade on September 15, 2022.

days we have left.  at what price do we go bust . . . ."  Also on that day, Mr. Mashinsky withdrew $1,792,255 in stablecoins.

123.    On May 19, 2022, Mr. Bolger sent a presentation to Mr. Mashinsky which included projections that were dramatically different than the projections presented to the board of directors 17 days earlier.  Mr. Bolger now projected that Celsius' capital position sat at **_approximately negative $800 million_** and Celsius would be approximately $1.1 billion in the red by the end of the year.  Mr. Bolger concluded that "[t]he current business model is not financially sustainable" and that "[n]o business unit or coin is currently profitable at the current level of rewards rates and OpEx."  Mr. Bolger warned Mr. Mashinsky that "profitability is not achieved even at 2x growth."  Mr. Mashinsky responded that he understood "the current business model is not sustainable and that our capital position is making things worse."

124.    On May 27, 2022, Celsius triggered the reduced liquidity stress test introduced weeks before.  On that same day, Mr. Mashinsky, via Koala1 LLC, withdrew substantially all of his non-CEL token cryptocurrency—worth $5,120,317.

125.    On May 29, 2022, Mr. Leon withdrew $2,370,634 of stablecoins.

126.    On May 31, 2022, Mrs. Mashinsky withdrew CEL tokens with a value of $2,027,339.  The same day, Mr. Leon withdrew BTC with a value of $423,376 and Ms. Landes, who was the Vice President of Lending at Celsius and is the wife of Mr. Leon, withdrew $333,548 of stablecoins.

127.    In a June 1, 2022 interview Mr. Mashinsky was asked whether account holders' funds were safe at Celsius.  Mr. Mashinsky responded, "not just that they are safe but we provided anyone who wanted to withdraw partially or fully, there were no problems . . . I know people are concerned about the whole market . . . about the TerraLuna situation.  That's the service, you can

withdraw at any time . . . We have billions of dollars of liquidity."

128. On June 7, 2022, at the direction of Mr. Leon, Celsius published a blog titled "Damn the Torpedoes, Full Speed Ahead." Celsius sought to reassure the community, stating that it was prepared for the crypto downturn, that it will "continue to process withdrawal[] without delay," and that "Celsius has the reserves (and more than enough ETH) to meet obligations" under its "comprehensive liquidity risk management framework."

## VIII.   **The Pause**

129. On June 12, 2022, Celsius paused all withdrawals from the platform to prevent further erosion of value (the "**Pause**").  Shortly thereafter, upon information and belief, Celsius failed to meet a margin call with respect to its over $1 billion loan with Tether Limited Inc., who liquidated Celsius' BTC and ETH collateral, resulting in *a further $97 million loss to Celsius*.

130. Thereafter, certain of the D&O Defendants instructed VP of Lending, Tal Bentov, to continue liquidating retail loans to avoid making Celsius' asset to liability gap larger.

131. On July 13, 2022, the Debtors filed for relief under Chapter 11 of the Bankruptcy Code.  The Committee was appointed on July 27, 2022.  Since that time it has investigated the prepetition actions that led to their Chapter 11 filing, which investigation remains ongoing.

## **COUNT I**
**(Breach of Fiduciary Duty — Defendants Alexander Mashinsky, Shlomi Daniel Leon, Hanoch Goldstein, Harumi Urata-Thompson, and Jeremie Beaudry)**

132. Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

133. At all times relevant to this Complaint, Celsius was insolvent.  Celsius' debts and liabilities exceeded the value of its assets, and it did not have the ability to meet its on demand and other obligations, or to satisfy its existing or probable liabilities, as they came due in the ordinary

course of its business.

134.    The Defendants were directors and officers of Celsius Network, Inc., Celsius Network Limited, and certain other of their affiliates.  While not explicitly named as directors, Mr. Goldstein, Ms. Urata-Thompson, and Mr. Beaudry made high-level decisions for the Company that would normally be carried out by directors.  Additionally, these Defendants were senior level employees enjoying significant trust and independence within the Company.

135.    The Defendants therefore owed the Company, including, but not limited, to its creditors, a fiduciary duty to exercise the care, skill, and diligence that an ordinarily careful and prudent person would use when carrying out the functions exercised by the directors and officers in relation to the Company.  This duty included the obligation to acquire and maintain sufficient knowledge to enable them to discharge their duties as directors and officers, and to act on an informed basis after considering relevant and reasonably available information.

136.    The Defendants breached their fiduciary duty to Celsius, as well as its creditors, by acting in bad faith, without exercising the care, skill, and diligence that an ordinarily careful and prudent person would exercise in similar circumstances; by not acquiring and maintaining sufficient knowledge and considering relevant and reasonably available material information; by disregarding knowledge they did possess; and by acting with negligence, gross negligence, and reckless and irrational indifference to the interests of Celsius.

137.    The Defendants' conduct was arbitrary and unreasonable, frustrating the overarching purpose of Celsius' governing documents, and breaching the implied contractual covenant of good faith and fair dealing.

138.    Celsius was a financial services company that catered to retail investors.  Mr. Mashinsky marketed Celsius through online "Ask Mashinsky Anything" videos that were

broadcast to the public.  During those videos, Mr. Mashinsky repeatedly and persistently made fraudulent, false, and misleading statements to the public.  Mr. Mashinsky was aware his statements were false when he made them.  Mr. Mashinsky intentionally made those false and misleading statements to encourage more individuals to transfer cryptocurrency to Celsius.

139.    The Defendants and other employees of Celsius collectively and knowingly engaged in a scheme to cover up Mr. Mashinsky's misrepresentations and false statements. Members of the risk, legal, compliance, regulatory, and media teams would flag problematic and false statements to be deleted from the AMAs after such videos had been broadcast live and many had already been posted to YouTube.  Mr. Mashinsky and the other Defendants were warned about the fraudulent, false, and misleading statements Mr. Mashinsky was making and the claims and liability that the Company would incur as a result of those statements.  Despite that knowledge, Mr. Mashinsky and the Defendants continued to intentionally publish false and misleading statements to the public to entice individuals to transfer cryptocurrency to Celsius.  As a result of the Defendants' willful misconduct, Celsius is now subject to millions (and potentially billions) of damage claims from account holders and potentially other entities.

140.    Celsius received billions of dollars of assets from retail investors and had a fiduciary duty to handle and invest those assets in a responsible manner.  Celsius and the Defendants stressed the safety of its investments and systems repeatedly in public communications targeted at current and prospective account holders, specifically retail investors.  The Defendants failed to establish adequate controls, systems, technology, infrastructure, and decision-making processes to responsibly invest or protect the assets that they were trusted to invest.

141.    Celsius managed its assets and investments on spreadsheets in which positions were required to be manually inputted and updated.  Those spreadsheets were not accurate and did not

adequately track Celsius' relative positions in certain cryptocurrencies. This and other failures caused Celsius to incur over *$250 million* of losses in late 2020 and early 2021, when, unbeknownst to the Company, its BTC and other coin obligations greatly exceeded its BTC assets as the market price of BTC (and cryptocurrency prices generally) increased rapidly. Celsius' losses could have been avoided or mitigated if proper systems were in place.

142.     In response to that exorbitant loss, the Company again failed to implement a system that could accurately track its assets and liabilities. Rather, it relied on another Google spreadsheet. The sheet required many different employees to manually input investments and positions. The updates were done in an unorganized, ad hoc manner. As a result, the Google sheet regularly misreported the Company's positions by hundreds of millions of dollars. The Defendants were repeatedly informed of the inadequacy of the Company's systems, but failed to take adequate measures to remedy the situation. Instead, the Defendants directed that more technological resources be invested in new products and the customer facing side of the business, to attract more assets from retail investors, rather than investing in the necessary systems to protect the Company and its customers' assets.

143.     The Defendants also failed to implement proper risk management procedures. Up until spring of 2021, Celsius employed two risk management professionals. In March of 2021, those two risk management professionals were overseeing more than $10 billion of assets and investments. Many of the investments that led to the large losses described in Section V, *supra*, were incurred while those two individuals oversaw Celsius' risk exposure. Such investment decisions included posting collateral with EFH without conducting proper diligence or receiving financial statements and transferring money to KeyFi, an entity in which Mr. Mashinsky and Mr. Goldstein owned equity, before executing a written contract.

144.    Even after the Company brought in additional risk professionals, the problems continued.  For instance, the Company did not have risk limits for its $1.3 billion CeFi trading desk until the end of 2021.  It also had not established any mechanism, policy, or procedure to monitor and oversee the traders' positions and ensure that such traders were following Celsius' investment policy and properly hedging their positions.  Celsius also had no method to effectively police the risk limits.

145.    The lack of effective risk limits and risk monitoring led to significant losses in January 2022, when traders refused to reduce positions that were outside of their delta neutral mandates and risk limits for more than 15 days while the cryptocurrency market plummeted.  Mr. Mashinsky then took a massive gamble on BTC continuing to drop, betting over $200 million of customer funds.  The Company lacked appropriate controls or the delegation of responsibility to stop that reckless decision.  Ultimately, the Defendants' reckless conduct caused the Company to incur more than $60 million in avoidable losses in January 2022 alone.

146.    The Defendants also failed to take appropriate actions to manage their business.  From at least as early as 2021, through 2022, the Defendants were repeatedly informed that Celsius had a negative net interest margin and was not making enough money from its investments to fund the rewards rates it promised to pay to account holders.  Members of the Finance and Treasury departments made multiple proposals to reduce the rewards rates.  With full knowledge of Celsius' financial condition, including an extreme shortfall in assets compared to liabilities, the Defendants refused to lower rewards rates and continued to offer rates that were regularly higher than their competitors.  The failure to reduce rewards rates caused Celsius to incur hundreds of millions in operating losses in 2021 and 2022.

147.    The Defendants' breach of their fiduciary duties caused substantial damage to

Celsius and its account holders and other creditors in an amount to be proven at trial.  But for such breaches of fiduciary duty, Celsius and its creditors would not have suffered such damage.

## COUNT II
**(Breach of Fiduciary Duty of Loyalty — Purchase and Manipulation of CEL token — Defendants Alexander Mashinsky, Shlomi Daniel Leon, Hanoch Goldstein, Harumi Urata-Thompson, and Johannes Treutler)**

148.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

149.    At all times relevant to this Complaint, Celsius was insolvent.  Its debts and liabilities exceeded the value of its assets, and it did not have the ability to meet its on demand and other obligations, or to satisfy its existing or probable liabilities, as they came due in the ordinary course of its business.

150.    Mr. Mashinsky, Mr. Leon, Mr. Goldstein, Ms. Urata-Thompson, and Mr. Treutler, as well as their family, friends, and affiliated entities, all owned large quantities of CEL tokens.

151.    Mr. Mashinsky, Mr. Leon, Mr. Goldstein, and Ms. Urata-Thompson were directors and officers of Celsius Network, Inc., Celsius Network Limited, and certain other of their affiliates. While not explicitly named as directors, Mr. Goldstein and Ms. Urata-Thompson made high-level decisions for the Company that would normally be carried out by directors.  Additionally, Mr. Goldstein and Ms. Urata-Thompson were senior level employees enjoying significant trust and independence within the Company.

152.    Mr. Treutler was the Head of the CeFi trading desk and in charge of implementing and directing Celsius' purchase of CEL tokens from public markets.  Though not a director or officer of the Debtors, Mr. Treutler was a key, senior employee within the Company, who made material decisions with respect to the Company's strategy, operations, and the use of significant assets of the Company.  Mr. Treutler ran the CeFi division of the Company, participated in

financial decisions of the Company, had input into and knowledge of the financial welfare of the Company, and advised Mr. Mashinsky, Mr. Leon, Mr. Goldstein, and Ms. Urata-Thompson, who were the Company's Directors, CEO, COO, CTO, and CFO at times relevant to this Count II. Together with Mr. Mashinsky and Ms. Urata-Thompson, Mr. Treutler would establish price targets for Celsius' purchase of CEL tokens.  Mr. Treutler would determine the specific quantities of CEL tokens purchased, the prices to purchase CEL tokens, and when the purchases would occur to inflate the price of the CEL token.  As a key managerial employee, Mr. Treutler owed the Company the same fiduciary duties as its officers and directors.  Additionally, Mr. Treutler owed the Debtors an implied fiduciary duty to Celsius because Mr. Treutler and Celsius had a relationship of trust on which Celsius relied, Mr. Treutler and the Debtors' interests were aligned, and Mr. Treutler exercised control and domination over a substantial amount of the Debtors' property, instructing the purchase of hundreds of millions of dollars of CEL tokens, and overseeing and directing Celsius' CeFi trading activities.

153.    Each of the Defendants therefore owed Celsius a fiduciary duty of loyalty, including the duty to act in good faith and in the best interest of Celsius, promote the success of the Company, and, at all times, to subordinate their personal interests to the interests of Celsius.

154.    The Defendants breached their fiduciary duty of loyalty to the Company by acting in bad faith, failing to act in the best interest of the Company as a whole, failing to act in a way that promoted the success of the Company, and failing to subordinate their personal interests to the interests of the Company.  The Defendants' conduct was arbitrary and unreasonable, which frustrated the overarching purpose of Celsius' governing documents and breached the implied contractual covenant of good faith and fair dealing.

155.    Mr. Mashinsky, Ms. Urata-Thompson, and Mr. Treutler repeatedly directed Celsius

to purchase CEL tokens on the open market in a manner designed to artificially increase the price of the token, including directing the timing, amount, and price of such purchases and setting resting purchase orders to purchase the token at set prices.  Contrary to Mr. Mashinsky and Celsius' public statements, the amount of these purchases was determined in an ad hoc manner and often exceeded the amount of weekly rewards in CEL tokens to be paid to account holders.

156.    On certain occasions, the Defendants directed CEL tokens to be purchased during Mr. Mashinsky's public AMA segments to encourage retail investors to purchase CEL tokens.

157.    Mr. Mashinsky, Mr. Leon, and Mr. Goldstein all sold large amounts of CEL tokens on public exchanges on or around the time Celsius was buying CEL tokens.

158.    Those sales violated Celsius' corporate policy regarding the sale of CEL tokens by insiders and employees.  Ms. Urata-Thompson and Mr. Treutler were aware of those sales and that such sales violated Celsius policies.  Nevertheless, Ms. Urata-Thompson and Mr. Treutler specifically directed the purchase of CEL tokens to support its price around the times of certain of the large sales by Mr. Mashinsky, Mr. Leon, and Mr. Goldstein.

159.    Celsius' strategic purchases were designed and intended to artificially increase the price of the CEL token above a fair market price.  The manipulation of the price of the CEL token primarily benefited insiders, including, but not limited to, the Defendants, their family, and affiliates, who held substantial amounts of CEL tokens, at the expense of the Company and its account holders and other creditors.

160.    The Defendants used wallets with commingled customer deposits and other undeployed assets to make the above-mentioned CEL token purchases.

