Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Counsel to the Initial Debtors and Debtors in Possession*

*Proposed Counsel to the GK8 Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) ) ) | Case No. 22-10964 (MG) |
| Debtors. | ) ) ) | (Jointly Administered) |

**DEBTORS' STATEMENT REGARDING**
**COMMENCEMENT OF CLAIMS RECONCILIATION PROCESS**

The above-captioned debtors and debtors in possession (collectively, "Celsius" or the "Debtors") provide the following statement regarding the claims process.

1.     The Examiner's final report[2] concludes what many have long suspected—Alex Mashinsky and other members of Celsius' prior management team lied to all account holders from

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 USA LLC (9450); and GK8 UK Limited (0893).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, PH05, Hoboken, New Jersey 07030.

[2]   *See* [Docket No. 1956] (the "Examiner's Report" prepared by the "Examiner").

the beginning of Celsius' business.[3]  Celsius recognizes the community's pain and the hardship

caused by these chapter 11 cases, and Celsius' current management team and the special committee

of the board are committed to doing everything possible to make things right for account holders.[4]

Celsius understands that the community would prefer greater transparency, and Celsius has

endeavored to convey publicly the rationale behind its decisions wherever possible.

2.      Since September, Celsius has been engaged in a marketing and sale process,

working with the Official Committee of Unsecured Creditors and bidders to improve bids and

ultimately select a transaction that Celsius believes will maximize the value of Celsius' liquid and

illiquid assets so that value can be returned to Celsius' stakeholders as promptly as possible.  Due

to the confidential nature of the process, Celsius has not been able to share many details about the

path forward and creditor recoveries.  This past week, that changed.  With the *Debtors' Statement*

*with Respect to the Status of the Debtors' Chapter 11 Plan Process* [Docket No. 2066]

(the "Plan Update") and the *Motion of the Official Committee of Unsecured Creditors to Approve*

*Joint Stipulation and Agreed Order Between the Official Committee of Unsecured Creditors and*

*the Debtors with Respect to Certain Claims and Causes of Action Belonging to the Debtors'*

*Estates* [Docket No. 2054], Celsius is hopeful that the community will see both the future potential

contained in the proposed plan framework and a path to closure on what has undeniably been a

horrible chapter in many account holders' lives.  The proposed chapter 11 plan will provide for

---

[3]   For purposes of this statement, Celsius treats the facts and conclusions in the Examiner Report as true.  Nothing
      herein shall be treated as an admission regarding any matter in the Examiner Report.

[4]   *See Declaration of Alan Carr, Director of Celsius Network Limited, in Support of (I) the Debtors' Second
      Exclusivity Extension and (II) the Debtors' Objection to the Motion to Appoint a Chapter 11 Trustee* [Docket No.
      2047]; *Declaration of Christopher Ferraro, Interim Chief Executive Officer, and Chief Financial Officer of the
      Debtors, in Support of (I) the Debtors' Second Exclusivity Extension and (II) the Debtors' Objection to the Motion
      to Appoint a Chapter 11 Trustee* [Docket No. 2046].  As discussed during the February 15, 2023 hearing, the
      Debtors will also file a similar declaration of David Barse—a member of the Board of Directors of Celsius
      Network Limited, and the second and final member of its special committee—in the coming days.

the distribution of the vast majority of the Debtors' liquid cryptocurrency, for the professional management of the Debtors' illiquid assets, and for the pursuit of claims against those individuals whose misconduct led to Celsius' collapse.

3.     Celsius is committed to distributing value to its account holders as soon as possible. To streamline the process and facilitate this goal, Celsius scheduled claims for each of its account holders according to the cryptocurrency balances reflected in Celsius' records. Now that the claims bar date has passed, Celsius understands that tens of thousands of account holders have filed proofs of claim, many of which assert additional individual claims beyond the return of cryptocurrency, including seeking damages for fraud or breach of contract. Counterintuitively, to return value to account holders as quickly and equitably as possible, Celsius needs to object to these claims and seek to reduce them to reflect only the amount of cryptocurrency that is owed to the account holders. Celsius will also object where account holders filed multiple/duplicative claims, or claims that are not supported by Celsius' books and records.

