Hearing Date:  **March 21, 2023, at 10:00 a.m. (prevailing Eastern Time)**
Objection Deadline:  **March 14, 2023, at 4:00 p.m. (prevailing Eastern Time)**

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) Case No. 22-10964 (MG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**NOTICE OF HEARING ON DEBTORS' MOTION FOR ENTRY OF AN**
**ORDER (I) AUTHORIZING AND APPROVING CERTAIN BID PROTECTIONS**
**FOR THE PROPOSED PLAN SPONSOR AND (II) GRANTING RELATED RELIEF**

**PLEASE TAKE NOTICE** that a hearing on the *Debtors' Motion for Entry of an Order*

*(I) Authorizing and Approving Certain Bid Protections for the Proposed Plan Sponsor and*

*(II) Granting Related Relief* (the "Motion") will be held on **March 21, 2023, at 10:00 a.m.,**

**prevailing Eastern Time** (the "Hearing") before the Honorable Martin Glenn, Chief United States

Bankruptcy Judge.  In accordance with General Order M-543 dated March 20, 2020, the Hearing

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

will be conducted remotely using Zoom for Government.  Parties wishing to appear at the Hearing, whether making a "live" or "listen only" appearance before the Court, need to make an electronic appearance    (an "eCourtAppearance")    through    the    Court's    website    at https://ecf.nysb.uscourts.gov/cgi-bin/nysbAppearances.pl.    Electronic    appearances (eCourtAppearances) need to be made by **4:00 p.m., prevailing Eastern Time, the business day before the hearing (*i.e.*, on March 20, 2023)**.

PLEASE TAKE FURTHER NOTICE that due to the large number of expected participants in the Hearing and the Court's security requirements for participating in a Zoom for Government audio and video hearing, all persons seeking to attend the Hearing at 10:00 a.m., prevailing Eastern Time on March 21, 2023, must connect to the Hearing beginning at 9:00 a.m., prevailing Eastern Time on March 21, 2023.  When parties sign in to Zoom for Government and add their names, they must type in the first and last name that will be used to identify them at the Hearing.  Parties that type in only their first name, a nickname, or initials will not be admitted into the Hearing.  When seeking to connect for either audio or video participation in a Zoom for Government Hearing, you will first enter a "Waiting Room" in the order in which you seek to connect.  Court personnel will admit each person to the Hearing from the Waiting Room after confirming the person's name (and telephone number, if a telephone is used to connect) with their eCourtAppearance.  Because of the large number of expected participants, you may experience a delay in the Waiting Room before you are admitted to the Hearing.

PLEASE TAKE FURTHER NOTICE that any responses or objections to the relief requested in the Motion shall:  (a) be in writing; (b) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern

District of New York; (c) be filed electronically with the Court on the docket of *In re Celsius Network LLC*, No. 22-10964 (MG) by registered users of the Court's electronic filing system and in accordance with all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York (which are available on the Court's website at http://www.nysb.uscourts.gov); and (d) be served in accordance with the *Amended Final Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief,* [Docket No. 1181] (the "Case Management Order") by **March 14, 2023, at 4:00 p.m., prevailing Eastern Time**, to (i) the entities on the Master Service List (as defined in the Case Management Order and available on the Debtors' case website at https://cases.stretto.com/celsius) and (ii) any person or entity with a particularized interest in the subject matter of the Motion.

 **PLEASE TAKE FURTHER NOTICE** that only those responses or objections that are timely filed, served, and received will be considered at the Hearing.  Failure to file a timely objection may result in entry of a final order granting the Motion as requested by the Debtors.

 **PLEASE TAKE FURTHER NOTICE** that copies of the Motion and other pleadings filed in these chapter 11 cases may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/celsius.  You may also obtain copies of the Motion and other pleadings filed in these chapter 11 cases by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

New York, New York
Dated:  March 1, 2023

_/s/ Joshua A. Sussberg_

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:            jsussberg@kirkland.com

 - and -

Patrick J. Nash, Jr., P.C. (admitted _pro hac vice_)
Ross M. Kwasteniet, P.C. (admitted _pro hac vice_)
Christopher S. Koenig
Dan Latona (admitted _pro hac vice_)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:            patrick.nash@kirkland.com
                      ross.kwasteniet@kirkland.com
                      chris.koenig@kirkland.com
                      dan.latona@kirkland.com

_Counsel to the Debtors and Debtors in Possession_

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER**
**(I) AUTHORIZING AND APPROVING CERTAIN BID PROTECTIONS**
**FOR THE PROPOSED PLAN SPONSOR AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state

the following in support of this motion (this "Motion"):

**Preliminary Statement**

1.    Since the outset of these chapter 11 cases, the Debtors have diligently worked to

identify a sale and restructuring transaction that maximizes the value of their liquid and illiquid

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

assets and businesses for the benefit of their account holders.  To that end, the Debtors, in close consultation with the official committee of unsecured creditors (the "Committee") and its advisors, have pursued a dual-track process of marketing the Debtors' retail platform and mining business while simultaneously evaluating a potential standalone reorganization.  That months-long marketing process resulted in six initial, non-binding bids that the Debtors and the Committee have worked to improve in order to identify the bid that provides the value-maximizing solution for the Debtors' liquid and illiquid assets.

2.     As disclosed in the *Debtors' Statement With Respect to the Status of the Debtors' Chapter 11 Plan Process* [Docket No. 2066], the Debtors and the Committee identified NovaWulf Digital Management, LP ("NovaWulf" or the "Plan Sponsor") as the potential purchaser and plan sponsor in restructuring transactions that will (a) provide for the distribution of a significant majority of the Debtors' liquid cryptocurrency to account holders on the effective date of the chapter 11 plan of reorganization to be proposed by the Debtors (the "Plan"), and (b) create a new entity or entities ("NewCo") that will operate and/or manage the Debtors' illiquid assets (including the mining business, retail and institutional loan portfolios, staked cryptocurrency, and other alternative investments), and distribute that value to Earn creditors in the form of equity in NewCo, which creditors will receive 100% of the "common" equity of NewCo.  Beyond serving as a vehicle to store and, over time, monetize the Debtors' illiquid assets, NewCo will be a public and fully regulatory compliant company that will operate and expand into a variety of cryptocurrency related businesses, including, among others, staking, mining, lending, and other potential future opportunities for the purpose of delivering value to its creditor shareholders.  NewCo will be predicated on transparency, governed by a board of its creditor shareholders, all as further detailed in the Plan Term Sheet (as defined herein). The NewCo structure is—and was expressly designed

2

to—deliver value to the Debtors' account holders over time as the cryptocurrency market continues to improve.

3.      Critically, NovaWulf has developed partnerships with service providers that have the required licenses to operate the segments of NewCo subject to licensure and distribute tokenized equity securities under the Plan in compliance with all regulatory requirements. NovaWulf does not have, and NewCo will not have, any affiliation to the Debtors or their founders and will be a regulated entity with financial reporting obligations consistent with public-company best practices.  The Plan will also include a 70% recovery for "convenience class" creditors who hold Earn claims below $5,000 and will present settlement options for holders of custody claims and retail loans.  The Plan will also provide for a litigation trust to pursue certain claims and causes of action against Alex Mashinsky, S. Daniel Leon, and certain other insiders, among other claims and causes of action that will be agreed upon by the Debtors and the Committee.

4.      Contemporaneously with the filing of this Motion, the Debtors, the Committee, and NovaWulf entered into a binding plan sponsor agreement, attached hereto as **Exhibit B** (the "Plan Sponsor Agreement"), which sets forth the terms of the proposed transaction (as defined in the Plan Support Agreement, the "Restructuring Transactions"), the commitments and obligations of the parties with respect to the Restructuring Transactions, and milestones for the disclosure, solicitation, and Plan confirmation processes and the consummation of the Restructuring Transactions.  Attached hereto as **Exhibit C** is a presentation that provides key features of the proposed transaction, the Plan Sponsor, and NewCo.[2]  While the Plan Sponsor Agreement represents a critical step in the Debtors' sale process, it is not the final step.  As set forth in the *Notice of (I) Selection of Stalking Horse Bidder and (II) Amended Dates and Deadlines With*

---

[2]    The presentation includes certain updates to the version that was filed on February 15, 2023 [Docket No. 2066].

*Respect to Bidding Procedures for the Potential Sale of Substantially All of the Debtors' Assets*
[Docket No. 2150], the Debtors have selected NovaWulf as the proposed plan sponsor.  Although
the Debtors and the Committee have entered into the Plan Sponsor Agreement and believe that the
NovaWulf transaction represents the best option presently available to maximize the value of the
Debtors' assets, the Debtors and the Committee will continue to have the ability to engage with
other bidders and potential bidders with respect to alternative proposals between now and April 17,
2023.  The Plan Sponsor Agreement includes a broad "fiduciary out" provision that allows the
Debtors or the Committee, consistent with their fiduciary duties, to terminate the Plan Sponsor
Agreement to the extent the Debtors and/or the Committee identify an alternative proposal that is
superior to the proposed NovaWulf transaction.

5.     The Plan Sponsor Agreement provides material value to the Debtors and their
estates by securing a commitment from NovaWulf to serve as Plan Sponsor for a transaction the
Debtors and Committee believe maximizes the value of the Debtors' assets.  Pursuant to the
proposed sale and restructuring transaction, NovaWulf has committed substantial resources,
including the investment of $45 million of cash, to implement the Restructuring Transactions that
will facilitate recoveries for the Debtors' creditors.  And, to the extent the Debtors and the
Committee identify an alternative proposal that is superior to the Restructuring Transactions
between now and April 17, 2023, the Debtors' and the Committee's capacity to solicit such
superior proposal is predicated on the framework provided by the Plan Sponsor Agreement with
NovaWulf and the Debtors' and the Committee's capacity to take actions consistent with their
respective fiduciary duties under the Plan Sponsor Agreement.

6.     In recognition of the framework provided by the NovaWulf transaction, the Debtors
file this Motion to provide bid protections to NovaWulf that are typical for "stalking horse bidders"

in chapter 11 and that are reasonable and appropriate in light of NovaWulf's efforts prior to the date hereof and commitments to continue such efforts in furtherance of the Restructuring Transactions. Specifically, the Debtors, the Committee, NovaWulf, and their respective advisors undertook enormous efforts over the past few months improving upon the proposed transaction, including hard-fought negotiations and substantive analyses of complex legal issues. These efforts culminated in the Plan Sponsor Agreement, which creates the architecture for a complex and structured transaction designed to maximize the value of the Debtors' assets for their account holders over time. NovaWulf and its advisors have spent thousands of hours of time and have incurred significant legal fees and other expenses in formulating and negotiating the proposed transaction, and moving forward, NovaWulf will continue to expand significant efforts and incur substantial costs in negotiating and drafting the definitive documentation with respect to the Restructuring Transactions. Additionally, NovaWulf is incurring expenses on behalf of NewCo (*e.g.*, expenses incurred establishing payroll and other infrastructure, in connection with the formation and organization of NewCo and any of its subsidiaries, filing various corporate documents on behalf of NewCo, transferring assets to NewCo, and addressing regulatory matters) that NewCo would bear in any transaction structure.

7.    In a uniquely challenging environment for cryptocurrency and cryptocurrency-related businesses, coupled with significant government and regulatory scrutiny and oversight, NovaWulf has agreed not only to invest in NewCo and partner with the Debtors to consummate the Restructuring Transactions, but also to continue to expend significant resources to pursue the Restructuring Transactions while the Debtors and the Committee have the ability to exercise their broad fiduciary out under the terms of the Plan Sponsor Agreement to pursue a superior alternative transaction. Therefore, as part of the Plan Sponsor Agreement (and as a

5

condition of NovaWulf's entry into the Plan Sponsor Agreement), the Debtors, in a sound exercise of their business judgment, seek to provide NovaWulf with the Bid Protections—a Break-Up Fee of $5 million and an Expense Reimbursement (each as defined herein) of up to a maximum of $15 million—to compensate NovaWulf for the substantial time and resources it has spent (and will continue to spend) in negotiating and consummating the complex and novel Restructuring Transactions on the terms set forth in the Plan Sponsor Agreement.

8.    The Bid Protections will ensure that NovaWulf is properly incentivized to continue expending considerable resources to develop, document, and, ultimately, implement the Restructuring Transactions.  To be sure, while the Debtors believe the NovaWulf transaction represents the best option presently available to maximizing the value of the Debtors' estates, to the extent another bidder proposes a transaction that is superior to the Restructuring Transactions, the Debtors have the flexibility to consider and, if appropriate, act upon that transaction in an exercise of their fiduciary duties.  Accordingly, providing the Bid Protections to the Plan Sponsor is a sound exercise of the Debtors' business judgment and should be approved.

## Relief Requested

9.    The Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"): (a) authorizing and approving the Break-Up Fee and Expense Reimbursement (each as defined herein) as set forth in the Plan Sponsor Agreement (collectively, the "Bid Protections"); and (b) granting related relief.

## Jurisdiction and Venue

10.    The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York, entered February 1, 2012.  The Debtors confirm their consent to the Court

entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

11.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

12.     The statutory bases for the relief requested herein are sections 105(a), 363, and 503(b) of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 2002-1 and 6004-1 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules").

### Background

13.     The Debtors, together with their non-Debtor affiliates (collectively, "Celsius"), are one of the largest and most sophisticated cryptocurrency-based finance platforms in the world and provide financial services to institutional, corporate, and retail clients across more than 100 countries. Celsius was created in 2017 to be one of the first cryptocurrency platforms to which users could transfer their crypto assets and (a) earn rewards on crypto assets and/or (b) take loans using those transferred crypto assets as collateral. Headquartered in Hoboken, New Jersey, Celsius has more than 1.7 million registered users and approximately 300,000 active users with account balances greater than $100.

14.     On July 13, 2022 (the "Petition Date"), certain of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. A detailed description of the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Robert Campagna, Managing Director of Alvarez & Marsal North America, LLC, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 22]. The Debtors commenced these chapter 11 cases to

provide Celsius an opportunity to stabilize its business and consummate a comprehensive restructuring transaction that maximizes value for stakeholders.

15.    On December 7, 2022, Debtors GK8 Ltd., GK8 UK Limited, and GK8 USA LLC (collectively, the "GK8 Debtors") each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description of the facts and circumstances of the GK8 Debtors' chapter 11 cases is set forth in the *Declaration of Christopher Ferraro, Director and Chief Financial Officer of GK8 Ltd., in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 1629].

16.    The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  These chapter 11 cases have been consolidated for procedural purposes only and are jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket Nos. 53, 1648].  On July 27, 2022, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed an official committee of unsecured creditors [Docket No. 241] (the "Committee").  On September 29, 2022, the Court entered an order appointing an examiner [Docket No. 920].

## The Marketing Process

17.    To maximize the value of the Debtors' assets, the Debtors, with input from the Committee, conducted a robust, transparent marketing and sale process to solicit proposals for their retail platform, mining business, and other assets, all in accordance with the *Order (I) Approving the Bidding Procedures in Connection With the Sale of Substantially All of the Debtors' Assets, (II) Scheduling Certain Dates With Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving Contract Assumption and Assignment Procedures,*

8

*and (V) Granting Related Relief* [Docket No. 1272].  In parallel, the Debtors and their advisors

developed a plan for a standalone operating business upon emergence (the "Standalone Plan").

18.    To that end, as explained in the Puntus Declaration,[3] in September 2022, the

Debtors and Centerview Partners LLC ("Centerview"), in consultation with the Committee,

developed a list of over 130 parties they believed might be interested in consummating a sale

transaction, including strategic parties, private equity firms, companies in the cryptocurrency

ecosystem, scaled fintech companies, and traditional financial institutions.  As part of that process,

the Debtors executed over 40 confidentiality agreements with prospective bidders.  Such parties

were granted access to a virtual data room populated with diligence materials to facilitate their

evaluation and assessment of the Debtors' assets.  Parties that expressed interest in the Debtors'

assets were also afforded the opportunity to discuss the business with the Debtors' management

team.

19.    The Debtors' robust marketing process ultimately produced six non-binding bids

for their retail platform and/or related cryptocurrency assets and other certain assets residing on

the Debtors' platform, three non-binding bids for their mining business, and several bids for

discrete individual assets.  The bids contemplated various transaction structures involving some or

all of the Debtors' assets, and the Debtors and their advisors, together with the Committee and its

advisors, engaged with certain of these bidders in order to diligence the bids and bidders, increase

competitive tension, and identify the bid that provides the value-maximizing solution for the

Debtors' assets.  Where appropriate and practicable, the Debtors endeavored to supplement the

---

[3]    "Puntus Declaration" means the *Declaration of Marc Puntus in Support of the Debtors' Motion for Entry of an
Order (I) Authorizing and Approving Certain Bid Protections for the Plan Sponsor and (II) Granting Related
Relief*, filed contemporaneously herewith.

virtual data room in response to bidder diligence requests and have hosted virtual and in-person diligence sessions with the Debtors' management team.

20.     The Debtors and their advisors thoroughly examined these bids in parallel with a thorough examination and vetting of the Standalone Plan, and eventually determined, in the exercise of their business judgement and in a manner consistent with the exercise of their fiduciary duties, and in consultation with the Committee and its advisors, that the NovaWulf proposal represents the value-maximizing path forward for the Debtors, their account holders, and other stakeholders.  Notably, none of the other bids received for the Debtors' mining business were cash bids.  All such bids were non-binding, contingent on raising financing, and structured as non-cash acquisitions or mergers, with the Debtors proposed to be left with a significantly diluted equity stake in the combined mining company on a go-forward basis.

21.     Pursuant to the Restructuring Transactions, NewCo will harvest and distribute the value of the Debtors' substantial illiquid assets over time—including the Debtors' mining operations, retail and institutional loans, staked cryptocurrency, and other investments—for the benefit of the Debtors' Earn creditors, who will receive 100% of the tokenized equity in the public company upon emergence.  Importantly, NovaWulf proposes not only to manage NewCo pursuant to the terms of the Plan Sponsor Agreement but to assist the Debtors in distributing a significant majority of the Debtors' liquid cryptocurrency to account holders on the effective date of the Plan (less certain holdbacks to facilitate NewCo's efforts to maximize the value of the Debtors' illiquid assets).

22.     The Debtors, in direct consultation with the Committee, weighed a myriad of factors in determining that NovaWulf's proposal will maximize the value of the Debtors' estates, including, most prominently, that NovaWulf's proposal is centered around the distribution of the

Debtors' illiquid assets over time, the value that the Restructuring Transactions will provide account holders, the timeline on which the Restructuring Transactions may be consummated, and the likelihood that the Restructuring Transactions would pass regulatory scrutiny.  In fact, feasibility of the Plan was of paramount concern when analyzing bids.  Critically, NovaWulf has developed partnerships with service providers that have the required licenses to operate NewCo and distribute the Debtors' liquid and illiquid assets to account holders under the Plan in compliance with all regulatory requirements.

23.    Over the course of the last several weeks, the Debtors, the Committee, and NovaWulf have engaged in extensive hard-fought and arms'-length negotiations regarding the terms of the proposed Restructuring Transactions, including:  a proposed Plan distribution structure; maximizing liquid cryptocurrency distributions for creditors; the management and operation of the Debtors' illiquid assets, over time through NewCo; the development of NewCo's operating model; addressing regulatory and related requirements; and the treatment of the Debtors' borrow program.  To that end, the parties have held countless meetings, including in-person meetings and telephone and video conferences, with the Debtors' management team, NovaWulf's principals, members of the Committee, and each of their respective advisors, exchanged numerous proposals, and engaged extensively with other parties in interest, including regulatory authorities and the *ad hoc* group of retail borrowers.  NovaWulf has expended extensive time, efforts, and financial resources conducting due diligence of the Debtors' business, structuring the Restructuring Transactions, and negotiating the Plan Sponsor Agreement and related documents, and NovaWulf will continue to expend substantial time and resources to negotiate and draft the definitive documentation with respect to the Restructuring Transactions.  Importantly, NovaWulf

has continued to engage with its partners to ensure the regulatory compliance of the Restructuring Transactions.

24.     As a result of these extensive negotiations, on February 28, 2023, the Debtors, the Plan Sponsor, and the Committee executed the Plan Sponsor Agreement, and agreed on the terms of a chapter 11 plan term sheet (the "Plan Term Sheet"), attached to the Plan Sponsor Agreement as Exhibit A, that will form the backbone of the Debtors' Plan.  A summary of the Plan Sponsor Agreement and Plan Term Sheet are set forth below:

| Material Terms of Plan Sponsor Agreement[4] | |
|---|---|
| **Plan Sponsor** | NovaWulf Digital Management, LP |
| **Milestones (Plan Sponsor Agreement § 4)** | The following milestones shall apply to the Plan Sponsor Agreement (collectively, the "Milestones"), which in each case may be waived or extended in writing by the Plan Sponsor (electronic mail among counsel is sufficient):<br><br>(a)  by no later than March 17, 2023, the Plan Sponsor shall have delivered a schedule setting out all required Regulatory Approvals and a proposed business plan for Mining to the Debtors and the Committee;<br><br>(b)  by no later than March 22, 2023, the Bankruptcy Court shall have entered the Bid Protections Order;<br><br>(c)  by no later than March 31, 2023, the Debtors shall file the Plan, the Disclosure Statement, Solicitation Materials, and a motion seeking entry of the Disclosure Statement Order;<br><br>(d)  by no later than May 5, 2023, the Plan Sponsor shall have proposed a manager or managers for Mining to the Debtors and the Committee (to be reasonably acceptable to the Debtors and the Committee);<br><br>(e)  by no later than May 10, 2023, the Bankruptcy Court shall have entered the Disclosure Statement Order;<br><br>(f)  by no later than June 20, 2023, the Bankruptcy Court shall have entered the Confirmation Order; and<br><br>(g)  by no later than June 30, 2023, the Effective Date of the Plan shall have occurred. |

---

4    Capitalized terms used but not otherwise defined in these summary charts shall have the meanings ascribed to them in the Plan Sponsor Agreement or the Plan Term Sheet, as applicable.

| Material Terms of Plan Sponsor Agreement[4] |
|---|

| Termination (Plan Sponsor Agreement § 12) | Termination Generally: |
|---|---|
| | • The Debtors, the Plan Sponsor, and the Committee, as applicable, shall have the ability to terminate the Plan Sponsor Agreement upon the occurrence of one of the following events, subject to certain exceptions as further detailed in the Plan Sponsor Agreement: |
| | (a)  the breach in any material respect by one of the other parties to the Plan Sponsor Agreement of any of the applicable representations, warranties, or commitments set forth in the Plan Sponsor Agreement that (i) would reasonably be expected to prevent, impede, or materially impair the implementation or consummation of the Restructuring Transactions and (ii) to the extent curable, remains uncured for ten (10) days after the transmission of written notice by the applicable party in accordance with section 15.11 of the Plan Sponsor Agreement; |
| | (b)  any Governmental Authority that must grant a Regulatory Approval has taken any action or failed to take any action that either (i) denies such approval or (ii) imposes a material condition that in the reasonable judgment of the relevant party, based upon the advice of counsel, would reasonably be expected to materially prevent or impede the implementation or consummation of a material portion of the Restructuring Transactions; |
| | (c)  the Bankruptcy Court enters an order denying confirmation of the Plan; |
| | (d)  the Debtors and the Committee may terminate the Plan Sponsor Agreement if any Governmental Authority that must grant a Regulatory Approval has (i) denied such approval (ii) imposes a material condition that in the reasonable judgement of the Debtors, based upon the advice of Debtors Counsel, would reasonably be expected to materially prevent or impede the implementation or consummation of a material portion of the Restructuring Transactions; |
| | (e)  the Debtors may terminate the Plan Sponsor Agreement if the board of directors, board of managers, or such similar governing body of any Debtor determines, after consulting with counsel to the Debtors, and in the case of the Committee, the Committee determines, after consulting with counsel to the Committee, (i) that proceeding with any of the Restructuring Transactions or failing to terminate the Plan Sponsor Agreement would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal; |
| | (f)  the Debtors and the Committee may terminate the Plan Sponsor Agreement if all conditions precedent to the occurrence of the Effective Date of the Plan have been |

| Material Terms of Plan Sponsor Agreement[4] |
|---|

| | | |
|---|---|---|
| | | satisfied or waived in accordance with the Plan and the Plan Sponsor fails to complete the actions to be taken by it on the Effective Date in accordance with the Plan Sponsor Agreement; or |
| | (g) | the Committee and the Plan Sponsor may terminate the Plan Sponsor Agreement if the Debtors withdraw or revoke the Plan or modify the Plan, in whole or in part, in a manner that is not consistent with the Plan Sponsor Agreement in all material respects. |

Termination by the Plan Sponsor:

- In addition to the foregoing, the Plan Sponsor shall have the ability to terminate the Plan Sponsor Agreement upon the occurrence of one of the following events, subject to certain exceptions as further detailed in section 12.01 of the Plan Sponsor Agreement:

| | | |
|---|---|---|
| | (a) | the Bankruptcy Court grants relief that is (i) inconsistent with the Plan Sponsor Agreement in any material respect or (ii) would, or would reasonably be expected to, materially frustrate the purposes of the Plan Sponsor Agreement, including by preventing the consummation of the Restructuring Transactions, in each case unless the Debtors have sought a stay of such relief within seven (7) days after the date that the Bankruptcy Court grants such relief and such order is stayed, reversed, or vacated within fourteen (14) days after the date that the Bankruptcy Court grants such relief; |
| | (b) | the termination of this Agreement in accordance with its terms by the Committee; |
| | (c) | the delivery of a notice by the Debtors in accordance with Section 8.02; |
| | (d) | the failure to meet any Milestone set forth in Section 4 that has not been waived or extended in a manner consistent with this Agreement; |
| | (e) | the Bankruptcy Court enters an order granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code authorizing any party to proceed with regard to any material asset of the Debtors and such relief would materially delay or impede the implementation of the Restructuring Transactions; |
| | (f) | the Bankruptcy Court enters an order (i) converting one or more of the Chapter 11 Cases of the Debtors to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code (other than the *Order Approving the Appointment of Chapter 11 Examiner* [Docket No. 923] or any other order of the Bankruptcy Court with respect to the examiner appointed thereby) or a trustee in one or more of the Chapter 11 Cases |

14

| Material Terms of Plan Sponsor Agreement[4] | |
|---|---|
| | of the Debtors, (iii) terminating any Debtor's exclusive right to file and solicit acceptances of a plan of reorganization, or (iv) rejecting the PLan Sponsor Agreement; |
| | (g) the filing of a motion or application by any Debtor seeking an order (without the prior written consent of the Plan Sponsor), (i) converting one or more of the Chapter 11 Cases of the Debtors to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of the Debtors, or (iii) rejecting the Plan Sponsor Agreement; |
| | (h) the Bankruptcy Court denies entry of the Bid Protections Order; or |
| | (i) following entry of the Bid Protections Order, the Debtors fail to promptly pay and reimburse all Fees and the Break-Up Fee in accordance with the Plan Sponsor Agreement and the Bid Protections Order. |
| | Mutual Termination. The Plan Sponsor Agreement, and the obligations of the Parties hereunder, may be terminated by mutual written agreement among each of the Parties. |
| | Automatic Termination. The Plan Sponsor Agreement shall terminate automatically without any further required action or notice immediately after the Effective Date. |
| **Bid Protections (Plan Sponsor Agreement § 13)** | The Bid Protections are detailed in paragraph 26 of this Motion. |

| Material Terms of Plan Term Sheet | |
|---|---|
| **Plan Sponsor** | NovaWulf Digital Management, LP |
| **NewCo / ESTs** | On the Effective Date, the NewCo Assets shall vest in NewCo. The NewCo Assets will include, among other things, all Retail Loan Settlement Cryptocurrency Assets (which shall be used to settle NewCo's obligations under the Retail Loan Settlement Agreements). |
| | Holders of General Earn Claims (which, for the avoidance of doubt, include any portion of any Borrow Claim treated as an Earn Claim and any Convenience Claim for which the holder has elected to receive the treatment provided to General Earn Claims) will receive Equity Share Tokens ("ESTs") which will represent 100% of the common equity interests in NewCo. The Manager will manage NewCo at the direction of the New Board for the benefit of holders of ESTs. |
| **Earn Treatment** | Holders of Allowed General Earn Claims will receive a recovery comprising (i) a distribution on the Effective Date or as soon as |

| Material Terms of Plan Sponsor Agreement[4] |
|---|

| | reasonably practicable thereafter of a portion of the Debtors' Liquid Cryptocurrency, (ii) 100% of the common equity interests in NewCo, which shall be issued as ESTs, (iii) preferred equity interests represented by Management Share Tokens ("MSTs") entitled to an annual distribution in an amount equal to 50 bps of the NewCo Fee-Paying Asset Value and a 2.5% incentive fee (to be further described in the Management Agreement), and (iv) Litigation Proceeds; provided that an MST will be forfeited if its corresponding EST is traded within one year of the Effective Date.<br><br>Holders of Allowed General Earn Claims who vote for the Plan will have the option to indicate their preference to modify their default distribution to either: (i) receive a greater amount of Liquid Cryptocurrency (but subject to a discount, as described in the following sentence) or (ii) receive additional ESTs and MSTs, each as compared to the default allocation under the Plan, which preferences will be accommodated to the extent reasonably possible in the aggregate (which determination shall be made by the Debtors in consultation with the Committee) given the preferences of other holders of General Earn Claims. More specifically, as a trade for the benefit of receiving a higher proportion of Liquid Cryptocurrency, an effective discount of 30% will be applied to the recoveries of Account Holders whose preference for additional Liquid Cryptocurrency are accommodated, as further described in the Plan Term Sheet. |
|---|---|
| **Convenience Class** | Account Holders holding Allowed Earn Claims above the De Minimis Claim Threshold ($10) but at or below Convenience Claim Threshold ($5,000) shall be classified in the Convenience Class, and shall receive a 70% recovery on account of such Allowed Convenience Claims, to be satisfied through a distribution of Liquid Cryptocurrency on the Effective Date or as soon as reasonably practicable thereafter. Account Holders with Allowed Earn Claims equal to or less than the Convenience Claim Threshold, but equal to or greater than $1,000 may opt out of the Convenience Class and receive the above-described treatment for Allowed General Earn Claims. Account Holders whose Allowed Earn Claims exceed the Convenience Claim Threshold will have the opportunity to irrevocably elect through a Convenience Claim Election Form in accordance with the procedures set forth in the Disclosure Statement Order to have their Allowed Earn Claims reduced to the Convenience Claim Threshold and treated as Convenience Claims. |
| **Custody / Withhold / Borrow Treatment** | Certain Account Holders whose Claims are associated with the Custody or Borrow Programs will have the opportunity to elect through the applicable settlement opt-in form or through their ballot in accordance with the procedures set forth in the Disclosure Statement Order to receive program-specific treatment based on settlements included in the Plan and the Court's rulings on pending legal issues, as further described in the program-specific term sheets attached to the Plan Term Sheet as Exhibit 2 (Custody) and Exhibit 3 (Borrow). |

| Material Terms of Plan Sponsor Agreement[4] | |
|---|---|
| **Management Fee / Management Contribution** | In exchange for its services, the Manager shall be paid the Management Preferred Interests, which shall provide the right to receive a dividend that will initially be calculated based on the NewCo Fee Paying Asset Value (as determined by an independent audit or valuation firm or valuation professional), with the dividend payable in future years to be calculated based on the trading price of ESTs, as will be set forth more fully in the Management Agreement.<br><br>On the Effective Date, the Manager shall make the Management Contribution equal to $45 million. |
| **Governance** | The New Board shall initially consist of seven members: (i) two of whom will be appointed by the Manager; (ii) two of whom will be appointed by the Committee, in its sole discretion; and (iii) three of whom will be appointed by the Committee and consented to by the Manager (whose consent shall not be unreasonably withheld or conditioned), which directors contemplated in the foregoing clause (iii) shall be independent as such term is generally used for public companies listed on a registered exchange. Members of the New Board (other than the designees of the Manager) shall have staggered terms classified across three approximately equal classes, with one class subject to reelection each year. Each board member may be reelected at the end of their term; provided that, for so long as the Management Agreement is in effect, the Plan Sponsor shall have the right to nominate and elect two members of the New Board via the Management Preferred Interests.<br><br>The Management Agreement's initial term will be five years; provided that the Management Agreement and each member of the Management Team shall be subject to termination for cause, as will be defined in the Management Agreement (which shall be consistent with the Management Term Sheet). Following the first five-year term (the "Initial Term"), the Management Agreement shall automatically renew for a successive 5 year term, unless either the Manager or the New Board provides notice no more than twelve (12) months but not less than six (6) months prior to the end of the Initial Term or any renewal term that it does not wish to renew the Management Agreement or wishes to renew the Management Agreement on different terms. To the extent the Management Agreement is terminated, NewCo shall have no further obligation to pay the Management Fee.<br><br>The New Board shall adopt and approve (i) the investment policy, (ii) the dividend policy, (iii) any policies regarding potential conflicts of interest (including with respect to the Plan Sponsor, NewCo, and their respective personnel and Affiliates), and (iv) all major investment and operational decisions of NewCo (taking into account the recommendation of the Manager).<br><br>The New Organizational Documents shall provide for the ability of 25% of the EST holders to call, and for NewCo to convene in such case, a special meeting of shareholders to, with the approval of a majority of the ESTs held by holders that (i) are in attendance (in person or by proxy) and (ii) vote for or against such proposal at such special meeting |

