Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) ) ) | Case No. 22-10964 (MG) |
| Debtors. | ) ) ) | (Jointly Administered) |

**DECLARATION OF MARC D. PUNTUS**
**IN SUPPORT OF THE DEBTORS' MOTION**
**FOR ENTRY OF AN ORDER (I) AUTHORIZING**
**AND APPROVING CERTAIN BID PROTECTIONS FOR THE**
**PROPOSED PLAN SPONSOR AND (II) GRANTING RELATED RELIEF**

I, Marc D. Puntus, hereby declare under penalty of perjury that the following is true and

correct to the best of my knowledge, information, and belief:

1.      I am a Partner and Co-Head of the Debt Advisory and Restructuring Practice of

Centerview Partners LLC ("Centerview"), a full-service independent investment banking firm

with its principal offices at 31 West 52nd Street, New York, New York 10019.  Centerview has

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

been engaged as the investment banker for the debtors and the debtors in possession (collectively,

the "Debtors") in the above-captioned chapter 11 cases, which appointment was approved pursuant

to the *Order (I) Authorizing the Employment and Retention of Centerview Partners LLC As*

*Investment Banker for the Debtors Effective as of July 13. 2022, (II) Approving the Terms of the*

*Centerview Agreement, (III) Waiving Certain Reporting Requirements Pursuant to Local Rule*

*2016-2, and (IV) Granting Related Relief* [Docket No. 846].

2.      I submit this declaration (this "Declaration") in support of the relief requested in

the *Debtors' Motion For Entry of An Order (I) Authorizing and Approving Certain Bid Protections*

*For the Proposed Plan Sponsor and (II) Granting Related Relief* [Docket No. 2151]

(the "Motion")[2] and to inform the Court and other parties in interest as to the factual background

surrounding the Bid Protections.

3.      Unless otherwise indicated, all facts set forth in this Declaration are based upon

(a) my oversight of the Centerview team running the sale process, (b) information learned from

my review of relevant documents, (c) information I received from members of the Debtors'

management, and/or (d) my past experience advising both distressed and non-distressed businesses

and companies and their stakeholders.  I am not being specifically compensated for this testimony

other than through payments that are proposed to be received by Centerview as a professional

retained by the Debtors.  If I were called upon to testify, I could and would competently testify to

the facts set forth herein on that basis.

## Qualifications

4.      I am a Partner and Co-Head of the Debt Advisory and Restructuring Practice of

Centerview.  Centerview is a full-service independent investment banking firm providing financial

---

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion,
Plan Sponsor Agreement, or Plan Term Sheet, as applicable.

advisory services, including mergers and acquisitions and restructuring advice, across a broad range of industries. Centerview and its senior professionals have extensive experience in the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 proceedings.

5.      Prior to and since joining Centerview in 2011, I have advised companies in numerous in-court and out-of-court restructurings, recapitalizations, and reorganizations, and I have experience in structuring, negotiating and executing sale transactions, including under section 363 of the Bankruptcy Code and pursuant to chapter 11 plans. Before joining Centerview, I was a Managing Director and founder of Miller Buckfire & Co., an investment bank that provided financial advisory services to constituents in a broad range of restructuring and corporate transactions. Prior to that, I was a member of the financial restructuring group of Dresdner Kleinwort Wasserstein ("DrKW"). Prior to joining DrKW, I was a Partner in the Business, Finance and Restructuring department of Weil, Gotshal & Manges LLP. I received my B.S.B.A. *magna cum laude* from Georgetown University and my J.D. *cum laude* from Boston University School of Law.

6.      Centerview was engaged by the Debtors in June 2022 to serve as their investment banker to evaluate various strategic alternatives to maximize recovery for the Debtors' stakeholders. In September 2022, at the direction of the Debtors, Centerview commenced a marketing process designed to identify potential parties that might be interested in purchasing the Debtors' retail platform, mining business, cryptocurrency and related assets, loan portfolio, and/or other assets pursuant to section 363 of the Bankruptcy Code or under a chapter 11 plan. I have been involved as a senior member of the Centerview team throughout our engagement, including in the process to solicit proposals for the Debtors' assets and businesses.

**The Marketing Process**

7.      From the start of the Debtors' chapter 11 cases, the Debtors and their advisors have diligently worked to identify a sale and restructuring transaction that maximizes the value of their liquid and illiquid assets and businesses for the benefit of their account holders.  To that end, the Debtors, in close consultation with the official committee of unsecured creditors (the "Committee") and its advisors, have pursued a dual-track process of marketing the Debtors' retail platform, mining business, and other assets, while the Debtors and their advisors developed a plan for a standalone operating business upon emergence (the "Standalone Plan").

