Michael S. Etkin, Esq
Phillip Khezri, Esq.
**LOWENSTEIN SANDLER LLP**
1251 Avenue of the Americas
17th Floor
New York, New York 10020
Telephone: (212) 262-6700
Facsimile: (212) 262-7402
Email: metkin@lowenstein.com

Andrew Behlmann, Esq.
**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, New Jersey 07068
Telephone: (973) 597-2500
Facsimile: (973) 597-2333

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                        :

In re                        :        Chapter 11
                        :

CELSIUS NETWORK LLC, et al.,[1]  :        Case No. 22-10964 (MG)
                        :

        Debtors.        :        (Jointly Administered)
                        :

---------------------------------------------------------------x

## PROPOSED SECURITIES LEAD PLAINTIFFS' LIMITED OBJECTION TO MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO APPROVE JOINT STIPULATION AND AGREED ORDER BETWEEN THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND THE DEBTORS WITH RESPECT TO CERTAIN CLAIMS AND CAUSES OF ACTION BELONGING TO THE DEBTORS' ESTATES

The proposed lead plaintiffs ("Proposed Lead Plaintiffs")[2] in the federal securities law

class action captioned as *Taylor Goines, Individually and on Behalf of Itself and All Others*

*Similarly Situated v. Celsius Network, LLC, Celsius Lending, LLC, Celsius KeyFi LLC,*

*Alexander Mashinsky, Shlomi "Daniel" Leon, David Barse, And Alan Jeffrey Carr,* Case No.

2:22-cv-04560-KM-ESK (the "Securities Litigation"), pending in the United States District

Court for the District of New Jersey, on behalf of themselves and the putative class they seek to

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

[2] The Proposed Lead Plaintiffs are Zack Kaplan, Michael Kaplan, Eli Kaplan, Ben Kaplan and Michael Mazzotta.

represent in the Securities Litigation (the "Proposed Class"), hereby submit this limited objection (the "Objection") to the *Motion of the Official Committee of Unsecured Creditors to Approve Joint Stipulation and Agreed Order Between the Official Committee of Unsecured Creditors and the Debtors with Respect to Certain Claims and Causes of Action Belonging to the Debtors' Estates* (the "Motion") [Docket No. 2054], pursuant to which the Debtors and Official Committee of Unsecured Creditors (the "Committee") seek authority to enter into, and approval of, a certain stipulation regarding certain claims and causes of action belonging to the Debtors' estates (the "Stipulation"). In support of this Objection, the Proposed Lead Plaintiffs respectfully state as follows:

## **RELEVANT BACKGROUND**

### A.     **The Securities Litigation**

1.     The Securities Litigation is a federal securities class action filed on July 13, 2022 against Celsius Network, LLC, Celsius Lending, LLC, Celsius Keyfi LLC, Alexander Mashinsky, Shlomi "Daniel" Leon, David Barse, and Alan Jeffrey Carr (collectively, the "Defendants"). By motion dated September 13, 2022 [Securities Litigation Docket No. 16], the Proposed Lead Plaintiffs sought appointment as lead plaintiffs and Scott+Scott Attorneys at Law LLP ("Scott+Scott") and Radice Law Firm ("Radice") as Lead and Liaison Counsel, respectively, in the Securities Litigation. That motion remains pending.

2.     The complaint filed in the Securities Litigation (the "Complaint") asserts claims on behalf of the Proposed Class (the "Class Action Claims"), comprised of all persons, other than the Defendants, who purchased Celsius financial products by way of a Celsius Earn

Rewards Account, CEL tokens and/or Celsius loans (collectively referred to as the "Celsius Financial Products") from February 9, 2018 to the July 13. 2022.[3]

3.      The Complaint generally alleges that the Defendants violated sections 5 and 12(a)(1) of the Securities Act of 1933 (the "Securities Act"); Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78j(b), and Rule 10b-5(b) promulgated thereunder, 17 C.F.R. §240.10b-5(b); Section 20(a) of the Securities Act; and Section 15 of the Securities Act.

**B.      Relevant Bankruptcy Proceedings**

4.      On July 13, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  As a result, the Securities Litigation is stayed as against the Debtors.

5.      On July 27, 2022, the Office of the United States Trustee appointed the Committee.

6.      On February 14, 2023, the Committee filed the Motion.

7.      In relevant part with respect to this Objection, the Stipulation provides:

Any plan of reorganization or liquidation proposed or supported by the Debtors shall include a "litigation trust" or other similar entity to which, except as otherwise agreed by the Debtors and the Committee, the Debtors or their successor shall transfer (1) the Complaint Claims and all other claims and causes of action against the prospective defendants identified therein and (2) any applicable director and officers insurance policies.

Stipulation at ¶ 3.

**OBJECTION**

8.      The Proposed Lead Plaintiffs do not object to the Motion or the Stipulation as a general matter.  However, to avoid any ambiguity arising from the general language where the Stipulation describes certain claims and insurance policies to be assigned to a litigation trust, the

---

[3] A copy of the Complaint is attached hereto as Exhibit A.

Stipulation must be modified to explicitly clarify that the Class Action Claims - which arose under federal securities law, are claims belonging to, and properly asserted directly by, the Proposed Lead Plaintiffs - are not property of the Debtors' estates, and are not among the claims to be transferred to the litigation trust (as they cannot be).  Because the Class Action Claims are not property of the Debtors' estates, the Debtors have no ability or standing to prosecute such claims, or to transfer such claims to a litigation trust or to anyone else.

9.    Additionally, any directors' and officers' liability insurance policies (the "D&O Policies") must remain unaffected by the Stipulation despite any assignment of claims to a litigation trust.

10.    The Motion does not include the insurance policies themselves and is silent as to whether the D&O Policies can, in fact and in law, be assigned to a litigation trust without impacting coverage thereunder.  Clearly, it is in no party's interest to jeopardize coverage under the D&O Policies with respect to either the Debtors' potential claims or the Class Action Claims.

11.    Moreover, to the extent any D&O Policies are transferred to any litigation trust or other post-confirmation vehicle in these cases, such transfer must be insurance-neutral, leaving all provisions of, and coverage under, such policies unaltered.  In other words, the Stipulation cannot have the effect of limiting any coverage provided under the D&O Policies to those claims properly assigned to a litigation trust.

12.    To address the issues raised in this Limited Objection, the Proposed Lead Plaintiffs respectfully request that paragraph 3 of the Stipulation be modified to reflect the following revisions (additions in **bold**; collectively, the "Class Action Proposed Provisions"):

Any plan of reorganization or liquidation proposed or supported by the Debtors shall include a "litigation trust" or other similar entity to which, except as otherwise agreed by the Debtors and the Committee, the Debtors or their successor shall transfer (1) the Complaint Claims and all other claims and causes of action against the prospective defendants identified therein and (2)

4

**solely to the extent permitted by the terms of such policies and applicable law,** any applicable director and officers insurance policies ***provided*** **that any assignment of such insurance policies shall not alter or otherwise impact any terms, conditions, or coverage thereunder. For the avoidance of doubt, the claims now or hereafter asserted in the litigation captioned as *Taylor Goines, Individually and on Behalf of Itself and All Others Similarly Situated v. Celsius Network, LLC, Celsius Lending, LLC, Celsius KeyFi LLC, Alexander Mashinsky, Shlomi "Daniel" Leon, David Barse, and Alan Jeffrey Carr,* Case No. 2:22-cv-04560-KM-ESK (the "Securities Litigation"), pending in the United States District Court for the District of New Jersey are not property of the Debtors' estates and are not subject to the transfer pursuant to this paragraph 3**.

## <u>RESERVATION OF RIGHTS</u>

13.     In the event that any other party seeks approval of the Stipulation with modified terms, the Proposed Lead Plaintiffs (a) respectfully submit that any such modified Stipulation should not be approved unless the applicable order contains the Class Action Proposed Provisions and (b) reserve the right to object to approval of the Motion and/or the Stipulation on any other basis, whether or not asserted herein.

Dated: March 1, 2023

Respectfully submitted,

 */s/ Michael S. Etkin*
Michael S. Etkin, Esq.
Phillip Khezri, Esq.
**LOWENSTEIN SANDLER LLP**
1251 Avenue of the Americas, 17th Floor
New York, New York 10020
Telephone:     (212) 262-6700
Email:          metkin@lowenstein.com
Email:          pkhezri@lowenstein.com
-and-
Andrew Behlmann, Esq.
**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, New Jersey 07068
Telephone:     (973) 597-2500
Facsimile:      (973) 597-2333
Email:          abehlmann@lowenstein.com

*Bankruptcy Counsel to the Proposed Lead Plaintiffs and the Proposed Class*

# EXHIBIT A

**RADICE LAW FIRM**
John Radice (Bar No. 023612004)
475 Wall Street
Princeton, NJ 08540
Telephone: 646-245-8502
Facsimile:  609-385-0745
jradice@radicelawfirm.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Johnathan M. Zimmerman (Bar No. 204322016)
Sean T. Masson (*pro hac vice* forthcoming)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
jzimmerman@scott-scott.com
smasson@scott-scott.com

Attorneys for Plaintiffs

[Additional Counsel Appear on Signature Page.]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| TAYLOR GOINES, Individually and on Behalf of Itself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CELSIUS NETWORK, LLC, CELSIUS LENDING, LLC, CELSIUS KEYFI LLC, ALEXANDER MASHINSKY, SHLOMI "DANIEL" LEON, DAVID BARSE, and ALAN JEFFREY CARR,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Taylor Goines ("Plaintiff" and/or "Goines") brings this action on behalf of himself and all others similarly situated against Defendants Celsius Network LLC ("Celsius"), Celsius Lending LLC, Celsius KeyFi LLC (collectively, the "Celsius Entities") and the company executives Individual Defendants Alexander Mashinsky, Shlomi "Daniel" Leon, David Barse, and Alan Jeffrey Carr. Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

## NATURE OF THE ACTION

1.     This is a class action lawsuit on behalf of all people in the United States who purchased Celsius Financial Products by way of a Celsius Earn Rewards Account, the Company's so-called native "CEL Tokens," and/or the Celsius Loans (collectively referred to as the "Celsius Financial Products") from February 9, 2018 to the present (the "Relevant Period").

2.     Celsius is a financial services company that generates revenue through cryptocurrency trading, lending, and borrowing, the sale of its unregistered securities, as well as engaging in proprietary trading.

3.     In particular, Celsius has offered and sold Celsius Earn Rewards Accounts to investors, through which investors lend crypto assets to Celsius in exchange for Celsius' promise to provide a variable monthly interest payment. Celsius generated the interest paid out to Earn Rewards Account investors by deploying its assets in various ways, including loans of crypto assets made to institutional and corporate borrowers, lending U.S. dollars and stablecoins to retail investors, and by investing in other highly speculative cryptocurrency ventures. Celsius then pools these cryptocurrencies together to fund its lending operations and proprietary trading.

4.       Celsius investors are promised a better-than-market interest rate that is paid monthly in cryptocurrency in exchange for investing in the Earn Rewards Accounts.  The Earn Rewards Accounts are not protected by the Securities Investor Protection Corporation (the "SIPC") nor are they insured by the Federal Deposit Insurance Corporation (the "FDIC").  Furthermore, the Earn Rewards Accounts are not registered with the United States Securities and Exchange Commission ("SEC"), the New Jersey Commissioner of Corporations ("Commissioner"), or any other securities regulatory authority, or exempt from registration.  Despite the additional risk, and lack of safeguards and regulatory oversight, as of March 2021, Celsius held the equivalent of $10 billion from the sale of these unregistered securities in violation of federal and state securities laws, which peaked at over $25 billion later that year.

5.       Since February 9, 2018, Celsius, through its affiliates Celsius Lending LLC and Celsius KeyFi LLC, has been, at least in part, funding its lending operations and proprietary trading through the sale of unregistered securities in the form of Earn Rewards Accounts and CEL tokens, and through providing loans to investors that deposited CEL Tokens or other digital assets in exchange for a fiat cash loan (a "Celsius Loan").

6.       The Earn Rewards Accounts and Celsius Loans were securities under the securities test set forth in *Reves v. Ernst & Young*, 494 U.S. 56, 64-66 (1990) and its progeny.  Additionally, all of the Celsius Financial Products are investment contracts under the four-prong test set forth in *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946) and its progeny, including the cases discussed by the SEC in its Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO.[1]

---

[1]       Securities and Exchange Commission, Release No. 81207, *Report of Investigation Pursuant to Section(a) of the Securities Exchange Act of 1934: The DAO,* (Jul. 25, 2017).

7.     Worse still, throughout the Relevant Period, Defendants made a series of misleading statements that induced unsuspecting investors to purchase the Celsius Financial Products at inflated rates.

8.     In June 2022, the cryptocurrency market in general faced a downtrend, with the prices of digital assets decreasing across the board.  This broader market downturn exposed the fragility of the Celsius ecosystem and, more importantly, that Celsius did not have enough assets on hand to meet its withdrawal obligations.  Much like a literal Ponzi scheme, Celsius could only maintain its yield rate promises by continually bringing in new investors whose new influx of money would be used to pay off the yield for old investors.

9.     Because of Defendants' unregistered offers and sales of securities, the New Jersey Bureau of Securities, on or around July 20, 2021, issued a cease-and-desist order to Celsius requiring the Company to "halt[] the offer and sale of these unregistered securities."[2]

## PARTIES

*Plaintiffs*

10.     Plaintiff Taylor Goines ("Goines") is a citizen of the State of Arkansas and resides in Rogers, Arkansas.  Plaintiff Goines purchased the Celsius Financial Products during the Relevant Period and suffered investment losses as a result of Defendants' conduct.

*Defendants*

11.     Celsius Network, LLC ("Celsius") is a Delaware limited liability company, registered on June 14, 2021, with offices at 221 River Street, 9th Floor, Hoboken, New Jersey.  Celsius conducts its business on the internet, through a website accessible to the general public at

---

[2]     State of New Jersey Bureau of Securities, *Summary Cease and Desist Order, In the Matter of Celsius Network, LLC*, (Sep. 17, 2021).

https://www.celsius.network (the "Celsius Website"), which is also accessible through Celsius' own proprietary app via smartphone/tablet.

12.     Celsius Lending LLC is a Delaware limited liability company, registered on December 29, 2020, with offices at 221 River Street, 9th Floor, Hoboken, New Jersey. Celsius Lending LLC conducts its business on the internet, through a website accessible to the general public at https://www.celsius.network (the "Celsius Website"), which is also accessible through Celsius' own proprietary app via smartphone/tablet.

13.     Celsius and Celsius Lending LLC are collectively referred to as the "Company."

14.     Celsius KeyFi LLC is a Delaware limited liability company formed on May 28, 2019, with its headquarters located in Hoboken, New Jersey. Celsius KeyFi is a wholly owned subsidiary of Celsius.

15.     Defendant Alexander Mashinsky ("Mashinsky") is a resident and citizen of New York, living in New York, New York. Mashinsky is the founder and Chief Executive Officer of Celsius, and he exercised control over Celsius and directed and/or authorized, directly or indirectly, the sale and/or solicitation of Celsius Financial Products to the public.

16.     David Barse ("Barse") is a resident and citizen of New York, living in Harrison, New York. Barse served as an executive director of Celsius, and he exercised control over Celsius and directed and/or authorized, directly or indirectly, the sale and/or solicitation of Celsius Financial Products to the public.

17.     Alan Jeffrey Carr ("Carr") is a resident and citizen of New York, living in East Quogue, New York. Carr served as an executive director of Celsius, and he exercised control over Celsius and directed and/or authorized, directly or indirectly, the sale and/or solicitation of Celsius Financial Products to the public.

18.     Shlomi Daniel Leon ("Leon") is a resident and citizen of New York, living in New York, New York.  Leon was the co-founder of Celsius and served as an executive director and the Chief Operating Officer, and he exercised control over Celsius and directed and/or authorized, directly or indirectly, the sale and/or solicitation of Celsius Financial Products to the public.

