**WHITE & CASE LLP**
David M. Turetsky
Samuel P. Hershey
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: david.turetsky@whitecase.com
       sam.hershey@whitecase.com

– and –

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
Email: mandolina@whitecase.com
       gregory.pesce@whitecase.com

**WHITE & CASE LLP**
Keith H. Wofford
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Email: kwofford@whitecase.com

– and –

**WHITE & CASE LLP**
Aaron E. Colodny (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone: (213) 620-7700
Facsimile: (213) 452-2329
Email: aaron.colodny@whitecase.com

*Counsel to the Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

## STATEMENT OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS REGARDING THE DEBTORS' EXCLUSIVE PERIODS

The Official Committee of Unsecured Creditors (the "**Committee**") appointed in the cases of the above-captioned debtors and debtors-in-possession (collectively the "**Debtors**" and together with their non-debtor affiliates, "**Celsius**") files this statement (the "**Statement**") with respect to

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 USA LLC (9450); GK8 Ltd. (1209); and GK8 UK Limited (0893). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

the Debtors' motion to extend their exclusive period to file and solicit a plan of reorganization and disclosure statement and respectfully states as follows:

**Statement**

1. Throughout the course of its plan negotiations with the Debtors, the Committee has prioritized developing a plan that will maximize value by distributing liquid cryptocurrency to account holders and unsecured creditors while also providing them with the opportunity to benefit from the long-term appreciation of the Debtors' illiquid assets (as opposed to liquidating those assets at fire-sale prices). On February 14, 2023, the Debtors filed a presentation outlining certain terms of a potential plan of reorganization developed in consultation with the Committee. At the Committee's insistence, the proposed plan framework contemplated that the Debtors would distribute liquid cryptocurrency to all Earn creditors. The framework also contemplated that the Debtors would contribute certain of their liquid and illiquid assets to a new, public reporting company ("**NewCo**") that would be: (1) 100% owned by creditors, (2) operated by qualified and experienced management, and (3) overseen by a board of directors with the majority of members appointed by creditors.

2. Since that time, the Debtors, the Committee, and the proposed plan sponsor, NovaWulf Digital Management, LP ("**NovaWulf**") have continued their discussions and the Debtors and the Committee have engaged with creditors and regulators to discuss the proposed plan (the "**NovaWulf Transaction**"). Many of those discussions have been productive and resulted in improvements to the plan framework.

3. On February 28, 2023, the Debtors, the Committee, and NovaWulf entered into a Plan Sponsor Agreement (the "**PSA**"). Under the PSA, the Debtors and the Committee have

agreed to support the NovaWulf Transaction as a stalking horse proposal.[2] Importantly, the NovaWulf Transaction will be subject to a competitive auction process. The Committee intends to further engage with third parties that are interested in pursuing a better transaction (and, indeed, recently received an alternative proposal). If a better transaction is proposed, the PSA allows each of the Committee and the Debtors to exercise a "fiduciary out" to pursue that better transaction.[3] Thus, while the PSA is an important step toward resolving these cases, it is not the end of the road.

4. With that said, the Committee believes that the NovaWulf Transaction currently presents the best option to maximize value for account holders and unsecured creditors. Accordingly, the Committee supports extending the Debtors' exclusive period to March 31, 2023 to allow the Debtors to file a plan of reorganization and disclosure statement reflecting the NovaWulf Transaction and that are acceptable to the Committee.

5. The NovaWulf Transaction offers several potential benefits and opportunities to creditors. Creditors will not be made whole on the effective date of any plan. The Debtors' prior management lost billions of dollars and left Celsius insolvent. The Debtors' core business is no longer operating and will not be restarted. To the extent more value is provided to one creditor now, it will not be available for another. However, there is the potential to increase creditors' recoveries over time through the creation of NewCo under the NovaWulf Transaction. The Debtors' Bitcoin mining business has suffered numerous setbacks, but could be lucrative and developed into one of the largest mining operations in the world, if it is managed properly. NovaWulf has also indicated that it plans for NewCo to operate its own validator nodes with

---

[2] The bid protections provided in the PSA will be heard at the March 21, 2023 hearing. *See Debtors' Motion for Entry of an Order (I) Authorizing and Approving Certain Bid Protections for the Proposed Plan Sponsor and (II) Granting Related Relief* [Dkt. No. 2151].

