WILLIAM K. HARRINGTON
United States Trustee
U.S. Department of Justice
Office of the United States Trustee
Alexander Hamilton Custom House
One Bowling Green, Room 534
New York, NY 10004
Tel. (212) 510-0500

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| CELSIUS NETWORK LLC, et al.,[1] | : | Case No. 22-10964 (MG) |
| | : | |
| Debtors. | : | (Jointly Administered) |

## OBJECTION OF THE UNITED STATES TRUSTEE TO DEBTORS' MOTION FOR AN ORDER (I) AUTHORIZING AND APPROVING CERTAIN BID PROCTECTIONS FOR THE PROPOSED PLAN SPONSOR AND (II) GRANTING RELATED RELIEF

William K. Harrington, the United States Trustee for Region 2 (the "United States Trustee"), through his counsel, files this Objection (the "Objection") to the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving Certain Bid Protections for the Proposed Plan Sponsor and (II) Granting Related Relief* (the "Motion") [ECF Doc. No. 2151]. In support thereof, the United States Trustee respectfully represents as follows:

### INTRODUCTION

The Motion seeks an order approving bidding protections (the "Bidding Protections") for the Proposed Plan Sponsor. This Motion should be denied for the following reasons.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

1

The Bidding Protections should not be approved until and unless the Motion discloses whether and to what extent the recent *Memorandum Opinion Regarding which Debtor Entities have Liability for Customer Claims under the Terms of Use* has upon the Motion and the agreements and Plan Term Sheet (defined below) included with the Motion.

Given that there is not a conventional sale price, there should be further explanation of how the $5 million breakup fee was determined, and whether the expense reimbursement of $15,000,000 will be augmented by an additional $15,000,000 under the Management Agreement if the Plan Sponsor Agreement is implemented. Similarly, additional information is warranted regarding the Management Fee, the Incentive Fee, and the distribution to of Liquid Cryptocurrency (defined below to be limited to four types of digital currency) to account holders.

The Motion should provide information regarding the competitive nature of the Management Fee and the Incentive Fee. Because both fees are based, in part, on the trading value of the Equity Share Tokens ("ESTs") to be distributed to holders of General Earn Claims, the anticipated initial trading price of the ESTs, the trading platforms that will be available to the ESTs, and the safeguards that will be in place to prevent a manipulation of the trading price of the ESTs. Also, because one component of the Incentive Fee includes the issuance of ESTs, there should be a discussion of the dilutive effect on the ESTs held by the account holders.

The Motion should include the total amount of claims held by (i) all account holders, (ii) holders of claims under $5,000, and (iii) holders of claims over $1,000 but not more than $5,000. In addition, the Motion should provide an estimate of the Liquid Cryptocurrency Distribution Amount (defined below) likely to be available to the holders of General Earn Claims on the Plan Effective Date.

Finally, the Motion should confirm that the holder of a $1,000 Convenience Class Claim will receive $700 of Liquid Cryptocurrency regardless of when all digital currencies are converted to the Liquid Cryptocurrency. While the timing and market conditions at the time all digital currencies are converted to Liquid Cryptocurrencies will affect the Liquidation Cryptocurrency Distribution Amount, the Motion should provide an estimated range of the recovery percentage likely to be distributed to the holders of the General Earn Claims on the Effective Date.

For these reasons, the United States Trustee objects to the relief sought in the Motion.

## BACKGROUND

### A. General Background

1. On July 13, 2022 (the "Petition Date"), Celsius Network LLC, Celsius KeyFi LLC, Celsius Lending LLC, Celsius Mining LLC, Celsius Network Inc., Celsius Network Limited, Celsius Networks Lending LLC, and Celsius US Holding LLC (collectively, the "Debtors") each commenced a voluntary case under Chapter 11 of the Bankruptcy Code. *See* Voluntary Petitions, SDNY Case No. 22-10964(MG), ECF Doc. No. 1. On July 19, 2022, the Court entered an Order directing that these cases be jointly administered. ECF Doc. No. 53.

