Page 1

```
 1    UNITED STATES BANKRUPTCY COURT

 2    SOUTHERN DISTRICT OF NEW YORK

 3    Case No. 22-10964-mg

 4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

 5    In the Matter of:

 6

 7    CELSIUS NETWORK, LLC,

 8              Debtor.

 9    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10    Adv. Case No. 22-01002-mg

11    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12    CELSIUS NETWORK LIMITED et al.,

13                   Plaintiff,

14           v.

15    FABRIC VENTURES GROUP SARL,

16                   Defendants.

17    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

18    Adv. Case No. 22-01179-mg

19    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

20    FRISHBERG,

21                   Plaintiff,

22           v.

23    CELSIUS NETWORK LLC et al.,

24                   Defendants.

25    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

Page 2



1    Adv. Case No. 22-01003-mg

2    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

3    YANCHUK,

4                    Plaintiff,

5            v.

6    GK8 Ltd/GK8 UK Limited/GK8 U.S.A, LLC,

7                    Defendants.

8    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

9

10                   United States Bankruptcy Court

11                   One Bowling Green

12                   New York, NY   10004

13

14                   March 8, 2023

15                   11:02 AM

16

17

18

19

20

21    B E F O R E :

22    HON MARTIN GLENN

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO:  F. FERGUSON

1    HEARING re Status Update

2

3    HEARING re Hearing Using Zoom for Government RE: Second

4    Motion to Extend Exclusivity Period for Filing a Chapter 11

5    Plan and Disclosure Statement. (Doc## 1940, 1996, 2008,

6    2010, 2011, 2013 to 2015, 2038, 2043, 1645, 1317, 1764,

7    2043, 2046, 2047, 2048, 2052, 2057, 2058, 2066, 2067, 2068,

8    2071, 2088, 2094, 2101, 2111, 2157, 2158, 2159, 2162, 2163,

9    2168, 2184, 2186)

10

11   HEARING re Hearing Using Zoom for Government RE: Motion of

12   the Official Committee of Unsecured Creditors to Approve

13   Joint Stipulation and Agreed Order between the Official

14   Committee of Unsecured Creditors and the Debtors with

15   respect to Certain Claims and Causes of Action Belonging to

16   the Debtors Estates. (Doc## 2054, 2059, 2146, 2154)

17

18   HEARING re Hearing Using Zoom for Government RE: Debtors

19   Motion Seeking Entry of an Order (I) Striking Certain Items

20   from Appellants Designation of Record on Appeal and (II)

21   Granting Related Relief. (Doc# 2085, 2111, 2164, 2187)

22

23

24

25

1    HEARING re Hearing Using Zoom for Government RE: Debtor's

2    Motion Seeking Entry of an Order (I) Striking Certain Items

3    from Kulpreet Khanujas Designation of Record on Appeal and

4    (II) Granting Related Relief. (Doc# 2126, 2164, 2187, 2063)

5

6    HEARING re Hearing Using Zoom for Government RE: Debtor's

7    Motion Seeking Entry of an Order (I) Striking Certain Items

8    from Courtney Burks Steadmans Designation of Record on

9    Appeal and (II) Granting Related Relief. (Doc# 2127, 2164,

10   2187, 2121)

11

12   HEARING re Adversary proceeding: 22-01179-mg Frishberg v.

13   Celsius Network LLC et al

14   Pretrial Conference Using Zoom for Government. (Doc ## 1 to

15   13)

16

17   HEARING re Adversary proceeding: 23-01002-mg Celsius Network

18   Limited v. Fabric Ventures Group SARL

19   Pre-Trial Conference Using Zoom for Government. (Doc # 1 to

20   3)

21

22   HEARING re Adversary proceeding: 23-01003-mg Yanchuk v. GK8

23   Ltd/GK8 UK Limited/GK8 U.S.A, LLC

24   Pre-Trial Conference Using Zoom for Government. (Doc # 1 to

25   3)

1    HEARING re Hearing Using Zoom for Government RE: Official

2    Committee of Unsecured Creditors' Application for Entry of

3    an Order Authorizing the Employment and Retention of Selendy

4    Gay Elsberg PLLC as Co-Counsel Effective as of January 8,

5    2023. (Doc # 1964, 2156)

6

7    HEARING re Hearing Using Zoom for Government RE: Motion for

8    Order to Show Cause Why the Debtors Should not Retain Willis

9    Towers Watson. (Docifit 2042 to 2044, 1392, 1398, 1444,

10   1446, 1556, 1613, 1679, 1703, 1706, 1771, 1774, 1829, 1928,

11   2087)

12

13   HEARING re Doc# 2198 Amended Notice of Agenda for Hearing to

14   be held March 8, 2023, at 11:00 A.M. (Prevailing Eastern

15   Time)

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    MCCARTER ENGLISH, LLP

4        Attorneys for Certain Borrowers

5        245 Park Avenue

6        New York, NY 10167

7

8    BY:  DAVID J. ADLER

9

10    WHITE & CASE LLP

11        Attorneys for Official Committee of Unsecured Creditors

12        111 South Wacker Drive, Suite 5100

13        Chicago, IL 60606-4302

14

15    BY:  GREGORY F. PESCE

16

17    WHITE & CASE LLP

18        Attorneys for the Official Committee of Unsecured

19        Creditors

20        555 South Flower Street, Suite 2700

21        Los Angeles, CA 90071

22

23    BY:  AARON COLODNY

24

25

1       SELENDY GAY ELSBERG PLLC

2           Attorneys for Official Committee of Unsecured Creditors

3           1280 Avenue of the Americas, 17th Floor

4           New York, NY 10104

5

6       BY:  JENNIFER SELENDY

7

8       LOWENSTEIN SANDLER

9           Attorneys for Proposed Lead Plaintiffs

10          One Lowenstein Drive

11          Roseland, NJ 07068

12

13      BY:  MICHAEL S. ETKIN

14

15      KIRKLAND & ELLIS LLP

16          Attorneys for the Debtor

17          300 N. LaSalle

18          Chicago, IL 60654

19

20      BY:  CHRIS KOENIG

21

22

23

24

25

Page 8

