**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 ) |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) Case No. 22-10964 (MG) ) |
| Debtors. | ) (Jointly Administered) ) ) |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OBJECTION TO THE DEBTORS' MOTION SEEKING ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO ENTER INTO WITNESS COOPERATION AGREEMENTS WITH CERTAIN CURRENT AND FORMER EMPLOYEES, (II) AUTHORIZING REIMBURSEMENT OF PAST AND FUTURE OUT-OF-POCKET EXPENSES OF COOPERATING WITNESSES, INCLUDING ATTORNEY'S FEES, AND (III) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "**Committee**") of the above-captioned debtors and debtors-in-possession (collectively the "**Debtors**," and together with their non-Debtor affiliates "**Celsius**" or the "**Company**"), by and through its counsel, respectfully submits this objection to the *Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to Enter Into Witness Cooperation Agreements with Certain Current and Former Employees, (II) Authorizing Reimbursement of Past and Future Out-Of-Pocket Expenses of Cooperating Witnesses, Including Attorney's Fees and (II) Granting Related Relief* [Docket No. 2147] ("the "**Motion**"),[2] and states as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion.

**PRELIMINARY STATEMENT**

1.  The Motion seeks authorization for the Debtors to reimburse to-be-named employees up to $3 million in past legal expenses in the aggregate and $240,000 per employee in future legal expenses to act as cooperating witnesses in ongoing criminal and regulatory proceedings. While the Committee does not wish to minimize the burden to innocent employees who want to retain separate counsel to represent them, it is also aware that thousands of the Debtors' creditors who also want to retain separate counsel to press their own claims face similar hardship. It is improper to prospectively elevate requests for reimbursement of certain preferred parties. The Debtors, however, assert that their requested relief is ordinary or otherwise justified by their business judgment. But the Debtors cite no authority for this relief. Nor have the Debtors have offered any evidence to meet their burden. The Motion should be denied for four primary reasons.

2.  *First*, the Debtors argue that the payments contemplated by the motion are ordinary course activities under section 363(c) of the Bankruptcy Code. The Debtors' argument that it is ordinary for a non-operating cryptocurrency exchange to pay millions of dollars to fund its current and former employees' legal fees and expenses as part of criminal and other investigations by multiple federal and state authorities is not credible. Moreover, no creditor would have expected that their cryptocurrency would fund these types of expenses when transferring their assets to the Debtors prepetition.

3.  *Second*, the relief requested in the Motion is unnecessary, as the Bankruptcy Code already provides ample means by which employees can seek reimbursement of their legal expenses. As the Debtors acknowledge, certain potentially eligible employees are parties to prepetition indemnification agreements, which would permit such employees to assert prepetition

2

claims for indemnification of legal costs and expenses through the claims reconciliation process. The Debtors also acknowledge that employees who do not have prepetition indemnification claims can file administrative expense claims or, alternatively, substantial contribution claims. Circumventing these statutory processes is not necessary.[3]

4.   ***Third***, even if the business judgment rule applied here, the Debtors have failed to meet it.  The Debtors bear the burden of demonstrating, by a preponderance of the evidence, that the requested relief is a sound exercise of their business judgment.  The Motion fails to provide a factual record on which this Court could make that evaluation, much less evidence to support it. For example, the Debtors assert that "[g]iven that the aim of these chapter 11 cases is to reorganize the Debtors' business and emerge from bankruptcy as an efficient and compliant business, these proceedings, the Investigations, and the respective cooperation of the employees are crucial in preserving the value of the Debtors' estates."  Mot. ¶ 37.  But the Debtors do not identify (i) the employees whose cooperation they view as "crucial," (ii) the investigations with which those employees are cooperating, (iii) why each employee's cooperation is important to those investigations, and (iv) how the involvement of a potential Cooperating Witness in any such investigations would benefit the Debtors' restructuring process.  Indeed, many of the employees who presumably will seek reimbursement no longer work for the Debtors and, apart from providing testimony to law enforcement, are no longer contributing to their reorganization.  These facts would be adduced, with supporting evidence, in the claims process and substantial contribution process.  But rather than allow those processes to play out, the Debtors ask the Court to accept on faith that all cooperation by all employees in all investigations is "crucial" to their

