Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) ) Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) ) Case No. 22-10964 (MG) |
| Debtors. | ) ) (Jointly Administered) |
| | ) ) **Re: Docket No. 1766** |

**NOTICE OF ADDITIONAL STATEMENT OF WORK RELATED TO
THE RETENTION AND EMPLOYMENT OF ERNST & YOUNG LLP
AS TAX COMPLIANCE AND TAX ADVISORY SERVICES PROVIDER**

**PLEASE TAKE NOTICE** that, on July 13, 2022, certain of the above-captioned debtors

and debtors in possession (collectively, the "Original Debtors") each filed a voluntary petition for

relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United

States Bankruptcy Court for the Southern District of New York (the "Court"). On December 7,

2022, debtors and debtors in possession GK8 Ltd., GK8 UK Limited, and GK8 USA LLC

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

(collectively, the "GK8 Debtors") each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court (the GK8 Debtors together with the Original Debtors, the "Debtors").

 **PLEASE TAKE FURTHER NOTICE** that, on November 18, 2022, the Debtors filed the *Debtors' Application for Entry of an Order (I) Authorizing the Retention and Employment of Ernst & Young LLP as Tax Compliance and Tax Advisory Services Provider, Effective as of July 13, 2022 and (II) Granting Related Relief* [Docket No. 1404] (the "Retention Application").

 **PLEASE TAKE FURTHER NOTICE** that, on December 20, 2022, the Court entered the *Order (I) Authorizing the Retention and Employment of Ernst & Young LLP as Tax Compliance and Tax Advisory Services Provider, Effective as of July 13, 2022 and (II) Granting Related Relief* [Docket No. 1766] (the "Retention Order"), pursuant to which the Court authorized the Debtors to retain and employ Ernst & Young LLP ("E&Y") as the Debtors' tax compliance and tax advisory services provider on the terms set forth in the Retention Application and the Retention Order.[2]

 **PLEASE TAKE FURTHER NOTICE** that E&Y and the Debtors desire to enter into an additional statement of work (the "Additional Statement of Work"), attached hereto as **Exhibit A**, dated as of March 8, 2023, for the engagement of E&Y to provide certain income tax compliance services pursuant to the terms of the Master Services Agreement attached to the Retention Application as Exhibit 1.

 **PLEASE TAKE FURTHER NOTICE** that fees will be paid by the Debtors for the services, as set forth in the Additional Statement of Work and the Engagement Letters attached to the Retention Application.

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Retention Application or Retention Order.

2

**PLEASE TAKE FURTHER NOTICE** that, pursuant to paragraph 14 of the Retention Order, the Debtors must file the Additional Statement of Work with the Court, serve the Additional Statement of Work upon the applicable notice parties (the "Notice Parties"), and any of the Notice Parties may object to the proposed Additional Statement of Work and file an objection with the Court within fourteen days of service of this notice.  To the extent any party timely files an objection, the Debtors will promptly request that the Court set a hearing on the matter.

**PLEASE TAKE FURTHER NOTICE** that pursuant to paragraph 14 of the Retention Order, absent an objection within fourteen days of the filing and service of the Additional Statement of Work, such Additional Statement of Work shall be deemed approved pursuant to the Retention Order (without any further order being required to be entered by the Court).

*[Remainder of page intentionally left blank]*

New York, New York
Dated: March 17, 2023

*/s/ Joshua A. Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          jsussberg@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          patrick.nash@kirkland.com
                ross.kwasteniet@kirkland.com
                chris.koenig@kirkland.com
                dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

**<u>Exhibit A</u>**

**Additional Statement of Work**



**Statement of Work**
**US Tax Compliance Services FY 2022**

This Statement of Work, dated March 8, 2023 (this "**SOW**"), is made by Ernst & Young LLP ("**we**" or "**EY**") and Celsius Network, LLC on behalf of itself and its affiliated entities (collectively, "you" or "**Client**")**;** pursuant to the Agreement, dated July 13, 2022 (the "**Agreement**"), between EY and Celsius Network, LLC which was executed in connection with the Client filing a petition under Chapter 11 of the United States Bankruptcy Code ("**Chapter 11**") on July 13, 2022 with the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") and describes certain services that EY will perform for the Client during the Client's Chapter 11 proceedings.  This SOW shall be effective as of the date of its approval by the Bankruptcy Court in the proceedings captioned, *In re Celsius Network LLC, et al.*, No. 22-10964 (MG) (Bankr. S.D.N.Y.), pursuant to the procedures set forth in the Order (I) Authorizing the Retention and Employment of Ernst & Young LLP as Tax Compliance and Tax Advisory Services Provider, Effective as of July 13, 2022, and (II) Granting Related Relief [Docket No. 1766].

This SOW incorporates the Agreement by reference to form a contract. Capitalized terms used, but not otherwise defined, in this SOW shall have the meanings in the Agreement.

**Scope of Services**

EY will provide the following Income Tax Compliance Services to you (the "**Services**"):

- **Workstream I** – US income tax compliance services for tax year 2022

    o Preparation of the US federal income tax ("**USFIT**") returns for Celsius Network, Inc. and Celsius US Holding LLC and its US subsidiaries (US consolidated federal income tax return) as listed in Appendix A for the year ended December 31, 2022

    o Preparation of the state and local income and franchise tax returns for those jurisdictions listed in Appendix B.

    o The specific services to be provided under this SOW will include:

        ▪ Prepare estimated tax payment computations for USFIT return(s) and state income tax returns (for the relevant states, as included on Appendix B).
        ▪ Prepare extension requests for USFIT return(s) and state income tax returns (for the relevant states, as included on Appendix B).
        ▪ Prepare Federal tax depreciation calculations (regular, AMT, ACE) as well as gain/loss on disposal of fixed assets (specifically as it relates to Celsius Mining LLC).
        ▪ Prepare Schedule UTP (Form 1120), Uncertain Tax Position Statement



- Prepare computation of Subpart F income.
- Prepare the required calculations under the Global Intangible Low-Taxed Income (GILTI) Rules, including tested income/tested loss, Qualified Business Asset Investment (QBAI), and the inclusion percentage.
- Prepare computations pursuant to IRC Sections 987 and 988 (if relevant).
- Prepare the following Federal international forms, statements, attachments and elections:
  - Federal Form 5472, *Information Return of a 25% foreign-Owned U.S. Corporation or a Foreign Corporation Engaged in a U.S. Trade or Business*, as applicable;
  - Federal Form 5471, *Information Return of U.S. Person with Respect to Certain Foreign Corporations (for entities listed in Appendix C)*; and
  - FinCEN Form 114, Report of Foreign Bank and Financial Accounts, as applicable.
  - Form 1118, Foreign Tax Credit—Corporations (include schedules as required, as well as apportionment computations and analysis).
  - Form 5713, International Boycott Report.
  - Form 8858, *Information Return of U.S. Persons With Respect to Foreign Disregarded Entities (FDEs) and Foreign Branches (FBs) (for entities listed in Appendix C)* - include schedules as required.
- Prepare state tax deprecation calculations.
- Prepare and review state apportionment schedules.

