**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | x | |
| In re: | : | Chapter 11 |
| | : | |
| CELSIUS NETWORK LLC, *et al.*,[1] | : | Case No. 22-10964 (MG) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |
| | x | |
| IGNAT TUGANOV, | : | Adversary Proceeding |
| | : | Case No. _____ |
| Plaintiff, | : | |
| | : | **COMPLAINT FOR** |
| v. | : | **DECLARATORY RELIEF** |
| | : | **PURSUANT TO 11 U.S.C.105(a),** |
| CELSIUS NETWORK LLC; CELSIUS KEYFI | : | **BANKRUPTCY RULES 7001(2)** |
| LLC; CELSIUS LENDING LLC; CELSIUS | : | **AND (9) AND 28 U.S.C. § 2201** |
| MINING LLC; CELSIUS NETWORK INC.; | : | **DECLARING THAT (A)** |
| CELSIUS NETWORK LIMITED; CELSIUS | : | **DEFENDANTS' BUSINESSES** |
| NETWORKS LENDING LLC; CELSIUS US | : | **WERE OPERATED AS A** |
| HOLDING LLC, GK8 LTD., GK8 UK LIMITED, | : | **PONZI SCHEME AND (B)** |
| AND GK8 USA LLC | : | **DEFENDANTS' ESTATES** |
| Defendants. | : | **SHOULD BE** |
| | : | **SUBSTANTIVELY** |
| | : | **CONSOLIDATED** |
| | x | |

Mr. Ignat Tuganov ("**Plaintiff**"), a cryptocurrency customer and creditor of the

Defendants, by and through his undersigned counsel, Venable LLP, files this Complaint against

Celsius Network LLC *et al.*, the above-captioned Defendants and debtors and debtors-in-

possession (collectively, the "**Defendants**" or "**Celsius**"[2]) seeking an order for declaratory relief

---

[1] The above-captioned debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956), GK8 Ltd. (1209), GK8 UK Limited (0893), and GK8 USA LLC (9450). The location of Celsius Network LLC's principal place of business and the debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

[2] As used herein, the term "Celsius" refers generally to all of the Celsius group of entities.

1

pursuant to 28 U.S.C. § 2201 (the "**Declaratory Judgment Act**"), section 105(a) of chapter 11

of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 7001(2) and (9) of the

Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") adjudicating that (i) the

Defendants' businesses were operated as a Ponzi scheme from and after at least the spring of

2021 through the Petition Date, (ii) the Defendants' businesses were operated during such time

frame as a single, hopelessly intertwined enterprise such that the Defendants' estates should be

substantively consolidated for purposes of these chapter 11 cases, and (iii) as a consequence of

adjudicating that the Defendants operated as a Ponzi scheme, all contracts with the Defendants

on and after the date the Ponzi scheme began, including, without limitation, Terms of Use, are

deemed null and void.  In support thereof, Plaintiff states as follows:

## INTRODUCTION

1.    This is an action under 11 U.S.C. § 105(a), Bankruptcy Rules 7001(2) and (9) and

28 U.S.C. § 2201 seeking a declaratory judgment that (a) since at least the spring of 2021, the

Defendants have been operating their businesses as a Ponzi scheme, (b) the Defendants' books,

records, and businesses are so hopelessly intertwined that the Defendants' estates should be

substantively consolidated, and (c) as a consequence of adjudicating that the Defendants

operated as a Ponzi scheme, all contracts with the Defendants on and after the date the Ponzi

scheme began, including, without limitation, Terms of Use, are deemed null and void.

2.    In light of the findings contained in the Final Report of Shoba Pillay, Examiner

(the "**Examiner**"), dated January 30, 2023 [Dkt. No. 1956] (the "**Examiner's Report**") and

other facts gleaned from discovery and pleadings filed in the Celsius chapter 11 cases, Plaintiff

submits that, since at least the spring of 2021, Defendants' operated their businesses in a manner

that satisfies the indicia of a Ponzi scheme, namely:

2

a.   Lack of a legitimate business that produces revenue;

b.   The promise of guaranteed interest or other earnings at rates higher than

market rates;

c.   Lack of transparency

d.   Lack of adequate books and records or fabrication of books and records;

e.   Selling of unregistered securities;

f.   Commingling of customer funds;

g.   Misrepresentations made to lure and/or retain customers; and

h.   Use of new customer funds to pay guaranteed interest to existing customers.

3.      Defendants created a fraudulent business aimed at wooing customers with false promises of unusually high "rewards" in exchange for depositing billions of dollars of cryptocurrency that Defendants could use for either their own personal benefit or to pay the returns owed to other customers.  As of at least the spring of 2021, Defendants' intertwined businesses were insolvent and were not making enough revenues to pay the "rewards" promised to existing and prospective customers.  Rather than disclose this fact, reduce or eliminate reward payments, and cease marketing efforts to attract new customers, Defendants made both public and private material misrepresentations to existing and potential customers to convince them to either keep their money in Defendants' business or to deposit additional or new funds or digital assets in Defendants' business, which deposits Defendants used to operate their businesses and pay returns promised to old customers.  The cycle of relying on deposits from new customers to fund guaranteed returns to old customers describes a classic Ponzi scheme and is illegal under New York law.

4.      In addition, upon information and belief, Defendants, controlled by Mashinsky,[3] operated their businesses as one integrated enterprise, often failing to recognize the corporate separateness of entities within the common enterprise, often, if not most often, failing to keep accurate books and records, and treating all Celsius entities as if they were one and the same company.  As such, for purposes of these chapter 11 cases, the Defendants' estates should be substantively consolidated under section 105(a) of the Bankruptcy Code so that the assets and liabilities of the estates can better reflect the actual way in which the Defendants held themselves out to the world and conducted their businesses.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this adversary proceeding (the "**Adversary Proceeding**") pursuant to 28 U.S.C. §§ 157 and 1334, because it arises in and relates to the above-captioned chapter 11 cases (the "**Chapter 11 Cases**").  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(a) and (o).

