Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**REPLY IN SUPPORT OF**
**DEBTORS' MOTION FOR ENTRY OF AN ORDER**
**(I) AUTHORIZING AND APPROVING CERTAIN BID PROTECTIONS**
**FOR THE PROPOSED PLAN SPONSOR AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

submit this reply ("Reply") in support of the *Debtors' Motion for Entry of an Order (I) Authorizing*

*and Approving Certain Bid Protections for the Proposed Plan Sponsor and (II) Granting Related*

*Relief* [Docket No. 2085] (the "Motion")[2] and in response to the objections and responses thereto

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion or the Plan Sponsor Agreement (including the Plan Term Sheet), as applicable.

(collectively, the "Objections").[3]  In support of the Motion and this Reply, the Debtors state the

following:

### Preliminary Statement

1.      In the midst of a tumultuous time in the cryptocurrency industry, the Debtors, the

Committee, and NovaWulf entered into the Plan Sponsor Agreement, which sets forth the terms

of a comprehensive restructuring transaction that will provide material going-concern value to the

Debtors' estates and their stakeholders and sets a floor for any higher and better bid for the

Debtors' assets.  A monumental achievement, the proposed NovaWulf transaction contemplates,

among other things:

- the formation of a NewCo that will distribute 100% of its "common" equity to holders of General Earn Claims in the form of Equity Share Tokens ("ESTs");

- provides Management Share Tokens ("MSTs") to holders of General Earn Claims on the Effective Date or as soon as reasonably practicable thereafter (with MST holders being entitled to receive an annual distribution in an amount equal to 50 basis points of NewCo Fee-Paying Asset Value and a 2.5% incentive fee);

---

[3]     The Debtors received five Objections and joinders:  (a) *Objection of the United States Trustee to Debtors' Motion for an Order (I) Authorizing and Approving Certain Bid Protections for Proposed Plan Sponsor and (II) Granting Related Relief* [Docket No. 2218] filed by the United States Trustee (the "U.S. Trustee Objection"); (b) *Joinder and Supplement to Objection of the United States Trustee to Debtors' Motion for an Order (I) Authorizing and Approving Certain Bid Protections for the Proposed Plan Sponsor and (II) Granting Related Relief* [Docket No. 2224] submitted by Ignat Tuganov; (c) *Limited Objection and Reservation of Rights in Connection with the Debtors' Motion for an Order Authorizing and Approving Certain Bid Protections for the Proposed Plan Sponsor* filed by Community First Partners, LLC, Celsius SPV Investors, LP, Celsius New SPV Investors, and CDP Investissements Inc. [Docket No. 2229] (collectively, the "Series B Preferred Holders" and such Objection, the "Series B Objection")); (d) *Preliminary Joinder and Response of the Ad Hoc Group of Borrowers to the Debtors' Motion for an Order (I) Authorizing and Approving Certain Bid Protections for the Proposed Plan Sponsor and (II) Granting Related Relief (ECF Doc. #2151)* [Docket No. 2225] and *Objection of the Ad Hoc Group of Borrowers to the Debtors' Motion for an Order (I) Authorizing and Approving Certain Bid Protections for the Proposed Plan Sponsor and (II) Granting Related Relief (ECF Doc. #2151)* [Docket No. 2256] filed by the Ad Hoc Group of Borrowers; and (e) *Joinder and Supplement to Objection of the United States Trustee to Debtors' Motion for an Order (I) Authorizing and Approving Certain Bid Protections for the Proposed Plan Sponsor and (II) Granting Related Relief and Joinder to Joinder and Supplement Filed by Ignat Tuganov* [Docket No. 2236] filed by Víctor Ubierna de las Heras (the "Ubierna de las Heras Joinder").

- meaningful distributions of the Debtors' Liquid Cryptocurrency to holders of General Earn Claims on the Effective Date or as soon as reasonably practicable thereafter;

- a projected 70% recovery for "convenience class" creditors (who hold General Earn Claims below $5,000 or agree to have their General Earn Claims reduced to $5,000), and proposed settlements for holders of Custody Claims and Withhold Claims; and

- the harvesting and realization of the value of the Debtors' substantial illiquid assets over time for the benefit of the holders of ESTs.

