**Presentment Date: April 4, 2023, at 12:00 p.m. (prevailing Eastern Time)**
**Objection Deadline: April 3, 2023, at 12:00 p.m. (prevailing Eastern Time)**

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

**NOTICE OF FILING OF STIPULATION AND AGREED ORDER REJECTING TERMS AND CONDITIONS BY AND BETWEEN THE DEBTORS AND CHAINALYSIS INC.**

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "Debtors") and Chainalysis, Inc., on behalf of itself, its parent, subsidiaries, and affiliates ("Chain") will present the *Joint Stipulation and Agreed Order Rejecting Terms and Conditions By and Between the Debtors and Chainalysis, Inc.* (the "Stipulation and Order") to the Honorable Martin Glenn, Chief United States Bankruptcy Judge, for approval and signature on April 4, 2023, at 12:00 p.m., prevailing Eastern Time.

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections to the relief requested in the Stipulation and Order shall: (a) be in writing; (b) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York; (c) be filed electronically with the Court on the docket of In re Celsius Network LLC, No. 22-10964 (MG) by registered users of the Court's electronic filing system and in accordance with all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York (which are available on the Court's website at http://www.nysb.uscourts.gov); and (d) be served in accordance with the *Amended Final Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief* [Docket No. 1181] (the "Case Management Order") by **April 3, 2023, at 12:00 p.m., prevailing Eastern Time**, (the "Objection Deadline"), on (i) the entities on the Master Service List available on the case website of the Debtors at https://cases.stretto.com/celsius and (ii) any person or entity with a particularized interest in the subject matter of the Stipulation and Order.

**PLEASE TAKE FURTHER NOTICE** that if no objections or other responses are timely filed and served by the Objection Deadline with respect to the Stipulation and Order, the Debtors shall, on the Presentment Date, submit the Stipulation and Order to the Court, which order the Court may enter without further notice or opportunity to be heard.

**PLEASE TAKE FURTHER NOTICE** that if a written objection is timely filed, the Court will notify the moving and objecting parties of the date and time of the hearing and of the moving party's obligation to notify all other parties entitled to receive notice. The moving and objecting

parties are required to attend the hearing, and failure to attend in person or by counsel may result in relief being granted or denied upon default.

**PLEASE TAKE FURTHER NOTICE** that copies of the Stipulation and Order and other pleadings filed in the above-captioned chapter 11 cases may be obtained free of charge by visiting the website of Stretto at http://www.cases.stretto.com/celsius. You may also obtain copies of any pleadings by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

[*Remainder of page intentionally left blank*]

New York, New York
Dated: March 27, 2023

*/s/ Joshua A. Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: jsussberg@kirkland.com

\- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: patrick.nash@kirkland.com
ross.kwasteniet@kirkland.com
chris.koenig@kirkland.com
dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

**Exhibit A**

**Proposed Order and Stipulation**

**STIPULATION AND AGREED ORDER
REJECTING TERMS AND CONDITIONS
BY AND BETWEEN THE DEBTORS AND CHAINALYSIS INC.**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through their undersigned counsel, and Chainalysis Inc., on behalf of itself, its parent, subsidiaries, and affiliates, ("Chain," and together with the Debtors, the "Parties"), by its undersigned counsel, hereby enter into this stipulation and agreed order (this "Stipulation") rejecting the Terms and Conditions dated September 3, 2019 (the "T&C") and any other amendments and riders thereto, a copy of which is attached hereto as **Exhibit A**, as set forth below.

**RECITALS**

**WHEREAS**, on July 13, 2022, each of the Debtors filed for protection pursuant to Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

**WHEREAS**, the Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS**, on August 17, 2022, the Bankruptcy Court entered the revised *Order (I) Authorizing and Approving Procedures to Reject or Assume Executory Contracts and Unexpired Leases and (II) Granting Related Relief* [Docket No. 517] (the "Order");

**WHEREAS**, Chain is either authorized to enter into this Stipulation as the counterparty to the T&C or for and on behalf of itself, or any owner, operator, and/or manager, and each of the Debtors are authorized to enter into this Stipulation as a counterparty to the T&C or for and on behalf of itself, any owner, operator and/or manager;

**WHEREAS**, the Debtors have determined in the exercise of their reasonable business judgment to reject the T&C;

**WHEREAS**, the Debtors have authority under the Order to reject the T&C;

**WHEREAS**, the Parties desire to reject the T&C effective as of the filing of this Stipulation, and

**WHEREAS**, the Parties desire to resolve any and all issues with respect to the rejection of the T&C and establish effective date of rejection of the T&C.

**NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED, AND UPON APPROVAL BY THE COURT OF THIS STIPULATION AND ORDER, IT IS SO ORDERED AS FOLLOWS:**

1. The Parties represent and warrant that they have full authority to enter into this Stipulation and to consummate the transactions provided by this Stipulation.

2. The recitals stated above are incorporated by reference as if fully set forth herein. This Stipulation constitutes the entire agreement of the Parties.

3. The T&C shall be deemed rejected pursuant to section 365(a) of the Bankruptcy Code effective as of the filing of this Stipulation (the "Rejection Date").

4. Chain hereby waives any prepetition claims for damages and any claims for damages arising as a result of the rejection of the T&C. Notwithstanding the foregoing, the Debtors agree to pay $28,222.22 in full and final satisfaction of all remaining obligations owed to Chain under the T&C.

5. Each party fully, finally, and forever releases and discharges the other party, their estates, and their property or their successors, of and from any and all claims, debts, demands, actions, causes of actions, suits, controversies, proceedings, accounts, covenants, agreements, promises, judgments, executions, damages, attorneys' fees, costs (including out-of-pocket expenses, court costs, and expert witness fees), and any other liabilities of any nature whatsoever arising under the T&C and/or as a result of the rejection, whether sounding in contract, tort, or otherwise, whether matured or unmatured, accrued or unaccrued, liquidated or unliquidated,

absolute or contingent, known or unknown, whether now existing or that might arise hereafter.

6. This Stipulation may be executed in multiple counterparts, any of which may be transmitted by facsimile, and/or PDF and each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

7. This Stipulation constitutes the entire agreement between the Parties in respect of the subject matter hereof and shall not be modified, altered, amended, or vacated without the prior written consent of all Parties hereto.  No statement made or action taken in the negotiation of this Stipulation may be used by any party for any purpose whatsoever.

8. Each Party represents and warrants to the other Party that it:  (a) made this Stipulation freely and voluntarily and with full knowledge of its significance; and (b) has been represented by counsel of its own choice in the negotiations preceding the execution of this Stipulation and in connection with the preparation and execution of this Stipulation.

9. The Parties acknowledge that they have participated in and jointly consented to the drafting of this Stipulation and that any claimed ambiguity shall not be construed for or against either Party on account of such drafting.

10. Upon the Rejection Date, each Party stipulates and agrees that no Party has any further obligations under the T&C other than those specified in paragraph 4 of this Stipulation.

11. This Stipulation shall be binding on and inure to the benefit of the Parties and their respective heirs, executors, administrators, successors, and permitted assigns.

12. Neither this Stipulation nor any right or interest hereunder may be assigned in whole or in part by either of the Parties without the prior consent of the other Party.

13. Chain and the Debtors are authorized to take all actions necessary to effectuate the relief requested in this Stipulation.

14. This Stipulation shall not become effective unless and until it is approved by the Bankruptcy Court.

15. The Bankruptcy Court shall retain jurisdiction to interpret, enforce, and resolve any disputes arising under or related to this Stipulation. Any motion or application brought before the Bankruptcy Court to resolve any dispute arising under or related to this Stipulation shall be brought on proper notice in accordance with the relevant Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court.

16. Nothing in this Stipulation, whether express or implied, shall be construed to give to any person or entity other than the Parties any legal or equitable right, remedy, interest, or claim under or in respect of this Stipulation.

17. Notwithstanding the possible applicability of Bankruptcy Rule 6004, 7062, and 9014, or otherwise, the terms and conditions of this Stipulation shall be effective and enforceable immediately upon entry.

