Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 22-10964-mg

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    CELSIUS NETWORK, LLC,

8

9            Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11                 United States Bankruptcy Court

12                 One Bowling Green

13                 New York, NY  10004

14

15                 March 23, 2023

16                 11:00 AM

17

18

19

20

21   B E F O R E :

22   HON MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  F. FERGUSON

1    HEARING re Debtor's Motion for Entry of an Order (I)

2    Authorizing and Approving Certain Bid Protections for the

3    Proposed Plan Sponsor and (II) Granting Related Relief.

4    (Doc# 2151, 2151, 2190, 2218, 2224 to 2226, 2229, 2236,

5    2243, 2256, 2066, 2267, 2277, 2293)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

Page 3

1   A P P E A R A N C E S :

2

3   KIRKLAND ELLIS LLP

4        Attorneys for the Debtor

5        300 N. LaSalle

6        Chicago, IL 60654

7

8   BY:  ROSS M. KWASTENIET

9        TJ MCCARRICK

10       CHRIS KOENIG

11

12   UNITED STATES DEPARTMENT OF JUSTICE

13       Attorneys for the U.S. Trustee

14       201 Varick Street

15       New York, NY 10014

16

17   BY:  SHARA CORNELL

18

19   MILBANK LLP

20       Attorneys for Series B Preferred Holders

21       55 Hudson Yards

22       New York, NY 10001

23

24   BY:  ANDREW LEBLANC

25

Page 4

1   VENABLE LLP

2        Attorneys for Ignat Tuganov

3        600 Massachusetts Avenue NW

4        Washington, D.C. 20001

5

6   BY:  ANDREW CURRIE

7

8   TEXAS OFFICE OF ATTORNEY GENERAL

9        P.O. Box 12548

10       Austin, TX 78711

11

12  BY:  LAYLA MILLIGAN

13

14  WHITE CASE LLP

15       Attorneys for the Official Committee of Unsecured

16       Creditors

17       111 South Wacker Drive, Suite 5100

18       Chicago, IL 60606

19

20  BY:  GREGORY F. PESCE

21

22

23

24

25

Page 5

1   SECURITIES AND EXCHANGE COMMISSION

2        Attorneys for the SEC

3        100 F Street NE

4        Washington, D.C. 20549

5

6   BY:  THERESE SCHEUER

7

8   MCELROY DEUTSCH MULVANEY CARPENTER, LLP

9        Attorneys for the New Jersey Bureau of Securities

10        570 Broad Street

11        Newark, NJ 07102

12

13   BY:  JEFFREY BERNSTEIN

14

15   MCCARTER & ENGLISH

16        Attorneys for the Ad Hoc Group of Borrowers

17        Worldwide Plaza

18        825 Eighth Avenue, 31st Floor

19        New York, NY 10019

20

21   BY:  DAVID ADLER

22

23   REBECCA GALLAGHER

24        Pro Se Creditor

25

1    SIMON DIXON

2          Pro Se Creditor

3

4    IMMANUEL HERRMANN

5          Pro Se Creditor

6

7    ERIK MENDELSON

8          Pro Se Creditor

9

10   CAMERON CREWS

11         Pro Se Creditor

12

13   RYAN REPH

14         Pro Se Creditor

15

16   JOE LEHR

17         Pro Se Creditor

18

19   Victor Ubierna de las Heras

20         Pro Se Creditor

21

22   ROB CHRISTIANSEN

23         Pro Se Creditor

24

25

1    LAWRENCE CHARLES PORTER

2         Pro Se Creditor

3

4    ALSO PRESENT:

5    JEFF MONTGOMERY

6    NELLY ALMEIDA

7    RICHARD ARCHER

8    CHRIS BECIN

9    BRIANNA B. BILTER

10   OCTAVE J. BOURGEOIS

11   PAUL BREUDER

12   NURALDEEN BRIFKANI

13   JUDSON BROWN

14   SANTOS CACERES

15   RICKIE CHANG

16   DEAN CHAPMAN

17   JESSICA CHOI

18   STEVEN CHURCH

19   GEOFFREY R. CIRKEL

20   CHRISTOPHER COCO

21   DAKEN COLEMAN

22   AARON COLODNY

23   CARL J. COTE

24   DAVID DALHART

25   GEAN CARLOS DE OLIVEIRA BRINKER

1   CHRISTOPHER DISANTIS

2   THOMAS DIFIORE

3   TRISTAN DIAZ

4   DREW DUFFY

5   SCOTT DUFFY

6   DENNIS DUNNE

7   JOHN P. DZARAN

8   JANELL ECKHARDT

9   DANIEL EGGERMANN

10   KEN EHRLER

11   RASHA EL MOUATASSIM BIH

12   SIMON ELIMELECH

13   PAUL FABSIK

14   LISA FAUCHER

15   FLORENCE FLANNIGAN

16   JASLEIGH GEARY

17   BRADLEY GIARDIELLO

18   TODD GORDON

19   UDAY GORREPATI

20   MIRA HAQQANI

21   TAYLOR HARRISON

22   SAMUEL P. HERSHEY

23   KAITLYN HITTELMAN

24   ALI JAMSHID FAR

25   ROLAND JONES

1    DANIEL D. KAPLAN

2    BRIAN P. KARPUK

3    SEO KYONG (LISA) KIM

4    GEOFFREY KING

5    DIETRICH KNAUTH

6    BRYAN KOTLIAR

7    JEAN-PHILIPPE LATREILLE

8    JOE LEHR

9    BRIAN LENNON

10   NICOLE A. LEONARD

11   KEVIN M. MANUS

12   SARAH BETH MARONPOT

13   CHASE MARSH

14   BRIAN S. MASUMOTO

15   DAVID MAYO

16   ALAN S. MAZA

17   JAMES MCNAMARA

18   MITCHELL MENGDEN

19   JOSHUA MESTER

20   TIMON MITRAKAS

21   KEITH NOYES

22   CLAIRE O'BRIEN

23   KYLE J. ORTIZ

24   REGINA OSBORNE

25   ARIE PELED

Page 10

1   KHAI PHAM

2   RICHARD PHILLIPS

3   LUKE PORCARI

4   MACIEJ PORCZEK

5   DONALD POYNTER

6   ANNEMARIE V. REILLY

7   TIMOTHY REILLY

8   MARK ROBINSON

9   ANDREW RUDOLPH

10   ROBERT D. RYAN

11   CAROLINE SALLS

12   PETER SALYGO

13   KYLE SATTERFIELD

14   JACK SCHICKLER

15   DAVID SCHNEIDER

16   NOAH SCHOTTENSTEIN

17   WILLIAM D. SCHROEDER

18   MATTHEW W. SILVERMAN

19   JESSICA SIMON

20   CALIN T. ST. HENRY

21   COURTNEY BURKS STEADMAN

22   BRIAN STOUT

23   DAVID TURETSKY

24   ELVIN TURNER

25   TONY VEJSELI

1    HOLLY J. VERO

2    CAROLINE WARREN

3    MELANIE WESTOVER YANEZ

4    MORGAN WILLIS

5    KEITH WOFFORD

6    SARAH WYNN

7    LILY YARBOROUGH

8    ANNE YEILDING

9    TAK YEUNG

10   ANDREW YOON

11   KAILA ZAHARIS

12   KEN ZIMAN

13   TANZILA ZOMO

14   JAMO BERG

15   NANCY DANG

16   ROBERT M. KAUFMANN

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2              CLERK:  All right.  Judge, it's 11:00.  Would you

3     like to get started?

4              THE COURT:  Yes, I would, Deanna.  All right.

5     Who's going to begin for the Debtors?

6              MR. KWASTENIET:  Good morning, Judge Glenn.  It's

7     Ross Kwasteniet from Kirkland and Ellis.  Can you see me and

8     hear me okay?

9              THE COURT:  Yes, I can.

10             MR. KWASTENIET:  Okay, great.  Your Honor, the

11    only item on today's agenda is the Debtors' motion to

12    approve bid protections which was filed at Docket 2151.  We

13    appreciate Your Honor granting us a short adjournment and

14    for giving us time on your calendar today.  I am pleased to

15    report that we've used the last few days productively.

16             Last night, we filed an amended proposed form of

17    order at Docket No. 2301 that reflects an agreement with

18    NovaWulf to reduce the expense reimbursement cap from $15

19    million to $13 million for savings of $2 million.

20             Your Honor, we've also resolved the objection of

21    the ad hoc group of borrowers which was filed at Docket No.

22    2256.  And we resolved that objection by reaching an

23    agreement on a settlement that will be embodied in the

24    Debtors' plan of reorganization.  The Debtors are going to

25    work with the ad hoc borrower group over the next few days

Page 13

1      to memorialize this agreement in a term sheet and plan

2      support agreement which we will file on the docket as soon

3      as it's ready.

4              Your Honor, turning to the bid protections motion

5      for today, we propose to proceed first with the Debtors'

6      evidentiary presentation and then with argument.  So if that

7      order of events is acceptable to Your Honor, I would yield

8      the podium to my colleague, Mr. T.J. McCarrick who would

9      handle the evidentiary portion of the proceeding today.

10             THE COURT:  That's fine.

11             MR. KWASTENIET:  Thank you, Your Honor.

12             MR. McCARRICK:  Good morning, Your Honor. T.J.

13     McCarrick from Kirkland and Ellis on behalf of the Debtors.

14     Can you see and hear me?

15             THE COURT:  Yes, I can.  Go ahead.

16             MR. McCARRICK:  Okay.  Your Honor, we only have

17     one witness that we intend to call today.  That's Marc

18     Puntus, the partner and co-head of debt restructuring at

19     Centerview Partners who's been the Debtors' investment

20     banker in this case and obviously is intimately involved in

21     evaluating strategic alternatives for the Debtors' business.

22             What we would propose is having Mr. Puntus,

23     consistent with prior hearings, adopt his declaration as his

24     testimony under oath, ask very, very limited direct

25     questions about developments since the filing of his

Page 14

1    declaration, and then make Mr. Puntus available for cross

2    examination if that's acceptable to Your Honor.

3              THE COURT:  Let's proceed in that fashion.  Go

4    ahead.

5              MR. McCARRICK:  Okay.  Mr. Puntus, can you hear

6    and see me?

7              MR. PUNTUS:  Yes, I can.

8              MR. McCARRICK:  Okay.  Mr. Puntus, do you have a

9    clean copy of your declaration in support of the proposed

10   bid protections, which is Docket No. 2152 in front of you?

11             MR. PUNTUS:  Yes, I do.

12             MR. McCARRICK:  Is there anything you would like

13   to change about that declaration?

14             MR. PUNTUS:  No.

15             MR. McCARRICK:  Do you adopt that declaration as

16   your testimony here today?

17             MR. PUNTUS:  Yes, I do.

18             MR. McCARRICK:  Mr. Puntus, I just have a few

19   limited direct examination --

20             THE COURT:  Before you do that, Deanna, could you

21   swear the witness, please?

22             CLERK:  All right.  Mr. Puntus, if you could raise

23   your hands?  I'm trying to look -- there you are.  Okay.  Do

24   you solemnly swear or affirm that the testimony you are

25   going to give today is the truth?

Page 15

1                THE WITNESS:  Yes, I do.

2                CLERK:  Thank you.

3                THE COURT:  And I take it, you were asked before

4      you were sworn, you adopt your declaration as your direct

5      testimony; is that correct?

6                THE WITNESS:  Yes, I do, Your Honor.

7                THE COURT:  All right.  Go ahead.  Go ahead, Mr.

8      McCarrick.

9                MR. McCARRICK:  Thank you, Your Honor.

10                   DIRECT EXAMINATION OF MARC PUNTUS

11     BY MR. McCARRICK:

12     Q    Since filing your declaration, Mr. Puntus, have there

13     been any developments related to either of the bid

14     protections that are at issue in this motion?

15     A    Yes.  I think I would say there are three developments.

16     Mr. Kwasteniet just outlined two of them.  We've spent an

17     extensive amount of time with the borrower ad hoc group and

18     their advisors and we've reached a preliminary resolution of

19     the borrower's treatment under a Chapter 11 plan and as I

20     understand it, the borrowers have withdrawn their objection.

21          Secondly, a NovaWulf was a part of these negotiations.

22     After continuing negotiations with NovaWulf, they have

23     agreed to reduce the expense reimbursement component of

24     their bid protections from $15 million to $13 million.  The

25     third piece, and this is qualitative, I believe Mr. Pesce or

Page 16

 1   Mr. Colodny at the last hearing referenced an emerging

 2   potential bidder.

 3        That emerging potential bidder has accelerated its

 4   efforts, has continued to work with the Debtors and the

 5   Committee, has continued to due diligence, both business and

 6   legal diligence, and its bid has continued to progress.  It

 7   is not in final stages, but I would say the NovaWulf

 8   transaction has already served as a stalking horse for this

 9   bid, which adopts some components of the NovaWulf structure

10   and then comes up with other components that are different.

11   Q    Thank, thank you Mr. Puntus.

12             MR. McCARRICK:  I will pass the witness and

13   reserve the right for any redirect.

14             THE COURT:  All right.  May I ask, who wishes to

15   cross examine Mr. Puntus?  First, let me ask anybody from

16   the Committee wish to examine Mr. Puntus.

17             MR. PESCE:  Gregory Pesce for the Committee.  Nok

18   we pass the witness.

19             THE COURT:  All right.  Is there anybody who

20   wishes to cross examine the witness?  Please raise your hand

21   and I will recognize you.  Ms. Cornell.

22             MS. CORNELL:  Good morning, Your Honor, Shara

23   Cornell on behalf of the Office of the United States

24   Trustee.

25             THE COURT:  Yes, go ahead, please.

Page 17

1           MS. CORNELL:   Thank you.

2              CROSS EXAMINATION OF MARK PUNTUS

3    BY MS. CORNELL:

4    Q    Mr. Puntus, can you explain how the breakup fee and

5    expense reimbursement valuations were determined,

6    specifically how the expense reimbursement of now $13

7    million and breakup fee of $5 million were determined?

8    A    I'll answer that in a couple of ways.  They were

9    determined after extensive negotiation with NovaWulf.  I

10   think if we circle back to the beginning, NovaWulf's initial

11   proposal on a breakup fee was $15 million.  We were able to

12   negotiate it down to $5 million.  Their initial proposal on

13   when a breakup fee would be paid effectively was in all

14   circumstances, no matter what happened.  We were able to

15   narrow that considerably through negotiation.

16       At this point, it will only be paid to the extent the

17   Debtors or the Committee exercise their fiduciary out and

18   move forward with a higher or better offer.  To the extent

19   we pivot to an orderly winddown as defined in the term

20   sheets, NovaWulf will not be paid its $5 million breakup

21   fee.  That's how it was negotiated.  As to the expense

22   reimbursement, similarly, the numbers were considerably

23   higher.  Early on, we negotiated that down to $15 million

24   and subsequently to $13 million -- $13 million in the

25   context of what is, is I would (audio drops).

Page 18

```
1    Q.   Mister --

2              THE COURT:  Your sound is gone.  I don't hear --

3              THE WITNESS:  I'm sorry, I'm sorry.  I hit mute.

4    I apologize.

5              THE COURT:  Okay.

6              THE WITNESS:  I don't know how I did it.

7              THE COURT:  You're going to repeat your thought.

8    I don't know where -- what you had said.  I can't read lips.

9              THE WITNESS:  Where was I?

10             THE COURT:  Yeah.

11             THE WITNESS:  To the breakup fee.

12             THE COURT:  Go ahead.  Repeat it.  I want to be

13   sure.

14   BY MS. CORNELL:

15   A    So on the breakup fee, initially it was $15 million

16   payable in all circumstances, even if we pivoted to an

17   orderly winddown.  We ultimately negotiated it down to $5

18   million payable in what we believe are limited circumstances

19   and those are if they are topped, if we exercise our

20   fiduciary out to move forward with a higher or better bid.

21        As to the expense reimbursement, the numbers were

22   considerably higher.  We negotiated it down to $15 million

23   and now $13 million.  While $13 million may sound large in

24   the context of what I believe is one of the most complicated

25   if not the most complicated complex structured transactions
```

Page 19

1    I've ever worked on in my career, we believe $13 million is

2    reasonable and fair.  NovaWulf, its principals, and its

3    professionals and their partners, I suspect have already

4    expended millions of dollars in legal fees getting us to

5    this point.

6         NovaWulf with the Debtors and the Committee are

7    effectively the co-architects of what we think is a unique,

8    novel transaction that hopefully will maximize value for our

9    customers and create incremental value as the company

10   emerges from Chapter 11.  Tens of thousands of hours have

11   been expended here in getting to this point.  This is not a

12   simple purchase of an asset or an operating business under

13   363 of the Bankruptcy Code.

14        Quite the contrary, this deal involves business issues,

15   legal issues, regulatory issues, crypto issues, structural

16   issues, tax issues, and probably ten other types of issues

17   I'm forgetting to mention.  We believe NovaWulf has worked

18   hard, in earnest, in good faith with us, with the Committee.

19   And at this point, we believe in that context, these fees,

20   these big protections are fair and reasonable.

21   Q    So just to confirm, Mr. Puntus, based on your testimony

22   today and your previous declaration, is there any

23   relationship between the dollarization of either the expense

24   reimbursement or the breakup fee and the purchase price

25   proposed by NovaWulf?

Page 20

1   A    I would say that the comparables -- I'm quite familiar

2   with what breakup fees are typically paid in these

3   situations or straight asset purchases or purchases of

4   operating businesses, you know, 2 to 4 percent, 3 percent is

5   sort of the norm.  I would say those comparables are inapt

6   in these circumstances for the reasons I described.

7        To the extent this needs to fit into that framework,

8   what this transaction is -- and it's been described a couple

9   of times but I'll try to distill it down.  NovaWulf will be

10  forming a NewCo here, a new company.  That new company will

11  effectively be purchasing all of the assets of Celsius,

12  netting out the liquid crypto which will be distributed to

13  Earn customers and other customers on the effective date.

14       The quantum of that consideration, TBD will be in the

15  disclosure statement but certainly will be a billion-and-a-

16  half dollars, probably considerably more.  That NewCo will

17  pay $45 million in cash.  There will be incentive structures

18  for customers, discounts to transact on the NewCo platform.

19  And as has been discussed, 100 percent of the common equity

20  will be delivered to our customers, paid to our customers.

21       So if one must fit it into those comparables, this

22  transaction is at least a billion-and-a-half dollars in

23  value being paid effectively to our customers.  So looking

24  at it that way, we felt like a $5 million breakup fee, was

25  more than, than fair and reasonable hope.  Hopefully that

Page 21

1    answers your question.

2    Q    That's all that I have today.  Thank you, Mr. Puntus.

3              THE COURT:  All right, does any --

4              THE WITNESS:  Thank you.

5              THE COURT:  Thank you very much, Ms. Cornell.

6    Does anyone wish to cross examine?

7              MR. LEBLANC:  Your Honor, it's Andrew Leblanc of

8    Milbank on behalf of the Series B Preferred Holders.  In

9    light of that last answer, I do have some questions.

10             THE COURT:  Go ahead, Mr. Leblanc.

11                 CROSS EXAMINATION OF MARC PUNTUS

12   BY MR. LEBLANC:

13   Q    Mr. Puntus, you just, in answer to Ms. Cornell's last

14   question, you referred to the quantum of assets that are

15   being acquired for $45 million as part of the consideration

16   or the calculation of the breakup fee here; is that what I

17   understood?

18   A    So my -- just to be clear, my first and principle

19   answer is that this is a large, complex transaction

20   involving a billion-and-a-half to $2 billion in value where

21   NovaWulf was the principal architect.  In that context, we

22   believe a $5 million breakup fee is fair and reasonable,

23   particularly inasmuch as it only is paid in very limited

24   circumstances.

25        What I said, Mr. Leblanc, if one must fit it into the

Page 22

1    comps, if you look at the structure and the legal structure

2    of this transaction, there will be a NewCo paying 100

3    percent of its equity to customers plus the cash

4    consideration plus some other components.  In that context,

5    the 3 percent breakup fee test is certainly met from my

6    perspective.

7    Q    You've never in your career calculated the 3 percent

8    breakup fee by determining what amount of assets were being

9    acquired as opposed to what was being paid by a purchaser;

10   is that right?

11   A    I think I've calculated a 3 percent breakup fee in a

12   variety of ways.  It includes sometimes liabilities that one

13   might not include in a typical M&A transaction.  It

14   sometimes does include consideration that is ultimately

15   going back to creditors under a Chapter 11 plan or

16   otherwise.

17       So I would say there's not one straight way, but again,

18   I'll just say it again, that is not my principal defense of

19   this breakup fee.  My principal defense is $5 million in the

20   context of this large, complex, bespoke transaction which

21   NovaWulf has principally architected is fair and reasonable.

22   Q    Okay. And you didn't present in your declaration any

23   comparable transactions in which you calculated a breakup

24   fee by reference to the quantum of assets that are being

25   acquired by the purchaser, correct?

Page 23

1    A    There's no comparables in in the declaration.

2    Q    Now -- and just to confirm and I don't think there's

3    any lack of clarity in what the Debtors have presented, but

4    since you've said it a few times, if the Court were to

5    determine that the Series B Preferred Equity Holders, for

6    example, were entitled to some value out of the estate, then

7    the plan as it's currently contemplated cannot be confirmed;

8    isn't that right?

9    A    The current plan which we intend to file provides for

10   no recovery for the Series Being Preferred, as I understand

11   it.

12            MR. LEBLANC:  No further questions, Your Honor.

13            THE COURT:  Thank you very much, Mr. Leblanc.

14   Anybody else wish to cross examine?

15            All right, I have questions for you, Mr. Puntus.

16   How much capital is NovaWulf putting at risk under the plan

17   sponsor agreement?

18            THE WITNESS:  The direct consideration, cash

19   consideration to be paid, Your Honor, is $45 million in

20   capital, plus the expenses they are incurring as part of

21   this transaction.

22            THE COURT:  What if any compensation would

23   NovaWulf be entitled to if the plan fails and the Debtor is

24   forced to have an organized liquidation -- let me stop

25   there.

Page 24

1           THE WITNESS:  Under the plan term sheet, if we

2     pivot to an orderly winddown, which I believe is a defined

3     term, the breakup fee would not be paid.  Their expense

4     reimbursement component would be paid.  Obviously,

5     reasonable documented expenses to be vetted by the Debtors

6     and the Committee would be compensated.

7           THE COURT:  So if a Chapter 7 Trustee is appointed

8     and the Debtor is liquidated -- so I presume that a Chapter

9     7 Trustee would want to retain an asset manager to conduct

10    an orderly liquidation.

11          What if any compensation would NovaWulf be

12    entitled to if the case is converted to a Chapter 7 and

13    let's say it proceeds to an orderly liquidation under

14    Section 721 of the Bankruptcy Code, the Trustee can be

15    authorized to operate the business for a period and I

16    presume that it would take time to have an orderly

17    liquidation of the assets.  But if it's converted to a

18    Chapter 7, what if any compensation would NovaWulf be

19    entitled to receive under the plan sponsor agreement?

20          THE WITNESS:  I believe, Your Honor, under the

21    contractual terms of the bid protections, they would be

22    entitled to their expense reimbursement.  To the extent the

23    Trustee determined to employ NovaWulf --

24          THE COURT:  Well, I'm -- let's assume it employs

25    somebody else.

1          THE WITNESS:  Then all they would be entitled to,

2     Your Honor, is their expense reimbursement up to the $13

3     million cap.

4          THE COURT:  So that wasn't clear to me.  I may

5     have missed something in reading through the agreements.  I

6     understood that if the Debtor conducts an orderly

7     liquidation, it appeared that NovaWulf would be entitled to

8     expense reimbursement, but I didn't see it stated clearly

9     that if the case is converted to a Chapter 7, that they

10    would be entitled to compensation.  Where do I find that?

11         THE WITNESS:  I'm not sure, Your Honor.  It's --

12    you're now unfortunately above my pay grade in the document,

13    so I would defer to Mr. Kwasteniet or someone at Kirkland to

14    point to the provisions that -- and I may have misstated it

15    in the context of a Chapter 7.  I was really focused on an

16    orderly winddown under Chapter 11.

