| | |
|---|---|
| Joshua A. Sussberg, P.C.<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone:     (212) 446-4800<br>Facsimile:     (212) 446-4900<br><br>*Counsel to the Debtors and Debtors in Possession* | Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)<br>Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)<br>Christopher S. Koenig<br>Dan Latona (admitted *pro hac vice*)<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Telephone:     (312) 862-2000<br>Facsimile:     (312) 862-2200 |

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>CELSIUS NETWORK LLC, *et al.*,[1]<br><br>                    Debtors. | Chapter 11<br><br>Case No. 22-10964 (MG)<br><br>(Jointly Administered) |

**DECLARATION OF**
**ALLISON HOEINGHAUS IN SUPPORT OF DEBTORS'**
**MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE DEBTORS'**
**KEY EMPLOYEE INCENTIVE PLAN AND (II) GRANTING RELATED RELIEF**

I, Allison Hoeinghaus, hereby declare under penalty of perjury:

1.     I am a Managing Director at Alvarez & Marsal ("A&M"). A&M's retention was approved by the Court effective as of the Petition Date.[2] As part of this retention, Celsius Network LLC (one of the debtors and, together with the above-captioned debtors and debtors in possession

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2] *See Order Authorizing Debtors to Employ and Retain Alvarez and Marsal North America, LLC as Financial Advisor to the Debtors and Debtors in Possession Effective as of July 13, 2022* [Docket No. 842] (the "A&M Retention Order").

in these chapter 11 cases, collectively, the "Debtors") requested A&M to provide certain compensation consulting services.

2. I am a compensation consultant for companies in and out of bankruptcy and am familiar with the prepetition and postpetition structure of the Debtors' compensation programs, including the Debtors' key employee incentive plan (the "KEIP"), as set forth in the *Debtors' Motion for Entry of an Order (I) Approving the Debtors' Key Employee Incentive Plan and (II) Granting Related Relief* (the "KEIP Motion"), filed contemporaneously herewith.[3] My team and I assisted the Debtors in developing the proposed KEIP and advised them on, among other things, sizing, participation considerations, and structure of the KEIP.

3. I submit this declaration (this "Declaration") in support of the KEIP Motion. Except as otherwise indicated, I have personal knowledge of all facts in this Declaration, based on my review of the Debtors' business and compensation practices, my research into compensation practices for similarly sized companies, my research into the designs of incentive plans approved in comparable chapter 11 proceedings, my significant experience in developing such programs, and information supplied to me by members of the Debtors' management team and the Debtors' other advisors. For the reasons described below, it is my opinion that the KEIP is reasonable, consistent with market practice, and generally consistent with my consulting experience with similarly situated companies that have sought relief under chapter 11. If called upon to testify, I could and would testify competently to the facts and opinions set forth in this Declaration.

---

[3] Capitalized terms not defined herein shall have the meanings ascribed to such terms in the KEIP Motion.

**Background and Qualifications**

4.      I have a bachelor's degree in accounting and a master's degree in professional accounting from the McCombs School of Business at The University of Texas, Austin. I joined A&M in 2006 and work out of the firm's offices in Dallas, TX.

5.      Since 1983, A&M has been a global provider of turnaround advisory services to companies in crisis or those in need of performance improvement in specific financial and operational areas. A&M's debtor advisory services have encompassed a wide range of activities targeted at stabilizing and improving a company's financial position, including developing and validating forecasts and business plans; monitoring and managing cash, cash flow, and supplier relationships; assessing and recommending cost reduction strategies; and designing and negotiating financial restructuring packages.

6.      My responsibilities at A&M primarily involve advising companies, both in and out of bankruptcy, regarding a wide range of executive compensation matters. I have extensive experience advising organizations undergoing major financial transitions including bankruptcies, initial public offerings, leveraged buyouts, and acquisitions, on compensation issues, and with designing annual and multi-year incentive programs, change-in-control arrangements, and employment agreements.