161.    At the direction of Mr. Mashinsky, Mr. Leon, Ms. Urata-Thompson, and Mr. Treutler, Celsius spent hundreds of millions of dollars purchasing CEL tokens on public markets

to manipulate and support the token's price. These purchases were not conducted at a fair market value, and the strategic timing and pricing of the transactions caused Celsius to overpay for the CEL tokens it purchased. Celsius did not keep track of the amount of these purchases, and to this day the Company does not know the total amount it spent to purchase CEL tokens. The total amount Celsius spent buying CEL tokens on the open market from 2019 to 2022 exceeds $500 million.

162.    Mr. Mashinsky, Mr. Leon, Ms. Urata-Thompson, and Mr. Treutler spent hundreds of millions of dollars' worth of assets that had been deposited by account holders to enrich themselves, their friends, family, and affiliated entities. The Defendants' conduct with respect to the CEL token breached the Defendants' fiduciary duty of loyalty to Celsius because the Defendants acted in bad faith, failed to act in the best interest of Celsius as a whole, failed to act in a way that promotes the success of Celsius, and failed to subordinate their personal interests to the interests of Celsius. The Defendants' conduct also put Celsius at substantial risk of insolvency and additional claims to the detriment of Celsius, its account holders, and creditors.

163.    The Defendants' breach of the fiduciary duty of loyalty caused substantial damage to Celsius and its creditors in an amount to be proven at trial. But for such breaches of fiduciary duty, Celsius and its creditors would not have suffered such damage.

## <u>COUNT III</u>
### (Breach of Fiduciary Duty of Loyalty — KeyFi Purchase and Asset Deployment — Defendants Alexander Mashinsky and Hanoch Goldstein)

164.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

165.    At all times relevant to this Complaint, the Company was insolvent. Its debts and liabilities exceeded value of its assets, and it did not have the ability to meet its on demand and

other obligations, or to satisfy its existing or probable liabilities, as they came due in the ordinary course of its business.

166.    Mr. Mashinsky was a director and officer of Celsius. While Mr. Goldstein was an officer, and not explicitly named as a director, he made decisions for the Company that would normally be carried out by a director.   Additionally, Mr. Goldstein was a senior level officer enjoying significant trust and independence within the Company.

167.    The Defendants therefore owed the Celsius a fiduciary duty of loyalty, including the duty to act in good faith and in the best interest of Celsius, promote the success of the Company, and, at all times, to subordinate their personal interests to the interests of Celsius.

168.    The Defendants breached their fiduciary duty of loyalty to the Company by acting in bad faith, failing to act in the best interest of the Company as a whole, failing to act in a way that promotes the success of the Company, and failing to subordinate their personal interests to the interests of the Company.

169.    Mr. Mashinsky and Mr. Goldstein owned equity in KeyFi.

170.    The Defendants caused Celsius to transfer hundreds of millions of dollars' worth of customer assets to KeyFi.

171.    The Defendants directed certain of these transfers to be made before a formal agreement between KeyFi and Celsius was executed, displaying a clear disregard for the security of customer funds.

172.    The purchase of KeyFi was for more than fair market value.

173.    The Defendants were aware of the risks of the KeyFi investment but directed it nonetheless in bad faith, for the benefit of Mr. Mashinsky and Mr. Goldstein, and failed to subordinate their personal interests to the interests of the Company.  As a result, Celsius lost

approximately $200 million.

174.    The Defendants, by such aforementioned actions, breached their fiduciary duty of loyalty and did not act to maximize the value or the long-term wealth-creating capacity of the Company.  They did not act in good faith to promote the success of the Company as a whole.

175.    The Defendants' breach of the fiduciary duty of loyalty caused substantial damage to the Company and its creditors in an amount to be proven at trial.  But for such breaches of fiduciary duty, the Company and its creditors would not have suffered such damage.

## COUNT IV
### (Breach of Director's Duties — Duty to Exercise Independent Judgment (English Law) — Defendants Shlomi Daniel Leon, Hanoch Goldstein, Harumi Urata-Thompson, and Jeremie Beaudry)

176.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

177.    Mr. Leon was a director and officer of the Company, and Mr. Goldstein, Ms. Urata-Thompson, and Mr. Beaudry were officers of the Company.   While not explicitly named as directors, Mr. Goldstein, Ms. Urata-Thompson, and Mr. Beaudry made high-level decisions for the Company that would normally be carried out by directors.

178.    Each of the Defendants owed a duty to exercise independent judgment, to take responsibility for all decisions reached, consider issues for themselves, and regard themselves as the ultimate decision-maker.

179.    Mr. Leon, Mr. Goldstein, Ms. Urata-Thompson, and Mr. Beaudry breached their duty to exercise independent judgment by failing to consider issues for themselves and take responsibility for all decisions reached.

180.    Specifically, among other failures to exercise independent judgment, Mr. Leon, Mr. Goldstein, Ms. Urata-Thompson, and Mr. Beaudry repeatedly deferred to Mr. Mashinsky on

numerous consequential management decisions despite relevant and reasonably available information, indicating such decisions were not in the best interests of the Company.

181.   For example, despite being warned about the fraudulent, false, and misleading statements Mr. Mashinsky was making in his AMA videos and the liability that the Company would incur as a result, Mr. Leon, Mr. Goldstein, Ms. Urata-Thompson, and Mr. Beaudry failed to exercise independent judgment and stop these fraudulent statements.  Instead, they participated in a scheme to cover up Mr. Mashinsky's misrepresentations.  The Defendants were aware of the scheme to edit the AMAs after they were recorded live and to remove the live misrepresentations that Mr. Mashinsky had made.  The Defendants actively participated in the editing process.  None of the Defendants ever corrected or retracted any of Mr. Mashinsky's statements.

182.   Mr. Leon failed to exercise independent judgment with respect to the Token Sale Agreement between AMV and Celsius Network Limited.  Mr. Leon extended the deadline and reduced the price for AMV's purchase in 2018 at Mr. Mashinsky's direction, so that Mr. Mashinsky could avoid tax consequences.  Ultimately, rather than holding Mr. Mashinsky to his agreement to purchase $18,000,000 of CEL tokens under the Token Sale Agreement, Mr. Leon agreed to release Mr. Mashinsky from his purchase obligation in exchange for no consideration.  Mr. Leon subsequently authorized and approved the AMV Loan arrangement in an attempt to cover up the issue.  Ultimately, Mr. Leon authorized the termination of each agreement and the return of the 117,000,000 CEL tokens to Celsius' treasury instead of being burned as the whitepaper promised.  Mr. Leon's decisions and actions demonstrated that he was being influenced by Mr. Mashinsky rather than exercising independent judgment to make decisions in the best interest of Celsius.

183.   Ms. Urata-Thompson was a key member of the New Business Committee and the

Investment Committee and had significant input into Celsius' investment decisions. Ms. Urata-Thompson failed to exercise independent judgment with respect to many significant investment decisions, including, but not limited to: (1) posting significant cryptocurrency collateral with EFH without conducting proper diligence, (2) failing to sell shares in the Grayscale Bitcoin Trust when Celsius was able to do so, (3) transferring significant assets to KeyFi before an agreement had been executed, and (4) making unsecured loans to risky counterparties that exceeded the Company's risk limits. These poor investment decisions were influenced by Mr. Mashinsky, and had Ms. Urata-Thompson exercised independent judgment and considered all relevant issues for herself, she would not have made these decisions.

184. Mr. Leon, Mr. Goldstein, and Ms. Urata-Thompson failed to prioritize, develop, and authorize proper systems to track and monitor Celsius' assets, obligations, and trading positions. The Defendants' initial failure led to an approximate $250 million loss that was discovered in late 2020 and early 2021. In response, the Defendants attempted to implement a system to better track Celsius' assets and obligations. However, the ultimate system Google sheet that the Defendants created or oversaw creating to remedy the issue was woefully insignificant to track the billions of dollars of assets that had been entrusted to Celsius by retail investors and investments that Celsius made for the benefit of the Company and its account holders. The Defendants never implemented a system to track Celsius' trading positions.

185. The Defendants also failed to take appropriate actions to manage their business. From at least as early as 2021, through 2022, the Defendants were repeatedly informed that Celsius had a negative net interest margin and was not making enough money from its investments to fund the rewards rates it promised to pay to account holders. Members of the Finance and Treasury departments made multiple proposals to reduce the rewards rates. With full knowledge of Celsius'

financial condition, including an extreme shortfall in assets compared to liabilities, the Defendants buckled to Mr. Mashinsky's insistence that rewards rates remain competitive, refused to lower rewards rates, and continued to offer rates that were regularly higher than their competitors. The failure to reduce rewards rates caused Celsius to incur hundreds of millions in operating losses in 2021 and 2022.

186.     Defendants failed to take immediate action in January 2022 to block Mr. Mashinsky from betting that the cryptocurrency market would drop further during a period of extreme market volatility and selling hundreds of millions of dollars' worth of BTC and other cryptocurrency assets.

187.     In breaching their duty to exercise independent judgment, Mr. Leon, Mr. Goldstein, Ms. Urata-Thompson, and Mr. Beaudry caused substantial damage to Celsius and its creditors in an amount to be proven at trial. But for such breaches of duty, the Company and its creditors would not have suffered such damage.

## <u>COUNT V</u>
**(Breach of Fiduciary Duty — Duty to Avoid Conflicts of Interest (English Law) — Defendants Alexander Mashinsky, Shlomi Daniel Leon, Hanoch Goldstein, Jeremie Beaudry, Harumi Urata-Thompson, and Johannes Treutler)**

188.     Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

189.     Mr. Mashinsky, Mr. Leon, Mr. Goldstein, Mr. Beaudry, and Ms. Urata-Thompson were all directors and officers of various Celsius entities from 2018 to present. While not explicitly named as directors, Mr. Goldstein, Ms. Urata-Thompson, and Mr. Beaudry made high-level decisions for the Company that would normally be carried out by directors. Additionally, the Defendants were senior level officers enjoying significant trust and independence within the Company.

190.    Mr. Treutler was the Head of the CeFi trading desk and in charge of implementing and directing Celsius' purchases of CEL tokens from public markets. Though not a director or officer of the Debtors, Mr. Treutler was a key senior employee within the Company, who made material decisions with respect to the Company's strategy, operations, and the use of significant assets of the Company. Mr. Treutler ran the CeFi division of the Company, participated in financial decisions of the Company, had input into and knowledge of the financial welfare of the Company, and advised Mr. Mashinsky, Mr. Leon, and Ms. Urata-Thompson, who were the Company's Directors, CEO, COO, and CFO at times relevant to this Count V. Together with Mr. Mashinsky and Ms. Urata-Thompson, Mr. Treutler would establish price targets for Celsius' purchases of CEL tokens and set resting purchase orders at specific prices. Mr. Treutler would determine the specific quantities of CEL tokens to be purchased, the prices to purchase the CEL tokens, and when the purchases would occur, to inflate the price of the CEL token.

191.    Accordingly, each of the aforementioned Defendants owed a duty to avoid conflicts of interest, or situations in which they have, or can have, a direct or indirect interest that conflicts, or possibly may conflict, with the interests of Celsius.

192.    Mr. Mashinsky and Mr. Goldstein owned equity interests in KeyFi when, on behalf of Celsius, they transferred coins to KeyFi prior to entering into a written agreement with KeyFi and ultimately agreed to purchase KeyFi for more than fair-market value.

193.    Mr. Mashinsky, Mr. Leon, Mr. Goldstein, Ms. Urata-Thompson, Mr. Treutler, and their family, friends, and related entities each owned significant amounts of CEL tokens. They directed and engaged in strategic purchases of CEL tokens on public markets using Celsius assets to manipulate and support the price of CEL token. Mr. Mashinsky, Mr. Leon, and Mr. Goldstein sold substantial amounts of CEL tokens when they knew Celsius was purchasing CEL tokens on

the open market.

194.   As set forth in Counts VII through XII; XV through XXVIII; XXXI, and XXXII, *infra*, each of the aforementioned Defendants withdrew their assets from the Celsius platform with the actual intent to hinder, delay, and defraud Celsius and its creditors.

195.   The Defendants breached their duty to avoid conflicts of interest by engaging in fraudulent transfers in their own self-interest and withdrawing their assets from the Celsius platform at a time when the Company was suffering financial distress, harming the Company and its creditors to the benefit of themselves.

196.   The Defendants were able to obtain non-public information regarding Celsius' financial condition due to their positions, deliberately concealed this information from the public and account holders, misrepresented Celsius' financial condition or were aware of public misrepresentations of Celsius and its financial condition, and used this information for their own personal advantage.

197.   In breaching their duty to avoid conflicts of interest, the Defendants caused substantial damage to the Company and its creditors, in an amount to be proven at trial.  But for such breaches of duty, the Company and its creditors would not have suffered such damage.

## <u>COUNT VI</u>
**(Avoidance and Recovery of Preferential Transfers — 11 U.S.C §§ 547(b); 550 — Defendants Alexander Mashinsky, Shlomi Daniel Leon, Hanoch Goldstein, Jeremie Beaudry, Harumi Urata-Thompson, Aliza Landes, Kristine Meehan Mashinsky, AM Ventures Holding LLC, Koala1 LLC, Alchemy Capital Partners LP, Bits of Sunshine LLC, and John Doe Defendants)**

198.   Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

199.   Prior to the Pause, the Defendants withdrew cryptocurrency from the Celsius platform, and each withdrawal constituted a transfer of an interest of the Debtors in the property.

200.    A complete list of the Defendants' withdrawals is included as **Exhibit A** to this Complaint (the "**Preferential Transfers**").

201.    The Defendants were creditors of Celsius at the time of the Preferential Transfers.

202.    The Preferential Transfers were to, or for the benefit of, the Defendants within the meaning of section 547(b)(1) of the Bankruptcy Code.

203.    The Preferential Transfers were made for, or on account of, an antecedent debt or debts owed by the Debtors to each of the Defendants before such transfers were made.

204.    The Preferential Transfers each occurred within one year of the Petition Date.

205.    The Preferential Transfers were made while the Debtors were insolvent.

206.    Mr. Mashinsky, Mr. Leon, Mr. Goldstein, Mr. Beaudry, Ms. Urata-Thompson, Ms. Landes, and Mrs. Mashinsky qualify as statutory insiders under section 101(31) of the Bankruptcy Code as the Defendants were all directors, officers, or persons in control of the Debtors, or relatives of directors, officers, or persons in control of the Debtors. These Defendants are also non-statutory insiders because they shared close relationships with the Debtors and negotiated at less than arm's length with the Debtors leading up to the Preferential Transfers.

207.    AMV, Koala1 LLC, Alchemy, and Bits of Sunshine LLC are non-statutory insiders because they shared close relationships with the Debtors and negotiated at less than arm's length with the Debtors leading up to the Preferential Transfers. Specifically, AMV and Koala1 LLC are entities that, upon information and belief, are wholly-owned by Mr. Mashinsky, the founder, director, and former CEO of Celsius. Alchemy, upon information and belief, is an entity wholly-owned by Mr. Leon, a founder, director, and former CSO and COO of Celsius. Bits of Sunshine LLC is an entity that, upon information and belief, is wholly-owned by Mr. Goldstein.