4.     Recoveries from the Debtors' estates are a zero sum game. Absent objection, claimants who filed excessive or duplicative claims would recover more than other account holders who have "allowed" claims for just the return of the cryptocurrency they transferred onto Celsius' platform. To use just one example, one account holder filed a claim in the amount of $117 quintillion, which is 27,000 trillion times more than Celsius' total liability to **all** account holders as of the Petition Date ($4.2 billion). If that claim were to be allowed, it would be entitled to nearly all of the value of Celsius' assets by itself and there would be nothing left for other account holders. And the same holds true even for smaller claims—there are many account holders who filed duplicate proofs of claim or proofs of claim for excessive amounts, which, taken together, would significantly dilute the value that could be distributed to other account holders

3

who simply relied on the schedules. These claims must be reconciled prior to confirmation of a chapter 11 plan to ensure that distributions can proceed fairly and without delay.

5. This claims reconciliation process is also critical for the plan voting process. Ordinarily, creditors can vote the amount of their proof of claim. Given that there are so many account holders with duplicative and excessive proofs of claim, these account holders would have "extra" votes, both in terms of number and value. Celsius wants to ensure a full and fair voting process and believes that each account holder should be entitled to one vote in the amount of the value of the cryptocurrency in their Celsius account—nothing more, nothing less. Absent these claims objections, certain individual account holders would have dozens of votes with outsized claim amounts.

6. Celsius' most vocal account holders will no doubt argue that Celsius' objections to their claims for fraud or breach of contract mean that Celsius denies or discounts the historical misconduct that occurred or the harm that was done. The reality is that any bad thing that happened to account holders—if they were misled, if they were defrauded, if their contract was breached— happened, for all practical purposes, to all account holders. No account holder has brought forth "special" or "unique" circumstances that justify an enhanced claim, and delving into individuals' particular circumstances will only bring delay and additional costs and pit account holders against each other.

7. Celsius attempted to convey this point in connection with the Earn Motion: "Arguments by individual creditors that they should be entitled to 'these' assets or 'those' assets and thereby 'jump the line' ahead of similarly situated creditors will only delay, not hasten, the goal of returning assets to all customers."[5] The frenzy, however, had already begun. Several

---

[5] *Debtors' Reply in Support of Debtors' Amended Motion for Entry of an Order (I) Establishing Ownership of Assets in the Debtors' Earn Program, (II) Permitting the Sale of Stablecoin in the Ordinary Course, and*

account holders insisted on pursuing discovery and arguments on legally irrelevant issues to build the case for a return of "their" coins. A few of these creditors responded with individual counter-motions for a declaration that the coins associated with their accounts were theirs. Others commenced adversary proceedings. And, when the Court overruled their arguments—clarifying, in the process, that the Earn ownership ruling meant that the account holders had unsecured claims, entitling them to a share of the Debtors' assets—several of them appealed the Court's opinion.

8. All of these account holders are arguing that the coins at issue are *their* coins. Had they succeeded—or if they succeed on appeal—one of two things can happen: (1) a mad free-for-all race to the courthouse commences for all creditors to seek an individual remedy where some win and most lose or (2) the coins are distributed fairly through a collective process, exactly as the Debtors proposed from the beginning. Those are the options. Celsius simply doesn't have enough assets to repay all of its account holders. Celsius sought and obtained a ruling that coins in the Earn Program are property of the estate to ensure that these coins would be fairly distributed to all account holders under a chapter 11 plan and not grabbed by individual account holders who were litigating for the return of "their" coins. The Court's ruling on the Earn issue can best be understood as a ruling that the coins in Earn cannot be seized one-off by individual creditors, but rather must be held by the Debtors for fair distribution to all creditors under a chapter 11 plan. That is why Celsius is in bankruptcy.

9. Any account holders who insist on pursuing "extra" claims or who bring litigation in the bankruptcy court seeking individualized remedies are not "fighting for the community."