17

| Material Terms of Plan Sponsor Agreement[4] |
| --- |

| | where a quorum exists in accordance with the New Organizational Documents, instruct the New Board to consider whether to terminate or reconsider the Management Agreement or the Manager or wind down NewCo. |
| --- | --- |
| **Releases** | The Plan shall contain standard release and exculpation provisions applicable only to specific parties identified in this Plan Term Sheet or otherwise agreed to by the Debtors and the Committee (and timely disclosed in the Plan Supplement).  The Excluded Parties—including, without limitation, Alexander Mashinsky, Shlomi Daniel Leon, and all the other UCC Stipulation Defendants—shall be excluded from the release and exculpation provisions.<br><br>The Plan shall release Avoidance Actions against any current Account Holders that are not Insiders or Excluded Parties who (i) withdrew assets from the Debtors' platform totaling under $100,000 in the aggregate, valued as of the time of such withdrawals, in the 90 days prior to the Petition Date, (ii) vote in favor of the Plan, and (iii) agree to release the other Released Parties. |
| **Litigation Recoveries** | A Litigation Administrator will be appointed to pursue the Recovery Causes of Action, which will include, among others:  (i) Causes of Action against Alexander Mashinsky, Shlomi Daniel Leon, the other UCC Stipulation Defendants, and any other party that is not released under the Plan; and (ii) Avoidance Actions that are not released under the Plan.<br><br>The Litigation Oversight Committee shall be composed of five (5) to seven (7) creditors and shall oversee the Litigation Administrator.  The Litigation Oversight Committee shall be selected by the Committee through an open interview process.   The Litigation Oversight Committee shall contain a three (3) member subcommittee to oversee the prosecution of Avoidance Actions against non-Insider (or former Insider) Account Holders, with at least two (2) of the three (3) members not being members of the Committee. |
| **Orderly Wind-Down Toggle.** | The Bid Protections Order and the Plan will provide that the Debtors will effectuate an Orderly Wind Down in accordance with the Wind-Down Procedures if, at any time after the Bid Protections Order is entered by the Bankruptcy Court, the Debtors, the Committee, and their respective advisors determine that an Orderly Wind Down is in the best interests of the Estates due to complications or delays in implementing NewCo; provided that the Debtors and Committee may move for an Orderly Wind Down at any time by providing written notice to the Plan Sponsor and after notice and a hearing before the Bankruptcy Court. |

**The Bid Protections**

25.    In consideration for the substantial time, effort, and respires that the Plan Sponsor has expended, and will continue to expend, in and structuring a proposal and negotiating the terms of the transaction embodied in the Plan Term Sheet, the Debtors agreed, as part of the Plan Sponsor Agreement, to provide the Plan Sponsor with certain Bid Protections.  As further detailed below, the Bid Protections consist of (a) a $5 million break-up fee (the "Break-Up Fee"), and (b) the reimbursement of all reasonable and documented fees and expenses incurred by the Plan Sponsor and its advisors in connection with the Restructuring Transaction up to a maximum of $15 million (the "Expense Reimbursement"), each of which are payable only in the limited circumstances set forth in the Plan Sponsor Agreement.

26.    Specifically, the Plan Sponsor Agreement sets forth the following terms for the payment of the Bid Protections:

- **Expense Reimbursement**:  Pursuant to the Bid Protections Order, the Debtors shall promptly pay or reimburse, as and when required under the Plan Sponsor Agreement, the Plan Term Sheet, or the Plan, all reasonable and documented out-of-pocket fees (including success fees, transaction fees, or similar fees) and expenses of: (i) the Plan Sponsor; (ii) Paul, Weiss, Rifkind, Wharton & Garrison, LLP, as counsel to the Plan Sponsor ("Plan Sponsor Counsel"); and (iii) any other accountants and other professionals, advisors and consultants retained by the Plan Sponsor with the prior written consent of the Debtors (which shall not be unreasonably withheld), in each case, to implement the Restructuring Transactions (together with Plan Sponsor Counsel, the "Plan Sponsor Advisors"), regardless of when such fees are or were incurred (collectively, the "Fees").  The Fees shall be payable by the Debtors as administrative expenses promptly upon the written request of the applicable Plan Sponsor Advisor following the termination of the Plan Sponsor Agreement (x) by the Debtors pursuant to Sections 12.02(b), 12.02(c), 12.02(d) (unless the Plan Sponsor unreasonably withholds consent to a waiver or extension of the Milestones), or 12.02(f) or (y) by the Plan Sponsor pursuant to Section 12.01, without any requirement to (a) file retention or fee applications, (b) provide notice to any person other than the Debtors and the Committee, or (c) provide itemized time detail to the Debtors or any other Person; *provided* that the Plan Sponsor Advisor will provide additional detail as reasonably requested by the Debtors; *provided further*, that the aggregate amount of Fees to be

paid under this Section 13.01 shall not exceed $15,000,000 in the aggregate; provided, further, that the foregoing shall in no way limit the ability of NewCo to reimburse the Fees under the terms of the Management Agreement up to $15,000,000.

- **Break-Up Fee**:   In the event that the Plan Sponsor Agreement is (x) terminated by the Debtors pursuant to (i) Section 12.02(b) (other than to pursue an Orderly Wind Down) or (ii) pursuant to any other provision of Section 12.02 if, as of the Termination Date, the Debtors are in material breach of the Plan Sponsor Agreement or (y) terminated by the Plan Sponsor pursuant to Sections 12.01(a) (solely on account of a breach of the Plan Sponsor Agreement by the Debtors), 12.01(c) (unless the Debtors provide notice of their intention to pursue an Orderly Wind Down), or 12.01(d) (unless the Plan Sponsor unreasonably withholds consent to a waiver or extension of the Milestones) pursuant to the Bid Protections Order, in addition to any Fees owed pursuant to Section 13.01, the Debtors shall pay the Plan Sponsor an amount equal to $5,000,000, which shall be an administrative expense of the Debtors (the "Break Up Fee") and shall be paid on the Termination Date; *provided*, that, notwithstanding the foregoing, in the event that Plan Sponsor Agreement is terminated (A) by the Debtors pursuant to Section 12.02(b) to pursue an Orderly Wind Down or (B) by the Plan Sponsor upon receiving notice from the Debtors of their intention to pursue an Orderly Wind Down, the Debtors shall remain obligated to pay the Plan Sponsor the Break-Up Fee unless an Orderly Wind Down is actually consummated within six (6) months of the Termination Date; *provided*, that any sale or disposition of the Mining assets must be consummated within eighteen (18) months of the Termination Date.

27.    Importantly, under the Plan Sponsor Agreement, the Break-Up Fee will be payable only in the limited circumstances where the Debtors or the Committee terminate the Plan Sponsor Agreement pursuant to their "fiduciary out" (*i.e.*, the Break-Up Fee would be paid if the Debtors or the Committee determine that proceeding with the transaction contemplated by the Plan Sponsor Agreement would be inconsistent with the Debtors' fiduciary duties or applicable law and the Debtors determine to pursue an alternative "higher or better" restructuring transaction in accordance with their fiduciary duties) *or* the Debtors are in material breach of the Plan Sponsor Agreement.  In the event that the Debtors, the Committee, and their respective advisors determine that an Orderly Wind Down (as defined in the Plan Term Sheet) is in the best interests of the Debtors' estates due to complications, impediments, or delays in implementing the Plan Sponsor

20

Agreement, the Debtors and the Committee may move for an Orderly Wind Down at any time by providing written notice to the Plan Sponsor and after notice and hearing before the Court.  In the event of an Orderly Wind Down, only the Expense Reimbursement, and **not** the Break-Up Fee, will be payable to NovaWulf.  The Plan Term Sheet provides that the Debtors will file the Wind-Down Procedures within fourteen days of deciding to implement an Orderly Wind Down.

28.    The Bid Protections are an integral part of the Plan Sponsor Agreement and the Plan Sponsor's commitment to consummate the Restructuring Transactions, which are the result of hard-fought, arms'-length negotiations among the Debtors, the Committee, and the Plan Sponsor.  Indeed, the Plan Sponsor indicated that it would not have entered into the Plan Sponsor Agreement or agreed to the terms in the Plan Term Sheet absent the Bid Protections.  As a result, providing the Bid Protections to the Plan Sponsor is a sound exercise of the Debtors' business judgment.

## Basis for Relief

### I.    The Relief Requested Is in the Best Interests of the Debtors' Estates and Their Creditors and Should Be Approved.

29.    Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ."  11 U.S.C. § 363(b)(1).  In this district, "[t]he standard used for judicial approval of the use of estate property outside of the ordinary course of business is [] the business judgment of the debtor."  *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 464 (Bankr. S.D.N.Y. 2014) (citing *In re Glob. Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003)).  Additionally, section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any

order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

11 U.S.C. § 105(a).

30.    The Debtors conducted a robust marketing process designed to identify the value-maximizing path forward.  The marketing process led the Debtors, in consultation with the Committee, to the select the Plan Sponsor's bid as the value-maximizing bid because it represents the best option presently available to maximize the value of the Debtors' assets (including their substantial illiquid assets) in an efficient and regulatory-compliant manner.  Specifically, the Debtors and the Committee decided to proceed with the NovaWulf transaction due to the difficulty of proceeding with a standalone reorganization and after evaluating the bids for the Debtors' retail platform and/or Debtors' mining business.  The bids received for the Debtors' retail platform were all liquidation-style platform bids, with zero or minimal proposed "platform" consideration to be paid by the bidders.  None of the bids received for the Debtors' mining business were cash bids and all were non-binding and contingent on financing.

31.    In exercising their sound business judgment, the Debtors, in consultation with the Committee, concluded that executing the Plan Sponsor Agreement to implement the contemplated Restructuring Transactions would best serve the interests of the Debtors' estates and all stakeholders.  The Plan Sponsor, however, would not agree to enter into the Plan Sponsor Agreement and agree to the terms set forth in the Plan Term Sheet absent the Bid Protections and the Debtors' commitment to seek approval thereof.  Importantly, the Bid Protections are subject to caps and are only payable in certain limited circumstances, as set forth in the Plan Sponsor Agreement.

32.    As such, and as set forth in the Puntus Declaration, based on the circumstances of these chapter 11 cases, the Bid Protections are fair and reasonable, are an integral part of the Plan

Sponsor Agreement, will maximize the value of the Debtors' estates for their creditors and other stakeholders by incentivizing the Plan Sponsor to continue expending substantial effort and resources in furtherance of the Restructuring Transactions, and should therefore be approved.

## II.    The Bid Protections Are a Sound Exercise of the Debtors' Business Judgment and Are Reasonable and Appropriate Under the Circumstances.

33.    Courts in this district have recognized that the paramount goal of any proposed sale of property of a debtor's estate is maximizing value.  *See, e.g.*, *In re Metaldyne Corp.*, 409 B.R. 661, 667–68 (Bankr. S.D.N.Y. 2009) ("It is the overarching objective of sales in bankruptcy to maximize value to the estate."); *In re Integrated Res., Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("'It is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the [Debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.'").

34.    In furtherance of that goal, bid protections intended to enhance competitive bidding are consistent with the goal of maximizing the value of the estate and are appropriate in the context of bankruptcy transactions.  *See id.* (holding that bidding protections "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *see also In re Metaldyne Corp.*, 409 B.R. at 670 ("Bidder protections are granted when a bidder provides a floor for bidding by expending resources to conduct due diligence and allowing its bid to be shopped around for a higher offer."); *In re Dura Automotive Sys., Inc.*, No. 06-11202, 2007 WL 7728109, at *90 (Bankr. D. Del. Aug. 15, 2007) (recognizing that bidding procedures and bid protections "intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales").  Moreover, break-up fee arrangements, which have been described as "an incentive payment to a prospective purchaser with which a company fails to consummate a transaction," are a common feature of many sale

23

processes—whether conducted inside or outside of a bankruptcy court. *See Integrated Res.*, 147 B.R. at 653 ("Break-up fee arrangements outside of bankruptcy are presumptively valid under the business judgment rule."). This is because "[b]reak up fees are important tools to encourage bidding and to maximize the value of the debtor's assets." *Id.* at 659. To be sure, to the extent a third party (or multiple third parties) submit a competing bid that is superior to NovaWulf's proposal, the Debtors have the flexibility to consider and, if appropriate, act upon such alternative proposal in an exercise of their fiduciary duties. As such, the NovaWulf transaction is setting a floor for the Debtors' assets, and therefore the Bid Protections are appropriate.

35.     Bankruptcy courts in the Second Circuit analyze the appropriateness of bidding incentives such as those proposed here using the "business judgment rule" standard, and, in particular, courts in this district have considered three questions when considering such incentives: "(1) is the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation; (2) does the fee hamper, rather than encourage, bidding; (3) is the amount of the fee unreasonable relative to the proposed purchase price?" *See Integrated Res.*, 147 B.R. at 657; *see also Genco Shipping & Trading Ltd.*, 509 B.R. at 465; *Metaldyne Corp.*, 409 B.R. at 670. The answer to each of these questions in this instance is emphatically "no."

36.     *First*, the Debtors seek authority to pay Bid Protections in the form of the Break-Up Fee in the amount of $5 million and Expense Reimbursement up to a maximum of $15 million. Such Bid Protections are customary and regularly included in transactions of this magnitude to induce bidders to incur the time and expenses necessary to submit a credible and attractive bid and ultimately, to document and consummate such bid. *See, e.g.*, *Integrated Res.*, 147 B.R. at 659–60 ("Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . . In fact, because the . . . corporation has a duty to encourage bidding, break-up fees can

24

be necessary to discharge [such] duties to maximize value." (emphasis added)); *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (breakup fee "may be legitimately necessary to convince a 'white knight' bidder to enter the bidding by providing some form of compensation for the risks it is undertaking" (quotations omitted)).  Here, the Plan Sponsor and its advisors exhausted extensive time and effort to structure a unique and novel proposal that will maximize the value of the Debtors' business to benefit the Debtors' stakeholders.  The Plan Sponsor spent months working with the Debtors and Committee on the terms of the Restructuring Transactions, spending thousands of hours improving the terms of its proposal, exchanging draft documentation, holding numerous meetings, including in-person meetings, and conducting extensive diligence on the Debtors' business, assets, and regulatory hurdles.  In light of the Plan Sponsor's substantial effort and the considerable time and resources that the Plan Sponsor will expend in negotiating and drafting the definitive documentation with respect to the Restructuring Transactions, the Bid Protections are necessary to incentivize and compensate the Plan Sponsor for the risk that the Debtors may exercise their rights under the fiduciary out provisions of the Plan Sponsor Agreement and pivot to an alternative transaction or that the Restructuring Transactions are otherwise not consummated.

37.    ***Second***, the Bid Protections are the product of hard-fought, good faith, arms'-length negotiations among the Debtors, the Committee, and the Plan Sponsor, and each party's respective advisors.  The Debtors and the Plan Sponsor are wholly unrelated, sharing no officers, directors, shareholders, incorporators, employees or economic interests—other than as embodied in these

transactions—in common.  Additionally, the Plan Sponsor is not an "insider" as that term is defined in the Bankruptcy Code.  11 U.SC. § 101(31).

38.    ***Third***, the Bid Protections will enhance the value of the Debtors' estates.  These protections, individually and collectively, were a material inducement for, and a condition of, the Plan Sponsor's entry into the Plan Sponsor Agreement.  The Plan Sponsor was unwilling to serve as Plan Sponsor without the assurance of payment of the Break-Up Fee and Expense Reimbursement under the terms and conditions set forth in the Plan Sponsor Agreement.  The Restructuring Transactions embodied in the Plan Sponsor Agreement lay the foundation for the Debtors' proposed reorganization and provide the Debtors with a feasible path forward that maximizes the value of their estates.  Additionally, the Restructuring Transactions establish a floor and a framework against which other parties can bid.  Accordingly, authorizing and approving the Bid Protections will enhance, rather than hamper, competitive bidding.

39.    ***Fourth***, the amounts of the Break-Up Fee and Expense Reimbursement are fair and reasonable relative to the benefits that inure and will continue to inure to the Debtors and their stakeholders from the proposed transaction with the Plan Sponsor.  As discussed above, the Break-Up Fee is $5 million, the Expense Reimbursement is capped at $15 million, and each are payable only in the limited circumstances set forth in the Plan Sponsor Agreement.  In addition, the reasonableness of the Bid Protections is more than justified here given the substantial expenses that have been, and will continue to be, incurred by the Plan Sponsor to put forward a credible proposal that addresses the complex challenges raised by the Debtors' unique business.  Moreover, the significant time and expenses expended by the Plan Sponsor in formulating the Restructuring Transactions and preparing the establishment of NewCo will provide substantial benefits to the Debtors' estates even in the event the Debtors pursue an alternative transaction due to the fact that

such an alternative transaction would undoubtedly capture the value of the investments and progress made in establishing and structuring NewCo.

40.    Courts in this jurisdiction have approved similar break-up fees and bid protections. *See, e.g.*, *In re Voyager Digit. Holdings, Inc.*, No. 22-10943 (MEW) (Bankr. S.D.N.Y Aug. 5, 2022) (authorizing bid protections, including a break-up fee and expense reimbursement after three-day notice and objection period); *In re All Year Holdings Ltd.*, No. 21-12051 (MG) (Bankr. S.D.N.Y. Apr. 19, 2022) (approving a $1.8 million break-up fee and $300,000 expense reimbursement); *In re Evergreen Gardens Mezz LLC*, No. 21-10335 (MG) (Bankr. S.D.N.Y. Oct. 4, 2021) (approving $20 million break-up fee equal and expense reimbursement of up to $150,000); *In re Aralez Pharmaceuticals US Inc.*, No. 18-12425 (MG) (Bankr. S.D.N.Y. Oct. 11, 2018) (approving $1.6625 million break-up fee and expense reimbursement of up to $425,000); *In re Synergy Pharmaceuticals Inc.*, No. 18-14010 (LGB) (Bankr. S.D.N.Y. Jan. 7, 2019) (approving $7 million break-up fee and expense reimbursement of up to $1.95 million).[5]

41.    Furthermore, courts in this jurisdiction have provided administrative priority status to break-up fees and expense reimbursements in the event that the applicable bidder becomes entitled to them.    *See, e.g.*, *In re All Year Holdings Ltd.*, No. 21-12051 (MG) (Bankr. S.D.N.Y. Apr. 19, 2022) (approving treatment of break-up fee and expense reimbursement as administrative expenses); *In re Evergreen Gardens Mezz LLC*, No. 21-10335 (MG) (Bankr. S.D.N.Y. Oct. 4, 2021) (same); *In re KB US Holdings, Inc.*, No. 20-22962 (SHL) (Bankr. S.D.N.Y. Sep. 17, 2020) (same); *In re Fairway Group Holdings Corp.*, No. 20-10161 (JLG) (Bankr. S.D.N.Y. Feb. 21,

---

[5]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' counsel.

2020) (same); *In re Hooper Holmes, Inc. d/b/a Provant Health*, No. 18-23303 (Bankr. S.D.N.Y. Sept. 20, 2018) (same).[6]

42.    Here, the Bid Protections were a material inducement for, and a condition of, NovaWulf's execution of the Plan Sponsor Agreement.  Furthermore, NovaWulf was unwilling to serve as Plan Sponsor without assurance of the Bid Protections.  As discussed above, the Plan Sponsor's commitments to consummate the Restructuring Transactions provide substantial benefits to the Debtors estates by securing a feasible path forward that maximizes the value for their stakeholders and establishing a framework against which other interested parties can bid.  Thus, the Bid Protections are actual and necessary costs of preserving the Debtors' estates within the meaning of section 503(b) of the Bankruptcy Code.  Accordingly, the Bid Protections should be accorded administrative expense status.

43.    Based on the foregoing, the Bid Protections represent a reasonable exercise of the Debtors' business judgment and should be approved.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

44.    To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the fourteen-day stay period under Bankruptcy Rule 6004(h).

### Reservation of Rights

45.    Nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or should be construed as (a) an admission

---

[6]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' counsel.

as to the validity of any particular claim against the Debtors, (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds, (c) a promise or requirement to pay any particular claim, (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion, (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law, or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## Motion Practice

46.     This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Motion. Accordingly, the Debtors submit that this Motion satisfies Local Rule 9013-1(a).

## Notice

47.     The Debtors will provide notice of this Motion to the following parties or their respective counsel: (a) the U.S. Trustee; (b) counsel to the Committee; (c) the United States Attorney's Office for the Southern District of New York; (d) the Internal Revenue Service; (e) the offices of the attorneys general in the states in which the Debtors operate; (f) the Securities and Exchange Commission; (g) the Plan Sponsor; and (i) any party that has requested notice pursuant

to Bankruptcy Rule 2002.  In light of the nature of the relief requested, no other or further notice need be given.

## **No Prior Request**

48.     No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors request that the Court enter the Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

New York, New York
Dated:  March 1, 2023

/s/ Joshua A. Sussberg

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900
Email:            jsussberg@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200
Email:            patrick.nash@kirkland.com
                  ross.kwasteniet@kirkland.com
                  chris.koenig@kirkland.com
                  dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

**Exhibit A**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## ORDER (I) AUTHORIZING AND APPROVING CERTAIN BID PROTECTIONS FOR THE PROPOSED PLAN SPONSOR AND (II) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"), (a) authorizing and approving the Break-Up Fee and Expense Reimbursement as set forth in the Plan Sponsor Agreement; and (b) granting related relief, all as more fully set forth in the Motion; and upon the Puntus Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York, entered February 1, 2012; and this Court having the power to enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of these chapter 11 cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing thereon were appropriate

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

under the circumstances and no other notice need be provided; and this Court having reviewed the

Motion and having heard the statements in support of the relief requested therein at a hearing

before this Court (the "<u>Hearing</u>"); and this Court having determined that the legal and factual bases

set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and

after due deliberation and sufficient cause appearing therefore, **IT IS HEREBY FOUND AND**

**DETERMINED THAT**:

    A.    <u>Bid Protections</u>.  The Bid Protections (i) have been negotiated by the Debtors, the

Committee, and the Plan Sponsor and their respective advisors at arms'-length and in good faith

and (ii) are necessary to ensure that the Plan Sponsor will continue to pursue, and, ultimately,

consummate the Restructuring Transactions set forth in the Plan Sponsor Agreement.  The Bid

Protections, to the extent payable under the Plan Sponsor Agreement (a)(x) are actual and

necessary costs and expenses of preserving the Debtors' estates within the meaning of section

503(b) of the Bankruptcy Code and (y) shall be treated as an allowed administrative expense claim

against the Debtors' estates pursuant to sections 105(a), 503(b), and 507(a)(2) of the Bankruptcy

Code; (b) are commensurate to the real and material benefits conferred upon the Debtors' estates

by the Plan Sponsor and (c) are fair, reasonable, and appropriate, including in light of the size,

nature, and complexity of the Restructuring Transactions and the significant efforts that have been

and will continue to be expended by the Plan Sponsor in connection therewith.  The Bid Protections

are a material inducement for, and condition of, the Plan Sponsor's execution of the Plan Sponsor

Agreement.  The Plan Sponsor is unwilling to remain obligated to consummate the Restructuring

Transactions or otherwise be bound under the Plan Sponsor Agreement absent approval of the Bid

Protections.

B.      <u>Adequate Notice</u>.  Due and proper notice of the relief requested in the Motion and a reasonable opportunity to object or be heard regarding the relief granted herein has been afforded to all parties in interest in these chapter 11 cases.

C.      <u>Relief is Warranted</u>.  The Debtors has articulated good and sufficient reasons for approving the Bid Protections, and the legal and factual bases set forth in the Motion and the Puntus Declaration establish just and sufficient cause to grant the relief requested therein.

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Motion is granted as set forth herein.

2.      The Bid Protections are approved in their entirety, subject to the terms of the Plan Sponsor Agreement.

3.      The Debtors are authorized to pay the Break-Up Fee and the Expense Reimbursement in cash or by wire transfer of immediately available funds in accordance with the terms of the Plan Sponsor Agreement without further action or order by the Court.

4.      The Break-Up Fee and Expense Reimbursement, to the extent payable under the Plan Sponsor Agreement, shall constitute allowed administrative expense claims against the Debtors' estates pursuant to section 105(a), 503(b), and 507(a)(2) of the Bankruptcy Code.

5.      If, at any time after the entry of this Order, the Debtors, the Committee, and their respective advisors determine that an Orderly Wind Down (as defined in the Plan Term Sheet) is in the best interests of the Debtors' estates due to complications or delays in implementing NewCo, the Debtors and Committee may move for an Orderly Wind Down at any time by providing written notice to the Plan Sponsor and after notice and hearing before the Court.  The Debtors shall file the Wind-Down Procedures (as defined in the Plan Term Sheet) within fourteen days of deciding to implement an Orderly Wind Down.

3

6.      Notwithstanding anything to the contrary in the Motion, this Order, or any findings announced at the Hearing, nothing in the Motion, this Order, or announced at the Hearing constitutes a finding under the federal securities laws as to whether crypto tokens or transactions involving crypto tokens are securities, and the right of the United States Securities and Exchange Commission to challenge transactions involving crypto tokens on any basis are expressly reserved.

7.      Except with respect to the Bid Protections and any actions taken pursuant to such relief, the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed: (a) an admission as to the validity of any particular claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens. Any payment made pursuant to this Order is not intended and should not be construed as an admission as the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.  Notwithstanding anything to the contrary contained in this paragraph 8,

8.      Notice of the Motion satisfies the requirements of Bankruptcy Rule 6004(a).

9.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

10.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

11.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

New York, New York
Dated: _____, 2023

_____
THE HONORABLE MARTIN GLENN
CHIEF UNITED STATES BANKRUPTCY JUDGE

**Exhibit B**

**Plan Sponsor Agreement**

THIS PLAN SPONSOR AGREEMENT IS NOT, AND SHALL NOT BE DEEMED, AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS PLAN SPONSOR AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON THE PARTIES HERETO.

## *PLAN SPONSOR AGREEMENT*

This PLAN SPONSOR AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 15.02, this "**Agreement**") is made and entered into as of February 28, 2023 (the "**Execution Date**"), by and among the following parties (each, a "**Party**" and collectively the "**Parties**"):

(i)    Celsius Network LLC, a company incorporated under the Laws of Delaware ("**Celsius**"), and each of its affiliated debtors and debtors in possession that have executed and delivered counterpart signature pages to this Agreement (collectively, the "**Debtors**");

(ii)    the official committee of unsecured creditors of the Debtors, appointed by the United States Trustee for Region 2 (the "**U.S. Trustee**") in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (as defined herein) on July 27, 2022 [Docket No. 241], as may be reconstituted from time to time (the "**Committee**"); and

(iii)    NovaWulf Digital Management, L.P. (together with any successors thereto, the "**Plan Sponsor**").

## *RECITALS*

**WHEREAS,** on July 13, 2022 (the "**Initial Petition Date**") and December 7, 2022 (the "**GK8 Petition Date**"), as applicable, each of the Debtors commenced voluntary cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

**WHEREAS**, on November 2, 2022, the Bankruptcy Court entered the *Order (I) Approving the Bidding Procedures in Connection With the Sale of Substantially All of the Debtors' Assets, (II) Scheduling Certain Dates With Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving Contract Assumption and Assignment Procedures, and (V) Granting Related Relief* [Docket No. 1272] (the "**Bidding Procedures Order**") authorizing the Debtors to solicit bids for the sale of some or substantially all of their assets;

**WHEREAS**, following a comprehensive marketing process, in accordance with the Bidding Procedures Order and in consultation with the Committee, the Debtors selected the Plan

Sponsor as the Successful Bidder (as defined in the Bidding Procedures Order), in a manner consistent with the exercise of their fiduciary duties, and otherwise consistent with the Bidding Procedures Order;

**WHEREAS**, the Parties have engaged in good faith, arm's length negotiations regarding certain restructuring transactions (the "**Restructuring Transactions**") to be implemented through a chapter 11 plan of reorganization to be prepared and proposed by the Debtors in accordance with this Agreement (including all schedules and exhibits thereto, and as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms or to implement the Restructuring Transactions contemplated by this Agreement, the "**Plan**"), which Plan shall contain the terms and conditions set forth in, and be consistent in all respects with, the term sheet attached as **Exhibit A** hereto (such term sheet, including all exhibits thereto, the "**Plan Term Sheet**");

**WHEREAS**, the Parties have agreed to take certain actions in support of the Plan and the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Plan Term Sheet; and

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.**    *Definitions and Interpretation*.

1.01.    <u>Definitions</u>.  The following terms shall have the following definitions:

"**Account Holder**" means any single Person or Entity that maintained a Celsius Account with the Debtors as of the Petition Date.

"**Affiliate**" means, with respect to any Entity, all Entities that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code if such Entity was a debtor in a case under the Bankruptcy Code.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with <u>Section 15.02</u> (including the Plan Term Sheet).

"**Agreement Effective Date**" means the date on which the conditions set forth in <u>Section 2</u> have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Alternative Restructuring Proposal**" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to an Alternative Transaction.

"**Alternative Transaction**" means a sale (including, for the avoidance of doubt, a transaction premised on an asset sale under section 363 of the Bankruptcy Code), disposition, new-money investment, restructuring, reorganization, merger, amalgamation, joint venture, partnership, acquisition, consolidation, dissolution, winding up, debt investment, equity investment, liquidation, tender offer, rights offering, recapitalization, plan of reorganization or liquidation, share exchange, business combination, or similar transaction, in each case involving any one or more Debtors or the debt, equity, or other interests in any one or more Debtors that is inconsistent with this Agreement and the Restructuring Transactions.

"**Bankruptcy Code**" has the meaning set forth in the recitals to this Agreement.

"**Bankruptcy Court**" has the meaning set forth in the recitals to this Agreement.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended.