8.      As part of this dual-track process, beginning in September 2022, the Debtors and Centerview commenced a sale and marketing process designed to identify parties they believed might be interested in consummating a sale transaction.  The Debtors and Centerview, in consultation with the Committee and its advisors, developed a list of over 130 parties, including strategic parties, private equity firms, companies in the cryptocurrency ecosystem, scaled fintech companies, and traditional financial institutions.  As part of that process, the Debtors executed over 40 confidentiality agreements with prospective bidders.  Such parties were granted access to a virtual data room populated with diligence materials to facilitate their evaluation and assessment of the Debtors' assets.  Parties that expressed interest were also afforded the opportunity to discuss the Debtors' business, assets, and technology with the Debtors' management team.

9.      Pursuant to this process, the Debtors received six non-binding bids for the Debtors' retail platform and/or cryptocurrency-related assets and other certain assets residing on the Debtors' platform, three non-binding bids for the Debtors' mining business, and several bids for discrete individual assets.  The Debtors and the Committee, together with their respective advisors, engaged with certain of these bidders in order to diligence the bids and bidders, increase

4

competitive tension and identify the bid that provides the value-maximizing solution for the Debtors' assets.

10.    The Debtors and Centerview have made every effort to facilitate diligence for bidders.   Where appropriate and practicable, the Debtors and Centerview endeavored to supplement the virtual data room in response to bidder diligence requests and have hosted virtual and in-person diligence sessions with the Debtors' management team.   In addition, my team has frequently communicated with potential bidders.   In these communications, my team and I have encouraged potential bidders to improve the competitiveness, value, and structure of their bids, with the goal of maximizing value and minimizing execution risk.

11.    The Debtors, with assistance from Centerview and the Debtors' other advisors, and in direct and constant consultation with the Committee and its advisors, thoroughly examined all bids in parallel with a thorough examination and vetting of the Standalone Plan.   Ultimately, after careful consideration, the Debtors and the Committee identified NovaWulf Digital Management, LP ("NovaWulf" or the "Plan Sponsor") as the potential purchaser and plan sponsor in restructuring transactions that will (a) provide for the distribution of a significant majority of the Debtors' liquid cryptocurrency to account holders on the effective date of the Debtors' chapter 11 plan of reorganization to be proposed by the Debtors (the "Plan"), and (b) create a new entity or entities ("NewCo") that will operate and/or manage the Debtors' illiquid assets (including the mining business, retail and institutional loan portfolios, staked cryptocurrency, and other alternative investments), and distribute that value to Earn creditors in the form of equity in NewCo, which creditors will receive 100% of the "common" equity of NewCo.   Beyond serving as a vehicle to store and, over time, monetize the Debtors' illiquid assets, NewCo will be a public and fully regulatory compliant company that will operate and expand into a variety of cryptocurrency

related businesses, including, among others, staking, mining, lending, and other potential future opportunities for the purpose of delivering value to its creditor shareholders. NewCo will be predicated on transparency, governed by a board of its creditor shareholders all as further detailed in the Plan Term Sheet (as defined herein). The NewCo structure is—and was expressly designed to—deliver value to the Debtors' account holders over time as the cryptocurrency market continues to improve.

12.     The Debtors, in direct consultation with the Committee, weighed a myriad of factors in determining that NovaWulf's proposal will maximize the value of the Debtors' estates, including, most prominently, that NovaWulf's proposal is centered around the distribution of the Debtors' illiquid assets over time, the value that the Restructuring Transactions will provide account holders, the timeline on which the Restructuring Transactions may be consummated, and the likelihood that the Restructuring Transactions would pass regulatory scrutiny.

13.     Importantly, none of the other bids received for the Debtors' mining business were cash bids. All such bids were non-binding, contingent on raising financing, and structured as non-cash acquisitions or mergers, with the Debtors proposed to be left with a significantly diluted equity stake in the combined mining company on a go-forward basis. With respect to retail platform and related bids, all such bids contemplated variations of a liquidation plan, with zero or minimal proposed "platform" consideration to be paid by the bidders. For these reasons, the Debtors and the Committee believe that a transaction with NovaWulf will maximize the value of the Debtors' assets and business operations and is the best path forward to successfully conclude these chapter 11 cases.