19.     Defendants Mashinsky, Barse, Carr, and Leon are collectively referred to as the "Executive Defendants."

### JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over claims under the Securities Act pursuant to 15 U.S.C. §78aa and 28 U.S.C. §1331, and supplemental jurisdiction over the entire action under 28 U.S.C. §1367.

21.     Venue is proper under 28 U.S.C. §1391 because Defendants have their principal place of business in this District and therefore reside in this District.  Venue is further proper pursuant to 15 U.S.C. §78aa.

22.     This Court has personal jurisdiction over Defendants because they are subject to general jurisdiction in this District because Defendants' principal place of business is in this District.

### FACTUAL ALLEGATIONS

**A.     Celsius Background**

*There is no rules in this business.* – Alexander Mashinsky, CEO and Founder of Celsius

23.     Celsius began as Celsius Network Limited – a privately held company that was incorporated on February 9, 2018, with its registered office located at 77-79 New Cavendish Street, London, England and its headquarters at 35 Great St. Helen's, London, England, EC3A 6AP.

24.     On June 23, 2021, Celsius Network Limited announced that it was "migrating our main business activity and headquarters from the United Kingdom to the United States" and was withdrawing its "application from the UK Financial Conduct Authority's temporary registration regime for crypto assets."[3]  The Company stated that its "efforts will be focused on securing licenses and registrations in the US and other jurisdictions that will ensure the long-term viability of Celsius and its community."[4]

25.     In anticipation of this migration to the United States, Celsius formed a new corporate entity, Celsius Networks, LLC and opened its headquarters in Hoboken New Jersey.

26.     For its entire existence, Celsius was a financial services company, generating revenue through cryptocurrency trading, lending, and borrowing, as well as by engaging in propriety trading. Since June 2018, Celsius has been, at least in part, funding its lending operations and proprietary trading through the sale of unregistered securities in the form of cryptocurrency interest-earning accounts.  Celsius refers to these unregistered securities as its "Earn Rewards" account.

27.     Celsius solicits investors to invest in the Earn Rewards accounts by depositing certain eligible cryptocurrencies into the investors' accounts at Celsius.  Celsius then pools these cryptocurrencies together to fund its various income generating activities, including lending operations and proprietary trading.  In exchange for investing in the Earn Rewards product, investors are promised an attractive interest rate that is paid weekly in the same type of cryptocurrency as originally invested, or, subject to certain conditions, in Celsius' native digital token CEL.

---

[3]      https://blog.celsius.network/celsius-community-update-june-23-2021-a28fca899091  (last visited Jul. 12, 2022).

[4]      *Id.*

28.     The Celsius Earn Rewards Accounts, CEL Tokens, and the Celsius Loans are not registered with any state or federal securities regulatory authority, or are they otherwise exempt from registration.  Celsius' Earn Rewards accounts are not protected by the SIPC, insured by the FDIC, nor are they insured by the National Credit Union Administration ("NCUA").

29.     This lack of a protective scheme or regulatory oversight subject Celsius investors to additional risks not borne by investors who maintain assets with most SIPC member broker-dealers, banks and savings associations, or credit unions.

30.     Despite the lack of safeguards that SIPC, FDIC, and the NCUA would offer or the regulatory oversight of registration, Celsius held the equivalent of more than $14 billion from the sale of these unregistered securities in violation of the Securities Law as of August 18, 2021.

31.     On September 17, 2021, the New Jersey Bureau of Securities (the "Bureau") issued a Summary Cease and Desist Order against Celsius.  In this order, the Bureau made the following findings of fact: (1) the Earns Reward product was a security as defined in N.J. Stat. Ann. § 49:3-49(m) (West); (2) the "Earns Reward product had not been registered with the Bureau, is not exempt from registration, and is not federally covered"[5]; and (3) that Celsius had offered and sold unregistered securities in violation of N.J. Stat. Ann. § 49:3-60 (West) and continues to do so.

32.     In conclusion, the Bureau, pursuant to Uniform Securities Law (1997), N.J. Stat. Ann. § 49:3-47 to -89 (West), ordered Celsius to cease and desist from (1) offering for sale any security, including any Earn Rewards product, to or from New Jersey without first registering the security with the Bureau or qualifying for an exemption; (2) accepting any additional assets into an existing Earn Rewards account; and (3) violating any other provision of the Securities Law and any rules

---

[5]          *See* fn.2, *supra*.

7

promulgated thereunder for the sale of any security in New Jersey.[6]  The Bureau also denied that Celsius qualified for any exemptions to the New Jersey registration requirements for securities.

33.     Around the same time the Texas Bureau of Securities issued a similar cease and desist notice of hearing against Celsius.[7]

## B.     The Securities Offered and Sold by Celsius

34.     Celsius offers a suite of Financial Products to investors, including its Earn Rewards Accounts, CEL Tokens, and Celsius Loans.

### 1.     Earn Rewards Accounts

35.     Celsius offers and sells what it calls Earn Rewards Accounts, which are, in truth, unregistered securities in the form of individual and corporate accounts.  Investors in these accounts ("Earn Rewards Investors") deposit certain popular cryptocurrencies with Celsius to earn high interest rates of "up to 17.78% Annual Percentage Yield ("APY")."  The promoted interest rates advertised by Celsius are well in excess of the rates currently being offered by short-term investment grade fixed income securities or on bank savings accounts.

36.     Celsius offered its Earn Rewards Accounts to anyone over the age of 18, except for residents of certain foreign jurisdictions subject to regulatory restrictions.

37.     When an investor signs up with Celsius, they verify their age, identity, and address, provide an identification document, complete a user agreement and a KYC (Know Your Customer) protocol.  A link to the Celsius Terms of Use ("Celsius Terms") appears at the bottom of each of its web pages.

---

[6]     *Id.*

[7]     https://ssb.texas.gov/sites/default/files/2021-09/20210917_FINAL_Celsius_NOH_js_signed.pdf (last visited Jul. 12, 2022)

38.   The Celsius Website states that Celsius does not require a minimum amount of cryptocurrency for deposit in an Earn Rewards account.

39.   Celsius only accepts certain types of cryptocurrencies for deposit in the Earn Rewards accounts.  Although Celsius refers to its payments to Earn Rewards Investors as "Rewards," these "Rewards" are just another way to say "interest," which is clear from Celsius' API Partner disclosures from the Celsius Website.  For example, in the "Interest Calculations" section it states: "This pages describes how interest is calculated and disbursed.  Celsius pays interest on the value of each asset in a user's wallet.  Interest is paid using the same asst(s) that is held in the user's wallet.  Obtain current interest rates for each token using the SDK getinterestRates0 method or Get Interest Rates API operation."[8]

40.   Earn Rewards Investors earn a variable interest rate on their investment and may withdraw their digital assets at any time, subject to a maximum three-day processing time specified by Celsius.

41.   The variable interest rates for the Earn Rewards Investors are posted on the Celsius Website.  Celsius' interest rates for deposits of certain cryptocurrencies in its Earn Rewards accounts are "tiered" depending upon the nature and amount of the cryptocurrency invested, as explained on the Celsius Website.  Currently, Earn Rewards Investors are entitled to 6.2% on their first Bitcoin deposited and 3.51% on additional deposits of Bitcoin.  Rates on other cryptocurrencies range from 13.99% for the Synthetix Network Token (SNX) to 0.0% for Ripple.

42.   Celsius also pays interest for deposits of certain Stablecoins in its Earn Rewards accounts, as explained on the Celsius Website.

---

[8]      *See* fn.2, *supra*.

9

43. The manner in which interest is calculated and credited to Earn Rewards Investors illustrated on the Celsius Website and specified in the Celsius Terms, states as follows:



Rewards are payable based on a daily periodic rate applicable to the Loaned Digital Assets. The daily periodic rate is calculated by dividing the then-applicable annual reward rate by three hundred sixty-four (364) days; then it is further divided down to the hour, minute, and second of that day. Loaned Digital Assets, including those received as Rewards from previous weeks, will begin gaining Rewards according to the hour, minute, and second on the timestamp verifying the completion of the applicable transaction and shall cease and/or decrease the amount paid as Rewards at the moment when the User has entered an external transmission, withdrawal or transfer of rights (via CelPay) request, or posted any Loaned Digital Assets as collateral for a Fiat Loan. Therefore, any Loaned Digital Asset transferred mid-week will receive Rewards with no distinction, based on the rates calculated for the relative time within the allocation period. [9]

44. Celsius advertises that interest on the Earn Rewards product is paid to investors in cryptocurrency (or CEL Tokens depending on certain factors) based on the "daily periodic rate," which is "calculated by dividing the then-applicable annual reward rate by three hundred and sixty-four days (364); then it is further divided in the hour, minute, and second of that day" and is credited to the Earn Rewards Investors' accounts weekly on the first business day of the week.

45. Celsius describes its business model in a now-deleted blog post as one that returns 80% of its total revenue to Earn Rewards Investors: "The Celsius business model is structured to do the exact opposite of what banks do – by giving 80% of total revenue back to our community each

---

[9] https://celsius.network/ (last visited Jul. 12, 2022)

10

week in the form of earned interest. We earn profits by lending coins to hedge funds, exchanges, and institutional traders, and by issuing asset-backed loans at an average of 9% interest. We're taking the exact same 80% profit margin that banks have kept for themselves for centuries and returning it to our community of depositors."[10]

46.     Prior to the issuance of cease-and-desist orders from Texas and New Jersey, the Earn Rewards Accounts were available for purchase by anyone holding idle digital assets. In the wake of the Bureau's findings of fact, however, Celsius limited the sale of Earn Rewards Accounts in the U.S. to accredited investors.

47.     Notably, a similar financial product (i.e. a high APR interest account on crytpo lending) offered by cryptocurrency firm BlockFi was investigated by the SEC in 2022. On February 25, 2022, the SEC announced a settlement with BlockFi for $100 million in penalties for offering unregistered BlockFi interest accounts (BIAs) that offer high APRs to customers to lend out digital tokens. Pursuant to that settlement, the BIAs (which are virtually identical in form and substance to the Celsius Loan products) must now be classified and registered as securities under applicable security laws, as BlockFi was determined not to qualify for an exemption from SEC registration. BlockFi agreed to cease offering or selling BIAs in the U.S. until it registers its crypto lending products.

### 2.     CEL Tokens

48.     Celsius provides investors that deposit their crypto assets within the Celsius Network with two choices for how they would like to receive their yield: "In-Kind" or "In-CEL." Celsius pays users who select "In-Kind" in the same asset they deposited and users who choose "In-CEL" in CEL,

---

[10]     *See* https://www.nasdaq.com/articles/voyager-token-is-soaring-as-investors-search-for-yield-in-crypto-space-2021-04-13 (quoting Celsius blog post). (last visited on Jul. 12, 2022).

Celsius' native token, at a higher APY.  For example, Celsius currently advertises a 6% APY on

Ethereum ("ETH") deposits paid in ETH and 7.87% APY on ETH deposits paid in CEL.  Celsius

explains this extra CEL in its whitepaper: CEL Tokens are a "platform utility token" that is rewarded

to crypto holders in the Celsius Wallet as interest on their coins.  That interest is generated from fees,

in CEL tokens, collected from institutional traders who use the assets pool.  Celsius uses the proceeds

from the sale of CEL tokens to cover "all costs and membership growth" for the Celsius Earns

Rewards Accounts.

49.     These CEL tokens then get distributed back to the users lending their crypto on

Celsius' website.  In this model, the borrowers are the ones buying CEL.  Celsius is simply collecting

payment in its native token and transferring the proceeds back to its users.

50.     In reality, it appears that, rather than redistributing in-CEL fees from lenders to users,

Celsius was purchasing hundreds of millions of dollars of CEL Tokens to meet liabilities to users.

51.     On-chain analysis of Celsius' wallets and their CEL Token transactions show the scale

of potential CEL repurchases.  As detailed in the Arkham Report on the Celsius Network (the

"Arkham Report") "from July 2019 to March 2021 Suspected Celsius addresses withdrew over 76

million CEL from the exchange Liquid, worth $127 million at the time of withdrawal.  Since

December 2021, suspected Celsius addresses have also withdrawn around 82 million CEL from FTX

– equivalent to 12% of the total CEL supply and worth $226 million at time of withdrawal."[11]  The

Arkham Report concluded that because those withdrawals were not "preceded by equivalent CEL

---

[11]     Arkham     Report     on     Celsius     Network,     Arkham,
https://www.arkhamintelligence.com/reports/celsius-report (last visited Jul. 12, 2022).

deposits by Celsius, and because Celsius does not appear to use these exchanges for CEL custody, these withdrawals likely indicate CEL purchases."[12]

52.     By purchasing its customers' in-CEL payments rather than collecting them through fees or distributing from the treasury, Celsius profit margins decreased as this added another cost. Additionally, Celsius was required to expend capital that could otherwise be used to meet withdrawal requests, risking a liquidity crisis like Celsius began experiencing in June 2022 (discussed further below).

### 3.     The Celsius Loans

53.     The Company also offered and sold various promissory notes to investors that deposited their digital assets within the Celsius Network (the "Celsius Loans").

54.     The Celsius Loans were available to eligible investors via the "Borrow" option available on the Celsius mobile app.

55.     Borrowers deposited their digital assets as collateral onto the Celsius mobile app in exchange for fiat or one of several stablecoins like USDC, USDT, and DAI. Celsius then would collect monthly interest payments on the Celsius Loans.

56.     Celsius marketed these particular Financial Products with the hashtag slogan "#UnbankYourself" on its various social media accounts.  For example, on March 22, 2021, the Celsius Twitter account posted the following message to investors: "We know time is money, so we've made it easier to have both by offering loans with interest rates as low as 1%, ZERO

---

[12]     *Id.*

origination fees, and same day approval. Get cash in hand today without giving up on your investment."[13]

### C. Celsius Misleadingly Promoted Its Financial Products

#### 1. Misleading Statements

57. Celsius made a series of misleading and false statements in connection with the promotion of the Celsius Financial Products. For example, Celsius and Mashinsky repeatedly promoted its Earn Rewards Accounts as "high-yield" and "low-risk" investments for investors. They also claimed the stability of the interest paid was primarily due to all of the institutional payments Celsius received from its Celsius Loan products. Concurrently, Defendants also repeatedly touted the growth prospects for the Company and the CEL Token. These misrepresentations painted a rosy picture for Celsius' future and lured unsuspecting investors into purchasing the Celsius Financial Products at inflated rates.

58. At the outset, the Arkham Report describes the nature of Celsius' misrepresentations:

Celsius Network positions itself as a wallet that enables users to "Earn" on the assets they "deposit." The "deposit" could be described as an unsecured loan from the user to the organization, and "Earn," or accrual of value to the user over time, could be described as synthetic liability accrual, meaning it is not on-chain.

Celsius attracted users by offering exceptionally high yields on deposits, such as 5% APY for Bitcoin and up to 10% for USD-pegged stablecoins – 100x the average conventional savings account interest rate of 0.1%. For Celsius to make good on its high yield promised to investors it needed it outperform those high returns through its lending and investing to make money and remain solvent. This is impracticable through conventional lending in traditional finance, where interest rates aren't high enough. *Through Celsius' public materials, they claim such high yields are sustainable by the nature of the cryptocurrency market*.

---

[13]

https://twitter.com/CelsiusNetwork/status/1374010096145952769?s=20&t=sQgj5D1x21gHw
OFPs4eLHg

14

On the "Why Trust Celsius" section of the website, Celsius directs users to its whitepaper from 2018. ***This whitepaper explains that "members will be able to easily earn interest on their crypto assets the same way they earn on the savings in the bank – but with much better rates."*** When describing where this yield comes from, the whitepaper states, "Hedge funds, family offices and crypto funds still want to play in the world of cryptocurrency. Fortunately for us, they are willing to pay high fees to do so."