[3] To determine whether an alternative proposal is a better transaction, the parties may consider a number of factors, including whether the transaction meets regulatory approvals, is likely to close, is supported by adequate capital, and will provide a higher and better recovery for account holders and other creditors.

respect to the Debtors' staked Ethereum, the Debtors' largest illiquid asset. The rehabilitation and operation of those diversified businesses, and other opportunities that NovaWulf intends to develop inside NewCo, could generate value over time and increase recoveries to creditors.

6.      The NovaWulf Transaction would also provide an option for borrowers who have outstanding loans to agree to a structured settlement of their claims against the Debtors. At the end of the settlement term, electing borrowers would receive a significant portion of the digital assets they initially transferred to the Debtors. The interest paid by those borrowers and the return on the staked Ethereum that would be set aside to fund the ultimate repayment of NewCo's obligations to electing borrowers would benefit general Earn creditors, as 100% owners of NewCo.

7.      NewCo's equity would be represented by equity share tokens that will be traded on the Provenance Blockchain (not the pink sheets, as is often the case for post-reorganization equity), which would allow for near-instantaneous settlement of transactions and eliminate many of the middlemen present in traditional finance. Creditors would be able to trade the equity share tokens at their option to monetize their share of the Debtors' illiquid assets.

8.      When determining whether to support the NovaWulf Transaction, the Committee examined the alternatives, including all bids submitted through the Court-approved bid procedures and a potential liquidating plan. At this time, no other proposal has provided an actionable solution for the Debtors' retail loan portfolio. No other bid has offered a fair market price for the Debtors' illiquid assets. Many of the proposals presented potential regulatory hurdles, the resolutions of which remain uncertain. The time needed to address such issues could result in a significant delay to the chapter 11 process. No other proposal, to date, provided for as significant of a cash contribution coupled with the long-term upside for account holders and unsecured creditors as the NovaWulf Transaction. An orderly liquidation would require the liquidation of the Debtors' retail

loan portfolio, not provide any opportunity for creditors to realize incremental value for their claims, and would likely result in less value realized through the Debtors' loan receivables and other investments.

9. Accordingly, while the Committee will consider all options until a plan is confirmed and has become effective, the Committee also believes that the NovaWulf Transaction is the best, actionable alternative at this time. The Committee has worked hard with the Debtors and NovaWulf to develop the NovaWulf Transaction and is excited about the opportunity it provides to maximize value and move these chapter 11 cases towards their conclusion. That said, there is still significant work to be done. The NovaWulf Transaction will be subject to a competitive overbid process. Under the proposed PSA, both the Debtors and the Committee have the ability to change their minds and terminate the agreement if they determine, in an exercise of their fiduciary duty, that a better restructuring opportunity exists.

10. As more fully explained below, the NovaWulf Transaction would also provide for the consensual resolution of potential preference claims against the vast majority of account holders who may be subject to such claims. To be clear, the Committee itself does not intend to pursue preference actions. Rather, the issue for now is the extent to which preference claims will be released or transferred to a litigation trust to be resolved following consummation of a plan. As a fiduciary to account holders and unsecured creditors facing significant losses, the Committee must carefully consider – and cannot ignore – how to address the ***more than $3 billion*** of potential preference claims. At the same time, the Committee does not support pursuing preferences indiscriminately and has no interest in imposing undue burden on individuals who have already been devastated by the actions of Mr. Mashinsky and other prepetition insiders of the Debtors. After extensive dialogue with the Debtors, NovaWulf, and others, the Committee believes that it

5

is appropriate to release preference action against current account holders with claims worth more than $10 that withdrew less than $100,000 to the extent that such account holders support the plan and agree to a mutual release of non-account based claims against the Debtors. That release would apply to 83% of eligible current account holders with preference exposure. Also, the NovaWulf Transaction would include an offer to settle preference actions against account holders who withdrew between $100,000 and $250,000 on the same terms that will be offered to holders of custody claims – *i.e.*, to return 27.5% of the transferred amount. Amounts collected will fund recoveries for general Earn creditors. To further ensure that preferences are pursued in a thoughtful and efficient manner, the NovaWulf Transaction would create a subcommittee of creditors selected through an open interview process to oversee the resolution of preference actions and would include an alternative dispute resolution process to efficiently address the large number of cases.