2. An Official Committee of Unsecured Creditors was appointed on July 27, 2022. ECF Doc. No. 241.

3. On September 22, 2022, First Partners, LLC, Celsius SPV Investors, LP, Celsius New SPV Investors, LP, and CDP Investissements Inc. (collectively, the "Equity Holders" or "Series B Preferred Holders") filed for a *Motion for Entry of an Order Directing the Appointment of an Official Preferred Equity Committee* (the "Equity Committee Motion"). ECF Doc. No. 880.

4. On March 9, 2023, the Court issued the *Memorandum Opinion Regarding which Debtor Entities have Liability for Customer Claims under the Terms of Use* (the "Opinion"). ECF Doc. No. 2205.

5. The Opinion concluded that customer (*i.e.* account holder) contract claims were limited to claims against only Celsius Network LLC ("LLC") and not against Celsius Network Limited ("CNL"), the top-level parent company (where the Series B Preferred Holders made significant investments), although the Court specifically noted that the Series B Preferred Holders' investment contracts did not prohibit CNL and its affiliates (other than LLC) from incurring customer liability. *Id*.

**B.  The Motion for Bid Protections**

6. On March 1, 2023, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving Certain Bid Protections for the Proposed Plan Sponsor and (II) Granting Related Relief* (the "Motion"). ECF Doc. No. 2151. The Motion seeks bid protections (the "Bid Protections") for the Plan Sponsor, NovaWulf Digital Management, LP ("NovaWulf" or the "Plan Sponsor").

7. The Plan Sponsor Agreement (Motion, Exhibit B) provides material value to the Debtors and their estates by securing a commitment from NovaWulf to serve as Plan Sponsor for a transaction the Debtors and Committee believe maximizes the value of the Debtors' assets. Motion, p. 4, ¶ 5; Motion, Ex. B.

8. Pursuant to the proposed sale and restructuring transaction (the "Restructuring Transactions"), NovaWulf has committed resources, including the investment of $45 million of cash, to implement the Restructuring Transactions that will facilitate recoveries for the Debtors' creditors. *Id*.

9.      To the extent the Debtors and the Committee identify an alternative proposal that is superior to the Restructuring Transactions between now and April 17, 2023, the Debtors' and the Committee's capacity to solicit such superior proposal is predicated on the framework provided by the Plan Sponsor Agreement with NovaWulf and the Debtors' and the Committee's capacity to take actions consistent with their respective fiduciary duties under the Plan Sponsor Agreement. *Id.*

10.     As a condition of NovaWulf's entry into the Plan Support Agreement, the Debtors seek to provide NovaWulf with the Bid Protections – a Break-Up Fee of $5 million and an Expense Reimbursement of up to a maximum of $15 million. Motion, p. 6, ¶ 7.

11.     The "Expense Reimbursement" under the Plans Sponsor Agreement provides "that the aggregate amount of Fees to be paid under this Section 13.01 shall not exceed $15,000,000 in the aggregate provided, further, that the foregoing shall in no way limit the ability of NewCo to reimburse the Fees under terms of the Management Agreement up to $15,000,000." Motion, p. 19-20, ¶ 26.

**C. The Proposed Plan Term Sheet**

12.     The Plan Sponsor Agreement (Motion, Ex. B, p. 42 of 150) includes a Plan Term Sheet (the "Plan Term Sheet," p. 73 of 150). Motion, Exhibit A to Ex. B [Plan Sponsor Agreement].

13.     The proposed Restructuring Transactions "will (a) provide for the distribution of a significant majority of the Debtors' liquid cryptocurrency to account holders on the effective date of the chapter 11 plan of reorganization to be proposed by the Debtors (the "Plan"), and (b) create a new entity or entities ("NewCo") that will operate and/or manage the Debtors' illiquid assets (including the mining business, retail and institutional loan portfolios, staked cryptocurrency, and

5

other alternative investments), and distribute that value to Earn creditors in the form of equity in NewCo, which creditors will receive 100% of the "common" equity of NewCo." Motion, p. 2, ¶ 2.

14. Holders of General Earn Claims will receive Equity Share Tokens ("ESTs") which represent 100% of the common equity interests in NewCo. Motion, p. 15, ¶ 24; Plan Term Sheet, p. 2, p. 75 of 150.