```
 1     UNITED STATES DEPARTMENT OF JUSTICE

 2          Attorneys for the U.S. Trustee

 3          1 Bowling Green

 4          New York, NY 10004

 5

 6     BY:  SHARA CLAIRE CORNELL

 7

 8     TROUTMAN PEPPER HAMILTON SANDERS LLP

 9          Attorneys for Ad Hoc Group of Withhold Account Holders

10          4000 Town Center, Suite 1800

11          Southfield, MI 48075

12

13     BY:  DEBORAH KOVSKY-APAP

14

15     COURTNEY BURKS STEADMAN

16          Pro Se Creditor

17

18     LAWRENCE C. PORTER

19          Pro Se Creditor

20

21     DANIEL A. FRISHBERG

22          Plaintiff

23

24     IMMANUEL HERRMANN

25          Pro Se Creditor
```

1

2    SAMUEL ANDERSON

3        Pro Se Creditor

4

5    ALSO PRESENT TELEPHONICALLY:

6

7    CHRIS FERRARO

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2            THE COURT:  Thank you and good morning, everybody.

3   All right, so we have a long agenda, let's start to go

4   through it.  First, we're going to start with the -- so I'm

5   looking at the agenda for today's hearing.  Let's start with

6   the company status update.

7            MR. KOENIG:  Thank you, Your Honor.  For the

8   record, Chris Koenig, Kirkland & Ellis, for the Debtors.  As

9   we have, you know, we have Mr. Ferraro, who's the Debtor's

10  interim chief executive officer on the line to provide the

11  business update.  Given the data and Mr. Ferraro's

12  presentation, we filed some slides to help, you know, guide

13  Mr. Ferraro's statement.  We filed this at Docket No. 2197.

14           My colleague, Elizabeth Jones, is on the line.  If

15  she can have sharing privileges on the Zoom, we can put the

16  slides up for everybody to look at.

17           THE COURT:  Yes, she can, certainly.

18           CLERK:  All right.  She's been made a cohost.

19           THE COURT:  All right, and I have a copy in front

20  of me as well, Mr. Koenig.

21           MR. KOENIG:  Wonderful.  I'll just wait to see the

22  slides on the...

23           THE COURT:  Absolutely.

24           MR. KOENIG:  Okay, looks like we have it.  So, Mr.

25  Ferraro, could you please provide a general update about the

Page 11

1   company's current operations.

2            MR. FERRARO:  Yeah.  Hello and good morning, Your

3   Honor.

4            THE COURT:  Good morning.

5            MR. FERRARO:  To date, we have good progress with

6   respect to custody withdrawals in our mining operations.

7   Specifically, we started processing custody withdrawals for

8   eligible users on Thursday, March 2nd.  Additionally, we've

9   seen operational and margin improvements in our mining

10  business.  I will also be giving a quick update on the cash

11  position in a few minutes, but let's jump right in and get

12  started.

13           MR. KOENIG:  All right.  So, Mr. Ferraro, let's

14  get started with the current status of the custody account

15  withdrawals, including the KYC process and the processing of

16  the actual withdrawals themselves.

17           MR. FERRARO:  Okay, perfect.  As a reminder, on

18  December 20th, the Court authorized Celsius to return

19  custody of coins to eligible users.  Celsius is currently

20  allowed to distribute 94 percent of each eligible user's

21  distributable custody assets, less the transaction fees.

22           On February 15th, we opened up the system for

23  users to refresh their KYC data.  This is a pretty simple

24  and quick process.  A user logs onto the application and is

25  directed to verify their identity information and upload a

Page 12

1    government ID.  Additionally, users are required to enter

2    the destination wallet address.  In the last three weeks,

3    almost 60 percent of the users by count that are eligible to

4    withdraw have finished this process.  Measured in value,

5    those 60 percent of users represent 80 percent of the amount

6    of cryptocurrency that is eligible to be withdrawn from the

7    custody program.

8            I will go through additional details on the next

9    slide.

10           Beginning on March 2nd, eligible users who

11   finished the KYC process were allowed to begin custody

12   withdrawals.  As of yesterday, customers had completed

13   withdrawals of 17.7 million and 3.5 million are in process,

14   for a total of 21.2 million.  Since we opened on Thursday,

15   we've received over 1900 tickets.  Tickets are primarily for

16   withdrawals needing additional review and customers coming

17   back to the platform to update their KYC.  The oldest ticket

18   without a Celsius response is less than one day old.

19           Overall, the system is working as planned,

20   including our security processes.  In the last week, 234

21   transactions were scored as high risk and blocked.

22   Additionally, our security operations center has handled

23   over 100 alerts, including five phishing attacks.

24           Now moving on to the next slide.

25           In preparing for these withdrawals, we reset KYC

Page 13

1      for all eligible customers.  As of yesterday, only around .5

2      percent or 111 users were rejected.  Those users will need

3      to restart the process and upload their government issued

4      ID.  For those who have not started the process, we will

5      continue to send emails and provide in-application popups

6      directing users to complete the necessary step.

7              Customers who passed KYC had approximately 33

8      million of eligible balances.  Of that 33 million,

9      approximately 65 percent have started the process of

10     withdrawing coins off the platform in the first week.  Total

11     withdraw fees charged are in line with the transaction

12     costs, specifically gas fees and the costs related to KYC.

13             We will continue to monitor actual versus expected

14     costs, but as of now, we are satisfied with the current

15     level of withdrawal fees.

16             THE COURT:  Just remind me what those withdrawal

17     fees are.

18             MR. FERRARO:  Well, they range per transaction,

19     you know, not dependent upon the size.  It could be a couple

20     of dollars, you know, and up.  On average, Your Honor, it's

21     been about 10 basis points, 10 to 15 basis points of the

22     dollars that have been withdrawn, so pretty low transaction

23     costs.

24             THE COURT:  All right, go ahead.

25             MR. FERRARO:  Okay.

1          MR. KOENIG:  Thank you, Mr. Ferraro.  If there's

2     nothing else on the custody withdrawal process, can you

3     provide an update next on the mining operations and the

4     current status.

5          MR. FERRARO:  Yes.  Our uptime, or the percentage

6     of time our machines are hashing, improved in February on

7     the back of continued low energy prices and improved BTC.

8     You can see this on the graph in the top left.  We have an

9     uptime of 75 percent from February, a sizeable increase of

10     the January results and the highest since the petition date.

11          Moving to the graph on the top right.  The trend

12     in BTC price is shown in the blue columns and the orange

13     line represents the margin percentage.

14          THE COURT:  I haven't looked at it this week.

15     What's the BTC price this week?

16          MR. FERRARO:  22,000 right now.

17          THE COURT:  All right.

18          MR. FERRARO:  In February, our margin increased to

19     almost 40 percent driven by this favorable market backdrop.

20     As a point of comparison, our margin in February was double

21     what we earned in December.  We are currently mining around

22     a 30 percent margin, down slightly from the lower BTC price

23     of 22,000.

24          Moving to the graph on the bottom left, which

25     shows the number of rigs deployed in the blue columns and

Page 15

1    the average BTC mined per day in the orange line, we had

2    between 50,000 and 65,000 rigs deployed from the petition

3    date through December (sound drops).  In early January, Core

4    Scientific rejected our hosting agreement and 37,000 rigs

5    went offline, which you can see in both the significant

6    decline in rigs deployed and the drop in the average BTC

7    mined per day.

8         If you remember at the last update, I announced a

9    new hosting agreement for 17,000 rigs, and we deployed 7,000

10   of those rigs in late February and expect that all of the

11   remaining rigs will be deployed by the end of March.  We

12   also expect to have deployed all the rigs that were

13   previously at the core sites by the end of the second

14   quarter, at which point, we should exceed an average of 20

15   BTC mined per day.

16        Just for Your Honor's benefit, we're currently

17   mining around 9 BTC per day.

18        Finally on the bottom right, you can see the trend

19   for EBITDA, which for this business is effectively the net

20   income adjusted to add back depreciation.  EBITDA is a good

21   proxy for cash from operations.  You can see with the

22   favorable market backdrop, our EBITDA trended up nicely from

23   the low we saw in December with January and February over 1

24   million in EBITDA.

25        THE COURT:  So what was the price of Bitcoin at

Page 16

1      the petition date?