---

[3] The Committee reserves the right to oppose on any ground any claim for payment, indemnification or reimbursement filed by any current or former employee of the Debtors.

restructuring and therefore qualifies for reimbursement at 100 cents on the dollar. The Court should reject these assertions absent an appropriate evidentiary record.[4]

5.  *Fourth*, even were the Court inclined to allow the Debtors to fully reimburse their current and former employees' legal expenses (and it should not), the Court should not allow the Debtors to make such payments while investigations into the Debtors' prepetition activities remain pending and results have not been disclosed (unless the Committee otherwise consents). Indeed, the Debtors recognize that it would be inappropriate to reimburse the individuals who the Committee has identified as potential defendants in post-emergence litigation. But it is entirely possible, if not likely, that the ongoing investigations by state and federal authorities—who have significantly greater investigative power and legal tools at their disposal than the Committee—will reveal that additional employees bear responsibility for the Debtors' plight. If the Debtors make payments to those employees, it will be challenging for the Debtors or a successor such as the litigation trustee to later recover them, since those payments will either be passed on to those employees' attorneys or otherwise dissipated by the employees themselves. Creditors should not have to bear that risk of loss.

6.  Many of the Debtors' creditors who have significant sums tied up with the Debtors have proceeded *pro se* due to their inability to fund the cost of counsel. While the Committee is a fiduciary for all unsecured creditors, it does not (and cannot) provide individual representation to creditors on their specific issues. Similarly, the Debtors argue that their counsel cannot represent the individual interests of current and former employees. It is simply not equitable to create a

---

[4] The procedures proposed in the Motion appear to give the Committee at least some say in whether a witness can receive reimbursement. However, the extent of the Committee's role and authority is not clear. Additionally, the procedures indicate that, once a witness is deemed eligible for reimbursement, there are no further guardrails in place other than certain aggregate caps. At the very least, the procedures must be clarified to provide that the Committee has explicit authority to review and approve, in its sole discretion, (i) the witnesses entitled to reimbursement and (ii) the actual reimbursements those witnesses receive.

presumption that the Debtors' current and former employees (including employees that may have participated in the actions that caused the Debtors to file for chapter 11 or did not take appropriate action to stop or report wrongful conduct) may have their counsels' fees paid by the Debtors without making individualized showings to support an administrative claim or substantial contribution claim, while creditors cannot. For these reasons, the Court should deny the Motion, without prejudice to revisit the issue on an individualized basis or once the Debtors' forthcoming plan is confirmed and there is greater visibility regarding the identity of the litigation trustee and operations of the litigation trust.

7.   However, if the Court is inclined to grant the Motion, it should require the Debtors to allow the Committee to propose revisions to the proposed procedures, including, without limitation, confirming that the Committee shall have the right to review and approve, in its sole discretion, (i) the witnesses entitled to reimbursement and (ii) the actual reimbursements those witnesses receive, as well as to reexamine any of its conclusions regarding the propriety of (i) and (ii) in light of subsequent events. To the extent that the Court approves the relief requested by the Debtors, the Committee intends to be extremely rigorous in its review of which witnesses are entitled to receive reimbursements. The Committee will not consent to reimbursements absent a compelling showing regarding, among other things, the investigations at issue and the scope and importance of the witness's cooperation in those investigations and the Debtors' restructuring. These procedures will protect the rights of creditors while also allowing employees to file prepetition, administrative or substantial contribution claims if they believe the Committee has wrongly denied their reimbursement requests.