- **Workstream II** – filing amended US federal and state income tax returns for tax year 2021.

- **Workstream III** – drafting a tax filing memorandum for tax year 2022, including a summary of the relevant facts, applicable US tax provisions and the application of the technical tax analysis to the specific facts, as it relates to items identified as either uncertain tax positions, material transactions, or areas requiring further analysis.

- **Workstream IV** – ongoing support in connection with various controversy matters, such as (not limited to the below items):
  - Responding or assisting Client in responding to notices from taxing jurisdictions or IRS inquiries;
  - Representing Client in connection with an IRS audit (if applicable);
  - Corresponding with state and local authorities in connection with income and non-income tax matters (including VDAs, audits, etc.); and
  - Any other tax controversy services.

EY may access tax information relating to Client that is posted by governmental entities, partnerships, or others in order to provide tax services to Client, in cases where EY determines that it would be

DocuSign Envelope ID: BF9B5E70-415C-4E63-ABC6-8269B24F72SD



efficient for EY to do so. However, Client remains responsible for making sure that Client has provided EY with all relevant information to support EY's provision of tax services. If EY is preparing returns for Client, this includes either providing EY with all required Forms 1099-G, and other tax forms made available to Client, or informing EY specifically that such forms should be obtained online. While EY may access such forms online for purposes of convenience, EY is not responsible for identifying such forms, nor is EY responsible for collecting any particular form on Client's behalf unless Client has specifically requested that EY does so and EY has agreed.

Treasury regulations require taxpayers to file disclosure statements relating to certain tax strategies/transactions that the Internal Revenue Service ("IRS") has identified as Listed Transactions or Transactions of Interest, any transaction that is substantially similar to a Listed Transaction or Transaction of Interest, and Other Reportable Transactions. The disclosure statements must be filed with the proper tax returns and also sent separately to the IRS. In addition, some states have enacted tax shelter legislation requiring taxpayers to file reportable transaction disclosure statements with the appropriate state income and franchise tax returns. Failure to disclose properly any of these transactions/strategies in which Client directly or indirectly participated may result in the imposition of penalties. During the process of gathering data to prepare Client's tax return(s), EY requires Client to complete the Reportable Transaction Questionnaire, which is provided with this SOW. If there is a particular person other than Client who should respond to such questionnaire on behalf of Client, please immediately provide to EY that person's name, position, email address and telephone number. EY shall not be liable for any penalties resulting from Client's failure to accurately and timely respond to the questionnaire or to timely file the required disclosure statements.

Unless Client indicates otherwise, EY will check the box on Client's returns, when the option is available, indicating that the taxing authorities can discuss the return directly with the EY preparer who signed it. These discussions are limited to certain issues related to the processing of the returns. Interactions with taxing authorities beyond the scope of processing issues may require a Power of Attorney that must be signed by Client. Any services that may be performed under this arrangement are subject to the terms and conditions of this SOW but are not considered covered under the fee quoted for the preparation of Client's return(s) and therefore will be billed separately. If Client prefers that this box not be checked, please contact Client's EY tax professional.

This engagement does not include (1) an analysis of any shift in ownership of Client stock, (2) the preparation of statements required by Internal Revenue Code §§382 and 383, or (3) a determination of whether such code sections limit the amount of taxable income or tax that can be offset by net operating loss carryforwards, certain recognized built-in losses, certain excess credits, or net capital loss carryovers. The limitations under these provisions may have a material adverse impact on Client's tax liability. EY will not prepare a return on which taxable income (or tax) is offset by such attributes unless an analysis is performed. If Client would like EY to perform such an analysis, those services would be covered under a separate SOW. Please contact Client's EY tax professional named below if Client would like to discuss additional services and fees associated with the analysis and reporting requirements under these rules.



All Client copies of the tax return(s) will be presented to Client in an electronic format.

Upon written request, EY will assist Client with other tax compliance services, including preparation of additional returns for the current tax year, and extension requests and computation of estimated tax payments for subsequent tax years. However, these services are not covered under the fee quoted in this letter. EY will discuss with Client and provide fee estimates for such additional services, which would be invoiced separately and subject to all other terms and conditions of this SOW and the above-referenced Agreement.

**Other Provisions**

Client shall assign a qualified person to oversee the Services. Client is responsible for all management decisions relating to the Services and for determining whether the Services are appropriate for its purposes.

Notwithstanding anything to the contrary in the Agreement or this SOW, EY does not assume any responsibility for any third-party products, programs or services selected by Client, their performance or compliance with Client's specifications or otherwise.

To use EY Interact My Documents ("EYI MyDocs") for collaboration with Client, EY will create a client collaboration workspace with a sharing library to which Client's employees and external contractors using Client email addresses (collectively, "Client users") designated by Client and at least one member of the EY engagement team are provided access ("Client Library"). Client may use the Client Library to deposit information and retrieve EY deliverables. EY may establish a number of Client Libraries on the client collaboration workspace where Client and EY can exchange documents and information; everyone with access to a particular Client Library will have access to all documents stored in that Client Library. The client collaboration workspace should not be used as a repository by Client. Client is responsible for informing EY in writing of the names and email addresses of Client users who are to have access to each Client Library and for notifying EY in writing when access for any Client user is to be removed. Client will provide the name and email address of the Client representative who will inform EY which Client users are to have access.

A copy of the final deliverables will remain available to Client in EYI MyDocs in a read-only state for up to one (1) year after the engagement closes. Information contained in engagement dashboards (if used) within EYI MyDocs, draft work product and task tracking data will not remain available after the engagement closes.