6.      Venue of the Chapter 11 Cases and this Adversary Proceeding in this District is proper under 28 U.S.C. §§ 1408 and 1409.

7.      The statutory predicates for the relief requested herein is section 105(a) of Bankruptcy Code and Bankruptcy Rules 7001(2) and (9).  Declaratory relief is appropriate pursuant to Bankruptcy Rule 7001 and 28 U.S.C. § 2201(a).

8.      Plaintiff consents to the entry of a final order by the Bankruptcy Court in connection with this Adversary Proceeding to the extent that it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

---

[3] Capitalized terms used in this Introduction that have not been defined in the Introduction or the preamble shall have the same meaning as defined later in this Complaint.

**THE PARTIES**

9.      Plaintiff, Mr. Ignat Tuganov, is a natural person, a citizen of Cyprus, and the owner of an "Earn Account."  Plaintiff has filed Proof of Claim No. 19000 against each of the Defendants' in these Chapter 11 Cases in connection with his Earn Account, which claim was later amended by Proof of Claim No. 24383.

10.     Defendant, Celsius Network, LLC ("**Celsius LLC**") is a Delaware limited liability company with offices in Hoboken, New Jersey.  Celsius LLC is wholly owned by Celsius US Holding LLC.

11.     Defendant, Celsius Networks Lending LLC ("**Networks Lending**") is a Delaware limited liability company with offices in Hoboken, New Jersey.  Networks Lending is wholly owned by Celsius Network, Inc.

12.     Defendant, Celsius US Holding LLC ("**Celsius Holding**") is a Delaware limited liability company with offices in Hoboken, New Jersey.  Celsius Holding is wholly owned by Celsius Network Limited.

13.     Defendant Celsius KeyFi LLC ("**KeyFi**") is a Delaware limited liability company with offices in Hoboken, New Jersey.  KeyFi is wholly owned by Celsius Holding.

14.     Defendant Celsius Lending LLC ("**Lending**") is a Delaware limited liability company with offices in Hoboken, New Jersey.  Lending is wholly owned by Celsius Holding.

15.     Defendant Celsius Mining LLC ("**Mining**") is a Delaware limited liability company with offices in Hoboken, New Jersey.  Mining is wholly owned by Celsius Holding.

16.     Defendant, Celsius Network Limited ("**Celsius Ltd.**") is a United Kingdom private limited company with offices in the United Kingdom and in Hoboken, New Jersey. Upon information and belief, Celsius Ltd. is owned as follows: 65.32% by Celsius Network, Inc.

5

and 34.68% by institutional investors (which institutional investors acquired their equity interests through a series of funding investments from 2019 through 2022).

17.     Defendant Celsius Network, Inc. ("**Celsius Inc.**") is a Delaware corporation with offices in Hoboken, New Jersey.  Celsius Inc. is owned as follows: 83.7% by Alexander Mashinsky and 16.3% by S. Daniel Leon.

18.     Defendant GK8 Ltd. ("**GK8**") is an Israeli corporation with offices in Tel Aviv, Israel and Hoboken, New Jersey.  GK8 is wholly owned by non-debtor Celsius Network IL Ltd. which, in turn, is wholly owned by Celsius Ltd.

19.     Defendant GK8 UK Limited ("**GK8 UK**") is an Israeli corporation with offices in Tel Aviv, Israel and Hoboken, New Jersey.   GK8 UK is wholly owned by GK8.

20.     Defendant GK8 USA LLC ("**GK8 USA**") is a Delaware limited liability corporation with offices in Hoboken, New Jersey.  GK8 USA is wholly owned by GK8.

21.     Celsius LLC, Networks Lending, Celsius Holding, KeyFi, Lending, Mining, Celsius Ltd., Celsius Inc., GK8, GK8 UK, and GK8 USA are all debtors and debtors-in-possession in these Chapter 11 Cases.

## FACTUAL ALLEGATIONS

### Celsius: Overview of Business Model

22.     Celsius was founded in late 2017/early 2018 by Alex Mashinsky ("**Mashinsky**"), S. Daniel Leon ("**Leon**") and Hanoch "Nuke" Goldstein ("**Goldstein**").

23.     Upon information and belief, based on the Examiner's interview of Mashinsky, the business was designed to be a simple app that would accept customers' digital coins and would deploy the deposited digital coins for customers.[4]

---

[4] Examiner's Report at p. 65, quoting from Examiner Interview of Alex Mashinsky (January 5, 2023).

24.     Digital coins or cryptocurrency are virtual assets that exist only on a digital public ledger known as the blockchain.  As an alternative to traditional banks and financial institutions, digital coins are not government backed, do not rely on the banking system for transaction verification and are governed by individual users who transact directly with each other, excluding banks and governments as the middlemen.

25.     On February 8, 2018, Celsius Inc. was incorporated in Delaware.

26.     On February 9, 2018, Celsius incorporated Celsius Ltd. in the United Kingdom. From 2018 through the summer of 2021, Celsius Ltd. operated all of Defendants' retail customer-facing business.[5]

27.     On or about June 14, 2021, in response to regulatory pressure it was facing in the United Kingdom, Defendants reorganized the customer-facing business, caused Celsius LLC to be incorporated as a Delaware limited liability company, and moved their corporate offices to New Jersey.[6]

28.     Upon information and belief, from at least 2021, most of the operational decisions for the entire Celsius enterprise were made by Mashinsky and a handful of officers and key senior employees.

29.     Defendants' business model was three-fold: (i) the "Earn" rewards program, (ii) the Loan program, and (iii) the CEL token.