2.      The Debtors and the Committee believe that the proposed NovaWulf transaction presently represents the highest and best option to maximize the value of the Debtors' assets and, to the extent the Break-Up Fee is payable, it will be the result of the Debtors or the Committee electing to use their fiduciary out to pivot to a higher or better transaction.  Furthermore, since the filing of the Motion, the Debtors and the Committee worked collaboratively with NovaWulf to improve the terms of the Bid Protections.  As a result, NovaWulf *agreed to lower the cap of the aggregate amount of the Expense Reimbursement from $15 million to $13 million*.

3.      The revised terms are only one example of the effective partnership built among the Debtors, the Committee, and NovaWulf over the last four months.  Far from a straightforward undertaking, the Debtors, the Committee, and NovaWulf have expended significant time and resources laying the groundwork for NewCo's operational, regulatory, and reporting infrastructure amidst uncertain regulatory and market environments.  Much of this groundwork would be necessary in any alternative transaction contemplated and/or implemented by the Debtors as part of these chapter 11 cases and thus provides significant value to the Debtors' estates, regardless of whether the Restructuring Transactions with NovaWulf are consummated.  Specifically, NovaWulf has spent thousands of hours, at substantial financial expense and significant opportunity cost, in connection with, among many other things, the following:

- engaging with the Debtors' management, the Committee, and their respective advisors, often on a daily basis for several hours, to discuss issues related to NewCo;

- negotiating agreements with partners, including Figure, Provenance, and Anchorage, to ensure NewCo has the regulatory and operational infrastructure in place to facilitate distributions to account holders and operate and manage the Debtors' illiquid assets;

- working to implement information technology and data management systems to track NewCo's cryptocurrency positions;

- developing a new front-end platform for NewCo's customer-facing businesses, including a wallet feature;

- preparing new financial systems;

- developing a standalone business plan for mining and staking, including further vertical integration of the mining business and a strategy for insourcing the staking business;

- providing experienced leadership and recruiting new management team executives, both of which would otherwise require a protracted and costly personnel search;

- advising on go-forward risk management issues with respect to (a) philosophy and controls and (b) systems available;

- engaging in dialogue with the buy-side community on the repositioned NewCo and ESTs;

- preparing NewCo to be a public company; and

- working to establish and strengthen the corporate and organizational structure of NewCo.

Furthermore, most of the actual costs of the above activities are non-reimbursable. Only the reasonable out-of-pocket and documented expenses are eligible for reimbursement, subject to the aggregate $13 million cap. The Expense Reimbursement does not compensate NovaWulf for its time nor for the value contributed to the Debtors' estates.

4.      Consequently, evaluating the Bid Protections against NovaWulf's $45 million cash contribution disregards the substantial value NovaWulf is providing, and will continue to provide,

4

to the Debtors' estates by sponsoring the proposed chapter 11 plan.  The *sui generis* and complex structure of the Restructuring Transactions requires a more nuanced analysis of the value of the Bid Protections, and a comparison to other sale transactions misses the mark for the obvious reason that the transaction contemplated by the Plan Sponsor Agreement is ***not a sale***—the transaction contemplates the formation of a NewCo that is owned by ***account holders***, not NovaWulf.

5.      The Plan Sponsor Agreement also benefits the Debtors and their estates in various ways.  Notably, the Plan Sponsor Agreement provides a floor for the Debtors to seek out a higher or better alternative transaction.  Importantly, under the proposed Plan, NewCo is targeting the distribution of meaningful cryptocurrency to account holders shortly after emergence, as opposed to a future, uncertain date under an alternative transaction structure.  While not easily quantifiable, these benefits provide immense substantive value to the Debtors' estates and their stakeholders. Indeed, the Committee, Ad Hoc Group of Custodial Account Holders, the Ad Hoc Group of Withhold Account Holders, and an overwhelming majority of *pro se* creditors, collectively comprising most of the Debtors' significant economic stakeholders, did not object to the Bid Protections.