New York, New York
Dated: ____________, 2023

______________________________________

THE HONORABLE MARTIN GLENN
CHIEF UNITED STATES BANKRUPTCY JUDGE

**STIPULATED AND AGREED TO ON MARCH 27, 2023:**

*/s/ Joshua A. Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: jsussberg@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: patrick.nash@kirkland.com
ross.kwasteniet@kirkland.com
chris.koenig@kirkland.com
dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

*/s/ Jeffrey A. Reich*

**REICH, REICH & REICH P.C.**
Jeffrey A. Reich
235 Main Street, Suite 450
White Plains, NY 10601
(914) 949-2126
jreich@reichpc.com

*Counsel to Chainalysis, Inc.*

Pg 11 of 19

**Exhibit A**

6

**CHAINALYSIS KYT ORDER FORM**

THESE TERMS AND CONDITIONS (THE "**TERMS**") GOVERN THE USE OF AND ACCESS TO THE SOFTWARE-AS-A-SERVICE BLOCKCHAIN TRANSACTION MONITORING ANALYSIS PLATFORM (THE "**SERVICE**") MADE AVAILABLE BY CHAINALYSIS, INC. ("**CHAINALYSIS**"). BY EXECUTING AN ORDER FORM REFERENCING OR ATTACHED TO THESE TERMS, YOU (THE "**LICENSEE**") AGREE TO BE BOUND BY THESE TERMS AND THE ORDER FORM (COLLECTIVELY, THE "**AGREEMENT**").

**BACKGROUND**

Chainalysis has developed a proprietary software-as-a-service offering through which it makes available various authentication, risk assessment, and other solutions related to blockchain transactions (the "**Service**"). The Service may be accessed through Chainalysis' Application Programming Interface (the "**API**") or Authorized User (as defined below) credentials. Unless otherwise set forth below or the context requires otherwise, all references to the Service include the API.

Subject to the following terms and conditions and any limits in the applicable Order Form, Chainalysis agrees to provide Licensee with a license to the Service for the purposes set forth herein, and to provide additional services as indicated on the Order Form, if applicable.

**TERMS AND CONDITIONS**

**1. LICENSE RIGHTS AND RESTRICTIONS.**

**(a) Grant.**

(i) Subject to the terms and conditions of this Agreement, Chainalysis hereby grants Licensee a nonexclusive, nontransferable license to (A) access and use the elements of the Service identified on the Order Form during the Term (as defined in Section 3(a)) for the purpose of analyzing digital assets transactions related to Licensee's business or operations; and (B) provide Licensee's customers or partners with analysis or output from the Service as part of Licensee's standard compliance operations.

(ii) The license granted in this Section 1(a) includes the right to (1) make and use a reasonable number of copies of any written or online descriptions of the functionality, technical requirements, or use of the Service provided by Chainalysis (collectively, "**Documentation**"), and (2) use any modifications, improvements, bug fixes, or other new versions of the Service made available to all Chainalysis customers as part of a standard subscription at no additional cost (each, an "**Update**"), as and when each Update is made available. Updates are applied automatically to the Service, but may need to be configured with respect to the API. For the sake of clarity, Updates include new versions of the Service that Licensee has ordered under the Order Form and these Terms, but elements of the Service that are sold separately and that Licensee has not ordered, or that may be added to the Service following the Service Start Date, are subject to Section 1(c) below.

**(b) Restrictions**. Licensee agrees that it will not: (i) use the Service for any illegal or unauthorized purpose or in any manner that damages or interferes with the Service's operation; (ii) remove any copyright, trademark or other proprietary rights notices contained in or on the Service or any reports or outputs thereof; (iii) sublicense, sell, lease (including on a service bureau basis), share, or transfer the Service or make it available to anyone except for Authorized Users (as defined below); (iv) separately extract and provide or otherwise use data from the Service except as made available as part of the Service's normal functions; (v) modify, create derivative works of, reverse engineer, reverse compile, decompile or disassemble the API, Service, or any

elements thereof (except as this restriction (v) is prohibited by applicable law); (vi) use or access the Service for competitive or benchmarking purposes; (vii) circumvent any security measures or use restrictions in the Service; or (viii) attempt to do any of the foregoing. If Licensee or any Authorized User violates these restrictions or any other provision of this Agreement, Chainalysis may suspend or block Licensee's or such Authorized User's access to the Service.