17         THE COURT:  Right.  So in a Chapter 7, the Trustee

18    is entitled -- have you been involved in any Chapter 7's

19    before?

20         THE WITNESS:  I try not to be, Your Honor.

21         THE COURT:  I'm sure you -- I'm sure you try not

22    to be.

23         THE WITNESS:  I can't think of any I've been

24    involved in though.

25         THE COURT:  So ordinarily, the Trustee is

Page 26

1    compensated with a commission and so -- I'll turn to counsel

2    to ask about this, because it really is not clear to me

3    under the documentation about what if any compensation

4    NovaWulf would be entitled to receive if the case is

5    converted to a Chapter 7.  Okay.  So tell me, is NovaWulf

6    entitled to any compensation if the plan fails because

7    NovaWulf is determined not to be regulatory compliant?

8            THE WITNESS:  Yeah, I believe in those

9    circumstances, Your Honor, the plan fail circumstance and we

10   need to pivot to an orderly winddown, NovaWulf would not

11   receive its breakup fee but would receive its expense

12   reimbursement up to the cap.

13           THE COURT:  So if it was determined that NovaWulf

14   is not regulatory compliant, why should it receive expense

15   reimbursement when it's its own short shortcomings that have

16   resulted in that aspect failing?

17           THE WITNESS:  I think what we concluded it -- that

18   it wouldn't be NovaWulf, per se, who wouldn't be

19   regulatorily compliant.  It would be the plan itself for one

20   of several reasons.  We felt like the plan might fail for a

21   bunch of different reasons.  We're hopeful it won't.  We

22   jumped over a lot of hurdles to get to the point where we

23   think we're in very good shape to have this plan confirmed.

24   But our focus was not on NovaWulf itself not being

25   regulatorily compliant.

Page 27

1              THE COURT:  But what if anything was done by the

2      Debtor or its professionals to -- well, let me ask you.

3      Have you and the other -- and the legal and other advisers

4      reached a conclusion as to whether Nova can be regulatory

5      compliant?

6              THE WITNESS:  Yes, I believe we believe the deal,

7      the structure of the plan, and NovaWulf will be regulatorily

8      compliant.

9              THE COURT:  And --

10             THE WITNESS:  And its partners.  I'm sorry, Your

11     Honor.

12             THE COURT:  And where do I look to see that?  Is

13     there an opinion of counsel that's been given either by

14     NovaWulf counsel or by the Debtors' counsel or anyone else

15     as to the issue of whether NovaWulf may become regulatorily

16     compliant?

17             THE WITNESS:  I believe we intend to demonstrate

18     that, Your Honor, at the disclosure statement and

19     subsequently at the plan confirmation hearing.

20             THE COURT:  Well, but I'm being asked now to

21     approve expense, you know, breakup fee and expense

22     reimbursement and disclosure statement hearing will happen

23     later.  And if at that time, it's determined that that

24     NovaWulf is not regulatory compliant, why should they be

25     receiving expense reimbursement if they're failing that

Page 28

1    that's led to the disapproval?  This is an issue that's of

2    concern to me.  It's the sequence of events.

3         I'm being asked today to approve a breakup fee and

4    expense reimbursement before there's been any determination

5    whether NovaWulf is or can become regulatory compliant.  And

6    if that's the reason for the failure of this structure, I

7    don't see -- it's a question why they should be compensated.

8    I am I correct that I'm being asked today to approve a

9    structure that will -- Mr. Kwasteniet, I'm not to you yet.

10   Okay?  Let's go back on the screen to the witness.

11        I'm being asked today to approve something that

12   will result in NovaWulf at a minimum being entitled to

13   substantial amount of expense reimbursement before there's

14   been any determination whether it in fact may become

15   regulatory compliant.  Isn't that what I'm being asked?

16        THE WITNESS:  Yes, Your Honor.  I would say both

17   the Debtors, their professionals, their lawyers, the

18   Committee, their professionals, their lawyers have spent an

19   extensive amount of time vetting NovaWulf, understanding the

20   business they intend to run in NewCo, understanding the

21   legal and regulatory hurdles here, and I believe -- I won't

22   speak for Committee counsel or Debtor counsel, but I believe

23   both parties believe that NovaWulf will be deemed to be

24   regulatorily compliant as we move forward in this process.

25        THE COURT:  My next question is -- I don't want

1    you to tell me the amount at this point, but have you

2    determined the -- what income stream NovaWulf would receive

3    if the plan is confirmed?

4                THE WITNESS:  Yes, that is one component of -- an

5    important component of NovaWulf's transaction.  They will be

6    paid an incentive fee structure to effectively manage the

7    NewCo, the illiquid assets, and build a continuing business.

8    Those provisions, those economics have been carefully

9    negotiated with the Debtors and the Committee.  I don't know

10   whether they've been discussed publicly, but I'm happy to

11   give a high level of those if Your Honor would like.

12               THE COURT:  Before we do that, how does the $45

13   million advance payment by NovaWulf fit into this

14   calculation?  What I -- I guess bottom line, I'm trying to

15   understand, have there been estimated the net present value

16   of the future income stream which NovaWulf would be expected

17   to receive?  I understand there's no precise dollar.  It's

18   probably a range, high, low, midpoint.  Has that been

19   determined?  Have you, on behalf of the Debtors, made that,

20   those calculations?

21               THE WITNESS:  We have not as of yet, Your Honor,

22   but I can give you a sense.  The NovaWulf fee, management

23   incentive fee structure will be paid based upon the net

24   asset value at emergence.  As Your Honor knows, the net

25   asset value of these assets moves every day.

1              THE COURT:  There's a lot of illiquid assets in

2     this pile -- pool.  I don't know now the value of the

3     illiquid assets is to be -- one of the --

4              THE WITNESS:  Well --

5              THE COURT:  -- reasons for the structure is to

6     have over time hopefully the illiquid assets can be

7     liquidated at, you know, and maximize the value.

8              THE WITNESS:  So Your Honor, the way the structure

9     works is day one it's based upon NAV.  All of those NAVs

10    will be included and estimated in the disclosure statement.

11    The initial fee is 1.95 percent of NAV as of, I think, two

12    weeks ago -- and again, we haven't finalized all of the NAV

13    analysis of the illiquid assets -- but I believe that first

14    year fee would have been approximately $30 or $35 million.

15             To your second point, over time, that fee migrates

16    from a fee based on NAV, net asset value, to a fee based

17    upon equity, the ESTs that will be delivered to the Earn

18    customers.  So the trading value of, of those ESTs.  So by

19    year three, the fee is tied exclusively to the equity as

20    opposed to the NAV, to account for the fact that the NAV may

21    be lower than the equity and to incentivize NovaWulf to

22    maximize the value of the equity for Earn customers.

23             And I guess to further -- to put a bow on it, over

24    time as assets grow and value grows, the quantum of the fee

25    ratchets down based upon the size of the asset base and the

Page 31

```
1     equity account.

2              THE COURT:  Who is it that will be responsible for

3     judging the performance of NovaWulf if the plan is confirmed

4     and NewCo is established?

5              THE WITNESS:  So NovaWulf will be a public

6     company.  Its equity will be reflected in a token which will

7     be a security and will file Q's and K's.  The board will be

8     controlled by customer-appointed representatives who will

9     oversee the activities and business decisions of NovaWulf.

10             THE COURT:  So if the board decides to terminate

11    NovaWulf for poor performance and it's replaced by another

12    asset manager, what if any compensation would NovaWulf be

13    entitled to claim?

14             THE WITNESS:  There are extensively negotiated

15    provisions in the documents, Your Honor, which lay out the

16    facts and circumstances under which the board could

17    terminate NovaWulf, but they can be terminated after a

18    certain period of time and once terminated, they can be

19    replaced and would receive no further management incentive

20    fees.

21             THE COURT:  Would they, would NovaWulf -- let's

22    assume that six months, nine months after the plan's

23    confirmed and it begins operating, the board decides to

24    terminate NovaWulf because what it believes is poor

25    performance.  Would NovaWulf have any claim for the expense
```

Page 32

1    -- and the board goes ahead and retains another asset

2    manager.  Under those circumstances, would NovaWulf have a

3    claim for a breakup fee or expense reimbursement?

4              THE WITNESS:  Well, at that point, Your Honor, the

5    breakup fee would not have been earned because the plan

6    would have been confirmed and the expenses would already

7    have been compensated.  I believe NovaWulf is protected and

8    I don't have all the terms --

9              THE COURT:  How is the expenses compensated at

10   that point?  There's no -- expense, as I understand the

11   expense reimbursement is if someone comes in and bids higher

12   this goes forward with some other deal structure or a

13   different asset manager.  So I'm really focusing on the

14   plan's confirmed.  NovaWulf is operating this business.  The

15   board decides after six months that it's doing a terrible

16   job and it terminates them and replaces them, and my focus

17   is what if any compensation is NovaWulf entitled to under

18   those circumstances, under the agreements that have been

19   negotiated?

20             THE WITNESS:  So I believe that NovaWulf is

21   protected for a period longer than six months.  I don't have

22   the exact term in there, but not surprisingly they have

23   negotiated -- we have negotiated provisions that protect

24   them for a certain period of time, after which -- and I

25   don't know the time, Your Honor -- after which if they are

Page 33

1    terminated and replaced, they would receive no further

2    incentive compensation.

3            THE COURT:  Is -- under this structure, is no

4    NovaWulf compensated for any clawback recoveries?

5            THE WITNESS:  No.  The clawback recoveries and all

6    other litigation claims will reside outside of NovaWulf.

7    They will be in a litigation trust structure and prosecuted

8    separately for the benefit of customers.

9            THE COURT:  All right.  And let's assume for

10   hypothetically that settlement or judgment of avoidance

11   actions results in recovery of cryptocurrency.  Is there

12   anything in the agreements about how those -- that crypto

13   would be managed and disposed of?

14           THE WITNESS:  The crypto or anything else

15   recovered by the litigation trust will not be part of the

16   NovaWulf structure, Your Honor.  It may be the case because

17   NovaWulf will have linkage to our creditors and customers,

18   that NovaWulf serves as a distribution agent prospectively

19   to deliver that crypto back to customers' wallets.  They

20   will be doing that with respect to the liquid crypto

21   distributed under the plan, but that quantum of crypto will

22   not be part of the economic -- not be part of NovaWulf nor

23   will it be part of their incentive compensation structure.

24           THE COURT:  Okay.  I think the other questions

25   that I have will be for the lawyers, but in terms of the

Page 34

1    cross examination of Mr. Puntus, Ms. Gallagher, if you wish

2    to ask any questions of the witness, you need to unmute.

3            MS. GALLAGHER:  Oh, sorry.  I don't have any

4    questions at the moment.

5            THE COURT:  Thank you, Ms. Gallagher.  Mr. Currie,

6    do you wish to cross examine?

7            MR. CURRIE:  Good morning, Your Honor.  Andrew

8    Currie of Venable.  Nice to see you.  Can you see me and

9    hear me?

10           THE COURT:  I can.  And you're representing whom?

11           MR. CURRIE:  We represent Ignat Tuganov.  I just

12   have one question for Mr. Puntus.

13           THE COURT:  Just before you begin, Mr. Tuganov has

14   appeared before pro se and he's also, I think Venable has

15   just recently filed an adversary proceeding on his behalf.

16   There's been no -- I don't know whether it's been served.  I

17   just -- I'm just noting that for the record.  Go ahead, Mr.

18   Currie.

19           MR. CURRIE:  And Your Honor, Mr. Tuganov's been

20   represented by Venable since --

21           THE COURT:  Okay.

22           MR. CURRIE:  -- the initial filing of the

23   bankruptcy case.

24           THE COURT:  That's fine.

25           MR. CURRIE:  He's always had counsel.  My partner

Page 35

1    Mr. Sabin was not able to appear today but --

2              THE COURT:  That's fine.  Go ahead.

3                   CROSS EXAMINATION OF MARC PUNTUS

4    BY MR. CURRIE:

5    Q    So Mr. Puntus, there was some mention of another bidder

6    and that you were sort of hopeful or perhaps, you know,

7    moving towards that other bidder and timing of that.  Could

8    you elaborate for the Court where that stands in more

9    detail, please?

10   A    We -- there is another bidder.  I think Mr. Pesce or

11   Mr. Colodny alluded to that bidder in a prior hearing.  Our

12   negotiations and discussions with that bidder have

13   accelerated.  The bid is still a long way from being

14   finalized or in a form that is confirmable or presentable to

15   the Court, but we continue to work with that one bidder and

16   we will see, between the Debtors and the Committee, whether

17   we can create a definitive higher or better transaction for

18   the benefit of customers.

19   Q    In terms of sequencing, I understand that there's been

20   a reduction of the expense reimbursement, which is good,

21   obviously, but in terms of sequencing, if you've already

22   achieved a catalyst, if you will, with respect to another

23   interested bidder, would the estate be better off if you

24   were able to sort of not have these be approved and sort of

25   work forward with the other potential bidder and have a two-

Page 36

```
 1    horse race without all of these protections?

 2    A     No.  No, in my opinion, absolutely not.  That other bid

 3    is still quite a ways away from being higher or bidder

 4    (sic).  It still has hurdles and obstacles that we need to

 5    address, so no.  NovaWulf has been working now for two

 6    months, three months to get us to this point where we have a

 7    binding term sheet, a binding plan support agreement.

 8         We believe we have jumped over many of the hurdles we

 9    need to jump over to get a confirmable plan.  So absolutely

10    not.  If we don't move forward today and NovaWulf determines

11    not to move forward, we will maybe not be back to square

12    one, but we will be in a much, much more challenged place.

13    So no.

14    Q     In terms of the NewCo structure that you mentioned, is

15    there some Bankruptcy Code provision that would allow you to

16    short circuit the IPO process for a public company?  Is

17    there some thinking about how long that's going to take, the

18    delay, to sort of establish a NewCo that will allow for the

19    equity tokens to trade?

20    A     Well, we -- I'm sorry, I apologize for interrupting.

21    Q     No, that's my question.

22    A     We believe that the equity will be issued under 1145 of

23    the Bankruptcy Code.  We believe the company will

24    immediately be a public company filing Q's and K's.

25    NovaWulf has retained a partner under which -- a partner who
```

1    will facilitate the trading of the equity.  As I said, the

2    equity will be tokenized, a security.  So we believe that

3    will happen immediately upon the effective date of a Chapter

4    11 plan.

5    Q    Are you familiar with the plan that's currently on

6    appeal with respect to Voyager, Mr. Puntus?

7    A    I'm not involved in that case other than reading the

8    bankruptcy rags.  No.

9    Q    Are you aware that there was a dispute raised about

10   whether the tokens that you're talking about issuing would

11   be considered unregistered securities?

12        THE COURT:  I don't think that was -- I'm sorry,

13   I'm going to stop you there.  I don't -- that is a legal

14   question.  My understanding is that the tokens, the issue

15   was the tokens that Voyager had issued not as part of the

16   plan were securities that had to be registered.  I didn't

17   understand.  I read the transcript from Judge Wiles.  I'm

18   going to -- it's calling for a legal question.  You're not

19   asking this witness that question.  I'm sustaining an

20   objection, my own objection to it.  Ask your next question.

21        MR. CURRIE:  Thank you, Your Honor.

22   BY MR. CURRIE:

23   Q    And so if you could elaborate on 1145, Mr. Puntus, in

24   terms of the timing; you think that will be upon emergence

25   from confirmation, you'll have a public co structure with

Page 38

1    the NewCo that 1145 would sort of bleed over to your NewCo

2    structure?  I guess I wasn't following the --

3    A    Yeah, I don't understand the question, but I'll try to

4    answer it in a nonlegal fashion.  We are trying to address

5    some of the issues that have been raised perhaps in Voyager

6    and elsewhere.  What we are issuing to creditors is no

7    different than common equity.  That is what we are issuing.

8    It will be in tokenized form, but NewCo will be a public

9    company registered and reporting, filing Q's and K's, with a

10   board controlled by its customers.

11        So we are trying to address the issue as to whether a

12   token is security.  This is not CEL token.  This is not a

13   token native to some of the other exchange platforms.  This

14   is 100 percent of the common equity of NewCo.  It just will

15   be reflected in tokenized form.  Hopefully, that answers the

16   question.

17   Q    And as I mentioned, we represent Mr. Tuganov, who's one

18   of -- a large holder in the Earn category.  Can you explain

19   for the Court, you know, just broad strokes, you know, what

20   you expect an Earn customer to receive under the --

21   ultimately, if the plan is going to be confirmed?

22   A    I think we will be providing extensive detail in the

23   plan and disclosure statement we intend to file in a matter

24   of weeks, but in terms of consideration --

25             THE COURT:  I think it was due by the end of the

Page 39

 1    month, but --

 2            THE WITNESS:  In a week.  I'm sorry, Your Honor.

 3            THE COURT:  It's not weeks.

 4            THE WITNESS:  That's one week.  I apologize, Your

 5    Honor.  Time goes slowly in this case.

 6    BY MR. CURRIE:

 7    A    There will be two -- for Earn creditors, there will be

 8    two components of consideration as has already been

 9    discussed.  One will be a liquid crypto distribution, a

10    strip of liquid crypto, probably BTC, ETH, and U.S. -- and

11    stables.  And the second will be a pro rata share of 100

12    percent of the equity of NewCo.  As we've discussed, NewCo

13    will house most if not all of the illiquid assets of the

14    Celsius estate.

15    Q    And as we're sort of comparing that to what might be an

16    orderly liquidation, is there thinking about sort of rough

17    numbers, broad strokes, what people would receive in the

18    Earn category?  I mean, they're the ones so far that are --

19    appear to be -- there's lack of clarity about what they're

20    getting in comparison to, you know, other creditors and the

21    liquidation context.

22    A    All of that will be included in the disclosure

23    statement.  There will be a liquidation analysis which

24    allows us to satisfy best interests.  There will be a

25    comparison of that to the value being distributed under the

Page 40

1    NovaWulf NewCo plan.  There will be a discussion of what

2    each class of customers will receive, convenience class,

3    Earn customers, borrowers, custody, all of that and more

4    will be in the disclosure statement.  This will be one of

5    the most comprehensive disclosure statements I think I've

6    ever seen in my experience.

7              MR. CURRIE:  I have no further questions, Your

8    Honor.

9              THE COURT:  Thank you.  Mr. Dixon.

10             MR. DIXON:  Hello, sorry.  Just unmuting myself.

11   Simon Dixon, pro se creditor.  I'm the seventh largest

12   creditor in this case.

13                  CROSS EXAMINATION OF MARC PUNTUS

14   BY MR. DIXON:

15   Q    The first question I had is with regards to staked ETH.

16   I think it's being defined as an illiquid asset at the

17   moment, but on the 12th of April ETH becomes -- staked ETH

18   becomes a liquid asset.  Is it going to be defined as

19   illiquid or liquid for the purpose of the plan?

20   A    The staked ETH, the stETH, is part of NovaWulf

21   structure and will be ported over to the NewCo under the

22   plan.

23   Q    Okay.  I mean, I think there will be quite a lot of

24   objections from creditors because they like to receive as

25   much of their ETH back as possible.

1          THE COURT:  This is not the plan -- this is not a

2    disclosure statement plan hearing.  This is a hearing on

3    whether or not the Court should approve the bid protection.

4    So limit your questions to that.

5          MR. DIXON:  Okay, so it's not the plan hearing.

6          THE COURT:  This is not the plan hearing.  There

7    has not been a disclosure statement or proposed plan that's

8    been publicly released at this point.  So this is -- the

9    issue today is with respect to the motion to approve bid

10   protections for NovaWulf.

11         MR. DIXON:  Okay, so I'll leave it for a future

12   hearing.  But for the record, I did want to say, I think

13   they said that NovaWulf came up with a plan, but it was a

14   plan that was proposed by myself and Bank to the Future in

15   terms of the structure.  But I'll save the rest of my

16   questions for when we can actually ask on the actual plan.

17   Thank you.

18         THE COURT:  Thank you, Mr. Dixon.  Mr. Abreu?

19         MR. ABREU:  Chairman?

20         THE COURT:  Yes, go ahead.  You have to unmute --

21   yeah, go ahead.

22         MR. ABREU:  Yeah.  I wish to speak after this as

23   well about this motion, but I want to put some questions

24   towards Mr. Puntus about the NovaWulf plan.

25              CROSS EXAMINATION OF MARC PUNTUS

Page 42

1    BY MR. ABREU:

2    Q    The Ethereum that going to be staked, is that part of

3    the performance fee?  Will that be -- will they take a

4    performance fee from that stake ETH?

5    A    Yes.  All of the assets that will be part of the NewCo

6    structure will be included in the performance fee, save the

7    loan portfolio.

8    Q    So the loan portfolio, the restructuring will not be

9    included also in the performance fee?

10   A    There won't be a double counting.  There -- we won't be

11   counting the coin that ultimately is an obligation to the

12   lenders as restructured and the loans.  Only the coin itself

13   including the staked ETH.

14   Q    So the interest paid on the restructuring of the loans

15   will be not -- will not be included in the performance, fee?

16   A    The interest paid on the loans will ultimately become

17   part of the NewCo and ultimately will factor into the

18   performance fee.

19   Q    Okay.  About the current custodian that you are using,

20   Fireblocks, do you think they have the legal requirements to

21   stake Ethereum and hold your assets?

22            MR. McCARRICK:  Your Honor, I'm going to object.

23            THE WITNESS:  I didn't understand the question.  I

24   apologize.

25   BY MR. ABREU:

Page 43

1    Q    Currently, you have your assets in Fireblocks and you

2    have the crypto assets, right?  \

3    A    I believe that that's correct.

4    Q    So, is it -- in your view, there is a legal structure

5    there to be saving or guarding your current crypto assets on

6    that company?

7              THE COURT:  I'm sorry.  I don't understand the

8    question.  Mr. Puntus, did you understand the question?

9              THE WITNESS:  I didn't understand the question and

10   even I think, Your Honor, to the extent --

11             MR. ABREU:  Hello, okay, I'm going to --

12             THE WITNESS:  I may not be the right person to

13   answer the question.

14             MR. ABREU: I'm going to give greater context.

15   Sorry, Judge.  Currently --

16             THE COURT:  No, I don't want -- no context.  You

17   have questions of the witness, ask the witness questions.  I

18   don't want to hear argument from you at this --

19             MR. ABREU:  Okay, okay.

20   BY MR. ABREU:

21   Q    Currently you have assets on Fireblocks.  You think

22   that's fine?  Legally, that's fine, right?  I just want to

23   know that.

24   A    I don't -- I can't answer a legal question.  I believe

25   the assets we current -- we currently do have assets on

Page 44

1    Fireblocks.

2    Q    Yeah, and I believe it's being staked by them, correct?

3    A    I don't know the answer to that.

4    Q    Okay.

5              MR. ABREU:  Okay, that's all my questions.

6              THE COURT:  All right.  Mr. Ivene.

7              MR. IVENE:  Good afternoon.  It's Jason Ivene, pro

8    se creditor.

9                   CROSS EXAMINATION OF MARC MR. PUNTUS

10   BY MR. IVENE:

11   Q    Mr. Puntus -- I'm sorry, if I mess up your name -- does

12   -- okay, within the plan so far what we've been presented, a

13   CEL token is going to be subverted town to 20 cents.  In --

14   is there any issue if it deemed to be the value of date of

15   petition with this order?  If it goes up, does it change

16   anything?

17   A    I think that --

18             THE COURT:  I don't expect you to answer legal

19   questions, Mr. Puntus --

20             MR. IVENE:  Okay.

21             THE COURT:  -- factual questions, you go ahead and

22   do that, but -- are you able to respond?

23             THE WITNESS:  I would say on CEL token, I think

24   that issue is among a thousand other issues continues to be

25   negotiated as to what value will -- what claim CEL token

Page 45

1   holders will have, whether it's the 20 cents or so it traded

2   at, at or about the petition date or some other value.

3   That's an issue, I believe, that continues to be discussed

4   and ultimately will be reflected in the plan we file in a

5   week.

6            THE COURT:  All right --

7            MR. IVENE:  That's all I have.  Thank you.

8            THE COURT:  Mr. Porter?  Mr. Porter, if you want

9   to be heard, you need to unmute.  Mr. Porter, your hand is

10  raised, but you're still showing on mute.  Okay, go ahead.