7.      I am highly experienced in executive, management, and employee compensation, having over fifteen years of experience in the field. During my tenure at A&M, I have worked closely with a range of companies undergoing financial restructurings to develop a variety of prepetition and postpetition compensation arrangements, including compensation plans and programs for senior executive and non-executive employees. Specifically, I have led or co-led the review and/or design of key employee incentive plans, key employee retention plans, and other similar plans and/or assisted with other compensation matters in a number of chapter 11 cases,

3

including: *In re Packable Holdings, LLC*, Case No. 22-10797 (CTG) (Bankr. D. Del.); *In re LVI Intermediate Holdings, Inc.*, Case No. 20-11413 (KBO) (Bankr. D. Del.); *In re Hygea Holdings Corp.*, Case No. 20-10361 (KBO) (Bankr. D. Del.); *In re Libbey Glass Inc.*, Case No. 20-11439 (LSS) (Bankr. D. Del.); *In re American Commercial Lines Inc.*, Case No. 20-30982 (MI) (Bankr. S.D. Tex.); *In re Forever 21, Inc.*, Case No. 19-12122 (MFW) (Bankr. D. Del.); *In re Hospital Acquisition LLC*, Case No. 19-10998 (BLS) (Bankr. D. Del.); *In re iHeart Media, Inc.*, Case No. 18-31274 (MI) (Bankr. S.D. Tex.); *In re Nine West Holdings, Inc.*, Case No. 18-10947 (SCC) (Bankr. S.D.N.Y.); *In re Payless Holdings LLC*, Case No. 17-42267 (KAS) (Bankr. E.D. Mo.); *In re Toys "R" Us, Inc.*, Case No. 17-34665 (KLP) (Bankr. E.D. Va.); *In re Seventy Seven Energy Inc.*, Case No. 16-11409 (LSS) (Bankr. D. Del.); and *In re Old BPSUSH Inc.*, Case No. 16-12373 (BLS) (Bankr. D. Del.).[4]

### A&M's Involvement with the Debtors

8.  The details of A&M's engagement are as follows: A&M's retention was approved by the Court effective as of the Petition Date.[5] After A&M was engaged by the Debtors, I familiarized myself with the Debtors' operations, business, and restructuring efforts. At the outset of our engagement, the Debtors, the Debtors' other advisors, and A&M discussed the Debtors' operational history, financial performance, restructuring process, and various other issues and areas of concern regarding the Debtors' workforce and employee programs. A&M analyzed the structure of the Debtors' prepetition base salary and primary incentive programs, paying specific

---

[4] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' counsel.

[5] *See* A&M Retention Order.

4

attention to the various incentive plans' performance metrics, participating employees, payout frequency, and target payout levels.

9. My team and I performed significant due diligence in helping the Debtors develop the KEIP and closely collaborated with the Debtors' management and other advisors in reviewing and advising on the same. My team and I were provided information concerning the Debtors' historical compensation structure, recent financial and operational performance, and ongoing restructuring efforts. My team and I also discussed the rationale for the proposed KEIP with the Debtors, the Debtors' advisors, and the special committee of the board of directors of Debtor Celsius Network Limited. A&M's primary goal was to provide an independent assessment of the Debtors' compensation planning that drew directly upon relevant market data as well as my significant experience in designing comparable programs for similarly-situated companies, including companies in chapter 11.

### KEIP Overview

10. The KEIP is multi-faceted, with incentive payouts earned based on the achievement of specifically defined restructuring goals. The aggregate target award under the KEIP for the performance periods is approximately $2.86 million distributed among the ten senior managers and key employees (the "KEIP Participants"), assuming all performance measures meet the target performance goal.

11. The KEIP Participants include: (a) Christopher Ferraro, Interim Chief Executive Officer, Chief Financial Officer, and Chief Restructuring Officer; (b) Guillermo Bodnar, Chief Technology Officer; (c) Oren Blonstein, Chief Product Officer; (d) Ron Deutsch, General Counsel; (e) Trunshedda Ramos, Chief Human Resources Officer; (f) Roni Pavon Cohen, Chief Revenue Officer; (g) Adrian Alisie, Chief Compliance Officer; (h) Jenny Fan, Chief Financial Officer of

5

Mining; (i) Dave Albert, Chief Administrative Officer of Mining; and (j) Quinn Lawlor, Chief Strategy Officer of Mining (Quinn Lawlor, together with Jenny Fan and Dave Albert, the "Mining Executives").

    12.     The KEIP contains the following primary design features:

- *KEIP Awards*. Each KEIP award will be a cash amount provided (to the extent earned based on performance) upon the conclusion of one of two performance periods. In the event of a Transaction, KEIP Participants will receive a cash payment upon confirmation of the plan. In the event of an Orderly Wind-Down, KEIP Participants will receive a cash payment upon confirmation of the plan in connection with the Orderly Wind-Down. Potential payments are based on achievement of specified metrics for each such performance period and subject to continued employment of the KEIP Participant through each such time (except as provided below).