208.    As a result of the Preferential Transfers, each of the Defendants received more than

they would be entitled to receive if (i) under a hypothetical Chapter 7 case; (ii) the transfers had not been made; and (iii) such creditor received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

209.    As of the date hereof, the Defendants have not repaid all or a part of the value of the Preferential Transfers or returned the Preferential Transfers.

210.    The Preferential Transfers are avoidable under section 547(b) of the Bankruptcy Code.

211.    Under Section 550 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred and avoided under section 547 of the Bankruptcy Code from any immediate or mediate transferee of the initial transferee of such property.

212.    The Defendants are the recipients of the Preferential Transfers and are liable as initial transferees.  In the alternative, the Defendants are liable as subsequent or mediate transferees.

213.    Upon information and belief, the Defendants may have transferred the funds comprising the Preferential Transfers to third parties.  The exact identity of the individuals or entities that received a transfer is presently unknown.  The John Doe Defendants are thus immediate or mediate transferees of the Preferential Transfers, and upon information and belief, may currently be in possession of the funds comprising the transfers.

214.    Therefore, the Preferential Transfers or the value of the property transferred in Preferential Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## <u>COUNT VII</u>
**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 548(a)(1)(A); 550 — Defendant Alexander Mashinsky and Any Other Immediate or Mediate Transferees)**

215.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs,

which are incorporated by reference as if set forth fully herein.

216.    Between May 15, 2022 and the Petition Date, Mr. Mashinsky transferred the following amounts from the Celsius platform to his personal cryptocurrency wallet and/or personal accounts with third-party cryptocurrency exchanges (collectively, the "**Alexander Mashinsky Transfers**"):

| Date | Asset | Amount[21] |
|------|-------|-----------|
| May 15, 2022 | ETH | $208 |
| May 15, 2022 | USDC | 3 |
| May 15, 2022 | ETH | 124,274 |
| May 15, 2022 | BTC | 30 |
| May 15, 2022 | ETH | 778,485 |
| May 15, 2022 | BTC | 186,136 |
| May 16, 2022 | USDC | 1,299,827 |
| May 16, 2022 | USDC | 492,428 |
| **Total** | | **$2,881,391** |

217.    The Alexander Mashinsky Transfers constitute transfers of interest in the Debtors' property and were made within two years prior to the Petition Date.

218.    Mr. Mashinsky caused the Alexander Mashinsky Transfers to be made by the Debtors.

219.    Mr. Mashinsky caused Debtors to make the Alexander Mashinsky Transfers with the actual intent to hinder, delay, or defraud Plaintiff and Celsius.  Such transfers were made with the intention, among other things, to impede or obstruct Plaintiff's and Celsius' enforcement and collection of claims against Mr. Mashinsky.

220.    Mr. Mashinsky's actual intent to hinder, delay, or defraud Plaintiff and Celsius is established by, among other things, the following badges of fraud:

    a.    The close relationship between the Debtors and Mr. Mashinsky, who was a director and the CEO of the Debtors at the time of the transfers;

---

[21] Amount in USD based on market prices as of the date of the applicable transfer.

b.   Mr. Mashinsky's continued retention of possession, benefit, or use of the cryptocurrencies withdrawn;

c.   The timing of the transactions shortly before the Pause as Celsius was experiencing extreme financial distress;

d.   Contemporaneous communications that establish Mr. Mashinsky knew Celsius was insolvent and in dire financial condition;

e.   The fact that Mr. Mashinsky withdrew substantially all of his BTC, ETH, and stablecoins on deposit with Celsius;

f.   Mr. Mashinsky had not previously conducted a large withdrawal of all of his cryptocurrency holdings on the platform;

g.   That Mr. Mashinsky's transactions were conducted in secret and not disclosed until significantly after the Debtors filed voluntary petitions for protection under Chapter 11;

h.   The Alexander Mashinsky Transfers were to an insider; and

i.   Mr. Mashinsky, through initiating the Alexander Mashinsky Transfers and other transfers described herein, engaged in a pattern, or series of transactions, or course of conduct after the Debtors incurred debt, the onset of financial difficulties on Debtors, or pendency of threat of suits by creditors of Debtors.

221.    The Alexander Mashinsky Transfers were fraudulent transfers avoidable under section 548(a)(1)(A) of the Bankruptcy Code.  To the extent the Alexander Mashinsky Transfers are included in Count VI as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

222.    Plaintiff is entitled to avoid the Alexander Mashinsky Transfers.

223.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under section 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

224.     Mr. Mashinsky is the initial transferee for whose benefit the Alexander Mashinsky Transfers were made.  Upon information and belief, Mr. Mashinsky may have transferred the funds

comprising the Alexander Mashinsky Transfers to third parties.  The exact identity of the individuals or entities that received a transfer is presently unknown.  The John Doe Defendants are thus immediate or mediate transferees of the Alexander Mashinsky Transfers, and upon information and belief, may currently be in possession of the funds comprising the transfers.

225.    Therefore, the Alexander Mashinsky Transfers, or the value of the property transferred in the Alexander Mashinsky Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## <u>COUNT VIII</u>

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 544(b)(1); 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) — Defendant Alexander Mashinsky and Any Other Immediate or Mediate Transferees)**

226.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

227.    Plaintiff brings this claim under section 544(b)(1) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

228.    As set out in Count VII, Mr. Mashinsky executed the Alexander Mashinsky Transfers, which constitute a transfer of interest in the Debtors' property, and were made with the actual intent to hinder, delay, or defraud Plaintiff and Celsius.

229.    Mr. Mashinsky's actual intent to hinder, delay, or defraud Plaintiff and Celsius is further established by, among other things, the following badges of fraud:

    a.   The close relationship between the Debtors and Mr. Mashinsky, who was a director and the CEO of the Debtors at the time of the transfers;

    b.   Mr. Mashinsky's continued retention of possession, benefit, or use of the cryptocurrencies withdrawn;

    c.   The timing of the transactions shortly before the Pause as Celsius was experiencing extreme financial distress;

    d.   Contemporaneous communications that establish Mr. Mashinsky knew Celsius was insolvent and in dire financial condition;

    e.   The fact that Mr. Mashinsky withdrew substantially all of his BTC, ETH, and stablecoins on deposit with Celsius;

    f.   Mr. Mashinsky had not previously conducted a large withdrawal of all of his cryptocurrency holdings on the platform;

    g.   That Mr. Mashinsky's transactions were conducted in secret and not disclosed until significantly after the Debtors filed voluntary petitions for protection under Chapter 11;

    h.   The Alexander Mashinsky Transfers were to an insider; and

    i.   Mr. Mashinsky, through initiating the Alexander Mashinsky Transfers and other transfers described herein, engaged in a pattern, or series of transactions, or course of conduct after the Debtors incurred debt, the onset of financial difficulties on Debtors, or pendency of threat of suits by creditors of Debtors.

230.    By virtue of the foregoing, the Alexander Mashinsky Transfers were fraudulent transfers avoidable under 11 U.S.C. § 544 and applicable law, including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware. Thus, Plaintiff is entitled to avoid the Alexander Mashinsky Transfers.

231.    To the extent the Alexander Mashinsky Transfers are included in Count VI as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

232.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under section 544 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

233.    Mr. Mashinsky is the initial transferee for whose benefit the Alexander Mashinsky Transfers were made.  Upon information and belief, Mr. Mashinsky may have transferred the funds

comprising the Alexander Mashinsky Transfers to third parties. The exact identity of the individuals or entities that received a transfer is presently unknown. The John Doe Defendants are thus immediate or mediate transferees of the Alexander Mashinsky Transfers, and upon information and belief, may currently be in possession of the funds comprising the transfers.

234.    Therefore, the Alexander Mashinsky Transfers, or the value of the property transferred in the Alexander Mashinsky Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## COUNT IX
**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 548(a)(1)(A); 550 — Defendant Shlomi Daniel Leon and Any Other Immediate or Mediate Transferees)**

235.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

236.    Plaintiff brings this claim under sections 548(a)(1)(A) and 550 of the Bankruptcy Code.

237.    Between July 15, 2021 and the Petition Date, Mr. Leon transferred the following amounts from the Celsius platform to his personal cryptocurrency wallet and/or personal accounts with third-party cryptocurrency exchanges (collectively, the "**Leon Transfers**"):

| Date | Asset | Amount[22] |
|---|---|---|
| July 15, 2021 | BTC | $31,447 |
| July 18, 2021 | ETH | 1,916 |
| July 18, 2021 | CEL | 11 |
| July 19, 2021 | ETH | 69,320 |
| July 20, 2021 | CEL | 476,431 |
| August 8, 2021 | CEL | 636,462 |
| August 12, 2021 | CEL | 31 |
| August 13, 2021 | CEL | 642,466 |
| September 14, 2021 | CEL | 5 |
| September 14, 2021 | CEL | 104,200 |
| September 21, 2021 | CEL | 102,616 |
| September 22, 2021 | BTC | 1,355,123 |

---

[22] Amount in USD based on market prices as of the date of the applicable transfer.

| Date | Asset | Amount[22] |
|------|-------|-----------|
| September 27, 2021 | CEL | 177,575 |
| October 6, 2021 | CEL | 113,800 |
| October 21, 2021 | CEL | 184,800 |
| December 2, 2021 | CEL | 206,208 |
| March 29, 2022 | CEL | 64,030 |
| April 4, 2022 | CEL | 69,280 |
| April 11, 2022 | CEL | 265,576 |
| April 13, 2022 | USDC | 2 |
| April 13, 2022 | USDC | 50 |
| April 14, 2022 | USDC | 2,200,000 |
| April 26, 2022 | CEL | 41 |
| April 26, 2022 | CEL | 79,599 |
| May 29, 2022 | USDC | 100 |
| May 29, 2022 | USDC | 2,370,534 |
| May 31, 2022 | BTC | 100 |
| May 31, 2022 | BTC | 423,276 |
| **Total** | | **$9,574,999** |

238.    The Leon Transfers constitute transfers of interest in the Debtors' property and were made within two years prior to the Petition Date.

239.    Mr. Leon caused the Leon Transfers to be made by the Debtors.

240.    Mr. Leon caused Debtors to make the Leon Transfers with the actual intent to hinder, delay, or defraud Plaintiff and Celsius.  Such transfers were made with the intention, among other things, to impede or obstruct Plaintiff's and Celsius' enforcement and collection of claims against Mr. Leon.

241.    Mr. Leon's actual intent to hinder, delay, or defraud Plaintiff and Celsius is further established by, among other things, the following badges of fraud:

    a.  The close relationship between the Debtors and Mr. Leon, who was a director, the COO, or the CSO of the Debtors at the time of the transfers;

    b.  Mr. Leon's continued retention of possession, benefit, or use of the cryptocurrencies withdrawn in the Leon Transfers;

    c.  The timing of the transactions shortly before the Pause as Celsius was experiencing extreme financial distress;

    d.  Contemporaneous communications that establish Mr. Leon knew Celsius

was insolvent and in dire financial condition;

e.   The fact that Mr. Leon withdrew all of his BTC, ETH, and a majority of his stablecoins on deposit with Celsius;

f.   The fact that Mr. Leon moved nearly all of his CEL tokens between associated entities;

g.   Mr. Leon had not previously conducted a large withdrawal of all of his cryptocurrency holdings on the platform;

h.   Mr. Leon, through initiating the Leon Transfers, engaged in a pattern, or series of transactions, or course of conduct after the Debtors incurred debt, the onset of financial difficulties on Debtors, or pendency of threat of suits by creditors of Debtors;

i.   That Mr. Leon's transactions were conducted in secret and not disclosed until significantly after the Debtors filed voluntary petitions for protection under Chapter 11;

j.   The Leon Transfers were to an insider; and

k.   The Debtors were insolvent or became insolvent shortly after the Leon Transfers were made.

242.   As discussed in Section II, *supra*, Mr. Leon regularly sold CEL tokens during Celsius' buybacks of CEL tokens.

243.   By virtue of the foregoing, the Leon Transfers were fraudulent transfers avoidable under section 548(a)(1)(A) of the Bankruptcy Code.  Thus, Plaintiff is entitled to avoid the Leon Transfers.

244.   To the extent the Leon Transfers are included in Count VI as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

245.   Section 550 of the Bankruptcy Code provides that if a transfer is avoided under section 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

246.   Mr. Leon is the initial transferee for whose benefit the Leon Transfers were made.

Upon information and belief, Mr. Leon may have transferred the funds comprising the Leon Transfers to third parties. The exact identity of the individuals or entities that received a transfer is presently unknown. The John Doe Defendants are thus immediate or mediate transferees of the Leon Transfers, and upon information and belief, may currently be in possession of the funds comprising the transfers.

247.     Therefore, the Leon Transfers, or the value of the property transferred in the Leon Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## <u>COUNT X</u>

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 544(b)(1); 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) — Defendant Shlomi Daniel Leon and Any Other Immediate or Mediate Transferees)**

248.     Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

249.     Plaintiff brings this claim under section 544(b)(1) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

250.     As set out in Count IX, Mr. Leon executed the Leon Transfers, which constitute a transfer of interest in the Debtors' property, and were made with the actual intent to hinder, delay, or defraud Plaintiff and Celsius.

251.     Mr. Leon's actual intent to hinder, delay, or defraud Plaintiff and Celsius is further established by, among other things, the following badges of fraud:

> a.  The close relationship between the Debtors and Mr. Leon, who was a director, the CSO, or the COO of the Debtors at the time of the transfers;
>
> b.  Mr. Leon's continued retention of possession, benefit, or use of the cryptocurrencies withdrawn in the Leon Transfers;

    c.   The timing of the transactions shortly before the Pause as Celsius was experiencing extreme financial distress;

    d.   Contemporaneous communications that establish Mr. Leon knew Celsius was insolvent and in dire financial condition;

    e.   The fact that Mr. Leon withdrew all of his BTC, ETH, and a majority of his stablecoins on deposit with Celsius;

    f.   The fact that Mr. Leon moved nearly all of his CEL tokens between associated entities;

    g.   Mr. Leon had not previously conducted a large withdrawal of all of his cryptocurrency holdings on the platform;

    h.   That Mr. Leon's transactions were conducted in secret and not disclosed until significantly after the Debtors filed voluntary petitions for protection under Chapter 11;

    i.   The Leon Transfers were to an insider; and

    j.   The Debtors were insolvent or became insolvent shortly after the Leon Transfers were made.

252.    As discussed in Section II, *supra*, Mr. Leon regularly sold CEL tokens during Celsius' buybacks of CEL tokens.

253.    By virtue of the foregoing, the Leon Transfers were fraudulent transfers avoidable under 11 U.S.C. § 544 and applicable law, including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware. Thus, Plaintiff is entitled to avoid the Leon Transfers.

254.    To the extent the Leon Transfers are included in Count VI as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

255.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under section 544 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

256.    Mr. Leon is the initial transferee for whose benefit the Leon Transfers were made. Upon information and belief, Mr. Leon may have transferred the funds comprising the Leon Transfers to third parties.  The exact identity of the individuals or entities that received a transfer is presently unknown.  The John Doe Defendants are thus immediate or mediate transferees of the Leon Transfers, and upon information and belief, may currently be in possession of the funds comprising the transfers.