---

*(III) Granting Related Relief and Response to Certain Objections Thereto* [Docket No. 1578] ¶ 5; *Debtors' Amended Motion for Entry of an Order (I) Establishing Ownership of Assets in the Debtors' Earn Program, (II) Permitting the Sale of Stablecoin in the Ordinary Course and (III) Granting Related Relief* [Docket No. 1325] (the "Earn Motion").

They are fighting for themselves at the expense of the community. Any value paid for "extra" claims, or special remedies, asserted by these account holders necessarily comes from the recoveries of other account holders, as does the cost of the litigation itself.[6] The vast majority of account holders did not file proofs of claim asserting "extra" damages and are relying on the schedules as an accurate accounting of what they are owed, and if Celsius does not object to the "extra" claims filed—in often extraordinary amounts—by a small minority of account holders, this subset of account holders will receive supersized recoveries at the direct expense of the silent majority. To illustrate the point, approximately 23,000 proofs of claim were filed seeking over $78 billion in claims. If those claims were allowed, that would mean that approximately 3% of the Debtors' 600,000 account holders would have claims for over 18 times the value of the cryptocurrency deposited on the Debtors' platform—significantly diluting the 97% of account holders who relied on the schedules. This would be a grossly unfair result, and Celsius will continue to fight all efforts by a litigious minority of creditors to siphon away value that should be shared with all account holders. All account holders suffered the same harm—the loss of the cryptocurrency in their Celsius accounts—and their allowed claims (and, by extension, votes and recoveries) should reflect that.

10.     Unfortunately, the claims objection process is expensive, but it is necessary to avoid unjust outcomes. For those customers who filed "extra" claims out of fear that they would otherwise waive their rights or because they did not understand the implications, a form to modify a proof of claim back to its scheduled amount is attached to this statement. For those who do not

---

[6]   Celsius has long been troubled by the costs generated by this vocal minority, particularly relative to the benefits obtained. For example, searching "Frishberg" on the docket for Celsius' chapter 11 cases results in four pages of results. To date, Mr. Frishberg has only succeeded in one of his requests for relief, obtaining a one-hour deposition at the estate's expense. *Order Requiring Debtors to Allow Daniel Frishberg to Depose Mr. Blonstein for a Limited Period and Scope* [Docket No. 1542]. At this stage, Mr. Frishberg has now cost the estates hundreds of times more in costs than Celsius ever owed Mr. Frishberg.

request a modification, Celsius will be forced to spend estate resources to object to these "extra" claims, diminishing the assets available for distribution to all stakeholders.

11. To start the process without delay, Celsius is filing "test case" objections to claims filed by claimants who previously requested an earlier determination of these matters. So there is no doubt—Celsius does not seek to utilize claims objections to deny any account holder the right to a claim for the return of their cryptocurrency or a vote on Celsius' chapter 11 plan. Celsius is simply seeking to ensure that all account holders are allowed a claim for the return of their cryptocurrency, rather than allow duplicate or excessive recoveries simply because certain account holders filed multiple claims, overstated the amounts that they were owed, or added claims for "fraud" or "breach of contract" when other account holders did not. To ensure that this is abundantly clear, each proposed order to an objection to duplicate or excessive claims will specifically provide that the affected account holder's claim should revert to its scheduled amount.

**EVERY ACCOUNT HOLDER IS ENCOURAGED TO MONITOR THEIR NOTICING E-MAIL ADDRESS IN THE COMING WEEKS FOR ADDITIONAL NOTICES REGARDING THE CLAIMS RECONCILIATION PROCESS.**

**QUESTIONS REGARDING THE CLAIMS RECONCILIATION PROCESS CAN BE DIRECTED TO CELSIUSINQUIRIES@STRETTO.COM AND CELSIUSCUSTOMERQUESTIONS@KIRKLAND.COM.**

[*Remainder of page intentionally left blank.*]

New York, New York
Dated: February 19, 2023

*/s/ Joshua A. Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900
Email:              jsussberg@kirkland.com

 - and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200
Email:              patrick.nash@kirkland.com
                    ross.kwasteniet@kirkland.com
                    chris.koenig@kirkland.com
                    dan.latona@kirkland.com

*Counsel to the Initial Debtors and Debtors in Possession*

*Proposed Counsel to the GK8 Debtors and Debtors in Possession*