"**Bid Protections Order**" means an order of the Bankruptcy Court approving the Debtors' payment or reimbursement of the Fees and the Break-Up Fee contemplated by, and as set forth in, Section 13.

"**Bidding Procedures Order**" has the meaning set forth in the recitals to this Agreement.

"**Break-Up Fee**" has the meaning set forth in Section 13.02 of this Agreement.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Causes of Action**" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or otherwise. Causes of Action also include:  (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims or defenses pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any avoidance actions arising under chapter 5 of the Bankruptcy Code or under similar local, state, federal, or foreign statutes, and common law, including fraudulent transfer laws.

"**CEL Token**" means the Cryptocurrency Token native to the Debtors' platform defined by the smart contract code located at https://etherscan.io/token/0xaaaebe6fe48e54f431b0c390cfaf0b017d09d42d#code.

"**Celsius**" has the meaning set forth in the preamble to this Agreement.

"**Celsius Account**" means any active account identified in the Debtors' books and records as having a balance as of the Petition Date.  For the avoidance of doubt, (i) each Account Holder's Celsius Accounts shall be aggregated such that each Account Holder's holdings are reflected in a single Celsius Account and (ii) the consolidation described in (i) shall not eliminate the designations associated with such assets based on the program the Account Holders participated in (*e.g.*, "Earn," "Custody," etc.).

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

"**Committee**" has the meaning set forth in the preamble to this Agreement.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

"**Cryptocurrency**" means a fungible and transferable digital representation of units in which encryption techniques and a blockchain are used to regulate the generation of digital units and verify the transfer of assets pursuant to a decentralized protocol, operating independently from a central bank.

"**Debtors**" has the meaning set forth in the preamble to this Agreement.

"**Definitive Documents**" means the documents listed in Section 3.01.

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan, including all exhibits and schedules thereto, as may be amended, supplemented, or modified from time to time, to be approved pursuant to the Disclosure Statement Order.

"**Disclosure Statement Order**" means the order (and all exhibits thereto), entered by the Bankruptcy Court approving the Disclosure Statement and the Solicitation Materials, and allowing solicitation of the Plan to commence (as amended, modified, or supplemented from time to time in accordance with the terms thereof).

"**Effective Date**" means the date on which (a) all conditions precedent to the occurrence of the consummation of the Plan have been satisfied or waived in accordance with the Plan (including receipt of all Regulatory Approvals and the expiration or early termination of any applicable waiting periods related thereto) and (b) the Plan is declared effective by the Debtors.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Equity Interests**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Debtor, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor (in each case whether or not arising under or in connection with any employment agreement).

"**Equity Share Tokens**" or "**ESTs**" means, collectively, the new Tokens representing each Account Holder's Equity Interests in NewCo, to be distributed pursuant to the Plan on and after the Effective Date.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Express Representations**" has the meaning set forth in <u>Section 10</u> of this Agreement.

"**Fees**" has the meaning set forth in <u>Section 13.01</u> of this Agreement.

"**Figure Agreements**" means the agreements entered into by NewCo with Figure Technologies, Figure Securities, Inc., or any Affiliate thereof for the provision of services to NewCo following the Effective Date, each of which shall be in substantially final form prior to the hearing to consider approval of the Disclosure Statement.

"**GK8 Debtors**" means Debtors GK8 Ltd., GK8 UK Limited, and GK8 USA LLC.

"**GK8 Petition Date**" has the meaning set forth in the recitals to this Agreement.

"**Governmental Authority**" means (i) any U.S. federal, state, county, civil, or local legislative, administrative, self-regulatory or regulatory authority, agency court, tribunal, or judicial or arbitral body or other governmental or quasi-governmental entity with competent jurisdiction or (ii) any supranational or non-U.S. authority of similar jurisdiction.

"**HASH Token**" means the utility Token on the Provenance Blockchain.

"**Initial Litigation Funding Amount**" has the meaning set forth in the Plan Term Sheet.

"**Initial Petition Date**" has the meaning set forth in the recitals to this Agreement.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a Governmental Authority of competent jurisdiction (including the Bankruptcy Court).

"**Litigation Administrator**" has the meaning set forth in the Plan Term Sheet.

"**Litigation Oversight Committee**" has the meaning set forth in the Plan Term Sheet.

"**Litigation Proceeds**" has the meaning set forth in the Plan Term Sheet.

"**Litigation Recovery Account**" has the meaning set forth in the Plan Term Sheet.

"**Management Agreement**" means the agreement containing the terms and conditions under which the Manager will manage the assets held by the NewCo, including the terms of the Management Fee and such other terms as further set forth on the term sheet attached as Exhibit 4 to the Plan Term Sheet.  The Management Agreement shall be in substantially final form prior to the hearing to consider approval of the Disclosure Statement.

"**Management Contribution**" means the Manager's Effective Date contribution to NewCo of (i) cash consideration of $45 million and (ii) 450 million HASH Tokens to be used to fund the transaction fees of EST/MST holders, as provided in the Management Agreement.

"**Management Fee**" means the management fee payable to the Manager under the Management Agreement.

"**Management Share Tokens**" or "**MSTs**" means a restricted Token to be distributed on and after the Effective Date, as set forth in greater detail in the Management Agreement.

"**Manager**" means NovaWulf Digital Management, L.P., a Delaware limited partnership, or an Affiliate thereof.

"**Milestones**" has the meaning set forth in Section 4 of this Agreement.

"**Mining**" has the meaning set forth in the Plan Term Sheet.

"**New Board**" means the board of directors or the board of managers, as applicable, of NewCo which shall be appointed as provided in the Plan Term Sheet.  Unless otherwise agreed by the Parties, the identities of the members of the New Board shall be disclosed in the Plan Supplement.

"**NewCo**" means the Entity or Entities to be managed by the Manager following the Effective Date which shall hold the NewCo Assets for the benefit of holders of ESTs.

"**NewCo Assets**" has the meaning set forth in the Plan Term Sheet.

"**New Organizational Documents**" means the documents providing for corporate governance of NewCo, and any subsidiaries thereof, including charters, bylaws, operating agreements, agreements providing indemnification, contribution, or reimbursement to any Person or Entity, other organizational documents, and investment guidelines, as applicable, each of which shall be in substantially final form prior to the hearing to consider approval of the Disclosure Statement.

"**Orderly Wind Down**" means following a good-faith decision by the Debtors and the Committee that it is not prudent to proceed with confirmation of the Plan or implementation or consummation of the Restructuring Transactions, the orderly wind down of the Debtors' Estates to be effectuated (x) by a conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or (y) by the Plan Administrator pursuant to the Wind-Down Procedures.

6

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Person**" has the meaning set forth in section 101(41) of the Bankruptcy Code.

"**Petition Date**" means the Initial Petition Date with respect to the Debtors other than the GK8 Debtors and the GK8 Petition Date with respect to the GK8 Debtors.

"**Plan**" has the meaning set forth in the recitals to this Agreement.

"**Plan Administrator**" has the meaning set forth in the Plan Term Sheet.

"**Plan Sponsor**" has the meaning set forth in the preamble to this Agreement.

"**Plan Sponsor Advisors**" has the meaning set forth in <u>Section 13.01</u> of this Agreement.

"**Plan Sponsor Counsel**" has the meaning set forth in <u>Section 13.01</u> of this Agreement.

"**Plan Supplement**" means the compilation of documents and forms of documents, agreement, schedules, and exhibits to the Plan, in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with its terms, this Agreement, the Bankruptcy Code, and Bankruptcy Rules, to be filed (unless otherwise expressly required under this Agreement to be filed by a different date) by the Debtors no later than fourteen (14) days before the deadline set by the Disclosure Statement Order to object to the Plan or such later date as may be approved by the Bankruptcy Court, including the following, each as defined in this Agreement, the Plan, or Plan Term Sheet, as applicable:  (a) the Management Agreement; (b) the New Organizational Documents; (c) the identities of the members of the New Board; (d) the schedule of Rejected Executory Contracts and Unexpired Leases; (e) the schedule of proposed cure amounts; (f) the Transaction Steps Memorandum; (g) the Litigation Recovery Agreement; (h) the identity of the Litigation Administrator; (i) the identity and proposed compensation (if known) of the members of the Litigation Oversight Committee; (j) the Wind-Down Procedures (if applicable); (k) the Figure Agreements; (l) any agreements between NewCo and the proposed New Loan Servicer; and (m) the identities of Insiders and other individuals identified by the Committee who participated in the manipulation of the price of the CEL Token.  The Plan Supplement shall be deemed incorporated into and part of the Plan as if set forth therein in full; *provided* that in the event of a conflict between the Plan and the Plan Supplement, the Plan Supplement shall control.

"**Plan Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Provenance Blockchain**" means a distributed, proof-of-stake blockchain designed for financial services industries, as further described, and defined, by the Provenance Blockchain Foundation from time to time.  The current definition of the Provenance Blockchain is set forth at https://provenance-io.github.io/provenance-docs/docs/provenance-blockchain/.

"**Recovery Causes of Action**" has the meaning set forth in the Plan Term Sheet.

"**Regulatory Approvals**" means any consents, approvals, or permissions of Governmental Authorities, including, for the avoidance of doubt, the U.S. Securities and Exchange Commission, that are necessary to implement and consummate the Restructuring Transactions, which shall be

set forth in greater detail on a schedule to be delivered by the Plan Sponsor to the Debtors and the Committee.

"**Related Party**" means with respect to an Entity, each of, and in each case solely in its capacity as such, (i) such Entity's current and former Affiliates and (ii) such Entity's, and such Entity's current and former Affiliates', directors, managers, officers, shareholders, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by operation of law or otherwise), subsidiaries, associated entities, managed or advised entities, accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, fiduciaries, trustees, employees, agents (including any disbursing agent), advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, other representatives, and other professionals, representatives, advisors, predecessors, successors, and assigns (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), and the respective heirs, executors, estates, servants, and nominees of the foregoing. Notwithstanding anything to the contrary in the Plan, no Excluded Party shall constitute a Related Party in any capacity under the Plan.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Solicitation Materials**" means the solicitation materials with respect to the Plan, including the court-approved Disclosure Statement, form of ballots, and any other solicitation materials, including the solicitation version of the Plan.

"**Solvent**" means, with respect to any Person or Entity, that such Person or Entity: (i) is able to pay its debts as they become due; (ii) owns property that has a fair value greater than the amounts required to pay its debt (including a reasonable estimate of the amount of all contingent liabilities); and (iii) has adequate capital to carry on its business.

"**Successful Bidder**" has the meaning set forth in the recitals to this Agreement.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 12.01, 12.02, 12.03, 12.04, or 12.05.

"**Termination Event**" means any event described in Sections 12.01, 12.02, or 12.03.

"**Token**" means a unit of Cryptocurrency.

"**Wind-Down Procedures**" means the procedures to be filed by the Debtors within fourteen (14) days of a decision to implement an Orderly Wind Down, which shall identify the mechanics and procedures to effectuate the Orderly Wind Down. The Wind-Down Procedures shall be (a) included in the Plan Supplement if the decision to implement an Orderly Wind Down is made following entry of the Disclosure Statement Order or (b) filed separately if such decision is made following entry of the Bid Protections Order but prior to entry of the Disclosure Statement Order.

1.02.    <u>Interpretation</u>.  For purposes of this Agreement:

(a)    capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan or Plan Term Sheet, as applicable;

(b)    in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(c)    capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(d)    unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; *provided* that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)    unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)    the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)    captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)    references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)    whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation;"

(j)    the words "to the extent" shall mean "the degree by which" and not "if;"

(k)    all time periods before which, within which, or following which any act is to be done or step taken pursuant to this Agreement shall be calculated in accordance with Bankruptcy Rule 9006(a);

(l)    the word "will" will be construed to have the same meaning and effect as the word "shall."  The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive;

(m)    all references to "$" and "dollars" will be deemed to refer to United States currency unless otherwise specifically provided;

9

(n)    all references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided;

(o)    any reference to any agreement or contract will be a reference to such agreement or contract, as amended, modified, supplemented or waived, in accordance herewith, if applicable; and

(p)    where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

**Section 2.**    *Effectiveness of this Agreement*.  This Agreement shall become effective and binding upon each of the Parties at 12:01 a.m., prevailing Eastern Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)    each of the Debtors shall have executed this Agreement and delivered counterpart signature pages of this Agreement to counsel to each of the other Parties;

(b)    the Plan Sponsor shall have executed this Agreement and delivered counterpart signature pages of this Agreement to counsel to each of the other Parties;

(c)    counsel to the Committee shall have executed this Agreement and delivered counterpart signature pages of this Agreement to counsel to each of the other Parties; and

(d)    the Debtors shall have filed a motion seeking entry of the Bid Protections Order.

**Section 3.**    *Definitive Documents*.

3.01.    The Definitive Documents are all documents reasonably necessary or desirable to implement or give effect to the Restructuring Transactions, including the following:  (A) the Plan (and any and all exhibits, annexes, and schedules thereto); (B) the Confirmation Order; (C) the Disclosure Statement and the other Solicitation Materials; (D) the Disclosure Statement Order; (E) the Bid Protections Order; (F) the Plan Supplement (including, for the avoidance of doubt, the Management Agreement, the Figure Agreements, and the New Organizational Documents); (G) documents or agreements relating to the Equity Share Tokens and Management Share Tokens; (H) any and all other material documents, deeds, agreements, filings, notifications, letters, or instruments reasonably necessary or desirable to consummate the Restructuring Transactions, which shall exclude, for the avoidance of doubt, any affidavits, statements of financial affairs and schedules of assets and liabilities, monthly operating reports or other periodic reports, retention applications or fee applications, fee statements or other notices, declarations, or other documents filed by the Debtors or the Committee with respect thereto, and other similar ministerial documents filed with the Bankruptcy Court; and (I) any amendments, modifications or supplements to such documents.

3.02.    The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions,

representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 14. Further, the Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date shall be consistent with this Agreement and in form and substance reasonably acceptable to the Debtors, the Plan Sponsor, and the Committee; *provided* that the Plan (and any and all exhibits, annexes, and schedules thereto), the Confirmation Order, the Bid Protections Order, and the Plan Supplement shall be in form and substance acceptable to the Debtors, the Committee, and the Plan Sponsor; *provided*, *further*, that the documents and forms of documents, agreements, schedules, and exhibits to the Plan with respect to the Recovery Causes of Action, the Litigation Recovery Account, the Litigation Proceeds, the Litigation Administrator, and the Litigation Oversight Committee, including the Litigation Administrator Agreement, shall be in form and substance acceptable to the Committee in its sole and absolute discretion; *provided*, *further*, that the Initial Litigation Funding Amount shall be in form and substance acceptable to the Committee and the Debtors.

**Section 4.**     *Milestones.*  The following milestones shall apply to this Agreement (collectively, the "**Milestones**"), which in each case may be waived or extended in writing by the Plan Sponsor (electronic mail among counsel is sufficient):

(a)     by no later than March 17, 2023, the Plan Sponsor shall have delivered a schedule setting out all required Regulatory Approvals and a proposed business plan for Mining to the Debtors and the Committee;

(b)     by no later than March 22, 2023, the Bankruptcy Court shall have entered the Bid Protections Order;

(c)     by no later than March 31, 2023, the Debtors shall file the Plan, the Disclosure Statement, Solicitation Materials, and a motion seeking entry of the Disclosure Statement Order;

(d)     by no later than May 5, 2023, the Plan Sponsor shall have proposed a manager or managers for Mining to the Debtors and the Committee (to be reasonably acceptable to the Debtors and the Committee);

(e)     by no later than May 10, 2023, the Bankruptcy Court shall have entered the Disclosure Statement Order;

(f)     by no later than June 20, 2023, the Bankruptcy Court shall have entered the Confirmation Order; and

(g)     by no later than June 30, 2023, the Effective Date of the Plan shall have occurred.

**Section 5.**      *Commitments of the Plan Sponsor.*

5.01.  <u>General Commitments</u>.

(a)      During the Agreement Effective Period, the Plan Sponsor agrees to:

(i)      support the Restructuring Transactions and take all steps reasonably necessary and desirable to support, facilitate, implement, consummate or otherwise give effect to the Restructuring Transactions in accordance with this Agreement, including voting and exercising any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which it is legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions, and voting, if applicable, in favor of the Plan and supporting and consenting to the releases and exculpation provisions in the Plan;

(ii)      to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, take all steps reasonably necessary and desirable to address any such impediment;

(iii)      use commercially reasonable efforts to oppose the efforts of any Person seeking to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions; *provided*, that such commercially reasonable efforts shall not include filing formal objections or pleadings with the Bankruptcy Court;

(iv)      use commercially reasonable efforts to cooperate with and assist the Debtors in obtaining additional support for the Restructuring Transactions from the Debtors' other stakeholders;

(v)      use commercially reasonable efforts to obtain, or assist the Debtors in obtaining, as applicable, any and all required Regulatory Approvals and/or third-party approvals for the Restructuring Transactions; and

(vi)      negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement to which it is required to be a party.

5.02.  <u>Negative Commitments</u>.  During the Agreement Effective Period, the Plan Sponsor shall not directly or indirectly:

(a)      object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)      take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation and consummation of the Restructuring Transactions described in this Agreement or the Plan; or

(c)    file any motion or pleading with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan.

## Section 6.    *Commitments of the Debtors*.

6.01.    <u>Affirmative Commitments</u>.  Subject in all cases to <u>Section 8</u>, during the Agreement Effective Period, the Debtors agree to:

(a)    support and take all steps reasonably necessary and desirable to support, facilitate, implement, consummate or otherwise give effect to the Restructuring Transactions in accordance with this Agreement;

(b)    to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, take all steps reasonably necessary and desirable to address any such impediment;

(c)    use commercially reasonable efforts to oppose and object to the efforts of any Person seeking to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions, including, but not limited to, timely filing a formal objection to any motion filed with the Bankruptcy Court by any Person or Entity seeking the entry of an order (i) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), other than with respect to the examiner appointed pursuant to the *Order Approving the Appointment of Chapter 11 Examiner* [Docket No. 923] or any other order of the Bankruptcy Court with respect to the examiner appointed thereby; (ii) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; (iii) seeking relief from the automatic stay with respect to any material asset or assets of the Debtors; (iv) dismissing any of the Chapter 11 Cases; (v) providing for the Bankruptcy Court to abstain from hearing any of the Chapter 11 Cases; (vi) modifying or terminating any Debtor's exclusive right to file and solicit acceptances of a plan of reorganization; or (vii) for relief that (A) is materially inconsistent with this Agreement in any respect or (B) would, or would reasonably be expected to, frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring Transactions;

(d)    use commercially reasonable efforts, and provide such assistance as may be reasonably required by the Plan Sponsor, to obtain any and all required Regulatory Approvals and/or third-party approvals for the Restructuring Transactions;

(e)    negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(f)    use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent; and

(g)    provide Plan Sponsor Counsel with Definitive Documents that the Debtors intend to file with the Bankruptcy Court at least three (3) Business Days in advance of the filing thereof

where reasonably practicable, or if not reasonably practicable, as soon as reasonably practicable but in any event no less than twenty-four (24) hours in advance of filing thereof;

(h)     inform Plan Sponsor Counsel as soon as reasonably practicable and in any event within two (2) Business Days after becoming aware of (i) receipt of any notice or other correspondence from a third party asserting its consent is required to implement the Restructuring Transactions and (ii) any determination by the Debtors or the board of directors, board of managers, or similar governing body of a Debtor, after consulting with counsel, that taking any action, or refraining from taking any action, with respect to the Restructuring Transactions would be inconsistent with applicable Law or its fiduciary obligations under applicable Law or, in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal, in accordance with Section 8; and

(i)     seek entry of the Bid Protections Order, and, upon entry of the Bid Protections Order, promptly pay and reimburse all Fees and the Break-Up Fee in accordance with this Agreement and the Bid Protections Order.

6.02.   Negative Commitments.  Subject in all cases to Section 8, during the Agreement Effective Period, each of the Debtors shall not directly or indirectly:

(a)     object to, delay, impede, or take any other action to interfere with confirmation of the Plan or acceptance, implementation, or consummation of the Restructuring Transactions;

(b)     take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation, or consummation of the Restructuring Transactions described in this Agreement or the Plan;

(c)     (i) fail to draft the Plan in a manner consistent with this Agreement, the Plan Term Sheet, and the Milestones contained herein in all material respects or (ii) modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in all material respects;

(d)     withdraw or revoke the Plan, as applicable, or publicly announce its intention not to pursue the Restructuring Transactions;

(e)     file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement (including in violation of the consent rights of any Party as to the form and substance of such motion, pleading, or Definitive Document) or the Plan; or

(f)     commence, support, or join any litigation or adversary proceeding against the Plan Sponsor other than in connection with (i) the interpretation or enforcement of the Debtors' rights under this Agreement, (ii) litigation regarding the rights of Earn, Custody, Withhold, and Borrow assets with respect to applicable account holders generally; (iii) the Bankruptcy Court's determination that Earn assets constitute property of the Debtors' estates and that Custody and certain Withhold assets are not property of the estate, (iv) whether customers have claims at every Celsius entity, and (v) the Claims reconciliation process.

14

**Section 7.**    *Commitments of the Committee*.

7.01.    <u>Affirmative Commitments</u>.  Subject in all cases to <u>Section 9</u>, during the Agreement Effective Period, the Committee agrees to:

(a)    support the Restructuring Transactions and take all steps reasonably necessary and desirable to support, facilitate, implement, consummate or otherwise give effect to the Restructuring Transactions in accordance with this Agreement, including supporting the Plan and consenting to the releases and exculpation provisions in the Plan;

(b)    to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, take all commercially reasonable steps reasonably requested by the Debtors or the Plan Sponsor to address any such impediment;

(c)    use commercially reasonable efforts to oppose and object to the efforts of any Person seeking to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions, including timely filing a formal objection to any motion filed with the Bankruptcy Court by any Person or Entity seeking the entry of an order (i) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), other than with respect to the examiner appointed pursuant to the *Order Approving the Appointment of Chapter 11 Examiner* [Docket No. 923] or any other order of the Bankruptcy Court with respect to the examiner appointed thereby; (ii) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; (iii) seeking relief from the automatic stay with respect to any material asset or assets of the Debtors; (iv) dismissing any of the Chapter 11 Cases; (v) providing for the Bankruptcy Court to abstain from hearing any of the Chapter 11 Cases; or (vi) for relief that (A) is materially inconsistent with this Agreement in any respect or (B) would, or would reasonably be expected to, frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring Transactions; and

(d)    use commercially reasonable efforts to cooperate with and assist the Debtors in obtaining additional support for the Restructuring Transactions from the Debtors' other stakeholders, including by delivering to the Debtors at least five (5) Business Days prior to the hearing with respect to entry of the Disclosure Statement Order a draft of the proposed letter to be included in the Solicitation Materials expressing the Committee's support for the Plan and the Committee's recommendation that holders of unsecured claims against the Debtors vote to accept the Plan.

7.02.    <u>Negative Commitments</u>.  Subject in all cases to <u>Section 9</u>, during the Agreement Effective Period, the Committee shall not directly or indirectly:

(a)    object to, delay, impede, or take any other action to interfere with confirmation of the Plan or acceptance, implementation, or consummation of the Restructuring Transactions;

(b)    take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation, or consummation of the Restructuring Transactions described in this Agreement or the Plan;

15

(c)    file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan;

(d)    commence, support, or join any litigation or adversary proceeding against the Plan Sponsor other than in connection with the (i) interpretation or enforcement of the Committee's rights under this Agreement, (ii) litigation with respect to the Debtors' Cryptocurrency obligations generally (*e.g.*, Earn, Custody, Borrow, and Withhold), (iii) litigation with respect to whether customers have claims at every Celsius entity and any alternative legal theories related to such litigation, and (iv) the Claims reconciliation process; or

(e)    object, directly or indirectly, or support in any way the objection of any Party or Entity to entry of the Bid Protections Order or the payment of any amounts payable to the Plan Sponsor under the Bid Protections Order in accordance with its terms.

**Section 8.**    *Additional Provisions Regarding Debtors' Commitments.*

8.01.    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Debtor or the board of directors, board of managers, or similar governing body of a Debtor, after consulting with counsel to the Debtors, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would, based on the advice of counsel to the Debtors, be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 8.01 shall not be deemed to constitute a breach of this Agreement.

8.02.    Notwithstanding anything to the contrary in this Agreement (but subject to Section 8.01), each Debtor and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to: (a) consider, respond to, and facilitate Alternative Restructuring Proposals; (b) provide access to non-public information concerning any Debtor to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals; and (e) enter into or continue discussions or negotiations with holders of Claims against or Equity Interests in a Debtor, any other party in interest in the Chapter 11 Cases (including any official committee and the U.S. Trustee), or any other Entity regarding the Restructuring Transactions or Alternative Restructuring Proposals; *provided*, that the Debtors shall provide notice to the Plan Sponsor within two (2) Business Days of any decision by the Debtors or the board of directors, board of managers, or similar governing body of a Debtor, after consulting with counsel, to pursue an Alternative Restructuring Proposal.

8.03.    Nothing in this Agreement shall: (a) impair or waive the rights of any Debtor to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Debtor from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 9.**    *Additional Provisions Regarding Committee's Commitments*.

9.01.    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require the Committee, after consulting with counsel to the Committee, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action, based on the advice of counsel to the Committee, would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this <u>Section 9.01</u> shall not be deemed to constitute a breach of this Agreement.

9.02.    Notwithstanding anything to the contrary in this Agreement (but subject to <u>Section 9.01</u>), the Committee and its investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to:  (a) consider, respond to, and facilitate Alternative Restructuring Proposals; (b) enter into Confidentiality Agreements or nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals; and (e) enter into or continue discussions or negotiations with holders of Claims against or Equity Interests in a Debtor, any other party in interest in the Chapter 11 Cases (including any official committee and the U.S. Trustee), or any other Entity regarding the Restructuring Transactions or Alternative Restructuring Proposals; *provided* that the Committee shall provide notice to the Plan Sponsor Counsel within two (2) Business Days of any decision by the Committee, after consulting with counsel, to pursue an Alternative Restructuring Proposal.

9.03.    Nothing in this Agreement shall:  (a) impair or waive the rights of the Committee to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent the Committee from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 10.**    *Representations and Warranties of the Plan Sponsor*.    The Plan Sponsor represents and warrants that, as of the date such Plan Sponsor executes and delivers this Agreement and as of the Effective Date:

(a)    it is either (i) a qualified institutional buyer as defined in Rule 144A of the Securities Act; or (ii) an institutional accredited investor (as defined in Rule 501(a)(1), (2), (3), (7), (8), (9), (12) or (13) of the Securities Act );

(b)    any securities acquired by the Plan Sponsor in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act;

(c)    as of the Effective Date the Plan Sponsor will have sufficient funds in an aggregate amount necessary to consummate the Restructuring Transactions and to consummate all of the other transactions contemplated by this Agreement and the Management Agreement, including the payment of the Management Contribution and all fees, expenses of, and other amounts required to be paid by the Plan Sponsor in connection with the Restructuring Transactions;

(d)    the Plan Sponsor is, and immediately after giving effect to Restructuring Transactions, the Plan Sponsor shall be, Solvent;

(e)    to its knowledge, no facts or circumstances, including in respect to any pending or threatened legal actions, exist that would reasonably be expected to materially impair or materially delay the ability of the Plan Sponsor to consummate the Restructuring Transactions; Plan Sponsor holds (or has contractual relationships by which it has access to) all material licenses, franchises, permits, certificates, approvals, and authorizations from U.S. Governmental Authorities necessary for the Plan Sponsor to consummate the Restructuring Transactions and to execute, deliver, and perform under the Management Agreement;

(f)    there are no actions or proceedings pending or, to the Plan Sponsor's knowledge, threatened against or affecting the Plan Sponsor that would reasonably be expected to materially impair or materially delay the Plan Sponsor's performance under this Agreement or the Management Agreement or the consummation of the transactions contemplated by this Agreement, the Management Agreement, or the Restructuring Transactions;

(g)    other than as otherwise contemplated by this Agreement or the Management Agreement, there are no contracts, undertakings, commitments, agreements or obligations, whether written or oral, between Plan Sponsor or any of its Affiliates or representatives, on the one hand, and any member of the management of any Debtor or its board of directors (or applicable governing body of any Affiliate of any Debtor), any holder of equity or debt securities of any Debtor, or any lender or creditor of any Debtor or any Affiliate of any Debtor, on the other hand, that would be reasonably likely to prevent, restrict, impede, or affect adversely the ability of any Debtor or any of its Affiliates to entertain, negotiate or participate in any such transactions in any material respect;

(h)    to its knowledge, no facts or circumstances, including in respect to any pending or threatened legal actions, exist that would reasonably be expected to materially impair or materially delay the ability of such Party to consummate the Restructuring Transactions;

(i)    as of the Effective Date, the Plan Sponsor will not be a "foreign person," as defined in Section 721 of the U.S. Defense Production Act of 1950, including any implementing regulations thereof; and

(j)    notwithstanding anything contained in this Section 10 or any other provision of this Agreement to the contrary, the Plan Sponsor acknowledges and agrees that the representations and warranties expressly contained in Section 11 hereof (the "**Express Representations**") are the sole and exclusive representations, warranties, and statements of any kind made to the Plan Sponsor and on which the Plan Sponsor may rely in connection with the Restructuring Transactions. The Plan Sponsor acknowledges and agrees that all other representations, warranties, and statements of any kind or nature expressed or implied, whether in written, electronic or oral form are, in each case specifically disclaimed by the Debtors and that the Plan Sponsor has not relied, is not relying on, and will not rely on any such representations, warranties, or statements. The Plan Sponsor acknowledges that it has conducted to its full satisfaction an independent investigation and verification of the business including its financial condition, results of operations, assets, liabilities, properties, contracts, environmental compliance, employee matters, regulatory compliance,

business risks, and prospects of the Debtors, and, in making its determination to proceed with the Restructuring Transactions, the Plan Sponsor has relied solely on the results of its own independent investigation and verification, and has not relied on, is not relying on, and will not rely on, the Debtors, any information presentation, any projections, any dataroom, or any information, statements, disclosures, documents, projections, forecasts or other material made available to the Plan Sponsor or any of its Affiliates or representatives in any dataroom or otherwise, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or the Debtors or any of their Affiliates or representatives, or any failure of any of the foregoing to disclose or contain any information, except for the Express Representations (it being understood that the Plan Sponsor has relied, is relying, and will rely only on the Express Representations).