14.     The Debtors and their advisors have extensively negotiated the terms of the proposed Plan Sponsor Agreement and Plan Term Sheet. The Debtors, the Committee, NovaWulf,

and their respective advisors, undertook immense efforts over the past months improving upon the proposed transaction, including hard-fought, arms'-length negotiations and substantive analyses of complex issues. As a result of these extensive negotiations, on March 1, 2023, the Debtors, the Plan Sponsor, and the Committee entered into a binding plan sponsor agreement (the "Plan Sponsor Agreement") which sets forth the terms of the proposed transaction (as defined in the Plan Sponsor Agreement, the "Restructuring Transactions"). The Plan Sponsor Agreement and the Plan Term Sheet set forth the commitments and obligations of the parties with respect to the Restructuring Transactions, and milestones for the disclosure, solicitation, and Plan confirmation processes and the consummation the Restructuring Transactions. The Restructuring Transactions, formulated in a uniquely challenging environment for cryptocurrency and crypto-related businesses, with significant government and regulatory scrutiny and oversight, is a major achievement and the result of the extensive efforts expended by all parties. Undoubtedly, there is much more work to do between now and confirmation.

15.     Over the course of the last several weeks, the Debtors, the Committee, and NovaWulf have engaged in extensive hard-fought and arms'-length negotiations regarding the terms of the proposed sale and plan transaction, including: a proposed Plan distribution structure; maximizing liquid cryptocurrency distributions for creditors; the management and monetization of the Debtors' illiquid assets, over time, through NewCo; the development of NewCo's operating model; addressing regulatory and related requirements; and the treatment of the Debtors' borrow program. To that end, the parties have held countless meetings, including in-person meetings with the Debtors' management team, the Committee's principals, telephone and video conferences, exchanged numerous proposals, and engaged extensively with other parties in interest, including regulatory authorities and the *ad hoc* group of retail borrowers. NovaWulf has expended extensive

time, efforts, and financial resources conducting due diligence of the Debtors' business, structuring the Restructuring Transactions, and negotiating the Plan Sponsor Agreement and related documents, and NovaWulf, undoubtedly, will continue to expend substantial time and resources to negotiate and draft the definitive documentation with respect to the Restructuring Transactions. As part of this process, Centerview has been in constant communication with the Debtors, the Debtors' other advisors, the Committee and its advisors, and NovaWulf and its advisors.

16.     While the Plan Sponsor Agreement represents a critical step in the Debtors' sale and restructuring process, it is not the final step.  Although the Debtors and Committee have entered into the Plan Sponsor Agreement and believe that the Novawulf transaction represents the best option presently available to maximize the value of the Debtors' assets, the Debtors and the Committee will continue to seek offers from other bidders between now and April 17, 2023.  The Plan Sponsor Agreement does not prohibit continued engagement with potential bidders.  In fact, the Plan Sponsor Agreement includes a broad "fiduciary out" provision that allows the Debtors or the Committee, consistent with their fiduciary duties, to terminate the Plan Sponsor Agreement to the extent the Debtors and/or the Committee identify an alternative proposal that is superior to the proposed NovaWulf transaction.  Therefore, the Restructuring Transactions provide a framework against which other parties can bid.

17.     The Plan Sponsor Agreement contemplates the formation of NewCo, which will have no affiliation with the Debtors or their founders, and will be a regulated entity with financial reporting obligations consistent with public-company best practices.  Pursuant to the Restructuring Transactions, NewCo will harvest and distribute the value of the Debtors' substantial illiquid assets over time—including the Debtors' mining operations, retail and institutional loans, staked cryptocurrency, and other investments—for the benefit of the Debtors' Earn creditors, who will

receive 100% of the tokenized equity in the public company upon emergence.  Importantly, under the Restructuring Transactions, NovaWulf proposes not only to manage NewCo pursuant to the terms of the Plan Sponsor Agreement but to assist the Debtors in distributing a significant majority of the Debtors liquid cryptocurrency on the effective date of the Plan (less certain holdbacks to facilitate NewCo's efforts to maximize the value of the Debtors' illiquid assets).  Additionally, account holders may elect to receive incremental liquid cryptocurrency in lieu of tokenized NewCo equity pursuant to an exchange mechanic that will be built into the Plan.  Critically, NovaWulf has developed partnerships with service providers that have the required licenses to operate NewCo and distribute the Debtors' liquid and illiquid assets to account holders under the Plan in compliance with all regulatory requirements.  As discussed in the Plan Term Sheet, NewCo intends to operate and expand, over time, into a variety of cryptocurrency-related lines of business for the purpose of delivering value to the Debtors' account holders.  The Restructuring Transactions also includes a commitment by NovaWulf to invest $45 million in cash in NewCo to facilitate recoveries for the Debtors' creditors.