In a video on the official Celsius Network YouTube channel titled "How Celsius earns yield," ***CEO Alex Mashinsky explains that Celsius earns its yield through institutional lending***. According to Mashinsky, when an institution needs fast access to crypto assets for arbitrage, market making, or shorting, they borrow those assets from Celsius at a high interest rate for a short period of time. Mashinsky claims that "the key is to get a high yield at a low risk."

Building a banking business on the model of high yield at low risk can be compared to building a business on the model of buying dollars for 50 cents. It's a perfect model, except it requires finding someone who will take the other side of the trade. If other lenders agreed that a loan was low risk then it wouldn't be high yield, so you have to rely on systematically beating the market. This is hard to do with billions of dollars of capital at rates many times those of conventional low-risk loans, which recently have been at zero or even negative interest. In reality, ***despite their public emphasis on institutional lending, Celsius was chasing yield in other places that many would not characterize as low-risk***.[14] (Emphasis added).

59.     The Celsius Website also touted the increased return on investment that investors could expect from buying and holding CEL Tokens. For example, according to the promotion on the "CEL Token Explained" page on the Celsius Website, "More CEL. More rewards. It's not rocket science." Celsius also provided the following chart to investors, which outlines the high yield rates that CEL Token investors would receive. Notably, the yields could take the form of "Bonus Rewards" (*i.e.*, extra interest) or a "Loan Interest Discount" (*i.e.*, a credit towards a Celsius Loan product):

---

[14]     *Id.*

15

| Reward Status | CEL Ratio | or CEL Balance | Bonus Rewards | Loan Interest Discount |
|---|---|---|---|---|
| NONE | 0%–5% | 0 CEL | 0% | 5% |
| BRONZE | 5%–10% | 1 CEL | 10% | 5% |
| SILVER | 10%–15% | 1,000 CEL | 15% | 10% |
| GOLD | 15%–25% | 10,000 CEL | 20% | 15% |
| PLATINUM | 25%–100% | 25,000 CEL | 30% | 25% |

60. Celsius promoted the CEL Token as both an investment product that essentially paid dividends and a credit that could be used in the purchase of a Celsius Loan product.

61. The whitepaper further promoted what it calls the "Tokenized Flywheel," which purports to show how the Celsius Financial Products interact with each other to create a perpetual wealth creation system. The following diagram illustrates this notion:



Celsius Network: Borrow cash. Earn interest.

62.    A similar version of the Tokenize Flywheel is currently posted on the Celsius Website:



63.    Celsius and its executives, including but not limited to Mashinsky, also held weekly podcasts on YouTube throughout the Relevant Period, using the "Ask Me Anything" ("AMA") format, whereby investors could ask questions directly to Mashinsky and other Celsius

representatives.  During these podcasts, Mashinsky and Company insiders repeatedly made false and misleading statements regarding Celsius' operations and financial stability.

64.    For example, on February 5, 2021, Celsius held an AMA session on YouTube,[15] wherein Mashinsky made several statements promoting the Celsius Loans to investors.  In particular, response to a question about whether Celsius would allow borrows to use multiple sources of collateral for their Celsius Loans, Mashinsky proclaimed that crypto investors that held CEL Tokens or other cryptocurrencies should "borrow against it" because "it helps you earn [and] defer your taxes. That's what the rich guys do.  That's how they stay rich and famous."[16]

65.    Later during that AMA, an investor asked about the circumstances under which Celsius will liquidate a borrower's collateral.  Tal Bentov, the VP Lending (Retail) at Celsius, replied:

> First of all, we hate the word 'liquidations.'  We really want to avoid it at all costs.  If you get a margin call and you don't know how to answer . . . You have different coins, you need some more time . . . You need to contact us and let us know that. We have a big enough team that we can handle all of this . . . *We liquidate only when someone is not answering our margin calls and he/she keeps being in default. We give a lot of time. A lot more than others.  Trust me. Sometimes weeks to answer our margin calls*![17] (Emphasis added).

66.    Near the end of the February 5th AMA, Mashinsky promoted the Earn Rewards Accounts' ability to "earn" investors various cryptocurrencies "for free."

67.    On February 12, 2021, Mashinsky participated in the weekly Celsius AMA, discussing, among other things, the various future prospects for the Company.  Notably, Mashinsky agreed that the purchase of CEL Tokens was "an investment in Celsius' future," and went on to stated that "Celsius has 2 components.  Celsius has the CEL Token and also the equity.  When you buy the CEL Token, you're basically voting 'yes' or 'no'.  You're voting with the community on your need,

---

[15]    https://www.youtube.com/watch?v=2wqD78AnFaw (last visited Jul. 12, 2022).
[16]    *Id.*
[17]    *Id.*

or you're wanting to earn more interest. You're going to get that 25% bonus, or that 25% premium."[18]

68.     On February 26, 2021, Mashinsky participated in the weekly Celsius AMA on YouTube,[19] discussing, among other things, how Celsius would deal with "handling flash crashes." Mashinsky stated:

> We don't provide high LTV's. . . . Celsius doesn't make money by liquidating you. We don't charge any fees. We don't try to give you these gimmicks and special rates . . . Our goal, our mission is to make sure that we have you as a customer for life. What are the chances that you're going to stick with us if we liquidated you? Most of our loans are 25% or 33% LTV loans. We discourage you from taking 50% LTV loans because that is much higher risk. ***So Celsius did not have any liquidations, because we give you plenty of time. We give you advanced notice most of the time, then we tell you you can put more collateral or return some of the dollars or assets back.*** We have almost 0 liquidations. That's not our business. It's the opposite of our business.[20] (Emphasis added.)

69.     On April 23, 2021, Mashinsky again made statements regarding Celsius' borrower-friendly stance on liquidations during a Celsius weekly AMA on YouTube.[21] In particular, Mashinsky stated a "margin call doesn't mean we sold your assets or stole your coins. That's what the other guys do. ***We always give you ample time*** to post more collateral, return some of the assets, or instruct us to sell your coins."[22] (Emphasis added.)

70.     On May 28, 2021, Mashinsky promoted the stability and wherewithal of the CEL Token: "Looking at coins, the CEL token was one of the most stable out there. It did better than Bitcoin or Ethereum. It did not drawdown as much. Obviously Celsians who held CEL did very

---

18     *Id.*
19     https://www.youtube.com/watch?v=cZPy7Pu6vxg&t=3s (last visited Jul. 12, 2022).
20     *Id.*
21     https://www.youtube.com/watch?v=bzEyHLgBY7Y&t=350s (last visited Jul. 12, 2022).
22     *Id.*

well as well."[23]  Mashinsky congratulated the investors that held onto their CEL Tokens during the brief market downturn and bragged that there were "only 20 liquidations" from the 10,000 margin calls that occurred during that time period because Celsius "does a better job than most. Accommodating, providing enough warning, giving you enough time for doing what's right.  We don't make any money from liquidating you."[24]  Mashinsky proclaimed that "during these drawdowns is when Celsius shines, both from the fact that it does not crash [CEL].  I think NEXO token was down about 75% from top to bottom just last week.  So those are examples of just a different community.  A HODL community versus a speculative community.  Same thing with Binance and other platforms.  Obviously, we only care about doing what's in the best interests of the HODLer."[25]

71.     On July 16, 2021, Mashinsky participated in the Celsius AMA on YouTube and asked investors "So, when are you building us a rocket?  We're going to the moon!  Everyone wants to know when CEL Token is going to the moon [Mashinsky pounds on the desk]! . . . I have to beat these billionaires!  I want to be in outer space . . . ."[26]  The phrase "going to the moon" in the crypto trading context refers to a drastic increase in the price of digital asset in question.  Here, Mashinsky was signaling to investors that the price of the CEL Token was going to increase exponentially in the future.

72.     Similarly, Mashinsky stated during a September 10, 2021 AMA on YouTube that "We are shooting to the moon.  We might get there before Elon Musk.  Because our numbers are just

---

[23]     https://www.youtube.com/watch?v=C7d7rZUEfGo (last visited Jul. 12, 2022).
[24]     *Id.*
[25]     *Id.*
[26]     https://www.youtube.com/watch?v=B9eNsTnpAxk (last visited Jul. 12, 2022).

getting better and better."[27]   Again, these promotions were meant to mislead investors into purchasing CEL Tokens on the prospect that the CEL Tokens' value would increase.

73.   On December 1, 2021, Celsius held an AMA session on YouTube where investors could ask questions of Celsius representatives.  One investor expressed concern about a "CEL token liquidation cascade" and asked whether Celsius was "worried at all," to which Celsius content manager Zachary Wildes replied "I'm personally not . . . I do think we need to bring a lot more time and attention and focus to CEL token and its utilities.  I'm not concerned about a cascading liquidation event where everyone gets destroyed."[28]  Wildes continued that "We're at a low-point for CEL sentiment and the future of the token" and asked Mashinsky if there was "any level of reassurance we can give . . . to the community to show our commitment to CEL token?"[29]  Mashinsky responded that "Earning in CEL allows you to earn twice as many CEL right now with the price lower.  If you believe in the viability of the company, then you would know you're getting a 50% discount.  If you don't believe in it, then you probably don't want these CELs anyway.  If you're not sure about it, how about some of the worlds best investors coughing up 750$ Million?  They bought into half of all the CEL tokens out there. Our Treasury, which is mostly CEL token.  They're part owners of that . . . ."[30]  Mashinsky's statements suggested to investors that the Company's successes would lead to a 50% increase in the CEL Token price in the future and that Celsius had the support of well-capitalized backers who would be able to continue to shore up Celsius' finances.

---

[27]      https://www.youtube.com/watch?v=lc8crMFnRgY (last visited Jul. 12, 2022).

[28]      https://www.youtube.com/watch?v=1v9zDkWbZJc&list=PL91_dMxDmGklKGDKCX_YFD
LeRk0ag2Koj&index=28 (last visited Jul. 12, 2022)

[29]      *Id.*

[30]      *Id.*

74.    On January 12, 2022, Mashinsky participated in the weekly Celsius YouTube AMA podcast, promoting the "huge demand for CEL Token" that the Company was creating. [31] "We still have new users signing on every day and none of that changes.  But this is all new demand that never existed before."[32]  Mashinsky further stated that "We believe that the token has not shown its full potential yet.  A lot of it is on us.  Again, we were not focused on the token performance and all that in 2021.  As you can see, we're launching big things this year.  And obviously, these things are gonna have major major impact on the price of CEL."[33]

75.    Later during the AMA, Mashinsky was confronted by a popular commentator in the crypto sector, Dirty Bubble, who asked if Mashinsky or other Celsius insiders were selling their CEL Tokens.  Mashinsky became defensive, vaguely acknowledging that he and his wife "did a bunch of transfers.  We did sell some tokens.  It's not like we didn't sell any.  My wife hasn't sold anything."[34]  But then Mashinsky went on to challenge anyone listening "to go and find one project, just one, where the founders hold more tokens in their project than Celsius.  Just find one!"[35]  Mashinsky excused his selling activities saying "you know, there is no rules in this business.  It's not like somebody has to hold the tokens . . . I wouldn't measure what me or Nuke or Krissy or Daniel do as having anything to do with what the company does.  You guys should just watch if the company is working for you.  Does the company deliver things that are in your best interests?"[36]

76.    Dirty Bubble replied that "Celsius is going off of reputation" and asked about whether Celsius would be making the same kind of disclosures of CEL Token sales by Celsius executives as

---

[31]    https://www.youtube.com/watch?v=bPk7rKAXMvU&list=PL91_dMxDmGklKGDKCX_YFDLeRk0ag2Koj&index=22 (last visited Jul. 12, 2022).
[32]    *Id.*
[33]    *Id.*
[34]    *Id.*
[35]    *Id.*
[36]    *Id.*

would be required if Celsius was a public company.[37]  Mashinsky bluntly replied "We're not a public company!  So what the fuck are you talking about!?"[38]

77.    On January 19, 2022, Mashinsky participated in the weekly Celsius "Ask Me Anything" session on YouTube and made a series of statements regarding the CEL Token and how it was poised for future growth in use and, more importantly, price.[39]  For example, during this AMA, Mashinsky went on a rant about how everyone at Celsius did not "have to worry about humility" because they instead had "conviction."[40]  In a seemingly unintentional moment of honesty, Mashinsky essentially admitted that Celsius relied on con-man style tactics to instill confidence in a target: "Everybody from Celsius on this call has the same conviction.  They wouldn't be a part of CEL Team 6 if they didn't have that full conviction.  100%.  And they don't need humility.  They just need to share with you the conviction and CONVINCE you that it's the right thing."[41]  Mashinsky then quickly returned to promoting the CEL Token's future, acknowledging that the Company "took our hand off the wheel" with the CEL Token, but that they had a plan and a "super team" to "get the car back on the road."[42]

78.    For example, when asked about how Celsius generates revenue, Mashinsky responded that "***We always make all of our money from institutions*** . . . We don't charge fees, spreads, all of that stuff."[43] (Emphasis added).

---

[37]    *Id.*
[38]    *Id.*
[39]    https://www.youtube.com/watch?v=EE4k_WLqldc&list=PL91_dMxDmGklKGDKCX_YFDLeRk0ag2Koj&index=21 (last visited Jul. 12, 2022).
[40]    *Id.*
[41]    *Id.*
[42]    *Id.*
[43]    *Id.*

79.     Celsius' whitepaper also promoted the CEL Token as a necessity for the Company's future growth: "Our lending and borrowing model requires a blockchain and an open ledger technology, it also requires consensus and a global footprint of coin holder in order to really gain traction and complete our mission.  Any loan we issue may be collected from thousands of individual coin holders which may be switched at any time.  Only a smart contract capable of tracking and paying in micropayments can handle such complexity."[44]  In truth, Celsius does not operate a blockchain of its own and the CEL Token is a simply a standard ERC-20 token built on the Ethereum blockchain.  Moreover, Celsius' suggestion that managing a loan ownership profile requires a blockchain is not true.

80.     As noted in a blog post on January 18, 2022, entitled *Celsius Network: Financials proved it was a Ponzi scam* the "real purpose of this token was to create an Initial Coin Offering ("ICO") that netted them $50 million without strings to start financing their operations.  But there is one other valuable feature: they can pay investors with this token they minted out of thin air because non-US investors have the option to receive their returns in the CEL token for an extra 2% yield and it costs Celsius effectively nothing."[45]

81.     As such, this token really serves no purpose for investors.

82.     Celsius leads consumers to think that most of the yield Celsius offers its users comes from institutional securities lending.  When browsing the Celsius Network website, users find multiple explanations of how their return comes from lending assets to institutions on a short-term basis.  On the Celsius YouTube channel, customers find videos of the CEO of Celsius praising their institutional lending strategies and even berating the risk of DeFi yield strategies.

---

[44]     https://celsius.network/static/celsius-whitepaper.pdf (last visited Jul. 12, 2022).
[45]     https://wantfi.com/celsius-network-review.html (last visited Jul. 12, 2022).

83.     In a Celsius network video published on May 24th, 2022,[46] CEO Alexander Mashinsky offers his thoughts on the then-breaking Luna-Terra collapse. Mashinsky provided this advice regarding crypto yield-bearing products: "if you do not understand where the yield comes from, then you should not be in the project. If you cannot prove how the yield is earned, do not invest in the project."[47]

84.     Notably, Celsius does not make it clear for an average user of Celsius to figure out all of the sources of their money's yield, and their associated risks. Instead, what investors are told is that depositing crypto in Celsius is akin to depositing money in a savings account, and the profit comes from institutional lending. But as noted, Celsius has purposefully refused to provide investors with all of the wallet addresses owned/controlled by Company insiders. Without sophisticated wallet labeling to determine which anonymous addresses belong to Celsius Network and on-chain analysis of the movement and usage of these funds, it is extremely difficult to know Celsius is hunting yield with corporate funds via leveraged positions in DeFi protocols with liquidation risk.