11. The remainder of this Statement explains several of the important aspects of the NovaWulf Transaction.

### A. The Loan Settlement

12. The NovaWulf Transaction would provide borrowers with the opportunity to elect to accept a structured settlement of their borrow claims against the Debtors. The Ad Hoc Group of Borrowers contends that borrowers are entitled to 100% of the approximately $900 million in borrow claims. *See* Complaint (Adv. P. No. 23-02007). The Committee contends that the amount of borrow claims in excess of the associated loan obligations (*i.e.*, the amounts owed by the borrowers to the Debtors) are unsecured claims. *See*, *e.g.*, Dkt. No. 393, Ex. B-9 (Loan Terms of Use Version 9) at 936 ("Digital Assets posted as Collateral shall be the exclusive property of Celsius, and you grant Celsius your explicit consent to use such Digital Assets . . . . for the full term during which such Digital Assets are posted as Collateral.").

13. The NovaWulf Transaction would allow borrowers to choose a structured

settlement of that dispute and their claims against the Debtors (or, alternatively, to elect to set off the borrow claim against amounts owed to the Debtor, and receive the same treatment as an Earn claim for the excess claim). The Debtors' illiquid staked Ethereum would be transferred to NewCo and strict requirements would be established to ensure it is available to pay the electing borrowers upon maturity. Settling borrowers would have to agree to a longer repayment term and market interest rates but, at the end of the term, those borrowers would receive the vast majority of the digital assets they transferred to the Debtors to support their loans in the original transferred currency (*i.e.*, a Bitcoin-backed loan would receive Bitcoin). The interest payments from borrowers who elect to participate in the settlement and income from the staked Ethereum would be collected by NewCo. Over the term of the settlement, that income will compensate Earn holders for the additional amount of digital assets ultimately returned to electing borrowers.[4]

14.     The proposed treatment is a settlement and includes gives and takes on both sides. Staked Ethereum that would have otherwise been available for distribution to Earn holders over time would instead be set aside to pay NewCo's obligations under the settlement. The staked Ethereum would provide a safe and stable source of income for NewCo and would ensure that sufficient assets are available to be returned to electing borrowers at the end of the settlement term. But, the retail borrowers' ultimate repayment would be reduced if the price of Ethereum grows at a lower rate than the currency to be returned upon maturity. NewCo and the retail borrowers would share the benefit from the upside if the opposite proves to be true.

15.     Since the filing of the NovaWulf Transaction framework, the Debtors, the Committee, and NovaWulf have discussed the proposed settlement with the Ad Hoc Group of

---

[4] Earn claimants and other claimants that receive the same treatment under the proposed plan will be the 100% owners of NewCo, which will own mining, staking, and lending businesses. General Earn claimants (*i.e.* Earn claimants not in the Convenience Class) will also retain the sole right to the proceeds of the Debtors' litigation causes of action.

Borrowers. Shortly before this filing, the Ad Hoc Group of Borrowers provided feedback to the parties. The Committee looks forward to engaging with the Ad Hoc Group to improve the proposal.

### B. The Treatment of CEL Token

16. The Examiner's report and the Committee's proposed complaint detail how the Debtors' prepetition management team manipulated the price of the CEL token prior to the Petition Date, including by using assets transferred to Celsius by account holders to strategically purchase the CEL token to increase its price.[5] The Debtors' prepetition management "pumped" the price of the CEL token as late as May 12, 2022. Examiner's Report at 24; 303-304. On the morning of June 13, 2022—the day Celsius paused withdrawals—the CEL token had a market price of approximately $0.20.[6] At the end of the day, the CEL token had a market price of $0.31. Thereafter, approximately 80% of CEL token was locked on the Celsius platform. The CEL token continued to trade on thin volume on other exchanges and protocols after the Pause. Between June 13, 2022 and July 13, 2022 (the "**Petition Date**") the price of the CEL token moved significantly.