15. The Plan Term Sheet defines "Liquid Cryptocurrency" as "[t]he types of Cryptocurrency to be distributed to Account Holders, which shall include: (i) BTC; (ii) Pure ETH, (iii) Lido ETH, and (iv) stablecoins." Plan Term Sheet, Exhibit 1 Certain Plan Definitions, p. 10; Motion, p. 102 of 150.

16. The Plan Term Sheet Amount defines "Liquid Cryptocurrency Distribution Amount" as follows:

> The amount of Liquid Cryptocurrency to be distributed to holders of General Earn Claims in amount equal to the total value of Liquid Cryptocurrency held by the Debtors on the Effective Date less, without duplication: (1) distributions to (or reserves for) holders of Allowed Convenience Class Claims and Allowed Custody Claims, (2) amounts of Liquid Cryptocurrency associated with the Retail Loan Settlement Cryptocurrency Assets, (3) the NewCo Capitalization Amount, (4) amounts liquidated to fund the Professional Fee Escrow Account, (5) the Initial Litigation Funding Amount, (6) cash needed at emergence (pre-transaction items); and (7) Cryptocurrency in an amount equal to the Senior Claims Amount. The Committee, in consultation with the Debtors, shall have the discretion to adjust the Liquid Cryptocurrency Distribution Amount downward based upon the amount of aggregate Account Holder elections, the status and funding of the Litigation Recovery Account, or any other factors affecting the evaluation or liquidity of the assets anticipated to go to NewCo on the Effective Date of the Plan.

Plan Term Sheet, Ex. 1, p. 10; Motion, p. 102-3 of 150.

17.     The Management Fee paid to the Manager of NewCo will be based upon the total value of NewCo's assets and the aggregate trading value of all ESTs.  Motion, Exhibit 4, Management Term Sheet, pp. 2-3; Motion, p. 129-30 of 150.

18.     The Fees paid to the Manager will include an "Incentive Fee" that will be based on the aggregate trading value of all ESTs and paid 50% in cash and 50% in ESTs.  Management Term Sheet, p. 3; Motion p. 130 of 150.

## ARGUMENT

### A. The Debtors Must Disclose all Changes, if any, to the Motion Resulting from the Opinion.

The recent Opinion determined that the Customers contract claims were limited to LLC, which would remove the mining assets and the GK8 sale proceeds from the equity to be distributed to the Earn account holders.  If NovaWulf intends to continue to manage the mining assets, it would be necessary to distribute equity to the Series B Preferred Holders.  The Motion should disclose whether the Customers will seek to assert non-contract claims against the assets held by the Series B Preferred Holders.  It seems likely that the Series B Preferred Holders will contest any non-contract liability asserted against its assets.

The Debtors have previously emphasized the significance of the mining assets to the recovery of its account holders.  In the Debtors' motion to set a briefing schedule on the issue of which Debtor entities are liable to account holders, the Debtors characterized the "mining assets" as "a crown jewel to either be monetized or reorganized around . . . ." ECF Doc. No. 1338, p. 2, ¶ 3.  Given the significance of the mining assets, the Debtors must disclose any changes, if any, to the Motion, including but not limited to, the bid protections sought by the Motion.

### B. The Motion Should Provide Additional Information Regarding the Bid Protections and the Terms of the Proposed Plan.

The Motion seeks the Bid Protections for NovaWulf by analogizing the Plan Sponsor Agreement to a bid in connection with a Section 363 sale. A bankruptcy court has the authority to approve proposed sales outside of the ordinary course of business under § 363(b) of the Code upon appropriate notice and hearing; however, the burden is on the *debtor* to establish that the transaction is "fair and equitable," supported by sound business justification, and in the best interests of the estate. *See In re Phoenix Steel Corp.,* 82 B.R. 334 (Bankr. D. Del. 1987); *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1071 (2d Cir. 1983). Bankruptcy sales under Section 363 must be scrutinized closely by the Court in cases where all, or substantially all, of the assets of a Chapter 11 debtor are being liquidated due to the dangers associated with providing "the functional equivalent of an order confirming a conventional chapter 11 reorganization plan" without the protections inherent in the confirmation process. *Western Auto Supply Co. v. Savage Arms, Inc. (In re Savage Indus., Inc.),* 43 F.3d 714, 720 n.9 (1st Cir. 1994) (special bankruptcy scrutiny warranted in liquidations under Chapter 11).