2              MR. FERRARO:  I don't have it handy.  I think it

3      was around these levels.

4              THE COURT:  We can come back to it, but maybe you

5      can have somebody help you and find that.  If there'd been,

6      in terms of continuing communications from primarily ad hoc

7      creditors, they've focused on any appreciation in the

8      Bitcoin price since the petition date and who benefits from

9      that net increase, so that's why I'm asking about --

10             MR. FERRARO:  Got it.

11             THE COURT:  -- what it was at the petition date

12     versus now.

13             MR. FERRARO:  Yeah.  It was 20,250 as of July 18th

14     versus the 22,000 as of today, so it's about 10 percent up.

15             THE COURT:  Okay, thank you.  Go ahead.

16             MR. KOENIG:  Thank you, Mr. Ferraro.  If nothing

17     else on mining, can you please turn to the current cash

18     position of the company.

19             MR. FERRARO:  Yeah, flip to the next page.  As a

20     reminder, we started the case with 138 million of cash.  We

21     now have 139 on hand as of February month end.  Our cash

22     from operations was a positive 119 million; 92 of that was

23     related to the sale of stable coins and withdrawing funds

24     from exchanges.  Adjusting for these two items, our cash

25     flow from operations was approximately a positive 30

Page 17

 1   million.

 2          We invested 50 million in our mining business to

 3   finish the buildout of our proprietary sites and other

 4   investments and paid nearly 70 million related to

 5   restructuring.

 6          So net, Your Honor, our cash balance is basically

 7   flat to the petition date as the inflows from operations and

 8   returning deployments under both our investment and

 9   proprietary sites and restructuring costs.  And that's all I

10   have for you today.

11          THE COURT:  Thank you very much, Mr. Ferraro.  All

12   right, Mr. Koenig, let's move on.  We're on the contested

13   matters and the motion to extend exclusivity is the first on

14   the calendar.

15          MR. KOENIG:  Thank you, Your Honor.  We filed an

16   amended agenda last night that reflected that the

17   committee's retention application can go first just so that

18   those professionals can leave the hearing if that's

19   acceptable to Your Honor.

20          THE COURT:  It certainly is.  Mr. Colodny.

21          MR. KOENIG:  I believe Mr. Pesce will be handling

22   this one, Your Honor.

23          THE COURT:  Okay.  Good morning, Mr. Pesce.

24          MR. PESCE:  Good morning, Your Honor.  Gregory

25   Pesce, White & Case, on behalf of the committee.  I

Page 18

1    apologize I'm not on video.  I'm in a spot where the

2    connection is unstable, so forgive me.

3            THE COURT:  Okay.

4            MR. PESCE:  The first matter that we wanted to

5    deal with is an uncontested matter, which is the application

6    to retain Selendy & Gay as co-counsel to the committee.  We

7    filed the application at Docket 1964.  Ahead of the

8    objection deadline, we requested an extension to accommodate

9    some questions that the United States Trustee had.

10   Following that extension, supplemental declaration was filed

11   by Miss Jennifer Selendy of the firm at Docket No. 2191, and

12   a revised order was filed at Docket 2194.

13           The supplemental declaration includes additional

14   information regarding a separate team at my law firm that

15   represents the joint provisional liquidators of FTX, Digital

16   Markets, a non-debtor affiliate of FTX, and their role in

17   that bankruptcy case, as well as work that the Selendy firm

18   will do involving preferred equity holders involving some

19   discovery issues.

20           My understanding is the United States Trustee has

21   no further issues based on the declaration that was filed,

22   and Miss Selendy is online today to answer any questions

23   that the Court might have.

24           THE COURT:  For the benefit of everyone who's

25   appearing today, just briefly describe what work it is that

Page 19

1    Selendy & Gay will be undertaking.

2              MR. PESCE:  Sure.  Following FTX's bankruptcy

3    filing in November, the joint provisional liquidators of FTX

4    Digital Markets, which is a brokerage effectively in the

5    Bahamas, was taken under supervision by the Bahamian Supreme

6    Court.  They appointed joint provisional liquidators, which

7    are equivalent to receivers.

8              Those receivers then in turn hired a team of White

9    & Case attorneys to represent them effectively as one of the

10   largest creditors of FTX.  Those provisional liquidators

11   then filed a recognition proceeding in New York, which was

12   then subsequently transferred to Delaware, and that team of

13   White & Case attorneys is representing the provisional

14   liquidators in that capacity as large creditors effectively

15   of FTX.

16             As has been reported, there have been transfers

17   from some FTX entities, although we don't believe from FTX

18   Digital Markets to Celsius.  Out of an abundance of caution,

19   my firm implemented an ethical screen between that team and

20   the team that works on the Celsius matter and the additional

21   disclosures were made.  We also then sought to engage the

22   Selendy firm to deal with any issues that might implicate

23   the Bahamian joint provisional liquidators.

24             In addition to that, as disclosed in the

25   retention application and my declarations, prior to the

Page 20

1    bankruptcy filing, a separate team of people at my firm that

2    are not working on this matter did approximately $300,000 of

3    work on a due diligence project for WESCAP that was

4    associated with the Celsius investment that WESCAP made.  We

5    have a conflict waiver, but out of an abundance of caution,

6    we have engaged Selendy to deal with certain discovery

7    dispute that were implicated by the customer claim

8    litigation that was litigated before the Court earlier this

9    year in which they dealt with some discovery issues that

10   came up.

11          Again, out of an abundance of caution so that

12   questions regarding what work White & Case had done

13   previously for WESCAP were not a distraction for that

14   proceeding where we were -- and the positions that we were

15   taking in that regard.

16          THE COURT:  All right, thank you.  Miss Selendy,

17   do you want to say anything?

18          MS. SELENDY:  No, Your Honor.  I think it's

19   covered by Mr. Pesce.  Thank you.

20          THE COURT:  All right.  Miss Cornell?

21          MS. CORNELL:  Good morning, Your Honor.  Shara

22   Cornell on behalf of the Office of the United States

23   Trustee.  Everything that Mr. Pesce said is accurate.  We've

24   been working both with the Law Firm of White & Case and with

25   Miss Selendy's law firm to come to an agreement on these

Page 21

1    supplemental declarations, and as of right now, we have no

2    objection to the order being entered.

3              THE COURT:  All right, thank you.  Anybody else

4    wish to be heard?  All right.  The Court the has reviewed

5    the application for the retention of Selendy & Gay.  I'm

6    satisfied with everything that I've seen so far, the U.S.

7    Trustee, any issues have been resolved with supplemental

8    declarations, so that retention is approved.  Welcome

9    aboard, Ms. Selendy.

10             MS. SELENDY:  Thank you, Your Honor.

11             THE COURT:  Okay.  All right, Mr. Koenig, back to

12   you.

13             MR. KOENIG:  Thank you, Your Honor.  Again for the

14   record, Chris Koenig.

15             Turning back to the exclusivity motion, this is a

16   carryover from the last hearing.  We filed the motion to

17   obtain an extension of the plan filing date through March

18   31st and the solicitation date through June 30th.  Given the

19   bridge order that was entered at the last hearing, we now

20   just need a further extension of 23 days in order to reach

21   March 31st.  We think that this extension of just over a

22   little over three weeks is clearly justified by our progress

23   to date.

24             Specifically, we've been busy since February 15th

25   working to turn the plan framework, which were just

Page 22

1    PowerPoint slides, non-binding that we filed the night

2    before the hearing, into a binding commitment and we've done

3    that.

4            On the night of February 28th, we the committee

5    and NovaWulf, as proposed plan sponsor, signed and filed the

6    plan sponsor agreement that has a detailed plan term sheet

7    attached.  We filed a notice designating NovaWulf as the

8    stalking horse bidder and proposed plan sponsor.  We filed a

9    motion to approve certain bid protections for NovaWulf as

10   the stalking horse bidder.  The plan sponsor agreement and

11   term sheet are attached to that motion, which is filed at

12   Docket No. 2151.

13           But to be clear, this isn't the end of the sale

14   process.  We filed a notice explaining that the final bid

15   deadline has been extended to April 17th.  The Debtors and

16   the committee believe that the NovaWulf deal is the best