5

**ARGUMENT**

I.  **The Proposed Payments Are Not "Ordinary Course"**

8. The relief the Debtors seek is highly unusual—paying current and former employees one hundred cents on the dollar for legal fees, travel costs, and other expenses incurred in connection with investigations by various state and federal authorities regarding the Debtors' prepetition practices. Notably, the Debtors do not cite a single case in which any bankruptcy court granted any debtor similar relief. Instead, they claim that these payments do not even need this Court's approval because they are supposedly ordinary course. Not so.

9. "Neither the Code nor the legislative history defines the term 'ordinary' under section 363." *In re Enron Corp.*, No. 01-16034 (AJG), 2003 WL 1562202, at *16 (Bankr. S.D.N.Y. Mar. 21, 2003). Instead, "courts have developed a two-part test in determining whether a transaction is 'ordinary' for purposes of section 363 . . . (1) the 'creditor's expectation test' also known as the 'vertical test', and (2) the 'industry-wide test' also called the 'horizontal test." *In re Enron Corp.*, 2003 WL 1562202, at *16. A debtor must demonstrate that both tests are met. *Id.*

10. "The vertical test requires that a bankruptcy court consider whether the transaction imposes economic risks consistent with a hypothetical creditor's expectations measured from the time that the creditor chose to contract with this particular debtor." *Id.* at *17. "[T]he greater the degree of variance between the debtor's prepetition and postpetition activities, the stronger the inference may be that the proposed transaction is not in the ordinary course of business." *Id.*

11. Here, the Debtors have not asserted, much less provided evidence, that they ever paid their employees' attorneys' fees and other legal expenses in connection with investigations of the Debtors. Nor could creditors have foreseen these investigations and the resulting employee expenses, as the investigations arise from the Debtors' concealed illegal activities and demonstrable fraud. Such payments fail the vertical test. *See, e.g., Enron* at *18 (finding proposed

6

payment failed the vertical test where "there is no justification for why a hypothetical Enron creditor could have expected to bear the range of economic risks in the ordinary course of Enron's business"); *In re Lavigne*, 114 F.3d 379, 385 (2d Cir. 1997) (affirming rejection of proposed ordinary course transaction upon finding that "an interested party would not reasonably expect a debtor seeking to reorganize his business under Chapter 11 protection" to undertake such a transaction).

12. The Debtors argue that the proposed employee payments satisfy the vertical test because "reimbursing the Expenses that relate to the employees' cooperation with the Investigations falls within the reasonable expectations of parties in interest, particularly creditors, given the broad ongoing scrutiny of the Debtors and the cryptocurrency market." Mot. ¶ 26. But a vague reference to general "scrutiny" of the cryptocurrency markets does not support the claim that Celsius's creditors could have reasonably expected the entity they trusted with their cryptocurrency would be subject to multiple investigations by government authorities or be required to spend millions of dollars in legal fees for their current and former employees to participate in such investigations. That is especially the case given that those investigations were the result of Celsius's concealed, prepetition fraudulent activities—which, by definition, creditors could not have known about. Moreover, even if it is true that these payments to employees were "already contemplated" before the bankruptcy filing (*id.*), there is no indication, much less evidence, that creditors were aware of that fact, providing no basis for them to "reasonably expect" it to be the case. *See Enron* at *19 ("[T]he record before the Court is devoid of any facts from which this Court could even attempt to reconcile Enron's prepetition practices with the proposed postpetition conduct here. The Court should not have been left to surmise from the general

7

proposition that employee compensation issues are ordinary corporate transactions to the conclusion that the relief Enron requests is also ordinary under the circumstances presented.").