Client authorizes EY, its affiliates, other members of the global Ernst & Young network, including those located outside the United States, and subcontractors providing services on EY's or their behalf, to disclose Client's tax return information received or generated in connection with the Services described in this SOW, prior-years' tax return information and information relating to the immediately succeeding tax year, to and among each other for the purpose of rendering the Services, discussing and providing other services to Client (including tax advisory services and bringing to Client's attention

A member firm of Ernst & Young Global Limited

DocuSign Envelope ID: BF085E670-415C-4E63-ABC6-82B9B24F72SD



planning opportunities EY may identify based upon the preparation and/or review of Client's tax returns), and conducting quality reviews and reviews of compliance with EY policies and professional standards. Client has the ability to request a more limited disclosure of tax return information than that described above. If, at any time, Client would like EY to narrow the scope of the information to be disclosed, please contact EY in writing and EY will limit any disclosures that have not yet occurred. Client acknowledges that this consent will be valid for three years from the date this SOW is signed by Client below.

EY and other EY Firms may retain and use Client Information for benchmarking, analytics, research and development, thought leadership and related purposes, and to enhance their services, provided that any use does not externally identify, or make reference to, Client. In all such matters, EY and other EY Firms will comply with applicable law and professional obligations.

**Fees**

Client shall pay EY the following fees per applicable workstreams:

- **Workstream I** – Fees for preparation of the federal and state income tax returns are $170,000.
- **Workstream II** – Fees for preparation of the amended income tax returns are $25,000 per US federal income tax return, and $1,000 per state income tax return (2021 state income tax filing was made for 26 states.
- **Workstream III** - the fees for the supporting tax compliance memo will be billed based hours incurred at standard hourly rates in accordance with the Agreement, dated July 13, 2022.
- **Workstream IV** – the fees for income tax controversy support will be billed based on hours incurred at standard hourly rates in accordance with the Agreement, dated July 13, 2022.

In addition to the fees set out above, additional forms required to be filed will be charged as follows:

- For Workstream I and Workstream II - additional state tax returns, over those jurisdictions listed on Appendix B will be billed at $1,500 per separate state filing and $2,500 for combined state filing.
- For Workstream I - additional 5472 forms over the number of forms prepared for 2021 will be billed at $2,500 per form.
- For Workstream I - Additional 5471 forms over the number of forms prepared for 2021 will be billed as follows:
  - $2,500 for short version
  - $5,000 for full version


Client shall also pay any potential value-added taxes (VAT), sales taxes, and other indirect taxes incurred in connection with the delivery of the Services, including any such taxes and related administrative costs that result from billing arrangements specifically requested by Client.

DocuSign Envelope ID: B5985E670-415C-4E68-A8C6-8269B24E72SD



Any expenses, applicable taxes, or other charges will be billed separately as incurred.

Any legislative or regulatory change that significantly alters the scope of the Services, or the amount of time required to deliver the Services, will be considered an event for which EY may modify the fees. EY will communicate with Client regularly regarding any changes that may impact Client's scope and fees. Upon notice to Client, EY will bill for these items based on the rates for each level indicated above.

## Contacts

Client has identified Lior Koren as Client's contact with whom EY should communicate about these Services. Client's contact at EY for these Services will be Elizabeth Harvey, working with Amir Chenchinski and Yoav Shwartz of EY Israel.

**IN WITNESS WHEREOF,** EY and Client each caused this SOW to be signed and delivered by its duly authorized representative(s).

*Ernst & Young LLP*

**AGREED:**

Celsius Network, LLC on behalf of itself and its affiliates

By: _Chris Ferraro_   Chris Ferraro
     1315E92CCA0F408...

Date: _3/14/2023_ _____

DocuSign Envelope ID: 9E98E670-415C-4E63-ABC6-8269B24F72SD



## Appendix A: Affiliated entities

Celsius US Holding LLC

Celsius Mining LLC

Celsius KeyFi LLC

Celsius Network LLC

Celsius Operations LLC

Celsius Networks Lending LLC

Celsius US LLC

Celsius Network Limited (UK)

Celsius Lending LLC

Celsius Network Europe d.o.o. Beograd (Serbia)

Celsius Network IL LTD

GK8 LTD

Celsius Services CY LTD (Cyprus)

Celsius (AUS) Pty LTD (Australia)

Celsius Network (Gibraltar) Limited (Gibraltar)

Celsius EU UAB (Lithuania)

DocuSign Envelope ID: 9F98E670-415C-4E63-ABC6-8269B24F72SD



**Appendix B: State and local tax returns listing**

<u>Celsius Network, Inc and Affiliates</u>

AZ

CA

CO

CT

DC

FL

IL

MA

MI

ND

NH

NJ

NYS

NYC

OK

OR

TX

VA

WI

<u>Celsius Network Inc.</u>

AL

GA

MD

NC

PA

SC

TN

DocuSign Envelope ID: 5E98E670-415C-4E68-ABC6-82E9B24F72SD



Building a better
working world

Celsius US Holding LLC and Subsidiaries

AL

GA

MD

NC

PA

SC

TN


Celsius Mining

NYS



**Appendix C: list of entities filing forms 5471 and 5472**

<u>**5471:**</u>

Celsius Network Europe d.o.o. Beograd.

Celsius EU UAB (Lithuania)

Celsius Services CY Ltd (Cyprus)

Celsius (AUS) Pty Ltd. (Australia)

Celsius Network (Gibraltar)

<u>**5472:**</u>

Celsius Network Limited (UK)

Celsius Network LLC

DocuSign Envelope ID: 8F085E670-415C-4E68-A8C6-82E9B24F72SD



**EY**
Building a better
working world

# Reportable Transaction Questionnaire (revised April 2020)

**Celsius Network, Inc.**
**Celsius US Holding LLC and Subsidiaries**

**Purpose**:
Ernst & Young LLP (EY) uses this questionnaire to prepare your tax returns. US Treasury Department regulations require disclosure statements relating to certain transactions, plans and arrangements. These disclosure statements must be filed with the tax return and with a separate IRS office. Failure to make a proper disclosure may result in penalties. Some states have similar disclosure requirements. EY shall not be liable for any penalties resulting from your failure to accurately and timely respond to these questions or to timely file disclosure statements.