**The Earn Rewards Program**

30.     Celsius created a digital platform on which customers could deposit their crypto assets with Defendants in exchange for which Defendants promised to pay customers weekly interest or "rewards."  Defendants purported to deploy customers' crypto deposits through

---

[5] Id. at p. 66.
[6] Id. at p.67.

collateralized loans or other investments that Defendants claimed generated sufficient revenue for, among other things, payment of the weekly rewards to customers. This was known as the "Earn" program.

31.     From its inception, Defendants guaranteed rewards that were significantly higher than market rate. Initially, Celsius promised to pay customers "at least 5% annual interest" on their deposits in the Earn program at a time when market interest rates were significantly lower. Later, Celsius increased its rewards to 5.5% for BTC, 6.7% for ETH, and 7.01% for LTC.[7]

32.     Celsius had no formal rate determination policy for most of its existence. The basis on which Celsius determined its reward rates was not its ability to generate revenue to cover the rewards promised but, rather, its fear that, without promising high reward rates, it would lose, or fail to attract, customers.[8]

33.     On September 17, 2021, the State of New Jersey Bureau of Securities (the "**NJ Bureau**") issued a Summary Cease and Desist Order (the "**NJ Cease and Desist Order**") to Celsius LLC, finding that, as a matter of law, the Earn program (or Earn Rewards product) was a security as defined in N.J.S.A. 49:3-49(m), was required to be registered with the NJ Bureau pursuant to N.J.S.A. 49:3-60, was unregistered, and Celsius was offering and selling the security in violation of N.J.S.A. 49:3-60.[9]

34.     Celsius continued to market and offer the Earn product subsequent to the issuance of the NJ Cease and Desist Order, and upon information and belief, did not register the Earn product.

---

[7] Id. at p. 132 quoting from Current & Historical Rates – Celsians (archive.org). "BTC" refers to Bitcoin, ETH refers to Etherium and LTC refers to Litecoin, each a different type of crypto coin.
[8] Id. at p. 132-33, quoting Examiner Interview of Jason Perman (Former Vice President of Treasury – Celsius, November 3, 2022) and Tappan, Dean, re: Rate Suggestion, Internal Document, Email (December 13, 2021).
[9] New Jersey Bureau of Securities Summary Cease and Desist Order Against Celsius Network LLC, September 17, 2021 at ¶¶ 38 – 41,

### The Loan Program

35.     Second, Defendants offered its customers a "loan" program through which customers could obtain a loan in fiat currency[10] against crypto assets that the customer had deposited in its Celsius account.  Crypto assets used by a customer as collateral for a loan did not earn rewards, but Defendants deployed the collateral in the same manner as they deployed all other crypto assets on deposit with them.

36.     At all times relevant hereto, Defendants advertised interest rates on loans that were significantly lower than market rates.  In April 2021, for example, Celsius advertised 1% APR loans to its customers at a time when the market rates were significantly higher.[11]

37.     Upon information and belief, Celsius did not base its loan interest rates on economic factors but strictly on marketing motivations in an effort to attract and keep more and more customers.

### The CEL Coin and the Flywheel

38.     The CEL coin or token is Celsius' own digital currency.  On its website, Celsius described the CEL coin as "the backbone of the Celsius Network."[12]  Customers could elect to receive their rewards in CEL tokens at a higher reward rate than if the customer received returns in the same cryptocurrency it had deposited into its Celsius account.  Also, if a customer elected to use CEL coins as collateral for loans it borrowed from Celsius, the customer would get its loan at a discounted interest rate.  Mashinsky described the CEL coin as similar to "airline miles," providing an incentive for customers to use the Celsius platform instead of a third-party platform.[13]

---

[10] Fiat currency is traditional, government-issued currency.
[11] Examiner's Report at p. 73, quoting Celsius, Use your crypto to borrow [ ] at 1%, Email (April 28, 2021).
[12] Id. at p.78, quoting Celsius, Whitepaper, https://celsius.network/static/celsius-whitepaper.pdf.
[13] Id. quoting Examiner Interview of Alex Mashinsky (Former Chief Executive Officer – Celsius, January 5, 2023).

39.    According to Celsius' website, the process of customers depositing their crypto assets on Celsius' platform and earning rewards in CEL produced a self-sustaining "flywheel" that would generate profit for the platform.  According to Celsius and Mashinsky, the "flywheel" was supposed to work as follows: Defendants' marketing efforts would attract more customers and, therefore, more crypto assets; Celsius would lend these assets to earn yield, which would be used by Celsius to pay rewards and to buy back CEL tokens on the market (which would then be "burned" or cancelled), thereby increasing demand for the CEL token and increasing the price of CEL.  According to Mashinsky, the value of customers' accounts would increase as they continued to earn rewards paid in CEL.

40.    Unfortunately, few, if any, other entities accepted CEL as collateral, so the token had limited utility outside the Celsius system.  Instead, Leon and Goldstein took out millions of dollars of loans from Celsius, which loans were collateralized only with their CEL tokens, allowing them to use Celsius as a "piggybank" for their own personal use.[14]

41.    Moreover, Celsius' value was closely linked to the value of its CEL token.  On numerous occasions, Mashinsky made public representations linking the value of the CEL token to the value of the platform, making remarks such as "everything we do is measured by the [CEL] token . . . our job is to do everything we can to increase the price of the token as long as it's in the best interests of the community,"[15] "[t]he payment [to our customers] is made with our tokens, with the CEL tokens, which represents a transfer of value,"[16] and "[t]he yield on CEL is

---

[14] Draft Complaint of Official Committee of Unsecured Creditors of Celsius Network LLC [Dkt. No. 2054-2] ("**UCC Complaint**") at ¶ 56.
[15] Examiner's Report at p.83, quoting Celsius, AMA with Alex Mashinsky, CEO of Celsius, YouTube (March 8, 2018).
[16] Id.

an indication of profitability or how well is Celsius doing."[17]  The corollary to this premise, of

course, was that, as the value of CEL decreased, so did the value of the Celsius network.