6.      Additionally, the Debtors and the Committee have reached an agreement in principle with the Ad Hoc Group of Borrowers on modifications to the treatment of the retail loans under the NovaWulf proposal, which the parties will work to document and make public in the coming days.  These agreed modifications resolve the objection of the Ad Hoc Group of Borrowers to the Motion.

7.      The other Objections that were filed primarily fall into three categories:  ***first***, the Objections argue the Bid Protections are outside the market for such bid protections. The U.S. Trustee Objection—a non-economic stakeholder—and the Series B Objection—a currently

out-of-the-money stakeholder[4]—complain about the cost of the Bid Protections while making the

same inapposite comparison they allege the Debtors make.  These Objections erroneously evaluate

the reasonableness of the Bid Protections against NovaWulf's $45 million cash consideration by

wrongly assuming the cash consideration is equivalent to the purchase price of a sale transaction.

Not so.  As discussed herein, the Debtors, the Committee, NovaWulf, and each party's respective

advisors, in negotiating the Plan Sponsor Agreement, carefully created the architecture for a unique

and complex transaction that provides going-concern value for the Debtors' estates and

stakeholders and addresses numerous complex legal and regulatory issues.    Furthermore,

NovaWulf has incurred, and is continuing to incur, substantial time and expenses related to

creating NewCo.  Many of the expenses incurred by NovaWulf on behalf of NewCo would be

necessary in any alternative transaction.  Far from being a run-of-the-mill sale transaction, the

proposed Restructuring Transactions provide for a fully regulatory-compliant NewCo to distribute

to holders of General Earn Claims a meaningful amount of the Debtors' Liquid Cryptocurrency

while also providing the upside value generated from the successful management of the Debtors'

illiquid assets over time.  The Debtors' stakeholders are projected to do worse under alternative

transaction structures, even an Orderly Wind-Down.

8.        **Second**, the Objections demand that the Debtors explain how the Court's Claims

Opinion [5] affects the Restructuring Transactions.    While not a direct objection to the Bid

Protections, to be clear, the Debtors believe that the Claims Opinion does not affect the trajectory

of the Debtors' proposed Plan or timeline.  For example, the Plan Term Sheet contemplates the

---

[4]    Notwithstanding the Claims Opinion (as defined herein), the Debtors do not believe the Series B Preferred
Holders are entitled to any value from the Debtors' assets.

[5]    *See Memorandum Opinion Regarding Which Debtor Entities Have Liability for Customer Claims Under the
Terms of Use* [Docket No. 2205] (the "Claims Opinion").

substantive consolidation of Debtors Celsius Network Limited ("CNL") and Celsius Network
LLC, and/or the allowance of an Intercompany Claim owing from CNL to Celsius Network LLC
of not less than $3.5 billion. Indeed, the Claims Opinion expressly contemplates the possibility
that the Series B Preferred Holders are nonetheless entitled to no recovery.[6] In other words, the
Claims Opinion is not expected to alter the Debtors' proposed Plan, which, in any event, is not an
issue to be decided in connection with the Bid Protections.

9.    ***Third***, the Objections prematurely object to certain disclosure statement and plan
confirmation issues. *See, e.g.*, U.S. Trustee Objection at 2 ("[A]dditional information is warranted
regarding the Management Fee, the Incentive Fee, and the distribution of Liquid Cryptocurrency .
. . to account holders."); Series B Objection, ¶¶ 7–11 (objecting generally to plan issues, including
intercompany claims and substantive consolidation); Ubierna de las Heras Objection, ¶¶ 6–8
(requesting that the Debtors address plan issues, including treatment of customers in unsupported
jurisdictions and calculation of claims). None of these issues related to the Debtors' yet-to-be-
filed chapter 11 plan are ripe for argument today. To be clear, the Motion is ***not*** seeking approval
of any of the Restructuring Transactions at this time. Parties in interest will have the opportunity
to voice their concerns regarding any proposed plan at the appropriate times at the disclosure
statement hearing and the confirmation hearing.