**(c) Additional Features**. Chainalysis may make additional Service features or modules (each, an "**Add-On**") available for an additional fee during the Term. Add-Ons are not required for the proper functioning of any Service already ordered and will be made available to Licensee as and when made available to other Chainalysis customers. If Licensee enters into a modified order form to include any additional features, any Updates to such features will be included in the license. Any Add-On will be reflected in an additional or modified Order Form executed by Chainalysis and Licensee.

**2. USE OF THE SERVICE.**

**(a) Chainalysis Responsibilities.**

(i) **Support**. Chainalysis will (A) use commercially reasonable efforts to promptly resolve issues with the Service reported by email to support@chainalysis.com, (B) provide Licensee with all Updates, and (C) provide Licensee with access to standard Documentation, which may be online. Additional support may be provided as set forth in the Order Form.

(ii) **Implementation**. Chainalysis will perform configuration and implementation services ("**Implementation**") as set forth in the Order Form. Implementation includes account setup and provisioning and API integration. Implementation is not included in the Support Services described in Section 2(a)(i) and may be subject to additional fees as set forth in the Order Form. Licensee will designate an Authorized User as Licensee's project lead for Implementation. Licensee agrees to complete Implementation within 45 days of the Service Start Date. At Chainalysis' sole option, if Implementation is not completed within 45 days of the Service Start Date, Chainalysis may decline to provide Licensee with documents evidencing its use of the Service.

(iii) **Security**. Chainalysis will maintain appropriate administrative, technical and physical safeguards to protect the security, confidentiality and integrity of the Service and any Licensee Data stored on, or accessible via, the Service. These safeguards include encryption of Licensee Data in transmission (using TLS or similar technologies).

(iv) **Service Levels**. The Service will be available 99%, measured monthly, excluding scheduled maintenance (Chainalysis will post notice of scheduled maintenance on the Service at least one (1) day in advance and such scheduled maintenance will not exceed two (2) hours in any calendar month) or unavailability resulting from failures of Licensee systems or networks, including modifications to same which render the API unable to reach the Service, unavailability of the public Internet, network disruptions beyond Chainalysis' control, or Force Majeure Events (as defined below) (collectively, "**Uptime**"). Chainalysis' temporary suspension of the Service in accordance with the Terms will not be deemed to be a failure of Chainalysis to provide adequate service levels under this Agreement.

(v) **Additional Services**. Chainalysis will provide additional services to Licensee as set forth in an Order Form.

**CHAINALYSIS KYT ORDER FORM**

**(b)    Licensee Responsibilities.**

(i)    Licensee will provide (or Chainalysis will provide at Licensee's direction if the Service does not allow Licensee to do so itself) its employees or contractors authorized to access the Service on its behalf (each, an "**Authorized User**") with credentials to do so. Licensee is responsible for all actions of its Authorized Users with respect to the Service. Authorized User credentials may not be shared.

(ii)    Licensee is required to enter into the API all information required for the verification and other services to be performed by the Service. Licensee will provide Chainalysis with all, current, accurate information as requested by Chainalysis via the Service and will promptly update any such information determined to be incorrect. Licensee expressly acknowledges that the information required for the Service to function does not, by itself, allow for the identification of any individual, and Licensee represents and warrants that it will not, unless explicitly agreed to in writing, provide Chainalysis with any Personal Data (as defined in Section 5(b)).

(iii)    Licensee will use commercially reasonable efforts to prevent unauthorized access to or use of the Service, and notify Chainalysis immediately of any such unauthorized access or use or suspected unauthorized access or use of which Licensee becomes aware.

(iv)    Licensee is responsible for any network or internet connectivity required to access the Service over the Internet. Licensee consents to the processing and storage of Licensee Data (as defined below) on hardware owned or controlled by third parties (e.g., AWS).

**3.    CONSIDERATION.**

**(a)    Fees**. In exchange for the license granted hereunder and any related services to be performed by Chainalysis, Licensee agrees to pay to Chainalysis the amounts set forth on the Order Form (the "**Fees**"). Unless otherwise set forth on the Order Form, Fees are due thirty (30) days from the date of an invoice.

**(b)    Taxes**. In addition to the Fees, Licensee will pay any sales, use, excise, import or export, value added or similar tax or duty ("**Taxes**") not based on Chainalysis' net income, including any penalties and interest, which may be assessed on the Fees. Chainalysis will use commercially reasonable efforts to include on its invoices to Licensee any Taxes that Chainalysis is responsible for collecting and remitting on the applicable invoice.