11           MR. PORTER:  Apologize.

12           THE COURT:  Go ahead.

13           MR. PORTER:  Good afternoon, Judge.  Judge Glenn,

14  the problem we have before us now is cryptocurrency's rise

15  in price versus the Chapter 11 petition dates value of the

16  accounts.  Depositors are curious where the extra monies

17  will go over the value of the Chapter 11 petition date.  In

18  the event we are experiencing significantly higher prices

19  than our deposits in the cryptocurrency's --

20           THE COURT:  Mr. Porter, since the petition date as

21  of yesterday, Bitcoin had increased 3.9 percent.  I happened

22  to look at that yesterday.  I don't know what's happened

23  with the other crypto, so some things have gone up.  Some

24  things have gone down.

25           MR. PORTER:  I was referring specifically to the

Page 46

1    top tier.  As of January 1st, Bitcoin was 16,600 and change

2    and today it's around 28,000 and it could be significantly

3    higher, 40,000, who knows.

4         THE COURT:  How it will get distributed is a plan

5    issue and not the issue about approving the fees for

6    NovaWulf, if it's approved.  That's going to be plan issue.

7         MR. PORTER:  Your Honor --

8         THE COURT:  If you have --

9         MR. PORTER:  No, Your Honor --

10        THE COURT:  I'm sorry.  No.  listen to me.  If you

11   want to ask -- you need to ask questions with respect to the

12   issues about approving the breakup fee and expense

13   reimbursement.  That's the issue for today.  You and

14   everyone else will have an opportunity to address any

15   issues, the disclosure statement or plan confirmation.  Do

16   you have questions regarding expense reimbursement and

17   breakup fees?

18        MR. PORTER:  Yes.  I disagree with the amount --

19        THE COURT:  I don't care whether you disagree with

20   me or not.  Do you have any questions for this witness about

21   breakup fees and expense reimbursement?  Otherwise I'm going

22   to cut you off.

23        MR. PORTER:  I'll wait until another time that's

24   more appropriate.  I apologize, Your Honor.

25        THE COURT:  Mr. Herrmann, go ahead.

1          MR. HERRMANN:  Thank you, Your Honor.  Immanuel

2   Herrmann, pro se creditor.

3               CROSS EXAMINATION OF MARC PUNTUS

4   BY MR. HERRMANN:

5   Q    Mr. Puntus, in my view, we need to release all of the

6   Ethereum.  If creditors were to argue to release all of the

7   Ethereum rather than NewCo holding onto it, would these bid

8   protections and the breakup fee still makes sense as

9   proposed?

10  A    I don't completely understand the question.  The

11  current structure provides for, the NovaWulf deal provides

12  for the staked ETH  and the stETH to be ported to the NewCo

13  structure and the value of that staked ETH and stETH and the

14  other assets, the mining business, the loan portfolio, the

15  alternative investments, to be reflected in the ESTs, the

16  common equity to be issued by NewCo to 100 percent of the

17  Earn creditors.

18  Q    I under --

19  A    That's the current deal that we've negotiated with

20  NovaWulf.

21  Q    I understand that's the current deal and any changes

22  will come under the context of a plan, but would the bid

23  protections or breakup fees need to change in a scenario

24  where all the Ethereum would be released?  In other words,

25  creditors will -- this is a big issue for creditors.  We

1   want the Ethereum released and my question is specifically

2   about the bid protections and the breakup fee.  If the plan

3   had to change that way or creditors insisted on it, would

4   this plan you have to pay these, you know, to have these bid

5   protections and have this breakup fee, would it still be

6   able to survive as it is?

7   A    We'd have to negotiate that with NovaWulf.  The current

8   deal with NovaWulf is this plan, this purchase, these

9   assets, and these bid protections.  To the extent something

10  changes and a portion of these assets are distributed

11  directly to Earn creditors, as the deal stands today, it

12  wouldn't exist.  Would we go back to NovaWulf and try to

13  renegotiate it?  Sure.  But as it stands today, we are

14  seeking approval of these breakup fees, these expense

15  reimbursements for this transaction.  Hopefully, that

16  answers your question.

17  Q    Yeah, I think it does, although you know, I asked

18  because before we --

19          THE COURT:  Let's not argue.  Ask your questions,

20  Mr. Herrmann.

21          MR. HERRMANN:  Sure.  Sorry, Your Honor.

22  BY MR. HERRMANN:

23  Q    Yeah, I just want to make sure there's an outline of a

24  plan creditors can stand behind.  Do you think it would make

25  sense to have a rough disclosure statement, super rough, or

1    something that includes the liquid crypto amounts, what's

2    going to happen to the ETH, the amount of liquid crypto

3    going back to Earn before we approve these bid protections

4    and the breakup fee?  So similar -- the order of operations

5    questions that had been asked by -- earlier by one of the

6    attorneys.

7    A    No, we don't have time here.  We have to move forward

8    quickly.  We can't wait until we resolve every single issue.

9    I think we've resolved a lot of them.  We will have a

10   disclosure statement that's not rough but detailed hopefully

11   in a very short period of time and we can then proceed to a

12   disclosure statement hearing and a plan confirmation hearing

13   where all of these issues can be raised and addressed.

14   We're simply out of time.

15       NovaWulf has expended and extensive amount of dollars

16   and time and resources to get us to this point and we just

17   can't afford to wait.  And my fear would be at some point,

18   this carefully crafted transaction simply falls apart and I

19   also believe, as I've said, $5 million, and again, they

20   don't get it unless there's a higher or better bid.

21   If we pivot to something that looks like an orderly

22   winddown, they don't get the $5 million and the expense

23   reimbursement are reasonable prices to pay.

24       I know it's a lot of money, but in the circumstances,

25   in a complex case, we believe we should move forward and get

Page 50

1    these approved today and keep this sort of train running

2    towards the towards the finish line.

3    Q    All right.  Mr. Puntus, could you let us know what you

4    understand the estimated liquid crypto recovery to be for

5    Earn under these bid protections and breakup fee, like what

6    you're relying on?  Because my understanding now after

7    you're answering these questions is that if the deal changes

8    a lot, then the breakup fee and the bid protections may need

9    to change.  So like roughly what is the plan for how much

10   liquid --

11   A    I --

12   Q    -- crypto would go out to Earn versus how much would go

13   into this?

14   A    Yeah, I think we're -- I'm not going to answer that.

15   We're not going to include roughly.  We will include

16   detailed analysis in the disclosure statement when we file

17   it.

18   Q    All right.  And could you -- okay, so I have -- my

19   other question was similar, so I'm not going to ask.  Yeah.

20   And I think you've already answered, but just to clarify

21   again, a big issue for creditors, price appreciation of

22   coins, post-petition.  Anything held on the balance sheet,

23   let's say that the price of Ethereum goes up from, you know,

24   to $20,000 per coin so 10X.  You'd be taking a 20 percent

25   management fee; is that correct, like on the U.S. dollar

Page 51

1    price appreciation?

2        So like, if Ethereum, just irrespective of the

3    management, right, you'd be taking performance fees just,

4    you know, because the U.S. dollar price of the Ethereum on

5    the balance sheet goes up.  NovaWulf would, sorry, not you.

6    A    Yes.

7    Q    Yeah.

8    A    The management fee, as I said, will initially be tied

9    to NAV, net asset value, and to the extent values of the

10   crypto, the illiquid crypto go up, then the -- go up and the

11   fee would go up.  That's correct.

12   Q    All right.  And are you aware that most crypto stocks

13   illiquid crypto vehicles such as the BitWise, the Grayscale,

14   Ethereum, and Bitcoin Trusts and other sorts of vehicles

15   that are a security that contains crypto tend to trade

16   significantly below net asset value.  For example, 50

17   percent is typical, a 50 percent discount to net asset

18   value.

19   A    I can't speak to the universal crypto stocks.  I'm

20   aware of the unique issues associated with Grayscale and it

21   being a trust versus an ETF.  I think what we're trying to

22   accomplish here versus a liquidating trust which will have

23   to hold and monetize these assets is to create a structure

24   where the instrument that reflects the customer's ownership

25   trades as well as it can and we think a public company

Page 52

```
 1    filing Q's and K's with customer representatives controlling
 2    the board will be better than a liquidating trust which I
 3    have a ton of experience with as do many others on this call
 4    where the claims of that liquidating trust tend to trade at
 5    a meaningful discount to underlying value if they trade at
 6    all.
 7    Q    All right --
 8              THE COURT:  Anything else, Mr. Herrmann?
 9              MR. HERRMANN:  No, Your Honor, unless you want --
10    unless you disagree with Mr. Puntus and want him to give us
11    a rough deal, of a rough outline of any deals, in other
12    words, ask him to answer those questions.  I don't have
13    anything further.
14              THE COURT:  I'm not going to -- I, you know, at
15    this stage, Mr. Herrmann, we'll all look forward to the
16    disclosure statement and the plan.  I think it's a fair
17    point that you and others have raised as to whether the
18    expense reimbursement and breakup fees should be approved
19    without some further information about projected recoveries
20    and things like that because it's a separate issue.  So
21    that's a point that's been made.  Anything else, Mr.
22    Herrmann?
23              MR. HERRMANN:  No, that's all.  Thank you.
24              THE COURT:  Thanks very much.  Mr. Mendelson.
25              MR. MENDELSON:  Yes.  Thank you, Your Honor.
```

1                CROSS EXAMINATION OF MARC PUNTUS

2    BY MR. MENDELSON:

3    Q    Thank you, Mr. Puntus, for answering the questions.

4    You obviously are extremely knowledgeable and I have a few

5    questions and concerns regarding the breakup fee.  Have you

6    done any analysis or know how much NovaWulf was making on,

7    let's say, a monthly basis prior to this Celsius engagement?

8    A    No.

9    Q    Well, the reason that I ask is I'm trying to, I'm

10   trying to do my own mathematical analysis.  If we were to

11   take a look at how many hours they spent on making the plan

12   and multiply that by an hourly -- you know, hourly wage or

13   salary, how is that in comparison to the amount of, I guess

14   money that's being asked for creditors to pay for this

15   breakup fee.  I believe that they're -- sorry.

16   A    Yes.  No, I guess I would take the position, Mr.

17   Mendelson, that the breakup fee only -- it's a breakup fee

18   because we do believe they are serving as a stalking horse

19   and it only -- and if they don't, and if they don't get

20   topped, it only gets paid in the circumstances where we get

21   a higher or better bid.

22        And in my view, if we do that's great for customers and

23   that higher or better bid will effectively cover their

24   breakup fee, so that's the way we look at breakup fees, not

25   in relation to, you know, what they were making before, how

Page 54

1    many hours specifically they spent.

2        There was as part of these negotiations, a per diem

3    concept that was introduced by NovaWulf at some point where

4    they, you know, to your point, where they had asked for sort

5    of a fee related to sort of how much they think they should

6    be paid per diem, given that they're highly compensated

7    professionals.  We ultimately rejected that that concept as

8    part of these negotiations.

9    Q    So just to summarize or to clarify, that $5 million

10   that creditors would be paying as part of the breakup fee if

11   a higher bid comes in, would exponentially lead to a greater

12   return back to the estate to pay creditors because of that

13   $5 million stalking horse proposal?

14   A    I think that's correct, right.  This is not your

15   typical case where someone buys a business for $100 million

16   and then the next bid has to cover the breakup fee and the

17   expenses.  Bids will be different.  There will be different

18   components, but yes, the debtors and the Creditors Committee

19   will have to determine that that higher or better bid is

20   higher or better enough to cover the breakup fee and the

21   expenses here in order to proceed.  That will be one

22   component of, you know, of a complicated comprehensive

23   analysis.

24   Q    Yeah, I understand.  It makes sense.  You know, I guess

25   my only one or two additional concerns would be that I

Page 55

```
 1    believe that NovaWulf's plan is based around Simon Dixon's

 2    plan and maybe pulled from other pieces of other plans and I

 3    don't believe that these other individuals are getting a

 4    "breakup fee" and I believe that they provided the

 5    foundation for this plan.

 6              THE COURT:  We're not going to argue, Mr. Crews --

 7    Mr. Mendelson.  I'm sorry, I --

 8              MR. MENDELSON:  No worries, no worries.

 9              THE COURT:  We're not going to talk about what

10    other plans do.  I'm happy to ask -- have you ask whatever

11    questions of the witness you want, but not in comparing with

12    -- you know, we're dealing with the breakup fee and expense

13    reimbursement today.

14              MR. MENDELSON:  Understand.  I appreciate that.

15    I'm not -- I'm obviously not a lawyer.  I'm just a pro se

16    U.S. citizen.

17              THE COURT:  You've asked good questions before and

18    I'm happy to have you ask questions now.

19              MR. MENDELSON:  No worries.  Thank you.

20    BY MR. MENDELSON:

21    Q    I guess my only other question is what -- I don't want

22    to say precedent, but what are we putting out there in the

23    public if companies can just come in, into the bankruptcy

24    cases, make bids, and if they're selected by future UCCs or

25    this UCC that they get compensated for their bid, even if
```

Page 56

1    their bid doesn't get approved?  I am in a relationship.  I

2    have a girlfriend.  If we break up tomorrow, fortunately,

3    she doesn't get my money.  If we get married, she takes it

4    all.  We're not married to NovaWulf, I don't think, and so

5    I'm just concerned about what this, what kind of precedence

6    this may set in future bankruptcy cases.

7    A    I'm happy if Your Honor wants me to, to take --

8          THE COURT:  No, I think -- I don't want you to

9    answer that.  Okay, thanks very much, Mr. Mendelson.  Mr.

10   Crews.

11         MR. CREWS:  Yes, thank you, Your Honor.  Cam

12   Crews, pro se creditor.

13              CROSS EXAMINATION OF MARC PUNTUS

14   BY MR. CREWS:

15   Q    For the sake of clarity, Mr. Puntus, is NovaWulf being

16   compensated in terms of their hourly employees investing

17   time towards this process?

18   A    No.  The hourly compensation will be for their counsel.

19   Q    And do you have an estimate of how much has been

20   expended so far?

21   A    I don't.

22   Q    Would you be able to put a probability in terms of the

23   likelihood of all $13 million being expended?

24   A    I would say the probability is high that we get close

25   to the cap.  This is a very complex, complicated transaction

Page 57

1    and significant time and fees including lawyer fees have

2    been expended already.

3    Q    And could you also clarify in terms of the

4    determination of higher and better, both who would determine

5    that and any metrics that would be used to evaluate that?

6    A    I think the standard of bankruptcy is higher or better.

7    The or I think is important here.  I think as we've done

8    throughout the case, the Debtors, their principals, their

9    professionals, the Committee, their principals, and their

10   professionals would sit down and carefully analyze other

11   transactions available and determine whether they're higher

12   or better.

13       As I said, in this case, versus some others, higher or

14   better is not as quantifiable.  I think there are components

15   that are quantifiable.  Some of it is qualitative.  Some of

16   it is quantifiable.  We'll sort of know it when we see it,

17   and ultimately, Your Honor will be the ultimate arbiter of

18   that.

19   Q    And do both, then the Debtors and the UCC have to come

20   to an agreement or what happens if there is some

21   disagreement over those terms?

22   A    I think in this unique case where the Committee

23   represents the customers who clearly have been harmed here,

24   we have tried our level best to work -- and Kirkland may

25   yell at me about this -- as co-advisors with the Committee.

1   We think it is critically important to do so.  So my -- I

2   have a strong -- I strongly believe that ultimately, the

3   Committee and the Debtors would come to the same conclusion

4   here as to what's higher or better.

5   Q    Great.  And just as a final question, in terms of just

6   as an example, if somebody were to come in with a slightly

7   higher bid of say $46 million over the 45 that's been

8   proposed to add, that would technically be higher and better

9   but not exceed the $5 million breakup fee.  So, would they

10  need to essentially exceed it by more than $5 million in

11  that case?

12  A    In a normal -- in a usual circumstance, they would need

13  to exceed it by the breakup fee and the expense

14  reimbursement.  The first bid, if we were talking about

15  apples to apples would be the bid plus expense reimbursement

16  plus breakup fee plus some reasonable increment.  So no,

17  that bid, to your point, wouldn't be higher or better

18  because we would need to then pay $5 million plus $13

19  million.

20  Q    Ok.  So $23 million would be the expected watermark,

21  effectively, to exceed?

22  A    Again, if we're just talking about dollars, I think

23  there are other ways competing bidders can create a higher

24  or better bid that don't relate only to direct dollars.  But

25  yes, if we're just speaking to dollars, you're correct.

1    Q    Thank you.  No more questions.

2    A    (indiscernible).

3         THE COURT:  Thank you very much, Mr. Crews.  Mr.

4    Reph.

5         MR. REPH:  Thank you, Judge Glenn.  Ryan Reph, pro

6    se creditor.

7              CROSS EXAMINATION OF MARC PUNTUS

8    BY MR. REPH:

9    Q    I agree with the breakup fee, but with that said,

10   considering NovaWulf will receive approximately $30 to $35

11   million for the first year in their management fee, is that

12   what you said, Mr. Puntus, they're -- you're kind of

13   guessing?

14   A    Again, it depends upon --

15   Q    A guesstimate.

16   A    It depends on the NAVs at disclosure statement and then

17   we'll have to update those as of the filing date, but we're

18   trying to give Your Honor a sense of what those fees might

19   be in year one.  So, yes, that was a -- purely a guesstimate

20   and I hope not to be completely held to it as valuations

21   move around over the next few months.

22   Q    And that's going to be a question for the plan, is the

23   date that we're going to be using for liquidation analysis

24   and et cetera.  And so considering you guys will get that in

25   your investments, $45 million, to me it's kind of a minimal

Page 60

1    bet.  And in my opinion, would think that there would be a 1

2    percent breakup fee or -- mas o menos.

3        I understand the complexity that you speak about, we're

4    in this, but the estates are already paying for the other

5    professionals involved creating the plan and working with

6    NovaWulf and paying our fair share of expenses already.

7        And considering they've been on the case for a few

8    months and only part of -- and only a part of this case, a

9    large part nonetheless, I believe the $5 million breakup fee

10    would be sufficient.

11        So my question regarding the additional expenses, are

12    the additional expenses considered to be from when plan

13    confirmation happens on?  So then, you know, the creditor

14    body will just -- or the Debtor will just take on those

15    expenses or are these all the expenses since day one that

16    NovaWulf has kind of put in?

17    A    The latter.

18    Q    The latter.  And do you have an approximate already,

19    like a tally?  Are they giving any monthly statements to you

20    guys or are they just keeping everything?

21    A    Yeah, I don't.  They've been paying those expenses

22    themselves, so I don't have an estimate other than to say,

23    you know, thousands of hours have been spent, tens of

24    thousands of hours between the Debtors, NovaWulf, and the

25    Committee.

Page 61

1    Q    Yeah, no, 100 percent.  And that's what I'm saying.

2    And the creditor body is basically paying for the majority

3    of that already, just not the NovaWulf expenses.  That's

4    where I'm thinking the $5 million breakup fee should satisfy

5    all salaries and expenses, but that's all I have today.

6    Thank you.

7              MR. REPH:  Thank you, Judge.

8              THE COURT:  Mr. Puntus, am I correct that the

9    breakup fee and the expense reimbursement is only paid if

10   someone tops the bid and is selected instead of  NovaWulf?

11             THE WITNESS:  If the Debtors or the Committee

12   exercise their fiduciary out to accept a higher or better

13   bid.  Yes.

14             THE COURT: Yes, but NovaWulf does not receive

15   either the breakup fee or the expense reimbursement if the

16   plan's confirmed and they go forward as the sponsor?

17             THE WITNESS:  They don't receive the breakup fee.

18   I believe that the expense reimbursement will be addressed

19   as part of their management fee structure going forward, if

20   they prevail in NewCo.

21             THE COURT:  Okay.  All right.  Mr. Christiansen.

22   Thank you very much, Mr. Reph.  Mr. Christiansen.

23             MR. CHRISTIANSEN:  Thank you, Your Honor.  I have

24   two questions.

25                   CROSS EXAMINATION OF MARC PUNTUS

Page 62

```
 1    BY MR. CHRISTIANSEN:

 2    Q    In the event of a rally in crypto prices between now

 3    and the confirmation of the plan such that the proposed plan

 4    is less than the liquidation analysis, would the breakup fee

 5    still be paid?

 6    A    The breakup fee is only paid to the extent we move

 7    forward with a higher or better bidder.  To the extent we

 8    pivot to an orderly winddown, the breakup fee will not be

 9    paid.

10    Q    And what about reimbursement of expenses?  Similar

11    answer?  No.

12    A    No.  the answer is no.

13    Q    Great.  This -- my second question, I think, is just a

14    point of clarification for your benefit, Mr. Puntus.  You

15    made multiple references including in a response to a

16    question from Judge Glenn about how the board will be

17    constituted.  With the plan that was submitted, the proposal

18    had seven board members, two are UCC appointed, three are

19    UCC nominated but subject to a NovaWulf approval, and two

20    are NovaWulf appointed and you made a statement that it

21    would be customer appointed.  Has the makeup of the board

22    changed following the last presentation to the Court.

23    A    I believe I said customer controlled, and I still

24    believe it will be customer controlled under the math you

25    just laid out.
```

1   Q    Okay.  Thank you for those.  That's the extent of my

2   questions.

3            THE COURT:  Thank you very much.  Anybody else

4   have any questions?

5            All right, I do have some questions for counsel

6   and, I guess, I've asked these of Mr. Puntus, but they're

7   really legal questions and just bear with me a second here.

8   So Mr. McCarrick or -- I'm not sure which one of your

9   colleagues is going to answer these questions, but I'm just

10  trying to understand.  Well, first let's assume the plan is

11  confirmed.  The assets transfer to NovaWulf to NewCo and

12  what happens in the event of a subsequent breach?  What

13  happens to the assets?  Does the case -- the case can be

14  converted to a Chapter 7 case?  I mean, now you have a new

15  entity holding.  Is there a provision -- is it contemplated

16  as a provision about unwinding the transfer to NewCo?

17           MR. KOENIG:  Your Honor for the record, Chris

18  Koenig, Kirkland and Ellis for the Debtors.  So your

19  question is, after the plan, after the Chapter 11 plan is

20  consummated and --

21           THE COURT:  Yeah.  You know, I've had cases where

22  there's a breach of the plan, where there's a failure to

23  perform.  What happens then?  What happens to the assets

24  that have gone into NewCo?

25           MR. KOENIG:  So if the terms of the plan are

Page 64

1    breached or are not actually complied with Your Honor?

2            THE COURT:  Correct.  There's already been a

3    transfer of the assets into NewCo and I want to know whether

4    -- do the assets come back?  Does the -- what happens to it?

5    If the case is converted to a Chapter 7 at that point, what

6    are the assets of the estate?

7            MR. KOENIG:  Your Honor, at that point, I think

8    that the plan would have been substantially consummated.

9    The old bankruptcy would be over and there would be a NewCo

10   that would -- you know, if it was in financial distress for

11   some reason or another, you know, would have to --  you

12   know, we don't anticipate this, of course, but I think it

13   would be a -- the distress of NewCo, it wouldn't have

14   anything to do with the old Chapter 11 estates.

15           At that point, all of the assets would have been

16   sold, would have been transferred to NewCo to be managed by

17   NovaWulf and it wouldn't sort of revert back to the extent

18   that there's a breach.  Of course, if there's, you know, a

19   violation of the terms of the plan, Your Honor will, you

20   know, retain jurisdiction to, you know, adjudicate that.

21   But at that point, I believe the transaction would have been

22   substantially consummated.

23           THE COURT:  All right.  What happens if the case

24   is converted to Chapter 7 before a plan is confirmed?  Is

25   NovaWulf entitled to expense reimbursement?  Not a breakup

Page 65

1   fee, there isn't a higher bidder, but will NovaWulf be

2   entitled to receive expense reimbursement if the case is

3   converted to a Chapter 7?