- *Performance Periods.* The performance metrics will be measured over distinct performance periods for each metric. In the event of a Transaction, the KEIP award will be measured as of confirmation of the plan, with an outside date of September 30, 2023. In the event of an Orderly Wind-Down, the KEIP award will be measured as of confirmation of a plan reflecting the Orderly Wind-Down, with an outside date of December 31, 2023.

- *KEIP Payments.* Payments will be made as soon as practicable upon (i) the confirmation of a plan pursuant to a Transaction or (ii) confirmation of a plan in connection with an Orderly Wind-Down.

- *KEIP Payout Ranges.* The KEIP will provide for potential payments of 50 percent of target payment for threshold performance and 100 percent of target payment for target performance.

- *Performance Targets.* KEIP awards will be based on performance metrics tied to two potential restructuring transactions, either (i) a Transaction or (ii) an Orderly Wind-Down. Such awards are conditioned upon each KEIP Participant's full cooperation with all ongoing and future investigations, including those of federal and state governmental agencies or regulators and the Committee. The performance metrics consist of:

    - *Confirmation Metrics*. (i) target performance requires confirmation of a chapter 11 plan pursuant to a Transaction by September 30, 2023; and (ii) threshold performance requires confirmation of a plan pursuant to a Transaction after September 30, 2023, or confirmation of a plan of liquidation pursuant to an Orderly Wind-Down by December 31, 2023. For the Mining Executives, such metrics shall be weighted at 25% of each

6

>   Participant's KEIP award. For Christopher Ferraro, such metrics are weighted at 75% of his KEIP award. For all other KEIP Participants, such metrics are weighed at 100% of their KEIP award.
>
> - *Mining Metrics*. For the Mining Executives and Christopher Ferraro, (i) target performance requires that the Debtors have 70,000 mining rigs hashing by June 30, 2023, and (ii) threshold performance requires that the Debtors have a minimum of 60,000 mining rigs hashing by June 30, 2023. For the Mining Executives, such metrics are weighted at 75% of each Participant's KEIP award. For Christopher Ferraro, such metrics are weighted at 25% of his KEIP award.

- *Target Payouts*. The target incentive payouts constitute the following percentages of the KEIP Participants' base salaries:

    - *Tier 1 Executives = 125%*

    - *Tier 2 Executives = 75%*

    - *Tier 3 Executives = 50%*

- *Termination of Employment*. If a KEIP Participant's employment is terminated by the Debtors without "cause," by the KEIP Participant for "good reason," or upon death or disability of the KEIP Participant, the KEIP Participant will be entitled to 100 percent of the KEIP payment that would otherwise have been earned for such performance period based on the percentage of the performance period the KEIP Participant was engaged by the Debtors. If a KEIP Participant's employment is terminated for any other reason (voluntary termination, termination by the Debtors for cause), any remaining unpaid portion of the KEIP payment will be forfeited.

13. If approved, the KEIP would provide aggregate (for all KEIP Participants) threshold and target opportunities of approximately $1.43 million and $2.86 million, respectively, to be earned for performance through (a) confirmation of a plan including a Transaction, or (b) confirmation of a plan reflecting an Orderly Wind-Down, summarized as follows:

7

| Individual KEIP Values |||
| --- | --- | --- |
| **Participant** | **Threshold Award Opportunity** | **Target Award Opportunity** |
| Christopher Ferraro | $468,750 | $937,500 |
| Guillermo Bodnar | $187,500 | $375,000 |
| Oren Blonstein | $131,250 | $262,500 |
| Ron Deutsch | $120,000 | $240,000 |
| Trunshedda Ramos | $120,000 | $240,000 |
| Roni Pavon Cohen[6] | $119,625 | $239,250 |
| Adrian Alisie | $75,000 | $150,000 |
| Jenny Fan | $75,000 | $150,000 |
| Dave Albert | $70,000 | $140,000 |
| Quinn Lawlor | $62,500 | $125,000 |
| **Total Award Values** | $1.43 million | $2.86 million |

### Analysis of the KEIP

14. The purpose of this KEIP is to provide the Debtors a mechanism by which they can incentivize their most critical senior management and key employees to remain employed with the Debtors and focus their collective efforts on the Debtors' restructuring throughout the duration of these chapter 11 cases.