257.    Therefore, the Leon Transfers, or the value of the property transferred in the Leon Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## COUNT XI

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 548(a)(1)(A); 550 — Defendant Hanoch Goldstein and Any Other Immediate or Mediate Transferees)**

258.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

259.    Plaintiff brings this claim under sections 548(a)(1)(A) and 550 of the Bankruptcy Code.

260.    Between August 12, 2021 and the Petition Date, Mr. Goldstein transferred the following amounts from the Celsius platform to his personal cryptocurrency wallet (collectively, the "**Goldstein Transfers**"):

| Date | Asset | Amount[23] |
|------|-------|--------|
| August 12, 2021 | ETH | $4,269 |
| October 27, 2021 | USDC | 100,000 |
| October 28, 2021 | USDT ERC20 | 2,828 |
| December 4, 2021 | USDC | 250,000 |
| March 4, 2022 | ETH | 682,381 |
| March 4, 2022 | CEL | 152,000 |
| April 17, 2022 | CEL | 44,270 |
| May 6, 2022 | ETH | 539,225 |
| May 11, 2022 | ETH | 617,984 |

---

[23] Amount in USD based on market prices as of the date of the applicable transfer.

| | |
|---|---|
| **Total** | **$2,392,957** |

261.    The Goldstein Transfers constitute transfers of interest in the Debtors' property and were made within two years prior to the Petition Date.

262.    Mr. Goldstein caused the Goldstein Transfers to be made by the Debtors.

263.    Mr. Goldstein caused Debtors to make the Goldstein Transfers with the actual intent to hinder, delay, or defraud Plaintiff and Celsius.  Such transfers were made with the intention, among other things, to impede or obstruct Plaintiff's and Celsius' enforcement and collection of claims against Mr. Goldstein.

264.    Mr. Goldstein's actual intent to hinder, delay, or defraud Plaintiff and Celsius is further established by, among other things, the following badges of fraud:

      a.    The close relationship between the Debtors and Mr. Goldstein, who was the CTO or President of Labs of the Debtors at the time of the transfers;

      b.    Mr. Goldstein's continued retention of possession, benefit, or use of the cryptocurrencies withdrawn in the Goldstein Transfers;

      c.    The timing of the transactions as Celsius was experiencing financial distress;

      d.    Contemporaneous communications that establish Mr. Goldstein knew Celsius was insolvent and in dire financial condition;

      e.    That Mr. Goldstein's transactions were conducted in secret and not disclosed until significantly after the Debtors filed voluntary petitions for protection under Chapter 11;

      f.    The Goldstein Transfers were to an insider;

      g.    The Debtors were insolvent or became insolvent shortly after the Goldstein Transfers were made;

      h.    Mr. Goldstein, through initiating the Goldstein Transfers, engaged in a pattern, or series of transactions, or course of conduct after the Debtors incurred debt, the onset of financial difficulties on Debtors, or pendency of threat of suits by creditors of Debtors;

      i.    The fact that Mr. Goldstein withdrew substantially all of his BTC, ETH and

a majority of his stablecoins on deposit with Celsius;

j.    The fact that Mr. Goldstein moved nearly all of his CEL tokens and a substantial majority of stablecoins between associated entities; and

k.    Mr. Goldstein had not previously conducted a large withdrawal of substantially all of his non-CEL cryptocurrency holdings on the platform.

265.    As discussed in Section II, *supra*, Mr. Goldstein regularly sold CEL tokens during Celsius' buybacks of CEL tokens.

266.    By virtue of the foregoing, the Goldstein Transfers were fraudulent transfers avoidable under section 548(a)(1)(A) of the Bankruptcy Code.  Thus, Plaintiff is entitled to avoid the Goldstein Transfers.

267.    To the extent the Goldstein Transfers are included in Count VI as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

268.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under section 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

269.    Mr. Goldstein is the initial transferee for whose benefit the Goldstein Transfers were made.  Upon information and belief, Mr. Goldstein may have transferred the funds comprising the Goldstein Transfers to third parties.  The exact identity of the individuals or entities that received a transfer is presently unknown.  The John Doe Defendants are thus immediate or mediate transferees of the Goldstein Transfers, and upon information and belief, may currently be in possession of the funds comprising the transfers.

270.    Therefore, the Goldstein Transfers, or the value of the property transferred in the Goldstein Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## COUNT XII

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 544(b)(1); 550; and Applicable Law (including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) — Defendant Hanoch Goldstein and Any Other Immediate or Mediate Transferees)**

271.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

272.    Plaintiff brings this claim under section 544(b)(1) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

273.    As set out in Count XI, Mr. Goldstein executed the Goldstein Transfers, which each constitute a transfer of interest in the Debtors' property, and were made with the actual intent to hinder, delay, or defraud Plaintiff and Celsius.

274.    Mr. Goldstein's actual intent to hinder, delay, or defraud Plaintiff and Celsius is further established by, among other things, the following badges of fraud:

       a.  The relationship between the Debtors and Mr. Goldstein, who was the CTO or President of Labs of the Debtors at the time of the transfers;

       b.  Mr. Goldstein's continued retention of possession, benefit, or use of the cryptocurrencies withdrawn in the Goldstein Transfers;

       c.  The timing of the transactions as Celsius was experiencing financial distress;

       d.  Contemporaneous communications that establish Mr. Goldstein knew Celsius was insolvent and in dire financial condition;

       e.  That Mr. Goldstein's transactions were conducted in secret and not disclosed until significantly after the Debtors filed voluntary petitions for protection under Chapter 11;

       f.  The Goldstein Transfers were to an insider;

       g.  The Debtors were insolvent or became insolvent shortly after the Goldstein Transfers were made;

h. The fact that Mr. Goldstein withdrew substantially all of his BTC, ETH and a majority of his stablecoins on deposit with Celsius;

i. The fact that Mr. Goldstein moved nearly all of his CEL tokens and a substantial majority of stablecoins between associated entities; and

j. Mr. Goldstein had not previously conducted a large withdrawal of substantially all of his non-CEL cryptocurrency holdings on the platform.

275. As discussed in Section II, *supra*, Mr. Goldstein regularly sold CEL tokens during Celsius' buybacks of CEL tokens.

276. By virtue of the foregoing, the Goldstein Transfers were fraudulent transfers avoidable under 11 U.S.C. § 544 and applicable law, including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware. Thus, Plaintiff is entitled to avoid the Goldstein Transfers.

277. To the extent the Goldstein Transfers are included in Count VI as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

278. Section 550 of the Bankruptcy Code provides that if a transfer is avoided under section 544 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

279. Mr. Goldstein is the initial transferee for whose benefit the Goldstein Transfers were made. Upon information and belief, Mr. Goldstein may have transferred the funds comprising the Goldstein Transfers to third parties. The exact identity of the individuals or entities that received a transfer is presently unknown. The John Doe Defendants are thus immediate or mediate transferees of the Goldstein Transfers, and upon information and belief, may currently be in possession of the funds comprising the transfers.

280. Therefore, the Goldstein Transfers, or the value of the property transferred in the

Goldstein Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## COUNT XIII

**(Avoidance and Recovery of Constructive Fraudulent Transfers — 11 U.S.C.
§§ 548(a)(1)(B); 550 — Defendant Hanoch Goldstein and Any Other Immediate or Mediate
Transferees)**

281.   Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

282.   Plaintiff brings this claim under sections 548(a)(1)(B) and 550 of the Bankruptcy Code.

283.   On April 1, 2021, Mr. Goldstein received a loan of $4,200,000 collateralized by 9,628,852 CEL tokens, which constitutes a transfer of interest in the Debtors' property, and was made to and for the benefit of Mr. Goldstein (the "**Goldstein Loan**").

284.   The Goldstein Loan was made within two years prior to the Petition Date.

285.   The Debtors received less than reasonably equivalent value or did not receive fair consideration in exchange for the Goldstein Loan.  At the time of the transfer, the 9,628,852 CEL tokens received as collateral were worth significantly less than the $4,200,000 received by Mr. Goldstein, particularly when the Defendants' manipulation of the CEL token is considered.

286.   The Goldstein Loan was a *de facto* transfer of cash to Mr. Goldstein for little to no value.

287.   The Debtors were insolvent on the date of the Goldstein Loan; were left with unreasonably small capital on the date of the Goldstein Loan or as a result of the Goldstein Loan; or intended to incur or believed it would incur debts beyond its ability to pay as such debts matured.

288.   Moreover, the Debtors made the Goldstein Loan to, or for the benefit of, an insider, or incurred such obligation to or for the benefit of an insider and not in the ordinary course of business.

289.    By virtue of the foregoing, the Goldstein Loan was a constructive fraudulent transfer avoidable under section 548(a)(1)(B) of the Bankruptcy Code.  Thus, Plaintiff is entitled to avoid the Goldstein Loan.

290.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under section 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

291.    Mr. Goldstein is the initial transferee for whose benefit the Goldstein Loan was made. Upon information and belief, Mr. Goldstein may have transferred the funds comprising the Goldstein Loan to third parties.  The exact identity of the individuals or entities that received a transfer is presently unknown.   The John Doe Defendants are thus immediate or mediate transferees of the Goldstein Loan, and upon information and belief, may currently be in possession of the funds comprising the transfers.

292.    Therefore, the Goldstein Loan, or the value of the property transferred in the Goldstein Loan, is recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## COUNT XIV

**(Avoidance and Recovery of Constructive Fraudulent Transfers — 11 U.S.C. §§ 544(b)(2); 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) — Defendant Hanoch Goldstein and Any Other Immediate or Mediate Transferees)**

293.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

294.    Plaintiff brings this claim under section 544(b)(2) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

295.    As set out in Count XIII, Mr. Goldstein entered into the Goldstein Loan, which constitutes a transfer of interest in the Debtors' property made within two years prior to the Petition Date, and was made to and for the benefit of Mr. Goldstein.

296.    The Debtors received less than reasonably equivalent value or did not receive fair consideration in exchange for the Goldstein Loan.  At the time of the transfer, the 9,628,852 CEL tokens received by the Debtors were worth significantly less than the $4,200,000 received by Mr. Goldstein, particularly when the Defendants' manipulation of the CEL token is considered.

297.    The Goldstein Loan was a *de facto* transfer of cash to Mr. Goldstein for little to no value.

298.    The Debtors were insolvent on the date of the Goldstein Loan; were engaged or about to engage in a business or transaction for which the remaining assets of the Debtors were unreasonably small on the date of the Goldstein Loan or as a result of the Goldstein Loan; or intended to incur, believed, or reasonably should have believed it would incur debts beyond its ability to pay as such debts came due.

299.    Moreover, the Debtors made the Goldstein Loan to, or for the benefit of, an insider, or incurred such obligation to or for the benefit of an insider and not in the ordinary course of business.

300.    By virtue of the foregoing, the Goldstein Loan was a constructive fraudulent transfer avoidable under section 544(a)(1)(B) of the Bankruptcy Code and applicable law, including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.  Thus, Plaintiff is entitled to avoid the Goldstein Loan.

301.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under section 544 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property

transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

302.    Mr. Goldstein is the initial transferee for whose benefit the Goldstein Loan was made.  Upon information and belief, Mr. Goldstein may have transferred the funds comprising the Goldstein Loan to third parties.  The exact identity of the individuals or entities that received a transfer is presently unknown.  The John Doe Defendants are thus immediate or mediate transferees of the Goldstein Loan, and upon information and belief, may currently be in possession of the funds comprising the transfers.

303.    Therefore, the Goldstein Loan, or the value of the property transferred in the Goldstein Loan, is recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## COUNT XV
### (Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 548(a)(1)(A); 550 — Defendant Jeremie Beaudry and Any Other Immediate or Mediate Transferees)

304.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

305.    Plaintiff brings this claim under sections 548(a)(1)(A) and 550 of the Bankruptcy Code.

306.    Between July 16, 2021 to the Petition Date, Mr. Beaudry transferred the following amounts of cryptocurrency from the Celsius platform to his personal cryptocurrency wallet (collectively, the "**Beaudry Transfers**"):

| Date | Asset | Amount[24] |
|------|-------|--------|
| July 16, 2021 | BTC | $100 |
| July 16, 2021 | BTC | 147,929 |
| July 19, 2021 | USDC | 15,000 |
| July 23, 2021 | CEL | 58 |
| July 23, 2021 | CEL | 508,723 |

---

[24] Amount in USD based on market prices as of the date of the applicable transfer.

| Date | Asset | Amount[24] |
|------|-------|-----------|
| July 31, 2021 | CEL | 62 |
| August 1, 2021 | CEL | 984,489 |
| August 4, 2021 | USDC | 850,000 |
| August 9, 2021 | USDC | 35,000 |
| August 13, 2021 | USDC | 41,000 |
| August 20, 2021 | USDC | 400,000 |
| October 16, 2021 | ETH | 453,879 |
| November 10, 2021 | CEL | 1,931,392 |
| November 17, 2021 | USDC | 30,000 |
| December 1, 2021 | USDC | 42,000 |
| December 1, 2021 | BAT | $61 |
| December 2, 2021 | BCH | 16,615 |
| December 2, 2021 | BTC | 37,702 |
| December 2, 2021 | DASH | 8 |
| December 2, 2021 | UNI | 9,352 |
| December 2, 2021 | USDC | 100,000 |
| December 3, 2021 | USDT ERC20 | 28 |
| December 3, 2021 | BTC | 13,987 |
| December 3, 2021 | USDC | 6,000 |
| December 3, 2021 | USDC | 21,000 |
| December 4, 2021 | USDC | 40,000 |
| December 4, 2021 | USDC | 400,000 |
| December 5, 2021 | USDC | 30,000 |
| December 6, 2021 | BTC | 31 |
| December 6, 2021 | BCH | 10 |
| December 6, 2021 | USDC | 37,000 |
| December 9, 2021 | UNI | 3 |
| December 9, 2021 | USDC | 40,000 |
| December 10, 2021 | USDC | 50,000 |
| December 12, 2021 | USDC | 50,000 |
| December 13, 2021 | USDC | 20,000 |
| December 15, 2021 | USDC | 42,000 |
| December 17, 2021 | USDC | 25,050 |
| December 20, 2021 | USDC | 50,000 |
| December 20, 2021 | USDC | 10,000 |
| December 22, 2021 | USDC | 30,000 |
| December 23, 2021 | USDC | 13,000 |
| December 28, 2021 | USDC | 20,000 |
| December 29, 2021 | USDC | 25,000 |
| January 1, 2022 | CEL | 150,289 |
| January 1, 2022 | ETH | 500 |
| January 2, 2022 | USDC | 16,607 |
| January 3, 2022 | USDC | 76 |
| January 5, 2022 | CEL | 149,838 |
| January 5, 2022 | CEL | 140,059 |
| January 6, 2022 | USDC | 245,000 |
| January 7, 2022 | CEL | 149,236 |
| January 7, 2022 | ETH | 321,528 |
| January 7, 2022 | ETH | 480,847 |

| Date | Asset | Amount[24] |
|------|-------|-----------|
| January 7, 2022 | USDC | 866 |
| January 10, 2022 | USDC | 79 |
| January 10, 2022 | ETH | 87 |
| January 17, 2022 | BTC | 49 |
| March 2, 2022 | USDC | 100,000 |
| March 4, 2022 | USDC | 50,000 |
| March 5, 2022 | USDC | 50,001 |
| **Total** | | **$8,381,541** |

307.     The Beaudry Transfers constitute transfers of interest in the Debtors' property and were made within two years prior to the Petition Date.