**Section 11.**    *Mutual Representations and Warranties*.    Each of the Parties represents and warrants to each other Party that, as of the date such Party executes and delivers this Agreement and as of the Effective Date:

(a)    it is validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder, and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, partnership, limited liability company, or other similar action;

(b)    this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(c)    except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code (including, for the avoidance of doubt, all Regulatory Approvals), no consent or approval is required by any other Person or Entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(d)    the execution, delivery, and performance of such Party of this Agreement do not, and will not (i) violate (A) any provision of any Law or regulations applicable to it or (B) its articles of association, memorandum of association, charter, bylaws, or other governing documents or (ii) conflict with or constitute a breach of or default (without notice or lapse of time, or both) under, or give rise to a right of termination, modification, or cancellation of any obligation under any material contractual obligation to which it is a party, except in the case of clause (i)(A) and (ii)(Y) with respect to the Debtors, as would not reasonably be expected to have a material adverse effect on the Debtors, taken as a whole, and (Z) with respect to any other Party, as would not reasonably be expected to prevent or materially impair, alter, or delay the ability of such Party to consummate the transactions contemplated hereby and by the Management Agreement;

(e)    to its knowledge, no facts or circumstances, including with respect to any pending or threatened legal actions, exist that would be reasonably expected to impair or delay the ability of such Party to consummate the Restructuring Transactions; and

19

(f)    except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

**Section 12.    *Termination Events*.**

12.01.  <u>Plan Sponsor Termination Events</u>.  This Agreement may be terminated with respect to the Plan Sponsor by the Plan Sponsor by the delivery to the Debtors and the Committee of a written notice in accordance with <u>Section 15.11</u> upon the occurrence of the following events:

(a)    the breach in any material respect by a Debtor or the Committee of any of the applicable representations, warranties, or commitments set forth in this Agreement that (i) would reasonably be expected to prevent, impede, or materially impair the implementation or consummation of the Restructuring Transactions and (ii) to the extent curable, remains uncured for ten (10) days after the Plan Sponsor transmits a written notice in accordance with <u>Section 15.11</u> detailing any such breach; *provided*, that that the Plan Sponsor may not seek to terminate this Agreement based upon a breach of this Agreement by any other Party arising primarily out of the Plan Sponsor's own actions in material breach of this Agreement;

(b)    the termination of this Agreement in accordance with its terms by the Committee;

(c)    the delivery of a notice by the Debtors in accordance with <u>Section 8.02</u>;

(d)    the failure to meet any Milestone set forth in <u>Section 4</u> that has not been waived or extended in a manner consistent with this Agreement;

(e)    the issuance by any Governmental Authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) Business Days after the Plan Sponsor transmits a written notice in accordance with <u>Section 15.11</u> detailing any such issuance; *provided* that this termination right may not be exercised by the Plan Sponsor if the Plan Sponsor sought or requested such ruling or order in contravention of any obligation set out in this Agreement or such ruling or order resulted from any breach of this Agreement by the Plan Sponsor;

(f)    any Governmental Authority that must grant a Regulatory Approval has taken any action or failed to take any action that either (i) denies such approval or (ii) imposes a material condition that in the reasonable judgment of the Plan Sponsor, based upon the advice of Plan Sponsor Counsel, would reasonably be expected to materially prevent or impede the implementation or consummation of a material portion of the Restructuring Transactions;

(g)    the Bankruptcy Court grants relief that is (i) inconsistent with this Agreement in any material respect or (ii) would, or would reasonably be expected to, materially frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring Transactions, in each case unless the Debtors have sought a stay of such relief within seven (7) days after the date that the Bankruptcy Court grants such relief and such order is stayed, reversed, or vacated within fourteen (14) days after the date that the Bankruptcy Court grants such relief;

(h)      the Bankruptcy Court enters an order granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code authorizing any party to proceed with regard to any material asset of the Debtors and such relief would materially delay or impede the implementation of the Restructuring Transactions;

(i)      the Debtors withdraw or revoke the Plan or modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in all material respects;

(j)      the Bankruptcy Court enters an order denying confirmation of the Plan;

(k)      the Bankruptcy Court enters an order (i) converting one or more of the Chapter 11 Cases of the Debtors to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code (other than the *Order Approving the Appointment of Chapter 11 Examiner* [Docket No. 923] or any other order of the Bankruptcy Court with respect to the examiner appointed thereby) or a trustee in one or more of the Chapter 11 Cases of the Debtors, (iii) terminating any Debtor's exclusive right to file and solicit acceptances of a plan of reorganization, or (iv) rejecting this Agreement;

(l)      the filing of a motion or application by any Debtor seeking an order (without the prior written consent of the Plan Sponsor), (i) converting one or more of the Chapter 11 Cases of the Debtors to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of the Debtors, or (iii) rejecting this Agreement;

(m)      the Bankruptcy Court denies entry of the Bid Protections Order; or

(n)      following entry of the Bid Protections Order, the Debtors fail to promptly pay and reimburse all Fees and the Break-Up Fee in accordance with this Agreement and the Bid Protections Order.

12.02.  Debtor Termination Events.  Any Debtor may terminate this Agreement as to all Parties upon prior written notice to the Plan Sponsor in accordance with Section 15.11 upon the occurrence of any of the following events:

(a)      the breach in any material respect by the Plan Sponsor of any of the representations, warranties, or commitments of the Plan Sponsor set forth in this agreement that (i) would reasonably be expected to prevent, impede, or materially impair the implementation or consummation of the Restructuring Transactions and (ii) to the extent curable, remains uncured for ten (10) days after the Debtors transmit a written notice in accordance with Section 15.11 detailing any such breach; *provided*, that that the Debtors may not seek to terminate this Agreement based upon a breach of this Agreement by any other Party arising primarily out of the Debtors' own actions in material breach of this Agreement;

(b)      the board of directors, board of managers, or such similar governing body of any Debtor determines, after consulting with counsel to the Debtors, (i) that proceeding with any of the Restructuring Transactions or failing to terminate this Agreement would be inconsistent with

the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(c)    the issuance by any Governmental Authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) Business Days after the Debtors transmit a written notice in accordance with Section 15.11 detailing any such issuance; *provided* that this termination right may not be exercised by the Debtors if any Debtor sought or requested such ruling or order in contravention of any obligation set out in this Agreement or such ruling or order resulted from any breach of this Agreement by any Debtor;

(d)    any Governmental Authority that must grant a Regulatory Approval has taken any action or failed to take any action that either (i) denies such approval or (ii) imposes a material condition that in the reasonable judgment of the Debtors, based upon the advice of counsel to the Debtors, would reasonably be expected to materially prevent or impede the implementation or consummation of a material portion of the Restructuring Transactions;

(e)    if all conditions precedent to the occurrence of the Effective Date of the Plan have been satisfied or waived in accordance with the Plan and the Plan Sponsor fails to complete the actions to be taken by it on the Effective Date in accordance with this Agreement; or

(f)    the Bankruptcy Court enters an order denying confirmation of the Plan.

12.03.  Committee Termination Events.  This Agreement may be terminated with respect to the Committee by the Committee by the delivery to the Debtors and the Plan Sponsor of a written notice in accordance with Section 15.11 upon the occurrence of the following events:

(a)    the breach in any material respect by the Debtors or Plan Sponsor of any of the applicable representations, warranties, or commitments set forth in this agreement that (i) would reasonably be expected to prevent, impede, or materially impair the implementation or consummation of the Restructuring Transactions and (ii) to the extent curable, remains uncured for ten (10) days after the Debtors transmit a written notice in accordance with Section 15.11 detailing any such breach; *provided*, that that the Committee may not seek to terminate this Agreement based upon a breach of this Agreement by any other Party arising primarily out of the Committee's own actions in material breach of this Agreement

(b)    the Committee determines, after consulting with counsel to the Committee, (i) that proceeding with any of the Restructuring Transactions or failing to terminate this Agreement would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to support an Alternative Restructuring Proposal;

(c)    any Governmental Authority that must grant a Regulatory Approval has taken any action or failed to take any action that either (i) denies such approval or (ii) imposes a material condition that in the reasonable judgment of the Committee, based upon the advice of counsel to the Committee, would reasonably be expected to materially prevent or impede the implementation or consummation of a material portion of the Restructuring Transactions;

(d)      the issuance by any Governmental Authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) Business Days after the Debtors transmit a written notice in accordance with <u>Section 15.11</u> detailing any such issuance; *provided* that this termination right may not be exercised by the Committee if the Committee sought or requested such ruling or order in contravention of any obligation set out in this Agreement or such ruling or order resulted from any breach of this Agreement by the Committee;

(e)      if all conditions precedent to the occurrence of the Effective Date of the Plan have been satisfied or waived in accordance with the Plan and the Plan Sponsor fails to complete the actions to be taken by it on the Effective Date in accordance with this Agreement;

(f)      the Debtors withdraw or revoke the Plan or modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in all material respects; or

(g)      the Bankruptcy Court enters an order denying confirmation of the Plan.

12.04.   <u>Mutual Termination</u>.  This Agreement, and the obligations of the Parties hereunder, may be terminated by mutual written agreement among each of the Parties.

12.05.   <u>Automatic Termination</u>.  This Agreement shall terminate automatically without any further required action or notice immediately after the Effective Date.

12.06.   <u>Effect of Termination</u>.  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement except as otherwise expressly provided herein.  Nothing in this Agreement shall be construed as prohibiting a Party from contesting whether any such termination is valid or effective in accordance with this Agreement or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Party, or the ability of any Party, to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its Claims against the Plan Sponsor, and (b) any right of the Plan Sponsor, or the ability of the Plan Sponsor, to protect and preserve its rights (including rights under this Agreement), remedies, and interests.  Unless and until there is an unstayed order of the Bankruptcy Court providing that the giving of notice under and termination of this Agreement in accordance with its terms is prohibited by the automatic stay imposed by section 362 of the Bankruptcy Code, the occurrence of a Termination Event shall result in the automatic termination of this Agreement with respect to each Party for which this Agreement would terminate if the Parties having the right to terminate this Agreement (the "**Requisite Notice Parties**") were permitted to provide notice of such occurrence in accordance with this Agreement, upon the date that is five (5) days following such occurrence, unless the Requisite Notice Parties waive such Termination Event in writing.  No purported termination of this Agreement shall be effective under this <u>Section 12.06</u> or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination

pursuant to Section 12.02(b) or 12.02(f). Nothing in this Section 12.06 shall restrict any Debtor's right to terminate this Agreement in accordance with Section 12.02(b).

**Section 13.**     *Expense Reimbursement and Bid Protections.*

13.01.  Pursuant to the Bid Protections Order, the Debtors shall promptly pay or reimburse, as and when required under this Agreement, the Plan Term Sheet, or the Plan, all reasonable and documented out-of-pocket fees (including success fees, transaction fees, or similar fees) and expenses of: (i) the Plan Sponsor; (ii) Paul, Weiss, Rifkind, Wharton & Garrison, LLP, as counsel to the Plan Sponsor ("**Plan Sponsor Counsel**"); and (iii) any other accountants and other professionals, advisors and consultants retained by the Plan Sponsor with the prior written consent of the Debtors (which shall not be unreasonably withheld), in each case, to implement the Restructuring Transactions (together with Plan Sponsor Counsel, the "**Plan Sponsor Advisors**"), regardless of when such fees are or were incurred (collectively, the "**Fees**").  The Fees shall be payable by the Debtors as administrative expenses promptly upon the written request of the applicable Plan Sponsor Advisor following the termination of this Agreement (x) by the Debtors pursuant to Sections 12.02(b), 12.02(c), 12.02(d) (unless the Plan Sponsor unreasonably withholds consent to a waiver or extension of the Milestones), or 12.02(f) or (y) by the Plan Sponsor pursuant to Section 12.01, without any requirement to (a) file retention or fee applications, (b) provide notice to any person other than the Debtors and the Committee, or (c) provide itemized time detail to the Debtors or any other Person; *provided* that the Plan Sponsor Advisor will provide additional detail as reasonably requested by the Debtors; *provided further*, that the aggregate amount of Fees to be paid under this Section 13.01 shall not exceed $15,000,000 in the aggregate; *provided*, *further*, that the foregoing shall in no way limit the ability of NewCo to reimburse the Fees under the terms of the Management Agreement up to $15,000,000.

13.02.  In the event that this Agreement is (x) terminated by the Debtors pursuant to (i) Section 12.02(b) (other than to pursue an Orderly Wind Down) or (ii) pursuant to any other provision of Section 12.02 if, as of the Termination Date, the Debtors are in material breach of this Agreement or (y) terminated by the Plan Sponsor pursuant to Sections 12.01(a) (solely on account of a breach of this Agreement by the Debtors), 12.01(c) (unless the Debtors provide notice of their intention to pursue an Orderly Wind Down), or 12.01(d) (unless the Plan Sponsor unreasonably withholds consent to a waiver or extension of the Milestones) pursuant to the Bid Protections Order, in addition to any Fees owed pursuant to Section 13.01, the Debtors shall pay the Plan Sponsor an amount equal to $5,000,000, which shall be an administrative expense of the Debtors (the "**Break-Up Fee**") and shall be paid on the Termination Date; *provided*, that, notwithstanding the foregoing, in the event that this Agreement is terminated (A) by the Debtors pursuant to Section 12.02(b) to pursue an Orderly Wind Down or (B) by the Plan Sponsor upon receiving notice from the Debtors of their intention to pursue an Orderly Wind Down, the Debtors shall remain obligated to pay the Plan Sponsor the Break-Up Fee unless an Orderly Wind Down is actually consummated within six (6) months of the Termination Date; *provided*, that any sale or disposition of the Mining assets must be consummated within eighteen (18) months of the Termination Date.

**Section 14.**    *Amendments and Waivers*.

(a)    This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 14.

(b)    This Agreement may be modified, amended, or supplemented in a writing signed by: (i) each Debtor; (ii) the Committee; and (iii) the Plan Sponsor.  Any provision, condition, or other term of this Agreement may be waived only in a writing signed by the Party against which enforcement of such waiver is sought.

(c)    Any proposed modification, amendment, waiver, or supplement that does not comply with this Section 14 shall be ineffective and void *ab initio*.

(d)    Notwithstanding anything to the contrary in this Section 14, the Milestones shall be subject to waiver and extension as set forth in Section 4.

(e)    The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power, or remedy under this Agreement shall operate as a waiver of any such right, power, or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power, or remedy by such Party preclude any other or further exercise of such right, power, or remedy or the exercise of any other right, power, or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 15.**    *Miscellaneous*

15.01.    Acknowledgement.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

15.02.    Exhibits Incorporated by Reference; Conflicts.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

15.03.    Further Assurances.  Subject to the other terms of this Agreement, the Parties agree to use commercially reasonable efforts to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary and not inconsistent with this Agreement, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

15.04.  <u>Publicity</u>.  The Parties shall use commercially reasonable efforts to consult with each other regarding material press releases or public announcements concerning this Agreement or the transactions contemplated hereby.  For the avoidance of doubt, material public announcements do not include any routine statements made via social media.

15.05.  <u>Complete Agreement</u>.  This Agreement, together with the other documents expressly referred to herein, constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

15.06.  <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement:  (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or do not have jurisdiction over any Party hereto.

15.07.  <u>TRIAL BY JURY WAIVER</u>.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

15.08.  <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery (including .pdf), each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

15.09.  <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Parties, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Parties were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

15.10.  <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity without the prior written consent of the other Parties.

15.11.  <u>Notices</u>.  Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail, if received prior to 5:00 PM (local time of the recipient) on a Business Day or otherwise on the next Business Day, (c) the Business Day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third (3rd) Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the electronic mail address or street address, as applicable, set forth below, or at such other electronic mail address or street address as such Party may specify by written notice to the other Party.

(a)    if to the Debtors, to:

Celsius Network LLC
50 Harrison Street, Suite 209F
Hoboken, New Jersey 07030
Attention:  Ron Deutsch
E-mail address:  ron.deutsch@celsius.network

with copies to:

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attention:  Patrick J. Nash, P.C.; Ross M. Kwasteniet, P.C.; Christopher S. Koenig; Dan Latona; and Alison J. Wirtz
E-mail address:  patrick.nash@kirkland.com; ross.kwasteniet@kirkland.com; chris.koenig@kirkland.com; dan.latona@kirkland.com; and alison.wirtz@kirkland.com

and

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention: Joshua A. Sussberg, P.C.
E-mail address:  joshua.sussberg@kirkland.com

(b)    if to the Plan Sponsor, to:

NovaWulf Digital Management, L.P.
536 W 29th Street
New York, NY 10001
Attention:  Jason New and Michael Abbate
E-mail address:  jason@novawulf.io and mike@novawulf.io

with copies to:

Paul, Weiss, Rifkind, Wharton & Garrison, LLP
1285 Avenue of the Americas
New York, NY 10019-6065
Attention:  Brian Hermann, Ken Ziman, and Michael Turkel
E-mail address:  bhermann@paulweiss.com; kziman@paulweiss.com; and
mturkel@paulweiss.com

and

(c)      if to the Committee, to:

White & Case LLP
1221 Avenue of the Americas
New York, New York 10020
Attn:  David M. Turetsky
E-mail address:  david.turetsky@whitecase.com

and

White & Case LLP
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Attention:  Gregory F. Pesce
E-mail address:  gregory.pesce@whitecase.com

and

White & Case LLP
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Attention:  Keith H. Wofford
E-mail address: kwofford@whitecase.com

and

White & Case LLP
555 Flower Street, #2700
Los Angeles, California 90071
Attention:  Aaron Colodny
E-mail address: aaron.colodny@whitecase.com

    15.12.  <u>Independent Due Diligence and Decision Making</u>.  Each Party hereby confirms that
its  decision  to  execute  this  Agreement  has  been  based  upon  its  independent  assessment  of
documents and information available to it, as it has deemed appropriate.

15.13.  <u>Enforceability of Agreement</u>.  Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

15.14.  <u>Waiver</u>.  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

15.15.  <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

15.16.  <u>Several, Not Joint, Claims</u>.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

15.17.  <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

15.18.  <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

15.19.  <u>Survival</u>.  Notwithstanding the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in <u>Section 13</u> and the Confidentiality Agreements shall survive such termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof.

15.20.  <u>Email Consents</u>.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to <u>Section 3.02</u>, <u>Section 14</u>, or otherwise, including a written approval by the Debtors, the Plan Sponsor, or the Committee, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

[*Signature pages omitted.*]

## EXHIBIT A

**Plan Term Sheet**

*Execution Version*

*In re Celsius Network LLC, et al.*, **Case No. 22-10964 (MG)**

## PLAN TERM SHEET

**THIS PLAN TERM SHEET (INCLUDING ALL EXHIBITS, ANNEXES, APPENDICES, AND/OR SCHEDULES HERETO, THE "<u>PLAN TERM SHEET</u>") CONTAINS CERTAIN MATERIAL TERMS AND CONDITIONS OF THE PROPOSED CHAPTER 11 PLAN (THE "<u>PLAN</u>") OF THE DEBTORS IN THE JOINTLY-ADMINISTERED CASES CAPTIONED *IN RE CELSIUS NETWORK LLC, ET AL.*, CASE NO. 22-10964 (MG) (THE "<u>DEBTORS</u>" AND, TOGETHER WITH THEIR NON-DEBTOR AFFILIATES, "<u>CELSIUS</u>"). THIS PLAN TERM SHEET DOES NOT ADDRESS ALL TERMS, CONDITIONS, OR OTHER PROVISIONS THAT WOULD BE REQUIRED IN CONNECTION WITH THE PLAN OR THAT WILL BE SET FORTH IN THE PLAN AND THE OTHER DEFINITIVE DOCUMENTS, WHICH ARE SUBJECT TO AGREEMENT IN ACCORDANCE WITH THIS PLAN TERM SHEET AND IN ACCORDANCE WITH THE PLAN SPONSOR AGREEMENT TO WHICH THIS PLAN TERM SHEET IS ATTACHED.**

**THIS PLAN TERM SHEET IS NOT AN OFFER, ACCEPTANCE, OR SOLICITATION WITH RESPECT TO ANY SECURITIES, LOANS, OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER, ACCEPTANCE, OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE LAW, INCLUDING SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE TO THE EXTENT APPLICABLE. NOTHING CONTAINED IN THIS PLAN TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY. THIS PLAN TERM SHEET IS BINDING SOLELY TO THE EXTENT PROVIDED IN THE PLAN SPONSOR AGREEMENT.**

| **GENERAL PROVISIONS** |
| --- |

| **Transaction Summary** | The restructuring transactions will include the following, as set forth in further detail in this Term Sheet.  The Plan's exact transaction steps and the creditor recovery levels may require adjustment to ensure feasibility.  Terms capitalized but not defined in this Transaction Summary shall have the meanings ascribed to such terms in **Exhibit 1**.<br><br>***NewCo / ESTs***.  On the Effective Date, the NewCo Assets shall vest in NewCo. The NewCo Assets will include, among other things, all Retail Loan Settlement Cryptocurrency Assets (which shall be used to settle NewCo's obligations under the Retail Loan Settlement Agreements).<br><br>Holders of General Earn Claims (which, for the avoidance of doubt, include any portion of any Borrow Claim treated as an Earn Claim and any Convenience Claim for which the holder has elected to receive the treatment provided to General Earn Claims) will receive Equity Share Tokens ("ESTs") which will represent 100% of the common equity interests in NewCo.  The Manager will manage NewCo at the direction of the New Board for the benefit of holders of ESTs.<br><br>***Earn Treatment***.  Holders of Allowed General Earn Claims will receive a recovery comprising (i) a distribution on the Effective Date or as soon as reasonably practicable thereafter of a portion of the Debtors' Liquid Cryptocurrency, (ii) 100% of the common equity interests in NewCo, which shall be issued as ESTs, (iii) preferred equity interests represented by Management Share Tokens ("MSTs") entitled to an annual distribution in an amount equal to 50 bps of the NewCo Fee-Paying Asset Value and a 2.5% incentive fee (to be further described in the Management Agreement), and (iv) Litigation Proceeds; *provided* that an MST will be forfeited if its corresponding EST is traded within one year of the Effective Date.<br><br>Holders of Allowed General Earn Claims who vote for the Plan will have the option to indicate their preference to modify their default distribution to either: (i) receive a greater amount of Liquid Cryptocurrency (but subject to a discount, as described in the following sentence) or (ii) receive additional ESTs and MSTs, each as compared to the default allocation under the Plan, which preferences will be accommodated to the extent reasonably possible in the aggregate (which determination shall be made by the Debtors in consultation with the Committee) given the preferences of other holders of General Earn Claims.  More specifically, as a trade for the benefit of receiving a higher proportion of Liquid Cryptocurrency, an effective discount of 30% will be applied to the recoveries of Account Holders whose preference for additional Liquid Cryptocurrency are accommodated, as further described herein.<br><br>***Convenience Class***.  Account Holders holding Allowed Earn Claims above the *De Minimis* Claim Threshold ($10) but at or below Convenience Claim Threshold ($5,000) shall be classified in the Convenience Class, and shall receive a 70% recovery on account of such Allowed Convenience Claims, to be satisfied through a distribution of Liquid Cryptocurrency on the Effective Date or as soon as reasonably practicable thereafter.  Account Holders with Allowed |

Earn Claims equal to or less than the Convenience Claim Threshold, but equal to or greater than $1,000 may opt out of the Convenience Class and receive the above-described treatment for Allowed General Earn Claims. Account Holders whose Allowed Earn Claims exceed the Convenience Claim Threshold will have the opportunity to irrevocably elect through a Convenience Claim Election Form in accordance with the procedures set forth in the Disclosure Statement Order to have their Allowed Earn Claims reduced to the Convenience Claim Threshold and treated as Convenience Claims.

***Custody / Withhold / Borrow Treatment***.  Certain Account Holders whose Claims are associated with the Custody or Borrow Programs will have the opportunity to elect through the applicable settlement opt-in form or through their ballot in accordance with the procedures set forth in the Disclosure Statement Order to receive program-specific treatment based on settlements included in the Plan and the Court's rulings on pending legal issues, as further described in the program-specific term sheets attached hereto as **Exhibit 2** (Custody) and **Exhibit 3** (Borrow).

***Management Fee / Management Contribution.***  In exchange for its services, the Manager shall be paid the Management Preferred Interests, which shall provide the right to receive a dividend that will initially be calculated based on the NewCo Fee-Paying Asset Value (as determined by an independent audit or valuation firm or valuation professional), with the dividend payable in future years to be calculated based on the trading price of ESTs, as will be set forth more fully in the Management Agreement.

On the Effective Date, the Manager shall make the Management Contribution equal to $45 million.

***Releases***.  The Plan shall contain standard release and exculpation provisions applicable only to specific parties identified in this Plan Term Sheet or otherwise agreed to by the Debtors and the Committee (and timely disclosed in the Plan Supplement).  The Excluded Parties—including, without limitation, Alexander Mashinsky, Shlomi Daniel Leon, and all the other UCC Stipulation Defendants—shall be ***excluded*** from the release and exculpation provisions.

The Plan shall release Avoidance Actions against any current Account Holders that are not Insiders or Excluded Parties who (i) withdrew assets from the Debtors' platform totaling under $100,000 in the aggregate, valued as of the time of such withdrawals, in the 90 days prior to the Petition Date, (ii) vote in favor of the Plan, and (iii) agree to release the other Released Parties.

***Litigation Recoveries***.  A Litigation Administrator will be appointed to pursue the Recovery Causes of Action, which will include, among others:  (i) Causes of Action against Alexander Mashinsky, Shlomi Daniel Leon, the other UCC Stipulation Defendants, and any other party that is not released under the Plan; and (ii) Avoidance Actions that are not released under the Plan.

The Litigation Oversight Committee shall be composed of five (5) to seven (7) creditors and shall oversee the Litigation Administrator.  The Litigation Oversight Committee shall be selected by the Committee through an open interview process.  The Litigation Oversight Committee shall contain a three (3)

| | |
|---|---|
| | member subcommittee to oversee the prosecution of Avoidance Actions against non-Insider (or former Insider) Account Holders, with at least two (2) of the three (3) members not being members of the Committee. |
| | ***Orderly Wind-Down Toggle***.   The Bid Protections Order and the Plan will provide that the Debtors will effectuate an Orderly Wind Down in accordance with the Wind-Down Procedures if, at any time after the Bid Protections Order is entered by the Bankruptcy Court, the Debtors, the Committee, and their respective advisors determine that an Orderly Wind Down is in the best interests of the Estates due to complications or delays in implementing NewCo; *provided* that the Debtors and Committee may move for an Orderly Wind Down at any time by providing written notice to the Plan Sponsor and after notice and a hearing before the Bankruptcy Court. |
| **Key Assumptions** | This Plan Term Sheet is premised on the following key assumptions: |
| | ▪ ***Earn***:    Account balances associated with the Earn Program as of the Petition Date are Unsecured Claims, and the assets associated with such balances are property of the Debtors' Estates under section 541 of the Bankruptcy Code. |
| | ▪ ***Withhold***:   Account balances reflected in the Debtors' records as "withheld" are Unsecured Claims and treated the same as Earn Program balances/assets, except in the case of balances/assets on account of Unsupported Digital Assets:<br><br>▪ Unsupported Digital Assets that remain on the platform are assumed to be Account Holder property; and<br><br>▪ Unsupported Digital Assets that no longer remain on the platform are assumed to give rise to Account Holder Claims. |
| | ▪ ***Custody***:    Digital assets held in the Custody Program do not constitute property of the Debtors' Estates, *provided, however*, that, unless otherwise agreed or settled by the parties, such assets shall be subject to Avoidance Actions. |
| | ▪ ***Priority of Account Holder Claims***.  Account Holder Claims are senior in priority to rights of the Preferred Equityholders, either by virtue of (i) having Claims against every Debtor Entity, (ii) the existence of the CNL-Network LLC Intercompany Claim, and/or (iii) the CNL-Network LLC Consolidation. |
| | ▪ ***Value of CEL Token***.  Except as provided below, in settlement of Claims and Causes of Action with respect to the CEL Token for, among other things, recharacterization and subordination, all CEL Token Claims, other than Custody Claims that are CEL Token Claims, shall be Allowed at $0.20/CEL Token (*i.e.*, 1 CEL Token equals a $0.20 CEL Token Claim), reflecting the pre-sale price of the CEL Token in the Debtors' initial coin offering, or such other amount as may be consented to by the Committee, and shall otherwise receive the treatment associated with the applicable program. |

| | |
|---|---|
| | All Claims on account of the CEL Token held by (i) UCC Stipulation Defendants or (ii) any other individuals agreed on by the Committee and the Debtors and set forth in the Plan Supplement who participated in, or had direct knowledge of, the manipulation of the price of the CEL Token will be Disallowed. |
| **NewCo & Management Arrangements** | The Manager will manage NewCo at the direction of the New Board for the benefit of holders of ESTs in accordance with the terms of the Management Agreement and the New Organizational Documents. NewCo will implement a policy regarding the provision of quarterly dividends to holders of ESTs, which dividends, if any, shall be paid either in Cash, Bitcoin, or stablecoins, in each case, in the discretion of the New Board in accordance with the New Organizational Documents and applicable law.<br><br>On the Effective Date, the Manager shall make the Management Contribution, which shall be $45 million.<br><br>In exchange for its services, the Manager will be paid the Management Fee, including an Incentive Fee (as defined in the Management Term Sheet), as will be more fully described in the Management Agreement.<br><br>NewCo will be a public reporting company and will file financial statements on Forms 10-Q and 10-K as well as annual proxy statements.<br><br>The New Organizational Documents shall be included in the Plan Supplement and shall be consistent with the Management Term Sheet in all material respects.<br><br>NewCo shall have any and all necessary licenses, if any, to fulfill its obligations under the Plan (including any settlements entered in connection therewith) or, to the extent NewCo does not possess such licenses, NewCo shall use commercially reasonable efforts to make appropriate arrangements through a partnership with a third party to ensure that NewCo can meet its obligations under the Plan without disruption. |
| **Governance** | The New Board shall initially consist of seven members:  (i) two of whom will be appointed by the Manager; (ii) two of whom will be appointed by the Committee, in its sole discretion; and (iii) three of whom will be appointed by the Committee and consented to by the Manager (whose consent shall not be unreasonably withheld or conditioned), which directors contemplated in the foregoing clause (iii) shall be independent as such term is generally used for public companies listed on a registered exchange.  Members of the New Board (other than the designees of the Manager) shall have staggered terms classified across three approximately equal classes, with one class subject to reelection each year.  Each board member may be reelected at the end of their term; *provided* that, for so long as the Management Agreement is in effect, the Plan Sponsor shall have the right to nominate and elect two members of the New Board via the Management Preferred Interests.<br><br>The Management Agreement's initial term will be five years; *provided* that the Management Agreement and each member of the Management Team shall be subject to termination for cause, as will be defined in the Management |

| | Agreement (which shall be consistent with the Management Term Sheet). Following the first five-year term (the "Initial Term"), the Management Agreement shall automatically renew for a successive 5 year term, unless either the Manager or the New Board provides notice no more than twelve (12) months but no less than six (6) months prior to the end of the Initial Term or any renewal term that it does not wish to renew the Management Agreement or wishes to renew the Management Agreement on different terms.   To the extent the Management Agreement is terminated, NewCo shall have no further obligation to pay the Management Fee. |
|---|---|
| | The New Board shall adopt and approve (i) the investment policy, (ii) the dividend policy, (iii) any policies regarding potential conflicts of interest (including with respect to the Plan Sponsor, NewCo, and their respective personnel and Affiliates), and (iv) all major investment and operational decisions of NewCo (taking into account the recommendation of the Manager). |
| | The New Organizational Documents shall provide for the ability of 25% of the EST holders to call, and for NewCo to convene in such case, a special meeting of shareholders to, with the approval of a majority of the ESTs held by holders that (i) are in attendance (in person or by proxy) and (ii) vote for or against such proposal at such special meeting where a quorum exists in accordance with the New Organizational Documents, instruct the New Board to consider whether to terminate or reconsider the Management Agreement or the Manager or wind down NewCo. |
| **Substantive Consolidation** | The Plan assumes the CNL-Network LLC Consolidation shall result in (i) a separate chapter 11 plan for each of the Non-Consolidated Debtors for substantive purposes and (ii) a joint plan for both procedural and substantive purposes for Debtors Celsius Network Limited and Celsius Network LLC. |
| **Release & Exculpation Provisions** | The Plan shall include customary release, exculpation, and injunction provisions, subject to the following. |
| | Notwithstanding anything to the contrary in the Plan, the Excluded Parties—including, without limitation, Alexander Mashinsky, Shlomi Daniel Leon, and the other UCC Stipulation Defendants—will be ***excluded*** from the Plan's releases and exculpation provisions.  Further, the Debtors shall use commercially reasonable efforts to subordinate or disallow any Excluded Party's claims for indemnity, exculpation, or reimbursement unless such claims are specifically authorized to be paid pursuant to a Bankruptcy Court order. |
| | Notwithstanding anything to the contrary in the Plan: |
| | ▪ All Avoidance Actions for withdrawals by Account Holders that are not Insiders, UCC Stipulation Defendants, or other Excluded Parties in the 90 days prior to the Petition Date valued at or below $100,000 in the aggregate, valued at the time of such withdrawals, shall be released ***if*** the applicable withdrawing party (i) votes in favor of the Plan and (ii) agrees to release the other Released Parties; |
| | ▪ Avoidance Actions for withdrawals by Account Holders that are not Insiders, UCC Stipulation Defendants, or other Excluded Parties valued |

|  | between $100,000 and $250,000 in the aggregate, valued at the time of such withdrawals, shall have the opportunity to elect to settle any Avoidance Action with respect to such withdrawals in exchange for a cash payment equal to 27.5% of the aggregate value of such withdrawal, valued at the time of such withdrawal in return for a release of such Avoidance Action;<br><br>▪ Avoidance Actions for withdrawals by Account Holders that are not Insiders, UCC Stipulation Defendants, or other Excluded Parties valued above $250,000 in the aggregate, valued at the time of such withdrawals, shall be ***excluded*** from the Plan's release and exculpation provisions absent a separate settlement consented to (i) prior to the Effective Date, by the Debtors and the Committee, and (ii) as of and following the Effective Date, by the Litigation Administrator; and<br><br>▪ All Avoidance Actions against Insiders, UCC Stipulation Defendants, other Excluded Parties, or third party non-Account Holder Entities shall be preserved and overseen by the Litigation Administrator on the Effective Date. |
| **Orderly Wind Down** | The Debtors will effectuate an Orderly Wind Down in accordance with the Wind-Down Procedures if, at any time after the Bid Protections Order is entered by the Bankruptcy Court, the Debtors, the Committee, and their respective advisors determine that an Orderly Wind Down is in the best interests of the Estates due to complications or delays in implementing NewCo; *provided* that the Debtors and Committee may move for an Orderly Wind Down at any time by providing written notice to the Plan Sponsor and after notice and a hearing before the Bankruptcy Court.<br><br>In the event of an Orderly Wind Down, (a) the Plan Administrator or any other Person or Entity identified by the Debtors and the Committee will wind down the Estates and (b) the Debtors' Cryptocurrency, Cash, and other assets will be distributed, in each case, in an orderly manner pursuant to the Plan and the Wind-Down Procedures.<br><br>The Orderly Wind Down is anticipated to occur over a wind-down period to be set forth in the Wind-Down Procedures.<br><br>Notwithstanding anything to the contrary in the Plan, this Plan Term Sheet, or the Plan Sponsor Agreement, whether or not the Debtors implement the Orderly Wind Down, the Litigation Administrator shall be appointed on the date that the Effective Date occurs. |
| **Recovery Causes of Action** | The Committee will select a Litigation Administrator, who will be identified in the Plan Supplement and be appointed as of the Effective Date to prosecute the Recovery Causes of Action on behalf of the holders of General Earn Claims. For the avoidance of doubt, the Recovery Causes of Action shall not include any released Claims or Causes of Action against the Released Parties, and the Recovery Causes of Action will remain with the Post-Effective Date Debtors to be prosecuted by the Litigation Administrator as set forth herein. |

On the Effective Date, the Post-Effective Date Debtors will establish a segregated Litigation Recovery Account, funded with the Initial Litigation Funding Amount and controlled by the Litigation Administrator. The funds in the Litigation Recovery Account shall be available to pay the costs and fees of the Litigation Administrator (and any fees associated with the Litigation Recovery Account), including professional fees, costs, and expenses in connection with the prosecution of the Recovery Causes of Action. To the extent not spent by the Litigation Administrator, the funds in the Litigation Recovery Account shall be returned to holders of General Earn Claims.