18.    Based on my involvement in the sale and marketing process and in the negotiations conducted by the Debtors, the Plan Sponsor, the Committee, and their respective advisors, I believe that the proposed sale and restructuring transaction is the best path forward to maximize the value of the Debtors' estates for the benefit all account holders.  The Debtors and the Committee, in consultation with their respective advisors, decided to proceed with the NovaWulf proposal after thoroughly evaluating liquidation-style platform bids received, the structured and highly contingent mining bids received, and the significant challenges associated with proceeding with the Standalone Plan.  In my years of experience, I have seen few other proposed transactions that demonstrate the level of effort, creativity, and ingenuity deployed by the Debtors, the Committee,

and NovaWulf in architecting the proposed sale and restructuring transaction.  I believe that the

proposed sale and restructuring transaction will provide solutions to the multitude of unique and

challenging problems that have arisen in these chapter 11 cases.

### The Bid Protections

19.    In consideration for the substantial time, effort, and  respires that the Plan Sponsor

has expended, and will continue to expend, in and structuring a proposal and negotiating the terms

of the transaction embodied in the Plan Term Sheet, the Debtors agreed, as part of the Plan Sponsor

Agreement, to provide the Plan Sponsor with certain Bid Protections.  As further detailed below,

the Bid Protections consist of (a) a $5 million break-up fee (the "Break-Up Fee"), and (b) the

reimbursement of all reasonable and documented fees and expenses incurred by the Plan Sponsor

and its advisors in connection with the Restructuring Transaction up to a maximum of $15 million

(the "Expense Reimbursement"), each of which are payable only in the limited circumstances set

forth in the Plan Sponsor Agreement. Specifically, the Plan Sponsor Agreement provides the Plan

Sponsor with the following Bid Protections:

- **Expense Reimbursement**:  Pursuant to the Bid Protections Order, the Debtors shall promptly pay or reimburse, as and when required under the Plan Sponsor Agreement, the Plan Term Sheet, or the Plan, all reasonable and documented out-of-pocket fees (including success fees, transaction fees, or similar fees) and expenses of: (i) the Plan Sponsor; (ii) Paul, Weiss, Rifkind, Wharton & Garrison, LLP, as counsel to the Plan Sponsor ("Plan Sponsor Counsel"); and (iii) any other accountants and other professionals, advisors and consultants retained by the Plan Sponsor with the prior written consent of the Debtors (which shall not be unreasonably withheld), in each case, to implement the Restructuring Transactions (together with Plan Sponsor Counsel, the "Plan Sponsor Advisors"), regardless of when such fees are or were incurred (collectively, the "Fees").  The Fees shall be payable by the Debtors as administrative expenses promptly upon the written request of the applicable Plan Sponsor Advisor without any requirement to (a) file retention or fee applications, (b) provide notice to any person other than the Debtors and the Committee, or (c) provide itemized time detail to the Debtors or any other Person; *provided* that the Plan Sponsor Advisor will provide additional detail as reasonably requested

by the Debtors; *provided further*, that the aggregate amount of Fees to be paid under this Section 13.01 shall not exceed $15,000,000 in the aggregate; *provided, further*, that the foregoing shall in no way limit the ability of NewCo to reimburse the Fees under the terms of the Management Agreement up to $15 million.

- **Break-Up Fee**:  In the event that the Plan Sponsor Agreement is terminated by the Debtors solely pursuant to Section 12.02(b) and the Debtors consummate an Alternative Transaction (other than in connection with the Wind-Down Procedures), to the extent due and owing pursuant to the Bid Protections Order, in addition to any Fees owed pursuant to Section 13.01, the Debtors shall pay the Plan Sponsor an amount equal to $5,000,000, which shall be an administrative expense of the Debtors and shall be paid from the proceeds of such Alternative Transaction.