85.     On June 4, 2022, Mashinsky posted a message on his official Twitter account, admitting to using risky decentralized finance investments after users accused his company of misleading customers on the source of yield and use of funds: "Celsius lends on DeFi when yields are high and borrows on DeFi when rates are low like now. @CelsiusNetwork is earning income from these activities."[48] Mashinsky then dismissed the criticism of the way Celsius promoted the source of yield and use of funds, calling them "baseless allegations" to make investors doubt the validity of the well-founded criticisms.

---

[46]     https://cryptonews.com/videos/bitcoin-has-never-done-this-before-alex-mashinsky-gives-price-outlook-talks-terra-collapse.htm (last visited Jul. 12, 2022).

[47]     Id.

[48]     https://twitter.com/Mashinsky/status/1533261237202599938?s=20&t=nHwUESvAsmWNp8dmmyy-dA (last visited Jul. 12, 2022).

86.     The Company also misled investors about the future growth potential for the Earn Rewards Accounts, encouraged Earn Rewards Investors to treat their Earn Rewards Accounts as long-term investments as evidenced by the statement on Celsius' homepage: "Start earning top rates on any amount of crypto and get paid every paid every Monday to keep HODLing."  According to Celsius,  "HODL started as a typo and has become a crypto rallying cry.  A misspelling of the word 'hold,' HODLers believe in the future of digital currencies and know it would be a mistake to sell at this early stage."[49]

87.     Celsius also touted the ability of Earn Rewards Investors to manage their Earn Rewards accounts as long-term investments using the "HODL Mode" feature of their Celsius account.  Celsius describes HODL Mode on its Website as an account security feature "that gives [account holders] the ability to temporarily disable outgoing transactions from [their] Celsius account. [Account holders] control when HODL Mode is activated and it is an ideal feature for those that do not plan on withdrawing or transferring funds from their account for an extended period of time."[50]

88.     Celsius' corporate culture of promoting "HODLing," including its description of Celsius as a "HODLing platform," the premium interest rates Celsius pays on its Earn Rewards accounts, the weekly compounding of interest payments, and the availability of HODL Mode makes the Celsius Earn Rewards account an attractive long-term investment to Celsius Earn Rewards Investors.

89.     At the same time Celsius and Mashinsky were promoting the Earn Rewards Accounts and the CEL Tokens, Mashinsky was secretly selling millions of dollars' worth of CEL Tokens.

---

[49]     https://support.celsius.network/hc/en-us/articles/360001716538-What-s-HODL- (last visited Jul. 12, 2022).
[50]     https://support.celsius.network/hc/en-us/articles/360007608077-What-is-the-HODL-Mode- (last visited Jul. 12, 2022).

90.     According to the Arkham Report, several Ethereum addresses have been identified as likely belonging to Celsius CEO Alexander Mashinsky (the "Mashinsky Wallets").[51]   The Mashinsky Wallets regularly sold large amounts of CEL Tokens on decentralized exchanges, totaling $44 million.  At the same time that he was promoting CEL Tokens to users and denying that he was selling the token, Mashinsky appears to have been quietly selling millions of dollars of CEL Tokens.

91.     The following is a list of the specific addresses comprising the Mashinsky Wallets, which are owned/controlled by Mashinsky and/or his wife Krissy Mashinsky, and were used to sell the CEL Tokens that Mashinsky had set aside for himself at the time of minting:

- 0xf716F34cb7FabfaA930169eC66278f525b6a1597 ($21M in sales)

- 0x34F30e5473fE5D2dcD9A930275Be30ACC1EEF12b ($100k in sales)

- 0x11729acCDA2dA02B453cB4AEA4EFCDeDc0E56bD9 ($1M in sales)

- 0xc33192B79AD149b05169516A8aF2adc6e1E08EF6 ($12M in sales)

- 0x6D27BA372b148A190F0806899e53a6D4009cf5af ($8M in sales)

- 0x23cE2180754AF6207Ee13e745BC903795661e7C9 ($300k in sales)

- 0xd50061dDC6E813F56dF865D450B3cC61973E881A ($2M in sales)

- 0x2a020312Dd646D81acBC81015Df532eAFC2D5257 ($530k in sales)

92.     Most of the CEL sales from the Mashinsky Wallets took place on the decentralized exchanges Uniswap and Airswap.  Typically, Mashinsky swapped CEL Tokens for the stablecoin USDC.  In other instances, Mashinsky opted to take ETH or wBTC.  Notably, one of the Mashinsky Wallets also deposited CEL Tokens to the centralized exchange Liquid at the same time that Celsius was purchasing large amounts of CEL Tokens on that same exchange.  As discussed in the Arkham

---

[51]     *See* fn.10, *supra*.

Report, this particular Mashinsky Wallet address deposited over 9.1 million CEL Tokens to Liquid from June 2019 to July 2020.[52]  During the same time, Celsius appears to have purchased over 29 million CEL from Liquid, creating a situation where Celsius was using corporate funds on the same orderbook the CEO used to exit his CEL Token position.

93.    As all of this activity was occurring within the Mashinsky Wallets, Mashinsky publicly promoted CEL and denied that he or other founders were selling.  He also gave the impression that he was increasing his CEL holdings by publicizing CEL purchases.

94.    For example, on October 9, 2021, Mashinsky tweeted, "Lots to CELebrate here in #London busy week with a lot of large deals and events.  It pays to #HODL."[53]  Nine hours later on the very same day, one of the Mashinsky Wallets sold 12K CEL on Airswap for $69k in USDC. Similarly, on December 9, 2021, Mashinsky posted a message on his Twitter account, promoting CEL Tokens as a long-term investment for Company insiders and stating: "All @CelsiusNetwork founders have made purchases of #CEL and are not sellers of the token."[54]  But only five days earlier, on December 4, 2021, one of the Mashinsky Wallets was selling over 11,000 CEL Tokens for about $43,000 worth of WBTC.

95.    Since June 9, 2021, the Mashinsky Wallets sold approximately 2.8 million CEL Tokens valued at over $16 million at the time.

### 2.    Celsius Used the API Partners Program to Sell Earns Rewards Accounts

96.    Celsius offers an Application Programming Interface ("API") that allows certain institutional users, known as Celsius "API Partners," to integrate with the Celsius platform.

---

[52]    *Id.*
[53]    https://twitter.com/Mashinsky/status/1446846073713184772 (last visited Jul. 12, 2022).
[54]    https://twitter.com/Mashinsky/status/1468995783982825480 (last visited Jul. 12, 2022).

97.     Celsius affords its API Partners the ability to offer the Earn Rewards accounts to retail investors in two different ways.

98.     First, the Celsius "Segmented Accounts" platform allows API Partners to offer the API Partners' own customers the Celsius Earn Rewards accounts through the API Partners' own portal. An API Partner availing itself of Celsius' Segmented Accounts structure offers the API Partner's own retail customers the opportunity to access the Celsius Earn Rewards account through the API Partner's own portal, as opposed to the API Partner's retail customers accessing the Celsius Earn Rewards account directly from Celsius' own website.  Apart from the difference in how the Earn Rewards account is accessed, individual retail customers of API Partners offering the Segmented Account option are subject to the same rights, benefits, terms, and conditions as Celsius' own Earn Rewards Investors.

99.     Second, Celsius' API Partners can choose to access the Celsius Earn Rewards accounts through what Celsius refers to as an "Omnibus Account."  In the Omnibus Account, the API Partner maintains a direct relationship with Celsius and invests in a Celsius Earn Rewards account for the benefit of its individual customers, whose cryptocurrencies the API Partner has aggregated for the purpose of investing in the Celsius Earn Rewards account on behalf of, and for the benefit of, the API Partner's individual retail customers.

100.    Celsius incentivizes the API Partners by paying a fee to Segmented Account partners based on a percentage of rewards payable by Celsius to the end-user, and also pays fees to Omnibus Partners, in addition to the Earn Rewards payable.

101.    Celsius is selling unregistered securities in the form of Earn Rewards accounts to it API Partners' Segmented Account customers.

102.   Celsius is selling unregistered securities to its API Partners who choose to open API Partner Omnibus Accounts with Celsius.

### D.   The June 2022 Celsius Crisis

103.   On-chain analysis of Celsius owned/controlled wallets indicates that Celsius had billions of dollars in leveraged positions on decentralized finance (DeFi) protocols that were threatened with liquidation when the broader crypto market was in decline.   In order to avoid liquidation, it appears Celsius was forced to deploy $750 million of liquid assets that could no longer be used to meet withdrawal obligations.

104.   Upon information and belief, it was Celsius taking of these risky, highly-leveraged positions that caused Celsius to pause user withdrawals, swaps and transfers.

105.   On July 8, 2022, a research company Arkham published the Arkham Report on Celsius Network, detailing the business practices of Celsius and company insiders like Defendant Mashinsky.   According to the Arkham report, "Celsius was one of the biggest players in DeFi, accounting for a huge portion of the funds deployed to the three largest DeFi protocols, Compound, Aave, and Maker."[55]

106.   The Arkham Report also provided the following breakdown of Celsius' DeFi positions as of June 21st, 2022, eight days after freezing user accounts:

---

[55]   *See* fn.10, *supra*.



- → **On AAVE** – 32% of stETH supplied; 17% of WBTC supplied; 6% of ETH supplied; 35% of LINK supplied; 78% of SNX supplied; 70% of xSUSHI supplied; 37% of USDC borrowed; 30% of DAI borrowed; 12% of REN borrowed.
  - ◆ Celsius' cumulative positions account for 12% of the total supply and 17% of the total amount borrowed in US dollar value on AAVE.
- → **On Compound** – 43% of WBTC supplied; 13% of ETH supplied; 57% of DAI borrowed.
  - ◆ Celsius' cumulative positions account for 11% of the total supply and 20% of the total amount borrowed in US dollar value on Compound.
- → **On Maker** – 38% of WBTC-A supply; 59% of DAI borrowed from WBTC-A pool.
  - ◆ Celsius' cumulative positions account for 6% of the total supply and 3% of the total amount borrowed in US dollar value on Maker.
- → **ETH2 staking** – 2.5% of all ETH staked.
- → **stETH** – 10% of stETH in circulation.

$671M Supplied    $492M Supplied    $396M Supplied

$273M Borrowed    $210M Borrowed    $178M Borrowed

Aave    Maker    Compound

*Celsius DeFi Positions on 21 June 2022* [56]

107. In early June 2022, the broader digital asset and cryptocurrency market saw a steep decline in price, which precipitated Celsius Network's crisis. On June 10th, 2022, Bitcoin began the day trading at around $30,000. Over the following eight days, Bitcoin's price fell over 40% to below $18,000. Other crypto assets saw an even more dramatic crash during this time.

108. The crypto market downturn forced Celsius to deploy significant capital to protect the Company's highly-leveraged DeFi positions from liquidation. Maker allows users to borrow DAI (Maker's native stablecoin pegged to one US dollar), against various collateral options. Each loan has a maximum collateral-to-debt ratio that triggers a liquidation of the posted collateral when

---

[56] *Id.*

crossed.  On June 10, 2022, Celsius had 17.8k WBTC of collateral in Maker and $280 million in DAI borrowed against it.  The loan had a minimum collateralization ratio of 145%, meaning the position is liquidated when the collateral posted is worth less than 145% of the debt.  At the time, this WBTC was worth $530 million for a 190% collateralization ratio, seemingly a comfortable cushion.  But the combination of liability-asset denomination mismatch and volatility caused the strength of the position to deteriorate rapidly.

109.   In three days, the price of Bitcoin fell below Celsius' original liquidation price of $22.8k.  The fragility of Celsius' leveraged positions forced the company to use liquidity to pay down debt instead of honoring customer withdrawals.  Between June 11, 2022 and June 16, 2022, Celsius added 6.2k WBTC as collateral and paid back 53.8 million of its DAI debt, reducing its liquidation price to $13.6k per BTC.  Since July 1, 2022, they paid back another $220 million in DAI to close out the position.  AAVE rates every position on its platform with a health factor based on various risk parameters and liquidates any position with a health factor below 1.0.  At the start of the market downturn, around June 10, 2022, Celsius appears to have had $604 million of collateral against $303 million in debt on AAVE with a health factor of 1.6.  On Compound, Celsius appears to have had $421 million of collateral against a $218 million debt.  During the market crash, Celsius again gathered liquid capital to shore up these liabilities, adding tens of millions of dollars' worth of BTC, ETH, LINK, SNX, and BAT as collateral on AAVE and paying $30 million toward their debt.  On Compound, they paid $40 million towards their debt and added over $1 million UNI as collateral.  Since June 10, 2022, Celsius has deployed $546 million in stablecoins, 7.2k BTC, 16.3k ETH, and tens of millions of dollars of other tokens to its leveraged DeFi positions.  These deployments were worth roughly $750 million at the time of transactions.

32

110.   On June 13, 2022, Celsius froze all accounts.   According to their official announcement, this was done "due to extreme market conditions in order to stabilize liquidity and operations while we take steps to preserve and protect assets."[57]

**E.      The Celsius Financial Products Are Unregistered Securities**

**1.      Earns Rewards Accounts and Celsius Loans Are Securities Under *Reeves***

111.   As noted by the United States Supreme Court, "Congress' purpose in enacting the securities laws was to regulate ***investments***, in whatever form they are made and by whatever name they are called.  However, notes are used in a variety of settings, not all of which involve investments.  Thus, they are not securities per se, but must be defined using the 'family resemblance' test." *Reves*, 494 U.S. 56, 67.

112.   Pursuant to the family resemblance test, a note is presumed to be a "security," and that presumption may be rebutted only by a showing that the note bears a strong resemblance (in terms of the four factors we have identified) to one of the enumerated categories of instrument.  *Id.*  These factors include: (1) investments in a business enterprise; (2) there was "common trading" of the notes, which offered and sold to a broad segment of the public; (3) the public reasonably perceived from advertisements for the notes that they were investments, and there were no countervailing factors that would have led a reasonable person to question this characterization; and (4) there was no risk-reducing factor that would make the application of the Securities Acts unnecessary, since the notes were uncollateralized and uninsured and would escape federal regulation entirely if the Acts were held not to apply.  *Id.*

113.   Here, the four enumerated factors do not militate in favor of rebutting the presumption that the Earn Rewards Accounts and Celsius Loans are securities.  First, Plaintiff and the class

---

[57]      https://blog.celsius.network/a-memo-to-the-celsius-community-59532a06ecc6

invested fiat and/or other digital assets and cryptocurrencies in a business enterprise, namely Celsius. There was common trading of the Earn Rewards Accounts insomuch as the digital assets deposited by investors were regularly offered and sold to both institutional and retail investors. All of the marketing materials promoted by Defendants led the public to believe that opening up an Earn Rewards Account with Celsius was a "high-yield, low-risk" investment.

      **2.**      **The Celsius Financial Products Are All Securities Under the *Howey* Test**

     114.    Under Section 2(a)(1) of the Securities Act of 1933 ("Securities Act"), a "security" is defined to include an "investment contract." 15 U.S.C. §77b(a)(1). An investment contract is "an investment of money in a common enterprise with profits to come solely from the efforts of others." *W.J. Howey*, 328 U.S. at 299. Specifically, a transaction qualifies as an investment contract and, thus, a security if it is: (1) an investment; (2) in a common enterprise; (3) with a reasonable expectation of profits; and (4) to be derived from the entrepreneurial or managerial efforts of others. *See United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852-53 (1975). This definition embodies a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits," and thereby "permits the fulfillment of the statutory purpose of compelling full and fair disclosure relative to the issuance of 'the many types of instruments that in our commercial world fall within the ordinary concept of a security.'" *W.J. Howey*, 328 U.S. at 299. Accordingly, in analyzing whether something is a security, "form should be disregarded for substance," and the emphasis should be "on economic realities underlying a transaction, and not on the name appended thereto." *Forman*, 421 U.S. at 849.