---

[5] *See Final Report of Shoba Pillay, Examiner* [Dkt. No. 1956] (the "**Examiner's Report**") at 76-123; 303-304; *see also, e.g., Motion of the Official Committee of Unsecured Creditors to Approve Joint Stipulation and Agreed Order Between the Official Committee of Unsecured Creditors and the Debtors with Respect to Certain Claim and Causes of Action Belonging to the Debtors' Estates* [Dkt. No. 2054] Ex. 2 ¶¶ 52-65. Although the Examiner's Report is not admissible evidence, it is a thorough and independent investigation that corroborates the allegations in the Committee's complaint with respect to the CEL token. The Committee will present evidence on the prepetition manipulation of the CEL token at the appropriate time.

[6] Unless otherwise stated, all prices in this paragraph are taken from https://coinmarketcap.com which was last accessed on March 1, 2023.



According to the Debtors, at 8:01 p.m., prevailing Eastern Time, on July 13, 2022 (*i.e.* the approximate time the Debtors commenced these chapter 11 cases), the price of the CEL token was approximately $0.82.[7]

17. Approximately 188 million CEL tokens are associated with non-insider Earn accounts. Many account holders that purchased CEL were likely not aware of the manipulation of the currency conducted by the Debtors' prior management. They did, however, make a risky investment of an uncertain nature whose value was significantly tied to the success of Celsius.

18. The Debtors have enough CEL token to distribute to account holders with claims for the return of CEL token. But, there are significant regulatory concerns with respect to returning the token. The Committee does not believe it is equitable to return a token with little value moving forward to account holders. There are also arguments that CEL token should be subordinated or given no value. *See, e.g.*, 11 U.S.C. § 510(b).

19. The NovaWulf Transaction, as currently structured, provides CEL token holders with an unsecured claim equal to $0.20 per CEL token. That amount equals the pre-sale price at

---

[7] *Notice of Filing of Cryptocurrency Conversion Rates* [Dkt. No. 1420].

9

which the majority of CEL token was sold as part of Celsius' initial coin offering. It also is approximately the price at which the CEL token traded on the morning of the Pause. The Debtors and the Committee intend to continue to discuss and consider the treatment of CEL with interested parties in the near future.

### C. Potential Preference Actions

20. Creditors will not be made whole on the effective date of any plan and may never receive a 100% recovery on account of their claims. Entities and individuals that withdrew digital assets prior to the Pause, on the other hand, received a 100% recovery.

21. To remedy this unfair and unequal treatment, the Bankruptcy Code allows a debtor's estate to seek the return of "preferences," which are payments to creditors in the 90 days (or, in the case of insiders, one year) prior to the commencement of the debtor's bankruptcy case (the "**Preference Period**") if such payments allowed the recipients to receive more than they otherwise would have received in the bankruptcy. *See* 11 U.S.C. § 547(b). The purpose of the preference statute is to reverse payments that caused one creditor to receive preferential recoveries over others and to equalize the recoveries on account of the Debtors' bankruptcy proceeding for all creditors. *Begier v. IRS*, 496 U.S. 53, 58 (1990) ("Equality of distribution among creditors is a central policy of the Bankruptcy Code that is furthered by § 547(b) . . . .").

22. The amount of potentially preferential transfers in these chapter 11 cases is massive. ***Entities and individuals above the preference threshold of $7,575 withdrew more than $3 billion of value after the Terra Luna de-pegging event***. Had those transfers not been made, those assets would be available to satisfy all claims.

23. The vast majority of account holders who withdrew took all (or virtually) all of their funds off of the Celsius platform are a small minority of the Debtors' current creditors. In fact, of the over 300,000 account holders who have more than $10 in their Earn accounts, only 7%

withdrew assets during the Preference Period.[8]