It is not uncommon for a proposed breakup fee to be calculated as a percentage of the sale price. While the percentage varies depending on the circumstances, a 3 percent figure is not uncommon. Accordingly, $5 million would represent approximately 3 percent of a $166.7 million sale price. Given the lack of an equivalent sale price in the contemplated bid by NovaWulf, the Motion should provide additional explanation of how the $5 million breakup fee was determined.

The Motion should also provide additional information regarding the Management Fee and the Incentive Fee, by establishing that the proposed fee structure is competitive under similar circumstances. Given that both fees are affected by the trading value of the ESTs, additional information regarding (i) the estimated initial trading price of the ESTs, (ii) what trading platforms

will be available for the ESTs and (iii) what safeguards exist to prevent price manipulation of the trading value of the ESTs. In addition, because the Incentive Fee results in the issuance of ESTs, the Motion should provide examples of the projected dilutive effect of such distributions to NovaWulf.

The Motion should confirm whether the Plan Sponsor Agreement limiting NovaWulf's expense reimbursement to $15,000,000 will be augmented by up to an additional $15,000,000 under the Management Agreement. If the foregoing interpretation is accurate, NovaWulf should disclose the amount of the expense reimbursement has incurred to date and the projected estimated expense that is likely upon the implementation of the Plan Sponsor Agreement.

While information relevant to an account holder's decision to be treated as a holder of a Convenience Class Claim or a holder of a General Earn Claim should certainly be provided prior to the need to make such decision, the lack of a conventional sale price raises concerns that the proposed Bid Protections should perhaps be affected by the likely distributions to the account holders. Accordingly, the Motion should include the total amount of claims held by (i) all account holders, (ii) holders of claims under $5,000, and (iii) holders of claims over $1,000 but not more than $5,000. In addition, the Motion should provide an estimate of the Liquid Cryptocurrency Distribution Amount likely to be available to the holders of General Earn Claims on the Plan Effective Date.

The Plan Term Sheet contemplates the distribution of Liquid Cryptocurrency to the Convenience Class holders and to the holders of General Earn Claims. Since Liquid Cryptocurrency will be limited to four digital currencies – BTC, ETH, Lido ETH, and stablecoins – the Motion should explain how and when the digital currencies other than the aforementioned four digital currencies will be converted to Liquid Cryptocurrency. The Motion should confirm

that the holder of a $1,000 Convenience Class Claim will receive $700 of Liquid Cryptocurrency regardless of when all digital currencies are converted to the Liquid Cryptocurrency. While the timing and market conditions at the time all digital currencies are converted to Liquid Cryptocurrencies, will affect the Liquidation Cryptocurrency Distribution Amount, the Motion should provide an estimated range of the recovery percentage likely to be distributed to the holders of the General Earn Claims on the Effective Date.

The United States Trustee reserves any and all rights, remedies, and obligations to, *inter alia*, complement, supplement, augment, alter, and/or modify this Objection and to conduct any and all discovery as may be deemed necessary or as may be required and to assert such other grounds as may become apparent upon further factual discovery, assert further and additional objections at any hearing on the Motion, and to take whatever other actions are deemed necessary, justifiable, and appropriate.

## CONCLUSION

WHEREFORE, the Motion should be denied.

Dated: New York, New York
March 13, 2023

                                        WILLIAM K. HARRINGTON
                                      UNITED STATES TRUSTEE

By:   */s/ Shara Cornell*
        Shara Cornell, Esq.
        Mark Bruh, Esq.
        Brian Masumoto, Esq.
        Trial Attorneys
        Alexander Hamilton Custom House
        One Bowling Green, Room 534
        New York, New York 10004
        Tel. No. (212) 510-0500
        Fax No. (212) 668-2255