17   offer received to date but will continue to engage with

18   other potential bidders ahead of April 17th to see if

19   there's a higher or better offer out there, and if there is,

20   the Debtors and the committee have a broad fiduciary out to

21   pursue that offer.

22           But we do think that there is very substantial

23   value to the estates from the plan sponsor agreement and

24   from NovaWulf's binding agreement to serve as a stalking

25   horse bidder.  If there is a higher or better bid, it will

Page 23

1    be because of the floor that's set by NovaWulf's stalking

2    horse bid.

3              So we filed the bid protections motion, which will

4    be heard on March 21st to provide NovaWulf with expense

5    reimbursement and a breakup fee as part of their agreement

6    to serve as a stalking horse bidder.  So that's the next

7    step of the process; on March 21st, this bid protection

8    hearing will take place.

9              And just briefly before turning to exclusivity, I

10   want to talk about some of the other key milestones in the

11   plan sponsor agreement.  We and the committee see on social

12   media that some account holders think it will be years

13   before Celsius can exit from bankruptcy and before

14   distributions can be made; that is absolutely not the case.

15             Specifically, we have a milestone to file a plan

16   and disclosure statement by the end of March, that coincides

17   with the exclusivity extension we're talking about right

18   now.  We then have a milestone to have that disclosure

19   statement approved by May 10th.  At that point, if the Court

20   approves the disclosure statement, the voting process will

21   commence.  We'll send out the solicitation materials and the

22   ballots to account holders.  There will be a solicitation

23   period of about 30 days.  Then we have another milestone to

24   obtain a confirmation order by June 20th, and a milestone

25   for the plan to become effective and for Celsius to exit

Page 24

1      from bankruptcy by the end of June, and the end of June is

2      within our latest projections for our liquidity runway.

3              If we're able to achieve this, Your Honor, that

4      would mean that Celsius would be in and out of bankruptcy in

5      under one year.  And I know that this process is taking much

6      longer than many account holders would like, but we now have

7      selected our stalking horse bidder, proposed plan sponsor.

8      We're picking up steam; we're headed for the exit.

9              So turning more formally now to exclusivity.  The

10     incremental progress that we've made over the past months

11     and certainly weeks is evidence that the Chapter 11 process

12     is working as intended, to allow the Debtors the time to

13     develop a transaction and work to build a consensus for that

14     transaction.

15             At our last hearing in February, we just had

16     PowerPoint slides.  Now, we have a binding agreement that's

17     signed by the proposed plan sponsor and the committee.  And

18     we've made progress with other stakeholders too.  We have a

19     settlement with the custody holders that will be heard on

20     March 21st.

21             And I'm pleased to report that we now have an

22     agreement in principle with the ad hoc group of withhold

23     holders -- say that five times fast -- but we need to

24     finalize that documentation, but we expect to file a motion

25     to approve that settlement in the coming days and have that

Page 25

1    heard at our April omnibus hearing.

2              We've made good progress with the borrower ad hoc

3    group as well.  We've had several constructive calls with

4    them to address their comments and questions on the retail

5    loan treatment.  We continue to engage with the regulators

6    as well.  We have regular calls with them, have provided

7    diligence, and answered a variety of different questions

8    that they have about the plan.

9              Now, I think it's notable how few supplemental

10   objections were filed as part of the supplemental objection

11   deadline.  There were objections filed by the withhold ad

12   hoc group, which I believe is now resolved given our

13   agreement in principle.  There's an objection by the

14   borrower ad hoc group.  I don't know how Mr. Adler intends

15   to proceed today, but I know that we've had very

16   constructive discussions with him and we intend to keep

17   moving those forward.

18             There were a few other pro se account holders that

19   filed objections.  You know, I believe that those are

20   objections really to confirmation of the plan, not really an

21   objection to the extension of exclusivity.  I can turn to

22   those in a moment.

23             But I think it's notable that there weren't

24   objections by any of the regulators.  We understand that

25   that was intentional, given the constructive dialogue that

1     we've had.  To be clear, obviously, we have to keep talking

2     to the regulators.  My comments shouldn't be interpreted to

3     mean that the regulators are signed off on the transaction

4     or anything like that, but I think it's evidence that the

5     process is working.  We're speaking to our key stakeholders

6     and we're making incremental progress from each hearing.

7     This is exactly what the exclusivity deadline is designed to

8     cause and that's exactly how it has worked here.

9          So let me pause there to see if Your Honor has any

10     initial comments and then I can turn it over to the

11     committee and any other party that wishes to be heard and I

12     can address any remaining objections after they're raised.

13          THE COURT:  Well, let me hear from any parties who

14     support the requested extension of exclusivity; it's a 23-

15     day extension.  Do you want to be heard, Mr. Colodny, are

16     you going to speak for the committee?

17          MR. COLODNY:  Yes, Your Honor.  Aaron Colodny from

18     White & Case on behalf of the Official Committee of

19     Unsecured Creditors.

20          As Mr. Koenig describes, we are making progress

21     towards the Chapter 11 plan and resolving these Chapter 11

22     cases.  I don't want to tread over too much of what Mr.

23     Koenig said, but at this point, I will say that the

24     committee believes the NovaWulf transaction presents the

25     best opportunity to maximize value for creditors and the

Page 27

1   most certain path to conclude these Chapter 11 cases in a

2   timely manner.

3          But critically, the committee's support for the

4   plan support agreement and the NovaWulf transaction is

5   conditioned on the ability of both the committee and the

6   Debtors to continue to develop and consider other bids in

7   the coming weeks and months.

8          Currently, our support is for NovaWulf to be a

9   stalking horse and we remain open to all options and better

10  alternatives.  If any better alternative is received, the

11  Debtors and the committee have the ability to hold an

12  auction to determine the highest and best proposed bid.

13         THE COURT:  Let me ask this -- I don't know -- Mr.

14  Koenig or Mr. Colodny.  Are there any -- without naming them

15  at this point, are there other parties who are kicking the

16  tires that you've been, you know, sharing information with?

17  I guess let me ask -- one of you can tell me that -- Mr.

18  Koenig.

19         MR. KOENIG:  Sure, Your Honor.  Again, Chris

20  Koenig.

21         We have ongoing dialogues with -- there's one

22  bidder that is still -- you know, we're still having an

23  ongoing dialogue with.  And obviously, if some other bidder

24  emerges as part of the process, we'll continue to talk to

25  them too.

Page 28

1                THE COURT:  All right.  Mr. Colodny, anything you

2       want to add on that?  Again, I don't want to know the names

3       at this point.  I'm just interested in knowing if there are

4       more parties involved.

5                MR. COLODNY:  You beat me by one sentence, Your

6       Honor.  You know, two days ago, the Debtors and the

7       committee met with the interested party that Mr. Koenig was

8       referring to.  You know, we are interested in developing

9       that bid.  We currently don't believe that it provides the

10      higher and better transaction, but we're optimistic that it

11      could get there.

12               And, you know, I just want to be absolutely clear

13      that we are committed to get the most value to account

14      holders as soon as possible; that's our task and I believe

15      the Debtors are in the same boat with us on that.

16               THE COURT:  Thanks, Mr. Colodny.  Does anybody

17      want to speak in support of the extension of exclusivity

18      that's been requested?

19               All right, let me turn to the objections.  I'm

20      going to go through in the order in which I have them in my

21      notes.  I know Mr. Adler, you had your hand raised, but

22      we'll get to you, okay?

23               So the first one in my notes is Mr. Ubierna de las

24      Heras.  The objection is at ECF 1996.  Do you wish to be

25      heard?