13. The Debtors fare no better with respect to the horizontal test. The Debtors assert that "the practice of paying for, or reimbursing employees for the cost of, separate counsel to represent such employee in connection with matters related to their employment . . . is typical in matters involving regulatory and criminal investigations." Mot. ¶ 26. But again, the Debtors provide no evidence to support the proposition that insolvent companies pay their employees' attorneys' fees and expenses in connection with investigations, even where they have no obligation to do so. That is because there is no industry-wide practice in this regard.[5]

## II. The Bankruptcy Code Already Provides Ample Means for Employees to Seek Reimbursement, While Preserving Creditors' Due Process Rights

14. In addition to being improper, the requested relief is also unnecessary. The Debtors acknowledge that certain of their employees are parties to prepetition employment agreements that "provide for reimbursement of expenses incurred by [those] employees in connection with business-related activities." Mot. at 13, n.10. Like hundreds of thousands of account holders, those employees have prepetition claims against the Debtors, for which they can, and should, file proofs of claim. That the expenses for which the employees seek reimbursement arose postpetition is irrelevant—the alleged right to payment arises from a prepetition contract, and is therefore a prepetition claim. *See, e.g.*, *In re Residential Capital, LLC*, 558 B.R. 77, 85 (S.D.N.Y. 2016)

---

[5] To the extent there is any authority on this issue, chapter 28 of the United States Code authorizes the following reimbursement of witnesses for their time and travel expenses: $40 per day plus either (i) travel costs at the federal mileage rate, which is currently 65.5 cents per mile, or (ii) the most economical rate reasonably available by common carrier. 28 U.S.C. § 1821. If an overnight stay is required, a subsistence allowance is paid, not to exceed the maximum per diem allowance for official travel in the area of attendance by employees of the Federal Government, which, for New York City, varies by month between approximately $159 and $286 per night. *Id.* There is no provision for payment of attorneys' fees. Moreover, these amounts are paid by the *party seeking the testimony*, not the employer.

8

(holding that claims for attorney's fees based on prepetition contracts were "unsecured contingent claims for post-petition fees that were within the contemplation of the parties at the time of pre-petition contract execution" and therefore "accrued upon the execution of each Contract, years prior to the Petition Date."); *In re Manville Forest Products Corp.*, 225 B.R. 862, 867 (Bankr. S.D.N.Y. 1998) (finding that a postpetition indemnification claim based on prepetition agreement constituted a prepetition claim, and "[i]t is irrelevant whether the event triggering the Debtor's liability under the Indemnity Agreements occurred before or after the petition was filed").

15. Moreover, the Debtors acknowledge that "the practice of paying for, or reimbursing employees for the cost of, separate counsel to represent such employee in connection with matters related to their employment was already contemplated before the filing of these chapter 11 cases." Mot. ¶ 26. In other words, postpetition indemnification claims were "within the contemplation of the parties at the time of the pre-petition contract execution," and employees therefore must file proofs of claim to receive payment. *In re Residential Capital, LLC*, 558 B.R. at 85. The Debtors cannot shortcut this process, much less pay employees 100 cents on the dollar on their prepetition claims.

16. Additionally, to the extent employees do not possess prepetition indemnification claims, the Bankruptcy Code provides other alternatives, such as administrative expense claims or substantial contribution claims. Indeed, the Debtors argue that the employees' cooperation with the investigations is "crucial" to the Debtors' reorganization and assert that the reimbursement of expenses is entitled to administrative priority. Mot. at 17 (Header III); *see also* Mot. ¶ 35 (arguing that employees "would likely be entitled to receive [reimbursement] under a chapter 11 plan"). However, the Debtors have not demonstrated that each payment is necessary to preserve the estate.

9

That showing may be made by each employee or counsel seeking payment as an administrative expense claim or substantial contribution claim.

17.     The only justification the Debtors provide for the Court to adopt their procedures rather than the procedures set forth in the Bankruptcy Code is that employees should not have to endure the "potential costly litigation associated with seeking and/or defending" administrative expense and substantial contribution claims. Mot. ¶ 35. But the requirement to "seek and defend payment" is what is otherwise called due process. Creditors have the right under the Bankruptcy Code to understand the basis for each employee's claim and the opportunity to object.