**Instructions:**
This questionnaire must be completed for each year for which EY prepares an income tax return. If you are completing this questionnaire for one or more individuals or legal entities, your response should take into account the activities of each. If this questionnaire is being completed in connection with a statement of work, it should address all of the taxpayer(s) and return(s) included in the scope of the engagement. Otherwise, we've included an attachment that lists the taxpayers and returns that you should consider as you complete the questionnaire.  The terms "you," "your" and "taxpayer" refer collectively to all of these individuals and entities.

**Question:**

Please review the questions on the next two pages for each individual and entity covered by this engagement and check the box below that is applicable.

☐    My answer is **NO** or **N/A** to all questions. (Please sign and date this questionnaire to complete it.)

☐    My answer is **YES** or **UNSURE** to one or more questions and/or I am unsure of my answer to one or more questions. (Please complete the box below before signing and dating this questionnaire.)

If you answer **YES** or **UNSURE** to one or more questions, list in the following box the applicable taxpayer and the question number(s) of the reportable transaction and/or, if applicable, the transaction number(s) of the listed transaction or transaction of interest to which the answer relates.

DocuSign Envelope ID: 9E98E670-415C-4E63-ABC6-82B9B24F72SD



**Disclosure in connection with a reportable transaction**

If you are completing this questionnaire only with respect to a Regulated Investment Company (RIC), start with question 4. If you are completing this questionnaire for any other taxpayer, start with question 1. Section references are to the Internal Revenue Code of 1986, unless otherwise indicated.

**Questions:**

1. **Loss transactions:** Have you directly or indirectly entered into a transaction that results in claiming a gross loss (no netting against gains) over the loss threshold amounts described below that is deductible pursuant to a provision of the tax code that treats the transaction as a sale or other disposition (for example, Section 741 or Section 988) or otherwise results in a deduction under Section 165?

   Note that this question does not include a loss from a casualty or involuntary conversion. Also, consider this question with regard to losses reported on your federal or California state tax returns for each of the categories of taxpayers described in the paragraphs that follow that applies to you (more than one, if applicable). If you are a US shareholder of a controlled foreign corporation ("CFC", as defined below) or a 10% shareholder of a qualified electing fund ("QEF", as defined below), include any loss that the foreign corporation would report if it were treated as a domestic corporation filing a US return and consider the activities of the CFC or QEF in connection with the other questions below.

   <u>**Loss threshold amounts**</u>

   Individuals and trusts: At least $2 million on this tax return (or $50,000 or greater in the case of a Section 988 foreign currency loss transaction), or at least $4 million when combining this tax return with other years' returns. Include transaction losses that flow through from a partnership or S corporation.

   Partnerships and S corporations: At least $2 million on this tax return, or at least $4 million when combining this tax return with other years' returns. This category includes partnerships with at least one partner that is not a C corporation (looking through any partners that are partnerships).

   Corporate entities: At least $10 million on this tax return, or at least $20 million when combining this tax return with other years' returns. This category includes:

   - C corporations
   - Tax-exempt entities (with respect to Unrelated Business Taxable losses)
   - Partnerships, if every partner is a C corporation (looking through any partners that are partnerships)
   - Controlled foreign corporations (CFCs) – a non-US corporation that has US shareholders (i.e., US persons who directly or indirectly own 10% or more of the combined voting power, or, effective for taxable years of foreign corporations beginning after December



31, 2017, the value of all classes of stock of such non-US corporation) that own in the aggregate more than 50% of the total vote or value of such non-US corporation

- Qualified electing funds (QEFs) – a passive foreign investment company that meets the requirements of Section 1295 and the regulations thereunder, which include an annual taxpayer election

2. **Confidentiality agreement:** Have you entered into a transaction offered to you by a paid tax advisor who placed a limitation on your disclosure of the tax treatment or tax structure of the transaction?

3. **Contingent fees or other contractual protection:** Will your tax returns reflect the results of a transaction for which you (or a related party) paid fees to an advisor that were contingent on realizing federal, California or New York tax benefits, or for which you (or a related party) have the right to the refund of any fees if the federal, California or New York tax effects of the transaction are not sustained?

4. **Federal Listed Transactions and Transactions of Interest:** Have you participated in any transaction that is a Federal Listed Transaction or Federal Transaction of Interest or that might be considered the same as or substantially similar to any of the Federal Listed Transactions or Transactions of Interest and the tax benefits from your participation are expected to be reflected in the current or future year tax returns? The Federal Listed Transactions and Transactions of Interest are summarized in the attachment to this questionnaire. If the answer is "yes," please provide us with a copy of any previously filed Form 8886 disclosure.

5. **State Listed Transactions:** If you file a California, Colorado, New York, or Oregon state tax return, have you participated (i.e., in current or previous filing years) in any transaction that is an applicable State Listed Transaction or might be considered substantially similar to any of the applicable State Listed Transactions and the tax benefits from your participation are expected to be reflected in current or future year tax returns? The State Listed Transactions are summarized in the attachment to this questionnaire. If the answer is "yes," please provide us with a copy of any previously filed Form 8886 disclosure or equivalent state disclosure forms.

DocuSign Envelope ID: 9E98E670-415C-4E68-ABC6-8269B24F72SD



Signature on behalf of the identified individuals and entities, including any applicable CFCs and QEFs:

**Celsius Network, Inc.**

By:    <span style="color:red">**DRAFT FOR REVIEW - DO NOT SIGN**</span>

Date:  _____

**Celsius US Holding LLC and Subsidiaries**

By:    <span style="color:red">**DRAFT FOR REVIEW - DO NOT SIGN**</span>

Date:  _____

A member firm of Ernst & Young Global Limited

DocuSign Envelope ID: BF085E670-415C-4E68-ABC6-8269B24F72SD



# Listed Transactions and Transactions of Interest (revised April 2020)

**Celsius Network, Inc.**
**Celsius US Holding LLC and Subsidiaries**

As of April 2020, below are the titles of the transactions identified as "Listed Transactions" and "Transactions of Interest" by the IRS and "Listed" transactions by State taxing authorities, along with the citation to the pronouncement describing the transaction in greater detail.

## Federal Listed Transactions

1. Lease strips and other stripping transactions: Transactions that allow one participant to realize rental or other income from property or service contracts and another participant or the same participant in a different tax year reports deductions related to that income. Identified in IRS Notice 95-53 and IRS Notice 2003-55.