### Celsius' Revenue Fails to Support High Reward Rates

42.    A key indicator of Celsius' financial health was the difference between Celsius'

yield on customer assets and the rewards it paid to customers (known as its "net interest margin"

or "**NIM**").[18]  Typically, U.S. banks achieve annualized NIMs of two to three percent.[19]  As

Frank van Etten, one of Celsius' former Chief Financial Officers, told the Examiner, "over time

it [NIM] should be around 3% as otherwise there is no business."[20]

43.    Celsius rarely had even a positive NIM, let alone one near the 3% benchmark.

This was due, in large part, to the higher-than-market reward rates that Celsius promised its

customers.

44.    Celsius often boasted that it offered higher reward rates than its competitors.[21]

This was how Celsius planned to keep its customer base and attract ever-increasing numbers of

new customers.  Yet, as early as 2020, Celsius struggled to generate yield on its crypto assets

sufficient to pay its promised return to customers.  For example, as of July 22, 2020, Celsius'

yield on assets under management reached only 0.62% for the first seven months of the year,

significantly below the 3% yield goal.[22]

45.    By 2021, the NIM grew even worse.  For the week of February 6, 2021, reward

obligations aggregated 120% of Celsius' gross revenue for that week, and for the week of March

---

[17] Id. at 84, quoting Celsius, Celsius Network AMA with Alex Mashinsky, YouTube (November 26, 2019).
[18] Id. at 15.
[19] Id. at 138, quoting Examiner Interview of Jason Perman (Former Vice President of Treasury – Celsius, January 11, 2023).
[20] Id., quoting van Etten, Frank, re: NIM and other profitability measures, Email (November 24, 2021).
[21] Id. at 131.
[22] Id. at 138, citing Mashinsky, Alex, Email Re: Investment Committee: July 23, 2020.

21, 2021, reward obligations aggregated 174% of Celsius' gross revenue.[23]  In 2021, according to the Examiner, Celsius "entered a reward obligation/available revenue after overhead expense deficit. . .(at a negative $425 million)."[24]

46.     The situation was only exacerbated by Celsius' rapid growth.  According to the Examiner, the number of Celsius registered users tripled from January 2021 to December 2021, thereby increasing reward obligations.[25]  Yet profitability did not keep up with growth and soon liquidity shortages plagued the company.

47.     Indeed, "by Spring 2021, Celsius employees expressed concern about not having access to sufficient cash to meet Celsius' business expenses."[26]  For example, on April 15, 2021, former Celsius Chief Financial Officer, Ms. Harumi Urata-Thompson, requested access to cash to cover weekly expenses, but Celsius executives Mr. Dean Tappen and Mr. Connor Nolan responded that Celsius was unable to get access to the necessary liquidity.[27]

48.     Failing to generate enough yield to cover its rapidly growing, over-market reward obligations, Celsius resorted to making riskier investments in an effort to solve its financial woes.  Despite publicly assuring its customers that Celsius made only collateralized loans that carried minimal risk, in 2021, Celsius began making significantly more uncollateralized institutional loans that charged higher interest rates but carried increased risk.[28]  As the Examiner found, "[b]y June 2021, it was routine for one-third or more of Celsius's institutional loan portfolio to consist of unsecured loans."[29]

---

[23] Id. at 139, citing Celsius, Weekly P&L, Excel Spreadsheet (February 6, 2021).
[24] Id, citing Urata-Thompson, Harumi (Slack) (April 15, 2021).
[25] Id. at 125 citing Huron generated Celsius registration numbers using data provided by Celsius in the ExCo Dashboard, Celsius, ExCo Dashboard, Internal Company Document.
[26] Id. at 139.
[27] Id. at 139-40.
[28] Id. at 172 citing Celsius Risk Committee Meeting Agenda, Internal Company Document (June 11, 2021).
[29] Id.

49.     In addition, Celsius began making increasingly risky investments, including investing over $752 million in Grayscale Bitcoin Trust which, in 2021, resulted in a loss to Celsius in of over $290 million, purchasing the assets of KeyFi, Inc. in December 2020, even though Celsius was aware of KeyFi's owner, Jason Stone's, losing investment track record, taking out loans with Equities First Holdings, which defaulted in July 2021 on its obligation to return Celsius' collateral (then valued in excess of $500 million) upon repayment of the loans, and investments on the DeFi platform that Celsius' risk team acknowledged were risky.

50.     By growing so rapidly, refusing to modulate its reward rates, incurring increasingly massive reward obligations and yet failing to generate yields on deployed assets sufficient to cover its reward obligations, and resorting to risky investments that forced the company to sustain huge losses, Celsius was unable to dig itself out of the financially distressed situation it had created.  By the spring of 2021, to fund the business, Celsius needed not only to keep its then current customers but also needed a continuous supply of new customers to deposit more assets to provide the funds to pay ever-increasing reward obligations and growing operating expenses, regardless of whether Celsius could actually generate enough yield to cover those unrealistic reward rates.

51.     Accordingly, by at least the spring of 2021, Celsius was operating at a loss, was insolvent, and failed to generate enough revenue to pay the rewards it promised to its ever-growing number of customers.

**Lack of Internal Controls and Proper Bookkeeping**

52.     At all relevant times, Celsius lacked the proper internal controls and formal systems to manage its ever-growing, complex business enterprise.  According to the Examiner,

Celsius' leadership frequently made important business decisions without any formal procedures, controls, or sufficient financial data to make informed decisions.

53.     Rather, Mashinsky made most, if not all, of the business decisions affecting the entire enterprise, forcing his co-founders and other Celsius officers to execute his business decisions regardless of the consequences to the company or to the officer themselves.