10.    Accordingly, for the reasons set forth above and herein, providing the Bid
Protections is a sound exercise of the Debtors' business judgment and should be approved.

---

[6]    *See* Claims Opinion at 3 n.1 ("Not addressed in this Opinion are two arguments that could reduce or eliminate
entirely any recovery for the Series B Preferred Equity holders, even if they prevail on the terms of use contract
interpretation issue, and thereby increase recoveries for [Celsius Network] LLC's Customers.").

**Reply**

I.      **The Break-Up Fee and Expense Reimbursement Are Fair and Reasonable Under the Circumstances and a Sound Exercise of the Debtors' Business Judgement.**

11.      As described in the Motion and the Plan Sponsor Agreement, the Bid Protections were a material inducement for, and a condition of, NovaWulf's execution of the Plan Sponsor Agreement, absent which NovaWulf would be unwilling to serve as Plan Sponsor.  Put another way, the proposed Bid Protections are necessary to preserve the "bird in the hand" the Debtors have with the proposed NovaWulf transaction.  Furthermore, the Bid Protections are only payable under limited circumstances, all of which were subject to intense negotiation among the Debtors, the Committee, and NovaWulf.  The Break-Up Fee is payable only in the narrow circumstances where the Debtors or the Committee terminate the Plan Sponsor Agreement pursuant to their "fiduciary out" to pursue a "higher or better" restructuring transaction *or* the Debtors are in material breach of the Plan Sponsor Agreement.  The Expense Reimbursement only entitles the Plan Sponsor and Plan Sponsor Advisors reimbursement for reasonable and documented out-of-pocket fees in the event of certain Termination Events or if the Debtors pivot to an Orderly Wind Down, subject to an aggregate $13 million cap as set forth in Section 13.01 of the Plan Sponsor Agreement.  To be clear, the payment of the Expense Reimbursement is only triggered in the event that the Restructuring Transactions are not effectuated.  In the event that the Restructuring Transactions are effectuated, pursuant to the terms of the Management Agreement, NovaWulf and its advisors may be entitled to payment or reimbursement of their expenses from NewCo after the Effective Date for costs incurred on account of establishing the operational, regulatory, and reporting infrastructure for NewCo, subject to an aggregate $13 million cap.  For the avoidance of doubt, the payment and reimbursement of expenses contemplated by the Management Agreement is not duplicative with the Expense Reimbursement contemplated by the Bid Protections and as

8

requested by this Motion.  The Expense Reimbursement is *only* payable if a Termination Event occurs.   Whereas, NovaWulf would *only* be entitled to expense reimbursement under the Management Agreement (an agreement to be entered into between NewCo and NovaWulf after closing) in which case the Expense Reimbursement would *not* be payable.

12.     The Break-Up Fee and Expense Reimbursement are fair and reasonable under the circumstances, and the Debtors' agreement to provide such Bid Protections is a sound exercise of their business judgment.  *First*, as noted in in the U.S. Trustee Objection,[7] the quantum of the Bid Protections cannot be adequately assessed solely in reference to the Management Contribution because the Management Contribution is not conventional consideration that would be typically contributed in a sale transaction.  Whereas bid protections, including break-up fees, are often assessed as a percentage of a stalking horse bid, the NovaWulf proposal is not structured as a sale transaction where it is merely buying the Debtors' assets.  Indeed, NovaWulf is not acquiring *any* of the Debtors' assets; rather, the Restructuring Transactions contemplate that (a) a significant portion of the Debtors' Liquid Cryptocurrency will be distributed to the Debtors' creditors on the Effective Date (or as soon as reasonably practicable thereafter) and (b) the Debtors' illiquid assets will be contributed to NewCo, an entity whose "common" interests will be 100% held by holders of General Earn Claims.  The Restructuring Transactions and their unique structure currently offer the optimal path towards maximizing the value of the Debtors' liquid and illiquid assets, while meeting the significant regulatory hurdles required to emerge from chapter 11 as a fully regulatory compliant, publicly traded NewCo, with the Debtors' customers being NewCo's equity holders.