**(c)    Late Payments; Disputed Fees**. If Fees are not received when due, Chainalysis may (i) assess a late payment charge of one and one-half percent (1.5%) per month or the maximum allowed by law, if less, and, (ii) upon notice of such overdue payment and Licensee's failure to provide payment within five (5) days of such notice, suspend access to the Service until payment in full of all overdue Fees is received. Licensee may dispute Fees in writing prior to the date such Fees are due, specifying the grounds for the dispute. The parties will work in good faith to promptly resolve disputes. Licensee will pay all undisputed amounts on any invoice on or before when such Fees are due.

**4.    TERM AND TERMINATION.**

**(a)    Term**. This Agreement will commence on the Service Start Date and remain in effect for the period set forth on the Order Form (the "**Initial Term**") which will be one (1) year if no such period is specified, unless earlier terminated as provided herein. Following the Initial Term, this Agreement will automatically renew for additional periods of one (1) year (each a

"**Renewal Term**," and all Renewal Terms, together with the Initial Term, the "**Term**"). Chainalysis Fee's will increase by up to 5% for each Renewal Term. This Agreement may be terminated by either party in writing at least thirty (30) days prior to the expiration of the then-current Term.

**(b) Termination for Cause**. Either party may terminate this Agreement for a material breach of this Agreement by the other party that is not cured within thirty (30) days following written notice thereof.

**(c) Termination for Insolvency and Related Events**. This Agreement may be terminated immediately by either party upon written notice to the other party (i) upon the institution by the other party of insolvency, receivership or bankruptcy proceedings or any other proceedings for the settlement of such other party's debts (or when such proceedings are instituted by a third party and not dismissed within twenty (20) days), (ii) upon the other party's making an assignment for the benefit of creditors, or (iii) upon the other party's dissolution or ceasing to do business.

**(d) Effect of Termination**. If this Agreement is terminated, the license granted under Section 1 will immediately terminate and Licensee will remit any Fees incurred prior to the date of such termination. Sections 3 (to the extent Fees remain unpaid), 4(d), 5, 6, 8, 9, and 10 of this Agreement will survive its expiration or termination for any reason.

**5. INTELLECTUAL PROPERTY.**

**(a) API; Services**. Chainalysis retains all right, title and interest in and to the Services and the API, except for the limited license granted herein.

**(b) Licensee Data**. Licensee grants Chainalysis a non-exclusive, non-transferable (except as set forth herein), worldwide, royalty-free license to use any information made available through the Service or otherwise provided to Chainalysis in connection with this Agreement by Licensee or Authorized Users or any third parties acting on Licensee's behalf (collectively, "**Licensee Data**"). Licensee represents and warrants that: (i) it owns or has the right to make Licensee Data available to Chainalysis, (ii) the posting and use of Licensee Data on or through the Service will not (A) violate the intellectual property, privacy, publicity, or other rights of any person or entity, or (B) breach any contract between Licensee and a third party; (iii) the Licensee Data is accurate; and (iv) except to the extent inextricable from the Licensee Data based on the nature of the blockchain technology, Licensee Data will not include information that, alone or in combination with other information provided to Chainalysis, can be used to identify an individual person ("**Personal Data**").

**(c) Performance Data**. Chainalysis owns all data (i) regarding installation, registration, and use of the Service, and (ii) related to performance of the Service, including response times, load averages, usage statistics, activity logs, (collectively, "**Performance Data**"). Performance Data does not include any Licensee Data or Licensee-specific output resulting from the use of the Service ("**Licensee Output**"), but may include aggregated or anonymized information derived from Licensee Output. Performance Data may be used to contribute to analytical models used by Chainalysis, to monitor and improve the Service, and to develop additional services and offerings.

**(d) Feedback**. Licensee hereby grants Chainalysis an unrestricted, worldwide, perpetual, irrevocable, royalty-free right and license to use any ideas, suggestions, comments, recommendations, enhancement requests or other input provided by Licensee, its Authorized Users, its employees or agents ("**Feedback**") about the Service to Chainalysis for any lawful purpose. Licensee acknowledges that it provides Feedback voluntarily, and Chainalysis has no obligations to use any Feedback.