4           MR. KOENIG:  Your Honor, the -- you're correct.

5   There would be no breakup fee because it would be within the

6   definition of an orderly winddown.  But the expense

7   reimbursement --

8           THE COURT:  Well -- I'm sorry, but the definition

9   of an orderly winddown, I didn't see where it included

10  converting the case to Chapter 7.  I may --

11          MR. KOENIG:  Your Honor --

12          THE COURT:  -- have missed it.

13          MR. KOENIG:  Yeah, Your Honor, I'm looking at Page

14  48 of 150 in the definition of orderly winddown, 48 of 150

15  on Docket No. 2151 which is the bid protections motion

16  itself which attached the plan sponsor agreement.  So I'm on

17  page 48 of 150.  The definition of orderly winddown says

18  "The orderly winddown of the Debtors' estates to be

19  effectuated, X, by a conversion of the Chapter 11 cases to

20  cases under Chapter 7 of the Bankruptcy Code or Y, by the

21  plan administrator pursuant to the winddown procedures."

22          THE COURT:  All right.  What if the regulators

23  determine that NovaWulf is not regulatory compliant?  Are

24  they entitled -- and therefore the plan does not get

25  confirmed.  Is NovaWulf entitled to expense reimbursement in

Page 66

1    that circumstance?

2              MR. KOENIG:  Your Honor, they would be entitled to

3    an expense reimbursement under the plan sponsor agreement.

4    Yes.

5              THE COURT:  Okay.  Even if the failure to be

6    regulatory compliant was entirely because of their conduct

7    or lack of conduct, the agreement would provide they're

8    entitled to the expense reimbursement?

9              MR. KOENIG:   Your Honor, it depends on whether

10   it's a breach of the plan sponsor agreement.  So if they

11   have a covenant or something that they're supposed to do and

12   they don't perform, it's a breach.  The plan sponsor

13   agreement is terminated because of their breach.  The

14   expense reimbursement is not due in that circumstance.  So

15   they have covenants to work in good faith to try to become

16   regulatorily compliant.  I'm -- this is a pure hypothetical,

17   of course.  We don't expect this.  If they were to not take

18   any actions, they don't answer any questions of regulators,

19   they don't provide any necessary --

20             THE COURT:  Let's say they do all that.  Let's say

21   they do all that.

22             MR. KOENIG:  Right.

23             THE COURT:  Regulators convince the Court that

24   they -- that the plan can't be confirmed because NovaWulf is

25   not regulatory compliant.

1          MR. KOENIG:  Right.

2          THE COURT:  Are they entitled to expense

3   reimbursement in that circumstance?

4          MR. KOENIG:  They would be entitled to expense

5   reimbursement as long as it was not the result of their

6   breach of their obligations under the plan sponsor agreement

7   and the Debtors believe that that is appropriate given the

8   shifting regulatory landscape that we have and you know, all

9   of the hard work that it's going to take to get -- there's

10  no certainty in this case.

11         THE COURT:  Okay, so I saw -- you know, I'm sure

12  you saw as well.  I read this morning that Coinbase received

13  a Wells notice from the SEC and why should NovaWulf have the

14  -- if it's because they can't, are not deemed, are not

15  determined to be plan compliant, why should the estate have

16  to pay their expense reimbursement in that circumstance?

17  I'm really --

18         MR. KOENIG:  Your Honor --

19         THE COURT:  I'm really balking at this.

20         MR. KOENIG:  Understood, Your Honor, and we

21  negotiated this heavily and this was one of the most

22  important points to us, but what the Debtors came to in our

23  business judgment was that they are working very hard along

24  with us to make this regulatorily compliant.  But there's no

25  guarantee because this is a shifting landscape.  If

Page 68

1    everybody, you know, tries their best and works their best

2    and at the end of the day, the regulators, you know, say

3    that this doesn't work, it doesn't mean that they shouldn't

4    be entitled for expense reimbursement for their good faith

5    efforts in trying to reach that result.  And we're working

6    with the regulators.  We have weekly calls with them.  We've

7    been providing --

8               THE COURT:  That was going to be my -- stop.  My

9    next questions were for you to explain what has been done so

10   far to be able to get any comfort that the regulators will

11   approve the structure that's proposed.

12              MR. KOENIG:  Yes, Your Honor.  So we have been in

13   constant communication with the regulators for the last

14   several weeks.  We have a weekly call with the state

15   regulators.  We have separate calls with federal regulators.

16   It is one of the most important issues to our board, Your

17   Honor.

18              It's a critical component to the Debtors and to

19   the Committee and in our business judgment, we believe that

20   this makes sense at this time and we believe that the there

21   is a, you know, a reasonable chance that this is going to

22   work.  Of course, there's no guarantees in this

23   circumstance, but we're standing here today with the bid

24   that is the result of a six-month sale process and we

25   believe that it is appropriate to continue down this path in

Page 69

1    light of the fact and circumstances --

2           THE COURT:  Well, except Mr. Koenig, that it was

3    only within the last few weeks that I began hearing that

4    there actually were direct communications between the

5    Debtors' professionals and the regulators.  For a long time,

6    I kept hearing that there was no communication with the

7    regulators and this is an extremely complex transaction.

8           Certainly I've read the transcript or the opinion

9    that Judge Wiles issued, two opinions, in Voyager and I know

10   that the government has appealed his confirmation of the

11   plan and I'm concerned about a structure that would -- could

12   result in $13 million in expense reimbursement being paid to

13   NovaWulf when the reason this has failed is that the

14   regulators, you know, the -- some action is taken to prevent

15   -- or I don't approve it.

16          There are objections from the regulators and I

17   conclude they're right and I don't approve the deal.  I'm

18   very concerned in that circumstance that you've put the

19   entire risk on the estate and none of it on NovaWulf as to

20   $13 million.

21          MR. KOENIG:  Your Honor, a couple of points.  So

22   first on the regulatory point, we wanted to make sure that

23   we had a transaction structure in hand before we engaged

24   with the regulators because if we went forward with

25   something that was, you know, not fully baked or, you know,

Page 70

1    we weren't going to be able to answer their questions, that

2    wouldn't be productive or that wouldn't be helpful.  We've

3    had very detailed calls with them where they have a lot of

4    diligence questions and a lot of questions in general about

5    the transaction structure, and put simply, we wouldn't have

6    been able to answer those questions, you know, a couple of

7    months ago.

8            You know, we waited until we had the certainty

9    that we had about the transaction structure so that we could

10   have a constructive meaningful dialogue with them and that's

11   why the dialogue has increased over the past few weeks now

12   that we have additional certainty about, you know, what the,

13   both the Debtors and the Committee believe to be the proper

14   path forward.

15           THE COURT:  That's fine, but it still raises the

16   question in my mind of you're putting $13 million of the

17   Debtors' assets on the line for expense reimbursement.  If

18   this all falls apart because of regulatory action and, you

19   know, why does the Debtor bear that risk and not NovaWulf?

20   That's my question.

21           MR. KOENIG:  Your Honor, NovaWulf is spending an

22   awful lot of time and effort and yes, cost, that isn't even

23   in the expense reimbursement because as Mr. Puntus

24   testified, they've spent thousands of hours on this

25   transaction.  They sought a per diem.  We were able to

Page 71

1   negotiate the per diem out of the expense reimbursement.  So

2   there's certainly cost and time effort and opportunity cost

3   for NovaWulf and their management team that could be

4   pursuing other opportunities.

5           So I don't believe that it's fair to say that that

6   NovaWulf has no risk.  They've been putting an awful lot of

7   time and effort and expense and manpower, you know, sweat

8   equity into this transaction that would certainly be lost in

9   the event that the deal is ultimately not approved by Your

10  Honor or by regulators or otherwise.

11          But we believe at the current time that our

12  business judgment is that this deal is reasonably likely to

13  succeed and there are certainly hurdles that we have to get

14  over between now and confirmation, but we've been laser

15  focused on making sure that we're regulatorily compliant.

16  We would not be standing here today if we did not believe

17  that there was a reasonable path forward on that, in that

18  regard.

19          THE COURT:  All right, let me hear from Mr. Pesce.

20          MR. PESCE:  Thank you, Your Honor.  Gregory Pesce,

21  White and Case, on behalf of the Committee.  Can you hear me

22  all right?

23          THE COURT:  I do.

24          MR. PESCE:  On the regulatory point, I just wanted

25  to make a couple of comments to help flesh out the record

Page 72

1    here.  So first off, in terms of engagement with the

2    regulators, I appreciate that there's been some commentary

3    that, you know, they haven't been engaged with, but the

4    Committee has been speaking with the regulators, including

5    about this type of NewCo structure for some time.

6          Specifically, the state regulators who have told

7    us they've been sort of taking the lead on it and we have

8    since that time in conjunction with Kirkland and Ellis been

9    helping them, you know, plan their communications with the

10   SEC in response to questions that the federal regulators

11   have now been sharing with the Debtors regarding the

12   structure.

13         We're very sensitive as to the allocation of risk

14   here on the regulatory approval point.  Having worked on

15   this for several months now, the Committee's view is that

16   the transaction should meet regulatory muster and there's a

17   lot of reasons we think that.  NovaWulf is a registered

18   investment advisor figure.  The banking counterparty is a

19   registered broker dealer and transfer agent and the party

20   that we believe is going to be the custodian whose name I

21   don't think is yet public, but in any event is a registered

22   national bank custodian.

23         THE COURT:  That's actually the first time I've

24   heard -- maybe, I didn't see anything in any of the papers

25   that NovaWulf was a registered investment advisor and that

Page 73

1    the other parties are also registered as well.  I actually

2    had in my list of questions for counsel -- I wasn't going to

3    ask Mr. Puntus that -- is whether NovaWulf has to register

4    as an investment advisor or -- so that, is there something

5    in the papers that I've read that shows that to be the case?

6           MR. PESCE:  I'll have to check the record, but we

7    can work with the Debtors to put forward some kind of

8    supplemental filing -- .

9           THE COURT:  Okay.

10          MR. PESCE:  -- in that regard, but I think the

11   point that I'm -- the key point I want to make here is that

12   there are a number of very sophisticated parties that are

13   not new to this space that are going to be parties to this

14   transaction.  You know, you've heard from a number of people

15   that could have, would have, might have been trying to

16   submit plans.

17          Candidly, it was the lack of regulatory muster

18   that we, that they already had that was a significant reason

19   that we decided to do a structure that many creditors might

20   view as similar to other things that have been floated on

21   the internet because the parties that NovaWulf itself and

22   the parties it's teamed up with, as well as their management

23   team that have extensive experience working for, you know,

24   large, you know, financial institutions with hundreds of

25   billions of dollars under capital -- under management, why

Page 74

1   we chose them versus others that had similar ideas about

2   tokenizing recoveries.

3            All that being said, and I -- you know, you

4   mentioned the Voyager decision.  You know, at the end of the

5   day though, whether NovaWulf is regulatory compliant is not

6   a matter for NovaWulf.  The question, that question will

7   fall to the regulators to make that determination based on

8   all of the information that we have today including past

9   statements by the government agencies regarding the

10  treatment of Bitcoin and Ethereum not being securities, all

11  of the other information that's out there.

12           We think that they will meet that test if it's

13  applied in a rigorous, honest, fair way, but we don't know

14  and NovaWulf cannot control that decision if the government

15  decides to make policy or re-alter policy that is out there

16  in the past.  So that said, we think it's an appropriate

17  allocation of risk because whether or not NovaWulf

18  ultimately meets that standard and we do think that they

19  will meet that standard, they are still going to be serving

20  as a stalking horse.

21           They're still going to be basically coordinating

22  and funding acquisitions and investments in the business

23  that would be necessary for any bidder that the company

24  deals with here to make distributions under the plan given

25  the prior issues with the company prepetition and we think

Page 75

1    that it's an appropriate allocation of risk in light of that

2    and the total value, the reorganization value that this

3    transaction would provide and the floor it would provide

4    through the auction process that might reveal another party

5    to come forward.

6              And as was mentioned earlier in the presentation,

7    the Committee in particular is very focused on one

8    particular consortium that also has a number of repeat

9    players in the crypto space, all of which familiar -- have

10   familiarity with the regulatory issues here as a potential

11   alternative bid.  And we think that it's important to get

12   NovaWulf approved so that we lock in the bird in the hand so

13   we have something to show for ourselves at that auction and

14   can continue to work with this other party.

15             THE COURT:  Mr. Pesce, I -- maybe my concern may

16   be misplaced, but I was, that was the reason for my question

17   earlier of whether NovaWulf would be entitled to expense

18   reimbursement in the event of a conversion to Chapter 7 and

19   let's assume an orderly liquidation through Chapter 7.

20             And the answers that I received was yes, they'd be

21   entitled to expense reimbursement in that circumstance.

22   Okay?  I'm not talking about them being topped by another

23   sponsor bid.  I'm focusing with these questions on what

24   happens in the -- hopefully circumstance that doesn't occur,

25   that the case would be converted to Chapter 7.  I assume a

Page 76

1    Chapter 7 Trustee would retain an asset manager to assist in

2    the orderly liquidation.

3           But the questions I asked was, and I got answers,

4    that they would be entitled to expense reimbursement in that

5    context.  If the bid is topped and somebody new comes in --

6           MR. PESCE:  Sure.

7           THE COURT:  In my mind, that's kind of a different

8    circumstance.  And I was really focused on why the estate

9    should bear the entire risk of up to $13 million if the deal

10   fails because of failure to achieve regulatory compliance,

11   et cetera.

12          MR. PESCE:  I think on the Chapter 7 point, you

13   know, we also -- look, this was a tough call.  There were

14   many late nights with all of us trying to get this right.  I

15   think on balance, the Committee believes that even -- that

16   paying the expense reimbursements, even in the Chapter 7

17   scenario is appropriate because we will be making that

18   decision, you know, not through happenstance, but -- well,

19   first off, we think -- we do not think that it's appropriate

20   to convert the case and I struggle to find a scenario where

21   that might happen.

22          But if it were to -- if the Committee and the

23   Debtor were to decide that it's appropriate to convert to

24   Chapter 7, as unlikely as that might be, it would be because

25   --

1          THE COURT:  It's not up to the Committee and the

2     Debtor to decide that.  It's up to me.

3          MR. PESCE:  You would order it, but I mean for us

4     to support that type of relief, if it's, you know, planned.

5          THE COURT:  I assumed you'd oppose that, okay, but

6     it's my call.

7          MR. PESCE:  Yeah.  Right, exactly.  It's your call

8     and I apologize for any, you know, misstatement in that

9     regard. Obviously, it's your call.  But we would only be

10    taking a position to support that type of relief because

11    we've had NovaWulf, the bird in the hand.  We've run the

12    process and we've determined that not only is there not

13    another liquidating bidder that could be effectuated in

14    Chapter 11, but that, you know, a liquidation Chapter 7

15    would provide more value.

16         And even in that scenario, the value that NovaWulf

17    would have provided and the stability it would have provided

18    as we work the rest of the auction process would still have

19    been obtained and received by the estate.  And therefore,

20    you know, in light of that value, we still think it's

21    appropriate to give them the expense reimbursement in the

22    unusual circumstances of this case.

23         THE COURT:  All right.  Anything else you want to

24    add?

25         MR. PESCE:  Just to kind of close out, just very

Page 78

1    briefly.  Look, we -- the Committee first met with NovaWulf

2    last fall and the NovaWulf team presented to the Committee a

3    very unique structure which we then, talked to the Debtor

4    about and have been working with them for, you know, the

5    better part of probably six months at this point to reach to

6    fruition.

7              It's been said that, you know, the -- they've

8    committed a lot of time to this endeavor already.  The

9    purpose of the bid protection is not to compensate them for

10   what they've done to date.  It's to make sure that they're

11   still going to be -- the bird in the hand is going to be in

12   the hand, so to speak, tomorrow and the day after or next

13   month.

14             The Committee has significant concerns that given

15   the amount they've spent, that either NovaWulf will not be

16   there or that the deal that NovaWulf would support would be

17   materially less valuable for creditors than the one that's

18   on the table today.  And for that reason, we think it's

19   really important to approve the bid protections and so I

20   want to make that clear.

21             Also in terms -- I just want to make one kind of

22   clarifying statement and it might be easiest just to sort of

23   put something on the docket after this, which we'd be happy

24   to do.  We also want to make it clear that NovaWulf is not

25   just going to get its fee under the transaction for sitting

Page 79

1    on a pile of tokens and assets and getting -- you know, that

2    they're not incentivized.  There is an incentive fee

3    structure.  It's called the MST and it receives a, you know,

4    a 10 percent incentive fee based on the base amount of the

5    assets.

6            So there was some commentary earlier about how

7    NovaWulf doesn't really have to hit any incentive measures.

8    We respectfully disagree.  We can work with the Debtor if

9    helpful to kind of highlight that in a filing or other kind

10   of statement to the Court if that's relevant to your

11   decision today.

12           And with all that, we would hope that the Court

13   blesses this so we can continue down our auction process and

14   hopefully use NovaWulf's competitive tension to find this

15   other bidder if they're real or not or at a minimum lock in

16   the baseline bid for our plan.  Thank you, Your Honor.

17           THE COURT:  All right.  Thank you, Mr. Pesce.  Mr.

18   Lehr, if I pronounce your name correctly.

19           MR. LEHR:  Yes, Your Honor.  Joe Lehrfeld, pro se

20   creditor.  I had a few questions for Mr. Koenig if that's

21   okay?

22           THE COURT:  Ask me and I'll see whether it's okay

23   or not.

24           MR. LEHR:  Sure.  So the first question, was

25   finalizing the nuanced negotiations with borrowers a key

Page 80

1   part of overcoming objections to the bid protection?

2           THE COURT:  Mr. Koenig, can you answer that?

3           MR. KOENIG:  Your Honor, Chris Koenig.  I

4   understood the question to be was coming to a deal with the

5   borrowers a key component of moving forward with the hearing

6   today; was that the question?

7           MR. LEHR:  Yes.

8           THE COURT:  That's the question.  Go ahead.

9           MR. KOENIG:  It was certainly -- I mean, the

10  borrow -- the deal with the borrowers is certainly key.

11  They're a large constituent in the case, as we've talked

12  about at prior hearings, and you know, we're happy to have

13  reached a resolution with them.

14          You know, we're obviously not in a situation, you

15  know, to play 20/20 hindsight whether we would have gone

16  forward or not without that deal, but we're very pleased to

17  be able to be building additional consensus for the

18  transaction and for the plan.  Certainly, it was one

19  component of the Debtors' belief that the bid protections

20  are reasonable at this stage, given the additional support

21  we've now received from one of our critical stakeholders.

22          THE COURT:  All right --

23          MR. LEHR:  (indiscernible).  Is --

24          THE COURT:  Go ahead, Mr. Lehr.

25          MR. LEHR:  Sorry.

1              THE COURT:  No, go ahead.  You have another

2       question?

3              MR. LEHR:  Yes.  Who's the largest class of

4       creditors in this case?

5              MR. KOENIG:  The Earn creditors are largest by

6       dollar amount as of the petition date.

7              MR. LEHR:  Okay, and is coming to terms,

8       negotiated terms with Earn creditors equally as important?

9       I understand at this point that Earn creditors really don't

10      even have a clue how much they might be getting back in

11      terms of crypto.

12             THE COURT:  That's really a disclosure statement

13      and plan issue.  So that is not really for today.  Mr. Abreu

14      and Mr. Leblanc, I'm not going to recognize either of you

15      because you've both spoken already.  Mr. Adler?

16             MR. ADLER:  Good afternoon, Your Honor.  David

17      Adler from McCarter and English on behalf of the ad hoc

18      group of borrowers.  I did want to note for the record that

19      we have had extended discussions over the last week with the

20      Committee and the Debtor and we have reached an agreement in

21      principle which we're hopeful to work out the remaining

22      issues in the next few days.

23             And we also went through the same sort of issue

24      that Mr. Pesce referred to as sort of considering a bird in

25      the hand versus one in the bush.  Could the deal be

Page 82

1    improved?  Yes, absolutely, Your Honor.  We're hopeful that

2    there will be a competitive process, but given where we are

3    today, we think it's important that a baseline be locked in.

4    So that was the reason for the fact that we reached a

5    resolution on these issues and we're hopeful to see that as

6    the process goes forward, that there will be more

7    competition.

8          Obviously, the proposal that's been provided to

9    us, gives an election to the borrowers to either liquidate

10   on the effective date or to extend their loan terms for a

11   period of time up to six years to get their collateral back

12   in full.  From the perspective of the borrowers, that is a

13   very valuable opportunity to us and especially for many of

14   the larger borrowers in this case.  So I just wanted to give

15   Your Honor that context.  And you know, hopefully in the

16   coming days, we will finalize the revised term sheet and

17   that will be filed on the docket.  Thank you, Your Honor.

18          THE COURT:  Thank you, Mr. Adler.  As I said, I'm

19   not going to recognize you Mr. Leblanc.  You've already

20   spoken today.

21          MR. LEBLANC:  Your Honor, I'm sorry --

22          THE COURT:  No, no, no, no.  All right.  This is

23   the first hearing, to my knowledge, when the SEC has made an

24   appearance on the record.  Ms. Scheuer, are you still on the

25   line?

1            MS. SCHEUER:  I am Your Honor.  Good morning.

2    Therese Scheuer for the Securities and Exchange Commission.

3            THE COURT:  Thank you very much.  And so

4    obviously, there's been a lot of discussion today whether

5    NovaWulf is or can become regulatory compliant.  Does the

6    SEC have any views that it's willing to express today?

7            MS. SCHEUER:  Your Honor, the SEC staff is

8    reviewing the plan term sheet that was filed with the bid

9    protections motion.  Not in a position for today's purposes

10   to take a position on the materials that have been filed so

11   far.  But we'll certainly raise any issues that we may have

12   regarding the plan at the appropriate time.  Thank you, Your

13   Honor.

14           THE COURT:  Well, do you have any issues that you

15   want to raise with respect to the bid protections?

16           MS. SCHEUER:  No.  Thank you, Your Honor.

17           THE COURT:  And if I gave you a week to be able to

18   put in a paper, just address to the issue of the bid

19   protections?  I mean, you've heard my concern, what happens

20   if NovaWulf is not regulatory compliant and it doesn't go

21   forward because of that.  I'm told that they would be

22   entitled to up to $13 million in expense reimbursement.

23   It's an issue for me.  Would you or your colleagues be

24   prepared to indicate any response on respect to that issue

25   within the next week?

Page 84

1              MS. SCHEUER:  With regards to whether we would

2     have a concern about the --

3              THE COURT:  Yes.

4              MS. SCHEUER:  -- expense reimbursement being paid?

5     If Your Honor would like, I can take that back to --

6              THE COURT:  All right.

7              MS. SCHEUER:  (indiscernible).

8              THE COURT:  And please do that and -- by next

9     Tuesday at noon, could you please file something one way or

10    the other as to whether the staff or the commission has any

11    position that it will take?  I'll give you until Tuesday at

12    noon.  Okay?

13             MS. SCHEUER:  Just with respect -- just to

14    clarify, Your Honor, just with respect to the breakup

15    reimbursement?

16             THE COURT:  Correct, correct.  There'll be plenty

17    of time to deal with issues about confirmation and

18    disclosure statement.  Okay, thank you very much.

19             All right, so any of the state regulators wish to

20    be heard?  Because I've heard from various counsel that

21    there's been greater engagement with the regulators in

22    recent weeks, certainly.  Ms. Milligan, I know you made an

23    appearance earlier.  Do you have anything you want to say at

24    this point?

25             MS. MILLIGAN:  Good morning or good afternoon,

Page 85

1    Your Honor.  Layla Milligan.  Can you hear me okay?

2              THE COURT:  Yes, I can.

3              MS. MILLIGAN:  Thank you.  With the Texas Attorney

4    General's Office on behalf of the Texas State Securities

5    Board and Texas Department of Banking.  We did not file a

6    formal objection to the bid protections.  We are encouraged

7    that there are still negotiations going on as far as the

8    reduction of some of the numbers.  I can confirm that there

9    have been discussions related to the proposed plan to be

10   filed and the associated entities that may be involved

11   ultimately.

12             We are anxiously awaiting the disclosure statement

13   and plan to be able to see exactly formally how all of this

14   will ultimately shake out.  But we are, I think it's safe to

15   stay, encouraged at the discussions that have been taking

16   place and I can only speak for Texas, certainly not the

17   other state agencies, but we are certainly doing our own

18   review of the entities that are being discussed to confirm

19   that they are either regulatorily compliant or can become

20   regulatorily compliant.