15. In assessing the reasonableness of the KEIP, I worked with my team to analyze incentive plans geared toward executive employees and covering fewer than twenty-five participants that were authorized and approved in the chapter 11 cases of the following fifteen similarly-sized non-energy companies (the "Comparison Group") undergoing Chapter 11 that had a key employee incentive plan approved from 2017 through 2023 and had prepetition assets greater than $1.0 billion: Avaya Inc.; Bristow Group Inc.; Claire's Stores, Inc.; Frontier Communications; Hertz; iHeartMedia, Inc.; Intelsat S.A.; LSC Communications, Inc.; Mallinckrodt plc; NPC International, Inc.; Purdue Pharma, L.P.; Sears Holdings Corporation; Stage Stores, Inc.; Toys "R" Us, Inc.; and Windstream Holdings, Inc.

---

[6] For purposes of calculating Roni Pavon Cohen's award, his base salary was converted from ILS to USD utilizing an exchange rate of 3.52 ILS = 1 USD.

8

16. In conducting this analysis, I also relied upon my significant consulting experience in the research and design of key employee incentive plans generally at dozens of other companies.

17. The structure of the KEIP (such as the timing of payments, participation levels, and use of cash) comports with my general experience and the findings of my review of incentive plans approved in similarly-sized companies. Based on my experience, when a reorganizing debtor's primary market for talent is comprised of non-distressed companies in the general industry, financial services and high tech, the reorganizing debtor lacks material short- and long-term incentive pay opportunities for critical employees that they could otherwise receive if they sought employment at a competitor in one of these industries. Based on my experience, similarly-sized companies operating in the financial services, technology, or general industry would not offer base salaries as the sole form of compensation, and it is my opinion the KEIP Participants would very likely receive incentive opportunities should they leave the Debtors for other jobs. A cash-based KEIP will mitigate this weakness in the Debtor's compensation program and help bring them closer to an appropriately competitive range of pay.

18. I note the following observations:

- The incentive awards are limited to a subset of critical senior management and key employees;

- Key employee incentive awards typically are paid in cash during a restructuring;

- The proposed number of KEIP Participants is consistent with market practices; and

- The incentive awards expressed as a percentage of salary (*i.e.*, 125, seventy-five, and fifty percent for Tiers one, two, and three, respectively) are generally consistent with awards in comparable key employee incentive plans.

19. My team and I also reviewed the annualized total cost of the KEIP against the annualized total cost of the key employee incentive plans in the Comparison Group. Analyzing

annual cost is consistent with other key employee incentive plans analyzed by A&M. As depicted in the table below:

- the total aggregate annualized target cost of the KEIP is well below the 25th percentile of the Comparison Group;

- the average cost per KEIP Participant is the lowest among the Comparison Group;

- the cost of the KEIP as a percentage of the Debtors' assets is less than the 25th percentile of the Comparison Group.

| Plan Design | Celsius | 25th Percentile in Comp. Group | 50th Percentile in Comp. Group | 75th Percentile in Comp. Group |
|---|---|---|---|---|
| Annualized Target Cost ($mm)[7] | $3.81 M | $6.02 M | $10.0 M | $14.1 M |
| Average Target Cost per Participant | $381,233 | $770,009 | $914,601 | $1.66 M |
| Cost as a Percentage of Assets | 0.09% | 0.11% | 0.21% | 0.27% |

20.     I have considered the compensation currently being paid to the KEIP Participants, and have compared it to market-based compensation survey data. The KEIP Participants' current aggregate total compensation (which consists of base salary only) is approximately 33% lower than the 25th percentile of total direct compensation paid for comparable positions in the market-based compensation survey data that I reviewed, as reflected in the table below:

---

[7] The total cost of the KEIP was annualized based on a 9-month performance period commencing April 1, 2023 and ending December 31, 2023.