308.     Mr. Beaudry caused the Beaudry Transfers to be made by the Debtors.

309.     Mr. Beaudry caused Debtors to make the Beaudry Transfers with the actual intent to hinder, delay, or defraud Plaintiff and Celsius.  Such transfers were made with the intention, among other things, to impede or obstruct Plaintiff's and Celsius' enforcement and collection of claims against Mr. Beaudry.

310.     Mr. Beaudry's actual intent to hinder, delay, or defraud Plaintiff and Celsius is further established by, among other things, the following badges of fraud:

a.   The close relationship between the Debtors and Mr. Beaudry, who was the Debtors' current or former General Counsel and Chief Compliance Officer at the time of the transfers;

b.   Mr. Beaudry's retention of possession, benefit, or use of the cryptocurrencies withdrawn in the Beaudry Transfers;

c.   The legal actions that had been taken against the Debtors and the Debtors' financial condition before and after each of the Beaudry Transfers;

d.   The Beaudry Transfers occurred on or about the time that significant regulatory action was taken against Celsius that had a material negative effect on its business.  As the Chief Compliance Officer, Mr. Beaudry was uniquely positioned to know the negative effect those regulatory actions would have on Celsius' ability to continue to operate as a going concern;

e.   Mr. Beaudry, through initiating the Beaudry Transfers, engaged in a pattern, or series of transactions, or course of conduct after the significant regulatory actions were taken against the Debtors and the Debtors suffered significant

losses;

f.   The fact that Mr. Beaudry withdrew the majority of his CEL tokens, all of his BTC, all of his ETH, and substantially all of his stablecoins, on deposit with Celsius;

g.   The general chronology of the events and the Beaudry Transfers;

h.   The Beaudry Transfers were questionable and not in the usual course of business;

i.   The Beaudry Transfers were made to an insider; and

j.   The secrecy, haste, or unusualness of the Beaudry Transfers.

311.   In early 2022, Mr. Beaudry engaged in a series of large CEL token withdrawals and then immediately swapped the withdrawn CEL tokens in exchange for ETH and stablecoins.

312.   By virtue of the foregoing, the Beaudry Transfers were fraudulent transfers avoidable under section 548(a)(1)(A) of the Bankruptcy Code.  Thus, Plaintiff is entitled to avoid the Beaudry Transfers.

313.   To the extent the Beaudry Transfers are included in Count VI as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

314.   Section 550 of the Bankruptcy Code provides that if a transfer is avoided under section 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

315.   Mr. Beaudry is the initial transferee for whose benefit the Beaudry Transfers were made.  Upon information and belief, Mr. Beaudry may have transferred the funds comprising the Beaudry Transfers to third parties.  The exact identity of the individuals or entities that received a transfer is presently unknown.  The John Doe Defendants are thus immediate or mediate transferees of the Beaudry Transfers, and upon information and belief, may currently be in

possession of the funds comprising the transfers.

316.    Therefore, the Beaudry Transfers, or the value of the property transferred in the Beaudry Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## COUNT XVI

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 544(b)(1); 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) — Defendant Jeremie Beaudry and Any Other Immediate or Mediate Transferees)**

317.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

318.    Plaintiff brings this claim under section 544(b)(1) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

319.    As set out in Count XV, Mr. Beaudry executed the Beaudry Transfers, which each constitute a transfer of interest in the Debtors' property, and were made with the actual intent to hinder, delay, or defraud Plaintiff and Celsius.

320.    Mr. Beaudry's actual intent to hinder, delay, or defraud Plaintiff and Celsius is further established by, among other things, the following badges of fraud:

a.    The close relationship between the Debtors and Mr. Beaudry, who was the Debtors' current or former General Counsel and Chief Compliance Officer at the time of the transfers;

b.    Mr. Beaudry's retention of possession, benefit, or use of the cryptocurrencies withdrawn in the Beaudry Transfers;

c.    The legal actions that had been taken against the Debtors and the Debtors' financial condition before and after each of the Beaudry Transfers;

d.    The Beaudry Transfers occurred on or about the time that significant regulatory action was taken against Celsius that had a material negative effect on its business. As the Chief Compliance Officer, Mr. Beaudry was uniquely positioned to know the negative effect those regulatory actions

would have on Celsius' ability to continue to operate as a going concern;

e.  Mr. Beaudry, through initiating the Beaudry Transfers, engaged in a pattern, or series of transactions, or course of conduct after the significant regulatory actions were taken against the Debtors and the Debtors suffered significant losses;

f.  The fact that Mr. Beaudry withdrew the majority of his CEL tokens, all of his BTC, all of his ETH, and substantially all of his stablecoins, on deposit with Celsius;

g.  The general chronology of the events and the Beaudry Transfers;

h.  The secrecy, haste, or unusualness of the Beaudry Transfers; and

i.  The Beaudry Transfers were made to an insider.

321.    In early 2022, Mr. Beaudry engaged in a series of large CEL token withdrawals and then immediately swapped the withdrawn CEL tokens in exchange for ETH and stablecoins.

322.    By virtue of the foregoing, the Beaudry Transfers were fraudulent transfers avoidable under 11 U.S.C. § 544 and applicable law, including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.  Thus, Plaintiff is entitled to avoid the Beaudry Transfers.

323.    To the extent the Beaudry Transfers are included in Count VI as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

324.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under section 544 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

325.    Mr. Beaudry is the initial transferee for whose benefit the Beaudry Transfers were made.  Upon information and belief, Mr. Beaudry may have transferred the funds comprising the Beaudry Transfers to third parties.  The exact identity of the individuals or entities that received a

transfer is presently unknown. The John Doe Defendants are thus immediate or mediate transferees of the Beaudry Transfers, and upon information and belief, may currently be in possession of the funds comprising the transfers.

326.    Therefore, the Beaudry Transfers, or the value of the property transferred in the Beaudry Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## COUNT XVII

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 548(a)(1)(A); 550 — Defendant Harumi Urata-Thompson and Any Other Immediate or Mediate Transferees)**

327.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

328.    Plaintiff brings this claim under sections 548(a)(1)(A) and 550 of the Bankruptcy Code.

329.    Between September 6, 2021 and the Petition Date, Ms. Urata-Thompson transferred the following cryptocurrency from the Celsius platform to her personal cryptocurrency wallet (collectively, the "**Urata-Thompson Transfers**"):

| Date | Asset | Amount[25] |
|---|---|---|
| September 6, 2021 | CEL | $6 |
| September 6, 2021 | CEL | 854,721 |
| January 18, 2022 | CEL | 608,126 |
| May 12, 2022 | CEL | 34 |
| June 11, 2022 | CEL | 7,898 |
| June 12, 2022 | CEL | 9,521 |
| **Total** | | **$1,480,306** |

330.    The Urata-Thompson Transfers constitute transfers of interest in the Debtors' property and were made within two years prior to the Petition Date.

---

[25] Amount in USD based on market prices as of the date of the applicable transfer.

331.    Ms. Urata-Thompson caused the Urata-Thompson Transfers to be made by the Debtors.

332.    Ms. Urata-Thompson caused Debtors to make the Urata-Thompson Transfers with the actual intent to hinder, delay, or defraud Plaintiff and Celsius.  Such transfers were made with the intention, among other things, to impede or obstruct Plaintiff's and Celsius' enforcement and collection of claims against Ms. Urata-Thompson.

333.    Ms. Urata-Thompson's actual intent to hinder, delay, or defraud Plaintiff and Celsius is further established by, among other things, the following badges of fraud:

    a.  The close relationship between the Debtors and Ms. Urata-Thompson, who was the Debtors' current or former CFO and CIO at the time of the transfers;

    b.  Ms. Urata-Thompson's knowledge of Celsius' financial distress;

    c.  Ms. Urata-Thompson's retention of possession, benefit, or use of the cryptocurrencies withdrawn in the Urata-Thompson Transfers;

    d.  The general chronology of the events and the Urata-Thompson Transfers;

    e.  The Urata-Thompson Transfers were questionable and not in the usual course of business;

    f.  The secrecy, haste, or unusualness of the Urata-Thompson Transfers;

    g.  The Urata-Thompson Transfers were made to an insider; and

    h.  Ms. Urata-Thompson, through initiating the Urata-Thompson Transfers, engaged in a pattern, or series of transactions, or course of conduct after the Debtors incurred debt, the onset of financial difficulties on Debtors, or pendency of threat of suits by creditors of Debtors.

334.    By virtue of the foregoing, the Urata-Thompson Transfers were fraudulent transfers avoidable under section 548(a)(1)(A) of the Bankruptcy Code.  Thus, Plaintiff is entitled to avoid the Urata-Thompson Transfers.

335.    To the extent the Urata-Thompson Transfers are included in Count VI as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

336.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under section 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

337.    Ms. Urata-Thompson is the initial transferee for whose benefit the Urata-Thompson Transfers were made.  Upon information and belief, Ms. Urata-Thompson may have transferred the funds comprising the Urata-Thompson Transfers to third parties.  The exact identity of the individuals or entities that received a transfer is presently unknown.  The John Doe Defendants are thus immediate or mediate transferees of the Urata-Thompson Transfers, and upon information and belief, may currently be in possession of the funds comprising the transfers.

338.    Therefore, the Urata-Thompson Transfers, or the value of the property transferred in the Urata-Thompson Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## COUNT XVIII

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 544(b)(1); 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) — Defendant Harumi Urata-Thompson and Any Other Immediate or Mediate Transferees)**

339.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

340.    Plaintiff brings this claim under section 544(b)(1) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

341.    As set out in Count XVII, Ms. Urata-Thompson executed the Urata-Thompson Transfers, which each constitute a transfer of interest in the Debtors' property, and were made with

the actual intent to hinder, delay, or defraud Plaintiff and Celsius.

342.    Ms. Urata-Thompson's actual intent to hinder, delay, or defraud Plaintiff and Celsius is further established by, among other things, the following badges of fraud:

    a.    The close relationship between the Debtors and Ms. Urata-Thompson, who was the Debtors' current or former CFO and CIO at the time of the transfers;

    b.    Ms. Urata-Thompson's knowledge of Celsius' financial distress;

    c.    Ms. Urata-Thompson's retention of possession, benefit, or use of the cryptocurrencies withdrawn in the Urata-Thompson Transfers;

    d.    The general chronology of the events and the Urata-Thompson Transfers;

    e.    The Urata-Thompson Transfers were questionable and not in the usual course of business;

    f.    The Urata-Thompson Transfers were made to an insider; and

    g.    The secrecy, haste, or unusualness of the Urata-Thompson Transfers.

343.    By virtue of the foregoing, the Urata-Thompson Transfers were fraudulent transfers avoidable under 11 U.S.C. § 544 and applicable law, including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.  Thus, Plaintiff is entitled to avoid the Urata-Thompson Transfers.

344.    To the extent the Urata-Thompson Transfers are included in Count VI as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

345.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under section 544 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

346.    Ms. Urata-Thompson is the initial transferee for whose benefit the Urata-Thompson Transfers were made.  Upon information and belief, Ms. Urata-Thompson may have transferred

the funds comprising the Urata-Thompson Transfers to third parties.  The exact identity of the individuals or entities that received a transfer is presently unknown.  The John Doe Defendants are thus immediate or mediate transferees of the Urata-Thompson Transfers, and upon information and belief, may currently be in possession of the funds comprising the transfers.

347.    Therefore, the Urata-Thompson Transfers, or the value of the property transferred in the Urata-Thompson Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## COUNT XIX

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 548(a)(1)(A); 550 — Defendant Aliza Landes and Any Other Immediate or Mediate Transferees)**

348.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

349.    Plaintiff brings this claim under sections 548(a)(1)(A) and 550 of the Bankruptcy Code.

350.    Between August 17, 2021 and the Petition Date, Ms. Landes transferred the following cryptocurrency from the Celsius platform to her personal cryptocurrency wallet (collectively, the "**Landes Transfers**"):

| Date | Asset | Amount[26] |
|---|---|---|
| August 17, 2021 | USDC | $50 |
| August 17, 2021 | USDC | 100 |
| August 23, 2021 | USDC | 100 |
| August 31, 2021 | USDC | 690,000 |
| October 20, 2021 | USDC | 370,000 |
| January 24, 2022 | USDC | 20 |
| January 24, 2022 | USDC | 400,000 |
| February 15, 2022 | USDC | 125,600 |
| May 31, 2022 | USDC | 333,548 |
| **Total** | | **$1,919,418** |

---

[26] Amount in USD based on market prices as of the date of the applicable transfer.

351.    The Landes Transfers constitute transfers of interest in the Debtors' property and were made within two years prior to the Petition Date.

352.    Ms. Landes caused the Landes Transfers to be made by the Debtors.

353.    Ms. Landes caused Debtors to make the Landes Transfers with the actual intent to hinder, delay, or defraud Plaintiff and Celsius.  Such transfers were made with the intention, among other things, to impede or obstruct Plaintiff's and Celsius' enforcement and collection of claims against Ms. Landes.

354.    Ms. Landes' actual intent to hinder, delay, or defraud Plaintiff and Celsius is further established by, among other things, the following badges of fraud:

    a.  Ms. Landes' spousal relationship with Mr. Leon;

    b.  The close relationship between the Debtors, Ms. Landes, who was the current or former VP of Lending of the Debtors at the time of the transfers, and Mr. Leon, who was a director, the COO or the CSO of the Debtors at the time of the transfers;

    c.  Ms. Landes' continued retention of possession, benefit, or use of the cryptocurrencies withdrawn in the Landes Transfers;

    d.  The timing of the transactions shortly before the Pause when the Debtors were experiencing extreme financial distress;

    e.  That Ms. Landes' transactions were conducted in secret and not disclosed until significantly after the Debtors filed voluntary petitions for protection under Chapter 11;

    f.  The Landes Transfers were to an insider;

    g.  The Debtors were insolvent or became insolvent shortly after the Landes Transfers were made;

    h.  Contemporaneous communications that establish that Ms. Landes' spouse, Mr. Leon, knew Celsius was insolvent and in dire financial condition;

    i.  Ms. Landes withdrew substantially all of her stablecoins on deposit with Celsius;

j.  Ms. Landes had not previously conducted a large scale withdrawal of substantially all of her stablecoins on the Celsius platform; and

k.  The Landes Transfers were questionable and not in the usual course of business.

355.    By virtue of the foregoing, the Landes Transfers were fraudulent transfers avoidable under section 548(a)(1)(A) of the Bankruptcy Code.  Thus, Plaintiff is entitled to avoid the Landes Transfers.

356.    To the extent the Landes Transfers are included in Count VI as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

357.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under section 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

358.    Ms. Landes is the initial transferee for whose benefit the Landes Transfers were made.  Upon information and belief, Ms. Landes may have transferred the funds comprising the Landes Transfers to third parties.  The exact identity of the individuals or entities that received a transfer is presently unknown.  The John Doe Defendants are thus immediate or mediate transferees of the Landes Transfers, and upon information and belief, may currently be in possession of the funds comprising the transfers.