The loans (or beneficial interests in such loans) collateralized by CEL Token issued to (1) Hanoch "Nuke" Goldstein, (2) Shlomi Daniel Leon, and (3) any other Excluded Party shall be transferred to the Litigation Administrator, who shall succeed to any and all rights of the Debtors with respect to such loans following the occurrence of the Effective Date.

On the Effective Date, the Debtors' rights under all applicable directors and officers or other insurance policies or proceeds of such policies shall be transferred to and managed by the Litigation Administrator for the benefit of the holders of General Earn Claims.

The Litigation Administrator shall report to, and act at the direction of, the Litigation Oversight Committee, whose members shall be selected by the Committee and identified in the Plan Supplement; *provided* that: (a) prior to selecting any such members, the Committee will solicit potential candidates to serve on the Litigation Oversight Committee from the holders of General Earn Claims through an open interview process; (b) the Litigation Oversight Committee may include at least one member of the Committee; (c) the Litigation Oversight Committee shall include at least two individuals that are not members of the Committee; and (d) between the filing of the Plan Supplement and the Confirmation Date, the Committee, in consultation with the proposed members of the Litigation Oversight Committee, shall develop and file on the Bankruptcy Court's docket a proposed work plan for evaluating and, if appropriate, prosecuting the Recovery Causes of Action, including alternative dispute resolution procedures to minimize the time and expense associated with pursuing any potential Recovery Causes of Action against ADR-Eligible Potential Defendants as described in more detail herein; *provided, however* that, absent cause shown, the alternative dispute resolution procedures shall not be available to any ADR-Ineligible Potential Defendants.

The Litigation Oversight Committee shall contain a three (3) member subcommittee to oversee the settlement and prosecution of Avoidance Actions against non-Insider (or former Insider) individual Account Holders (the "Avoidance Action Subcommittee"). At least two (2) members of the subcommittee shall not be current members of the Committee. The Avoidance Action Subcommittee shall confer with the Litigation Administrator with respect to, and oversee the potential prosecution or settlement of, any Avoidance Action against any such individual Account Holder for a prepetition transfer of less than $1 million, valued at the date of the applicable transfer.

The Litigation Oversight Committee will determine the frequency and quantum

| | of any distributions from the Litigation Recovery Account. The Litigation Oversight Committee, in consultation with the Litigation Administrator, shall be entitled to control the financing of any litigation, with the right to cause the Litigation Administrator to pledge or transfer a portion of the Recovery Causes of Action, the Litigation Recovery Account, or any proceeds of the foregoing to facilitate such financing, and may obtain such financing from NewCo or third party sources, in their respective business judgment.
Holders of General Earn Claims will receive periodic distributions from the Litigation Recovery Account. Holders of Convenience Claims who do not opt out of the treatment provided to the Convenience Class will not receive distributions from the Litigation Recovery Account. The Debtors, the Committee, and the Plan Sponsor will continue to discuss whether NewCo shall be the Disbursing Agent for Litigation Proceeds on behalf of the Post-Effective Date Debtors.
Any privilege or immunity attaching to any documents or communications (whether written or oral) including, but not limited to, any attorney-client privilege, work-product privilege, joint interest privilege, or any other evidentiary privileges or immunity, in each case relating to any Recovery Causes of Action held by the Debtors pursuant to applicable federal, state, and other law shall vest in the Litigation Administrator as of the Effective Date. The Debtors and the Litigation Administrator are authorized to take all necessary actions to effectuate the transfer of such privileges and available defenses, and the Debtors shall transfer any and all prepetition case files and work product from the Debtors' current and former in-house and outside counsel (or unredacted copies of such files, as appropriate) within thirty (30) days of the Effective Date; *provided*, for the avoidance of doubt, that such production shall not include (i) any materials relating to the preparation, filing, or prosecution of these chapter 11 cases or (ii) any internal communications of any advisors to the Debtors that are Released Parties; *provided*, *further*, that notwithstanding the foregoing proviso, the Litigation Administrator may request, and such advisors shall provide, any primary documents or final work product identified (in such advisors' professional judgement) as materially relevant to the prosecution of any claims against Excluded Parties (including the UCC Stipulation Defendants).
No action taken by the Debtors, the Committee, or the Litigation Administrator shall be (or be deemed to be) a waiver of any privilege or immunity of the Debtors, the Committee, or the Litigation Administrator, including any attorney-client privilege or work product privilege attaching to any documents or communications (whether written or oral). |
| **Contributed Third-Party Claims** | Because aggregating all Contributed Third-Party Claims may enable the pursuit and settlement of such litigation claims in a more efficient and effective manner, each Holder of a Claim or Interest may agree, by electing on its ballot or opt-in form, to contribute its Contributed Third-Party Claims to the Litigation Administrator to prosecute on behalf of the holders of General Earn Claims. By electing such option on its ballot or opt-in form, each Contributing Claimant agrees that, subject to the occurrence of the Effective Date and the formation of the Litigation Recovery Account, it will be deemed, without further action, |

| | |
|---|---|
| | (i) to have irrevocably contributed its Contributed Third-Party Claims to the Litigation Administrator, and (ii) to have agreed to execute any documents reasonably requested by the Committee or the Litigation Administrator to memorialize and effectuate such contribution. |
| | On the Effective Date, all Contributed Third-Party Claims will be irrevocably contributed to the Litigation Administrator. No Person may rely on the absence of a specific reference in the Plan, the Disclosure Statement, the Confirmation Order, the Litigation Administrator Agreement, the Plan Supplement, or any other document as any indication that the Litigation Administrator will or will not pursue any and all available Contributed Third-Party Claims against such Person. The Litigation Administrator shall have, retain, reserve, and be entitled to assert all Contributed Third-Party Claims fully to the same extent that the Contributing Claimants could have asserted such claims prior to the Effective Date. For the avoidance of doubt, the Contributed Third-Party Claims shall not include the rights of any of the Contributing Claimants to receive the distributions under the Plan on account of their Claims or Interests. |
| | The contribution of Contributed Third-Party Claims remains subject to further evaluation by the Debtors and the Committee regarding potential tax consequences. |
| **Section 502(h) Claims** | The Plan shall provide that any potential Section 502(h) Claims will be preemptively netted against the property to be recovered, with such Section 502(h) Claims assumed to recover at the midpoint of General Earn Claim recoveries set forth in the Disclosure Statement. For illustrative purposes, if the midpoint of recoveries on account of General Earn Claims is 53%, a potential Section 502(h) Claim holder will only be required to return 47% (100-53) of the value such claimant would otherwise be required to return in lieu of returning the full value of the transfer and receiving a corresponding Section 502(h) Claim; *provided* that the foregoing recovery assumptions shall not apply to any subordinated claim (*e.g.*, a Claim held by an Excluded Party). |
| **Near-Term Liquidity** | The Debtors, the Committee, and the Plan Sponsor shall agree on mechanisms to ensure a liquid market for ESTs, which mechanisms shall be described in the Disclosure Statement and/or Plan Supplement. |
| **Convenience Class** | The Plan shall contain a Convenience Class for all Account Holders with Allowed Earn Claims valued greater than the *De Minimis* Claim Threshold ($10) and equal to or less than the Convenience Claim Threshold ($5,000). As soon as reasonably practicable following the Effective Date of the Plan, in full and final satisfaction of such Convenience Claims, Account Holders classified in the Convenience Class shall receive a distribution of Liquid Cryptocurrency in an amount sufficient to provide a 70% recovery on such Convenience Claim. |
| | Notwithstanding anything herein to the contrary, (i) Account Holders whose Allowed Earn Claims are valued under the Convenience Claim Threshold but at or above $1,000 may opt out of the Convenience Class and receive the above-described General Earn Claim treatment, and (ii) Account Holders whose Allowed Earn Claims exceed the Convenience Claim Threshold may irrevocably |

| | |
|---|---|
| | elect, through a Convenience Claim Election Form in accordance with the procedures set forth in the Disclosure Statement Order, to have their Claims reduced to the Convenience Claim Threshold (*i.e.*, $5,000) and treated as Convenience Claims. |
| **CEL Token Claims** | Except as provided below, in settlement of Claims and Causes of Action for, among other things, recharacterization and subordination, all CEL Token Claims, other than Custody Claims that are CEL Token Claims, shall be valued at $0.20/CEL Token (*i.e.*, 1 CEL Token equals a $0.20 CEL Token Claim), or such other amount as may be consented to by the Debtors and the Committee, and shall otherwise receive the treatment associated with the program in which they were deployed. All CEL Token Claims of (i) UCC Stipulation Defendants or (ii) any other individuals agreed on by the Committee and the Debtors and set forth in the Plan Supplement as participating in, or having direct knowledge of, the manipulation of the price of the CEL Token shall be Disallowed, without prejudice to any other Claims or Causes of Action against such Persons. |
| **Institutional Loans** | To the extent that Institutional Loans and any agreements, documents, or instruments related thereto are Executory Contracts under the Plan, on the Effective Date, pursuant to section 365(a) of the Bankruptcy Code, the Debtors shall be deemed to have assumed all agreements, documents, and instruments related thereto. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the assumption of all such Institutional Loans and related agreements. |
| **GK8 Sale Proceeds** | Notwithstanding anything to the contrary in the *Order (I) Approving the Sale of the GK8 Debtors' Assets Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances, (II) Authorizing the GK8 Debtors to Enter Into and Perform Their Obligations Under the Asset Purchase Agreement, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [Docket No. 1686], the Debtors shall be authorized to use the net proceeds of the GK8 sale to fund distributions under, or payments required by, the Plan. |
| **Conditions Precedent to Confirmation** | The Plan shall provide that Confirmation of the Plan (in addition to other reasonable and customary conditions) shall be subject to the occurrence of the following, unless waived in accordance with the Plan: (i)  the Bankruptcy Court shall have entered the Disclosure Statement Order; (ii)  the Management Agreement, the New Organizational Documents, and the Figure Agreements shall be agreed as required under the Plan Sponsor Agreement; (iii)  the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed; and (iv)  the Bankruptcy Court shall have entered the Confirmation Order. |

| | |
|---|---|
| **Conditions Precedent to the Effective Date** | The Plan shall provide that the Effective Date of the Plan (in addition to other reasonable and customary conditions) shall be subject to the occurrence of the following, unless waived in accordance with the Plan:<br><br>(i)    the Bankruptcy Court shall have entered the Confirmation Order (and such order shall be a Final Order);<br><br>(ii)    NewCo shall have obtained all regulatory approvals included in <u>Schedule 1</u> to the Plan Sponsor Agreement, and any applicable waiting periods related thereto shall have expired or terminated early;<br><br>(iii)    the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements and exhibits to the Plan, shall be consistent with this Plan Term Sheet in all material respects, and shall have been Filed in a manner consistent with this Plan Term Sheet;<br><br>(iv)    the Debtors shall have transferred, liquidated, monetized, or sold Cryptocurrency in an amount equal to an amount determined by the Debtors, and consented to by the Committee, as reasonably necessary to pay in full, or reserve for payment in full of, all Allowed Administrative Claims, Priority Tax Claims, Secured Claims, and Other Priority Claims (the "<u>Senior Claims Amount</u>");<br><br>(v)    the Litigation Administrator Agreement shall have been executed and the Litigation Recovery Account shall have been established and funded with the Initial Litigation Funding Amount;<br><br>(vi)    each Definitive Document (as defined in the Plan Sponsor Agreement) and each other document contained in any supplement to the Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications or supplements thereto or other documents contained therein, shall have been executed or Filed, if applicable, in form and substance consistent in all material respects with the Plan and the Plan Sponsor Agreement, and shall not have been modified in a manner inconsistent therewith;<br><br>(vii)    the Professional Fee Escrow Account shall have been established and funded with Cash in accordance with the Plan; and<br><br>(viii)    the Plan shall have been substantially consummated or shall be anticipated to be substantially consummated concurrently with the occurrence of the Effective Date. |
| **Minimum Distributions** | No payment, in Cash or Cryptocurrency, will be made to a stakeholder holding aggregate Allowed Claims less than or equal to $10 on account of such Allowed Claims.  Such Claims shall be classified as Class 9 *De Minimis* Claims and shall be cancelled without distribution. |
| **Undeliverable Distributions** | Any distribution under the Plan that is an Unclaimed Distribution or otherwise remains undeliverable for a period of one year after the first attempt to deliver such distribution shall be deemed unclaimed property pursuant to section 347(b) of the Bankruptcy Code and such Unclaimed Distribution or undeliverable distribution shall irrevocably revert to the applicable Post-Effective Date Debtor, |

| | NewCo, or the Litigation Recovery Account, as applicable, automatically (and without need for a further order by the Bankruptcy Court, notwithstanding any applicable federal, provincial, or estate escheat, abandoned, or unclaimed property laws to the contrary). Upon such revesting, the Claim of the holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary. |
|---|---|
| **Tax Matters** | The Plan shall be structured in a tax-efficient and cost-effective manner to be agreed among the Debtors, the Committee, and the Plan Sponsor. |
| | Holders of Earn Claims who are projected to receive more than $100,000 in Liquid Cryptocurrency distributions may contact the Debtors to discuss potential individualized accommodations to the composition of their liquid recovery (including a discussion of the allocation of the associated administrative costs of such customized distributions), and the Debtors, in consultation with the Committee, shall use commercially reasonable efforts to accommodate those requests, in the aggregate. |
| **Professional Fees** | An escrow account shall be funded by the Debtors to fund all Professional Fee Claims and other unpaid fees and expenses that Professionals estimate they have incurred or will incur in rendering services through the Effective Date. |
| **Alternative Dispute Resolution Procedures** | The Plan shall include alternative dispute resolution procedures to provide an efficient and cost-effective manner to resolve Claims of or against the Debtors' Estates, including, for the avoidance of doubt, the Recovery Causes of Action. |
| | Such alternative dispute resolution procedures shall contain a process to be commenced by the Litigation Administrator shortly after the Effective Date to resolve Avoidance Actions against ADR-Eligible Potential Defendants which shall include (1) an information request with respect to the applicable transfers, (2) a settlement offer and acceptance procedure with specific time limits, (3) voluntary mediation, and (4) voluntary binding arbitration. |

| **TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN** | | | |
|---|---|---|---|
| **Class No.** | **Type of Claim** | **Treatment** | **Impairment / Voting** |
| **Unclassified Non-Voting Claims** | | | |
| **N/A** | **Administrative Claims** | In full and final satisfaction, compromise, settlement, and release of and in exchange for such Claim, each holder of an Allowed Administrative Claim (including Professional Fee Claims) shall receive treatment in a manner consistent with section 1129(a)(2) of the Bankruptcy Code. | N/A |

| TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN | | | |
|---|---|---|---|
| **Class No.** | **Type of Claim** | **Treatment** | **Impairment / Voting** |
| **N/A** | **Priority Tax Claims** | In full and final satisfaction, compromise, settlement, and release of and in exchange for such Claim, each holder of an Allowed Priority Tax Claim shall receive treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code. | N/A |
| **Classified Claims and Interests of the Debtors** | | | |
| **Class 1** | **Secured Claims** | In full and final satisfaction, compromise, settlement, and release of and in exchange for such Claim, on, or as soon as reasonably practicable following the Effective Date, each holder of an Allowed Secured Claim shall receive, at the Debtors' option: (a) payment in full in Cash; (b) the collateral securing its Allowed Secured Claim; (c) Reinstatement of its Allowed Secured Claim; or (d) such other treatment rendering its Allowed Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | Not Entitled to Vote (Presumed to Accept) |

| TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN | | | |
|---|---|---|---|
| **Class No.** | **Type of Claim** | **Treatment** | **Impairment / Voting** |
| **Class 2** | **Borrow Claims** | In full and final satisfaction, compromise, settlement, and release of and in exchange for such Claim, each holder of an Allowed Borrow Claim shall have the opportunity to elect through the applicable settlement opt-in form or through its ballot in accordance with the procedures set forth in the Disclosure Statement one of two treatments: <br><br> **Treatment A**: Borrowers with Allowed Borrow Claims on the Petition Date that (1) vote to accept the Plan, (2) elect to receive this Treatment A, and (3) fulfill all conditions precedent to the receipt of Treatment A (including the execution of a Retail Loan Settlement Agreement and contribution of any required additional digital assets under such Retail Loan Settlement Agreement), shall settle their Claims related to their Retail Loan according to the terms described in more detail in the term sheet attached hereto as **Exhibit 3**. No loans associated with (1) outstanding Borrow Loan Obligations of $5,000 or less or (2) CEL Tokens or FTT Tokens shall be entitled to elect Treatment A, and such loans shall receive Treatment B. <br><br> **Treatment B**: Borrowers with Allowed Borrow Claims who (i) elect to receive Treatment B, (ii) do not make an election, (iii) are ineligible to receive Treatment A, or (iv) fail to meet the conditions to receive Treatment A, shall receive the following treatment: Borrow Loan Obligations that were outstanding on the Petition Date will be set off or recouped against the corresponding Borrow Claim associated with such obligation such that the Retail Borrower retains the proceeds of the Retail Loan and the corresponding Borrow Claim is reduced by the amount of the Borrow Loan Obligations set off. The remaining amount of the Borrow Claim (calculated in dollars as of the Petition Date) after such set off or recoupment is accounted for will receive the same treatment as is provided to all General Earn Claims or Convenience Claims, as applicable. | Entitled to Vote |

| TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN | | | |
|---|---|---|---|
| **Class No.** | **Type of Claim** | **Treatment** | **Impairment / Voting** |
| **Class 3** | **Other Priority Claims** | In full and final satisfaction, compromise, settlement, and release of and in exchange for such Claim, on, or as soon as reasonably practicable following the Effective Date, each holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. | Not Entitled to Vote (Presumed to Accept) |
| **Class 4** | **Convenience Claims** | In full and final satisfaction, compromise, settlement, and release of and in exchange for such Claim, on, or as soon as reasonably practicable following the Effective Date, each holder of an Allowed Convenience Claim shall receive the Convenience Class Distribution. | Entitled to Vote |
| **Class 5** | **General Earn Claims** | In full and final satisfaction, compromise, settlement, and release of and in exchange for such Claim, on, or as soon as reasonably practicable following, the Effective Date, each holder of an Allowed General Earn Claim shall receive its Pro Rata share of (i) the Liquid Cryptocurrency Distribution Amount, (ii) ESTs, (iii) MSTs, and (iv) Litigation Proceeds.<br><br>Holders of General Earn Claims shall receive each of the types of consideration noted above, but holders of General Earn Claims who vote in favor of the Plan shall, in connection with their vote, have the opportunity to indicate on their ballot whether they would prefer to receive:<br><br>(i) a greater share of EST/MSTs in lieu of some or all of their Pro Rata share of the Liquid Cryptocurrency Distribution Amount; or<br>(ii) a greater share of the Liquid Cryptocurrency Distribution Amount (at a discount, as described below) in lieu of some or all of their Pro Rata share of the EST/MSTs.<br><br>The Debtors shall use reasonable efforts to redistribute the consideration provided to the holders of General Earn Claims according to their preferences. To the extent an Account Holder's request for option (ii) (a greater share of the Liquid Cryptocurrency Distribution Amount) is honored, such Account Holder will forfeit all or a portion of their EST/MST | Entitled to Vote |

| TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN | | | |
|---|---|---|---|
| **Class No.** | **Type of Claim** | **Treatment** | **Impairment / Voting** |
| | | distribution at a 30% discount and receive any incremental Liquid Cryptocurrency. The amount of EST/MST forfeited, and therefore the amount of Liquid Cryptocurrency received, will depend on the amount of Liquid Cryptocurrency being made available by other Account Holders seeking incremental EST/MST relative to their original recovery. For Account Holders seeking more EST/MST, such Holders will receive incremental EST/MST at a 30% premium to the Liquid Cryptocurrency Distribution Amount they are forfeiting. | |
| **Class 6** | **Custody Claims** | In full and final satisfaction, compromise, settlement, and release of and in exchange for such Claim, each holder of an Allowed Custody Claim shall have the opportunity to elect through the applicable settlement opt-in form or through its ballot in accordance with the procedures set forth in the Disclosure Statement one of two treatments:<br><br>**Treatment A:** (1) a distribution of Cryptocurrency equal to 72.5% of the amount of such Allowed Custody Claim on the Effective Date in-kind and (2) a full and final release of all Avoidance Actions with respect to such Allowed Custody Claim.<br><br>**Treatment B**: The Cryptocurrency associated with the applicable Allowed Custody Claim will be transferred to a segregated wallet held by the Post-Effective Date Debtors and shall be subject to all Avoidance Actions and other claims with respect to such Allowed Custody Claim. The Litigation Administrator shall have 180 days to bring any Avoidance Action or other claim against the Account Holder otherwise entitled to such assets, such time period subject to extension by the Bankruptcy Court following notice and a hearing. To the extent no such action is brought and no settlement is reached in the time period set forth in the immediately preceding sentence, such assets shall be released to the holder of the applicable Allowed Custody Claim. Any such Allowed Custody Claim will be subject to the Alternative Dispute Resolution Procedures.<br><br>Holders of Allowed Custody Claims that elect to receive the Custody Settlement set forth in the term sheet attached hereto as **Exhibit 2**, shall be required to | Entitled to Vote |

| Class No. | Type of Claim | Treatment | Impairment / Voting |
|---|---|---|---|
| | | **TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN** | |
| | | vote to accept the Plan and shall receive a distribution on the Effective Date equal to the amount set forth in Treatment A, above, minus any amounts already received under such settlement. | |
| **Class 7** | **General Unsecured Claims** | In full and final satisfaction, compromise, settlement, and release of and in exchange for such Claim, on, or as soon as reasonably practicable following the Effective Date, each holder of an Allowed General Unsecured Claim shall receive treatment consistent with section 1129 of the Bankruptcy Code, as agreed by the Debtors and the Committee. | Entitled to Vote |
| **Class 8** | **Government Claims** | In full and final satisfaction, compromise, settlement, and release of and in exchange for such Claim, on, or as soon as reasonably practicable following the Effective Date, each holder of an Allowed Government Claim shall receive treatment consistent with section 1129 of the Bankruptcy Code, as agreed by the Debtors and the Committee. | Entitled to Vote |
| **Class 9** | *De Minimis* **Claims** | All *De Minimis* Claims (*i.e.*, Claims equal to or less than the *De Minimis* Claim Threshold) shall be cancelled, released, and extinguished without distribution, and will be of no further force or effect. | Not Entitled to Vote (Deemed to Reject) |
| **Class 10** | **Intercompany Claims** | In full and final satisfaction, compromise, settlement, and release of and in exchange for such Claim, each Allowed Intercompany Claim shall, at the option of the applicable Debtor(s) with the consent of the Committee, be: (i) Reinstated; or (ii) set off, settled, distributed, contributed, cancelled, or released, without any distribution on account of such Allowed Intercompany Claim, in each case, subject to the Transaction Steps Memorandum; *provided* that the CNL-Network LLC Intercompany Claim shall be Allowed and reinstated. | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| **Class 11** | **Intercompany Interests** | Each Intercompany Interest shall, at the option of the applicable Debtor(s) with the consent of the Committee, be: (i) Reinstated; or (ii) set off, settled, distributed, contributed, cancelled, or released, in each case, subject to the Transaction Steps Memorandum. | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |

| TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN | | | |
|---|---|---|---|
| **Class No.** | **Type of Claim** | **Treatment** | **Impairment / Voting** |
| **Class 12** | **Preferred Equity Interests** | All Preferred Equity Interests shall be cancelled, released, and extinguished without distribution, and will be of no further force or effect. | Not Entitled to Vote (Deemed to Reject) |
| **Class 13** | **Common Interests** | All common equity interests in Celsius Network Limited shall be cancelled, released, and extinguished without distribution, and will be of no further force or effect. | Not Entitled to Vote (Deemed to Reject) |
| **Class 14** | **Section 510(b) Claims** | On the Effective Date, all Allowed Section 510(b) Claims, if any, shall be cancelled, released, and extinguished without distribution, and will be of no further force or effect. | Not Entitled to Vote (Deemed to Reject) |
| **Class 15** | **Disallowed CEL Token Claims** | On the Effective Date, all CEL Token Claims held by (i) UCC Stipulation Defendants or (ii) any other individuals agreed on by the Committee and the Debtors and set forth in the Plan Supplement who participated in, or had direct knowledge of, the manipulation of the price of the CEL Token shall be Disallowed and receive no distribution. | Not Entitled to Vote (Deemed to Reject) |

## Exhibit 1

| CERTAIN PLAN DEFINITIONS | |
|---|---|
| **Term** | **Definition** |
| **Account Holder** | Any single Person or Entity that maintained a Celsius Account with the Debtors as of the Petition Date. |
| **Account Holder Claim** | Any Claim held by an Account Holder on account of a Celsius Account. |
| **Administrative Claim** | A Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' businesses; (b) Allowed Professional Fee Claims; (c) the reasonable and documented fees and out-of-pocket expenses of counsel to any members of the Committee that have demonstrated a substantial contribution to the Debtors' estates; and (d) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code. |
| **ADR-Eligible Potential Defendants** | Any potential Avoidance Action defendant that is not an ADR-Ineligible Potential Defendant. |
| **ADR-Ineligible Potential Defendants** | Any potential Avoidance Action defendant that is (i) an equity holder of the Debtors, (ii) a current or former Insider of the Debtors, (iii) party to an agreement with the Debtors to promote the Debtors' business to holders of General Earn Claims (*i.e.*, a promoter or brand ambassador agreement), or (iv) controls a potential Avoidance Action defendant described in (iii). |
| **Affiliate** | With respect to any Entity, all Entities that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code if such Entity was a debtor in a case under the Bankruptcy Code. |
| **Allowed** | With respect to any Claim or Interest, except as otherwise provided herein: (a) a Claim or Interest in a liquidated amount as to which no objection has been Filed prior to the applicable Claims objection deadline and that is evidenced by a Proof of Claim or Interest, as applicable, timely Filed by the applicable Bar Date or that is not required to be evidenced by a Filed Proof of Claim or Interest, as applicable, under the Plan, the Bankruptcy Code, or a Final Order; (b) a Claim or Interest that is scheduled by the Debtors as neither disputed, contingent, nor unliquidated, and for which no Proof of Claim or Interest, as applicable, has been timely Filed in an unliquidated or a different amount; (c) a Claim or Interest that is upheld or otherwise Allowed (i) pursuant to the Plan; (ii) in any stipulation that is approved by the Bankruptcy Court; (iii) pursuant to any contract, instrument, indenture, or other agreement |

| **CERTAIN PLAN DEFINITIONS** | |
|---|---|
| **Term** | **Definition** |
| | entered into or assumed in connection herewith; or (iv) by Final Order (including any such Claim to which the Debtors had objected or which the Bankruptcy Court had Disallowed prior to such Final Order); *provided* that with respect to a Claim or Interest described in clauses (a) through (c) above, such Claim or Interest shall be considered Allowed only if and to the extent that with respect to such Claim or Interest no objection to the allowance thereof has been or, in the Debtors' or Post-Effective Date Debtors' reasonable good faith judgment, may be interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim or Interest, as applicable, shall have been Allowed by a Final Order; *provided, further*, that no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Post-Effective Date Debtor, as applicable.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim or Interest is or has been timely Filed, is not considered Allowed and shall be deemed expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  For the avoidance of doubt, a Proof of Claim or Interest Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim; *provided* that "late-filed" Proofs of Claim that are filed solely to amend a timely filed Proof of Claim to "reinstate" the Claim the Debtors scheduled for an Account Holder shall not require a Final Order to be Allowed.<br><br>"Allow," "Allowing," and "Allowance" shall have correlative meanings. |
| **Available Cryptocurrency** | The (i) BTC; (ii) Pure ETH; (iii) Lido ETH; (iv) stablecoins; and (v) altcoins on the Debtors' balance sheet as of the Effective Date that are, in each case, not associated with the Institutional Loan portfolio, Retail Loan Settlement Agreements, PE & VC Investments, DeFi Cryptocurrency Assets, or Mining assets.  The Disclosure Statement will include a schedule of Available Cryptocurrency |
| **Avoidance Actions** | Any and all actual or potential avoidance, recovery, subordination, or other similar Claims and Causes of Action that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, Causes of Action, or remedies arising under chapter 5 of the Bankruptcy Code or under similar or related local, state, federal, or foreign statutes or common law, including fraudulent transfer laws. |

| CERTAIN PLAN DEFINITIONS | |
|---|---|
| **Term** | **Definition** |
| **Bar Date** | The applicable date established by the Bankruptcy Court by which Proof of Claims must be Filed with respect to such Claims or Interests, other than Administrative Claims. |
| **Bid Protections Order** | An order of the Bankruptcy Court approving the Debtors' payment or reimbursement of the Fees and the Break-Up Fee (as each term is defined in, and contemplated by, the Plan Sponsor Agreement). |
| **Borrow Claim** | A retail Account Holder's Claim against the Debtors on account of the Cryptocurrency an Account Holder transferred to the Borrow Program in connection with its Borrow Loan Obligations. |
| **Borrow Claims Settlement** | The settlement between the Debtors and the holders of Borrow Claims, in accordance with the terms attached hereto as **Exhibit 3**. |
| **Borrow Loan Obligation** | Any claim of the Debtors against a retail Account Holder on account of a loan from the Debtors to such Account Holder under the Borrow Program. |
| **Borrow Program** | The prepetition program through which the Debtors provided lending services to Entities and Account Holders. |
| **Cash** | Cash in legal tender of the United States of America and cash equivalents, including bank deposits, checks, and other similar items. |
| **Cause of Action** | Any claim, counterclaim, cross-claim, interest, damages, remedy, cause of action, demand, right, action, controversy, proceeding, agreement, suit, obligation, liability, account, judgment, defense, offset, power, privilege, license, lien, indemnity, guaranty, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, disputed or undisputed, liquidated or unliquidated, secured or unsecured, asserted or assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or otherwise.  For the avoidance of doubt, Causes of Action include:  (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of state or federal law or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) the right to object to or otherwise contest Claims or Interests; (d) claims or defenses pursuant to section 362 or chapter 5 of the Bankruptcy Code; (e) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the |