20.    As I understand it, the Break-Up Fee will be payable only in the limited circumstances where the Debtors or the Committee terminate the Plan Sponsor Agreement pursuant to their "fiduciary out" (*i.e.*, the Break-Up Fee would be paid if the Debtors or the Committee determine that proceeding with the transaction contemplated by the Plan Sponsor Agreement would be inconsistent with the Debtors' fiduciary duties or applicable law and the Debtors determine to pursue an alternative "higher or better" restructuring transaction in accordance with their fiduciary duties) *or* the Debtors are in material breach of the Plan Sponsor Agreement.  In the event that the Debtors, the Committee, and their respective advisors determine that an Orderly Wind Down (as defined in the Plan Term Sheet) is in the best interests of the Debtors' estates due to complications, impediments, or delays in implementing the Plan Sponsor Agreement, the Debtors and the Committee may move for an Orderly Wind Down at any time by providing written notice to the Plan Sponsor and after notice and hearing before the Court.  In the event of an Orderly Wind Down, only the Expense Reimbursement, and *not* the Break-Up Fee, will be payable to NovaWulf.

21.    Based on my experience and the terms of the Bid Protections, I believe that the proposed Bid Protections are in the best interests of the Debtors and their estates, and are

11

reasonable and appropriate relative to the complexity, size, and nature of the proposed transaction. In my experience, bid protections and break-up fees serve as necessary economic incentives to compensate a plan sponsor or stalking horse bidder for the risks taken in pursuing a transaction and the risk that a debtor will pivot to an alternative transaction, including a transaction consistent with a debtor's fiduciary duties.  Absent the Bid Protections, I believe that a sale or auction process that requires the level of in-depth negotiations, diligence, and discussions as that required here would be challenging.  Moreover, a debtor's capacity to effectively shop a stalking horse bid is predicated on the value created by the stalking horse and the debtor's capacity to take action consistent with their fiduciary duties.

22.     The Plan Sponsor Agreement and Plan Term Sheet propose a unique and novel transaction that addresses the complex business, legal, and other issues raised by the Debtors' chapter 11 cases.  The transactions contemplated thereunder are bespoke and highly structured. The Plan Sponsor and its advisors have spent thousands of hours of time and have expended a significant amount of money on legal fees and other expenses in formulating and negotiating the Restructuring Transactions.  NovaWulf has worked tirelessly to improve the terms of their proposed bid, exchanging draft documentation, holding numerous meetings, including in-person meetings, and conducting extensive diligence on the Debtors' business, assets, and regulatory hurdles.  Importantly, NovaWulf has continued to engage with its partners to ensure the regulatory compliance of the Restructuring Transactions.  Moreover, NovaWulf is incurring expenses on behalf of NewCo (*e.g.*, expenses incurred establishing payroll and other infrastructure, in connection with the formation and organization of NewCo and any of its subsidiaries, filing various corporate documents on behalf of NewCo, transferring assets to NewCo, and addressing regulatory matters) that NewCo would bear in any transaction structure.  believe that such

12

contributions will likely provide considerable benefits to the Debtors' estates even in the event the Debtors pursue an alternative transaction due to the fact that such an alternative transaction would undoubtedly capture the value of the investments and progress made in establishing and structuring NewCo. Based upon the foregoing, I believe that the Bid Protections are necessary and appropriate to compensate the Plan Sponsor for the risk it is taking in pursuing the Restructuring Transactions, the risk that the Debtors pivot to an alternative transaction, and to properly incentivize the Plan Sponsor to continue working on the Restructuring Transactions. Absent the Bid Protections, it is my understanding that the Plan Sponsor would be unwilling to enter into the Plan Sponsor Agreement and Plan Sponsor Term Sheet—transactions the Debtors and the Committee have determined to be value maximizing for the Debtors' estates and their creditors.

23.     I believe that the Bid Protections reflect and compensate the Plan Sponsor for the magnitude of their efforts and the risk that the Debtors pivot to an alternative transaction. To the extent another bidder proposes a transaction that presents "higher or better" value to the Debtors, the Debtors have the broad flexibility to consider and, if appropriate, pivot to that transaction in an exercise of their fiduciary duties. Given the level of diligence and negotiations involved in the proposed sale and restructuring transaction, the uniquely challenging environment for cryptocurrency and cryptocurrency-related businesses, and the risk that the value of the Plan Sponsor's efforts inure to an alternative purchaser and/or plan sponsor, I believe the Bid Protections are necessary and appropriate.

24.     Based upon the foregoing, I believe that the proposed Bid Protections are in the best interests of the Debtors, their estates, creditors, and other parties in interest and should be approved in all respects.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge, information, and belief.

Dated:  March 1, 2023

/s/ Marc D. Puntus
_____
Name:   Marc D. Puntus
Title:    Partner and Co-Head of the Debt
Advisory and Restructuring Practice
Centerview Partners LLC