115.     Investors who bought Earn Rewards accounts invested money or other valuable consideration, in a common enterprise: namely Celsius.  Investors had a reasonable expectation of profit based upon the efforts of the Defendants.

### i.        Celsius Investors Invested Money

116.     Plaintiff and the Class invested fiat, including U.S. dollars, and digital currencies, such as Bitcoin and Ethereum, to purchase Earn Rewards accounts.

117.     The Earn Rewards accounts were available on the Company's website and mobile app, which allowed retail investors to purchase Earn Rewards accounts with traditional and other digital currencies.

118.     Defendants sold Earn Rewards accounts to the general public through global, online cryptocurrency exchanges during its so-called launch.

119.     Every purchase of Earn Rewards accounts by a member of the public is an investment contract.

### ii.       Celsius Financial Product Investors Were Intertwined in a Common Enterprise with Defendants

120.     Additionally, investors were passive participants in the Earn Rewards Accounts' launch and the profits of each Plaintiff, and the Class were intertwined with those of Defendants and of other investors.  Celsius concedes that it uses the funds from the CEL tokens to also fund its operations.

121.     Defendants also were responsible for supporting the Earn Rewards accounts, pooled investors' assets, and controlled those assets.

122.     Further, Defendants held and/or hold a significant stake in the Earn Rewards accounts, and thus shared in the profits and risk of the project.

        **iii.**        **Investors Purchased the Celsius Financial Products with a Reasonable Expectation of Profit from Owning Them**

123.    Investors in the Earn Rewards Accounts, including Plaintiff and the Class, made their investment with a reasonable expectation of profits.  The Earn Rewards accounts were sold to investors prior to a network or "ecosystem" being fully developed on which they could be used.  For pre-functional tokens, such as the Earn Rewards accounts, the primary purpose for purchasing Earn Rewards accounts was to make a profit or accumulate additional "reflections" (*i.e.*, additional tokens of value), rather than to utilize the Earn Rewards accounts themselves for a task.

        **iv.**        **Investors Expected Profits from the Earn Rewards accounts to Be Derived from the Managerial Efforts of the Executive Defendants**

124.    Investors' profits in the Earn Rewards accounts were to be derived from the managerial efforts of others – specifically the Company and the Executive Defendant.  Earn Rewards Account Investors relied on the managerial and entrepreneurial efforts of the Executive Defendants to manage, oversee, and/or develop the projects funded by sale of the Earn Rewards accounts.

125.    Purchasers of pre-functional tokens necessarily rely on the managerial efforts of others to realize value from their investments.  The success of these managerial efforts in developing the networks on which these tokens will operate is the primary factor in their price, that is, until such tokens transition into being functional utility tokens.

126.    Each of the Earn Rewards accounts was a security at issuance because profit from the Earn Rewards accounts would be derived primarily from the managerial efforts of Celsius' teams developing the associated networks on which the Earn Rewards accounts would function, rather than having their profit derived from market forces of supply and demand, such as might affect the price of a commodity such as gold (or Bitcoin).

127.    Investors in Earn Rewards accounts relied on the managerial and entrepreneurial efforts of Celsius and the Executive Defendants to manage, market, and develop the so-called Celsius ecosystem.

128.    The Executive Defendants typically held themselves out to investors as experts in the blockchain and crypto field.  Investors in the Earn Rewards accounts reasonably expected the Celsius development teams to provide significant managerial efforts after the Earn Rewards accounts' launch.

129.    Investors in Earn Rewards accounts thus reasonably expected the Company and Executive Defendants to provide significant managerial efforts after the token launch.

130.    This dependency, however, on the managerial efforts of the Company and Executive Defendants was not apparent at issuance to a reasonable investor.  Considering the limited available information about how these Earn Rewards accounts were designed and intended to operate, if such an investor were even able to interpret the relevant law at the time, a reasonable investor lacked sufficient bases to conclude whether the Earn Rewards accounts were securities until the platform at issue, and its relevant "ecosystem," had been given time to develop.  In the interim, the investor lacked the facts necessary to conclude – let alone formally allege in court – that the tokens she had acquired were securities.  It was only after certain revelations that provided more information about Defendants' intent, Celsius' token economics, and how the Executive Defendants operated to hide their ownership in both the Company and the CEL Token, that an investor could reasonably determine that a token that was advertised as something other than a security was a security all along.

### 3. Investors Would Not Reasonably Have Understood that the Financial Products Sold by Celsius Were Securities

131.   In connection with the launch of the Celsius Financial Products, the Company and Executive Defendants made statements that reasonably led Plaintiff and Class members to conclude that the Celsius Financial Products were not securities.

132.   As a threshold matter, the Company refused to register any of the Celsius Financial Products with the SEC, which indicated to investors that these were not securities.  In fact, Celsius touts its application for an exemption from registrations as if it is an actual exemption, which it is not.  No such valid exemption from registration requirements exists for any of the Celsius Financial Products.

133.   At the time of the launch of the Celsius Financial Products, Defendants took advantage of the market's lack of understanding and awareness concerning how cryptocurrency projects – particularly decentralized finance projects – work.  Considering the new technology at issue and the Company's other statements, many investors were understandably unaware that Celsius Financial Products had fundamentally different features than other cryptocurrencies, which the SEC has determined are not securities.

134.   Moreover, the Celsius project was advertised as developing revolutionary and cutting edge blockchain technology that was "high yield" and "low risk" when compared with other existing products.

135.   In addition to claiming Celsius' technical superiority over other cryptocurrencies, the Company also indicated that it would benefit financially and use the funds raised through the sale of the Celsius Financial Products to continue to fund the Celsius-related products (*e.g.*, wallet and exchange) and support the growth of the project.

136.    At the time the Celsius Financial Products were publicly released, Defendants took advantage of the market's lack of understanding and awareness concerning how this investment contract worked.  With promises that Celsius would outperform other cryptocurrencies, many individuals were unaware that the Celsius Financial Products had fundamentally different features than other cryptocurrencies, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all CEL Tokens were issued by Mashinsky and the Company at creation at very little economic cost – and enormous potential upside – to them.

137.    The creation of the Celsius Financial Products occurred through a centralized process, in contrast to Bitcoin and Ethereum.  This however would not have been apparent at issuance to a reasonable investor.  Rather, it was only after the passage of time and disclosure of additional information about the issuer's intent and process of management that a reasonable purchaser could have known that he or she had acquired a security.  Purchasers were thereby misled into believing that the Celsius Financial Products were something other than a security, when it was a security.

138.    Accordingly, it was not apparent to a reasonable investor, at issuance, that the Celsius Financial Products were securities under the law, and a reasonable investor would not have believed they were securities.

### 4.    Guidance from the SEC

#### i.    The SEC's 2019 Framework

139.    On April 3, 2019, the SEC published its "Framework for 'Investment Contract' Analysis of Digital Assets" (the "Framework") in which it provided "a framework for analyzing

whether a digital asset is an investment contract and whether offers and sales of a digital asset are securities transactions."[58]

140.    The Framework described how to analyze the various facts surrounding an ICO in making the determination of whether a given digital asset is a security.

141.    In particular, the Framework provides that the "inquiry into whether a purchaser is relying on the efforts of others focuses on two key issues: Does the purchaser reasonably expect to rely on the efforts of an [Active Participant or "AP"]?  Are those efforts 'the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise,' as opposed to efforts that are more ministerial in nature?"[59]

142.    The Framework further notes that the "stronger the[ ] presence" of the following factors, "the more likely it is that a purchaser of a digital asset is relying on the 'efforts of others.'"[60]

143.    The first factor the SEC looked at was whether an AP is responsible for the development, improvement (or enhancement), operation, or promotion of the network, particularly if purchasers of the digital asset expect an AP to be performing or overseeing tasks that are necessary for the network or digital asset to achieve or retain its intended purpose or functionality.

144.    At the time of the Celsius Token launch, Defendants actively marketed the token launch and the Celsius project, thereby necessitating the continued managerial efforts of the Company and Executive Defendants.  Where the network or the digital asset is still in development and the network or digital asset is not fully functional at the time of the offer or sale, purchasers

---

[58]    https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets    (last visited Jul. 12, 2022).
[59]    *Id.*
[60]    *Id.*

would reasonably expect an AP to further develop the functionality of the network or digital asset (directly or indirectly).

145.    Another factor the Framework considers is whether the AP creates or supports a market for, or the price of, the digital asset. This includes, *inter alia*, whether the AP "(1) controls the creation and issuance of the digital asset; or (2) takes other actions to support a market price of the digital asset, such as by limiting supply or ensuring scarcity, through, for example, buybacks, 'burning,' or other activities."[61]

146.    As noted above, all of the CEL Tokens in circulation were created at the direction of Mashinsky.

147.    The framework further states that "An AP has a continuing managerial role in making decisions about or exercising judgment concerning the network or the characteristics or rights the digital asset represents[.]"[62]

148.    Here, the Company and Executive Defendants have discussed the long-term prospects on years-long time frames, continually noting how the Celsius ecosystem will "evolve" in the future.

149.    The ability to determine whether and where the digital asset will trade is another factor discussed in the Framework. For example, "purchasers may reasonably rely on an AP for liquidity, such as where the AP has arranged, or promised to arrange for, the trading of the digital asset on a secondary market or platform."[63]

150.    Here, the Company and Mashinsky are the liquidity providers for the CEL Tokens that are traded publicly.

---

[61]    *Id.*
[62]    *Id.*
[63]    *Id.*

151.    Another factor the Framework notes is whether the AP has the ability to determine who will receive additional digital assets and under what conditions.  This could be, for example, "[m]aking or contributing to managerial level business decisions, such as how to deploy funds raised from sales of the digital asset."[64]

152.    Here, the Company, along with the Controlling Defendants, are the arbiters over the use of the cryptocurrency deposited on Earn Rewards investors.

153.    The Celsius Terms provide that an Earn Rewards investor relinquishes control over the deposited cryptocurrency to Celsius and that Celsius is free to use those assets as it sees fit, including commingling the Earn Rewards investor's cryptocurrency with those of other Earn Rewards investors, investing those pooled assets in the market, and lending them to institutional and corporate borrowers.  Having relinquished control over the deposited cryptocurrency in their Earn Rewards accounts, the Earn Rewards Investors are passive investors.

154.    Specifically, Paragraph 4. D. "Earn Rewards" of the recently-amended Celsius Terms provides:

> Our Earn Rewards service allows you to earn a financing fee from Celsius, referred to as "Rewards," in the form of Digital Assets (either in-kind, i.e. in the same Digital Asset you transfer, or in CEL Tokens, where permitted) in exchange for entering into open-ended loans of your Eligible Digital Assets to Celsius under the terms hereof. If our Earn Service is available to you, upon your election, you will lend your Eligible Digital Assets to Celsius you grant Celsius all rights and title to such Digital Assets, for Celsius to use in its sole discretion while using the Earn Service.[65]

155.    Paragraph 13 of Celsius' recently-amended Terms, "Consent To Celsius' Use of Digital Assets," also describes the status of cryptocurrency deposited with Celsius by Earn Rewards Investors:

---

[64]    *Id.*
[65]    https://celsius.network/terms-of-use (last visited Jul. 12, 2022).

In consideration for the Rewards payable to you on the Eligible Digital Assets using the Earn Service, for us entering into any Loan Agreement, and the use of our Services, you grant Celsius, subject to applicable law and for the duration of the period during which you elect to utilize the Eligible Digital Assets in the Earn Service (if available to you), all right and title to such Eligible Digital Assets, including ownership rights, and the right, without further notice to you, to hold such Digital Assets in Celsius' own Virtual Wallet or elsewhere, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets in Celsius' full discretion. You acknowledge that with respect to the Digital Assets used by Celsius pursuant to this paragraph:

(i)     You will not be able to exercise rights of ownership;

(ii)     Celsius may receive compensation in connection with lending or otherwise using Digital Assets in its business to which you have no claim or entitlement; and

(iii)     In the event that Celsius becomes bankrupt, enters liquidation or is otherwise unable to repay its obligations, any Eligible Digital Assets used in the Earn Service or as collateral under the Borrow Service may not be recoverable, and you may not have any legal remedies or rights in connection with Celsius' obligations to you other than your rights as a creditor of Celsius unders any applicable laws.[66]

156. Celsius then pools the deposited cryptocurrencies together with Celsius' other assets, to, among other income-generating activities, collateralize Celsius' borrowings, purchase securities and digital assets for Celsius' own account, make loans to institutional and corporate borrowers, and mine for cryptocurrency.

157. Celsius does not disclose to investors: (a) the amount of money devoted to each of these investment activities; (b) the nature and creditworthiness of the borrowers, as well as the identity of any borrowers to whom Celsius has lent material amounts of cryptocurrency; (c) the

---

[66]     *Id.*

terms and duration of the loans; (d) the types of securities and digital assets it trades; or (e) the profits or losses derived from these activities.

158.    As Celsius' founder, Alexander Mashinsky, stated in an article he authored on March 7, 2021, for the DataDrivenInvestor's website, reposted in the "Media" tab on the Celsius Website, "[u]sers transfer assets with Celsius, Celsius lends funds to institutions and returns up to 80% of earnings to users."[67]

159.    Making other managerial judgements or decisions that will directly or indirectly impact the success of the network or the value of the digital asset generally.

160.    The Framework also remarks that purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset, including, but not limited to, the instances where the AP "has the ability to realize capital appreciation from the value of the digital asset.  This can be demonstrated, for example, if the AP retains a stake or interest in the digital asset."[68]  According to the SEC, in these instances, "purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset."[69]

161.    Here, Mashinsky and Company insiders retain a significant interest in the Celsius project even after selling off many CEL Tokens throughout the Relevant Period.

###    ii.    SEC's Previous Statements and Findings

162.    On May 7, 2021, on CNBC's "Squawk Box" television program, chairman of the SEC Gary Gensler stated that "a lot of crypto tokens – I won't call them cryptocurrencies for this

---

[67]    Alex Mashinsky, *How Celsius creates prosperity for retail and institutional investors alike,* DataDrivenInvestor (Mar. 7, 2021), https://medium.datadriveninvestor.com/how-celsius-creates-prosperity-for-retail-and-institutional-investors-alike-cc086084c6bd
[68]    *See* fn.42, *supra*.
[69]    *Id.*

moment – *are indeed securities*[.]"[70] (Emphasis added). In addition to being the Chairman of the SEC, Mr. Gensler is also a world-renowned expert on cryptocurrencies and blockchain technology, having taught the "Blockchain and Money" course at the Sloan School of Management at the Massachusetts Institute of Technology ("MIT").[71]

163. In a June 14, 2018 speech entitled "Digital Asset Transactions: When Howey Met Gary (Plastic)" that is available on the SEC's website, the following observations were made on "when a digital transaction may no longer represent a security offering."[72]

164. If the network on which the token or coin is to function is sufficiently decentralized – where purchasers would no longer reasonably expect a person or group to carry out essential managerial or entrepreneurial efforts – the assets may not represent an investment contract. Moreover, when the efforts of the third party are no longer a key factor for determining the enterprise's success, material information asymmetries recede. As a network becomes truly decentralized, the ability to identify an issuer or promoter to make the requisite disclosures becomes difficult, and less meaningful.

165. "And so, when I look at Bitcoin today, I do not see a central third party whose efforts are a key determining factor in the enterprise. The network on which Bitcoin functions is operational and appears to have been decentralized for some time, perhaps from inception."[73]

---

[70]    Jesse Point, *SEC Chairman Gary Gensler says more investor protections are needed for bitcoin and crypto markets*, CNBC (May 7, 2021), https://www.cnbc.com /2021/05/07/sec-chairman-gary-gensler-says-more-investor-protections-are-needed-for-bitcoin-and-crypto-markets.html.