**Potential Preference Claims by Account Holders ($ in Millions)**

| Amounts Transferred in 90 Days Before Petition Date | | Earn Claim Amount | | | Total |
|---|---|---|---|---|---|
| | | Convenience Class | | Greater than $5K | |
| | | Less than $10 | $10 - $5K | | |
| 1. At or Below $100K | Users | 7,032 | 15,574 | 7,512 | 30,118 |
| | % of Total Earn Claimants | 1.2% | 2.6% | 1.2% | 5.0% |
| 2. $100K to $250K | Users | 452 | 1,984 | 1,130 | 3,566 |
| | % of Total Earn Claimants | 0.1% | 0.3% | 0.2% | 0.6% |
| 3. $250K and Above | Users | 267 | 916 | 820 | 2,003 |
| | % of Total Earn Claimants | 0.0% | 0.2% | 0.1% | 0.3% |
| Total Earn Claimants with Preference Exposure | | 7,751 | 18,474 | 9,462 | 35,687 |
| Total Earn Claims | | $0 | $246 | $3,976 | $4,222 |
| Total Earn Claimants | | 225,696 | 294,349 | 83,452 | 603,497 |
| % of Total Claimants with Preference Claims | | 3.4% | 6.3% | 11.3% | 5.9% |
| % of Total Claimants without Preference Claims | | 96.6% | 93.7% | 88.7% | 94.1% |

*The amounts in the table above exclude any transfer below the $7,575 statutory threshold.*

24.    The Committee ***cannot and will not*** sue any non-insider account holder to recover a preference payment. Preference actions are property of the Debtors' estates and the Committee does not have (and does not intend to seek) standing to pursue such claims against non-insider account holders. Rather, the Committee has been asked whether it supports an unconditional and gratuitous release of all potential preference claims at this time. As a fiduciary for unsecured creditors (approximately 93% of whom did not withdraw assets during the Preference Period) tasked with maximizing recoveries, the Committee cannot blindly release billions of dollars of potential value when creditors are slated to experience significant losses as a result of the Debtors' prior management's incompetence and fraud.

**Potential Preference Claims by Amounts ($ in Million)**

| Amounts Transferred in the 90 Days Before Petition Date | Earn Claim Amount | | | | Total |
|---|---|---|---|---|---|
| | Convenience Class | | Non-Convenience | | |
| | Less than $10 | $10 - $5K | $5K - $100K | Greater than $100K | |
| 1. At or Below $100K | $170 | $499 | $210 | $31 | $910 |
| 2. $100K to $250K | $69 | $300 | $127 | $48 | $544 |
| 3. $250K and Above | $196 | $823 | $556 | $446 | $2,021 |
| Total | $435 | $1,622 | $892 | $526 | $3,475 |

*The amounts in the tables above exclude any transfer below the $7,575 statutory threshold.*

---

[8] Under the Debtors' proposed plan, account holders with balances under $10 will not receive a distribution and will not be entitled to receive a release of preference actions.

11

25. The NovaWulf Transaction would include a settlement offer to release preference claims against current Celsius creditors (other than insiders and suspected bad actors) with claims above $10 that withdrew $100,000 or less during the preference period. Those creditors account for approximately 83% of current users with claims over $10 who face preference exposure. To receive a release, eligible creditors would be required to vote to accept the proposed plan and agree to a mutual release of non-account based claims. The plan will also allow all account holders (other than insiders and suspected bad actors) who withdrew between $100,000 to $250,000 during the Preference Period to elect to settle all potential preference actions against such account holder in return for a 27.5% cash payment (*i.e.*, the same settlement agreement reached with the Ad Hoc Group of Custody Holders). Money from any settlement payments will be distributed to Earn creditors.

26. The NovaWulf Transaction would transfer unreleased preference claims and other avoidance actions to a litigation vehicle that would be operated by an administrator with a fiduciary duty to all Earn holders who receive interests in that entity. The Bankruptcy Code requires that the administrator perform appropriate diligence, including analyzing potential defenses, before bringing an action. 11 U.S.C. § 547(b) (requiring an action to be "based on reasonable due diligence in the circumstances of the case and taking into account a party's known or reasonably knowable affirmative defenses").[9] Moreover, the administrator will be overseen by an oversight committee of creditors and a special subcommittee of three creditors who will be selected through an open interview process. The subcommittee will include at least two members who are not current Committee members. The NovaWulf Transaction will also provide for alternative dispute

---

[9] This requirement seeks to prevent trustees from pursuing actions that are not likely to be successful or would be costly for the defendant to litigate, thereby forcing those defendants to accept *de minimis* settlements. COLLIER ON BANKRUPTCY ¶ 547.02A (16th ed. 2022).

resolution procedures so that the litigation vehicle and participating creditors can efficiently resolve claims without the incurrence of significant legal expenses.