```
 1                 Deanna, can you tell me whether he's signed in

 2      today?

 3                 CLERK:  Yes, he is signed in.  Mr. de las Heras?

 4                 THE COURT:  All right, I'll give him another

 5      chance.  The next in my notes, I have the ad hoc group of

 6      withhold account holders and their objection is at ECF 1940.

 7                 MS. KOVSKY:  Good morning, Your Honor.  Deb Kovsky

 8      for the ad hoc group.  Are you able to hear me okay?

 9                 THE COURT:  Yes, I can.  Thank you very much.

10      Good morning.

11                 MS. KOVSKY:  Good morning.  Further to what Mr.

12      Koenig said, we do have an agreement in principle between

13      the Debtors, the committee, and the withhold account

14      holders.  I wanted to thank counsel for the Debtors and

15      counsel for the committee for working productively with us

16      towards a consensual resolution.

17                 Based on our agreement in principle, we'll

18      withdraw our objection to the extension of exclusivity with

19      all rights reserved with respect to the plan.

20                 THE COURT:  Thank you very much, Miss Kovsky.  All

21      right, next on my list is Mr. Herrmann, which his objection

22      is at ECF 2015.

23                 MR. HERRMANN:  Immanuel Herrmann, pro se creditor.

24      Thank you, Your Honor.

25                 THE COURT:  Good morning.
```

Page 30

1          MR. HERRMANN:  Good morning.  So, yeah, I don't

2     have a whole lot to say about this.  I'm okay with a short-

3     term extension, so I can withdraw my objection.

4          The one thing I will say is I think it would be

5     good to get alternative plans made public so that creditors

6     can decide if they're better and not just have it sort of

7     decided behind the scenes.  I understand there's some other

8     motion we can raise this in the context of, so I can look at

9     that.  I believe the Debtors mentioned that in their reply

10    so I'll take a look at that.

11          THE COURT:  All right.  Thanks, Mr. Herrmann.

12    Miss Cornell, the U.S. Trustee, the objection was at ECF

13    2010.

14          MS. CORNELL:  Good morning again, Your Honor.

15    Shara Cornell with the Office of the United States Trustee.

16          Our office still has some questions regarding the

17    liquidity through the end of the solicitation period

18    requested by the Debtors.  And obviously, some of our other

19    questions about the plan itself still persist, but we are

20    working constructively with the Debtors and the committee to

21    get more answers.

22          I cannot withdraw our objection at this time, but

23    I can report that we are working constructively on those

24    issues.

25          THE COURT:  All right.  Thanks very much, Miss

Page 31

1    Cornell.

2            MS. CORNELL:  Thank you.

3            THE COURT:  All right.  The ad hoc group of

4    borrowers, the objection is at ECF 2013.

5            MR. ADLER:  Good morning, Your Honor.  David Adler

6    from McCarter & English.

7            I can also report that we've had a number of

8    meetings with the Debtor and the committee and that we are

9    making, I believe, progress.  We still do not have a

10   resolution that is acceptable or satisfactory on the issues

11   that I raised in my objection with respect to the

12   availability of all borrowers to participate in the program,

13   number one.  And, number two, ensuring --

14           THE COURT:  Some of that has to do with

15   eligibility within particular states; am I correct?

16           MR. ADLER:  Right.  So, for example, Your Honor,

17   there are a number of members in the ad hoc group who are in

18   foreign countries -- I think Australia, Switzerland, Spain -

19   - and we want to make certain that the program that's

20   available is available to all borrowers, number one.

21           Number two, we obviously are concerned about this

22   extension of the loans.  We want to make sure that for the

23   borrowers that sign up, they're not signing up for another

24   situation like Celsius of FTX.

25           We're working on those issues, Your Honor.  I am

Page 32

1    not going to press the objection since we're talking about

2    three weeks.  Obviously, we're hopeful that we can reach a

3    resolution on these issues with the Debtor and the

4    interested parties and the bidder.  We have been contacted

5    by other interested parties as well, who may make a bid.

6              So I guess, Your Honor, we'll see how things play

7    out when we get to March 21st on the motion for the bid.

8    Okay?

9              THE COURT:  Okay.  Thanks, Mr. Adler.  Thank you

10   very much.  Mr. Frishberg, your objection is at ECF 2014.

11             MR. FRISHBERG:  Thank you, Your Honor.  I agree

12   with most of what the other people have said, especially Mr.

13   Herrmann.  I do think that basically making the bids public

14   would be quite useful for creditors to see what the other

15   options are and transparency, as people have said, is the

16   best disinfectant.

17             It would make me feel a lot better knowing that

18   the best bid is actually being picked and not what the

19   committee or the special committee feels is the best bid or

20   what is best for creditors.

21             Yeah, that's about it.  Thanks so much and have a

22   great day, Your Honor.

23             THE COURT:  All right.  Thanks very much, Mr.

24   Frishberg.

25             Mr. Koenig, are there any other firm proposals

1    other than expressions of interest.  I mean, one of the

2    issues, Mr. Frishberg, about what you say is, you know,

3    people come in and kick the tires and express interest, but

4    there's nothing binding about it, and then they're unwilling

5    to sign on the dotted line to commit.

6            So I don't know whether -- Mr. Koenig, are there

7    competing firm offers at this stage?

8            MR. KOENIG:  Your Honor, again for the record,

9    Chris Koenig.

10           There's not any other firm offers at this point.

11   I'd describe it more as an initial indication of interest

12   and we've had dialogue and we intend to continue that

13   dialogue and maybe it will ripen into a binding commitment

14   or not, but at this point, we certainly don't have that

15   standing here today.

16           THE COURT:  Okay, thank you.  All right, is there

17   anybody else who wishes to be heard?  At least in my notes,

18   I think I have now covered all of the objections that I have

19   noted.  Is there anybody else wo wants to speak in

20   opposition to the extension of exclusivity?  All right.

21           CLERK:  Sorry, Judge.  You have one raised hand,

22   Lawrence Porter.

23           THE COURT:  All right, Mr. Porter.  You need to

24   unmute.

25           CLERK:  I'm asking you to unmute, Mr. Porter.

1          THE COURT:  All right, go ahead.  You were unmuted

2     and then you muted again.

3          CLERK:  All right.  I'm asking -- there you are.

4          THE COURT:  Go ahead.

5          MR. PORTER:  Thank you again, Your Honor.  This is

6     not a reorganization of Celsius Network.  This is a new

7     company coming in and they are trying to turn us into hedge

8     fund investors.  We feel NovaWulf's plan is predatory.  We

9     would like to see competitive bids and try to get the best

10    outcome for creditors.  Please do not extend this Celsius

11    exclusivity.

12          Thank you, Your Honor.

13          THE COURT:  All right, Mr. Porter.  My only

14    comment is, you know, it's the only firm offer that's been

15    made.  There is a procedure that's established.  Both the

16    committee and the Debtor, I believe them when they say

17    they're committed to the highest and best offer.  Things

18    that might go to objections to a disclosure statement or

19    plan are premature for today but thank you for your

20    comments.

21          Anybody else who wishes to be heard?  All right.

22    I'll be brief in my analysis.

23          I'm going to grant the requested extension of

24    exclusivity.  The reasons for that are the Debtors have now

25    proposed a plan structure, entered into a plan sponsor

Page 35

1    agreement, and have reached a settlement with the custody

2    group.  The Adelphia factors, and I think I've talked about

3    the Adelphia case before; it's one of the leading cases in

4    this district in terms of the factors for approving an

5    extension of exclusivity.  The Adelphia factors

6    overwhelmingly support the extension of exclusivity.

7             I won't spend a lot of time on it, but this case

8    is large and complex.  In my view, progress has been made.

9    In my view, the creditors will not be prejudiced by an

10   extension.  From all indications, the Debtor is paying its

11   bills as they come due, but it is, there's no question,

12   using customer funds to do so.  That would be a negative

13   factor.

14            There is no evidence that the Debtor is seeking an

15   extension to pressure creditors.  Indeed, this has been for

16   some time now.  I'm very appreciative of the fact that the

17   committee has been working very cooperatively with the

18   Debtors in trying to come to a value maximizing transaction.

19            Next, the amount of time that has elapsed, again,

20   also weighs in favor of an extension.  The reality is, in

21   large Chapter 11 cases, it can take quite some time to move

22   those cases forward.  By those standards, this actually has

23   been fairly prompt.

24            So on balance, the Adelphia factors favor the

25   extension of exclusivity.  The Debtors have a fairly

Page 36

1       detailed plan structure with dates to come forward with the

2       disclosure statement and move forward.  In terms of the

3       NovaWulf transaction, while we don't have them on today, the

4       bid protections that have been asked for; they'll be taken

5       up at another time.  But there's a broad fiduciary out so

6       that if a higher and better transaction comes forward, there

7       certainly is the hope that that will take place.

8               Let me make a couple of comments.  Mr. Koenig and

9       Mr. Colodny, there are a lot of unsecured creditors in this

10      case, many of them pro se, some may be lawyers, most not.

11      There are ad hoc committees represented by counsel, the

12      committee is represented by counsel.

13              It's my hope that this disclosure statement, when

14      you provide it, will have a pretty thorough plain English

15      executive summary that all creditors -- I mean, they can

16      look -- hopefully, they'll read the whole thing.  You know,

17      the problem with disclosure statements necessarily, they're

18      quite lengthy.  And the executive summary, obviously, it

19      needs to be accurate and fair, but it's very important for

20      creditors to be able to read that, understand what's

21      proposed.

22              So I would hope that when you file a proposed

23      disclosure statement, it will have a very plain English

24      executive summary that will sort of tell the story and put

25      it together.

Page 37

1          You know, there have been -- the Court continues

2     to receive many communications and they fall into a couple

3     of different categories.  And I'm sure you're seeing the

4     same things, both the committee and the Debtor, and I assume