### III.     Even if the Business Judgment Rule Applied, the Debtors Provide No Evidence to Support That They Have Met It

18.     "'[A] judge determining a § 363(b) application [must] expressly find from the evidence presented before him at the hearing a good business reason to grant such an application[.]" *In re Lionel Corp.*, 722 F.2d 1063, 1071-72 (2d Cir. 1983); *see also In re Enron Corp.*, No. 01-16034 (AJG), 2003 WL 1562202, at *19 (Bankr. S.D.N.Y. Mar. 21, 2003) ("The debtor carries the burden of demonstrating that a use, sale or lease" outside the ordinary course "will assist the debtor's reorganization[.]"). For this reason, courts have held that "the facially lenient requirement of an 'articulated business justification' for a transaction outside the ordinary course of business is not a license to rely on pretextual justifications that fail to withstand scrutiny. This is particularly true when the proposed transaction and the motion filed seeking its approval are the subject of a substantive objection." *In re FirstEnergy Sols. Corp.*, 591 B.R. 688, 695 (Bankr. N.D. Ohio 2018) (citing *Lionel*, 722 F.2d at 1070). Thus, "even th[e] ostensibly deferential [business judgment] standard requires findings based on a fair preponderance of evidence actually presented." *FirstEnergy*, 591 B.R. at 695; *see also In re Flour City Bagels, LLC*, 557 B.R. 53, 57 (Bankr. W.D.N.Y. 2016) (denying proposed transaction outside the ordinary course of business

10

where the debtor "failed to carry its burden to prove by a preponderance of evidence that it exercised sound business judgment").

19. The Debtors premise the Motion on a series of unsupported, sweeping claims:

- "[T]hese employees' continued cooperation with the Investigations is crucial to the implementation of a restructuring plan and successful emergence from chapter 11" (Mot. ¶ 5).

- "Diminished cooperation from Cooperating Witnesses would hinder the Debtors' progress towards emergence from chapter 11" (Mot. ¶ 30).

- "[T]he reimbursement of the Expenses on a postpetition basis . . . will expedite the Debtors' progress in these chapter 11 cases" (Mot. ¶ 29).

20. The Debtors do not provide *any* evidence—not even a declaration—to support these conclusory assertions. Nor are many of these assertions credible. As an initial matter, it is not clear how cooperation by the Debtors' former employees—who no longer play any role in the Debtors' restructuring efforts—could be important, much less "crucial," to the Debtors' reorganization. It is also not clear why reimbursement of already-incurred expenses is important to the Debtors' reorganization, particularly if that reimbursement goes to employees who no longer need to cooperate with the investigations going forward. Nor is it clear why this relief is necessary at this time, given that the Debtors have filed a plan sponsor agreement and term sheet, putting these cases on track for a hopeful near-term resolution.[6]

21. The Debtors also have not provided a factual record on which the Court can assess these claims. The Debtors do not identify (i) the employees whose cooperation they view as "crucial," (ii) the investigations with which those employees are cooperating, (iii) why each employee's cooperation is important to those investigations, and (iv) how the involvement of a

---

[6] Additionally, certain of the proposed payments to employees may be subject to heightened scrutiny as insider transactions. Without an understanding of whose expenses the Debtors propose to pay, it is impossible to know.

11

potential Cooperating Witness in any such investigations would benefit the Debtors' restructuring process. Instead, the Debtors ask the Court and creditors to accept their generalized and conclusory assertions on faith. That falls far short of what the Bankruptcy Code requires. By presenting a bare record, the Debtors have "failed to carry [their] burden to prove by a preponderance of evidence that it exercised sound business judgment." *Flour City Bagels,* 557 B.R. at 57.