2. 401(k) accelerator: Transactions in which taxpayers claim deductions for contributions to a qualified cash or deferred arrangement or matching contributions to a defined contribution plan where the contributions are attributable to compensation earned by plan participants after the end of the taxable year. Identified in Rev. Rul. 90-105.

3. Multiple employer plans: Trust arrangements purported to qualify as multiple employer welfare benefit funds exempt from the limits of §§419 and 419A. Identified in IRS Notice 95-34. (See item #21 below regarding collectively bargained welfare benefit funds.)

4. Certain contingent installment sales by partnerships with tax-indifferent partners: Transactions involving contingent installment sales of securities by partnerships in order to accelerate and allocate income to a tax-indifferent partner, such as a tax-exempt entity or foreign person, and to allocate later losses to another partner. Identified as ACM Transactions. See IRS Notice 2009-59.

5. Distributions from charitable remainder trusts: Transactions involving distributions described in Treas. Reg. §1.643(a)-8 from charitable remainder trusts. This transaction uses a §664 charitable remainder trust to convert appreciated assets into cash, while avoiding the gain on the disposition of the assets. See IRS Notice 2009-59.

6. Lease-in, lease-out transactions (LILOs): Transactions in which a taxpayer purports to lease property and then purports to immediately sublease it back to the lessor (that is, lease-in/lease-out or LILO transactions). See IRS Notice 2009-59.

7. Distribution of encumbered property: Transactions involving the distribution of encumbered property in which taxpayers claim tax losses for capital outlays that they have in fact recovered. Identified in IRS Notice 99-59.

DocuSign Envelope ID: 9F985E670-415C-4E63-ABC6-8269B24F72SD



EY
Building a better
working world

8.  Fast-pay arrangements with corporate stock: Transactions involving fast-pay arrangements as defined in Treas. Reg. §1.7701(l)-3(b) in which a corporation's outstanding stock is structured (in whole or in part) to return the stockholder's investment by distributions treated as dividends. Identified as Fast-pay Arrangements. See IRS Notice 2009-59.

9.  Counterbalancing debt instruments: Transactions involving the acquisition of two debt instruments the values of which are expected to change significantly at about the same time in opposite directions. Identified in Rev. Rul. 2000-12.

10. Artificially inflated tax basis of partnership interests: Transactions generating losses resulting from artificially inflating the tax basis of partnership interests. Identified in IRS Notice 2000-44.

11. Employee stock transfer: Transactions involving the purchase of a parent corporation's stock by a subsidiary, a subsequent transfer of the purchased parent stock from the subsidiary to the parent's employees, and the eventual liquidation or sale of the subsidiary. Identified in Notice 2000-60.

12. Guamanian trusts: Transactions purporting to apply §935 to Guamanian trusts. Identified in IRS Notice 2000-61.

13. Intermediary ("Midco") transactions: A broad range of "routine" transactions that happen to include the acquisition, disposition, or movement of stock and assets. The typical Midco transaction is one in which a taxpayer desires to sell stock of a corporation and a buyer desires to purchase the assets. These parties conduct the transaction through an intermediary, with the taxpayer selling the stock to the intermediary and the buyer then purchasing the assets from it and claiming a fair market value basis. The intermediary, having enabled the target corporation to not pay tax on the built-in gain in its assets, usually receives compensation for participating in the transaction. See IRS Notice 2008-111 and IRS Notice 2001-16.

14. Contingent liability transactions: Transactions involving a loss on the sale of stock acquired in a purported §351 transfer of a high basis asset to a corporation and the corporation's assumption of a liability that the transferor has not yet taken into account for federal income tax purposes. Identified in IRS Notice 2001-17.

15. Basis shifting on stock redemptions not subject to US tax: Redemptions of stock in transactions not subject to US tax in which the basis of the redeemed stock is purported to shift to a US taxpayer. Identified in IRS Notice 2001-45.

16. Inflated tax basis: Transactions in which the taxpayer as part of an acquisition of assets also assumes debt exceeding their fair market value. The taxpayer claims a higher basis due to the debt assumption. Upon sale of the assets, the taxpayer claims a loss for basis in excess of the fair market value of the assets. Identified in IRS Notice 2002-21.

17. Reporting payments made on notational principal contracts while disregarding offsetting future payments: Transactions using a notional principal contract to claim deductions for periodic



payments made by the taxpayer while disregarding the accrual of a right to receive offsetting payments in the future. Identified in IRS Notice 2002-35.

18. Allocation of straddle gain or loss in a common trust fund or pass-through entity: Transactions involving the creation of straddles in a common trust fund or pass-thru entity (i.e., partnership, S corporation, or grantor trust), with the allocation of gain to one party and loss to another party. Identified in IRS Notice 2002-50, IRS Notice 2002-65 and IRS Notice 2003-54.

19. Prohibited ownership of S corporation securities by an employee stock ownership plan (ESOP): Transaction in which an S corporation and an associated employee stock ownership plan (ESOP), which was formed on or before March 14, 2001, is subsequently transferred and the ESOP claims the benefit of a delayed effective date under §409(p). As a result of the delayed effective date, the earnings of the S corporation are not currently taxed. Identified in IRS Rev. Rul. 2003-6. (See item 26 below regarding S corporation ESOPs involving synthetic equity.)

20. Offshore deferred compensation arrangements involving an offshore employment leasing company: Transactions involving an individual taxpayer who purportedly resigns from his or her current employer or professional corporation and enters an employment contract with an offshore employment leasing company. The offshore leasing company leases the individual's services back to the original employer, typically using one or more intermediaries. The participants claim tax benefits in the form of reduced or avoided individual and corporate income and employment taxes. Identified in IRS Notice 2003-22.

21. Collectively bargained welfare benefit funds: Trust arrangements purporting to qualify as collectively-bargained welfare benefit funds exempt from the limits of §§419 and 419A. Identified in IRS Notice 2003-24. (See item #3 above regarding multiple employer plans.)

22. Transfers of compensatory stock options to related persons: Transactions involving an individual, generally an employee, who has been granted a nonstatutory compensatory stock option, and transfers that option to a related person. The individual does not claim compensation income when the related person exercises the stock option or, in cases where the related person pays for the option with a note or other deferred payment, the individual does not claim compensation income until receiving the deferred payments. Identified in IRS Notice 2003-47.