54.     For example, under a Token Sale Agreement executed in 2018, Mashinsky's own company, AM Ventures Holdings, Inc., was required to purchase 117,000,000 CEL tokens, but, ultimately, Mashinsky refused to do so.  In 2020, to settle his outstanding obligation to Celsius Ltd., Mashinsky arranged to have Celsius Ltd. give AM Ventures Holdings a loan, collateralized by the 117,000,000 CEL tokens that Mashinsky had never purchased, then offset the loan against AM Venture Holdings' obligation to purchase the CEL tokens.  Leon signed the loan to AM Ventures Holdings on behalf of Celsius Ltd. and Mashinsky signed the loan agreement on behalf of AM Ventures Holding.  The "secured" loan made for Mashinsky's sole benefit was, in reality, collateralized by nothing.[30]  A few months later, the transaction was terminated.[31]

55.     Moreover, Celsius often executed business decisions without proper record keeping and with a total disregard to which Celsius entity was undertaking financial transactions. For example, though Celsius spent millions of dollars buying back its own CEL to prop up the value of the token, upon information and belief, no one at Celsius appears to know the total cost to the company of these buy-backs, and the expense was never reflected in Celsius' books and records or financial statements.[32]

---

[30] UCC Complaint at ¶ 47; Examiner's Report at pp. 88-9.
[31] Examiner's Report at p. 89.
[32] UCC Complaint at ¶ 64.

56.     Not until the spring and summer of 2021, after Celsius had already sustained significant losses and discovered the mismatch between customer assets and customer liabilities, did Celsius hire professionals who could try to monitor and manage Celsius' investment risks.[33] After hiring these professionals, it took months for the Risk Management Team to adopt "stop-gap measures" that simply got the ball rolling on creating formal risk management policies.

57.     Moreover, Celsius had no audit function to make sure that these risk policies were being implemented and followed.[34]  As late as March 2022, Celsius' leadership had still not created an internal audit team and no Celsius personnel held a formal audit role.[35]

58.     In addition to a lack of risk management policies and an internal audit team, Celsius lacked robust accounting capabilities and had no way of determining the true financial condition of the enterprise.  By early 2021, Celsius was still lacking accurate bookkeeping and financial reconciliation methods, including profit and loss reporting and asset deployment analyses.  On February 9, 2021, even Mashinsky noted that "we are 3 years old and we still don't have any way to reconcile what *we* owe our customers vs. what our borrower owes *us*." (emphasis added).[36]

59.     Indeed, the Defendants have admitted that their books and records concerning intercompany transfers are so deficient that it would be nearly impossible to accurately reconstruct their intercompany claims.  As counsel for Defendants recently informed the Court:

> The Debtors did not generally record prepetition intercompany transactions in their books and records contemporaneously with such transfers, and in many cases did not record intercompany transactions at all. This has resulted in a backlog of unaccounted for transactions that, to date, have not been fully reconciled. Moreover, with respect to certain intercompany entries that

---

[33] Examiner's Report at 185.
[34] Id. at 190.
[35] Id. at 191-2.
[36] Id. at 193 quoting Mashinsky, Alex, Risk Committee Meeting Notes, Email (February 14, 2021).

represent transfers of cryptocurrency, the Debtors did not record the full value of the assets that were transferred between Celsius Network Limited ("CNL") to LLC, but rather accounted for only the cost basis of such assets through intercompany accounting. In addition to not capturing the full market value of coins transferred via intercompany transactions, the Debtors did not engage in "mark to market" reconciliation practices to track the subsequent impact of market movements on any intercompany entries on an ongoing basis.[37]

60.    The lack of proper accounting controls left Celsius with costly cryptocurrency shortfalls.  For example, Celsius often used customer-deposited Bitcoin and Etherium to purchase its native CEL in the market to use to pay rewards to customers, but Celsius failed to replenish its Bitcoin and Etherium coffers.  Because personnel were either not able or not bothering to reconcile assets used with assets repurchased, in March 2021, as the prices of Bitcoin and Etherium rose, Celsius personnel discovered that they had a shortfall of customer-deposited Bitcoin and Etherium coins that would cost them $164 million to replenish.[38]

61.    To remedy the haphazard and inadequate state of Celsius' record keeping and properly segregate and identify assets and liabilities (billions of dollars of investments had been discovered that no one at Celsius knew about), in or about May 2021, the "Freeze Report" was created.[39]  The Freeze Report was a manual, Google spreadsheet that was updated by anyone in the Celsius enterprise, at any time they felt an update might be needed, and there was no formal schedule or monitoring of the Freeze Report.[40]  The Freeze Report was inaccurate and had severe limitations, causing one employee to call it merely "a band-aid."[41]

---

[37] Debtors' Statement With Respect To Intercompany Claims Held By Debtor Celsius Network LLC Against Its Debtor Affiliates, Dkt No. 2092 at ¶ 5 (internal citations omitted).
[38] Examiner's Report at 195, quoting Celsius, Internal Company Document (March 5, 2021).
[39] Id. at 194-95; UCC Complaint at ¶ 80.
[40] UCC Complaint at ¶¶ 81-2.
[41] Examiner's Report at 198, quoting Examiner Interview of Seshu Vavilikolanu (January 6, 2023).

62.     Celsius also created the "Waterfall Report" in May 2021 to track all of Celsius' revenue-generating activities, but this report, too, was inaccurate, leading more than one employee to comment that the NIM calculation the report created was "broken" or "fake".[42]

63.     Indeed, Celsius' internal structures were so bad, that an internal report made in 2022 stated that Celsius had no order management systems, portfolio management system, pre-trade mandate or compliance controls, institutional grade trading systems, risk systems, or systems to generate profit and loss statements.[43]

64.     These record keeping and structural deficiencies were a symptom of Mashinsky's singular control of the Celsius enterprise.  Mashinsky relied on a few trusted officers to execute his decisions, such as Leon and Ms. Urata-Thompson, but generally, no significant decisions were made within the enterprise without Mashinsky's approval, regardless of the negative consequences to the company of Mashinsky's singular objective to grow the platform and attract new customers.