---

[7]     U.S. Trustee Objection at 2 ("Given that there is not a conventional sale price, there should be further explanation of how the $5 million breakup fee was determined, and whether the expense reimbursement of $15,000,000 will be augmented by an additional $15,000,000 under the Management Agreement if the Plan Sponsor Agreement is implemented.").

13.     While the purchase price of a debtor's assets or business might at first glance be an apt analogy to the cash consideration NovaWulf has committed to provide—namely, $45 million—such consideration is distinguishable from a purchase price because it does not entitle NovaWulf to the Debtors' assets.  Indeed, as discussed above, under the Plan Sponsor Agreement, NovaWulf is not purchasing any of the Debtors' assets.  Instead, NovaWulf is effectively acquiring the right to serve as the Manager of NewCo, the entity that will effectuate the Debtors' customer-owned reorganization.  Consequently, measuring the Bid Protections in reference to the $45 million contribution from NovaWulf is an inappropriate means of assessment.

14.     ***Second***, the $45 million contribution from NovaWulf is only a portion of the significant investment NovaWulf has made, and will continue to make, in the Debtors' go-forward business.  To date, NovaWulf has spent approximately $2.5 million and expects to expend an additional $4.5 million (excluding legal fees and expenses) to help build NewCo's operational and technological infrastructure.  Unlike the typical expenses incurred under a traditional sale transaction, however, some of the costs incurred by NovaWulf to establish NewCo will be preserved for the benefit of the Debtors' creditors even if the Debtors terminate the NovaWulf transaction.  Such contributions include significant time spent establishing the operational, regulatory, and reporting infrastructure for NewCo.  Simply put, NovaWulf must incur substantial expenses to be in a position to operate NewCo following emergence from chapter 11 for the benefit of the Debtors' customers, and NovaWulf should be reimbursed for these expenses.

15.     Moreover, an Orderly Wind Down  would burden the Debtors' estates with numerous additional costs that are otherwise avoided by pursuing the NovaWulf transaction. The costs to be incurred by NovaWulf over the coming months are required for NewCo to be operational on the Effective Date, which enhances creditor recoveries and expedites distributions.

With time being of the essence, the alternative would be for NovaWulf to spend the weeks and

months after Plan confirmation operationalizing NewCo, which would unnecessarily delay and

reduce the value returned to the Debtors' account holders.   What is more, NovaWulf has

contributed substantial value to the Debtors by sharing their wealth of operational expertise

garnered from years of effectuating complex turnarounds and through the countless hours spent

collaborating and working on core strategic issues with the Debtors' management team, which has

come at a significant opportunity cost to NovaWulf.

16.     ***Third*,** NovaWulf has made clear that it would be unwilling to proceed with the

Plan Sponsor Agreement without the Bid Protections.  The Debtors, in an exercise of their sound

business judgement, and the Committee, which has executed the Plan Sponsor Agreement, have

determined that the Plan Sponsor Agreement offers a value-maximizing transaction to the benefit

of all creditors of their estates, and offers significant incremental value relative to the other

proposed transactions or an Orderly Wind Down.   NovaWulf has expressed that the Bid

Protections reflect both the unusually high expenses it is incurring to ensure it can fully

operationalize NewCo on the contemplated timeline and clear the non-insignificant remaining

regulatory, operational, and legal hurdles.  The Bid Protections are therefore commensurate with

the costs to be incurred by NovaWulf on behalf of NewCo, the uniqueness and complexity of the

transaction, and the substantial risk NovaWulf faces as the Plan Sponsor.