**(e) Open Source Software**. Certain elements of the API and Service may be subject

to "open source" or "free software licenses" ("**Open Source Software**") owned by third parties. Open Source Software is not licensed under Section 1. Instead, each item of Open Source Software is licensed under the terms of the end-user license that accompanies such Open Source Software. Nothing in this Agreement limits Licensee's rights under, or grants Licensee rights that supersede, the terms and conditions of the applicable end-user license for such Open Source Software.

**(f)** **Marks**. "Reactor," "KYT" and Chainalysis' other product and service names, marks, and logos used or displayed on the Service are registered or unregistered trademarks of Chainalysis (collectively, "**Marks**"), and Licensee may only use such Marks to identify itself as a Chainalysis customer, or as incorporated into reports or other Licensee Output; provided Licensee may not attempt to claim any rights in the Marks, degrade the distinctiveness of the Marks, or use the Marks to disparage or misrepresent Chainalysis, its services or products. All use of the Marks will inure to Chainalysis' benefit.

**6. CONFIDENTIALITY.**

**(a)** **Definition.** "**Confidential Information**" means any non-public material or information, in any form or medium (whether oral, written, electronic or other), including pricing information, technology, business methods, finances, trade secrets, or other proprietary information, that a reasonable person would recognize as confidential from its nature or the circumstances of its disclosure. Chainalysis Confidential Information includes, but is not limited to, the access codes, technical specifications, connectivity standards or protocols, or other relevant procedures used by Licensee or the API to connect to the Service.

**(b)** **Ownership**. In connection with the performance of this Agreement, each party (the "**Receiving Party**") may have access to certain of the other party's (the "**Disclosing Party**") Confidential Information or that of third parties that the Disclosing Party is required to maintain as confidential. No ownership in or rights to Confidential Information is transferred by as a result of such access.

**(c)** **Obligations**. The Receiving Party will: (i) only use Confidential Information to fulfill its obligations hereunder; (ii) only provide access to Confidential Information on an "as-needed" basis to its personnel, agents, and/or consultants who are bound by obligations materially similar to this Section 6; and (iii) maintain Confidential Information using methods at least as protective as it uses to protect its own information of a similar nature, but in no event using less than a reasonable degree of care. At the option of the Disclosing Party, the Receiving Party will promptly return or destroy the Disclosing Party's Confidential Information upon termination or expiration of this Agreement. If the Disclosing Party requires the destruction of its Confidential Information pursuant to this Section 6(c), the Receiving Party will certify in writing that it has done so. Nothing herein will require the destruction or purging of Confidential Information maintained on routine computer system backup tapes, disks or similar storage devices, or as required to defend or maintain any litigation relating to this Agreement or the Confidential Information, or as required by applicable law.

**(d)** The obligations in this Section 6(c) will apply during and for three (3) years after the Term, except in the case of Confidential Information that is a trade secret, in which case the obligations will remain in effect for so long as the trade secret is maintained.

**(e)** **Exceptions**. Confidential Information does not include, and Section 6(c) does not apply to, information that is: (i) publicly available when disclosed or becomes publicly available without fault of the Receiving Party after disclosure; (ii) rightfully communicated to the Receiving Party by a third party not bound to keep such information confidential, whether prior to or following disclosure, (iii) independently developed by Receiving Party; or (iv) approved for unrestricted disclosure by the Disclosing Party. In addition, the Receiving Party may disclose Confidential

Information to the limited extent required (x) to comply with the order of a court or other governmental body, or with applicable law, provided that, to the extent permitted by law, the Receiving Party will first give written notice to the Disclosing Party and reasonably cooperate (at the Disclosing Party's expense) with the Disclosing Party's efforts to obtain a protective order; or (y) to establish its rights under this Agreement.

**7. WARRANTIES AND DISCLAIMER.**

**(a) Mutual Representations and Warranties**. Each party represents and warrants that it has the right to enter into and perform its obligations under this Agreement, and that such performance does not and will not conflict with any other agreement of such party or any judgment, order, or decree by which it is bound. Each party will comply with all laws applicable to its performance under this Agreement.