21             THE COURT:  Is there a timeline as to which you

22   can at least provide some guidance to the Court as to

23   whether it appear -- without committing your agency to a

24   final answer, I'm -- you've heard my concern.  I just --

25             MS. MILLIGAN:  Yes.

1          THE COURT:  $13 million is a lot of money and if

2     it turns out that it's a nonstarter, well, that's, you know,

3     money out from the estate.

4          MS. MILLIGAN:  I can certainly visit with my

5     client agencies if the Court would allow the same time

6     period that was granted to the SEC for any sort of --

7          THE COURT:  I would.  If you could by Tuesday at

8     noon, if you could indicate one way or the other, whether

9     you have any, can provide any comfort on this issue.  Okay?

10          MS. MILLIGAN:  Absolutely, Your Honor.  I would be

11    happy to do that.  And I would also offer to circulate that

12    to the other state agencies.  I haven't seen their

13    appearance today, but I'm happy to circulate that and see if

14    they have any thoughts as well.

15          THE COURT:  I very much appreciate that.

16          MS. MILLIGAN:  Sure, Your Honor.  Thank you.

17          THE COURT:  Is there anyone else who's made an

18    appearance today on behalf of any of the state regulatory

19    agencies?

20          MR. BERNSTEIN:  Good afternoon, Your Honor,

21    Jeffrey Bernstein, McElroy Deutsch Mulvaney and Carpenter --

22          THE COURT:  For New Jersey?

23          MR. BERNSTEIN:  For New Jersey and I wouldn't want

24    to have to repeat what Ms. Milligan has said, but we will

25    certainly address this post haste on the open issue.  There

1    have been discussions and engagement with the UCC and the

2    Debtors and we will work to address Your Honor -- response

3    to Your Honor's concerns.  Thank you.

4              THE COURT:  Thank you again.  I would say the same

5    Tuesday at noon is the -- you know, even if the answer is

6    you can't, I'd like to see something in writing that you

7    can, you know, your client has considered it and they can or

8    can't say whatever you're going to say, you know.

9              MR. BERNSTEIN:  Thank you, Your Honor.  Appreciate

10   --

11             THE COURT:  Okay.  Thank you very much, Mr.

12   Bernstein.  Ms. Gallagher, you've already spoken today and

13   consistent with what I've done with others, I won't

14   recognize you again.  Is there anybody who's not been heard

15   who wants to be heard now?  Mr. Ubierna de las Heras, go

16   ahead.

17             MR. UBIERNA DE LAS HERAS:  Good morning, Your

18   Honor.  Just to say that I (audio drops) 2236 and I (audio

19   drops).

20             THE COURT:  All right.  Anybody else who wants to

21   be heard who has not been heard already?

22             All right.  The Court is going to take the matter

23   under submission.  I've set this deadline of Tuesday at noon

24   for regulators to provide any further guidance or

25   information or the fact that they're unable to do that.  So

Page 88

1    I'm going to take it under submission at least until then.

2    Hearing is adjourned.   Thank you very much, everybody.

3              (Whereupon these proceedings were concluded at

4    12:44 PM)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 89

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7    *Sonya M. Ledanski Hyde*

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  March 26, 2023

**&**

**&**   5:15

**0**

**07102**   5:11

**1**

**1**   60:1
**1.95**   30:11
**10**   79:4
**100**   5:3 20:19
  22:2 38:14
  39:11 47:16
  54:15 61:1
**10001**   3:22
**10004**   1:13
**10014**   3:15
**10019**   5:19
**10x**   50:24
**11**   15:19 19:10
  22:15 25:16
  37:4 45:15,17
  63:19 64:14
  65:19 77:14
**111**   4:17
**1145**   36:22
  37:23 38:1
**11501**   89:23
**11:00**   1:16 12:2
**12151**   89:7
**12548**   4:9
**12:44**   88:4
**12th**   40:17
**13**   12:19 15:24
  17:6,24,24
  18:23,23 19:1
  25:2 56:23
  58:18 69:12,20

70:16 76:9
83:22 86:1
**15**   12:18 15:24
  17:11,23 18:15
  18:22
**150**   65:14,14
  65:17
**16,600**   46:1
**1st**   46:1

**2**

**2**   12:19 20:4
  21:20
**20**   44:13 45:1
  50:24
**20,000**   50:24
**20/20**   80:15
**20001**   4:4
**201**   3:14
**2023**   1:15
  89:25
**20549**   5:4
**2066**   2:5
**2151**   2:4,4
  12:12 65:15
**2152**   14:10
**2190**   2:4
**2218**   2:4
**2224**   2:4
**2226**   2:4
**2229**   2:4
**2236**   2:4 87:18
**2243**   2:5
**2256**   2:5 12:22
**2267**   2:5
**2277**   2:5

**2293**   2:5
**23**   1:15 58:20
**2301**   12:17
**26**   89:25
**28,000**   46:2

**3**

**3**   20:4 22:5,7
  22:11
**3.9**   45:21
**30**   30:14 59:10
**300**   3:5 89:22
**31st**   5:18
**330**   89:21
**35**   30:14 59:10
**363**   19:13

**4**

**4**   20:4
**40,000**   46:3
**45**   20:17 21:15
  23:19 29:12
  58:7 59:25
**46**   58:7
**48**   65:14,14,17

**5**

**5**   17:7,12,20
  18:17 20:24
  21:22 22:19
  49:19,22 54:9
  54:13 58:9,10
  58:18 60:9
  61:4
**50**   51:16,17
**5100**   4:17
**55**   3:21
**570**   5:10

**6**

**600**   4:3
**60606**   4:18
**60654**   3:6

**7**

**7**   24:7,9,12,18
  25:9,15,17
  26:5 63:14
  64:5,24 65:3
  65:10,20 75:18
  75:19,25 76:1
  76:12,16,24
  77:14
**7's**   25:18
**721**   24:14
**78711**   4:10

**8**

**825**   5:18

**a**

**aaron**   7:22
**able**   17:11,14
  35:1,24 44:22
  48:6 56:22
  68:10 70:1,6
  70:25 80:17
  83:17 85:13
**above**   25:12
**abreu**   41:18,19
  41:22 42:1,25
  43:11,14,19,20
  44:5 81:13
**absolutely**   36:2
  36:9 82:1
  86:10
**accelerated**
  16:3 35:13

[accept - anticipate]                                                      Page 2

accept  61:12
acceptable
   13:7 14:2
accomplish
   51:22
account  30:20
   31:1
accounts  45:16
accurate  89:4
achieve  76:10
achieved  35:22
acquired  21:15
   22:9,25
acquisitions
   74:22
action  69:14
   70:18
actions  33:11
   66:18
activities  31:9
actual  41:16
actually  41:16
   64:1 69:4
   72:23 73:1
ad  5:16 12:21
   12:25 15:17
   81:17
add  58:8 77:24
additional
   54:25 60:11,12
   70:12 80:17,20
address  36:5
   38:4,11 46:14
   83:18 86:25
   87:2
addressed
   49:13 61:18

adjourned
   88:2
adjournment
   12:13
adjudicate
   64:20
adler  5:21
   81:15,16,17
   82:18
administrator
   65:21
adopt  13:23
   14:15 15:4
adopts  16:9
advance  29:13
adversary
   34:15
advisers  27:3
advisor  72:18
   72:25 73:4
advisors  15:18
   57:25
affirm  14:24
afford  49:17
afternoon  44:7
   45:13 81:16
   84:25 86:20
agencies  74:9
   85:17 86:5,12
   86:19
agency  85:23
agenda  12:11
agent  33:18
   72:19
ago  30:12 70:7
agree  59:9

agreed  15:23
agreement
   12:17,23 13:1
   13:2 23:17
   24:19 36:7
   57:20 65:16
   66:3,7,10,13
   67:6 81:20
agreements
   25:5 32:18
   33:12
ahead  13:15
   14:4 15:7,7
   16:25 18:12
   21:10 32:1
   34:17 35:2
   41:20,21 44:21
   45:10,12 46:25
   80:8,24 81:1
   87:16
alan  9:16
ali  8:24
allocation
   72:13 74:17
   75:1
allow  36:15,18
   86:5
allows  39:24
alluded  35:11
almeida  7:6
alter  74:15
alternative
   47:15 75:11
alternatives
   13:21
amended  12:16

amount  15:17
   22:8 28:13,19
   29:1 46:18
   49:2,15 53:13
   78:15 79:4
   81:6
amounts  49:1
analysis  30:13
   39:23 50:16
   53:6,10 54:23
   59:23 62:4
analyze  57:10
andrew  3:24
   4:6 10:9 11:10
   21:7 34:7
anne  11:8
annemarie
   10:6
answer  17:8
   21:9,13,19
   38:4 43:13,24
   44:3,18 50:14
   52:12 56:9
   62:11,12 63:9
   66:18 70:1,6
   80:2 85:24
   87:5
answered
   50:20
answering
   50:7 53:3
answers  21:1
   38:15 48:16
   75:20 76:3
anticipate
   64:12

anxiously
85:12
anybody 16:15
16:19 23:14
63:3 87:14,20
apart 49:18
70:18
apologize 18:4
36:20 39:4
42:24 45:11
46:24 77:8
appeal 37:6
appealed 69:10
appear 35:1
39:19 85:23
appearance
82:24 84:23
86:13,18
appeared 25:7
34:14
apples 58:15
58:15
applied 74:13
appointed 24:7
31:8 62:18,20
62:21
appreciate
12:13 55:14
72:2 86:15
87:9
appreciation
50:21 51:1
appropriate
46:24 67:7
68:25 74:16
75:1 76:17,19
76:23 77:21

83:12
approval 48:14
62:19 72:14
approve 12:12
27:21 28:3,8
28:11 41:3,9
49:3 68:11
69:15,17 78:19
approved
35:24 46:6
50:1 52:18
56:1 71:9
75:12
approving 2:2
46:5,12
approximate
60:18
approximately
30:14 59:10
april 40:17
arbiter 57:17
archer 7:7
architect 21:21
architected
22:21
architects 19:7
argue 47:6
48:19 55:6
argument 13:6
43:18
arie 9:25
asked 15:3
27:20 28:3,8
28:11,15 48:17
49:5 53:14
54:4 55:17
63:6 76:3

asking 37:19
aspect 26:16
asset 19:12
20:3 24:9
29:24,25 30:16
30:25 31:12
32:1,13 40:16
40:18 51:9,16
51:17 76:1
assets 20:11
21:14 22:8,24
24:17 29:7,25
30:1,3,6,13,24
39:13 42:5,21
43:1,2,5,21,25
43:25 47:14
48:9,10 51:23
63:11,13,23
64:3,4,6,15
70:17 79:1,5
assist 76:1
associated
51:20 85:10
assume 24:24
31:22 33:9
63:10 75:19,25
assumed 77:5
attached 65:16
attorney 4:8
85:3
attorneys 3:4
3:13,20 4:2,15
5:2,9,16 49:6
auction 75:4
75:13 77:18
79:13

audio 17:25
87:18,18
austin 4:10
authorized
24:15
authorizing
2:2
available 14:1
57:11
avenue 4:3
5:18
avoidance
33:10
awaiting 85:12
aware 37:9
51:12,20
awful 70:22
71:6

**b**

b 1:21 3:20 7:9
21:8 23:5
back 17:10
22:15 28:10
33:19 36:11
40:25 48:12
49:3 54:12
64:4,17 81:10
82:11 84:5
baked 69:25
balance 50:22
51:5 76:15
balking 67:19
bank 41:14
72:22
banker 13:20
banking 72:18
85:5

**bankruptcy**
1:1,11,23
19:13 24:14
34:23 36:15,23
37:8 55:23
56:6 57:6 64:9
65:20
**base** 30:25
79:4
**based** 19:21
29:23 30:9,16
30:16,25 55:1
74:7 79:4
**baseline** 79:16
82:3
**basically** 61:2
74:21
**basis** 53:7
**bear** 63:7
70:19 76:9
**becin** 7:8
**began** 69:3
**beginning**
17:10
**begins** 31:23
**behalf** 13:13
16:23 21:8
29:19 34:15
71:21 81:17
85:4 86:18
**belief** 80:19
**believe** 15:25
18:18,24 19:1
19:17,19 21:22
24:2,20 26:8
27:6,6,17
28:21,22,23

30:13 32:7,20
36:8,22,23
37:2 43:3,24
44:2 45:3
49:19,25 53:15
53:18 55:1,3,4
58:2 60:9
61:18 62:23,24
64:21 67:7
68:19,20,25
70:13 71:5,11
71:16 72:20
**believes** 31:24
76:15
**benefit** 33:8
35:18 62:14
**berg** 11:14
**bernstein** 5:13
86:20,21,23
87:9,12
**bespoke** 22:20
**best** 39:24
57:24 68:1,1
**bet** 60:1
**beth** 9:12
**better** 17:18
18:20 35:17,23
49:20 52:2
53:21,23 54:19
54:20 57:4,6
57:12,14 58:4
58:8,17,24
61:12 62:7
78:5
**bid** 2:2 12:12
13:4 14:10
15:13,24 16:6

16:9 18:20
24:21 35:13
36:2 41:3,9
47:7,22 48:2,4
48:9 49:3,20
50:5,8 53:21
53:23 54:11,16
54:19 55:25
56:1 58:7,14
58:15,17,24
61:10,13 65:15
68:23 75:11,23
76:5 78:9,19
79:16 80:1,19
83:8,15,18
85:6
**bidder** 16:2,3
35:5,7,10,11
35:12,15,23,25
36:3 62:7 65:1
74:23 77:13
79:15
**bidders** 58:23
**bids** 32:11
54:17 55:24
**big** 19:20 47:25
50:21
**bih** 8:11
**billion** 20:15
20:22 21:20,20
**billions** 73:25
**bilter** 7:9
**binding** 36:7,7
**bird** 75:12
77:11 78:11
81:24

**bitcoin** 45:21
46:1 51:14
74:10
**bitwise** 51:13
**bleed** 38:1
**blesses** 79:13
**board** 31:7,16
31:16,23 32:1
32:15 38:10
52:2 62:16,18
62:21 68:16
85:5
**body** 60:14
61:2
**borrow** 80:10
**borrower**
12:25 15:17
**borrower's**
15:19
**borrowers**
5:16 12:21
15:20 40:3
79:25 80:5,10
81:18 82:9,12
82:14
**bottom** 29:14
**bourgeois** 7:10
**bow** 30:23
**bowling** 1:12
**box** 4:9
**bradley** 8:17
**breach** 63:12
63:22 64:18
66:10,12,13
67:6
**breached** 64:1

**break** 56:2
**breakup** 17:4,7
17:11,13,20
18:11,15 19:24
20:2,24 21:16
21:22 22:5,8
22:11,19,23
24:3 26:11
27:21 28:3
32:3,5 46:12
46:17,21 47:8
47:23 48:2,5
48:14 49:4
50:5,8 52:18
53:5,15,17,17
53:24,24 54:10
54:16,20 55:4
55:12 58:9,13
58:16 59:9
60:2,9 61:4,9
61:15,17 62:4
62:6,8 64:25
65:5 84:14
**breuder** 7:11
**brian** 9:2,9,14
10:22
**brianna** 7:9
**briefly** 78:1
**brifkani** 7:12
**brinker** 7:25
**broad** 5:10
38:19 39:17
**broker** 72:19
**brown** 7:13
**bryan** 9:6
**btc** 39:10

**build** 29:7
**building** 80:17
**bunch** 26:21
**bureau** 5:9
**burks** 10:21
**bush** 81:25
**business** 13:21
16:5 19:12,14
24:15 28:20
29:7 31:9
32:14 47:14
54:15 67:23
68:19 71:12
74:22
**businesses**
20:4
**buys** 54:15

## c

**c** 3:1 12:1 89:1
89:1
**caceres** 7:14
**calculated** 22:7
22:11,23
**calculation**
21:16 29:14
**calculations**
29:20
**calendar** 12:14
**calin** 10:20
**call** 13:17 52:3
68:14 76:13
77:6,7,9
**called** 79:3
**calling** 37:18
**calls** 68:6,15
70:3

**cam** 56:11
**cameron** 6:10
**candidly** 73:17
**cap** 12:18 25:3
26:12 56:25
**capital** 23:16
23:20 73:25
**care** 46:19
**career** 19:1
22:7
**carefully** 29:8
49:18 57:10
**carl** 7:23
**carlos** 7:25
**caroline** 10:11
11:2
**carpenter** 5:8
86:21
**case** 1:3 4:14
13:20 24:12
25:9 26:4
33:16 34:23
37:7 39:5
40:12 49:25
54:15 57:8,13
57:22 58:11
60:7,8 63:13
63:13,14 64:5
64:23 65:2,10
67:10 71:21
73:5 75:25
76:20 77:22
80:11 81:4
82:14
**cases** 55:24
56:6 63:21
65:19,20

**cash** 20:17
22:3 23:18
**catalyst** 35:22
**category** 38:18
39:18
**cel** 38:12 44:13
44:23,25
**celsius** 1:7
20:11 39:14
53:7
**centerview**
13:19
**cents** 44:13
45:1
**certain** 2:2
31:18 32:24
**certainly** 20:15
22:5 69:8 71:2
71:8,13 80:9
80:10,18 83:11
84:22 85:16,17
86:4,25
**certainty** 67:10
70:8,12
**certified** 89:3
**cetera** 59:24
76:11
**chairman**
41:19
**challenged**
36:12
**chance** 68:21
**chang** 7:15
**change** 14:13
44:15 46:1
47:23 48:3
50:9

| | | | |
|---|---|---|---|
| changed 62:22 | 66:1,14 67:3 | clerk 12:2 | commission |
| changes 47:21 | 67:16 68:23 | 14:22 15:2 | 5:1 26:1 83:2 |
| 48:10 50:7 | 69:18 75:21,24 | client 86:5 87:7 | 84:10 |
| chapman 7:16 | 76:8 | close 56:24 | committed |
| chapter 15:19 | circumstances | 77:25 | 78:8 |
| 19:10 22:15 | 17:14 18:16,18 | clue 81:10 | committee |
| 24:7,8,12,18 | 20:6 21:24 | coco 7:20 | 4:15 16:5,16 |
| 25:9,15,16,17 | 26:9 31:16 | code 19:13 | 16:17 17:17 |
| 25:18 26:5 | 32:2,18 49:24 | 24:14 36:15,23 | 19:6,18 24:6 |
| 37:3 45:15,17 | 53:20 69:1 | 65:20 | 28:18,22 29:9 |
| 63:14,19 64:5 | 77:22 | coin 42:11,12 | 35:16 54:18 |
| 64:14,24 65:3 | cirkel 7:19 | 50:24 | 57:9,22,25 |
| 65:10,19,20 | citizen 55:16 | coinbase 67:12 | 58:3 60:25 |
| 75:18,19,25 | claim 31:13,25 | coins 50:22 | 61:11 68:19 |
| 76:1,12,16,24 | 32:3 44:25 | coleman 7:21 | 70:13 71:21 |
| 77:14,14 | claims 33:6 | collateral | 72:4 75:7 |
| charles 7:1 | 52:4 | 82:11 | 76:15,22 77:1 |
| chase 9:13 | claire 9:22 | colleague 13:8 | 78:1,2,14 |
| check 73:6 | clarification | colleagues 63:9 | 81:20 |
| chicago 3:6 | 62:14 | 83:23 | committee's |
| 4:18 | clarify 50:20 | colodny 7:22 | 72:15 |
| choi 7:17 | 54:9 57:3 | 16:1 35:11 | committing |
| chose 74:1 | 84:14 | come 47:22 | 85:23 |
| chris 3:10 7:8 | clarifying | 55:23 57:19 | common 20:19 |
| 63:17 80:3 | 78:22 | 58:3,6 64:4 | 38:7,14 47:16 |
| christiansen | clarity 23:3 | 75:5 | communicati... |
| 6:22 61:21,22 | 39:19 56:15 | comes 16:10 | 68:13 69:6 |
| 61:23 62:1 | class 40:2,2 | 32:11 54:11 | communicati... |
| christopher | 81:3 | 76:5 | 69:4 72:9 |
| 7:20 8:1 | clawback 33:4 | comfort 68:10 | companies |
| church 7:18 | 33:5 | 86:9 | 55:23 |
| circle 17:10 | clean 14:9 | coming 80:4 | company 19:9 |
| circuit 36:16 | clear 21:18 | 81:7 82:16 | 20:10,10 31:6 |
| circulate 86:11 | 25:4 26:2 | commentary | 36:16,23,24 |
| 86:13 | 78:20,24 | 72:2 79:6 | 38:9 43:6 |
| circumstance | clearly 25:8 | comments | 51:25 74:23,25 |
| 26:9 58:12 | 57:23 | 71:25 | |

comparable
  22:23
comparables
  20:1,5,21 23:1
comparing
  39:15 55:11
comparison
  39:20,25 53:13
compensate
  78:9
compensated
  24:6 26:1 28:7
  32:7,9 33:4
  54:6 55:25
  56:16
compensation
  23:22 24:11,18
  25:10 26:3,6
  31:12 32:17
  33:2,23 56:18
competing
  58:23
competition
  82:7
competitive
  79:14 82:2
completely
  47:10 59:20
complex  18:25
  21:19 22:20
  49:25 56:25
  69:7
complexity
  60:3
compliance
  76:10

compliant  26:7
  26:14,19,25
  27:5,8,16,24
  28:5,15,24
  65:23 66:6,16
  66:25 67:15,24
  71:15 74:5
  83:5,20 85:19
  85:20
complicated
  18:24,25 54:22
  56:25
complied  64:1
component
  15:23 24:4
  29:4,5 54:22
  68:18 80:5,19
components
  16:9,10 22:4
  39:8 54:18
  57:14
comprehensive
  40:5 54:22
comps  22:1
concept  54:3,7
concern  28:2
  75:15 83:19
  84:2 85:24
concerned  56:5
  69:11,18
concerns  53:5
  54:25 78:14
  87:3
conclude  69:17
concluded
  26:17 88:3

conclusion
  27:4 58:3
conduct  24:9
  66:6,7
conducts  25:6
confirm  19:21
  23:2 85:8,18
confirmable
  35:14 36:9
confirmation
  27:19 37:25
  46:15 49:12
  60:13 62:3
  69:10 71:14
  84:17
confirmed  23:7
  26:23 29:3
  31:3,23 32:6
  32:14 38:21
  61:16 63:11
  64:24 65:25
  66:24
conjunction
  72:8
consensus
  80:17
considerably
  17:15,22 18:22
  20:16
consideration
  20:14 21:15
  22:4,14 23:18
  23:19 38:24
  39:8
considered
  37:11 60:12
  87:7

considering
  59:10,24 60:7
  81:24
consistent
  13:23 87:13
consortium
  75:8
constant  68:13
constituent
  80:11
constituted
  62:17
constructive
  70:10
consummated
  63:20 64:8,22
contains  51:15
contemplated
  23:7 63:15
context  17:25
  18:24 19:19
  21:21 22:4,20
  25:15 39:21
  43:14,16 47:22
  76:5 82:15
continue  35:15
  68:25 75:14
  79:13
continued  16:4
  16:5,6
continues
  44:24 45:3
continuing
  15:22 29:7
contractual
  24:21

[contrary - crypto]                                                    Page 8

**contrary** 19:14
**control** 74:14
**controlled** 31:8
  38:10 62:23,24
**controlling**
  52:1
**convenience**
  40:2
**conversion**
  65:19 75:18
**convert** 76:20
  76:23
**converted**
  24:12,17 25:9
  26:5 63:14
  64:5,24 65:3
  75:25
**converting**
  65:10
**convince** 66:23
**coordinating**
  74:21
**copy** 14:9
**cornell** 3:17
  16:21,22,23
  17:1,3 18:14
  21:5
**cornell's** 21:13
**correct** 15:5
  22:25 28:8
  43:3 44:2
  50:25 51:11
  54:14 58:25
  61:8 64:2 65:4
  84:16,16
**correctly** 79:18