| Executive | Title | Current Base Salary | Market TDC | | |
|---|---|---|---|---|---|
| | | | P25 | P50 | P75 |
| Ferraro, Chris | CEO, CFO, Chief Restr. Officer | $750 | $1,029 | $1,682 | $2,768 |
| Bodnar, Guillermo | Chief Technology Officer | $500 | $620 | $860 | $1,529 |
| Blonstein, Oren | Chief Product Officer | $350 | $540 | $696 | $1,109 |
| Deutsch, Ron | General Counsel | $320 | $566 | $750 | $1,263 |
| Ramos, Trunshedda | Chief HR Officer | $320 | $507 | $658 | $977 |
| Pavon Cohen, Roni | Chief Revenue Officer | $319[(1)] | $662 | $928 | $1,482 |
| Alisie, Adrian | Chief Compliance Officer | $300 | $454 | $590 | $856 |
| Fan, Jenny | Chief Financial Officer - Mining | $300 | $439 | $560 | $816 |
| Albert, Dave | Chief Admin Officer - Mining | $280 | $334 | $504 | $1,046 |
| Lawlor, Quinn | Chief Strategy Officer - Mining | $250 | $365 | $444 | $583 |
| n = 10 | | | | | |
| | **Total** | **$3,689** | **$5,514** | **$7,672** | **$12,430** |
| | Current Total Compensation relative to Market TDC | | (-33%) | (-52%) | (-70%) |

[(1)] Annual base salary has been converted from ILS to USD utilizing an exchange rate of 3.52 ILS = 1 USD.

21.     I have also considered the KEIP Participants' proposed total direct compensation, taking the KEIP awards into account. When the target KEIP payments are taken into account, the KEIP Participants' total direct compensation is approximately at or below the market median for all of the KEIP Participants, as reflected in the table below:

| Executive | Title | Current Base Salary | Proposed KEIP at Target | Proposed Target TDC | Market TDC | | | Posture Relative to Market |
|---|---|---|---|---|---|---|---|---|
| | | | | | P25 | P50 | P75 | |
| Ferraro, Chris | CEO, CFO, Chief Restr. Officer | $750 | $938 | $1,688 | $1,029 | $1,682 | $2,768 | ~P50 |
| Bodnar, Guillermo | Chief Technology Officer | $500 | $375 | $875 | $620 | $860 | $1,529 | ~P50 |
| Blonstein, Oren | Chief Product Officer | $350 | $263 | $613 | $540 | $696 | $1,109 | P25 - P50 |
| Deutsch, Ron | General Counsel | $320 | $240 | $560 | $566 | $750 | $1,263 | ~P25 |
| Ramos, Trunshedda | Chief HR Officer | $320 | $240 | $560 | $507 | $658 | $977 | P25 - P50 |
| Pavon Cohen, Roni | Chief Revenue Officer | $319[(1)] | $239 | $558 | $662 | $928 | $1,482 | < P25 |
| Alisie, Adrian | Chief Compliance Officer | $300 | $150 | $450 | $454 | $590 | $856 | ~P25 |
| Fan, Jenny | Chief Financial Officer - Mining | $300 | $150 | $450 | $439 | $560 | $816 | ~P25 |
| Albert, Dave | Chief Admin Officer - Mining | $280 | $140 | $420 | $334 | $504 | $1,046 | P25 - P50 |
| Lawlor, Quinn | Chief Strategy Officer - Mining | $250 | $125 | $375 | $365 | $444 | $583 | ~P25 |
| n = 10 | | **$3,689** | **$2,859** | **$6,548** | **$5,514** | **$7,672** | **$12,430** | P25 - P50 |

[(1)] Annual base salary has been converted from ILS to USD utilizing an exchange rate of 3.52 ILS = 1 USD.

22.     Based on these analyses, I observed that the Debtors' KEIP opportunities per Participant generally were positioned at or below the market median. Given this relationship, I believe the KEIP opportunities are reasonable and appropriate in light of competitive market practice. Based on the market data my team and I reviewed, and my significant experience with incentive-based compensation programs in other matters, the structure of the KEIP is also

11

generally consistent from a key design perspective (such as the timing of payments, participation levels, and use of cash) of similar employee incentive plans approved on a postpetition basis.

## Conclusion

23. Based on my education and my experience in these and in similar chapter 11 cases, I believe that the design, structure, cost, and award opportunities available under the KEIP are reasonable given the facts and circumstances of these chapter 11 cases.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

| | |
|---|---|
| Dated: March 28, 2023<br>Dallas, Texas | By: */s/ Allison Hoeinghaus*<br>Name: Allison Hoeinghaus<br>Title: Managing Director<br>Alvarez & Marsal |