359.    Therefore, the Landes Transfers, or the value of the property transferred in the Landes Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## COUNT XX

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 544(b)(1); 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) — Defendant Aliza Landes and Any Other Immediate or Mediate Transferees)**

360.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

361.    Plaintiff brings this claim under section 544(b)(1) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

362.    As set out in Count XIX, Ms. Landes executed the Landes Transfers, which each constitute a transfer of interest in the Debtors' property, and were made with the actual intent to hinder, delay, or defraud Plaintiff and Celsius.

363.    Ms. Landes' actual intent to hinder, delay, or defraud Plaintiff and Celsius is further established by, among other things, the following badges of fraud:

     a.  Ms. Landes' spousal relationship with Mr. Leon;

     b.  The relationship between the Debtors, Ms. Landes, who was the current or former VP of Lending of the Debtors at the time of the transfers, and Mr. Leon, who was a director, the COO, or the CSO of the Debtors at the time of the transfers;

     c.  Ms. Landes' continued retention of possession, benefit, or use of the cryptocurrencies withdrawn in the Landes Transfers;

     d.  The timing of the transactions shortly before the Pause when the Debtors were experiencing extreme financial distress;

     e.  That Ms. Landes' transactions were conducted in secret and not disclosed until significantly after the Debtors filed voluntary petitions for protection under Chapter 11;

     f.  The Landes Transfers were to an insider;

     g.  The Debtors were insolvent or became insolvent shortly after the Landes Transfers were made;

    h. Contemporaneous communications that establish that Ms. Landes' spouse, Mr. Leon, knew Celsius was insolvent and in dire financial condition;

    i. Ms. Landes withdrew substantially all of her stablecoins on deposit with Celsius; and

    j. Ms. Landes had not previously conducted largescale withdrawal of substantially all of her stablecoins on the Celsius platform.

364. By virtue of the foregoing, the Landes Transfers were fraudulent transfers avoidable under 11 U.S.C. § 544 and applicable law, including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware. Thus, Plaintiff is entitled to avoid the Landes Transfers.

365. To the extent the Landes Transfers are included in Count VI as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

366. Section 550 of the Bankruptcy Code provides that if a transfer is avoided under section 544 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

367. Ms. Landes is the initial transferee for whose benefit the Landes Transfers were made. Upon information and belief, Ms. Landes may have transferred the funds comprising the Landes Transfers to third parties. The exact identity of the individuals or entities that received a transfer is presently unknown. The John Doe Defendants are thus immediate or mediate transferees of the Landes Transfers, and upon information and belief, may currently be in possession of the funds comprising the transfers.

368. Therefore, the Landes Transfers, or the value of the property transferred in the Landes Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## COUNT XXI

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 548(a)(1)(A); 550 — Defendant Kristine Meehan Mashinsky and Any Other Immediate or Mediate Transferees)**

369.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

370.    Between April 6, 2022 and the Petition Date, Mrs. Mashinsky transferred the following cryptocurrency from the Celsius platform to her personal cryptocurrency wallet (collectively, the "**Kristine Mashinsky Transfers**"):

| Date | Asset | Amount[27] |
|------|-------|-----------|
| April 6, 2022 | CEL | $20 |
| April 10, 2022 | CEL | 2,946,336 |
| May 31, 2022 | CEL | 8 |
| May 31, 2022 | CEL | 2,027,331 |
| **Total** | | **$4,973,695** |

371.    The Kristine Mashinsky Transfers constitute transfers of interest in the Debtors' property and were made within two years prior to the Petition Date.

372.    Mrs. Mashinsky caused the Kristine Mashinsky Transfers to be made by the Debtors.

373.    Mrs. Mashinsky caused Debtors to make the Kristine Mashinsky Transfers with the actual intent to hinder, delay, or defraud Celsius and Plaintiff.  Such transfers were made with the intention, among other things, to impede or obstruct Plaintiff's and Celsius' enforcement and collection of claims against Mrs. Mashinsky.

374.    Mrs. Mashinsky's actual intent to hinder, delay, or defraud Plaintiff and Celsius is further established by, among other things, the following badges of fraud:

    a.    The close relationship between the Debtors and Mrs. Mashinsky, who is the spouse

---

[27] Amount in USD based on market prices as of the date of the applicable transfer.

of Alexander Mashinsky, a director and the CEO of the Debtors at the time of the transfers;

b.  Mrs. Mashinsky's retention of possession, benefit, or use of the cryptocurrencies withdrawn in the Kristine Mashinsky Transfers;

c.  The financial condition of the Debtors before and after each of the Kristine Mashinsky Transfers and Mrs. Mashinsky's knowledge of the Debtors' financial condition;

d.  Contemporaneous communications that establish that Mrs. Mashinsky's spouse, Alexander Mashinsky, knew Celsius was insolvent and in dire financial condition;

e.  Mrs. Mashinsky, through initiating the Kristine Mashinsky Transfers, engaged in a pattern, or series of transactions, or course of conduct after the Debtors incurred debt, the onset of financial difficulties on Debtors, or pendency of threat of suits by creditors of Debtors;

f.  The general chronology of the events and the Kristine Mashinsky Transfers;

g.  The timing of the transactions shortly before the Pause as Celsius was experiencing extreme financial distress;

h.  The Kristine Mashinsky Transfers were questionable and not in the usual course of business;

i.  The secrecy, haste, and unusualness of the Kristine Mashinsky Transfers;

j.  Mrs. Mashinsky had not previously conducted largescale withdrawal of her CEL token holdings on the Celsius platform;

k.  The Kristine Mashinsky Transfers were made to an insider; and

l.  Mrs. Mashinsky's transactions were conducted in secret and not disclosed until significantly after the Debtors filed voluntary petitions for protection under Chapter 11.

375.    Following each large withdrawal of CEL token, Mrs. Mashinsky sold CEL tokens in small batches regularly for the month after the withdrawal.  The sales appear coordinated to not draw scrutiny or affect the price of the CEL token.

376.    By virtue of the foregoing, the Kristine Mashinsky Transfers were fraudulent transfers avoidable under section 548(a)(1)(A) of the Bankruptcy Code.  Thus, Plaintiff is entitled to avoid the Kristine Mashinsky Transfers.

377.    To the extent the Kristine Mashinsky Transfers are included in Count VI as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

378.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under section 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

379.    Mrs. Mashinsky is the initial transferee for whose benefit the Kristine Mashinsky Transfers were made. Upon information and belief, Mrs. Mashinsky may have transferred the funds comprising the Kristine Mashinsky Transfers to third parties. The exact identity of the individuals or entities that received a transfer is presently unknown. The John Doe Defendants are thus immediate or mediate transferees of the Kristine Mashinsky Transfers, and upon information and belief, may currently be in possession of the funds comprising the transfers.

380.    Therefore, the Kristine Mashinsky Transfers, or the value of the property transferred in the Kristine Mashinsky Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## <u>COUNT XXII</u>

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 544(b)(1); 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) — Defendant Kristine Mashinsky and Any Other Immediate or Mediate Transferees)**

381.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

382.    Plaintiff brings this claim under section 544(b)(1) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

383.    As set out in Count XXI, Mrs. Mashinsky executed the Kristine Mashinsky Transfers, which constitute a transfer of interest in the Debtors' property, and were made with the actual intent to hinder, delay, or defraud Plaintiff and Celsius.

384.    Mrs. Mashinsky's actual intent to hinder, delay, or defraud Plaintiff and Celsius is further established by, among other things, the following badges of fraud:

a.    The close relationship between the Debtors and Mrs. Mashinsky, who is the spouse of Alexander Mashinsky, a director and the CEO of the Debtors at the time of the transfers;

b.    Mrs. Mashinsky's retention of possession, benefit, or use of the cryptocurrencies withdrawn in the Kristine Mashinsky Transfers;

c.    The financial condition of the Debtors before and after each of the Kristine Mashinsky Transfers and Mrs. Mashinsky's knowledge of the Debtors' financial condition;

d.    Mrs. Mashinsky, through initiating the Kristine Mashinsky Transfers, engaged in a pattern, or series of transactions, or course of conduct after the Debtors incurred debt, the onset of financial difficulties on Debtors, or pendency of threat of suits by creditors of Debtors;

e.    The general chronology of the events and the Kristine Mashinsky Transfers;

f.    The Kristine Mashinsky Transfers were questionable and not in the usual course of business;

g.    The secrecy, haste, and unusualness of the Kristine Mashinsky Transfers;

h.    The Kristine Mashinsky Transfers were concealed until well after the Petition Date;

i.    The timing of the transaction shortly before the Pause as Celsius was experiencing extreme financial distress;

j.    Contemporaneous communications that establish that Mrs. Mashinsky's spouse, Alexander Mashinsky, knew Celsius was insolvent and in dire financial condition;

k.    The Kristine Mashinsky Transfers were made to an insider; and

l.    Mrs. Mashinsky had not previously conducted largescale withdrawal of her CEL token holdings on the Celsius platform.

385.     Following each large withdrawal of CEL token, Mrs. Mashinsky sold CEL tokens in small batches regularly for the month after the withdrawal.  The sales appear coordinated to not draw scrutiny or affect the price of the CEL token.

386.     By virtue of the foregoing, the Kristine Mashinsky Transfers were fraudulent transfers avoidable under 11 U.S.C. § 544 and applicable law, including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware. Thus, Plaintiff is entitled to avoid the Kristine Mashinsky Transfers.

387.     To the extent the Kristine Mashinsky Transfers are included in Count VI as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

388.     Section 550 of the Bankruptcy Code provides that if a transfer is avoided under section 544 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

389.     Mrs. Mashinsky is the initial transferee for whose benefit the Kristine Mashinsky Transfers were made. Upon information and belief, Mrs. Mashinsky may have transferred the funds comprising the Kristine Mashinsky Transfers to third parties.  The exact identity of the individuals or entities that received a transfer is presently unknown.  The John Doe Defendants are thus immediate or mediate transferees of the Kristine Mashinsky Transfers, and upon information and belief, may currently be in possession of the funds comprising the transfers.

390.     Therefore, the Kristine Mashinsky Transfers, or the value of the property transferred in the Kristine Mashinsky Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## <u>COUNT XXIII</u>

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 548(a)(1)(A); 550 — Defendant AM Ventures Holding Inc. and Any Other Immediate or Mediate Transferees)**

391.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

392.    Plaintiff brings this claim under sections 548(a)(1)(A) and 550 of the Bankruptcy Code.

393.    Between July 28, 2021 to the Petition Date, AMV transferred the following cryptocurrency from the Celsius platform to its cryptocurrency wallet (collectively, the "**AMV Transfers**"):

| Date | Asset | Amount[28] |
|------|-------|-----------|
| July 28, 2021 | CEL | $584 |
| July 28, 2021 | CEL | 6,592,283 |
| October 7, 2021 | CEL | 5,591,165 |
| **Total** | | **$12,184,032** |

394.    The AMV Transfers constitute transfers of interest in the Debtors' property and were made within two years prior to the Petition Date.

395.    AMV caused the AMV Transfers to be made by the Debtors.

396.    AMV caused Debtors to make the AMV Transfers with the actual intent to hinder, delay, or defraud Plaintiff and Celsius.  Such transfers were made with the intention, among other things, to impede or obstruct Plaintiff's and Celsius' enforcement and collection of claims against AMV.

397.    AMV's actual intent to hinder, delay, or defraud Plaintiff and Celsius is further established by, among other things, the following badges of fraud:

---

[28] Amount in USD based on market prices as of the date of the applicable transfer.

a. Mr. Mashinsky's ownership and control of AMV;

b. The close relationship between the Debtors and Mr. Mashinsky, who was a director and the CEO of the Debtors at the time of the transfers;

c. Mr. Mashinsky's continued retention of possession, benefit, or use of the cryptocurrencies withdrawn in the AMV Transfers;

d. The timing of the transactions shortly before the Pause as Celsius was experiencing extreme financial distress;

e. Contemporaneous communications that establish Mr. Mashinsky knew Celsius was insolvent and in dire financial condition;

f. The fact that Mr. Mashinsky withdrew substantially all non-CEL token cryptocurrency in accounts held by himself or his affiliated entities on deposit with Celsius;

g. Mr. Mashinsky had not previously conducted a large withdrawal of all of his cryptocurrency holdings on the platform;

h. That AMV and Mr. Mashinsky's transactions were conducted in secret and not disclosed until significantly after the Debtors filed voluntary petitions for protection under Chapter 11;

i. The AMV Transfers were to an insider;

j. The Debtors were insolvent or became insolvent shortly after the AMV Transfers were made;

k. Alexander Mashinsky knowingly caused the withdrawals of cryptocurrencies in the AMV Transfers; and

l. The AMV Transfers were questionable and not in the usual course of business.

398.    Following each large withdrawal of CEL token, Mr. Mashinsky sold CEL tokens in small consistent batches regularly after the withdrawal. The sales appear coordinated to not draw scrutiny or affect the price of the CEL token.

399.    By virtue of the foregoing, the AMV Transfers were fraudulent transfers avoidable under section 548(a)(1)(A) of the Bankruptcy Code. Thus, Plaintiff is entitled to avoid the AMV Transfers.

400.    To the extent the AMV Transfers are included in Count VI as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

401.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under section 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

402.    AMV is the initial transferee for whose benefit the AMV Transfers were made. Upon information and belief, AMV may have transferred the funds comprising the AMV Transfers to third parties.  The exact identity of the individuals or entities that received a transfer is presently unknown.  The John Doe Defendants are thus immediate or mediate transferees of the AMV Transfers, and upon information and belief, may currently be in possession of the funds comprising the transfers.

403.    Therefore, the AMV Transfers, or the value of the property transferred in the AMV Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## COUNT XXIV

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 544(b)(1); 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) — Defendant AM Ventures Holding Inc. and Any Other Immediate or Mediate Transferees)**

404.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

405.    Plaintiff brings this claim under section 544(b)(1) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

406.    As set out in Count XXIII, AMV executed the AMV Transfers, which constitute a

transfer of interest in the Debtors' property, and were made with the actual intent to hinder, delay,

or defraud Plaintiff and Celsius.

407.    AMV's actual intent to hinder, delay, or defraud Plaintiff and Celsius is further

established by, among other things, the following badges of fraud:

a.  Mr. Mashinsky's ownership and control of AMV;

b.  The close relationship between the Debtors and Mr. Mashinsky, who was a director and the CEO of the Debtors at the time of the transfers;

c.  Mr. Mashinsky's continued retention of possession, benefit, or use of the cryptocurrencies withdrawn in the AMV Transfers;

d.  The timing of the transactions shortly before the Pause as Celsius was experiencing extreme financial distress;

e.  Contemporaneous communications that establish Mr. Mashinsky knew Celsius was insolvent and in dire financial condition;

f.  The fact that Mr. Mashinsky withdrew substantially all non-CEL token cryptocurrency in accounts held by himself or his affiliated entities on deposit with Celsius;

g.  Mr. Mashinsky had not previously conducted a large withdrawal of all of his cryptocurrency holdings on the platform;

h.  That AMV and Mr. Mashinsky's transactions were conducted in secret and not disclosed until significantly after the Debtors filed voluntary petitions for protection under Chapter 11;

i.   The AMV Transfers were to an insider;

j.  The Debtors were insolvent or became insolvent shortly after the AMV Transfers were made; and

k.  Mr. Mashinsky knowingly caused the withdrawals of cryptocurrencies in the AMV Transfers.