3

| CERTAIN PLAN DEFINITIONS | |
|---|---|
| **Term** | **Definition** |
| | Bankruptcy Code;   (f) any state or foreign law fraudulent transfer or similar claim; and (g) any other Avoidance Action. |
| **CEL Token** | The Cryptocurrency Token native to the Debtors' platform defined by the smart contract code located at:    https://etherscan.io/token/0xaaae be6fe48e54f431b0c390cfaf0b017d09d42d#code. |
| **CEL Token Claim** | Any Account Holder Claim against the Debtors on account of CEL Token. |
| **Celsius Account** | Any active account identified in the Debtors' books and records as having a balance as of the Petition Date.  For the avoidance of doubt, (i) each Account Holder's Celsius Accounts shall be aggregated such that each Account Holder's holdings are reflected in a single Celsius Account and (ii) the consolidation described in (i) shall not eliminate the designations associated with such assets based on the program(s) the Account Holders participated in (*e.g.*, "Earn," "Custody," etc.). |
| **Claim** | Any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors. |
| **Class** | A category of holders of Claims or Interests pursuant to section 1122(a) of the Bankruptcy Code. |
| **CNL-Network LLC Consolidation** | The substantive consolidation of Celsius Network Limited and Celsius Network LLC for purposes of their chapter 11 plans. |
| **CNL-Network LLC Intercompany Claim** | The Intercompany Claim between Celsius Network Limited and Celsius Network LLC on account of the transfer of certain Account Holder Claims, which, to the extent not eliminated via the CNL-Network LLC Consolidation, shall be Allowed in an amount no less than $3.5 billion. |
| **Committee** | The official committee of unsecured creditors of the Debtors, appointed by the United States Trustee for the Southern District of New York pursuant to section 1102 of the Bankruptcy Code on July 27, 2022 [Docket No. 241]. |
| **Confirmation Date** | The date on which the Court enters the Confirmation Order on the docket of the chapter 11 cases within the meaning of Bankruptcy Rules 5003 and 9021. |
| **Confirmation Order** | With respect to any Debtor, the order of the Bankruptcy Court confirming the Plan with respect to that Debtor pursuant to section 1129 of the Bankruptcy Code. |

4

| CERTAIN PLAN DEFINITIONS | |
|---|---|
| **Term** | **Definition** |
| **Contributed Digital Assets** | All Cryptocurrency assets held by the Debtors, excluding any Cryptocurrency assets contemplated to be directly distributed under the Plan to holders of Claims. |
| **Contributed Third-Party Claim** | Any direct Cause of Action that any Contributing Claimant has against any Person (other than a Debtor) that had a direct relationship with the Debtors, their predecessors, or respective Affiliates and that harmed such Contributing Claimant in the claimant's capacity as a creditor of Celsius, including (a) any Cause of Action based on, arising out of, or related to the marketing, sale, and issuance of Cryptocurrency that at any point was held or offered on Celsius' platform; (b) any Cause of Action based on, arising out of, or related to the alleged misrepresentation of any of the Debtors' financial information, business operations, or related internal controls; and (c) any Cause of Action based on, arising out of, or related to any alleged failure to disclose, or actual or attempted cover up or obfuscation of, any of the Debtors' conduct prior to the Petition Date; *provided*, *however*, that Contributed Third-Party Claims do not include (i) any derivative claims of the Debtors, or (ii) any direct claims against the Released Parties. |
| **Contributing Claimant** | Any Holder of a Claim or Interest that elects through the applicable opt-in form or through its ballot in accordance with the procedures set forth in the Disclosure Statement to contribute their Contributed Third-Party Claims to the Litigation Administrator to prosecute on behalf of the holders of General Earn Claims. |
| **Convenience Claim** | Any aggregate Account Holder Claim (excluding Custody Claims and Borrow Claims, but including Borrow Claims to the extent they are treated as Earn Claims) valued greater than the *De Minimis* Claim Threshold and less than or equal to the Convenience Claim Threshold; *provided* that Account Holders whose Claims are valued under the Convenience Claim Threshold but at or above $1,000 may opt out of the Convenience Class and receive Earn Claim treatment, and Account Holders whose Claims exceed the Convenience Claim Threshold may irrevocably elect to have their Claims reduced to the Convenience Claim Threshold and treated as Convenience Claims. <br><br> For the avoidance of doubt, (i) Celsius Accounts shall be consolidated for purposes of applying the Convenience Claim Threshold such that each unique Account Holder only maintains one Celsius Account, and (ii) Custody Claims and Borrow Claims shall be treated in accordance with the applicable settlements and shall be (A) disregarded for purposes of evaluating whether a Claim is within the Convenience Claim Threshold and (B) unaffected by Convenience Claim Elections. |

| CERTAIN PLAN DEFINITIONS | |
|---|---|
| **Term** | **Definition** |
| **Convenience Claim Election** | The election through a Convenience Claim Election Form in accordance with the procedures set forth in the Disclosure Statement Order pursuant to which (i) an Account Holder whose Claims are valued under the Convenience Claim Threshold but at or above $1,000 may irrevocably opt out of the Convenience Class and receive Earn Claim treatment, and (ii) Account Holders whose Claims exceed the Convenience Claim Threshold will be offered an opportunity to irrevocably elect to have their Claims reduced to the Convenience Claim Threshold and treated as Convenience Claims. |
| **Convenience Claim Election Form** | A form, to be sent by the Solicitation Agent in connection with solicitation of the Plan (which may, for the avoidance of doubt, be a ballot) to Account Holders by which, in accordance with the order approving the Disclosure Statement, Account Holders may make a Convenience Claim Election. |
| **Convenience Claim Threshold** | $5,000. |
| **Convenience Class** | The Class consisting of Convenience Claims after giving effect to any Convenience Claim Elections. |
| **Convenience Class Distribution** | The consideration distributed to holders of Convenience Claims in full and final satisfaction of such Convenience Claims, which shall consist of a type of Liquid Cryptocurrency as determined by the Debtors with the consent of the Committee, in an amount sufficient to provide a 70% recovery on such Convenience Claim holder's Claims. |
| **Cryptocurrency** | A fungible and transferable digital representation of units in which encryption techniques and a blockchain are used to regulate the generation of digital units and verify the transfer of assets pursuant to a decentralized protocol, operating independently from a central bank. |
| **Custody Claim** | Any Account Holder Claim on account of Cryptocurrency transferred into the Custody Program. |
| **Custody Preference Actions** | Has the meaning ascribed to such term in the Custody Term Sheet, attached hereto as **Exhibit 2**. |
| **Custody Program** | The prepetition program through which the Debtors allowed Account Holders to store Cryptocurrency on the Debtors' platform. |
| **Custody Settlement** | The full and final settlement and resolution of all disputes regarding the Custody Program (other than Avoidance Actions with respect to non-settling Custody Account Holders), as set forth in the Plan and motion with respect to the Custody Settlement. |

| CERTAIN PLAN DEFINITIONS | |
|---|---|
| **Term** | **Definition** |
| *De Minimis* **Claim Threshold** | $10 |
| **DeFi Cryptocurrency Assets** | Cryptocurrency assets at Stakehound or in other DeFi protocols. |
| **Disallowed** | With respect to any Claim or Interest, except as otherwise provided herein, any Claim or Interest that is finally determined to be not Allowed by the Plan, the Bankruptcy Code, or a Final Order, as applicable. |
| **Disbursing Agent** | The Debtors or the Plan Administrator (as applicable), or the Entity or Entities selected by the Debtors or the Plan Administrator, to make or facilitate distributions contemplated under the Plan. |
| **Disclosure Statement** | The disclosure statement related to the Plan, including all exhibits and schedules thereto, in each case, as may be amended, supplemented, or modified from time to time, to be approved pursuant to the Disclosure Statement Order. |
| **Disclosure Statement Order** | The order (and all exhibits thereto), entered by the Bankruptcy Court approving the Disclosure Statement and the Solicitation Materials, and allowing solicitation of the Plan to commence (as amended, modified, or supplemented from time to time in accordance with the terms thereof). |
| **Earn Claim** | Any Account Holder Claim arising out of or related to the Earn Program. Any Account Holder Claim not separately classified shall default to classification as an Earn Claim. |
| **Earn Program** | The prepetition program through which the Debtors allowed Account Holders to earn "rewards" in exchange for transferring their Cryptocurrency to the Debtors. |
| **Effective Date** | The date on which (a) all conditions precedent to the occurrence of the Effective Date of the Plan have been satisfied or waived in accordance with the Plan and (b) the Plan is declared effective by the Debtors. |
| **Entity** | An "Entity" as defined in section 101(15) of the Bankruptcy Code. |
| **Estate** | The estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case. |
| **Equity Share Token ("EST")** | A Token to be distributed on the Effective Date, representing an Account Holder's common equity interest in NewCo. |

7

| **CERTAIN PLAN DEFINITIONS** | |
|---|---|
| **Term** | **Definition** |
| **Excluded Party** | Each of the following:  (a) Alexander Mashinsky; (b) Shlomi Daniel Leon; (c) all other UCC Stipulation Defendants; (d) any current or former director, officer, employee, independent contractor, professional, equity holder, or other Entity associated with the Debtors that is not specifically identified as a Released Party;  and (e) with respect to each of the foregoing, each Related Party of such Person or Entity that is not specifically identified as a Released Party.<br><br>Notwithstanding anything to the contrary in the Plan, no Excluded Party shall constitute a Released Party in any capacity under the Plan. |
| **Exculpated Parties** | Collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Special Committee and each of its members; (c) the Post-Effective Date Debtors; (d) the Committee and each of its members; (e) the Litigation Administrator; (f) the Plan Sponsor and each of its members; (g) with respect to each of the foregoing, each such Entity's current financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; (h) Christopher Ferraro; and (i) any other current or former officer, director, manager, employee, or other agent of the Debtors identified in the Plan Supplement as an Exculpated Party, as agreed to by the Debtors and the Committee.<br><br>Notwithstanding anything to the contrary in the Plan, an Exculpated Party shall be entitled to exculpation under the Plan solely for actions taken from the Petition Date through the Effective Date.<br><br>Notwithstanding anything to the contrary in the Plan, no Excluded Party shall be an Exculpated Party. |
| **Executory Contract** | A contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code. |
| **Figure Agreements** | The agreements entered into by NewCo with Figure Technologies, Figure Securities, Inc., or any Affiliate thereof for the provision of services to NewCo following the Effective Date, each of which shall be in substantially final form prior to the hearing to consider approval of the Disclosure Statement. |
| **Filed** | Filed with the Bankruptcy Court or its authorized designee in the chapter 11 cases.  "File" and "Filing" shall have correlative meanings. |
| **Final Order** | An order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, as entered on the docket in any chapter 11 case or the docket of any court of competent jurisdiction, and |

| CERTAIN PLAN DEFINITIONS | |
|---|---|
| **Term** | **Definition** |
| | as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken; or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; *provided* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order will not preclude such order from being a Final Order. |
| **FTT Token** | The utility Token native to the FTX platform. |
| **General Earn Claims** | Allowed Earn Claims (other than Convenience Claims); *provided* that General Earn Claims shall include (i) any portion of a Borrow Claim treated as an Earn Claim and (ii) Convenience Claims for which the holder has opted out of the Convenience Class. |
| **General Terms of Use** | The general Terms of Use governing each Account Holder's access to, and use of, the Debtors' products and services as well as the Debtors' mobile and web-based application(s), website(s), software, programs, documentation, tools, hardware, Internet-based services, components, and any updates (including software maintenance, service information, help content, bug fixes or maintenance releases) provided to Account Holders by the Debtors, directly or indirectly, as amended, modified, or supplemented from time to time in accordance with their terms. |
| **General Unsecured Claims** | Any Unsecured Claim against any of the Debtors, other than:  (a) an Administrative Claim; (b) a Priority Tax Claim; (c) an Other Priority Claim; (d) an Intercompany Claim; (e) a Convenience Claim; (f) an Earn Claim; (g) a Custody Claim; (h) a Withhold Claim; (i) a Borrow Claim; or (j) a Government Claim.  For the avoidance of doubt, no Account Holder Claims shall be General Unsecured Claims. |
| **GK8** | Debtors GK8 Ltd., GK8 UK Limited, and GK8 USA LLC. |
| **Government Claims** | Any Unsecured Claim against any of the Debtors on account of penalties or fines issued by a Governmental Unit. |
| **Governmental Unit** | A "Governmental Unit" as defined in section 101(27) of the Bankruptcy Code. |

| CERTAIN PLAN DEFINITIONS | |
|---|---|
| **Term** | **Definition** |
| **HASH Token** | The utility Token on the Provenance Blockchain. |
| **Initial Litigation Funding Amount** | Cash in an amount to be agreed by the Debtors, the Committee, and the Plan Sponsor prior to the hearing to consider approval of the Disclosure Statement. |
| **Insider** | An "insider" as defined in section 101(a)(31) of the Bankruptcy Code or non-statutory insider identified in the Plan Supplement. |
| **Institutional Loan** | Any loan from the Debtors to an institutional Account Holder arranged on an "over the counter" basis under the Borrow Program (as opposed to lending services provided on standard terms to retail Account Holders under the Borrow Program). Institutional Loans are governed by master loan agreements and term sheets setting forth their detailed terms. |
| **Intercompany Claim** | Any Claim held by a Debtor or Affiliate of a Debtor against another Debtor or Affiliate of a Debtor. |
| **Intercompany Interest** | Other than an Interest in Celsius Network Inc., any Interest in one Debtor held by another Debtor. |
| **Interest** | Any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor. |
| **Liquid Cryptocurrency** | The types of Cryptocurrency to be distributed to Account Holders, which shall include:    (i) BTC;  (ii) Pure  ETH;  (iii) Lido  ETH;  and (iv) stablecoins. |
| **Liquid Cryptocurrency Distribution Amount** | The amount of Liquid Cryptocurrency to be distributed to holders of General Earn Claims in amount equal to the total value of Liquid Cryptocurrency held by the Debtors on the Effective Date less, without duplication: (1) distributions to (or reserves for) holders of Allowed Convenience Class Claims and Allowed Custody Claims, (2) amounts of Liquid Cryptocurrency associated with the Retail Loan Settlement Cryptocurrency Assets, (3) the NewCo Capitalization Amount, (4) amounts liquidated to fund the Professional Fee Escrow Account, (5) the Initial Litigation Funding Amount, (6) cash needed at emergence (pre-transaction items); and (7) Cryptocurrency in an amount equal to the Senior Claims Amount.  The Committee, in consultation with the Debtors, shall have the discretion to adjust the Liquid Cryptocurrency Distribution |

| CERTAIN PLAN DEFINITIONS | |
|---|---|
| **Term** | **Definition** |
| | Amount downward based upon the amount of aggregate Account Holder elections, the status and funding of the Litigation Recovery Account, or any other factors affecting the evaluation or liquidity of the assets anticipated to go to NewCo on the Effective Date of the Plan. |
| **Litigation Administrator** | The Person or Entity appointed by the Committee, in consultation with the Special Committee, to prosecute (in a fiduciary capacity) the Recovery Causes of Action, including any successors thereto.  The identity of the Litigation Administrator shall be disclosed in the Plan Supplement. |
| **Litigation Administrator Agreement** | The agreement providing for the prosecution of the Recovery Causes of Action by the Litigation Administrator, as may be amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof that, among other things, provides for the Initial Litigation Funding Amount and governs the powers, duties, and responsibilities of the Litigation Administrator, which shall be Filed as part of the Plan Supplement. |
| **Litigation Oversight Committee** | The five (5) to seven (7) member committee tasked with overseeing (in a fiduciary capacity) the Litigation Administrator's prosecution of the Recovery Causes of Action in accordance with the Plan, the members of which shall be determined by the Committee through an open interview process, at least two (2) of which shall not be Committee members, and identified and disclosed in the Plan Supplement, and any successors thereto appointed pursuant to and in accordance with the Plan. |
| **Litigation Proceeds** | The proceeds of the Recovery Causes of Action. |
| **Litigation Recovery Account** | The segregated account established by the Post-Effective Date Debtors on the Effective Date and funded with the Initial Litigation Funding Amount. The Litigation Recovery Account shall be controlled by the Litigation Administrator, and the funds in the Litigation Recovery Account shall be available for the costs and fees of the Litigation Administrator (and any fees associated with the Litigation Recovery Account), including professional fees, costs, and expenses in connection with prosecution of the Recovery Causes of Action. |
| **Management Agreement** | The agreement containing the terms and conditions under which the Manager will manage the assets held by NewCo, including the terms of the Management Fee, which shall be consistent with this Plan Term Sheet in all material respects.  The Management Agreement shall be in substantially final form prior to the hearing to consider approval of the Disclosure Statement. |

| CERTAIN PLAN DEFINITIONS | |
|---|---|
| **Term** | **Definition** |
| | In the event of an Orderly Wind Down, the Plan Administrator will manage the Orderly Wind Down of the Estates.<br><br>The Management Agreement shall be consistent in all material respects with the Management Term Sheet |
| **Management Contribution** | The Manager's Effective-Date contribution of:<br><br>(i)   Cash consideration of $45 million; and<br><br>(ii)   450 million HASH Tokens to be used to fund the transaction fees of EST/MST holders;<br><br>to fund NewCo and distributions under the Plan, all as more fully set out in the Management Agreement. |
| **Management Fee** | The "Management Fee" as defined in the Management Term Sheet, as will be set forth more fully in the Management Agreement. |
| **Management Preferred Interests** | Preferred equity interests issued by NewCo to the Manager on the Effective Date, the terms of which shall include:<br><br>▪ liquidation preference of $0;<br>▪ Management Fee accruing and payable in accordance with the terms of the Management Agreement;<br>▪ right of NewCo to unilaterally redeem all Management Preferred Interests upon termination of the Management Agreement and payment of any then outstanding Management Fee that is payable in accordance with the terms of the Management Agreement;<br>▪ right to designate two members of the New Board for so long as the Management Agreement has not been terminated;<br>▪ not transferable; and<br>▪ no voting on matters submitted to the vote of common equity holders. |
| **Management Share Token ("MST")** | A Token issued by NewCo to be distributed on the Effective Date, representing an Account Holder's preferred equity interest in NewCo, which shall entitle the holder of such MST to its Pro Rata share of an annual distribution in an amount equal to 50 bps of the NewCo Fee-Paying Asset Value and a 2.5% incentive fee (such fee base to be calculated based on the Incentive Fee Base Amount, as defined in the Management Agreement and the Management Term Sheet), the terms of which shall include:<br><br>▪ liquidation preference of $0;<br>▪ incentive fee accruing and payable as provided above and in the Management Term Sheet; |

12

| CERTAIN PLAN DEFINITIONS | |
|---|---|
| **Term** | **Definition** |
| | ▪ not transferable, subject to mandatory redemption in the first year as described below; and<br>▪ no voting rights (other than on amendments to terms of the preferred interest).<br><br>For one year following the Effective Date, it is intended that MSTs not be traded. On the Effective Date, MSTs distributed pursuant to the Plan will be placed in locked wallets and subject to the MST Smart Contract. Any MSTs NewCo redeems pursuant to the MST Smart Contract will be retired and burned on the blockchain.<br><br>For the avoidance of doubt, the 2.5% incentive fee will be in addition to any Incentive Fee payable to the Manager under the Management Agreement and described in the Management Term Sheet. |
| **Management Team** | Certain personnel of NovaWulf Digital Management, L.P. (or an Affiliate thereof), including Jason New and Michael Abbate. The Management Team who will manage Mining will be agreed by the Debtors, the Committee, and the Plan Sponsor and set forth in the Disclosure Statement. |
| **Management Term Sheet** | The term sheet setting forth the key terms of the Management Agreement, which term sheet is attached to this Plan Term Sheet as **Exhibit 4**. |
| **Manager** | NovaWulf Digital Management, L.P., a Delaware limited partnership, or an Affiliate thereof. |
| **Mining** | Debtor Celsius Mining LLC, its non-Debtor subsidiary Celsius Mining IL Ltd., and any assets associated with the operation of the business of Debtor Celsius Mining LLC and its non-Debtor subsidiary Celsius Mining IL Ltd. |
| **MST Smart Contract** | The one-year smart contract, effective as of the Effective Date, which shall be applicable to all MSTs issued pursuant to the Plan. The MST Smart Contract shall provide that an Account Holder's MSTs will be redeemed in a mandatory redemption 1:1 for any ESTs such Account Holder trades prior to expiration of the MST Smart Contract. |
| **New Board** | The board of directors or the board of managers, as applicable, of NewCo which shall be appointed as provided in this Plan Term Sheet. The identities of the members of the New Board shall be disclosed in the Plan Supplement. |
| **New Organizational Documents** | The documents providing for corporate governance of NewCo and any subsidiaries thereof, including charters, bylaws, operating agreements, agreements providing indemnification, contribution or reimbursement to |

13

| **CERTAIN PLAN DEFINITIONS** | |
|---|---|
| **Term** | **Definition** |
| | any Person or Entity, other organizational documents or agreements, and investment guidelines, as applicable, each of which shall be in substantially final form prior to the hearing to consider approval of the Disclosure Statement. |
| **NewCo** | The Entity or Entities to be managed by the Manager following the Effective Date which shall hold the NewCo Assets for the benefit of holders of ESTs. |
| **NewCo Assets** | Assets of NewCo as of the Effective Date, including (i) Retail Loan Settlement Cryptocurrency Assets; (ii) DeFi Cryptocurrency Assets; (iii) the obligations owed to NewCo under the Retail Loan Settlement Agreement; (iv) the Institutional Loan portfolio; (v) PE & VC Investments; (vi) Mining assets; (vii) the NewCo Capitalization Amount; and (viii) any proceeds from monetization events of the NewCo Assets pre-emergence. |
| **NewCo Capitalization Amount** | $150 million of Available Cryptocurrency to be transferred to NewCo on the Effective Date to fund its operations.    Additional Available Cryptocurrency shall be transferred to NewCo in the event the Debtors make capital or other contractual commitments prior to the Effective Date that results in payment of such commitments after the Effective Date; *provided*, *however*, such additional amount shall be netted against any balance sheet liquidity provided to NewCo arising from the election of Treatment B among the Retail Borrowers. |
| **NewCo Fee-Paying Asset Value** | NewCo Total Asset Value less the value of the obligations owed to NewCo under the Retail Loan Settlement Agreements. |
| **NewCo Total Asset Value** | The total fair market value of the NewCo Assets as of a given date. |
| **Non-Consolidated Debtors** | All Debtors other than Celsius Network Limited and Celsius Network LLC. |
| **Orderly Wind Down** | The orderly wind down of the Debtors' Estates by the Plan Administrator pursuant to the Wind-Down Procedures. |
| **Other Priority Claim** | Any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code. |
| **PE & VC Investments** | The Debtors' alternative investments as identified in the schedules of Celsius Network Ltd. |
| **Person** | A "Person" as defined in section 101(41) of the Bankruptcy Code. |

14

| CERTAIN PLAN DEFINITIONS | |
|---|---|
| **Term** | **Definition** |
| **Petition Date** | July 13, 2022 with respect to the Debtors other than GK8, and December 7, 2022 with respect to GK8. |
| **Plan Administrator** | The Person or Entity, or any successor thereto, designated by the Committee in consultation with the Debtors, whose identity shall be disclosed within fourteen (14) days of a decision to implement an Orderly Wind Down, and who shall have all powers and authorities set forth in the Plan. |
| **Plan Administrator Agreement** | That certain agreement by and among the Debtors, the Committee, and the Plan Administrator governing the Plan Administrator's rights and obligations in connection with the Orderly Wind Down, which shall be executed and Filed in the Plan Supplement within fourteen (14) days of a decision to implement an Orderly Wind Down, and which shall be in form and substance reasonably acceptable to the Debtors and the Committee. |
| **Plan Distribution Record Date** | The record date for purposes of determining which holders of Allowed Claims against or Allowed Interests in the Debtors are eligible to receive distributions under the Plan, which date shall be the Confirmation Date, or such other date as is announced by the Debtors or designated in a Final Order. |
| **Plan Sponsor** | The "Plan Sponsor" as defined in the Plan Sponsor Agreement. |
| **Plan Sponsor Agreement** | That certain agreement, dated February 28, 2023, by and among the Debtors, the Committee, and the Plan Sponsor, including all exhibits, annexes, and schedules thereto, as such agreement may be amended, restated, amended and restated, modified, or otherwise supplemented from time to time in accordance with its terms. |
| **Plan Supplement** | The "Plan Supplement" as defined in the Plan Sponsor Agreement. |
| **Post-Effective Date Debtors** | Collectively, all Debtors and successors thereto after the Effective Date that are not acquired by the Plan Sponsor or otherwise managed by the Manager that are responsible for winding down the Debtors' Estates and implementing the terms of the Plan. |
| **Preferred Equity Interest** | The Class A Preferred Shares, Class A1 Preferred Shares, and Class B Preferred Shares issued by Celsius Network Limited. |
| **Preferred Equityholders** | Collectively, the beneficial holders, or investment advisors or managers of beneficial holders, of Preferred Equity Interests. |

15

| **CERTAIN PLAN DEFINITIONS** | |
|---|---|
| **Term** | **Definition** |
| **Priority Tax Claims** | Any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code. |
| **Pro Rata** | The proportion that the U.S. Dollar value of an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate U.S. Dollar value of the Allowed Claims or Allowed Interests in that Class (or as otherwise specified), in each case calculated as of the Petition Date. |
| **Professional** | An Entity: (a) employed in the Chapter 11 Cases pursuant to a Bankruptcy Court order in accordance with sections 327, 328, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or as of the Confirmation Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code. |
| **Professional Fee Claim** | A Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code. |
| **Professional Fee Escrow Account** | An escrow account funded by the Debtors with Cash no later than the Effective Date in an amount equal to the aggregate amount of Professional Fee Claims and other unpaid fees and expenses professionals retained by the Debtors or the Committee under sections 327 or 1103 of the Bankruptcy Code have incurred or will incur in rendering services in connection with the chapter 11 cases prior to and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date. |
| **Proof of Claim** | A proof of Claim Filed against any of the Debtors in the Chapter 11 Cases by the applicable Bar Date as established by the Court. |
| **Provenance Blockchain** | A distributed, proof-of-stake blockchain designed for financial services industries, as further described, and defined, by the Provenance Blockchain Foundation from time to time. The current definition of the Provenance Blockchain is set forth at https://provenance-io.github.io/provenance-docs/docs/provenance-blockchain/. |
| **Recovery Causes of Action** | To the extent not expressly released pursuant to the terms of the Plan or the Confirmation Order, any (i) Causes of Action that the Debtors or their Estates may have that are based on or related to actions taken by, or omissions of, any Excluded Party or any other Person or Entity that is not a Released Party in connection with the management or affairs of the |

16

| **CERTAIN PLAN DEFINITIONS** | |
|---|---|
| **Term** | **Definition** |
| | Debtors prior to or after the filing of the Chapter 11 Cases and (ii) Avoidance Actions.<br><br>For the avoidance of doubt, the Recovery Causes of Action shall include (a) those Causes of Action identified in the complaint attached as <u>Exhibit 2</u> to the UCC Claims Stipulation Motion, (b) any additional Causes of Action agreed to be included by the Debtors and the Committee, and (c) any additional Causes of Action determined to be included by the Court and described in the Confirmation Order. |
| **Reinstatement or Reinstated** | With respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code. |
| **Related Party** | With respect to an Entity, each of, and in each case solely in its capacity as such, (i) such Entity's current and former Affiliates and (ii) such Entity's, and such Entity's current and former Affiliates', directors, managers, officers, shareholders, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by operation of law or otherwise), subsidiaries, associated Entities, managed or advised Entities, accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, fiduciaries, trustees, employees, agents (including any Disbursing Agent), advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, other representatives, and other professionals, representatives, advisors, predecessors, successors, and assigns (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), and the respective heirs, executors, estates, servants, and nominees of the foregoing.<br><br>Notwithstanding anything to the contrary in the Plan, no Excluded Party shall constitute a Related Party under the Plan, except for purposes of the Excluded Party definition (which utilizes the term "Related Party"). |
| **Released Parties** | Collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Special Committee and each of its members; (c) the Post-Effective Date Debtors; (d) the Committee and each of its members; (e) the Litigation Administrator; (f) the Plan Sponsor and each of its members; (g) with respect to each of the foregoing, each such Entity's current financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; and (h) any other current or former officer, director, manager, employee, or other agent of the Debtors identified in the Plan Supplement as a Released Party, as agreed to by the Debtors and the Committee. |