[71]    Lectures and Materials from Chairman Gensler's MIT course are available to the public for free at: https://ocw.mit.edu/courses/sloan-school-of-management/15-s12-blockchain-and-money-fall-2018/video-lectures/session-1-introduction/.

[72]    William Hinman, *Digital Asset Transactions: When Howey Met Gary (Plastic), Remarks at the Yahoo Finance All Markets Summit: Crypto*, SEC (Speech) (Jun. 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418.

166.    A key factor in determining whether a digital asset is a security or not is whether the there is a centralized entity behind the digital asset.[74]

167.    As discussed above, the circumstances surrounding the creation of the Celsius Token demonstrate that an exceedingly small number of centralized insiders maintained exclusive control over the Celsius project.

168.    Finally, the SEC also already concluded that another virtual currency (*i.e.*, DAO tokens) that is substantially similar to Earn Rewards accounts are "securities and therefore subject to the federal securities laws." As stated by the SEC, "issuers of distributed ledger or blockchain technology-based securities must register offers and sales of such securities unless a valid exemption applies."[75]

169.    Stablecoins in particular have come under scrutiny by regulators recently given the rapid growth of the $130 billion market.

170.    For example, in June 2021 Representative Warren Davidson from Ohio, one of crypto's loudest advocates on Capitol Hill, said that in his view, not all stablecoins should be treated as securities, but stablecoins that specifically are backed by securities should fall under the same sort of regulatory regime: "if you've got a stablecoin that is essentially backed by securities, it gets hard to say that it's not a security."[76]

---

[73]    *Id.*

[74]    *Id.* (noting that the "decentralized structure" of Bitcoin and Ethereum placed these digital assets outside the "disclosure regime of the federal securities laws").

[75]    Press Release, *SEC Issues Investigative Report Concluding DAO Tokens, a Digital Asset, Were Securities*, SEC (July 25, 2017), https://www.sec.gov /news/press-release/2017-131.

[76]    Nikhilesh De, *Opinion – State of Crypto: Stablecoin Rules Are Coming,* CoinDesk.com (Jul. 20, 2021), https://www.coindesk.com/policy/2021/07/20/state-of-crypto-stablecoin-rules-are-coming/.

171.    While certain of Celsius' loan products appear to be licensed under various state licensing requirements for money services businesses or money transmitters, the Celsius Earn Rewards product is not currently registered with any federal or state securities regulator, nor is it exempt from registration – as required by law, even though the Earn Rewards product is a "security" and subject to such requirements.

## CLASS ALLEGATIONS

172.    Plaintiff brings this action, individually, and on behalf of a nationwide class, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3), defined as follows:

> All persons who, during the Class Period, purchased Celsius Financial Products and were subsequently damaged thereby.

173.    The Class Period is defined as the period between February 9, 2018 and the date of this filing.[77]

174.    Excluded from the Class are: (a) Defendants; (b) Defendants' affiliates, agents, employees, officers, and directors; (c) Plaintiff's counsel and Defendants' counsel; and (d) the judge assigned to this matter, the judge's staff, and any member of the judge's immediate family.  Plaintiff reserves the right to modify, change, or expand the various class definitions set forth above, based on discovery and further investigation.

175.    **Numerosity**: Upon information and belief, the Class is so numerous that joinder of all members is impracticable.  While the exact number and identity of individual members of the Class is currently unknown, such information being in the sole possession of Luna and/or third parties and obtainable by Plaintiff only through the discovery process, Plaintiff believes, and on that basis

---

[77]    Plaintiff reserves the right to expand or amend the Class Period based on discovery produced in this matter.

alleges, that the Class consists of at least hundreds of people.  The number of Class members can be determined based on Luna's and other third party's records.

176.  **Commonality**: Common questions of law and fact exist as to all members of the Class.  These questions predominate over questions affecting individual Class members.  These common legal and factual questions include, but are not limited to:

a.      whether the Celsius Financial Products are securities under the Securities Act;

b.      whether the sale of Celsius Financial Products violates the registration of the Securities Act;

c.      whether Defendants improperly and misleadingly marketed Celsius Financial Products;

d.      whether Defendants' conduct violates the state consumer protection statutes asserted herein;

e.      whether Individual Defendants conspired to artificially inflate the price of the Celsius Financial Products and then sell their Celsius Financial Products to unsuspecting investors;

f.      whether Defendants have been unjustly and wrongfully enriched as a result of their conduct;

g.      whether the proceeds that Defendants obtained as a result of the sale of Celsius Financial Products, rightfully belongs to Plaintiff and Class members;

h.      whether Defendants should be required to return money they received as a result of the sale of Celsius Financial Products to Plaintiff and Class members;

i.      whether Individual Defendants breached the implied covenant of good faith and fair dealing; and

        j.      whether Plaintiff and Class members have suffered damages, and, if so, the nature and extent of those damages.

177.   **Typicality**: Plaintiff has the same interest in this matter as all Class members, and Plaintiff's claims arise out of the same set of facts and conduct as the claims of all Class members. Plaintiff's and Class members' claims all arise out of Luna's uniform misrepresentations, omissions, and unlawful, unfair, and deceptive acts and practices related to the sale of Celsius Financial Products.

178.   **Adequacy**: Plaintiff has no interest that conflicts with the interests of the Class and are committed to pursuing this action vigorously. Plaintiff has retained counsel competent and experienced in complex consumer class action litigation. Accordingly, Plaintiff and his counsel will fairly and adequately protect the interests of the Class.

179.   **Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and members of the Class. The injury suffered by each individual Class member is relatively small compared to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by the Company's conduct. It would be virtually impossible for individual Class members to effectively redress the wrongs done to them. Even if Class members could afford individualized litigation, the court system could not. Individualized litigation would increase delay and expense to all parties, and to the court system, because of the complex legal and factual issues of this case. Individualized rulings and judgments could result in inconsistent relief for similarly situated individuals. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

180.    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class as a whole.

## FIRST CAUSE OF ACTION

### Unregistered Offering and Sale of Securities in
### Violation of Sections 5 and 12(a)(1) of the Securities Act
### (Against the Celsius Entities and Individual Defendant Mashinsky)

181.    Plaintiff restates and realleges all preceding allegations above as if fully set forth herein.

182.    Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this complaint, and further alleges as follows:

183.    Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interest commerce for the purpose of sale or for delivery after sale.

184.    Celsius Financial Products are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1).

185.    Plaintiff and members of the Class purchased Celsius Financial Product securities.

186.    No registration statements have been filed with the SEC or have been in effect with respect to any of the offerings alleged herein.  No exemption to the registration requirement applies.

187.    SEC Rule 159A provides that, for purposes of Section 12(a)(2), an "issuer" in "a primary offering of securities" shall be considered a statutory seller.  17 C.F.R. §230.159A(a).  The Securities Act in turn defines "issuer" to include every person who issues or proposes to issue any security.  15 U.S.C. §77b(a)(4).  Celsius is an issuer of Celsius Financial Products.

188.     The U.S. Supreme Court has held that statutory sellers under §12(a)(1) also include "the buyer's immediate seller" and any person who actively solicited the sale of the securities to plaintiff and did so for financial gain.  *See Pinter v. Dahl*, 486 U.S. 622, 644 n.21, 647 (1988); *accord, e.g.*, *Steed Fin. LDC v. Nomura Sec. Int'l, Inc*., No. 00 Civ. 8058, 2001 WL 1111508, at *7 (S.D.N.Y. Sept. 20, 2001).  That is, §12(a)(1) liability extends to sellers who actively solicit the sale of securities with a motivation to serve their own financial interest or those of the securities owner.  *Pinter*, 486 U.S. at 647; *Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir. 1988).  Celsius and the Defendants are all statutory sellers.

189.     By reason of the foregoing, Defendants violated Sections 5(a), 5(c), and 12(a) of the Securities Act, 15 U.S.C. §§77e(a), 77e(c), and 771(a).

190.     As a direct and proximate result of Defendants' unregistered sale of securities, Plaintiff and the Class have suffered damages in connection with their Celsius Financial Product purchases.

## SECOND CAUSE OF ACTION

### Violation of Sections 10b of the Securities Act and Rule 10b-5
### (Against all Defendants)

191.     Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference paragraphs 1-179, and further alleges as follows:

192.     Plaintiff brings this claim for violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78j(b), and Rule 10b-5(b) promulgated thereunder, 17 C.F.R. §240.10b-5(b).

193.     Plaintiff brings this claim on behalf of all Class members who purchased Celsius Financial Products from February 9, 2018 to the time of this filing.

194.    The Celsius Financial Products are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1).

195.    Section 10(b) and Rule 10b-5(b) make it illegal, in connection with the purchase or sale of any security, "for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange . . . to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Id.*

196.    Defendants carried out a plan, scheme, and course of conduct that Celsius intended to and did deceive the retail investors - Plaintiff and the other Class members - who acquired Celsius Financial Products pursuant to the March 2021 launch offering and thereby caused them to purchase Celsius Financial Products at artificially inflated prices.

197.    In connection with the March 2021 launch of Celsius Financial Products, Defendants disseminated, approved, and/or endorsed the false statements described herein, which these Defendants knew or recklessly should have known were materially misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not materially misleading.

198.    Defendants employed devices, schemes, and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading; and engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the Class members that resulted in artificially high market prices for Celsius Financial

Products in connection with the March 2021 launch, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**Misrepresentations and Omissions**

199.    Defendants' untrue statements and omissions of material facts in connection with the sale of Celsius Financial Products include at least the following:

a.    On February 5, 2021, Mashinsky made several statements promoting the Celsius Loans to investors.  In particular, when an investor asked about the circumstances under which Celsius will liquidate a borrower's collateral, Tal Bentov, the VP Lending (Retail) at Celsius, replied: "We liquidate only when someone is not answering our margin calls and he/she keeps being in default.  We give a lot of time.  A lot more than others.  Trust me. Sometimes weeks to answer our margin calls!"[78]  Near the end of the February 5th AMA, Mashinsky promoted the Earn Rewards Accounts' ability to "earn" investors various cryptocurrencies "for free."[79]  In order to make those statements not misleading, Defendants were obligated to disclose that (1) borrowers did not have flexibility of options when receiving a margin call, but rather faced immediate liquidation without proper notice, and (2) that the yield rate offered by Celsius was not "free" but rather was provided off of highly risky, yet undisclosed, investments by Celsius.

b.    On February 26, 2021, Mashinsky participated in the weekly Celsius AMA on YouTube, discussing, among other things, how Celsius would deal with "handling flash crashes." Mashinsky stated:

> We don't provide high LTV's. . . .  Celsius doesn't make money by liquidating you. We don't charge any fees.  We don't try to give you these gimmicks and special rates… Our goal, our mission is to make sure that we have you as a customer for life. What are the chances that you're going to stick with us if we liquidated you? Most of

---

[78]    https://www.youtube.com/watch?v=2wqD78AnFaw (last visited Jul. 12, 2022).
[79]    *Id.*

our loans are 25% or 33% LTV loans.  We discourage you from taking 50% LTV
loans because that is much higher risk.  *So Celsius did not have any liquidations,
because we give you plenty of time.  We give you advanced notice most of the time,
then we tell you you can put more collateral or return some of the dollars or assets
back.*  We have almost 0 liquidations.  That's not our business.  It's the opposite of
our business.[80]

In order to make those statements not misleading, Defendants were obligated to disclose that

borrowers did not have flexibility of options when receiving a margin call, but rather faced immediate

liquidation without proper notice.

> c.      On April 23, 2021, Mashinsky again made statements regarding Celsius'

borrower-friendly stance on liquidations during a Celsius weekly AMA on YouTube.  In particular,

Mashinsky stated a "margin call doesn't mean we sold your assets or stole your coins.  That's what

the other guys do.  *We always give you ample time* to post more collateral, return some of the assets,

or instruct us to sell your coins."[81]   (Emphasis added).   In order to make this statement not

misleading, Defendants were obligated to disclose that borrowers did not have flexibility of options

when receiving a margin call, but rather faced immediate liquidation without proper notice.

> d.      On May 28, 2021, Mashinsky promoted the stability and wherewithal of the

CEL Token: "Looking at coins, the CEL token was one of the most stable out there.  It did better

than Bitcoin or Ethereum. It did not drawdown as much.  Obviously Celsians who held CEL did

very well as well."[82]  Mashinsky congratulated the investors that held onto their CEL Tokens during

the brief market downturn and bragged that there were "only 20 liquidations" from the 10,000

margin calls that occurred during that time period because Celsius "does a better job than most.

Accommodating, providing enough warning, giving you enough time for doing what's right.  We

---

[80]      https://www.youtube.com/watch?v=cZPy7Pu6vxg&t=3s (last visited Jul. 12, 2022).
[81]      https://www.youtube.com/watch?v=bzEyHLgBY7Y&t=350s (last visited Jul. 12, 2022).
[82]      https://www.youtube.com/watch?v=C7d7rZUEfGo (last visited Jul. 12, 2022).

don't make any money from liquidating you."[83]   Mashinsky proclaimed that "during these drawdowns is when Celsius shines, both from the fact that it does not crash [CEL].  I think NEXO token was down about 75% from top to bottom just last week.  So those are examples of just a different community.  A HODL community versus a speculative community.  Same thing with Binance and other platforms.  Obviously, we only care about doing what's in the best interests of the HODLer."[84]   In order to make those statements not misleading, Defendants were obligated to disclose that (1) borrowers did not have flexibility of options when receiving a margin call, but rather faced immediate liquidation without proper notice, and (2) that the CEL Token was far from stable but rather subject to severe volatility because of Company insider selling pressure.

> e.     On October 9, 2021, Mashinsky stated the following: "Lots to CELebrate here in #London busy week with a lot of large deals and events.  It pays to #HODL."[85]   In order to make those statements not misleading, Defendants were obligated to disclose that, when this statement was made, Mashinsky intended to (and later did) actually sell a portion of his CEL Tokens.

> f.     On December 1, 2021, Celsius held an AMA session on YouTube where investors could ask questions of Celsius representatives.  One investor expressed concern about a "CEL token liquidation cascade" and asked whether Celsius was "worried at all," to which Celsius content manager Zachary Wildes replied "I'm personally not . . . I do think we need to bring a lot more time and attention and focus to CEL token and its utilities.  I'm not concerned about a cascading liquidation event where everyone gets destroyed."[86]  Wildes continued that "We're at a low-point for CEL sentiment and the future of the token" and asked Mashinsky if there was "any level of

---

[83]   *Id.*
[84]   *Id.*

[85]   *See* fn.38, *supra.*
[86]   *See* fn.18, *supra.*

reassurance we can give . . . to the community to show our commitment to CEL token?"[87]  Mashinsky responded that "Earning in CEL allows you to earn twice as many CEL right now with the price lower.  If you believe in the viability of the company, then you would know you're getting a 50% discount.  If you don't believe in it, then you probably don't want these CELs anyway.  If you're not sure about it, how about some of the worlds best investors coughing up 750$ Million?  They bought into half of all the CEL tokens out there.  Our Treasury, which is mostly CEL token.  They're part owners of that . . . ."[88]  In order to make those statements not misleading, Defendants were obligated to disclose that (1) borrowers did not have flexibility of options when receiving a margin call, but rather faced immediate liquidation without proper notice; (2) that there was a significant risk that a CEL Token liquidation cascade not only could happen, but was likely to happen in the near future; (3) that the Company's successes would not automatically lead to a 50% increase in the CEL Token price in the future; and (4) that Celsius did not, in fact, have the support of well-capitalized backers or the ability to maintain the Company's operations in the event of a price collapse.

g.      On December 9, 2021, Mashinsky posted a message on his Twitter account, promoting CEL Tokens as a long-term investment for Company insiders and stating: "All @CelsiusNetwork founders have made purchases of #CEL and are not sellers of the token."[89]  In order to make those statements not misleading, Defendants were obligated to disclose that only five days earlier Mashinsky sold over 11,000 CEL Tokens for about $43,000 worth of WBTC.

h.      On January 19, 2022, Mashinsky made a series of statements regarding the CEL Token and how it was poised for future growth in use and, more importantly, price.  For

---

[87]      *Id.*

[88]      *Id.*
[89]      *See* fn.39, *supra*.

example, when asked about how Celsius generates revenue, Mashinsky responded that "**We always make all of our money from institutions** . . . We don't charge fees, spreads, all of that stuff."[90]  In order to make that statement not misleading, Defendants were obligated to disclose that depositing digital assets into Earn Rewards Accounts was not akin to depositing money into a savings account and that the profit comes from the Company searching of yield with corporate funds via leveraged positions in DeFi protocols with severe liquidation risk.