27. Even if preference claims were brought by the litigation trustee, such claims are subject to defenses. The Bankruptcy Code provides that transfers made in the ordinary course are not subject to avoidance. 11 U.S.C. § 547(c)(2). Nothing about these cases or the Debtors' operations prior to the Petition Date is ordinary, and the facts may vary for the hundreds of thousands of different of cases. The Bankruptcy Code also provides for a safe harbor for margin payments or settlement payments made by or to, among other entities, a financial participant in connection with a securities contract, commodity contract, or forward contract (the "**Safe Harbor**"). 11 U.S.C. § 546(e). Although the Committee anticipates that one or more defendants (if any) may raise the Safe Harbor as a defense to a preference action, application of the Safe Harbor to cryptocurrency is questionable and an issue that has not, to the Committee's knowledge, been determined by any Court.

28. To be clear, $3 billion will not be returned to the Debtors' estates. First, if a transfer is returned, the Bankruptcy Code provides a creditor an unsecured claim for the amount returned, which would be entitled to the same consideration given to all other unsecured creditors. *Id*. § 502(h). The NovaWulf Transaction provides that any potential payment would be netted against the estimated value of such a claim based on agreed amounts published in the disclosure statement and subject to the approval of the Court. That netting will substantially reduce any amount a potential claimant is required to return. Second, to the extent certain claims proceed to litigation, the Committee expects that the litigation vehicle contemplated by the NovaWulf Transaction will engage counsel (and, most likely, counsel that is paid on a contingency basis) and that there will be costs, including attorney's fees, incurred to recover the preferential amounts. Those fees are a

part of the legal system. Again, the litigation trustee will have a fiduciary duty to address claims in a manner that makes economic sense using the counsel of its choice.

29. The Committee understands that people are worried about the potential of having to return a portion of the assets they withdrew ahead of the Pause. But current creditors of Celsius have also had to live with the uncertain reality of the Debtors' bankruptcy since last July without access to funds, unlike those who got out early. There are hundreds of thousands of potential preference actions to sort out, and now is not the time to do so. Investigating each potential preference claim (and litigating preference claims) now will extend the timeline of these cases and increase costs. For most cases, it will likely not be economical to investigate or litigate the claims at the hourly rates charged by the firms engaged by the Debtors in these cases.

30. If any individual has questions about the facts related to their individual withdrawals and applicable defense they should contact an attorney. If anyone hears of people who may need additional help or may harm themselves or others, they should inform the United States Trustee or other appropriate government authority.

31. Throughout these cases, the Committee's professionals and members have received emails, phone calls, and other messages from victims of the Debtors' prepetition conduct. The Committee and its professionals have done their best to read and answer each and every one of those messages, as appropriate. Those conversations are often not easy. Many people are now facing extreme hardship as a result of the Debtors' prepetition conduct. The Committee has listened and, where possible, brokered meetings with the Debtors to help ensure that those individuals are heard. The Committee has also sought to engage directly with account holders through town halls. Unfortunately, the Committee's efforts have, in certain circumstances, been twisted by loud voices that the Committee suspects seek to further personal agendas, whether to

14

shield their substantial personal exposure or maximize individual claims at the expense of others.

32. Recently, those efforts have resulted in threats to the Committee co-chairs and its counsel, comments that certain individuals will confront the Court, and incitement of threats and harassment by others. While some of these individuals purport to represent account holders, the Committee has a fiduciary duty to all unsecured creditors and will not be intimidated from fulfilling that fiduciary duty.

[*Remainder of page intentionally left blank*]

Dated: March 1, 2023
       New York, New York

Respectfully submitted,

/s/ *Aaron Colodny*
**WHITE & CASE LLP**
David M. Turetsky
Samuel P. Hershey
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: david.turetsky@whitecase.com
       sam.hershey@whitecase.com

– and –

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
Email: mandolina@whitecase.com
       gregory.pesce@whitecase.com

– and –

**WHITE & CASE LLP**
Keith H. Wofford
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Email: kwofford@whitecase.com

– and –

**WHITE & CASE LLP**
Aaron E. Colodny (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone: (213) 620-7700
Facsimile: (213) 452-2329
Email: aaron.colodny@whitecase.com

*Counsel to the Official Committee of Unsecured Creditors*