5     the U.S. Trustee and the other ad hoc committees as well.

6          There's been a lot of concern about the potential

7     for clawback actions.  I understand in the framework for

8     those creditors who vote in favor, anybody with less than

9     $100,000, as I understand it right now.  The outline --

10    anybody with less than $100,000 potential clawback who votes

11    in favor would not be -- there would not be a clawback

12    action.

13         I think all of those -- you know, we've had

14    discussions about clawback actions a number of times.  This

15    obviously came up with respect to the custody account

16    holders because most of those transfers into custody

17    accounts happened 89 days before the petition date.

18         Under the bankruptcy law, you know, to some extent

19    the Debtors and the committee and other professionals, they

20    have to follow the law.  Yes, and I commented earlier in the

21    case, there certainly can be a consensual resolution of

22    clawbacks and that, in part, is what's happened with respect

23    to the custody account holders because of the potential --

24    other than the pure custody who've been receiving their

25    distributions, the custody account holders faced the

Page 38

1    potential of clawback actions.  There is a proposed

2    settlement.  People, as I understand it, have the

3    opportunity to opt out of it and take their chances.

4          I'm mindful of the concerns that many people have.

5    You know, the issue about people who withdrew their -- let's

6    put the insiders apart because they're excluded from this.

7    The insiders, I think, appropriately are treated

8    differently.  But for the non-insiders, you know, a very

9    fundamental -- I've talked about this before, both in

10   writing and orally at hearings.

11          The very fundamental policy of bankruptcy is a

12   quality of distribution.  If some creditors were able to

13   withdraw all of their funds within the 90 days and in effect

14   recovered 100 percent of what they believe their claim was,

15   it has a significant impact on the remaining unsecured

16   creditors whose funds were still on deposit on the petition

17   date.

18          And so, some of this is not a question -- I follow

19   the law.  There's certainly, you know, in some of the

20   settlements that have been proposed, a substantial recovery

21   by custody account holders, but not 100 percent, so we'll

22   have to see how this all shakes out.

23          But I want people to understand, I don't view this

24   as an issue of either the committee or the Debtors trying to

25   take unfair advantage of those people who were able to

Page 39

1    withdraw their funds within 90 days and may be subject to

2    avoidance actions.  That isn't to resolve any issues about

3    defenses because there certainly are defenses.  I'm mindful

4    that some people have raised the issue of the expense of

5    being able to defend against those actions.

6              The Bankruptcy Code is what the Bankruptcy Code

7    is.  The issue about avoidance and preferences is an

8    important part of the Bankruptcy Code and it's intended to

9    provide a quality of distribution among all creditors.  It

10   would be unfortunate if some small group of creditors was

11   able to be substantially advantaged while others are left

12   holding the back, in effect.

13             So I'll make those comments now.  That isn't to

14   say that there won't be an appropriate consensual resolution

15   of those issues, but there's certainly been quite a few

16   things that I've seen from pro ses who are very concerned

17   about the avoidance actions.

18             I'm certainly committed, if there are avoidance

19   actions, to find a way to expedite it so we can get through

20   this and resolve the issue.  It's my hope that creditors

21   will be able to recover the maximum amount of their claims

22   within the shortest period of time.  It's certainly in my

23   interest to have this dragged out.

24             Is there anybody else who wishes to be heard at

25   this point before we move on from the exclusivity motion?

Page 40

1              All right, Mr. Koenig, let's move on on the

2      agenda.

3              MR. KOENIG:  Thank you, Your Honor.  The next item

4      on the agenda is a stipulation that I believe the committee

5      filed, so I'll turn it over to Mr. Colodny.

6              MR. COLODNY:  Your Honor, Aaron Colodny again on

7      behalf of the Official Committee of Unsecured Creditors.

8              Since the beginning of these cases, the committee

9      has investigated the Debtors and the events leading up to

10     these Chapter 11 cases.  It has done so in connection with

11     the examiner's report and done so and attempted to do so

12     efficiently alongside the examiner to minimize the

13     administrative burden on these estates.

14             That investigation has revealed prepetition

15     conduct by the Debtors' former management that was

16     reprehensible.  Individuals who are identified in the

17     proposed Complaint that is attached to the stipulation were

18     aware that Celsius was promising its customers interest it

19     could not afford and they did nothing to fix the problem.

20     They made negligent, reckless, and sometimes self-interested

21     investments that caused Celsius to lose billions of dollars

22     of customer assets.

23             They could not keep track of Celsius's position,

24     which resulted in hundreds of millions of dollars of losses.

25     And even after they realized those losses had occurred, they

Page 41

1    did not adequately fix the problem.  It caused Celsius to

2    spend hundreds of millions of dollars of customer money to

3    strategically inflate the price of CEL Token, and then

4    caused the company to purchase their own CEL Tokens at those

5    inflated prices.

6              Employees and insiders sat idly by as Mr.

7    Mashinsky recklessly bet hundreds of millions of dollars on

8    the movement of cryptocurrency markets, and they covered up

9    Mr. Machinsky's repeated lies about Celsius investments and

10   its financial condition.

11             And finally, when it became apparent that

12   Celsius's business was doomed and it would file for

13   bankruptcy, many of those individuals withdrew their assets

14   while they were actively encouraging customers to keep their

15   assets on the platform.  Those prospective defendants caused

16   the situation we all find ourselves in today.

17             But to be clear, this was not solely created by

18   Mr. Mashinsky.  Either by direct action or systematic

19   omission, each of the defendants and the other employees and

20   other interpreted parties identified in the Complaint is

21   liable to Celsius and its creditors for the damage they

22   caused.

23             By the stipulation and agreed order, the Debtors

24   and the special committee have agreed to place those causes

25   of action and other claims against parties to be agreed with

Page 42

1    the committee and a litigation vehicle to be pursued after

2    the effective date.  The stipulation also provides the

3    committee and the Debtors with the ability to come to this

4    Court on an emergency basis and request relief if needed to

5    preserve those claims.

6            The committee understands that many other

7    governmental organizations are also investigating Mr.

8    Mashinsky and his co-conspirators.  We're available to

9    discuss our investigation with those entities and help

10   ensure that any recovery is returned to the victims who were

11   harmed by the proposed defendant's actions.

12           We received one objection from a group of security

13   class action plaintiffs with respect to the treatment of the

14   Debtors' directors and officers.  We've added language

15   resolving that objection and filed a revised form of order

16   at Docket No. 2193.

17           We request that the Court enter the stipulation,

18   which will ensure that these causes of action are preserved

19   against the Debtors' former management are preserved for the

20   benefit of the estate.

21           THE COURT:  Why don't you explain for the record,

22   if you would, Mr. Colodny, what the changes that were made.

23   The original stipulation was at 2154 and, as you say, the

24   revised joint stipulation is 2913.  Just explain for the

25   record so people understand what change was made in

Page 43

1     response.  And I'll certainly give, if the security

2     plaintiffs want to be heard, I'll give them an opportunity,

3     but why don't you just go ahead and just explain for the

4     record what changes have been made.

5              MR. COLODNY:  Of course, Your Honor.  So the first

6     change was to make it clear that only the Debtors' interest

7     in the directors and officers insurance policy is going to

8     be transferred and that those policies will only be

9     transferred if allowed by the Bankruptcy Code, applicable

10    law, or the terms of the policy.  And those changes were

11    intended to make sure that all that is transferred is what

12    is owned by the Debtors and what is allowed by the law.

13              The second change was just to clarify that nothing

14    in the stipulation is going to determine whether the

15    securities class action is property of the Debtors' estate

16    or not.  It simply punts that for another day.

17              But with those changes, we believe their objection

18    is resolved.

19              THE COURT:  Thank you very much, Mr. Colodny.

20    Does anybody else wish to be heard?  Mr. Etkin.

21              MR. ETKIN:  Yes, Your Honor.  Michael Etkin,

22    Lowenstein Sandler on behalf of the proposed lead

23    plaintiffs.

24              We appreciate the efforts of Mr. Colodny to add

25    that language.  Obviously, our concern -- it was a limited

Page 44

1    objection, which set forth our concerns.  We think those

2    concerns have been addressed.  We would note that we don't

3    understand how the direct claims of customers under the

4    securities laws could ever be causes of action or claims

5    owned by the Debtor, but we did agree to punt that, and to

6    the extent that issue comes up, we'll resolve it at that

7    time.

8              So with that, our objection has been resolved.

9              THE COURT:  Thanks very much, Mr. Etkin.  All

10   right.  Does anybody wish to be heard with respect to this

11   stipulation?

12             MR. KOENIG:  Your Honor,  Chris Koenig for the

13   Debtors, just very briefly.

14             THE COURT:  Go ahead, Mr. Koenig.

15             MR. KOENIG:  We agree with Mr. Colodny that the

16   examiner's report demonstrates reprehensible conduct by the

17   Debtors' former management team and obviously the word

18   former is very important.  We have a new management team.

19   We have a special committee that was appointed just before

20   the petition date.

21             That special committee, that new management team

22   has fully complied with all of investigations, including by

23   the committee, the examiner, and various governmental

24   authorities as well, and it's because we think that this

25   conduct is so reprehensible that we agreed to turn over

Page 45

1    these claims to a litigation trust.

2            In many large Chapter 11 cases, we would be