22. Additionally, the Debtors have not identified any precedent supporting their proposed procedures. Indeed, the Committee has identified only one case in which a bankruptcy court approved payment of employees' attorneys' fees in connection with investigations of the debtor, and that case is inapt. There, the debtor, Enron, filed an application to retain a law firm to serve as employees' counsel under § 363(b) in connection with various ongoing investigations. *Official Comm. of Unsecured Creditors of Enron Corp. v. Enron Corp.* (*In re Enron Corp.*), 335 B.R. 22, 28 (S.D.N.Y. 2005). The court found, based on the "unique circumstances of this case, especially the unprecedented scrutiny of Enron by governmental investigators," that the proposed retention satisfied the business judgment standard. *Id.* at 32. Notably, the decision makes clear that the debtor mounted substantial evidence to support its business judgment. *See id.* at 30 (noting that "[t]he record supports the finding that the retention was for a good business reason" and summarizing testimony). Additionally, the decision did not reimburse employees for their past expenses or travel or lodging expenses. Moreover, the debtor had actually retained the law firm in the chapter 11 cases, and sought to retain only a single law firm to represent all employees. Together these actions allowed the debtor to substantially control costs and allowed creditors visibility and the ability to object to the law firm's retention application and fee applications. *See, e.g.*, *id.* at 25 (noting that law firm had incurred $1.7 million in fees in connection with representing 105 employees). Finally, the Court found that the payment of counsel fees was justified because

12

it would better allow employees to focus their time and energy on their work and would contribute to the Debtors' retaining employees. Those concerns do not apply here, where the majority of individuals who will likely seek reimbursement are former employees. *Id.* at 30.

### IV. <u>Creditors Should Not Be Forced to Bear the Risk of Reimbursing the Debtors' Employees Before the Investigations into Those Employees Conclude</u>

23. As the Debtors note, the Committee has already identified certain of the Debtors' employees who it believes bear responsibility for the Debtors' bankruptcy. However, the Committee's investigation (and the Debtors' production of evidence) is not complete. Further investigation following a full production of evidence is necessary to determine the full scope of liability among the Debtors' current and former personnel.

24. The Committee is encouraged that multiple state and federal authorities are investigating the Debtors. However, the Committee has no visibility into those investigations or their findings and conclusions. Indeed, until those investigations are concluded and their results announced, it will be impossible to know which employees are responsible for the Debtors' current situation. The governmental authorities conducting those investigations have far greater tools and resources at their disposal than does the Committee. It is therefore possible that those investigations will turn up additional evidence that will implicate additional employees in the Debtors' prepetition misconduct.

25. For this reason, it is premature for the Debtors to reimburse their employees' legal costs, even if those employees are not presently believed to have aided and abetted the fraud and other illegal activities that resulted in the Debtors' bankruptcy. Doing otherwise would not only risk transferring estate assets to culpable employees, but potentially require the estate to seek to claw back those assets after they have been transferred to those employees' attorneys or otherwise dissipated—a likely impossible task.

## RESERVATION OF RIGHTS

26.     For the aforementioned reasons, the Court should deny the Motion.  However, if the Court is inclined to grant the Motion, it should require the Debtors to allow the Committee to propose revisions to the proposed procedures, including, without limitation, confirming that the Committee shall have the right to review and approve, in its sole discretion, (i) the witnesses entitled to reimbursement and (ii) the actual reimbursements those witnesses receive, as well as to reexamine any of its conclusions regarding the propriety of (i) and (ii) in light of subsequent events. As noted above, the Committee intends to be extremely rigorous in its review of which witnesses are entitled to receive reimbursements and the payment of such reimbursements based on the specific evidence adduced as to each witness.

## CONCLUSION

For the aforementioned reasons, the Motion should be denied.

Dated: March 14, 2023
New York, New York

/s/ Samuel P. Hershey
**WHITE & CASE LLP**
David M. Turetsky
Samuel P. Hershey
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: david.turetsky@whitecase.com
sam.hershey@whitecase.com

– and –

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
Email: mandolina@whitecase.com
gregory.pesce@whitecase.com

– and –

**WHITE & CASE LLP**
Keith H. Wofford
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Email: kwofford@whitecase.com

– and –

**WHITE & CASE LLP**
Aaron E. Colodny (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone: (213) 620-7700
Facsimile: (213) 452-2329
Email: aaron.colodny@whitecase.com

*Counsel to the Official Committee of Unsecured Creditors*