23. Contested liability trusts: Transactions involving transfers to a trust to provide for the satisfaction of contested liabilities in an attempt to accelerate deductions for the contested liabilities under §461(f). Identified in IRS Notice 2003-77.

24. Offsetting foreign currency option contracts: Transactions in which a taxpayer claims a loss upon the assignment of a §1256 foreign currency option contract to a charity but fails to report the recognition of gain when the taxpayer's obligation under an offsetting non-section 1256 foreign currency option contract terminates. Identified in IRS Notice 2003-81.

DocuSign Envelope ID: 9F085E670-415C-4E63-ABC6-8269B24F72SD



EY
Building a better
working world

25. Roth IRA contributions in transactions designed to avoid contribution limits: Transactions designed to avoid the statutory limits on contributions to a Roth IRA contained in §408A using a corporation, substantially all the shares of which are owned or acquired by the Roth IRA. Identified in IRS Notice 2004-8.

26. S corporation ESOP involving synthetic equity: Transaction involving an S corporation that is at least 50% owned by an employee stock ownership plan (ESOP,) designed to avoid current taxation of the S corporation's profits generated by the business activities of a specific individual or individuals. The profits are accumulated and held for the benefit of the individual(s) in a qualified subchapter S subsidiary (QSub) or similar entity (such as a limited liability company), the profits are not paid to the individual(s) as compensation within 2½ months after the end of the year in which earned, and the individual or individuals have rights to acquire stock or similar interests equal to 50% or more of the fair market value of the QSub. Identified in IRS Rev. Rul. 2004-4. (See item #19 above also involving S corporation ESOPs.)

27. Pension plans involving excessive life insurance: Transactions involving a qualified pension plan that includes life insurance contracts on the life of a participant in the plan with a face amount that exceeds the participant's death benefit under the plan by more than $100,000. Upon the death of the covered employee, the life insurance contract proceeds exceeding the death benefit are applied to the premiums under the plan for other participants. Identified in Rev. Rul. 2004-20.

28. Foreign tax credit intermediary transactions: Transactions in which, pursuant to a prearranged plan, a domestic corporation purports to acquire stock in a foreign target corporation and makes an election under §338 before selling all or substantially all of the target corporation's assets in a transaction that triggers foreign tax on built-in gains that are not subject to US tax. The domestic corporation claims foreign tax credits generated with respect to the foreign income tax imposed on the asset sale. Identified in IRS Notice 2004-20. IRS.  IRS Notice 2020-19 withdraws Notice 2004-20 effective for transactions entered into after April 6, 2020.

29. S corporation nonvoting stock issued to tax-exempt organization: Transactions in which S corporation shareholders attempt to transfer the incidence of taxation on S corporation income by donating S corporation nonvoting stock to an exempt organization, while retaining the economic benefits associated with that stock (through warrants issued to the S corporation shareholders that would dilute the shares of nonvoting stock held by the exempt organization or agreements to repurchase the nonvoting stock from the exempt organization at a value that is substantially reduced by reason of the warrants). Identified in IRS Notice 2004-30.

30. Intercompany financing through partnerships using guaranteed payments: Transactions in which a corporation that is exempt from US federal income tax, such as a foreign corporation, provides financing to a domestic subsidiary by investing in the preferred stock of the subsidiary through a partnership in an attempt to convert interest payments that would not be currently deductible under §163(j) into deductible payments. The foreign corporation's return on investment is structured as a



DocuSign Envelope ID: 8E085E670-415C-4E63-ABC6-8269B24F72SD

guaranteed payment by the partnership, most of which is allocated to, and deducted by, another domestic subsidiary that is a partner in the partnership. In some cases, the guaranteed payments are made to a partner that is unrelated to the foreign corporation and the partnership's obligations to make the guaranteed payments are assured by the foreign corporation or a related party. Identified in IRS Notice 2004-31.

31. Sale-in, lease-out transaction (SILOs) with a tax-indifferent party: Transactions in which a taxpayer/lessor enters into a purported sale-leaseback arrangement with a tax-indifferent person (such as a foreign entity, a domestic tax exempt organization or government, or a company in a net operating loss position or other tax neutral situation) as lessee in which substantially all of the tax-indifferent person's future rental payment obligations and purchase option rights are economically defeased/nullified and the taxpayer's risk of loss from a decline, and opportunity for profit from an increase, in the value of the leased property are substantially limited, and there is an obligation on the lessee to provide to the lessor a service contract arrangement or contingent residual value insurance in the event that the lessee purchase option right is not exercised. These leases are frequently referred to as "lease-to-service contracts" or "QTE leases." Identified in IRS Notice 2005-13.

32. Loss importation transactions: Transactions in which a taxpayer acquires control of a foreign entity treated as a corporation for US tax purposes, and uses the foreign entity's offsetting positions with respect to foreign currency or other property for the purpose of importing losses, but not corresponding gains. Gain is not imported because the taxpayer causes the foreign entity to close out the gain position while the foreign entity is still treated as a foreign corporation. The taxpayer enters into a new offsetting position to lock in the unrealized loss on the loss position and eliminate further economic risk. The taxpayer then imports the unrealized loss into the US, typically by making a check-the-box election with respect to the foreign entity and then closing out the loss position. It may also import the assets of the foreign entity into the US in another type of carryover basis transaction such as a reorganization described in section 368(a). The taxpayer must make the check-the-box election or otherwise dispose of the stock of the foreign entity within 30 days of acquiring it, so that the foreign entity will not qualify as a CFC and the gain it recognizes will not be taxable under subpart F. Identified in IRS Notice 2007-57.

33. Welfare benefit funds utilizing cash value life insurance policies: Trust arrangements purporting to provide employees welfare benefits in the form of cash value life insurance policies. In these arrangements the employer claims deductions for its contributions to the trust per the premium amounts paid, but the employee/policy owners include little if any in corresponding income. These arrangements may involve either a taxable trust or a tax-exempt trust. Identified in IRS Notice 2007-83.

34. Distressed asset trust: Distressed Asset Trust: Transactions in which trusts are used to shift built-in losses in distressed assets that have been transferred into such trusts by a tax-indifferent party to a beneficiary who is a US taxpayer. The distressed assets are then written off by the US taxpayer

DocuSign Envelope ID: 0E085E670-415C-4E63-ABC6-82C9B24F72SD



EY
Building a better
working world

under §166 or sold with the US taxpayer claiming a deduction under §165, even though the US taxpayer has not incurred an economic loss. Identified in IRS Notice 2008-34.