**Fraud in the Marketplace**

65.     Celsius' business model was based on a two-pronged fraud: (i) it lured customers to make "deposits" by promising unrealistically high reward rates despite being unable to generate yields sufficient to pay such rates and (ii) it induced customers not to redeem their assets by fraudulently assuring customers that Celsius' deployment of assets assumed little if any risk, because it only invested in collateralized loans and low-risk investments.  As detailed above, those promises were not true, and yet, Celsius, and specifically Mashinsky, regularly made public statements denying that Celsius was making uncollateralized loans or investing in risky business ventures.

---

[42][42] Id. at 202, quoting Tappen, Dean Slack (May 6, 2022) and Perman, Jason Slack (March 3,, 2022).
[43] UCC Complaint at ¶ 83.

66.     All during 2019, Mashinsky made numerous public representations that Celsius did not lend on an uncollateralized basis, stating that "'we loan coins out at up to 150% collateral'" and "'[w]e require 200% minimum collateral on all loans."[44]  Mashinsky made similar statements throughout 2020, 2021, and even as late as April 2022, when he said, "we have very credible counterparties that have billions of dollars on their balance sheet and for those, we have undercollateralized but we don't offer non-collateralized loans."[45]  Yet, as set forth above, at least as early as 2021, a significant portion of Celsius' loan portfolio was uncollateralized.

67.     Even when Celsius' business was nearing collapse, Mashinsky continued to misrepresent the company's financial circumstances to the public in order to keep existing customers from withdrawing their assets and to attract new customers and deposits.  For example, on May 11, 2022, Celsius and Mashinsky posted on Twitter that "'As part of our responsibility to serve our community, @CelsiusNetwork implemented and abides by robust risk management frameworks to ensure the safety and security of assets on our platform.  All user funds are safe.'"[46]

68.     On May 13, 2022, Mashinsky held an "Ask Mashinsky Anything" session on YouTube and said, "Celsius is stronger than ever.  We have billions of dollars in liquidity."[47]  Yet, in truth, just days before the YouTube session, Mr. Perman had described Celsius as a sinking ship and had stated his belief that there was no hope for the company.[48]

---

[44] Examiner's Report at 244, quoting @MashinskyTwitter (March 11, 2019) and @Mashinsky Twitter (May 16, 2019).

[45] Id. at 245-46, quoting Celsius CEO on best practices for retail investing in cryptocurrencies, CNBC (April 13, 2022).

[46] Id. at 299, quoting @CelsiusNetwork, Twitter (May 11, 2022); @Mashinsky, Twitter (May 11, 2022).

[47] Id. at 300, quoting Celsius, Celsius AMA May 13, 2022, YouTube (May 13, 2022).

[48] Id. at 299, quoting Perman, Jason Slack (May 9, 2022) at 15 and Perman, Jason Slack (May 12, 2022) at 1-2.

69.    Still, Mashinsky courted future customers, trying to attract new deposits.  On May 23, 2022, for example, Celsius sent a blast email to its then customers containing new promotional deals, on May 27, 2022, Mashinsky offered crypto rewards for users who made referrals to Celsius, and on May 29, 2022, Mashinsky offered to pay $1,000 to anyone who opened a new Celsius account.[49]

70.    At the time these promotions and offers to new customers were being made, Celsius was assuring the public and its then existing customers that it was financially sound, meanwhile, Celsius was actually insolvent, its NIM had been negative for months, and it was sustaining millions of dollars in losses.

**Market Manipulation**

71.    Upon information and belief, at all times relevant hereto, Celsius spent millions of dollars to purchase CEL in the public market to inflate and manipulate the price of CEL and then bought back those CEL tokens at inflated prices, for, among other things, the personal benefit of Mashinsky and other co-founders.

72.    For instance, as the Examiner explained, historically, Celsius went into the public markets on a weekly basis to buy the amount of CEL it needed to pay customer rewards and would time those purchases to either raise the price of CEL or to avoid a price drop.[50]  Celsius also placed "resting orders" of CEL purchases on exchanges at prices below the then-current market price of CEL so that orders would automatically trigger if CEL dipped to the specified price.  "Celsius did this for the express purpose of token price control."[51]

---

[49] Id. at 302.
[50] Id. at 99.
[51] Id., citing Nolan, Connor, Slack (May 29, 2020).

73.    Often this tactic was used to offset the price drops caused by Mashinsky selling large amounts of his CEL tokens.  For instance, in January 2021, one of Mahsinsky's companies began selling off so much CEL that Celsius had to increase the size of its resting orders to protect the CEL price from "'drop[ping] like a stone,'" essentially buying back what Mashinsky was selling and letting Mashinsky reap the profit created thereby.[52]

74.    Celsius also began using its over-the-counter trading desk to buy CEL in order to make CEL more attractive to investors.  As the Examiner concluded, "the amount of CEL purchased and the price involved were secondary concerns.  The primary goal was to 'always . . . buy at le[ast] as much to keep the OTC flywheel alive and to rescue CEL from large sellers if needed.'"[53]  Because the value of Celsius was so closely linked to the value of the CEL token, the goal was to "keep the FOMO flywheel spinning" apparently no matter how costly the strategy was to Celsius.[54]

75.    Despite the leadership-acknowledged strategy Celsius was using to prop up the price of its own token, Celsius failed to disclose the millions of dollars it was spending to keep its so-called "flywheel" going and maintain the appearance of CEL's and Celsius' market value. On March 21, 2021, Mr. Treutler told Ms. Urata-Thompson and Mr. Nolan in a Slack conversation that "Just to clarify between us three: the last 3-4 months we bought always more CEL than what we pay as interest per week but we did not buy it for the interest payments, that was just what we told the community."[55]  Clearly, Celsius was intent on misleading the market, its then existing customers, and trying to attract new customers in order to maintain the appearance that Celsius was financially strong.