17.     The Debtors have thus articulated a sound business judgement pursuant to the

requirements of section 363 of the Bankruptcy Code.  *In re Genco Shipping & Trading Ltd.*,

509 B.R. 455, 464 (Bankr. S.D.N.Y. 2014) (citing *In re Glob. Crossing Ltd.*, 295 B.R. 726, 743

(Bankr. S.D.N.Y. 2003)).  The business judgement rule shields a debtor's decisions from second

guessing.  *See In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) (noting

a "presumption of reasonableness attaches to a debtor's management decisions" and courts will generally not entertain objections to a debtor's conduct after a reasonable basis is set forth); *see also Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (stating "the business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company," and has continued applicability in bankruptcy) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)) (internal quotation marks omitted).  The Debtors, in consultation with the Committee and NovaWulf, developed a transaction structure that they believe benefits all key stakeholders, including, most prominently, the Debtors' account holders, and provides the most value to the Debtors' estates.

18.     As a result—and given the significant time and resources that NovaWulf has devoted, and will continue to devote, to the implementation of the Restructuring Transactions, which have benefitted, and will continue to benefit, the Debtors, their estates, and all stakeholders—the Bid Protections represent a fair and reasonable price that will ultimately produce a confirmable, value-maximizing plan to enable the Debtors to emerge from chapter 11. Accordingly, the Bid Protections are a necessary component of the Debtors' restructuring efforts, are a sound and reasonable exercise of their business judgment, and should therefore be approved.

## II.     The Claims Opinion Does Not Undermine the Debtors' Reasonable Business Judgement in Providing the Bid Protections.

19.     On March 9, 2023, the Court issued the Claims Opinion.  The appropriateness of the Bid Protections is not directly related to the Claims Opinion, nor is the ultimate effect of the Claims Opinion on account-holder recoveries ripe for decision.  Moreover, the Claims Opinion only addressed the limited issue of whether Account Holders may assert contractual claims against

12

CNL pursuant to the terms of use—the Claims Opinion importantly clarifies that Account Holders can assert non-contract claims against CNL.[8]  In any event, despite the Claims Opinion, the Debtors believe that the Series B Preferred Holders will ultimately receive no recovery.  More specifically, the Plan Sponsor Agreement and Plan Term Sheet contemplate (a) the resolution under the Plan of an intercompany Claim owing from CNL to Celsius Network LLC that, to the extent not eliminated via substantive consolidation, shall be allowed in an amount no less than $3.5 billion, and/or (b) the substantive consolidation of CNL and Celsius Network LLC.  In either case, the Debtors expect that account holders' claims will be senior to the rights of the Series B Preferred Holders, who would be, notwithstanding the Claims Opinion, out-of-the-money.

### III.    The Remaining Objections Are Veiled Plan and Disclosure Statement Objections.

20.    The remaining objections are veiled objections to the Debtors' not-yet-filed chapter 11 plan of reorganization and/or disclosure statement.  This is not the appropriate time to assert such objections, nor do such objections apply the appropriate standard to assess the relief that is actually before the Court:  the Debtors' decision to provide NovaWulf with Bid Protections.  The Debtors are ***not*** seeking approval of any Restructuring Transactions at this time, and parties in interest may raise appropriate concerns with the forthcoming disclosure statement and/or plan once filed and at the appropriate times.

21.    For these reasons, as well as the reasons set forth in the Motion, the Bid Protections should be approved and the Objections should be denied.

---

[8]    *See* Claims Opinion at 4 ("[T]he Court finds and concludes that the terms of use do not limit Customers (or the Committee) from asserting non-contract claims against CNL, or against other Debtor or non-Debtor affiliates, such as claims for fraud, negligent misrepresentation, or other statutory or common law claims.")

New York, New York
Dated:  March 22, 2023

/s/ Joshua A. Sussberg
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:           joshua.sussberg@kirkland.com

 - and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:           patrick.nash@kirkland.com
                 ross.kwasteniet@kirkland.com
                 chris.koenig@kirkland.com
                 dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*