**(b) Disclaimer**. EXCEPT AS SPECIFICALLY PROVIDED IN SECTION 7(a), NEITHER PARTY MAKES, AND EACH PARTY EXPRESSLY DISCLAIMS, ANY REPRESENTATIONS OR WARRANTIES IN CONNECTION WITH THIS AGREEMENT, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT. WITHOUT LIMITING THE FOREGOING, CHAINALYSIS MAKES THE API AND SERVICE AVAILABLE ON AN "AS IS" BASIS.

**8. INDEMNIFICATION; RELEASE**

**(a) Infringement.** Chainalysis will indemnify and hold harmless (including payment of reasonable attorneys' fees and court costs) Licensee and its officers, directors and employees against any third party claim alleging that the API or Service, to the extent used in accordance with the Documentation and this Agreement, infringes the intellectual property rights of a third party, except to the extent the alleged infringement arises out of (i) Licensee's failure to use an Update of the API or Service that Chainalysis communicated was required to avoid infringement, or (ii) Licensee Data.

**(b) Alternative Remedy**. If the API or Service or any element thereof is (or in Chainalysis' view is likely to be) found to infringe any third party intellectual property rights, Chainalysis, in its sole discretion and at its cost and expense, will either (i) procure the right for Licensee to continue to use the API or Service; or (ii) modify the API or Service to be non-infringing without materially diminishing its functionality. If neither (i) nor (ii) is commercially reasonable, Chainalysis may terminate the Agreement by giving Licensee at least thirty (30) days' prior written notice and, as Licensee's sole and exclusive remedy therefor, refund Licensee the portion of any prepaid Fees attributable to the terminated portion of the Agreement.

**(c) Procedures.** The obligations in this Section 8 are contingent on Licensee (i) promptly notifying Chainalysis of any indemnifiable claim; (ii) granting Chainalysis sole control over the defense and/or settlement of the claim (provided that a settlement may not impose costs or liability on Licensee without its consent); and (iii) providing reasonable assistance to Chainalysis at Chainalysis' expense.

**(d) Sole Remedy.** The remedies in this Section 8 are Licensee's sole remedy, and Chainalysis' entire liability, with respect to any indemnifiable claim.

**9. LIMITATION OF LIABILITY.**

**(a)** EXCEPT FOR A PARTY'S BREACH OF SECTION 6 (CONFIDENTIALITY), GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, OR CHAINALYSIS' INDEMNIFICATION OBLIGATIONS UNDER SECTION 8, IN NO EVENT WILL EITHER PARTY BE LIABLE FOR (1)

LOST PROFITS, LOSS OF DATA OR ANY OTHER CONSEQUENTIAL, SPECIAL, INCIDENTAL, OR INDIRECT DAMAGES, HOWEVER CAUSED AND REGARDLESS OF THE THEORY OF LIABILITY ASSERTED, ARISING OUT OF THIS AGREEMENT, EVEN IF THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, OR (2) DAMAGES EXCEEDING, IN THE AGGREGATE, THE TOTAL AMOUNT PAID BY LICENSEE TO CHAINALYSIS UNDER THIS AGREEMENT IN THE TWELVE (12) MONTHS PRIOR TO THE DATE ON WHICH THE CLAIM AROSE. THIS LIMITATION IS CUMULATIVE AND THE EXISTENCE OF MORE THAN ONE CLAIM WILL NOT ENLARGE THIS LIABILITY LIMITATION.

**(b)** WITHOUT LIMITING THE FOREGOING, LICENSEE ACKNOWLEDGES AND AGREES THAT IN NO EVENT WILL CHAINALYSIS BE RESPONSIBLE FOR ANY ACTUAL OR POTENTIAL LEGAL OR REGULATORY VIOLATIONS UNCOVERED IN CONNECTION WITH LICENSEE'S USE OF THE SERVICE. CHAINALYSIS PROVIDES A REPORTING AND INFORMATION SERVICE ONLY, AND HAS NO RESPONSIBILITY OR LIABILITY FOR THE TRANSACTIONS ANALYZED BY THE SERVICE OR FOR ANY DECISION MADE OR ACTION TAKEN IN RELIANCE ON THE SERVICE.