**cost** 70:22 71:2
  71:2
**cote** 7:23
**counsel** 26:1
  27:13,14,14
  28:22,22 34:25
  56:18 63:5
  73:2 84:20
**counterparty**
  72:18
**counting** 42:10
  42:11
**country** 89:21
**couple** 17:8
  20:8 69:21
  70:6 71:25
**course** 64:12
  64:18 66:17
  68:22
**court** 1:1,11
  12:4,9 13:10
  13:15 14:3,20
  15:3,7 16:14
  16:19,25 18:2
  18:5,7,10,12
  21:3,5,10 23:4
  23:13,22 24:7
  24:24 25:4,17
  25:21,25 26:13
  27:1,9,12,20
  28:25 29:12
  30:1,5 31:2,10
  31:21 32:9
  33:3,9,24 34:5
  34:10,13,21,24
  35:2,8,15
  37:12 38:19,25

  39:3 40:9 41:1
  41:3,6,18,20
  43:7,16 44:6
  44:18,21 45:6
  45:8,12,20
  46:4,8,10,19
  46:25 48:19
  52:8,14,24
  55:6,9,17 56:8
  59:3 61:8,14
  61:21 62:22
  63:3,21 64:2
  64:23 65:8,12
  65:22 66:5,20
  66:23,23 67:2
  67:11,19 68:8
  69:2 70:15
  71:19,23 72:23
  73:9 75:15
  76:7 77:1,5,23
  79:10,12,17,22
  80:2,8,22,24
  81:1,12 82:18
  82:22 83:3,14
  83:17 84:3,6,8
  84:16 85:2,21
  85:22 86:1,5,7
  86:15,17,22
  87:4,11,20,22
**courtney** 10:21
**covenant** 66:11
**covenants**
  66:15
**cover** 53:23
  54:16,20
**crafted** 49:18

**create** 19:9
  35:17 51:23
  58:23
**creating** 60:5
**creditor** 5:24
  6:2,5,8,11,14
  6:17,20,23 7:2
  40:11,12 44:8
  47:2 56:12
  59:6 60:13
  61:2 79:20
**creditors** 4:16
  22:15 33:17
  38:6 39:7,20
  40:24 47:6,17
  47:25,25 48:3
  48:11,24 50:21
  53:14 54:10,12
  54:18 73:19
  78:17 81:4,5,8
  81:9
**crews** 6:10
  55:6 56:10,11
  56:12,14 59:3
**critical** 68:18
  80:21
**critically** 58:1
**cross** 14:1
  16:15,20 17:2
  21:6,11 23:14
  34:1,6 35:3
  40:13 41:25
  44:9 47:3 53:1
  56:13 59:7
  61:25
**crypto** 19:15
  20:12 33:12,14

[crypto - described]                                                    Page 9

33:19,20,21
39:9,10 43:2,5
45:23 49:1,2
50:4,12 51:10
51:10,12,13,15
51:19 62:2
75:9 81:11
**cryptocurrency**
33:11
**cryptocurren...**
45:14,19
**curious** 45:16
**current** 23:9
42:19 43:5,25
47:11,19,21
48:7 71:11
**currently** 23:7
37:5 43:1,15
43:21,25
**currie** 4:6 34:5
34:7,8,11,18
34:19,22,25
35:4 37:21,22
39:6 40:7
**custodian**
42:19 72:20,22
**custody** 40:3
**customer** 31:8
38:20 52:1
62:21,23,24
**customer's**
51:24
**customers** 19:9
20:13,13,18,20
20:20,23 22:3
30:18,22 33:8
33:17,19 35:18

38:10 40:2,3
53:22 57:23
**cut** 46:22

**d**

**d** 9:1 10:10,17
12:1
**d.c.** 4:4 5:4
**daken** 7:21
**dalhart** 7:24
**dang** 11:15
**daniel** 8:9 9:1
**date** 20:13 37:3
44:14 45:2,17
45:20 59:17,23
78:10 81:6
82:10 89:25
**dates** 45:15
**david** 5:21
7:24 9:15
10:15,23 81:16
**day** 29:25 30:9
60:15 68:2
74:5 78:12
**days** 12:15,25
81:22 82:16
**de** 6:19 7:25
87:15,17
**deadline** 87:23
**deal** 19:14 27:6
32:12 47:11,19
47:21 48:8,11
50:7 52:11
69:17 71:9,12
76:9 78:16
80:4,10,16
81:25 84:17

**dealer** 72:19
**dealing** 55:12
**deals** 52:11
74:24
**dean** 7:16
**deanna** 12:4
14:20
**debt** 13:18
**debtor** 1:9 3:4
23:23 24:8
25:6 27:2
28:22 60:14
70:19 76:23
77:2 78:3 79:8
81:20
**debtor's** 2:1
**debtors** 12:5
12:11,24,24
13:5,13,19,21
16:4 17:17
19:6 23:3 24:5
27:14 28:17
29:9,19 35:16
54:18 57:8,19
58:3 60:24
61:11 63:18
65:18 67:7,22
68:18 69:5
70:13,17 72:11
73:7 80:19
87:2
**decide** 76:23
77:2
**decided** 73:19
**decides** 31:10
31:23 32:15
74:15

**dealer** ...
**decision** 74:4
74:14 76:18
79:11
**decisions** 31:9
**declaration**
13:23 14:1,9
14:13,15 15:4
15:12 19:22
22:22 23:1
**deemed** 28:23
44:14 67:14
**defense** 22:18
22:19
**defer** 25:13
**defined** 17:19
24:2 40:16,18
**definition** 65:6
65:8,14,17
**definitive**
35:17
**delay** 36:18
**deliver** 33:19
**delivered**
20:20 30:17
**demonstrate**
27:17
**dennis** 8:6
**department**
3:12 85:5
**depends** 59:14
59:16 66:9
**depositors**
45:16
**deposits** 45:19
**described** 20:6
20:8

**detail** 35:9
38:22
**detailed** 49:10
50:16 70:3
**determination**
28:4,14 57:4
74:7
**determine** 23:5
54:19 57:4,11
65:23
**determined**
17:5,7,9 24:23
26:7,13 27:23
29:2,19 67:15
77:12
**determines**
36:10
**determining**
22:8
**deutsch** 5:8
86:21
**developments**
13:25 15:13,15
**dialogue** 70:10
70:11
**diaz** 8:3
**diem** 54:2,6
70:25 71:1
**dietrich** 9:5
**different** 16:10
26:21 32:13
38:7 54:17,17
76:7
**difiore** 8:2
**diligence** 16:5
16:6 70:4

**direct** 13:24
14:19 15:4,10
23:18 58:24
69:4
**directly** 48:11
**disagree** 46:18
46:19 52:10
79:8
**disagreement**
57:21
**disantis** 8:1
**disapproval**
28:1
**disclosure**
20:15 27:18,22
30:10 38:23
39:22 40:4,5
41:2,7 46:15
48:25 49:10,12
50:16 52:16
59:16 81:12
84:18 85:12
**discount** 51:17
52:5
**discounts**
20:18
**discussed**
20:19 29:10
39:9,12 45:3
85:18
**discussion** 40:1
83:4
**discussions**
35:12 81:19
85:9,15 87:1
**disposed** 33:13

**dispute** 37:9
**distill** 20:9
**distress** 64:10
64:13
**distributed**
20:12 33:21
39:25 46:4
48:10
**distribution**
33:18 39:9
**distributions**
74:24
**district** 1:2
**dixon** 6:1 40:9
40:10,11,14
41:5,11,18
**dixon's** 55:1
**doc** 2:4
**docket** 12:12
12:17,21 13:2
14:10 65:15
78:23 82:17
**document**
25:12
**documentation**
26:3
**documented**
24:5
**documents**
31:15
**doing** 32:15
33:20 85:17
**dollar** 29:17
50:25 51:4
81:6
**dollarization**
19:23

**dollars** 19:4
20:16,22 49:15
58:22,24,25
73:25
**donald** 10:5
**double** 42:10
**drew** 8:4
**drive** 4:17
**drops** 17:25
87:18,19
**due** 16:5 38:25
66:14
**duffy** 8:4,5
**dunne** 8:6
**dzaran** 8:7

**e**

**e** 1:21,21 3:1,1
12:1,1 89:1
**earlier** 49:5
75:6,17 79:6
84:23
**early** 17:23
**earn** 20:13
30:17,22 38:18
38:20 39:7,18
40:3 47:17
48:11 49:3
50:5,12 81:5,8
81:9
**earned** 32:5
**earnest** 19:18
**easiest** 78:22
**eckhardt** 8:8
**economic**
33:22
**economics** 29:8

ecro  1:25
effective  20:13
  37:3 82:10
effectively
  17:13 19:7
  20:11,23 29:6
  53:23 58:21
effectuated
  65:19 77:13
effort  70:22
  71:2,7
efforts  16:4
  68:5
eggermann  8:9
ehrler  8:10
eighth  5:18
either  15:13
  19:23 27:13
  61:15 78:15
  81:14 82:9
  85:19
el  8:11
elaborate  35:8
  37:23
election  82:9
elimelech  8:12
ellis  3:3 12:7
  13:13 63:18
  72:8
elvin  10:24
embodied
  12:23
emergence
  29:24 37:24
emerges  19:10
emerging  16:1
  16:3

employ  24:23
employees
  56:16
employs  24:24
encouraged
  85:6,15
endeavor  78:8
engaged  69:23
  72:3
engagement
  53:7 72:1
  84:21 87:1
english  5:15
  81:17
entire  69:19
  76:9
entirely  66:6
entities  85:10
  85:18
entitled  23:6
  23:23 24:12,19
  24:22 25:1,7
  25:10,18 26:4
  26:6 28:12
  31:13 32:17
  64:25 65:2,24
  65:25 66:2,8
  67:2,4 68:4
  75:17,21 76:4
  83:22
entity  63:15
entry  2:1
equally  81:8
equity  20:19
  22:3 23:5
  30:17,19,21,22
  31:1,6 36:19

36:22 37:1,2
  38:7,14 39:12
  47:16 71:8
erik  6:7
especially
  82:13
essentially
  58:10
establish  36:18
established
  31:4
estate  23:6
  35:23 39:14
  54:12 64:6
  67:15 69:19
  76:8 77:19
  86:3
estates  60:4
  64:14 65:18
estimate  56:19
  60:22
estimated
  29:15 30:10
  50:4
ests  30:17,18
  47:15
et  59:24 76:11
etf  51:21
eth  39:10 40:15
  40:17,17,20,25
  42:4,13 47:12
  47:13 49:2
ethereum  42:2
  42:21 47:6,7
  47:24 48:1
  50:23 51:2,4
  51:14 74:10

evaluate  57:5
evaluating
  13:21
event  45:18
  62:2 63:12
  71:9 72:21
  75:18
events  13:7
  28:2
everybody
  68:1 88:2
evidentiary
  13:6,9
exact  32:22
exactly  77:7
  85:13
examination
  14:2,19 15:10
  17:2 21:11
  34:1 35:3
  40:13 41:25
  44:9 47:3 53:1
  56:13 59:7
  61:25
examine  16:15
  16:16,20 21:6
  23:14 34:6
example  23:6
  51:16 58:6
exceed  58:9,10
  58:13,21
except  69:2
exchange  5:1
  38:13 83:2
exclusively
  30:19

exercise 17:17
  18:19 61:12
exist 48:12
expect 38:20
  44:18 66:17
expected 29:16
  58:20
expended 19:4
  19:11 49:15
  56:20,23 57:2
expense 12:18
  15:23 17:5,6
  17:21 18:21
  19:23 24:3,22
  25:2,8 26:11
  26:14 27:21,21
  27:25 28:4,13
  31:25 32:3,10
  32:11 35:20
  46:12,16,21
  48:14 49:22
  52:18 55:12
  58:13,15 61:9
  61:15,18 64:25
  65:2,6,25 66:3
  66:8,14 67:2,4
  67:16 68:4
  69:12 70:17,23
  71:1,7 75:17
  75:21 76:4,16
  77:21 83:22
  84:4
expenses 23:20
  24:5 32:6,9
  54:17,21 60:6
  60:11,12,15,15
  60:21 61:3,5

62:10
experience
  40:6 52:3
  73:23
experiencing
  45:18
explain 17:4
  38:18 68:9
exponentially
  54:11
express 83:6
extend 82:10
extended 81:19
extensive
  15:17 17:9
  28:19 38:22
  49:15 73:23
extensively
  31:14
extent 17:16,18
  20:7 24:22
  43:10 48:9
  51:9 62:6,7
  63:1 64:17
extra 45:16
extremely 53:4
  69:7

**f**

f 1:21,25 4:20
  5:3 89:1
fabsik 8:13
facilitate 37:1
fact 28:14
  30:20 69:1
  82:4 87:25
factor 42:17

facts 31:16
factual 44:21
fail 26:9,20
failed 69:13
failing 26:16
  27:25
fails 23:23 26:6
  76:10
failure 28:6
  63:22 66:5
  76:10
fair 19:2,20
  20:25 21:22
  22:21 52:16
  60:6 71:5
  74:13
faith 19:18
  66:15 68:4
fall 74:7 78:2
falls 49:18
  70:18
familiar 20:1
  37:5 75:9
familiarity
  75:10
far 8:24 39:18
  44:12 56:20
  68:10 83:11
  85:7
fashion 14:3
  38:4
faucher 8:14
fear 49:17
federal 68:15
  72:10
fee 17:4,7,11
  17:13,21 18:11

18:15 19:24
  20:24 21:16,22
  22:5,8,11,19
  22:24 24:3
  26:11 27:21
  28:3 29:6,22
  29:23 30:11,14
  30:15,16,16,19
  30:24 32:3,5
  42:3,4,6,9,15
  42:18 46:12
  47:8 48:2,5
  49:4 50:5,8,25
  51:8,11 53:5
  53:15,17,17,24
  54:5,10,16,20
  55:4,12 58:9
  58:13,16 59:9
  59:11 60:2,9
  61:4,9,15,17
  61:19 62:4,6,8
  65:1,5 78:25
  79:2,4
fees 19:4,19
  20:2 31:20
  46:5,17,21
  47:23 48:14
  51:3 52:18
  53:24 57:1,1
  59:18
felt 20:24
  26:20
ferguson 1:25
fiduciary
  17:17 18:20
  61:12

figure 72:18
file 13:2 23:9
   31:7 38:23
   45:4 50:16
   84:9 85:5
filed 12:12,16
   12:21 34:15
   82:17 83:8,10
   85:10
filing 13:25
   15:12 34:22
   36:24 38:9
   52:1 59:17
   73:8 79:9
final 16:7 58:5
   85:24
finalize 82:16
finalized 30:12
   35:14
finalizing
   79:25
financial 64:10
   73:24
find 25:10
   76:20 79:14
fine 13:10
   34:24 35:2
   43:22,22 70:15
finish 50:2
fireblocks
   42:20 43:1,21
   44:1
first 13:5 16:15
   21:18 30:13
   40:15 58:14
   59:11 63:10
   69:22 72:1,23

76:19 78:1
   79:24 82:23
fit 20:7,21
   21:25 29:13
flannigan 8:15
flesh 71:25
floated 73:20
floor 5:18 75:3
florence 8:15
focus 26:24
   32:16
focused 25:15
   71:15 75:7
   76:8
focusing 32:13
   75:23
following 38:2
   62:22
forced 23:24
foregoing 89:3
forgetting
   19:17
form 12:16
   35:14 38:8,15
formal 85:6
formally 85:13
forming 20:10
fortunately
   56:2
forward 17:18
   18:20 28:24
   32:12 35:25
   36:10,11 49:7
   49:25 52:15
   61:16,19 62:7
   69:24 70:14
   71:17 73:7

75:5 80:5,16
   82:6 83:21
foundation
   55:5
framework
   20:7
front 14:10
fruition 78:6
full 82:12
fully 69:25
funding 74:22
further 23:12
   30:23 31:19
   33:1 40:7
   52:13,19 87:24
future 29:16
   41:11,14 55:24
   56:6

**g**

g 12:1
gallagher 5:23
   34:1,3,5 87:12
gean 7:25
geary 8:16
general 4:8
   70:4
general's 85:4
geoffrey 7:19
   9:4
getting 19:4,11
   39:20 55:3
   79:1 81:10
giardiello 8:17
girlfriend 56:2
give 14:25
   29:11,22 43:14
   52:10 59:18

77:21 82:14
   84:11
given 27:13
   54:6 67:7
   74:24 78:14
   80:20 82:2
gives 82:9
giving 12:14
   60:19
glenn 1:22 12:6
   45:13 59:5
   62:16
go 13:15 14:3
   15:7,7 16:25
   18:12 21:10
   28:10 34:17
   35:2 41:20,21
   44:21 45:10,12
   45:17 46:25
   48:12 50:12,12
   51:10,10,11
   61:16 80:8,24
   81:1 83:20
   87:15
goes 32:1,12
   39:5 44:15
   50:23 51:5
   82:6
going 12:5,24
   14:25 18:7
   22:15 36:17
   37:13,18 38:21
   40:18 42:2,22
   43:11,14 44:13
   46:6,21 49:2,3
   50:14,15,19
   52:14 55:6,9

59:22,23 61:19
63:9 67:9 68:8
68:21 70:1
72:20 73:2,13
74:19,21 78:11
78:11,25 81:14
82:19 85:7
87:8,22 88:1
**good** 12:6
13:12 16:22
19:18 26:23
34:7 35:20
44:7 45:13
55:17 66:15
68:4 81:16
83:1 84:25,25
86:20 87:17
**gordon** 8:18
**gorrepati** 8:19
**government**
69:10 74:9,14
**grade** 25:12
**granted** 86:6
**granting** 2:3
12:13
**grayscale**
51:13,20
**great** 12:10
53:22 58:5
62:13
**greater** 43:14
54:11 84:21
**green** 1:12
**gregory** 4:20
16:17 71:20
**group** 5:16
12:21,25 15:17

81:18
**grow** 30:24
**grows** 30:24
**guarantee**
67:25
**guarantees**
68:22
**guarding** 43:5
**guess** 29:14
30:23 38:2
53:13,16 54:24
55:21 63:6
**guessing** 59:13
**guesstimate**
59:15,19
**guidance** 85:22
87:24
**guys** 59:24
60:20

**h**

**half** 20:16,22
21:20
**hand** 16:20
45:9 69:23
75:12 77:11
78:11,12 81:25
**handle** 13:9
**hands** 14:23
**happen** 27:22
37:3 49:2
76:21
**happened**
17:14 45:21,22
**happens** 57:20
60:13 63:12,13
63:23,23 64:4
64:23 75:24

83:19
**happenstance**
76:18
**happy** 29:10
55:10,18 56:7
78:23 80:12
86:11,13
**haqqani** 8:20
**hard** 19:18
67:9,23
**harmed** 57:23
**harrison** 8:21
**haste** 86:25
**head** 13:18
**hear** 12:8
13:14 14:5
18:2 34:9
43:18 71:19,21
85:1
**heard** 45:9
72:24 73:14
83:19 84:20,20
85:24 87:14,15
87:21,21
**hearing** 2:1
16:1 27:19,22
35:11 41:2,2,5
41:6,12 49:12
49:12 69:3,6
80:5 82:23
88:2
**hearings** 13:23
80:12
**heavily** 67:21
**held** 50:22
59:20

**hello** 40:10
43:11
**help** 71:25
**helpful** 70:2
79:9
**helping** 72:9
**henry** 10:20
**heras** 6:19
87:15,17
**herrmann** 6:4
46:25 47:1,2,4
48:20,21,22
52:8,9,15,22
52:23
**hershey** 8:22
**high** 29:11,18
56:24
**higher** 17:18
17:23 18:20,22
32:11 35:17
36:3 45:18
46:3 49:20
53:21,23 54:11
54:19,20 57:4
57:6,11,13
58:4,7,8,17,23
61:12 62:7
65:1
**highlight** 79:9
**highly** 54:6
**hindsight**
80:15
**hit** 18:3 79:7
**hittelman** 8:23
**hoc** 5:16 12:21
12:25 15:17
81:17

[hold - interest]                                                                     Page 15

| | | | |
|---|---|---|---|
| **hold** 42:21 | 82:17,21 83:1 | **i** | **including** |
| 51:23 | 83:7,13,16 | **ideas** 74:1 | 42:13 57:1 |
| **holder** 38:18 | 84:5,14 85:1 | **ignat** 4:2 34:11 | 62:15 72:4 |
| **holders** 3:20 | 86:10,16,20 | **ii** 2:3 | 74:8 |
| 21:8 23:5 45:1 | 87:2,9,18 | **il** 3:6 4:18 | **income** 29:2,16 |
| **holding** 47:7 | **honor's** 87:3 | **illiquid** 29:7 | **increased** |
| 63:15 | **hope** 20:25 | 30:1,3,6,13 | 45:21 70:11 |
| **holly** 11:1 | 59:20 79:12 | 39:13 40:16,19 | **increment** |
| **hon** 1:22 | **hopeful** 26:21 | 51:10,13 | 58:16 |
| **honest** 74:13 | 35:6 81:21 | **immanuel** 6:4 | **incremental** |
| **honor** 12:10,13 | 82:1,5 | 47:1 | 19:9 |
| 12:20 13:4,7 | **hopefully** 19:8 | **immediately** | **incurring** |
| 13:11,12,16 | 20:25 30:6 | 36:24 37:3 | 23:20 |
| 14:2 15:6,9 | 38:15 48:15 | **important** 29:5 | **indicate** 83:24 |
| 16:22 21:7 | 49:10 75:24 | 57:7 58:1 | 86:8 |
| 23:12,19 24:20 | 79:14 82:15 | 67:22 68:16 | **indiscernible** |
| 25:2,11,20 | **horse** 16:8 36:1 | 75:11 78:19 | 59:2 80:23 |
| 26:9 27:11,18 | 53:18 54:13 | 81:8 82:3 | 84:7 |
| 28:16 29:11,21 | 74:20 | **improved** 82:1 | **individuals** |
| 29:24 30:8 | **hourly** 53:12 | **inapt** 20:5 | 55:3 |
| 31:15 32:4,25 | 53:12 56:16,18 | **inasmuch** | **information** |
| 33:16 34:7,19 | **hours** 19:10 | 21:23 | 52:19 74:8,11 |
| 37:21 39:2,5 | 53:11 54:1 | **incentive** 20:17 | 87:25 |
| 40:8 42:22 | 60:23,24 70:24 | 29:6,23 31:19 | **initial** 17:10,12 |
| 43:10 46:7,9 | **house** 39:13 | 33:2,23 79:2,4 | 30:11 34:22 |
| 46:24 47:1 | **hudson** 3:21 | 79:7 | **initially** 18:15 |
| 48:21 52:9,25 | **hundreds** | **incentivize** | 51:8 |
| 56:7,11 57:17 | 73:24 | 30:21 | **insisted** 48:3 |
| 59:18 61:23 | **hurdles** 26:22 | **incentivized** | **institutions** |
| 63:17 64:1,7 | 28:21 36:4,8 | 79:2 | 73:24 |
| 64:19 65:4,11 | 71:13 | **include** 22:13 | **instrument** |
| 65:13 66:2,9 | **hyde** 2:25 89:3 | 22:14 50:15,15 | 51:24 |
| 67:18,20 68:12 | 89:8 | **included** 30:10 | **intend** 13:17 |
| 68:17 69:21 | **hypothetical** | 39:22 42:6,9 | 23:9 27:17 |
| 70:21 71:10,20 | 66:16 | 42:15 65:9 | 28:20 38:23 |
| 79:16,19 80:3 | **hypothetically** | **includes** 22:12 | **interest** 42:14 |
| 81:16 82:1,15 | 33:10 | 49:1 | 42:16 |

| | | | |
|---|---|---|---|
| **interested** 35:23 | **issued** 36:22 37:15 47:16 69:9 | **job** 32:16 | **kevin** 9:11 |
| **interests** 39:24 | | **joe** 6:16 9:8 79:19 | **key** 73:11 79:25 80:5,10 |
| **internet** 73:21 | **issues** 19:14,15 19:15,15,16,16 19:16 38:5 44:24 46:12,15 49:13 51:20 68:16 74:25 75:10 81:22 82:5 83:11,14 84:17 | **john** 8:7 | **khai** 10:1 |
| **interrupting** 36:20 | | **jones** 8:25 | **kim** 9:3 |
| **intimately** 13:20 | | **joshua** 9:19 | **kind** 56:5 59:12,25 60:16 73:7 76:7 77:25 78:21 79:9,9 |
| **introduced** 54:3 | | **judge** 1:23 12:2,6 37:17 43:15 45:13,13 59:5 61:7 62:16 69:9 | |
| **investing** 56:16 | | | **king** 9:4 |
| **investment** 13:19 72:18,25 73:4 | **issuing** 37:10 38:6,7 | **judging** 31:3 | **kirkland** 3:3 12:7 13:13 25:13 57:24 63:18 72:8 |
| | **item** 12:11 | **judgment** 33:10 67:23 68:19 71:12 | |
| **investments** 47:15 59:25 74:22 | **ivene** 44:6,7,7 44:10,20 45:7 | | **knauth** 9:5 |
| | | **judson** 7:13 | **know** 18:6,8 20:4 27:21 29:9 30:2,7 32:25 34:16 35:6 38:19,19 39:20 43:23 44:3 45:22 48:4,17 49:24 50:3,23 51:4 52:14 53:6,12 53:25 54:4,22 54:24 55:12 57:16 60:13,23 63:21 64:3,10 64:11,12,18,20 64:20 67:8,11 68:1,2,21 69:9 69:14,25,25 70:6,8,12,19 71:7 72:3,9 73:14,23,24 |
| **involved** 13:20 25:18,24 37:7 60:5 85:10 | **j** | **jump** 36:9 | |
| | **j** 7:10,23 9:23 11:1 | **jumped** 26:22 36:8 | |
| **involves** 19:14 | **jack** 10:14 | **jurisdiction** 64:20 | |
| **involving** 21:20 | **james** 9:17 | **justice** 3:12 | |
| **ipo** 36:16 | **jamo** 11:14 | **k** | |
| **irrespective** 51:2 | **jamshid** 8:24 | **k's** 31:7 36:24 38:9 52:1 | |
| **issue** 15:14 27:15 28:1 37:14 38:11 41:9 44:14,24 45:3 46:5,5,6 46:13 47:25 49:8 50:21 52:20 81:13,23 83:18,23,24 86:9,25 | **janell** 8:8 | **kaila** 11:11 | |
| | **january** 46:1 | **kaitlyn** 8:23 | |
| | **jasleigh** 8:16 | **kaplan** 9:1 | |
| | **jason** 44:7 | **karpuk** 9:2 | |
| | **jean** 9:7 | **kaufmann** 11:16 | |
| | **jeff** 7:5 | **keep** 50:1 | |
| | **jeffrey** 5:13 86:21 | **keeping** 60:20 | |
| | **jersey** 5:9 86:22,23 | **keith** 9:21 11:5 | |
| | **jessica** 7:17 10:19 | **ken** 8:10 11:12 | |
| | | **kept** 69:6 | |