408.    Following each large withdrawal of CEL token, Mr. Mashinsky sold CEL tokens

in small consistent batches regularly after the withdrawal.  The sales appear coordinated to not

draw scrutiny or affect the price of the CEL token.

409.    By virtue of the foregoing, the AMV Transfers were fraudulent transfers avoidable

under 11 U.S.C. § 544 and applicable law, including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware. Thus, Plaintiff is entitled to avoid the AMV Transfers.

410.    To the extent the AMV Transfers are included in Count VI as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

411.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under section 544 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

412.    AMV is the initial transferee for whose benefit the AMV Transfers were made. Upon information and belief, AMV may have transferred the funds comprising the AMV Transfers to third parties. The exact identity of the individuals or entities that received a transfer is presently unknown. The John Doe Defendants are thus immediate or mediate transferees of the AMV Transfers, and upon information and belief, may currently be in possession of the funds comprising the transfers.

413.    Therefore, the AMV Transfers, or the value of the property transferred in the AMV Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## COUNT XXV
**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 548(a)(1)(A); 550 — Defendant Koala1 LLC and Any Other Immediate or Mediate Transferees)**

414.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

415.    Koala1 LLC is owned and controlled by Mr. Mashinsky.

416.    On May 27, 2022, Koala1 LLC transferred the following cryptocurrency from the

Celsius platform to its cryptocurrency wallet and/or personal accounts with third-party cryptocurrency exchanges (collectively, the "**Koala Transfers**"):

| Date | Asset | Amount[29] |
|---|---|---|
| May 27, 2022 | BTC | $10 |
| May 27, 2022 | BTC | 411,139 |
| May 27, 2022 | ETH | 10 |
| May 27, 2022 | USDC | 10 |
| May 27, 2022 | BTC | 1,573,922 |
| May 27, 2022 | ETH | 1,496,932 |
| May 27, 2022 | USDC | 1,638,293 |
| **Total** | | **$5,120,316** |

417.    The Koala Transfers constitute transfers of interest in the Debtors' property and were made within two years prior to the Petition Date.

418.    Koala1 LLC caused the Koala Transfers to be made by the Debtors.

419.    Koala1 LLC caused Debtors to make the Koala Transfers with the actual intent to hinder, delay, or defraud Plaintiff and Celsius. Such transfers were made with the intention, among other things, to impede or obstruct Plaintiff's and Celsius' enforcement and collection of claims against Koala1 LLC.

420.    Koala1 LLC's actual intent to hinder, delay, or defraud Plaintiff and Celsius is further established by, among other things, the following badges of fraud:

    a.    Mr. Mashinsky's ownership and control of Koala1 LLC;

    b.    The close relationship between the Debtors and Mr. Mashinsky, who was a director and the CEO of the Debtors at the time of the transfers;

    c.    Mr. Mashinsky's continued retention of possession, benefit, or use of the cryptocurrencies withdrawn in the Koala Transfers;

    d.    The timing of the transactions shortly before the Pause as Celsius was experiencing extreme financial distress;

    e.    Contemporaneous communications that establish Mr. Mashinsky knew

---

[29] Amount in USD based on market prices as of the date of the applicable transfer.

Celsius was insolvent and in dire financial condition;

f.   The fact that Mr. Mashinsky withdrew substantially all non-CEL token cryptocurrency in accounts held by himself or his affiliated entities on deposit with Celsius;

g.   Mr. Mashinsky had not previously conducted a large withdrawal of all of his cryptocurrency holdings on the platform;

h.   That Koala1 LLC and Mr. Mashinsky's transactions were conducted in secret and not disclosed until significantly after the Debtors filed voluntary petitions for protection under Chapter 11;

i.   The Koala Transfers were to an insider;

j.   The Debtors were insolvent or became insolvent shortly after the Koala Transfers were made;

k.   Mr. Mashinsky knowingly caused the withdrawals of cryptocurrencies in the Koala Transfers;

l.   The fact that all or substantially all of Koala1 LLC's stablecoin holdings on deposit with Celsius were withdrawn;

m.   The fact that Koala1 LLC had not previously conducted a largescale withdrawal of its stablecoin holdings on the Celsius platform; and

n.   The Koala Transfers were questionable and not in the usual course of business.

421.   By virtue of the foregoing, the Koala Transfers were fraudulent transfers avoidable under section 548(a)(1)(A) of the Bankruptcy Code. Thus, Plaintiff is entitled to avoid the Koala Transfers.

422.   To the extent the Koala Transfers are included in Count VI as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

423.   Section 550 of the Bankruptcy Code provides that if a transfer is avoided under section 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

424.    Koala1 LLC is the initial transferee for whose benefit the Koala Transfers were made. Upon information and belief, Koala1 LLC may have transferred the funds comprising the Koala Transfers to third parties.  The exact identity of the individuals or entities that received a transfer is presently unknown.   The John Doe Defendants are thus immediate or mediate transferees of the Koala Transfers, and upon information and belief, may currently be in possession of the funds comprising the transfers.

425.    Therefore, the Koala Transfers, or the value of the property transferred in the Koala Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## COUNT XXVI

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 544(b)(1); 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) — Defendant Koala1 LLC and Any Other Immediate or Mediate Transferees)**

426.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

427.    Plaintiff brings this claim under section 544(b)(1) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

428.    As set out in Count XXV, Koala1 LLC executed the Koala Transfers, which constitute a transfer of interest in the Debtors' property, and were made with the actual intent to hinder, delay, or defraud Plaintiff and Celsius.

429.    Koala1 LLC's actual intent to hinder, delay, or defraud Plaintiff and Celsius is further established by, among other things, the following badges of fraud:

    a.   Mr. Mashinsky's ownership and control of Koala1 LLC;

    b.   The close relationship between the Debtors and Mr. Mashinsky, who was a director and the CEO of the Debtors at the time of the transfers;

c. Mr. Mashinsky's continued retention of possession, benefit, or use of the cryptocurrencies withdrawn in the Koala Transfers;

d. The timing of the transactions shortly before the Pause as Celsius was experiencing extreme financial distress;

e. Contemporaneous communications that establish Mr. Mashinsky knew Celsius was insolvent and in dire financial condition;

f. The fact that Mr. Mashinsky withdrew substantially all non-CEL token cryptocurrency in accounts held by himself or his affiliated entities on deposit with Celsius;

g. Mr. Mashinsky had not previously conducted a large withdrawal of all of his cryptocurrency holdings on the platform;

h. That Koala1 LLC and Mr. Mashinsky's transactions were conducted in secret and not disclosed until significantly after the Debtors filed voluntary petitions for protection under Chapter 11;

i. The Koala Transfers were to an insider;

j. The Debtors were insolvent or became insolvent shortly after the Koala Transfers were made;

k. Mr. Mashinsky knowingly caused the withdrawals of cryptocurrencies in the Koala Transfers;

l. The fact that all or substantially all of Koala1 LLC's stablecoin holdings on deposit with Celsius were withdrawn; and

m. The fact that Koala1 LLC had not previously conducted a largescale withdrawal of its stablecoin holdings on the Celsius platform.

430.    By virtue of the foregoing, the Koala Transfers were fraudulent transfers avoidable under 11 U.S.C. § 544 and applicable law, including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.  Thus, Plaintiff is entitled to avoid the Koala Transfers.

431.    To the extent the Koala Transfers are included in Count VI as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

432.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under

section 544 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

433.    Koala1 LLC is the initial transferee for whose benefit the Koala Transfers were made. Upon information and belief, Koala1 LLC may have transferred the funds comprising the Koala Transfers to third parties.  The exact identity of the individuals or entities that received a transfer is presently unknown.   The John Doe Defendants are thus immediate or mediate transferees of the Koala Transfers, and upon information and belief, may currently be in possession of the funds comprising the transfers.

434.    Therefore, the Koala Transfers, or the value of the property transferred in the Koala Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## COUNT XXVII

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 548(a)(1)(A); 550 — Defendant Alchemy Capital Partners LP and Any Other Immediate or Mediate Transferees)**

435.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

436.    Plaintiff brings this claim under sections 548(a)(1)(A) and 550 of the Bankruptcy Code.

437.    On April 13, 2022, Mr. Leon transferred 8,000,0002 CEL tokens to Alchemy.  That same day, Alchemy entered into a loan agreement with the Debtors and, on April 14, 2022, received $4,000,000 in exchange for posting 7,373,272 CEL tokens as collateral.  On May 27, 2022, Mr. Leon transferred 7,023,636 CEL tokens to Alchemy.  That same day, Alchemy posted additional collateral of 7,654,644 CEL tokens.  In total, Alchemy posted 15,027,916 CEL tokens as collateral in exchange for the $4 million USD loan from the Debtors (the "**Alchemy Loan**").

438.    The Alchemy Loan constitutes a transfer of interest in the Debtors' property and was made within two years prior to the Petition Date.

439.    Alchemy caused the Alchemy Loan to be made by the Debtors.

440.    The Alchemy Loan was a *de facto* transfer of cash to Alchemy for little to no value.

441.    Alchemy caused Debtors to make the Alchemy Loan with the actual intent to hinder, delay, or defraud Plaintiff and Celsius.  Such transfers were made with the intention, among other things, to impede or obstruct Plaintiff's and Celsius' enforcement and collection of claims against Alchemy.

442.    Alchemy's actual intent to hinder, delay, or defraud Plaintiff and Celsius is further established by, among other things, the following badges of fraud:

    a.  Mr. Leon's ownership and control of Alchemy;

    b.  The close relationship between the Debtors and Mr. Leon, who was a director, the COO or the CSO of the Debtors at the time of the transfers;

    c.  Mr. Leon's continued retention of possession, benefit, or use of the money received from the Alchemy Loan;

    d.  The timing of the transactions shortly before the effective date of the New Jersey Order and as Celsius was experiencing financial distress;

    e.  Contemporaneous communications that establish Mr. Leon knew Celsius was insolvent and in dire financial condition;

    f.  Mr. Leon had not previously entered into a loan collateralized by CEL tokens;

    g.  The Alchemy Loan was conducted in secret and not disclosed until significantly after the Debtors filed voluntary petitions for protection under Chapter 11;

    h.  Alchemy, and by extension, Mr. Leon, was able to receive USD value for the CEL token collateral, which was worth significantly less than the USD value received. Therefore, reasonably equivalent value was not received;

    i.  Alchemy, and by extension, Mr. Leon, was able to receive USD value for the CEL token collateral without having to sell his CEL token positions, guaranteeing a USD value in exchange for the CEL tokens as Debtors faced

the consequences of the New Jersey Order and insolvency;

j.   It was likely that CEL tokens would be worth less due to Celsius' financial distress and regulatory issues;

k.   The Alchemy Loan was to an insider;

l.   The Alchemy Loan was unusual and not in the regular course of business; and

m.   The Debtors were insolvent or became insolvent shortly after the Alchemy Loan was made.

443.    By virtue of the foregoing, the Alchemy Loan was a fraudulent transfer avoidable under section 548(a)(1)(A) of the Bankruptcy Code.  Thus, Plaintiff is entitled to avoid the Alchemy Loan.

444.    To the extent the Alchemy Loan is included in Count VI as an avoidable preferential transfer, the transfer is pled alternatively as fraudulent transfers.

445.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under section 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

446.    Alchemy is the initial transferee for whose benefit the Alchemy Loan was made. Upon information and belief, Alchemy may have transferred the funds comprising the Alchemy Loan to third parties.  The exact identity of the individuals or entities that received a transfer is presently unknown.  The John Doe Defendants are thus immediate or mediate transferees of the Alchemy Loan, and upon information and belief, may currently be in possession of the funds comprising the transfers.

447.    Therefore, the Alchemy Loan, or the value of the property transferred in the Alchemy Loan, is recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## COUNT XXVIII

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 544(b)(1); 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) — Defendant Alchemy Capital Partners LP and Any Other Immediate or Mediate Transferees)**

448.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

449.    Plaintiff brings this claim under section 544(b)(1) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

450.    As set out in Count XXVII, Alchemy executed the Alchemy Loan, which constitutes a transfer of interest in the Debtors' property, and was made with the actual intent to hinder, delay, or defraud Plaintiff and Celsius.

451.    The Alchemy Loan was a *de facto* transfer of cash to Alchemy for little to no value.

452.    Alchemy's actual intent to hinder, delay, or defraud Plaintiff and Celsius is further established by, among other things, the following badges of fraud:

    a.    Mr. Leon's ownership and control of Alchemy;

    b.    The close relationship between the Debtors and Mr. Leon, who was a director, the COO or the CSO of the Debtors at the time of the transfers;

    c.    Mr. Leon's continued retention of possession, benefit, or use of the cash received from the Alchemy Loan;

    d.    The timing of the transactions shortly before the effective date of the New Jersey Order and as Celsius was experiencing financial distress;

    e.    Contemporaneous communications that establish Mr. Leon knew Celsius was insolvent and in dire financial condition;

    f.    Mr. Leon had not previously entered into a loan collateralized by CEL tokens;

    g.    That Mr. Leon and Alchemy's transactions were conducted in secret and not disclosed until significantly after the Debtors filed voluntary petitions

for protection under Chapter 11;

h.  Alchemy, and by extension, Mr. Leon, were able to receive USD value for the CEL token collateral, which was worth significantly less than the USD value received;

i.  Alchemy, and by extension, Mr. Leon, were able to receive USD value for the CEL token collateral without having to sell his CEL token positions, guaranteeing a USD value in exchange for the CEL tokens as Debtors faced the consequences of the New Jersey Order and insolvency;

j.  It was likely that CEL tokens would be worth less due to Celsius' financial distress and regulatory issues;

k.  The Alchemy Loan was to an insider; and

l.  The Debtors were insolvent or became insolvent shortly after the Alchemy Loan was made.

453.  By virtue of the foregoing, the Alchemy Loan was a fraudulent transfer avoidable under 11 U.S.C. § 544 and applicable law, including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.  Thus, Plaintiff is entitled to avoid the Alchemy Loan.

454.  To the extent the Alchemy Loan is included in Count VI as an avoidable preferential transfer, the transfer is pled alternatively as fraudulent transfers.

455.  Section 550 of the Bankruptcy Code provides that if a transfer is avoided under section 544 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

456.  Alchemy is the initial transferee for whose benefit the Alchemy Loan was made. Upon information and belief, Alchemy may have transferred the funds comprising the Alchemy Loan to third parties.  The exact identity of the individuals or entities that received a transfer is presently unknown.  The John Doe Defendants are thus immediate or mediate transferees of the

Alchemy Loan, and upon information and belief, may currently be in possession of the funds comprising the transfers.