17

| CERTAIN PLAN DEFINITIONS | |
|---|---|
| **Term** | **Definition** |
| | Notwithstanding anything to the contrary in the Plan, no Excluded Party nor any holder of a Claim or Interest that would otherwise constitute a Released Party that opts out of, or objects to, the releases contained in the Plan, shall constitute a "Released Party" in any capacity under the Plan. |
| **Releasing Parties** | Collectively, and in each case in its capacity as such: (a) each Released Party; (b) all holders of Claims that are presumed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan; (c) all holders of Claims or Interests that vote to accept the Plan; (d) all Holders of Claims or Interests that are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; (e) all holders of Claims who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan; (f) all holders of Claims who vote to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; and (g) each Related Party of each Entity in clause (a) through clause (f). |
| **Retail Borrowers** | The individual Account Holders with outstanding Retail Loans in the Debtors' Borrow Program as of the Petition Date. |
| **Retail Loan Settlement Agreement** | Any settlement agreement entered on the Effective Date between the Settlement Administrator, NewCo, and a consenting retail Account Holder, providing the settlement terms of such Account Holder's Borrow Loan Obligations. The Retail Loan Settlement Agreements shall have the general terms attached hereto as **Exhibit 3**. |
| **Retail Loan Settlement Cryptocurrency Assets** | All Cryptocurrency assets that formerly supported Retail Loans settled under Retail Loan Settlement Agreements, which Cryptocurrency assets shall be contributed to NewCo as of the Effective Date (and shall be used to satisfy NewCo's obligations under the Retail Loan Settlement Agreements); *provided*, that NewCo may convert (or cause the Debtors or Post-Effective Date Debtors to convert) the Retail Loan Settlement Cryptocurrency Assets to Ethereum, Ethereum derivatives, or other Cryptocurrency assets (or any combination thereof) as agreed by the Debtors, the Committee, and the Plan Sponsor in connection with their transfer to NewCo; *provided*, *further*, that the Retail Loan Settlement Agreements may provide for the return of a specific Liquid Cryptocurrency notwithstanding any such conversions. |
| **Retail Loans** | The loans of Retail Borrowers, which relate to the Debtors' Borrow Program and were outstanding as of the Petition Date. |
| **Section 502(h) Claim** | Any claim arising under section 502(h) of the Bankruptcy Code. |

18

| | CERTAIN PLAN DEFINITIONS | |
|---|---|---|
| **Term** | **Definition** | |
| **Secured Claim** | A Claim that is: (a) secured by a lien on property in which any of the Debtors has an interest, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtors' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan, or separate order of the Bankruptcy Court, as a secured Claim. | |
| **Secured Tax Claim** | Any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties, and excluding the special tax Claims from Government Claims. | |
| **Settlement Administrator** | The Entity that shall administer NewCo's rights and obligations under the Retail Loan Settlement Agreements. | |
| **Solicitation Agent** | Stretto, Inc., the notice, claims, and solicitation agent retained by the Debtors for these chapter 11 cases. | |
| **Solicitation Materials** | The solicitation materials with respect to the Plan, including the court-approved Disclosure Statement, form of ballots, and any other solicitation materials, including the solicitation version of the Plan and the Convenience Claim Election Form. | |
| **Special Committee** | David M. Barse and Alan J. Carr, together, in their capacity as the special committee of the board of directors of Celsius Network Limited. | |
| **Token** | A unit of Cryptocurrency. | |
| **UCC Claims Stipulation Motion** | The *Motion of the Official Committee of Unsecured Creditors to Approve Joint Stipulation and Agreed Order Between the Official Committee of Unsecured Creditors and the Debtors with Respect to Certain Claims and Causes of Action Belonging to the Debtors' Estates* [Docket No. 2054]. | |
| **UCC Stipulation Defendants** | Alexander Mashinsky, Shlomi Daniel Leon, Hanoch Goldstein, Harumi Urata-Thompson, Jeremie Beaudry, Johannes Treutler, Kristine Meehan Mashinsky, Aliza Landes, AM Ventures Holding, Inc., Koala1 LLC, Alchemy Capital Partners LP, Bits of Sunshine LLC, and John Doe 1-100, as described in the complaint attached as <u>Exhibit 2</u> to the UCC Claims Stipulation Motion. | |

| CERTAIN PLAN DEFINITIONS | |
|---|---|
| **Term** | **Definition** |
| **Unclaimed Distribution** | Any distribution under the Plan on account of an Allowed Claim or Allowed Interest to a holder that has not:  (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check within one year of receipt; (b) given notice to NewCo, the Post-Effective Date Debtors, or the Disbursing Agent, as applicable, of an intent to accept a particular distribution within one year of receipt; (c) responded to the Debtors', NewCo's, the Post-Effective Date Debtors', or the Disbursing Agent's requests for information necessary to facilitate a particular distribution prior to the deadline included in such request for information; or (d) timely taken any other action necessary to facilitate such distribution. |
| **Unsecured Claim** | Any Claim that is not a Secured Claim. |
| **Unsupported Digital Asset** | Any Cryptocurrency that was not eligible for any of the Debtors' services as determined in the Debtors' sole discretion under the General Terms of Use. |
| **Wind-Down Procedures** | The procedures to be Filed by the Debtors within fourteen (14) days of a decision to implement an Orderly Wind Down, which shall identify the mechanics and procedures to effectuate the Orderly Wind Down. The Wind-Down Procedures shall be (a) included in the Plan Supplement if the decision to implement an Orderly Wind Down is not made prior to entry of the Disclosure Statement Order or (b) Filed separately if such decision is made following entry of the Bid Protections Order but prior to entry of the Disclosure Statement Order. |
| **Withhold Claim** | An Account Holder Claim arising from an attempted transfer of Cryptocurrency to the Debtors' Custody Program in a jurisdiction in which the Debtors did not offer the Custody Program. |

## **Exhibit 2**

**Custody Settlement Term Sheet**

*In re Celsius Network LLC, et al.*, Case No. 22-10964 (MG)

## SETTLEMENT TERM SHEET

## REGARDING CUSTODY ASSETS

THIS SETTLEMENT TERM SHEET (THIS "SETTLEMENT TERM SHEET") CONTAINS CERTAIN MATERIAL TERMS AND CONDITIONS OF A PROPOSED SETTLEMENT BY AND BETWEEN THE DEBTORS IN THE JOINTLY-ADMINISTERED CASES CAPTIONED *IN RE CELSIUS NETWORK LLC, ET AL.*, CASE NO. 22-10964 (MG) (THE "DEBTORS" AND, TOGETHER WITH THEIR NON-DEBTOR AFFILIATES, "CELSIUS"), THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS (THE "COMMITTEE"), THE AD HOC GROUP OF CUSTODIAL ACCOUNT HOLDERS (THE "CUSTODY AD HOC GROUP" AND, TOGETHER WITH THE DEBTORS AND THE COMMITTEE, THE "PARTIES").   THIS SETTLEMENT TERM SHEET CONTEMPLATES A FULL AND FINAL SETTLEMENT OF ALL CLAIMS BETWEEN THE PARTIES RELATED TO THE CUSTODY ASSETS, INCLUDING PHASE II OF THE CUSTODY AND WITHHOLD ISSUES (WITH RESPECT TO THE CUSTODY AD HOC GROUP), AS DEFINED IN THE *JOINT STIPULATION AND AGREED SCHEDULING ORDER BY AND AMONG THE DEBTORS, THE COMMITTEE, AND THE AD HOC GROUPS WITH RESPECT TO THE CUSTODY AND WITHHOLD ISSUES* [DOCKET NO. 1044] (THE "SCHEDULING ORDER").[1]

THIS SETTLEMENT TERM SHEET DOES NOT ADDRESS ALL TERMS, CONDITIONS, OR OTHER PROVISIONS THAT WOULD BE REQUIRED IN CONNECTION WITH THE SETTLEMENT, WHICH SHALL BE SET FORTH IN THE SETTLEMENT MOTION AND SETTLEMENT ORDER (EACH AS DEFINED BELOW), WHICH ARE SUBJECT TO AGREEMENT IN ACCORDANCE WITH THIS SETTLEMENT TERM SHEET.

THIS SETTLEMENT TERM SHEET IS NOT AN OFFER, ACCEPTANCE OR SOLICITATION WITH RESPECT TO ANY SECURITIES, LOANS, OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.   ANY SUCH OFFER, ACCEPTANCE OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE LAW, INCLUDING SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE TO THE EXTENT APPLICABLE.   NOTHING CONTAINED IN THIS SETTLEMENT TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL APPROVAL OF THE SETTLEMENT MOTION OR CONFIRMATION OF THE PLAN CONTEMPLATED HEREBY (AND THEN ONLY AS PROVIDED THEREIN), AS APPLICABLE, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

| SETTLEMENT TERMS | |
|---|---|
| **Settlement Summary** | The settlement (the "Settlement") between the Parties will include the following, as set forth in further detail in this Settlement Term Sheet: |

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Scheduling Order or the *Order (I) Authorizing the Debtors to Reopen Withdrawals for Certain Customers with Respect to Certain Assets Held in the Custody Program and Withhold Accounts and (II) Granting Related Relief* [Docket No. 1767] (the "Withdrawal Order"), as applicable.

- ▪ The Parties will file a joint motion to approve the Settlement, including distribution procedures, which shall be in form and substance acceptable to each of the Parties and otherwise consistent with this Settlement Term Sheet (together with all exhibits attached thereto, the "Settlement Motion"), to be heard at the March 21, 2023 omnibus hearing.

- ▪ Subject to the terms set forth herein, it is contemplated that this Settlement shall be offered to all account holders with balances reflected in Custody Accounts that are not otherwise authorized to fully withdraw the substantial majority such holders' Custody Assets from Celsius' platform pursuant to the Withdrawal Order (the "Non-Withdrawal Custody Account Holders"), including any holder with both (1) a Custody Account and (2) an outstanding loan owed to the Debtors through the Debtors' Borrow Program.    Each Non-Withdrawal Custody Account Holder shall be afforded an opportunity to become a Settling Custody Account Holder (as defined below).

- ▪ Any Non-Withdrawal Custody Account Holders that voluntarily agree to the terms of the Settlement (the "Settling Custody Account Holders") shall receive the treatment set forth herein.

- ▪ The Settlement constitutes the full and final satisfaction of all allowed Custody claims on account of Custody Assets (each such claim, an "Allowed Custody Claim") held by the Settling Custody Account Holders against Celsius, including a settlement with respect to the approximately six percent shortfall between the amount of digital assets in the Debtors' Custody wallets compared to aggregate Custody liabilities (the "Shortfall Issue").

- ▪ This Settlement is contingent on the Steering Committee of the Custody Ad Hoc Group accepting the Settlement such that the Custody Ad Hoc Group agrees to the Standstill (the "Consenting Member Threshold").

- ▪ Upon entry of an order approving the Settlement Motion, which shall be in form and substance acceptable to each of the Parties and otherwise consistent with this Settlement Term Sheet (together with all exhibits attached thereto, the "Settlement Order"), the Custody Ad Hoc Group shall withdraw, subject to the Standstill (as defined below), the complaint in the adversary proceeding captioned *Ad Hoc Group of Custodial Account Holders v. Celsius Network LLC, et al*, Adv. Pro. No. 22-01142 (MG) (Bankr. S.D.N.Y. Aug. 31, 2022) (the "Custody Complaint").    The Custody Complaint shall be withdrawn with prejudice on the Plan Effective Date (as defined below).

- ▪ Upon entry of the Settlement Order, the Scheduling Order shall be

2

| | |
|---|---|
| | subject to the Standstill. The Scheduling Order shall be withdrawn with prejudice on the Plan Effective Date. |
| | ▪ Upon entry of the Settlement Order, the Debtors shall be authorized to distribute to those account holders with balances associated with Custody Accounts authorized to withdraw assets pursuant to the Withdrawal Order the additional 6% originally held back as a result of the Shortfall Issue. For the avoidance of doubt, only those holders of Custody Accounts permitted to withdraw assets pursuant to the Withdrawal Order shall receive assets totaling 100% of such holders' entitlement to the amounts permitted to be withdrawn by such holders under the Withdrawal Order, minus applicable transaction costs and fees. |
| | ▪ By agreeing to the Settlement, any Settling Custody Account Holder agrees that, following the distribution of a court-approved disclosure statement and balloting materials, he or she shall support and vote to accept all of its claims provided for hereunder in connection with a chapter 11 plan that provides for treatment of the Allowed Custody Claims that are subject to this Settlement held by Settling Custody Account Holders in accordance with the terms of this Settlement (the "Plan"). The disclosure statement for such Plan may include a statement that the Custody Ad Hoc Group supports such Plan as it relates to the treatment of Allowed Custody Claims that are subject to this Settlement held by the Settling Custody Account Holders or a letter from the Custody Ad Hoc Group to the same effect. For the avoidance of doubt, nothing in this Settlement shall dictate the manner in which a Settling Custody Account Holder votes any claim other than an Allowed Custody Claim. |
| | For the avoidance of any doubt, nothing herein precludes any account holder from withdrawing any assets from Celsius' platform as permitted by the Withdrawal Order (the "Withdrawn Assets"). |
| **Settlement Motion** | The Custody Ad Hoc Group shall inform the Debtors and the Committee (a) of the members of the Custody Ad Hoc Group that have stated their intention to participate in the Settlement and (b) that the Consenting Member Threshold has been met no later than two (2) business days prior to the filing of the Settlement Motion. |
| | Any account holders with balances reflected in Custody Accounts shall be permitted to sign on to the Settlement within 30 days of the entry of the Settlement Order (the "Election Period").[2] |
| **Custody Claims** | "Custody Distribution Claim" means the balance of the Custody Account Holder (such balance, the "Custody Account Balance") *minus* (a) any Withdrawn Assets and (b) any further amounts for which such Custody Account Holder is alleged to be obligated or indebted to the Debtors, except on account of (1) avoidance actions |

---

[2]    The process for joining the Settlement shall be set forth in the Settlement Motion as approved by the Settlement Order.

or (2) an obligation with respect to an outstanding retail loan to the extent such loan obligation is supported by an allowed Borrow Claim (as will be defined in the Plan) in an amount that results in a loan to value ratio of equal to or less than 80% on the date of the entry of the Settlement Order (it is expected that no such claims exist). With respect to (b)(2), the Debtors shall be authorized to subtract from the Custody Account Balance any amounts necessary to make any such outstanding retail loan's loan to value ratio equal 80%, which shall be calculated as of the date such Custody Account Holder's Custody Distribution Claim is calculated.

The "Withdrawal Date" is the first date on which digital assets corresponding to Custody digital assets are withdrawn from the Debtors' platform following the entry of the Settlement Order, in accordance with the terms set forth therein. The Withdrawal Date shall occur as soon as reasonably practicable following the (i) entry of the Settlement Order and (ii) expiration of the Election Period.

Each Settling Custody Account Holder must vote all of his or her Allowed Custody Claims to accept the Plan and shall receive, in full and final satisfaction and settlement of such Settling Account Holder's Allowed Custody Claim and in exchange for such Holder's agreement to abide by the Standstill, a distribution comprising:

- Commencing on the Withdrawal Date, the right to withdraw from the Debtors' platform an in-kind distribution of 36.25% of such Settling Custody Account Holder's Custody Distribution Claim in the currency associated with such balance (the "First Custody Settlement Payment"); *plus*

- Upon the earliest of (i) the effective date of the Plan (the "Plan Effective Date"), (ii) the occurrence of a Rejection Event,[3] (iii) June 11, 2023 if the Debtors do not file a chapter 11 plan by such date, and (iv) December 31, 2023, the right to withdraw from the Debtors' platform an in-kind distribution of 36.25% of such Settling Custody Account Holder's Custody Distribution Claim in the currency associated with such balance (the "Second Custody Settlement Payment" and, together with the First Custody Settlement Payment, the "Custody Settlement Payments");

- On the Plan Effective Date, a release of any causes of action, including avoidance actions, that the Debtors' estates may assert against such Settling Custody Account Holder on account of such holders' Custody Distribution Claim;

- Notwithstanding the foregoing, if any sale or chapter 11 plan provides any holders, or subset thereof, of Allowed Custody Claims with treatment on terms better than those set forth in this Settlement, including as a result of a release of claims against holders of Custody

---

[3] "Rejection Event" means the date the Debtors' chapter 11 cases are dismissed or converted to cases under chapter 7 of the Bankruptcy Code.

|  | Claims (including avoidance actions), then any Settling Custody Account Holders shall be entitled to receive the difference between the Custody Settlement Payments and the treatment set forth in the sale or chapter 11 plan, as applicable, on the same terms set forth in such sale or chapter 11 plan, as applicable.<br><br>Each Holder of an Allowed Custody Claim that does not opt into the above settlement and is not a Settling Custody Holder within 30 days after entry of the Settlement Order **that votes to accept the Plan** shall receive, in full and final satisfaction and settlement of such Holder's Allowed Custody Claim, a distribution comprising:<br><br>    ▪    Commencing on the Plan Effective Date, the Custody Settlement Payments.<br><br>    ▪    On the Plan Effective Date, a release of any causes of action, including avoidance actions, that the Debtors' estates may assert against such Custody Account Holder on account of such holders' Custody Distribution Claim.<br><br>Each Holder of an Allowed Custody Claim that does not "opt-in" to the Settlement within 30 days after entry of the Settlement Order and that abstains from voting or votes to reject the Plan shall not be a Settling Custody Account Holder (the "Non-Settling Custody Account Holders"), and shall have an amount escrowed corresponding to such Holder's Allowed Custody Claims, and the litigation trustee appointed under the Plan shall have a period of time to be set forth in the Plan to commence avoidance actions against any Non-Settling Custody Account Holders following the Plan Effective Date.  For the avoidance of doubt, any Non-Settling Custody Account Holders shall not grant or receive a release with respect to their Custody Claims, and shall retain all rights to litigate with respect to their Custody Claims following the Plan Effective Date, and the litigation trustee shall be vested with all legal entitlements, and defenses, and other rights held by the Debtors with respect to such Custody Claims, including the right to pursue avoidance actions with respect to any such Custody Claims.<br><br>For the avoidance of doubt, any Holder of an Allowed Custody Claim that abstains from voting or votes to reject the Plan and has only Pure Custody Assets or Transferred Custody Assets, but was prevented from receiving his or her Custody Assets under the Withdrawal Order as a result of an outstanding loan owed to the Debtors through the Debtors' Borrow Program, shall receive his or her Custody Assets in accordance with the treatment of allowed Borrow Claims under the Plan and otherwise consistent with the Court's findings in the Withdrawal Order. |
| **Release & Exculpation Provisions** | Upon entry of the Settlement Order, neither the Debtors nor the Debtors' estates shall pursue any avoidance actions such entities may have against the Settling Custody Account Holders, and the Settling Custody Account Holders shall agree not to pursue any litigation, including seeking relief from the automatic stay, turnover, or other claims or causes of action, related to any such holder's Custody Claims, in each case until the earlier of (a) the occurrence of a Rejection Event, |

|  | (b) Plan Effective Date, and (c) 90 days after the confirmation hearing on the Plan, regardless of whether such Plan is confirmed (the "Standstill"). |
|---|---|
|  | Upon entry of the Settlement Order, the Parties agree that any and all digital assets (other than collateral on account of loan claims) in the Settling Custody Account Holders' accounts that are not distributed or required to be distributed to such Holders under the Withdrawal Order, the Settlement Order, or any order confirming the Plan, as applicable, shall be considered property of the Debtors' estates and any claims and/or causes of action held by any Party with respect to such assets shall be released and waived pursuant to such applicable order. For the avoidance of doubt, after the Plan Effective Date, Holders of Allowed Custody Claims that vote to accept the Plan agree that on the Plan Effective Date any and all digital assets in such Holders' accounts that are not distributed to such Holder under the order confirming the Plan, or were not distributed or required to be distributed to such Holder under the Withdrawal Order or the Settlement Order, shall be considered property of the Debtors' estates and any claims and/or causes of action held by any Party with respect to such assets shall be released and waived pursuant to such order. |
|  | Upon the Plan Effective Date, each of the Parties shall mutually release each other Party from any and all claims and causes of action related to the applicable Custody Claims of Settling Custody Account Holders, including any avoidance actions or, with respect to such Settling Custody Account Holders' Custody Distribution Claims, setoff rights. |
|  | Notwithstanding anything to the contrary set forth herein, the Parties are not releasing any rights or causes of action against any Parties with respect to any assets other than Custody Assets, subject to the terms set forth in this Settlement Term Sheet, including: (a) assets held in the Earn Program by an account holder party to the Settlement; (b) assets held in the Borrow Program by an account holder party to the Settlement; (c) assets held in the Withhold Accounts by an account holder party to the Settlement (if any); and (d) assets transferred off of Celsius' platform by an account holder party to the Settlement (other than in accordance with the Withdrawal Order and/or Settlement Order). |
| **Distribution Procedures** | The Custody Settlement Payments shall be made in-kind and the Debtors shall be permitted to make such payments using any combination of digital assets currently held in Custody Wallets or Aggregator Wallets, respectively, in an amount sufficient to satisfy such in-kind distribution; *provided that*, in the event there are insufficient in-kind digital assets to satisfy the Custody Settlement Payments, the remainder of such payments shall be made in cryptocurrency based on a manner that is tax-efficient. |
|  | The Debtors shall notify Settling Custody Account Holders through the Debtors' mobile application (the "Celsius App") and by email of the amount and type of digital asset that such holder will receive within 15 days of expiration of the Election Period. |

| | Settling Custody Account Holders shall be required to provide the Debtors with an external wallet address through the Celsius App and comply with any KYC requirements prior to receiving the Custody Settlement Payment. |
|---|---|
| **Fees and Expenses** | The Debtors will not object to or otherwise oppose the Custody Ad Hoc Group's filing of applications pursuant to section 503(b)(3)(D) of the Bankruptcy Code for payment of the reasonable and documented fees and out of pocket expenses of Togut, Segal & Segal LLP, as counsel for the Custody Ad Hoc Group, in connection with the chapter 11 cases. |
| **Minimum Distributions** | No holders of Custody Distribution Claims that aggregate less than $10.00 shall be entitled to a distribution under the Settlement, except as otherwise provided under the Plan. |
| **Undeliverable Distributions** | Any distribution under the Settlement Order that is an Unclaimed Distribution (as will be defined in the Plan) or otherwise remains undeliverable for a period of one year after the first attempt to deliver such distribution shall be deemed unclaimed property pursuant to section 347(b) of the Bankruptcy Code, except as otherwise provided in the Plan. |
| **Tax Matters** | The Settlement shall be structured in a tax-efficient and cost-effective manner. |

## **Exhibit 3**

**Retail Loan Settlement Agreement General Terms & Borrow Settlement Term Sheet**

*In re Celsius Network LLC, et al.*, **Case No. 22-10964 (MG)**

## PLAN TREATMENT TERM SHEET REGARDING CLAIMS AND OBLIGATIONS OF RETAIL BORROWERS

This term sheet (the "**Term Sheet**") is presented in connection with the negotiation of a chapter 11 plan of reorganization (the "**Proposed Plan**") proposed by Celsius Networks, LLC and its affiliated debtors (the "**Debtors**") in the jointly-administered cases styled *In re Celsius Network LLC, et al.*, Case No. 22-10964 (MG) (the "**Chapter 11 Cases**").[1]

This term sheet contains certain material terms and conditions concerning the proposed treatment of the claims and obligations of individual account holders (the "**Retail Borrowers**") with outstanding loans (the "**Retail Loans**") in the Debtors' Borrow program as of July 13, 2022 (the "**Petition Date**"). Under the proposed treatment, Retail Borrowers will have the option to either: (A) set off their outstanding Retail Loan obligation (a "**Loan Obligation**") to the Debtors against the claims for the return of previously deposited assets with such Retail Loan (a "**Borrow Claim**") and receive the same treatment for the difference between their Loan Obligation and Borrow Claim as account holders with claims related to the Debtors' Earn program *or* (B) enter into a structured settlement of their outstanding Borrow Claim on the terms set forth in detail below, in exchange for a full and final release of all claims between the parties related to the Loan Obligation, Borrow Claim, and all other potential litigation claims against the Debtors, *but not* claims of such Retail Borrower associated with the Earn, Custody, or Withhold programs.

This Term Sheet is being provided for negotiation purposes only and does not address all terms, conditions, or other provisions that would be required in connection with the Proposed Plan, which terms shall be set forth in the Proposed Plan and associated disclosure statement, each of which is subject to further negotiation between the parties.

This Term Sheet is supported by the Debtors, the Official Committee of Unsecured Creditors (the "**Committee**"), and the proposed Plan Sponsor. This Term Sheet is subject to further discussions with the Ad Hoc Group of Borrowers.

**THIS TERM SHEET IS NOT AN OFFER, ACCEPTANCE OR SOLICITATION WITH RESPECT TO ANY SECURITIES, LOANS, OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER, ACCEPTANCE OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE LAW, INCLUDING SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE TO THE EXTENT APPLICABLE. NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE CONFIRMATION OF THE PROPOSED PLAN (AND THEN ONLY AS PROVIDED THEREIN), AS APPLICABLE, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

---

[1] Where context requires, capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Plan Term Sheet.

| **TERMS** |
|---|

| | |
|---|---|
| **Proposed Plan Treatment Summary** | The Proposed Plan will provide Retail Borrowers the opportunity to elect one of two treatments in full and final satisfaction of such Borrow Claims.<br><br>**Treatment A**: Electing Retail Borrowers that vote to **ACCEPT** the Plan and elect to receive Treatment A shall execute a Retail Loan Settlement Agreement and settle their Borrow Claims on the following terms (a "**Settled Loan**"):<br><br>• **Maturity**: 5 years from the effective date of the Plan (the "**Effective Date**").<br><br>• **Prepayment**: No prepayment.<br><br>• **Loan to Value Ratio**:<br>Any Settled Loan must have a loan to value ratio ("**LTV**") of 80% or lower with such LTV measured 30 calendar days prior to the projected Effective Date (the "**Measuring Date**").  To the extent a proposed Settled Loan has a LTV greater than 80% on the Measuring Date, the applicable Retail Borrower shall be required to provide additional cryptocurrency to support such Settled Loan.<br><br>The Debtors will provide electing Retail Borrowers with a notice five (5) calendar days after the Measuring Date of any additional cryptocurrency such Retail Borrower is required to provide to the Debtors under the above paragraph and details regarding how to provide such cryptocurrency.  To the extent the identified additional cryptocurrency are not provided within seven (7) calendar days prior to the projected Effective Date, the applicable Retail Borrower will receive Treatment B.<br><br>• **Interest**:  Interest shall be payable on the first of each month on the principal amount of the Loan Obligation.  Payments can be made either in cash or through a deduction to a respective Retail Borrower's Borrow Claim (or additional cryptocurrency transferred with respect to such Borrow Claim) at a 200 bps premium to the interest rates set forth below.<br><br>The annual interest rate shall be established based on the LTV of the applicable loan based on the following interest rate schedule:<br><br>    o  ≤25% LTV - 7.5%<br>    o  >25% and ≤35% LTV - 8.5%<br>    o  >35% and ≤45% LTV - 9.5%<br>    o  >45% and ≤55% LTV - 10.5% |

> - >55% and ≤65% LTV - 11.5%
> - >65% and ≤85% LTV - 12.5%

The monthly interest rate will be based on the applicable LTV rate for the first five days of the preceding month such that the payment is set for three weeks prior to the scheduled due date. Retail Borrowers can top up the cryptocurrency supporting such LTV amount at any time using cash or ETH to improve their interest rate tier. The margin trigger for a Retail Borrower that tops up the digital asset supporting such LTV shall not change.

There shall be a 30 day cure period before the failure to pay interest results in an Event of Default.

- **Treatment and Repayment of Borrow Claim**:

  Subject to the adjustments contained in this section, at the conclusion of the Settled Loan (whether through maturity or liquidation/foreclosure) and upon repayment or satisfaction of the Loan Obligation, the Servicer and Plan Sponsor will have the obligation to return to the applicable Retail Borrower cryptocurrency in an amount equal to (1) the principal amount of the loan *plus* (2) 85% of the excess of (a) the total value of the applicable Borrow Claim in coins *minus* (b) the principal amount of the loan, in-kind, in the cryptocurrency of such Borrow Claim (*i.e.* a Borrow Claim denominated in Bitcoin shall receive payment in Bitcoin upon maturity); *plus* (3) any amount of cryptocurrency posted after the Effective Date *minus* any amounts recovered for interest payments, margin calls, loan liquidations, make-whole amounts, or other amounts owed under the terms of the applicable loan agreement from such Borrow Claim (*e.g.*, interest charged elected to be deducted from such Borrow Claim).

  Electing Retail Borrowers agree that cryptocurrency identified as supporting the Settled Loans is property of NewCo, agree that they have transferred all rights, title, and interest to such cryptocurrency, and agree that such cryptocurrency may be staked by NewCo according to the investment guidelines of the NewCo, which guidelines shall be included in the Plan Supplement and subject to the terms of the Plan. NewCo will agree to hold such cryptocurrency (or their equivalent) for so long as the corresponding supported Settled Loans remain outstanding.

  The initial cryptocurrency identified as supporting the Settled Loans shall include the ETH that is currently staked by the Debtors on the Beacon chain *plus* additional ETH to be staked or otherwise invested by NewCo as set forth above.

  To the extent the ratio of price of ETH and the currency of the applicable Borrow Claim on the maturity date of a Settled Loan is less than the same

3

ratio on the Effective Date, the applicable Retail Borrower shall receive an in-kind payment in the currency of the Borrow Claim that reflects a discount equal to the change in such ratio from the Effective Date to the maturity date (*e.g.* if a Borrow Claim is denominated in Bitcoin and ETH grows at a rate that is 10% less than Bitcoin between the Effective Date and the maturity date, the Retail Borrower shall receive Bitcoin on the maturity date equal to 90% of their Borrow Claim).

To the extent the ratio of price of ETH and the currency of the original loan on the maturity date is greater than the same ratio on the Effective Date, the Borrower shall receive an in-kind payment in the currency of the Borrow Claim that reflects a 50% premium equal to the change in such ratio from the Effective Date to the maturity date. The remaining 50% premium shall be property of NewCo.

The amount of the Retail Loan Obligations shall not be included in the calculation of the distribution to the Management Team.

- **Cryptocurrency Call**: The Settled Loans are unsecured, but will be akin to margin loans with a cryptocurrency call required if the LTV of such loan exceeds the greater of (1) 140% of the LTV on the Measuring Date or (2) 65%. Notwithstanding the foregoing, in no event shall a cryptocurrency call point exceed 85% LTV.

  In the event of a cryptocurrency call, the Retail Borrower must provide additional USD or Ethereum ("**ETH**") within 5 days of receiving a cryptocurrency call notice such that the resulting LTV of the applicable Retail Loan is 5% lower than the cryptocurrency call trigger (*i.e.* with a trigger at 65%, a Retail Borrower must provide sufficient cryptocurrency to return to a 60% LTV. There shall be no reverse cryptocurrency call feature.

- **Default and Liquidation**: Upon the occurrence of an Event of Default of the Retail Borrower under the Retail Loan Settlement Agreement, the Servicer shall be entitled to liquidate the loan and recover an amount equal to (1) the outstanding amount of the reinstated loan, *plus* (2) the currently outstanding and unpaid interest payments, *plus* (3) an amount equal to the present value of and the remaining interest payments owed until the maturity date of the reinstated loan calculated using a discount rate equal to the prevailing Treasury Rate plus 50 bps.