**Materiality**

200.    The forgoing misrepresentations and omissions were each material.  These representations related to critical issues concerning the security of Celsius Financial Product holders' investments.

201.    These misrepresentations and omissions related to, among other things:  (i) the extent to which the Defendants and other insiders were restricted from selling substantial amounts of Celsius Financial Products on crypto-asset exchanges; (ii) the extent to which Defendants and its insiders intended to sell their Celsius Financial Product holdings over that same period; and (iii) the extent to which Defendants and its insiders did in fact sell substantial amounts of their Celsius Financial Products crypto-asset exchanges over that same period while simultaneously promoting the same securities as long-term investments.  If a reasonable investor knew that the Company and the Executive Defendants were engaging in highly speculative investments in a volatile crypto market to earn the yield necessary to make good on its promises to investors, then that investor would reasonably expect the price of Celsius Financial Products to be substantially lower, given that the investment would be much riskier.

202.    Accordingly, there is a substantial likelihood that the disclosure of the omitted facts would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

---

[90]      *See* fn.27, *supra.*

**Scienter**

203.    The Company and Executive Defendants acted with scienter in engaging in the forgoing misconduct, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

204.    Indeed, the Company and the Executive Defendants created and controlled the software that determined whether they would have the ability to retain control over funds staked in the Earn Rewards Accounts and CEL Token liquidity pool and whether they could draw on those funds.  They have likewise admitted that they intentionally decided to retain control over funds supposedly "locked" in liquidity pools because they wanted to provide themselves with flexibility to pay for expenses that could arise in the future.

205.    Defendants knew before the 2018  launch that any applicable vesting periods would not preclude the Executive Defendants or their friends and family dumping massive quantities of Celsius Financial Products on the market and Celsius intended to transfer millions of the newly issued Celsius Financial Products to project insiders, and that it, along with those insiders, intended to dump tens of millions of these tokens on crypto-asset exchanges, such that Celsius and its insiders intended to profit massively from the offering, while outside investors would be precluded from doing so.

206.    Indeed, Defendants necessarily knew what restrictions were imposed on their own CEL Tokens, as well as the tokens that they issued and allocated to current and former team members, and to outside investors.  These Defendants likewise knew that they, along with current and former team members, held a significant amount of the total CEL Token supply in circulation, and that if that portion of the Float were sold, the price of the CEL Tokens would plummet and likely cause the collapse of the other Celsius Financial Products.  It was thus highly unreasonable for Defendants to conceal information relating to selling restrictions imposed on them and their insiders' tokens.

207.    Defendants' failure to disclose such information, coupled with their constant promotion of the Celsius Financial Products as being "low risk," demonstrates that these Defendants intended that they and their insiders would sell substantial amounts of CEL Tokens at significant profits at a price that was artificially inflated on and during the weeks and months that followed the CEL Token launch.

208.    The Company and the Executive Defendants had the motive not to disclose these facts because such disclosure would have been self-defeating.  They controlled a significant proportion of Celsius Financial Products, and such a disclosure would decrease the value of those assets.  In other words, they had an incentive to ensure that the price of Celsius Financial Products remained inflated.

209.    These Defendants executed on that plan, too, by (along with current and former team members) selling billions of Celsius Financial Products on the market during that period.

210.    Defendants knew that they had sold Celsius Financial Products on the market on and in the months that followed the Company's launch.  They likewise know that their current and former team members sold Celsius Financial Products:  in addition to Mashinsky's admission of selling some of his CEL Token holdings, Defendants know which CEL Tokens they allocated to team members and can therefore track the transaction history of that CEL Token on the blockchain.

**Reliance, Economic Loss, and Loss Causation**

211.    As a result of the publication and dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the price of the Celsius Financial Products upon issuance on February 9, 2018, and for a period of time, thereafter, were artificially inflated.

212.    In ignorance of the fact that the price of Celsius Financial Products was artificially inflated, and relying directly or indirectly on the false, misleading, and materially incomplete statements that Defendants made and approved, or upon the integrity of the market in which the Celsius Financial Products were sold, or on the absence of material adverse information that these Defendants knew or recklessly should have known of but failed to disclose in public statements,

Plaintiff and the other Class members acquired Celsius Financial Products at artificially high prices and were damaged thereby.

213.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other Class members suffered damages in connection with the respective purchases of Celsius Financial Products and are entitled to an award compensating them for such damages.

214.    Indeed, the price of CEL Tokens dropped significantly as Defendants disclosed, and the market discovered, the truth concerning the CEL Tokens project and its prospects.  For example, the price of CEL Tokens went from a high of $7.73 on June 3, 2021, to a low of $0.28 just over a year later on June 12, 2021, in the wake of the June Crisis and Celsius freezing its investors accounts.

215.    In addition, as a direct and proximate result of Defendants' wrongful conduct, Celsius has generated and retained ill-gotten gains in connection with the launch of Celsius Financial Products, such that Plaintiff and the other Class members are entitled to the disgorgement of Celsius' ill-gotten gains acquired from such misconduct.

216.    As a direct and proximate result of Defendants' unregistered sale of securities, Plaintiff and the Class have suffered damages in connection with their Celsius Financial Product purchases.

### THIRD CAUSE OF ACTION

**Violation of Sections 20(a) of the Securities Act**
**(Against the Celsius Entities and Defendant Mashinsky)**

217.    Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference paragraphs 1-217, and further alleges as follows:

218.    This Count is asserted against the Executive Defendants (collectively, the "Control Person Defendants") under Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a).

219.    The Control Person Defendants, by virtue of their offices, ownership, agency, agreements or understandings, and specific acts were, at the time of the wrongs alleged herein, and

as set forth herein, controlling persons within the meaning of Section 15 of the Securities Act. The Control Person Defendants, and each of them, had the power and influence and exercised the same to cause the unlawful scheme to artificially increase the interest in and price of the Celsius Financial Products, particularly the CEL Token.

220. The Control Person Defendants, separately or together, possess, directly or indirectly, the power to direct or cause the direction of the management and policies of Celsius, through ownership of voting securities, by contract, subscription agreement, or otherwise.

221. The Control Person Defendants also have the power to direct or cause the direction of the management and policies of Celsius.

222. The Control Person Defendants, separately or together, have sufficient influence to have caused the Company to engage in the fraudulent conduct described above.

223. The Control Person Defendants, separately or together, jointly participated in the Company's fraudulent conduct described above.

224. By virtue of the conduct alleged herein, the Control Person Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiff and the Class for rescission and/or damages suffered.

## FOURTH CAUSE OF ACTION

### Violation of Sections 20A of the Exchange Act
### (Against the Celsius Entities and Defendant Mashinsky)

225. Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference paragraphs 1-217, and further alleges as follows:

226. Plaintiff brings this claim under Section 20A of the Exchange Act, 15 U.S.C. §78t-1, against Defendants on behalf of Class members who transacted in CEL Tokens contemporaneously with Defendants' transactions in Celsius Financial Products.

227.     Plaintiff brings this claim on behalf of all Class members who purchased Celsius Financial Products from February 8, 2020, to the present.

228.     Since 2018, the Celsius Entities and Defendant Mashinsky (collectively referred to in this cause of action as the "Section 20A Defendants") have been in possession of material, non-public information about Celsius and its insiders, as set forth above with respect to the Section 20A Defendants' violation of Section 10(b) and Rule 10b-5, while the Section 20A Defendants have been transacting in CEL Tokens.  Section 20A Defendants have thus engaged in insider trading through which they have received at least millions of dollars in profits.

229.     The material, non-public information about Celsius and its insiders that the Section 20A Defendants have failed to disclose, during some or all of the time in which they have been transacting in CEL Tokens since 2018, includes the details of any applicable vesting schedules for Celsius and Celsius insiders; that Defendant Mashinsky was not subject to any vesting schedule; that any applicable vesting periods would allow the Section 20A Defendants to transfer tens of millions of the newly issued CEL Tokens to crypto-asset exchanges; that the Section 20A Defendants intended to deposit tens of millions of these tokens on crypto-asset exchanges; that the Section 20A Defendants intended to profit massively from the offering; that the Section 20A Defendants reserved the right to liquidate their tokens far more than necessary to pay expenses; and that the Section 20A Defendants dumped massive amounts of CEL tokens on the market beginning on 2018.

## **FIFTH CAUSE OF ACTION**

### **Violation of Sections 15 of the Securities Act**
### **(Against all the Executive Defendants)**

230.     Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference paragraphs 1-217, and further alleges as follows:

231.   This Count is asserted against the Executive Defendants (collectively referred to in this cause of action as the "Control Person Defendants") under Section 15 of the Securities Act, 15 U.S.C. §77o.

232.   The Control Person Defendants, by virtue of their offices, ownership, agency, agreements or understandings, and specific acts were, at the time of the wrongs alleged herein, and as set forth herein, controlling persons within the meaning of Section 15 of the Securities Act. The Control Person Defendants, and each of them, had the power and influence and exercised the same to cause the unlawful offer and sale of Celsius Financial Products securities as described herein.

233.   The Control Person Defendants, separately or together, possess, directly or indirectly, the power to direct or cause the direction of the management and policies of Celsius, through ownership of voting securities, by contract, subscription agreement, or otherwise.

234.   The Control Person Defendants also have the power to direct or cause the direction of the management and policies of the Company.

235.   The Control Person Defendants, separately or together, have sufficient influence to have caused Celsius Financial Products and/or the Company to submit a registration statement.

236.   The Control Person Defendants, separately or together, jointly participated in Celsius' failure to register Celsius Financial Products.

237.   By virtue of the conduct alleged herein, the Control Person Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiff and the Class for rescission and/or damages suffered.

## SIXTH CAUSE OF ACTION

**Unjust Enrichment/Restitution**
**(New Jersey Common Law, in the Alternative)**
**(Against the Celsius Entities)**

238.     Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference paragraphs 1-217, and further alleges as follows:

239.     Plaintiff and members of the Class conferred a monetary benefit on Defendants by raising the price and trading volume of the Celsius Financial Products, which allowed Defendants to sell their Celsius Financial Products to Plaintiff and Class members at inappropriately and artificially inflated prices.

240.     Defendants received a financial benefit from the sale of their Celsius Financial Products at inflated prices and are in possession of this monetary value that was intended to be used for the benefit of, and rightfully belong to Plaintiff and members of the Class.

241.     Plaintiff seeks restitution in the form of the monetary value of the difference between the purchase price of the Celsius Financial Products and the price those Celsius Financial Products sold for.

## SEVENTH CAUSE OF ACTION

### Declaratory Judgment
### (Declaratory Judgment Act, N. J. S. A. 2A:16-51 *et seq.*)
### (Against the Celsius Entities)

242.     Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference paragraphs 1-217, and further alleges as follows:

243.     This Count is asserted against the Celsius Entities under Section 2A:16-59 of the New Jersey Revised Statutes.

244.     The Declaratory Judgments Act, N.J. Stat. Ann. § 2A:16-51 *et seq*. (West), authorizes courts to declare rights, status and other legal relations so as to afford litigants relief from uncertainty and insecurity. *Chamber of Com. of U. S. v. State*, 89 N.J. 131, 140 (1982). To maintain such an action, there must be a "justiciable controversy" between adverse parties, and plaintiff must have an interest in the suit.

64

245.    Plaintiff and the members of the Class have an obvious and significant interest in this lawsuit.

246.    Upon information and belief, each class member who purchased a Celsius Loan product in exchange for a promissory note received a loan agreement that contained misrepresentations and/or omissions of material fact that were made negligently or with the intent to deceive investors about the risks underlying the Celsius Loans.

247.    Plaintiff and class members justifiably relied on the representations by the Celsius entities that the Celsius Loans were a "low risk" way to "earn" interest and that, in the event of a margin call, borrowers would have ample time and opportunity to address the underlying issue.

248.    If the true facts had been known, Plaintiff and the class would not have purchased a Celsius Loan from the Company and/or would have not purchased the Celsius Loan under the same terms.

249.    There is, thus, a justiciable controversy over the legality and enforceability of the Celsius Loan products offering.

250.    Plaintiff seeks an order from the Court declaring that all current and/or open Celsius Loans are (a) unauthorized; (b) wrongfully and fraudulently entered into; and as a result (c) void and unenforceable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually, and on behalf of all others similarly situated, respectfully requests that this Court:

A.    Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying one or more of the Classes defined above;

B.  Appoint Plaintiff as a representative of the Class and his counsel as Class counsel;

C.  Declare that the Company and Executive Defendants offered and sold unregistered securities in violation of Sections 5(a), 12(a), and 15 of the Securities Act;

D.  Declare that all Celsius Loans currently held by the Company are void and unenforceable, and issue an order directing Celsius to rescind any outstanding Celsius Loans;

E.  Award all actual, general, special, incidental, statutory, rescission, punitive, and consequential damages and restitution to which Plaintiff and the Class members are entitled;

F.  Award post-judgment interest on such monetary relief;

G.  Grant appropriate injunctive and/or declaratory relief;

H.  Award reasonable attorneys' fees and costs; and

I.  Grant such further relief that this Court deems appropriate.

## **JURY DEMAND**

Plaintiff, individually and on behalf of the putative Class, demands a trial by jury on all issues so triable.

DATED:  July 13, 2022

**RADICE LAW FIRM**

/s/ John Radice
John Radice (Bar No. 023612004)
475 Wall Street
Princeton, NJ 08540
Telephone: 646-245-8502
Facsimile:  609-385-0745
jradice@radicelawfirm.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Johnathan M. Zimmerman (204322016)
Sean T. Masson (*pro hac vice* forthcoming)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
jzimmerman@scott-scott.com

smasson@scott-scott.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
John T. Jasnoch (*pro hac vice* forthcoming)
jjasnoch@scott-scott.com
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile: 619-236-0508

*Attorneys for Plaintiff and the Proposed Class*

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

## DEFENDANTS

**(b)** County of Residence of First Listed Plaintiff   Benton County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Hudson County
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
John Radice, Radice Law Firm
475 Wall Street, Princeton, NJ 08540
(646) 245-8502

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [x] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [x] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [x] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | | | [ ] 820 Copyrights | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | | [ ] 830 Patent | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | | [ ] 840 Trademark | [ ] 460 Deportation |
| | | | **LABOR** | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [x] 370 Other Fraud | [ ] 710 Fair Labor Standards Act | | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 371 Truth in Lending | [ ] 720 Labor/Management Relations | **SOCIAL SECURITY** | [ ] 485 Telephone Consumer Protection Act |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 380 Other Personal Property Damage | [ ] 740 Railway Labor Act | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice | [ ] 385 Property Damage Product Liability | [ ] 751 Family and Medical Leave Act | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | | | [ ] 790 Other Labor Litigation | [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 Other Statutory Actions |
| | | | [ ] 791 Employee Retirement Income Security Act | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | [ ] 865 RSI (405(g)) | [ ] 893 Environmental Matters |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | | | [ ] 895 Freedom of Information Act |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | **FEDERAL TAX SUITS** | [ ] 896 Arbitration |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | [ ] 871 IRS—Third Party 26 USC 7609 | |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | **IMMIGRATION** | | [ ] 950 Constitutionality of State Statutes |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 462 Naturalization Application | | |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | | |
| | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. §78aa and 28 U.S.C. §1331
Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

[x] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes   [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____ DOCKET NUMBER _____

DATE
July 13, 2022

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

  **(b)**   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

  **(c)**   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.**   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**   **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: <u>Nature of Suit Code Descriptions</u>.