3    standing here not with a stipulation but with a fight about

4    standing and whether the committee had demonstrated standing

5    to pursue these claims.  It doesn't make sense to do that

6    here.  We think that these claims should be pursued at the

7    appropriate time.

8            But given the progress that we have made to date,

9    we are, as I said a few minutes ago, we're headed for the

10   exit and we don't want these claims to be a distraction to

11   the ultimate goal of getting us out of bankruptcy as fast as

12   possible, returning distributions of cryptocurrency to

13   customers as fast as possible.  And this will be taken up

14   promptly, you know, on emergence and pursued for the benefit

15   of account holders.

16           But just wanted to be clear that, you know, we

17   fully support the stipulation given the unique facts and

18   circumstances here.  Thank you.

19           THE COURT:  Thank you, Mr. Koenig.  All right.

20   The joint stipulation, to the extent there are any remaining

21   objections overrule.  I don't think there are any at this

22   point.  It's approved.  Just submit a Word copy and it'll be

23   promptly entered, okay?

24           MR. COLODNY:  We submitted that yesterday.  Thank

25   you, Your Honor.

1              THE COURT:  All right.  Thanks very much.  All

2      right, let's move on.  The next, 4, 5, and 6 on the agenda

3      all relate to motions to strike designations of the record

4      for pending appeals.  It first relates to the appeal by Mr.

5      Frishberg.  I'm going to take these all together, the

6      Khanuja appeal, and the Steadman appeal.

7              You know, there's no question that the motion to

8      strike is properly made before the Bankruptcy Court, always

9      struck me as a little odd that the Bankruptcy Court is being

10     asked to decide what should be part of the record on appeal,

11     but that's what I guess Rule 8009 deals with.

12             Are you going to deal with this, Mr. Koenig?

13             MR. KOENIG:  I am, Your Honor, thank you.  So

14     again, I'll take these all together.  These are all appeals

15     of the Court's earn ruling in January.  The purpose of

16     designating a record on appeal is to accurately reflect what

17     actually took place before the lower court.

18             The appellants sought to introduce over 250

19     different items, most of which are simply not related to

20     what took place in earn stablecoin ruling.  Many of the

21     items that they seek to designate were not even existence at

22     the time of the earn trial, so they certainly could not be

23     part of the record on appeal.  They certainly were not even

24     in existence at the time that the Court held the proceeding.

25             And as Your Honor pointed out, Bankruptcy Rule

1    8009(e) provides that if there's a dispute about what the

2    record, you know, below was that we're supposed to bring

3    that dispute to Your Honor, so we filed the motions to

4    strike.  We met and conferred with some of the appellants a

5    couple of days ago.  We've managed to narrow the issues a

6    little bit.

7            To be clear, we do not object to the appellate

8    record including the motions, both the original motion, the

9    amended motion, all the responses, the objections to those

10   motions, the scheduling order and the responses and

11   objections to those motions being included.  And, of course,

12   the record should include the transcripts of the hearings,

13   the November 1st status conference and the trial on December

14   5th.

15           But what the appellants are seeking to do is to

16   include a bunch of wholly irrelevant documents: letters that

17   predate the earn motion itself, documents that were created

18   after the earn trial concluded, and purported evidence that

19   they argue they would have introduced but for their mistake.

20           In their omnibus objection, which was filed at

21   Docket No. 2164, the appellants cite several cases for the

22   proposition that their mistake in failing to introduce

23   evidence at the earn hearing means that this evidence means

24   that this evidence should be included in the record on

25   appeal.  That's not actually what those cases say.

1                    Those cases actually support our motions to

2          strike.  Specifically in Prudential Wines, the Court was

3          talking about a mistake in designating the record on appeal,

4          not a failure to introduce that evidence in the first place,

5          and the district court in that case even denied the request

6          to add additional materials on appeal because those

7          materials were not part of the record before the Bankruptcy

8          Court.

9                    Likewise, in Food Fair, the appellants were

10         seeking to add a related adversary proceeding that the Court

11         described as closely related to the issue before the

12         Bankruptcy Court.  Here, the appellants are seeking to

13         introduce materials from the custody and withhold disputes,

14         not the earn dispute; those are not closely related.

15                   So to allow the record on appeal to include items

16         that clearly were not before the Court as part of the earn

17         motion is improper and would deny the Debtors the right to

18         challenge the authenticity or admissibility of these

19         documents.  For example, they're seeking to admit the

20         depositions of the witnesses.  Those depositions are hearsay

21         and are not admissible for the truth of the matter asserted

22         and we would have raised that objection had they sought to

23         introduce them at the trial.

24                   So in any event, what we've agreed to do with the

25         appellants is rather than going line by line on each

1    document, which would be excruciating I think in open court,

2    I believe that they're going to raise categories of

3    documents that they believe should be included and, you

4    know, we will argue that they should be excluded.

5         And Your Honor can resolve these categories of

6    documents and then we'll agreed to meet and confer after the

7    hearing and take Your Honor's ruling on the categories and

8    apply it to the specific documents.  I'm cautiously

9    optimistic that we'll be able to reach, you know, an agreed

10   form of order once we have sort of the ruling on the

11   categories themselves.

12        So I'll pause there and see if Your Honor has any

13   questions for me and, if not, we can turn it over to the

14   objectors.

15        THE COURT:  I don't.  Mr. Frishberg.

16        MR. FRISHBERG:  Thank you, Your Honor.  Several of

17   the appellants, as the Debtors have stated, had a fairly

18   productive call with the Debtors on Monday.  We agree that

19   we can work with some stuff, but we also had some

20   disagreements, as Mr. Koenig stated.

21        But we also have a different question, and I mean

22   no disrespect to you, Your Honor, but does this Court even

23   have jurisdiction over this matter since Judge

24   (indiscernible) has already entered two orders of the docket

25   on appeal.  He's accepted the Steadman appeal to the

Page 50

1    original appeal and is considering consolidating all of the

2    appeals.  That's a question I respectfully must raise.

3            THE COURT:  Well, I just say this, Mr. Frishberg.

4    It was always a surprise to me that Rule 8009 says come back

5    to the Bankruptcy Court if there's a dispute about what

6    should be part of the record on appeal.  That's what the

7    rule says, so I'm supposed to decide that.

8            That doesn't stop you from arguing whatever you're

9    going to argue in the district court, whether something else

10   should be considered or not, but the rule puts it in my

11   court to decide it and that's what I'm going to do.

12           MR. FRISHBERG:  Thank you, Your Honor.  In their

13   initial motion, the Debtors attempted to strike basically

14   everything our designation, which was apparently an

15   accident.  But would it be all right if we got to you a new

16   list of categorized documents by March 19th?

17           THE COURT:  Look, what I would like to see is that

18   you and Mr. Khanuja and Miss Steadman continue to try and

19   iron this out with Mr. Koenig or his colleagues, get it

20   narrowed down to the fullest extent you can.

21           My only concern was when you said March 19th.  I

22   don't know whether -- I'm not sure what the schedule in the

23   district court is.  I don't want to do anything to slow

24   down, you know, the process in the district court.

25           Mr. Koenig, can you shed any light on what the

Page 51

1    district court has done?

2          MR. KOENIG:  Yes, Your Honor.  The district court

3    is currently considering whether to hear the appeals.  The

4    appellants have argued that Your Honor's earn order is a

5    final order or that if it is interlocutory, it should be

6    heard at this time.

7          The Debtors filed an objection and argued that it

8    is not final; it is interlocutory and in an appeal, should

9    not be granted permissively.  The district court has not yet

10   ruled on that motion -- on that objection on whether to

11   accept the appeal and have it go forward.

12         THE COURT:  All right.  Mr. Frishberg, could you

13   do this in a week by the 15th, by 5:00 p.m. Wednesday, the

14   15th?  I'd like to be able to get this done so that the

15   district court can decide whatever it's going to decide.

16   I'd just be cutting back -- you asked for the 17th, I'm

17   asking whether you could do it by close of business on the

18   15th.

19         MR. FRISHBERG:  We will do our best, Your Honor.

20   We will arrange a meet and confer with the Debtors again

21   after we have some time to review the documents to see what

22   we can work out.

23         THE COURT:  Okay, look, it would be helpful to me.

24   To the extent you're able to narrow your disagreements, I

25   think it would be in everybody's interest to be able to do

Page 52

1    that.

2            MR. FRISHBERG:  Yes, Your Honor.

3            THE COURT:  Okay.  Let me just say, you know, Mr.

4    Koenig, that may require you to sort of bend over backwards

5    a little bit, even though you think that some things -- you

6    know, if you want to argue to the district court it couldn't

7    consider certain things that have been put in the record,

8    you're obviously free to do that.

9            But let's -- this is the first time I've ever had

10   this come up before me where anybody's had to use 8009 to

11   try and get me to strike things from a record on appeal.

12   You know, see what you can do, okay?

13           MR. KOENIG:  Understood, Your Honor.  And we

14   wouldn't have done it if we didn't feel it was necessary,

15   but we'll certainly endeavor to narrow the issues.

16           THE COURT:  Okay.  Mr. Khanuja, do you want -- Mr.

17   Frishberg, is that an okay way to proceed?

18           MR. FRISHBERG:  Yes, Your Honor.  Thank you.

19           THE COURT:  Okay.  Mr. Khanuja, is that acceptable

20   to you?

21           MR. KHANUJA:  Yes, Your Honor.  I've been

22   listening and I think Mr. Frishberg has raised some valid

23   concerns, but we'll work together to get these resolved with

24   Mr. Koenig and his team.

25           THE COURT:  Thank you very much.  All right, Miss