**35.** Basket option contract transactions: Transactions in which a taxpayer enters into a contract, denominated as an option with a stated term exceeding one year, to receive a return based on the performance of a basket of assets that qualify as actively traded property. The taxpayer retains the right to change the assets in the basket or the trading algorithm that determines how the assets in the basket are traded. The taxpayer takes the position that any income from the performance of the assets in the basket is deferred until the contract terminates, and the entire amount of income is treated as long-term capital gain if the contract itself is held for more than one year. Identified in IRS Notice 2015-73.

**36.** Syndicated conservation easement transaction: Transactions in which an investor receives promotional materials, oral or written, that offer prospective investors in a pass-through entity the possibility of a charitable contribution deduction that equals or exceeds an amount that significantly exceeds the amount of the investor's investment. The investor purchases an interest, directly or indirectly (through one or more tiers of pass-through entities), in the pass-through entity that holds real property. The pass-through entity that holds the real property contributes a conservation easement encumbering the property to a tax-exempt entity and allocates, directly or through one or more tiers of pass-through entities, a charitable contribution deduction to the investor, which the investor reports on its federal income tax return. Identified in IRS Notice 2017-10.

## Federal Transactions of Interest

**TOI1.** Contribution of a successor member interest to a charity: A transaction in which a taxpayer acquires a successor interest in an LLC or similar entity that directly or indirectly holds real property, transfers the rights more than one year after the acquisition to a charity described in section 170(c), and claims a charitable contribution deduction that is significantly higher than the amount that the taxpayer paid to acquire the rights. Identified in IRS Notice 2007-72.

**TOI2.** Toggling grantor trusts: Transactions in which grantor creates and funds a grantor trust with four options with values that are expected to move inversely in relation to at least one of the other options. The grantor then gives a unitrust interest to a beneficiary while retaining a noncontingent remainder interest and the power to reacquire trust property at a specified future date by substituting other property of equivalent value. Through a series of successive transactions involving the sale of the remainder interest to an unrelated buyer for an amount substantially equal to the fair market value of the options contributed to the trust, the "activation" of the substitution power on its effective date, the close-out of the "loss options," and the sale of the unitrust interest to the unrelated buyer, the grantor trust status of the trust is purportedly "toggled off" and "toggled on." The grantor claims a tax loss attributable to the close-out of the loss options even though the grantor has not suffered an equivalent economic loss. A variation of the transaction described above involves an initial contribution of liquid assets instead of options, and a subsequent substitution of appreciated property for the liquid

DocuSign Envelope ID: 8E985E670-415C-4E63-ABC6-8269B24F72SD



assets. This variation is designed to enable the grantor to avoid the recognition of gain upon the disposition of the appreciated assets. Identified in IRS Notice 2007-73.

**TOI3.** Potential for avoidance of tax through sale of charitable remainder trust interests: Transactions involving the sale or other disposition of all interests in a charitable remainder trust (subsequent to the contribution of appreciated assets to the trust but after their sale by the trust). The grantor or other noncharitable claims an increased basis in the annuity or unitrust interest sold based upon the tax basis of assets within the trust (rather than with reference to the tax basis of assets transferred to the trust) thereby recognizing little, if any, gain from such sale or other disposition of the unitrust or annuity interest. Identified in IRS Notice 2008-99.

**TOI4.** Use of domestic partnership with CFC partners to avoid taxable Subpart F inclusions: Transactions involving a US taxpayer owning at least one CFC which is a partner in a domestic partnership (the other partner(s) may or may not also be CFCs). The domestic partnership owns a CFC Opco that earns income of a type which is subpart F income. The US taxpayer claims that the subpart F income of the CFC Opco is not subpart F income in the hands of the CFC partner (or the partner's US owner) because of the interposition of the domestic partnership. Identified in IRS Notice 2009-7.

**TOI5.** Basket contract transactions: Basket Contract Transactions: Transactions in which a taxpayer enters into a contract to receive a return based on the performance of a basket of assets. The contract has a term of more than one year (or overlaps two of the taxpayer's taxable years). The assets in the basket may include securities, commodities, foreign currency, interests in entities that trade in such assets, or similar property. The taxpayer retains the right to change the assets in the basket, change the algorithm that determines the assets, or to request the counterparty to make either of these changes. On the termination of the contract, the taxpayer receives a settlement based on the performance of the assets in the basket. The taxpayer takes the position that any income from the performance of the assets in the basket is deferred until the contract terminates, and the entire amount of income is treated as long-term capital gain if the contract itself is held for more than a year. Identified in IRS Notice 2015-74.

**TOI6.** Micro-captive transactions: Transactions in which a person ("A"), directly or indirectly owns an interest in a trade or business ("Insured"), which purchases insurance from an entity ("Captive") or from an intermediary insurance company that initially accepts the risk and premium then subsequently transfers it to Captive, commonly referred to as a fronting company ("C"). Captive is broadly defined as an insurance company that is at least 20% owned in voting power or value by either A, Insured, or a related party within the meaning of § 267(b) or §707(b). Captive makes an election under section 831(b) to be taxed only on taxable investment income. During a specified "computation period," generally five years, either (i) Captive's liabilities for losses and claims administrative expenses are less than 70% of premiums less policyholder dividends, or (ii) a portion of the payment under the insurance contract is, or will, be made available to A, Insured, or any related party in a manner that does not result in taxable income or gain (e.g., loan). Participants to the transaction may include A, Insured, Captive, and C. Identified in IRS Notice 2016-66 and IRS Notice 2017-08.

DocuSign Envelope ID: B5985E670-415C-4E68-ABC6-8269B24F72SD



EY
Building a better
working world

## California Listed Transactions

**CA1.**  Real estate investment trust (REIT) consent dividends: Transactions occurring after February 28, 2000, in which a REIT takes a deduction for a consent dividend but the REIT's owners do not report the consent dividend as income. Identified in [Cal. FTB Chief Counsel Notice 2003-1](#).