---

[52] Id. at 101 quoting Treutler, Johannes, Slack (January 7, 2021) at 1.
[53] Id. at 102-03, quoting Treutler, Johannes, Slack (November 30, 2020) at 1.
[54] Id. at 105, quoting Treutler, Johannes, Slack (November 22, 2020) at 1.
[55] Id. at 108, quoting Treutler, Johannes, Slack (March 21, 2021).

76. Upon information and belief, Celsius implemented its CEL purchasing strategy by using assets from its general wallets, which contained commingled customer deposits.

**Personal Gain: Mashinsky, Leon and Goldstein**

77. Between 2018 and the date Celsius filed for bankruptcy relief, top Celsius managers manipulated the price of CEL tokens for their own personal gain. According to the Examiner, during that time, Mashinsky either directly sold or swapped at least 25.1 million CEL for at least $68.7 million; co-founder, Goldstein either directly sold or swapped at least 2.5 million CEL for at least $2.8 million, and co-founder Leon either directly sold or swapped at least 2.6 million CEL for at least $9.74 million.[56]

78. Despite repeatedly assuring customers that he was not a seller of CEL tokens, Mashinsky regularly sold CEL tokens.

79. By mid-May 2022, Celsius was rewarding Celsius employees (including Mashinsky) with CEL tokens, then using millions of customer-deposited coins to buy back those same CEL tokens from these employees. In an April 13, 2022 Slack channel discussion between Mr. Tappen and former Chief Financial Officer, Mr. Chris Ferraro, Mr. Ferraro clarified that "we pay in CEL then we buy back what they sell?" and Mr. Tappen responded, "Correct . . . we are using users USDC to pay for employees worthless CEL . . . All because the company is the one inflating the price to get the valuations to be able to sell back to the company."[57]

80. Celsius employees and co-founders were secretly trading in CEL tokens at the same time that they were making material misrepresentations to the market about their buying and selling activities in order to manipulate the market price of CEL for their own personal gain.

---

[56] Id. at 321.
[57] Id. at 323-24 quoting Celsius, Slack between Tappen, Dean and Ferraro, Chris (April 13, 2022).

**Using New Deposits to Pay Rewards to Old Customers**

81.    Upon information and belief, by 2021, Celsius was using new and existing customer assets to fund operating expenses and pay rewards to existing customers.

82.    As early as August 2020, Celsius managers suspected that Celsius was dipping into customer accounts to cover the full cost of its expensive CEL buyback program.  Ms. Urata-Thompson stated that, prior to Celsius' 2020 equity raise, she was "'nervous'" about CEL purchases because "'technically we were using customer money right?" given that Celsius was "'in deficit. . . and we will remain [in] deficit for probably like a year to come.'"[58]

83.    Later, in early 2021, Celsius learned that it had a significant coin shortage in BTC and ETH, because Celsius had been using customer-deposited BTC and ETH to buy back CEL on the secondary market but had not tracked and accounted for the shortfall.[59]  To cover the deficit, Celsius again dipped into customer accounts using customer-deposited stablecoins to buy BTC and ETH on the open market.  Now, instead of having a deficit in BTC and ETH coins, Celsius had a deficit in customer-deposited stablecoins.[60]  As an internal memorandum from March 6, 2021 advised in explaining the situation, "'SAID MORE BLUNTLY, CELSIUS USED CUSTOMER FUND[S] TO BUY CEL TOKEN.'"[61]

84.    Other coin shortfalls were also discovered.  Mr. Nolan identified CEL buybacks and Celsius reward rates as the two primary reasons for these shortfalls.[62]

85.    Yet Celsius continued to pay CEL rewards to its existing customers.

---

[58] Id. at 305, quoting Urata-Thompson, Harumi, Slack (August 5, 2020) at 3.
[59] Id. quoting Examiner Interview of Dean Tappen (January 17, 2023).
[60] Id. at 326 citing Deposition of Chris Ferraro (November 21, 2022, at 95-97; 96:17-23; Examiner Interview of Dean Tappen (January 17, 2023); Examiner Interview of Connor Nolan (January 12, 2023); Examiner Interview of Roni Cohen-Pavon (December 29, 2023).
[61] Id. at 307, quoting Celsius, Internal Company Document (March 6, 2021) (emphasis in the original).
[62] Id. at 306, citing Examiner Interview of Connor Nolan (January 12, 2023).

86.     Moreover, as the crypto markets began to fall in 2022, Celsius found itself with significantly less liquid assets than it needed to pay its obligations.  According to the Examiner's calculations, by mid-April 2022, Celsius had liquid assets sufficient to meet only 54.5% of its total liabilities, yet it continued to pay rewards.[63]

87.     On April 29, 2022, Mr. Tappen described Celsius' practice of "'using customer stable coins'" and "'growing short in customer coins'" to buy CEL as "'very ponzi like.'"[64] Later, when explaining to the Examiner why he considered the money being used to buy back CEL tokens was user money, he said that, at the time, Celsius had a " 'negative equity position'" and so, any time you use funds, you are using " 'user funds, [because Celsius] won't be using the company money because there is no company money if you have negative equity.'"[65]

88.     On May 16, 2022, Jason Perman, former Celsius Vice President of Treasury, wrote in a Slack conversation that Celsius had "'paid more in rewards than gross rev[enues].'"[66] Celsius was continuing to dig a financial hole from which it would never emerge, yet it continued to pay rewards and mislead the public that it was financially sound.

89.     Based on the foregoing, from at least the spring of 2021, Celsius was insolvent, was paying rewards to existing customers from assets that were not generated by business operations but from other customer accounts and was operating its business as a Ponzi scheme.