**10. GENERAL TERMS.**

**(a) Governing Law; Attorneys' Fees**. This Agreement, including its formation, is governed by the laws of the State of New York, without giving effect to conflicts of laws principles that would require a different result. Any claim, action or judicial proceeding arising out of or related to this Agreement will be brought in the federal or state courts in New York County, New York, and the prevailing party will be entitled to recover reasonable attorneys' fees and expenses incurred in resolving such claim, action or judicial proceeding.

**(b) Insurance**. At all times during the Term, Chainalysis will maintain Commercial General Liability insurance in the amounts of $1,000,000 per claim and $2,000,000 in aggregate.

**(c) Remedies; Injunctive Relief**. All rights and remedies of the Parties under this Agreement are cumulative and the exercise of one remedy will not exclude election of other remedies. A party's breach or threatened breach of any of Sections 1(b), 5 or 6 of this Agreement may cause irreparable injury that may not be compensated by monetary damages. Accordingly, notwithstanding Section 9(a) and in addition to any other remedies available to it, a party may seek injunctive or other equitable relief for such breach or threatened breach.

**(d) Notices**. Any notice, consent, or other communication intended to have legal effect hereunder will be in writing, and will be given personally or sent via overnight delivery requiring signature upon receipt to the relevant party at the address for such party indicated on the Order Form (or such other address as provided by that party). Notices will be deemed given when delivered or refused. Operational communications, such as changing a party's notice address, may be given via email.

**(e) Attribution.** Chainalysis may indicate that Licensee is a customer on Chainalysis' website and standard marketing materials. Any such attribution will be consistent with Licensee's style guidelines or requirements as communicated to Chainalysis. The parties may agree to additional marketing efforts (e.g., case studies, events) in writing.

**(f) Relationship Between the Parties**. Nothing in this Agreement will be construed as creating a partnership or joint venture of any kind between the parties. Neither party will have the authority or power to bind the other party or represent that is has such right.

**(g) Assignment**. Neither party may assign this Agreement, in whole or in part, without the other party's written consent, except in connection with any merger, consolidation, sale of all or substantially all of such party's assets, or otherwise by operation of law. Any attempt to assign

**CHAINALYSIS KYT ORDER FORM**

this Agreement except as set forth in this provision will be null and void.

**(h) Waiver; Amendment**. This Agreement may not be modified except by a written instrument signed by both parties. A party's failure to enforce any provision of this Agreement will not be deemed a waiver of future enforcement of that or any other provision.

**(i) Force Majeure**. Nonperformance of either party will be excused to the extent that performance is rendered impossible by events beyond its reasonable control (a "**Force Majeure Event**"), provided that the affected party takes commercially reasonable steps to mitigate the effect of such event.

**(j) Federal Government End Use Terms**. If Licensee is a U.S. federal government department or agency or contracting on behalf of such department or agency, the Service is a "Commercial Item" as that term is defined at 48 C.F.R. §2.101, consisting of "Commercial Computer Software" and "Commercial Computer Software Documentation", as those terms are used in 48 C.F.R. §12.212 or 48 C.F.R. §227.7202. Consistent with 48 C.F.R. §12.212 or 48 C.F.R. §227.7202-1 through 227.7202-4, as applicable, the Service is licensed to Licensee with only those rights as provided under these Terms.

**(k) Miscellaneous**. Titles and headings used in this Agreement are intended solely for convenience of reference and do not affect its meaning. If any provision of this Agreement will be held by a court of competent jurisdiction to be contrary to law, the remaining provisions of this Agreement will be unaffected. Except as expressly set forth herein, nothing in this Agreement grants any rights to any entity other than the parties to this Agreement.

**(l) Entire Agreement**. This Agreement is the entire agreement between the parties with respect to the Service and supersedes any prior agreements, proposals and understandings about the same subject. This Agreement may be executed in counterparts, each of which will be deemed an original, but all of which will constitute one and the same document. The parties may electronically sign this Agreement and any documents related thereto.

The parties have caused their duly authorized representatives to execute these Terms as of the Service Start Date.

**Celsius Network Limited**

DocuSigned by:

By: Jeremie Beaudry
43134C6AA018449

Name: Jeremie Beaudry

Title: GC & CCO

Date: 9/3/2019

**Chainalysis, Inc.**

DocuSigned by:

By: Jason Bonds
33A0B9D4643C461

Name: Jason Bonds

Title: Chief Revenue Officer

Date: 9/3/2019