74:3,4,13
76:13,18 77:4
77:8,14,20
78:4,7 79:1,3
80:12,14,15
82:15 84:22
86:2 87:5,7,8
**knowledge**
82:23
**knowledgeable**
53:4
**knows** 29:24
46:3
**koenig** 3:10
63:17,18,25
64:7 65:4,11
65:13 66:2,9
66:22 67:1,4
67:18,20 68:12
69:2,21 70:21
79:20 80:2,3,3
80:9 81:5
**kotliar** 9:6
**kwasteniet** 3:8
12:6,7,10
13:11 15:16
25:13 28:9
**kyle** 9:23 10:13
**kyong** 9:3

**l**

**lack** 23:3 39:19
66:7 73:17
**laid** 62:25
**landscape** 67:8
67:25
**large** 18:23
21:19 22:20

38:18 60:9
73:24 80:11
**larger** 82:14
**largest** 40:11
81:3,5
**las** 6:19 87:15
87:17
**lasalle** 3:5
**laser** 71:14
**late** 76:14
**latreille** 9:7
**lawrence** 7:1
**lawyer** 55:15
57:1
**lawyers** 28:17
28:18 33:25
**lay** 31:15
**layla** 4:12 85:1
**lead** 54:11 72:7
**leave** 41:11
**leblanc** 3:24
21:7,7,10,12
21:25 23:12,13
81:14 82:19,21
**led** 28:1
**ledanski** 2:25
89:3,8
**legal** 16:6 19:4
19:15 22:1
27:3 28:21
37:13,18 42:20
43:4,24 44:18
63:7 89:20
**legally** 43:22
**lehr** 6:16 9:8
79:18,19,24
80:7,23,24,25

81:3,7
**lehrfeld** 79:19
**lenders** 42:12
**lennon** 9:9
**leonard** 9:10
**level** 29:11
57:24
**liabilities**
22:12
**light** 21:9 69:1
75:1 77:20
**likelihood**
56:23
**likely** 71:12
**lily** 11:7
**limit** 41:4
**limited** 13:24
14:19 18:18
21:23
**line** 29:14 50:2
70:17 82:25
**linkage** 33:17
**lips** 18:8
**liquid** 20:12
33:20 39:9,10
40:18,19 49:1
49:2 50:4,10
**liquidate** 82:9
**liquidated** 24:8
30:7
**liquidating**
51:22 52:2,4
77:13
**liquidation**
23:24 24:10,13
24:17 25:7
39:16,21,23

59:23 62:4
75:19 76:2
77:14
**lisa** 8:14 9:3
**list** 73:2
**listen** 46:10
**litigation** 33:6
33:7,15
**llc** 1:7
**llp** 3:3,19 4:1
4:14 5:8
**loan** 42:7,8
47:14 82:10
**loans** 42:12,14
42:16
**lock** 75:12
79:15
**locked** 82:3
**long** 35:13
36:17 67:5
69:5
**longer** 32:21
**look** 14:23 22:1
27:12 45:22
52:15 53:11,24
76:13 78:1
**looking** 20:23
65:13
**looks** 49:21
**lost** 71:8
**lot** 26:22 30:1
40:23 49:9,24
50:8 70:3,4,22
71:6 72:17
78:8 83:4 86:1
**low** 29:18

**lower** 30:21
**luke** 10:3

**m**

**m** 3:8 9:11
  11:16
**m&a** 22:13
**maciej** 10:4
**made** 29:19
  52:21 62:15,20
  82:23 84:22
  86:17
**majority** 61:2
**make** 14:1
  48:23,24 55:24
  67:24 69:22
  71:25 73:11
  74:7,15,24
  78:10,20,21,24
**makes** 47:8
  54:24 68:20
**makeup** 62:21
**making** 53:6
  53:11,25 71:15
  76:17
**manage** 29:6
**managed** 33:13
  64:16
**management**
  29:22 31:19
  50:25 51:3,8
  59:11 61:19
  71:3 73:22,25
**manager** 24:9
  31:12 32:2,13
  76:1
**manpower**
  71:7

**manus** 9:11
**marc** 13:17
  15:10 21:11
  35:3 40:13
  41:25 44:9
  47:3 53:1
  56:13 59:7
  61:25
**march** 1:15
**mark** 10:8 17:2
**maronpot** 9:12
**married** 56:3,4
**marsh** 9:13
**marth** 89:25
**martin** 1:22
**mas** 60:2
**massachusetts**
  4:3
**masumoto**
  9:14
**materially**
  78:17
**materials**
  83:10
**math** 62:24
**mathematical**
  53:10
**matter** 1:5
  17:14 38:23
  74:6 87:22
**matthew** 10:18
**maximize** 19:8
  30:7,22
**mayo** 9:15
**maza** 9:16
**mccarrick** 3:9
  13:8,12,13,16

  14:5,8,12,15
  14:18 15:8,9
  15:11 16:12
  42:22 63:8
**mccarter** 5:15
  81:17
**mcelroy** 5:8
  86:21
**mcnamara**
  9:17
**mean** 39:18
  40:23 63:14
  68:3 77:3 80:9
  83:19
**meaningful**
  52:5 70:10
**measures** 79:7
**meet** 72:16
  74:12,19
**meets** 74:18
**melanie** 11:3
**members**
  62:18
**memorialize**
  13:1
**mendelson** 6:7
  52:24,25 53:2
  53:17 55:7,8
  55:14,19,20
  56:9
**mengden** 9:18
**menos** 60:2
**mention** 19:17
  35:5
**mentioned**
  36:14 38:17
  74:4 75:6

**mess** 44:11
**mester** 9:19
**met** 22:5 78:1
**metrics** 57:5
**mg** 1:3
**midpoint**
  29:18
**migrates** 30:15
**milbank** 3:19
  21:8
**milligan** 4:12
  84:22,25 85:1
  85:3,25 86:4
  86:10,16,24
**million** 12:19
  12:19,19 15:24
  15:24 17:7,7
  17:11,12,20,23
  17:24,24 18:15
  18:18,22,23,23
  19:1 20:17,24
  21:15,22 22:19
  23:19 25:3
  29:13 30:14
  49:19,22 54:9
  54:13,15 56:23
  58:7,9,10,18
  58:19,20 59:11
  59:25 60:9
  61:4 69:12,20
  70:16 76:9
  83:22 86:1
**millions** 19:4
**mind** 70:16
  76:7
**mineola** 89:23

**minimal** 59:25
**minimum**
  28:12 79:15
**mining** 47:14
**mira** 8:20
**misplaced**
  75:16
**missed** 25:5
  65:12
**misstated**
  25:14
**misstatement**
  77:8
**mister** 18:1
**mitchell** 9:18
**mitrakas** 9:20
**moment** 34:4
  40:17
**monetize** 51:23
**money** 49:24
  53:14 56:3
  86:1,3
**monies** 45:16
**montgomery**
  7:5
**month** 39:1
  68:24 78:13
**monthly** 53:7
  60:19
**months** 31:22
  31:22 32:15,21
  36:6,6 59:21
  60:8 70:7
  72:15 78:5
**morgan** 11:4
**morning** 12:6
  13:12 16:22

34:7 67:12
83:1 84:25
87:17
**motion** 2:1
  12:11 13:4
  15:14 41:9,23
  65:15 83:9
**mouatassim**
  8:11
**move** 17:18
  18:20 28:24
  36:10,11 49:7
  49:25 59:21
  62:6
**moves** 29:25
**moving** 35:7
  80:5
**mst** 79:3
**multiple** 62:15
**multiply** 53:12
**mulvaney** 5:8
  86:21
**muster** 72:16
  73:17
**mute** 18:3
  45:10

**n**

**n** 3:1,5 12:1
  89:1
**name** 44:11
  72:20 79:18
**nancy** 11:15
**narrow** 17:15
**national** 72:22
**native** 38:13
**nav** 30:9,11,12
  30:16,20,20

51:9
**navs** 30:9
  59:16
**ne** 5:3
**necessary**
  66:19 74:23
**need** 26:10
  34:2 36:4,9
  45:9 46:11
  47:5,23 50:8
  58:10,12,18
**needs** 20:7
**negotiate**
  17:12 48:7
  71:1
**negotiated**
  17:21,23 18:17
  18:22 29:9
  31:14 32:19,23
  32:23 44:25
  47:19 67:21
  81:8
**negotiation**
  17:9,15
**negotiations**
  15:21,22 35:12
  54:2,8 79:25
  85:7
**nelly** 7:6
**net** 29:15,23,24
  30:16 51:9,16
  51:17
**netting** 20:12
**network** 1:7
**never** 22:7
**new** 1:2,13
  3:15,22 5:9,19

20:10,10 63:14
73:13 76:5
86:22,23
**newark** 5:11
**newco** 20:10
  20:16,18 22:2
  28:20 29:7
  31:4 36:14,18
  38:1,1,8,14
  39:12,12 40:1
  40:21 42:5,17
  47:7,12,16
  61:20 63:11,16
  63:24 64:3,9
  64:13,16 72:5
**nice** 34:8
**nicole** 9:10
**night** 12:16
**nights** 76:14
**nine** 31:22
**nj** 5:11
**noah** 10:16
**nok** 16:17
**nominated**
  62:19
**nonlegal** 38:4
**nonstarter**
  86:2
**noon** 84:9,12
  86:8 87:5,23
**norm** 20:5
**normal** 58:12
**note** 81:18
**notice** 67:13
**noting** 34:17
**nova** 27:4

**novawulf**
12:18 15:21,22
16:7,9 17:9,20
19:2,6,17,25
20:9 21:21
22:21 23:16,23
24:11,18,23
25:7 26:4,5,7
26:10,13,18,24
27:7,14,15,24
28:5,12,19,23
29:2,13,16,22
30:21 31:3,5,9
31:11,12,17,21
31:24,25 32:2
32:7,14,17,20
33:4,6,16,17
33:18,22 36:5
36:10,25 40:1
40:20 41:10,13
41:24 46:6
47:11,20 48:7
48:8,12 49:15
51:5 53:6 54:3
56:4,15 59:10
60:6,16,24
61:3,10,14
62:19,20 63:11
64:17,25 65:1
65:23,25 66:24
67:13 69:13,19
70:19,21 71:3
71:6 72:17,25
73:3,21 74:5,6
74:14,17 75:12
75:17 77:11,16
78:1,2,15,16

78:24 79:7
83:5,20
**novawulf's**
17:10 29:5
55:1 79:14
**novel** 19:8
**noyes** 9:21
**nuanced** 79:25
**number** 73:12
73:14 75:8
**numbers** 17:22
18:21 39:17
85:8
**nuraldeen** 7:12
**nw** 4:3
**ny** 1:13 3:15,22
5:19 89:23

**o**

**o** 1:21 12:1
60:2 89:1
**o'brien** 9:22
**oath** 13:24
**object** 42:22
**objection**
12:20,22 15:20
37:20,20 85:6
**objections**
40:24 69:16
80:1
**obligation**
42:11
**obligations**
67:6
**obstacles** 36:4
**obtained** 77:19
**obviously**
13:20 24:4

35:21 53:4
55:15 77:9
80:14 82:8
83:4
**occur** 75:24
**octave** 7:10
**offer** 17:18
86:11
**office** 4:8 16:23
85:4
**official** 4:15
**oh** 34:3
**ok** 58:20
**okay** 12:8,10
13:16 14:5,8
14:23 18:5
22:22 26:5
28:10 33:24
34:21 40:23
41:5,11 42:19
43:11,19,19
44:4,5,12,20
45:10 50:18
56:9 61:21
63:1 66:5
67:11 73:9
75:22 77:5
79:21,22 81:7
84:12,18 85:1
86:9 87:11
**old** 64:9,14
89:21
**oliveira** 7:25
**once** 31:18
**ones** 39:18
**open** 86:25

**operate** 24:15
**operating**
19:12 20:4
31:23 32:14
**operations**
49:4
**opinion** 27:13
36:2 60:1 69:8
**opinions** 69:9
**opportunities**
71:4
**opportunity**
46:14 71:2
82:13
**oppose** 77:5
**opposed** 22:9
30:20
**order** 2:1
12:17 13:7
44:15 49:4
54:21 77:3
**orderly** 17:19
18:17 24:2,10
24:13,16 25:6
25:16 26:10
39:16 49:21
62:8 65:6,9,14
65:17,18 75:19
76:2
**ordinarily**
25:25
**organized**
23:24
**ortiz** 9:23
**osborne** 9:24
**outline** 48:23
52:11

outlined 15:16
outside 33:6
overcoming
80:1
oversee 31:9
own 26:15
37:20 53:10
85:17
ownership
51:24

**p**

p 3:1,1 8:7,22
9:2 12:1
p.o. 4:9
page 65:13,17
paid 17:13,16
17:20 20:2,20
20:23 21:23
22:9 23:19
24:3,4 29:6,23
42:14,16 53:20
54:6 61:9 62:5
62:6,9 69:12
84:4
paper 83:18
papers 72:24
73:5
part 15:21
21:15 23:20
33:15,22,22,23
37:15 40:20
42:2,5,17 54:2
54:8,10 60:8,8
60:9 61:19
78:5 80:1
particular 75:7
75:8

particularly
21:23
parties 28:23
73:1,12,13,21
73:22
partner 13:18
34:25 36:25,25
partners 13:19
19:3 27:10
party 72:19
75:4,14
pass 16:12,18
past 70:11 74:8
74:16
path 68:25
70:14 71:17
paul 7:11 8:13
pay 20:17
25:12 48:4
49:23 53:14
54:12 58:18
67:16
payable 18:16
18:18
paying 22:2
54:10 60:4,6
60:21 61:2
76:16
payment 29:13
peled 9:25
people 39:17
73:14
percent 20:4,4
20:19 22:3,5,7
22:11 30:11
38:14 39:12
45:21 47:16

50:24 51:17,17
60:2 61:1 79:4
perform 63:23
66:12
performance
31:3,11,25
42:3,4,6,9,15
42:18 51:3
period 24:15
31:18 32:21,24
49:11 82:11
86:6
person 43:12
perspective
22:6 82:12
pesce 4:20
15:25 16:17,17
35:10 71:19,20
71:20,24 73:6
73:10 75:15
76:6,12 77:3,7
77:25 79:17
81:24
peter 10:12
petition 44:15
45:2,15,17,20
50:22 81:6
pham 10:1
philippe 9:7
phillips 10:2
piece 15:25
pieces 55:2
pile 30:2 79:1
pivot 17:19
24:2 26:10
49:21 62:8

pivoted 18:16
place 36:12
85:16
plan 2:3 12:24
13:1 15:19
22:15 23:7,9
23:16,23 24:1
24:19 26:6,9
26:19,20,23
27:7,19 29:3
31:3 32:5
33:21 36:7,9
37:4,5,16
38:21,23 40:1
40:19,22 41:1
41:2,5,6,7,13
41:14,16,24
44:12 45:4
46:4,6,15
47:22 48:2,4,8
48:24 49:12
50:9 52:16
53:11 55:1,2,5
59:22 60:5,12
62:3,3,17
63:10,19,19,22
63:25 64:8,19
64:24 65:16,21
65:24 66:3,10
66:12,24 67:6
67:15 69:11
72:9 74:24
79:16 80:18
81:13 83:8,12
85:9,13
plan's 31:22
32:14 61:16

planned 77:4
plans 55:2,10
  73:16
platform 20:18
platforms
  38:13
play 80:15
players 75:9
plaza 5:17
please 14:21
  16:20,25 35:9
  84:8,9
pleased 12:14
  80:16
plenty 84:16
plus 22:3,4
  23:20 58:15,16
  58:16,18
pm 88:4
podium 13:8
point 17:16
  19:5,11,19
  25:14 26:22
  29:1 30:15
  32:4,10 36:6
  41:8 49:16,17
  52:17,21 54:3
  54:4 58:17
  62:14 64:5,7
  64:15,21 69:22
  71:24 72:14
  73:11,11 76:12
  78:5 81:9
  84:24
points 67:22
  69:21

policy 74:15,15
pool 30:2
poor 31:11,24
porcari 10:3
porczek 10:4
ported 40:21
  47:12
porter 7:1 45:8
  45:8,9,11,13
  45:20,25 46:7
  46:9,18,23
portfolio 42:7
  42:8 47:14
portion 13:9
  48:10
position 53:16
  77:10 83:9,10
  84:11
possible 40:25
post 50:22
  86:25
potential 16:2
  16:3 35:25
  75:10
poynter 10:5
precedence
  56:5
precedent
  55:22
precise 29:17
preferred 3:20
  21:8 23:5,10
preliminary
  15:18
prepared
  83:24

prepetition
  74:25
present 7:4
  22:22 29:15
presentable
  35:14
presentation
  13:6 62:22
  75:6
presented 23:3
  44:12 78:2
presume 24:8
  24:16
prevail 61:20
prevent 69:14
previous 19:22
price 19:24
  45:15 50:21,23
  51:1,4
prices 45:18
  49:23 62:2
principal
  21:21 22:18,19
principally
  22:21
principals 19:2
  57:8,9
principle 21:18
  81:21
prior 13:23
  35:11 53:7
  74:25 80:12
pro 5:24 6:2,5
  6:8,11,14,17
  6:20,23 7:2
  34:14 39:11
  40:11 44:7

47:2 55:15
  56:12 59:5
  79:19
probability
  56:22,24
probably
  19:16 20:16
  29:18 39:10
  78:5
problem 45:14
procedures
  65:21
proceed 13:5
  14:3 49:11
  54:21
proceeding
  13:9 34:15
proceedings
  88:3 89:4
proceeds 24:13
process 28:24
  36:16 56:17
  68:24 75:4
  77:12,18 79:13
  82:2,6
productive
  70:2
productively
  12:15
professionals
  19:3 27:2
  28:17,18 54:7
  57:9,10 60:5
  69:5
progress 16:6
projected
  52:19

pronounce
  79:18
proper  70:13
proposal  17:11
  17:12 54:13
  62:17 82:8
propose  13:5
  13:22
proposed  2:3
  12:16 14:9
  19:25 41:7,14
  47:9 58:8 62:3
  68:11 85:9
prosecuted
  33:7
prospectively
  33:18
protect  32:23
protected  32:7
  32:21
protection
  41:3 78:9 80:1
protections  2:2
  12:12 13:4
  14:10 15:14,24
  19:20 24:21
  36:1 41:10
  47:8,23 48:2,5
  48:9 49:3 50:5
  50:8 65:15
  78:19 80:19
  83:9,15,19
  85:6
provide  66:7
  66:19 75:3,3
  77:15 85:22
  86:9 87:24

provided  55:4
  77:17,17 82:8
provides  23:9
  47:11,11
providing
  38:22 68:7
provision
  36:15 63:15,16
provisions
  25:14 29:8
  31:15 32:23
public  31:5
  36:16,24 37:25
  38:8 51:25
  55:23 72:21
publicly  29:10
  41:8
pulled  55:2
puntus  13:18
  13:22 14:1,5,7
  14:8,11,14,17
  14:18,22 15:10
  15:12 16:11,15
  16:16 17:2,4
  19:21 21:2,11
  21:13 23:15
  34:1,12 35:3,5
  37:6,23 40:13
  41:24,25 43:8
  44:9,11,19
  47:3,5 50:3
  52:10 53:1,3
  56:13,15 59:7
  59:12 61:8,25
  62:14 63:6
  70:23 73:3

purchase
  19:12,24 48:8
purchaser  22:9
  22:25
purchases  20:3
  20:3
purchasing
  20:11
pure  66:16
purely  59:19
purpose  40:19
  78:9
purposes  83:9
pursuant
  65:21
pursuing  71:4
put  30:23
  41:23 56:22
  60:16 69:18
  70:5 73:7
  78:23 83:18
putting  23:16
  55:22 70:16
  71:6

**q**

q's  31:7 36:24
  38:9 52:1
qualitative
  15:25 57:15
quantifiable
  57:14,15,16
quantum
  20:14 21:14
  22:24 30:24
  33:21
question  21:1
  21:14 28:7,25