457.    Therefore, the Alchemy Loan, or the value of the property transferred in the Alchemy Loan, is recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## COUNT XXIX
**(Avoidance and Recovery of Constructive Fraudulent Transfers — 11 U.S.C. §§ 548(a)(1)(B); 550 — Defendant Alchemy Capital Partners LP and Any Other Immediate or Mediate Transferees)**

458.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

459.    Plaintiff brings this claim under sections 548(a)(1)(B) and 550 of the Bankruptcy Code.

460.    As set out in Counts XXVII and XXVIII, Alchemy caused the Alchemy Loan to be made by the Debtors, which constitutes a transfer of interest in the Debtors' property, and was made to and for the benefit of Alchemy.

461.    The Alchemy Loan was made within two years prior to the Petition Date.

462.    The Debtors received less than reasonably equivalent value or did not receive fair consideration in exchange for the Alchemy Loan.  At the time of the transfer, the 15,027,916 CEL tokens posted by Alchemy as collateral were worth significantly less than the $4,000,000 received by Alchemy, particularly when the Defendants' manipulation of the CEL token is considered.

463.    The Alchemy Loan was a *de facto* transfer of cash to Alchemy for little to no value.

464.    The Debtors were insolvent on the date of the Alchemy Loan; were left with unreasonably small capital on the date of the Alchemy Loan; or intended to incur or believed it would incur debts beyond its ability to pay as such debts matured.

465.    Moreover, the Debtors made the Alchemy Loan to, or for the benefit of, an insider,

or incurred such obligation to or for the benefit of an insider and not in the ordinary course of business.

466.    By virtue of the foregoing, the Alchemy Loan was a constructive fraudulent transfers avoidable under section 548(a)(1)(B) of the Bankruptcy Code.  Thus, Plaintiff is entitled to avoid the Alchemy Loan.

467.    To the extent the Alchemy Loan is included in Count VI as an avoidable preferential transfer and in Counts XXVII and XXVIII as a fraudulent transfer, the Alchemy Loan is pled alternatively as a constructive fraudulent transfer.

468.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under section 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

469.    Alchemy is the initial transferee for whose benefit the Alchemy Loan was made. Upon information and belief, Alchemy may have transferred the funds comprising the Alchemy Loan to third parties.  The exact identity of the individuals or entities that received a transfer is presently unknown.  The John Doe Defendants are thus immediate or mediate transferees of the Alchemy Loan, and upon information and belief, may currently be in possession of the funds comprising the transfers.

470.    Therefore, the Alchemy Transfers, or the value of the property transferred in the Alchemy Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## <u>COUNT XXX</u>

**(Avoidance and Recovery of Constructive Fraudulent Transfers — 11 U.S.C. §§ 544(b)(2); 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) — Defendant Alchemy Capital Partners LP and Any Other Immediate or Mediate Transferees)**

115

471.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

472.    Plaintiff brings this claim under section 544(b)(2) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

473.    As set out in Counts XXVII, XXVIII, and XXIX, Alchemy caused the Alchemy Loan to be made by the Debtors, which constitutes a transfer of interest in the Debtors' property made within two years prior to the Petition Date, and was made to and for the benefit of Alchemy.

474.    The Debtors received less than reasonably equivalent value or did not receive fair consideration in exchange for the Alchemy Loan.  At the time of the transfer, the 15,027,916 CEL tokens posted by the Alchemy as collateral were worth significantly less than the $4,000,000 received by Alchemy, particularly when the Defendants' manipulation of the CEL token is considered.

475.    The Alchemy Loan was a *de facto* transfer of cash to Alchemy for little to no value.

476.    The Debtors were insolvent on the date of the Alchemy Loan; were engaged or about to engage in a business or transaction for which the remaining assets of the Debtors were unreasonably small in relation to the transaction on the date of the Alchemy Loan; or intended to incur, believed, or reasonably should have believed it would incur debts beyond its ability to pay as such debts came due.

477.    Moreover, the Debtors made the Alchemy Loan to, or for the benefit of, an insider, or incurred such obligation to or for the benefit of an insider and not in the ordinary course of business.

478.    By virtue of the foregoing, the Alchemy Loan was a constructive fraudulent transfer

avoidable under section 544(a)(1)(B) of the Bankruptcy Code and applicable law, including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.  Thus, Plaintiff is entitled to avoid the Alchemy Loan.

479.    To the extent the Alchemy Loan is included in Count VI as an avoidable preferential transfer and in Counts XXVII and XXVIII as a fraudulent transfer, the Alchemy Loan is pled alternatively as a constructive fraudulent transfer.

480.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under section 544 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

481.    Alchemy is the initial transferee for whose benefit the Alchemy Loan was made. Upon information and belief, Alchemy may have transferred the funds comprising the Alchemy Loan to third parties.  The exact identity of the individuals or entities that received a transfer is presently unknown.  The John Doe Defendants are thus immediate or mediate transferees of the Alchemy Loan, and upon information and belief, may currently be in possession of the funds comprising the transfers.

482.    Therefore, the Alchemy Loan, or the value of the property transferred in the Alchemy Loan, is recoverable by Plaintiff under section 550 of the Bankruptcy Code.

### COUNT XXXI
**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 548(a)(1)(A); 550 — Defendant Bits of Sunshine LLC and Any Other Immediate or Mediate Transferees)**

483.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

484.    Plaintiff brings this claim under sections 548(a)(1)(A) and 550 of the Bankruptcy

Code.

485.    Between February 7, 2022 and the Petition Date, Bits of Sunshine LLC transferred

the following cryptocurrency from the Celsius platform to its cryptocurrency wallet (collectively,

the "**Sunshine Transfers**"):

| Date | Asset | Amount[30] |
|------|-------|-----------|
| February 7, 2022 | CEL | $150,000 |
| February 23, 2022 | CEL | 154,500 |
| April 27, 2022 | CEL | 105,845 |
| May 9, 2022 | CEL | 161,791 |
| **Total** | | **$572,136** |

486.    The Sunshine Transfers constitute transfers of interest in the Debtors' property and

were made within two years prior to the Petition Date.

487.    Bits of Sunshine LLC caused the Sunshine Transfers to be made by the Debtors.

488.    Bits of Sunshine LLC caused Debtors to make the Sunshine Transfers with the

actual intent to hinder, delay, or defraud Plaintiff and Celsius.  Such transfers were made with the

intention, among other things, to impede or obstruct Plaintiff's and Celsius' enforcement and

collection of claims against Bits of Sunshine LLC.

489.    Bits of Sunshine LLC's actual intent to hinder, delay, or defraud Plaintiff and

Celsius is further established by, among other things, the following badges of fraud:

    a.   Mr. Goldstein's ownership and control of Bits of Sunshine;

    b.   The close relationship between the Debtors and Mr. Goldstein, who was the
     CTO or President of Labs of the Debtors at the time of the transfers;

    c.   Bits of Sunshine's continued retention of possession, benefit, or use of the
     cryptocurrencies withdrawn in the Sunshine Transfers;

    d.   The timing of the transactions as Celsius was experiencing financial
     distress;

---

[30] Amount in USD based on market prices as of the date of the applicable transfer.

e.  Contemporaneous communications that establish Mr. Goldstein knew
    Celsius was insolvent and in dire financial condition;

f.  The Sunshine Transfers were made to an insider;

g.  The fact that Bits of Sunshine LLC moved nearly of its CEL tokens and a
    substantial majority of stablecoins between associated entities;

h.  The Sunshine Transfers were questionable and not in the usual course of
    business; and

i.  That Bits of Sunshine and Mr. Goldstein's transactions were conducted in
    secret and not disclosed until significantly after the Debtors filed voluntary
    petitions for protection under Chapter 11.

490.    As discussed in Section II, *supra*, Mr. Goldstein regularly caused Bits of Sunshine

LLC to sell its CEL tokens during Celsius' buybacks.

491.    By virtue of the foregoing, the Sunshine Transfers were fraudulent transfers

avoidable under section 548(a)(1)(A) of the Bankruptcy Code.  Thus, Plaintiff is entitled to avoid

the Sunshine Transfers.

492.    To the extent the Sunshine Transfers are included in Count VI as avoidable

preferential transfers, those transfers are pled alternatively as fraudulent transfers.

493.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under

section 548 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property

transferred from the initial transferee, the entity for whose benefit the transfers were made, or any

immediate or mediate transferee of the initial transferee.

494.    Bits of Sunshine LLC is the initial transferee for whose benefit the Sunshine

Transfers were made.  Upon information and belief, Bits of Sunshine LLC may have transferred

the funds comprising the Sunshine Transfers to third parties.  The exact identity of the individuals

or entities that received a transfer is presently unknown.  The John Doe Defendants are thus

immediate or mediate transferees of the Sunshine Transfers, and upon information and belief, may

currently be in possession of the funds comprising the transfers.

495.     Therefore, the Sunshine Transfers, or the value of the property transferred in the Sunshine Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## **COUNT XXXII**

**(Avoidance and Recovery of Actual Fraudulent Transfers — 11 U.S.C. §§ 544(b)(1); 550; and Applicable Law (including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware) — Defendant Bits of Sunshine LLC and Any Other Immediate or Mediate Transferees)**

496.     Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

497.     Plaintiff brings this claim under section 544(b)(1) of the Bankruptcy Code, section 550 of the Bankruptcy Code, and applicable law including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware.

498.     As set out in Count XXXI, Bits of Sunshine LLC executed the Sunshine Transfers, which each constitute a transfer of interest in the Debtors' property, and were made with the actual intent to hinder, delay, or defraud Plaintiff and Celsius.

499.     Bits of Sunshine LLC's actual intent to hinder, delay, or defraud Plaintiff and Celsius is further established by, among other things, the following badges of fraud:

    a.  Mr. Goldstein's ownership and control of Bits of Sunshine;

    b.  The close relationship between the Debtors and Mr. Goldstein, who was the CTO or President of Labs of the Debtors at the time of the transfers;

    c.  Bits of Sunshine's continued retention of possession, benefit, or use of the cryptocurrencies withdrawn in the Sunshine Transfers;

    d.  The timing of the transactions as Celsius was experiencing financial distress;

    e.  Contemporaneous communications that establish Mr. Goldstein knew Celsius was insolvent and in dire financial condition;

f.  The fact that Bits of Sunshine LLC moved nearly all of its CEL tokens and a substantial majority of stablecoins between associated entities;

g.  The Sunshine Transfers were made to an insider; and

h.  That Bits of Sunshine and Mr. Goldstein's transactions were conducted in secret and not disclosed until significantly after the Debtors filed voluntary petitions for protection under Chapter 11.

500.    As discussed in Section II, *supra*, Mr. Goldstein regularly caused Bits of Sunshine LLC to sell its CEL tokens during Celsius' buybacks.

501.    By virtue of the foregoing, the Sunshine Transfers were fraudulent transfers avoidable under 11 U.S.C. § 544 and applicable law, including, but not limited to, the Uniform Fraudulent Transfer Act as enacted in the states of New York, New Jersey, and Delaware. Thus, Plaintiff is entitled to avoid the Sunshine Transfers.

502.    To the extent the Sunshine Transfers are included in Count VI as avoidable preferential transfers, those transfers are pled alternatively as fraudulent transfers.

503.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under section 544 of the Bankruptcy Code, Plaintiff may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

504.    Bits of Sunshine LLC is the initial transferee for whose benefit the Sunshine Transfers were made. Upon information and belief, Bits of Sunshine LLC may have transferred the funds comprising the Sunshine Transfers to third parties. The exact identity of the individuals or entities that received a transfer is presently unknown. The John Doe Defendants are thus immediate or mediate transferees of the Sunshine Transfers, and upon information and belief, may currently be in possession of the funds comprising the transfers.

505.    Therefore, the Sunshine Transfers, or the value of the property transferred in the

Sunshine Transfers, are recoverable by Plaintiff under section 550 of the Bankruptcy Code.

## COUNT XXXIII

**(Disallowance of Defendants' Claims — 11 U.S.C. § 502(d) — Defendants Alexander Mashinsky, Shlomi Daniel Leon, Hanoch Goldstein, Jeremie Beaudry, Harumi Urata-Thompson, Aliza Landes, Kristine Mashinsky, AM Ventures Holding LLC, Koala1 LLC, Alchemy Capital Partners LP, Bits of Sunshine LLC, and John Doe Defendants)**

506.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

507.    The Defendants are all persons or entities from which property is recoverable under section 550 of the Bankruptcy Code or is a transferee of transfers avoidable under sections 544, 547, and 548 of the Bankruptcy Code.

508.    The Defendants have not paid the amount or turned over any property transferred for which the Defendants are liable under section 550 of the Bankruptcy Code.

509.    Any filed or scheduled claims held by the Defendants are disallowed until the Defendants pay in full or return the property for which they are liable under section 550 of the Bankruptcy Code.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in its favor against the Defendants as follows:

(a) Damages in an amount to be proven at trial;

(b) Punitive damages in an amount to be proven at trial;

(c) Determining that each of the Preferential and Fraudulent Transfers[31] is avoidable as a preferential transfer or fraudulent transfers pursuant to the applicable provisions of the

---

[31] The "**Fraudulent Transfers**" are those transfers identified in Counts VII, VIII, IX, X, XI, XII, XV, XVI, XVII, XVIII, XIX, XX, XXI, XXII, XXIII, XXIV, XXV, XXVI, XXVII, XXVIII, XXXI, and XXXII.

Bankruptcy Code and applicable state law, including, without limitation, sections 544, 547, 548, and 550 of the Bankruptcy Code;

(d) Ordering that Plaintiff may recover and the Defendants or any mediate transferee must turnover, for the benefit of the estate, the transferred cryptocurrency or, in the alternative, if greater, the U.S. dollars in an amount equal to the price of the transferred cryptocurrency on the day of the transfer, with interest;

(e) Ordering that pursuant to the applicable provisions of the Bankruptcy Code, including, without limitation, section 502(d) of the Bankruptcy Code, each claim asserted by the Defendants is disallowed;

(f) Granting Plaintiff costs of suit incurred herein, including, without limitation, attorneys' fees, costs, and other expenses incurred in this action;

(g) Granting Plaintiff pre- and post-judgment interest on the judgment amount to the fullest extent allowed by applicable law; and

(h) Ordering such other and further relief as the Court may deem just and proper.

*[Remainder of Page Intentionally Left Blank]*

Dated:    [●]
          New York, New York

[PROPOSED COMPLAINT]

**WHITE & CASE LLP**
David M. Turetsky
Samuel P. Hershey
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113
Email:  david.turetsky@whitecase.com
            sam.hershey@whitecase.com

– and –

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile:  (312) 881-5450
Email:  mandolina@whitecase.com
            gregory.pesce@whitecase.com

– and –

**WHITE & CASE LLP**
Keith H. Wofford
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile:  (305) 358-5744
Email: kwofford@whitecase.com

– and –

**WHITE & CASE LLP**
Aaron E. Colodny (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone: (213) 620-7700
Facsimile:  (213) 452-2329
Email:  aaron.colodny@whitecase.com

*Counsel to the Official Committee of
Unsecured Creditors*