- **Release of Claims and No Further Recovery**: The Debtors and each Retail Borrower who elects Treatment A shall release each other from all claims with respect to the applicable Borrow Claim, including any potential claims under section 363 and any avoidance actions, and any other tort or other litigation claims. For the avoidance of doubt, such release shall not apply to any claims associated with the Earn, Custody, or

|   | Withhold programs of such Retail Borrowers.<br><br>Retail Borrowers who elect to receive Treatment A will not receive any further recovery from the Debtors under the Proposed Plan, including, but not limited to, interests in a litigation trust or equity share tokens ("**EST**").<br><br>**Treatment B**:  Obligations of Retail Borrowers under Retail Loans that were outstanding on the Petition Date will be set off or recouped against the corresponding Borrow Claim associated with such obligation such that the Retail Borrower retains the proceeds of the Retail Loan and the corresponding Borrow Claim is reduced by an equal amount.  The remaining amount of the Borrow Claim (calculated in dollars as of the Petition Date) after such set off or recoupment is accounted for will receive the same treatment as is provided to all account holders with claims associated with the Earn program.<br><br>Treatment B shall be the default treatment if no action is taken by a Retail Borrower or the Retail Borrower fails to meet its obligations under Treatment B, below, including executing an acceptable loan agreement.<br><br>Treatment B shall be the only treatment available for (1) Borrow Claims under $5,000, (2) Borrow Claims in CEL token, FTT token, and LUNC token, and (3) Retail Loans of Retail Borrowers located in Nevada and North Dakota. |
|---|---|
| **Means Of Implementation** | On the Effective Date of the Proposed Plan, (1) the keys to the private wallet which will receive the ETH directly staked by the Debtors on the Beacon chain (the "**Directly Staked ETH**") and (2) all other Retail Loan Settlement Cryptocurrency Assets shall be transferred to NewCo.<br><br>Any staking rewards from such Directly Staked ETH and other Retail Loan Settlement Cryptocurrency shall be property of NewCo.<br><br>It shall be a condition precedent to the Plan that the Plan Sponsor will use best efforts (at NewCo's expense) to acquire appropriate slashing insurance with respect to the Directly Staked ETH that is contributed to NewCo and the formation documents of the NewCo shall require the NewCo to use best efforts to maintain similar insurance for all staked ETH associated with the Settled Loans.<br><br>The Settled Loans shall be assigned to Figure Lending, LLC ("**Figure Lending**") who shall act as the servicer of the Settled Loans.  Figure Lending shall enter into a loan servicing agreement with NewCo whereby it shall service the loans for the benefit of NewCo.  The execution of such agreement in form and substance acceptable to the Debtors, the Committee, and the Plan Sponsor shall be a condition to the Effective Date of the Proposed Plan.  The servicing fee owed to the servicer shall be paid by NewCo. |

## <u>Exhibit 4</u>

**Management Term Sheet**

| **MANAGEMENT AGREEMENT TERM SHEET** | |
|---|---|
| **Overview** | The Management Agreement will be entered into between NewCo and the Manager and will include the following terms.  Terms capitalized but not defined in this Term Sheet will have the meanings ascribed to such terms in the Plan Term Sheet. |
| **Term** | The Management Agreement's initial term will be five (5) years from the Effective Date; *provided* that the Management Agreement and each member of the Management Team will be subject to termination by the New Board for cause (as defined in the Management Agreement); *provided*, *further* that the Management Agreement will be subject to termination by the New Board if, during the initial term, either member of the Management Team depart and is not replaced by an executive with comparable industry experience, subject to the New Board's approval, such approval not to be unreasonable withheld. |
| | Following the first five-year term (the "Initial Term"), the Management Agreement will automatically renew for a successive 5-year term (each such term, a "Renewal Term"), unless either the Manager or the New Board provides notice no more than twelve (12) months but not less than six (6) months prior to the end of the Initial Term or any Renewal Term that it does not wish to renew the Management Agreement or wishes to renew the Management Agreement on different terms. |
| | If the Management Agreement is terminated, the Management Fee will cease to accrue as of the date of such termination. Any Management Fee accrued prior to such termination date shall be payable by NewCo to the Manager upon such termination. |
| **Role of the Manager; Services Performed** | As further described in the New Organizational Documents, the New Board will adopt, approve and oversee the investment policy, dividend policy, any policies regarding conflicts of interest (including with respect to the Plan Sponsor, NewCo, and their respective personnel and Affiliates), and all major investment and operational decisions of NewCo (taking into account the recommendation of the Manager). Subject always to the oversight, supervision, and approval of the New Board, the Manager will perform the following services (the "Services"):<br><br>•     manage NewCo's day-to-day business and operations, including managing its liquidity and capital resources and causing NewCo to comply with applicable law;<br><br>•     identify, evaluate, manage, perform due diligence on, negotiate and oversee the acquisitions of target businesses by NewCo and any other assets of NewCo; |

|  | |
|---|---|
|  | - evaluate, manage, negotiate and oversee the disposition of all or any part of the property or assets of NewCo, including dispositions of all or any part of NewCo's subsidiaries;<br><br>- evaluate the financial and operational performance of any of NewCo's subsidiaries, including monitoring the business and operations thereof, and the financial performance of any of NewCo's other assets; and<br><br>- perform any other services for and on behalf of NewCo to the extent that such services are consistent with those that are customarily performed by the executive officers and employees of a publicly listed or quoted Person.<br><br>NewCo acknowledges and agrees that nothing in this Term Sheet, the Plan Term Sheet, the Management Agreement, Plan Sponsor Agreement or any other agreement entered in connection with the Plan will preclude the Manager from engaging in any other business venture or ventures of any nature or description including the management, financing, syndication or development of other accounts or other ventures similar to NewCo. The Manager will develop a customary allocation policy, subject to the New Board's approval, which will specify how investment activities and opportunities will be allocated, including among NewCo and other accounts or similar vehicles managed or advised by the Manager. The Manager will use commercially reasonable efforts, subject to any tax, regulatory or other considerations, to (i) allocate opportunities involving a supermajority ownership of an operating company to NewCo and (ii) provide NewCo with a right of first offer on opportunities related to other cryptocurrency chapter 11 opportunities. |
| **Fees Paid to Manager** | In exchange for its performance of the Services, the Manager will be paid a quarterly Management Fee and a quarterly Incentive Fee. Any such payment will be made in U.S. dollars by wire transfer in immediately available funds to an account or accounts designated by the Manager from time to time.<br><br>**Management Fee**<br><br>NewCo will pay to the Manager, quarterly in arrears, an amount equal to the sum total of the Management Fee Rate *multiplied by* the applicable incremental value of the Management Fee Base Amount (the "Management Fee").<br><br>"Management Fee Rate" means:<br><br>1.    0.4975% (i.e., 1.95% per annum) on the first $2,000,000,000 of Management Fee Base Amount;<br><br>2.    0.4375% (i.e., 1.75% per annum) on any incremental Management Fee Base Amount above $2,000,000,000, up to (and including) $3,000,000,000; and |

| | |
|---|---|
| | 3.      0.375% (i.e., 1.50% per annum) on any incremental Management Fee Base Amount above $3,000,000,000. |
| | "Management Fee Base Amount" means: (1) from the Effective Date through the last date before the second anniversary of the Effective Date, the NewCo Fee-Paying Asset Value (2) from the date that is the second anniversary of the Effective Date through the last date before the third anniversary of the Effective Date, 50% of the NewCo Fee-Paying Asset Value and 50% of the aggregate trading value of all ESTs, and (3) for all years starting on and after the third year anniversary of the Effective Date, the trading price of the ESTs; *in each case*, reduced on a dollar-for-dollar basis by the aggregate amount of all cash and stablecoins held by NewCo in excess of the lesser of (1) 5% of NewCo Total Asset Value or (2) $100 million (provided such $100 million balance is maintained for more than two consecutive quarters). |
| | "NewCo Fee-Paying Asset Value" means the total value of NewCo's assets set forth in Schedule I of the Plan Term Sheet minus any Retail Loan Assets. |
| | An independent audit or valuation firm or valuation professional will be appointed by the New Board to value NewCo's assets. For purposes of calculating the Management Fee Base Amount, the value of the trading price of the ESTs will be calculated based on a 90-day volume weighted average price. |
| | **Incentive Fee** |
| | NewCo will pay to the Manager a quarterly fee in an amount equal to 10% of the Incentive Fee Base Amount as of each quarterly calculation date during such year (the "Incentive Fee"). The Incentive Fee will be paid 50% in cash and 50% in ESTs. The Incentive Fee shall not be less than zero. |
| | "Incentive Fee Base Amount" means, as of each quarterly calculation date (*i.e.*, the end of each fiscal quarter), the excess, if any, of (a) the aggregate trading value of all ESTs over (b) the aggregate trading value of all ESTs as of the immediately preceding calculation date (or, in the case of the first Incentive Fee calculation, the Effective Date); *provided*, that the Incentive Fee will only be payable to the Manager if the forgoing Incentive Fee Base Amount equals or exceeds an amount equal to an 8% per annum compounded return (adjusted proportionally to account for any partial fiscal period) on the Day 1 Trading Value. |
| | "Day 1 Trading Value" shall mean the aggregate trading value of all ESTs as of the Effective Date. For purposes of calculating the Incentive Fee Base Amount and the Day 1 Trading Value, the value of the trading price of the ESTs will be calculated based on a 90-day volume weighted average price. |
| **Expenses** | Subject to the terms and conditions, including the aggregate cap set forth in Section 13.01, of the Plan Sponsor Agreement, any and all costs and expenses incurred by the Manager and/or its affiliates in connection with the formation and ongoing operation of NewCo will be borne by NewCo. NewCo will reimburse the Manager for any and all costs and expenses of NewCo that are incurred by the Manager or its affiliates on behalf of NewCo |

| | |
|---|---|
| | during the term of the Management Agreement, including, without limitation, any and all costs and expenses incurred in connection with the formation and organization of NewCo and any of its subsidiaries; evaluation, management, due diligence on and negotiation of the Plan; retention of outside service providers such as legal counsel, accountants and other professionals, advisors and consultants; break-up fees; filings; transfer of assets to NewCo; regulatory matters; and any and all other costs and expenses incurred in connection with NewCo, the Plan, the Plan Sponsor Agreement, the Plan Term Sheet and the Management Agreement.<br><br>For the avoidance of doubt, NewCo and its subsidiaries will bear their own expenses. |
| **Indemnification** | NewCo will indemnify reimburse, defend and hold harmless the Manager and its successors and permitted assigns, together with their respective employees, officers, members, managers, directors, agents and representatives (collectively the "<u>Indemnified Parties</u>"), from and against all losses (including lost profits), costs, damages, injuries, taxes, penalties, interests, expenses, obligations, claims and liabilities (joint or severable) of any kind or nature whatsoever (collectively "<u>Losses</u>") that are incurred by such Indemnified Parties in connection with, relating to or arising out of the performance of any Services hereunder; *provided, however,* that NewCo will not be obligated to indemnify, reimburse, defend or hold harmless any Indemnified Party for any Losses incurred, by such Indemnified Party in connection with, relating to or arising out of gross negligence, willful misconduct or fraud.<br><br>The Indemnified Parties will also be indemnified from all Losses due to the negligence of third-party brokers, collateral managers or other third-party agents of NewCo. |
| **Exculpation** | Manager will not be liable for, and NewCo will not take, or permit to be taken, any action against the Manager to hold the Manager liable for, any error of judgment or mistake of law or for any loss suffered by NewCo or its subsidiaries (including, without limitation, by reason of the purchase, sale or retention of any security) in connection with the performance of the Manager's duties under the Management Agreement, except for a loss resulting from gross negligence, willful misconduct or fraud.<br><br>The Manager will not be liable for any loss due to the negligence of third-party brokers, collateral managers or other third-party agents of NewCo. |

**<u>Exhibit C</u>**

**Plan Sponsor Presentation**



# Celsius / NovaWulf Sale and Plan Overview

February 28, 2023

# Disclaimer

The information provided in this presentation pertaining to Celsius Network Limited and certain of its affiliates ("Celsius", the "Company" or the "Debtors"), its business assets, strategy and operations is for general informational purposes only and is not a formal offer to sell or a solicitation of an offer to buy any securities, options, futures, or other derivatives related to securities in any jurisdiction and its content is not prescribed by securities laws. Information contained in this presentation should not be relied upon as advice to buy or sell or hold such securities or as an offer to sell such securities. This presentation does not take into account nor does it provide any tax, legal or investment advice or opinion regarding the specific investment objectives or financial situation of any person. Celsius and its agents, advisors, directors, officers, employees and shareholders make no representation or warranties, expressed or implied, as to the accuracy of such information and Celsius expressly disclaims any and all liability that may be based on such information or errors or omissions thereof. Celsius reserves the right to amend or replace the information contained herein, in part or entirely, at any time, and undertakes no obligation to provide the recipient with access to the amended information or to notify the recipient thereof. This is not a binding term sheet, no definitive documents have been signed, and parties reserve their rights in connection with any proposed transaction. Any information, representations or statements not contained herein shall not be relied upon for any purpose.

Neither Celsius nor any of Celsius' representatives shall have any liability whatsoever, under contract, tort, trust or otherwise, to you or any person resulting from the use of the information in this presentation by you or any of your representatives or for omissions from the information in this presentation. Additionally, neither the Company nor Celsius' representatives undertake obligation to comment on the expectations of, or statements made by, third parties in respect of the matters discussed in this presentation.

THIS PRESENTATION IS NOT, AND SHALL NOT BE DEEMED, AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.

# Introduction

- After running a comprehensive sale process and evaluating multiple potential bids and transaction structures, the Debtors have chosen to pursue a plan of reorganization sponsored by NovaWulf Digital Management ("NovaWulf")

- The Debtors believe that the NovaWulf plan provides the best method to distribute the Debtors' liquid crypto assets and maximize the value of the Debtors' illiquid assets through a new company run by experienced asset managers

- The NovaWulf plan has the support of the unsecured creditors' committee (the "UCC" or the "Committee")

- NovaWulf will make a ***direct cash contribution*** of $45mm to NewCo, furnish additional consideration to customers transacting on the NewCo platform to offset anticipated gas fees, and assume significant liquidation and winddown costs that would otherwise be incurred by the Debtors in a controlled liquidation of the Debtors' business

- NovaWulf has also partnered with Figure Technologies and the Provenance Blockchain to provide licensed trading and loan services, allowing Celsius' Earn creditors the opportunity to gain immediate access to liquidity for their share of the Debtors' illiquid assets, and Celsius' retail loan holders the ability to reinstate their loan on new terms

- The NovaWulf plan is the product of the Debtors' court-approved sales process. As part of that process, the Debtors' advisors contacted over 130 parties and executed non-disclosure agreements with ~40 potential bidders

- The sale process yielded 6 bids for the retail platform, and 3 bids for the mining operation

- The Debtors, in concert with the UCC, have worked over the last several months to negotiate with bidders, and are pleased to announce an agreement in principle with NovaWulf as plan sponsor

# Introduction (*cont'd*)

The proposed sale and plan structure provides three key forms of consideration for Earn Creditors:

- Earn Creditors with claims valued below $5,000 on the petition date will be placed in a "Convenience Class" that will receive a one-time distribution of liquid crypto (in the form of BTC, ETH and USDC) on the plan effective date. The Debtors estimate that the Convenience Class will provide over 85%[1] of Celsius' customers with a recovery equal to ~70% of their claim in liquid crypto
  - Any Earn creditor can elect to reduce their claim to $5,000 and participate in the Convenience Class
  - Any Convenience Class creditor with a claim of at least $1,000 can "opt out" of the Convenience Class and receive the recoveries provided to general Earn creditors

- General Earn Creditors will receive their pro rata share of:
  - A significant distribution of liquid crypto (in the form of BTC, ETH and USDC) on the plan effective date
  - 100% of the "common" equity in NewCo, which will own and seek to maximize the value of the Debtors' illiquid assets over time, including illiquid crypto (*e.g.*, staked ETH), the mining operations, retail and institutional loans and alternative assets. NewCo also intends to develop new value accretive business lines for the benefit of Earn creditors who own the equity of NewCo
  - Interests in a well-funded litigation trust, which will be overseen by creditors or their appointees, and vigorously pursue designated litigation claims against certain former insiders of Celsius and other third parties

- NewCo will be a regulatory compliant public, reporting company 100% owned by Earn creditors. Its "common" equity will be provided in a tokenized form that will trade on the Provenance Blockchain through a SEC-registered broker dealer and alternative trading system

- The proposed plan also will provide a framework to resolve custody account holder claims and retail borrower claims through settlements that allow each electing customer to opt into a settlement treatment described in greater detail in the following slides

- Insider CEL token claims to be subordinated and receive no recovery; non-insider CEL Earn claims will be valued at $0.20 (pre-sale ICO price) or such higher amount as may be agreed upon by the Debtors and the UCC

KIRKLAND & ELLIS LLP    ALVAREZ & MARSAL    CENTERVIEW PARTNERS    3

(1)    Does not reflect adjustment for minimum distribution amount.

# Key Plan Highlights

**1**  All Earn creditors receive a significant distribution of liquid crypto on the plan effective date, with "Convenience Class" creditors receiving a ~70% recovery on the plan effective date

**2**  NewCo will be led by reputable digital asset investors and operators (no Celsius founder involvement or relationship)

**3**  NewCo "common" equity will be <u>100% owned by Earn creditors</u> & publicly traded; NewCo will be a public company with attendant disclosure requirements (e.g., 10Qs & 10Ks)

**4**  Meaningful incremental direct and indirect consideration to be paid by the proposed buyer / plan sponsor, including $45mm of cash

**5**  Comprehensive settlement frameworks with custody account holders and retail borrowers

**6**  Well-funded Bitcoin mining operations with detailed plan to vertically integrate over time

**7**  Strong governance and transparency – majority of NewCo board appointed by the UCC

**8**  NewCo equity will benefit from maximization of illiquid asset value and creation of new business lines over time

**9**  Litigation claims will be vigorously pursued for the benefit of General Earn creditors



**Celsius**

**Proposed Plan**

KIRKLAND & ELLIS LLP  ALVAREZ & MARSAL  CENTERVIEW PARTNERS

4

# Earn Creditor Distribution

Celsius is distributing the vast majority of its liquid assets plus new tokens representing 100% of the equity in its illiquid assets, with further upside as NewCo grows over time

### *Earn Claims Less Than or Equal to $5,000 (Convenience Class)*

- **70% recovery** in liquid crypto assets (BTC, ETH and USDC)

- Customers with balances over $5,000 may opt-in to the Convenience Class by reducing their claim to $5,000

- Customers with convenience claims larger than $1,000 may opt-out and participate in the general Earn creditor distribution

### *Represents over 85%[(1)] of all Earn Account Creditors*

### *Earn Claims Greater Than $5,000*

- Distributes **up to 100% of liquid crypto** assets to creditors less payments to other creditors under the plan and reserve for an amount needed to operate NewCo (including the mining business)

- Distributes **100% of NewCo equity as tokenized securities – Equity Share Tokens ("ESTs")**

- Distributes **Management Share Tokens ("MSTs")** entitling holders to ~50bps of NewCo net asset value annually plus incremental profit sharing

- Earn claimants voting to **accept the plan may request to swap liquid crypto or ESTs** with other creditors as part of their distribution and the Debtors will endeavor to match requests and facilitate reallocation of liquid crypto and ESTs among requesting claimants

### *Plan provides for distribution of liquid crypto assets on the effective date and distribution of illiquid assets over time through NewCo equity (ESTs) and potential dividends*

KIRKLAND & ELLIS LLP  ALVAREZ & MARSAL  CENTERVIEW PARTNERS  5

(1)   Does not reflect adjustment for minimum distribution amount.

# Plan Structure

Customer owned NewCo positions customers to benefit from a recovery in the crypto market, maximization of the value of illiquid estate assets and NewCo value creation
- NovaWulf's incentives are closely aligned with EST holders through profit sharing arrangement



*Received by Earn and Convenience Class Claimants*

**Liquid Crypto Distribution on Effective Date**
*(BTC, ETH, USDC)*

*Received by Earn Claimants[1]*

**Celsius**

**Contributes Assets**
*(Alternative investments, retail & institutional loans and collateral, mining business, illiquid crypto and needed working capital)*

**NewCo**
*(NovaWulf as Manager)*

**Equity Share Token ("EST")**
*Represents 100% of the common stock of NewCo; will pay quarterly dividends to holders of tokens*

**Management Share Token ("MST")**
*Stapled to EST token for 1 year; fees paid quarterly in USD / stablecoin*

**Litigation Trust**
*(see page 15)*

KIRKLAND & ELLIS LLP    ALVAREZ & MARSAL   CENTERVIEW PARTNERS

6

(1)    Excludes claimants participating in Convenience Class.

# Overview of NewCo Activities

NewCo will house Celsius' illiquid assets and mining business, and will develop crypto-oriented operating businesses and services for the benefit of EST holders

- NewCo will be a regulated, publicly traded, creditor-owned company with disclosure, reporting and accounting requirements consistent with best practices for public companies
- NewCo will immediately be one of the largest direct staking platforms with significant growth opportunities



**NewCo Operating Company**

**At the Plan Effective Date**

*Celsius' Illiquid Assets and Operating Businesses*

- **Direct Staking**
- **Mining Operations**
- **Illiquid Crypto and Alternative Holdings**
- **Existing Retail and Institutional Loan Portfolio**

**Potential Future Business Lines[1]**

- **Asset-Lite Lending**
- **Debit Cards**
- **Trade Finance**
- **Factoring**
- **Private Wealth Services**
- **Other M&A**
- **Direct Staking**
- **Mining Operations**
- **Illiquid Crypto and Alternative Holdings**
- **Existing Retail and Institutional Loan Portfolio**

(1)    All future business lines subject to obtaining regulatory licenses.

# Overview of NovaWulf & Figure

NewCo will be managed by experienced and pedigreed investors and operators
— NovaWulf has partnered with Figure as its end-to-end blockchain solution

| NovaWulf | FIGURE |
|---|---|
| ✅ Founded in 2022 by former Blackstone, King Street and Beowulf Energy executives with a history of growing platforms | ✅ Founded in 2018, focused on loan origination, banking and payments for digital assets |
| ✅ Firm is focused on bringing a value-oriented approach to digital assets | ✅ Early mover in leveraging the disruptive potential of blockchain technology, bringing material savings to both consumers and institutions |
| ✅ Deep collective experience in distressed investing and rehabilitating businesses | ✅ Deep financial services, blockchain, regulatory and technology domain expertise |
| ✅ Significant experience in bitcoin mining through historical involvement with TeraWulf and Marathon (hosted for MARA) | ✅ Powered by the Provenance Blockchain |
| ✅ Focused on financing the infrastructure for digital assets, including mining data centers, lending, custody and trading operations | ✅ SEC-registered trading platform paired with lending licenses in 49 states |

# Overview of NovaWulf & Figure (*cont'd*)

NewCo will be managed by experienced and pedigreed investors & operators

## NovaWulf



**Jason New**
*Co-Founder &
Managing Partner*

- Previously CEO of Onex Credit
- Before Onex, spent 15 years at Blackstone where he was Co-Head of Distressed and Special Situation Investing



**Nazar Khan**
*Co-Founder*

- COO, CTO and Co-Founder of TeraWulf; previously served as Executive Vice President of Beowulf Energy for nearly 20 years
- Lead developer of over 400 MW of mining datacenters; initial operating partner of Marathon Digital

**Michael Abbate**
*Co-Founder &
Managing Partner*

- Spent 17 years at King Street Capital Management as a Partner
- Sat on King Street's US Investment, Risk and Brokerage committees and oversaw US trading operations



**Paul Prager**
*Co-Founder*

- Chairman, CEO and Co-Founder of TeraWulf[1]
- Founder and CEO of Beowulf Energy since 1987

## FIGURE



**Mike Cagney**
*Co-Founder & CEO*

- Co-founded and served as CEO of SoFi until 2017
- Co-founded Cabezon Investment Group, a global macro hedge fund



**June Ou**
*Co-Founder & President*

- Previously served as CTO of SoFi until 2017
- Served as CEO and Founder of CCO Solutions and VP of Engineering at Finaplex

*Plan combines leaders in traditional finance & blockchain technology*

(1)    Appropriate protocols to be established with respect to information and other issues with TeraWulf and its principals.

KIRKLAND & ELLIS LLP    ALVAREZ & MARSAL    CENTERVIEW PARTNERS    9

# Operational and Technological Partnerships

NovaWulf's partnerships with Figure / Provenance Blockchain and a federally licensed custodian provide end-to-end blockchain-based, fully <u>regulated</u> solutions for issuing, trading and custodying tokenized securities



### FIGURE

- Pioneer in developing blockchain technology
- Holistic suite of blockchain solutions for NewCo including **digital wallets, secondary trading, KYC and fiat on / off ramp**
- Unmatched lending capabilities with technology and licenses to **support NewCo's retail loan portfolio**

### PROVENANCE *Blockchain*

- Public, open-source and proof-of-stake blockchain utilized by Figure's SEC-registered ATS
- Instantaneous settlement with lower trading costs than peers
- **EST and MST tokens will trade on the Provenance Blockchain**

### Federally Licensed Custodian

- OCC-chartered crypto bank
- Offers unique combination of secure custody and regulatory compliance
- **All applicable NewCo assets will be custodied here**

# Celsius Mining Under NewCo

**$50mm specifically reserved to capitalize the mining operations under NewCo for the benefit of EST holders**
  – NovaWulf has significant industry experience in bitcoin mining through its historical experience with TeraWulf and Marathon

---

### *NewCo's Vision for Celsius Mining*

✅ Capitalize the business with $50mm reserved for investments and other growth opportunities

✅ Grow into vertically integrated business within NewCo with over 120k rigs

  – Operating results will be publicly disclosed, broken out from other NewCo business lines and assets

✅ Led by dedicated management team with significant industry expertise

✅ Excess BTC to be distributed to creditors via dividends on ESTs

✅ NewCo will expand mining management team to support growth of operations over time

✅ Leverage energy expertise and mining equipment to optimize profitability

✅ Opportunities for strategic consolidation

KIRKLAND & ELLIS LLP    ALVAREZ & MARSAL    CENTERVIEW PARTNERS    11

# Strong Governance and Oversight

Majority of NewCo board will be appointed by the UCC, with incentives aligned to drive EST value
- NovaWulf will receive a preferred equity instrument that pays a dividend initially calculated based on the net asset value of NewCo. The calculation of that dividend will transition to being based on the trading price of the EST by year 4

 NewCo will be entirely owned by the Earn creditors through Equity Share Tokens

 Holders entitled to voting rights typical of most public companies

 NewCo will publicly file financial statements, annual reports (10Qs and 10Ks) and comply with other SEC reporting requirements, providing significant transparency on performance and operations

 NewCo will be overseen by a Board comprised of 7 members with no prior Celsius involvement:

- Two directors appointed by NovaWulf

- Two directors appointed by the UCC

- Three independent directors appointed by the UCC and consented to by NovaWulf; consent not to be unreasonably withheld

 The Board will control investment policy, dividend policy, issuance of new tokens, and other major strategic and operational decisions

# Retail Borrower Proposed Settlement

Retail borrowers will be able to select one of the following two treatments
— Retail borrowers with loan balances below or equal to $5,000 will receive Treatment B

## Treatment A

- Retail borrowers that vote to **accept** the plan and agree to have their loan settled under the following terms, will have an amount equal to their prior loan obligation plus 85% of their remaining collateral for their former loan returned upon repayment of their structured settlement at maturity
  - Maturity: 5 years
  - Collateral: All existing collateral swapped into ETH during term of loan
  - Prepayment: None
  - Max Loan-to-Value: 80%
    - Any loans in excess of 80% will be required to contribute additional collateral
  - Interest: Sliding scale, ranging from 7.5% - 12.5% per annum, based on the LTV of the loan with ability to add more collateral to receive lower interest
  - Interest may be paid by reducing collateral instead of being paid in cash, subject to a fee
- At maturity, borrowers will receive collateral in the form it was deposited[1]
  - Borrower bears all basis risk due to conversion of collateral to ETH

## Treatment B

- Retail loan balances as of the Petition Date will be set off against existing collateral based on the value as of the Petition Date

- Claims for return of excess collateral above the principal balance of the loan will receive the same treatment as Earn claims of similar size

### Treatment B: Illustrative Example

| | |
|---|---:|
| Market Value of Collateral on Petition Date | $125 |
| (Less): Loan Balance | (50) |
| **Claim for Excess Collateral Value** | **$75** |

*Borrower will receive $75 Earn Claim treatment under the plan and have no further loan obligations*

(1)    Excludes CEL and FTT tokens.

# Custody Holder Proposed Settlement

The Debtors, the UCC and the Ad Hoc Group of Custodial Account Holders have reached an agreement in principle on a settlement that would resolve the outstanding preference litigation and the pending "Phase II" litigation with custody holders

- Each custody account holder will have the option to settle all preference actions with respect to the applicable custody claim pursuant to a settlement motion and the plan

- Settling custody holders will receive cryptocurrency equal to 36.25% of their allowed custody claim following approval of the settlement motion, and will receive cryptocurrency equal to an additional 36.25% of their allowed custody claim following the effective date of the plan

  - Custody holders who do not settle as part of the initial motion, but elect to settle under the plan will receive the total recovery of 72.5% under the plan

  - All other claims of settling custody holders against the Debtors will be released

- Custody holders who do not elect to settle will retain their right to seek full payment of their custody claims, and the Debtors (or their successor) will retain the estate's rights to pursue preference actions against such custody holders

- Existing "Phase II" litigation with custody holders to be subject to a standstill pending approval of the plan

- Settlement does not affect existing withdrawal order permitting withdrawals of "pure custody" and transferred custody below $7,575 threshold

KIRKLAND & ELLIS LLP    ALVAREZ & MARSAL    CENTERVIEW PARTNERS    14

# Litigation Trust Overview

- On February 13, 2023, the Committee entered into a stipulation with the Debtors which provided that all claims against Alex Mashinsky, Daniel Leon, and certain other entities, set forth in the proposed Complaint filed by the Committee, would be contributed to a litigation vehicle

- The Debtors and the Committee will agree on additional claims and causes of action to be contributed to the litigation vehicle, including claims against third parties. Any disagreement as to the claims to be contributed will be resolved by the Court

- The litigation vehicle will be adequately funded to pursue the claims and causes of action for the benefit of General Earn Creditors

- The litigation vehicle will be administered by a litigation administrator overseen by an oversight board of creditors (the **"Litigation Oversight Board"**), which will be selected by the Committee through an open interview process

- Any amounts recovered on account of the claims contributed to the litigation vehicle will be distributed to General Earn Creditors

# Treatment of Potential Avoidance Actions

- The Debtors will release preference claims against any customers who were not insiders and are not otherwise subject to claims by the Debtors' estates for mismanagement or breaches of duty who (a) withdrew assets from the Debtors' platform totaling under $100,000 in the aggregate, valued as of the time of such withdrawals, in the 90 days prior to the Petition Date, and (b) vote in favor of the plan.

- The Debtors will provide any customers who were not insiders and are not otherwise subject to claims by the Debtors' estates for mismanagement or breaches of duty, or actual fraudulent transfers who withdrew assets from the Debtors' platform totaling between $100,000 and $250,000 in the aggregate, valued as of the time of the such withdrawals, with the opportunity to elect to settle any avoidance action with respect to such withdrawals in exchange for a cash payment equal to 27.5% of the aggregate value of such withdrawals. Any such settlement payments shall be redistributed directly to General Earn Creditors.

- All other avoidance actions (including preference claims) will be transferred to the litigation vehicle.

- A three member subcommittee of the Litigation Oversight Board will be selected to oversee the settlement and prosecution of avoidance actions against non-insiders (the "**Avoidance Action Subcommittee**"). At least two members of the Avoidance Action Subcommittee shall not be UCC members. The Avoidance Action Subcommittee shall confer with the Litigation Administrator with respect to, and oversee the potential prosecution or settlement of, at least any avoidance action against any such individual account holder for a prepetition transfer of less than $1 million, valued at the date of the applicable transfer.

- The Plan shall include an alternative dispute resolution procedure ("**ADR Procedure**") to provide a timely, efficient and cost-effective manner to resolve claims, including avoidance actions. The ADR Procedure shall include (1) an information request, (2) a settlement offer and acceptance procedure with specific time limits, (3) voluntary mediation, and (4) voluntary binding arbitration.

# Proposed Timeline