**V.**   **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.**   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.**   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

## <u>CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS</u>

I, Samuel Taylor Goines, hereby certify that the following is true and correct to the best of my knowledge information and belief:

1.      I have reviewed the complaint in this action and authorize Scott+Scott Attorneys at Law to file it on my behalf.

2.      I am willing to serve as a representative party on behalf of all persons and entities that purchased, or otherwise acquired, CEL tokens.

3.      During the relevant period, I purchased and/or sold the security that is the subject of the complaint, as set forth in the attached **Schedule A.**

4.      I did not engage in the foregoing transactions at the direction of counsel nor in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

5.      During the three-year period preceding the date of my signing this Certification, I have not sought to serve, or served, as a representative party or lead plaintiff on behalf of a class in any private action arising under the Securities Act or the Exchange Act.

6.      I will not accept any payment for serving as a representative party on behalf of the Class beyond the *pro rata* share of any recovery, expert for such reasonable costs and expenses (including lost wages) directly related to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____ at _____ (city, state).

DocuSigned by:

*Taylor Goines*

69A8D31B974A4CF...

_____

Samuel Taylor Goines

**SCHEDULE A**

| Date | Transaction | CEL Tokens | Consideration | Appx. Value |
|---|---|---|---|---|
| 1/3/2020 | Reward | 1 | | |
| 2/28/2020 | Reward | 0.000211982 | | <$0.01 |
| 3/6/2020 | Reward | 0.000961742 | | <$0.01 |
| 3/13/2020 | Reward | 0.000962667 | | <$0.01 |
| 3/20/2020 | Reward | 0.000963593 | | <$0.01 |
| 3/27/2020 | Reward | 0.000964519 | | <$0.01 |
| 4/3/2020 | Reward | 0.000965447 | | <$0.01 |
| 4/10/2020 | Reward | 0.000966375 | | <$0.01 |
| 4/17/2020 | Reward | 0.000967304 | | <$0.01 |
| 4/24/2020 | Reward | 0.000968234 | | <$0.01 |
| 5/1/2020 | Reward | 0.000969165 | | <$0.01 |
| 5/8/2020 | Reward | 0.000970097 | | <$0.01 |
| 5/15/2020 | Reward | 0.00097103 | | <$0.01 |
| 5/22/2020 | Reward | 0.000971964 | | <$0.01 |
| 5/29/2020 | Reward | 0.000972898 | | <$0.01 |
| 6/5/2020 | Reward | 0.000973834 | | <$0.01 |
| 6/12/2020 | Reward | 0.00097477 | | <$0.01 |
| 6/19/2020 | Reward | 0.000975707 | | <$0.01 |
| 6/26/2020 | Reward | 0.000976646 | | <$0.01 |
| 7/3/2020 | Reward | 0.000977585 | | <$0.01 |
| 7/10/2020 | Reward | 0.000978525 | | <$0.01 |
| 7/17/2020 | Reward | 0.000979465 | | <$0.01 |
| 7/24/2020 | Reward | 0.000980407 | | <$0.01 |
| 7/31/2020 | Reward | 0.00098135 | | <$0.01 |
| 8/7/2020 | Reward | 0.000982294 | | <$0.01 |
| 8/14/2020 | Reward | 0.000983238 | | <$0.01 |
| 8/21/2020 | Reward | 0.000984183 | | <$0.01 |
| 8/28/2020 | Reward | 0.00098513 | | <$0.01 |
| 9/4/2020 | Reward | 0.000986077 | | <$0.01 |
| 9/11/2020 | Reward | 0.000987025 | | <$0.01 |
| 9/18/2020 | Reward | 0.000987974 | | <$0.01 |
| 9/25/2020 | Reward | 0.000988924 | | <$0.01 |
| 10/2/2020 | Reward | 0.000989875 | | <$0.01 |
| 10/9/2020 | Reward | 0.000990827 | | <$0.01 |

| 10/16/2020 | Reward | 0.00099178 | | <$0.01 |
|---|---|---|---|---|
| 10/23/2020 | Reward | 0.000992733 | | <$0.01 |
| 10/30/2020 | Reward | 0.000993688 | | <$0.01 |
| 11/6/2020 | Reward | 0.000994643 | | <$0.01 |
| 11/13/2020 | Reward | 0.0009956 | | <$0.01 |
| 11/14/2020 | Buy | 198.97 | | $378.63 |
| 11/14/2020 | Deposit | 198.97 | | |
| 11/20/2020 | Reward | 0.148399593 | | $0.31 |
| 11/27/2020 | Reward | 0.192460018 | | $0.41 |
| 12/4/2020 | Reward | 0.192645075 | | $0.46 |
| 12/11/2020 | Reward | 0.192830311 | | $0.41 |
| 12/18/2020 | Reward | 0.193015725 | | $0.53 |
| 12/25/2020 | Reward | 0.193201317 | | $0.72 |
| 1/1/2021 | Reward | 0.193387087 | | $1.07 |
| 1/8/2021 | Reward | 0.193573036 | | $1.06 |
| 1/15/2021 | Reward | 0.193759164 | | $1.01 |
| 1/22/2021 | Reward | 0.184248198 | | $0.81 |
| 1/29/2021 | Reward | 0.184416501 | | $0.90 |
| 2/5/2021 | Reward | 0.184584959 | | $0.91 |
| 2/12/2021 | Reward | 0.18475357 | | $1.09 |
| 2/17/2021 | Buy | 819.89 | 2.5 ETH | $4,714.14 |
| 2/17/2021 | Deposit | 819.89 | | |
| 2/19/2021 | Reward | 0.420728219 | | $2.38 |
| 2/26/2021 | Reward | 0.934250572 | | $4.65 |
| 3/5/2021 | Reward | 0.935103972 | | $4.26 |
| 3/12/2021 | Reward | 0.935958154 | | $5.21 |
| 3/19/2021 | Reward | 0.936813115 | | $4.71 |
| 3/26/2021 | Reward | 0.937668858 | | $4.56 |
| 4/2/2021 | Reward | 0.938525383 | | $4.50 |
| 4/9/2021 | Reward | 0.939382689 | | $7.34 |
| 4/16/2021 | Reward | 0.940240779 | | $6.31 |
| 4/23/2021 | Reward | 0.941099653 | | $5.38 |
| 4/30/2021 | Reward | 0.941959312 | | $5.45 |
| 5/7/2021 | Reward | 0.942819755 | | $5.97 |
| 5/14/2021 | Reward | 0.943680985 | | $6.65 |
| 5/21/2021 | Reward | 0.944543001 | | $6.45 |
| 5/28/2021 | Reward | 0.945405805 | | $6.29 |

| 6/4/2021 | Reward | 0.946269397 | | $7.43 |
|---|---|---|---|---|
| 6/11/2021 | Reward | 0.947133777 | | $6.74 |
| 6/18/2021 | Reward | 0.947998948 | | $6.35 |
| 6/25/2021 | Reward | 0.948864908 | | $5.51 |
| 7/2/2021 | Reward | 0.94973166 | | $5.57 |
| 7/9/2021 | Reward | 0.950599203 | | $5.94 |
| 7/16/2021 | Reward | 0.951467539 | | $5.19 |
| 7/23/2021 | Reward | 0.952336668 | | $5.14 |
| 7/30/2021 | Reward | 0.953206591 | | $5.67 |
| 8/6/2021 | Reward | 0.954077308 | | $5.76 |
| 8/13/2021 | Reward | 0.954948821 | | $5.99 |
| 8/20/2021 | Reward | 0.95582113 | | $5.88 |
| 8/27/2021 | Reward | 0.956694236 | | $5.31 |
| 9/3/2021 | Reward | 0.957568139 | | $5.97 |
| 9/10/2021 | Reward | 0.958442841 | | $5.59 |
| 9/17/2021 | Reward | 0.959318342 | | $5.19 |
| 9/24/2021 | Reward | 0.960194642 | | $4.80 |
| 10/1/2021 | Reward | 0.961071743 | | $4.82 |
| 10/8/2021 | Reward | 0.961949645 | | $5.45 |
| 10/15/2021 | Reward | 0.962828349 | | $5.45 |
| 10/22/2021 | Reward | 0.963707856 | | $5.00 |
| 10/29/2021 | Reward | 0.964588166 | | $4.72 |
| 11/5/2021 | Reward | 0.96546928 | | $3.99 |
| 11/12/2021 | Reward | 0.966351199 | | $4.41 |
| 11/19/2021 | Reward | 0.967233924 | | $3.92 |
| 11/26/2021 | Reward | 0.968117455 | | $4.06 |
| 12/3/2021 | Reward | 0.969001793 | | $3.88 |
| 12/10/2021 | Reward | 1.016849885 | | $3.88 |
| 12/17/2021 | Reward | 1.017823714 | | $3.93 |
| 12/24/2021 | Reward | 1.018798476 | | $4.05 |
| 12/31/2021 | Reward | 1.019774172 | | $4.68 |
| 1/4/2022 | Buy | 460.39 | 0.5 ETH | $1,849.55 |
| 1/5/2022 | Buy | 6,598.59 | 7 ETH | $24,039.36 |
| 1/5/2022 | Buy | 9,279.77 | 10 ETH | $33,807.17 |
| 1/5/2022 | Buy | 30,896.22 | 34 ETH | $112,558.12 |
| 1/5/2022 | Deposit | 47,234.98 | | |
| 1/7/2022 | Reward | 9.269918841 | | $29.85 |

| 1/8/2022 | Buy | 4,912.01 | 15,998.54 USDC | $15,822.24 |
|---|---|---|---|---|
| 1/8/2022 | Deposit | 4,912.01 | | |
| 1/13/2022 | Buy | 6,109.73 | 20,003.13 USDC | $20,617.36 |
| 1/13/2022 | Deposit | 6,109.73 | | |
| 1/13/2022 | Buy | 5,902.26 | 19,992.6 USDC | $19,917.27 |
| 1/13/2022 | Deposit | 5,902.26 | | |
| 1/14/2022 | Reward | 50.9192416 | | $172.36 |
| 1/15/2022 | Buy | 1,576.4 | 5,068.03 USDC | $5,058.51 |
| 1/15/2022 | Deposit | 1,576.4 | | |
| 1/21/2022 | Reward | 63.7306246 | | $193.74 |
| 1/28/2022 | Reward | 64.09371905 | | $133.96 |
| 1/31/2022 | Buy | 2,493.63 | 2.5 ETH | $6,377.76 |
| 1/31/2022 | Deposit | 2,493.63 | | |
| 2/4/2022 | Reward | 65.3698573 | | $162.12 |
| 2/11/2022 | Reward | 83.25729508 | | $285.76 |
| 2/18/2022 | Reward | 83.3569636 | | $271.74 |
| 2/19/2022 | Buy | 284.84 | 0.32 ETH | $897.25 |
| 2/21/2022 | Deposit | 284.84 | | |
| 2/25/2022 | Reward | 86.97511874 | | $260.93 |
| 3/4/2022 | Reward | 87.25793884 | | $259.16 |
| 3/11/2022 | Reward | 87.36657497 | | $269.61 |
| 3/18/2022 | Reward | 87.47534636 | | $281.67 |
| 3/23/2022 | Buy | 1,868.46 | 5,995 USDC | $5,985.62 |
| 3/23/2022 | Buy | 201.6 | 0.215 ETH | $649.37 |
| 3/23/2022 | Deposit | 2,070.06 | | |
| 3/25/2022 | Reward | 88.04362158 | | $287.90 |
| 4/1/2022 | Reward | 90.27110325 | | $295.19 |
| 4/8/2022 | Reward | 90.38349077 | | $275.53 |
| 4/9/2022 | Collateral | -60,963.32 | | $18,000 |
| 4/9/2022 | Collateral | -59,459 | | $17,600 |
| 4/15/2022 | Reward | 33.67060543 | | $72.39 |

| 4/22/2022 | Reward | 16.51091132 | | $34.91 |
| 4/29/2022 | Reward | 16.48543303 | | $34.75 |
| 5/2/2022 | Collateral | -13,181.43 | | -$27,200 |
| 5/6/2022 | Collateral | 13,181.43 | | $26,758.31 |
| 5/6/2022 | Reward | 7.131194048 | | $14.45 |
| 5/6/2022 | Loan Interest | -1.263 | | -$2.56 |
| 5/11/2022 | Loan Interest | -1.835 | | -$2.75 |
| 5/11/2022 | Collateral | -13,100 | | -13,847.76 |
| 5/12/2022 | Collateral | 59,459.45 | | $39,947.29 |
| 5/12/2022 | Collateral | 13,100 | | $8,801.11 |
| 5/12/2022 | Loan Interest | -27.31 | | -$18.35 |
| 5/12/2022 | Liquidation | -65,491 | | -$44,000 |
| 5/12/2022 | Operation Cost | -1,965.57 | | -$1,320 |
| 5/13/2022 | Reward | 0.020647223 | | $0.02 |
| 5/20/2022 | Reward | 0.000019 | | <$0.01 |
| 5/27/2022 | Reward | 0.000019 | | <$0.01 |
| 6/3/2022 | Reward | 0.000019 | | <$0.01 |
| 6/10/2022 | Reward | 0.000019 | | <$0.01 |
| 6/17/2022 | Reward | 0.000019 | | <$0.01 |

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of New Jersey

| | |
|---|---|
| TAYLOR GOINES, Individually and on Behalf of Itself and All Others Similarly Situated, | ) |
| | ) |
| | ) |
| | ) |
| _Plaintiff(s)_ | ) |
| v. | ) |
| Celsius Network, LLC, Celsius Lending, LLC, Celsius Keyfi LLC, Alex Mashinsky, Shlomi "Daniel" Leon, Rod Bolger, Ron Deutsch, Oren Blonstein, David Barse, and Alan Jeffrey Carr | ) |
| | ) |
| | ) |
| | ) |
| _Defendant(s)_ | ) |

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_   See Schedule A, attached hereto and incorporated herein

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

John Radice
Radice Law Firm
475 Wall Street
Princeton, NJ  08540

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

_CLERK OF COURT_

Date: _____

_____
_Signature of Clerk or Deputy Clerk_

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No. _____

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.


Date: _____                    _____
                                                          *Server's signature*

                                                          _____
                                                          *Printed name and title*

                                                          _____
                                                          *Server's address*

Additional information regarding attempted service, etc:

*Goines v. Celsius Network LLC, et al.*

# <u>SCHEDULE A</u>

**CELSIUS NETWORK, LLC**
c/o The Corporation Trust Company
1209 Orange Street
Wilmington, DE 19801

**CELSIUS LENDING, LLC**
c/o The Corporation Trust Company
1209 Orange Street
Wilmington, DE 19801

**CELSIUS KEYFI LLC**
c/o The Corporation Trust Company
1209 Orange Street
Wilmington, DE 19801

**ALEXANDER MASHINSKY**
140 E 63rd Street PH 4
New York, NY 10065

**SHLOMI "DANIEL" LEON**
75 W End Ave
NEW YORK, NY 10023

**DAVID BARSE**
230 Osborn Road
Harrison, NY 10528

**ALAN JEFFREY CARR**
18 Weesuck Ave
East Quogue, NY 11942