Page 53

1     Steadman.  You're muted.

2              MS. STEADMAN:  Sorry.

3              THE COURT:  No, that's okay.

4              MS. STEADMAN:  I just wanted to thank you.

5              THE COURT:  The most common words in these remote

6     hearings is, you're on mute, you're on mute.  Go ahead.

7              MS. STEADMAN:  Can you hear me now?  That's

8     another one.

9              THE COURT:  I can hear you.  Yes, I can hear you.

10             MS. STEADMAN:  So I just wanted to thank you.  I'm

11    also in the Voyager case and you and Judge Wiles have both

12    been very kind and understanding.  These are complex cases,

13    as you've said, and most of us are not in the legal

14    profession and we have no idea what we're doing.

15             And I just wanted to state that my reason for the

16    appeal was, I didn't know that the UCC was going to agree

17    with the Debtors.  And by the time I realized it, I filed a

18    joinder on an objection in a rush because I do disagree, but

19    I believe that -- I didn't know enough to make sure that my

20    attorney was going to do anything.  And so, then afterwards,

21    it was kind of confusing and upsetting.

22             So just thank you for giving us the opportunity to

23    work with the Debtors, and I want to thank Kirkland & Ellis

24    also for working with us.  And I do believe if we weren't in

25    the situation that we're in, that we would all be getting

Page 54

1     along just fine, but right now, we're one great big

2     dysfunctional family.

3               Thank you very much.

4               THE COURT:  All right, thanks Ms. Steadman.  I see

5     several hands raised.  First, Mr. Anderson and then Mr.

6     Herrmann, I'll call on you next.  Go ahead, Mr. Anderson.

7               MR. ANDERSON:  Hi.  Can you hear me?

8               THE COURT:  Yes, I can.  Go ahead.

9               MR. ANDERSON:  Hi.  My name is Samuel Anderson and

10    I am -- I'm sorry, I've never done this before.  I wanted to

11    bring something to the Court's attention.  It's been

12    slightly, I guess, addressed a little bit.  But I wanted to

13    say that we have what I consider to be a hostile creditor,

14    Daniel Frishberg, who is consistently aggressive and

15    verbally abusive to others online, and he is explicit in

16    wasting all of our funds and is extremely juvenile.

17              THE COURT:  Mr. Anderson, this is not a forum for

18    one creditor to criticize another creditor.  What I have

19    before me now, and if you want to address that, I'll permit

20    you to do it.  There are three motions -- well, the Debtor

21    has made motions to strike portions of the designation of

22    the appellate record by Mr. Frishberg, Mr. Khanuja, and Miss

23    Steadman.  That's what's being discussed right now.

24              MR. ANDERSON:  Okay.

25              THE COURT:  If you have something to talk about

1    that, I'll permit you to do it, okay?

2            MR. ANDERSON:  No, that's it.  I just want to say

3    how juvenile he was.

4            THE COURT:  Well, okay.  Mr. Herrmann.

5            MR. HERRMANN:  Thank you, Your Honor.  Immanuel

6    Herrmann, pro se creditor.  I just wanted to speak just to

7    remind you, I think you probably saw, but I'm also on one of

8    the appeals.

9            THE COURT:  I did.  I saw it.

10           MR. HERRMANN:  Yeah, so I just wanted to address

11   some of the categories.

12           THE COURT:  Let me ask you to do this, because

13   I've reviewed it, okay.  I'm not ruling today.  I think you

14   definitely should be part -- you know, you've been active in

15   this case from the start and I appreciate that.  You've

16   raised good issues, some not so good issues, but many good

17   issues, okay.

18           What I'd like you to do is, along with Mr.

19   Frishberg, Miss Steadman to the extent she's proceeding, and

20   Mr. Khanuja is talk with Mr. Koenig, see if you can narrow

21   down what the items in dispute are.  As I've suggested to

22   Mr. Koenig, you know, the world isn't going to come to an

23   end, Mr. Koenig, if some things are included in the record

24   on appeal, which you then argue to the district court really

25   aren't relevant to the issues on appeal.

Page 56

1              You know, the district court, you know, is not

2      going to want to see everything on the docket; well, that's

3      not what's been proposed, but, you know.  If you want to get

4      an appellate ruling in real time, what's important is that

5      you provide the district court with those parts of the

6      record that are pertinent to the matters on appeal, okay.

7              You know, you've been cooperative on many things

8      throughout this case, Mr. Herrmann.  That's what I'd like to

9      see, see if you can narrow it down.  If you can provide me

10     with that, if I get something by next week by close of

11     business Wednesday that shows here are the remaining

12     disputes, I'll resolve them.  Okay?

13             MR. HERRMANN:  Okay, thank you, Your Honor.  Yeah,

14     I mean, I would say that, like, actually, I thought that the

15     call was with the Debtors.  I mean, we resolved a surprising

16     amount.  I think that this, it'll be far fewer than the

17     number of items that were originally in the (crosstalk).

18             THE COURT:  I know, I've got this long list of

19     items.  Rather than have to go through that, let me see, to

20     the extent there's still a disagreement after you work it

21     out.  It sounds like you've made progress and, hopefully,

22     both sides will show a little flexibility.

23             Look, it's in the -- it seems that on the

24     Bankruptcy Court docket, if you think they're critically

25     important, the district court has the ability to look at

Page 57

1     them.  Let's leave it at that for now, okay?  Thanks, Mr.

2     Herrmann.

3               MR. HERRMANN:  All right, thank you.

4               THE COURT:  All right.  Now we move on to status

5     conferences, Frishberg v. Celsius, Adversary Proceeding 22-

6     01179.  First, Mr. Frishberg.

7               MR. FRISHBERG:  Thank you, Your Honor.  As you

8     likely know, there has not been very much progress on my

9     adversary proceeding thus far since I've not served my

10    summons.  I expect to serve the summons, the second summons

11    -- the first one I actually requested -- as soon as I

12    receive it, which will hopefully be today.  And I would know

13    shortly before that be amending my adversary proceedings

14    before I serve it (indiscernible) today.

15              That's about it.  I mean, that's all said.

16              THE COURT:  All right, thanks.  Does somebody from

17    the Debtor want to respond?  Mr. Koenig, are you going to

18    respond to this?

19              MR. KOENIG:  Your Honor, Chris Koenig.  We'll, of

20    course, you know, review what Mr. Frishberg files and

21    respond in due course.

22              THE COURT:  All right, thank you very much.  All

23    right, next is Celsius Network Limited v. Fabric Ventures

24    Group, SARL, Adversary Proceeding 23-01002.  Mr. Koenig, are

25    you going to address that?

1          MR. KOENIG:  Yes, Your Honor.  This is an

2    adversary that we filed.  I don't believe that the

3    defendant's time to respond has actually run yet, but I

4    believe that this pretrial conference was automatically

5    scheduled --

6          THE COURT:  It was.

7          MR. KOENIG:  -- even though they haven't actually

8    filed anything yet.

9          THE COURT:  All right.  Is anybody appearing today

10   for Fabric Ventures?  All right, we'll wait until -- have

11   they been served at this point, Mr. Koenig?

12         MR. KOENIG:  I believe so, Your Honor.

13         THE COURT:  Okay.  When is their deadline for

14   response?

15         MR. KOENIG:  I unfortunately don't have that in

16   front of me, but I can give it to your chambers.

17         THE COURT:  Okay.  All right, the next adversary

18   proceeding is Yanchuk v. GK8, Ltd., et al, Adversary

19   Proceeding 23-01003.  Mr. Koenig.

20         MR. KOENIG:  Your Honor, we're the defendant.

21   This adversary proceeding was filed as an adversary

22   proceeding.  It was, the Complaint was a one-page

23   handwritten note and the plaintiff's proof of claim was

24   attached to that handwritten note.  We've reached out to her

25   to try to, you know, have a dialogue with her to explain

1    that she doesn't need an adversary proceeding for her proof

2    of claim to work in the claims process.  To date, we haven't

3    been able to have a constructive dialogue with the

4    plaintiff.  I don't know if she's on the line or not, but we

5    haven't been able to move that forward.

6              THE COURT:  All right.  Miss Yanchuk, are you on

7    the phone or on the line?

8              CLERK:  I don't see anyone with that name, Judge.

9              THE COURT:  Okay.  Take what action you think is

10   appropriate, Mr. Koenig.

11             MR. KOENIG:  Thank you.  All right, we've dealt

12   with the Selendy Gay Elsberg retention, has been approved

13   already.  Moving on in the resolved matters.  Why don't you

14   update me on where things stand on Willis Towers Watson.

15             MR. KOENIG:  Certainly, Your Honor.  So we've

16   agreed to file a retention application for Willis Towers

17   Watson.  We understand that that resolves the U.S. Trustee's

18   issue.  Obviously, the reserve rights on the actual

19   retention application itself, so they're going through the

20   conflicts checks and we're, you know, preparing the

21   retention application.

22             We expect it to be submitted, you know, in the

23   coming days, perhaps a week or so.  But hopefully we have

24   that on file soon and then, you know, Miss Cornell and the

25   other parties can review the retention application and we'll

Page 60

1      have it determined at a hearing.

2                THE COURT:  That's fine.  Miss Cornell.

3                MS. CORNELL:  Thank you, Your Honor.  Shara

4      Cornell on behalf of the Office of the United States

5      Trustee.  That's correct.  I have not seen the retention

6      application yet though.  Thank you.

7                THE COURT:  Thank you very much.  All right.  I

8      think that deals with everything on the agenda.  Starting at

9      Page 11, it deals with things that have been adjourned.  We

10     don't have to deal with that today.

11               Mr. Koenig, anything else that we need to cover

12     today?

13               MR. KOENIG:  No thank you, Your Honor.  We'll see

14     you on the 21st.

15               THE COURT:  All right.  Thank you very much

16     everybody and we are adjourned.

17               MR. KOENIG:  Thank you.

18               CLERK:  Please stop the recording.

19               (Whereupon these proceedings were concluded at

20     12:08 PM)

21

22

23

24

25

1                            I N D E X

2

3                             RULINGS

4                                            Page        Line

5    Extension of Exclusivity Granted        34          23

6

7    Application for the Retention of

8    Selendy & Gay Approved                  221         8

9

10   Joint Stipulation Approved              45          22

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 62

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  March 10, 2023