**CA2.**  Wholly owned or controlled regulated investment company (RIC): Transactions occurring after February 28, 2000, in which a corporation forms a wholly owned or controlled entity that registers as a RIC and the parent corporation transfers to the RIC some of its income producing assets. The RIC claims the dividends paid deduction under IRC §852 and the parent corporation claims an intercompany dividend received deduction under the California tax code. Thus, no California income or franchise tax is paid on the income earned by the income producing assets contributed to the RIC. Identified in [Cal. FTB Chief Counsel Notice 2003-1](#).

**CA3.**  Sales factor denominator inflation Intercompany transactions occurring after February 28, 2000, between unitary corporate taxpayers and partnerships to inflate the denominator of the California sales factor and thereby reduce the amount of income apportioned to California. The transactions involve the use of the special sales factor rules in California Regulation 25137-1(f)(3) to include intercompany sales in the denominator of the sales factor. The transactions typically involve a group of corporations filing a California combined report with at least one member (the partner-corporation) of the group owning or acquiring an interest in a partnership and with at least one other corporate member (the nonpartner-corporation) of the combined group not owning an interest in the partnership. The partnership's business is unitary with the combined group and its activities were, or could be, performed by a corporate member of the combined group. The partnership sells goods or services to the nonpartner corporation or the nonpartner corporation makes sales to the partnership. The sales are included in the sales factor denominator, but are generally excluded from the sales factor numerator of the unitary group. Identified in [Cal. FTB Notice 2011-01](#).

**CA4.**  Circular cash flow with sale of subsidiary: Transaction occurring after February 28, 2000, involving a parent corporation (Parent) that "artificially" increases its basis in the stock of its wholly-owned subsidiary (Subsidiary) through a circular flow of cash from Parent to Subsidiary and back to Parent prior to Parent selling the stock of Subsidiary to a third party. In order to minimize gain on the sale of Subsidiary, Parent contributes a promissory note or other instrument to Subsidiary in a transaction treated as a nontaxable contribution to capital. Parent's contribution to Subsidiary's capital is temporary and is intended to remain with Subsidiary for a short period of time. Subsidiary then generates what it claims are earnings and profits through the sale or transfer of intangible property to a related entity in a manner that avoids the application of California intercompany transaction rules. Parent pays off the promissory note or instrument issued to Subsidiary. Shortly thereafter, Subsidiary distributes cash or other property back to Parent in a distribution claimed to be a nontaxable dividend not requiring Parent to reduce its basis in Subsidiary. As a result, Parent claims an increased basis in Subsidiary for its

DocuSign Envelope ID: 8E085E670-415C-4E53-ABC6-8269B24F72SD



contribution of the promissory note or other instrument, but the note or instrument does not remain with Subsidiary. Identified in Cal. FTB Notice 2011-04.

## Colorado Listed Transactions

**CO1.** Captive real estate investment trust (REIT): Transactions in any open tax year, between a captive REIT and its more than 50% beneficial owner if there is a Colorado tax benefit. A captive REIT is defined as a REIT in which shares or beneficial interests are not regularly traded on an established securities market and of which more than 50% of the voting power or value of the beneficial interest or shares are owned or controlled directly, indirectly, or constructively, by a single entity that is: (1) treated as an association taxable as a corporation under the Internal Revenue Code; and (2) not exempt from federal income tax under IRC §501(a). For these purposes, an "association taxable as a corporation" does not include any REIT other than a captive REIT, any qualified REIT subsidiary other than a qualified REIT subsidiary of a captive REIT, any listed Australian property trust, or a qualified foreign entity. Identified in Colorado Reg. 39-22-652.

**CO2.** Captive regulated investment company (RIC): Transactions in any open tax year, between a captive RIC and its more than 50% beneficial owner if there is a Colorado tax benefit. A captive RIC is defined as a RIC in which shares or beneficial interests are not regularly traded on an established securities market and of which more than 50% of the voting power or value of the beneficial interest or shares are owned or controlled directly, indirectly, or constructively, by a single entity that is: (1) treated as an association taxable as a corporation under the IRC; and (2) not exempt from federal income tax under IRC section 501(a). Voting stock in a RIC that is held in a segregated asset account of a life insurance corporation (IRC §817) is not taken into account in determining whether the RIC is captive. Identified in Colorado Reg. 39-22-652.

## New York Listed Transaction

**NY1**. Certain charitable contribution deductions involving remainder interests: A transaction occurring on or after January 1, 2006, involving the purchase of a remainder interest in real property by a newly formed pass-through entity, which after holding the remainder interest for one year, contributes it to an exempt organization thereby meeting the federal requirements for computing the charitable contribution deduction based on the fair market value of the remainder interest. The remainder interest is appraised using an income approach that takes into consideration the amount of lease payments remaining on the long term lease resulting in a value of the remainder interest substantially higher than what the pass-through entity paid for it. Following the contribution, the pass-through entity is dissolved, allowing its members/partners to claim a pro-rata share of the charitable contribution deduction. Identified in New York State Department of Taxation and Finance-Office of Tax Policy Analysis Technical Service Division TSB-M-07.

## Oregon Listed Transactions



**OR1.** Certain real estate investment trust (REIT) transactions: Transactions occurring on or after January 1, 2007 that lack economic substance in which an Oregon taxable corporation that directly or indirectly owns a REIT: (1) transfers income-producing assets to the REIT; and, (2) claims a dividend-received deduction and the REIT claims a dividend-paid deduction. An "Oregon taxable corporation" is a corporation that does business in Oregon, is organized in Oregon, has income from Oregon sources, or is owned by an Oregon income or corporate excise taxpayer. A "transaction without economic substance" is a transaction for which the taxpayer cannot demonstrate a business purpose other than tax savings. See 2015 Oregon Revised Statute 314-307.

**OR2.** Certain regulated investment company (RIC) transactions: Transactions occurring on or after January 1, 2007 that lack economic substance in which an Oregon taxable corporation that directly or indirectly owns a RIC: (1) transfers income-producing assets to the RIC; and, (2) claims a dividend-received deduction and the RIC claims a dividend-paid deduction. An "Oregon taxable corporation" is a corporation that does business in Oregon, is organized in Oregon, has income from Oregon sources, or is owned by an Oregon income or corporate excise taxpayer. A "transaction without economic substance" is a transaction for which the taxpayer cannot demonstrate a business purpose other than tax savings. See 2015 Oregon Revised Statute 314-307.