## COUNT I

**(Declaration that the Defendants Operated Celsius as a Ponzi Scheme -
28 U.S.C. § 2201, 11 U.S.C. §105(a) and Bankruptcy Rules 7001(2) and (9))**

90.     Plaintiff repeats and realleges the paragraphs above as if fully stated herein.

---

[63] Id. at 288.
[64] Id. at 308, quoting Tappen, Dean Slack (April 29, 2022) at 2.
[65] Id. at 308, quoting Examiner Interview of Dean Tappen (January 17, 2023).
[66] Id. at 299, quoting Perman, Jason, Slack (May 16, 2022) at 1.

91.     From their inception, the Defendants promised unrealistically high reward rates to lure customers to the Defendants' cryptocurrency platform regardless of whether the Defendants generated sufficient yield to pay such rewards.

92.     From at least 2021, Celsius operated at a significant loss as it was never able to generate sufficient yield on the deployment of its crypto assets to cover business expenses and pay the unrealistically high rewards it promised its customers.

93.     To cover up its lack of profitability and/or revenue, Celsius spent millions of dollars manipulating the price of its native CEL token to make the company appear more profitable than it was, all to the detriment of the company.

94.     While Celsius' business suffered significant losses from the CEL market manipulation, former Celsius management reaped huge personal profits as a result of the manipulation strategy.

95.     From its inception, Celsius had materially inadequate operational controls, risk management policies, accounting and tracking capabilities, and reporting functions so that management was unable to track profitability or manage its risk.

96.     Despite its financial distress, Celsius and its former management, specifically Mashinsky, made public misrepresentations, upon which creditors relied, as to the Defendants' financial condition, the safety and risk of their investment strategies, the fact that their loan portfolio included a substantial number of uncollateralized loans, and the creditworthiness of the counterparties with which they were doing business, all to lure new customers into making deposits of crypto assets with Celsius and to prevent existing customers from withdrawing their assets from Celsius.

97.     As Celsius' user growth increased and it relied more and more on risky investments, it was less able to pay its growing reward obligations and, by 2021, fell further and further into debt.

98.     From at least 2021, Defendants' businesses were insolvent.

99.     From at least the spring of 2021, Celsius used customer assets to remedy coin deficits and operating losses, including payment of reward obligations.

100.     From at least 2022, as Celsius was able to generate less and less yield on deployment of its assets, Celsius used new customer deposits to pay rewards to old customers.

101.     There is an actual controversy regarding whether, since the spring of 2021, the Defendants operated their businesses as a Ponzi scheme, the resolution of which bears significantly on the treatment of claims and other stakeholders' interests in these Chapter 11 Cases, and, accordingly, a declaratory judgment finding that Celsius' business operated as a Ponzi scheme from at least the spring of 2021 is warranted under section 2201(a) of the Declaratory Judgment Act, section 105(a) of the Bankruptcy Code, and Bankruptcy Rules 7001(2) and (9).

## <u>COUNT II</u>

**(Declaration that the Defendants Should be Substantively Consolidated**
**for Purposes of the Chapter 11 Cases**
**28 U.S.C. § 2201, 11 U.S.C. §105(a) and Bankruptcy Rules 7001(2) and (9)**

102.     Plaintiff repeats and realleges the paragraphs above as if fully stated herein.

103.     Upon information and belief, from at least the spring of 2021 through the Petition Date, Defendants operated the Celsius business as a single, integrated enterprise.

104.     There is substantial identity of ownership interests among all of the Celsius entities.

25

105.    There is a substantial overlap among the management of the various Celsius entities.

106.    Upon information and belief, Defendants operated the Celsius business as a single enterprise with an absence of corporate formalities and a disregard for the corporate separateness of the Celsius identities.

107.    Upon information and belief, since at least the spring of 2021, the Celsius enterprise was inadequately capitalized and was insolvent.

108.    Mashinsky ordered the market manipulation of the price of the CEL token so that he, Leon, and Goldstein, among others, could, and did, withdraw funds from Celsius for their own personal gain at the expense of the company.

109.    Upon information and belief, the Defendants, prepetition, commingled funds between and among all of the Celsius entities and failed to consistently and/or accurately account for intercompany transfers.

110.    Upon information and belief, it is impossible or impractical to separate the assets and liabilities of the various Celsius entities.

111.    Upon information and belief, the Celsius entities have dealt with each other in financial matters at less than arm's length.

112.    There is an actual controversy regarding whether the Defendants operated their businesses in such an integrated and intertwined manner that they should be substantively consolidated for purposes of these Chapter 11 Cases, and, accordingly, a declaratory judgment finding that the Defendants' chapter 11 cases should be substantively consolidated is warranted under section 2201(a) of the Declaratory Judgment Act, section 105(a) of the Bankruptcy Code and Bankruptcy Rules 7001(2) and (9).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment against

Defendants:

(a)    declaring that, as of at least the spring of 2021, the Defendants operated their

businesses as a Ponzi scheme;

(b)    declaring that the Defendants' chapter 11 estates should be substantively

consolidated for purpose of these Chapter 11 Cases;

(c)    declaring that, as a consequence of adjudicating the Defendants' business a Ponzi

scheme, all contracts with the Defendants as of and after the date the Ponzi scheme began,

including without limitation, all Terms of Use, are deemed null and void; and

(d)    granting such other and further relief as is just and proper.

Dated:  March 20, 2023
        New York, New York

**VENABLE LLP**

By:    _/s/ Jeffrey S. Sabin_
       Jeffrey S. Sabin
       1270 Avenue of the Americas, 24th Floor
       New York, New York 10020
       Telephone: (212) 307-5500
       Email: JSSabin@venable.com
       Email: CWeinerLevy@venable.com
       Email: APeled@venable.com

       and

       Andrew Currie (*admitted pro hac vice*)
       600 Massachusetts Avenue, NW
       Washington, DC 20001
       Telephone: (202) 344-4586
       Facsimile: (202) 344-8300
       Email: AJCurrie@venable.com

       *Counsel for Plaintiff*