34:12 36:21
37:14,18,19,20
38:3,16 40:15
42:23 43:8,8,9
43:13,24 47:10
48:1,16 50:19
55:21 58:5
59:22 60:11
62:13,16 63:19
70:16,20 74:6
74:6 75:16
79:24 80:4,6,8
81:2
questions
  13:25 21:9
  23:12,15 33:24
  34:2,4 40:7
  41:4,16,23
  43:17,17 44:5
  44:19,21 46:11
  46:16,20 48:19
  49:5 50:7
  52:12 53:3,5
  55:11,17,18
  59:1 61:24
  63:2,4,5,7,9
  66:18 68:9
  70:1,4,4,6
  72:10 73:2
  75:23 76:3
  79:20
quickly  49:8
quite  19:14
  20:1 36:3
  40:23

| r | | | |
|---|---|---|---|
| **r** 1:21 3:1 7:19 12:1 89:1 | **reason** 28:6 53:9 64:11 69:13 73:18 75:16 78:18 82:4 | 81:18 82:24 89:4 | **regina** 9:24 |
| **race** 36:1 | | **recovered** 33:15 | **register** 73:3 |
| **rags** 37:8 | | **recoveries** 33:4 33:5 52:19 74:2 | **registered** 37:16 38:9 72:17,19,21,25 73:1 |
| **raise** 14:22 16:20 83:11,15 | **reasonable** 19:2,20 20:25 21:22 22:21 24:5 49:23 58:16 68:21 71:17 80:20 | **recovery** 23:10 33:11 50:4 | **regulatorily** 26:19,25 27:7 27:15 28:24 66:16 67:24 71:15 85:19,20 |
| **raised** 37:9 38:5 45:10 49:13 52:17 | | **redirect** 16:13 | |
| **raises** 70:15 | **reasonably** 71:12 | **reduce** 12:18 15:23 | **regulators** 65:22 66:18,23 68:2,6,10,13 68:15,15 69:5 69:7,14,16,24 71:10 72:2,4,6 72:10 74:7 84:19,21 87:24 |
| **rally** 62:2 | **reasons** 20:6 26:20,21 30:5 72:17 | **reduction** 35:20 85:8 | |
| **range** 29:18 | | **reference** 22:24 | |
| **rasha** 8:11 | **rebecca** 5:23 | **referenced** 16:1 | |
| **rata** 39:11 | **receive** 24:19 26:4,11,11,14 29:2,17 31:19 33:1 38:20 39:17 40:2,24 59:10 61:14,17 65:2 | **references** 62:15 | **regulatory** 19:15 26:7,14 27:4,24 28:5 28:15,21 65:23 66:6,25 67:8 69:22 70:18 71:24 72:14,16 73:17 74:5 75:10 76:10 83:5,20 86:18 |
| **ratchets** 30:25 | | **referred** 21:14 81:24 | |
| **rather** 47:7 | | **referring** 45:25 | |
| **reach** 68:5 78:5 | | **reflected** 31:6 38:15 45:4 47:15 | |
| **reached** 15:18 27:4 80:13 81:20 82:4 | **received** 67:12 75:20 77:19 80:21 | **reflects** 12:17 51:24 | |
| **reaching** 12:22 | **receives** 79:3 | **regard** 71:18 73:10 77:9 | **reilly** 10:6,7 |
| **read** 18:8 37:17 67:12 69:8 73:5 | **receiving** 27:25 | | **reimbursement** 12:18 15:23 17:5,6,22 18:21 19:24 24:4,22 25:2,8 26:12,15 27:22 27:25 28:4,13 |
| **reading** 25:5 37:7 | **recent** 84:22 | **regarding** 46:16 53:5 60:11 72:11 74:9 83:12 | |
| **ready** 13:3 | **recently** 34:15 | | |
| **real** 79:15 | **recognize** 16:21 81:14 82:19 87:14 | | |
| **really** 25:15 26:2 32:13 63:7 67:17,19 76:8 78:19 79:7 81:9,12 81:13 | | **regards** 40:15 84:1 | |
| | **record** 34:17 41:12 63:17 71:25 73:6 | | |

32:3,11 35:20
46:13,16,21
49:23 52:18
55:13 58:14,15
61:9,15,18
62:10 64:25
65:2,7,25 66:3
66:8,14 67:3,5
67:16 68:4
69:12 70:17,23
71:1 75:18,21
76:4 77:21
83:22 84:4,15
**reimburseme...**
48:15 76:16
**rejected** 54:7
**relate** 58:24
**related** 2:3
15:13 54:5
85:9
**relation** 53:25
**relationship**
19:23 56:1
**release** 47:5,6
**released** 41:8
47:24 48:1
**relevant** 79:10
**relief** 2:3 77:4
77:10
**relying** 50:6
**remaining**
81:21
**renegotiate**
48:13
**reorganization**
12:24 75:2

**repeat** 18:7,12
75:8 86:24
**reph** 6:13 59:4
59:5,5,8 61:7
61:22
**replaced** 31:11
31:19 33:1
**replaces** 32:16
**report** 12:15
**reporting** 38:9
**represent**
34:11 38:17
**representatives**
31:8 52:1
**represented**
34:20
**representing**
34:10
**represents**
57:23
**requirements**
42:20
**reserve** 16:13
**reside** 33:6
**resolution**
15:18 80:13
82:5
**resolve** 49:8
**resolved** 12:20
12:22 49:9
**resources**
49:16
**respect** 33:20
35:22 37:6
41:9 46:11
83:15,24 84:13
84:14

**respectfully**
79:8
**respond** 44:22
**response** 62:15
72:10 83:24
87:2
**responsible**
31:2
**rest** 41:15
77:18
**restructured**
42:12
**restructuring**
13:18 42:8,14
**result** 28:12
67:5 68:5,24
69:12
**resulted** 26:16
**results** 33:11
**retain** 24:9
64:20 76:1
**retained** 36:25
**retains** 32:1
**return** 54:12
**reveal** 75:4
**revert** 64:17
**review** 85:18
**reviewing** 83:8
**revised** 82:16
**richard** 7:7
10:2
**rickie** 7:15
**right** 12:2,4
14:22 15:7
16:13,14,19
21:3 22:10
23:8,15 25:17

33:9 43:2,12
43:22 44:6
45:6 50:3,18
51:3,12 52:7
54:14 61:21
63:5 64:23
65:22 66:22
67:1 69:17
71:19,22 76:14
77:7,23 79:17
80:22 82:22
84:6,19 87:20
87:22
**rigorous** 74:13
**rise** 45:14
**risk** 23:16
69:19 70:19
71:6 72:13
74:17 75:1
76:9
**road** 89:21
**rob** 6:22
**robert** 10:10
11:16
**robinson** 10:8
**roland** 8:25
**ross** 3:8 12:7
**rough** 39:16
48:25,25 49:10
52:11,11
**roughly** 50:9
50:15
**rudolph** 10:9
**run** 28:20
77:11
**running** 50:1

| | | | |
|---|---|---|---|
| ryan 6:13 10:10 59:5 | schottenstein 10:16 | seen 40:6 86:12 | sharing 72:11 |
| **s** | schroeder 10:17 | selected 55:24 61:10 | sheet 13:1 24:1 36:7 50:22 51:5 82:16 83:8 |
| s 3:1 9:14,16 12:1 | scott 8:5 | sense 29:22 47:8 48:25 54:24 59:18 68:20 | sheets 17:20 |
| sabin 35:1 | screen 28:10 | | shifting 67:8 67:25 |
| safe 85:14 | se 5:24 6:2,5,8 6:11,14,17,20 6:23 7:2 26:18 34:14 40:11 44:8 47:2 55:15 56:12 59:6 79:19 | sensitive 72:13 | short 12:13 26:15 36:16 49:11 |
| sake 56:15 | | seo 9:3 | |
| salaries 61:5 | | separate 52:20 68:15 | |
| salary 53:13 | | | shortcomings 26:15 |
| sale 68:24 | | separately 33:8 | show 75:13 |
| salls 10:11 | | sequence 28:2 | showing 45:10 |
| salygo 10:12 | sec 5:2 67:13 72:10 82:23 83:6,7 86:6 | sequencing 35:19,21 | shows 73:5 |
| samuel 8:22 | | series 3:20 21:8 23:5,10 | sic 36:4 |
| santos 7:14 | second 30:15 39:11 62:13 63:7 | served 16:8 34:16 | signature 89:7 |
| sarah 9:12 11:6 | | serves 33:18 | significant 57:1 73:18 78:14 |
| satisfy 39:24 61:4 | secondly 15:21 | serving 53:18 74:19 | significantly 45:18 46:2 51:16 |
| satterfield 10:13 | section 24:14 | set 56:6 87:23 | silverman 10:18 |
| save 41:15 42:6 | securities 5:1,9 37:11,16 74:10 83:2 85:4 | settlement 12:23 33:10 | similar 49:4 50:19 62:10 73:20 74:1 |
| saving 43:5 | | seven 62:18 | |
| savings 12:19 | security 31:7 37:2 38:12 51:15 | seventh 40:11 | |
| saw 67:11,12 | | several 26:20 68:14 72:15 | similarly 17:22 |
| saying 61:1 | see 12:7 13:14 14:6 25:8 27:12 28:7 34:8,8 35:16 57:16 65:9 72:24 79:22 82:5 85:13 86:13 87:6 | shake 85:14 | simon 6:1 8:12 10:19 40:11 55:1 |
| says 65:17 | | shape 26:23 | |
| scenario 47:23 76:17,20 77:16 | | shara 3:17 16:22 | simple 19:12 |
| scheuer 5:6 82:24 83:1,2,7 83:16 84:1,4,7 84:13 | | share 39:11 60:6 | simply 49:14 49:18 70:5 |
| | seeking 48:14 | | |
| schickler 10:14 | | | |
| schneider 10:15 | | | |

single 49:8
sit 57:10
sitting 78:25
situation 80:14
situations 20:3
six 31:22 32:15
  32:21 68:24
  78:5 82:11
size 30:25
slightly 58:6
slowly 39:5
sold 64:16
solemnly 14:24
solutions 89:20
somebody
  24:25 58:6
  76:5
sonya 2:25
  89:3,8
soon 13:2
sophisticated
  73:12
sorry 18:3,3
  27:10 34:3
  36:20 37:12
  39:2 40:10
  43:7,15 44:11
  46:10 48:21
  51:5 53:15
  55:7 65:8
  80:25 82:21
sort 20:5 35:6
  35:24,24 36:18
  38:1 39:15,16
  50:1 54:4,5
  57:16 64:17
  72:7 78:22

81:23,24 86:6
sorts 51:14
sought 70:25
sound 18:2,23
south 4:17
southern 1:2
space 73:13
  75:9
speak 28:22
  41:22 51:19
  60:3 78:12
  85:16
speaking 58:25
  72:4
specifically
  17:6 45:25
  48:1 54:1 72:6
spending 70:21
spent 15:16
  28:18 53:11
  54:1 60:23
  70:24 78:15
spoken 81:15
  82:20 87:12
sponsor 2:3
  23:17 24:19
  61:16 65:16
  66:3,10,12
  67:6 75:23
square 36:11
st 10:20
stability 77:17
stables 39:11
staff 83:7
  84:10
stage 52:15
  80:20

stages 16:7
stake 42:4,21
staked 40:15
  40:17,20 42:2
  42:13 44:2
  47:12,13
stakeholders
  80:21
stalking 16:8
  53:18 54:13
  74:20
stand 48:24
standard 57:6
  74:18,19
standing 68:23
  71:16
stands 35:8
  48:11,13
started 12:3
state 68:14
  72:6 84:19
  85:4,17 86:12
  86:18
stated 25:8
statement
  20:15 27:18,22
  30:10 38:23
  39:23 40:4
  41:2,7 46:15
  48:25 49:10,12
  50:16 52:16
  59:16 62:20
  78:22 79:10
  81:12 84:18
  85:12
statements
  40:5 60:19

74:9
states 1:1,11
  3:12 16:23
stay 85:15
steadman
  10:21
steth 40:20
  47:12,13
steven 7:18
stocks 51:12,19
stop 23:24
  37:13 68:8
stout 10:22
straight 20:3
  22:17
strategic 13:21
stream 29:2,16
street 3:14 5:3
  5:10
strip 39:10
strokes 38:19
  39:17
strong 58:2
strongly 58:2
structural
  19:15
structure 16:9
  22:1,1 27:7
  28:6,9 29:6,23
  30:5,8 32:12
  33:3,7,16,23
  36:14 37:25
  38:2 40:21
  41:15 42:6
  43:4 47:11,13
  51:23 61:19
  68:11 69:11,23

70:5,9 72:5,12
73:19 78:3
79:3
**structured**
18:25
**structures**
20:17
**struggle**  76:20
**subject**  62:19
**submission**
87:23 88:1
**submit**  73:16
**submitted**
62:17
**subsequent**
63:12
**subsequently**
17:24 27:19
**substantial**
28:13
**substantially**
64:8,22
**subverted**
44:13
**succeed**  71:13
**sufficient**
60:10
**suite**  4:17
89:22
**summarize**
54:9
**super**  48:25
**supplemental**
73:8
**support**  13:2
14:9 36:7 77:4
77:10 78:16

80:20
**supposed**
66:11
**sure**  18:13
25:11,21,21
48:13,21,23
63:8 67:11
69:22 71:15
76:6 78:10
79:24 86:16
**surprisingly**
32:22
**survive**  48:6
**suspect**  19:3
**sustaining**
37:19
**swear**  14:21,24
**sweat**  71:7
**sworn**  15:4

**t**

**t**  10:20 89:1,1
**t.j.**  13:8,12
**table**  78:18
**tak**  11:9
**take**  15:3 24:16
36:17 42:3
53:11,16 56:7
60:14 66:17
67:9 83:10
84:5,11 87:22
88:1
**taken**  69:14
**takes**  56:3
**talk**  55:9
**talked**  78:3
80:11

**talking**  37:10
58:14,22 75:22
**tally**  60:19
**tanzila**  11:13
**tax**  19:16
**taylor**  8:21
**tbd**  20:14
**team**  71:3
73:23 78:2
**teamed**  73:22
**technically**
58:8
**tell**  26:5 29:1
**ten**  19:16
**tend**  51:15
52:4
**tens**  19:10
60:23
**tension**  79:14
**term**  13:1
17:19 24:1,3
32:22 36:7
82:16 83:8
**terminate**
31:10,17,24
**terminated**
31:17,18 33:1
66:13
**terminates**
32:16
**terms**  24:21
32:8 33:25
35:19,21 36:14
37:24 38:24
41:15 56:16,22
57:3,21 58:5
63:25 64:19

72:1 78:21
81:7,8,11
82:10
**terrible**  32:15
**test**  22:5 74:12
**testified**  70:24
**testimony**
13:24 14:16,24
15:5 19:21
**texas**  4:8 85:3
85:4,5,16
**thank**  13:11
15:2,9 16:11
16:11 17:1
21:2,4,5 23:13
34:5 37:21
40:9 41:17,18
45:7 47:1
52:23,25 53:3
55:19 56:11
59:1,3,5 61:6,7
61:22,23 63:1
63:3 71:20
79:16,17 82:17
82:18 83:3,12
83:16 84:18
85:3 86:16
87:3,4,9,11
88:2
**thanks**  52:24
56:9
**therese**  5:6
83:2
**things**  45:23,24
52:20 73:20
**think**  15:15
17:10 19:7

| | | | |
|---|---|---|---|
| 22:11 23:2 | **tied** 30:19 51:8 | **today's** 12:11 | **transact** 20:18 |
| 25:23 26:17,23 | **tier** 46:1 | 83:9 | **transaction** |
| 30:11 33:24 | **time** 12:14 | **todd** 8:18 | 16:8 19:8 20:8 |
| 34:14 35:10 | 15:17 24:16 | **token** 31:6 | 20:22 21:19 |
| 37:12,24 38:22 | 27:23 28:19 | 38:12,12,13 | 22:2,13,20 |
| 38:25 40:5,16 | 30:6,15,24 | 44:13,23,25 | 23:21 29:5 |
| 40:23 41:12 | 31:18 32:24,25 | **tokenized** 37:2 | 35:17 48:15 |
| 42:20 43:10,21 | 39:5 46:23 | 38:8,15 | 49:18 56:25 |
| 44:17,23 48:17 | 49:7,11,14,16 | **tokenizing** | 64:21 69:7,23 |
| 48:24 49:9 | 56:17 57:1 | 74:2 | 70:5,9,25 71:8 |
| 50:14,20 51:21 | 68:20 69:5 | **tokens** 36:19 | 72:16 73:14 |
| 51:25 52:16 | 70:22 71:2,7 | 37:10,14,15 | 75:3 78:25 |
| 54:5,14 56:4,8 | 71:11 72:5,8 | 79:1 | 80:18 |
| 57:6,7,7,14,22 | 72:23 78:8 | **told** 72:6 83:21 | **transactions** |
| 58:1,22 60:1 | 82:11 83:12 | **tomorrow** 56:2 | 18:25 22:23 |
| 62:13 64:7,12 | 84:17 86:5 | 78:12 | 57:11 |
| 72:17,21 73:10 | **timeline** 85:21 | **ton** 52:3 | **transcribed** |
| 74:12,16,18,25 | **times** 20:9 23:4 | **tony** 10:25 | 2:25 |
| 75:11 76:12,15 | **timing** 35:7 | **top** 46:1 | **transcript** |
| 76:19,19 77:20 | 37:24 | **topped** 18:19 | 37:17 69:8 |
| 78:18 82:3 | **timon** 9:20 | 53:20 75:22 | 89:4 |
| 85:14 | **timothy** 10:7 | 76:5 | **transfer** 63:11 |
| **thinking** 36:17 | **tj** 3:9 | **tops** 61:10 | 63:16 64:3 |
| 39:16 61:4 | **today** 12:14 | **total** 75:2 | 72:19 |
| **third** 15:25 | 13:5,9,17 | **tough** 76:13 | **transferred** |
| **thomas** 8:2 | 14:16,25 19:22 | **towards** 35:7 | 64:16 |
| **thought** 18:7 | 21:2 28:3,8,11 | 41:24 50:2,2 | **treatment** |
| **thoughts** 86:14 | 35:1 36:10 | 56:17 | 15:19 74:10 |
| **thousand** | 41:9 46:2,13 | **town** 44:13 | **tried** 57:24 |
| 44:24 | 48:11,13 50:1 | **trade** 36:19 | **tries** 68:1 |
| **thousands** | 55:13 61:5 | 51:15 52:4,5 | **tristan** 8:3 |
| 19:10 60:23,24 | 68:23 71:16 | **traded** 45:1 | **true** 89:4 |
| 70:24 | 74:8 78:18 | **trades** 51:25 | **trust** 33:7,15 |
| **three** 15:15 | 79:11 80:6 | **trading** 30:18 | 51:21,22 52:2 |
| 30:19 36:6 | 81:13 82:3,20 | 37:1 | 52:4 |
| 62:18 | 83:4,6 86:13 | **train** 50:1 | **trustee** 3:13 |
| | 86:18 87:12 | | 16:24 24:7,9 |

24:14,23 25:17
25:25 76:1
**trusts** 51:14
**truth** 14:25
**try** 20:9 25:20
  25:21 38:3
  48:12 66:15
**trying** 14:23
  29:14 38:4,11
  51:21 53:9,10
  59:18 63:10
  68:5 73:15
  76:14
**tuesday** 84:9
  84:11 86:7
  87:5,23
**tuganov** 4:2
  34:11,13 38:17
**tuganov's**
  34:19
**turetsky** 10:23
**turn** 26:1
**turner** 10:24
**turning** 13:4
**turns** 86:2
**two** 15:16
  30:11 35:25
  36:5 39:7,8
  54:25 61:24
  62:18,19 69:9
**tx** 4:10
**type** 72:5 77:4
  77:10
**types** 19:16
**typical** 22:13
  51:17 54:15

**typically** 20:2

**u**

**u.s.** 1:23 3:13
  39:10 50:25
  51:4 55:16
**ubierna** 6:19
  87:15,17
**ucc** 55:25
  57:19 62:18,19
  87:1
**uccs** 55:24
**uday** 8:19
**ultimate** 57:17
**ultimately**
  18:17 22:14
  38:21 42:11,16
  42:17 45:4
  54:7 57:17
  58:2 71:9
  74:18 85:11,14
**unable** 87:25
**under** 13:24
  15:19 19:12
  22:15 23:16
  24:1,13,19,20
  25:16 26:3
  31:16 32:2,17
  32:18 33:3,21
  36:22,25 38:20
  39:25 40:21
  47:18,22 50:5
  62:24 65:20
  66:3 67:6
  73:25,25 74:24
  78:25 87:23
  88:1

**underlying**
  52:5
**understand**
  15:20 23:10
  29:15,17 32:10
  35:19 37:17
  38:3 42:23
  43:7,8,9 47:10
  47:21 50:4
  54:24 55:14
  60:3 63:10
  81:9
**understanding**
  28:19,20 37:14
  50:6
**understood**
  21:17 25:6
  67:20 80:4
**unfortunately**
  25:12
**unique** 19:7
  51:20 57:22
  78:3
**united** 1:1,11
  3:12 16:23
**universal**
  51:19
**unmute** 34:2
  41:20 45:9
**unmuting**
  40:10
**unregistered**
  37:11
**unsecured** 4:15
**unusual** 77:22
**unwinding**
  63:16

**update** 59:17
**use** 79:14
**used** 12:15
  57:5
**using** 42:19
  59:23
**usual** 58:12

**v**

**v** 10:6
**valuable** 78:17
  82:13
**valuations**
  17:5 59:20
**value** 19:8,9
  20:23 21:20
  23:6 29:15,24
  29:25 30:2,7
  30:16,18,22,24
  39:25 44:14,25
  45:2,15,17
  47:13 51:9,16
  51:18 52:5
  75:2,2 77:15
  77:16,20
**values** 51:9
**varick** 3:14
**variety** 22:12
**various** 84:20
**vehicles** 51:13
  51:14
**vejseli** 10:25
**venable** 4:1
  34:8,14,20
**veritext** 89:20
**vero** 11:1
**versus** 45:15
  50:12 51:21,22

57:13 74:1
81:25
**vetted** 24:5
**vetting** 28:19
**victor** 6:19
**view** 43:4 47:5
53:22 72:15
73:20
**views** 83:6
**violation** 64:19
**visit** 86:4
**voyager** 37:6
37:15 38:5
69:9 74:4

**w**

**w** 10:18
**wacker** 4:17
**wage** 53:12
**wait** 46:23
49:8,17
**waited** 70:8
**wallets** 33:19
**want** 18:12
24:9 28:25
41:12,23 43:16
43:18,22 45:8
46:11 48:1,23
52:9,10 55:11
55:21 56:8
64:3 73:11
77:23 78:20,21
78:24 81:18
83:15 84:23
86:23
**wanted** 69:22
71:24 82:14

**wants** 56:7
87:15,20
**warren** 11:2
**washington**
4:4 5:4
**watermark**
58:20
**way** 20:24
22:17 30:8
35:13 48:3
53:24 74:13
84:9 86:8
**ways** 17:8
22:12 36:3
58:23
**we've** 12:15,20
15:16,18 39:12
44:12 47:19
49:9 57:7 68:6
70:2 71:14
77:11,11,12
80:11,21
**week** 39:2,4
45:5 81:19
83:17,25
**weekly** 68:6,14
**weeks** 30:12
38:24 39:3
68:14 69:3
70:11 84:22
**wells** 67:13
**went** 69:24
81:23
**westover** 11:3
**white** 4:14
71:21

**wiles** 37:17
69:9
**william** 10:17
**willing** 83:6
**willis** 11:4
**winddown**
17:19 18:17
24:2 25:16
26:10 49:22
62:8 65:6,9,14
65:17,18,21
**wish** 16:16
21:6 23:14
34:1,6 41:22
84:19
**wishes** 16:14
16:20
**withdrawn**
15:20
**witness** 13:17
14:21 15:1,6
16:12,18,20
18:3,6,9,11
21:4 23:18
24:1,20 25:1
25:11,20,23
26:8,17 27:6
27:10,17 28:10
28:16 29:4,21
30:4,8 31:5,14
32:4,20 33:5
33:14 34:2
37:19 39:2,4
42:23 43:9,12
43:17,17 44:23
46:20 55:11
61:11,17

**wofford** 11:5
**words** 47:24
52:12
**work** 12:25
16:4 35:15,25
57:24 66:15
67:9 68:3,22
73:7 75:14
77:18 79:8
81:21 87:2
**worked** 19:1
19:17 72:14
**working** 36:5
60:5 67:23
68:5 73:23
78:4
**works** 30:9
68:1
**worldwide**
5:17
**worries** 55:8,8
55:19
**writing** 87:6
**wynn** 11:6

**x**

**x** 1:4,10 65:19

**y**

**y** 65:20
**yanez** 11:3
**yarborough**
11:7
**yards** 3:21
**yeah** 18:10
26:8 38:3
41:21,22 44:2
48:17,23 50:14

[yeah - zomo]                                                    Page 32

50:19 51:7
54:24 60:21
61:1 63:21
65:13 77:7
**year**   30:14,19
59:11,19
**years**   82:11
**yeilding**   11:8
**yell**   57:25
**yesterday**
45:21,22
**yeung**   11:9
**yield**   13:7
**yoon**   11:10
**york**   1:2,13
3:15,22 5:19

**z**

**zaharis**   11:11
**ziman**   11:12
**zomo**   11:13